# EXHIBIT 1

The Corporation: COMMENTARY
## TO REALLY BE A PLAYER, MATTEL NEEDS HOTTER TOYS

By Christopher Palmeri
1,151 words
28 July 2003
BusinessWeek
64
Number 3843
English
(Copyright 2003 McGraw-Hill, Inc.)

The Bratz pack has invaded the Gabriele house. The line of trendy dolls burst on the scene two years ago, offering girls a hipper alternative to that old standby, Barbie: Think Jennifer Lopez to Barbie's Reese Witherspoon. Joan Gabriele, a Hollywood (Fla.) mother of two, now has eight Bratz dolls in her home. Her daughters, ages 6 and 8, rarely touch their Barbies. ``Barbie is pretty much a thing of the past," she says. ``They like Bratz better."

That's bad news for Barbie's maker, Mattel Inc. -- and for the three-year-old turnaround efforts of CEO Robert A. Eckert, the ex-president of Kraft Foods Inc. who replaced the embattled Jill E. Barad. The El Segundo (Calif.) toy giant counts on Barbie for about one-third of its revenues and more of its profits. But Mattel says U.S. Barbie sales declined 2% last year and 14% in this year's first quarter. The overall doll category, says market researcher NPD Group Inc., dropped only 3% in the quarter.

Give Eckert, 48, his due: He pulled Mattel out of its tailspin after its disastrous $3.8 billion acquisition of Learning Co. He got rid of the money-losing computer-game maker and slashed costs. His goal: to bring the stability of a consumer-products company to the hit-driven toymaker. And using such practices as computer-aided design to speed up product development and just-in-time inventory management, he succeeded.

But now it looks like Eckert is learning a valuable lesson: Mattel is selling toys, not soap or cornflakes. Good brand management goes only so far in a business that caters to children's whims. Like it or not, the key to success is launching innovative products and promoting the heck out of them. If you don't do it, your competitors will.

Eckert's strategy has been great for Mattel's bottom line. Profits last year, before special charges, were a

© 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.
EXHIBIT 8 PAGE 110

EXHIBIT 1 PAGE 6

healthy $455 million, and the stock has nearly doubled, to $20, since Eckert arrived in May, 2000. But top-line growth has sputtered. U.S. revenues, $3.4 billion in 2002, have declined marginally in the past few years. Total 2002 sales of $4.9 billion crept up from $4.6 billion in 2000 -- thanks to overseas expansion.

While Eckert continues to build on the massive Barbie franchise that Barad constructed, he now knows that he needs hot new toys. Recycling old characters like Sesame Street's Elmo just won't be enough. "We need to do a better job on the top line," he says. "The good news is, it's only spring training, and we have a long season ahead of us."

To that end, Eckert has begun an ambitious push. Between now and Christmas, he hopes to launch 250 new toys, including dozens of Hot Wheels models and Flavas, a Bratz-like hip-hop posse with baggy jeans and serious bling-bling. Originally, half of these toys weren't scheduled until 2004.

That should help boost sales. But it's even more important that Mattel prove it can respond to nimble upstarts as well as traditional big rivals like Hasbro Inc. After all, it took the company more than a year to launch a competitor to MGA Entertainment's Bratz. My Scene Barbie didn't hit stores until last October and has yet to make a dent in Bratz's success. At its Santa Monica (Calif.) store recently, Toy 'R' Us Inc. devoted just a sliver of the shelf space to My Scene that it did to Bratz. And My Scene dolls were being offered at 2 for 1. "It's not really catching ground," says Sean P. McGowan, toy industry analyst at Harris Nesbitt Gerard Inc. Mattel will start tossing in a cell phone with 300 free minutes if you buy four of the $13.99 dolls. It also plans to add accessories and boy versions -- Hudson, River, and Bryant.

Barbie isn't the only Mattel stalwart under attack. Its Fisher-Price unit, long the king of preschool, is losing sales to newcomer LeapFrog Enterprises Inc., whose electronic interactive books have captured 19% of the $2.9 billion preschool toy and electronic learning aid markets. Eckert is counting on a successful launch in August for PowerTouch, Mattel's version of LeapFrog's popular interactive book. PowerTouch is operated by pointing a finger at an image or a word, instead of the stylus used in LeapFrog's original products. That's key for younger kids. "It's much easier for her to use," says Christopher Coye, a Los Angeles-area parent whose 4-year-old tested a PowerTouch. Still, LeapFrog releases a finger-operated system in August, too.

Over the long term, Eckert puts at risk one of the strongest toy companies around if he can't instill innovation and rapid reaction in his much-tightened organization. To his credit, he is making it crystal clear that he doesn't want ideas to linger in the pipeline. When Matchbox brand managers mentioned this year that they had designed a toy firehouse that could be shipped with no assembly required, Eckert told them to get it out by fall. "Why wait?" he says. "If you've got it, sell it." And not a moment too soon: Sales of Mattel's Hot Wheels and Matchbox cars fell 6% in the first quarter, thanks to competition for boys' attention from action figures like Hasbro's resurgent G.I. Joe and Transformers.

 © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved. EXHIBIT _18_ PAGE _111_

EXHIBIT _1_ PAGE _7_

The question is how much Eckert needs to tweak his model. He probably cut back too much, for instance, on marketing. In 1998, Mattel's advertising and promotional spending totaled $631 million, or 13.8% of sales. By last year, it had fallen to $552 million, or 11.2% of sales. Aggressive television marketing boosted sales of Hot Wheels cars in Spain last year, and a strong new campaign could help Mattel toys here.

Mattel won't live or die on every new toy it develops. But it can't just rely on Barbies, either. "Like they say in business school -- no risk, no reward," says Isaac Larian, CEO of privately held MGA. He should know: He got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers. As Eckert is finding out, sometimes the best ideas are right in front of you.

```
First Came Bratz...
MAKER       MGA Entertainment
DEBUT       2001
NAMES       Yasmin, Sasha, Cloe, Jade, and Meygan
MOTTO       The girls with a passion for fashion
HER RIDE    Late-night stretch limo
Data: MGA Entertainment, Mattel
...Then, My Scene Barbie
MAKER       Mattel
DEBUT       2002
NAMES       Barbie, Madison, Chelsea, and Nolee
MOTTO       My city. My style. My scene.
HER RIDE    Vespa motorscooter
Data: MGA Entertainment, Mattel
```

Palmeri covers toys from Los Angeles.

Document bw00000020030724dz7s0001w

 © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.



EXHIBIT 1   PAGE 8

# EXHIBIT 2

AO88 (Rev. 12/06) Subpoena in a Civil Ca...

Issued by the

# UNITED STATES DISTRICT COURT

__Central__   DISTRICT OF __California__

MATTEL, INC., a Delaware Corporation

## SUBPOENA IN A CIVIL CASE

V.

CARTER BRYANT, an Individual; and DOES
1 through 10, inclusive

Case Number: [1]  CV 04-9059 NM (RNBx)
Consolidated with cases
CV 04-9049 and CV 05-2727

TO:  Christopher Palmeri c/o Business Week
     3333 Wilshire Blvd., Suite 500
     Los Angeles, CA 90010

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☒   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
the above case. Testimony will be recorded stenographically and by videographer.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017 | September 4, 2007 9:30 a.m. |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Attachment A.

| PLACE | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017 | August 28, 2007 9:30 a.m. |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |
|  |  |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Plaintiff, Mattel, Inc. | July 25, 2007 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER
Timothy L. Alger, QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017   (213) 443-3000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

EXHIBIT 2 PAGE 9

AO-88

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|

**SERVED**

SERVED ON (PRINT NAME)                    MANNER OF SERVICE

SERVED BY (PRINT NAME)                     TITLE

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

EXHIBIT 2 PAGE 10

ATTACHMENT A

Documents To Be Produced

I.   **DEFINITIONS**

1.     "YOU" or "YOUR" means Christopher Palmeri, and any other
PERSON acting on YOUR behalf, pursuant to YOUR authority or subject to
YOUR control.

2.     "LARIAN" means Isaac Larian and his representatives and
agents.

3.     "ARTICLE" means the article bearing YOUR byline published
in the Business Week edition dated July 28, 2003, bearing the headline, "To Really
Be A Player, Mattel Needs Hotter Toys."

4.     "DOCUMENT" means any "writing" or "recording" as defined
in Federal Rule of Civil Procedure 34 or Federal Rule of Evidence 1001 and
includes any tangible thing upon which any expression, communication or
representation has been recorded, including but not limited to correspondence, e-
mails, preliminary, intermediate or final drafts, memoranda, notes, reports of
telephone or other oral conversations, audio or videotape recordings, computer
tape, computer disk or storage media, computer printout, optical storage disk, other
electronic media, and all other writings and recordings of any kind.

5.     "REFERRING OR RELATING TO" means reflecting,
identifying, describing, summarizing, evidencing, referencing, concerning,
discussing, constituting, or indicating in any way.

6.     Wherever used herein, the singular shall include the plural and
the plural shall include the singular.

II.   **INSTRUCTIONS**

A.     YOU are to produce all DOCUMENTS requested hereby that
are in YOUR possession, custody and control.

B.     If YOU contend that YOU are not required to produce certain
DOCUMENTS called for by these requests on the grounds of a privilege or
protection that YOU are not prepared to waive, in lieu of producing such

ATTACHMENT A

EXHIBIT  2   PAGE   11

DOCUMENTS identify each DOCUMENT and provide the following information:

           1.     The privilege or protection that you claim precludes disclosure;

           2.     The subject matter of the DOCUMENT;

           3.     The date, author(s), addressee(s); and

           4.     Any additional facts on which YOU would base YOUR claim of privilege or protection.

        C.     YOU are required to identify any and all DOCUMENTS sought by this document request that have been destroyed.

        D.     YOU are required to identify the source of all DOCUMENTS produced, and the person for whom, or department, division or office for which, such DOCUMENTS are maintained.

        E.     Each DOCUMENT shall be produced in its original file folder, or in lieu thereof, any writing on the file folder from which each such DOCUMENT is taken shall be copied and appended to such DOCUMENT.

## III.   DOCUMENTS TO BE PRODUCED.

        All DOCUMENTS REFERRING OR RELATING TO statements made to YOU by LARIAN during YOUR research for the ARTICLE.

ATTACHMENT A

EXHIBIT 2 PAGE 12

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 7/25/2007 | 3333 Wilshire Boulevard, #500<br>Los Angeles, CA 90010 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| CHRISTOPHER PALMERI<br>(Witness Fee Paid $49.02) | Personal<br>(Served 7-25-07, 3:57 p.m.) |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Rayn Jerez | Process Server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on   7/26/2007
DATE

SIGNATURE OF SERVER

Now Legal Service, 1301 W. 2nd St., #206, Los

ADDRESS OF SERVER

Angeles, CA 90026, (213) 482-1567, L.A. Cty. #5426

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

EXHIBIT _2_ PAGE _13_

# EXHIBIT 3

Timothy Alger

| | |
|---|---|
| **From:** | Farley, William [william_farley@mcgraw-hill.com] |
| **Sent:** | Wednesday, June 27, 2007 6:02 AM |
| **To:** | Timothy Alger |
| **Subject:** | RE: Deposition subpoena |

Tim:
I am in an all day meeting out of the office. I'll contact you tomorrow.
Bill

Sent from my GoodLink synchronized handheld (www.good.com)

-----Original Message-----
From:       Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Tuesday, June 26, 2007 06:49 PM Eastern Standard Time
To:     Farley, William
Subject:    RE: Deposition subpoena

Bill,
I just left you a voicemail.  Please call when you can.
Tim

---

From: Farley, William [mailto:william_farley@mcgraw-hill.com]
Sent: Tuesday, June 26, 2007 3:09 PM
To: Timothy Alger
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena

Tim:

        The article quotes Larian as saying: "Like they say in
business school - no risk, no reward."  There are no quotations or other
statements attributed to Larian ("Larian said...").  Consequently, I do
not see how you could argue that he would just be verifying a quotation
when the only quotation is the one I've reproduced above.

        As far as other sources are concerned, I am correct in
assuming then that you have already deposed Larian and anyone else he
identified as being at any interview with a BusinessWeek reporter?

        Like you, I have no interest in burdening a court or anyone
else (including ourselves) with this but this is a very serious issue
for us that we have litigated many times.  As a result, I cannot proceed
on the basis of simple assurances that everything will be OK and, so
far, I am not convinced that a deposition here would be appropriate.

Bill

William P. Farley

Associate General Counsel

The McGraw-Hill Companies, Inc.

1221 Avenue of the Americas

1

EXHIBIT __3__ PAGE __14__

New York, New York 10020

Tel: 212-512-3625

Fax: 212-512-6531

From: Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Tuesday, June 26, 2007 5:52 PM
To: Farley, William
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena

Bill,

Put simply, we need deposition testimony verifying Isaac Larian's statements to Chris about the origins of Bratz that were published in the article. This should not be something we need to fight about or discuss at great length. Certainly you can have counsel at the deposition who will object and instruct at appropriate times. There are no alternative sources for the information we seek, unless you are aware of someone who participated in the interview of Larian other than Chris and Larian and, perhaps, Larian's employees. The area of questioning goes to the heart of our case. Also, waiver does not occur under California law if the reporter verifies published statements, and I'm not aware of any federal decision to the contrary. As I've mentioned, I represent the media, and I know the law very well. Mattel takes this very seriously and is fully aware of the sensitive issues raised by depositions of reporters. It does no one any good to burden a court with this, given the very limited scope of my questions.

If we can agree on a date in July, and if you accept service of the subpoena, I would be glad to discuss in detail the line of questioning with you and/or local counsel. Indeed, if it is more convenient for you and Chris, I will be glad to take the deposition in NY. But we need to tie this down this week; absent agreement now about service of the subpoena and a date of deposition, I will proceed to have Chris served.

Tim

From: Farley, William [mailto:william_farley@mcgraw-hill.com]
Sent: Tuesday, June 26, 2007 1:05 PM
To: Timothy Alger
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena

Tim:

        I did not realize that you were in federal court. I agree

2

EXHIBIT 3 PAGE 15

that the application of the California privilege is unclear, there is, of course, the privilege recognized in federal court under the First Amendment.

        In any event, it is not accurate to claim that deposing a journalist about an article he authored does not involve unpublished information. If it were published, you would not need him to explain it for you. Further, such testimony would open up the journalist to claims of waiver and subject him to even broader questioning.

        Also, I've taken a look at the article you mention, the 7/28/2003 piece about Mattel. There appear to be only a couple of statements that could be ascribed to someone at Mattel and there should be alternative sources for the information in those statements.

        At this point, I am not convinced that a deposition of our reporter is necessary or permissible. You might be able to change my mind if you explained what information from the article you believe to be critical to your case, how that information fit into the claims in the law suit, and what efforts have been taken to obtain the information from an alternative source.

Bill


William P. Farley

Associate General Counsel

The McGraw-Hill Companies, Inc.

1221 Avenue of the Americas

New York, New York 10020

Tel: 212-512-3625

Fax: 212-512-6531


---

From: Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Thursday, June 21, 2007 3:31 PM
To: Farley, William
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena


Bill,


I am very familiar with the law; I wrote my law review note on it and I have been representing media organizations and reporters for 15 years. As an initial matter, it is unclear whether the California shield law would apply here, where we are in federal court on a federal question. Further, even if it did, the shield law does not permit Chris to avoid appearance at a deposition where we will not be inquiring about unpublished information. The published statements in the article are critical to Mattel's claims and they cannot be verified through an alternative source. What I would like to do at this point is reach agreement regarding a convenient date and service of the subpoena.

EXHIBIT   3.   PAGE  16

Tim

---

From: Farley, William [mailto:william_farley@mcgraw-hill.com]
Sent: Thursday, June 21, 2007 12:01 PM
To: Timothy Alger
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena

Tim:

   It is our corporate policy to assert the journalist privilege in all appropriate cases. As I am sure you are aware, journalists cannot be compelled to reveal sources or to provided unpublished information pursuant to the privilege set out in the California Constitution, Article 1, Section 2(b) and Cal. Evid. Code Section 1107. As a result, we would resist any effort to compel Chris or another BusinessWeek reporter to testify.

Bill

William Farley

Associate General Counsel

The McGraw-Hill Companies, Inc.

1221 Avenue of the Americas

New York, New York 10020

Tel.: 212-512-3625

Fax: 212-512-6531

      -----Original Message-----
      From: Timothy Alger [mailto:timalger@quinnemanuel.com]
      Sent: Wednesday, June 20, 2007 9:47 PM
      To: Palmeri, Chris (MHM - chris_palmeri); Farley, William
      Subject: Deposition subpoena

      Chris, I understand that you spoke with Jules Andres of Mattel and she informed you that I was trying to reach you about a deposition in the Mattel-MGA litigation. She tells me that you gave her Mr. Farley's email address, so I am directing this email to you both. If Mr. Farley is representing you in this matter, please let me know and I will direct all future communications to him.

      We would like to depose Chris about published statements in his July 28, 2003 article, "To Really Be A Player, Mattel Needs Hotter Toys." We will not be seeking documents. I am a former newspaper reporter and editor, and represent a number of media organizations, so I am fully aware of the sensitivity here. Be assured that Chris' testimony is critical to our case and, again, our interest only is in those statements that were published in Business Week.

EXHIBIT 3 PAGE 17

Please let me know what dates Chris is available in July (other than the first week, when I will be out of town), and how you would like to handle service of a subpoena.


Thanks in advance,

Tim


Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3223
Main Phone: (213) 443-3000
Main Fax:   (213) 443-3100
E-mail: timalger@quinnemanuel.com
<mailto:timalger@quinnemanuel.com>
Web:  www.quinnemanuel.com <http://www.quinnemanuel.com/>

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.


The information contained in this message is intended only for the recipient, and may be a confidential attorney-client communication or may otherwise be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, please be aware that any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by replying to the message and deleting it from your computer.

Thank you,

The McGraw-Hill Companies

EXHIBIT _3_ PAGE _19_

# EXHIBIT 4

Received:   8/ 8/07   4:18F      +2136336899  -> QUINN   ANUEL;   Page 1
Aug-08-07   03:53pm   From-DAVIS WRIGHT TREMAINE LLP          +2136336899      T-468   P.001/007   F-396

# Davis Wright Tremaine LLP

ANCHORAGE  BELLEVUE  HONOLULU  LOS ANGELES  NEW YORK  PORTLAND  SAN FRANCISCO  SEATTLE  SHANGHAI  WASHINGTON, D.C.

SUITE 2400
865 SOUTH FIGUEROA STREET
LOS ANGELES, CA 90017-2566

TEL (213) 633-6800
FAX (213) 633-6899
www.dwt.com

## FACSIMILE TRANSMITTAL

Date:  August 8, 2007

## SEND TO:

Name:              John B. Quinn                    Name:              M. Randall Oppenheimer
Fax Number:        (213) 443-3100                   Fax Number:        (213) 430-6407

Name:              Douglas A. Wickman
Fax Number:        (310) 553-5583

Client and Matter Number:          50022-348

## FROM:

Name:              Robyn Aronson, Esq.
Fax Number:        (213) 633-6899
Telephone Number:  (213) 633-6816

## NUMBER OF PAGES (INCLUDING COVER PAGE):   7

Time Sent: _____

## COMMENTS:

THE WRITTEN MESSAGE TRANSMITTED HEREBY IS FOR THE EXCLUSIVE USE OF THE ADDRESSEE AND CONTAINS CONFIDENTIAL, PRIVILEGED AND NONDISCLOSABLE INFORMATION. IF THE RECIPIENT OF THIS MESSAGE IS NOT THE ADDRESSEE, OR A PERSON RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE ADDRESSEE, SUCH RECIPIENT IS PROHIBITED FROM READING OR USING THIS MESSAGE IN ANY WAY. IF YOU HAVE RECEIVED THIS MESSAGE BY MISTAKE, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DESTROY THE FACSIMILE MESSAGE.

IF YOU DO NOT RECEIVE ALL PAGES OF THIS TRANSMISSION,
PLEASE CALL (213) 633-6800 AS SOON AS POSSIBLE

EXHIBIT  4  PAGE 19

Received:   8/ 8/07  4:18P                    +2136336899 -> QUINN   ANUEL:  Page 2
Aug-08-07   03:54pm   From-DAVIS WRIGHT TREMAINE LLP          +2136336898        T-468  P.002/007  F-396

1 | **DAVIS WRIGHT TREMAINE LLP**
2 | 865 S. FIGUEROA ST.
     SUITE 2400
3 | LOS ANGELES, CALIFORNIA 90017-2566
     TELEPHONE (213) 633-6800
     FAX (213) 633-6899
4 |
5 | ALONZO WICKERS IV (State Bar No. 169454)
     alonzowickers@dwt.com
6 | ROBYN ARONSON (State Bar No. 228613)
     robynaronson@dwt.com
7 |
8 | Attorneys for Non-Party Reporter
     CHRISTOPHER PALMERI
9 |
10 |          UNITED STATES DISTRICT COURT
11 |          CENTRAL DISTRICT OF CALIFORNIA
12 |
13 | MATTEL, INC., a Delaware    Case No. CV 04-9059 SGL (RNBx)
     corporation,
14 |                            **NON-PARTY REPORTER**
15 |          Plaintiff,        **CHRISTOPHER PALMERI'S**
                                **OBJECTIONS TO PLAINTIFF'S**
16 | vs.                        **SUBPOENA**
17 | CARTER BRYANT, an Individual;
     and DOES 1 through 10, inclusive,
18 |          Defendants.
19 |
20 |
21 |
22 |     Pursuant to Federal Rule of Civil Procedure 45(c), non-party reporter
23 | Christopher Palmeri hereby objects to the July 25, 2007, subpoena that plaintiff
24 | Mattel, Inc. purported to serve on Mr. Palmeri, seeking the production of documents
25 | on August 28, 2007, and the deposition of Mr. Palmeri on September 4, 2007.
26 |
27 |
28 |

OBJECTIONS TO SUBPOENA
LAX 465466v1 0050022-000348

EXHIBIT _4_ PAGE _20_

## GENERAL OBJECTIONS AND QUALIFICATIONS

1.     Mr. Palmeri objects to the subpoena on the basis that it was improperly served. The subpoena was sent by fax on July 25, 2007. Such service is ineffective; a civil litigant must personally serve a third-party witness with a subpoena. *See, e.g., Firefighter's Institute for Racial Equality ex rel. Anderson v. City of St. Louis,* 220 F. 3d 898, 903 (8th Cir. 2000); *Barnhill v. U.S.,* 11 F.3d 1360, 1369 (7th Cir. 1993); *FTC v. Compagnie de Saint-Gobain-Pont-a-Mousson,* 636 F.2d 1300, 1312-1313 (D.C. Cir. 1980); *In re Smith,* 126 F.R.D. 461, 462 (E.D.N.Y. 1989). Absent proper service, Mr. Palmeri has no obligation to respond or to object to the subpoena or to produce responsive documents, if any exist. By serving these objections, Mr. Palmeri does not waive his right to object to the improper method by which plaintiff attempted to serve the subpoena.

2.     Mr. Palmeri objects to the subpoena on the basis that it was not accompanied by witness fees. Federal Rule of Civil Procedure 45(b)(1) requires that all subpoenas requesting in-person testimony be accompanied by a payment of witness fees and reasonable mileage as allowed by law. Service of a subpoena is invalidated if witness fees are not tendered simultaneously. *See CF&I Steel Corp. v. Mitsui & Co.,* 713 F. 2d 494, 496 (9th Cir. 1983). By serving these objections, Mr. Palmeri does not waive his right to object to the improper method by which plaintiff attempted to serve the subpoena.

3.     Mr. Palmeri objects to the subpoena being addressed to him in his personal capacity, on the grounds that the documents requested, if they exist, would be possessed by Mr. Palmeri only by virtue of his employment by Business Week, and any such documents would belong to Business Week.

4.     Mr. Palmeri objects to the subpoena as unduly burdensome and oppressive to the extent it purports to impose any requirement or discovery obligation other than or beyond that set forth in the Federal Rules of Civil Procedure,

OBJECTIONS TO SUBPOENA
LAX 465466v1 0050022-000348

1

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST., SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

EXHIBIT  4  PAGE  21

Received:   8/ 8/07  4:18P                    +2136336899 -> QUINN   ANUEL;  Page 4
Aug-08-07   03:54pm   From-DAVIS WRIGHT TREMAINE LLP              +2136336899              T-468   P.004/007   F-396

1  the Local Rules of the Central District of California, or other applicable rules of

2  court.

3      5.      Mr. Palmeri objects to the subpoena to the extent it seeks disclosure of

4  information, communications, and/or documents protected by the attorney-client

5  privilege, the attorney work-product doctrine, or any other applicable privilege,

6  doctrine, or immunity.  To the extent that it may be construed as seeking such

7  privileged or protected information, Mr. Palmeri hereby claims such privilege and

8  invokes such protection.  The fact that Mr. Palmeri does not specifically object to an

9  individual request on the ground that it seeks such privileged or protected

10  information or documents shall not be deemed a waiver of the protection afforded by

11  the attorney-client privilege, the attorney work-product doctrine, or other applicable

12  privilege or protection.

13      6.      Mr. Palmeri objects to this subpoena to the extent that it calls for the

14  production of information protected from compelled disclosure by the First

15  Amendment to the United States Constitution, Article I, Section 2(b) of the

16  California Constitution, California Evidence Code § 1070, and the common law.

17      7.      Mr. Palmeri objects to the subpoena to the extent that it seeks

18  documents not in his possession, custody, or control.  Mr. Palmeri further objects to

19  the subpoena to the extent that it purports to require Mr. Palmeri to produce

20  documents exclusively within the possession, custody, or control of other parties.

21      8.      Mr. Palmeri objects to the subpoena to the extent it purports to require

22  him to produce information available from other sources.  Such requests are

23  overbroad and unduly burdensome.

24      9.      Mr. Palmeri objects to the subpoena to the extent that it seeks discovery

25  regarding matters that are not relevant to the subject matter of this litigation or that

26  are not reasonably calculated to lead to the discovery of admissible evidence.

27

28

OBJECTIONS TO SUBPOENA                              2
LAX 465466v1 0050022-000348

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax (213) 633-6899

EXHIBIT  4  PAGE  22

Received:   8/ 8/07  4:20'                        +2136336899 -> QUINN   ANUEL;   Page 5
Aug-08-07    03:55pm   From-DAVIS WRIGHT TREMAINE LLP              +2136336899            T-468  P.005/007  F-386

1    10.   Insofar as any requests in the subpoena are vague, ambiguous, and/or
2 overbroad, Mr. Palmeri objects because such requests are unduly burdensome.
3 Reasonable assumptions will be made, where possible, as to the intended meanings.

4    11.   By objecting to this subpoena, Mr. Palmeri is not acknowledging the
5 existence of any responsive documents.

6    12.   The foregoing objections and qualifications apply to each and every
7 request made in the subpoena, and are incorporated by reference to the extent
8 applicable in each of the specific responses set forth below as though fully set forth
9 there. The failure to mention one of the foregoing objections in any of the specific
10 responses set forth below shall not be deemed a waiver of such objection or
11 qualification.

12                          **SPECIFIC OBJECTIONS**

13 REQUEST FOR PRODUCTION NO. 1

14    All DOCUMENTS REFERRING OR RELATING TO statements made to
15 YOU by LARIAN during YOUR research for the ARTICLE.

16 RESPONSE TO REQUEST FOR PRODUCTION NO. 1

17    Mr. Palmeri objects that this request calls for the production of information
18 protected from compelled disclosure by the First Amendment of the United States
19 Constitution, Article I, Section 2(b) of the California Constitution, California
20 Evidence Code § 1070, and the common law. Mr. Palmeri further objects to the
21 subpoena being addressed to him in his personal capacity, on the grounds that the
22 documents requested, if they exist, would be possessed by Mr. Palmeri only by virtue
23 of his employment by Business Week, and any such documents would belong to
24 Business Week. Mr. Palmeri further objects to this request to the extent that it seeks
25 information that is not relevant to the subject matter of this litigation or that is not
26 reasonably calculated to lead to the discovery of admissible evidence. Mr. Palmeri

27

28

OBJECTIONS TO SUBPOENA                                3
LAX 465466v1 0050022-000348

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

EXHIBIT 4 PAGE 23

Received:    8/ 8/07  4:20f         +2136336899 -> QUINN - 'ANUEL;   Page 6
Aug-08-07   03:55pm   From-DAVIS WRiGHT TREMAINE LLP         +2136336999      T-468  P.006/007  F-396

1   further objects that this request is oppressive and designed to harass rather than to

2   obtain information legitimately available under the applicable discovery rules.

3

4   DATED: August 8, 2007                DAVIS WRIGHT TREMAINE LLP
                                          ALONZO WICKERS IV
5                                         ROBYN ARONSON

6

7

8                                         By: _____

9                                                 Robyn Aronson

10                                        Attorneys for Non-Party Reporter
                                          CHRISTOPHER PALMERI
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTIONS TO SUBPOENA                   4
LAX 465466v1 0050022-000348

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

EXHIBIT  4   PAGE  24

## PROOF OF SERVICE BY FACSIMILE AND U.S. MAIL

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Davis Wright Tremaine LLP, Suite 2400, 865 South Figueroa Street, Los Angeles, California 90017-2566.

On August 8, 2007, I served the foregoing document(s) described as: NON-PARTY REPORTER CHRISTOPHER PALMERI'S OBJECTIONS TO PLAINTIFF'S SUBPOENA on the interested parties to this action, by Facsimile and by U.S. Mail by placing a true copy of said document(s) enclosed in a sealed envelope(s) for each addressee named below, with the name and address of the person served shown on the envelope as follows:

John B. Quinn                                           **Plaintiff Mattel, Inc.**
Michael T. Zeller
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3100 (FAX)

Douglas A. Wickman                                      **Defendant Carter Bryant**
Keith Jacoby
Littler Mendelson
A Professional Corporation
2049 Century Park East, 5th Floor
Los Angeles, CA 90067-3107
(310) 553-5583 (FAX)

M. Randall Oppenheimer                                  **Attorneys for Applicant-Intervenor MGA**
Diana M. Torres                                         **Entertainment, Inc.**
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899
(213) 430-6407 (FAX)

(FROM FACSIMILE TELEPHONE NO. (213) 633-6899) at Suite 2400, 865 South Figueroa Street, Los Angeles, California. Upon completion of the said facsimile machine transmission, the transmitting machine will issue a transmission report showing that the transmission was complete and without error.

(U.S. MAIL) - I placed such envelope(s) with postage thereon fully prepaid for deposit in the United States Mail in accordance with the office practice of Davis Wright Tremaine LLP for collecting and processing correspondence for mailing with the United States Postal Service. I am familiar with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service, which practice is that when correspondence is deposited with the Davis Wright Tremaine LLP, personnel responsible for delivering correspondence to the United States Postal Service, such correspondence is delivered to the United States Postal Service that same day in the ordinary course of business.

Executed on August 8, 2007, at Los Angeles, California.

☑       Federal        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

                        _____Frank M. Romero_____                    _____
                                Print Name                                        Signature

LAX 466736v1 0050022-000348

EXHIBIT  4  PAGE 25

# EXHIBIT 5

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3223**

WRITER'S INTERNET ADDRESS
**timalger@quinnemanuel.com**

August 17, 2007

<u>VIA E-MAIL AND U.S. MAIL</u>

Alonzo Wickers IV, Esq.
Davis Wright Tremaine LLP
865 S. Figueroa Street
Suite 2400
Los Angeles, CA  90017

Re:     <u>Bryant v. Mattel, Inc.</u>

Dear Al:

We have spoken several times regarding the *subpoena duces tecum* served by my client, Mattel,
Inc. ("Mattel") on Christopher Palmeri, and I received an email from you on August 16, 2007,
stating (1) there are no documents responsive to the subpoena's request for documents, and
(2) Mr. Palmeri intends to move to quash the subpoena.  It is Mattel's view that Mr. Palmeri
must appear and testify pursuant to the subpoena, and the journalists' privilege does not even
apply here, where Mattel seeks testimony confirming published statements by a non-confidential
source.  Further, even if the privilege applies, it must yield here.  *See Shoen v. Shoen*, 48 F.3d
412 (9th Cir. 1995); *McKevitt v. Pallasch*, 339 F.3d 531 (7th Cir.); *Dillon v. City of San
Francisco*, 748 F. Supp. 722 (N.D. Cal. 1990).

As we have discussed, Hon. Edward A. Infante (Ret.) has been appointed discovery master in
this litigation, and I previously forwarded to you the Stipulation for Appointment of a Discovery
Master ("Stipulation").  I attach another copy of the Stipulation, for your convenience.  By this
letter, Mattel requests an in-person conference to resolve the dispute, pursuant to Paragraph 5 of
the Stipulation.  I am available to confer with you on Wednesday, August 22, or Friday, August
24, 2007.  Please provide me with a convenient time on either of those days.

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

EXHIBIT __5__ PAGE __26__

Alonzo Wickers IV, Esq.
August 17, 2007
Page 2

I look forward to speaking with you next week.

Very truly yours,

Timothy L. Alger

07209/2196964.1

FXHIBIT   5   PAGE  27

# EXHIBIT 6

**Timothy Alger**

**From:**    Wickers, Alonzo [alonzowickers@dwt.com]
**Sent:**    Wednesday, August 08, 2007 10:41 PM
**To:**      Timothy Alger
**Subject:**  RE: Chris Palmeri

Tim:

I will reconfirm the information provided to us about service.  Obviously, if you are correct about service, then we'll have two less things to worry about...

Thanks!

Al

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Wednesday, August 08, 2007 5:02 PM
**To:** Wickers, Alonzo
**Subject:** Chris Palmeri

Al,

I just received your objections, which assert that Chris was purportedly served by fax and not paid his witness fees.  I have a proof of service showing that he was personally served on July 25, 2007, at 3:57 p.m., at 3333 Wilshire Blvd., Suite 500, and paid $49.02.  Is there some miscommunication here?  Let me know because I would certainly want to sort it out.

With warmest regards,

Tim

Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3223
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: timalger@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

EXHIBIT _6_ PAGE _28_

1/20/2008

**Timothy Alger**

| | |
|---|---|
| **From:** | Wickers, Alonzo [alonzowickers@dwt.com] |
| **Sent:** | Friday, August 10, 2007 10:53 AM |
| **To:** | Timothy Alger |
| **Subject:** | RE: Stip & Order re Appointment of a Discovery Master.PDF |

Tim:

At this point, I don't know definitively. But I should know by early next week and will call you then. If there are not any such documents -- which I suspect is the case -- it should narrow the issues in the dispute.

Thanks.

Al

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Friday, August 10, 2007 9:37 AM
**To:** Wickers, Alonzo
**Subject:** RE: Stip & Order re Appointment of a Discovery Master.PDF

Al,

In the hope of narrowing the issues: Do any documents exist that are called for in the subpoena?

Thanks,
Tim

---

**From:** Wickers, Alonzo [mailto:alonzowickers@dwt.com]
**Sent:** Thursday, August 09, 2007 4:58 PM
**To:** Timothy Alger
**Subject:** RE: Stip & Order re Appointment of a Discovery Master.PDF

Tim:

Thanks for forwarding this. We'll take a look.

Al

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Thursday, August 09, 2007 4:31 PM
**To:** Wickers, Alonzo
**Subject:** FW: Stip & Order re Appointment of a Discovery Master.PDF

Al,
It looks like any motion will need to be presented to Judge Infante.
Tim

---

**From:** Albert Villamil

EXHIBIT 6 PAGE 29

1/20/2008

## Timothy Alger

| | |
|---|---|
| **From:** | Wickers, Alonzo [alonzowickers@dwt.com] |
| **Sent:** | Thursday, August 16, 2007 5:22 PM |
| **To:** | Timothy Alger |
| **Subject:** | Business Week: Mattel Subpoena to Chris Palmeri |

Tim:

Just wanted to let you know that there are no documents responsive to your document request to Chris Palmeri.
We will proceed with our motion to quash, and are preparing our pre-filing meet-and-confer letter, which we hope
to send you next week.

Thanks.

Al

**Alonzo Wickers IV**| Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6865 | Fax: (213) 633-6899
Email: alonzowickers@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/WickersIVAlonzo.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

Disclaimer: This message may contain confidential communications protected by the attorney client privilege. If
you received this message in error, please delete it and notify the sender.

EXHIBIT _b_ PAGE _30_

**Timothy Alger**

| | |
|---|---|
| **From:** | Wickers, Alonzo [alonzowickers@dwt.com] |
| **Sent:** | Friday, August 31, 2007 11:09 AM |
| **To:** | Timothy Alger |
| **Subject:** | RE: Palmeri |

Tim:

I'm happy to continue the matter while we meet and confer.  If we cannot resolve our disagreement, we still intend to file a motion to quash the subpoena.

Thanks and enjoy the long weekend.

Al

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Friday, August 31, 2007 10:02 AM
**To:** Wickers, Alonzo
**Subject:** Palmeri

Al,
I would like your agreement to continue the Palmeri deposition to a mutually convenient date in September, without the need for new service, while we continue to meet and confer.  New counsel will be taking over the matter.  Let me know.
Tim

EXHIBIT _6_ PAGE _31_

1/20/2008

# EXHIBIT 7

# STROOCK

Via Fax & E-Mail

September 5, 2007

Michael J. Niborski
Direct Dial  310-556-5873
Direct Fax  310-556-5959
MNiborski@stroock.com

Alonzo Wickers IV, Esq.
Davis Wright Tremaine LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, California  90017

Re:   *Carter Bryant v. Mattel, Inc. and Consolidated Cases*, United States District Court, Central District of California, Case No. CV 04-9049 (SGL) (RNBx), Consolidated with Case Nos. CV 04-9059 and CV 05-2727

Dear Mr. Wickers:

I am writing to introduce myself and our firm who will be representing Mattel, Inc. in the above-referenced matters in connection with the deposition subpoena of Christopher Palmeri.  It is our understanding from Quinn Emanuel, primary counsel for Mattel in this litigation, that you were investigating whether September 26, 2007 would be a convenient date for the deposition of Mr. Palmeri.  For scheduling purposes, I am also available on Thursday, September 27 and Friday, September 28.

I also understand that you and Tim Alger of Quinn Emanuel were meeting and conferring regarding whether the deposition should be held at all or, if it goes forward, whether there would be some limitations on the questioning.  I look forward to continuing this discussion.  Please let me know what time and date works for you this week.  I look forward to speaking with you soon.

Very truly yours,

Michael J. Niborski

cc:   Timothy L. Alger, Esq. (By Email)

EXHIBIT  7  PAGE  32

50369786

# EXHIBIT 8

A10825B

## MAUREEN TKACIK  SEPTEMBER 28, 2007

```
 1
 2      UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA
 3      EASTERN DIVISION
        ----------------------------------------------X
 4      CARTER BRYANT, an individual,

 5                          Plaintiff,

 6                                Case No. CV 04-9049

 7              -against-

 8      MATTEL, INC., a Delaware corporation,

 9                          Defendant.
        ------------------------------------------
10      AND CONSOLIDATED CASES
        ----------------------------------------------X
11                      180 Maiden Lane
                        New York, New York
12
                        DATE: September 28, 2007
13                      TIME: 10:32 a.m.

14

15              DEPOSITION of MAUREEN TKACIK, taken

16      pursuant to the Federal Rules of Civil Procedure,

17      and Subpoena, held at the above-mentioned time and

18      place before Karen D. Williams, a Notary Public of

19      the State of New York.

20

21

22

23      ATKINSON-BAKER, INC.
        COURT REPORTERS
24      (800) 288-3376
        www.depo.com
25      FILE NO.: A10825B
```

EXHIBIT 8 PAGE 33

A10825B

MAUREEN TKACIK   SEPTEMBER 28, 2007

```
 1
 2   APPEARANCES:
 3
 4       KEKER & VAN NEST, LLP
             Attorney for Plaintiff
 5           710 Sansome Street
             San Francisco, California 94111
 6       BY:    (Not present)
 7
         DOW JONES & COMPANY, INC.
 8           Attorney for Defendant
             The Wall Street Journal
 9           200 Liberty Street
             New York, New York 10281
10       BY:    STUART D. KARLE, ESQ.
11
         LAW OFFICES OF JAMES W. SPERTUS
12           Attorney for Defendant
             Carlos Gustavo Machado Gomez
13           12100 Wilshire Boulevard
             Suite 620
14           Los Angeles, California 90025
         BY:    (Not Present)
15
16       STROOCK & STROOCK & LAVAN, LLP
             Attorney for Defendant
17           Mattel, Inc.
             2029 Century Park East
18           Los Angeles, California 90067
         BY:    MICHAEL J. NIBORSKI
19
20
21
22
23
24
25
                                          Page 2
```

```
 1
 2   APPEARANCES:
 3
 4       O'MELVENY & MYERS
             Attorney for Defendant
 5           MGA Entertainment, Inc.,
             MGA Entertainment, (HK), LTD.,
 6           Isaac Larian and
             MGAE de Mexico, S.R.I. de C.V.
 7           Times Square Tower
             7 Times Square
 8           New York, New York 10036
         BY:    DALE M. CENDALI, ESQ.
 9
10
         O'MELVENY & MYERS
11           Attorney for Defendant
             MGA Entertainment, Inc.,
12           MGA Entertainment, (HK), LTD.,
             Isaac Larian and
13           MGAE de Mexico, S.R.I. de C.V.
             Times Square Tower
14           7 Times Square
             New York, New York 10036
15       BY:    KENDALL J. BURR, ESQ.
16
17
18
19
20
21
22
23
24
25
                                          Page 3
```

```
 1
 2
 3
 4
 5            IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that the sealing and filing of the
 8   within deposition be waived.
 9
10
11            IT IS FURTHER STIPULATED AND AGREED
12   that this deposition may be signed and sworn to
13   before any officer authorized to administer an oath
14   with the same force and effect as if signed and
15   sworn to before the officer before whom said
16   deposition is taken.
17
18
19            IT IS FURTHER STIPULATED AND AGREED
20   that all objections, except as to form, are
21   reserved to the time of trial.
22
23
24
25
                                          Page 4
```

```
 1                     TKACIK
 2   M A U R E E N   T K A C I K, having first been
 3   duly sworn by a Notary Public of the State of New
 4   York, was examined and testified as follows:
 5   BY THE REPORTER:
 6       Q   Please state your name for the record.
 7       A   Maureen Tkacik.
 8       Q   What is your address?
 9       A   65-67 Rivington, Apartment 7, New York,
10   New York 10002.
11
12   EXAMINATION BY
13   MR. NIBORSKI:
14       Q   Good morning, Miss Tkacik.
15       A   Good morning.
16       Q   Could you tell us where you are
17   currently employed?
18       A   I am currently employed by Gawker
19   Media.
20       Q   And is that here in New York?
21       A   Yes.
22       Q   And were you previously employed by the
23   Wall Street Journal?
24       A   I was.
25       Q   And approximately what time period were
                                          Page 5
```

2 (Pages 2 to 5)


EXHIBIT 8 PAGE 34

A10825B
MAUREEN TKACIK   SEPTEMBER 28, 2007

| | |
|---|---|
| 1          TKACIK<br>2  you employed by the Journal?<br>3     A     May 2001 through August or September of<br>4  2003.<br>5     Q     And following your time at the Journal,<br>6  did you then go to Gawker Media?<br>7     A     I worked at Philadelphia Magazine in<br>8  between, and free-lanced for several publications.<br>9     Q     And where did you work prior to the<br>10 Wall Street Journal as a reporter, if anything?<br>11    A     I worked for Time Magazine in Asia, in<br>12 Hong Kong. I worked at the Philadelphia Daily News<br>13 in Philadelphia and I worked at the Washington<br>14 Times in Washington, D.C. and I worked for a web<br>15 company called Asia Wise in Hong Kong.<br>16    Q     Can you just give us a brief background<br>17 about your education?<br>18    A     I went to University of Pennsylvania<br>19 for two years. I dropped out. I took some<br>20 graduate classes at George Mason's -- at George<br>21 Mason University School of Public Policy, and<br>22 that's the extent.<br>23    Q     And what was your job title while you<br>24 worked at the The Wall Street Journal?<br>25    A     My specific job title was reporting<br><div align="right">Page 6</div> | 1          TKACIK<br>2     A     I do.<br>3     Q     And what is it?<br>4     A     It is a story that I wrote, that I<br>5  think is why I am here.<br>6     Q     And just for the record, this is a Wall<br>7  Street Journal article dated July 18, 2003<br>8  entitled, "To Lure Older Girls, Mattel Brings in<br>9  Hip-Hop Crowd."<br>10    A     Correct.<br>11    Q     And this is an article that you wrote?<br>12    A     Yes.<br>13    Q     And if I could have you turn to the<br>14 second page, you will see a highlighted paragraph.<br>15        Do you see that?<br>16    A     Yes.<br>17    Q     Could I have you read that out loud,<br>18 please?<br>19    A     "Isaac Larian, chief executive of MGA,<br>20 says he had never heard of a project similar to the<br>21 Bratz at Mattel. He says he chose Mr. Bryant's<br>22 idea for the Bratz over several others after<br>23 holding a sort of fashion-doll design contest in<br>24 late 1999."<br>25    Q     And did you interview Isaac Larian in<br><div align="right">Page 8</div> |
| 1          TKACIK<br>2  assistant or assistant reporter, something like<br>3  that.<br>4     Q     And could you describe your job duties<br>5  while you were there?<br>6     A     I had to cover, it was somewhat -- and<br>7  I had a few companies that I had to cover. I had<br>8  to cover, generally, youth oriented consumer<br>9  products firms. So, that would be toy companies<br>10 like Mattel and footwear, the footwear companies,<br>11 some youth retailers. There was a crop of<br>12 companies that I had to keep track of.<br>13    Q     Thank you. I am going to show you what<br>14 we are going to mark as Exhibit 1. This is a July<br>15 18, 2003 article from The Wall Street Journal. I<br>16 have copies for the witness and counsel.<br>17        (Whereupon, the aforementioned<br>18        article was marked as Plaintiff's<br>19        Exhibit 1 for identification as of this<br>20        date by the Reporter.)<br>21 BY MR. NIBORSKI:<br>22    Q     Miss Tkacik, could I have you take a<br>23 look at what's been marked as Exhibit 1?<br>24    A     Yes.<br>25    Q     Do you recognize this?<br><div align="right">Page 7</div> | 1          TKACIK<br>2  preparation for writing this article?<br>3     A     Yes.<br>4     Q     And you would agree, wouldn't you, that<br>5  the article attributes certain statements to<br>6  Mr. Larian?<br>7        MS. CENDALI:  Objection.<br>8     A     I am not sure what -- that statement<br>9  that is highlighted, I would say that that is<br>10 attributed to Isaac Larian.<br>11    Q     And again, turning to the highlighted<br>12 paragraph, the --<br>13        MR. KARLE:  And we are staying on<br>14        that paragraph?<br>15        MR. NIBORSKI:  Yes.<br>16    Q     The second sentence reads, "He says he<br>17 chose Mr. Bryant's idea for the Bratz over several<br>18 others after holding a sort of fashion-doll contest<br>19 in late 1999." Did I read that correctly.<br>20    A     You missed the word design. It's<br>21 fashion-doll design contest.<br>22    Q     Fair enough. Let me repeat it. He<br>23 says he chose Mr. Bryant's idea for the Bratz over<br>24 several others after holding a sort of fashion-doll<br>25 design contest in late 1999; is that correct?<br><div align="right">Page 9</div> |

<div align="right">3 (Pages 6 to 9)</div>



EXHIBIT _8_   PAGE _35_

A10825B

## MAUREEN TKACIK   SEPTEMBER 28, 2007

TKACIK

1  TKACIK
2  A   Yes.
3  Q   And did Mr. Larian tell you that
4  statement during your interview?
5  A   Yes.
6  Q   Following the publication of your
7  article, did anybody from MGA ever contact you and
8  ask for a correction or retraction or anything from
9  the article?
10  A   No.
11  Q   Did Mr. Larian ever contact you and
12  asked for a correction or retraction or anything
13  from the article?
14  A   No.
15      MR. KARLE:  Just let him finish.
16  Q   Did you ever learn that anyone
17  contacted The Wall Street Journal and asked for a
18  correction or retraction or anything in the
19  article?
20  A   No.
21      MR. NIBORSKI:  I have only one
22      more exhibit and this is just for
23      housekeeping purposes.  This is just the
24      deposition notice which I would like to
25      make an exhibit to the deposition.

Page 10

1  TKACIK
2  date by the Reporter.)
3      MR. NIBORSKI:  And I have no more
4      questions.
5  EXAMINATION BY
6  MS. CENDALI:
7  Q   Ms. Tkacik, the original Exhibit 3
8  subpoena in this case asks for you to appear at the
9  office of Quinn Emanuel, a law firm representing
10  Mattel.  Have you ever had any contacts with the
11  Quinn Emanuel law firm?
12  A   I don't think so.
13  Q   Do you have any idea why Quinn Emanuel,
14  I represent to you is Mattel's normal counsel in
15  this case, is not taking your deposition today?
16  A   No.
17  Q   You say that you left University of
18  Pennsylvania, when was that?
19  A   1998.
20  Q   And did you begin work in journalism
21  after you left Pennsylvania?
22  A   Directly following that.
23  Q   And the job that you mentioned that you
24  had prior to working for The Wall Street Journal,
25  were they full-time jobs or free-lance jobs?

Page 12

1  TKACIK
2      MR. KARLE:  Did you ask her if
3      she has seen it?
4      MR. NIBORSKI:  That's all right.
5      This is just for the deposition.
6  A   Miss Tkacik, this is an amended
7  deposition notice which I am handing you.  This is
8  just for the record, just to include this as part
9  of the transcript.  This would be marked as Exhibit
10  2.
11      (Whereupon, the aforementioned
12      Notice of Deposition was marked as
13      Plaintiff's Exhibit 2 for identification
14      as of this date by the Reporter.)
15      MR. NIBORSKI:  And finally, I
16      would like to mark as Exhibit 3 the
17      subpoena for this deposition, which
18      again is just for the record.
19      MS. CENDALI:  The amended
20      subpoena?
21      MR. NIBORSKI:  This is the
22      original subpoena.
23      (Whereupon, the aforementioned
24      subpoena was marked as Plaintiff's
25      Exhibit 3 for identification as of this

Page 11

1  TKACIK
2  A   Full time.  They were all full-time
3  jobs.
4  Q   When you were working for The Wall
5  Street Journal from May 2001 to August/September
6  2003, where were you living?
7  A   I was living in Los Angeles.
8  Q   Am I correct that prior to having
9  written the article reflected in Exhibit 1, you had
10  previously wrote several other articles about
11  Mattel for The Wall Street Journal?
12  A   True.  Yes, you are correct in saying
13  that.
14  Q   Let me show you some of these articles?
15      MS. CENDALI:  Let's mark as
16      Exhibit 4 an article dated February 1,
17      2001.
18      (Whereupon, the aforementioned
19      2/1/02 article was marked as Plaintiff's
20      Exhibit 4 for identification as of this
21      date by the Reporter.)
22  BY MS. CENDALI:
23  A   It's 2002.
24  Q   Right.  Do you recognize that?
25      MR. KARLE:  Take a look at it

Page 13

4 (Pages 10 to 13)

ATKINSON-BAKER, INC. COURT REPORTERS          1 (800) 288-3376

EXHIBIT  8  PAGE  36

A10825B
MAUREEN TKACIK   SEPTEMBER 28, 2007

**Page 62**

1            TKACIK
2    that they instructed their subordinates at Mattel
3    to rush production of Flavas in three months?
4        A    It does.  I am fairly certain now
5    reading this over again that I discussed the timing
6    with Mr. Bousquette.
7        Q    And you understood from your
8    discussions with him that he had instructed the
9    Mattel team to rush Flavas into production in
10   three months; isn't that true?
11       A    Yes.
12       Q    This next paragraph goes on to say,
13   "Flavas design team often slept in their cubicles
14   to get the dolls ready in time for summer
15   shipment."
16           You see that?
17       A    Yes. .
18       Q    You remember discussing that with
19   Mr. Bousquette and Miss Ross?
20       A    No.
21       Q    I believe you testified that you left
22   the Wall Street Journal in August or September of
23   2003; is that right?
24       A    Yeah, end of August.
25       Q    Pardon?

**Page 63**

1            TKACIK
2        A    The end of August.
3        Q    So that was approximately a month after
4    that article came out, right?
5        A    Yes.
6        Q    Why did you leave the Journal?
7        A    I was really young and stressed out,
8    and I wanted to go into magazine journalism, and I
9    had a friend who had been named editor of
10   Philadelphia Magazine, and I wanted to leave L.A.
11       Q    So, you would have no way of knowing
12   one way or the other, what communications MGA may
13   have had with The Wall Street Journal about your
14   article after you left; is that true?
15       A    Yes.  I kept in touch with them.  I
16   never heard about anything.  I kept in touch with
17   The Wall Street Journal.
18       Q    When was the last time you did any work
19   for The Wall Street Journal?
20       A    When I left.
21       Q    When was the first time you heard about
22   the lawsuit Mattel filed against Carter Bryant?
23       A    I don't remember.
24       Q    I'll represent to you that lawsuit was
25   filed in or about April of 2004.  You recall

**Page 64**

1            TKACIK
2    hearing about it approximately at that time?
3        A    I don't recall.
4        Q    Were you aware of the lawsuit in 2005
5    when you were thinking of doing your article about
6    Lilly Martinez?
7        A    Yes.
8        Q    How had you become aware of the
9    lawsuit?
10       A    The Internet.  I read the paper.  I
11   don't know how I had become aware in that window of
12   time.
13       Q    Prior to your deposition today and your
14   meetings, if any, with counsel for the Wall Street
15   Journal who is representing you today, had you
16   discussed the lawsuit with anyone?
17       A    I don't know.  No.  I mean casually.
18       Q    Had you discussed the lawsuit with
19   anyone at Mattel?
20       A    I don't know.
21       Q    You might have?
22       A    It's a possibility.
23       Q    Do you know who?
24       A    It would have been Julia Jensen.  That
25   would probably be the extent of it.  I really don't

**Page 65**

1            TKACIK
2    remember.
3        Q    Do you recall discussing the lawsuit
4    with any ex-Mattel employees?
5        A    No.  I may have, I don't know.
6           MS. CENDALI:  I have no further
7    questions.
8           MR. NIBORSKI:  Just a couple
9    quick closing remarks.  I just wanted to
10   go over the custody of the transcript,
11   just to let you know there is going to
12   be a transcript prepared, I will receive
13   a copy and send it to your attorney.  He
14   would give you a chance to review it and
15   make any changes or corrections and then
16   you can return it to him; and we will
17   maintain custody of the original.
18
19
20
21   (Continued on next page to include jurat.)
22
23
24
25

17 (Pages 62 to 65)

EXHIBIT  8   PAGE 37

A10825B
MAUREEN TKACIK   SEPTEMBER 28, 2007

```
 1                      TKACIK
 2    I also want to confirm that there was no
 3    medical or other reason why you were
 4    unable to give your best testimony today?
 5        THE WITNESS:  No.
 6        MR. NIBORSKI:  And I appreciate
 7    your time.  Thank you.
 8        (Whereupon, at 12:15 p.m., the
 9    Examination of this Witness was
10    concluded.
11
12
13
                _____
14                  MAUREEN TKACIK
15
      Subscribed and sworn to before me
16    this _____ day of _____, 2007.
17
18
      _____
19        NOTARY PUBLIC
20
21
22
23
24
25
                                    Page 66
```

```
 1
 2    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
 3        PAGE    LINE
 4        42      20
 5        43      25
 6        45      14
 7        45      22
 8        47      21
 9        50      23
10        52      23
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 68
```

```
 1
 2
 3        E X H I B I T S
 4
      PLAINTIFF'S EXHIBITS:
 4    EXHIBIT    EXHIBIT          PAGE
      NUMBER     DESCRIPTION
 5
 6      1     7/18/03 Article        7
 7      2     Notice of Deposition   11
 8      3     Subpoena               11
 9      4     2/1/02 Article         13
10      5     2/7/02 Article         15
11      6     2/8/02 Article         16
12      7     4/3/03 Article         20
13      8     E-mail                 36
14
15
16        I N D E X
17
18    EXAMINATION BY            PAGE
19    MR. NIBORSKI
20    MS. CENDALI
21
22
23
24
25
                                    Page 67
```

```
 1
 2        C E R T I F I C A T E
 3
 4    STATE OF NEW YORK    )
                           : SS.:
 5    COUNTY OF KINGS      )
 6
 7
 8        I, KAREN D. WILLIAMS, a Notary Public
 9    for and within the State of New York, do hereby
10    certify:
11        That the witness whose examination is
12    hereinbefore set forth was duly sworn and that such
13    examination is a true record of the testimony given
14    by that witness.
15        I further certify that I am not related
16    to any of the parties to this action by blood or by
17    marriage and that I am in no way interested in the
18    outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto set
20    my hand this 1st day of October, 2007.
21
22
23
      _____
24        KAREN D. WILLIAMS
25
                                    Page 69
```

18 (Pages 66 to 69)

EXHIBIT  8  PAGE 38

# EXHIBIT 9

A107CD0

DENISE O'NEAL     OCTOBER 3, 2007

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an                )
individual,                      )
                                 )
                                 ) Case No.
                     Plaintiff,  ) CV 04-9049
                                 ) SGL (RNBx)
            vs.                  ) Consolidated with
                                 ) No. CV 04-09059
MATTEL, INC., a                  ) No. CV 05-02727
Delaware corporation,            )
                                 )
                     Defendant.  )
_____)
And Consolidated Cases

DISCOVERY DEPOSITION OF

DENISE O'NEAL

CHICAGO, ILLINOIS

OCTOBER 3, 2007

Atkinson-Baker, Inc.
Court Reporters
(800) 288-3376
www.depo.com

Reported by: Janice Smith, RPR
             No. 084-001346

FILE NO: A107CD0

Page 1

ATKINSON-BAKER, INC. COURT REPORTERS                    1 (800) 288-3376

EXHIBIT _9_ PAGE _39_

A107CD0

**DENISE O'NEAL          OCTOBER 3, 2007**

| | |
|---|---|
| 1       UNITED STATES DISTRICT COURT<br>         CENTRAL DISTRICT OF CALIFORNIA<br>2            EASTERN DIVISION<br>3  CARTER BRYANT, an        )<br>   individual,              )<br>4                           )<br>                            ) Case No.<br>5         Plaintiff, ) CV 04-9049<br>                            ) SGL (RNBx)<br>6  vs.              ) Consolidated with<br>                            ) No. CV 04-09059<br>7  MATTEL, INC., a    ) No. CV 05-02727<br>   Delaware corporation,    )<br>8                           )<br>         Defendant.  )<br>9<br>   And Consolidated Cases<br>10<br>11       The deposition of DENISE O'NEAL,<br>12  called by Plaintiff for examination, taken<br>13  pursuant to the Federal Rules of Civil<br>14  Procedure of the United States District Courts<br>15  pertaining to the taking of depositions for<br>16  discovery, taken before Janice Smith, a Notary<br>17  Public within and for the County of Cook, State<br>18  of Illinois, and a Registered Professional<br>19  Reporter of said state, taken at Suite 2300,<br>20  55 W. Monroe St., Chicago, Illinois 60603, on<br>21  the 3rd day of October, A. D.  2007, at 2:07<br>22  p.m.<br>23<br>24<br>25<br>                                    Page 2 | 1                INDEX<br>    EXAMINATION<br>2<br>    Witness Name                    Page<br>3   DENISE O'NEAL<br>     By Mr. Niborski ............................ 5<br>4    By Mr. O'Brien ............................. 18<br>     By Mr. Niborski (CONTINUED) .................. 19<br>5<br>6<br>7<br>                EXHIBITS<br>8<br>                                 Page<br>9   Deposition Exhibit No. 927 Marked for<br>    Identification                    7<br>10<br>    Deposition Exhibit No. 928 Marked for      15<br>11  Identification<br>12  Deposition Exhibit No. 929 Marked for      15<br>    Identification<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>                                    Page 4 |
| 1  APPEARANCES:<br>2<br>   FUNKHOUSER VEGOSEN LIEBMAN & DUNN, LTD.,<br>3  BY: DAMON E. DUNN, ESQ.,<br>   55 West Monroe St.,<br>4  Suite 2300,<br>   Chicago, Illinois 60603,<br>5<br>   Appeared on behalf of the Deponent;<br>6<br>7  STROOCK & STROOCK & LAVAN, LLP,<br>8  BY: MICHAEL J. NIBORSKI, ESQ.,<br>   2029 Century Park East, Suite 1600<br>9  Los Angeles, Ca. 90067-3086,<br>10 Appeared on behalf of Mattel, Inc.;<br>11<br>   QUINN, EMANUEL, URQUHART OLIVER &<br>12 HEDGES, LLP;<br>   BY: MICHAEL T. ZELLER, ESQ.,<br>13 865 S. Figueroa St.,<br>   10th Floor,<br>14 Los Angeles, Ca.  90017,<br>15 Appeared on behalf of Mattel, Inc.;<br>16<br>   SIDLEY AUSTIN, LLP,<br>17 BY: RICHARD J. O'BRIEN, ESQ.,<br>   One South Dearborn St.,<br>18 Chicago, Il. 60603,<br>19 Appeared on behalf of MGA.<br>20<br>   REPORTED BY: MS. JANICE SMITH, RPR<br>21         License No. 084-1346<br>22<br>23<br>24<br>25<br>                                    Page 3 | 1         THE VIDEOGRAPHER:  We are on the<br>2   record at 2:07 p.m. on October 3, 2007.  Here<br>3   begins the videotaped deposition of Denise<br>4   O'Neal, taking place in Chicago, Illinois.<br>5   This deposition is being taken in the matter of<br>6   Carter Bryant versus Mattel, Incorporated.<br>7         Will counsel please state the<br>8   names for the record?<br>9         MR. NIBORSKI:  Michael Niborski, of<br>10  Stroock & Stroock & Lavan, on behalf of Mattel.<br>11        MR. ZELLER:  Michael Zeller, Quinn<br>12  Emanuel, for Mattel.<br>13        MR. DUNN:  Damon Dunn, for the<br>14  witness.<br>15        MR. O'BRIEN:  Dick O'Brien, on behalf<br>16  of MGA.<br>17        THE VIDEOGRAPHER:  Thank you,<br>18  counsel.  The witness will now be sworn in.<br>19            (Witness sworn.)<br>20            DENISE O'NEAL,<br>21  called as a witness herein, having been first<br>22  duly sworn, was examined and testified, as<br>23  follows:<br>24            EXAMINATION<br>25  BY MR. NIBORSKI:<br>                                    Page 5 |

2 (Pages 2 to 5)

EXHIBIT 9  PAGE 40

A107CD0

DENISE O'NEAL        OCTOBER 3, 2007

| | |
|---|---|
| 1   Q.   Good afternoon, Ms. O'Neal.   02:06 | 1   Q.   I would ask you to take a quick   02:09 |
| 2   A.   Hi. | 2   look at that and tell me if you recognize it, |
| 3   Q.   Could you spell your full name for   02:06 | 3   this document? |
| 4   the record, please? | 4   A.   It appears to be a story that I |
| 5   A.   My first name is Denise, | 5   wrote for the paper. It has my byline, so I am |
| 6   D-e-n-i-s-e. My last name is O'Neal, | 6   assuming it is the story I wrote. |
| 7   O'-N-e-a-l. | 7   Q.   Do you recall this particular   02:09 |
| 8   Q.   And could you also state for the   02:07 | 8   article? |
| 9   record your current address? | 9   A.   I know that I wrote an article on |
| 10   A.   14732 South Princeton Avenue, | 10   the Bratz, one lengthy article, and that is the |
| 11   Dolton, D-o-l-t-o-n, Illinois 60419. | 11   only I do believe. It is the one that appeared |
| 12   Q.   And where are you currently   02:07 | 12   in 2004, yes. |
| 13   employed? | 13   Q.   Okay. And would you like to take a   02:09 |
| 14   A.   Chicago Sun-Times. | 14   minute and review it, or are you quite |
| 15   Q.   And when did you start working for   02:07 | 15   confident you wrote this article? |
| 16   the Sun-Times? | 16   A.   If it has my byline, I am sure I |
| 17   A.   December. Yeah, December of 1990. | 17   wrote it. |
| 18   Q.   And have you worked for the   02:07 | 18   Q.   If you could turn to page 2, please?   02:09 |
| 19   Sun-Times from December 1990 until now? | 19   You will see some highlighted portions. And if |
| 20   A.   Yes. | 20   I could have you focus on the first sentence, |
| 21   Q.   And did you have any -- what was   02:07 | 21   it says, "When Larian's daughter was 7, he |
| 22   your employment history prior to the Sun-Times? | 22   noticed she had become bored with Barbie |
| 23   A.   Prior to the Sun-Times I worked for | 23   dolls." |
| 24   Advertising Age Magazine. | 24       Do you see that? |
| 25   Q.   Could you just give us a brief   02:07 | 25   A.   Yes. |
| Page 6 | Page 8 |

| | |
|---|---|
| 1   description of your educational background? | 1   Q.   Do you recall interviewing for this   02:10 |
| 2   A.   I have a bachelor's from Roosevelt | 2   article an individual named Isaac Larian? |
| 3   University in Chicago, Illinois, in mass | 3   A.   Yes. |
| 4   communication, which covered broadcast and | 4   Q.   You do. Do you remember   02:10 |
| 5   print media. | 5   approximately when that interview occurred |
| 6   Q.   Could you give us a brief summary of   02:08 | 6   compared to the publication of this article? |
| 7   your job titles while you have been at the | 7   A.   It would more likely be one to two |
| 8   Sun-Times? | 8   weeks prior to -- |
| 9   A.   I have been -- my current title is | 9   Q.   To the publication date?   02:10 |
| 10   editorial assistant, food staff writer. I have | 10   A.   -- to the publication date. Right. |
| 11   worked for a food section, our weekend section, | 11   Q.   So approximately between mid   02:10 |
| 12   and have been assistant and still assistant to | 12   February? |
| 13   our features editor. | 13   A.   Somewhere in February, yeah. |
| 14   Q.   And do you recall what your official   02:08 | 14   Q.   2004?   02:10 |
| 15   position was in March of 2004? | 15   A.   Yeah. Right. |
| 16   A.   Editorial assistant and staff | 16   Q.   Thank you. Now turning back to that   02:10 |
| 17   writer. | 17   first sentence, do you recall Mr. Larian |
| 18   Q.   Thank you. I would like to show you   02:08 | 18   telling you that information during your |
| 19   an article and we will mark it as an exhibit | 19   interview with him? |
| 20   for the deposition, and I believe we are going | 20   A.   I do. |
| 21   in order so that will be marked as Exhibit 927. | 21   Q.   And if I could have you focus on the   02:10 |
| 22       (Whereupon, Deposition Exhibit | 22   next sentence, it says, "He decided to again |
| 23       No. 927 was marked for I.D. | 23   change the focus of his company, wanting to |
| 24       as of 10-3-07.) | 24   create a doll product for girls ages 7 to 13. |
| 25   BY MR. NIBORSKI: | 25   The dolls would have to be urban dolls |
| Page 7 | Page 9 |

3 (Pages 6 to 9)



EXHIBIT   9   PAGE  41

A107CD0
DENISE O'NEAL          OCTOBER 3, 2007

1  representing America's multi-ethnicity.  They
2  also had to reflect the trends and attitudes of
3  the tween generation."
4          Do you recall Mr. Larian
5  telling you that information?
6      A.   To the best of my knowledge, yes.
7      Q.   Turning to the next paragraph, you          02:11
8  will see a quote.  It says, "We were looking
9  for a new toy to challenge Barbie.  Something
10 that would span girls' interest in dolls for a
11 few more years," says Larian.
12          And you attribute that quote to
13 Mr. Isaac Larian, correct?
14     A.   Yes.
15     Q.   And to the best of your knowledge,          02:11
16 that was an exact quote from him to you,
17 correct?
18     A.   Most quotes are pretty much
19 verbatim, yes.
20     Q.   And to the best of your memory, that        02:11
21 quote was words specifically spoken by Mr.
22 Larian?
23     A.   To the best of my knowledge, yes, it
24 was.
25     Q.   Thank you.  Turning to the next            02:11
                                              Page 10

1      Q.   If you could turn a few paragraphs          02:12
2  down below, you will see a highlighted quote
3  that reads, "We don't have plans laid out for
4  the Bratz.  We come up with new ideas as we go
5  along and we are having fun doing it."
6          Do you see that?
7      A.   Yes.
8      Q.   And is it your recollection that            02:13
9  that is a quote from Mr. Isaac Larian?
10     A.   It is in quotation marks.  Yes, it
11 would have been a quote from Mr. Larian.
12     Q.   Thank you.  If I could have you turn        02:13
13 back to page one of the exhibit, you will see
14 another series of paragraphs that are
15 highlighted.
16     A.   Um-hmm.
17     Q.   The first one is also a quote which        02:13
18 reads, "We wanted a respectable product that
19 reflected the lifestyle of school girls and
20 fashionable trends, but also one that
21 represented clean fun with learning values," he
22 says.
23          And is it your recollection
24 that that quote came from Mr. Larian as well?
25     A.   Yes, it did.
                                              Page 12

1  paragraph it says, "Larian began shopping
2  around for interested vendors.  Getting
3  negative response because of the company name,
4  Larian once again changed the company's name,
5  shortening it to MGA Entertainment.  That done,
6  Larry needed a name for his dolls."
7          Do you recall Mr. Larian telling
8  you that information?
9      A.   To the best of my knowledge, yes, I
10 do.
11     Q.   And the next paragraph reads, "His        02:12
12 creative team decided the name should be catchy
13 and not have more than six letters."
14          Do you recall him telling you
15 that?
16     A.   To the best of my knowledge, yes.
17     Q.   It goes on to say, "When looking at       02:12
18 sketches and pitching ideas, someone said the
19 dolls looked like little brats.  Keeping with
20 today's trend of making names more cool by
21 changing the spelling, MGA executives decided
22 to replace the S with a Z."
23          And you recall Mr. Larian
24 telling you that information?
25     A.   Yes.
                                              Page 11

1      Q.   Turning to the next paragraph, it          02:13
2  reads, "The Bratz are moving into another
3  medium this year, starring in their first
4  direct-to-DVD movie titled, "The Bratz Go
5  Hollywood."  The movie is set for a late summer
6  release.  The dolls also will star in an
7  animated feature film, which is expected to be
8  released in late 2005."
9          Do you recall Mr. Larian
10 telling you that information?
11     A.   To the best of my knowledge, yes.
12     Q.   Thank you.  And continuing with the        02:14
13 next paragraph, it reads, "Doll products new
14 for 2004 include Bratz Petz, cats Brigitte,
15 Kendall, Jolie and Daphne; Bratz Wild Life, an
16 exclusive set featuring Nevra, Meyghan and
17 Fianna; Bratz Girls Nite Out, with Cloe, Sasha,
18 Yasmin, Jade and Dana preparing for Saturday
19 night fun; Sun-kissed Summer, with Cloe,
20 Yasmin, Sasha, Jade and Dana dressed in beach
21 attire; Best Friends Beach Party, with friends
22 Calista and Noelle spending a day at the beach;
23 Best Friends Pajama Party, with Brianne and
24 Zana in a themed slumber party setting, and
25 Flower Fairies, featuring Rose, Daisy and
                                              Page 13

                                       4 (Pages 10 to 13)

ATKINSON-BAKER, INC. COURT REPORTERS          1 (800) 288-3376


EXHIBIT  9  PAGE  42

A107CD0

DENISE O'NEAL          OCTOBER 3, 2007

1  Sunflower, a trio of scented dolls."
2       Do you recall Mr. Larian
3  giving you all of that information?
4  A.  The best of my knowledge, yes, I do.
5       Q.  A few more quick housekeeping things      02:15
6  just for the record.  Also did you -- do you
7  recall interviewing anybody else from MGA in
8  preparation for this article?
9  A.  No, I did not.
10      Q.  Just Mr. Larian?                          02:15
11 A.  Isaac Larian, yes.
12      Q.  When we discuss the timing of the         02:15
13 interview, do you recall was it in person or
14 was it on the telephone?
15 A.  It was a telephone interview.
16      Q.  Do you recall approximately how long      02:15
17 it lasted?
18 A.  No, I don't.
19      Q.  Would you say more than a few             02:15
20 minutes, less than an hour?
21 A.  I would be speculating in saying
22 probably 15 to 20 minutes.
23      Q.  And was that your only conversation       02:15
24 with Mr. Larian in preparation for this
25 article?

Page 14

1  A.  Yes, it was.  Yes.
2       Q.  I would like to just put for the         02:15
3  record exhibits -- I guess it would be 928 and
4  929.  These are just for housekeeping.  These
5  are the copies of the deposition notice and the
6  subpoena.  No need to ask any questions.  Just
7  would like to make them part of the record.  We
8  will make the notice 928 and the subpoena 929.
9       (Whereupon, Deposition
10      Exhibit Nos. 928 and 929
11      were marked for I.D. as of
12      10-3-07.)
13 BY MR. NIBORSKI:
14      Q.  Were you ever contacted by Mr.            02:16
15 Larian at any point after this article was
16 published and asked for a correction or a
17 retraction of anything in this article?
18 A.  No.
19      Q.  Were you ever contacted by a person       02:16
20 named Carter Bryant asking for a retraction or
21 correction?
22 A.  No.
23      Q.  Do you recall ever being contacted        02:16
24 by anybody from MGA asking for a correction or
25 retraction of anything in this article?

Page 15

1  A.  No.
2       Q.  And are you aware of anybody ever         02:17
3  contacting the Chicago Sun-Times asking for a
4  correction or retraction of this article in any
5  way?
6  A.  No.
7       Q.  Okay.  We need to take a 5 minutes        02:17
8  break.  I think we can wrap up.
9       THE VIDEOGRAPHER:  Going off the
10 record.  The time now is 2:18 p.m.
11      (Recess was taken.)
12      THE VIDEOGRAPHER:  We are back on the
13 record.  Time now is 2:20 p.m.
14 BY MR. NIBORSKI:
15      Q.  Ms. O'Neal, just a few more               02:20
16 questions.
17      We talked briefly about the
18 timing of your interview with Mr. Larian.  The
19 article again was published March 5, 2004, and
20 it is your recollection, correct, that you
21 interviewed Mr. Larian sometime in February of
22 2004, correct?
23 A.  Correct.
24      Q.  And to the best of your recollection       02:20
25 it would have been within one to two weeks

Page 16

1  before publication of the article?
2  A.  Normally that is the time span              02:20
3  between interviews because we have to have
4  stories filed a week prior to publication.
5       Q.  And you have a specific recollection      02:20
6  following that policy in this particular case
7  in interviewing Mr. Larian in February of '04?
8  A.  As I said, it was sometime within
9  two weeks prior to the publication.  I can't
10 give you an exact date.
11      Q.  Sometime within two weeks before          02:20
12 publication?
13 A.  To my best recollection.
14      Q.  Okay.  Thank you.                         02:20
15      Just a couple of quick
16 admonitions in closing.
17      We will get -- I will get a copy
18 of the transcript of the deposition.  I will
19 give it to your attorney.  He will give you an
20 opportunity to review it and make any
21 corrections and we will retain custody of the
22 original.  Just want to confirm that there is
23 no medical or other reason why you were unable
24 to give your best testimony today.
25 A.  No.

Page 17

5 (Pages 14 to 17)



EXHIBIT 9 PAGE 43

A107CD0
## DENISE O'NEAL          OCTOBER 3, 2007

1     Q.   Okay. And I have nothing further.     02:21
2   I really appreciate your time. Thank you.
3       A.   Thank you.
4       MR. O'BRIEN: I just have a few
5   follow-ups.
6           EXAMINATION
7   BY MR. O'BRIEN:
8       Q.   With respect to the stuff in the     02:21
9   article that you just attributed to Mr. Larian
10  which was not in quotes, were you
11  characterizing what Mr. Larian said to you?
12      MR. DUNN: Yes or no.
13      THE WITNESS: Yes.
14  BY MR. O'BRIEN:
15      Q.   Are there things that Mr. Larian     02:21
16  said to you during the interview that did not
17  find themselves in the article?
18      MR. DUNN: You can give a yes or no
19  to that one.
20      THE WITNESS: Yes, most likely.
21  BY MR. O'BRIEN:
22      Q.   And how did you, when you     02:22
23  interviewed him, record those things that you
24  put into quotes?
25      MR. DUNN: I am going to object to

Page 18

1     BY MR. NIBORSKI:
2       Q.   Let me rephrase.     02:23
3       MR. DUNN: Okay.
4   BY MR. NIBORSKI:
5       Q.   Is this any reason to believe that     02:23
6   the information that you actually published in
7   the article does not accurately reflect what
8   Mr. Larian told you during your interview?
9       MR. DUNN: You can answer that one.
10      THE WITNESS: No.
11      MR. NIBORSKI: Nothing further.
12  Thank you so much for your time.
13      THE WITNESS: Thank you.
14      THE VIDEOGRAPHER: Going off the
15  record. The time now is 2:24 p.m. This is the
16  end of videotape number one.
17      * * FURTHER DEPONENT SAYETH NOT * *
18
19
20
21
22
23
24
25

Page 20

1   that. That goes into the substance of the
2   interview and Mr. Bryant and I basically, in
3   setting the ground rules for allowing this
4   deposition without filing a motion to quash,
5   limited it to the authentication of the story
6   itself, and for that reason the witness isn't
7   going to answer anything with respect to what
8   took place at the interview other than just to
9   set the general foundation of the situation,
10  though she will — I will allow her to
11  voluntarily testify as to what was actually in
12  the story.
13      MR. DUNN: I have nothing further.
14      EXAMINATION (continued)
15  BY MR. NIBORSKI:
16      Q.   Just one quick follow-up,     02:22
17  Ms. O'Neal. Is there any reason to believe
18  that the information Mr. Larian provided you
19  was not accurately conveyed in your article?
20      MR. DUNN: I am going to object to
21  that just because I think the question is too
22  broad. If you are asking whether or not she
23  believes that she printed something in the
24  article that didn't come from that source, I
25  will let her answer that question yes or no.

Page 19

1   STATE OF ILLINOIS  )
2                      ) ss.
3   COUNTY OF C O O K  )
        UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA
4           EASTERN DIVISION
5   CARTER BRYANT, an        )
    individual,              )
6                            )
                             ) Case No.
7       Plaintiff, ) CV 04-9049
                   ) SGL (RNBx)
8   vs.            ) Consolidated with
                   ) No. CV 04-09059
9   MATTEL, INC., a          ) No. CV 05-02727
    Delaware corporation,    )
10                           )
        Defendant. )
11      I hereby certify that I have read
12  the foregoing transcript of my deposition, pages
13  1 through 23 inclusive, given at the time and
14  place aforesaid, and I do again subscribe and
15  make oath that the same is a true, correct, and
16  complete transcript of my deposition given as
17  aforesaid, with corrections, if any, appearing
18  on the attached correction sheet (s).
19
20          DENISE O'NEAL
21  No corrections (please initial)_____
22  Number of errata sheets submitted_____(pgs.)
23
    SUBSCRIBED AND SWORN TO
24  before me this_____ day of
    _____, A.D. 2007.
25
    Notary Public

Page 21

6 (Pages 18 to 21)


EXHIBIT  9  PAGE  44

A107CD0

DENISE O'NEAL          OCTOBER 3, 2007

1   STATE OF ILLINOIS )
              ) ss.
2   COUNTY OF C O O K )
3
4          I, JANICE SMITH, RPR, a
5   Notary Public within and for the County of Cook,
6   State of Illinois, and a Registered Professional
7   Reporter of said state, do hereby certify:
8          That, previous to the commencement of
9   the examination of the witness, DENISE O'NEAL,
10  she was first duly sworn to testify the whole
11  truth concerning the matters herein;
12         That, the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting, via
15  computer-aided transcription, under my personal
16  direction, and constitutes a true record of the
17  testimony given and the proceedings had;
18         That, the said deposition was taken
19  before me at 55 West Monroe Street, Suite 2300,
20  Chicago, Illinois 60603, on the 3rd day of
21  October, A.D. 2007;
22         That, the reading and signing by the
23  witness of the deposition transcript was not
24  waived;
25         That, I am not a relative or employee

                                           Page 22

1   or
2   attorney or counsel, nor a relative or employee
3   of such attorney or counsel for any of the
4   parties hereto; nor interested directly or
5   indirectly in the outcome of this action.
6          IN WITNESS WHEREOF, I do hereunto set
7   my hand and affix my seal of office at Chicago,
8   Illinois, this 3rd day of October, A. D. 2007.
9
10  _____
           Janice Smith, RPR
           Cook County, Illinois
11         License No. 84-1346
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                           Page 23

7 (Pages 22 to 23)

EXHIBIT 9 PAGE 45

# EXHIBIT 10

**CONFORMED**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   Timothy L. Alger (Bar No. 160303) •
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9            UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11                   EASTERN DIVISION

12 | CARTER BRYANT, an individual,    | CASE NO. CV 04-9049 SGL (RNBx)
13 |            Plaintiff,            | Consolidated with
   |                                  | Case No. CV 04-09059
14 |       vs.                        | Case No. CV 05-02727
15 | MATTEL, INC., a Delaware         | Hon. Stephen G. Larson
   | corporation,                     |
16 |                                  | NOTICE OF MOTION AND MOTION
   |            Defendant.            | OF MATTEL, INC. FOR LEAVE TO
17 |                                  | TAKE ADDITIONAL DISCOVERY
                                      | AND OBJECTIONS TO DISCOVERY
18 | AND CONSOLIDATED ACTIONS        | MASTER ORDER OF SEPTEMBER
                                      | 28, 2007; AND
19 |                                  | MEMORANDUM OF POINTS AND
                                      | AUTHORITIES
20 |                                  |
                                      | [Declaration of B. Dylan Proctor filed
21 |                                  | concurrently]
22 |                                  | Hearing Date: January 7, 2008
                                      | Time: 10:00 a.m.
23 |                                  | Courtroom: 1
24 |                                  | **Phase 1:**
                                      | Discovery Cut-off: January 28, 2008
25 |                                  | Pre-trial Conference: May 5, 2008
                                      | Trial Date: May 27, 2008
26
27
28

07209/2299353.1                          11-19

MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10 PAGE 46

1 | TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2 |      PLEASE TAKE NOTICE that on January 7, 2008, at 10:00 a.m., or as soon

3 | thereafter as the matter may be heard, in the courtroom of Honorable Stephen G.

4 | Larson, located at 3470 Twelfth Street, Riverside, California, 92501, Mattel, Inc. will,

5 | and hereby does, move the Court, pursuant to <u>Federal Rule of Civil Procedure</u> 26(b)

6 | and the Court's February 12, 2007 Scheduling Order, for an order granting Mattel leave

7 | to take additional depositions, including <u>Rule</u> 30(b)(6) depositions of defendants MGA

8 | Entertainment, Inc., and MGAE de Mexico S.R.L. de C.V., beyond the current limit set

9 | by the Court and to serve additional interrogatories on defendants. Pursuant to 28

10 | U.S.C. § 636(b)(1), Mattel also seeks an additional 12 hours to depose Carter Bryant, in

11 | addition to the seven hours already permitted by Discovery Master Infante.

12 |      Mattel makes this Motion on the grounds that the breadth and complexity of this

13 | case warrant more than the 24 depositions and 50 interrogatories permitted by the

14 | Court's Scheduling Order. Mattel further makes this Motion on the grounds that, given

15 | Bryant's central role in the hundreds of products that MGA has sued upon in this case,

16 | and because both the parties and third-parties have produced many millions of pages of

17 | documents since Mr. Bryant's deposition in 2005, seven hours is not enough time to

18 | fully depose Mr. Bryant.

19 |      This Motion is based on this Notice of Motion and Motion, the accompanying

20 | Memorandum of Points and Authorities, the Declaration of B. Dylan Proctor filed

21 | concurrently herewith, the records and files of this Court, and all other matters of which

22 | the Court may take judicial notice.

23

24

25

26

27

28

07209/2299353.1

EXHIBIT 10 PAGE 47

1

## <u>Statement of Local Rule 7-3 Compliance</u>

2     The parties met and conferred pursuant to <u>Local Rule</u> 7-3 on October 3, 2007,

3   and times thereafter, but were not able to resolve this motion.

4

5   DATED: November 19, 2007        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

6

7                                   By_____

8                                      Jon Corey
                                       Attorneys for Mattel, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2299353.1

-iii-

EXHIBIT __10__ PAGE __48__

# **TABLE OF CONTENTS**

                                                                                    **Page**

PRELIMINARY STATEMENT..................................................................................1

STATEMENT OF FACTS .......................................................................................3

ARGUMENT ...........................................................................................................6

I.     THE RULES CONTEMPLATE ADDITIONAL DISCOVERY....................6

    A.    Each Category of Claims Warrants More Depositions..........................8

        1.    The Bratz Claims Require Additional Depositions .....................8

        2.    Mattel's Trade Secret and RICO Claims and MGA's Unfair
            Competition Claims Require Additional Depositions ...............12

    B.    Mattel Needs Additional Depositions Because the Integrity of
        MGA's and Bryant's Preservation of Documents Is At Issue..............14

    C.    Mattel Seeks Leave to Take 30(b)(6) Depositions On Non-
        Duplicative Topics............................................................................15

    D.    Mattel Meets The Requirements for Additional Discovery.................15

II.    THE COURT SHOULD GRANT LEAVE WITH RESPECT TO
    MATTEL'S INTERROGATORIES................................................................16

III.   THE COURT SHOULD ALLOW ADDITIONAL TIME FOR THE
    BRYANT DEPOSITION ...........................................................................20

CONCLUSION ......................................................................................................25

07209/2299353.1

-i-

EXHIBIT 10 PAGE 49

# TABLE OF AUTHORITIES

<div align="right"><u>Page</u></div>

### Cases

Andamiro v. Konami Amusement of Am.,
  2001 WL 535667 (C.D. Cal. April 26, 2001) ........................................................ 8

Bahn v. NME Hosps., Inc.,
  929 F.2d 1404 (9th Cir. 1991) ........................................................ 22

Bromgard v. Montana,
  2007 WL 1101179 (D. Mont. April 11, 2007) ........................................ 11, 18

Collaboration Prop. v. Polycom, Inc.,
  224 F.R.D. 473 (N.D. Cal. 2004) ........................................................ 8

Fresenius Med. Care Hldgs, Inc. v. Roxane Labs., Inc.,
  2007 WL 764302 Proctor Dec., Ex. 43 ........................................................ 23

Rx USA Wholesale, Inc. v. McKesson Corp.,
  2007 WL 1827335 (E.D.N.Y. June 25, 2007) .................................... 7, 11, 19

Whittingham  v. Amherst Coll.,
  163 F.R.D. 170 (D. Mass. 1995) ........................................................ 7

### Statutes

Cal. Civ. Code § 3426.1 ........................................................ 20

Fed. R. Civ. P. 26(b) ........................................................ 8, 20

Fed. R. Civ. P. 30(a)(2)(A) ........................................................ 7, 20

Fed. R. Civ. P. 33 ........................................................ 7, 8, 20

Local Rule 7-3 ........................................................ 3

Fed. R. Civ. P. 30(b)(6) ........................................ 9, 14, 16, 17

Fed. R. Civ. P. 53(e) ........................................................ 21

EXHIBIT 1D  PAGE 50

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

1 
2 
3     In its Scheduling Order, the Court limited each side to 50 interrogatories and 24
4  fact depositions.  The Court recognized, however, that the case's complexity could
5  require additional depositions or interrogatories and invited motions for additional
6  discovery, if necessary:  "I don't want to say they are soft limits [on the number of
7  depositions], but they are limits which the Court would certainly understand or would
8  invite counsel to submit a motion to expand if there's reason to.  But I just want to have
9  some parameters placed on this at the outset."   Likewise, with respect to the
10 interrogatory limit, the Court stated:   "[L]et's try and work within the confines of the
11 50 interrogatories, and if you need more, again, the Court is going to be forthcoming, if
12 there's a need for it."[1]  Mattel respectfully submits that time has come.

13     Under the Federal Rules, leave to take additional discovery "shall be granted" to
14 the extent consistent with the principles set forth in Rule 26(b)(2).  Fed. R. Civ. P.
15 30(a)(2)(A) & 33(a).  The additional discovery Mattel seeks is appropriate under that
16 framework.  It is not duplicative of prior discovery, Mattel has not had an adequate
17 opportunity to take discovery on these matters, and the substantial benefits of discovery
18 on these central issues outweigh any burden.  MGA has identified many dozens of
19 witnesses with knowledge of the parties' claims or defenses. Mattel has sued MGA for
20 inducing several Mattel employees to misappropriate many thousands of pages of
21 documents containing Mattel trade secrets over an extended period of time.   For its
22 part, MGA has accused over 400 Mattel products of infringing the trade dress of more
23 than 200 MGA products.  As MGA has proclaimed, it will be seeking "billions" of
24 dollars from Mattel on its claims alone.  Additional depositions are warranted given the
25 breadth and complexity of the claims and defenses in this case and the stakes involved.

26
27  [1] February 12, 2007 Scheduling Conference Tr. at 22:12-15 and 24:5-7, Exhibit 7 to the Declaration of B. Dylan Proctor, dated November 19, 2007 ("Proctor Dec.").
28

07209/2299353.1

EXHIBIT 10  PAGE 51

1    To date, Mattel has taken 18 depositions, which leaves Mattel with six
2    remaining.  Mattel has been able to take only one deposition on its counterclaims or
3    defenses to MGA's unfair competition claims, and as of yet, Mattel has been unable to
4    depose any of the individuals actively involved in the theft of Mattel's trade secrets.
5    The specific individuals who Mattel seeks to depose are identified below, along with
6    the justification for each.  In addition, Mattel cannot obtain without the Court's leave
7    the corporate testimony of MGA or MGAE de Mexico on the facts related to either
8    MGA's unfair competition claims or Mattel's counterclaims.  Mattel seeks leave to
9    serve the First Notice of Deposition of MGAE de Mexico, attached as Exhibit A, and
10   an additional Notice of Deposition of MGA, attached as Exhibit B, on those subjects.

11   Mattel also seeks leave to serve defendants with additional interrogatories.
12   Mattel has served interrogatories seeking MGA's contentions with respect to the
13   creation of Bratz and MGA's unfair competition claims.  Mattel's proposed
14   interrogatories, which are attached as Exhibit C, seek information related to Mattel's
15   counterclaims and to MGA's claims against Mattel for alleged unfair competition, as
16   well as certain of defendants' defenses.[2]

17   Finally, Mattel seeks additional time to depose Mr. Bryant.  Although Bryant was
18   deposed in 2004, since that time MGA and Bryant have produced millions of pages of
19   documents that they had long withheld until compelled by the Court, and the scope of
20   the claims in these consolidated cases has increased dramatically.  Only after Bryant's
21   deposition occurred, MGA asserted its broad unfair competition claims against Mattel.
22   Only after Bryant's deposition occurred, Mattel asserted its counterclaims, including its
23   copyright infringement and RICO counterclaims, against Bryant and other defendants.
24   And, despite the fact that Mattel sought documents relating to the origins of Bratz

25
26   [2]  Because defendants refuse to answer Mattel's previously served interrogatories based
     on spurious claims that they exceed the 50 limit, Mattel seeks leave as to them to avoid
27   defendants' further quarreling over the counting of interrogatories and thereby obtain
     obvious information about defendants' own contentions and other critical subjects.
28

EXHIBIT 10 PAGE 52

1   before Bryant's initial deposition, both MGA and Bryant were, unbeknownst to Mattel,

2   withholding such documents at the time of the deposition – this was discovered only

3   after multiple motions to compel brought by Mattel were granted.   Judge Infante

4   recognized that Bryant is the "most knowledge witness with respect to virtually all of

5   the factual issues" and claims in these matters.[3]  Judge Infante nevertheless gave Mattel

6   only seven additional hours for Bryant's deposition (on top of two hours previously

7   granted due to Bryant's and his counsel's improper conduct during the prior deposition).

8   That simply is not enough to depose Bryant on MGA's claims, Mattel's counterclaims

9   and all the newly produced evidence that post-dates the 2004 deposition.   Mattel

10  therefore requests that this Court grant additional time of another 12 hours for a total of

11  21 additional hours to question Bryant.

12                                    **Statement of Facts**

13       Mattel's Original Complaint.   Mattel filed its initial Complaint on April 27, 2004,

14  alleging that Carter Bryant breached his duties to Mattel by working with and assisting

15  a Mattel competitor, MGA, while he was employed by Mattel.[4]   While at Mattel,

16  Bryant worked on the "Bratz" project.[5]  On December 7, 2004, MGA filed an answer in

17  intervention claiming that the action put at issue MGA's rights to Bratz.[6]

18       MGA's Complaint.  MGA filed a complaint against Mattel on April 13, 2005

19  alleging that Mattel engaged in "serial copycatting" of the Bratz dolls.[7]  Mattel's action

20  and MGA's action were later consolidated along with a declaratory relief action filed by

21  Bryant, which was later dismissed.[8]

22       Mattel's Counterclaims.   On November 19, 2006, Mattel moved for leave to

23  amend its complaint.  The Court granted Mattel's motion, allowing Mattel's new claims

24  _____

     [3]  9/27/07 Hearing Tr. at 24:24-25:2, Proctor Dec., Ex 85.

25      [4]  Proctor Dec., Ex. 1.

     [5]  Id. ¶¶ 12-13.

26      [6]  Proctor Dec., Ex. 2.

     [7]  Proctor Dec., Ex. 3.

27      [8]  Minute Order Re Consolidation (June 19, 2006), Proctor Dec., Ex. 4.

28

MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10   PAGE 53

1  to be alleged as counterclaims to MGA's complaint.[9]  Mattel filed its Second Amended

2  Answer and Counterclaims on July 12, 2007.  Mattel's counterclaims against MGA

3  Entertainment, Inc., MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L.

4  de C.V. include claims for copyright infringement, violation of RICO, conspiracy to

5  violate RICO, misappropriation of trade secrets, intentional interference with contract,

6  aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of

7  loyalty, conversion and unfair competition.[10]   MGA's current amended answer to

8  Mattel's counterclaims asserts twenty-two affirmative defenses.[11]

9     Scheduling Conference.  At the February 12, 2007, and as reflected in a Minute

10  Order, the Court limited depositions to 24 per side and interrogatories to 50 per side.[12]

11  The Court recognized that the parties might need more depositions or interrogatories:

12         I don't want to say they are soft limits [on the number of
           depositions], but they are limits which the Court would
13         certainly understand or would invite counsel to submit a
           motion to expand if there's reason to.  But I just want to have
14         some parameters placed on this at the outset.
15         . . .

16         [L]et's try and work within the confines of the 50
           interrogatories, and if you need more, again, the Court is
17         going to be forthcoming, if there's a need for it.[13]

18

19     Mattel's Interrogatories.  To date, Mattel has propounded 50 interrogatories.[14]  In

20  June 2007, Mattel propounded 19 interrogatories on MGA, MGA Hong Kong, Larian

21

22   [9]  1/11/07 Order Re Mattel's Motion for Leave to Amend, Proctor Dec., Ex. 5.
     [10]  See Mattel's Second Amended Answer in Case No. 05-2727 and Counterclaims,
23  dated July 12, 2007 ("Mattel's Counterclaims"), Proctor Dec., Ex. 16.
     [11]  See MGA's Amended Answer and Affirmative Defenses ("MGA's Amended
24  Answer"), Proctor Dec., Ex. 46.  MGA had filed its original answer on August 13, 2007.
    Proctor Dec., Ex. 17.  After meeting and conferring, MGA acknowledged deficiencies in
25  its defenses and served its amended answer on September 19, 2007.
     [12]  2/12/07 Scheduling Order, at 1, Proctor Dec., Ex. 6.
26   [13]  2/12/07 Scheduling Conference Tr., at 22:12-15 and 24:5-7, Proctor Dec., Ex. 7.
     [14]  See Proctor Dec., Exs. 8-12, 15, 64-68.
27

28

7209/2299353.1

EXHIBIT 10  PAGE 54

1  and Bryant, seeking information about Bratz development, their affirmative defenses to

2  Mattel's claims, defendants' contentions regarding unfair competition claims and

3  MGA's benefit from Bratz.[15]  Defendants claimed they exceeded the interrogatory limit,

4  and on September 5, 2007, Judge Infante ruled that identical interrogatories served on

5  multiple parties, as well as interrogatories asking defendants to "state all facts"

6  supporting a particular contention, "identify all persons with knowledge of such facts,"

7  and "identify all documents" relevant to such facts, would each count as only one

8  interrogatory.[16]  However, an interrogatory asking a party to state facts supporting

9  different affirmative defenses would count as a different interrogatory per defense.[17]  In

10  accordance with that ruling, on September 21, 2007, Mattel served revised sets of

11  fifteen interrogatories.[18]  Defendants nevertheless still refuse to substantively answer

12  these interrogatories, including because they allegedly exceed the number permitted.[19]

13      Mattel Depositions.  To date, Mattel has taken 18 depositions.  Mattel has had

14  good cause for each of those depositions.  They include:

15  • Carter Bryant – defendant

16  • Victoria O'Connor – former MGA executive with knowledge of MGA's and Larian's spoliation of evidence

17
18  • Jaqueline Prince – witness allegedly supporting Bryant's Bratz creation story

19  • Isaac Larian – defendant

20  • Steve Linker – third party with knowledge of work on Bratz before Bryant left Mattel

21
22  • Paula Garcia – Bratz project manager from the start who worked on Bratz with Bryant before he left Mattel

23  • Brooke Gilbert – Bryant's niece with knowledge of Bryant's computer on which Bryant installed and used "Evidence Eliminator"

24

25  [15]  Proctor Dec., Ex. 13.

26  [16]  9/5/07 Order Re Mattel's Interrogatories, at 5-6, Proctor Dec., Ex. 14.
      [17]  See id. at 7.

27  [18]  Proctor Dec., Ex. 45.
      [19]  See Proctor Dec., Exs. 73-74.

28

EXHIBIT 10  PAGE 55

- Kerri Brode – MGA employee with knowledge of Bryant's work on Bratz while at Mattel

- Dave Malacrida – MGA public relations employee with knowledge regarding early Bratz design and marketing

- Janet Bryant – Bryant's mother and relied upon by Bryant to establish alleged date of Bratz creation

- Thomas Bryant – Bryant's father and relied upon by Bryant to establish alleged date of Bratz creation

- Sarah Chui – worked on Bratz in 2000 for MGA Hong Kong

- Richard Irmen – Bryant's partner and relied upon by Bryant to establish alleged date of Bratz creation

- Maureen Tkacik – *Wall Street Journal* reporter to whom Larian stated, in an interview, that he chose Mr. Bryant's idea for the Bratz over several others after holding "a sort of fashion-doll design contest in late 1999" -- a time during which Bryant was employed by Mattel and months before MGA and Bryant now say they first were introduced

- MGA Entertainment, Inc. – defendant

- MGA Entertainment (HK) Limited – defendant

- Schyler Bacon – MGA employee who recruited Mattel employees who stole trade secrets

- Denise O'Neal – *Chicago Sun Times* reporter to whom Larian made prior inconsistent statements, including that MGA's creative team decided to use the "Brats" name but to change the "s" to a "z"

## Argument

### I.   THE RULES CONTEMPLATE ADDITIONAL DISCOVERY

The Federal Rules require that a party obtain leave before serving interrogatories or taking depositions beyond the limits established by the Court. See Fed. R. Civ. P. 33(a) (interrogatories); id. 30(a)(2)(A) (depositions). The purpose of these limits is to allow the Court to "maintain a 'tighter rein' on the extent of discovery and to minimize the potential cost of [w]ide ranging discovery". Rx USA Wholesale, Inc. v. McKesson Corp., 2007 WL 1827335, at *2-3 (E.D.N.Y. June 25, 2007) (quoting Whittingham v. Amherst Coll., 163 F.R.D. 170, 171-72 (D. Mass. 1995)). The limits, however, are not intended to "prevent needed discovery," and courts have "broad[] discretion" to allow

07209/2299353.1

-6-

MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10  PAGE 56

1   additional discovery "based on the complexity" of the case at hand.  Notes of the

2   Advisory Committee (1993) to Fed. R. Civ. P. 26(b) & 33.  Leave to take additional

3   discovery "shall be granted" to the extent consistent with the principles set forth in Rule

4   26(b)(2).  Fed. R. Civ. P. 30(a)(2)(A), & 33(a).  Courts permit additional interrogatories

5   or depositions after considering whether:

6       (1) the discovery sought is unreasonably cumulative or duplicative, or is
7       obtainable from some other source that is more convenient, less
        burdensome, or less expensive; (2) the party seeking discovery has [had]
8       ample opportunity obtain the information sought; or (3) the burden or
9       expense of the proposed discovery outweighs its likely benefit, taking into
        account the needs of the case, the amount in controversy, the party's
10      resources, and the importance of the proposed discovery in resolving the
11      issues.

12  Andamiro v. Konami Amusement of Am., 2001 WL 535667, at *2 (C.D. Cal. April

13  26, 2001) (depositions); see also Collaboration Prop. v. Polycom, Inc., 224 F.R.D.

14  473, 475 (N.D. Cal. 2004) (interrogatories).

15  **II.     MATTEL SHOULD BE GRANTED ADDITIONAL DEPOSITIONS**

16      Mattel should be permitted to take more than 24 depositions in these

17  consolidated cases.  This action contains three broad categories of significant claims,

18  each of which necessitates additional depositions:  Mattel's Bratz-related claims,

19  MGA's unfair competition claims, and Mattel's trade secret theft and RICO claims.

20  MGA's supplemental initial disclosures identified 86 witnesses with knowledge of

21  MGA's claims and defenses, 62 of whom are not Mattel employees.[20]  Mattel's

22  supplemental disclosures contain nearly double the number of witnesses with

23  knowledge, only 43 of whom are Mattel employees.[21]  Based on the million-and-a-half

24  pages that MGA has recently produced, Mattel is preparing third supplemental

25

26  [20]   See MGA Entertainment, Inc.'s Supplemental Disclosures and MGA Entertainment
    (HK) Limited, MGAE de Mexico S.R.L. de C.V. and Larian's Initial Disclosures Under
27  Rule 26(a)(1), dated September 21, 2007, at 1-16, Proctor Dec., Ex. 18.
    [21]   See Proctor Dec., Ex. 19, at 3-19.
28

EXHIBIT 10   PAGE 57

1   disclosures which will name additional witnesses. Mattel can rely on Rule 30(b)(6) to

2   obtain some information, but Mattel cannot effectively prosecute or defend these cases

3   with only 24 depositions.

## A.   Each Category of Claims Warrants More Depositions

### 1.   The Bratz Claims Require Additional Depositions

6       The number of witnesses involved with the creation of Bratz or with knowledge

7   of Bryant's purported story about when he created – and the inconsistent stories that

8   MGA spun in the media – justify additional depositions. For example, Bryant claims

9   that he created Bratz when he was not a Mattel employee.[22] He initially identified three

10   people who he claimed could corroborate this story:   Tom and Janet Bryant (his

11   parents) and Richard Irmen (his partner). Bryant's mother for the first time in this case

12   recently identified a fourth:  her friend, Jeanne Galvano. Bryant will introduce their

13   testimony to vouch for his story, so Mattel obviously needs and is entitled to depose

14   them. Similarly, Isaac Larian has repeatedly made conflicting, inconsistent statements

15   about Bratz's creation to the press, among others.[23] Mattel thus far has deposed two of

16   the journalists who wrote those stories – depositions where Mattel's questioning lasted

17   far less than an hour. Bryant's "alibi" witnesses and the reporters alone use up one-third

18   of Mattel's originally allotted 24 depositions.

19       In addition, at the time of the Scheduling Order, Bryant and MGA had said only

20   a handful of people worked directly on Bratz prior to 2002:  Bryant, Anna Rhee,

21   Mercedeh Ward, Margaret Leahy, Paula Garcia and unidentified people in Hong

22   Kong.[24] In a recent supplemental interrogatory response, MGA identified 11 more

23   people who worked on the first Bratz dolls, including Sarah Halpern, Veronica Marlow,

24

25   [22]   Bryant Dep. Tr. at 140:9-141:8, Proctor Dec., Ex. 20.

26   [23]   Proctor Dec., Ex. 21.
      [24]   See Bryant's Objections and Responses to Second Set of Interrogatories
27   Propounded by Mattel, Inc., at 4, Proctor Dec., Ex. 22; MGA's Response to Mattel's
      Second Set of Interrogatories, at 4:17-20, Proctor Dec., Ex. 23.

28

07209/2299353.1

EXHIBIT 10   PAGE 58

1   Cecilia Kwok, David Dees, Stephen Tarmichael, Edmond Lee, Franki Tsang, Samuel
2   Wong, Stephen Lee, William Ragsdale and Wendy Ragsdale (and Mattel now knows
3   that even this list is incomplete).[25] This list does not include anyone involved in early
4   sales, marketing, product testing or advertising of Bratz.

5          When a deponent possesses unique information, courts generally grant leave for
6   additional depositions because they do not undermine the key purpose of the limits –
7   preventing duplicative discovery. See, e.g., Bromgard v. Montana, 2007 WL 1101179,
8   at *2 (D. Mont. April 11, 2007). Courts deny additional depositions when deponents
9   are likely to have common, interchangeable information. And, even in such instances,
10  courts may allow a limited number or sequential depositions to proceed. See, e.g., Rx
11  USA, 2007 WL 182/335, at *3 (allowing additional deposition testimony on one but
12  not both individuals with generalized information).

13         Here, Mattel seeks depositions of witnesses who each have specific, unique
14  personal knowledge of the Bratz claims as well as about other claims in the case. All of
15  them are third parties:

16     • Sarah Halpern – worked on the patterns for the first Bratz dolls

17     • Margaret Leahy – sculpted the first Bratz dolls and 4-Ever Best Friends

18     • Veronica Marlow – worked on the first Bratz doll fashions as well on
19       products at issue in MGA's claims

19     • Elise Cloonan – worked with Bryant on his Bratz pitch to MGA while both
20       were employed by Mattel

21     • Jesse Ramirez – worked on molds for Bratz

22     • Jeanne Galvano – alleged witness Bryant's mother recently claimed can
23       verify facts relating to Bratz's creation

23     • Stephen Lee – Managing Director of MGA Hong Kong during development
24       of Bratz and other products at issue

25  ─────────────────────
26  [25] MGA's Third Supplemental Responses to Mattel's Second Set of Interrogatories, at
    4:1-6:3, Proctor Dec., Ex. 24; see Linker Dep. Tr. at 59:22-64:9, Proctor Dec., Ex. 25
27  (testifying that Paula (Treantafelles) Garcia and Bryant approached him and his partner,
    Liz Hogan, before Bryant left Mattel to work on Bratz).
28

EXHIBIT 10 PAGE 59

1   • Cecilia Kwok – MGA Hong Kong employee principally involved with first
        Bratz dolls

2   • Farhad Larian – brother of Isaac Larian, who sued Isaac Larian and alleged,
3       inter alia, that MGA was working on Bratz by early 2000 (months before
        MGA and Bryant claim to have met) when he was a part owner of MGA[26]

4   • Certain as yet unidentified attorneys who represented parties to disputes
5       between Isaac Larian and Farhad Larian in which the creation of and value of
        Bratz was at issue

6
7   • Sandra Bilotto – sculptor who worked on Prayer Angel dolls at issue[27]

    • Anne Wang – represented Bryant in negotiations with MGA while he was a
8       Mattel employee that led to the agreement dated "as of September 18, 2000"[28]

9   • David Rosenbaum – represented MGA in negotiations with Bryant's first
        agreement with MGA[29]

10
    • Christensen Glaser LLP – firm to which Victoria O'Connor faxed the
11      MGA/Bryant agreement that Isaac Larian had ordered her to alter[30]

12  • Lucy Arant – lawyer with knowledge of MGA's first use of Bratz

13  • Mitchell Kamarck – former MGA counsel who responsible for patent
        applications, including those in which Isaac Larian had claimed to be the
14      inventor of Bratz features that Bryant has since testified he created[31]

15  • Carol Witschell – lawyer who worked on MGA trademark applications and
        other trademark matters at issue

16
    • Nana Ashong – former MGA employee who stated Bratz was created during
17      Bryant's employment by Mattel[32]

18  • Larry McFarland – wrote MGA copyright registrations that stated the Bratz
        dolls were created during 2000 and that, after this suit was filed, MGA
19      claimed were incorrect

20  • Eric Yip – MGA Hong Kong Sales Administrator in 2000 and 2001, when
        Bratz were created and first shipped to Bandai in Spain[33]

21

22  ────────────
23  [26]  See Larian Dep. Tr. at 159:17-160:14, Proctor Dec. Ex. 54.
    [27]  Brode Dep. Tr. at 303:9-316:16, Proctor Dec. Ex. 55; Dep. Exhs. 607, 608, 609,
24  Proctor Dec., Ex. 56.
    [28]  See Bryant Tr. at 39:6-42:18, Proctor Dec. Ex. 60.
25  [29]  See O'Connor Dep. Tr. at 94:1-95:21, Proctor Dec., Ex. 61.
    [30]  See O'Connor Tr. 17:3-19:19, Proctor Dec., Ex 75.
26  [31]  See Armstrong Dep. Tr. at 10:7-12, 26:16-23, 244:18-21, Proctor Dec. Ex. 62.
    [32]  See Brode Tr. at 87:13-88:11, Proctor Dec., Ex. 55.
27  [33]  See Harris Dep. Tr. at 121:16-122:17, Proctor Dec. Ex. 63.
28


EXHIBIT _10_ PAGE _60_

- Gentle Giant Studios – created relevant moldings and casts while Bryant was still employed at Mattel[34]

- Christopher Palmeri – *Business Week* reporter who wrote that Larian purportedly "got the idea for Bratz after seeing his own kids run around in navel-bearing tops and hip-huggers"[35]

- Jeff Weiss – *San Fernando Valley Business Journal* reporter who quoted another inconsistent Larian statement concerning the origin of Bratz[36]

- Kickapoo High School – where Bryant allegedly found inspiration for Bratz and author of documents refuting that claim

- LA Focus – conducted Bratz focus groups, including focus groups that MGA denies occured

- Joyce Ng – independent contractor who moderated Bratz focus groups

- Rachel Harris – former MGA employee who worked on initial Bratz packaging as well as on other packaging which MGA's claims rest on

- Peter Marlow – spouse of Veronica Marlow who negotiated millions of dollars in payments for Bratz from Bryant on her behalf

- Andreas Koch – former MGA manager who has knowledge of Bryant's initial contacts with MGA

- Kami Gillmour – former Mattel and MGA employee who has knowledge regarding Paula Garcia's employment with MGA, confidential information taken from Mattel and MGA's projects at issue

- Mercedeh Ward – engineer on initial Bratz dolls and author of emails reflecting the use of Mattel property in its creation

- Moss Adams – accounting firm with knowledge of MGA's profits and distributions thereof to Larian (who owns 90% of MGA's shares)

- Wachovia Bank – bank identified as being involved in early Bratz financing and knowledgeable about MGA's net worth or value

- Amy Myers – formerly with MGA and has knowledge of Prayer Angels project that MGA has raised as a defense

- Two or three parties MGA sued for infringement of Bratz and whose identities are not yet known to Mattel – they will have knowledge of the dolls and other properties MGA has sued on in the past, which is relevant to refuting MGA's current claims that earlier iterations of Bratz products look nothing like subsequent iteration of Bratz products

---

[34] <u>See</u> Proctor Dec., Ex 72.
[35] Proctor Dec. Ex. 52.
[36] Proctor Dec. Ex. 53.

EXHIBIT 10 PAGE 41

1   Further, many of these same witnesses are also knowledgeable as to MGA's
2   claims of unfair competition and Mattel's trade secret and RICO claims, as they
3   continued to work with MGA in later years. For example, MGA has already identified
4   Halpern, Kwok, Leahy, Marlow, Lee, Ward and Yip as individuals involved with the
5   products at issue.[37] Likewise, Ramirez continued working on molds for subsequent
6   Bratz dolls through at least 2005,[38] while  Kamarck,[39] Witschell,[40] Arant, and
7   McFarland[41] were involved in subsequent Bratz-related intellectual property matters.
8   As such, testimony from these witnesses is essential for both phases of trial.

2.   **Mattel's Trade Secret and RICO Claims and MGA's Unfair**
**Competition Claims Require Additional Depositions**

11   Mattel has sued MGA for misappropriating Mattel trade secrets and RICO
12   violations by, among other things, stealing thousands of pages of Mattel confidential
13   information in the United States, Canada and Mexico.[42] Mattel identified Ron Brawer,
14   Janine Brisbois, Gustavo Machado, Mariana Trueba Almada and Pablo Vargas as
15   individuals who misappropriated Mattel trade secrets. The only person Mattel has been
16   able to depose on its counterclaims is Ms. Bacon, who coordinated MGA's recruiting of

---

[37]   See MGA's Fourth Supp. Response to Interrogatory No. 1 of Mattel's First Set of Interrogatories Re Claims of Unfair Competition, at 10-12, 18, 19, Proctor Dec., Ex. 27.
[38]   See, e.g., Proctor Dec., Ex. 69 (showing various Bratz-related work in 2005).
[39]   See, e.g., Armstrong Tr. 26:5-23, Proctor Dec., Ex. 62 (discussing involvement in Bratz-related patent applications through 2004).
[40]   See, e.g., Proctor Dec., Ex. 70 (discussing involvement with Bratz registrations).
[41]   See, e.g., Proctor Dec., Ex. 71 (discussing involvement with Bratz licensing).
[42]   Mattel's Counterclaims ¶¶ 37-54, 70-76, Proctor Dec., Ex 16.

07209/2299353.1

-12-

EXHIBIT 10 PAGE 62

1  Mattel employees.[43]   Accordingly, Mattel seeks leave to take the depositions of the

2  following witnesses on such claims:[44]

3  • Ron Brawer – has knowledge of stolen Mattel trade secrets in the U.S.

4  • Janine Brisbois – former Mattel employee who stole Mattel trade secrets

5  • Gustavo Machado – former Mattel employee who stole Mattel trade secrets

6  • Mariana Trueba – former Mattel employee who stole Mattel trade secrets

7  • Pablo Vargas – former Mattel employee who stole Mattel trade secrets

8  • Ricardo Abundis – has knowledge of stolen Mattel trade secrets in Mexico

9  • Jorge Castilla – believed to have stolen Mattel trade secrets in the U.S.

10  • Nic Contreras – believed to have knowledge of stolen Mattel trade secrets

11  • Dan Cooney – believed to have knowledge of stolen Mattel trade secrets

12  • Susan Kuemmerle – believed to have knowledge regarding stolen Mattel

13  trade secrets in Mexico

14  • Shirin Salemnia – believed to have knowledge of stolen Mattel trade secrets

15  • MGAE de Mexico – defendant to trade secret theft and RICO claims

16  • MGA Entertainment, Inc. – defendant

17  Further, MGA has accused Mattel of trade dress infringement and dilution and

18  unfair competition in connection with more than 440 products.[45]  MGA has identified

19

20  [43]  Bacon Dep. Tr. at 12:12-13, 51:22-52:17, 86:8-12, and 114:19-116:9, Proctor Dec.,
Ex. 28.  And even with respect to Ms. Bacon's deposition, MGA attempted to prevent her

21  from testifying on the grounds that Mattel had not noticed her deposition individually, but

22  only as a Rule 30(b)(6) designee.  See Proctor Dec., Ex. 29.
    [44]  These are those who Mattel has identified to date.  Mattel anticipates that there may

23  be more who will need to be deposed in connection with MGA's unfair competition claims
and Mattel's counterclaims because (a) it continues to review the over one-and-a-half

24  million pages of documents that MGA produced in the past month and (b) MGA, to date,
has failed to identify how it anticipates defending Mattel's counterclaims or which

25  documents or witnesses it will rely upon to do so, including by its ongoing failures to

26  answer Mattel contention interrogatories related to its defenses to Mattel's counterclaims.
    [45]  MGA's Supp. Response to Interrogatory No. 2 Of Mattel, Inc.'s First Set of

27  Interrogatories Re Claims of Unfair Competition, at 5-19, Proctor Dec., Ex. 26.

28

07209/2299353.1

EXHIBIT  1   PAGE 63

1   117 witnesses with knowledge of the creation or promotion of those products,[46]
2   including many of the persons listed above. Mattel has taken the depositions of only
3   six of those 117 named individuals, and has not yet been able to depose two of them,
4   Bryant or Larian, regarding the unfair competition allegations.

B.   **Mattel Needs Additional Depositions Because the Integrity of MGA's and Bryant's Preservation of Documents Is At Issue**

7        Mattel also is entitled to inquire about MGA's and Bryant's preservation and
8   production of evidence. For example, as MGA's designee on document preservation
9   testified, MGA had only obtained off-site documents as of the summer of 2007 and had
10  searched none of these documents for responsive documents, even though the Court
11  had ordered MGA to produce them and MGA had previously represented that its
12  production was complete.[47] Further, MGA's designee on MGA's electronic document
13  preservation and collection testified that MGA's only search of such information was a
14  single search of Isaac Larian's e-mails in 2005, nothing more.[48] MGA's designee
15  repeatedly testified that Joe Tiongco, who Mattel seeks to depose, has more
16  knowledge.[49] In the same vein, Mattel seeks to depose Daphne Gronich, who provided
17  the preservation declaration on MGA's behalf.[50] In addition, there are serious issues
18  about Bryant's hard drives, including because of Bryant's prior counsel's conflicting
19  representations about their collection and preservation – and indeed even their
20  existence. Mattel therefore seeks testimony on these subjects.[51] Bryant's belated
21  revelation that he installed and used the "Evidence Eliminator" program on these drives
22

---

[46]   MGA's Fourth Supp. Resp. Unfair Comp. No. 1, at 5-16, Proctor Dec., Ex. 27.
[47]   9/24/07 Stip. and Order, Proctor Dec., Ex. 30; Tonnu Dep. Tr. at 612:13-612:15, 620:14-621:21, Proctor Dec., Ex. 31; 8/13/07 Order, at 14:18-22, Proctor Dec., Ex. 32.
[48]   See Lockhart Deposition Tr. at 265:1-11, Proctor Dec., Ex. 33.
[49]   Id. at 116:2-14, 150:25-151:5, 158:10-15, 258:17-259:9, 265:1-11, 266:12-267:5.
[50]   See Dec. of Daphne Gronich in Response to Court's Request for Information Regarding Document Preservation, dated September 10, 2007, Proctor Dec., Ex. 34.
[51]   Notice of Deposition of Littler Mendelson Pursuant to Federal Rule of Procedure 30(b)(6), dated September 6, 2007, Proctor Dec., Ex. 35.

EXHIBIT 10 PAGE 64

1  underscores all the more the legitimacy of full and fair discovery into the  integrity of

2  his drives.

3        **C.**    <u>**Mattel Seeks Leave to Take 30(b)(6) Depositions On Non-Duplicative**</u>

4                <u>**Topics**</u>

5        MGA objected, and the Discovery Master has ruled, that a corporate party who

6  has been deposed pursuant to a <u>Rule</u> 30(b)(6) notice cannot be deposed pursuant to a

7  subsequent notice absent Court leave.[52]  Mattel has not propounded a <u>Rule</u> 30(b)(6)

8  Notice of Deposition on MGA or MGAE de Mexico related to either MGA's unfair

9  competition claims or Mattel's counterclaims.  Mattel's Notices of Deposition—

10  attached as Exhibits A and B—contain topics of testimony which relate to those

11  claims.[53]  Mattel has not previously served any <u>Rule</u> 30(b)(6) Notice on MGAE de

12  Mexico at all, and the topics in the additional Notice to MGA are not duplicative of

13  those in Mattel's prior Notices to MGA.[54]  Mattel respectfully submits that it should be

14  granted leave to proceed with those depositions.

15        **D.**    <u>**Mattel Meets The Requirements for Additional Discovery**</u>

16        When a deponent possess unique information, courts will generally allow leave

17  for additional depositions because they do not undermine the key purpose of the

18

19  [52]  9/25/07 Order Re Mattel's Motion to Compel MGA to Produce Witnesses Pursuant to Third Notice of Deposition Under 30(b)(6), Proctor Dec., Ex. 36.

20  [53]  <u>See</u> Exhibits A & B.  Mattel's Fourth Notice of Deposition is far less than

21  burdensome compared to MGA's recently served Notice of Deposition, which contains more than 80 topics, each of which has many sub-parts.  <u>See</u> MGA Entertainment, Inc.'s

22  Notice of Deposition of Mattel, dated September 5, 2007, Proctor Dec., Ex. 40.

23  [54]  Mattel's First Notice of Deposition was narrowly tailored to obtain information related to MGA's contentions that Bryant and Anna Rhee had worked on Prayer Angels,

24  not Bratz, while Bryant employed by Mattel.  Proctor Dec., Ex. 37.  Mattel's Second

25  Notice sought information related to Bratz, including Bratz revenues, costs and profits, and evidence preservation and collection.  Proctor Dec., Ex. 38.  Mattel's Third Notice sought

26  follow-up information on matters that had arisen in discovery, including with respect to specific electronic evidence, specific individuals who worked on the first Bratz dolls,

27  payments made to witnesses or parties, and statements to reporters related to Bratz's

28  creation and inspiration.  Proctor Dec., Ex. 39.

EXHIBIT 10  PAGE 65

1  limits—preventing duplicative discovery. See, e.g., Bromgard, 2007 WL 1101179, at
2  *2 (D. Mont. April 11, 2007). As explained above, Mattel seeks depositions of
3  individuals who each have specific, unique knowledge of the underlying events.

4      Without additional depositions, Mattel cannot discover the full extent of MGA's
5  wrongdoing or adequately prepare to defend against MGA's claims. Mattel seeks a
6  declaration of ownership of Bratz works that Bryant created during his Mattel
7  employment and their derivatives – property that MGA and Bryant have claimed are
8  worth hundreds of millions of dollars and perhaps more. Mattel has accused MGA of
9  stealing thousands of pages of Mattel's most valuable trade secrets, including product
10 lines, and strategic plans. MGA has accused Mattel of infringing hundreds of MGA
11 products, alleging "billions" of dollars in damages. In light of the magnitude of this
12 case, the burden or additional expense of these depositions pales in comparison to
13 Mattel's need to fully prepare to try this case. As set forth above, the depositions that
14 Mattel seeks by this motion are not collateral, but go to the heart of its claims and
15 defenses. See, e.g., Rx USA, 2007 WL 1827335, at *2-3 (additional depositions
16 warranted in a dispute between large corporations, given the complexity of the issues
17 and the parties' resources).

18 **III.   THE COURT SHOULD GRANT LEAVE WITH RESPECT TO**
19      **MATTEL'S INTERROGATORIES**

20      Two categories of interrogatories are involved here: first, Mattel's proposed
21 additional interrogatories that it seeks leave to serve; and, second, interrogatories which
22 Mattel has already served on defendants.

23      **A.   Mattel Should Be Allowed To Propound Additional Interrogatories**
24      Mattel seeks leave to propound additional interrogatories related to MGA's unfair
25 competition claims and Mattel's counterclaims, and MGA's evidence collection and
26 preservation. To properly prepare for trial, Mattel seeks leave to serve interrogatories
27 requiring defendants to identify the facts, documents and witnesses it will use to prove
28 its claims, defenses and damages. Mattel's proposed interrogatories thus seek to

EXHIBIT 1 PAGE 66

1 | identify which specific Mattel designs or products defendants allege infringe on
2 | defendants' designs[55] and trade dress[56] and the facts supporting those legal claims.[57]
3 | Additionally, Mattel seeks to determine defendants' position regarding their
4 | misappropriation of Mattel documents, including whether defendants contend that no
5 | such documents were obtained improperly,[58] that the information contained therein has
6 | no value as a trade secret,[59] that the information had been publicly disclosed,[60] that
7 | defendants did not use or disclose such information,[61] that any such disclosure neither
8 | benefited defendants nor harmed Mattel,[62] and that defendants have a right to possess,
9 | use or disclose any such documents in their possession.[63]  These are essential elements
10 | of the trade secret theft claim.  See Cal. Civ. Code § 3426.1.  Finally, Mattel seeks
11 | information related to MGA's efforts to collect and preserve evidence relevant or
12 | potentially relevant to this action.[64]

13 | The proposed interrogatories are consistent with the factors set out in Rule 26(b)
14 | and should be permitted.  They seek disclosure of specific relevant facts regarding
15 | topics which have not been the subject of prior interrogatories.  The majority of Mattel's
16 | prior interrogatories focused on issues related to creation and ownership of Bratz.[65]
17 | Only Mattel's set of interrogatories relating to MGA's unfair competition claims could

---

[55] See Mattel's Proposed Interrogatory No. 51.
[56] See Mattel's Proposed Interrogatory No. 52.
[57] See Mattel's Proposed Interrogatories Nos. 53, 54, 55.
[58] See Mattel's Proposed Interrogatory No. 56.
[59] See Mattel's Proposed Interrogatory No. 57.
[60] See Mattel's Proposed Interrogatory No. 58.
[61] See Mattel's Proposed Interrogatory No. 59.
[62] See Mattel's Proposed Interrogatory No. 60.
[63] See Mattel's Proposed Interrogatory No. 61.
[64] See Mattel's Proposed Interrogatories Nos. 63-64.
[65] See First Set to Bryant, Proctor Dec., Ex 8; First Set to MGA, Proctor Dec., Ex. 9; Second Set to Bryant, Proctor Dec., Ex. 11; Second Set to MGA, Proctor Dec., Ex. 10; Third Set Revised, Proctor Dec., Ex. 45.

-17-
MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10 PAGE 47

1   conceivably overlap with the proposed interrogatories.[66] However, the interrogatories
2   already propounded focused on issues distinct from the proposed interrogatories—
3   specifically, facts relating to MGA employees involved with certain MGA products,[67]
4   MGA's alleged injuries,[68] MGA's allegations regarding Mattel's conduct with certain
5   third-parties in the industry[69] and MGA's allegations of product confusion.[70] These are
6   not duplicated in the interrogatories which Mattel is proposing.

7        Finally, the benefits of the proposed interrogatories outweigh any added burden,
8   as these type of facts are properly revealed through interrogatories, and the information
9   sought by the interrogatories will advance this litigation and avoid surprise at trial.

10  **B.    The Court Should Grant Leave With Respect To Mattel's**
11       **Outstanding Interrogatories That Defendants Will Not Answer**

12       To date, Mattel has served 50 interrogatories on the defendants.  Yet, by
13  objecting to some of those previously served interrogatories served as being compound,
14  defendants refuse to answer on the purported ground that they exceed the Court's
15  limit.[71] Although defendants are wrong, the Court should eliminate further delay and
16  quarreling by defendants by simply granting Mattel leave to serve them regardless of
17  how they are counted.

18       Mattel has been seeking answers to these basic interrogatories for over five
19  months now.  To justify their wholesale refusal to answer them, defendants claimed
20  they exceeded the Court's limit on the number of interrogatories.  Mattel moved to
21  compel, defendants moved for a protective order, and in a September 5, 2007 Order
22  Judge Infante provided guidance on the counting of the interrogatories.  Mattel then

23  ───────────────
24  [66]  See First Set Re Unfair Comp., Proctor Dec., Ex. 12.
     [67]  See id. No. 1.
25  [68]  See id. No. 4.
     [69]  See id. Nos. 5, 8, 9, and 10.
26  [70]  See id. No. 7.
27  [71]  See Bryant's Objections to Revised Third Set, Proctor Dec., Ex. 73; Bryant's
     Objections to Amended Fourth Set, Proctor Dec., Ex. 74.
28

-18-
MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT  1 ᴰ  PAGE  48

1 propounded revised interrogatories that were consistent with the Discovery Master's

2 Order.

3     Defendants nevertheless claim, once again, that Mattel exceeds its 50 allotted

4 interrogatories.  Not only is this without merit,[72] but it is clear that defendants rehash

5 this objection for no other reason than to obstruct.  Bryant refuses to answer any

6 interrogatory past No. 27 because "Mattel has propounded more than 50

7 interrogatories."[73]  And, even the minimal answers he gave to others amply confirms

8 that he continues to stonewall on even basic discovery in this case.  MGA makes

9 essentially the same objection.[74]  Accordingly, through nothing more than creatively

10

[72]  The essence of the defendants' objection is that Mattel's revised interrogatories are
11 compound interrogatories because they improperly require them to respond to individual
12 interrogatories with "different and distinct facts."  See Bryant's Objections to Revised
Third Set, at 18; Bryant's Objections to Amended Fourth Set, at 4.  For example,
13 defendants frivolously object to having to identify both the name of a product and its
corresponding product number.  But Judge Infante ruled on this matter, explaining that
14 interrogatories "'containing subparts directed at eliciting details concerning [a] common
15 theme should be considered a single question,'" while interrogatories on "discrete issues"
should be treated as multiple interrogatories.  Order re Mattel's Interrogs., at 5 (quoting 8A
16 Wright & Miller, Federal Practice & Procedure § 2168.1 (2d ed. 1994)); see also id. at 7.
17 The scope of Mattel's revised interrogatories is no different than those which Judge Infante
ruled were permissible, as in both instances the "subparts are related and directed to the
18 underlying details of a specifically identified" subject.  See id.  Judge Infante specifically
19 observed that under the Advisory Committee notes, interrogatories which required distinct
factual answers relating to the same subject—e.g., the time, place, persons present, and
20 contents of a particular communication—should be treated as a single interrogatory.  See
id.  Mattel's revised interrogatories are not compound, and defendants' arguments to the
21 contrary are groundless:  the fact that an interrogatory answer requires *different facts* does
22 not convert it into a compound interrogatory on *different issues*.
[73]  Bryant's Objections to Revised Third Set, at 7.  Bryant then makes the same
23 objection to the remaining 23 interrogatories.
[74]  See MGA's Objections to Revised Third Set, at 8, Proctor Dec., Ex. 76; MGA (HK)
24 Ltd.'s Objections to Revised Third Set, at 17, Proctor Dec., Ex. 77; MGAE de Mexico's
25 Objections to Revised Third Set, at 8, Proctor Dec., Ex. 78; Larian's Objections to Revised
Third, at 8, Proctor Dec., Ex. 79; MGA's Objections Amended Fourth Set, at 7, Proctor
26 Dec., Ex. 80; MGA (HK) Ltd.'S Objections to Amended Fourth Set, at 7-8, Proctor Dec.,
Ex. 81; MGAE de Mexico's Objections to Amended Fourth Set, at 8, Proctor Dec., Ex. 82;
27 Larian's Objections to Amended Fourth Set, at 7, Proctor Dec., Ex. 83.

28

07209/2299353.1

-19-
MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10  PAGE 69

1   counting a few interrogatories as a multitude, defendants manufacture grounds to delay

2   yet more and refuse obviously appropriate discovery. To the extent that defendants

3   have substantive objections to specific interrogatories, these issues may be properly

4   heard before the Discovery Master. But defendants should not be permitted to serially

5   raise the same objection to a few specific interrogatories in order to delay for yet more

6   months in responding to the bulk of Mattel's interrogatories. Mattel requests that this

7   Court cut through this issue by granting Mattel leave, to the extent needed, to serve

8   each of the interrogatories that have been served to date regardless of how they are

9   counted.

10  ## IV.   THE COURT SHOULD ALLOW ADDITIONAL TIME FOR THE

11  ## BRYANT DEPOSITION

12          On September 28, 2007, the Discovery Master issued an Order Granting in Part

13  Mattel's Motion for Additional Time to Depose Carter Bryant for All Purposes,

14  granting Mattel seven additional hours to depose Bryant (in addition to 2 hours

15  previously granted based on counsel's dozens of improper instructions not to answer at

16  the Bryant deposition), but denying Mattel the 21 hours that it sought.[75]   Mattel

17  respectfully submits that the facts, as determined by the Discovery Master, justify far

18  more than seven additional hours, and the Court should grant additional time.

19          Mattel does not contest the Discovery Master's factual findings in any way. To

20  the contrary, the underlying factual findings were plainly correct. As Judge Infante

21  noted, Mattel's deposition of Bryant in 2004 took place before MGA even brought its

22  unfair competition claims and before Mattel filed its counterclaims, and Mattel had no

23  opportunity to depose Bryant on either.[76]  Thus, as Judge Infante justifiably found:

24      •   The new claims and defenses that were added to the case after Bryant's
            deposition justify additional deposition time. . . . Without question,

25  _____

26  [75]  Order Granting in Part Mattel's Motion for Additional Time to Depose Carter
       Bryant for All Purposes (Sept. 28, 2007) ("Order re Additional Time"), at 8:7-13, Proctor

27  Dec., Ex. 43.
       [76]  Id. at 5:2-10.

28

EXHIBIT _10_ PAGE _70_

1

       •   Bryant is a critical witness regarding MGA's unfair competition claims and Mattel has not had an opportunity to depose him on such claims.[77]

2

3

       •   In addition, Mattel filed a counterclaim against Bryant, MGA, and other defendants in 2007, asserting thirteen different claims . . . . Bryant filed an answer asserting over twenty affirmative defenses. Mattel has not had an opportunity to depose Bryant on any of these claims or defenses.[78]

4

5

6

       •   Bryant is the central figure in this litigation and arguably the most important witness *for virtually every claim in the case*. No other witness in the case has his depth and breadth of relevant information.[79]

7

8

    Bryant and MGA cannot dispute any of this. In interrogatory responses, MGA

9

lists Bryant as a person directly involved with and knowledgeable about the allegedly

10

infringed MGA products that MGA has put at issue.[80] MGA's responses to Mattel's

11

interrogatories also state that the <u>entire</u> Bratz line is the subject of MGA's claims, and

12

an MGA witness has declared that there are more than 200 Bratz products.[81] Moreover,

13

Paula Garcia, MGA's Vice President of Product Design and Development, has declared

14

that she and Bryant are "the *only* people who know what the concept is and who see

15

the early product drawings" with respect to many Bratz products.[82] That is particularly

16

important because many of both Mattel's *and* MGA's claims will turn on the source and

17

timing of these products at issue. As the Court knows, Mattel's defenses to MGA's

18

infringement claims rest, in part, on the fact that it was MGA which stole and copied

19

Mattel products through its trade secret thefts. Testimony on the origins of those MGA

20

products and when they were created is indispensable.

21

22

  [77]  <u>Id.</u> at 5:4-5.

23

  [78]  <u>Id.</u> at 5:6-10.

  [79]  <u>Id.</u> at 5:15-17 (emphasis added).

24

  [80]  MGA's Responses to Mattel's First Set of Interrogatories Re Claims of Unfair Competition, dated January 19, 2007, Response No. 1, at 6:9, Proctor Dec., Ex. 57.

25

  [81]  <u>See</u> Declaration of Patricia Perrier in Support of MGA's Opposition to Mattel's

26

Motion to Try All Claims Related to Bratz Ownership in Phase One, dated May 25, 2007, at ¶ 2, Proctor Dec., Ex. 58; MGA Sup. Resp. Unfair Comp. No. 2, Proctor Dec., Ex. 26.

27

  [82]  Declaration of Paula Garcia in Support of MGA's Opposition to Mattel's Motion to Compel, dated February 9, 2007, ¶ 6 (emphasis in original), Proctor Dec., Ex. 59.

28

07209/2299353.1

-21-

MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT __10__ PAGE __71__

1    Bryant is also obviously a crucial witness on Mattel's copyright infringement,

2  RICO and other counterclaims, which raise a host of new issues Bryant has not been

3  deposed on. According to MGA, Mattel's copyright infringement claim against Bryant

4  alone relates to "*hundreds* of products."[83]  Bryant was also personally involved, either

5  as sender or recipient, in approximately 100 of the predicate acts of mail and wire fraud

6  alleged by Mattel. [84]  Mattel is entitled to question Bryant about these and all the other

7  issues presented for the first time by Mattel's counterclaims and Bryant's answer.

8    Moreover, as Judge Infante found, "new evidence justifies additional time to

9  depose Bryant."[85]  Judge Infante noted that Bryant's deposition took place before "98

10  percent of Bryant's and MGA's collective document production took place"[86] – and that

11  did not even reflect the more than a million-and-a-half pages, that MGA has produced

12  in recent weeks.[87]  In truth, *99.9%* of defendants' production in this case has occurred

13  only after Bryant's 2004 deposition.  Thus, Mattel has had no opportunity to examine

14  Bryant on the vast bulk of the evidence, whether relevant to new claims or the original

15  ones. This includes, for example:

16  •  Bryant's fee agreements with MGA, which reflect that MGA is paying
     Bryant's legal fees at its discretion, and which were withheld by Bryant
17     even in the face of prior court orders;

18  •  Bratz design drawings produced by Bryant for the first time this year,
     only after being ordered, which bear handwritten dates of September
19     19, 1999, at time when Bryant was employed by Mattel;

20  •  Bryant's desktop hard drive, which reveals his use of "Evidence
     Eliminator" software, which was not produced until compelled this
21     year.

22  ───────────────────────

23  [83]  See MGA's Opposition to Mattel's Motion to Try All Claims Related to Bratz
     Ownership in Phase One at 3:12-19.

24  [84]  See Mattel's Second Amended Answer & Counterclaims, Exhibit C.
     [85]  Order re Additional Time at 5:20 (font altered), Proctor Dec., Ex. 43.

25  [86]  Id. at 5:24-27, Proctor Dec., Ex. 43. Notably, Judge Infante calculated the 98
     percent number based on MGA's production of 157,000 pages of documents as of the close
26  of briefing in late August. Since that time MGA has produced over a million-and-a-half
     pages of documents. See Proctor Dec. ¶ 45.

27  [87]  See Proctor Dec. ¶ 45.

28

EXHIBIT 10 PAGE 72



1    •   Original Bratz drawings, which Bryant did not make available for
2       inspection until this summer, after being ordered to do so,
       notwithstanding his promise that he would produce such documents at
3       the 2004 deposition.

   •   A fax from Bryant to David Rosenbaum, outside counsel for MGA,
4       dated September 14, 2000, wherein Bryant stated that he could not ask
5       Mattel's Human Resources any more questions about his contract with
       Mattel "without risking suspicion."

6    •   October 10, 2000 e-mails between Isaac Larian, Victoria O'Connor and
7       Paula Garcia (formerly Treantafelles), reflecting that Bryant worked on
       Bratz with MGA "on average about 4 hours a day," starting at least six
8       weeks before he left Mattel.

   •   Invoices showing that Veronica Marlow, a key third party, billed MGA
9       for 169 hours of development services on Bratz that were performed
10      before Bryant left Mattel.

11 The list of new evidence that was requested by Mattel before Bryant's deposition but

12 first produced by defendants only later literally goes on and on. As Judge Infante

13 ruled, "a witness may be re-deposed with respect to . . . new developments" in a

14 case, including new documents such as these, as well as new claims.[88]

15     Despite his factual findings, Judge Infante ruled that Mattel is only entitled to an

16 additional seven hours of deposition. Previously Judge Infante had gave Mattel two

17 additional hours as a result of the improper instructions and objections by counsel at

18 Bryant's deposition.[89] So, under Judge Infante's ruling, Mattel has been limited to only

19 seven hours to depose Bryant – the "most important witness for virtually every claim in

20 the case"[90] – on MGA's claims, Mattel's counterclaims, the hundreds of MGA and

21 Mattel products now at issue about which Bryant has unique knowledge, and the vast

22 amounts of recently produced new evidence. This is unfair. The ruling that Mattel be

23

24 ───────────
[88]   Order re Additional Time at 4:20-24 (quoting Fresenius Med. Care Hldgs, Inc. v.
25 Roxane Labs., Inc., 2007 WL 764302 (S.D. Ohio 2007)), Proctor Dec., Ex. 43.
[89]   Order re Additional Time at 7:24-25, Proctor Dec., Ex. 43; see Order Granting In
26 Part And Denying In Part Mattel's Motion To Overrule Instructions Not To Answer During
27 The Deposition Of Carter Bryant (March 7, 2007), Proctor Dec., Ex. 44.
[90]   Id. at 5:15-17.
28

EXHIBIT 10 PAGE 73

1   granted only seven additional hours is clearly erroneous given Bryant's singular
2   importance, the magnitude of this case and the tectonic shift of claims.

3           Also, based on Rule 30's "presumptive one day, seven-hour limitation on
4   depositions," Judge Infante awarded Mattel a total of 7 hours to depose Bryant on all of
5   MGA's claims and all of Mattel's counterclaims.[91] It is simply impossible to conduct a
6   deposition on those claims -- which had not even been filed when Bryant was first
7   deposed -- in that amount of time.  Judge Infante apparently awarded Mattel no
8   additional time based on new evidence, even though 99.9% of defendants' production
9   has taken place since the 2004 deposition.  That effectively punishes Mattel for
10  defendants' discovery misconduct. Mattel requested defendants' documents before the
11  deposition took place; defendants withheld them at their own peril, not at Mattel's.[92]
12  Mattel is entitled to a fair amount of time to depose the key witness in the case on the
13  new claims and evidence he has not been deposed on.  The Court should afford that,
14  and grant Mattel a total of 21 hours for the deposition.[93]

15

16

17      [91]  Id. at 8:10-13.
18      [92]  See, e.g., Fresenius Medical Care Holdings, Inc. v. Roxane Laboratories, Inc., 2007
        WL 764302, at *2 (S.D. Ohio 2007) (originally cited by Bryant to Judge Infante) (allowing
19      second deposition because defendant failed to produce requested documents prior to first
        deposition); Robins v. Scholastic Book Fairs, 928 F. Supp. 1027, 1036 (D. Or. 1996) ("the
20      second set of depositions of these individuals was necessary because they had to be
        questioned about additional documents that Defendant produced after the first set of
21      depositions"); Ritchie v. U.S., 2004 WL 1161171, at *3 (N.D. Cal. 2004) ("when further
        evidence linking [witness to the project in dispute] subsequently came to light this court
22      permitted plaintiff to depose [the witness] a second time").
        [93]  In the alternative, the Court should excercise its discretion to enlarge Mattel's time
23      to depose Bryant.  The Court previously extended MGA's deadlines to produce documents
24      that it was compelled to produce even though Judge Infante had specifically *rejected*
25      MGA's request for additional time to comply and despite MGA's failure to show there was
        any error in that ruling.  Here, there can be no dispute that the Court has the right to ensure
26      that the parties receive fair discovery, proportionate to the magnitude and complexity of
27      the case, and that trial in this matter is conducted without undue surprises which will cause
        prejudice and waste the time of the Court and the jury.
28

07209/2299353.1

-24-

EXHIBIT 10 PAGE 74

1                                      **Conclusion**

2       For the foregoing reasons, Mattel respectfully requests that the Court grant

3 Mattel's motion for leave.

4 DATED:  November 19, 2007        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5

6                                  By Jon Corey /s/

7                                    Jon Corey
                                   Attorneys for Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-25-

EXHIBIT 10 PAGE 75