# EXHIBIT 22

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 23

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899
TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
527436-04

WRITER'S DIRECT DIAL
(213) 430-7466

WRITER'S E-MAIL ADDRESS
pambrosini@omm.com

May 17, 2006

**VIA FACSIMILE**

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 Figueroa Street, 10th Floor
Los Angeles, California 90017

Dear Mr. Zeller:

Pursuant to Local Rule 37-1, MGA requests to meet and confer with Mattel regarding Mattel's Objections and Responses to MGA's First Set of Interrogatories. To facilitate discussion, this letter is broken into two parts. The first concerns Mattel's "General Objections." The second concerns Mattel's objections and responses to individual interrogatories.

### I.   Mattel's General Objections

**Mattel's Preliminary Statement**

Mattel initially qualifies its responses to MGA's Interrogatories by stating that Mattel has not yet interviewed all witnesses in this action, and contends that it has yet to receive requested discovery from defendants. This, however, does not excuse Mattel from undertaking a reasonable inquiry and responding to the Interrogatories to the best of its present ability. Mattel must supplement its responses immediately to the extent that Mattel has failed to respond to any Interrogatory, or withheld information, because it is waiting until after it has interviewed all witnesses in the action and received all discovery from the defendants.

**General Objection No. 2.**

Mattel objects generally to the Interrogatories on the grounds that they call for the disclosure of information subject to the attorney-client privilege, work-product doctrine of "other applicable privilege" but has not indicated, specifically, what, if any, information has been withheld based on any asserted privilege. MGA insists that Mattel (1) state whether it has refused to respond fully and completely to any particular interrogatory, or qualified any particular response, to protect privileged information from disclosure; (2) if it has, identify which interrogatory(ies) and response(s) are implicated; and (3) provide information, in the nature of a

EXHIBIT 23

PAGE 298

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 2

privilege log, sufficient for MGA to evaluate the claim of privilege. Please confirm that Mattel will do so.

**General Objection No. 3:**

Mattel also generally objects to the Interrogatories on the grounds that "they seek the disclosure of information or documents that are "in the possession, custody and control of independent parties," and information or documents that are "in the possession, custody and control of defendants" or are " publicly available and hence equally available to all parties to this litigation." Mattel, however, must respond to the Interrogatories based on the information known to Mattel, irrespective of whether the source of the information was a third party, the defendants themselves, or a publicly available source.[1] Please confirm that Mattel has not withheld any responsive information because the source of the information was a third party, defendants, or a publicly available source.

**General Objection Number 4:**

Mattel generally objects to MGA's Interrogatories on the grounds that they call for information that is not relevant. Nowhere, however, does Mattel justify this blanket objection. Please confirm that Mattel has not withheld or qualified any response based on this objection or, if it has, please identify, with particularity, the specific interrogatory(ies) that Mattel has not answered, in full or in part, based on this objection.

**General Objection Number 5:**

Mattel also objects to MGA's requests on the grounds that they are "unduly burdensome and oppressive." A party asserting an objection such as this, however, bears the burden of justifying the objection by showing how and why any particular Interrogatory is unduly burdensome. Mattel has not done so. To the extent that Mattel has refused to respond to any Interrogatory or withheld information based on burden, MGA requests that Mattel identify, with specificity, each Interrogatory implicated and explain precisely why and in what way responding to the Interrogatory would impose an undue burden upon Mattel.

---

[1] *Orleman v. Jumpking, Inc.*, No. Civ. A. 99-2522-CM, 2000 WL 1114849, at *6 (D. Kan. July 11, 2000) ("The court counsels defendant that where responsive information is in its possession, it is obligated to produce the information, *whether or not plaintiff has obtained the information from an alternate source. The rules of discovery do not permit* parties to withhold material *because the opponent either has or could discover it on their own.* Accordingly, to the extent defendant has not produced all responsive information within its possession, it shall do so.") (citation omitted) (emphasis added); *St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 513 (N.D. Iowa 2000) ("The plaintiffs' fifth objection to CFC's request is based on the ground that it seeks information and documents equally available to the propounding parties from their own records or from records which are equally available to the propounding parties. However, with respect to this objection, courts have unambiguously stated that this exact objection is insufficient to resist a discovery request.").

EXHIBIT __23__

PAGE __299__

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 3

**General Objection No. 6:**

MGA also requests that Mattel provide further and more specific information to support its general objection that MGA's Interrogatories seek the disclosure of information or documents "in violation of the terms of agreements or protective orders entered into with third parties, or in violation of the privacy, contractual, or other rights of third parties." Specifically, MGA requests that Mattel (1) identify each Interrogatory to which Mattel claims it cannot fully respond without violating the rights of third parties; (2) with respect to each such Interrogatory, identify who the third party is and the nature of the right implicated (i.e. right of privacy, contractual rights, etc.); and (3) in each instance in which Mattel has withheld information based on a third party contract or protective order, produce each such contract or protective order, or such documents as may be necessary and sufficient for MGA to evaluate Mattel's assertion, and to challenge the protection, as appropriate.

**General Objection No. 7:**

Mattel's general objection that the definition of "Mattel" is vague, ambiguous and unduly burdensome is meritless. Mattel is obligated to use common sense and reason in responding to discovery.[2] Please confirm that Mattel has not refused to respond or qualified its response to any of MGA's Interrogatories based on this general objection.

A. **Specific Interrogatories**

**Interrogatories 1 and 2:** Facts supporting Mattel's contention, if Mattel so contends, that Mattel has suffered harm as a result of any act or omission of MGA; identify all persons with knowledge of each such facts.

Mattel's objections to these interrogatories lack merit. Each of these interrogatories seeks information simply requiring Mattel to prove its own contentions; MGA is clearly entitled to discovery on regarding Mattel's own contentions. Unless Mattel agrees to disavow any contention that it has suffered harm as a result of any alleged act or omission of MGA, the subject matter of these interrogatories is relevant and MGA is entitled to Mattel's responses.

**Interrogatory 3 and 4:** Damages; proof of Mattel's contention that it is entitled to punitive damages.

In response to these interrogatories, Mattel asserts that it has produced documents from which the answers to these interrogatories may be ascertained. MGA is entitled to know specifically the documents to which Mattel refers. In addition, the parties have already

---

[2] *Swackhammer v. Sprint Corp. PCS*, 225 F.R.D. 658, 662 (D. Kan. 2004) ("The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity. *A party responding to discovery requests 'should exercise reason and common sense to attribute ordinary definitions to terms and phrases* utilized in interrogatories.'") (emphasis added).

EXHIBIT 23

PAGE 300

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 4

conducted substantial discovery and MGA is entitled to the information presently in Mattel's possession, including "the value of Mattel assets, resources, opportunities and/or property, including intellectual property" that Mattel contends "Bryant converted, diverted from Mattel or otherwise improperly used or usurped." Finally, in connection with Mattel's response to Interrogatory No. 4, MGA is entitled to more specificity, particularly regarding Mattel's statement that "Bryant and MGA have concealed and intentionally spoliated evidence in an effort to conceal the true nature, timing and extent of their unlawful behavior."

**Interrogatory 5:** Facts to prove Mattel's contention that MGA copied Mattel's property, including, without limitation, "Toon Teens."

Mattel's objection that this subject matter has no bearing on this suit is baseless. Mattel contends that Bryant converted/copied/stole Mattel property. 2005 U.S. Dist. LEXIS 3568, at *26. Indeed, there is an abundance of evidence suggesting that Mattel contends that Bryant converted Mattel's scrapped "Toon Teens" idea. Moreover, the Court has concluded that "the rights to the Bratz were and are in controversy" and that Mattel is assisting another party in asserting that "the Bratz are knock-offs of the Toon Teens." *Id.* at *28-*29. Mattel must either disavow its contention or cooperate in discovery concerning this subject. Mattel simply cannot have it both ways.

Mattel's objection that this interrogatory is vague and ambiguous is not credible, as MGA's definitions of "your" and "property" cannot plausibly be said to render the phrase "your property" vague and ambiguous. Indeed, the referenced property is limited by Mattel's own contentions. The term "copied" is also perfectly comprehensible, as it has an ordinary, plain-language meaning. Mattel's objection to the term "some element" is a non-sequitur, as the interrogatory does not use that phrase. MGA's reference to "Toon Teens" must also be understandable to Mattel, as MGA's use of that phrase, by its own terms, is coterminous with Mattel's contention regarding them. It is not MGA's burden to discern, at this point, whether Mattel's contention about "Toon Teens," about which Mattel has refused to provide information, concerns drawings, prototypes, photographs, or the like.

In any case, to the extent Mattel contends that MGA has copied Mattel property in any way and seeks any remedies for such alleged copying, this interrogatory seeks relevant information regardless of whether Mattel's Complaint sounds in state tort law or in federal intellectual copyright law.

**Interrogatory 6:** Identify all communications that refer to this lawsuit.

Mattel has raised privilege objections to this interrogatory, and MGA offers to limit the interrogatory to "each non-public, non-privileged COMMUNICATION" Mattel has had about the suit, including, but not limited to, internal communications, communications with current or former employees, or with one or more of its investors. Excluded from this would be press releases or other statements to the press or in an open forum. Responsive communications, for example, might include non-privileged discussions between or among Mattel executives and/or

EXHIBIT 23

PAGE 301

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 5

officers, at non-privileged strategy or informational meetings with Mattel personnel, or at Board of Directors' meetings. How Mattel has described the suit, what it has said about the factual or legal basis of the suit, its damages, and its prospects is discoverable information relevant to Mattel's claims and prayer for relief.

<u>Interrogatory 7</u>: Identify all persons interviewed for the July 18, 2003, *Wall Street Journal* article.

Mattel's objection that this interrogatory is unreasonably burdensome and overbroad is baseless. Contrary to Mattel's assertion, interrogatory 7 does not require it to "gather and summarize all facts on the subject, including without limitation facts that are known to or in the possession, custody or control of defendants and non-parties, including the Wall Street Journal staff." Rather, this interrogatory simply requires Mattel to "identify" all persons interviewed for the article.

Mattel's relevance objections to these interrogatories are also insupportable. As Mattel knows, the article, which it produced, liberally quotes both named and unnamed Mattel employees foreshadowing Mattel's belief with regard to its core contention in this case – that Bryant copied one of its ideas, referring to "Toon Teens." MGA is clearly entitled to discovery concerning who was interviewed for the article. Indeed, the Court has already noted the importance of the article to the case. 2005 U.S. Dist. LEXIS 3568, at *7 n.4. Moreover, the discovery rules provides that parties should seek to obtain information from a party to the suit before attempting to obtain it from a non-party such as the Wall Street Journal or former Mattel employees. To the extent Mattel has any information concerning the identity of those who provided information for this article, Mattel is obligated to provide it, regardless of whether those people are identified in the article itself. Indeed, MGA is entitled to have Mattel's confirmation of the accuracy of the information provided therein with respect to the sources for the article so that MGA can pursue further discovery on its defense of laches, among other things.

<u>Interrogatory 8</u>: Identify each error in the *Wall Street Journal* article and explain why and in what way each fact is incorrect.

As with its objections to Interrogatory No. 7, Mattel's objections to interrogatory 8 are not well founded. The interrogatory does not require Mattel to "summarize all facts on this subject", but rather merely requires Mattel to "describe, with particularity, each error contained in [the article] by explaining why and in what way each fact is incorrect." The interrogatory as phrased is not overbroad or unduly burdensome, let alone "harassing." To the extent Mattel contends that the article contains misstatements that pertain to the issues in this lawsuit, Mattel is obligated to identify those misstatements and explain why it believes the statements are wrong.

<u>Interrogatories 10 and 11</u>: State when and how Mattel first learned that Bryant performed work for MGA; and when and how Mattel first learned that Bryant conceived of the Bratz concept.

EXHIBIT 23

PAGE 302

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 6

These requests seek the information Mattel had, and when it learned that information, regarding Bryant's involvement with MGA's "Bratz" property and his creation of the original "Bratz" concept. Such information is pertinent to the affirmative defenses asserted in this case. In response to Interrogatory No. 10, Mattel asserts that it was first "confirmed" that Bryant was the Bratz designer by the Wall Street Journal's July 200 article. Mattel appears to be equating MGA's confirmation with Mattel's knowledge. In fact, the interrogatory seeks to learn when Mattel first obtained this information, regardless of whether it had been confirmed by MGA or anyone else. Indeed, Mattel produced a document indicating that it was told in August 2002 that Bryant had supposedly created the "Bratz" dolls. Thus, it appears that Mattel first had information concerning Bratz and Bryant's work for MGA before the July 2003 Wall Street Journal article, and MGA is entitled to know when.

Mattel's objection that the phrase "first learned that Bryant conceived of the Bratz Concept" is "vague and ambiguous" is meritless, as the phrase "first learned of" has a readily ascertainable, ordinary meaning, and Mattel does not object to MGA's definition of the term "Bratz Concept." In combination, these words are not somehow rendered mysterious. For purposes of these interrogatories only, MGA will define "Mattel" to include only persons who were employed by Mattel at the time they acquired the knowledge at issue.

In conclusion, counsel for MGA seek to meet and confer in person with you in the next ten days concerning the aforementioned discovery and issues. In addition, as stated above, we urge you to give serious consideration to the appointment of a Discovery Special Master, the use of which would substantially reduce the burden on the Court and the costs to the parties, and would facilitate and expedite the resolution of discovery disputes (or perhaps avoid them in the first instance).

We look forward to your response.

Very truly yours,

Paula B. Ambrosini
for O'MELVENY & MYERS LLP

cc:     Keith Jacoby, Esq.

LA2:799782.1

EXHIBIT 23

PAGE 303

# EXHIBIT 24

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 25

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 26

1

# CERTIFIED COPY

2   UNITED STATES DISTRICT COURT
    CENTRAL DISTRICT OF CALIFORNIA
3   EASTERN DIVISION
    ------------------------------------------------X
4   CARTER BRYANT, an individual,

5                       Plaintiff,

6                          Case No. CV 04-9049

7            -against-

8   MATTEL, INC., a Delaware corporation,

9                       Defendant.
    ------------------------------------------------
10  AND CONSOLIDATED CASES
    ------------------------------------------------X
11                      180 Maiden Lane
                        New York, New York
12
                        DATE: September 28, 2007
13                      TIME: 10:32 a.m.

14

15           DEPOSITION of MAUREEN TKACIK, taken

16  pursuant to the Federal Rules of Civil Procedure,

17  and Subpoena, held at the above-mentioned time and

18  place before Karen D. Williams, a Notary Public of

19  the State of New York.

20

21

22

.23  ATKINSON-BAKER, INC.
     COURT REPORTERS
24   (800) 288-3376
     www.depo.com
25   FILE NO.:  A10825B

1

2  A P P E A R A N C E S:

3

4        KEKER & VAN NEST, LLP
                    Attorney for Plaintiff
5                   710 Sansome Street
                    San Francisco, California 94111
6        BY:        (Not present)

7

        DOW JONES & COMPANY, INC.
8                   Attorney for Defendant
                    The Wall Street Journal
9                   200 Liberty Street
                    New York, New York 10281
10       BY:        STUART D. KARLE, ESQ.

11

        LAW OFFICES OF JAMES W. SPERTUS
12                  Attorney for Defendant
                    Carlos Gustavo Machado Gomez
13                  12100 Wilshire Boulevard
                    Suite 620
14                  Los Angeles, California 90025
         BY:        (Not Present)
15

16       STROOCK & STROOCK & LAVAN, LLP
                    Attorney for Defendant
17                  Mattel, Inc.
                    2029 Century Park East
18                  Los Angeles, California 90067
         BY:        MICHAEL J. NIBORSKI
19

20

21

22

23

24

25

EXHIBIT _26_

PAGE _320_

```
 1
 2   A P P E A R A N C E S:
 3
 4.           O'MELVENY & MYERS
                   Attorney for Defendant
 5                 MGA Entertainment, Inc.,
                   MGA Entertainment, (HK), LTD.,
 6                 Isaac Larian and
                   MGAE de Mexico, S.R.I. de C.V.
 7                 Times Square Tower
                   7 Times Square
 8                 New York, New York 10036
             BY:   DALE M. CENDALI, ESQ.
 9
10
             O'MELVENY & MYERS
11                 Attorney for Defendant
                   MGA Entertainment, Inc.,
12                 MGA Entertainment, (HK), LTD.,
                   Isaac Larian and
13                 MGAE de Mexico, S.R.I. de C.V.
                   Times Square Tower
14                 7 Times Square
                   New York, New York 10036
15           BY:   KENDALL J. BURR, ESQ.
16
17
18
19
20
21
22
23
24
25
```

3

EXHIBIT __26__

PAGE __321__

1

2

3

4

5          IT IS HEREBY STIPULATED AND AGREED, by

6    and between the attorneys for the respective

7    parties herein, that the sealing and filing of the

8    within deposition be waived.

9

10

11          IT IS FURTHER STIPULATED AND AGREED

12   that this deposition may be signed and sworn to

13   before any officer authorized to administer an oath

14   with the same force and effect as if signed and

15   sworn to before the officer before whom said

16   deposition is taken.

17

18

19          IT IS FURTHER STIPULATED AND AGREED

20   that all objections, except as to form, are

21   reserved to the time of trial.

22

23

24

25

EXHIBIT 26

PAGE 322

```
 1                          TKACIK
 2   M A U R E E N   T K A C I K, having first been
 3   duly sworn by a Notary Public of the State of New
 4   York, was examined and testified as follows:
 5   BY THE REPORTER:
 6        Q    Please state your name for the record.
 7        A    Maureen Tkacik.
 8        Q    What is your address?
 9        A    65-67 Rivington, Apartment 7, New York,
10   New York 10002.
11
12   EXAMINATION BY
13   MR. NIBORSKI:
14        Q    Good morning, Miss Tkacik.
15        A    Good morning.
16        Q    Could you tell us where you are
17   currently employed?
18        A    I am currently employed by Gawker
19   Media.
20        Q    And is that here in New York?
21        A    Yes.
22        Q    And were you previously employed by the
23   Wall Street Journal?
24        A    I was.
25        Q    And approximately what time period were
```

                                                              5

EXHIBIT 26

PAGE 323

1                          TKACIK

2              the bottom of which is an e-mail from

3         Mr. Larian to Miss Tkacik dated July 14,

4         2003.

5                   (Whereupon, the aforementioned

6              e-mail was marked as Plaintiff's Exhibit

7              8 for identification as of this date by

8              the Reporter.)

9         Q      Miss Tkacik, do you recognize the

10   oldest e-mail in the chain, the last e-mail on the

11   page as an e-mail you received on or about July 14,

12   2003 from Mr. Larian to you?

13        A      I believe that -- I don't remember it

14   specifically, but I do remember him being -- I

15   remember him specifically saying to me at some

16   point, something about Formal Funk and how Mattel

17   had copied it, but I don't recognize the e-mail.  I

18   think it was one of the talking points.

19        Q      And there is nothing in this e-mail

20   that talks about a Bratz doll contest or when it

21   occurred; is that right?

22        A      Yes.

23        Q      And you are not aware of any written

24   communication of any kind from MGA on that point,

25   correct?

EXHIBIT __26__

PAGE __324__

TKACIK

1

2      A      I don't know.

3      Q      And the e-mail also says, "Please

4  e-mail me a copy of the article when it's out as I

5  am in the orient. "

6             Do you see that?

7      A      Yes.

8      Q      And does that refresh your recollection

9  that he was, whether he mentioned to you he was in

10 Asia when he was speaking to you?

11     A      Yes, it does refresh.

12     Q      Now, when you spoke to Mr. Larian, did

13 you notice that he had a heavy accent?

14     A      I remember him, he does have an accent.

15 It certainly didn't make him unintelligible.

16     Q      Was it your impression that English was

17 not his first language?

18     A      I didn't really think about it.  He

19 spoke it very well.

20     Q      Do you understand that he came from

21 Iran?

22     A      I understood that he was Persian, but I

23 didn't know -- I don't remember.  I think that at

24 one point I probably talked to him about, you know,

25 when he had come over or what have you, but I have

```
 1                           TKACIK
 2    no recollection of that now.
 3         Q    When you lived in Los Angeles, did you
 4    have friends who worked for Mattel?
 5         A    No.
 6         Q    You say in your article after the
 7    highlighted paragraph, "Mr. Larian, who emigrated
 8    to the U.S. from Iran found his company in the late
 9    1970."
10              Do you see that?  It's on Page 2.
11                   MR. KARLE:   It's right after the
12              highlight.
13         A    Okay.
14         Q    Does that refresh your recollection
15    that you understood that he had been born in Iran
16    and only later came to the United States?
17         A    Yes.
18         Q    Now, in your article, on that same Page
19    2, in the paragraph that starts, "The history of
20    the Bratz is intertwined with Mattel."
21              You see that?
22         A    Yes.
23         Q    And it goes on to say, "Inside Mattel,
24    some are convinced the Bratz borrowed liberally
25    from a Mattel project that was scrapped at the
```

38

EXHIBIT __26__

PAGE __326__

TKACIK

1

2    testing stage in 1998."

3              Do you see that?

4        A     Yes.

5        Q     Did Mr. Bousquette give you that

6    information?

7        A     No.

8        Q     Did Miss Ross give you that

9    information?

10       A     No one at Mattel who is quoted in the

11   story gave me that information.

12       Q     Did the people at Mattel who is quoted

13   in the story encourage you to investigate this

14   issue?

15       A     They had no idea.   They were oblivious.

16   My understand was that the people that I quoted in

17   the story were oblivious to that.

18       Q     So you have no idea, the people quoted

19   in the story never told you that they had been

20   involved in an investigation of Carter Bryant the

21   year before; is that right?

22       A     No.   They never told me anything like

23   that.

24       Q     Did you speak to Mr. Bousquette or

25   Miss Ross about Carter Bryant?

EXHIBIT 26

PAGE 327

```
 1
 2                    C E R T I F I C A T E
 3
 4    STATE OF NEW YORK      )
                          :   SS.:
 5    COUNTY OF KINGS        )
 6
 7
 8         I, KAREN D. WILLIAMS, a Notary Public for and
 9    within the State of New York, do hereby certify:
10         That the witness whose examination is
11    hereinbefore set forth was duly sworn and that such
12    examination is a true record of the testimony given
13    by that witness.
14         I further certify that I am not related to
15    any of the parties to this action by blood or by
16    marriage and that I am in no way interested in the
17    outcome of this matter.
18         IN WITNESS WHEREOF, I have hereunto set my
19    hand this 2nd day of October, 2007.
20
21
22                              KAREN D. WILLIAMS
23
24
25 Signature Requested
```

EXHIBIT 26

PAGE 328

# EXHIBIT 27

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 28

Jensen   EXHIBIT 2
EVD
BENJAMIN REPORTING SERVICE
6-8-67   M. KORENMAN-BANGEI

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 2

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Friday, July 18, 2003

Dolled Up: To Lure Older Girls, Mattel Brings In
Hip-Hop Crowd

It Sees Stalwart Barbie Lose Market Share, So
'Flavas' Will Take on the 'Bratz'

Battle of the Big Heads
By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8-

to 12- year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT 28

PAGE 360

M 0012536

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories, she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized heads — with their pursed lips and cartoonish eyes — are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet — they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and

former designers say, because Mattel had strict quotas that allowed only one "flanker brand" — that is, a brand that would compete with Barbie for shelf space — on the market at a time. At the time, Mattel chose a product called "What's Her Face" — a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000; after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million — with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT 28

PAGE 361

M 0012537

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 4

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips, as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights — meaning separate molds — and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self-expression," she says.

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire.".

EXHIBIT 28

PAGE 362

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012538

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 5

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11 body piercings and her mud wrestling-themed MTV video called "Dirty."It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."

#### —— INDEX REFERENCES ——

COMPANY:        KB Holdings LLC (KBTY); Mattel Inc (MATL)

NEWS SUBJECT:      (Marketing (C31); Market Share (C313); Corporate/Industrial News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice - Consumer Products (REQRCP); Editor's Choice – Industry Trends/Analysis (RBQR))

INDUSTRY:        (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

REGION:        (North American Countries (NAMZ); United States (USA); United States - California (USCA); Northeast U.S. (USE); United States - Massachusetts (USMA); Western U.S. (USW))

OTHER INDEXING:    Marketing; Market Share; Page-One Story; Content Types; Corporate/Industrial News; United States - California; United States - Massachusetts; United States; Northeast U.S.; Western U.S.; North American Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores; Consumer Products;

Media; Consumer Cyclical; Newswire More Code; Newswire End Code; All Entertainment & Leisure; Limited Product Specialty Retailers; Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index; S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

Word Count: 2217

7/18/03 WSJ A1

—— END OF DOCUMENT ——

EXHIBIT 28

PAGE 363

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012539

# EXHIBIT 29

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**