1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 090378)
   johnquinn@quinnemanuel.com
3     Michael T. Zeller (Bar No. 196417)
   (michaelzeller@quinnemanuel.com)
4     Jon D. Corey (Bar No. 185066)
   (joncorey@quinnemanuel.com)
5     Timothy L. Alger (Bar No. 160303)
   (timalger@quinnemanuel.com)
6  865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
7  Telephone: (213) 443-3000
Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9

10                UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                  EASTERN DIVISION

| | |
|---|---|
| 13  CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 14        Plaintiff, | Consolidated with |
| 15        vs. | Case No. CV 04-09059<br>Case No. CV 05-02727 |
| 16  MATTEL, INC., a Delaware | HON. STEPHEN G. LARSON |
| 17  corporation,<br>      Defendant. | MATTEL, INC.'S *EX PARTE*<br>APPLICATION TO STRIKE |
| 18  | PORTIONS OF THE EXPERT<br>REPORTS OF DR. ALBERT LYTER |
| 19  AND CONSOLIDATED ACTIONS | AND MR. ROBERT KULLMAN;<br>AND |
| 20  | MEMORANDUM OF POINTS AND |
| 21  | AUTHORITIES |
| 22  | [Declaration of Diane C. Hutnyan and<br>Proposed Order filed concurrently] |
| 23  | Date: N/A |
| 24  | Time: N/A<br>Place: N/A |
| 25  | **Phase 1** |
| 26  | Discovery Cut-off: January 28, 2008<br>Pre-trial Conference: April 21, 2008 |
| 27  | Trial Date: May 27, 2008 |
| 28  | |

1    Mattel, Inc. ("Mattel") hereby respectfully applies *ex parte*, pursuant to
2  Local Rule 7-19 and Fed. R. Civ. P. 37, for an order striking Dr. Lyter's May 6 report
3  on the Prince notary book ("the May 6 Report") and the portions of Dr. Lyter's initial
4  report ("the March 17 Report") and Mr. Kullman's initial report ("the April 4 Report")[1]
5  that pertain to the sequencing of the tracing paper drawings and the multimedia
6  "posterboard" drawings.

7    This Application is made with regard to Dr. Lyter's May 6 Report on the
8  grounds that Dr. Lyter has failed to include the information required under Fed. R. Civ.
9  P. 26(a)(2)(B).  First, the report excludes most of the basis, reasons and data upon
10 which Dr. Lyter's ink testing opinions are based.  Second, it contains a purported
11 handwriting analysis that should have been in his March 17 initial expert report.

12   This Application is made with regard to the portions of Dr. Lyter's March
13 17 Report and Mr. Kullman's April 4 Report pertaining to the sequencing of certain
14 tracing paper documents and certain multimedia "posterboard" drawings on the grounds
15 that the opinions, bases and data supporting these sequencing opinions are neither in
16 their reports, nor were disclosed at deposition, and MGA has in fact opposed Mattel's
17 efforts to view and assess any of the evidence Dr. Lyter and Mr. Kullman contend
18 exists to support their opinions.  Meanwhile, while withholding this evidence from
19 Mattel's experts, MGA gave Mr. Kullman unfettered access to that same evidence
20 throughout April and May 2008 so that he could create more than 200 exhibits
21 Mr. Kullman and Dr. Lyter plan to use to support their opinions.  Not only are these
22 exhibits untimely under Rule 26, but MGA has refused to allow Dr. Lyter or
23 Mr. Kullman to be deposed about them.

24

25   [1]   Mr. Kullman's first report was served on March 17, 2008 but was amended on
   April 4 to exclude any reference to the images of Bryant originals of the sort that were
26 served on Mattel last week.  See Declaration of Diane C. Hutnyan ("Hutnyan Decl.") in
   support of Mattel's Motion to Strike Portions of the Expert Reports of Dr. Lyter, Exh.
27 21, and Mr. Kullman, Exh. 22 and 48 (Mr. Kullman's Expert reports dated March
   17,2008 and May 4, 2008 respectively).
28

1    MGA's gamesmanship has prejudiced Mattel's and its experts' trial
2  preparation and is preventing the Court from adequately performing its gatekeeping
3  function. Thus, Mattel seeks exclusion of: Dr. Lyter's May 6 report and the portions of
4  Dr. Lyter's March 17 and Mr. Kullman's April 4, 2008 reports pertaining to the Prince
5  notary book and the sequencing of the Bryant originals.

6                    **Statement of Compliance with Local Rule 7-19**

7    Pursuant to <u>Local Rule</u> 7-19, on May 11 and May 12, 2008, Mattel's
8  counsel gave notice of this Application and the relief being sought to counsel for all
9  other parties. Counsel for Carter Bryant is Matthew M. Werdegar of Keker and Van
10 Nest LLP (telephone: 415-391- 5400, Address: 710 Sansome Street, San Francisco, CA
11 94111-1704). Mr. Werdegar did not respond.

12   Counsel for MGA Entertainment Inc., MGA Entertainment (HK) Limited,
13 MGAE de Mexico, S.R.L. de C.V. and Isaac Larian (collectively "MGA") is Matthew
14 E. Sloan of Skadden, Arps, Slate, Meagher & Sloan (Telephone: 213-687-5276;
15 Address: 300 South Grand Ave., Los Angeles, CA  90017-3144). A telephonic meet-
16 and-confer was also held on May 13, 2008, but the parties could not resolve their
17 differences. Mr. Sloan has indicated that he opposes this motion.

18   Counsel for Jacqueline Prince is Daniel J. Warren of Sutherland Asbill &
19 Brennan, LLP (Telephone: 404-853-8028; Address: 999 Peachtree Street, Suite 2300,
20 Atlanta, GA 30309). Mr. Warren did not respond.

21   Counsel for Carlos Gustavo Machado is Mark E. Overland of Overland
22 Borenstein Scheper & Kim LLP (Telephone: ; Address: 601 West Fifth Street, 12th
23 Floor, Los Angeles, CA). Mr. Overland did not respond.

24   This Motion is based on this Notice of Motion and Motion, the
25 accompanying Memorandum of Points and Authorities, the Declaration of Diane C.
26 Hutnyan (and its exhibits) filed concurrently herewith, the records and files of this
27 Court, and all other matters of which the Court may take judicial notice.

28

1 | DATED:  May 15, 2008

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP

By _____
Diane C. Hutnyan
Attorneys for Mattel, Inc.

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................ 3

ARGUMENT ........................................................................................................ 13

I.    FRCP 26 REQUIRES EXPERTS TO TIMELY PROVIDE ALL
      BASES, OPINIONS, DATA AND EXHIBITS; A FAILURE TO DO
      SO MUST RESULT IN THE EXPERTS' REPORTS BEING
      STRICKEN ............................................................................................... 13

II.   DR. LYTER FAILED TO PROVIDE ALL THE BASES, EXHIBITS,
      AND OPINIONS HE PLANS TO TESTIFY ABOUT IN HIS MAY 6
      REPORT ..................................................................................................... 16

III.  DR. LYTER'S AND MR. KULLMAN'S OPINIONS REGARDING
      THE SEQUENCING OF BRYANT'S ORIGINAL DOCUMENTS
      MUST BE STRICKEN FOR BEING INSUFFICIENT AND
      UNTIMELY ............................................................................................... 18

CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Barrett v. Atl. Richfield Co.,
95 F.3d 375 (5th Cir. 1996)........................................................................23, 24

Carr v. Pacific Maritime Ass'n,
904 F.2d 1313 (9th Cir. 1990).........................................................................21

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (2003) .......................................................................................15

Dodge v. Cotter Corp.,
328 F.3d 1212 (10th Cir. 2003)........................................................................15

Johnson v. J.B. Hunt Transport, Inc.,
280 F.3d 1125 (7th Cir. 2002).....................................................................23, 24

Leyva v. U.S.,
2007 WL 1992095 (D. Ariz. 2007) ..................................................................24

Lindner v. Meadow Gold Dairies, Inc.,
2008 WL 763236 (D. Hawaii 2008)..................................................................16

Minebea Co., Ltd. v. Papst,
231 F.R.D. 3 (D. D.C. 2005) ...........................................................................14

Olson v. Montana Rail Link, Inc.,
227 F.R.D. 550 (D. Mont. 2005)......................................................................18

Phillips v. Netblue, Inc.,
2007 WL 528722 (N.D. Cal. 2007)...................................................................14

Positive Black Talk Inc. v. Cash Money Records, Inc.,
394 F.3d 357 (5th Cir. 2004)...........................................................................24

Salgado v. General Motors Corp.,
150 F.3d 735 (7th Cir. 1998)...........................................................................15

Taylor v. Burlington Northern R. Co.,
787 F.2d 1309 (9th Cir. 1986).....................................................................14, 15

Toomey v. Nextel Communications, Inc.,
2004 WL 5512967 (N.D. Cal., 2004).............................................................17, 24

Ullman v. Auto-Owners Mut. Ins. Co.,
2007 WL 1057397 (S.D. Ohio 2007).................................................................16

United States v. Frazier,
387 F.3d 1244 (11th Cir. 2004).........................................................................15

United States v. Hempfling,
2008 WL 703809 (E.D. Cal. 2008) ....................................................................21

Watts v. Cyprus Hill,
  2008 WL 697356 (N.D. Ill. 2008)............................................................................. 15

Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,
  259 F.3d 1101 (9th Cir. 2001) ................................................................................. 14

## **Statutes**

Federal Rules of Civil Procedure

  Rule 26.......................................................................................... 13, 16, 22, 24

  Rule 26(a) ............................................................................................. 13, 14

  Rule 26(a)(2)(B)(i) .................................................................................. 1, 13

  Rule 26(a)(2)(B)(ii) ................................................................................. 1, 13

  Rule 26(a)(2)(B)(iii) ............................................................................... 1, 13

  Rule 26(3) ................................................................................................... 16

  Rule 37 ........................................................................................................ 13

  Rule 37(c) ................................................................................................... 13

  Rule 403...................................................................................................... 15

# MEMORANDUM OF POINTS AND AUTHORITIES

## **Preliminary Statement**

Mattel's Discovery-Master-approved experts made two dramatic forensic findings. First, they discovered evidence that the last line of the August 1999 entry in the Prince notary book for the Bratz drawings Bryant has claimed he drew in 1998, "From 1998 Missouri," was written in a different ink, and added at a later time, than the rest of the entry, suggesting that the drawings were created in 1999, when Bryant worked for Mattel. Second, they determined that drawings Bryant claimed were originals he drew in 1998 were in fact tracings from drawings he admitted were done in 1999, when he was working for Mattel, also suggesting that the supposed 1998 originals were also done in 1999 or later.

MGA's purported experts -- whose credentials MGA refused to subject to the Discovery Master's scrutiny -- reached contrary opinions in each of these two areas. Their reports, however, did not include, as required by Fed. R. Civ. P. 26(a)(2)(B)(i), (ii), and (iii), (1) all the bases and reasons for these opinions, (2) the data and other information considered by Dr. Lyter and Mr. Kullman in forming their opinions, or (3) any exhibits that will be used to summarize or support the opinions. MGA has sandbagged Mattel's experts across the board.

With respect to the May 6 report on the notary book, MGA failed to include any of the chromatograms, mass spectra, and other data supporting Dr. Lyter's ink testing analysis and serving as the bases for Dr. Lyter's opinion. And although MGA's Court-ordered deadline to serve Mattel with its report on the notary book was May 12, it is now just the 15th, just 12 days from trial, and MGA has *still* not produced this data.

Also, despite MGA's many representations that Dr. Lyter only sought to "replicate" Dr. Aginsky's tests, Dr. Lyter based his analysis in part on eight microplugs from a section of the notary book that Dr. Aginsky did not test. Mattel sought to obtain

1 and analyze similar data by taking eight plugs from the same area, but MGA refused,
2 apparently preferring to seek an advantage by being able to present expert testimony
3 based on evidence that Mattel's experts could not examine or test themselves.

4 Finally, although he admitted at his April 17 deposition that he had
5 reviewed Dr. Aginsky's report and the notary book entry before finalizing his March 17
6 Report, Dr. Lyter waited until almost two months after the deadline to serve Mattel on
7 May 6 with an extensive opinion on his analysis of Ms. Prince's handwriting habits.

8 With respect to the sequencing opinions in the March 17 and April 4
9 Reports, MGA's experts failed to identify in their reports the supposed pencil marks
10 upon which their opinion is based. This deficiency could not begin to be cured at their
11 depositions because the supposed marks in question could not be seen without the use
12 of specialized equipment. Mattel's efforts for its experts to obtain and be able to
13 examine the bases of their opinions and data they claimed to be relying on -- just two
14 weeks' access to the documents -- were blocked by MGA on the basis that Mattel's
15 expert, Mr. Flynn, should have dreamed up MGA's creative pencil-line-theory seven
16 months before it had been advanced, and found and thoroughly analyzed the supposed
17 lines that MGA's experts have to this day never even identified -- all within a timeframe
18 that that even *MGA's* experts admit was prohibitively short.

19 MGA's experts also excluded from their reports two other bases for their
20 sequencing opinions: their supposed observations that all of the pen lines on the tracing
21 paper drawings were traced from the pencil lines, and that all of the pen lines on the
22 tracing paper drawings done after the pencil lines were there. As a result, Mattel has no
23 information on the bases or reasons for these conclusions.

24 Meanwhile, while withholding the underlying evidence from Mattel's
25 experts, MGA allowed Dr. Kullman to use it throughout April and May so that he could
26 prepare more than 200 exhibits to support his and Dr. Lyter's opinions at trial. Not only
27 were these 200+ exhibits served on May 5, two months late, but MGA has refused to
28 allow Mattel to ask any questions about them.

1    Experts have a tremendous amount of potential power, and because of that,
2    the opinions they present to the jury are supposed to be thoroughly examined, explored,
3    and tested by the opposing side's experts.   Further, parties and experts that refuse to
4    share the underlying evidence; refuse to provide fair notice of their bases, reasons, and
5    data; and refuse to allow their opinions to be scrutinized and tested, cannot be permitted
6    to put those untested opinions before the jury.

7                                **Factual Background**

8    A brief introduction to the experts in question is relevant to understanding
9    MGA's reticence to share their experts' full opinions with Mattel's experts.

10   **Mattel's Experts.**  Mr. William Flynn has worked in the field of forensic
11   document examination for over forty years.   In order to become a board-certified
12   forensic document examiner, one must take and pass a series of tests instituted by the
13   nonprofit, internationally recognized American Board of Forensic Document
14   Examiners, Inc. ("ABFDE").[2]  Not only is Mr. Flynn board-certified, but he has served
15   as President of the ABFDE.[3]

16   Mr. Lloyd Cunningham was educated in forensic document examination
17   by the United States Secret Service, received training in questioned handwriting and
18   documents during an internship with the United States Postal Crime Laboratory, and
19   has over thirty years of experience examining questioned handwriting and documents.[4]
20   Mr. Cunningham was invited by the F.B.I. to serve on the federally-funded Scientific
21   Working Group for Forensic Document Examination ("SWGDOC") committee,[5]
22
23
24
25   _____
       [2]   Id., Exh. 17 (Deposition Transcript of Robert Kullman dated April 8, 2008 at
26   33:11-13).
       [3]   Id., Exh. 39 (CV of William Flynn dated February 11, 2008).
27     [4]   Id., Exh. 40 (CV of Lloyd Cunningham dated February 11, 2008).
       [5]   Id.
28

1  which was responsible for creating standards for handwriting analysts in the field of
2  forensic document examination.[6]

3          Dr. Valery Aginsky is one of the world's foremost experts on ink
4  chemistry for the past nearly thirty years.[7] Dr. Aginsky has published more than twenty
5  peer-reviewed articles on ink analysis and dating, including chapters in three books and
6  two encyclopedias.[8]

7          Mattel submitted to the Discovery Master, for each of these three experts,
8  (1) their C.V.; and (2)(a) statements from each of them as to the location and nature of
9  their laboratory facilities; (b) as to their individual practices with regard to the
10 preservation of evidence;  and (c) as to their understanding that they were fully
11 accountable for Bryant's original documents while those documents were in their
12 custody. Although Mattel was only planning to conduct non-destructive examination at
13 the time, it agreed to make this submission because it believed the Discovery Master
14 would impose a similar requirement on MGA's "experts" and prevent them from further
15 subjecting key originals to destructive testing without notice to the Court or to Mattel.
16 The Discovery Master found the showing with respect to all of Mattel's experts to be
17 satisfactory and approved them to handle the original documents.[9]

18         **MGA's Experts.** Neither of MGA's purported experts, Mr. Kullman or
19 Dr. Lyter, have earned ABFDE board certification. Mr. Kullman admitted at deposition
20 that his application for board certification was denied during his presentation before the
21 review committee[10] and so was his appeal.[11] Dr. Lyter testified that he sought ABFDE

22

---

23  [6]  Id., Exh. 18 (Deposition transcript of Lloyd Cunningham, dated March 31, at 93:9-15).
24  [7]  Id., Exh. 41 (CV of Dr. Valery Aginsky dated February 11, 2008).
25  [8]  Id.
    [9]  Id., Exh. 38 (Order Granting Mattel, Inc.'s Motion To Compel Bryant To Make
26  Original Documents Available For Expert Examination And Testing, August 30, 2007
27  ("08/30/2007 Order").
    [10] Id., Exh. 17 (Kullman Depo. 33:22).
28  [11] Id., Exh. 17. (Kullman Depo. 34:11-12).

1 | board certification as a forensic document examiner[12] because he lacks the credentials
2 | required to obtain such certification.[13]

3 | Further, Dr. Lyter, who presented a handwriting-based analysis in each of
4 | his March 17 and May 6 Reports, has admitted he is not an expert in handwriting
5 | analysis[14] and considers himself to be "an expert in the examination of question
6 | documents in areas other than examination of handwriting."[15]   At deposition, while
7 | describing the typical work conducted by a handwriting expert, Dr. Lyter admitted, "I
8 | do not consider myself one of those."[16]

9 | In contrast to Mattel, MGA has refused to make any showing to the
10 | Discovery Master about Mr. Kullman or Dr. Lyter.[17]  As a result, neither of them was
11 | ever reviewed or approved by the Discovery Master and neither of them made a sworn
12 | statement to the Discovery Master or to this Court, as Mattel's experts did, as to their
13 | understanding that they were accountable for preserving the evidence while in their
14 | possession.[18]

15 | And Mr. Kullman and Dr. Lyter took a very casual approach to their
16 | treatment of the documents. Mr. Kullman admitted at deposition that, contrary to his
17 | normal practice, in this case, he reordered all the documents in the seven boxes of
18 | documents when he received them and kept no record of the documents original
19 |
20 |

21 | [12]  Id., Exh. 8 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at 36:18).
22 | [13]  Id. at 36:22.
23 | [14]  Id. at 53:15.
   | [15]  Id. at 256:3-5.
24 | [16]  Id. at 12:21-22.
25 | [17]  Id., Exh. 10. (MGA's Opposition to Mattel's *Ex Parte* Application for Protective Order Re Prince Notary Book dated March 12, 2008).
26 | [18]  Dr. Lyter was approved by the Court to take certain plugs from the notary book,
27 | but that was because Mattel agreed that he could take the microplugs under Dr. Aginsky's and the Court's supervision, not because any showing was ever made to the
28 | Discovery Master.

1 order.[19]  Dr. Lyter admitted that he discarded the boxes the documents were kept in
2 (and any markings they had on them) without notice to Mattel because he thought they
3 were worn out.[20]  And in contrast to Mattel's experts, who had just a few days with
4 thousands of originals, both Mr. Kullman and Dr. Lyter conducted unrestricted,
5 pervasive testing on the Bryant originals, with Mr. Kullman doing so throughout April
6 and well into May.

7 **Mattel's Experts' Findings.**  When Carter Bryant created the original
8 Bratz drawings is a key issue for Phase I. Mr. Bryant contends that he first drew the
9 original drawings of the Bratz dolls in black-and-white on tracing paper in 1998,[21] and
10 that in 1999, he took those drawings and, using a lightbox, traced those drawings onto
11 posterboards and then colored them in for the first time.[22] Mr. Bryant has testified that
12 he then put the colored drawings aside for another year, when he then used them in
13 2000 to pitch the Bratz to MGA.[23]

14 Mattel's experts, Lloyd Cunningham and William Flynn, examined
15 Bryant's original drawings. They found evidence, based on a variety of forensic tests,
16 that the tracing paper drawings were traced from the posterboards that Mr. Bryant

---

[19] Mr Kullman admitted that he found it too time consuming to keep the documents in their original order and so he reorganized them and in fact departed from his normal practice of keeping a record of the original order of the documents, losing that evidence in the process. Id. Exh. 17 (Kullman Depo. at 180:1-181:12).

[20] Id. Exh. 2 (Lyter Depo. at 79:25-80:24).

[21] Id., Exh. 36 at 49:1-5; 152:1-17; Exh. 25 (Deposition transcript of Carter Bryant dated January 24, 2008 at 1186:1-1187:21; 1198:3-24). The tracing paper drawings subject to this testimony that superimpose with existing multimedia posterboard drawings are: 194, 197, 199, 201, 204, 206, 208, 212, 213 and are attached as Exh. 35.

[22] Id., Exh. 28 at 1198:3-24 and Exh. 26 (Deposition transcript of Carter Bryant dated November 4, 2004 at 1156:1-19). The multimedia posterboard drawings subject to this testimony that superimpose with existing tracing paper drawings are: 220, 222, 224, 226, 227, 231, 233, 234 and are attached as Exh. 35.

[23] Id., Exh. 36 (Deposition transcript of Carter Bryant dated November 4, 2004 56:3-64:20).

1  admits did not exist until 1999, meaning that the tracing paper drawings Bryant claims
2  he drew in 1998 were actually drawn in 1999, while he worked for Mattel.[24]

3         Mr. Bryant further testified, with respect to 13 of the tracing paper
4  drawings he said he created in 1998, that he had had them notarized by a friend,
5  Jacqueline Prince, on August 26, 1999.[25] He claims that when he brought the drawings
6  to her, he told her that he had created them in Missouri in 1998.[26] The first four lines of
7  the notation in her notary log book for that date reads: "Original sketches of / doll idea
8  - characters / 6 - total = Names are:  Zoe, / Lupe, Hallidae, Jade, 2 males."  The final
9  line, which appears to be squeezed in below the other lines, says "From 1998
10  Missouri."[27]

11         Mattel's expert, Dr. Aginsky, examined the pages of the notary book
12  containing the August 26, 1999 notary log book entry.  Dr. Aginsky, as did Mr.
13  Cunningham, observed that the last line "From 1998 Missouri" appeared squeezed in
14  between the fourth line of the entry and the pre-printed line of the notary book entry.[28]
15  He also found that the ink used for that last line was a different ink than the ink used in
16  the first four lines of the same entry, and different than that used for all the other entries
17  on pages 11 and 12.[29]  He concluded that the last line was added after and at a different
18  time than the previous lines, and that it was likely added after all the later entries in the
19

20   [24]  Id. Exhs. 15 and 14 (Expert Reports of William Flynn and Lloyd Cunningham
21  dated February 11, 2008.)
     [25]  Id., Exh. 26 (Deposition transcript of Carter Bryant dated January 23, 2008 at
22  846:1-847:15) and Exh. 27 (Deposition transcript of Jacqueline Prince dated December
23  21, 2004 at 148:5-25).  Bryant deposition, November 4, 2004 55:15-56:9. The notarized
     tracing paper drawings that superimpose with existing multimedia posterboard
24  drawings are: 194, 201, 204, 208 and attached as Exhibit 35.
     [26]  Id., Exh. 26 (Deposition transcript of Carter Bryant dated January 23, 2008 at
25  846:1-847:15) and Exh. 27 (Deposition transcript of Jacqueline Prince dated December
26  21, 2004 at 148:5-25).
     [27]  Id., Exh. 1 (Report of Dr. Aginsky dated February 11, 2008 at 7).
27   [28]  Id.
28   [29]  Id.

1  notary book had been added.[30] This evidence suggests that the self-serving "From 1998
2  Missouri" notation was not placed in the book in August 1999, but was added at some
3  later time when Mr. Bryant realized such "evidence" would be useful to him.

4          **Dr. Lyter's March 17 and Mr. Kullman's April 4, 2008 Opinions:  The**
5  **Pencil-Line-Sequencing Theory.**   In his first rebuttal report, dated March 17, 2008,
6  Dr. Lyter, reached the exact opposite conclusion of Mr. Flynn, concluding that the
7  posterboard drawings had in fact been traced from the drawings on the tracing paper
8  and not vice versa.[31]  Dr. Lyter alleges that he found pencil lines underneath the ink
9  lines on Bryant's tracing paper drawings.[32]  He extrapolates from this finding that the
10 posterboard drawings, which do not contain pencil lines, must have been based on the
11 tracing paper drawings and not vice-versa.[33]

12         During his deposition, however, Dr. Lyter admitted that even though the
13 pencil lines were important to his conclusions,[34] he had not disclosed them in his report
14 or in his testimony.[35]  He testified that an expert wanting to see the pencil lines he had
15 relied upon would require access to the Bryant originals.[36]  Dr. Lyter further admitted
16 that he did not disclose in his report even his conclusions with respect to the tracing
17 paper drawings that the pen was traced from the pencil,[37] or that the pen was in all cases
18 written over the top of the pencil,[38]   much less any bases for them, or any data

19

20
    _____
21      [30]  Id.
        [31]  Id. Exh. 21 (Expert Report of Dr. Lyter dated March 17, 2008).
22      [32]  Id.
        [33]  Id.
23      [34]  Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at
24 303:1-25).
        [35]  Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at
25 291:16-296:15).
26      [36]  Id.
        [37]  Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at
27 64:4-66:19).
28      [38]  Id.

1   supporting them.  Meanwhile, Dr. Lyter had testified that he had taken some images of
2   the pencil lines using infrared reflectance but that he did not produce them to Mattel.[39]

3            Similarly, in his April 4, 2008 report, Mr. Kullman presented a pencil-line-
4   sequencing analysis and mentioned in his report just a handful of the faint lines he
5   supposedly saw.[40]  Mr. Kullman could not identify at deposition the pencil lines he was
6   relying on.[41]  Mr. Kullman's original report referenced exhibits showing infrared testing
7   results supporting his pencil-line-sequencing analysis, but the exhibits were not
8   attached.[42]  When Mattel's counsel asked for the exhibits, Mr. Kullman refused to
9   produce them and amended his report to remove the reference to the exhibits.[43]

10           Despite MGA's sandbagging, the contours of the pencil-line-sequencing
11  theory began to emerge in Mattel's experts' depositions on March 27 and March 31.  On
12  April 2, 2008 Mattel requested two weeks' access for Mr. Cunningham and Mr. Flynn
13  to examine these drawings and to conduct non-destructive infrared testing and imaging
14  to see these purported pencil lines,[44] but MGA refused to allow any access, and
15  opposed Mattel's *ex parte* application to the Discovery Master seeking that access.[45]
16  Almost six weeks later, on May 13, the Discovery Master ruled against Mattel on the
17  issue, in significant part because it was at that point too late to conduct the examination
18  and any follow-on discovery that might be necessary.

19  _____
20  [39]   Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at
     97:20-98:20).
21  [40]   Id., Exh. 22 (Expert Report of Robert Kullman dated March 17, 2008.)
     [41]   Id., Exh. 17 (Deposition Transcript of Robert Kullman dated April 8, 2008 at
22  85:11-86:24.)
     [42]   Hutnyan Decl. at ¶ 22.
23   [43]   Hutnyan Decl. at ¶ 23.
     [44]   Id., at Exh. 23  (Letter from Diane Hutnyan to Matthew Sloan dated April 2,
24  2008).
25  [45]   Id., at Exh. 23 (Letter from D. Hutnyan to M. Sloan and M. Werdegar, dated
26  April 2, 2008) and Exh. 24 (Defendants' Joint "Preliminary" Opposition to Mattel's
     Motion for Access to Certain Bryant Originals dated April 8, 2008) and Exh. 25.
27  (footnote continued)
28

While MGA would not even let Mattel's experts *look at* the evidence MGA's experts were relying on, throughout April and into May 2008, Mr. Kullman was freely using the documents for MGA's benefit, lining them up individually and in composite shots, subjecting them to further infrared testing and examination, and imaging them at his leisure for presentation by himself and/or Dr. Lyter to the jury.[46] On May 5, 2008, Mattel learned this when MGA served on it 210 images of the documents created by infrared testing. MGA admitted that these images relate to Dr. Lyter's pencil-line-sequencing theory, and that they were taken after Dr. Lyter's deposition.[47] Mattel requested additional deposition time on the new materials,[48] but MGA, having avoided Dr. Lyter's and Mr. Kullman's questioning on their actual infrared results previously by refusing to produce the images they had created before their depositions, and then producing these after their depositions were long over, refused to allow Mattel any questioning on them whatsoever.[49] As a result, it is unclear as to which documents or composites they are purportedly images of.

**Dr. Lyter's May 6, 2008 Opinion: The Notary Book Entry.** After receiving Dr. Aginsky's report, MGA sought permission to "replicate" the ink testing performed by Dr. Aginsky.[50] Over and over and over, MGA assured Mattel and the Discovery Master that it sought no more than to "replicate Mattel's testing" and to

---

(Defendants' Joint Second Opposition to Mattel's Motion for Access to Certain Bryant Originals dated April 17, 2008)

[46] Id., Ex. 42 (Email from Matthew Sloan to Diane Hutnyan dated May 15, 2008) ("The images were marked by our paralegals with an AL bates number because we anticipate that they will likely be introduced by Dr. Lyter at trial ("although we reserve the right to have Mr. Kullman testify about them as well").

[47] Id., Exh. 33 (MGA's response to the Second Supplemental Declaration of Diane C. Hutnyan in support of Mattel's *Ex Parte* Application for Access to Certain Bryant Originals dated May 9, 2008).

[48] Id., Exh. 43 (Letter from Diane Hutnyan to Matthew Sloan dated May 11, 2008.)

[49] Id., Exh. 20 (Letter from Matthew Sloan to Diane Hutnyan dated May 12, 2008).

[50] Id., Exh. 43 (Letter from Diane Hutnyan to Matthew Sloan dated May 11, 2008.)

1 conduct "the very same testing" Mattel had performed on the Prince notary book.[51]
2 While the two draft testing protocols MGA sent Mattel were accompanied with the
3 same reassurances,[52] they were in fact so open-ended as to allow unlimited ink plugging
4 and testing by multiple, unapproved "experts."[53]

5       Frustrated by Mattel's unwillingness to allow just anyone to handle and
6 punch holes in this key piece of evidence, MGA had Ms. Prince's counsel send the
7 notary book to Dr. Lyter and informed Mattel that it would begin the destructive testing
8 almost immediately.[54] Mattel brought a motion for protective order, asking the Court
9 for protection against MGA's uncontrolled destructive "testing." On April 11, 2008, at
10 the Discovery Master's request, the parties each submitted a proposed protocol for the
11 ink testing, and on April 22, the Discovery Master issued an order mirroring Mattel's
12 proposed protocol in nearly every aspect[55] and ordering that Lyter could take a total of
13 19 sets of samples -- 17 sets of writing ink samples, and 2 sets of blank paper samples.

14

15    [51] Id., Exh. 5 ( Letter from Ryan Weinstein to Daniel Warren dated February 18,
16 2008); Id., Exh. 8 (Letter from Matthew E. Sloan to Diane Hutnyan dated March 4,
17 2008); see also id., Exh. 10 (MGA's Opposition to Mattel's Ex Parte Application for
Protective Order Re Prince Notary Book) at 16:23-24 ("All that MGA seeks is the
18 opportunity to perform the same testing performed by Mattel's expert, pursuant to the
19 same protocol employed by Mattel"); Exh. 13 (MGA's Ex Parte Application for an
Order Extending the March 17 Deadline, "MGA simply seeks the right to perform the
20 same testing, under the exact same circumstances.") at 2:15-16; id., at 19:3 ("MGA
21 seeks to perform the exact same testing performed by Mattel."); id., at 18:14-16 (stating
that Mattel "cannot genuinely claim that it will be prejudiced by MGA's attempt to
22 replicate testing" because MGA sought to test exactly what Mattel had tested).
23    [52] Id., Exh. 6 (Stipulation Re MGA's Proposed Testing of Jacqueline Prince's
Notary Book, Version 1 at 2) ) (stating that MGA seeks to have "its own expert
24 replicate Mr. Aginsky's ink testing") and Exh. 7 (Stipulation Re MGA's Proposed
25 Testing of Jacqueline Prince's Notary Book, Version 2 at 2 (same).
   [53] Id., Exhs. 6 and 7 (From previous footnote, whatever the numbers are)
26    [54] Id., Exh. 44 (Letter from Matthew Sloan to Diane Hutnyan dated March 6, 2008).
27    [55] Compare Exh. 11 (Order Re Testing of Jacqueline Prince's Notary Log Book) at
¶ 4 to Exh. 29 Mattel's Proposed Protocol to the Discovery Master dated April 11,
28 2008).

1 | The sampling was scheduled for April 28, and Dr. Lyter's report was due May 12,
2 | 2008.[56]

3 | But Dr. Lyter did not limit himself to the 19 authorized sets, or to
4 | replicating what Dr. Aginsky did. Dr. Lyter took a *twentieth* set of eight microplugs
5 | from one of the thick, preprinted, horizontal lines in the notary book.[57]   Since
6 | Dr. Lyter's report included no mention of these plugs, much less the testing results or
7 | chromatograms, Mattel asked if it could take eight plugs from the same new area
8 | Dr. Lyter had, so that it could replicate his data for examination that way.[58] The answer
9 | was no.[59]

10 | Meanwhile, Dr. Lyter's May 6 Report, contrary to Dr. Aginsky's
11 | conclusion, found there was no difference between the ink of the fifth line, "From 1998
12 | Missouri," and the ink used in the rest of the August 1999 and subsequent notary book
13 | entries. At least, Dr. Lyter stated that he could not detect a difference between the fifth
14 | line and any other ink on the page.[60]   The May 6 Report did not include any
15 | chromatograms or mass spectra and they have still not been produced.[61] Thus, several
16 | days past the Court's May 12 Rebuttal Report deadline, five days before Dr. Lyter's
17 |
18 |

[56] Id., Exh. 34 (Court's Order dated March 19, 2008 granting MGA Defendants' Ex Parte Application For an Order Extending the March 17 Deadline for MGA to Serve Its Rebuttal Expert Report Concerning Ms. Prince's Notary Book dated March 19, 2008).
[57] Id., Exh. 12. [attached color photocopy of the notary book page (unauthorized microplugs are circled). -- there are three groupings of microplugs taken from "blank" areas of the page. From each of the areas with no lines in them, four plugs were taken by Dr. Aginsky, and four plugs were taken by Dr. Lyter. The third area, the area containing the pre-printed line, contains a group of 8 microplugs taken only by Dr. Lyter. Compare to Exh. 45 (page prior to Lyter's testing).
[58] Id., Exh. 46 (Letter from Diane Hutnyan to Matthew Sloan dated May 5, 2008).
[59] Id., Exh. 47 (Letter from Matthew Sloan to Diane Hutnyan dated May 6, 2008).
[60] Id., Exh. 48 (May 6 report of Dr. Lyter).
[61] When Mattel asked MGA to produce these chromatograms, it replied that it would only produce them less than 2 weeks before trial. See, id., Exh. 20 (Letter from Matthew E. Sloan to Diane C. Hutnyan dated May 12, 2008).

1 deposition, and twelve days from trial, Mattel still has none of the actual data resulting
2 from the GC-MS test.

3          Dr. Lyter's May 6 Report also included handwriting-based opinions
4 pertaining to the notary book.[62]  But there was no legitimate reason why Dr. Lyter
5 could not have provided this opinions in March when his rebuttal report was due.
6 Although Dr. Lyter had not disclosed in his March 17 report that he had read
7 Dr. Aginsky's report,[63] he admitted on April 17 that he had read it and seen copies of
8 the notary log book entry (with the handwriting in question) before issuing his report.[64]
9 Even though the May 6 Report contains both new ink testing opinions and handwriting
10 analysis, MGA will only allow Mattel four hours of deposition time to explore the
11 entirety of the May 6 report.

12 **Argument**

13 **I.   FRCP 26 REQUIRES EXPERTS TO TIMELY PROVIDE ALL BASES,**
14 **OPINIONS, DATA AND EXHIBITS; A FAILURE TO DO SO MUST**
15 **RESULT IN THE EXPERTS' REPORTS BEING STRICKEN**

16          Under the Federal Rules of Civil Procedure, initial expert reports must
17 disclose "a complete statement of *all opinions the witness will express* and the *basis*
18 and reasons for them; the *data or other information considered* by the witness in
19 forming them; and *any exhibits* that will be used to summarize or support them." Fed.
20 R. Civ. P. 26(a)(2)(B)(i)(ii)(iii) (emphasis added).  Further, under FRCP 37, "if a party
21 fails to provide information or identify a witness as required by Rule 26(a) ..., the party
22 is *not allowed to use that information* or witness to supply evidence on a motion, at a
23 hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.
24 R. Civ. P. 37(c) (emphasis added).

25     [62]   Id., Exh. 48 (May 6 report of Dr. Lyter).
26     [63]   Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at
27 86:6-87:9; 142:1-24.

28

1          In <u>Yeti by Molly, Ltd. v. Deckers Outdoor Corp.</u>, 259 F.3d 1101 (9th Cir.

2  2001), the Ninth Circuit affirmed the district court's decision to exclude the expert

3  report and testimony of the defendant's only damages expert. The Court held that the

4  party submitting testimony that was not disclosed in the original expert report bears the

5  burden of proving that the failure was substantially justified or harmless. <u>Id</u>. at 1106-7.

6  Specifically, the defense report was excluded because it was served only 28 days before

7  trial and could and should have been served earlier. <u>Id</u>. The Court found that the

8  defendant's late submission was not substantially justified. <u>Id</u>. The court concluded that

9  even though the defendants "never violated an explicit court order to produce the

10  Vuckovich report and even absent a showing in the record of bad faith or willfulness,

11  exclusion is an appropriate remedy for failing to fulfill the required disclosure

12  requirements of Rule 26(a)." <u>Id</u>. at 1106.

13          Similarly, in <u>Minebea Co., Ltd. v. Papst</u>, 231 F.R.D. 3 (D. D.C. 2005), the

14  Court found that defendant's expert could have and should have submitted his findings

15  in advance of trial. When the defendant could not offer a substantial reason for serving

16  the report just weeks before trial, the Court excluded his report. <u>Id</u>. The Court also

17  found that the inclusion of this report would not be harmless because, among other

18  reasons, the report provided "additional information to support specific elements of

19  Minebea's case." <u>Id</u>. at 6.

20          Both Dr. Lyter and Mr. Kullman's report are glaringly insufficient and

21  untimely in many respects. The Court has an obligation as a gatekeeper to allow all the

22  facts to come before the jury. <u>See</u> <u>Phillips v. Netblue, Inc.</u>, 2007 WL 528722 (N.D.

23  Cal. 2007), ("sitting in its capacity as gatekeeper, the Court must ensure that an expert's

24  testimony 'both rests on a reliable foundation and is relevant to the task at hand.)

25  (citations omitted); <u>Taylor v. Burlington Northern R. Co.</u>, 787 F.2d 1309, 1315 (9th

26

27     ——————————

[64] <u>Id</u>., Exh. 2, (Deposition transcript of Dr. Lyter dated April 17, 2007 at 86:6-10);
28  <u>Id</u>., Exh. 3 (Letter from Dan Warren to Dr. Lyter dated March 6, 2008).

1 | Cir. 1986) (In doing so, "[t]he trial court has broad discretion in admitting and
2 | excluding expert testimony").

3 |         As the Supreme Court has explained, "Expert evidence can be both
4 | powerful and quite misleading because of the difficulty in evaluating it. Because of this
5 | risk, the judge in weighing possible prejudice against probative force under Rule 403 of
6 | the present rules exercises more control over experts than over lay witnesses." Daubert
7 | v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 595 (2003); see also United States
8 | v. Frazier, 387 F. 3d 1244, 1263 (11th Cir. 2004) (warning about the "powerful and
9 | potentially misleading effect of expert evidence"). Thus, the Court's role as gatekeeper
10 | is even more important when it pertains to expert testimony. See Dodge v. Cotter
11 | Corp., 328 F. 3d 1212, 1229 (10th Cir. 2003) (finding that district court abused its
12 | discretion and violated its role as gatekeeper when it admitted expert reports without
13 | concluding that they were based on valid reasoning).

14 |         It is not the first time Dr. Lyter has failed to include all the bases of his
15 | opinions in his report. In Watts v. Cyprus Hill, 2008 WL 697356 (N.D. Ill. 2008), the
16 | Court excluded Dr. Lyter's report for because, among other things, it was incomplete
17 | and lacked the bases for many of Dr. Lyter's conclusions. Id. at *2. The report
18 | included only a four-page CV; nine photographs of the document in question at various
19 | levels of magnification; one page with some handwritten notations; and a
20 | chromatography printout. Id. The Court found that the report must include whatever
21 | the party intends to elicit from the expert during trial. Id at 8. A report must be
22 | complete enough "such that opposing counsel is not forced to depose an expert in order
23 | to avoid ambush at trial." Id. at *3 citing Salgado v. General Motors Corp., 150 F.3d
24 | 735, 741 n. 6 (7th Cir. 1998).

25
26
27
28

1  **II.    DR. LYTER FAILED TO PROVIDE ALL THE BASES, EXHIBITS,**
2         **AND OPINIONS HE PLANS TO TESTIFY ABOUT IN HIS MAY 6**
3         **REPORT**

4          Dr. Lyter's opinions relating to the handwriting habits of Ms. Prince in the
5  notary book should have and could have been included in the first report he filed on
6  March 17, 2008. See Lindner v. Meadow Gold Dairies, Inc., 2008 WL 763236, at *13-
7  14 (D. Hawaii 2008) ("Although Fed.R.Civ.P. 26(e) requires a party to 'supplement or
8  correct' disclosure upon information later acquired, that provision does not give license
9  to sandbag one's opponent with claims and issues which should have been included in
10  the expert witness' [initial] report") (citations omitted); see also Ullman v. Auto-Owners
11  Mut. Ins. Co., 2007 WL 1057397, at *5 (S.D. Ohio 2007) (Rule 26 "prevents experts
12  from 'lying in wait' to express new opinions at the last minute, thereby denying the
13  opposing party the opportunity to depose the expert on the new information or closely
14  examine the expert's new testimony").

15          Dr. Lyter had already reviewed Dr. Aginsky's report, as well as the reports
16  of Mattel's other experts.[65] Dr. Aginsky's and Mr. Cunningham's reports had included
17  their visual observations and conclusions relating to the "From 1998 Missouri" entry
18  and the pages in question were reproduced in Dr. Aginsky's report itself.[66]
19  Furthermore, by March 7, 2008, Dr. Lyter had access to the actual notary book, the
20  ability to examine it, and thus the ability to include his opinions regarding the spacing
21  of the "1998 Missouri" entry in his first report.[67]  The conclusions Dr. Lyter drew
22  regarding the spacing of the handwriting in this entry did not require ink testing or
23  anything more than examination with the naked eye.  Instead of properly including this

24

25  [65]  Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at
291:16-296:15).
26  [66]  Id., Exhs. 1 and 14 (Expert Reports of Dr. Aginsky and Mr. Cunningham, dated
27  February 11, 2008).
28  [67]  Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at
291:16-296:15).

1   opinion in his first report, he chose to wait until weeks after his deposition, and days
2   before trial, to serve this new opinion on Mattel.   See Toomey v. Nextel
3   Communications, Inc., 2004 WL 5512967, at *4-5 (N.D. Cal., 2004) (holding that an
4   expert report ordinarily must contain "a complete statement of all opinions to be
5   expressed and the basis and reasons therefore"  and that a party must "disclose
6   information regarding expert testimony sufficiently in advance of trial that opposing
7   parties have a reasonable opportunity to prepare for effective cross-examination and
8   perhaps arrange for expert testimony from other witnesses").

9          Likewise, Dr. Lyter has not attached the chromatograms or mass spectra
10  generated from his ink testing of the notary book microplugs.  In the case of an optimal
11  separation of ink components, different peaks or patterns on the chromatogram
12  correspond to different components of the separated ink.   By examining these
13  chromatograms and mass spectra, which are significant bases for Dr. Lyter's opinions,
14  Mattel and its experts could examine, verify or challenge those opinions.  Because the
15  chromatograms and mass spectra are the "bases . . . for [his opinion" they should have
16  been disclosed in Dr. Lyter's report no later than May 12.[68]  Not only were they not
17  disclosed, but they would never have been disclosed, had Mattel not demanded them.[69]

18         There was a reason this Court *required* Dr. Lyter's report to be completed
19  two weeks from the testing.  Without this information, Mattel and its experts cannot
20  even begin to analyze Dr. Lyter's findings or prepare a thorough and informed
21  deposition outline, a process made more difficult by MGA's refusal to allow more than
22  four hours of deposition time with Dr. Lyter on all of his new opinions (the May 6
23  Report is longer and more complex than the March 17 Report, especially since it is
24  missing all the underlying bases for his opinions and data supporting them).  Mattel

25

---

26  [68] Id., Exh. 34 (Court's Order Granting MGA Defendants' Ex Parte Application For
27  an Order Extending the March 17 Deadline for MGA to Serve Its Rebuttal Expert
    Report Concerning Ms. Prince's Notary Book dated March 19, 2008).
28  [69] Hutnyan Decl. at ¶ 48.  As of this writing, Mattel has still not received them.

1  should not have to bear the burden of MGA's selective and late disclosure. Dr. Lyter
2  has failed to properly disclose the data supporting his ink testing opinions, and thus any
3  reference to his ink testing opinions should be excluded.

4     Not only do these chromatographs serve as the basis for Dr. Lyter's
5  opinion, but they also constitute underlying "data or other information considered by
6  the witness in forming [his opinion]." Like bases, if the underlying data is not timely
7  produced, the proper remedy is the exclusion of the expert report. In <u>Olson v. Montana</u>
8  <u>Rail Link, Inc.</u>, 227 F.R.D. 550, 552-553 n.1 (D. Mont. 2005), the court held that
9  "failure to timely disclose underlying data of expert report warranted sanction of
10  excluding expert from in any way relying upon data or conclusions specifically not
11  included and spelled out in his timely disclosure."

12     In addition, MGA has failed to produce the main basis for Dr. Lyter's
13  opinion -- the new area of the notary book from which Dr. Lyter took plugs. Dr. Lyter
14  performed tests on these plugs, and the conclusions in his report are partly based on
15  them. Without disclosure of the chromatograms and other bases for these conclusions,
16  it was all the more important to afford Mattel eight microplugs from the same area so
17  that at least it could generate similar data that it could analyze and prepare for trial, but
18  MGA refused to allow that either so that can it spring Dr. Lyter's opinions to the jury
19  virtually untested.

20     For these reasons, Dr. Lyter's opinions regarding the ink testing of the
21  notary book must be excluded.

22  **III. DR. LYTER'S AND MR. KULLMAN'S OPINIONS REGARDING THE**
23     **SEQUENCING OF BRYANT'S ORIGINAL DOCUMENTS MUST BE**
24     **STRICKEN FOR BEING INSUFFICIENT AND UNTIMELY**

25     Both Dr. Lyter and Mr. Kullman allege as an important part of their
26  pencil-line-sequencing theory that purported pencil lines they detected underneath the
27  colored part of the multimedia posterboard drawings indicate that the tracing paper
28

1 | drawings were drawn first.[70]  Rather than agreeing to give Mattel access to the Bryant
2 | originals to examine them and either verify or test Dr. Lyter and Mr. Kullman's
3 | conclusions, MGA has treated expert discovery as a game, where MGA and Bryant's
4 | experts can avoid such scrutiny by denying Mattel even basic access to the facts.

5 |      Mattel had a *mere 35 days,* back in September, to have its four experts
6 | examine thousands of Bryant originals, but MGA and Bryant have had possession of
7 | these documents for *years*.  And Mattel had much more to examine, not just because it
8 | was preparing the opening report and examining all the previously unexamined
9 | documents, but since MGA had previously engaged in destructive testing of the key
10 | documents without authorization, since witnesses had testified as to documents being
11 | altered, etc.  Also, Mattel's experts were required to maintain the original order of the
12 | documents, which was quite time consuming in itself.  Accordingly, the 35-day period
13 | was sufficient for a review of the materials and some concentrated study in certain
14 | areas, but it was not comparable to the access to the documents that MGA's experts
15 | enjoyed.

16 |      MGA and Bryant gave Dr. Lyter and Mr. Kullman whatever access they
17 | wanted (in fact, Mr. Kullman now has possession of the Bryant originals, having
18 | apparently just created 210 images of them on the VSC machine to use as exhibits to
19 | support Dr. Lyter and Mr. Kullman in presenting their opinions to the jury).  With the
20 | benefit of Mattel's experts' reports having narrowed down the issues for them, and
21 | having no restrictions whatsoever, much less Court oversight, as to their activities, Dr.
22 | Lyter and Mr. Kullman conducted tests they knew Messrs. Flynn and Cunningham had
23 | no time to perform.  Taking full advantage of the fact that the evidence they supposedly
24 | developed could not be seen by Mattel's experts without further access to the
25 | documents (at Dr. Lyter's deposition, he actively advocated against sharing access to

---

[70] Id., Exhs. 21 and 22 (Dr. Lyter and Mr. Kullman's Expert Reports).

1   the evidence with Mattel's experts),[71] they created a whole novel theory around the

2   supposed pencil lines -- supposed pencil lines that can be questioned but never fully

3   tested or assessed by Mattel.

4           MGA's own experts *agree* that the time in which Mattel's experts had to

5   examine the documents was insufficient to explore fully every facet of each of the 200

6   questioned documents.  Mr. Kullman admitted that it would take him an "extended

7   period of time" for him to do a basic examination of the seven boxes, and that with

8   three helpers, he alone spent from 50-100 work hours just processing the small subset

9   of documents (approximately 200) that were the subject of Mr. Flynn's initial report.[72]

10  Kullman's testimony establishes that it would be extremely difficult, if not impossible,

11  for a forensic document examiner to run the full spectrum of tests on all seven boxes of

12  documents during in an 8-day period, much less the 3-day period that Mr. Flynn had.[73]

13

14

15  ───────────────

[71]   See, generally, id., Exh. 2 (Deposition transcript of Dr. Albert Lyter, dated April
16  17, 2008, at 294:4-296:18).

[72]   Id., Exh. 17 (Deposition Transcript of Robert Kullman dated April 8, 2008 at
17  205:24-205:23).

18  [73]   Despite MGA's contentions otherwise, Mattel's first expert, Mr. Lloyd
19  Cunningham, had only eight days to examine the documents. See deposition transcript
    of Lloyd Cunningham, dated March 31, 2008, at 32:17-33:17, attached as Exh. 18 to
20  the Hutnyan Decl. Mattel's other expert, Mr. William Flynn, had only three working
    days to examine the documents. See also deposition transcript of William Flynn, dated
21  March 27, 2008, at 18:22-19:7, attached as Exh. 19 to the Hutnyan Dec. Mattel did not
22  have 40 days to examine the document as Defendants contend; rather they had 35 days
    to examine them during which they had to shuttle the documents between 4 experts
23  located in vastly different parts of the country.  The stipulation for four days of paper
24  testing by Mr. Rantanen only contemplated sampling of 200 documents; the balance of
    the documents were sent because MGA and Bryant insisted on keeping all the
25  documents in their original order at all times.  At least they insisted on *Mattel's experts*
26  keeping the documents in their original order. Mr Kullman admitted that he found that
    procedure too time consuming and so he reorganized them and in fact departed from his
27  normal practice of keeping a record of the original order of the documents, losing that
28  evidence in the process.  See Exh. 17 (Kullman Depo at 180:1-181:12).

1  Even Dr. Lyter admitted that Mattel's experts would need access to the Bryant originals
2  to see the purported pencil lines.[74]

3        Thus, although Mattel was given <u>access</u> to the documents for a brief period
4  several months ago, the unusual circumstances here -- the extreme 35-day limitation on
5  Mattel's access; the unlimited access provided to MGA's experts; and the inherent
6  invisibility of the obscured pencil lines without access and special testing -- have all
7  worked to deprive Mattel of fair opportunity to challenge Defendants' conclusions,
8  rendering the playing field uneven and preventing Mattel's access from being
9  <u>meaningful</u>. Notably, embodied within litigants' right to conduct broad discovery is the
10  recognition that such discovery must be *meaningful*. <u>See, e.g.</u>, Carr v. Pacific Maritime
11  <u>Ass'n</u>, 904 F.2d 1313, 1321 (9th Cir. 1990) (grievance and arbitration procedures
12  "conducted within an extremely constricted time frame and without provisions for any
13  meaningful discovery, were wholly inadequate to the task of fairly adjudicating the
14  individual or class claims…."); <u>United States v. Hempfling</u>, 2008 WL 703809 * 9 (E.D.
15  Cal. 2008) ("Government's prejudice continues with its inability to conduct meaningful
16  discovery to pursue its claims.").

17        For all Mattel knows, the pencil lines Dr. Lyter and Mr. Kullman find so
18  significant do not even exist, or in fact cut against Lyter's and Kullman's conclusions.
19  Mattel has a right to see this same evidence, explore it and fully address it. It is simply
20  not fair to allow two parties almost all of the control over the key evidence while not
21  even allowing *access* to another party.

22        MGA will undoubtedly rely heavily on the Discovery Master's order
23  denying Mattel's request for access to the Bryant. The Discovery Master's opinion,
24  among other things, was based on the erroneous finding that Mr. Cunningham had
25  sixteen days to examine these documents.[75] In reality, Mr. Cunningham had only half

26

27  [74]  <u>Id.</u>, Exh. 2 (Deposition Transcript of Dr. Lyter dated April 17, 2008 at 291:16-296:15).
28  [75]  <u>Id.</u>, Exh. 32 (Discovery Master's May 13, 2008 Order at 2).

1  that time.[76] Moreover, MGA criticizes Mattel for not having moved for more time after
2  the 35 days were over, but it ignores the fact that Mattel had just moved for 60 days
3  unsuccessfully.[77]

4          Contrary to MGA's argument, Mattel is not trying to "re-do" testing that it
5  should have done in the first place. Its world-class experts conducted an examination
6  of the documents they found sufficient. The task now is to allow them to properly test
7  the unsupported opinions that MGA and experts have fought so hard to keep from
8  them. After all, without fair access, MGA's experts could say "these documents were
9  made of green cheese because I performed XYZ test" and Mattel would not be able to
10 refute this at trial. Basic fairness -- and F.R.C.P. 26 -- dictates that one party should not
11 have unlimited access to vital evidence while the other party has only a few days.[78]

12         Moreover, during his deposition, and in his expert report, Dr. Lyter
13 referenced only 2 of the "many" pencil lines that he allegedly found[79] and did not
14 disclose the rest in his report or in his testimony.[80] He admitted that an expert wanting
15 to see the pencil lines he had relied upon would require access to the Bryant originals.[81]
16 Nor does Dr. Lyter's or Mr. Kullman's report include their conclusions with respect to
17 the tracing paper drawings: that the pen was traced from the pencil,[82] and that the pen
18

19  [76]  Id., Exh. 18 (Deposition transcript of Lloyd Cunningham, dated March 31, 2008
20  at 32:17-33:17).
     [77]  Id., Exh. 38 (08/30/2007 Order).
21   [78]  MGA has also argued that Mattel somehow wasted its 35 days by splitting that
22  time amongst its four experts. But each of these four experts have a different area of
    expertise, and it was important for each of them to review and make their own
23  observations about the eight boxes of Bryant documents without counsel steering them
24  through their analyses, as was apparently done by MGA's counsel.
     [79]  Id., Exh. 2 (Deposition Transcript of Dr. Lyter dated April 17, 2008 at 291:16-
25  296:15).
26   [80]  Id.
     [81]  Id.
27   [82]  Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at
28  64:4-66:19).

1   was in all cases written over the top of the pencil.[83]   MGA's experts' failure to disclose

2   these opinions and their bases in their reports hindered Mattel's analysis and deposition

3   of these experts, because they came as a surprise at the deposition.

4            As for MGA's production just days before trial of 210 images which

5   purport to show these pencil lines and other elements of Bryant's original drawings,

6   based on MGA representations, these are images were produced by Mr. Kullman so

7   that Dr. Lyter and Mr. Kullman can refer to them in front of the jury.[84]   As such, they

8   properly should have been produced before their depositions such that Mattel could

9   inquire about them.  In fact, both of MGA's experts had testified at deposition that he

10   had taken some images of the pencil lines using infrared reflectance but they did not

11   produce them.[85]

12            Strikingly, now that these images have been produced, MGA refuses to

13   allow Mattel to inquire about them at his deposition.[86]   Specifically, counsel for MGA

14   stated that he "will instruct [Dr. Lyter] not to answer any questions about the report or

15   about the digital infrared images and *enhanced color scans* of the Bryant documents

16   that MGA produced last week."[87] (emphasis added).  This alone is enough to strike this

17   portion of Mr. Lyter's report.  See Barrett v. Atl. Richfield Co., 95 F.3d 375, 381 (5th

18   Cir. 1996) ("There can be no question that each delay in producing and deposing expert

19   witnesses resulted in additional expense and disrupted the Defendants' preparation of

20   the case."); Johnson v. J.B. Hunt Transport, Inc., 280 F.3d 1125, 1131-1132 (7th Cir.

21             [83]   Id.

22             [84]   Id., Ex. 42 (Email from Matthew Sloan to Diane Hutnyan dated May 15, 2008)

23   ("The images were marked by our paralegals with an AL bates number because we

24   anticipate that they will likely be introduced by Dr. Lyter at trial (although we reserve the right to have Mr. Kullman testify about them as well").

25             [85]   Id., Exh. 2 (Deposition transcript of Dr. Albert Lyter dated April 17, 2008 at 97:20-98:20).

26             [86]   Id., Exh. 20 ( Letter from Matthew Sloan to Diane Hutnyan dated March 12,

27   2008).

28

1   2002) (affirming exclusion of expert testimony for refusal to appear for deposition);
2   Barrett v. Atl. Richfield Co., 95 F.3d 375, 380-382 (5th Cir. 1996) (same); Positive
3   Black Talk Inc. v. Cash Money Records, Inc., 394 F.3d 357, 377-378 (5th Cir. 2004)
4   (same); Leyva v. U.S., 2007 WL 1992095, *10 (D. Ariz. 2007) (excluding opinions in
5   expert affidavit, where party refused to allow deposition to proceed).

6       MGA admits that these images were created and "enhanced" after
7   Dr. Lyter's and Mr. Kullman's examinations and that they plan to reference these items
8   in front of a lay jury.[88] Yet, somehow, MGA contends that they have no requirement to
9   allow Mattel to find out what they are, or how they were created or "enhanced." This
10  violates both the spirit and the letter of FRCP 26.

11      Moreover, *all* pencil lines that Dr. Lyter found properly should have been
12  included in his report. See Toomey, 2004 WL 5512967, at *4 (expert report must
13  "disclose the data and other information considered by the expert and any exhibits or
14  charts that summarize or support the expert's opinions"). Given that they were not, Dr.
15  Lyter should be precluded from referring to any pencil lines not specifically identified
16  in his report.

17      Given that Dr. Lyter and Mr. Kullman failed to include the pencil lines in
18  their reports, cannot be deposed on the images they took of the Bryant originals, and
19  have refused to give Mattel access to the data (the Bryant originals) to test their
20  conclusions, FRCP 26 demands that the portion of their reports relating to the Bryant
21  originals be stricken.

22                      **Conclusion**

23      For the foregoing reasons, Mattel respectfully requests that the Court
24  exclude: Dr. Lyter's May 6 report and the portions of Dr. Lyter's March 17 and

25

26  [87]  Id., Exh. 20 ( Letter from Matthew Sloan to Diane Hutnyan dated March 12,
27  2008).
    [88]  Id., Exh. 20 ( Letter from Matthew Sloan to Diane Hutnyan dated March 12,
28  2008); Ex. 42 (Email from Matthew Sloan to Diane Hutnyan dated May 15, 2008)

1   Mr. Kullman's April 4, 2008 reports pertaining to the Prince notary book and the

2   sequencing of the Bryant originals.

3

4   DATED:  May 15, 2008                    QUINN EMANUEL URQUHART OLIVER &
                                            HEDGES, LLP
5

6                                           By _____
                                              Diane C. Hutnyan
7                                             Attorneys for Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28