EXHIBIT 1

www.rileywelch.com

# RILEY WELCH AGINSKY
## &
### FORENSIC DOCUMENT EXAMINATIONS, Inc.

P.O. Box 80225, Lansing, Michigan 48908-0225
Telephone (517) 394-1512   Fax (517) 882-2767

Thomas P. Riley, BS
Forensic Document Examiner *, **

Valery N. Aginsky, Ph.D., Ink Chemist
Gregoire P. Michaud, BA, Latent Print Examiner
Felix Adatsi, Ph.D., Toxicologist

Todd W. Welch, BA
Forensic Document Examiner*

February 8, 2008

Diane Cafferata Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3666

>          **Re:**   Bryant v. Mattel

Dear Ms. Hutnyan:

I have examined the following document:

**A-1:**   Official Journal of Notarial Acts comprising handwritten entries dated from 1/15/96 (pages 1 and 2) to 9/14/99 (pages 11 and 12).[1]

## EXAMINATION TASK

I was asked to determine whether the 8/26/99 notation "From 1998 Missouri" was written contemporaneously with the rest of the entry dated 8/26/99 on pages 11 and 12 of document **A-1** or whether it was written at a later date.

## QUALIFICATIONS

I am a forensic chemist of 27 years' experience.  I am currently employed, as a Forensic Chemist specializing in the field of ink analysis and document dating, with Riley, Welch & Aginsky Forensic Document Examinations, Inc. (formerly known as Riley, Welch & Associates Forensic Document Examinations, Inc.)  I received my Ph.D. in Analytical Chemistry in 1980.  Prior to joining Riley, Welch & Associates I worked as a senior research chemist with the Forensic

---

[1] Also, I have reviewed the following documents:  the August 30, 2007 Order of Judge Infante;  8 boxes of original Carter Bryant production documents described in Judge Infante's August 30, 2007 Order; bates numbered photocopies, video and photographs of these documents;  the transcripts of Carter Bryant's depositions taken on 11/4/2004 (Vol. 1), 11/5/2004 (Vol. 2), 11/8/2004 (Vol. 3);  the transcripts of Jacqueline Prince's deposition taken on 12/21/2004.

*Diplomate of the American Board of Forensic Document Examiners, Inc.
**American Society of Questioned Document Examiners

EXHIBIT __1__
PAGE __8__



Science Center, Ministry of the Interior, Russia. I am experienced in a wide range of examination techniques, but my particular specialty is the analysis and dating of ink on documents by Thin-Layer Chromatography and Gas Chromatography-Mass Spectrometry. I am the author of more than 20 peer-reviewed articles on ink analysis and dating, including chapters in three books and two encyclopedias.

A copy of my curriculum vitae showing further details of my professional history and a list of my professional publications is attached hereto as Exhibit "VNA-1."

In the past five years I have been deposed in my capacity as an expert fifteen times and have testified at trial and hearings as an expert on thirteen occasions, a list of which is attached hereto as Exhibit "VNA-2." I am being compensated for my work in this case according to my hourly rate, which is outlined in the fee schedule attached hereto as Exhibit "VNA-3."

## REPORT OF LABORATORY EXAMINATION

The addition of extra writing can greatly change the meaning of the wording or the value of a document. Therefore, forensic document examinations are often conducted in order to determine whether two pieces of written text originated from the same pen.

As it is usually preferable not to damage the document, the process of forensic ink comparison always begins with the physical examination of the inks using techniques designed to obtain as much information as possible from the ink (and the document as a whole) by visual examination and other nondestructive means, such as microscopic and infrared absorption examinations.[2] If any of the nondestructive techniques shows that the inks being compared are different, then no additional tests, including more sophisticated chemical tests, are required to prove that the two pieces of the written text did not originate from the same pen.

If the nondestructive techniques cannot discriminate between the inks being compared, then chemical methods are to be used. A few samples of each ink are taken from the paper for their chemical analysis. Chemical methods are more effective for discriminating between inks of the same color than the physical (nondestructive) methods. It is widely accepted in the field of forensic writing ink analysis that a combination of two chemical methods, thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS), allows the examiner to retrieve maximum information about the composition of writing ink.

Writing inks are made of colorants (dyes, pigments) and a carrier (vehicle). Oil- and water-based ballpoint ink vehicles consist of two main ingredients – solvents that are used to dissolve or disperse the colorants, and the resins that are used to thicken the inks. TLC analyzes ink colorants (ink colored components) and GC-MS analyzes ink vehicle components (volatile solvents, resins and other noncolored ink components, such as modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, etc.) That is, each of these two chemical methods, TLC and

---

[2] ASTM Standard Guide E1422-05, "Standard Guide for Test Methods for Forensic Writing Ink Comparison." Published January 2006. Originally approved in 1991. Last previous edition approved in 2001 as E 1422 – 01.

EXHIBIT ____1____
PAGE ____9____



GC-MS, can provide only some partial information about the composition of writing ink. In simple terms, TLC can analyze one half of the ink composition (1/2 of the "chemical fingerprint" of an ink), and GC-MS can analyze the other half of the ink composition (the other 1/2 of the "chemical fingerprint" of the ink). Thus, these two methods perfectly complement each other.[3]

The physical and chemical examinations including visual, microscopic, and infrared absorption examinations, TLC, and GC-MS were conducted in the following succession.

## PHYSICAL (NONDESTRUCTIVE OPTICAL) EXAMINATIONS

### VISUAL EXAMINATION

As mentioned above, the insertion of a modifying clause or sentence may change the meaning of a document. Visual examination is an accepted method in the field of forensic document examination that is used to detect insertions (interlineations or additions). To determine that an insertion or addition has been made usually involves a study of the document as a whole.

Two most common indications of the insertion of a handwritten sentence are as follows[4]:

1. The inserted sentence and the balance of the document are written with different inks.

2. Some sentence is either (*A*) inserted between the lines of the initial text (if no sufficient space was available within the initial text) or (*B*) inserted/added immediately after the last line of the initial text (if no sufficient space is available immediately after the last line of the initial text, then the spacing/distance between the inserted sentence and the last line of the text is usually smaller than the spacing between the lines of this text).

All the pages of document A-1 that contained handwritten entries were examined visually (pages 1 through 12; entries dated 1/15/96 through 9/14/99; see Attachment 3). Among these pages, the only place that showed the insertion of material to the initial text was where the notation "From 1998 Missouri" was added to the entry dated 8/26/99 on page 11.[5] The 4 lines of the text "Original sketches of doll idea – characters 6-total = Names are: Zoe, Lupe, Hallidae, Jade, 2 males." appear evenly spaced and, without the presence of the 5th line (the notation "From 1998 Missouri"), they appear to fill up the entire cell of the table on page 11. Thus, a person wishing to add further information to this 4-line entry would have to squeeze the new wording in between the last line of the entry and the printed horizontal line of the cell of the table in a way that would prevent the same even spacing as was in the original entry. Because no sufficient space was available immediately after the last line of the initial 4-line entry, there is almost no spacing

---

[3] Aginsky, V.N. "Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch," *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1, 2006, pp. 19-27.

[4] Scientific Examination of Questioned Documents / Edited by J.S. Kelly and B.S. Lindblom. – 2nd edition, CRC Press, Taylor & Francis, 2006, pp. 319-335.

[5] There might be other notations on pages 1 through 12 that could have been inserted, but the overall appearance of the other entries on pages 1 through 12 did not suggest later insertion.

EXHIBIT ___1___
PAGE ___10___



between the inserted 5th line (the notation "From 1998 Missouri") and the last line of the initial 4-line entry.

MICROSCOPY

The eye is in itself a powerful scientific instrument capable of discovering much information from an examination of ink on paper. With the aid of glass lenses for magnifying and focusing or a microscope (that uses visual light for illumination), the appearance of a line written on paper gives the document examiner valuable information that may allow discrimination between inks or may individualize the writing instrument through its performance characteristics.

In this examination, 4X and 10X magnifying glasses and a microscope with magnification up to 140X were used. I noted that the width of the ink lines in the notation "From 1998 Missouri" was slightly larger than the width of the ink lines in the rest of the 8/26/99 entry.

The microscopic study did not detect any significant differences between the inks or writing instruments used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by the microscopic examination.

INFRARED ABSORPTION

Inks of the same color (indistinguishable to the naked eye) may differently absorb/reflect invisible radiation beyond the red portion of the visible spectrum. This may allow discrimination between similar (in color) but not identical (in composition) inks. The infrared absorption examination did not detect any differences between the inks used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by the infrared absorption examination method.

**CHEMICAL EXAMINATIONS**

SAMPLING

The sampling procedure involved removing portions of the written lines from the entries to be examined. This was accomplished with a hypodermic needle sized hole punch, which removes hole punches of less than 1 mm in diameter. (The bored out ink samples are removed with a plunger). The ink-on-paper samples were taken from 17 areas on pages 11 and 12 of document A-1. The paper blank samples were taken from two areas of paper (on page 11) that did not contain ink. These 17 sets of ink samples and 2 sets of paper blank samples were then analyzed by TLC and GC-MS (as described below). Prior to their analysis by TLC and GC-MS, the samples were kept in my laboratory at normal environmental conditions.[6]

---

[6] Normal room/office humidity and temperature: 72 degrees Fahrenheit plus/minus up to approximately 15 degrees Fahrenheit (i.e. $22^{\circ}C$ +/- *ca.* $8^{\circ}C$).

EXHIBIT ___1___
PAGE ___11___



Black and white copies of pages 11 and 12 from which I took ink samples are attached to this report as Attachments 1 and 2, respectively. On these two attachments, each of the above 17 areas is circled and numbered. The questioned notation "From 1998 Missouri" is numbered as entry "8" (see Attachment 1).

## CHROMATOGRAPHY

Chromatography is used to separate mixtures of substances into their components. Chromatography was discovered in 1901 when Michael S. Tswett separated pigments from chlorophyll using self-made chromatographic columns packed with various adsorbents. This fundamental discovery marked a milestone in the development of chromatographic separation techniques that led to Nobel prizes in chemistry. Today, chromatography has become the main analytical method in the pharmaceutical industry, food analysis, petrochemical analysis (crude oil, gasoline, kerosene, etc.), biochemical research, environmental analysis (e.g., pesticides in drinking water), clinical analysis (e.g., therapeutic drug monitoring, metabolism disorders), toxicology, forensic and doping analysis, and in many other areas. Thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS) are 2 chromatographic methods that are most widely used in analytical and forensic science laboratories all over the world.

Both methods, TLC and GC-MS, were used in this examination.

## THIN-LAYER CHROMATOGRAPHY (TLC)

A TLC plate is a sheet of glass or plastic that is coated with a thin layer of a solid adsorbent (usually silica). A sample of the substance to be analyzed is dissolved in an appropriate solvent, and a small amount of the obtained solution is spotted near the bottom of the TLC plate. The TLC plate is then placed in a shallow pool of a solvent in a developing chamber so that only the very bottom of the plate is in the liquid. This liquid, or the eluent, is the mobile phase, and it slowly rises up the TLC plate by capillary action. The components of the sample become separated from one another because of their different degrees of attachment to the coating material (stationary phase) on the plate. The solvent is then allowed to evaporate, and the separated components of the mixture are visualized. If the separated components are colored, visualization is straightforward. If the colorant of ink is a mixture of different dyes, then these dyes are separated on the TLC plate into spots of different colors. Thus, TLC is a very effective method for discriminating between similarly colored inks (if the colorants of the inks consist of different ink dye components that can be separated on the TLC plate).

In this examination, the TLC analysis of the ink samples was conducted as follows. A subset consisting of 3 samples of ink (microplugs) was isolated from each of the above 17 sets of ink samples. Each subset of microplugs was placed into a small glass vial. To each of the vials 2-3 microliters of dimethylformamide were added. The ink was extracted for 30 minutes. The ink extract (visually colorless) was transferred by a capillary pipette to the TLC plate. This transfer process continued until the entire extract had been transferred to the TLC plate (for each sample to be tested). The TLC plate was allowed to air dry and was then placed in a vertical orientation into a developing tank. The tank was a glass enclosure with a removable lid and contained a few milliliters of solution (ethyl acetate – isopropanol – water – acetic acid = 30:15:10:1). After 10 minutes of development the TLC plate was removed from the tank and viewed in both UV (254

EXHIBIT ___1___
PAGE ___12___



and 365 nm) and white light with the unaided eye. Often similarities and differences in colored (dyes) and non-colored components present and relative proportions of the components are noted resulting in conclusions about the number of different ink formulations within the ink samples examined. In this examination, the TLC analysis of the ink samples showed that none of them contained any extractable ink components that could be seen in the form of separated colored spots on the TLC plate. It indicates that the colorant of the ink(s) within the ink samples examined is either carbon black or another insoluble black pigment. Thus, the TLC analysis did not detect any differences between the inks used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by TLC.

## GAS CHROMATOGRAPHY-MASS SPECTROMETRY (GC-MS)

GC-MS is a widely accepted analytical method of determining the qualitative composition of multi-component systems. It is routinely used in analytical and forensic science laboratories all over the world.[7] In the field of forensic document examination, GC-MS is used for discriminating between similarly colored inks that have been made using different ink vehicle components (solvents, resins, modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, etc.)

The procedure of the GC-MS analysis involves vaporizing a sample and sweeping it through a column with a moving stream of gas termed the mobile phase or the carrier gas. Compressed gas cylinders commonly supply the gases. The sample is introduced into the injection port. The most common type of analysis involves the injection of approximately 1 microliter of a liquid sample into a heated injection port, which is interfaced to the capillary column where the actual separation takes place. The capillary column's inner walls are coated with a viscous liquid material (it is called the stationary phase). This inner coating will interact with different molecules to different extents. Those components of the mixture, which weakly interact with the stationary phase, pass more quickly through the column than those compounds, which have strong interactions with the stationary phase. For this reason, different components of the mixture exit the column at different times. As each component of the mixture comes off the column, it is detected by the MS detector. The detector sends a signal to the attached computer, which displays each signal as a peak on a chart. The array of peaks (one peak for each component) is called a chromatogram. A chromatogram obtained for a certain material can be considered as a "chemical fingerprint" of the vehicle components of this material. When GC-MS is used for comparing, say, 10 entries written with similarly colored inks, the chromatograms are recorded for each of the 10 inks, and then these "chemical fingerprints" are compared to determine the number of different ink formulations used to produce the entries.

In this examination, the GC-MS analysis of the ink samples was conducted as follows. A subset consisting of 3 to 5 microplugs was isolated from each of the above 17 sets of ink samples. Each subset of microplugs was placed into a small glass vial. (3 microplugs of the paper blanks were placed into another vial). To each of the vials 2 microliters of chloroform were added. The ink

---

[7] For example, GC-MS is used for separating accelerants in fire residue from suspected arson fires and for the analysis of drugs.

EXHIBIT ___1___
PAGE ___13___



was extracted for 30 minutes. The extracts were analyzed using an Agilent 6850 gas chromatograph interfaced with an Agilent 5973N mass selective detector and equipped with a split/splitless injection system.

The GC-MS conditions and parameters were as follows:

Column: HP-5MS, 30 m x 0.25 mm ID x 0.25-micrometer film thickness (cross-linked 5%-phenyl-95%-dimethylpolysiloxane)
Carrier: helium (column flow 1 mL/min)
Oven program: isothermal for 1 min at 35°C, program 15°C/min to 230°C and hold for 7 minutes
Injection: 1 microliter, splitless, T=250°C
Purge on time: 1 minute
GC-MS transfer line: 280°C

The GC-MS analysis revealed the presence of 2 different inks of black color within the ink samples examined: the ink (*ink 1*) used to produce the notation "From 1998 Missouri" on page 11 of document **A-1** and the ink (*ink 2*) used to produce the other examined entries on pages 11 and 12 of document **A-1**.

The difference between *ink 1* and *ink 2* revealed by the GC-MS test is that *ink 1* contains a vehicle component (alkyl derivative of cyclohexanol) that is absent in *ink 2*. This result of the GC-MS analysis shows that *ink 1* and *ink 2* are of different compositions.

## SUMMARY OF EXAMINATION RESULTS

I.      The black inks of two different compositions were found among the examined entries appearing on pages 11 and 12 of document **A-1**:

- *Ink 1:* the ink used to produce the notation "From 1998 Missouri" on page 11 of document **A-1** (entry **8**; see Attachment 1).

- *Ink 2:* the ink used to produce the remainder of the writing made by the Notary Public on pages 11 and 12 of document **A-1** (entries **1** through **7** and **9** through **17**; see Attachments 1 and 2).

II.     As considered above, in section Visual Examination, the location of the notation "From 1998 Missouri" on page 11 of document **A-1** clearly shows that this notation is squeezed in between the last line of the 8/26/99 entry "Original sketches of doll idea – characters 6-total = Names are: Zoe, Lupe, Hallidae, Jade, 2 males." and the printed horizontal line below it.

EXHIBIT ___1___
PAGE ___14___



**Ms. Diane Hutnyan**                    February 8, 2008                    Page 8 of 8

## CONCLUSION

Based on the results of this examination and my professional experience, it is my opinion that the notation "From 1998 Missouri" was written on page 11 of document **A-1** at a later time compared to the rest of the 8/26/99 entry written on pages 11 and 12 of document **A-1**.

It is also my opinion that the most probable sequence of the writing of the entries on pages 11 and 12 of document **A-1** was as follows:

1. The entry dated 8/26/99

2. The entry dated 9/14/99

3. The second entry dated 9/14/99

4. The notation "From 1998 Missouri"

## DISPOSITION OF EVIDENCE

The evidence was returned to Mr. Daniel J. Warren, Esq. (Sutherland Asbill & Brennan, LLP, 999 Peachtree Street, Suite 2300, Atlanta, GA 30309) on January 31, 2008 via Federal Express, tracking number 8635 6224 9130.

Very truly yours,

RILEY, WELCH & AGINSKY
FORENSIC DOCUMENT EXAMINATIONS, INC.

Valery N. Aginsky, Ph.D.
Forensic Chemist

Attachments:

Attachment 1 – Reduced copy of page 11 of document **A-1**
Attachment 2 – Reduced copy of page 12 of document **A-1**
Attachment 3 – Reduced copies of the cover page and pages 1 through 12 of document **A-1**
Exhibit "VNA-1" – Curriculum Vitae (incl. List of publications)
Exhibit "VNA-2" – Court Cases and Depositions
Exhibit "VNA-3" – RWAFDE Schedule of Fees

EXHIBIT ___1___
PAGE ___15___

EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an
individual,

        Plaintiff,

    v.

MATTEL, INC., a Delaware
corporation,

        Defendant.

_____

AND CONSOLIDATED ACTIONS.

CASE NO.
CV 04-9040 SGL(RNBx)
Consolidated with
Case No. CV 04-09059
Case No. CV 05-02727

**CERTIFIED
COPY**

Video Deposition of ALBERT LYTER, Ph.D.

(Taken by Defendant)

Raleigh, North Carolina

April 17, 2008

Reported by:
Marisa Munoz-Vourakis
RMR, CRR and Notary Public

JOB No. 86338

EXHIBIT __2__
PAGE __16__

```
 1    APPEARANCE OF COUNSEL:

 2    For the Plaintiff:

 3              MATTHEW E. SLOAN, ESQ.

 4              Skadden, Arps, Slate, Meagher & Flom LLP

 5              300 South Grand Avenue

 6              Los Angeles, CA 90071

 7              213-687-5276

 8              matthew.sloan@skadden.com

 9

10    For the Defendant:

11              DIANE CAFFERATA HUTNYAN, ESQ.

12              Quinn Emanuel Urquhart Oliver & Hedges, LLP

13              865 S. Figueroa Street, 10th Floor

14              Los Angeles, CA 90017

15              213-443-3666

16              dianehutnyan@quinnemanuel.com

17

18    Also Present:  ROBERT MERRITT, Videographer

19

20

21

22

23

24

25
```

2

EXHIBIT __2__

PAGE __17__

ALBERT LYTER, PH.D.                    04/17/08

1

2                    Deposition of ALBERT LYTER, taken by the

3     Defendant, at Kennedy Covington, 4350 Lassiter at North

4     Hills Avenue, Suite 300, Raleigh, North Carolina, on

5     the 17th day of April, 2008 at 9:43 a.m., before Marisa

6     Munoz-Vourakis, Registered Merit Reporter, Certified

7     Realtime Reporter and Notary Public.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

EXHIBIT  2
PAGE  18

ALBERT LYTER, PH.D.                          04/17/08

1   exist?

2       A.      It was started in order to get the

3   individuals that were involved in doing ink analysis

4   together and iron out some concerns that existed within

5   the community, but the community was always a very

6   small one, so the membership never progressed.  Several

7   of the individuals retired.  The organization was

8   simply not viable at the size that it was.

9       Q.      Were there presidents before you?

10      A.      Yes.

11      Q.      How many?

12      A.      At least one, and maybe two.  I'm not

13  certain about that.

14      Q.      So when was this organization started, if

15  you know?

16      A.      I don't remember the exact date.  I would

17  say probably in the mid to late 1990s.  It's not a real

18  old organization.

19      Q.      What is your profession?

20      A.      I'm a forensic chemist specializing in the

21  physical and chemical examination of documents.

22      Q.      What question document services do you

23  offer?

24      A.      We basically will perform physical and/or

25  chemical testing on documents to include an evaluation

11

EXHIBIT __2__

PAGE   19

1    of the materials as well as the determination of method

2    and manner and preparation of the documents.

3              We do not analyze handwriting or hand

4    printing for the determination of authorship, but

5    pretty much any other testing on documents we will look

6    at.

7         Q.     When you say we, who are you talking about?

8         A.     Myself; I do all the testing.

9         Q.     So you don't examine or compare handwritten

10   items?

11        A.     Not for the purpose of authorship.  I do

12   look at handwriting almost every day, but it usually is

13   for some other reason than to determine who the author

14   of that writing might be.

15        Q.     Do you consider yourself an expert in the

16   field of handwriting but not for purposes of

17   determining authorship?

18        A.     I don't know that there is such an animal.

19             Usually people that do handwriting analysis

20   for the determination of authorship are called

21   handwriting experts or handwriting analysts, and I do

22   not consider myself one of those, although I am

23   familiar with all of the premises and precepts that go

24   into that particular field as well as a lot of the

25   research that's been done recently on statistics of

EXHIBIT __2__

PAGE __20__

ALBERT LYTER, PH.D.                                    04/17/08

1   being able to do that.  But I do not do that kind of

2   testing.

3        Q.      On the training section of your CV, the

4   first line on the training it says Fiber Microscopy

5   Institute of Paper Chemistry in 1975?

6        A.      That's correct.

7        Q.      How long was that course?

8        A.      Two weeks.

9        Q.      Did that course alone enable you to work as

10  an expert in fiber microscopy?

11       A.      No.  One would have to have first a

12  background in microscopy in general, and then one would

13  have to basically develop an expertise through practice

14  in order to be able to be, in my mind, an expert in

15  fiber microscopy.

16       Q.      Have you done that kind of training?

17       A.      Yes.

18       Q.      Where did you do that training?

19       A.      It was mostly on-the-job training at the US

20  Treasury Department.

21       Q.      So on-the-job training meaning you came

22  into contact with cases that had issues in fiber

23  microscopy and you worked those cases?

24       A.      In addition, actually testing sample of

25  different types of paper that contained different types

13

EXHIBIT __2__
PAGE __21__

1    of fibers.

2            Fiber microscopy, in this context, is

3    basically identifying the different species of trees

4    that might have been used to perform the fibers that

5    were used in the preparation of the paper, and the

6    identification of various processes that were used to

7    make the wood in the fibers by various chemicals.

8        Q.    When was the last case that you had that

9    development with fiber microscopy or where you

10   performed fiber microscopy?

11       A.    It's been a long time, several years at

12   least.

13       Q.    So you didn't perform that in this case?

14       A.    I did not, no.

15       Q.    Did you ask anybody whether you could

16   perform fiber microscopy on any documents in this case?

17       A.    No.

18             MR. SLOAN:   Object --

19       Q.    Okay.   In your CV, you list a question

20   document Secret Service course that you took in 1977,

21   is that right?

22       A.    Yes.

23       Q.    And how long was that course?

24       A.    Three weeks, I believe.

25       Q.    Was that considered an introductory course?

14

EXHIBIT __2__

PAGE __22__

1    passed and a two-year internship in a recognized

2    question document laboratory had to be done?

3        A.    That's a compound question.  I answered the

4    first part of it.

5             The Secret Service laboratory may have

6    required some kind of a form blindness test.  I know

7    that some laboratories did.  But I know some

8    laboratories that did not.

9             And as far as the two-year training

10   program, that's normally required for somebody who is

11   going to involve themselves in all of the fields of

12   question document examination, including handwriting

13   and hand printing, and in fact, most of the time is

14   spent doing handwriting and hand printing.

15       Q.    So the Secret Service laboratory actually

16   does require the testing, doesn't it?

17       A.    , I don't know.  I'm not sure whether the

18   Secret Service does or not.

19       Q.    Did you take any pattern recognize or form

20   blindness test?

21       A.    Prior to my employment with the treasury

22   department?  No, I did not.

23       Q.    Ever?

24       A.    Not specifically.  I've done work that

25   requires pattern recognition my entire career, so if by

1   doing those types of examinations and then having that

2   reviewed by a superior, I would say that is testing for

3   pattern recognition.

4        Q.    But you have never actually taken a pattern

5   recognition aptitude test, correct?

6        A.    Yeah, I don't know that one exists.  I've

7   never seen one.

8        Q.    But you haven't taken any?

9        A.    No, I have not.

10       Q.    Were you accepted into a recognized

11  question document laboratory as a full-time intern for

12  two years?

13       A.    No, I was not.

14       Q.    Did you serve as a question document intern

15  in any recognized question documents laboratory?

16            MR. SLOAN:  Objection, vague and

17       ambiguous as to the meaning of that term.

18       A.    Yeah, I worked with other individuals in

19  the field of question document examination, both at the

20  treasury department and after I left the treasury

21  department, either in workshops or short segments of

22  time where I would be in their laboratory doing work

23  with them, not necessarily a formalized internship

24  program, but certainly getting the benefit of whatever

25  expertise they had, as well as providing them insights

18

EXHIBIT __2__

PAGE __24__

1   based on what my experience had been.

2        Q.      So you weren't an intern?

3        A.      No, I was not an intern.

4        Q.      Were you employed as a forensic document

5   examiner at the ATF?

6        A.      No, my title was a forensic chemist.  I was

7   performing duties that would normally be done by a

8   document examiner, but I was a chemist.

9        Q.      As part of your assignments with the ATF,

10  were you asked to work in the capacity of a forensic

11  document examiner?

12       A.      Well, I guess yes, because I was doing work

13  that would have normally been done by a question

14  document examiner.  In other words, if I hadn't been

15  there, a question document examiner would have done it.

16       Q.      I think that's a little different than my

17  question.

18             Were you asked to work in the capacity as a

19  forensic document examiner?  I think it's different to

20  say that I did some tests that a document examiner

21  might do, but were you asked to work in that capacity?

22             MR. SLOAN:  Objection, vague as to

23       what you mean by a capacity of a forensic

24          document examiner.  Can you define that?

25             MS. HUTNYAN:  I think the question is

19

EXHIBIT   2

PAGE   25

1      Q.      Is high pressure liquid chromatography

2   generally used in the area of ink analysis, or are

3   there other applications as well within the area of

4   forensic document identification?

5      A.      Yeah, within materials that might be

6   extractable from documents, so it could include as well

7   paper components.

8      Q.      Did you have any internship training in ink

9   analysis and chemistry, or was it on-the-job training

10  that you described?

11     A.      Yeah, on-the-job training.  I mean, I knew

12  how to do the testing.  They told me to do, it was

13  simply a matter of applying the testing to ink and then

14  determining what kind of conclusions could be reached.

15     Q.      So you are a member of the Southwestern

16  Association of Forensic Document Examiners?

17     A.      Yes.

18     Q.      Are you a contributing or on line member?

19     A.      I started out as an honorary member, and

20  then they did away with that class of membership, and

21  now I'm a contributing member.

22     Q.      Do you contribute to SWAFDE?  Is that how

23  you say it?

24     A.      Yes.

25     Q.      As an ink chemist?

34

EXHIBIT __2__
PAGE __26__

ALBERT LYTER, PH.D.                              04/17/08

1        A.      Well, yes.  I mean, that's not my

2    limitation of contributing.  In fact, I was in a

3    meeting last weekend in San Diego with them and gave a

4    presentation on a line crossing study that I had done.

5        Q.      Besides line crossing and ink chemistry,

6    what other document examination presentations have you

7    made at SWAFDE?

8        A.      I don't remember.  I'd have to think about

9    that.

10       Q.      How long have you been a member of any

11   kind?

12       A.      Since 1984.

13       Q.      Do you have the credentials for membership

14   in SWAFDE as a question document examiner?

15       A.      No, I don't do handwriting analysis.

16       Q.      So you've never applied for membership in

17   SWAFDE?

18       A.      I can't.  I don't do handwriting analysis,

19   so I don't meet their qualifications.

20       Q.      Do you have the credentials for membership

21   in the American Society of Document Examiners, the

22   ASQDE as a question document examiner?

23       ~ A.     Well, I'm not sure.  They just instituted a

24   new membership class, and I'm not sure exactly what

25   they call it.  So I don't know whether they call it a

35

EXHIBIT 2
PAGE 27

1    question document examiner or they call it something

2    different.  But apparently they made changes so that

3    people that do not do handwriting can in fact be

4    members.  And if that's the case, then yes, I meet

5    those qualifications.

6         Q.    But you haven't actually applied for

7    membership?

8         A.    No, I haven't had time to do that.  I

9    expect to do -- their meeting is in August, actually,

10   it's in Asheville this year, and I'm going to apply for

11   membership.  I just haven't done it yet.

12        Q.    How long -- have you been a member of the

13   ASQDE?

14        A.    No.

15        Q.    And you have never previously applied for

16   membership because the rules were such that you

17   couldn't apply?

18        A.    That's correct.

19        Q.    Do you have the credentials for membership

20   in the question document section of the American

21   Academy of Forensic Sciences?

22        A.    No.  Again, I don't do handwriting testing,

23   so I can't be, plus I'm already a fellow of the

24   criminalistic section.

25        Q.    What is the criminalistic section?

36

EXHIBIT  2
PAGE  28

1      A.      Those individuals that are involved in the

2  analysis of various kinds of evidence in criminalistics

3  those would include the people that do blood analysis,

4  hair and fiber, paint, polymers, all those types of

5  things.

6      Q.      And so your expertise within the

7  criminalistic section would be ink, is that one of the

8  other?

9      A.      Well, yeah, I do testing on documents, and

10  that's also kind of evidence, it's just that I don't do

11  handwriting testing, and the question document area was

12  designed specifically for those individuals that did

13  handwriting.

14     Q.      Have you ever not been qualified as an

15  expert to give testimony in any court?

16     A.      Not that I'm aware of.

17     Q.      Have you ever been criticized by any court?

18     A.      What do you mean by criticized?

19     Q.      Has a federal or state court ever commented

20  negatively in any respect on the work that you did in

21  connection with that case?

22     A.      There's been at least one instance that I

23  can remember where the evidence I was going to give was

24  not allowed.  It was not because I wasn't qualified, it

25  was because of the evidence.

EXHIBIT __2__

PAGE __29__

ALBERT LYTER, PH.D.                                                04/17/08

1       A.      I guess so.  I mean, that makes sense.

2   Some strokes could be more difficult for an individual

3   to produce than others.  Some letter forms would be

4   easier for an individual to reproduce than other letter

5   forms.

6       Q.      So it's your testimony that the tenants of

7   determining whether something is a tracing are

8   different for handwriting than they are for other types

9   of documents, such as drawing?

10      A.      To a certain extent, because that I believe

11  in this particular case, most of the drawings, if not

12  all of them, are in fact tracings to begin with.  So

13  that you have a model and then something is traced over

14  top of it.

15              So we're not even starting -- and drawings

16  are somewhat different in nature than handwriting,

17  because you are going to expect to find pen lifts, some

18  slowness in drawings that are as complicated as the

19  drawings we've had here.

20      Q.      But you are not an expert in handwriting,

21  right?

22              MR. SLOAN:  Objection, argumentative.

23    ~ A.      That seems to me it's fairly common sense.

24  I know if I were to sit down and try to draw, let's say

25  I'm making a pattern to drill a hole, and it's a big

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __2__

PAGE __30__

1   hole, and I put a jar down and I try to trace around

2   the bottom of that jar, I know that depending upon the

3   size of that jar, that that's either an easy task or a

4   hard task, and it's going to be different for different

5   people.

6           So that to try to draw something that is as

7   complex as the images that you've dealt here with, to

8   me would be almost impossible to do in a single stroke,

9   which is what you're talking about when you start

10   talking about handwriting.

11       Q.    My question was, you are not an expert in

12   handwriting, are you?

13           MR. SLOAN:  Objection, asked and

14       answered, argumentative.

15       A.    I'm not.

16       Q.    You are not.

17           So somebody who was an expert in

18   handwriting analysis might have a different opinion

19   than you, correct?

20           MR. SLOAN:  Objection, lack of

21       foundation, argumentative.

22       A.    Sure.  Somebody can have a different

23   opinion than I do.

24       Q.    And when you say that the tenants of

25   handwriting analysis cannot be applied to drawings, you

1    are applying your common sense, correct?

2              MR. SLOAN:   Objection, misstates his

3         evidence.

4         Q.    From the analysis you just gave me, you

5    said it was common sense.  Was it based on anything

6    else?

7         A.    Well, what I said initially, the part that

8    was wrong of your question is I didn't say the tenants

9    of handwriting can't be applied to drawing.

10        Q.    That was my question.

11        A.    I said they need to be applied differently,

12   because actually handwriting examiners don't examine

13   drawings very frequently either, so that they don't

14   really know the extent to which drawings are going to

15   vary.  The way handwriting does, and in fact if you

16   look in some of the question document literature, when

17   people talk about tracings, they describe them as

18   looking drawn, which is exactly what we're talking

19   about.  We're talking about drawings.

20        Q.    Is it your testimony that the tremor that

21   naturally exists in the course of handwriting does not

22   exist with respect to drawings?

23        A.    My -- I believe that you are saying that

24   you had said that the tremor you are talking about is

25   something that occurs with tracing, not handwriting.

1  one of the problems.  There's a component of tracings

2  and there's a component of drawing that's involved in

3  both of those.

4      Q.    Did it seem odd to you that many of those

5  drawings had no faces?

6            MS. HUTNYAN:   Objection, vague as to

7      odd.

8      A.    Well, yes and no.  I mean, when you see a

9  drawing, you might think there would be a space, but I

10  have no idea what the process is that these individuals

11  use.

12            So what might be odd to me, that's simply a

13  layperson looking at it.  I don't know that you can

14  assign any special thing, the fact that there's no

15  faces there.

16      Q.    But in some cases though, the hair is

17  suspended in air over the rest of the body, isn't that

18  true?

19      A.    Yes.

20      Q.    So wouldn't it, as a matter of common

21  sense, be that perhaps that was traced from something

22  that would allow that distance to be established, even

23  though there wasn't a face?

24      A.    That certainly could have occurred.  I

25  didn't find any instances where I could find proof that

1  that occurred, and there were some pages that had

2  multiple hairs on them, I mean hairdos, I guess, is the

3  right word, yeah.

4       Q.     Did you put anywhere in your report your

5  conclusion that the pen ink lines on some of the

6  tracing paper drawings were in fact traced from the

7  pencil lines on the same drawings?

8       A.     I don't remember.  Maybe not, I don't

9  recall.

10      Q.     Can you tell me which drawings you drew

11  that conclusion on?

12      A.     Well, I believe that all of the drawings

13  that were pencil and ink drawings, I mean, the best way

14  would be to go through each one individually and let me

15  tell you about it, because it's --

16      Q.     Maybe you can point me first in your report

17  where you stated an opinion about this?

18           MR. SLOAN:  Objection, vague and

19       ambiguous as to opinion about exactly what?

20           MS. HUTNYAN:  The conclusions we have

21       been talking about for five minutes.

22           MR. SLOAN:  Same objection, if you

23       understand the question.

24      Q.     As the ink being traced from the pencil on

25  the same drawings?

EXHIBIT 2

PAGE 34

64

1      A.      I don't see that I specifically made any

2   comments regarding -- no, I don't see anything where I

3   specifically made a comment about -- I characterize all

4   the drawings as ink and pencil drawings, but I have not

5   specified that the pencil was there first and the ink

6   was over top of the pencil, which would be consistent

7   with what I've given as testimony.  Although that's

8   what I was concluding.

9      Q.      So it's not just that the pen is over the

10   pencil, that you actually concluded with respect to

11   these drawings that the pen was traced from the pencil

12   lines on this drawing, is that my understanding?

13      A.      Yeah, it followed the outline of the

14   pencil.  I mean, there's no -- there's no evidence --

15   well, there's no reason for somebody to do two freehand

16   drawings, one with pencil and then one with ink in the

17   same area.

18           So from a logical standpoint, it doesn't

19   make any sense that that's the case.

20           And secondly, the pencil -- the ink lines

21   follow the pencil lines sufficiently in detail to be

22   able to say that they are in fact duplicating the

23   pencil lines.

24           Now, the fact that they are over top of

25   allows me to use the word tracing.

ALBERT LYTER, PH.D.                                    04/17/08

1        Q.      Is that all the evidence that you have that

2   would suggest to you that the pen lines were traced

3   from the pencil lines on the same pages?

4        A.      Well, they follow the pencil lines, I mean,

5   yeah, the pen lines follow the pencil lines.  Like I

6   said, I can't think of a logical reason why one would

7   free hand draw on a paper the same image that already

8   existed there, other than the areas where the drawing

9   or the drawer expanded on what was originally there,

10  more detail.

11       Q.      My question is, is that all the evidence

12  that you have that suggests to you that the pen lines

13  were traced from the pencil lines on the same drawings,

14  meaning, you are not knowing of any other situation

15  where somebody might be doing pencil lines with the

16  drawings, your conclusion that the pen was done over

17  the pencil and what else?

18       A.      The pen lines end up adding detail to the

19  pencil.

20       Q.      Okay.  Anything else?  Any other evidence

21  that you have to support your conclusion that the pen

22  is in fact traced from the pencil?

23       A.      I can't think of anything else right now.

24       Q.      Are you an artist?

25       A.      No, I'm not.

ALBERT LYTER, PH.D.                                    04/17/08

1      Q.      Have you ever worked with artists before?

2              MS. HUTNYAN:   Objection, vague as to

3        what you mean by worked with.

4      A.      I have been around some people that have

5   been artistic.

6      Q.      Gone to art school?

7      A.      Beg your pardon?

8      Q.      Gone to art school?

9      A.      No.

10     Q.      Are you familiar with the process of design

11  drawings for products?

12     A.      No.

13     Q.      Is it possible that somebody who designs

14  products might use a pencil to experiment with

15  different variations on a particular shape that they

16  had drawn?

17     A.      I assume so.   I mean, that wouldn't

18  surprise me.

19     Q.      Did you study the quality of the pencil

20  lines?

21     A.      In those that I could see, yes.

22     Q.      Which ones could you not see?

23   -  A.      The ones that are covered by the ink.

24     Q.      How can you tell that they are covered by

25  the ink and not the other way around?

67

EXHIBIT __2__

PAGE __31__

1    the documents in March of 2008, meaning you saw the

2    micro-plugs have been taken?

3        A.    I did.  I knew that they existed, because I

4    had read Mr. Flynn and Mr. Cunningham's report prior to

5    getting the documents.

6              So I knew they were there, and when I

7    examined the documents, I saw them.

8        Q.    And did you believe that the micro-plugs

9    were taken for purposes of some kind of testing?

10              Did you recognize those kind of

11   micro-plugs?

12       A.    Well, what I saw were the holes, and the

13   holes are of the size and shape and type that normally

14   are used to take ink samples to do testing on.

15       Q.    But you saw they were all holes that had --

16   that were taken from the paper alone?

17       A.    Yes, that's correct.

18       Q.    Did you ever receive any information about

19   the results of those tests, if any tests were taken?

20       A.    No.

21       Q.    Did you ask for the results of those tests?

22       A.    No.

23       Q.    Why not?

24       A.    Had enough to do.  So I didn't concern

25   myself with that.

EXHIBIT __2__

PAGE __38__

ALBERT LYTER, PH.D.                                04/17/08

1      Q.      When you say you had enough to do, what do
2   you mean?
3      A.      The time period during which I had to
4   examine the documents was limited, and therefore what I
5   was doing on those documents would take up a majority
6   of that time.
7      Q.      And you were specifically focusing in on
8   the documents that were referred to in Mr. Flynn's and
9   Mr. Cunningham's reports?
10     A.      That's right.
11     Q.      So you weren't going through every page in
12   seven boxes, correct?
13     A.      I did simply to look at all the documents,
14   and they weren't organized very well, so it was
15   difficult to even find what I needed.  But I did not
16   spend an extensive period of time looking through every
17   document or studying every document.
18     Q.      They were not in Bates numbered order
19   within boxes?
20     A.      They might have been in some boxes, but not
21   in all boxes.
22     Q.      Did you see envelopes that were enclosing
23   some of the documents within boxes?
24     A.      Yes.
25     Q.      Did you take note of the order that the

1   documents were kept in when you received them?

2       A.      Initially, no.  I actually re-boxed the

3   materials to send them out, because the boxes were in

4   really bad shape of some of the documents, and because

5   of the amount of documents that needed to be sent, they

6   didn't require several boxes that could all be put in

7   one.

8       Q.      To where were you sending them?

9       A.      When I sent them out for depositions.  I

10  didn't need to send all of them, I just needed to send

11  the ones that were pertinent.

12      Q.      So the other documents, did you replace

13  those boxes, documents that were made Trilem (sic)?

14      A.      There are some documents in my lab still in

15  boxes, but I wouldn't send those boxes out anywhere.  I

16  would think that they would fall apart.  So I may

17  re-box them.

18      Q.      When you did get new boxes, did you retain

19  the old boxes and just put the bigger boxes around

20  them, or did you throw away those boxes?

21      A.      No, I threw them away.

22      Q.      Did you ask if you could throw those boxes

23  away?

24      A.      No.

25      Q.      Did you feel like you had sufficient time

80

EXHIBIT 2

PAGE 40

1     to render the analyses that you did in your report?

2          A.    Yes.

3          Q.    Is that why you didn't go back into the

4     documents and try to look at them some more after the

5     report was in?

6          A.    Yes.

7          Q.    Have we talked about this case prior to

8     receiving the original documents?

9               MR. SLOAN:  Objection.  Again, I'm

10         going to object insofar as anything that he

11         relates would call for him to reveal any

12         communications he's had with counsel, and I

13         will direct him not to answer in that

14         manner.  To the extent that you can answer

15         otherwise, he can answer.

16         A.    I just knew what the case involved.  I

17    don't remember that I had any other discussions about

18    any evidence specifically.

19         Q.    What was your understanding of what the

20    case involved?

21              MR. SLOAN:  Same objection and same

22         direction to the witness.

23       - A.    Dispute between two parties related to the

24    Bratz.

25         Q.    Anything else?

1    communications he had with counsel, that

2    that's beyond the scope of the stipulation.

3         I will say that given the fact that he

4    was prohibited from doing an ink analysis or

5    taking samples from or doing an ink analysis

6    of any of the entries in the notary book,

7    that counsel felt that it was inappropriate

8    for him to opine on that, because we've

9    always anticipated that he would have to

10   prepare a subsequent report dealing with the

11   Aginsky report and in specific, the chemical

12   testing.

13        BY MS. HUTNYAN:

14   Q.    This is your report, isn't it?

15   A.    At this point, yes.

16   Q.    Was it ever not your report?

17   A.    No.

18        MR. SLOAN:  Objection, argumentative.

19    Move to strike the last question.

20   Q.    At this point, what did you mean at this

21   point?

22   A.    Well, what I meant by it is that this is

23   the first report that I prepared in this case.  It may

24   not be the last.

25   Q.    This report that we are talking about now,

ALBERT LYTER, PH.D.                              04/17/08

1     which is Exhibit 5149, is your report?

2          A.     That's right.

3          Q.     And you decide what goes in the report,

4     correct?

5          A.     That's correct.

6          Q.     Were you given Dr. Aginsky's report before

7     you rendered your report in this case?

8                 MR. SLOAN:  Objection, asked and

9            answered.

10         A.     Yes, I was.

11         Q.     But you did not include the fact that you

12    considered Dr. Aginsky's report in your report, right?

13         A.     I haven't done sufficient work in order to

14    consider Dr. Aginsky's report.

15         Q.     Let's look at the first page of your

16    report.

17                MS. HUTNYAN:  How many minutes do I

18           have?

19                THE VIDEOGRAPHER:  Over two.

20         Q.     If you look on page two, documents and

21    reports considered in preparation of my report.  Right

22    above that you can see you received Jacqueline Prince's

23    notary logbook.  You noted that, correct?

24         A.     Yes.

25         Q.     And below that, you didn't list Dr.

86

EXHIBIT __2__

PAGE __43__

1    Aginsky's report?

2         A.    That's right.

3         Q.    But it was there at one time when you

4    drafted your report?

5              MR. SLOAN:  Objection, misstates his

6         testimony.

7         A.    No.  I have had Dr. Aginsky's report, and

8    I've read it, but I did not include anything in the

9    report, because I don't think I'm finished yet.

10             MS. HUTNYAN:  Okay.  We need to switch

11        tapes.  Want to take a break?

12             THE WITNESS:  Yes, please.

13             THE VIDEOGRAPHER:  This is the end of

14        media No. 2 in this deposition of Dr. Lyter.

15        Off the record at 11:45.

16             (Off the record at 11:45 a.m.)

17             THE VIDEOGRAPHER:  We are back on the

18        record at 11:52.  This marks the beginning

19        of tape No. 3 in this deposition of

20        Dr. Lyter.

21             BY MS. HUTNYAN:

22        Q.    Dr. Lyter, are you -- let me ask you, you

23   have a consulting fee on your invoice.  What does that

24   mean?  Does that mean you just talked with people?

25        A.    Yes.

87

1       Q.      Is there anything special to your

2   consulting fee, or is it just time spent?

3       A.      No, just time spent.  That's just a

4   category of how I do that.

5       Q.      Okay.  So the document review that you

6   conducted on the 25th of February, that would have been

7   the reports, Flynn and Cunningham's reports?

8       A.      Partially on the 25th and the 26th, and

9   then also looking through all the documents on the

10  26th.

11      Q.      All what documents?

12      A.      All the Carter Bryant documents, the books

13  of documents.

14      Q.      So you got them on the 26th?  You got them

15  that early?

16      A.      Oh, no, no, I did not.  You are right, I

17  didn't get them that early.  Both those days would have

18  been just looking at the reports and making notes

19  regarding the reports.

20      Q.      Okay.  And so examination performed, the

21  first entry like that, that's where you would have

22  gotten the original document?

23    - A.      That's right.

24      Q.      And Matt has been the attorney you are

25  working with on this case?

EXHIBIT **2**

PAGE __45__

1    that was there did not luminesce either.  So it didn't

2    allow for any additional contrast.

3              So I found that infrared reflectance was

4    found.  I didn't need the luminescence.

5              And the field of view is much smaller with

6    the luminescence than it is with the reflectance.

7         Q.    So which document did you try out with

8    infrared luminescence and conclude that it wasn't

9    helping?  They would have been the multicolored ones?

10        A.     They would have been the multicolored ones.

11   I imagine the first one that I looked at would have

12   been the 220.

13        Q.    And did you look at any others with the

14   infrared luminescence or?

15        A.     I think I did, but it soon became evident

16   that it wasn't going to be helpful.  So probably two or

17   three documents I looked at that way.

18        Q.    Did you look under ultraviolet light?

19        A.     No, I did not.

20        Q.    The infrared reflectance that you, I guess,

21   is that the test, the reflectance test?

22        A.     Yes.

23      - Q.    The infrared reflectance test, you did that

24   with the video spectral comparator?

25        A.     Yes.

EXHIBIT _2_ 96

PAGE _46_

ALBERT LYTER, PH.D.                                    04/17/08

1      Q.      Is that a VSC2000?

2      A.      No, it's a VSC4C.

3      Q.      4C.  Is that different from the 2000?

4      A.      Yes.

5      Q.      How is it different?

6      A.      2000 is bigger.  They basically both have

7   the same capabilities when it comes to infrared

8   reflectance.  I believe the camera is the same and

9   software is the same and filters, et cetera, are all

10  the same.  It's just, it's a different unit.

11     Q.      Did you take pictures using the video

12  spectral comparator, pictures of the infrared

13  reflectance test results?

14     A.      I'm not sure if I took pictures of infrared

15  reflectance or simply used it to take some images in,

16  you know, basically white light.  I don't remember

17  which those images are.  I did take some images, yes.

18     Q.      Can you tell me what you mean in white

19  light?

20     A.      Just like with a camera, but used the

21  camera in the VSC 4C so that I could store it on my

22  computer.

23     Q.      Okay.  Do you have any images of the

24  infrared reflectance results that you saw?

25     A.      I don't recall.  I probably do, but I just

1   simply don't remember.  I would expect that if the

2   infrared reflectance showed something that was useful,

3   then I do have an image of it, and thinking about what

4   it was actually used for, I'm fairly certain that I do

5   have at least one image that's with the infrared

6   reflectance.

7        Q.     You don't think you have more?

8        A.     I probably do.  I just don't remember how

9   many I have.

10        Q.     Would they be of the multicolored drawings?

11        A.     Yes.

12        Q.     And so those would show what you saw when

13   you did the infrared reflectance test on those

14   documents?

15        A.     Yes.

16        Q.     Did you produce those?  Are those films?

17   What are those called?  Photographs?

18        A.     They are just images.  They are digital

19   images right now.

20        Q.     Did you produce those in connection with

21   the document production request that we sent over?

22        A.     No.

23        Q.     You did electrostatic imaging on some

24   documents correct?

25        A.     I did, yes.

ALBERT LYTER, PH.D.                                    04/17/08

1          Q.      And you sent over the photocopies of the --

2     sorry, let me back up, ESDA test?

3          A.      Yes.

4          Q.      Using an ESDA machine?

5          A.      Yes.

6          Q.      You produced photocopies of the ESDA test

7     results?

8          A.      I did.

9          Q.      Is it necessary to use a video spectral

10    comparator machine to do infrared reflectance test?

11         A.      No, that's the easiest way to do it,

12    because it's the most ergonomics machine, but there are

13    other methods to do the same test.

14         Q.      Are there other methods besides the VSC to

15    do the infrared luminescence test?

16         A.      Yes.

17         Q.      I note in the paragraph below that on page

18    two you talk about superimposition.

19                 Is it your understanding that the word

20    superimposed means exactly match up?

21                 MR. SLOAN:  Can you point to exactly

22         where you are speaking about, counsel?

23                 MS. HUTNYAN:  Right there.

24         Q.      Middle of the paragraph, last paragraph on

25    that page.

EXHIBIT **2** 99
PAGE 49

```
 1            A F T E R N O O N   S E S S I O N
 2               (On the record at 2:15 p.m.)
 3               THE VIDEOGRAPHER:  We're back on the
 4        record at 2:15.
 5               BY MS. HUTNYAN:
 6        Q.     Okay so we are talking -- oh, let's see,
 7   did I ask you whether you had prepared any other
 8   invoices yet?
 9        A.     I don't remember if you did, but I had not.
10        Q.     And if you were to prepare an invoice now,
11   about how many hours would be on it, do you know?
12        A.     If you don't include the time spent today,
13   probably somewhere in the neighborhood of ten to twelve
14   hours.
15        Q.     And that was mostly preparing for this
16   deposition?
17        A.     Yes.
18        Q.     Anything else?
19        A.     No.
20        Q.     And those ten hours would be billed at your
21   regular rate of $350?
22        A.     That's correct.
23        Q.     And that is your regular rate?
24        A.     That's correct, well, regular for this
25   case.
```

                                                                141

EXHIBIT __2__

PAGE __50__

ALBERT LYTER, PH.D.                    04/17/08

1        Q.      You have different rates for different

2    cases?

3        A.      My present rate is $400 an hour for work,

4    but because I was retained a while back, my rate is 350

5    for this case.

6        Q.      So it's not for MGA gets special discount?

7        A.      No, they do not.

8        Q.      So if you were to replicate Dr. Aginsky's

9    test, how many micro-plugs would you need to take?

10       A.      I would take the same number that he took.

11       Q.      Would you need to take more than he took?

12              MR. SLOAN:  I'm going to object here,

13          because this is beyond the scope of his

14          expert report, and I understand the purpose

15          of this deposition is to depose him about

16          the testimony that he would give consistent

17          with his expert report.

18              You know, he hasn't prepared to speak

19          to this, and we can have this conversation

20          off line.  I don't think it's an appropriate

21          area for deposition testimony.

22       Q.      In part, you are appearing in this case as

23   an expert in ink chemistry, right?

24       A.      That is part of what I do.  Whether or not

25   I actually give testimony in that area, will depend on

142

EXHIBIT __2__

PAGE __51__

ALBERT LYTER, PH.D.                    04/17/08

1    what the results of any examination are.

2        Q.      Sure.

3        A.      So whether I'm going to be giving testimony

4    as an ink chemist or not, will depend on any testing

5    that I do.

6                MR. SLOAN:  Diane --

7        Q.      Your expertise in this case then is

8    forensic document examiner, including ink chemistry?

9        A.      Well, what I have done in this case is

10   examined a series of documents using physical

11   techniques.  I haven't used any chemical techniques.

12   So I have looked at ink, even though just physically

13   and with infrared.  I haven't done any chemical

14   testing.

15               So I have still done ink analysis.  I just

16   haven't done any chemical ink analysis in this case.

17       Q.      You anticipate doing ink testing in this

18   case, don't you?

19       A.      It's my understanding that I will be asked

20   to do it, but at this point in time, I have not been

21   approved to do it.

22               MR. SLOAN:  Diane, I don't want to

23       be --

24               MS. HUTNYAN:  I am allowed to find out

25       about his expertise in this case.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __2__

PAGE __52__

ALBERT LYTER, PH.D.                                    04/17/08

1            MR. SLOAN:  You are, but I think

2       that --

3            MS. HUTNYAN:  The fact that you have

4       purposefully isolated what he's opined in

5       his report and avoided the fact that he

6       reviewed Dr. Aginsky's report, I think

7       that's what's improper, and I think I'm

8       entitled to ask questions about ink testing.

9            MR. SLOAN:  Diane, no one has covered

10      up anything.  The situation is since you

11      have blocked us and Dr. Lyter --

12           MS. HUTNYAN:  You blocked yourselves.

13      We have been down this road.

14           MR. SLOAN:  Since you blocked us from

15      being able to performing the testing, he

16      hasn't been able to perform the testing, and

17      therefore he hasn't been able to replicate

18      Dr. Aginsky's test.  Once Judge Infanti

19      approves a protocol allowing us to do that,

20      he will then test, he will then provide

21      another report, and you will have an

22      opportunity to depose him again.

23           Listen, I'm not trying to obstruct

24      you.  If you want off line, if you want to

25      talk about what he really needs and you need

144

EXHIBIT __2__

PAGE __53__

1      to limit it down some more, we may be able

2      to do that.  But I just don't think that

3      that's an appropriate topic for his

4      testimony here today.  I don't think he's

5      prepared to testify as to it.

6          MS. HUTNYAN:  He shouldn't have to be

7      prepared, Matt, that's the point.

8          MR. SLOAN:  Well, he hasn't been

9      looking at the notary book, I think.  So I

10     just don't think it's an appropriate area

11     for examination today.  That's not what he's

12     prepared to answer questions about.

13         So I would object on that ground.  If

14     you want to spend more time, you know, on

15     it, I think it's --

16         MS. HUTNYAN:  You are the one spending

17     the time.

18     Q.     When you touched the original documents in

19 this case, did you use gloves?

20     A.     No.

21     Q.     You stated you had certain opinions in this

22 case that were beyond a reasonable doubt in your level

23 of certainty, do you remember that testimony?

24     A.     Most of the opinions, if not all of the

25 opinions that I give are opinions that I would be

1    this morning, Ms. Hutnyan asked you some questions

2    about some discrepancies between the curriculum vitae

3    in your web site and the curriculum vitae which you

4    attached to your report, and there were, I believe,

5    some memberships or other qualifications that were on

6    the curriculum vitae on the web site.  Why haven't you

7    changed that?

8         A.    I frankly am not aware of how to do it, and

9    therefore I'd have to hire somebody to do it, and I

10   haven't gotten around to that yet.  I'm speaking with

11   somebody tomorrow in fact about that.

12        Q.    When you sometimes refer to the studies you

13   conducted, you used the word we.  Are you referring to

14   it as we being Forensic -- your company, FFA?

15        A.    Basically, yes, it's a habit that I have

16   that I've tried to break, but it's difficult.  I'm the

17   only one that does any testing within the company.

18        Q.    Is it fair to say that -- well, Ms. Hutnyan

19   asked you a bunch of questions about what it takes to

20   become a forensic document examiner or forensic

21   question document examiner.

22             Would you say that it's fair to -- or that

23   you would consider yourself to be an expert forensic

24   question document examiner in all aspects, except for

25   handwriting analysis?

EXHIBIT  2

PAGE  55

ALBERT LYTER, PH.D.                    04/17/08

1           MS. HUTNYAN:   Vague and
2       unintelligible.
3       A.      I consider myself to be an expert in the
4    examination of question documents in areas other than
5    examination of handwriting or hand printing.
6       Q.      Can you describe areas of forensic document
7    examination that you have testified about in your
8    career, different areas?
9       A.      Sure.   Typewriting, machine printing, Xerox
10   copies, inks, papers, pencil, typewritten impressions,
11   stamped impressions, indented impressions, staple
12   holes.
13      Q.      How about computer protocols?
14      A.      I haven't done anything with digital media.
15   I have looked at the output from printers, computer
16   printers, but that's more relating to the printer as
17   opposed to the computer.
18      Q.      Ms. Hutnyan asked you earlier about a
19   course that you taught at FLETC or the Federal Law
20   Enforcement Training Center, do you recall that?
21      A.      Yes.
22      Q.      And you said that you taught a course in --
23   well, what did the course involve?   What different
24   subject areas?
25      A.      Well, my responsibility included all the

ALBERT LYTER, PH.D.                                04/17/08

1    identification areas, which were question document

2    examination, fingerprints, firearms and tool marks and

3    voice print analysis.

4          Q.     And was that a course taught to the agents?

5          A.     Yes, it was.

6          Q.     And was the purpose of that to teach them

7    how to perform those tests on their own?

8          A.     No, it was simply to tell them what could

9    be done and what kind of conclusions they might expect

10   and relate it back to the different types of cases that

11   they would be investigating.

12         Q.     I believe you testified earlier that you

13   are a certified criminalist, is that correct?

14         A.     Yes.

15         Q.     And what organization credential are you

16   certified in?

17         A.     The American Board of Criminalistics.

18         Q.     To your knowledge, do you need to be

19   certified by any organization to testify as a question

20   document examiner in a court?

21         A.     No, in fact, there are a lot of people that

22   do that that are not certified by anybody.

23         Q.     Ms. Hutnyan asked you this morning about

24   whether you had ever been qualified to testify as a

25   question document examination expert in a case, is that

EXHIBIT ___2___

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

PAGE ___57___

1    that in your report?

2         A.    Yes.

3         Q.    And so none of the ones that -- none of the

4    conclusions that Mr. Flynn drew, where you drew a

5    different conclusion did you have ESDA results that

6    supported your conclusion?

7         A.    I don't believe so.  I mean, I would have

8    to look at the actual ESDA conclusions, but I don't

9    believe that's the case, and I don't recall exactly

10   which documents Mr. Flynn made comments about, so I'd

11   have to go back and look at those.

12        Q.    Okay.  Well, when we went through, that's

13   why I went through individually and asked you what is

14   your bases.  Do you have any other bases, and then you

15   were checking, I thought, to see whether any ESDA

16   paragraph there was something different.  In one case

17   you said you thought that there was some ESDA analysis

18   supporting it, and then you realized there wasn't.  Do

19   you remember that?

20        A.    Right, there's a correlation between

21   several of the tracing paper documents with each other

22   related to the ESDA testing that we didn't go over, but

23   within the series of documents that we did go over,

24   there is no ESDA testing that I remember.

25        Q.    And with respect to which documents came

EXHIBIT 2   290

PAGE 58

1    first, is it your opinion that 178 and 186 came before

2    the closed tracing paper drawings that Mr. Flynn opined

3    about in his report?

4        A.    Yes.

5        Q.    How certain are you of that conclusion?

6        A.    Well, there were indented impressions

7    from -- that came from the preparation of some detail

8    in 194 that were present on 178 and 186, which means

9    that 178 and/or 186 were underneath 194 when portions

10   of 194 were prepared.

11             The only other explanation would be that

12   178 and 186 were blank when they were underneath there,

13   and that just doesn't follow logically.

14       Q.    So you're quite certain?

15       A.    Yes.

16       Q.    Do you remember Mr. Sloan asking you about

17   whether all of the pencil lines that you had relied

18   upon were in your report?

19       A.    Yes.

20       Q.    And you had said that they weren't in your

21   report?

22       A.    That's correct.

23       Q.    Would you agree with me that an expert

24   wanting to see what you would rely upon in this case

25   would need access to the originals in order to see

1    those pencil lines then?

2              MR. SLOAN:  Objection, vague as to

3        when he would need them.

4        A.     Certainly going backwards and saying oh, I

5    didn't see that, let me look at the originals to see

6    that, yes, you would need the originals.  You couldn't

7    see it from copies.

8        Q.     But I mean, you can't see it from your

9    report either, right?

10       A.     Well, I mean, you can read those instances

11   where it is in my report.  You can read it.

12       Q.     Right.  I'm talking about the instances

13   where it's not in your report.  You had said, for

14   example, where I asked you about the hips on that one,

15   you said well, there were lots of -- that was just an

16   example -- there were lots of areas where pencil lines

17   that you relied on for your conclusions, right?

18       A.     Yes.

19       Q.     And so those are not in the report, and

20   that's something somebody couldn't figure out without

21   seeing the originals, right?

22       A.     Well, that's true, but there was no mention

23   of any of the pencil lines in Mr. Flynn's report, nor

24   was there anything made of the pencil lines in

25   Mr. Cunningham's report, which I commented on.

EXHIBIT 2  292

PAGE  60

1          So I mean, it seems like they had an

2    opportunity to do that.

3          MS. HUTNYAN:   Okay.   Well, let's

4      strike that legal argument.

5          Q.     My question was, and so those are not in

6    your report that you relied upon in your expert report,

7    isn't it?

8          A.     Well, there's a general comment, the report

9    would have been much larger, and given the time

10   constraints it already had, that was, as far as I'm

11   concerned, overkill.

12         Q.     You just had a report stricken on the basis

13   that it didn't contain sufficient detail, isn't that

14   right?

15         A.     Regarding the basis, yes.

16         Q.     Right.

17         A.     But the basis was explained, and there were

18   explanation given regarding what those bases meant and

19   specific examples of those basis.

20         Q.     But Rule 26 requires you to have all the

21   bases in your report, correct?

22         MR. SLOAN:   Objection, calls for a

23      legal conclusion.

24         A.     I don't know what Rule 26 says for sure.

25         Q.     But you do reports for federal court all

1   the time, don't you?

2       A.     I do a lot of reports.  They are not all

3   for federal court.

4       Q.     And if you want your opposing expert to

5   understand what it was that you were relying upon as a

6   basis for your report, you would include the things

7   that you were relying on as support for your

8   conclusion, wouldn't you?

9       A.     And I did, yes.

10      Q.     But so the examples that you have listed in

11  your report that are identifiable specifically, for

12  example, the hips issue that we touched upon, that's

13  the only example that you relied on with respect to

14  those drawings?

15          MR. SLOAN:   Objection, misstates his

16      testimony.

17      A.     No.

18      Q.     So you didn't include all the bases?

19          Another document examiner would not know

20  which portions of those documents you looked at in

21  order to form your conclusion, wouldn't he?

22      A.     Well, an appropriate examination would be

23  to look at all of the drawings for that, and

24  Mr. Cunningham didn't make any comment about where the

25  pencil markings were that he saw.

EXHIBIT **2**     294

PAGE ___62___

1          MS. HUTNYAN:  I'm going to strike

2      that.

3          MR. SLOAN:  Object to striking it.

4          BY MS. HUTNYAN:

5      Q.     Another document examiner would not know

6  which portions of those documents you looked at in

7  order to form your conclusion, would he?

8      A.     Well, he should assume that all of the

9  answers -- all of the document.

10     Q.     So he should assume that every bit of the

11  document had that particular feature when you specify

12  an example of it?

13     A.     Well, a complete examination of the

14  documents would have resulted in the same evidence that

15  I found.

16     Q.     But of course you had eight days to examine

17  the documents, and you had already, as you testified

18  earlier, you had had it narrowed down for you 200 some

19  documents at most, is that right?

20          MR. SLOAN:  Objection, argumentative

21      and misstates his testimony.

22     Q.     You said you looked through the other seven

23  boxes, but it was a very cursory examination, but that

24  you focused on the ones that were mentioned in

25  Mr. Flynn's and Mr. Cunningham's report?

EXHIBIT **2**

PAGE **63**

1      A.      That's correct.

2      Q.      So if a document examiner had eight days to

3   look at, start to finish, at all of those documents in

4   the seven boxes, would they be able to do a complete

5   analysis of every single document?

6              MR. SLOAN:   Objection, incomplete

7          hypothetical.   Assumes facts not in

8          evidence, lack of foundation.

9      A.      Well, if I were a question document

10  examiner, and somebody put seven boxes of documents on

11  my door and said examine them, please, I'd say which

12  ones are the most important.   Because for whatever time

13  period you had, examining every document in every box

14  would not be practical.

15     Q.      It would just be way too many documents to

16  do a complete examination on them, wouldn't it?

17     A.      Right.   But if you narrow it down, then

18  certainly one could do a complete examination.

19     Q.      And so is it your experience that counsel

20  usually narrows down the documents that you should look

21  at?

22             MR. SLOAN:   Objection, insofar as it

23         calls for him to divulge any communications

24         he's had with counsel in this case.   But if

25         you are asking just generally in his

EXHIBIT 2

PAGE 64

1          experience, he can answer that question.

2          A.      In those instances where there are a lot of

3    documents, counsel will normally say I'm interested

4    mostly in this area, yes, that happens.

5          Q.      Well, where there are thousands of drawings

6    and no forensic evidence has been gathered yet,

7    wouldn't it be improper for counsel to presuppose that

8    a particular drawing was the most relevant?

9               MR. SLOAN:   Objection, incomplete

10              hypothetical, assumes facts not in evidence,

11              argumentative, calls for a legal conclusion.

12         A.      I don't know about the appropriateness of

13   it.  But certainly I would guess that there was some

14   ability to narrow the number of documents from the

15   seven boxes based on the context of the lawsuit, which

16   is about specific product, these Bratz dolls, and

17   therefore any items that might have contained a drawing

18   or a portion of a drawing that was related to those

19   would be appropriate for examination.

20         Q.      There were hundreds of such documents

21   weren't there?

22         A.      I don't know how many there were.

23              MR. SLOAN:   I'm going to object to

24              that last question as vague and ambiguous

25              with respect to which documents she's

1    A.    I don't believe so.

2    Q.    Do you believe that any qualified expert

3  who examined the multicolored drawings, that had the

4  appropriate equipment, could see the pencil lines that

5  you've testified about?

6              MS. HUTNYAN:   Objection, calls for

7        speculation, assumes facts not in evidence.

8    A.    I would assume so.

9    Q.    So a properly qualified expert with the

10  right equipment should have been able to see the same

11  lines, the same pencil lines that you saw in the

12  multicolored drawings?

13              MS. HUTNYAN:   Incomplete hypothetical.

14        Assuming he has access to the drawings?

15              BY MR. SLOAN:

16    Q.    Assuming that that person has access to the

17  drawings and had, let's say, three complete days to

18  perform the analysis?

19    A.    If any competent examiner examined these

20  multicolored drawings with the use of magnification

21  and/or microscope, they will be able to detect the

22  pencil lines.

23    Q.    Were you confused about whether MGA had

24  already retained you, or did you just fail to remember

25  that they had retained you?

ALBERT LYTER, PH.D.                    04/17/08

```
 1        A.      Yes, I failed to remember.
 2        Q.      And if you had remembered that they had
 3   retained you when one of Ms. Hutnyan's colleagues
 4   called you to retain you from Mattel, would you have
 5   accepted that assignment?
 6        A.      No.
 7                MR. SLOAN:  No further questions.
 8                FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
 9                BY MS. HUTNYAN:
10        Q.      Mr. Sloan asked you if Mr. Cunningham had
11   identified every single pencil line that he saw when he
12   examined documents.  Do you remember that?
13        A.      I believe he was referring to what he
14   characterizes in his report as faint pencil marks.
15        Q.      But he didn't rely on those pencil lines
16   for any portion of his analysis, did he?
17        A.      Apparently not, no.
18        Q.      And -- but you are relying on the pencil
19   lines as an important basis for the conclusions that
20   you drew, aren't you?
21        A.      Yes.
22        Q.      When you talk about any qualified expert in
23   the areas of forensic document examination, would you
24   agree with me that Mr. Cunningham is a qualified expert
25   in that field?
```

303

EXHIBIT  **2**

PAGE  **67**

1           MR. SLOAN:   Objection, lacks

2       foundation, improper question.   It calls for

3       a legal conclusion.

4       Q.      You don't know -- you worked with

5   Mr. Cunningham before, haven't you?

6       A.      Yes.  He is a qualified forensic document

7   examiner.

8       Q.      Have you worked with Mr. Flynn before,

9   Mr. William Flynn?

10      A.      Yes.

11          MR. SLOAN:   Same objections.

12      Q.      Would you consider him a qualified question

13  document examiner?

14      A.      Yes.

15          MS. HUTNYAN:   Okay, no further

16      questions for me.

17          MR. SLOAN:   None.

18          THE VIDEOGRAPHER:   This concludes

19      today's deposition of Dr. Lyter.  The number

20      of media used was eight.  We are off the

21      record at 7:28 p.m.

22          (Whereupon the deposition was

23      concluded at 7:28 p.m.)

24          (Signature reserved.)

25

EXHIBIT **2**

PAGE __68__

1

2

3    STATE OF NORTH CAROLINA )

4    COUNTY OF WAKE          )

5                    CERTIFICATE OF REPORTER

6        I, MARISA MUNOZ-VOURAKIS, an RMR, CRR and Notary

7    Public in the State of North Carolina, the reporter by

8    whom the foregoing deposition was taken, do hereby certify

9    that the testimony of the witness appearing in the

10   foregoing deposition was taken by me in Stenotype and

11   thereafter reduced to typewriting under my direction,

12   pages 1 through   . that I am neither counsel for,

13   related to, or employed by any of the parties to the

14   action in which this deposition was taken; and further,

15   that I am not a relative or employee by the parties

16   hereto, nor financially or otherwise interested in the

17   outcome of the action.

18              IN WITNESS WHEREOF, I have hereto set

19   my hand, dated this      day of         ,

20

21   _____

22      MARISA MUNOZ-VOURAKIS, RMR, CRR, Notary Public

23

24

25   My Commission expires November 23, 2008.

EXHIBIT  2
PAGE  69

EXHIBIT 3

**Sutherland**
■ **Asbill &** ■
**Brennan** LLP
ATTORNEYS AT LAW

999 Peachtree Street, NE
Atlanta, GA 30309-3996
404.853.8000
fax 404.853.8806
www.sablaw.com

**Daniel J. Warren**
**DIRECT LINE:** 404.853.8028
E-Mail: daniel.warren@sablaw.com

March 6, 2008

**VIA FEDERAL EXPRESS**

Federal Forensic Associates, LLP
c/o Albert H. Lyter, III
7425 Capstone Dr.
Raleigh, NC 27615

RE:     Carter Bryant v. Mattel
            Our Ref. No. 22897.0001

Dear Mr. Lyter:

Pursuant to the Subpoena issued in the above-referenced case on March 5, 2008 by MGA, please find enclosed the notary book of Jacqueline R. Prince.

Please return the notary book to my attention when your evaluation is complete.

Very truly yours,

SUTHERLAND ASBILL & BRENNAN LLP

Daniel J. Warren

DJW/tlc
Encl.

cc:  Ryan Weinstein, Esq.
       Diane Hutnyan, Esq.
       Matthew W. Werdegar, Esq.

7844345.1

EXHIBIT **3**
PAGE **70**

EXHIBIT 4

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                                    **Certified Copy**

5    - - - - - - - - - - - - - - - - - - - - - -

6    CARTER BRYANT,            )

7    an individual,           )

8            Plaintiff,       )

9        vs.                  ) No. CV 04-09049 SGL (RNBx)

10   MATTEL, INC., a          )     Consolidated with

11   Delaware corporation,    )     CV 04-09059

12           Defendant.       )     CV 05-02727

13   - - - - - - - - - - - - - - - - - - - - - -

14

15

16       Videotaped Deposition of VALERY AGINSKY,

17       taken at 2105 University Park Drive,

18       Okemos, Michigan, commencing at 10:00 a.m.,

19       Monday, March 24, 2008, before Rhonda

20       M. Foster, RMR, RPR, CSR No. 3612.

21

22

23

24

25   PAGE 1 - 157

                                                          1

RECEIVED

MAR 27 2008

Certified Copy

EXHIBIT __4__
PAGE __72__

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR MGA ENTERTAINMENT:

 4

 5        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 6        BY:  MATTHEW E. SLOAN, ESQ.

 7        300 South Grand Avenue

 8        Los Angeles, California  90071

 9        matthew.sloan@skadden.com

10        (213) 687-5000

11

12    FOR THE DEFENDANT MATTEL:

13

14        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

15        BY:  DUANE R. LYONS, ESQ.

16        865 South Figueroa Street, 10th Floor

17        Los Angeles, California  90017

18        duanelyons@quinnemanuel.com

19        (213) 443-3126

20

21    ALSO PRESENT:

22

23        LYNSEY RAUKER, VIDEOGRAPHER

24

25
                                                      2
```

EXHIBIT __4__
PAGE __73__

1    and they have this red color.  I just said that it

2    is -- let's say hypothetically it is a red color

3    printing ink, then the analysis would show that this

4    ink contains a certain component of red color, and

5    because I had analyzed the paper blank from -- and I

6    know that this red color comes from the paper blank,

7    therefore, I will simply subtract the red color from

8    the analysis of the ink in areas 1, 2, and 3.

9         Q.    And then why did you take PB-2?

10        A.    PB-2 was taken from the adjacent column,

11   which was white.

12        Q.    By the way, the ink in those columns, and

13   I'd call them the column that says month, year, time,

14   and the column that says document date, the first and

15   third columns, you said that -- assume it is red.  Do

16   ·you recall whether it is red or not?

17        A.    I don't recall as of sitting today.   I

18   believe it was gray.

19        Q.    You believe it was gray?

20        A.    Yes.

21        Q.    And is it -- to your knowledge, is it --

22   does it use the same ink as the ink on the cross lines,

23   the·vertical and horizontal lines on the preprinted

24   notary book?

25                     MR. LYONS:   Vague and ambiguous.

                                                    69

EXHIBIT  4
PAGE   74

1    BY MR. SLOAN:

2        Q.    Do you want me to repeat the question?

3        A.    I understood your question.  It is easy to

4    answer if we take a look at this document, the original

5    document.  But I believe it was of the same color, of

6    the same gray color.  But I think that it is

7    probably -- it doesn't matter for this case, because

8    first of all, I didn't take paper blank samples from

9    the lines, printed, preprinted on these pages.  And I

10   tried, when I took samples from the ink in the 17 areas

11   on these Pages 11 and 12, I tried to take samples to

12   avoid any -- any sampling -- any samples that would

13   contain a preprinted line.

14       Q.    Did you succeed in not taking any samples

15   that crossed the preprinted line?

16       A.    What I usually do, when I take these

17   samples, as I said, I try not to take a preprinted

18   line.  But if I take it, then there are two scenarios.

19   One scenario is I always, when I do the analysis, I can

20   easily discard a sample that contains a preprinted line

21   in it.

22                      For example, if I took a sample from

23   Page 11, and accidentally picked the

24   printed -- preprinted line from Page 10, which is the

25   back of Page 11, then I would simply look at this

                                                          70

EXHIBIT __4__
PAGE __75__

1    microplug, at a later time, and if I see that the

2    bottom of the microplug, which is supposed to be white,

3    is actually not white but it contains a line,

4    preprinted line, I can either discard it, if the

5    ink -- if the printed ink can be extracted, and

6    analyzed, and therefore interfere with my results.  Or

7    if it is not soluble in the solvent which I used for

8    the chemical analysis, I could use it, because it will

9    not interfere with my results.

10        Q.    Did you accidentally or purposely take any

11   microplugs from any of the 17 areas of ink that,

12   whether accidentally or on purpose, you plugged

13   through one of the preprinted lines on Page 11 or 12 of

14   the notary book?

15        A.    It could happen in this case, and it is

16   absolutely not important for the results that I

17   obtained using chemical methods, because the printed

18   ink, even if I took it, accidentally, it is not soluble

19   in the solvents which I used for the chemical analysis.

20        Q.    How do you know the printed ink was not

21   soluble?

22        A.    Because I -- when I analyzed the 17 areas

23   from which I took ink samples using TLC, which stands

24   for thin-layer chromatography, I determined that none

25   of these samples, 17 sets of samples that I analyzed,

71

EXHIBIT 4
PAGE 76

1    none of them contains any dye component, either from

2    the writing ink or from the printing ink on these

3    documents, that was soluble in the solvent that I used.

4        Q.    But Mr. Aginsky, correct me if I am wrong,

5    you said that you tried to avoid hitting any of the

6    preprinted lines, correct?

7        A.    Yes, in order not to complicate my

8    subsequent analysis.

9        Q.    And to your knowledge, you didn't hit any of

10   the preprinted lines; is that correct?

11       A.    As I said, I tried to avoid, and then at a

12   later point, when I do the analysis, if I see that the

13   chemical analysis show me that certain information from

14   the printed ink was extracted by the solvent, then I

15   would repeat the analysis to subtract this information.

16   In other words, as I said, the procedure is I always

17   try to avoid the preprinted line.  And then at a later

18   point, when I do the analysis, I can either discard

19   this microplug that accidentally picked the printed

20   line from the back of the page, or I can use it, even

21   use it, if I determine that the printed ink is not

22   soluble.  It means that it doesn't matter whether it is

23   there or not, it doesn't interfere at all with the

24   analysis.

25       Q.    I understand, Mr. Aginsky, but you can't, as

                                                      72

EXHIBIT 4
PAGE 77

1                     CERTIFICATE OF NOTARY

2

3     STATE OF MICHIGAN       )

4                            ) SS

5     COUNTY OF ST. CLAIR   )

6          I, Rhonda M. Foster, Certified Shorthand

7    Reporter, a Notary Public in and for the above county

8    and state, do hereby certify that the above

9    examination under oath was taken before me at the time

10   and place hereinbefore set forth; that the witness was

11   by me first duly sworn to testify to the truth, and

12   nothing but the truth, that the foregoing questions

13   asked and answers made by the witness were duly

14   recorded by me stenographically and reduced to

15   computer transcription; that this is a true, full and

16   correct transcript of my stenographic notes so taken;

17   and that I am not related to, nor of counsel to either

18   party nor interested in the event of this cause.

19

20

21               *Rhonda M Foster*

22               Rhonda M. Foster

23               RMR, RPR, CSR 3612, Notary Public,

24               St. Clair County, Michigan

25  My Commission expires: March 11, 2008

EXHIBIT **4**

PAGE **78**

EXHIBIT 5

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

——

TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

February 18, 2008

**BY E-MAIL**

Daniel Warren, Esq.
Sutherland Asbil & Brennan LLP
999 Peachtree Street
Suite 2300
Atlanta, GA 30309

RE:    Bryant v. Mattel

Dear Dan:

As I mentioned in my voice mail to you, our client, MGA Entertainment, contemplates conducting forensic ink tests on certain entries in Ms. Prince's notary book. These tests would seek to replicate Mattel's testing of the same notary book, and, as such, would employ the same sampling methodology that Mattel's expert has used. That methodology was set forth in a letter to you from Mattel's counsel, dated December 25, 2007.

Per your request, I write to provide you with additional detail on the sampling methodology. MGA's expert would extract small, hypodermic-needle sized holes or "microplugs" of about 0.5 millimeters in diameter from certain handwritten portions of the log entries. The sampled log entries would include, but would not necessarily be limited to, Ms. Prince's 8/26/1999 log entry. To the extent possible, MGA's expert would seek to preserve a significant portion of the handwritten text to allow for future sampling.

If MGA elects to proceed with the sampling, it would first provide notice to you, Carter Bryant, and Mattel of (1) MGA's intent to conduct the sampling; (2) the identity and qualifications of MGA's expert; and (3) the sampling location. We would further provide you and all parties with the opportunity to

EXHIBIT   5
PAGE   79

Daniel Warren, Esq.
February 18, 2008
Page 2


observe the sampling at the expert's laboratory.  Once the sampling is completed, we would promptly return the notary book to your custody.

If this arrangement is agreeable to you, please send Ms. Prince's notary book to my attention at the above address.  As you may know, the deadline for providing expert rebuttal reports is fast approaching and time is of the essence. We therefore ask that you please send Ms. Prince's notary book as soon as practicable, or, alternatively, that you notify us promptly of any objections you might have to the above arrangement.

Thanks very much for your assistance.

Sincerely,

Ryan Weinstein

Ryan Weinstein


cc:     Matthew M. Werdegar, Esq.
        Diane C. Hutnyan, Esq.


EXHIBIT __5__
PAGE __80__

EXHIBIT 6

1  THOMAS J. NOLAN (Bar No. 66992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, CA  90071-3144
3  Telephone:  (213) 687-5000
   Facsimile:  (213) 687-5600
4  E-mail:    tnolan@skadden.com

5  KENNETH A. PLEVAN
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  Four Times Square
   New York, New York, 10036-6522
7  Telephone:  (212) 735-3000
   Facsimile:  (212) 735-2000
8  Email:      kplevan@skadden.com

9  Attorneys for Counter-Defendants
   MGA ENTERTAINMENT, INC., ISAAC LARIAN,
10 MGA ENTERTAINMENT (HK) LIMITED, and
   MGAE de MEXICO S.R.L. de C.V.

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                   EASTERN DIVISION

15

16 CARTER BRYANT, an individual,        )  CASE NO. CV 04-9049 SGL (RNBx)
                                        )
17              Plaintiff,              )  Consolidated with:
                                        )  Case No. CV 04-9059
18      v.                              )  Case No. CV 05-2727
                                        )
19 MATTEL, INC., a Delaware             )  **DISCOVERY MATTER**
   corporation,                         )
20                                      )  Hon. Edward A. Infante (Ret.)
              Defendant.                )  Discovery Master
21                                      )
   ─────────────────────────────       )  **STIPULATION RE MGA'S**
22                                      )  **PROPOSED TESTING OF**
   Consolidated with MATTEL, INC. v.    )  **JACQUELINE PRINCE'S**
23 BRYANT and MGA                       )  **NOTARY BOOK; [PROPOSED]**
   ENTERTAINMENT, INC. v.               )  **ORDER**
24 MATTEL, INC.                         )
                                        )  **Phase 1**
25                                      )  Discovery Cut-Off:      Jan. 28, 2008
                                           Expert Rebuttal
26                                         Reports Due:            March 17, 2008
                                           Expert Discovery
27 EXHIBIT ___V___                        Cut-Off:                March 31, 2008
                                           Pre-Trial Conference:   May 5, 2008
28 PAGE ___81___                          Trial Date:             May 27, 2008

─────────────────────────────────────────────────────────────────────────
   STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
   495716.03-Los Angeles Server 1A                    MSW - Draft February 27, 2008 - 10:23 AM

**STIPULATION**

1  This Stipulation is entered into by and between Mattel, Inc. ("Mattel") on the

2  one hand, and MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK)

3  Limited, and MGAE de Mexico S.R.L. de C.V. (collectively referred to herein as

4  "MGA"), on the other hand, with reference to the following:

5  WHEREAS, Jacqueline Prince, a notary public, made notations in a log book

6  entitled "Official Journal of Notarial Acts" (the "log book") which relate to the date

7  on which certain of plaintiff and counter-defendant Carter Bryant's ("Bryant")

8  drawings were created;

9  WHEREAS, on page 11 of the notary book, there is an entry, dated 8/26/99,

10  which identifies 6 sketches of dolls made by Bryant;

11  WHEREAS, the same entry includes the notation "From 1998 Missouri";

12  WHEREAS, on or about December 25, 2007, counsel for Mattel sent a letter

13  to Daniel J. Warren, counsel for Ms. Prince, requesting production of the notary

14  book for purposes of conducting a forensic analysis on the ink used on the above-

15  referenced entry;

16  WHEREAS, in response, Mr. Warren produced said log book to Mattel, and

17  MGA did not object;

18  WHEREAS, on January 4, 2008, Mattel's expert, Valery N. Aginsky,

19  extracted 17 sets of hypodermic needle-sized samples or "microplugs" from written

20  lines appearing on pages 11 and 12 of the notary book and two sets of blank paper

21  "microplug" samples from page 11 of the notary book;

22  WHEREAS, Mr. Aginsky subsequently subjected the "microplug" samples to

23  various chemical analyses, including chromatography, thin-layer chromatography

24  ("TLC"), and gas chromatography-mass spectrometry ("GC-MS");

25  WHEREAS, on January 31, 2008, Mr. Aginsky returned Ms. Prince's log

26  book to Mr. Warren;

27

28

EXHIBIT PAGE 27

1    WHEREAS, on February 11, 2008, Mattel transmitted to MGA a copy of Mr.

2 Aginsky's expert report, wherein Mr. Aginsky set forth the results of ink tests that he

3 performed on samples extracted from the notary book;

4    WHEREAS, on the basis of his tests, Mr. Aginsky concluded that the notation

5 "From 1998 Missouri" on page 11 of the notary book was written in different ink

6 than the remainder of the 8/26/99 entry;

7    WHEREAS, MGA now seeks to test the accuracy of Mr. Aginsky's findings

8 by having its own expert replicate Mr. Aginsky's ink testing;

9    WHEREAS, the current deadline for submitting expert rebuttal reports is

10 March 17, 2008;

11    THEREFORE, the undersigned parties, through their undersigned counsel,

12 stipulate and agree as follows:

13    1.    MGA will be allowed to take samples and conduct testing on the notary

14 book to test the accuracy of Mr. Aginsky's findings, pursuant to the following

15 protocol.

16    2.    MGA's testing of Ms. Prince's log book will be limited to analysis of

17 "microplug" samples extracted from pages 11 and 12 of the notary book.

18    3.    MGA's expert (or experts) will remove no more than 17 sets of

19 "microplug" samples from the written portions of the entries on pages 11 and 12 of

20 the notary book, and no more than two sets of blank paper "microplug" samples from

21 the areas of pages 11 and 12 which do not contain writing.   (Although this

22 Stipulation refers to MGA's "expert," MGA reserves the right to employ more than

23 one expert for the proposed sampling and testing of the notary book).

24    4.    MGA's expert will extract all "microplug" samples using a hypodermic-

25 needle-sized hole punch, which removes holes of less than one millimeter in

26 diameter.

27    5.    Before subjecting the samples to ink analysis, MGA's expert will

28 maintain the samples at his or her laboratory in normal environmental conditions.

EXHIBIT 5
PAGE 53

-2-

1    6.    All sampling and testing will occur at the laboratory of MGA's expert.

2    7.    Before Mr. Warren sends the notary book to MGA's expert, MGA will

3    send a letter to Mattel's counsel by facsimile (and U.S. Mail) setting forth: (a) the

4    name of MGA's expert (or experts) who will conduct the sampling; (b) the expert's

5    curriculum vitae; (c) the location of the expert's laboratory; and (d) samples of

6    "microplugs" similar to those that would be extracted from the notary book.

7    8.    Mattel will have three days from its receipt of the above-referenced

8    letter by facsimile to object to the contemplated testing.  During this three-day period,

9    Mr. Warren will maintain custody of the notary book, and no testing will be

10   performed.  If Mattel raises no objection, then Mr. Warren will be directed to

11   transmit the notary book to MGA's expert and MGA's expert will be authorized to

12   conduct testing pursuant to the protocol set forth herein.

13   9.    In the event Mattel objects to the proposed testing, Mattel's counsel

14   must notify MGA by letter and/or a telephone call within the 3-day period set forth

15   above.  The parties must then meet and confer and, within two more Court days, file

16   a joint statement to Judge Infante seeking resolution of the dispute.

17   10.   Mattel may elect to have its own expert attend the extraction of

18   "microplug" samples provided that (1) Mattel makes the election in writing within

19   the three-day objection period; (2) Mattel provides counsel for MGA with the

20   credentials of any observing expert; and (3) the testing can take place within ten (10)

21   calendar days of the execution of this Stipulation.  At this time, MGA's expert is

22   available to conduct the sampling on March 10, 11, or 12, 2008.

23   11.   If Mattel's expert raises any issues about the sampling being performed

24   while he or she is observing the sampling, the parties will seek immediate resolution

25   from the Court so that the sampling will not be delayed.  If Mattel's counsel does not

26   object or seek attendance by its expert within the three-day objection period, the

27   proposed destructive testing shall be deemed unobjectionable and may be carried out

28   by MGA's expert without further delay.

EXHIBIT 4
PAGE 84

-3-

12.   With the exception of alterations resulting from any destructive testing, which would be conducted in accordance with the protocol set forth above, the notary book will be returned promptly to Mr. Warren in the same condition it was received.

13.   The parties agree that, should Mattel raise any objections to the proposed sampling, testing, or credentials of Mattel's expert, or to any other aspects of the testing process, MGA will be granted an extension of time within which to submit a rebuttal report in response to Mr. Aginsky's initial expert report. Specifically, in the event that Mattel objects to MGA's proposed expert sampling, the current March 17, 2008 deadline for submitting MGA's rebuttal expert report will be extended by one calendar day for each day from the date Mattel raises its objection to the date upon which any such objection is resolved by Judge Infante or by the agreement of the parties.

IT IS SO STIPULATED.

DATED:  February __, 2008      SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM, LLP


By: _____
      Matthew E. Sloan
Attorneys for Counter-Defendants
MGA ENTERTAINMENT, INC., ISAAC LARIAN,
MGA ENTERTAINMENT (HK) LIMITED, and
MGAE de MEXICO S.R.L. de C.V.


DATED:  February __, 2008      QUINN EMANUEL URQUHART OLIVER
                                & HEDGES, LLP


By: _____
      Diane C. Hutnyan
Attorneys for Mattel, Inc.

EXHIBIT 6
PAGE 85

-4-

1
2
3 ### ORDER

4     The Court, having reviewed MGA and Mattel's Stipulation Re MGA's

5 Proposed Testing Of Jacqueline Prince's Notary Book (the "Stipulation") and for

6
7 good cause shown, hereby approves the procedure for MGA's proposed expert

8 testing of the notary book set forth in the Stipulation.

9
10     IT IS SO ORDERED.

11

12 DATED: _____   _____

13                               Hon. Edward A. Infante (Ret.)
                                Discovery Master
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT ⎼
PAGE ⎯ 86

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

———

TEL: (213) 687-5000

FAX: (213) 687-5600

www.skadden.com

DIRECT DIAL
213-687-5276
DIRECT FAX
213-621-5276
EMAIL ADDRESS
MATTHEW.SLOAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 3, 2008

**VIA E-MAIL AND U.S. MAIL**

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

RE: Bryant v. Mattel:  Stipulation Re Proposed Testing of
    Prince's Log Book

Dear Diane:

      I am writing in response to your letter to Ryan Weinstein, dated March 3, 2008, which you transmitted to us earlier today.  As we feared, rather than respond in good faith to our proposed stipulation regarding the testing of Ms. Prince's notary book, you have raised largely frivolous objections in a transparent attempt to delay MGA's testing of the notary book and obstruct our ability to challenge the findings reached by your expert, Dr. Aginsky.  In the spirit of compromise, we are willing to make certain minor amendments to the stipulation to accommodate your alleged concerns.  (A copy of the amended stipulation (the "amended Stipulation") is attached hereto).  The overwhelming majority of your objections, however, are frivolous and clearly designed primarily, if not solely, for the purpose of obtaining an unfair litigation advantage by obstructing MGA's ability to conduct the very same testing, under the very same conditions, that MGA allowed your expert to conduct without objection or court intervention.  I discuss your objections and our responses to them below.

      First, you object that the stipulation "appears to contemplate the idea of a future protocol, rather than contain an actual protocol."  We do not know what you

EXHIBIT 6
PAGE 87

Diane C. Hutnyan, Esq.
March 3, 2008
Page 2

mean by this and you have failed to specify precisely how you would revise the stipulation or why any additional procedures are necessary. Notwithstanding these shortcomings in your letter, we will slightly modify the testifying protocol as set forth below and in the amended Stipulation to provide further procedure. We believe this should cover any reasonable concerns you may have.

Second, you object that the "stipulation does not reflect any plan to obtain the Court's approval of Mr. Lyter and his credentials." This is not accurate. The Stipulation specifically provides that MGA must provide Mattel with notice of the expert we plan to use to perform the sampling and provide Mattel the expert's curriculum vitae. *See* Stipulation, ¶ 7. Mattel then has three days to object to the expert's credentials or the proposed testing, during which time Mr. Warren will not transmit the notary book to MGA. Accordingly, if Mattel has any objections to Mr. Lyter's credentials, then the Court will have to approve Dr. Lyter and his proposed testing. If Mattel has no such objection, there is no reason for MGA to have to obtain court approval – unless Mattel is trying to delay the testing to obtain an unfair litigation advantage.[1]

Third, you complain that you are "concerned about having the notary book in anyone's hands or possession but the (by then Court-approved) expert in the presence of [Mattel's] expert." To the extent you are concerned about the custody of the notary book, we will amend the stipulation to provide that the notary book must be maintained in the custody of Dr. Lyter or one of his employees or assistants at all times from the time Dr. Lyter's lab receives the notary book from Mr. Warren until it is transmitted back to Mr. Warren. *See* Amended Stipulation, ¶ 10.

The rest of your concerns are unfounded, and designed primarily to obstruct. As explained above, if you object to the delivery of the notary book to Dr. Lyter, you will have a full opportunity to litigate this matter before Judge Infante *before* the

---

[1]   As you know, the only reason that Judge Infante required Mattel to submit its experts' curriculum vitae to the court and obtain advance court approval before Mattel could perform any sampling on Bryant's drawings *is because Mattel refused to reveal the identity of its experts to Mr. Bryant's counsel*. Given that MGA has disclosed the identity and curriculum vitae of our expert already, there is no need for the added step of obtaining court approval of MGA's experts – unless, of course, Mattel has some good faith basis to object to Dr. Lyter's credentials. We assume by your silence that you recognize that Dr. Lyter is a highly-respected expert, and that any such objections would therefore be unfounded.

It is worth noting, moreover, that Mattel failed to give MGA *any* advance notice of the identity of Mattel's expert until just before Dr. Aginsky took his samples from the notary book. We simply fail to comprehend how you can claim the procedure we have proposed is insufficient compared to the paltry notice and procedure you provided MGA in connection with the testing of the notary book.

EXHIBIT __6__
PAGE __88__

Diane C. Hutnyan, Esq.
March 3, 2008
Page 3

notary book is delivered to Dr. Lyter. Thus, under the Stipulation, Dr. Lyter will not obtain possession unless he is either approved by the Court (over Mattel's objections) or you decide not to object to his performing the sampling. As for your request that "the notary book should not be handled by either expert outside the presence of the other," this is absurd. Mattel's expert, Dr. Aginsky, had possession of the notary book for at least 27 days[2] without any oversight. Mattel's expert is entitled to observe our expert's destructive sampling procedure; he is not entitled to be present at all times while Dr. Lyter visually inspects the notary book or engages in other non-destructive testing. You have provided no basis for such an invasive request to monitor our expert's examination and, as you well know, no such basis exists. If you want more information about Dr. Lyter's non-destructive examination of the notary book, you will have to do what any litigant must do (and what MGA will have to do with respect to Dr. Aginsky): ask him in his deposition.

Fourth, you complain that the stipulation must be "more specific in setting forth the exact method or delivery, time of delivery, location of delivery, and return date" and must set forth the "specific conditions" under which the book will be stored. Although MGA thinks that these objections are largely irrelevant, at your suggestion we have revised the stipulation to conform more closely with Judge Infante's August 30, 2007 Order. *See* Amended Stipulation, ¶¶ 9, 10, 14.

As for the storage conditions, the Stipulation specifies that the notary book will be maintained in "normal environmental conditions." *See* Stipulation, ¶ 5. We think this is more than sufficient to ensure the integrity of the notary book, but in the spirit of compromise, we will amend Paragraph 5 by providing that "normal environment conditions," means "generally accepted laboratory conditions that will preserve the integrity of the notary book from any damage caused by heat, cold, humidity, or other conditions."

Fifth, you have asked for a provision that all the samples must be taken in one-day. We think this is reasonable and will amend the Stipulation accordingly.

Sixth, you have asked that MGA limit the number of "microplug" samples which Dr. Lyter can take in any one "set" of samples. We believe this is also a reasonable request, and are prepared to stipulate that each "set" will be limited to 15-20 microplugs, subject to MGA's right to apply to the court for the right to increase the amount of "microplugs" allowed. We will amend the Stipulation accordingly. *See* Amended Stipulation, ¶ 3.

---

[2]   Per Mr. Aginsky's report, he removed the "microplug" samples from the notary book on January 4, 2008, and did not return the notary book to Ms. Prince's counsel, Mr. Warren, until January 31, 2008.

EXHIBIT __6__
PAGE __89__

Diane C. Hutnyan, Esq.
March 3, 2008
Page 4

Seventh, you object to the "Whereas" section of the Stipulation as unnecessary and argumentative.  We disagree.  It is appropriate and necessary for the Court to know the history of testing that has been performed on the notary book, and to be informed that Mattel performed the very same testing, in order to render a decision.  We see no valid reason that you should object to presenting the whole story unless you have something to hide.  Accordingly, we will not revise the "Whereas" provisions in the Stipulation.

Eighth, you remarkably reject our reasonable and necessary request for an agreement that the deadline for submitting our rebuttal report should be extended during the pendency of any court proceedings regarding Dr. Lyter's right to obtain samples from the notary book.  Your refusal to agree to such a provision reveals your true intentions.  Failing to include such a provision would render the whole stipulation futile from MGA's perspective because you would undoubtedly use it as an opportunity to tie us up in litigation until the March 17 deadline for rebuttal reports had passed, and thereby prevent us from engaging in any expert testing.

Finally, you request that Mattel be guaranteed access to the notary book to perform additional tests after MGA has served its rebuttal report and/or Mr. Lyter has been deposed.  Given that Dr. Aginsky has already had free and unfettered access to the notary book for almost a month, and no constraints were placed on his ability to test the book, we see no reason to address such a request at this juncture.  If you can present grounds for such additional testing later, we will consider them, but we think that any request at this juncture is premature and we will not incorporate it in the amended Stipulation.

Please review the attached Amended Stipulation and let us know by 4:00 pm PST tomorrow, Tuesday, March 4, 2008, whether you are willing to sign the Amended Stipulation as is.  In the event you reject this reasonable proposal, we will proceed to subpoena the notary book from Mr. Warren so that Mr. Lyter can perform his sampling in time to meet the March 17, 2008 deadline for submitting MGA's expert rebuttal reports.  In the event Mattel seeks to delay our legitimate testing

EXHIBIT 6
PAGE 90

Diane C. Hutnyan, Esq.
March 3, 2008
Page 5


further by improper obstructionist tactics, and interferes with our ability to perform the necessary sampling before the March 17 deadline, we will seek preclusionary sanctions to prevent Mattel from introducing Dr. Aginsky's testimony or expert report at trial.

Very truly yours,

Matthew E. Sloan

Enclosures

cc:  Ryan Weinstein, Esq.
     Carl Roth, Esq.

EXHIBIT __6__
PAGE __91__

EXHIBIT 7

1  THOMAS J. NOLAN (Bar No. 66992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, CA  90071-3144
3  Telephone:  (213) 687-5000
   Facsimile:  (213) 687-5600
4  E-mail:      tnolan@skadden.com

5  KENNETH A. PLEVAN
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  Four Times Square
   New York, New York, 10036-6522
7  Telephone:  (212) 735-3000
   Facsimile:  (212) 735-2000
8  Email:       kplevan@skadden.com

9  Attorneys for Counter-Defendants
   MGA ENTERTAINMENT, INC., ISAAC LARIAN,
10 MGA ENTERTAINMENT (HK) LIMITED, and
   MGAE de MEXICO S.R.L. de C.V.

11

12             UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14                    EASTERN DIVISION

15

16 CARTER BRYANT, an individual,      )  CASE NO. CV 04-9049 SGL (RNBx)
                                      )
17                Plaintiff,          )  Consolidated with:
                                      )  Case No. CV 04-9059
18        v.                          )  Case No. CV 05-2727
                                      )
19 MATTEL, INC., a Delaware           )  **DISCOVERY MATTER**
   corporation,                       )
20                                    )  Hon. Edward A. Infante (Ret.)
                Defendant.            )  Discovery Master
21                                    )
                                      )  **STIPULATION RE MGA'S**
22                                    )  **PROPOSED TESTING OF**
   Consolidated with MATTEL, INC. v.  )  **JACQUELINE PRINCE'S**
23 BRYANT and MGA                     )  **NOTARY BOOK;  [PROPOSED]**
   ENTERTAINMENT, INC. v.             )  **ORDER**
24 MATTEL, INC.                       )
                                      )  **Phase 1**
25                                    )  Discovery Cut-Off:      Jan. 28, 2008
                                         Expert Rebuttal
26                                       Reports Due:            March 17, 2008
                                         Expert Discovery
27                                       Cut-Off:                March 31, 2008
                                         Pre-Trial Conference:   May 5, 2008
28                                       Trial Date:             May 27, 2008

   STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT  7
PAGE  92

## STIPULATION

This Stipulation is entered into by and between Mattel, Inc. ("Mattel") on the one hand, and MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively referred to herein as "MGA"), on the other hand, with reference to the following:

WHEREAS, Jacqueline Prince, a notary public, made notations in a log book entitled "Official Journal of Notarial Acts" (the "log book") which relate to the date on which certain of plaintiff and counter-defendant Carter Bryant's ("Bryant") drawings were created;

WHEREAS, on page 11 of the notary book, there is an entry, dated 8/26/99, which identifies 6 sketches of dolls made by Bryant;

WHEREAS, the same entry includes the notation "From 1998 Missouri";

WHEREAS, on or about December 25, 2007, counsel for Mattel sent a letter to Daniel J. Warren, counsel for Ms. Prince, requesting production of the notary book for purposes of conducting a forensic analysis on the ink used on the above-referenced entry;

WHEREAS, in response, Mr. Warren produced said log book to Mattel, and MGA did not object;

WHEREAS, on January 4, 2008, Mattel's expert, Valery N. Aginsky, extracted 17 sets of hypodermic needle-sized samples or "microplugs" from written lines appearing on pages 11 and 12 of the notary book and two sets of blank paper "microplug" samples from page 11 of the notary book;

WHEREAS, Mr. Aginsky subsequently subjected the "microplug" samples to various chemical analyses, including chromatography, thin-layer chromatography ("TLC"), and gas chromatography-mass spectrometry ("GC-MS");

WHEREAS, on January 31, 2008, Mr. Aginsky returned Ms. Prince's log book to Mr. Warren;

EXHIBIT 1
PAGE 93

1    WHEREAS, on February 11, 2008, Mattel transmitted to MGA a copy of

2   Mr. Aginsky's expert report, wherein Mr. Aginsky set forth the results of ink tests

3   that he performed on samples extracted from the notary book;

4    WHEREAS, on the basis of his tests, Mr. Aginsky concluded that the notation

5   "From 1998 Missouri" on page 11 of the notary book was written in different ink

6   than the remainder of the 8/26/99 entry;

7    WHEREAS, MGA now seeks to test the accuracy of Mr. Aginsky's findings

8   by having its own expert replicate Mr. Aginsky's ink testing;

9    WHEREAS, the current deadline for submitting expert rebuttal reports is

10   March 17, 2008;

11    THEREFORE, the undersigned parties, through their undersigned counsel,

12   stipulate and agree as follows:

13    1.    MGA will be allowed to take samples and conduct testing on the notary

14   book to test the accuracy of Mr. Aginsky's findings, pursuant to the following

15   protocol.

16    2.    MGA's testing of Ms. Prince's log book will be limited to analysis of

17   "microplug" samples extracted from pages 11 and 12 of the notary book.

18    3.    MGA's expert (or experts) will remove no more than 17 sets of

19   "microplug" samples from the written portions of the entries on pages 11 and 12 of

20   the notary book, and no more than two sets of blank paper "microplug" samples from

21   the areas of pages 11 and 12 which do not contain writing.   (Although this

22   Stipulation refers to MGA's "expert," MGA reserves the right to employ more than

23   one expert for the proposed sampling and testing of the notary book).   MGA's

24   expert will take no more than 15 to 20 "microplugs" from any set of "microplug"

25   samples.   However, MGA retains the right to apply to the Court for the right to

26   increase the number of "microplugs" from each set of samples if necessary.

27

28

-2-

EXHIBIT __7__

PAGE __94__

1    4.    MGA's expert will extract all "microplug" samples using a hypodermic-

2    needle-sized hole punch, which removes holes of less than one millimeter in

3    diameter.

4    5.    Before subjecting the samples to ink analysis, MGA's expert will

5    maintain the samples at his or her laboratory in normal environmental conditions,

6    which means generally accepted laboratory conditions that will preserve the integrity

7    of the notary book from any damage that could be caused by heat, cold, humidity or

8    other conditions.

9    6.    All sampling and testing will occur at the laboratory of MGA's expert.

10    7.    Before Mr. Warren sends the notary book to MGA's expert, MGA will

11    send a letter to Mattel's counsel by facsimile (and U.S. Mail) setting forth: (a) the

12    name of MGA's expert (or experts) who will conduct the sampling; (b) the expert's

13    curriculum vitae; (c) the location of the expert's laboratory; and (d) samples of

14    "microplugs" similar to those that would be extracted from the notary book.

15    8.    Mattel will have three days from its receipt of the above-referenced

16    letter by facsimile to object to the contemplated testing.  During this three-day period,

17    Mr. Warren will maintain custody of the notary book, and no testing will be

18    performed.  If Mattel raises no objection, then Mr. Warren will be directed to

19    transmit the notary book to MGA's expert and MGA's expert will be authorized to

20    conduct testing pursuant to the protocol set forth herein.

21    9.    Mr. Warren will transmit the notary book to MGA's expert by overnight

22    mail, using Federal Express or UPS or a similar service that Mr. Warren selects.

23    10.    Upon receipt of the notary book, MGA's expert and/or his employees

24    and assistants will maintain custody of the notary book in a safe place at all times,

25    and will not release the notary book to any unauthorized third parties.

26    11.    In the event Mattel objects to the proposed testing, Mattel's counsel

27    must notify MGA by letter and/or a telephone call within the 3-day period set forth

28

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT ___7___
PAGE ___95___

1   above. The parties must then meet and confer and, within two more Court days, file

2   a joint statement to Judge Infante seeking resolution of the dispute.

3         12.   Mattel may elect to have its own expert attend the extraction of

4   "microplug" samples provided that (1) Mattel makes the election in writing within

5   the three-day objection period; (2) Mattel provides counsel for MGA with the

6   credentials of any observing expert; and (3) the testing can take place within ten (10)

7   calendar days of the execution of this Stipulation. At this time, MGA's expert is

8   available to conduct the sampling on March 10, 11, or 12, 2008.

9         13.   If Mattel's expert raises any issues about the sampling being performed

10   while he or she is observing the sampling, the parties will seek immediate resolution

11   from the Court so that the sampling will not be delayed. If Mattel's counsel does not

12   object or seek attendance by its expert within the three-day objection period, the

13   proposed destructive testing shall be deemed unobjectionable and may be carried out

14   by MGA's expert without further delay.

15         14.   With the exception of alterations resulting from any destructive testing,

16   which would be conducted in accordance with the protocol set forth above, the

17   notary book will be returned promptly to Mr. Warren in the same condition it was

18   received. MGA's expert will return the notary book to Mr. Warren by overnight

19   mail, using Federal Express or UPS or a similar service, on the 35th day after

20   receiving such notary book from Mr. Warren, providing MGA's expert's testing is

21   not delayed by any court proceedings. In the event MGA's expert's testing is

22   delayed by such proceedings, MGA's expert will have an additional 15 days after the

23   resolution of such proceedings to perform testing on the notary book before having

24   to return it to Mr. Warren.

25         15.   The parties agree that, should Mattel raise any objections to the

26   proposed sampling, testing, or credentials of Mattel's expert, or to any other aspects

27   of the testing process, MGA will be granted an extension of time within which to

28   submit a rebuttal report in response to Mr. Aginsky's initial expert report.

-4-

**EXHIBIT 1**
**PAGE 96**

1  Specifically, in the event that Mattel objects to MGA's proposed expert sampling,

2  the current March 17, 2008 deadline for submitting MGA's rebuttal expert report

3  will be extended by one calendar day for each day from the date Mattel raises its

4  objection to the date upon which any such objection is resolved by Judge Infante or

5  by the agreement of the parties.

6      IT IS SO STIPULATED.

7  DATED: February __, 2008      SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM, LLP
8

9

10                              By: _____
                                       Matthew E. Sloan
11                                  Attorneys for Counter-Defendants
                                 MGA ENTERTAINMENT, INC., ISAAC LARIAN,
12                                MGA ENTERTAINMENT (HK) LIMITED, and
                                    MGAE de MEXICO S.R.L. de C.V.
13

14  DATED: February __, 2008      QUINN EMANUEL URQUHART OLIVER
                                 & HEDGES, LLP
15

16

17                              By: _____
                                       Diane C. Hutnyan
18                                  Attorneys for Mattel, Inc.

19

20

21

22

23

24

25

26

27

28

-5-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT **7**

PAGE **97**

## ORDER

The Court, having reviewed MGA and Mattel's Stipulation Re MGA's Proposed Testing Of Jacqueline Prince's Notary Book (the "Stipulation") and for good cause shown, hereby approves the procedure for MGA's proposed expert testing of the notary book set forth in the Stipulation.

IT IS SO ORDERED.

DATED: _____

_____
Hon. Edward A. Infante (Ret.)
Discovery Master

-6-

EXHIBIT 1
PAGE 98

EXHIBIT 8

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

———

TEL: (213) 687-5000

FAX: (213) 687-5600

www.skadden.com

DIRECT DIAL
213-687-5276
DIRECT FAX
213-621-5276
EMAIL ADDRESS
MATTHEW.SLOAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 3, 2008

**VIA E-MAIL AND U.S. MAIL**

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

> RE: <u>Bryant v. Mattel: Stipulation Re Proposed Testing of Prince's Log Book</u>

Dear Diane:

I am writing in response to your letter to Ryan Weinstein, dated March 3, 2008, which you transmitted to us earlier today. As we feared, rather than respond in good faith to our proposed stipulation regarding the testing of Ms. Prince's notary book, you have raised largely frivolous objections in a transparent attempt to delay MGA's testing of the notary book and obstruct our ability to challenge the findings reached by your expert, Dr. Aginsky. In the spirit of compromise, we are willing to make certain minor amendments to the stipulation to accommodate your alleged concerns. (A copy of the amended stipulation (the "amended Stipulation") is attached hereto). The overwhelming majority of your objections, however, are frivolous and clearly designed primarily, if not solely, for the purpose of obtaining an unfair litigation advantage by obstructing MGA's ability to conduct the very same testing, under the very same conditions, that MGA allowed your expert to conduct without objection or court intervention. I discuss your objections and our responses to them below.

First, you object that the stipulation "appears to contemplate the idea of a future protocol, rather than contain an actual protocol." We do not know what you

EXHIBIT __8__
PAGE __99__

Diane C. Hutnyan, Esq.
March 3, 2008
Page 2


mean by this and you have failed to specify precisely how you would revise the stipulation or why any additional procedures are necessary. Notwithstanding these shortcomings in your letter, we will slightly modify the testifying protocol as set forth below and in the amended Stipulation to provide further procedure. We believe this should cover any reasonable concerns you may have.

     Second, you object that the "stipulation does not reflect any plan to obtain the Court's approval of Mr. Lyter and his credentials." This is not accurate. The Stipulation specifically provides that MGA must provide Mattel with notice of the expert we plan to use to perform the sampling and provide Mattel the expert's curriculum vitae. *See* Stipulation, ¶ 7. Mattel then has three days to object to the expert's credentials or the proposed testing, during which time Mr. Warren will not transmit the notary book to MGA. Accordingly, if Mattel has any objections to Mr. Lyter's credentials, then the Court will have to approve Dr. Lyter and his proposed testing. If Mattel has no such objection, there is no reason for MGA to have to obtain court approval – unless Mattel is trying to delay the testing to obtain an unfair litigation advantage.[1]

     Third, you complain that you are "concerned about having the notary book in anyone's hands or possession but the (by then Court-approved) expert in the presence of [Mattel's] expert." To the extent you are concerned about the custody of the notary book, we will amend the stipulation to provide that the notary book must be maintained in the custody of Dr. Lyter or one of his employees or assistants at all times from the time Dr. Lyter's lab receives the notary book from Mr. Warren until it is transmitted back to Mr. Warren. *See* Amended Stipulation, ¶ 10.

     The rest of your concerns are unfounded, and designed primarily to obstruct. As explained above, if you object to the delivery of the notary book to Dr. Lyter, you will have a full opportunity to litigate this matter before Judge Infante *before* the

---

[1] As you know, the only reason that Judge Infante required Mattel to submit its experts' curriculum vitae to the court and obtain advance court approval before Mattel could perform any sampling on Bryant's drawings *is because Mattel refused to reveal the identity of its experts to Mr. Bryant's counsel.* Given that MGA has disclosed the identity and curriculum vitae of our expert already, there is no need for the added step of obtaining court approval of MGA's experts – unless, of course, Mattel has some good faith basis to object to Dr. Lyter's credentials. We assume by your silence that you recognize that Dr. Lyter is a highly-respected expert, and that any such objections would therefore be unfounded.

    It is worth noting, moreover, that Mattel failed to give MGA *any* advance notice of the identity of Mattel's expert until just before Dr. Aginsky took his samples from the notary book. We simply fail to comprehend how you can claim the procedure we have proposed is insufficient compared to the paltry notice and procedure you provided MGA in connection with the testing of the notary book.

Diane C. Hutnyan, Esq.
March 3, 2008
Page 3

notary book is delivered to Dr. Lyter. Thus, under the Stipulation, Dr. Lyter will not obtain possession unless he is either approved by the Court (over Mattel's objections) or you decide not to object to his performing the sampling. As for your request that "the notary book should not be handled by either expert outside the presence of the other," this is absurd. Mattel's expert, Dr. Aginsky, had possession of the notary book for at least 27 days[2] without any oversight. Mattel's expert is entitled to observe our expert's destructive sampling procedure; he is not entitled to be present at all times while Dr. Lyter visually inspects the notary book or engages in other non-destructive testing. You have provided no basis for such an invasive request to monitor our expert's examination and, as you well know, no such basis exists. If you want more information about Dr. Lyter's non-destructive examination of the notary book, you will have to do what any litigant must do (and what MGA will have to do with respect to Dr. Aginsky): ask him in his deposition.

Fourth, you complain that the stipulation must be "more specific in setting forth the exact method or delivery, time of delivery, location of delivery, and return date" and must set forth the "specific conditions" under which the book will be stored. Although MGA thinks that these objections are largely irrelevant, at your suggestion we have revised the stipulation to conform more closely with Judge Infante's August 30, 2007 Order. *See* Amended Stipulation, ¶¶ 9, 10, 14.

As for the storage conditions, the Stipulation specifies that the notary book will be maintained in "normal environmental conditions." *See* Stipulation, ¶ 5. We think this is more than sufficient to ensure the integrity of the notary book, but in the spirit of compromise, we will amend Paragraph 5 by providing that "normal environment conditions," means "generally accepted laboratory conditions that will preserve the integrity of the notary book from any damage caused by heat, cold, humidity, or other conditions."

Fifth, you have asked for a provision that all the samples must be taken in one-day. We think this is reasonable and will amend the Stipulation accordingly.

Sixth, you have asked that MGA limit the number of "microplug" samples which Dr. Lyter can take in any one "set" of samples. We believe this is also a reasonable request, and are prepared to stipulate that each "set" will be limited to 15-20 microplugs, subject to MGA's right to apply to the court for the right to increase the amount of "microplugs" allowed. We will amend the Stipulation accordingly. *See* Amended Stipulation, ¶ 3.

---

[2]   Per Mr. Aginsky's report, he removed the "microplug" samples from the notary book on January 4, 2008, and did not return the notary book to Ms. Prince's counsel, Mr. Warren, until January 31, 2008.

EXHIBIT **8**
PAGE **101**

Diane C. Hutnyan, Esq.
March 3, 2008
Page 4

Seventh, you object to the "Whereas" section of the Stipulation as unnecessary and argumentative. We disagree. It is appropriate and necessary for the Court to know the history of testing that has been performed on the notary book, and to be informed that Mattel performed the very same testing, in order to render a decision. We see no valid reason that you should object to presenting the whole story unless you have something to hide. Accordingly, we will not revise the "Whereas" provisions in the Stipulation.

Eighth, you remarkably reject our reasonable and necessary request for an agreement that the deadline for submitting our rebuttal report should be extended during the pendency of any court proceedings regarding Dr. Lyter's right to obtain samples from the notary book. Your refusal to agree to such a provision reveals your true intentions. Failing to include such a provision would render the whole stipulation futile from MGA's perspective because you would undoubtedly use it as an opportunity to tie us up in litigation until the March 17 deadline for rebuttal reports had passed, and thereby prevent us from engaging in any expert testing.

Finally, you request that Mattel be guaranteed access to the notary book to perform additional tests after MGA has served its rebuttal report and/or Mr. Lyter has been deposed. Given that Dr. Aginsky has already had free and unfettered access to the notary book for almost a month, and no constraints were placed on his ability to test the book, we see no reason to address such a request at this juncture. If you can present grounds for such additional testing later, we will consider them, but we think that any request at this juncture is premature and we will not incorporate it in the amended Stipulation.

Please review the attached Amended Stipulation and let us know by 4:00 pm PST tomorrow, Tuesday, March 4, 2008, whether you are willing to sign the Amended Stipulation as is. In the event you reject this reasonable proposal, we will proceed to subpoena the notary book from Mr. Warren so that Mr. Lyter can perform his sampling in time to meet the March 17, 2008 deadline for submitting MGA's expert rebuttal reports. In the event Mattel seeks to delay our legitimate testing

EXHIBIT __8__
PAGE ___102___

Diane C. Hutnyan, Esq.
March 3, 2008
Page 5


further by improper obstructionist tactics, and interferes with our ability to perform the necessary sampling before the March 17 deadline, we will seek preclusionary sanctions to prevent Mattel from introducing Dr. Aginsky's testimony or expert report at trial.

Very truly yours,

Matthew E. Sloan


Enclosures

cc:  Ryan Weinstein, Esq.
     Carl Roth, Esq.

EXHIBIT __B__
PAGE ___103___

1  THOMAS J. NOLAN (Bar No. 66992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, CA  90071-3144
3  Telephone:   (213) 687-5000
   Facsimile:    (213) 687-5600
4  E-mail:       tnolan@skadden.com

5  KENNETH A. PLEVAN
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  Four Times Square
   New York, New York, 10036-6522
7  Telephone:   (212) 735-3000
   Facsimile:    (212) 735-2000
8  Email:        kplevan@skadden.com

9  Attorneys for Counter-Defendants
   MGA ENTERTAINMENT, INC., ISAAC LARIAN,
10 MGA ENTERTAINMENT (HK) LIMITED, and
   MGAE de MEXICO S.R.L. de C.V.

11

12               UNITED STATES DISTRICT COURT

13               CENTRAL DISTRICT OF CALIFORNIA

14                      EASTERN DIVISION

15

16 CARTER BRYANT, an individual,        )  CASE NO. CV 04-9049 SGL (RNBx)

17              Plaintiff,              )  Consolidated with:
                                        )  Case No. CV 04-9059
18      v.                              )  Case No. CV 05-2727
                                        )
19 MATTEL, INC., a Delaware             )  **DISCOVERY MATTER**
   corporation,                         )
20                                      )  Hon. Edward A. Infante (Ret.)
              Defendant.                )  Discovery Master
21                                      )
                                        )  **STIPULATION RE MGA'S**
22 _____          )  **PROPOSED TESTING OF**
                                        )  **JACQUELINE PRINCE'S**
23 Consolidated with MATTEL, INC. v.    )  **NOTARY BOOK;  [PROPOSED]**
   BRYANT and MGA                       )  **ORDER**
24 ENTERTAINMENT, INC. v.               )
   MATTEL, INC.                         )  **Phase 1**
25 _____          )  Discovery Cut-Off:      Jan. 28, 2008
                                           Expert Rebuttal
26                                         Reports Due:            March 17, 2008
                                           Expert Discovery
27                                         Cut-Off:                March 31, 2008
                                           Pre-Trial Conference:   May 5, 2008
28                                         Trial Date:             May 27, 2008

_____
STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT __B__
PAGE __104__

1

### STIPULATION

2     This Stipulation is entered into by and between Mattel, Inc. ("Mattel") on the

3 one hand, and MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK)

4 Limited, and MGAE de Mexico S.R.L. de C.V. (collectively referred to herein as

5 "MGA"), on the other hand, with reference to the following:

6     WHEREAS, Jacqueline Prince, a notary public, made notations in a log book

7 entitled "Official Journal of Notarial Acts" (the "log book") which relate to the date

8 on which certain of plaintiff and counter-defendant Carter Bryant's ("Bryant")

9 drawings were created;

10     WHEREAS, on page 11 of the notary book, there is an entry, dated 8/26/99,

11 which identifies 6 sketches of dolls made by Bryant;

12     WHEREAS, the same entry includes the notation "From 1998 Missouri";

13     WHEREAS, on or about December 25, 2007, counsel for Mattel sent a letter

14 to Daniel J. Warren, counsel for Ms. Prince, requesting production of the notary

15 book for purposes of conducting a forensic analysis on the ink used on the above-

16 referenced entry;

17     WHEREAS, in response, Mr. Warren produced said log book to Mattel, and

18 MGA did not object;

19     WHEREAS, on January 4, 2008, Mattel's expert, Valery N. Aginsky,

20 extracted 17 sets of hypodermic needle-sized samples or "microplugs" from written

21 lines appearing on pages 11 and 12 of the notary book and two sets of blank paper

22 "microplug" samples from page 11 of the notary book;

23     WHEREAS, Mr. Aginsky subsequently subjected the "microplug" samples to

24 various chemical analyses, including chromatography, thin-layer chromatography

25 ("TLC"), and gas chromatography-mass spectrometry ("GC-MS");

26     WHEREAS, on January 31, 2008, Mr. Aginsky returned Ms. Prince's log

27 book to Mr. Warren;

28

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT **8**

PAGE 105

1      WHEREAS, on February 11, 2008, Mattel transmitted to MGA a copy of

2  Mr. Aginsky's expert report, wherein Mr. Aginsky set forth the results of ink tests

3  that he performed on samples extracted from the notary book;

4      WHEREAS, on the basis of his tests, Mr. Aginsky concluded that the notation

5  "From 1998 Missouri" on page 11 of the notary book was written in different ink

6  than the remainder of the 8/26/99 entry;

7      WHEREAS, MGA now seeks to test the accuracy of Mr. Aginsky's findings

8  by having its own expert replicate Mr. Aginsky's ink testing;

9      WHEREAS, the current deadline for submitting expert rebuttal reports is

10  March 17, 2008;

11      THEREFORE, the undersigned parties, through their undersigned counsel,

12  stipulate and agree as follows:

13     1.    MGA will be allowed to take samples and conduct testing on the notary

14  book to test the accuracy of Mr. Aginsky's findings, pursuant to the following

15  protocol.

16     2.    MGA's testing of Ms. Prince's log book will be limited to analysis of

17  "microplug" samples extracted from pages 11 and 12 of the notary book.

18     3.    MGA's expert (or experts) will remove no more than 17 sets of

19  "microplug" samples from the written portions of the entries on pages 11 and 12 of

20  the notary book, and no more than two sets of blank paper "microplug" samples from

21  the areas of pages 11 and 12 which do not contain writing.   (Although this

22  Stipulation refers to MGA's "expert," MGA reserves the right to employ more than

23  one expert for the proposed sampling and testing of the notary book).   MGA's

24  expert will take no more than 15 to 20 "microplugs" from any set of "microplug"

25  samples.   However, MGA retains the right to apply to the Court for the right to

26  increase the number of "microplugs" from each set of samples if necessary.

27

28

-2-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT **8**

PAGE **106**

4.    MGA's expert will extract all "microplug" samples using a hypodermic-needle-sized hole punch, which removes holes of less than one millimeter in diameter.

5.    Before subjecting the samples to ink analysis, MGA's expert will maintain the samples at his or her laboratory in normal environmental conditions, which means generally accepted laboratory conditions that will preserve the integrity of the notary book from any damage that could be caused by heat, cold, humidity or other conditions.

6.    All sampling and testing will occur at the laboratory of MGA's expert.

7.    Before Mr. Warren sends the notary book to MGA's expert, MGA will send a letter to Mattel's counsel by facsimile (and U.S. Mail) setting forth: (a) the name of MGA's expert (or experts) who will conduct the sampling; (b) the expert's curriculum vitae; (c) the location of the expert's laboratory; and (d) samples of "microplugs" similar to those that would be extracted from the notary book.

8.    Mattel will have three days from its receipt of the above-referenced letter by facsimile to object to the contemplated testing. During this three-day period, Mr. Warren will maintain custody of the notary book, and no testing will be performed. If Mattel raises no objection, then Mr. Warren will be directed to transmit the notary book to MGA's expert and MGA's expert will be authorized to conduct testing pursuant to the protocol set forth herein.

9.    Mr. Warren will transmit the notary book to MGA's expert by overnight mail, using Federal Express or UPS or a similar service that Mr. Warren selects.

10.    Upon receipt of the notary book, MGA's expert and/or his employees and assistants will maintain custody of the notary book in a safe place at all times, and will not release the notary book to any unauthorized third parties.

11.    In the event Mattel objects to the proposed testing, Mattel's counsel must notify MGA by letter and/or a telephone call within the 3-day period set forth

EXHIBIT **8**
PAGE **107**

1  above.  The parties must then meet and confer and, within two more Court days, file

2  a joint statement to Judge Infante seeking resolution of the dispute.

3      12.    Mattel may elect to have its own expert attend the extraction of

4  "microplug" samples provided that (1) Mattel makes the election in writing within

5  the three-day objection period; (2) Mattel provides counsel for MGA with the

6  credentials of any observing expert; and (3) the testing can take place within ten (10)

7  calendar days of the execution of this Stipulation.  At this time, MGA's expert is

8  available to conduct the sampling on March 10, 11, or 12, 2008.

9      13.    If Mattel's expert raises any issues about the sampling being performed

10  while he or she is observing the sampling, the parties will seek immediate resolution

11  from the Court so that the sampling will not be delayed.  If Mattel's counsel does not

12  object or seek attendance by its expert within the three-day objection period, the

13  proposed destructive testing shall be deemed unobjectionable and may be carried out

14  by MGA's expert without further delay.

15      14.    With the exception of alterations resulting from any destructive testing,

16  which would be conducted in accordance with the protocol set forth above, the

17  notary book will be returned promptly to Mr. Warren in the same condition it was

18  received.  MGA's expert will return the notary book to Mr. Warren by overnight

19  mail, using Federal Express or UPS or a similar service, on the 35th day after

20  receiving such notary book from Mr. Warren, providing MGA's expert's testing is

21  not delayed by any court proceedings.  In the event MGA's expert's testing is

22  delayed by such proceedings, MGA's expert will have an additional 15 days after the

23  resolution of such proceedings to perform testing on the notary book before having

24  to return it to Mr. Warren.

25      15.    The parties agree that, should Mattel raise any objections to the

26  proposed sampling, testing, or credentials of Mattel's expert, or to any other aspects

27  of the testing process, MGA will be granted an extension of time within which to

28  submit a rebuttal report in response to Mr. Aginsky's initial expert report.

-4-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT __8__
PAGF  10**9**

1 Specifically, in the event that Mattel objects to MGA's proposed expert sampling,

2 the current March 17, 2008 deadline for submitting MGA's rebuttal expert report

3 will be extended by one calendar day for each day from the date Mattel raises its

4 objection to the date upon which any such objection is resolved by Judge Infante or

5 by the agreement of the parties.

6       IT IS SO STIPULATED.

7 DATED: February ___, 2008     SKADDEN, ARPS, SLATE, MEAGHER

8                                 & FLOM, LLP

9

10                       By: _____

11                             Matthew E. Sloan
                       Attorneys for Counter-Defendants

12        MGA ENTERTAINMENT, INC., ISAAC LARIAN,
        MGA ENTERTAINMENT (HK) LIMITED, and
          MGAE de MEXICO S.R.L. de C.V.

13

14 DATED: February ___, 2008     QUINN EMANUEL URQUHART OLIVER

15                              & HEDGES, LLP

16

17                       By: _____

18                             Diane C. Hutnyan
                       Attorneys for Mattel, Inc.

19

20

21

22

23

24

25

26

27

28

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT **8**
PAGE 109

1
## **ORDER**

2
3      The Court, having reviewed MGA and Mattel's Stipulation Re MGA's

Proposed Testing Of Jacqueline Prince's Notary Book (the "Stipulation") and for

4      good cause shown, hereby approves the procedure for MGA's proposed expert

5      testing of the notary book set forth in the Stipulation.

6
7      IT IS SO ORDERED.

8
9   DATED: _____          _____

10                                          Hon. Edward A. Infante (Ret.)
                                                  Discovery Master
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-6-
STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.05-Los Angeles Server 1A - MSW

EXHIBIT **B**
PAGE ___110___

EXHIBIT 9

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR EMBARCADERO CENTER
SUITE 3800
SAN FRANCISCO, CALIFORNIA 94111-4144
TEL: (415) 984-6400
FAX: (415) 984-2698
www.skadden.com

DIRECT DIAL
(415) 984-6450
DIRECT FAX
(888) 329-6047
EMAIL ADDRESS
RKENNEDY@SKADDEN.COM

FIRM/AFFILIATE OFFICES
—
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

April 4, 2008

**VIA EMAIL AND MESSENGER**

Hon. Edward Infante (Ret.)
Discovery Master
c/o Sandra Chan
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, California  94111

RE:     Bryant v. Mattel, Inc.
        JAMS Ref. 1100049530

Dear Judge Infante:

We are writing with regard to Mattel's pending *Ex Parte* Application for a Protective Order Preventing MGA's Destructive Sampling of the Prince Notary Book, which Mattel filed on March 10, 2008. Because of the earlier, March 17, 2008 deadline for the submission of expert rebuttal reports, the parties sought expedited relief and completed all briefing of this matter by Friday, March 14, 2008. Although Judge Larson subsequently granted MGA's separate *ex parte* application to extend the March 17 deadline, Mattel's filing of its *ex parte* Application has effectively enjoined MGA from extracting any ink samples from Ms. Prince's notary book and thus prevented it from completing its expert report rebutting Mattel's ink testing chemist, Valery Aginsky.

MGA asks that the Court establish a testing protocol so that MGA's expert, Dr. Albert Lyter, can perform the necessary testing and prepare his expert report in advance of trial. Given the looming deadline for submitting *in limine* motions to Judge Larson, and the possibility that MGA may seek to exclude Mr. Aginsky's testimony on *Daubert* grounds, it is essential that Dr. Lyter be allowed to commence

EXHIBIT __9__
PAGE __111__

Hon. Edward Infante (Ret.)
April 4, 2008
Page 2

his examination and testing of the notary book soon.  Because the issues surrounding
Mattel's *ex parte* Application have been extensively briefed, MGA respectfully
believes that the Court can decide this matter on the papers without the need for oral
argument.

    As set forth in the parties' moving papers, the sole issue for the Court to
resolve is the appropriate protocol that should govern Dr. Lyter's extraction of paper
and ink samples from Ms. Prince's notary book, and the amount of time that
Dr. Lyter should have to complete his testing.[1]  In the weeks preceding the filing of
Mattel's *ex parte* Application, MGA submitted two draft protocols to Mattel that
required that Mattel's experts be allowed to observe any sampling procedures and
provided a mechanism for Mattel to raise objections to the Court in advance of any
destructive sampling.[2]  Although Mattel has rejected those proposed procedures as
insufficient, MGA respectfully suggests that they can serve as a model for a Court-
endorsed testing protocol to resolve this dispute.

    There are two points which have come to MGA's attention since the filing of
its opposition, both of which highlight the unjustified double standard that Mattel has
tried to impose on MGA.  As the Court is aware, Mattel has taken the position that
MGA's experts should be subjected to more scrutiny than Mattel's experts because
Mattel's experts are purportedly more trustworthy.[3]  Yet, MGA recently learned that
Mattel itself tried to hire Dr. Lyter as an expert witness in 2005.[4]  Accordingly,
Mattel is simply playing games when it asserts that it needs the Court to vet Dr.
Lyter before allowing him to handle the notary book and suggests that this is
necessary because Dr. Lyter or other unnamed MGA experts are "unqualified and
unscrupulous."[5]

---

[1]   Mattel has conceded that MGA has a right to extract samples and perform chemical testing, and
claims that it is objecting solely as to whether the protocol proposed by MGA is sufficient to
safeguard the integrity of the notary book.  *See Ex Parte* at 15; Reply at 1.

[2]   *See* Exhibits 16 and 25 to the Declaration of Matthew Sloan, filed concurrently on March 12,
2008 with MGA's Opposition to Mattel's *Ex Parte* Application.

[3]   *See* Reply at 7, 9, 10.

[4]   *See* January 20, 2005 letter from Dr. Lyter to Quinn Emanuel declining offer to act as consulting
expert on behalf of Mattel, attached hereto.

[5]   *See* Reply at 4, 7.

EXHIBIT **9**
PAGE **112**

Hon. Edward Infante (Ret.)
April 4, 2008
Page 3

Contrary to Mattel's claims about the purportedly superior integrity and professionalism of its experts, moreover, MGA also recently learned that Mr. Aginsky, Mattel's ink testing expert, secretly extracted samples from the notary book in violation of the parties' agreed upon testing protocol. At his deposition on March 24, 2008, Mr. Aginsky admitted that after extracting approximately 170 samples from Ms. Prince's notary book on January 4, 2008, under the observation of MGA's expert, he secretly took an additional 4 paper and ink "microplug" samples on January 14, 2008, without notice *to anyone,* in knowing breach of the parties' testing protocol. When asked if he was aware that MGA had the right to be present when any samples were taken, Mr. Aginsky replied, "Of course I was."[6] Mr. Aginsky took the samples anyway, however, thus vividly demonstrating the hypocrisy and double standard of Mattel's position.

On March 19, 2008, Judge Larson granted MGA's *ex parte* application for an extension of the expert rebuttal report deadline. (A courtesy copy of the Judge Larson's Order is attached hereto for the Court's convenience). Judge Larson's order provides that MGA shall have 14 days after the Discovery Master's resolution of Mattel's Application to perform the relevant testing and submit Dr. Lyter's rebuttal expert report, but the testing cannot commence until the Court rules on this motion and establishes a testing protocol. Realizing there are limits on the amount of time this Court can devote to this case, MGA would be willing to postpone the hearing of matter number 10 on the April 11 hearing calendar if that would allow this Court to address Mattel's application.

Respectfully submitted,

Raoul D. Kennedy

Attachments

cc:   Diane Hutnyan, Esq.
      Michael Page, Esq.

---

[6]   *See* Aginsky Depo. Tr. at 60-61, attached hereto.

EXHIBIT __9__
PAGE __113__



# FEDERAL FORENSIC ASSOCIATES, INC.

Post Office Box 31567 • Raleigh, North Carolina 27612
(919) 848-3696 • FAX (919) 848-8849

January 20, 2005

Tania Krebs
Quinn Emanuel
865 South Figueroa St.
10th Floor
Los Angeles, CA  90017

RE:  retention as consulting expert

Dear Ms. Krebs:

As we discussed yesterday, January 19, 2005, we mistakenly accepted your offer to act as a consulting expert in the matter of Mattel Inc. regarding ink analysis.  We had previously accepted a similar assignment with the firm of O'Melveny and Myers of Los Angeles and as such are returning your previously received retainer of $2500.00.  Please find enclosed our check number 5827 in that amount.

We regret any inconvenience this may have caused you and hope we will have an opportunity to aid you on other matters in the future.

Sincerely,

Albert H. Lyter III, Ph.D.
Forensic Chemist

Enc. Check #5827

EXHIBIT ___47___

PAGE ___412___

EXHIBIT ___9___
PAGE ___114___

rough draft aginsky.txt

1

1           IMPORTANT INFORMATION!!

2

3

4     (This realtime/rough draft transcript is provided for

5     your immediate review of the proceedings, and is not

6     provided for, nor intended to be used or cited in any

7     type of court proceeding.)

8

9     ROUGH DRAFT DEPO VALERY AGINSKY

10    TAKEN 3/24/08

11    VIDEOGRAPHER:  LYNSEY RAUKER

12    REPORTER:  RHONDA M. FOSTER

13

14              THE VIDEOGRAPHER:  We are now on the

15    record.  This is the videotaped deposition of Valery

16    Aginsky being taken in Okemos, Michigan.  Today is

17    March 24, 2008.  The time is 10:42 and 25 seconds a.m.

18              Would the attorneys introduce

19    themselves and the court reporter please swear in the

20    witness.

21              MR. SLOAN:  Matthew Sloan from

22    Skadden, Arps on behalf of MGA Entertainment.

23              MR. LYONS:  Duane Lyons, Quinn

24    Emanuel Urquhart Oliver & Hedges on behalf of Mattel

25    Inc. and the witness.  Witness sworn.

2

1     EXAMINATION BY MR. SLOAN:

2          Q.   Good morning, Mr. Aginsky.

3          A.   Good morning.

                    Page 1

EXHIBIT __9__
PAGE __115__

rough draft aginsky.txt
17    additional four samples from set 8?

18        A.    It was on the date when I analyzed this

19    sample, it was the third analysis of the sample using

20    GC-MS, and I can tell you the exact date, if I could

21    look at the GC-MS data that I submitted to you.

22        Q.    Actually, yeah, that would be -- let me hand

23    that to you.  When you say the GC-MS data, do you mean

24    the charts themselves?

25        A.    Yes.

                                                          56

1         Q.    These charts?

2         A.    Yes.

3         Q.    Let me show you those.

4         DEPOSITION EXHIBIT 4598

5         CHROMATOGRAMS

6         WAS MARKED BY THE REPORTER

7         FOR IDENTIFICATION

8    BY MR. SLOAN:

9         Q.    So let me hand you what is marked as

10    Exhibit 4598, and can you briefly describe to me what

11    this Exhibit is?

12        A.    This exhibit comprises copies of the

13    chromatograms, GC-MS, chromatograms that I obtained in

14    this case.

15        Q.    And can you tell from this the date on which

16    you took those additional four samples from set 8?

17        A.    Yes.  This is Page Number 12 of this

18    exhibit.

19        Q.    And we are referring to the pages at the

20    bottom.  M-VA 00012?

21        A.    Yes.

                        Page 47

EXHIBIT __9__
PAGE __116__

rough draft aginsky.txt

22    Q.    Okay.

23    A.    The sample name that I analyzed was Q1-8-2.

24    Q.    M-hum.

25    A.    And the date is 14th of January.

57

1    Q.    That means that that's the date in which you

2    performed the chromatography test, correct?

3    A.    When I analyzed these four additional

4    samples, yes.

5    Q.    Do you know that that is also the date on

6    which you actually took the additional four plugs from

7    the notary book?

8    A.    Yes.

9    Q.    Did you obtain any -- let me ask you this:

10    Do you know whether Mga or its attorneys or Mr. Carter

11    Bryant was notified that you were taking additional

12    samples on January 14th?

13    A.    No, nobody was notified.

14    Q.    Nobody was notified.

15              Did you notify counsel for Mattel

16    that you were taking additional samples on

17    January 14th?

18    A.    As I said, nobody was notified.

19    Q.    Mr. Aginsky, did you consider the samples

20    that you took from Pages 11 and 12 -- can you give me a

21    ballpark about how many samples, if you can't tell me

22    exactly, can you just give me a ballpark?

23    A.    As I said, it is most of the areas, is 8

24    through 10, and one area was 15. And this area from

25    the questioned entry was 14. So it is easy to

58

Page 48

EXHIBIT 9
PAGE 117

rough draft aginsky.txt

1    calculate, approximately 170.

2                    THE COURT REPORTER:    Seventy?

3                    THE WITNESS:   Yes.

4    BY MR. SLOAN:

5        Q.    Did you take those samples in such a way

6    that you tried to minimize the damage to the notary

7    book caused by the destructive sampling?

8        A.    Yes, this is the -- always the task, not to

9    damage the writing.

10        Q.    And do you think that your taking those 170

11    approximate samples, do you think that that damaged the

12    notary book in any significant way?  And what I mean by

13    that is:  Did it render it so that another expert would

14    be unable to perform confirming tests on the same

15    document?

16        A.    First of all, I never take more than

17    50 percent samples.  In other words, there are always

18    should be at least 50 percent of the ink left on the

19    document for the other side to do their own analysis.

20    In this case, the rate of damage was so minimal that it

21    is sometimes even hard to see which samples -- I mean,

22    which entries were sampled from.  And I would say that

23    the amount of ink that I took from these 17 areas is

24    insignificant comparing with the amount of microplugs

25    one would take if he or she would take all the ink.  I

                                                        59

1    think that, of course, it is a very approximate

2    estimation, but I would say that I took roughly less

3    than 1 percent of the ink from these pages.

4        Q.    So by 170 samples, you took less than

5    1 percent of the ink?
                    Page 49

EXHIBIT 9
PAGE 118

rough draft aginsky.txt

6      A.     Yes, as I said, it is a very approximate

7   estimation, but if it is less than 1 percent, it means

8   that we can multiply 170 by 100, and that would be

9   17,000.

10     Q.     M-hum.

11     A.     That's how many microplugs can theoretically

12  be taken.

13     Q.     So would it be fair to say that you think

14  you could safely have taken, let's say, 4 or 500

15  microplugs, and even if you had done that, that

16  wouldn't render the -- spoiled in some way?

17     A.     First of all, nobody would take so enormous

18  amount of samples, it is no need to do it for the

19  analysis, it is usually what is necessary is the amount

20  of samples that I took was my estimation when I did it

21  that it should be enough for me.  I always try to take

22  less than my -- I know colleagues, my colleagues

23  usually take more than I take.  And you can easily

24  compare the amount of samples that I took with the

25  amount of samples that were taken from the other

                                                    60

1   drawings by Mr. Carter Bryant, and it is much more

2   samples were taken from those drawings comparing with

3   what I took from any of these areas on this document.

4                   MR. SLOAN:   I move to strike the

5   part about Carter Bryant.  I think that that is

6   nonresponsive.

7   BY MR. SLOAN:

8      Q.     Let my ask you this: Were you aware that

9   MGA had asked to have its expert present when you

10  performed the sampling, when you took the microplug

                        Page 50

EXHIBIT  9
PAGE  119

rough draft aginsky.txt

11   samples from the notary book?

12        A.   Of course I was, and actually someone from

13   Mr. Speckin's forensic laboratory was present when I

14   did sampling.  I think -- I don't remember his name, I

15   think his name is Jason, and he is Mr. Speckin's

16   trainee.  So like a student.  And he was present there,

17   and he took some photographs after I took samples.

18        Q.   And you understood that he was there on

19   behalf of -- representing MGA, correct?

20        A.   Yes.

21        Q.   And you understood that MGA wanted to be

22   there whenever you took microplug samples from the

23   notary book, correct?

24        A.   Yes, I understood that, that taking samples

25   should be videotaped and observed.

                                                    61

1         Q.   You understood that that was the -- you

2    thought that was the appropriate process, that they

3    should be observed and videotaped by the other side's

4    experts, correct?

5         A.   I wouldn't say it is appropriate process,

6    simply the process which in most cases where I do the

7    analysis, nobody is present.  And so it is more an

8    exclusion from the rule.  And I was not restricted in

9    the amount of samples that I needed for the analysis.

10   So I -- I decided to take eight samples, but I took 15

11   samples from area number 17.  It means that I could

12   easily take 15 samples from each of those areas and

13   there would be no objection.

14             MR. SLOAN:  Objection, strike as

15   speculative, the answer.
                    Page 51

EXHIBIT 9
PAGE 120

rough draft aginsky.txt

16                    THE WITNESS:  It is simply based on

17    the fact that I took 15 samples.

18    BY MR. SLOAN:

19        Q.   . Mr. Aginsky --

20                    MR. LYONS:  Just listen to his

21    question and, you know, he can make a motion to strike

22    if he wants to, but the answer is what the answer is.

23                    THE WITNESS:  Yeah, I am sorry.

24    BY MR. SLOAN:

25        Q.    Mr. Aginsky, but you understood in this case

                                                              62

1     that MGA specifically wanted to observe and videotape

2     you when you took the microplug samples, correct?

3         A.    Correct.

4         Q.    And, in fact, they did do that when you took

5     the samples on January 4th, correct?

6         A.    That's correct.

7         Q.    And when you decided to take additional

8     samples from set 8, the portion that says "From 1998

9     Missouri," you never asked MGA or told their counsel to

10    ask MGA for approval to take additional samples, did

11    you?

12        A.    I never asked for their approval.

13        Q.    And no one from MGA or any of MGA's

14    representatives ever told you or gave you permission to

15    take additional samples after January 4th, correct?

16        A.    Correct.

17        Q.    Let's go back.  You were giving me a list of

18    the sets of microplugs that you took, and I think we

19    stopped with set 8.  You said you took 10 samples on

20    January 4th and four additional samples on
                        Page 52

EXHIBIT __9__

PAGE __121__

rough draft aginsky.txt

20   So this is the additional factor.  But the main factor

21   is the -- that the ink was different.

22        Q.   Any other factors on which your conclusion

23   is based?

24        A.   Only these two, and they are described in my

25   report.

                                151

1              MR. SLOAN:  Can we go off the

2   record?

3              THE VIDEOGRAPHER:  We are going off

4   the record.  The time is 4:06 and 18 seconds p.m.

5             (A short recess was taken)

6              THE VIDEOGRAPHER:  We are back on

7   the record.  The time is 4:07 and 20 seconds p.m.

8              MR. SLOAN:  Mr. Aginsky, I have no

9   further questions for you today.

10            MR. LYONS:  I have no questions.

11   Pass the witness.

12            THE WITNESS:  Thank you.

13            THE VIDEOGRAPHER:  This concludes to

14   today's deposition.  We are going off the record.  The

15   time is 4:07 and 35 seconds p.m.

16

17

18

19

20

21

22

23

24

Page 127

EXHIBIT __9__
PAGE __122__

rough draft aginsky.txt

25

EXHIBIT __9__
PAGE __123__

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware<br>corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-09049 SGL<br>(RNBx)<br><br>Consolidated with Case No. 04-9059<br>and Case No. 05-2727<br><br>**ORDER GRANTING MGA<br>DEFENDANTS'** *EX PARTE*<br>**APPLICATION FOR AN ORDER<br>EXTENDING THE MARCH 17<br>DEADLINE FOR MGA TO SERVE<br>ITS REBUTTAL EXPERT<br>REPORT CONCERNING MS.<br>PRINCE'S NOTARY BOOK**<br><br>Honorable Stephen G. Larson |

## <u>ORDER</u>

The Court has reviewed the ex parte application of the MGA defendants, as well as Mattel's opposition thereto. Based on the Application filed with the Court, and good cause appearing for the entry thereof, IT IS HEREBY ORDERED that:

1.    The *Ex Parte* Application For An Order Extending the March 17 Deadline for MGA to Serve Its Rebuttal Expert Report Concerning Ms. Prince's Notary Book is granted.

2.    In order to allow MGA to serve a rebuttal expert report to the expert report of Valery Aginsky submitted by Mattel, Inc. ("Mattel"), the March 17, 2008

EXHIBIT __9__
PAGE __124__

deadline for rebuttal expert reports set forth in the Scheduling Order entered October 31, 2007, is hereby extended for a period of fourteen (14) days following the entry of an Order by the Discovery Master resolving Mattel's pending *Ex Parte* Application for a Protective Order Preventing MGA's Destructive Sampling of the Prince Notary Book, filed March 10, 2008 (Docket No. 2563).

DATED:   March 19, 2008 _____

Hon. Stephen G. Larson
United States District Court Judge

-2-

EXHIBIT **9**
PAGE **125**

EXHIBIT 10

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER