EXHIBIT 13

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 14

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 15

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 16

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 17

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION


CARTER BRYANT, an
individual,

       Plaintiff,

vs.

MATTEL, INC., a Delaware
corporation,

       Defendant.

_____

AND CONSOLIDATED ACTIONS

No. CV 04-9049
   SGL (RNBx)

**CERTIFIED COPY**


DEPOSITION OF ROBERT KULLMAN

Los Angeles, California

Tuesday, April 8, 2008


Reported by:
Stephanie Leslie
CSR No. 12893

Job No. 85751

EXHIBIT 17
PAGE 225

```
 1                 UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
 2                     EASTERN DIVISION

 3

 4              .

 5    CARTER BRYANT, an
      individual,
 6
                      Plaintiff,
 7
      vs.                            No. CV 04-9049
 8                                       SGL  (RNBx)
      MATTEL, INC., a Delaware
 9    corporation,

10                    Defendant.

11    _____

      AND CONSOLIDATED ACTIONS
12    _____

13

14

15

16          Deposition of ROBERT KULLMAN, taken on behalf

17    of Defendant, at Quinn Emanuel, 865 South Figueroa

18    Street, Tenth Floor, Los Angeles, California, beginning

19    at 9:48 a.m. and ending at 8:14 p.m. on Tuesday,

20    April 8, 2008, before Stephanie Leslie, Certified

21    Shorthand Reporter No. 12893.

22

23

24

25
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __17__
PAGE __226__

ROBERT KULLMAN                                    04/08/08

1   APPEARANCES:

2

3   For Defendant, MATTEL, INC.:

4          QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
           BY:   DIANE CAFFERATA HUTNYAN
5          ATTORNEY AT LAW
           865 South Figueroa Street, Tenth Floor
6          Los Angeles, California  90017
           (213) 443-3666
7          Dianehutnyan@quinnemanuel.com

8

   For Defendant and Cross-Complainant, MGA ENTERTAINMENT:

9

          SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
10         BY:   MATTHEW E. SLOAN
           ATTORNEY AT LAW
11         300 South Grand Avenue
           Los Angeles, California  90071
12         (213) 687-5276
           Matthew.sloan@skadden.com

13

14

   ALSO PRESENT:

15

          GREGORY PAPIGNY, Videographer

16

17

18

19

20

21

22

23

24

25

                                                          3

EXHIBIT __17__
PAGE __227__

1    not been researched.  That was part of our finding when

2    we researched it, that it had not been studied.  There

3    had been a lot of studies about ESDAs, but nothing to

4    do with that trace forgery.

10:22  5         Q    So at the time of your publication in June

6    2002, no one else had given a presentation on

7    impression by trace forgery?

10:22  8              MR. SLOAN:  Misstates the testimony.

10:22  9              THE WITNESS:  Not that I could find in

10    research, that's correct.  When I researched the area,

11    I could not find anything dealing with impression by

12    traced forgery in any publication that I could find.

10:22 13              I searched the American Academy publications.

14    I searched publications from the American Society of

15    Questioned Document Examiners.  I could not find any.

16    And obviously, the journal published this particular

17    item, so I would say they were unaware of anything in

18    that field.

10:23 19    BY MS. HUTNYAN:

10:23 20         Q    Did anybody ever tell you that the American

21    Society of Questioned Document Examiners was unaware of

22    anything in the field by -- concerning impression by

23    traced forgery?

10:23 24              MR. SLOAN:  Objection, assumes facts not in

25    evidence.

30

EXHIBIT  17
PAGE  228

**ROBERT KULLMAN**                                      04/08/08

10:23 1            THE WITNESS:  If I could answer that, I

2   presented this particular publication at an American

3   Society meeting in Des Moines, Iowa.

10:23 4   BY MS. HUTNYAN:

10:23 5       Q    I was referring to your testimony a moment ago

6   that they published it, so they must not have had any

7   knowledge of this subject before that, and I was just

8   trying to find out the basis for that statement.

10:23 9       A    Oh, well --

10:23 10      Q    What makes you think that?

10:23 11      A    Because it had been published.  I'm sure --

12   had I presented this paper for publication, unless

13   there was something new in my finding, I'm sure they

14   would have said, "We already have this."  But maybe

15   not, maybe they would have published it anyway.

10:24 16      Q    But are you a current member of the American

17   Society of Questioned Document Examiners?

10:24 18      A    No, I only hold membership in the American

19   Academy of Forensic Scientists.

10:24 20      Q    And has that always been true?  You have never

21   been a member of the American Society of Questioned

22   Document Examiners?

10:24 23      A    I was a provisional member, or applied for

24   membership back a number of years ago, and because of

25   some of the requirements of attending meetings,

31

EXHIBIT __17__
PAGE __229__

ROBERT KULLMAN                          04/08/08

1    preparing papers and so forth, it was a business

2    decision that it was better that I didn't hold

3    membership to that.

10:24  4       Q    Did you take the test?

10:24  5       A    Yes.  I took part of the test, yes.

10:24  6       Q    You didn't take the whole test?

10:24  7       A    I don't know.  They had a proficiency -- or

8    not proficiency, but testing that you would conduct and

9    then send your answers in.  I don't know that I did any

10   follow-up interviews or presentation of that.

10:25 11       But maybe -- maybe they don't have that in the

12   American Academy.  I don't remember -- sorry, American

13   Society.  But yes, I took some practical problem tests,

14   excuse me, practical problem.

10:25 15       Q    Had you passed the test, you would have been a

16   full member of the American Society of Questioned

17   Document Examiners; correct?

10:25 18       A    I don't recall if passing the test, then you

19   automatically became a member or if you had to do a

20   presentation.  I just don't recall.

10:25 21       Q    But if you don't pass the test, you can't be a

22   member; right?

10:25 23       A    Oh, no.  You can still be a member, from my

24   understanding, if you are a member of the American

25   Board of Forensic Document Examiners.  That's my

32

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __17__
PAGE __230__

1    understanding of it, but that may not be correct, but

2    that's my understanding.

10:25  3        Q    Okay.  So is that --

10:25  4        A    But if you are not a member of the American

5    Board and you don't pass the test, certainly you can't

6    be a member, from my understanding.

10:26  7        Q    And to be a member of the American Board, you

8    have to be certified using their testing; correct?

10:26  9        A    Now it's testing, yes.  It wasn't in the past,

10   but it is now, yes.

10:26 11        Q    So the way to be a member of the American

12   Society of Questioned Document Examiners would either

13   be to pass their test or to pass the certification by

14   the American Board?

10:26 15        A    Yes.

10:26 16        Q    And that's the American Board of Forensic

17   Document Examiners, Inc.; correct?

10:26 18        A    Yes.

10:26 19        Q    And you're not certified as a forensic

20   document examiner by the American Board of Forensic

21   Document Examiners; correct?

10:26 22        A    No, I'm not.

10:26 23        Q    Why not?

10:26 24        A    Basically, I went through the testing process,

25   passed the written test, passed the practical problems.

33

EXHIBIT 17
PAGE 231

1    And when I did presentation before the committee, they

2    questioned me, asked me questions about computer

3    printers that I was not prepared to answer.  And I'm

4    not -- don't have a ready, retrievable knowledge on

5    computer printers, so they said they would not

6    recommend me for certification because they felt I had

7    insufficient knowledge in computer printers.

10:27 8       Q    Did you appeal that decision?

10:27 9       A    Yes.

10:27 10      Q    What happened?

10:27 11      A    They sent me back a letter that said my appeal

12   was denied.

10:27 13      Q    Did you pursue it any further?

10:27 14      A    No.  I don't know if there is a further

15   pursuit.  There could have been, but did I, no.

10:27 16      Q    Well, did you get any training in the area of

17   computer printers that you apparently were lacking

18   earlier?

10:27 19      A    I had training in computer printers.  And as I

20   explained to the committee when they were asking me

21   about it, I said, "I'm not prepared.  You did not test

22   me on computer printers.  Part of my presentation has

23   nothing to do with computer printers.  If you want to

24   test me on computer printers, I would have to go back

25   to my research material, the reference materials that I

34

EXHIBIT  17
PAGE  232

ROBERT KULLMAN                                04/08/08

1    have, study it up, and then I would answer your

2    questions."

10:28  3         It's sort of like -- I received training on

4    counterfeit money. Do I remember that? No. Do I have

5    the materials available that I could refresh my memory?

6    Absolutely. That was my explanation to the

7    three-member panel who said they would not recommend

8    me. That was what was in my appeal letter that I sent

9    to the president, I believe, of the American Board at

10   that time.

10:28 11    Q     Who was on the panel?

10:28 12    A     I only know one person, and I think his name

13   is Lindbloom out of California. The other two

14   gentlemen I didn't know. Three gentlemen, who were

15   apparently members of the American Board, obviously, to

16   be on that, yes.

10:28 17    Q     And who was the president of the American

18   Board at that time? Do you remember?

10:28 19    A     I do not.

10:28 20    Q     Are you a member of any regional forensic

21   document examiners association?

10:28 22    A     No.

10:28 23    Q     Why not?

10:29 24    A     Time -- time and business decisions. I just

25   basically am not.

35

EXHIBIT __17__
PAGE __233__

**ROBERT KULLMAN**                                    04/08/08

10:29 1      Q    When was the last time that you attended a

2      seminar or workshop that was presented by a regional

3      forensic document examiners association?

10:29 4      A    I don't know that I ever have attended a

5      regional one, no.

10:29 6      Q    But you're familiar with the South Western

7      Association of Forensic Document Examiners?

10:29 8      A    I know what it is.  I've seen publications.

9      I've seen -- they sent information that I've read about

10      seminars coming up and so forth, yeah.

10:29 11     Q    Earlier I asked you about seminars that you

12      had recently attended by the American Academy of

13      Forensic Sciences.  Let me broaden out that question to

14      ask you, when is the last seminar or workshop that you

15      attended that was affiliated with any forensic document

16      examination organization?

10:30 17     A    Probably 2004.  I may have went in 2005.  I'm

18      not certain.  But about -- probably about 2004,

19      neighborhood.  It may have been 2003.  I'm not certain.

20      But in that -- in that era, in that time at some point.

10:30 21     Q    Why did you stop going?

10:30 22     A    Cost, Number 1; business; time available to

23      me; time available to my family.  Basically, it was a

24      business decision.  It costs money to go to those

25      items.  When you're gone, your case work can't get

EXHIBIT **17**

PAGE _234_

ROBERT KULLMAN                                04/08/08

```
          1    done.  Less time with family.  So it's a business

          2    decision.  It's a decision that I have chose not to go.

          3    Other examiners may go.  I chose not to.

10:30     4        Q    What's your hourly rate?

10:31     5        A    I don't remember for sure.  I would say in the

          6    neighborhood of $50.00 an hour.  I'm not certain.  That

          7    I get paid, you mean, or that we bill?

10:31     8        Q    Both.

10:31     9        A    Okay.  Both.  We bill at 250.00 per hour.  I

         10    believe my compensation is in the neighborhood of

         11    $50.00.  I don't remember exactly.  In that

         12    neighborhood.

10:31    13        Q    Are you salaried with Speckin Forensic

         14    Laboratories?

10:31    15        A    No.  I'm an hourly employee.

10:31    16        Q    So when you say I am being compensated at my

         17    standard rate of $250.00 per hour on my time spent in

         18    this case, you're really talking about how much Speckin

         19    Forensic Laboratories is being compensated?

10:32    20        A    Absolutely.  That's our billing rate.

10:32    21        Q    You said you were assisted by other examiners

         22    at Speckin Forensic Laboratory.  Who were those other

         23    examiners?

10:32    24             MR. SLOAN:  Can I ask you to point to where

         25    you're referring to in the report?
```

37

EXHIBIT  17

PAGE  235

**ROBERT KULLMAN**                    04/08/08

| | |
|---|---|
| 10:32 | 1 |

BY MS. HUTNYAN:

    Q    The last page of your report.

        THE COURT REPORTER:  What did you say?

        MS. HUTNYAN:  Last page of your report, page 6.

        THE WITNESS:  Certainly.  Eric Speckin and Jason Harner.  I believe those are the only two, as well as, you know, support staff, secretarial staff, and intern.

BY MS. HUTNYAN:

    Q    What did Mr. Speckin do to help you with your report -- your expert report in this matter?

    A    With my report?

    Q    Well, it says, "In conducting my examinations, I have been assisted by other examiners at Speckin Forensic Laboratory."  So what did Mr. Speckin do to assist you?

    A    He examined some of the documents.  There was a volume of documents.  He did some examinations.  He did some sorting out.  He did some evaluations of some of the findings I had, assisted in putting together this report.  We conferred a lot on the report, what the findings were, what the forensic evidence actually can show and what a person can actually attest to through the forensic evidence.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT ___17___
PAGE __236__

10:33  1          Helped go through this volume of ESDAs that we

        2    had, searching for impressions, trying to source

        3    impressions, helping with the sequencing of items.  I

        4    would say that's the majority of what he did with me.

10:33  5          Q    So you talked to him about your examinations

        6    before you prepared your report?

10:34  7          A    Absolutely.  We shared some of the

        8    examinations.  We went through some examinations.  I

        9    demonstrated information -- or some of what I observed

       10    to him, absolutely.

10:34 11          Q    And what examinations did he actually help you

       12    with?

10:34 13          A    A lot of the examinations dealing with

       14    sourcing of ESDAs, a lot of the examinations dealing

       15    with faint lines that were observable on the

       16    mixed-media drawings.  He assisted me with putting

       17    together a possible future court exhibit to use if we

       18    need it.  So that's roughly it.

10:34 19          I mean, first off, it's a large file.  One of

       20    the things he assisted with, that he's very good at, is

       21    arranging items and laying out what type of thing that

       22    you may find in certain examinations.

10:35 23          Q    So -- so he helped you organize them so --

       24    such that you -- he would select certain portions of

       25    the documents that were available for you to look at

EXHIBIT  17
PAGE  237

```
 1   for a particular examination?
10:35 2      A    No.  He may point out something to me that I
 3   could examine.  He may -- we may discuss back and forth
 4   what some of the observations are we saw.  This was a
 5   large case.  It could be overwhelming for one
 6   individual to look at, I would think.  But the more
 7   people you have, the more you're able to go through
 8   things and sort things out, organize things, the easier
 9   it is.  So he and I worked, basically, in a tandem on
10   this matter as well as having Jason Harner -- Harner do
11   some work on it for us.
10:35 12     Q    What did he do?
10:35 13     A    Mostly ESDA examinations, reading through
14   depositions -- I mean, sorry -- yeah, depositions,
15   reading reports, helping, again, organize, keep things
16   in an orderly fashion so they were easier to locate
17   when we needed certain documents, things like that.
10:36 18     Q    And then you had support staff helping as
19   well?
10:36 20     A    Yes.  We had a secretary that did some, but
21   not a great deal.  Then we had an intern.  She was a
22   young lady that worked as an intern for us.  We called
23   her, had her come back and do some work on this as far
24   as organizing items, putting them in an orderly fashion
25   for us to sort through and do our exams.
```

40

EXHIBIT __11__

PAGE __238__

ROBERT KULLMAN                                    04/08/08

10:36 1          Q      When did you receive the Bryant originals?

10:36 2          A      I don't remember for certain.  It may be on my

3      report.  I don't see it on my report, so I'm not

4      certain when I received them.  It would be in -- we

5      would have the shipping label at the laboratory that

6      said when we received them.  I don't recall for

7      certain, but obviously, a few weeks before this

8      March 17th report, I would think.

10:37 9          Q      So how long total were they at Speckin

10      Forensic Labs?

10:37 11         A      I'm not certain, but I would estimate some

12      place between three and four weeks, I would think.  It

13      could have been a little less, could have been more,

14      but in that neighborhood, is my recollection.

10:37 15         Q      How many --

10:37 16         A      I believe I started doing work on this in

17      January of '08, on the documents.  So they must have

18      come to us sometime in January, I would think, possibly

19      February.  It seemed like it was January, the latter

20      part of January.

10:38 21         Q      Are you familiar with the SWGDOC, Scientific

22      Working Group for Document Examination?

10:38 23         A      Absolutely.

10:38 24         Q      Have you served on the SWGDOC committee?

10:38 25         A      No.

                                                                        41

EXHIBIT ___17___
PAGE ___239___

ROBERT KULLMAN                                                04/08/08

```
        1    concur.  That's something we do often at Speckin
        2    Laboratories.
10:40   3        Q    So tell me more about this.  What areas of
        4    your findings did you share with him?
10:41   5        A    Everything that's in my report.
10:41   6        Q    So everything in your report was peer reviewed
        7    by Mr. Speckin?
10:41   8        A    Absolutely.
10:41   9        Q    And so -- so let's take, for example, your
       10    conclusions about the colorant on the back of 199.
10:41  11        A    That isn't there; right?
10:41  12        Q    What?
10:41  13        A    The colorant that's not there?
10:41  14        Q    Right, the issue.  Whatever that finding --
       15    whatever it was, that's something you shared with
       16    Mr. Speckin and had him peer review it?
10:41  17        A    Absolutely.
10:41  18        Q    So you told him that it was your finding that
       19    the colorant wasn't there and then asked if he
       20    concurred?
10:41  21        A    Yes.  What I said is, "I cannot see it.  Can
       22    you?  I've looked at it with the microscope.  I've
       23    looked at it with the VSC2000, under infrared, under
       24    luminescence, under UV.  I've looked at it with side
       25    lighting.  I don't see anything here.  Can you see it?"
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT  17
PAGE  240

ROBERT KULLMAN                    04/08/08

10:41 1          So that was basically what the peer review

2      was.  So he did a microscopic examination, and then he

3      examined it with a VSC2000 also.

10:42 4      Q    And he agreed with you?

10:42 5      A    Absolutely.  There's nothing there.

10:42 6      Q    Okay.

10:42 7      A    I mean, I don't know -- I don't know how

8      anyone would have seen anything that isn't there.

9      There's nothing there.

10:42 10      Q    Well, that was just an example.  In the other

11      cases where you drew certain conclusions on the basis

12      of the evidence, you then shared those findings with

13      Mr. Speckin and then asked him whether he concurred?

14      Is that how it went?

10:42 15      A    Pretty much.  Pretty much.  Sometimes he would

16      find things, because we're working on these as a team.

17      Sometimes he would find things that he would show me.

18      I would then review them, examine them, and either

19      concur or say, "I don't see this or that."

10:42 20          And what I can tell you is -- yeah, we

21      concurred on those items.  I don't believe there's

22      anything that he showed me that I could not observe and

23      draw a similar conclusion.  I don't believe there's

24      anything that I showed him that he could not concur and

25      draw a similar conclusion from.

45

EXHIBIT __17__
PAGE __241__

10:43 1     Q    So which findings did he come up with that you

2    hadn't noticed?

10:43 3     A    The --

10:43 4     MR. SLOAN:  Objection to the form of the

5    question.  I think it misstates his testimony.

10:43 6  BY MS. HUTNYAN:

10:43 7     Q    I thought you said he sometimes presented you

8    with findings, and then you would discuss them?

10:43 9     A    Absolutely.

10:43 10     Q    And so in those -- what cases were those?

11    What were the findings that he found and shared with

12    you?

10:43 13     A    Okay.  The first finding would have dealt with

14    an examination of the mixed-media drawing.  When I

15    examined it under the -- and this dealt with a finding

16    that Mr. Flynn had in his report, dealing with 199

17    being able to be superimposed in an exact overlay of, I

18    believe it was, 220.

10:43 19     So when I did the evaluation of that with a

20    VSC and Mr. Flynn said, "When you spread it out,

21    stretch it," you could.  I did that examination, made

22    some prints, showed them to Eric, and said, "They don't

23    overlay absolutely in all areas," as Mr. Flynn had

24    stated.

10:44 25     He then went in to examine it and look at it

EXHIBIT __17__

PAGE ___242___

1    Flynn would expect it to be slow, if he knew where it

2    came from, if he knew what was being traced when 199

3    was written, the black ink line anyway.

11:28 4        Q    And you're talking about the black ink line on

5    the tracing paper?

11:28 6        A    Yes, on 199.

11:28 7        Q    So you agree with Mr. Flynn that the

8    tracing-paper drawing 199 was traced?

11:28 9        A    I agree with him that the black ink line on

10   199 was, apparently, slowly trying to outline

11   something, which, to me, appeared to be outlining the

12   pencil that was on 199.  But certainly, it was slowly

13   drawn.  I agree with that, yes.

11:29 14       Q    And is that true with all of the tracing-paper

15   drawings that he concluded had been traced?

11:29 16       A    It was true with the majority of the

17   tracing-paper documents.  It could have been true with

18   all of the tracing-paper documents that had black ink

19   on them, that had pencil and then were followed by

20   black ink.  Some of the tracing-paper drawings may not

21   have had pencil on them.  They may have been paper

22   drawings from something else and then drawn on that,

23   again traced.

11:29 24            What I can tell you is that the finding is

25   that none of these tracing papers, in my opinion, were

84

EXHIBIT __17__

PAGE __243__

ROBERT KULLMAN                                    04/08/08

1       created tracing any of the mixed medias except one.

11:29  2            Q     Which one was that?

11:30  3            A     On page 3 of my report, the second paragraph,

4       it says, "I only found evidence of color offset on the

5       back of the tracing paper on one document.  This

6       document is Bryant 232, and likely came as offset from

7       trace" -- or "from 225."

11:30  8                  So it would have been tracing paper 232, in my

9       opinion was probably -- or higher than probably, traced

10      from lying on top of 232 and then tracing.

11:30 11            Q     Show me in your report where you pointed out

12      your conclusion that the -- the ink on the

13      tracing-paper drawings was a tracing from the pencil on

14      those same drawings.

11:30 15            A     It probably doesn't say that in there.

11:30 16            Q     Why not?

11:30 17            A     I don't know why I would.  In other words, to

18      me, it was -- when you look at the document, there is

19      pencil on there.  It's slowly executed.  It follows

20      along the lines of some of these pencils.  And the

21      other findings dealing with the mixed media, I knew it

22      didn't come from tracing from -- at least in my

23      opinion, tracing from the mixed media.

11:31 24                  So it would make sense that it was traced from

25      tracing the pencils, so it wasn't something that I put

85

EXHIBIT 17
PAGE 244

ROBERT KULLMAN                          04/08/08

1    in my report, no.

11:31 2        Q    When you say that it made sense that it was

3    traced from the pencil, did you see where the ink line

4    perfectly superimposed over the pencil on the same

5    drawing?

11:31 6        A    Sure.

11:31 7        Q    And did you see areas where it didn't?

11:31 8        A    Absolutely.

11:31 9        Q    But you didn't draw a conclusion -- or did you

10   draw a conclusion on whether the ink had been traced in

11   every case from the pencil on that same drawing?

11:32 12       A    No.  Some of them didn't have pencil that I

13   could observe.  But no, I didn't.

11:32 14       Q    What evidence did you see to -- if any, to

15   suggest that the pencil lines were on the tracing-paper

16   drawings before the ink was put there?

11:32 17       A    I didn't see evidence of that.  I saw reason

18   and logic, I guess.  The pencil mark was very rapidly

19   written, fluidly written at times, overwritten a few

20   times, a rough sketch.  The other is slowly drawn on

21   there.

11:32 22            But to determine if the ink came before the

23   pencil, I don't believe I could do that in this

24   particular case.  I attempted to, but I couldn't.

11:32 25       Q    You attempted to with all the drawings -- all

86

EXHIBIT __17__
PAGE __245__

ROBERT KULLMAN                    04/08/08

1    the tracing-paper drawings?

11:33 2        A    No.  I attempted to do it with some of them,

3    and --

11:33 4        Q    Just didn't --

11:33 5        A    -- no.  In my opinion, it can't be determined

6    on any of the methods that I know how to determine.

11:33 7        Q    So it's possible, is it not, that the ink

8    could have been traced onto the tracing-paper drawings

9    and then an artist might have wanted to make some

10    variations using pencil to see how they would work out;

11    isn't that true?

11:33 12       A    In a world of anything being possible, it

13    would certainly be possible that you could put black

14    ink line on a document and then take a pencil and try

15    to make lines on it or around.  Yes, that would be

16    possible.

11:33 17       Q    But even in our little world in this case,

18    that could happen, couldn't it?

11:33 19       A    I don't believe so, not from the other

20    evidence that I found.  I don't believe that happened.

21    But is it possible it could have happen?  I wouldn't

22    rule out the possibility, no.

11:33 23       Q    Tell me about that evidence.

11:33 24       A    The evidence of sequencing.  Which came first?

25    In order to logically do that, you would have had to,

87

EXHIBIT __17__
PAGE __246__

1    it's an incomplete hypothetical, assumes facts not in

2    evidence.

3:28  3         THE WITNESS:  It is basically unanswerable,

4    but I'll try.  You may spend three or four hours

5    examining one document.  It depends on what you

6    observe, what you don't observe.  You may spend -- if

7    you're going to run ESDA on it and possibly a Dage and

8    a microscopic, you may spend 20 minutes to a half an

9    hour on a document.

3:29 10         If you're not going to do all those exams, you

11   may only spend five or ten minutes, so it varies.  I

12   couldn't say how long it would take, average, to

13   examine a document.  It depends on what you observe,

14   what you're looking for.  And things that you may not

15   even look for you may see.  And then you have to do

16   additional examinations on that.  You can't say.  I

17   wish I could.  I wish I could say, "Well, I can do 50

18   in two hours," but I can't say that.  I don't know.

3:29 19         Q    It might be a lot less to do a thorough

20   examination?  A lot less --

3:29 21         A    To do a thorough examination, I don't think

22   you could do 50 in any kind of -- two hours or so.  No.

23   To do a thorough examination of a document takes time.

24   And it depends on what you're all looking for.  If

25   you're looking for a printed document to see if the

204

EXHIBIT __17__
PAGE  247

**ROBERT KULLMAN**                                    **04/08/08**

1    printing aligns, to see if there's additions to it,

2    deletions, it may take hours to examine one document.

3:30   3         Q    So the seven boxes that you received in 2008,

4    could you do a thorough examination of all of those

5    documents and -- let's say you're not looking for

6    anything in particular.  You're looking for the

7    evidence that the documents show.  Could you do that in

8    eight days?

3:30   9              MR. SLOAN:  Objection, vague as to what

10   particular tasks he would be performing and which

11   documents.  Again, it assumes facts that aren't in

12   evidence.

3:30   13   BY MS. HUTNYAN:

3:30   14        Q    Thorough examination.  You know what a

15   thorough examination is.  I mean, I'm not saying

16   exhaustively, referencing every single thing in the

17   document.  But the one that we've been talking about,

18   your examination of a document.  Let's see what this

19   document has to tell me -- you know, maybe oblique

20   lighting and microscopic, whatever you normally do.

3:30   21        A    Okay.

3:30   22              MR. SLOAN:  Same objection.

3:30   23   BY MS. HUTNYAN:

3:30   24        Q    Could you go through all those seven boxes and

25   do that kind of basic examination in eight days?

                                                         205

EXHIBIT __17__

PAGE __248__

| 3:30 | 1 | MR. SLOAN:  Same objection. |
| 3:30 | 2 | THE WITNESS:  Eight days of ten-hour days? |
| 3:30 | 3 | BY MS. HUTNYAN: |
| 3:30 | 4 | Q    Sure. |
| 3:30 | 5 | A    No, I couldn't.  Some people may be able to. |
| | 6 | I couldn't, no. |
| 3:31 | 7 | Q    If -- could you do it in 15 days? |
| 3:31 | 8 | MR. SLOAN:  Same objection. |
| 3:31 | 9 | BY MS. HUTNYAN: |
| 3:31 | 10 | Q    You saw the documents.  You have more -- |
| 3:31 | 11 | A    It depends.  First off, as I had stated |
| | 12 | before, I didn't examine all the documents in the box. |
| | 13 | Had I examined all the documents in the box for each of |
| | 14 | the examinations that I conducted on the majority of |
| | 15 | the -- of the ones I did on the tracing papers and on |
| | 16 | the notebook and on the mixed-media, I don't know how |
| | 17 | long it would take me, as an individual, by myself, but |
| | 18 | it would be a career maker.  I'm sure I would have to |
| | 19 | devote the majority of my time for an extended period |
| | 20 | of time to do that. |
| 3:31 | 21 | So -- but as I stated, the examinations that I |
| | 22 | did alone, I probably spent anywhere from 50 to 100 |
| | 23 | hours, I would think.  I don't know exactly, but I |
| | 24 | would think that much time.  And I certainly didn't |
| | 25 | take them all out of the box, individually catalog them |

206

EXHIBIT __17__

PAGE __249__

**ROBERT KULLMAN**                    04/08/08

1    all, individually examine every document that was in

2    there. Some of them didn't have Bryant numbers. They

3    weren't examined. So -- I had a task. I had a task

4    related to Mr. Flynn and Mr. Cunningham's reports. So

5    that's what the examination surrounded.

3:32  6    Q    So you were going to zero in on the ones that

7    they were focusing on and examine those. And even

8    then, it took 50 to 100 hours, you think?

3:32  9    A    I examined -- yes. But I examined more than

10   they did, from what I can see. Mr. Cunningham ran some

11   ESDAs. I don't believe Mr. Flynn did, from my

12   recollection of his report. I conducted probably 150

13   to 180, 190 ESDAs. So just doing the ESDAs alone, if

14   you can run through maybe six or seven an hour at a

15   reasonable pace, that takes a long time to go through

16   that many.

3:33  17   Q    So if somebody told you that you had a total

18   of eight days to thoroughly examine -- not every single

19   piece of evidence, but basically do an examination of

20   each document in those seven boxes, what would you

21   think of that?

3:33  22          MR. SLOAN: Objection, vague and ambiguous,

23   incomplete hypothetical.

3:33  24   BY MS. HUTNYAN:

3:33  25   Q    Impossible task?

207

EXHIBIT **17**
PAGE **250**

1        I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11        Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15        I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:   APR 1 1 2008   _____

22

23                  *Styl Lesl.*_____

24               STEPHANIE LESLIE

                   CSR No. 12893

25

EXHIBIT 17

PAGE 251

EXHIBIT 18

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                                    **Certified Copy**

5   MATTEL, INC., a Delaware        )
    Corporation,                    )

6                                   )

                 Plaintiff,         )

7                                   )

                 vs.                )  No. CV 04-9059 NM

8                                   )  (RNBx)

    CARTER BRYANT, an individual;   )

9   and DOES 1 through 10,          )

    Inclusive,                      )

10                                  )

                 Defendants.        )

11  ----------------------------- )

    (COMPLETE CAPTION ON NEXT PAGE.)

12

13

14

15      Videotaped Deposition of LLOYD W. CUNNINGHAM,

16      taken on behalf of Defendants, at 300 South

17      Grand Street, Los Angeles, California,

18      beginning at 9:59 A.M. and ending at 5:25 P.M.,

19      on Monday, March 31, 2008, before Wendy S.

20      Schreiber, CSR No. 3558, RPR, CLR.

21

22

23

24

25  PAGES 1 - 223

                                                    1

EXHIBIT **18**

PAGE **252**

CALENDARED
RECEIVED
APR 1 0 2008

EXHIBIT __18__
PAGE __253__

```
 1                UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                      EASTERN DIVISION
 4
 5   MATTEL, INC., a Delaware          )
     Corporation,                      )
 6                                     )
                     Plaintiff,        )
 7                                     )
                  vs.                  )  No. CV 04-9059 NM
 8                                     )  (RNBx)
     CARTER BRYANT, an individual;     )
 9   and DOES 1 through 10,            )
     Inclusive,                        )
10                                     )
                     Defendants.       )
11   ------------------------------    )
     CARTER BRYANT, on behalf of       )
12   himself, all present and          )
     former employees of Mattel,       )
13   Inc., and the general public,     )
                                       )
14                  Counter-Claimants, )
                                       )
15                  vs.                )
                                       )
16   MATTEL, INC., a Delaware          )
     Corporation,                      )
17                                     )
                  Counter-Defendant.   )
18
19
20
21
22
23
24
25
                                                          2
```

EXHIBIT __18__

PAGE __254__

```
 1    APPEARANCES:
 2
 3        For the Plaintiff:
 4
 5            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
              BY:  DIANE C. HUTNYAN, ESQ.
 6            865 South Figueroa Street, Tenth Floor
              Los Angeles, California 90017
 7            (213) 443-3000
              dianehutnyan@quinnemanuel.com
 8
                          -and-
 9
              MATTEL, INC.
10            333 Continental Boulevard
              El Segundo, California 90245-5012
11            (310) 252-2000
              (NOT PRESENT)
12
13
              For the Defendant and Counterclaimant Carter
14            Bryant:
15
16            KEKER & VAN NEST LLP
              710 Sansome Street
17            San Francisco, California 94111-1704
              (415) 391-5400
18            (NOT PRESENT)
19
20
21
22
23
24
25
                                                            3
```

EXHIBIT __18__

PAGE __255__

```
 1    APPEARANCES (Continued):

 2

 3       For Defendant MGA Entertainment, Inc.:

 4

 5          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
            BY:  MATTHEW SLOAN, ESQ.
 6          300 South Grand Avenue
            Los Angeles, California 90071-3144
 7          (213) 687-5000
            matthew.sloan@skadden.com

 8

 9
            Video Operator - David West
10

11

12          Also present:  Donna Hill

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                          4
```

EXHIBIT 18
PAGE 256

1    drawings that you would be examining?

2         A.   Well, excuse me, you used the word

3    "drawings."  Any indentations in any documents, not

4    just drawings.

5         Q.   Why were you asked to look at whether there  10:37AM

6    was any evidence of indentations in the documents?

7              MS. HUTNYAN:  Are we getting into

8    communications?

9    BY MR. SLOAN:

10        Q.   Without disclosing any communications with  10:37AM

11   counsel, can you indicate to me your understanding

12   as to why you were being asked to determine whether

13   there were any indentations in the documents?

14             MS. HUTNYAN:  Calls for speculation.

15             THE WITNESS:  Because indented writing or  10:37AM

16   just indentations in the paper fiber generally may

17   be a good indicator of when a document was prepared.

18   BY MR. SLOAN:

19        Q.   Were you -- well, let me ask you this.

20   Without, again, disclosing any communications with  10:38AM

21   counsel, were you under the belief or understanding

22   that you were being asked to determine the

23   sequencing of certain documents?

24        A.   No, not at that point I wasn't.

25        Q.   If we can again look at 4625, the entry for  10:38AM

                                                                    31

EXHIBIT 18

PAGE 257

1    September 12th of 2007 indicates a meeting with

2    Ms. Hutnyan and Mr. Tanden.  Is that an attorney or

3    is that someone else?

4        A.   Mr. Tanden?

5        Q.   Yes.                                          10:38AM

6        A.   He's an attorney now.  At that point he was

7    awaiting his results of the bar examination so he

8    wasn't an attorney at that point.

9            MR. SLOAN:  Is he an attorney at Quinn

10   Emanuel?                                               10:39AM

11           MS. HUTNYAN:  No.

12           MR. SLOAN:  Was he at your office in his

13   capacity as an attorney?

14           MS. HUTNYAN:  He was hired as a law clerk by

15   us.                                                    10:39AM

16           MR. SLOAN:  Okay.

17       Q.   The same entry on September 12th, 2007

18   indicates that you discussed the documents to be

19   examined and opened boxes that contained documents.

20   Was that the first day on which you had actually       10:39AM

21   reviewed any original documents in this case?

22       A.   Yes.

23       Q.   September 12th, 2007?

24       A.   Yes.

25       Q.   Were they brought to you by counsel?          10:39AM
                                                                32

EXHIBIT __18__
PAGE __258__

1       A.    Yes.

2       Q.    On the third page of this invoice which is

3  Bates-labeled M-LC 00140, the entry for September

4  28, 2007 indicates that on that day you returned --

5  there's a return of documents to boxes and FedEx          10:40AM

6  pick up.  Who do you -- who did you send the

7  documents to at that time?

8       A.    I believe it was William Flynn.

9       Q.    By the way, can you describe the

10  documents -- the amount of documents and the type of     10:40AM

11  documents that you were looking at during that time

12  period from September 12 through September 28, 2007?

13      A.    Just voluminous documents.  I didn't take

14  notes describing each individual document so I truly

15  can't remember the nature of each document, but         10:41AM

16  generally I examined sketches, color copies,

17  handwritten notations and paper in general.

18      Q.    And these are the documents that are

19  referenced in your expert report, correct?

20      A.    Some of them, yes.                             10:41AM

21      Q.    If you can turn to the next page in Exhibit

22  4625 which is an invoice entitled "Supplemental

23  Billing" and dated October 18th, 2007, do you see

24  that?

25      A.    I do.                                          10:41AM
                                                                33

EXHIBIT 18
PAGE 259

1      Q.   On the entry for October 6, 2007 it

2   indicates that you opened boxes containing question

3   documents and witnessed the photography and scanning

4   of the selected question documents.   Which documents

5   were -- were those?                                          10:42AM

6      A.   I can only state that there were numerous

7   documents.   Many of them were drawings of Bratz

8   dolls.   I didn't take notes as to each individual

9   document that was photographed or scanned.   I was

10  just present as a witness to the photography and       10:42AM

11  scanning and to make sure no destruction was done to

12  the documents at that time.

13     Q.   Were these the same or some of the same

14  documents that you had examined earlier and sent to

15  Mr. Flynn on September 28th, 2007?                          10:42AM

16     A.   Yes.

17     Q.   And why were they shipped back to you?

18          MS. HUTNYAN:   Calls for speculation.

19          THE WITNESS:   I don't know why they were

20  shipped back to me but eventually I was asked to       10:43AM

21  witness the scanning and photography of selected

22  documents.

23  BY MR. SLOAN:

24     Q.   And where did that scanning and photography

25  take place?                                                 10:43AM
                                                                    34

```
 1       Q.    Wouldn't you normally expect that if someone

 2  has to squeeze something in in a small amount of

 3  space that they would write it with a slower pen

 4  stroke?

 5       A.    Yes, that certainly could occur.        12:28PM

 6       Q.    And there's nothing suspicious about that,

 7  is there?

 8       A.    No.

 9       Q.    You testified earlier that you are trained

10  in handwriting analysis, correct?                  12:28PM

11       A.    Handwriting examination, yes.

12       Q.    Handwriting examination.  And one of the

13  purposes of that is to be able to determine whether

14  samples of questioned handwriting are made by the

15  same individual, correct?                          12:28PM

16       A.    That's correct.

17       Q.    And you indicate in your report that no

18  conclusion could be reached as to the authorship of

19  the fifth line.  In other words, whether it was

20  authored by the same person as the person who wrote 12:29PM

21  the first four lines; is that correct?

22       A.    That's correct.

23       Q.    Does the fifth line appear to have been

24  written by the same individual?

25       A.    There are handwriting features in common  12:29PM
                                                            92
```

EXHIBIT **18**
PAGE **261**

1    between the fifth line of writing and the preceding

2    four lines plus other entries in the notary journal.

3        Q.   When you examine handwriting, is there a

4    scale prepared by the American Society of Forensic

5    Document Examiners as to whether something is a          12:29PM

6    positive match, highly probable, probable,

7    et cetera?

8        A.   It's not by the American Society of Document

9    Examiners.   These are opinions expressed by forensic

10   document examiners which were formulated by a            12:30PM

11   federally-funded group called the Scientific Working

12   Group For Document Examination which is referred to

13   as SWG -- SWGDOC, SWGDOC.   I personally served on

14   that committee for the government and once we

15   finalized the opinions expressed by document            12:30PM

16   examiners, they were submitted to the American

17   Society of Testing Materials, the ASTM, to be

18   accepted as standards for our profession and there

19   are nine different opinions expressed by forensic

20   document examiners.   And if you'd like, I could tell    12:30PM

21   you what they are.

22       Q.   Very quickly why don't you tell me what they

23   are without explaining what they mean.

24       A.   The two strongest opinions are No. 1 on the

25   scale which is a positive identification and at the      12:31PM

93

EXHIBIT __18__
PAGE __262__

```
 1    other end of the scale which is No. 9 a positive

 2    elimination.  The opinions between those two on the

 3    scale are qualified opinions.  After No. 1 is a

 4    highly probable.  After highly probable is a

 5    probable.  After a probable, indications.  And then    12:31PM

 6    no conclusion.  All the opinions that I just

 7    mentioned above no conclusions relate to a person

 8    did write something.  On the other side of no

 9    conclusion is indications did not write, probably

10    did not write, quite probably did not write and as I   12:31PM

11    previously testified to positive elimination is No.

12    9.

13        Q.   Did you examine the first four lines in this

14    questioned entry, the one that begins "original

15    sketches of the doll idea," and determine whether      12:32PM

16    those were made or likely made by the same

17    individual?

18        A.   Yes.

19        Q.   And was your conclusion that that's a

20    positive identification?                               12:32PM

21        A.   Yes.

22        Q.   And comparing the first four lines to the

23    fifth line are you saying that you can't reach any

24    conclusion at all as to whether or not they were

25    written by the same person?                            12:32PM
                                                                   94
```

EXHIBIT 19
PAGE 263

```
 1    STATE OF CALIFORNIA    ) ss:

 2    COUNTY OF LOS ANGELES )

 3

 4         I, WENDY S. SCHREIBER, C.S.R. No. 3558, do

 5    hereby certify:

 6

 7         That the foregoing deposition of LLOYD W.

 8    CUNNINGHAM was taken before me at the time and place

 9    therein set forth, at which time the witness was

10    placed under oath and was sworn by me to tell the

11    truth, the whole truth, and nothing but the truth;

12         That the testimony of the witness and all

13    objections made by counsel at the time of the

14    examination were recorded stenographically by me,

15    and were thereafter transcribed under my direction

16    and supervision, and that the foregoing pages

17    contain a full, true and accurate record of all

18    proceedings and testimony to the best of my skill

19    and ability.

20         I further certify that I am neither

21    counsel for any party in said action, nor am I

22    related to any party to said action, nor am I in any

23    way interested in the outcome thereof.

24

25
                                                      220
```

```
1              IN WITNESS WHEREOF, I have subscribed my

2    name this 7th day of April, 2008.

3

4

5

6    _____

7         WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                    221
```

EXHIBIT __18__

PAGE __265__