THOMAS J. NOLAN (Bar No. 66992)
(tnolan@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, CA  90071-3144
Tel.: (213) 687-5000 / Fax: (213) 687-5600

RAOUL D. KENNEDY (Bar No. 40892)
(rkennedy@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Embarcadero Center, 38th Floor
San Francisco, CA  94111-5974
Tel.: (415) 984-6400 / Fax: (415) 984-2698

Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited, MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>                    Plaintiff,<br><br>        v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>                    Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with Case No. 04-9059 and Case No. 05-2727<br><br>MGA'S OPPOSITION TO MATTEL, INC.'S *EX PARTE* APPLICATION TO STRIKE PORTIONS OF THE EXPERT REPORTS OF DR. ALBERT LYTER AND MR. ROBERT KULLMAN<br><br>Date:   TBD<br>Time:   TBD<br>Place:  TBD<br><br>**Phase 1:**<br>Discovery Cut-off:   January 28, 2008<br>Expert Disc. Cut-off: March 31, 2008<br>Pre-trial Conference: May 19, 2008<br>Trial Date:          May 27, 2008 |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................- 1 -

II.   FACTS AND PROCEDURAL HISTORY .....................................- 3 -

    A.   The Key Carter Bryant Drawings.....................................- 4 -

    B.   Mattel Examined, Photographed and Videotaped The Bryant
        Documents for 5 Days in February, May and June 2007.................- 5 -

    C.   Mattel's July 2007 Motion to Compel Bryant to Make Original
        Documents Available For Expert Examination and Testing............- 5 -

    D.   Mattel's Experts Examined and Performed Testing on the Bryant
        Documents for a Total of Approximately 40 Days ..........................- 6 -

    E.   Mattel's Expert Reports ................................................- 7 -

    F.   Dr. Aginsky's Expert Report and Mattel's Attempt To Thwart
        MGA's Timely Testing of Mr. Prince's Notary Book ......................- 8 -

    G.   MGA's Expert Examinations and Reports........................................- 9 -

    H.   Mattel's Experts Admitted to Seeing Faint Pencil Lines in The
        Multi-Colored Drawings During Their Depositions ........................- 9 -

    I.   Mattel's Belated Requests for Further Expert Examination of the
        Bryant Documents ........................................................- 11 -

    J.   Dr. Lyter's Examination of the Prince Notary Book and His May
        6, 2008 Expert Report..................................................- 12 -

III.  ARGUMENT ........................................................................- 13 -

    A.   Mattel's Application to Strike Dr. Lyter's and Mr. Kullman's
        March 17 Reports On The Sequencing of the Carter Bryant
        Original Drawings Should Be Denied............................................- 13 -

        1.   Mattel's Motion to Strike is an Unwarranted and Untimely
            Attempt to File a Sixteenth *In Limine* Motion Well After
            the April 14 Deadline for *In Limine Motions*......................- 13 -

        2.   Dr. Lyter's and Mr. Kullman's Reports Thoroughly
            Explained the Basis for Their Opinions Regarding The
            Sequencing of Carter Bryant's Drawings............................- 15 -

        3.   Neither Dr. Lyter Nor Mr. Kullman Relied on the Digital
            Infrared Images or Enhanced Color Scans Which MGA
            Recently Produced..................................................- 18 -

1
2
3
    4.    The Discovery Master Has Already Considered and Rejected Mattel's Claims That Its Experts Should Be Allowed to Perform a Further Expert Examination of the Bryant Documents .................................................................. - 19 -

   B.   Mattel's Application to Strike Dr. Lyter's May 6, 2008 Report Regarding His Examination of Ms. Prince's Notary Book Should Be Denied ...................................................................................... - 20 -

    1.    MGA Produced Dr. Lyter's Chromatograms to Mattel on a Timely Basis ......................................................................... - 21 -

    2.    Dr. Lyter Was Justified in Waiting Until He Prepared His May 6 Report to Express His Opinions About Ms. Prince's Handwriting Habits; Mattel Suffered No Prejudice From This Approach ..................................................................... - 22 -

    3.    Mattel's Claims That Dr. Lyter Violated Judge Infante's Order and That It Has Been Prejudiced By MGA's Objection to Mattel Taking Further Samples from the Notary Book are Baseless ................................................. - 24 -

IV.   CONCLUSION ...................................................................... - 25 -

12
13
...
28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>CASE</u>                                                                                                      <u>PAGE(S)</u>

3

4     *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
          259 F.3d 1101 (9th Cir. 2001).................................................................22

5

6     *Minebea Co., Ltd. v. Pabst,*
          231 F.R.D. 3 (D.D.C. 2005)...................................................................22

7

8     *Gillespie v. Sears, Roebuck & Co.,*
          386 F.3d 21 (1st Cir. 2004)...................................................................22

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINT AND AUTHORITIES

### I.   INTRODUCTION

Mattel, no doubt fearing that its experts will lose the impending "battle of the experts" at trial, has filed this *ex parte* application in a desperate, last minute attempt to keep MGA's experts from testifying on the crucial issue of the sequence in which Carter Bryant created the drawings at issue in this case.  Faced with the Discovery Master's recent denial of Mattel's last *ex parte*, requesting additional time for Mattel's experts to "re-do" the flawed and incomplete examinations they conducted last fall, Mattel now seeks to strike key portions of Dr. Lyter's and Mr. Kullman's March 17 expert reports on the purported grounds that they failed to provide a sufficient basis for their opinions.  Mattel's application -- ***its fourth ex parte application involving the parties' document experts in just the past 9 weeks*** -- is fatally flawed, however, and should be denied for several reasons, including the following:

> ➤ First, Mattel's application to strike MGA's expert reports is really nothing more than a thinly disguised attempt to file a ***sixteenth*** motion *in limine* and is thus both untimely – since the deadline for filing such motions was April 14 – and in violation of the Court's Order limiting each side to 15 motions *in limine.* Mattel received Dr. Lyter's and Mr. Kullman's reports on March 17, 2008, so it had almost a month to bring these motions before the April 14 deadline.

> ➤ Second, both Dr. Lyter's and Mr. Kullman's reports provided detailed descriptions of the basis for their opinions, which are far in excess of the requirements of Rule 26 and far more detailed than the conclusory opinions offered by Mattel's experts.  Moreover, Mattel deposed both Dr. Lyter and Mr. Kullman and thus had a full and a fair opportunity to probe the basis of their opinions and to clear up any alleged ambiguities.

> ➤ Third, Mattel's eleventh hour claim that it was prejudiced by MGA's recent production of trial exhibits consisting of enhanced color scans and digital infra red images of the Bryant originals – and that Mattel should thus get a second chance to depose Dr. Lyter and Mr. Kullman – is baseless.   As MGA has explained to Mattel on several occasions now – and as Judge Infante implicitly recognized in denying Mattel's *ex parte* application to give Mattel's experts additional time to examine the Bryant originals – these images were created

*after* Dr. Lyter and Mr. Kullman issued their reports and gave their depositions. Thus, by definition, Dr. Lyter and Mr. Kullman could not have relied upon them or considered them as a basis for their opinions.   The new images (which are little more than enhanced and magnified versions of the photographic images Mattel took in 2007) were made merely for the purpose of demonstrating Dr. Lyter's and Mr. Kullman's findings to the jury.

Mattel's request to strike Dr. Lyter's May 6 Report regarding his examination of Ms. Prince's notary book is even more flawed.  Mattel's principal assertion appears to be that Dr. Lyter's report should be stricken because he did not attach his chromatograms to his May 6 report.  Mattel conveniently forgets to relate, however, it did not request the production of these chromatograms until the evening of Sunday, May 11, and that MGA promised to provide them to Mattel by May 15, which MGA did.  Indeed, MGA hand delivered all 23 pages of Dr. Lyter's chromatograms to Mattel's counsel on the afternoon of May 15 within hours after Mattel served this motion.  Thus, there has been no prejudice since Mattel will have a full 6 days to analyze the chromatograms before Dr. Lyter's second deposition on May 21. Mattel's claim that this short delay in producing the chromatograms violates Rule 26 is, to put it mildly, disingenuous.  Indeed, Mattel did not send MGA the chromatograms that its ink testing expert, Dr. Valery Aginsky, generated in his GC/MS testing until nearly *3 weeks* after Dr. Aginsky produced his February 11, 2008 report.  Thus, by Mattel's own logic, the Court should strike Dr. Aginsky's expert report.

Mattel's other objections are equally without merit.  Contrary to Mattel's unsubstantiated allegations, Dr. Lyter scrupulously followed Judge Infante's April 22 Order concerning the testing of the notary book; he did not extract a *twentieth* sample from the notary book and the eight microplugs he took from the pre-printed line of the notary book were fully authorized by the Order which allowed Dr. Lyter to take two sets of samples from any two areas of the relevant pages which did not

MGA's Opposition To Mattel, Inc.'s *Ex Parte* Application to Strike Portions of the Expert Reports of Dr. Albert Lyter and Mr. Robert Kullman, Case No. CV 04-9049 SGL (RNBx)

- 2 -

1  contain "writing." (Ex. 1: April 22 Infante Order, ¶ 4.)[1]  More importantly, contrary
2  to Mattel's suggestions, ***Dr. Lyter's testing of these 8 allegedly offending***
3  ***microplugs had absolutely no impact on Dr. Lyter's opinion,*** so MGA is frankly at
4  a loss as to why Mattel would need to extract yet another sample from the notary
5  book which Mattel professes to be so concerned about preserving. Dr. Lyter was
6  also fully justified in waiting until he could thoroughly examine the notary book and
7  replicate Dr. Aginsky's testing of the ink samples extracted from that book before
8  rendering his opinion about why the fifth line of the entry ("From 1998 Missouri")
9  was prepared in a manner consistent with Ms. Prince's writing "habits."

10      In sum, Mattel's application to strike Dr. Lyter's and Mr. Kullman's March 17
11  Reports is little more than an untimely attempt to file a sixteen *in limine* motion, in
12  clear contravention of this Court's scheduling order. Moreover, almost all of Mattel's
13  arguments have already been considered and rejected by Judge Infante. Mattel's
14  request to strike Dr. Lyter's May 6 Report is even more baseless. Accordingly, the
15  Court should deny Mattel's *ex parte* application in it entirety.

16  **II.    FACTS AND PROCEDURAL HISTORY**

17      After the Discovery Master flatly rejected Mattel's efforts to obtain a "re-do"
18  of its deficient expert reports (Ex. 2: May 13 Infante Order), Mattel has decided to
19  now switch from attempting to cure its experts reports from Messrs. Flynn and
20  Cunningham, to attempting to eliminate their competition—namely, MGA's expert
21  reports from Dr. Lyter and Mr. Kullman. Because Mattel's effort to avoid the "battle
22  of the experts" is only one in a series of *ex parte* applications filed by Mattel's
23  counsel on this subject, a brief recitation of the relevant history is in order.

24
25
26

27  [1] Except where noted, all exhibits herein referenced as "Ex. __ " are those attached to the accompanying Declaration of Matthew E. Sloan, filed under separate cover.
28

## A.   The Key Carter Bryant Drawings

Mattel has known since at least 2004 that there were only several dozen key documents in this case, including the "master drawings"[2] on tracing paper and the color posterboard drawings which are at issue in both Mattel's and MGA's experts' reports.  Indeed, in Mattel's Second Amended Answer and Counterclaims, Mattel specifically identified the 16 Bryant images in which Mattel purports to own a copyright. (Second Am. Answer and Counterclaims at 53, ¶ 83.)   From the inception of this case, Bryant and MGA have truthfully contended that Bryant created the "master drawings" after Bryant resigned from Mattel in April 1998 and returned to Missouri to live with his parents to do freelance work.

This was known to Mattel at least as early as November 2004 when Mattel first deposed Bryant in a three-day marathon session.  During that testimony, Mattel's attorneys grilled Bryant about the dates on which he created hundreds of key drawings, including substantially all of the documents at issue in the reports of Mattel's four ink and paper experts.  In his deposition, Bryant testified that he had traced the "multi-color posterboard drawings" from the "master" drawings, and then added color to them, in 1999.[3]

Thus, given Mattel's questioning of Bryant and his responses, it is undeniable that the dates and sequence in which these two categories of documents were created have been front and center in Mattel's thinking since at least 2004.  In fact, the central purpose of Mattel's expert reports was apparently to rebut Bryant's testimony and advance the illogical argument that the "multi-color" drawings actually preceded the "master drawings."

---

[2] In his deposition, Carter Bryant refers to the black-and-white drawings he made on the tracing papers (*e.g.*, bates-stamped Bryant 194, 197-219) as his "master drawings" because he used them as the model for later generation drawings, including the multi-media color drawings, which Mattel claims it owns and has tried to copyright. (Ex. 3: Depo. Tr. of Carter Bryant (Nov. 4, 2004), at pp. 151-152.)

[3] Ex. 3: Depo. Tr. of Carter Bryant (Nov. 4, 2004), at pp. 151-152.

**B.   Mattel Examined, Photographed and Videotaped The Bryant Documents for 5 Days in February, May and June 2007**

Although Mattel's primary argument until this week was that its experts were hampered by only having 35 days to complete their examinations of the Bryant documents (and thus needed a "re-do" of their examinations), Mattel was well aware of the relevant documents its experts could potentially examine long before its actual testing period began in September 2007.  Mattel, in fact, sought and obtained permission to inspect and photograph all 2,000 original Bryant documents long before Cunningham and Flynn conducted their examinations.  (Ex. 2: May 13 Infante Order, at 2.)  Then, between February and June 2007, Mattel's attorneys spent five days examining, photographing, and videotaping all of these documents to determine which of the originals were appropriate candidates for expert analysis.  (*See id.* at 2.)

**C.   Mattel's July 2007 Motion to Compel Bryant to Make Original Documents Available For Expert Examination and Testing**

In July 2007, Mattel moved to compel Bryant to make over 2,000 of Bryant's original documents available for expert examination and testing.[4]  Although Mattel had previously examined and had the opportunity to photograph and videotape all of these documents, Mattel made no attempt to narrow down the universe of documents for its experts' review.  Moreover, Mattel demanded that it be given total control over the documents for a period of over two months, and that it be allowed to shuttle the documents to three or four different experts, all of whom it refused to identify to Bryant on work-product grounds.[5]  While the Discovery Master generally agreed with Bryant's objection to the lack of specificity and sheer volume of Mattel's request – noting that "a smaller universe of documents would probably be adequate for

---

[4] Ex. 4: D. Hutnyan Decl. in Support of Mattel's Motion to Compel Carter Bryan to Make Original Documents Available for Expert Examination and Testing and For Sanctions (July 6, 2007), Ex. 1 thereto at 3-4.
[5] *Id.*

MGA's Opposition To Mattel, Inc.'s *Ex Parte* Application to Strike Portions of the Expert Reports of Dr. Albert Lyter and Mr. Robert Kullman, Case No. CV 04-9049 SGL (RNBx)

- 5 -

1   testing" – he ultimately granted Mattel's requests with only two conditions.[6]  First,

2   Mattel was required to submit *in camera* the names and credentials of its experts,

3   because it was refusing to identify them before any testing (as MGA did).  Second,

4   the Discovery Master found that the two-month time period initially requested by

5   Mattel was "excessive" and ruled that Mattel's experts should only have an initial 35

6   days to complete their examination.[7]  The Discovery Master indicated in the hearing,

7   however, that he would agree to give Mattel additional time for its experts to

8   complete their examinations for "good cause" if the experts were not able to

9   complete their tasks "within the time allotted."[8]

10      The August 30, 2007 Order likewise provided that the 35-day time limit "may

11   be extended upon a showing by Mattel of good cause."[9] ***Despite the inclusion of***

12   ***this provision, however, Mattel never sought leave for more time for its experts to***

13   ***conduct additional testing.***  Instead, at the end of the initial 35-day period granted by

14   the Discovery Master, Mattel simply returned the documents to Bryant without

15   objection.  (Ex. 2: May 13 Infante Order, at 4.)

16   **D.      Mattel's Experts Examined and Performed Testing on the Bryant**
17   **Documents for a Total of Approximately 40 Days**

18      In total, Mattel's experts had possession of the Bryant documents for testing

19   for approximately 40 days.  Lloyd Cunningham, Mattel's principal forensic

20   document examiner, obtained the documents on September 12, 2007 and maintained

21   possession of the documents until September 28, 2007.  (Ex. 2: May 13 Infante

22   Order, at 2.)  During those 16 days, Cunningham spent over 80 hours examining the

23   documents.  (*Id.*)  Cunningham has stated that he used numerous different methods

24   of examination, including the use of oblique lighting, magnification, reflected

25   [6] Ex. 5: Infante Hearing Tr. (Aug. 23, 2007), at 15.

26   [7] *Id.* at 18.
   [8] *Id.*
27   [9] Ex. 6: August 30, 2007 Order, ¶ 4.

28

1  infrared luminescence, UV lighting, as well as the examination of indented writing
2  with the indentation materializer device.[10]  (*Id.*)

3      William Flynn, Mattel's second forensic document examiner, received the
4  Bryant documents from Cunningham on September 29, 2007, and had a total of three
5  days to examine the documents.  (*Id.*)  Flynn indicated that he spent approximately
6  35 hours examining the documents.  (*Id.* at 3.)  Mattel's paper expert, Walter
7  Rantanen, and its ink chemist, Valery Aginsky, also spent substantial time reviewing
8  the documents.  (*Id.*)  After completing its examinations, Mattel's counsel returned
9  the Bryant documents to Bryant's counsel on October 17, 2007.  (*Id.*)

10      Prior to April 2, 2008, however, Mattel never indicated that Cunningham or
11  Flynn needed additional time to perform their examination of the Bryant documents.
12  Nor did Mattel seek leave from Bryant, MGA or the Court to allow Cunningham or
13  Flynn additional time to perform such examinations.  (*Id.* at 4.)[11]

14  **E.    Mattel's Expert Reports**

15      Mattel served Cunningham's and Flynn's expert reports on MGA on or about
16  February 11, 2008.  Cunningham indicated in his report that he noticed "light pencil"
17  strokes on several of the multi-color posterboard drawings that could have been from
18  either "a rough sketch" or "tracing outlines" from another drawing.[12]  Contrary to
19  Mattel's representations, Cunningham's report specifically states that he did employ
20  infrared luminescence and reflective infrared testing.[13]  Further contrary to Mattel's

21

22

---

23  [10] Declaration of Diane C. Hutnyan in Support of Mattel, Inc.'s *Ex Parte* Application to Strike Portions of the Expert Reports of Dr. Albert Lyter & Mr. Robert Kullman ("Hutnyan Decl."), Ex. 14: Expert Report of Lloyd Cunningham (dated Feb. 11, 2008), at 9.

24

25  [11] Significantly, when Mattel asked Bryant's counsel for leave to have Rantanen test some documents in December 2007, Bryant voluntarily agreed.

26  [12] Hutnyan Decl., Ex. 14, at 6-8.

27  [13] *Id.* at 9 (stating that he employed "oblique lighting, magnification, reflected infrared, infrared luminescence and UV [tests]").

28

---

MGA's Opposition To Mattel, Inc.'s *Ex Parte* Application to Strike Portions of the Expert Reports of Dr. Albert Lyter and Mr. Robert Kullman, Case No. CV 04-9049 SGL (RNBx)

- 7 -

1 representations, Cunningham testified that he could *not* determine the sequencing of

2 the drawings.

### F.    Dr. Aginsky's Expert Report and Mattel's Attempt To Thwart MGA's Timely Testing of Mr. Prince's Notary Book

5 Mattel also sent MGA a copy of Dr. Aginsky's expert report in February

6 2008.[14]  In the report, Dr. Aginsky said that he found the presence of the chemical

7 "menthol" in the ink extracted from the notation reading "From 1998 Missouri," but

8 found no presence of "menthol" in any of the other ink extracted from the notary

9 book.  Dr. Aginsky concluded from this that two different inks were used in

10 Jacqueline Prince's notary book entry involving the Bryant drawings, and that the

11 "From 1998 Missouri" notation was made *after* the other entries on that page of the

12 notary book.[15]

13 In response to Dr. Aginsky's report, MGA sent a letter to Ms. Prince's attorney,

14 Daniel Warren, on February 18, 2008, asking him to send the notary book to MGA

15 so that MGA's expert, Dr. Lyter, could perform similar testing to that conducted by

16 Dr. Aginsky.  Although Dr. Lyter is himself a renowned and widely-respect ink-

17 testing expert,[16] Mattel proceeded to spend the next three weeks trying to thwart Dr.

18 Lyter's ability to extract any ink samples.[17]  Mattel's efforts culminated with its filing

19 of an *ex parte* application on March 10, 2008 to block Dr. Lyter from performing any

---

[14] Hutnyan Decl., Ex. 7: Expert Report of Valery Aginsky (dated Feb. 11, 2008).

[15] *Id.* at 8.

[16] Indeed, we later learned that Mattel's counsel, Quinn Emanuel, thought so highly of Dr. Lyter, that they tried to hire Dr. Lyter as Mattel's ink testing expert. (Ex. 7.)

[17] While Mattel gave lip service to trying to reach a compromise, it never once offered a proposed protocol, and repeatedly objected to the provision in the stipulation providing that should Mattel raise an objection, and thus block MGA's ability to take samples from the notary book on a timely basis, MGA would be granted an extension of time to submit its rebuttal expert report beyond the March 17 deadline.  The reason for Mattel's objection is obvious; Mattel's goal was never to bargain in good faith towards an agreement, but rather to string out the process until after the March 17 expert rebuttal report deadline so as to preclude MGA from performing its own sampling or being able to rebut Mattel's expert testimony at trial.

1  testing except upon express approval from the Discovery Master and pursuant to a

2  Court approved protocol.[18]

### G. MGA's Expert Examinations and Reports

MGA retained two forensic document examiners to review the Cunningham
and Flynn reports and provide rebuttal reports: Robert Kullman and Dr. Albert
Lyter.[19] Lyter and Kullman reviewed the original drawings and finalized their
reports on March 17, 2008. Both Kullman and Lyter found evidence of faint or
partially obscured lines in the colored poster board drawings which superimposed
with the final ink lines on the "master drawings" on the tracing paper.[20] Based on
this, and other observations, Kullman and Lyter concluded, in most instances, that
the multi-color poster board drawings were traced from the master drawings.

### H. Mattel's Experts Admitted to Seeing Faint Pencil Lines in The Multi-Colored Drawings During Their Depositions

On March 27, 2008, Flynn was deposed by MGA. Flynn admitted that he had,
in fact, seen "faint pencil lines" in the multi-color drawings through his microscopic
analysis.[21] Flynn also testified that, like Kullman and Lyter, he tried to see whether

---

[18] With the March 17 deadline for rebuttal expert reports approaching, and Mattel's refusal to extend that deadline even though the extension was needed as a direct result of its obstructionist conduct, MGA sought and obtained an extension of the March 17 rebuttal expert report deadline for Dr. Lyter to prepare an expert report responding to Dr. Aginsky's opinions. *See* MGA's Ex Parte Application for an Order Extending the March 17 Deadline of Filing of Rebuttal Expert Reports (March 14, 2008), Docket No. 2645; Order, Docket No. 2737 (March 19, 2008).

[19] Mattel's veiled attack on the credentials of Dr. Kullman and Dr. Lyter are baseless and, moreover, its 4-page diatribe on the qualifications of Mattel's experts versus MGA's experts is 100% irrelevant to the application before the Court. (App. at 2-6.)

[20] Ex. 8: Expert Report of Robert Kullman, at 3 ("In every case, the faint lines in the mixed media drawings matched with the lines from the tracing paper sketches/drawings."); Ex. 9: Expert Report of Albert Lyter (Mar. 17), at 5-9.

[21] Ex. 10: Depo. Tr. of William J. Flynn (Mar. 27, 2008), at 77; *see also id.* at 174-175: "Q. Did you find any partially obscured pencil lines on 227? I'm sorry, let me direct your attention to 227, which is the colored or multimedia drawing, do you see any partially obscured pencil lines on 227? A. There -- yes, in only one area, I think what I see is a partially obscured pencil line. Q. Where is that? A. There's a fold in the doll's skirt just below her right hip and it appears on the poster board that there's almost a semi-circular pencil line that is on the right side of the skirt."

1  the faint pencil lines on the multi-color drawings matched up with the ink lines on
2  the outline drawings.[22]  Unlike Kullman and Lyter, however, Flynn indicated that
3  there was "never an exact one-to-one" match between the faint pencil lines and the
4  ink on the outline tracings.[23]  Accordingly, Flynn disagreed with Lyter's and
5  Kullman's conclusion that the poster board drawings had been traced from the master
6  drawings.[24]  Indeed, Flynn reached the exact opposite conclusion: namely, that the
7  master drawings were "traced" from the poster boards.[25]

8       Flynn also expressly testified that he had had sufficient time to reach the
9  conclusion set forth in his report.

10            Q:   In your view, did you have enough time to draw the
                   conclusion that you drew in your report?
11            A:   Certainly.
12  (Ex. 10: Depo. Tr. of William J. Flynn, at 229:23-25.)

13       On March 31, 2008, MGA took Cunningham's deposition.  Like Flynn,
14  Cunningham testified that he saw many areas of faint or partially obscured pencil
15  lines on the multi-colored poster board drawings.[26]  Consistent with his report,
16  Cunningham testified that he believed these pencil lines in some cases might be
17  evidence that those pencil lines were traced from other documents.

18            Q:   And you indicated that there was a possible pencil tracing
                   outline from another document on Bryant 223; is that
19                 correct?
              A:   Yes.
20
                             *       *       *       *
21
              Q:   [Y]ou testified that [the faint pencil lines] exhibit
22                 possible evidence or they are possible evidence that those
                   lines were traced from another drawing, correct?
23
───────────────────
24  [22] *Id.* at 80-81.
    [23] *Id.* at 81-82.
25  [24] *Id.* at 225.
26  [25] *See* Hutnyan Decl., Ex. 15: Expert Report of William J. Flynn, at 7-8.
27  [26] Ex. 11: Depo. Tr. of Lloyd Cunningham, at 141, 144-45 (describing where he observes faint pencil strokes).
28

1    A:    Could have been, yes.

2  (Ex. 12: Depo. Tr. of Lloyd Cunningham, at 140:7-10; 141:23-142:2.)

3         Contrary to Mattel's repeated assertions,[27] Cunningham specifically testified

4  that he "use[d] infrared and infrared luminescence on the poster board drawings to

5  determine if there was a pencil line under some of the bold outline[s]," and

6  determined that there were pencil strokes under some of those bold lines.[28]

7  Cunningham also stated that although he only conducted a "cursory examination" on

8  some of the documents, he had sufficient time to examine all of the specific

9  documents which are actually discussed in his report.[29]

10   **I.    Mattel's Belated Requests for Further Expert Examination of the
11          Bryant Documents**

12         On March 31, 2008, two weeks after Lyter's and Kullman's reports were

13  released to Mattel, the expert discovery deadline imposed by the Court's scheduling

14  order expired.[30]  Two days later, on April 2, 2008, Mattel's attorneys sent a letter to

15  MGA and Bryant demanding that Bryant agree to provide Cunningham and Flynn an

16  additional one week each to perform additional non-destructive testing and

17  examination of the documents.[31]  Bryant rejected Mattel's request in a letter dated

18  April 3, 2008, explaining that Mattel's request was improper for numerous reasons,

19  including that Mattel's experts had already had sufficient time to examine the

20  documents and had not requested additional time for testing as permitted by this

21  Court's August 30 Order.[32]

22  [27] *See* App. at 19 (alleging that "Dr. Lyter and Mr. Kullman conducted tests they knew Messrs. Flynn and Cunningham had no time to perform"); *see also* Docket No.
23  3008 at 4 (complaint that Mattel's experts did not have time to conduct infrared luminescence and reflective infrared testing).
24  [28] Ex. 11: Depo. Tr. of Lloyd Cunningham, at 143:1-5.
25  [29] *Id.* at 53.
26  [30] Ex. 12: Scheduling Order (Oct. 31, 2007).
27  [31] Ex. 13: April 2, 2008 Letter from D. Hutnyan to M. Sloan & M. Werdegar.
28  [32] Ex. 14: April 3, 2008 Letter from M. Werdegar to D. Hutnyan, at 2.

1    In early April 2008, Mattel filed twin *ex parte* applications with this Court and

2  the Discovery Master, seeking leave to re-open expert discovery so Mattel could "re-

3  do" its examinations and submit new expert reports.[33]   This Court essentially

4  deferred to the Discovery Master on the merits of the issues.  On May 13, 2008, the

5  Discovery Master denied Mattel's ex parte motion in its entirety.  (Ex. 2.)

6  Specifically, the Discovery Master found that Mattel was not diligent in seeking its

7  relief in three respects; that neither MGA nor Bryant did anything to justify Mattel's

8  lack of diligence; that "Mattel's belated assertion that its experts did not have

9  sufficient time to conduct testing is dubious"; that "Mattel's assertion that MGA's

10  rebuttal reports are improper is without merit;" that Mattel had no good cause to

11  justify a second round of reports; and that MGA and Bryant would be significantly

12  prejudiced by a second round or expert reports.  (Ex. 2: May 13 Infante Order, at 4-6.)

13  **J.    Dr. Lyter's Examination of the Prince Notary Book and His May 6,**
14  **2008 Expert Report**

15    On April 22, 2008, the Discovery Master set forth a protocol for MGA's

16  testing of the Prince notary book.  Dr. Lyter thereafter executed and followed the

17  protocol, tested the notary book in the presence of Mattel's expert – who voiced not

18  one objection – and issued his findings in a report dated May 6, 2008.  Contrary to

19  Dr. Aginsky, Dr. Lyter found no menthol in the ink from the notary book, concluded

20  that any possible traces of menthol picked up by Dr. Aginsky must have been so

21  minute that they could only be present on the notary book due to an external

22  contaminant; and that Ms. Prince's writing of the questioned entry by squeezing in

23  the five lines of text was consistent with her apparent habits.[34]

24
—————————————————

25  [33] See Mattel's *Ex Parte* Application to Compel Access to Certain Bryant Originals for Non-Destructive Expert Examination and Testing (April 7, 2008) (filed with Discovery Master); Mattel's *Ex Parte* Application to File Supplemental Expert

26  Reports By Messrs. Flynn and Cunningham Regarding Certain Bryant Originals (April 8, 2008), Docket No. 3008.

27  [34] Ex. 15: May 6, 2008 Expert Report of Dr. Lyter.

28

## III.   ARGUMENT

### A.   Mattel's Application to Strike Dr. Lyter's and Mr. Kullman's March 17 Reports On The Sequencing of the Carter Bryant Original Drawings Should Be Denied

Phase 1a of the trial will hinge in large measure on the credibility of Carter Bryant's testimony that he created certain key drawings (the "master drawings") in 1998 after he had resigned from Mattel and moved back to Missouri to live with his parents.  Dr. Lyter and Mr. Kullman have been able to conclusively establish through their expert examination of these "master drawings" that they preceded and were used as the models for the color, multi-media drawings which Bryant has testified he traced from the "master drawings" in 1999, and which Mattel claims they own by virtue of the Inventions Agreement.

Recognizing by now that their experts failed to perform a thorough examination of the Bryant drawings -- and that MGA's experts have developed overwhelming evidence corroborating Bryant's testimony that he traced the color drawings from the "master drawings" (and not vice versa, as Mr. Flynn contends) -- Mattel now seeks to exclude MGA's experts in a desperate gambit to keep the truth from the jury.  As set forth below, Mattel's arguments are wholly without merit and should be rejected in their entirety on the following grounds.

### 1.   Mattel's Motion to Strike is an Unwarranted  and Untimely Attempt to File a Sixteenth *In Limine* Motion Well After the April 14 Deadline for *In Limine Motions*

First and foremost, Mattel's *ex parte* application must be denied because it is nothing more than an attempted end run around the Court's Scheduling Order limiting each side to 15 motions *in limine* and requiring those motions to be filed no later than April 14, 2008.  (Order on Stipulation Regarding Briefing on Phase One Motions in Limine, entered March 11, 2008; Docket No. 2613.)  Mattel has exhausted its allotted 15 motions in limine, however, and the deadline for filing such

1   motions passed over a month ago.  Accordingly, Mattel's poorly disguised sixteenth
2   motion *in limine* here should be summarily denied.

3          As Mattel well knows, a motion to strike an expert report, or a portion of an
4   expert report, as Mattel seeks to do here, should properly have been filed as an *in*
5   *limine* motion.  Mattel's awareness of this fact is illustrated by the fact that Mattel
6   used 4 of its 15 motions *in limine* to do precisely that -- i.e., challenge the expert
7   reports and testimony of 6 of MGA's expert witnesses.[35]  In fact, in a March 25, 2008
8   letter requesting a meet-and-confer on the 15 motions *in limine* it was intending on
9   filing, Mattel advised MGA and Bryant that it was specifically contemplating filing a
10  motion *in limine* to strike portions of Dr. Lyter's report and prevent him from
11  testifying.[36]  Obviously realizing that there was no bases to strike Dr. Lyter's report
12  (or Mr. Kullman's, for that matter), Mattel decided not to use any of its 15 motions
13  for that purpose.  Now that it realizes that it is going to lose the "battle of the
14  experts," Mattel cannot retroactively change it prior strategic decision and file a
15  sixteenth motion *in limine.*

16         Further, Mattel's *ex parte* application comes dispositively too late.  Dr. Lyter
17  and Mr. Kullman both served their rebuttal expert reports on March 17, 2008.  If
18  those reports were so insufficient or incomplete, or if they failed to adequately state
19  the bases for their opinions, as Mattel now alleges, then why did Mattel wait *two*
20  *months,* until the very eve of trial, to raise these matters?  Mattel cannot be and is not
21  saved by dubiously alleging that it did not recognize its problem until Mr. Kullman
22  and Dr. Lyter were deposed, because they were deposed over one month ago, on
23  April 8 and 17, 2008, respectively.

24

25  _____
    [35] *See* Motions in Limine No. 1 (Duffy), No. 10 (Vilppu), No. 12 (Menell) and No.
26  13 (Bergstein, Tonner, and Middleton).

27  [36] Ex. 16: March 25, 2008 Letter from Dylan Proctor to Jason Russell and Matthew
    Werdegar, at 3.

28

2.   <u>Dr. Lyter's and Mr. Kullman's Reports Thoroughly Explained the Basis for Their Opinions Regarding The Sequencing of Carter Bryant's Drawings</u>

Mattel also moves to strike Dr. Lyter's and Mr. Kullman's reports on the grounds that they purportedly failed to provide a sufficient basis for their opinions under Fed. R. Civ. Proc. 26(a)(2).   (App. 18-24).  More specifically, Mattel alleges that Dr. Lyter and Mr. Kullman have not sufficiently explained the bases for their sequencing opinions because they failed to describe each and every pencil line or faint line they observed in concluding that the multi-colored drawings were traced from the "master drawings" on the tracing paper.  (App at 18, 24.)  This is wrong.

Both Dr. Lyter's March 17 report and Mr. Kullman's March 17 Report provide detailed bases for their sequencing opinions.  Dr. Lyter's report, which is 11 single-spaced pages long, explains that his sequencing opinion is based on a series of factors, including (1) ESDA impression tests, which demonstrate that some of the color multi-media drawings were impressed into the "master drawings" (*see, e.g.,* Ex. 9: Lyter Report at 8, ¶ 19);  (2) the use of rapid strokes in at least one of the "master drawings," which indicates that it was free-hand drawn, not traced from a color drawing (*see id.* at 5, ¶ 3); and (3) the fact that the obscured pencil lines on several of the multi-color drawings match corresponding ink lines in the "master drawings." (*Id.* at 4-6, ¶¶ 1-11).   Contrary to Mattel's claims, moreover, Dr. Lyter's March 17 Report also goes into substantial detail in describing where some of these pencil marks appear.

In his description of how he concluded that Bryant 226 (a multi-color drawing of a figure) was copied from Bryant 204, a "master drawing" on tracing paper, for example, Dr. Lyter states as follows:

> Superimposition of various portions of the drawings are consistent with a common source for the items.  I found faint pencil marks on Bryant 226, including on the heel of the character and the triangular shaped object on the right side bottom of the vest of Bryant 226, which superimpose exactly with the ink lines on Bryant 204.  These pencil marks on Bryant 226

MGA's Opposition To Mattel, Inc.'s *Ex Parte* Application to Strike Portions of the Expert Reports of Dr. Albert Lyter and Mr. Robert Kullman, Case No. CV 04-9049 SGL (RNBx)

- 15 -

1   were later colored over so that they are obscured by the colored
2   drawing; these results indicate that Bryant 226 appears to be
    traced from Bryant 204.  Evidence was found on Bryant 00226 to
3   indicate that Bryant 00204 was used as a model for the partial
    construction of Bryant 00226.

4   (Ex. 9: Lyter Report at 6, ¶ 7.)  *See also Id.* at 5, ¶ 4 (noting that sequencing is

5   supported by "pencil line" observed on "right side of the hair line of Bryant 00234"),

6   ¶ 5 ("I found pencil lines on Bryant 00227 [the colored drawing] on both hips that

7   correspond to ink lines within the same location of Bryant 00213 [the master

8   drawing]" which support sequencing.)

9        Mr. Kullman's report is just as (if not more) detailed in its description of the

10  sequencing analysis than Dr. Lyter's report.   In the course of Mr. Kullman's opinion,

11  he identifies approximately 20 different drawings from which he obtained ESDA

12  impressions in his sequencing analysis. (Ex. 8.)  In addition, Mr. Kullman also

13  provides a detailed description of at least 15 different areas where he found faint or

14  obscured pencil lines or other areas of evidential value on at least seven different

15  drawings, as set forth below.

| Tracing paper (Bryant #) | Mixed-media (Bryant #) | Areas of Evidential Value |
| --- | --- | --- |
| 00194 | 00222 | Line between hems at bottom of skirt of third doll<br>Missing upper crease in skirt of third doll<br>Corner of pant cuff on upper left leg of second doll<br>Crease in cuff left side of left leg of second doll |
| 00199 | 00220 | Left side of doll's left leg<br>Left side of doll's right leg |
| 00201 | 00231 | Two lines between sock and buckle on doll's left leg<br>Two lines between sock and buckle on doll's right leg<br>Vertical line on shoe near buckle |
| 00201 | 00230 | Left and right vertical lines of skirt |
| 00204 | 00226 | Triangle shaped object on right side bottom of vest |
| 00206 | 00224 | Area at bottom of pant leg on left leg<br>Straight lines in area of crease in lower left leg |
| 00213 | 00227 | Lines of offset in hem at bottom of shirt on left and right |

1                            Vertical line between two lines of hem on left of skirt

2    (Ex. 8.)

3          Mattel's claims that these descriptions are insufficient to satisfy Rule 26 are

4    disingenuous.   Indeed, both Dr. Lyter's and Mr. Kullman's March 17 Reports are far

5    more detailed than the reports prepared by Mattel's experts, Mr. Flynn and Mr.

6    Cunningham.   Mr. Flynn's opinions about the sequencing of the master drawings

7    and multi-colored drawings are barely more than one page long and are filled with

8    conclusory observations without *any* evidentiary support. (Hutnyan Decl., Ex. 16 at

9    7-8).   Rather than provide a detailed description of how he concludes that one

10   drawing was traced from another, Mr. Flynn merely states again and again that one

11   drawing "*appears*" to be a "tracing" of another. (*Id.*)  Take these representative

12   samples, for example:

13

14                  Bryant 00212 [master drawing] appears to be a tracing of 00234 [color
                    drawing].

15
                    Bryant 00213 [master drawing] appears to be a pencil and ink trace of
16                  00227 [color drawing].

17   (*Id.*).   Given the flimsy basis for Mr. Flynn's expert report, Mattel's claim that Dr.

18   Lyter's and Mr. Kullman's reports lack a sufficient evidentiary basis under Rule 26

19   smacks of hypocrisy.

20         Mr. Cunningham's Expert Report is slightly more detailed than Mr. Flynn's

21   report.  But, contrary to Mattel's suggestion (*see* App. at 1), Mr. Cunningham has not

22   proffered any opinion on the sequencing of the multi-color versus the "master

23   drawings" on the tracing paper.   Rather, Mr. Cunningham's Report provides only

24   that certain of the "master drawings" and the "multi-color" drawings superimpose in

25   sufficient detail that he believes they came from a common model. (*See, e.g.,*

26   Hutnyan Decl., Ex. 15: Cunningham Report at 8).   Cunningham reaffirmed again

27

28

1  and again during his deposition, however, that he could not render an opinion on the

2  sequencing of the drawings.

3    Mattel's attack on the sufficiency of Dr. Lyter's and Mr. Kullman's deposition

4  is also without merit because if the exact location of each and every pencil line on

5  which MGA's experts based their opinion was of such importance to Mattel, Mattel's

6  counsel had abundant time to ask Dr. Lyter and Mr. Kullman detailed questions

7  about the location of such pencil lines.  However, despite taking Dr. Lyter's

8  testimony and Mr. Kullman's testimony for more than seven hours a piece,[37] Mattel's

9  counsel failed to ask any detailed questions about the location of any pencil lines on

10  the drawings besides those already mentioned by Dr. Lyter and Mr. Kullman in their

11  reports.  MGA simply should not be blamed for Mattel's failure to sufficiently probe

12  the basis of MGA's expert reports through depositions.   MGA's expert were

13  prepared to answer these types of questions if they were asked, but Mattel never did.

14        3.    Neither Dr. Lyter Nor Mr. Kullman Relied on the Digital Infrared
15              Images or Enhanced Color Scans Which MGA Recently
16              Produced

17  Mattel also claims that it has been prejudiced by MGA's production of

18  additional digital infra-red images and enhanced color scans of selected portions of

19  the Bryant originals since Dr. Lyter's and Mr. Kullman's depositions.  As MGA has

20  repeatedly explained to Mattel, however, these images were created *after* the

21  depositions, and therefore were not relied upon by Dr. Lyter or Mr. Kullman in

22  reaching the conclusions presented in their reports.[38]    Rather, these images are

23  merely meant to be the basis for demonstrative exhibits that MGA may present at

24  trial to demonstrate Dr. Lyter's and/or Mr. Kullman's opinions to the jury.

25  ———————————
26  [37] Indeed, Mattel's deposition of Mr. Kullman lasted so long and went so late, that the lights at Quinn Emanuel's offices went out automatically, causing Mattel to have to take several minutes of the deposition in the near dark.  (Sloan Decl., ¶ 2.)
27  [38] *See* Ex. 19: May 12, 2008 letter from M. Sloan to D. Hutnyan, at 3-4.
28

1      Contrary to the suggestions in Mattel's moving papers, moreover, these images

2   do not constitute radically new information. (*See* Ex. 17: Bates-numbers AL 00087-

3   00296.)   They are just enhanced photographic type images of the same 10-20 key

4   Carter Bryant original drawings that are at the center of this case and have been

5   extensively photographed by Mattel and MGA.   Thus, the fact that Mattel did not

6   have a chance to depose MGA's experts on these images is of no moment because

7   Mattel could have asked MGA's experts the same questions about the original Bryant

8   drawings, which MGA meticulously brought to Dr. Lyter and Mr. Kullman's

9   depositions, but Mattel failed to do so.

10                4.      The Discovery Master Has Already Considered and Rejected
                         Mattel's Claims That Its Experts Should Be Allowed to Perform a
11                       Further Expert Examination of the Bryant Documents

12      Mattel's application to strike Dr. Lyter's and Mr. Kullman's reports suffers

13   from another fatal flaw.  It is based largely on the same grounds that Mattel already

14   raised in its *ex parte* application to compel MGA and Bryant to give its experts

15   further access to the Bryant drawings, which the Discovery Master soundly rejected.

16   (*See* Ex. 2: May 13 Infante Order).  Like Mattel's earlier *ex parte* application, Mattel

17   repeats its grievance here that its experts were purportedly denied sufficient time to

18   conduct a thorough examination.   (*See, e.g.*, App. at 21) (complaining that one 35-

19   day period was insufficient to conduct expert examination).

20      Judge Infante found, however, that "Mattel was not diligent in three respects"

21   in its management of its experts. (Ex. 2 at 4). First, Mattel failed to ask the Court

22   for more time for its experts to conduct their testing in the fall of 2007 even though

23   the Discovery Master's order specifically allowed Mattel to ask for more time for

24   good cause.   Second, Mattel failed to seek additional time to conduct testing in

25   March 2008, after receiving Dr. Lyter's and Mr. Kullman's reports on March 17.

26   Third, Mattel failed to diligently request an extension of time before the March 31

27   expert discovery cut-off.   (*Id.* at 4-5).

28

1    The Discovery Master noted, moreover, that both Mr. Cunningham and Mr.

2  Flynn indicated that they thought the examinations they performed at the time were

3  sufficient. (Ex. 1 at 5).   In addition, Judge Infante has suggested that Mattel may

4  have been negligent in electing to use their 35-day examination period to send the

5  Bryant documents to four different experts around the country.  (*Id.*)

6    Mattel's thinly disguised effort to circumvent the ramification of Judge

7  Infante's ruling by moving to strike MGA's experts should not be countenanced.

8  Mattel's motion to strike must therefore be denied.

9    **B.**    Mattel's Application to Strike Dr. Lyter's May 6, 2008 Report

10         Regarding His Examination of Ms. Prince's Notary Book Should Be
           Denied

11    Mattel seeks to strike Dr. Lyter's May 6, 2008 Report regarding his

12  examination of Ms. Prince's notary book and his rebuttal to Dr. Aginsky's report on 3

13  separate grounds.  As set forth below, Mattel's arguments are baseless and should be

14  rejected.[39]

15

16

17

18

---

19  [39] Mattel's suggestion that MGA has unfairly limited Mattel's second deposition of
     Dr. Lyter to four hours is similarly without merit. (App. at 13, 17).  As MGA's

20  counsel explained to Mattel by letter, dated May 12, 2008, Mattel is not entitled to a
     full 7-hour deposition of Dr. Lyter because Mattel already deposed Dr. Lyter for over

21  7 hours on April 17, 2008. (Ex. 19.) *But for* Mattel's obstructionist tactics in filing a
     last minute *ex parte* application blocking Dr. Lyter from testing the notary book,

22  however, Dr. Lyter would have examined the notary book in early March 2008 and
     would have included his analysis regarding his examination of the notary book,

23  including his GC/MS testing, in his March 17 Report. (*Id.*).  If that were the case,
     then Mattel would have been limited to taking Dr. Lyter's testimony about the

24  sequencing *and* the notary book in a single 7-hour session. *See* Fed. R. Civ. Pro.
     30(d)(1)(limiting depositions to a 7-hour day).   Here, Mattel will have a total of 11

25  hours to depose Dr. Lyter on all topics, rather than the 7 hours it would have
     received if Dr. Lyter had been able to file a joint report, so Mattel is actually getting

26  more than 50 percent more time than it otherwise would have had. (MGA originally
     offered to give Mattel 3 *additional* hours to depose Dr. Lyter (*id.* at 1), but during the

27  telephonic meet and confer on May 13, 2008, MGA volunteered to give Mattel a
     total of 4 hours to depose Dr. Lyter on the May 6 report. (Sloan Decl., ¶ 3).

28

---

1    1.    MGA Produced Dr. Lyter's Chromatograms to Mattel on a
2          Timely Basis[40]

3        Mattel asserts, first, that the Court should strike Dr. Lyter's report regarding
4   his examination of the notary book because MGA failed to produce the
5   chromatograms or mass spectra generated by Dr. Lyter's GC/MS testing of the ink
6   plugs extracted from the notary book together with Dr. Lyter's actual report on May
7   6. (App. at 12, 17.)   MGA agrees that such data, upon which Dr. Lyter relied in
8   concluding that there was no menthol in the extracted ink samples, has to be
9   produced to Mattel prior to Dr. Lyter's examination.   What Mattel neglected to
10  inform the Court, however, is that Mattel did not ask for MGA to produce these
11  chromatograms until the evening of Sunday, May 11, 2008, when it sent a letter to
12  MGA's counsel requesting for the first time that MGA make Dr. Lyter available for a
13  deposition and provide Mattel with the chromatograms (Ex: 18: May 11, 2008 Letter
14  from D. Hutnyan to M. Sloan).   MGA's counsel responded by letter the following
15  day, May 12, 2008,  and informed Mattel that due to Dr. Lyter's schedule, he would
16  be unable to generate the chromotographs until later that week,[41] but that MGA
17  would produce the full set of chromatograms to Mattel by Thursday, May 15. (Ex.
18  19: May 12, 2008 Letter from M. Sloan to D. Hutnyan.)   True to MGA's word, MGA
19  had the 23 pages of chromotogarphs hand delivered to Mattel's counsel on the
20  afternoon of May 15 (Sloan Decl. ¶ 4 & Ex. 20), just hours after Mattel filed this *ex
21  parte* application, which was only 9 days after the report was served on Mattel, and a
22  full 6 days before Dr. Lyter's deposition, which is scheduled to take place in Los
23  Angeles on Wednesday, May 21, 2008.  Thus, Mattel cannot claim to have been

24
25  [40] Mattel's application incorrectly refers to chromatograms as "chromotograms." (App. at 12, 17.)
26  [41] Dr. Lyter was slowed down in delivering the chromatograms in part because he
27  was out of the country, in the middle east, from May 3 to May 10, 2008, and then had further business travel during the week of May 12, 2008.  (Sloan Decl. ¶ 5.)
28

2:04-cv-09049-DOC-RNB   Document 3695   Filed 05/17/08   Page 26 of 29   Page ID
#:66680

1  prejudiced in any way by MGA's failure to produce the chromatograms (and
2  accompanying mass spectra) contemporaneously with Dr. Lyter's report.[42]
3       Mattel's claim that MGA violated its duties under Rule 26 by failing to
4  produce Dr. Lyter's chromotographs until 9 days after his May 6 Report is also
5  disingenuous.   In fact, as Mattel well knows, Mattel did not produce the first 30
6  pages of the chromotographs prepared by Mattel's ink chemist, Dr. Valerie Aginsky,
7  until March 4, 2008, *almost three weeks after Mattel served Dr. Aginsky's report on*
8  *MGA.[43]*   (Ex. 21: March 4, 2008 Letter from D. Hutnyan to T. Nolan).   Thus, by
9  Mattel's *own* strict liability interpretation of the federal rules, Dr. Aginsky's report
10 should be stricken -- something to which MGA would happily consent if that is
11 really how Mattel believes the rules should be interpreted and applied.

12
13      2.  Dr. Lyter Was Justified in Waiting Until He Prepared His May 6
            Report to Express His Opinions About Ms. Prince's Handwriting
14          Habits; Mattel Suffered No Prejudice From This Approach

15      Mattel also asserts that part or all of Dr. Lyter's May 6 Report should be
16 stricken because he failed to include his opinions about the handwriting habits of Ms.
17 Prince in his initial March 17 Report.   (App. at 16).[44]   Mattel claims, without

18 [42] It should be kept in mind that the fact that Mattel is having to take these last
   minute depositions of Dr. Lyter is totally of Mattel's own making.  If Mattel had not
19 engaged in the obstructionist tactic of trying to block or slow down Dr. Lyter's
   testing of the notary book in early March, the parties would not be engaged in this
20 last minute discovery.

21 [43] The case law cited by Mattel in its cursory attempt to support its improvident
   position is easily distinguishable. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259
22 F.3d 1101 (9th Cir. 2001), involved a Rule 37(c)(1) sanction for serving an expert
   report 2 years after the close of discovery, and *Minebea Co., Ltd. v. Pabst*, 231 F.R.D.
23 3 (D.D.C. 2005) involved supplemental reports, which are not at issue here.  The law
   requires precisely what MGA has done here—namely, provide a detailed and
24 complete report along with the data relied upon.  Working notes, recordings and
   similar background materials prepared in connection with the running of tests and
25 exams relating to the expert report need not be produced as part of the Rule 26(a)
   report, but rather upon a document request. *See, e.g., Gillespie v. Sears, Roebuck &*
26 *Co.*, 386 F.3d 21, 35 (1st Cir. 2004) (Rule 26 report requirement).  In fact, this is
   precisely what Mattel has practiced as well.

27 [44] In his May 6 Report, Dr. Lyter opined, among other things, that notation reading
   "From 1998 Missouri" did not appear to be an unnatural "insertion" into the notary
28                                                                          *(cont'd)*

1   explanation, that this is somehow evidence that MGA was trying to "sandbag" Mattel

2   or that it was "lying in wait" because Dr. Lyter purportedly could have expressed

3   these opinions in his March 17 report.   Mattel's complaints are completely

4   disingenuous, however.

5       As Mattel's counsel well knows, the reason that Dr. Lyter did not perform a

6   more fulsome examination of the Prince notary book prior to his March 17 report –

7   on include his conclusions in that report  -- was because Mattel filed an *ex parte*

8   application on March 10, 2008, just days after Dr. Lyter received the notary book,

9   moving for a Court Order prohibiting Dr. Lyter from even "handling" Ms. Prince's

10  notary book without permission of the Court or a stipulation of the parties.  Given

11  this strong command in Mattel's *ex parte* application, plus the fact that the

12  application effectively prohibited Dr. Lyter from being able to test the key

13  conclusions in Dr. Aginsky's report based on his GC/MS testing, it was perfectly

14  reasonable from Dr. Lyter to delay performing a comprehensive examination of the

15  notary book and rendering an opinion on the Ms. Prince's writing "habits" until he

16  could respond to Dr. Aginsky's report in full.   Indeed, in response to Mattel's *ex*

17  *parte* application, MGA was forced to file its own *ex parte* application with this

18  Court asking for an extension of the March 17, 2008 expert rebuttal deadline for Dr.

19  Lyter to file his rebuttal to Dr. Aginsky's report. (Docket No. 2645).   In granting

20  MGA's *ex parte*, this Court expressly stated that Dr. Lyter should have two weeks

21  after Judge Infante's ruling on Mattel's *ex parte* application to file MGA's "Rebuttal

22  Report Concerning Ms. Prince's Notary Book" and to respond to Dr. Aginsky's

23  report.   (Docket No. 2737 at 1-2.)   Because Dr. Lyter's observations about the

24  spacing of the "From 1998 Missouri" notation and the habits of the author were

25  primarily directed to rebutting Dr. Aginsky's report rather than Mr. Flynn or Mr.

26  _____

*(cont'd from previous page)*

27  book and did not appear to be inconsistent with the "habits" of the author.  (D.
Hutnyan Decl., Ex. 48 at 590).

28

1  Cunningham's report (which were primarily concerned with examining Brant's
2  original drawings), Dr. Lyter's decision to wait until his May 6 report to issue these
3  opinions was totally appropriate and reasonable.

4       In any event, Mattel can not claim *any* prejudice as a result of Dr. Lyter's
5  decision to only put these opinions into his second report because Mattel's counsel
6  will have the opportunity to depose Dr. Lyter about this very issue for four hours on
7  May 21, 2008.  Given the fact that Mattel's counsel used up her entire seven hours
8  (and then some) questioning Dr. Lyter just about the sequencing issues in his March
9  17 Report, Mattel would be hard pressed to argue that they have been disadvantaged
10  because they did not have to also cram in questions about the notary book during Dr.
11  Lyter's April 17 deposition.  To the contrary, if anything Mattel has been *advantaged*
12  because they now have an additional four hours to ask Dr. Lyter questions about Ms.
13  Prince's writing habits and his GC/MS examination, which they would not have had
14  if Dr. Lyter had been able to include these conclusions in his initial report.

15          3.    Mattel's Claims That Dr. Lyter Violated Judge Infante's Order
16               and That It Has Been Prejudiced By MGA's Objection to Mattel
17               Taking Further Samples from the Notary Book are Baseless

     Mattel's final arguments -- that Dr. Lyter violated Judge Infante's April 22,
18
19  2008 Order by taking a "twentieth" set of samples from the notary book and that
20  Mattel was somehow harmed by MGA's objection to allowing Mattel to extract
21  further samples from the notary book (*see* App. at 11-12, 18) – are also patently
22  wrong.  Dr. Lyter took exactly 17 sets of microplug samples from "the written
23  portions of the entries in the notary book" and exactly two sets of microplug samples
24  from the areas of the notary book "which do not contain writing."  (*See* Ex. 1 at 2, ¶
25  4).  There simply is no "twentieth" set of samples, as Mattel maintains.

26       Mattel's contention that it was harmed by MGA's refusal to let Dr. Aginsky
27  take further microplugs from the same area of the notary book from which Dr. Lyter
28  took 8 microplugs from the "pre-printed" line strains credulity.  (App. at 12, 18).

1  Mattel's claim that Dr. Lyter's results from his GC/MS analysis of these 8 microplugs
2  formed the "main basis for Dr. Lyter's opinion" in his May 6 Report (*id.* at 18) is
3  patently wrong, as Mattel surely knows.  The main opinions expressed in Dr. Lyter's
4  May 6 report are his opinions that: (1) he found no menthol in the ink sample
5  extracted from the line reading "From 1998 Missouri"; (2) if there were any menthol
6  present in that sample, it was such a trace amount that he believes it most likely came
7  from an external contaminant; and (3) he believes that the handwriting in the August
8  26, 1999 entry was all entered contemporaneously.  (Ex. 15: Lyter May 6 Report at
9  3-5.)  None of these conclusions rest, even in the most remote way, on Dr. Lyter's
10 testing of the 8 microplugs at issue.  Indeed, as Mattel itself states, Dr. Lyter's report
11 does not even mention these plugs, much less his "testing results" concerning them.
12 (App. at 12).  Accordingly, there is no reason why Mattel needs to perform further
13 tests on this part of the notary book.

14 **IV.    CONCLUSION**

15     For these reasons set forth above, Mattel's *ex parte* Application should be
16 denied in its entirety.

17

18 DATED:  May 17, 2008

19                                              SKADDEN, ARPS, SLATE, MEAGHER &
                                                FLOM, LLP

20                                              By:  Thomas J Nolan (by Apl)
21                                                   Thomas J. Nolan
                                                     Attorneys for MGA Entertainment, Inc.,
22                                                   MGA Entertainment (HK) Ltd., MGAE de
                                                     Mexico, S.R.L. de C.V., and Isaac Larian
23

24

25

26

27

28