EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an
individual,

        Plaintiff,

        v.

MATTEL, INC., a Delaware
corporation,

        Defendant.

CASE NO.
CV 04-9040 SGL(RNBx)
Consolidated with
Case No. CV 04-09059
Case No. CV 05-02727

**CERTIFIED**
**COPY**

_____
AND CONSOLIDATED ACTIONS.

Video Deposition of ALBERT LYTER, Ph.D.

(Taken by Defendant)

Raleigh, North Carolina

April 17, 2008

Reported by:
Marisa Munoz-Vourakis
RMR, CRR and Notary Public

JOB No. 86338

EXHIBIT __1__
PAGE __3__

ALBERT LYTER, PH.D.                                    04/17/08

```
 1    APPEARANCE OF COUNSEL:

 2    For the Plaintiff:

 3              MATTHEW E. SLOAN, ESQ.

 4              Skadden, Arps, Slate, Meagher & Flom LLP

 5              300 South Grand Avenue

 6              Los Angeles, CA 90071

 7              213-687-5276

 8              matthew.sloan@skadden.com

 9

10    For the Defendant:

11              DIANE CAFFERATA HUTNYAN, ESQ.

12              Quinn Emanuel Urquhart Oliver & Hedges, LLP

13              865 S. Figueroa Street, 10th Floor

14              Los Angeles, CA 90017

15              213-443-3666

16              dianehutnyan@quinnemanuel.com

17

18    Also Present:  ROBERT MERRITT, Videographer

19

20

21

22

23

24                                  EXHIBIT ___1___

25                                  PAGE ___4___
```

                                                          2

```
 1    for your examination that's not reflected here in your
 2    report?
 3        A.    No, not that I know of.
 4        Q.    On the second page of your report it says
 5    you performed a physical examination on many of the
 6    listed documents using various methods.
 7              So what documents were subject to visual
 8    examination?
 9        A.    Well, as I said, I looked at most of the
10    documents that were in all seven boxes, at least a
11    cursory review.  And the documents that I make
12    reference to in the report specifically by Bates
13    numbers or description, those would have had a more
14    extensive examination, not only a visual examination
15    but also magnification and microscope and infrared and
16    as that were appropriate.
17        Q.    So did you do any of those other more
18    advanced examinations on any documents other than the
19    documents that you referenced in your report?
20        A.    I don't think so.  I think every one that
21    was, that had a Bates number is the one that -- the
22    ones that I examined.
23        Q.    Had a Bates number in your report, you
24    mean?
25        A.    In my report, that's right, yeah.
```

EXHIBIT 1
PAGE 5

90

1      Q.      What did you do with the notary book?

2      A.      Stuck it away.  I mean, I looked at it and

3   then I stuck it away.

4      Q.      So when did you look at it?

5      A.      I looked at it when I first got it to

6   confirm that it was the correct document, and I believe

7   that there were some photographs of it in one of the

8   reports that I looked at, and I looked at that.

9      Q.      The photographs or?

10      A.      Looked at the photographs to make sure that

11   what they were talking about was the same one that I

12   had.  I noticed that there had been ink samples taken.

13      Q.      So was that on March 7 when it arrived?

14      A.      It may not have been that day.  I can't

15   remember specifically what day it was, but it was

16   certainly after that point in time.

17      Q.      Was it shortly after it arrived?

18      A.      Yes.

19      Q.      Were you satisfied that the notary log that

20   you saw, that you had received from Ms. Prince's

21   attorney, was the same one whose photographs you saw in

22   the Aginsky report?

23    - A.      Yes.

24      Q.      The photographs that you saw were attached

25   to the Aginsky report?

EXHIBIT __1__

PAGE __ᴜ__

91

```
 1        A.      I don't recall where they were from, but
 2   yes, it was the same book wherever the photographs were
 3   attached.
 4        Q.      The items that you had seen up until that
 5   point included expert reports?
 6        A.      Right.
 7        Q.      Deposition transcripts?
 8        A.      No deposition transcripts.
 9        Q.      Not yet, okay, so expert reports?
10        A.      Um-hum.
11        Q.      You recognized you would try to look and
12   see if this was the notary book that was in the
13   photographs that you had seen by that point?
14        A.      Right, that's true.
15        Q.      So before that point you had seen expert
16   reports only or other types of documents?
17        A.      I don't know whether I received any images
18   from counsel or not.  I don't remember.
19                So the photographs that I had seen might
20   have been either attached to a report or they were
21   received from counsel.
22        Q.      You remember seeing red boundaries on the
23   pages of the photographs of the notary book?
24        A.      Well, I do remember seeing those, but I
25   don't remember this particular initial review was with
```

EXHIBIT 1
PAGE 7

1      A.      I don't believe so.

2      Q.      Do you believe that any qualified expert

3   who examined the multicolored drawings, that had the

4   appropriate equipment, could see the pencil lines that

5   you've testified about?

6              MS. HUTNYAN:   Objection, calls for

7          speculation, assumes facts not in evidence.

8      A.      I would assume so.

9      Q.      So a properly qualified expert with the

10  right equipment should have been able to see the same

11  lines, the same pencil lines that you saw in the

12  multicolored drawings?

13             MS. HUTNYAN:   Incomplete hypothetical.

14         Assuming he has access to the drawings?

15             BY MR. SLOAN:

16     Q.      Assuming that that person has access to the

17  drawings and had, let's say, three complete days to

18  perform the analysis?

19     A.      If any competent examiner examined these

20  multicolored drawings with the use of magnification

21  and/or microscope, they will be able to detect the

22  pencil lines.

23      ⁻ Q.    Were you confused about whether MGA had

24  already retained you, or did you just fail to remember

25  that they had retained you?      EXHIBIT __1____

                                    PAGE __8____

                                                          302

1       A.      Yes, I failed to remember.

2       Q.      And if you had remembered that they had

3   retained you when one of Ms. Hutnyan's colleagues

4   called you to retain you from Mattel, would you have

5   accepted that assignment?

6       A.      No.

7               MR. SLOAN:   No further questions.

8               FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

9               BY MS. HUTNYAN:

10      Q.      Mr. Sloan asked you if Mr. Cunningham had

11  identified every single pencil line that he saw when he

12  examined documents.  Do you remember that?

13      A.      I believe he was referring to what he

14  characterizes in his report as faint pencil marks.

15      Q.      But he didn't rely on those pencil lines

16  for any portion of his analysis, did he?

17      A.      Apparently not, no.

18      Q.      And -- but you are relying on the pencil

19  lines as an important basis for the conclusions that

20  you drew, aren't you?

21      A.      Yes.

22      Q.      When you talk about any qualified expert in

23  the areas of forensic document examination, would you

24  agree with me that Mr. Cunningham is a qualified expert

25  in that field?

EXHIBIT __1__

PAGE ___9___

303

```
 1                    MR. SLOAN:  Objection, lacks
 2              foundation, improper question.  It calls for
 3              a legal conclusion.
 4         Q.    You don't know -- you worked with
 5    Mr. Cunningham before, haven't you?
 6         A.    Yes.  He is a qualified forensic document
 7    examiner.
 8         Q.    Have you worked with Mr. Flynn before,
 9    Mr. William Flynn?
10         A.    Yes.
11                    MR. SLOAN:  Same objections.
12         Q.    Would you consider him a qualified question
13    document examiner?
14         A.    Yes.
15                    MS. HUTNYAN:  Okay, no further
16              questions for me.
17                    MR. SLOAN:  None.
18                    THE VIDEOGRAPHER:  This concludes
19              today's deposition of Dr. Lyter.  The number
20              of media used was eight.  We are off the
21              record at 7:28 p.m.
22                    (Whereupon the deposition was
23         ~    concluded at 7:28 p.m.)
24                    (Signature reserved.)
25
```

EXHIBIT __1__

PAGE __10__

304

1

2

3    STATE OF NORTH CAROLINA )

4    COUNTY OF WAKE         )

5                    CERTIFICATE OF REPORTER

6        I, MARISA MUNOZ-VOURAKIS, an RMR, CRR and Notary

7    Public in the State of North Carolina, the reporter by

8    whom the foregoing deposition was taken, do hereby certify

9    that the testimony of the witness appearing in the

10   foregoing deposition was taken by me in Stenotype and

11   thereafter reduced to typewriting under my direction,

12   pages 1 through    . that I am neither counsel for,

13   related to, or employed by any of the parties to the

14   action in which this deposition was taken; and further,

15   that I am not a relative or employee by the parties

16   hereto, nor financially or otherwise interested in the

17   outcome of the action.

18              IN WITNESS WHEREOF, I have hereto set

19   my hand, dated this      day of          ,

20

21   _____

22      MARISA MUNOZ-VOURAKIS, RMR, CRR, Notary Public

23

24

25   My Commission expires November 23, 2008.

EXHIBIT __1__
PAGE __11__

EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION


CARTER BRYANT, an
individual,

        Plaintiff,

vs.

MATTEL, INC., a Delaware
corporation,

        Defendant.

_____

AND CONSOLIDATED ACTIONS

_____

No. CV 04-9049
   SGL (RNBx)


**CERTIFIED COPY**


DEPOSITION OF ROBERT KULLMAN

Los Angeles, California

Tuesday, April 8, 2008


Reported by:
Stephanie Leslie
CSR No. 12893

Job No. 85751


EXHIBIT __2__
PAGE __12__

ROBERT KULLMAN                                    04/08/08

1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
2                        EASTERN DIVISION

3

4

5       CARTER BRYANT, an
        individual,
6
                        Plaintiff,
7
        vs.                              No. CV 04-9049
8                                           SGL (RNBx)

        MATTEL, INC., a Delaware
9       corporation,

10                      Defendant.

11      _____
        AND CONSOLIDATED ACTIONS
12      _____

13

14

15

16              Deposition of ROBERT KULLMAN, taken on behalf

17      of Defendant, at Quinn Emanuel, 865 South Figueroa

18      Street, Tenth Floor, Los Angeles, California, beginning

19      at 9:48 a.m. and ending at 8:14 p.m. on Tuesday,

20      April 8, 2008, before Stephanie Leslie, Certified

21      Shorthand Reporter No. 12893.

22

23

24

25

                                                              2

EXHIBIT   2
PAGE      13

ROBERT KULLMAN                    04/08/08

1   APPEARANCES:

2

3   For Defendant, MATTEL, INC.:

4           QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
            BY:  DIANE CAFFERATA HUTNYAN
5           ATTORNEY AT LAW
            865 South Figueroa Street, Tenth Floor
6           Los Angeles, California  90017
            (213) 443-3666
7           Dianehutnyan@quinnemanuel.com

8

    For Defendant and Cross-Complainant, MGA ENTERTAINMENT:

9

            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
10          BY:  MATTHEW E. SLOAN
            ATTORNEY AT LAW
11          300 South Grand Avenue
            Los Angeles, California  90071
12          (213) 687-5276
            Matthew.sloan@skadden.com

13

14

    ALSO PRESENT:

15

            GREGORY PAPIGNY, Videographer

16

17

18

19

20

21

22

23

24

25

                                                    3

EXHIBIT   2
PAGE      14

ROBERT KULLMAN                    04/08/08

10:33  1        Helped go through this volume of ESDAs that we

       2  had, searching for impressions, trying to source

       3  impressions, helping with the sequencing of items.  I

       4  would say that's the majority of what he did with me.

10:33  5        Q    So you talked to him about your examinations

       6  before you prepared your report?

10:34  7        A    Absolutely.  We shared some of the

       8  examinations.  We went through some examinations.  I

       9  demonstrated information -- or some of what I observed

      10  to him, absolutely.

10:34 11        Q    And what examinations did he actually help you

      12  with?

10:34 13        A    A lot of the examinations dealing with

      14  sourcing of ESDAs, a lot of the examinations dealing

      15  with faint lines that were observable on the

      16  mixed-media drawings.  He assisted me with putting

      17  together a possible future court exhibit to use if we

      18  need it.  So that's roughly it.

10:34 19        I mean, first off, it's a large file.  One of

      20  the things he assisted with, that he's very good at, is

      21  arranging items and laying out what type of thing that

      22  you may find in certain examinations.

10:35 23        Q    So -- so he helped you organize them so --

      24  such that you -- he would select certain portions of

      25  the documents that were available for you to look at

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __2__

PAGE __15__

**ROBERT KULLMAN**                                        04/08/08

1    for a particular examination?

10:35 2        A    No.  He may point out something to me that I

3    could examine.  He may -- we may discuss back and forth

4    what some of the observations are we saw.  This was a

5    large case.  It could be overwhelming for one

6    individual to look at, I would think.  But the more

7    people you have, the more you're able to go through

8    things and sort things out, organize things, the easier

9    it is.  So he and I worked, basically, in a tandem on

10   this matter as well as having Jason Harner -- Harner do

11   some work on it for us.

10:35 12       Q    What did he do?

10:35 13       A    Mostly ESDA examinations, reading through

14   depositions -- I mean, sorry -- yeah, depositions,

15   reading reports, helping, again, organize, keep things

16   in an orderly fashion so they were easier to locate

17   when we needed certain documents, things like that.

10:36 18       Q    And then you had support staff helping as

19   well?

10:36 20       A    Yes.  We had a secretary that did some, but

21   not a great deal.  Then we had an intern.  She was a

22   young lady that worked as an intern for us.  We called

23   her, had her come back and do some work on this as far

24   as organizing items, putting them in an orderly fashion

25   for us to sort through and do our exams.

40

EXHIBIT __2__
PAGE __16__

ROBERT KULLMAN                    04/08/08

| | | |
|---|---|---|
| 10:36 | 1 | Q When did you receive the Bryant originals? |
| 10:36 | 2 | A I don't remember for certain. It may be on my |
| | 3 | report. I don't see it on my report, so I'm not |
| | 4 | certain when I received them. It would be in -- we |
| | 5 | would have the shipping label at the laboratory that |
| | 6 | said when we received them. I don't recall for |
| | 7 | certain, but obviously, a few weeks before this |
| | 8 | March 17th report, I would think. |
| 10:37 | 9 | Q So how long total were they at Speckin |
| | 10 | Forensic Labs? |
| 10:37 | 11 | A I'm not certain, but I would estimate some |
| | 12 | place between three and four weeks, I would think. It |
| | 13 | could have been a little less, could have been more, |
| | 14 | but in that neighborhood, is my recollection. |
| 10:37 | 15 | Q How many -- |
| 10:37 | 16 | A I believe I started doing work on this in |
| | 17 | January of '08, on the documents. So they must have |
| | 18 | come to us sometime in January, I would think, possibly |
| | 19 | February. It seemed like it was January, the latter |
| | 20 | part of January. |
| 10:38 | 21 | Q Are you familiar with the SWGDOC, Scientific |
| | 22 | Working Group for Document Examination? |
| 10:38 | 23 | A Absolutely. |
| 10:38 | 24 | Q Have you served on the SWGDOC committee? |
| 10:38 | 25 | A No. |

41

EXHIBIT __2__
PAGE ___17___

**ROBERT KULLMAN**                                    04/08/08

| | |
|---|---|
| 10:43 1 | Q   So which findings did he come up with that you |
| 2 | hadn't noticed? |
| 10:43 3 | A   The -- |
| 10:43 4 | MR. SLOAN:  Objection to the form of the |
| 5 | question.  I think it misstates his testimony. |
| 10:43 6 | BY MS. HUTNYAN: |
| 10:43 7 | Q   I thought you said he sometimes presented you |
| 8 | with findings, and then you would discuss them? |
| 10:43 9 | A   Absolutely. |
| 10:43 10 | Q   And so in those -- what cases were those? |
| 11 | What were the findings that he found and shared with |
| 12 | you? |
| 10:43 13 | A   Okay.  The first finding would have dealt with |
| 14 | an examination of the mixed-media drawing.  When I |
| 15 | examined it under the -- and this dealt with a finding |
| 16 | that Mr. Flynn had in his report, dealing with 199 |
| 17 | being able to be superimposed in an exact overlay of, I |
| 18 | believe it was, 220. |
| 10:43 19 | So when I did the evaluation of that with a |
| 20 | VSC and Mr. Flynn said, "When you spread it out, |
| 21 | stretch it," you could.  I did that examination, made |
| 22 | some prints, showed them to Eric, and said, "They don't |
| 23 | overlay absolutely in all areas," as Mr. Flynn had |
| 24 | stated. |
| 10:44 25 | He then went in to examine it and look at it |

46

EXHIBIT ___2___
PAGE ___18___

| | |
|---|---|
| 1 | and said, "Not only that, Bob, but I think I've found |
| 2 | something else significant." And that was a faint line |
| 3 | that's inside of the outer line on 220. I believe that |
| 4 | one is in the area of the knees, but I'm not sure. In |
| 5 | that that actually perfectly overlays with the black |
| 6 | outline of the 199 stencil. |
| 10:44 7 | So he showed me that. I observed it. I said, |
| 8 | "I wonder if there's on other ones." We then got the |
| 9 | other ones. He and I looked at them together, at the |
| 10 | other ones under the VSC2000. So that would have been |
| 11 | a finding that he discovered. I didn't discover that. |
| 12 | He discovered that particular finding, and then he and |
| 13 | I worked on that together to see if the finding that we |
| 14 | believed we were observing was significant or not. |
| 10:45 15 | Q So the finding of the pencil line, these were |
| 16 | documents that you had already examined yourself? |
| 10:45 17 | A Yes. I had looked at the item. I had looked |
| 18 | at the back of 199. I had looked at 199. I had looked |
| 19 | at the front of 199. I had looked at the front of 220. |
| 20 | I had also done some VSC examinations of 220. |
| 10:45 21 | It's sort of like looking for trees and not |
| 22 | seeing them because of the woods. In other words, they |
| 23 | were there. I just did not observe them. When he |
| 24 | pointed them out, then it was obvious that they were |
| 25 | there. |

47

EXHIBIT ___2___
PAGE ___19___

**ROBERT KULLMAN**                                    04/08/08

| | | |
|---|---|---|
| 10:45 | 1 | Q    Uh-huh. |
| 10:45 | 2 | A    So yes, I did not see that when I initially |
| | 3 | looked at it. |
| 10:45 | 4 | Q    And you didn't find it particularly |
| | 5 | significant until he showed them to you? |
| 10:45 | 6 | A    I didn't see them prior to him showing them to |
| | 7 | me. |
| 10:45 | 8 | Q    Oh, you didn't see them at all? |
| 10:45 | 9 | A    I didn't see them at all because that was not |
| | 10 | the focus of what I was looking at.  Possibly, had I |
| | 11 | examined them in a little greater detail, I'm sure I |
| | 12 | would have seen them because they're obvious once you |
| | 13 | see them.  But at that particular time, my focus of the |
| | 14 | examination dealt with why there is nothing embedded on |
| | 15 | the back of 199, and does 199 perfectly overlay with |
| | 16 | 220. |
| 10:46 | 17 | So -- yeah, my focus of my examination was |
| | 18 | different.  When he examined it -- as I said, he's a |
| | 19 | very sharp gentleman -- he saw that. |
| 10:46 | 20 | Q    So the perfect overlay -- it's your view that |
| | 21 | Mr. Flynn thought that there was a perfect overlay |
| | 22 | between 199 and 220? |
| 10:46 | 23 | A    I believe when he states in his report -- I |
| | 24 | may be misspoken, but my view of what he said in his |
| | 25 | report was that they overlay each other exactly. |

48

EXHIBIT __2__
PAGE __20__

**ROBERT KULLMAN**                    04/08/08

                1   That's what I thought he said.  If I'm mistaken, it's

                2   because I don't have a copy of the report.  But that

                3   was my understanding when I was looking at it that he

                4   was saying that they were a perfect overlay.

    10:46   5       Q     So if he said that the drawings superimposed

                6   one another, is that a perfect overlay?

    10:47   7       A     To me, that's what he would be stating.  If he

                8   said they superimposed, then that would mean one

                9   overlays the other one exactly, yes.

    10:47  10       Q     Perfectly?

    10:47  11       A     Correct.

    10:47  12       Q     And you took this to mean that it was a

               13   perfect overlay with just the ink lines?

    10:47  14             MR. SLOAN:  Objection, vague as to "ink

               15   lines."  On which document?

    10:47  16             THE WITNESS:  What I understood that to mean

               17   is that he believed that 199, when you laid it on top

               18   of 220 -- that the ink lines on 199 followed the ink

               19   lines -- or the darker outer lines of -- because I

               20   believe he said the outer or silhouette, I don't

               21   remember --

    10:47  22   BY MS. HUTNYAN:

    10:47  23       Q     On the poster board?

    10:47  24       A     On the poster board, yes.

    10:47  25       Q     So you thought somehow he had excluded these

                                                                    49

EXHIBIT __2__

PAGE __21__

1        on the computer.  I don't know for certain.  I would

2        say probably anywhere from 50 to 100 hours, maybe more,

3        but that would only be a range.

11:11  4        Q        That's for the whole case?

11:11  5        A        I would think so, yes.

11:11  6        Q        How much time have you spent since preparing

7        your rebuttal report?

11:11  8        A        I don't know.  It would be on the computer,

9        and I just don't know what it would be.

11:11 10        Q        One day?

11:11 11        A        I don't know.  I just don't know, because I

12        don't know if there -- I'm sure there's additional

13        items that I looked at, but I don't know for certain.

14        I have traveled out here.  I just don't know how much

15        time, no.

11:11 16        Q        Okay.  So putting aside the travel here for

17        your deposition and your prep time, did you do any

18        other work between your rebuttal report and, I guess,

19        when you got on the plane?

11:11 20        A        No, just the fact that reading the report,

21        realizing there was some -- a couple of typographical

22        items that needed to be changed and one other facet of

23        it, no, I don't believe I did any more.  I don't

24        believe so, no.  I didn't conduct any more

25        examinations.  I may have evaluated some things from

71

EXHIBIT __2__

PAGE __22__

1    examinations I had already done and relooked at them,

2    but I don't believe there's any other examinations I

3    did.

11:12 4       Q    Okay.  How much time did you spend preparing

5    for your deposition?

11:12 6       A    I spent all of last Friday preparing for it,

7    part of yesterday.  That's pretty much it.

11:12 8       Q    Is there other significant work that you did

9    to prepare for your deposition besides those two

10   occasions?

11:12 11      A    I don't believe so, no.

11:12 12      Q    Okay.  Earlier you testified that Mr. Speckin

13   helped you with preparing a potential demonstrive --

14   demonstrative exhibit.  Do you recall that?

11:12 15      A    Yes.

11:12 16      Q    Did that demonstrative exhibit have

17   highlighting on it?

11:13 18      A    I don't remember.  The one that he assisted

19   most with dealt with the computer.  I don't -- and I

20   don't know if it has highlights on it or not.  I just

21   don't remember.

11:13 22      Q    Did it deal with the CPS code opinion that

23   Mr. Flynn had?

11:13 24      A    No.

11:13 25      Q    What was the demonstrative exhibit supposed to

EXHIBIT __2__
PAGE __23__

ROBERT KULLMAN                    04/08/08

| | |
|---|---|
| 1 | address or illustrate? |
| 11:13  2 | A    Illustrating the overlaying of the faint lines |
| 3 | with the black outline on the -- the faint lines on the |
| 4 | mixed-media drawings with the black outline as opposed |
| 5 | to the pencil outline on the tracing paper. |
| 11:13  6 | Q    Was it supposed to be an enhancement to your |
| 7 | report? |
| 11:13  8 | A    I thought we were going to at one point, but I |
| 9 | realized we were not going to have time to complete |
| 10 | what we needed to do, so it did not become an |
| 11 | attachment. |
| 11:14 12 | Q    But it was the one that was referenced in your |
| 13 | original report? |
| 11:14 14 | A    Yes, it would have been.  And it was taken out |
| 15 | because, like I said, I don't believe it was complete |
| 16 | at that time.  If it was complete, I don't believe it |
| 17 | was something satisfactory that I would attach to the |
| 18 | report. |
| 11:14 19 | Q    Which particular Bryant original documents did |
| 20 | it deal with? |
| 11:14 21 | A    It dealt with the items that are listed on |
| 22 | page 4 of my report, the upper portion, so the |
| 23 | mixed-media drawings 222, 220, 231, 230, 226, 224, 227, |
| 24 | with relationship to tracing paper 194, 199, 201, 204, |
| 25 | 206, and 213.  I believe that's what they were. |

73

EXHIBIT __2__
PAGE __24__

**ROBERT KULLMAN**                              04/08/08

| | |
|---|---|
| 11:14 1 | Q And so they would have pointed out the areas |
| 2 | of evidential value that's in the third column at the |
| 3 | top of page 4? |
| 11:15 4 | A Yes. |
| 11:15 5 | Q Was that the general purpose? |
| 11:15 6 | A Yes. |
| 11:15 7 | Q So if you turn to page 3, it talks about the |
| 8 | areas of interest. |
| 11:15 9 | A Where on page 3? |
| 11:15 10 | Q Kind of in the middle, about six, seven -- six |
| 11 | lines up from the big paragraph in the middle, from the |
| 12 | bottom of it, and the attachment areas of interest are |
| 13 | highlighted with green for the areas of tracing paper, |
| 14 | and in yellow for the areas of mixed-media drawings. |
| 11:15 15 | A I'm sorry. I'm just not seeing it. |
| 11:15 16 | Q See -- okay. See the big -- right here |
| 17 | (indicating). |
| 11:15 18 | A Yes. |
| 11:15 19 | Q Okay. See that part? |
| 11:16 20 | A It starts -- oh, yes. In the attachments? |
| 11:16 21 | Q Uh-huh, yes. |
| 11:16 22 | A Okay. Yes, yes. |
| 11:16 23 | Q So the areas of interest, do those correspond |
| 24 | to the areas of evidential value on the next page of |
| 25 | the report? |

74

EXHIBIT __2__
PAGE __25__

| | |
|---|---|
| 1 | Flynn would expect it to be slow, if he knew where it |
| 2 | came from, if he knew what was being traced when 199 |
| 3 | was written, the black ink line anyway. |
| 11:28 4 | Q    And you're talking about the black ink line on |
| 5 | the tracing paper? |
| 11:28 6 | A    Yes, on 199. |
| 11:28 7 | Q    So you agree with Mr. Flynn that the |
| 8 | tracing-paper drawing 199 was traced? |
| 11:28 9 | A    I agree with him that the black ink line on |
| 10 | 199 was, apparently, slowly trying to outline |
| 11 | something, which, to me, appeared to be outlining the |
| 12 | pencil that was on 199.  But certainly, it was slowly |
| 13 | drawn.  I agree with that, yes. |
| 11:29 14 | Q    And is that true with all of the tracing-paper |
| 15 | drawings that he concluded had been traced? |
| 11:29 16 | A    It was true with the majority of the |
| 17 | tracing-paper documents.  It could have been true with |
| 18 | all of the tracing-paper documents that had black ink |
| 19 | on them, that had pencil and then were followed by |
| 20 | black ink.  Some of the tracing-paper drawings may not |
| 21 | have had pencil on them.  They may have been paper |
| 22 | drawings from something else and then drawn on that, |
| 23 | again traced. |
| 11:29 24 | What I can tell you is that the finding is |
| 25 | that none of these tracing papers, in my opinion, were |

84

EXHIBIT __2__
PAGE __26__

**ROBERT KULLMAN**                                    04/08/08

```
        1   created tracing any of the mixed medias except one.
11:29   2       Q    Which one was that?
11:30   3       A    On page 3 of my report, the second paragraph,
        4   it says, "I only found evidence of color offset on the
        5   back of the tracing paper on one document.  This
        6   document is Bryant 232, and likely came as offset from
        7   trace" -- or "from 225."
11:30   8            So it would have been tracing paper 232, in my
        9   opinion was probably -- or higher than probably, traced
       10   from lying on top of 232 and then tracing.
11:30  11       Q    Show me in your report where you pointed out
       12   your conclusion that the -- the ink on the
       13   tracing-paper drawings was a tracing from the pencil on
       14   those same drawings.
11:30  15       A    It probably doesn't say that in there.
11:30  16       Q    Why not?
11:30  17       A    I don't know why I would.  In other words, to
       18   me, it was -- when you look at the document, there is
       19   pencil on there.  It's slowly executed.  It follows
       20   along the lines of some of these pencils.  And the
       21   other findings dealing with the mixed media, I knew it
       22   didn't come from tracing from -- at least in my
       23   opinion, tracing from the mixed media.
11:31  24            So it would make sense that it was traced from
       25   tracing the pencils, so it wasn't something that I put
```

85

EXHIBIT __2__

PAGE __27__

|       |   |                                                        |
|-------|---|--------------------------------------------------------|
|       | 1 | in my report, no.                                      |
| 11:31 | 2 | Q    When you say that it made sense that it was        |
|       | 3 | traced from the pencil, did you see where the ink line |
|       | 4 | perfectly superimposed over the pencil on the same     |
|       | 5 | drawing?                                               |
| 11:31 | 6 | A    Sure.                                              |
| 11:31 | 7 | Q    And did you see areas where it didn't?             |
| 11:31 | 8 | A    Absolutely.                                        |
| 11:31 | 9 | Q    But you didn't draw a conclusion -- or did you     |
|       | 10 | draw a conclusion on whether the ink had been traced in |
|       | 11 | every case from the pencil on that same drawing?       |
| 11:32 | 12 | A    No.  Some of them didn't have pencil that I        |
|       | 13 | could observe.  But no, I didn't.                      |
| 11:32 | 14 | Q    What evidence did you see to -- if any, to         |
|       | 15 | suggest that the pencil lines were on the tracing-paper |
|       | 16 | drawings before the ink was put there?                 |
| 11:32 | 17 | A    I didn't see evidence of that.  I saw reason       |
|       | 18 | and logic, I guess.  The pencil mark was very rapidly   |
|       | 19 | written, fluidly written at times, overwritten a few   |
|       | 20 | times, a rough sketch.  The other is slowly drawn on   |
|       | 21 | there.                                                 |
| 11:32 | 22 | But to determine if the ink came before the            |
|       | 23 | pencil, I don't believe I could do that in this        |
|       | 24 | particular case.  I attempted to, but I couldn't.      |
| 11:32 | 25 | Q    You attempted to with all the drawings -- all      |

86

EXHIBIT __2__

PAGE __28__

ROBERT KULLMAN                    04/08/08

```
        1   the tracing-paper drawings?
11:33   2        A    No.   I attempted to do it with some of them,
        3   and --
11:33   4        Q    Just didn't --
11:33   5        A    -- no.   In my opinion, it can't be determined
        6   on any of the methods that I know how to determine.
11:33   7        Q    So it's possible, is it not, that the ink
        8   could have been traced onto the tracing-paper drawings
        9   and then an artist might have wanted to make some
       10   variations using pencil to see how they would work out;
       11   isn't that true?
11:33  12        A    In a world of anything being possible, it
       13   would certainly be possible that you could put black
       14   ink line on a document and then take a pencil and try
       15   to make lines on it or around.   Yes, that would be
       16   possible.
11:33  17        Q    But even in our little world in this case,
       18   that could happen, couldn't it?
11:33  19        A    I don't believe so, not from the other
       20   evidence that I found.   I don't believe that happened.
       21   But is it possible it could have happen?   I wouldn't
       22   rule out the possibility, no.
11:33  23        Q    Tell me about that evidence.
11:33  24        A    The evidence of sequencing.   Which came first?
       25   In order to logically do that, you would have had to,
```

87

EXHIBIT __2__

PAGE __29__

**ROBERT KULLMAN**                          . 04/08/08

1   at times, have more than one piece of paper.  For

2   instance, a tracing paper such as -- I'd have to find

3   one that I could correlate it with.

11:34  4          Okay.  194 would have had to be -- had

5   directly below it 198 and had directly below that 220

6   for you to trace 194 -- I'm sorry, I said 222, excuse

7   me, 223 -- in order to trace 194 from 223.  Because

8   there are impressions in 178 and 186 both of the

9   drawing in 194.

11:35 10          So in order to create 194 by tracing 222, you .

11   would have to have a stack of things on top of 222 to

12   create 194.  That's the other evidence that I'm talking

13   about, the sequencing portion of it.

11:35 14   Q      But isn't it true that the indentations could

15   have been made by some common source drawing?

11:35 16          MR. SLOAN:  Objection, vague as to

17   "indentations" and which document you're talking about.

11:35 18   BY MS. HUTNYAN:

11:35 19   Q      The indentations you talked about two seconds

20   ago.

11:35 21   A      The ones I talked about two seconds ago, no.

22   The -- as the impressions overlay one to one, so

23   they're one to one to each other.  So when you lay the

24   original over the top of the other impression, they're

25   going to align.

88

EXHIBIT __2__

PAGE __30__

| | | |
|---|---|---|
| 3:08 | 1 | THE VIDEOGRAPHER: We are back on the record |
| | 2 | at 3:08 p.m., and this marks the beginning of Media |
| | 3 | Number 3 of the deposition of Robert Kullman. |
| 3:08 | 4 | BY MS. HUTNYAN: |
| 3:08 | 5 | Q    Okay.  So we were talking about -- about your |
| | 6 | report. |
| 3:08 | 7 | MS. HUTNYAN:  If you could read back just my |
| | 8 | last question so I can remember where I was. |
| 3:08 | 9 | (Record read as follows: |
| 3:08 | 10 | "Q    So you don't recall any |
| | 11 | peculiarities of the Bates numbers on the |
| | 12 | notebooks?") |
| 3:09 | 13 | MS. HUTNYAN:  Ah, okay.  Great. thanks. |
| 3:09 | 14 | BY MS. HUTNYAN: |
| 3:09 | 15 | Q    So on page 2 of Exhibit 5201 -- got that one? |
| 3:09 | 16 | A    Uh-huh. |
| 3:09 | 17 | Q    You have a discussion about your ESDA |
| | 18 | examinations.  Do you see that? |
| 3:09 | 19 | A    Yes. |
| 3:09 | 20 | Q    And you have -- the column on the right says, |
| | 21 | "Source of impressions by Bryant number."  Do you see |
| | 22 | that? |
| 3:09 | 23 | A    Yes. |
| 3:09 | 24 | Q    And those are the likely sources of those |
| | 25 | impressions? |

188

EXHIBIT __2__

PAGE __31__

ROBERT KULLMAN                                    04/08/08

3:09   1        A      That's what it says above it, "likely

       2    sources."

3:09   3        Q      So there could be other sources as well?

3:09   4        A      Could be.  I believe there was sufficient

       5    information for me to say it's the likely source.  But

       6    certainly, some of the impressions were sort of

       7    miniscule impressions, so likely source, yes.

3:09   8        Q      Are you aware of the opinions expressed by

       9    forensic document examiners?

3:10  10        A      Which ones?

3:10  11        Q      The ones that are set forth by the American

      12    Society of Testing Materials.

3:10  13        A      I'm sorry.  I thought you meant opinions of --

      14    ask me that again.

3:10  15        Q      Do you -- are you familiar with the opinions

      16    expressed by forensic document examiners?

3:10  17              MR. SLOAN:  Objection, vague and ambiguous.

3:10  18              THE WITNESS:  Are you talking about the ASTM

      19    standards?

3:10  20    BY MS. HUTNYAN:

3:10  21        Q      Yes.

3:10  22        A      Yes, to some degree.

3:10  23        Q      Do you know what their purpose is?

3:10  24        A      Sure, to -- at least my understanding of the

      25    purpose is to basically put order and understanding

                                                              189

EXHIBIT __2__
PAGE ___32___

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | into the examination of documents, both the methodology      |
| 2     | that someone uses to examine documents and the opinions      |
| 3     | that are offered in document examinations so that a --       |
| 4     | a document examiner examines -- reviews another report,      |
| 5     | they have a pretty good idea of what the opinion is and      |
| 6     | degrees of opinions.  When the Court sees them, when         |
| 7     | the trier of fact sees them, there's some order and          |
| 8     | understanding of what the weight would be on that            |
| 9     | opinion.                                                     |

3:11 10      Q    Okay.  And there -- are there nine levels of

11   weight that you're familiar with?

3:11 12      A    There are a lot -- recommended nine degrees of

13   opinions that are offered, yes.  Some examiners don't

14   use nine, but that's recommended by the standard, yes.

3:11 15      Q    And what do you use?

3:11 16      A    Nine.

3:11 17      Q    Nine.  And you use the nine that the ASTM

18   suggests?

3:11 19      A    Yes.  There may be some where you have some

20   variation within it; but generally, those nine, yes.

3:11 21      Q    What are the nine?

3:11 22      A    First off, I'll do them by number, Number 1

23   down.  Number 1 would say things were the same,

24   positive conclusion.  If it's handwriting, it's the

25   questioned and the known written by the same person,

190

EXHIBIT __2__
PAGE __33__

```
  1   or -- it's a positive identification.  Number 2 would
  2   be a highly probable opinion.  Number 3 would be
  3   probably opinion.  So something is probably written by
  4   the same person or probably -- A is from B, that sort
  5   of thing.
  6         Number 4 says, "indications," opinion that
  7   they were from the same.  Number 5 says, "no
  8   conclusion."  Number 6 says, "indications not."  Number
  9   7 says, "probably not."  Number 8, "highly probable
 10   not."  Number 9, "not," or "no identification," or "not
 11   identified," something like that.
 12       Q    Positive elimination?
 13       A    Positive elimination, yes.  Number 1's a
 14   positive identification, and Number 2's [sic] a
 15   positive elimination, yes.  And there's various degrees
 16   in between, Number 5 being, for some reason, no
 17   conclusion offered.
 18       Q    So did you employ these standardized opinions
 19   in preparing your April 26 report in this case?
 20       A    Pretty much.  Pretty much so.  Like I said,
 21   there's some variation.  When I say "likely source," to
 22   me that would be indication that that's the source, not
 23   much higher than indication, but still a likely source.
 24   So yes, I believe I did.  Sometimes I use the word
 25   "likely."  Sometimes I use "indications."  It depends.
```

3:12 on line 6
3:12 on line 12
3:12 on line 13
3:13 on line 18
3:13 on line 20

EXHIBIT __2__
PAGE __34__

**ROBERT KULLMAN**                                   **04/08/08**

```
        1    But I generally follow the guidelines of the ASTM
        2    standards.
 3:13   3         Q    So indications mean there are some indications
        4    that it could be X, but there are also potentially
        5    indications that there could be not X?
 3:13   6         A    Yes.   Indications basically says there is
        7    substantial -- or there are some significant findings,
        8    similarities in handwriting.  And there can be some
        9    differences.  There can be some limitations to the
       10    examination, and there can be limitations of even the
       11    known or the questioned.  So yeah, that's -- there can
       12    certainly be differences.  That's why it's about the
       13    weakest opinion as far as strength of opinion that's
       14    offered, is "indications" or "likely by."
 3:14 15          Q    And the same thing would be true of the
       16    indications not?
 3:14 17          A    Yes, yes.
 3:14 18          Q    So -- and "likely" you view as fairly close to
       19    "indications"?
 3:14 20          A    I'm sorry.  What was that?
 3:14 21          Q    The word "likely" that you employ sometimes,
       22    is that -- I mean, is that indications, or is that
       23    something different?
 3:14 24          A    No.
 3:14 25               MR. SLOAN:  Objection, vague as to where he
```

192

EXHIBIT __2__
PAGE __35__

ROBERT KULLMAN                          04/08/08

```
         1    specifically -- you're talking about the word "likely."
3:14     2    BY MS. HUTNYAN:
3:14     3        Q    Wherever you used it.  I mean, these are
         4    important words in your report; right?  If you say
         5    something's likely, that's a conclusion that you've
         6    drawn?
3:15     7        A    Right.  That's a conclusion that I've drawn
         8    based on the observations, the examinations I've done,
         9    certainly.  I'm saying likely source of these.  That
        10    would be that I see some significant similarities that
        11    would tell me there's enough here to say, "That's the
        12    likely source."
3:15    13              Is it absolutely the source?  No.  I wouldn't
        14    know that.  If it was absolutely the source, there
        15    would be sufficient similarities, especially with
        16    ESDAs, to where they overlaid and I could determine
        17    that A was created when B was written.  Then I would
        18    say, yeah, A is created from B.  So yes.  "Likely"
        19    would be in the area of indications on the ASTM
        20    standard.
3:15    21        Q    So if you look at page 3 of your report -- oh,
        22    I'm so sorry.  If you look at the bottom of page 2
        23    where you said, "The ESDA tests indicate that Bryant
        24    5025, Bryant 02692, and Bryant 00179 through 182 were
        25    created within close proximity of one another and
```

193

EXHIBIT __2__
PAGE __36__

**ROBERT KULLMAN**                                    04/08/08

| | | |
|---|---|---|
| 4:11 | 1 | Q   So if it doesn't appear in that chart, you |
| | 2 | didn't draw a conclusion as to the sequencing? |
| 4:11 | 3 | A   I'm sure I likely did here.  Let me see if the |
| | 4 | chart on page 4 -- if there's any in the chart on |
| 4:11 | 5 | page 4 that's not on here, yes.  For instance -- |
| 4:11 | 6 | Q   The chart on page 4?  No.  We're talking about |
| | 7 | the chart on page 5. |
| 4:11 | 8 | A   Right.  You asked me if I could, in fact, draw |
| | 9 | any other associations.  I said, no, I could draw other |
| | 10 | associations. |
| 4:11 | 11 | Q   I don't think I -- |
| 4:11 | 12 | A   Some of them are drawn on page 4.  For |
| | 13 | instance, on page 4, I've drawn an association between |
| | 14 | 199 to 220, based on the faint lines and the overlays |
| | 15 | of the faint lines with the dark line on 199, faint |
| | 16 | lines on 222 -- 220 -- I'm sorry, 220.  220 is not |
| | 17 | addressed in the chart on page 5. |
| 4:12 | 18 | And also that I can see when I leaf through |
| | 19 | it, 231 is not addressed on this particular chart.  So |
| | 20 | the two charts have different methods of association. |
| | 21 | The one on page 5 can associate ESDAs and the faint |
| | 22 | lines on the mixed-media with the dark lines on the |
| | 23 | tracing papers.  The one -- the chart on page 5 can |
| | 24 | address other issues too, including ESDAs. |
| 4:13 | 25 | Q   So where's 212? |

237

EXHIBIT __2__
PAGE __37__

ROBERT KULLMAN                                04/08/08

| | | |
|---|---|---|
| 4:13 | 1 | MR. SLOAN: Objection, vague as to where is |
| | 2 | 212? On which page of the document? |
| 4:13 | 3 | THE WITNESS: I don't see 212 addressed in |
| | 4 | either chart, on either page 4 or page 5. |
| 4:13 | 5 | BY MS. HUTNYAN: |
| 4:13 | 6 | Q    Was it addressed in your report at all? |
| 4:13 | 7 | A    I don't remember. I would have to go through |
| | 8 | it and see. 212 is what you're asking about; right? |
| 4:13 | 9 | Q    Yeah, 212 and 234. |
| 4:13 | 10 | MR. SLOAN: I object just that the document |
| | 11 | speaks for itself. They're either addressed or they're |
| | 12 | not addressed. |
| 4:14 | 13 | THE WITNESS: I don't see where I made an |
| | 14 | association between -- 212 and 234? |
| 4:14 | 15 | BY MS. HUTNYAN: |
| 4:14 | 16 | Q    Uh-huh. |
| 4:14 | 17 | A    That was your question? I don't see where |
| | 18 | there is an association made, no. |
| 4:14 | 19 | Q    So -- so the chart on page 4 says, "The |
| | 20 | forensic evidence therefore indicates that the |
| | 21 | mixed-media drawings were traced from the tracing paper |
| | 22 | sketches or drawings." And that was -- what you |
| | 23 | indicated before was fairly weak level of certainty as |
| | 24 | to that conclusion? |
| 4:14 | 25 | A    Sure. |

238

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT _2_
PAGE __38__

ROBERT KULLMAN                    04/08/08

| 4:14 | 1 | Q    You were using the ASTM use of "indicates" |
| | 2 | there? |
| 4:14 | 3 | A    Yes. |
| 4:14 | 4 | Q    Now, a sentence above it, it says, "This also |
| | 5 | makes logical sense.  A person tracing a sketch would |
| | 6 | not trace lines that he had erased or colored over." |
| 4:15 | 7 | A    Which line are you -- |
| 4:15 | 8 | Q    The previous sentence. |
| 4:15 | 9 | A    On page 3? |
| 4:15 | 10 | Q    Right here (indicating). |
| 4:15 | 11 | A    Yes.  It does to me.  If you're going to trace |
| | 12 | something, I would believe you would trace the thing |
| | 13 | you can see, the dark line as the one that you had |
| | 14 | eradicated or erased in some way, yes. |
| 4:15 | 15 | Q    But you don't know whether the coloring had |
| | 16 | happened by this point or not? |
| 4:15 | 17 | A    I do not know if the coloring had happened, |
| | 18 | no. |
| 4:15 | 19 | Q    So if the coloring weren't there, you could |
| | 20 | trace it; right? |
| 4:15 | 21 | MR. SLOAN:  Objection, vague as to time and |
| | 22 | specific documents you're talking about. |
| 4:15 | 23 | BY MS. HUTNYAN: |
| 4:15 | 24 | Q    Anytime the coloring is not there, the |
| | 25 | underlying image on the document could be traced; |

239

EXHIBIT __2__
PAGE __39__

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | right?                                                    |
| 4:16  | 2  | MR. SLOAN:  Objection, vague as to, again,                |
|       | 3  | time.  It's not clear what you're saying.                 |
| 4:16  | 4  | THE WITNESS:  I would think that if you're                |
|       | 5  | tracing something, and whatever you're tracing -- if      |
|       | 6  | you can see it and that's what you're trying to trace,    |
|       | 7  | you trace it, whether it was faint or dark.  But          |
|       | 8  | maybe -- if it's dark, I would believe, visually,         |
|       | 9  | that's what you're attempting to trace.                   |
| 4:16  | 10 | I believe that's why the black ink was put on             |
|       | 11 | the tracing paper to start with, so you can see it.       |
|       | 12 | Because some of the fainter lines, when I put a piece     |
|       | 13 | of tracing paper over it, you couldn't see it well        |
|       | 14 | enough to be able to follow it.  And I believe the        |
|       | 15 | purpose of the black lines on the tracing paper was to    |
|       | 16 | make it visible.                                          |
| 4:16  | 17 | BY MS. HUTNYAN:                                           |
| 4:16  | 18 | Q    But what if the person used a light box?             |
| 4:16  | 19 | A    I looked at them with a light box.  Some are         |
|       | 20 | faint.  It's -- it's definitely more visible the darker   |
|       | 21 | it is.  The fainter lines are not very visible with a     |
|       | 22 | light box, without a light box.  They're not nearly as    |
|       | 23 | visible as the dark lines.  That's what I'm saying.       |
| 4:17  | 24 | Q    Is it logical that somebody might trace              |
|       | 25 | something that they had put on the paper in pencil and    |

240

EXHIBIT __2__
PAGE __40__

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | It depends on what you're meaning by a "mechanical     |
|       | 2  | pencil." My understanding of a mechanical pencil would |
|       | 3  | be a -- excuse me, more of a liquid pencil. I don't    |
|       | 4  | believe so. But is it possible? Sure.                  |
| 4:38  | 5  | Q    What's a liquid pencil?                           |
| 4:38  | 6  | A    I believe that's -- that's what you're talking    |
|       | 7  | about is a mechanical pencil. I'm not sure. A liquid   |
|       | 8  | pencil, to me, would be one where the graphite is      |
|       | 9  | softer and flows, as opposed to a harder graphite. I   |
|       | 10 | thought that's what you were referring to. What do you |
|       | 11 | mean by a mechanical pencil? I guess I'd have to know  |
|       | 12 | that.                                                  |
| 4:38  | 13 | Q    The kind where you put the ink -- the graphite    |
|       | 14 | in, as opposed to the kind where -- you know, like,    |
|       | 15 | Ticonderoga No. 2 -- or that I grew up with anyway,    |
|       | 16 | like, wood.                                            |
| 4:38  | 17 | A    Right. No. I don't believe that you could         |
|       | 18 | press hard enough to make furrows in paper with a      |
|       | 19 | mechanical pencil that you're talking about, because my|
|       | 20 | experience is when you press too hard, they break.     |
| 4:39  | 21 | Q    Yeah.                                             |
| 4:39  | 22 | A    So I don't believe you could, no.                 |
| 4:39  | 23 | Q    I'm pretty rough too.                             |
| 4:39  | 24 | But what about the Ticonderoga No. 2? Could            |
|       | 25 | you do it then?                                        |

252

EXHIBIT __2__

PAGE ___41___

ROBERT KULLMAN                                    04/08/08

```
4:39   1        A     If you press hard enough, you probably could.
       2   When I examined the documents, I didn't see any of the
       3   pencil writing on them, any of the pencil strokes on
       4   them that left deep furrows.
4:39   5        Q     Because you saw the -- you're saying you saw
       6   the faint pencil lines, but the ones that had the
       7   furrows, you couldn't be sure what they were; is that
       8   right?
4:39   9        A     I've got to clear this up again for about the
      10   12th time.  I don't know if there were pencil lines on
      11   here or not.  I said faint lines.  I would have said
      12   faint lines --
4:39  13        Q     Oh.  You don't even know if they're pencil?
4:39  14        A     No.  I do not know if they're pencil.  I'm
      15   saying they're faint.
4:39  16        Q     I'm so sorry.
4:39  17        A     No problem.  I just want to clear that up.  If
      18   there are pencil lines on that mixed-media, I don't
      19   know.  I can tell you they're faint lines.  There
      20   appears to be pencil colorings, but I don't know for
      21   certain.
4:40  22        Q     "Pencil colorings" meaning colored pencils
      23   perhaps?
4:40  24        A     I believe so, yes.  They may not be, but
      25   that's what they appear to be.  I believe
```

253

EXHIBIT __2__
PAGE __42__

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Mr. Cunningham's the one that talked about pencil lines      |
|       | 2  | in his report possibly.                                      |
| 4:40  | 3  | Q   So the pencil that you're talking about on              |
|       | 4  | page 4 is only referring to tracing paper drawings?         |
|       | 5  | It's the big paragraph there.                                |
| 4:40  | 6  | A   Yes.  In the center part of that paragraph,             |
|       | 7  | about halfway down, it says, "the tracing paper."  It       |
|       | 8  | is more logical that the pencil was on the paper first      |
|       | 9  | and the ink was added, correct.                             |
| 4:41  | 10 | Q   But that's all with regard to the tracing              |
|       | 11 | paper drawings as opposed to what we think of as the        |
|       | 12 | poster board multimedia drawings?                            |
| 4:41  | 13 | A   That's correct.                                          |
| 4:41  | 14 | Q   Okay.  Did you receive any other                       |
|       | 15 | information -- putting aside the documents themselves       |
|       | 16 | and whatever the documents told you, did you receive        |
|       | 17 | any other information about this case about which of        |
|       | 18 | the elements of the poster board drawings was put on        |
|       | 19 | first, second, or third?                                     |
| 4:41  | 20 | MR. SLOAN:  Objection, vague as to source of            |
|       | 21 | information you're talking about.                            |
| 4:41  | 22 | THE WITNESS:  Not any definitive information           |
|       | 23 | that I know of.  It may have been addressed in              |
| 4:41  | 24 | Mr. Bryant's deposition, but I wouldn't call it a           |
|       | 25 | definitive.  But I'm not certain even if it was.  So        |

254

EXHIBIT __2__
PAGE __43__

1    make any determination that the ink lines on the

2    tracing paper drawings matched up better with the

3    pencil lines on the tracing paper drawings or with the

4    poster board drawings that matched up with them?

6:11  5        A    No.  I would say that there are deviations

6    from the poster board mixed-media drawings, that the

7    lines -- the darker lines on that at certain areas, as

8    I point out in my report, deviate.  And the faint lines

9    agree with what's on the dark ink line.

6:11 10        Whether they agree more between the poster

11    board and the pencil, no.  I would say there's

12    significant agreement all the way through on them.  But

13    there's also more pencil lines that were not traced

14    with black ink on the tracing paper.

6:11 15        Q    And so wouldn't that lend support to the

16    conclusion that the traced black lines on the tracing

17    paper drawings were potentially traced from some

18    version of the poster board drawings, meaning before or

19    after the color was added?

6:12 20        A    Not to me, no.  No.

6:12 21        Q    Well, if there's a major deviation between the

22    pencil and the pen lines on the tracing paper outline

23    drawings, then you don't think that when the ink

24    matches up with the poster board drawings, that they

25    might have been traced from the poster board drawings?

EXHIBIT __2__

PAGE __44__

6:12  1      A    There's multiple pencil markings on many of

      2   these tracing papers.

6:12  3      Q    I'm talking about the ones where they're

      4   divergent.  Why would you conclude that the ink --

6:12  5      A    Because there --

6:12  6      Q    -- was traced from the pencil if it's

      7   divergent?

6:12  8      A    They're not divergent in all areas.

6:12  9         MR. SLOAN:  Diane, let him answer the

    10   question, please.

6:12 11        THE WITNESS:  They're not divergent in all

    12   areas.  What I'm saying is there was multiple pencils

    13   traced on some of these.  Some of them, the black ink

    14   line goes over them.  Other places, there's extra

    15   lines.  So there's multiple lines.  And there may be

    16   three lines in a location.  One of them has the black

    17   ink that goes over it.  The other two don't.

6:13 18        But to answer your question about wouldn't it

    19   be more reasonable -- was that it?

6:13 20   BY MS. HUTNYAN:

6:13 21      Q    No.  How can you exclude the idea that the ink

    22   lines were, in fact, traced from the poster board

    23   drawings?  How can you exclude that as a possibility?

6:13 24      A    I didn't exclude it as a possibility.

6:13 25      Q    So it's possible?

324

EXHIBIT __2__
PAGE __45__

**ROBERT KULLMAN**                    04/08/08

6:13  1     **A**    I said before it's possible.  Do I believe it
      2   occurred that way?  Absolutely not.  Is there any
      3   physical evidence -- for instance, on 199 -- that tells
      4   me that it was used to trace -- that it was created by
      5   tracing 220?  No.  There's no substantial evidence to
      6   tell me -- or I wouldn't think other document examiners
      7   that -- because, again, it's not under the line.  The
      8   embedded part on the back side is not where the tracing
      9   line is.

6:13 10           I only saw one speck, fleck, minor skip.  I
     11   don't know how many Mr. Flynn saw.  But from reading
     12   his report, it would indicate to me that he saw a
     13   sufficient enough amount of offset directly under the
     14   line of the black ink writing on 199 to have him draw
     15   this conclusion.  What I'm saying is that evidence is
     16   not there.

6:14 17     **Q**    But we already just discussed for two or three
     18   minutes the fact that there could be lots of reasons
     19   why the colorant didn't transfer and, in fact, the
     20   tracing was done at Mr. -- as Mr. Flynn said it was.

6:14 21     **A**    Hey.  I'm not saying that it could not
     22   possibly have been done that way.  What I'm saying, in
     23   my opinion, the evidence is not there to substantiate
     24   that, that the evidence actually is there with the
     25   faint lines to tell me that, no, the opposite was

                                                            325

EXHIBIT __2__
PAGE __46__

ROBERT KULLMAN                                    04/08/08

Page 408

1                          PENALTY OF PERJURY

2

3

4              I, ROBERT KULLMAN, do hereby declare under

5       penalty of perjury that I have read the foregoing

6       transcript; that I have made any corrections as appear

7       noted, in ink, initialed by me, or attached hereto;

8       that my testimony as contained herein, as corrected, is

9       true and correct.

10             EXECUTED this _6_ᵀʰ_ day of _May_ , 20_08_ ,

11      at _Okemos_ , _Michigan_ .
                (City)              (State)

12

13

14

15
                                    ROBERT KULLMAN

16

17

18

19

20

21

22

23

24

25

EXHIBIT __2__
PAGE ___47___

EXHIBIT 3

| | Month/Day/Time of Notarization | Kind or Type of Notarization | Document Date (Month/Day/Year) | Document Kind or Type | Name and Address of Signer |
|---|---|---|---|---|---|
| 11 | 8/26/99 | Acknowledgment | 8/26/99 | Original sketches of "Carter Bryant, 3611 Jitbea – characters 1319 W. 160th St. G- tohal's Names are 204, Gardena, CA 90247 Jade, Sasha, Cloe, 2 mts. Josef Kebick | |
| 1 | 9/14/99 | Acknowledgment | 9/14/99 | Power of Attorney | |
| 2 | 9/14/99 | Acknowledgment | 9/10/99 | Letter | Victoria Polzin |
| 3 | | | | | |
| 4 | | | | | |
| 5 | No holes | | | | |
| 6 | | | | | |
| 7 | | | | | |

EXHIBIT 3
PAGE 48

| 11 | Month/Day/Year/Time of Notarization | Kind or Type of Notarization | Document Date (Month/Day/Year) | Document Kind or |
|---|---|---|---|---|
| 1 | 8/26/99 | Acknowledgment | 8/26/99 | Original sketch – dati Viva – Sh 6-total: Nancy Lupie, Halliidae, Susan, Halliidae Hirst |
| 2 | 9/14/99 | Acknowledgment | 9/14/99 | Power of Atto |
| 3 | 6/14/99 | Acknowledgment | 9/10/99 | Letter |
| 4 | | | | |
| 5 | Lupie's Christmas Sundos | | | |

EXHIBIT 3
PAGE 49