# THIS PAGE IS INTENTIONALLY LEFT BLANK

Exhibit 1

**COPY**

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  Michael T. Zeller (Bar No. 196417)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Plaintiff
Mattel, Inc.

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2004

John A. Clarke, Executive Officer/Clerk
By ⎯⎯⎯⎯⎯⎯⎯⎯ Deputy
           SUE GARB

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>CARTER BRYANT, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO.   BC314398<br><br>COMPLAINT FOR:<br><br>(1) BREACH OF CONTRACT;<br>(2) BREACH OF FIDUCIARY DUTY;<br>(3) BREACH OF DUTY OF LOYALTY;<br>(4) UNJUST ENRICHMENT; AND<br>(5) CONVERSION |

EXHIBIT ___1___
PAGE ___2___

7209/579342.1

COMPLAINT

1    Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter

2  Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as

3  "defendants") and alleges as follows:

4

5                                    Parties

6

7         1.    Mattel is a corporation organized and existing under the laws of the

8  State of Delaware and has its principal place of business in El Segundo, California.

9         2.    Mattel is informed and believes, and on that basis alleges, that defendant

10  Bryant is an individual currently residing in Springfield, Missouri.

11        3.    The true names and capacities of defendants sued herein as Does 1

12  through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such

13  fictitious names. Mattel will amend this Complaint to allege their true names and capacities

14  when the same are ascertained.

15        4.    Mattel is informed and believes, and on that basis alleges, that at all

16  times relevant herein, defendants, and each of them, were acting in concert and active

17  participation with each other in committing the wrongful acts alleged herein, and were the

18  agents of each other, and in doing the things alleged herein, each defendant was acting

19  within the course and scope of his, her or its agency and was subject to and under the

20  supervision of, and was acting with the knowledge of, his, her or its co-defendants.

21

22                            Jurisdiction and Venue

23

24        5.    During the time of the acts complained of herein, Bryant was employed

25  by Mattel in, and was a resident of, Los Angeles County. Bryant's contracts with Mattel that

26  are at issue in this action were executed, performed and breached by Bryant in Los Angeles

27  County.  In addition, defendants committed the tortious conduct alleged herein while

28  physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

07209/579342.1                                -2-                          COMPLAINT

EXHIBIT __1__
PAGE __5__

1 defendants' other wrongful acts in Los Angeles County. Accordingly, this Court has
2 personal jurisdiction over defendants.

3         6.     Venue is proper pursuant to Code of Civil Procedure §§ 393 and 395(a),
4 as the causes of action arose in Los Angeles County, the contractual obligations at issue were
5 incurred, were to be performed and were breached by Bryant in Los Angeles County, and
6 Bryant does not currently reside in California.

7

8                                  Factual Background

9

10         7.     Mattel is a long standing and successful independent manufacturer and
11 marketer of toys, dolls, games and stuffed toys and animals. Mattel was founded in 1945 by
12 Elliot and Ruth Handler and Harold "Matt" Mattson. The name of the company was created
13 by incorporating the names of two of its founders, "MATT-son" and "EL-liot." Originating
14 from the Handlers' garage in Southern California, the company greatly expanded its
15 operations following World War II and soon began to thrive as its reputation for producing
16 high-quality toys spread. During the next several decades, Mattel became world famous for
17 producing high-quality products at reasonable prices. Today, some of Mattel's most famous
18 brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19         8.     Critical to Mattel's success, and to the livelihood of its employees, is
20 Mattel's ability to design and develop new products. Mattel invests many millions of dollars
21 in product design and development annually, and it introduces hundreds of new products
22 each year. In El Segundo, California alone, Mattel maintains a 180,000 square-foot design
23 center that houses more than 850 designers, sculptors, painters and other artists, whom
24 Mattel pays to work exclusively and full-time to create the products that Mattel sells and on
25 which Mattel's business depends.

26         9.     Defendant Bryant was employed by Mattel from September 1995
27 through April 1998, and then again from January 1999 through October 2000, as a product
28 designer at Mattel's design center in El Segundo, California.

-3-

EXHIBIT __1__
PAGE __6__

COMPLAINT

1      10.     On January 4, 1999, upon starting his second term of employment by
2  Mattel, and as a condition of and in consideration for his employment, Bryant executed an
3  Employee Confidential Information and Inventions Agreement (the "Employee
4  Agreement").   Among other things, Bryant agreed that he would not, without Mattel's
5  express written consent, "engage in any employment or business other than for [Mattel], or
6  invest in or assist (in any manner) any business competitive with the business or future
7  business plans of [Mattel]." Bryant further acknowledged that he held a position of trust
8  with Mattel.   In addition, Bryant assigned to Mattel all rights, title and interest in
9  "inventions," including without limitation "designs," that he conceived or reduced to practice
10  during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement
11  with Mattel is attached as Exhibit A.

12      11.     Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest
13  Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the
14  Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor
15  of Mattel in the prior twelve months and had not engaged in any business venture or
16  transaction involving a Mattel competitor that could be construed as a conflict of interest.
17  Bryant specifically agreed that he would immediately notify his supervisor of any change
18  in his situation that would cause him to change any of the foregoing certifications. The only
19  conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time
20  subsequently) concerned freelance work that is unrelated to the conduct alleged herein. A
21  true and correct copy of the Conflict Questionnaire executed by Bryant is attached as
22  Exhibit B.

23      12.     In late November 2003, Mattel learned that Bryant had secretly aided,
24  assisted and worked for a Mattel competitor, including without limitation by entering into
25  an agreement with the competitor, during the time Bryant was employed by Mattel pursuant
26  to the above-referenced agreements and was being paid by Mattel as a product designer.
27  Bryant's agreement with the competitor obligated Bryant to provide product design services
28  to the competitor on a "top priority" basis. Bryant's agreement also provided, among other

-4-

EXHIBIT ___1___

PAGE ___7___

COMPLAINT

1  things, that Bryant would receive royalties and other consideration for sales of products on
2  which Bryant provided aid or assistance; that all work and services furnished by Bryant to
3  the competitor under the agreement purportedly would be considered "works for hire"; and
4  that all intellectual property rights to preexisting work by Bryant purportedly would be
5  assigned to the competitor. In addition, while Bryant was employed by Mattel, Bryant and
6  the other defendants converted, misappropriated and misused Mattel property and resources
7  for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8      13.    During the time that he was employed by Mattel and thereafter, Bryant
9  concealed these actions from Mattel, including without limitation by failing to notify his
10  supervisor of his conflict of interest regarding the competitor and by making affirmative
11  misrepresentations to Mattel management upon his departure from Mattel. Because of
12  Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to
13  suspect that Bryant had worked for the competitor while still employed by Mattel until late
14  November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's
15  agreement with the competitor and saw that the date of the agreement predated Bryant's
16  departure from Mattel.

17      14.    As a consequence, Bryant breached his contracts with Mattel and
18  violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have
19  unlawfully aided and abetted his violation of such duties; and each of the defendants has
20  been unjustly enriched and engaged in acts of conversion.

21

22                          FIRST CLAIM FOR RELIEF

23                              (Breach of Contract)

24

25      15.    Mattel repeats and realleges each and every allegation set forth in
26  paragraphs 1 through 14, above, as though fully set forth at length.

27      16.    Pursuant to his Mattel Employment Agreement, and for good and
28  valuable consideration, Bryant agreed that he would not, without Mattel's express written



07209/579342.1                      -5-                                    COMPLAINT

1 | consent, engage in any employment or business other than for Mattel or assist in any manner
2 | any business competitive with the business or future business plans of Mattel during his
3 | employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further
4 | assigned to Mattel all right, title and interest in "inventions," including without limitation
5 | "designs," that he conceived or reduced to practice during his employment by Mattel. In
6 | addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as
7 | disclosed, he had not worked for any competitor of Mattel and had not engaged in any
8 | business venture or transaction involving a Mattel competitor that could be construed as a
9 | conflict of interest. Bryant further promised that he would notify his superior immediately
10 | of any change in his situation that would cause him to change any of the foregoing
11 | certifications or representations.

12 |         17.     The Employment Agreement and the Conflict Questionnaire are valid,
13 | enforceable contracts, and Mattel has performed each and every term and condition of the
14 | Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

15 |         18.     Bryant materially breached the foregoing contracts with Mattel, in that,
16 | among other things, he secretly aided, assisted and worked for a Mattel competitor during
17 | his employment with Mattel, without the express written consent of Mattel.

18 |         19.     As a consequence of Bryant's breach, Mattel has suffered and will in
19 | the future continue to suffer damages in an amount to be proven at trial. Such damages
20 | include, without limitation, the amounts paid by the competitor to Bryant during his Mattel
21 | employment; the amounts paid by the competitor to Bryant as a result of the work he
22 | performed for the competitor during his Mattel employment; the amount that Mattel paid
23 | Bryant during the time he wrongfully worked for the competitor; the value of information
24 | and intellectual property owned by Mattel which Bryant provided to the competitor; the
25 | value of the benefits the competitor obtained from Bryant during the time he was employed
26 | by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of
27 | the work he performed for the competitor during his Mattel employment.

28

EXHIBIT _/_
PAGE _9_

COMPLAINT

1    20.    Furthermore, Bryant's conduct has caused, and unless enjoined will
2    continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
3    money damages and for which Mattel has no adequate remedy at law. Bryant specifically
4    acknowledged in his Employment Agreement that his breach of the Agreement "likely will
5    cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to
6    enforce this Agreement, in addition to damages and other available remedies." Accordingly,
7    Mattel is entitled to orders mandating Bryant's specific performance of his contracts with
8    Mattel and restraining Bryant from further breach.

9

10                          SECOND CLAIM FOR RELIEF

11                           (Breach of Fiduciary Duty)

12

13    21.    Mattel repeats and realleges each and every allegation set forth in
14    paragraphs 1 through 20, above, as though fully set forth at length.

15    22.    Bryant held a position of trust and confidence with Mattel. In his
16    position, Bryant had access to and was entrusted with Mattel's proprietary and confidential
17    information, supervised the work of others, exercised discretion and worked independently
18    in many of his job assignments and duties. In his position, Bryant also represented Mattel
19    in its dealings with third parties and, in his actions in the course and scope of his
20    employment with Mattel, was an agent of Mattel. Bryant confirmed his relationship of trust
21    with Mattel in the Employee Agreement. Bryant thus owed Mattel a fiduciary duty that
22    included, but was not limited to, an obligation not to take any action that would be contrary
23    to Mattel's best interests or that would deprive Mattel of any opportunities, profit or
24    advantage which Bryant might bring to Mattel.

25    23.    Bryant breached his fiduciary duty to Mattel in that, while employed
26    by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including
27    without limitation by entering into an agreement with a Mattel competitor. As alleged

28

EXHIBIT ____/____
PAGE ___/0___

COMPLAINT

1 | above, Bryant also breached the aforementioned duty by using Mattel property and resources
2 | for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3 | 24.    The other defendants, acting with full knowledge of Bryant's obligations
4 | to Mattel, aided and abetted Bryant in such conduct.

5 | 25.    As a direct and proximate result of defendants' wrongful conduct,
6 | Mattel has incurred damages in an amount to be determined at trial.

7 | 26.    Defendants acted with malice, fraud and oppression, and in conscious
8 | disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages
9 | against defendants in an amount to be determined at trial.

10 | 27.    Furthermore, defendants' conduct has caused, and unless enjoined will
11 | continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
12 | money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel
13 | is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or
14 | restraining defendants from continuing to benefit from such breach.

15 |

16 | ### THIRD CLAIM FOR RELIEF

17 | (Breach of Duty of Loyalty)

18 |

19 | 28.    Mattel repeats and realleges each and every allegation set forth in
20 | paragraphs 1 through 27, above, as though fully set forth at length.

21 | 29.    As an employee of Mattel, Bryant owed a duty of undivided loyalty to
22 | Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist
23 | a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant
24 | was required to always give preference to Mattel's business over his own, similar interests
25 | during the course of his employment with Mattel.

26 | 30.    Bryant breached his duty of loyalty to Mattel in that, while employed
27 | by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including
28 | without limitation by entering into an agreement with a Mattel competitor. As alleged

1  above, Bryant also breached the aforementioned duty by using Mattel property and resources
2  for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3          31.     The other defendants, acting with full knowledge of Bryant's obligations
4  to Mattel, aided and abetted Bryant in such wrongful conduct.

5          32.     As a direct and proximate result of defendants' wrongful conduct,
6  Mattel has incurred damages in an amount to be determined at trial.

7          33.     Defendants acted with malice, fraud and oppression, and in conscious
8  disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages
9  against defendants in an amount to be determined at trial.

10          34.     Furthermore, defendants' conduct has caused, and unless enjoined will
11  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
12  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel
13  is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or
14  restraining defendants from continuing to benefit from such breach.

15
16                          FOURTH CLAIM FOR RELIEF
17                              (Unjust Enrichment)
18
19          35.     Mattel repeats and realleges each and every allegation set forth in
20  paragraphs 1 through 34, above, as though fully set forth at length.

21          36.     Defendants, by the aforementioned conduct, unfairly used and diverted
22  Mattel property, resources and opportunities for the benefit of, and to aid and assist,
23  themselves, all without authorization by or payment to Mattel for the same. Defendants have
24  been unjustly enriched as a result.

25          37.     Mattel is entitled to an award of all such amounts by which defendants
26  have been unjustly enriched in an amount to be determined at trial.

27
28

EXHIBIT ___/____
PAGE __/2_____

                                                          COMPLAINT

1          38.    Defendants acted with malice, fraud and oppression, and in conscious

2  disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

3  against defendants in an amount to be determined at trial.

4          39.    Furthermore, defendants' conduct has caused, and unless enjoined will

5  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

6  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

7  is entitled to an order restraining defendants from any further unjust enrichment.

8

9                          FIFTH CLAIM FOR RELIEF

10                            (Conversion)

11

12         40.    Mattel repeats and realleges each and every allegation set forth in

13  paragraphs 1 through 39, above, as though fully set forth at length.

14         41.    Mattel was entitled to, inter alia, Bryant's exclusive services and the

15  exclusive ownership of his inventions as a Mattel product designer. However, Bryant

16  provided such services, and purported to grant rights to such inventions, to a competitor

17  during the time of his exclusive Mattel employment. All such services and the inventions

18  and work product resulting from such services, including without limitation ideas, concepts,

19  rights, designs, proprietary information, and other intellectual property and intangible

20  property created by Bryant during the term of the aforesaid agreements, were the property

21  of Mattel. Such services and property were provided by Bryant to others, including

22  defendants, and used by them.

23         42.    Defendants wrongfully converted Mattel property and resources by

24  asserting ownership thereto and by appropriating and using Mattel's property and resources

25  for their own benefit and gain and for the benefit and gain of others, without the permission

26  of Mattel.

27

28

EXHIBIT ___1___
PAGE ___13___

-10-

COMPLAINT

1    43.    As a direct and proximate result of defendants' wrongful conversion of

2  Mattel's property and resources, Mattel has incurred damages. Mattel is entitled to recover

3  compensatory damages against defendants in an amount to be determined at trial.

4    44.    Defendants acted with malice, fraud and oppression, and in conscious

5  disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

6  against defendants in an amount to be determined at trial.

7    45.    Furthermore, defendants' conduct has caused, and unless enjoined will

8  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

9  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

10  is entitled to an order restraining defendants from further conversion of Mattel property and

11  resources and/or restraining defendants from continuing to benefit from such conversion.

12

13                    PRAYER FOR RELIEF

14

15    WHEREFORE, Mattel hereby respectfully requests that this Court:

16    A.    Award Mattel its damages;

17    B.    Order defendants to disgorge to Mattel all payments, revenue, profits,

18  monies, royalties and any other benefits derived or obtained by defendants as a result of the

19  conduct described herein;

20    C.    Order specific performance by Bryant to comply with and satisfy

21  Bryant's contractual obligations to Mattel;

22    D.    Enter an injunction restraining defendants, and all those acting in

23  concert or participation with them, from engaging in further wrongful conduct and/or from

24  continuing to benefit from their wrongful conduct;

25    E.    Order defendants to pay Mattel the full cost of this action and Mattel's

26  reasonable attorneys' fees;

27    F.    Award Mattel punitive damages in an amount sufficient to punish

28  defendants and deter such misconduct in the future; and

EXHIBIT _____1_____

PAGE _____14_____

COMPLAINT

1          G.     Award such other and further relief as this Court deems just and proper.

2

3  DATED:  April 27, 2004         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

4

5                            By _____

6                              Michael T. Zeller

                             Attorneys for Plaintiff

7                               Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1
PAGE 15

07209/579342.1

-12-

Exhibit A

**EXHIBIT** 1
**PAGE** 16

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement. In addition to damages and other available remedies.

(f) This Agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature

Employee Name (print)   CARTER H. BRYANT

Date   01/04/99

MATTEL, INC.
By:
Signature

Name of Witness (print)   TERESA NEWCOMB

EXHIBIT A PAGE 13

EXHIBIT 1
PAGE 17

Exhibit B



## CONFLICT OF INTEREST QUESTIONNAIRE

_BRYANT, CARTER H.     PROJECT DESIGNER_
Name (Last, first, M.I.)                    Job Title                    Department

Instructions: The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES  ● NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES  ● NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES  ● NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES  ○ NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES  ○ NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES  ● NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES  ● NO   7. Have you engaged in any activity including the acquisition or ownership of any interest for personal profit not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES  ● NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES  ● NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

_4., 5.  freelance design & artwork in 1998.
from appx. 5/98 - 11/98  for the Ashton Drake
galleries._

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

_Carter Bryant_                    01/04/98
Signature                          Date

EXHIBIT **B** PAGE **14**

EXHIBIT **1**
PAGE **19**

Exhibit 2

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2      (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
      Duane R. Lyons (Bar No. 125091)
5      (duanelyons@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
6   Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
7   Facsimile: (213) 443-3100

8   Attorneys for Mattel, Inc.

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11   CARTER BRYANT, an individual,      CASE NO. CV 04-9049 SGL (RNBx)

12                    Plaintiff,          Consolidated With Case No. 04-9059 and
                                          Case No. 05-2727
13            v.
                                          MATTEL, INC.'S SECOND AMENDED
14   MATTEL, INC., a Delaware            ANSWER IN CASE NO. 05-2727 AND
15   corporation,                        COUNTERCLAIMS FOR:

16                    Defendant.          1.   COPYRIGHT INFRINGEMENT;
                                          2.   VIOLATION OF THE
17   _____              RACKETEER INFLUENCED AND
                                              CORRUPT ORGANIZATIONS
18   MGA ENTERTAINMENT, INC. a               ACT;
                                          3.   CONSPIRACY TO VIOLATE THE
19   California corporation,                  RACKETEER INFLUENCED AND
                                              CORRUPT ORGANIZATIONS
20                    Plaintiff,              ACT;
                                          4.   MISAPPROPRIATION OF TRADE
21            v.                              SECRETS;
                                          5.   BREACH OF CONTRACT;
22   MATTEL, INC., a Delaware            6.   INTENTIONAL INTERFERENCE
     corporation, and DOES 1-10,             WITH CONTRACT;
23                                        7.   BREACH OF FIDUCIARY DUTY;
                      Defendants.          8.   AIDING AND ABETTING
24                                            BREACH OF FIDUCIARY DUTY;
                                          9.   BREACH OF DUTY OF
25                                           LOYALTY;

26                                        **CONFIDENTIAL FILED UNDER**
                                          **SEAL, PURSUANT TO**
27                                        **PROTECTIVE ORDER**

28                                        **Volume I**

07209/2154363.3

EXHIBIT 2

PAGE 20

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | MATTEL, INC., a Delaware corporation,

2 |                              Counter-claimant,

3 |        v.

4 |

5 | MGA ENTERTAINMENT, INC., a California corporation; ISAAC LARIAN, an individual; CARTER

6 | BRYANT, an individual; MGA ENTERTAINMENT (HK) LIMITED,

7 | a Hong Kong Special Administrative Region business entity; MGAE DE

8 | MEXICO, S.R.L. DE C.V., a Mexico business entity; CARLOS

9 | GUSTAVO MACHADO GOMEZ, an individual; and DOES 4 through 10,

10 |

11 |                              Counter-defendants.

12 | AND CONSOLIDATED CASES

10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11. CONVERSION;
12. UNFAIR COMPETITION; AND
13. DECLARATORY RELIEF.

DEMAND FOR JURY TRIAL

EXHIBIT __2__
PAGE __21__

-2-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

## SECOND AMENDED ANSWER

Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007, Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment, Inc. ("Complaint") as follows:

### Preliminary Statement

The Complaint in this case contravenes Rule 8(a) of the Federal Rules of Civil Procedure in multiple respects. For example, in many places, the Complaint improperly mixes factual averments with argumentative rhetoric. The Complaint also includes a selective recitation of alleged historical facts and "rumor," much of which is both irrelevant and inflammatory in tone and content. In addition, many of the allegations of the Complaint are overly broad, vague or conclusory and include terms which are undefined and which are susceptible to different meanings. Accordingly, by way of a general response, all allegations are denied unless specifically admitted, and any factual averment admitted is admitted only as to the specific facts and not as to any conclusions, characterizations, implications or speculations which are contained in the averment or in the Complaint as a whole. These comments and objections are incorporated, to the extent appropriate, into each numbered paragraph of this Second Amended Answer.

Mattel further submits that the use of the headings throughout the Complaint is improper, and therefore no response to them is required. In the event that a response is required, Mattel denies those allegations.

The Complaint also contains many purported photographs of various items, and it uses one or more headings purporting to describe, either individually or in groups, these various photographs. The images of these photographs contained in the Complaint are all relatively small and some are of less than optimal quality, making it difficult to evaluate the adequacy of the photographs or their fairness and accuracy in depicting what they purport to represent. The Complaint also does not describe the circumstances or time frame in which these photographs were taken,

EXHIBIT 2

PAGE 22

1   and in many cases does not identify, or does not sufficiently or properly identify, the
2   item depicted in the photographs.  All of these factors, as well as the use of these
3   photographs and headings out of context, or with an insufficient context, impair the
4   ability of Mattel to fully respond to these photographs and headings, or to any
5   purported allegations involving, or relying upon, the use of such photographs and
6   accompanying headings.  By way of a general response, Mattel therefore does not
7   admit the authenticity of any photograph, or the accuracy or adequacy of any
8   heading, nor does it admit any allegation or inference that is based on, or purports to
9   be based on, any photograph or accompanying heading in the Complaint.  Mattel
10  reserves the right to challenge the authenticity of any photograph and the accuracy
11  or adequacy of any heading (either as included in the Complaint or in the context of
12  additional material not included).  Further, with reference to all photographs and
13  accompanying headings, or any averments based on the Complaint's use of such
14  photographs and headings, which might be offered into evidence, Mattel specifically
15  reserves its right to object to any use of such photographs, headings, and averments,
16  or the Complaint as a whole or in part, in evidence for any purpose whatsoever.

17          To the extent that Mattel has endeavored to answer any particular
18  allegation containing any such photographs and headings, any admission concerning
19  the item purported to be depicted in such photograph, or described in such headings,
20  shall not constitute an admission that the photograph is authentic, adequate, or
21  admissible, nor that any heading is accurate, adequate, or admissible.  All such items
22  purportedly depicted in such photographs, and described in such headings, "speak
23  for themselves".  Accordingly, to the extent that any such referenced materials are
24  deemed allegations against Mattel, they are denied.

25                              Responses

26          1.      Answering paragraph 1 of the Complaint, Mattel admits that
27  plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California
28  corporation with a principal place of business in Van Nuys, California.

EXHIBIT _2_
PAGE _23_

154363.2

-4-

**Twelfth Counterclaim**

**Unfair Competition**

**(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

**(Against All Counter-defendants)**

163.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164.  Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165.  By engaging in the foregoing conduct, Counter-defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166.  As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial.  No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining Counter-defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

EXHIBIT __2__
PAGE __24__

### Thirteenth Counterclaim
### Declaratory Relief
### (Against All Counter-defendants)

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and Counter-defendants regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1.  For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived,

EXHIBIT 2
PAGE 25

2154363.2

-75-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  created or reduced to practice by Bryant during the term of his Mattel employment

2  and/or by any others then-employed by Mattel, as well as in all derivatives

3  prepared therefrom, and that Mattel is the true owner of the foregoing;

4          2.    For a declaration that any agreement between Bryant, on the one

5  hand, and MGA or any person or entity, on the other hand, in which Bryant

6  purported to assign any right, title or interests in any work that he conceived,

7  created or reduced to practice while a Mattel employee, including but not limited to

8  the Bratz designs, is void and of no effect;

9          3.    For an Order enjoining and restraining Counter-defendants, their

10  agents, servants and employees, and all persons in active concert or participation

11  with them, from further wrongful conduct, including without limitation from

12  imitating, copying, distributing, importing, displaying, preparing derivatives from

13  and otherwise infringing Mattel's copyright-protected works;

14          4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other

15  applicable law, impounding all of Counter-defendants' products and materials that

16  infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

17  by which copies of the works embodied in Mattel's copyrights may be reproduced

18  or otherwise infringed;

19          5.    For an Order mandating that Counter-defendants return to Mattel

20  all tangible items, documents, designs, diagrams, sketches or any other

21  memorialization of inventions created or reduced to practice during Bryant's

22  employment with Mattel as well as all Mattel property converted by Counter-

23  defendants;

24          6.    For an Order mandating specific performance by Bryant to

25  comply with and satisfy Bryant's contractual obligations to Mattel;

26          7.    That Mattel be awarded, and Counter-defendants be ordered to

27  disgorge, all payments, revenues, profits, monies and royalties and any other

28  benefits derived or obtained as a result of the conduct alleged herein, including



EXHIBIT 2

PAGE 26

-76-

2154363.2

1    ### DEMAND FOR JURY TRIAL

2

3        Mattel, Inc. respectfully requests a jury trial on all issues triable

4    thereby.

5

6    DATED: July 12, 2007            QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
7

8                                    By _John Quinn / BM_____

9                                       John B. Quinn
                                        Attorneys for Defendant and Counter-
10                                      claimant Mattel, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   EXHIBIT  2

28   PAGE  27

                              SECOND AMENDED ANSWER AND COUNTERCLAIMS

Exhibit 3

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:  (213) 443-3100

7  Attorneys for Mattel, Inc.

8

9                  UNITED STATES DISTRICT COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11                       EASTERN DIVISION

| 12 | CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
|---|---|---|
| 13 | Plaintiff, | Consolidated with Case No. CV 04-09059 |
| 14 | vs. | Case No. CV 05-02727 |
| 15 | MATTEL, INC., a Delaware corporation, | Hon. Stephen G. Larson |
| 16 17 | Defendant. | MATTEL, INC.'S OBJECTIONS AND SECOND SUPPLEMENTAL RESPONSES TO DEFENDANT'S |
| 18 | AND CONSOLIDATED ACTIONS | FIRST SET OF INTERROGATORIES, NUMBERS 1-14 |

19

20

21  PROPOUNDING PARTY:     CARTER BRYANT

22  RESPONDING PARTY:      MATTEL, INC.

23  SET NO.:               ONE (1)

24

25           **ATTORNEY'S EYES ONLY --**

26           **SUBJECT TO PROTECTIVE ORDER**

27

28

EXHIBIT __3__
PAGE __2?__

07209/2323329.2

12-14

1              **Preliminary Statement**

2              Mattel, Inc. ("Mattel") has not yet completed its investigation of the

3    facts relating to this action, has not yet reviewed all documents relating to this

4    action, has not yet interviewed all witnesses in this action, and has not completed

5    discovery from defendants Carter Bryant ("Bryant") or MGA Entertainment, Inc.

6    ("MGA") or any third parties with regard to this action.  Consequently, Mattel

7    reserves the right to amend and/or supplement these responses if and when

8    additional facts or documents are discovered.  Additionally, because Mattel's

9    responses are based on facts and documents that Mattel has identified to date, they

10   do not preclude Mattel from later relying on facts or documents discovered or

11   generated pursuant to subsequent investigation or discovery.  Mattel's second

12   supplemental response to any of Defendant's First Set of Interrogatories (the

13   "Interrogatories") is not to be construed as a waiver of any of its objections or its

14   right to object to any other discovery request.

15             **General Objections**

16             Mattel generally objects to each of the Interrogatories on each and

17   every one of the following grounds, which are incorporated into and made a part of

18   Mattel's response to each and every individual Interrogatory:

19             1.     Mattel objects to the Interrogatories on the grounds that they

20   seek to impose obligations upon Mattel beyond those imposed by the Federal Rules

21   of Civil Procedure.

22             2.     Mattel objects to the Interrogatories on the grounds that they call

23   for the disclosure of information subject to the attorney-client privilege, the attorney

24   work-product doctrine, or any other applicable privilege, including the privilege

25   against disclosure of the identities and work product of consulting experts.  Such

26   information and documents will not be produced.

27             3.     Mattel objects to the Interrogatories on the grounds that they call

28   for production or disclosure of confidential, proprietary and/or private information.

07209/2323329.2

-2-
MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

EXHIBIT 3

PAGE _____ 29

1   Such information and documents will not be disclosed or produced except pursuant
2   to and in reliance upon the operative protective order.

3           4.      Mattel objects to the Interrogatories on the grounds that they
4   seek the disclosure of information or documents that are in the possession, custody
5   and control of independent parties over whom Mattel has no control, and seek the
6   disclosure of information or documents that are in the possession, custody and
7   control of defendant Bryant or are publicly available and hence equally available to
8   all parties to this litigation.

9           5.      Mattel objects to the Interrogatories on the grounds that they call
10  for information that is neither relevant to the claims or defenses in the pending
11  action nor reasonably calculated to lead to the discovery of admissible evidence.

12          6.      Mattel objects to the Interrogatories on the grounds that they are
13  unduly burdensome and oppressive.  To the extent the Interrogatories call for the
14  identification of, or Mattel's responses state that Mattel will produce, any
15  documents or tangible items, at a mutually convenient time and place Mattel will
16  make available for inspection and copying those documents or tangible items that it
17  is able to locate after a reasonable, good-faith search for and review of non-
18  privileged files that are reasonably likely to contain responsive documents and
19  tangible things.

20          7.      Mattel objects to the Interrogatories on the grounds that they
21  seek the disclosure of information or documents in violation of the terms of
22  agreements or protective orders entered into with third parties, or in violation of the
23  privacy, contractual, or other rights of third parties.

24          8.      Mattel objects to the Interrogatories on the grounds that the
25  definition of "Mattel" is overbroad, vague and ambiguous and unduly burdensome.

26          9.      A statement by Mattel that it will produce documents in response
27  to an Interrogatory is not intended to suggest, nor should it be construed to mean,

28

07209/2323329.2

EXHIBIT 2

PAGE 30

1  that any such documents exist, or that they are in Mattel's possession, custody or
2  control.

### Specific and General Supplemental Responses

4  Each of the following objections and responses to the Interrogatories is
5  expressly made subject to the above Preliminary Statement and General Objections,
6  all of which are incorporated in each of the following objections and responses to
7  specific Interrogatories.

8

9  INTERROGATORY NO. 1:

10  State all facts supporting YOUR contention, if YOU so contend, that
11  Bryant performed services or did any work for a third party or for himself while in
12  the employ of MATTEL.

13

14  RESPONSE TO INTERROGATORY NO. 1:

15  In addition to the general objections stated above, Mattel specifically
16  objects to this Interrogatory on the grounds that it calls for the disclosure of
17  information subject to the attorney-client privilege, the attorney work-product
18  doctrine and other applicable privileges. Mattel further objects to this Interrogatory
19  on the ground that it calls for the disclosure of confidential and/or proprietary
20  information, which Mattel will disclose only subject to and in reliance upon a
21  suitable protective order. Mattel further objects to this Interrogatory as
22  unreasonably burdensome and overbroad in that it purports to require Mattel to
23  summarize all facts on this subject, including without limitation facts that are known
24  to or in the possession, custody and control of defendant and nonparties, including
25  nonparties associated with defendant. Mattel further objects to this Interrogatory on
26  the grounds that it is premature in that it purports to seek to all facts relating to this
27  subject at the outset of discovery in this action and also seeks to circumvent the
28  expert disclosure provisions of the Federal and Local Rules.

1   in its possession, custody or control from which the answer to this Interrogatory may
2   be derived.

3          By way of further answer, Mattel currently has not yet received
4   discovery from defendant or MGA, has not yet obtained any deposition testimony
5   and has not yet had the opportunity to obtain information from other third parties
6   who may possess relevant information. Mattel therefore reserves the right to
7   supplement this response after Mattel receives more information about defendant's
8   activities. By way of further answer, this topic may be the subject of expert
9   testimony, which will be disclosed in the manner, and at the time, required for
10  expert disclosures pursuant to the Federal and Local Rules.

11

12  FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

13         In addition to the general objections stated above, Mattel specifically
14  objects to this Interrogatory on the grounds that it is overbroad, oppressive and
15  harassing, including without limitation that the Interrogatory is not restricted to
16  claims in this suit and thus purports to require disclosure of matters that have no
17  bearing on and are not at issue in this suit. Such matters will not be revealed or
18  addressed. Mattel further objects to this Interrogatory as unreasonably burdensome
19  and overbroad in that it purports to require Mattel to summarize all facts and
20  identify all documents on this subject, including without limitation facts that are
21  known to or in the possession, custody and control of defendants and non-parties,
22  including non-parties associated with defendants. Mattel further objects to this
23  Interrogatory on the grounds that it is vague and ambiguous. Mattel further objects
24  to this Interrogatory on the grounds that it calls for the disclosure of information
25  subject to the attorney-client privilege, the attorney work-product doctrine and other
26  applicable privileges. Mattel further objects to this Request on the grounds that it is
27  premature and seeks to circumvent the expert disclosure provisions of the Federal
28  and Local Rules. Mattel continues its factual investigation and currently awaits the

EXHIBIT 3

PAGE 32

1 opposing parties compliance with multiple Court Orders compelling the production
2 of documents, to answer Interrogatories and to produce witnesses for deposition
3 which have not been complied with and indeed that the Court has found MGA
4 violated. Mattel also has pending motions to compel against defendants MGA,
5 Bryant, Machado and others associated with defendants, including to compel them
6 to produce documents, to appear for deposition and to answer requests for
7 admissions. In addition, the depositions of certain witnesses, including without
8 limitation Carter Bryant and various MGA representatives, have yet to be
9 completed, and other witnesses, such as Veronica Marlow and Elise Cloonan, have
10 yet to be produced for deposition. Furthermore, although MGA's original
11 production in this case regarding the alleged origins and development of Bratz
12 consisted of only a few thousand pages, and only after multiple Court Orders
13 compelling MGA and Bryant to produce their documents, MGA and other
14 Defendants have begun to produce voluminous documents only in recent weeks,
15 including documents that Mattel has been unable to access or review because of
16 technical deficiencies in MGA's production that MGA only recently corrected.
17 Furthermore, despite prior Court Order directing MGA to provide documents in
18 unredacted form, MGA has failed to comply and thus continues to deny Mattel
19 information that the Court has ruled Mattel is entitled to. The review of MGA's,
20 Bryant's and other Defendants' belated, and still incomplete, productions continues.
21 Mattel reserves the right to supplement this response consistent with <u>Federal Rule of</u>
22 <u>Civil Procedure</u> 26(e).

23        Subject to and without waiving the foregoing general and specific
24 objections, Mattel responds as follows:

25        <u>Bryant's Theft of Bratz from Mattel</u>. Carter Bryant is a former Mattel
26 employee who worked as a Mattel product designer during two time periods, first
27 from September 1995 to April 1998, and then from January 4, 1999 to October 20,
28 2000. Bryant conceived, created, developed, improved and reduced to practice

EXHIBIT ___3___

PAGE ___33___

1  Bratz designs while employed by Mattel as a designer. Bryant wrongfully
2  concealed his Bratz work from Mattel. Then, Bryant wrongfully sold Bratz to
3  MGA, and MGA wrongfully purported to acquire Bratz, while Bryant was a Mattel
4  employee. Moreover, while still working for Mattel, Bryant (1) accepted money
5  from MGA; (2) did work for MGA; (3) used Mattel personnel and resources to
6  benefit himself and help MGA in connection with the design and development of
7  Bratz. Through all of this, MGA and Larian knew that Bryant was a Mattel
8  employee. Nonetheless, they encouraged, aided and financed Bryant to develop
9  Bratz, knowing that by performing such work, including design-related work, for his
10 own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his
11 contractual, statutory and common law duties to Mattel.

12         Mattel is the rightful owner of Bratz concepts, designs and properties
13 that Bryant created, conceived, reduced to practice, improved or otherwise worked
14 on pursuant to Bryant's contracts with Mattel, namely the Inventions Agreement and
15 Conflict of Interest Questionnaire. Bryant, MGA, and other Defendants have
16 infringed Mattel's copyrights in Bratz drawings and works created by Bryant while
17 employed by Mattel by copying and preparing derivative works based on those
18 Bratz works. The works that infringe Mattel's copyrights and other rights in such
19 works include numerous Bratz dolls and other Bratz products that MGA has
20 released to market. In fact, MGA's own original copyright registrations for Bratz
21 doll products admit that they are derivatives of Bryant's drawings owned by Mattel.

22         When Bryant started his second term of employment with Mattel,
23 Bryant executed an Employee Confidential Information and Inventions Agreement
24 ("Inventions Agreement"). In the Inventions Agreement, Bryant assigned to Mattel
25 all rights in "inventions," including "designs," that he created during his Mattel
26 employment to the fullest extent of the law. As Bryant's counsel has acknowledged,
27 "[t]he nature of the assignment here is that it is a broad based assignment of all
28 inventions during their employment; all things that were conceived and practiced."

-17-
MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

EXHIBIT ___3___
PAGE ___34___

1   Accordingly, under the Inventions Agreement, Mattel owns, among other things, all
2   doll and toy ideas, concepts, designs, works and other matters that were conceived,
3   created or reduced to practice by Bryant during the term of his Mattel employment.
4   In addition, Bryant promised in the Inventions Agreement that, during his Mattel
5   employment, he would not "engage in any employment or business other than for
6   [Mattel], or invest in or assist (in any manner) any business competitive with the
7   business or future business plans of [Mattel]" without Mattel's express written
8   consent. Similarly, in a Conflict of Interest Questionnaire Bryant signed at the same
9   time as the Inventions Agreement, Bryant certified that, other than as disclosed, he
10  had not worked for any competitor of Mattel and had not engaged in any business
11  transaction involving a Mattel competitor that could be construed as a conflict of
12  interest in the prior year. Bryant promised to immediately notify his supervisor of
13  any change in his situation that would cause him to change that certification, yet
14  never disclosed his work with MGA. To the contrary, as established by deposition
15  testimony and other evidence, Bryant misled others at Mattel upon his departure.
16  Bryant understood what the Conflict Questionnaire required because, among other
17  things, he disclosed on it the freelance work he had performed while in Missouri for
18  Ashton-Drake, but never disclosed his claimed work on Bratz in 1998. Finally,
19  Bryant promised in the Inventions Agreement not to disclose or misuse Mattel's
20  proprietary or confidential information. That obligation continues to this day, and
21  continues to be violated.

22          During his Mattel employment, Bryant knowingly entered into a
23  contract with MGA to assign the rights to Bratz. In late November 2003, Mattel
24  first obtained a copy of a contract between Bryant and MGA, a Mattel competitor,
25  dated as of September 18, 2000 — a time when Bryant was still employed by
26  Mattel. That contract required Bryant to provide design services on Bratz, a line of
27  dolls created by Bryant and marketed by MGA, to MGA on a "top priority" basis.
28  Obviously, this agreement squarely conflicted with Bryant's preexisting obligations

1  to Mattel. It also purported to grant MGA ownership of works produced by Bryant
2  both before and after the agreement's effective date, in further contravention of
3  Bryant's obligations to Mattel under the Inventions Agreement. Bryant knew that
4  these actions were in direct violation of his obligations to Mattel, as did MGA.

5          Moreover, Bryant misrepresented that he was leaving his employment
6  with Mattel to pursue non-competitive interests. At the time that Bryant made those
7  misrepresentations, he knew the statements were false. He also knew at the time
8  that he made those misrepresentations that he had engaged in business activities that
9  were competitive with Mattel and planned to continue to do so, which he failed to
10 dislose.

11         Bryant's last day of employment with Mattel was October 20, 2000. At
12 that time, he signed a further agreement, called the "Proprietary Information
13 Checkout." In it, Bryant acknowledged that "he has agreed to transfer all inventions
14 made or conceived during the period of his employment to Mattel," and that:

15         My interest in (a) any and all inventions . . . which I have made
16         or conceived . . . and in (b) any . . . designs, trademarks,
17         copyright subject matter [or] . . . artistic works which I have
18         made or conceived . . . during the period of my employment
19         which relate or are applicable directly or indirectly to any phase
20         of [Mattel's] business shall be the exclusive property of [Mattel].
21 Bryant executed the Proprietary Information Checkout notwithstanding his
22 execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works
23 to MGA one month earlier. Nor did Bryant otherwise disclose to Mattel his MGA
24 agreement or work. To the contrary, Bryant concealed from Mattel that he was
25 going to a competitor and explicitly told others at Mattel that he was going to do
26 "non-competitive" pursuits. Bryant knew at the time that those representations were
27 false and made those false statements to conceal from Mattel the facts that he was
28 already working with MGA and that he had contracted with MGA to purportedly

07209/2323329.2

EXHIBIT __3__

PAGE __36__

1  MGA 000718-20; MGA 000721-3; MGA 000724-6; MGA 000734; MGA 000727-
2  8; MGA 0072358-60; MGA 0072361-3; MGA 000678-80; MGA 000681-3; MGA
3  000684-6; MGA 000687-9; MGA 000691-3; MGA 0072326-8; MGA 0007002;
4  MGA 000699; MGA 007200; MGA 000703; MGA 0022099; MGA 0878994-5;
5  MGA 0842185; MGA 0878996-9007; MGA 0842184; MGA 0842182; MGA
6  002616-7; MGA 002620-4; MGA 002619; MGA 002630-1; MGA 002633-4; MGA
7  002636-7; MGA 0008859-61; MGA 0050570-1; MGA 0050711-2; MGA 0050554-
8  5; documents referring or relating to payments or compensation that Bryant and
9  other former Mattel employees received from Mattel and MGA; telephone records
10 produced in this action, including those showing communications between Bryant
11 and MGA while Mattel was employed by Mattel; and the tangible items produced
12 for inspection in this action, including all photographs and videotape of such
13 tangible items.

14      By way of further answer, this topic may be the subject of expert
15 testimony, which will be disclosed in the manner, and at the time, required for
16 expert disclosures pursuant to the Federal and Local Rules.

17      Mattel reserves the right to supplement this response and, consistent
18 with its obligations under Federal Rule of Civil Procedure 26(e), Mattel will
19 supplement this response if Mattel receives additional responsive information.

20

21 INTERROGATORY NO. 2:

22      State all facts supporting YOUR contention, if YOU so contend, that
23 Bryant for his own gain, or the gain of any third party, at any time converted,
24 improperly used, sold, assigned or otherwise transferred any work product of his
25 creation which YOU believe was owned by MATTEL.

26

27

28

07209/2323329.2

EXHIBIT ___3___

PAGE ___37___

1  activities.  By way of further answer, this topic may be the subject of expert
2  testimony, which will be disclosed in the manner, and at the time, required for
3  expert disclosures pursuant to the Federal and Local Rules.

4

5  FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

6  In addition to the general objections stated above, Mattel specifically
7  objects to this Interrogatory on the grounds that it is overbroad, oppressive and
8  harassing, including without limitation that the Interrogatory is not restricted to
9  claims in this suit and thus purports to require disclosure of matters that have no
10  bearing on and are not at issue in this suit.  Such matters will not be revealed or
11  addressed.  Mattel further objects to this Interrogatory as unreasonably burdensome
12  and overbroad in that it purports to require Mattel to summarize all facts and
13  identify all documents on this subject, including without limitation facts that are
14  known to or in the possession, custody and control of defendants and non-parties,
15  including non-parties associated with defendants.  Mattel further objects to this
16  Interrogatory on the grounds that it is vague and ambiguous.  Mattel further objects
17  to this Interrogatory on the grounds that it calls for the disclosure of information
18  subject to the attorney-client privilege, the attorney work-product doctrine and other
19  applicable privileges.  Mattel further objects to this Request on the grounds that it is
20  premature and seeks to circumvent the expert disclosure provisions of the Federal
21  and Local Rules.  Mattel continues its factual investigation and currently awaits the
22  opposing parties compliance with multiple Court Orders compelling the production
23  of documents, to answer Interrogatories and to produce witnesses for deposition
24  which have not been complied with and indeed that the Court has found MGA
25  violated.  Mattel also has pending motions to compel against defendants MGA,
26  Bryant, Machado and others associated with defendants, including to compel them
27  to produce documents, to appear for deposition and to answer requests for
28  admissions.  In addition, the depositions of certain witnesses, including without

EXHIBIT ___

PAGE ___ 38

1 limitation Carter Bryant and various MGA representatives, have yet to be

2 completed, and other witnesses, such as Veronica Marlow and Elise Cloonan, have

3 yet to be produced for deposition. Furthermore, although Bryant's original

4 production in this case regarding the alleged origins and development of Bratz

5 consisted of only a few thousand pages, and only after multiple Court Orders

6 compelling MGA and Bryant to produce their documents, MGA and other

7 Defendants have begun to produce voluminous documents only in recent weeks,

8 including documents that Mattel has been unable to access or review because of

9 technical deficiencies in MGA's production that MGA only recently corrected.

10 Furthermore, despite prior Court Order directing MGA to provide documents in

11 unredacted form, MGA has failed to comply and thus continues to deny Mattel

12 information that the Court has ruled Mattel is entitled to. The review of MGA's,

13 Bryant's and other Defendants' belated, and still incomplete, productions continues.

14 Mattel reserves the right to supplement this response consistent with <u>Federal Rule of</u>

15 <u>Civil Procedure</u> 26(e).

16　　　　　Subject to and without waiving the foregoing general and specific

17 objections, Mattel responds as follows:

18　　　　　<u>Defendants' Theft of Bratz from Mattel</u>. Carter Bryant is a former

19 Mattel employee who worked as a Mattel product designer during two time periods,

20 first from September 1995 to April 1998, and then from January 4, 1999 to October

21 20, 2000. Bryant conceived, created, developed, improved and reduced to practice

22 Bratz designs while employed by Mattel as a designer. Bryant wrongfully

23 concealed his Bratz work from Mattel. Then, Bryant wrongfully sold Bratz to

24 MGA, and MGA wrongfully purported to acquire Bratz, while Bryant was a Mattel

25 employee. Moreover, while still working for Mattel, Bryant (1) accepted money

26 from MGA; (2) did work for MGA; (3) used Mattel personnel and resources to

27 benefit himself and help MGA in connection with the design and development of

28 Bratz. Through all of this, MGA and Larian knew that Bryant was a Mattel

EXHIBIT __3__

PAGE __39__

1  employee. Nonetheless, they encouraged, aided and financed Bryant to develop
2  Bratz, knowing that by performing such work, including design-related work, for his
3  own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his
4  contractual, statutory and common law duties to Mattel.

5  Mattel is the rightful owner of Bratz concepts, designs and properties
6  that Bryant created, conceived, reduced to practice, improved or otherwise worked
7  on pursuant to Bryant's contracts with Mattel, namely the Inventions Agreement and
8  Conflict of Interest Questionnaire. Bryant, MGA, and other Defendants have
9  infringed Mattel's copyrights in Bratz drawings and works created by Bryant while
10 employed by Mattel by copying and preparing derivative works based on those
11 Bratz works. The works that infringe Mattel's copyrights and other rights in such
12 works include numerous Bratz dolls and other Bratz products that MGA has
13 released to market. In fact, MGA's own original copyright registrations for Bratz
14 doll products admit that they are derivatives of Bryant's drawings owned by Mattel.

15 When Bryant started his second term of employment with Mattel,
16 Bryant executed an Employee Confidential Information and Inventions Agreement
17 ("Inventions Agreement"). In the Inventions Agreement, Bryant assigned to Mattel
18 all rights in "inventions," including "designs," that he created during his Mattel
19 employment to the fullest extent of the law. As Bryant's counsel has acknowledged,
20 "[t]he nature of the assignment here is that it is a broad based assignment of all
21 inventions during their employment; all things that were conceived and practiced."
22 Accordingly, under the Inventions Agreement, Mattel owns, among other things, all
23 doll and toy ideas, concepts, designs, works and other matters that were conceived,
24 created or reduced to practice by Bryant during the term of his Mattel employment.
25 In addition, Bryant promised in the Inventions Agreement that, during his Mattel
26 employment, he would not "engage in any employment or business other than for
27 [Mattel], or invest in or assist (in any manner) any business competitive with the
28 business or future business plans of [Mattel]" without Mattel's express written

EXHIBIT ___3___

PAGE ___40___

1  consent.  Similarly, in a Conflict of Interest Questionnaire Bryant signed at the same
2  time as the Inventions Agreement, Bryant certified that, other than as disclosed, he
3  had not worked for any competitor of Mattel and had not engaged in any business
4  transaction involving a Mattel competitor that could be construed as a conflict of
5  interest in the prior year.  Bryant promised to immediately notify his supervisor of
6  any change in his situation that would cause him to change that certification, yet
7  never disclosed his work with MGA.  To the contrary, as established by deposition
8  testimony and other evidence, Bryant misled others at Mattel upon his departure.
9  Bryant understood what the Conflict Questionnaire required because, among other
10  things, he disclosed on it the freelance work he had performed while in Missouri for
11  Ashton-Drake, but never disclosed his claimed work on Bratz in 1998.  Finally,
12  Bryant promised in the Inventions Agreement not to disclose or misuse Mattel's
13  proprietary or confidential information.  That obligation continues to this day, and
14  continues to be violated.

15          During his Mattel employment, Bryant knowingly entered into a
16  contract with MGA to assign the rights to Bratz.  In late November 2003, Mattel
17  first obtained a copy of a contract between Bryant and MGA, a Mattel competitor,
18  dated as of September 18, 2000 — a time when Bryant was still employed by
19  Mattel.  That contract required Bryant to provide design services on Bratz, a line of
20  dolls created by Bryant and marketed by MGA, to MGA on a "top priority" basis.
21  Obviously, this agreement squarely conflicted with Bryant's preexisting obligations
22  to Mattel.  It also purported to grant MGA ownership of works produced by Bryant
23  both before and after the agreement's effective date, in further contravention of
24  Bryant's obligations to Mattel under the Inventions Agreement.  Bryant knew that
25  these actions were in direct violation of his obligations to Mattel, as did MGA.

26          Moreover, Bryant misrepresented that he was leaving his employment
27  with Mattel to pursue non-competitive interests.  At the time that Bryant made those
28  misrepresentations, he knew the statements were false.  He also knew at the time

EXHIBIT 3

PAGE 41

1 | that he made those misrepresentations that he had engaged in business activities that
2 | were competitive with Mattel and planned to continue to do so, which he failed to
3 | disclose.

4 |       Bryant's last day of employment with Mattel was October 20, 2000.  At
5 | that time, he signed a further agreement, called the "Proprietary Information
6 | Checkout."  In it, Bryant acknowledged that "he has agreed to transfer all inventions
7 | made or conceived during the period of his employment to Mattel," and that:

8 |       My interest in (a) any and all inventions . . . which I have made
9 |       or conceived . . . and in (b) any . . . designs, trademarks,
10 |       copyright subject matter [or] . . . artistic works which I have
11 |       made or conceived . . . during the period of my employment
12 |       which relate or are applicable directly or indirectly to any phase
13 |       of [Mattel's] business shall be the exclusive property of [Mattel].
14 | Bryant executed the Proprietary Information Checkout notwithstanding his
15 | execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works
16 | to MGA one month earlier.  Nor did Bryant otherwise disclose to Mattel his MGA
17 | agreement or work.  To the contrary, Bryant concealed from Mattel that he was
18 | going to a competitor and explicitly told others at Mattel that he was going to do
19 | "non-competitive" pursuits.  Bryant knew at the time that those representations were
20 | false and made those false statements to conceal from Mattel the facts that he was
21 | already working with MGA and that he had contracted with MGA to purportedly
22 | assign Bratz works to MGA and to provide design and development services to
23 | MGA, a Mattel competitor.

24 |       As a result of the efforts of Bryant and other Mattel employees working
25 | on Bratz (done without Mattel's knowledge until the time Bryant admitted it at
26 | deposition in 2004), the Bratz dolls had been designed and were far along in
27 | development during the time that Bryant was employed by Mattel and prior to the
28 | time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and

EXHIBIT ___3___
PAGE ___42___

1  develop designs for the dolls as well as other aspects of the products such as their
2  fashion accessories during the time he was employed by Mattel, but MGA showed
3  Bratz prototypes and/or visual representations of Bratz to numerous third parties,
4  including without limitation retailers, no later than November 2000, less than three
5  weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these
6  presentations while Bryant was still employed by Mattel. Bryant and MGA
7  employees also repeatedly and continuously communicated with employees of
8  MGA Entertainment (HK) Limited regarding the design and manufacturing of
9  Bratz. Bratz also were shown to retailers at the Hong Kong Toy Fair in January
10 2001 and very soon thereafter at the New York Toy Fair. The Bratz dolls which had
11 been created during the time of Bryant's employment by Mattel, and based on
12 Bryant's concepts, designs, three-dimensional items and other works, were very
13 similar to the dolls as released, which was possible only because of Bryant's work
14 on Bratz with MGA during his Mattel employment, using Mattel resources.

15         Evidence Mattel has been able to obtain thus far has established that
16 Bryant worked for his own and MGA's benefit during his Mattel employment, and
17 did so using Mattel resources. First, Bryant admitted at deposition, and documents
18 confirm, that he worked and aided MGA during the term of his Mattel employment
19 without Mattel's consent or knowledge, although further showing his guilty
20 knowledge he sought to minimize and conceal the time period and extent of his aid
21 to and work with MGA. At deposition, Bryant further admitted, and documents
22 confirm, among other things, that: (1) he worked on his Bratz drawings while
23 employed by Mattel and showed them to MGA while employed by Mattel; (2) he
24 used Mattel employees and materials to prepare a three-dimensional doll prototype
25 for his pitch to MGA — a pitch he made while employed by Mattel; (3) he
26 performed development-related work on Bratz while employed by Mattel; (4) he
27 worked on an ostensibly separate doll called "Angel" for MGA while employed by
28 Mattel; (5) he targeted Mattel vendors and engaged them to start their work on Bratz

EXHIBIT ___

PAGE ___ 43

1    before he left Mattel, using Mattel resources; (6) he used Mattel personnel and other

2    Mattel resources to work on the Bratz project during his Mattel employment,

3    including without limitation by identifying Mattel vendors who Bryant knew as a

4    consequence of his Mattel employment to work on the project and enlisting them to

5    work on the Bratz project during the term of his Mattel employment; and (7) he

6    received monetary payments and other benefits from MGA during the term of his

7    Mattel employment, at least some of which Bryant and MGA sought to conceal in

8    this litigation. MGA and Isaac Larian, MGA's CEO, were aware when Bryant first

9    met with them that Bryant was still employed at Mattel and furthermore were aware

10    of Bryant's obligations to Mattel. Both Bryant and MGA benefited as a

11    consequence of his aid and assistance to and work with MGA during the term of his

12    Mattel employment.

13        Other evidence adduced to date also shows, among other things, that:

14    (1) Contrary to Bryant's testimony, Bryant created a key design drawing that was the

15    basis for three-dimensional Bratz dolls while employed by Mattel. Bryant testified

16    at deposition that he created this drawing in November 2000, after he had left

17    Mattel. However, Steve Linker, a third-party vendor working with MGA, testified

18    that he received that design drawing (as well as other Bratz development

19    documents) from MGA at a meeting held *before* Bryant left Mattel. (2) Bryant

20    created Bratz designs that bear an April 2000 fax header date, six months before he

21    left Mattel; (3) Contrary to Bryant's testimony, Bryant had faces of three-

22    dimensional Bratz dolls painted as of June 2000 (*i.e.*, some five months before he

23    left Mattel). Anna Rhee, a third party vendor also working for MGA, has testified

24    that she was asked by Bryant and paid by MGA to paint Bratz doll heads in June

25    2000. (4) Bratz design drawings produced by defendants with alleged "8/1998"

26    creation dates (*i.e.*, purportedly when Bryant was not employed by Mattel) did not

27    bear those dates as of October 2000, and thus the dates were added to the drawings

28    produced by defendants *post hoc.* These include drawings registered by MGA with

EXHIBIT

PAGE _____ 44

1 │ the Copyright Office which bear false '8/1998' creation dates. (5) According to
2 │ MGA's own emails, Bryant worked on Bratz with MGA for at least 4 hours per day
3 │ starting weeks before he left Mattel. (6) One vendor alone, Veronica Marlow, billed
4 │ for 169 hours of development services on Bratz before Bryant left Mattel. (7)
5 │ While he was working for Mattel, Bryant contacted vendors for his own and MGA's
6 │ benefit, including but not limited to, vendors in Hong Kong for doll hair for Bratz
7 │ and admitted to them that he was working with MGA.

8 │       Other witnesses who have testified in the case have provided testimony
9 │ revealing that Bryant aided and worked with MGA during his Mattel employment.
10 │ Bryant introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee
11 │ agree that she had no involvement with MGA prior to Bryant's introduction). As
12 │ stated above, Anna Rhee was asked by Bryant and paid by MGA to paint Bratz doll
13 │ heads in June 2000. Ms. Rhee produced approximately twenty invoices for work
14 │ that she performed on Bryant-related MGA projects in the year 2000. These
15 │ invoices also reveal that Ms. Rhee performed work with Bryant and MGA on at
16 │ least seven separate occasions before Bryant's departure from Mattel--including one
17 │ invoice that dates to June 12, 2000, well before Bryant claimed at deposition to have
18 │ even heard of MGA.

19 │       After Ms. Rhee produced these documents, MGA then made a
20 │ supplemental production of certain internal documents relating to work performed
21 │ by Ms. Rhee during the June-October 2000 time period. These belatedly produced
22 │ MGA records purport to show that Ms. Rhee's work during that time period related
23 │ to a project known as "Angel" and/or "Prayer Angels." At her deposition, however,
24 │ Ms. Rhee testified that her work during that time period was for Bratz and that
25 │ "Angel" was MGA's and Bryant's code name for Bratz. Thus, Ms. Rhee testified
26 │ that her June 12, 2000 work was for face painting on two Bratz doll heads; her late
27 │ August 2000 work was for face painting on four Bratz doll heads; and her work as
28 │

EXHIBIT ___3___
PAGE ___45___

1    of September 8, 2000 was for face painting on additional Bratz doll heads. All of

2    these are times when Bryant was employed by Mattel.

3            At the deposition, defendants' counsel repeatedly tried--and failed--to

4    persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

5    was a different doll project than Bratz and that she worked on that project in the

6    June 2000, not Bratz. For example, defendants' counsel asked whether the June 12,

7    2000 invoice--which Ms. Rhee had testified was for work on Bratz--"could" instead

8    relate to the doll "that ultimately came to market as Prayer Angels." Ms. Rhee

9    responded: "There's no way." Ms. Rhee further testified that during a time when

10   Bryant was necessarily employed by Mattel, he had contacted her about the "big"

11   and "secret" project that he was working on. Bryant instructed Anna Rhee not to tell

12   anyone about the "secret" project, including Mattel employees. He discussed this

13   project with Ms. Rhee while she was visiting the Mattel Design Center where

14   Bryant was working and informed her that he had engaged a "corporate attorney" to

15   help him with the "secret" project. Although MGA has claimed, under oath and

16   falsely, that Ms. Rhee was supposedly working on a separate project other than

17   Bratz in June 2000, its claims are contradicted by MGA's own documents and the

18   testimony of its witnesses, including Paula Garcia.

19           Further, Paula Garcia, MGA's Bratz project manager, worked for

20   Mattel until April 2000. Ms. Garcia was heavily involved with the Bratz project,

21   including when Bryant while employed by Mattel. Ms. Garcia, among others

22   working at MGA in 2000, had had access and knowledge of the DIVA STARZ

23   project while she was still a Mattel employee. In addition, Maureen Mullen, also a

24   former Mattel employee, worked for MGA in 2000. Ms. Mullen, one of the primary

25   designers on DIVA STARZ, worked with Ms. Garcia at Mattel and was friends with

26   her. Concurrently with her consulting work on DIVA STARZ in 2000, Mullen was

27   paid $17,000 by MGA for work on a doll design. Ms. Garcia and Larian emailed

28

-66-

EXHIBIT _____3_____

PAGE _____46_____

1 Ms. Mullen in October 2000 asking if she could recommend any former Mattel
2 seamstresses to work on the clothing for Bratz.

3 Bryant has paid and continues to pay Veronica Marlow -- who Bryant
4 claims introduced him to MGA -- at least 10% of his 3% royalty from Bratz. As a
5 result, Ms. Marlow has since been paid millions of dollars by both Bryant and
6 MGA. Ms. Marlow was originally employed at Mattel, where she got to know
7 Bryant, and then began to work for MGA in or around April 2000. She worked as a
8 third party vendor on dolls for MGA prior to July 2000. She made sample clothing
9 for the original Bratz dolls.

10 Even according to defendants, Bryant made his Bratz pitch to MGA
11 during the time when he was still employed with Mattel, and after Bryant's initial
12 meeting with Ms. Garcia and Ms. Marlow. Also present at that meeting were Isaac
13 Larian, his daughter Jasmine, Paula Garcia, Veronica Marlow and Victoria
14 O'Connor. Also, while still employed by Mattel, Bryant solicited Margaret Hatch-
15 Leahy, a Mattel employee until September 5, 2000, to sculpt the Bratz dolls and
16 introduced her to MGA. Bryant attended a meeting with Ms. Garcia and Margaret
17 Leahy, to discuss Bratz doll sculptures during a time that Bryant was still employed
18 at Mattel. As a result of Bryant's and MGA's solicitation, Ms. Hatch-Leahy created
19 the first Bratz sculpt and, according to Ms. Garcia, was the sole person to work on
20 the Bratz sculptures in the time period of 2000. The initial Bratz head sculpt was
21 completed prior to Bryant's departure from Mattel. Ms. Hatch Leahy also worked
22 on Bratz samples exhibited at the Hong Kong Toy Fair in January 2001 and the
23 New York Toy Fair in February 2001.

24 Further, MGA and those associated with MGA have made statements,
25 including under oath, that confirm Bryant assisted and worked with MGA during his
26 Mattel employment. In statements to the press, for example, MGA's CEO, Isaac
27 Larian, told the *Wall Street Journal* that "he chose Mr. Bryant's idea for the Bratz
28 over several others after holding a sort of fashion-doll design contest in late 1999"--

07209/2323329.2

EXHIBIT **3**
PAGE **47**

1 | a time when Bryant was employed by Mattel and well before the time that MGA
2 | and Bryant claim in this case to have even been introduced. In a sworn affidavit
3 | filed in a Hong Kong lawsuit brought by MGA, Isaac Larian stated that "[t]he Bratz
4 | dolls were first exhibited in the USA in November 2000," which further confirms
5 | that Bryant was working with and aiding MGA on the project prior to his departure
6 | from Mattel on or about October 20, 2000.

7 | Moreover, in an MGA email dated September 9, 2001, authored by
8 | Nana Ashong, an associate product manager at MGA who worked on the Bratz
9 | project, Ms. Ashong gives the "key legally relevant dates for Bratz" as reflected by
10 | MGA's copyright registration applications, including a "date of creation" of
11 | September 18, 2000. Sam Khare, an MGA Rule 30(b)(6) designee on the subject of
12 | MGA's copyright, trademark and patent applications and registrations and
13 | associated communications, confirmed that the meaning of Ms. Ashong's email was
14 | "that the Bratz dolls were created on September 18, 2000."

15 | Additionally, Isaac Larian was sued for fraud and other claims by his
16 | brother and one-time partner in MGA, Farhad Larian. Farhad Larian's verified
17 | Complaint asserts, among other things, that "in or about late 1999 and early 2000,
18 | Isaac became aware of a potential new product line that had tremendous potential
19 | for [MGA]. The new product line involved the 'Bratz' dolls and related products."
20 | The verified Complaint further states: "In or about early 2000, Isaac called a
21 | meeting to discuss the new Bratz product line with selected individuals" at MGA,
22 | and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the
23 | Bratz line" in February, March and May 2000. Bryant was working for Mattel
24 | during each of these time periods.

25 | Bryant's, Garcia's And Others Exposure To Mattel Projects. Other
26 | evidence adduced to date also confirms, among other things, that Bryant designed
27 | Bratz while employed by Mattel and not in 1998 as he has attempted to claim.
28 | Mattel designer Lily Martinez was working on a project in 1999 called Toon Teens.

1 | Ms. Martinez had her sketches up in her cubicle for a period of time in 1999.

2 | Bryant saw Ms. Martinez's Toon Teens sketches on at least one occasion and

3 | commented that he liked them and "had never seen anything like them." The

4 | sketches Ms. Martinez had done in 1999 of Toon Teens bear strong resemblances to

5 | the initial Bratz design drawings that Bryant did. According to Bryant,

6 | Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while

7 | both Bryant and Ms. Cloonan were employed by Mattel. Ms. Cloonan was Bryant's

8 | roommate in 1999-2000. She also worked on the Mattel "Toon Teens" project.

9 | Bryant's exposure to Toon Teens designs and the similarities between the Toon

10 | Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created

11 | Bratz works while he was a Mattel employee and not in 1998 as he claims.

12 |      Second, documents and designs for Mattel's DIVA STARZ project in

13 | late 1999 and in 2000 that were never publicly released, and that pre-date the release

14 | of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz

15 | dolls. For example, names internally considered at Mattel in late 1999 and through

16 | 2000 for the DIVA STARZ project tend to show that Bryant designed Bratz while at

17 | Mattel. Names that were internally considered at Mattel during that time period

18 | included "Brats" and variations thereon, "Brat Pack," "Boyz" and "Petz." Ms.

19 | Garcia acknowledged that "Brats" spelled with an "s" was subsequently considered

20 | as a name for the "Bratz" dolls. Furthermore, design work that Steve Linker did for

21 | "Mini Diva Starz" at Mattel's behest in early 2000 bear similarities to the Bratz dolls

22 | and, indeed, Ms. Garcia later contacted him in the summer of 2000 to solicit his

23 | involvement with Bryant and Bratz.

24 |      Bryant's, Paula Garcia's and other individual's exposure to aspects of

25 | the DIVA STARZ projects, including designs and names, while they were Mattel

26 | employees, tends to establish that Bryant created Bratz works and conceived of the

27 | name "Bratz" while he was a Mattel employee. For example, as a Mattel design

28 | employee, Bryant had access to DIVA STARZ designs and drawings in the Mattel

1   design center.  As a further example, Paula Garcia also had access and knowledge of

2   the DIVA STARZ project while she and Bryant were Mattel employees as she

3   testified at deposition and for reasons stated above.  And other persons working with

4   or at MGA during 2000 either themselves worked on the DIVA STARZ project or

5   were associated with those who did.

6          Bryant and MGA's Concealment of Their Misconduct.  Showing their

7   guilty knowledge and further harming Mattel, Bryant and MGA attempted to

8   conceal their unlawful conduct from Mattel for as long as possible, hiding that

9   Bryant developed Bratz while working for Mattel, among other things.  In fact, both

10  Bryant and MGA have spoliated evidence relating to the timing and extent of

11  Bryant's aid to and work with MGA during his Mattel employment.  Thus, not only

12  did Bryant mislead others at Mattel as noted above, but evidence revealed in

13  discovery to date also shows the following:

14         First, MGA's CEO, Isaac Larian, ordered former MGA executive,

15  Victoria O'Connor, to redact "Barbie Collectibles" from the faxed version of

16  Bryant's Bratz agreement with MGA to conceal that Bryant had sent the contract

17  from Mattel's Design Center.  According to Ms. O'Connor, Bryant faxed a signed

18  copy of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of

19  the contract included a fax header that read "Barbie Collectibles" and bore the

20  number of the Mattel fax machine that it came from, revealing that it came from

21  Mattel's Designer Center where Bryant worked.  When Ms. O'Connor brought this

22  to the attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax

23  header information on all pages of the contract and send the contract, as altered, to

24  an outside MGA attorney and MGA's former counsel in this action, Patricia Glaser.

25  At Mr. Larian's direction, Ms. O'Connor proceeded to alter each page of the

26  contract in order to conceal, as Ms. O'Connor testified, the fact that Bryant "was

27  still employed at Mattel at the time the contract [between MGA and Bryant] was

28  executed."

EXHIBIT ___3___

PAGE ___50___

1    By way of further answer, this topic may be the subject of expert

2  testimony, which will be disclosed in the manner, and at the time, required for

3  expert disclosures pursuant to the Federal and Local Rules.

4    Mattel continues its factual investigation and currently has outstanding

5  discovery requests to Bryant and to MGA, as well as motions to compel Bryant and

6  MGA to disclose information relevant to this subject. Mattel reserves the right to

7  supplement this response and, consistent with its obligations under Federal Rule of

8  Civil Procedure 26(e), Mattel will supplement this response if Mattel receives

9  additional responsive information.

10

11  DATED:  December 13, 2007        QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP
12

13                          By Jon D. Corey TB

14                             Jon D. Corey
                               Attorneys for Mattel, Inc.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2323329.2

EXHIBIT  3

PAGE  51

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is NOW Messenger Service, 1301 West Second Street, Suite 206, Los Angeles, California 90026.

On December 14, 2007, I served true copies of the following documents described as **MATTEL, INC.'S OBJECTIONS AND SECOND SUPPLEMENTAL RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES, NUMBERS 1-14** on the parties in this action as follows:

| | |
|---|---|
| Thomas Nolan, Esq.<br>Carl Roth, Esq.<br>**SKADDEN ARPS SLATE MEAGHER & FLOM, LLP**<br>300 South Grand Avenue, Suite 3400<br>Los Angeles, CA 90071 | |
| | |

[√ ]   **[PERSONAL]** by personally delivering the document listed above to the person(s) at the address(es) set forth above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made

Executed on December 14, 2007, at Los Angeles, California.

David Quintana

-1-

Case No. CV 04-9049 SGL (RNBx)
PROOF OF SERVICE

EXHIBIT 3

PAGE 52

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017.

On December 14, 2007, I served true copies of the following documents described as **MATTEL, INC.'S OBJECTIONS AND SECOND SUPPLEMENTAL RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES, NUMBERS 1-14** on the parties in this action as follows:

| | |
|---|---|
| John W. Keker, Esq.<br>Michael H. Page, Esq.<br>Christina M. Anderson, Esq.<br>**KEKER & VAN NEST, LLP**<br>710 Sansome Street<br>San Francisco, CA 94111 | |
| Mark E. Overland, Esq.<br>Alexander H. Cote<br>**OVERLAND BORENSTEIN SCHEPER &**<br>**KIM LLP**<br>300 South Grand Avenue, Suite 2750<br>Los Angeles, CA 90071-3144 | |

[√]    **BY FEDEX:** I deposited such document(s) in a box or other facility regularly maintained by FedEx, or delivered such document(s) to a courier or driver authorized by FedEx to receive documents, in sealed envelope(s) or package(s) designated by FedEx with delivery fees paid or provided for, addressed to the person(s) being served.

Executed on December 14, 2007, at Los Angeles, California.

_Suzanne Johnson_
Suzanne Johnson

07209/2325189.207209/25189.1

-2-

Case No. CV 04-9049 SGL (RNBx)

PROOF OF SERVICE

EXHIBIT  3
PAGE  53

Exhibit 4

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
   Telephone:   (213) 443-3000
7  Facsimile:   (213) 443-3100

8  Attorneys for Plaintiff Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  EASTERN DIVISION

12  CARTER BRYANT, an individual,        CASE NO. CV 04-09049 SGL (RNBx)

13            Plaintiff,                  Consolidated with Case Nos. CV 04-
                                          9059 and CV 05-2727
14       vs.
                                          MATTEL, INC.'S FIFTH SET OF
15  MATTEL, INC., a Delaware             INTERROGATORIES
    corporation,
16                                        Discovery Cut-off:  January 14, 2008
              Defendant.                  Pre-trial Conference:  April 7, 2008
17  _____     Trial Date:  April 29, 2008

18  AND CONSOLIDATED ACTIONS             Discovery Cutoff:  March 3, 2008
                                          Final Pretrial Conf.:  June 2, 2008
19  _____     Trial Date:  July 1, 2008

20

21

22  PROPOUNDING PARTY:    Mattel, Inc.

23  RESPONDING PARTIES:   MGA Entertainment, Inc., Isaac Larian, Carter

24                        Bryant, MGA Entertainment (HK) Limited, MGAE

25                        de Mexico S.R.L. de C.V., and Carlos Gustavo

26                        Machado Gomez

27  SET NO.:              FIVE            EXHIBIT ___4___
                                          PAGE ___54___
28

07209/2259967.1

_____
                                    MATTEL'S FIFTH SET OF INTERROGATORIES

1            Pursuant to <u>Federal Rule of Civil Procedure</u> 33, plaintiff Mattel, Inc.

2 ("Mattel") hereby requests that MGA Entertainment, Inc., Isaac Larian, Carter Bryant,

3 MGA Entertainment (HK) Limited, MGAE de Mexico S.R.L. de C.V., and Carlos

4 Gustavo Machado Gomez (collectively, "the Responding Parties") individually answer

5 the following Interrogatories separately and fully, in writing and under oath, within 30

6 days after service hereof.  The Responding Parties shall be obligated to supplement

7 their responses to the Interrogatories at such times and to the extent required by the

8 <u>Federal Rules of Civil Procedure.</u>

9

10                         **Definitions**

11

12         1.      "YOU" and "YOUR" mean each of the Responding Parties.

13         2.      "MGA" means MGA Entertainment, Inc., any of its current or

14 former employees, officers, directors, agents, representatives, attorneys, experts,

15 divisions, AFFILIATES (including without limitation defendants MGA Entertainment

16 (HK) Limited, MGAE de Mexico S.R.L. de C.V.), predecessors-in-interest and

17 successors-in-interest, and any other PERSON acting on its behalf, pursuant to its

18 authority or subject to its control. Without limiting the foregoing, "MGA" includes the

19 entities known as ABC International Traders or ABC International Traders, Inc.  For

20 purposes of the these Interrogatories, "MGA" does not include BRYANT.

21         3.      "MATTEL" means Mattel, Inc., its current employees, officers,

22 directors, agents, representatives, attorneys, parents, subsidiaries, divisions,

23 AFFILIATES, predecessors-in-interest and successors-in-interest, and any other

24 PERSON acting on its behalf, pursuant to its authority or subject to its control.

25         4.      "O'MELVENY" means the law firm of O'Melveny & Myers, LLP,

26 and any of its current or former attorneys, partners, associates, employees, agents,

27 representatives, predecessors-in-interest and successors-in-interest, and any other

28 PERSON acting on its behalf, pursuant to its authority or subject to its control.

-2-

EXHIBIT ___

MATTEL'S FIFTH SET OF INTERROGATORIES

PAGE ___

1        5.    "CHRISTENSEN" means the law firm of Christensen, Glaser, Fink,

2    Jacobs, Weil & Shapiro, LLP and any of its current or former attorneys, partners,

3    associates, employees, agents, representatives, predecessors-in-interest and successors-

4    in-interest, and any other PERSON acting on its behalf, pursuant to its authority or

5    subject to its control.

6        6.    "BRYANT" means Carter Bryant individually, and his current or

7    former employees, agents, representatives, attorneys, accountants, experts,

8    predecessors-in-interest and successors-in-interest, and any other PERSON acting on

9    his behalf, pursuant to his authority or subject to his control.

10       7.    "LARIAN" means Isaac Larian individually, and his current or

11   former employees, agents, representatives, attorneys, accountants, experts,

12   predecessors-in-interest and successors-in-interest, and any other PERSON acting on

13   his behalf, pursuant to his authority or subject to his control.

14       8.    "MACHADO" means Carlos Gustavo Machado Gomez, and his

15   current or former employees, agents, representatives, attorneys, accountants, experts,

16   predecessors-in-interest and successors-in-interest, and any other PERSON acting on

17   his behalf, pursuant to his authority or subject to his control.

18       9.    "AFFILIATES" means any and all corporations, proprietorships,

19   d/b/a's, partnerships, joint ventures and business entities of any kind that, directly or

20   indirectly, in whole or in part, own or control, are under common ownership or control

21   with, or are owned or controlled by a PERSON, party or entity, including without

22   limitation each parent, subsidiary and joint venture of such PERSON, party or entity.

23       10.    "PERSON" or "PERSONS" means all natural persons, partnerships,

24   corporations, joint ventures and any kind of business, legal or public entity or

25   organization, as well as its, his or her agents, representatives, employees, officers and

26   directors and any one else acting on its, his or her behalf, pursuant to its, his or her

27   authority or subject to its, his or her control.

28

EXHIBIT __4__

PAGE __56__

MATTEL'S FIFTH SET OF INTERROGATORIES

1        11.   "BRATZ" means any project, product, doll or DESIGN ever known

2  by that name (whether in whole or in part and regardless of what such project, product

3  or doll is or has been also, previously or subsequently called) and any product, doll or

4  DESIGN or any portion thereof that is now or has ever been known as, or sold or

5  marketed under, the name or term "Bratz" (whether in whole or in part and regardless

6  of what such product, doll or DESIGN or portion thereof is or has been also, previously

7  or subsequently called) or that is now or has ever been sold or marketed as part of the

8  "Bratz" line, and each version or iteration of such product, doll or DESIGN or any

9  portion thereof.  As used herein, "product, doll or DESIGN or any portion thereof" also

10  includes without limitation any names, fashions, accessories, artwork, packaging or any

11  other works, materials, matters or items included or associated therewith.   Without

12  limiting the generality of the foregoing, and contrary to MGA's recent assertions in

13  connection with other Mattel discovery requests, the term "BRATZ" does not and shall

14  not require that there be a doll existing at the time of the event, incident or occurrence

15  that is the subject of, or otherwise relevant or responsive to, the Interrogatories.

16        12.   "DESIGN" or "DESIGNS" means any and all representations,

17  whether two-dimensional or three-dimensional, and whether in tangible, digital,

18  electronic or other form, including but not limited to all works, designs, artwork,

19  sketches, drawings, illustrations, representations, depictions, blueprints, schematics,

20  diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to

21  practice, developments, inventions and/or improvements, as well as all other items,

22  things and DOCUMENTS in which any of the foregoing are or have been

23  expressed, embodied, contained, fixed or reflected in any manner, whether in whole

24  or in part.

25        13.   "DOCUMENT" or "DOCUMENTS" means all "writings" and

26  "recordings" as those terms are defined in <u>Rule</u> 34 of the <u>Federal Rules of Civil</u>

27  <u>Procedure</u> and <u>Rule</u> 1001 of the <u>Federal Rules of Evidence</u>, including, but not limited

28  to, all writings and records of every type and description including, but not limited to,

-4-

EXHIBIT ____4____

PAGE ____57____

MATTEL'S 5TH SET OF INTERROGATORIES

1   contracts, agreements, correspondence, memoranda, letters, facsimiles, electronic mail
2   ("e-mail"), records of telephone conversations, handwritten and typewritten notes of
3   any kind, statements, reports, minutes, recordings, transcripts and summaries of
4   meetings, voice recordings, pictures, photographs, drawings, computer cards, tapes,
5   discs, printouts and records of all types, studies, instruction manuals, policy manuals
6   and statements, books, pamphlets, invoices, canceled checks and every other device or
7   medium by which or through which information of any type is transmitted, recorded or
8   preserved.  Without any limitation on the foregoing, the term "DOCUMENT" shall
9   include all copies that differ in any respect from the original or other versions of the
10  DOCUMENT, including, but not limited to, all drafts and all copies of such drafts or
11  originals containing initials, comments, notations, insertions, corrections, marginal
12  notes, amendments or any other variation of any kind.

13          14.   "COMMUNICATION" or "COMMUNICATIONS" means and
14  includes any disclosure, transfer or exchange of information between two or more
15  PERSONS, whether orally or in writing, including without limitation, any conversation
16  or discussion by means of meeting, letter, telephone, note, memorandum, telegraph,
17  telex, telecopier, electronic mail, or any other electronic or other medium, including
18  without limitation in written, audio or video form.

19          15.   "REFER OR RELATE TO" a given subject matter means relate to,
20  refer to, constitute, contain, embody, depict, incorporate, reflect, evidence, identify,
21  state, deal with, comment on, respond to, describe, analyze, support, refute, contradict,
22  or in any way pertain to that subject matter, either directly or indirectly.

23          16.   "DIGITAL INFORMATION" means any information created or
24  stored digitally, including but not limited to electronically, magnetically or optically.

25          17.   "STORAGE DEVICE" means any computer hard drive,
26  memory, USB device, tape, storage array or any other device or medium that allows
27  a user, whether permanently, temporarily or otherwise, to create, generate, transmit,
28  copy, retain, store or maintain DIGITAL INFORMATION.

EXHIBIT 4
PAGE 58

1        18.   "SOURCE OF INFORMATION" means any medium containing

2   DOCUMENTS or other information, whether in paper, electronic or other form,

3   including but not limited to any STORAGE DEVICE, file, file cabinet or other any

4   other source of information or DOCUMENTS.

5        19.   "COLLECT," "COLLECTED" or "COLLECTION," with reference

6   to DOCUMENTS, means to collect, review, produce, request, seek, look for, search for,

7   analyze or in any other way collect or review or attempt to collect or review such

8   DOCUMENTS in connection with YOUR search for, review of and/or production of

9   DOCUMENTS in this ACTION.

10       20.   "THIS ACTION" refers to *Mattel, Inc. v. Bryant*, Case No. CV 04-

11  9059 SGL (RNBx), filed by Mattel on April 27, 2004, and the cases consolidated

12  therewith.

13       21.   "IDENTIFY" or "IDENTITY" means the following:

14            (a)   with reference to an individual or individuals, means to state,

15  fully and separately as to each, such individual's full name, any known business title,

16  current or last known business affiliation, current or last known residential address,

17  current or last known business address, current or last known relationship to MGA, and

18  current or last known telephone number.

19            (b)   with reference to an entity or entities, means to state, fully and

20  separately as to each, such entity's full name, state (or country) of incorporation or

21  organization, present or last known address, and present or last known telephone

22  number.

23            (c)   with reference to a SOURCE OF INFORMATION, means

24  to describe and state, fully and separately as to each, the SOURCE OF

25  INFORMATION so as to distinctly identify each such SOURCE OF INFORMATION

26  and differentiate each such SOURCE OF INFORMATION from all other SOURCES

27  OF INFORMATION, including without limitation by stating its nature (e.g., USB

28  drive, computer hard drive, file cabinet, etc.), and any unique identifier information

EXHIBIT __4__
MATTEL'S FIFTH SET OF INTERROGATORIES
PAGE __59__

1   (such as hard drive serial number); the physical location(s), including full address
2   information and full identifying computer network drive information if applicable, of
3   each such SOURCE OF INFORMATION (as of the time of YOUR COLLECTION of
4   DOCUMENTS from the SOURCE OF INFORMATION, regardless of whether such
5   DOCUMENTS were thereafter moved elsewhere for the purpose of YOUR review); the
6   IDENTITY of each natural person or individual who is, was or has been associated
7   with each such SOURCE OF INFORMATION; the date(s) on which YOU
8   COLLECTED DOCUMENTS from each such SOURCE OF INFORMATION in
9   connection with this ACTION; whether, at the time of YOUR COLLECTION of
10   DOCUMENTS from such SOURCE OF INFORMATION, each such SOURCE OF
11   INFORMATION contained or included DOCUMENTS that REFER OR RELATE TO
12   BRATZ and the time period prior to February 28, 2001; and the IDENTITY of any
13   DOCUMENTS, by Bates number, that YOU have produced from each such SOURCE
14   OF INFORMATION to Mattel in this ACTION that REFER OR RELATE TO BRATZ
15   and that also REFER OR RELATE TO the time period prior to February 28, 2001
16   (regardless of when such DOCUMENT was, in whole or part, created, drafted,
17   generated, sent, received or transmitted).

18            (d)    with reference to any other DOCUMENT or DOCUMENTS,
19   means to describe each DOCUMENT by Bates number. In the event that a
20   DOCUMENT does not have a Bates number, IDENTIFY means, with respect to each
21   such DOCUMENT, to provide a complete description of it such that it may be the
22   subject of a request for the production of documents, including by stating the date,
23   identity of the author, addressee(s), signatories, parties, or other PERSONS identified
24   therein, its present location or custodian and a description of its contents.

25           22.   "Any" as used in these interrogatories includes the word "all," and
26   the word "all" as used in these interrogatories includes the word "any."

27           23.   The singular form of a noun or pronoun includes within its meaning
28   the plural form of the noun or pronoun so used, and vice versa; the use of the masculine

-7-

EXHIBIT ___4___