1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
   Telephone:   (213) 443-3000
7  Facsimile:    (213) 443-3100

8  Attorneys for Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11                   EASTERN DIVISION

12  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,               Consolidated with
                                         Case No. CV 04-09059
14        vs.                            Case No. CV 05-02727

15  MATTEL, INC., a Delaware             **AMENDED FINAL PRE-TRIAL**
    corporation,                         **CONFERENCE ORDER FOR**
16                                       **PHASE 1 TRIAL**
              Defendant.
17                                       Pretrial Conference:  May 19, 2008
   _____      Time:                 10:00 a.m.
18  AND CONSOLIDATED ACTIONS             Place:                Courtroom 1
                                         Trial Date:           May 27, 2008
19

20

21

22

23

24

25

26

27

28

I.      PARTIES ............................................................................................ 1

II.     ABANDONED CLAIMS, COUNTERCLAIMS AND DEFENSES ......... 5

III.    JURISDICTION AND VENUE ........................................................... 9

IV.     TRIAL ESTIMATE ........................................................................... 10

V.      TYPE OF TRIAL .............................................................................. 10

VI.     STIPULATED FACTS ...................................................................... 11

VII.    CLAIMS AND DEFENSES ............................................................... 13

VIII.   INTENTIONAL INTERFERENCE WITH CONTRACT (RE
        BRYANT; AC 6) (AGAINST MGA, LARIAN) .................................... 27

        A.      Valid Agreements Existed between Mattel And Bryant ............... 27

        B.      MGA And Larian Had Knowledge Of Mattel's Contracts
                With Bryant. .................................................................................. 30

        C.      Bryant Breached His Contractual Obligations to Mattel ............. 31

        D.      Breaches of the Conflicts of Interest Questionnaire: ................... 44

        E.      Breach of The Proprietary Information Checkout Form: ............. 44

        F.      MGA and Larian Induced And Encouraged Bryant To
                Breach, and Disrupted The Performance of His Contracts
                With Mattel. .................................................................................. 45

IX.     AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
        (RE:  BRYANT; AC 8) (AGAINST MGA AND LARIAN) ................... 48

        A.      Bryant Owed A Fiduciary Duty To Mattel .................................. 49

        B.      Bryant Breached The Fiduciary Duty He Owed To Mattel .......... 51

        C.      MGA and Larian Knew That Bryant Was Engaging In
                Conduct That Constituted A Breach Of The Fiduciary Duty
                He Owed Mattel. ........................................................................... 54

        D.      MGA and Larian Knowingly Assisted Bryant In Breaching
                His Fiduciary Duty Owed To Mattel. ........................................... 55

X.      AIDING AND ABETTING BREACH OF DUTY OF LOYALTY
        (RE BRYANT; AC 10) (AGAINST MGA AND LARIAN) ................... 56

        A.      Bryant Was Mattel's Employee and Owed A Duty of Loyalty
                to Mattel ....................................................................................... 57

        B.      Bryant Knowingly Acted Against Mattel's Interests and
                Materially Breached the Duty of Loyalty He Owed to Mattel ...... 57

|   | C. | Mattel Did Not Give Informed Consent To Bryant's Conduct | 58 |
| XI. | | CONVERSION (RE BRATZ; AC 11) (AGAINST MGA, MGA HK and LARIAN) | 58 |
|   | A. | Mattel Owns Valuable Property And Tangible Materials Including Drawings and Items Created By Bryant When He Was A Mattel Product Designer | 58 |
|   | B. | Defendants' Wrongful Conversion of Mattel's Property Constituted A Substantial Interference With Mattel's Rights | 60 |
|   | C. | Mattel Did Not Consent To the Conversion | 60 |
| XII. | | STATUTORY UNFAIR COMPETITION  (RE BRYANT; AC 12) (AGAINST MGA, MGA HK, AND LARIAN) | 60 |
|   | A. | Defendants Violated Section 17200 of the California Business and Professions Code By Engaging In An "Unlawful, Unfair Or Fraudulent Business Act Or Practice. . . . " | 61 |
| XIII. | | DECLARATORY RELIEF (AC 13) (AGAINST MGA, MGA HK, AND LARIAN AND) | 63 |
|   | A. | An actual controversy exists between Mattel and Defendants regarding Defendants' lack of ownership interests in Bratz works and Mattel's rights in the same | 63 |
|   | B. | Defendants have no valid or protectible ownership rights or interests in Bratz works, and Mattel is the true owner of the same | 64 |
|   | C. | Mattel is entitled to an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz | 64 |
| XIV. | | COPYRIGHT INFRINGEMENT (AC 1) (AGAINST MGA, MGA HK, AND LARIAN) | 65 |
|   | A. | Mattel Is The Owner Of Valid Copyrights In Works That Are Fixed In Tangible Media Of Expression, And Are The Subject Of Federal Copyright Registrations | 65 |
|   | B. | Defendants Have Infringed Upon Mattel's Exclusive Rights In The Copyrighted Works, Including By Reproducing Them and Preparing Derivative Works From Them, Without Mattel's Authorization | 66 |

C.     Defendants' Infringement Or Substantial Contributions To Infringement Of Mattel's Copyrighted Works Without Mattel's Consent ................................................................. 69

D.     Isaac Larian Is Vicariously Liable For Copyright Infringement ................................................................. 70

E.     Isaac Larian and MGA HK are Contributorily Liable for Copyright Infringement ................................................ 71

XV.     DAMAGES (RE ALL PHASE 1 CLAIMS) .............................. 74

XVI.    CONVERSION (DAMAGES) (RE BRATZ; AC 11) (AGAINST MGA, MGA HK and LARIAN) ................................................. 74

XVII.   INTENTIONAL INTERFERENCE WITH CONTRACT (RE BRYANT; AC 6) (AGAINST MGA, LARIAN) ............................... 75

XVIII.  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (DAMAGES) (RE:  BRYANT; AC 8) (AGAINST MGA AND LARIAN) ..................................................................... 76

XIX.    AIDING AND ABETTING BREACH OF DUTY OF LOYALTY (DAMAGES) (RE BRYANT; AC 10) ........................................ 78

XX.     COPYRIGHT INFRINGEMENT CLAIM (DAMAGES) (AC 1) (AGAINST MGA, MGA ENTERTAINMENT (HK) LIMITED, AND LARIAN) ................................................................... 79

XXI.    MATTEL SEEKS PUNITIVE OR EXEMPLARY DAMAGES ON EACH PERTINENT CLAIM ................................................ 80

XXII.   MATTEL'S PROPOSED EVIDENCE TO SUPPORT FINDING OF ADVERSE INFERENCE CONTENTIONS AGAINST COUNTER DEFENDANTS ................................................ 80

XXIII.  DEFENDANTS' AFFIRMATIVE DEFENSES ......................... 86

XXIV.   ISSUES TO BE TRIED ........................................................ 108

XXV.    DISCOVERY ........................................................................ 131

XXVI.   EXHIBITS ............................................................................ 131

XXVII.  WITNESSES ......................................................................... 131

1   Following pretrial proceedings, pursuant to Federal Rule of Civil

2  Procedure 16 and Local Rule 16-1 et seq., and in accordance with the Court's

3  Scheduling Order entered February 22, 2007, IT IS ORDERED:

4

5                                  **I.**

6                              **PARTIES**

7   For purposes of this Phase 1 trial, the parties are:

8   Mattel's position:

9   (a)   Plaintiff and Counter-Defendant Mattel, Inc. ("Mattel");

10  (b)   Defendant and Counter-Defendant MGA Entertainment, Inc.

11  ("MGA");

12  (c)   Defendant and Counter-Defendant Isaac Larian;

13  (d)   Defendant and Counter-Defendant MGA Entertainment (HK)

14  Limited ("MGA HK").

15  In addition, the following are parties to Phase 2 proceedings:

16  (e)   Counter-Defendant MGA de Mexico S.R.L. de C.V. ("MGA

17  Mexico"); and

18  (f)   Counter-Defendant Carlos Gustavo Machado Gomez

19  ("Machado").

20   Each of these parties has been served and has appeared.  For purposes

21  of this Phase 1 trial, and the claims and defenses to be tried therein, no party other

22  than those identified above has asserted a claim, been served, or asserted any

23  defense.  Because the Court has bifurcated these consolidated cases, the Court will

24  not at this point dismiss any other party, including any Doe defendants.

25   In addition, as a result of the confidential settlement between Mattel

26  and Carter Bryant, Carter Bryant is no longer a party to this case, although Carter

27  Bryant remains bound by all past Orders of this Court and will be bound by any

28

1  injunctive, declaratory or other non-monetary relief relating to Bratz that the Court

2  enters in the future against the MGA parties.

3              <u>The MGA parties' position:</u>

4              The MGA parties agree with the list of Phase 1 parties set forth by

5  Mattel, with two exceptions:  Counter-Defendant MGA de Mexico S.R.L. de C.V.

6  ("MGA Mexico") and Counter-Defendant Carlos Gustavo Machado Gomez

7  ("Machado").  These two parties are named as defendants only in claims that the

8  Court has ordered, pursuant to its bifurcation and trial phasing order of July 2, 2007

9  [Docket No. 608], to be tried in Phase 2.  To the extent Mattel is seeking to inject

10  Phase 2 claims or issues into the Phase 1 trial, the MGA parties object to the

11  inclusion of these parties in any Final Pretrial Conference Order to be entered by the

12  Court pertaining to the Phase 1 trial.  Mattel has not provided any substantive or

13  procedural basis for including these parties in Phase 1, and these parties would be

14  prejudiced were they to be included at this late date in the Phase 1 trial.  Mattel

15  never even copied counsel for Machado on its drafts of the joint proposed order,

16  even though Mattel is well-aware that Mr. Machado is separately represented.

17              The MGA parties agree with Mattel that each of these parties has been

18  served and has appeared.  For purposes of this Phase 1 trial, and the claims and

19  defenses to be tried therein, no party other than those identified above has asserted a

20  claim, been served or asserted any defense.  Consistent with Appendix A to the

21  Local Rules, all other parties named in the pleadings in connection with the claims

22  to be tried in the Phase 1 trial (as set forth below), including any "Doe" defendants,

23  should now be dismissed.

24              The pleadings that raise the issues are:

25              <u>Mattel's position:</u>

26              (a)      Complaint filed by Mattel, Inc. (Case No. BC314398) on April

27  27, 2004 in the Superior Court of the State of California for the County of Los

28  Angeles (the "Bryant Case");

-2-

1          (b)     Answer to Plaintiff's Unverified Complaint filed by Carter

2  Bryant on May 14, 2004;

3          (c)     Defendant/Cross-Complainant Carter Bryant's Cross-Complaint

4  for (1) Unfair Competition; (2) Rescission; (3) Declaratory Relief; and (4) Fraud,

5  filed by Bryant on September 8, 2004 in the Superior Court of the State of

6  California for the County of Los Angeles;

7          (d)     Notice to Federal Court of Removal of Civil Action from State

8  Court Pursuant to 28 U.S.C. Section 1332(a)(1) and 1331, filed by defendant Carter

9  Bryant on November 2, 2004.  That notice removed the case to federal court on

10  November 2, 2004, where it was assigned Case No. 04-9059;

11          (e)     Stipulation Permitting MGA to Intervene as a Party to This

12  Action and Order, dated December 7, 2004, and MGA's Answer in Intervention.

13          (f)     Complaint filed by MGA Entertainment, Inc. (Case No. CV 05-

14  2727 SGL (RNBx)) on April 13, 2005 in the District Court of the Central District of

15  California (the "MGA Case"), as limited by the Court's Order dated August 25,

16  2005, striking allegations regarding the Brawer litigation;

17          (g)     Second Amended Answer and Counterclaims filed by Mattel,

18  Case No. CV 04-9059 SGL (RNBx) on July 12, 2007 in the District Court of the

19  Central District of California;

20          (h)     Amended Answer and Affirmative Defenses of MGA

21  Entertainment Inc., MGA Entertainment (HK) Limited and MGAE de Mexico

22  S.R.L. de C.V. to Mattel, Inc.'s Second Amended Answer and Counterclaims filed

23  by defendants MGA, MGA HK, and MGA Mexico (collectively, the "MGA

24  Defendants") on September 19, 2007 in the District Court of the Central District of

25  California;

26          (i)     Isaac Larian's Amended Answer and Affirmative Defenses to

27  Mattel, Inc.'s Second Amended Answer and Counterclaims filed by Larian on

28  November 8, 2007 in the District Court of the Central District of California; and

1         (j)     Amended Answer and Affirmative Defenses of Carlos Gustavo

2    Machado Gomez's to Mattel, Inc.'s Second Amended Answer and Counterclaims

3    filed by Machado on September 26, 2007.

4         By Order dated June 19, 2006, the Court consolidated the <u>Bryant</u> case

5    and the <u>MGA</u> case with <u>Bryant v. Mattel, Inc.</u>, Case No. 04-9049.

6         <u>MGA parties' position:</u>

7         Following the settlement between Mattel and Bryant, all claims

8    asserted by or against Bryant have been dismissed and Mattel and Bryant have fully

9    and generally released one another from all such claims.  The MGA Parties object to

10   the confidentiality of the Bryant-Mattel settlement agreement and contend that they

11   are entitled to discovery of its terms for purposes of proportionate liability.  The

12   MGA Parties may file a motion seeking a determination of good faith settlement

13   pursuant to CCP § 877.6.  To the extent that Mattel continues to list pleadings that

14   address claims asserted by or against Bryant – and fail to exclude them specifically

15   from the list – the MGA Parties object to Mattel's list of pleadings.  Mattel's claims

16   against the MGA parties have been modified by the terms of the Court's April 25,

17   2008 and May 22, 2008 Orders.

18        Consistent with this Court's bifurcation and trial phasing order dated

19   July 2, 2007, the MGA parties also object to Mattel's reference to the *Amended*

20   *Answer and Affirmative Defenses of Carlos Gustavo Machado Gomez's to Mattel,*

21   *Inc.'s Second Amended Answer and Counterclaims filed by Machado on September*

22   *26, 2007.*  Mr. Machado is a defendant only as to claims that the Court has ordered

23   to be tried in Phase 2.  The MGA parties object to the inclusion of Mr. Machado's

24   Amended Answer and Affirmative Defenses in any Final Pretrial Conference Order

25   to be entered by the Court pertaining to the Phase 1 trial.  Mattel has not provided

26   any substantive or procedural basis for including this pleading in the Phase 1 Final

27   Pretrial Conference Order.  Mattel never copied counsel for Machado on its drafts of

28

-4-

the joint proposed order, even though Mattel is aware Mr. Machado is separately represented.

## II.

## ABANDONED CLAIMS, COUNTERCLAIMS AND DEFENSES

The following claims, counter-claims, or defenses have been dismissed or abandoned:

Mattel's position:

By Order dated July 17, 2006, the Court dismissed Defendant/Cross-Complainant Carter Bryant's Cross-Complaint for (1) Unfair Competition; (2) Rescission; (3) Declaratory Relief; and (4) Fraud; and Bryant's Complaint for Declaratory Relief of Copyright Non-Infringement.  Bryant was given leave to amend his Complaint and Cross-Complaint, but elected not to do so and the dismissal became final.

Bryant's Ninth Affirmative Defense: Failure of Contract was withdrawn by Bryant, by stipulation on October 5, 2007;

Bryant's Tenth Affirmative Defense: Duress/Unconscionability was withdrawn by Bryant, by stipulation on October 5, 2007;

Bryant's Eleventh Affirmative Defense: Alleged Duties Contrary to Law was withdrawn by Bryant, by stipulation on October 5, 2007;

MGA Defendants' Sixteenth Affirmative Defense:  Innocent Intent was withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

Larian's Sixteenth Affirmative Defense:  Innocent Intent was withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

MGA Defendants' Ninth Affirmative Defense:  Res Judicata was withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

Larian's Ninth Affirmative Defense:  Res Judicata was withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

MGA Defendants' Twelfth Affirmative Defense: Lack of Ownership was withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

Unclean Hands Affirmative Defense was withdrawn with respect to Phase 1 claims by the MGA Defendants by Notice on February 15, 2008;

Unclean Hands Affirmative Defense was limited by Carter Bryant as to Phase 1 issues by letter dated February 27, 2008.

By Order dated April 25, 2008, the Court granted partial summary judgment in favor of Mattel. In particular, the Court ruled that the Employee Confidential Information and Inventions Agreement that Carter Bryant entered into as a Mattel designer is a valid and enforceable contract. It further ruled that, under the Inventions Agreement, Mattel owns "any Bratz-related 'inventions' (including any designs, improvements, ideas, concepts and copyrightable subject matter)" that Carter Bryant "created during the period of his employment with Mattel." The Court found that it was irrelevant whether Bryant performed such work on Bratz during his own time.

In its Order granting Mattel partial summary judgment, the Court further ruled that Carter Bryant owed Mattel a duty of loyalty and that Bryant "breached this duty by entering into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products." The Court rejected defendants' claim that such activities were mere "preparations to compete" with Mattel.

In its April 25, 2008 Order granting Mattel partial summary judgment, the Court ruled that Carter Bryant owed a fiduciary duty to Mattel. It further ruled that Carter Bryant had "breached his fiduciary duty" to Mattel when "he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products." By Order dated May 21, 2008, the Court partially modified its ruling as to the breach of fiduciary duty claim, reaffirming that Mattel is entitled to partial

1  summary judgment regarding the existence of a fiduciary duty but holding that there

2  is a triable issue of fact as to Bryant's breach of that duty.

3        Also by Order dated April 25, 2008, the Court granted partial summary

4  judgment in favor of Bryant and the MGA Defendants on Mattel's claims for (1)

5  tortious interference with contractual relations, but only "to the extent that it is based

6  on Mattel's rights to Bratz," such that it remains in the case "as to Mattel's claims for

7  breach of fiduciary duty" (Order at 2); (2) conversion, but only to the extent it is

8  based on conversion of ideas, such that it remains in the case "to the extent it seeks

9  the return of tangible things" (*id.* at 3); (3) common law unfair competition (*id.* at 7);

10 and (4) unjust enrichment (*id.*).

11       By Order dated May 21, 2008, the Court further ruled that the MGA

12 parties were entitled to partial summary judgment on the remainder of Mattel's

13 statutory unfair competition claim.  Mattel respectfully submits, however, that the

14 May 21, 2008 Order may need to be clarified since the Court's earlier summary

15 judgment ruling of April 25, 2008 had denied the defendants' summary judgment

16 motion as to Mattel's unfair competition claim.  In particular, the April 25, 2008

17 Order had stated that Mattel's statutory unfair competition claim presented triable

18 issues of fact relating to "whether MGA tortiously interfered with Bryant and

19 Mattel's contractual relationship and whether MGA engaged in commercial

20 bribery."  April 25, 2008 Order at 7.  Mattel respectfully suggests that this claim

21 should still proceed to trial and will seek the Court's guidance on this issue.

22       Finally, pursuant to the confidential settlement between Mattel and

23 Carter Bryant and pursuant to the Stipulation entered as part of that settlement, all

24 claims, counterclaims and defenses as between Mattel and Carter Bryant have been

25 dismissed, although Carter Bryant remains bound by all past Orders of this Court

26 and will be bound by any injunctive, declaratory or other non-monetary relief

27 relating to Bratz that the Court enters in the future against the MGA parties.

28       MGA parties' position:

1    On April 25, 2008 and May 21, 2008, the Court granted the MGA

2  parties' motions for summary judgment as follows:

3       • Mattel's claim for tortious interference is dismissed to the extent

4         it is based on Mattel's purported rights to Bratz.

5       • Mattel's claim for conversion is dismissed to the extent it is

6         based on an alleged conversion of ideas or any damages flowing

7         from the exploitation of such ideas and limited the claim to the

8         value at the time of the alleged conversion of any sketches done

9         at the time by Carter Bryant owned by Mattel under the

10        Inventions Agreement.

11      • Mattel's claim for statutory unfair competition is dismissed

12        entirely as to the fraudulent and unfair prongs, and limited on the

13        unlawful prong as to commercial bribery and tortious

14        interference but preempted as to any purported rights to Bratz.

15      • Mattel's common law claim for unfair competition is dismissed.

16      • Mattel's claim for unjust enrichment is dismissed.

17  The MGA Parties disagree with Mattel's characterizations of the Court's April 25,

18  2008 and May 21, 2008 Summary Judgment Orders.  The Court deferred ruling on

19  MGA's motion for summary judgment on statute of limitations grounds.

20    As noted above, the MGA Parties object to the confidentiality of the

21  Bryant-Mattel settlement agreement and contend that they are entitled to discovery

22  of its terms for purposes of proportionate liability and may file a motion seeking a

23  determination of good faith settlement pursuant to CCP § 877.6.

24

25

26

27

28

# III.

## **JURISDICTION AND VENUE**

Federal jurisdiction and venue are invoked upon the following grounds:

<u>Mattel's position</u>:

This Court has diversity jurisdiction over the claims asserted in <u>Mattel v. Bryant</u> pursuant to 28 U.S.C. § 1332, as determined by the Ninth Circuit in <u>Mattel v. Bryant, Inc.</u>, 446 F.3d 1011, 1013 (9th Cir. 2006).  This Court has supplemental jurisdiction over Mattel's state law claims in that case pursuant to 28 U.S.C. § 1367.

This Court has federal question jurisdiction over MGA's claims in <u>MGA Entertainment, Inc. v. Mattel, Inc.</u> pursuant to 15 U.S.C. §§ 1116 and §1121" \, 28 U.S.C. §§ 1331, 1338(a), and supplemental subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C. § 1367.

This Court has federal question jurisdiction over Mattel's counterclaims in <u>MGA Entertainment, Inc. v. Mattel, Inc.</u> pursuant to 28 U.S.C. §§ 1331, 1338(a), 17 U.S.C. §§ 101 et seq., and 18 U.S.C. § 1964(c).  This court has supplemental jurisdiction over Mattel's state law counterclaims pursuant to 28 U.S.C. § 1367.

<u>MGA parties' position</u>:

The MGA parties admit that the Court has federal question jurisdiction over the MGA action pursuant to 28 U.S.C. §1331, 17 U.S.C. §§ 101 et. seq. and 18 U.S.C. § 1964(c), but deny that the Court may assert jurisdiction over the extraterritorial conduct alleged by Mattel in the Counterclaims.

Venue in this Court for <u>MGA Entertainment, Inc. v. Mattel, Inc.</u> is alleged to be proper pursuant to 28 U.S.C. §§ 1391(b) - (d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.  The MGA parties admit that venue is proper in this District for Mattel's claims based on conduct alleged to have occurred in this district and deny that venue is proper in this District for acts alleged to have occurred in Mexico, Canada, Hong Kong or other places outside of this District.

# IV.

## TRIAL ESTIMATE

The parties understand that the Court has directed each side to complete the presentation of evidence in Phase 1, including the examination and cross-examination of witnesses, in 60 hours.  The parties further understand that the 60 hours shall not apply to argument, jury selection, opening statements, or closing arguments.

Mattel's position:

Mattel further understands that this 60-hour limit may be enlarged upon a showing of good cause to the Court.

MGA parties' position:

Consistent with the express language of the Court's April 7, 2008 Order [Docket No. 2998], the MGA parties understand that the 60-hour limit may be enlarged "if extraordinary circumstances warrant such relief."  Apr. 7, 2008 Order, at 2.

# V.

## TYPE OF TRIAL

The trial is to be a jury trial, except for issues which are not properly tried to jury.  Pursuant to the Court's Scheduling Order, the parties have already delivered to the Court (a) a set of Joint Proposed Jury Instructions and (b) a set of disputed Jury Instructions, along with reasons supporting and opposing each disputed instruction, and (c) at the Pre-Trial Conference brief proposed voir dire questions for the jury.  The parties anticipate that they will need to revise and supplement the jury instructions and verdict forms in light of the Court's May 22 and May 23 Orders relating to the parties' respective motions for partial summary judgment and motions *in limine*, as well as the Court's May 22, 2008 Order on the MGA Parties' motion for reconsideration.

1    The MGA parties contend that all issues in the Phase 1 trial are

2 properly tried to a jury.  The MGA parties note that the Court has tentatively

3 indicated that it intends to rule upon the MGA parties' equitable affirmative

4 defenses at the close of the Phase 1 trial but will allow evidence as to these defenses

5 to be presented to the jury.  It is the MGA parties' position that the Court have the

6 jury answer special interrogatories as to certain of these equitable defenses so as to

7 establish the requisite factual findings for the Court to rule upon such defenses.

8

9                                    **VI.**

10                          **STIPULATED FACTS**

11        1.      The following facts have been stipulated, and shall be deemed

12 established:[1]

13                              **Parties**

14        1.      Mattel, Inc. is a corporation formed under the laws of the State of

15                Delaware with its headquarters in El Segundo, California.

16        2.      MGA Entertainment, Inc. is a privately held California

17                corporation.

18        3.      MGA Entertainment (HK) Limited, a Hong Kong company, and

19                MGAE de Mexico, S.R.L. de C.V., a Mexico corporation, are

20                wholly owned subsidiaries of MGA Entertainment, Inc.

21

22

23        [1]   The parties to this action do not understand the rules to require the recitation

24 of admissions in the Pre-Trial Conference Order for those admissions to be
introduced at trial.  Therefore, admissions are not included herein.

25    The parties' lists of facts herein are not exhaustive.  The parties reserve the right

26 to introduce additional evidence in support of their claims — or in opposition to
affirmative defenses — at trial.  In addition, the parties intend to introduce expert

27 evidence not listed below in support of its claims.

28

Case No. CV 04-9049 SGL (RNBx)
FINAL PRE TRIAL CONFERENCE ORDER

4.     Isaac Larian, an individual, is the CEO and majority shareholder of MGA Entertainment, Inc. and is a resident of California.

**<u>Bryant's Employment at Mattel</u>**

5.     Carter Bryant first worked for Mattel in the mainline Barbie group from September 1995 to April 1998.

6.     Bryant signed a document titled "Employee Confidential Information and Inventions Agreement," dated November 6, 1995.

7.     Bryant signed a document titled "Conflict of Interest Questionnaire," dated November 6, 1995.

8.     Bryant left California in December 1997 and moved to Missouri to live with his parents, where he continued to do work for Mattel until April 1998.

9.     In late December 1998, Mattel offered Bryant a position in the Barbie Collectibles group.

10.    Bryant accepted Mattel's offer, moved back to California, and started work at Mattel on January 4, 1999.

11.    Bryant signed a document titled "Employee Confidential Information and Inventions Agreement" dated January 4, 1999.

12.    Bryant signed a document titled "Conflict of Interest Questionnaire," incorrectly dated January 4, 1998, instead of 1999.

13.    Before Bryant left Mattel, he was asked to and did participate in an exit interview.

14.    During his exit interview, Bryant signed a document titled "Proprietary Information Checkout," dated October 19, 2000.

<u>The MGA Parties' Position:</u>

-12-

1    The parties previously stipulated to the following additional fact:

2    "Carter Bryant, an individual, is a resident of Missouri."  The MGA

3    Parties see no reason to delete this stipulated fact.

4

5                                    **VII.**

6                    **CLAIMS AND DEFENSES**

7          1.      In Phase 1 of the Trial, pursuant to the Court's July 5, 2007

8    Order, the parties' respective Claims and Affirmative Defenses are as follows:[2]

9          Mattel's position:

10   **A.    MATTEL INC.'S CLAIMS AND COUNTERCLAIMS**

11         Mattel, Inc. plans to pursue the following claims and counterclaims

12   against the defendants in Phase 1 trial as indicated:

13         **Claim 1:  Intentional Interference with Contract (Against Larian**

14   **and MGA).**

15                    Elements to be Proven

16         (a)      That there was a contract or contracts between Mattel and

17   Carter Bryant;

18         (b)      That MGA and/or Mr. Larian knew of the contract;[3]

19

20   _____

21     [2]   Mattel has claims for misappropriation of trade secrets that are being reserved

22   for Phase II of this litigation.  To the extent defendants seek to raise the issue of
     trade secrets during Phase I, either as a claim or as an affirmative defense, Mattel

23   reserves its right to argue its misappropriation of trade secrets claim in Phase I.

24   The MGA parties note that the Court gave specific guidance on this issue and
     expressly limited the type of evidence that Mattel may introduce that falls outside of

25   the scope of Phase I of the trial in ruling on the MGA parties' motion *in limine*

26   number 6.

27     [3]   As explained below, Mattel's position is that willful blindness is equivalent to
     knowledge.

28

1             (c)     That MGA and/or Mr. Larian intended to disrupt the

2    performance of this contract;

3             (d)     That the conduct of MGA and/or Mr. Larian prevented

4    performance or made performance more difficult;

5             (e)     That Mattel was harmed; and

6             (f)     That the conduct of MGA and/or Mr. Larian was a

7    substantial factor in causing Mattel's harm.[4]

8             **Claim 2:  Aiding and Abetting Breach of Fiduciary Duty (Against**

9    **Larian and MGA).**

10                      Elements to be Proven

11            (a)     Mr. Bryant's conduct constituted a breach of a duty or

12   duties;[5]

13            (b)     MGA and/or Mr. Larian knew that Mr. Bryant's conduct

14   constituted a breach of duty or duties; and

15            (c)     MGA and/or Mr. Larian gave substantial assistance or

16   encouragement to Mr. Bryant to breach his duty or duties.

17            **Claim 3:  Aiding and Abetting Breach of Duty of Loyalty (Against**

18   **Larian and MGA).**

19                      Elements to be Proven

20            (a)     Mr. Bryant's conduct constituted a breach of a duty or

21   duties;[6]

22   _____

23       [4]  Elements of this claim were already decided in Mattel's favor in the Court's

24   Order dated April 25, 2008.

25       [5]  This Court's April 25, 2008 Order (at 6) "grant[ed] Mattel's motion for summary judgment … on the issue of the existence and breach of a fiduciary duty."

26   The Court's May 21, 2008 Order reaffirmed that Bryant was subject to a fiduciary duty, but ruled that the scope of that duty and whether Bryant breached his fiduciary

27   duty should be submitted to the jury.  (Order at 4).

28

Case No. CV 04-9049 SGL (RNBx)

FINAL PRE TRIAL CONFERENCE ORDER

1          (b)     MGA and/or Mr. Larian knew that Mr. Bryant's conduct

2    constituted a breach of duty or duties; and

3          (c)     MGA and/or Mr. Larian gave substantial assistance or

4    encouragement to Mr. Bryant to breach his duty or duties.

5              **Claim 4:  Conversion (Against MGA, MGA HK and Larian).**

6                        <u>Elements to be Proven</u>

7          (a)     That Mattel was the rightful owner of the property at

8    issue;

9          (b)     That Bryant, Larian, MGA, or MGA HK intentionally

10   took possession of such property for a significant period of time or deprived Mattel

11   of the beneficial use of such property;

12         (c)     That Mattel did not consent;

13         (d)     That Mattel was harmed;[7] and

14         (e)     That Bryant's conduct was a substantial factor in causing

15   Mattel's harm.

16             **Claim 5:  Statutory Unfair Competition (Against Larian, MGA,**

17   **and MGA HK).**

18                        <u>Elements to be Proven</u>

19         (a)     That any defendant engaged or engages in conduct that is

20   unlawful.

21

22

23

24   _____

25   [6]  This Court's April 25, 2008 Order (at 6) "grant[ed] Mattel's motion for
     summary judgment on the issues of the existence and breach of the duty of loyalty."

26   [7]  The Court ruled in its April 25, 2008 Order (at 5) that "[t]he undisputed facts
     … [show] Bryant directly competed with Mattel by entering into a contract with its

27   competitor to produce a competing product while still employed by Mattel."

28

**Claim 6:  Declaratory Relief  (Against Larian, MGA, and MGA HK) (ownership of original Bratz works and associated copyrights allegedly created by Bryant while employed by Mattel)**

Elements to be Proven

(a)      Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to Bratz designs, are void and of no effect, including because Bryant previously assigned all right, title or interest in Bratz to Mattel and because Mattel was otherwise the owner of said right, title or interest.

**Claim 7: Copyright Infringement (Against Larian, MGA, and MGA HK)**

Elements to be Proven

(a)      Mattel is the owner of a valid copyright; and

(b)      The defendants infringed such copyright.

For Vicarious Liability (against Larian):

(a)      Mr. Larian profited directly from the infringing activity of MGA;

(b)      Mr. Larian had the right and ability to supervise/control the infringing activity of MGA; and

(c)      Mr. Larian failed to exercise that right and ability.

For Contributory Liability (against Larian, and/or MGA HK):

(a)      Mr. Larian and/or MGA HK knew or had reason to know of the infringing activity of MGA; and

(b)      Mr. Larian and/or MGA HK intentionally materially contributed to MGA's infringing activity.

The MGA parties' position as to Phase 1 claims and claim elements:

1   The MGA parties object to Mattel's recitation of the required elements

2   of the claims Mattel contends are to be tried in Phase 1. Mattel's recitation misstates

3   the applicable elements of its claims, as set forth in standard jury instructions and/or

4   relevant case law. *See* L.R. 16, Appendix A. The MGA parties submit that the

5   elements that Mattel must prove to prevail on its Phase 1 claims are accurately

6   stated as set forth below. The authority supporting the MGA parties' position with

7   respect to the required claim elements is set forth in their joint and disputed

8   proposed jury instructions relating to these claims, their objections to Mattel's

9   proposed jury instructions, and their responses to Mattel's objections to their

10  proposed instructions – which have yet to be addressed by the Court.

11  Additionally, the MGA parties object to any attempt by Mattel to assert

12  any claim for misappropriation of trade secrets in Phase 1 of this case, as suggested

13  by Mattel in a footnote in its section. Pursuant to the Court's bifurcation and trial

14  phasing order dated July 2, 2007 [Docket No. 608], which adopted as the order of

15  the Court Mattel's trial phasing proposal dated June 20, 2008, Mattel's

16  misappropriation of trade secrets claim is to be tried in Phase 2. *See* Mattel's Memo.

17  Re: Trial Structure dated June 20, 2008, at 8. Despite being asked repeatedly by

18  counsel for the MGA parties, Mattel has provided no procedural basis or authority

19  for leaving open the possibility of seeking to pursue a misappropriation of trade

20  secrets claim in Phase 1 of this case.

21  The MGA parties would be prejudiced by any reallocation of claims

22  from Phase 2 to Phase 1 at this late date. The MGA parties did not focus their

23  discovery efforts on Mattel's misappropriation of trade secrets claim on the

24  understanding that it was a Phase 2 claim and because they were never informed by

25  Mattel that this claim related to ownership of Bratz. Additionally, the MGA parties

26  did not move for summary adjudication of this claim, again because Mattel agreed

27  and the Court ordered that this claim be adjudicated in Phase 2. At the hearing on

28

1  May 22, 2008, the Court provided guidance to the parties as to the issues that may

2  be tried as part of Phase 1 versus Phase 2.

3              MGA disagrees with Mattel's characterizations of the Court's April 25,

4  2008 and May 22, 2008 Summary Judgment Orders.  The Court deferred ruling on

5  MGA's motion for summary judgment on statute of limitations grounds.

6              Mattel's claims 1-3 have been dismissed and Mattel and Bryant have

7  exchanged general releases with one another as to these claims.

8  **MGA Response to Mattel's Statement Re: Conversion**:  As conceded by Mattel

9  in its Motion for Partial Summary Judgment, there is no conversion claim asserted

10  against MGA in Phase 1.  (_See_ Mattel MSJ at 50:18-20.)  Moreover, the elements

11  as set forth above are objectionable to the extent they include ideas and concepts as

12  property in question for Mattel's conversion claim, as the Court already dismissed

13  Mattel's conversion claim to the extent it is based on conversion of "ideas" and

14  limited Mattel to seeking recovery of any sketches created by Bryant that fall

15  within the scope of the Inventions Agreement (but not permitting damages for the

16  exploitation of any rights to those sketches beyond the value at the time of any

17  alleged conversion of the sketches themselves).  (_See_ April 25, 2008 MSJ Order;

18  see also Mattel MSJ Opp'n at 71-72, citing _Melchior v. New Line Prods., Inc._, 106

19  Cal. App. 4th 779, 793 (2003) ("[t]he tort of conversion does not apply to ideas").)

20  The elements are further improper to the extent they include discarded property.

21  _See Ananda Church of Self-Realization v. Mass. Bay Ins. Co._, 95 Cal. App. 4th

22  1273, 1282 (2002).  The elements should be stated as follows:

23              Claim 4:  Conversion (Against Larian, MGA, and MGA HK).

24                   Elements to be Proven

25                   1) That   Mattel   owned   the   BRATZ

26                        sketches   under   Section   2(a)   of   the

27                        Inventions Agreement and the rights to

28

a Mattel doll head and Mattel's telephones and fax machines;

2) That Larian, MGA, or MGA HK intentionally prevented Mattel form having access to the above-mentioned items for a significant period of time, or destroyed Mattel's personal property;

3) That Mattel did not consent and did not discard the property;

4) That Mattel was harmed;

5) That Larian's, MGA's, or MGA HK's conduct was a substantial factor in causing Mattel's harm; and

6) That the above-referenced items had something more than de minimis value at the time of the alleged conversion.

**MGA Response to Mattel's Statement Re: Tortious Interference**:  The statement of elements above is objectionable to the extent it is based on Mattel's rights to BRATZ, as the Court has already held that claim is preempted in part by the Copyright Act.  (*See* April 25, 2008 MSJ Order.)  Further, Mattel omits the required element of a claim for intentional interference with an at-will employment relationship, which requires Mattel to prove that Larian and MGA engaged in wrongful conduct independent of "interfering" with Bryant's contracts with Mattel. *See* *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152-53 (2004) ("[T]o recover for a defendant's interference with an at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act – *i.e.*, an act 'proscribed by some constitutional, statutory, regulatory, common law, or other

determinable legal standard' – that induced an at-will employee to leave the plaintiff.") (citations omitted); *see also* *American Mortg. Network v. LoanCity.com*, 2006 WL 3199291, at *15 (Cal. Ct. App. Nov. 7, 2006) (holding that jury instruction that "[a]n employee is subject to liability for the tort of inducing breach of contract/unfair competition if, before or after leaving the employment, the employee uses unlawful or unfair means to cause fellow employees to break their contracts with the employer" was incorrect because "liability for unfair competition/ inducing breach of contract can be based only on unlawful conduct") (emphasis in original; citations omitted).

Mattel's statement of the elements is further objectionable to the extent it does not require Mattel to prove that the underlying contract was a valid and enforceable one.   *See* *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 601 (1996). Finally, the preceding statement is objectionable to the extent it suggests that proving all the elements as against either MGA or Larian establishes the liability of both.  The elements should be stated as follows:

<div align="center">Elements to be Proven</div>

1) That there was a valid and enforceable contract between Mattel and Carter Bryant;

2) That MGA and Larian actually knew of the contract and its terms;

3) That MGA and Larian intended to disrupt the performance of this contract;

4) That Larian and MGA engaged in wrongful conduct independent of "interfering" with Bryant's contracts with Mattel through (1) aiding and

abetting Bryant in a breach of the duties he owed Mattel; (2) engaging in acts of unfair competition; or (3) infringing Mattel's BRATZ-related copyrights;

5) That the conduct of MGA and/or Mr. Larian prevented performance of the contract;

6) That Mattel was harmed; and

7) That the conduct of MGA and Larian was a substantial factor in causing Mattel's harm.

**MGA Response to Mattel's Statement Re: Aiding and Abetting Breach of Fiduciary Duty**: Mattel's language incorrectly suggests that proving all the elements as against <u>either</u> MGA <u>or</u> Larian establishes the liability of both.  The statement also omits the element requiring Mattel to prove that Bryant owed the duties in question.  *See Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 574 (2005).  The statement is also misleading in that it does not specify that <u>actual</u> knowledge on behalf of MGA and Larian of the specific wrong they substantially assisted is required to find them liable for aiding and abetting.  *See Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118-20 (C.D. Cal. 2003).  The elements should be stated as follows:

<u>Elements to be Proven</u>

1) That Bryant owed a fiduciary duty to Mattel;

2) That Bryant breached a fiduciary duty he owed to Mattel;

-21-

3) That MGA and Larian substantially assisted or encouraged Bryant in accomplishing the breach; and

4) That MGA and Larian had actual knowledge of the specific wrong they substantially assisted.

**MGA Response to Mattel's Statement Re: Aiding and Abetting Breach of Duty of Loyalty**: Mattel's language incorrectly suggests that proving all the elements as against <u>either</u> MGA <u>or</u> Larian establishes the liability of both. The statement also omits the element requiring Mattel to prove that Bryant owed the duties in question. *See Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 574 (2005). The statement is also misleading in that it does not specify that <u>actual</u> knowledge on behalf of MGA and Larian of the specific wrong they substantially assisted is required to find them liable for aiding and abetting. *See Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118-20 (C.D. Cal. 2003). The elements should be stated as follows:

<div align="center">Elements to be Proven</div>

1) Bryant owed a duty of loyalty to Mattel;

2) Bryant breached any duty of loyalty he owed to Mattel;

3) MGA and Larian substantially assisted or encouraged Bryant in accomplishing the breach and

4) MGA and Larian had actual knowledge of the specific wrong they substantially assisted.

**MGA Response to Mattel's Statement Re: Statutory Unfair Competition**:

1   Statutory unfair competition involves business conduct that is either unfair,
2   fraudulent, or unlawful that may be remedied equitably by restitutionary
3   disgorgement.  *See* *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134,
4   1144 (2003). The Court has already dismissed Mattel's statutory unfair competition
5   claims to the extent they are based on "unfair" conduct (*see* April 25, 2008 MSJ
6   Order) or "fraudulent" conduct (*see* May 22, 2008 MSJ Order).  As for "unlawful"
7   conduct, it includes only business acts that are forbidden by civil, criminal, federal,
8   state, municipal, statutory, regulatory or court-made law.  *See* *Saunders v. Superior*
9   *Court*, 27 Cal. App. 4th 832, 839 (1994).  Pursuant to the Court's April 25, 2008
10  and May 22, 2008 Orders, the only portion of Mattel's statutory unfair competition
11  claim that remains is that it may attempt to prove the "unlawful" prong by showing:
12  (a) that the MGA Parties violated <u>Cal. Penal Code § 641.3(a) by engaging in</u>
13  <u>commercial bribery; or (b) that the MGA Parties intentionally interfered with</u>
14  <u>Bryant's contract with Mattel (as that claim has been limited and narrowed by the</u>
15  <u>Court's prior orders).</u>

16       Furthermore, there are no unfair competition claims asserted against MGA or
17  Bryant in Phase 1.  (*See* Mattel MSJ at 50:18-21; 4/25/08 Order at 7.)  To the extent
18  Mattel attempts to assert a statutory unfair competition claim based on alleged
19  copyright infringement by MGA or includes "unfair conduct" threatening
20  competition or fraudulent conduct, those claims already have been dismissed by the
21  Court.  (*See* April 25, 2008 MSJ Order; May 21, 2008 MSJ Order.)

22       Mattel's statutory unfair competition claims are not to be tried in Phase 1, nor
23  to be resolved by the jury as this claim is an equitable one that should be resolved by
24  the Court.  However, out of an abundance of caution, and reserving the right to
25  amend when these issues are properly before the Court, the MGA Parties propose
26  that the elements should be stated as follows:

27                      <u>Elements to be Proven</u>
28

1       1) That Larian, MGA and MGA HK are

2          "businesses" as defined under Cal. Bus.

3          & Prof. Code Section 17200 et seq.;

4       2) That Larian, MGA and MGA HK

5          engaged in commercial bribery or

6          intentional interference with Carter

7          Bryant's Inventions Agreement with

8          Mattel when they entered into a

9          consulting agreement with Carter

10          Bryant.

11

12 **MGA Response to Mattel's Statement Re: Declaratory Relief**:

13       The MGA parties object to Mattel's failure to set forth any of the elements

14 required to prevail on its request for declaratory judgment.  The correct elements are

15 as follows:

16               Elements to be Proven – Declaratory Relief

17       1) That the Inventions Agreement was a

18          valid contract between Mattel and

19          Bryant;

20       2) That the term "inventions" in the

21          Inventions Agreement applies to the

22          BRATZ sketches;

23       3) That Carter Bryant "conceived" or

24          "reduced to practice" the "invention"

25          "during [his] employment" at Mattel;

26       4) That MGA did not purchase the rights

27          in good faith;

28

<div style="margin-left:2em">

5) That under section 204(a) of the Copyright Act and Section 988 of the California Civil Code, the Inventions Agreement clearly and unambiguously transferred any copyright ownership in the BRATZ sketches to Mattel.

</div>

**MGA Response to Mattel's Statement Re: Copyright Infringement**:

The elements set forth by Mattel are improper, as Mattel fails to distinguish among the defendants and require appropriate findings with respect to each defendant. Further, Mattel's contributory liability elements fail to clarify the requirements of showing intentional inducement, that is, that a defendant acted with the desire or purpose of intentionally inducing the infringement; mere awareness that potential infringing activity might result is not enough.  Further, the elements improperly cluster all defendants together in such a way that it suggests that a finding of contributory liability against one defendant would be sufficient to enter a finding against all defendants.  The elements are properly stated as follows:

<div style="text-align:center">

Elements to be Proven – Copyright Infringement

</div>

<div style="margin-left:2em">

1) That the Inventions Agreement was a valid contract between Mattel and Bryant;

2) That the term "inventions" in the Inventions Agreement applies to the BRATZ sketches;

3) That Carter Bryant "conceived" or "reduced to practice" the "invention" during his employment at Mattel;

</div>

4) That MGA did not purchase the rights in good faith;

5) That under section 204(a) of the Copyright Act 204 and Section 988 of the California Civil Code 988, the Inventions Agreement clearly and unambiguously transferred any copyright ownership in the BRATZ sketches to Mattel.

6) That in creating the BRATZ dolls, MGA actually copied the Bryant drawings in the BRATZ dolls.

7) That, even if copied, that there is "substantial similarity" between original protectible expression in the Bryant drawings and the BRATZ dolls to the level of "virtual identity."

<u>Elements to be Proven – Vicarious Infringement (Larian)</u>

1) That MGA or MGA Hong Kong infringed Mattel's copyrights in the Bryant sketches;

2) That Larian profited directly from the infringing activity of MGA or MGA Hong Kong;

3) That Larian had the right and ability to supervise the infringing activities of MGA and MGA Hong Kong; and

4) That Larian failed to exercise that right and ability.

<u>Elements to be Proven – Contributory Infringement (Larian)</u>

1) That MGA or MGA Hong Kong infringed Mattel's copyrights in the Bryant sketches;

2) That Larian knew or had reason to know of the infringing activity of MGA or MGA Hong Kong; and

3) That Larian intentionally induced MGA or MGA Hong Kong's infringing activity.

<u>Mattel's Key Evidence:</u>

In brief, and without in any way waiving its right to rely on other evidence, Mattel's key evidence is summarized as follows:

# VIII.

## INTENTIONAL INTERFERENCE WITH CONTRACT

## (RE BRYANT; AC 6)[8]

## (AGAINST MGA, LARIAN)

**A.    Valid Agreements Existed between Mattel And Bryant**

Although this Court has ruled on this issue in favor of Mattel in the April 25, 2008 Order, many of these facts are necessary for the jury in determining the full scope and nature of the breach and damages.

1.    Inventions Agreement:  Bryant joined Mattel in September 1995, where he worked in Mattel's Design Center as a BARBIE product designer.  In or about April 1998, Bryant resigned his position with Mattel.  Late in 1998, Bryant applied to Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's Design Center, again as a product designer, for Mattel's BARBIE Collectibles line.

2.    Upon his return to Mattel in January 1999, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Inventions Agreement").

3.    The Inventions Agreement provides at its outset that it "is designed to make clear that … inventions that I create will be owned by the Company"); it concludes with the capitalized, bold-faced statement that "**THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHT TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT**."

---

[8]  MC = Mattel's Claims in *Mattel v. Bryant (Case No. CV 04-9059 SGL (RNBx))*
    AC = Mattel's Counterclaims in *MGA v. Mattel (Case No. CV 05-2727 SGL (RNBx))*.

4.      In the Inventions Agreement, Bryant assigned to Mattel all rights in "inventions . . . conceived or reduced to practice by [Bryant] (alone or jointly by others at any time during [his] employment by the Company" to the fullest extent of the law.  The assignment is broad and included "all [his] right, title and interest in such inventions, and all [his] right title and interest in any patents, copyrights, patent applications and copyright applications based thereon."  As this Court held in the April 25, 2008 Order (at 4), "the Inventions Agreement explicitly conveys to Mattel an employee's interest in any copyrights or copyright applications."  *See also id.* at 5 ("[T]he plain language of the Inventions Agreement assigns his 'designs' to his employer.").

5.      The Court's April 25, 2008 Order further held (at 5) that the Inventions Agreement assigns to Mattel "any Bratz-related 'inventions' (including any designs, improvements, ideas, concepts, and copyrightable subject matter) that [Bryant] is found to have created during the period of his employment with Mattel." The Court's April 25, 2008 Order ruled (at 5) in addition that "because the subject matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing fashion dolls, the factual question of whether Bryant worked on them on his own time, rather than during his working hours at Mattel, is not relevant."

6.      The plain language of the Inventions Agreement confirms that ideas and concepts are within its scope.  Most notably, paragraph 2(a) refers to inventions that are "conceived or reduced to practice" (emphasis added).  See also ¶ 2(b) (defining "inventions" to include "know-how" and "discoveries").

7.      As this Court held in the April 25, 2008 Order (at 5) and reaffirmed in its May 21, 2008 Order, Bryant "owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement."  The Inventions Agreement also required Bryant, during and after his Mattel tenure, not to disclose or misuse Mattel's proprietary or confidential information.

8.     The Inventions Agreement also precluded Bryant from engaging in behavior that constituted a conflict of interest.

9.     <u>Conflict of Interest Questionnaire</u>.  Bryant further agreed, when he started at Mattel in 1999, that he would immediately notify his supervisor of any change in his situation that would cause him to change any of his certifications regarding whether he was engaged in activities that could constitute a conflict of interest.

10.     This Questionnaire, on its face, required Bryant to disclose to his supervisor any work he did while employed by Mattel for a Mattel competitor, including MGA, or on a competing line of dolls, including Bratz.

11.     <u>Proprietary Information Checkout</u>.  On Bryant's last day of employment with Mattel, October 20, 2000, Bryant signed a further agreement, called the "Proprietary Information Checkout" form.  Bryant acknowledged that "he has agreed to transfer all inventions made or conceived during the period of his employment to Mattel," and that "[m]y interest in (a) any and all inventions . . . which I have made or conceived . . . and in (b) any . . . designs, trademarks, copyright subject matter [or] . . . artistic works which I have made or conceived . . . during the period of my employment which relate or are applicable directly or indirectly to any phase of [Mattel's] business shall be the exclusive property of [Mattel]."

**B.     <u>MGA And Larian Had Knowledge Of Mattel's Contracts With Bryant.</u>**

1.     MGA and Larian knew and/or were willfully blind to the fact that Bryant had an inventions assignment agreement with Mattel.  Evidence so showing includes the following.  First, before Bryant signed a contract with MGA, Bryant provided MGA's attorney with a copy of his 1998 Mattel employment letter.  That letter specifically identified his Inventions Agreement with Mattel.  Bryant's cover letter to MGA's lawyers stated he was unable to ask Mattel Human Resources

1   about agreements that he signed, as that would be "risking suspicion."  Second,

2   David Rosenbaum, MGA's agent and the recipient of Bryant's "suspicion" memo,

3   testified as to his awareness that Bryant's agreement with Mattel likely assigned to

4   Mattel right, title and interest in designs and other works Bryant created while a

5   Mattel employee.  Third, Bryant was a Mattel doll designer who was pitching a doll

6   design to MGA while he was still working at Mattel.  MGA had its designers — and

7   later Bryant — agree that work done by MGA designers belonged to MGA.  MGA

8   knew that Mattel would require the same of its employees.  Fourth, Paula

9   Treantafelles, as well as other former Mattel employees, worked at MGA in 2000;

10   each of them had signed agreements identical or similar to Bryant's Mattel

11   agreements as a condition of being hired by Mattel.  Each of them also knew that

12   Bryant was required to do the same.  Fifth, MGA used other Mattel employees,

13   including without limitation Cabrera, Morales and Salazar, to work on Bratz while

14   they were still employed by Mattel.  MGA's knowledge can also be inferred from

15   evidence of MGA's wrongdoing and concealment, such as the fact that MGA

16   executive Victoria O'Connor, at Larian's direction, "whited-out" the "Barbie

17   Collectibles" fax header on the copy of the signed contract that MGA had received

18   from Bryant.  O'Connor has testified that she carried out Larian's instruction out of

19   concern that the fax header showed Bryant was employed by Mattel at the time that

20   he signed the agreement with MGA.  Other examples of MGA's and Larian's

21   concealment include Larian's, Garcia's and other MGA personnel's instructions to

22   others within MGA to conceal Bryant's involvement with Bratz, Larian's and

23   Garcia's false and misleading statement to the public and the press regarding the

24   origins and timing of Bratz, and Larian's false and misleading statement to the

25   Courts and public agencies, including the United States Patent Office, regarding the

26   origins and timing of Bratz.  Furthermore, MGA and its agents took steps to conceal

27   their use of other Mattel employees, including Cabrera, Morales and Salazar, for

28   years on Bratz, including by making payments under false names and false social

1  security numbers.  MGA, Larian and Bryant also all spoliated evidence to conceal

2  their activities, further giving rise to an inference of guilty knowledge, among other

3  things.

4

5  **C.**     **Bryant Breached His Contractual Obligations to Mattel**

6            Although this Court has partially ruled on this issue in favor of Mattel

7  in the April 25, 2008 Order, *see id.* at 5 ("Bryant … argues that his actions went no

8  further than lawful preparations to compete with his employer.  The undisputed

9  facts, however, tell a different story:  Bryant directly competed with Mattel by

10  entering into a contract with its competitor to produce a competing product while

11  still employed by Mattel."), many of these facts are necessary for the jury in

12  determining breach and damages.

13        1.    Breach of Inventions Agreement:

14            a.    Bryant conceived, created, made, and reduced to practice during

15  his Mattel tenure all of the following:

16            (i)    Bratz ideas and concepts, including, but not limited to, the

17            name "Bratz;"

18            (ii)    Bratz drawings and designs, including without limitation Bratz

19            drawings and designs which the Bratz dolls, their fashions and

20            accessories and other Bratz products were based on or derived from or

21            which the Bratz dolls otherwise infringed; and

22            (iii)    Bratz prototypes, sculptures, samples and other tangible items,

23            including without limitation Bratz prototypes, sculptures, samples and

24            other tangible items which the Bratz dolls or products were based on

25

26

27

28

1    or derived from or which the Bratz dolls or products otherwise

2    infringed.[9]

3          b.     Bryant admits that he failed to disclose to Mattel that he worked

4    on Bratz during his tenure at Mattel; he therefore breached the Agreement.

5          c.     Bryant also signed a contract purporting to assign *to MGA* all

6    "Bryant Work Product," which included copyrights to "all results and proceeds of

7    services provided during the term of this Agreement. . . ."  Bryant later signed a

8    "Modification and Clarification" (of his MGA contract), which "confirms" that "it is

9    the continuing intent, and has always been the intent of the parties from the

10   beginning of their contractual relationship, that MGA shall own all Intellectual

11   Property Rights subsisting in all Services and Materials created and worked on by

12   Bryant."  This purported assignment indisputably includes the drawings (and

13   associated copyrights) created during Bryant's Mattel tenure.  Indeed, paragraph 3.2

14   of the contract "confirms" assignment of "all work done by Bryant <u>prior to</u>

15   <u>September 18, 2000</u>, which became known as the Bratz property. . . ."  Prior to

16   September 18, 2000, Bryant was a Mattel employee.

17         d.     Bryant also breached the term of the Inventions Agreement that

18   prohibited him from "engag[ing] in any employment or business other than for the

19   Company, or invest[ing] in or assist[ing] (in any manner) any business competitive

---

[9] In its May 21, 2008 Order, the Court stated that "it is uncontroverted that four drawings (each with a color and a black-and-white version) of dolls in evening wear, were created by Bryant during the period of his employment with Mattel. (Order at 8).  Likewise, the Court ruled that "[i]t is also undisputed that, during the period of his employment, Bryant created a dummy doll, anticipating it would be used in his pitch of Bratz to MGA." (<u>Id</u>.)  "Finally," the Court stated, "it is undisputed that a drawing by Bryant, from which the sculpt of the Bratz doll was made, was created during the period of Bryant's employment with Mattel." (<u>Id</u>.)  Nonetheless, the Court held that there were "factors regarding each of these three categories" -- namely, their relation to other drawings whose creation date remains in dispute -- "that preclude a grant of summary judgment at this time." (<u>Id</u>).

20
21
22
23
24
25
26
27
28

1  with the business or future business plans of the Company," unless he had "the

2  Company's express written consent."  As this Court found in the April 25, 2008

3  Order (at 5), "[t]he undisputed facts … [show] Bryant directly competed with Mattel

4  by entering into a contract with its competitor to produce a competing product while

5  still employed by Mattel."

6           e.      While Bryant was employed by Mattel, Bryant and other

7  defendants misappropriated and misused Mattel property and Mattel resources for

8  the benefit of Bryant and MGA.  Such acts included, but are not limited to, the

9  following:

10                  (i)     Creating the concept, design and name of Bratz; while Bryant

11                  was employed at Mattel, he was routinely exposed to Mattel concepts

12                  that inspired Bryant in his creation of Bratz and thus show that Bryant

13                  created Bratz while employed by Mattel.  For example, a Mattel

14                  designer named Lily Martinez was working on a project in 1999

15                  called Toon Teens.  Though the Toon Teen dolls never went to

16                  market, Bryant had access to Martinez's sketches, which were posted

17                  in her cubicle for a period of time beginning in 1999.  Furthermore,

18                  Carter Bryant's roommate, Elise Cloonan, worked on the Toon Teens

19                  project.  As another example, starting in approximately the late 1999

20                  and early 2000 time period, Mattel considered certain names for dolls

21                  in its line that ultimately became known as DIVA STARZ.  The

22                  names Mattel considered included "Brats" and variations, including

23                  "Mall Brats," as well as other names such as "Boyz" and "Petz."  Such

24                  names were either subsequently considered to be used or were used by

25                  MGA and Bryant in connection with Bratz.  Mattel also

26                  commissioned drawings from outside vendor, Steve Linker, for its

27                  DIVA STARZ project that included elements later incorporated in

28                  Bratz by Bryant and/or MGA.

(ii)    Using Mattel resources, and while employed by Mattel, Bryant worked by himself and with other Mattel employees and contractors to design and develop Bratz, including without limitation by creating drawings and three-dimensional models of Bratz dolls, and fashion designs for the dolls' associated clothing and accessories;

(iii)   Using Mattel resources, and while employed by Mattel, Bryant took steps to assist MGA to produce Bratz dolls.  By his account, Bryant met with MGA in August or September 2000, and eventually sold Bratz to MGA and quit Mattel to work with MGA on the Bratz dolls.

(iv)    A further example is the work that Bryant did in conjunction with Steve Linker, a Mattel vendor who created designs for Mattel for DIVA STARZ.  In Summer 2000, Linker was contacted by an MGA employee — Paula Garcia — who had left Mattel in April 2000 to work for MGA.  Garcia has testified that (i) when she left Mattel she was aware of DIVA STARZ at Mattel through several of her Mattel colleagues and (ii) when she contacted Linker in Summer 2000 and asked him to do work for MGA, she knew that Linker had worked on DIVA STARZ for Mattel.  Linker has since testified and confirmed that Garcia made this approach, and that when he met with her and Bryant in October 2000, Bryant showed Linker "Bratz" artboards and illustrations.  Garcia knew that Linker had worked on, and had full access to, all of Mattel's DIVA STARZ property, and she pursued Linker to have him work on the Bratz project for MGA.

(v)     Bryant admitted creating a Bratz model using Mattel resources and that he paid at least one Mattel employee for her work on Bratz.

(vi)    Bryant admitted at deposition that he worked on his Bratz drawings while employed by Mattel and showed them to MGA while

employed by Mattel; Bryant admitted creating drawings of Bratz characters wearing evening fashion designs in or about July 2000; he performed development-related work on Bratz while employed by Mattel and used Mattel employees and materials to prepare a three-dimensional doll prototype for his pitch to MGA — a pitch he made while employed by Mattel; he worked on an ostensibly separate doll for MGA while employed by Mattel; he targeted Mattel vendors and engaged them to start their work on Bratz before he left Mattel, using Mattel resources; MGA and Isaac Larian, MGA's CEO, were aware when Bryant first met with them that Bryant was still employed at Mattel; Bryant worked on Bratz with MGA for at least four hours per day starting weeks before he left Mattel; and one vendor alone billed for 169 hours of development services on Bratz before Bryant left Mattel.  Both MGA HK's Lee Shiu Cheung and MGA HK's outside counsel have separately declared under oath that "[t]he designs of the Bratz dolls are all original drawings created by Mr. Bryant using his own independent labour, skill and judgement [sic]."

(vii)    A former Mattel employee, Veronica Marlow, worked with Bryant and MGA on Bratz products.  Ms. Marlow was originally employed at Mattel, where she knew Bryant, and began to work for MGA in or around 2000.  Marlow worked closely with Bryant and, according to Bryant, Marlow and some MGA witnesses, made an introduction for Bryant to MGA.  Bryant has paid and continues to pay Marlow — who Bryant claims introduced him to MGA — at least 10% of his 3% royalty from Bratz.  As a result, Ms. Marlow has since been paid millions of dollars by both Bryant and MGA.  Marlow induced Mattel employees Ana Cabrera, Beatrice Morales and Elena Salazar to work on Bratz for MGA and for Bryant during 2000

1    through 2005.  Marlow took steps to conceal the fact that Mattel

2    employees were working on Bratz, including without limitation by

3    paying them using false names and false social security numbers.

4         (viii)    Paula Garcia, MGA's Bratz project manager, worked for

5    Mattel until April 2000.  Ms. Garcia was involved with the Bratz

6    project, including when Bryant while employed by Mattel.  Ms.

7    Garcia, among others working at MGA in 2000, had had access and

8    knowledge of the DIVA STARZ project while she was still a Mattel

9    employee.  In addition, Maureen Mullen, also a former Mattel

10   employee, worked for MGA in 2000.  Ms. Mullen, one of the primary

11   designers on DIVA STARZ, worked with Ms. Garcia at Mattel and

12   was friends with her.  Concurrent with her consulting work on DIVA

13   STARZ in 2000, Mullen was paid $17,000 by MGA for work on a

14   doll design.  Ms. Garcia and Larian emailed Ms. Mullen in October

15   2000 asking if she could recommend Mattel personnel to work on

16   Bratz.

17        f.    During the time that he was employed by Mattel, Bryant

18   concealed his actions from Mattel, by, *inter alia*, failing to notify his supervisor of

19   the conflict of interest he created when he began working with MGA and when he

20   began receiving payments from MGA, by conceding Bratz, and by spoliating

21   evidence:

22        (i)    While he was still a Mattel employee, Bryant sent a fax to an

23   MGA attorney, David Rosenbaum, to provide information about his

24   Mattel employment and Mattel agreements to MGA.  In the fax, Bryant

25   advised MGA, "I am unable to look into this too much further with our

26   [i.e., Mattel's] Human Resources director without risking suspicion."

27   Bryant did send his offer letter from Mattel to MGA with this fax.

28   That letter made it clear to MGA that, as is standard in the industry and

standard within MGA as well, Bryant had signed an Inventions Agreement with Mattel.

(ii)    MGA, Larian and Bryant altered numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings, even though the drawings were not created in August 1998.  These notations were not made in 1998, and defendants do not deny the drawings were not completed in 1998.  Nevertheless, defendants falsely told the Copyright Office they were completed in 1998.

(iii)   Jacqueline Ramona Prince, a third-party witness, has raised other questions about the integrity of Bryant's documents.  According to both Ms. Prince and Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he was employed by Mattel, and asked her to notarize them "as of" 1998.  Ms. Prince, however, testified that markings which now appear on the copy of a Bratz drawing produced by defendants did not appear on the original drawing that Bryant showed her in 1999.  This conflicts with Bryant's testimony about the drawing.  Furthermore, expert forensic analysis has shown that a key portion of the entry from Ms. Prince's notary book relating to certain of Bryant's Bratz drawings -- reflecting that those drawings are supposedly "From 1998 Missouri" -- was subsequently added to the book using different ink.

(iv)   As further examples, Bryant and MGA have produced other documents that appear to have been altered to conceal information, including without limitation to conceal the true timing of Bratz's creation and Bryant's involvement with MGA.  These include, most notably, faxes of Bratz drawings that have fax header dates of April 2000 and thereabouts — six months before Bryant left Mattel's employ.

One page produced by Bryant states that it was the third page of a fax transmission, but neither preceding nor subsequent pages, nor any cover sheet, has been produced.  Further, even though the fax headers on the produced pages have fields for both the sender's name and the sender's telephone number, neither the name of the sender nor the sender's telephone number appears in the fax headers — in violation of federal law, as the Court has recognized.

(v)     Bryant and MGA caused destructive testing to be performed on Bryant's original drawings without either advance notice to or approval by the Court or Mattel.  Some of these drawings — including the originals of documents BRYANT 192 and BRYANT 210 — had holes in them.  Bryant testified that his drawings did not have holes in them when he turned them over to defendants' counsel and that he was unaware of the origin of the holes.  As the Court has stated:  "That there are serious questions concerning the handling of these critical documents [by MGA] certainly causes the Court much concern about whether the truth seeking functions of the adversarial system have been fundamentally compromised in this case."  Order Re Motion for Appointment of Expert Witnesses, at 11:10-13.

(vi)    Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000.  For example, during 2000, Bryant told other Mattel employees that he was going to leave Mattel for "non-competitive" pursuits.  Bryant knew at the time that this was false because he was already working with MGA and had contracted with MGA to assign Bratz works to MGA and to provide design and development services to it.  Bryant also enlisted other Mattel employees to perform work on Bratz during the time he was employed

by Mattel.  Bryant even misled some to believe that they were performing work on a project for Mattel.

g.      Bryant and other Mattel employees working on a Bratz prototype — without Mattel's knowledge — had designed and were far along in development of Bratz prior to the time that Bryant left Mattel on October 20, 2000. Such evidence includes, but is not limited to, the following:

(i)      Bryant created a key design drawing that was the basis for three-dimensional Bratz dolls while employed by Mattel.  Bryant testified at deposition that he created this drawing in November 2000, after he had left Mattel.  However, Steve Linker, a third-party vendor working with MGA, testified that he received that design drawing (as well as other Bratz development documents) from MGA at a meeting held before Bryant left Mattel.

(ii)      Bryant created Bratz designs that bear an April 2000 fax header date, six months before he left Mattel;

(iii)      Contrary to Bryant's testimony, Bryant had faces of three-dimensional Bratz dolls painted as of June 2000 (*i.e.*, some five months before he left Mattel).  Anna Rhee has testified that she was asked by Bryant and paid by MGA to paint Bratz doll heads in June 2000.

(iv)      Bratz design drawings produced by defendants with alleged "8/1998" creation dates (*i.e.*, purportedly when Bryant was not employed by Mattel) did not bear those dates as of October 2000 — in other words, the dates were added to the drawings after the fact.  These include drawings registered by MGA with the Copyright Office that bear false '8/1998' creation dates.

(v)      According to MGA's own e-mails, Bryant worked on Bratz with MGA for at least four hours per day starting weeks before he left Mattel.

(vi)    One vendor alone, Veronica Marlow, billed for 169 hours of development services on Bratz before Bryant left Mattel.

(vii)    While he was working for Mattel, Bryant contacted vendors for his own and MGA's benefit, including, but not limited to, vendors in Hong Kong for doll hair for Bratz and admitted to them that he was working with MGA.

(viii)  Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel.  Those meetings were arranged by Bryant, Larian and others at MGA, *i.e.*, while Bryant was still employed by Mattel.

(ix)    Anna Rhee was asked by Bryant and paid by MGA to paint Bratz doll heads in June 2000.  Ms. Rhee produced approximately twenty invoices for work that she performed on Bryant-related MGA projects in the year 2000.  These invoices also reveal that Ms. Rhee performed work with Bryant and MGA on at least seven separate occasions before Bryant's departure from Mattel — including one invoice that dates to June 12, 2000, well before Bryant claimed at deposition to have even heard of MGA.

(x)    Ms. Rhee testified that her work during that time period was for Bratz and that "Angel" was MGA's and Bryant's code name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face painting on two Bratz doll heads; her late August 2000 work was for face painting on four Bratz doll heads; and her work as of September 8, 2000 was for face painting on additional Bratz doll heads.  All of these are times when Bryant was employed by Mattel.

(xi)    According to defendants, Bryant made his Bratz pitch to MGA
during the time when he was still employed with Mattel, and after
Bryant's initial meeting with Ms. Garcia and Ms. Marlow.  Also
according to defendants, present at that meeting were Isaac Larian, his
daughter Jasmine, Paula Garcia, Veronica Marlow and Victoria
O'Connor.  Also, while still employed by Mattel, Bryant solicited
Margaret Hatch-Leahy, a Mattel employee until September 5, 2000, to
sculpt the Bratz dolls and introduced her to MGA.  Bryant attended a
meeting with Ms. Garcia and Margaret Leahy, to discuss Bratz doll
sculptures during a time that Bryant was still employed at Mattel.  As a
result of Bryant's and MGA's solicitation, Ms. Hatch-Leahy worked on
Bratz sculpts while he was still a Mattel employee and under Bryant's
creative direction.

(xii)   Further, MGA and those associated with MGA have made
statements, including under oath, that confirm Bryant assisted and
worked with MGA during his Mattel employment.  In statements to the
press, for example, MGA's CEO, Isaac Larian, told the Wall Street
Journal that "he chose Mr. Bryant's idea for the Bratz over several
others after holding a sort of fashion-doll design contest in late 1999"
— a time when Bryant was employed by Mattel and well before the
time that MGA and Bryant claim in this case to have even been
introduced.  In a sworn affidavit filed in a Hong Kong lawsuit brought
by MGA, Isaac Larian stated that "[t]he Bratz dolls were first exhibited
in the USA in November 2000," which further confirms that Bryant
was working with and aiding MGA on the project prior to his departure
from Mattel on or about October 20, 2000.

(xiii)  In an MGA e-mail dated September 9, 2001, authored by Nana
Ashong, an associate product manager at MGA who worked on the

Bratz project, Ms. Ashong gives the "key legally relevant dates for Bratz" as reflected by MGA's copyright registration applications, including a "date of creation" of September 18, 2000.  Sam Khare, an MGA Rule 30(b)(6) designee on the subject of MGA's copyright, trademark and patent applications and registrations and associated communications, confirmed that the meaning of Ms. Ashong's email was "that the Bratz dolls were created on September 18, 2000."

(xiv)   Additionally, Isaac Larian was sued for fraud and other claims by his brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified Complaint asserts, among other things, that "in or about late 1999 and early 2000, Isaac became aware of a potential new product line that had tremendous potential for [MGA].  The new product line involved the 'Bratz' dolls and related products."  The verified Complaint further states:  "In or about early 2000, Isaac called a meeting to discuss the new Bratz product line with selected individuals" at MGA, and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the Bratz line" in February, March and May 2000.  Bryant was working for Mattel during each of these time periods.

(xv)   Other evidence adduced to date also confirms, among other things, that Bryant designed Bratz while employed by Mattel and not in 1998 as he has asserted.  For example, Bryant and/MGA's use of elements from Mattel projects created during the 1999 and 2000 time period -- including elements from Toon Teens and DIVA STARZ described above -- tend to show that Bratz was created while Bryant was a Mattel employee and not in 1998 as he and MGA claims.

(xvi)   While Bryant was still employed by Mattel, he and MGA employees repeatedly provided design and manufacturing information to MGA HK for Bratz.

(xvii) Mattel will offer expert testimony regarding the timing of the marketing research and sales of Bratz dolls, and other evidence regarding the credibility of MGA's claims as to when it began to develop the Bratz product line. This will include evidence showing that the Bratz product line was developed in an earlier timeframe than MGA now alleges; that events taking place within Mattel regarding its own Toon Teens and DIVA STARZ projects indicate that Bratz had sources of inspiration other than those identified by Bryant and that Bratz was created while Bryant was employed by Mattel.

h.      It is beyond legitimate dispute that MGA -- a toy company -- was and is "a business competitive with the business or future business plans of" Mattel within the meaning of the Inventions Agreement.  It is also undisputed that Mattel never granted Bryant "express written consent" to work with MGA while still employed by Mattel.  Accordingly, Bryant's work with MGA while employed at Mattel breached the Inventions Agreement.

i.      Bryant promised in the Inventions Agreement not to disclose or misuse Mattel's proprietary or confidential information.  That obligation remains in effect to this day, and continues to be violated by Bryant.

j.      Bryant's breaches of contract and defendants' other misconduct have caused Mattel substantial harm.

**D.      Breaches of the Conflicts of Interest Questionnaire:**

Bryant breached the Conflict of Interest Questionnaire.  The Questionnaire required Bryant to notify Mattel if he became engaged in any business venture with a Mattel competitor that could be construed as a conflict of

1    interest.  Bryant worked on Bratz and with MGA while employed by Mattel.  He did

2    not notify Mattel of this fact.  Bryant misled others at Mattel upon his departure.

3          Bryant understood what the Conflict Questionnaire required because,

4    among other things, he disclosed on it the freelance work he had performed while in

5    Missouri for Ashton-Drake, but never disclosed the Bratz work he now claims he

6    did in 1998.

7

8    **E.     Breach of The Proprietary Information Checkout Form:**

9          Bryant's last day of employment with Mattel was October 20, 2000.  At

10   that time, he signed a further agreement, called the "Proprietary Information

11   Checkout" form.  In it, Bryant acknowledged that "he has agreed to transfer all

12   inventions made or conceived during the period of his employment to Mattel," and

13   that:

14          My interest in (a) any and all inventions . . . which I have

15          made or conceived . . . and in (b) any . . . designs,

16          trademarks, copyright subject matter [or] . . . artistic works

17          which I have made or conceived . . . during the period of

18          my employment which relate or are applicable directly or

19          indirectly to any phase of [Mattel's] business shall be the

20          exclusive property of [Mattel].

21   Bryant executed the Proprietary Information Checkout form despite his execution of

22   the MGA/Bratz agreement purporting to convey Bryant's Bratz works to MGA.  Nor

23   did Bryant otherwise disclose to Mattel his MGA agreement or his work for MGA.

24   To the contrary, Bryant concealed from Mattel that he was going to a competitor

25   and explicitly told others at Mattel that he was going to do "non-competitive"

26   pursuits.  Bryant knew at the time that those representations were false and made

27   those false statements to conceal from Mattel the facts that he was already working

28   with MGA and that he had contracted with MGA purportedly to assign Bratz works

1  to MGA and to provide design and development services to MGA, a Mattel

2  competitor.

3          Mattel seeks an injunction barring defendants from further use and

4  possession of the converted property and requiring its return to Mattel.

5

6  **F.**   **MGA and Larian Induced And Encouraged Bryant To Breach, and**

7         **Disrupted The Performance of His Contracts With Mattel.**

8          1.   MGA and Larian paid Bryant to breach his contracts with Mattel.

9          2.   While a Mattel employee, Bryant met with MGA employee

10  Paula Treantafelles (now Garcia) and discussed the various resources that might be

11  used to pull the Bratz doll line together; Bryant admitted creating drawings of Bratz

12  in or about July 2000; MGA employee Anna Rhee testified that she was painting

13  sculpted Bratz heads in June 2000; Bryant wrote on a note to a vendor on September

14  18, 2000 that he was "working with MGA Entertainment;" Bryant created a Bratz

15  prototype using Mattel doll parts; Bryant solicited and directed Margaret Hatch-

16  Leahy to sculpt a head for Bratz while he was at Mattel; according to an MGA

17  email, Bryant was spending at least four hours a day on Bratz while a Mattel

18  employee during September and October 2000; and both MGA HK's Lee Shiu

19  Cheung and MGA HK's outside counsel have separately declared under oath that

20  "[t]he designs of the Bratz dolls are all original drawings created by Mr. Bryant

21  using his own independent labour, skill and judgement [sic]." MGA and Larian

22  paid Bryant while Bryant was still a Mattel employee.  In conjunction with the

23  payment, MGA and Larian required Bryant to make MGA "top priority."  For

24  Bryant's efforts on Bratz as set forth below, MGA has admitted to paying Bryant

25  approximately $7,000.  MGA was the source of other deposits beginning in April

26  2000, the source of which Bryant cannot recall.  MGA also directly interfered with

27  Bryant's contract to assign Bratz to Mattel when MGA induced Bryant to assign

28  those same rights to Bratz to MGA.

3.      Mattel will show that MGA induced Bryant to breach further provisions of the Inventions Agreement.  For example, in Section 3, Bryant agreed:

> My employment with the Company requires my undivided
> attention and effort.  Therefore, during my employment
> with the Company, I will fully comply with the Company's
> Conflict of Interest Policy as it may be amended from time
> to time.  I shall not, without the Company's express written
> consent, engage in any engagements or business other than
> for the Company, or invest in or assist [in any manner] any
> business competitive with the business or future business
> of the Company.

4.      MGA's CEO, Isaac Larian, ordered former MGA executive, Victoria O'Connor, to redact "Barbie Collectibles" from the faxed version of Bryant's Bratz agreement with MGA to conceal that Bryant had sent the contract from Mattel's Design Center.  According to Ms. O'Connor, Bryant faxed a signed copy of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the contract included a fax header that read "Barbie Collectibles" and bore the number of the Mattel fax machine that it came from, revealing that it came from Mattel's Designer Center where Bryant worked.  When Ms. O'Connor brought this to the attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header information on all pages of the contract and send the contract, as altered, to an outside MGA attorney and MGA's former counsel in this action, Patricia Glaser. At Mr. Larian's direction, Ms. O'Connor proceeded to alter each page of the contract in order to conceal, as Ms. O'Connor testified, that Bryant "was still employed at Mattel at the time the contract [between MGA and Bryant] was executed."

5.      MGA and Isaac Larian knowingly and intentionally made conflicting and false claims, some under oath, regarding the origins and creation of

Bratz.  For example, MGA made public statements about the origins of Bratz in the press that claimed persons other than Bryant created Bratz — sometimes Larian took credit for inventing Bratz, sometimes he gave credit to his son for the idea.  At points, MGA claimed that Larian chose Bratz during a "competition" hosted by MGA.  In 2004, MGA submitted an Affidavit of Isaac Larian to the High Court of Justice in the United Kingdom.  In that Affidavit, Mr. Larian swore:  "I established the Claimant and *was the inspiration behind the BRATZ dolls*."

6.     In 2003, Larian represented to the U.S. Patent and Trademark Office that Bratz originated from him.  The patent application credited Mr. Larian as the sole "Inventor" and sought a patent for "changeable footwear."  Bryan Armstrong, MGA's Rule 30(b)(6) witness on the subject of patent applications, testified that the subject of this application was, in fact, the Bratz dolls.  The pre-prepared Bratz pitch materials that Carter Bryant testified he first presented to MGA in September 2000 — and, significantly, at the meeting where Mr. Larian and Mr. Bryant claim they first had any contact with one another — also show Bratz dolls with the features that are the subject of the claims of the patent application.  According to Bryant's deposition testimony, Bryant was the one who came up with the changeable footgear for Bratz.  Nevertheless, Bryant also made false, sworn statements to the U.S. Patent and Trademark Office in connection with the application.  These are just a few examples of the well-documented false statements that MGA, Larian and Bryant have made over the years (including in this case) with respect to Bratz, including its origins, creation, design and development.

7.     MGA has spoliated electronic evidence.  For example, MGA engaged in the practice of "wiping" the hard drives on Mr. Larian's two computers every six months to a year.  MGA's designee on documentary and electronic evidence preservation and collection testified that the only effort made by MGA to collect e-mail messages was a search conducted in 2005 of the e-mail messages of Isaac Larian.  As another example, Farhad Larian, Isaac Larian's brother, former

MGA shareholder and executive and an MGA consultant at the time, deleted emails
and other electronic documents relating to Bratz and other relevant matters after this
lawsuit was filed.  Bryant, too, destroyed electronic data from his computers after
this suit was filed.  In a similar vein, as a tactical measure to conceal the truth,
defendants refused to produce virtually any evidence or witnesses until ordered and
often not even then.  For example, Bryant and Larian both refused to answer
questions under oath until twice ordered by the Court to do so.  Defendants also
redacted relevant information from their documents and concealed many of their
documents until ordered to produce them.

## IX.

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

## (RE:  BRYANT; AC 8)

## (AGAINST MGA AND LARIAN)

Although this Court has ruled on the issue of the existence of a
fiduciary duty in favor of Mattel in the April 25, 2008 and May 21, 2008 Orders,[10]
many of these facts are necessary for the jury in determining the scope of the duty,
breach of that duty, and damages.

**A.     Bryant Owed A Fiduciary Duty To Mattel**

1.     Bryant was Mattel's employee and was entrusted with
confidential, proprietary information.  Mattel restates and hereby incorporates by

---

[10]   April 25, 2008 Order at 6 ("The Court grants Mattel's motion for summary
judgment and denies Bryant's motion for summary judgment on the issue of the
existence and breach of a fiduciary duty.").  In its May 21, 2008 Order (at 4), the
Court reaffirmed that Bryant was subject to a fiduciary duty, but held that the scope
of that duty and whether Bryant breached his fiduciary duty should be submitted to
the jury.

1  reference the facts and evidence set forth above.  Bryant's fiduciary duty to Mattel

2  emanates from two sources:  (1) the Inventions Agreement, which by its terms

3  imposed on Bryant an obligation of confidentiality and trust; (2) Bryant's role at

4  Mattel, which endowed him with trust and gave him broad access to confidential

5  information.

6            2.      Mattel's letter to Bryant offering him a position with Mattel

7  conveyed the importance to Mattel of Bryant's preservation of confidentiality as a

8  Mattel employee, stating that "this offer is contingent upon satisfactory verification

9  of all information…, and the signing of a Confidential Information and Inventions

10  Agreement."  The Inventions Agreement further manifested an intent to create a

11  confidential relationship, underscoring the "competitive environment" in which

12  Mattel operates and requiring Bryant to "maintain the confidentiality of the

13  Company's trade secrets," and to "use those trade secrets for the exclusive benefit of

14  the Company."  In addition, it required that Bryant, during his Mattel employment,

15  would not "engage in any employment or business other than for [Mattel], or invest

16  in or assist (in any manner) any business competitive with the business or future

17  business plans of [Mattel]" without Mattel's express written consent.  Inventions

18  Agreement ¶ 3.  And upon leaving the Company, Bryant was obligated to "deliver

19  all tangible, written, graphical, machine readable and other materials (including all

20  copies) in my possession or under my control containing or disclosing Proprietary

21  information."  Taken together, these provisions, among others, clearly evince an

22  intent to create a close, confidential relationship between Mattel and Bryant.  These

23  provisions create a fiduciary duty under California law.   Bryant's acceptance of

24  these terms as a condition of employment manifests his intent to be bound.  As this

25  Court held in the April 25, 2008 Order (at 5), "Bryant … owed a fiduciary duty to

26  Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement."

27  The Court reiterated this conclusion in its May 21, 2008 Order, but clarified that this

28  duty extends as a matter of law to Bryant's guardianship of "Mattel's confidential

1   information…." (Order at 4) and declined to determine on summary judgment

2   whether that duty extended beyond that.  (Id.)

3           3.      Even apart from the Inventions Agreement, Bryant owed Mattel

4   a fiduciary duty because Mattel entrusted him with highly confidential information.

5   While at Mattel, Bryant had extensive access to and exposure to confidential and

6   proprietary information (including designs for BARBIE and proposed lines of other

7   dolls and toys); confidential knowledge relating to design, marketing, production,

8   sales; and access to the creative resources and concepts at the core of Mattel's

9   business.  He also supervised the work of others, exercised discretion and worked

10  independently in many of his job assignments and duties.  Bryant also represented

11  Mattel in its dealings with third parties and, in actions in the course and scope of his

12  employment with Mattel, was an agent of Mattel.  As this Court found in the April

13  25, 2008 Order (at 6), "Bryant was 'in a superior position to exert unique influence

14  over' Mattel because he was in the best position, arguably the only one in a position,

15  to know of and police his actions."

16          4.      Bryant thus occupied a position of trust within the company.

17  Bryant admitted to this position of trust repeatedly.

18          5.      The Conflict of Interest Questionnaire Bryant executed on

19  January 4, 1999, contained his certification that, other than as disclosed, he had not

20  worked for any competitor of Mattel in the prior twelve months and had not engaged

21  in any business venture or transaction involving a Mattel competitor that could be

22  construed as a conflict of interest.  Pursuant to the Conflict Questionnaire, Bryant

23  also agreed that he would immediately notify his supervisor of any change in his

24  situation that would cause him to change any of the foregoing certifications.

25          6.      The effect of these circumstances and agreements was that

26  Bryant owed Mattel a fiduciary duty that included, but was not limited to, an

27  obligation not to take any action that would be contrary to Mattel's best interests or

28

1   that would deprive Mattel of any opportunities, profit or advantage which Bryant

2   might bring to Mattel.

3

4   **B.**      **Bryant Breached The Fiduciary Duty He Owed To Mattel**

5          Bryant breached his fiduciary duty to Mattel in a variety of ways which

6   elevated his own interests above Mattel's in dereliction of his duties.  Specifically:

7                1.      Bryant failed to act in the best interests of Mattel while

8   employed at Mattel.  Among other things, Bryant worked with MGA and accepted

9   payments from MGA while still a Mattel employee, entered in an agreement with a

10  competitor, conveyed Mattel property and concepts to MGA, failed to disclose

11  inventions he created while a Mattel employee, failed to disclose his conflicts of

12  interest, solicited and paid Mattel employees to work on Bratz, used Mattel

13  resources for Bratz and to benefit himself and MGA and its affiliates, and

14  misrepresented to Mattel his future plans.  This pattern of conduct is a classic breach

15  of fiduciary duty.

16                Bryant breached his duties by conveying to MGA inventions --

17  including without limitation drawings, sculpts and three-dimensional tangibles -- he

18  created while employed by Mattel and those he may have created later but that

19  derived from or otherwise infringed upon the works he created while a Mattel

20  employee.  As discussed above, the Inventions Agreement formalized this common

21  law duty by explicitly prohibiting such a transfer.  Apart from his actual conveyance

22  of these inventions, Bryant breached his fiduciary obligations to Mattel by secretly

23  contracting with MGA while employed by Mattel.  Without Mattel's knowledge,

24  and without its consent, Bryant entered into a contract with MGA dated as of

25  September 18, 2000 -- while he was indisputably still employed by Mattel.  The

26  MGA-Bryant contract required Bryant to provide design services on Bratz, a line of

27  dolls created by Bryant, to MGA on a "top priority" basis.  This contract squarely

28  conflicted with Bryant's pre-existing contractual obligations to Mattel.  *See id.*

Bryant has admitted to conduct during his Mattel tenure that constituted multiple breaches of his duties to Mattel, including without limitation:

- **Drawing Bratz**.  Bryant indisputably created and worked on Bratz drawings while employed by Mattel.  He admitted this in binding responses to requests for admission.  He also admitted he showed them to MGA while employed by Mattel.

- **Using Mattel resources for Bratz**.  Bryant used Mattel employees and materials to prepare a three-dimensional doll prototype for his pitch to MGA (a pitch he made while employed by Mattel), and separately paid at least one Mattel employee for such work on Bratz.  Bryant also called MGA dozens of times from his work telephone at Mattel and sent MGA faxes from Mattel's fax machine.

- **Soliciting Mattel vendors for Bratz**.  Bryant targeted Mattel vendors and engaged them to start their work on Bratz before he left Mattel. For example, he "learned about the existence of [a hair vendor] Universal in connection with [his] Mattel employment" and obtained its contact information from another Mattel employee.

- **Work on Another, Allegedly Separate MGA Project**.  Bryant worked for MGA on an allegedly separate (from Bratz) doll while employed by Mattel, and was paid by MGA for that work.

Bryant's work on Bratz while employed at Mattel cannot be dismissed as mere preparation to compete with Mattel, i.e., rather than actual competition which breached his duties.  This Court explicitly so found in the April 25, 2008 Order (at 5):  "Bryant … argues that his actions went no further than lawful preparations to compete with his employer.  The undisputed facts, however, tell a different story.  Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel."

1          Bryant also breached his fiduciary duty to communicate his inventions

2   to Mattel.  Specifically, Bryant never disclosed his plans to Mattel.  Bryant

3   concealed his creation of Bratz and relationship with MGA from Mattel.  Thus, he

4   did not disclose his invention and/or assignment of Bratz to MGA in his exit

5   interview or when he signed the Proprietary Information Checkout Form, on

6   October 19, 2000, in which he certified that "[a]ll documents … and other items

7   including, but not limited to, … sketches … relating to the business of the

8   Company, made or obtained by me while employed by the Company shall be the

9   exclusive property of the Company and shall be delivered by me to the Company on

10  termination of my employment or at any time as requested by the Company."

11  Bryant also hid the truth from his co-workers.  For instance, Jill Nordquist testified

12  that "[I asked] him if he was going to a competitor -- competitive doll company, to

13  which he responded no."  Likewise, Ivy Ross recalled, "[Bryant] told me he was

14  going to have more time on his hands, be able to sit at home and with his dog on his

15  side and do drawings and spend more quality time at home, and it's just something

16  he felt he really needed to do at this point in his life, and I asked if he was going to a

17  competitor, and he said no, it was not a competitor …."

18          2.    Mattel did not give informed consent to Bryant's conduct.

19          Bryant was a doll designer.  Rather than devote his talents to Mattel,

20  Bryant plotted against Mattel, exploited the resources available to him, accepted

21  secret payments, pitched his idea, drawings and model for a new doll line to MGA,

22  secretly solicited and paid Mattel employees to work on Bratz, entered into a secret

23  contract to work for MGA, and then took affirmative steps to conceal it.  Mattel

24  never gave informed consent to this secret scheme.

25

26

27

28

**C.    MGA and Larian Knew That Bryant Was Engaging In Conduct That Constituted A Breach Of The Fiduciary Duty He Owed Mattel.**

1.    MGA and Larian knew that Bryant was a Mattel employee when they first met with him.  They also knew that Bryant had pre-existing obligations to Mattel, including a duty to assign to Mattel all designs created while employed there.  MGA and Larian knew that Bryant held a position of trust and confidence at Mattel.  MGA and Larian knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA.  Bryant told MGA that he had signed a confidentiality agreement with Mattel.

2.    MGA either knew of and/or willfully and intentionally blinded itself to (1) the terms of the Bryant-Mattel Inventions Agreement and (2) the nature of Bryant's role at Mattel.  For example, MGA knew — because Bryant told them and because MGA saw it mentioned in a copy of Mattel's offer letter to Bryant — that Bryant had signed an Inventions Agreement with Mattel; MGA also knew that Bryant could (but did not want to) procure a copy of the agreement from Mattel.  MGA did not press Bryant to obtain the copy or inquire as to the nature of his confidential role at Mattel.  Instead, it purportedly satisfied itself, without basis, with Bryant's "warranty that BRATZ was Bryant's exclusive property" and Bryant's promise to "indemnif[y] MGA and Larian against any claims raised by a third party."

MGA entirely ignored that Bryant informed MGA that he had entered into an agreement with Mattel, and that Bryant could (but did not want to) obtain a copy of that agreement.  MGA's lawyer Rosenbaum has admitted that he knew such an agreement likely meant that any work Bryant did while employed by Mattel would be owned by Mattel.  Notwithstanding this, MGA's "diligence" regarding Mattel's rights in Bratz amounted to approximately half of a five-minute

1  conversation in which Rosenbaum asked Bryant's attorney, Anne Wang, whether

2  Bryant owned the rights to Bratz.

3

4  **D.     MGA and Larian Knowingly Assisted Bryant In Breaching His Fiduciary**

5       **Duty Owed To Mattel.**

6           1.     Mattel hereby refers to and incorporates by reference the facts set

7  forth above in relation to the claim against MGA and Larian for Intentional

8  Interference with Bryant's Contract with Mattel and Bryant's breaches of fiduciary

9  duties.  As Mattel demonstrated, MGA's misconduct was an essential factor in

10  defendants' scheme to steal Bratz from Mattel.  MGA's agreement to purchase Bratz

11  aggravated Bryant's disloyalty.  Thus, for example, Bryant would not have

12  commenced his secret campaign of soliciting Mattel's vendors had MGA not agreed

13  to develop Bratz, and pay him handsomely for it.  Without MGA, Bryant was only a

14  willing seller of stolen property; MGA provided him a buyer.

15           2.     MGA concedes Bryant worked on and was paid for another,

16  allegedly separate MGA project while he was still employed by Mattel.  MGA knew

17  that Bryant was a Mattel employee at the time.

18           3.     MGA not only paid Bryant while employed by Mattel, it

19  reimbursed him for expenses incurred regarding development of Bratz, thus freeing

20  Bryant from the burden of speculating on this concept and design on his own dime.

21  MGA also dangled the carrot of revenue-sharing in the future, payments that

22  ultimately added up to millions of dollars.  MGA encouraged Bryant's

23  misappropriation of Bratz by promising him huge potential profits.

24           4.     Larian and MGA profited financially from encouraging Bryant to

25  breach his duties to Mattel, including by selling Bratz to MGA.  Such financial gain

26  corroborates the two elements of an aiding/abetting claim.  By their same conduct,

27  MGA and Larian intentionally and without justification solicited, encouraged, aided

28

1  and abetted and gave substantial assistance to Bryant to breach his fiduciary duties

2  to Mattel, knowing that their conduct would cause such a breach.

3

4  **X.**

5  **AIDING AND ABETTING BREACH OF DUTY OF LOYALTY**

6  **(RE BRYANT; AC 10)**

7  **(AGAINST MGA AND LARIAN)**

8         Mattel hereby refers to and incorporates by reference the facts and

9  evidence set forth above in relation to each claim above.

10        Although this Court has ruled on the existence and breach of the duty

11  of loyalty in Mattel's favor in the April 25, 2008 Order,[11] as well as the existence of

12  Bryant's fiduciary duty, many of these facts are necessary for the jury in

13  determining breach of fiduciary duty and damages.

14

15  **A.    Bryant Was Mattel's Employee and Owed A Duty of Loyalty to Mattel**

16        Mattel restates and hereby incorporates by reference the facts and

17  evidence set forth above in relation to each claim asserted above.  Every California

18  employee owes a duty of undivided loyalty to his employer and may not take any

19  action that is adverse to his employer.  The duty of loyalty is also codified in the

20  <u>Labor Code</u>, which obligates every employee to comply with his employer's

21  directions, to assign to the employer everything (except compensation) the

22  employee acquires by virtue of his employment, and to give preference to the

23

24  _____

25  [11]   April 25, 2008 Order at 6 (granting summary judgment to Mattel because

26  "The undisputed facts establish that [Bryant] breached this duty [of loyalty] by

27  entering into a contract with Mattel's competitor, while still employed by Mattel, to

   produce a line of fashion dolls to be marketed in direct competition with Mattel's

   products.").

28

business of the employer over his own similar interests.  Cal. Labor Code §§ 2856, 2860, 2863.

Pursuant to this duty, Bryant could not compete with Mattel or assist a competitor of Mattel during his employment with Mattel.  Bryant was required to give preference to Mattel's business over his own or others' interests during the course of his employment with Mattel.  While California law does permit an employee to seek other employment and even to make some "preparations to compete" before resigning, an employee may not transfer his loyalty to a competitor without violating his duty of loyalty.

**B.     Bryant Knowingly Acted Against Mattel's Interests and Materially Breached the Duty of Loyalty He Owed to Mattel**

Mattel refers to and hereby incorporates by reference the facts set forth above regarding Bryant's breaches of contract.  By their nature, and in these circumstances, those breaches also constituted breaches of the duty of loyalty owed by Bryant to Mattel.  As shown above, Bryant indisputably engaged in ongoing, pervasive and secretive interactions with a competitor involved in the *same business* as Mattel for private gain at his employer's expense.

Bryant breached his loyalty to Mattel in that, while employed by Mattel, he secretly aided and assisted MGA and its affiliates, all of which are competitors of Mattel, including without limitation by entering into an agreement with MGA.  Bryant worked with MGA (and was paid by MGA) while employed by Mattel.  The contract Bryant secretly entered into with MGA required him to provide design services to MGA on a "top priority" basis while employed by Mattel.

**C.     Mattel Did Not Give Informed Consent To Bryant's Conduct**

Bryant worked on a line of dolls while employed by Mattel and did not disclose that work to Mattel.  Bryant also breached the aforementioned duty by

aiding a Mattel competitor and using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA and its affiliates.  Mattel never gave informed consent to Bryant's conduct.

## XI.

## CONVERSION

## (RE BRATZ; AC 11)

## (AGAINST MGA, MGA HK and LARIAN)

**A.** **Mattel Owns Valuable Property And Tangible Materials Including Drawings and Items Created By Bryant When He Was A Mattel Product Designer**

Mattel restates and hereby incorporates by reference the facts and evidence set forth in relation to each claim asserted above.  Mattel owned valuable tangible property created by Bryant while a Mattel employee, including without limitation Bratz drawings, Bratz sculpts and other three-dimensional items, and "Swan" drawings that Bryant created while employed by Mattel.  This property is referred to below for the purposes of this claim for conversion as "the Converted Property."

Defendants unlawfully converted the Converted Property by: (1) removing drawings, sculpts and other tangible materials owned by Mattel; and (2) unlawfully possessing such tangible materials.

In the Inventions Agreement, paragraph 2, Bryant assigned to Mattel all rights in "inventions," including "designs," that he created during his Mattel employment to the fullest extent of the law.  As Bryant's prior counsel has acknowledged, "[t]he nature of the assignment here is that it is a broad based

1   assignment of all inventions during their employment; all things that were conceived
2   and practiced."[12]  And this Court held in the April 25, 2008 Order (at 5) that "the
3   plain language of the Inventions Agreement assigns [Bryant's] 'designs' to his
4   employer."  Mattel owns (among other things) all doll and toy designs and works
5   that were created by Bryant during the term of his Mattel employment.  Without
6   Mattel's knowledge, and while he was still employed by Mattel, Bryant entered into
7   a contract with MGA dated as of September 18, 2000.[13]  That contract required
8   Bryant to provide design services on Bratz, a line of dolls created by Bryant and
9   marketed by MGA, to MGA on a "top priority" basis.  This agreement conflicted
10  with Bryant's preexisting contractual obligations to Mattel.[14]  Paragraphs 1 and 2 of
11  the September 18, 2000 Agreement with MGA purported to grant MGA ownership
12  of works produced by Bryant both before and after the agreement's effective date, in
13  further contravention of Bryant's obligations to Mattel under the Inventions
14  Agreement.

15          The Converted Property was taken by Bryant from Mattel to further his
16  own interests and provided by Bryant to Larian and MGA in furtherance of the
17  interests of Bryant, Larian and MGA.  MGA and Isaac Larian met with Bryant, paid
18  for his designs, and contracted with him for his services, all the time knowing that
19  Bryant was a Mattel employee in a confidential role.  This taking of Mattel's
20  tangible materials constituted conversion.

21

22

23

24  _____

25

26  [13]   Consulting Agreement between MGA and Bryant dated as of September 18,
27  2000, Proctor Dec. Exh. 3.
    [14]   Id. ¶ 1.

28

**B.** **Defendants' Wrongful Conversion of Mattel's Property Constituted A Substantial Interference With Mattel's Rights.**

1. The Converted Property was physically taken by Bryant from Mattel to further his own interests and provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA, and contrary to the interests of Mattel, to this day Bryant, Larian and MGA retain possession of the Converted Property.

2. Mattel was also deprived of its enjoyment and usage of the Converted Property, and was thereby injured and had its rights substantially interfered with by defendants.

**C.** **Mattel Did Not Consent To the Conversion**

1. As set forth above in relation to Mattel's claim for aiding and abetting breach of fiduciary duty, Bryant's wrongful conduct was secretive and Mattel never consented to the conversion of its property.

## XII.

## STATUTORY UNFAIR COMPETITION

## (RE BRYANT; AC 12)

## (AGAINST MGA, MGA HK, AND LARIAN)

As noted above, by Order dated May 21, 2008, the Court ruled that the MGA parties were entitled to partial summary judgment on the remainder of Mattel's statutory unfair competition claim. Mattel respectfully submits, however, that the May 21, 2008 Order may need to be clarified since the Court's earlier summary judgment ruling of April 25, 2008 had denied the defendants' summary judgment motion as to Mattel's unfair competition claim. In particular, the April 25, 2008 Order had stated that Mattel's statutory unfair competition claim presented

triable issues of fact relating to "whether MGA tortiously interfered with Bryant and Mattel's contractual relationship and whether MGA engaged in commercial bribery."  April 25, 2008 Order at 7.  Mattel respectfully suggests that this claim should still proceed to trial and will seek the Court's guidance on this issue.

A.   **Defendants Violated Section 17200 of the California Business and Professions Code By Engaging In An "Unlawful, Unfair Or Fraudulent Business Act Or Practice. . . . "**

1.      Mattel hereby refers to and incorporates by reference the facts and evidence set forth above in relation to each claim above.  Defendants thereby engaged in conduct that was unlawful.  MGA's and Larian's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641, constitutes unlawful acts of unfair competition in violation of both the common law of the State of California and *Cal. Bus. & Prof. Code* § 17200 et seq.  The evidence to support this claim includes:

   (a)   The payments made by MGA to Bryant while he remained employed by Mattel.

   (b)   MGA and Larian knew and/or were willfully blind to the fact that Bryant had an inventions assignment agreement with Mattel. Evidence so showing includes the following.  First, before Bryant signed a contract with MGA, Bryant provided MGA's attorney with a copy of his 1998 Mattel employment letter.  That letter specifically identified his Inventions Agreement with Mattel.  Bryant's cover letter to MGA's lawyers stated he was unable to ask Mattel Human Resources about agreements that he signed, as that would be "risking suspicion."  Second, David Rosenbaum, MGA's agent and the recipient of Bryant's "suspicion" memo, testified as to his awareness that Bryant's agreement with Mattel likely assigned to Mattel right, title and

1   interest in designs and other works Bryant created while a Mattel

2   employee.  Third, Bryant was a Mattel doll designer who was

3   pitching a doll design to MGA while he was still working at

4   Mattel.  MGA had its designers — and later Bryant — agree that

5   work done by MGA designers belonged to MGA.  MGA knew

6   that Mattel would require the same of its employees.  Fourth,

7   Paula Treantafelles, as well as other former Mattel employees,

8   worked at MGA in 2000; each of them had signed agreements

9   identical or similar to Bryant's Mattel agreements as a condition

10  of being hired by Mattel.  Each of them also knew that Bryant

11  was required to do the same.  Fifth, MGA used other Mattel

12  employees, including without limitation Cabrera, Morales and

13  Salazar, to work on Bratz while they were still employed by

14  Mattel.  MGA's knowledge can also be inferred from evidence of

15  MGA's wrongdoing and concealment, such as the fact that MGA

16  executive Victoria O'Connor, at Larian's direction, "whited-out"

17  the "Barbie Collectibles" fax header on the copy of the signed

18  contract that MGA had received from Bryant.  O'Connor has

19  testified that she carried out Larian's instruction out of concern

20  that the fax header showed Bryant was employed by Mattel at

21  the time that he signed the agreement with MGA.  Other

22  examples of MGA's and Larian's concealment include Larian's,

23  Garcia's and other MGA personnel's instructions to others within

24  MGA to conceal Bryant's involvement with Bratz, Larian's and

25  Garcia's false and misleading statement to the public and the

26  press regarding the origins and timing of Bratz, and Larian's false

27  and misleading statement to the Courts and public agencies,

28  including the United States Patent Office, regarding the origins

1    and timing of Bratz.  Furthermore, MGA and its agents took
2    steps to conceal their use of other Mattel employees, including
3    Cabrera, Morales and Salazar, for years on Bratz, including by
4    making payments under false names and false social security
5    numbers.  MGA, Larian and Bryant also all spoliated evidence to
6    conceal their activities, further giving rise to an inference of
7    guilty knowledge, among other things.

8    (c)    The payments were intended to induce, and encourage Bryant to
9    breach his contracts with and duties owed to Mattel.  Mattel
10   hereby incorporates by reference the facts and evidence set forth
11   above in relation to the claims for interference.

12

13                           **XIII.**
14                    **DECLARATORY RELIEF**
15                         **(AC 13)**
16       **(AGAINST MGA, MGA HK, AND LARIAN AND)**

17

18   **A.    An actual controversy exists between Mattel and Defendants regarding**
19        **Defendants' lack of ownership interests in Bratz works and Mattel's**
20        **rights in the same**
21            Mattel hereby refers to and incorporates by reference the facts and
22   evidence set forth above in relation to each claim above.  Mattel seeks a declaration
23   that it owns the Bratz works that Bryant created while at Mattel.

24

25   **B.    Defendants have no valid or protectible ownership rights or interests in**
26        **Bratz works, and Mattel is the true owner of the same**
27            Mattel will present evidence of its contracts with Bryant, as set forth
28   above in relation to the claim for breach of contract asserted against Bryant, and

hereby incorporated by reference.  In addition, based on the facts summarized above and expert and other testimony, Mattel will show that Bryant created intellectual property (including without limitation designs, concepts, ideas, improvements, drawings and sculpts) relating to Bratz during his Mattel employment and that such intellectual property is therefore owned by Mattel.  Such concepts and ideas include, but are not limited to, the name "Bratz."  For these same reasons, Bryant's later, conflicting assignment to and agreement with MGA was invalid and transferred no rights in Bratz to MGA or any other person or entity.

C.    **Mattel is entitled to an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz**

        Mattel seeks a declaration by the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports or purported to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, are void and of no effect, including because Bryant previously assigned all right, title or interest in Bratz to Mattel and because Mattel was otherwise the owner of said right, title or interest.  Mattel will provide expert testimony regarding an accounting of the revenues from Bratz earned by Defendants to prove the value of this entitlement to relief.

# XIV.

## COPYRIGHT INFRINGEMENT

## (AC 1)

## (AGAINST MGA, MGA HK, AND LARIAN)

**A.** **Mattel Is The Owner Of Valid Copyrights In Works That Are Fixed In Tangible Media Of Expression, And Are The Subject Of Federal Copyright Registrations**

1.      Mattel is the owner of copyrights in Bratz works that are fixed in tangible media of expression.  Mattel owns valid, and subsisting, copyright registrations in certain Bratz works, including without limitation, the works that are the subject of each of the following Registrations issued by the United States Copyright Office:  (1) VA 1-378-648, (2) VA 1-378-649, (3) VAu 960-439, (4) VA 1-378-650, (5) VA 1-378-651, (6) VA 1-378-652, (7) VA 1-378-653, (8) VA 1-378-654, (9) VA 1-378-655, (10) VA 1-378-656, (11) VA 1-378-657, (12) VA 1-378-659, (13) VA 1-378-658, (14) VA 1-378-660, (15) VAu 715-270, (16) VAu 715-271 and (17) VAu 715-273.

2.      Mattel will offer evidence and facts at trial in relation to the claims set forth above, and hereby incorporates the same by reference.  In sum, Bryant created and developed Bratz works while employed by Mattel.  By virtue of its Inventions Agreement and related contracts with Bryant, Mattel owns the Bratz drawings and other works created by Bryant during his Mattel employment.

3.      The drawings are original works of authorship that qualify for copyright protection.  Bryant admitted that the drawings at issue are original works of authorship within the meaning of the Copyright Act.  Similarly, defendants MGA and Isaac Larian have made admissions in other cases that judicially estop them from arguing that the drawings are not original works.  When defendant Isaac Larian sought to enforce MGA's copyrights in the courts of Hong Kong, he swore that the

1   defendant's dolls "have infringed the 2 dimensional drawings which are artistic

2   works in which copyright subsists."  Also, in <u>MGA v. Hunglam Toys</u>, Daphne

3   Gronich, MGA's former general counsel, repeatedly identified fifteen Bryant

4   drawings as "copyright works."  Similarly, the copyright registrations relating to

5   such works themselves constitute prima facie evidence of the validity of the

6   copyright and of the facts stated in the certificate.  Accordingly, the drawings are

7   presumed to be protectible original works of authorship.

8

9   **B.**   **<u>Defendants Have Infringed Upon Mattel's Exclusive Rights In The</u>**

10      **<u>Copyrighted Works, Including By Reproducing Them and Preparing</u>**

11      **<u>Derivative Works From Them, Without Mattel's Authorization.</u>**

12          1.   <u>MGA's principals have made admissions in other cases that</u>

13   <u>judicially estop them from denying that the Bratz dolls are derivative works of the</u>

14   <u>Bratz drawings</u>.  When defendant Isaac Larian sought to enforce MGA's copyrights

15   in the courts of Hong Kong, he swore that the defendant's dolls "have infringed the

16   2 dimensional drawings which are artistic works in which copyright subsists."  In

17   <u>MGA v. Hunglam Toys</u>, Daphne Gronich, MGA's former general counsel,

18   repeatedly identified fifteen Bryant drawings as the "copyright works" upon which

19   the Bratz dolls are modeled.  Even MGA's complaint in this action is predicated on

20   the uniqueness of Bratz:  "At approximately 9.5 to 10 inches tall, the 'BRATZ' dolls

21   were intentionally shorter than 'Barbie' dolls and looked like no other, with

22   disproportionately large heads, big, dramatic eyes and lips, small, thin bodies,

23   oversized feet (to emphasize shoe fashion and to stand on their own, unlike 'Barbie'

24   which requires a stand), and up-to-date fashions."  Bryant's complaint against Mattel

25   that was dismissed by the Court also repeatedly admits that the Bratz drawings are

26   original and that the Bratz dolls were based on those drawings.

27          In another action, <u>MGA v. Double Grand Corp. Ltd</u>., MGA's managing

28   director, Lee Shiu Cheung, declared under oath that "[t]he designs of the Bratz dolls

1   are all original drawings created by Mr. Bryant using his own independent labour,

2   skill and judgement [sic]."  Daphne Gronich, MGA's former general counsel, also

3   identified Bryant's drawings as the "copyright works" upon which the three-

4   dimensional Bratz dolls are modeled.    As a result, defendants may not argue to the

5   contrary now.

6        2.        The Bratz Dolls Are Substantially Similar To Bryant's Drawings

7            The Bratz dolls are substantially similar to Mattel's copyrighted works.

8   First, Defendants' access to the infringed work is clear and undisputed by MGA:

9   MGA received the drawings at issue during Bryant's September 2000 pitch.  The

10  Bratz dolls came on the market in the summer of 2001.  Thereafter, MGA submitted

11  some of Bryant's drawings to the Copyright Office for registration.  Defendants

12  repeatedly admitted that the Bratz dolls are based on Bryant's designs.

13           •        Bryant's and MGA's 2004 Modification of their 2000

14                    Agreement states that "all work done by Bryant prior to

15                    September 18, 2000 [] became known as the Bratz property."

16                    The Agreement explicitly confirms that Bryant's "work," which

17                    "became known" as the Bratz property, includes the Bratz

18                    drawings that are the subject of MGA's Copyright Registration

19                    Nos. VA 1-218-487, VA  1-218-488, VA 1-218-489, VA 1-218-

20                    490 and VA 1-218-491.

21           •        Bryant admitted that he intended his Bratz drawings to serve as

22                    guides for creation of the Bratz dolls.  His now-dismissed

23                    complaint against Mattel also admitted that the Bratz dolls were

24                    based on the drawings.

25           •        Defendant Larian testified in another case that the Bratz dolls he

26                    showed to retailers were based on Bryant's drawings.

27           •        The copyright registrations for numerous Bratz dolls reflect that

28                    they are derived from Bryant's design drawings.  For example,

1    according to MGA's registrations for the doll configurations,

2    accessories and packaging for Jade (registration no. VA 1-301-

3    533), Sasha (VA 1-301-534), Cloe (VA 1-301-535) and Yasmin

4    (VA 1-301-536), these dolls are derived from Bryant's earlier

5    drawings, registered by MGA, discussed above, all claimed as

6    created before October 19, 2000.

7    •    In an April 25, 2001 email, Paula Garcia, MGA's Senior Project

8    Manager for Bratz, responded to several interview questions

9    posed by Dolls Magazine.  In response to one question, "How

10    did MGA design the four different girls [Cloe, Sasha, Jade and

11    Yasmin]?" Ms. Garcia stated: "The four girls were already

12    concepted [sic] when presented by the inventor during our first

13    meeting.  I thought they were incredible and I tried to stay true

14    [to] this inventor/creator's vision."

15    •    In <u>MGA v. Double Grand Corporation Limited</u>, MGA's Lee

16    Shiu Cheung declared under oath that "[t]he designs of the Bratz

17    dolls are all original drawings created by Mr. Bryant using his

18    own independent labour, skill and judgement [sic]."

19    •    In <u>MGA v. Hunglam Toys</u>, Daphne Gronich, MGA's former

20    general counsel, repeatedly identified fifteen Bryant drawings as

21    the "artistic works" upon which the Bratz dolls are modeled**.**

22    Based on this evidence, Mattel will show that defendants intended to

23    make the Bratz dolls as close to the drawings (and in turn the sculpts Bryant also

24    had prepared) as possible, and that any claimed dissimilarities are insignificant.

25    Important similarities exist between the drawings and the dolls, including but not

26    limited to body proportions, facial features, eyes, eye makeup, lips, hair styling,

27    clothing, accessories, footwear and postures and posing.

28

1   Mattel will show that the similarities between Bryant's drawings and
2   sculpts, on the one hand, and the dolls, on the other hand, are apparent upon first
3   glance.  The faces are substantially the same, the proportions are virtually identical,
4   the attitude projected is the same, and the clothes and the shoes are markedly
5   similar.  These similarities are pervasive.

6        (i)    The Bratz line of products constitutes defendants'
7   reproduction and creation of derivative works from and infringement of the
8   exclusive rights of Mattel in its protected works, including drawings and sculpts
9   created by Bryant while a Mattel employee.  Mattel never authorized the use of its
10  protected works in this manner.  The Bratz line of products includes numerous lines
11  of dolls, each of which have subproducts within them.  The Bratz doll lines include
12  but are not limited to the following dolls: Sasha, Jade, Yasmin, Chloe, Phoebe,
13  Meygan, Alicia, Twins, Kumi, Felicia, Dana, Lana, Nevra, Sharidan, Fianna,
14  Vanessa, Maribel, Lilee, Roxxi, Sorya and Sienna.

15       (ii)    The Bratz line of products is substantially similar to and
16  derivative of the drawings and sculpts made by Bryant while employed by and
17  under contractual obligations to Mattel.  The two-dimensional art work and sculpts
18  were copied by Bryant, Larian, MGA, and MGA HK into the three dimensional
19  dolls that became known as the Bratz product line.

20

21  **C.**    **Defendants' Infringement Or Substantial Contributions To Infringement**
22         **Of Mattel's Copyrighted Works Without Mattel's Consent**

23      1.    Mattel hereby incorporates the facts stated above by reference.
24  The infringement of Mattel's copyrighted works is and has been made without
25  Mattel's consent by each of defendants MGA, MGA HK, and Larian.  Mattel will
26  show through financial statements and accounting records, and through expert
27  testimony regarding copyright damages, that Defendants have profited substantially,
28  using Mattel's copyrighted materials for commercial purposes and for their direct

1   financial benefit.  Mattel will show that Larian and MGA have failed to exercise

2   their right and ability to supervise the infringing activities of others within their

3   control to refrain from infringing Mattel's copyrighted works and have failed to do

4   so in order to further their significant financial interest in the infringement of

5   Mattel's copyrighted works.  Mattel will also show that Larian and MGA HK knew

6   of the infringing activity of MGA, and intentionally and materially contributed to

7   MGA's infringing activity.  Accordingly, Larian and MGA have engaged in direct,

8   contributory and vicarious infringement of Mattel's copyrighted works.  This

9   infringement has been willful.

10          2.      From the time Bryant was induced to breach his contracts with

11  Mattel, Larian and MGA have intentionally caused the further infringement of

12  Mattel's copyrighted works.  The facts and evidence that will support the showing

13  by Mattel set forth in relation to Mattel's claim for interference with contract above

14  are hereby incorporated by reference.

15

16  **D.      Isaac Larian Is Vicariously Liable For Copyright Infringement.**

17          Mattel restates and hereby incorporates by reference the facts and

18  evidence set forth above in relation to Mattel's copyright claim.  Isaac Larian is

19  vicariously liable for MGA's copyright infringement because he profited directly

20  from MGA's infringement of Mattel's copyrights; he had the right and ability to

21  supervise/control the infringing activity of MGA; and he failed to stop the

22  infringement.

23          **1.      Mr. Larian profited directly from the infringing activity of**

24  **MGA.**

25          Bratz has been a very successful product for MGA, and Isaac Larian, as

26  CEO and owner of MGA, has directly profited from its sales.  In 1999, Mr. Larian

27  purportedly listed his income on his tax returns as $466,895.  By 2002 -- the year

28  after Bratz was released -- his reported income had sky-rocketed to nearly $34

1   million.  MGA and Larian have claimed in this litigation that Mr. Larian's current

2   personal net assets are approximately $1.9 billion.  The vast majority of Mr. Larian's

3   wealth stems from the sales of Bratz.

4           **2.      Mr. Larian had the right and ability to supervise/control the**

5   **infringing activity of MGA.**

6           Mr. Larian supervised and/or controlled the creation and development

7   of the Bratz line, as well as the ongoing production, sales, and marketing of Bratz.

8   Mr. Larian met with Carter Bryant at least as early as early September 2000 and

9   made the decision to manufacture the Bratz dolls based on drawings shown to him at

10  the meeting.  Mr. Larian admitted in the case <u>Art Attacks Ink, LLC v. MGA</u>

11  <u>Entertainment, Inc.</u> that he is the person at MGA who determines what new products

12  MGA will manufacture.  He also admitted that he was "hands-on" with many

13  aspects of Bratz development, including, *inter alia*, setting shipping dates,

14  determining doll names, determining what items to sell with the dolls, and

15  advertising the Bratz line.  Mr. Larian stated in an affidavit in the case <u>MGA</u>

16  <u>Entertainment, Inc. and Thomas Christopher Joseph Metson</u>: "I established the

17  Claimant [MGA] and was the inspiration behind the BRATZ dolls.  I have been the

18  main driving force behind the success of the Claimant [MGA]."

19          **3.      Mr. Larian failed to exercise that right and ability.**

20          While Mr. Larian was in a supervisory and/or controlling position at

21  MGA, he failed to take any action to stop MGA from infringing intellectual property

22  that belonged to Mattel.  Instead, he actively participated in developing the Bratz

23  line of dolls.

24  **E.    Isaac Larian and MGA HK are Contributorily Liable for Copyright**

25        **Infringement.**

26          Mattel restates and hereby incorporates by reference the facts and

27  evidence set forth above in relation to Mattel's copyright claim and Mattel's

28  vicarious liability claim.  Isaac Larian, and MGA HK are contributorily liable for

MGA's copyright infringement because each of them knew or had reason to know of MGA's infringing activity, and each also intentionally materially contributed to MGA's infringing activity.

**1.      Mr. Larian and/or MGA HK knew or had reason to know of the infringing activity of MGA.**

Isaac Larian and MGA HK knew or had reason to know that MGA was infringing Mattel's ownership rights in the Bratz drawings, and that Carter Bryant created and worked on Bratz while employed by Mattel.  Mr. Larian knew that Mr. Bryant was employed by Mattel when Mr. Bryant pitched his idea for Bratz to MGA; when Mr. Bryant's employment agreement with MGA was created; when Mr. Bryant was set up as a vendor at MGA; when Mr. Bryant began receiving payments and reimbursements for expenses from MGA; and when Mr. Bryant began developing the Bratz line.  Former MGA employee Rachel Harris testified that she and others knew by October 2000 that Mr. Bryant was a Mattel employee and that it would be "bad" for Mr. Bryant if Mattel learned he was presenting drawings to MGA while still employed by Mattel.

Mr. Bryant and Mr. Larian therefore tried to hide the fact that Bryant created and worked on Bratz while an employee of Mattel.  For example, Mr. Bryant wrote to counsel at MGA while he was still employed by Mattel and enclosed his Mattel employment agreement.  In asking for advice regarding that agreement, Mr. Bryant stated: "I am unable to look into this too much further with our Human Resources director without risking suspicion ..."

MGA's records also affirm that MGA took steps to conceal the fact that Mr. Bryant worked for Mattel during the time Bratz was being developed: in a list of former Mattel employees then working at MGA, under Bryant's name, both the end date at Mattel and the start date at MGA are denoted: "don't ask."  Further, in an e-mail an MGA employee sent to Mr. Larian in February 2003 regarding asking

1  someone associated with Bratz to sign the packaging, she wrote: "Signed by....?????
2  I know we want to keep Carter under wraps."

3         Like Mr. Larian and Mr. Bryant, MGA HK also knew or had reason to
4  know that Bratz rightly belonged to Mattel.  When MGA and MGA Hong Kong
5  sought to enforce MGA's copyrights in the courts of Hong Kong, the former
6  director of MGA Hong Kong swore in an affirmation that Mr. Bryant created 17
7  drawings as the "initial concept and design drawings of the Bratz dolls" "in the year
8  2000 pursuant to the [Bryant-MGA] Agreement."

9         **2.     Mr. Bryant, Mr. Larian and/or MGA HK intentionally**
10 **materially contributed to MGA's infringing activity.**

11        Isaac Larian, and MGA HK all intentionally materially contributed to
12 MGA's infringement of the Bratz drawings.  Carter Bryant contributed by creating
13 Bratz, taking the Bratz project to Mattel's competitor (MGA), and working on the
14 Bratz line -- all while still employed by Mattel.  Mr. Larian similarly contributed to
15 the infringing activity by (as described in more detail in Section D2, *supra*) actively
16 participating in bringing the Bratz project to MGA and leading the development of
17 it.  Additionally, MGA (under Mr. Larian's control) paid Mr. Bryant for his Bratz
18 expenses, among other things.  MGA also had Mr. Bryant sign an agreement with
19 MGA while Mr. Bryant was a Mattel employee, which purported to require Mr.
20 Bryant to work on Bratz on a "top priority" basis.

21        MGA HK materially contributed to MGA's infringing activity by
22 manufacturing the first Bratz dolls.

# XV.

## DAMAGES

## (RE ALL PHASE 1 CLAIMS)

# XVI.

## CONVERSION (DAMAGES)

## (RE BRATZ; AC 11)

## (AGAINST MGA, MGA HK and LARIAN)

As a result of defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered. Mattel suffered loss as a result of the conversion and defendants obtained revenues that would not have been generated but for the conversion. Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to the acts of conversion.

Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of all Bratz-related "inventions," including without limitation designs, concepts, ideas, drawings, sculpts and copyrightable subject matter that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom. Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world. Among other witnesses, Mattel's expert witness, Michael Wagner, will testify at trial to defendants' benefits from their misconduct.

Mattel is also entitled to seek a constructive trust in relation to the converted property. *Cal Civ. Code* §§ 2223, 2224. Mattel also seeks an injunction barring defendants from further use and possession of the converted property and requiring its return to Mattel.

Defendants engaged in the acts of conversion with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is

1  entitled to recover exemplary damages from Bryant in an amount to be determined

2  at trial.

3           Mattel is seeking punitive and exemplary damages on this claim.

4

5                                    **XVII.**

6              **INTENTIONAL INTERFERENCE WITH CONTRACT**

7                           **(RE BRYANT; AC 6)**

8                        **(AGAINST MGA, LARIAN)**

9           Pursuant to the Inventions Agreement, among other things, Mattel is

10  the owner of all Bratz-related "inventions," including without limitation designs,

11  concepts, ideas, drawings, sculpts and copyrightable subject matter that were

12  conceived, created, made or reduced to practice during Bryant's Mattel employment

13  as well as all designs and works that are or have been derived therefrom.  Since

14  2001, MGA has distributed and sold Bratz and Bratz-related products throughout the

15  world and also licenses Bratz to third parties.  Mattel will present evidence that

16  MGA derives annual revenue from its sales and licenses of Bratz in excess of $500

17  million.  Mattel is entitled to all benefit that defendants received from their wrongful

18  conduct.  Among other witnesses, Mattel's expert witness, Michael Wagner, will

19  testify to such benefits.

20           Mattel will provide further expert testimony regarding the computation

21  of the exact amount of damages it suffered and continues to suffer which will

22  include, at a minimum and without limitation, the following: (a) monies paid to

23  Bryant by MGA during his periods of disloyalty or misconduct, (b) disgorgement of

24  any benefit, or its value, or its proceeds, derived or obtained by defendants as a

25  result of their misconduct, (c) the value of Mattel assets, resources, opportunities

26  and/or property, including intellectual property, that defendants converted, diverted

27  from Mattel or otherwise improperly used or usurped, (d) the value of confidential,

28  proprietary or trade secret information and intellectual property owned by Mattel

1    that Bryant provided MGA in violation of their obligations to Mattel, (e)

2    disgorgement of any profits or other benefit, or its value, or its proceeds, derived or

3    obtained by defendants as a result of their misconduct including, without limitation,

4    all profits that are attributable to their breaches of duty to Mattel or other unlawful

5    or improper conduct, (f) all unjust enrichment obtained by defendants as a result of

6    their misconduct, and (g) prejudgment interest, costs and attorneys' fees.

7            Mattel's claim for interference with contract can also result in making

8    Larian and MGA a constructive trustee.

9            MGA and Larian engaged in the acts of interference with malice, fraud

10   and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel

11   is entitled to recover punitive and exemplary damages from MGA and Larian.

12           Mattel is seeking punitive and exemplary damages on this claim.

13

14                                    **XVIII.**

15   **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (DAMAGES)**

16                            **(RE:  BRYANT; AC 8)**

17                         **(AGAINST MGA AND LARIAN)**

18           Mattel will present evidence and facts to show that as a direct and

19   proximate result of MGA and Larian's conduct, Bryant breached his fiduciary duties

20   to Mattel.  Mattel will present evidence through Bryant's financial records and

21   revenue statements and through its experts to show the profits to be disgorged as a

22   remedy for Bryant's breach of fiduciary duty.  Mattel's expert witness, Michael

23   Wagner, will testify at trial that Carter Bryant benefited and continues to benefit

24   from his wrongdoing in the amount of $35,825,449 as of October 2007.  Mattel

25   expects to present the current amount of Bryant's benefit at trial.  This number

26   includes the compensation he received from Bratz.

27           Mattel will present evidence that since 2001, MGA has distributed and

28   sold Bratz and Bratz-related products throughout the world.  Mattel will show that

MGA also licenses Bratz to third parties.  Mattel will show through expert testimony and through MGA, Larian and Bryant's financial and accounting documents that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  MGA claims current ownership of Bratz, and all copyrights and copyright registrations attendant thereto.  Defendants' use, sale, distribution and licensing of Bratz infringe upon Mattel's rights and unlawfully enriches defendants.

Mattel will show through expert damages testimony the exact amount of damages it suffered and continues to suffer which will include, at a minimum and without limitation, the following: (a) monies paid to Bryant by MGA during his periods of disloyalty or misconduct, (b) disgorgement of any benefit, or its value, or its proceeds, derived or obtained by defendants as a result of their misconduct, (c) the value of Mattel assets, resources, opportunities and/or property, including intellectual property, that defendants converted, diverted from Mattel or otherwise improperly used or usurped, (d) the value of confidential, proprietary or trade secret information and intellectual property owned by Mattel that Bryant provided MGA in violation of their obligations to Mattel, (e) disgorgement of any profits or other benefit, or its value, or its proceeds, derived or obtained by defendants as a result of their misconduct including, without limitation, all profits that are attributable to their aiding and abetting breaches of duty to Mattel or other unlawful or improper conduct, (f) all unjust enrichment obtained by defendants as a result of their misconduct, and (g) prejudgment interest, costs and attorneys' fees.

Mattel's claim for aiding and abetting breach of fiduciary duty can also result in making Larian and MGA a constructive trustee.

MGA and Larian engaged in this conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from these defendants in an amount to be determined at trial.

Mattel is seeking punitive and exemplary damages on this claim.

# XIX.

## AIDING AND ABETTING BREACH OF DUTY OF LOYALTY (DAMAGES) (RE BRYANT; AC 10)

Mattel will present evidence and facts to show that as a direct and proximate result of MGA and Larian's conduct, Bryant breached his duty of loyalty to Mattel.  Mattel hereby incorporates the facts and evidence above.

Mattel hereby incorporates that facts and evidence above supporting the claim for damages for breach of fiduciary duty.

Mattel will prove MGA's actual profits by expert testimony, and based on defendants' own accounting records and financial statements.  Mattel will provide expert testimony regarding the computation of the exact amount of its damages it seeks, which will include at a minimum and without limitation, the following: (a) monies paid to Bryant by MGA during his periods of disloyalty or misconduct, (b) disgorgement of any benefit, or its value, or its proceeds, derived or obtained by defendants as a result of their misconduct, (c) the value of Mattel assets, resources, opportunities and/or property, including intellectual property, that defendants converted, diverted from Mattel or otherwise improperly used or usurped, (d) the value of confidential, proprietary or trade secret information and intellectual property owned by Mattel that Bryant provided MGA in violation of their obligations to Mattel, (e) disgorgement of any profits or other benefit, or its value, or its proceeds, derived or obtained by defendants as a result of their misconduct including, without limitation, all profits that are attributable to their aiding and abetting breaches of duty to Mattel or other unlawful or improper conduct, (f) all unjust enrichment obtained by defendants as a result of their misconduct, and (g) prejudgment interest, costs and attorneys' fees.

Mattel's claim for aiding and abetting breach of duty of loyalty can also result in making Larian and MGA a constructive trustee.

Mattel is seeking punitive and exemplary damages on this claim.

## XX.

## COPYRIGHT INFRINGEMENT CLAIM (DAMAGES)

## (AC 1)

## (AGAINST MGA, MGA ENTERTAINMENT (HK) LIMITED, AND LARIAN)

By virtue of defendants' infringing acts, Mattel is entitled to recover defendants' profits, Mattel's costs of suit and attorneys' fees, and all other relief permitted under the Copyright Act, including some relief that is available for willful infringement.

Under the Copyright Act, a plaintiff is entitled to recover a "defendant's profits" from the infringement.  17 U.S.C. § 504(b).  Here, in establishing defendants' profits, Mattel is required to present proof only of defendants' gross revenues, and the burden then shifts to defendants to prove deductible expenses and any elements of profit attributable to factors other than the copyrighted work, if such reductions are available.  *Id.* ("In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work").  Mattel seeks profits on the Bratz product line.  Mattel seeks direct and indirect profits attributable to the infringements.

Mattel's expert witness, Michael Wagner, will testify at trial that MGA has made more than $599,665,188 in profits on Bratz, after subtracting out all costs and distributions to shareholders for income taxes (and assuming defendants can sustain their burden of proving any such costs are deductible).  In addition, Isaac Larian has received benefits exceeding $1,023,677,098.

Mattel also seeks an Order, pursuant to 17 U.S.C. § 503(a), impounding all of defendants and counter-defendants' products and materials that infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles by which

copies of the works embodied in Mattel's copyrights may be reproduced or otherwise infringed.

Mattel also seeks an Order mandating that defendants and counter-defendants return to Mattel all tangible items, documents, designs, diagrams, sketches or any other memorialization of inventions conceived, created, made or reduced to practice during Bryant's employment with Mattel as well as all Mattel property converted by defendants and counter-defendants, as well as all derivative works.

## XXI.

## MATTEL SEEKS PUNITIVE OR EXEMPLARY DAMAGES
## ON EACH PERTINENT CLAIM

Exemplary damages are available for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, pursuant to *Cal. Civil Code* § 3294. As a result of defendants' oppression, fraud and malice, Mattel is entitled to exemplary damages in relation to many of its claims and counter-claims. Mattel incorporates by reference the discussion of claims, evidence and damages above.

## XXII.

## MATTEL'S PROPOSED EVIDENCE TO SUPPORT FINDING OF
## ADVERSE INFERENCE CONTENTIONS AGAINST COUNTER
## DEFENDANTS

1.      Plaintiff's Adverse Inference Contentions Against MGA.

Plaintiff intends to seek an adverse inference against MGA based on its intentional spoliation of crucial documents and evidence and its agents' invocation of the Fifth Amendment. This evidence includes, but is not limited to:

      (a)     Bryant's Evidence Eliminator Software.

      Bryant used and installed a program called "Evidence Eliminator" on his computers, including the desktop computer he purchased in October 2000.  The "Evidence Eliminator" program has only one purpose, which is permanently to destroy data from computer hard drives.  Although the desktop computer likely had documents from a key time period regarding Bratz, it appears that no Bratz documents from 2000 are on the desktop computer.  There are also only a few pages of Bratz documents from 2001 on the desktop computer.  Mattel will offer expert testimony in relation to computer forensics to show that evidence has been removed and or rendered irretrievable through Bryant's actions.

      (b)     MGA's Destruction of Evidence Through Eric Speckin.

      MGA's consultant Eric Speckin purports to be an expert in ink examination.  The manner in which Speckin transported, analyzed, tested, or otherwise used the documents that he tested will be the subject of evidence at trial.  Through such evidence Mattel intends to show that critical documents were destroyed or compromised.  In August 2006 Judge Larson noted concerns about MGA's and Bryant's potential spoliation with respect to key Bratz design, drawings and the destructive testing defendants' performed on them after this suit was filed, without prior notice to either the Court or Mattel.  Expert Order at 11:1-11:13 ("that there are serious questions concerning the handling of these critical documents certainly causes the Court much concern about whether the truth seeking functions of the adversarial system have been fundamentally compromised in this case").  As the Court noted, the documents "are not peripheral to the case[,]" and their dating "is a fundamental, perhaps dispositive, issue to this case."  Expert Order 10:25-11:1, 11:9-110.

      (c)     Alteration of Key Dates on Critical Documents.

      MGA, Larian and Bryant altered numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "©

8/1998" to the drawings, even though the drawings were not created in August 1998. These notations were not made in 1998, and defendants do not deny the drawings were not completed in 1998.  Nevertheless, they falsely told the Copyright Office they were.

(d)     Removal of Fax Headers on a Critical Contract

Larian directed a subordinate to conceal a fax header from Bryant's signed contract signature page before sending the page to Patricia Glaser, Larian's attorney.  The concealed fax header would have shown that the page was faxed from "Barbie Collectibles."  Nor have defendants produced this spoliated evidence.

MGA executive Victoria O'Connor, at Larian's direction, "whited-out" the "Barbie Collectibles" fax header on the copy of the signed contract that MGA had received from Bryant.  O'Connor has testified that she carried out Larian's instruction out of concern that the fax header showed Bryant was employed by Mattel at the time that he signed the agreement with MGA.  Farhad Larian, Isaac Larian's brother, former MGA shareholder and executive and an MGA consultant at the time, deleted emails and other electronic documents relating to Bratz and other relevant matters after this lawsuit was filed.

Jacqueline Ramona Prince, a third-party witness, has raised questions about the integrity of Bryant's documents.  According to both Ms. Prince and Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he was employed by Mattel, and asked her to notarize them "as of" 1998.  Ms. Prince, however, testified that markings which now appear on the copy of a Bratz drawing produced by defendants did not appear on the original drawing that Bryant showed her in 1999.  This conflicts with Bryant's testimony about the drawing.  Furthermore, expert forensic analysis has shown that a key portion of the entry from Ms. Prince's notary book relating to certain of Bryant's Bratz drawings -- reflecting that those drawings are supposedly "From 1998 Missouri" -- was subsequently added to the book using different ink.

(e)   MGA Agents' Invocation Of The Fifth Amendment

As further detailed in a motion that Mattel is finalizing and will be filing shortly, Mattel employees in addition to Bryant worked on and were ultimately paid by MGA beginning in the year 2000 and continuing until at least 2005 to work on Bratz while they were employed by Mattel.  These included Ana Isabelle Cabrera, Maria Salazar and Beatriz Morales.  MGA's agents, including Veronica Marlow and Peter Marlow, who are represented by MGA's long-standing outside counsel, knowingly paid these employees substantial amounts of money to work on Bratz and potentially other MGA products while they were employed by Mattel.  MGA was aware of this work by then-current Mattel employees.   Peter Marlow, Cabrera and Salazar refused to answer questions at their recent depositions, including questions about MGA's knowledge, based on selective claims of the Fifth Amendment privilege against self-incrimination.  Such invocations may properly be considered by the Court and the jury as giving rise to negative inferences against MGA.  Such inferences also may properly be made against MGA based upon its repeated failures to disclose these then-current Mattel employees' work on Bratz, in violation of Court Orders compelling the disclosure of such information.

<u>The MGA parties' response and objections to Mattel's alleged "Key Evidence"</u>:

The parties stipulated, and the Court agreed, that contentions of law and fact, which is what the foregoing summary of "key evidence" proposed by Mattel effectively constitutes, were not necessary and would not be productive, in light of the parties' exhaustive briefing of the same issues in their cross-motions for partial summary judgment and the fact that the Court has not yet ruled on certain of those cross-motions.  The MGA parties submit that Mattel's insistence, over their objections, on including the foregoing recitation of alleged "key evidence" is contrary to the spirit, if not the letter, of the parties' stipulation and the Court's Order regarding Contentions of Law and Fact.  <u>See</u> Apr. 4, 2008 Order.

1        Furthermore, the MGA parties submit that inclusion of Mattel's lengthy

2   and argumentative recitation of the "key evidence" supporting its claims in the

3   parties' Joint Proposed Final Pretrial Conference Order is inappropriate and contrary

4   to Local Rule 16.  Local Rule 16, and Appendix A thereto, contemplates a "brief"

5   summary of the plaintiff's key evidence.  It does not contemplate inclusion of what

6   is, effectively the plaintiff's trial brief in the Court's Final Pretrial Conference Order.

7        The MGA Parties disagree with Mattel's characterizations of the

8   Court's April 25, 2008 and May 21, 2008 Summary Judgment Orders.  The Court

9   deferred ruling on MGA's motion for summary judgment on statute of limitations

10  grounds.

11       The MGA parties also disagree with, and object to, Mattel's

12  characterization of the facts and the supposed evidence supporting that

13  characterization.  As discussed in great detail in the MGA parties' and Bryant's

14  motions for partial summary judgment, and as will be proven at trial, Mattel's

15  version of the "facts" is inaccurate and misleading.

16       The MGA parties also object to any reference to the supposed "key

17  evidence" to support Mattel's request for an adverse inference instruction at trial.  As

18  set forth in MGA's and Bryant's joint Motion *in Limine* No. 13, to exclude evidence

19  and argument regarding alleged spoliation by Bryant, a party is not permitted, as a

20  matter of right, to present evidence and argument of alleged spoliation to the jury at

21  trial.  Indeed, California law does not recognize spoliation as a claim.  Moreover, the

22  presentation of spoliation allegations to the jury-is an "extreme" sanction that may

23  be imposed by the Court only under limited circumstances, not present in this case.

24  *Thompson*, 219 F.R.D. at 100; *see also Zubulake v. UBS Warburg, LLC*, 220 F.R.D.

25  212, 216 (S.D.N.Y. 2003) (adverse inference instruction is an "extreme" sanction

26  that should "not be given lightly"); *see also Hamilton v. Signature Flight Support

27  Corp.*, No.  C-05-0490 CW (MEJ), 2005 WL 3481423, at * 3 (N.D. Cal. Dec. 20,

28  2005) ("Courts determine the proper sanction for destruction of relevant evidence on

1   a case-by-case basis." (citing *Unigard Sec. Ins. Co. v. Lakewood Eng. & Mfg. Corp.*,

2   982 F.2d 363, 368 (9th Cir. 1992)).  As established in prior briefing to this Court,

3   including on the MGA Parties' motion *in limine* number 13, Mattel was required

4   during to discovery, but did not, seek an evidentiary hearing to have the Court make

5   an evidentiary finding that evidence was in fact destroyed.  Here, never even sought

6   such a hearing and Mattel has failed to make the threshold evidentiary showing that

7   is required for Mattel to be entitled to present any evidence or argument of

8   spoliation to the jury, or for the Court to issue an adverse inference instruction to the

9   jury at trial.  For these reasons, among others, the MGA Parties moved in the motion

10  *in limine* number 13 to have all evidence and argument relating to alleged spoliation

11  by non-party Carter Bryant excluded.  The Court has deferred ruling on this issue.

12  The MGA parties also objected to Mattel's proposed spoliation jury instructions and

13  the Court has not yet had the opportunity to address those objections.  If, however,

14  Mattel is permitted to introduce such evidence to the jury and to have such an

15  instruction without an evidentiary hearing, then the MGA Parties respectfully

16  submit that they likewise be permitted to introduce evidence of Mattel's spoliation

17  of evidence and to have a similar jury instruction in its favor.

18          Mattel's claims of spoliation with respect to Erich Speckin's testing of

19  certain Bryant original documents is similarly without merit.  Indeed, the Court has

20  already addressed this issue at length, and concluded that the previous testing of the

21  drawings (though technically "destructive" of the tiny samples taken) did not alter

22  the drawings' evidentiary value or in any way affect Mattel's ability to conduct

23  similar testing.  Moreover, Mattel has had the opportunity to have its own experts

24  inspect and conduct destructive testing on Bryant's original documents.  None of

25  those experts has opined that Mr. Speckin's prior testing in any way affected their

26  ability to perform their expert testing or analysis or otherwise adversely impacted

27  Mattel's ability to present any evidence in support of its case at trial.  And,

28  ironically, the MGA parties recently discovered that one of Mattel's experts

1  knowingly violated the Court's Order setting forth the testing protocol by

2  surreptitiously taking samples from certain documents without providing any notice

3  to the MGA parties.

4          Finally, the MGA parties object to the categories of damages that

5  Mattel intends to pursue in this matter – many of which are defective as a matter of

6  law.  Nothing herein shall be deemed an acknowledgment of or consent to Mattel's

7  attempt to pursue any categories of damages in this matter.  All rights to object to

8  Mattel's claims of damages are reserved.

9

10                           **XXIII.**

11          **DEFENDANTS' AFFIRMATIVE DEFENSES**

12          **MGA PARTIES' THIRD AFFIRMATIVE DEFENSE**

13                          **(Laches)**

14  MGA, MGA (HK), and/or Larian must prove:

15      1.     Mattel's delay in filing suit was unreasonable in light of Mattel's

16             knowledge of its claims against MGA, MGA (HK), or Larian; and

17      2.     Mattel's delay was prejudicial to MGA, MGA (HK), or Larian in light

18             of investments of time and money that MGA and Larian made; *or*

19      3.     Mattel's delay was prejudicial to MGA, MGA (HK), or Larian in that

20             substantial evidence has been lost and memories faded in the years

21             since Mattel was first on notice of its claims.

22          **MGA PARTIES' FOURTH AFFIRMATIVE DEFENSE**

23                   **(Statute of Limitations)**

24  MGA, MGA (HK), and/or Larian must prove:

25      1.     <u>Intentional Interference with Contract (MGA and Larian)</u>: MGA and

26             Larian must prove Mattel did not file its claims against them within two

27             years of the occurrence of the acts that Mattel contends were wrongful, in

28

this case the alleged breach of Carter Bryant's contracts with Mattel.  The claim "accrues" whether or not Mattel actually knew of the acts at the time.  MGA and Larian contend that for purposes of this claim, Mattel did not file against them until November 20, 2006.

2. <u>Aiding and Abetting Breach of Fiduciary Duty (Larian and MGA)</u>:  Isaac Larian and MGA must prove that Mattel did not file its claims against them within two years of the date when Mattel knew or when a reasonable person would have had any reason to suspect that wrongdoing had taken place, in this case when Bryant allegedly breached a fiduciary duty to Mattel.    MGA and Larian contend that for purposes of this claim, Mattel did not file against them until November 20, 2006.

3. <u>Aiding and Abetting Breach of Duty of Loyalty (Larian and MGA)</u>:  Isaac Larian and MGA must prove that Mattel did not file its claims against them within two years of the date when Mattel knew or when a reasonable person would have had any reason to suspect that wrongdoing had taken place, in this case when Bryant allegedly breached a duty of loyalty to Mattel.    MGA and Larian contend that for purposes of this claim, Mattel did not file against them until November 20, 2006.

4. <u>Copyright Infringement (Larian, MGA and MGA (HK))</u>:  Larian, MGA, and MGA (HK) must prove that Mattel did not file its claims within three years of when Mattel discovered or reasonably could have discovered that MGA was asserting ownership over property to which Mattel had a copyright interest.    MGA, MGA (HK) and Larian contend that for purposes of this claim, Mattel did not file against them until November 20, 2006.

5. <u>Conversion (Larian and MGA (HK))</u>:  Larian and MGA (HK) must prove that Mattel did not file its claims within three years of the act of

wrongfully taking the property that Mattel contends was converted.  The claim "accrues" whether or not Mattel actually knew of the acts     MGA, MGA (HK) and Larian contend that for purposes of this claim, Mattel did not file against them until November 20, 2006.at the time.

**MGA PARTIES' FIFTH AND SIXTH AFFIRMATIVE DEFENSES**

**(205(d)/ Bona Fide Purchaser for Value)**

The MGA Parties must prove that the MGA-Bryant agreement was:

1.  Recorded with the Copyright Office first in such a manner as to give Mattel constructive notice of the transfer; and

2.  Executed in good faith; and

3.  For valuable consideration; and

4.  Without notice of an earlier transfer.

Recordation with the Copyright Office means either (1) the filing of the transfer agreement itself, or (2) registration with the Copyright Office listing ownership by assignment.

**MGA PARTIES' NINTH AFFIRMATIVE DEFENSE**

**(Estoppel)**

MGA, MGA (HK), and/or Larian must prove:

1.  Estoppel of Copyright Claims:  MGA, MGA (HK), and/or Larian must prove all of the following:

    a)    That Mattel made a representation of fact by conduct intending that MGA, MGA (HK), and/or Larian should rely on it.  Conduct is used "in its broadest meaning as including … silence or negative omission to do anything";

    b)    That Mattel had knowledge that BRATZ potentially infringed on its intellectual property and that Carter Bryant worked for MGA;

c)     That MGA, MGA (HK), and Larian were ignorant of Mattel's claims of ownership of Bryant's BRATZ sketches; and

d)     That MGA, MGA (HK), and Larian reasonably relied on Mattel's silence to their detriment.  MGA Parties' reliance and Carter Bryant's reliance must be reasonable in the sense that under the circumstances, a reasonable person would have acted as defendants did.

2.     <u>Estoppel of Employment Claims/Duty Claims</u>:  MGA, MGA (HK), and/or Larian must prove all of the following:

a)     That Mattel made a representation of fact by conduct intending that Defendant should rely on it.  Conduct is used "in its broadest meaning as including … silence or negative omission to do anything."

b)     That Mattel had knowledge that its employees were moonlighting or independent creation of artistic works;

c)     That Carter Bryant was ignorant of the fact that Mattel allowing moonlighting or the independent creation of artistic works was not intended as a policy; and

d)     That MGA, MGA (HK), and Larian reasonably relied on Mattel's silence to their detriment.  MGA Parties' reliance and Carter Bryant's reliance must be reasonable in the sense that under the circumstances, a reasonable person would have acted as defendants did.

## MGA PARTIES' TENTH AFFIRMATIVE DEFENSE

### (Acquiescence)

MGA, MGA (HK), and/or Larian must prove:

(as to development and marketing of BRATZ)

1. Mattel, through its acts or words, silence or inaction, as understood by a reasonable person, indicated the development and marketing of BRATZ was allowed, and

2. Larian, MGA, and/or MGA (HK) understood that Mattel allowed the development and marketing of BRATZ.

(as to the MGA Parties' alleged aiding & abetting/inducement, and interference with contract)

1. Mattel, through its acts or words, silence or inaction, as understood by a reasonable person, indicated its employees were allowed to moonlight and/or develop their own artistic work; and

2. Bryant understood that Mattel allowed its employees to moonlight and/or develop their own artistic work.

## MGA PARTIES' ELEVENTH AFFIRMATIVE DEFENSE
### (Mitigation)

Larian, MGA, and MGA (HK) must prove:

1. that Mattel failed to use reasonable efforts to mitigate damages; and

2. the amount by which damages would have been mitigated.

## MGA PARTIES' THIRTEENTH AFFIRMATIVE DEFENSE
### (Waiver)

Larian, MGA and MGA (HK) must prove:

1. Mattel was aware of its employees' alleged breaches of the provisions of the employment agreements at issue; and

2. Mattel indicated, by its words, actions or silence that it did not intend to enforce the provisions of its employment agreements at issue.

## MGA PARTIES' FOURTEENTH AFFIRMATIVE DEFENSE
### (Abandonment)

Larian, MGA and MGA (HK) must prove:

1. Mattel intended to surrender ownership rights in the work; and

1   2.  Conduct by Mattel which was "consistent with an intent to abandon" or

2      which "implies an abandonment."

3     **MGA PARTIES' FIFTEENTH AFFIRMATIVE DEFENSE**

4         **(*De Minimis* Use)**

5 Larian, MGA and MGA (HK) must prove:

6   1.  Any similarities between the protectable elements of the drawings and

7      the protectable elements of the BRATZ dolls are *de minimis*; <u>or</u>

8   2.  If there was copying, it was not done to an unfair extent; <u>or</u>

9   3.  Any similarities between the copyrighted work and the copied work

10      consist only of unprotectable elements and elements in the public

11      domain.

12    **MGA PARTIES' SEVENTEENTH AFFIRMATIVE DEFENSE**

13       **(Privilege/Justification)**

14 Larian, MGA, and MGA (HK) must prove:

15    1.  The competition privilege applies where:

16      (a) the relation between Bryant and the MGA Parties concerned

17        a matter involved in the competition between the MGA

18        Parties and Mattel, and

19      (b) the MGA Parties did not employ improper, independently

20        actionable conduct, and

21      (c) the MGA Parties did not intend thereby to create or continue

22        an illegal restraint of competition, and

23      (d) the MGA Parties purpose was at least in part to advance an

24        interest in competition with Mattel.

25

26    **MGA PARTIES' EIGHTEENTH AFFIRMATIVE DEFENSE**

27        **(Good Faith)**

28

The good faith of Larian, MGA, and MGA (HK) is a factor that should be considered when assessing any claim by Mattel that Larian, MGA, and MGA (HK) acted in bad faith or with bad intent.  To the extent Mattel's claims implicate defendants' intent or mental state, good faith is a relevant inquiry for which Mattel bears the burden of proof.

## MGA PARTIES' TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Consent)

Larian, MGA and MGA (HK) must prove:

1.  Mattel indicated, by its words, actions or silence that it consented to its employees moonlighting and developing their own artistic work; and

2.  Bryant understood that Mattel allowed its employees to moonlight and develop their own artistic work.

## MGA PARTIES' AFFIRMATIVE DEFENSE TO COPYRIGHT DAMAGES

MGA, MGA (HK), and/or Larian must prove:

1.  Expenses deductible from gross revenues causally connected to the alleged infringement;

2.  Elements of defendants' profit attributable to factors other than the copyrighted work.

## THE MGA PARTIES' KEY EVIDENCE

The MGA parties object to the discussion and inclusion of their contentions of fact surrounding their claims and defenses because the parties stipulated, and the Court ordered, that they are under no obligation to do so.  However, because Mattel has chosen, notwithstanding that stipulation and order, to include its contentions of fact, out of an abundance of caution, the MGA parties include a brief summary of

illustrative key evidence that relates to their various affirmative defenses.  To the extent any evidence cited relates only to a defense asserted by a certain defendant(s), such evidence is only asserted on behalf of such defendant(s).  The following listing is not intended as a complete and exhaustive listing of all of the evidence and the MGA parties reserve the right to rely on additional evidence not listed herein.

1.    <u>Statute of Limitations</u>:  The MGA parties assert the following facts in support of this affirmative defense.  Mattel was on notice of its claims as early as October 2000 and no later than March 2002.

a. In October of 2000, Bryant told Mattel that he was leaving to design a line of dolls.  (MGA Undisputed Facts ("UF") ¶ 27.)

b. The personnel supervising Bryant suspected that he was going to a competitor (MGA UF ¶¶ 28-29), and Mattel had constructive notice that it was MGA (MGA UF ¶ 30; Mattel UF ¶ 8).

c. Mattel's telephone records from September 2000 show that Bryant "placed dozens of calls to MGA" while still employed at Mattel. (Mattel UF ¶ 8; MGA OF ¶ 8.)

d. A little over two months after Bryant left to "to work on [his] own doll line," prototypes of the BRATZ dolls were exhibited by MGA at the Hong Kong, Tokyo and New York Toy Fairs in January and February 2001, respectively.  (MGA UF ¶¶ 31-32, MGA MSJ at 18; MGA Opposed Facts ("OF") ¶¶ 109, 160.)

e. The BRATZ display at the Hong Kong Toy Fair included not only doll prototypes, but also BRATZ drawings from Bryant's sketches. (OF ¶ 153.)

f. Mattel saw and videotaped the BRATZ booth used by MGA at the Tokyo toy fair in February 2001, which had both dolls and drawings at it. (MGA OF ¶¶ 109, 155.)

g.  The New York Toy Fair is where speculation in the media started about alleged similarities between the BRATZ and Mattel's internal projects. (MGA UF ¶ 51 ("When I first saw the Bratz dolls at Toy Fair this year, they reminded me of Mattel Inc.'s … Diva Starz dolls.").)

h.  At the same time, in February of 2001, Larian began generating publicity as the man behind MGA's BRATZ dolls.  (MGA UF ¶ 36.)

i.  On March 5, 2001, the BRATZ drawings were published in a trade journal, with a write up of the BRATZ display at the New York Toy Fair. (MGA OF ¶ 157.)

j.  Mattel not only attended the New York Toy Fair (MGA UF ¶ 34), it actually saw the BRATZ and discussed with MGA that Mattel might carry and sell BRATZ (MGA UF ¶ 37).

k.  In March 2001, shortly after the fair, Mattel wrote MGA saying that Mattel would not carry BRATZ, noting that BRATZ "are very similar to our [Mattel's] own concepts and this is a very sensitive issue with the brand groups."  (Id.)

l.  Despite not wanting to distribute BRATZ because of supposed similarities to Mattel's own products, Mattel apparently surreptitiously placed the BRATZ line into Mattel's computer systems, a fact that MGA confronted Mattel about in early April 2001.  (MGA UF ¶ 38.)

m. At the 2001 toy fairs, Mattel saw the BRATZ prototypes and became aware of the alleged similarities between them and Mattel's "Diva Starz" and "Toon Teens."  (MGA MSJ at 8, 18.)

n.  Mattel's designers and executives (including the head of its Girls' Division) believed as soon as the BRATZ was first publicly unveiled (i.e., at the Toy Fairs) that the BRATZ was copied from Mattel products.  (MGA UF ¶¶ 47-50.)

o. As of the time in 2001 of the first release of the BRATZ, it was "common knowledge" within Mattel that Bryant was working at MGA and was the designer of the BRATZ.  (MGA UF ¶¶ 52-54.)

p. The Mattel "Toon Teens" line, which Mattel believed BRATZ looked similar to, had never been released and remained within Mattel's exclusive possession at all times.  (MGA OF ¶ 152.)

q. In 2001, Mattel was bombarded by publicity surrounding BRATZ, MGA and Larian. (MGA UF ¶¶ 35-36; MGA OF ¶¶ 154, 156-57, 160.)

r. By February of 2002, Mattel was also on notice of Internet publications linking the BRATZ with Mattel's line of "Diva Starz." On February 7, 2002 Mattel sent Larian a letter threatening him with a legal action if the link between the products was not removed.  (MGA OF ¶ 82.)

s. Indeed, as Mattel's letter indicated, anybody who searched the Internet at that time for either Mattel's "Barbie" or "Divastar" would have been directed to a Yahoo! discussion group devoted to BRATZ. (Id.)

t. Crucially, the site that Mattel was monitoring identified Bryant as BRATZ's creator and linked him to MGA in March of 2002 (id.).

u. By March 15, 2002, the facts known to Mattel materialized into its launch of a formal investigation into MGA and Larian's involvement in Bryant's creation and development of the BRATZ.  (MGA UF ¶¶ 56-58.)

v. In August 2002, Mattel CEO Robert Eckert received an anonymous letter, in which Bryant is again accused of having created BRATZ while employed by Mattel and bringing it to MGA.  (UF ¶ 69.)  The letter specifically alleged that Bryant, a former Mattel employee, had taken the BRATZ concept to MGA Entertainment, confirming for Mattel's highest authority what nearly a year of "rumor and innuendo"

1    had already revealed – that Bryant, Isaac Larian, and MGA had turned

2    Bryant's idea into a highly successful line of dolls.

3    w.  In October 2002, Lilly Martinez references in an internally circulated

4    memorandum at Mattel that Carter Bryant was the creator of the Bratz

5    dolls sold by MGA.  (May 22, 2008 Declaration of Thomas J. Nolan,

6    Ex. 148.)

7    x.  Further, Mattel admits that if the allegations in the letter were true, then

8    Mattel would have been on notice of the same claims that it is asserting

9    in this case. (UF ¶ 72.)  Yet Mattel did nothing at all.

10   y.  Mattel admits receipt of the contract between MGA and Mattel no later

11   than November 24, 2003.

12   z.  Mattel receives a copy of the City World claim in the Hong Kong

13   proceedings no later than September 23, 2003.  The City World claim

14   expressly references the contract between MGA and Bryant, the date

15   the contract was entered (i.e., before Bryant resigned from Mattel), and

16   that Bryant created seventeen sketches that were the inspiration for

17   Bratz between 1998 and 2000.  (May 21, 2008 Supplemental

18   Declaration of Marina Bogorad at Exs. 143-147; May 22 Declaration of

19   Dexter Lam.)

20   aa. Mattel admits that it was on notice of its claims no later than November

21   24, 2003.  (Mattel UF ¶26.)

22   bb. The earliest pleading in these consolidated proceedings is Mattel's '04

23   Complaint, filed on April 27, 2004 against a single defendant – Bryant

24   – and ten "Doe" defendants.  Mattel's claims in that action focused on

25   Bryant's involvement with an unnamed "competitor," which allegedly

26   received from Bryant Mattel's intellectual property; this Complaint

27   further alleged that Bryant used "Mattel's property and resources" for

28   the benefit of himself and the aforementioned "competitor," and that

1    Bryant "converted" Mattel's "intellectual property and intangible
2    property" by "asserting ownership" of that property and providing it to
3    "others."  ('04 Compl. ¶¶ 12, 18, 23, 24, 30, 31, 36, 41 & 42.)

4    cc. The '04 Complaint specified that no later than November 2003 Mattel
5    already knew that "Bryant had secretly aided, assisted and worked for a
6    Mattel competitor . . . by entering into an agreement with the
7    competitor, during the time [he] was employed by Mattel."  (*Id.* ¶ 12.)
8    Mattel also knew that "Bryant's agreement with the competitor
9    obligated Bryant to provide product design services to the competitor
10   on a 'top priority' basis."  (*Id.*)  Mattel also knew that Bryant's
11   agreement with that competitor "provided . . . that Bryant would
12   receive royalties and other consideration for sales of products on which
13   [he] provided aid or assistance; that all work and services furnished by
14   Bryant to the competitor under the agreement would be considered
15   'works for hire'; and that all intellectual property rights to preexisting
16   work by Bryant purportedly would be assigned to the competitor."
17   (*Id.*)  Mattel sought damages for the alleged misappropriation of its
18   property and an injunction against Bryant and "those acting in concert
19   and participation: with him, prohibiting them from continuing to
20   benefit from" Bryant's alleged misappropriation.  (*Id.* ¶¶ 19, 27, 29, 34
21   & 45.)

22   dd. Mattel candidly admitted in its motion for leave to assert the claims at
23   issue here that the discovery obtained by Mattel after it filed the '04
24   Complaint only "confirmed" what it had already suspected; namely,
25   that "Bryant created BRATZ designs, and aided MGA, during his
26   Mattel employment and that he did so using Mattel resources."
27   (Memorandum of Points and Authorities in Support of Mattel, Inc.'s
28   Motion for Leave to File Amended Complaint, at 5:7-10.)

ee.  MGA Entertainment, Inc., by stipulation intervened in the April 2004 Action on December 7, 2004.  (*See* Stipulation and Order dated December 7, 2004, at 1:10-11, 1:14-15.)  Under the terms of that stipulation, the parties agreed that MGA would intervene "as a procedural matter" only.  (Id.)

ff.   Mattel did not register any copyright interests in any of the BRATZ drawings it now claims to own until October 30, 2006.  (UF ¶ 80.)

gg. On November 20, 2006, Mattel – for the first time in the two and a half years since the inception of this litigation – moved to assert claims against MGA Entertainment, Inc., MGA (HK) and Isaac Larian. Neither MGA (HK) nor Isaac Larian had been a party to any litigation with Mattel prior to that time.

2.   Laches:  The MGA parties assert the following facts in support of this affirmative defense.  As described above, the MGA parties' evidence shows that Mattel waited over five years before challenging MGA's ownership of the highly successful BRATZ dolls, until MGA spent millions on development and production.  (MGA MSJ at 15-33 & MGA UF ¶¶ 32-36.)  Furthermore, MGA was prejudiced by Mattel's destruction and "misplacing" of evidence from the relevant time period and Mattel's witnesses cannot recollect important events given the passage of time. (MGA Opp'n at 29-30, MGA OF ¶ 120 (Mattel employee testimony that "[i]t's been too long" and "ten years is a long time").)

3.   205(d)/Bona Fide Purchaser for Value:  The MGA parties assert the following facts in support of this affirmative defense.  MGA registered Bryant's drawings on December 22, 2003, ***three years in advance of Mattel.***  (Mattel UF ¶ 23.)  Each Certificate of Registration lists Bryant as the author of the drawings, 1998 as the year they were created, and that MGA obtained ownership through an "assignment."  (*Id.*)  When MGA

-99-

registered its copyrights, Mattel had neither registered nor recorded any alleged interest in Bryant's drawings (id. ¶ 24), even though Mattel admits it knew of its present claims.  Thus, when MGA registered, it took the assignment in good faith without notice of any earlier claims by Mattel (MGA UF ¶¶ 14-22; MGA OF ¶ 133), and it publicly filed documents noting its copyright interest came by assignment (Mattel UF ¶ 23).  In addition, by the time that MGA registered its copyright interests in BRATZ, Mattel had *actual* notice of the assignment from Carter Bryant to MGA as Mattel was in possession of a copy the contract between MGA and Bryant and had send the drawings that would be copyrighted by MGA. Thus, Mattel was not merely on constructive notice of MGA's claim to ownership, but also on actual notice.

4.   Estoppel as to Copyright Claims:  The MGA parties assert the following facts in support of this affirmative defense.  As described above, despite knowing that Bryant created the BRATZ and believing that the BRATZ infringed on its copyright, Mattel took no action for five and a half years. While Mattel sat on its claims, MGA spent millions of dollars marketing and developing the BRATZ.  (MGA MSJ at 15-33 & MGA UF ¶¶ 32-36.) Moreover, by March 2002, Mattel began investigating MGA's ownership of BRATZ.  This investigation was headed by Mattel's chief internal investigator and was aided by Mattel's outside counsel Michael Zeller. (MGA OF ¶¶ 57-58, 66, 68.)  This investigation, and the receipt of an anonymous letter claiming Bryant created the BRATZ, supported Mattel's prior belief that Bryant created the BRATZ.  (*Id.* ¶¶ 61-63, 66-67, 69-73.)

5.   Estoppel as to Employment Agreement Claims/Duty Claims:  The MGA parties assert the following facts in support of this affirmative defense. Mattel knew its employees were moonlighting for its competitors and/or creating their own independent artistic work.  (MGA OF ¶¶ 110, 124.)

-100-

Despite this knowledge, Mattel took no steps to prevent its employees from moonlighting or from working on their own independent artistic work.  In fact, Mattel's head of security (who himself moonlights (*id.* ¶ 171)) could not recall a single instance of investigating such behavior.  (Bryant UF ¶ 41.)  Every one of the employees that moonlighted or created independent artistic work while working at Mattel had a contract like Bryant's.  (*Id.* ¶¶ 9-11.)

6.   Acquiescence as to Bryant's Drawings:  The MGA parties assert the following facts in support of this affirmative defense.  Mattel contends that it owns various drawings and colorings on drawings done while Bryant was employed at Mattel, but the evidence is undisputed that such activities occurred, if at all, on Bryant's own time and not in the course and scope of his employment.  (MGA OF ¶ 175.)  As described above, Mattel had a longstanding practice of allowing its employees to moonlight or create their own artistic work; indeed, so many Mattel employees moonlighted with Mattel's competitors that they developed a name for these jobs.  (MGA OF ¶¶ 110, 124.)  Every one of these employees signed the same form employment agreement with Mattel as did Bryant.  (Bryant UF ¶¶ 9-11.)  Despite the widespread knowledge of this practice at Mattel, it never investigated or punished this behavior.  (*Id.* ¶ 41.)  Mattel knew (or should have known) of Bryant's conduct no later than 2001.  (MGA UF ¶¶ 53-54, 56.)  Nonetheless, it waited until 2004 to bring an action based on Bryant's employment agreement.  Moreover, Mattel never brought such an action against any of the other numerous employees who moonlighted or created their own artistic work during the same period.

7.   Acquiescence as to MGA's Alleged Copyright Violations:  The MGA parties assert the following facts in support of this affirmative defense.  As described above, Mattel learned of the BRATZ dolls five and a half years

1    before bringing an action against the MGA parties and meanwhile, the

2    MGA parties have expended millions of dollars marketing and developing

3    the BRATZ.  (MGA UF ¶¶ 31-32, 34-37.)

4    8.    Waiver:  The MGA parties assert the following facts in support of this

5          affirmative defense.  Mattel contends that it owns various drawings and

6          colorings on drawings done while Bryant was employed at Mattel, but the

7          evidence is undisputed that such activities occurred, if at all, on Bryant's

8          own time and not in the course and scope of his employment.  (MGA OF ¶

9          175.)  Yet, as described above, Mattel knowingly allowed its employees to

10         "moonlight" at competitors without protest and/or create their own artistic

11         work.  (OF ¶¶ 110, 124 (citing Bryant UF ¶¶ 37- 38).)  Everyone of these

12         employees signed a contract with Mattel like Bryant.  (Bryant UF ¶¶ 9-11.)

13         Mattel did not conduct a single investigation into this conduct.  (*Id.* ¶ 41.)

14         Mattel has not produced any evidence that it has ever enforced its

15         contracts to prevent employees from working for competitors on the side

16         or from creating their own independent artistic work, despite repeated

17         discovery requests from MGA.  (Nolan Decl. in Support of MGA SJ ¶ 6.)

18   9.    Abandonment:  The MGA parties assert the following facts in support of

19         this affirmative defense.  As discussed above, Mattel suspected that the

20         BRATZ infringed on its copyrights in early 2001. (MGA UF ¶¶ 31-32, 34-

21         37.)   To make a determination regarding this potential violation, Mattel

22         conducted an investigation, headed by Mattel's director of security and

23         aided by outside counsel, Michael Zeller.  (MGA OF ¶¶ 57-58, 66, 68.)

24         Mattel expended time, resources, and money on this investigation but

25         decided not to pursue any claims against the MGA Parties, or even to

26         contact the MGA Parties to resolve any remaining doubts concerning the

27         alleged violations of Mattel's copyrights.

28

10. <u>Good Faith</u>:  The MGA parties assert the following facts in support of this affirmative defense.  Before MGA entered into an agreement with Bryant on October 4, 2000, during negotiations with Bryant, the MGA parties sought and received assurances from Bryant and his attorney that the BRATZ concept and drawings fell outside any contractual obligations owed to Mattel  (MGA UF ¶¶ 14-23; Mattel UF ¶ 94).  Bryant's contract with MGA and Larian included a warranty that BRATZ was Bryant's exclusive property and indemnified MGA and Larian against any claims raised by a third party.  (MGA UF ¶ 23, Mattel UF ¶¶ 97-98.)  Anything Bryant prepared while employed at Mattel to pitch the BRATZ idea to MGA was believed by MGA and Larian as also created outside the scope of his duties to Mattel, based on the representations of Bryant and his attorney.  (OF ¶¶ 6, 19, 133.)

11. <u>Consent</u>:  The MGA parties assert the following facts in support of this affirmative defense.  Mattel knew that its employees were moonlighting with its competitors and/or creating independent artistic works and did not object.  (OF ¶¶ 110, 124.)  Mattel consented when it allowed its employees, all of whom signed employment agreements like Bryant's, to engage in this behavior.

12. <u>Mitigation</u>:  The MGA Parties assert the following facts in support of this affirmative defense.  As discussed above as to the statute of limitations and laches defenses, Mattel knew about its claims years before it filed its claims in this case against the MGA parties.  Despite this knowledge, Mattel initially concluded that Bratz was not a threat to Mattel's market share and chose not to sue.  It was only when Mattel's Barbie line began to lost market at a "chilling rate" and Mattel concluded that it had been "out thought and out executed" in the market, that Mattel decided to commence suit.  Mattel had a duty to mitigate its claimed damages by asserting any

1    claims it had relating to Bratz as quickly as possible and it is not entitled to

2    recover any damages that could reasonably have been avoided had Mattel

3    promptly filed suit.

4    13.   Privilege/Justification:  The MGA Parties assert the following facts in

5          support of this affirmative defense:  (a) before ever meeting with Bryant,

6          MGA was considering developing a line of fashion dolls (Garcia Tr. at

7          214:8-215:20, 232:23-233:24, 921:10-922:13; O'Connor Tr. at 50:23-

8          51:18; V. Marlow Tr. at 117:14-118:16, 119:24-120:7; I. Larian Tr. at

9          15:10-25, 16:7-22, 56:25-57:23); (b) MGA's contract with Bryant sought

10         his services to develop a line of dolls based on his concept for the BRATZ.

11         Mattel and MGA compete in the fashion doll industry (MGA UF ¶ 23); (c)

12         Bryant approached MGA and both he and his counsel assured MGA and

13         its counsel that he was under no obligation to Mattel to provide his concept

14         to them (MGA UF ¶¶ 5-26; MGA OF ¶¶ 140, 143-145); (d)  MGA

15         reasonably relied on these assurances and incorporarted them into his

16         agreement (MGA UF ¶¶ 16-26; MGA OF ¶¶ 133); (e) MGA did not seek

17         to or actually restrain competition; rather, MGA promoted competition to

18         the extent it entered a new market by lawful means and provided a new,

19         competitive product to the marketplace, and in fact, reduced Barbie's

20         market share substantially (MGA UF ¶¶ 74-80; MGA OF ¶¶ 66, 149);  and

21         (f) MGA sought to produce a fashion doll that would compete with

22         Mattel's and other toy companies' products (I. Larian Tr. at 56:25-57:23,

23         111:6-13).

24   14.   Deductible expenses: MGA incurred substantial costs and expenses to

25         develop, manufacture, market and sell the various products that Mattel

26         now alleges infringe its copyrights.  At trial, MGA intends to present

27         evidence of these costs, expenses and related deductions, including, but

28         not limited to, the following:

a.  Sales returns

b.  Sales discounts and allowances

c.  Costs of goods sold

d.  Production costs

e.  Other costs of sales

f.  Ad production expense

g.  Ad media expense

h.  Other sales and marketing expense

i.  Product development expense

j.  Travel and entertainment expense

k.  Salaries and related expenses

l.  Professional fees

m. Premises-related expenses

n.  Supplies, postage and delivery expenses

o.  Other expenses

p.  Distribution expenses

q.  Mold depreciation

r.  Other depreciation and amortization

s.  Tax expense

15.  <u>Apportionment Factors</u>:  Substantial elements of the MGA parties' profits were attributable to factors other than the copyrighted work.  At trial, the MGA parties intend to introduce evidence confirming these factors as critical to the success of the allegedly infringing products.  This evidence will include, but will not necessarily be limited to, market research and related documents produced by MGA, Mattel and third parties.  The MGA parties further expect to elicit testimony from lay witnesses and experts that supports these apportionment factors, consistent with the MGA

parties' Rule 26 disclosures.  In particular, the MGA parties intend to introduce evidence supporting each of the apportionment factors below:

a. <u>Design of the doll.</u>  The "design of the doll" refers to a variety of developmental steps, each of which involved substantial creative contributions.  These steps include:  (a) Carter Bryant's drawings, both before and after his departure from Mattel, (b) the sculpts for the Bratz dolls created by Margaret Leahy, (c) the engineering concepts that allowed for production of the doll, (d) the face painting of the dolls by Anna Rhee, and (e) the Bratz dolls hair rooting and hairstyling by Steve Tarmichael.  All of these doll development steps were overseen by Ms. Garcia.  As the evidence will show, Mr. Bryant's drawings had a relatively minor contribution to the ultimate design of the Bratz dolls.

b. <u>Themes associated with the doll</u>.  Fashion dolls are commonly sold using doll "themes," and doll makers like MGA and Mattel expend considerable resources developing fashions, packaging, accessories and storylines consistent with those themes.  As the evidence will show, successful execution of themes is critical to the sales of fashion dolls, including Bratz.

c. <u>Fashions sold with the doll</u>:  The evidence will further show that MGA's continued development of cutting-edge, innovative fashions helped drive and sustain the commercial success of the Bratz fashion doll line.

d. <u>Accessories sold with the doll:</u> The evidence will show that accessories significantly enhance the "play value" of fashion dolls, including Bratz. Thus, companies like Mattel and MGA expended substantial sums to develop, test and market fashion doll accessories.  MGA's continued development of high-quality and innovative doll accessories helped drive and sustain the commercial success of the Bratz doll fashion line.

e. <u>Characters associated with the doll line.</u>  The evidence will show that girls must "relate" to a fashion doll if the doll is to enjoy commercial success.  To that end, doll companies like Mattel and MGA invest considerable resources to develop personalities, interests, storylines, and even ethnicities for their fashion dolls.  As even Mattel's marketers recognized, MGA was extraordinarily successful at imbuing its Bratz fashion dolls with memorable personalities that, in turn, drove the sales and profits of the fashion doll line.

f. <u>Packaging in which the dolls were sold.</u>  The MGA parties intend to introduce evidence that MGA's innovative and award-winning packaging helped drive sales of fashion dolls.  Indeed, as the evidence will show, Mattel recognized the impact of Bratz's innovative packaging, and, in response, invested substantial amounts to makes its own doll packaging more attractive.  Even Mattel's own consumer research attests to the drawing power of Bratz's doll packaging, as the evidence will show.

g. <u>MGA's branding, marketing, and advertising efforts.</u>  As the evidence will show, MGA developed a strong Bratz brand in record time using skilled marketing and innovative branding techniques.  The MGA parties intend to elicit expert testimony regarding the nature of MGA's branding efforts and the importance of branding, marketing and advertising to Bratz's commercial success.

16. <u>Apportionment Approaches:</u>  Based on the factors above, the MGA parties intend to elicit expert testimony regarding approaches that may be used to apportion MGA's profits.  In support of these approaches, the MGA parties may introduce documents and testimony further corroborating the apportionment calculations of its experts.  In particular, the MGA parties

intend to elicit expert testimony regarding the following apportionment approaches:

a. Mattel's "Key Fashion Doll Attributes":  The apportionment approach is based on Mattel's own assessment of Bratz's performance along several "key fashion doll attributes."

b. Royalties paid by MGA to Bryant:  This approach uses the royalty rate paid to Mr. Bryant as a proxy for the value of Mr. Bryant's contribution to the Bratz doll line.

c. Work tasks to develop the original Bratz doll.  This approach compares the total work tasks of Mr. Bryant to the overall creative work tasks incurred by MGA to develop the original Bratz dolls.

d. MGA's product development contributions to Bratz.  This approach apportions Bratz profits based on an equal weighting of the apportionment factors listed above.

e. MGA's licensing in and licensing out royalty rates.   This approach compares the "licensing in" royalty rate paid to Mr. Bryant to the average "licensing out" royalty rates for the Bratz property.  The difference between these two rates is used as a proxy for the value added to the Bratz line by MGA.

f. MGA's investment in the Bratz product line.  This approach compares MGA's costs to acquire the allegedly copyrighted property, i.e., royalties paid to Mr. Bryant, to MGA's costs associated with developing and marketing the Bratz doll line and other Bratz-branded merchandise.

g. Sales variation among Bratz products.  This approach measures the variation in sales revenue among different Bratz doll SKUs containing the same doll design.  The difference in sales can be fairly attributed to

1    factors other than the allegedly infringing doll design, including

2    fashions, themes, characters, accessories, and packaging.

3    h.  Brandware Group's "Bratz Doll Purchasing Influence Study":  This

4    approach apportions profits based on consumer research conducted by

5    Thomas Gruca of Brandware Group.  Mr. Gruca's research measured

6    the relative importance of each of the apportionment factors identified

7    above to consumers' decision to purchase Bratz dolls.

8    The foregoing apportionment methodologies result in a range of profits attributable

9    to "doll design" from 14.3 percent (%) to 25.0 percent (%).  As the evidence will

10   further show, and as discussed above, "doll design" may be further apportioned

11   between the contribution of the protectable elements of Carter Bryant's drawings (if

12   any) on the one hand, and the contributions of others, including but not limited to

13   Margaret Leahy, Paula Garcia, Veronica Marlow,   Isaac Larian and Mr. Bryant

14   (following his departure from Mattel) on the other hand.

15

16

17   **XXIV.**

18   **ISSUES TO BE TRIED**

19   Mattel's Position:

20   **Factual Issues to be Decided by the Court:**

21   Intentional Interference with Contractual Relations:

22   Subject to the findings of the Court's April 25, 2008 and May 21, 2008

23   Orders:

24

25

26

27

28

1.     Whether MGA and/or Mr. Larian knew of the contractual relationship between Mattel and Bryant;[15]

2.     Whether MGA and/or Mr. Larian intended to disrupt the performance of this contractual relationship;

3.     Whether Bryant breached his contractual duties owed to Mattel or the conduct of MGA and/or Mr. Larian prevented performance or made performance more difficult;

4.     Whether the conduct of MGA and/or Mr. Larian was a substantial factor in causing Mattel's harm; and

5.     Damages.

<u>Aiding and Abetting Breach of Fiduciary Duty:</u>

Subject to the findings of the Court's April 25, 2008 and May 21, 2008 Orders:

6.     The scope of the duty owed by Bryant beyond Mattel's confidential information;

7.     Whether Mr. Bryant's conduct constituted a breach of a duty or duties;[16]

8.     Whether MGA and/or Mr. Larian knew that Mr. Bryant's conduct constituted a breach of duty or duties;

9.     Whether MGA and/or Mr. Larian gave substantial assistance or encouragement to Mr. Bryant to breach his duty or duties; and

---

[15]   As explained above, Mattel's position is that willful blindness is equivalent to knowledge.

[16]   This Court's April 25, 2008 Order (at 6) "grant[ed] Mattel's motion for summary judgment … on the issue of the existence and breach of a fiduciary duty." The Court's May 21, 2008 Order reaffirmed that Bryant was subject to a fiduciary duty, but ruled that the scope of that duty and whether Bryant breached his fiduciary duty should be submitted to the jury.  (Order at 4).

10.      Damages.

## Aiding and Abetting Breach of Duty of Loyalty:

Subject to the findings of the Court's April 25, 2008 and May 21, 2008 Orders:

11.      Whether MGA and/or Mr. Larian knew that Mr. Bryant's conduct constituted a breach of duty or duties;[17]

12.      Whether MGA and/or Mr. Larian gave substantial assistance or encouragement to Mr. Bryant to breach his duty or duties; and

13.      Damages.

## Conversion:

Subject to the findings of the Court's April 25, 2008 and May 21, 2008 Orders:

14.      Whether Mattel was the rightful owner of the property at issue;

15.      Whether Larian, MGA, or MGA HK intentionally took possession of such property for a significant period of time or deprived Mattel of the beneficial use of such property;

16.      Whether Mattel consented;

17.      Whether Mattel was harmed;[18]

18.      Whether defendants' conduct was a substantial factor in causing Mattel's harm; and

19.      Damages.

---

[17]   This Court's April 25, 2008 Order (at 6) "grant[ed] Mattel's motion for summary judgment on the issues of the existence and breach of the duty of loyalty."

[18]   The Court ruled in its April 25, 2008 Order (at 5) that "[t]he undisputed facts … [show] Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel."

<div align="center">Unfair Competition:</div>

20.     Whether any defendant engaged or engages in conduct that is unlawful (although excluding fraudulent conduct, copyright infringement and "unfair conduct").

<div align="center">Declaratory Relief:</div>

21.     Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to Bratz designs, are void and of no effect, including because Bryant previously assigned all right, title or interest in Bratz to Mattel and because Mattel was otherwise the owner of said right, title or interest.

<div align="center">Copyright:</div>

22.     Whether Mattel is the owner of a valid copyright; and

23.     Whether defendants infringed such copyright.

Vicarious Liability:

24.     Whether defendants profited directly from the infringing activity of MGA;

25.     Whether defendants had the right and ability to supervise/control the infringing activity; and

26.     Whether defendants failed to exercise that right and ability.

Contributory Liability:

27.     Whether defendants knew or had reason to know of the infringing activity; and

28.     Whether defendants intentionally materially contributed to the infringing activity.

1

2                    <u>Inferences on Ultimate Facts</u>

3              Whether computer data and evidence has been removed and or

4    rendered irretrievable through Bryant's actions.

5              Whether critical documents were destroyed or compromised as a result

6    of destructive testing of documents by MGA.

7              Whether MGA, Larian and Bryant altered original Bratz drawings

8    created by Bryant by adding false and misleading date notations of "8/1998" and "©

9    8/1998" to the drawings, even though the drawings were not created in August 1998.

10             Whether Larian directed a subordinate to conceal evidence on

11   documents from Carter Bryant.

12             Whether markings which now appear on the copy of a Bratz drawing

13   produced by defendants did not appear on the original drawing that Bryant showed

14   in 1999.

15             Whether the notary book relating to certain of Bryant's Bratz drawings

16   -- reflecting that those drawings are supposedly "From 1998 Missouri" -- was

17   subsequently added to the book.

18

19   **<u>Legal Issues to be Decided by the Court:</u>**

20                         <u>Aiding and Abetting:</u>

21        29.    Whether willful blindness or conscious avoidance can satisfy the

22   knowledge element.

23             (a)    <u>Argument:</u>  Willful blindness or conscious avoidance can

24   satisfy the knowledge element.

25

26

27

28

<u>Copyright:</u>

30.    Whether the drawings, sculpts and other works, if any, owned by Mattel are sufficiently original to qualify for copyright protection and, relatedly, whether such protection is full or "thin"?

(a)    <u>Argument:</u>  The drawings, sculpts and other works are sufficient to qualify for full protection.

31.    Whether the Inventions Agreement complies with Section 204(a) of the Copyright Act to effect a transfer of copyright by agreement.

(a)    <u>Argument:</u>  The Inventions Agreement complies with Section 204(a).

32.    Whether MGA's mere registration of copyrights without recording an instrument of transfer allows MGA to invoke the protections of Section 205(d) of the Copyright Act.  Relatedly, whether, if MGA can invoke those protections, MGA satisfies the good-faith element of Section 205(d).

(a)    <u>Argument:</u>  MGA cannot invoke Section 205(d) because it did not timely record and in any event did not act in good faith.

33.    What elements, if any, should be excluded from the scope of the drawings' copyright protection.

(a)    <u>Argument:</u>  It is inappropriate to filter out the elements of the visual works at issue here, including on the grounds of judicial estoppel.

34.    Whether the affirmative defense of independent creation apply where the same person created, or assisted in creating, both the original and the allegedly infringing work.

(a)    <u>Argument:</u>  The affirmative defense does not apply in such situations.

35.    Whether it is proper to consider the dolls' and/or the drawings' clothing in conducting a substantial similarity analysis.

1          (a)      Argument:  The dolls' and drawings' clothing is not

2  utilitarian, and thus is entitled to full copyright protection.

3          36.      Whether the jury should be permitted to consider differences

4  between the works as part of its substantial similarity analysis.

5          (a)      Argument:  The Ninth Circuit has adopted the principle

6  that "'no plagiarist can excuse the wrong by showing how much of his work he did

7  not pirate.'" Shaw v. Lindheim, 919 F.2d 1353, 1362 (9th Cir. 1990); Harper & Row

8  Publishers, Inc. v. Nation Enters., 471 U.S. 539, 565 (1985) (same).

9                      Laches Affirmative Defense:

10         37.      Whether laches bars any of Mattel's claims.

11         (a)      Argument:  Laches does not bar any of Mattel's claims.

12                     Estoppel Affirmative Defense:

13         38.      Whether estoppel bars any of Mattel's claims.

14         (a)      Argument:  Estoppel does not bar any of Mattel's claims.

15                      Waiver Affirmative Defense:

16         39.      Whether waiver bars any of Mattel's claims.

17         (a)      Argument:  Waiver does not bar any of Mattel's claims.

18                  Acquiescence Affirmative Defense:

19         40.      Whether acquiescence bars any of Mattel's claims.

20         (a)      Argument:  Acquiescence does not bar any of Mattel's

21  claims.

22            Statute of Limitations Affirmative Defense:

23         41.      Whether no reasonable juror could find that Mattel's copyright

24  claim accrued before Nov. 24, 2003.

25         (a)      Argument:  No reasonable juror could find that the claim

26  accrued before Nov. 24, 2003 and in any event Mattel's claims are timely on the

27  grounds of relation back, the stay period and fraudulent conceal, among others.

28

<div align="center">Abandonment Affirmative Defense:</div>

42.     Whether abandonment bars any of Mattel's claims.

(a)     <u>Argument:</u>  Abandonment does not bar any of Mattel's claims.

<div align="center">Acts and Omissions of Others Affirmative Defense:</div>

43.     Whether acts and omissions of others bar any of Mattel's claims.

(a)     <u>Argument:</u>  Acts and omissions of others do not bar any of Mattel's claims.

<div align="center">Failure to Mitigate Affirmative Defense:</div>

44.     Whether failure to mitigate bars any of Mattel's claims.

(a)     <u>Argument:</u>  Failure to mitigate does not bar any of Mattel's claims.

The MGA Parties' Position:

In view of the admitted facts and the elements required to establish the claims, counterclaims and affirmative defenses, the following issues remain to be tried:

**A.     <u>Mattel's Claim 1 (Breach of Contract Against Bryant)</u>**

1.     This claim has been dismissed and all liability released based on the settlement between Mattel and Bryant.  No issues remain to be tried.

**B.     <u>Mattel's Claim 2 (Breach of Fiduciary Duty Against Bryant)</u>**

1.     This claim has been dismissed and all liability released based on the settlement between Mattel and Bryant.  No issues remain to be tried.

**C.    Mattel's Claim 3 (Breach of Duty of Loyalty Against Bryant)**

1.     This claim has been dismissed and all liability released based on the settlement between Mattel and Bryant.  No issues remain to be tried.

**D.    Mattel's Claim 4 (Conversion Against Bryant, MGA, MGA HK and Larian)**

1.     This claim has been dismissed and all liability released based on the settlement between Mattel and Bryant.

2.     As to MGA, MGA HK and Larian, the Court already dismissed Mattel's conversion claim to the extent it is based on conversion of "ideas."  (_See_ April 25, 2008 MSJ Order).  The following issues remain to be tried:

> 1) Whether Mattel owned the BRATZ sketches under Section 2(a) of the Inventions Agreement and the rights to a Mattel doll head and Mattel's telephones and fax machines;
>
> 2) Whether Larian, MGA, or MGA HK intentionally prevented Mattel form having access to the above-mentioned items for a significant period of time, or destroyed Mattel's personal property;
>
> 3) Whether Mattel did not consent and did not discard the property;
>
> 4) Whether Mattel was harmed; and
>
> 5) Whether Larian's, MGA's, or MGA HK's conduct was a substantial factor in causing Mattel's harm.

**E.**     **Mattel's Claim 5 (Intentional Interference with Contract Against Larian and MGA)**

1.     The Court has already held that this claim is preempted by the Copyright Act to the extent it is based on Mattel's rights to BRATZ.  (_See_ April 25, 2008 MSJ Order.)  The following issues remain to be tried:

> 1) Whether MGA and Larian actually knew of the contract between Mattel and Carter Bryant and its terms;
>
> 2) Whether MGA and Larian intended to disrupt the performance of this contract;
>
> 3) Whether Larian and MGA engaged in wrongful conduct independent of "interfering" with Bryant's contracts with Mattel through (1) aiding and abetting Bryant in a breach of any duties he allegedly owed to Mattel; or (2) engaging in acts of unlawful unfair competition;
>
> 4) Whether the conduct of MGA and/or Mr. Larian prevented performance of the contract;
>
> 5) Whether Mattel was harmed; and
>
> 6) Whether the conduct of MGA and Larian was a substantial factor in causing Mattel's harm.

**F.**    **Mattel's Claim 6 (Aiding and Abetting Breach of Fiduciary Duty As To Larian and MGA)**

1.    The Court has determined that Bryant owed a limited fiduciary duty to Mattel as regards Mattel's confidential information that Bryant learned of and obtained during the course and scope of his employment at Mattel, and as circumscribed by the terms of the Inventions Agreement.  The following issues remain to be tried:

1) Whether Bryant owed any fiduciary duty beyond protecting Mattel's confidential information that he learned of and obtained during the course and scope of his employment at Mattel;

2) Whether Bryant committed an actionable breach of a fiduciary duty he owed to Mattel;

3) Whether Bryant's conduct was privileged as permissible "preparations to compete";

4) Whether MGA and Larian substantially assisted or encouraged Bryant in accomplishing the breach;

5) That MGA and Larian had actual knowledge of the specific wrong they substantially assisted; and

6) What harm, if any, MGA and Larian caused Mattel to suffer while Bryant was still an employee of Mattel.

**G.     Mattel's Claim 7 (Aiding and Abetting Breach of the Duty of Loyalty As To Larian and MGA)**

1.      The Court has determined that Bryant owed a duty of loyalty to Mattel. The following issues remain to be tried:

> 1) What is the scope of that duty of loyalty under the facts of this case;
>
> 2) Whether Bryant committed an actionable breach of a duty of loyalty he owed to Mattel;
>
> 3) Whether Bryant's conduct was privileged as permissible "preparations to compete";
>
> 4) Whether MGA and Larian substantially assisted or encouraged Bryant in accomplishing the breach;
>
> 5) Whether MGA and Larian had actual knowledge of the specific wrong they substantially assisted; and
>
> 6) What harm, if any, MGA and Larian caused Mattel to suffer while Bryant was still an employee of Mattel.

**H.     Mattel's Claim 8 (Statutory Unfair Competition As To Bryant, Larian, MGA, and MGA HK)**

1.      This claim has been dismissed and all liability released based on the settlement between Mattel and Bryant.

2.      The Court already has dismissed Mattel's statutory unfair competition claim to the extent it is based on alleged copyright infringement by MGA or includes "unfair conduct" threatening competition or "fraudulent conduct.. (*See*

April 25, 2008 MSJ Order; May 21, 2008 MSJ Order). The following issues remain to be tried:

      3) Whether Larian, MGA and MGA HK are "businesses" as defined under Cal. Bus. & Prof. Code Section 17200 <u>et seq.</u>;

      4) Whether Larian, MGA and MGA HK engaged in "unlawful" conduct by proving: (a) that the MGA Parties violated Cal. Penal Code § 641.3(a) by engaging in commercial bribery; or (b) that the MGA Parties intentionally interfered with Bryant's contract with Mattel (as that claim has been limited and narrowed by the Court's prior orders);

      5) What, if anything, was taken from Mattel that it is entitled to obtain restitution of.

## I. <u>Mattel's Claim 9 (Declaratory Relief Against Bryant, Larian, MGA, and MGA HK – ownership of original Bratz works and associated copyrights allegedly created by Bryant while employed by Mattel)</u>

1. This claim has been dismissed and all liability released based on the settlement between Mattel and Bryant.

2. The Court has determined that the Inventions Agreement between Carter Bryant and Mattel is a valid contract. The following issues remain to be tried:

1)  Whether the Inventions Agreement was a valid contract between Mattel and Bryant;

2)  Whether the term "inventions" in the Inventions Agreement applies to the BRATZ sketches;

3)  Whether Carter Bryant "conceived" or "reduced to practice" the "invention" "during [his] employment" at Mattel;

4)  Whether MGA purchased the rights in good faith;

5)  Whether under section 204(a) of the Copyright Act and Section 988 of the California Civil Code, the Inventions Agreement clearly and unambiguously transferred any copyright ownership in the BRATZ sketches to Mattel.

**J.  Mattel's Claim 10 Copyright Infringement (Against Bryant, Larian, MGA, and MGA HK)**

1.  This claim has been dismissed and all liability released based on the settlement between Mattel and Bryant.

2.  As to Larian, MGA, and MGA HK, the following issues remain for trial:

1)  Whether the term "inventions" in the Inventions Agreement applies to the BRATZ sketches;

2) Whether Carter Bryant "conceived" or "reduced to practice" the "invention" during his employment at Mattel;

3) Whether MGA purchased the rights in good faith;

4) Whether under section 204(a) of the Copyright Act 204 and Section 988 of the California Civil Code 988, the Inventions Agreement clearly and unambiguously transferred any copyright ownership in the BRATZ sketches to Mattel.

5) Whether in creating the BRATZ dolls, MGA actually copied the Bryant drawings in the BRATZ dolls.

6) Whether, even if copied, that there is "substantial similarity" between original protectible expression in the Bryant drawings and the BRATZ dolls to the level of "virtual identity."

Elements to be Proven – Vicarious Infringement (Larian)

5) Whether MGA or MGA Hong Kong infringed Mattel's copyrights in the Bryant sketches;

6) Whether Larian profited directly from the infringing activity of MGA or MGA Hong Kong;

7) Whether Larian had the right and ability to supervise the infringing activities of MGA and MGA Hong Kong; and

8) Whether Larian failed to exercise that right and ability.

Elements to be Proven – Contributory Infringement (Larian)

4) Whether MGA or MGA Hong Kong infringed Mattel's copyrights in the Bryant sketches;

5) Whether Larian knew or had reason to know of the infringing activity of MGA or MGA Hong Kong; and

6) Whether Larian intentionally induced MGA or MGA Hong Kong's infringing activity.

**K.      MGA Parties' Third Affirmative Defense (Laches)**

1.      The following issues remain to be tried:

1)      Whether Mattel's delay in filing suit was unreasonable in light of Mattel's knowledge of its claims against, MGA, MGA (HK), or Larian; and

2)      Whether Mattel's delay was prejudicial to MGA, MGA (HK), or Larian in light of investments of time and money that MGA and Larian made; *or*

3)      Whether Mattel's delay was prejudicial to MGA, MGA (HK), or Larian in that substantial evidence has been lost and memories faded in the years since Mattel was first on notice of its claims.

**L.      MGA Parties' Forth Affirmative Defense (Statute of Limitations)**

1.      The following issues remain to be tried:

1)      <u>Intentional Interference with Contract (MGA and Larian)</u>: Whether Mattel filed its claims within two years of the occurrence of the acts that Mattel contends were wrongful, in this case the alleged breach of Carter Bryant's contracts with Mattel.  The claim "accrues" whether or not Mattel actually knew of the acts at the time.

2)      <u>Aiding and Abetting Breach of Fiduciary Duty (Larian and MGA)</u>:  Whether Mattel filed its claims within two years of the date when Mattel knew or when a reasonable person would have had any reason to suspect that wrongdoing had taken place, in this case when Bryant allegedly breached a fiduciary duty to Mattel.

3)      <u>Aiding and Abetting Breach of Duty of Loyalty (Larian and MGA)</u>:  Whether Mattel filed its claims within two years of the date when Mattel knew or when a reasonable

person would have had any reason to suspect that wrongdoing had taken place, in this case when Bryant allegedly breached a duty of loyalty to Mattel.

4)      <u>Copyright Infringement (Larian, MGA and MGA (HK))</u>: Whether Mattel filed its claims within three years of when Mattel discovered or reasonably could have discovered that MGA was asserting ownership over property to which Mattel had a copyright interest.

5)      <u>Conversion (Larian and MGA (HK))</u>: Whether Mattel filed its claims within three years of the act of wrongfully taking the property that Mattel contends was converted. The claim "accrues" whether or not Mattel actually knew of the acts at the time.

6)      <u>Statutory Unfair Competition (Isaac Larian and MGA (HK))</u>: Whether Mattel filed its claims within four years of when the acts that Mattel contends constitute unfair competition occurred. The claim "accrues" whether or not Mattel actually knew of the acts at the time.

**M.      <u>MGA Parties' Fifth and Sixth Affirmative Defenses (205(d)/ Bona Fide Purchaser for Value)</u>**

1.      The following issues remain for trial:

1             1)     Whether the MGA-Bryant Agreement

2            was recorded with the Copyright Office first

3            in such a manner as to give Mattel

4            constructive notice of the transfer; and

5             2)     Whether the MGA-Bryant Agreement

6            was executed in good faith, for valuable

7            consideration; and without notice of an earlier

8            transfer.

9   Recordation with the Copyright Office means either (1) the filing of the transfer

10  agreement itself, or (2) registration with the Copyright Office listing ownership by

11  assignment.

12

13      **N.**     **MGA Parties' Ninth Affirmative Defense (Estoppel)**

14      1.     Estoppel of Copyright Claims: The following issues remain for trial:

15            a)     Whether Mattel made a representation of fact by conduct

16      intending that MGA, MGA (HK), and/or Larian should rely on it.  ;

17            b)     Whether Mattel had knowledge that BRATZ potentially

18      infringed on its intellectual property and that Carter Bryant worked

19      with MGA;

20            c)     Whether MGA, MGA (HK), and Larian were ignorant of

21      Mattel's claims of ownership of Bryant's BRATZ sketches; and

22            d)     Whether MGA, MGA (HK), and Larian reasonably relied on

23      Mattel's silence to their detriment.

24      2.     Estoppel of Employment Claims/Duty Claims: The following issues

25  remain for trial:

26            a)     Whether Mattel made a representation of fact by conduct

27      intending that Defendant should rely on it.  Conduct is used "in its

28

broadest meaning as including … silence or negative omission to do anything."

      b)      Whether Mattel had knowledge that its employees were moonlighting or independent creation of artistic works;

      c)      Whether Carter Bryant was ignorant of the fact that Mattel allowing moonlighting or the independent creation of artistic works was not intended as a policy; and

      d)      Whether Carter Bryant, MGA, MGA (HK), and Larian reasonably relied on Mattel's silence to their detriment.

**O.**      **MGA Parties' Tenth Affirmative Defense (Acquiescence)**

1.      The following issues remain for trial:

*(as to development and marketing of BRATZ)*

      3.  Whether Mattel, through its acts or words, silence or inaction, as understood by a reasonable person, indicated the development and marketing of BRATZ was allowed, and

      4.  Whether Larian, MGA, Bryant and/or MGA (HK) understood that Mattel allowed the development and marketing of BRATZ.

*(as to Bryant's alleged breaches of duties/contract and MGA Parties' alleged aiding & abetting/inducement, and interference with contract)*

      1.  Whether Mattel, through its acts or words, silence or inaction, as understood by a reasonable person, indicated its employees were allowed to moonlight and/or develop their own artistic work; and

      2.  Whether Bryant understood that Mattel allowed its employees to moonlight and/or develop their own artistic work.

**P.** **MGA Parties' Eleventh Affirmative Defense (Mitigation)**

1. The following issues remain for trial:

    1) Whether Mattel failed to use reasonable efforts to mitigate damages; and

    2) the amount by which damages would have been mitigated.

**Q.** **MGA Parties' Thirteenth Affirmative Defense (Waiver)**

1. The following issues remain for trial:

    1) Whether Mattel was aware of its employees' alleged breaches of the provisions of the employment agreements at issue; and

    2) Whether Mattel indicated, by its words, actions or silence that it did not intend to enforce the provisions of its employment agreements at issue.

**R.** **MGA Parties' Fourteenth Affirmative Defense (Abandonment)**

1. The following issues remain for trial:

    1). Whether Mattel intended to surrender ownership rights in the work; and

    2) Whether conduct by Mattel which was "consistent with an intent to abandon" or which "implies an abandonment."

**S.** **MGA Parties' Fifteenth Affirmative Defense (*De Minimis* Use)**

1. The following issues remain for trial:

1                               1)      Whether any similarities between the

2 protectable elements of the drawings and the

3 protectable elements of the BRATZ dolls are

4 *de minimis*; <u>or</u>

5                               2)      Whether, if there was copying, it was

6 not done to an unfair extent; <u>or</u>

7                               3)      Whether any similarities between the

8 copyrighted work and the copied work consist

9 only of unprotectable elements and elements

10 in the public domain.

**T.**     **<u>MGA Parties' Seventeenth Affirmative Defense (Privilege)</u>**

1.     The following issues remain for trial:

    (a) Whether the relation between Bryant and the MGA Parties concerned a matter involving competition with Mattel, and

(b) Whether the MGA Parties employed improper, independently actionable  means in dealing with Bryant, and

(c) Whether the MGA Parties intended thereby to create or continue an illegal restraint of competition, and

(d) Whether the MGA Parties' purpose was at least in part to advance his interest in his competition with Mattel.

**U.**   **MGA Parties' Eighteenth Affirmative Defense (Good Faith)**

1.   The following issues remain for trial:  the good faith of Larian, MGA, and MGA (HK) is a factor that should be considered when assessing any claim by Mattel that Carter Bryant, Larian, MGA, and MGA (HK) acted in bad faith or with bad intent.  To the extent Mattel's claims implicate defendants' intent or mental state, good faith is a relevant inquiry for which <u>Mattel bears the burden of proof</u>.

**V.**   **MGA Parties' Twenty-First Affirmative Defense (Consent)**

1.   Bryant, Larian, MGA and MGA (HK) must prove:

      1)   Whether Mattel indicated, by its words, actions or silence that it consented to its employees moonlighting and developing their own artistic work; and

      2)   Whether Bryant understood that Mattel allowed its employees to moonlight and develop their own artistic work.

**W.**   **MGA Parties' Affirmative Defense to Copyright Infringement Damages**

1.   The following issues remain for trial:

      1.   The expenses deductible from gross revenues causally connected to the alleged infringement;

2.   The elements of defendants' profit attributable to factors other than the copyrighted work.

# XXV.

## DISCOVERY

Discovery is not complete.  Phase 2 discovery has been stayed.  Many Phase 1 discovery motions remain to be heard.  Certain depositions of fact and expert witnesses remain to be conducted.  The parties are working to complete them as expeditiously as possible.

The MGA Parties' Position:

Discovery is not complete.  Phase 2 discovery has been stayed.  Certain Phase 1 discovery motions remain to be heard and certain 30(b)(6) depositions ordered by the Court remain to be conducted.  Although the MGA parties are ready and eager to complete the depositions, Mattel has not, as of the time of the filing of this Order, provided dates or identified witnesses for the depositions.

# XXVI.

## EXHIBITS

All disclosures under F.R.Civ. P. 26(a)(3) have been made.  The joint exhibit list of the parties will be filed pursuant to the schedule approved by the Court.

# XXVII.

## WITNESSES

All disclosures under F.R.Civ.P. 26(a)(3) have been made.  Witness lists of the parties will be filed with the Court pursuant to the schedule approved by the Court.  Each party intending to present evidence by way of deposition testimony has marked such depositions in accordance with L.R. 16-2.7.  For this purpose, the following depositions shall be lodged with the Clerk as required by L.R. 32-1: William Ackerman (Art Attacks), Bryant Joseph Armstrong, Nana Ashong, Schuyler Bacon, Ronald Brawer, Kerry Brode, Charnayne Brooks, Carter Bryant,

Carter Bryant (Art Attacks), Carter Bryant (Gunther-Wahl), Janet Bryant, Thomas Bryant, Ana Cabrera, Mei Wah (Sarah) Chui, Elise Cloonan, Nick Contreras, Daniel Cooney, Wendy Feinberg, Jeanne Galvano, Paula Garcia, Paula Garcia (Art Attacks), Brooke Gilbert, Kami Gillmour, Daphne Gronich, Sarah Halpern, Esther Han, Rachel Harris, Rebecca Harris (Art Attacks), Amy Hyland, Richard Irmen, Mitchell Kamarck, Samir Khare, Andreas Koch, Susana Kuemmerle, Robert Kullman, Farhad Larian, Isaac Larian, Isaac Larian (Art Attacks), Isaac Larian (Larian v. Larian), Isaac Larian (Ubisoft), Margaret Leahy, Edmond Lee, Steven Linker, Kenneth Lockhart, Jennifer Lynn Maurus (Larian v. Larian), Albert Lyter, David Malacrida, Peter Marlow, Veronica Marlow, Karl Meyer, Beatriz Morales, Amy Myers, Joyce Ng, Victoria O'Connor, Sarah D. Odom, Denise O'Neal, Jacqueline Prince, Jessie Ramirez, Anna Rhee, David Rosenbaum, Lon Ross (Fun4All), Maria Salazar, Shirin Salemnia, Joe Tiongco, Maureen Tkacik, Lisa Tonnu, Anne Wang, Jeffrey Neil Weiss, Spencer Woodman, Mel Woods, and MGA's 30(b)(6) witness regarding Larian v. Larian.

Additional depositions to be lodged: Ronald Brawer, Richard DeAnda, Ann Driskill, Robert Eckert, Kevin Farr, Lissa Freed, Jeanne Galvano, Hoi Hoffman-Briggs, Brian Hooks, Julia Jensen, Alan Kaye, Fred Kawashima, Tim Kilpin, Liliana Martinez, Heather McComb, Ginger McRae, Nicholas Mirzoeff, Teresa Newcomb, Jill Nordquist, Ralph Oman, Rodney Palmer, Joni Pratte, Jacqueline Prince, Kathleen Simpson-Taylor, Maureen Tafoya, and Sandra Yonemoto.

Furthermore, certain depositions have been recently taken or remain to be taken. The parties will advise the Court of such transcripts to be lodged as they become available and relevant.

Pursuant to ¶ 97 of the Court's Scheduling Order, the parties identify the following expert witnesses to be called:

1    Mattel:  Valery Aginsky, John Alex, Lloyd Cunningham, William
2 Flynn, Frank Keiser, Lee Loetz, Mark Menz, Nicholas Mirzoeff, Ralph Oman,
3 Walter Rantanen, Carol Scott, Bryce Stein, Michael Wagner, Robert Lind, Angel
4 Gomez, Heather McComb, Ginger McRae, Denise Van Patten, and Kenneth
5 Hollander.
6    Defendants:  Mary Bergstein, D. Jan Duffy, Thomas S. Gruca, Erich
7 Joachimstaler, Robert D. Kullman, Albert H. Lyter, Peter Menell, Paul Meyer,
8 Debora Middleton, Robert Tonner, Glenn Vilppu, Douglas Kidder, and Gary Funck.
9    The following law and motion matters and motions in limine are
10 pending or contemplated (where disposed of, the disposition is provided in
11 parentheses):
12    Mattel has filed the following motions *in limine*:
13    1.    MIL No. 1 to exclude: (1) evidence or argument that Bryant's
14 invention assignment agreements are unfair or unconscionable; (2) evidence of other
15 versions of Mattel's inventions agreements; and (3) expert testimony of D. Jan
16 Duffy;
17          (a)    <u>Mattel's Position</u>: Granted.
18          (b)    <u>MGA Parties' Position</u>: **Action:** Granted  5/22/08
19    2.    MIL No. 2 to exclude evidence, argument or reference to
20 Mattel's alleged motive in filing suit or re consequences thereof ;
21          (a)    <u>Mattel's Position</u>: Granted as to consequences of lawsuit,
22 otherwise denied without prejudice to objections to specific evidenceas to
23 consequences of lawsuit, otherwise denied without prejudice to objections to
24 specific evidence.
25          (b)    <u>MGA Parties' Position</u>: **Action:** Denied as written.  Will allow
26 related evidence with proper foundation.
27
28

3.      MIL No. 3 to exclude Phase 1(B) evidence in the Phase 1(A) trial and Phase 2 evidence in the Phase 1 trials or, in the alternative, to permit expedited Phase 2 discovery;

(a)      <u>Mattel's Position</u>: Granted insofar as apportionment and responsive evidence is limited to 1B; deferred on rest.

(b)      <u>MGA Parties' Position</u>: **Action:** Granted in part. Denied in part. Apportionment in 1b only.  Judge may allow some evidence depending on how case presented.

4.      MIL No. 4 to preclude introduction to jury of evidence and testimony relating to equitable defenses to be tried by court ;

(a)      <u>Mattel's Position</u>: Denied.

(b)      <u>MGA Parties' Position</u>: **Action:** Denied.

5.      MIL No. 5 to exclude evidence of or argument concerning other lawsuits and other purported bad acts and dismissed defenses;

(a)      <u>Mattel's Position</u>: Granted as to Nos. 1-4 and 10; Denied without prejudice to specific objections as to Nos. 5-9.

(b)      <u>MGA Parties' Position</u>: **Action:** Denied as written.   Granted only as to scorched earth tactics, lead, security law violations.

6.      MIL No. 6 to exclude evidence or argument concerning actions taken by or against Mattel employees other than Carter Bryant;

(a)      <u>Mattel's Position</u>: Granted to the extent such evidence is admissible only if such other employees are analogous to Bryant.

(b)      <u>MGA Parties' Position</u>: **Action:** Denied as written.

7.      MIL No. 7 to preclude the MGA Defendants from asserting or relying on an advice of counsel defense;

(a)      <u>Mattel's Position</u>: Granted

(b)      <u>MGA Parties' Position</u>: **Action:**  Granted.  However, the MGA Parties can introduce Rosenbaum's testimony relaying his factual conversations not as

1  reliance on any legal advice he gave but as to the fact that he undertook certain actions
2  and had certain conversations.

3        8.      MIL No. 8 to exclude evidence relating to whether Mattel would
4  have marketed Bratz;

5        (a)     <u>Mattel's Position</u>: Granted as to 1A; Deferred as to 1B.

6        (b)     <u>MGA Parties' Position</u>: **Action:** Granted as to Phase 1a.

7        9.      MIL No. 9 to exclude argument, evidence, or expert testimony
8  regarding Barbie and other Mattel dolls;

9        (a)     <u>MGA Parties' Position</u>: **Action:**  For experts, Daubert hearing to
10  be held one day prior to testifying.

11       10.     MIL No. 10 to exclude testimony by Glenn V. Vilppu;

12       (a)     <u>MGA Parties' Position</u>: **Action:**  For experts, Daubert hearing to
13  be held one day prior to testifying.

14       11.     MIL No. 11 to preclude Defendants from offering improperly
15  disclosed evidence;

16       (a)     <u>Mattel's Position</u>: Granted as to test project; deferred on
17  apportionment issues.

18       (b)     <u>MGA Parties' Position</u>: **Action:** Denied

19       12.     MIL No. 12 to exclude the testimony of Peter S. Menell;

20       (a)     <u>MGA Parties' Position</u>: **Action:**  For experts, Daubert hearing to
21  be held one day prior to testifying.

22       13.     MIL No. 13 to exclude expert testimony of Mary Bergstein,
23  Robert Tonner, and Debora Middleton;

24       (a)     <u>MGA Parties' Position</u>: **Action:**  For experts, Daubert hearing to
25  be held one day prior to testifying.

26       14.     MIL No. 14 to exclude evidence and argument related to certain
27  discovery matters;

28       (a)     <u>Mattel's Position</u>: Granted.

1        (b)      MGA Parties' Position: **Action:** Granted

2        15.     MIL No. 15 for a preclusion order regarding MGA's disqualified

3 expert Christina Tomiyama.

4        (a)      MGA Parties' Position: **Action:** Taken under submission.

5        Defendants filed the following motions in limine:

6        1.      MGA Parties' Notice of Motion and Motion in Limine Number 1

7 to  Exclude All Evidence Relating to Litigation or Other Proceedings Between Isaac

8 and Farhad Larian;

9        (a)      Mattel's Position: Denied.

10       (b)      MGA Parties' Position: **Action:** Denied.  Court would rule case by

11 case throughout trial. Mattel warned re: "crossing the line" during Opening.

12       2.      MGA Parties' Notice of Motion and Motion in Limine Number 2

13 to  Exclude All Evidence Relating to Isaac Larian's Wealth and Assets;

14       (a)      Mattel's Position: Granted as to 1A except that Mattel can

15 discuss Larian's interest in company and evidence of what he stood to gain at the

16 time MGA acquired Bratz; Denied as to 1B.

17       (b)      MGA Parties' Position: **Action:** Grant in part, deny in part. Wealth

18 per se out.  Any gain to Larian from Bratz may be introduced only in Phase 1b.  In

19 Phase 1a, Mattel only may submit evidence of what Larian stood to gain **at the time** of

20 any alleged breach, not subsequent gain.

21       3.      MGA Parties' Notice of Motion and Motion in Limine Number 3

22 to Exclude Reference to and Use of Evidence of Other Legal Proceedings;

23       (a)      Mattel's Position: Granted insofar as findings of foreign courts

24 are excluded unless they are the only evidence of MGA's prior positions.

25       (b)      MGA Parties' Position: **Action:** No "Findings" from earlier

26 litigation allowed, but factual statements from prior cases available for impeachment of

27 witnesses.

28

1         4.       MGA Parties' Notice of Motion and Motion in Limine Number 4

2 to Exclude Reference to and Use of MGA's Employment Agreements With its

3 Employees;

4         (a)     <u>Mattel's Position</u>: Denied.

5         (b)     <u>MGA Parties' Position</u>: **Action:** Denied.

6         5.       MGA Parties' Notice of Motion and Motion in Limine Number 5

7 to Exclude References to Prior Legal Representation;

8         (a)     <u>Mattel's Position</u>: Granted.

9         (b)     <u>MGA Parties' Position</u>: **Action:** Granted.

10         6.       MGA Parties' Notice of Motion and Motion in Limine Number 6

11 to Exclude Reference to and Use of Phase Two Evidence;

12         (a)     <u>Mattel's Position</u>: Denied as to Nos. 1, 2, and 5. Granted/moot as

13 to Nos. 4 and 6. Granted as to No. 3 in 1A but door may be opened in 1B.

14         (b)     <u>MGA Parties' Position</u>: **Action:** Denied in part, Granted in part.

15 Mattel is prohibited from submitting evidence that MGA hired Mattel employees.

16 Mattel can submit evidence of Toon Teens with regard to timing of Bryant drawings.

17         7.       MGA Parties' Notice of Motion and Motion in Limine Number 7

18 to Exclude All References to and Use of Certain "Expert" Testimony Proffered by

19 Mattel Witness Michael J. Wagner;

20         (a)     <u>MGA Parties' Position</u>: **Action:** For experts, Daubert hearing to

21 be held one day prior to testifying.

22         8.       MGA Parties' Notice of Motion and Motion in Limine Number 8

23 to Strike Expert Rebuttal Report of Kenneth Hollander and Sections of Expert

24 Rebuttal Reports of Heather McComb, Denise Van Patten, and Nicholas Mirzoeff;

25         (a)     <u>MGA Parties' Position</u>: **Action:** For experts, Daubert hearing to

26 be held one day prior to testifying.

27         9.       MGA Parties' Notice of Motion and Motion in Limine Number 9

28 to Strike the Expert Report and Testimony of Ralph Oman and John Alex;

1   (a)   MGA Parties' Position: **Action:** For experts, Daubert hearing to

2   be held one day prior to testifying.

3   10.   MGA Parties' Notice of Motion and Motion in Limine Number

4   10 to Exclude All References to and Use of Certain "Expert" Testimony Proffered

5   by Mattel Witness Carol A. Scott;

6   (a)   MGA Parties' Position: **Action:** For experts, Daubert hearing to

7   be held one day prior to testifying.

8   11.   MGA Parties' Notice of Motion and Motion in Limine Number

9   11 to Strike the Expert Rebuttal Report of Robert C. Lind;

10   (a)   MGA Parties' Position: **Action:** For experts, Daubert hearing to

11   be held one day prior to testifying.

12   12.   MGA Parties' Notice of Motion and Motion in Limine Number

13   12 to Strike Portion of the Expert Report of Lee Loetz;

14   (a)   MGA Parties' Position: **Action:** For experts, Daubert hearing to

15   be held one day prior to testifying.

16   13.   Motion in Limine Number 13:  To exclude evidence and

17   argument regarding alleged spoliation by Bryant;

18   (a)   MGA Parties' Position: **Action:** Deferred

19   14.   Motion in Limine Number 14:  To exclude evidence and

20   argument regarding Bryant's alleged "borrowing" of ideas or concepts from

21   preexisting Mattel projects, including Toon Teens, Diva Starz, the "Swan" line, and

22   Skipper.

23   (a)   MGA Parties' Position: **Action:** Deferred

24   The Court ruled upon or otherwise addressed the bulk of the motions

25   during recent hearings.

26   Bifurcation of the claims and counterclaims was ordered pursuant to

27   the Court's Order of July 2, 2007.  The claims and counterclaims to be tried in Phase

28   1 trial are set forth herein.  The claims remaining for trial in Phase 2 are set forth on

1  pages 8-9 in Mattel's Memorandum of Trial Structure, filed June 20, 2007, as

2  adopted in the July 2, 2007 Order.

3        The foregoing admissions having been made by the parties, and the

4  parties having specified the foregoing issues of fact and law remaining to be

5  litigated, this Pretrial Conference Order shall supersede the pleadings as they relate

6  to claims or defenses to be tried in Phase 1 and govern the course of the trial of the

7  Phase 1 claims and defense, unless modified to prevent manifest injustice.

8        The MGA Parties' Position:

9        Bifurcation of the claims and counterclaims was ordered pursuant to the

10 Court's Order of July 2, 2007.  The claims and counterclaims to be tried in Phase 1

11 trial are set forth herein.  The claims remaining for trial in Phase 2 are set forth on

12 pages 8-9 in Mattel's Memorandum of Trial Structure, filed June 20, 2007, as

13 adopted in the July 2, 2007 Order.  At the hearing on May 22, 2008, the Court

14 provided guidance to the parties as to the issues that may be tried as part of Phase 1a

15 versus Phase 1b.  The Court has not yet issued its final order regarding the MGA

16 Parties' Motion in Limine No. 6 and Mattel's Motion in Limine No. 9.

17        The MGA Parties contend that that Phase 1a is limited to the discrete

18 issue of when Carter Bryant created the initial master drawings embodying the

19 idea/concept of Bratz, in which Mattel claims a copyright interest and has a valid

20 copyright registration.

21        The MGA Parties expressly reserve the right—and acknowledges that

22 Mattel also reserves its rights—to supplement and/or amend their sections after

23 having had an opportunity to review Mattel's portions of the Order.

24 //

25 //

26 //

27 //

28 //

1    The foregoing admissions having been made by the parties, and the

2  parties having specified the foregoing issues of fact and law remaining to be

3  litigated, this Pretrial Conference Order shall supersede the pleadings as they relate

4  to claims or defenses to be tried in Phase 1 and govern the course of the trial of the

5  Phase 1 claims and defense, unless modified to prevent manifest injustice.

6

7  DATED:  May       . 2008

8

9                                              _____

10                                             HON. STEPHEN LARSON

11  Approved as to form by:

12  QUINN EMANUEL URQUHART OLIVER &
    HEDGES, LLP

13

14   By /s/ John B. Quinn_____
15        John B. Quinn, Esq.
          Attorneys for Mattel, Inc.

16

17

18  SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP

19

20

21   By_____
         Thomas J. Nolan, Esq.
22        Attorneys for MGA Entertainment, Inc.

23

24

25

26

27

28