1 QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
2   johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
3   michaelzeller@quinnemanuel.com
  Jon D. Corey (Bar No. 185066)
4   joncorey@quinnemanuel.com
  865 South Figueroa Street, 10th Floor
5 Los Angeles, California 90017-2543
  Telephone: (213) 443-3000
6 Facsimile: (213) 443-3100

7 Attorneys for Mattel, Inc.

8

9               UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                    EASTERN DIVISION

| | |
|---|---|
| 12 CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 13 Plaintiff, | Consolidated with Case No. CV 04-09059 and Case No. CV 05-02727 |
| 14 vs. | [PUBLIC REDACTED] NOTICE OF MOTION AND MOTION OF PLAINTIFF MATTEL, INC. FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS MADE IN FURTHERANCE OF CRIMES AND FRAUDS; |
| 15 MATTEL, INC., a Delaware corporation, | |
| 16 | |
| 17 Defendant. | |
| 18 AND CONSOLIDATED ACTIONS | |
| 19 | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| 20 | |
| 21 | [Declaration of Harry A. Olivar, Jr. filed concurrently herewith] |
| 22 | |
| 23 | Date: August 4, 2008<br>Time: 10:00 a.m.<br>Place: Courtroom 1 |
| 24 | |
| 25 | **Phase 1**<br>Pre-Trial Conference: May 19, 2008<br>Trial Date: May 27, 2008 |
| 26 | |

27
28            CONFIDENTIAL -- ATTORNEY'S EYES ONLY
         FILE UNDER SEAL PURSUANT TO PROTECTIVE ORDER

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  michaelzeller@quinnemanuel.com
  Jon D. Corey (Bar No. 185066)
  joncorey@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. CV 04-09059 and Case No. CV 05-02727 |
| vs. | NOTICE OF MOTION AND MOTION OF PLAINTIFF MATTEL, INC. FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS MADE IN FURTHERANCE OF CRIMES AND FRAUDS; |
| MATTEL, INC., a Delaware corporation, | |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| | [Declaration of Harry A. Olivar, Jr. filed concurrently herewith] |
| | Date: August 4, 2008 |
| | Time: 10:00 a.m. |
| | Place: Courtroom 1 |
| | **Phase 1** |
| | Pre-Trial Conference: May 19, 2008 |
| | Trial Date: May 27, 2008 |

CONFIDENTIAL -- ATTORNEY'S EYES ONLY
FILE UNDER SEAL PURSUANT TO PROTECTIVE ORDER

1 TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that in Courtroom 1 of the above-captioned court

3 located at 3470 Twelfth Street, Riverside, California, before the Honorable Steven

4 G. Larson, on August 4, 2008 at 10 a.m. or on such earlier date as the parties may be

5 heard, plaintiff Mattel, Inc. ("Mattel") will, and hereby does, move the Court:

6    (1) to compel MGA Entertainment, Inc. ("MGA") to produce Entry Nos. 374,

7 375, 548, 549, 550, 1327, 1328, 1643, 1820, 1821, and 1822 from MGA's

8 January 23, 2008 Privilege Log; and

9    (2) to compel Isaac Larian ("Larian") to produce Entry Nos. 69, 70, 72, 73,

10 79, 89, 90, 92, 95, 97, 100, 101, 113, 114, and 115 from his January 15, 2008

11 Privilege Log and Entry No. 63 from his January 30, 2008 Privilege Log.

12    Mattel brings this motion based on the crime-fraud exception to the attorney-

13 client privilege.  In the alternative, Mattel requests that the Court review these

14 communications *in camera* for possible production.

15    This Motion is based on this Notice of Motion and Motion, the accompanying

16 Memorandum of Points and Authorities, the Declaration of Harry A. Olivar, Jr.

17 dated May 23, 2008 filed concurrently herewith, the records and files of this Court,

18 all matters of which the Court may take judicial notice, and any other evidence and

19 argument as may be presented at the hearing on the Motion.

20

21

22

23

24

25

26

27

28

07209/2517450.1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................. 2

ARGUMENT ....................................................................................................... 9

I.  THE ATTORNEY-CLIENT PRIVILEGE DOES NOT PROTECT
    COMMUNICATIONS FROM A CLIENT SEEKING TO FURTHER
    A CRIME OR FRAUD .................................................................................. 9

II. LARIAN'S COMMUNICATIONS WITH GLASER FALL WITHIN
    THE CRIME FRAUD EXCEPTION TO THE ATTORNEY-CLIENT
    PRIVILEGE .................................................................................................. 11

    A.  MGA Engaged in Criminal Infringement of Mattel's Copyrights ........ 12

        1.  MGA Has Infringed Mattel's Copyrights in Bratz ..................... 13

        2.  Defendants' Infringement Was Willful ....................................... 16

        3.  Defendants' Infringement Was Unquestionably Profitable ........ 17

    B.  Larian's Communications Were "In Furtherance of" MGA's
        Larceny of Mattel's Property .................................................................. 17

        1.  Larian and MGA Took Property that Belonged to Mattel ......... 18

        2.  Larian and MGA Intended to Permanently Deprive Mattel
            of Its Property ............................................................................. 18

        3.  Larian and MGA Carried Away Mattel's Property and
            Controlled It by Removing It from Mattel's Possession ............ 19

    C.  MGA Has Perpetrated a Fraud on the Court ......................................... 19

CONCLUSION .................................................................................................. 21

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

Appling v. State Farm. Mut. Auto. Ins. Co.,
340 F.3d 769 (9th Cir. 2003) ........................................................................... 18

Clark v. United States,
289 U.S. 1 (1933) ..................................................................................... 9, 16

Columbia Pictures Television, Inc. v. Krypton Broad.,
106 F.3d 284 (9th Cir. 1997) .......................................................................... 12

Dolman v. Agee,
157 F.3d 708 (9th Cir. 1998) .......................................................................... 12

Foreshee v. Runnels,
No. S-03-1647, 2007 WL 2505578 (E.D. Cal. Aug. 31, 2007) ............................ 17

In re Grand Jury Proceedings,
87 F.3d 377 (9th Cir. 1996) ..................................................................... 9, 10, 11

In re Grand Jury Proceedings,
727 F.2d 1352 (4th Cir. 1984) ........................................................................ 19

In re Grand Jury Subpoena 92-I (SJ),
31 F.3d 826 (9th Cir. 1994) ............................................................................. 8

Int'l Tel. & Tel. Corp. v. United Tel. Co.,
60 F.R.D. 177 (M.D. Fla. 1973) ...................................................................... 19

In re Levander,
180 F.3d 1114 (9th Cir. 1999) ........................................................................ 18

In re Napster, Inc. Copyright Litig.,
479 F.3d 1078 (9th Cir. 2007) ................................................................ *Passim*

People v. Avery,
27 Cal. 4th 49 (2002) ................................................................................... 17

People v. Davis,
19 Cal. 4th 301 (1998) .................................................................................. 18

People v. Kronemyer,
189 Cal. App. 3d 314 (1987) .......................................................................... 17

In re Sealed Cases,
676 F.2d 793 (D.C. Cir. 1982) ........................................................................ 19

In re St. Johnbury Trucking Co.,
184 B.R. 446 (Bankr. D. Vt. 1995) ................................................................. 19

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

United States v. Chen,
  99 F.3d 1495 (9th Cir. 1996)............................................................ 10

United States v. Corona-Sanchez,
  234 F.3d 449 (9th Cir. 2000)........................................................... 17

United States v. Drebin,
  557 F.2d 1316 (9th Cir. 1977).......................................................... 12

United States v. Hodge & Zweig,
  548 F.2d 1347 (9th Cir. 1977)....................................................... 9, 10

United States v. Laurins,
  857 F.2d 529 (9th Cir. 1988).......................................................... 10

United States v. Martin,
  278 F.3d 988 (9th Cir. 2002)............................................................ 8

United States v. Thordarson,
  646 F.2d 1323 (9th Cir. 1981).......................................................... 17

United States v. Wise,
  550 F.2d 1180 (9th Cir. 1977).......................................................... 12

United States v. Zolin,
  491 U.S. 554 (1989) ................................................................... 8, 11

**Statutes**

Cal. Labor Code § 2870............................................................... 3

**Other Authorities**

3 Nimmer on Copyright § 1404[B] ..................................................... 12

8 Wigmore, Evidence § 2298 (McNaughton ed. 1961) ............................... 19

07209/2517450.107209/2517450.107209/2517450.107209/2517450.1

Case No. CV 04-9049 SGL (RNBx)

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3  **Introduction**

4      Years before this litigation was commenced, on June 30, 2001, Isaac Larian

5  advised his then-attorney, Patricia Glaser, by e-mail that

6

7

8

9

10

11

12

13      Mattel does not know what Glaser told Larian in response. Mattel does know,

14  however, that there were a number of e-mails back and forth between Larian and

15  Glaser in the days that followed. And, just last week, Mattel learned from Glaser's

16  deposition that on July 3, 2001--three days after Larian e-mailed Glaser--

17

18

19

20                           . Thus, something Glaser said made

21  Larian want to misrepresent the facts to his own attorney, not to mention Mattel.

22  The deception had begun.

23      The fraud has continued for years, including right into this Courthouse. In

24  their dealings with Mattel, filings with the Copyright Office and this Court, and in

25  litigation around the globe, Defendants concealed what Larian had reported to

26  Glaser concerning the development of Bratz. Instead of disclosing that

27                             , MGA and Bryant

28

1  fashioned a story of Bryant's supposedly inspirational breakthrough while driving by

2  a Missouri high school in 1998 during a brief interruption of his Mattel employment.

3  By alleging that Bryant created Bratz while living in Missouri in 1998--

4                                                                          --

5  MGA was able to hide Defendants' willful infringement of Mattel's copyrights in

6  Bratz and its theft of Bryant's drawings, both crimes.  Larian's communications with

7  Glaser in the summer of 2001--

8                                                        --were "in furtherance" of

9  MGA's willful infringement of Mattel's copyrights and theft of Mattel property and,

10  hence, were not privileged.  Those communications should either be ordered

11  produced, or reviewed for possible production *in camera*.[1]

12

13                          **Statement of Facts**

14

15  **MGA's Production of the June 30, 2001 E-Mail Message**

16          On January 31, 2008, counsel for MGA produced, among other documents,

17  an e-mail message identified by Bates No. KS 07831.  The message was sent from

18  Isaac Larian to Patty Glaser on June 30, 2001.  It is identified on Larian's

19  January 15, 2008 Privilege Log, Entry No. 89, as a "message requesting legal advice

20  regarding Mattel litigation."

21          Eight days earlier, on January 23, 2008, Mattel had filed a motion asserting

22  that MGA had waived the attorney-client privilege with respect to at least 21

23  communications based on its assertion of "good faith" defenses.[2]  Mattel's motion

24  _____

25      [1]   Mattel has seen the June 30, 2001 e-mail because it was produced by MGA.
26  However, recognizing its damning significance, MGA has since clawed it back,
    claiming it was supposedly inadvertently produced.
27      [2]   Motion of Plaintiff Mattel, Inc. for Order Finding Waiver and to Compel
    Production of Documents withheld as Privileged, dated January 23, 2008,
28          (footnote continued)

1  specifically sought production of Entry No. 89 on Larian's Privilege Log.[3]  In its

2  Opposition filed January 31, 2008--the same day KS 07831 was produced--MGA

3  offered to produce 17 of the communications, tying its disclosure to its own requests

4  for privileged Mattel documents.[4]  The 17 documents specifically identified by

5  MGA included Entry No. 89 on Isaac Larian's Privilege Log of January 15, 2008.[5]

6  The same day, MGA produced that message voluntarily as part of the disclosure

7  noted earlier.  Thus, on January 31, 2008, MGA simultaneously produced KS 07831

8  and specifically called it out as one of 17 documents that it was willing to produce

9  voluntarily.

10  **The E-mail Message**

11

12

13

14

15

16

17

18

19

20

21

22  Declaration of David Harry A. Olivar, Jr. dated May 23, 2008 ("Olivar Decl.") Exh. 1.

23  [3] See id.  Mattel sought: (1) Entry Nos. 655-657 and 660 on MGA's August 14, 2007 Supplemental Privilege Log; (2) Entry Nos. 12-19 and 21-27 on MGA's Supplemental

24  Revised Privileged and Redaction Log for MGA's 2005 Document Production; and (3) Entry Nos. 89 and 90 on Isaac Larian's Privilege Log of January 15, 2008.  Id. at 2:2-

25  16.
    [4]  MGA Entertainment Inc.'s Opposition to the Motion of Plaintiff Mattel, Inc.

26  for Order Finding Waiver and to Compel Production of Documents Withheld as Privileged, dated January 31, 2008 ("Opposition to Motion for Waiver"), Olivar

27  Decl. Exh. 2 at 10 n.7.
    [5]  Id. at 10 n.7.

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

8

In the next three days after that email was sent, there were seven e-mail communications between Larian and Glaser.[9]

. As the Court will recall, Bryant had faxed his MGA agreement to MGA from Mattel's Design Center.  MGA has never produced a copy of this agreement with the Mattel fax header.  Victoria O'Connor, a former MGA executive, testified that Larian instructed her to white out "Barbie Collectibles" from the MGA/Bryant contract and

_____

[6]   Cal. Labor Code § 2870; see also Order Granting in Part, Denying In Part, and Deferring in Part the Parties' Motions for Partial Summary Judgment ("Summary Judgment Order"), dated April 25, 2008 at 5, Olivar Decl. Exh. 3 ("Pursuant to that statute (and its incorporation in the Inventions Agreement) . . . the factual question of whether Bryant worked on them on his own time, rather during his working hours at Mattel, is not relevant").
[7]   Deposition of David Rosenbaum ("Rosenbaum Dep.") at 38:14-22, 64:2-10, Olivar Decl. Exh. 4.
[8]   Id. at 90:9-17.  Moreover, Bryant was only one of a number of former Mattel employees hired by MGA during this period, such as Paula Garcia (formerly Treantafelles), who also signed Inventions Agreements with Mattel.  See Garcia's Employee Confidential Information and Inventions Agreement with Mattel, dated July 4, 1997, Olivar Decl. Exh. 5.  MGA also produced in discovery a September 14, 2000 fax, sent from Bryant to Rosenbaum, enclosing Bryant's offer letter from Mattel, which specifically referenced Bryant's Confidential Information and Inventions Agreement with Mattel, Olivar Decl. Exh. 6.  In the fax, Bryant advised Rosenbaum that he was                        on Mattel's part.  Id.
[9]   See Entry No. 63 on the January 30, 2008 Larian Privilege Log; Entry Nos. 69, 70, 89 from the January 15, 2008 Larian Privilege Log; and Entry Nos. 549, 1327, and 1328 on the January 23, 2008 MGA Privilege Log, Olivar Decl. Exh. 7.

1  send it to Glaser.[10]

2

3

4                                    [12]

5

6  **MGA Fabricates the Genesis of Bratz**

7          From the beginning, MGA tried mightily to hide Bryant's role in the creation

8  of Bratz and his relationship with Mattel.  Bryant acknowledged at deposition that

9  both MGA and Larian knew that he was a Mattel employee when he pitched his

10  ideas to MGA, accepted payments from it, worked with MGA, and entered into an

11  agreement with MGA.[13]  Rachel Harris of MGA, who attended a meeting with

12  Bryant and Larian in October 2000, testified that she and others knew that it would

13  be "      " for Bryant if Mattel learned he was presenting drawings to MGA while still

14  employed by Mattel.[14]  Harris also testified that Larian told MGA employees that if

15  asked, he planned to say either that he came up with Bratz or that the inspiration

16  came from his daughter.[15]

17          Accordingly, after Bryant left Mattel, both Larian and Paula Garcia instructed

18  that no one at MGA was to discuss Bryant's involvement with Bratz outside MGA.[16]

19  Larian directed MGA personnel that "

20

21

_____

22  [10]   Deposition of Victoria O'Connor ("O'Connor Dep.") at 18:5-19:4, Olivar

23  Decl. Exh. 8.
       [11]   Deposition of Patricia Glaser at 26:3-24, 28:3-12, 29:11-14 and Exh. 5905

24  thereto, Olivar Decl. Exh. 9.
       [12]   Id.

25  [13]   Deposition of Carter Bryant ("Bryant Dep.") at 67:7-21, 88:7-13, 21-24,
Olivar Decl. Exh. 10.

26  [14]   Deposition of Rachel Harris ("Harris Dep.") at 167:20-169:11, 170:12-
172:10, 262:21-264:11, Olivar Decl., Exh. 11.

27  [15]   Harris Dep. at 263:6-264:11, Olivar Decl. Exh. 11.
       [16]   Id.

28

07209/2517450.10209/2
17450.107209/2517450.1
7209/2517450.1

-5-                    Case No. CV 04-9049 SGL (RNBx)

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

1    ."[17]  Similarly, MGA

2    employee Dee Dee Valencia wrote "                                        " in

3    response to an e-mail message from Larian in which he proposed the development

4    of a limited edition model and asked "                    "[18]  A later list of MGA

5    employees who came from Mattel notes Bryant's dates of employment at MGA as

6    "                    " and his Mattel dates as "                    ."[19]

7        Publicly, Larian likewise sought to conceal Bryant's role in Bratz.  He

8    variously:  (1) identified himself, not Bryant, as the creator of Bratz; (2) claimed that

9    he, Larian, "was the inspiration behind the Bratz dolls;"[20] (3) averred that "he got the

10   idea for Bratz after seeing his own kids run around in navel-baring tops and hip-

11   huggers;"[21] (4) stated it was his son's "idea for Bratz;"[22] and (5) declared under

12   penalty of perjury to the U.S. Patent and Trademark Office that he personally

13   created the Bratz feet and packaging,[23] even though Bryant testified that he (Bryant)

14   had created that invention before even meeting MGA and had presented it to

15   MGA.[24]  MGA admits that no public statement recognizing Bryant as Bratz's creator

16

17

18

---

19   [17]  E-mail message from Issac Larian, dated March 12, 2002, Bates-numbered
20   MGA 3801819R-22R, Olivar Decl. Exh. 12.
     [18]  E-mail message from Isaac Larian to Dee Dee Valencia, dated February 6,
21   2003, Bates-numbered MGA 3801558-9, Olivar Decl. Exh. 14.
     [19]  MGA spreadsheet listing former Mattel employees ("Former Mattel
22   Employee List"), Bates-numbered MGA 1134723-30, dated April 20, 2006, Olivar
     Decl. Exh. 13 at MGA 1134726-20.
23   [20]  Affidavit of Isaac Larian in MGA v. Metson, dated May 14, 2004, Olivar
     Decl. Exh. 15, ¶ 8.
24   [21]  Palmeri, Christopher, "To Really Be a Player Mattel Needs Hotter Toys,"
     Business Week, July 28, 2003, Olivar Decl. Exh. 16 at 65.
25   [22]  Weiss, Jeff, "Immigrant's Company Shakes Up Toy Industry," San Fernando
     Valley Business Journal, March 29, 2004 ("My oldest son, seventeen year old Jason
26   is very creative . . . It was Jason's idea for Bratz."), Olivar Decl. Exh. 17 at 230.
     [23]  See United States Patent Application for a Doll with Aesthetic Changeable
27   Footgear, Matter No. 15904-142, Olivar Decl. Exh. 18.
     [24]  Bryant Dep. at 343:15-344:7, 1172:7-18, Olivar Decl. Exh. 10.

07209/2517450.107209/2
17450.107209/2517450.1
7209/2517450.1

-6-                     Case No. CV 04-9049 SGL (RNBx)

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

1 │ was issued until July 18, 2003, when the *Wall Street Journal* published an article

2 │ with that information.[25]

3 │     MGA's deceptions were not limited to keeping Bryant's role under wraps, or

4 │ to Bryant's own exit interview lies to Mattel and to co-workers. Undoubtedly

5 │ working with MGA, Bryant wrote "1998" on drawings that even Bryant admits were

6 │ made later.[26] MGA then used those drawings, and that date, to register its claims of

7 │ copyright in Bryant's Bratz drawings, listing the date of creation as 1998.[27]

8 │     Similarly, on November 2, 2004, Bryant filed a Complaint for Declaratory

9 │ Relief of Copyright Non-Infringement, representing to this Court that he created

10 │ Bratz in 1998 while living at his parents' home in Missouri.[28] This was Defendants'

11 │ first public recitation of Bryant's "inspiration" story. Bryant alleged that while he

12 │ was in Missouri, "he worked exclusively on his own ideas and drawings, with the

13 │ hopes of building a career as a freelance artist."[29] While returning home from Old

14 │ Navy (where he worked to supplement his income), Bryant had a "eureka

15 │ moment."[30] Allegedly "[i]nspired by the 'bratty' attitude he had observed, as well as

16 │

17 │   [25] MGA Entertainment, Inc.'s Supplemental and Amended Responses to Mattel,

18 │ Inc.'s Third Set of Requests for Admission to MGA Entertainment, Inc., dated May 4, 2007, Response to Request for Admission Nos. 183-185, Olivar Decl.

19 │ Exh. 19.
  [26] Carter Bryant's Responses to Mattel, Inc.'s Fifth Set of Requests for

20 │ Admission to Carter Bryant, dated July 9, 2007, Response Nos. 27 and 29 at 25, 27-28, Olivar Decl. Exh. 20.

21 │   [27] MGA's 2003 applications for copyright registration of the four original Bratz drawings for (1) Yasmin, (2) Sasha, (3) Jade, and (4) Cloe, provide 1998 as the year

22 │ of creation and identify Carter Bryant as the author. MGA simultaneously applied to register a group drawing of the four characters enumerated above. That

23 │ application also gave 1998 as the year of creation and identified Bryant as the author. Certificate of Registration VA 1-218-491 (Yasmin drawing), Certificate of

24 │ Registration VA 1-218-488 (Sasha drawing), Certificate of Registration VA 1-218-487 (Jade drawing), Certificate of Registration VA 1-218-490 (Cloe drawing),

25 │ Certificate of Registration VA 1-218-489 (Bratz group drawing), Olivar Decl. Exh. 21.

26 │   [28] Carter Bryant v. Mattel, Inc., Complaint for Declaratory Relief of Copyright Non-Infringement, dated November 2, 2004 ¶¶ 31-33, Olivar Decl. Exh. 22.

27 │   [29] Id. ¶ 31.
  [30] Id. ¶ 32.

28 │

Case No. CV 04-9049 SGL (RNBx)

1   advertisements that he had seen relating to hip-hop fashion and other trends of the
2   time, Bryant started sketching multi-ethnic, urban youth, dressed in trendy fashions.
3   Bryant tried to capture in his sketches the 'bratty' attitude he had observed."[31]  He
4   claimed to have observed multi-ethnic, trendy students in August 1998 after he
5   passed Kickapoo High School in Springfield, Missouri while driving home one day
6   from Old Navy.[32]  Bryant averred that he made the drawings the same day.[33]  Bryant
7   also testified that he wrote the text related to the Bratz dolls in 1998, and that he also
8   came up with the "Bratz" name in 1998.[34]  According to Bryant, the name "Bratz"
9   was always attached to the project.[35]  Bryant's deposition was defended by counsel
10  for MGA even before MGA appeared in the case.[36]

11

12  ## MGA Claws Back the E-mail

13      On or about March 17, 2008, six weeks after MGA had identified the June 30,
14  2001 e-mail as one of the 17 documents identified to be produced to resolve a
15  discovery dispute, and the message was voluntarily produced, Mattel was notified
16  by MGA that the disclosure of the message in question was inadvertent, and that the
17  message was being clawed back on attorney-client privilege grounds.[37]  Mattel
18  returned the document.

19

20

21

22  [31]  Id. ¶ 32.
23  [32]  Bryant Dep., Olivar Decl. Exh. 10 at 140:9-20, 141:7-21, 142:6-17.
    [33]  Id. at 142:24-143:1.
24  [34]  Id. at 139:23-140:8 ("

25                                                                    ").

    [35]  Id. at 156:5-8.
26  [36]  Id. at 3:23-24.
    [37]  March 17, 2008 Clawback Letter from Bryant Delgadillo to Juan Pablo
27  Albán, Olivar Decl. Exh. 23.  Mattel destroyed the e-mail message in accordance
    with the Protective Order and hence cannot lodge it with this motion.

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

1          <u>**Argument**</u>

2  **I.    <u>THE ATTORNEY-CLIENT PRIVILEGE DOES NOT PROTECT</u>**

3          <u>**COMMUNICATIONS FROM A CLIENT SEEKING TO FURTHER A**</u>

4          <u>**CRIME OR FRAUD**</u>

5          The attorney-client privilege is not absolute. <u>In re Grand Jury Subpoena 92-I</u>

6  <u>(SJ)</u>, 31 F.3d 826, 829 (9th Cir. 1994). When a lawyer's advice is solicited by a

7  client to further a crime or fraud, a communication loses its privilege. <u>See United</u>

8  <u>States v. Martin</u>, 278 F.3d 988, 1000 (9th Cir. 2002) (holding that "when a lawyer's

9  advice is sought to further a crime or fraud, those communications are not

10  privileged"). The Supreme Court has long prohibited the misuse of the attorney-

11  client privilege to protect communications made for the purpose of obtaining advice

12  for the commission of a fraud or a crime. In <u>United States v. Zolin</u>, 491 U.S. 554,

13  563 (1989), the Court held that "it is the purpose of the crime/fraud exception to the

14  attorney-client privilege to assure that the seal of secrecy between lawyer and client

15  does not extend to communications made for the purpose of getting advice for the

16  commission of a fraud or crime."

17          The Ninth Circuit has similarly recognized an exception to protect against the

18  abuse of the attorney-client relationship. In <u>United States v. Hodge & Zweig</u>,

19  548 F.2d 1347, 1354-55 (9th Cir. 1977), the Ninth Circuit explained that because the

20  "attorney-client privilege is not to be used as a cloak for illegal or fraudulent

21  behavior, it is well established that the privilege does not apply where legal

22  representation was secured in furtherance of intended, or present, continuing

23  illegality." Simply put, "the privilege takes flight if the relation is abused. A client

24  who consults an attorney for advice that will serve him in the commission of a fraud

25  will have no help from the law." <u>Clark v. United States</u>, 289 U.S. 1, 15 (1933), *cited*

26  *with approval by* <u>In re Napster, Inc. Copyright Litig.</u>, 479 F.3d 1078, 1090 (9th Cir.

27  2007).

28

1   It is immaterial whether the attorney aided the crime or fraud.  All that is

2   required is that the client have made the communication because the client wanted

3   to advance a fraud or crime.  "[T]he crime-fraud exception does not require a

4   completed crime or fraud but only that the client have consulted the attorney in an

5   effort to complete one."  In re Grand Jury Proceedings, 87 F.3d at 381 (emphasis

6   added).

7   It is also well settled that the attorney need not have been aware that the client

8   had an improper purpose in seeking advice.  See Napster, 479 F.3d at 1090 ("The

9   attorney need not have been aware that the client harbored an improper purpose.

10   Because both the legal advice and the privilege are for the benefit of the client, it is

11   the client's knowledge and intent that are relevant"); In re Grand Jury Proceedings,

12   87 F.3d at 381-82 ("the attorney need not himself be aware of the illegality

13   involved; it is enough that the communication furthered, or was intended by the

14   client to further, that illegality"); United States v. Chen, 99 F.3d 1495, 1504 (9th

15   Cir. 1996) ("it is the client's knowledge and intentions that are of paramount concern

16   to the application of the crime-fraud exception; the attorney need know nothing

17   about the client's ongoing or planned illicit activity for the exception to apply");

18   Hodge & Zweig, 548 F.2d at 1354 ("[t]he crime or fraud exception applies even

19   where the attorney is completely unaware that his advice is sought in furtherance of

20   such an improper purpose").  It is the client's abuse of the attorney client-

21   relationship, irrespective of whether there is a successful criminal or fraudulent act,

22   that warrants piercing the privilege.  In re Grand Jury Proceedings, 87 F.3d at 381.

23

24

25

26

27

28

## II.   LARIAN'S COMMUNICATIONS WITH GLASER FALL WITHIN THE CRIME FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE

A party seeking to establish the crime-fraud exception must satisfy a two-part test. First, the party must show that the party asserting the privilege "was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." In re Grand Jury Proceedings, 87 F.3d 377, 381 (9th Cir. 1996); see also Napster, 479 F.3d at 1090 (emphasis added).  Second, the party must show that "the attorney-client communications for which production is sought are 'sufficiently related to' and were made 'in furtherance of [the] intended, or present, continuing illegality.'" Napster, 479 F.3d at 1090 (emphasis in original); see also In re Grand Jury Proceedings, 87 F.3d at 382-83.  In this Circuit, the "in furtherance" requirement is met if there is "some relationship between the communications and the illegality." Napster, 479 F.3d at 1094-1095; United States v. Laurins, 857 F.2d 529, 540 (9th Cir. 1988).  To pierce the privilege, the movant need only establish these elements by a preponderance of the evidence. Napster, 479 F.3d at 1094-95. An even lower standard is applied when in camera review, rather than disclosure, is sought. Id. at 1096.

These standards are met here.  The Ninth Circuit has recognized that a party seeking to pierce the privilege is inevitably at a disadvantage in establishing how communications it is not fully aware of furthered a crime or fraud. See id. at 1096; Zolin, 491 U.S. at 569-70.  Here, though, it is clear that MGA's claim of rights to Bryant's drawings is grounded in its deceptions about the timing and substance of Bryant's work.

,

1

2

3          . Larian had no right to seek legal

4  "counsel" to assist him in infringing Mattel's copyrights and stealing its property.

5          It is not necessary that Ms. Glaser did anything unlawful.  Indeed, it appears

6  that because of advice Larian received from Glaser, he then proceeded to alter facts

7  to deceive his lawyers.  It is not even necessary that Larian or the MGA defendants

8  completed any crime or fraud, although they plainly did.  All that is necessary is for

9  Mattel to establish by a preponderance of the evidence that the communications at

10 issue, instead of reflecting a proper effort to secure advice on compliance with the

11 law, were made in furtherance of unlawful action.  Given the factual record here,

12 that is the case.  The communication furthered at least two crimes, as discussed

13 below.

14    **A.    MGA Engaged in Criminal Infringement of Mattel's Copyrights**

15

16                                                                    ,

17 which has been ongoing from the introduction of Bratz to the present.  In re Grand

18 Jury Proceedings, 87 F.3d at 381.

19                                                          . MGA's

20 subsequent, elaborate efforts to recreate the history of Bratz's creation and cover up

21 the facts attest to its willful effort to infringe those copyrights.

22          Criminal copyright infringement consists of (1) infringement of a copyright,

23 (2) committed willfully, (3) for profit.  United States v. Drebin, 557 F.2d 1316, 1326

24 (9th Cir. 1977); United States v. Wise, 550 F.2d 1180, 1190 (9th Cir. 1977).

25 Willfulness is defined as "with knowledge that [one's] conduct constitutes copyright

26 infringement."  Dolman v. Agee, 157 F.3d 708, 715 (9th Cir. 1998); see also

27 Columbia Pictures Television, Inc. v. Krypton Broad., 106 F.3d 284, 293 (9th Cir.

28

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

1 │ 1997), *rev'd on other grounds by* Feltner v. Columbia Pictures Television, Inc.,

2 │ 523 U.S. 340 (1998); 3 Nimmer on Copyright § 1404[B], at 14-40.2-.3.

3 │ **1.    MGA Has Infringed Mattel's Copyrights in Bratz**

4 │      Pursuant to the Inventions Agreement, Bryant agreed to "promptly and fully"

5 │ disclose and assign to Mattel his "right, title, and interest in such inventions, and all

6 │ [his] right, title, and interest in any . . . copyrights . . . [and] copyright applications"

7 │ he conceived or reduced to practice while employed by Mattel. "Inventions"

8 │ included, but was not limited to, "all discoveries . . . [and] designs, whether

9 │ patentable or unpatentable."[38] Whether or not MGA ever saw Bryant's specific

10 │ agreement, it was clearly familiar with such agreements:  MGA was populated with

11 │ employees who had signed such agreements when they were at Mattel, such as

12 │ Paula Garcia.[39] Rosenbaum, MGA's lawyer, testified that he knew the "        "

13 │ terms of Mattel's agreement that works created by Carter Bryant while employed by

14 │ Mattel belonged to Mattel.[40] And MGA made its own employees sign comparable

15 │ agreements.[41]

16 │      Because Bryant's work for Mattel had always involved fashion dolls (*i.e.*,

17 │ dolls whose clothing and accessories are intended to be changed) and Bratz is a

18 │ competing fashion doll,

19 │

20 │

21 │

22 │      Of course, the evidence of Mattel's ownership is not limited to the e-mail

23 │ message. To the contrary, the evidence adduced to date overwhelmingly shows

24 │

25 │ [38]  Carter Bryant's Confidential Information and Inventions Agreement with
Mattel, Olivar Decl., Exh. 24.

26 │ [39]  Former Mattel Employee List, Olivar Decl. Exh. 13.
   [40]  Rosenbaum Dep, at 90:9-17, Olivar Decl. Exh. 4.

27 │ [41]  Ward Confidentiality and Inventions Assignment Agreement, dated
October 18, 2000, Olivar Decl. Exh. 38.

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

1    Mattel's ownership.  For example, forensic evidence shows that Bryant's first Bratz

2    drawings, purportedly made in 1998, were drawn on pages torn from the middle of a

3    notebook that has drawings, images, and entries for projects that Bryant worked on

4    for Mattel in 1999 and 2000.[42]  Bryant would have had to make a three mile detour

5    through a residential neighborhood to pass Kickapoo High School when commuting

6    from his job at Old Navy;[43] and even if he had done so, he would not have seen

7    ethnically diverse students who resembled the Bratz dolls because Kickapoo High

8    School is not ethnically diverse.[44]  Bryant failed to retain the magazine that

9    supposedly inspired his work (his mother testified that she had not subscribed to

10   Seventeen in 20 years, and certainly did not while her son was living with her).[45]

11   Advertisements similar to the one he claimed to have seen in 1998 appeared in

12   Seventeen in 1999 and 2000, but the latter ads resembled Bratz much more

13   closely.[46]  In other litigation, Bryant himself denied under oath that he had done

14   *anything* in the design field while he was away from Mattel in 1998--at a time when

15

16

17

18

19   [42]   Expert Report of Lloyd Cunningham, dated February 11, 2008, at 2-4, Olivar
     Decl. Exh. 25;  see also Deposition of Anna Rhee at 107:4-108:10; 109:5-25;
20   110:7-9, 112:21-113:12, 113:22-114:15; 127:8-14; 132:22-133:2; 138:9-22; 201:25-
     204:9, Olivar Decl. Exh. 26 (

21                                                    ).

22   [43]   Map showing Kickapoo High School, Old Navy, and the Bryant home, Olivar
     Decl. Exh. 27.
23   [44]   Deposition of Sarah Odom at 22:9-23:16 and Springfield Public Schools
     Annual Report, 2006-2007, Exhibit B thereto, Olivar Decl. Exh. 28 at 6.
24   [45]   Deposition of Janet Bryant at 305:14-306:3, 307:3-9, Olivar Decl. Exh. 29.
     [46]   September 1999 Seventeen, Trial Exhibit 10132, December 1999 Seventeen,
25   Trial Exhibit 10139, March 2000 Seventeen, Trial Exhibit 10142, April 2000
     Seventeen, Trial Exhibit 10145, Olivar Decl. Exh. 39; see also Expert Rebuttal
26   Report of Lee Loetz, dated March 17, 2008, Olivar Decl. Exh. 40.

27

28

1   he had already made millions on Bratz.[47]  In another proceeding in Hong Kong,

2   MGA expressly admitted under oath that Bryant's drawings were created in 1999.[48]

3       Other forensic evidence is even more damning. "8/1998" shows up on

4   drawings that Bryant himself admits were not prepared in 1998.  They are, instead,

5   color drawings he created in 1999 or later.[49]  To "date" them, Bryant had some of

6   his Bratz drawings notarized by a Mattel notary in August 1999.  To "date" black-

7   and-white Bratz line drawings Bryant claims to have created in 1998, Bryant had

8   some of his Bratz drawings notarized by a Mattel notary in August 1999.[50]  Because

9   the notary refused his request to back-date the drawings, he claimed he asked her to

10  write in her notary book: "                          ."[51]  However, the word

11  "             " were added to the notary book after the fact, and were not present

12  when the original entry was written--in other words, the entry in the notary book

13  was forged.[52]

14      Nor is MGA's story of the creation of the name "Bratz" supportable.

15  According to MGA, Bryant had already attached the name "Bratz" when he first

16  pitched it.[53]  However, Jennifer Maurus, a former MGA employee, testified in

17  another action that the Bratz name did not even exist when Bryant first pitched the

18

19

20  [47]   Deposition of Carter Bryant in Gunther Wahl v. Mattel, taken Sept. 9, 2003,
     M 0061802-917 at M 0061890-91 (deposition transcript at 89:23-90:7), Olivar Decl.

21  Exh. 30.
     [48]   Affidavit of Raymond David Black from MGA Entertainment, Inc. (1st

22  Plaintiff), MGA Entertainment (HK) Limited (2nd Plaintiff) and Double Grand
     Corporation Limited (Defendant) HCA No. 1883/2003, dated June 3, 2003, Bates-

23  numbered MGA 0885348 - MGA 0885414 at 0885378, Olivar Decl. Exh. 41.
     [49]   Bryant Dep. at 151:12-25, Olivar Decl. Exh.10.

24     [50]   Id. at 55:22-56:7; See also Deposition of Jacqueline Ramona Prince at
     124:21-125:7; 138:20-139:21, Olivar Decl. Exh. 31.

25     [51]   Id. at 55:22-56:7; see also Deposition of Jacqueline Ramona Prince at
     124:21-125:7; 138:20-139:21, Olivar Decl. Exh. 31.

26     [52]   Expert Report of Valery Aginsky ("Aginsky Report"), dated February 8,
     2008, Olivar Decl. Exh. 8.

27     [53]   Deposition of Paula Garcia at 1073:18-1074:6, 1076:17-1077:14, Olivar
     Decl. Exh. 42; Deposition of Isaac Larian at 180:22-181:4, Olivar Decl. Exh. 43.

1    project to MGA.[54]  Rachel Harris of MGA testified to the same thing.[55]  And Isaac

2    Larian has admitted the same thing on video.[56]

3         In short, with or without the e-mail message, the evidence of Mattel's

4    ownership, and of MGA's infringement, is overwhelming, and clearly meets the

5    preponderance threshold the Court must apply now.

6              **2.    Defendants' Infringement Was Willful**

7         Rather than own up to these facts, the MGA defendants have sought to cloak

8    their knowledge--an unprivileged fact--in the attorney-client privilege and create a

9    fictional account of the creation of Bratz to place it outside Mattel's ownership.

10   Once it became clear that the "                    " story would not protect them,

11   they told the Copyright Office and this Court that the project was created in 1998,

12

13        Defendants went to great lengths to conceal the truth.  Extensive evidence of

14   this concealment has been set forth at length elsewhere[57] and will not be repeated

15   here.

16                                                        .  Mattel had known

17   since O'Connor was deposed that Larian instructed her to white-out "Barbie

18   Collectibles" from the header of the MGA/Bryant agreement and send it to Glaser.

19   But Mattel just learned last week

20

21

22

23        [54]   Testimony of Jennifer Maurus, Larian v. Larian, at 228:10-18, Olivar Decl.
24   Exh. 33.
          [55]   Harris Dep. at 57:5-58:1, 61:14-63:3, Olivar Decl. Exh. 11.
25        [56]   Joan Gaynor Video Interview of Isaac Larian at the 2001 Tokyo Toy Fair,
     Trial Exh. 13182, Olivar Decl. Exh. 44.
26        [57]   See Mattel, Inc.'s Corrected Separate Statement of Uncontroverted Facts and
     Conclusions of Law, dated March 10, 2008, Olivar Decl. Exh. 34; Notice of Motion
27   and Corrected Motion of Mattel, Inc. for Partial Summary Judgment, dated
     March 10, 2008, Olivar Decl. Exh. 35.
28

1

2                                                              .[58] That Larian sought to

3 hide the relevant facts even from his own lawyer, when seeking her advice, shows

4 that these communications with her are not entitled to protection. See, e.g., Clark,

5 289 U.S. at 15 ("A client who consults an attorney for advice that will serve him in

6 the commission of a fraud will have no help from the law.")

7          **3.    Defendants' Infringement Was Unquestionably Profitable**

8          Defendants' infringement of Mattel's copyright interests has been enormously

9 profitable. Mattel's experts estimate the total net revenue of Bratz to be in excess of

10 $2.8 billion.[59]

11         Accordingly, the preponderance of the evidence demonstrates that defendants

12 engaged in criminal copyright infringement. Under Larian's own version of the

13 facts, Mattel owned the Bratz copyrights. Defendants therefore tried to conceal

14 Mattel's ownership of Bratz, and profited handsomely from their acts. A

15 preponderance of the evidence--the legal standard--demonstrates both infringement

16 and willfulness.

17    **B.    Larian's Communications Were "In Furtherance of" MGA's**

18         **Larceny of Mattel's Property**

19         There is also a tangible, physical aspect to MGA's wrongdoing, as this Court

20 recognized in concluding that Mattel's copyright claim did not preempt its

21 allegations of conversion. The criminal analogue for conversion is larceny. To

22 sustain a claim for larceny in California, a person must establish that (1) a person

23 took personal property of some value belonging to another, (2) when the person took

24 the property he had the specific intent to deprive the alleged victim permanently of

25 ─────────────────

26 [58] Email identified as Bates No. CG 0009, produced May 13, 2008, Olivar Decl.
Exh. 36.

27 [59] Expert Report of Michael Wagner, dated February 11, 2008, at 11, Olivar
Decl. Exh. 37.

28

1  his property; and (3) the person carried the property away by obtaining physical

2  possession and control for some period of time and by some movement of the

3  property. United States v. Corona-Sanchez, 234 F.3d 449, 454 (9th Cir. 2000);

4  United States v. Thordarson, 646 F.2d 1323, 1335 (9th Cir. 1981).

5          **1.    Larian and MGA Took Property that Belonged to Mattel**

6       This Court has ruled that any Bratz drawings or other Bratz-related inventions

7  made while Bryant worked for Mattel belong to Mattel under the Inventions

8  Agreement.[60] The Court has also recognized that the Bratz drawings are "works of

9  art that may have value of apart from the copyrights they represent." Id. at 3. It

10  follows that in taking these drawings, which they unquestionably did, Larian and

11  MGA took Mattel's property.

12          **2.    Larian and MGA Intended to Permanently Deprive Mattel of**

13               **Its Property**

14       The requirement of intent to deprive permanently is not interpreted literally in

15  California. People v. Avery, 27 Cal. 4th 49, 55 (2002) (noting that "the word

16  permanently as used here is not to be taken literally") (internal citations omitted).

17  Rather, this requirement is "satisfied by the intent to deprive temporarily but for an

18  unreasonable time so as to deprive the person of a major portion of its value or

19  enjoyment." Id. at 58; Foreshee v. Runnels, No. S-03-1647, 2007 WL 2505578

20  at *6 (E.D. Cal. Aug. 31, 2007) (noting that "California law requires an intent to

21  permanently deprive the owner of his or her property or to take the property

22  temporarily but for an unreasonable time to deprive the owner of a major part of its

23  value or enjoyment."). For purposes of larceny, the relevant intent is the intent at

24  the time of taking. People v. Kronemyer, 189 Cal. App. 3d 314, 363 (1987) (finding

25

26

27        [60] Summary Judgment Order at 4-5, Olivar Decl. Exh. 3.

28

1   that "a key element of larceny is that the perpetrator has the intent to permanently

2   deprive the victim of property at the time it was taken") (emphasis in original).

3          When he provided the Bratz drawings to Larian and MGA, Bryant

4   unquestionably had the requisite intent to deprive Mattel of their value and use, and

5   MGA and Larian intended to do the same.

6              **3.     Larian and MGA Carried Away Mattel's Property and**

7                       **Controlled It by Removing It from Mattel's Possession**

8          The requirement of carrying away and controlling the victim's property is a

9   low threshold that can be satisfied by even the slightest movement. People v. Davis,

10  19 Cal. 4th 301, 305 (1998) (holding that "if the taking has begun, the slightest

11  movement of the property constitutes a carrying away or asportation"). Here, there

12  is no dispute that Larian and MGA took the Mattel-owned Bratz drawings from

13  Bryant, and have retained both possession and control of the drawings from late

14  2000 to the present. Thus, the final element is satisfied as well.

15      **C.     MGA Has Perpetrated a Fraud on the Court**

16         Defendants' fraud on the Court provides an additional and independent basis

17  for piercing the attorney-client privilege. Fraud on the court embraces "that species

18  of fraud [that] does or attempts to defile the court itself, or is a fraud perpetrated by

19  officers of the court so that the judicial machinery cannot perform in the usual

20  manner its impartial task of adjudging cases that are presented for adjudication." In

21  re Levander, 180 F.3d 1114, 1119 (9th Cir. 1999). Fraud on the court requires "a

22  grave miscarriage of justice, and a fraud that is aimed at the court." Appling v. State

23  Farm. Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003) (citations omitted).

24  The Ninth Circuit has held that isolated instances of perjury or the non-disclosure of

25  information do not ordinarily constitute fraud on the court. Napster, 479 F.3d

26  at 1096.

27

28

07209/2517450.107209/2
17450.107209/2517450.1
7209/2517450.1

-19-                    Case No. CV 04-9049 SGL (RNBx)

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS

1    However, this is not a case of such isolated instances.  Here, Defendants have

2  engaged in a continuous, complex, multi-year effort to directly mislead this Court.

3  Specifically, Defendants have <u>repeatedly</u> falsely stated to the Court in their various

4  pleadings and discovery responses that Bryant created Bratz in 1998 while in

5  Missouri, falsified and back-dated drawings, and otherwise attempted to hide the

6  truth.  Their actions go to the core question in the litigation:  ownership of Bratz.

7  Defendants have manipulated and subverted the judicial machinery, and continue to

8  do so to this day.  It would be unconscionable to allow defendants to hide the truth

9  behind the privilege.[61]

10

11

12

13

14    [61]  Notably, proof of an actual crime or fraud--which Mattel has shown--is not
required.  Courts also pierce the attorney-client privilege where communications
15  furthered torts and other misconduct.  In re Sealed Cases, 676 F.2d 793, 812 (D.C.
Cir. 1982) (holding that crime-fraud exception applies to crimes, frauds, and "other
16  type[s] of misconduct fundamentally inconsistent with the basic premises of the
adversary system"); In re Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir.
17  1984) (piercing the privilege on a number of grounds in a tax fraud case and holding
18  that "privilege applies only when the person claiming the privilege has as a client
consulted an attorney for the purpose of securing a legal opinion or services and not
19  'for the purpose of committing a crime or tort'"); Int'l Tel. & Tel. Corp. v. United
20  Tel. Co., 60 F.R.D. 177, 180 (M.D. Fla. 1973) (holding that the attorney-client
privilege applies "not only where fraud or crime is involved, but also where there
21  are other substantial abuses of the attorney-client relationship); In re St. Johnbury
22  Trucking Co., 184 B.R. 446, 456 (Bankr. D. Vt. 1995) (piercing the privilege based
23  upon the filing of an unreasonable pleading for an improper purpose and noting that
"precedent and authority also recognize that not just technical crimes or frauds are
24  excluded from the attorney-client privilege").  See also 8 Wigmore, Evidence
25  § 2298 (McNaughton rev. 1961) ("[I]t is difficult to see how any moral line can
properly be drawn at [the] crude boundary [of the definition of crime or fraud], or
26  how the law can protect a deliberate plan to defy the law and oust another person of
27  his rights, whatever the precise nature of those rights may be").

## Conclusion

1
2   For the foregoing reasons, Mattel respectfully requests that the Court enter an

3   Order compelling:  (1) MGA to produce Entry Nos. 347, 375, 548, 549, 1325, 1326,

4   1641, 1818, 1819, and 1820 from MGA's January 23, 2008 Privilege Log, and

5   (2) Larian to produce Entry Nos. 69, 70, 73, 79, 89, 90, 91, 95, 97, 100, 101, 113,

6   114, and 115 from his January 15, 2008 Privilege Log and Entry No. 63 from his

7   January 30, 2008 Privilege Log.  At a minimum, Mattel respectfully requests that

8   the Court review those e-mails in camera to determine if disclosure is required under

9   the standard set forth in Napster.

10

11   DATED:  May 23, 2008                QUINN EMANUEL URQUHART OLIVER &
                                         HEDGES, LLP
12

13                                        By /s/ John B. Quinn
14                                           John B. Quinn
                                             Attorneys for Mattel, Inc.
15

16
17
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS