1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2   (johnquinn@quinnemanuel.com)
   Michael T. Zeller (Bar No. 196417)
3   (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4   (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  EASTERN DIVISION

11

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. CV 04-09059 and Case No. CV 05-2727 |
| vs. | [PUBLIC REDACTED] DECLARATION OF HARRY A. OLIVAR, JR. IN SUPPORT OF MOTION OF MATTEL, INC. FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS MADE IN FURTHERANCE OF CRIMES AND FRAUDS |
| MATTEL, INC., a Delaware corporation, | |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | |

EXHIBIT 44 MANUALLY FILED

Hearing Date: August 4, 2008
Time:        10:00 a.m.
Place:       Courtroom 1
Judge:       Hon. Stephen G. Larson

**Phase 1**
Pre-Trial Conference: May 19, 2008
Trial Date:           May 27, 2008

1             <u>DECLARATION OF HARRY A. OLIVAR, JR.</u>

2         I, Harry A. Olivar, Jr., declare as follows:

3         1.     I am a member of the bar of the State of California, admitted to

4 practice in the Central District of California and elsewhere, and a partner at Quinn

5 Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. ("Mattel").

6 Except where otherwise indicated, I make this declaration of personal, firsthand

7 knowledge, and if called and sworn as a witness, I could and would testify

8 competently thereto.

9         2.     Attached as **Exhibit 1** hereto is a true and correct copy of the

10 Motion of Plaintiff Mattel, Inc. for an Order Finding Waiver and to Compel

11 Production of Documents Withheld as Privileged, dated January 23, 2008.

12         3.     Attached as **Exhibit 2** hereto is a true and correct copy of MGA

13 Entertainment, Inc.'s Opposition to the Motion of Plaintiff Mattel, Inc. for an Order

14 Finding Waiver and to Compel Production of Documents Withheld as Privileged,

15 dated January 31, 2008.

16         4.     Attached as **Exhibit 3** hereto is a true and correct copy of the

17 Court's Order Granting in Part, Denying in Part, and Deferring in Part the Parties'

18 Motions for Partial Summary Judgment, dated April 25, 2008.

19         5.     Attached as **Exhibit 4** hereto is a true and correct copy of

20 excerpts of the Deposition of David Rosenbaum in the above-captioned case.

21         6.     Attached as **Exhibit 5** is a true and correct copy of Paula Garcia's

22 Employee Confidential Information and Inventions Agreement with Mattel, dated

23 July 4, 1997.

24         7.     Attached as **Exhibit 6** hereto is a true and correct copy of the

25 September 14, 2000 fax, sent by Carter Bryant to David Rosenbaum, enclosing

26 Bryant's offer letter from Mattel.

27

28

8. Attached as **Exhibit 7** hereto are true and correct copies of selected entries from the January 15, 2008 Larian Privilege Log, the January 30, 2008 Larian Privilege Log, and the January 23, 2008 MGA Privilege Log.

9. Attached as **Exhibit 8** hereto is a true and correct copy of excerpts from the Deposition of Victoria O'Connor in the above-captioned case.

10. Attached as **Exhibit 9** hereto is a true and correct copy of excerpts from the Deposition of Patricia Glaser in the above-captioned case and exhibit 5905 thereto.

11. Attached as **Exhibit 10** hereto is a true and correct copy of excerpts from Volume 1 of the Deposition of Carter Bryant in the above-captioned case.

12. Attached as **Exhibit 11** hereto is a true and correct copy of excerpts from the Deposition of Rachel Harris in the above-captioned case.

13. Attached as **Exhibit 12** hereto is a true and correct copy of a March 12, 2002 e-mail from Isaac Larian to nine MGA employees, Bates-numbered MGA 3801819R-22R.

14. Attached as **Exhibit 13** hereto is a true and correct copy of an MGA spreadsheet listing former Mattel employees, Bates-numbered MGA 1134723-30, dated April 20, 2006.

15. Attached as **Exhibit 14** hereto is a true and correct copy of a February 6, 2003 e-mail from Isaac Larian to Dee Dee Valencia, Bates-numbered MGA 3801448-9.

16. Attached as **Exhibit 15** hereto is a true and correct copy of the affidavit of Isaac Larian in <u>MGA v. Metson</u>, dated May 14, 2004.

17. Attached as **Exhibit 16** hereto is a true and correct copy of a *Business Week* article entitled "To Really Be a Player Mattel Needs Hotter Toys," written by Christopher Palmeri, and dated March 29, 2004.

DECLARATION OF HARRY A. OLIVAR. JR

1    18.    Attached as **Exhibit 17** hereto is a true and correct copy of a *San*
2  *Fernando Valley Business Journal* article entitled "Immigrant's Company Shakes
3  Up Toy Industry," written by Jeff Weiss, and dated July 28, 2003.

4    19.    Attached as **Exhibit 18** hereto is a true and correct copy of
5  United States Patent Application for a Doll with Aesthetic Changeable Footgear,
6  Matter No. 15904-142.

7    20.    Attached as **Exhibit 19** hereto is a true and correct copy of MGA
8  Entertainment, Inc.'s Supplemental and Amended Responses to Mattel, Inc.'s Third
9  Set of Requests for Admission to MGA Entertainment, Inc., dated May 4, 2007.

10    21.    Attached as **Exhibit 20** hereto is a true and correct copy of
11  Carter Bryant's Responses to Mattel, Inc.'s Fifth Set of Requests for Admission to
12  Carter Bryant, dated July 9, 2007.

13    22.    Attached as **Exhibit 21** hereto are true and correct copies of
14  Copyright Registrations VA 1-218-491 (Yasmin drawing), VA 1-218-488 (Sasha
15  drawing), VA 1-218-487 (Jade drawing), VA 1-218-490 (Cloe drawing), and VA 1-
16  218-489 (Bratz group drawing).

17    23.    Attached as **Exhibit 22** hereto is a true and correct copy of the
18  Complaint for Declaratory Relief of Copyright Non-Infringement, filed in <u>Carter</u>
19  <u>Bryant v. Mattel, Inc.</u>, dated November 2, 2004.

20    24.    Attached as **Exhibit 23** hereto is a true and correct copy of a
21  March 17, 2008 claw-back letter from Bryant Delgadillo to Juan Pablo Alban.

22    25.    Attached as **Exhibit 24** hereto is a true and correct copy of
23  Carter Bryant's Employee Confidential Information and Inventions Agreement with
24  Mattel.

25    26.    Attached as **Exhibit 25** hereto is a true and correct copy of the
26  Expert Report of Lloyd Cunningham, dated February 11, 2008, without exhibits.

27    27.    Attached as **Exhibit 26** hereto is a true and correct copy of
28  excerpts from the Deposition of Anna Rhee in the above-captioned case.

DECLARATION OF HARRY A. OLIVAR, JR.

1          28.    Attached as **Exhibit 27** hereto is a true and correct copy of a map
2  showing Kickapoo High School, Old Navy, and the Bryant Home.

3          29.    Attached as **Exhibit 28** hereto is a true and correct copy of the
4  excerpts from the Deposition of Sarah Odom in the above-captioned case and
5  exhibit B thereto, the Springfield Public Schools Annual Report for 2006-2007.

6          30.    Attached as **Exhibit 29** hereto is a true and correct copy of
7  excerpts from Volume 2 of the Deposition of Janet Bryant in the above-captioned
8  case.

9          31.    Attached as **Exhibit 30** hereto is a true and correct copy of
10  excerpts from the September 9, 2003 Deposition of Carter Bryant in <u>Gunther Wahl</u>
11  <u>v. Mattel</u>.

12          32.    Attached as **Exhibit 31** hereto is a true and correct copy of
13  excerpts from the Deposition of Jacqueline Ramona Prince in the above-captioned
14  case.

15          33.    Attached as **Exhibit 32** hereto is a true and correct copy of
16  excerpts from the Expert Report of Valerie Aginsky, dated February 8, 2008.

17          34.    Attached as **Exhibit 33** hereto is a true and correct copy of
18  excerpts from the testimony of Jennifer Maurus in <u>Larian v. Larian</u>.

19          35.    Attached as **Exhibit 34** hereto is a true and correct copy of
20  Mattel, Inc.'s Corrected Separate Statement of Uncontroverted Facts and
21  Conclusions of Law, dated March 10, 2008.

22          36.    Attached as **Exhibit 35** hereto is a true and correct copy of the
23  Corrected Notice of Motion and Motion of Mattel, Inc. for Partial Summary
24  Judgment, dated March 10, 2008.

25          37.    Attached as **Exhibit 36** hereto is a true and correct copy of an e-
26  mail produced on May 13, 2008 and identified by Bates number CG 0009.

27          38.    Attached as **Exhibit 37** hereto is a true and correct copy of the
28  Expert Report of Michael Wagner, dated February 11, 2008.

DECLARATION OF HARRY A. OLIVAR JR

1    39.    Attached as **Exhibit 38** hereto is a true and correct copy of the
2 Ward Confidentiality and Inventions Assignment Agreement, dated October 18,
3 2000.

4    40.    Attached as **Exhibit 39** hereto is are true and correct copies of
5 excerpts from the December 1999 issue of <u>Seventeen</u>, the March 2000 issue of
6 <u>Seventeen</u>, the April 2000 issue of <u>Seventeen</u>, and the September 1999 issue of
7 <u>Seventeen</u>.

8    41.    Attached as **Exhibit 40** hereto is a true and correct copy of the
9 Rebuttal Expert Report of Lee Loetz, dated March 17, 2008.

10    42.    Attached as **Exhibit 41** hereto is a true and correct copy of the
11 Affidavit of Raymond David Black from MGA Entertainment, Inc. (1st Plaintiff),
12 MGA Entertainment (HK) Limited (2nd Plaintiff) and Double Grand Corporation
13 Limited (Defendant) HCA No. 1883/2003, dated June 3, 2003.

14    43.    Attached as **Exhibit 42** hereto is a true and correct copy of
15 excerpts from Volume 4 of the Deposition of Paula Garcia in the above-captioned
16 case.

17    44.    Attached as **Exhibit 43** hereto is a true and correct copy of
18 excerpts from Volume 1 of the Deposition of Isaac Larian in the above-captioned
19 case.

20 /
21 /
22 /
23 /
24 /
25 /
26 /
27 /
28 /

DECLARATION OF HARRY A. OLIVAR, JR

1        45.    Attached as **Exhibit 44** hereto is a true and correct copy of the

2    Joan Gaynor Interview of Isaac Larian at the 2001 Tokyo Toy Fair.

3

4        I declare under penalty of perjury under the laws of the United States of

5    America that the foregoing is true and correct, and that this Declaration was

6    executed on May 23, 2008 at Los Angeles, California.

7

8    Harry A. Olivar, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-

**Exhibit 1**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
    Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
    Telephone:  (213) 443-3000
6  Facsimile:  (213) 443-3100

7  Attorneys for Mattel, Inc.

8

9                  UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                      EASTERN DIVISION

| 12 | CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
|---|---|---|
| 13 | Plaintiff, | Consolidated with Case No. CV 04-09059 and Case No. CV 05-02727 |
| 14 | vs. | |
| 15 | MATTEL, INC., a Delaware corporation, | **DISCOVERY MATTER** |
| 16 | | **[To Be Heard By Discovery Master Hon. Edward Infante (Ret.) Pursuant To The Court's Order of December 6, 2006]** |
| 17 | Defendant. | |
| 18 | AND CONSOLIDATED ACTIONS | NOTICE OF MOTION AND MOTION OF PLAINTIFF MATTEL, INC. FOR ORDER FINDING WAIVER AND TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD AS PRIVILEGED; AND |
| 19 | | |
| 20 | | |
| 21 | | MEMORANDUM OF POINTS AND AUTHORITIES |
| 22 | | |
| 23 | | [Declaration of Bernard B. Smyth filed concurrently] |
| 24 | | |
| 25 | | Date:  February 8, 2008<br>Time:  9:30 a.m.<br>Place:  TBA |
| 26 | | |
| 27 | | **Phase 1**<br>Discovery Cut-Off:  January 28, 2008<br>Pre-Trial Conference: May 5, 2008 |
| 28 | | Trial Date:  May 27, 2008 |

MATTEL'S MOTION FOR ORDER FINDING IMPLIED WAIVER AND TO COMPEL DOCUMENTS

EXHIBIT _____ 1

PAGE _____ 8

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that, at a conference before Discovery Master

3  Hon. Edward Infante (Ret.) that will occur on February 8, 2008 at 9:30 a.m., or at

4  another date and time to be set by Judge Infante, plaintiff Mattel, Inc. ("Mattel") will,

5  and hereby does, move the Court pursuant to <u>Federal Rules of Civil Procedure</u> 26 and

6  37 to compel MGA Entertainment, Inc. ("MGA") and Isaac Larian to produce all

7  documents, communications and information related to advice they sought and/or

8  received prior to April 27, 2004, regarding the legal propriety of MGA's contracting

9  with Bryant regarding Bratz, MGA's subsequent copying, development, production

10  and sales of Bratz, and MGA's or Bryant's obligations to Mattel, including without

11  limitation (1) Entry Nos. 655-657 and 660 on MGA's August 14, 2007 Supplemental

12  Privilege Log, (2) Entry Nos. 12-19 and 21-27 on MGA's Supplemental Revised

13  Privilege and Redaction Log for MGA's 2005 Document Production, (3) Entry Nos.

14  89 and 90 on Isaac Larian's Privilege Log, and (4) testimony in response to questions

15  that MGA's counsel instructed Isaac Larian not to answer at his deposition (<u>see</u>

16  Larian Depo. Tr. at 47:22-48:1).

17        This Motion is made on the grounds that MGA and Isaac Larian have

18  waived any claimed privilege as to these materials because they have affirmatively

19  asserted good faith affirmative defenses, putting protected information relevant to

20  those defenses at issue, and because the application of the attorney-client privilege or

21  work product doctrine would deny Mattel information vital to responding to MGA

22  and Larian's affirmative defenses.

23        This Motion is based on this Notice of Motion and Motion, the

24  accompanying Memorandum of Points and Authorities, the Declaration of Bernard B.

25  Smyth filed concurrently herewith, the records and files of this Court, and all other

26  matters of which the Court may take judicial notice.

27

28

07209/2356870.1

EXHIBIT ___1___

PAGE ___9___

1    <u>**Statement of Rule 37-1 Compliance**</u>

2    The parties met and conferred regarding MGA and Larian's implied

3    waiver of privilege on January 23, 2008.

4

5    DATED: January 23, 2008          QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP
6

7                                     By _____

8                                        Bernard B. Smyth
                                         Attorneys for Plaintiff
9                                        Mattel, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                              EXHIBIT _____ 1

28                                              PAGE _____ 10

07209/2356870.1                              -3-
                  MATTEL'S MOTION FOR ORDER FINDING IMPLIED WAIVER AND TO COMPEL DOCUMENTS

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT ......................................................................................................... 8

I.    FAIRNESS DEMANDS THAT MGA AND LARIAN PRODUCE PROTECTED INFORMATION ........................................................................ 8

II.   MGA AND LARIAN HAVE IMPLIEDLY WAIVED PRIVILEGE .............. 11

CONCLUSION ................................................................................................... 15

EXHIBIT _____1_____

PAGE _____11_____

i

MATTEL'S MOTION FOR ORDER FINDING IMPLIED WAIVER AND TO COMPEL DOCUMENTS

# TABLE OF AUTHORITIES

                                                                                    **Page**

**Cases**

*Bittaker v. Woodford,*
   331 F.3d 715 (9th Cir. 2003) ................................................................. 10

*Chevron Corp. v. Pennzoil Corp.,*
   974 F.2d 1156 (9th Cir. 1992) .................................................................. 8

*Cox v. Administrator U.S. Steel & Carnegie,*
   17 F.3d 1386 (11th Cir. 1994), cert. denied, 513 U.S. 1110 (1995) ............. 9, 12, 14

*Hearn v. Rhay,*
   68 F.R.D. 574 (E.D. Wash. 1975) ............................................................ 11, 12, 13

*United States v. Amlani,*
   169 F.3d 1189 (9th Cir. 1999) .................................................................. 11, 12

*United States v. Blizerian,*
   926 F.2d 1285 (2d Cir. 1991), cert. denied, 502 U.S. 813 (1991) ..................... 12, 13

EXHIBIT ___*1*___

PAGE ___*12*___

07209/2356870.1

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

The lynchpin of a number of MGA's and Isaac Larian's affirmative defenses is their allegation that they "acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA . . . was valid and permissible." MGA claims it "did not believe that Mattel owned any of the materials Carter Bryant presented to it" and, in fact, "took steps to confirm the timing of Bryant's work prior to executing the agreement" with him. Yet MGA and Larian have refused to produce any information showing what those steps were and what advice they sought and received regarding (i) the propriety of contracting with Bryant and (ii) the subsequent copying, development, production and sales of Bratz. They have consistently shielded that information behind the attorney-client privilege.

Thus, MGA and Larian are withholding substantial evidence showing what they were told regarding the propriety of their actions, while at the same time baldly professing their good faith. For example, as evidence of his good faith, Larian testified that he instructed an MGA executive to consult with MGA's attorneys concerning Bryant's contract obligations with Mattel before he contracted with Bryant and that she did so. However, MGA's counsel instructed Larian not to go beyond that partial disclosure. MGA is thus trying to rely on the consultation with counsel -- and the implication that it was advised that MGA could properly contract with Bryant -- as evidence of its good faith, but at the same time withhold the actual substance of the advice. MGA and Larian are likewise withholding dozens of emails from the dates leading up to the execution of MGA's agreement with Bryant that show what MGA asked its lawyers and what its lawyers told it regarding the propriety of contracting with Bryant.

MGA is also withholding several emails to and from its attorneys after MGA first unveiled Bratz. Those emails are described as seeking and receiving legal

1  advice regarding Bryant's contract and licensing.  They likely show what MGA was
2  told about the propriety of further copying and sales of Bratz.  Further, MGA is
3  withholding communications with its litigation counsel from June 2001 -- nearly
4  three years before Mattel filed suit -- which are described as "requesting legal advice
5  regarding Mattel litigation" and "seeking legal advice regarding Bratz."

6  　　　　Fairness demands that MGA and Larian produce those documents and
7  any other information they are withholding regarding advice they sought and/or
8  received regarding the legal propriety of MGA's contract with Bryant and subsequent
9  copying and sales of Bratz.  The case law is clear that in asserting their good faith as
10  affirmative defenses, MGA and Larian have put in issue otherwise privileged
11  information showing their true state of mind regarding the legal propriety of their
12  actions.  In order to fairly respond to MGA's asserted "good faith," Mattel needs
13  access to the documents that would show what advice MGA and Larian were
14  provided, and what steps they took (and asked their lawyers to take) to do "due
15  diligence" about Bryant's representations and Bryant's relationship with Mattel.  The
16  only actual evidence necessary to test MGA's "good faith" defenses in this case is
17  privileged communications that MGA and Larian refuse to produce.   MGA and
18  Larian cannot use the privilege as both a sword -- in baldly proclaiming their good
19  faith -- and as a shield.

20  　　　　　　　　　**Statement of Facts**

21  　　　**Mattel's Counterclaims and MGA's "Good Faith" Affirmative Defenses.**
22  Mattel filed its Second Amended Answer and Counterclaims on July 12, 2007.[1]
23  Mattel alleges, among other things, that MGA and Larian (collectively, "MGA")
24  encouraged, aided and paid Carter Bryant to develop Bratz designs while Bryant was

25

26

27  　　[1]　Mattel's Second Amended Answer in Case No. 05-2727 and Counterclaims,
   dated July 12, 2007, attached as Exhibit 3 to the concurrently filed Declaration of
28  Bernard B. Smyth ("Smyth Dec.").

**EXHIBIT** I

**PAGE** 14

1 | a Mattel employee, knowing that such conduct was a breach of Bryant's contractual
2 | duties to Mattel;[2] that MGA and Bryant intentionally concealed these facts from
3 | Mattel;[3] that Mattel is the rightful owner of Bratz drawings; and that MGA's
4 | infringement of Mattel copyrights in those drawings harmed, and continues to harm,
5 | Mattel.[4]  Mattel claims that MGA and Larian are liable for, among other things,
6 | aiding and abetting Bryant's breaches of duty to Mattel, copyright infringement, and
7 | willful copyright infringement.[5]

8 |       MGA asserted 22 affirmative defenses in response to Mattel's
9 | counterclaims.  Central to a number of those defenses is MGA's claim that it "acted
10 | with a good faith belief that Bryant owned the rights to his original Bratz drawings
11 | and that his assignment of such rights to MGA . . . was valid and permissible."[6]
12 | MGA also separately asserts the defense of "good faith" to Mattel's counterclaims.[7]
13 | Thus, MGA has affirmatively put its state of mind at issue and done so repeatedly.

14 |       <u>MGA's Discovery Responses Demonstrate Continued Reliance on Its</u>
15 | <u>Alleged "Good Faith."</u>  Discovery in this case also has demonstrated that MGA
16 | clearly intends to rely on its alleged "good faith" in defending Mattel's counterclaims.
17 | In response to requests for admissions, MGA acknowledged that "it contends it
18 | believed at the time it entered into its agreement with Bryant and at all times
19 | thereafter" that:

20 |
21 |
22 |

23 | [2] <u>Id.</u>, ¶ 33.
    [3] <u>Id.</u>, ¶ 35.
24 | [4] <u>Id.</u>, ¶¶ 83-87.
25 | [5] <u>Id.</u>, ¶¶ 83-87, 136-141, 149-154.
    [6] <u>See, e.g.,</u> MGA's Fifth and Sixth Affirmative Defenses, Amended Answer and
26 | Affirmative Defenses of MGA Entertainment Inc., MGA Entertainment (HK)
27 | Limited, and MGAE de Mexico S.R.L. de C.V. to Mattel, Inc.'s Second Amended
Answer and Counterclaims, dated September 19, 2007, at p. 22, Smyth Dec., Exh. 4.
28 | [7] MGA's Eighteenth Affirmative Defense, <u>Id.</u> at p. 25.

EXHIBIT _____ *1*

PAGE _____ *15*

- "[I]t had the right to market products developed as a result of its agreement with Bryant;"[8]

- "[I]t would have the lawful right to fully exploit the drawings drawn and presented by Bryant prior to the execution of MGA's agreement with Bryant;"[9]

- "[I]t had the right to fully exploit products developed as a result of its agreement with Bryant;"[10] and

- "[I]t had the lawful right to fully exploit the drawings drawn and presented by Bryant prior to the execution of its agreement with Bryant."[11]

In addition, as recently as January 7, 2008, MGA served interrogatory responses in which it contended that "MGA acted in good faith when Bryant transferred and MGA acquired all rights to the Bratz concept,"[12] and that MGA "acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA [] was valid and permissible."[13]  MGA contends that, "despite [its] fair inquiry" it did not know that Carter Bryant entered into an inventions agreement with Mattel.[14]  According to MGA, these contentions support its affirmative defenses.[15]

MGA Shields the Only Evidence that Could Rebut Its Alleged "Good Faith" Behind the Attorney-Client Privilege.  Although MGA has repeatedly injected its alleged "good faith" as to the central events in this case, it refuses to produce the

---

[8]   MGA Entertainment Inc.'s Supplemental Responses to Mattel, Inc.'s Fifth Set of Requests for Admission, dated August 21, 2007, at p. 4, Smyth Dec., Exh. 5.

[9]   Id. at p. 5.

[10]   Id. at p. 6.

[11]   Id. at p. 8.

[12]   MGA's Response to Mattel, Inc.'s Amended Supplemental Interrogatory Regarding Defendants' Affirmative Defenses, dated January 7, 2008, at p. 35, Smyth Dec., Exh. 6.

[13]   Id. at p. 32.

[14]   MGA Entertainment, Inc.'s Second Supplemental Responses to Mattel, Inc.'s Revised Third Set of Interrogatories, dated January 7, 2008, at pp. 79-80, Smyth Dec., Exh. 7.

[15]   Id.

**EXHIBIT** _____ **1**

**PAGE** _____ **16**

1 communications with its attorneys that are the only evidence of (1) what it actually
2 thought, and was advised about, the legal propriety of contracting with Bryant and the
3 subsequent copying and sales of Bratz, and (2) what inquiry, if any, it asked its
4 lawyers to conduct. MGA has withheld those communications as privileged.

5 　　　　According to MGA, Isaac Larian and other MGA personnel, including
6 Victoria O'Connor, first met with Bryant on September 1, 2000. MGA admits that
7 "Bryant told them . . . that he was employed by Mattel at that time."[16] MGA claims
8 that despite some undisclosed "fair inquiry," it did not know Bryant had signed an
9 inventions agreement with Mattel. However, MGA produced a fax from the same
10 time period (September 14, 2000) from Bryant to David Rosenbaum, who both
11 Larian and O'Connor testified was the attorney MGA hired to assist with the Bryant
12 contract,[17] in which Bryant encloses his offer letter with Mattel. That offer letter
13 expressly calls attention to his Confidential Information and Inventions Agreement.[18]
14 In the fax, Bryant advised MGA's lawyer that he was "unable to look into this too
15 much . . . without risking suspicion" on Mattel's part.[19]

16 　　　　MGA claims that "Bryant and his counsel . . . represented and warranted
17 to MGA that Bryant was the exclusive originator and owner of his Bratz ideas and
18 drawing and that no third party had any interest or rights in the drawings or ideas
19 reflected in the drawings."[20] Despite Bryant's alleged representations, Larian testified
20 that in entering into a contract with Bryant he "wanted to make sure . . . that this idea

21 ────────────

22 [16]　MGA Entertainment Inc.'s Supplemental Responses to Mattel, Inc.'s Fifth Set
of Requests for Admission, dated August 21, 2007, at p. 21, Smyth Dec., Exh. 5.
23 [17]　Deposition Transcript of Victoria O'Connor, dated December 6, 2004
24 ("O'Connor Depo. Tr."), at 226:24-227:7, Smyth Dec., Exh. 10; Larian Depo. Tr. at
50:25-51:6, 140:18-140:21, Smyth Dec., Exh. 9.
25 [18]　See Smyth Dec., Exh. 8.
[19]　Id.
26 [20]　MGA's Response to Mattel, Inc.'s Amended Supplemental Interrogatory
27 Regarding Defendants' Affirmative Defenses, dated January 7, 2008, at p. 35, 76-77,
28 Smyth Dec., Exh. 6.

1   that he was showing us was nothing that was at Mattel or Mattel had done."[21]   In fact,

2   MGA has stated that "[b]ased on the information provided to it, MGA did not believe

3   that Mattel owned any of the materials Carter Bryant presented to it, *but nonetheless*

4   *took steps to confirm the timing of Mr. Bryant's work prior to executing the*

5   *agreement*, as Mr. Larian testified to at his deposition."[22]   At his deposition, Larian

6   testified that, as evidence of his good faith, he asked Victoria O'Connor to make sure

7   to check with MGA's attorney regarding whether Bryant had a contract with Mattel.[23]

8            However, MGA has refused to disclose what its attorneys told it

9   regarding the legal propriety of contracting with Bryant.   MGA's counsel instructed

10  Larian not to answer, on attorney-client privilege grounds, questions regarding what

11  MGA asked its attorneys about the propriety of contracting with Bryant and what its

12  attorneys told MGA.[24]   MGA is also withholding more than a dozen emails between

13  O'Connor and Rosenbaum that were sent between September 1, 2000, the date of the

14  claimed meeting with Bryant, and October 4, 2000, the date Bryant's contract was

15  executed.[25]   Those emails are all described as messages "rendering [or requesting]

16  legal advice regarding Carter Bryant contract."[26]   Many emails between O'Connor

17  and Rosenbaum from the same time period were withheld by Rosenbaum as well.[27]

18

19

20
      [21]   Deposition Transcript of Isaac Larian, dated July 18, 2006 ("Larian Depo.
21    Tr."), at 46:16-19, Smyth Dec., Exh. 9.
      [22]   MGA Entertainment Inc.'s Supplemental Responses to Mattel, Inc.'s Fifth Set
22    of Requests for Admission, dated August 21, 2007, at p. 12 (emphasis added), Smyth
23    Dec., Exh. 5.
      [23]   Larian Depo. Tr. at 47:16-23, Smyth Dec., Exh. 9.
24    [24]   Id. at 47:22-48:1.
      [25]   Supplemental Revised Privilege and Redaction Log for MGA's 2005 Document
25    Production, Entry Nos. 12-19, 21-27, Smyth Dec., Exh. 11.
26    [26]   Id.
      [27]   David Rosenbaum's Privilege Log, Entry Nos. 9-17, 19-25, Smyth Dec., Exh.
27    12.
28

07209/2356870.1

EXHIBIT _____

PAGE _____

1  Those emails may include advice regarding the propriety of MGA contracting with
2  Bryant and MGA's or Bryant's obligations to Mattel.

3          MGA alleges that it first unveiled Bratz at the Hong Kong Toy Fair in
4  January 2001.[28]  The next month, on February 10, 2001, Isaac Larian emailed David
5  Rosenbaum, noting that "Bratz are very hot."[29]  MGA redacted the rest of that email
6  as privileged, describing it as "requesting legal advice regarding Carter Bryant
7  contract and licensing."[30]  That email apparently started a series of communications --
8  first between Larian and Rosenbaum and then between O'Connor and Rosenbaum --
9  all described as "requesting [or rendering] legal advice regarding Carter Bryant
10  contract and licensing."[31]  MGA is withholding all of those communications.

11          MGA is thus withholding dozens of emails between MGA and its
12  counsel that, based on their description, evidence legal advice MGA requested and
13  received regarding the legal propriety of contracting with Bryant, both before the
14  contract with him was executed and once it became apparent that MGA would begin
15  significant efforts copying, developing, producing and selling Bratz.

16          Isaac Larian is also personally withholding on privilege grounds
17  documents that appear to evidence what he knew regarding the legal propriety of
18  MGA's contract with Bryant and subsequent development of Bratz.  Larian's privilege
19  log, which the Discovery Master ordered Larian to provide and which was served last
20  week, includes a June 30, 2001 email from Larian to Patricia Glaser, Larian's
21  litigation counsel.  The email is described as a "message requesting legal advice

22

23

24  _____

25  [28]    MGA's Complaint in Case No. 05-2727, dated April 13, 2005, ¶ 23, Smyth
       Dec., Exh. 13.
26  [29]    See Smyth Dec., Exh. 14.
27  [30]    Supplemental Revised Privilege and Redaction Log for MGA's 2005 Document
       Production, Entry No. 8, Smyth Dec., Exh. 11.
28  [31]    Id., Entry Nos. 3-6, 8-11.

EXHIBIT _____ / _____

PAGE _____ 19

1   regarding Mattel litigation,"[32] and was sent approximately when the Bratz dolls were
2   first put on sale,[33] well before Mattel filed suit in April 2004.  Additional emails from
3   Larian to Glaser between June 29, 2001 and July 2, 2001, are listed on MGA's logs as
4   well,[34] including one described as an email "seeking legal advice regarding Bratz."[35]
5   These 2001 communications between Larian and Glaser are particularly suspicious in
6   light of Victoria O'Connor's testimony.  She testified that the executed agreement
7   between Bryant and MGA was faxed to her by Bryant with a heading at the top
8   stating "Barbie Collectibles."[36]  She acknowledged that the heading caused her
9   concern "because [Bryant] was still at Mattel at the time the contract was executed."[37]
10  She expressed that concern to Isaac Larian.[38]  Larian then asked her to whiteout
11  "Barbie Collectibles" from the faxed agreement and send it to Patricia Glaser.[39]

12                                    **Argument**

13  **I.    FAIRNESS DEMANDS THAT MGA AND LARIAN PRODUCE**
14        **PROTECTED INFORMATION**

15          In the Ninth Circuit as elsewhere, "[t]he privilege which protects
16  attorney-client communications may not be used both as a sword and a shield.  When
17  a party raises a claim which in fairness requires disclosure of the protected
18  communication, the privilege may be implicitly waived."  Chevron Corp. v. Pennzoil
19  Corp., 974 F.2d 1156, 1162 (9th Cir. 1992) (citation omitted).

20  _____

21  [32]   Larian Privilege Log, Entry No. 89, Smyth Dec., Exh. 15.  Entry No. 90 on
22  Larian's log is another communication from Larian to Glaser, dated June 29, 2001.
       [33]   MGA's Complaint in Case No. 05-2727, dated April 13, 2005, ¶ 23 ("MGA
23  introduced [Bratz] to consumers in June 2001."), Smyth Dec., Exh. 13.
24  [34]   MGA's August 14, 2007 Supplemental Privilege Log, Entry Nos. 655-657, 660,
    Smyth Dec., Exh. 16.
25     [35]   Id., Entry No. 660.
26     [36]   O'Connor Depo. Tr. at 18:13-18, Smyth Dec., Exh. 10.
       [37]   Id. at 20:8-20.
27     [38]   Id. at 20:8-21:20.
28     [39]   Id. at 18:13-18.

07209/2356870.1

                                    -8-

EXHIBIT _____1____

PAGE _____20____

1        It is unfair for MGA to argue that it should be absolved of liability
2  because it supposedly had a good faith belief that its actions were lawful, while at the
3  same time withholding from production communications with its attorneys bearing on
4  that very subject. The withheld communications reflect the "steps [MGA took] to
5  confirm the timing of Mr. Bryant's work prior to executing the agreement" and the
6  "fair inquiry" MGA claims it conducted, and apparently form the basis of MGA's
7  claim that "at the time it entered into its agreement with Bryant . . . it had the lawful
8  right to fully exploit the drawings drawn and presented by Bryant."[40]  Such
9  communications may show that MGA was, in truth, aware that Mattel had or may
10  have legal rights to Bratz and are critical evidence regarding the merits of MGA's
11  "good faith" defenses and are the only way for Mattel to test its claim of good faith.

12        Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1418-20
13  (11th Cir. 1994), cert denied, 513 U.S. 1110 (1995), is instructive. In that case, the
14  defendant claimed that at the time it revised the leave-of-absence policy at issue in
15  the case it "believed the policy to be lawful." Id. at 1418. Thus, defendant's alleged
16  "good faith" was at issue. Although the defendant did not claim that its belief was
17  based on communications with attorneys, the court upheld a finding of implied
18  waiver because defendant's claimed belief "necessarily implicates all of the
19  information at its disposal when it made the decision to change the leave of absence
20  policy." Id. The court ordered the defendant to produce communications with its
21  lawyers about the lawfulness of its policy, holding that defendant's allegation of
22  "good faith" injected "into the case an issue that in fairness requires an examination
23  of otherwise protected communications." Id. at 1419.

24

25  ————————————

26    [40]  MGA Entertainment Inc.'s Supplemental Responses to Mattel, Inc.'s Fifth Set
27  of Requests for Admission, dated August 21, 2007, at p. 8, 12, Smyth Dec., Exh. 5;
    MGA Entertainment, Inc.'s Second Supplemental Responses to Mattel, Inc.'s Revised
28  Third Set of Interrogatories, at pp. 79-80, dated January 7, 2008, Smyth Dec., Exh. 7.

MATTEL'S MOTION FOR ORDER FINDING IMPLIED WAIVER AND TO COMPEL DOCUMENTS

EXHIBIT _____ I

PAGE _____ 2 1

1    Similarly here, MGA has injected into this litigation what advice it
2  received from its lawyers regarding the legality of its contract with Bryant and its
3  rights to copy and sell Bratz. MGA cannot obtain the benefit of invoking the advice
4  of counsel as establishing good faith -- including the clear implication that Bryant
5  was legally free to contract with MGA -- but withhold the rest of the communication.
6  Fairness requires that Mattel be permitted to examine that information. That is
7  especially true here because the *only* evidence of what MGA knew regarding the
8  lawfulness of its actions has been withheld as privileged. By "assert[ing] claims the
9  opposing party cannot adequately dispute unless it has access to the privilege
10 materials," Bittaker v. Woodford, 331 F.3d 715, 719 (9th Cir. 2003), MGA has
11 waived the privilege.

12    It is clear that MGA sought and obtained legal advice regarding the
13 propriety of entering into a contract with Bryant, who it knew to be employed by
14 Mattel as a doll designer, to acquire Bratz, and subsequent copying of Bratz. Larian
15 testified that in entering into a contract with Bryant he "wanted to make sure . . . that
16 this idea that he was showing us was nothing that was at Mattel or Mattel had
17 done."[41] MGA has stated that it "took steps to confirm the timing of Mr. Bryant's
18 work prior to executing the agreement."[42] MGA claims to have conducted a "fair
19 inquiry."[43] This is a partial disclosure, for MGA's benefit, of its communications with
20 counsel. And MGA concedes that it affirmatively has put its alleged good faith at
21 issue.[44] Yet MGA has refused to provide testimony or produce documents that

22

23   [41]  Larian Depo. Tr. at 46:16-19, Smyth Dec., Exh. 9.
24   [42]  MGA Entertainment Inc.'s Supplemental Responses to Mattel, Inc.'s Fifth Set
     of Requests for Admission, dated August 21, 2007, at p. 12, Smyth Dec., Exh. 5.
25   [43]  MGA Entertainment, Inc.'s Second Supplemental Responses to Mattel, Inc.'s
26   Revised Third Set of Interrogatories, at pp. 79-80, dated January 7, 2008, Smyth
     Dec., Exh. 7.
27   [44]  MGA Entertainment Inc.'s Supplemental Responses to Mattel, Inc.'s Fifth Set
28   of Requests for Admission, dated August 21, 2007, at pp. 4-8, Smyth Dec., Exh. 5.

1  demonstrate what those steps were or what MGA learned in taking those steps. The
2  closest MGA has come to providing that information is when Larian testified that he
3  asked Victoria O'Connor to make sure to check with MGA's attorney regarding
4  whether Bryant had a contract with Mattel, but he was then promptly interrupted by
5  his counsel and instructed not to divulge any attorney-client communications.[45] Such
6  partial "lifting of the veil" to gain an advantage is clearly improper.

7          MGA and Larian are withholding dozens of documents that, based on
8  privilege log descriptions, appear to involve legal advice regarding the propriety of
9  MGA's actions. Those include emails from Larian to Patricia Glaser seeking legal
10  advice regarding "Bratz" and "Mattel litigation" even as Bratz was first being released
11  and no litigation was pending. Fairness demands that MGA produce those
12  documents and any other information that MGA is withholding as privileged
13  regarding advice it sought and/or obtained regarding the propriety of contracting with
14  Bryant, MGA's or Bryant's obligations to Mattel, and the propriety of MGA's
15  copying, development, production and/or sales of Bratz.

16  **II.    MGA AND LARIAN HAVE IMPLIEDLY WAIVED PRIVILEGE**

17          As MGA has recognized,[46] the Ninth Circuit applies the three-part test
18  set forth in Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975), to determine
19  whether a party has impliedly waived privilege: "(1) assertion of the privilege was a
20  result of some affirmative act, such as filing suit, by the asserting party; (2) through
21  this affirmative act, the asserting party put the protected information at issue by
22  making it relevant to the case; and (3) application of the privilege would have denied
23  the opposing party access to information vital to his defense." See also United States

24

25

26   [45]  Larian Depo. Tr. at 47:16-23, Smyth Dec., Exh. 9.
27   [46]  See MGA's Notice of Motion and Motion to Compel Regarding Mattel's
     Privilege Waiver by Claim Assertion, dated December 18, 2007, at pp. 15-16, Smyth
28   Dec., Exh. 17.

07209/2356870.1                              -11-          **EXHIBIT** _____ *1*
                    MATTEL'S MOTION FOR ORDER FINDING IMPLIED WAIVER AND TO COMPEL DOCUMENTS
                                                          PAGE _____ *23*

1    v. Amlani, 169 F.3d 1189, 1195 (9th Cir. 1999) (applying the Hearn test for implied

2    waiver).

3              Under the Hearn test, which MGA heavily relies on in its recently filed

4    motion for implied waiver against Mattel, MGA and Larian have waived the privilege

5    by asserting their "good faith" affirmative defenses.  The facts here are closely

6    analogous to those in Hearn, where the court found implied waiver.  In Hearn,

7    defendants asserted as a defense "in their answer that they 'have acted in good faith.'"

8    Hearn, 68 F.R.D. at 578.  The court found that all the elements of its three-part test

9    were satisfied because:

> [D]efendants invoked the privilege in furtherance of an
> affirmative defense they asserted for their own benefit;
> through this affirmative act they placed the privileged
> information at issue, for the legal advice they received is
> germane to the qualified immunity defense they raised; and
> one result of asserting the privilege has been to deprive
> plaintiff of information necessary to 'defend' against
> defendants' affirmative defenses, for the protected information
> is also germane to plaintiff's burden of proving malice or
> unreasonable    disregard    of    his    clearly    established
> constitutional rights.

18    Id. at 581.

19              The same is true here.  First, as in Hearn, MGA has asserted the privilege

20    by alleging the affirmative defense of "good faith."  The assertion of an affirmative

21    defense based on good faith is a particularly common grounds for finding implied

22    waiver.  See, e.g., Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1419

23    (11th Cir. 1994), cert denied, 513 U.S. 1110 (1995) ("Having gone beyond mere

24    denial, affirmatively to assert good faith, USX injected the issue of its knowledge of

25    the law into the case and thereby waived the attorney-client privilege."); United

26    States v. Blizerian, 926 F.2d 1285, 1293 (2d Cir. 1991), cert denied, 502 U.S. 813

27    (1991) (defendant's good faith assertion that his actions were lawful waived attorney-

28    client privilege).

07209/2356870:1

-12-

EXHIBIT ___ 1

1    Second, MGA's "good faith" defenses have affirmatively put privileged
2    information at issue.  In Hearn, the court found that privileged information was put at
3    issue because the legal advice defendants received was "germane" to the defense they
4    raised.  Here, MGA acknowledges that it "took steps to confirm the timing of Mr.
5    Bryant's work prior to executing the agreement."[47]  It also contends that it conducted
6    a "fair inquiry" into Bryant's representations about his creation and ownership of
7    Bratz.[48]  Larian testified that he told Victoria O'Connor to talk to MGA's lawyers.[49]
8    MGA's privilege log includes a number of emails between MGA and its lawyers
9    regarding Bryant's contract, Mattel litigation and the like.  Not only are such
10   communications "germane" to MGA's "good faith" defenses, they are the *only*
11   evidence of the steps MGA took to determine the propriety of its actions.  MGA has
12   shielded everything in this regard by asserting the privilege.

13   Third, as in Hearn, the result of MGA's privilege assertions has been to
14   deprive Mattel of information "necessary to 'defend' against [MGA's] affirmative
15   defenses."  The information MGA is withholding is critical to Mattel's ability to
16   respond to MGA's purported "good faith" defenses because, as discussed in Section I
17   above, it is the *only* evidence of what advice MGA solicited and received regarding
18   the propriety of its actions and the steps it claims it took to ensure that Bryant could
19   and did lawfully assign rights to Bratz and that no Mattel rights were infringed.

20   In short, MGA contends that its actions in contracting with Bryant and
21   subsequent acts of copying, developing, producing and selling Bratz were in good
22   faith because it believed they were lawful.  And MGA contends that it cannot be

23

24   _____

25   [47]  MGA Entertainment Inc.'s Supplemental Responses to Mattel, Inc.'s Fifth Set
     of Requests for Admission, dated August 21, 2007, at p. 12, Smyth Dec., Exh. 5.
26   [48]  MGA Entertainment, Inc.'s Second Supplemental Responses to Mattel, Inc.'s
27   Revised Third Set of Interrogatories, at pp. 79-80, dated January 7, 2008, Smyth
     Dec., Exh. 7.
28   [49]  Larian Depo. Tr. at 47:16-23, Smyth Dec., Exh. 9.

EXHIBIT ___1___

PAGE ___25___

1  liable to Mattel because of its good faith.[50]  These contentions have placed at issue
2  numerous otherwise protected attorney-client communications, including relevant
3  documents listed on MGA's and Larian's privilege logs.  Those communications are
4  the only evidence of what MGA asked and was told about the legal propriety of its
5  actions.  Mattel needs the information withheld to fairly respond to MGA's "good
6  faith" defenses.

7          Those facts are in marked contrast to the facts MGA relies on to claim
8  that Mattel impliedly waived the privilege in MGA's currently pending motion.
9  MGA argues that Mattel waived the privilege because Mattel alleges that MGA and
10  Bryant concealed their wrongful acts.  But Mattel has produced substantial non-
11  privileged information regarding when Mattel learned of Bryant's wrongful conduct.
12  MGA thus already has sufficient information to litigate its statute of limitations and
13  laches defenses.  Here, MGA and Larian have produced *no* information regarding
14  what they asked or were told about the propriety of their actions -- information that is
15  necessary to assess their "good faith" defenses.  Moreover, Mattel has not raised its
16  alleged good intent as an affirmative defense or claim as MGA has.  Rather, Mattel
17  simply denies *MGA's* contentions that Mattel's claims are time barred.  See, e.g., Cox
18  v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1419 (11th Cir. 1994), cert
19  denied, 513 U.S. 1110 (1995) ("*Having gone beyond mere denial, affirmatively to*
20  *assert good faith*, USX injected the issue of its knowledge of the law into the case
21  and thereby waived the attorney-client privilege." (emphasis added)).  MGA has
22  impliedly waived the privilege; Mattel has not.

23

24

25  [50]   MGA's Fifth, Sixth and Eighteenth Affirmative Defenses, Amended Answer
26  and Affirmative Defenses of MGA Entertainment Inc., MGA Entertainment (HK)
27  Limited, and MGAE de Mexico S.R.L. de C.V. to Mattel, Inc.'s Second Amended
   Answer and Counterclaims, dated September 19, 2007, at pp. 22, 25, Smyth Dec.,
28  Exh. 4.

EXHIBIT _____ *1*

## Conclusion

For the foregoing reasons, Mattel respectfully requests that the Court enter an Order (1) finding that MGA and Isaac Larian have impliedly waived the attorney-client and work product privileges as to all documents, communications, and information related to advice they sought and/or received prior to April 27, 2004, regarding the legal propriety of MGA's contracting with Bryant, MGA's or Bryant's obligations to Mattel, and their subsequent copying, development, production and sales of Bratz, and (2) compelling MGA to produce the documents specified herein and overruling the instructions not to answer specified herein.

DATED: January 23, 2008        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _____
    B. Dylan Proctor
    Attorneys for Plaintiff
    Mattel, Inc.

07209/2356870.1

-15-

MATTEL'S MOTION FOR ORDER FINDING IMPLIED WAIVER AND TO COMPEL DOCUMENTS

EXHIBIT 1

PAGE 27

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action. My business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

On January 23, 2008, I served true copies of the following document(s) described as **NOTICE OF MOTION AND MOTION OF PLAINTIFF MATTEL, INC. FOR ORDER FINDING WAIVER AND TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD AS PRIVILEGED; AND MEMORANDUM OF POINTS AND AUTHORITIES** on the parties in this action as follows:

John W. Keker, Esq.
Michael H. Page, Esq.
Christa M. Anderson, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111

**BY FEDEX:** I deposited such document(s) in a box or other facility regularly maintained by FedEx, or delivered such document(s) to a courier or driver authorized by FedEx to receive documents, in sealed envelope(s) or package(s) designated by FedEx with delivery fees paid or provided for, addressed to the person(s) being served.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 23, 2008, at Los Angeles, California.

_Rita Turner_
Rita Turner

07209/2140692.1

EXHIBIT _____ 1

PROOFS OF SERVICE
PAGE _____ 28

1

## PROOF OF SERVICE

2      I am employed in the County of Los Angeles, State of California.  I am over
3  the age of eighteen years and not a party to the within action.  My business address
   is Apex Attorney Services, 1055 West Seventh Street, Suite 250, Los Angeles, CA
4  90017.

5      On January 23, 2008, I served true copies of the following document(s)
   described as **NOTICE OF MOTION AND MOTION OF PLAINTIFF**
6  **MATTEL, INC. FOR ORDER FINDING WAIVER AND TO COMPEL**
   **PRODUCTION OF DOCUMENTS WITHHELD AS PRIVILEGED; AND**
7  **MEMORANDUM OF POINTS AND AUTHORITIES**
   on the parties in this action as follows:

8  Thomas J. Nolan, Esq.                    Mark E. Overland, Esq.
   Skadden, Arps, Slate, Meagher & Flom     David C. Scheper, Esq.
9  LLP                                      Alexander H. Cote, Esq.
   300 So. Grand Ave.                       Overland, Borenstein, Scheper &
10 Suite 3400                                 & Kim, LLP
   Los Angeles CA  90071                    300 S. Grand Avenue, Suite 2750
11                                          Los Angeles, CA  90071

12

13 **BY PERSONAL SERVICE:**  I delivered such envelope(s) by hand to the office of
   the person(s) being served.
14
       I declare that I am employed in the office of a member of the bar of this Court
15 at whose direction the service was made.

16     Executed on January 23, 2008, at Los Angeles, California.

17

18  _____

19

20

21

22

23

24

25

26

27

28

07209/2190147.1

EXHIBIT _____ 1

PAGE _____ **PROOFS OF SERVICE** 29

**Exhibit 2**

**FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

**Exhibit 3**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES – GENERAL

Case No.    CV 04-09049 SGL(RNBx)                           Date: April 25, 2008
Title:      CARTER BRYANT -v- MATTEL, INC.

Consolidated With Related Actions:
CASE NO. CV 04-09059 SGL(RNBx): MATTEL, INC., v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
============================================================================

PRESENT: HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes
        Courtroom Deputy Clerk

ATTORNEYS PRESENT FOR CARTER BRYANT:        ATTORNEYS PRESENT FOR MATTEL:

None Present                                 None Present

ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN:

None Present

PROCEEDINGS:    ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING IN
                PART THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT
                (IN CHAMBERS)

        This matter is before the Court on the parties' motions for partial summary judgment. The
motions were heard on April 22, 2008, and the Court has set the motions for further hearing on
May 19, 2008, at 1:30 p.m. As set forth below, the Court rules on a number of issues presented
by the motions for partial summary judgment and reserves ruling on other issues until after further
hearing on the motions for partial summary judgment and, in the case of MGA's affirmative
defenses, until after the Phase 1 trial.

        The parties have made hundreds of objections to evidence offered in support of and in
opposition to the motions for partial summary judgment. Although counsel for Bryant requested

MINUTES FORM 90                                             Initials of Deputy Clerk: jh
CIVIL – GEN                        Page 1

EXHIBIT____3____

PAGE____48____

explicit rulings on the objections raised by Bryant, the Court declines to do so. To the extent that this Order necessarily relies on evidence subject to any party's objections, the objections are implicitly overruled.

## PREEMPTION

MGA and Bryant seek summary judgment in their favor as to Mattel's claims for intentional interference with contractual relations, conversion, and unfair competition, arguing that these claims are preempted by the Copyright Act. They are partially correct.

A state law is preempted by the Copyright Act where (1) the work at issue comes within the subject matter of copyright, and (2) the state law rights are "equivalent to rights within the general scope of copyright[.]" Del Madera Properties v. Rhodes and Gardner, Inc., 820 F.2d 973, 977 (9th Cir.1987). "If a state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act." Altera Corp. v. Clear Logic, Inc., 424 F.3d 1079, 1089 (9th Cir. 2005). Generally the Copyright Act does not preempt the enforcement of contractual rights. Id.

As to the first element, the intentional interference with contractual relations claim addresses generally an issue within the subject matter of copyright -- the underlying wrong upon which the claim is premised is Mattel's deprivation of rights to intellectual property.

As to the second element, it is clear that the tort of intentional interference with contractual relations is neither categorically preempted or categorically saved from preemption; rather, the Court must engage in a determination of whether the substance of the tort claim differs qualitatively from the copyright claim at issue. Compare Altera, 424 F.3d at 1089 (holding that a intentional interference claim was not preempted because it was based not on copyrights but on a contractual provision) with Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1144 (9th Cir. 2006) (holding preempted a singer's voice misappropriation claim was not qualitatively different from her copyright claim).

Here, to the extent that the tortious interference is premised upon MGA's alleged interference with any copyrights that Mattel may have under the Inventions Agreement, it is preempted. Such a claim is not qualitatively different from Mattel's copyright claim. However, to the extent that the claim is based on MGA's acts that may be found to have aided and abetted the breach or induced the breach of Bryant's fiduciary duty, the claim is not preempted. That claim is qualitatively different from Mattel's copyright claim.

Therefore, the tortious interference with contractual relations is preempted to the extent that it is based on Mattel's rights to Bratz. It is not preempted as to Mattel's claims for breach of fiduciary duty.

The parties' arguments regarding the conversion claim address two distinct issues: Conversion of ideas and conversion of tangible things. The Court addresses each in turn.

MINUTES FORM 90
CIVIL -- GEN

Page 2

Initials of Deputy Clerk: jh

EXHIBIT _____ 3

PAGE _____ 49

Both sides acknowledge, as this Court certainly agrees, that one cannot copyright an idea. Thus, it would seem, a claim for conversion of ideas is not subject to preemption because it is not "within the subject matter of copyright." Del Madera, 820 F.2d at 977. MGA argues that ideas are not subject to a claim of conversion, to which Mattel responds that such rights in ideas may be created by contract. Mattel relies on Desny v. Wilder, 46 Cal.2d 715, 733 (1956) which, remarkably, so holds. However, that case does not support the proposition that a breach of such rights may be remedied by the tort claim of conversion rather than a breach of contract claim. The law in California regarding the tort of conversion's applicability to ideas remains the same today as in 1956: "The tort of conversion does not apply to ideas." Melchior v. New Line Productions, Inc., 106 Cal.App.4th 779 (2003). Therefore, although this claim is not preempted, it is not actionable as a tort claim. Accordingly, summary judgment in favor of MGA and Bryant is granted as to this particular claim.

Mattel also argues that its conversion claim is not preempted to the extent that it seeks the return of tangible things, most notably the original Bratz drawings. This claim is "within the subject matter of copyright," but the state rights go beyond the rights protected by the Copyright Act by allowing for the return of property.

At oral argument, counsel for MGA argued that Mattel seeks the rights that the drawings represent, not the "paper and ink" of which those drawings are comprised. Mattel disagreed with that interpretation, noting that it seeks the return of the original drawings and certain sculpts to which it may have rights under the Inventions Agreement.

The items to which Mattel lays claim are not like the manuscript at issue in Dielsi v. Falk, 916 F.Supp. 985, 992 (C.D. Cal. 1996), or the government documents at issue in Idema v. Dreamworks, Inc., 162 F.Supp.2d 1129, 1192-93 (C.D. Cal. 2001), both of which had value merely for their ability to hold and convey their contents. Rather, the materials Mattel seeks are works of art that may have value apart from the copyrights they represent or the "paper and ink" and other materials of which they are comprised. Given the role of the drawings and sculpts in developing a new, commercially successful line of fashion dolls, and given the role of these items in the present litigation, the Court discerns a possible inherent value to the materials themselves.

MGA and Bryant also pressed at oral argument that Mattel had not advanced such a claim for return of tangible items. The Court disagrees. Citing to its Complaint at ¶ 157, Mattel contends it has long sought the return of tangible items.[1] An examination of Mattel's claim for conversion reveals that it encompasses such a claim. Therefore, the conversion claim seeking the return of tangible items is not preempted. MGA and Bryant's motions for summary judgment on this issue are therefore denied.

To the extent that Mattel's statutory unfair competition claim, discussed more fully below, is

---

[1]   From a review of the record, it is clear to the Court that Mattel intended to cite ¶ 157 of its Amended Answer and Counterclaims, not its Complaint.

Page 3

Initials of Deputy Clerk: jh

EXHIBIT____3____

PAGE____SO____

based on copyright infringement, it is preempted, and the Court grants summary judgment in favor of MGA on this issue.

## STATUTE OF LIMITATIONS

The Court heard argument at length on the statute of limitations issue. Although it is not entirely clear, it appears to the Court from the hearing and from MGA's Rule 56(f) affidavit, that there remain outstanding discovery matters that may have the potential, if resolved in MGA's favor, to factor into the inquiry into the determination of the date of the accrual of any claims against Bryant and/or MGA. Accordingly, the Court defers ruling on the issue of statute of limitations at this time.

## INVENTIONS AGREEMENT

The Court addressed many issues of the enforceability of the Employee Confidentiality and Inventions Agreement in its July 17, 2006, Order. The Court finds no good reason to revisit or revise that Order.

Bryant argues that the Inventions Agreement is ambiguous on the issue of whether it covered anything other than "inventions" as that term is used in patent law. Here, Bryant was a fashion designer. He signed an agreement that assigned his "inventions" to Mattel. "Inventions" is defined by the agreement to include "designs," which was undeniably the focus of Bryant's employment with Mattel. In addition to assigning all rights to Bryant's "inventions" (i.e., "designs") to Mattel, the agreement also assigned to Mattel "all [Bryant's] right, title, and interest in any . . . copyrights . . . and copyright applications based [on those inventions]".

In order to conclude that the Inventions Agreement is ambiguous on the issue of whether it would include any copyrightable drawings or doll designs developed by an employee, the Court would have to read out of the agreement explicit terms assigning to the employer the rights to "designs," "copyrights," and "copyright applications." The Court is required to read the contract as a whole and, where possible, give effect to all its terms. Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). To accept the interpretation advanced by Bryant, the Court would have to disregard this bedrock principle of contract construction by ignoring an explicit assignment by the employee to the employer of copyrights. The interpretation advanced by Bryant is therefore not reasonable, and the Court finds that the Inventions Agreement is not ambiguous on the issue of its scope with respect to copyrightable materials.

The Inventions Agreement explicitly conveys to Mattel an employee's interest in any copyrights or copyright applications. Assuming copyrightability and the resolution of certain (as yet unresolved) issues of timing of creation and/or alteration in Mattel's favor, the original Bratz drawings clearly fall within the scope of the Inventions Agreement.

Moreover, the Inventions Agreement incorporates, and therefore does not violate, Cal.

MINUTES FORM 90
CIVIL -- GEN

Page 4

Initials of Deputy Clerk: jh

EXHIBIT ___3___

PAGE ___51___

Labor Code § 2870. Pursuant to that statute (and its incorporation in the Inventions Agreement),
because the subject matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing
fashion dolls, the factual question of whether Bryant worked on them on his own time, rather
during his working hours at Mattel, is not relevant.

MGA argues that contracts of adhesion are unenforceable if they are either outside the
scope of the parties' expectations or they are substantively unconscionable. The Court previously
determined that the Inventions Agreement was not substantively unconscionable, and now
determines that it is not outside the scope of the parties' expectations. As noted above, Bryant
was a designer, and the plain language of the Inventions Agreement assigns his "designs" to his
employer. Objectively, therefore, it would not be surprising that Mattel would lay claim to Bryant's
rights to any doll or doll fashions he designed during the period of his employment with Mattel.
Moreover, undisputed evidence establishes that Bryant's subjective understanding of the contract
was that it transferred at least some of his rights to Mattel.

Bryant also argues that his actions went no further than lawful preparations to compete with
his employer. The undisputed facts, however, tell a different story: Bryant directly competed with
Mattel by entering into a contract with its competitor to produce a competing product while still
employed by Mattel.

The Court grants summary judgment in favor of Mattel on the issue of the enforceability of
the Inventions Agreement and the issue of applicability of the Inventions Agreement to any Bratz-
related "inventions" (including any designs, improvements, ideas, concepts, and copyrightable
subject matter) that he is found to have created during the period of his employment with Mattel.

## DUTY OF LOYALTY AND FIDUCIARY DUTY

Carter Bryant, like all other California employees, owed a duty of loyalty to Mattel while
employed there. See Cal. Labor Code § 2863. The undisputed facts establish that he breached
this duty by entering into a contract with Mattel's competitor, while still employed by Mattel, to
produce a line of fashion dolls to be marketed in direct competition with Mattel's products. See
Huong Que, Inc. v. Luu, 150 Cal.App.4th 400, 414 (2007) ("The duty of loyalty is breached, and
the breach may give rise to a cause of action in the employer, when the employee takes action
which is inimical to the best interests of the employer.") (internal quotation marks and citation
omitted).

Bryant also owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of
the Inventions Agreement. Id. ("The value of the Proprietary Information depends on it remaining
confidential. The Company depends on me to maintain that confidentiality, and I accept that
position of trust."). Under California law, a confidential relationship that gives rise to a fiduciary
duty is created "where a confidence is reposed by one person in the integrity of another, and . . .
the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the
confidence . . . ." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d
1048, 1050-51 (N.D. Cal. 2002). The Inventions Agreement imposed such a duty on Bryant.

EXHIBIT _____3_____

PAGE _____52_____

At the hearing on this matter, counsel contended that a required element for imposing a
fiduciary duty -- that the party with the duty be in a superior position to the party to whom the duty
is owed -- was missing.  That element is described as follows: "[T]he essence of a fiduciary or
confidential relationship is that the parties do not deal on equal terms, because the person in
whom trust and confidence is reposed and who accepts that trust and confidence is in a superior
position to exert unique influence over the dependent party." City Solutions, Inc. v. Clear Channel
Communications, Inc., 201 F.Supp.2d 1048, 1050 (N.D. Cal. 2002) (internal quotation marks and
citation omitted).  The "superior position" to which California courts refer in this context is not
superior bargaining power -- a position on which Mattel would apparently have the edge -- but
rather it refers to a superior position vis-à-vis the duty imposed.  Here, because the duty imposed
upon Bryant was essentially to police his own actions by maintaining Mattel's confidentiality and
communicating his own "inventions" to Mattel, Bryant was "in a superior position to exert unique
influence over" Mattel because he was in the best position, arguably the only one in a position, to
know of and police his actions.

As with the duty of loyalty, the undisputed facts establish that Bryant breached his fiduciary
duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into
a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion
dolls to be marketed in direct competition with Mattel's products.

Accordingly, the Court grants Mattel's motion for summary judgment on the issues of the
existence and breach of the duty of loyalty.  The Court grants Mattel's motion for summary
judgment and denies Bryant's motion for summary judgment on the issue of the existence and
breach of a fiduciary duty.

In its motion, MGA argued that there can be no liability for aiding and abetting a breach of
fiduciary duty in the absence of a fiduciary duty.  Because the Court has rejected this argument,
the Court denies MGA's motion for summary judgment on this issue.

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

MGA moved for summary judgment as to Mattel's claim for intentional interference with
contractual relations.

The elements of a claim for intentional interference with contractual relations are stated as
(1) a valid contract between a plaintiff and a third party; (2) the defendant's knowledge of the
contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the
contractual relationship; (4) actual breach or disruption of the contractual relationship; and
(5) resulting damage.  Family Home & Finance Center, Inc. v. Federal Home Loan Mortg. Corp.,
461 F.Supp.2d 1188, 1193 (C.D. Cal. 2006) (citing Pac. Gas & Elec. Co. v. Bear Stearns Co., 50
Cal.3d 1118, 1126 (1990)).

The undisputed facts show that the first, third, and fifth elements are met.  Mattel has
raised a triable issue of fact as to the second.  The fourth element may be resolved after the

MINUTES FORM 90                                              Initials of Deputy Clerk: jh
CIVIL -- GEN                            Page 6

EXHIBIT ___3___

PAGE ___53___

Court's further hearing on the motions for partial summary judgment. The Court therefore defers ruling on this issue.

## UNFAIR COMPETITION

MGA and Bryant's motions are granted in part and denied in part as to Mattel's unfair competition claims.

Mattel's statutory unfair competition claim, brought pursuant to Cal. Bus. & Profs. Code § 17200, survives summary judgment because Mattel has raised a triable issue of fact as to whether MGA tortiously interfered with Bryant and Mattel's contractual relationship and whether MGA engaged in commercial bribery.

However, two bases for this claim are foreclosed at this time. To the extent that the § 17200 claim is based on copyright infringement, it is preempted. To the extent that it is based on unfair conduct, summary judgment in favor of MGA is granted because the articulated unfair conduct does not approximate an antitrust violation that threatens competition. See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 186-87 (1999).

As to Mattel's common law unfair competition claim, summary judgment in favor of MGA and Bryant is granted. This claim is not, as it must be, based on the act of passing off another's goods as one's own. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1153 (9th Cir. 2008) (citing Bank of the W. v. Superior Court, 2 Cal.4th 1254 (1992)).

## UNJUST ENRICHMENT

Because Mattel failed to oppose this portion of Bryant's motion, the Court grants Bryant's motion for partial summary judgment on the issue of unjust enrichment.

## AFFIRMATIVE DEFENSES

Mattel seeks summary judgment as to many of the affirmative defenses asserted by the MGA entities and Carter Bryant. Most of these defenses are essentially equitable in nature, and therefore the Court **DEFERS RULING** on them until after trial. Specifically, the Court **DEFERS RULING** on the affirmative defenses of abandonment, acts and omissions of others, acquiescence, consent, estoppel, failure to mitigate, laches, unclean hands, and waiver until after trial.

For the reason set forth above in a separate section, the Court defers ruling on Mattel's motion as to the statute of limitations defense.

The final affirmative defense is based on 17 U.S.C. § 205(d). With this affirmative defense, MGA essentially contends that it is a bona fide purchaser for value of the Bratz copyrights which

MINUTES FORM 90
CIVIL – GEN                                    Page 7

Initials of Deputy Clerk: jh

EXHIBIT _____ 3 _____

PAGE _____ 54 _____

Case 2:04-cv-09049-SGL-RNB    Document 3286    Filed 04/25/2008    Page 9 of 11

took the rights in good faith and without notice of any prior transfer of the rights therein to Mattel.
As the issue is argued by the parties, the Court would be required to determine the legal issue of
whether MGA's registration of the copyrights as an "assignment" constitutes "constructive notice"
in the manner required to give MGA the protection of 17 U.S.C. § 205(d). In the Court's view, this
is a complex legal issue that is not thoroughly addressed by the parties' briefs. Moreover, the
Court notes that a trial on the merits is likely to resolve the less complex factual issue of whether
MGA acted in good faith and without notice of an earlier assignment of rights. Accordingly, the
Court **DEFERS RULING** on this issue until after the Phase 1 trial.

* * * *

The Court will consider a number of remaining issues at the further hearing on these
motions, set for May 19, 2008. Specifically, referencing the parties' Notices of Motion, the Court
will consider the following issues:

Mattel's motion: Issue (2)(c), whether there is a factual dispute regarding the timing of
certain drawings and a dummy model; issue (3), whether the first-generation Bratz dolls are
substantially similar to seventeen drawings and a doll sculpt drawing or blueprint created by
Bryant and whether those are original, protectable works of expression; issue (5), whether MGA
and Larian are liable for aiding and abetting Bryant's breaches of the duty of loyalty and fiduciary
duty; and issue (6)(a) whether Mattel is entitled to summary judgment as to the affirmative
defense of statute of limitations.

Bryant's motion: Whether Bryant is entitled to summary judgment as to Mattel's claim for
copyright infringement; whether Bryant is entitled to summary judgment as to Mattel's breach of
contract claim; and whether Bryant is entitled to summary judgment on any portion of his claim for
declaratory relief.

MGA's motion: Whether Mattel's claims are time barred; and whether the fourth element of
intentional interference with contractual relations -- actual breach or disruption of the contractual
relationship -- can be resolved on summary judgment.

Except for any updates from any party regarding the outstanding discovery matters that
may be relevant to the statute of limitations, these issues are considered by the Court to be fully
briefed. Any supplemental briefs by the parties on any issue other than the statute of limitations
will be stricken by the Court. Any supplemental filings regarding the statute of limitations issue
shall be limited to addressing the status of outstanding discovery issues and/or recently produced
evidence.

**IT IS SO ORDERED.**

MINUTES FORM 90                                    Initials of Deputy Clerk: jh
CIVIL – GEN                          Page 8

EXHIBIT _____ 3 _____

PAGE _____ 55 _____

Case 2:04-cv-09049-SGL-RNB    Document 3286    Filed 04/25/2008    Page 10 of 11

## NOTICE PARTY SERVICE LIST

**Case No.**  CV 04-09049 SGL(RNBx)    **Case Title**  Carter Bryant v. Mattel, Inc.

**Title of Document**  Minute Order of April 25, 2008

| | |
|---|---|
| Atty Stlmnt Officer Panel Coordinator | |
| BAP (Bankruptcy Appellate Panel) | |
| Beck, Michael J (Clerk, MDL Panel) | |
| BOP (Bureau of Prisons) | |
| CA St Pub Defender (Calif. State PD) | |
| CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) | |
| Case Asgmt Admin (Case Assignment Administrator) | |
| Catterson, Cathy (9th Circuit Court of Appeal) | |
| Chief Deputy Admin | |
| Chief Deputy Ops | |
| Clerk of Court | |
| Death Penalty H/C (Law Clerks) | |
| Dep In Chg E Div | |
| Dep In Chg So Div | |
| Federal Public Defender | |
| Fiscal Section | |
| Intake Section, Criminal LA | |
| Intake Section, Criminal SA | |
| Intake Supervisor, Civil | |
| PIA Clerk - Los Angeles (PIALA) | |
| PIA Clerk - Riverside (PIAED) | |
| PIA Clerk - Santa Ana (PIASA) | |
| PSA - Los Angeles (PSALA) | |
| PSA - Riverside (PSAED) | |
| PSA - Santa Ana (PSASA) | |
| Schnack, Randall (CJA Supervising Attorney) | |
| Statistics Clerk | |

| | |
|---|---|
| US Attorneys Office - Civil Division -L.A. | |
| US Attorneys Office - Civil Division - S.A. | |
| US Attorneys Office - Criminal Division -L.A. | |
| US Attorneys Office - Criminal Division -S.A. | |
| US Bankruptcy Court | |
| US Marshal Service - Los Angeles (USMLA) | |
| US Marshal Service - Riverside (USMED) | |
| US Marshal Service -Santa Ana (USMSA) | |
| US Probation Office (USPO) | |
| US Trustee's Office | |
| Warden, San Quentin State Prison, CA | |

| ✓ | **ADD NEW NOTICE PARTY** (If sending by fax, mailing address must also be provided) |
|---|---|

Name: Ambassador Pierre-Richard Prosper

Firm:

Address *(include suite or floor)*:  P.O. Box 581103

Salt Lake City, UT  84158

*E-mail: Prosper.Pierre@Arentfox.com

*Fax No.:

\* For CIVIL cases only

**JUDGE / MAGISTRATE JUDGE (list below):**

| | |
|---|---|
| | |
| | |
| | |
| | |

Initials of Deputy Clerk  jh

G-75  (03/07)                    NOTICE PARTY SERVICE LIST

EXHIBIT _____ 3 _____

PAGE _____ 56 _____

## NOTICE PARTY SERVICE LIST

**Case No.**  CV 04-09049 SGL(RNBx)     **Case Title**  Carter Bryant v. Mattel, Inc.

**Title of Document**  Minute Order of April 25, 2008

| |
|---|
| Atty Stlmnt Officer Panel Coordinator |
| BAP (Bankruptcy Appellate Panel) |
| Beck, Michael J (Clerk, MDL Panel) |
| BOP (Bureau of Prisons) |
| CA St Pub Defender (Calif. State PD) |
| CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| Case Asgmt Admin (Case Assignment Administrator) |
| Catterson, Cathy (9th Circuit Court of Appeal) |
| Chief Deputy Admin |
| Chief Deputy Ops |
| Clerk of Court |
| Death Penalty H/C (Law Clerks) |
| Dep In Chg E Div |
| Dep In Chg So Div |
| Federal Public Defender |
| Fiscal Section |
| Intake Section, Criminal LA |
| Intake Section, Criminal SA |
| Intake Supervisor, Civil |
| PIA Clerk - Los Angeles (PIALA) |
| PIA Clerk - Riverside (PIAED) |
| PIA Clerk - Santa Ana (PIASA) |
| PSA - Los Angeles (PSALA) |
| PSA - Riverside (PSAED) |
| PSA - Santa Ana (PSASA) |
| Schnack, Randall (CJA Supervising Attorney) |
| Statistics Clerk |

| |
|---|
| US Attorneys Office - Civil Division -L.A. |
| US Attorneys Office - Civil Division - S.A. |
| US Attorneys Office - Criminal Division -L.A. |
| US Attorneys Office - Criminal Division -S.A. |
| US Bankruptcy Court |
| US Marshal Service - Los Angeles (USMLA) |
| US Marshal Service - Riverside (USMED) |
| US Marshal Service -Santa Ana (USMSA) |
| US Probation Office (USPO) |
| US Trustee's Office |
| Warden, San Quentin State Prison, CA |

| ✓ | **ADD NEW NOTICE PARTY**<br>(if sending by fax, mailing address must also be provided) |
|---|---|

Name:  Hon. Edward A. Infante (Ret.)

Firm:

Address *(include suite or floor)*:  Two Embarcadero
Center, Suite 1500, San Francisco, CA  94111

*E-mail:

*Fax No.:

\* For CIVIL cases only

| *JUDGE / MAGISTRATE JUDGE (list below):* |
|---|
| |
| |
| |

Initials of Deputy Clerk  jh

G-75  (03/07)                     NOTICE PARTY SERVICE LIST

EXHIBIT ___3___

PAGE ___57___

Case 2:04-cv-09049-SGL-RNB     Document 3286     Filed 04/25/2008     Page 1 of 11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CARTER BRYANT, | CASE NUMBER |
| | CV 04-09049 SGL (RNBx) |
| PLAINTIFF(S), | |
| v. | |
| MATTEL, INC., et al., | NOTICE OF CLERICAL ERROR |
| DEFENDANT(S), | |

TO:     U. S. District Judge(s)
        U. S. Magistrate Judge(s)
        Counsel of Record

You are hereby notified that due to a clerical error ☐ documents associated with the filing of the new action ☐ the following scanned document ☑ docket entry  have/has been corrected as indicated below.

Title of Scanned Document:  Minute Order of 4-25-08, Granting in part, Denying in part, and Deferring in Part the Parties' MSJ

Filed Date: 4-25-08 _____     Document Number: 3285

☐   Incorrect case number _____ was assigned to this ☐ action ☐ document.

☐   Case number has been corrected. The correct case number is _____

☐   Incorrect judge's initials were indicated on this ☐ action ☐ document. The correct judge's initials are _____

☐   Incorrect magistrate judge's initials were indicated on this ☐ action ☐ document. The correct magistrate judge's initials are _____

☐   Case has been reassigned from ☐ Judge ☐ Magistrate Judge _____ to

        ☐ Judge ☐ Magistrate Judge _____. The initials of the new judge(s) are _____

☐   Case was assigned to ☐ Western ☐ Southern ☐ Eastern division. Pursuant to General Order ☐ 349, ☐ 98-3 ☐ 02-06,

        the case has been reassigned to the ☐ Western ☐ Southern ☐ Eastern division. The former case number _____
        has been reassigned to new case number _____

☐   Subsequent documents must be filed at the ☐ Western ☐ Southern ☐ Eastern division. Failure to file at the proper location
        will result in your documents being returned to you.

☐   Case title is corrected from _____ to _____

☐   Document has been re-numbered as document number _____

☐   Incorrect ☐ Filed Date ☐ Date of Document ☐ ENTERED Date ☐ DATE ENTERED ON CM/ICMS was stamped on
        document. The correct date is _____

☑   Document is missing page number(s):  7 and 8

☐   To ensure proper routing of documents, all documents filed with the court must reflect the following case number and judge's
        initials: _____

☑   Other: a complete copy with missing pages are re-scanned for service on the parties.

CLERK, U.S. DISTRICT COURT

Date 4-25-08 _____          By: _____ Jim Holmes, CRD
                                                        Deputy Clerk
cc: Intake Supervisor / Deputy In Charge

G-11 (06/05)                              NOTICE OF CLERICAL ERROR

EXHIBIT_____3_____

PAGE_____58_____

**Exhibit 4**

**FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

**Exhibit 5**

**FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

**Exhibit 6**

**FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

**Exhibit 7**

# FILED UNDER SEAL
# PURSUANT TO PROTECTIVE ORDER

Exhibit 8

**FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**Exhibit 9**

**FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**Exhibit 10**

**FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

**Exhibit 11**

**FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

**Exhibit 12**

# FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

**Exhibit 13**

# FILED UNDER SEAL
# PURSUANT TO PROTECTIVE ORDER

**Exhibit 14**

**FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

**Exhibit 15**

**FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**Exhibit 16**

# ANNUAL RETIREMENT GUIDE

The McGraw-Hill companies

# BusinessWeek

JULY 28, 2003                    www.businessweek.com

## STOCK VS. OPTIONS
**THE NEW EXEC COMP GAME**

## STRATEGIES
▶YAHOO!
▶GENERAL MILLS
▶MATTEL

## GE
MEET CHARLENE BEGLEY, A RISING STAR

## INVESTING
HOW OUR WALL STREET COLUMN PERFORMED

# CITI'S NEXT ACT



**CHUCK PRINCE,** Sandy Weill's top troubleshooter, is the unlikely choice to become CEO. Does he have the right stuff to lead the world's most important bank? PAGE 30

HBX88C0D ****CR LOT 0016A*C033
HJLZ121G091 0H300116        BX003676
Illiluidluuulldludlulidllluulluuluuhdlid
                      071994
              MAR 22 04   0975
                       T099
GARY JOLICOPUR
2121 OATES AVE 8
REDONDO BEACH  CA  90278-2007

EXHIBIT ___16___

PAGE ___260___



M 0074054

631.1

stead, regular uniform fabric may sport nano-size umbrellas that open to seal the cloth's pores, making it impervious to airborne chemicals and pathogens.

In both cases, a key objective is to take a load off soldiers' backs. Today, they lug 60 pounds or more into battle, depending upon which weapon they carry, and the so-called marching load is almost twice as heavy. In five years, the Army wants to trim the combat load to 40 pounds, and then to 15 pounds with the Future Warrior outfit. MIT's Vest predicts that armored vests, which weigh 28 pounds now, will end up "at around eight pounds, maybe even five."

Artificial muscles that could enable soldiers to leap tall walls, if not buildings, are in the works, too. One candidate is made from polypyrrole. It flexes when jolted by electricity, then relaxes when the juice is turned off. So far, though, its reactions are much too slow.

Even with the best armor, wounds are inevitable. So when a soldier is hit in an arm or leg, special fibers in the uniform would constrict into a tourniquet. This will be a real life-saver, because half of all battlefield deaths are due to massive blood loss before wounded soldiers can be treated. In addition, sensors would provide the soldier's vital signs and location to medics via radio. Until the Future Warrior garment is ready, soldiers will wear an adhesive chest patch fitted with sensors and a tiny radio. It's being developed by MIT partner CIMIT (Center for Integration of Medicine & Innovative Technology) in Cambridge, Mass.

To satisfy its industrial partners and avoid chewing up money needlessly, the new institute will be "run on a business model, with regular milestone reviews," says Edwin L. "Ned" Thomas, the MIT materials-science professor tapped as its head. It will have a staff of 40 MIT scientists from eight departments, plus 100-odd graduate students and visiting researchers from the Army and industry.

Thomas admits that some wish-list items may never materialize. But that's okay—the idea is to infuse army research with new thinking. So the Pentagon plans to announce, starting in August, more research centers at other universities, focused on such areas as biotechnology and detecting landmines. In the same spirit, to supplement its $1.2 billion research effort, the Army will funnel $25 million to small, innovative companies that probably never dreamed of getting a Pentagon contract. The fund's top priority? Finding better ways to generate and store power for the Army's high-tech gadgets. It's easy to see why: A brigade of 1,500 troops goes through 120 tons of batteries a year. And that's before they hit their invisibility buttons.

*By Otis Port in Cambridge, Mass.*

## The Corporation

### COMMENTARY
### By Christopher Palmeri

# TO REALLY BE A PLAYER, MATTEL NEEDS HOTTER TOYS

The Bratz pack has invaded the Garfield home. The like of trendy dolls burst onto the scene two years ago, offering girls a hipper alternative to the old standby Barbie. Think Jennifer Lopez to Barbie's Reese Witherspoon. Joan Gabriel, a Hollywood mom, a mother of two, now has eight Bratz dolls in her home. Her daughters, ages 6 and 8, rarely touch their Barbies. "Barbie is pretty much a thing of the past," she says. "They like Bratz better."

That's bad news for Barbie's maker, Mattel Inc.—and the three-year-old turnaround efforts of CEO Robert A. Eckert, the ex-president of Kraft Foods Inc. who replaced the embattled Jill E. Barad. The El Segundo (Calif.) toy giant counts on Barbie for about one-third of its revenues and more of its profits. But Mattel says U.S. Barbie sales declined 2% last year and 14% in this year's first quarter. The overall doll category, says market researcher NPD Group Inc., dropped only 3% in the quarter.

Give Eckert, 48, his due. He pulled Mattel out of its tailspin after its disastrous $3.3 billion acquisition of Learning Co. He got rid of the money-losing computer-game maker and slashed costs. His goal: to bring the stability of a consumer-products company to the hit-driven toymaker. And using such practices as computer-aided design to speed up product development and just-in-time inventory management, he succeeded.

But now it looks like Eckert is learning a valuable lesson: Mattel is selling toys, not soap or cornflakes. Good brand management goes only so far in a business that caters to children's whims. Like it or not, the key to success is launching innovative products and promoting the heck out of them. If you don't do it, your competitors will.

Eckert's strategy has been great for Mattel's bottom line. Profits last year, before special charges, were a healthy $456 million, and the stock has nearly doubled, to $20, since Eckert arrived in May, 2000. But top-line growth has sputtered. U.S. revenues, $3.4 billion in 2002, have declined marginally in the past few years. Total 2002 sales of $4.9 bil-

lion crept up from $4.6 billion in 2000—thanks to overseas expansion.

While Eckert continues to build on the massive Barbie franchise that Barad constructed, he now knows that he needs hot new toys. Recycling old characters like Sesame Street's Elmo just won't be enough. "We need to do a better job on the top line," he says. "The good news is it's a only spring training, and we have a long season ahead of us."

To that end, Eckert has begun an ambitious push. Between now and Christmas, he hopes to launch 250 new toys, including dozens of Hot Wheels models and Flavas, a Bratz-like hip-hop posse with baggy jeans and serious bling-bling. Originally, half of these toys weren't scheduled until 2004.



**FIRST CAME BRATZ...**

| | |
|---|---|
| MAKER | MGA Entertainment |
| DEBUT | 2001 |
| NAMES | Yasmin, Sasha, Cloe, Jade, and Meygan |
| MOTTO | The girls with a passion for fashion |
| HER RIDE | Late-night stretch limo |

M 0074055

EXHIBIT ___16___

PAGE ___261___

631.2

That should help boost sales. But it's even more important that Mattel prove it can respond to nimble upstarts as well as traditional big rivals like Hasbro Inc. After all, it took the company more than a year to launch a competitor to MGA Entertainment's Bratz. My Scene Barbie didn't hit stores until last October and has yet to make a dent in Bratz's success. At its Santa Monica (Calif.) store recently, Toy 'R' Us Inc. devoted just a sliver of the shelf space to My Scene that it did to Bratz. And My Scene dolls were being offered at 2 for 1. "It's not really catching ground," says Sean P. McGowan, toy industry analyst at Harris Nesbitt Gerard Inc.

Barbie will start tossing in a cell phone with .300 free minutes if you buy four of the $13.99 dolls. It also plans to add accessories and boy versions—Hudson, River, and Bryant.

Barbie isn't the only Mattel stalwart under attack. Its Fisher-Price unit, long the king of preschool, is losing sales to newcomer LeapFrog Enterprises Inc., whose electronic interactive books have captured 19% of the $2.9 billion preschool toy and electronic-learning aid markets. Eckert is counting on a successful launch in August for Power-Touch, Mattel's version of LeapFrog's popular interactive book. PowerTouch is operated by pointing a finger at an image or a word, instead of the stylus used in LeapFrog's original products. That's key for younger kids. "It's much easier for her to use," says Christopher Coye, a Los Angeles-area parent whose 4-year-old tested a PowerTouch. Still, LeapFrog releases a finger-operated system in August, too.

Over the long term, Eckert puts at risk one of the strongest toy companies around if he can't instill innovation and rapid reaction in his much-tightened organization. To his credit, he is making it crystal clear that he doesn't want ideas to linger in the pipeline. When Matchbox brand managers mentioned this year that they had designed a toy firehouse that could be shipped with no assembly required, Eckert told them to get it out by fall. "Why wait?" he says. "If you've got it, sell it." And not a moment too soon: Sales of Mattel's Hot Wheels and Matchbox cars fell 6% in the first quarter, thanks to competition for boys' attention from action figures like Hasbro's resurgent G.I. Joe and Transformers.

The question is how much Eckert needs to tweak his model. He probably cut back too much, for instance, on marketing. In 1998, Mattel's advertising and promotional spending totaled $631 million, or 18.3% of sales. By last year, it had fallen to $552 million, or 11.2% of sales. Aggressive television marketing boosted sales of Hot Wheels cars in Spain last year, and a strong new campaign could help Mattel toys here.

Mattel won't live or die on every new toy it develops. But it can't just rely on Barbie, either. "Like they say, in business school—no risk, no reward," says Isaac Larian, CEO of privately held MGA. He should know: He got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers. As Eckert is finding out, sometimes the best ideas are right in front of you.

By Christopher Palmeri in Los Angeles

**THEN, MY SCENE BARBIE**

| | |
|---|---|
| **MAKER** | Mattel |
| **DEBUT** | 2002 |
| **NAMES** | Barbie, Madison, Chelsea, and Nolee |
| **MOTTO** | My city. My style. My scene. |
| **HER RIDE** | Vespa motorscooter |

Data: MGA Entertainment, Mattel

# BusinessWeek

## Manage your account online

Now you can manage your subscription through the Internet. You may change your delivery address, check your account status, renew your subscription, pay your invoice, report a missing or damaged copy, or suspend delivery of your magazine through our Customer Service site. You may go directly to www.businessweek.com/service.htm or follow these simple steps:

1. Go to www.businessweek.com.

2. Scroll down the left side listings until you reach the "Customer Service" link.

3. Click on the "Customer Service" link.

4. Scroll down below and click on US/Canadian subscribers link.

NOTE: You will ▮▮▮▮▮▮▮▮▮▮ number, which appears on the label of your magazine.

For individual subscriptions, changes, or inquiries:
Phone: (800) 635-1200
Email: bwcustomerservice@neodata.com

**Education Department**
Phone: (800) 843-7352
Fax: (800) 876-9416
Email: bw_group@businessweek.com
Web Site:
www.resourcecenter.businessweek.com

M 0074056

EXHIBIT     16

PAGE     262

631.3

**Exhibit 17**

Immigrant's Creative Company Shakes Up Toy Industry

By JEFF WEISS; Contributing Reporter
1,099 words
29 March 2004
San Fernando Valley Business Journal
English
2004 San Fernando Valley Business Journal.  All rights reserved.

Large Business Award - MGA Entertainment, North Hills

Only 16 years old, with a mere $750 in his pocket, and with parents across the globe in Iran, Isaac Larian never expected to eventually be the founder of one of the fastest growing toy companies in the world.

Initially undecided whether to emigrate to the United States or to Israel, Larian opted to pursue the American dream. The Business Journal's recipient of the family business Best Large Company award, MGA Entertainment, is the end product of Larian's hard work, determination, and foresight in capitalizing upon opportunity.

Yet before becoming a toy mogul, Larian set out to forge a career in the civil engineering industry before realizing his true talents lay elsewhere.

"I came here to get a civil engineering degree because I thought I'd be a civil engineer and go back to Iran and build infrastructure," Larian said. "I graduated in 1978 from Cal State Los Angeles but I never worked as an engineer. Shortly after graduating, the (Iranian) revolution broke out and I discovered that engineering wasn't for me. I was more of an entrepreneur."

The following year Larian and his brother Farhad founded MGA as a consumer electronics company. Their first foray into the toy industry didn't come until 1987 when Isaac saw the opportunity to manufacture Nintendo's hand-held electronic games.

"I'm an entrepreneur and in 1987 I saw an opportunity to become the distributor for Nintendo's hand-held games. I just saw opportunity. Most entrepreneurs do that," Larian said.

After two years in the hand-held video game industry, MGA left the toy game and returned to consumer

 © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.



EXHIBIT   17

PAGE   263

electronics. Returning in 1993 to produce Mighty Morphin Power Rangers accessories, MGA never left the toy industry, having its first breakthrough item with 1997's wildly successful Singing Bouncing Baby Doll.

"Singing Bouncing Baby was our first doll and it was a huge hit," Larian said. "We ended up winning Family Fun Toy of the Year which is the Oscars of the toy industry. We ended up doing in excess of a million pieces," said Larian.

Introducing Bratz

But MGA's greatest success came later, with the introduction of 2001's Bratz dolls. Against all odds, Larian pioneered a line of dolls able to undercut the success of Barbie, the only company to do so since Barbie's 1959 debut.

However, the modest Larian is quick to acknowledge others for contributing to the company's success. A close knit family, Larian's sister, Shirin Makabi, is the company's director of travel and expenses. Shirin's husband, Eli Makabi, is MGA's vice-president in charge of traffic in sales. In addition, the Makabis co-own the business with Larian. But Larian family involvement does not stop there; Larian's children have played a crucial role in MGA's development.

"My oldest son, 17-year-old Jason, is very creative and a music writer. He has come up with some of our popular toys," Larian said. "He came up with Commandobot—a robot that was the first ever robot toy to work on voice recognition. It was a fantastic seller that was featured in Wired magazine. It was Jason's idea for Bratz."

Larian's other children have also been key to product development.

"Yasmin, my 15-year-old daughter, is involved in the business as well. She's particularly interested in fashion and focus groups. One of the Bratz is named after her," Larian said. "My 10-year-old son, Cameron, is also the namesake for one of the boy Bratz. Cameron comes up with different product ideas. One of our best ideas was a winter wonderland Bratz line. We were on a family ski vacation and he said 'Dad, you should do a Bratz winter break.' So we did it and it sold wonderfully."

Thanking the employees

Larian also credits the company's 430 employees for much of MGA's success.

"Our success is due to the passion of the people we have working for us. Each one has contributed to our success because they are passionate about the company and winning."

Page 250      © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT ___17___

PAGE ___264___

With business booming, a Bratz licensing deal with 20th Century Fox has been inked. A Bratz DVD and a Bratz feature film are soon on the way.

"The Bratz are a true phenomenon that has taken the toy/doll industry by storm," Jim Gianopulos, chairman of Fox Filmed Entertainment, said. "They are more than just toys; they reflect the cultural diversity and contemporary style that kids relate to. That kind of success and impact on young people make the company a natural in a major motion picture, and we look forward to turning the Bratz figures into major motion picture stars."

MGA's projected revenue for 2004 is $1 billion and the company has openings for 110 employees in a variety of positions. Although MGA's success is now assured, there were obstacles along the way.

"I noticed some discrimination when I first got into the business world. I think that after living here for 33 years, there is unfortunately discrimination whether you're Jewish, Persian, black or whatever," Larian said. "But it made me stronger to go out and fight. People become resilient and they get angry and they need to turn that anger into positive energy."

Larian has certainly come a great distance from being a teenager with inclinations towards civil engineering and less than a thousand dollars in his pocket. Thanks to MGA, Barbie's pedestal seems a little less secure.

"I'm having a lot of fun and enjoying what I'm doing here right now and I think as long as you have fun at your job, it's a great thing," Larian said. "I believe that in life you have to have passion for what you do and if you lose that passion you shouldn't do it. My vision is for MGA to become a multibillion-dollar entertainment company and specialize in other things besides just toys."

Looking back on the whirlwind rise of MGA, Larian still seems a bit surprised by the amount of success he's encountered.

"My life is proof that dreams come true. You can't give up. They were definitely moments of self-doubt. I just didn't want to fail, I always had that desire to win," Larian said. "We've made history by unseating Barbie and for a small San Fernando Valley company to do that is a miracle."

Document SFVBJ00020041020e03t0003p

Page 231      © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT ___17___

PAGE ___265___

**Exhibit 18**

Matter No. 15904-142

UNITED STATES PATENT APPLICATION

For

## DOLL WITH AESTHETIC CHANGEABLE FOOTGEAR

Inventor:    Isaac Larian

OPPENHEIMER

OPPENHEIMER WOLFF & DONNELLY LLP
2029 Century Park East, Suite 3800
Los Angeles, California 90067
(310) 788-5000
Fax (310) 788-5100

Attorney Matter No. 15904-142

EXHIBIT _____ 18 _____

PAGE _____ 266 _____

LA: 333498 v01 02/13/2003

MGA 0825485

# DOLL WITH AESTHETIC CHANGEABLE FOOTGEAR

## FIELD OF THE INVENTION

[0001] This invention relates to dolls or toy figures with changeable footgear.

## BACKGROUND OF THE INVENTION

[0002] It has previously been proposed to make dolls with shoes, boots or footgear which may be changed, and patents which relate to such arrangements include the following:

[0003]

| | | |
|---|---|---|
| L. Schmetzer | U.S. Pat. No. 187,322 | Granted February 13, 1877 |
| G. Doebrich | U.S. Pat. No. 831,330 | Granted September 18, 1906 |
| F. Steiff | U.S. Pat. No. 898,018 | Granted September 8, 1908 |
| P.H. Young | U.S. Pat. No. 2,175,789 | Granted October 10, 1939 |
| G.H. Calverley | U.S. Pat. No. 2,662,335 | Granted December 15, 1953 |
| S.F. Speers et al. | U.S. Pat. No. 3,475,042 | Granted October 28, 1969 |
| H.J. Solson et al. | U.S. Pat. No. 3,624,960 | Granted December 7, 1971 |
| Goldfarb et al. | U.S. Pat. No. 3,782,027 | Granted January 1, 1974 |
| Port | U.S. Pat. No. 4,030,240 | Granted June 21, 1977 |
| Lambert | U.S. Pat. No. 4,137,115 | Granted January 30, 1979 |
| Rahmstorf | U.S. Pat. No. 4,185,412 | Granted January 29, 1980 |
| Keiji | U.S. Pat. No. 4,643,691 | Granted February 17, 1987 |
| Schiavo et al. | U.S. Pat. No. 4,729,751 | Granted March 8, 1988 |
| Fogarty et al. | U.S. Pat. No. 1,186,673 | Granted February 16, 1993 |
| Larson | U.S. Pat. No. 5,588,895 | Granted December 31, 1996 |
| Kulchyski | U.S. Pat. No. 5,803,787 | Granted September 8, 1998 |
| Toft | U.S. Pat. No. 6,179,685 | Granted January 30, 2001 |
| Asmussen et al. | U.S. Pat. No. 6,203,396 | Granted March 20, 2001 |

[0004] In reviewing these patents, the appearance of the resultant dolls or figures is relatively "clunky" and not aesthetically pleasing.

## SUMMARY OF THE INVENTION

[0005] In accordance with the present invention a more aesthetically pleasing and elegant doll with changeable footgear, includes open work shoes with exposed portions of the feet matching the color and texture of the exposed legs; and straps of the shoes extend around the lower legs at the separation point where the removable foot/shoe assemblies mate with the lower leg. With this configuration, the straps of the shoes conceal the joint between the leg and the foot/shoe assembly, resulting in a more realistic and elegant doll construction.

-1-

EXHIBIT __18__

PAGE __267__          MGA 0825486

[0006]  Additional features which may be included would involve the use of colored shoes and shoe straps which contrast sharply with the exposed skin areas of the foot; and snap-in mechanical arrangements for assembling the shoe/foot assemblies to the legs of the doll.

[0007]  Other objects, features and advantages will become apparent from a consideration of the following detailed description, and from the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0008]  Fig. 1 shows a doll provided with changeable shoes or footgear, illustrating the principles of the invention;

[0009]  Fig. 2 is an enlarged cross-sectional view taken along the plane indicated at 2-2 of Fig. 1; and

[0010]  Figs. 3 – 5 illustrate alternative shoes or foot/shoe assemblies shown mounted on one leg of the doll of Fig. 1.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0011]  While the specification describes particular embodiments of the present invention, those of ordinary skill can devise variations of the present invention without departing from the inventive concepts.

[0012]  Referring more particularly to the drawings, Fig. 1 shows a doll 12 formed of known materials employed for dolls, such as resilient plastic material.  The doll 12 has lower legs 14, 16 and foot and shoe assemblies 18, 20 for mounting on the lower legs 14, 16, respectively.

[0013]  Fig. 2 is an enlarged cross-sectional view taken in the plane indicated at 2 – 2 in Fig. 1.

[0014]  In order to removably secure the shoe and foot assemblies 18, 20 to the legs 14, 16, the leg 14 has an enlarged protuberance 22 which snaps into a recess 24 in the assembly 18; and similarly, as shown in Fig. 2, the leg 16 has an enlarged protuberance 26 which locks into a recess 28 in the shoe and foot assembly 20.

2

**EXHIBIT** 18

**PAGE** 268

MGA 0825487

Matter No. 15904-142

[0015]   It is desirable that the separation points 30 and 32 be concealed or made less noticeable, to provide a more realistic appearance. This is accomplished by providing the shoes with the appearance of a strap 34 on assembly 18, and strap 36 on assembly 20. With the upper edge of the simulated strap enlargements 34, 36 coincident with the separation points 30, 32, the separation points are not conspicuous.

[0016]   This effect is enhanced by the exposed skin areas 42 on assembly 18 and 44 on assembly 20. Further, the color and texture of the lower legs 14, 16 are substantially the same as the color and texture of the exposed feet areas 42 and 44.

[0017]   Figs. 3, 4 and 5 illustrate typical alternative shoe styles which may be employed with the doll 12 of Fig. 1. Thus, a shoe/foot assembly may be selected of a color to match the color of a dress to be worn by the doll, or may be selected for special activities such as beach wear or formal occasions.

[0018]   In Fig. 3 the leg 52, separation point 54, and upper strap 56 on the foot/shoe assembly 58, are shown. In addition, the skin area 60 of the foot/shoe assembly 58 is substantially the same as that of the leg 52.

[0019]   Fig. 4 shows another alternative shoe/foot configuration 64 mounted on the leg 66 at separation point 68. As in the arrangements of Figs. 1 – 3, the simulated strap 70 conceals the separation point 68, and the skin area 72 of the foot matches that of the lower leg 66.

[0020]   Fig. 5 is a similar showing of a shoe/foot assembly 76 mounted on the lower leg 78 of the doll at separation point 80. The simulated strap 82 serves to camouflage the separation point. In Fig. 5 the shoe is shown darkened to emphasize that different colored shoes may be employed, and that it is desirable that the shoe color contrast sharply with the skin color for more effective concealment or camouflaging of the separation point. For specific examples, the shoe colors may be blue, green, red, black or some combination thereof.

[0021]   Return to Fig. 2 of the drawings, it may be noted that the protuberance 26 has a larger cross-sectional configuration than the mouth 27 of the opening 28. Accordingly, with both the doll legs 16, 18 and the foot/shoe assemblies 18 and 20 being of resilient

3

EXHIBIT ___18___

PAGE ___269___                                 MGA 0825488

Matter No. 15904-142

material, the protuberance 26 may be snapped through the mouth 27 of the opening 28, and thereafter the shoe/foot assemblies are firmly held onto the legs 14, 16 of the doll.

[0022]   In the foregoing detailed description, specific embodiments of the invention have been described.  However, it is to be understood that various changes and modifications may be made without departing from the spirit and scope of the invention. Thus, by way of example and not of limitation instead of having the protuberance 26 on the leg 16 and the recess 28 on the shoe/foot assemblies, this configuration may be reversed, with the protuberance on the shoe/foot assembly, and the recess on the doll legs.  Further, instead of a single protuberance and mating recess, other snap-together arrangements may be employed, using more than one protuberance/recess, or a snap-in ring and mating ring shaped recess could be used.  It is also noted that, instead of using resilient plastic for the doll, stiffer plastic could be employed, and the foot/shoe assemblies may be attached using a simple concealed mechanical latch.  Accordingly, the invention is not limited to the exact embodiments described hereinabove and shown in the drawings.

EXHIBIT ___18___

PAGE ___270___          MGA 0825489

WE CLAIM:

    1.   A doll with changeable footgear comprising:

        a torso having a body and legs, said legs having a predetermined skin color and texture;

        a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined skin color and texture;

        each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

        each said assembly and lower legs having a snap-together joint with a protuberance on one part and a mating recess on the other part; and

        a simulated strap forming part of said shoe extending around said assembly at said separation point.

    2.   A doll as defined in claim 1 wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

    3.   A doll with changeable footgear as defined in claim 1 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

    4.   A doll as defined in claim 1 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

    5.   A doll with changeable footgear comprising:

        a torso having a body and legs, said legs having a predetermined color;

        a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined color;

        each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

EXHIBIT ___18___

PAGE ___271___

MGA 0825490

Matter No. 15904-142

each said assembly and lower legs having a joint for releasably securing the foot/shoe assemblies to the legs; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

6.  A doll as defined in claim 5 wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

7.  A doll with changeable footgear as defined in claim 5 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

8.  A doll as defined in claim 5 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

9.  A doll with changeable footgear comprising:

a torso having a body and legs, said legs having a predetermined color;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined color;

each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a snap-together joint; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

10.  A doll as defined in claim 9 wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

11.  A doll with changeable footgear as defined in claim 9 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

12.  A doll as defined in claim 9 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

6.

EXHIBIT ___18___

PAGE ___277___          MGA 0825491

Matter No. 15904-142

13. A doll with changeable footgear comprising:

a torso having a body and legs;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot;

each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a joint for releasably securing the foot/shoe assemblies to the legs; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

14. A doll as defined in claim 13 wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

15. A doll with changeable footgear as defined in claim 13 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

16. A doll as defined in claim 13 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

17. A doll as defined in claim 13 wherein said exposed parts of the feet have substantially the same color as said legs.

EXHIBIT ___18___

PAGE ___273___          MGA 0825492

Matter No. 15904-142

# Doll With Aesthetic Changeable Footgear

## ABSTRACT OF THE DISCLOSURE

A doll with changeable footgear includes a torso with legs, and a pair of foot/shoe assemblies mounted on the legs at separation points; and each foot shoe assembly has exposed skin of a color and texture substantially matching the skin of the legs, and the simulated shoes include simulated straps extending around the foot/shoe assembly immediately adjacent the separation point on each leg. Each foot/shoe assembly may be mounted on one of the doll legs, employing a protuberance on one part and a recess on the other part, with a snap-in locking fit between the two parts. The simulated shoes may be of a sharply contrasting color relative to the skin color.

8

EXHIBIT ___18___

PAGE ___274___          MGA 0825493

**Exhibit 19**

RECEIVED

MAY 0 7 2007

1  DALE M. CENDALI (admitted *pro hac vice*)
   DIANA M. TORRES (S.B. #162284)
2  JAMES P. JENAL (S.B. #180190)
   O'MELVENY & MYERS LLP
3  400 South Hope Street
   Los Angeles, CA 90071-2899
4  Telephone: (213) 430-6000
   Facsimile: (213) 430-6407
5  Email: jjenal@omm.com

6  PATRICIA GLASER (S.B. #55668)
   CHRISTENSEN, GLASER, FINK,
7  JACOBS, WEIL & SHAPIRO LLP
   10250 Constellation Boulevard, 19th Floor
8  Los Angeles, CA 90067
   Telephone: (310) 553-3000
9  Facsimile: (310) 556-2920
   Email: pglaser@chrisglase.com

10
   Attorneys for Plaintiff
11 MGA Entertainment, Inc.

12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

                     EASTERN DIVISION

15

16 CARTER BRYANT, an individual,      Case No. CV 04-09049 SGL (RNBx)
                                       (consolidated with CV 04-9059 & 05-2727)
17          Plaintiff,
                                       **MGA ENTERTAINMENT, INC.'S**
18     v.                              **SUPPLEMENTAL AND AMENDED**
                                       **RESPONSES TO MATTEL, INC.'S**
19 MATTEL, INC., a Delaware            **THIRD SET OF REQUESTS FOR**
   Corporation,                        **ADMISSION TO MGA**
20                                     **ENTERTAINMENT, INC.**
            Defendant.
21

22 CONSOLIDATED WITH
   MATTEL, INC. v. BRYANT and
23 MGA ENTERTAINMENT, INC. v.
   MATTEL, INC.
24

25

26

27

28
                                       MGA'S SUPPL + AMENDED RESPONSES TO
                                       MATTEL'S 3RD SET OF RFA TO MGA

                    EXHIBIT _____19_____

                    PAGE _____275_____

1
## **INTRODUCTORY STATEMENT**

2   MGA Entertainment, Inc. ("MGA") hereby provides supplemental and

3 amended responses to certain of MATTEL, INC.'S THIRD SET OF REQUESTS

4 FOR ADMISSION TO MGA ENTERTAINMENT, INC. The supplemental and

5 amended responses below are made pursuant to the agreement reached by counsel

6 for both parties at the in-person meet and confer that occurred on April 19, 2007.

7 The supplemental and amended responses are made in a good faith effort to address

8 Mattel's concerns. In accordance with the agreement reached at the meet and

9 confer, the language of Requests for Admissions 136 to 139 has been changed to

10 replace the word "represented" with the word "told," and responses have been

11 supplemented and amended to reflect that change.

12   MGA's responses and objections are made solely for the purpose of

13 this action, and are made based upon information presently known and available to

14 MGA. MGA has not completed its investigation of facts relating to this case, has

15 not fully completed its discovery in this action, and has not completed its

16 preparation for trial. Accordingly, the following responses are based only upon

17 such information and documents as are presently available and specifically known

18 to MGA, and disclose only those facts and contentions that presently occur to

19 MGA. Further discovery, independent investigation, legal research and analysis

20 may supply additional facts, add meaning to known facts, and establish entirely

21 new factual conclusions and legal contentions, any of which may lead to additions

22 to, changes to, or variations from the responses set forth below.

23   The following responses are given without prejudice to MGA's right

24 to produce evidence of any subsequently discovered facts that MGA may later

25 recall or locate. MGA, accordingly, reserves the right to supplement and/or change

26 any and all of the following responses as additional facts are ascertained, analyses

27 are made, legal research is completed, and contentions are investigated, and

28 reserves the right to rely upon and present at hearing or trial any information or

EXHIBIT _____19_____

PAGE _____276_____

- 2 -

MGA'S SUPPL + AMENDED RESPONSES TO
MATTEL'S 3RD SET OF RFA TO MGA

1   documents that may be subsequently discovered as a result of this ongoing

2   discovery and investigation. The responses contained herein are made in a good

3   faith effort to supply as much factual information and as much specification of legal

4   contentions as are presently known, but should in no way be to the prejudice of

5   MGA in relation to further discovery, research or analysis.

6         A response to any of the Requests does not constitute an admission by

7   MGA that it agrees with plaintiff's characterization or definition contained therein,

8   that the information sought is relevant to a claim or defense, or that the information

9   sought is likely to lead to admissible evidence. Except for explicit facts admitted

10  herein, no admission of any nature whatsoever is to be implied by or inferred from

11  any response anywhere stated in this document. By responding to these Requests,

12  MGA does not concede the relevancy, materiality, or admissibility of any

13  information sought by the requests or any responses thereto.

14        MGA responds on behalf of MGA Entertainment, Inc. alone and not

15  on behalf of any of its officers, employees, or affiliates.

16        This Introductory Statement applies to each and every response

17  contained herein.

18        **GENERAL OBJECTIONS**

19        The following general objections apply to the entirety of Mattel's

20  Third Set of Requests for Admission (the "Requests"). The assertion of same,

21  similar, or additional objections to the individual requests does not waive any of

22  MGA's general objections as set forth below.

23        1.    To the extent these Requests request MGA to provide

24  information concerning the legal basis regarding its defense of this matter, MGA

25  objects on the grounds that the Requests impermissibly call for mental impressions,

26  conclusions, opinions and/or legal theories of MGA's attorneys.

27        2.    MGA also objects to the extent these Requests call for the

28  disclosure of information protected by the attorney-client privilege, the work-

EXHIBIT _____ 19 _____     - 3 -

PAGE _____ 277 _____

MGA'S SUPPL + AMENDED RESPONSES TO
MATTEL'S 3RD SET OF RFA TO MGA

1   product doctrine, the joint defense or common interest privilege or any other
2   applicable privilege.

3         3.    MGA further objects to the extent that these Requests seek
4   information comprising the trade secrets of MGA and/or third parties, and/or
5   otherwise constitute confidential information, protected from disclosure by
6   California and/or federal law.

7         4.    MGA objects to the Requests on the grounds that they attempt to
8   unfairly restrict the facts on which MGA may rely at trial. Discovery has not been
9   completed and MGA is not yet necessarily in possession of all the facts and
10  documents upon which MGA intends to rely. All of the responses submitted
11  herewith are tendered to Mattel with the reservation discovery is ongoing and, thus,
12  the responses are submitted without limiting the evidence on which MGA may rely
13  to support the contentions that MGA may assert at the trial of this action. Further,
14  MGA reserves the right to supplement or amend these responses at a future date if
15  same is deemed appropriate.

16        5.    MGA objects to the Requests on the grounds that they are
17  compound, vague, overbroad, unduly burdensome or oppressive, seek information
18  that is not within MGA's knowledge, or seek information that is neither relevant to
19  this litigation nor reasonably calculated to lead to the discovery of admissible
20  evidence.

21        6.    MGA objects to the Requests on the grounds that they
22  prematurely seek discovery related to claims by Mattel that MGA has
23  misappropriated Mattel's trade secrets; pursuant to California Code of Civil
24  Procedure section 2019.210, which applies to this case, a party must designate its
25  trade secrets with particularity before it may commence discovery on any trade
26  secret claims; and Mattel has not identified its alleged misappropriated trade secrets
27  and therefore is not entitled to discovery on those claims.

28        7.    MGA objects to the defined terms "You," "MGA," "Mattel,"

EXHIBIT ____19____          - 4 -          MGA'S SUPPL + AMENDED RESPONSES TO
                                           MATTEL'S 3RD SET OF RFA TO MGA
PAGE ____278____

1  "Bryant," "Bratz" and "Bratz Work" on the grounds that these terms, as defined,

2  are overbroad, are vague and ambiguous, and call for legal conclusions.

3  These general objections shall be deemed incorporated into each

4  specific response below as if they were fully set forth below.  Nevertheless, without

5  waiver of, without prejudice to, and expressly hereby reserving all of the foregoing

6  general objections, MGA submits the following responses to the Requests.

7

8  <u>**SUPPLEMENTAL AND AMENDED RESPONSES**</u>

9

10  <u>**REQUEST FOR ADMISSION NO. 136 (AS AMENDED):**</u>

11  Admit that Isaac Larian told to at least one retailer that MATTEL

12  would not be supporting MY SCENE BLING BLING with real gems with

13  television advertising.

14

15  <u>**RESPONSE TO REQUEST FOR ADMISSION NO. 136(AS AMENDED):**</u>

16  MGA incorporates by reference the above-stated general objections as

17  if fully set forth herein.

18  Subject to and without waiving the foregoing general objections, MGA

19  responds as follows to the request: MGA denies the request.

20

21  <u>**REQUEST FOR ADMISSION NO. 137 (AS AMENDED):**</u>

22  Admit that Isaac Larian told to more than one retailer that MATTEL

23  would not be supporting MY SCENE BLING BLING with real gems with

24  television advertising.

25

26  <u>**RESPONSE TO REQUEST FOR ADMISSION NO. 137 (AS AMENDED):**</u>

27  MGA incorporates by reference the above-stated general objections as

28  if fully set forth herein.

EXHIBIT _____19_____

PAGE _____279_____

- 5 -

MGA'S SUPPL + AMENDED RESPONSES TO
MATTEL'S 3RD SET OF RFA TO MGA

1    Subject to and without waiving the foregoing general objections, MGA

2    responds as follows to the request: MGA denies the request.

3

4    **REQUEST FOR ADMISSION NO. 138 (AS AMENDED):**

5    Admit that Isaac Larian told to at least one retailer that such retailer

6    was the only retailer to purchase MY SCENE BLING BLING with real gems.

7

8    **RESPONSE TO REQUEST FOR ADMISSION NO. 138 (AS AMENDED):**

9    MGA incorporates by reference the above-stated general objections as

10   if fully set forth herein.

11   Subject to and without waiving the foregoing general objections, MGA

12   responds as follows to the request: MGA admits that Isaac Larian told one retailer

13   that such retailer was the only retailer to purchase MY SCENE BLING BLING

14   with real gems, at a time when Isaac Larian had a good faith belief that such retailer

15   was the only retailer to purchase MY SCENE BLING BLING with real gems.

16

17   **REQUEST FOR ADMISSION NO. 139 (AS AMENDED):**

18   Admit that Isaac Larian told to more than one retailer that each such

19   retailer was the only retailer to purchase MY SCENE BLING BLING with real

20   gems.

21   **RESPONSE TO REQUEST FOR ADMISSION NO. 139 (AS AMENDED):**

22   MGA incorporates by reference the above-stated general objections as

23   if fully set forth herein.

24   Subject to and without waiving the foregoing general objections, MGA

25   responds as follows to the request: MGA denies the request.

26

27

28

EXHIBIT __19__

PAGE __280__

- 6 -

MGA'S SUPPL + AMENDED RESPONSES TO
MATTEL'S 3RD SET OF RFA TO MGA

1 **REQUEST FOR ADMISSION NO. 183:**

2        Admit that, prior to July 1, 2003, MGA had not issued any press

3 release that identified BRYANT as the creator of BRATZ.

4

5 **RESPONSE TO REQUEST FOR ADMISSION NO. 183:**

6        MGA incorporates by reference the above-stated general objections as

7 if fully set forth herein. MGA specifically objects to this request on the grounds

8 that it is vague and ambiguous, particularly in its use of the phrase "identified

9 BRYANT as the creator of BRATZ."

10        Subject to and without waiving the foregoing general and specific

11 objections, MGA responds as follows to the request: MGA admits the request.

12

13 **REQUEST FOR ADMISSION NO. 184:**

14        Admit that MGA is not aware of any press report or publication that

15 identified BRYANT as the creator of BRATZ prior to July 15, 2003.

16

17 **RESPONSE TO REQUEST FOR ADMISSION NO. 184:**

18        MGA incorporates by reference the above-stated general objections as

19 if fully set forth herein. MGA specifically objects to this request on the grounds

20 that it is vague and ambiguous, particularly in its use of the phrase "identified

21 BRYANT as the creator of BRATZ."

22        Subject to and without waiving the foregoing general and specific

23 objections, MGA responds as follows to the request: MGA admits the request.

24

25 **REQUEST FOR ADMISSION NO. 185:**

26        Admit that the first press report or publication that identified

27 BRYANT as the creator of BRATZ was the *Wall Street Journal* article entitled

28

EXHIBIT ___19___         - 7 -

PAGE ___281___

MGA'S SUPPL + AMENDED RESPONSES TO
MATTEL'S 3RD SET OF RFA TO MGA

1    "Dolled Up: To Lure Older Girls, Mattel Brings in Hip-Hop Crowd" and published

2    on July 18, 2003.

3

4    **RESPONSE TO REQUEST FOR ADMISSION NO. 185:**

5             MGA incorporates by reference the above-stated general objections as

6    if fully set forth herein. MGA specifically objects to this request on the grounds

7    that it is vague and ambiguous, particularly in its use of the phrase "identified

8    BRYANT as the creator of BRATZ."

9             Subject to and without waiving the foregoing general and specific

10   objections, MGA responds as follows to the request: MGA admits the request.

11

12

13       Dated: May 4, 2007                    O'MELVENY & MYERS LLP

14

15

16                                             By:  Chris D. Nguyen
                                               Attorneys for MGA Entertainment, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

                                    - 8 -       MGA'S SUPPL + AMENDED RESPONSES TO
                                                MATTEL'S 3RD SET OF RFA TO MGA

     EXHIBIT ____19____

     PAGE ____282____

1

## PROOF OF SERVICE

2

I, C. Kelley Canning, declare:

3

I am a resident of the State of California and over the age of eighteen years, and
not a party to the within action; my business address is 400 South Hope Street, Los Angeles,

4

California 90071-2899. On May 4, 2007, I served the within document(s):

5

## MGA ENTERTAINMENT, INC.'S SUPPLEMENTAL AND AMENDED RESPONSES TO MATTEL, INC.'S THIRD SET OF REQUESTS FOR

6

## ADMISSION TO MGA ENTERTAINMENT, INC.

7

☒        by placing the document(s) listed above in a sealed envelope with postage thereon
fully prepaid, in the United States mail at Los Angeles, California addressed as set

8

forth below. I am readily familiar with the firm's practice of collecting and
processing correspondence for mailing. Under that practice it would be deposited

9

with the U.S. Postal Service on that same day with postage thereon fully prepaid in
the ordinary course of business. I am aware that on motion of the party served,

10

service is presumed invalid if the postal cancellation date or postage meter date is
more than one day after date of deposit for mailing in affidavit.

11

12

Michael T. Zeller, Esq.                      Douglas A. Wickham, Esq.
Timothy Alger, Esq.                          LITTLER MENDELSON, P.C.

13

QUINN EMANUEL URQUHART OLIVER &              2049 Century Park East,

14

HEDGES, LLP                                  Fifth Floor
865 South Figueroa Street, 10th Floor        Los Angeles, CA 90067

15

Los Angeles, CA 90017

16

Patricia Glaser, Esq.                        Michael H. Page, Esq.

17

CHRISTENSEN, GLASER, FINK, JACOBS,           KEKER AND VAN NEST LLP
WEIL & SHAPIRO, LLP                          710 Sansome Street

18

10250 Constellation Blvd.,                   San Francisco, CA  90067-3107
19th Floor

19

Los Angeles, CA 90067

20

I declare under penalty of perjury under the laws of the United States that the

21

above is true and correct.

22

Executed on May 4, 2007, at Los Angeles, California.

23

24

_C. Kelley Canning_

25

C. Kelley Canning

LA2:827618

26

27

28

MGA'S SUPPL + AMENDED RESPONSES TO
MATTEL'S 3RD SET OF RFA TO MGA;
PROOF OF SERVICE

- 9 -

EXHIBIT ___19___

PAGE ___283___