1    Mattel, printed on Mattel stationery. The Agreement purports to completely prohibit or, at a

2    minimum, creates a substantial chilling effect on, Bryant's or any other employee's preparations to

3    compete and purports to prevent Bryant and other employees from taking meaningful steps to obtain

4    any other competitive employment while still in the employ of Mattel. Such an agreement

5    unlawfully restrains Bryant (and similarly situated employees) in his/their business, trade and

6    professions and thus violates well-established rights of employee mobility under California law.

7           16.     The Agreement also purports to effect an assignment of all inventions created

8    or even simply touched by Bryant during the time period of his employment with Mattel, regardless

9    of whether or not they relate to any aspect of Mattel's business and regardless of when or where this

10   occurred. On its face, Mattel's Agreement theoretically purports to assign to Mattel any "invention"

11   of any kind conceived or reduced to practice by Bryant during the time period of his employment

12   with Mattel. As Mattel has construed the Agreement, any time Bryant placed pen and pencil to

13   paper during the time period of his Mattel employment, such "works" are owned by Mattel even if

14   such works or inventions were created on his own time with his own materials.

15          17.     As applied here, the Agreement unlawfully infringes on Bryant's right to

16   prepare to compete and to seek other employment and it unlawfully appropriates to Mattel

17   inventions that were created or reduced to practice on Bryant's own time and using his own

18   equipment that are unrelated to his work for Mattel. Such an invention assignment is overbroad,

19   unconscionable, violates Labor Code section 2870, constitutes an unfair business practice and is

20   therefore unlawful.

21          18.     The Agreement primarily contains a sweeping provision that purports to

22   assign to Mattel each and every invention by Bryant that he created or reduced to practice during the

23   time period of his employment with Mattel. The Agreement's only attempt to limit the scope of the

24   assignment is a perfunctory reference to California Labor Code section 2870. That quotation is

25   found in a separate part of the Agreement from the overbroad, illegal clause defining what is

26   covered, appears in fine print, and is stated in language so confusing that no lay person could

27   reasonably understand it.

28

ITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
os Angeles, CA 90067 3107
310 553 0308

4

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 7 PAGE 46

19.    Even considering the language of Mattel's reference to Labor Code section 2870 in the Agreement, the Agreement remains impermissibly overbroad and unenforceable. According to that provision of the Agreement, any invention conceived or reduced to practice by Bryant during his employment with Mattel would belong to Mattel by virtue of the unlawful Agreement, regardless of whether the invention related to the work performed by Bryant for Mattel.

20.    In addition to the unlawful inventions assignment, the Agreement contains several other provisions that are equally unlawful, either on the face of the Agreement or as applied by Mattel, as it seeks to enforce the Agreement.  As discussed above, the confidentiality provision in the Agreement is grossly overbroad and purports to prohibit employees from disclosing and using publicly available information and it purports to prohibit employees from engaging in lawful off duty conduct in violation of Business and Professions Code 16600 and 17200, the California Labor Code and this State's public policy.

21.    Furthermore, Mattel's overly broad agreement cannot be saved from illegality by narrow construction.  Otherwise, if these sorts of agreements could simply be reformed during litigation, employers would have no disincentive to draft and attempt to enforce such overbroad, illegal agreements that chill employees from exercising their rights.

22.    Due to Mattel's fraudulent and/or negligent misrepresentation of the terms contained within the Agreement (and Mattel's failure to affirmatively disclose its material terms to Bryant when Bryant was instructed to sign the Agreement by Mattel), Bryant did not discover, and would not reasonably be expected to discover, that the Agreement was misleading, unconscionable and unlawful until Mattel instituted the underlying lawsuit on April 27, 2004, attempting to enforce the Agreement.  At the time it required Bryant to execute the adhesive Agreement as a condition of his employment, Mattel did not explain the terms of the Agreement to Bryant, give him sufficient time to review it, or permit or encourage him to seek independent counsel regarding its legal effect. Had Bryant been made aware of the full meaning and intent of the Agreement, he would not have signed it.

23.    Furthermore, Bryant is informed and believes that Plaintiff Mattel has been aware that Bryant was involved in designing the "Bratz" line of toys since at least sometime in 2001.

5

ITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067-3107
310 553 0308

EXHIBIT __7__ PAGE __47__

1    Rather than bringing suit at that time, Mattel elected instead to wait until three years later to attempt

2    to enforce the unlawful Agreement in the underlying lawsuit.

3            24.    Even though Bryant conceived the "Bratz" idea when he was not employed by

4    Mattel in 1998 and he, with others, did not reduce that idea to practice until after Bryant left Mattel,

5    Mattel nevertheless is using the Agreement to frivolously sue Bryant, in an attempt to hijack

6    "Bratz."

7            25.    Bryant is informed and believes that all employees of Mattel who were hired

8    between 1999 (and before) and the present were required to execute the same or substantially

9    similar agreements, as a pre-condition of their employment with Mattel.  Bryant is informed and

10   believes that his case is representative of a larger pattern and practice of wrongful conduct engaged

11   in by Mattel.  Mattel, as a standard business practice, has forced its employees to enter into and has

12   wrongfully enforced similar quasi-non-competition and assignment of inventions contracts with its

13   present and former employees.  Bryant is informed and believes that Mattel uses these agreements

14   to prevent or stifle competition in the toy industry and/or to unlawfully inhibit employee mobility.

15   Indeed, Bryant is informed and believes, and based thereon alleges, that Mattel continues to force

16   new and current employees to enter into the same or similarly overbroad and unlawful agreements.

17           26.    Bryant was presented with the form Agreement by Mattel on or about January

18   4, 1999, at the outset of his second term of employment.  At that time, he was told that his execution

19   of the Agreement was a condition of his employment with Mattel.  The terms of the Agreement were

20   not explained to him, nor was he told that the Agreement would preclude him from maintaining any

21   employment other than with Mattel, despite statutory guarantees to the contrary.  Bryant was not

22   informed that by executing the Agreement, he was assigning to Mattel all the inventions and

23   creations he created or simply even touched during the time period of his employment with Mattel

24   regardless of how unrelated they might be to his work at Mattel.  Bryant was not advised that Mattel

25   would attempt to claim ownership of any invention he may have conceived prior to employment by

26   Mattel and perfected after he left Mattel.  Bryant neither was given a meaningful opportunity to

27   review the Agreement at the time he executed it, nor was he given the opportunity to consult with an

28   attorney before executing it.    Mattel did not give Bryant the opportunity to negotiate the

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

EXHIBIT ___7___ PAGE ___48___

1  Agreement's terms, allow him to review it overnight, or suggest that he consult an attorney before

2  executing it.  In essence, the Agreement was a pre-printed form and was presented to Bryant's on a

3  "take it or leave it" basis and Bryant and all present and former Mattel employees in effect were

4  bludgeoned into accepting its terms or not being allowed to work there.

5         27.  At the time Bryant executed the Agreement, he did not understand the scope,

6  breadth or meaning of its terms.  Bryant is informed and believes, and on that basis alleges that at the

7  time all other current and former employees of Mattel executed identical or similar agreements with

8  Mattel, they, too, did not understand the scope, breadth or meaning of their terms.  As discussed

9  below, the Agreement is both procedurally and substantively unconscionable and thus wholly

10  unenforceable.

11         28.  In this action, Bryant seeks on behalf of himself and the general public the

12  intervention of the Court to obtain remedies to preclude Mattel's unlawful acts.  Among other

13  things, Bryant seeks a declaration from this Court that Mattel's Agreements are not enforceable

14  against Bryant and all other present and former similarly situated Mattel employees.  Bryant also

15  seeks permanent injunctive relief barring Mattel from forcing present and future employees to sign

16  such agreements, stopping Mattel from threatening to enforce and attempting to enforce illegal non-

17  compete/invention assignment contracts against Bryant and any other current or former Mattel

18  employees, and requiring Mattel to disgorge and/or make restitution for all unlawful profits

19  received and/or costs incurred by virtue of its unlawful and unfair business practices and other legal

20  and/or equitable relief to which Bryant and/or the general public may be justly entitled.

21         29.  Bryant also seeks, through this Cross-Complaint, rescission of the

22  unconscionable and unlawful Agreement signed by Bryant.

23           **FIRST CAUSE OF ACTION**

24     **(UNFAIR COMPETITION AGAINST DEFENDANT MATTEL)**

25     **(Business & Professions Code § 17200 et seq.)**

26         30.  Bryant realleges and incorporates by reference each of the allegations in

27  Paragraphs 1 through 29 of this Cross-Complaint as if fully set forth herein.

28         31.  Bryant brings his claim for unfair competition and unfair business practices

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

7

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 7 PAGE 49

1  on behalf of himself, the current and former employees of Mattel and the general public, pursuant

2  to California Business and Professions Code sections 16600, 17200, 17203 and 17204.

3      32.   The non-competition and invention assignment provisions contained in the

4  Agreement, which Mattel forced Bryant to execute as a condition of employment, and which it is

5  now trying to enforce in the underlying action, are illegal pursuant to California Business and

6  Professions Code sections 16600 and 17200.  Said provisions constitute an unfair restraint of trade

7  for the following, non-exclusive reasons:  they illegally restrict the job mobility of current and even

8  former Mattel employees, they illegally restrict current Mattel employees from seeking other

9  gainful employment, they illegally restrict the use of public information, such as the identity or job

10  functions of current Mattel employees, they specifically prevent or deter Mattel's present and

11  former employees, such as Bryant, from accepting or holding any lawful employment within the

12  State of California or elsewhere other than with Mattel, and they purport to assign for Mattel's

13  unlawful benefit all the inventions of Mattel's current and former employees, with a narrow

14  exception which is the employee's burden to prove.

15      33.   The Agreement is also unlawful in that it violates the provisions of California

16  Labor Code section 96(k), which guarantees the rights of employees to be free in the lawful

17  activities they pursue outside working hours, section 98.6 to the extent Mattel has taken adverse

18  employment actions against employees who have refused to sign the Agreement, and Labor Code

19  section 2699.

20      34.   The Agreement also violates the provisions of California Labor Code section

21  2870 inasmuch as it provides for a far broader assignment of employee inventions than is permitted

22  by applicable law.

23      35.   The Agreement was a contract of adhesion and was procedurally

24  unconscionable because, among other things, Bryant was required to sign it as a condition of his

25  employment with no negotiations allowed, it was presented to him on a preprinted form and on a

26  take-it-or-leave-it basis, he was not allowed to thoroughly review or consider its terms, he was not

27  permitted to review it overnight, he was not provided with the opportunity to consult counsel prior

28  to executing it, and it was never thoroughly and completely explained to him.

LITTLER MENDELSON

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 7 PAGE 50

1   36.   Because of its onerous, unfair, unlawful and one-sided provisions, which are

2   surprising, grossly unfair and shock the conscience, the Agreement is substantively unconscionable.

3   37.   Because it is both procedurally and substantively unconscionable, the

4   Agreement is unenforceable. Moreover, the Agreement is so permeated by unconscionability that

5   the unlawful provisions cannot be severed.

6   38.   Due to Mattel's fraudulent and/or negligent misrepresentation of the terms

7   contained within the Agreement, Bryant did not discover, and would not reasonably have

8   discovered, that the Agreement, as Mattel attempted to enforce it, was unconscionable and unlawful

9   until Mattel instituted the underlying lawsuit against him to attempt to enforce the Agreement, in

10   approximately April 2004.

11   39.   Even though the quasi-non-competition and invention assignment provisions

12   of the Agreement are not enforceable, Bryant is informed and believes and based thereon alleges

13   that Mattel utilizes these provisions as part of a scheme and device to restrain the business

14   opportunities, both within and outside the State of California, otherwise available to Bryant and

15   other current and former Mattel employees.

16   40.   Bryant is informed and believes and based thereon alleges that, in effect,

17   through its wrongful acts, Mattel is able to create for itself an unfair competitive advantage along

18   with other benefits at the expense of its present and former employees (including Bryant), other

19   competing companies or employers, and members of the public.

20   41.   Mattel's unlawful conduct in requiring Bryant, and its other current and

21   former employees, to sign the Agreement, or other similar Agreements with equally unlawful

22   provisions as a term and condition of employment or continued employment, and then threatening

23   to enforce such unlawful provisions, constitutes unfair competition and an unfair business practice

24   in violation of the California Business and Professions Code sections 16600 and 17200 et seq. and

25   under the common law.

26   42.   As a proximate result of such unlawful acts and/or unfair business acts and

27   practices, Bryant has suffered actual damages, and Mattel has enjoyed unlawful profits, in a sum

28   not yet fully ascertained but in excess of the jurisdictional limits of this Court. Furthermore, on

9

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 1 PAGE 51

1  behalf of Bryant and all present and former California employees of Mattel and the general public,

2  Bryant seeks injunctive relief pursuant to Business and Professions Code section 17203, barring

3  Mattel from continuing to engage in such unlawful and unfair business practices, and the remedies

4  of disgorgement and restitution for illicit profits obtained by Mattel from its unlawful and/or unfair

5  business acts and practices pursuant to Business and Professions Code section 17204.

6       43.    In addition, as a result of the illegal and wrongful conduct alleged above, in

7  the absence of injunctive relief prohibiting Mattel from continuing to engage in unfair competition,

8  Cross-Complainant Bryant, the current and former employees of Mattel and the general public have

9  been and will be irreparably harmed.

10       44.    For these reasons, Bryant requests permanent injunctive relief prohibiting

11  Cross-Defendant Mattel from continuing to engage in unfair competition by threatening and

12  attempting to enforce illegal non-compete/invention assignment contracts against Bryant or any

13  other current or former Mattel employees.

14  **SECOND CAUSE OF ACTION**

15  **(RESCISSION AGAINST DEFENDANT MATTEL)**

16       45.    Bryant realleges and incorporates by reference each of the allegations in

17  Paragraphs 1 through 44 of this Cross-Complaint as if fully set forth herein.

18       46.    Bryant's consent to the Agreement was given due to mistake, or obtained

19  through duress, menace and/or fraud.

20       47.    The Agreement is unlawful and unconscionable, due to the fault not of

21  Bryant but of Mattel, which exclusively drafted the Agreement's unlawful and unconscionable

22  terms.

23       48.    Due to Mattel's fraudulent misrepresentation and/or concealment of the terms

24  contained within the Agreement, Bryant did not discover, and would not reasonably be expected to

25  discover, that the Agreement was unconscionable and unlawful until Mattel instituted the underlying

26  lawsuit against him to attempt to enforce the agreement, in approximately April 2004.

27       49.    The public interest will be prejudiced by permitting the Agreement or other

28  similar agreements to stand.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
os Angeles, CA 90067 3107
310 553 0308

10

EXHIBIT __7__ PAGE __52__

50.     By the filing of this Cross-Complaint, Bryant hereby gives notice to Mattel that he seeks rescission of the Agreement, and further offers to restore to Mattel all consideration and everything of value which he received from Mattel under the Agreement, upon condition that Mattel do likewise.

51.     Bryant therefore requests that the Court rescind the Agreement in its entirety.

## THIRD CAUSE OF ACTION

## (FRAUD AGAINST DEFENDANT MATTEL)

52.     Bryant realleges and incorporates by reference each of the allegations in Paragraphs 1 through 51 of this Cross-Complaint as if fully set forth herein.

53.     Mattel required Bryant to execute the Agreement without disclosing to him its true import and terms.

54.     Having drafted the Agreement and all the oppressive, unfair and onerous terms contained therein, Mattel was of course aware of the contents of the Agreement and its import.

55.     Due to Mattel's concealment of its interpretation of the force and effect of the Agreement from Bryant, he did not discover that the Agreement was unconscionable and unlawful until Mattel instituted the underlying lawsuit against him to attempt to enforce the agreement, in late April 2004.

56.     In so failing to disclose to Bryant the true meaning of the terms and the purported legal effect of the Agreement, and Mattel's intent to attempt to enforce it with regard to work he conceived and/or reduced to practice while not employed at Mattel, Mattel misrepresented and suppressed the nature of the Agreement, and in doing so, committed actual fraud against Bryant.

57.     Because of its malicious, oppressive and/or fraudulent conduct, Mattel is subject to punitive damages in an amount necessary and appropriate to punish and deter it and others from engaging in similar conduct in the future.

//

//

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067-3107
310.553.0308

11

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT _7_ PAGE _53_

## FOURTH CAUSE OF ACTION

### (DECLARATORY RELIEF AGAINST DEFENDANT MATTEL)

58.    Bryant realleges and incorporates by reference each of the allegations in Paragraphs 1 through 60 of this Cross-Complaint as if fully set forth herein.

59.    Mattel's unlawful conduct in requiring Bryant, and its other current and former employees, to sign the Agreement with its unlawful provisions as a term and condition of their employment or continued employment and then threatening to enforce such unlawful provisions and eventually filing a lawsuit to enforce such provisions against Bryant constitutes unfair competition and unfair business practices in violation of the California Business and Professions Code sections 16600 and 17200 et seq. and under the common law.

60.    Moreover, the Agreement is both procedurally and substantively unconscionable.

61.    Through its suit against Bryant, Mattel has demonstrated that a controversy exists concerning the enforceability of the Agreement and its terms.

62.    Bryant therefore requests declaratory relief stating that the Agreement, as well as all similar agreements executed by current and former employees of Mattel, are unlawful and unenforceable.

### PRAYER FOR RELIEF

WHEREFORE, Cross-Complainant Bryant prays for judgment and relief as follows:

1.    For restitution, disgorgement and interest in an amount to be determined at trial;

2.    For an order permanently enjoining and barring Mattel from forcing present and future employees to sign agreements containing quasi-non-compete or invention assignment provisions identical or substantively similar to those in the Agreement, and prohibiting Mattel from threatening and attempting to enforce such agreements or restrictions against Bryant or any other current or former employees;

3.    For an order declaring that the Agreement between Mattel and Bryant (and the agreements between Mattel and all similarly situated present and former employees) are void.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

12

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT __7__ PAGE __54__

1  unenforceable and unconscionable;

2        4.    For rescission of the Agreement;

3        5.    For declaratory relief stating that the Agreement is unlawful and

4  unenforceable;

5        6.    For compensatory damages according to proof;

6        7.    For statutory penalties pursuant to Labor Code section 2699;

7        8.    For punitive damages according to proof;

8        9.    For reasonable attorneys' fees incurred in bringing and litigating this action

9             pursuant to the private attorneys general statutes;

10       10.   For costs of suit herein; and

11       11.   For such further or other relief as the Court deems just and proper.

12

13 Dated: August 24, 2004

14

15                                    DOUGLAS A. WICKHAM
                                      LITTLER MENDELSON
16                                    A Professional Corporation
                                      Attorneys for Defendant/Cross-Complainant
17                                    CARTER BRYANT

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

                              13
          DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

                              EXHIBIT  7  PAGE  55

## DEMAND FOR A TRIAL BY JURY

Pursuant to Section 592 of the California Code of Civil Procedure, Cross-Complainant Carter Bryant hereby demands that the causes in this matter be tried by a jury to the extent provided for by law.


Dated: August 24, 2004

C. Wickham

DOUGLAS A. WICKHAM
LITTLER MENDELSON
A Professional Corporation
Attorneys for Defendant/Cross-Complainant
CARTER BRYANT

Los_Angeles:371607.1 028307.1010

LITTLER MENDELSON
A Professional Corporation
2048 Century Park East
5th Floor
Los Angeles, CA. 90067-3107
310 553 0308

14

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 7 PAGE 56

**Exhibit 8**



FILED

**ENTERED**

2006 JUL 18 AM 10: 16

JUL 18 2006

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CARTER BRYANT,

Plaintiff,

v.

MATTEL, INC.,

Defendant,

and related actions.

CASE NO. CV 04-09049 SGL (RNBx)

(Consolidated with cases CV 04-09059 and CV 05-02727)

ORDER GRANTING MOTIONS TO DISMISS

## I. Introduction

This consolidated action involves the individual cases of Bryant v. Mattel, Inc., CV 04-09049; Mattel, Inc. v. Bryant, CV 04-09059; and MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727. This Order rules on Motions to Dismiss previously docketed in cases 04-09049 and 04-9059.

The factual background underlying this consolidated action is complex. The Court sets forth the factual background only to the extent that it is necessary to discuss its ruling on two pending motions to dismiss. A hearing regarding these motions was held on June 26, 2006. For the reasons and in the manner set forth below, the Court grants both motions.

DOCKETED ON CM
JUL 18 2006

EXHIBIT 8 PAGE 51

## II. Motion to Dismiss (04-09049)

A.   **Factual Background**

Carter Bryant is a designer to whom creation of MGA's "Bratz" line of dolls has been attributed.  Compl. ¶ 6.  Mattel has sued him under a variety of state-law theories relating to certain agreements Bryant signed while an employee with Mattel.  See generally Compl. filed in 04-09059.  Although Mattel has not sued him for copyright infringement of any Mattel product, Bryant nevertheless claims that he is reasonably apprehensive regarding being sued for copyright infringement.  Specifically, Bryant makes the following allegations in his complaint seeking declaratory relief:

First, Bryant claims that an article published in the Wall Street Journal in July, 2003, attributed to Mattel sources a belief that "the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998."  Compl. Ex. A; Compl. ¶ 54.  The scrapped Mattel project is alleged to be the project referred to by Mattel as "Toon Teens."  Compl. ¶ 56.

Second, Bryant alleges that he suggested, as a way to resolve a discovery dispute, that Mattel stipulate that it would not sue based on "Toon Teens."  Compl. ¶ 55.  Mattel refused to do so.  Id.  However, since that initial refusal, Mattel has represented to the Court that it "will not maintain that Bratz infringes the copyright in Toon Teens."  June 26, 2006, Tr. at 64 (statement of Mattel counsel John B. Quinn).  Mattel has reiterated this position in a post-hearing brief, filed on July 5, 2006.

Third, Mattel cooperated with a Hong Kong toy company that MGA sued for copyright infringement.  Compl. ¶ 56.  MGA's claims involved the Bratz dolls.  Id.  Mattel's cooperation consisted of providing the Hong Kong toy company with documents and photographs of the Toon Teens products, ostensibly to help prove that Bratz was not an original design and that Bryant had copied and infringed Toon Teens.  Compl. ¶ 57.

Finally, Bryant notes that Mattel did not seek copyright registration until November, 2003, which is the same time Mattel claims it first learned of Bryant's

2

EXHIBIT 8   PAGE 56

contract with MGA. Compl. ¶¶ 59-60. Bryant alleges that registration of a copyright is a necessary step to be taken prior to filing a copyright infringement action. Compl. ¶ 60.

**B.   Standing to Seek Declaratory Relief**

The purpose of the Declaratory Judgment Act is "to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure — or never." <u>Societe de Conditionnement v. Hunter Engineering Co.</u>, 655 F.2d 938, 943 (9th Cir.1981). However, a party seeking declaratory relief must still satisfy the "case or controversy" requirement found in 28 U.S.C. § 2201(a). <u>Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.</u>, 896 F.2d 1542,1555 (9th Cir. 1990). This requirement must be satisfied at the time the suit is filed and must continue throughout the term of the suit. <u>Id.</u> at 1556 (citing <u>International Harvester Co. v. Deere & Co.</u>, 623 F.2d 1207, 1210 (7th Cir.1980)).

To meet this requirement, a party seeking declaratory relief must show that, based on his reasonable perceptions, under all the circumstances of the case, there is a substantial controversy between parties having adverse legal interests that causes in the plaintiff a real and reasonable apprehension that he will be subject to liability, and the controversy is of sufficient immediacy and reality to warrant declaratory relief. <u>Hal Roach</u>, 896 F.2d at 1555. The apprehension must have been caused by the defendant's actions. <u>Id.</u> (citing <u>International Harvester</u>, 623 F.2d at 1211).

Viewing Bryant's allegations in light of this standard, and in light of recent developments, the Court must conclude that Bryant, although having a reasonable apprehension of suit prior to counsel's representations regarding the intent to sue based on Toon Teens, no longer has a reasonable apprehension that he will be subject to liability. Bryant's Complaint, of course, makes reference to "other Mattel products;" however, the substance of his allegations all address the product "Toon Teens." The <u>Wall Street Journal</u> article is alleged to have involved Toon Teens. Mattel's cooperation with the Hong Kong toy company allegedly involved Toon Teens.

3

EXHIBIT 8 PAGE 59

1  The copyright registration referenced in the Complaint relates to Toon Teens. No

2  other allegations are made that might tend to raise a real and reasonable

3  apprehension that Bryant could be subject to liability for copyright infringement based

4  on any other Mattel product. Accordingly, Bryant has not met the standard for

5  asserting a claim for declaratory relief.

6  **C.**   **Ruling on Motion to Dismiss**

7       Accordingly, the Court **GRANTS** the Motion to Dismiss and dismisses without

8  prejudice Bryant's claim for declaratory relief. Should Bryant, through discovery or

9  otherwise, acquire a real and reasonable apprehension of being subject to liability on

10  the basis of another identifiable Mattel product, Bryant may file a declaratory relief

11  claim. A claim by Mattel of copyright infringement based on the Toon Teens product

12  is barred by counsel's representation; therefore, Bryant may not seek declaratory relief

13  regarding this issue.

14                    **III. Motion to Dismiss (04-9059)**

15  **A.**   **Factual Background**

16       The parties make the following factual allegations and assert the following

17  claims and counterclaims.

18       Bryant was employed by Mattel from September, 1995, to April, 1998, and

19  again beginning in January, 1999, and ending in October, 2000. Compl. ¶ 9. In

20  January, 1999, Bryant signed documents entitled "Employee Confidential Information

21  and Inventions Agreement" ("Employee Agreement") and "Conflict of Interest

22  Questionnaire" ("COI Questionnaire"). The Employee Agreement provides:

23       This Agreement is designed to make clear that: (I) I will maintain the

24       confidentiality of the Company's trade secrets; (ii) I will use those trade

25       secrets for the exclusive benefit of the Company; (iii) inventions that I

26       create will be owned by the Company; (iv) my prior and continuing

27       activities separate from the Company will not conflict with the Company's

28       development of its proprietary rights; and (v) when and if my employment

                                    4

EXHIBIT 8 PAGE 60

1   with the Company terminates I will not use my prior position with the

2   Company to the detriment of the Company.

3         1.      Provisions Related to Trade Secrets

4             . . . .

5        (b) As used in the Agreement, "Proprietary Information" means

6   any information (including formula, pattern, compilation, device, method,

7   technique or process) that derives independent economic value, actual

8   or potential, from not being generally known to the public or to other

9   persons who can obtain economic value from its disclosure or use, and

10  includes information on the Company, its customers, suppliers, joint

11  ventures, licensors, licensees, distributors and other persons and entities

12  with whom the Company does Business.

13       (c) I will not disclose or use at any time either during or after my

14  employment with the Company, any Proprietary Information except for

15  the exclusive benefit of the Company as required by my duties for the

16  Company, or as the Company expressly may consent to in writing, I will

17  cooperate with the Company and use my best efforts to prevent the

18  unauthorized disclosure, use or reproduction of all Proprietary

19  Information.

20            . . . .

21        2.      Ownership of Inventions

22       (a) I agree to communicate to the Company as promptly and fully

23  as practicable all inventions [as defined below] conceived or reduced to

24  practice to me (alone or jointly by others) at any time during my

25  employment by the Company, I hereby assign to the Company and/or its

26  nominees all my right, title and interest in such inventions, and all my

27  right, title and interest in any patents, copyrights, patent applications or

28  copyright applications based thereon. . . .

                                            5

EXHIBIT  3  PAGE  61

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

. . . .

3.    Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

4.    Miscellaneous

. . . .

6    EXHIBIT 8 PAGE 62

1    (f) This agreement will be governed by and interpreted in

2    accordance with the laws of the State of California.

3         . . . .

4    CAUTION: THIS AGREEMENT CREATES IMPORTANT

5    OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS

6    TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER

7    EMPLOYMENT.

8    Employment Agreement, attached to the Compl. as Ex. A.[1]

9    **B.   The Parties' Claims**

10        Mattel brings a number of claims based on these documents, including breach

11   of contract, breach of fiduciary duty, breach of the duty of loyalty, unjust enrichment,

12   and conversion.

13        Bryant brings a number of counterclaims based on these documents.

14   Specifically, Bryant makes the following challenges to the Employment Agreement:

15        In his first counterclaim, Bryant claims that the Employment Agreement violates

16   Cal. Bus. & Prof. Code §§ 17200 (unfair competition law) because (a) it is an unfair

17   restraint of trade (restricting job mobility and use of publicly available information) in

18   violation of Cal. Bus. & Prof. Code § 16600; (b) it violates Cal. Labor Code §§ 96(k),

19   98.6, and 2699; (c) it violates Cal. Labor Code § 2870; and (d) it is procedurally and

20   substantively unconscionable. See Bryant's Counterclaims ¶¶ 33-47.

21        In his second counterclaim, Bryant claims that the Employment Agreement

22   should be rescinded because it was procured due to mistake, duress, menace and/or

23

24   ─────────────

25   [1] Bryant objects to the Court's consideration of the Agreement and the COI Questionnaire. Bryant purports to dispute the authenticity of these documents.

26   However, examining the substance of Bryant's objections, it becomes clear that Bryant objects not to the content of these documents, but to the validity and legal effect of

27   these documents. Accordingly, the Court's consideration of these documents in connection with the present Motion to Dismiss is proper. See Parrino v. FHP, Inc., 146

28   F.3d 699, 706 (9th Cir. 1998) (the Court may consider documents whose authenticity is not questioned and upon which the complaint necessarily relies).

7

EXHIBIT  3  PAGE  63

1    fraud. See Bryant's Counterclaims ¶¶ 48-54.

2        In his third counterclaim, Bryant alleges that the Employment Agreement was

3    procured by fraud in that Mattel "fail[ed] to disclose to Bryant the true meaning of the

4    terms and the purported legal effect of the [Employment] Agreement." See Bryant's

5    Counterclaims ¶¶ 55-60.

6        Finally, in his fourth counterclaim, Bryant seeks declaratory judgment that

7    Mattel's conduct in requiring Bryant and other employees to execute the Employment

8    Agreement constitutes unfair competition and unfair business practices in violation of

9    Cal. Bus. & Prof. Code §§ 17200 and 16600.  Bryant also seeks a declaration that the

10   Employment Agreement is unlawful and unenforceable as to him and as to other

11   current and former employees of Mattel. See Bryant's Counterclaims ¶¶ 61-65.

12   C.    Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

13        The present Motion to Dismiss requires the Court to determine whether the

14   counterclaims state any claim upon which relief may be granted.  See Fed R. Civ. P.

15   12(b)(6).  The Court will not dismiss the claims for relief unless Bryant cannot prove

16   any set of facts in support of the claims that would entitle him to relief.  See Steckman

17   v. Hart Brewing, Inc., 143 F.3d 1293, 1295 (9th Cir. 1998).  In limiting its inquiry to the

18   content of the counterclaims, the Court must take the allegations of material fact as

19   true and construe them in the light most favorable to Bryant.  See Western Reserve

20   Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985).  Additionally, the Court "is

21   not required to accept legal conclusions cast in the form of factual allegations if those

22   conclusions cannot be reasonably drawn from the facts alleged." Clegg v. Cult

23   Awareness Network, 18 F.3d 752, 755 (9th Cir. 1994).

24   D.    § 17200 Claim

25        1.    Generally

26        "California's unfair competition law (UCL) (17200 et seq.) defines 'unfair

27   competition' to mean and include any unlawful, unfair or fraudulent business act or

28   practice. . . ." Kasky v. Nike, Inc., 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296 (2002)

8

EXHIBIT 8 PAGE 64

1    (internal quotation marks and citation omitted).  Because "section 17200 is written in

2    the disjunctive, it establishes three varieties of unfair competition--acts or practices

3    which are unlawful, unfair, or fraudulent."  Cel-Tech Communications v. Los Angeles

4    Cellular Telephone Co., 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548 (1999) (emphasis

5    added).  "Unlawful" practices are those practices that are prohibited by law, whether

6    "civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made."

7    Saunders v. Superior Court, 27 Cal.App.4th 832, 839 (citing People v. McKale, 25

8    Cal.3d 626, 632 (1979)).  The prohibition against "unfair" conduct is not as broad as it

9    would seem.  In Cel-Tech, the California Supreme Court announced that the test of

10   "unfairness" for commercial cases:  "Unfair" means "conduct that threatens an

11   incipient violation of an antitrust law, or violates the policy or spirit of one of those laws

12   because its effects are comparable to or the same as a violation of the law, or

13   otherwise significantly threatens or harms competition."  Cel-Tech, 20 Cal.4th at 187.

14       2.    **Standing**

15            Bryant claims to be bringing the § 17200 "on his own behalf, on behalf of all

16   current and former employees of Mattel employees . . . and on behalf of the general

17   public."  See Counterclaims ¶ 10.  The parties disagree as to whether he may bring

18   such a claim on behalf of anyone other than himself and argue this point on state-law

19   grounds.  However, it is clear under established Ninth Circuit authority that Bryant's

20   purported claims on behalf of others suffer from a federal constitutional deficiency:

21   Bryant must satisfy the case-or-controversy requirement of Article III for any claim that

22   he brings under § 17200.  Bryant has not alleged facts that establish that he has

23   standing to bring his claims on behalf of anyone other than himself.[2]  See Lee v.

24   American Nat. Ins. Co., 260 F.3d 997, 1001 (9th Cir. 2001) (rejecting, on

25   constitutional grounds, a plaintiff's attempt to assert a § 17200 claim on behalf of

26   others noting that "Article III of the Constitution . . . limits the jurisdiction of the federal

27

28

---

[2] As stated below, Bryant has failed to state a claim on his own behalf as well.

9

EXHIBIT 8   PAGE 65

1   courts to 'cases and controversies,' a restriction that has been held to require a

2   plaintiff to show, *inter alia*, that he has actually been injured by the defendant's

3   challenged conduct.") (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,

4   528 U.S. 167, 180, 120 S.Ct. 693 (2000)).

5       Absent class-action type allegations (and a successful motion to certify a class

6   pursuant to Fed. R. Civ. P. 23), it appears to the Court that Bryant cannot assert

7   claims challenging the Employee Agreement or the COI Questionnaire on behalf of

8   anyone other than himself.  Therefore, the Court considers only whether Bryant has

9   stated a claim pursuant to § 17200 on his own behalf.

10      **3.    Cal. Bus. & Prof. Code § 16600**

11      Bryant argues that the Agreement is "unlawful" because it violates Cal. Bus. &

12  Prof. Code § 16600, which provides: "Except as provided in this chapter, every

13  contract by which anyone is restrained from engaging in a lawful profession, trade, or

14  business of any kind is to that extent void."  Id.  Specifically, Bryant argues (without

15  further elaboration) that "the [Employment] Agreement unlawfully impair[s] Bryant's

16  right to prepare to compete with Mattel." Opp. at 7.

17      California law permits an employee to seek other employment and even to

18  make some "preparations to compete" before resigning.  See Bancroft-Whitney Co. v.

19  Glen, 64 Cal.2d 327, 346 (1966) ("The mere fact that the officer makes preparations

20  to compete before he resigns his office is not sufficient to constitute a breach of duty.

21  It is the nature of his preparations which is significant.")  However, "an employee may

22  not transfer his loyalty to a competitor."  Stokes v. Dole Nut Co., 41 Cal.App.4th 285,

23  295 (1995).  "During the term of employment, an employer is entitled to its employees'

24  undivided loyalty."  Id.  (internal citations and quotation marks omitted).

25      Mattel alleges in the Complaint that Bryant entered into an agreement with

26  MGA to provide MGA design services on a "top priority" basis while he was still

27  employed with by Mattel.  Compl. ¶ 13.  Bryant also makes similar allegations in the

28  related case, Bryant v. Mattel, Inc., 04-09049: "MGA ultimately offered Bryant a

10

EXHIBIT 8 PAGE 66

1  consulting arrangement.  His agreement with MGA was signed on or about October 4,

2  2000.  Bryant resigned from Mattel immediately, giving two weeks notice, but stayed at

3  the company until October 20 to finish up and transition the projects on which he had

4  been working."  Compl. ¶ 38.

5          The parties' arguments assume that the Employment Agreement would prohibit

6  such conduct;[3] therefore, the Court considers whether an agreement prohibiting an

7  employee from entering into a contract with a competitor *during the course of his*

8  *employment* constitutes an unfair restraint of trade in violation of § 16600. The Court

9  concludes that it does not.  Such an agreement is more akin to ensuring the employer

10 has the "employee's undivided loyalty" than it is to an agreement that restricts an

11 employee from "prepar[ing] to compete."  For this reason, Plaintiff cannot state a

12 § 17200 claim on this basis.

13     4.     **Cal. Labor Code §§ 96(k), 98.6 and 2699**

14         Bryant also argues that the Agreement is "unlawful" because it violates a

15 number of provisions of the California Labor Code.  Specifically, Bryant alleges that

16 the Agreement is "unlawful" because it violates § 96(k), which provides:

17         The Labor Commissioner and his or her deputies and

18         representatives authorized by him or her in writing shall, upon the filing

19         of a claim therefor by an employee, or an employee representative

20         authorized in writing by an employee, with the Labor Commissioner, take

21         assignments of: . . . (k) Claims for loss of wages as the result of

22         demotion, suspension, or discharge from employment for lawful conduct

23         occurring during nonworking hours away from the employer's premises.

24 Cal. Labor Code § 96(k).

25         Section 98.6 prohibits discrimination or retaliation against an employee who

26 engages in conduct described in §96(k).  Section 2699 authorizes a private right of

27

28

---

[3] The Court does not mean to imply that Bryant has conceded this point.

11     EXHIBIT 8   PAGE 67

1  action for certain violations of the Labor Code.

2      Assuming that § 96(k) would otherwise support a § 17200 claim, Bryant has still

3  failed to allege any "loss of wages" or "demotion, suspension or discharge" based on

4  lawful off-duty conduct.  Therefore, Bryant has not alleged facts sufficient to support a

5  violation of § 96(k) that would, in turn, support his § 17200 claim.

6      Despite Mattel's arguments against § 98.6 and § 2699 as a proper basis for

7  Bryant's § 17200 claim, Bryant did not defend such claims in his opposition; therefore,

8  the Court treats these claims as abandoned.

9      5.   **Cal. Labor Code § 2870**

10      Bryant also argues that the Agreement is "unlawful" because it violates Cal.

11  Labor Code § 2870.  That provision states:

12      (a) Any provision in an employment agreement which provides

13  that an employee shall assign, or offer to assign, any of his or her rights

14  in an invention to his or her employer shall not apply to an invention that

15  the employee developed entirely on his or her own time without using the

16  employer's equipment, supplies, facilities, or trade secret information

17  except for those inventions that either:

18      (1) Relate at the time of conception or reduction to practice of the

19  invention to the employer's business, or actual or demonstrably

20  anticipated research or development of the employer; or

21      (2) Result from any work performed by the employee for the

22  employer.

23      (b) To the extent a provision in an employment agreement

24  purports to require an employee to assign an invention otherwise

25  excluded from being required to be assigned under subdivision (a), the

26  provision is against the public policy of this state and is unenforceable.

27  Cal. Labor Code § 2870.

28      The Employment Agreement assigns the rights to certain inventions by the

12

EXHIBIT _8_ PAGE _68_

1   employee to the Company.  The Agreement limits the scope of this assignment to the

2   extent required by § 2870 by specifically incorporating and quoting § 2870.  The

3   Agreement also informs the employee that he bears the burden of proving that the

4   invention falls within the scope of § 2870.  This is consistent with California law.  See

5   Cal. Labor Code § 2872 ("In any suit or action arising thereunder, the burden of proof

6   shall be on the employee claiming the benefits of its provisions.").

7          Therefore, Bryant cannot maintain a § 17200 claim based on § 2870.

8      **6.      Unconscionability**

9          Unconscionability has both procedural and substantive elements.  Armendariz

10  v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 99 (2000).  Both must

11  be present for a court to invalidate a contract or one of the contract's provisions.  Id. at

12  114.  However, "[t]he more substantively oppressive the contract term, the less

13  evidence of procedural unconscionability is required to come to the conclusion that the

14  term is unenforceable, and vice versa."  Id.

15         Procedural unconscionability focuses on the elements of oppression and

16  surprise.  Discover Bank v. Superior Court, 36 Cal.4th 148, 160 (2005).  "Oppression

17  arises from an inequality of bargaining power which results in no real negotiation and

18  an absence of meaningful choice . . . . Surprise involves the extent to which the terms

19  of the bargain are hidden in a 'prolix printed form' drafted by a party in a superior

20  bargaining position."  Crippen v. Central Valley RV Outlet, 124 Cal.App.4th 1159, 1165

21  (2004).

22         Substantive unconscionability focuses on the actual terms of the agreement

23  and evaluates whether they create "overly harsh" or "one-sided results."  Armendariz,

24  24 Cal.4th at 114.  To be substantively unconscionable, a contractual provision must

25  shock the conscience.  California Grocers Assn. v. Bank of America, 22 Cal.App.4th

26  205, 214 (1994).

27         Here, Bryant alleges that the Employee Agreement is a contract of adhesion.

28  Counterclaims ¶ 26.  For purposes of the present analysis, the Court assumes that the

13      EXHIBIT  8  PAGE  69

1  Employment Agreement is procedurally unconscionable.  See Discover Bank v.

2  Superior Court, 36 Cal.4th 148, 160 (2005) ("The procedural element of an

3  unconscionable contract generally takes the form of a contract of adhesion, which,

4  imposed and drafted by the party of superior bargaining strength, relegates to the

5  subscribing party only the opportunity to adhere to the contract or reject it.") (internal

6  quotation marks and citation omitted).  However, upon examination of the terms of the

7  Employment Agreement, the Court is unable to conclude that the element of

8  substantive unconscionability has been met.  It is not surprising or overly harsh that

9  Mattel would expect its trade secrets and proprietary information to be kept

10 confidential; the same is true regarding Mattel's expectation that the works of its

11 design staff — created by Mattel's employees, using Mattel's resources, during time

12 for which Mattel paid the employee — be considered its property.  Therefore, Bryant

13 cannot state a claim based on unconscionability.

14      **7.    Cal. Labor Code §§ 232 and 232.5**

15      Although not pleaded in the Counterclaims, Bryant argues that his § 17200

16 claim is supported by an alleged violation of §§ 232 and 232.5.  These provisions

17 prohibit limitations on an employee's ability to disclose the amount of his or her wages

18 or information about his or her working conditions.  Bryant's arguments fail to address

19 how the Employment Agreement (which prohibits the disclosure of "trade secrets" and

20 "proprietary information") prevented him from disclosing the amount of his wages or

21 information about his working conditions.  Bryant has failed to state a § 17200 claim

22 based on §§ 232 and 232.5.

23      **8.    Unfairness**

24      As noted above, there is only a limited basis on which a plaintiff may challenge

25 conduct as an "unfair" business practice.  See Cel-Tech Communications, 20 Cal.4th

26 at 187 ("unfair" conduct that may be challenged pursuant to § 17200 is conduct that is,

27 or is similar to, conduct that constitutes a violation of antitrust laws).  Bryant's

28 allegations do not state a claim for an "unfair" business practice in violation of

14      EXHIBIT  8  PAGE  70

1    § 17200.

2        **9.    "Fraudulent" Conduct**

3        Bryant also argues that the same conduct complained of in connection with his

4    fraud claim also supports a § 17200 claim based on the prohibition against

5    "fraudulent" conduct. This claim is not cognizable. Bryant's fraud claim, explored

6    more fully in the following section, is based upon Mattel's alleged failure to explain to

7    him the terms of the Employment Agreement. However, to allege a "fraudulent

8    business practice" under § 17200, a plaintiff must allege that "members of the public

9    are likely to be deceived." Comm. on Children's Television, Inc. v. Gen. Foods Corp.,

10   35 Cal.3d 197, 211 (1983). Bryant has not alleged facts that would tend to establish

11   that the public might be deceived by Mattel's conduct regarding its employment

12   practices.

13   **E.    Fraud Claim**

14       The parties agree that Bryant's fraud claim is one for fraudulent concealment,

15   and that Bryant must allege all the elements set forth in Marketing West, Inc. v. Sanyo

16   Fisher Corp., 6 Cal.App.4th 603, 612-13 (1992): (1) Mattel must have concealed or

17   suppressed a material fact; (2) Mattel must have been under a duty to disclose the

18   fact to Bryant; (3) Mattel must have intentionally concealed or suppressed the fact with

19   the intent to defraud Bryant; (4) Bryant must have been unaware of the fact and would

20   not have acted as he did if he had known of the concealed or suppressed fact; and (5)

21   as a result of the concealment or suppression of the fact, Bryant must have sustained

22   damage. Bryant alleges that "Mattel required [him] to execute the [Employment]

23   Agreement without disclosing to him its true import and terms." Counterclaims ¶ 56.

24   Bryant's claim is, in essence, that Mattel failed to inform him of the potential legal

25   effect the Agreement might have; in other words, Bryant claims that Mattel failed to

26   fully explain the Agreement to him. This does not support a fraudulent concealment

27   claim.

28       Bryant argues, based on Marketing West, that because Mattel chose to

1    respond to his inquiries, Mattel was under a duty to disclose material facts.  Under

2    Marketing West, where a party is "under no duty to speak" but nevertheless

3    "undertakes to do so, either voluntarily or in response to inquiries, he is bound not only

4    to state truly what he tells but also not to suppress or conceal any facts within his

5    knowledge which materially qualify those stated." Marketing West, 6 Cal.App.4th at

6    613 (citing Rogers v. Warden, 20 Cal.2d 286, 289 (1942)) (internal quotation marks

7    omitted).  In other words, one who speaks "must make a full and fair disclosure." Id.

8            Bryant makes no allegations that suggest that anyone at Mattel falls into this

9    category.  He alleges that he was "presented with the form Agreement by Mattel," and

10   that "he was told that his execution of the Agreement was a condition of his

11   employment." Counterclaims ¶ 26.  He then alleges that "[t]he terms of the Agreement

12   were not explained to him." Id.  This is not the situation discussed in Marketing West

13   which, not surprisingly, prohibits a party from disclosing only that part of the truth that

14   favors it.  Here, Bryant's allegations complain that Mattel did not disclose anything

15   regarding the Employment Agreement.

16   **F.    Rescission**

17           Bryant asserts that rescission is proper because (1) the Agreement was

18   obtained through fraud; (2) Mattel required Bryant to execute the document as a

19   condition of employment, which resulted in duress; and (3) Mattel did not explain the

20   terms of the Agreement to Bryant, did not give him sufficient time to review it, and did

21   not permit or encourage him to seek legal counsel regarding the Agreement.

22           Bryant failed to state a fraud claim; therefore, rescission based on his fraud

23   claim would be improper.

24           Bryant's allegations do not meet the standard for duress, and Mattel's failure to

25   encourage him to seek legal counsel also does not require rescission of the

26   Employment Agreement.  See Robison v. City of Manteca, 78 Cal.App.4th 452, 457

27   (2000).  Additionally, although Bryant argues that he was not "given a meaningful

28   opportunity to review the Agreement at the time he executed it," he does not allege

                                   16   EXHIBIT  8  PAGE  72

1   that he asked for, and was refused, sufficient time to actually read the Agreement with

2   which he was presented.

3   **G.   Declaratory Relief**

4          Finally, in his fourth counterclaim, Bryant seeks declaratory judgment that

5   Mattel's conduct in requiring Bryant and other employees to execute the Employment

6   Agreement constitutes unfair competition and unfair business practices in violation of

7   Cal. Bus. & Prof. Code §§ 17200 and 16600.  This claim for declaratory relief fails

8   because the underlying § 17200 fails.

9          Bryant also seeks a declaration that the Employment Agreement is unlawful

10   and unenforceable as to him and as to other current and former employees of Mattel.

11   See Bryant's Counterclaims ¶¶ 61-65.  As discussed previously, Bryant has no

12   standing to assert claims on behalf of anyone other than himself.  As discussed

13   throughout this Order, Bryant has not sufficiently alleged that the Employment

14   Agreement is unlawful or unenforceable as to him.

15   **H.   Ruling on Motion to Dismiss (04-09059)**

16          The Motion to Dismiss is **GRANTED** in its entirety.  Bryant requested in his

17   Opposition for an opportunity to amend his counterclaims.  Therefore, the Court

18   dismisses Bryant's counterclaims without prejudice.  Bryant may file Amended

19   Counterclaims that conform with this Order within ten days of the entry of this Order.

20                                **IV. Conclusion**

21          For the reasons set forth above, the Court **GRANTS** the Motion to Dismiss in

22   04-09049 and **DISMISSES WITHOUT PREJUDICE** Bryant's action for declaratory

23   relief.  The Court also **GRANTS** the Motion to Dismiss in 04-09059, and **DISMISSES**

24   **WITHOUT PREJUDICE** Bryant's counterclaims.  Bryant is granted ten days' leave to

25   amend the counterclaims in conformity with this Order.

26

27

28

EXHIBIT 8   PAGE 73

1    Although this Order dismisses the Complaint in 04-09049, any future filings in

2   the consolidated action shall continue to be filed under 04-09049 in conformity with

3   the Court's consolidation order.

4        IT IS SO ORDERED.

5   DATE: _7 - 17 - 06_

6

7                              STEPHEN G. LARSON
                              UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 8 PAGE 74

**Exhibit 9**

1  ROBERT F. MILLMAN, Bar No. 062152
   DOUGLAS A. WICKHAM, Bar No. 127268
2  KEITH A. JACOBY, Bar No. 150233
   LITTLER MENDELSON
3  A Professional Corporation
   2049 Century Park East, 5th Floor
4  Los Angeles, CA 90067.3107
   Telephone: 310.553.0308
5  Facsimile:  310.553.5583
   Attorneys for Plaintiff
6  CARTER BRYANT

7

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12  CARTER BRYANT, an individual        Case No.

13             Plaintiff,               COMPLAINT FOR:

14      v.                              DECLARATORY RELIEF OF
                                        COPYRIGHT NON-
15  MATTEL, INC., a Delaware            INFRINGEMENT
    corporation
16
               Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 9 PAGE 75

1          Plaintiff Carter Bryant ("Bryant") for his complaint against Defendant

2 Mattel, Inc. ("Mattel") alleges as follows:

3                              **PARTIES**

4      1.     Bryant is an individual residing in Springfield-Greene County,

5 Missouri.

6      2.     Bryant is informed and believes, and based thereon alleges, that Mattel

7 is a Delaware corporation with a principal place of business at 333 Continental

8 Boulevard, El Segundo, California.

9                  **JURISDICTION AND VENUE**

10      3.     This is an action under 28 U.S.C. §§ 2201 and 2202 for declaratory

11 relief and further relief based upon a declaratory judgment or decree and the

12 Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*. This Court has original subject

13 matter jurisdiction over Bryant's claim pursuant to 28 U.S.C. §§ 1331 and 1338(a)

14 & (b).

15      4.     This Court has personal jurisdiction over Mattel, as it conducts

16 continuous, systematic and routine business within the State of California and the

17 County of Los Angeles.

18      5.     Venue is proper in the United States District Court for the Central

19 District of California pursuant to 28 U.S.C. §§ 1391(b) & (c).

20                  **BACKGROUND FACTS**

21      6.     Bryant is the creative genius and inspiration behind an immensely

22 successful line of fashion dolls called "Bratz."

23      7.     Since its debut on the market in June, 2001, the "Bratz" line has

24 revitalized and invigorated the fashion-doll industry, long dominated by Mattel's

25 "Barbie" dolls.

26      8.     Mattel, however, does not like the competition.

27

28

EXHIBIT 9 PAGE 76

9.   First, Mattel, the world's largest toy company, tried, and failed, to drive "Bratz" out of the market by, *inter alia,* introducing competing products that copy the fresh, new and trendy look of "Bratz."

10.   When this failed, Mattel resorted to other tactics – suing Bryant, three and one half years after the launch of "Bratz," in California state court accusing him, among other things, of the alleged "conversion" of Mattel's "ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property."

11.   Recent events discussed herein reveal what Mattel intends by this vague and overly-broad pleading.  Mattel intends to try to obtain control over the rights to "Bratz," apparently based, in whole or in part, on grounds that "Bratz" was allegedly copied from and infringes upon a scrapped Mattel project called "Toon Teens," or some other as yet undisclosed Mattel property, which Bryant was supposedly exposed to during a period of time when he was employed by Mattel.

12.   Bryant did not copy or infringe anything in coming up with "Bratz." Since these copyright issues cannot be resolved in state court, due to federal preemption, Bryant has a reasonable fear that Mattel will bring another lawsuit against him for copyright infringement.

13.   Bryant brings this action, accordingly, for a Declaratory Judgment that his past, present, and continuing contributions to and work on the conception and development of "Bratz" did not and do not violate or infringe any copyrights or intellectual or other property owned by Mattel.

### Carter Bryant's Background

14.   Bryant is a creative, innovative, artistic person who since an early age has had a special interest in dolls and fashion design.

15.   As a young boy, when his family could not afford to buy him toys, Bryant would draw them.  Dolls and puppets were particular favorites.  While still very young, Bryant began constructing marionettes from papier-mache.

3

EXHIBIT __9__ PAGE __77__

16.    By age nine, Bryant had begun to draw fashions.  Fashion soon became a passion.  He bought books on Hollywood costume design and studied them intensely.  He made designs for his puppets and drew characters and outfits for them.  He even won a contest drawing "Archie" comic book characters and considered becoming a comic book artist.

17.    Bryant took art classes throughout junior high and high school.  He also began reading, and studying, fashion magazines such as "Vogue" and "Harper's Bazaar," thinking he might one day have a career in fashion design.  He began creating his own fashions based on what he saw in such magazines.

18.    After high school, Bryant considered going to design school, but gave up the dream when he realized that his family could not afford to send him.

19.    Instead, he tried songwriting for a while, and even formed a band in 1988.  For several years, he took dead-end jobs to make ends meet, such as stocking shelves at Toys 'R' Us.  But Bryant never let go of his dream, or gave up his interest in drawing and design.

20.    In 1993 he applied and was accepted to Parsons School of Design in Paris.  Based on the information contained in Parsons' website, since its founding in 1896, Parsons has been a forerunner in the field of art and design and was the first art and design school in America to found a campus abroad in 1920.

21.    Unfortunately, despite loans and work programs, attendance was cost-prohibitive.  Bryant went, instead, to Otis College of Art and Design in Los Angeles.  According to its website, Otis began in 1918, when Los Angeles Times founder Harrison Gray Otis bequeathed his MacArthur Park property for a public art college.  Otis is a four-year college offering bachelor's degrees in a variety of art and design-related areas including architecture, fine arts, fashion design and toy design.

22.    On an accelerated track, Bryant finished his entire first year in just 5 months, from January to June of 1994.  He then applied and was accepted to

4

EXHIBIT 9 PAGE 78

1   transfer to Parsons, however, again he could not raise enough money to go. He
2   stayed one more semester at Otis, but with only a small scholarship and mounting
3   debt, Bryant left the school in December, 1994. He went home to Missouri for
4   Christmas and ended up staying.

5       23.    Realizing that going to Paris and working as a fashion designer was
6   simply not economically feasible, Bryant got the idea that he might be able to
7   combine his love of dolls and fashion by becoming a fashion designer for dolls in
8   the toy industry. Naturally thinking of "Barbie," the fashion doll that had
9   dominated the market for decades, he put together a portfolio of ten or so drawings
10  to send to Mattel, but lacked the confidence to actually send it to such a huge,
11  intimidating company.

12      24.    By 1995, however, he decided he had nothing to lose. Broke and with
13  no real career opportunities in sight, Bryant sent the package to Mattel.

14                  **Bryant's Employment by Mattel**

15      25.    Much to his surprise, Mattel called him for an interview. After
16  completing a "trial project" for the company at its request prior to his being
17  considered for formal employment, he was hired as a temporary employee in
18  September, 1995. He was promoted to a full-time position in November, 1995.

19      26.    During his time at Mattel, Bryant worked exclusively on "Barbie"-
20  related projects for the "Barbie" family of dolls, as directed by Mattel's marketers.
21  Mattel told him what they wanted him to design, and he did what he was directed to
22  do.

23      27.    On occasion, Bryant would offer new, original and creative ideas to
24  Mattel, but Mattel discouraged anything non-traditional. No matter what the idea
25  was, Mattel would try to figure out a way to use it for "Barbie," or not at all.

26      28.    Bryant felt that his creativity and originality were being stifled and
27  suppressed at Mattel.

28

EXHIBIT __9__ PAGE __79__

1    29.    Within two years at Mattel, Bryant was feeling frustrated. He simply
2    did not fit Mattel's mold. He also missed his family, and so decided to return home
3    to Missouri. With some significant design and work experience under his belt, he
4    thought he might be able to build a career as a freelance design artist.

5    30.    He left California in approximately January 1998, but continued to
6    work for Mattel from Missouri, on a part-time basis, until April, 1998.

7                        **Bryant's Inspiration: "Bratz"**

8    31.    Bryant continued to live with his parents in Missouri for the rest of the
9    1998, working exclusively on his own ideas and drawings, with the hopes of
10   building a career as a freelance artist.

11   32.    Among other things, Bryant created greeting cards, and considered
12   going into the greeting card business. He even applied for a job at Hallmark.
13   Bryant also did a bit of freelance design and artwork for Ashton Drake Galleries of
14   Chicago. On information and belief, Ashton Drake is the world's largest direct
15   marketer of limited edition, collectible porcelain dolls, and its dolls have sold at
16   auction for as much as $1200. It is widely renowned among doll collectors for its
17   top-quality, handcrafted collectible dolls. Ashton Drake employs artists and
18   freelancers to work on its doll programs and new doll concepts. Bryant worked on
19   "Angel" and "Wedding" theme projects for the company in 1998. He
20   supplemented his income by working at a clothing store, Old Navy. But Bryant
21   also worked on his own ideas for dolls – his lifelong obsession. One day, while
22   returning home from Old Navy, Bryant drove past a high school and had a "eureka"
23   moment. Inspired by the "bratty" attitude he had observed, as well as
24   advertisements that he had seen relating to hip-hop fashions and other trends of the
25   time, Bryant started sketching multi-ethnic, urban youth, dressed in trendy fashions.
26   Bryant tried to capture in his sketches the "bratty" attitude he had observed. Little
27   did he know then that his concept, "Bratz," would become a national, indeed,
28   international, sensation.

6

EXHIBIT __9__ PAGE __80__

33.   Bryant was simply trying to figure out a way to make a living doing what he enjoyed.  Unable to support himself as a freelance artist, however, and turning thirty and not wanting to live at home forever, Bryant realized he needed a steady job.  Based on Mattel's comments to him before he left its employ in 1998 indicating an interest in having him remain with the company, he reapplied and secured a position with Mattel starting in January 1999.

34.   Mattel hired Bryant back to work exclusively on Mattel's "collectibles" line, a high-end, expensive line of "Barbie" dolls designed for adult doll collectors, not children.  He began working for the company again on January 4, 1999.  Again, Mattel's marketing department directed Bryant to create the designs it wanted to market.

35.   Bryant never showed Mattel the ideas, drawings, designs and concepts that he had worked on on his own while he had been gone from the company, including the concept for what later became the "Bratz" dolls.  He already knew that Mattel was not receptive to new, creative, innovative ideas.  Besides that, they were his, and he was afraid that Mattel would not give him credit or compensation.

36.   One day he happened to show his concept for "Bratz" dolls to a friend who did freelance work for MGA Entertainment, Inc. ("MGA").

37.   Bryant's friend thought that MGA might be interested in talking to Bryant, and arranged a meeting.

38.   MGA ultimately offered Bryant a consulting arrangement.  His agreement with MGA was signed on or about October 4, 2000.  Bryant resigned from Mattel immediately, giving two weeks notice, but stayed at the company until October 20 to finish up and transition the projects on which he had been working.

39.   On information and belief, MGA was founded in 1979 as a small consumer electronics business and made its first foray into the toy business in 1987 marketing handheld LCD games featuring licensed "Nintendo" characters, where its initial success allowed it the opportunity to obtain additional licenses for such

7

EXHIBIT 9   PAGE 81

1   popular properties as the "Power Rangers" and others. By the time Bryant started

2   working for MGA in late 2000, the company was selling other kinds of toys and

3   dolls.

4         40.    After leaving Mattel, Bryant began working with a team of MGA

5   employees and freelancers to develop and physically embody Bryant's concept.

6   The development took substantial time, effort, creativity, money, and know-how,

7   but with this effort, Bryant's concept for "Bratz" dolls was reduced to practice and

8   became a reality.

9             **"Bratz" Dolls Revolutionize The Fashion Doll Market**

10       41.    MGA first unveiled the "Bratz" doll concept at the Hong Kong Toy

11   Fair in January 2001. In June 2001, MGA introduced the line to the market.

12       42.    Unlike Barbie Dolls, the "Bratz" line of dolls and branded products

13   (collectively "Bratz Dolls") sport a hip, multi-ethnic urban look that appeals to

14   contemporary teenage and pre-teen girls. At approximately 9.5 to 10 inches tall,

15   the Bratz Dolls are intentionally shorter than Barbie Dolls and look notably

16   different, with large heads, big dramatic eyes and lips, small, thin bodies, oversized

17   feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which

18   requires a stand), and up-to-date fashions.

19       43.    Featuring and embodying the slogan "The Girls With a Passion for

20   Fashion!", Bratz Dolls, invigorated, transformed and expanded the fashion doll

21   market, in particular proving popular among "tween" age girls – *i.e.,* those between

22   childhood and adolescence – who Mattel had all but abandoned as a market.

23       44.    On information and belief, the "Bratz" line has been praised by

24   consumers, retailers and toy industry analysts alike. In 2001, the "Bratz" line won

25   the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the

26   Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the

27   "Bratz" line again won the TIA People's Choice Toy of the Year Award, the

28   Family Fun Toy of the Year Award. LIMA, the licensing industries official arm,

8

EXHIBIT ___9___ PAGE _8 2_

1    awarded MGA's "Bratz" the best character license of the year as well as the overall

2    best licensed property of the year for 2003. MGA's "Bratz" also earned the coveted

3    TIA "Property of the Year" and "Girl Toy of the Year," in 2003, as well as the

4    Family Fun Toy of the Year Award. MSNBC named "Bratz" the "Hottest Toy of

5    the Year," and both MGA and "Bratz" received several other accolades.

6         45.    According to media reports and business analysts, this success caught

7    Mattel by surprise, with many Mattel insiders reportedly assuming that Bratz would

8    be a short-lived fad.

9         46.    As it turned out, "Bratz" was not a fleeting fancy among young girls.

10         47.    Beginning in 2002, "Bratz" really gave "Barbie" a run for its money

11    as the top selling fashion doll.

12         48.    Bryant continues to contribute to, and provide ideas, concepts and

13    designs for "Bratz" on an ongoing basis as a designer and consultant for MGA. For

14    example, Bryant designed a wholly original male character for MGA, which was

15    turned into the "Bratz Boyz" line of dolls by MGA.

16                    **Mattel's Market Response to "Bratz"**

17         49.    In response to "Bratz", Mattel, in 2002, rushed to release "My Scene

18    Barbie," a line of fashion dolls under the "Barbie" name that looked much more

19    like "Bratz" than the traditional main line "Barbie" Doll. Like "Bratz," "My Scene

20    Barbie" dolls have oversized heads, artfully made-up almond-shaped eyes, large,

21    overly-lined and lipsticked lips, trendy clothes and hair styles, over-sized feet and a

22    more ethnic look. Like the "Bratz" Dolls, "My Scene" Dolls are packaged with two

23    outfits and an accessory. And, since fall 2003, like the "Bratz, which are

24    introduced with themes, "My Scene" Dolls are introduced with a theme as well.

25         50.    After the success of MGA's "Bratz Boyz" dolls, Mattel also

26    introduced male doll characters to the "My Scene" line, even though for 45 years

27    the "Barbie" line had only included a single male doll – Barbie's boyfriend "Ken"

28

9

EXHIBIT 9  PAGE 83

1   (whom, after 45 years as her boyfriend, Barbie "dumped" in a 2004 Mattel publicity

2   stunt to revive "Barbie" in the face of the "Bratz" success).

3       51.   On information and belief, the "My Scene" Dolls, however, have not

4   come close to achieving the popularity and acclaim of "Bratz."

5       52.   A year after the debut of "My Scene," Mattel launched "Flavas," a line

6   of urban fashion dolls also intended to appeal to the "tween" market. "Flavas,"

7   were poorly received by children, parents and the toy industry, and Mattel

8   discontinued the line less than a year after its launch.

9   **Mattel's Accusations of Copyright Infringement Against Bryant**

10       53.   Unable to supplant "Bratz" – the more popular, better quality product

11   – with the inferior and less popular "Flavas" or even "My Scene," Mattel changed

12   tactics. It turned to disparaging Bryant, and accusing him of copying from Mattel.

13       54.   In or about July 2003, Mattel "sources" told a *Wall Street Journal*

14   reporter that "[I]nside Mattel, some are convinced the BRATZ borrow liberally

15   from a Mattel project that was scrapped at the testing stage in 1998." Attached

16   hereto as Exhibit A is a true and correct copy of this article.

17       55.   Mattel's thinly veiled accusation of copyright infringement against

18   Bryant took more substantive form when, in April, 2004, Mattel sued Bryant in

19   California state court for, among other things, allegedly "converting" Mattel's

20   intellectual property (the "Bryant Litigation"). Bryant sought discovery from

21   Mattel, accordingly, regarding any Mattel idea, concept, project or product

22   allegedly stolen or copied by Bryant, including "Toon Teens," "Diva Stars," and

23   "My Scene." Faced with objections from Mattel, Bryant offered to take no further

24   discovery on such issues if Mattel would enter into a fact stipulation that it would

25   not claim that Bryant copied "Bratz" from Mattel's "Toon Teens." Mattel refused

26   to enter into such a stipulation. For reasons unknown, Mattel has not yet sued

27   Bryant for copyright infringement. It has, however, enlisted a surrogate to take a

28

10

EXHIBIT 9 PAGE 84

1   first-run at attempting to establish infringement, perhaps intending to see what the

2   outcome might be before launching a direct attack itself.

3      56.   Specifically, in 2002, MGA filed suit in Hong Kong against the

4   manufacturers of "Funky Tweenz" (known infringers of intellectual property in the

5   toy industry) (the "Hong Kong defendants"). "Funky Tweenz" is a line of "Bratz"

6   knock-off products. In connection with this lawsuit (the "Hong Kong Lawsuit"),

7   Bryant has been informed that MGA filed various documents substantiating its

8   ownership of "Bratz," including with regard to Bryant's involvement in MGA's

9   development of "Bratz" and in its reduction to practice of Bryant's original

10  inspirational sketches. Bryant has also been informed that in August 2004 the

11  Hong Kong defendants produced to MGA's counsel *unreleased photographs* of,

12  and documents relating to, Mattel's "Toon Teens" project – the same project Mattel

13  had mentioned in the *Wall Street Journal* article as the supposed origin of "Bratz."

14  The Hong Kong defendants initially refused, however, to authenticate these

15  documents, or to divulge the source of these photographs. The defendants also

16  refused to explain the purported relevance of the documents to the Hong Kong

17  Lawsuit.

18     57.   Finally, however, Bryant has been informed that on October 7, 2004,

19  the Hong Kong defendants revealed that Mattel was the source of the "Toon Teens"

20  documents and information. Indeed, the Hong Kong defendants have revealed that

21  they – accused copyright infringers -- have a document-sharing agreement with

22  Mattel. Apparently, Mattel prefers to assist known infringers in Hong Kong in

23  trying to prove that Bryant copied Mattel in coming up with "Bratz", instead of

24  trying to prove it themselves in a United States federal court of law – or at least for

25  the time being, that seems to be Mattel's strategy.

26     58.   On information and belief, Mattel, and the same counsel representing

27  it in the Bryant Litigation, have told the Hong Kong defendants that "Bratz" is not

28  an original design and have provided documents and other information to those

11

EXHIBIT __9__ PAGE __85__

1   defendants in an effort to assist such infringers to evade liability for copyright

2   infringement of "Bratz" in the Hong Kong action.  On information and belief,

3   Matter has told the Hong Kong defendants that the "Toon Teens" documents

4   provided to such defendants prove that Bryant copied and infringed Mattel's "Toon

5   Teens" or other Mattel property.

6        59.   Mattel even rushed to register the copyright for its long-shelved "Toon

7   Teens" during the very same month that it claims to have first learned of Bryant's

8   contract with MGA, November, 2003, and using the same counsel that Mattel is

9   using in the Bryant Litigation.  A true and correct copy of this registration is

10  attached hereto as Exhibit B.  Notably, Bryant is informed that the dates on Mattel's

11  "Toon Teens" drawings and pictures reflect that they were created in 1999, *after*

12  Bryant conceived of "Bratz" in 1998.

13       60.   On information and belief, Mattel's copyright registration of "Toon

14  Teens" is no coincidence; it is a preliminary step necessary for Mattel to sue Bryant

15  for copyright infringement.

16       61.   There is no doubt that Mattel intends to get back at Bryant via false

17  allegations and to try to obtain control of Bryant's brainchild any way it can,

18  including falsely alleging that "Bratz" is nothing more than derivative of Mattel's

19  own work(s).  This is wholly untrue.  "Bratz," is an original idea and concept,

20  independently conceived and created during a time when Bryant was not working

21  for Mattel.  The fact that MGA reduced the original designs to practice and further

22  developed "Bratz" into a highly successful product that now competes directly with

23  and has taken market share from Mattel's "Barbie" line of fashion dolls, including

24  as a result of the "Bratz"-inspired and imitating dolls distributed by others, is not to

25  be under-estimated.

26

27

28

EXHIBIT 9 PAGE 86

**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-infringement)**

62.     Bryant repeats and realleges the allegations contained in paragraphs 1 through 61 of this Complaint and incorporates them by reference, as though fully and completely set forth herein.

63.     Bryant has a reasonable apprehension that Mattel will bring an action against him under 17 U.S.C.A. §§ 101, *et seq*. alleging that "Bratz" is not an independent or original work but, rather, is copied, derived from or infringes Mattel's copyrights in "Toon Teens," or some other Mattel work; that Mattel is the rightful owner of his "Bratz" idea, concept or original drawings or works and any copyrights and other intellectual property rights therein; and that Mattel alone possesses the exclusive rights to exploit such rights.

64.     Bryant contends that "Bratz" is his own independent and original idea, concept and work, that "Bratz" dolls were derived from Bryant's original idea, concept and work, and that Mattel has no right in "Bratz" whatsoever.  Bryant denies that he copied any of Mattel's property or work in conceiving and developing "Bratz," and denies that "Bratz" infringes or was derived from any Mattel property or work.

65.     Indeed, "Bratz" and "Toon Teens" are not substantially similar. "Bratz" are sexy, hip, modern fashion dolls with up-to-date fashions, and are designed to look like real teenagers, and the "Bratz" themes and playsets are based on places and activities that real teenagers would go to and do.  Bryant is informed that "Toon Teens," in contrast, appear to be childlike, soft-bodied dolls with "baby-fat" and bright, fantasy-colored hair and are, by Mattel's own statements to the *Wall Street Journal*, "cartoonish."

66.     An actual and justiciable controversy exists between Bryant and Mattel regarding whether Bryant's ideas, concepts, or designs for, or contributions to,

13

EXHIBIT 9 PAGE 87

1   "Bratz" were and are original works, or copied from, derivative of or infringing on

2   Mattel's works, be it "Toon Teens," or any other unidentified Mattel work.

3        67.    This actual and justiciable controversy arises under federal copyright

4   law.

5        68.    Bryant seeks Declaratory Judgment of non-infringement; specifically

6   that his ideas, concepts, and designs for, and contributions to, "Bratz" were and are

7   original works, and were and are not copied from, derivative of or infringing on any

8   Mattel work.

9        69.    A judicial declaration of non-infringement is necessary and

10   appropriate at this time pursuant to 28 U.S.C. § 2201, so that Bryant may ascertain

11   his rights and duties with respect to "Bratz," including but not limited to dispelling

12   any potential cloud over his ability to have assigned or otherwise transferred rights

13   to his original works to MGA. It is also necessary to clear Bryant's name and

14   mitigate the continuing damage to his reputation resulting from Mattel's unfounded

15   representations about Bryant made in the press and to the defendants in the Hong

16   Kong Litigation.

17        WHEREFORE, Bryant hereby prays for relief against Mattel as

18   follows:

19        1.     For a Declaratory Judgment of non-infringement.

20        2.     For a Declaratory Judgment that Bryant's ideas, concepts,

21   drawings and designs for, and contributions to, "Bratz" were and are independent

22   and original works, and were and are not copied from, derivative of or infringing

23   any Mattel work, including, without limitation, Mattel's copyrighted "Toon Teens."

24        3.     For a Declaratory Judgment that Bryant was the sole and true

25   owner of all rights relating to "Bratz" that Bryant heretofore assigned to MGA and

26   that such rights were owned by Bryant free and clear of any ownership claim by

27   Mattel at the time he assigned rights to MGA. .

28        4.     For a Declaratory Judgment that none of Bryant's contributions

14

EXHIBIT 9 PAGE 88

1    to and work on "Bratz" infringes Mattel's copyrighted "Toon Teens" or any other

2    property allegedly owned by Mattel and that all such contributions to and work on

3    "Bratz" by Bryant were independent and original to Bryant.

4         5.      For costs of suit herein, including reasonable attorneys' fees,

5    and such other and further relief as the court may deem just and proper.

6

7       Dated: November 2, 2004         ROBERT F. MILLMAN

8                                      DOUGLAS A. WICKHAM

9                                      KEITH A. JACOBY
                                      LITTLER MENDELSON

10

11

12                            By

13                                      KEITH A. JACOBY
                                     Attorneys for Plaintiff
                                     CARTER BRYANT

14

15

16    Los_Angeles:381846.1 028307.1010

17

18

19

20

21

22

23

24

25

26

27

28

15

EXHIBIT 9    PAGE 89

Westlaw.                                                                                              factiva

7/18/03 WSJ A1                                                                                        Page 1

7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Friday, July 18, 2003

Dolled Up: To Lure Older Girls, Mattel Brings In Hip-Hop Crowd

---

It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'Bratz'

---

Battle of the Big Heads

By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8- to 12-year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT A          EXHIBIT 9   PAGE 90

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories; she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet -- they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT 9 PAGE 92

as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights -- meaning separate molds -- and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self-expression," she says.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT 9 PAGE 93

7/18/03 WSJ A1                                                                    Page 5

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's
missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and
you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's
going to backfire."

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week,
as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as
pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed
by the blond Happy D. doll. "Look, she's got black [hair] extensions like
Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals
during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on
the Disney Channel, is now probably as well known for her 11 body piercings and
her mud wrestling-themed MTV video called "Dirrty."It's a sign of the changing
times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try
to tie up with someone like Christina Aguilera."

                             ---- INDEX REFERENCES ----

    COMPANY:         KB Holdings LLC (KBTY); Mattel Inc (MATL)


    NEWS SUBJECT:     (Marketing (C31); Market Share (C313); Corporate/Industrial
    News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice -
    Consumer Products (REQRCP); Editor's Choice - Industry Trends/Analysis (REQR))


    INDUSTRY:        (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores
    (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

    REGION:          (North American Countries (NAMZ); United States (USA); United
    States - California (USCA); Northeast U.S. (USE); United States - Massachusetts
    (USMA); Western U.S. (USW))

    Language:  EN

    OTHER INDEXING:   Marketing; Market Share; Page-One Story; Content Types;
    Corporate/Industrial News; United States - California; United States -
    Massachusetts; United States; Northeast U.S.; Western U.S.; North American
    Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores;
    Consumer Products; Media; Consumer Cyclical; Newswire More Code; Newswire End
    Code; All Entertainment & Leisure; Limited Product Specialty Retailers;
    Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index;
    S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

    Word Count: 2217

    7/18/03 WSJ A1
    END OF DOCUMENT

            Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT  9  PAGE  94

Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

**VAu 612-625**

EFFECTIVE DATE OF REGISTRATION

11 - 28 - 03

DO NOT WRITE ABOVE THIS LINE IF YOU NEED MORE SPACE USE A SEPARATE CONTINUATION SHEET

**1**

Title of This Work ▼
TOON TEENS

NATURE OF THIS WORK See Instructions
Doll designs

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical serial or collection give information about the collective work in which the contribution appeared Title of Collective Work ▼

If published in a periodical or serial give   Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

**2**
**a**

NAME OF AUTHOR ▼
Mattel Inc

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

**NOTE**

Under the law the author of a work made for hire is generally the employer not the employee (see Instructions) For any part of this work that was made for hire check Yes in the space provided give the employer (or other person for whom the work was prepared) as Author of that part and leave the space for dates of birth and death blank

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
     Domiciled in United States

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes ☑ No
Pseudonymous?  ☐ Yes ☑ No
If the answer to either of these questions is "Yes" see detailed instructions

Nature of Authorship Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture   ☐ Map   ☐ Technical drawing
☑ 2 Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

**b**

Name of Author ▼

Dates of Birth and Death
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
     Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes" see detailed instructions

Nature of Authorship Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2 Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

**3**
**a**

Year in Which Creation of This Work Was Completed
1999
Year in all cases

**b**

Date and Nation of First Publication of This Particular Work
Complete this information   Month _____   Day _____   Year _____
ONLY if this work has been published

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼
Mattel Inc
333 Continental Blvd
El Segundo CA 90245

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2 give a brief statement of how the claimant(s) obtained ownership of the copyright ▼

APPLICATION RECEIVED
NOV 21 2003
ONE DEPOSIT RECEIVED
NOV 2 8 2003
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

**EXHIBIT 8**

MORE ON BACK ▶

EXHIBIT 7   PAGE 95