| | | |
|---|---|---|
| 1 | 14:10:21 | MR. ZELLER: Well, I will ask the question as |
| 2 | 14:10:24 | I would like. You guys were the ones who were |
| 3 | 14:10:28 | objecting earlier when I tried to do it in a more |
| 4 | 14:10:30 | leading form on foundational things just to get |
| 5 | 14:10:33 | through but -- |
| 6 | 14:10:34 | MS. CENDALI: I am not leading. I am not |
| 7 | 14:10:34 | leading. You can ask it without leading. You can |
| 8 | 14:10:37 | also ask it without going through each one and |
| 9 | 14:10:39 | asking exactly the same thing, but it's up to you. |
| 10 | 14:10:41 | MR. ZELLER: But the information on these |
| 11 | 14:10:43 | things is different, so that's why I am doing it. |
| 12 | | BY MR. ZELLER: |
| 13 | 14:10:48 | Q.    So we are discussing Deposition Exhibit |
| 14 | 14:10:51 | No. 10, specifically M1491. I am sorry. Was I on |
| 15 | 14:11:03 | 90? Let me ask that question then as to M1491. |
| 16 | 14:11:11 | You will see the information in the lower |
| 17 | 14:11:13 | right-hand corner, it says "all rights assigned," |
| 18 | 14:11:16 | and then it continues on and ends with a |
| 19 | 14:11:19 | handwritten notation that starts off "contract |
| 20 | 14:11:22 | date." |
| 21 | 14:11:22 | A.    Yes. |
| 22 | 14:11:22 | Q.    Was that information on any of the |
| 23 | 14:11:24 | artboards that either Mr. Bryant or MGA showed to |
| 24 | 14:11:27 | you in October of 2000? |

EXHIBIT 11 PAGE 162

136

| | | | |
|---|---|---|---|
|1|14:11:28|A.|No, it wasn't.|
|2|14:11:31|Q.|Directing your attention to the next|
|3|14:11:33|page, M1492, you will see that this drawing has a|
|4|14:11:39|circle C/1998.|
|5|14:11:43|A.|Um-hmm.|
|6|14:11:45|Q.|Was that handwritten notation or date|
|7|14:11:47|written on any of the artboards that you saw from|
|8|14:11:50|Carter Bryant or MGA in October of 2000 --|
|9|14:11:53|A.|No.|
|10|14:11:54|Q.|-- or at any other time?|
|11|14:11:57|A.|No, I have not seen that.|
|12|14:11:58|Q.|Was the same true of the rest of the|
|13|14:12:00|printed information and the other handwriting that|
|14|14:12:03|continues on on 1492?|
|15|14:12:06|A.|The same is true.|
|16|14:12:10|Q.|Was the same true for 1493?|
|17|14:12:14|A.|Yes.|
|18|14:12:18|Q.|Is the same true for M1494?|
|19|14:12:24|A.|Yes.|
|20|14:12:26|Q.|Directing your attention to Page M1495|
|21|14:12:31|of Deposition Exhibit 10, you will see that there|
|22|14:12:34|is a handwritten circle "C" with 8/1998 on it?|
|23|14:12:39|A.|Yes.|
|24|14:12:40|Q.|Was that on the artboards that|

EXHIBIT 11  PAGE 163

137

| | | |
|---|---|---|
| 1 | 14:12:44 | Mr. Bryant or MGA showed to you in October of 2000? |
| 2 | 14:12:49 | A.    No. |
| 3 | 14:12:51 | Q.    Is the same true for the rest of the |
| 4 | 14:12:53 | information that's there on M1495 that begins "all |
| 5 | 14:12:58 | rights assigned" and then continues on to that |
| 6 | 14:13:00 | handwritten notation contract date? |
| 7 | 14:13:02 | A.    The same is true. |
| 8 | 14:13:04 | Q.    Is the same true for the next page, |
| 9 | 14:13:06 | M1496? |
| 10 | 14:13:12 | A.    The same is true. |
| 11 | 14:13:16 | Q.    Directing your attention to M1497, you |
| 12 | 14:13:22 | will see that that has a handwritten notation, |
| 13 | 14:13:27 | 8/11 -- excuse me -- 8/1998.  Was that handwritten |
| 14 | 14:13:34 | notation or that date on the artboards or artwork |
| 15 | 14:13:39 | that Carter Bryant and MGA showed you in October of |
| 16 | 14:13:42 | 2000? |
| 17 | 14:13:43 | A.    No. |
| 18 | 14:13:44 | Q.    Is the same true of the additional |
| 19 | 14:13:50 | written information on this page beginning with |
| 20 | 14:13:52 | "all rights assigned to" and then ending with that |
| 21 | 14:13:56 | handwritten notation "contract date" and then with |
| 22 | 14:13:58 | a date? |
| 23 | 14:13:59 | A.    The same is true. |
| .4 | 14:14:01 | Q.    Is the same true for 1498? |

EXHIBIT 11  PAGE 164

138

| | | | |
|---|---|---|---|
| 1 | 14:14:07 | A. | The same is true. |
| 2 | 14:14:09 | Q. | Is the same true for 1499? |
| 3 | 14:14:14 | A. | The same is true. |
| 4 | 14:14:17 | Q. | Is the same true for the next page, |
| 5 | 14:14:20 | M1500? | |
| 6 | 14:14:29 | A. | In regards to this written stuff on the |
| 7 | 14:14:31 | bottom? | |
| 8 | 14:14:31 | Q. | Yes. |
| 9 | 14:14:32 | A. | Yes, the same is true. |
| 10 | 14:14:32 | Q. | Is the same true for the next page, |
| 11 | 14:14:35 | M501? | |
| 12 | 14:14:39 | A. | It's upside-down. The same is true. |
| 13 | 14:15:11 | MR. ZELLER: Would you please mark as |
| 14 | 14:15:12 | Exhibit 328 a one-page document which appears to be |
| 15 | 14:15:16 | an e-mail from Liz Hogan to Paula Treantafelles |
| 16 | 14:15:19 | with a CC to Steve Linker dated October 12, 2000. |
| 17 | 14:15:25 | It bears Bates number SL 0004. |
| 18 | | (WHEREUPON, a certain document was |
| 19 | | marked Deposition Exhibit No. 328, |
| 20 | 14:15:54 | for identification, as of 9/13/06.) |
| 21 | 14:15:54 | MS. CENDALI: Do you have copies of that for |
| 22 | 14:15:56 | us? |
| 23 | 14:15:57 | MS. KREBS: It is in the Steve Linker |
| 24 | 14:15:59 | production. SL 0004. |

EXHIBIT 11 PAGE 165

| | | |
|---|---|---|
| 1 | 14:16:10 | MS. CENDALI:   Thank you. |
| 2 | | BY MR. ZELLER: |
| 3 | 14:16:19 | Q.   Do you recognize what we have marked as |
| 4 | 14:16:21 | Exhibit 328? |
| 5 | 14:16:22 | A.   Yes, I do. |
| 6 | 14:16:23 | Q.   Please tell us what this is, at least |
| 7 | 14:16:27 | the typewritten portion for now? |
| 8 | 14:16:30 | A.   These are lists of questions regarding |
| 9 | 14:16:34 | packaging direction for product Scooter Samantha |
| 10 | 14:16:37 | for MGA, for Paula Treantafelles.   These were our |
| 11 | 14:16:43 | questions. |
| 12 | 14:16:44 | Q.   And was this e-mail sent to MGA? |
| 13 | 14:16:49 | A.   Sorry? |
| 14 | 14:16:50 | Q.   Was this e-mail sent to MGA? |
| 15 | 14:16:52 | A.   Yes. |
| 16 | 14:16:53 | Q.   To Paula Treantafelles specifically? |
| 17 | 14:16:55 | A.   Yes. |
| 18 | 14:16:57 | Q.   Did you participate in creating this |
| 19 | 14:16:58 | e-mail? |
| 20 | 14:16:59 | A.   Yes. |
| 21 | 14:16:59 | Q.   And please tell me what your |
| 22 | 14:17:03 | participation was, generally speaking. |
| 23 | 14:17:05 | A.   I conversed with Liz Hogan to come up |
| 24 | 14:17:08 | with these questions of certain details that we |

EXHIBIT  11  PAGE 166

255

STATE OF ILLINOIS )

                        ) SS:

COUNTY OF DuPAGE   )

        I, PAULINE M. VARGO, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter of said state, C.S.R. No. 84-1573, do hereby certify:

        That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

        That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

        That the said deposition was taken before me at the time and place specified;

        That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

EXHIBIT __11__ PAGE __167__

256

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois, this 22nd day of September, 2006.


Notary Public, DuPage County, Illinois.

My commission expires July 27, 2007.


C.S.R. Certificate No. 84-1573

EXHIBIT ___11___ PAGE 168

Exhibit  12



TOP OF HEAD

ROOTING LINE / SEPERATION LINE

ACTUAL PROPORTION

ACTUAL SIZE
10"

0.7
3. 110
2.52
1.47

310) 580 -3615

ATTORNEY'S EYES ONLY

BRYANT 00278

EXHIBIT 12  PAGE 169

**Exhibit 13**



TOP OF HEAD

ROOTING LINE / SEPERATION LINE

ACTUAL PROPORTION

ACTUAL SIZE
10"

EXHIBIT 13 PAGE 10

SL08077

**Exhibit 14**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., A DELAWARE )
CORPORATION, )
)
PLAINTIFF, )
)
VS. )  NO. CV 04-9059 NM(RNBX)
)
CARTER BRYANT, AN )
INDIVIDUAL; AND DOES 1 )
THROUGH 10, INCLUSIVE, )
)
DEFENDANTS. )
_____ )
)
AND RELATED COUNTER-CLAIM. )
_____ )

CONFIDENTIAL TRANSCRIPT

VOLUME I

DEPOSITION OF ANNA RHEE

LOS ANGELES, CALIFORNIA

THURSDAY, FEBRUARY 3, 2005

REPORTED BY:

KAREN E. KAY
C.S.R. NO. 3862, R.M.R., C.R.R.

JOB NO.
C40593LMF

**LUDWIG KLEIN**
REPORTERS

10868 KLING STREET
TOLUCA LAKE, CALIFORNIA 91602
800.540.0681      FAX 818.508.6326
e-mail: lois@ludwigklein.com

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    A    OKAY.                                                      04:05:06

2    Q    WHERE IT SAYS "[READING:]   3 ANGEL FACES"?               04:05:06

3    A    YEAH.                                                      04:05:09

4    Q    NOW, DOES THAT REFER -- DOES THIS INVOICE                 04:05:11

5    REFER TO WORK THAT YOU DID ON PRAYER ANGELS?                   04:05:15

6         MR. ZELLER:   THIS IS ASKED AND ANSWERED.                 04:05:19

7    IN FACT, THAT'S EXACTLY WHAT WAS ANSWERED.   AND               04:05:19

8    ALSO, SINCE YOU'RE JUST ASKING A REPETITIVE                    04:05:26

9    QUESTION, I AM GOING TO OBJECT AT THIS POINT TO THE            04:05:29

10   ALLOCATION OF TIME.   YOU'VE USED NOW WELL OVER 3-1/2          04:05:30

11   HOURS OF THE 7 HOURS THAT THIS WITNESS HAS                     04:05:35

12   AVAILABLE.                                                     04:05:40

13        THE WITNESS:   IT COULD BE.                               04:05:45

14   BY MR. WICKHAM:

15   Q    IT COULD BE.   OKAY.   SO SAME QUESTION --                04:05:46

16        MR. BERMAN:   WAIT A SECOND.                              04:05:52

17        (MR. BERMAN CONFERS WITH THE WITNESS.)                    09:16:47

18   BY MR. WICKHAM:

19   Q    SAME QUESTION WITH REGARD TO YOUR INVOICE                 04:06:08

20   DATED SEPTEMBER 12, 2001.                                      04:06:09

21        MR. ZELLER:   WE WENT OVER EXACTLY THESE                  04:06:22

22   QUESTIONS.                                                     04:06:22

23   BY MR. WICKHAM:

24   Q    COULD THIS INVOICE REFER TO YOUR WORK ON                  04:06:23

25   THE DOLL THAT ULTIMATELY CAME TO MARKET AS PRAYER              04:06:26

1   ANGELS?                                                     04:06:29

2          MR. BERMAN:  OBJECTION.  LACKS FOUNDATION,           04:06:30

3   CALLS FOR SPECULATION.                                      04:06:33

4          THE WITNESS:  IT'S POSSIBLE.                         04:06:45

5   BY MR. WICKHAM:

6      Q    OKAY.  LET'S GO TO PAGE 1 OF EXHIBIT 201.           04:06:45

7   COULD THIS INVOICE DATED JUNE 12, 2000, RELATE TO           04:06:54

8   YOUR WORK ON THE DOLL THAT ULTIMATELY CAME TO MARKET        04:07:01

9   AS PRAYER ANGELS?                                           04:07:05

10         MR. ZELLER:  OBJECTION.  AGAIN ASKED AND             04:07:11

11  ANSWERED.                                                   04:07:11

12         THE WITNESS:  THERE'S NO WAY.                        04:07:11

13  BY MR. WICKHAM:                                             04:07:12

14     Q    NO WAY?                                             04:07:12

15     A    NO WAY.                                             04:07:13

16     Q    OKAY.  SO IF M.G.A. HAS YOUR WORK, DOLL             04:07:14

17  HEADS, THAT ARE PART OF THE PRAYER ANGEL PROJECT            04:07:22

18  THAT WERE SUBMITTED TO M.G.A. IN JUNE OF 2000 --            04:07:28

19     A    OKAY.                                               04:07:33

20     Q    -- YOU'RE SAYING THAT WOULD BE AN                   04:07:35

21  IMPOSSIBILITY?                                              04:07:36

22     A    IT'S IMPOSSIBLE.                                    04:07:37

23     Q    "IMPOSSIBLE"?                                       04:07:39

24     A    IT'S IMPOSSIBLE.                                    04:07:40

25     Q    WHY IS IT IMPOSSIBLE?                               04:07:40

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1          MR. BERMAN:  OBJECT.  YOU KNOW, THIS IS          04:07:4:

2    BADGERING OF THE WITNESS.  THIS IS A THIRD-PARTY          04:07:4:

3    WITNESS, AND, YOU KNOW, YOU'RE ENTITLED TO A LITTLE          04:07:4(

4    LATITUDE, BUT YOU'VE ASKED HER MANY TIMES.  YOU'VE          04:07:4:

5    ASKED HER TO ASSUME FACTS, AND, YOU KNOW, YOU          04:07:5:

6    HAVEN'T SHOWN HER THOSE FACTS.  YOU HAVEN'T SHOWN          04:07:54

7    HER THE -- YOU HAVEN'T SHOWN HER THE FACT THAT YOU          04:07:57

8    SAY IF THEY HAVE THIS.  I JUST THINK THAT'S AN          04:08:03

9    IMPROPER ARGUMENTATIVE FORM OF ---          04:08:07

10          MR. ZELLER:  AND I WILL TAKE IT AS          04:08:07

11   ABSOLUTELY FASCINATING, COUNSEL, IF YOUR          04:08:08

12   REPRESENTATION IS TRUE THAT IN FACT M.G.A. HAS SUCH          04:08:11

13   A THING AND IT HAS NOT BEEN PRODUCED.  I WILL FIND          04:08:14

14   THAT MORE THAN FASCINATING, AND WE WILL, OF COURSE,          04:08:17

15   BRING THAT UP WITH THE COURT.  BUT I ASSUME THAT YOU          04:08:19

16   HAVE A FACTUAL BASIS FOR YOUR QUESTION.  SO ONE OF          04:08:22

17   TWO THINGS IS TRUE:  ONE, AS WE HAVE SHOWN          04:08:24

18   PREVIOUSLY, M.G.A. IS WITHHOLDING EVIDENCE; OR, TWO,          04:08:27

19   THERE WAS NO BASIS FOR YOUR QUESTION.  EITHER ONE IS          04:08:30

20   FINE BY ME.          04:08:33

21   BY MR. WICKHAM:

22      Q    CAN YOU PLEASE ANSWER MY QUESTION?          04:08:35

23          MR. BERMAN:  WAIT A SECOND.          04:08:39

24   BY MR. WICKHAM:          04:08:39

25      Q    WHY IS IT IMPOSSIBLE THAT YOUR JUNE 12,          04:08:39

CONFIDENTIAL TRANSCRIPT - VOLUME I          EXHIBIT 14 PAGE 198 174

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1  2000, INVOICE --                                             04:08:4:

2       MR. BERMAN:  WAIT A SECOND.                             04:08:4:

3       (MR. BERMAN CONFERS WITH THE WITNESS.)                  09:16:4'

4  BY MR. WICKHAM:                                              09:22:5(

5     Q    -- CANNOT REFER TO WORK THAT ULTIMATELY LED

6  TO THE DOLL PRAYER ANGELS?                                   04:08:5(

7     A    ARE YOU ASKING ME WHY CAN'T THIS BE THIS?            04:09:0!

8     Q    NO.  YOU SAID THAT IT IS IMPOSSIBLE FOR THE          04:09:1(

9  INVOICE, WHICH IS PAGE 1 OF EXHIBIT 201 -- YOU SAID          04:09:1:

10 IT'S IMPOSSIBLE THAT THAT COULD REFER TO YOUR WORK           04:09:1(

11 ON THE DOLL THAT ULTIMATELY BECAME PRAYER ANGELS.            04:09:1!

12 MY QUESTION FOR YOU IS:  WHY IS THAT IMPOSSIBLE?             04:09:22

13      MR. BERMAN:  SAME OBJECTIONS.                            04:09:26

14      THE WITNESS:  BECAUSE THIS IS THE FIRST ONE              04:09:28

15 THAT I DID FOR CARTER, AND BRATZ WAS IT.  THAT'S THE          04:09:30

16 ONLY THING I DID.                                            04:09:36

17      MR. BERMAN:  SHE SAID THAT FIVE TIMES.                   04:09:37

18 THIS IS THE FIFTH TIME YOU'VE DONE THIS.  IT'S               04:09:39

19 GETTING BORING.  IT'S NOT BORING.  IT'S GETTING              04:09:43

20 HARASSING, AND IT'S BECOMING REPETITIVE AND --              04:09:48

21 BY MR. WICKHAM:                                              04:09:58

22     Q    NOW, WHEN YOU WERE PAINTING DOLL FACES FOR          04:09:58

23 M.G.A., BESIDES BRATZ, DID YOU PAINT ANY DOLL FACES          04:10:03

24 FOR BLACK OR AFRICAN-AMERICAN DOLLS?                         04:10:09

25      MR. BERMAN:  I'M GOING TO OBJECT.  THAT'S               04:10:12

CONFIDENTIAL TRANSCRIPT - VOLUME II   PAGE 175

EXHIBIT 4   199

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | VAGUE AND AMBIGUOUS. | 04:10:1 |
| 2 | THE WITNESS:  FOR WHO? | 04:10:1 |
| 3 | BY MR. WICKHAM: | |
| 4 | Q    NON-BRATZ DOLLS. | 04:10:1 |
| 5 | A    FOR WHO? | 04:10:1 |
| 6 | Q    M.G.A. | 04:10:2 |
| 7 | A    WAY LATER, WAY, WAY LATER. | 04:10:2 |
| 8 | Q    OKAY.  WHEN YOU SAY "WAY, WAY LATER," WHAT | 04:10:2 |
| 9 | DO YOU MEAN BY THAT?  WHAT TIME PERIOD ARE YOU | 04:10:2 |
| 10 | REFERRING TO? | 04:10:3 |
| 11 | A    LIKE, I DON'T KNOW.  MONTHS LATER WHEN THEY | 04:10:3 |
| 12 | REFERRED ME TO OTHER PEOPLE. | 04:10:3 |
| 13 | Q    OKAY.  IF YOU WOULD TURN TO YOUR INVOICE | 04:10:5 |
| 14 | DATED JANUARY 4, 2001. | 04:10:5 |
| 15 | A    JANUARY -- | 04:11:00 |
| 16 | Q    JANUARY 4. | 04:11:03 |
| 17 | MR. BERMAN:  THAT REALLY IS DATED JANUARY | 04:11:05 |
| 18 | 4TH, 2000. | 04:11:07 |
| 19 | MR. WICKHAM:  HE'S CLARIFIED THAT IT'S A | 04:11:11 |
| 20 | 2001 INVOICE. | 04:11:12 |
| 21 | MR. BERMAN:  THAT BEARS THE DATE OF 021. | 04:11:13 |
| 22 | MR. ZELLER:  THIS IS AR21? | 04:11:21 |
| 23 | MR. BERMAN:  YEAH.  THAT'S THE WAY -- | 04:11:22 |
| 24 | MR. ZELLER:  THANK YOU. | 04:11:23 |
| 25 | THE WITNESS:  OKAY. | 04:11:23 |

200

1          REPORTER'S CERTIFICATE

2

3

4          I, KAREN E. KAY, C.S.R. NO. 3862, A CERTIFIED

5     SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA,

6     DO HEREBY CERTIFY:

7          THAT PRIOR TO BEING EXAMINED THE WITNESS NAMED

8     IN THE FOREGOING PROCEEDINGS WAS BY ME DULY SWORN TO

9     TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

10    THE TRUTH;

11         THAT SAID PROCEEDINGS WERE TAKEN BY ME IN

12    SHORTHAND AT THE TIME AND PLACE HEREIN NAMED AND WAS

13    THEREAFTER TRANSCRIBED INTO TYPEWRITING UNDER MY

14    DIRECTION, SAID TRANSCRIPT BEING A TRUE AND CORRECT

15    TRANSCRIPTION OF MY SHORTHAND NOTES.

16         I FURTHER CERTIFY THAT I HAVE NO INTEREST IN

17    THE OUTCOME OF THIS ACTION.

18

19                    FEBRUARY 7, 2005

20

21

22

23                    KAREN E. KAY
                      C.S.R. NO. 3862
24

25

EXHIBIT 14 PAGE 177

234

**Exhibit 15**

| From: | Isaac Larian |
|---|---|
| Sent: | Tuesday, October 10, 2000 6:38 PM |
| To: | Victoria O'Connor |
| Cc: | Dennis Medici |
| Subject: | RE: CARTER COMPENSATION |

from the date he signed the contract.

-----Original Message-----
| From: | Victoria O'Connor |
|---|---|
| Sent: | Tuesday, October 10, 2000 10:56 AM |
| To: | Isaac Larian |
| Cc: | Dennis Medici |
| Subject: | FW: CARTER COMPENSATION |

Do you want to start his salary for the month of Octoebr since he began in September? Please advise.

-----Original Message-----
| From: | Paula Treantafelles |
|---|---|
| Sent: | Tuesday, October 10, 2000 9:02 AM |
| To: | Victoria O'Connor |
| Subject: | RE: CARTER COMPENSATION |

I would say that Carter has worked on average about 4 hours a day and we began working on this line the first part of September.

-----Original Message-----
| From: | Victoria O'Connor |
|---|---|
| Sent: | Tuesday, October 10, 2000 8:11 AM |
| To: | Paula Treantafelles |
| Subject: | FW: CARTER COMPENSATION |

Please let me know how many hours Carter has worked and the day he started meetings with you.  Thanks.

-----Original Message-----
| From: | Dennis Medici |
|---|---|
| Sent: | Tuesday, October 10, 2000 6:46 AM |
| To: | Victoria O'Connor |
| Subject: | CARTER COMPENSATION |

Victoria,
Please reply what amount we should pay Carter and have Isaac approve.  Thanks.

Dennis Medici
MGA Entertainment
(818) 894-2525
(818) 830-7176 fax

*II*  EX. NO. *305*
/ PAGES *7, 18, 06*
A. PRAXMARER, CSR • WIT: *LARIAN*

CONFIDENTIAL
ATTORNEY'S EYES ONLY          MGA004717

*30 5*

EXHIBIT *15* PAGE *178*

**Exhibit 16**

*26604*
*PM 7514*

# Veronica Marlow

12250 Woodley Ave.
Granada Hills CA, 91344

# INVOICE

*PCT05478*

**INVOICE NO.:**   G000625

**DATE:**          11/14/00

**Sold To:**

Paula Treantafales
MGA Entertainment
16730 Schoenborn St.
North Hills, CA 91343

**Ship To:**      Same

| SALESPERSON | P.O. NUMBER | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
|  | PO03521 | 10/26/00 |  |  | net |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
|  | "Bratz" dolls research, development and support services from 9/29/00 to 10/20/00. |  |  |
| 18 hrs. | Brainstorm and development meetings. | 50.00 | 900.00 |
| 12 hrs. | Support for body sculpting and packaging. | 50.00 | 600.00 |
| 18 hrs. | Fashion research. | 50.00 | 900.00 |
| 19 hrs. | Fashion development and support. | 50.00 | 950.00 |
| 21 hrs. | Pattern and sample development. | 50.00 | 1,050.00 |

|  |  |
|---|---|
| SUBTOTAL | 4,400.00 |
| SALES TAX @ 8.25% | 363.00 |
| SHIPPING & HANDLING |  |
| TOTAL DUE | 4,763.00 |

*only pay $4,400.00 (per P.O.)*

_____
**Customer Signature**

*THANK YOU FOR YOUR BUSINESS!*

CONFIDENTIAL - ATTORNEYS' EYES ONLY          REDACTED

MGA0008739

EXHIBIT 16   PAGE 179

# Veronica Marlow

12250 Woodley Ave.
Granada Hills CA, 91344

# INVOICE

INVOICE NO.:   G000626

DATE:          11/14/00

**Sold To:**

Paula Treantafales
MGA Entertainment
16730 Schoenborn St.
North Hills, CA 91343

**Ship To:**   Same

| SALESPERSON | P.O. NUMBER | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
| | PO03522 | 10/26/00 | | | net |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| | "Bratz" dolls third party services from 10/13/00 to 10/20/00. | | |
| 49 hrs. | Third party sewing and pattern making support. | 30.00 | 1,470.00 |
| 32 hrs. | Third party sewing and pattern making support. | 30.00 | 960.00 |
| | SUBTOTAL | | 2,430.00 |
| | SALES TAX @ 8.25% | | |
| | SHIPPING & HANDLING | | |
| | TOTAL DUE | | 2,630.48 |

Only pay $2,430.00
(per P.O.)

_____
Customer Signature

### THANK YOU FOR YOUR BUSINESS!

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

REDACTED

MGA0008742

EXHIBIT 16 PAGE 180

**Exhibit 17**



ATTORNEY'S EYES
ONLY

BRYANT 00167

36-1

EXHIBIT 7  PAGE 81

Exhibit  18

M. RANDALL OPPENHEIMER (S.B. #77649)
DIANA M. TORRES (S.B. #162284)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile:  (213) 430-6407

Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.

*SEND*

FILED
CLERK, U.S. DISTRICT COURT

DEC 7 2004

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware Corporation,

Plaintiff,

v.

CARTER BRYANT, an individual; and DOES 1 through 10, inclusive,

Defendant.

Case No. CV 04-9059 NM (RNBx)

**STIPULATION PERMITTING MGA TO INTERVENE AS A PARTY TO THIS ACTION** *+ ORDER*

Hon. Nora Manella

DOCKETED ON CM

DEC - 8 2004

BY _____ 006

STIPULATION PERMITTING MGA TO INTERVENE AS A PARTY

EXHIBIT ___ PAGE ___

1    WHEREAS, on April 27, 2004, Plaintiff Mattel, Inc. ("Mattel") filed suit

2    against Carter Bryant ("Bryant") and ten unnamed "Does" alleging breach of

3    contract, breach of the duty of loyalty, breach of fiduciary duty, conversion and

4    unjust enrichment.

5    WHEREAS, MGA, believes, at this time, that it has a significantly

6    protectable interest relating to the subject matter of the action, that the disposition

7    of the action may impair or impede MGA's ability to protect its interest absent

8    intervention, and that MGA's interest is not adequately represented by the existing

9    parties.

10    WHEREAS, Mattel is agreeable to the filing of the Answer in Intervention as

11    a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

12    its rights, defenses or positions in this or any other action or to the Answer in

13    Intervention, including without limitation to Mattel's jurisdictional objections;

14    WHEREAS, Bryant is agreeable to the filing of the Answer in Intervention as

15    a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

16    his rights, defenses or positions in this or any other action;

17    NOW THEREFORE, MGA, Mattel and Bryant hereby stipulate, subject to

18    this Court's approval, as follows:

19        1.    MGA may intervene as a party to this action; and

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

- 1 -

EXHIBIT 12 PAGE 183

2.      MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:        December 3, 2004       O'MELVENY & MYERS LLP

                                      By: _____
                                          Diana M. Torres
                                          Attorneys for Applicant-Intervenor
                                          MGA ENTERTAINMENT, INC.


Dated:        December___, 2004       QUINN EMANUEL URQUHART
                                      OLIVER & HEDGES LLP


                                      By: _____
                                          Michael T. Zeller
                                          Attorneys for Plaintiff
                                          MATTEL, INC.

Dated:        December___, 2004       LITTLER MENDELSON, P.C.


                                      By: _____
                                          Keith A. Jacoby
                                          Attorneys for Defendant
                                          CARTER BRYANT

IT IS SO ORDERED.


        Dated:        December___, 2004

                                          _____
                                          Hon. Nora M. Manella
                                          United States District Judge

- 2 -

EXHIBIT 18 PAGE 174

2.      MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:      December___, 2004      O'MELVENY & MYERS LLP


By:_____
    Diana M. Torres
    Attorneys for Applicant-Intervenor
    MGA ENTERTAINMENT, INC.


Dated:      December___, 2004      QUINN EMANUEL URQUHART
                                   OLIVER & HEDGES LLP


By: _____
    Michael T. Zeller
    Attorneys for Plaintiff
    MATTEL, INC.


Dated:      December___, 2004      LITTLER MENDELSON, P.C.


By:_____
    Keith A. Jacoby
    Attorneys for Defendant
    CARTER BRYANT


IT IS SO ORDERED.


Dated:      December_____, 2004

                                   _____
                                   Hon. Nora M. Manella
                                   United States District Judge


- 2 -

EXHIBIT ___ PAGE ___

2.   MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:        December___, 2004        O'MELVENY & MYERS LLP

By:_____
      Diana M. Torres
Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.

Dated:        December___, 2004        QUINN EMANUEL URQUHART
                                                            OLIVER & HEDGES LLP

By:_____
      Michael T. Zeller
Attorneys for Plaintiff
MATTEL, INC.

Dated:        December 3, 2004        LITTLER MENDELSON, P.C.

By:_____
      Keith A. Jacoby
Attorneys for Defendant
CARTER BRYANT

IT IS SO ORDERED.

Dated:        December 7th, 2004

_____
      Hon. Nora M. Manella
United States District Judge

- 2 -

EXHIBIT 8 PAGE 186

EXHIBIT 18 PAGE 187

Exhibit 19

1   DALE M. CENDALI
    *(of counsel, not admitted in California)*
2   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA  90071-2899
    Telephone:  (213) 430-6000
5   Facsimile:   (213) 430-6407
    email:        dtorres@omm.com
6
7   PATRICIA GLASER (S.B. # 55668)
    CHRISTENSEN, MILLER, FINK,
8   JACOBS, GLASER, WEIL &
    SHAPIRO LLP
9   10250 Constellation Boulevard, 19ᵗʰ Floor
    Los Angeles, CA  90067
10  Telephone:  (310) 553-3000
    Facsimile:   (310) 556-2920
11
12  Attorneys for Plaintiff
    MGA Entertainment, Inc.
13
14                  UNITED STATES DISTRICT COURT
15                  CENTRAL DISTRICT OF CALIFORNIA
                    CV 05-02727   CBM(RZx)
16  MGA ENTERTAINMENT, INC.,          Case No.
17                  Plaintiff,         COMPLAINT FOR FALSE
                                       DESIGNATION OF ORIGIN,
18          v.                         AFFILIATION, ASSOCIATION OR
                                       SPONSORSHIP (15 U.S.C. § 1125
19  MATTEL, INC., a Delaware           (a)); UNFAIR COMPETITION (15
    Corporation, and DOES 1-10,        U.S.C. § 1125 (a), Cal. Bus. & Prof.
20                                     Code § 17200 *et seq.* and California
                    Defendants.        Common Law); DILUTION (15
21                                     U.S.C. § 1125 (c), Cal. Bus. & Prof
                                       Code § 14330 and California Common
22                                     Law); AND UNJUST ENRICHMENT
23                                     **DEMAND FOR JURY TRIAL**
24
25
26
27
28

EXHIBIT 19 PAGE 188

1         Plaintiff MGA Entertainment, Inc. for its complaint against

2    Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

3

4                        **PARTIES**

5        1.    Plaintiff MGA Entertainment, Inc. ("MGA") is a California

6    corporation organized and existing under the laws of the State of California, with a

7    principal place of business in Van Nuys, California.

8        2.    MGA is informed and believes, and based thereon alleges, that

9    Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place

10   of business in El Segundo, California.

11       3.    MGA is ignorant of the true names and capacities of the defendants

12   sued herein under the fictitious names DOES 1 through 10 inclusive.  MGA will

13   seek leave of court to amend this complaint to allege such names and capacities

14   when they are ascertained.  MGA is informed and believes, and based thereon

15   alleges, that each of the fictitiously named DOE defendants is responsible in some

16   manner for the wrongful conduct alleged herein.  MGA further alleges that each

17   defendant acted in concert with, as agent or representative for, or at the request or

18   on behalf of another or Mattel.  Each charging allegation contained herein is,

19   therefore, also hereby alleged against each fictitiously named DOE defendant.

20

21               **JURISDICTION AND VENUE**

22       4.    Through this action MGA asserts claims against Mattel arising under

23   the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and

24   Professions Code Sections 17200 *et seq.*, California Business and Professions Code

25   Section 14330 and California common law.  This Court has original subject matter

26   jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and

27   1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

28

                            1

1   subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2   Section 1367(a).

3       5.    This Court has specific personal jurisdiction over Mattel, as it has

4   purposefully committed, within the State of California, the acts from which these

5   claims arise and/or has committed tortious acts outside California, knowing and

6   intending that such acts would cause injury to MGA within the state.  The Court

7   also has general personal jurisdiction over Mattel, as it conducts continuous,

8   systematic and routine business within the State of California and the County of

9   Los Angeles.

10       6.    Venue is proper in the United States District Court for the Central

11   District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                      **FACTUAL BACKGROUND**

14       7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15   competition-by-intimidation and serial copycatting of MGA's products, which

16   Mattel has used in an unbridled effort to cause confusion in the market place and

17   eliminate MGA as a competitor in the toy and fashion doll market long dominated

18   and controlled by Mattel.

19       8.    MGA is a privately-held company in the San Fernando Valley that

20   began in 1979 as a small consumer electronics business.  In 1987, the company

21   made its first foray into the toy business when it secured rights to market handheld

22   LCD games featuring licensed Nintendo® characters.  Building on that small

23   success, the company began marketing products for popular licensed properties

24   such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25   successful company, however, was propelled into the limelight after its daring

26   release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27   "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28   contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

EXHIBIT 19 PAGE 190

1   sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2   new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3   has been able to seriously challenge "Barbie" for market share, and begin to loosen

4   Mattel's 50-year iron-fisted grip on the fashion doll market.

5         9.    Mattel has not taken kindly to the challenge. Either unable or

6   unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7   has, instead, taken a more expeditious approach, resorting to unfair and anti-

8   competitive business practices. Wielding its substantial clout and influence in the

9   toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11   suppliers and others in the industry – both in the U.S. and internationally – in order

12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13   from obtaining licensees, contracts and supplies for its products. Mattel has also

14   serially imitated and copy-catted the look of MGA products, trade dress,

15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16   line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17   competitive conduct and to recover the extensive damage that Mattel's illicit

18   behavior has caused, and continues to cause, MGA. Mattel's own website states:

19   "As the global leader in the toy industry, we believe that how we achieve success is

20   just as important as the success itself." It also proclaims that "unwavering integrity

21   defines our corporate culture on every level, guiding how we work and how we do

22   business." Mattel's own corporate governance standards require it to "play by the

23   rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24   speak louder than its words.

25

26

27

28

EXHIBIT ____ PAGE ____

**Mattel History and Performance**

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat... Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT 17 PAGE 192

reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later, it spent $700 million for the Pleasant Co., a mail-order doll company and maker of the "American Girl" doll collection. And in December 1998, Mattel announced plans to fork out a monumental $3.5 billion to buy the Learning Company, followed quickly by Mattel's purchase, in March 1999, of a software company, Purple Moon.

14. Despite these acquisitions, the company continued to struggle. The retail environment and buying patterns had unquestionably changed, but Mattel had not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary profit-generator was still "Barbie." But "Barbie" had grown stale, and sales languished. Posting additional losses in the first quarter of 1999, Mattel announced that it would lay off 3,000 employees – 10% of its work force.

15. Mattel's stock plummeted again in late 1999, dropping 30% on Mattel's announcement that it would fall as much as 55% short of analysts' earning estimates for the third quarter. Mattel blamed its troubles primarily on its expensive, $3.5 billion acquisition of the Learning Company, which had turned out to be a disaster fraught with licensing and distribution problems, bad debt, high product returns and high advertising costs.

16. By early 2000, Mattel's stock had crashed to as low as $8 per share, and some analysts considered Mattel vulnerable to a takeover. Investors clamored for Ms. Barad's resignation, and got their wish.

17. Jill Barad resigned from Mattel in February 2000.

18. For three months, the company was without a permanent chief executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23 years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

EXHIBIT ___ PAGE 92

1   with reviving its ailing cheese business.  Investors looked for him to do the same

2   for Mattel.

3        19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4   *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5        20.    The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6   closed factories in the United States, shipped production to Mexico, and sold off the

7   Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8   bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9   meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10  industry that had become increasingly driven by consumer whims and fads, and the

11  hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12  resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13  business plan was not to diversify, but to build upon and expand sales of its existing

14  brands.  Mattel was, after all, still generating billions in revenue despite the decline

15  of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16  other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17  for approximately a third of the company's sales.

18       21.    Then came the competition – MGA's "BRATZ".

19

20  **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21       22.    "BRATZ" challenged "Barbie's" half-century domination of the

22  fashion-doll market like nothing ever before had been able to do.

23       23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24  Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25  that spring.  Finished products were first shipped in May 2001.  MGA introduced

26  the line to consumers in June 2001.

27

28

EXHIBIT __19__ PAGE __94__

24.    Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25.    At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

EXHIBIT 19 PAGE 195

26.    Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

<table>
<tr><td>MGA's "BRATZ"</td><td>Mattel's "Barbie"</td></tr>
</table>

**MGA's "BRATZ"**          **Mattel's "Barbie"**

  

27.    Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.    The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT 19 PAGE 96

2004, including the Suppliers Performance Award by Retail Category (the "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing Today/Apparel Merchandising.

29.     Although but a tiny fraction of Mattel's size, with "BRATZ", MGA was able to chip away at Mattel's stranglehold on the fashion doll market, gaining shelf space and market share as "Barbie" sales remained flat or, at times, declined.

30.     The competition that MGA (once a licensee of Mattel!) and "BRATZ" posed to Mattel was unexpected and unwelcomed by Mattel.  Where "Barbie" had once enjoyed a 90% share of the fashion doll market in 1997, that share had already slipped to 85% or less by the time of the release of "BRATZ".  With the company still struggling under Mr. Eckert to overcome prior years of declining sales and mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the untimely competition.  Mr. Eckert's "leaner" Mattel was not enough to battle more potential erosion in "Barbie's" market share.  Mattel had to combat "BRATZ" and MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

**Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

31.     Mattel was not poised to nimbly respond to "BRATZ" with a new, creative product of its own – indeed, it had been antithetical to Mattel's corporate culture and mentality for Mattel to even conceive that a product might vie for shelf space with "Barbie", let alone be available for sale to consumers mere months after first being shown to retailers.  Mattel had to take a more expeditious route.

32.     Instead of fairly competing, Mattel waged war against MGA using a wide-array of tortious, unfair and anti-competitive practices including systematic, serial copycatting and intellectual property infringement, aided by intimidation, threats and other acts of unfair competition and anti-competitive conduct, all with one goal in mind – to banish MGA from the market – or minimize its ability to capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT 17  PAGE 99

**Mattel's serial copycatting and intellectual property infringement**

33.     Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.     The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**



circa 2002                     circa 2004






10

EXHIBIT A PAGE 197

35.     These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.     Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.     Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

### BLONDE

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |
|---|---|---|
|  |  |  |

11

EXHIBIT 1   PAGE 9

1
2

Mattel's
Traditional "Barbie"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

3
4
5
6
7
8



9

**BRUNETTE**

10
11

Mattel's
Traditional "Theresa"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

12
13
14
15
16
17



18
19
20
21
22
23
24
25
26
27
28

12

EXHIBIT 13  PAGE 200

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |



38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye



EXHIBIT 19 PAGE 201

13

39.    The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**            **New Mattel "My Scene" Eye**

    

40.    Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT 19  PAGE 202



15

EXHIBIT 19 PAGE 203



Mattel's
Traditional "Theresa"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

**AFRICAN AMERICAN**

Mattel's
Traditional "Barbie"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

16

EXHIBIT 19 PAGE 264

41.    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging



43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT ___ PAGE ___

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

**MGA's "BRATZ"**
**"Wintertime Wonderland" Packaging**

**Mattel's "My Scene"**
**"Chillin' Out" Packaging**



45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble,*" as shown here

**MGA's "BRATZ"**
**"SPORTZ" Packaging**

**Mattel's Recent "My Scene"**
**"MIAMI GETAWAY" Packaging**



18

EXHIBIT 19 PAGE 206

46.     In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.     As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.     For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.     When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.     When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

EXHIBIT 11 PAGE 207

51.    Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.    Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.    For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.    Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition.  It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products.  Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.    As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

20



| MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |

56.   Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a **Bratz** hair and makeup doll head."



Hairstyle practice

21

EXHIBIT ___ PAGE 509

57.     Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.     At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users:  "Do you have a passion for fashion?"

59.     Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

<u>**MGA's "BRATZ Dogz"**</u>          <u>**Mattel's "My Scene" dog**</u>




60.     And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.     Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

22



customers too have been confused.

62.    Indeed, Mattel's television commercials and "My Scene" products have become so confusingly similar to MGA's that even advertising executives have expressed concern.  One went so far as to say that although imitation is the best form of flattery, what the individual had seen at Mattel's showroom, and how its "My Scene" dolls now look so confusingly similar to "BRATZ", was "shocking."  This person further opined that it was clear that Mattel is intending to confuse customers and capture "BRATZ" market share, and even asked MGA if it was considering legal action.

63.    The press also has taken notice of Mattel's attempts to confuse consumers.  On or about February 18, 2005, a visitor to MGA's showroom from a prominent news publication stated, "Oh my, I just came from Mattel's showroom and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."  Another member of the press visiting MGA's showroom offered the unsolicited comment, "have you seen the new 'My Scene' dolls eyes are exactly like 'BRATZ'?"  Yet another opined that Mattel's "My Scene" line was exactly like "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had bought "BRATZ", and still another has commented on Mattel's imitation of MGA.  On or about February 16, 2005, during an interview of a Mattel representative on local network news in New York, "My Scene Barbie" was displayed by a Mattel representative.  During conversation about the dolls, the interviewer exclaimed that they looked like "BRATZ".  The Mattel representative just laughed – but this is no laughing matter.  This colloquy was available for replay and viewing, and was even transcribed, on the internet.

64.    Customers too have been similarly confused.  Some actually contacted MGA seeking to purchase "My Scene" dolls.

65.    Mattel's conduct is planned, deliberate and intentional.  Mattel has systematically, copied, imitated and liberally borrowed many of the distinctive,

23

EXHIBIT 19 PAGE 211

1    essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting

2    the brand, creating customer confusion, and unfairly stifling competition.

3        66.    Ironically, Mattel sued one of its other competitors in Europe for doing

4    much the same thing: "systematically copying and borrowing elements" from "My

5    Scene", on grounds that "this conduct constitutes unfair competition and passing

6    off." Indeed it does.

7        67.    What is more, Mattel's conduct has reached beyond "BRATZ" and

8    "BRATZ"-related products to include other new MGA toy lines.

9        68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and

10   well-recognized model for Mattel's "Wee 3 Friends" line.  Mattel even adopted

11   changes to the color scheme of its similarly-shaped packaging to create confusion

12   with MGA's distinctive packaging.

13

14   **MGA's "4-Ever Best Friends"**        **Mattel's "Wee 3 Friends"**

15

16           

17

18

19

20

21

22

23           

24

25

26

27

28

24

EXHIBIT 17 PAGE 22

69.   In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

| MGA's "Mommy's Little Patient" | Mattel's "Little Mommy Potty Training Baby Doll" |
|---|---|
|  |  |

70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line.  When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R", and "S" in compressed block lettering.  Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

EXHIBIT 1   PAGE 213

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

EXHIBIT ___ PAGE ___

75.   For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees.  Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004.  Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint.  As a result, Mattel's case against its former executive was dismissed with prejudice.

76.   Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution.  The threats are not idle.  In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ".  While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.   Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.   When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.   Mattel has also manipulated the retail market.  For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead.  MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

EXHIBIT 9  PAGE 25