and falsely told a United Kingdom retailer that MGA was discontinuing one of its lines, in order to make such line less attractive to buyers and thereby attempt to increase sales of the competitive Mattel product and improve its own sales, at MGA's expense.

80.   Even supposedly unbiased and impartial industry organizations have fallen prey to Mattel's abusive wield of power, to MGA's detriment.

81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales statistics in the toy industry.  Accurate NPD statistics are essential for efficient product-line management.  Without these statistics, it is difficult, if not impossible, for toy companies to assess and measure the relative success of their products in key categories.  It is, however, a subscription service, and NPD restricts the manner in which its subscribers may use the data it provides.

82.   Mattel has regularly ignored the restrictions – using NPD data about Mattel's comparative standing relative to other companies in press releases and in communications with retailers and financial investors who are not NPD subscribers.

83.   Mattel generates substantially more annual subscription revenue for NPD than does MGA, and carries more clout.

84.   After MGA had subscribed to the service for more than 12 years, NPD terminated MGA's subscription in 2003 theoretically on the grounds that MGA misused NPD data in a press release.

85.   MGA is informed and believes that the termination was the result of pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's restrictions.

86.   In addition to this, the market share numbers that NPD generates are heavily dependent on the category in which NPD places a particular product.  MGA is informed and believes that Mattel also pressured NPD into changing certain product classifications for its "BRATZ" products in order to manipulate the data

28

EXHIBIT 19  PAGE 216

1  and preserve Mattel's market share rankings in the critical fashion doll category –
2  and thereby lower MGA's.

3      87.    The Children's Advertising Review Unit ("CARU") is another
4  organization that, upon information and belief, appears to have been subject to
5  improper influence by Mattel. CARU is the toy industry's supposedly independent
6  self-regulatory body in charge of maintaining standards in advertising. CARU's
7  approval is considered critical within the toy industry to avoiding regulatory action
8  by the Federal Trade Commission.

9      88.    CARU is heavily subsidized by Mattel.

10      89.    Upon information and belief, Mattel has used its influence as a major
11  contributor to CARU's budget to induce CARU to place onerous restrictions on
12  MGA advertisements, and require MGA to amend aspects of commercials that have
13  gone unchallenged in other parties' commercials.

14      90.    As a result of CARU's restrictions, MGA has been forced to incur
15  unnecessary costs for reshooting and producing or re-editing its commercials.

16      91.    On several occasions, CARU has also either strongly suggested, if not
17  also required, that MGA respond to inquiries about its website policies and make
18  substantial changes to the "BRATZ" website notably and significantly in excess of
19  restrictions imposed on Mattel and others.

20      92.    Even TIA, the toy industry's trade association, is apparently not
21  untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-
22  the-Year Awards, the most prestigious of which had been the award for Toy of the
23  Year. Winning the Toy of the Year Award is a significant achievement that not
24  only very likely increases the sales of the winning toy, but also denotes the winning
25  company as a leader in toy innovation and generates substantial goodwill with
26  retailers, distributors, licensees, and customers.

27      93.    For the years 2000 (the first year of the award), 2001 and 2002, the
28  Toy of the Year award was chosen by consumer vote. The awards ceremony was

29

EXHIBIT 11 PAGE 217

1   then held the following year, at a dinner in New York.  (For example, the awards

2   dinner for the year 2000 award was held in February 2001).  Leap Frog won the

3   2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4   People's Choice Toy of the Year Awards.  With the 2003 Toy of the Year Award,

5   however, the rules suddenly changed.  Now, the award is selected by members of

6   the industry.

7          94.   Upon information and belief, this change was orchestrated by a Fisher

8   Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9   TIA.

10         95.   Perhaps not surprisingly given this change in the winner selection

11  procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12  2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13  Funk Super Stylin' Runway Disco."

14         96.   TIA has refused to provide MGA with the vote count procedure and

15  totals for this award, despite repeated requests.

16         97.   MGA is also informed and believes that Mattel was instrumental in

17  attempting to keep MGA from participating as a sponsor in this year's "Kids'

18  Choice Awards."

19         98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in

20  its unfettered efforts to disrupt, if not destroy, MGA.  Indeed, this is apparently

21  Mattel's current *modus operandi* when it comes to "competing" in the industry.

22  The once immensely successful "LeapFrog" interactive learning product, for

23  example, has apparently been one of Mattel's other recent victims.

24         99.   Mattel may not shield its illegal, unfair and unethical business practices

25  from the public eye.  It is time for the truth to be told, and the world to know of

26  Mattel's unfair, unethical and illegal business practices and unfair competition.

27  "Barbie" does not "play nice" with others (particularly her competitors), and needs

28  to be taught how "to share" (at least in the fashion doll marketplace).  She cannot be

30

EXHIBIT 19 PAGE 212

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3       100.  As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law.  Its ability to enter new markets and product lines has been hampered and

8   delayed.  Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10  business has been diminished, and its ability to attract, hire and retain employees

11  has been affected.

12

13  **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15      101.  MGA repeats and realleges the allegations contained in paragraphs 1

16  through 100 of this Complaint and incorporates them by reference as though fully

17  and completely set forth herein.

18      102.  MGA's "BRATZ" line has a unique and distinctive style and

19  distinctive characteristics, such as the disproportionately large head, large dramatic

20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21  pouty, plump lips with a distinctive presentation (including the lip shape and make-

22  up), small, thin bodies, oversized feet, and up-to-date fashions.  MGA's "BRATZ"

23  line is known for and recognized by the total image that is presented by its product

24  and the style and arrangement of the packaging and display.  This *"tout ensemble"*

25  is representatively described and depicted herein.  The characteristics of MGA's

26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27  and its source, MGA, and thus serve as protectable trade dress.  MGA's trade dress

28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

EXHIBIT 14  PAGE 219

is not essential to the purpose, quality or source identifying attributes of the aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has acquired distinction within the meaning of the Lanham Act.

103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also has its own unique and distinctive characteristics, such as the humanlike eye and unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ" line has become known for and recognized by the total image that is presented by the product and the style and arrangement of its packaging. This *tout ensemble*" is representatively described and depicted herein. The characteristics of MGA's "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if any utility exists, it is not essential to the purpose, quality or source identifying attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is inherently distinctive or has acquired distinction within the meaning of the Lanham Act.

104. Mattel's production, sale and marketing of "My Scene" dolls, including styling heads and doll heads, and "My Scene" pets that are confusingly similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's permission or consent, constitutes designation and use of a term, symbol, device or combination thereof that is false or misleading within the meaning of 15 U.S.C. Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association, or as to the origin, sponsorship, or approval of Mattel's goods or commercial activities, within the meaning of 15 U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

105. Mattel's conduct has been intentional and willful, and is calculated specifically to trade off the goodwill that MGA has developed in its successful "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

EXHIBIT 17 PAGE 220

features of MGA's "BRATZ" line in connection with goods sold and distributed in interstate commerce, Mattel has infringed and is likely to continue to infringe on MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing, Mattel has falsely represented and designated to the public generally and consumers of fashion doll products specifically the source and origin of Mattel's "My Scene" fashion doll products in violation of 15 U.S.C. § 1125(a).

106.   MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

107.   For each act of infringement, MGA is entitled to recover its actual damages as well as Mattel's profits from such infringement.

108.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's illegal actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade dress.

## SECOND CLAIM FOR RELIEF

### (Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law)

109.   MGA repeats and realleges the allegations contained in paragraphs 1 through 108 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

110.   Mattel has deliberately and, indeed, repeatedly adopted, imitated and mimicked the make-up, appearance, features, trade dress, and image of MGA's products, packaging and advertising, including its repackaging and refreshing of older Mattel toys.  Mattel's actions were and are done with the intent to deceive consumers, cause confusion and mistake, and interfere with the ability of consumers to identify the source of goods by appearance and packaging.  By this

33

EXHIBIT 1  PAGE 221

1   conduct, Mattel pirates and exploits, by subliminal or conscious association with

2   MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3       111.  Mattel has particularly and deliberately poached upon the commercial

4   magnetism of MGA's "BRATZ" and the success of "BRATZ".  Mattel's conduct

5   has been intentional and willful, and is calculated specifically to trade off the

6   goodwill that MGA has developed in its successful "BRATZ" line.

7       112.  By its acts, including its intentional imitation of the distinctive features

8   of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9   well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10  total image of the "BRATZ" line, imitation of other MGA products, packaging and

11  advertising, and other conduct alleged herein, Mattel has engaged in unfair

12  competition under both federal and California state law.

13      113.  Mattel has also willfully and maliciously used its power, influence and

14  intimidation to threaten certain retailers, suppliers, licensees, distributors and

15  manufacturers so as to limit, if not prevent, MGA from doing business with these

16  retailers, suppliers, licensees, distributors and manufacturers, using its power and

17  influence to intimidate and manipulate industry bodies.  Mattel has further used its

18  power and influence to attempt to, if not actually, intimidate and threaten MGA's

19  current and potential employees so as to cause MGA competitive injury.

20      114.  Alone, in combination, or in totality, Mattel's actions discussed and

21  alleged herein constitute unfair competition and unfair business practices within the

22  meaning of federal law, California statutory law and/or California common law.

23      115.  As a result of its conduct, Mattel has derived substantial monetary and

24  non-monetary benefit and business advantage.  Mattel has also wrongfully diverted

25  profits away from MGA and to Mattel and, on information and belief, deprived

26  MGA of the patronage of a large number of actual and potential customers.

27      116.  MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

34

EXHIBIT 1 PAGE 227

117.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.  MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

## THIRD CLAIM FOR RELIEF

**(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)**

119.  MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.  The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.  Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.  MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

EXHIBIT 1 PAGE 23

123.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.   MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.   As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.   That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.   using confusingly similar trade dress;

    b.   improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.   engaging in unfair competition and unfair business practices; and

    d.   diluting MGA's trade dress;

2.   For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.   For the disgorgement of all profits derived by Mattel for its acts of:

    a.   false designation of origin or affiliation;

36

EXHIBIT 1  PAGE 34

b.    unfair competition and unfair business practices; and

c.    dilution;

4.    For costs of suit and reasonable attorneys' fees;

5.    For punitive and/or exemplary damages as a result of Mattel's willful and malicious conduct to the extent allowable by law; and

6.    For such other and further relief as the Court deems just and proper.

Dated:    April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: _____
    Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

37

EXHIBIT ____ PAGE ___

1

## DEMAND FOR JURY TRIAL

2

3          MGA hereby demands a jury trial on all triable issues.

4

5    Dated:        April 13, 2005                    PATRICIA GLASER
                                                     CHRISTENSEN, MILLER, FINK,
6                                                    JACOBS, GLASER, WEIL &
                                                     SHAPIRO LLP

7                                                    DALE M. CENDALI
                                                     DIANA M. TORRES
8                                                    PAULA E. AMBROSINI
                                                     O'MELVENY & MYERS LLP
9

10

11                                                   By: _____
                                                        Diana M. Torres
12                                                   Attorneys for Plaintiff
                                                     MGA ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT ___ PAGE ___

Exhibit 20

RightFAX                    5/20/2005 1:52    PAGE 002/002    Fax Server

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES-GENERAL

CV04-09059-NM(RNBx)
CASE NO. CV05-02727-NM(RNBx)        DATE:  5/20/05

TITLE:  Mattel Inc. -v- Carter Bryant, et al
        MGA Entertainment Inc. -v- Mattel, Inc.

PRESENT:        HON. NORA M. MANELLA, JUDGE

Judith Hurley              N/A
Deputy Clerk               Court Reporter

ATTORNEY FOR PLAINTIFF        ATTORNEY FOR DEFENDANT

      N/A                          N/A

PROCEEDINGS:  IN CHAMBERS

    Now that the Ninth Circuit has granted Mattel's petition for permission to file an interlocutory appeal, all discovery in these actions is stayed pending the determination of the appeal.  The stay of discovery also applies to pending & prospective discovery motions.

☑ Priority
☑ Send
☐ Clsd
☐ Enter
☐ JS-5/JS-6
☐ JS-2/JS-3

DOCKETED ON CM
MAY 2 0 2005
BY ___ 010

Initials of Deputy Clerk

cc: Counsel
CIVIL MINUTES 11

EXHIBIT ___ PAGE ___

**Exhibit 21**

**EXHIBIT 22**

JUN 2 0 2006

# PRIORITY SEND & ENTER JS-6

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
—CIVIL MINUTES -- GENERAL

Case No.   CV 05-02727 SGL(RNBx)                    Date: June 19, 2006

Title:   MGA ENTERTAINMENT, INC. -v- MATTEL, INC.
===========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

    Jim Holmes                                None Present
    Courtroom Deputy                          Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

None present                         None present

PROCEEDINGS:   MINUTE ORDER (IN CHAMBERS) RE CONSOLIDATION

    On May 16, 2006, this Court issued orders to show cause why the following three cases should not be consolidated: Bryant v. Mattel, Inc., CV 04-09049; Mattel, Inc. v. Bryant, CV 04-09059; MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727. All parties have responded, and the Court has reviewed those responses. Because the Court has determined that these actions involve a number of common issues of law and fact, the Court orders that these three cases be consolidated for all purposes.

    Mattel's request that the Court stay MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727, pending the outcome of the other two cases. The Court denies this request.

    For ease of record keeping, the Court ORDERS that all further documents and proceedings occur under Bryant v. Mattel, 04-09049 SGL, and that Case Number CV 04-09059 and 05-02727 be CLOSED by the Clerk. Counsel are directed to file all further documents under Case Number CV 04-09049. The first paragraph of any document filed with the Court shall inform the Court to which case(s) the document relates.

    IT IS SO ORDERED.

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ___✓___  Send ___✓___
Entered _____  Closed ___✓___
JS-5/JS-6 ___✓___  JS-2/JS-3 _____
Scan Only _____  Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

/Initials of Deputy Clerk __jh__

MINUTES FORM 90
CIVIL -- GEN

JUN 20 2006
EASTERN DIVISION


EXHIBIT _____ PAGE 2 6

**EXHIBIT 23**

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 90378)
      (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
      Duane R. Lyons (Bar No. 125091)
5     (duanelyons@quinnemanuel.com)
      865 South Figueroa Street, 10th Floor
6   Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
7   Facsimile: (213) 443-3100

8   Attorneys for Plaintiff Mattel, Inc.

9                 UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

| 11  MATTEL, INC., a Delaware corporation, | CASE NO. CV 04-9049 SGL (RNBx) |
|---|---|
| 12                      Plaintiff, | Consolidated With Case No. 04-9059 and Case No. 05-2727 |
| 13          v. | MATTEL, INC.'S FIRST AMENDED COMPLAINT FOR: |
| 14  MGA ENTERTAINMENT, INC., a California corporation; ISAAC LARIAN, an individual; CARTER BRYANT, an individual; MGA ENTERTAINMENT (HK) LIMITED, a Hong Kong Special Administrative Region business entity; MGAE DE MEXICO, S.R.L. DE C.V., a Mexico business entity; CARLOS GUSTAVO MACHADO GOMEZ, an individual; and DOES 4 through 10, |  |

MGA ENTERTAINMENT, INC., a
California corporation; ISAAC
LARIAN, an individual; CARTER
BRYANT, an individual; MGA
ENTERTAINMENT (HK) LIMITED,
a Hong Kong Special Administrative
Region business entity; MGAE DE
MEXICO, S.R.L. DE C.V., a
Mexico business entity; CARLOS
GUSTAVO MACHADO GOMEZ, an
individual; and DOES 4 through 10,

                    Defendants.

AND CONSOLIDATED CASES

1.   COPYRIGHT INFRINGEMENT;
2.   VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
3.   CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
4.   MISAPPROPRIATION OF TRADE SECRETS;
5.   BREACH OF CONTRACT;
6.   INTENTIONAL INTERFERENCE WITH CONTRACT;
7.   BREACH OF FIDUCIARY DUTY;
8.   AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;
9.   BREACH OF DUTY OF LOYALTY;
10.  AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11.  CONVERSION;
12.  UNFAIR COMPETITION; AND
13.  DECLARATORY RELIEF.

DEMAND FOR JURY TRIAL

**Preliminary Statement**

1.     For years defendant MGA Entertainment, Inc. has engaged in a pattern of stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the stolen property and trade secrets caused and continues to cause significant harm to Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued stealing Mattel's confidential and proprietary information to fuel MGA's growth.

2.     Defendant Carter Bryant conceived, created and developed Bratz designs while he was employed by Mattel as a doll designer. He concealed his Bratz work from Mattel and wrongfully sold Bratz to MGA while time that he was a Mattel employee. As MGA knows, Mattel owns the Bratz designs that Bryant made. As the rightful owner of those Bratz designs, Mattel has registered copyrights for them and seeks damages arising from MGA's repeated infringement of those copyrights.

3.     Emboldened by the success of its illegal conduct, MGA has repeated—and even expanded—its pattern of theft on numerous occasions. For example, in or about 2004, MGA decided to expand into Mexico. To do so, and operating from its Southern California offices, MGA hired away three key Mattel employees in Mexico, who, on their way out, stole virtually every category of Mattel's sensitive and trade secret business plans and information for the Mexican market, as well as a significant quantity of sensitive and trade secret information for Mattel's U.S. and worldwide businesses, and took them to MGA. Armed with Mattel's confidential business plans and methods, MGA claimed to have increased its market share in Mexico alone by 90% in a single year.

4.     In 2005, MGA needed help in Canada. So MGA, again operating from its Southern California headquarters, hired Janine Brisbois from Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys 'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same

1   accounts, and she took from Mattel documents containing proprietary advertising,
2   project, sales, customer and strategy information for not only Canada, but for the
3   United States.  Eliminating any doubt that MGA then proceeded to use those stolen
4   materials, Brisbois subsequently accessed and modified certain of those Mattel
5   documents while employed by MGA.

6          5.      These are not the only instances of such misconduct, which
7   MGA orchestrated and carried out from its headquarters in this District.
8   Defendants have engaged in an ongoing, widespread pattern of illegal acts,
9   consisting of inducing Mattel employees to steal Mattel's confidential information
10  or other property and take it with them to MGA to further MGA's business interests
11  and to harm Mattel.

## Jurisdiction

13         6.      This Court has federal question jurisdiction over this action
14  pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).
15  This Court has supplemental jurisdiction over Mattel's state law claims pursuant to
16  28 U.S.C. § 1367.

## Venue

18         7.      Venue is proper in this District pursuant to 28 U.S.C.
19  §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

## Parties

21         8.      Mattel is a corporation organized and existing under the laws of
22  the State of Delaware, with its principal place of business in El Segundo,
23  California.

24         9.      Defendant MGA Entertainment, Inc. ("MGA") is a corporation
25  organized and existing under the laws of the State of California, with its principal
26  place of business in Van Nuys, California.  Mattel is informed and believes, and on
27  that basis alleges, that ABC International Traders, Inc. is a predecessor corporation
28  to MGA and that until September 16, 2002, MGA was incorporated and known as

/2001691.1

-2-

EXHIBIT 22 PAGE 259

FIRST AMENDED COMPLAINT

1 | ABC International Traders, Inc.  Upon the filing of the Complaint, Mattel, being
2 | ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement
3 | and complicity in the conduct alleged therein and having designated MGA
4 | Entertainment, Inc. in the Complaint as Doe 1 and having discovered its
5 | involvement and complicity, Mattel hereby amends this Complaint by substituting
6 | MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

7 |       10.    Defendant Carter Bryant ("Bryant") is an individual who
8 | formerly was employed by Mattel and has worked for and continues to work as a
9 | contactor for MGA.  Mr. Bryant currently resides in the State of Missouri.

10 |       11.    Defendant MGA Entertainment (HK) Limited is a business entity
11 | organized and existing under the laws of the Hong Kong Special Administrative
12 | Region, with its principal place of business in Hong Kong.  Upon the filing of the
13 | Complaint, Mattel, being ignorant of the nature, extent and scope of involvement
14 | and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein
15 | and having designated MGA Entertainment (HK) Limited in the Complaint as Doe
16 | 2 and having discovered its involvement and complicity, Mattel hereby amends this
17 | Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe
18 | name Doe 2.

19 |       12.    Defendant MGAE de Mexico, S.R.L. de C.V. ("MGA de
20 | Mexico") is a business entity organized and existing under the laws of Mexico,
21 | with its principal place of business in Mexico City, Mexico.

22 |       13.    Mattel is informed and believes, and on that basis alleges, that
23 | defendant Larian is the President and CEO of MGA and an individual residing in
24 | the County of Los Angeles.  Upon the filing of the Complaint, Mattel, being
25 | ignorant of the nature, extent and scope of involvement and complicity of Larian in
26 | the conduct alleged therein and having designated Larian in the Complaint as Doe 3
27 | and having discovered his involvement and complicity, Mattel hereby amends this
28 | Complaint by substituting Larian for the fictitious Doe name Doe 3.

EXHIBIT ___ PAGE 240

FIRST AMENDED COMPLAINT

14.    Defendant Carlos Gustavo Machado Gomez is an individual who is employed by defendant MGA and who, on information and belief, currently resides in the County of Los Angeles.

15.    The true names and capacities of defendants sued herein as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such fictitious names. Mattel will amend this First Amended Complaint to allege their true names and capacities when the same are ascertained.

**Factual Background**

**I.    MATTEL**

16.    Mattel manufactures and markets toys, games, dolls and other consumer products. Harold Mattson and Eliot and Ruth Handler founded Mattel in 1945. The name of the company was created by incorporating the names of two of its founders, "MATT-son" and "EL-liot." Originating from the Handlers' garage in Southern California, the company greatly expanded its operations following World War II. During the next several decades, Mattel became famous for producing high-quality products at reasonable prices.

17.    Critical to Mattel's success is its ability to design and develop new products. Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year. Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18.    Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its

4/2001691.1

-4-

FIRST AMENDED COMPLAINT

1   inventory methods and processes. These represent a material part of the intellectual
2   infrastructure of Mattel and are highly valuable.

3 **II.   MGA ENTERTAINMENT**

4       19.   Defendant MGA is also a toy manufacturer. MGA began as a
5   consumer electronics business, but expanded into the toy business with licenses to
6   sell handheld electronic games. By approximately late 1999 or early 2000, MGA
7   developed a strategy to expand its business and compete directly with Mattel by
8   launching a fashion doll line, so it stole a fashion doll that was owned by Mattel –
9   "Bratz."

10       20.   MGA intentionally stole not just specific Mattel property, such
11   as Bratz designs, prototypes and related materials, but also a vast array of trade
12   secrets and other confidential information that comprise Mattel's intellectual
13   infrastructure. MGA's rapid growth was not organic, but rather was based upon its
14   theft of Bratz. As a result, MGA lacked an appropriate intellectual infrastructure
15   for a company of its size and it became increasingly difficult to manage. To deal
16   with these problems, as detailed below, time and time again MGA simply stole
17   Mattel's proprietary business methods, practices and information. This not only
18   allowed MGA to avoid expending time, money and effort necessary to build a
19   legitimate business, but also allowed MGA to unfairly compete against Mattel by
20   taking Mattel's playbook.

21 **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

22       21.   Defendant Carter Bryant is a former Mattel employee. Bryant
23   joined Mattel in September 1995, where he worked in Mattel's Design Center as a
24   BARBIE product designer. In or about April 1998, Bryant resigned his position
25   with Mattel and moved to Missouri to live with his parents. Late in 1998, Bryant
26   applied to Mattel to be rehired. On January 4, 1999, he began working at Mattel in
27   Mattel's Design Center, again as a product designer, for Mattel's BARBIE
28   collectibles line.

**23**    **242**

22.   Upon his return to Mattel in January 1999, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employment Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

23.   Pursuant to his Employment Agreement and as a condition of and in consideration for his employment, Bryant agreed, among other things, that he held a position of trust with Mattel, that the designs and inventions he created during his Mattel employment (with certain exceptions not relevant here) were owned by Mattel, and that he would be loyal to the company by agreeing not to assist or work for any competitor of Mattel while he was employed by Mattel.

24.   On January 4, 1999, Bryant also executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant understood what the Conflict Questionnaire required because, among other things, he disclosed on it the freelance work he had performed while in Missouri for Ashton-Drake, which is unrelated to the conduct alleged herein. A true and correct copy of the Conflict Questionnaire executed by Bryant is attached hereto as Exhibit B.

25.   Pursuant to the Conflict Questionnaire, Bryant also agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. Despite this obligation, at no time did Bryant disclose to Mattel that he was engaging in any business venture or transaction with MGA or any other Mattel competitor.

26.   More specifically, while Bryant was employed by Mattel, Bryant and other defendants misappropriated and misused Mattel property and Mattel resources for the benefit of Bryant and MGA. Such acts included, but are not limited to, the following:

4/2001691.1

1        a.     using his exposure to Mattel development programs to
2 create the concept, design and name of Bratz;

3        b.     using Mattel resources, and while employed by Mattel,
4 Bryant worked by himself and with other Mattel employees and contractors to
5 design and develop Bratz, including without limitation by creating drawings and
6 three-dimensional models of Bratz dolls, and fashion designs for the dolls'
7 associated clothing and accessories; and

8        c.     using Mattel resources, and while employed by Mattel,
9 Bryant took steps to assist MGA to produce Bratz dolls.

10     27.   During the time that he was employed by Mattel and thereafter,
11 Bryant concealed these actions from Mattel, including by failing to notify his
12 supervisor of the conflict of interest he created when he began working on MGA's
13 behalf and when he began receiving payments from MGA.  Bryant additionally
14 enlisted other Mattel employees to perform work on Bratz during the time he was
15 employed by Mattel and, by all indications, in at least some cases led them to
16 believe that they were performing work on a project for Mattel.

17     28.   Bryant also made affirmative misrepresentations to Mattel
18 management and employees immediately before his departure from Mattel on
19 October 20, 2000.  For example, during Bryant's exit interview in October 2000, he
20 told the Mattel Human Resources representative who conducted the interview that
21 he was leaving Mattel to engage in non-competitive work.  During his last few
22 weeks at Mattel, Bryant told his co-workers and supervisors that he was going to
23 leave Mattel for "non-competitive" pursuits.  Bryant's representations to his
24 supervisors and his co-workers were false.  Bryant knew at the time that those
25 representations were false and made those false statements to conceal from Mattel
26 the fact that he was already working with MGA and that he had contracted with
27 MGA to assign Bratz works to MGA and to provide design and development
28 services to MGA, a Mattel competitor.

23     244

14/2001691.1

FIRST AMENDED COMPLAINT

29.   As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed finished Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these meetings and focus groups while Bryant was still employed by Mattel.

30.   Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz.  On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001.  By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32.   Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world.  Mattel is informed and believes that MGA also licenses Bratz to third parties.  Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant

1  thereto. MGA continues to market, sell and license Bratz and has expressed an
2  intention to continue to do so.

3         33.   Mattel is informed and believes that MGA and Larian
4  encouraged, aided and financed Bryant to develop Bratz, knowing full well that
5  Bryant was still employed by Mattel at the time and that by performing such work,
6  including design-related work, for his own benefit and/or the benefit of MGA,
7  Bryant would be, and was, in breach of his contractual, statutory and common law
8  duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid
9  and encourage Bryant to develop Bratz with the goal of obtaining a valuable
10  fashion doll line that would be commercially successful in the competitive, multi-
11  billion dollar market for fashion dolls.

12         34.   Pursuant to Bryant's contract with Mattel, among other things,
13  Mattel is the true owner of Bratz designs and works, including those specifically
14  that were conceived, created or reduced to practice during Bryant's Mattel
15  employment as well as all designs and works that are or have been derived
16  therefrom. Defendants' continued use, sale, distribution and licensing of Bratz thus
17  infringes upon Mattel's rights, injures Mattel and unlawfully enriches the
18  defendants.

19         35.   Bryant and MGA deliberately and intentionally concealed facts
20  sufficient for Mattel to suspect or to know that it was the true owner of Bratz.
21  Their acts of concealment include, but are not limited to, concealing the fact that
22  Bryant conceived, created, designed and developed Bratz while employed by
23  Mattel, including by tampering with and defacing documents which showed that, in
24  fact, Bryant was a Mattel employee while he was working for and with MGA;
25  concealing the fact that Bryant worked with and assisted MGA during the time
26  Bryant was employed by Mattel and was compensated for that assistance;
27  concealing that Bryant was providing consulting services to MGA; concealing
28  Bryant's role in Bratz by falsely claiming that Larian and others were the creators

/2001691.1

23  246

FIRST AMENDED COMPLAINT

of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

36.    Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement. Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis. Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under the agreement, including those he purportedly provided while still a Mattel employee, purportedly would be considered "works for hire" of MGA; and that all intellectual property rights to preexisting works by Bryant, including Bratz designs, purportedly were assigned to MGA.

## IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO

37.    On information and belief, in or about late 2003 or early 2004, MGA decided to open business operations in Mexico. Faced with the difficult task of developing an overall strategy for expanding into a market in which it had only a nominal presence and no operations, MGA elected to steal Mattel's plans, strategy and business information for the Mexican market and materials related to Mattel's

FIRST AMENDED COMPLAINT

worldwide business strategies.  As detailed below, MGA and Larian approached three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to steal Mattel's most sensitive business planning materials, and then hired them to assist in establishing and running MGA's new Mexican subsidiary.

### A.   MGA Hires Three Senior Mattel Employees in Mexico

38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and confidence.  He was employed at Mattel Mexico from April 1, 1997 until April 19, 2004.  His duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan.  In his position, Machado had access to highly confidential and sensitive marketing and product development information.  Machado had an employment agreement with Mattel in which he agreed to maintain the confidentiality of Mattel's protected information.  Mattel's policies also required Machado to protect Mattel's proprietary information and not to disclose it to competitors.

39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.  She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.  Like Machado, her duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan.  In her position, Trueba had access to highly confidential and sensitive marketing and product development information.  Trueba had an employment agreement with Mattel in which she agreed to maintain the confidentiality of Mattel's protected information.  Mattel's policies also required Trueba to protect Mattel's proprietary information and not to disclose it to competitors.

40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing Manager with Mattel Mexico, a position of trust and confidence.  He was employed at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was

FIRST AMENDED COMPLAINT

4/2001691.1

responsible for ensuring that point-of-sale promotions were carried out, analyzing the results of such promotions, negotiating promotion budgets, and generally managing promotional activities. Vargas also had access to highly confidential and sensitive marketing and product development information. Vargas had an employment agreement with Mattel in which he agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Vargas to protect Mattel's proprietary information and not to disclose it to competitors.

41. Beginning in late 2003 or early 2004, Machado, Trueba and Vargas began planning to leave Mattel Mexico to join MGA. In connection with that plan, and with the encouragement of Larian and other MGA officers operating in the United States, they began accessing, copying and collecting proprietary Mattel documents to take with them. On April 19, 2004, Machado, Trueba and Vargas each resigned their positions with Mattel, effective immediately. They stated that they had been hired by a Mattel competitor, but refused to identify that competitor. In fact, they had been offered and accepted employment by MGA to establish and run MGA's new operation in Mexico.

**B.     Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42. Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

23    249

43.   In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel.  Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City.  On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA.  This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned.  For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park.  In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion.  We will be available during the nights of the week after 16:30 Los Angeles time . . . ."  In another e-mail message, showing that the participants intentionally sought to maximize the damage to Mattel from their conduct, Kuemmerle wrote to Larian and Park:  "Gustavo, Mariana and Pablo want to resign (all at the same time, and you can believe my smile!) next Wednesday."

44.   Beginning on April 12, 2004, a week before his resignation and after numerous communications and meetings with Larian and other MGA personnel, Machado began transferring additional Mattel confidential and proprietary information to a portable USB storage device (also know as a "thumb drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the last business day before he gave notice, Machado copied at least 70 sensitive documents to the portable USB storage device.

23    250

FIRST AMENDED COMPLAINT



1/2001691.1

45.   Starting on April 12, 2004, Vargas also copied a host of confidential and proprietary materials to a portable USB storage device, including sales plans, sales projections and customer profiles.

46.   On April 16, 2004, Trueba also copied Mattel confidential and proprietary information to a portable USB storage device connected to her Mattel computer.

47.   With full knowledge that she was going to leave Mattel for a competitor, Trueba also took steps to increase further her access to Mattel's confidential information shortly before her resignation.  For example, just four days before leaving, Trueba went out of her way to seek to attend a meeting at which Mattel personnel analyzed BARBIE programs for the United States, Canada and South America.  Two days before her resignation, she contacted both a Mattel employee located in El Segundo, California and Mattel's advertising agency to request updated confidential information about advertising plans for BARBIE.  On information and belief, Trueba acted at the direction of MGA and Larian and did so in order to obtain further information that would allow MGA to obtain unfair competitive advantage over Mattel.

48.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and

-14-

projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.    The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.    MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican market share by 90 percent over the prior year.  This increase came at the expense of Mattel, which lost market share during 2004 in Mexico and was forced to increase its advertising and promotional spending to offset further losses.

51.    Machado, Trueba and Vargas attempted to conceal their widespread theft of Mattel's proprietary information.  For example, Machado ran a software program on his Mattel personal computer in an attempt to erase information, including information that would reveal the addresses to which he had sent, or from which he had received, e-mail messages.  On information and belief, for the same purpose Machado also damaged the hard drive of the personal computer that he used at Mattel.

23  252

FIRST AMENDED COMPLAINT

52.    On information and belief, on April 19, 2004, immediately after Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico to Los Angeles to meet with MGA personnel, including Larian, in person.

53.    Mattel notified Mexican authorities about the theft of its trade secret and confidential information.  On October 27, 2005, the Mexican Attorney General Office obtained a search warrant from the Mexican Federal Criminal Courts for MGA's facilities in Mexico City.  In that search, the Mexican authorities found and seized from MGA's offices both electronic and paper copies of a large number of documents containing Mattel trade secrets, including those that Mattel discovered through its forensic investigations, plus many others that Mattel had not known had been stolen.

54.    Based on Machado's "performance" in Mexico, Isaac Larian subsequently promoted Machado and he was transferred to MGA's main office in Van Nuys, California.  On information and belief, Machado currently resides in the County of Los Angeles, California.

## V.    MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES

55.    On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

FIRST AMENDED COMPLAINT

1/2001691.1

56.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.

We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the information is not likely to be kept secret, such as planes, restaurants and elevators.  The obligation to preserve confidential information continues even after employment ends.

The Code of Conduct applied to Brawer and required that he meet his obligations under the Code of Conduct.

57.   By 2003, Brawer had advanced within Mattel to a Senior Vice President position over customer marketing, a position of trust and confidence.  In his executive position, Brawer was provided access to information that was both sensitive and confidential, including, but not limited to, detailed information related to development, manufacture, marketing, pricing, shipping, and performance of



FIRST AMENDED COMPLAINT

1    Mattel's then-current and anticipated future product lines, and other confidential

2    business plans between Mattel and its most significant retail customers.

3        58.    In December 2003, Alan Kaye, Mattel's Senior Vice President of

4    Human Resources, asked Brawer whether he was discussing potential employment

5    with MGA.  Brawer denied that he had been in contact with MGA and represented

6    that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

7    its employees, including Brawer, the importance of protecting Mattel's confidential

8    and proprietary materials and information.

9        59.    On March 18, 2004, in response to a survey from the President of

10   Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

11   Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

12   protection of it's [sic] intellectual property," reflecting Brawer's clear

13   understanding that Mattel required its proprietary information to be kept

14   confidential.

15       60.    In April 2004, Mattel promoted Brawer to Senior Vice

16   President/General Manager.  The General Manager position also is an executive

17   position of trust and confidence.  The role of a General Manager is to lead a cross-

18   functional "Customer Business Team."  Each General Manager is accountable for a

19   strategic partnership with a key Mattel retailer, covering all aspects of the business,

20   including both traditional toy sales and retail development of licensed products.

21       61.    In or about late May 2004, Brawer began performing General

22   Manager duties, working with one of Mattel's major retail customer accounts.

23   Thereafter, Brawer began receiving information related not only to the Senior Vice

24   President, Customer Marketing position that he still formally held, but also began

25   receiving detailed information related to his role as General Manager.  Brawer

26   began requesting and analyzing detailed information related to Mattel and its four

27   key retail accounts.

28

 

:4/2001691.1

FIRST AMENDED COMPLAINT

62.   On September 15, 2004, Brawer left work at noon for observance of Rosh Hashanah. As Brawer left, he carried a large cardboard box with binders and other materials. Several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers and to provide it to him, falsely claiming he needed it for a meeting

63.   On September 17, 2004, Brawer returned to Mattel and immediately informed his supervisor that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.

64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing obligation to preserve the confidentiality of Mattel's proprietary information and trade secrets not only through October 1, 2004, but continuing beyond the termination of his employment.

65.   At his exit interview on September 29, 2004, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment. Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct. During the exit interview, however, Brawer noted that he had not signed the Code of Conduct, which he intended and Mattel understood to mean that Brawer believed he was not bound by Mattel's policy because he had not signed it. Brawer was unwilling to complete or sign the form that sought to confirm that Brawer understood his ongoing obligations under the Code of Conduct, which included the obligation to preserve the confidentiality of Mattel's proprietary and trade secret information.

66.   On October 1, 2004, Brawer's final day of employment with Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

67.   Upon joining MGA, Brawer became its Executive Vice-President of Sales and Marketing. In that role he was responsible for MGA's sales

-19-

worldwide. As part of those responsibilities, Brawer had and continues to have responsibility for MGA's accounts with the same retailers that he worked with while at Mattel.

68.   Brawer represented during his Mattel exit interview that he had returned all proprietary information to Mattel. That representation was false. On information and belief, Brawer removed proprietary and trade secret information from Mattel that he did not return. Mattel is informed and believes that Brawer did not return to Mattel, for example, the information contained in his contacts file. The contacts file included contact information for Mattel customers, most notably TRU, and extensive contact information for Mattel employees, including titles, e-mail addresses and telephone numbers.

69.   Mattel has recently learned that Brawer has been using that contact information on a regular basis, including within recent months. Since leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone and by electronic mail. Based on his knowledge of Mattel's operations and the roles of certain Mattel employees, he has targeted certain Mattel employees who have broad access to Mattel proprietary information in an effort to induce and encourage them to join MGA and to steal or otherwise wrongfully misappropriate Mattel confidential information and trade secrets. Brawer has done so by promising these Mattel employees salaries 25 percent or more higher than they earn at Mattel and stating to them that they should not be concerned by legal action taken by Mattel to protect its trade secrets and its rights because such claims are hard to prove and easy to defeat.

## VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA

70.   In an effort to increase its market share and sales in Canada and elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales, projects, advertising and strategy, not only for Canada, but the United States and the rest of the world.

23   257

4/2001691.1

71.   Janine Brisbois was a Director of Sales for the Girls Division in Canada. Mattel hired her as a National Account Manager in August 1999. When she was hired as a Mattel employee, Brisbois agreed that she would preserve and would not disclose Mattel's proprietary or confidential information. For example, Brisbois agreed:

> You must keep Mattel's Proprietary Information confidential, and you may only use or disclose such information as necessary to perform your job responsibilities in accordance with Mattel policies. Your obligation to keep Mattel's Proprietary Information confidential will continue even after any termination of your employment with your employer.
>
> . . .
>
> Mattel takes steps to maintain the secrecy and confidential nature of Mattel's Proprietary Information and, if a competitor discovered Mattel's Proprietary Information, it could significantly damage Mattel and your Employer.

72.   While with Mattel, Brisbois had responsibility for Mattel's account with TRU and later had responsibility for Mattel's Wal-Mart account. In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

73.   On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA. Mattel is informed and believes that in that position Brisbois has responsibility for MGA's accounts with both TRU and Wal-Mart. During Brisbois' exit interview she was specifically asked whether she was "taking anything." Brisbois responded, "No." Both during and after her exit interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's confidential and proprietary information.

74.   Mattel is informed and believes that Brisbois spoke with Isaac Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day that she spoke with Mr. Larian and four days before she resigned, Brisbois copied approximately 45 Mattel documents on to a USB or "thumb" drive with the volume label "BACKPACK."  On information and belief, Brisbois removed the thumb drive from Mattel Canada's office by concealing it in her backpack or gym bag the last time that she left that office.  These documents contained Mattel trade secret and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and
- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

75.   After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities. Canadian law enforcement authorities recovered from Brisbois a thumb drive with the volume label "BACKPACK" containing the documents that Brisbois had copied from Mattel's computer system.  Mattel later learned that while she was working as a Vice President of Sales at MGA, Brisbois accessed and modified documents on that thumb drive.

23    251

FIRST AMENDED COMPLAINT

4/2001691.1

76.   After joining MGA, Brisbois repeatedly traveled to MGA's offices in Van Nuys, California and met with Larian and Brawer.  In February, 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City offices and that at least three MGA employees were under criminal investigation, MGA nonetheless issued a press release trumpeting its 2005 performance, with Larian himself concluding, "Our international teams in Mexico and Canada have done a fantastic job."

## VII.  MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO JOINT MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA

77.   In the past few years, MGA has hired directly from Mattel's United States operations at least 25 employees, from Senior Vice-President level to lower level employees.  On information and belief, many of these employees were specifically targeted and recruited by MGA, including by Larian and Brawer, based on the Mattel confidential and proprietary information they could access.  Many of these employees had access to information that Mattel considers to be highly proprietary and confidential.  Mattel believes that some of those former Mattel employees may be observing their obligations not to misappropriate, disclose or use Mattel's confidential and proprietary information.  Mattel is informed and believes, however, that certain additional employees accessed, copied and took from Mattel confidential and proprietary information, including Mattel's strategic plans; business operations, methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins; and customer requirements.  The misappropriated confidential and proprietary information included information that these Mattel employees were not authorized to access.  On information and belief, the misappropriated confidential and proprietary information taken from Mattel is being disclosed to and used by MGA for the benefit of MGA and to the detriment of Mattel.

23      260

## VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT MATTEL'S PRODUCTS

78. Defendants have engaged in other illegal practices in their efforts to compete unfairly with Mattel. Larian has a practice of sending e-mail messages to a "Bratz News" distribution list that Larian created or that was created for him. Mattel is informed and believes that the recipients of e-mail messages sent to the "Bratz News" distribution list include members of the media as well as representatives of many of Mattel's most significant customers.

79. On May 12, 2006, Larian sent an e-mail message to the "Bratz News" distribution list that included a reference to Mattel's updated MY SCENE MY BLING BLING product with real gems. Mattel had not publicly announced this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel had guarded the identification of this particular product.

80. Shortly thereafter, Larian engaged in a campaign of calling Mattel's most significant customers, including but not limited to Target and TRU, regarding the MY SCENE MY BLING BLING product with real gems. In an effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING BLING product with real gems, Larian knowingly made false factual statements about that product to each retailer. As of the writing of this First Amended Complaint, Mattel is aware that Larian represented to each retailer that each was the only retailer to purchase the product and that Mattel would not be supporting the product with television advertising. At the time that Larian made these statements, he knew them to be false. As a result of Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units of the MY SCENE MY BLING BLING product with real gems. Only after Mattel learned of Larian's misrepresentations and was able to correct them was Mattel able to assure the retailer that Larian's representations were false and to persuade the retailer to reinstate the order.

23    26

4/2001691.1

81.   Such conduct is not an isolated incident.  MGA and Larian, in an effort to gain an unfair competitive advantage, repeatedly issued false and misleading press releases.  In these press releases, MGA and Larian have misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market share of Mattel's BARBIE products.

## CLAIMS FOR RELIEF

### First Claim

### Copyright Infringement

### (Against MGA, MGA Entertainment (HK) Limited,

### Larian, Bryant and Does 4 through 10)

82.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 81, above, as though fully set forth at length.

83.   Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel.  These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

84.   Defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization.  Defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

85.   Defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made

I/2001691.1

FIRST AMENDED COMPLAINT

without Mattel's consent and for commercial purposes and the direct financial benefit of defendants.  Defendants, moreover, have deliberately failed to exercise their right and ability to supervise the infringing activities of others within their control to refrain from infringing Mattel's copyrighted works and have failed to do so in order to deliberately further their significant financial interest in the infringement of Mattel's copyrighted works.  Accordingly, defendants have engaged in direct, contributory and vicarious infringement of Mattel's copyrighted works.

86.   By virtue of defendants' infringing acts, Mattel is entitled to recover Mattel's actual damages plus defendants' profits, Mattel's costs of suit and attorneys' fees, and all other relief permitted under the Copyright Act.

87.   Defendants' actions described above have caused and will continue to cause irreparable damage to Mattel, for which Mattel has no remedy at law.  Unless defendants are restrained by this Court from continuing their infringement of Mattel's copyrights, these injuries will continue to occur in the future.  Mattel is accordingly entitled to injunctive relief restraining defendants from further infringement.

### Second Claim

### Violation of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against All Defendants)

88.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.   Beginning at various times from approximately 1999 through the filing of this First Amended Complaint, in the Central District of California and elsewhere, defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in

1/2001691.1

-26-

and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise"). The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe defendants and Brawer), the Bryant Group (Bryant and certain of the Doe defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).

90.    MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the MGA Criminal Enterprise's affairs through a pattern of racketeering activity. Their actions include multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

91.    MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, shared the common purpose of enabling MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in order to assist MGA in illegally competing with Mattel domestically and throughout the world.

92.    The MGA Criminal Enterprise as described herein is at all relevant times a continuing enterprise because, among obvious reasons, it is designed and did unlawfully acquire the confidential business information and

14/2001691.1

1   property of Mattel and incorporated this information and property into MGA's

2   ongoing business, marketing strategies and business methods, practices and

3   processes.  The conduct of the enterprise continues through the date of this First

4   Amended Complaint and is ongoing by virtue of MGA's continuing use of Mattel's

5   information and property, all to the detriment of Mattel.

6              93.   The pattern of racketeering activity, as defined by 18 U.S.C.

7   §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

8   of continuing criminal activity.  This activity consists of multiple acts of

9   racketeering by each member of the MGA Criminal Enterprise, is interrelated, not

10  isolated and is perpetrated for the same or similar purposes by the same persons.

11  This activity extends over a substantial period of time, up to and beyond the date of

12  this First Amended Complaint.  These activities occurred after the effective date of

13  18 U.S.C. §§ 1961 *et seq.*, and the last such act occurred within 10 years after the

14  commission of a prior act of racketeering activity.  These racketeering activities

15  included repeated acts of:

16          (a)   <u>Mail Fraud</u>:  Defendants MGA, MGA Entertainment (HK)

17                Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4

18                through 10, aided and abetted by each other and some or all of the

19                remaining members of the MGA Criminal Enterprise, having

20                devised a scheme or artifice to defraud Mattel of its confidential

21                trade secret information and property by conversion, false

22                representations, concealment and breaches of fiduciary duty, did

23                for the purpose of furthering and executing such a scheme or

24                artifice to defraud, deposited or caused to be deposited matters or

25                things to be sent or delivered by the Postal Service, or any private

26                or commercial interstate carrier, or took or received matters or

27                things therefrom, or knowingly caused matters or things to be

28                delivered by mail or such carrier according to the direction

-28-