1    thereon, or at the place at which it is directed to be delivered by

2    the person to whom it is addressed, in violation of 18 U.S.C.

3    § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in

4    the foregoing paragraphs and as set forth in Exhibit C;

5    (b)   Wire Fraud:  Defendants MGA, MGA Entertainment (HK)

6    Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4

7    through 10, aided and abetted by each other and some or all of the

8    remaining members of the MGA Criminal Enterprise, having

9    devised a scheme or artifice to defraud Mattel of its confidential

10   and trade secret information and property by conversion, false

11   representations, concealment and breaches of fiduciary duty, did

12   for the purpose of furthering and executing such a scheme or

13   artifice to defraud, transmit and cause to be transmitted by means

14   of wire communications in interstate or foreign commerce,

15   writing, signs, signals, pictures or sound, in violation of 18

16   U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater

17   particularity in the foregoing paragraphs and as set forth in

18   Exhibit C;

19   (c)   Tampering With a Witness, Victim or Informant:  Defendants

20   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

21   Larian, Bryant, Machado and Does 4 through 10, aided and

22   abetted by each other and some or all of the remaining members

23   of the MGA Criminal Enterprise, did corruptly alter, destroy,

24   mutilate, or conceal a record, document, or other object, or

25   attempted to do so, with the intent to impair the object's integrity

26   or availability for use in an official proceeding.  Such actions are

27   in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged

28   with greater particularity in the foregoing paragraphs;

EXHIBIT

26

4/2001691.1

-29-

FIRST AMENDED COMPLAINT

(d)  <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e)  <u>Criminal Copyright Infringement</u>: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, willfully infringed Mattel's copyrights, including with respect to documents containing Mattel trade secret and confidential information, for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater particularity in the foregoing paragraphs.

94.  The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, MGA, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group.

95.  MGA had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. MGA also attempted to benefit,

1  and did benefit, from the activity of its employees and agents alleged herein, and

2  thus was not a passive victim of racketeering activity, but an active perpetrator.

3      96.   Mattel has been injured in its business or property as a direct

4  and proximate result of the defendants' and the other enterprise members' violations

5  of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting

6  the pattern of racketeering activity.

7      97.   As a result of the violations of 18 U.S.C. § 1962(c), by the MGA

8  Group, the Bryant Group, the Mexican Group and the Canadian Group, Mattel has

9  suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18

10  U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

11  compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

12  of defendants' violations of 18 U.S.C. § 1962(c).

### Third Claim

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Defendants)**

18      98.   Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 97, above, as though fully set forth at length.

20      99.   Beginning at various times from approximately 1999 through the

21  filing of this First Amended Complaint, in the Central District of California and

22  elsewhere, defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

23  Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

24  Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did

25  conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

26      100.  These conspirators were employed by and associated-in-fact with

27  the MGA Criminal Enterprise engaging in, and the activities of which affect,

28  interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group,

1    the Mexican Group and the Canadian Group, constituting a group of individuals

2    associated-in-fact, did unlawfully, willfully, and knowingly participate in and

3    conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a

4    pattern of racketeering activity.

5            101.  The pattern of racketeering activity, as defined by 18 U.S.C.

6    §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341

7    and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

8    U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

9    18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

10   racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

11   acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

12   U.S.C. § 506(a)(1)(A).

13           102.  Defendants and the other members of the MGA Criminal

14   Enterprise schemed to defraud Mattel and steal its property and trade secret

15   information by means of false representation, breaches of fiduciary duty,

16   conversation and concealment, as more fully set forth in the foregoing paragraphs.

17           103.  In furtherance of this unlawful conspiracy, and to effect its

18   objectives, defendants and various co-conspirators committed numerous overt acts,

19   including but not limited to those set forth in the foregoing paragraphs.

20           104.  Mattel has been injured in its business or property as a direct and

21   proximate result of the defendants' and the other enterprise members' violations of

22   18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting

23   the pattern of racketeering activity.

24           105.  As a result of the conspiracies between and among all defendants

25   and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has suffered

26   substantial damages, in an amount to be proved at trial.  Pursuant to 18 U.S.C.

27   § 1964(c), Mattel is entitled to recover treble its general and special compensatory

28

FIRST AMENDED COMPLAINT

1   damages, plus interest, costs and attorneys, fees, incurred by reason of defendants'

2   violations of 18 U.S.C. § 1962(d).

3                               **Fourth Claim**

4                    **Misappropriation of Trade Secrets**

5                   **(Against Defendants MGA, MGA de Mexico,**

6                   **Larian, Machado and Does 4 through 10)**

7          106.  Mattel repeats and realleges each and every allegation set forth in

8   paragraphs 1 through 105, above, as though fully set forth at length.

9          107.  As used herein, "Trade Secret Material" shall mean the

10  documents, materials and information stolen by Machado, Trueba, Vargas,

11  Brisbois, the Other Former Employees, and other persons acting for, on behalf of or

12  at the direction of MGA and/or Larian.  Prior to their theft by defendants, the Trade

13  Secret Materials gave Mattel a significant competitive advantage over its existing

14  and would-be competitors, including MGA.  This advantage, as to MGA, has now

15  been compromised as a result of defendants' unlawful activities.

16         108.  Mattel made reasonable efforts under the circumstances to

17  maintain the confidentiality of the Trade Secret Materials, including by having

18  employees and consultants who may have access the Trade Secret Materials sign

19  confidentiality agreements that oblige them not to disclose the Trade Secret

20  Materials or characteristics of the Trade Secret Materials; by limiting the

21  circulation of said materials within Mattel; by protecting and limiting access to

22  computers with log-in identifications and passwords; by limiting each employee's

23  access to electronic files to those that the particular employee needs to access; by

24  educating employees on the nature of Mattel's information that is confidential and

25  proprietary; and by reminding employees on a regular and periodic basis of their

26  obligation to protect and maintain Mattel's confidential and proprietary

27  information.

28

 

14/2001691.1

FIRST AMENDED COMPLAINT

109. Mattel's Trade Secret Materials derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

110. Defendants have illegally obtained the trade secret materials, as set forth above, and through other means of which Mattel is presently unaware.

111. Defendants have used and disclosed Mattel's Trade Secret Materials without Mattel's consent and without regard to Mattel's rights, and without compensation, permission, or licenses for the benefit of themselves and others.

112. Defendants' conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Mattel's valid and enforceable rights.

113. Defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel is therefore entitled to a permanent injunction restraining and enjoining defendants, and each of them, as well as their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from further using in any manner Mattel's trade secrets.

114. In addition, as a proximate result of defendants' misconduct, Mattel has suffered actual damages, and defendants have been unjustly enriched.

115. The aforementioned acts of the defendants were willful and malicious, including in that defendants misappropriated Mattel's trade secrets with the deliberate intent to injure Mattel's business and improve their own. Mattel is therefore entitled to enhanced damages. Mattel is also entitled to reasonable attorney's fees.

**Fifth Claim**

**Breach of Contract**

**(Against Bryant)**

116.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 115, above, as though fully set forth at length.

117.  Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest.  Bryant further promised that he would notify his supervisor immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

118.  The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

119.  Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel without the express written consent of Mattel.

23   272

-35-

4/2001691.1

1    120. As a consequence of Bryant's breach, Mattel has suffered and

2  will, in the future, continue to suffer damages in an amount to be proven at trial.

3  Such damages include, without limitation, the amounts paid by the competitor to

4  Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

5  his Mattel employment; the amount that Mattel paid Bryant during the time he

6  wrongfully worked with MGA; the value of information and intellectual property

7  owned by Mattel which Bryant provided to MGA; the value of the benefits that

8  MGA obtained from Bryant during the time he was employed by Mattel; and the

9  value of the benefits that MGA obtained from Bryant as a result of the work he

10  performed for or with MGA during his Mattel employment.

11    121. Bryant's conduct has caused, and unless enjoined will continue to

12  cause, irreparable injury to Mattel that cannot be adequately compensated by

13  money damages and for which Mattel has no adequate remedy at law. Bryant

14  specifically acknowledged in his Employment Agreement that his breach of the

15  Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

16  entitled to injunctive relief to enforce this Agreement, in addition to damages and

17  other available remedies." Accordingly, Mattel is entitled to orders mandating

18  Bryant's specific performance of his contracts with Mattel and restraining Bryant

19  from further breach.

## Sixth Claim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

23    122. Mattel repeats and realleges each and every allegation set forth in

24  paragraphs 1 through 121, above, as though fully set forth at length.

25    123. Valid agreements existed between Mattel and Bryant, Brawer,

26  Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,

27  the "Mattel Employees")

28



FIRST AMENDED COMPLAINT

124. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees had a duty under their agreements not to work for or assist any competitor of Mattel, such as MGA. In addition, at all times mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had assigned to Mattel, and was obligated to disclose to Mattel all inventions, including designs and other works, created, conceived or reduced to practice during their employment with Mattel.

125. Despite such knowledge, defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

126. As a direct and proximate result of defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

127. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128. Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

### Seventh Claim

### Breach of Fiduciary Duty

### (Against Bryant and Machado)

129. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job

1   assignments and duties.  In their positions, Bryant and Machado also represented
2   Mattel in its dealings with third parties and, in actions in the course and scope of
3   their employment with Mattel, were agents of Mattel.  They confirmed their
4   relationship of trust with Mattel in respective employee agreements.  Bryant and
5   Machado thus owed Mattel a fiduciary duty that included, but was not limited to,
6   an obligation not to take any action that would be contrary to Mattel's best interests
7   or that would deprive Mattel of any opportunities, profit or advantage which Bryant
8   or Machado might bring to Mattel.

9        131.  Bryant breached his fiduciary duty to Mattel in that, while
10  employed by Mattel, he secretly aided and assisted a competitor of Mattel,
11  including without limitation by entering into an agreement with a Mattel
12  competitor.  As alleged above, Bryant also breached the aforementioned duty by
13  using Mattel property and resources for the benefit of, and to aid and assist, himself
14  personally and MGA.

15       132.  Machado breached his fiduciary duty to Mattel, in that while
16  employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
17  among other things, misappropriating Mattel trade secret and proprietary
18  information and providing said information to officers of MGA.  Machado also
19  breached the aforementioned duty by using Mattel property and resources for the
20  benefit of, and to aid and assist, himself personally and MGA.

21       133.  As a direct and proximate result of defendants' wrongful conduct,
22  Mattel has incurred damages in an amount to be determined at trial.

23       134.  Defendants acted with malice, fraud and oppression, and in
24  conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award
25  of exemplary damages against defendants in an amount to be determined at trial.

26       135.  Furthermore, defendants' conduct has caused, and unless
27  enjoined will continue to cause, irreparable injury to Mattel that cannot be
28  adequately compensated by money damages and for which Mattel has no adequate

1   remedy at law.  Accordingly, Mattel is entitled to an order restraining further

2   breach of Bryant's fiduciary duty to Mattel and/or restraining defendants from

3   continuing to benefit from such breach.

4                          **Eighth Claim**

5                **Aiding and Abetting Breach of Fiduciary Duty**

6                **(Against MGA, Larian and Does 4 through 10)**

7           136.  Mattel repeats and realleges each and every allegation set forth in

8   paragraphs 1 through 135, above, as though fully set forth at length.

9           137.  At all times herein mentioned, MGA, Larian and Does 4 through

10  10 knew that Bryant held a position of trust and confidence at Mattel.  At all times

11  herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a

12  fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

13  best interests, including but not limited to secretly developing and designing Bratz

14  while employed by Mattel and by secretly assisting Larian and MGA .

15          138.  At all times herein mentioned, MGA, Larian and Does 4 through

16  10 knew that the Mattel Employees (excluding Bryant) held positions of trust and

17  confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4

18  through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary

19  duty to Mattel not to take any action that would be contrary to Mattel's best

20  interests, including but not limited to taking confidential trade secret information

21  from Mattel's premises and providing that information to a competitor.

22          139.  Despite such knowledge, defendants MGA, Larian and Does 4

23  through 10 intentionally and without justification solicited, encouraged, aided and

24  abetted and gave substantial assistance to the Mattel Employees to breach their

25  fiduciary duties to Mattel, knowing that their conduct would constitute breaches of

26  their fiduciary duties to Mattel.

27          140.  As a direct and proximate result of defendants' efforts, the Mattel

28  Employees did breach their fiduciary duties to Mattel and Mattel has incurred

1    damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover

2    compensatory damages in an amount to be determined at trial.

3             141. In taking the aforesaid actions, MGA, Larian and Does 4 through

4    10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

5    rights. Accordingly, Mattel is entitled to recover exemplary damages from

6    defendants in an amount to be determined at trial.

7                            **Ninth Claim**

8                     **Breach of Duty of Loyalty**

9                   **(Against Bryant and Machado)**

10            142. Mattel repeats and realleges each and every allegation set forth in

11   paragraphs 1 through 141, above, as though fully set forth at length.

12            143. As employees of Mattel, Bryant and Machado owed a duty of

13   undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not

14   compete with Mattel or assist a competitor of Mattel during their employment with

15   Mattel. Pursuant to this duty, Bryant and Machado were required to always give

16   preference to Mattel's business over their own, similar interests during the course of

17   their employment with Mattel.

18            144. Bryant and Machado breached their duty of loyalty to Mattel in

19   that, while employed by Mattel, they secretly aided, assisted and worked for a

20   competitor of Mattel, including without limitation by entering into agreements with

21   a Mattel competitor. As alleged above, they also breached the aforementioned duty

22   by using Mattel property and resources for the benefit of, and to aid and assist,

23   themselves personally and the competitor of Mattel.

24            145. As a direct and proximate result of defendants' wrongful conduct,

25   Mattel has incurred damages in an amount to be determined at trial.

26            146. Defendants acted with malice, fraud and oppression, and in

27   conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award

28   of punitive damages against defendants in an amount to be determined at trial.

23

211

1       147.  Furthermore, defendants' conduct has caused, and unless

2   enjoined will continue to cause, irreparable injury to Mattel that cannot be

3   adequately compensated by money damages and for which Mattel has no adequate

4   remedy at law.  Accordingly, Mattel is entitled to an order restraining further

5   breach of defendants' duty of loyalty to Mattel and/or restraining defendants from

6   continuing to benefit from such breach.

7       148.  In breaching their duty of loyalty to Mattel, Bryant and Machado

8   acted with malice, fraud and oppression, and in conscious disregard of Mattel's

9   rights.  Accordingly, Mattel is entitled to recover exemplary damages from

10  defendants in an amount to be determined at trial.

11  **Tenth Claim**

12  **Aiding and Abetting Breach of Duty of Loyalty**

13  **(Against MGA, Larian and Does 4 through 10)**

14      149.  Mattel repeats and realleges each and every allegation set forth in

15  paragraphs 1 through 148, above, as though fully set forth at length.

16      150.  MGA, Larian and Does 4 through 10 knew that Bryant, as an

17  employee of Mattel, owed a duty of loyalty to his employer.  MGA, Larian and

18  Does 4 through 10 knew that this duty included an obligation on the part of Bryant

19  not to compete with Mattel or assist a competitor of Mattel during the term of his

20  employment with Mattel.  MGA, Larian and Does 4 through 10 also knew that

21  Bryant was required to give preference to Mattel's business over his own, similar

22  interests or those of Mattel's competitors. or those of Mattel's competitors during

23  the course of his employment with Mattel.

24      151.  MGA, Larian and Does 4 through 10 knew that the Mattel

25  Employees (excluding Bryant) were employed by Mattel, and, as employees of

26  Mattel, that they owed duties of loyalty to Mattel.  MGA, Larian and Does 4

27  through 10 knew that these duties included an obligation on the part of the Mattel

28

34/2001691.1

FIRST AMENDED COMPLAINT

1  Employees (excluding Bryant) not to compete with Mattel or assist a competitor of
2  Mattel during their Mattel employment.

3       152.  Despite such knowledge, defendants MGA, Larian and Does 4
4  through 10 intentionally and without justification solicited, encouraged, aided and
5  abetted and gave substantial assistance to the Mattel Employees to breach their
6  duties of loyalty to Mattel, knowing that their conduct would constitute breaches of
7  their duties of loyalty to Mattel.

8       153.  As a further consequence of defendants' efforts, Mattel has
9  suffered injury and is entitled to compensatory damages in an amount to be proven
10 at trial.

11      154.  In taking the aforesaid actions, MGA, Larian and Does 4 through
12 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's
13 rights.  Accordingly, Mattel is entitled to recover exemplary damages from
14 defendants in an amount to be determined at trial.

15                       **Eleventh Claim**
16                         **Conversion**
17                   **(Against All Defendants)**
18      155.  Mattel repeats and realleges each and every allegation set forth in
19 paragraphs 1 through 154, above, as though fully set forth at length.

20      156.  Defendants wrongfully converted Mattel property and resources
21 by appropriating and using them for their own benefit and gain and for the benefit
22 and gain of others, without the permission of Mattel.

23      157.  Mattel was entitled to, among other things, the exclusive right
24 and enjoyment in property and tangible materials owned by Mattel, including
25 without limitation such proper and materials that were created by Bryant while he
26 was a Mattel product designer.  Such property was taken by Bryant from Mattel to
27 further his own interests and, in at least some instances, provided by Bryant to
28 Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

-42-

158. In addition, defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices. Defendants did so without Mattel's permission and continue to possess them.

159. As a direct and proximate result of defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160. As a result of defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered, which is not measured by the value of the property misappropriated, but includes the lost profits that Mattel suffered as a result of the conversion or, alternatively, the profits generated by the defendants that would not have been generated but for the conversion. Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to defendants' acts of conversion.

161. Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

162. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

 

## Twelfth Claim

### Unfair Competition

(Common Law and *Cal. Bus. & Prof. Code* § 17200)

(Against All Defendants)

163.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164.   Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165.   By engaging in the foregoing conduct, defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq*.  Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166.   As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial.  No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining defendants' continued wrongful acts.  Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.



## Thirteenth Claim

### Declaratory Relief

### (Against All Defendants)

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and defendants regarding defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1.    For a declaration that defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived, created or

34/2001691.1

1 reduced to practice by Bryant during the term of his Mattel employment and/or by

2 any others then-employed by Mattel, as well as in all derivatives prepared

3 therefrom, and that Mattel is the true owner of the foregoing;

4         2.    For a declaration that any agreement between Bryant, on the one

5 hand, and MGA or any person or entity, on the other hand, in which Bryant

6 purported to assign any right, title or interests in any work that he conceived,

7 created or reduced to practice while a Mattel employee, including but not limited to

8 the Bratz designs, is void and of no effect;

9         3.    For an Order enjoining and restraining defendants, their agents,

10 servants and employees, and all persons in active concert or participation with

11 them, from further wrongful conduct, including without limitation from imitating,

12 copying, distributing, importing, displaying, preparing derivatives from and

13 otherwise infringing Mattel's copyright-protected works;

14         4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other

15 applicable law, impounding all of defendants' products and materials that infringe

16 Mattel's copyrights, as well as all plates, molds, matrices and other articles by

17 which copies of the works embodied in Mattel's copyrights may be reproduced or

18 otherwise infringed;

19         5.    For an Order mandating that defendants return to Mattel all

20 tangible items, documents, designs, diagrams, sketches or any other

21 memorialization of inventions created or reduced to practice during Bryant's

22 employment with Mattel as well as all Mattel property converted by defendants;

23         6.    For an Order mandating specific performance by Bryant to

24 comply with and satisfy Bryant's contractual obligations to Mattel;

25         7.    That Mattel be awarded, and defendants be ordered to disgorge,

26 all payments, revenues, profits, monies and royalties and any other benefits derived

27 or obtained as a result of the conduct alleged herein, including without limitation of

28

34/2001691.1

FIRST AMENDED COMPLAINT

1    all revenues and profits attributable to defendants' infringement of Mattel's

2    copyrights under 17 U.S.C. § 504;

3           8.   For an accounting of all profits, monies and/or royalties from the

4    exercise of ownership, use, distribution, sales and licensing of Bratz;

5           9.   For the imposition of a constructive trust over Bratz, including

6    without limitation registrations and applications for registrations relating thereto

7    made or filed by defendants and third parties, and all profits, monies, royalties and

8    any other benefits derived or obtained from defendant's exercise of ownership, use,

9    sale, distribution and licensing of Bratz;

10          10.   That Mattel recover its actual damages and lost profits;

11          11.   That defendants be ordered to pay exemplary damages in a sum

12    sufficient to punish and to make an example of them, and deter them and others

13    from similar wrongdoing;

14          12.   That defendants be ordered to pay treble its general and special

15    damages, plus interest, costs and attorney's fees incurred by reason of defendants'

16    violations of 18 U.S.C. §§ 1962(c)-(d).

17          13.   That defendants be ordered to pay double damages due to their

18    willful and malicious misappropriation of Mattel's trade secrets with deliberate

19    intent to injure Mattel's business and improve its own;

20          14.   That defendants pay to Mattel the full cost of this action and

21    Mattel's attorneys' and investigators' fees; and

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

1          15.   That Mattel have such other and further relief as the Court may

2   deem just and proper.

3

4   DATED:  November 19, 2006        QUINN EMANUEL URQUHART OLIVER &

5                                       HEDGES, LLP

6

7                           By_____

                           John B. Quinn

8                              Attorneys for Plaintiff

                           Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23     285

FIRST AMENDED COMPLAINT

1/2001691.1

1

# DEMAND FOR JURY TRIAL

2

3       Plaintiff Mattel, Inc. respectfully requests a jury trial on all issues

4    triable thereby.

5

6    DATED:  November 19, 2006          QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP
7

8                                       By _John B Quinn jwc_____

9                                          John B. Quinn
                                           Attorneys for Plaintiff
10                                         Mattel, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                        23    286

FIRST AMENDED COMPLAINT

14/2001691.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit A**

4/2001691.1

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patent, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for it and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business of future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continued employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement. In addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _____

MATTEL, INC.
By _____
Signature

Employee Name (print)   CARTER H. BRYANT

Name of Witness (print)   TERESA NEWCOMB

Date   01/04/99

M 0001622
23    288

1

**Exhibit B**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4/2001691.1

-51-

## CONFLICT OF INTEREST QUESTIONNAIRE

**BRYANT, CARTER H.**      **PROJECT DESIGNER**

Name (Last, First, M.I.)        Job Title        Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES ● NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES ● NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES ● NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES ○ NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES ○ NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES ● NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES ● NO   7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES ● NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES ● NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

*4, 5, freelance design & artwork in 1998, from appx. 5/98 - 11/98 for the Ashton Drake galleries.*

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature: *Carter H. Bryant*        Date: **01/04/98**

M 0001621



# EXHIBIT C

## CURRENTLY KNOWN PREDICATE ACTS BY DEFENDANTS RE MAIL AND WIRE COMMUNICATIONS

| Date | Type of Communication | Bates Reference (if applicable) |
|---|---|---|
| 4/15/2001 | Email from Isaac Larian (MGA) Aldo Horvat (GIG ITALY) | MGA000746 |
| 3/28/2001 | Email from Stephen Lee (MGA Hong Kong) to Earlylight (vendor) | MGA000747 |
| 4/15/2001 | Email from Isaac Larian Stephen Lee and Stanley Li | MGA000748-750 |
| 4/11/2001 | Email from Isaac Larian to Stephen Lee | MGA000766-767 |
| 4/10/2001 | Email from Isaac Larian to Pedro Feist (Concentra) | MGA001027-29 |
| 4/5/2001 | Email from Dave Malacrida (MGA) to Gary Cogland | MGA001030-32 |
| 4/3/2001 | Email from Isaac Larian to John Young | MGA001040-44 |
| 1/9/2000 | Email from Martin Hitch (MGA Hong Kong) to Pedro Feist | MGA001061-64 |
| 4/2/2001 | Email from Isaac Larian to Ron Stover | MGA001099-1100 |
| On or about 4/3/2001 | Fed Ex shipment from Isaac Larian to Ron Stover | MGA001099-1100 |
| 4/2/2001 | Email from Isaac Larian to Craig Cunningham (Eckerd Drugs) | MGA001105 |
| 3/28/2001 | Email from Isaac Larian to Stephen Lee | MGA001113-14 |
| On or about 3/28/2001 | Letter from Isaac Larian sent to Ron Stover | MGA001116-17 |
| 4/18/2001 | Email from Victoria O'Connor (MGA) to Avi Kreisel (Kreisel Dist.) | MGA001208-09 |
| 4/17/2001 | Email from Isaac Larian to Stephen Lee and Stanley Li | MGA001213-14 |
| On or about 4/18/2001 | Shipment from Stephen Lee to Isaac Larian | MGA001219-20 |
| 4/4/2001 | Email from Isaac Larian to John Young | MGA001278-82 |
| 3/10/2001 | Email from Isaac Larian to John Young | MGA001289-90 |
| 6/12/2003 | Facsimile transmission from MGA Entertainment to Jessie Ramirez | MGA001310 |
| 10/4/2000 | Email from David Rosenbaum (attorney for MGA) to Anne Wang (attorney for Carter Bryant) | MGA001320-29 |

23    294

\4/2001691.1

FIRST AMENDED COMPLAINT

| | | |
|---|---|---|
| 10/26/2000 | Email from Mercedeh Ward (MGA) to Samuel Wong, Cecilia Kwok and Franki Tsang (MGA Hong Kong) | MGA000012-13 |
| 10/25/2000 | Email from Mercedeh Ward Samuel Wong, Cecilia Kwok and Franki Tsang | MGA000015-17 |
| 10/30/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000019-21 |
| 11/3/2000 | Email from Mercedeh Ward to Victor Lee and Paula Treantafelles | MGA000043-45 |
| 11/4/2000 | Email from Isaac Larian to Carter Bryant and Paula Treantafelles | MGA000046-47 |
| 11/11/2000 | Email from Judy Rich to Cecilia Kwok and Mercedeh Ward | MGA000049 |
| 11/15/2000 | Emails between Paula Treantafelles and Samuel Wong and Franki Tsang | MGA000071-74 |
| 12/8/2000 | Email from Mercedeh Ward to Cecilia Kwok and Samuel Wong | MGA000077-81 |
| On or about 12/23/2000 | Package sent from MGA Hong Kong to MGA Los Angeles per instructions from MGA Los Angeles | MGA000089-90 |
| 12/15/2000 | Email from Paula Treantafelles to Samuel Wong and Mercedeh Ward | MGA000091-92 |
| 12/16/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000097-104 |
| 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000109-112 |
| On or about 12/16/2000 | Package of fabric swatches sent from MGA Los Angeles to MGA Hong Kong | MGA000113-122 |
| On or about 12/20/2000 | Package of samples sent from MGA Los Angeles to MGA Hong Kong | MGA000124-125 |
| 12/20/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000124-125 |
| 12/12/2000 | Fed Ex shipment from MGA Los Angeles to Cecilia Kwok | MGA000131-132 |
| 12/19/2000 | Email from Mercedeh Ward to Cecilia Kwok and Wendy Reed | MGA000131-132 |
| 12/20/2000 | Email from Paula Treantafelles to Jimmy Cheng, Samuel Wong, Cecilia Kwok | MGA000140-141 |
| 12/10/2000 | Email from Mercedeh Ward to Sarah Halpern | MGA000147-149 |
| 12/22/2000 | Email from Mercedeh Ward to Samuel Wong and Judy Rich | MGA000190 |
| 12/22/2000 | Email from Paula Treantafelles to Samuel Wong, Judy Rich and Mercedeh Ward | MGA000197-199 |
| 12/29/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000211 |
| 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000212-217 |

FIRST AMENDED COMPLAINT

| | | | |
|---|---|---|---|
| 1 | 12/27/2000 | Email from Paula Treantafelles to Franki Tsang et al. | MGA000212-217 |
| 2 | 12/26/2000 | Email from Paula Treantafelles to Carter Bryant | MGA000219 |
| 3 | 12/27/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000234-236 |
| 4 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000249-250 |
| 5 | 12/27/2000 | Email from Paula Treantafelles to Cecilia Kwok and Mercedeh Ward | MGA000253 |
| 6 7 | 12/27/2000 | Email from Paula Treantafelles to Samuel Wong | MGA000254, 256 |
| 8 | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000322 |
| 9 | 12/29/2000 | Email from Paula Treantafelles to Carter Bryant and Mercedeh Ward | MGA000333 |
| 10 | 1/16/2001 | Email from Paula Treantafelles to Samuel Wong et al. | MGA000366-368 |
| 11 | 1/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000369-370 |
| 12 13 | 1/18/2001 | Email from Paula Treantafelles to Cecilia Kwok, Judy Rich and Carter Bryant | MGA000371-378 |
| 14 | 1/18/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok and Samuel Wong | MGA000379-381 |
| 15 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000406-414 |
| 16 | 9/27/2000 | Email from Paula Treantafelles to Franki Tsang and Judy Rich | MGA000422 |
| 17 | 10/5/2000 | Email from Isaac Larian to Carter Bryant | MGA000423 |
| 18 | 10/18/2000 | Email from Mercedeh Ward to Franki Tsang and Victor Lee | MGA000425-426 |
| 19 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000482 |
| 20 21 | 12/22/2000 | Email from Isaac Larian to Franki Tsang, Mercedeh Ward and Paula Treantafelles | MGA000524-528 |
| 22 | 12/20/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000530-531 |
| 23 24 | 10/26/2000 | Email from Paula Treantafelles to Cecilia Kwok, Isaac Larian, and Carter Bryant | MGA000539-541 |
| 25 | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok | MGA000539-541 |
| 26 | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok and Isaac Larian | MGA000539-541 |
| 27 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok, Samuel Wong, and Judy Rich | MGA000545 |
| 28 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000546-547 |

34/2001691.1

-54-

| 2/26/2001 | Email from Paula Treantafelles to Samuel Wong, Cecilia Kwok, and Carter Bryant | MGA000548 |
| 2/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000549 |
| 2/26/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000550 |
| 2/24/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000551 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000554 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000556-557 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000558 |
| 2/23/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000560 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000561 |
| On or about 2/20/2001 | Fed Ex shipment from Carter Bryant to Cecilia Kwok | MGA000566 |
| 2/20/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000566 |
| 2/19/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000568 |
| 2/19/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000569-570 |
| 2/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000571-572 |
| 2/16/2001 | Emails from Paula Treantafelles to Cecilia Kwok | MGA000573, 574, 576, 582, 589-90 |
| 2/16/2001 | Emails from Paula Treantafelles to Carter Bryant | MGA000575, 579, 588 |
| 2/12/2001 | Email from Lon Ross (MGA) to Carter Bryant et al. | MGA000583-587 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok et al. | MGA000599 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000600 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000602 |
| 2/3/2001 | Email from Paula Treantafelles to Cecilia Kwok and Judy Rich | MGA000603-05 |
| 2/2/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000606 |

FIRST AMENDED COMPLAINT

.4/2001691.1

| 1/31/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000608 |
|---|---|---|
| 1/30/2001 | Email from Paula Treantafelles to Carter Bryant and Judy Rich | MGA000609 |
| On or about 1/30/2001 | Shipment from MGA Los Angeles to Carter Bryant | MGA000609 |
| 1/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000610 |
| 1/24/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000611 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Samuel Wong | MGA000612 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000613 |
| 3/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000617 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000618 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000620 |
| 3/6/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000621-622 |
| 3/6/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000625-626 |
| 3/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000625-626 |
| 3/3/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000634 |
| On or about 3/2/2001 | Fed Ex shipment from MGA Los Angeles to MGA Hong Kong | MGA000634 |
| 4/10/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000635 |
| 4/7/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000635 |
| 4/30/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000654 |
| 5/14/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000655 |
| 5/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000656-664 |
| 5/9/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000666 |
| 10/20/2000 | Email from Kerri Legg (MGA) to Steve Linker and Liz Hogan | MGA0008032 |
| | Letter from Mattel de Mexico employee to Thomas Park and Isaac Larian (MGA) | |
| 3/30/2004 | Letter to Carlos Gustavo Machado Gomez from Isaac Larian | |
| 3/30/2004 | Letter to Mariana Trueba Almada from Isaac Larian | |

| | | |
|---|---|---|
| 1 | 4/14/2004 | Email from "plot04@aol.com" to Thomas Park copying Isaac Larian and Susana Kuemmerle |
| 2 | | |
| 3 | 4/14/2004 | Email from Susana Kuemmerle to Isaac Larian and Thomas Park copying "plot04@aol.com" |
| 4 | 4/15/2004 | Email from Jean Paul Farah to "plot04@aol.com" copying Daphne Gronich |
| 5 | | |
| 6 | 4/15/2004 | Email from "plot04@aol.com" to Thomas Park copying Jean Paul Farah and Isaac Larian |
| 7 | 4/12/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 8 | | |
| 9 | 4/15/2004 | Email from "plot04@aol.com" to Jean Paul Farah copying Daphne Gronich and Isaac Larian |
| 10 | 4/15/2004 | Email from Mariana Trueba Almada to Andrea Ramirez |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |



FIRST AMENDED COMPLAINT

14/2001691.1

**Exhibit  24**

SEP 14 '00 11:36 FR MGA'S COLLECTIBLES  310 252 0409 TO 18007517         P.01/04

To: David Rosenbaum

From: Carter H. Bryant

Total Pages: 4

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MGA001356



EXHIBIT 24 PAGE 298

September 14, 2000

Dear David,

Enclosed is a copy of my original offer of employment with Mattel. To the best of my knowledge, other than an agreement of confidentiality, there are no other expressed contracts that have been signed. I am unable to look into this too much further with our Human Resources director without risking suspicion, but I am quite certain that this should suffice.

Thank you very much.

Sincerely,


Carter H. Bryant

## REDACTED

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MGA001357


EXHIBIT 24 PAGE 299

SEP 14 '00 11:56 FR 84    COLLECTIBLES 310 252 8659 TO 955    P.03/04



Mattel, Inc.

333 Continental Boulevard
El Segundo, California 90245-5012
Phone: (310) 252-2000
Wire: 188135 or 188170

December 11, 1998

Mr. Carter Bryant
1-A Sycamore Dr.
Kimberling, MO 65686

Dear Carter,
Congratulations and welcome to Mattel!

We are pleased to confirm your acceptance of our offer for the position of Project Designer, and to outline the various benefits that are available to you as a member of the Mattel team.

**Compensation**

Your annual base salary will be [redacted] payable on a bi-weekly basis.

**Relocation**

You will receive a relocation payment of [redacted] less appropriate federal and state taxes, payable to you no later than 30 days following commencement of your employment.

If you choose to voluntarily terminate your employment with Mattel within one year of your date of hire, you will be required to repay this amount in full.

**Benefits**

The following is a brief outline of benefits in which you will be eligible to participate as of your date of hire. Specific details and plan limitations are provided in Summary Plan Descriptions or Plan Documents, and are subject to periodic modification and revision.

You and your qualified dependents, if applicable, will be eligible for the following coverage:

- Medical
- Dental
- Vision
- Prescription

- Life Insurance – 1-1/2 x base salary
- Accidental Death & Dismemberment – 1-1/2 x base salary
- Business Travel Coverage – $1,000,000
- Short & Long-Term Disability

You will be enrolled in the Mattel Personal Investment Plan (PIP), which is a 401(k) savings/retirement plan. The plan offers both Company Automatic and Matching contribution provisions as outlined below:

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MGA001358

EXHIBIT 24 PAGE 200

SEP 14 '98 11:38 FR B4     CUCUELTHBLES  310 252 6859 TO 33#   #1     P.04/04

- **Company Automatic Contributions**
  The Company will make automatic contributions to your account ranging from 3% to 8% of your salary, based on age.

- **Company Matching Provision**
  The Company will match up to the first 6% of pay you contribute to your PIP account on a dollar-for-dollar basis up to 2% of your annual salary and on a fifty-cents-on-the-dollar basis for up to the next 4% of your salary.

Of course, this offer is contingent upon satisfactory verification of all information as to previous employers and academic institutions attended, eligibility to work in the United States, and the signing of a Confidential Information and Inventions Agreement. Further, you understand that this letter does not imply employment for a specific term and thus your employment is at will, either you or the Company can terminate it at any time, with or without cause. This letter acknowledges there are no oral or written side agreements or representations concerning the term or conditions of employment. Additional details of your employment relationship are contained in our employment application.

Enclosed is a packet containing various information and forms required to activate your employment. Please complete these forms and bring them with you on your first day of employment. Also, you will need to bring with you certain documents as set forth in the enclosed directions. Upon your arrival in the second floor lobby, please advise the security officer that you are a new employee. You will be escorted to an orientation session beginning at 8:00 a.m., which will last most of the morning.

Carter, we are all looking forward to you joining the Mattel team on 1/4/99. As a new member of the Mattel family, please feel free to call me at (310) 252-2595 if you have any questions.

Sincerely,

*Lynne Rob*

Lynne Robinson
VP, Human Resources

·2

** TOTAL PAGE.04 **

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MGA001359

EXHIBIT 24 PAGE 301

**Exhibit  25**

The Corporation: COMMENTARY

## TO REALLY BE A PLAYER, MATTEL NEEDS HOTTER TOYS

By Christopher Palmeri

1,151 words

28 July 2003

BusinessWeek

64

Number 3843

English

(Copyright 2003 McGraw-Hill, Inc.)

The Bratz pack has invaded the Gabriele house. The line of trendy dolls burst on the scene two years ago, offering girls a hipper alternative to that old standby, Barbie: Think Jennifer Lopez to Barbie's Reese Witherspoon. Joan Gabriele, a Hollywood (Fla.) mother of two, now has eight Bratz dolls in her home. Her daughters, ages 6 and 8, rarely touch their Barbies. ``Barbie is pretty much a thing of the past,'' she says. ``They like Bratz better.''

That's bad news for Barbie's maker, Mattel Inc. -- and for the three-year-old turnaround efforts of CEO Robert A. Eckert, the ex-president of Kraft Foods Inc. who replaced the embattled Jill E. Barad. The El Segundo (Calif.) toy giant counts on Barbie for about one-third of its revenues and more of its profits. But Mattel says U.S. Barbie sales declined 2% last year and 14% in this year's first quarter. The overall doll category, says market researcher NPD Group Inc., dropped only 3% in the quarter.

Give Eckert, 48, his due: He pulled Mattel out of its tailspin after its disastrous $3.8 billion acquisition of Learning Co. He got rid of the money-losing computer-game maker and slashed costs. His goal: to bring the stability of a consumer-products company to the hit-driven toymaker. And using such practices as computer-aided design to speed up product development and just-in-time inventory management, he succeeded.

But now it looks like Eckert is learning a valuable lesson: Mattel is selling toys, not soap or cornflakes. Good brand management goes only so far in a business that caters to children's whims. Like it or not, the key to success is launching innovative products and promoting the heck out of them. If you don't do it, your competitors will.

Eckert's strategy has been great for Mattel's bottom line. Profits last year, before special charges, were a

© 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights

EXHIBIT ___ PAGE

202

healthy $455 million, and the stock has nearly doubled, to $20, since Eckert arrived in May, 2000. But top-line growth has sputtered. U.S. revenues, $3.4 billion in 2002, have declined marginally in the past few years. Total 2002 sales of $4.9 billion crept up from $4.6 billion in 2000 -- thanks to overseas expansion.

While Eckert continues to build on the massive Barbie franchise that Barad constructed, he now knows that he needs hot new toys. Recycling old characters like Sesame Street's Elmo just won't be enough. ``We need to do a better job on the top line," he says. ``The good news is, it's only spring training, and we have a long season ahead of us."

To that end, Eckert has begun an ambitious push. Between now and Christmas, he hopes to launch 250 new toys, including dozens of Hot Wheels models and Flavas, a Bratz-like hip-hop posse with baggy jeans and serious bling-bling. Originally, half of these toys weren't scheduled until 2004.

That should help boost sales. But it's even more important that Mattel prove it can respond to nimble upstarts as well as traditional big rivals like Hasbro Inc. After all, it took the company more than a year to launch a competitor to MGA Entertainment's Bratz. My Scene Barbie didn't hit stores until last October and has yet to make a dent in Bratz's success. At its Santa Monica (Calif.) store recently, Toy 'R' Us Inc. devoted just a sliver of the shelf space to My Scene that it did to Bratz. And My Scene dolls were being offered at 2 for 1. ``It's not really catching ground," says Sean P. McGowan, toy industry analyst at Harris Nesbitt Gerard Inc. Mattel will start tossing in a cell phone with 300 free minutes if you buy four of the $13.99 dolls. It also plans to add accessories and boy versions -- Hudson, River, and Bryant.

Barbie isn't the only Mattel stalwart under attack. Its Fisher-Price unit, long the king of preschool, is losing sales to newcomer LeapFrog Enterprises Inc., whose electronic interactive books have captured 19% of the $2.9 billion preschool toy and electronic learning aid markets. Eckert is counting on a successful launch in August for PowerTouch, Mattel's version of LeapFrog's popular interactive book. PowerTouch is operated by pointing a finger at an image or a word, instead of the stylus used in LeapFrog's original products. That's key for younger kids. ``It's much easier for her to use," says Christopher Coye, a Los Angeles-area parent whose 4-year-old tested a PowerTouch. Still, LeapFrog releases a finger-operated system in August, too.

Over the long term, Eckert puts at risk one of the strongest toy companies around if he can't instill innovation and rapid reaction in his much-tightened organization. To his credit, he is making it crystal clear that he doesn't want ideas to linger in the pipeline. When Matchbox brand managers mentioned this year that they had designed a toy firehouse that could be shipped with no assembly required, Eckert told them to get it out by fall. ``Why wait?" he says. ``If you've got it, sell it." And not a moment too soon: Sales of Mattel's Hot Wheels and Matchbox cars fell 6% in the first quarter, thanks to competition for boys' attention from action figures like Hasbro's resurgent G.I. Joe and Transformers.

   © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All right   EXHIBIT _____ PAGE 303

The question is how much Eckert needs to tweak his model. He probably cut back too much, for instance, on marketing. In 1998, Mattel's advertising and promotional spending totaled $631 million, or 13.8% of sales. By last year, it had fallen to $552 million, or 11.2% of sales. Aggressive television marketing boosted sales of Hot Wheels cars in Spain last year, and a strong new campaign could help Mattel toys here.

Mattel won't live or die on every new toy it develops. But it can't just rely on Barbies, either. ``Like they say in business school -- no risk, no reward,'' says **Isaac Larian**, CEO of privately held MGA. He should know: He got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers. As Eckert is finding out, sometimes the best ideas are right in front of you.

```
First Came Bratz...
MAKER      MGA Entertainment
DEBUT      2001
NAMES      Yasmin, Sasha, Cloe, Jade, and Meygan
MOTTO      The girls with a passion for fashion
HER RIDE   Late-night stretch limo
Data: MGA Entertainment, Mattel
...Then, My Scene Barbie
MAKER      Mattel
DEBUT      2002
NAMES      Barbie, Madison, Chelsea, and Nolee
MOTTO      My city. My style. My scene.
HER RIDE   Vespa motorscooter
Data: MGA Entertainment, Mattel
```

Palmeri covers toys from Los Angeles.

Document bw00000020030724dz7s0001w

EXHIBIT 25 PAGE 304

    © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

Weekend Plus

**Bratz packers are what's cool in doll world**

Denise I. O'Neal

897 words

5 March 2004

Chicago Sun-Times

North City Zone

55

English

Copyright (c) 2004 Bell & Howell Information and Learning Company. All rights reserved.

Bratz dolls are leaving America's sweetheart -- Barbie -- eating their dust.

Who are these fly girls with the funky wardrobe and devoted tween following?

In 2001, MGA Entertainment introduced Cloe, Sasha, Yasmin and Jade. The fashion divas have since skyrocketed to success. Four boy Bratz have been added to the line: Dylan, Eitan, Koby and Cameron. New friends on occasion will appear in exclusive themed sets.

Isaac Larian, CEO of MGA Entertainment, explains why he decided to have dolls make brief appearances in the line.

"Just like in any neighborhood, new friends arrive and others move on," he says. "Children have to adjust to old friends exiting and new friends arriving in their lives."

More than a fad product imitating life through the eyes of tweens, Larian wanted to incorporate aspects of real life and values associated with the real world in his dolls.

"We wanted a respectable product that reflected the lifestyle of schoolgirls and fashionable trends, but also one that represented clean fun with learning values," he says.

The Bratz are moving into another medium this year, starring in their first direct-to-DVD movie titled, "The Bratz Go Hollywood." The movie is set for a late-summer release. The dolls also will star in an animated feature film, which is expected to be released in late 2005.

EXHIBIT 25 PAGE 305

    © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

Doll products new for 2004 include Bratz Petz cats Brigitte, Kendall, Jolie and Daphne; Bratz Wild Life, an exclusive set featuring Nevra, Meyghan and Fianna; Bratz Girls Nite Out, with Cloe, Sasha, Yasmin, Jade and Dana preparing for Saturday night fun; Sun-kissed Summer, with Cloe, Yasmin, Sasha, Jade and Dana dressed in beach attire; Best Friends Beach Party, with friends Calista and Noelle spending a day at the beach; Best Friends Pajama Party, with Brianne and Zana in a themed slumber party setting, and Flower Fairies, featuring Rose, Daisy and Sunflower, a trio of scented dolls.

Larian, along with his brother and brother-in-law, founded ABC Electronics, a trading company dealing in consumer electronics, in 1982. In the late '80s, the company began focusing primarily on hand- held electronic games and changed its name to Micro Games of America.

When Larian's daughter was 7, he noticed she had become bored with Barbie dolls. He decided to again change the focus of his company, wanting to create a doll product for girls ages 7 to 13. The dolls would have to be urban dolls representing America's multi- ethnicity. They also had to reflect the trends and attitudes of the tween generation.

"We were looking for a new toy to challenge Barbie. Something that would span girls' interest in dolls for a few more years," says Larian.

Larian began shopping around for interested vendors. Getting negative response because of the company name, Larian once again changed the company's name, shortening it to MGA Entertainment. That done, Larian needed a name for his dolls.

His creative team decided the name should be catchy and not have more than six letters. When looking at sketches and pitching ideas, someone said the dolls look like little brats. Keeping with today's trend of making names more "cool" by changing the spelling, MGA executives decided to replace the "s" with a "z."

The Bratz were born and have been making big strides in the doll world ever since. A team of more than 15 designers are responsible for making certain the dolls always sport the latest fashions, accessories and hair styles.

For Larian and his creative team, not only have they struck gold with their product but they are having fun with the dolls as well.

"We are like children in a candy store -- everything is exciting," says Larian. "We don't have plans laid out for the Bratz. We come up with new ideas as we go along and we are having fun doing it."

    © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiv

To keep on top of what tweens are interested in, MGA polls children in the dolls' targeted age group. That formula, along with the company's strong sense of ethics and responsibility to children, have turned the Bratz into one of the best-selling products worldwide.

Larian also is compelled to produce a product that is affordable for all.

"I think children are very precious gifts, and it's our job in the toy industry to look beyond pricing to create products to stretch children's imagination and to not cheat any child out of the opportunity to be able to enjoy products," says Larian.

Bratz dolls are available in most toy stores. The company's Web site also has a free Bratz Fan Club that children can join. For more information, visit   www.bratzpack.com .

EVENTS: The Winnetka Antiques Fair takes place this weekend at the Winnetka Community House. Fifty dealers from across the country will showcase their wares. Dealers from England and Portugal also will be on hand. Hours for the event are 10 a.m. to 8 p.m. today, 10 a.m. to 6 p.m. Saturday and 11 a.m. to 5 p.m. Sunday. Admission is $12, good for all three days. The Winnetka Community House is at 620 Lincoln, Winnetka. For more information, call (847) 446-0537.

The popular line of Bratz dolls include Cloe, Yasmin, Jade, Dana and Sasha.

Document CHI0000020040305e0350000r

EXHIBIT 25 PAGE 307

    © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

BRATZ - LEADER They're every mother's nightmare this Christmas and they're called...

By JENNIFER SELWAY.

1,278 words

23 December 2003

The Express

13

English

(c) 2003 Express Newspapers

WHICH did I like better, she asked: Yasmin or Cloe or Jade or Dana or Sasha? You always play this game with little girls. Which do you like better, Mum - horses or cats, pink or yellow, apples or bananas? It's no good saying you don't have a view or that it depends on circumstances because they get cross. Well, she does anyway.

So I said Jade but, truth to tell, I thought Jade looked like a piece of trash, though no worse than Yasmin or Cloe or Sasha or Dana. They all did: little madams in micro-skirts and tight tops with knowing expressions and lips like something on an inflatable sex toy. They are called Bratz but I like to think of them as Strumpetz.

In the British Association of Toy Retailers' Top 10, Bratz dolls are number six. They have overtaken Barbie in popularity, though they have only been around since 2001.

Last year, half a million sold in this country. This year, the figure looks likely to triple, in spite of adult misgivings.

The dolls are the brainchild of Iranian-born Jewish businessman **Isaac Larian**, who went to America in the Seventies to study engineering. In 1987 he won the licence to import Nintendo from Japan, and the Bratz came about as a result of a conversation with a buyer from US retail giant Wal-Mart, who challenged him to build a "Barbie-beater".

Whereas Barbie and her longterm boyfriend Ken are mild, suburban beings who go on activity weekends and attend barbecues, the Bratz girls, accompanied by Bratz boys Cade, Cameron, Dylan, Eitan and Kaby, are feral, urban creatures.

According to the toy shop Hamleys, the brand values are "edgy, trendy, aspirational, with attitude and sociable". Rude and pushy in other words - and (as granny used to say) "no better than they ought to be", whereas one

© 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights

liked to think that Barbie had nice manners.

It comes to something when one starts to compare Barbie favourably to the new upstart. After all, for some years poor Barbie has been an object of loathing and derision among mothers who grew up believing in some sort of feminism. Though she did pursue a number of career options, including prima ballerina, astronaut and shop-girl (in no particular order), many considered her a poor role model for tiny girls.

IT WAS Barbie's body that was at fault. Wasn't there a danger that our daughters would grow up believing that only those built along the lines of Pamela Anderson would prosper? And then there was the question of all that pink. Pink was Barbie's colour and we no longer want girls to think genderspecific pink, do we?

Barbie is now 45 and may be on the shelf. The age at which little girls embrace the doll has been dropping rapidly. Nowadays, a three-year-old will have a brace of straggly-haired Barbies but it is the nine and 10year-olds who are demanding Bratz this Christmas. They love these dolls because they see them as teenagers, not very different from themselves.

With their big heads and spindly legs and rather large, coltish feet, Bratz are clearly not "adult" in the way that Barbie purports to be.

But they are sexual creatures and this is the big worry. While Barbie was merely objectionable because she was pink and passive, the Bratz are up front and aggressive. They dress the way you do not want your daughter to dress when she goes out. With their languid, made-up eyes and sultry pouts, they are pure jailbait. In a world where we increasingly fear for our children's safety and limit their freedom, parents don't want to take any chances.

At the same time, it seems as though the worlds of fashion, pop music, MTV and all manner of commercial interests conspire to sexualise our children long before they are ready - long before the age of consent. Say no to Bratz and you look like a meanie; say yes and you are part of the conspiracy to make children grow up too fast. Are we being too po-faced about this? If there is a good, positive side to the Bratz pack it is that their appearance is studiously multicultural - black, Asian, Jewish and Hispanic. Ethnic Barbies always looked something of a token gesture, implicitly conveying the idea that, in order to succeed, you not only had to have enormous breasts and long legs but that it would also help if you were blonde and blue-eyed as well.

Watch a group of girls playing with their Bratz and it becomes apparent that they are pleasingly "colourblind"; that the issue of ethnicity has become irrelevant.

It's also apparent that, while an imaginative adult may look at Cloe and Yasmin and Co and conjure up a sleazy

    © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights

lifestyle involving danger, too early sex, possibly drugs and a hideous precociousness, children are not burdened with this awful foreknowledge. They still have their innocence, though we sometimes doubt it.

It's no good trying to look at their toys through our adult eyes. They watch those "living dolls" Shakira, Christina Aguilera and Britney writhing about and admire them for their funkiness, their slickness and their prettiness. We adults just see tight trousers that barely cover the pubic bone and hear alarm bells.

If there is a worry about the Bratz pack it is not so much what they do to children; it is more about the signals they send out to the elements of the adult world that do not understand the nuances of children's imaginations. Try telling your preteen daughter that she mustn't go out dressed like a Bratz wearing a tiny skirt, crop top and lashings of lipstick. With the best will in the world, she will not understand the point you are making. She thinks she is looking cool, adult and in control.

You know she looks like a potential victim. She tells you indignantly that she has no interest in attracting men, and means it. You know that she will attract men, and inevitably the wrong sort.

Watching my daughter and her friends playing with their Bratz collections, it is clear that the whole ritual has nothing do with sexualisation. It is about collecting the set (a good marketing ploy); about swapping and sharing and using their imagination and deciding which doll/ outfit you prefer and why.

ALL THIS, most parents would agree, is perfectly fine. You do much the same with conkers or cigarette cards or marbles. I don't see them sending Cloe to a drug dealer or Dana asleep in the gutter after a bout of underage drinking.

Thankfully, even in this age of computer games, children still play and in their games they act out and prepare for scenes in their future lives. This is the purpose of play and it is no good expecting them to settle for rosy-cheeked dolls in gingham skirts, or even a previous generation's plaything such as Barbie.

We adults tend to be sentimental about toys, which is perfectly understandable, but little girls want the new, the next thing and the thing that their best friend has.

And if you are buying Bratz this year against your better judgment, remember that - like all must-have things - it is a passing phase and the chances are that, next year, you'll be worrying about some other toy that experts warn is unsuitable and sends out all the wrong signals as a role model.

Document THEEXP0020031223dzcn00014

25 ... 310

 © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

## Immigrant's Creative Company Shakes Up Toy Industry

By JEFF WEISS; Contributing Reporter

1,098 words

29 March 2004

San Fernando Valley Business Journal

English

2004 San Fernando Valley Business Journal.  All rights reserved.

Large Business Award - MGA Entertainment, North Hills

Only 16 years old, with a mere $750 in his pocket, and with parents across the globe in Iran, Isaac Larian never expected to eventually be the founder of one of the fastest growing toy companies in the world.

Initially undecided whether to emigrate to the United States or to Israel, Larian opted to pursue the American dream. The Business Journal's recipient of the family business Best Large Company award, MGA Entertainment, is the end product of Larian's hard work, determination, and foresight in capitalizing upon opportunity.

Yet before becoming a toy mogul, Larian set out to forge a career in the civil engineering industry before realizing his true talents lay elsewhere.

"I came here to get a civil engineering degree because I thought I'd be a civil engineer and go back to Iran and build infrastructure," Larian said. "I graduated in 1978 from Cal State Los Angeles but I never worked as an engineer. Shortly after graduating, the (Iranian) revolution broke out and I discovered that engineering wasn't for me. I was more of an entrepreneur."

The following year Larian and his brother Farhad founded MGA as a consumer electronics company. Their first foray into the toy industry didn't come until 1987 when Isaac saw the opportunity to manufacture Nintendo's hand-held electronic games.

"I'm an entrepreneur and in 1987 I saw an opportunity to become the distributor for Nintendo's hand-held games. I just saw opportunity. Most entrepreneurs do that," Larian said.

After two years in the hand-held video game industry, MGA left the toy game and returned to consume

© 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights r

25   311

electronics. Returning in 1993 to produce Mighty Morphin Power Rangers accessories, MGA never left the toy industry, having its first breakthrough item with 1997's wildly successful Singing Bouncing Baby Doll.

"Singing Bouncing Baby was our first doll and it was a huge hit," Larian said. "We ended up winning Family Fun Toy of the Year which is the Oscars of the toy industry. We ended up doing in excess of a million pieces," said Larian.

Introducing Bratz

But MGA's greatest success came later, with the introduction of 2001's Bratz dolls. Against all odds, Larian pioneered a line of dolls able to undercut the success of Barbie, the only company to do so since Barbie's 1959 debut.

However, the modest Larian is quick to acknowledge others for contributing to the company's success. A close knit family, Larian's sister, Shirin Makabi, is the company's director of travel and expenses. Shirin's husband, Eli Makabi, is MGA's vice-president in charge of traffic in sales. In addition, the Makabis co-own the business with Larian. But Larian family involvement does not stop there; Larian's children have played a crucial role in MGA's development.

"My oldest son, 17-year-old Jason, is very creative and a music writer. He has come up with some of our popular toys," Larian said. "He came up with Commandobot—a robot that was the first ever robot toy to work on voice recognition. It was a fantastic seller that was featured in Wired magazine. It was Jason's idea for Bratz."

Larian's other children have also been key to product development.

"Yasmin, my 15-year-old daughter, is involved in the business as well. She's particularly interested in fashion and focus groups. One of the Bratz is named after her," Larian said. "My 10-year-old son, Cameron, is also the namesake for one of the boy Bratz. Cameron comes up with different product ideas. One of our best ideas was a winter wonderland Bratz line. We were on a family ski vacation and he said 'Dad, you should do a Bratz winter break.' So we did it and it sold wonderfully."

Thanking the employees

Larian also credits the company's 430 employees for much of MGA's success.

"Our success is due to the passion of the people we have working for us. Each one has contributed to our success because they are passionate about the company and winning."

 © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights res

EXHIBIT 25 PAGE 312

With business booming, a Bratz licensing deal with 20th Century Fox has been inked. A Bratz DVD and a Bratz feature film are soon on the way.

"The Bratz are a true phenomenon that has taken the toy/doll industry by storm," Jim Gianopulos, chairman of Fox Filmed Entertainment, said. "They are more than just toys; they reflect the cultural diversity and contemporary style that kids relate to. That kind of success and impact on young people make the company a natural in a major motion picture, and we look forward to turning the Bratz figures into major motion picture stars."

MGA's projected revenue for 2004 is $1 billion and the company has openings for 110 employees in a variety of positions. Although MGA's success is now assured, there were obstacles along the way.

"I noticed some discrimination when I first got into the business world. I think that after living here for 33 years, there is unfortunately discrimination whether you're Jewish, Persian, black or whatever," Larian said. "But it made me stronger to go out and fight. People become resilient and they get angry and they need to turn that anger into positive energy."

Larian has certainly come a great distance from being a teenager with inclinations towards civil engineering and less than a thousand dollars in his pocket. Thanks to MGA, Barbie's pedestal seems a little less secure.

"I'm having a lot of fun and enjoying what I'm doing here right now and I think as long as you have fun at your job, it's a great thing," Larian said. "I believe that in life you have to have passion for what you do and if you lose that passion you shouldn't do it. My vision is for MGA to become a multibillion-dollar entertainment company and specialize in other things besides just toys."

Looking back on the whirlwind rise of MGA, Larian still seems a bit surprised by the amount of success he's encountered.

"My life is proof that dreams come true. You can't give up. They were definitely moments of self-doubt. I just didn't want to fail, I always had that desire to win," Larian said. "We've made history by unseating Barbie and for a small San Fernando Valley company to do that is a miracle."

Document SFVBJ00020041020e03t0003p

EXHIBIT 25 PAGE 313

© 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

Exhibit 26

1   sufficient material for another expert to test the exact same <u>documents</u>," but admits

2   that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3   Erich J. Speckin ¶14).

4          Another episode brought to light during discovery causing Mattel concern

5   relates to MGA's handling of the original Bryant/MGA contract before the inception of

6   the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7   testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8   Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9   between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14         Q.      . . . Was there ever anything that you were asked to
                   do that you – made you feel kind of uncomfortable?
15
       A.      Yes.
16                                        . . . .

17         Q.      And what was that?

18         A.      When the original contract was executed by Carter
                   Bryant, it was sent to me <u>via</u> fax, and on the top of
19                 the fax listed the phone number from where it was
                   faxed, which said "Barbie Collectibles," and at one
20                 point my boss, Isaac Larian, asked me to white that
                   out and send it to a lawyer, Patty Glaser.
21

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26         Q.      Were you ever asked to change the date on any
                   agreements between Mr. Bryant and MGA?
27
       A.      No.
28

                                        7

                           EXHIBIT 26 PAGE 314

RightFAX          8/ '2006 3:02    PAGE 009/019  _Fax Server

1    Q.    Are you aware of anybody being asked to change
          the date on any of those agreements?
2
     A.    No.
3
     Q.    I mean, do you have any reason to believe that any
4         agreement that was entered into between Mr. Bryant
          and MGA had a date altered or changed?
5
     A.    No.
6
     Q.    You never heard that from – from any source?
7
     A.    No.
8

9    (Decl. Paula E. Ambrosini, Ex. 3).

10         Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11   faxed on April 10, 2000, had the fax header altered, much in the same manner

12   described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13   fields on the fax header for the sender's name and the sender's telephone number are

14   missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

15   _____

16      [2] Mattel speculates that the time sheets produced by MGA for one of its

17   employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
     "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked
18   on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
     painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at
19   3). The basis for this speculation is based on the fact that the initial disclosure by MGA
     of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,
20   on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
     mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
21   departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).
22   Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
     supplemented its earlier production of Rhee's time sheets showing that during the mid-
23   to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
     Angels" and was not involved in any BRATZ-related work until after Bryant's departure
24   from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time
25   sheets were altered is allegedly bolstered by the fact that Rhee testified during her
     deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
26   that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
27   nothing but a cover or code word for BRATZ-related work. This argument is hard to
     accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
28   for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
     362). It is not until December, 2000, that any of the invoices submitted by Rhee show

EXHIBIT 36 PAGE 315