1         109.   Answering paragraph 119 of the Complaint, Mattel repeats its
2   responses contained in paragraphs 1 through 108 of this Answer and incorporates
3   them by reference as though fully and completely set forth herein.

4         110.   Answering paragraph 120 of the Complaint, Mattel denies the
5   truth of the allegations set forth therein.

6         111.   Answering paragraph 121 of the Complaint, Mattel denies the
7   truth of the allegations set forth therein.

8         112.   Answering paragraph 122 of the Complaint, Mattel denies the
9   truth of the allegations set forth therein.

10        113.   Answering paragraph 123 of the Complaint, Mattel denies the
11  truth of the allegations set forth therein and specifically denies that plaintiff is
12  entitled to injunctive relief.

13        114.   Answering paragraph 124 of the Complaint, Mattel repeats its
14  responses contained in paragraphs 1 through 113 of this Answer and incorporates
15  them by reference as though fully and completely set forth herein.

16        115.   Answering paragraph 125 of the Complaint, Mattel denies the
17  truth of the allegations set forth therein.

18

19        <u>General Denial</u>

20        Unless specifically admitted herein, Mattel denies the truth of each and
21  every allegation set forth in plaintiff's Complaint and specifically denies that
22  plaintiff is entitled to any relief against Mattel.

23

24        <u>Affirmative Defenses</u>

25        By alleging the Affirmative Defenses set forth below, Mattel does not
26  agree or concede that it bears the burden of proof or the burden of persuasion on any
27  of these issues, whether in whole or in part.

EXHIBIT __2__ PAGE __46__

28

AMENDED ANSWER AND COUNTERCLAIMS

First Affirmative Defense

1
2        Plaintiff's Complaint fails to state a claim upon which relief can be
3   granted.
4
5                        Second Affirmative Defense
6        Plaintiff has no valid, enforceable or protectible rights or interest in the
7   alleged trade dress or other matters asserted, including without limitation in that
8   plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.
9
10                        Third Affirmative Defense
11       Plaintiff's claims, including without limitation plaintiff's claims based
12  upon alleged extra-territorial acts, are barred in whole or in part by lack of subject
13  matter jurisdiction.
14
15                        Fourth Affirmative Defense
16       Plaintiff's claims are barred in whole or in part by plaintiff's unclean
17  hands.
18
19                        Fifth Affirmative Defense
20       Plaintiff's claims are barred in whole or in part by virtue of Mattel's
21  prior-creation of the elements and other matters asserted in the Complaint.
22
23                        Sixth Affirmative Defense
24       Plaintiff's claims are barred in whole or in part by its lack of standing.
25
26                        Seventh Affirmative Defense
27       Plaintiff's claims are barred in whole or in part by the applicable
28  statutes of limitation and the doctrine of laches.

EXHIBIT 2  PAGE 47

1

2                          Eighth Affirmative Defense

3          Plaintiff's claims are barred in whole or in part by the doctrines of

4   waiver, estoppel and acquiescence.

5

6                          Ninth Affirmative Defense

7          Plaintiff's claims are barred in whole or in part by Mattel's

8   constitutional rights of free speech, petitioning and association, including without

9   limitation by the litigation privilege as protected by and/or codified in *inter alia*

10  Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the

11  common interest privilege and by other privileges.

12

13                         Tenth Affirmative Defense

14         Plaintiff's claims are barred in whole or in part by Mattel's federal and

15  state constitutional rights of free speech, including without limitation under the First

16  Amendment of the United States Constitution.

17

18                        Eleventh Affirmative Defense

19         Plaintiff's claims are barred in whole or in part by the competitor

20  privilege.

21

22                         Twelfth Affirmative Defense

23         Plaintiff's claims are in whole or in part preempted by the Copyright

24  Act and barred by the *Sears-Compco* doctrine.

25

26

27         EXHIBIT 2   PAGE 48

28

!09/2035941.2

-25-

AMENDED ANSWER AND COUNTERCLAIMS

### Thirteenth Affirmative Defense

Plaintiff's requested relief, including plaintiff's requests for punitive and/or enhanced damages, are barred in whole or in part because all of Mattel's actions were in good faith.

### Fourteenth Affirmative Defense

Plaintiff's damages, if any, were not caused by Mattel and are not attributable to the acts or omissions of Mattel.

### Fifteenth Affirmative Defense

Plaintiff has failed to mitigate its damages, if any.

### Additional Defenses

Mattel has insufficient knowledge or information upon which to form a belief as to whether additional defenses are available.  Mattel reserves the right to amend this Answer to add, delete, or modify additional defenses based on legal theories which may or will be divulged through clarification of the Complaint, through discovery, through change or clarification of the governing law or through further legal analysis of plaintiff's positions in this litigation.

### Prayer for Relief

WHEREFORE, Mattel prays for relief as follows:

1.    That the Complaint be dismissed with prejudice;

2.    That plaintiff take nothing by reason of the Complaint against Mattel and that judgment be entered in Mattel's favor;

3.    That Mattel recover its costs and attorneys' fees; and

EXHIBIT 2  PAGE 49

AMENDED ANSWER AND COUNTERCLAIMS

4.     That this Court award such other and further relief as it deems just and proper.

## COUNTERCLAIMS

Pursuant to the Court's Order of January 12, 2007, and incorporating its [Proposed] Amended Complaint dated November 19, 2006, Mattel, Inc. alleges as follows:

### Preliminary Statement

1.     For years MGA Entertainment, Inc. has engaged in a pattern of stealing and using Mattel, Inc.'s property and trade secrets.  MGA's use of the stolen property and trade secrets caused and continues to cause significant harm to Mattel.  MGA first stole "Bratz," a fashion doll, from Mattel, and then continued stealing Mattel's confidential and proprietary information to fuel MGA's growth.

2.     Carter Bryant conceived, created and developed Bratz designs while he was employed by Mattel as a doll designer.  He concealed his Bratz work from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.  As MGA knows, Mattel owns the Bratz designs that Bryant made.  As the rightful owner of those Bratz designs, Mattel has registered copyrights for them and seeks damages arising from MGA's repeated infringement of those copyrights.

3.     Emboldened by the success of its illegal conduct, MGA has repeated—and even expanded—its pattern of theft on numerous occasions.  For example, in or about 2004, MGA decided to expand into Mexico.  To do so, and operating from its Southern California offices, MGA hired away three key Mattel employees in Mexico, who, on their way out, stole virtually every category of Mattel's sensitive and trade secret business plans and information for the Mexican market, as well as a significant quantity of sensitive and trade secret information for Mattel's U.S. and worldwide businesses, and took them to MGA.  Armed with

EXHIBIT __2__   PAGE __50__

AMENDED ANSWER AND COUNTERCLAIMS

1  Mattel's confidential business plans and methods, MGA claimed to have increased
2  its market share in Mexico alone by 90% in a single year.

3       4.    In 2005, MGA needed help in Canada.  So MGA, again
4  operating from its Southern California headquarters, hired Janine Brisbois from
5  Mattel.  At that time, Ms. Brisbois was responsible for Mattel's account with Toys
6  'R Us ("TRU") and Wal-Mart.  MGA gave her responsibility for those same
7  accounts, and she took from Mattel documents containing proprietary advertising,
8  project, sales, customer and strategy information for not only Canada, but for the
9  United States.  Eliminating any doubt that MGA then proceeded to use those stolen
10  materials, Brisbois subsequently accessed and modified certain of those Mattel
11  documents while employed by MGA.

12       5.    These are not the only instances of such misconduct, which
13  MGA orchestrated and carried out from its headquarters in this District.  Counter-
14  defendants have engaged in an ongoing, widespread pattern of illegal acts,
15  consisting of inducing Mattel employees to steal Mattel's confidential information
16  or other property and take it with them to MGA to further MGA's business interests
17  and to harm Mattel.

### Jurisdiction

19       6.    This Court has federal question jurisdiction over this action
20  pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).
21  This Court has supplemental jurisdiction over Mattel's state law claims pursuant to
22  28 U.S.C. § 1367.

### Venue

24       7.    Venue is proper in this District pursuant to 28 U.S.C.
25  §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

EXHIBIT 2   PAGE 51

209/2035941.2

AMENDED ANSWER AND COUNTERCLAIMS

**Parties**

8.      Mattel is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Segundo, California.

9.      Counter-defendant MGA Entertainment, Inc. ("MGA") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Van Nuys, California.  Mattel is informed and believes, and on that basis alleges, that ABC International Traders, Inc. is a predecessor corporation to MGA and that until September 16, 2002, MGA was incorporated and known as ABC International Traders, Inc.  Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

10.     Counter-defendant Carter Bryant ("Bryant") is an individual who formerly was employed by Mattel and has worked for and continues to work as a contactor for MGA.  Mr. Bryant currently resides in the State of Missouri.

11.     Counter-defendant MGA Entertainment (HK) Limited is a business entity organized and existing under the laws of the Hong Kong Special Administrative Region, with its principal place of business in Hong Kong.  Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein and having designated MGA Entertainment (HK) Limited in the Complaint as Doe 2 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe name Doe 2.

EXHIBIT 2   PAGE 52

-29-

AMENDED ANSWER AND COUNTERCLAIMS

12.    Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA de Mexico") is a business entity organized and existing under the laws of Mexico, with its principal place of business in Mexico City, Mexico.

13.    Mattel is informed and believes, and on that basis alleges, that Counter-defendant Larian is the President and CEO of MGA and an individual residing in the County of Los Angeles.    Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of Larian in the conduct alleged therein and having designated Larian in the Complaint as Doe 3 and having discovered his involvement and complicity, Mattel hereby amends its Complaint by substituting Larian for the fictitious Doe name Doe 3.

14.    Counter-defendant Carlos Gustavo Machado Gomez is an individual who is employed by Counter-defendant MGA and who, on information and belief, currently resides in the County of Los Angeles.

15.    The true names and capacities of Counter-defendants sued herein as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said Counter-defendants by such fictitious names.  Mattel will amend its pleadings to allege their true names and capacities when the same are ascertained.

**Factual Background**

**I.    MATTEL**

16.    Mattel manufactures and markets toys, games, dolls and other consumer products.  Harold Mattson and Eliot and Ruth Handler founded Mattel in 1945.  The name of the company was created by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in Southern California, the company greatly expanded its operations following World War II.  During the next several decades, Mattel became famous for producing high-quality products at reasonable prices.

EXHIBIT 2    PAGE 53

AMENDED ANSWER AND COUNTERCLAIMS

17.   Critical to Mattel's success is its ability to design and develop new products.  Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year.  Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18.   Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its inventory methods and processes.  These represent a material part of the intellectual infrastructure of Mattel and are highly valuable.

## II.   MGA ENTERTAINMENT

19.   MGA is also a toy manufacturer.  MGA began as a consumer electronics business, but expanded into the toy business with licenses to sell handheld electronic games.  By approximately late 1999 or early 2000, MGA developed a strategy to expand its business and compete directly with Mattel by launching a fashion doll line, so it stole a fashion doll that was owned by Mattel – "Bratz."

20.   MGA intentionally stole not just specific Mattel property, such as Bratz designs, prototypes and related materials, but also a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure.  MGA's rapid growth was not organic, but rather was based upon its theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure for a company of its size and it became increasingly difficult to manage.  To deal with these problems, as detailed below, time and time again MGA simply stole Mattel's proprietary business methods, practices and information.  This not only

EXHIBIT 2   PAGE 54

-31-

AMENDED ANSWER AND COUNTERCLAIMS

1    allowed MGA to avoid expending time, money and effort necessary to build a

2    legitimate business, but also allowed MGA to unfairly compete against Mattel by

3    taking Mattel's playbook.

4    **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

5           21.    Carter Bryant is a former Mattel employee.  Bryant joined Mattel

6    in September 1995, where he worked in Mattel's Design Center as a BARBIE

7    product designer.  In or about April 1998, Bryant resigned his position with Mattel

8    and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to

9    Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's

10   Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

11          22.    Upon his return to Mattel in January 1999, Bryant executed an

12   Employee Confidential Information and Inventions Agreement (the "Employment

13   Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

14          23.    Pursuant to his Employment Agreement and as a condition of

15   and in consideration for his employment, Bryant agreed, among other things, that

16   he held a position of trust with Mattel, that the designs and inventions he created

17   during his Mattel employment (with certain exceptions not relevant here) were

18   owned by Mattel, and that he would be loyal to the company by agreeing not to

19   assist or work for any competitor of Mattel while he was employed by Mattel.

20          24.    On January 4, 1999, Bryant also executed Mattel's Conflict of

21   Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

22   certified in the Conflict Questionnaire that, other than as disclosed, he had not

23   worked for any competitor of Mattel in the prior twelve months and had not

24   engaged in any business venture or transaction involving a Mattel competitor that

25   could be construed as a conflict of interest.  Bryant understood what the Conflict

26   Questionnaire required because, among other things, he disclosed on it the

27   freelance work he had performed while in Missouri for Ashton-Drake, which is

28   EXHIBIT 2   PAGE 55

-32-

209/2035941.2

1  unrelated to the conduct alleged herein.  A true and correct copy of the Conflict

2  Questionnaire executed by Bryant is attached hereto as Exhibit B.

3          25.    Pursuant to the Conflict Questionnaire, Bryant also agreed that

4  he would immediately notify his supervisor of any change in his situation that

5  would cause him to change any of the foregoing certifications.  Despite this

6  obligation, at no time did Bryant disclose to Mattel that he was engaging in any

7  business venture or transaction with MGA or any other Mattel competitor.

8          26.    More specifically, while Bryant was employed by Mattel, Bryant

9  and other Counter-defendants misappropriated and misused Mattel property and

10  Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are

11  not limited to, the following:

12                  a.    using his exposure to Mattel development programs to

13  create the concept, design and name of Bratz;

14                  b.    using Mattel resources, and while employed by Mattel,

15  Bryant worked by himself and with other Mattel employees and contractors to

16  design and develop Bratz, including without limitation by creating drawings and

17  three-dimensional models of Bratz dolls, and fashion designs for the dolls'

18  associated clothing and accessories; and

19                  c.    using Mattel resources, and while employed by Mattel,

20  Bryant took steps to assist MGA to produce Bratz dolls.

21          27.    During the time that he was employed by Mattel and thereafter,

22  Bryant concealed these actions from Mattel, including by failing to notify his

23  supervisor of the conflict of interest he created when he began working on MGA's

24  behalf and when he began receiving payments from MGA.  Bryant additionally

25  enlisted other Mattel employees to perform work on Bratz during the time he was

26  employed by Mattel and, by all indications, in at least some cases led them to

27  believe that they were performing work on a project for Mattel.

28                              EXHIBIT  2    PAGE 56

AMENDED ANSWER AND COUNTERCLAIMS

28.   Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000.  For example, during his last few weeks at Mattel, Bryant told his co-workers and supervisors that he was going to leave Mattel for "non-competitive" pursuits.  Bryant's representations to his supervisors and his co-workers were false.  Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the fact that he was already working with MGA and that he had contracted with MGA to assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

29.   As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these meetings while Bryant was still employed by Mattel.

30.   Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz.  On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.   EXHIBIT 2 PAGE 57

AMENDED ANSWER AND COUNTERCLAIMS

31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001.  By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32.   Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world.  Mattel is informed and believes that MGA also licenses Bratz to third parties.  Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto.  MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

33.   Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel.  Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

34.   Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom.  Counter-defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the Counter-defendants.

EXHIBIT 2  PAGE 58

35.    Bryant and MGA deliberately and intentionally concealed facts
sufficient for Mattel to suspect or to know that it was the true owner of Bratz.
Their acts of concealment include, but are not limited to, concealing the fact that
Bryant conceived, created, designed and developed Bratz while employed by
Mattel, including by tampering with and defacing documents which showed that, in
fact, Bryant was a Mattel employee while he was working for and with MGA;
concealing the fact that Bryant worked with and assisted MGA during the time
Bryant was employed by Mattel and was compensated for that assistance;
concealing that Bryant was providing consulting services to MGA; concealing
Bryant's role in Bratz by falsely claiming that Larian and others were the creators
of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among
other things, filing fraudulent registrations and/or amendments to registrations with
the United States Copyright Office claiming MGA as the author of Bratz as a work
for hire and altering relevant dates on such documents to further obscure the true
facts of when the works were created.

36.    Because of Bryant's and MGA's acts of concealment and Bryant's
misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had
worked with MGA, or assisted MGA, while he still employed by Mattel until
approximately November 24, 2003, when Mattel received, through an unrelated
legal action, a copy of Bryant's agreement with MGA which showed that the date
of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was
then, as a result, that Mattel learned for the first time that Bryant had secretly aided,
assisted and worked for and with MGA while employed at Mattel and in violation
of his Mattel Employment Agreement. Specifically, Bryant's agreement with
MGA obligated Bryant to provide product design services to MGA on a "top
priority" basis. Bryant's agreement with MGA also provided that Bryant would
receive royalties and other consideration for sales of products on which Bryant
provided aid or assistance; that all works and services furnished by Bryant under

EXHIBIT _2_  PAGE _59_

AMENDED ANSWER AND COUNTERCLAIMS

1  the agreement, including those he purportedly provided while still a Mattel

2  employee, purportedly would be considered "works for hire" of MGA; and that all

3  intellectual property rights to preexisting works by Bryant, including Bratz designs,

4  purportedly were assigned to MGA.

5  **IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6         37.   On information and belief, in or about late 2003 or early 2004,

7  MGA decided to open business operations in Mexico.  Faced with the difficult task

8  of developing an overall strategy for expanding into a market in which it had only a

9  nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10  and business information for the Mexican market and materials related to Mattel's

11  worldwide business strategies.  As detailed below, MGA and Larian approached

12  three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13  steal Mattel's most sensitive business planning materials, and then hired them to

14  assist in establishing and running MGA's new Mexican subsidiary.

15       **A.    MGA Hires Three Senior Mattel Employees in Mexico**

16         38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior

17  Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18  confidence.  He was employed at Mattel Mexico from April 1, 1997 until April 19,

19  2004.  His duties included short, medium and long-term marketing planning,

20  generating product sales projections, and assisting in creation of the media plan.  In

21  his position, Machado had access to highly confidential and sensitive marketing

22  and product development information.  Machado had an employment agreement

23  with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24  information.  Mattel's policies also required Machado to protect Mattel's

25  proprietary information and not to disclose it to competitors.

26         39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing

27  Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28  She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

EXHIBIT __2__ PAGE _60_

AMENDED ANSWER AND COUNTERCLAIMS

1  Like Machado, her duties included short, medium and long-term marketing

2  planning, generating product sales projections, and assisting in creation of the

3  media plan.  In her position, Trueba had access to highly confidential and sensitive

4  marketing and product development information.  Trueba had an employment

5  agreement with Mattel in which she agreed to maintain the confidentiality of

6  Mattel's protected information.  Mattel's policies also required Trueba to protect

7  Mattel's proprietary information and not to disclose it to competitors.

8        40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing

9  Manager with Mattel Mexico, a position of trust and confidence.  He was employed

10  at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was

11  responsible for ensuring that point-of-sale promotions were carried out, analyzing

12  the results of such promotions, negotiating promotion budgets, and generally

13  managing promotional activities.  Vargas also had access to highly confidential and

14  sensitive marketing and product development information.  Vargas had an

15  employment agreement with Mattel in which he agreed to maintain the

16  confidentiality of Mattel's protected information.  Mattel's policies also required

17  Vargas to protect Mattel's proprietary information and not to disclose it to

18  competitors.

19        41.   Beginning in late 2003 or early 2004, Machado, Trueba and

20  Vargas began planning to leave Mattel Mexico to join MGA.  In connection with

21  that plan, and with the encouragement of Larian and other MGA officers operating

22  in the United States, they began accessing, copying and collecting proprietary

23  Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and

24  Vargas each resigned their positions with Mattel, effective immediately.  They

25  stated that they had been hired by a Mattel competitor, but refused to identify that

26  competitor.  In fact, they had been offered and accepted employment by MGA to

27  establish and run MGA's new operation in Mexico.

28                                    EXHIBIT 2    PAGE 61

                              -38-
                              AMENDED ANSWER AND COUNTERCLAIMS

**B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.    Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations.  The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>.  On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.    In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel.  Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City.  On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA.  This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned.  For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park.  In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion.  We will be available during the nights of the week after 16:30 Los Angeles time . . . ."  In another e-mail message, showing that the

EXHIBIT __2__  PAGE __62__

209/2035941.2

-39-

AMENDED ANSWER AND COUNTERCLAIMS

1  participants intentionally sought to maximize the damage to Mattel from their

2  conduct, Kuemmerle wrote to Larian and Park:  "Gustavo, Mariana and Pablo want

3  to resign (all at the same time, and you can believe my smile!) next Wednesday."

4       44.   Beginning on April 12, 2004, a week before his resignation and

5  after numerous communications and meetings with Larian and other MGA

6  personnel, Machado began transferring additional Mattel confidential and

7  proprietary information to a portable USB storage device (also know as a "thumb

8  drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the

9  last business day before he gave notice, Machado copied at least 70 sensitive

10 documents to the portable USB storage device.

11      45.   Starting on April 12, 2004, Vargas also copied a host of

12 confidential and proprietary materials to a portable USB storage device, including

13 sales plans, sales projections and customer profiles.

14      46.   On April 16, 2004, Trueba also copied Mattel confidential and

15 proprietary information to a portable USB storage device connected to her Mattel

16 computer.

17      47.   With full knowledge that she was going to leave Mattel for a

18 competitor, Trueba also took steps to increase further her access to Mattel's

19 confidential information shortly before her resignation.  For example, just four days

20 before leaving, Trueba went out of her way to seek to attend a meeting at which

21 Mattel personnel analyzed BARBIE programs for the United States, Canada and

22 South America.  Two days before her resignation, she contacted both a Mattel

23 employee located in El Segundo, California and Mattel's advertising agency to

24 request updated confidential information about advertising plans for BARBIE.  On

25 information and belief, Trueba acted at the direction of MGA and Larian and did so

26 in order to obtain further information that would allow MGA to obtain unfair

27 competitive advantage over Mattel.

EXHIBIT 2   PAGE 63

28

48.     Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.     The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.     MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

EXHIBIT 2    PAGE 64

AMENDED ANSWER AND COUNTERCLAIMS

209/2035941.2

1   market share by 90 percent over the prior year. This increase came at the expense
2   of Mattel, which lost market share during 2004 in Mexico and was forced to
3   increase its advertising and promotional spending to offset further losses.

4         51.   Machado, Trueba and Vargas attempted to conceal their
5   widespread theft of Mattel's proprietary information. For example, Machado ran a
6   software program on his Mattel personal computer in an attempt to erase
7   information, including information that would reveal the addresses to which he had
8   sent, or from which he had received, e-mail messages. On information and belief,
9   for the same purpose Machado also damaged the hard drive of the personal
10  computer that he used at Mattel.

11        52.   On information and belief, on April 19, 2004, immediately after
12  Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico
13  to Los Angeles to meet with MGA personnel, including Larian, in person.

14        53.   Mattel notified Mexican authorities about the theft of its trade
15  secret and confidential information. On October 27, 2005, the Mexican Attorney
16  General Office obtained a search warrant from the Mexican Federal Criminal
17  Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities
18  found and seized from MGA's offices both electronic and paper copies of a large
19  number of documents containing Mattel trade secrets, including those that Mattel
20  discovered through its forensic investigations, plus many others that Mattel had not
21  known had been stolen.

22        54.   Based on Machado's "performance" in Mexico, Isaac Larian
23  subsequently promoted Machado and he was transferred to MGA's main office in
24  Van Nuys, California. On information and belief, Machado currently resides in the
25  County of Los Angeles, California.

26

27   EXHIBIT __2__    PAGE __65__

28

AMENDED ANSWER AND COUNTERCLAIMS

V.   **MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
> We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

EXHIBIT 2   PAGE 66

AMENDED ANSWER AND COUNTERCLAIMS

1    information is not likely to be kept secret, such as planes,

2    restaurants and elevators.  The obligation to preserve confidential

3    information continues even after employment ends.

4    The Code of Conduct applied to Brawer and required that he meet his obligations

5    under the Code of Conduct.

6          57.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7    President position over customer marketing, a position of trust and confidence.  In

8    his executive position, Brawer was provided access to information that was both

9    sensitive and confidential, including, but not limited to, detailed information related

10   to development, manufacture, marketing, pricing, shipping, and performance of

11   Mattel's then-current and anticipated future product lines, and other confidential

12   business plans between Mattel and its most significant retail customers.

13         58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14   Human Resources, asked Brawer whether he was discussing potential employment

15   with MGA.  Brawer denied that he had been in contact with MGA and represented

16   that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17   its employees, including Brawer, the importance of protecting Mattel's confidential

18   and proprietary materials and information.

19         59.   On March 18, 2004, in response to a survey from the President of

20   Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21   Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22   protection of it's [sic] intellectual property," reflecting Brawer's clear

23   understanding that Mattel required its proprietary information to be kept

24   confidential.

25         60.   In April 2004, Mattel promoted Brawer to Senior Vice

26   President/General Manager.  The General Manager position also is an executive

27   position of trust and confidence.  The role of a General Manager is to lead a cross-

28   functional "Customer Business Team."  Each General Manager is accountable for a

EXHIBIT  2   PAGE 67

-44-

AMENDED ANSWER AND COUNTERCLAIMS

1   strategic partnership with a key Mattel retailer, covering all aspects of the business,

2   including both traditional toy sales and retail development of licensed products.

3         61.   In or about late May 2004, Brawer began performing General

4   Manager duties, working with one of Mattel's major retail customer accounts.

5   Thereafter, Brawer began receiving information related not only to the Senior Vice

6   President, Customer Marketing position that he still formally held, but also began

7   receiving detailed information related to his role as General Manager.  Brawer

8   began requesting and analyzing detailed information related to Mattel and its four

9   key retail accounts.

10         62.   On September 15, 2004, Brawer left work at noon for observance

11   of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders

12   and other materials.  Several hours after his departure, Brawer instructed his

13   assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers

14   and to provide it to him, falsely claiming he needed it for a meeting

15         63.   On September 17, 2004, Brawer returned to Mattel and

16   immediately informed his supervisor that he was leaving Mattel, effective October

17   1, 2004, to work for competitor MGA.

18         64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer

19   reminding him of his continuing obligation to preserve the confidentiality of

20   Mattel's proprietary information and trade secrets not only through October 1,

21   2004, but continuing beyond the termination of his employment.

22         65.   At his exit interview on September 29, 2004, Mattel reminded

23   Brawer that he had ongoing duties of confidentiality to Mattel, even after the

24   termination of his employment.  Brawer was given a copy of his Original

25   Confidentiality Agreement, which he had signed on April 22, 1996, and another

26   copy of the Code of Conduct.  During the exit interview, however, Brawer noted

27   that he had not signed the Code of Conduct, which he intended and Mattel

28   understood to mean that Brawer believed he was not bound by Mattel's policy

EXHIBIT __2__   PAGE __68__

-45-

AMENDED ANSWER AND COUNTERCLAIMS

1  because he had not signed it.  Brawer was unwilling to complete or sign the form

2  that sought to confirm that Brawer understood his ongoing obligations under the

3  Code of Conduct, which included the obligation to preserve the confidentiality of

4  Mattel's proprietary and trade secret information.

5      66.    On October 1, 2004, Brawer's final day of employment with

6  Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7  Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8      67.    Upon joining MGA, Brawer became its Executive Vice-

9  President of Sales and Marketing.  In that role he was responsible for MGA's sales

10  worldwide.  As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13      68.    Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel.  That representation was false.  On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return.  Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21      69.    Mattel has recently learned that Brawer has been using that

22  contact information on a regular basis, including within recent months.  Since

23  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

24  and by electronic mail.  Based on his knowledge of Mattel's operations and the

25  roles of certain Mattel employees, he has targeted certain Mattel employees who

26  have broad access to Mattel proprietary information in an effort to induce and

27  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

28  Mattel confidential information and trade secrets.  Brawer has done so by

EXHIBIT  2  PAGE  69

-46-

AMENDED ANSWER AND COUNTERCLAIMS

1   promising these Mattel employees salaries 25 percent or more higher than they earn

2   at Mattel and stating to them that they should not be concerned by legal action

3   taken by Mattel to protect its trade secrets and its rights because such claims are

4   hard to prove and easy to defeat.

5   **VI.   MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6           70.   In an effort to increase its market share and sales in Canada and

7   elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,

8   projects, advertising and strategy, not only for Canada, but the United States and

9   the rest of the world.

10          71.   Janine Brisbois was a Director of Sales for the Girls Division in

11  Canada.  Mattel hired her as a National Account Manager in August 1999.  When

12  she was hired as a Mattel employee, Brisbois agreed that she would preserve and

13  would not disclose Mattel's proprietary or confidential information.  For example,

14  Brisbois agreed:

15          You must keep Mattel's Proprietary Information confidential,

16          and you may only use or disclose such information as necessary

17          to perform your job responsibilities in accordance with Mattel

18          policies.  Your obligation to keep Mattel's Proprietary

19          Information confidential will continue even after any termination

20          of your employment with your employer.

21          . . .

22          Mattel takes steps to maintain the secrecy and confidential nature

23          of Mattel's Proprietary Information and, if a competitor

24          discovered Mattel's Proprietary Information, it could

25          significantly damage Mattel and your Employer.

26          72.   While with Mattel, Brisbois had responsibility for Mattel's

27  account with TRU and later had responsibility for Mattel's Wal-Mart account.  In

28  her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

-47-

EXHIBIT 2   PAGE 70

AMENDED ANSWER AND COUNTERCLAIMS

1    Mattel confidential and proprietary information regarding Mattel's future product
2    lines, advertising and promotional campaigns and product profitability.

3         73.   On September 26, 2005, Brisbois resigned from Mattel to take a
4    position as Vice President of Sales at MGA.  Mattel is informed and believes that
5    in that position Brisbois has responsibility for MGA's accounts with both TRU and
6    Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she
7    was "taking anything."  Brisbois responded, "No."  Both during and after her exit
8    interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's
9    confidential and proprietary information.

10        74.   Mattel is informed and believes that Brisbois spoke with Isaac
11   Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he
12   called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day
13   that she spoke with Mr. Larian and four days before she resigned, Brisbois copied
14   approximately 45 Mattel documents on to a USB or "thumb" drive with the volume
15   label "BACKPACK."  On information and belief, Brisbois removed the thumb
16   drive from Mattel Canada's office by concealing it in her backpack or gym bag the
17   last time that she left that office.  These documents contained Mattel trade secret
18   and proprietary information, and included:

19        • a document containing the price, cost, sales plan and quantity of every
20          Mattel product ordered by every Mattel customer in 2005 and 2006;
21        • the BARBIE television advertising strategy and information concerning
22          sales increases generated by television advertisements;
23        • competitive analysis of Mattel vis-à-vis its competitors in Canada;
24        • an analysis of Mattel's girls business sales beginning in 2003 and
25          forecasts through 2006;
26        • profit and loss reviews for Mattel's products being sold in Wal-Mart,
27          including margins and profit in not only Canada, but in the United
28          States and Mexico; and

EXHIBIT 2    PAGE 71

AMENDED ANSWER AND COUNTERCLAIMS

1       •  a document containing the product launch dates and related advertising

2          for all Mattel new products between Fall 2005 and Spring 2006.

3       75.   After Mattel discovered that Brisbois had copied these sensitive

4 documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

5 Canadian law enforcement authorities recovered from Brisbois a thumb drive with

6 the volume label "BACKPACK" containing the documents that Brisbois had

7 copied from Mattel's computer system. Mattel later learned that while she was

8 working as a Vice President of Sales at MGA, Brisbois accessed and modified

9 documents on that thumb drive.

10       76.   After joining MGA, Brisbois repeatedly traveled to MGA's

11 offices in Van Nuys, California and met with Larian and Brawer. In February,

12 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City

13 offices and that at least three MGA employees were under criminal investigation,

14 MGA nonetheless issued a press release trumpeting its 2005 performance, with

15 Larian himself concluding, "Our international teams in Mexico and Canada have

16 done a fantastic job."

17 **VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**

18      **JOINT MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**

19      **FOR THE BENEFIT OF MGA**

20       77.   In the past few years, MGA has hired directly from Mattel's

21 United States operations at least 25 employees, from Senior Vice-President level to

22 lower level employees. On information and belief, many of these employees were

23 specifically targeted and recruited by MGA, including by Larian and Brawer, based

24 on the Mattel confidential and proprietary information they could access. Many of

25 these employees had access to information that Mattel considers to be highly

26 proprietary and confidential. Mattel believes that some of those former Mattel

27 employees may be observing their obligations not to misappropriate, disclose or

28 use Mattel's confidential and proprietary information. Mattel is informed and

EXHIBIT 2   PAGE 72

AMENDED ANSWER AND COUNTERCLAIMS

1    believes, however, that certain additional employees accessed, copied and took

2    from Mattel confidential and proprietary information, including Mattel's strategic

3    plans; business operations, methods and systems; marketing and advertising

4    strategies and plans; future product lines; product profit margins; and customer

5    requirements. The misappropriated confidential and proprietary information

6    included information that these Mattel employees were not authorized to access.

7    On information and belief, the misappropriated confidential and proprietary

8    information taken from Mattel is being disclosed to and used by MGA for the

9    benefit of MGA and to the detriment of Mattel.

10   **VIII.  LARIAN MAKES MISREPRESENTATIONS TO RETAILERS**

11   **ABOUT MATTEL'S PRODUCTS**

12          78.   Counter-defendants have engaged in other illegal practices in

13   their efforts to compete unfairly with Mattel. Larian has a practice of sending e-

14   mail messages to a "Bratz News" distribution list that Larian created or that was

15   created for him. Mattel is informed and believes that the recipients of e-mail

16   messages sent to the "Bratz News" distribution list include members of the media

17   as well as representatives of many of Mattel's most significant customers.

18          79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz

19   News" distribution list that included a reference to Mattel's updated MY SCENE

20   MY BLING BLING product with real gems. Mattel had not publicly announced

21   this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel

22   had guarded the identification of this particular product.

23          80.   Shortly thereafter, Larian engaged in a campaign of calling

24   Mattel's most significant customers, including but not limited to Target and TRU,

25   regarding the MY SCENE MY BLING BLING product with real gems. In an

26   effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

27   BLING product with real gems, Larian knowingly made false factual statements

28   about that product to each retailer. As of the writing of this First Amended

EXHIBIT 2   PAGE 73

-50-

AMENDED ANSWER AND COUNTERCLAIMS

209/2035941.2

Complaint, Mattel is aware that Larian represented to each retailer that each was the only retailer to purchase the product and that Mattel would not be supporting the product with television advertising. At the time that Larian made these statements, he knew them to be false. As a result of Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units of the MY SCENE MY BLING BLING product with real gems. Only after Mattel learned of Larian's misrepresentations and was able to correct them was Mattel able to assure the retailer that Larian's representations were false and to persuade the retailer to reinstate the order.

81.    Such conduct is not an isolated incident. MGA and Larian, in an effort to gain an unfair competitive advantage, repeatedly issued false and misleading press releases. In these press releases, MGA and Larian have misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market share of Mattel's BARBIE products.

**CLAIMS FOR RELIEF**

**First Counterclaim**

**Copyright Infringement**

**(Against MGA, MGA Entertainment (HK) Limited,**

**Larian, Bryant and Does 4 through 10)**

82.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 81, above, as though fully set forth at length.

83.    Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel. These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-

EXHIBIT 2 PAGE 74

-51-

AMENDED ANSWER AND COUNTERCLAIMS

1  378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-

2  378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

3      84.  Counter-defendants have reproduced, created derivative works

4  from and otherwise infringed upon the exclusive rights of Mattel in its protected

5  works without Mattel's authorization.  Counter-defendants' acts violate Mattel's

6  exclusive rights under the Copyright Act, including without limitation Mattel's

7  exclusive rights to reproduce its copyrighted works and to create derivative works

8  from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

9      85.  Counter-defendants' infringement (and substantial contributions

10  to the infringement) of Mattel's copyrighted works is and has been knowingly made

11  without Mattel's consent and for commercial purposes and the direct financial

12  benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately

13  failed to exercise their right and ability to supervise the infringing activities of

14  others within their control to refrain from infringing Mattel's copyrighted works

15  and have failed to do so in order to deliberately further their significant financial

16  interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-

17  defendants have engaged in direct, contributory and vicarious infringement of

18  Mattel's copyrighted works.

19      86.  By virtue of defendants' infringing acts, Mattel is entitled to

20  recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of

21  suit and attorneys' fees, and all other relief permitted under the Copyright Act.

22      87.  Counter-defendants' actions described above have caused and

23  will continue to cause irreparable damage to Mattel, for which Mattel has no

24  remedy at law.  Unless Counter-defendants are restrained by this Court from

25  continuing their infringement of Mattel's copyrights, these injuries will continue to

26  occur in the future.  Mattel is accordingly entitled to injunctive relief restraining

27  Counter-defendants from further infringement.

28

EXHIBIT  2  PAGE  75

7209/2035941.2

AMENDED ANSWER AND COUNTERCLAIMS

### Second Counterclaim

### Violation of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against All Counter-defendants)

88.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.   Beginning at various times from approximately 1999 through the filing of this First Amended Complaint, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise").  The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).

90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the MGA Criminal Enterprise's affairs through a pattern of racketeering activity. Their actions include multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and foreign travel to aid

EXHIBIT 2   PAGE 76

-53-

AMENDED ANSWER AND COUNTERCLAIMS

racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, shared the common purpose of enabling MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in order to assist MGA in illegally competing with Mattel domestically and throughout the world.

92.   The MGA Criminal Enterprise as described herein is at all relevant times a continuing enterprise because, among obvious reasons, it is designed and did unlawfully acquire the confidential business information and property of Mattel and incorporated this information and property into MGA's ongoing business, marketing strategies and business methods, practices and processes.  The conduct of the enterprise continues through the date of this First Amended Complaint and is ongoing by virtue of MGA's continuing use of Mattel's information and property, all to the detriment of Mattel.

93.   The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity.  This activity consists of multiple acts of racketeering by each member of the MGA Criminal Enterprise, is interrelated, not isolated and is perpetrated for the same or similar purposes by the same persons. This activity extends over a substantial period of time, up to and beyond the date of this First Amended Complaint.  These activities occurred after the effective date of 18 U.S.C. §§ 1961 *et seq.,* and the last such act occurred within 10 years after the commission of a prior act of racketeering activity.  These racketeering activities included repeated acts of:

(a)   <u>Mail Fraud</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and

EXHIBIT 2   PAGE 77

AMENDED ANSWER AND COUNTERCLAIMS

Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, deposited or caused to be deposited matters or things to be sent or delivered by the Postal Service, or any private or commercial interstate carrier, or took or received matters or things therefrom, or knowingly caused matters or things to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as set forth in Exhibit C;

(b)   <u>Wire Fraud</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with

EXHIBIT ___2___   PAGE _78_____

1    greater particularity in the foregoing paragraphs and as set forth

2    in Exhibit C;

3    (c)    Tampering With a Witness, Victim or Informant:  Counter-

4    defendants MGA, MGA Entertainment (HK) Limited, MGA de

5    Mexico, Larian, Bryant, Machado and Does 4 through 10, aided

6    and abetted by each other and some or all of the remaining

7    members of the MGA Criminal Enterprise, did corruptly alter,

8    destroy, mutilate, or conceal a record, document, or other object,

9    or attempted to do so, with the intent to impair the object's

10    integrity or availability for use in an official proceeding.  Such

11    actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as

12    alleged with greater particularity in the foregoing paragraphs;

13    (d)    Interstate and Foreign Travel in Aid of Racketeering Enterprises:

14    Counter-defendants MGA, MGA Entertainment (HK) Limited,

15    MGA de Mexico, Larian, Bryant, Machado and Does 4 through

16    10, aided and abetted by each other and some or all of the

17    remaining members of the MGA Criminal Enterprise, traveled in

18    interstate and foreign commerce, or used the mail or any facility

19    in interstate or foreign commerce, with the intent to promote,

20    manage, establish, carry on and facilitate the promotion,

21    management, establishment and carrying on of unlawful activity,

22    *i.e.* bribery, in violation of the laws of the State of California,

23    *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and

24    18 U.S.C. § 2, as alleged with greater particularity in the

25    foregoing paragraphs;

26    (e)    Criminal Copyright Infringement: Counter-defendants MGA,

27    MGA Entertainment (HK) Limited, MGA de Mexico, Larian,

28    Bryant, Machado and Does 4 through 10, aided and abetted by

EXHIBIT 2    PAGE 79

209/2035941.2

-56-

AMENDED ANSWER AND COUNTERCLAIMS

1  each other and some or all of the remaining members of the MGA

2  Criminal Enterprise, willfully infringed Mattel's copyrights,

3  including with respect to documents containing Mattel trade

4  secret and confidential information, for purposes of commercial

5  advantage and private financial gain, all in violation of 18 U.S.C.

6  § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater

7  particularity in the foregoing paragraphs.

8       94.   The persons alleged herein to have violated 18 U.S.C. § 1962(c)

9  are separate from, though employed by or associated with, MGA, the MGA Group,

10  the Bryant Group, the Mexican Group and the Canadian Group.

11       95.   MGA had a role in the racketeering activity that was distinct

12  from the undertaking of those acting on its behalf. MGA also attempted to benefit,

13  and did benefit, from the activity of its employees and agents alleged herein, and

14  thus was not a passive victim of racketeering activity, but an active perpetrator.

15       96.   Mattel has been injured in its business or property as a direct

16  and proximate result of the Counter-defendants' and the other enterprise members'

17  violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts

18  constituting the pattern of racketeering activity.

19       97.   As a result of the violations of 18 U.S.C. § 1962(c), by the MGA

20  Group, the Bryant Group, the Mexican Group and the Canadian Group, Mattel has

21  suffered substantial damages, in an amount to be proved at trial. Pursuant to 18

22  U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

23  compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

24  of Counter-defendants' violations of 18 U.S.C. § 1962(c).

25

26

27

28

EXHIBIT _2_ PAGE _80_

-57-

AMENDED ANSWER AND COUNTERCLAIMS

### Third Counterclaim

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Counter-defendants)**

98.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 97, above, as though fully set forth at length.

99.    Beginning at various times from approximately 1999 through the filing of this First Amended Complaint, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

100.    These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.

101.    The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A).

EXHIBIT 2    PAGE 81

'209/2035941.2

AMENDED ANSWER AND COUNTERCLAIMS

102. Counter-defendants and the other members of the MGA Criminal Enterprise schemed to defraud Mattel and steal its property and trade secret information by means of false representation, breaches of fiduciary duty, conversation and concealment, as more fully set forth in the foregoing paragraphs.

103. In furtherance of this unlawful conspiracy, and to effect its objectives, Counter-defendants and various co-conspirators committed numerous overt acts, including but not limited to those set forth in the foregoing paragraphs.

104. Mattel has been injured in its business or property as a direct and proximate result of the Counter-defendants' and the other enterprise members' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

105. As a result of the conspiracies between and among all Counter-defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has suffered substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys, fees, incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(d).

## Fourth Counterclaim
### Misappropriation of Trade Secrets
### (Against Counter-defendants MGA, MGA de Mexico,
### Larian, Machado and Does 4 through 10)

106. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 105, above, as though fully set forth at length.

107. As used herein, "Trade Secret Material" shall mean the documents, materials and information stolen by Machado, Trueba, Vargas, Brisbois, the Other Former Employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants, the Trade Secret Materials gave Mattel a significant competitive advantage over its

EXHIBIT 2   PAGE 82

AMENDED ANSWER AND COUNTERCLAIMS

1   existing and would-be competitors, including MGA. This advantage, as to MGA,

2   has now been compromised as a result of Counter-defendants' unlawful activities.

3        108. Mattel made reasonable efforts under the circumstances to

4   maintain the confidentiality of the Trade Secret Materials, including by having

5   employees and consultants who may have access the Trade Secret Materials sign

6   confidentiality agreements that oblige them not to disclose the Trade Secret

7   Materials or characteristics of the Trade Secret Materials; by limiting the

8   circulation of said materials within Mattel; by protecting and limiting access to

9   computers with log-in identifications and passwords; by limiting each employee's

10  access to electronic files to those that the particular employee needs to access; by

11  educating employees on the nature of Mattel's information that is confidential and

12  proprietary; and by reminding employees on a regular and periodic basis of their

13  obligation to protect and maintain Mattel's confidential and proprietary

14  information.

15       109. Mattel's Trade Secret Materials derive independent economic

16  value from not being generally known to the public or to other persons who can

17  obtain economic benefit from their disclosure.

18       110. Counter-defendants have illegally obtained the trade secret

19  materials, as set forth above, and through other means of which Mattel is presently

20  unaware.

21       111. Counter-defendants have used and disclosed Mattel's Trade

22  Secret Materials without Mattel's consent and without regard to Mattel's rights, and

23  without compensation, permission, or licenses for the benefit of themselves and

24  others.

25       112. Counter-defendants' conduct was, is, and remains willful and

26  wanton, and was taken with blatant disregard for Mattel's valid and enforceable

27  rights.

28

EXHIBIT 2   PAGE 83

AMENDED ANSWER AND COUNTERCLAIMS

113.  Counter-defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Mattel.  Mattel has no adequate remedy at law for such wrongs and injuries.  Mattel is therefore entitled to a permanent injunction restraining and enjoining Counter-defendants, and each of them, as well as their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from further using in any manner Mattel's trade secrets.

114.  In addition, as a proximate result of Counter-defendants' misconduct, Mattel has suffered actual damages, and Counter-defendants have been unjustly enriched.

115.  The aforementioned acts of the Counter-defendants were willful and malicious, including in that Counter-defendants misappropriated Mattel's trade secrets with the deliberate intent to injure Mattel's business and improve their own. Mattel is therefore entitled to enhanced damages.  Mattel is also entitled to reasonable attorney's fees.

## **Fifth Counterclaim**

### **Breach of Contract**

### **(Against Bryant)**

116.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 115, above, as though fully set forth at length.

117.  Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire,

EXHIBIT __2__ PAGE __84__

09/2035941.2

1  Bryant certified that, other than as disclosed, he had not worked for any competitor

2  of Mattel and had not engaged in any business venture or transaction involving a

3  Mattel competitor that could be construed as a conflict of interest.  Bryant further

4  promised that he would notify his supervisor immediately of any change in his

5  situation that would cause him to change any of the foregoing certifications or

6  representations.

7       118.  The Employment Agreement and the Conflict Questionnaire are

8  valid, enforceable contracts, and Mattel has performed each and every term and

9  condition of the Employment Agreement and Conflict Questionnaire required to be

10  performed by Mattel.

11       119.  Bryant materially breached the foregoing contracts with Mattel,

12  in that, among other things, he secretly aided, assisted and worked for a Mattel

13  competitor during his employment with Mattel without the express written consent

14  of Mattel.

15       120.  As a consequence of Bryant's breach, Mattel has suffered and

16  will, in the future, continue to suffer damages in an amount to be proven at trial.

17  Such damages include, without limitation, the amounts paid by the competitor to

18  Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

19  his Mattel employment; the amount that Mattel paid Bryant during the time he

20  wrongfully worked with MGA; the value of information and intellectual property

21  owned by Mattel which Bryant provided to MGA; the value of the benefits that

22  MGA obtained from Bryant during the time he was employed by Mattel; and the

23  value of the benefits that MGA obtained from Bryant as a result of the work he

24  performed for or with MGA during his Mattel employment.

25       121.  Bryant's conduct has caused, and unless enjoined will continue to

26  cause, irreparable injury to Mattel that cannot be adequately compensated by

27  money damages and for which Mattel has no adequate remedy at law.  Bryant

28  specifically acknowledged in his Employment Agreement that his breach of the

EXHIBIT __2__ PAGE 85

-62-

AMENDED ANSWER AND COUNTERCLAIMS

1    Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

2    entitled to injunctive relief to enforce this Agreement, in addition to damages and

3    other available remedies."  Accordingly, Mattel is entitled to orders mandating

4    Bryant's specific performance of his contracts with Mattel and restraining Bryant

5    from further breach.

6                              **Sixth Counterclaim**

7                   **Intentional Interference with Contract**

8           **(Against MGA, Larian and Does 4 through 10)**

9           122.  Mattel repeats and realleges each and every allegation set forth in

10   paragraphs 1 through 121, above, as though fully set forth at length.

11          123.  Valid agreements existed between Mattel and Bryant, Brawer,

12   Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,

13   the "Mattel Employees")

14          124.  At all times herein mentioned, MGA, Larian and Does 4 through

15   10 knew that the Mattel Employees had a duty under their agreements not to work

16   for or assist any competitor of Mattel, such as MGA.  In addition, at all times

17   mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had

18   assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

19   designs and other works, created, conceived or reduced to practice during their

20   employment with Mattel.

21          125.  Despite such knowledge, Counter-defendants MGA, Larian and

22   Does 4 through 10 intentionally and without justification solicited, induced and

23   encouraged the Mattel Employees to breach their contracts with Mattel.

24          126.  As a direct and proximate result of Counter-defendants' efforts

25   and inducements, the Mattel Employees did breach their contracts with Mattel.

26          127.  As a result of said breaches, Mattel has suffered damages and

27   will imminently suffer further damages, including the loss of its competitive

28   position and lost profits, in an amount to be proven at trial.

EXHIBIT 2  PAGE 86

AMENDED ANSWER AND COUNTERCLAIMS

1   128.  Counter-defendants performed the aforementioned conduct with
2   malice, fraud and oppression, and in conscious disregard of Mattel's rights.
3   Accordingly, Mattel is entitled to recover exemplary damages from Counter-
4   defendants in an amount to be determined at trial.

5   **Seventh Counterclaim**
6   **Breach of Fiduciary Duty**
7   **(Against Bryant and Machado)**

8   129.  Mattel repeats and realleges each and every allegation set forth in
9   paragraphs 1 through 128, above, as though fully set forth at length.

10   130.  Bryant and Machado held positions of trust and confidence with
11   Mattel.  In their positions, Bryant and Machado had access to and were entrusted
12   with Mattel's proprietary and confidential information, supervised the work of
13   others, exercised discretion and worked independently in many of their job
14   assignments and duties.  In their positions, Bryant and Machado also represented
15   Mattel in its dealings with third parties and, in actions in the course and scope of
16   their employment with Mattel, were agents of Mattel.  They confirmed their
17   relationship of trust with Mattel in respective employee agreements.  Bryant and
18   Machado thus owed Mattel a fiduciary duty that included, but was not limited to,
19   an obligation not to take any action that would be contrary to Mattel's best interests
20   or that would deprive Mattel of any opportunities, profit or advantage which Bryant
21   or Machado might bring to Mattel.

22   131.  Bryant breached his fiduciary duty to Mattel in that, while
23   employed by Mattel, he secretly aided and assisted a competitor of Mattel,
24   including without limitation by entering into an agreement with a Mattel
25   competitor.  As alleged above, Bryant also breached the aforementioned duty by
26   using Mattel property and resources for the benefit of, and to aid and assist, himself
27   personally and MGA.

28   EXHIBIT __2__ PAGE __87__

209/2035941.2

-64-

AMENDED ANSWER AND COUNTERCLAIMS

132.   Machado breached his fiduciary duty to Mattel, in that while employed by Mattel, he secretly aided and assisted a competitor of Mattel by, among other things, misappropriating Mattel trade secret and proprietary information and providing said information to officers of MGA.   Machado also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

133.   As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

134.   Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.   Accordingly, Mattel is entitled to an award of exemplary damages against Counter-defendants in an amount to be determined at trial.

135.   Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.   Accordingly, Mattel is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

### Eighth Counterclaim   .

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

136.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137.   At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel.   At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

EXHIBIT __2__ PAGE __88__

AMENDED ANSWER AND COUNTERCLAIMS

1   best interests, including but not limited to secretly developing and designing Bratz

2   while employed by Mattel and by secretly assisting Larian and MGA .

3          138.   At all times herein mentioned, MGA, Larian and Does 4 through

4   10 knew that the Mattel Employees (excluding Bryant) held positions of trust and

5   confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4

6   through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary

7   duty to Mattel not to take any action that would be contrary to Mattel's best

8   interests, including but not limited to taking confidential trade secret information

9   from Mattel's premises and providing that information to a competitor.

10         139.   Despite such knowledge, Counter-defendants MGA, Larian and

11  Does 4 through 10 intentionally and without justification solicited, encouraged,

12  aided and abetted and gave substantial assistance to the Mattel Employees to breach

13  their fiduciary duties to Mattel, knowing that their conduct would constitute

14  breaches of their fiduciary duties to Mattel.

15         140.   As a direct and proximate result of Counter-defendants' efforts,

16  the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has

17  incurred damages in an amount to be proven at trial.  Mattel, therefore, is entitled to

18  recover compensatory damages in an amount to be determined at trial.

19         141.   In taking the aforesaid actions, MGA, Larian and Does 4 through

20  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

21  rights.  Accordingly, Mattel is entitled to recover exemplary damages from

22  Counter-defendants in an amount to be determined at trial.

23                          **Ninth Counterclaim**

24                       **Breach of Duty of Loyalty**

25                    **(Against Bryant and Machado)**

26         142.   Mattel repeats and realleges each and every allegation set forth in

27  paragraphs 1 through 141, above, as though fully set forth at length.

28

EXHIBIT 2    PAGE 89

AMENDED ANSWER AND COUNTERCLAIMS