143. As employees of Mattel, Bryant and Machado owed a duty of undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not compete with Mattel or assist a competitor of Mattel during their employment with Mattel. Pursuant to this duty, Bryant and Machado were required to always give preference to Mattel's business over their own, similar interests during the course of their employment with Mattel.

144. Bryant and Machado breached their duty of loyalty to Mattel in that, while employed by Mattel, they secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into agreements with a Mattel competitor. As alleged above, they also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, themselves personally and the competitor of Mattel.

145. As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

146. Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against Counter-defendants in an amount to be determined at trial.

147. Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

148. In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

EXHIBIT 2  PAGE 90

AMENDED ANSWER AND COUNTERCLAIMS

**Tenth Counterclaim**

**Aiding and Abetting Breach of Duty of Loyalty**

**(Against MGA, Larian and Does 4 through 10)**

149. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel. MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel Employees (excluding Bryant) not to compete with Mattel or assist a competitor of Mattel during their Mattel employment.

152. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their duties of loyalty to Mattel, knowing that their conduct would constitute breaches of their duties of loyalty to Mattel.

153. As a further consequence of Counter-defendants' efforts, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

EXHIBIT _2_ PAGE _91_

AMENDED ANSWER AND COUNTERCLAIMS

154. In taking the aforesaid actions, MGA, Larian and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Eleventh Counterclaim

### Conversion

### (Against All Counter-defendants)

155. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 154, above, as though fully set forth at length.

156. Counter-defendants wrongfully converted Mattel property and resources by appropriating and using them for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

157. Mattel was entitled to, among other things, the exclusive right and enjoyment in property and tangible materials owned by Mattel, including without limitation such proper and materials that were created by Bryant while he was a Mattel product designer. Such property was taken by Bryant from Mattel to further his own interests and, in at least some instances, provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

158. In addition, Counter-defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices. Counter-defendants did so without Mattel's permission and continue to possess them.

159. As a direct and proximate result of Counter-defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160. As a result of Counter-defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss

EXHIBIT __2__ PAGE __92__

209/2035941.2

AMENDED ANSWER AND COUNTERCLAIMS

1  suffered, which is not measured by the value of the property misappropriated, but

2  includes the lost profits that Mattel suffered as a result of the conversion or,

3  alternatively, the profits generated by the Counter-defendants that would not have

4  been generated but for the conversion.  Only such a measure of damages would

5  fully and fairly compensate Mattel for the injury it suffered due to Counter-

6  defendants' acts of conversion.

7    161.  Counter-defendants performed the aforementioned conduct with

8  malice, fraud and oppression, and in conscious disregard of Mattel's rights.

9  Accordingly, Mattel is entitled to recover exemplary damages from Counter-

10  defendants in an amount to be determined at trial.

11    162.  Furthermore, Counter-defendants' conduct has caused, and unless

12  enjoined will continue to cause, irreparable injury to Mattel that cannot be

13  adequately compensated by money damages and for which Mattel has no adequate

14  remedy at law.  Accordingly, Mattel is entitled to an order restraining Counter-

15  defendants from further conversion of Mattel property and resources and/or

16  restraining Counter-defendants from continuing to benefit from such conversion.

17  **Twelfth Counterclaim**

18  **Unfair Competition**

19  **(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

20  **(Against All Counter-defendants)**

21    163.  Mattel repeats and realleges each and every allegation set forth in

22  paragraphs 1 through 162, above, as though fully set forth at length.

23    164.  Section 17200 of the California Business and Professions Code

24  prohibits unfair competition, including "any unlawful, unfair or fraudulent business

25  act or practice . . . ."

26    165.  By engaging in the foregoing conduct, Counter-defendants have,

27  individually and in combination, engaged in unlawful, unfair and/or fraudulent acts

28  of unfair competition in violation of both the common law of the state of California

EXHIBIT 2  PAGE 93

AMENDED ANSWER AND COUNTERCLAIMS

1  and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without

2  limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code*

3  § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

4  Such conduct also included, without limitation, MGA's and Larian's disparagement

5  of Mattel's products and misrepresentations as alleged above.

6      166. As a result of the aforementioned conduct, Mattel has suffered

7  damages and will imminently suffer further damages, including but not limited to

8  lost profits in an amount to be proven at trial. No adequate remedy at law exists for

9  the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel

10  is entitled to an injunction enjoining Counter-defendants' continued wrongful acts.

11  Mattel is also entitled to recover compensatory and exemplary damages pursuant to

12  the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

**Thirteenth Counterclaim**

**Declaratory Relief**

**(Against All Counter-defendants)**

16      167. Mattel repeats and realleges each and every allegation set forth in

17  paragraphs 1 through 166, above, as though fully set forth at length.

18      168. As shown in the foregoing paragraphs above, an actual

19  controversy exists between Mattel and Counter-defendants regarding Counter-

20  defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

21      169. Accordingly, Mattel seeks a declaration of the Court that

22  Counter-defendants have no valid or protectable ownership rights or interests in

23  Bratz, and that Mattel is the true owner of the same, and further seeks an

24  accounting and imposition of a constructive trust over Bratz, including without

25  limitation registrations and applications for registrations relating thereto made or

26  filed by Counter-defendants and third parties, and over all revenues and other

27  monies or benefits derived or obtained from MGA's and Bryant's purported

28  ownership, use, sale, distribution and licensing of Bratz.

EXHIBIT 2   PAGE 94

AMENDED ANSWER AND COUNTERCLAIMS

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1. For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived, created or reduced to practice by Bryant during the term of his Mattel employment and/or by any others then-employed by Mattel, as well as in all derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

2. For a declaration that any agreement between Bryant, on the one hand, and MGA or any person or entity, on the other hand, in which Bryant purported to assign any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect;

3. For an Order enjoining and restraining Counter-defendants, their agents, servants and employees, and all persons in active concert or participation with them, from further wrongful conduct, including without limitation from imitating, copying, distributing, importing, displaying, preparing derivatives from and otherwise infringing Mattel's copyright-protected works;

4. For an Order, pursuant to 17 U.S.C. § 503(a) and other applicable law, impounding all of Counter-defendants' products and materials that infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

1    by which copies of the works embodied in Mattel's copyrights may be reproduced
2    or otherwise infringed;

3         5.    For an Order mandating that Counter-defendants return to Mattel
4    all tangible items, documents, designs, diagrams, sketches or any other
5    memorialization of inventions created or reduced to practice during Bryant's
6    employment with Mattel as well as all Mattel property converted by Counter-
7    defendants;

8         6.    For an Order mandating specific performance by Bryant to
9    comply with and satisfy Bryant's contractual obligations to Mattel;

10        7.    That Mattel be awarded, and Counter-defendants be ordered to
11   disgorge, all payments, revenues, profits, monies and royalties and any other
12   benefits derived or obtained as a result of the conduct alleged herein, including
13   without limitation of all revenues and profits attributable to Counter-defendants'
14   infringement of Mattel's copyrights under 17 U.S.C. § 504;

15        8.    For an accounting of all profits, monies and/or royalties from the
16   exercise of ownership, use, distribution, sales and licensing of Bratz;

17        9.    For the imposition of a constructive trust over Bratz, including
18   without limitation registrations and applications for registrations relating thereto
19   made or filed by Counter-defendants and third parties, and all profits, monies,
20   royalties and any other benefits derived or obtained from Counter-defendant's
21   exercise of ownership, use, sale, distribution and licensing of Bratz;

22        10.   That Mattel recover its actual damages and lost profits;

23        11.   That Counter-defendants be ordered to pay exemplary damages
24   in a sum sufficient to punish and to make an example of them, and deter them and
25   others from similar wrongdoing;

26        12.   That Counter-defendants be ordered to pay treble its general and
27   special damages, plus interest, costs and attorney's fees incurred by reason of
28   Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

EXHIBIT 2  PAGE 96

AMENDED ANSWER AND COUNTERCLAIMS

13.   That Counter-defendants be ordered to pay double damages due to their willful and malicious misappropriation of Mattel's trade secrets with deliberate intent to injure Mattel's business and improve its own;

14.   That Counter-defendants pay to Mattel the full cost of this action and Mattel's attorneys' and investigators' fees; and

15.   That Mattel have such other and further relief as the Court may deem just and proper.

DATED: January 12, 2007          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


By _____
    John B. Quinn
    Attorneys for Defendant and Counter-
    claimant Mattel, Inc.

EXHIBIT 2     PAGE 97

AMENDED ANSWER AND COUNTERCLAIMS

'209/2035941.2

1

## DEMAND FOR JURY TRIAL

2

3          Mattel, Inc. respectfully requests a jury trial on all issues triable

4   thereby.

5

6   DATED:  January 12, 2007       QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

7

8             By _John Quin /BAP_____

9             John B. Quinn
           Attorneys for Defendant and Counter-

10            claimant Mattel, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27               EXHIBIT  2   PAGE 98

28

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 2 PAGE 99

**Exhibit A**

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) Inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company: its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) during the period of my employment with the Company. Thereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patent, copyright, patent application or copyright application based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (i) relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continued employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employees' employment with the Company.

### CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS
### THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.

_Carter H. Bryant_
Employee Signature

_Teresa Newcomb_
MATTEL, INC.
Signature

CARTER H. BRYANT
Employee Name (print)

TERESA NEWCOMB
Name of Witness (print)

01/04/99
Date

EXHIBIT _2_ PAGE _100_

M 0001622

EXHIBIT __2__ PAGE __101__

**Exhibit B**

# CONFLICT OF INTEREST QUESTIONNAIRE

**BRYANT, CARTER H.**     **PROJECT DESIGNER**

Name (Last, first, M.I.)          Job Title          Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.**, means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

- ◯ YES  ● NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?
- ◯ YES  ● NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?
- ◯ YES  ● NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?
- ● YES  ◯ NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?
- ● YES  ◯ NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?
- ◯ YES  ● NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?
- ◯ YES  ● NO   7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?
- ◯ YES  ● NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?
- ◯ YES  ● NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

_4, 5, freelance design + artwork in 1998. from appx. 5/98 - 11/98 for the Ashton Drake galleries._

I certify that I have read Mattel's policies concerning Conflict of Interest and the answer to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in any situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature: _Carter H Bryant_          Date: _01/04/98_

**M 0001621**

EXHIBIT _2_  PAGE _102_

EXHIBIT _B_ PAGE _77_

Exhibit C

EXHIBIT 2 PAGE 103

## EXHIBIT C

### CURRENTLY KNOWN PREDICATE ACTS BY DEFENDANTS RE MAIL AND WIRE COMMUNICATIONS

| Date | Type of Communication | Bates Reference (if applicable) |
|---|---|---|
| 4/15/2001 | Email from Isaac Larian (MGA) Aldo Horvat (GIG ITALY) | MGA000746 |
| 3/28/2001 | Email from Stephen Lee (MGA Hong Kong) to Earlylight (vendor) | MGA000747 |
| 4/15/2001 | Email from Isaac Larian Stephen Lee and Stanley Li | MGA000748-750 |
| 4/11/2001 | Email from Isaac Larian to Stephen Lee | MGA000766-767 |
| 4/10/2001 | Email from Isaac Larian to Pedro Feist (Concentra) | MGA001027-29 |
| 4/5/2001 | Email from Dave Malacrida (MGA) to Gary Cogland | MGA001030-32 |
| 4/3/2001 | Email from Isaac Larian to John Young | MGA001040-44 |
| 1/9/2000 | Email from Martin Hitch (MGA Hong Kong) to Pedro Feist | MGA001061-64 |
| 4/2/2001 | Email from Isaac Larian to Ron Stover | MGA001099-1100 |
| On or about 4/3/2001 | Fed Ex shipment from Isaac Larian to Ron Stover | MGA001099-1100 |
| 4/2/2001 | Email from Isaac Larian to Craig Cunningham (Eckerd Drugs) | MGA001105 |
| 3/28/2001 | Email from Isaac Larian to Stephen Lee | MGA001113-14 |
| On or about 3/28/2001 | Letter from Isaac Larian sent to Ron Stover | MGA001116-17 |
| 4/18/2001 | Email from Victoria O'Connor (MGA) to Avi Kreisel (Kreisel Dist.) | MGA001208-09 |
| 4/17/2001 | Email from Isaac Larian to Stephen Lee and Stanley Li | MGA001213-14 |
| On or about 4/18/2001 | Shipment from Stephen Lee to Isaac Larian | MGA001219-20 |
| 4/4/2001 | Email from Isaac Larian to John Young | MGA001278-82 |
| 3/10/2001 | Email from Isaac Larian to John Young | MGA001289-90 |
| 6/12/2003 | Facsimile transmission from MGA Entertainment to Jessie Ramirez | MGA001310 |
| 10/4/2000 | Email from David Rosenbaum (attorney for MGA) to Anne Wang (attorney for Carter Bryant) | MGA001320-29 |

EXHIBIT 2 PAGE 104

78

EXHIBIT C

| | | | |
|---|---|---|---|
| 1 | 10/26/2000 | Email from Mercedeh Ward (MGA) to Samuel Wong, Cecilia Kwok and Franki Tsang (MGA Hong Kong) | MGA000012-13 |
| 2 3 | 10/25/2000 | Email from Mercedeh Ward Samuel Wong, Cecilia Kwok and Franki Tsang | MGA000015-17 |
| 4 | 10/30/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000019-21 |
| 5 6 | 11/3/2000 | Email from Mercedeh Ward to Victor Lee and Paula Treantafelles | MGA000043-45 |
| 6 | 11/4/2000 | Email from Isaac Larian to Carter Bryant and Paula Treantafelles | MGA000046-47 |
| 7 | 11/11/2000 | Email from Judy Rich to Cecilia Kwok and Mercedeh Ward | MGA000049 |
| 8 9 | 11/15/2000 | Emails between Paula Treantafelles and Samuel Wong and Franki Tsang | MGA000071-74 |
| 10 | 12/8/2000 | Email from Mercedeh Ward to Cecilia Kwok and Samuel Wong | MGA000077-81 |
| 11 | On or about 12/23/2000 | Package sent from MGA Hong Kong to MGA Los Angeles per instructions from MGA Los Angeles | MGA000089-90 |
| 12 13 | 12/15/2000 | Email from Paula Treantafelles to Samuel Wong and Mercedeh Ward | MGA000091-92 |
| 14 | 12/16/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000097-104 |
| 15 | 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000109-112 |
| 16 17 | On or about 12/16/2000 | Package of fabric swatches sent from MGA Los Angeles to MGA Hong Kong | MGA000113-122 |
| 18 | On or about 12/20/2000 | Package of samples sent from MGA Los Angeles to MGA Hong Kong | MGA000124-125 |
| 19 | 12/20/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000124-125 |
| 20 | 12/12/2000 | Fed Ex shipment from MGA Los Angeles to Cecilia Kwok | MGA000131-132 |
| 21 | 12/19/2000 | Email from Mercedeh Ward to Cecilia Kwok and Wendy Reed | MGA000131-132 |
| 22 | 12/20/2000 | Email from Paula Treantafelles to Jimmy Cheng, Samuel Wong, Cecilia Kwok | MGA000140-141 |
| 23 | 12/10/2000 | Email from Mercedeh Ward to Sarah Halpern | MGA000147-149 |
| 24 | 12/22/2000 | Email from Mercedeh Ward to Samuel Wong and Judy Rich | MGA000190 |
| 25 | 12/22/2000 | Email from Paula Treantafelles to Samuel Wong, Judy Rich and Mercedeh Ward | MGA000197-199 |
| 26 | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000211 |
| 27 | 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000212-217 |

28

EXHIBIT __2__ PAGE _105_          EXHIBIT __C__ PAGE _79_

AMENDED ANSWER AND COUNTERCLAIMS

| | | | |
|---|---|---|---|
| 1 | 12/27/2000 | Email from Paula Treantafelles to Franki Tsang et al. | MGA000212-217 |
| 2 | 12/26/2000 | Email from Paula Treantafelles to Carter Bryant | MGA000219 |
| 3 | 12/27/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000234-236 |
| 4 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000249-250 |
| 5 | 12/27/2000 | Email from Paula Treantafelles to Cecilia Kwok and Mercedeh Ward | MGA000253 |
| 6 7 | 12/27/2000 | Email from Paula Treantafelles to Samuel Wong | MGA000254, 256 |
| | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000322 |
| 8 9 | 12/29/2000 | Email from Paula Treantafelles to Carter Bryant and Mercedeh Ward | MGA000333 |
| 10 | 1/16/2001 | Email from Paula Treantafelles to Samuel Wong et al. | MGA000366-368 |
| 11 | 1/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000369-370 |
| 12 | 1/18/2001 | Email from Paula Treantafelles to Cecilia Kwok, Judy Rich and Carter Bryant | MGA000371-378 |
| 13 14 | 1/18/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok and Samuel Wong | MGA000379-381 |
| 15 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000406-414 |
| 16 | 9/27/2000 | Email from Paula Treantafelles to Franki Tsang and Judy Rich | MGA000422 |
| 17 | 10/5/2000 | Email from Isaac Larian to Carter Bryant | MGA000423 |
| 18 | 10/18/2000 | Email from Mercedeh Ward to Franki Tsang and Victor Lee | MGA000425-426 |
| 19 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000482 |
| 20 21 | 12/22/2000 | Email from Isaac Larian to Franki Tsang, Mercedeh Ward and Paula Treantafelles | MGA000524-528 |
| 22 | 12/20/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000530-531 |
| 23 | 10/26/2000 | Email from Paula Treantafelles to Cecilia Kwok, Isaac Larian, and Carter Bryant | MGA000539-541 |
| 24 25 | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok | MGA000539-541 |
| | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok and Isaac Larian | MGA000539-541 |
| 26 27 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok, Samuel Wong, and Judy Rich | MGA000545 |
| 28 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000546-547 |

EXHIBIT 2 PAGE 106

-80-

EXHIBIT C PAGE 80

AMENDED ANSWER AND COUNTERCLAIMS

| 2/26/2001 | Email from Paula Treantafelles to Samuel Wong, Cecilia Kwok, and Carter Bryant | MGA000548 |
|---|---|---|
| 2/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000549 |
| 2/26/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000550 |
| 2/24/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000551 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000554 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000556-557 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000558 |
| 2/23/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000560 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000561 |
| On or about 2/20/2001 | Fed Ex shipment from Carter Bryant to Cecilia Kwok | MGA000566 |
| 2/20/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000566 |
| 2/19/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000568 |
| 2/19/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000569-570 |
| 2/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000571-572 |
| 2/16/2001 | Emails from Paula Treantafelles to Cecilia Kwok | MGA000573, 574, 576, 582, 589-90 |
| 2/16/2001 | Emails from Paula Treantafelles to Carter Bryant | MGA000575, 579, 588 |
| 2/12/2001 | Email from Lon Ross (MGA) to Carter Bryant et al. | MGA000583-587 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok et al. | MGA000599 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000600 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000602 |
| 2/3/2001 | Email from Paula Treantafelles to Cecilia Kwok and Judy Rich | MGA000603-05 |
| 2/2/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000606 |

EXHIBIT 2 PAGE 107            EXHIBIT C PAGE 81

AMENDED ANSWER AND COUNTERCLAIMS

209/2035941.2

| | | |
|---|---|---|
| 1/31/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000608 |
| 1/30/2001 | Email from Paula Treantafelles to Carter Bryant and Judy Rich | MGA000609 |
| On or about 1/30/2001 | Shipment from MGA Los Angeles to Carter Bryant | MGA000609 |
| 1/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000610 |
| 1/24/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000611 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Samuel Wong | MGA000612 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000613 |
| 3/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000617 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000618 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000620 |
| 3/6/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000621-622 |
| 3/6/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000625-626 |
| 3/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000625-626 |
| 3/3/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000634 |
| On or about 3/2/2001 | Fed Ex shipment from MGA Los Angeles to MGA Hong Kong | MGA000634 |
| 4/10/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000635 |
| 4/7/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000635 |
| 4/30/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000654 |
| 5/14/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000655 |
| 5/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000656-664 |
| 5/9/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000666 |
| 10/20/2000 | Email from Kerri Legg (MGA) to Steve Linker and Liz Hogan | MGA0008032 |
| | Letter from Mattel de Mexico employee to Thomas Park and Isaac Larian (MGA) | |
| 3/30/2004 | Letter to Carlos Gustavo Machado Gomez from Isaac Larian | |
| 3/30/2004 | Letter to Mariana Trueba Almada from Isaac Larian | |

EXHIBIT 2  PAGE 108

EXHIBIT C  PAGE 82

AMENDED ANSWER AND COUNTERCLAIMS

209/2035941.2

| | | |
|---|---|---|
| 3/30/2004 | Letter to Pablo Vargas San Jose from Isaac Larian | |
| | Email from Pablo Vargas San Jose to Mattel de Mexico | |
| 4/15/2004 | Email from Karla Papayanopulos Carvajal to Mariana Trueba Almada | |
| 1/25/2004 | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez | |
| 4/15/2004 | Email from Therese Wilbur to Carlos Gustavo Machado Gomez | |
| 4/15/2004 | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez attaching confidential documents | |
| 3/15/2004 | Email from Susana Kuemmerle to "plot04@aol.com" | |
| 3/16/2004 | Email from Susana Kuemmerle to "plot04@aol.com" | |
| 3/22/2004 | Email from "plot04@aol.com" to Isaac Larian copying Susana Kuemmerle and Thomas Park | |
| 3/22/2004 | Email from Isaac Larian to "plot04@aol.com" copying Susana Kuemmerle and Thomas Park | |
| 3/23/2004 | Email from Marlene Parker (MGA) to Isaac Larian and "plot04@aol.com" | |
| 3/30/2004 | Email from Thomas Park to "plot04@aol.com" copying Isaac Larian | |
| 4/2/2004 | Email from Maria de Carmen Mendez to Isaac Larian, Thomas Park, and Susana Kuemmerle | |
| 4/4/2004 | Email from Maria de Carmen Mendez to Susana Kuemmerle | |
| 4/7/2004 | Email from Maria de Carmen Mendez to Thomas Park | |
| 4/12/2004 | Email from Thomas Park to "plot04@aol.com" | |
| 4/14/2004 | Email from "plot04@aol.com" to Isaac Larian and Thomas Park | |
| 4/14/2004 | Email from Isaac Larian to "plot04@aol.com", Thomas Park and Daphne Gronich | |

EXHIBIT 2 PAGE 109

EXHIBIT C PAGE 83

-83-

AMENDED ANSWER AND COUNTERCLAIMS

09/2035941.2

| | | |
|---|---|---|
| 1 | 4/14/2004 | Email from "plot04@aol.com" to Thomas Park copying Isaac Larian and Susana Kuemmerle |
| 2 | 4/14/2004 | Email from Susana Kuemmerle to Isaac Larian and Thomas Park copying "plot04@aol.com" |
| 3 | | |
| 4 | 4/15/2004 | Email from Jean Paul Farah to "plot04@aol.com" copying Daphne Gronich |
| 5 | 4/15/2004 | Email from "plot04@aol.com" to Thomas Park copying Jean Paul Farah and Isaac Larian |
| 6 | | |
| 7 | 4/12/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 8 | | |
| 9 | 4/15/2004 | Email from "plot04@aol.com" to Jean Paul Farah copying Daphne Gronich and Isaac Larian |
| 10 | 4/15/2004 | Email from Mariana Trueba Almada to Andrea Ramirez |

EXHIBIT $2$ PAGE $110$

EXHIBIT $C$ PAGE $84$

!09/2035941.2

AMENDED ANSWER AND COUNTERCLAIMS

1

## PROOF OF SERVICE

2      I am employed in the County of Los Angeles, State of California.  I am over the age of
eighteen years and not a party to the within action; my business address is Now Legal Service,
3   1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

4      On January 12, 2007, I served true copies of the following document(s) described as
**MATTEL, INC.'S AMENDED ANSWER IN CASE NO. 05-2727, AND COUNTERCLAIMS**
5   on the parties in this action as follows:

6      Diana M. Torres, Esq.                        Keith Jacoby, Esq.
       **O'MELVENY & MYERS, LLP**                     **LITTLER MENDELSON**
7      400 S. Hope Street                           2049 Century Park East, 5th Floor
       Los Angeles, CA 90071                        Los Angeles, CA 90067

8

**BY PERSONAL SERVICE:**  I delivered such envelope(s) by hand to the office of the person(s)
9   being served.

10      I declare that I am employed in the office of a member of the bar of this Court at whose
direction the service was made.

11

12      Executed on January 12, 2007, at Los Angeles, California.

13

14      _____
       NOW LEGAL -- Dave Quintana

15

16

17

18

19

20

21

22

23

24

25

26

27

28      EXHIBIT   2   PAGE  111

07209/2035966.1

**Exhibit 3**

**MGA ENTERTAINMENT**
16730 Schoenborn Street
North Hills, California 91343

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

1.   **Retention as Consultant/Services:** MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

2.   **Term/Exclusivity:** The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3.   **Ownership:**

(a)   All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

[0C008662.DOC/2 / 10/04/2000  03:53 PM]

1

EXHIBIT 3 PAGE 112

ents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute. Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents. If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)   Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine. Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.    Compensation/Costs:                                    REDACTED

(a)   For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of _____ ive hundred dollars ($_____ per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of _____ dollars ($_____) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)   MGA shall pay to Bryant a royalty of _____ percent ([ ]%) the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services. As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances). MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00006662.DOC/2 / 10/04/2000  11:05 PM}

2

EXHIBIT __3__ PAGE __113__

...ing on Bryant, shall constitute an account stated, and shall not be subject to any question for ...eason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to ...A within two (2) years after the date rendered.  No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA  in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)      All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent.  In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)      Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis.  Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable).  MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)      MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales.  MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell.  Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant.  Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.      __Warranties and Indemnity__:  Bryant represents, warrants and agrees that:

(a)      he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)      neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)      the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

[C0505812.DOC/2 / 10/4/2000  C1:35 PM]

3

EXHIBIT 3    PAGE 114

..opyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property

    (d)   he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

    (e)   he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.    <u>Default/Termination</u>:

    (a)   In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

    (b)   Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.    <u>Confidentiality</u>:

    (a)   Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement.  As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential.  This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

    (b)   Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

    (c)   Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{0C006662.DOC/2 / 1/04/2000  03:05 PM}

4

EXHIBIT <u>3</u>   PAGE <u>115</u>

⏄ equitable relief in the nature of injunction and to all other available relief, at law and/or in

⏄.     **Notices:** All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time. All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid. Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 180th Street, Gardena, California 90247.

9.     **Independent Contractor/No Partnership/Third Party Beneficiary:** Bryant's relationship with MGA is that of an independent contractor. Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name. Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties. In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship. Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise. This Agreement shall not be construed to be for the benefit of any third party.

10.    **Services Rendered Deemed Special, etc.:** Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.    **General Provisions:**

       (a).    This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law. Any such assignment shall not relieve such Party of its obligations hereunder.

       (b)     The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

       (c)     A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof. All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

       (d)     Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

[C0006662.DOC2 / 10/04/2000 E1:25 PM]

5

EXHIBIT __3__    PAGE __116__

(e)    This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction of the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)    This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained. No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)    Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____

CARTER BRYANT

Social Security Number _____

REDACTED

EXHIBIT 3    PAGE 117

**Exhibit  4**

CONFIDENTIAL                                    1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware corporation, )   CASE NO.
                                      )   CV 04-9059 DDP (AJWx)
                Plaintiff,            )
                                      )
        vs.                           )
                                      )
CARTER BRYANT, an individual, and     )
DOES 1 through 10, inclusive,         )
                                      )
                Defendants.           )
_____ )
CARTER BRYANT, on behalf of himself,  )
all present and former employees of   )
Mattel, Inc., and the general public, )
                                      )
                Cross-Complainant,    )
                                      )
        vs.                           )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
                Cross-Defendant.      )


VOLUME I
THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Thursday, November 4, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

EXHIBIT 4   PAGE 118

CONFIDENTIAL                                    2

### A P P E A R A N C E S

For Plaintiff and
Cross-Defendant:

MR. JOHN B. QUINN
MR. MICHAEL T. ZELLER
MS. TANIA KREBS
Quinn, Emanuel, Urquhart,
    Oliver & Hedges
865 South Figueroa Street
10th Floor
Los Angeles, California 90017

For Defendants and
Cross-Complainant:

MR. DOUGLAS A. WICKHAM
Littler Mendelson
2049 Century Park East
5th Floor
Los Angeles, California 90067

Also Present:

Ms. Dale M. Cendali
Mr. Michael Moore

Videotaped by:

Mr. Donald Gifford
Mr. Donald Gifford, II
1528 East Glenwood
Springfield, Missouri 65804

### I N D E X

WITNESS:  CARTER BRYANT                               Page
Direct Examination by Mr. Quinn ...................   4
Notarial Certificate and Costs ...................   262

* * *

### E X H I B I T S

DEPOSITION EXHIBIT        DESCRIPTION            IDENTIFIED

(NONE)

Phonetic spelling:   (Ph.)
Exactly as stated:   (Sic)

EXHIBIT 4   PAGE 119

CONFIDENTIAL                                                    44

1        you showed it to anyone else on earth?                          10:1

2    A   Yes.  I had shown it to my mother.  I had shown it to my

3        partner, Richard.  My mother informs me that she had shown

4        the drawings to my father, and I showed it to Veronica,

5        Veronica Marlow.                                                 10:1

6    Q   What is Richard's last name?

7    A   Irmen, I-R-M-E-N.

8    Q   And where does he reside?

9    A   He resides here in Springfield.

10   Q   Could you give us his address, please.                          10:14

11   A   1303 South Farm Road 115.

12   Q   Is that your residence as well?

13   A   Yes.

14   Q   And when was it that you showed this to Mr. Irmen?

15   A   It was when I was returning to California from Missouri.         10:14

16       I believe it was New Year's Eve when I was unpacking my

17       things.

18   Q   New Year's Eve in what year?

19   A   1998.

20   Q   So you were unpacking in California?                            10:14

21   A   Yes.

22   Q   And you showed it to him on December 31st, 1998?

23   A   Yes.  He was living in California at the time.

24   Q   So, as I understand it, in 1998 for some period of time

25       you had come back here to live; is that true?                   10:15

EXHIBIT 4   PAGE 120

CONFIDENTIAL

45

| | | | |
|---|---|---|---|
| 1 | A | Yes. | 10:1 |
| 2 | Q | "Here" meaning Springfield, Missouri? | |
| 3 | A | Yes.  Springfield area, yes. | |
| 4 | Q | And Mr. Irmen had remained in California during that | |
| 5 | | period? | 10:1 |
| 6 | A | Yes. | |
| 7 | Q | When was it that you showed the Bratz concept to your | |
| 8 | | mother? | |
| 9 | A | It was sometime in August, late August 1998. | |
| 10 | Q | And how is it that you remember that particular month? | 10:1 |
| 11 | A | That's when I created them. | |
| 12 | Q | And it's your recollection that you showed them to her at | |
| 13 | | the time that you created them? | |
| 14 | A | Yes. | |
| 15 | Q | And were you living with your mother at the time? | 10:15 |
| 16 | A | Yes. | |
| 17 | Q | And does your father reside there as well? | |
| 18 | A | Yes. | |
| 19 | Q | And what address was that? | |
| 20 | A | That was 1-A Sycamore Drive, Kimberling City. | 10:16 |
| 21 | Q | Missouri? | |
| 22 | A | Missouri. | |
| 23 | Q | Does your mother still reside at that address? | |
| 24 | A | No. | |
| 25 | Q | Where does your mother reside now? | 10:16 |

EXHIBIT 4    PAGE 121

<u>CONFIDENTIAL</u>                                        46

```
 1    A    They reside at --                                      10:1
 2               MR. WICKHAM:  For the time being I'm going
 3         to instruct the witness not to respond.  At a break I may
 4         revisit that instruction but for the time being I'll
 5         object on privacy grounds and instruct the witness not to   10:1
 6         respond.
 7               MR. QUINN:  As to what his mother's address
 8         is?
 9               MR. WICKHAM:  Yes.
10    Q    (By Mr. Quinn)  What's your mother's name?  Can I know   10:16
11         that?
12    A    Janet Bryant.
13    Q    And your father?
14    A    Tom Bryant.
15               MR. QUINN:  Okay.  Change the tape.  We'll        10:17
16         have to change tape.
17               VIDEOGRAPHER:  We're off the record.  Time's
18         10:17.
19               (Break in proceedings.)
20               VIDEOGRAPHER:  Back on the record.  The           10:28
21         time's 10:28.
22    Q    (By Mr. Quinn)  Mr. Bryant, is it true that as of the time
23         that you first presented the Bratz materials to MGA in
24         late August of 2000, the only people you had shown those
25         materials to were your mother, Mr. Irwin, and Veronica   10:28
```

EXHIBIT 4   PAGE 122

CONFIDENTIAL                                        119

| | | |
|---|---|---|
| 1 | | just don't recall? | 12:15 |
| 2 | A | I don't recall. |
| 3 | Q | Do you recall at some point that you did see some |
| 4 | | preliminary fashion designs she had done for Bratz? |
| 5 | A | Yes. | 12:15 |
| 6 | Q | And did you give some feedback on that? |
| 7 | A | Yes. |
| 8 | Q | Do you know a Jesse Ramirez? |
| 9 | A | Jesse Ramirez.  I know the name. |
| 10 | Q | Do you know what context you know the name from? | 12:16 |
| 11 | A | I believe Margaret used him as a mold maker, some sort of |
| 12 | | a model maker. |
| 13 | Q | A mold -- can you tell me what a mold maker does as it |
| 14 | | relates -- I assume it relates to dolls. |
| 15 | A | I couldn't tell you specifically what he does because I've | 12:16 |
| 16 | | never had any personal contact with him.  I don't know |
| 17 | | what -- what he does. |
| 18 | Q | You've never met him? |
| 19 | A | I've never met him. |
| 20 | Q | But it's your understanding that he worked with Margaret | 12:16 |
| 21 | | relating to some molds or something like that? |
| 22 | A | I believe he made some fastcasts for Margaret at some |
| 23 | | point. |
| 24 | Q | What are fastcasts? |
| 25 | A | They are hard casts of a sculpture that are made from | 12:17 |

EXHIBIT 4   PAGE 123

CONFIDENTIAL                                          120

1        resin.

2    Q   And he did these for the Bratz project?

3    A   Yes.

4    Q   Did you ever see any of these casts?

5    A   Yes.                                               12:17

6    Q   Did you see them before the last day of your employment at

7        Mattel?

8    A   I don't recall.

9    Q   You saw them at some point?  You just don't recall whether

10       it was before your last day?                       12:17

11   A   Right.

12   Q   Do you have any understanding how Mr. Ramirez came to be

13       engaged to work on the Bratz project?

14   A   I think it was through Margaret.

15   Q   He was an independent contractor?                   12:17

16   A   Yes.

17   Q   Was he ever employed by MGA to your knowledge?

18   A   Not to my knowledge, no.

19   Q   Were the molds -- did he end up creating molds that were

20       then used in connection with the Bratz project?     12:18

21                   MR. WICKHAM:  Objection, ambiguous, lacks

22       foundation.

23   A   I don't know.  My -- I don't know.  I don't think so.

24   Q   (By Mr. Quinn)  You indicated that Margaret Leahy's

25       preliminary sculp was -- that it had to be redone.   12:18

EXHIBIT 4   PAGE 124

CONFIDENTIAL                                                    121

| | | | |
|---|---|---|---|
| 1 | A | Yes. | 12:18 |
| 2 | Q | In what way did it have to be redone? | |
| 3 | A | Pretty much completely. | |
| 4 | Q | And who is the one who redid it? | |
| 5 | A | Margaret redid the sculpt. | 12:18 |
| 6 | Q | And when was it that she redid it? | |
| 7 | A | It was after Mercedeh Ward had come on board to MGA.  She | |
| 8 | | saw the work that Margaret had done and said this is not | |
| 9 | | going to work, we need to start again, and Mercedeh was | |
| 10 | | really the one who knew how to put together a doll.  She | 12:19 |
| 11 | | knew how to form the joints.  She knew how to construct a | |
| 12 | | doll.  None of us really did, so she was the one that said | |
| 13 | | this sculpt is not going to work, we're going need to | |
| 14 | | start from scratch. | |
| 15 | Q | Did you have any understanding as to what it was about the | 12:19 |
| 16 | | sculpt that Margaret had done that wasn't going to work | |
| 17 | | according to Mercedeh? | |
| 18 | A | Yes.  She basically said, you know, what we have here is a | |
| 19 | | figurine.  The doll had a curved sort of structure in the | |
| 20 | | hips that wouldn't work for a doll.  The body was not | 12:19 |
| 21 | | really aesthetically pleasing.  We wanted to make the doll | |
| 22 | | younger looking. | |
| 23 | Q | Do you recall any -- any other issues that Mercedeh had | |
| 24 | | with the preliminary sculpt Margaret had done? | |
| 25 | A | Well, as I said before, basically that it was just -- it | 12:20 |

EXHIBIT 4   PAGE 125

CONFIDENTIAL                                              138

| | | |
|---|---|---|
| 1 | Q | Did they send you some samples? | 12:42 |
| 2 | A | Yes. |
| 3 | Q | Did you receive those before the last day of your |
| 4 | | employment at Mattel? |
| 5 | A | I don't recall. | 12:42 |
| 6 | Q | One way or the other? |
| 7 | A | I don't recall when I got them. |
| 8 | Q | But whenever you got them, you then shared them with MGA? |
| 9 | A | Yes. |
| 10 | Q | Who -- who did you provide them to? | 12:42 |
| 11 | A | I believe I provided them to Paula Treantafelles. |
| 12 | Q | Did you have any communication with Universal other than |
| 13 | | this phone call where you asked for samples and their |
| 14 | | sending you samples? |
| 15 | A | Not to my recollection, no. | 12:43 |
| 16 | Q | Did you ever have any written communications with |
| 17 | | Universal? |
| 18 | A | I may have.  I don't recall what they were, but I may |
| 19 | | have. |
| 20 | Q | During the time that you were employed by Mattel did | 12:43 |
| 21 | | you -- do you recall receiving any written communications |
| 22 | | from Universal? |
| 23 | A | I may have, but I don't remember. |
| 24 | Q | Have you reviewed any written communications between you |
| 25 | | and Universal in preparation for your deposition? | 12:43 |

EXHIBIT 4    PAGE 126

CONFIDENTIAL                                   139

1                MS. CENDALI:  Objection.                    12:43

2   A   I don't recall.

3   Q   (By Mr. Quinn)  Did you review any yesterday?

4                MR. WICKHAM:  Objection.  If you reviewed

5       any documents in connection with preparation for your   12:43

6       deposition for purposes of refreshing your memory -- you

7       know what, you've already asked this question about 14

8       times.  Objection, attorney-client privilege.  Instruct

9       the witness not to respond.  Harassing, burdensome.

10               MR. QUINN:  Okay.  On that note why don't we    12:44

11      break for lunch.

12               VIDEOGRAPHER:  We're off the record.  The

13      time's 12:40 --

14               MR. QUINN:  Wait.  Wait.  One hour enough?

15               MR. WICKHAM:  That's fine.                     12:44

16               MR. QUINN:  Okay.

17               VIDEOGRAPHER:  The time is 12:44.

18               (Break in proceedings.)

19               VIDEOGRAPHER:  Back on the record.  Time is

20      1:47.                                                   01:47

21  Q   (By Mr. Quinn)  Good afternoon, Mr. Bryant.

22  A   Good afternoon.

23  Q   You've told us this morning that you first came up with

24      the Bratz concept, as I understand it, in 1998; is that --

25  A   Yes.

EXHIBIT 4   PAGE 127

CONFIDENTIAL                                140

1   Q    -- correct?

2   A    Yes.

3   Q    We've used the "Bratz" name.  Did you come up with the

4        "Bratz" name as well?

5   A    Yes.

6   Q    And when did you come up with the name?

7   A    About the time of the creation of the Bratz.  About the

8        same time.

9   Q    Can you tell me as best you can recall when it was that

10       you created the Bratz?

11  A    Yes.  Let's see.  I was driving by a high school.  I

12       believe it was on my way home from work, and there were --

13       the kids were getting out of school and I was just kind of

14       struck by the way they looked.  They were wearing kind of,

15       you know, oversized clothes, big, baggy jeans.  They had

16       on backpacks and -- I don't know.  There was just

17       something very interesting and exciting about their energy

18       and just got me to kind of thinking, you know, wouldn't it

19       be cool if there were some characters that kind of

20       accurately represented today's teenager.

21            And so when I got home I started doing a little bit

22       of sketching and sketched some characters fairly quickly.

23       I had also kind of been looking at magazines and things

24       like that.  There were some advertising things that were

25       going on at the same time that kind of all melded together

01:47
01:47
01:47
01:48
01:48
01:49

EXHIBIT  4   PAGE 128

CONFIDENTIAL                                                            141

1       and kind of gave me the idea.  There was a Paris Blues ad.      01:49

2       There was -- 17 Magazine had a Steve Madden ad.  There was

3       an ad for the Dixie Chicks' album and it said "Chicks with

4       Attitude" on it, and it all just kind of came together and

5       it all just kind of really struck me when I drove by that      01:49

6       high school.

7  Q    Can you place this in a month in 1998?

8  A    It was in late August.

9  Q    And do you recall the high school?

10 A    I believe it was Kickapoo High.                                 01:49

11 Q    Kickapoo?

12 A    Uh-huh.

13 Q    Is that here in Springfield?

14 A    Yes.

15 Q    And there is a street that you were driving on that            01:50

16      actually fronts right on this high school?

17 A    Yes.

18 Q    And do you recall what the name of that street is?

19 A    I think it's Primrose.

20 Q    So school was in session in late August?                       01:50

21 A    Yes, as far as I know.

22 Q    And did these kids seem to be coming out of school?

23 A    Yeah.  They seemed like they were getting out of school,

24      going to their cars, whatever.

25 Q    It wasn't just one or two kids?  There was a whole bunch       01:50

EXHIBIT 4   PAGE 129

CONFIDENTIAL

142

1      of kids like the school was empty?        01:50

2  A  There were, yeah, quite a few kids.

3  Q  And this would have been what time of day?

4  A  I don't recall.  Maybe around -- I don't know -- two

5      o'clock or so.        01:50

6  Q  And you said that you were coming home from work; is that

7      right?

8  A  You know, I think I was coming home from work, but I'm not

9      sure whether it was going or coming.

10  Q  And where were you working at that time?        01:51

11  A  I was working at Old Navy at the mall.

12  Q  Which mall would that -- would that be?

13  A  Battlefield Mall.

14  Q  Battlefield?

15  A  Uh-huh.        01:51

16  Q  Is that a yes?

17  A  Yes.  I'm sorry.

18  Q  And do you recall what shift you were working?

19  A  I don't.

20  Q  Did you sometimes work days, sometimes swing different        01:51

21      hours or --

22  A  Yes.  I think sometimes it was days, sometimes it was

23      evenings, but I don't recall.

24  Q  And did you say that that very day you went home and

25      actually did some sketches?        01:51

EXHIBIT 4   PAGE 130

CONFIDENTIAL                                      177

1   A   I think she was around nine.                          02:41

2   Q   Do you recall anything else that you said at this meeting

3       that you haven't already told me about?

4   A   Not at this time I don't.

5   Q   Was there any discussion about the terms on which MGA     02:42

6       might pursue this project?

7   A   I believe there was.  Again, I would be kind of

8       paraphrasing, but I believe that Isaac said if we -- if we

9       were to do this project, I would like you to be involved,

10      help develop it with our team.  That's about all I        02:42

11      remember.

12  Q   Was there any discussion about financial terms?

13  A   No, not at that time.

14  Q   All right.  And did you make any response to him when he

15      indicated that he would like you to be involved in the    02:43

16      development of the project?

17  A   I told him that I would be glad to help, that I thought it

18      would be -- since it was my original idea, it would be

19      good to be involved, but I was of the understanding that I

20      would be working with the team, that I would be taking my  02:43

21      direction from MGA.

22  Q   Was there any discussion of any projects that you might

23      work on for MGA other than Bratz?

24              MR. WICKHAM:  This is at the September 1

25      meeting?                                                  02:43

EXHIBIT  4  PAGE  131

CONFIDENTIAL

178

1        MR. QUINN:  Yes, sir.

2   A    No.

3   Q    (By Mr. Quinn)  At any time prior to the last day of your

4        employment at Mattel did you have any discussion with MGA

5        about any projects you might work on with them other than

6        Bratz?

7   A    I did sort of a tryout kind of a project for them.  It was

8        an angel project.  It was actually not my project.  It was

9        Veronica's project, and I did some face designs for them,

10       just some drawings, and I don't know if they used any of

11       them or not, but it was my -- excuse me, my understanding

12       that this was kind of a test to see how well I would do,

13       you know, with working with the team, working with

14       direction.

15  Q    And this work that you did on face designs for the angel

16       project, that's work that you did before your last day of

17       employment at Mattel?

18  A    Yes.

19  Q    All right.  When you entered into your agreement with MGA,

20       was it your understanding at that point that you were

21       being engaged to work with them on the Bratz project?

22  A    Yes.

23  Q    There was -- at that point was there any other project

24       which you understood you were being engaged to work on?

25  A    No.

EXHIBIT 4    PAGE 132

CONFIDENTIAL

179

1   Q   The work that you were going to do with MGA as                    02:45

2       contemplated by you at that time was just Bratz?

3   A   That's right.

4               MR. QUINN:  Okay.  We need to change tape.

5               VIDEOGRAPHER:  Off the record.  The time's       02:45

6       2:45.

7               (Break in proceedings.)

8               VIDEOGRAPHER:  Back on the record.  Time is

9       2:53.

10  Q   (By Mr. Quinn)  Mr. Bryant, at any time during your      02:53

11      discussions with MGA leading up to the agreement that you

12      entered into with MGA, did you contemplate that you would

13      be working with MGA on anything other than the Bratz

14      project?

15  A   No, not at that time.                                     02:53

16  Q   And basically this was -- as far as you were concerned,

17      these discussions all related to the potential

18      exploitation of the Bratz idea?

19  A   Yes.

20  Q   Did you contemplate that if MGA -- if you were able to   02:54

21      reach an agreement with MGA that, you know, this would

22      require all your time?

23              MR. WICKHAM:  Objection --

24              MS. CENDALI:  Objection.

25              MR. WICKHAM:  -- vague -- vague as to time,       02:54

EXHIBIT 4   PAGE 133

CONFIDENTIAL

193

1   Q   (By Mr. Quinn)  Sir, you understand I'm not asking you to          03:16

2       make something up and tell me something if you don't

3       recall it?  Do you understand that?

4   A   Yes.  Can you restate the question?

5   Q   Sure.  I'm asking you whether you ever saw any draft of an        03:16

6       agreement between you and MGA other than this draft that

7       MGA provided around September 18th.

8              MR. WICKHAM:  Asked and answered.  Asked and

9       answered.

10  Q   (By Mr. Quinn)  Remind me.  What was the answer?                   03:16

11             MR. WICKHAM:  He said he didn't recall,

12      Counsel.

13             MR. QUINN:  No.  That's what you said.

14             MR. WICKHAM:  No.  That's what he said.  You

15      see, you don't like the answers to his questions at times         03:16

16      and so you re-ask the same question four or five times, as

17      the record will reflect.

18  Q   (By Mr. Quinn)  Go ahead.

19  A   I don't recall.

20  Q   Is it your recollection that the agreement -- or that the         03:16

21      form of agreement that you received from MGA on or about

22      September 18th ended up being the agreement which you

23      signed?

24  A   For the most part, yes.

25  Q   Were there some differences between the form of agreement         03:17

EXHIBIT 4   PAGE 134

CONFIDENTIAL

194

1    that you received from MGA on or about September 18th and          03:17

2    the form of agreement which you signed?

3              MR. WICKHAM:  Lacks foundation, calls for

4    speculation.

5    A    All I remember is that there were some minor changes made.      03:17

6    Q    (By Mr. Quinn)  Do you remember what they were?

7    A    I don't.

8    Q    Do you have a copy of that draft that MGA sent to you on

9    or about September 18th?

10   A    Somewhere, yes.                                                 03:17

11             MR. QUINN:  Has that been provided to us,

12   folks?

13             MR. ZELLER:  (Shakes head.)

14             MR. QUINN:  My troops are telling me no.  Do

15   you know, Counsel?

16             MR. WICKHAM:  I don't know.  I don't believe

17   so.

18             MR. QUINN:  May we have it, please.

19             MR. WICKHAM:  I believe that we have

20   addressed that issue in correspondence and with regard to          03:17

21   objections.  We can take up those issues in the

22   appropriate meet-and-confer session.

23             MR. QUINN:  Well, just help me out here.

24   What would be the basis for not giving us a copy of a

25   draft prepared by MGA and submitted to Mr. Bryant?                 03:18

EXHIBIT 4   PAGE 135

CONFIDENTIAL

195

1        MR. WICKHAM:  Counsel, I'm more than willing          03:19

2    to meet and confer with you at an appropriate time, at an

3    appropriate place, and this is neither.

4        MR. QUINN:  You're not willing to discuss

5    that now?                                                  03:18

6        MR. WICKHAM:  Correct.  I am here for Mr.

7    Bryant's deposition.

8        MR. QUINN:  Is it your view that that's

9    privileged, something that MGA drafted and sent to this

10   individual?  Is that your view, sir?                       03:18

11       MR. WICKHAM:  Counsel, can we proceed with

12   the deposition?

13       MR. QUINN:  Yeah, if you'll just tell me.

14   Will you answer my question or no?

15       MR. WICKHAM:  I will take that up with you           03:18

16   at an appropriate time pursuant to a meet-and-confer

17   session.  Happy to do so.

18       MR. QUINN:  I'm going to assume that you're

19   just refusing to answer the question now and we'll

20   proceed.                                                   03:18

21  Q   (By Mr. Quinn)  Did you prior to the time of your -- prior

22   to your last day of employment with Mattel, did you

23   receive any money at all from MGA?

24  A   I think I received a payment for the angel face designs.

25  Q   And how much was that?                                  03:19

EXHIBIT 4  PAGE 136

CONFIDENTIAL

196

1   A   I don't recall.                                                    03:19

2   Q   Can you give me an approximation, a wild ballpark

3       speculation?

4               MS. CENDALI:  Objection.

5               MR. WICKHAM:  Compound.                                    03:19

6   Q   (By Mr. Quinn)  Bigger than a breadbox, more --

7               MR. WICKHAM:  Do you want an

8       approximation --

9               MR. QUINN:  Yeah.

10              MR. WICKHAM:  -- or wild ballpark                          03:19

11      speculation?

12              MR. QUINN:  Whichever you'll let him answer.

13      If it works for you, it works for me.

14              MR. WICKHAM:  If you have -- if you have a

15      memory that is --                                                  03:19

16  A   To the --

17              THE WITNESS:  Okay.  Go ahead.

18              MR. WICKHAM:  If you have a memory, by all

19      means tell him.

20  A   I think to the best of my recollection it was maybe around        03:19

21      $500 or so.

22  Q   (By Mr. Quinn)  Did you have a bank account somewhere back

23      in September 2000?

24  A   Yes.

25  Q   Where was your bank account?                                      03:20

EXHIBIT 4   PAGE 137

CONFIDENTIAL                                              261

DEPONENT'S SIGNATURE PAGE

RE:   Mattel, Inc., vs. Carter Bryant, et al.
      Carter Bryant vs. Mattel, Inc.
      Case No. CV 04-9059 DDP (AJWx)
      Deposition taken on November 4, 2004


        I do hereby certify that the foregoing is a true and

correct transcript of the deposition in the foregoing-styled

and numbered cause, and I now sign the same as true and

correct, with the exception of the corrections which I have

noted on the correction sheet provided.


                            _____
                                 CARTER BRYANT


        Subscribed and sworn to before me this __2ⁿᵈ__ day of

__March_____, 20_05_.


                            _____
                                 Notary Public


My Commission Expires:

__Dec. 31, 2008__



EXHIBIT 4   PAGE 138

CONFIDENTIAL

197

1    A    It was at the Mattel Federal Credit Union.                    03:20

2    Q    Is that the only account that you have?

3    A    To the best of my recollection, yes.

4    Q    You didn't have a checking account with any commercial

5         bank anywhere?                                                03:20

6    A    Not to my recollection.

7    Q    Would it be true that whatever payment you received from

8         MGA you would have deposited in that account with the

9         Mattel Credit Union?

10   A    Probably.                                                     03:20

11   Q    Do you still have an account with the Mattel Credit Union?

12   A    No.

13   Q    When did you close out that account?

14   A    I believe I closed that account in 2002.

15   Q    At any time during the year 2000 did you open any other      03:20

16        bank account?

17   A    During the year 2000.  I don't remember opening any other

18        account.

19   Q    All right.  So after your -- the last day of your

20        employment at Mattel did you begin to receive these          03:21

21        monthly checks from MGA?

22              MR. WICKHAM:  Would the reporter please read

23        back that question.

24   Q    (By Mr. Quinn)  After your employment with Mattel ended,

25        did you begin to receive monthly checks from MGA?            03:21

EXHIBIT 4   PAGE 139

CONFIDENTIAL                                                           262

## NOTARIAL CERTIFICATE

STATE OF MISSOURI          )
                           )  ss.
COUNTY OF GREENE           )


        I, Sherrie L. Hunt, Certified Court Reporter, and
Notary Public within and for the State of Missouri, do
hereby certify that on November 4, 2004, pursuant to Notice,
the above witness, CARTER BRYANT, was by me first duly sworn
to testify the truth, the whole truth, and nothing but the
truth in the case aforesaid; and that the deposition by him
was reduced to writing by me in stenotype, and thereafter
transcribed by me, and is fully and accurately set forth in
the preceding pages; that presentment by me to the witness for
signature was waived; and that the deposition will be
thereafter by the witness read, signed, and sworn to on or
before the date of trial.

        I do further certify that I am not related to, nor
attorney for, nor employed by any of the said parties, nor
otherwise interested in the event of said action.


| Sherrie L Hunt |
| Notary Public |
| Greene County |
| State of Missouri |
| My Commission Expires May 17, 2005 |

                                    _____
                                    Sherrie L. Hunt
                                    Certified Court Reporter
                                    C.C.R. Number 1027
                                    Notary Public


My commission expires:  May 17, 2005



Costs:  To Plaintiff and Cross-Defendant $1,399.25
        To Defendants and Cross-Complainant $422.65



                COURT REPORTERS OF THE MIDWEST, INC.
                          P.O. Box 4282
                Springfield, MO 65808 (417) 889-2079

EXHIBIT 4   PAGE 140

<u>**Confidential; Subject to Protective Order**</u>

CORRECTIONS TO THE DEPOSITION OF

CARTER BRYANT

VOLUME I

---

RE:     Mattel, Inc., vs. Carter Bryant, et al.
        Carter Bryant vs. Mattel, Inc.
        Case No. CV 04-9059 NM (RNBx)
        Deposition taken on November 4, 2004

| <u>Page/Line</u> | <u>Change Requested</u> |
|---|---|
| 86:5 | Delete: "I may have." Insert: "I don't recall." |
| 124:1 and 3 | Delete: "No." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 131:19 | Delete: "No, I did not." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 132:3 | Delete: "I don't remember telling anybody that, no." Insert: "Other than my communications with Universal, I don't recall telling anybody that." |
| 132:18 | Delete: "To the best of my recollection that's true." Insert: "To the best of my recollection, other than my communications with Universal, that's true." |
| 195:24 | Insert: "I also received expense reimbursements from MGA and an advance against royalties." |
| 252:24 | Delete: "No." Insert: "No. I interpreted your question as asking whether I was employed by MGA at that time and the answer is no." |
| 253:20 | Delete: "I don't remember that, no." Insert: "Other than my communications with Universal, I don't remember that." |
| 253:22 | Delete: "That – as far as I can remember that never happened." Insert: "Other than my communications with Universal, as far as I can remember, that never happened." |

EXHIBIT 4    PAGE 141

253:25                    Delete:  "No."  Insert:  "Other than my communications with Universal, no that I remember."

EXHIBIT 4   PAGE 142

<u>CONFIDENTIAL</u>                                                  264

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


MATTEL, INC., a Delaware corporation, )   CASE NO.
                                       )   CV 04-9059 DDP (AJWx)
                Plaintiff,             )
                                       )
           vs.                         )
                                       )
CARTER BRYANT, an individual, and      )
DOES 1 through 10, inclusive,          )
                                       )
                Defendants.            )
_____)
CARTER BRYANT, on behalf of himself,   )
all present and former employees of    )
Mattel, Inc., and the general public,  )
                                       )
                Cross-Complainant,     )
                                       )
           vs.                         )
                                       )
MATTEL, INC., a Delaware corporation,  )
                                       )
                Cross-Defendant.       )


VOLUME II
THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Friday, November 5, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

EXHIBIT 4  PAGE 143

A P P E A R A N C E S

For Plaintiff and                  MR. JOHN B. QUINN
Cross-Defendant:                   MR. MICHAEL T. ZELLER
                                   MS. TANIA KREBS
                                   Quinn, Emanuel, Urquhart,
                                      Oliver & Hedges
                                   865 South Figueroa Street
                                   10th Floor
                                   Los Angeles, California 90017

For Defendants and                 MR. DOUGLAS A. WICKHAM
Cross-Complainant:                 MS. DIBA RASTEGAR
                                   Littler Mendelson
                                   2049 Century Park East
                                   5th Floor
                                   Los Angeles, California 90067

Also Present:                      Ms. Dale M. Cendali
                                   Mr. Michael Moore

Videotaped by:                     Mr. Donald Gifford
                                   Mr. Donald Gifford, II
                                   1528 East Glenwood
                                   Springfield, Missouri 65804

I N D E X

WITNESS:  CARTER BRYANT                              Page

Direct Examination (Cont.) By Mr. Quinn ..........    267

Notarial Certificate and Costs ...................    495

* * *

Phonetic spelling:  (Ph.)
Exactly as stated:  (Sic)

EXHIBIT 4   PAGE 144

CONFIDENTIAL                                                        318

```
 1    Q    And why -- why do you think that?                              10:35
 2    A    Because these were the final designs and the final designs
 3         for the fashions weren't finished until December of 2000.
 4    Q    I see that there's a fax header on the top that says April
 5         10th, 2000, 7:57 a.m. --                                       10:35
 6    A    Yes.
 7    Q    -- page 3.  Do you see that?
 8    A    Yes.
 9    Q    Do you have any recollection or knowledge or information
10         you can share with us about this being faxed or the          10:36
11         circumstances or --
12    A    I don't really remember, but if it had anything to do with
13         my fax machine at home, my fax machine was not set
14         correctly.
15    Q    So if it was sent from your fax machine, the date on your    10:36
16         machine wasn't set right?
17    A    Right.
18    Q    It was off by some -- by some number of months?
19    A    Yes.
20    Q    Do you know?                                                  10:36
21    A    I don't -- I don't recall.
22    Q    The --
23              MR. QUINN:  Maybe counsel can tell us.  Has
24         some information been redacted from the fax header here?
25         It looks like there's -- it says from blank, fax number      10:36
```

EXHIBIT 4   PAGE 145

CONFIDENTIAL                                           319

1    blank.  I don't know if that's redacted or --          10:36

2  A  I don't think I had any of that set on my fax machine.

3  Q  (By Mr. Quinn)  So if you sent a fax from your machine --

4    if you sent or you received -- if you received, it would

5    be blank?  Is that how it worked?                       10:36

6  A  I don't know.  I don't know.

7              (Pause in proceedings.)

8  Q  (By Mr. Quinn)  If this is -- I mean, this -- can you tell

9    whether this is something that you received on your fax

10    machine?                                                10:37

11  A  I don't know.

12  Q  But when you receive things on your fax, because the -- it

13    wasn't set right --

14  A  Uh-huh.

15  Q  -- you wouldn't get the right date and things?         10:37

16  A  Right.

17  Q  And are you saying that your fax machine also wouldn't

18    indicate the number and the identity of the sender?

19  A  That's right.

20  Q  So looking at this, does this then appear to be something  10:37

21    that you received on your fax machine?

22  A  I don't recall if I received this or if I sent it.

23              MR. QUINN:  I would assume, Counsel, if

24    something was redacted when it was produced, you would

25    tell us that.                                           10:38

EXHIBIT 4  PAGE 146

CONFIDENTIAL                                        320

1          MR. WICKHAM:  Yes.  I'll look into it.                    10:38

2                  (Pause in proceedings.)

3    Q    (By Mr. Quinn)  Also -- also it says page 3 there?

4    A    Uh-huh.

5    Q    Is that yes?                                               10:38

6    A    Yes.

7    Q    Were there other pages or did your fax machine just

8         designate everything as page 3 or what?

9    A    I don't know.  You're asking me things that happened four

10        years ago.  I can't recall.                                10:38

11   Q    All right.

12   A    I don't know.

13   Q    But do you remember that there was some problem on your

14        fax machine with the capability of designating the number

15        of pages in a fax, also?                                   10:38

16   A    I don't recall.

17   Q    Do you know where the rest of the pages of this fax are?

18             MR. WICKHAM:  Objection, foundation, calls

19        for speculation.

20   A    I have no idea.                                            10:38

21   Q    (By Mr. Quinn)  Do you know any reason why people --

22        someone might be faxing to you drawings that you did?

23   A    No.

24                  (Pause in proceedings.)

25   Q    (By Mr. Quinn)  Can you rule out the possibility, sir,    10:39

EXHIBIT 4   PAGE 147

CONFIDENTIAL                                                    321

1    that this is something you either faxed or received in          10:39

2    April of 2000?

3  A   Yes.  Absolutely.

4  Q   And that's because?

5  A   Because these drawings weren't done until December of        10:39

6    2000.

7  Q   I hesitate to ask what 168 is but --

8  A   This is a sketch for a headpiece.

9  Q   Okay.

10                 (Pause in proceedings.)                          10:39

11  Q   (By Mr. Quinn)  So is this also something that was created

12    in November or December?

13  A   Yes.

14  Q   And 169?

15  A   This is just a fashion sketch that was created in that      10:40

16    same time period with some swatches.

17  Q   That you selected?

18  A   Yes.

19  Q   Same questions regarding 170.

20  A   Same thing.  Drawings that were done in the November,       10:40

21    December time period.

22  Q   What is -- it looks like we've got a photocopy of some

23    type of retail hang tag.

24  A   Yes.  That was attached to an earring which had the kind

25    of fabric that I wanted to use for one of the tops.          10:40

EXHIBIT   4   PAGE 148