1  <u>McDonnell Douglas Corp.</u>, 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2  706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3  experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4  Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5        In no instance uncovered by the Court's research (or by Mattel's citation to

6  authority) has a court appointed an expert because of a fear, even one that is well-

7  founded, that such wide divergence in privately-retained expert testimony <u>may</u>

8  materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9  experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  <u>See</u> FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.      <u>SPOLIATION OF EVIDENCE</u>

19        The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23        1.      <u>Evidence of spoliation</u>

24        Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

4

EXHIBIT 19   PAGE 260

1    lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2    Specifically, at Bryant's deposition the following exchange took place between Bryant

3    and counsel for Mattel:

4            Q.    (By Mr. Quinn) I wanted to ask you about one of
                   these original drawings that were produced today.
5                          . . . .
                   – what we're talking about here.  This is – the Post-It
6                  says that's Bryant – that's the original of Bryant
                   192, Bates number 192, which has the heads on it,
7                  and this is one of the originals that your counsel was
                   kind enough to have shipped here today for us to
8                  look at.

9            A.    Yes

10           Q.    And we were just looking at these this afternoon and
                   we notice[d] that there's a bunch of holes on the
11                 page, including in the signature, as if somebody
                   were taking ink samples.
12
13           A.    Uh-huh.

14           Q.    Do you see that?
15
             A.    Yes.
16           Q.    Do you know anything about why those holes were
                   made or how or when?
17
             A.    I have no idea what those are.
18           Q.    I mean, when you had – when you had possession
                   of this document did it have those holes in it?
19
             A.    Not that I remember.
20
             Q.    You certainly never had anything to do with that?
21
22           A.    No.  I don't know anything about those holes.

             Q.    And, similarly, if you wouldn't mind holding this up to
23                 the camera, this is the original of Bryant 210 and it's
                   also – if you take a look at it, I think you'll see it has
24                 some of those holes in it, although not as many as
                   the last one we looked at.  Again, you don't know
25                 anything about how or why those holes got put on
                   there?
26
             A.    I don't.
27
28   (Decl. Michael T. Zeller, Ex. 7 at 161-163).

                                    5

                        EXHIBIT ___19___  PAGE __261__

1    Mattel has submitted the declaration of a questioned document analysis expert,

2   Lloyd Cunningham, who has opined that the holes described in the document

3   mentioned above are consistent with those that would be generated by taking

4   microplug samples to perform analysis of the ink found on a document. (Decl. Lloyd

5   Cunningham ¶ 5). Bryant and MGA eventually conceded (although at first refusing to

6   do so under the veil of work-product privilege) that they tested some of the original

7   BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8   Speckin. (Response to Order to Show Cause ("Response") at 1-2).

9    Mr. Speckin states that in June, 2004, he performed a series of tests "on

10   various 'Bratz' documents" at the request of MGA's counsel.[1] (Decl. Erich J. Speckin

11   ¶ 8). Those tests included examining the documents in question under an infrared

12   light as well as performing sidelight testing, which involves "visually inspecting a

13   document by holding a side light up to the document at an oblique angel . . . to

14   determine preliminarily whether the document contains impressions, or markings

15   impressed upon the document by drawing and writing done on a sheet of paper laid

16   on top of the document being tested." (Decl. Erich J. Speckin ¶¶ 9, 10). Mr. Speckin

17   also performed an electrostatic detection apparatus to see if there was indented

18   impressions on the documents. (Decl. Erich J. Speckin ¶ 11). Finally, Mr. Speckin

19   "performed ink identifications tests" on the documents. (Decl. Erich Speckin ¶¶ 12-

20   13). Such testing involved Mr. Speckin removing "very small microplug samples from

21   the document at issue and testing the microplug." (Decl. Erich Speckin ¶13).

22   Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23   original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24   it averred from what parts of the documents that were tested was the microplug taken.

25   Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27   _____

28   [1] At the time the testing was done by Mr. Speckin, Bryant had already been
     sued by Mattel for violating the terms of the invention agreement he signed when he
     worked for them from 1999 to 2000. (Response at 1).

EXHIBIT 19 PAGE 262

1   sufficient material for another expert to test the exact same <u>documents</u>," but admits

2   that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3   Erich J. Speckin ¶14).

4        Another episode brought to light during discovery causing Mattel concern

5   relates to MGA's handling of the original Bryant/MGA contract before the inception of

6   the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7   testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8   Larian, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9   between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14       Q.      . . . Was there ever anything that you were asked to
                 do that you – made you feel kind of uncomfortable?
15
         A.      Yes.
16                                        . . . .

17       Q.      And what was that?

18       A.      When the original contract was executed by Carter
                 Bryant, it was sent to me <u>via</u> fax, and on the top of
19               the fax listed the phone number from where it was
                 faxed, which said "Barbie Collectibles," and at one
20               point my boss, Isaac Larian, asked me to white that
                 out and send it to a lawyer, Patty Glaser.
21

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26       Q.      Were you ever asked to change the date on any
                 agreements between Mr. Bryant and MGA?
27
         A.      No.
28

                                   7

EXHIBIT 19  PAGE 263

1    Q.    Are you aware of anybody being asked to change
           the date on any of those agreements?
2
     A.    No.
3
     Q.    I mean, do you have any reason to believe that any
4          agreement that was entered into between Mr. Bryant
           and MGA had a date altered or changed?
5
     A.    No.
6
     Q.    You never heard that from – from any source?
7
     A.    No.
8

9    (Decl. Paula E. Ambrosini, Ex. 3).

10        Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11   faxed on April 10, 2000, had the fax header altered, much in the same manner

12   described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13   fields on the fax header for the sender's name and the sender's telephone number are

14   missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

15   _____

16       [2] Mattel speculates that the time sheets produced by MGA for one of its
17   employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
     "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked
18   on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
     painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at
19   3). The basis for this speculation is based on the fact that the initial disclosure by MGA
     of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,
20   on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
     mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
21   departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).
22   Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
     supplemented its earlier production of Rhee's time sheets showing that during the mid-
23   to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
     Angels" and was not involved in any BRATZ-related work until after Bryant's departure
24   from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time
25   sheets were altered is allegedly bolstered by the fact that Rhee testified during her
     deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
26   that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
     nothing but a cover or code word for BRATZ-related work. This argument is hard to
27   accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
     for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
28   362). It is not until December, 2000, that any of the invoices submitted by Rhee show

8

EXHIBIT 19   PAGE 264

1   facsimile machines normally insert senders' names and numbers as a matter of

2   course, and indeed is required by law [to do so], it appears likely that the document

3   was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."

4   (Mattel's Mot. Appt. Expert at 10).  The premise underlying Mattel's concern on this

5   topic is not unreasonable.  The law requires such information to be found on any

6   document, like the one in question, that has been faxed.  Additionally, the testimony

7   elicited from Ms. O'Connor that MGA altered the fax header for other documents

8   related to BRATZ from the same time period leads to an obvious inference that other

9   documents where spaces on other fax headers are absent suffered a similar fate.

10        2.    Analysis

11             a.    Microplug Ink Testing

12        Bryant and MGA begin by downplaying the significance of the spoilation issue

13   in this case.  With respect to the holes on some of the original BRATZ design

14   drawings produced at Bryant's deposition, they note that, even with these holes,

15   nothing prevents Mattel from performing its own testing on the remaining portions of

16   the drawings on the document.  "Indeed, the very fact that Mattel is asking for court-

17   appointed experts to perform ink and paper testing only underscores the fact that

18   nothing has been 'destroyed.'" (Joint Opp. at 2).  Mr. Speckin makes similar assertions

19   in his declaration, stating that the fact that the same microplug cannot be tested "is

20   entirely irrelevant because there is more than enough ink on each of the documents I

21   tested to allow numerous microplug samples to be extracted and tested by different

22   experts."  (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23   ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25   _____

26   her doing work on the BRATZ doll, well after Bryant had left Mattel.  (Decl. Michael T. Zeller, Ex. 21 at 367, 370, 373).  To accept Mattel's argument, not only would MGA

27   have had to alter the invoices it produced in the supplemental production, but the documents produced by Rhee would also have to be similarly altered.  An alternative

28   and just as plausible explanation is that Rhee is simply mistaken as to when she began performing work on the BRATZ project.

EXHIBIT 19 PAGE 265

1   that fact is entirely irrelevant because, unlike in a situation where the entire object is

2   destroyed during the testing, there is more than enough ink on each of the documents

3   Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4   (emphasis added))).  This argument is not persuasive.  This is not a case where

5   everyone concedes that the documents in question were created at one point in time,

6   but dispute what that date may have been.  In such a circumstance all the ink

7   markings on the documents are comparable to one another as it is conceded that all

8   the marks came from one point in time.

9        Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel.  An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document.  One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later.  In taking microplug samples from one of

16  these ink markings without the ability of the other side to test the same mark would

17  forever foreclose a potential avenue of crucial evidence in this case.  It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoilation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed.  As

21  MGA and Bryant make clear spoilation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire &

24  Rubber Co., 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25       At this point, it should not be lost that the documents in question are not

26

27      [3] The Court does not mean to suggest that Mattel's theory is correct.  Instead,
    the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  complete destruction of a document would amount to spoilation under the particular
    circumstances in this case.

EXHIBIT 19   PAGE 266

1  peripheral to the case.  At its heart, this case asks the question:  Who owns the rights

2  to the Bratz dolls?  Bryant asserts that he came up with the idea for the Bratz dolls

3  while on a break from his employment at Mattel in 1998, and that he sold his idea to

4  MGA when he went to work for them in October, 2000.  Mattel claims, among other

5  things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while

6  he was working for them from January, 1999, to October, 2000, and that pursuant to

7  an inventions agreement he signed with the Mattel when he went to work for them,

8  that idea now belongs to Mattel.  As this clash of factual contentions makes clear, the

9  dating of the original BRATZ drawings and the markings contained thereon is a

10  fundamental, perhaps despositive, issue to this case.  That there are serious

11  questions concerning the handling of these critical documents certainly causes the

12  Court much concern about whether the truth seeking functions of the adversarial

13  system have been fundamentally compromised in this case.  As Mattel rightly notes,

14  "The adversarial process is not an end in itself; its value is in its ability to promote a

15  search for truth."  (Mattel's Reply at 9).

16       Bryant and MGA concede that the sections that were holed out contained

17  markings, be they handwritten dates or other words or letters, that may be crucial to

18  the case.  Indeed, one of the drawings – Bryant 192 – had a portion of the signature

19  line sampled.  What is left unclear is whether, for those portions of the document

20  where ink or signatures were sampled, enough of the same part of the document in

21  question (meaning the same mark) remains to be sampled by Mattel.  For instance, is

22  there enough of the signature line from Bryant 192 left to sample, or has too much of it

23  already been sampled?  In that sense, MGA's and Bryant's argument that nothing has

24  been destroyed by the microplug testing procedure because other parts of the

25  document still exist is misplaced.  Indeed, MGA and Bryant later admit that the

26  circumstances allowing for "multiple experts [to] remove multiple microplugs and test

27  the exact same paper and ink" is dependent upon there being the same exact paper

28  and ink there to test.  (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

11

EXHIBIT 19  PAGE 267

1   The continued existence of the "exact same pen stroke" is the very issue that is now

2   left open because of the holes in some of Bryant's original BRATZ design drawings.

3   Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4   remaining on the original drawing for Mattel to test?  None of these questions have

5   been addressed by MGA, Bryant, or Mr. Speckin in their papers.  Instead, they simply

6   make the observation that there remain other ink markings on the same drawings for

7   Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8   Court that Mattel has not been prejudiced by MGA's actions.

9         Given the absence of any representation by them on this point, the Court

10   pressed MGA's counsel about the same at oral argument:

11         THE COURT:  And part of your argument is that
     while a small portion of the small portion of the page may
12   be gone, as you in your most recent papers concede is
     gone, there are other portions of the page that can be
13   tested.  The concern I have, I guess – and maybe you can
     clear this up for me – I've seen some of the drawings and I
14   have a pretty good mental image of what the drawings look
     like.  But there is also writing on these drawings,
15   signatures, copyright registration indications; some are
     large, some are small.  As I gather from the plaintiff, from
16   Mattel, the concern is that these different drawings or
     writings were done at different times.  And I guess I can
17   understand why when those drawings or writings were
     done could be significant from an evidentiary standpoint.
18   So the concern is not so much there's another part of the
     paper that can be tested; it's whether or not the particular
19   marking in question has been so damages as to not permit
     a full further testing on that particular marking.  Does my
20   question make sense?

21         MS. CENDALI: Yes, it does, your Honor.  And I
     anticipated that.  Significant, we thought, in their papers
22   was that . . . they cited to the fact that Mr. Bryant admitted
     in his deposition that there were holes in some of the
23   documents that he didn't know how they got there
     originally.  As an example, if you look at part of Zeller,
24   Exhibit 17, Bates number Bryant 201, that's an example of
     one of the documents that's been tested.
25
         THE COURT: One second so I have that in front of
26   me.  Okay.

27         MS. CENDALI: There are many many others that were
     submitted that were also submitted to this type of ink
28   testing, but this is just an example of one of them.  And if

12

EXHIBIT  19  PAGE 268

1  you look at the document, you would never know —
   granted, this is smaller, so the actual drawing is even larger
2  than this, so there's even more ink on the larger drawing
   than there would be available on this reproduction size.
3
          But if you look at it — and I'll represent to you that we
4  didn't test the face; the face is absent before and after the
   testing — but if you look at it, you couldn't even see that
5  there were any pin pricks to it. If you look very, very
   carefully at the signature at the bottom, you can maybe see
6  where it says "Ramona Prints, 8-26-99"; that maybe there
   was like a little tiny hole in one of the little slash marks; that
7  was a teeny little pin prick hole that showed the testing.
   There's ample amount of ink to do the testing on all of
8  these documents. This is the normal course of procedure
   that was done.
9

10        When asked by the Court whether it accepted MGA's representation that there

11  was "ample amount of ink" left on the same marks that the microplugs were taken

12  from for further microplug testing, Mattel, in seeming contradiction to its position in its

13  papers, said it did: "I agree with Ms. Cendali. We do not maintain any portion of the

14  ink on a signature or an image has been so obliterated that you couldn't take a plug

15  now on any of it; that's not our point." (Emphasis added).

16        In light of this concession by Mattel, the Court finds that no colorable claim of

17  spoliation has been established at this time vis-à-vis Mr. Speckin's testing of the

18  documents to warrant the appointment of an expert by the Court to investigate the

19  same. See Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga.

20  1998)(sanction warranted where because "defendant's expert has conducted

21  destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22  conditions of the original documents"). If there was any evidence indicating that MGA,

23  Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24  discover crucial information in this case, the Court would be sympathetic to the

25  appointment of an expert to investigate the same. Here, no such evidence exists.

26  The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27  documents that were handled so compromised that Mattel cannot perform the exact

28  same tests on those exact same marks as performed by Mr. Speckin.

EXHIBIT 19 PAGE 269

1    Indeed, the only basis for spoliation that Mattel has left to argue – that the

2    passage of time has left the ability to perform any meaningful ink testing at this time

3    problematic – is an argument that has nothing to do with MGA's conduct, but much

4    more with Mattel's own dereliction.  As the Court understands it, the process of dating

5    when ink was placed on a document has only a limited window of time in which it can

6    be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7    leaving nothing capable of being sampled after that point to test (save to acknowledge

8    that the ink in question was put on the paper some time more than 3 to 4 years ago).

9    Mattel essentially argues that the impossibility of testing ink after a certain period

10   mandates that, if the other side is going to test ink while "fresh" ink remains on the

11   document, that party has an obligation to inform the other side so that they can do the

12   same before the ink "dries out"; failure to do so renders the test performed something

13   that cannot be replicated.[4]  By Mattel's own admission, they knew there had been

14   testing done on the BRATZ original drawings as far back as November, 2004, during

15   Bryant's deposition testimony when they saw some of the original BRATZ drawings

16   (drawings that had been tested by Mr. Speckin five months earlier).  Rather than

17   immediately seeking the production of those documents and having its own expert

18   perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19   anything, either by way of court-pleadings or formal requests made to MGA and

20   Braynt, related to having ink tests performed on the documents.  Nowhere has Mattel

21

22        [4]  The basic factual assumption in Mattel's argument may indeed be faulty – that
23   when MGA tested the ink there was enough "fresh" ink to test.  Mr. Speckin states that
     "[i]nk takes approximately 3 to 4 years to dry on paper.  Thus, by testing the ink to
24   determine if it is dry, it can be determined whether the document was created within the
     last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years
25   old." (Decl. Erich J. Speckin ¶ 13).  Given that Mr. Speckin performed his ink dating
     test in June, 2004, at best he could determine whether the ink had been put on the
26   paper on or after June, 2000.  Beyond that time frame his test could not tell when the
     now-dried ink was marked on the document.  Given that the relevant period in question
27   in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would
     appear to be only marginally relevant in adducing proof as to when the BRATZ
28   drawings were made.

                                        14         EXHIBIT 19   PAGE 270

1  explained how MGA or Bryant had anything to do with it not having the ability to

2  perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3  was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4  valuable time on account of the stay, it could have at any time filed with this Court an

5  emergency request for relief from the stay to have such tests performed.  All it needed

6  to do was inform the Court that it had only a short period of time to perform the test on

7  account of the fact that ink dries; something which it never did in this case.

8       Mattel's citation to the case Edwardes v. Southampton Hospital Associates,

9  278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  Id. at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned."  Id. at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  on account of the passage of time that has elapsed.  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27       Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

EXHIBIT 19   PAGE 271

1   prejudicing Mattel's ability to pursue lines of potential evidence in this case.  The

2   expert declaration submitted by Mattel notes another possible spoliation of the original

3   drawings even if there remained enough of the pertinent portion of the document in

4   question to sample: The sampling process itself may have contaminated the

5   document in question by obliterating potential crucial clues that were on the document

6   or otherwise the sampling process led to the introduction of foreign materials onto the

7   documents themselves which may complicate any future analysis.  As explained by

8   Mattel's expert:

9           [P]erforming many such types of testing, even if described
            as "non-destructive," on a particular original document
10          carries the risk that potential evidence on it, including
            indentations in the paper fiber, might be contaminated or
11          destroyed in the process.  Furthermore, the order of the
            types of testing to be performed on a given document
12          might have an impact on developing potential evidence
            during subsequent examinations. . . .
13
                . . . . [With respect to the original BRATZ drawings
14          containing holes in them,] it is possible that the destructive
            testing performed on the document may have caused
15          some form of contamination and/or alteration, which carries
            the further prospect that subsequent examinations by
16          experts may not enable them to develop potential evidence
            or the same evidence that the other [earlier] expert
17          developed.

18   (Decl. Lloyd Cunningham ¶¶ 4-5).

19          MGA has rebutted this risk of contamination argument by proffering Mr.

20   Speckin's declaration, the expert who actually performed the tests in question.  Mr.

21   Speckin states that he "exercised the utmost care in handling the documents [he]

22   tested," that a number of the tests he performed on the documents "has absolutely no

23   effect on the tested document whatsoever," and that with respect to those tests that

24   could effect the document he followed established procedures in carrying out the test

25   in question.  (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13).  Nowhere has Mattel

26   proffered any evidence rebutting or calling into question Mr. Speckin's

27   representations.  The Court therefore finds that, based on the evidence that is

28   currently before it, Mattel has not established a colorable claim of spoliation by way of

EXHIBIT 19   PAGE 272

1    contamination in the tests MGA performed on the documents in question.

2         b.    <u>Alteration of Fax Headers</u>

3         Insofar as O'Connor's deposition testimony relating to the white out of the fax

4    header on the October, 2000, contract between Bryant and MGA, this too is

5    downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6    Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7    Bryant readily admitted that fact at his deposition, which took place <u>before</u> Ms.

8    O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)).  This argument seeks

9    to compare apples to oranges.  While it may be true that <u>now</u> there is no dispute by

10   MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11   Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12   was not apparent.  It is from that perspective in time – the prologue to the litigation —

13   that O'Connor's deposition testimony is to be judged.  And from that perspective her

14   testimony calls into question MGA's handling of relevant documents in its possession.

15        When the contract was first executed there is no indication that MGA and/or

16   Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17   was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18   Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19   fax header clearly indicates that they would not admit to the fact.  If MGA mistreated

20   this document where an open issue existed, it is not unreasonable to infer that it may

21   have been just as cavalier with its obligations to maintain the other documents in their

22   possession – say, for instance, the original BRATZ drawings – where similar open

23   issues remained.  This concern with MGA's handling of documents in its possession at

24   the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25   footnote to their opposition that the original to this contract, the one which they

26   describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6).  Indeed, it

27   has been suggested that MGA and Bryant or their counsel have made representations

28   that they are not sure of the exact whereabouts of a number of the original BRATZ

17

EXHIBIT 19 PAGE 273

1  drawings.  (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2  23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3  majority of the originals of BRATZ drawings and sketches, and further claimed not to

4  know where those originals were located")).

5       All that being said, the Court does not find that the alteration of the fax header

6  on the original Bryant/MGA contract warrants the appointment of an expert at this

7  time.  Ms. O'Connor testified that, other than this one instance, she is aware of no

8  other documents that were purposefully altered by MGA.  While the evidence related

9  to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10  more than one document had been tampered with by MGA personnel, the Court has

11  nothing at this time to basis that conclusion on other than speculation and conjecture.

12  Without any tangible, concrete proof that MGA's mishandling of documents was more

13  widespread, the Court is left with what appears simply as an isolated instance of

14  tampering.

15       Accordingly, the motion for appointment of expert witnesses is **DENIED.**

16       IT IS SO ORDERED.

17

18  DATE: 8-9-06 .

19

20

21  STEPHEN G. LARSON
    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

18

EXHIBIT 19 PAGE 274

Exhibit  20

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware Corporation,

          Plaintiff,

      vs.            CASE NO. CV 04-9059 NM
                            (RJBx)

CARTER BRYANT, an individual, and
DOES 1 through 10, Inclusive.

          Defendants.

_____

CARTER BRYANT, on behalf of himself,
all present and former employees of
Mattel, Inc., and the general public.

          Cross-Complaint.

      vs.

MATTEL, INC.,
a Delaware corporation.

          Cross-Defendant.

_____

**CERTIFIED COPY**

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF JACQUELINE RAMONA PRINCE

Tuesday, December 21, 2004

Atlanta, Georgia

Reported by:
Kendra R. Bridges
B-2194 Court Reporter
Court Reporter/Notary Public
JOB NO. 29654

EXHIBIT 20 PAGE 275



www.sarnoffcourtreporters.com
46 Corporate Park, Suite 100   445 South Figueroa St., Suite 2950
Irvine, CA  92606          Los Angeles, CA  90071

phone  877.955.3855
fax     949.955.3854

**SARNOFF**
*Court Reporters and
Legal Technologies*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

4    MATTEL, INC., a Delaware Corporation,

5                    Plaintiff,

6          vs.                 CASE NO. CV 04-9059 NM
                                        (RJBx)
7    CARTER BRYANT, an individual, and
     DOES 1 through 10, Inclusive.
8
                    Defendants.
9    _____

     CARTER BRYANT, on behalf of himself,
10   all present and former employees of
     Mattel, Inc., and the general public.
11
                    Cross-Complaint.
12
             vs.
13
     MATTEL, INC.,
14   a Delaware corporation.

15                  Cross-Defendant.
     _____
16

17

18          Deposition of JACQUELINE PRINCE, taken by the

19   Defendant, at 999 Peachtree Street, Suite 2300, Atlanta,

20   Georgia, on the 21st day of December, 2004, at 9:40 a.m.,

21   before Kendra R. Bridges, Registered Professional

22   Reporter and Notary Public.

23

24                              EXHIBIT 20 PAGE 276

25

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   APPEARANCES OF COUNSEL:

2

3   For the Plaintiff and Cross-Defendant:

4   MR. MICHAEL T. ZELLER, Esq.

5   Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP

6   865 South Figueroa Street

7   Tenth Floor

8   Los Angeles, California  90017

9   213-624-7707

10   213-624-0643

11   mtz@quinnemanuel.com

12

13   MICHAEL MOORE, Esq.

14   Mattel, Inc.

15   333 Continental Boulevard

16   El Segundo, California  90245

17   310-252-2000

18   310-252-3861

19   michael.moore@mattel.com

20

21

22

23

24

25   EXHIBIT 20 PAGE 277

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    APPEARANCES OF COUNSEL:  (CONTINUED)

2

3    For the Defendants:

4    LARRY W. MCFARLAND, Esq.

5    KEATS MCFARLAND & WILSON

6    9720 Wilshire Boulevard

7    Penthouse Suite

8    Beverly Hills, California   90212

9    310-777-3750

10    310-860-0363

11    lmcfarland@kmwlaw.com

12

13    DONALD W. BENSON, Esq.

14    LITTLER MEDELSON

15    3348 Peachtree Road, NE

16    Suite 1100

17    Atlanta, Georgia   30326

18    404-233-0330

19    404-233-2361

20    dbenson@littler.com

21

22

23

24

25                          EXHIBIT _20_ PAGE _278_

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    APPEARANCES OF COUNSEL:  (CONTINUED)

2

3    For Ms. Prince:

4    DANIEL J. WARREN, Esq.

5    Sutherland Asbill & Brennan, LLP

6    999 Peachtree Street

7    Suite 2300

8    Atlanta, Georgia   30309

9    404-853-8028

10    404-853-8806

11    djwarren@sablaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                    EXHIBIT 20  PAGE 279

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.  Yes.  Isn't that the same as this one?

2      Q.  (By Mr. Zeller)  Yeah, perhaps we should clarify

3   this point here.  You'll see that there are some

4   additional handwritten notations on Bryant 211 as

5   compared to the other drawing of the -- of the character.

6   For the record, the other drawing is 202.  You'll see

7   that the words 90 percent are written on 211.  They do

8   not appear on 202.

9      A.  So it's the same drawing.

10      Q.  Well, I'm about to ask you something about those

11   lines that I'm hoping to get clarification on.

12      A.  It looks like the same drawing to me.

13      Q.  Do you have any recollection of the words 90

14   percent being on the drawing that you notarized of this

15   particular figure?

16      A.  I don't recall.

17      Q.  So you can't say for certain that that

18   handwriting was on the drawing that you notarized?

19      A.  No, I can't say.

20      Q.  And you can't be certain that the version that's

21   marked as Bryant 202 is the one that you notarized as

22   compared to the drawing that bears the number 211?

23      MR. MCFARLAND:  I will just object.  Obviously,

24      what we're dealing with here are copies --

25      THE WITNESS:  Yeah.

EXHIBIT __20__ PAGE __280__

170

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       MR. MCFARLAND:  -- of what she notarized.  So

2    the witness is not reviewing the original documents

3    that she notarized and you're asking her to conduct

4    comparisons between copies; and therefore I think

5    we're going to get some confusion with the

6    testimony.

7       THE WITNESS:  Because I don't understand why

8    the -- I don't know what good it is for me to look

9    at these, because this you can't see the seal, on

10   this one you can.  So it doesn't make sense to me

11   why this isn't showing up, the stamp.

12   Q.  (By Mr. Zeller)  Did you notarize more than one

13 drawing that was of the head with no hair and the body in

14 this pose that is depicted in 202?

15   A.  I don't remember.

16   Q.  Turning to Bryant 214 --

17   A.  Uh-huh.

18   Q.  -- part of Exhibit 62, do you see the words 85

19 percent?

20   A.  Yes.

21   Q.  Do you know if that writing was on the drawing

22 that you notarized?

23   A.  I don't remember.

24   Q.  Turning to Bryant 301, did you notarize a

25 drawing that had these faces and heads on them along with

EXHIBIT 20  PAGE 281

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the additional handwriting?

2        A.   I don't recall seeing that.

3        Q.   And is the sense --

4        A.   Yeah, I don't recall seeing all these markings

5    on anything.

6        Q.   And so the record is clear, the markings that

7    you're referring to are the words that say, Please see

8    Jay's glamour drawing for more accurate lip shape basic

9    actual size three/four view heads?

10       A.   Yeah.  That wasn't on anything I notarized.

11   There were just drawings, the ones I notarized.  They

12   didn't have -- I don't know if you'd call that specs or

13   what, but it didn't have all that.

14       Q.   You don't recall there being written words other

15   than the individual character names on the drawings?

16       A.   I don't recall this.  I don't recall this.

17       Q.   And so the record's clear --

18       A.   I don't recall this.

19            MR. WARREN:  You have to use the numbers.

20            THE WITNESS:  Okay.  On page -- on drawing 301,

21       I don't recall this and all these markings showing

22       the sizes and the -- and this.

23       Q.   (By Mr. Zeller)  And the this you're referring

24   to is that an additional drawing of a -- of a head?

25       A.   Right.  And the markings with the arrows.

EXHIBIT 30 PAGE 282

172

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  And then the handwriting as well?  Again setting
2  aside the character names, the individual character
3  names.
4    A.  Yeah, I don't remember seeing that.
5    Q.  You do recall on the drawings that you saw that
6  the individual character names were written down?
7    A.  Yes, I remember that.
8    Q.  Do you recall handwriting of any kind other than
9  the individual character names being on the drawings that
10  you saw?
11    A.  I don't remember any handwriting.
12    Q.  And so the record is clear, when you're
13  referring to the drawings that you don't recall seeing in
14  that form, you're referring to Bryant 301?
15    A.  Right.  Let me go back to that other one.
16    Q.  And Bryant 1003, which is the next one?
17    A.  Right.  I don't recall seeing all of those
18  markings and writing.
19    Q.  Do you have knowledge or information from any
20  source as to whether any changes were made to the
21  drawings after you notarized them?
22    A.  I wouldn't know.
23    Q.  Turning back for a moment to Bryant 192, which
24  is the first page.
25    A.  Yeah.

EXHIBIT 20  PAGE 283

173

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  You'll see here that there's a -- this is a

2  sketch that has four heads on it?

3    A.  Right.

4    Q.  Did you notarize one drawing that was just of

5  heads or more than one?

6    A.  It seems like these were all on one page.  It's

7  hard to remember the details.

8    Q.  Let me try it this way.  Do you have a

9  recollection of notarizing more than one drawing that had

10  just heads on it?

11    A.  I just don't remember.

12    Q.  Directing your attention to the specific names

13  that are on page 192 --

14    A.  Yeah.

15    Q.  -- it has Jay, Lupe, and Zoe and then how were

16  you pronouncing the other one?

17    A.  Hallyday?

18    Q.  Hallyday.  Were those names on the drawings --

19    A.  Yes.

20    Q.  -- that you notarized?

21    A.  Yes.  I remember seeing those.

22    Q.  And do you recall seeing this Hallyday name in

23  particular?

24    A.  Yes, because I asked him how to pronounce it.

25    Q.  And you'll see here that it's spelled

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    H-a-l-l-y-d-a-y on the drawing?

2         A.   Right.

3         Q.   Turning back to your notary journal, do you see

4    it has an entry that spells Hallyday differently?

5         A.   Yeah.

6         Q.   Do you have any explanation to why it's

7    different?

8         I have no idea.  Maybe he told me and I didn't look

9    at it.  I don't know; I don't know why it's spelled

10   differently.

11        Q.   But beyond what it is that you know for a fact,

12   do you have any explanation for that?

13        A.   No.

14        Q.   Turning to the next page, Bryant 194, you'll see

15   that the word Bratz is on this drawing?

16        A.   Uh-huh.  Yes.

17        Q.   Do you have a specific recollection of that word

18   being on this drawing when you notarized it?

19        A.   No.

20        Q.   During the conversation that you had with

21   Mr. Bryant about the drawings, did he point out any of

22   them in particular and discuss them?

23        A.   No.

24        Q.   So he didn't express anything in particular

25   about any of the specific drawings?

EXHIBIT 20  PAGE 285

175

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.  No.  He just asked me what did I think of them.

2    Q.  Did you look at them all at the same time and

3    flip through them or did you go through them one by one

4    as they were being notarized?

5    A.  At first I looked at all of them.  And then I

6    notarized one by one.

7    Q.  Do you recall how long approximately Mr. Bryant

8    was over at your house on that day?

9    A.  It wasn't very long.  I don't really know.

10    Maybe 40 minutes.  I'm not really sure.

11    Q.  Do you have a recollection about how long it

12    took to go through and notarize the drawings that you

13    notarized and then do the entries in the journal?

14    A.  Maybe 30 minutes.  I don't know.

15    Q.  That's your best recollection?

16    A.  Yes.

17    Q.  I've asked a similar question before, but let me

18    ask something even more broadly than this --

19    A.  Uh-huh.

20    Q.  -- than I had asked before.

21    Had you ever notarized anything for Mr. Bryant

22    other than the drawings?

23    A.  No.

24    Q.  I'd like to turn back to your journal for a

25    moment, which we marked as Exhibit 60, and let me ask

EXHIBIT 20 PAGE 286    176

Page 199

1

2    STATE OF GEORGIA:

3    COUNTY OF FULTON:

4    I hereby certify that the foregoing

5    deposition was stenographically recorded by me, as

6    stated in the caption.   The deponent was duly sworn

7    to tell the truth, the whole truth, and nothing but

8    the truth.   The colloquies, statements, questions,

9    and answers thereto were reduced to typewriting

10   under my direction and supervision; that the

11   deposition is a true and correct record of the

12   testimony/evidence given by the deponent.

13   I further certify that I am not a relative,

14   an employee of attorney or counsel of the parties,

15   nor am I financially interested in the action.

16                 This, the 21st day of December, 2004

17

18            _Kendra R. Bridges_

19            KENDRA R. BRIDGES

20            Certified Court Reporter

21            (B-2194) and Notary Public

22            My commission expires on the

23            5th day of August 2008.

24

25

EXHIBIT 20  PAGE 287

Exhibit  21

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, an individual, )

                Plaintiff, )

     vs.               )    Case No.

MATTEL, INC., a Delaware   ) CV 04-09049 SGL

corporation,          )    (RNBx)

            Defendant. )


CONFIDENTIAL - ATTORNEYS' EYES ONLY


      The videotaped deposition of

STEVEN LINKER, called as a witness for examination,

taken pursuant to the Federal Rules of Civil

Procedure of the United States District Courts

pertaining to the taking of depositions, taken

before PAULINE M. VARGO, a Notary Public within and

for the County of DuPage, State of Illinois, and a

Certified Shorthand Reporter of said state, C.S.R.

No. 84-1573, at Suite 4000, One IBM Plaza, Chicago,

Illinois, on the 13th day of September, A.D. 2006,

at 9:50 a.m.

EXHIBIT 21 PAGE 288

2

```
 1          PRESENT:

 2              LITTLER MENDELSON,

 3              (2049 Century Park East, 5th Floor,

 4              Los Angeles, California  90067.3107,

 5              310.712.7314), by:

 6              MR. DOUGLAS A. WICKHAM,

 7                  appeared on behalf of the Plaintiff

 8                  Carter Bryant;

 9

10               MATTEL, INC.,

11              (333 Continental Boulevard,

12              El Segundo, California  90245.5012,

13              310.252.6733), by:

14              MR. MICHAEL MOORE,

15              Senior Counsel,

16                  -and-

17              QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP,

18              (865 South Figueroa Street, 10th Floor,

19              Los Angeles, California  90017.2543,

20              213.443.3000), by:

21              MR. MICHAEL T. ZELLER,

22              MS. TANIA KREBS,

23                  appeared on behalf of Defendant

24                  Mattel, Inc.;
```

EXHIBIT 21   PAGE 289

3

1          PRESENT (Continued):

2              O'MELVENY & MYERS, LLP,

3              (Times Square Tower,

4              7 Times Square,

5              New York, New York  10036,

6              212.326.2000), by:

7          MS. DALE M. CENDALI,

8                  appeared on behalf of Intervenor

9                  MGA Entertainment;

10

11         BERMAN, MAUSNER & RESSER,

12         (11601 Wilshire Boulevard, Suite 600,

13         Los Angeles, California  90025,

14         310.473.3333), by:

15         MR. LAURENCE M. BERMAN,

16                 appeared on behalf of the Deponent.

17

18

19

20

21

22

23

24                    EXHIBIT 21  PAGE 290

```
 1        ALSO PRESENT:
 2              MR. MICHAEL A. HALL,
 3                   Paralegal, Littler Mendelson;
 4              MR. CARTER BRYANT.
 5
 6        VIDEOGRAPHER:
 7              MR. JOSEPH BURKE,
 8              Esquire Deposition Services.
 9
10        REPORTED BY:
11              PAULINE M. VARGO,
12   09:46:12  C.S.R. No. 84-1573.
13
14
15
16
17
18
19
20
21
22
23
24
```

EXHIBIT _21_  PAGE _291_

| | | |
|---|---|---|
| 1 | 14:03:35 | BY MR. ZELLER: |
| 2 | 14:03:35 | Q.    Yes, right. |
| 3 | 14:03:36 | A.    No.  We didn't continue anything after |
| 4 | 14:03:39 | this.  We never heard back. |
| 5 | 14:03:41 | Q.    So MGA never responded to this? |
| 6 | 14:03:44 | A.    We never replied, yeah, so we were |
| 7 | 14:03:46 | caught off guard. |
| 8 | 14:03:48 | Q.    Do you have an understanding as to why |
| 9 | 14:03:51 | you didn't receive a further response? |
| 10 | 14:03:53 | A.    No. |
| 11 | 14:03:58 | Q.    Did you ever talk to anybody at MGA |
| 12 | 14:04:00 | about this last revised quote that was sent? |
| 13 | 14:04:03 | A.    No. |
| 14 | 14:04:46 | Q.    I am going to show you a series of |
| 15 | 14:04:49 | drawings that were previously marked as Deposition |
| 16 | 14:04:53 | Exhibit 10.  For the record, the first page is a |
| 17 | 14:04:59 | affirmation in connection with some MGA litigation |
| 18 | 14:05:04 | in Hong Kong made by a Lee Shiu, S-h-i-u, Cheung, |
| 19 | 14:05:11 | C-h-e-u-n-g, dated June 18th, 2002, that describes, |
| 20 | 14:05:19 | quote, "Copies of 17 initial concept and design |
| 21 | 14:05:22 | drawings of the Bratz dolls made by Mr. Bryant in |
| 22 | 14:05:26 | the year 2000," end quote. |
| 23 | | MR. BERMAN:  You are not going to mark those. |
| .4 | | Are you going to mark those? |

EXHIBIT 21  PAGE 292

131

| | | |
|---|---|---|
| 1 | | MR. ZELLER:   No.   They will be separately |
| 2 | 14:05:40 | marked.   Under the rules in the Central District |
| 3 | 14:05:43 | they -- |
| 4 | 14:05:44 | MR. BERMAN:   Retain the same number. |
| 5 | | MR. ZELLER:   Right. |
| 6 | | MR. BERMAN:   You had handed it to him, so. . . |
| 7 | | MR. ZELLER:   No. |
| 8 | 14:05:53 | BY MR. ZELLER: |
| 9 | 14:05:53 | Q.   So if you would let me know when you |
| 10 | 14:05:55 | have had a chance to take a look at those drawings |
| 11 | 14:05:57 | and the other pages marked as Exhibit 10. |
| 12 | 14:06:33 | A.   Okay. |
| 13 | 14:06:39 | Q.   So with respect to Exhibit 10, you can |
| 14 | 14:06:41 | ignore the first page for purposes of my questions. |
| 15 | 14:06:47 | First, just focusing on the figures, setting aside |
| 16 | 14:06:51 | the handwriting and that sort of thing on these |
| 17 | 14:06:54 | drawings, are these -- do you recognize these as |
| 18 | 14:06:59 | copies of any of the artboards that you saw at the |
| 19 | 14:07:03 | Starbucks meeting on or about October 10th or 11th, |
| 20 | 14:07:07 | 2000? |
| 21 | 14:07:07 | A.   Yes. |
| 22 | 14:07:09 | Q.   Those were the artboards that Mr. Bryant |
| 23 | 14:07:12 | showed you of Bratz dolls? |
| .4 | 14:07:13 | A.   Yes. |

EXHIBIT 21   PAGE 293

132

| | | |
|---|---|---|
| 1 | 14:07:19 | Q.    Directing your attention to the second |
| 2 | 14:07:22 | page of Exhibit 10, which is the one that's M1489? |
| 3 | 14:07:27 | A.    1489? |
| 4 | 14:07:30 | Q.    Right. |
| 5 | 14:07:30 | A.    Yes. |
| 6 | 14:07:30 | Q.    At the bottom it says, "All rights |
| 7 | 14:07:33 | assigned to ABC International Traders," and then it |
| 8 | 14:07:37 | continues on.  It has a signature, a date and then |
| 9 | 14:07:40 | a contract date.  Do you see that material there in |
| 10 | 14:07:43 | the lower right-hand corner? |
| 11 | 14:07:45 | A.    Correct, yes. |
| 12 | 14:07:46 | Q.    Was any of that on the artboards that |
| 13 | 14:07:49 | you saw at the Starbucks meeting in October of |
| 14 | 14:07:54 | 2000? |
| 15 | 14:07:54 | A.    No. |
| 16 | 14:07:56 | Q.    Was this information on any of the |
| 17 | 14:08:01 | artboard artwork that you saw, whether it was the |
| 18 | 14:08:03 | original or the copies, back in October of 2000? |
| 19 | 14:08:06 | A.    No, I did not see that stuff on those |
| 20 | 14:08:08 | boards. |
| 21 | 14:08:09 | Q.    Was it on there? |
| 22 | 14:08:10 | A.    It wasn't on there. |
| 23 | 14:08:14 | Q.    Directing your attention to the next |
| 4 | 14:08:16 | page, M1490, you will see that there is a |

EXHIBIT __21__ PAGE __294__

| | | |
|---|---|---|
| 1 | 14:08:21 | handwritten notation that looks like a circle "C" |
| 2 | 14:08:24 | and then 8/1998.  Do you see that? |
| 3 | 14:08:28 | A.    Yes. |
| 4 | 14:08:29 | Q.    Was that handwritten notation on any of |
| 5 | 14:08:33 | the artboards that you saw from Mr. Bryant or MGA |
| 6 | 14:08:37 | in October of 2000? |
| 7 | 14:08:39 | A.    No. |
| 8 | 14:08:41 | Q.    Is the same true for the rest of the |
| 9 | 14:08:44 | information there in the lower right-hand corner, |
| 10 | 14:08:46 | "all rights assigned" and so on and then ends with |
| 11 | 14:08:49 | the handwritten note "contract date 9/5/00"? |
| 12 | 14:08:54 | A.    The same is true.  I did not see this |
| 13 | 14:08:56 | stuff on those boards. |
| 14 | 14:08:58 | Q.    None of that information was on the |
| 15 | 14:09:00 | artboards that you saw? |
| 16 | 14:09:01 | A.    No. |
| 17 | 14:09:04 | MR. WICKHAM:  I will actually -- counsel, I |
| 18 | 14:09:05 | think that you may have misread what that number |
| 19 | 14:09:07 | is, and actually, the number that you just read, |
| 20 | 14:09:10 | you said it was 9/5.  It very well could be 9/18, |
| 21 | 14:09:14 | but the number itself is a little bit |
| 22 | | unintelligible. |
| 23 | 14:09:18 | MR. ZELLER:  Or 15.  So let me -- I will |
| 24 | 14:09:21 | rephrase the question then. |

EXHIBIT 21   PAGE 295

```
 1   14:09:22  BY MR. ZELLER:

 2   14:09:23      Q.    You will see the typewritten portion,

 3   14:09:26  "all rights assigned to ABC International Traders"?

 4   14:09:31      A.    Yes.

 5   14:09:31      Q.    And then it ends with "contract date"

 6   14:09:33  and then some additional handwriting there; it

 7   14:09:35  looks like a date of some kind, perhaps?

 8   14:09:37      A.    Correct.

 9   14:09:38      Q.    Was any of that information on any of

10   14:09:40  the artboards that you saw from Mr. Bryant or MGA

11   14:09:45  in October of 2000?

12   14:09:46      A.    No.

13   14:09:50      Q.    Directing your attention to the next

14   14:09:52  page, M1491, was any of the information there in

15   14:09:58  the lower right-hand corner starting with "all

16   14:10:00  rights assigned" and then again ending with a

17   14:10:03  handwritten notation, a contract date and then a

18   14:10:07  handwritten date, was any of that on the artboards

19   14:10:09  or the other artwork that you saw pertaining to

20   14:10:13  Bratz shown?

21   14:10:14      MS. CENDALI:  Mr. Zeller, this is a waste of

22   14:10:16  time.  Why don't you just ask him for each of these

23   14:10:18  whether that information was there or not and move

.4   14:10:21  on?
```

EXHIBIT 21 PAGE 296

```
 1   14:10:21        MR. ZELLER:  Well, I will ask the question as
 2   14:10:24   I would like.  You guys were the ones who were
 3   14:10:28   objecting earlier when I tried to do it in a more
 4   14:10:30   leading form on foundational things just to get
 5   14:10:33   through but --
 6   14:10:34        MS. CENDALI:  I am not leading.  I am not
 7   14:10:34   leading.  You can ask it without leading.  You can
 8   14:10:37   also ask it without going through each one and
 9   14:10:39   asking exactly the same thing, but it's up to you.
10   14:10:41        MR. ZELLER:  But the information on these
11   14:10:43   things is different, so that's why I am doing it.
12              BY MR. ZELLER:
13   14:10:48        Q.    So we are discussing Deposition Exhibit
14   14:10:51   No. 10, specifically M1491.  I am sorry.  Was I on
15   14:11:03   90?  Let me ask that question then as to M1491.
16   14:11:11   You will see the information in the lower
17   14:11:13   right-hand corner, it says "all rights assigned,"
18   14:11:16   and then it continues on and ends with a
19   14:11:19   handwritten notation that starts off "contract
20   14:11:22   date."
21   14:11:22        A.    Yes.
22   14:11:22        Q.    Was that information on any of the
23   14:11:24   artboards that either Mr. Bryant or MGA showed to
24   14:11:27   you in October of 2000?
```

EXHIBIT 21  PAGE 297

| | | |
|---|---|---|
| 1 | 14:11:28 | A.    No, it wasn't. |
| 2 | 14:11:31 | Q.    Directing your attention to the next |
| 3 | 14:11:33 | page, M1492, you will see that this drawing has a |
| 4 | 14:11:39 | circle C/1998. |
| 5 | 14:11:43 | A.    Um-hmm. |
| 6 | 14:11:45 | Q.    Was that handwritten notation or date |
| 7 | 14:11:47 | written on any of the artboards that you saw from |
| 8 | 14:11:50 | Carter Bryant or MGA in October of 2000 -- |
| 9 | 14:11:53 | A.    No. |
| 10 | 14:11:54 | Q.    -- or at any other time? |
| 11 | 14:11:57 | A.    No, I have not seen that. |
| 12 | 14:11:58 | Q.    Was the same true of the rest of the |
| 13 | 14:12:00 | printed information and the other handwriting that |
| 14 | 14:12:03 | continues on on 1492? |
| 15 | 14:12:06 | A.    The same is true. |
| 16 | 14:12:10 | Q.    Was the same true for 1493? |
| 17 | 14:12:14 | A.    Yes. |
| 18 | 14:12:18 | Q.    Is the same true for M1494? |
| 19 | 14:12:24 | A.    Yes. |
| 20 | 14:12:26 | Q.    Directing your attention to Page M1495 |
| 21 | 14:12:31 | of Deposition Exhibit 10, you will see that there |
| 22 | 14:12:34 | is a handwritten circle "C" with 8/1998 on it? |
| 23 | 14:12:39 | A.    Yes. |
| 24 | 14:12:40 | Q.    Was that on the artboards that |

EXHIBIT 21   PAGE 298

157

| | | |
|---|---|---|
| 1 | 14:12:44 | Mr. Bryant or MGA showed to you in October of 2000? |
| 2 | 14:12:49 | A.    No. |
| 3 | 14:12:51 | Q.    Is the same true for the rest of the |
| 4 | 14:12:53 | information that's there on M1495 that begins "all |
| 5 | 14:12:58 | rights assigned" and then continues on to that |
| 6 | 14:13:00 | handwritten notation contract date? |
| 7 | 14:13:02 | A.    The same is true. |
| 8 | 14:13:04 | Q.    Is the same true for the next page, |
| 9 | 14:13:06 | M1496? |
| 10 | 14:13:12 | A.    The same is true. |
| 11 | 14:13:16 | Q.    Directing your attention to M1497, you |
| 12 | 14:13:22 | will see that that has a handwritten notation, |
| 13 | 14:13:27 | 8/11 -- excuse me -- 8/1998.  Was that handwritten |
| 14 | 14:13:34 | notation or that date on the artboards or artwork |
| 15 | 14:13:39 | that Carter Bryant and MGA showed you in October of |
| 16 | 14:13:42 | 2000? |
| 17 | 14:13:43 | A.    No. |
| 18 | 14:13:44 | Q.    Is the same true of the additional |
| 19 | 14:13:50 | written information on this page beginning with |
| 20 | 14:13:52 | "all rights assigned to" and then ending with that |
| 21 | 14:13:56 | handwritten notation "contract date" and then with |
| 22 | 14:13:58 | a date? |
| 23 | 14:13:59 | A.    The same is true. |
| .4 | 14:14:01 | Q.    Is the same true for 1498? |

EXHIBIT 21  PAGE 299

138

```
1    14:14:07      A.      The same is true.

2    14:14:09      Q.      Is the same true for 1499?

3    14:14:14      A.      The same is true.

4    14:14:17      Q.      Is the same true for the next page,

5    14:14:20   M1500?

6    14:14:29      A.      In regards to this written stuff on the

7    14:14:31   bottom?

8    14:14:31      Q.      Yes.

9    14:14:32      A.      Yes, the same is true.

10   14:14:32      Q.      Is the same true for the next page,

11   14:14:35   M501?

12   14:14:39      A.      It's upside-down.  The same is true.

13   14:15:11      MR. ZELLER:  Would you please mark as

14   14:15:12   Exhibit 328 a one-page document which appears to be

15   14:15:16   an e-mail from Liz Hogan to Paula Treantafelles

16   14:15:19   with a CC to Steve Linker dated October 12, 2000.

17   14:15:25   It bears Bates number SL 0004.

18                           (WHEREUPON, a certain document was

19                           marked Deposition Exhibit No. 328,

20   14:15:54                 for identification, as of 9/13/06.)

21   14:15:54      MS. CENDALI:  Do you have copies of that for

22   14:15:56   us?

23   14:15:57      MS. KREBS:  It is in the Steve Linker

.4   14:15:59   production.  SL 0004.
```

EXHIBIT 21 PAGE 300

139

```
 1   14:16:10        MS. CENDALI:   Thank you.

 2              BY MR. ZELLER:

 3   14:16:19        Q.    Do you recognize what we have marked as

 4   14:16:21   Exhibit 328?

 5   14:16:22        A.    Yes, I do.

 6   14:16:23        Q.    Please tell us what this is, at least

 7   14:16:27   the typewritten portion for now?

 8   14:16:30        A.    These are lists of questions regarding

 9   14:16:34   packaging direction for product Scooter Samantha

10   14:16:37   for MGA, for Paula Treantafelles.   These were our

11   14:16:43   questions.

12   14:16:44        Q.    And was this e-mail sent to MGA?

13   14:16:49        A.    Sorry?

14   14:16:50        Q.    Was this e-mail sent to MGA?

15   14:16:52        A.    Yes.

16   14:16:53        Q.    To Paula Treantafelles specifically?

17   14:16:55        A.    Yes.

18   14:16:57        Q.    Did you participate in creating this

19   14:16:58   e-mail?

20   14:16:59        A.    Yes.

21   14:16:59        Q.    And please tell me what your

22   14:17:03   participation was, generally speaking.

23   14:17:05        A.    I conversed with Liz Hogan to come up

24   14:17:08   with these questions of certain details that we
```

EXHIBIT 21 PAGE 301