**EXHIBIT 1**

JUN 2 0 2006

## PRIORITY SEND & ENTER JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES – GENERAL

Case No.   CV 05-02727 SGL(RNBx)                     Date: June 19, 2006

Title:   MGA ENTERTAINMENT, INC. -v- MATTEL, INC.
=================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          Jim Holmes                          None Present
          Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:      ATTORNEYS PRESENT FOR DEFENDANTS:

None present                           None present

PROCEEDINGS:   MINUTE ORDER (IN CHAMBERS) RE CONSOLIDATION

     On May 16, 2006, this Court issued orders to show cause why the following three cases should not be consolidated: Bryant v. Mattel, Inc., CV 04-09049; Mattel, Inc. v. Bryant, CV 04-09059; MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727. All parties have responded, and the Court has reviewed those responses. Because the Court has determined that these actions involve a number of common issues of law and fact, the Court orders that these three cases be consolidated for all purposes.

     Mattel's request that the Court stay MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727, pending the outcome of the other two cases. The Court denies this request.

     For ease of record keeping, the Court ORDERS that all further documents and proceedings occur under Bryant v. Mattel, 04-09049 SGL, and that Case Number CV 04-09059 and 05-02727 be CLOSED by the Clerk. Counsel are directed to file all further documents under Case Number CV 04-09049. The first paragraph of any document filed with the Court shall inform the Court to which case(s) the document relates.

     IT IS SO ORDERED.

MINUTES FORM 90
CIVIL – GEN

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ✓    Send ✓
Entered       Closed ✓
JS-5/JS-6 ✓   JS-2/JS-3 ____   /Initials of Deputy Clerk ___ jh
Scan Only ____   Docketed on CM ____
THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

JUN 2 0 2006
EASTERN DIVISION

EXHIBIT ___1___ PAGE __4__

#47

**EXHIBIT  2**

**COPY**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 90378)
2    Michael T. Zeller (Bar No. 196417)
   865 South Figueroa Street, 10th Floor
3  Los Angeles, California 90017
   Telephone:   (213) 443-3000
4  Facsimile:   (213) 443-3100

5  Attorneys for Plaintiff
   Mattel, Inc.

6

7

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2004

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
        SUE GABB

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware corporation,     )  CASE NO.  BC314398
                                              )
12                 Plaintiff,                  )
                                              )  COMPLAINT FOR:
13         v.                                  )
                                              )  (1)  BREACH OF CONTRACT;
14                                             )  (2)  BREACH OF FIDUCIARY
                                              )       DUTY;
15  CARTER BRYANT, an individual; and         )  (3)  BREACH OF DUTY OF
16  DOES 1 through 10, inclusive,             )       LOYALTY;
                                              )  (4)  UNJUST ENRICHMENT; AND
17                 Defendants.                 )  (5)  CONVERSION
                                              )
18                                             )

19

20

21

22

23

24

25

26

27

28

07209/579342.1

                                                        COMPLAINT

EXHIBIT  2   PAGE  5

1    Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter
2  Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as
3  "defendants") and alleges as follows:

4

5                                          Parties

6

7         1.      Mattel is a corporation organized and existing under the laws of the
8  State of Delaware and has its principal place of business in El Segundo, California.

9         2.      Mattel is informed and believes, and on that basis alleges, that defendant
10 Bryant is an individual currently residing in Springfield, Missouri.

11        3.      The true names and capacities of defendants sued herein as Does 1
12 through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such
13 fictitious names.  Mattel will amend this Complaint to allege their true names and capacities
14 when the same are ascertained.

15        4.      Mattel is informed and believes, and on that basis alleges, that at all
16 times relevant herein, defendants, and each of them, were acting in concert and active
17 participation with each other in committing the wrongful acts alleged herein, and were the
18 agents of each other, and in doing the things alleged herein, each defendant was acting
19 within the course and scope of his, her or its agency and was subject to and under the
20 supervision of, and was acting with the knowledge of, his, her or its co-defendants.

21

22                                 Jurisdiction and Venue

23

24        5.      During the time of the acts complained of herein, Bryant was employed
25 by Mattel in, and was a resident of, Los Angeles County.  Bryant's contracts with Mattel that
26 are at issue in this action were executed, performed and breached by Bryant in Los Angeles
27 County.  In addition, defendants committed the tortious conduct alleged herein while
28 physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

07209/579342.1

-2-

EXHIBIT _2_ PAGE _6_                                              COMPLAINT

1  defendants' other wrongful acts in Los Angeles County.  Accordingly, this Court has

2  personal jurisdiction over defendants.

3      6.     Venue is proper pursuant to Code of Civil Procedure §§ 393 and 395(a),

4  as the causes of action arose in Los Angeles County, the contractual obligations at issue were

5  incurred, were to be performed and were breached by Bryant in Los Angeles County, and

6  Bryant does not currently reside in California.

7

8                          Factual Background

9

10     7.     Mattel is a long standing and successful independent manufacturer and

11  marketer of toys, dolls, games and stuffed toys and animals.  Mattel was founded in 1945 by

12  Elliot and Ruth Handler and Harold "Matt" Mattson.  The name of the company was created

13  by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating

14  from the Handlers' garage in Southern California, the company greatly expanded its

15  operations following World War II and soon began to thrive as its reputation for producing

16  high-quality toys spread.  During the next several decades, Mattel became world famous for

17  producing high-quality products at reasonable prices.  Today, some of Mattel's most famous

18  brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19     8.     Critical to Mattel's success, and to the livelihood of its employees, is

20  Mattel's ability to design and develop new products.  Mattel invests many millions of dollars

21  in product design and development annually, and it introduces hundreds of new products

22  each year.  In El Segundo, California alone, Mattel maintains a 180,000 square-foot design

23  center that houses more than 850 designers, sculptors, painters and other artists, whom

24  Mattel pays to work exclusively and full-time to create the products that Mattel sells and on

25  which Mattel's business depends.

26     9.     Defendant Bryant was employed by Mattel from September 1995

27  through April 1998, and then again from January 1999 through October 2000, as a product

28  designer at Mattel's design center in El Segundo, California.

10.   On January 4, 1999, upon starting his second term of employment by Mattel, and as a condition of and in consideration for his employment, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employee Agreement").   Among other things, Bryant agreed that he would not, without Mattel's express written consent, "engage in any employment or business other than for [Mattel], or invest in or assist (in any manner) any business competitive with the business or future business plans of [Mattel]." Bryant further acknowledged that he held a position of trust with Mattel.   In addition, Bryant assigned to Mattel all rights, title and interest in "inventions," including without limitation "designs," that he conceived or reduced to practice during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement with Mattel is attached as Exhibit A.

11.   Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant specifically agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. The only conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time subsequently) concerned freelance work that is unrelated to the conduct alleged herein.   A true and correct copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B.

12.   In late November 2003, Mattel learned that Bryant had secretly aided, assisted and worked for a Mattel competitor, including without limitation by entering into an agreement with the competitor, during the time Bryant was employed by Mattel pursuant to the above-referenced agreements and was being paid by Mattel as a product designer. Bryant's agreement with the competitor obligated Bryant to provide product design services to the competitor on a "top priority" basis.   Bryant's agreement also provided, among other

1  things, that Bryant would receive royalties and other consideration for sales of products on

2  which Bryant provided aid or assistance; that all work and services furnished by Bryant to

3  the competitor under the agreement purportedly would be considered "works for hire"; and

4  that all intellectual property rights to preexisting work by Bryant purportedly would be

5  assigned to the competitor. In addition, while Bryant was employed by Mattel, Bryant and

6  the other defendants converted, misappropriated and misused Mattel property and resources

7  for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8         13.    During the time that he was employed by Mattel and thereafter, Bryant

9  concealed these actions from Mattel, including without limitation by failing to notify his

10  supervisor of his conflict of interest regarding the competitor and by making affirmative

11  misrepresentations to Mattel management upon his departure from Mattel. Because of

12  Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to

13  suspect that Bryant had worked for the competitor while still employed by Mattel until late

14  November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's

15  agreement with the competitor and saw that the date of the agreement predated Bryant's

16  departure from Mattel.

17         14.    As a consequence, Bryant breached his contracts with Mattel and

18  violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have

19  unlawfully aided and abetted his violation of such duties; and each of the defendants has

20  been unjustly enriched and engaged in acts of conversion.

21

22  <u>FIRST CLAIM FOR RELIEF</u>

23  (Breach of Contract)

24

25         15.    Mattel repeats and realleges each and every allegation set forth in

26  paragraphs 1 through 14, above, as though fully set forth at length.

27         16.    Pursuant to his Mattel Employment Agreement, and for good and

28  valuable consideration, Bryant agreed that he would not, without Mattel's express written

-5-

COMPLAINT

EXHIBIT __2__ PAGE __9__

1  consent, engage in any employment or business other than for Mattel or assist in any manner

2  any business competitive with the business or future business plans of Mattel during his

3  employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further

4  assigned to Mattel all right, title and interest in "inventions," including without limitation

5  "designs," that he conceived or reduced to practice during his employment by Mattel.  In

6  addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as

7  disclosed, he had not worked for any competitor of Mattel and had not engaged in any

8  business venture or transaction involving a Mattel competitor that could be construed as a

9  conflict of interest.  Bryant further promised that he would notify his superior immediately

10  of any change in his situation that would cause him to change any of the foregoing

11  certifications or representations.

12         17.   The Employment Agreement and the Conflict Questionnaire are valid,

13  enforceable contracts, and Mattel has performed each and every term and condition of the

14  Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

15         18.   Bryant materially breached the foregoing contracts with Mattel, in that,

16  among other things, he secretly aided, assisted and worked for a Mattel competitor during

17  his employment with Mattel, without the express written consent of Mattel.

18         19.   As a consequence of Bryant's breach, Mattel has suffered and will in

19  the future continue to suffer damages in an amount to be proven at trial.  Such damages

20  include, without limitation, the amounts paid by the competitor to Bryant during his Mattel

21  employment; the amounts paid by the competitor to Bryant as a result of the work he

22  performed for the competitor during his Mattel employment; the amount that Mattel paid

23  Bryant during the time he wrongfully worked for the competitor; the value of information

24  and intellectual property owned by Mattel which Bryant provided to the competitor; the

25  value of the benefits the competitor obtained from Bryant during the time he was employed

26  by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of

27  the work he performed for the competitor during his Mattel employment.

28

-6-

COMPLAINT

EXHIBIT __2__ - PAGE __10__

20.     Furthermore, Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

## SECOND CLAIM FOR RELIEF

(Breach of Fiduciary Duty)

21.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 20, above, as though fully set forth at length.

22.     Bryant held a position of trust and confidence with Mattel.  In his position, Bryant had access to and was entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of his job assignments and duties.  In his position, Bryant also represented Mattel in its dealings with third parties and, in his actions in the course and scope of his employment with Mattel, was an agent of Mattel.  Bryant confirmed his relationship of trust with Mattel in the Employee Agreement.  Bryant thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant might bring to Mattel.

23.     Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor.  As alleged

COMPLAINT

EXHIBIT ___2___ PAGE _11___

1 | above, Bryant also breached the aforementioned duty by using Mattel property and resources
2 | for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3 |     24.    The other defendants, acting with full knowledge of Bryant's obligations
4 | to Mattel, aided and abetted Bryant in such conduct.

5 |     25.    As a direct and proximate result of defendants' wrongful conduct,
6 | Mattel has incurred damages in an amount to be determined at trial.

7 |     26.    Defendants acted with malice, fraud and oppression, and in conscious
8 | disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages
9 | against defendants in an amount to be determined at trial.

10 |     27.    Furthermore, defendants' conduct has caused, and unless enjoined will
11 | continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
12 | money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel
13 | is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or
14 | restraining defendants from continuing to benefit from such breach.

15 |

16 | <center>THIRD CLAIM FOR RELIEF</center>
17 | <center>(Breach of Duty of Loyalty)</center>
18 |

19 |     28.    Mattel repeats and realleges each and every allegation set forth in
20 | paragraphs 1 through 27, above, as though fully set forth at length.

21 |     29.    As an employee of Mattel, Bryant owed a duty of undivided loyalty to
22 | Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist
23 | a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant
24 | was required to always give preference to Mattel's business over his own, similar interests
25 | during the course of his employment with Mattel.

26 |     30.    Bryant breached his duty of loyalty to Mattel in that, while employed
27 | by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including
28 | without limitation by entering into an agreement with a Mattel competitor. As alleged

-8-

COMPLAINT

EXHIBIT 2 PAGE 12

1  above, Bryant also breached the aforementioned duty by using Mattel property and resources

2  for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3         31.   The other defendants, acting with full knowledge of Bryant's obligations

4  to Mattel, aided and abetted Bryant in such wrongful conduct.

5         32.   As a direct and proximate result of defendants' wrongful conduct,

6  Mattel has incurred damages in an amount to be determined at trial.

7         33.   Defendants acted with malice, fraud and oppression, and in conscious

8  disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9  against defendants in an amount to be determined at trial.

10         34.   Furthermore, defendants' conduct has caused, and unless enjoined will

11  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13  is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or

14  restraining defendants from continuing to benefit from such breach.

15

16                FOURTH CLAIM FOR RELIEF

17                  (Unjust Enrichment)

18

19         35.   Mattel repeats and realleges each and every allegation set forth in

20  paragraphs 1 through 34, above, as though fully set forth at length.

21         36.   Defendants, by the aforementioned conduct, unfairly used and diverted

22  Mattel property, resources and opportunities for the benefit of, and to aid and assist,

23  themselves, all without authorization by or payment to Mattel for the same. Defendants have

24  been unjustly enriched as a result.

25         37.   Mattel is entitled to an award of all such amounts by which defendants

26  have been unjustly enriched in an amount to be determined at trial.

27

28

-9-

COMPLAINT

EXHIBIT ___2___ PAGE _13_

38.    Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

39.    Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining defendants from any further unjust enrichment.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

40.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 39, above, as though fully set forth at length.

41.    Mattel was entitled to, inter alia, Bryant's exclusive services and the exclusive ownership of his inventions as a Mattel product designer. However, Bryant provided such services, and purported to grant rights to such inventions, to a competitor during the time of his exclusive Mattel employment. All such services and the inventions and work product resulting from such services, including without limitation ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property created by Bryant during the term of the aforesaid agreements, were the property of Mattel. Such services and property were provided by Bryant to others, including defendants, and used by them.

42.    Defendants wrongfully converted Mattel property and resources by asserting ownership thereto and by appropriating and using Mattel's property and resources for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

07209/579342.1

-10-

COMPLAINT

EXHIBIT __2__ PAGE __14__

43.     As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages.  Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## PRAYER FOR RELIEF

WHEREFORE, Mattel hereby respectfully requests that this Court:

A.     Award Mattel its damages;

B.     Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C.     Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D.     Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E.     Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F.     Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and

-11-

COMPLAINT

EXHIBIT  2  - PAGE  15

1    G. Award such other and further relief as this Court deems just and proper.

2

3 DATED:  April 27, 2004   QUINN EMANUEL URQUHART OLIVER &
             HEDGES, LLP

4

5          By _____

6           Michael T. Zeller
           Attorneys for Plaintiff

7           Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/579342.1

-12-

COMPLAINT

EXHIBIT __2__ - PAGE __16__

**Exhibit A**

EXHIBIT _2_ PAGE _17_

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that; [i] I will maintain the confidentiality of the Company's trade secrets; [ii] I will use those trade secrets for the exclusive benefit of the Company; all inventions that I create will be owned by the Company; [iv] my prior and continuing activities separate from the Company will not conflict with the Company's development or its proprietary rights; and [v] when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

1. **Provisions Related to Trade Secrets**

   [a] I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information [as defined below], including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

   [b] As used in this Agreement, "Proprietary Information" means any information [including formula, pattern, compilation, device, method, technique or process] that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint-ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

   [c] I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

   [d] Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials [including all copies] in my possession or under my control containing or disclosing Proprietary Information.

2. **Ownership of Inventions**

   [a] I agree to communicate to the Company as promptly and fully as practicable all inventions [as defined below] conceived or reduced to practice by me [alone or jointly by others] at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees [without charge but at no expense to me] at any time in every proper way to obtain for it and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

   [b] As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

   [c] Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either [1] relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer or [2] result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

   [d] I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

3. **Conflicts with Other Activities**

   [a] My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist [in any manner] any business competitive with the business or future business plans of the Company.

4. **Miscellaneous**

   [a] My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

   [b] Each provision of this Agreement will be treated as a separate and independent clause; and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

   [c] My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

   [d] I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continued employment by the Company, or to my employment for any particular term.

   [e] Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

   [f] This agreement will be governed by and interpreted in accordance with the laws of the State of California.

   [g] This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _(signed)_    MATTEL, INC. By: _Teresa Newcomb (signed)_
Signature

Employee Name (print) CARTER H. BRYANT    Name of Witness (print) TERESA NEWCOMB

Date 01/04/99

EXHIBIT A PAGE 13

EXHIBIT 2 PAGE 18

**Exhibit B**

EXHIBIT __2__ PAGE __19__

# CONFLICT OF INTEREST QUESTIONNAIRE

**BRYANT, CARTER H.** (Name (Last, First, M.I.))   **PROJECT DESIGNER** (Job Title)   (Department)

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

- ( ) YES  (●) NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?
- ( ) YES  (●) NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?
- ( ) YES  (●) NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?
- (●) YES  ( ) NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?
- (●) YES  ( ) NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?
- ( ) YES  (●) NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?
- ( ) YES  (●) NO   7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?
- ( ) YES  (●) NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?
- ( ) YES  (●) NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

_4, 5, freelance design & artwork in 1998, from appx. 5/98 - 11/98 for the Ashton Drake galleries._

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

_Carter H. Bryant_ (Signature)   **01/04/98** (Date)

EXHIBIT **B** PAGE **14**

EXHIBIT __2__ PAGE __20__

**EXHIBIT 3**

1  ROBERT F. MILLMAN, Bar No. CA 062152
   DOUGLAS A. WICKHAM, Bar No. CA 127268
2  KEITH A. JACOBY, Bar No. CA 150233
   LITTLER MENDELSON
3  A Professional Corporation
   2049 Century Park East, 5th Floor
4  Los Angeles, CA  90067.3107
   Telephone:   310.553.0308
5  Facsimile:   310.553.5583

6  Attorneys for Defendant/Cross-Complainant
   CARTER BRYANT

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware Corporation,        Case No.  BC314398

12              Plaintiff,                        ASSIGNED FOR ALL PURPOSES TO THE
                                                  HONORABLE GREGORY W. ALARCON –
13        v.                                      DEPARTMENT 36

14  CARTER BRYANT, an individual; and            DATE ACTION FILED:  April 27, 2004
    DOES 1 through 10, inclusive,
15                                                DEFENDANT/CROSS-COMPLAINANT
                Defendant.                        CARTER BRYANT'S CROSS-
16                                                COMPLAINT FOR:

17                                                (1)  UNFAIR COMPETITION (Business &
                                                 Professions Code  §§ 16600, et seq. and 17200
18                                                et seq.);
                                                 (2)  RESCISSION;
19                                                (3)  DECLARATORY RELIEF; AND
                                                 (4)  FRAUD.
20
                                                 DEMAND FOR JURY TRIAL
21
                                                 [Code Of Civil Procedure § 428.10]
22

23  CARTER BRYANT, on behalf of himself,
    all present and former employees of Mattel,
24  Inc., and the general public,

25              Cross-Complainant,

26        v.

27  MATTEL, INC., a Delaware Corporation,

28              Cross-Defendant.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310.553.0308

              DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

                                    EXHIBIT   3   PAGE  21

1.      Defendant and Cross-Complainant Carter Bryant ("Bryant"), for his Cross-Complaint alleges, upon personal knowledge with respect to himself and his own acts, and upon information and belief as to all other matters, as follows:

## OVERVIEW

2.      In this Action, Bryant's former employer, Mattel, Inc. ("Mattel"), has sued Bryant for, among other things, breach of a purported Employee Confidential Information and Inventions Agreement ("Agreement"). The Agreement is a classic contract of adhesion, drafted solely by Mattel, forced upon Bryant on a take-it-or-leave-it basis with no negotiations invited or allowed. Although signing the Agreement was a condition of Bryant's employment, Mattel never explained the terms and conditions of the Agreement to Bryant and Bryant never was given a meaningful opportunity to secure legal advice concerning its meaning or terms. Bryant, who is a high school graduate, did not and could not understand the terms of the Agreement; indeed, no reasonable layperson could understand the legal significance, meaning and terms of the Agreement, which appeared to be written for lawyers with several years of experience as corporate attorneys.

3.      Furthermore, the Agreement contains terms and conditions that violate established California law on their face and/or in connection with Mattel's interpretation and threats to enforce this Agreement. For example, the confidentiality provision in the first section of the Agreement (as interpreted by Mattel) purports to require Bryant (and similarly situated present and former Mattel employees) to maintain a cone of silence – on pains of a breach of contract lawsuit by Mattel's lawyers – over such innocuous *and public* information as the identities of Mattel employees and the general skills and knowledge of such employees. Such a provision clearly is unlawful and violates public policy because it *de facto* inhibits the free flow of information regarding employee talents and thereby restricts employee mobility in this State, thus undermining one of California's fundamental public policies.

4.      The Agreement also purports to prevent current employees from accepting any other employment or engagement of any nature whatsoever, regardless of whether such work or services could lead to the disclosure of Mattel's proprietary information or trade secrets or otherwise constitute a breach of the employee's duty of loyalty. Thus, if a Mattel employee went to work at a

1

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT __3__ PAGE __22__



1  gas station or a grocery store to earn extra money for his or her family, the Agreement flatly — and

2  unlawfully – prohibits such employment and renders such an employee liable to Mattel for breach of

3  contract.   Such a broad restriction concerning an employee's lawful off-duty conduct violates

4  California Business and Professions Code sections 16600 and 17200 and California Labor Code

5  sections 96(k) and 98.6 and California's broad public policies prohibiting unlawful covenants not to

6  compete.

7         5.     Finally, the Agreement also purports to require each and every Mattel

8  employee, including Bryant, to assign all inventions or creations conceived or reduced to practice

9  during the time period of his or her Mattel employment in direct violation of California Labor Code

10  section 2870. While the Agreement purports to limit this broad assignment to the extent required

11  under Section 2870, this limitation is shrouded in so much legalese that no employee in Bryant's

12  shoes would know or understand either the inventions assignment or the limit on that assignment.

13  On information and belief, Bryant alleges that Mattel intentionally and purposefully implemented

14  this overly broad and unconscionable Agreement to lure employees to adhere to its unlawful terms

15  and to assign to Mattel inventions and creations that, by law, do not belong to Mattel.

16         6.     With this Cross-Compliant, Bryant alone and on behalf of all present and

17  former Mattel employees within the applicable limitations period and the general public, seeks to put

18  an end to Mattel's unlawful and unconscionable practices, with an injunction barring Mattel from

19  requiring employees to sign such agreements and threatening to enforce them, with a declaration that

20  all such agreements (including the Agreement signed by Bryant and any later, similar agreements)

21  are void and unenforceable because they are unconscionable, and with an order disgorging Mattel of

22  all profits unlawfully obtained by its misconduct.

23                                **THE PARTIES**

24         7.     Bryant is an individual residing in the State of Missouri who was employed by

25  Mattel from 1995 through April 1998 and again from January 1999 to approximately October 20,

26  2000.

27         8.     On information and belief, Bryant alleges that Mattel is a multi-billion dollar,

28  international toy company that, at its El Segundo facility alone, maintains a 180,000 square-foot

2

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

EXHIBIT __3__ PAGE __23__

1   design center with more than eight hundred fifty (850) employees.  On information and belief,

2   Bryant alleges that Mattel also maintains facilities in New York state, Wisconsin, New Jersey and

3   Illinois.

4        9.    Mattel markets numerous lines of toys, but one of its most well-known

5   products is the "Barbie" doll line, which, according to Mattel's website, accounts for more than $3.6

6   billion in annual retail sales.  On information and belief, Bryant alleges that Mattel, either directly or

7   indirectly through subsidiaries or affiliates, markets and sells Hot Wheels toy cars, "ViewMasters"

8   (three-dimensional viewer toys), the Fisher-Price line of toys and a line of dolls named "American

9   Girl."

10        10.    Bryant brings this Cross-Complaint on his own behalf, on behalf of all

11   current and former Mattel employees (identified below) and on behalf of the general public

12   pursuant to California Business and Professions Code sections 16600, 17200, 17203 and 17204 and

13   the California Labor Code sections 98(k), 98.6, and 2699 (the California Labor Code Private

14   Attorneys' General Act of 2004).

15        **NATURE OF THE ACTION**

16        11.    Cross-Complainant Bryant brings this Cross-Complaint to remedy the unfair

17   business practices of his former employer, Mattel.

18        12.    During Bryant's initial employment by Mattel, he was assigned to the "Main

19   Line" Barbie Department, where he designed fashions and hairstyles for Barbie and her toy

20   companions, including "Teen Skipper."

21        13.    Between approximately late April 1998 and January 4, 1999, Bryant was not

22   employed by Mattel.  However, commencing on or about January 4, 1999, Bryant returned to work

23   at Mattel and was employed in Mattel's Barbie "Collector" Department, designing clothing fashions

24   and accessories for high-end Barbie dolls for the adult "collector" market.

25        14.    Upon beginning this second term of employment with Mattel, Bryant was

26   required to execute a boilerplate document entitled "Employee Confidential Information And

27   Inventions Agreement" (defined above as the "Agreement").

28        15.    The Agreement was a preprinted, non-negotiable form contract prepared by

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

3

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT   3   PAGE   23

1   Mattel, printed on Mattel stationery.  The Agreement purports to completely prohibit or, at a

2   minimum, creates a substantial chilling effect on, Bryant's or any other employee's preparations to

3   compete and purports to prevent Bryant and other employees from taking meaningful steps to obtain

4   any other competitive employment while still in the employ of Mattel.   Such an agreement

5   unlawfully restrains Bryant (and similarly situated employees) in his/their business, trade and

6   professions and thus violates well-established rights of employee mobility under California law.

7           16.    The Agreement also purports to effect an assignment of all inventions created

8   or even simply touched by Bryant during the time period of his employment with Mattel, regardless

9   of whether or not they relate to any aspect of Mattel's business and regardless of when or where this

10  occurred.  On its face, Mattel's Agreement theoretically purports to assign to Mattel any "invention"

11  of any kind conceived or reduced to practice by Bryant during the time period of his employment

12  with Mattel.  As Mattel has construed the Agreement, any time Bryant placed pen and pencil to

13  paper during the time period of his Mattel employment, such "works" are owned by Mattel even if

14  such works or inventions were created on his own time with his own materials.

15          17.    As applied here, the Agreement unlawfully infringes on Bryant's right to

16  prepare to compete and to seek other employment and it unlawfully appropriates to Mattel

17  inventions that were created or reduced to practice on Bryant's own time and using his own

18  equipment that are unrelated to his work for Mattel.  Such an invention assignment is overbroad,

19  unconscionable, violates Labor Code section 2870, constitutes an unfair business practice and is

20  therefore unlawful.

21          18.    The Agreement primarily contains a sweeping provision that purports to

22  assign to Mattel each and every invention by Bryant that he created or reduced to practice during the

23  time period of his employment with Mattel.  The Agreement's only attempt to limit the scope of the

24  assignment is a perfunctory reference to California Labor Code section 2870.  That quotation is

25  found in a separate part of the Agreement from the overbroad, illegal clause defining what is

26  covered, appears in fine print, and is stated in language so confusing that no lay person could

27  reasonably understand it.

28

ITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310 553 0308

4

EXHIBIT __3__ PAGE __24__

 

19.     Even considering the language of Mattel's reference to Labor Code section 2870 in the Agreement, the Agreement remains impermissibly overbroad and unenforceable. According to that provision of the Agreement, any invention conceived or reduced to practice by Bryant during his employment with Mattel would belong to Mattel by virtue of the unlawful Agreement, regardless of whether the invention related to the work performed by Bryant for Mattel.

20.     In addition to the unlawful inventions assignment, the Agreement contains several other provisions that are equally unlawful, either on the face of the Agreement or as applied by Mattel, as it seeks to enforce the Agreement. As discussed above, the confidentiality provision in the Agreement is grossly overbroad and purports to prohibit employees from disclosing and using publicly available information and it purports to prohibit employees from engaging in lawful off duty conduct in violation of Business and Professions Code 16600 and 17200, the California Labor Code and this State's public policy.

21.     Furthermore, Mattel's overly broad agreement cannot be saved from illegality by narrow construction. Otherwise, if these sorts of agreements could simply be reformed during litigation, employers would have no disincentive to draft and attempt to enforce such overbroad, illegal agreements that chill employees from exercising their rights.

22.     Due to Mattel's fraudulent and/or negligent misrepresentation of the terms contained within the Agreement (and Mattel's failure to affirmatively disclose its material terms to Bryant when Bryant was instructed to sign the Agreement by Mattel), Bryant did not discover, and would not reasonably be expected to discover, that the Agreement was misleading, unconscionable and unlawful until Mattel instituted the underlying lawsuit on April 27, 2004, attempting to enforce the Agreement. At the time it required Bryant to execute the adhesive Agreement as a condition of his employment, Mattel did not explain the terms of the Agreement to Bryant, give him sufficient time to review it, or permit or encourage him to seek independent counsel regarding its legal effect. Had Bryant been made aware of the full meaning and intent of the Agreement, he would not have signed it.

23.     Furthermore, Bryant is informed and believes that Plaintiff Mattel has been aware that Bryant was involved in designing the "Bratz" line of toys since at least sometime in 2001.

5

.ITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
os Angeles, CA 90067 3107
310.553.0308

1    Rather than bringing suit at that time, Mattel elected instead to wait until three years later to attempt

2    to enforce the unlawful Agreement in the underlying lawsuit.

3            24.    Even though Bryant conceived the "Bratz" idea when he was not employed by

4    Mattel in 1998 and he, with others, did not reduce that idea to practice until after Bryant left Mattel,

5    Mattel nevertheless is using the Agreement to frivolously sue Bryant, in an attempt to hijack

6    "Bratz."

7            25.    Bryant is informed and believes that all employees of Mattel who were hired

8    between 1999 (and before) and the present were required to execute the same or substantially

9    similar agreements, as a pre-condition of their employment with Mattel.  Bryant is informed and

10   believes that his case is representative of a larger pattern and practice of wrongful conduct engaged

11   in by Mattel. Mattel, as a standard business practice, has forced its employees to enter into and has

12   wrongfully enforced similar quasi-non-competition and assignment of inventions contracts with its

13   present and former employees.  Bryant is informed and believes that Mattel uses these agreements

14   to prevent or stifle competition in the toy industry and/or to unlawfully inhibit employee mobility.

15   Indeed, Bryant is informed and believes, and based thereon alleges, that Mattel continues to force

16   new and current employees to enter into the same or similarly overbroad and unlawful agreements.

17           26.    Bryant was presented with the form Agreement by Mattel on or about January

18   4, 1999, at the outset of his second term of employment.  At that time, he was told that his execution

19   of the Agreement was a condition of his employment with Mattel.  The terms of the Agreement were

20   not explained to him, nor was he told that the Agreement would preclude him from maintaining any

21   employment other than with Mattel, despite statutory guarantees to the contrary.  Bryant was not

22   informed that by executing the Agreement, he was assigning to Mattel all the inventions and

23   creations he created or simply even touched during the time period of his employment with Mattel

24   regardless of how unrelated they might be to his work at Mattel.  Bryant was not advised that Mattel

25   would attempt to claim ownership of any invention he may have conceived prior to employment by

26   Mattel and perfected after he left Mattel.  Bryant neither was given a meaningful opportunity to

27   review the Agreement at the time he executed it, nor was he given the opportunity to consult with an

28   attorney before executing it.   Mattel did not give Bryant the opportunity to negotiate the

6

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

EXHIBIT  3   PAGE  26

1   Agreement's terms, allow him to review it overnight, or suggest that he consult an attorney before

2   executing it. In essence, the Agreement was a pre-printed form and was presented to Bryant's on a

3   "take it or leave it" basis and Bryant and all present and former Mattel employees in effect were

4   bludgeoned into accepting its terms or not being allowed to work there.

5        27.    At the time Bryant executed the Agreement, he did not understand the scope,

6   breadth or meaning of its terms. Bryant is informed and believes, and on that basis alleges that at the

7   time all other current and former employees of Mattel executed identical or similar agreements with

8   Mattel, they, too, did not understand the scope, breadth or meaning of their terms. As discussed

9   below, the Agreement is both procedurally and substantively unconscionable and thus wholly

10  unenforceable.

11       28.    In this action, Bryant seeks on behalf of himself and the general public the

12  intervention of the Court to obtain remedies to preclude Mattel's unlawful acts. Among other

13  things, Bryant seeks a declaration from this Court that Mattel's Agreements are not enforceable

14  against Bryant and all other present and former similarly situated Mattel employees. Bryant also

15  seeks permanent injunctive relief barring Mattel from forcing present and future employees to sign

16  such agreements, stopping Mattel from threatening to enforce and attempting to enforce illegal non-

17  compete/invention assignment contracts against Bryant and any other current or former Mattel

18  employees, and requiring Mattel to disgorge and/or make restitution for all unlawful profits

19  received and/or costs incurred by virtue of its unlawful and unfair business practices and other legal

20  and/or equitable relief to which Bryant and/or the general public may be justly entitled.

21       29.    Bryant also seeks, through this Cross-Complaint, rescission of the

22  unconscionable and unlawful Agreement signed by Bryant.

23              **FIRST CAUSE OF ACTION**

24       (UNFAIR COMPETITION AGAINST DEFENDANT MATTEL)

25          (Business & Professions Code § 17200 et seq.)

26       30.    Bryant realleges and incorporates by reference each of the allegations in

27  Paragraphs 1 through 29 of this Cross-Complaint as if fully set forth herein.

28       31.    Bryant brings his claim for unfair competition and unfair business practices

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310 553.0308

7

EXHIBIT __3__ PAGE __27__

1    on behalf of himself, the current and former employees of Mattel and the general public, pursuant

2    to California Business and Professions Code sections 16600, 17200, 17203 and 17204.

3         32.    The non-competition and invention assignment provisions contained in the

4    Agreement, which Mattel forced Bryant to execute as a condition of employment, and which it is

5    now trying to enforce in the underlying action, are illegal pursuant to California Business and

6    Professions Code sections 16600 and 17200.  Said provisions constitute an unfair restraint of trade

7    for the following, non-exclusive reasons:  they illegally restrict the job mobility of current and even

8    former Mattel employees, they illegally restrict current Mattel employees from seeking other

9    gainful employment, they illegally restrict the use of public information, such as the identity or job

10   functions of current Mattel employees, they specifically prevent or deter Mattel's present and

11   former employees, such as Bryant, from accepting or holding any lawful employment within the

12   State of California or elsewhere other than with Mattel, and they purport to assign for Mattel's

13   unlawful benefit all the inventions of Mattel's current and former employees, with a narrow

14   exception which is the employee's burden to prove.

15        33.    The Agreement is also unlawful in that it violates the provisions of California

16   Labor Code section 96(k), which guarantees the rights of employees to be free in the lawful

17   activities they pursue outside working hours, section 98.6 to the extent Mattel has taken adverse

18   employment actions against employees who have refused to sign the Agreement, and Labor Code

19   section 2699.

20        34.    The Agreement also violates the provisions of California Labor Code section

21   2870 inasmuch as it provides for a far broader assignment of employee inventions than is permitted

22   by applicable law.

23        35.    The Agreement was a contract of adhesion and was procedurally

24   unconscionable because, among other things, Bryant was required to sign it as a condition of his

25   employment with no negotiations allowed, it was presented to him on a preprinted form and on a

26   take-it-or-leave-it basis, he was not allowed to thoroughly review or consider its terms, he was not

27   permitted to review it overnight, he was not provided with the opportunity to consult counsel prior

28   to executing it, and it was never thoroughly and completely explained to him.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

8

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT  3    PAGE  28

36. Because of its onerous, unfair, unlawful and one-sided provisions, which are surprising, grossly unfair and shock the conscience, the Agreement is substantively unconscionable.

37. Because it is both procedurally and substantively unconscionable, the Agreement is unenforceable. Moreover, the Agreement is so permeated by unconscionability that the unlawful provisions cannot be severed.

38. Due to Mattel's fraudulent and/or negligent misrepresentation of the terms contained within the Agreement, Bryant did not discover, and would not reasonably have discovered, that the Agreement, as Mattel attempted to enforce it, was unconscionable and unlawful until Mattel instituted the underlying lawsuit against him to attempt to enforce the Agreement, in approximately April 2004.

39. Even though the quasi-non-competition and invention assignment provisions of the Agreement are not enforceable, Bryant is informed and believes and based thereon alleges that Mattel utilizes these provisions as part of a scheme and device to restrain the business opportunities, both within and outside the State of California, otherwise available to Bryant and other current and former Mattel employees.

40. Bryant is informed and believes and based thereon alleges that, in effect, through its wrongful acts, Mattel is able to create for itself an unfair competitive advantage along with other benefits at the expense of its present and former employees (including Bryant), other competing companies or employers, and members of the public.

41. Mattel's unlawful conduct in requiring Bryant, and its other current and former employees, to sign the Agreement, or other similar Agreements with equally unlawful provisions as a term and condition of employment or continued employment, and then threatening to enforce such unlawful provisions, constitutes unfair competition and an unfair business practice in violation of the California Business and Professions Code sections 16600 and 17200 et seq. and under the common law.

42. As a proximate result of such unlawful acts and/or unfair business acts and practices, Bryant has suffered actual damages, and Mattel has enjoyed unlawful profits, in a sum not yet fully ascertained but in excess of the jurisdictional limits of this Court. Furthermore, on

9

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

1   behalf of Bryant and all present and former California employees of Mattel and the general public,

2   Bryant seeks injunctive relief pursuant to Business and Professions Code section 17203, barring

3   Mattel from continuing to engage in such unlawful and unfair business practices, and the remedies

4   of disgorgement and restitution for illicit profits obtained by Mattel from its unlawful and/or unfair

5   business acts and practices pursuant to Business and Professions Code section 17204.

6        43.   In addition, as a result of the illegal and wrongful conduct alleged above, in

7   the absence of injunctive relief prohibiting Mattel from continuing to engage in unfair competition,

8   Cross-Complainant Bryant, the current and former employees of Mattel and the general public have

9   been and will be irreparably harmed.

10        44.   For these reasons, Bryant requests permanent injunctive relief prohibiting

11   Cross-Defendant Mattel from continuing to engage in unfair competition by threatening and

12   attempting to enforce illegal non-compete/invention assignment contracts against Bryant or any

13   other current or former Mattel employees.

14                    **SECOND CAUSE OF ACTION**

15             **(RESCISSION AGAINST DEFENDANT MATTEL)**

16        45.   Bryant realleges and incorporates by reference each of the allegations in

17   Paragraphs 1 through 44 of this Cross-Complaint as if fully set forth herein.

18        46.   Bryant's consent to the Agreement was given due to mistake, or obtained

19   through duress, menace and/or fraud.

20        47.   The Agreement is unlawful and unconscionable, due to the fault not of

21   Bryant but of Mattel, which exclusively drafted the Agreement's unlawful and unconscionable

22   terms.

23        48.   Due to Mattel's fraudulent misrepresentation and/or concealment of the terms

24   contained within the Agreement, Bryant did not discover, and would not reasonably be expected to

25   discover, that the Agreement was unconscionable and unlawful until Mattel instituted the underlying

26   lawsuit against him to attempt to enforce the agreement, in approximately April 2004.

27        49.   The public interest will be prejudiced by permitting the Agreement or other

28   similar agreements to stand.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310 553 0308

10.

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT __3__ PAGE __30__

1          50.    By the filing of this Cross-Complaint, Bryant hereby gives notice to Mattel

2    that he seeks rescission of the Agreement, and further offers to restore to Mattel all consideration

3    and everything of value which he received from Mattel under the Agreement, upon condition that

4    Mattel do likewise.

5          51.    Bryant therefore requests that the Court rescind the Agreement in its entirety.

6    <u>**THIRD CAUSE OF ACTION**</u>

7    **(FRAUD AGAINST DEFENDANT MATTEL)**

8          52.    Bryant realleges and incorporates by reference each of the allegations in

9    Paragraphs 1 through 51 of this Cross-Complaint as if fully set forth herein.

10         53.    Mattel required Bryant to execute the Agreement without disclosing to him

11   its true import and terms.

12         54.    Having drafted the Agreement and all the oppressive, unfair and onerous

13   terms contained therein, Mattel was of course aware of the contents of the Agreement and its

14   import.

15         55.    Due to Mattel's concealment of its interpretation of the force and effect of the

16   Agreement from Bryant, he did not discover that the Agreement was unconscionable and unlawful

17   until Mattel instituted the underlying lawsuit against him to attempt to enforce the agreement, in late

18   April 2004.

19         56.    In so failing to disclose to Bryant the true meaning of the terms and the

20   purported legal effect of the Agreement, and Mattel's intent to attempt to enforce it with regard to

21   work he conceived and/or reduced to practice while not employed at Mattel, Mattel misrepresented

22   and suppressed the nature of the Agreement, and in doing so, committed actual fraud against

23   Bryant.

24         57.    Because of its malicious, oppressive and/or fraudulent conduct, Mattel is

25   subject to punitive damages in an amount necessary and appropriate to punish and deter it and

26   others from engaging in similar conduct in the future.

27   //

28   //

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310 553 0308

11

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT __3__ PAGE __31__



## FOURTH CAUSE OF ACTION

## (DECLARATORY RELIEF AGAINST DEFENDANT MATTEL)

58. Bryant realleges and incorporates by reference each of the allegations in Paragraphs 1 through 60 of this Cross-Complaint as if fully set forth herein.

59. Mattel's unlawful conduct in requiring Bryant, and its other current and former employees, to sign the Agreement with its unlawful provisions as a term and condition of their employment or continued employment and then threatening to enforce such unlawful provisions and eventually filing a lawsuit to enforce such provisions against Bryant constitutes unfair competition and unfair business practices in violation of the California Business and Professions Code sections 16600 and 17200 et seq. and under the common law.

60. Moreover, the Agreement is both procedurally and substantively unconscionable.

61. Through its suit against Bryant, Mattel has demonstrated that a controversy exists concerning the enforceability of the Agreement and its terms.

62. Bryant therefore requests declaratory relief stating that the Agreement, as well as all similar agreements executed by current and former employees of Mattel, are unlawful and unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Cross-Complainant Bryant prays for judgment and relief as follows:

1. For restitution, disgorgement and interest in an amount to be determined at trial;

2. For an order permanently enjoining and barring Mattel from forcing present and future employees to sign agreements containing quasi-non-compete or invention assignment provisions identical or substantively similar to those in the Agreement, and prohibiting Mattel from threatening and attempting to enforce such agreements or restrictions against Bryant or any other current or former employees;

3. For an order declaring that the Agreement between Mattel and Bryant (and the agreements between Mattel and all similarly situated present and former employees) are void.

12

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310 553 0308

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 3  PAGE 32

unenforceable and unconscionable;

4.    For rescission of the Agreement;

5.    For declaratory relief stating that the Agreement is unlawful and unenforceable;

6.    For compensatory damages according to proof;

7.    For statutory penalties pursuant to Labor Code section 2699;

8.    For punitive damages according to proof;

9.    For reasonable attorneys' fees incurred in bringing and litigating this action pursuant to the private attorneys general statutes;

10.    For costs of suit herein; and

11.    For such further or other relief as the Court deems just and proper.

Dated: August 24, 2004

DOUGLAS A. WICKHAM
LITTLER MENDELSON
A Professional Corporation
Attorneys for Defendant/Cross-Complainant
CARTER BRYANT

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

EXHIBIT __3__ PAGE __33__

1

## DEMAND FOR A TRIAL BY JURY

2      Pursuant to Section 592 of the California Code of Civil Procedure, Cross-

3 Complainant Carter Bryant hereby demands that the causes in this matter be tried by a jury to the

4 extent provided for by law.

5

6

7 Dated: August 24, 2004

8

9                                    _____
                                     DOUGLAS A. WICKHAM
10                                   LITTLER MENDELSON
                                     A Professional Corporation
11                                   Attorneys for Defendant/Cross-Complainant
                                     CARTER BRYANT
12

13

14 Los_Angeles:371607.1 028307.1010

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

14

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT __3__   PAGE __34__

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 2049 Century Park East, 5th Floor, Los Angeles, California 90067.3107. On August 27, 2004, I served the within document(s):

**STIPULATION AND [PROPOSED] ORDER GRANTING DEFENDANT CARTER BRYANT LEAVE TO FILE COUNTER-CLAIM**

☒    by facsimile transmission at or about August 27, 2004 on that date. This document was transmitted by using a facsimile machine that complies with California Rules of Court Rule 2003(3), telephone number 310.553.5583. The transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached. The names and facsimile numbers of the person(s) served are as set forth below.

☐    by placing a true copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Los Angeles, California addressed as set forth below.

☐    by depositing a true copy of the same enclosed in a sealed envelope, with delivery fees provided for, in an overnight delivery service pick up box or office designated for overnight delivery, and addressed as set forth below.

☐    by personally delivering a copy of the document(s) listed above to the person(s) at the address(es) set forth below.

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

I am readily familiar with the firm's practice of collection and processing correspondence for mailing and for shipping via overnight delivery service. Under that practice it would be deposited with the U.S. Postal Service or if an overnight delivery service shipment, deposited in an overnight delivery service pick-up box or office on the same day with postage or fees thereon fully prepaid in the ordinary course of business.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on August 27, 2004, at Los Angeles, California.

*J. Monique McDonald*
J. Monique McDonald

Los_Angeles:372099.1 028307.1010

EXHIBIT __3__   PAGE __35__



## PROOF OF SERVICE BY MESSENGER

I am employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is Allstar Messenger Service, 345 South Figueroa Street, Suite 305, Los Angeles, California 90071. On August 27, 2004, I personally served:

**STIPULATION AND [PROPOSED] ORDER GRANTING DEFENDANT CARTER BRYANT LEAVE TO FILE CROSS-COMPLAINT**

by delivering copies thereof to:

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 27, 2004, at Los Angeles, California.

_____
MARCUS ROBINSON

Los_Angeles:372101.1 028307.1010

PROOF OF SERVICE

EXHIBIT __3__ PAGE __36__

**EXHIBIT 4**

1   ROBERT F. MILLMAN, Bar No. 062152
    DOUGLAS A. WICKHAM, Bar No. 127268
2   KEITH A. JACOBY, Bar No. 150233
    LITTLER MENDELSON
3   A Professional Corporation
    2049 Century Park East, 5th Floor
4   Los Angeles, CA  90067.3107
    Telephone:   310.553.0308
5   Facsimile:   310.553.5583
    Attorneys for Plaintiff
6   CARTER BRYANT

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  CARTER BRYANT, an individual        Case No.

12              Plaintiff,              COMPLAINT FOR:

13       v.                             DECLARATORY RELIEF OF
                                        COPYRIGHT NON-
14  MATTEL, INC., a Delaware            INFRINGEMENT
    corporation
15
16              Defendant.
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT __4__ PAGE __37__

1          Plaintiff Carter Bryant ("Bryant") for his complaint against Defendant

2    Mattel, Inc. ("Mattel") alleges as follows:

3                          **PARTIES**

4          1.     Bryant is an individual residing in Springfield-Greene County,

5    Missouri.

6          2.     Bryant is informed and believes, and based thereon alleges, that Mattel

7    is a Delaware corporation with a principal place of business at 333 Continental

8    Boulevard, El Segundo, California.

9               **JURISDICTION AND VENUE**

10         3.     This is an action under 28 U.S.C. §§ 2201 and 2202 for declaratory

11   relief and further relief based upon a declaratory judgment or decree and the

12   Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*  This Court has original subject

13   matter jurisdiction over Bryant's claim pursuant to 28 U.S.C. §§ 1331 and 1338(a)

14   & (b).

15         4.     This Court has personal jurisdiction over Mattel, as it conducts

16   continuous, systematic and routine business within the State of California and the

17   County of Los Angeles.

18         5.     Venue is proper in the United States District Court for the Central

19   District of California pursuant to 28 U.S.C. §§ 1391(b) & (c).

20                 **BACKGROUND FACTS**

21         6.     Bryant is the creative genius and inspiration behind an immensely

22   successful line of fashion dolls called "Bratz."

23         7.     Since its debut on the market in June, 2001, the "Bratz" line has

24   revitalized and invigorated the fashion-doll industry, long dominated by Mattel's

25   "Barbie" dolls.

26         8.     Mattel, however, does not like the competition.

27

28

<div align="center">2</div>

EXHIBIT 4 PAGE 37

1    9.    First, Mattel, the world's largest toy company, tried, and failed, to

2  drive "Bratz" out of the market by, *inter alia*, introducing competing products that

3  copy the fresh, new and trendy look of "Bratz."

4    10.    When this failed, Mattel resorted to other tactics – suing Bryant, three

5  and one half years after the launch of "Bratz," in California state court accusing

6  him, among other things, of the alleged "conversion" of Mattel's "ideas, concepts,

7  rights, designs, proprietary information, and other intellectual property and

8  intangible property."

9    11.    Recent events discussed herein reveal what Mattel intends by this

10  vague and overly-broad pleading.  Mattel intends to try to obtain control over the

11  rights to "Bratz," apparently based, in whole or in part, on grounds that "Bratz" was

12  allegedly copied from and infringes upon a scrapped Mattel project called "Toon

13  Teens," or some other as yet undisclosed Mattel property, which Bryant was

14  supposedly exposed to during a period of time when he was employed by Mattel.

15    12.    Bryant did not copy or infringe anything in coming up with "Bratz."

16  Since these copyright issues cannot be resolved in state court, due to federal

17  preemption, Bryant has a reasonable fear that Mattel will bring another lawsuit

18  against him for copyright infringement.

19    13.    Bryant brings this action, accordingly, for a Declaratory Judgment that

20  his past, present, and continuing contributions to and work on the conception and

21  development of "Bratz" did not and do not violate or infringe any copyrights or

22  intellectual or other property owned by Mattel.

23                        **Carter Bryant's Background**

24    14.    Bryant is a creative, innovative, artistic person who since an early age

25  has had a special interest in dolls and fashion design.

26    15.    As a young boy, when his family could not afford to buy him toys,

27  Bryant would draw them.  Dolls and puppets were particular favorites.  While still

28  very young, Bryant began constructing marionettes from papier-mache.

3

EXHIBIT __4__ PAGE _37_

16.     By age nine, Bryant had begun to draw fashions. Fashion soon became a passion. He bought books on Hollywood costume design and studied them intensely. He made designs for his puppets and drew characters and outfits for them. He even won a contest drawing "Archie" comic book characters and considered becoming a comic book artist.

17.     Bryant took art classes throughout junior high and high school. He also began reading, and studying, fashion magazines such as "Vogue" and "Harper's Bazaar," thinking he might one day have a career in fashion design. He began creating his own fashions based on what he saw in such magazines.

18.     After high school, Bryant considered going to design school, but gave up the dream when he realized that his family could not afford to send him.

19.     Instead, he tried songwriting for a while, and even formed a band in 1988. For several years, he took dead-end jobs to make ends meet, such as stocking shelves at Toys 'R' Us. But Bryant never let go of his dream, or gave up his interest in drawing and design.

20.     In 1993 he applied and was accepted to Parsons School of Design in Paris. Based on the information contained in Parsons' website, since its founding in 1896, Parsons has been a forerunner in the field of art and design and was the first art and design school in America to found a campus abroad in 1920.

21.     Unfortunately, despite loans and work programs, attendance was cost-prohibitive. Bryant went, instead, to Otis College of Art and Design in Los Angeles. According to its website, Otis began in 1918, when Los Angeles Times founder Harrison Gray Otis bequeathed his MacArthur Park property for a public art college. Otis is a four-year college offering bachelor's degrees in a variety of art and design-related areas including architecture, fine arts, fashion design and toy design.

22.     On an accelerated track, Bryant finished his entire first year in just 5 months, from January to June of 1994. He then applied and was accepted to

4

EXHIBIT ___4___ PAGE _37_

1   transfer to Parsons, however, again he could not raise enough money to go. He

2   stayed one more semester at Otis, but with only a small scholarship and mounting

3   debt, Bryant left the school in December, 1994. He went home to Missouri for

4   Christmas and ended up staying.

5       23.    Realizing that going to Paris and working as a fashion designer was

6   simply not economically feasible, Bryant got the idea that he might be able to

7   combine his love of dolls and fashion by becoming a fashion designer for dolls in

8   the toy industry. Naturally thinking of "Barbie," the fashion doll that had

9   dominated the market for decades, he put together a portfolio of ten or so drawings

10  to send to Mattel, but lacked the confidence to actually send it to such a huge,

11  intimidating company.

12      24.    By 1995, however, he decided he had nothing to lose. Broke and with

13  no real career opportunities in sight, Bryant sent the package to Mattel.

14                    **Bryant's Employment by Mattel**

15      25.    Much to his surprise, Mattel called him for an interview. After

16  completing a "trial project" for the company at its request prior to his being

17  considered for formal employment, he was hired as a temporary employee in

18  September, 1995. He was promoted to a full-time position in November, 1995.

19      26.    During his time at Mattel, Bryant worked exclusively on "Barbie"-

20  related projects for the "Barbie" family of dolls, as directed by Mattel's marketers.

21  Mattel told him what they wanted him to design, and he did what he was directed to

22  do.

23      27.    On occasion, Bryant would offer new, original and creative ideas to

24  Mattel, but Mattel discouraged anything non-traditional. No matter what the idea

25  was, Mattel would try to figure out a way to use it for "Barbie," or not at all.

26      28.    Bryant felt that his creativity and originality were being stifled and

27  suppressed at Mattel.

28

EXHIBIT __4__ PAGE 38

29.    Within two years at Mattel, Bryant was feeling frustrated. He simply did not fit Mattel's mold. He also missed his family, and so decided to return home to Missouri. With some significant design and work experience under his belt, he thought he might be able to build a career as a freelance design artist.

30.    He left California in approximately January 1998, but continued to work for Mattel from Missouri, on a part-time basis, until April, 1998.

### Bryant's Inspiration: "Bratz"

31.    Bryant continued to live with his parents in Missouri for the rest of the 1998, working exclusively on his own ideas and drawings, with the hopes of building a career as a freelance artist.

32.    Among other things, Bryant created greeting cards, and considered going into the greeting card business. He even applied for a job at Hallmark. Bryant also did a bit of freelance design and artwork for Ashton Drake Galleries of Chicago. On information and belief, Ashton Drake is the world's largest direct marketer of limited edition, collectible porcelain dolls, and its dolls have sold at auction for as much as $1200. It is widely renowned among doll collectors for its top-quality, handcrafted collectible dolls. Ashton Drake employs artists and freelancers to work on its doll programs and new doll concepts. Bryant worked on "Angel" and "Wedding" theme projects for the company in 1998. He supplemented his income by working at a clothing store, Old Navy. But Bryant also worked on his own ideas for dolls – his lifelong obsession. One day, while returning home from Old Navy, Bryant drove past a high school and had a "eureka" moment. Inspired by the "bratty" attitude he had observed, as well as advertisements that he had seen relating to hip-hop fashions and other trends of the time, Bryant started sketching multi-ethnic, urban youth, dressed in trendy fashions. Bryant tried to capture in his sketches the "bratty" attitude he had observed. Little did he know then that his concept, "Bratz," would become a national, indeed, international, sensation.

6

EXHIBIT __4__ PAGE 39

33.   Bryant was simply trying to figure out a way to make a living doing what he enjoyed.  Unable to support himself as a freelance artist, however, and turning thirty and not wanting to live at home forever, Bryant realized he needed a steady job.  Based on Mattel's comments to him before he left its employ in 1998 indicating an interest in having him remain with the company, he reapplied and secured a position with Mattel starting in January 1999.

34.   Mattel hired Bryant back to work exclusively on Mattel's "collectibles" line, a high-end, expensive line of "Barbie" dolls designed for adult doll collectors, not children.  He began working for the company again on January 4, 1999.  Again, Mattel's marketing department directed Bryant to create the designs it wanted to market.

35.   Bryant never showed Mattel the ideas, drawings, designs and concepts that he had worked on on his own while he had been gone from the company, including the concept for what later became the "Bratz" dolls.  He already knew that Mattel was not receptive to new, creative, innovative ideas.  Besides that, they were his, and he was afraid that Mattel would not give him credit or compensation.

36.   One day he happened to show his concept for "Bratz" dolls to a friend who did freelance work for MGA Entertainment, Inc. ("MGA").

37.   Bryant's friend thought that MGA might be interested in talking to Bryant, and arranged a meeting.

38.   MGA ultimately offered Bryant a consulting arrangement.  His agreement with MGA was signed on or about October 4, 2000.  Bryant resigned from Mattel immediately, giving two weeks notice, but stayed at the company until October 20 to finish up and transition the projects on which he had been working.

39.   On information and belief, MGA was founded in 1979 as a small consumer electronics business and made its first foray into the toy business in 1987 marketing handheld LCD games featuring licensed "Nintendo" characters, where its initial success allowed it the opportunity to obtain additional licenses for such

7

EXHIBIT 4   PAGE 40

1  popular properties as the "Power Rangers" and others.  By the time Bryant started

2  working for MGA in late 2000, the company was selling other kinds of toys and

3  dolls.

4      40.    After leaving Mattel, Bryant began working with a team of MGA

5  employees and freelancers to develop and physically embody Bryant's concept.

6  The development took substantial time, effort, creativity, money, and know-how,

7  but with this effort, Bryant's concept for "Bratz" dolls was reduced to practice and

8  became a reality.

9          **"Bratz" Dolls Revolutionize The Fashion Doll Market**

10     41.    MGA first unveiled the "Bratz" doll concept at the Hong Kong Toy

11  Fair in January 2001.  In June 2001, MGA introduced the line to the market.

12     42.    Unlike Barbie Dolls, the "Bratz" line of dolls and branded products

13  (collectively "Bratz Dolls") sport a hip, multi-ethnic urban look that appeals to

14  contemporary teenage and pre-teen girls.  At approximately 9.5 to 10 inches tall,

15  the Bratz Dolls are intentionally shorter than Barbie Dolls and look notably

16  different, with large heads, big dramatic eyes and lips, small, thin bodies, oversized

17  feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which

18  requires a stand), and up-to-date fashions.

19     43.    Featuring and embodying the slogan "The Girls With a Passion for

20  Fashion!", Bratz Dolls, invigorated, transformed and expanded the fashion doll

21  market, in particular proving popular among "tween" age girls – *i.e.*, those between

22  childhood and adolescence – who Mattel had all but abandoned as a market.

23     44.    On information and belief, the "Bratz" line has been praised by

24  consumers, retailers and toy industry analysts alike.  In 2001, the "Bratz" line won

25  the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the

26  Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award.  In 2002, the

27  "Bratz" line again won the TIA People's Choice Toy of the Year Award, the

28  Family Fun Toy of the Year Award.  LIMA, the licensing industries official arm,

8

EXHIBIT ___4___  PAGE _41_

1    awarded MGA's "Bratz" the best character license of the year as well as the overall

2    best licensed property of the year for 2003.  MGA's "Bratz" also earned the coveted

3    TIA "Property of the Year" and "Girl Toy of the Year," in 2003, as well as the

4    Family Fun Toy of the Year Award.  MSNBC named "Bratz" the "Hottest Toy of

5    the Year," and both MGA and "Bratz" received several other accolades.

6        45.    According to media reports and business analysts, this success caught

7    Mattel by surprise, with many Mattel insiders reportedly assuming that Bratz would

8    be a short-lived fad.

9        46.    As it turned out, "Bratz" was not a fleeting fancy among young girls.

10       47.    Beginning in 2002, "Bratz" really gave  "Barbie" a run for its money

11   as the top selling fashion doll.

12       48.    Bryant continues to contribute to, and provide ideas, concepts and

13   designs for "Bratz" on an ongoing basis as a designer and consultant for MGA.  For

14   example, Bryant designed a wholly original male character for MGA, which was

15   turned into the "Bratz Boyz" line of dolls by MGA.

16                    **Mattel's Market Response to "Bratz"**

17       49.    In response to "Bratz", Mattel, in 2002, rushed to release "My Scene

18   Barbie," a line of fashion dolls under the "Barbie" name that looked much more

19   like "Bratz" than the traditional main line "Barbie" Doll.  Like "Bratz," "My Scene

20   Barbie" dolls have oversized heads, artfully made-up almond-shaped eyes, large,

21   overly-lined and lipsticked lips, trendy clothes and hair styles, over-sized feet and a

22   more ethnic look.  Like the "Bratz" Dolls, "My Scene" Dolls are packaged with two

23   outfits and an accessory.  And, since fall 2003, like the "Bratz, which are

24   introduced with themes, "My Scene" Dolls are introduced with a theme as well.

25       50.    After the success of MGA's "Bratz Boyz" dolls, Mattel also

26   introduced male doll characters to the "My Scene" line, even though for 45 years

27   the "Barbie" line had only included a single male doll – Barbie's boyfriend "Ken"

28

                                       9

                    EXHIBIT __4__ PAGE __42__