1  (whom, after 45 years as her boyfriend, Barbie "dumped" in a 2004 Mattel publicity

2  stunt to revive "Barbie" in the face of the "Bratz" success).

3      51.   On information and belief, the "My Scene" Dolls, however, have not

4  come close to achieving the popularity and acclaim of "Bratz."

5      52.   A year after the debut of "My Scene," Mattel launched "Flavas," a line

6  of urban fashion dolls also intended to appeal to the "tween" market. "Flavas,"

7  were poorly received by children, parents and the toy industry, and Mattel

8  discontinued the line less than a year after its launch.

9        **Mattel's Accusations of Copyright Infringement Against Bryant**

10      53.   Unable to supplant "Bratz" – the more popular, better quality product

11  – with the inferior and less popular "Flavas" or even "My Scene," Mattel changed

12  tactics. It turned to disparaging Bryant, and accusing him of copying from Mattel.

13      54.   In or about July 2003, Mattel "sources" told a *Wall Street Journal*

14  reporter that "[I]nside Mattel, some are convinced the BRATZ borrow liberally

15  from a Mattel project that was scrapped at the testing stage in 1998." Attached

16  hereto as Exhibit A is a true and correct copy of this article.

17      55.   Mattel's thinly veiled accusation of copyright infringement against

18  Bryant took more substantive form when, in April, 2004, Mattel sued Bryant in

19  California state court for, among other things, allegedly "converting" Mattel's

20  intellectual property (the "Bryant Litigation"). Bryant sought discovery from

21  Mattel, accordingly, regarding any Mattel idea, concept, project or product

22  allegedly stolen or copied by Bryant, including "Toon Teens," "Diva Stars," and

23  "My Scene." Faced with objections from Mattel, Bryant offered to take no further

24  discovery on such issues if Mattel would enter into a fact stipulation that it would

25  not claim that Bryant copied "Bratz" from Mattel's "Toon Teens." Mattel refused

26  to enter into such a stipulation. For reasons unknown, Mattel has not yet sued

27  Bryant for copyright infringement. It has, however, enlisted a surrogate to take a

28

10

EXHIBIT 4 PAGE 43

1   first-run at attempting to establish infringement, perhaps intending to see what the

2   outcome might be before launching a direct attack itself.

3        56.   Specifically, in 2002, MGA filed suit in Hong Kong against the

4   manufacturers of "Funky Tweenz" (known infringers of intellectual property in the

5   toy industry) (the "Hong Kong defendants"). "Funky Tweenz" is a line of "Bratz"

6   knock-off products. In connection with this lawsuit (the "Hong Kong Lawsuit"),

7   Bryant has been informed that MGA filed various documents substantiating its

8   ownership of "Bratz," including with regard to Bryant's involvement in MGA's

9   development of "Bratz" and in its reduction to practice of Bryant's original

10  inspirational sketches. Bryant has also been informed that in August 2004 the

11  Hong Kong defendants produced to MGA's counsel *unreleased photographs* of,

12  and documents relating to, Mattel's "Toon Teens" project – the same project Mattel

13  had mentioned in the *Wall Street Journal* article as the supposed origin of "Bratz."

14  The Hong Kong defendants initially refused, however, to authenticate these

15  documents, or to divulge the source of these photographs. The defendants also

16  refused to explain the purported relevance of the documents to the Hong Kong

17  Lawsuit.

18       57.   Finally, however, Bryant has been informed that on October 7, 2004,

19  the Hong Kong defendants revealed that Mattel was the source of the "Toon Teens"

20  documents and information. Indeed, the Hong Kong defendants have revealed that

21  they – accused copyright infringers – have a document-sharing agreement with

22  Mattel. Apparently, Mattel prefers to assist known infringers in Hong Kong in

23  trying to prove that Bryant copied Mattel in coming up with "Bratz", instead of

24  trying to prove it themselves in a United States federal court of law – or at least for

25  the time being, that seems to be Mattel's strategy.

26       58.   On information and belief, Mattel, and the same counsel representing

27  it in the Bryant Litigation, have told the Hong Kong defendants that "Bratz" is not

28  an original design and have provided documents and other information to those

11

EXHIBIT 4 PAGE 44

1    defendants in an effort to assist such infringers to evade liability for copyright

2    infringement of "Bratz" in the Hong Kong action.  On information and belief,

3    Matter has told the Hong Kong defendants that the "Toon Teens" documents

4    provided to such defendants prove that Bryant copied and infringed Mattel's "Toon

5    Teens" or other Mattel property.

6         59.   Mattel even rushed to register the copyright for its long-shelved "Toon

7    Teens" during the very same month that it claims to have first learned of Bryant's

8    contract with MGA, November, 2003, and using the same counsel that Mattel is

9    using in the Bryant Litigation.  A true and correct copy of this registration is

10   attached hereto as Exhibit B.  Notably, Bryant is informed that the dates on Mattel's

11   "Toon Teens" drawings and pictures reflect that they were created in 1999, *after*

12   Bryant conceived of "Bratz" in 1998.

13        60.   On information and belief, Mattel's copyright registration of "Toon

14   Teens" is no coincidence; it is a preliminary step necessary for Mattel to sue Bryant

15   for copyright infringement.

16        61.   There is no doubt that Mattel intends to get back at Bryant via false

17   allegations and to try to obtain control of Bryant's brainchild any way it can,

18   including falsely alleging that "Bratz" is nothing more than derivative of Mattel's

19   own work(s).  This is wholly untrue.  "Bratz," is an original idea and concept,

20   independently conceived and created during a time when Bryant was not working

21   for Mattel.  The fact that MGA reduced the original designs to practice and further

22   developed "Bratz" into a highly successful product that now competes directly with

23   and has taken market share from Mattel's "Barbie" line of fashion dolls, including

24   as a result of the "Bratz"-inspired and imitating dolls distributed by others, is not to

25   be under-estimated.

26

27

28

12

EXHIBIT  4    PAGE 45

**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-infringement)**

62.     Bryant repeats and realleges the allegations contained in paragraphs 1 through 61 of this Complaint and incorporates them by reference, as though fully and completely set forth herein.

63.     Bryant has a reasonable apprehension that Mattel will bring an action against him under 17 U.S.C.A. §§ 101, *et seq.* alleging that "Bratz" is not an independent or original work but, rather, is copied, derived from or infringes Mattel's copyrights in "Toon Teens," or some other Mattel work; that Mattel is the rightful owner of his "Bratz" idea, concept or original drawings or works and any copyrights and other intellectual property rights therein; and that Mattel alone possesses the exclusive rights to exploit such rights.

64.     Bryant contends that "Bratz" is his own independent and original idea, concept and work, that "Bratz" dolls were derived from Bryant's original idea, concept and work, and that Mattel has no right in "Bratz" whatsoever.  Bryant denies that he copied any of Mattel's property or work in conceiving and developing "Bratz," and denies that "Bratz" infringes or was derived from any Mattel property or work.

65.     Indeed, "Bratz" and "Toon Teens" are not substantially similar.  "Bratz" are sexy, hip, modern fashion dolls with up-to-date fashions, and are designed to look like real teenagers, and the "Bratz" themes and playsets are based on places and activities that real teenagers would go to and do.  Bryant is informed that "Toon Teens," in contrast, appear to be childlike, soft-bodied dolls with "baby-fat" and bright, fantasy-colored hair and are, by Mattel's own statements to the *Wall Street Journal*, "cartoonish."

66.     An actual and justiciable controversy exists between Bryant and Mattel regarding whether Bryant's  ideas, concepts, or designs for, or contributions to,

13

EXHIBIT __4__   PAGE __40__

1  "Bratz" were and are original works, or copied from, derivative of or infringing on

2  Mattel's works, be it "Toon Teens," or any other unidentified Mattel work.

3      67.    This actual and justiciable controversy arises under federal copyright

4  law.

5      68.    Bryant seeks Declaratory Judgment of non-infringement; specifically

6  that his ideas, concepts, and designs for, and contributions to, "Bratz" were and are

7  original works, and were and are not copied from, derivative of or infringing on any

8  Mattel work.

9      69.    A judicial declaration of non-infringement is necessary and

10  appropriate at this time pursuant to 28 U.S.C. § 2201, so that Bryant may ascertain

11  his rights and duties with respect to "Bratz," including but not limited to dispelling

12  any potential cloud over his ability to have assigned or otherwise transferred rights

13  to his original works to MGA.  It is also necessary to clear Bryant's name and

14  mitigate the continuing damage to his reputation resulting from Mattel's unfounded

15  representations about Bryant made in the press and to the defendants in the Hong

16  Kong Litigation.

17      WHEREFORE, Bryant hereby prays for relief against Mattel as

18  follows:

19      1.    For a Declaratory Judgment of non-infringement.

20      2.    For a Declaratory Judgment that Bryant's ideas, concepts,

21  drawings and designs for, and contributions to, "Bratz" were and are independent

22  and original works, and were and are not copied from, derivative of or infringing

23  any Mattel work, including, without limitation, Mattel's copyrighted "Toon Teens."

24      3.    For a Declaratory Judgment that Bryant was the sole and true

25  owner of all rights relating to "Bratz" that Bryant heretofore assigned to MGA and

26  that such rights were owned by Bryant free and clear of any ownership claim by

27  Mattel at the time he assigned rights to MGA. .

28      4.    For a Declaratory Judgment that none of Bryant's contributions

14

EXHIBIT 4  PAGE 47

1   to and work on "Bratz" infringes Mattel's copyrighted "Toon Teens" or any other

2   property allegedly owned by Mattel and that all such contributions to and work on

3   "Bratz" by Bryant were independent and original to Bryant.

4          5.     For costs of suit herein, including reasonable attorneys' fees,

5   and such other and further relief as the court may deem just and proper.

6

7          Dated: November 2, 2004            ROBERT F. MILLMAN

8                                             DOUGLAS A. WICKHAM
                                              KEITH A. JACOBY
9                                             LITTLER MENDELSON

10

11

12                                    By
13                                             KEITH A. JACOBY
                                              Attorneys for Plaintiff
14                                            CARTER BRYANT

15

16   Los_Angeles:381846.1 028307.1010

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 4 PAGE 48

Westlaw.



7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Friday, July 18, 2003

Dolled Up: To Lure Older Girls, Mattel Brings In Hip-Hop Crowd

---

It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'Bratz'

---

Battle of the Big Heads

By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8- to 12-year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT 4 PAGE 49

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories; she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized

*Copr. © West 2004 No Claim to Orig. U.S. Govt. Works*

EXHIBIT  4   PAGE 50

heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet -- they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT   4   PAGE 51

as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer.  "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights -- meaning separate molds -- and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self-expression," she says.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT  4  PAGE 52

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire."

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11 body piercings and her mud wrestling-themed MTV video called "Dirrty."It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."

---- INDEX REFERENCES ----

COMPANY:        KB Holdings LLC (KBTY); Mattel Inc (MATL)

NEWS SUBJECT: .  (Marketing (C31); Market Share (C313); Corporate/Industrial . News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice - Consumer Products (REQRCP); Editor's Choice - Industry Trends/Analysis (REQR))

INDUSTRY:        (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

REGION:        (North American Countries (NAMZ); United States (USA); United States - California (USCA); Northeast U.S. (USE); United States - Massachusetts (USMA); Western U.S. (USW))

Language: EN

OTHER INDEXING:    Marketing; Market Share; Page-One Story; Content Types; Corporate/Industrial News; United States - California; United States - Massachusetts; United States; Northeast U.S.; Western U.S.; North American Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores; Consumer Products; Media; Consumer Cyclical; Newswire More Code; Newswire End Code; All Entertainment & Leisure; Limited Product Specialty Retailers; Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index; S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

Word Count: 2217

7/18/03 WSJ A1
END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT __4__ PAGE __53__

# Certificate of Registratic



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

**VAu 612 – 625**

EFFECTIVE DATE OF REGISTRATION

11 - 28 - 03
Month   Day   Year

---

DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE USE A SEPARATE CONTINUATION SHEET

**1**

Title of This Work ▼
TOON TEENS

NATURE OF THIS WORK ▼ See Instructions
Doll designs

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical serial or collection give information about the collective work in which the contribution appeared Title of Collective Work ▼

If published in a periodical or serial give   Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

**2**

**a**

NAME OF AUTHOR ▼
Mattel Inc

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

**NOTE**

Under the law the author of a work made for hire is generally the employer not the employee (see instructions) For any part of this work that was made for hire check 'Yes' in the space provided give the employer (or other person for whom the work was prepared) as 'Author' of that part and leave the space for dates of birth and death blank

Was this contribution to the work a 'work made for hire'?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
Domiciled in **United States**

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is 'Yes' see detailed instructions

Nature of Authorship Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture   ☐ Map   ☐ Technical drawing
☑ 2 Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

**b**

Name of Author ▼

Dates of Birth and Death
Year Born ▼   Year Died ▼

Was this contribution to the work a 'work made for hire'?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is 'Yes' see detailed instructions

Nature of Authorship Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2 Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

**3**

**a**

Year In Which Creation of This Work Was Completed
1999
This information must be given

**b**

Date and Nation of First Publication of This Particular Work
Complete this information Month _____ Day _____ Year _____

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼
Mattel Inc
333 Continental Blvd
El Segundo CA 90245

APPLICATION RECEIVED
NOV 28 2003
ONE DEPOSIT RECEIVED
NOV 2 8 2003
TWO DEPOSITS RECEIVED
FUNDS RECEIVED

EXHIBIT 4 PAGE 54

MORE ON BACK ▶

| EXAMINED BY | | FORM VA |
| CHECKED BY | | |
| ☐ CORRESPONDENCE<br>☐ Yes | | FOR<br>COPYRIGHT<br>OFFICE<br>USE<br>ONLY |

**DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE USE A SEPARATE CONTINUATION SHEET**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes  ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form

b. ☐ This is the first application submitted by this author as copyright claimant

c. ☐ This is a changed version of the work, as shown by space 6 on this application

If your answer is "Yes"  give  Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation

a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates ▼

b Material Added to This Work  Give a brief general statement of the material that has been added to this work and in which copyright is claimed ▼

**6**

a

See instructions
before completing
this space

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account

Name ▼                                          Account Number ▼

Mattel  Inc                                       DA037842

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent  Name/Address/Apt/City/State/ZIP ▼  5

Tania Krebs  Quinn Emanuel Urquhart Oliver & Hodges
865 South Figueroa Street, 10th Floor
Los Angeles  CA 90017 2543

b

Area code and daytime telephone number    (213 ) 443 3675              Fax number    (213 )624 0643

Email   taniakrebs@quinnemanuel com

**CERTIFICATION\*** I  the undersigned  hereby certify that I am the

check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  Mattel  Inc
Name of author or other copyright claimant or owner of exclusive right(s)

**8**

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

Typed or printed name and date ▼ If this application gives a date of publication in space 3 do not sign and submit it before that date

Tania Krebs                                        Date  11 20 2003

Handwritten signature (X) ▼

x  Tania Krebs   11-20-03

| Certificate<br>will be<br>mailed in<br>window<br>envelope<br>to this<br>address | Name ▼<br>Tania Krebs  Quinn Emanuel | **9** |
| | Number/Street/Apt ▼<br>865 South Figueroa Street 10th Floor | |
| | City/State/ZIP ▼<br>Los Angeles  CA 90017 2543 | |

EXHIBIT  4   PAGE  55

**EXHIBIT  5**



Received:  7/18/08  4:40PM    RightFAX -> JetFax  20;  Page 2
RightFAX         7/18/2006 4:37    PAGE 002/019   Fax Server

FILED

**ENTERED**

JUL 1 8 2006

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
DEPUTY

2006 JUL 18 AM 10: 16

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(D).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

        Plaintiff,

v.

MATTEL, INC.,

        Defendant,

and related actions.

CASE NO. CV 04-09049 SGL (RNBx)

(Consolidated with cases CV 04-09059 and CV 05-02727)

ORDER GRANTING MOTIONS TO DISMISS

## I. Introduction

This consolidated action involves the individual cases of Bryant v. Mattel, Inc., CV 04-09049; Mattel, Inc. v. Bryant, CV 04-09059; and MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727.  This Order rules on Motions to Dismiss previously docketed in cases 04-09049 and 04-9059.

The factual background underlying this consolidated action is complex.  The Court sets forth the factual background only to the extent that it is necessary to discuss its ruling on two pending motions to dismiss.  A hearing regarding these motions was held on June 26, 2006.  For the reasons and in the manner set forth below, the Court grants both motions.

DOCKETED ON CM
JUL 1 8 2006

EXHIBIT  5   PAGE  56

Received:   7/18/06  4:41P)                    RightFAX -> JetFax  )20;   Page 3
RightFAX                    7/ _d/2006 4:37    PAGE 003/019    Fax Server

1                     **II. Motion to Dismiss (04-09049)**

2     A.     <u>Factual Background</u>

3           Carter Bryant is a designer to whom creation of MGA's "Bratz" line of dolls has

4     been attributed.  Compl. ¶ 6.  Mattel has sued him under a variety of state-law theories

5     relating to certain agreements Bryant signed while an employee with Mattel.  <u>See</u>

6     <u>generally</u> Compl. filed in 04-09059.  Although Mattel has not sued him for copyright

7     infringement of any Mattel product, Bryant nevertheless claims that he is reasonably

8     apprehensive regarding being sued for copyright infringement.  Specifically, Bryant

9     makes the following allegations in his complaint seeking declaratory relief:

10           First, Bryant claims that an article published in the <u>Wall Street Journal</u> in July,

11    2003, attributed to Mattel sources a belief that "the Bratz borrow liberally from a Mattel

12    project that was scrapped at the testing stage in 1998."  Compl. Ex. A; Compl. ¶ 54.

13    The scrapped Mattel project is alleged to be the project referred to by Mattel as "Toon

14    Teens."  Compl. ¶ 56.

15           Second, Bryant alleges that he suggested, as a way to resolve a discovery

16    dispute, that Mattel stipulate that it would not sue based on "Toon Teens."  Compl.

17    ¶ 55.  Mattel refused to do so.  <u>Id.</u>  However, since that initial refusal, Mattel has

18    represented to the Court that it "will not maintain that Bratz infringes the copyright in

19    Toon Teens."  June 26, 2006, Tr. at 64 (statement of Mattel counsel John B. Quinn).

20    Mattel has reiterated this position in a post-hearing brief, filed on July 5, 2006.

21           Third, Mattel cooperated with a Hong Kong toy company that MGA sued for

22    copyright infringement.  Compl. ¶ 56.  MGA's claims involved the Bratz dolls.  <u>Id.</u>

23    Mattel's cooperation consisted of providing the Hong Kong toy company with

24    documents and photographs of the Toon Teens products, ostensibly to help prove that

25    Bratz was not an original design and that Bryant had copied and infringed Toon

26    Teens. ·Compl. ¶ 57.

27           Finally, Bryant notes that Mattel did not seek copyright registration until

28    November, 2003, which is the same time Mattel claims it first learned of Bryant's

                                          2

                          EXHIBIT _5___ PAGE 5̶7̶

Received:   7/18/06   4:41PM                    RightFAX -> JetFax   20;   Page 4
RightFAX                    7/18/2006 4:37    PAGE 004/019   Fax Server

1    contract with MGA.  Compl. ¶¶ 59-60.  Bryant alleges that registration of a copyright is

2    a necessary step to be taken prior to filing a copyright infringement action.  Compl.

3    ¶ 60.

4    **B.    Standing to Seek Declaratory Relief**

5         The purpose of the Declaratory Judgment Act is "to relieve potential defendants

6    from the Damoclean threat of impending litigation which a harassing adversary might

7    brandish, while initiating suit at his leisure — or never." Societe de Conditionnement

8    v. Hunter Engineering Co., 655 F.2d 938, 943 (9th Cir.1981).  However, a party

9    seeking declaratory relief must still satisfy the "case or controversy" requirement found

10   in 28 U.S.C. § 2201(a).  Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896

11   F.2d 1542,1555 (9th Cir. 1990).  This requirement must be satisfied at the time the

12   suit is filed and must continue throughout the term of the suit. Id. at 1556 (citing

13   International Harvester Co. v. Deere & Co., 623 F.2d 1207, 1210 (7th Cir.1980)).

14        To meet this requirement, a party seeking declaratory relief must show that,

15   based on his reasonable perceptions, under all the circumstances of the case, there is

16   a substantial controversy between parties having adverse legal interests that causes

17   in the plaintiff a real and reasonable apprehension that he will be subject to liability,

18   and the controversy is of sufficient immediacy and reality to warrant declaratory relief.

19   Hal Roach, 896 F.2d at 1555.  The apprehension must have been caused by the

20   defendant's actions. Id. (citing International Harvester, 623 F.2d at 1211).

21        Viewing Bryant's allegations in light of this standard, and in light of recent

22   developments, the Court must conclude that Bryant, although having a reasonable

23   apprehension of suit prior to counsel's representations regarding the intent to sue

24   based on Toon Teens, no longer has a reasonable apprehension that he will be

25   subject to liability.  Bryant's Complaint, of course, makes reference to "other Mattel

26   products;" however, the substance of his allegations all address the product "Toon

27   Teens."  The Wall Street Journal article is alleged to have involved Toon Teens.

28   Mattel's cooperation with the Hong Kong toy company allegedly involved Toon Teens.

3

EXHIBIT  5  PAGE 58

Received:   7/18/08   4:42PM          RightFAX -> JetFax    20;   Page 5
RightFAX              7/13/2008 4:37    PAGE 005/019   Fax Server

1   The copyright registration referenced in the Complaint relates to Toon Teens.  No

2   other allegations are made that might tend to raise a real and reasonable

3   apprehension that Bryant could be subject to liability for copyright infringement based

4   on any other Mattel product.  Accordingly, Bryant has not met the standard for

5   asserting a claim for declaratory relief.

6   **C.**   **Ruling on Motion to Dismiss**

7        Accordingly, the Court **GRANTS** the Motion to Dismiss and dismisses without

8   prejudice Bryant's claim for declaratory relief.  Should Bryant, through discovery or

9   otherwise, acquire a real and reasonable apprehension of being subject to liability on

10   the basis of another identifiable Mattel product, Bryant may file a declaratory relief

11   claim.  A claim by Mattel of copyright infringement based on the Toon Teens product

12   is barred by counsel's representation; therefore, Bryant may not seek declaratory relief

13   regarding this issue.

14                **III. Motion to Dismiss (04-9059)**

15   **A.**   **Factual Background**

16        The parties make the following factual allegations and assert the following

17   claims and counterclaims.

18        Bryant was employed by Mattel from September, 1995, to April, 1998, and

19   again beginning in January, 1999, and ending in October, 2000.  Compl. ¶ 9.  In

20   January, 1999, Bryant signed documents entitled "Employee Confidential Information

21   and Inventions Agreement" ("Employee Agreement") and "Conflict of Interest

22   Questionnaire" ("COI Questionnaire").  The Employee Agreement provides:

23        This Agreement is designed to make clear that: (i) I will maintain the

24        confidentiality of the Company's trade secrets; (ii) I will use those trade

25        secrets for the exclusive benefit of the Company; (iii) inventions that I

26        create will be owned by the Company; (iv) my prior and continuing

27        activities separate from the Company will not conflict with the Company's

28        development of its proprietary rights; and (v) when and if my employment

4              EXHIBIT 5   PAGE 59

Received:   7/18/06   4:42PM          RightFAX -> JetFax   20;   Page 6
RightFAX              7/18/2006 4:37    PAGE 006/019   Fax Server

with the Company terminates I will not use my prior position with the Company to the detriment of the Company.

1.     Provisions Related to Trade Secrets

. . . .

(b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does Business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing, I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

. . . .

2.     Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions [as defined below] conceived or reduced to practice to me (alone or jointly by others) at any time during my employment by the Company, I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. . . .

5          EXHIBIT  5  PAGE 6D

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code.  That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer."  I understand that I bear the burden of proving that an invention qualifies under Section 2870.

. . . .

3.      Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort.  Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time.  I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

4.      Miscellaneous

. . . .

6

EXHIBIT -5   PAGE 6

Received:   7/18/08   4:43PM         RightFAX -> JetFax    20;   Page 8
RightFAX            7/18/2008 4:37    PAGE 008/019    Fax Server

1       (f) This agreement will be governed by and interpreted in

2   accordance with the laws of the State of California.

3                                . . . .

4       CAUTION: THIS AGREEMENT CREATES IMPORTANT

5   OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS

6   TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER

7   EMPLOYMENT.

8   Employment Agreement, attached to the Compl. as Ex. A.[1]

9   **B.     The Parties' Claims**

10      Mattel brings a number of claims based on these documents, including breach

11  of contract, breach of fiduciary duty, breach of the duty of loyalty, unjust enrichment,

12  and conversion.

13      Bryant brings a number of counterclaims based on these documents.

14  Specifically, Bryant makes the following challenges to the Employment Agreement:

15      In his first counterclaim, Bryant claims that the Employment Agreement violates

16  Cal. Bus. & Prof. Code §§ 17200 (unfair competition law) because (a) it is an unfair

17  restraint of trade (restricting job mobility and use of publicly available information) in

18  violation of Cal. Bus. & Prof. Code § 16600; (b) it violates Cal. Labor Code §§ 96(k),

19  98.6, and 2699; (c) it violates Cal. Labor Code § 2870; and (d) it is procedurally and

20  substantively unconscionable. See Bryant's Counterclaims ¶¶ 33-47.

21      In his second counterclaim, Bryant claims that the Employment Agreement

22  should be rescinded because it was procured due to mistake, duress, menace and/or

23

24  _____

25  [1] Bryant objects to the Court's consideration of the Agreement and the COI
    Questionnaire.  Bryant purports to dispute the authenticity of these documents.
26  However, examining the substance of Bryant's objections, it becomes clear that Bryant
    objects not to the content of these documents, but to the validity and legal effect of
27  these documents.  Accordingly, the Court's consideration of these documents in
    connection with the present Motion to Dismiss is proper.  See Parrino v. FHP, Inc., 146
28  F.3d 699, 706 (9th Cir. 1998) (the Court may consider documents whose authenticity is
    not questioned and upon which the complaint necessarily relies).

                                7

EXHIBIT  5   PAGE  62

1   fraud. See Bryant's Counterclaims ¶¶ 48-54.

2        In his third counterclaim, Bryant alleges that the Employment Agreement was

3   procured by fraud in that Mattel "fail[ed] to disclose to Bryant the true meaning of the

4   terms and the purported legal effect of the [Employment] Agreement." See Bryant's

5   Counterclaims ¶¶ 55-60.

6        Finally, in his fourth counterclaim, Bryant seeks declaratory judgment that

7   Mattel's conduct in requiring Bryant and other employees to execute the Employment

8   Agreement constitutes unfair competition and unfair business practices in violation of

9   Cal. Bus. & Prof. Code §§ 17200 and 16600. Bryant also seeks a declaration that the

10  Employment Agreement is unlawful and unenforceable as to him and as to other

11  current and former employees of Mattel. See Bryant's Counterclaims ¶¶ 61-65.

12  C.    **Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

13       The present Motion to Dismiss requires the Court to determine whether the

14  counterclaims state any claim upon which relief may be granted. See Fed R. Civ. P.

15  12(b)(6). The Court will not dismiss the claims for relief unless Bryant cannot prove

16  any set of facts in support of the claims that would entitle him to relief. See Steckman

17  v. Hart Brewing, Inc., 143 F.3d 1293, 1295 (9th Cir. 1998). In limiting its inquiry to the

18  content of the counterclaims, the Court must take the allegations of material fact as

19  true and construe them in the light most favorable to Bryant. See Western Reserve

20  Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985). Additionally, the Court "is

21  not required to accept legal conclusions cast in the form of factual allegations if those

22  conclusions cannot be reasonably drawn from the facts alleged." Clegg v. Cult

23  Awareness Network, 18 F.3d 752, 755 (9th Cir. 1994).

24  D.    **§ 17200 Claim**

25       1.    **Generally**

26       "California's unfair competition law (UCL) (17200 et seq.) defines 'unfair

27  competition' to mean and include any unlawful, unfair or fraudulent business act or

28  practice. . . ." Kasky v. Nike, Inc., 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296 (2002)

EXHIBIT 5 PAGE 63

1   (internal quotation marks and citation omitted).  Because "section 17200 is written in

2   the disjunctive, it establishes three varieties of unfair competition—acts or practices

3   which are unlawful, unfair, or fraudulent." Cel-Tech Communications v. Los Angeles

4   Cellular Telephone Co., 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548 (1999) (emphasis

5   added). "Unlawful" practices are those practices that are prohibited by law, whether

6   "civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made."

7   Saunders v. Superior Court, 27 Cal.App.4th 832, 839 (citing People v. McKale, 25

8   Cal.3d 626, 632 (1979)).  The prohibition against "unfair" conduct is not as broad as it

9   would seem.  In Cel-Tech, the California Supreme Court announced that the test of

10  "unfairness" for commercial cases:  "Unfair" means "conduct that threatens an

11  incipient violation of an antitrust law, or violates the policy or spirit of one of those laws

12  because its effects are comparable to or the same as a violation of the law, or

13  otherwise significantly threatens or harms competition." Cel-Tech, 20 Cal.4th at 187.

14      2.    **Standing**

15          Bryant claims to be bringing the § 17200 "on his own behalf, on behalf of all

16  current and former employees of Mattel employees . . . and on behalf of the general

17  public." See Counterclaims ¶ 10.  The parties disagree as to whether he may bring

18  such a claim on behalf of anyone other than himself and argue this point on state-law

19  grounds.  However, it is clear under established Ninth Circuit authority that Bryant's

20  purported claims on behalf of others suffer from a federal constitutional deficiency:

21  Bryant must satisfy the case-or-controversy requirement of Article III for any claim that

22  he brings under § 17200.  Bryant has not alleged facts that establish that he has

23  standing to bring his claims on behalf of anyone other than himself.[2] See Lee v.

24  American Nat. Ins. Co., 260 F.3d 997, 1001 (9th Cir. 2001) (rejecting, on

25  constitutional grounds, a plaintiff's attempt to assert a § 17200 claim on behalf of

26  others noting that "Article III of the Constitution . . . limits the jurisdiction of the federal

27

28

    ────────────

    [2] As stated below, Bryant has failed to state a claim on his own behalf as well.

                            9

EXHIBIT   5   PAGE 64

1    courts to 'cases and controversies,' a restriction that has been held to require a

2    plaintiff to show, *inter alia*, that he has actually been injured by the defendant's

3    challenged conduct.") (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,

4    528 U.S. 167, 180, 120 S.Ct. 693 (2000)).

5         Absent class-action type allegations (and a successful motion to certify a class

6    pursuant to Fed. R. Civ. P. 23), it appears to the Court that Bryant cannot assert

7    claims challenging the Employee Agreement or the COI Questionnaire on behalf of

8    anyone other than himself.  Therefore, the Court considers only whether Bryant has

9    stated a claim pursuant to § 17200 on his own behalf.

10        **3.    Cal. Bus. & Prof. Code § 16600**

11        Bryant argues that the Agreement is "unlawful" because it violates Cal. Bus. &

12    Prof. Code § 16600, which provides: "Except as provided in this chapter, every

13    contract by which anyone is restrained from engaging in a lawful profession, trade, or

14    business of any kind is to that extent void." Id. Specifically, Bryant argues (without

15    further elaboration) that "the [Employment] Agreement unlawfully impair[s] Bryant's

16    right to prepare to compete with Mattel." Opp. at 7.

17        California law permits an employee to seek other employment and even to

18    make some "preparations to compete" before resigning.  See Bancroft-Whitney Co. v.

19    Glen, 64 Cal.2d 327, 346 (1966) ("The mere fact that the officer makes preparations

20    to compete before he resigns his office is not sufficient to constitute a breach of duty.

21    It is the nature of his preparations which is significant.")  However, "an employee may

22    not transfer his loyalty to a competitor." Stokes v. Dole Nut Co., 41 Cal.App.4th 285,

23    295 (1995).  "During the term of employment, an employer is entitled to its employees'

24    undivided loyalty." Id. (internal citations and quotation marks omitted).

25        Mattel alleges in the Complaint that Bryant entered into an agreement with

26    MGA to provide MGA design services on a "top priority" basis while he was still

27    employed with by Mattel. Compl. ¶ 13. Bryant also makes similar allegations in the

28    related case, Bryant v. Mattel, Inc., 04-09049: "MGA ultimately offered Bryant a

                                    10

EXHIBIT __5__ PAGE __45__

Received:   7/18/08   4:45PM          RightFAX -> JetFax   20:   Page 12
RightFAX                    7/18/2008 4:37    PAGE 012/019   Fax Server

1   consulting arrangement.  His agreement with MGA was signed on or about October 4,

2   2000.  Bryant resigned from Mattel immediately, giving two weeks notice, but stayed at

3   the company until October 20 to finish up and transition the projects on which he had

4   been working."  Compl. ¶ 38.

5          The parties' arguments assume that the Employment Agreement would prohibit

6   such conduct;[3] therefore, the Court considers whether an agreement prohibiting an

7   employee from entering into a contract with a competitor *during the course of his*

8   *employment* constitutes an unfair restraint of trade in violation of § 16600.  The Court

9   concludes that it does not.  Such an agreement is more akin to ensuring the employer

10  has the "employee's undivided loyalty" than it is to an agreement that restricts an

11  employee from "prepar[ing] to compete."  For this reason, Plaintiff cannot state a

12  § 17200 claim on this basis.

13         4.      <u>Cal. Labor Code §§ 96(k), 98.6 and 2699</u>

14         Bryant also argues that the Agreement is "unlawful" because it violates a

15  number of provisions of the California Labor Code.  Specifically, Bryant alleges that

16  the Agreement is "unlawful" because it violates § 96(k), which provides:

17             The Labor Commissioner and his or her deputies and

18         representatives authorized by him or her in writing shall, upon the filing

19         of a claim therefor by an employee, or an employee representative

20         authorized in writing by an employee, with the Labor Commissioner, take

21         assignments of: . . . (k) Claims for loss of wages as the result of

22         demotion, suspension, or discharge from employment for lawful conduct

23         occurring during nonworking hours away from the employer's premises.

24  Cal. Labor Code § 96(k).

25         Section 98.6 prohibits discrimination or retaliation against an employee who

26  engages in conduct described in §96(k).  Section 2699 authorizes a private right of

27

28

---

[3] The Court does not mean to imply that Bryant has conceded this point.

11

EXHIBIT  5  PAGE  66

1    action for certain violations of the Labor Code.

2         Assuming that § 96(k) would otherwise support a § 17200 claim, Bryant has still

3    failed to allege any "loss of wages" or "demotion, suspension or discharge" based on

4    lawful off-duty conduct.  Therefore, Bryant has not alleged facts sufficient to support a

5    violation of § 96(k) that would, in turn, support his § 17200 claim.

6         Despite Mattel's arguments against § 98.6 and § 2699 as a proper basis for

7    Bryant's § 17200 claim, Bryant did not defend such claims in his opposition; therefore,

8    the Court treats these claims as abandoned.

9         5.   <u>Cal. Labor Code § 2870</u>

10        Bryant also argues that the Agreement is "unlawful" because it violates Cal.

11   Labor Code § 2870.  That provision states:

12             (a) Any provision in an employment agreement which provides

13        that an employee shall assign, or offer to assign, any of his or her rights

14        in an invention to his or her employer shall not apply to an invention that

15        the employee developed entirely on his or her own time without using the

16        employer's equipment, supplies, facilities, or trade secret information

17        except for those inventions that either:

18             (1) Relate at the time of conception or reduction to practice of the

19        invention to the employer's business, or actual or demonstrably

20        anticipated research or development of the employer; or

21             (2) Result from any work performed by the employee for the

22        employer.

23             (b) To the extent a provision in an employment agreement

24        purports to require an employee to assign an invention otherwise

25        excluded from being required to be assigned under subdivision (a), the

26        provision is against the public policy of this state and is unenforceable.

27   Cal. Labor Code § 2870.

28        The Employment Agreement assigns the rights to certain inventions by the

12

EXHIBIT __5__ PAGE __67__

1    employee to the Company.  The Agreement limits the scope of this assignment to the

2    extent required by § 2870 by specifically incorporating and quoting § 2870.  The

3    Agreement also informs the employee that he bears the burden of proving that the

4    invention falls within the scope of § 2870.  This is consistent with California law.  See

5    Cal. Labor Code § 2872 ("In any suit or action arising thereunder, the burden of proof

6    shall be on the employee claiming the benefits of its provisions.").

7        Therefore, Bryant cannot maintain a § 17200 claim based on § 2870.

8        **6.    Unconscionability**

9        Unconscionability has both procedural and substantive elements.  Armendariz

10   v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 99 (2000).  Both must

11   be present for a court to invalidate a contract or one of the contract's provisions.  Id. at

12   114.  However, "[t]he more substantively oppressive the contract term, the less

13   evidence of procedural unconscionability is required to come to the conclusion that the

14   term is unenforceable, and vice versa."  Id.

15       Procedural unconscionability focuses on the elements of oppression and

16   surprise.  Discover Bank v. Superior Court, 36 Cal.4th 148, 160 (2005).  "Oppression

17   arises from an inequality of bargaining power which results in no real negotiation and

18   an absence of meaningful choice . . . .  Surprise involves the extent to which the terms

19   of the bargain are hidden in a 'prolix printed form' drafted by a party in a superior

20   bargaining position."  Crippen v. Central Valley RV Outlet, 124 Cal.App.4th 1159, 1165

21   (2004).

22       Substantive unconscionability focuses on the actual terms of the agreement

23   and evaluates whether they create "overly harsh" or "one-sided results."  Armendariz,

24   24 Cal.4th at 114.  To be substantively unconscionable, a contractual provision must

25   shock the conscience.  California Grocers Assn. v. Bank of America, 22 Cal.App.4th

26   205, 214 (1994).

27       Here, Bryant alleges that the Employee Agreement is a contract of adhesion.

28   Counterclaims ¶ 26.  For purposes of the present analysis, the Court assumes that the

13

EXHIBIT  5  PAGE 68

Received:   7/18/06   4:46PM       RightFAX -> JetFax ' 20;   Page 15
RightFAX              7/1../2006 4:37    PAGE 016/019   Fax Server

1   Employment Agreement is procedurally unconscionable.  See Discover Bank v.

2   Superior Court, 36 Cal.4th 148, 160 (2005) ("The procedural element of an

3   unconscionable contract generally takes the form of a contract of adhesion, which,

4   imposed and drafted by the party of superior bargaining strength, relegates to the

5   subscribing party only the opportunity to adhere to the contract or reject it.") (internal

6   quotation marks and citation omitted).  However, upon examination of the terms of the

7   Employment Agreement, the Court is unable to conclude that the element of

8   substantive unconscionability has been met.  It is not surprising or overly harsh that

9   Mattel would expect its trade secrets and proprietary information to be kept

10   confidential; the same is true regarding Mattel's expectation that the works of its

11   design staff — created by Mattel's employees, using Mattel's resources, during time

12   for which Mattel paid the employee — be considered its property.  Therefore, Bryant

13   cannot state a claim based on unconscionability.

14       7.    **Cal. Labor Code §§ 232 and 232.5**

15       Although not pleaded in the Counterclaims, Bryant argues that his § 17200

16   claim is supported by an alleged violation of §§ 232 and 232.5.  These provisions

17   prohibit limitations on an employee's ability to disclose the amount of his or her wages

18   or information about his or her working conditions.  Bryant's arguments fail to address

19   how the Employment Agreement (which prohibits the disclosure of "trade secrets" and

20   "proprietary information") prevented him from disclosing the amount of his wages or

21   information about his working conditions.  Bryant has failed to state a § 17200 claim

22   based on §§ 232 and 232.5.

23       8.    **Unfairness**

24       As noted above, there is only a limited basis on which a plaintiff may challenge

25   conduct as an "unfair" business practice.  See Cel-Tech Communications, 20 Cal.4th

26   at 187 ("unfair" conduct that may be challenged pursuant to § 17200 is conduct that is,

27   or is similar to, conduct that constitutes a violation of antitrust laws).  Bryant's

28   allegations do not state a claim for an "unfair" business practice in violation of

14   EXHIBIT _5_ PAGE 69

Received:   7/18/06   4:46PM          RightFAX -> JetFax  ~20;   Page 16
RightFAX              7/__/2006 4:37     PAGE 016/019   Fax Server

§ 17200.

**9.    "Fraudulent" Conduct**

Bryant also argues that the same conduct complained of in connection with his fraud claim also supports a § 17200 claim based on the prohibition against "fraudulent" conduct. This claim is not cognizable. Bryant's fraud claim, explored more fully in the following section, is based upon Mattel's alleged failure to explain to him the terms of the Employment Agreement. However, to allege a "fraudulent business practice" under § 17200, a plaintiff must allege that "members of the public are likely to be deceived." Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal.3d 197, 211 (1983). Bryant has not alleged facts that would tend to establish that the public might be deceived by Mattel's conduct regarding its employment practices.

**E.    Fraud Claim**

The parties agree that Bryant's fraud claim is one for fraudulent concealment, and that Bryant must allege all the elements set forth in Marketing West, Inc. v. Sanyo Fisher Corp., 6 Cal.App.4th 603, 612-13 (1992): (1) Mattel must have concealed or suppressed a material fact; (2) Mattel must have been under a duty to disclose the fact to Bryant; (3) Mattel must have intentionally concealed or suppressed the fact with the intent to defraud Bryant; (4) Bryant must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, Bryant must have sustained damage. Bryant alleges that "Mattel required [him] to execute the [Employment] Agreement without disclosing to him its true import and terms." Counterclaims ¶ 56. Bryant's claim is, in essence, that Mattel failed to inform him of the potential legal effect the Agreement might have; in other words, Bryant claims that Mattel failed to fully explain the Agreement to him. This does not support a fraudulent concealment claim.

Bryant argues, based on Marketing West, that because Mattel chose to

15

EXHIBIT _5_ PAGE 70

Received:   7/18/06  4:47PM;                RightFAX -> JetFax M⁻⁻0;   Page 17
RightFAX                7/. /2006 4:37     PAGE 017/019     Fax Server

1  respond to his inquiries, Mattel was under a duty to disclose material facts.  Under

2  Marketing West, where a party is "under no duty to speak" but nevertheless

3  "undertakes to do so, either voluntarily or in response to inquiries, he is bound not only

4  to state truly what he tells but also not to suppress or conceal any facts within his

5  knowledge which materially qualify those stated."  Marketing West, 6 Cal.App.4th at

6  613 (citing Rogers v. Warden, 20 Cal.2d 286, 289 (1942)) (internal quotation marks

7  omitted).  In other words, one who speaks "must make a full and fair disclosure."  Id.

8         Bryant makes no allegations that suggest that anyone at Mattel falls into this

9  category.  He alleges that he was "presented with the form Agreement by Mattel," and

10  that "he was told that his execution of the Agreement was a condition of his

11  employment."  Counterclaims ¶ 26.  He then alleges that "[t]he terms of the Agreement

12  were not explained to him."  Id.  This is not the situation discussed in Marketing West

13  which, not surprisingly, prohibits a party from disclosing only that part of the truth that

14  favors it.  Here, Bryant's allegations complain that Mattel did not disclose anything

15  regarding the Employment Agreement.

16  F.     Rescission

17         Bryant asserts that rescission is proper because (1) the Agreement was

18  obtained through fraud; (2) Mattel required Bryant to execute the document as a

19  condition of employment, which resulted in duress; and (3) Mattel did not explain the

20  terms of the Agreement to Bryant, did not give him sufficient time to review it, and did

21  not permit or encourage him to seek legal counsel regarding the Agreement.

22         Bryant failed to state a fraud claim; therefore, rescission based on his fraud

23  claim would be improper.

24         Bryant's allegations do not meet the standard for duress, and Mattel's failure to

25  encourage him to seek legal counsel also does not require rescission of the

26  Employment Agreement.  See Robison v. City of Manteca, 78 Cal.App.4th 452, 457

27  (2000).  Additionally, although Bryant argues that he was not "given a meaningful

28  opportunity to review the Agreement at the time he executed it," he does not allege

16

EXHIBIT  5   PAGE  71

1   that he asked for, and was refused, sufficient time to actually read the Agreement with

2   which he was presented.

3   **G.    Declaratory Relief**

4          Finally, in his fourth counterclaim, Bryant seeks declaratory judgment that

5   Mattel's conduct in requiring Bryant and other employees to execute the Employment

6   Agreement constitutes unfair competition and unfair business practices in violation of

7   Cal. Bus. & Prof. Code §§ 17200 and 16600.  This claim for declaratory relief fails

8   because the underlying § 17200 fails.

9          Bryant also seeks a declaration that the Employment Agreement is unlawful

10  and unenforceable as to him and as to other current and former employees of Mattel.

11  See Bryant's Counterclaims ¶¶ 61-65.  As discussed previously, Bryant has no

12  standing to assert claims on behalf of anyone other than himself.  As discussed

13  throughout this Order, Bryant has not sufficiently alleged that the Employment

14  Agreement is unlawful or unenforceable as to him.

15  **H.    Ruling on Motion to Dismiss (04-09059)**

16         The Motion to Dismiss is **GRANTED** in its entirety.  Bryant requested in his

17  Opposition for an opportunity to amend his counterclaims.  Therefore, the Court

18  dismisses Bryant's counterclaims without prejudice.  Bryant may file Amended

19  Counterclaims that conform with this Order within ten days of the entry of this Order.

20                              **IV. Conclusion**

21         For the reasons set forth above, the Court **GRANTS** the Motion to Dismiss in

22  04-09049 and **DISMISSES WITHOUT PREJUDICE** Bryant's action for declaratory

23  relief.  The Court also **GRANTS** the Motion to Dismiss in 04-09059, and **DISMISSES**

24  **WITHOUT PREJUDICE** Bryant's counterclaims.  Bryant is granted ten days' leave to

25  amend the counterclaims in conformity with this Order.

26

27

28

EXHIBIT  5  PAGE  72

Received:   7/18/06  4:47PM
RightFAX              7/  /2006 4:37   PAGE 019/019   Fax Server

RightFAX -> JetFax   '20;  Page 19

1     Although this Order dismisses the Complaint in 04-09049, any future filings in

2     the consolidated action shall continue to be filed under 04-09049 in conformity with

3     the Court's consolidation order.

4        IT IS SO ORDERED.

5     DATE:  7 - 17 - 06

6

7                                    STEPHEN G. LARSON
                                     UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    18          EXHIBIT  5  PAGE  73

**EXHIBIT 6**

1   DALE M. CENDALI
    (of counsel, not admitted in California)
2   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA 90071-2899
    Telephone:  (213) 430-6000
5   Facsimile:   (213) 430-6407
    email:       dtorres@omm.com
6
    PATRICIA GLASER (S.B. # 55668)
7   CHRISTENSEN, MILLER, FINK,
    JACOBS, GLASER, WEIL &
8   SHAPIRO LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA 90067
    Telephone:  (310) 553-3000
10  Facsimile:   (310) 556-2920
11  Attorneys for Plaintiff
    MGA Entertainment, Inc.

12

13

14                 UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

                    CV 05 - 02727  CBM (RZx)

16  MGA ENTERTAINMENT, INC.,        Case No.

17                  Plaintiff,       **COMPLAINT FOR FALSE
                                     DESIGNATION OF ORIGIN,**
18         v.                        **AFFILIATION, ASSOCIATION OR
                                     SPONSORSHIP (15 U.S.C. § 1125**
19  MATTEL, INC., a Delaware         **(a)); UNFAIR COMPETITION (15
    Corporation, and DOES 1-10,      U.S.C. § 1125 (a), Cal. Bus. & Prof.**
20                                   **Code § 17200 et seq. and California
                    Defendants.       Common Law); DILUTION (15**
21                                   **U.S.C. § 1125 (c), Cal. Bus. & Prof
                                     Code § 14330 and California Common**
22                                   **Law); AND UNJUST ENRICHMENT**

23                                   **DEMAND FOR JURY TRIAL**

24

25

26

27

28

                          EXHIBIT   6   PAGE   74

1    Plaintiff MGA Entertainment, Inc. for its complaint against

2  Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

3

4                              **PARTIES**

5       1.    Plaintiff MGA Entertainment, Inc. ("MGA") is a California

6  corporation organized and existing under the laws of the State of California, with a

7  principal place of business in Van Nuys, California.

8       2.    MGA is informed and believes, and based thereon alleges, that

9  Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place

10  of business in El Segundo, California.

11      3.    MGA is ignorant of the true names and capacities of the defendants

12  sued herein under the fictitious names DOES 1 through 10 inclusive.  MGA will

13  seek leave of court to amend this complaint to allege such names and capacities

14  when they are ascertained.  MGA is informed and believes, and based thereon

15  alleges, that each of the fictitiously named DOE defendants is responsible in some

16  manner for the wrongful conduct alleged herein.  MGA further alleges that each

17  defendant acted in concert with, as agent or representative for, or at the request or

18  on behalf of another or Mattel.  Each charging allegation contained herein is,

19  therefore, also hereby alleged against each fictitiously named DOE defendant.

20

21                     **JURISDICTION AND VENUE**

22      4.    Through this action MGA asserts claims against Mattel arising under

23  the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and

24  Professions Code Sections 17200 *et seq.*, California Business and Professions Code

25  Section 14330 and California common law.  This Court has original subject matter

26  jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and

27  1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

28

EXHIBIT __6__ PAGE __75__

1    subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2    Section 1367(a).

3         5.      This Court has specific personal jurisdiction over Mattel, as it has

4    purposefully committed, within the State of California, the acts from which these

5    claims arise and/or has committed tortious acts outside California, knowing and

6    intending that such acts would cause injury to MGA within the state.  The Court

7    also has general personal jurisdiction over Mattel, as it conducts continuous,

8    systematic and routine business within the State of California and the County of

9    Los Angeles.

10        6.      Venue is proper in the United States District Court for the Central

11   District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                        **FACTUAL BACKGROUND**

14        7.      MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15   competition-by-intimidation and serial copycatting of MGA's products, which

16   Mattel has used in an unbridled effort to cause confusion in the market place and

17   eliminate MGA as a competitor in the toy and fashion doll market long dominated

18   and controlled by Mattel.

19        8.      MGA is a privately-held company in the San Fernando Valley that

20   began in 1979 as a small consumer electronics business.  In 1987, the company

21   made its first foray into the toy business when it secured rights to market handheld

22   LCD games featuring licensed Nintendo® characters.  Building on that small

23   success, the company began marketing products for popular licensed properties

24   such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25   successful company, however, was propelled into the limelight after its daring

26   release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27   "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28   contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT __6__ PAGE __76__

1    sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2    new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3    has been able to seriously challenge "Barbie" for market share, and begin to loosen

4    Mattel's 50-year iron-fisted grip on the fashion doll market.

5          9.     Mattel has not taken kindly to the challenge. Either unable or

6    unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7    has, instead, taken a more expeditious approach, resorting to unfair and anti-

8    competitive business practices. Wielding its substantial clout and influence in the

9    toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11   suppliers and others in the industry – both in the U.S. and internationally – in order

12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13   from obtaining licensees, contracts and supplies for its products. Mattel has also

14   serially imitated and copy-catted the look of MGA products, trade dress,

15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16   line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17   competitive conduct and to recover the extensive damage that Mattel's illicit

18   behavior has caused, and continues to cause, MGA. Mattel's own website states:

19   "As the global leader in the toy industry, we believe that how we achieve success is

20   just as important as the success itself." It also proclaims that "unwavering integrity

21   defines our corporate culture on every level, guiding how we work and how we do

22   business." Mattel's own corporate governance standards require it to "play by the

23   rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24   speak louder than its words.

25

26

27

28

3

EXHIBIT __4__ PAGE __11__

**Mattel History and Performance**

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT 6 PAGE 78

1  reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us

2  and Wal-Mart.  Mattel spent a reported $881 million in March 1997 to purchase

3  Tyco Toys and acquire the "Matchbox" toy car brand.  Just more than a year later,

4  it spent $700 million for the Pleasant Co., a mail-order doll company and maker of

5  the "American Girl" doll collection.  And in December 1998, Mattel announced

6  plans to fork out a monumental $3.5 billion to buy the Learning Company,

7  followed quickly by Mattel's purchase, in March 1999, of a software company,

8  Purple Moon.

9        14.    Despite these acquisitions, the company continued to struggle.  The

10  retail environment and buying patterns had unquestionably changed, but Mattel had

11  not kept up.  Despite Mattel's feverish acquisitions, Mattel's mainstay and primary

12  profit-generator was still "Barbie."  But "Barbie" had grown stale, and sales

13  languished.  Posting additional losses in the first quarter of 1999, Mattel announced

14  that it would lay off 3,000 employees – 10% of its work force.

15        15.    Mattel's stock plummeted again in late 1999, dropping 30% on

16  Mattel's announcement that it would fall as much as 55% short of analysts' earning

17  estimates for the third quarter.  Mattel blamed its troubles primarily on its

18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out

19  to be a disaster fraught with licensing and distribution problems, bad debt, high

20  product returns and high advertising costs.

21        16.    By early 2000, Mattel's stock had crashed to as low as $8 per share,

22  and some analysts considered Mattel vulnerable to a takeover.  Investors clamored

23  for Ms. Barad's resignation, and got their wish.

24        17.    Jill Barad resigned from Mattel in February 2000.

25        18.    For three months, the company was without a permanent chief

26  executive until Robert Eckert took the helm in May 2000.  Mr. Eckert had spent 23

27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

EXHIBIT  4  PAGE  79

1    with reviving its ailing cheese business.  Investors looked for him to do the same

2    for Mattel.

3        19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4    *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5        20.    The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6    closed factories in the United States, shipped production to Mexico, and sold off the

7    Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8    bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9    meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10   industry that had become increasingly driven by consumer whims and fads, and the

11   hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12   resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13   business plan was not to diversify, but to build upon and expand sales of its existing

14   brands.  Mattel was, after all, still generating billions in revenue despite the decline

15   of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16   other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17   for approximately a third of the company's sales.

18       21.    Then came the competition – MGA's "BRATZ".

19

20   **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21       22.    "BRATZ" challenged "Barbie's" half-century domination of the

22   fashion-doll market like nothing ever before had been able to do.

23       23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24   Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25   that spring.  Finished products were first shipped in May 2001.  MGA introduced

26   the line to consumers in June 2001.

27

28

EXHIBIT __4__ PAGE __80__

24.    Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25.    At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT 6 PAGE 81

26.   Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**          **Mattel's "Barbie"**

          

27.   Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.   The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike.  In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award.  In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award.  LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003.  MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award.  MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT 6   PAGE 82

1   2004, including the Suppliers Performance Award by Retail Category (the

2   "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing

3   Today/Apparel Merchandising.

4       29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA

5   was able to chip away at Mattel's stranglehold on the fashion doll market, gaining

6   shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7       30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"

8   posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had

9   once enjoyed a 90% share of the fashion doll market in 1997, that share had already

10  slipped to 85% or less by the time of the release of "BRATZ". With the company

11  still struggling under Mr. Eckert to overcome prior years of declining sales and

12  mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the

13  untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more

14  potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and

15  MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17  **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18      31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,

19  creative product of its own – indeed, it had been antithetical to Mattel's corporate

20  culture and mentality for Mattel to even conceive that a product might vie for shelf

21  space with "Barbie", let alone be available for sale to consumers mere months after

22  first being shown to retailers. Mattel had to take a more expeditious route.

23      32.    Instead of fairly competing, Mattel waged war against MGA using a

24  wide-array of tortious, unfair and anti-competitive practices including systematic,

25  serial copycatting and intellectual property infringement, aided by intimidation,

26  threats and other acts of unfair competition and anti-competitive conduct, all with

27  one goal in mind – to banish MGA from the market – or minimize its ability to

28  capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT __6__ PAGE __83__

**Mattel's serial copycatting and intellectual property infringement**

33.    Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.    The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie."  This was no ordinary "Barbie", however.  Indeed, not even close.  Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**

                                    circa 2002              circa 2004



10

EXHIBIT  6  PAGE  84

35.    These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.    Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.    Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

**BLONDE**

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

11

EXHIBIT 4  PAGE 85



12

EXHIBIT 6   PAGE 86

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**AFRICAN AMERICAN**

| Mattel's<br>Traditional "Barbie" | Mattel's<br>Original "My Scene" | Mattel's<br>Recent "My Scene" |

38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

**Original Mattel "My Scene" Eye**

13

EXHIBIT 6  PAGE 87

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**              **New Mattel "My Scene" Eye**



40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT 6   PAGE 88