1    best interests, including but not limited to secretly developing and designing Bratz
2    while employed by Mattel and by secretly assisting Larian and MGA .

3          138.  At all times herein mentioned, MGA, Larian and Does 4 through
4    10 knew that the Mattel Employees (excluding Bryant) held positions of trust and
5    confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4
6    through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary
7    duty to Mattel not to take any action that would be contrary to Mattel's best
8    interests, including but not limited to taking confidential trade secret information
9    from Mattel's premises and providing that information to a competitor.

10         139.   Despite such knowledge, Counter-defendants MGA, Larian and
11   Does 4 through 10 intentionally and without justification solicited, encouraged,
12   aided and abetted and gave substantial assistance to the Mattel Employees to breach
13   their fiduciary duties to Mattel, knowing that their conduct would constitute
14   breaches of their fiduciary duties to Mattel.

15         140.  As a direct and proximate result of Counter-defendants' efforts,
16   the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has
17   incurred damages in an amount to be proven at trial.  Mattel, therefore, is entitled to
18   recover compensatory damages in an amount to be determined at trial.

19         141.  In taking the aforesaid actions, MGA, Larian and Does 4 through
20   10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's
21   rights.  Accordingly, Mattel is entitled to recover exemplary damages from
22   Counter-defendants in an amount to be determined at trial.

23                        **Ninth Counterclaim**
24                     **Breach of Duty of Loyalty**
25                   **(Against Bryant and Machado)**

26         142.  Mattel repeats and realleges each and every allegation set forth in
27   paragraphs 1 through 141, above, as though fully set forth at length.

28

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 7 PAGE 183

143. As employees of Mattel, Bryant and Machado owed a duty of undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not compete with Mattel or assist a competitor of Mattel during their employment with Mattel. Pursuant to this duty, Bryant and Machado were required to always give preference to Mattel's business over their own, similar interests during the course of their employment with Mattel.

144. Bryant and Machado breached their duty of loyalty to Mattel in that, while employed by Mattel, they secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into agreements with a Mattel competitor. As alleged above, they also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, themselves personally and the competitor of Mattel.

145. As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

146. Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against Counter-defendants in an amount to be determined at trial.

147. Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

148. In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

## Tenth Counterclaim

### Aiding and Abetting Breach of Duty of Loyalty

### (Against MGA, Larian and Does 4 through 10)

149. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel. MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel Employees (excluding Bryant) not to compete with Mattel or assist a competitor of Mattel during their Mattel employment.

152. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their duties of loyalty to Mattel, knowing that their conduct would constitute breaches of their duties of loyalty to Mattel.

153. As a further consequence of Counter-defendants' efforts, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

-68-

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _ 7 _ PAGE 185

154. In taking the aforesaid actions, MGA, Larian and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Eleventh Counterclaim

### Conversion

### (Against All Counter-defendants)

155. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 154, above, as though fully set forth at length.

156. Counter-defendants wrongfully converted Mattel property and resources by appropriating and using them for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

157. Mattel was entitled to, among other things, the exclusive right and enjoyment in property and tangible materials owned by Mattel, including without limitation such proper and materials that were created by Bryant while he was a Mattel product designer. Such property was taken by Bryant from Mattel to further his own interests and, in at least some instances, provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

158. In addition, Counter-defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices. Counter-defendants did so without Mattel's permission and continue to possess them.

159. As a direct and proximate result of Counter-defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160. As a result of Counter-defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss

07209/2035941.2

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _ 7 _ PAGE 186

1  suffered, which is not measured by the value of the property misappropriated, but

2  includes the lost profits that Mattel suffered as a result of the conversion or,

3  alternatively, the profits generated by the Counter-defendants that would not have

4  been generated but for the conversion. Only such a measure of damages would

5  fully and fairly compensate Mattel for the injury it suffered due to Counter-

6  defendants' acts of conversion.

7      161. Counter-defendants performed the aforementioned conduct with

8  malice, fraud and oppression, and in conscious disregard of Mattel's rights.

9  Accordingly, Mattel is entitled to recover exemplary damages from Counter-

10  defendants in an amount to be determined at trial.

11      162. Furthermore, Counter-defendants' conduct has caused, and unless

12  enjoined will continue to cause, irreparable injury to Mattel that cannot be

13  adequately compensated by money damages and for which Mattel has no adequate

14  remedy at law. Accordingly, Mattel is entitled to an order restraining Counter-

15  defendants from further conversion of Mattel property and resources and/or

16  restraining Counter-defendants from continuing to benefit from such conversion.

17                    **Twelfth Counterclaim**

18                      **Unfair Competition**

19      **(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

20                  **(Against All Counter-defendants)**

21      163. Mattel repeats and realleges each and every allegation set forth in

22  paragraphs 1 through 162, above, as though fully set forth at length.

23      164. Section 17200 of the California Business and Professions Code

24  prohibits unfair competition, including "any unlawful, unfair or fraudulent business

25  act or practice . . . ."

26      165. By engaging in the foregoing conduct, Counter-defendants have,

27  individually and in combination, engaged in unlawful, unfair and/or fraudulent acts

28  of unfair competition in violation of both the common law of the state of California

1   and *Cal. Bus. & Prof. Code* § 17200 *et seq.*  Such conduct included, without

2   limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code*

3   § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

4   Such conduct also included, without limitation, MGA's and Larian's disparagement

5   of Mattel's products and misrepresentations as alleged above.

6        166.  As a result of the aforementioned conduct, Mattel has suffered

7   damages and will imminently suffer further damages, including but not limited to

8   lost profits in an amount to be proven at trial.  No adequate remedy at law exists for

9   the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel

10  is entitled to an injunction enjoining Counter-defendants' continued wrongful acts.

11  Mattel is also entitled to recover compensatory and exemplary damages pursuant to

12  the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

13  <div align="center">**Thirteenth Counterclaim**</div>

14  <div align="center">**Declaratory Relief**</div>

15  <div align="center">**(Against All Counter-defendants)**</div>

16       167.  Mattel repeats and realleges each and every allegation set forth in

17  paragraphs 1 through 166, above, as though fully set forth at length.

18       168.  As shown in the foregoing paragraphs above, an actual

19  controversy exists between Mattel and Counter-defendants regarding Counter-

20  defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

21       169.  Accordingly, Mattel seeks a declaration of the Court that

22  Counter-defendants have no valid or protectable ownership rights or interests in

23  Bratz, and that Mattel is the true owner of the same, and further seeks an

24  accounting and imposition of a constructive trust over Bratz, including without

25  limitation registrations and applications for registrations relating thereto made or

26  filed by Counter-defendants and third parties, and over all revenues and other

27  monies or benefits derived or obtained from MGA's and Bryant's purported

28  ownership, use, sale, distribution and licensing of Bratz.

-71-

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __7__ PAGE _188_

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1.    For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived, created or reduced to practice by Bryant during the term of his Mattel employment and/or by any others then-employed by Mattel, as well as in all derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

2.    For a declaration that any agreement between Bryant, on the one hand, and MGA or any person or entity, on the other hand, in which Bryant purported to assign any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect;

3.    For an Order enjoining and restraining Counter-defendants, their agents, servants and employees, and all persons in active concert or participation with them, from further wrongful conduct, including without limitation from imitating, copying, distributing, importing, displaying, preparing derivatives from and otherwise infringing Mattel's copyright-protected works;

4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other applicable law, impounding all of Counter-defendants' products and materials that infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

-72-

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _ 7 _ PAGE _ 89

1  by which copies of the works embodied in Mattel's copyrights may be reproduced

2  or otherwise infringed;

3        5.    For an Order mandating that Counter-defendants return to Mattel

4  all tangible items, documents, designs, diagrams, sketches or any other

5  memorialization of inventions created or reduced to practice during Bryant's

6  employment with Mattel as well as all Mattel property converted by Counter-

7  defendants;

8        6.    For an Order mandating specific performance by Bryant to

9  comply with and satisfy Bryant's contractual obligations to Mattel;

10        7.    That Mattel be awarded, and Counter-defendants be ordered to

11  disgorge, all payments, revenues, profits, monies and royalties and any other

12  benefits derived or obtained as a result of the conduct alleged herein, including

13  without limitation of all revenues and profits attributable to Counter-defendants'

14  infringement of Mattel's copyrights under 17 U.S.C. § 504;

15        8.    For an accounting of all profits, monies and/or royalties from the

16  exercise of ownership, use, distribution, sales and licensing of Bratz;

17        9.    For the imposition of a constructive trust over Bratz, including

18  without limitation registrations and applications for registrations relating thereto

19  made or filed by Counter-defendants and third parties, and all profits, monies,

20  royalties and any other benefits derived or obtained from Counter-defendant's

21  exercise of ownership, use, sale, distribution and licensing of Bratz;

22        10.    That Mattel recover its actual damages and lost profits;

23        11.    That Counter-defendants be ordered to pay exemplary damages

24  in a sum sufficient to punish and to make an example of them, and deter them and

25  others from similar wrongdoing;

26        12.    That Counter-defendants be ordered to pay treble its general and

27  special damages, plus interest, costs and attorney's fees incurred by reason of

28  Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

-73-

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 7 PAGE 190

1    13.    That Counter-defendants be ordered to pay double damages due

2    to their willful and malicious misappropriation of Mattel's trade secrets with

3    deliberate intent to injure Mattel's business and improve its own;

4    14.    That Counter-defendants pay to Mattel the full cost of this action

5    and Mattel's attorneys' and investigators' fees; and

6    15.    That Mattel have such other and further relief as the Court may

7    deem just and proper.

8

9    DATED:  January 12, 2007            QUINN EMANUEL URQUHART OLIVER &
                                         HEDGES, LLP
10

11                                       By _John Quinn (BM_____

12                                          John B. Quinn
                                            Attorneys for Defendant and Counter-
13                                          claimant Mattel, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED: January 12, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By_____John Quinn / BPP_____
John B. Quinn
Attorneys for Defendant and Counter-claimant Mattel, Inc.

07209/2035941.2

-75-

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 7 PAGE 192

**Exhibit A**

EXHIBIT 7 PAGE 193

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) Inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

**1. Provisions Related to Trade Secrets**

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

**2. Ownership of Inventions**

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly with others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for it and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

**3. Conflicts with Other Activities**

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

**4. Miscellaneous**

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continued employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understanding. The Agreement may be executed in counterparts. The Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _____    Witness Signature _____

Employee Name (print)  CARTER H. BRYANT    Name of Witness (print)  TERESA NEWCOMB

Date  01/04/99

M 0001622

EXHIBIT  7   PAGE  194

EXHIBIT  A   PAGE  76

**Exhibit B**

EXHIBIT 7 PAGE 195

## CONFLICT OF INTEREST QUESTIONNAIRE

Name (Last, first, M.I.)  *BRYANT, CARTER H.*   Job Title  *PROJECT DESIGNER*   Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES  ● NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES  ● NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES  ● NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES  ○ NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES  ○ NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES  ● NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES  ● NO   7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES  ● NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES  ● NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

*4, 5, freelance design & artwork in 1998.*
*from appr. 5/98 – 11/98 for the Ashton Drake*
*galleries.*

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature  *Carter H. Bryant*   Date  *01/04/98*

M 0001621

EXHIBIT  7  PAGE  196   EXHIBIT  B  PAGE  77

**Exhibit C**

EXHIBIT 7 PAGE 197

# EXHIBIT C

## CURRENTLY KNOWN PREDICATE ACTS BY DEFENDANTS RE MAIL AND WIRE COMMUNICATIONS

| Date | Type of Communication | Bates Reference (if applicable) |
|---|---|---|
| 4/15/2001 | Email from Isaac Larian (MGA) Aldo Horvat (GIG ITALY) | MGA000746 |
| 3/28/2001 | Email from Stephen Lee (MGA Hong Kong) to Earlylight (vendor) | MGA000747 |
| 4/15/2001 | Email from Isaac Larian Stephen Lee and Stanley Li | MGA000748-750 |
| 4/11/2001 | Email from Isaac Larian to Stephen Lee | MGA000766-767 |
| 4/10/2001 | Email from Isaac Larian to Pedro Feist (Concentra) | MGA001027-29 |
| 4/5/2001 | Email from Dave Malacrida (MGA) to Gary Cogland | MGA001030-32 |
| 4/3/2001 | Email from Isaac Larian to John Young | MGA001040-44 |
| 1/9/2000 | Email from Martin Hitch (MGA Hong Kong) to Pedro Feist | MGA001061-64 |
| 4/2/2001 | Email from Isaac Larian to Ron Stover | MGA001099-1100 |
| On or about 4/3/2001 | Fed Ex shipment from Isaac Larian to Ron Stover | MGA001099-1100 |
| 4/2/2001 | Email from Isaac Larian to Craig Cunningham (Eckerd Drugs) | MGA001105 |
| 3/28/2001 | Email from Isaac Larian to Stephen Lee | MGA001113-14 |
| On or about 3/28/2001 | Letter from Isaac Larian sent to Ron Stover | MGA001116-17 |
| 4/18/2001 | Email from Victoria O'Connor (MGA) to Avi Kreisel (Kreisel Dist.) | MGA001208-09 |
| 4/17/2001 | Email from Isaac Larian to Stephen Lee and Stanley Li | MGA001213-14 |
| On or about 4/18/2001 | Shipment from Stephen Lee to Isaac Larian | MGA001219-20 |
| 4/4/2001 | Email from Isaac Larian to John Young | MGA001278-82 |
| 3/10/2001 | Email from Isaac Larian to John Young | MGA001289-90 |
| 6/12/2003 | Facsimile transmission from MGA Entertainment to Jessie Ramirez | MGA001310 |
| 10/4/2000 | Email from David Rosenbaum (attorney for MGA) to Anne Wang (attorney for Carter Bryant) | MGA001320-29 |

-78-

EXHIBIT __C__ PAGE __78__

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __7__ PAGE __198__

| | | | |
|---|---|---|---|
| 1 | 10/26/2000 | Email from Mercedeh Ward (MGA) to Samuel Wong, Cecilia Kwok and Franki Tsang (MGA Hong Kong) | MGA000012-13 |
| 2 3 | 10/25/2000 | Email from Mercedeh Ward Samuel Wong, Cecilia Kwok and Franki Tsang | MGA000015-17 |
| 4 5 | 10/30/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000019-21 |
| 6 | 11/3/2000 | Email from Mercedeh Ward to Victor Lee and Paula Treantafelles | MGA000043-45 |
| 7 | 11/4/2000 | Email from Isaac Larian to Carter Bryant and Paula Treantafelles | MGA000046-47 |
| 8 | 11/11/2000 | Email from Judy Rich to Cecilia Kwok and Mercedeh Ward | MGA000049 |
| 9 | 11/15/2000 | Emails between Paula Treantafelles and Samuel Wong and Franki Tsang | MGA000071-74 |
| 10 | 12/8/2000 | Email from Mercedeh Ward to Cecilia Kwok and Samuel Wong | MGA000077-81 |
| 11 | On or about 12/23/2000 | Package sent from MGA Hong Kong to MGA Los Angeles per instructions from MGA Los Angeles | MGA000089-90 |
| 12 13 | 12/15/2000 | Email from Paula Treantafelles to Samuel Wong and Mercedeh Ward | MGA000091-92 |
| 14 | 12/16/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000097-104 |
| 15 | 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000109-112 |
| 16 17 | On or about 12/16/2000 | Package of fabric swatches sent from MGA Los Angeles to MGA Hong Kong | MGA000113-122 |
| 18 | On or about 12/20/2000 | Package of samples sent from MGA Los Angeles to MGA Hong Kong | MGA000124-125 |
| 19 | 12/20/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000124-125 |
| 20 | 12/12/2000 | Fed Ex shipment from MGA Los Angeles to Cecilia Kwok | MGA000131-132 |
| 21 | 12/19/2000 | Email from Mercedeh Ward to Cecilia Kwok and Wendy Reed | MGA000131-132 |
| 22 | 12/20/2000 | Email from Paula Treantafelles to Jimmy Cheng, Samuel Wong, Cecilia Kwok | MGA000140-141 |
| 23 | 12/10/2000 | Email from Mercedeh Ward to Sarah Halpern | MGA000147-149 |
| 24 | 12/22/2000 | Email from Mercedeh Ward to Samuel Wong and Judy Rich | MGA000190 |
| 25 | 12/22/2000 | Email from Paula Treantafelles to Samuel Wong, Judy Rich and Mercedeh Ward | MGA000197-199 |
| 26 | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000211 |
| 27 | 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000212-217 |
| 28 | | | |

EXHIBIT ___C___ PAGE ___79___

-79-

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _7_ PAGE _199_

| 1 | 12/27/2000 | Email from Paula Treantafelles to Franki Tsang et al. | MGA000212-217 |
| 2 | 12/26/2000 | Email from Paula Treantafelles to Carter Bryant | MGA000219 |
| 3 | 12/27/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000234-236 |
| 4 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000249-250 |
| 5 | 12/27/2000 | Email from Paula Treantafelles to Cecilia Kwok and Mercedeh Ward | MGA000253 |
| 6 | | | |
| 7 | 12/27/2000 | Email from Paula Treantafelles to Samuel Wong | MGA000254, 256 |
| 8 | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000322 |
| 9 | 12/29/2000 | Email from Paula Treantafelles to Carter Bryant and Mercedeh Ward | MGA000333 |
| 10 | 1/16/2001 | Email from Paula Treantafelles to Samuel Wong et al. | MGA000366-368 |
| 11 | 1/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000369-370 |
| 12 | 1/18/2001 | Email from Paula Treantafelles to Cecilia Kwok, Judy Rich and Carter Bryant | MGA000371-378 |
| 13 | | | |
| 14 | 1/18/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok and Samuel Wong | MGA000379-381 |
| 15 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000406-414 |
| 16 | 9/27/2000 | Email from Paula Treantafelles to Franki Tsang and Judy Rich | MGA000422 |
| 17 | 10/5/2000 | Email from Isaac Larian to Carter Bryant | MGA000423 |
| 18 | 10/18/2000 | Email from Mercedeh Ward to Franki Tsang and Victor Lee | MGA000425-426 |
| 19 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000482 |
| 20 | | | |
| 21 | 12/22/2000 | Email from Isaac Larian to Franki Tsang, Mercedeh Ward and Paula Treantafelles | MGA000524-528 |
| 22 | 12/20/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000530-531 |
| 23 | 10/26/2000 | Email from Paula Treantafelles to Cecilia Kwok, Isaac Larian, and Carter Bryant | MGA000539-541 |
| 24 | | | |
| 25 | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok | MGA000539-541 |
| 26 | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok and Isaac Larian | MGA000539-541 |
| 27 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok, Samuel Wong, and Judy Rich | MGA000545 |
| 28 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000546-547 |

-80-

EXHIBIT  C  PAGE  80

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___7___ PAGE __200__

| | | | |
|---|---|---|---|
| 2/26/2001 | Email from Paula Treantafelles to Samuel Wong, Cecilia Kwok, and Carter Bryant | MGA000548 |
| 2/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000549 |
| 2/26/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000550 |
| 2/24/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000551 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000554 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000556-557 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000558 |
| 2/23/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000560 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000561 |
| On or about 2/20/2001 | Fed Ex shipment from Carter Bryant to Cecilia Kwok | MGA000566 |
| 2/20/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000566 |
| 2/19/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000568 |
| 2/19/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000569-570 |
| 2/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000571-572 |
| 2/16/2001 | Emails from Paula Treantafelles to Cecilia Kwok | MGA000573, 574, 576, 582, 589-90 |
| 2/16/2001 | Emails from Paula Treantafelles to Carter Bryant | MGA000575, 579, 588 |
| 2/12/2001 | Email from Lon Ross (MGA) to Carter Bryant et al. | MGA000583-587 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok et al. | MGA000599 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000600 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000602 |
| 2/3/2001 | Email from Paula Treantafelles to Cecilia Kwok and Judy Rich | MGA000603-05 |
| 2/2/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000606 |

07209/2035941.2

EXHIBIT ___C___ PAGE _81_

-81-

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __7__ PAGE 20

| | | | |
|---|---|---|---|
| 1/31/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000608 |
| 1/30/2001 | Email from Paula Treantafelles to Carter Bryant and Judy Rich | | MGA000609 |
| On or about 1/30/2001 | Shipment from MGA Los Angeles to Carter Bryant | | MGA000609 |
| 1/26/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000610 |
| 1/24/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000611 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Samuel Wong | | MGA000612 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | | MGA000613 |
| 3/26/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000617 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000618 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000620 |
| 3/6/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | | MGA000621-622 |
| 3/6/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | | MGA000625-626 |
| 3/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | | MGA000625-626 |
| 3/3/2001 | Email from Paula Treantafelles to Cecilia Kwok | | MGA000634 |
| On or about 3/2/2001 | Fed Ex shipment from MGA Los Angeles to MGA Hong Kong | | MGA000634 |
| 4/10/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000635 |
| 4/7/2001 | Email from Paula Treantafelles to Cecilia Kwok | | MGA000635 |
| 4/30/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000654 |
| 5/14/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | | MGA000655 |
| 5/11/2001 | Email from Paula Treantafelles to Carter Bryant | | MGA000656-664 |
| 5/9/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | | MGA000666 |
| 10/20/2000 | Email from Kerri Legg (MGA) to Steve Linker and Liz Hogan | | MGA0008032 |
| | Letter from Mattel de Mexico employee to Thomas Park and Isaac Larian (MGA) | | |
| 3/30/2004 | Letter to Carlos Gustavo Machado Gomez from Isaac Larian | | |
| 3/30/2004 | Letter to Mariana Trueba Almada from Isaac Larian | | |

EXHIBIT __C__ PAGE __82__

AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __7__ PAGE __202__

07209/2035941.2

| | | |
|---|---|---|
| 1 | 3/30/2004 | Letter to Pablo Vargas San Jose from Isaac Larian |
| 2 | | Email from Pablo Vargas San Jose to Mattel de Mexico |
| 3 | | |
| 4 | 4/15/2004 | Email from Karla Papayanopulos Carvajal to Mariana Trueba Almada |
| 5 | 1/25/2004 | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez |
| 6 | | |
| 7 | 4/15/2004 | Email from Therese Wilbur to Carlos Gustavo Machado Gomez |
| 8 | 4/15/2004 | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez attaching confidential documents |
| 9 | | |
| 10 | 3/15/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 11 | | |
| 12 | 3/16/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 13 | 3/22/2004 | Email from "plot04@aol.com" to Isaac Larian copying Susana Kuemmerle and Thomas Park |
| 14 | | |
| 15 | 3/22/2004 | Email from Isaac Larian to "plot04@aol.com" copying Susana Kuemmerle and Thomas Park |
| 16 | | |
| 17 | 3/23/2004 | Email from Marlene Parker (MGA) to Isaac Larian and "plot04@aol.com" |
| 18 | 3/30/2004 | Email from Thomas Park to "plot04@aol.com" copying Isaac Larian |
| 19 | 4/2/2004 | Email from Maria de Carmen Mendez to Isaac Larian, Thomas Park, and Susana Kuemmerle |
| 20 | | |
| 21 | 4/4/2004 | Email from Maria de Carmen Mendez to Susana Kuemmerle |
| 22 | 4/7/2004 | Email from Maria de Carmen Mendez to Thomas Park |
| 23 | | |
| 24 | 4/12/2004 | Email from Thomas Park to "plot04@aol.com" |
| 25 | 4/14/2004 | Email from "plot04@aol.com" to Isaac Larian and Thomas Park |
| 26 | 4/14/2004 | Email from Isaac Larian to "plot04@aol.com", Thomas Park and Daphne Gronich |
| 27 | | |
| 28 | | |

EXHIBIT C PAGE 83

-83-

AMENDED ANSWER AND COUNTERCLAIMS

07209/2035941.2

EXHIBIT 7 PAGE 203

| | | |
|---|---|---|
| 1 | 4/14/2004 | Email from "plot04@aol.com" to Thomas Park copying Isaac Larian and Susana Kuemmerle |
| 2 3 | 4/14/2004 | Email from Susana Kuemmerle to Isaac Larian and Thomas Park copying "plot04@aol.com" |
| 4 5 | 4/15/2004 | Email from Jean Paul Farah to "plot04@aol.com" copying Daphne Gronich |
| 6 | 4/15/2004 | Email from "plot04@aol.com" to Thomas Park copying Jean Paul Farah and Isaac Larian |
| 7 | 4/12/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 8 9 | 4/15/2004 | Email from "plot04@aol.com" to Jean Paul Farah copying Daphne Gronich and Isaac Larian |
| 10 | 4/15/2004 | Email from Mariana Trueba Almada to Andrea Ramirez |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT ___C___ PAGE ___84___

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is Now Legal Service, 1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

On January 12, 2007, I served true copies of the following document(s) described as **MATTEL, INC.'S AMENDED ANSWER IN CASE NO. 05-2727, AND COUNTERCLAIMS** on the parties in this action as follows:

Diana M. Torres, Esq.                Keith Jacoby, Esq.
**O'MELVENY & MYERS, LLP**           **LITTLER MENDELSON**
400 S. Hope Street                   2049 Century Park East, 5th Floor
Los Angeles, CA 90071                Los Angeles, CA 90067

**BY PERSONAL SERVICE:**  I delivered such envelope(s) by hand to the office of the person(s) being served.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 12, 2007, at Los Angeles, California.

_Dave Quintana_
NOW LEGAL -- Dave Quintana

07209/2035966.1

EXHIBIT 7 PAGE 208

**EXHIBIT  8**

CALENDARED          RECEIVED

JAN 1 6 2007

P. Send

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 1 2 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION          BY DEPUTY

FILED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

<div style="margin-left:2em;font-style:italic;">THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(D).</div>

CARTER BRYANT,

        Plaintiff,

v.

MATTEL, INC.,

        Defendant.

and related actions.

CASE NO. CV-04-9049-SGL

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND

This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant. The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire"). Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

EXHIBIT __8__ PAGE 206

1-12

1   resources in creating and/or developing the BRATZ dolls or whether he continued

2   to develop his BRATZ design while still working in Mattel's employ.  In either event,

3   the rights to the BRATZ dolls could become the property of Mattel, either through

4   infringement or through operation of the agreements noted above.  The case was

5   later removed to this Court and was assigned the case number CV-04-9059.  MGA

6   Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to

7   protect its rights to Bratz dolls" that were at stake in the action.  Mattel, Inc. v.

8   Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a

9   significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual

10   property, i.e., the Bratz creations, were decided in the absence of MGA").

11        In the interim, Bryant filed a declaratory judgment action in this Court,

12   seeking for the Court to declare that his BRATZ doll creations did not infringe

13   Mattel's copyright in its Toon Teens products.  See Court's July 18, 2006, Order at

14   3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel

15   products,' . . . the substance of his allegations all address the product 'Toon

16   Teens'").  The declaratory judgment action was assigned the case number CV-04-

17   9049.

18        MGA then filed an action against Mattel in this Court broadening the scope

19   of the controversy beyond that concerned with the ownership rights to the BRATZ

20   doll line.  MGA's complaint asserted various Lanham Act claims and their California

21   state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of

22   competition-by-intimidation and serial copycatting of MGA's products." (Compl.

23   ¶ 7).  In essence, although the prior actions were concerned with ownership in the

24   rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there

25   had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.

26   MGA's complaint did make mention of other products that were affected by Mattel's

27   alleged predatory business practices, but by far the largest portion of its complaint

28   concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

2

EXHIBIT  8  -  PAGE 207

1   line of BRATZ dolls.[1]

2       By Order dated June 19, 2006, the Court consolidated all three cases "for all

3   purposes" as they "involve[d] a number of common issues of law and fact." As the

4   Court later noted in its August 10, 2006, Order: "At its heart, this case asks the

5   question: Who owns the rights to the Bratz dolls?" Resolution of this question lies

6   at the heart of or, at the very least, affects many of the other claims set forth in

7   each of the three respective cases. For instance, even though the allegations in

8   05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ

9   dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot

10  many of those allegations. It is hard to imagine how it is unlawful for a company to

11  thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel

12  owned the rights to the BRATZ dolls, many of the allegations in the 05-2727

13  complaint would become moot. That said, such consolidation did not do away with

14  the distinctions that do exist between the three cases. As the Court highlighted in

15  its consolidation order, when either party files a pleading in the case, "the first

16  paragraph of [that] document . . . shall inform the Court to which case(s) the

17  document relates."

18      On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,

19  04-9049, finding there existed no reasonable apprehension of an imminent

20  copyright infringement claim being filed against him by Mattel based on Mattel's

21  Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The

22  Court's Order was predicated entirely upon counsel for Mattel's representation

23  during oral argument that it "will not maintain that Bratz infringes the copyright in

24  Toon Teens." Owing to this representation, the Court, in dismissing the declaratory

25  judgment action, made clear that any future "claim by Mattel of copyright

26

27      [1] That the marketing of the BRATZ dolls lies at the heart of the issues
    between the rival doll makers in the 05-2727 case is best illustrated by the Court's
28  discussion of those allegations in its August 26, 2005, Order, Granting in Part and
    Denying Part Mattel's Motion to Strike portions of MGA's complaint.

3

EXHIBIT 8   PAGE 209

1   infringement based on the Toon Teens product is barred by counsel's

2   representation." July 18, 2006, Order at 4.

3       Presently before the Court is Mattel's request for leave to file an amended

4   complaint in the 04-9059 action.  The complaint broadens considerably the nature

5   of the action from its genesis in state court.  Whereas before the complaint simply

6   sought to litigate alleged contractual and fiduciary breaches by Bryant while in the

7   employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay

8   claim to the BRATZ doll line), the amended complaint adds five more defendants

9   and nine new legal claims, alleging a wide range of commercial disputes between

10  the rival doll makers that spans three countries.  For instance, the amended

11  complaint now contains RICO claims, a misappropriation of trade secrets claim,

12  and various aiding and abetting claims all stemming from allegations that MGA

13  cherry-picked certain high-ranking Mattel executives in foreign markets (many also

14  named as defendants in the amended complaint) or designers (namely, Bryant),

15  and then enticed or encouraged those same individuals to steal various trade and

16  proprietary secrets (be it sales plans, sales projections, customer profiles, or

17  intellectual property) from Mattel and hand them over to MGA before going to work

18  at MGA.

19      Moreover, the amended complaint expands upon the existing breaches of

20  contract and fiduciary duty claims in the original complaint by expanding the

21  universe of former employees (namely, the cherry-picked executives) to whom

22  those claims now apply.

23      Finally, Mattel now makes plain what was always lurking in its original

24  complaint — a copyright claim, but one directed not only to Bryant but also to MGA,

25  MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.

26  Moreover, Mattel characterizes its copyright claim somewhat differently from that at

27  issue in Bryant's declaratory relief action: "The Amended Complaint does not

28  include a claim for infringement of copyrights in Toon Teens, but rather

4

EXHIBIT -8    PAGE 210

1   infringement of copyrights in Bratz." (Reply to MGA Opp. at 11).  Toward that end,

2   Mattel has recently filed copyright registrations with the U.S. Copyright Office

3   claiming ownership in various BRATZ doll design drawings penned by Bryant.

4   A.    ANALYSIS

5       Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6   pleading has been served, "a party may amend the party's pleading only by leave of

7   court or by written consent of the adverse party; and leave shall be freely given

8   when justice so requires."  With no consent to Mattel's proposed filing proffered by

9   MGA and Bryant, determining whether to grant Mattel leave to file an amended

10  complaint is gauged by looking to the familiar formulation of factors set forth by the

11  Supreme Court in Forman v. Davis:

12

13      In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory

14  motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed,

15  undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment,

16  etc.—the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an

17  opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave

18  without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that

19  discretion and inconsistent with the spirit of the Federal Rules.

20  371 U.S. 178, 182 (1962).

21      MGA and Bryant offer the following reasons for denying Mattel leave to

22  amend:  (1) Mattel has long known of the factual predicates underlying its copyright

23  and intentional interference claims but delayed in asserting them; (2) the proposed

24  amendment to add the copyright claim and the intentional interference claims

25  (against the new defendants) are futile because they are barred by the applicable

26  statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27  because of its prior public disavowal of an intent to assert such a claim; and (4)

28  MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

EXHIBIT  8   PAGE 21

1   suit because of alleged spoilation of evidence issues involving Mattel's ZEUS
2   computer system used by doll designers at Mattel and its e-mail system.  None of
3   these arguments are persuasive.

4        1.    Awareness of Factual Predicate for Copyright and Intentional
5               Interference Claims

6        MGA argues that Mattel has long known about the factual predicate for its
7   recently added copyright claim, observing that, "[o]ver four years ago, in August
8   2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant
9   created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'
10  that project — while still employed at Mattel." (MGA Opp. at 9).  Similarly, MGA
11  argues that Mattel has long known of the factual predicate for its intentional
12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own
13  admission, it learned in November 2003 — more than three years ago — that
14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at
15  Mattel." (MGA Opp. at 11-12).

16       At the outset it must be observed that "[m]ere delay in proffering an
17  amendment does not justify denying leave to amend." Sierra Club v. Union Oil Co.
18  of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,
19  485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988).  Seizing upon
20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would
21  require discovery to be reopened after summary judgment motions have been filed"
22  has the Ninth Circuit found the denial of leave "justified" based on the passage of
23  time alone.  (Reply to MGA Opp. at 3).  That is incorrect.  There is a line of cases
24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should
25  know of the facts underlying the amendment when the original complaint is filed,
26  the motion to amend may be denied." Sierra Club, 813 F.2d at 1493 (citing Jordan
27  v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)).  And, recently, the
28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

EXHIBIT 8   PAGE 212

1   even though the requested leave to amend was tendered <u>before</u> the time, as set

2   forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired.

3   See <u>AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006).

4   The Ninth Circuit observed that, even when a request for leave to amend is timely

5   under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless

6   still deny the request based on any of the <u>Forman</u> factors. <u>Id.</u> at 951-52. The Ninth

7   Circuit then noted that the issue of untimeliness (regardless of whether the

8   amendment is tendered "within the period of time allotted by the district court in a

9   Rule 16 scheduling order") in seeking to amend can constitute a justification for

10  denying leave to amend if "the moving party knew or should have known the facts

11  and theories raised by the amendment in the original pleading." <u>Id.</u> at 953.

12  Toward that end, the Ninth Circuit observed that "an eight month delay between the

13  time of obtaining a relevant fact and seeking a leave to amend is unreasonable."

14  <u>Id.</u> In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that,

15  even though the moving party had known of the facts prompting the amendment for

16  a long period of time, there still remained eight more months of discovery for the

17  parties to marshal facts against the allegations raised by the amended pleading:

18  "Even though eight months of discovery remained, requiring the parties to scramble

19  and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was

20  tainted, would have unfairly imposed potentially high, additional litigation costs on

21  Dialysist West that could have easily been avoided had AmerisourceBergen

22  pursued its 'tainted product' theory in its original complaint or reply." <u>Id.</u> Thus,

23  absent "a satisfactory explanation" for the delay in amending the complaint, the

24  Court is well within its rights to deny leave to amend. <u>Id.</u>

25      Mattel proffers the following reasons for taking the time that it did before

26  presenting its amended complaint: (1) Acting out of an abundance of caution to its

27  obligations under Rule 11 to present "factual contentions [that] have evidentiary

28  support," Mattel waited until its claims were better supported by evidence

7

EXHIBIT   8   PAGE 213

1   uncovered in discovery; and (2) the delay in the proceedings caused by "the year-
2   long stay and the parties' prior jurisdictional disputes" have left the case still in its
3   "nascent stage." (Reply to MGA Opp. at 2, 4).
4        The first reason is not well-founded. Rule 11 specifically allows parties to
5   aver factual allegations that "are likely to have evidentiary support after a
6   reasonable opportunity for further investigation or discovery" so long as the party
7   makes clear in its pleading that its factual contentions on those points are with the
8   caveat that they are based on a good faith belief that further discovery would
9   unearth evidence to support them. See FED. R. CIV. P. 11(b)(3). Simply put, Rule
10  11 did not stand in the way of Mattel averring the factual contentions it now claims it
11  "merely suspected" as being the case based on the limited information before it.
12  Mattel could have gone ahead and made such suspected factual allegations so
13  long as it caveated those claims with the declaration that it reasonably believed that
14  those allegations would be borne out by further discovery. Perhaps the time by
15  which Mattel could have reasonably believed such allegations would be borne out
16  by further discovery occurred after the dates noted by MGA, but it is hard to fathom
17  that such materialization took three or four years to occur.
18       The second reason would have some merit to it but for the fact that the
19  information that alerted (or should have alerted) Mattel to the existence of its now
20  asserted copyright and intentional interference claims was brought to Mattel's
21  attention well before the case was stayed on May 20, 2005. The stay, therefore,
22  did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the
23  stay does not explain why Mattel waited nearly six months after the stay was lifted
24  on May 16, 2006, to present those claims now.
25       All of that being said, the one thing that gives the Court pause in denying
26  leave based on the tardiness in Mattel's presentation is the lack of any evidence
27  that MGA or Bryant have been prejudiced by the delay. Delay unconnected to
28  some showing of prejudice, be it prejudice to the parties or disruption in judicial

8

EXHIBIT 8  PAGE 214

1   management of the case, does not suffice to deny granting leave to amend. The

2   Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3   in an amendment to a complaint, there is no serious prejudice to defendant in

4   allowing the amendment" even if it is made tardily. Sierra Club, 813 F.2d at 1493.

5   Indeed, the denial of leave was proper in the Dialysist case not simply because of

6   the length of the delay, but because the delay itself was "detrimental" in that it

7   would entail the opposing party to have "unfairly" incurred "potentially high,

8   additional litigation costs" that could have been avoided if the moving party had

9   made clear its intentions earlier. 465 F.3d at 953.

10          Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11   pleadings filed by MGA and Bryant in this case that both have been aware for some

12   time of the factual predicates now underlying Mattel's copyright claim and

13   intentional interference claim. (See MGA Opp. at 5 ("As Bryant and MGA

14   suspected at the time of filing — and Mattel now concedes by conduct — those

15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16   along")(emphasis added)).  The parties have engaged in meaningful discovery

17   regarding many of the facts touched upon by these new claims, be it tracking down

18   experts in various forensic fields or taking depositions of various of the key players

19   to those claims.   In point of fact, in their papers filed with this Court before this

20   present motion, both Bryant and MGA have made it abundantly clear that they have

21   long suspected that a copyright infringement claim was in the offing as evidenced

22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23   05-9059 matter to protect its rights to the BRATZ dolls.  Similarly, MGA and Bryant

24   have been on notice to the facts comprising the interference claim concerning

25   Bryant's contract as evidenced by the identity of the individuals who have been

26   deposed by Mattel, as well as the nature of the questions posed and the testimony

27   proffered at those depositions.  MGA's argument that, with the amendments, it

28   faces the prospect of defending "against stale claims" owing to faded memories and

9

EXHIBIT  8   PAGE 215

1   loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2   is diminished by the fact that (no doubt owing to the sophistication of all counsel

3   involved) discovery on these very issues have been proceeding apace by both

4   sides long before Mattel filed its proposed amendments.  This is simply not a case

5   where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6   allowing the proposed amendments; much of those costs have already been borne

7   by the parties for some time.

8          2.    Spoliation of Evidence

9          MGA next argues that Mattel's delay in bringing the amended complaint has

10  caused it prejudice as, in the interim, critical pieces of evidence have been or are

11  suspected of having become lost.  For instance, MGA asserts that Mattel's Rule

12  30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13  "although Mattel identified and segregated its most relevant backup tapes available

14  for Zeus, Mattel allowed its tape backup system to expire the database for those

15  backup tapes, thereby eliminating all information about what was actually stored on

16  those backup tapes." (MGA Opp. at 9-10).  Information on the Zeus computer

17  system is critical because of Mattel's assertion that part of its copyright claim rests

18  on Bryant's exposure to Mattel development programs.  (First Am. Compl. ¶ 26(a)).

19  As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20  center personnel are stored on Zeus.  Thus, the electronic documents stored on

21  Zeus – which should include the metadata showing who created, edited and

22  accessed Mattel's concept drawings and designs – during the time Bryant worked

23  in the design center at Mattel is vitally important to defending against Mattel's

24  claims." (MGA Opp. at 14).  MGA's argument is neither an accurate

25  characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26  claim.

27         Ms. Marine did not testify that the information on the backup tapes (some

28  fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

10

EXHIBIT  8    PAGE  214

1    that could restore the information still found on those tapes:

2         Q.   So if you wanted to restore that 2002 backup
3              tape[s] then, how would you go about doing that?

4              . . . .

5         A.   You need the hardware so if we don't have the
              hardware — if [the technology used by the tape
6              is] DLT we don't have the hardware and you've
              got to buy it and — well, first you have to find a
7              place to put it with adequate power which we
              don't have in the design center. You need to
8              have a tape library. You need to have the tape
              drives that carried those tapes. You need a
9              server that has the capability to — that's big
              enough to handle all of the hardware. You need
10             the software — the license for the backup
              software[, Net Backup]. You need the disk space
11             to restore it to and then you have to start reading
              in all those tapes.

12        Q.   You said that you don't have that in the design
13             center. Do you have that hardware anywhere
              else in the company?

14        A.   DLT? No, no.

15        Q.   At what point did you get rid of the hardware?

16        A.   Once the last backups — DLT backups expired
17             so it would have been a couple years ago
              probably.

18   (Decl. Diana Torres, Ex. K at 118-119).

19        The above testimony clearly denotes the difficulty in restoring what was on

20   Mattel's Zeus computer system during the relevant time frame, but it certainly does

21   not demonstrate that the information on those backup tapes has been "eliminated"

22   or forever lost. Undoubtedly it will be a costly endeavor to recover that information

23   (not to mention to later search and sort through it); but to argue, as MGA does, that

24   the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25   plight. Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26   information on the Zeus backup tapes has been present for some time (maybe

27   since 2004 or perhaps even earlier). This is important because it undermines

28   MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

                                        11

                              EXHIBIT __8__ PAGE 217

1   it to suffer prejudice it otherwise would not have faced if the amendments were
2   brought sooner.  Such prejudice has been present for years, and Mattel's failure to
3   bring its amended complaint sooner would not have changed this situation.
4          Similarly, MGA's point that access to what was on the Zeus computer
5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not
6   hack the system to steal other designers work is diminished to some extent by the
7   fact that Bryant himself testified that he did not use the Zeus computer system and
8   was "pretty much computer illiterate" while employed at Mattel.  Admittedly, the
9   ability to point to information on the Zeus system backup tapes to prove that Bryant
10  did not access other designers drawings or to prove the date those drawings were
11  created by those other designers would be useful evidence to negate Mattel's
12  factual claims.  Nonetheless, such evidence still would not discount other avenues
13  outside of the Zeus computer system by which Mattel could seek to prove that
14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant
15  saw drawings of the same posted on other designers' cubicles.
16         MGA next surmises that Mattel's e-mail records have disappeared, not
17  because it has any proof on that point, but simply because Mattel has postponed
18  the deposition of the individual most knowledgeable of Mattel's e-mail records until
19  after the hearing on Mattel's motion for leave to amend.  (MGA Opp. at 10).
20  Speculation of spoilation does not suffice.  That MGA's argumentation on this point
21  is nothing more than speculation is best exhibited by the evidence it has proffered
22  in support of its argument:  "[I]f the sole retained backup for Zeus is no longer
23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly
24  out of reach."  (MGA Opp. at 15 (emphasis added)).  MGA then makes much of a
25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his
26  inbox would be automatically deleted if they had remained there for more than a
27  certain time period.  (Decl. Diana Torres, Ex. H at 292-93).  MGA takes from this
28  acknowledgment that Mattel has an "automatic email deletion system" that has

<center>12</center>

EXHIBIT  8  PAGE 219

1  compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2  Noticeably absent from MGA's argument is any evidence that the e-mails so

3  deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4  whether such information remains or is otherwise archived on some backup file on

5  Mattel's computer system. Absent concrete proof that spoilation has occurred,

6  nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7  amend.

8       3.    <u>Statute of Limitations</u>

9       MGA next argues that Mattel's copyright and intentional interference claims

10  are futile as both are barred by the applicable statute of limitations. This argument

11  was pressed emphatically at oral argument. With respect to the copyright claim,

12  MGA argues that the applicable statute of limitations is three years, with the

13  limitations period accruing from when a party has knowledge of a violation or when

14  a reasonably diligent person would have been put on inquiry of the infringement.

15  (MGA Opp. at 16 (citing <u>Roley v. New World Pictures</u>, 19 F.3d 479, 481 (9th Cir.

16  1994)). MGA argues that Mattel was put on notice about its copyright claim in

17  August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18  had stolen the idea for BRATZ while working at Mattel. Thus, according to MGA,

19  the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20  current copyright claim stale.

21       The problem with MGA's analysis is it fails to take into account the relations-

22  back principles found in Rule 15(c), which provides that "[a]n amendment of a

23  pleading relates back to the date of the original pleading when "the claim . . . in the

24  amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25  in the original pleading," or if such relation back is otherwise permissible by the

26  state "law that provides the statute of limitations applicable to the action." By

27  MGA's own admission Mattel's copyright claim arises out of the same conduct or

28  transaction contained in the original complaint filed in April, 2004, well within the

13

EXHIBIT 8 PAGE 220

1    applicable limitations period.[2] (MGA Opp. at 12 ("These very same allegations

2    [contained in the original complaint] underlie the copyright infringement and

3    intentional interference contract claims Mattel now seeks to allege against MGA,

4    Mr. Larian and Bryant")).

5         MGA's statute of limitations argument with respect to the intentional

6    interference claims fares no better.  According to MGA, the applicable statute of

7    limitations is two years for an intentional interference with contract claim and Mattel

8    was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9    concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10   to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11   prior to the expiration of his contractual relationship with Mattel."[3] (MGA Opp. at 18

12   (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999)).  Such a time line

13   would, according to MGA, mean that the applicable limitations period expired on

14   Mattel's interference with Bryant's contract claim on November 24, 2005, well

15   before Mattel sought leave to file its amended complaint.  (Id).  The problem again

16   with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17   interference claim would relate back to when it filed its original complaint in April,

18

19

20         [2]  The same would appear to be true — that the amendments would be timely
21   — if the amendments related back to Mattel's answer (filed on May 13, 2005) to
     MGA's complaint in the 05-2727 case.
22
23         [3]  With respect to Mattel's interference with contract claim as to one of its
     former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim
24   on September 17, 2004, when Brawer informed Mattel that he leaving to go to work
     for MGA.  (MGA Opp. at 19-20).  The problem with this argument is that nothing from
25   that simple event — Brawer's declaration of his intent to leave — in any way would
     apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct
26   (the stealing of proprietary information) causing Brawer to breach his contract with
     Mattel that he would not do anything to help a competitor while working for them.
27   MGA's contention that Mattel must have known of those misdeeds in mid-September
     is nothing more than speculation.  Futility cannot be founded on what might or might
28   not be the case; either a claim is futile to bring or it is not.

                                          14

EXHIBIT  8  PAGE 22|

1    2004, well before the limitations period expired.[4]

2         Accordingly, MGA's futility argument is not well-founded.

3    4.    Prior Disavowals of Asserting a Copyright Claim

4         Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5    this case as to whether or not it is asserting a copyright infringement claim against

6    it. To MGA, such ducking and weaving on Mattel's part renders its effort to now

7    bring such a copyright claim as one done in bad faith. No doubt the Court itself has

8    been subjected to Mattel's overly vague statements on this point, but in the end

9    nothing in those statements has ever foreclosed the possibility that such a claim

10   may be in the offing. Indeed, during the oral argument on Mattel's motion to

11   dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12   to whether it would assert such a copyright claim against Bryant as it is currently

13   seeking to do. The most that Mattel's counsel would proffer was that Mattel would

14   not assert a copyright claim against Bryant based on Mattel's copyright rights in

15   TOON TEENS. At that point, the Court directed the parties to engage in a meet

16   and confer based on counsel for Mattel's representation and to provide a report to

17   the Court based on those discussions. The report submitted to the Court made

18   clear that, although Mattel was willing to accede that it would not bring a copyright

19   claim based on TOON TEENS, it refused to accede to Bryant's broader request

20   that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21   to any claim that Mattel has or ever will assert against Bryant." This by itself should

22   have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23   prior statements had foreclosed any potential copyright claim against them.[5]

24

25      [4] Again the relations-back principle would also seem to render its claim timely
26   if it were filed as an amended answer (the original having been filed in May, 2005) in
     the 05-2727 case.

27      [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac
28   Larian, for the "Doe" defendants listed in its original complaint is improper because
     Mattel knew of their identity when it filed the original complaint. The argument is

15

EXHIBIT  8  PAGE 222

1   That said, Mattel's allegation in the amended complaint as to how it is

2   seeking to lay claim to the copyright in BRATZ is disconcerting. Paragraph 26,

3   subsection a, in the amended complaint alleges that Bryant "misappropriated and

4   misused Mattel property" by "using his exposure to Mattel development programs to

5   create the concept, design and name of Bratz." (First Am. Compl. ¶ 26(a)). Such

6   "exposure" could include Bryant misappropriating the Mattel design concept in

7   TOON TEENS in drawing his inspiration for the BRATZ doll. Were Mattel's

8   copyright claim so predicated it would be barred by this Court's July, 2006, Order,

9   dismissing Bryant's declaratory judgment action. Mattel was pressed on this point

10  during oral argument and conceded that such "exposure" to Mattel "development

11  programs" did not include TOON TEENS. With this representation, nothing in

12  Mattel's proposed copyright claim is barred under the rubric of bad faith.

13      5.    Judicial Economy Considerations

14      In his opposition, Bryant adds an additional reason for denying leave beyond

15  those contained in MGA's papers — the amendment would muddy the waters in the

16  04-9059 by adding "tangential" issues that would only serve to delay resolution of

17  the key issue lying at the heart of the complaint: Who owns the rights to the

18  BRATZ line of dolls. (Bryant Opp. at 2 ). Bryant notes that the case has proceeded

19  apace in moving toward resolving that issue, and the amendment would "transform

20

21  ─────────────────────────

22  misplaced. As made clear by Mattel, California law allows a plaintiff to substitute in a
    defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or

23  ignorant of the basis for liability at the time the complaint was filed. See Miller v.
    Thomas, 121 Cal.App.3d 440 (1981). MGA does not dispute this legal contention

24  but at oral argument disputed that Mattel did not know the basis for liability against
    itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in

25  the original complaint and those now proffered against the two in the amended
    complaint. Specifically, MGA notes that the original complaint spoke of Bryant

26  working for one of Mattel's competitors and of that employee's theft of Mattel's
    intellectual property before leaving to work for that competitor. At most, all this

27  shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
    Larian encouraged Bryant's alleged unlawful behavior recited in the original

28  complaint.

16

EXHIBIT 8   PAGE 223

1  what Mattel has always claimed was a straightforward employment action against

2  an individual defendant into a global commercial dispute against Mattel's primary

3  competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns

4  BRATZ.[6]  (Bryant Opp. at 2).  Mattel argues that "the law does not deny leave to

5  amend because claims are 'tangential'" and then reiterates its point that some

6  showing of prejudice, namely, seeking leave after expiration of discovery, is

7  necessary.  (Reply to Bryant Opp. at 3).  That is not entirely correct.

8        As noted previously, the Ninth Circuit recently upheld a denial for leave to

9  amend because the amendment would have "drastically changed" the litigation,

10  even though the leave request was tendered before the time, as set forth in a Rule

11  16(b) pre-trial scheduling order, for filing a motion to amend had expired and well

12  before the discovery cut-off.  See AmerisourceBergen Corp. v. Dialysist West, Inc.,

13  465 F.3d 946, 953 (9th Cir. 2006).  In justifying its reasoning the Ninth Circuit cited

14  approvingly to the following statement from a well-respected treatise: "If an

15  amendment substantially changes the theory on which the case has been

16  proceeding and is proposed late enough so that the opponent would be required to

17  engage in significant new preparation, the court may deem it prejudical."  Id. at 953

18  n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,

19  FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)).  Thus, Dialysist

20  recognized that the introduction of "different legal theories" and/or proof of

21  materially different facts well into the litigation can itself be a basis for finding

22  prejudice regardless of whether the period for discovery has expired (or is even

23  close to expiring) or the parties have already filed summary judgment motions.  Id.

24  at 953-54.

25        Although the parties can safely be said to be at this point well into the

27        [6] Bryant also brings intricate legal arguments about the sufficiency of the allegations Mattel has averred in building its RICO claims against him.  Such
28  considerations are best left to be resolved on a properly filed motion to dismiss.

17

EXHIBIT  8   PAGE 224

1  litigation in this consolidated action (as evidenced by the protracted discovery
2  disputes contained in the docket sheet that the parties have had before the
3  magistrate judge and now the special master, and the litigation of motions to
4  dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel
5  has made painfully clear in its papers, no scheduling order has been entered in this
6  case.[7] This takes away somewhat from the prejudice Dialysist found to exist when
7  a "drastic change [in a party's] litigation theory" takes place mid-stream in the
8  litigation process. Id. at 953.  Simply put, without a schedule for the filing of pre-trial
9  motions and other matters (e.g., discovery cutoff), the parties have been given free
10 reign in how to conduct the litigation in this case.

11       That the delay in bringing the proposed amendments and the relative length
12 of time into the litigation when those amendments were brought may not neatly fold
13 into Dialysist's reasoning does not mean that leave must nonetheless be granted.
14 The 04-9059 action, as it is presently constituted, is not a complex one.  It asks a
15 rather narrow and straightforward question — Did anything from Bryant's
16 employment at Mattel during the 1999-2000 period give Mattel ownership rights to
17 the BRATZ doll line?  The proposed amendments would radically alter the litigation
18 in that case to include far ranging disputes involving multiple parties and concerning
19 events not connected with the BRATZ ownership issue.  That the original action
20 was a relatively simple and straight-forward matter raises another point beyond the
21 change in the action's litigation posture — whether entangling the rival doll makers'
22 other commercial disputes into this particular case would serve to muddy the waters
23 and make the matter that much more difficult to manage from the Court's
24 perspective.

25
26       [7] Mattel's repeated refrain that the matter is in its nascent stage as evidenced
   by the fact that the parties only just recently exchanged in initial disclosures is
27 misleading.  The exchange of initial disclosures referred to by Mattel is in the 05-
   2727 case.  With respect to the 04-9059 case it appears that such initial disclosures
28 were completed long ago as evidenced by the fact that discovery disputes appeared
   in that case as far back as January, 2005.

18

EXHIBIT  8  PAGE 225

1    As has long been recognized, equally important in determining whether to

2  grant such leave is what impact such amendments would have on the court's ability

3  to manage the case. See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE

4  § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial

5  economy and its ability to manage the case. . . . The court should also temper the

6  policy favoring freely granting leave to amend with consideration of the ability of the

7  district court to manage the case adequately if amendment is allowed"). As Judge

8  Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule,

9  the court should consider judicial economy and whether the amendments would

10  lead to expeditious disposition of the merits of the litigation. Finally, the court

11  should consider whether the amendment adds substance to the original allegations,

12  and whether it is germane to the original case of action." Chitimacha Tribe of

13  Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also

14  Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.

15  1987)("General considerations of judicial economy also justify allowing the

16  amendments. The violations included in the proposed amendment relate to the

17  same subject matter as the original complaint. Allowing the amendment will further

18  the federal policy of 'wrapping in one bundle all matters concerning the same

19  subject matter.'").

20    Mattel's amendments do not add substance to the claims contained in its

21  original complaint. Rather, they would expand the universe of claims and

22  defendants stretching well-beyond the questions raised in the original complaint

23  over whether Bryant's conduct while in the employ of Mattel subjected his later

24  attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions

25  Agreement or otherwise rendered his creation subject to an infringement action.

26  Nowhere does Mattel seek to reconcile the breadth of its present amendments with

27  the narrowness of the allegations contained in its original complaint. In fact, the

28  precise opposite is true. Mattel acknowledges that its proposed amendments bear

19

EXHIBIT  8  PAGE 226

1   more congruity to the allegations leveled against it in MGA's Lanham Act case than

2   to those in the action to which it seeks to add them:

3
4           [M]any of the matters raised by Mattel's proposed
            Amended Complaint are and will remain at issue
5           because of MGA's Complaint, whether or not leave to
            amend is granted.  MGA's claims allege that a broad
6           array of purported Mattel conduct across the globe,
            starting at least as early as 1999, has violated the
7           Lanham Act and unfair competition law.  This includes
            Mattel's alleged infringement of Bratz and other MGA
8           products.  As a result, issues in the proposed Amended
            Complaint are already part and parcel of Mattel's
9           defenses to MGA's unfair competition claims, including
            because they show that MGA and Bryant, and not
10          Mattel, are ones who stole the products and other
            properties involved.

11  (Reply to Bryant Opp. at 7 (emphasis added)).  Mattel apparently finds this

12  discongruity unimportant because "all of these matters have been consolidated with

13  the Bryant case."  (Id. at 7).  As noted earlier, the fact that the cases have been

14  consolidated does not mean that the parties can ignore the distinctions that still

15  exist between them.  If, as Mattel acknowledges, the present amendments are

16  nothing more than re-formulated defenses and counterclaims it presently has to

17  MGA's complaint against it in the 05-2727 case, then such amendments should be

18  brought in the form of an amended answer and counterclaim in that case.

19          Consideration of the distinctions between the two cases is wise as it serves

20  as a useful tool in providing the Court a better means to manage the cases now

21  that they have been consolidated.  The proverbial dog (ownership in BRATZ)

22  should be wagging the proverbial tail (the remaining commercial disputes), not the

23  other way around.  Admittedly, the dog's tail has grown in size both by MGA's filing

24  of its complaint in the 05-2727 action and Mattel's response thereto through its

25  proposed amendments.  Nonetheless, it is readily apparent to the Court that the

26  crown jewel in this action still remains the ownership rights to the BRATZ dolls.  The

27  parties have engaged in extensive and undoubtedly expensive discovery on this

28  very issue (from hiring world-renowned experts to test the age of Bryant's design

20

EXHIBIT   8   PAGE  227

1    drawings to technically complex discovery of what is on each other's computers).

2    Indeed the separateness of the two matters is reflected in how the cases are

3    currently structured, namely, the narrowness of the issue involved in 04-9059 and

4    the expansiveness of the facts at issue in 05-2727. In light of this fact, the Court

5    believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6    off and trial date are set well-ahead of those in 05-2727 makes the most sense. As

7    noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8    the result of the litigation in 04-9059. If, for instance, Mattel does own the rights to

9    the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10   "development programs" or by way of the Inventions Agreement because he

11   continued to work on his designs while at Mattel), then large portions of MGA's

12   Lanham Act infringement claims may become moot. By the same token, if Mattel

13   does not own rights to BRATZ, then some of the defenses and counterclaims set

14   forth as independent claims in the present amended complaint may become moot,

15   including Mattel's copyright infringement claim as well as portions of its remaining

16   RICO, misappropriation, and aiding and abetting claims. If, however, the Court

17   were to allow the amended complaint to be filed in the 04-9059 action, such case

18   management would be difficult, if not impossible as many of the issues being

19   litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20   amendment. Due to this substantial overlap in claims and facts, a two-track

21   scheduling order utilizing the case number distinctions would be impossible to craft.

22   When pressed by the Court at oral argument as to which of its proposed claims it

23   believed would not undermine the BRATZ ownership posture of the 04-9059 case,

24   Mattel cited to its copyright and RICO claims. However, upon further questioning

25   by the Court, counsel for Mattel acknowledged that much of those claims were, like

26   the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27   In light of the burden allowing Mattel's amendment to proceed would have on

28   this Court's ability to efficiently manage these consolidated matters denial of

21

EXHIBIT  8   PAGE 229

1  Mattel's request to amend its complaint in the 04-9059 matter is justified.  See
2  Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial
3  system can justify a denial of a motion to amend 'even if the amendment would
4  cause no hardship at all to the opposing party'").  Buttressing the Court's decision is
5  the fact that, even with such a denial, Mattel may file (and the Court provides leave
6  to Mattel to so file) an amended answer and counterclaim in the 05-2727 case
7  raising all the new claims and defendants presently sought to be achieved through
8  amendment of its complaint in the 04-9059 action.  None of the substantive
9  concerns raised by MGA and Bryant to the present amended complaint, e.g.,
10  statutes of limitations, would appear to be affected if the new claims and
11  defendants were brought as defenses and counterclaims in the 05-2727 case as
12  opposed to the 04-9059 one.

13        Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed
14  amendments, but only insofar as they are pled in the form of an amended answer
15  and counterclaim in the 05-2727 case.

16        Finally, the lack of a scheduling order in this case is problematic; one should
17  have been entered long ago.  See Fed. R. Civ. P. 16(b)(noting that a scheduling
18  "order shall issue as soon as practicable but in any event within 90 days after the
19  appearance of a defendant and within 120 days after the complaint has been
20  served on a defendant").  In light of the fact that entry of a scheduling order is
21  woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)
22  scheduling conference be held in this consolidated matter on February 12, 2007, at
23  1:30 p.m. in Courtroom One.  The parties are directed to file a Joint Rule 26(f)
24  report with the Court by February 5, 2007.

25        IT IS SO ORDERED.
26  DATE: _1-11-07_

27
28                                    STEPHEN G. LARSON
                                      UNITED STATES DISTRICT JUDGE

                                      22

EXHIBIT __8__ PAGE _230_

BLUEBIRD OFFICE SUPPLIES (888) 477-4 www.bluebird...

**EXHIBIT 9**

CALENDARED 

RECEIVED

FEB 2 3 2007

SEND

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9     CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

10

11  MATTEL, INC.,                    )   Case No. CV 04-09059 SGL(RNBx)
                                     )
12                 Plaintiff,        )   SCHEDULING ORDER [FRCP 16(b)]
                                     )
13      v.                           )   1.   Establishing a Discovery Cut-off Date of
                                     )        October 22, 2007
14  CARTER BRYANT, DOES 1-10,        )
    INCLUSIVE,                       )   2.   Non-Discovery Motion Hearing Cutoff
15                                   )        date of November 19, 2007, at 10:00
                   Defendants.       )        a.m.
16                                   )
                                         3.   Setting Final Pretrial Conference for
17                                            January 14, 2008, at 11:00 a.m.

18                                       4.   Setting Jury Trial Date of February 12,
                                              2008, at 9:30 a.m.
19

20

21      READ THIS ORDER CAREFULLY.  IT CONTROLS THE CASE

22      AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES.

23

24      The above matter is set for trial before the Honorable Stephen G. Larson,

25  United States District Judge, Courtroom 1, United States District Court, Eastern

26  Division, 2nd Floor, Riverside, California.

                                              DOCKETED ON

                                              FEB 2 2 2007
27

28      1.     **Discovery Cut-Off:**  This is the last date to complete discovery, including

    expert discovery, and the resolution of any discovery motions before this court.  If

EXHIBIT  9   PAGE  231

1 | expert witnesses are to be called at trial, the parties shall designate experts to be called
2 | at trial and provide reports required by Fed. R. Civ. P. 26(a)(B), not later than eight
3 | weeks prior to the discovery cutoff date.  Rebuttal expert witnesses shall be designated
4 | and reports provided as required by Fed.R.Civ.P. 26(a)(2)(B), not later than five weeks
5 | prior to the discovery cutoff date.  Failure to timely comply with this deadline may result
6 | in the expert being excluded at trial as a witness.  The Court requires compliance with
7 | Local Rule 37-1 and 37-2 in the preparation and filing of discovery motions.  Discovery
8 | motions may not be heard on an ex parte basis.

9 |     2.    **Joinder of Parties and Amendment of Pleadings:**  This deadline does
10 | not apply if the deadline for joining parties or amending pleadings has already been
11 | calendared or occurred by virtue of an order issued by another Judge.

12 |     In addition to the requirements of Local Rule 15-1, all motions to amend the
13 | pleadings shall (a) state the effect of the amendment; (b) be serially numbered to
14 | differentiate the amendment from previous amendments and (c) state the page, line
15 | number(s), and wording of any proposed change or addition of material.

16 |     3.    **Motion Filing Cut-Off:**  The Court hears motions on Mondays at 10:00
17 | a.m.  The motion filing cut-off date is the last day motions may be heard (not filed).  The
18 | Court will not decide late motions.  Issues left undetermined by the passage of the
19 | motion cut-off date should be listed as issues for trial in the Final Pretrial Conference
20 | Order. As an exception to the above, motions in limine dealing with evidentiary matters
21 | may be heard at or before trial; however, summary judgment motions disguised as
22 | motions in limine will not be heard.  Parties need not wait until the discovery cut-off to
23 | bring motions for summary judgment or partial summary judgment.  However, in the
24 | usual case, the court expects that more than the minimum notice will be provided to
25 | counsel opposing motions for summary judgment.  In the usual case, the parties should
26 | confer and agree on the date for setting such motions.

27

28

2

EXHIBIT __9__ PAGE 232

1    Ex parte applications are entertained solely for extraordinary relief. See Mission
2  Power Eng. Co. v. Continental Casualty Co., 883 F.Supp. 488 (C.D. Cal. 1995). Strict
3  adherence to proper ex parte procedures is required for any ex parte application filed
4  with the Court.

5    4.   **Stipulations to Extend Time:**  Stipulations to extend the time to file any
6  required document or to continue any pretrial or trial date must set forth (a) the existing
7  due date or hearing date; (b) the current pretrial conference date and trial date; (c) the
8  specific reasons supporting good cause for granting the extension or continuance; and
9  (d) whether there have been any prior requests for extensions or continuances, and
10  whether these were granted or denied by the Court.

11    5.   **Summary Judgment Motions:**  The Separate Statement of Undisputed Facts
12  is to be prepared in a two-column format.  The left-hand column should set forth the
13  allegedly undisputed fact.  The right-hand column should set forth the evidence that
14  supports the factual statement. The fact statements should be set forth in sequentially
15  numbered paragraphs.  Each paragraph should contain a narrowly focused statement
16  of fact.  Each numbered paragraph should address a single subject in as concise a
17  manner as possible.

18    The opposing party's statement of genuine issues must be in two columns and
19  track the movant's separate statement exactly as prepared.  The document must be in
20  two columns; the left-hand column must restate the allegedly undisputed fact, and the
21  right-hand column must indicate either undisputed, or disputed.  The opposing party
22  may dispute all or only a portion of the statement, but if disputing only a portion, must
23  clearly indicate what part is being disputed.  Where the opposing party is disputing the
24  fact in whole or part, the opposing party must, in the right-hand column, label and
25  restate the moving party's evidence in support of the fact, followed by the opposing
26  party's evidence controverting the fact.  Where the opposing party is disputing the fact
27  on the basis of an evidentiary objection, the party must cite to the evidence alleged to
28

3

EXHIBIT __-9__ PAGE 233

1  be objectionable and state the ground of the objection and nothing more.  **No**

2  **argument should be set forth in this document.**

3      The opposing party may submit additional material facts that bear on or relate to

4  the issues raised by the movant, which shall follow the format described above for the

5  moving party's separate statement.  These additional facts shall follow the movant's

6  facts, shall continue in sequentially numbered paragraphs (*i.e.,* if movant's last

7  statement of fact was set forth in paragraph 30, then the first new fact will be set forth in

8  paragraph 31), and shall set forth in the right hand column the evidence that supports

9  that statement.

10      The moving party, in its reply, shall respond to the additional facts in the same

11  manner and format that the opposition party is required to adhere to in responding to

12  the

13  statement of undisputed facts, as described above.

14      (a) <u>Supporting Evidence:</u> No party should submit any evidence other than

15  the specific items of evidence or testimony necessary to support or controvert a

16  proposed statement of undisputed fact.  Thus, for example, the entire transcript of a

17  deposition, entire sets of interrogatory responses, and documents that do not

18  specifically support or controvert material in the separate statements, should not be

19  submitted in support or opposition to a motion for summary judgment.  Any such

20  material will not be considered.

21      Evidence submitted in support of or in opposition to a motion should be

22  submitted either by way of stipulation or as exhibits to declarations sufficient to

23  authenticate the proffered evidence, and should not be attached to the Memorandum of

24  Points and Authorities.  The Court will accept counsel's authentication of deposition

25  transcript, of written discovery responses, and of the <u>receipt</u> of documents in discovery

26  <u>if the fact that the document was in the opponent's possession is of independent</u>

27  <u>significance</u>.  Documentary evidence as to which there is no stipulation regarding

28

4

EXHIBIT __9__ PAGE __234__