1    making of decisions, whether it be hierarchical or consensual.  The structure should
2    provide some mechanism for controlling and directing the affairs of the group on an
3    on-going, rather than an an-hoc, basis." *Id.* at 1299.

4        Mattel, however, draws no distinction whatsoever in its Counterclaims between
5    the persons alleged to have violated 18 U.S.C. § 1962(c) and the "MGA Criminal
6    Enterprise" through which those violations allegedly occurred.  It simply alleges that
7    the Counter-Defendants and Third Parties conspired together to defraud Mattel
8    through a series of underlying acts.  (¶¶ 89-90)  It does not allege a *tangible enterprise*
9    separate from the parties themselves through which these purported acts of fraud were
10   conducted.  *See Cedric Kushner Promotions, Ltd., v. King*, 533 U.S. 158, 161 (2001)
11   ("to establish liability under § 1962(c) one must allege and prove the existence of two
12   distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same
13   'person' referred to by a different name").

14       The purpose behind the "enterprise" requirement of the Act is clear.  RICO is
15   designed to root out systemic, organized crime – the type of crime that is committed
16   through an ongoing organization, be it an informal gang, an organized crime family, a
17   legitimate business, or a business "front."   The organization through which the
18   fraudulent acts are perpetrated cannot merely consist of a list of defendants, as Mattel
19   has alleged here.  Rather, there must be a distinct system of organization through
20   which the predicate acts of racketeering are committed.   The Eighth Circuit has
21   defined this "distinct structure" requirement for a RICO enterprise, as follows:

22           The distinct structure might be demonstrated by proof that a group
             engaged in a diverse pattern of crimes or that it has an organizational
23           pattern or system of authority beyond what was necessary to perpetrate
             the predicate crimes.  The command system of a Mafia family is an
24           example of this type of structure as is the hierarchy, planning, and
             division of profits within a prostitution ring.
25
     *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770 (8th Cir. 1992) (citations and
26
     quotations omitted).
27
         Mattel's RICO claims are similar to the fatally flawed RICO claims presented
28

                                    7.       **MPA'S IN SUPPORT OF BRYANT'S MOTION
                                             TO DISMISS COUNTERCLAIMS**

EXHIBIT 12  PAGE 285

1   in *Chang v. Chen*, where the plaintiffs asserted a series of alleged criminal actions,

2   which allegedly were repeated during the course of several transaction, and which the

3   plaintiffs characterized as the RICO enterprise. 80 F.3d at 1295-1296. However, the

4   Ninth Circuit rejected the plaintiff's RICO allegations and concluded that a mere

5   collection of alleged predicate acts was insufficient to establish the existence of a

6   RICO enterprise:

7
8           We now adopt the majority interpretation of the enterprise element, which
            requires the organization, formal or informal, to be 'an entity separate and
9           apart from the pattern of [racketeering] activity in which it engages.'
                                        * * *
10          Under our interpretation of the enterprise element, the predicate acts of
11          racketeering activity, by themselves, do not satisfy the RICO enterprise
            element. Although the evidence used to establish an enterprise and a pattern
12          of racketeering activity may in particular cases coalesce, 'the existence of an
13          enterprise at all times remains a separate element which must be provided. ..'

14   *Chang*, 80 F.3d at 1298-99 (citations omitted).

15          Here, Mattel makes no effort to describe and alleged separate organizational

16   entity or command system giving rise to a RICO enterprise that is distinct from the

17   underlying predicate acts. Thus, as in *Chang*, Mattel's RICO claims fail and must be

18   dismissed for want of a separate and distinct criminal enterprise. *Chang*, 80 F.3d at

19   1296-1301 (affirming district court order granting Rule 12(b)(6) motion and

20   dismissing RICO claims with prejudice due to the plaintiff's failure to allege the

21   existence of a separate RICO enterprise that was distinct from the collection of alleged

22   predicate acts).

23                  (2)    **There Is No Allegation, Nor Can There Be, That**
                           **Bryant Participated In The Ownership Or**
24                         **Management Of The "MGA Criminal Enterprise"**

25          Further, for an individual defendant such as Bryant to be liable in a RICO

26   action, he "must participate in the operation or management of the enterprise itself."

27   *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). "*[S]ome* part in directing the

28   enterprise's affairs is required for liability." *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th

                                          8.    MPA'S IN SUPPORT OF BRYANT'S MOTION
                                                    TO DISMISS COUNTERCLAIMS

EXHIBIT 12 PAGE 284

1   Cir. 1993) (quoting *Reves*, 507 U.S. at 179).  *See also Gutierrez v. Givens*, 989
2   F.Supp. 1033, 1042 n.4 (S.D. Cal. 1997) (there must be some showing that the
3   defendant "personally participated in the organization or management of the
4   conspiratorial enterprise").

5        According to Mattel's allegations, Bryant was a contractor, not an employee, of
6   MGA, and Bryant is a designer of fashion doll designs.  He is not a corporate
7   executive and he was not even a mid-level manager or supervisor.  Further, there is no
8   allegation that Mattel makes – or can make consistent with Rule 11 – that Bryant in
9   any way owned, controlled, or made any decisions for MGA or for the alleged MGA
10  Criminal Enterprise.

11       As noted above, Mattel's RICO enterprise allegations fail to state a claim under
12  RICO.  However, if the purported RICO enterprise here is MGA itself, i.e., a company
13  for which Bryant did consulting work, this completely negates Bryant being able to
14  engage in a pattern of racketeering activities *through* that enterprise.  *See, e.g.*,
15  *Hamilton v. Willms*, 2005 U.S. Dist. LEXIS 25697, at *29 (E.D. Cal. Oct. 27, 2005)
16  (while an enterprise can be operated by lower-rung participants under the direction of
17  upper management . . . "a person charged with a RICO violation [must] have some
18  part in directing the management or affairs of the enterprise itself").

19       If, however, Mattel contends that the alleged and so-called MGA Criminal
20  Enterprise is something else, presumably much broader than MGA as a company, this
21  completely forecloses Bryant's liability under RICO because Mattel fails to allege that
22  Bryant managed or operated the alleged and so-called MGA Criminal Enterprise.  *See*
23  *Reves*,  507 U.S. at 177-181 (adopting the "operation or management" test for RICO
24  liability; affirming dismissal of RICO defendant who did not operate or manage the
25  alleged RICO enterprise).  In any event, Mattel's RICO claims against Bryant fail as a
26  matter of law.

27
28

9.                    **MPA'S IN SUPPORT OF BRYANT'S MOTION
                       TO DISMISS COUNTERCLAIMS**

EXHIBIT 12 PAGE 287

      **b.**   <u>Mattel Has Not Sufficiently Plead That Bryant Engaged In Predicate Acts</u>

While it purports to allege that Bryant was a "member" of the "MGA Criminal Enterprise," Mattel fails to allege that Bryant himself committed any predicate acts through that alleged enterprise.  Allegations of violations of the underlying predicate acts must be specifically plead as to *each* defendant.  *See, e.g., Zito v. Leasecomm Corp.*, 2003 U.S. Dist. LEXIS 17236, at *37 (S.D. N.Y. Sept. 30, 2003) ("Plaintiffs fail to comprehend that in making allegations under RICO, they are charging the defendants with having committed serious criminal offenses.  It is not enough to allege that predicate acts were committed by somebody, in furtherance of an enterprise in which the defendants were involved.  Rather, to state a violation of § 1962(c) by any defendant, plaintiffs must allege that *that defendant* personally committed two or more predicate acts") (emphasis added); *McHale v. NuEnergy Group*, 2002 U.S. Dist. LEXIS 3307, at *11 (E.D. Pa. Feb. 27, 2002) ("In order to plead mail or wire fraud as a predicate act, as to which each defendant must have participated two or more times, plaintiffs must allege facts giving rise to a strong inference of scienter on the part of *each defendant*") (emphasis added).

Further, failure to plead underlying predicate acts of mail or wire fraud with specificity is fatal to a RICO claim.  *See, e.g., Alan Neuman Productions, Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1998), *cert. denied*, 493 U.S. 858 (1999) ("The allegations of predicate acts in the complaint concerning those . . . elements of RICO are entirely general, no specifics of time, place, or nature of the alleged communications are plead.  This is a fatal defect under Fed. R. Civ. P. 9(b), which requires that circumstances constituting fraud be stated with particularity"); *Yang v. Xiong*, 2006 U.S. Dist. LEXIS 80265 (E.D. Cal. Nov. 2, 2006) (RICO is subject to the same Rule 9(b) pleading requirements as fraud and predicate acts, such as specific dates of mailings, must be set forth in full); *Quach v. Cross*, 2004 U.S. Dist. LEXIS 28981 (C.D. Cal. June 9, 2004) (dismissing with prejudice a RICO claim that did not

**MPA'S IN SUPPORT OF BRYANT'S MOTION TO DISMISS COUNTERCLAIMS**

EXHIBIT 12 PAGE 288

1  make the necessary specific factual allegations).

2      On this issue, the Ninth Circuit has made clear:

3           Rule 9(b) ensures that allegations of fraud are specific enough to give
4           defendants notice of the particular misconduct which is alleged to
            constitute the fraud charged so that they can defend against the charge
5           and not just deny that they have done anything wrong.  It also prevents
6           the filing of a complaint as a pretext for the discovery of unknown
7           wrongs and protects potential defendants – especially professionals
            whose reputations in their fields of expertise are most sensitive to slander
8           – from the harm that comes from being charged with the commission of
9           fraudulent acts.

10 *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

11      Exhibit C to the Counterclaims, which purports to be a list of the "predicate

12 acts," does not even begin to satisfy the heightened Rule 9(b) pleading requirements

13 necessary for claims of mail and/or wire fraud.   The Exhibit simply references a

14 number of e-mails and/or documents, only some of which have even been produced in

15 the underlying case, without describing the content of those communications, let alone

16 *how* or *why* such communications could be considered to be actions by Bryant in

17 furtherance of a fraudulent scheme.  Mattel's utter lack of detail in Exhibit C renders

18 its purported mail and wire fraud allegations fatally deficient and subject to dismissal

19 under Rules 9(b) and 12(b)(6).

20      **c.   RICO Is Not Intended To Prosecute Defendants Like Bryant**

21      RICO was originally enacted to combat organized crime.  *See Sedima v. Imrex*

22 *Co.*, 473 U.S. 479, 498 (1985) ("RICO was an aggressive initiative to supplement old

23 remedies and develop new methods for fighting crime").   While its scope has since

24 been broadened to include civil actions, courts are nonetheless very cautious in

25 allowing such claims.  *See Smith v. Our Lady of the Lake Hospital*, 960 F.2d 439, 444

26 (5th Cir. 1992) ("Given the . . . proliferation of civil RICO claims and the potential for

27 frivolous suits in search of treble damages, greater responsibility will be placed on the

28

11.   **MPA'S IN SUPPORT OF BRYANT'S MOTION TO DISMISS COUNTERCLAIMS**

EXHIBIT 12 PAGE 289

1   bar to inquire into the factual and legal bases of potential claims or defenses prior to

2   bringing such suit or risk sanctions for failing to do so"); *Miranda v. Ponce Federal*

3   *Bank*, 948 F.2d 41, 44 (1st Cir. 1991) ("in cases alleging civil RICO violations,

4   particular care is required to balance the liberality of the Civil Rules with the necessity

5   of preventing abusive or vexatious treatment of defendants. . . . Civil RICO is an

6   unusually potent weapon – the litigation equivalent of a thermonuclear device");

7   *Pelletier v. Zweifel*, 921 F.2d 1465, 1522 (11th Cir. 1991) ("Particularly with regard to

8   RICO civil claims, plaintiffs must stop and think before filing them"); *In re*

9   *Prudential Securities Ltd. Partnerships Litigation*, 930 F. Supp. 68, 80 (S.D.N.Y.

10  1996) (citing Justice Thurgood Marshall's comments in the debate on the Private

11  Securities Litigation Reform Act) ("Many a civil defendant, facing a ruinous

12  exposure, will decide to settle even a case with no merit. It is thus not surprising that

13  civil RICO has been used for extortive purposes, giving rise to the very evils it was

14  designed to combat").

15       It is undisputed that Bryant is a designer of doll fashions who came up with the

16  incredibly creative idea that MGA later turned into the Bratz dolls. It is equally

17  undisputed that he is not some sort of common criminal, let alone a leader, manager or

18  operator of a criminal enterprise or syndicate, as was the fictional character, Rico

19  Bandello.[4]   As such, it simply is inappropriate to assert RICO claims arising out of

20  what are essentially state law employment claims against a former employee relating

21  to his ownership rights vis-à-vis a line of fashion dolls. Mattel had it right when it

22  solely asserted contract, breach of duty and other common law claims against Bryant

23  in its original Complaint; while such claims ultimately will fail, those are the only

24  types of claims that are properly plead against Bryant, and Mattel's attempt to drag

25  _____

26  [4]     Legend has it that the inspiration for the acronym "RICO" was Rico Bandello,
    Edward G. Robinson's character in the film "Little Caesar." *See, e.g., Diaz v. Gates*,
27  420 F.3d 897, 907 (9th Cir. 2005); *Parnes v. Heinold Commodities, Inc.*, 548 F. Supp.
    20, 21 n.1 (N.D. Ill. 1982).
28

                                        12.     **MPA'S IN SUPPORT OF BRYANT'S MOTION**
                                                **TO DISMISS COUNTERCLAIMS**

EXHIBIT 12 PAGE 290

1    this case into the criminal realm must be rejected as nothing more than over-reaching

2    zealotry that has no place here (and containing language constituting nothing less than

3    an unwarranted *ad hominem* attack on Bryant).

4        For these reasons, Counterclaim II (Violation of RICO) should be dismissed as

5    a matter of law.

6        **2.   Because The RICO Violation Counterclaim Fails To State A Claim, The RICO Conspiracy Claim Necessarily Fails To State A Claim**

7

8        As a matter of law, when the underlying RICO claim fails, a conspiracy to

9    violate RICO claim is also defective. *Howard v. America Online, Inc.*, 208 F.3d 741,

10   751 (9th Cir. 2000), *cert. denied*, 531 U.S. 828 (2000) . Accordingly, Counterclaim

11   III (Conspiracy to Violate RICO) should also be dismissed as a matter of law.

12       **C.   MATTEL'S FIFTH, SEVENTH, NINTH, AND ELEVENTH COUNTERCLAIMS MUST BE DISMISSED BECAUSE THEY ARE DUPLICATIVE OF AND IDENTICAL TO CLAIMS ASSERTED IN MATTEL'S ORIGINAL COMPLAINT**

13

14

15       A litigant has no right to maintain a second action duplicative of an earlier one.

16   *Barapind v. Reno*, 72 F. Supp. 2d 1132, 1145 (E.D. Cal. 1999), *cert. denied*, 531 U.S.

17   828 (2000) (citations omitted). A suit is duplicative if the "claims, parties, and

18   available relief do not significantly differ between the two actions." *Ridge Gold

19   Standard Liquors v. Joseph E. Seagram & Sons, Inc.*, 572 F. Supp. 1210, 1213 (N.D.

20   Ill. 1983). A litigant "has no right to maintain two separate actions involving the same

21   subject matter at the same time in the same court and against the same defendant."

22   *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977). Accordingly, when a plaintiff

23   files a second complaint alleging the same claims as a prior, pending, related action,

24   the second complaint may be dismissed. *Zerilli v. Evening News Ass'n*, 628 F.2d 217,

25   222 (D.C. Cir. 1980).

26       Four of the Counterclaims purport to assert claims that are legally and factually

27   indistinguishable from the prior action and that, for the most part, have simply been

28   cut and pasted from the Original Complaint, as set forth in the following table:

13.      **MPA'S IN SUPPORT OF BRYANT'S MOTION TO DISMISS COUNTERCLAIMS**

EXHIBIT 12 PAGE 291

| Complaint | Counterclaims |
|---|---|
| <u>Breach of Contract</u> (Count I)<br><br>"Pursuant to his Mattel Employment Agreement . . . Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in 'inventions,' including without limitation 'designs,' that he conceived or reduced to practice during his employment by Mattel." (¶ 16.)<br><br>"Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel, without the express written consent of Mattel." (¶ 18.) | <u>Breach of Contract</u> (Counterclaim V)<br><br>"Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in 'inventions,' including without limitation 'designs' and other works that he conceived, created or reduced to practice during his employment with Mattel." (¶ 117.)<br><br>"Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted, and worked for a Mattel competitor during his employment with Mattel without the express written consent of Mattel." (¶ 119.) |
| <u>Breach of Fiduciary Duty</u> (Count II)<br><br>Bryant "held a position of trust and confidence with Mattel," "had access to and was entrusted with Mattel's proprietary and confidential information," and "owed Mattel a fiduciary duty that included, but was not limited to an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities[,] profit or advantage which Bryant might bring to Mattel." (¶ 22.)<br><br>"Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor." (¶ 23.) | <u>Breach of Fiduciary Duty</u> (Counterclaim VII)<br><br>Bryant held a "position[] of trust and confidence with Mattel," "had access to and [was] entrusted with Mattel's proprietary and confidential information," and "owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any other opportunities, profit or advantage which Bryant ... might bring to Mattel." (¶ 130.)<br><br>"Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided and assisted a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor." (¶ 131.) |

14.

EXHIBIT 12 PAGE 292

| Breach of Duty of Loyalty (Count III) | Breach of Duty of Loyalty (Counterclaim IX) |
|---|---|
| Bryant "owed a duty of undivided loyalty to Mattel," breached that duty "in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel," and "acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights." (¶¶ 29-30, 33.) | Bryant "owed a duty of undivided loyalty to Mattel," breached that duty "in that, while employed by Mattel, [he] secretly aided, assisted and worked for a competitor of Mattel," and "acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights." (¶¶ 143-146.) |
| Conversion (Count V) | Conversion (Counterclaim XI) |
| "Mattel was entitled to, *inter alia* Bryant's exclusive services and the exclusive ownership of his inventions as a Mattel product designer. However, Bryant provided such services, and purported to grant rights to such inventions, to a competitor during the time of his exclusive Mattel employment. . . . Such services and property were provided by Bryant to others, including defendants, and used by them." (¶ 41.)<br><br>"As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages. Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial." (¶ 44.) | "Mattel was entitled to, among other things, the exclusive right and enjoyment in property and tangible materials that were created by Bryant while he was a Mattel product designer. Such property was taken by Bryant from Mattel to further his own interests and, at least in some cases, provided by Bryant to Larian and MGA." (¶ 157.)<br><br>"As a direct and proximate result of Counter-defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial." (¶ 159.) |

Clearly, these Counterclaims "do not significantly differ" from the corresponding Counts in the Complaint. *Ridge Gold Standard Liquors*, 572 F. Supp. at 1213. Accordingly, they must be dismissed as duplicative.

Additionally, in its January 12, 2007 Order, this Court squarely addressed Bryant's point that adding additional issues to the Complaint would delay resolution of "the key issue lying at the heart of the complaint: Who owns the rights to the BRATZ line of dolls." (Order at p. 16.) In noting that the "crown jewel in this action

MPA'S IN SUPPORT OF BRYANT'S MOTION TO DISMISS COUNTERCLAIMS

EXHIBIT 12 PAGE 293

1    still remains the ownership rights to the BRATZ dolls" (Order at p. 20), the Court

2    concluded that it made practical sense for that issue to be tried first. (Order at pp. 21-

3    22.) Adding duplicative, unnecessary Counterclaims muddies the waters and delays

4    resolution of this key issue, thereby violating the spirit of the Court's Order.

5       For these reasons, Counterclaims V, VII, IX, and XI should be dismissed as

6    duplicative of Claims for Relief asserted in Mattel's original Complaint.

7 **IV.**

8 **CONCLUSION**

9       For the foregoing reasons, Defendant Carter Bryant respectfully submits that his

10    motion should be granted and that Mattel's Counterclaims II, III, V, VII, IX, and XI

11    should be dismissed. Bryant is a talented designer; he is not a racketeer. This Court

12    should not allow Mattel to make a mockery of the law by attempting to paint this

13    former employee as anything other than that, a former employee who was incredibly

14    talented and was tremendously lucky in coming up with a successful toy idea that has

15    now swept the world.

16

17 Dated: February 12, 2007        Respectfully submitted,

18                            By: _/s/ C. Wickham_

19                              DOUGLAS A. WICKHAM
                             LITTLER MENDELSON

20                              A Professional Corporation
                             Attorneys for Defendant and

21                              Counter-Defendant CARTER BRYANT

22 Firmwide:81944537.6 028307.1010

23

24

25

26

27

28

**MPA'S IN SUPPORT OF BRYANT'S MOTION
TO DISMISS COUNTERCLAIMS**

EXHIBIT 12 PAGE 294

BLUEBIRD
OFFICE SUPPLY

**EXHIBIT 13**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

March 21, 2007

<u>VIA FACSIMILE AND U.S. MAIL</u>

Diana Torres, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071-2899

Re:   <u>Mattel v. Bryant</u>

Dear Diana:

I write in response to your March 1, 2007, letter setting forth defendants' views on Mattel's trial structure proposals. I am disappointed that defendants appear to have decided not to accept any of Mattel's proposals.

As you know, Mattel contemplates filing a motion to try the aspects of Counterclaims 1 and 5-13 (as pleaded in the 05-02727 case) that directly relate to the issues presented by the 04-9059 case, including Bratz ownership issues, during the Phase One trial. During our telephonic conferences, you expressed tentative agreement that many of these Counterclaims (or at least aspects of these Counterclaims) overlap and could be conveniently tried with the claims in the 04-9059 case. Hence, MGA's current position leaves Mattel with no choice but to file a motion.

During our calls, it became apparent that one potential obstacle to agreement regarding claims 5-12 is defendants' position that Mattel's Counterclaims should be tried in Phase One only insofar as they relate to ownership of Bratz. As we discussed, Mattel does not agree with that position — the Court's <u>Rule</u> 16 Order does not say that only Bratz ownership is to be tried in Phase One; to the contrary, all claims and issues in the 04-9059 case have been set for trial in February 2008. Therefore, insofar as they relate to Bryant's misconduct at issue in the 04-9059 case or other defendants' complicity in that misconduct, Counterclaims 5-12 should be tried in Phase One

EXHIBIT 13   PAGE 295

**quinn emanuel urquhart oliver & hedges, llp**

07209/2080324.1

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

because all of that misconduct is at issue in Phase One. This is especially true as to Counterclaims 5, 7, 9 and 11, which Bryant has argued are so similar to the claims in Phase One that they should be dismissed as "duplicative."

Nonetheless, to attempt to reach a compromise I suggested defendants could offer to stipulate that Counterclaims 5-12 should be tried in Phase One only insofar as those claims relate to both Bryant and ownership of Bratz. Mattel could then make a motion later (or the parties could negotiate) to have any additional aspects of those claims tried in Phase One. I gather that defendants are not willing to enter into any such stipulation. Of course, please let me know if I have misunderstood.

Mattel also proposed a compromise as to Counterclaim 1, for Copyright Infringement. You agreed during our calls that the liability and damages issues regarding the copyright infringement and the Phase One claims are related. Nonetheless, you were concerned that trying the copyright infringement claim with the state law claims could be unworkable if the number of allegedly infringing works is significant. As a potential solution, I suggested that the parties could attempt to divide the copyright infringement claim into two parts to render it more workable. One option would be to try Mattel's claim that what defendants have characterized as the "First Generation" of the Bratz dolls are infringing works in Phase One. There can be little dispute that those dolls are copied from or derivative of works Mattel claims it owns. Therefore, the key issue on that claim will be Bratz ownership, and trying that claim in Phase One would make sense. The balance of the copyright infringement claim — i.e., Mattel's claim that other works also infringe Mattel's Bratz copyrights — could then be tried in a separate phase. I understand that defendants have rejected this proposal as well.

The only issue that defendants appear to be willing to compromise on relates to Counterclaim 13, for Declaratory Relief. However, your letter is somewhat ambiguous. In your letter, you state that defendants will agree to try this claim in Phase One "to the extent it addresses the ownership of the original 'Bratz' creation." Mattel's Counterclaim, however, seeks a declaration that "Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same," among other things — Mattel's Counterclaim is not limited to "the original 'Bratz' creation." Accordingly, in the hope that we can avoid motion practice on at least this issue, please let me know if defendants are willing to stipulate that Counterclaim 13, in its entirety, should be tried in Phase One. Based on your letter, I assume defendants are not willing to so stipulate.

I appreciate your consideration of Mattel's proposals. Please do not hesitate to contact me if you have any questions.

Very truly yours,

B. Dylan Proctor

cc: Douglas Wickham, Esq.

EXHIBIT 13 PAGE 295

**EXHIBIT 14**

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, an individual, )

                 Plaintiff, )

     vs.            )     Case No.

MATTEL, INC., a Delaware   ) CV 04-09049 SGL

corporation,          )   (RNBx)

           Defendant. )

CONFIDENTIAL - ATTORNEYS' EYES ONLY

    The videotaped deposition of
STEVEN LINKER, called as a witness for examination,
taken pursuant to the Federal Rules of Civil
Procedure of the United States District Courts
pertaining to the taking of depositions, taken
before PAULINE M. VARGO, a Notary Public within and
for the County of DuPage, State of Illinois, and a
Certified Shorthand Reporter of said state, C.S.R.
No. 84-1573, at Suite 4000, One IBM Plaza, Chicago,
Illinois, on the 13th day of September, A.D. 2006,
at 9:50 a.m.

EXHIBIT 14 PAGE 297

2

```
 1        PRESENT:

 2             LITTLER MENDELSON,

 3             (2049 Century Park East, 5th Floor,

 4             Los Angeles, California  90067.3107,

 5             310.712.7314), by:

 6             MR. DOUGLAS A. WICKHAM,

 7                  appeared on behalf of the Plaintiff

 8                  Carter Bryant;

 9

10              MATTEL, INC.,

11             (333 Continental Boulevard,

12             El Segundo, California  90245.5012,

13             310.252.6733), by:

14             MR. MICHAEL MOORE,

15             Senior Counsel,

16                  -and-

17             QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP,

18             (865 South Figueroa Street, 10th Floor,

19             Los Angeles, California  90017.2543,

20             213.443.3000), by:

21             MR. MICHAEL T. ZELLER,

22             MS. TANIA KREBS,

23                  appeared on behalf of Defendant

24                  Mattel, Inc.;
```

EXHIBIT 14   PAGE 298

3

```
 1        PRESENT (Continued):

 2             O'MELVENY & MYERS, LLP,

 3             (Times Square Tower,

 4             7 Times Square,

 5             New York, New York  10036,

 6             212.326.2000), by:

 7             MS. DALE M. CENDALI,

 8                  appeared on behalf of Intervenor

 9                  MGA Entertainment;


11             BERMAN, MAUSNER & RESSER,

12             (11601 Wilshire Boulevard, Suite 600,

13             Los Angeles, California  90025,

14             310.473.3333), by:

15             MR. LAURENCE M. BERMAN,

16                  appeared on behalf of the Deponent.

17

18

19

20

21

22

23

24
```

EXHIBIT 14  PAGE 299

4

```
 1              ALSO PRESENT:
 2                    MR. MICHAEL A. HALL,
 3                          Paralegal, Littler Mendelson;
 4              MR. CARTER BRYANT.
 5

 6              VIDEOGRAPHER:
 7                    MR. JOSEPH BURKE,
 8                    Esquire Deposition Services.
 9

10              REPORTED BY:
11                    PAULINE M. VARGO,
12  09:46:12          C.S.R. No. 84-1573.
13
14
15
16
17
18
19
20
21
22
23
24
```

EXHIBIT 14 PAGE 300

58

| | | |
|---|---|---|
| 1 | 11:19:28 | bunch of questions that we needed to ask to get |
| 2 | 11:19:33 | prepared to send a quote and to get started on this |
| 3 | 11:19:38 | rush project, so we needed all this information. |
| 4 | 11:19:43 | So we conversed, and these were the questions we |
| 5 | 11:19:46 | had. |
| 6 | 11:19:48 | Q.    When you say "rush project," what are |
| 7 | 11:19:51 | you referring to? |
| 8 | 11:19:53 | A.    Very tight deadlines as far as like we |
| 9 | 11:20:00 | knew that this was a urgent packaging as far as |
| 10 | 11:20:02 | getting the project done quick, so your lead time |
| 11 | 11:20:06 | is less, and we needed to get all the information |
| 12 | 11:20:11 | possible in order to quote accurately for the job. |
| 13 | 11:20:13 | Q.    I am sorry.  I was asking something |
| 14 | 11:20:15 | actually slightly different. |
| 15 | 11:20:16 | A.    I am sorry. |
| 16 | 11:20:17 | Q.    You just mentioned the rush project. |
| 17 | 11:20:19 | What project is this you are referring to in your |
| 18 | 11:20:22 | answer? |
| 19 | 11:20:23 | A.    Oh, what's the project? |
| 20 | 11:20:24 | Q.    Yes. |
| 21 | 11:20:25 | A.    The Bratz packaging. |
| 22 | 11:20:28 | MS. CENDALI:  Counsel, I'd appreciate it if |
| 23 | 11:20:30 | you wouldn't interrupt the witness. |
| 24 | | BY MR. ZELLER: |

EXHIBIT 14 PAGE 301

59

| | | |
|---|---|---|
| 1 | 11:20:35 | Q.    I don't think I did, but I apologize to |
| 2 | 11:20:37 | you, Mr. Linker, if I interrupted you.  Was there |
| 3 | 11:20:43 | anything else that you had to add to the prior |
| 4 | 11:20:45 | answers? |
| 5 | 11:20:46 | A.    I forgot the questions.  If you want to |
| 6 | 11:20:49 | repeat the question. |
| 7 | 11:20:54 | Q.    You had referred to this exhibit, 320, |
| 8 | 11:20:59 | as being an e-mail to Carter Bryant? |
| 9 | 11:21:03 | A.    It was addressed to him. |
| 10 | 11:21:08 | Q.    And why was this e-mail addressed to |
| 11 | 11:21:11 | Paula Treantafelles and Carter Bryant? |
| 12 | 11:21:14 | A.    They were the two people that we were |
| 13 | 11:21:15 | told to contact regarding this project and they |
| 14 | 11:21:18 | were the two we met at the meeting when we first |
| 15 | 11:21:23 | saw the concept, so we were -- they were our |
| 16 | 11:21:29 | contact person.  Paula was our contact person at |
| 17 | 11:21:32 | MGA and Carter was, from our knowledge, was the |
| 18 | 11:21:36 | creator of the concept. |
| 19 | 11:21:40 | MS. CENDALI:  I object to the |
| 20 | 11:21:43 | characterization.  The document speaks for itself. |
| 21 | | BY MR. ZELLER: |
| 22 | 11:21:46 | Q.    And what project are you referring to? |
| 23 | 11:21:48 | A.    Bratz packaging project. |
| 24 | 11:21:57 | Q.    Add you met with Paula and Carter Bryant |

EXHIBIT  14  PAGE  302

60

| | |
|---|---|
| 1 | 11:22:00   prior to October 12th, 2000, prior to this e-mail? |
| 2 | 11:22:04      A.    Yes. |
| 3 | 11:22:06      Q.    And where did you meet them? |
| 4 | 11:22:10      A.    We met them at a Starbucks coffee shop |
| 5 | 11:22:15   on Rosécrans Avenue in Manhattan Beach or El |
| 6 | 11:22:21   Segundo, on the border. |
| 7 | 11:22:25      Q.    When did this meeting took place? |
| 8 | 11:22:27      A.    It took place that week, either that |
| 9 | 11:22:31   Tuesday or Wednesday before the October 12th |
| 10 | 11:22:36   e-mail. |
| 11 | 11:22:36      Q.    So what days would that be? |
| 12 | 11:22:39      A.    Tuesday the 10th, Wednesday the 11th in |
| 13 | 11:22:43   the a.m. |
| 14 | 11:22:47      Q.    The meeting was in the morning? |
| 15 | 11:22:49      A.    Yes. |
| 16 | 11:22:50      Q.    And who was present for that meeting at |
| 17 | 11:22:53   Starbucks on October 10th or 11th, 2000? |
| 18 | 11:22:57      A.    It was myself; my partner, business |
| 19 | 11:22:59   partner, Liz Hogan; Paula Treantafelles; Carter |
| 20 | 11:23:05   Bryant; and a fifth party, a woman whose name I |
| 21 | 11:23:11   don't recall that was associated with Mr. Bryant. |
| 22 | 11:23:14      Q.    I am sorry.  Associated with Mr. Bryant? |
| 23 | 11:23:17      A.    Well, came with Mr. Bryant, yeah. |
| 24 | 11:23:19      Q.    You saw them walk in together? |

EXHIBIT __14__ PAGE 303

61

| | | | |
|---|---|---|---|
| 1 | 11:23:21 | A. | Yeah, they were together. |
| 2 | 11:23:28 | Q. | Was she someone who was working for MGA? |
| 3 | 11:23:30 | A. | Sorry? |
| 4 | 11:23:31 | Q. | Was she someone who was working for MGA |
| 5 | 11:23:34 | as far as you knew? | |
| 6 | 11:23:35 | A. | No, I don't know. |
| 7 | 11:23:42 | Q. | I would like to ask you a few questions |
| 8 | 11:23:44 | about this meeting that you had at Starbucks on or | |
| 9 | 11:23:48 | about October 10th or 11, 2000.  Was this meeting | |
| 10 | 11:23:54 | about Bratz? | |
| 11 | 11:23:55 | A. | Yes. |
| 12 | 11:23:57 | Q. | Please tell me what it is that you can |
| 13 | 11:24:00 | recall being discussed at this meeting about Bratz? | |
| 14 | 11:24:05 | A. | We discussed packaging direction and -- |
| 15 | 11:24:11 | well, we mostly talked with Paula.  She expressed | |
| 16 | 11:24:16 | what she was looking for as far as direction and | |
| 17 | 11:24:18 | piece count as far as what she would like to see us | |
| 18 | 11:24:24 | do for packaging and gave us kind of like rough | |
| 19 | 11:24:30 | time lines on when she needed stuff done, but | |
| 20 | 11:24:36 | before all that, she presented the concept to us or | |
| 21 | 11:24:39 | they presented it to us. | |
| 22 | 11:24:41 | Q. | I am sorry.  You say before that she |
| 23 | 11:24:43 | presented the concept? | |
| 24 | 11:24:44 | A. | Before telling us what she wanted, she |

EXHIBIT __14__ PAGE __304__

62

| | | |
|---|---|---|
| 1 | 11:24:47 | presented the concept.  We needed to see the |
| 2 | 11:24:50 | concept first before we could talk about packaging. |
| 3 | 11:24:53 | Q.    Please tell me what you mean when you |
| 4 | 11:24:56 | say that she presented it to you. |
| 5 | 11:24:57 | A.    At this meeting we were shown the |
| 6 | 11:25:02 | concept of Bratz, the dolls. |
| 7 | 11:25:07 | Q.    What were you shown? |
| 8 | 11:25:09 | A.    We were shown artboards, illustrations |
| 9 | 11:25:12 | of dolls and their features as far as what the |
| 10 | 11:25:19 | dolls do and what they represent. |
| 11 | 11:25:27 | Q.    At this meeting on or about October 10th |
| 12 | 11:25:31 | or 11th, 2000, did anyone refer to this project as |
| 13 | 11:25:37 | being Bratz by name? |
| 14 | 11:25:39 | A.    Yes. |
| 15 | 11:25:44 | Q.    Was that the first time that you heard |
| 16 | 11:25:48 | anyone at MGA use the word "Bratz," B-r-a-t-z, to |
| 17 | 11:25:54 | describe the project, that is, the MGA project? |
| 18 | 11:25:58 | A.    The term "Bratz" was used by MGA or |
| 19 | 11:26:02 | Paula at the meeting, yes. |
| 20 | 11:26:04 | Q.    Well, I am driving at something a little |
| 21 | 11:26:06 | bit different. |
| 22 | 11:26:07 | A.    Okay. |
| 23 | 11:26:07 | Q.    Was that the first time that you heard |
| 24 | 11:26:09 | the term "Bratz" in connection with the MGA |

EXHIBIT __14__ PAGE _305_

63

| | | |
|---|---|---|
| 1 | 11:26:12 | project? |
| 2 | 11:26:12 | A.    Yes, yes. |
| 3 | 11:26:14 | Q.    So prior to that time, you didn't hear |
| 4 | 11:26:17 | the name from MGA? |
| 5 | 11:26:19 | A.    No. |
| 6 | 11:26:24 | Q.    Did Mr. Bryant say or do anything at |
| 7 | 11:26:27 | this meeting? |
| 8 | 11:26:29 | A.    Not much. |
| 9 | 11:26:32 | Q.    Well -- |
| 10 | 11:26:33 | A.    He presented -- it was his -- he brought |
| 11 | 11:26:36 | the portfolio with the images. |
| 12 | 11:26:39 | Q.    When you say "the images," you are |
| 13 | 11:26:42 | referring to the artboards and the illustrations |
| 14 | 11:26:44 | and the things you mentioned earlier? |
| 15 | 11:26:46 | A.    Yes. |
| 16 | 11:26:51 | Q.    Did you know Mr. Bryant before this |
| 17 | 11:26:53 | meeting? |
| 18 | 11:26:53 | A.    Yes. |
| 19 | 11:26:53 | Q.    How did you know him? |
| 20 | 11:26:55 | A.    We worked at Mattel at the same time in |
| 21 | 11:27:00 | 1996 before I left, so I knew him from there. |
| 22 | 11:27:06 | Q.    Did you and Mr. Bryant talk about Mattel |
| 23 | 11:27:08 | at all during the meeting? |
| 24 | 11:27:12 | A.    Briefly.  I think I asked him when he |

EXHIBIT  14   PAGE 306

62

| | | |
|---|---|---|
| 1 | 11:24:47 | presented the concept.  We needed to see the |
| 2 | 11:24:50 | concept first before we could talk about packaging. |
| 3 | 11:24:53 | Q.    Please tell me what you mean when you |
| 4 | 11:24:56 | say that she presented it to you. |
| 5 | 11:24:57 | A.    At this meeting we were shown the |
| 6 | 11:25:02 | concept of Bratz, the dolls. |
| 7 | 11:25:07 | Q.    What were you shown? |
| 8 | 11:25:09 | A.    We were shown artboards, illustrations |
| 9 | 11:25:12 | of dolls and their features as far as what the |
| 10 | 11:25:19 | dolls do and what they represent. |
| 11 | 11:25:27 | Q.    At this meeting on or about October 10th |
| 12 | 11:25:31 | or 11th, 2000, did anyone refer to this project as |
| 13 | 11:25:37 | being Bratz by name? |
| 14 | 11:25:39 | A.    Yes. |
| 15 | 11:25:44 | Q.    Was that the first time that you heard |
| 16 | 11:25:48 | anyone at MGA use the word "Bratz," B-r-a-t-z, to |
| 17 | 11:25:54 | describe the project, that is, the MGA project? |
| 18 | 11:25:58 | A.    The term "Bratz" was used by MGA or |
| 19 | 11:26:02 | Paula at the meeting, yes. |
| 20 | 11:26:04 | Q.    Well, I am driving at something a little |
| 21 | 11:26:06 | bit different. |
| 22 | 11:26:07 | A.    Okay. |
| 23 | 11:26:07 | Q.    Was that the first time that you heard |
| 24 | 11:26:09 | the term "Bratz" in connection with the MGA |

EXHIBIT 14  PAGE 307

63

| | | |
|---|---|---|
| 1 | 11:26:12 | project? |
| 2 | 11:26:12 | A.   Yes, yes. |
| 3 | 11:26:14 | Q.   So prior to that time, you didn't hear |
| 4 | 11:26:17 | the name from MGA? |
| 5 | 11:26:19 | A.   No. |
| 6 | 11:26:24 | Q.   Did Mr. Bryant say or do anything at |
| 7 | 11:26:27 | this meeting? |
| 8 | 11:26:29 | A.   Not much. |
| 9 | 11:26:32 | Q.   Well -- |
| 10 | 11:26:33 | A.   He presented -- it was his -- he brought |
| 11 | 11:26:36 | the portfolio with the images. |
| 12 | 11:26:39 | Q.   When you say "the images," you are |
| 13 | 11:26:42 | referring to the artboards and the illustrations |
| 14 | 11:26:44 | and the things you mentioned earlier? |
| 15 | 11:26:46 | A.   Yes. |
| 16 | 11:26:51 | Q.   Did you know Mr. Bryant before this |
| 17 | 11:26:53 | meeting? |
| 18 | 11:26:53 | A.   Yes. |
| 19 | 11:26:53 | Q.   How did you know him? |
| 20 | 11:26:55 | A.   We worked at Mattel at the same time in |
| 21 | 11:27:00 | 1996 before I left, so I knew him from there. |
| 22 | 11:27:06 | Q.   Did you and Mr. Bryant talk about Mattel |
| 23 | 11:27:08 | at all during the meeting? |
| 24 | 11:27:12 | A.   Briefly.  I think I asked him when he |

EXHIBIT 14  PAGE 308

64

1   11:27:15   left or, you know, because I was no longer there,

2   11:27:18   so I assumed he was no longer there, and he said he

3   11:27:21   had just quit, so that was about it.

4   11:27:25        Q.    Mr. Bryant said he had quit?

5   11:27:27        A.    Yes.

6   11:27:29        Q.    Quit Mattel?

7   11:27:29        A.    Or he left.  He was no longer there.

8   11:27:32   That's all I know from that meeting, that he was no

9   11:27:34   longer with Mattel.

10  11:27:59        Q.    Was there anything that happened in

11  11:28:03   between the meeting that you had that you described

12  11:28:07   at Starbucks on or about October 10th or 11th,

13  11:28:13   2000, and then the time that the October 12th, 2000

14  11:28:17   e-mail was sent, which we marked as Exhibit 320, as

15  11:28:20   it pertains to Bratz, or was the next thing that

16  11:28:23   happened that you sent the e-mail or Liz sent the

17  11:28:26   e-mail with your participation?

18  11:28:29        A.    When we left, I know that we prepared

19  11:28:31   this e-mail, because we had a lot of questions, and

20  11:28:34   also, we were starting to work on quotes for the

21  11:28:38   job because that's typically what we do and we knew

22  11:28:41   this was a big job, so we started bouncing back

23  11:28:46   ideas, but primarily we left there with these

24  11:28:50   questions and wanted to set up a secondary meeting

EXHIBIT 14 PAGE 309

65

| | | |
|---|---|---|
| 1 | 11:28:53 | to go over these and to get more information. |
| 2 | 11:29:00 | Q.    Returning for a moment to Exhibit 320, |
| 3 | 11:29:07 | you will see it starts off about the third |
| 4 | 11:29:09 | paragraph down, "Here are some questions and |
| 5 | 11:29:13 | comments on the Brats project"? |
| 6 | 11:29:16 | A.    Yes. |
| 7 | 11:29:17 | Q.    And then it says in Point 2 in the |
| 8 | 11:29:21 | typewritten portion, it says, "We need the existing |
| 9 | 11:29:24 | artboards that we saw in the meeting or good color |
| 10 | 11:29:27 | copies." |
| 11 | 11:29:28 | A.    Yes. |
| 12 | 11:29:28 | Q.    Do you see that portion? |
| 13 | 11:29:29 | A.    Yes. |
| 14 | 11:29:31 | Q.    What's that meeting that's being |
| 15 | 11:29:32 | referred to here? |
| 16 | 11:29:34 | A.    The meeting at Starbucks. |
| 17 | 11:29:36 | Q.    This is referring to the artboards that |
| 18 | 11:29:40 | you had seen at the Starbucks meeting a day or two |
| 19 | 11:29:44 | before? |
| 20 | 11:29:44 | A.    Yes. |
| 21 | 11:29:52 | Q.    Then in Point 5 in the typewritten |
| 22 | 11:29:55 | portion of Exhibit 320 it says, quote, "Are the |
| 23 | 11:29:59 | renderings of the outfits (that we saw) the |
| 24 | 11:30:05 | confirmed outfits that you will be manufacturing?" |

EXHIBIT 14 PAGE 310

| | |
|---|---|
| 1 | 11:43:54        I tried as hard as I could to get the |
| 2 | 11:43:56 documents produced at the time.  I had to walk in |
| 3 | 11:44:00 the rain.  So, you know, I got here at 8:30, and no |
| 4 | 11:44:02 one was here.  So to the extent that that reflects |
| 5 | 11:44:05 how I -- my tone, I apologize.  So let's go on. |
| 6 | 11:44:09      MS. CENDALI:  It is -- it is very clear -- |
| 7 | 11:44:11      MR. BERMAN:  Let's go on. |
| 8 | 11:44:13      MS. CENDALI:  Please don't interrupt me, |
| 9 | 11:44:14 counsel.  It is very clear that our calls were not |
| 10 | 11:44:17 returned.  It's very clear that I suspect your |
| 11 | 11:44:20 calls to Mr. Zeller were returned. |
| 12 | 11:44:23      MR. ZELLER:  Are you quite finished?  Can we |
| 13 | 11:44:25 now -- |
| 14 | 11:44:25      MS. CENDALI:  Let's continue. |
| 15 | 11:44:32      MR. ZELLER:  Thank you. |
| 16 | 11:44:33      MR. WICKHAM:  I will note for the record that |
| 17 | 11:44:34 the deposition notice says 9:30. |
| 18 | 11:44:37      MR. ZELLER:  And the documents say 8:30.  It's |
| 19 | 11:44:39 on the same subpoena, if I may. |
| 20 | 11:44:48      THE REPORTER:  I have to mark the document. |
| 21 | 11:44:48      MR. ZELLER:  Let me re-identify it.  I will |
| 22 | 11:44:50 start again so we can pick up fresh.  Let's please |
| 23 | 11:44:55 mark as Exhibit 323 a multi-page document bearing |
| 24 | 11:45:02 Bates numbers SL 13 through SL 63 consisting of |

EXHIBIT 14 PAGE 311

77

```
 1  11:45:12  drawings and other materials.
 2                      (WHEREUPON, a certain document was
 3                      marked Deposition Exhibit No. 323,
 4  11:46:49           for identification, as of 9/13/06.)
 5            BY MR. ZELLER:
 6  11:46:50      Q.    Do you recognize what's been marked as
 7  11:46:53  Exhibit 323 or any portion of it?
 8  11:46:55      A.    Yes.
 9  11:46:56      Q.    What are these pages?
10  11:47:02      A.    Well, there is a combination of stuff,
11  11:47:05  but for the most part, this was the package that
12  11:47:09  was provided to me at the October 19th meeting at
13  11:47:18  MGA, excluding SL 00015.  That is a poster from the
14  11:47:25  final product that I had put into the envelope just
15  11:47:31  for cross-reference when I bought the toy.  So that
16  11:47:38  is a poster that wasn't anywhere near or part of
17  11:47:44  the package that was at MGA when I went there on
18  11:47:49  October 19th.
19  11:47:50      Q.    I am sorry.  The other things were in
20  11:47:53  Exhibit 323?
21  11:47:54      A.    Everything -- all these other things,
22  11:47:56  yes, they were all part of the package, but like I
23  11:48:00  said, this was at a later date.  This is something
24  11:48:05  I threw into the envelope, just in my files.
```

EXHIBIT 14 PAGE 312

78

| | | |
|---|---|---|
| 1 | 11:48:10 | Q.    Then let's maybe break this down a |
| 2 | 11:48:13 | little bit. |
| 3 | | A.    Okay. |
| 4 | 11:48:14 | Q.    You have been referring to a package? |
| 5 | 11:48:17 | A.    Yes. |
| 6 | 11:48:19 | Q.    Did you receive a package at the |
| 7 | 11:48:21 | October 19, 2000 meeting? |
| 8 | 11:48:24 | A.    I did. |
| 9 | 11:48:24 | Q.    And who did you get that from? |
| 10 | 11:48:26 | A.    I got it from MGA, Paula or the group |
| 11 | 11:48:30 | that was working on this, but pretty much Paula and |
| 12 | 11:48:33 | her design team as far as -- |
| 13 | 11:48:37 | Q.    And you received those materials while |
| 14 | 11:48:39 | you were actually at MGA's offices? |
| 15 | 11:48:41 | A.    While I was in the meeting, they gave me |
| 16 | 11:48:44 | this yellow envelope. |
| 17 | 11:48:49 | Q.    So then just so the record is clear on |
| 18 | 11:48:51 | this, what you received from MGA was pages starting |
| 19 | 11:48:59 | SL 16 through SL 63 on October 19th, 2000? |
| 20 | 11:49:09 | MS. CENDALI:  Mischaracterizes his testimony. |
| 21 | | BY THE WITNESS: |
| 22 | 11:49:13 | A.    Yes.  This is all stuff that was put in |
| 23 | | there. |
| 24 | 11:49:25 | BY MR. ZELLER: |

EXHIBIT __14__ PAGE 313

79

| | |
|---|---|
| 1 | 11:49:25      Q.     And then the first two pages of |
| 2 | 11:49:30  Exhibit 323, that's an envelope? |
| 3 | 11:49:33      A.     Yes. |
| 4 | 11:49:36      Q.     And does this envelope relate to the |
| 5 | 11:49:40  materials that you received from MGA on October 19, |
| 6 | 11:49:43  2000? |
| 7 | 11:49:45      A.     Yes, it is. |
| 8 | 11:49:47      Q.     And how is it related? |
| 9 | 11:49:52      A.     How is it related?  This envelope held |
| 10 | 11:49:55  all the images.  All these images were in the |
| 11 | 11:50:02  envelope.  Can you rephrase the question? |
| 12 | 11:50:04      Q.     Well, I guess one thing I am trying to |
| 13 | 11:50:05  ask is, were you given this, these materials that |
| 14 | 11:50:10  we were discussing in an envelope from MGA? |
| 15 | 11:50:12      A.     Yes. |
| 16 | 11:50:13      Q.     In other words, MGA provided the |
| 17 | 11:50:14  envelope? |
| 18 | 11:50:15      A.     Yes, and it was addressed on the second |
| 19 | 11:50:16  page, SL 00014, to Steve and Liz from Bratz or with |
| 20 | 11:50:21  the "Bratz" in quotes. |
| 21 | 11:50:25      Q.     So this was the -- SL 14 was the front |
| 22 | 11:50:31  of the envelope that contained the other materials? |
| 23 | 11:50:34      A.     Yes. |
| 24 | 11:50:37      Q.     Is this your handwriting on SL 14? |

EXHIBIT  14  PAGE  314

43

```
1                          marked Deposition Exhibit No. 317,

2                          for identification, as of 9/13/06.)

3    11:00:09  BY MR. ZELLER:

4    11:00:10     Q.    Do you recognize what's depicted here as

5    11:00:12  Exhibit 317?

6    11:00:13     A.    Yes.

7    11:00:14     Q.    What are these?

8    11:00:16     A.    These are logo variations and color

9    11:00:21  variations for Chat Brats, Chat Room for the Diva

10   11:00:28  Starz lines.

11   11:00:29     Q.    Did you create these?

12   11:00:30     A.    I created these.

13   11:00:32     Q:    Did you create them for Mattel?

14   11:00:33     A.    I created them for Mattel, yes.

15   11:00:36     Q.    Approximately what time period did you

16   11:00:38  create these designs that are shown here as part of

17   11:00:41  Exhibit 317?

18   11:00:42     A.    Late 1999.

19   11:00:44     Q.    And did that include the ones that show

20   11:00:48  on the left side and the right side the word

21   11:00:51  "Brats," B-r-a-t-s?

22   11:00:53     A.    Yes.

23   11:00:57     Q.    Now I really am moving on to a new

24   11:01:02  subject.  At some point did you have contact with
```

EXHIBIT 14 PAGE 315

44

| 1 | 11:01:08 | anyone at MGA? |
| 2 | 11:01:12 | A.   Yes. |
| 3 | 11:01:13 | Q.   What was your first contact with anyone |
| 4 | 11:01:15 | at MGA? |
| 5 | 11:01:16 | A.   I received a call from Paula |
| 6 | 11:01:23 | Treantafelles regarding she had called and |
| 7 | 11:01:27 | introduced herself, and she told me she knew who I |
| 8 | 11:01:33 | was from work that she has seen that I worked on |
| 9 | 11:01:36 | the Diva Starz at Mattel and through Maureen |
| 10 | 11:01:40 | Mullen, said she referred me, and she asked me if I |
| 11 | 11:01:43 | was available for freelance work.  She said she was |
| 12 | 11:01:47 | fond of my work and she said "Could you come in to |
| 13 | 11:01:49 | do some packaging, graphics and logo design." |
| 14 | 11:01:57 | Q.   Was this a face-to-face meeting or a |
| 15 | 11:01:59 | phone call? |
| 16 | 11:02:00 | A.   This was a phone call. |
| 17 | 11:02:03 | Q.   And Ms. Treantafelles called you? |
| 18 | 11:02:07 | A.   Yes. |
| 19 | 11:02:08 | Q.   Approximately when was this? |
| 20 | 11:02:10 | A.   Approximately probably the summer of |
| 21 | 11:02:12 | 2000, early like before summer, early summer, |
| 22 | 11:02:17 | somewhere in there. |
| 23 | 11:02:33 | MR. ZELLER:  Let's please mark as Exhibit 318 |
| 24 | 11:02:37 | a two-page document -- I am sorry.  Actually, just |

EXHIBIT 14 PAGE 316

```
11:02:40   1   one page.  Strike that.  Let's please mark as

11:02:44   2   Exhibit 318 a one-page document bearing Bates

11:02:47   3   number SL 00063.

           4                   (WHEREUPON, a certain document was

           5                   marked Deposition Exhibit No. 318,

11:03:07   6                   for identification, as of 9/13/06.)

11:03:07   7        MS. CENDALI:  Do we have copies?

11:03:12   8        MS. KREBS:  Yeah.  That's in the Linker

11:03:13   9   production that you all have.

11:03:14  10        MR. BERMAN:  I gave you these ones myself.

          11        MS. CENDALI:  Right.  I know that.  I am just

11:03:16  12   trying to figure out what you want.  So we will

11:03:17  13   have to just separately pull them out to make the

11:03:21  14   exhibit.

11:03:21  15        MR. BERMAN:  There is not any separate to do.

11:03:23  16   There is just pieces of paper.  Do you want me to

11:03:25  17   find it for you?

11:03:26  18        MS. CENDALI:  I will be able to find it.

11:03:29  19        MS. KREBS:  It's probably in the bottom there.

          20        MS. CENDALI:  63?

          21        MR. BERMAN:  It should be, yeah.

11:03:32  22        MS. CENDALI:  It's a one-page exhibit?

11:03:34  23        MR. ZELLER:  That's right.  SL 63.

          24        BY MR. ZELLER:
```

EXHIBIT 14   PAGE 317

45

```
 1   11:02:40   one page.  Strike that.  Let's please mark as
 2   11:02:44   Exhibit 318 a one-page document bearing Bates
 3   11:02:47   number SL 00063.
 4                          (WHEREUPON, a certain document was
 5                          marked Deposition Exhibit No. 318,
 6   11:03:07              for identification, as of 9/13/06.)
 7   11:03:07       MS. CENDALI:  Do we have copies?
 8   11:03:12       MS. KREBS:  Yeah.  That's in the Linker
 9   11:03:13   production that you all have.
10   11:03:14       MR. BERMAN:  I gave you these ones myself.
11               MS. CENDALI:  Right.  I know that.  I am just
12   11:03:16   trying to figure out what you want.  So we will
13   11:03:17   have to just separately pull them out to make the
14   11:03:21   exhibit.
15   11:03:21       MR. BERMAN:  There is not any separate to do.
16   11:03:23   There is just pieces of paper.  Do you want me to
17   11:03:25   find it for you?
18   11:03:26       MS. CENDALI:  I will be able to find it.
19   11:03:29       MS. KREBS:  It's probably in the bottom there.
20               MS. CENDALI:  63?
21               MR. BERMAN:  It should be, yeah.
22   11:03:32       MS. CENDALI:  It's a one-page exhibit?
23   11:03:34       MR. ZELLER:  That's right.  SL 63.
24               BY MR. ZELLER:
```

EXHIBIT _14_ PAGE _318_

46

```
 1  11:03:53      Q.    Mr. Linker, have you had a chance to
 2  11:03:55  take a look at Exhibit 318?
 3  11:03:57      A.    Yes.
 4  11:03:58      Q.    Please tell us what it is.
 5  11:03:59      A.    It's an invoice that I sent to Paula
 6  11:04:05  Treantafelles for work rendered for her and her
 7  11:04:09  company.
 8  11:04:10      Q.    You say her company?
 9  11:04:11      A.    MGA.
10  11:04:13      Q.    And when is it that you sent this
11  11:04:16  invoice to MGA?
12  11:04:18      A.    Well, seeing that the invoice date is
13  11:04:22  8/31, it was either on that date or the day before
14  11:04:25  or within that time frame.
15  11:04:30      Q.    You will see on the left-hand side of
16  11:04:32  this invoice various dates ranging from August 12,
17  11:04:38  2000, through August 25th, 2000?
18  11:04:43      A.    Yes.  There is a typo.
19  11:04:46      Q.    Are those dates accurate with respect to
20  11:04:50  work that you performed for MGA on this project?
21  11:04:53      A.    Yes, those are correct dates.
22  11:04:56      Q.    To return then for a moment to the phone
23  11:04:59  call, the very first phone call that you received
24  11:05:01  from Paula Treantafelles, do you have that in mind?
```

EXHIBIT 14 PAGE 319

47

| | | | |
|---|---|---|---|
| 1 | 11:05:05 | A. | Yes. |

```
 1   11:05:05      A.    Yes.

 2   11:05:06      Q.    You had mentioned that you said it was

 3   11:05:08   sometime in the summer of 2000?

 4   11:05:10      A.    Yes.

 5   11:05:12      Q.    I take it that you received this phone

 6   11:05:15   call from Paula Treantafelles prior to the August

 7   11:05:20   12th date, which reflects here your first work?

 8   11:05:24      A.    Right, so it was probably within a week

 9   11:05:26   or so before August 12th.

10   11:05:29      Q.    You say probably.  Is it --

11   11:05:32      A.    You talk, you talk on the phone, you

12   11:05:36   touch base and you set up a time to meet, so

13   11:05:41   this -- okay.  I am sorry.

14   11:05:42      Q.    One thing I want to be clear about in

15   11:05:43   this deposition is I don't want you to guess.  If

16   11:05:45   you have a best recollection about something --

17   11:05:47      A.    Okay.

18   11:05:48      Q.    -- that's why I am asking.  So when you

19   11:05:49   say probably, I just want to make sure is this

20   11:05:51   something --

21   11:05:52      A.    Right.

22   11:05:52      Q.    -- that's your best recollection.

23   11:05:54      A.    Well, my best recollection is, yes,

24   11:05:56   that my first meeting with her was based on this
```

EXHIBIT 14 PAGE 320

48

| | | |
|---|---|---|
| 1 | 11:05:59 | project.  So seeing that on this invoice with the |
| 2 | 11:06:03 | project start date for me on my sketches was |
| 3 | 11:06:05 | August 12th, then that's the time when I met her. |
| 4 | 11:06:09 | Q.   What project does Exhibit 318 relate to? |
| 5 | 11:06:12 | A.   A logo design for one of their toys |
| 6 | 11:06:16 | called Hoppity. |
| 7 | 11:06:18 | Q.   Was that the first project you ever |
| 8 | 11:06:20 | worked on for MGA? |
| 9 | 11:06:21 | A.   Yes, it is. |
| 10 | 11:06:24 | Q.   And if you could please tell us just |
| 11 | 11:06:26 | generally speaking what was Hoppity? |
| 12 | 11:06:30 | A.   Hoppity was a doll that bounced on a |
| 13 | 11:06:33 | ball, and they needed a -- she needed or they |
| 14 | 11:06:39 | needed, I don't know how to refer it, but MGA |
| 15 | 11:06:41 | needed a better logo design that showed more action |
| 16 | 11:06:47 | and graphic elements. |
| 17 | 11:06:51 | Q.   Prior to the time that |
| 18 | 11:06:55 | Miss Treantafelles made that first phone call to |
| 19 | 11:06:58 | you in the summer of 2000, did you know |
| 20 | 11:07:02 | Miss Treantafelles? |
| 21 | 11:07:03 | A.   No. |
| 22 | 11:07:03 | Q.   Had you ever heard of her before then? |
| 23 | 11:07:06 | A.   No. |
| 24 | 11:07:17 | Q.   Returning for a moment to Exhibit 318, |

EXHIBIT _14_ PAGE _321_

49

| | | |
|---|---|---|
| 1 | 11:07:20 | it shows, of course, as we had mentioned or talked |
| 2 | 11:07:23 | about these various dates in August.  Did you have |
| 3 | 11:07:26 | any face-to-face meetings with Paula Treantafelles |
| 4 | 11:07:30 | in this time period up through August 25th, 2000? |
| 5 | 11:07:33 | A.    Yes. |
| 6 | 11:07:34 | Q.    If you could please tell us when you |
| 7 | 11:07:36 | recall first meeting her face-to-face? |
| 8 | 11:07:39 | A.    When I first met her, she reviewed my |
| 9 | 11:07:47 | portfolio.  She showed me some of the projects they |
| 10 | 11:07:51 | were working on in-house, and we discussed this |
| 11 | 11:07:54 | particular project and directions as far as what |
| 12 | 11:08:00 | she wanted to see and what she wanted me to work |
| 13 | | on. |
| 14 | 11:08:04 | Q.    And can you give us a time period when |
| 15 | 11:08:07 | you had that first meeting? |
| 16 | 11:08:09 | A.    Yes.  That first meeting was before |
| 17 | 11:08:12 | August 12th of 2000. |
| 18 | 11:08:23 | Q.    So if I understand, you had an initial |
| 19 | 11:08:27 | meeting with Miss Treantafelles before you started |
| 20 | 11:08:31 | doing any actual work? |
| 21 | 11:08:32 | A.    Yes. |
| 22 | 11:08:40 | Q.    And then on or about August 12th, 2000, |
| 23 | 11:08:44 | is when you first started doing actual work on |
| 24 | 11:08:46 | Hoppity? |

EXHIBIT 14 PAGE 322

50

```
 1   11:08:46      A.    Correct.

 2   11:08:48      MS. CENDALI:  Objection to form.

 3              BY MR. ZELLER:

 4   11:09:03      Q.    Did you do any work on Hoppity after

 5   11:09:07   August 25th, 2000?

 6   11:09:09      A.    No.

 7   11:09:13      Q.    After you did work on Hoppity, did you

 8   11:09:16   have any conversations with anyone at MGA about

 9   11:09:22   further work or potential work for MGA?

10   11:09:24      A.    Yes.

11   11:09:26      Q.    What happened next then in that regard?

12   11:09:30      A.    Paula contacted me about a couple of

13   11:09:35   jobs that she had in line for packaging, one that

14   11:09:43   could start and the other one was a rush or a new

15   11:09:48   concept that they wanted to get started on.

16   11:09:54      Q.    What were these two projects?

17   11:09:58      A.    The first one was Samantha Scooter, and

18   11:10:02   the other one at the time wasn't given a name, so I

19   11:10:05   didn't know what it was, but eventually, I mean, it

20   11:10:10   was the Bratz.

21   11:10:15      Q.    This was a phone call that she made to

22   11:10:17   you?

23   11:10:18      A.    Yes.

24   11:10:20      Q.    And approximately when was that phone
```

EXHIBIT 14 PAGE 323

51

```
1    11:10:22   call made?
2    11:10:24      A.    It was after this invoice and it was
3    11:10:30   before October 3rd, so somewhere in the middle of
4    11:10:39   September.
5    11:10:40      Q.    Of 2000?
6    11:10:41      A.    Of 2000, or late September.
7    11:10:46      MR. ZELLER:  Let's please mark as Exhibit 319
8    11:10:50   a one-page document which appears to be from a
9    11:10:56   planner or diary with the dates of October 2nd,
10   11:11:00   2000, and October 3rd, 2000, and bearing Bates
11   11:11:06   number SL 0002.
12                         (WHEREUPON, a certain document was
13                         marked Deposition Exhibit No. 319,
14   11:11:34              for identification, as of 9/13/06.)
15   11:11:36      MS. CENDALI:  This is 319?
16   11:11:38      MR. ZELLER:  Yes, 319.
17             BY MR. ZELLER:
18   11:11:41      Q.    Do you recognize what's been marked as
19   11:11:44   Exhibit 319?
20   11:11:45      A.    Yes.
21   11:11:45      Q.    What is this?
22   11:11:46      A.    These are some notes in one of my daily
23   11:11:51   planners.
24   11:11:51      Q.    Is all this your handwriting?
```

EXHIBIT 14 PAGE 324

52

```
1   11:11:52    A.    Yes.

2   11:11:56    Q.    I see that there is writing for

3   11:11:58  October 3rd, 2000?

4   11:12:00    A.    Yes.

5   11:12:01    Q.    These are all entries that you made on

6   11:12:04  or about October 3rd, 2000?

7   11:12:06    A.    Yes.

8   11:12:07    Q.    And if you could please tell us, what do

9   11:12:10  these entries relate to?

10  11:12:11    A.    These relate to taking on a packaging

11  11:12:17  project and getting the breakdown of what they

12  11:12:22  wanted for Scooter Samantha from MGA.

13  11:12:27    MS. CENDALI:  This is clearly attorneys' eyes

14  11:12:31  only and was not a document that should be shared

15  11:12:34  with Mattel, and I object to questioning and/or

16  11:12:42  production of documents that violate MGA's

17  11:12:46  proprietary information.

18          BY MR. ZELLER:

19  11:12:52    Q.    Does this relate to particular work that

20  11:12:55  you did on Scooter Samantha?

21  11:12:58    A.    I didn't do work on it.  I just took

22  11:13:01  down what they needed and what the project

23  11:13:05  consisted of.

24  11:13:06    Q.    And when you say "they," who are you
```

EXHIBIT 14 PAGE 325

255

```
 1        STATE OF ILLINOIS )

 2                          )  SS:

 3        COUNTY OF DuPAGE  )

 4               I, PAULINE M. VARGO, a Notary Public

 5        within and for the County of DuPage, State of

 6        Illinois, and a Certified Shorthand Reporter of

 7        said state, C.S.R. No. 84-1573, do hereby certify:

 8               That previous to the commencement of the

 9        examination of the witness, the witness was duly

10        sworn to testify the whole truth concerning the

11        matters herein;

12               That the foregoing deposition transcript

13        was reported stenographically by me, was thereafter

14        reduced to typewriting under my personal direction

15        and constitutes a true record of the testimony

16        given and the proceedings had;

17               That the said deposition was taken

18        before me at the time and place specified;

19               That I am not a relative or employee or

20        attorney or counsel, nor a relative or employee of

21        such attorney or counsel for any of the parties

22        hereto, nor interested directly or indirectly in

23        the outcome of this action.

 4
```

EXHIBIT 14 PAGE 326

256

```
1              IN WITNESS WHEREOF, I do hereunto set my

2       hand and affix my seal of office at Chicago,

3       Illinois, this 22nd day of September, 2006.

4

5

6                   Notary Public, DuPage County, Illinois.

7                   My commission expires July 27, 2007.

8

9       C.S.R. Certificate No. 84-1573

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

EXHIBIT __14__ PAGE __327__

**EXHIBIT 15**

*final*

**MGA ENTERTAINMENT**
16730 Schoenborn Street
North Hills, California 91343

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

1.    <u>Retention as Consultant/Services</u>: MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

2.    <u>Term/Exclusivity</u>: The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3.    <u>Ownership</u>:

(a)    All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the  "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

{00006862.DOC/2 / 10/04/2000  03:05 PM}

1

EXHIBIT 15 PAGE 328

ATTORNEY'S EYES ONLY

MGA000001

patents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute.  Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents.  If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)     Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine.  Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.     Compensation/Costs:                                    REDACTED

(a)     For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of [        ] dollars ($          ) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of [         ] dollars ($         ) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)     MGA shall pay to Bryant a royalty of     REDACTED percent (  %) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services.  As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances).  MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

2

EXHIBIT 15 PAGE 329

ATTORNEY'S EYES ONLY                         MGA000002

and binding on Bryant, shall constitute an account stated, and shall not be subject to any question for
any reason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to
MGA within two (2) years after the date rendered. No action, suit, or proceeding of any nature in
respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained
against MGA unless such action, suit, or proceeding is commenced against MGA in a court of
competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection.
Bryant or his representatives shall have the right, not more than once per year and not more than once
per statement of royalties, to examine MGA's books and records relating to the sales of such MGA
Products, such examination to be conducted during MGA's normal business hours and upon
reasonable prior written notice.

(c)     All costs and expenses incurred by Bryant in connection with the performance of his
obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with
MGA's prior written consent. In the event MGA requests Bryant to travel to the Orient on MGA's behalf
in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in
connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel
accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)     Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if
and as agreed) on a monthly basis. Each invoice shall provide sufficient detail to support the monthly
fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for
reimbursable expenses, as applicable). MGA shall pay each such invoice within fifteen (15) days after
receipt of such invoice, provided, however, MGA reserves the right to request further explanation or
documentation before paying any invoice submitted by Bryant.

(e)     MGA shall use its reasonable business efforts, consistent with its business judgment, to
market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from
sales. MGA has not made and does not hereby make any representation or warranty with respect to
the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell. Bryant
recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's
judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any
of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the
MGA Products shall be binding and conclusive upon Bryant. Bryant warrants and agrees that Bryant
will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more
sales could have been made or that better business could have been done than what was actually
made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or
terms could have been obtained.

5.     <u>Warranties and Indemnity</u>: Bryant represents, warrants and agrees that:

(a)     he has the right and is free to execute this Agreement, to grant the rights granted by him
to MGA hereunder, and to perform each and every term and provision hereof;

(b)     neither the execution and delivery of this Agreement nor the performance by Bryant of
any of his obligations hereunder will constitute a violation, breach or default under any agreement,
arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by
which Bryant is bound;

(c)     the Bryant Work Product shall be free of all liens and encumbrances and there will be no
claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work
Product is original and no part thereof infringes or shall infringe upon any common law or statutory
rights or intellectual property rights of any third party including, without limitation, contractual rights,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

3

EXHIBIT 15 PAGE 330

ATTORNEY'S EYES
ONLY

MGA000003

patents, copyrights, mask-work rights, trade secrets, rights of privacy and other Intellectual property rights;

    (d)    he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

    (e)    he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.    **Default/Termination:**

    (a)    In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

    (b)    Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.    **Confidentiality:**

    (a)    Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

    (b)    Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

    (c)    Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{00006662.DOC/2 / 10/04/2000  03:05 PM}

4

EXHIBIT _IS_ PAGE _331_

**ATTORNEY'S EYES ONLY**

**MGA000004**

entitled to equitable relief in the nature of injunction and to all other available relief, at law and/or in equity.

8.     Notices:  All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time.  All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid.  Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 160th Street, Gardena, California 90247.

9.     Independent Contractor/No Partnership/Third Party Beneficiary: Bryant's relationship with MGA is that of an independent contractor.  Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name.  Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties.  In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship.  Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise.  This Agreement shall not be construed to be for the benefit of any third party.

10.    Services Rendered Deemed Special, etc.:  Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.    General Provisions:

       (a)     This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law.  Any such assignment shall not relieve such Party of its obligations hereunder.

       (b)     The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

       (c)     A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

       (d)     Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

(00009862.DOC/2 / 10/04/2000  03:05 PM)

5

EXHIBIT _IS_ PAGE _332_

ATTORNEY'S EYES ONLY

MGA000005

(e)   This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction of the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)   This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained. No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)   Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____
CARTER BRYANT

Social Security No.____

REDACTED

{00006662.DOC/2 / 10/04/2000   03:05 PM}

6

ATTORNEY'S EYES ONLY

EXHIBIT 15  PAGE 333

MGA000006

**EXHIBIT 16**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., A DELAWARE )
CORPORATION, )
           )
    PLAINTIFF, )
           )
    VS. )   NO. CV 04-9059 NM(RNBX)
           )
CARTER BRYANT, AN )
INDIVIDUAL; AND DOES 1 )
THROUGH 10, INCLUSIVE, )
           )
    DEFENDANTS. )
_____)
           )
AND RELATED COUNTER-CLAIM.)
_____)

WORKING COPY

CONFIDENTIAL TRANSCRIPT

VOLUME I

DEPOSITION OF ANNA RHEE

LOS ANGELES, CALIFORNIA

THURSDAY, FEBRUARY 3, 2005

REPORTED BY:

KAREN E. KAY
C.S.R. NO. 3862, R.M.R., C.R.R.

JOB NO.
C40593LMF

**LUDWIG KLEIN**

10868 KLING STREET
TOLUCA LAKE, CALIFORNIA 91602
800.540.0681    Fax 818.508.6326
e-mail: lois@ludwigklein.com

EXHIBIT 16 PAGE 334

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1  APPEARANCES:

2      FOR THE PLAINTIFF AND COUNTER-DEFENDANT:

3          QUINN EMANUEL
           BY:  MICHAEL T. ZELLER
4              ATTORNEY AT LAW
           865 SOUTH FIGUEROA STREET
5          TENTH FLOOR
           LOS ANGELES, CALIFORNIA 90017
6          213.624.7707  FAX 213.624.0643

7      FOR THE DEFENDANT AND COUNTER-CLAIMANT CARTER BRYANT:

8          LITTLER MENDELSON, P.C.
           BY:  DOUGLAS A. WICKHAM
9              ATTORNEY AT LAW
           2049 CENTURY PARK EAST
10         FIFTH FLOOR
           LOS ANGELES, CALIFORNIA 90067.3107
11         310.553.0308  FAX 310.553.5583

12     FOR THE DEFENDANT M.G.A. ENTERTAINMENT, INC.:

13         O'MELVENY & MYERS, L.L.P.
           BY:  DIANA M. TORRES
14             ATTORNEY AT LAW
           400 SOUTH HOPE STREET
15         FIFTEENTH FLOOR
           LOS ANGELES, CALIFORNIA 90071.2899
16         213.430.6000  FAX 213.430.6407
                    -AND-
17         M.G.A. ENTERTAINMENT, INC.
           BY:  RICHARD DANIELS
18             IN-HOUSE SENIOR COUNSEL
           16380 ROSCOE BOULEVARD
19         VAN NUYS, CALIFORNIA 91406
           818.894.2525  FAX 818.894.0771

20

21

22

23

24

25

                                                    3
        NONCONFIDENTIAL TRANSCRIPT - VOLUME I

                    EXHIBIT 16 PAGE 335

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1   APPEARANCES:   (CONTINUED)

2        FOR THE WITNESS:

3            BERMAN, MAUSNER & RESSER
             BY:   LAURENCE M. BERMAN
4                 ATTORNEY AT LAW
             11601 WILSHIRE BOULEVARD
5            SUITE 600
             LOS ANGELES, CALIFORNIA 90025.1742
6            310.473.3333   FAX 323.965.1200

7

8        ALSO PRESENT:

9            DEIRDRE AARON
             JON SEIDEL, VIDEOGRAPHER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    4
               NONCONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT  14  PAGE 336

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1                        I N D E X

2    EXAMINATION BY                                    PAGE

3    MR. WICKHAM                                        16

4

5

6

7          CONFIDENTIAL PORTIONS OF TRANSCRIPT

8                        PAGES

9                         16
                        105-229
10

11

12

13

14                    E X H I B I T S

15   DEFENDANT'S                                       PAGE

16     202        HAND-DRAWN IMAGES OF DOLL            155
                  HEADS, BRYANT00173 (1 PG.)
17
       203        COLOR PHOTOCOPY OF A PRAYER          191
18                ANGELS DOLL IN ITS PACKAGING (1
                  PG.)
19
       204        COLOR PHOTOCOPY OF A PRAYER          192
20                ANGELS DOLL FACE (1 PG.)

21

22

23

24

25

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 14 PAGE 337

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | | | |
|---|---|---|---|---|
| 1 | SEE THAT THERE? | | | 01:40:46 |
| 2 | A | YEP. | | 01:40:48 |
| 3 | Q | IS THAT IN YOUR HANDWRITING? | | 01:40:49 |
| 4 | A | YES. | | 01:40:54 |
| 5 | Q | OKAY.  GREAT.  ALL RIGHT.  SO YOU CREATED | | 01:40:55 |
| 6 | ALL THE INFORMATION THAT'S ON THIS DOCUMENT? | | | 01:40:56 |
| 7 | MR. BERMAN:  OBJECTION.  SHE CREATED THE | | | 01:40:58 |
| 8 | HANDWRITING.  SHE DID NOT CREATE -- THE INFORMATION | | | 01:41:00 |
| 9 | IS DIFFERENT.  SHE WROTE IT. | | | 01:41:03 |
| 10 | MR. WICKHAM:  THANK YOU FOR THE | | | 01:41:05 |
| 11 | CLARIFICATION, COUNSEL. | | | 01:41:06 |
| 12 | THE WITNESS:  YES. | | | 01:41:09 |
| 13 | BY MR. WICKHAM: | | | |
| 14 | Q | COULD YOU TELL ME HOW YOU WERE FIRST | | 01:41:11 |
| 15 | REFERRED TO M.G.A. TO DO FREELANCE WORK? | | | 01:41:15 |
| 16 | A | CARTER BRYANT ASKED ME. | | 01:41:22 |
| 17 | Q | THIS ANGEL FACE THING? | | 01:41:30 |
| 18 | A | YES. | | 01:41:33 |
| 19 | Q | DO YOU KNOW A WOMAN BY THE NAME OF VERONICA | | 01:41:36 |
| 20 | MARLOW? | | | 01:41:39 |
| 21 | A | I KNOW HER A LITTLE BIT. | | 01:41:45 |
| 22 | Q | OKAY.  DID A WOMAN BY THE NAME OF VERONICA | | 01:41:47 |
| 23 | MARLOW CONTACT YOU ABOUT DOING SOME WORK ON THIS | | | 01:41:51 |
| 24 | ANGEL FACE PROJECT? | | | 01:41:58 |
| 25 | MR. BERMAN:  OBJECT.  ASSUMES FACTS NOT IN | | | 01:41:59 |

106

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 16 PAGE 338

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    EVIDENCE.                                             01:42:01

2          THE WITNESS:  NO.                               01:42:03

3  BY MR. WICKHAM:

4      Q    OKAY.  SO YOUR BEST RECOLLECTION IS THAT       01:42:04

5  CARTER BRYANT HAD REFERRED YOU TO M.G.A.?               01:42:06

6      A    DEFINITELY.                                    01:42:09

7      Q    OKAY.  AND SPECIFICALLY THAT HE HAD            01:42:11

8  REFERRED YOU TO M.G.A., WHICH ULTIMATELY LED TO YOU     01:42:13

9  DOING THIS WORK ON THE ANGEL FACE PROJECT?              01:42:16

10         MR. BERMAN:  I'M GOING TO OBJECT.  IT           01:42:21

11  ASSUMES FACTS NOT IN EVIDENCE ON THE ANGEL FACE        01:42:22

12  PROJECT.  IT SAYS "[READING:]  ANGEL BABY DOLL         01:42:24

13  HEADS."  YOU'RE SAYING IT'S ANGEL FACE.                01:42:28

14         THE WITNESS:  YEP.                              01:42:33

15  BY MR. WICKHAM:

16     Q    OKAY.  WELL, TELL ME ABOUT THE FIRST           01:42:33

17  CONVERSATION THAT YOU HAD WITH CARTER BRYANT           01:42:36

18  ABOUT -- THAT ULTIMATELY LED TO THE INVOICE THAT'S     01:42:39

19  THE FIRST PAGE OF EXHIBIT 201.                         01:42:43

20     A    THE FIRST CONVERSATION THAT WE HAD?            01:42:49

21     Q    YES.  THAT LED TO THIS FORM.                   01:42:50

22     A    I THINK IT WAS -- LET ME THINK WHAT IT WAS.    01:43:03

23  GIVE ME A SECOND.  I THINK I WAS AT HIS HOUSE, AND     01:43:09

24  HE MENTIONED THAT HE HAD LIKE A SECRET PROJECT, WAS    01:43:19

25  A BIG, BIG, BIG SECRET, AND -- AND HE TOLD ME IT       01:43:28

                                                          107

                CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 16 PAGE 339

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | | |
|---|---|---|---|
| 1 | WOULD BE COMING UP AND WOULD I WANT TO DO IT.  AND I | 01:43:32 |
| 2 | SAID, "SURE.  NO PROBLEM."  THEN LATER ON HE BROUGHT | 01:43:35 |
| 3 | IT TO MY HOUSE. | 01:43:38 |
| 4 | Q    AND THAT'S THIS ANGEL DOLL HEADS? | 01:43:41 |
| 5 |     MR. ZELLER:  OBJECTION. | 01:43:47 |
| 6 |     THE WITNESS:  YEAH. | 01:43:49 |
| 7 | BY MR. WICKHAM: | |
| 8 | Q    OKAY.  AND WHAT WERE THESE ANGEL DOLL | 01:43:52 |
| 9 | HEADS? | 01:43:56 |
| 10 | A    BRATZ. | 01:43:57 |
| 11 | Q    "BRATZ"? | 01:43:58 |
| 12 | A    YEAH. | 01:43:59 |
| 13 |     MR. BERMAN:  I'M GOING TO OBJECT THAT THAT | 01:43:59 |
| 14 | WAS ARGUMENTATIVE. | 01:44:00 |
| 15 | BY MR. WICKHAM: | |
| 16 | Q    CAN YOU TELL ME WHERE ON THE FIRST PAGE OF | 01:44:04 |
| 17 | EXHIBIT 201 THAT YOU SEE SOMETHING IN HERE THAT | 01:44:07 |
| 18 | MAKES YOU BELIEVE THAT THIS PARTICULAR INVOICE | 01:44:11 |
| 19 | RELATES TO BRATZ? | 01:44:13 |
| 20 | A    IT DOESN'T.  IT DOESN'T. | 01:44:19 |
| 21 | Q    OKAY.  DO YOU KNOW WHAT AN ANGEL BABY DOLL | 01:44:23 |
| 22 | HEAD IS? | 01:44:25 |
| 23 |     MR. ZELLER:  OBJECT.  THE QUESTION IS | 01:44:31 |
| 24 | VAGUE. | 01:44:32 |
| 25 |     THE REPORTER:  EXCUSE ME? | 01:44:32 |

108

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 16 PAGE 340