LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | MR. ZELLER:  I SAID, "THE QUESTION IS | 01:44:32 |
| 2 | VAGUE." | 01:44:32 |
| 3 | THE WITNESS:  I DON'T REMEMBER THIS. | 01:44:42 |
| 4 | BY MR. WICKHAM: | 01:44:43 |
| 5 | Q    DO YOU EVER REMEMBER WORKING ON AN ANGEL | 01:44:45 |
| 6 | BABY DOLL HEAD FOR M.G.A.? | 01:44:48 |
| 7 | A    POSSIBLY. | 01:44:58 |
| 8 | Q    OKAY.  DO YOU REMEMBER HAVING A REQUEST BY | 01:44:59 |
| 9 | SOMEONE BY THE NAME OF KERRI LEGG WHO REQUESTED YOU | 01:45:02 |
| 10 | TO CREATE TWO ANGEL BABY DOLL HEADS? | 01:45:07 |
| 11 | MR. ZELLER:  ASSUMES FACTS NOT IN EVIDENCE. | 01:45:12 |
| 12 | THE WITNESS:  I DON'T KNOW WHO THAT IS | 01:45:14 |
| 13 | ACTUALLY. | 01:45:15 |
| 14 | BY MR. WICKHAM: | |
| 15 | Q    OKAY.  WELL, HAVING LOOKED AT THIS AND | 01:45:16 |
| 16 | SEEING THAT IT'S IN YOUR WRITING, WHY DID YOU PUT | 01:45:19 |
| 17 | THAT THERE? | 01:45:23 |
| 18 | MR. BERMAN:  WHY DID YOU PUT THE | 01:45:23 |
| 19 | "[READING:]  REQUEST BY KERRI LEGG"? | 01:45:24 |
| 20 | THE WITNESS:  WELL, I THINK I ASKED | 01:45:30 |
| 21 | CARTER -- I DIDN'T KNOW IT WAS CALLED BRATZ OR | 01:45:32 |
| 22 | ANYTHING.  I GO, "WELL, WHAT DO YOU WANT ME TO PUT | 01:45:36 |
| 23 | ON THE INVOICE?" | 01:45:39 |
| 24 | AND HE TOLD ME TO PUT "ANGEL BABY DOLL | 01:45:40 |
| 25 | HEADS." | 01:45:43 |

109

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT __14__ PAGE __341__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | MR. BERMAN:  YEAH.  AND IT'S ON OR ABOUT. | 01:48:10 |
| 2 | JOIN IN THOSE OBJECTIONS. | 01:48:11 |
| 3 | THE WITNESS:  CORRECT. | 01:48:14 |
| 4 | BY MR. WICKHAM: | |
| 5 | Q   OKAY.  LET ME ASK YOU ABOUT A COUPLE PAGES | 01:48:14 |
| 6 | BACK, AR0013. | 01:48:22 |
| 7 | A   OKAY. | 01:48:33 |
| 8 | Q   OKAY.  NOW, DO YOU RECOGNIZE THE PRINTING | 01:48:33 |
| 9 | AND HANDWRITING ON THIS INVOICE? | 01:48:35 |
| 10 | A   YES, I DO. | 01:48:42 |
| 11 | Q   OKAY.  AND IS THAT ALL YOUR PRINTING AND | 01:48:44 |
| 12 | HANDWRITING? | 01:48:46 |
| 13 | A   YES. | 01:48:48 |
| 14 | Q   OKAY.  DO YOU KNOW WHAT THIS INVOICE | 01:48:49 |
| 15 | RELATES TO? | 01:48:51 |
| 16 | A   YES. | 01:48:54 |
| 17 | Q   WHAT DOES IT RELATE TO? | 01:48:56 |
| 18 | A   BRATZ. | 01:49:07 |
| 19 | Q   "BRATZ"? | 01:49:08 |
| 20 | A   YES. | 01:49:08 |
| 21 | Q   AND WHAT IS IT ON THIS INVOICE THAT MAKES | 01:49:09 |
| 22 | YOU BELIEVE THAT THIS INVOICE RELATES TO SOMETHING | 01:49:11 |
| 23 | ON BRATZ? | 01:49:14 |
| 24 | A   WELL, BECAUSE AT THAT TIME, THOSE EARLY | 01:49:18 |
| 25 | TIMES, I THINK THAT'S THE ONLY THING THAT I'VE DONE. | 01:49:24 |

112

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 16 PAGE 342

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | I MEAN EVERYTHING IS BRATZ.  WITH CARTER, EVERYTHING | 01:49:28 |
| 2 | HAS BEEN BRATZ. | 01:49:32 |
| 3 | Q    WELL, THERE'S ANOTHER NAME ON THIS.  DO YOU | 01:49:35 |
| 4 | RECOGNIZE THAT NAME? | 01:49:35 |
| 5 | A    YES. | 01:49:40 |
| 6 | Q    WHO IS THIS PAULA TRANTAFALES? | 01:49:41 |
| 7 | A    SHE WORKS FOR M.G.A. | 01:49:48 |
| 8 | Q    OKAY. | 01:49:51 |
| 9 | A    CARTER'S FRIEND. | 01:49:53 |
| 10 | Q    OKAY.  AND YOU BELIEVE THAT THIS RELATES TO | 01:49:54 |
| 11 | WHAT SORT OF WORK? | 01:49:56 |
| 12 | A    BRATZ. | 01:50:01 |
| 13 | MR. BERMAN:  LET ME OBJECT.  I'M SORRY. | 01:50:01 |
| 14 | BY MR. WICKHAM: | |
| 15 | Q    WHAT ABOUT BRATZ?  WHAT WORK WERE YOU | 01:50:03 |
| 16 | PERFORMING WHEN YOU WERE CARRYING OUT THE WORK? | 01:50:06 |
| 17 | MR. BERMAN:  THE INVOICE 0013? | 01:50:13 |
| 18 | MR. WICKHAM:  YES. | 01:50:15 |
| 19 | MR. BERMAN:  OKAY. | 01:50:15 |
| 20 | THE WITNESS:  BRATZ. | 01:50:16 |
| 21 | BY MR. WICKHAM: | |
| 22 | Q    WHAT ASPECT OF BRATZ? | 01:50:18 |
| 23 | A    WHAT DO YOU MEAN "WHAT ASPECT OF BRATZ"? | 01:50:21 |
| 24 | Q    BRATZ FEET, BRATZ HAIR, BRATZ NOSE?  WHAT | 01:50:24 |
| 25 | ABOUT BRATZ WERE YOU DOING THAT YOU WERE BILLING | 01:50:28 |

113

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 16 PAGE 343

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | | |
|---|---|---|---|
| 1 | M.G.A. FOR?  WHAT WERE YOU DOING? | | 01:50:31 |
| 2 | A | THEIR FACES. | 01:50:35 |
| 3 | Q | OKAY.  ALL RIGHT.  SO THIS DEALT WITH DOLL | 01:50:36 |
| 4 | FACES; CORRECT? | | 01:50:40 |
| 5 | A | CORRECT. | 01:50:42 |
| 6 | Q | PAINTING DOLL FACES? | 01:50:42 |
| 7 | | MR. BERMAN:  OBJECTION.  LEADING. | 01:50:45 |
| 8 | BY MR. WICKHAM: | | 01:50:45 |
| 9 | Q | CORRECT? | 01:50:46 |
| 10 | | MR. BERMAN:  LEADING. | 01:50:46 |
| 11 | | THE WITNESS:  CORRECT. | 01:50:47 |
| 12 | BY MR. WICKHAM: | | |
| 13 | Q | AND THIS WAS FOR PAINTING FOUR DOLL FACES; | 01:50:49 |
| 14 | YES? | | 01:50:55 |
| 15 | A | YES. | 01:50:57 |
| 16 | Q | OKAY.  NOW, YOU SEE THE DATE THERE, | 01:50:58 |
| 17 | "[READING:]  DECEMBER 7, 2000"? | | 01:50:59 |
| 18 | A | YES. | 01:51:02 |
| 19 | Q | DO YOU BELIEVE THAT'S AN ACCURATE DATE? | 01:51:02 |
| 20 | A | YES. | 01:51:08 |
| 21 | Q | OKAY.  ALL RIGHT.  LET'S TAKE A LOOK AT THE | 01:51:08 |
| 22 | NEXT PRIOR INVOICE, 0012.  WHAT IS THIS -- FIRST OF | | 01:51:16 |
| 23 | ALL, DOES ALL THE PRINTING AND HANDWRITING ON THIS | | 01:51:26 |
| 24 | PAGE APPEAR TO BE YOURS? | | 01:51:29 |
| 25 | A | YES. | 01:51:35 |

114

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 16 PAGE 344

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | | |
|---|---|---|---|
| 1 | Q | OKAY.  WHAT DOES THIS INVOICE RELATE TO? | 01:51:37 |
| 2 | | MR. BERMAN:  I'M GOING TO OBJECT.  THAT'S | 01:51:42 |
| 3 | VAGUE AND AMBIGUOUS.  DO YOU MEAN WHAT PROJECT OR | | 01:51:42 |
| 4 | WHAT -- LIKE IS THAT WHAT YOU'RE ASKING? | | 01:51:44 |
| 5 | | MR. WICKHAM:  ALL THE ABOVE, YES. | 01:51:47 |
| 6 | Q | WHAT DOES IT RELATE TO? | 01:51:50 |
| 7 | | MR. BERMAN:  OBJECTION.  ASKED AND | 01:51:51 |
| 8 | ANSWERED.  SHE'S ALREADY SAID ALL THE WORK WAS WHAT | | 01:51:52 |
| 9 | SHE SAID. | | 01:51:53 |
| 10 | | THE WITNESS:  BRATZ. | 01:51:56 |
| 11 | BY MR. WICKHAM: | | 01:51:58 |
| 12 | Q | THIS RELATED TO BRATZ AS WELL? | 01:51:58 |
| 13 | A | LET ME MAKE SURE.  YES, IT IS FOR SURE. | 01:52:00 |
| 14 | Q | NOW, WHAT'S THE REFERENCE THERE TO | 01:52:14 |
| 15 | "[READING:]  SET OF COLOR SWATCHES AND | | 01:52:15 |
| 16 | SPECIFICATIONS"?  WHAT DOES THAT MEAN? | | 01:52:17 |
| 17 | A | THAT MEANS THAT I GAVE HIM A SET OF | 01:52:24 |
| 18 | SWATCHES TO MATCH THE COLORS OF WHAT'S USED ON A | | 01:52:28 |
| 19 | BRATZ FACE. | | 01:52:33 |
| 20 | Q | OKAY.  AND WHAT IS THE -- WHAT IS BELOW | 01:52:35 |
| 21 | THAT? | | 01:52:39 |
| 22 | A | "[READING:]  LIP COLOR 'REDUE.'" | 01:52:39 |
| 23 | Q | OKAY.  AND WHAT DOES THAT REFER TO? | 01:52:42 |
| 24 | A | WELL, THAT MEANS HE ASKED FOR A SLIGHT | 01:52:45 |
| 25 | CHANGE IN LIP TONE. | | 01:52:50 |

115

CONFIDENTIAL TRANSCRIPT - VOLUME I

- EXHIBIT 16 PAGE 345

```
1                    REPORTER'S CERTIFICATE

2

3

4          I, KAREN E. KAY, C.S.R. NO. 3862, A CERTIFIED

5    SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA,

6    DO HEREBY CERTIFY:

7          THAT PRIOR TO BEING EXAMINED THE WITNESS NAMED

8    IN THE FOREGOING PROCEEDINGS WAS BY ME DULY SWORN TO

9    TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

10   THE TRUTH;

11         THAT SAID PROCEEDINGS WERE TAKEN BY ME IN

12   SHORTHAND AT THE TIME AND PLACE HEREIN NAMED AND WAS

13   THEREAFTER TRANSCRIBED INTO TYPEWRITING UNDER MY

14   DIRECTION, SAID TRANSCRIPT BEING A TRUE AND CORRECT

15   TRANSCRIPTION OF MY SHORTHAND NOTES.

16         I FURTHER CERTIFY THAT I HAVE NO INTEREST IN

17   THE OUTCOME OF THIS ACTION.

18

19          FEBRUARY 7, 2005

20

21

22

23          KAREN E. KAY
            C.S.R. NO. 3862
24

25
```

234

EXHIBIT 14 PAGE 346

**EXHIBIT 17**

CONFIDENTIAL

TO: MGA ENTERTAINMENT

| NAME ANNA RHEE | | | SHIP TO | | | |
|---|---|---|---|---|---|---|
| ADDRESS 1613 FORD AVE. | | | ADDRESS | | | |
| CITY, STATE, ZIP REDONDO BCH, CA. 91278 | | | CITY, STATE, ZIP | | | |

| ORDER NUMBER | DEPARTMENT | SALESPERSON | WHEN SHIP | TERMS 30 DAYS | HOW SHIP | DATE 10/15/01 |
|---|---|---|---|---|---|---|

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 1 | Extra Large Bratz Head (Make-up) | price → tax → TOTAL PRICE → INCLUDING TAX | $250.00  $20.00  $270.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | Request by Paula Treantafelles | | |
| | | | |

BUYER:

Adams
8100

KEEP THIS SLIP FOR REFERENCE

EXHIBIT 17  PAGE 347

AR 0054

**EXHIBIT 18**

# Veronica Marlow

12250 Woodley Ave.
Granada Hills CA, 91344

**INVOICE**

**INVOICE NO.:** G000626

**DATE:** 11/14/00

**Sold To:**

Paula Treantafales
MGA Entertainment
16730 Schoenborn St.
North Hills, CA 91343

**Ship To:**

Same

| SALESPERSON | P.O. NUMBER | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
| | PO03522 | 10/26/00 | | | net |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| | "Bratz" dolls third party services from 10/13/00 to 10/20/00. | | |
| 49 hrs. | Third party sewing and pattern making support. | 30.00 | 1,470.00 |
| 32 hrs. | Third party sewing and pattern making support. | 30.00 | 960.00 |

| | |
|---|---|
| SUBTOTAL | 2,430.00 |
| SALES TAX @ 8.25% | |
| SHIPPING & HANDLING | |
| TOTAL DUE | 2,630.48 |

*Only pay $2,430.00 (per P.O.)*

Customer Signature

**THANK YOU FOR YOUR BUSINESS!**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED

MGA0008742

EXHIBIT 18 PAGE 348

Y 26604
Pm 7514

# Veronica Marlow

12250 Woodley Ave.
Granada Hills CA, 91344

# INVOICE
RCTOS 48

**INVOICE NO.:** G000625

**DATE:** 11/14/00

**Sold To:**

Paula Treantafales
MGA Entertainment
16730 Schoenborn St.
North Hills, CA 91343

**Ship To:** Same

| SALESPERSON | P.O. NUMBER | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
| | PO03521 | 10/26/00 | | | net |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| | "Bratz" dolls research, development and support services from 9/29/00 to 10/20/00. | | |
| 18 hrs. | Brainstorm and development meetings. | 50.00 | 900.00 |
| 12 hrs. | Support for body sculpting and packaging. | 50.00 | 600.00 |
| 18 hrs. | Fashion research. | 50.00 | 900.00 |
| 19 hrs. | Fashion development and support. | 50.00 | 950.00 |
| 21 hrs. | Pattern and sample development. | 50.00 | 1,050.00 |

| | |
|---|---|
| SUBTOTAL | 4,400.00 |
| SALES TAX @ 8.25% | 363.00 |
| SHIPPING & HANDLING | |
| TOTAL DUE | 4,763.00 |

only pay
(per P.O.)

$4,400.00

_____
**Customer Signature**

*THANK YOU FOR YOUR BUSINESS!*

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

REDACTED

MGA0008739

EXHIBIT 18 PAGE 349

**EXHIBIT 19**

● ORIGINAL ●

1  William C. Conkle (SB# 076103)
   Mark D. Kremer (SB# 100978)
2  Eric S. Engel (SB# 105656), members of
   CONKLE & OLESTEN
3  Professional Law Corporation
   3130 Wilshire Boulevard, Suite 500
4  Santa Monica, California 90403-2403

5  Telephone: (310) 998-9100

6  Attorneys for Plaintiff Farhad Larian

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 2 8 2005

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY_____
      J. SUNGA, DEPUTY

Case assigned to
Judge  *Paul Gutman*          D34

7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF LOS ANGELES

10

11  FARHAD LARIAN,                    )  CASE NO.   BC 329501
                                      )
12              Plaintiff,            )  VERIFIED COMPLAINT FOR:
                                      )
13  v.                                )  1)   FRAUD
                                      )
14  MORAD ZARABI, ISAAC LARIAN        )  2)   NEGLIGENT
    AND KAMBIZ ZARABI AND DOES 1      )       MISREPRESENTATION
15  through 5, INCLUSIVE              )
                                      )  3)   CONSPIRACY
16              Defendants.           )
                                      )  4)   DECLARATORY RELIEF
17  _____  )
                                         5)   CONSTRUCTIVE TRUST
18
                                         6)   INJUNCTIVE RELIEF
19

20

21      Plaintiff alleges as follows:

22

23      1.      Plaintiff, Farhad Larian also known as Fred Larian ("FRED") is now and
    at all times relevant to this Complaint was a resident of Los Angeles County, California.

24

25      2.      Defendant, Morad Zarabi ("MORAD") is now and at all times relevant to
    this Complaint was a resident of Los Angeles County California.

26

27

28

2221.002\9929

                        Complaint

EXHIBIT 19 PAGE 350

3.     Defendant, Isaac Larian ("ISAAC") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

4.     Defendant Kambiz Robert Zarabi ("KAMBIZ") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

5.     Plaintiff is unaware of the true names and capacities of Does 1 through 5 and therefore sues such defendants by such fictitious names. Plaintiff will amend this Complaint to identify the true names and capacities of these defendants if and when additional information against them is ascertained. Plaintiff is informed and believes that each of the doe defendants is liable in some manner for the acts and omissions and the injuries and damages alleged in this Complaint.

6.     At all times relevant to this Complaint, each defendant was the agent or employee of each of the other defendants as the case may have been, and was acting within the course of the scope of such agency or employment in performing the acts alleged in this Complaint.

7.     FRED and ISAAC are brothers who for over 20 years engaged in business as partners through equal ownership of several businesses and ventures they co-founded. They shared profits and losses on an equal basis.

8.     The businesses they co-founded included the companies known as ABC International Traders, Inc. ("ABC") and MGA Entertainment Hong Kong Ltd. ("MGAEHK"). ABC and MGAEHK collectively are referred to as "MGA". At all times relevant to this Complaint FRED and ISAAC each owned 45% of the outstanding stock, while their brother in law Jangahir Makabi ("MAKABI") owned 10% of MGA. FRED's 45% interest amounted to 10,000,000 shares of common stock in ABC and

2221.002\9929

-2-
Complaint

EXHIBIT 19 PAGE 351

1  450 shares of common stock in MGAEHK (collectively "FRED's Stock"). Over time

2  FRED and ISAAC divided responsibilities in MGA's business:  ISAAC, as CEO

3  assumed responsibility for finance, sales, marketing and product development while

4  FRED, as Executive Vice President was responsible for operations, including customs,

5  warehousing, distribution and facilities.

6

7      9.    MORAD is the uncle of ISAAC and FRED.

8

9      10.    In the spring of 2000 ISAAC offered to buy FRED's 45% interest in MGA

10  for $9,000,000 valuing MGA at $20,000,000.  FRED responded that he wanted an

11  appraisal of MGA to consider selling his interest.  Consequently, ISAAC and FRED

12  continued to negotiate a buy-sell agreement for ISAAC to buy FRED's Stock. ISAAC

13  told FRED that he only wanted to appraise MGA as of December 31, 1999.  FRED

14  demanded a current appraisal. To avoid an appraisal ISAAC suggested using a process

15  by which he or FRED would make an offer to buy the other's interest which if not

16  accepted would require the refusing party to purchase the offeror's interest for the same

17  price. FRED rejected the method telling ISAAC that FRED did not want to be a buyer.

18  Ultimately ISAAC refused to go through with a buy-sell agreement that required three

19  appraisals of MGA.

20

21      11.    From the inception of their partnership, FRED and ISAAC had agreed that

22  their salaries and other compensation from MGA would always be equal.  They had

23  followed this agreement for more than twenty years, taking equal raises and pay-cuts

24  at the same time.  In early 2000, however, while he was attempting to buy FRED out

25  of MGA,  ISAAC secretly gave himself a $100,000 raise to about $325,000. ISAAC

26  later demanded that the MGA Board of Directors raise his salary to $500,000, ratify

27  $750,000 as a bonus for 1999, authorize a $1,500,000 bonus for 2000, and give him a

28  4% royalty on items he "personally develops for MGA's 2001 line or products".

2221.002\9929

-3-
Complaint

EXHIBIT 19 PAGE 352

1    Subsequently, Isaac's two brothers in-law purporting to act as MGA directors increased
2    ISAAC's salary to always be three times that of FRED's salary and authorized an
3    additional bonus of up to 50% of ISAAC's tripled salary.  FRED is informed and
4    believes that ISAAC engineered the compensation increase to put additional pressure
5    on FRED to sell out his interests in MGA.  FRED is further informed and believes that
6    in exchange for MAKABI's vote, ISAAC promised MAKABI some portion of FRED's
7    Stock if FRED agreed to sell it to ISAAC.

8

9        12.    In or around the summer of 2000, following ISAAC's refusal to proceed
10    with the buy-sell agreement, MORAD contacted FRED and urged him to let MORAD
11    arbitrate the impasse between ISAAC and FRED over the stock sale.  MORAD told
12    FRED that FRED should not wait any longer to resolve his disputes with ISAAC as
13    ISAAC was attempting to "take over the company" by the enormous raise in
14    compensation which MORAD said was "just a part of ISAAC's plans to oust FRED".
15    MORAD suggested that he determine which brother should sell his interest in MGA
16    and at what price.  FRED responded that he did not want to be a buyer and required for
17    any arbitration, that the price of his stock be determined by an appraisal of the current
18    value of MGA, as ISAAC had control of the financial and business information. FRED
19    also told MORAD he required a resolution of certain other partnership accounts.  In
20    response MORAD promised FRED that the price of FRED's interest in MGA would
21    be determined by a current and accurate appraisal of MGA that MORAD would obtain.
22    MORAD called the appraisal "the central piece of the arbitration".  MORAD also
23    promised to resolve the accounting of the other partnership accounts.

24

25        13.    In several communications with FRED, MORAD stressed his unique
26    position to serve as an arbitrator.  MORAD held out his familial relationship to the
27    brothers as assuring his impartiality and trustworthiness.  MORAD promised to treat
28    each brother "as one of his eyes", an expression meaning that MORAD would allow

2221.002\9929                          -4-
                                     Complaint

EXHIBIT 19 PAGE 353

1   no harm to come to either of them.  MORAD claimed that his business experience

2   would assure the accuracy of the appraisal and the accounting  and that he would hire

3   a CPA, Mike Shenassafar, to assist him.  MORAD said that he would serve as an

4   arbitrator free of charge, requiring reimbursement only for expenses, such as fees for

5   the appraisal and the CPA. MORAD told FRED that he could trust MORAD to resolve

6   the brothers' dispute, ending the unhappiness it was causing their family.

7

8        14.    MORAD presented FRED with an Agreement for Arbitration and

9   Selection of Arbitrator ("Arbitration Agreement"), a copy of which is attached as

10   Exhibit 1 to this Complaint.  FRED is informed and believes that MORAD's attorney

11   Ellis Stern drafted it. MORAD told FRED that he should not hire an attorney to advise

12   him about the Arbitration Agreement because "attorneys are in it for themselves and

13   would never allow this to end until they got all of the money for themselves".

14   MORAD reiterated to FRED that he could trust MORAD.

15

16        15.    In reliance on the representations of MORAD, on or about September 28,

17   2000 FRED signed the Arbitration Agreement without the advice of counsel and did

18   not hire counsel to represent him in the arbitration.

19

20        16.    Plaintiff is informed and believes that the representations of MORAD

21   were false when made in and around the summer of 2000 prior to FRED's execution

22   of the Arbitration Agreement.   MORAD engaged in misrepresentations and

23   concealments to induce FRED's agreement to allow MORAD to arbitrate the

24   controversy with ISAAC so that MORAD could fix the sale price without an appraisal.

25   MORAD never intended to engage in any neutral arbitration using an accurate and

26   current appraisal of MGA and never intended to use a CPA to assist him with the

27   appraisal. MORAD intended to trick FRED to sell his interest in MGA to ISAAC and

28   settle the other partnership accounts by making FRED believe the price for FRED's

EXHIBIT 19 PAGE 354

1  Stock had been established by an accurate appraisal and accounting, but in fact was

2  pre-determined by MORAD.  In furtherance of his plan, MORAD concealed from

3  FRED MORAD's inability to competently read and write English.

4

5      17.    Plaintiff is informed and believes that MORAD made his false

6  representations pursuant to an agreement and plan formed between MORAD and

7  ISAAC to induce FRED to give MORAD authority to determine a value for MGA and

8  trick FRED into selling his interests in MGA at a price pre-determined by ISAAC

9  without an appraisal.  Under the plan and agreement with ISAAC, MORAD agreed to

10  induce FRED's consent to the Arbitration Agreement, by promising FRED an accurate

11  and complete appraisal, but would fix the price for which FRED would sell his Stock

12  to ISAAC and settle the partnership accounts, at or below the $9,000,000 ISAAC had

13  previously offered to pay for FRED's Stock, irrespective of the true appraised value

14  of MGA.

15

16      18.    Following execution of the Arbitration Agreement, MORAD took steps

17  in accordance with his intent and the plan to defraud FRED into accepting a price for

18  his interests not determined by an appraisal including the following:

19      18.1   Consistent with ISAAC's earlier proposal to avoid an appraisal,

20  prior to commissioning the appraisal MORAD induced FRED to give him a written

21  offer to purchase ISAAC's 45% interest in MGA based upon a value of $17,500,000.

22  FRED withdrew the offer the same day.

23      18.2   MORAD hired National Business Appraisers ("NBA") to perform

24  an appraisal of ABC, and in order to lower the appraised value of ABC, allowed NBA

25  to restrict the valuation period to the end of December 1999 thereby eliminating year

26  2000 financial and business information from the appraisal, including information

27  relating to the "Bratz" product line.

28

2221.002\9929                              -6-
                                        Complaint

EXHIBIT 19 PAGE 355

18.3   MORAD allowed NBA to value only ABC and omit valuation of MGAEHK.

18.4   Upon receiving the initial draft of NBA's appraisal of ABC with a value of $26,942,000 as of December 31, 1999, MORAD instructed NBA to reduce the valuation to get close to $20,000,000 which would yield a price of $9,000,000 for FRED's interest.

18.5   MORAD subsequently concealed from FRED that the final reduced appraisal of ABC was at $21,600,000 and represented that the appraisal found the value of MGA to be $17,500,000.

18.6   On information and belief MORAD never involved the CPA in the appraisal process, never showed the appraisal to the CPA, nor allowed him to review it for accuracy.

19.   In or around late November or early December 2000, MORAD came to FRED with a proposed price of $8,775,000 for sale of FRED's Stock to ISAAC calculated on 45% of a combined valuation of $19,500,000 for MGA and the other partnership accounts. MORAD represented to FRED that the appraisal placed the value of MGA at $17,500,000.  MORAD said the $2,000,000 difference between the appraisal of $17,500,000 and the $19,500,000 was to satisfy the amount due from ISAAC to FRED for the other partnership accounts. Believing in his uncle's integrity, FRED trusted MORAD's representation of the value found by the appraisal.  In reliance on MORAD's representations, FRED agreed to settle his disputes with ISAAC by selling his interest at the price MORAD represented was determined by the appraisal of MGA and the partnership accounts.

20.   MORAD's personal attorney Ellis Stern drew up agreements for the sale and settlement of FRED's interest in MGA to ISAAC and the partnership accounts including an Agreement for Sale of Stock, Pledge Agreement, Promissory Note, Mutual

EXHIBIT 19 PAGE 354

1  Release and Consulting Agreement (collectively "December 2000 Agreement"). FRED

2  asked MORAD if FRED should have an attorney to advise him about the transaction.

3  MORAD said no.  MORAD said that he would make sure the agreements accurately

4  reflected the transaction and protected both FRED and ISAAC.  Based on MORAD's

5  representation, FRED did not have counsel advise him with respect to the transaction

6  and signed the December 2000 Agreement.

7

8       21.    In inducing FRED's agreement to sell FRED's Stock to ISAAC, MORAD

9  continued to conceal his fraud and deceit from FRED.  MORAD assured FRED that the

10 sale price based on a combined valuation of $19,500,000 for MGA and the partnership

11 accounts was determined by the appraisal and accounting.  MORAD convinced FRED

12 to agree to resolve any disputes with ISAAC over the December 2000 Agreement by

13 arbitrating them before MORAD or if MORAD was unavailable before his son

14 KAMBIZ.  MORAD repeated to FRED that he should keep resolution of such matters

15 in the family and FRED could trust both MORAD and KAMBIZ.  MORAD also

16 claimed that as a director of MGA and as the arbitrator, he would be in a position to

17 protect FRED's interest.  In reliance on MORAD's representations including that the

18 appraised value of MGA had been $17,500,000 upon which the sale price for his

19 interest in MGA was based, FRED agreed to the provisions for resolving any disputes

20 over the December 2000 Agreement by arbitrating before MORAD (and if MORAD

21 was unavailable to serve, MORAD's son KAMBIZ) ("December Arbitration

22 Provisions").

23

24      22.    MORAD's representations to FRED that FRED should trust him to

25 continue to act as an impartial and honest arbitrator of disputes that might arise under

26 the December 2000 Agreement were false and were made to conceal MORAD's fraud

27 and deceit in the appraisal and valuation of MGA and to induce FRED's agreement to

28 the December Arbitration Provisions so to allow MORAD to hide his wrongful acts and

2221.002\9929                          -8-
                                     Complaint

EXHIBIT 19 PAGE 357

1 omissions and/or conspiracy with ISAAC.  MORAD had not honestly and impartially

2 acted as an arbitrator in the past and had no intent to arbitrate or otherwise act

3 impartially and honestly to resolve any disputes that might arise under the December

4 2000 Agreement.  MORAD intended only to use his position as arbitrator to continue

5 to conceal his fraud and deceit and other wrongful acts and omissions toward FRED.

6

7      23.   Under the December 2000 Agreement, MORAD became a director of

8 MGA and took possession of the share certificates for FRED's Stock as Trustee to be

9 held as collateral for ISAAC's payment of the full purchase price to FRED.

10

11      24.   Following the execution of the December 2000 Agreement, MORAD

12 requested FRED to "return the favor" for what MORAD called his "pro-bono

13 arbitration work" in 2000. MORAD requested $10,000.00 from FRED for MORAD's

14 relative.  MORAD told FRED that ISAAC had already paid an identical amount.

15 FRED paid the money MORAD requested.  In June 2004 FRED's attorneys asked

16 MORAD to disclose and produce evidence of these payments. MORAD, through his

17 attorney Ellis Stern, refused.  In or around June 2004, in relation to FRED's inquiry

18 about these payments, MORAD publicly threatened that he "will destroy FRED and

19 make him equal to dirt".  On information and belief MORAD sought and obtained a

20 larger payment from ISAAC for MORAD's "pro-bono arbitration work" and for that

21 reason refused to disclose such payments.

22

23      25.   In 2001, ISAAC was unable to make the payment under the promissory

24 note given FRED as part of the December 2000 Agreement.  MORAD induced FRED

25 to extend the due date of the note and advanced money on behalf of ISAAC to FRED

26 for payments on the promissory note.

27

28

2221.002\9929                        -9-
                                  Complaint

EXHIBIT 19 PAGE 358

26.    In or around the summer of 2002, FRED became aware of facts that suggested the valuation of MGA in 2000 represented by MORAD may have been inaccurate and that the actual valuation of MGA was significantly higher because of a license and plans for a product line called "Bratz" which were undisclosed to FRED. FRED requested a copy of the appraisal of MGA performed in 2000. MORAD refused, maintaining that he was legally not allowed to disclose it. FRED did not suspect MORAD of any wrong doing at this time, believing instead that ISAAC had withheld the Bratz information from both FRED and MORAD without MORAD's knowledge or consent.

27.    Subsequently FRED submitted to MORAD his claim that FRED had been defrauded by ISAAC.

28.    A few months after FRED's submission of his claim to MORAD for the fraud in the sale of FRED's Stock, MORAD called a meeting at his offices on January 26, 2003. He advised FRED that no lawyers would be allowed and that no evidence would be presented as this was an informal meeting. MORAD tape recorded the meeting which lasted less than two hours. After ISAAC left the meeting, he called MORAD and MORAD reported to FRED that ISAAC said "figure out a way to pay FRED something and get rid of him". On or about September 14, 2004 MORAD declared under oath that the meeting occurred on a different day and was an "arbitration hearing" upon which he "took the matter under submission"!

29.    After the January meeting in several communications, MORAD and KAMBIZ advised FRED ways to settle the claim against ISAAC including buying back a portion of FRED's Stock, which MORAD said he had convinced ISAAC to allow.

2221.002\9929        -10-
Complaint

EXHIBIT 19 PAGE 359

30.     In 2003, FRED learned that sometime after the January 26, 2003 meeting MORAD had commissioned another appraisal of MGA ("2003 Appraisal"). MORAD told FRED he had commissioned the 2003 Appraisal but did not show it to him. In December 2004 FRED learned that the valuation date of the 2003 Appraisal was as of December 31, 2000 (the effective date under the December 2000 Agreement) and that it found the value of ABC to be $33,805,000. In December 2004 FRED also learned that in or about April 2004, MORAD had commissioned yet another appraisal of MGA based on a valuation date ending December 31, 2001 ("2004 Appraisal").

31.     Throughout 2003, FRED again asked MORAD and also KAMBIZ to provide FRED a copy of the appraisals. They initially refused to disclose any of the documentation for the appraisals. FRED filed suit in August 2003 against ISAAC for fraud arising from the non-disclosure of the Bratz line (The "Bratz Action"). In September 2003, MORAD promised to give FRED all documents and records relating to the 2000 and 2003 appraisals in exchange for payment of $15,000. MORAD's attorney, Ellis Stern corroborated MORAD's promise to give FRED all of the documents and records related to the appraisal. FRED paid MORAD the $15,000 but then MORAD refused to provide all of the records to FRED. MORAD said instead he had turned over his records and files to his attorney Stern who refused to produce copies to FRED.

32.     When FRED continued to press for production of MORAD's entire file concerning the 2000 and 2003 appraisals, ISAAC opposed production and demanded that no records from the appraisal be produced. Finally after the Court in the Bratz Action ordered discovery, MORAD's attorneys produced certain of the documents related to the 2000 appraisal but refused to produce documents related to the 2003 Appraisal. MORAD's attorney Stern represented to have produced all of the 2000 appraisal documentation and provided a privilege log which he later filed in Court. No

2221.002\9929                               -11-
                                          Complaint

EXHIBIT 19 PAGE 360

1   draft appraisals were produced to FRED by MORAD personally or by his attorneys.
2   The draft of the 2000 appraisal, the 2004 Appraisal, and some correspondence from
3   NBA relating to the 2000 appraisals were neither produced nor listed on the privilege
4   log Stern had submitted to FRED and the Court. FRED pursued discovery of NBA and
5   the appraiser but both ISAAC and MORAD opposed it.  Ultimately it was not until
6   FRED went to NBA directly in December 2004 that he discovered the extent and nature
7   of MORAD's wrongful acts.  The documents and information provided by NBA also
8   revealed that MORAD's attorney, Stern  had submitted a false privilege log to FRED
9   and to the Court.

10

11       33.   In or around April to July 2004 FRED learned of translations that
12  MORAD had ordered including translations related to a January 30, 2003 letter
13  MORAD had received from FRED's attorney, and of MORAD's need to use translators
14  in the contemplated arbitration of FRED's claims against ISAAC.  These facts and
15  documents were suppressed from FRED by MORAD and his attorney.

16

17       34.   In or around January 2004, FRED demanded of MORAD that FRED's
18  Stock held by MORAD as trustee pursuant to the December 2000 Agreement be
19  maintained pending resolution of FRED's claims against ISAAC. Through his attorney
20  Stern, MORAD agreed. In or around December 2004, FRED demanded that MORAD
21  show FRED the stock certificates.  MORAD refused.

22

23       35.   In or around December 2004, FRED obtained documentation and
24  information directly from NBA disclosing that:

25       35.1   NBA had never provided MORAD with an appraisal valuing ABC
26  or MGA at $17,500,000 as MORAD had represented to FRED;

27       35.2   In or around October 2000 NBA transmitted to MORAD an initial
28  draft appraisal valuing ABC at $26,942,000. MORAD then instructed NBA to decrease

the value to get close to $20,000,000 and allowed the valuation date to be as of December 31, 1999;

35.3 NBA's final reduced appraisal in November 2000 was $21,600,000.00 for the period ending December 31, 1999 and excluded MGAEHK from the valuation;

35.4 Commencing in February 2003, NBA met with MORAD and KAMBIZ concerning the November 2000 appraisal because of FRED's claim against ISAAC for fraud;

35.5 In February 2003, MORAD commissioned the appraisal of MGA as of December 31, 2000 (2003 Appraisal) without consideration of the Bratz License and product line. This appraisal found the value to be $33,805,000.00;

35.6 MORAD subsequently requested NBA to reduce the 2003 Appraisal by applying a minority shareholder discount.

35.7 In 2000, NBA had given the draft 2000 appraisal to MORAD and his attorneys.

35.8 In 2004, MORAD's attorneys advised NBA to destroy any drafts of the 2000 appraisal.

35.9 In 2004 MORAD commissioned the appraisal of ABC as of December 31, 2001 (2004 Appraisal) to obtain a valuation lower than the 2003 Appraisal. The 2004 Appraisal, the draft 2000 appraisal, and some correspondence from NBA relating to the 2000 appraisals had been suppressed from FRED and omitted from the privilege log Stern submitted to both FRED and the Court.

36. FRED is informed and believes that MORAD's suppression of the appraisals, his attempts to destroy and prevent discovery of evidence, and his lies to FRED were calculated to conceal his fraud in the inducement of the Arbitration Agreement and December Arbitration Provisions, his corruption of the appraisal in

2221.002\9929

-13-
Complaint

EXHIBIT 19 PAGE 362

1 | 2000, and/or in furtherance of the conspiracy with ISAAC to trick FRED into selling

2 | Fred's Stock at a price pre-determined by ISAAC and/or MORAD.

3

4 | **FIRST CAUSE OF ACTION FOR PROMISSORY FRAUD INDUCING**

5 | **CONSENT TO THE ARBITRATION AGREEMENT**

6 | **AGAINST MORAD ZARABI**

7 | 37.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

8

9 | 38.    MORAD's representations to Plaintiff concerning MORAD's intention

10 | to neutrally, honestly, completely and accurately appraise the current value of MGA,

11 | and account for the other partnership matters, to resolve Plaintiff's disputes with

12 | ISAAC were false and known by MORAD to be false when he made them.   The

13 | misrepresentations and omissions were material and made to induce Plaintiff to consent

14 | to the Arbitration Agreement and selection of MORAD as arbitrator. The true facts

15 | were that MORAD never intended to engage in an accurate, complete and current

16 | appraisal of MGA or accounting of the other partnership matters, but rather to set a

17 | pre-determined price for the sale of FRED's Stock to ISAAC.  In furtherance of this

18 | intent, MORAD concealed his disability in reading and writing English.

19

20 | 39.    Reasonably relying on MORAD's representation of what MORAD

21 | intended to do as an arbitrator and that Plaintiff could trust him, Plaintiff was induced

22 | to sign the Arbitration Agreement and selection of MORAD as the arbitrator.  Had

23 | Plaintiff known MORAD's true intentions, Plaintiff would not have signed the

24 | Arbitration Agreement, and would not have agreed to the December Arbitration

25 | Provisions.

26

27 | 40.    As a result of the fraud and deceit alleged herein, Plaintiff is entitled to

28 | rescission of the Arbitration Agreement and the December Arbitration Provisions

2221.002\9929

-14-

Complaint

EXHIBIT 19 PAGE 363

1  proximately caused by it as well as restitution of all sums obtained by MORAD from
2  Plaintiff because of them.

3

## SECOND CAUSE OF ACTION FOR NEGLIGENT
## MISREPRESENTATIONS INDUCING CONSENT
## TO THE ARBITRATION AGREEMENT
## AGAINST MORAD ZARABI

8      41.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

9

10     42.    MORAD owed a duty of reasonable care in making representations and
11  statements to Plaintiff regarding MORAD's ability and intentions with respect to the
12  appraisal of MGA and the accounting of the other partnership matters.

13

14     43.    MORAD breached his duty to Plaintiff by making misrepresentations of
15  material facts and by omitting and failing to disclose material facts which he knew or
16  in the exercise of reasonable care should have known were untrue or inaccurate and
17  which he was under a duty to disclose to Plaintiff, including without limitation, his
18  inability to competently read and write English, his intent to set a pre-determined price
19  for Fred's Stock and the value of the other partnership accounts.

20

21     44.    MORAD made the misrepresentations and omissions with the intent to
22  induce Plaintiff to agree to the Arbitration Agreement consenting to arbitrate before
23  MORAD as the arbitrator of the disputes between Plaintiff and ISAAC over MGA and
24  the other partnership matters.

25

26     45.    Plaintiff actually, reasonably and justifiably relied upon the false
27  statements and omissions of MORAD and consented to the Arbitration Agreement.
28  Had Plaintiff known the true facts, Plaintiff would not have entered into the Arbitration

2221.002\9929                        -15-
                                  Complaint

EXHIBIT 19 PAGE 364

1  Agreement and selection of MORAD as the arbitrator, and would not have given
2  MORAD authority as arbitrator to determine the price at which Plaintiff would sell his
3  interest in MGA and the other partnership accounts.

4

5      46.    As a result of the misrepresentation alleged herein, FRED is entitled to
6  rescission of the Arbitration Agreement and the December Arbitration Provisions
7  proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff
8  because of them.

9

10          **THIRD CAUSE OF ACTION FOR CONSPIRACY TO COMMIT**
11          **PROMISSORY FRAUD INDUCING CONSENT TO THE**
12                    **ARBITRATION AGREEMENT**
13          **AGAINST MORAD ZARABI AND ISAAC LARIAN**
14      47.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

15

16      48.    Plaintiff is informed and believes that commencing in or around the
17  summer and fall of 2000, ISAAC and MORAD conspired and agreed together to induce
18  FRED to give MORAD power and authority as an arbitrator to set a price
19  pre-determined by ISAAC and/or MORAD, at which ISAAC would purchase FRED's
20  shares in MGA.

21

22      49.    In furtherance of the conspiracy, MORAD made the misrepresentations
23  and omissions of material facts alleged in this Complaint to induce FRED to consent
24  to arbitration before MORAD and to execute the Arbitration Agreement. MORAD's
25  representations were false and known by MORAD and ISAAC to be false when made.

26

27      50.    In reasonable reliance on the representations of MORAD, Plaintiff
28  executed the Arbitration Agreement.

2221.002\9929                           -16-
                                      Complaint

EXHIBIT 19 PAGE 365

51.   Plaintiff is entitled to rescission of the Arbitration Agreement and the December Arbitration Provisions proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff because of them.

## FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF
## OVER VALIDITY OF THE ARBITRATION AGREEMENT
## AND THE DECEMBER ARBITRATION PROVISIONS
## AGAINST MORAD ZARABI AND ISAAC LARIAN

52.   Plaintiff reallages paragraphs 1 though 36 of this Complaint.

53.   An actual justiciable controversy exists between Plaintiff on the one hand, and Defendants MORAD and ISAAC on the other hand in that Plaintiff contends that the Arbitration Agreement was void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to it; and that the December Arbitration Provisions are likewise void because they were proximately caused by Plaintiff's consent to the Arbitration Agreement.   Plaintiff is informed and believes that Defendants MORAD and ISAAC contend that the Arbitration Agreement is valid and enforceable and that there is no basis for invalidating or voiding the Arbitration Agreement or the December Arbitration Provisions.

54.   Plaintiff has no accurate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the Arbitration Agreement and the December Arbitration Provisions.

2221.002\9929                                           -17-
                                                    Complaint

EXHIBIT 19  PAGE 366

# FIFTH CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT
# OF THE DECEMBER ARBITRATION PROVISIONS
# AGAINST MORAD ZARABI

55.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

56.   MORAD's representations to FRED in or around the end of November or the beginning of December 2000 concerning the accuracy of the appraisal of MGA, the appraised value being $17,500,000, and MORAD's honesty and trustworthiness were false when made and known by MORAD to be false when made.  The true facts were that MORAD concealed the appraisal showing the value of MGA to be significantly greater than the representation to Plaintiff, and concealed the fact that he had corrupted and acted to distort the appraisal of MGA by ordering the appraiser to reduce the value to close to $20,000,000.  In making the misrepresentations and omissions, MORAD intended to induce Plaintiff to agree to resolve any disputes arising from the December 2000 Agreement by arbitration before MORAD and/or KAMBIZ, so that MORAD could continue to conceal his fraud and deceit and his wrongful acts and omissions.

57.   The misrepresentations and omissions to Plaintiff were material and Plaintiff reasonably relied on them to his detriment and by them was induced to enter into the December Arbitration Provisions.

58.   As the result of MORAD's fraud and deceit, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

# SIXTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION INDUCING CONSENT TO THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI

59.     Plaintiff realleges paragraphs 1 through 36 of this Complaint.

60.     MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding the appraised value of MGA and the accounting of the other partnership matters.

61.     MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were inaccurate and which he was under a duty to disclose to Plaintiff, including without limitation, the true and correct valuation of MGA found by NBA's appraisal.

62.     MORAD made the misrepresentations and omissions with the intent to induce Plaintiff to consent to the December Arbitration Provisions selecting MORAD and his son KAMBIZ as the arbitrators with sole authority to determine disputes between Plaintiff and ISAAC arising from the December 2000 Agreement.

63.     Plaintiff actually, reasonably and justifiably relied upon the false statements and omissions of MORAD.  Had Plaintiff known the true facts, Plaintiff would not have entered into the December Arbitration Provisions which selected MORAD and his son KAMBIZ as the arbitrators.

EXHIBIT 19 PAGE 368

64.   As a result of MORAD's misrepresentations Plaintiff is entitled to rescission of the December Arbitration Provision and restitution of all sums obtained by MORAD from Plaintiff because of them.

## SEVENTH CAUSE OF ACTION FOR CONSPIRACY TO
## FRAUDULENTLY INDUCE EXECUTION OF THE
## DECEMBER ARBITRATION PROVISIONS
## AGAINST MORAD ZARABI AND ISAAC LARIAN

65.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

66.   Plaintiff is informed and believes that the misrepresentations and omissions by MORAD in late November to December 2000 were carried out pursuant to a conspiracy and agreement between MORAD and ISAAC to induce FRED to agree to arbitrate all disputes before MORAD and KAMBIZ so they could continue to conceal MORAD's and ISAAC's fraud and conspiracy.

67.   In furtherance of the conspiracy, MORAD committed the acts alleged in this Complaint, including without limitation manipulating and corrupting the appraisal, lying to FRED about the appraised value of MGA and inducing FRED to resolve all disputes arising out of the agreement by arbitration before MORAD or KAMBIZ in order to conceal the conspiracy.

68.   As the result of the misrepresentations by MORAD pursuant to the conspiracy of ISAAC and MORAD which induced FRED's consent to the December Arbitration Provisions, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

2221.002\9929                          -20-
                              Complaint

EXHIBIT 19 PAGE 369

## EIGHTH CAUSE OF ACTION FOR DECLARATORY RELIEF
## OVER VALIDITY OF THE DECEMBER ARBITRATION PROVISIONS
## AGAINST ISAAC LARIAN

69.    Plaintiff realleges paragraphs 1 though 36 of this Complaint.

70.    An actual justiciable controversy exists between Plaintiff on the one hand and ISAAC on the other hand in that Plaintiff contends that the December Arbitration Provisions were void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to them while Plaintiff is informed and believes that ISAAC contends that the December Arbitration Provisions are valid and enforceable and that there is no basis for invalidating or voiding them, in whole or part.

71.    Plaintiff has no adequate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the December Arbitration Provisions.

## NINTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT
## OVER THE DISQUALIFICATION OF MORAD ZARABI
## AND KAMBIZ ROBERT ZARABI FROM SERVING AS ARBITRATORS
## AGAINST ISAAC LARIAN, MORAD ZARABI
## AND KAMBIZ ROBERT ZARABI

72.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

73.    An actual justiciable controversy exists between Plaintiff on the one hand and Defendants on the other hand in that Plaintiff contends that as a result of the position, facts and circumstances concerning MORAD and KAMBIZ alleged in this Complaint, they are disqualified under California law from exercising any power or authority as an arbitrator of any disputes between Plaintiff and Defendant ISAAC

2221.002\9929                          -21-
                                    Complaint

EXHIBIT 19 PAGE 370

1 | LARIAN; while Plaintiff is informed and believes that Defendants and each of them
2 | contend that MORAD and KAMBIZ are not so disqualified.

3

4 |     74.    Plaintiff has no adequate remedy at law and the parties require a judicial
5 | declaration of their legal rights and obligations with respect to the ability of MORAD
6 | and KAMBIZ to exercise power and authority as arbitrators under the December 2000
7 | Agreement.

8

9 | **TENTH CAUSE OF ACTION  FOR DECLARATORY JUDGMENT**
10 | **OVER ENFORCEABILITY OF ARBITRATION AGREEMENTS**
11 | **AGAINST ISAAC LARIAN**

12 |     75.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

13

14 |     76.    An actual justiciable controversy exists between Plaintiff on the one hand
15 | and Defendant ISAAC LARIAN on the other hand in that Plaintiff contends that the
16 | Arbitration Agreement and the December Arbitration Provisions are unenforceable in
17 | that they are agreements to arbitrate solely before MORAD ZARABI and in the case
18 | of the December Arbitration Provisions, KAMBIZ ZARABI if MORAD is unavailable
19 | or such arbitrators as either of them might appoint if MORAD and KAMBIZ are both
20 | unavailable.  Because MORAD and KAMBIZ are disqualified under California law,
21 | neither may serve as arbitrator or appoint arbitrators.  Plaintiff is informed and believes
22 | that Defendant ISAAC LARIAN disputes the disqualification of MORAD and
23 | KAMBIZ ZARABI and that notwithstanding any disqualification of MORAD and
24 | KAMBIZ, contends the arbitration agreements are legally enforceable.

25

26 |     77.    Plaintiff has no adequate remedy at law and the parties require judicial
27 | declaration of their rights and obligations with respect to the Arbitration Agreement
28 | and the December Arbitration Provisions and their enforceability.

2221.002\9929          -22-

Complaint

EXHIBIT 19 PAGE 371

● ●

## ELEVENTH CAUSE OF ACTION FOR RESCISSION
## OF THE DECEMBER 2000 AGREEMENT BASED ON PROMISSORY
## FRAUD INDUCING CONSENT TO ARBITRATION AGREEMENT
## AGAINST MORAD ZARABI AND ISAAC LARIAN

78.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

79.    The fraud and deceit of MORAD and/or conspiracy of MORAD and ISAAC to deceive and defraud, inducing Plaintiff to consent to the Arbitration Agreement proximately caused Plaintiff's consent to the December 2000 Agreement. As a consequence of Plaintiff's entitlement to rescission of the Arbitration Agreement, Plaintiff is also entitled to rescission of the December 2000 Agreement, including the Pledge Agreement and restitution of his stock in MGA subject to any accounting required by law.

80.    As a proximate result of Defendants wrongful conduct, Plaintiff has been damaged in an amount and of a nature according to proof at trial.

81.    MORAD's wrongful acts were conducted maliciously, oppressively and fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award of punitive damages sufficient to punish MORAD and deter such conduct in the future.

## TWELFTH CAUSE OF ACTION FOR RESCISSION
## OF THE DECEMBER 2000 AGREEMENT
## AGAINST MORAD ZARABI AND ISAAC LARIAN

82.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

83.    MORAD's fraud and deceit and/or the conspiracy of MORAD and ISAAC to defraud and deceive, inducing Plaintiff into believing that MORAD had carried out

2221.002\9929                                   -23-
                                          Complaint

EXHIBIT 19 PAGE 372

1  an accurate, complete, and current appraisal of MGA which purportedly had
2  determined the value of MGA to be $17,500,000 proximately caused Plaintiff to
3  consent to the December 2000 Agreement and consequently Plaintiff is entitled to
4  rescission of it, including the Pledge Agreement and restitution of his stock in MGA
5  subject to any accounting required by law.

7      84.    As a proximate result of Defendants wrongful conduct, Plaintiff has been
8  damaged in an amount and of a nature according to proof at trial.

10     85.    MORAD's wrongful acts were conducted maliciously, oppressively and
11  fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award
12  of punitive damages sufficient to punish MORAD and deter such conduct in the future.

14           **THIRTEENTH CAUSE OF ACTION FOR RESCISSION BASED ON**
15                 **NEGLIGENT MISREPRESENTATIONS INDUCING**
16                    **THE DECEMBER 2000 AGREEMENT**
17                       **AGAINST MORAD ZARABI**
18     86.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

20     87.    MORAD owed a duty of reasonable care in making representations and
21  statements to Plaintiff regarding a) his purported intention to impartially arbitrate the
22  sale of Plaintiff's interest in MGA by an accurate, complete, and current appraisal and
23  b) the true and correct appraised value of MGA and the accounting of the other
24  partnership matters.

26     88.    MORAD breached his duty to Plaintiff by making misrepresentations of
27  material facts and by omitting and failing to disclose material facts which he knew or
28  in the exercise of reasonable care should have known were inaccurate and which he

2221.002\9929                          -24-
                                     Complaint

EXHIBIT 19 PAGE 372

1  was under a duty to disclose to Plaintiff, including without limitation, MORAD's true
2  intentions regarding setting the price for Plaintiff's stock and the true and correct
3  valuation of MGA found by NBA's appraisal.

4

5      89.    MORAD's misrepresentations induced Plaintiff's execution of the
6  December 2000 Agreement and Plaintiff is entitled to rescission of it, including the
7  Pledge Agreement and to restitution of his stock in MGA subject to an accounting
8  required by law.

9

10      90.    As a proximate result of Defendants wrongful conduct, Plaintiff has been
11  damaged in an amount and of a nature according to proof at trial.

12

13        **FOURTEENTH CAUSE OF ACTION FOR DECLARATORY**
14    **RELIEF OVER VALIDITY OF THE DECEMBER 2000 AGREEMENT**
15               **AGAINST ISAAC LARIAN**

16      91.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

17

18      92.    An actual justiciable controversy exists between Plaintiff on the one hand
19  and Defendant ISAAC on the other hand in that Plaintiff contends that the December
20  2000 Agreement was void ab initio due to the fraud and deceit of MORAD and/or
21  ISAAC inducing Plaintiff's consent to it while Plaintiff is informed and believes that
22  ISAAC contends the December 2000 Agreement is valid, enforceable and that there is
23  no basis for invalidating or voiding it.

24

25      93.    Plaintiff has no accurate remedy at law and the parties require a judicial
26  declaration of their legal rights and obligations with respect to the December 2000
27  Agreement.

28

2221.002\9929              -25-
                      Complaint

EXHIBIT 19 PAGE 372

### FIFTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE TRUST, PRELIMINARY INJUNCTION AND ACCOUNTING AGAINST MORAD ZARABI AND ISAAC LARIAN

94.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

95.   The share certificates for FRED's Stock were held in trust by MORAD pursuant to a pledge agreement made by ISAAC in connection with the December 2000 Agreement. Plaintiff has made demand on MORAD to show him the share certificates, but MORAD has failed and refused to do so. Plaintiff is informed and believes that MORAD has turned over the stock certificates or other instruments affecting the stock certificates to ISAAC.

96.   By virtue of their fraudulent acts, Plaintiff is entitled to rescission of the December 2000 Agreement and to restitution of his stock in MGA subject to an accounting by the Court of any amount of the consideration Plaintiff received for his stock that must be returned to Isaac, which Plaintiff hereby offers to restore. Defendants and each of them hold FRED's Stock as a constructive trustee for Plaintiff's benefit. Plaintiff is informed and believes that the stock certificates may be voided, lost or destroyed and Plaintiff's stock interest diluted or altered to Plaintiff's detriment unless Defendants and each of them are enjoined and restrained from taking any acts of any nature with respect to Plaintiff's stock certificates and stock interest.

97.   Plaintiff does not know what amounts, if any have accrued or been distributed on account of Plaintiff's MGA stock and an accounting is therefore necessary to determine what amounts, if any are due Plaintiff on account of his MGA stock.

2221.002\9929

-26-
Complaint

EXHIBIT 19 PAGE 374

WHEREFORE, Plaintiff prays for judgment as follows:

1.     That the September 28, 2000 Agreement to Arbitrate and Selection of Arbitrator is declared void ab initio or is rescinded;

2.     That the December Arbitration Provisions are declared void ab initio or are rescinded;

3.     That MORAD ZARABI is judicially declared as disqualified from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

4.     That KAMBIZ ROBERT ZARABI is judicially declared as disqualified from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

5.     That Defendants and each of them and their agents and employees hold Plaintiff's MGA Stock as constructive trustees for Plaintiff's benefit;

6.     That Defendants and each of them, their agents, employees and all those in active concert and participation with them are preliminarily and permanently enjoining from transferring, disposing of, or altering FRED's Stock certificates or interest in MGA;

7.     That the December 2000 Agreement (including all related agreements) is declared void ab initio or is rescinded;

8.     That Plaintiff's stock in MGA be restored to him;

9.     For an accounting of all monies accruing to or distributed on account of Plaintiff's stock in MGA;

10.    For damages as allowed by law and according to proof at trial;

11.    For reasonable attorneys fees;

12.    For costs as allowed by law;

13.    For punitive damages as allowed by law and according to proof at trial; and

2221.002\9929                                  -27-
                                            Complaint

EXHIBIT 19 PAGE 375

1      14.   For such other relief as the Court deems just and proper.

2

3   Dated:  February 24, 2005

                             William C. Conkle

4                                 Mark D. Kremer
                              Eric S. Engel, members of

5                                 CONKLE & OLESTEN
                              Professional Law Corporation

6

7   By: _____

8                             Mark D. Kremer
                          Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2221.002\9929                       -28-
                       Complaint

EXHIBIT 19 PAGE 376

## VERIFICATION

I have read the foregoing **Verified Complaint** and know its contents.

☒    I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐    I am _____ of _____, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

☐    I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☒    The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐    I am one of the attorneys for _____, a party to this action.  Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on February 25, 2005.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_Farhad Larian_  
Print Name of Signator

_Farhad L_____  
Signature

Verification to Complaint

EXHIBIT 19 PAGE 377

**ORIGINAL**

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
Mark D. Kremer
Conkle & Olesten, Professional Law Corporation
3130 Wilshire Blvd., Suite 500
Santa Monica, CA 90403
TELEPHONE NO. 310-998-9100   FAX NO: 310-998-9109
ATTORNEY FOR (Name): Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE Los Angeles, CA 90012-3014
BRANCH NAME Central District

CASE NAME: Farhad Larian v. Morad Zarabi, et al.

FOR COURT USE ONLY

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 2 8 2005

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY
J. SUNGA, DEPUTY

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: BC 329501 |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | | JUDGE: DEPT: |

All five (5) items below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Collections (09)
[ ] Insurance coverage (18)
[X] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not   complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial post-judgment judicial supervision

3. Type of remedies sought (check all that apply):
   a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [X] punitive

4. Number of causes of action (specify): 15

5. This case [ ] is [X] is not   a class action suit.

Date: February 24, 2005

Mark D. Kremer
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2003]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 201.8, 1800 –1812;
Standards of Judicial Administration, § 19

Legal Solutions Plus

EXHIBIT 19 PAGE 378

# ORIGINAL

| SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER: BC 329501 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

| This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court. |
|---|

Item I.  Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES   CLASS ACTION? [ ] YES  LIMITED CASE? [ ] YES  TIME ESTIMATED FOR TRIAL 7 [ ] HOURS/ [X] DAYS.

Item II.  Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III. Pg. 4):

**Step 1:**  After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:**  Check **one** Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:**  In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (See Column C below) |
|---|

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:**  Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|---|
| Auto Tort | Auto (22) | [ ] | A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] | A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | [ ] | A6070  Asbestos Property Damage | 2. |
| | | [ ] | A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] | A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] | A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | [ ] | A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | [ ] | A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | [ ] | A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | [ ] | A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | [ ] | A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | [ ] | A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | [ ] | A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | [ ] | A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | [ ] | A6013  Fraud (no contract) | 1., 2., 3. |
| | Intellectual Property (19) | [ ] | A6016  Intellectual Property | 2., 3. |

| CIV 109 03-04<br>LASC Approved | CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION | LASC, rule 2.0<br>Page 1 of 4<br>LA-481 |
|---|---|---|

EXHIBIT 19 PAGE 379

SHORT TITLE: Farhad Larian v. Morad Zarabi, et al.    CASE NUMBER

| A<br>Civil Case Cover Sheet Category No. | | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>- See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.)** | | | |
| Professional Negligence (25) | ☐ A6017 | Legal Malpractice | 1., 2., 3. |
| | ☐ A6050 | Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| Other (35) | ☐ A6025 | Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | | | |
| Wrongful Termination (36) | ☐ A6037 | Wrongful Termination | 1., 2., 3. |
| Other Employment (15) | ☐ A6024 | Other Employment Complaint Case | 1., 2., 3. |
| | ☐ A6109 | Labor Commissioner Appeals | 10. |
| **Contract** | | | |
| Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 | Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | ☐ A6008 | Contract/Warranty Breach-Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ A6019 | Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ A6028 | Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections (09) | ☐ A6002 | Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ A6012 | Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage (18) | ☐ A6015 | Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract (37) | ☒ A6009 | Contractual Fraud | 1., 2., 3., 5. |
| | ☐ A6031 | Tortious Interference | 1., 2., 3., 5. |
| | ☐ A6027 | Other Contract Dispute (not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | | | |
| Eminent Domain/Inverse Condemnation (14) | ☐ A7300 | Eminent Domain/Condemnation   Number of parcels _____ | 2. |
| Wrongful Eviction (33) | ☐ A6023 | Wrongful Eviction Case | 2., 6. |
| Other Real Property (26) | ☐ A6018 | Mortgage Foreclosure | 2., 6. |
| | ☐ A6032 | Quiet Title | 2., 6. |
| | ☐ A6060 | Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | | | |
| Unlawful Detainer - Commercial (31) | ☐ A6021 | Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer - Residential (32) | ☐ A6020 | Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer - Drugs (38) | ☐ A6022 | Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | | | |
| Asset Forfeiture (05) | ☐ A6108 | Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration (11) | ☐ A6115 | Petition to Compel/Confirm/ Vacate Arbitration | 2., 5. |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

EXHIBIT 19 PAGE 380

| SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br>(02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review<br>(39) | ☐ A6150  Other Writ / Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br>(20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br>(42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership/Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 3 of 4

EXHIBIT 19 PAGE 381

| SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER: |
|---|---|

**Item III. Statement of Location:** Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE | ADDRESS: |
|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | 20120 Plummer Street |

| CITY: Chatsworth | STATE: CA | ZIP CODE: 91311 | |
|---|---|---|---|

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk</u> _____ courthouse in the <u>Central</u> _____ District of the Los Angeles Superior Court (Code of Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: <u>February 24, 2005</u>

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

| **PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:** |
|---|

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form JC 982.2(b)(1).

4. Complete Addendum to Civil Case Cover Sheet form CIV 109 _____ (eff. Date).

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 4 of 4

EXHIBIT 19 PAGE 382

BLUEBIRD OFFICE SUPPLIES

**EXHIBIT 20**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

BRYANT,                     )
                            )
            PLAINTIFF,      )
                            )
      V.                    )        NO.  CV 04-9040 SGL
                            )               (RNBX)
MATTEL, INC.,               )
                            )
            DEFENDANTS.     )
                            )

# ATTORNEYS' EYES ONLY
### (THIS TRANSCRIPT HAS BEEN DESIGNATED ATTORNEYS' EYES ONLY.)

# DEPOSITION OF ISAAC LARIAN

# JULY 18, 2006



COURT REPORTERS
700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
APRIL PRAXMARER
CSR NO.  12437
JOB NO. 06AE315-AP

EXHIBIT 20  PAGE 383

```
1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         EASTERN DIVISION

4

5       BRYANT,                     )
                                    )
6            PLAINTIFF,             )
                                    )
7       VS.                         )CASE NO. CV 04-9040 SGL
                                    )          (RNBX)
8       MATTEL, INC.,               )
                                    )
9            DEFENDANTS.            )
                                    )

10

11

12                    ATTORNEYS' EYES ONLY

13            (THIS TRANSCRIPT HAS BEEN DESIGNATED

14                 ATTORNEYS' EYES ONLY.)

15

16

17          DEPOSITION OF ISAAC LARIAN, TAKEN ON BEHALF OF THE

18      PLAINTIFF, AT 1999 AVENUE OF THE STARS, SUITE 700, LOS

19      ANGELES, CALIFORNIA, COMMENCING AT 9:26 A.M., TUESDAY,

20      JULY 18, 2006, BEFORE APRIL PRAXMARER, CERTIFIED

21      SHORTHAND REPORTER NO. 12437.

22

23

24

25
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT __20__ PAGE __384__

```
 1     APPEARANCES OF COUNSEL:

 2

 3     FOR THE PLAINTIFF:

 4         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

           BY:  JOHN B. QUINN, ESQ.

 5         BY:  MICHAEL T. ZELLER, ESQ.

           865 SOUTH FIGUEROA STREET

 6         TENTH FLOOR

           LOS ANGELES, CALIFORNIA 90017-2543

 7         (213) 443-3000

 8

 9     FOR THE DEFENDANT, MGA & THE WITNESS:

10         O'MELVENY & MYERS LLP

           BY:  DALE M. CENDALI, ESQ.

11         7 TIMES SQUARE

           TIMES SQUARE TOWER

12         NEW YORK, NEW YORK, 10036

           (212) 326-2000

13

           O'MELVENY & MYERS LLP

14         BY:  JENNIFER GLAD, ESQ.

           400 SOUTH HOPE STREET

15         LOS ANGELES, CALIFORNIA 90071-2899

           (213) 430-7633

16

17     FOR THE DEFENDANT, CARTER BRYANT:

18         LITTLER MENDELSON

           BY:  DOUGLAS A. WICKHAM, ESQ.

19         2049 CENTURY PARK EAST

           5TH FLOOR

20         LOS ANGELES, CALIFORNIA 90067

           (310) 712-7314

21

22     ALSO PRESENT:

23         DAPHNE GRONICH, SENIOR COUNSEL FOR MATTEL

           MICHAEL MOORE, ASSISTANT GENERAL COUNSEL FOR MATTEL

24

25
```

                                                                    3

EXHIBIT __20__ PAGE __385__

```
1                                    INDEX

2

3      DEPONENT                    ISAAC LARIAN          PAGE

4      EXAMINATION

5      BY MR. QUINN                                        5

6

7      EXHIBITS FOR IDENTIFICATION

8      DEFENDANTS'.

9         NO.      DESCRIPTION                          PAGE

10        300      ARTICLE FROM EUROPE LICENSE            61

11        301      BATES NO. MGA 001473

12        302      BATES NO. 6453 THROUGH 6467           209

13        304      BATES NO. MGA 001356 THROUGH 001359   220

14        305      BATES NO. MGA 4717                    228

15        306      BATES NO. MGA 1291

16

17                INSTRUCTION NOT TO ANSWER

18         PAGE        LINE       PAGE       LINE

19          69          4         167         21

20          93          15        173         16

21          93          22        174         10

22          95          9         174         17

23         165          21        174         23

24         167          4         192          2

25         167          8
```

4

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT __20__ PAGE __386__

```
 1    09:44:05    BACKWARDS NOW.

 2    09:44:06        A    OKAY.

 3    09:44:06        Q    AT ANY TIME, HAD MGA OR ITS PREDECESSOR

 4    09:44:09    COMPANY EVER HAVE A FASHION DOLL CONCEPT?

 5    09:44:12        A    NOT THAT I RECALL.

 6    09:44:13        Q    WOULD IT BE TRUE TO SAY -- I TAKE IT BRATZ IS

 7    09:44:17    A FASHION DOLL, IN YOUR DEFINITION?

 8    09:44:19        A    SOME PEOPLE CALL IT A FASHION DOLL.  SOME

 9    09:44:21    PEOPLE CALL IT A SMALL DOLL.

10    09:44:23        Q    DID YOU REGARD IT AS A FASHION DOLL?

11    09:44:25        A    WHEN?

12    09:44:25        Q    WHEN IT WAS INTRODUCED.

13    09:44:27        A    NO.  I THINK WE -- TO THE BEST OF MY

14    09:44:30    RECOLLECTION, WE CONSIDERED IT A SMALL DOLL.

15    09:44:32        Q    OKAY.  SO -- AND TO THIS DAY, YOU DON'T

16    09:44:38    RECALL IT AS A FASHION DOLL OR YOU DO?

17    09:44:40        A    IT'S A GREAT DOLL.

18    09:44:43        Q    OKAY.  IT'S A GREAT DOLL.

19    09:44:45             BUT DO YOU REGARD IT AS A FASHION DOLL?

20    09:44:48        A    IT CAN BE A FASHION DOLL.

21    09:44:49        Q    DO YOU CONSIDER IT SUCH?

22    09:44:50        A    RIGHT NOW, YES, I DO.

23    09:44:52        Q    HAS BRATZ EVER HAD A FASHION DOLL PRODUCT

24    09:44:57    OTHER THAN -- I'M SORRY.  I'M GOING TO DO THAT SORT OF

25    09:45:02    THING.
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT  20  PAGE 387

| | | |
|---|---|---|
| 1 | 09:45:03 | HAS MGA EVER HAD A FASHION DOLL PRODUCT AT |
| 2 | 09:45:08 | ANY TIME OTHER THAN BRATZ? |
| 3 | 09:45:09 | A    NOT THAT I RECALL. |
| 4 | 09:45:11 | Q    ALL RIGHT.   AFTER YOU ANNOUNCED THIS SORT-OF |
| 5 | 09:45:17 | CONTEST -- |
| 6 | 09:45:20 | MS. CENDALI:   OBJECTION.   MISCHARACTERIZES |
| 7 | 09:45:22 | HIS TESTIMONY. |
| 8 | 09:45:23 | MR. QUINN:   NOT ANNOUNCED. |
| 9 | 09:45:25 | BY MR. QUINN: |
| 10 | 09:45:25 | Q    AFTER YOU TALKED TO FOLKS ABOUT THIS SORT-OF |
| 11 | 09:45:30 | FASHION DOLL CONTEST, DID CAMI GILMORE COME BACK TO YOU |
| 12 | 09:45:34 | WITH ANY IDEAS? |
| 13 | 09:45:35 | A    NOT THAT I RECALL. |
| 14 | 09:45:36 | Q    DID PAULA TRANTOFALIS COME BACK TO YOU WITH |
| 15 | 09:45:40 | ANY IDEA? |
| 16 | 09:45:41 | A    SHE BROUGHT BRATZ, WHAT WAS -- IS THE IDEA |
| 17 | 09:45:45 | THAT LATER ON CAME BRATZ. |
| 18 | 09:45:49 | Q    MR. LARIAN, DID ANYONE ELSE COME BACK TO YOU |
| 19 | 09:45:54 | WITH AN IDEA FOR A FASHION DOLL AS A RESULT OF YOUR |
| 20 | 09:45:57 | SPEAKING TO PEOPLE ABOUT THIS SORT-OF CONTEST? |
| 21 | 09:45:59 | A    NOT THAT I RECALL. |
| 22 | 09:46:00 | Q    SO THE ONLY ONE THAT RESPONDED WAS PAULA, AND |
| 23 | 09:46:04 | SHE CAME UP WITH THE CONCEPT FOR BRATZ; IS THAT RIGHT? |
| 24 | 09:46:06 | A    SHE SHOWED ME SOMETHING THAT BECAME THE IDEA |
| 25 | 09:46:17 | FOR BRATZ. |

26

EXHIBIT __20__ PAGE __388__

| | | |
|---|---|---|
| 1 | 09:46:17 | Q    WHAT WAS IT THAT SHE SHOWED YOU? |
| 2 | 09:46:17 | A    SHE SET UP AN APPOINTMENT ON MY CALENDAR, AND |
| 3 | 09:46:20 | A GENTLEMAN BY THE NAME OF CARTER BRYANT WAS IN THAT |
| 4 | 09:46:25 | MEETING, AND HE SHOWED ME SOME DRAWINGS AT THAT |
| 5 | 09:46:29 | MEETING, AND THAT WAS -- THAT WAS THE IDEA THAT BECAME |
| 6 | 09:46:32 | BRATZ LATER ON. |
| 7 | 09:46:33 | Q    ALL RIGHT.  NOW, AT ANY TIME, MR. LARIAN, |
| 8 | 09:46:39 | HAVE YOU ALTERED ANY DOCUMENTS RELATING TO THIS MATTER? |
| 9 | 09:46:44 | A    I HAVE NOT. |
| 10 | 09:46:45 | Q    HAVE YOU INSTRUCTED ANYBODY TO ALTER ANY |
| 11 | 09:46:49 | DOCUMENTS RELATING TO CARTER BRYANT OR THIS MATTER? |
| 12 | 09:46:53 | A    I HAVE NOT. |
| 13 | 09:46:55 | Q    DID YOU EVER INSTRUCT ANYONE TO WHITE-OUT |
| 14 | 09:46:59 | SOME INFORMATION ON A DOCUMENT? |
| 15 | 09:47:00 | A    I HAVE NOT. |
| 16 | 09:47:01 | Q    LIKE A HEADER ON A FAX -- ON A FAX THAT HAD |
| 17 | 09:47:05 | BEEN RECEIVED, DID YOU INSTRUCT ANYBODY TO ELIMINATE A |
| 18 | 09:47:08 | HEADER? |
| 19 | 09:47:08 | A    I HAVE NOT.  I HAVE SEEN YOUR ALLEGATION IN |
| 20 | 09:47:12 | THIS REGARD.  IT'S RIDICULOUS. |
| 21 | 09:47:14 | Q    WHAT -- WHAT ARE YOU AWARE OF REGARDING WHAT |
| 22 | 09:47:16 | YOU -- WHAT ARE YOU REFERRING TO BY "THE ALLEGATION"? |
| 23 | 09:47:18 | A    THAT I WAS TOLD BY MY ATTORNEY -- |
| 24 | 09:47:23 | MS. CENDALI:  INSTRUCT YOU NOT TO ANSWER AS |
| 25 | 09:47:25 | TO WHAT YOU WERE TOLD BY YOUR ATTORNEY. |

27

EXHIBIT__20__ PAGE 389

| | | |
|---|---|---|
| 1 | 09:47:28 | BY MR. QUINN: |
| 2 | 09:47:28 | Q    HAVE YOU -- DID YOU INSTRUCT -- DO YOU KNOW |
| 3 | 09:47:38 | SOME OF THE -- DO YOU -- DO YOU KNOW A PERSON BY THE |
| 4 | 09:47:42 | NAME OF VICTORIA O'CONNER? |
| 5 | 09:47:45 | A    I DO. |
| 6 | 09:47:46 | Q    AND DID SHE WORK AT MGA FOR SOME PERIOD OF |
| 7 | 09:47:49 | TIME? |
| 8 | 09:47:49 | A    SHE DID. |
| 9 | 09:47:50 | Q    AND WHAT WAS HER POSITION THERE? |
| 10 | 09:47:52 | A    IT CHANGED.  SHE STARTED AS THE DIRECTOR OF |
| 11 | 09:47:55 | LICENSING, AND SHE BECAME VP OF LICENSING. |
| 12 | 09:47:58 | Q    ARE YOU AWARE OF HER TESTIMONY THAT YOU |
| 13 | 09:48:01 | INSTRUCTED HER TO WHITE-OUT SOME INFORMATION ON A FAX |
| 14 | 09:48:04 | HEADER? |
| 15 | 09:48:04 | A    I HEARD ABOUT THAT FROM MY ATTORNEY.  IT'S |
| 16 | 09:48:08 | RIDICULOUS. |
| 17 | 09:48:08 | MS. CENDALI:  I -- I OBJECT AND INSTRUCT YOU |
| 18 | 09:48:10 | NOT TO TALK ABOUT ANYTHING THAT YOU'VE HEARD FROM YOUR |
| 19 | 09:48:14 | ATTORNEYS. |
| 20 | 09:48:14 | BY MR. QUINN: |
| 21 | 09:48:14 | Q    SO IF VICTORIA O'CONNER TESTIFIED THAT YOU |
| 22 | 09:48:18 | INSTRUCTED HER TO WHITE-OUT SOME INFORMATION RELATED TO |
| 23 | 09:48:22 | MATTEL FROM A CONTRACT RELATING TO CARTER BRYANT, THAT |
| 24 | 09:48:26 | WOULD BE SIMPLY FALSE? |
| 25 | 09:48:28 | A    IT'S MY -- IT'S MY BELIEF IT WOULD BE FALSE. |

28

EXHIBIT 20 PAGE 390

| | | |
|---|---|---|
| 1 | 10:31:42 | RESEARCHING IT? |
| 2 | 10:31:43 | A    IT DEPENDS WHAT YOU CALL "RESEARCHING."  I |
| 3 | 10:31:45 | MEAN, IF SOMEBODY SAYS TO YOU, "COME ON" -- LIKE WE |
| 4 | 10:31:49 | JUST CAME BACK AND WE MET THOSE FOLKS OVER HERE, I |
| 5 | 10:31:50 | DON'T WANT TO DISCLOSE A LOT OF THINGS. |
| 6 | 10:31:54 | Q    YOU'RE RESEARCHING NEW IDEAS ALL THE TIME? |
| 7 | 10:31:58 | A    RIGHT.  A BUYER SAYS, "BRING ME SOMETHING |
| 8 | 10:32:02 | LIKE THIS, BRING ME SOMETHING LIKE THIS," SO WE'RE |
| 9 | 10:32:05 | RESEARCHING IT ALL THE TIME.  WE'RE SAYING, "LET'S LOOK |
| 10 | 10:32:07 | AT IT.  LET'S SEE WHAT WE CAN COME UP WITH." |
| 11 | 10:32:08 | Q    OKAY. |
| 12 | 10:32:08 | A    SO PROBABLY -- |
| 13 | 10:32:09 | Q    SO, MR. LARIAN, WOULD IT BE TRUE -- |
| 14 | 10:32:10 | MS. CENDALI:  WELL, LET HIM -- LET HIM FINISH |
| 15 | 10:32:10 | HIS ANSWER. |
| 16 | 10:32:10 | BY MR. QUINN: |
| 17 | 10:32:10 | Q    OH, I'M SORRY.  DID I CUT YOU OFF?  I |
| 18 | 10:32:10 | APOLOGIZE. |
| 19 | 10:32:10 | A    WE RESEARCH THAT -- IF THERE WAS ANYTHING, |
| 20 | 10:32:13 | JUST LOOK FOR SOMETHING TO COME UP WITH. |
| 21 | 10:32:18 | Q    SO WOULD IT BE TRUE THAT PRIOR TO THE TIME |
| 22 | 10:32:28 | THAT PAULA JOINED MGA, YOU WERE LOOKING FOR A FASHION |
| 23 | 10:32:28 | DOLL TO COMPETE WITH BARBIE?  WOULD THAT BE TRUE? |
| 24 | 10:32:29 | A    IT'S POSSIBLE.  I DON'T RECALL EXACTLY.  IT'S |
| 25 | 10:32:32 | VERY POSSIBLE. |

65

EXHIBIT __20__ PAGE _391_