| | | | |
|---|---|---|---|
| 1 | 10:32:34 | Q | OKAY. |
| 2 | 10:32:44 | A | DO YOU WANT ME TO AUTOGRAPH THE PICTURE FOR |
| 3 | 10:32:47 | YOU? | |
| 4 | 10:32:47 | Q | YEAH.  WE'LL GET A BETTER ONE. |
| 5 | 10:32:51 | | SO YOU -- YOU STARTED TO TELL ME THAT PAULA |
| 6 | 10:32:55 | WON THIS SORT-OF CONTEST? | |
| 7 | 10:32:59 | | MR. WICKHAM:  OBJECTION.  FOUNDATION. |
| 8 | 10:33:01 | | MS. CENDALI:  MISCHARACTERIZES HIS TESTIMONY. |
| 9 | 10:33:03 | BY MR. QUINN: | |
| 10 | 10:33:03 | Q | SHE BROUGHT CARTER BRYANT TO YOU? |
| 11 | 10:33:05 | A | SHE -- SHE INTRODUCED CARTER BRYANT TO ME, |
| 12 | 10:33:07 | YES. | |
| 13 | 10:33:07 | Q | ALL RIGHT.  AND YOU HAD A MEETING WITH |
| 14 | 10:33:09 | CARTER BRYANT AND PAULA; IS THAT TRUE? | |
| 15 | 10:33:11 | A | I HAD A MEETING WITH CARTER BRYANT, WITH |
| 16 | 10:33:15 | PAULA, WITH VICTORIA O'CONNER, WITH SOMEBODY NAMED | |
| 17 | 10:33:22 | VERONICA MARLOW, AND MY DAUGHTER WAS IN THAT MEETING. | |
| 18 | 10:33:27 | Q | YASMIN? |
| 19 | 10:33:32 | A | YES. |
| 20 | 10:33:33 | Q | AND IS THAT THE FIRST TIME THAT YOU MET |
| 21 | 10:33:39 | MR. BRYANT IN THIS MEETING WITH ALL THESE PEOPLE? | |
| 22 | 10:33:41 | A | I DID.  IT IS. |
| 23 | 10:33:43 | Q | DO YOU RECALL WHAT MONTH THAT WAS, SIR? |
| 24 | 10:33:45 | A | SEPTEMBER. |
| 25 | 10:33:46 | Q | DO YOU RECALL THE DATE? |

66

EXHIBIT __20__ PAGE _392_

| | | |
|---|---|---|
| 1 | 10:33:48 | A    I THINK -- AGAIN, I THINK IT WAS SEPTEMBER 1 |
| 2 | 10:33:52 | OR SOMETHING LIKE THAT.  OR MAYBE SEPTEMBER 7TH.  I |
| 3 | 10:33:55 | DON'T REMEMBER EXACTLY. |
| 4 | 10:33:56 | Q    NOW, YOU HAVEN'T EXACTLY REMEMBERED LOTS OF |
| 5 | 10:34:00 | DATES SO FAR THIS MORNING. |
| 6 | 10:34:02 | A    RIGHT. |
| 7 | 10:34:02 | Q    HOW IS IT THAT YOU REMEMBER THAT ONE IN |
| 8 | 10:34:05 | PARTICULAR? |
| 9 | 10:34:05 | A    BECAUSE I HAVE LOOKED AT CERTAIN THINGS, |
| 10 | 10:34:07 | PREPARING FOR THIS DEPOSITION, SO THAT DATE COMES TO |
| 11 | 10:34:12 | MIND. |
| 12 | 10:34:12 | Q    WHAT DID YOU LOOK AT THAT REMINDED YOU OF |
| 13 | 10:34:15 | THAT SEPTEMBER 1 DATE? |
| 14 | 10:34:15 | A    I THINK MY CALENDAR. |
| 15 | 10:34:17 | Q    I SHOULD ASK YOU THAT, WHAT DOCUMENTS YOU |
| 16 | 10:34:24 | REVIEWED TO PREPARE FOR YOUR DEPOSITION.  STANDARD KIND |
| 17 | 10:34:27 | OF QUESTION. |
| 18 | 10:34:28 | MS. CENDALI:  AND A STANDARD KIND OF |
| 19 | 10:34:30 | OBJECTION THAT -- ON THE GROUNDS OF ATTORNEY WORK |
| 20 | 10:34:33 | PRODUCT AND PRIVILEGE. |
| 21 | 10:34:34 | AND I INSTRUCT YOU NOT TO ANSWER ABOUT WHAT |
| 22 | 10:34:37 | YOU MAY HAVE BEEN SHOWN BY YOUR ATTORNEYS IN PREP FOR |
| 23 | 10:34:42 | YOUR DEPOSITION. |
| 24 | 10:34:46 | MR. QUINN:  WE'RE GOING TO GET THAT CALENDAR |
| 25 | 10:34:49 | SOMEDAY?  IT HASN'T BEEN PRODUCED. |

67

EXHIBIT _20_ PAGE 393

```
 1                    DEPOSITION OFFICER'S CERTIFICATE

 2

    STATE OF CALIFORNIA  )

 3                       )   SS.

    COUNTY OF LOS ANGELES)

 4

 5          I, APRIL PRAXMARER, HEREBY CERTIFY:

 6      I AM A DULY QUALIFIED CERTIFIED SHORTHAND REPORTER IN

 7    THE STATE OF CALIFORNIA, HOLDER OF CERTIFICATE NUMBER

 8    CSR 12437 ISSUED BY THE COURT REPORTERS BOARD OF

 9    CALIFORNIA AND WHICH IS IN FULL FORCE AND EFFECT.  [FED.

10    R. DIV. P. 28(A)].

11          I AM AUTHORIZED TO ADMINISTER OATHS OR

12    AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

13    PROCEDURE, SECTION 2093(B) AND PRIOR TO BEING

14    EXAMINED, THE DEPONENT WAS FIRST DULY SWORN BY ME.

15    [FED. R. CIV. P. 28(A), 30(F)(1)].

16          I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY

17    OR COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE

18    OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, NOR AM I

19    FINANCIALLY INTERESTED IN THIS ACTION.  [FED. R CIV. P.

20    28].

21          I AM THE DEPOSITION OFFICER THAT

22    STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

23    FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS A

24    TRUE RECORD OF THE TESTIMONY GIVEN BY THE DEPONENT.

25    [FED. R. CIV. P. 30(F)(1)].
```

257

EXHIBIT __20__ PAGE _394_

```
 1          BEFORE COMPLETION OF THE DEPOSITION, REVIEW

 2    OF THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF

 3    REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

 4    PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED ARE

 5    APPENDED HERETO.  [FED. R. CIV. P. 30(E)].

 6          DATED August 9           , 2006

 7

 8

 9          APRIL PRAXMARER, CSR 12437

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

258

EXHIBIT  20  PAGE 395

**EXHIBIT 21**

CONFIDENTIAL                                    1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware corporation, )   CASE NO.
                                      )   CV 04-9059 DDP (AJWx)
                    Plaintiff,        )
                                      )
        vs.                           )
                                      )
CARTER BRYANT, an individual, and     )
DOES 1 through 10, inclusive,         )
                                      )
                    Defendants.       )
_____)
CARTER BRYANT, on behalf of himself,  )
all present and former employees of   )
Mattel, Inc., and the general public, )
                                      )
                    Cross-Complainant,)
                                      )
        vs.                           )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
                    Cross-Defendant.  )

VOLUME I
THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Thursday, November 4, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.

COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

EXHIBIT 21 PAGE 396

CONFIDENTIAL                                                    2

# A P P E A R A N C E S

For Plaintiff and            MR. JOHN B. QUINN
Cross-Defendant:             MR. MICHAEL T. ZELLER
                             MS. TANIA KREBS
                             Quinn, Emanuel, Urquhart,
                               Oliver & Hedges
                             865 South Figueroa Street
                             10th Floor
                             Los Angeles, California 90017

For Defendants and          MR. DOUGLAS A. WICKHAM
Cross-Complainant:          Littler Mendelson
                             2049 Century Park East
                             5th Floor
                             Los Angeles, California 90067

Also Present:                Ms. Dale M. Cendali
                             Mr. Michael Moore

Videotaped by:               Mr. Donald Gifford
                             Mr. Donald Gifford, II
                             1528 East Glenwood
                             Springfield, Missouri 65804


# I N D E X

WITNESS:  CARTER BRYANT                              Page
Direct Examination by Mr. Quinn ..................    4
Notarial Certificate and Costs ...................   262

* * *


# E X H I B I T S

DEPOSITION EXHIBIT        DESCRIPTION              IDENTIFIED

                            (NONE)


Phonetic spelling:  (Ph.)
Exactly as stated:  (Sic)

EXHIBIT __21__ PAGE __397__

· CONFIDENTIAL                                    8

| | | |
|---|---|---|
| 1 | Q | You don't recall one way or the other? | 09:17 |
| 2 | A | No. | |
| 3 | Q | Do you have any understanding as to how long she had been | |
| 4 | | working on those two projects for MGA? | |
| 5 | A | No, I don't. | 09:17 |
| 6 | Q | Do you know whether or not the projects she was ever -- | |
| 7 | | that those projects she was working on for MGA ever | |
| 8 | | actually became MGA products? | |
| 9 | A | I believe they did, yes. | |
| 10 | Q | Both the baby doll and the angel doll? | 09:18 |
| 11 | A | Yes. | |
| 12 | Q | Do you know when MGA began to offer those two dolls to the | |
| 13 | | public? | |
| 14 | A | I don't. | |
| 15 | Q | Can you tell us the context in which Ms. Marlow first | 09:18 |
| 16 | | spoke to you about MGA in July of 2000? | |
| 17 | A | I spoke with her.  I told her that I had a project that I | |
| 18 | | was interested in possibly doing something with, and I | |
| 19 | | spoke to her and asked her if she could possibly -- or if | |
| 20 | | she had any leads or if she could possibly help me pitch | 09:18 |
| 21 | | this idea. | |
| 22 | Q | So you contacted her? | |
| 23 | A | Yes. | |
| 24 | Q | And in response to that query what did she say? | |
| 25 | A | She told me that she had been working for a company called | 09:19 |

EXHIBIT  21  PAGE 398

CONFIDENTIAL                                    9.

```
 1        MGA and that they, in fact, were looking for new doll       09:19

 2        projects.

 3     Q  And is it true that you had never heard of MGA before?

 4     A  I had not.

 5     Q  What was the project that you were referring to?          09:19

 6     A  The Bratz.

 7     Q  And how did you describe it to her when you described this

 8        project that you were working on that you were interested

 9        in doing something with?

10     A  I don't remember exactly how the conversation went but it  09:19

11        was something to the effect that they were a group of teen

12        dolls with funky clothes and disproportionate features.

13     Q  Do you recall anything else that you told her when you

14        were describing this project to her?

15     A  I don't recall right at this time.                         09:20

16     Q  And what response did she make when you told her about

17        this project that you were interested in pursuing?

18     A  I don't recall exactly what she said.

19     Q  Well, in general can you recall what her response was?

20     A  In general I think she expressed interest, and she told me 09:20

21        that she had been working with MGA and that they might

22        possibly be interested.

23     Q  Do you recall anything else that she said?

24     A  No, not at this time I don't.

25     Q  Did she -- what was the next step in your presenting this  09:20
```

EXHIBIT __21__ PAGE __399__

CONFIDENTIAL                                    10

1       to MGA?  And by "this," I'm referring to the Bratz      09:21

2       project.

3    A  The next step was that Veronica put me in touch with one

4       of the product managers at MGA, Paula Treantafelles, and

5       helped set up a meeting time for me to meet with Paula and   09:21

6       to show her the project.

7    Q  Did you know Paula?

8    A  No, I did not.

9    Q  And do you recall -- did you actually meet with Paula?

10   A  Yes.                                                       09:21

11   Q  And can you recall approximately when that was?

12   A  Excuse me.  It was toward the end of August of 2000.

13   Q  And do you recall where that meeting took place?

14   A  Yes.  It took place at the MGA offices.

15   Q  Besides yourself and Paula, did anybody else participate    09:21

16      in that meeting?

17   A  Veronica was present and also a woman named Victoria

18      O'Connor.

19   Q  Was Victoria O'Connor an MGA employee at the time?

20   A  Yes.                                                       09:22

21   Q  And what was your understanding about what her position

22      was at MGA?

23   A  I understood that she was the director of licensing, that

24      she -- she was the one responsible for bringing in outside

25      projects.                                                  09:22

EXHIBIT 21 PAGE 400

CONFIDENTIAL                                          11

1    Q   So was that -- in that meeting was it just you, Victoria,     09:2:

2        Paula?  Just the three of you?

3    A   And Veronica.

4    Q   And Veronica?

5    A   Yes.                                                          09:2:

6    Q   How long did that meeting last?

7    A   Oh, approximately 45 minutes.

8    Q   And did you bring with you any sketches or illustrations

9        or prototypes to show them what this idea was that you

10       had?                                                          09:23

11   A   I brought drawings, yes.

12   Q   Anything else?

13   A   No.

14   Q   Were those drawings in a three-ring binder or folder or --

15   A   They were in a portfolio.                                     09:23

16   Q   Just sort of loose?

17   A   No.  They were in plastic sleeves.

18   Q   Between the time that Veronica first told you about MGA

19       and the time that you had this meeting --

20   A   Yes.                                                          09:23

21   Q   -- did you learn anything else about MGA?

22   A   What do you mean specifically?

23   Q   Well, for example, did you look them up on the web or did

24       you try to get any information about what this MGA company

25       was?                                                          09:23

EXHIBIT ___2|___ PAGE __40|__

CONFIDENTIAL                                    78

1      understanding it would compete with any Mattel products?        11:08
2                MR. WICKHAM:  Objection, vague as to time,
3      foundation.
4   A  I don't think I really even thought about that.
5   Q  (By Mr. Quinn)  All right.  So you didn't have any           11:09
6      understanding one way or another as to whether the Bratz
7      doll would compete with Mattel products; is that true?
8                MR. WICKHAM:  Objection, vague as to time.
9   A  Like I said before, I just -- I didn't even really think
10     about it.                                                     11:09
11  Q  (By Mr. Quinn)  All right.  So is it true that at the time
12     you engaged Ms. Leahy to create the sculpt for the Bratz
13     doll you had no understanding one way or another as to
14     whether that doll, if brought to market, would compete
15     with Mattel products; is that true?                           11:09
16               MS. CENDALI:  Objection, mischaracterizes
17     his testimony.  He did not state that he engaged Ms.
18     Leahy.
19  Q  (By Mr. Quinn)  Go ahead.
20  A  Again, I didn't think about it one way or another because    11:09
21     I didn't know that this project would even come to market.
22  Q  Did you think about whether it would compete with Mattel
23     products if it did come to market one way or the other?
24               MR. WICKHAM:  Objection, mischaracterizes
25     the witness's testimony, asked and answered.                  11:10

EXHIBIT  21  PAGE 402

CONFIDENTIAL                                                79

```
 1   A   No.  I didn't think about that.                        11:10
 2   Q   (By Mr. Quinn)  Was it -- did any -- was it your
 3       understanding that you're the one who engaged Ms. Leahy?
 4   A   No, it was not my understanding.  I had contacted Ms.
 5       Leahy but MGA was actually engaging her to do the work.   11:10
 6   Q   I see.  Who was it who had the first contact with Ms.
 7       Leahy as far as you're aware?  Was it you or was it
 8       somebody from MGA?
 9                MR. WICKHAM:  Objection, foundation, calls
10       for speculation.                                         11:10
11   A   I don't know if anybody from MGA had contacted her before
12       but I did contact her.
13   Q   (By Mr. Quinn)  And you contacted her about doing some
14       sculpting on Bratz, correct?
15   A   Yes.                                                     11:10
16   Q   Did she indicate to you that, oh, what a coincidence, I've
17       already been contacted by MGA about this?
18   A   Not to my recollection.
19   Q   It was your understanding at the time that you were the
20       first one to contact her about this project; is that true?  11:11
21   A   That was my understanding at the time.
22   Q   Did you tell her how she would get paid?
23   A   I don't recall anything like that.
24   Q   Did you have any understanding at that time as to how she
25       would be paid for her work?                              11:11
```

EXHIBIT 21 PAGE 403

CONFIDENTIAL                                         80

| | | |
|---|---|---|
| 1 | A | It was my understanding that MGA would pay for her work. | 11:11 |
| 2 | Q | Did you have discussions with MGA about that? |
| 3 | A | Yes, I think I did. |
| 4 | Q | Tell us about those discussions. |
| 5 | A | The only thing I can really remember is talking to Paula | 11:11 |
| 6 | | Treantafelles and saying that I had found somebody who |
| 7 | | could possibly do the sculpt for us. |
| 8 | Q | And what was her reaction? |
| 9 | A | She -- I don't remember exactly what she said but seemed |
| 10 | | like she said to the effect of something that, you know, | 11:11 |
| 11 | | that was fine, that was good.  I think they may have met. |
| 12 | | I don't recall. |
| 13 | Q | Were you ever present in a meeting between Ms. Leahy and |
| 14 | | somebody from MGA? |
| 15 | A | Yes. | 11:12 |
| 16 | Q | And did that meeting happen before your last day of |
| 17 | | employment at Mattel? |
| 18 | A | Yes. |
| 19 | Q | All right.  Where did that meeting take place? |
| 20 | A | It was at Ms. Leahy's house. | 11:12 |
| 21 | Q | And do you recall what time of day it was that the meeting |
| 22 | | took place? |
| 23 | A | I don't recall exactly. |
| 24 | Q | It might have been during the business day, it might have |
| 25 | | been at night or on weekends, you just don't recall; is | 11:12 |

EXHIBIT _21_ PAGE _404_

CONFIDENTIAL                                                                 81

```
 1        that true?                                              11:12
 2    A   Right.  I don't recall.
 3    Q   And who was the person from MGA who was in attendance at
 4        this meeting?
 5    A   Paula Treantafelles.                                    11:12
 6    Q   And what was the purpose of this meeting in your
 7        understanding?
 8    A   We were there to review the preliminary sculpt.
 9    Q   Did you ever have any conversations with anybody at MGA
10        that touched on the subject of how Ms. Leahy would be    11:13
11        compensated?
12              MR. WICKHAM:  Objection, asked and answered.
13    A   I don't -- I don't recall.  I think I only told Paula that
14        I had found a sculptor who could possibly do the work for
15        us.                                                      11:13
16    Q   (By Mr. Quinn)  Was it your understanding that Paula then
17        was to get in touch with Ms. Leahy?
18              MR. WICKHAM:  Objection, foundation.
19    A   I would be guessing.  I don't know.
20    Q   (By Mr. Quinn)  I'm talking about your understanding.  The  11:13
21        question's addressed to your understanding and you're the
22        only one who knows that.
23    A   My understanding was that, yes, that MGA would -- somebody
24        from MGA would get in touch with Margaret.
25    Q   And that they would make the arrangements to compensate   11:13
```

EXHIBIT 21 - PAGE 405

CONFIDENTIAL                                    82

| | | |
|---|---|---|
| 1 | | Margaret for her work? | 11:13 |
| 2 | A | Yes. |
| 3 | Q | And that's based on what people at MGA told you? |
| 4 | | MR. WICKHAM:  Objection, foundation. |
| 5 | A | I don't recall. | 11:14 |
| 6 | Q | (By Mr. Quinn)  I mean, the understanding that you have |
| 7 | | that you've just related to us -- |
| 8 | A | Uh-huh.  Yes. |
| 9 | Q | -- that's based on what people at MGA told you? |
| 10 | | MS. CENDALI:  Objection, mischaracterizes | 11:14 |
| 11 | | his testimony. |
| 12 | A | I don't remember ever actually being told that.  I guess |
| 13 | | that was just an assumption. |
| 14 | Q | (By Mr. Quinn)  Okay.  But whether or not you specifically |
| 15 | | recall being told that, your understanding is based on | 11:14 |
| 16 | | what people at MGA told you; is that true? |
| 17 | | MR. WICKHAM:  Objection, mischaracterizes |
| 18 | | the witness's testimony, asked and answered. |
| 19 | A | That was my assumption. |
| 20 | Q | (By Mr. Quinn)  And you assumed that based on what people | 11:14 |
| 21 | | at MGA told you? |
| 22 | | MR. WICKHAM:  Objection, asked and answered |
| 23 | | three or four times now, mischaracterizes the witness's |
| 24 | | testimony. |
| 25 | A | No, that wasn't based on anything anybody had said. | 11:14 |

EXHIBIT 21 PAGE 406

CONFIDENTIAL                                    86

```
 1        one way or the other; is that true?              11:18
 2   A    That's true.
 3   Q    So prior to the last day of your employment at Mattel you
 4        may have seen more than one preliminary sculpt?
 5   A    I may have.                                       11:18
 6   Q    And you may have given comments on it more than once?
 7   A    It's possible.
 8   Q    Did you keep it a secret from Mr. -- from the folks at MGA
 9        that you were employed by Mattel at the time?
10             MR. WICKHAM:   Objection, argumentative.     11:18
11   A    No, I did not.
12   Q    (By Mr. Quinn)  Did you tell them that you were still
13        employed by Mattel?
14   A    Yes.
15   Q    And you told them that before you signed the October 5    11:18
16        agreement?
17   A    Yes.
18   Q    And did you ask them whether that raised any problems as
19        far as they were concerned?
20             MR. WICKHAM:   Could the reporter please read  11:19
21        back that question.
22             MR. QUINN:   I'll just restate it.
23   Q    (By Mr. Quinn)  Did you -- the October 4th agreement is
24        what I'm referring to.  You understand what I'm --
25   A    Yes.                                              11:19
```

EXHIBIT _21_ PAGE 407

CONFIDENTIAL                                        87

```
 1   Q    -- referring to?  You told them you were still employed by      11:19
 2        Mattel prior to the time you signed the October 4
 3        agreement, correct?
 4   A    Yes.
 5   Q    And did you ask them whether that raised any problems as         11:19
 6        far as they were concerned at MGA?
 7              MS. CENDALI:  Objection to the form.
 8   A    Not that I recall.
 9   Q    (By Mr. Quinn)  Did -- what -- who did you tell that you
10        were still employed by Mattel?                                  11:19
11   A    I told Isaac Larian and Paula Treantafelles.
12   Q    Did either one of them tell you that you should keep this
13        work that you were doing with MGA confidential?
14              MR. WICKHAM:  Objection, lacks foundation,
15        mischaracterizes the witness's testimony.                       11:20
16   A    I don't recall the conversation.
17   Q    (By Mr. Quinn)  They might have said that, they might not
18        have said that, you just don't recall at all; is that
19        true?
20              MS. CENDALI:  Objection, mischaracterizes              11:20
21        his testimony.
22   Q    (By Mr. Quinn)  Is that true?
23   A    I don't recall.
24   Q    One way or the other?
25   A    One way or the other.                                           11:20
```

EXHIBIT __2__ PAGE 408

CONFIDENTIAL                                        88

1    Q    They might have said that, they might not, you just don't    11:20
2         recall?
3    A    Right.
4    Q    Do you recall -- what did you tell them when you said you
5         were still employed by Mattel?  Do you recall?    11:20
6    A    I don't remember how the conversation went.
7    Q    Let's -- let's take them one at a time.  When was it that
8         you first told Paula that you were still employed by
9         Mattel?
10                   MS. CENDALI:  Objection, mischaracterizes    11:20
11        his testimony, use of the word "still."
12   A    I believe that I told Paula that I was employed by Mattel
13        at my first meeting with her.
14   Q    (By Mr. Quinn)  And did that subject ever come up again
15        between you and Paula, the fact that you were still    11:20
16        employed by Mattel?
17   A    I don't remember.
18   Q    It might have, it might not have, you just don't recall
19        one way or the other?
20   A    That's right.    11:21
21   Q    When was it that you told Isaac Larian that you were still
22        employed by Mattel?
23                   MS. CENDALI:   Objection.
24   A    The first time I met Isaac.
25   Q    (By Mr. Quinn)  And when was that?    11:21

EXHIBIT___21___ PAGE 409

### DEPONENT'S SIGNATURE PAGE

RE:   Mattel, Inc., vs. Carter Bryant, et al.
      Carter Bryant vs. Mattel, Inc.
      Case No. CV 04-9059 DDP (AJWx)
      Deposition taken on November 4, 2004

I do hereby certify that the foregoing is a true and correct transcript of the deposition in the foregoing-styled and numbered cause, and I now sign the same as true and correct, with the exception of the corrections which I have noted on the correction sheet provided.

_____
CARTER BRYANT

Subscribed and sworn to before me this __2nd__ day of
__March_____, 20_05_.

_____
Notary Public

My Commission Expires:

Dec. 31, 2008

CECILY THOMAS-MCKOY
Commission # 1539977
Notary Public - California
Los Angeles County
My Comm. Expires Dec 31, 2008

EXHIBIT __21__ PAGE __410__

NOTARIAL CERTIFICATE

STATE OF MISSOURI      )
                       )  ss.
COUNTY OF GREENE       )


        I, Sherrie L. Hunt, Certified Court Reporter, and
Notary Public within and for the State of Missouri, do
hereby certify that on November 4, 2004, pursuant to Notice,
the above witness, CARTER BRYANT, was by me first duly sworn
to testify the truth, the whole truth, and nothing but the
truth in the case aforesaid; and that the deposition by him
was reduced to writing by me in stenotype, and thereafter
transcribed by me, and is fully and accurately set forth in
the preceding pages; that presentment by me to the witness for
signature was waived; and that the deposition will be
thereafter by the witness read, signed, and sworn to on or
before the date of trial.

        I do further certify that I am not related to, nor
attorney for, nor employed by any of the said parties, nor
otherwise interested in the event of said action.


┌─────────────────────────────┐
│        Sherrie L Hunt        │
│        Notary Public         │         _____
│        Greene County         │         Sherrie L. Hunt
│       State of Missouri      │         Certified Court Reporter
│ My Commission Expires May 17, 2005 │    C.C.R. Number 1027
└─────────────────────────────┘         Notary Public


My commission expires:  May 17, 2005


Costs:   To Plaintiff and Cross-Defendant $1,399.25
         To Defendants and Cross-Complainant $422.65


                COURT REPORTERS OF THE MIDWEST, INC.
                          P.O. Box 4282
                Springfield, MO 65808 (417) 889-2079


EXHIBIT  21  PAGE 411

**<u>Confidential; Subject to Protective Order</u>**

CORRECTIONS TO THE DEPOSITION OF

CARTER BRYANT

VOLUME I

---

RE:   Mattel, Inc., vs. Carter Bryant, et al.
      Carter Bryant vs. Mattel, Inc.
      Case No. CV 04-9059 NM (RNBx)
      Deposition taken on November 4, 2004

| <u>Page/Line</u> | <u>Change Requested</u> |
|---|---|
| 86:5 | Delete: "I may have." Insert: "I don't recall." |
| 124:1 and 3 | Delete: "No." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 131:19 | Delete: "No, I did not." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 132:3 | Delete: "I don't remember telling anybody that, no." Insert: "Other than my communications with Universal, I don't recall telling anybody that." |
| 132:18 | Delete: "To the best of my recollection that's true." Insert: "To the best of my recollection, other than my communications with Universal, that's true." |
| 195:24 | Insert: "I also received expense reimbursements from MGA and an advance against royalties." |
| 252:24 | Delete: "No." Insert: "No. I interpreted your question as asking whether I was employed by MGA at that time and the answer is no." |
| 253:20 | Delete: "I don't remember that, no." Insert: "Other than my communications with Universal, I don't remember that." |
| 253:22 | Delete: "That – as far as I can remember that never happened." Insert: "Other than my communications with Universal, as far as I can remember, that never happened." |

EXHIBIT __2l__ . PAGE __412__

253:25          Delete:  "No."  Insert:  "Other than my communications with Universal, no that I remember."

21        413

**EXHIBIT 22**

| | |
|---|---|
| From: | Paula Treantafelles |
| Sent: | Monday, October 30, 2000 10:09 AM |
| To: | Mercedeh Ward |
| Subject: | RE: Bratz Design. |

Thank God you are here.

-----Original Message-----
| | |
|---|---|
| From: | Mercedeh Ward |
| Sent: | Monday, October 30, 2000 9:58 AM |
| To: | Cecilia Kwok; Paula Treantafelles |
| Cc: | Isaac Kwok; Stephen Lee; Victor Lee; Franki Tsang; Disraeli Chan; Samuel Wong; Judy Rich |
| Subject: | RE: Bratz Design |

Cecilia;

Please slow down a bit. We are still defining the product and you are miles a head of use. I am going to comment on the sculpting and the doll's body at this point because I have to see the fabric swatches that were sent to you before I can make comment.

The doll's body:

- I worked it out with the sculptor we will make our sculpting armatures here in US. I thought you misunderstood me when I asked for the armatures I was only talking about sculpting armatures and not production doll armatures. We decided to make the armatures so there are no confusion.
- The doll has a movable head like the "skipper" doll.
- The arms will move like the "skipper" doll.
- The hip joints are just like the "skipper" doll and NOT BALL joints. The sculpting that you received is very ROUGH.
- the knee will bent and the "Skipper" doll.
- The head sculpting will be at the 6% up.
- The head and feet of our dolls will not be in proportion to dolls that you have seen before. The Rough sculpting is correct in the foot and head size difference to the doll body.

Best Regards;

*Mercedeh Ward*
Sr. Product Design/Engineer Manager
MGA Entertainment
(818) 894-2525 X105
http:\\www.mgae.com

-----Original Message-----
| | |
|---|---|
| From: | Cecilia Kwok |
| Sent: | Monday, October 30, 2000 1:53 AM |
| To: | Paula Treantafelles; Mercedeh Ward |
| Cc: | Isaac Larian; Stephen Lee; Victor Lee; Franki TSANG; Disraeli Chan; Samuel WONG; Judy Rich |
| Subject: | Bratz Design |

Dear All,

HK just received the packages for the Bratz Fashion & rough wax today (10/30).
Here are the photo of the fashion information & HK's comment:

Re: Doll Packs

ATTORNEY'S EYES ONLY

MGA000019

EXHIBIT 22  PAGE 414

1. Bratz Doll 1
- Fashion Fabric « File: Doll1a.JPG »   « File: doll1b.JPG »
- Fashion Pattern Drawing  « File: doll1fs.bmp »

Re: Bratz Doll 2
- Fashion Fabric  « File: Doll2a.JPG »   « File: doll2b.JPG »
- Fashion Pattern Drawing  « File: doll2fs.bmp »

Re: Bratz Doll 3
- Fashion Fabric  « File: doll3a.JPG »  « File: doll3b.JPG »  « File: doll3c.JPG »
- Fashion Pattern Drawing  « File: doll3fs.bmp »

Re: Bratz Doll 4
- Fashion Fabric  « File: doll4a.JPG »  « File: doll4b.JPG »
- Fashion Pattern Drawing  « File: doll4fs.bmp »

HK's comment :
1. Accessories such as belt, hats, head kerchief were added which did not mention in the PDF.  All the vendors quoting did not include these.  There will be cost impact for the accessories.
2. DChan quickly reviewed the fabric matrix and found some of the fabric material are expensive than TWILL.  There will be cost impact and listed out as follows for your quick reference:
   Doll 1 : Leopard print fuzz fabric for the shirt, Light weight dark denim w/ fine silver sparkle for the jacket, Light weight dark denim w/ coarse silver sparkle for the pants, Aqua panne velvet w. iredes cent film for the belt, Aqua & light brown vinyl snakeskin print for the hat, Vinyl lined w/ silver fabric & tricot for the backpack
   Doll 2 : Hombred from gold to fushia metal mesh for the Halter top, Light gray double knit w/ silver sparkle, Gray reflective fabric (good weight) for the backpack, Dark blue reflective vinyl (light weight) for the backpack
   Doll 3 : Deep periwinkle 15D tricot w. silver sparkle for the top sleeves, Iredescen denin in lighter weight for the skirt, M/C knit w/ glitter dots for the skirt trim, Lavender moire stretch velvet for the top, M/C mesh for the head kerchief
   Doll 4 : Cranberry red crebe knit w/ purple glitter for the top, Oliver green stretch poly satin with texture for the pants, Crimsom velboa for the skirt trim, Multi-color stripes satin knit for the Beannie
Anyway, we will get vendors quote based on your fabric matrix.  Our current quotes already over the target price US$2.75 and we need cost reduction.  However, the fabric proposed are adding cost.
3. For the Doll 1's belt, a tooling for the belt buckle is required.
4. Please advise the target age grading for this item.  LA provided to use some glitter dots on the fabric and are easily come off.  There may be safety issues.

Re: Fashion Pack 1
- Fashion Fabric  « File: fashion1.JPG »
- Fashion Pattern Drawing  « File: fashion1fs.bmp »
HK's comment :
1. There are totally 3 fashion pack.  HK only received one fashion pack design & fabric and still awaiting for the other 2.
2. DChan quickly reviewed the fabric matrix and found some of the fabric material are expensive than TWILL.  There will be cost impact and listed out for your quick reference: Fuzzy novelty knit in rasberry for the halter top, Crushed panne veluet in chartreuse for the pants.

Re: Carrying Case (for Child)

ATTORNEY'S EYES ONLY

MGA000020

EXHIBIT  22  PAGE 415

- Fabric information  « File: Case1.JPG »  « File: case2.JPG »  « File: case3.JPG »
HK's comment : per separate mail, HK commented the Carrying case design and waiting for LA reply.

« Message: Bratz Backpack design inquiry »

Re: Hair Pack
HK's comment : Did not receive the Hair pack.  Please advise the curl size of each hair styles for getting quote.  (FYI : curl hair is more expensive than straight hair)

Re: Rough Wax
HK received the rough wax body today.  HK downsized the head by 6% by the computer and attached to the 1:1 body.  This reflected the final size/ outlook of the wax.  Enclosed is the photo for your reference: « File: waxfinalsize.jpg »
HK's comment : The head & legs/ feet seem are not in proportion.  LA please advise if this is the actual size that you expected for future production.
HK also received the reference body showing the joint & armature required.  « File: MVC-003F.JPG »
HK's comment :
1. Please confirm the type of joint request by return.  « File: Joints.jpg »
2. Per separate email, HK already commented the armature mock up request and waiting for LA reply.

Please advise.
Regards,
Cecilia

ATTORNEY'S EYES ONLY

MGA000021

EXHIBIT __22__ PAGE 416

**From:** Mercedeh Ward
**Sent:** Thursday, October 26, 2000 1:55 PM
**To:** Samuel Wong; Cecilia Kwok; Franki Tsang
**Cc:** Paula Treantafelies; Judy Rich
**Subject:** Bratz

**Importance:** High

I am sorry but I missed the FedEx yesterday.
I have sent out the Bratz rough sculpting to you today with the following Parts and material list and description. Please let me know if there are any questions.

I had asked for a armature for the doll's shoulder joint so the sculptor can work with. She needs this armature so she can sculpt the arm around it. I am going to fax a hand drawn copy of what I need from you. Can you please tell me if your model shop can help me here.



Bratz.doc (23 KB)

Best regards;
*Mercedeh Ward*
Sr. Product Design/Engineer Manager
MGA Entertainment
(818) 894-2525 X105
http:\\www.mgae.com

ATTORNEY'S EYES ONLY

MGA000012

EXHIBIT __22__ PAGE __417__

The Bratz Body Assembly:
1.  Solid torso:  Torso Front, Torso Back (1 per toy)
2.  leg armatures Assemblies:  Top and bottom 2 pieces each (right and left)
3.  Shoulder joint Assemblies:  (2 per toy)
4.  Neck Plug : (1 per toy)
5.  Leg Connector:  (2 per toy)

Materials:
1.  Legs, neck, shoulder and arm armatures are made of nylon for strength
2.  Doll head is roto casted PVC
3.  Doll arms PVC are insert molded over the nylon shoulder armatures
4.  Doll legs PVC are insert molded over the nylon armatures
5.  Torso is made of ABS high polished injection molded tool

The dolls torso is sonic welded after assembling the arms, legs and neck connector are assembled first.  There are lap joints and male/female connectors for assembling the torsos.  The head is assembled last

I have included for your attention:
1.  Our rough sculpting (white casting)
2.  Two dolls competitor product (Which I have never seen before!! )

I have cut the PVC off of the leg of one of the dolls so you can see the type of leg armature we are looking for.  We will have to create our leg armature smaller than the one I have supplied.  Our doll will also have a separate foot that connects to the doll's leg.  I will be giving those specifications to the LA Sculptor.  Our dolls' arms will rotate just like doll with the leg armature showing.

**ATTORNEY'S EYES ONLY**

MGA000013

EXHIBIT __22__ PAGE __418__

| | |
|---|---|
| **From:** | Paula Treantafelles |
| **Sent:** | Wednesday, December 20, 2000 2:26 PM |
| **To:** | Jimmy Cheng; Samuel Wong; Cecilia Kwok; Ringo Tam; Franki Tsang; Mercedeh Ward; Becky Harris |
| **Subject:** | RE: HK and NY TF samples |

OK one more revision.  I apologize.

tf samples.xls (20 KB)

-----Original Message-----
| | |
|---|---|
| **From:** | Paula Treantafelles |
| **Sent:** | Wednesday, December 20, 2000 10:09 AM |
| **To:** | Jimmy Cheng; Samuel Wong; Cecilia Kwok; Ringo Tam; Franki Tsang; Mercedeh Ward; Becky Harris |
| **Cc:** | Isaac Larian |
| **Subject:** | HK and NY TF samples |

Please note the revisions made to the attached.
« File: tf samples.xls »


Isaac
Please understand that I needed to decrease the number of BRATZ samples for NYTF.  We will have 6 of each doll (24 dolls) and 6 of each fashion pack (18 packs).

...To put things in perspective our LA painter will still have to paint 66 pairs of shoes and 24 heads before NY.  Its a lot of work.

ATTORNEY'S EYES ONLY

MGA000140

EXHIBIT 22  PAGE 419

MGA000141

ATTORNEY'S EYES ONLY

| | HKTF samples | NYTF samples | In package |
|---|---|---|---|
| **Bratz doll packs** | 1 Cloe | 6 Cloe | of 6, 2 in package |
| | 1 Jade | 6 Jade | of 6, 2 in package |
| | 1 Yasmin | 6 Yasmin | of 6, 2 in package |
| | 1 Sasha | 6 Sasha | of 6, 2 in package |
| **Bratz fashion** | 1 Pajama Power-Cloe | 6 Pajama Power | of 6, 2 in package |
| | 1 Study Hall Style-Sasha | 6 Study Hall Style | of 6, 2 in package |
| | 1 With it Wear-Yasmin | 6 With it Wear | of 6, 2 in package |

REDACTED

REDACTED

EXHIBIT 22 PAGE 420

**EXHIBIT 23**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL, ) | |
| ) | |
| PLAINTIFF, ) | CASE NO. |
| ) | |
| V. ) | CV 04-9049 SGL (RNBX) |
| ) | [CONSOLIDATED WITH |
| MATTEL, INC., A DELAWARE ) | CASE NO. 04-9059 AND |
| CORPORATION, ) | CASE NO. 05-2727] |
| ) | |
| DEFENDANT. ) | |
| ) | |

# 30 (B)(6) DEPOSITION OF KERRI BRODE

## JANUARY 19, 2007



C O U R T   R E P O R T E R S
700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
J'ANA SIEGERS
CSR NO. 10845
JOB NO. 07AE024-JS

EXHIBIT 23 PAGE 421

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR MATTEL, INC.:

 4         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
           BY:  MICHAEL T. ZELLER, ESQ.
 5              BRIDGET MORRIS, ESQ.
           865 SOUTH FIGUEROA STREET
 6         TENTH FLOOR
           LOS ANGELES, CALIFORNIA 90017-2543
 7         (213) 624-7707

 8

 9    FOR MGA ENTERTAINMENT, INC.:

10         O'MELVENY & MYERS, LLP
           BY:  JAMES PAUL JENAL, ESQ.
11              ALICIA CARRASQUILLO MEYER, ESQ.
           400 SOUTH HOPE STREET
12         LOS ANGELES, CALIFORNIA 90071-2899
           (213) 430-6000

13

14

15

16

17

18    ALSO PRESENT:

19         RICHARD DANIELS - MGA ENTERTAINMENT

20         J. TONY RODRIGUEZ - JTV LITIGATION SERVICES

21

22

23

24

25

                                                    3
```

EXHIBIT 23 PAGE 422

```
 1                        I N D E X

 2

 3            DEPONENT:   KERRI BRODE

 4

 5     EXAMINATION                                 PAGE

 6     BY MR. ZELLER:                                 6

 7

 8     EXHIBITS FOR IDENTIFICATION                 PAGE

 9     MATTEL'S:

10     366 NOTICE OF DEPOSITION OF                   8
           MGA ENTERTAINMENT, INC., PURSUANT
11         TO FEDERAL RULE OF CIVIL PROCEDURE
           30(B)(6)  [7 PAGES]

12
       367 E-MAIL DATED DECEMBER 7, 2000,          55
13         FROM KERRI BRODE TO BARBARA
           MALCOLM  [1 PAGE]
14

15

16     EXHIBITS PREVIOUSLY MARKED                 PAGE

17     EXHIBIT 306                                  53

18

19

20         UNANSWERED QUESTIONS UPON ADVICE OF COUNSEL

21              PAGE         LINE

22               56           14

23               57            4

24

25
```

A & E Court Reporters        (213) 955-0070        Fax: (213) 955-0077

EXHIBIT 23 PAGE 423

11:02:13  1       A.   -- REPHRASE?

2       Q.   I WAS JUST TRYING TO ASK IT BROADLY AND

3    MAYBE CUT THROUGH SOME OF THESE THINGS.

4            IN ANY OF YOUR JOB RESPONSIBILITIES,

11:02:20  5    WHETHER AT MGA OR EQUITY OR ANY OTHER PLACE YOU'VE

6    EVER WORKED, HAVE YOU EVER DIRECTLY WORKED WITH

7    MATTEL?

8       A.   NO.

9       Q.   SO THERE'S NO POSITIONS YOU'VE EVER HAD

11:02:37  10   WHERE YOU HAD DIRECT CONTACT OR COMMUNICATIONS WITH

11   PEOPLE AT MATTEL; IS THAT CORRECT?

12      A.   CORRECT.

13      Q.   WHAT I'D LIKE TO DO IS FOCUS ON THE TIME

14   PERIOD FROM MARCH OF 2000, WHEN YOU STARTED WITH MGA

11:03:09  15   AND YOU WERE IN THE POSITION OF MARKETING

16   COORDINATOR, UP THROUGH DECEMBER OF 2000.  YOU HAVE

17   OBVIOUSLY TOLD US A BIT ABOUT YOUR GENERAL

18   RESPONSIBILITIES THERE.  ONE OF THE THINGS THAT YOU

19   MENTIONED THAT YOU DID WAS TAKING CARE OF INVOICES.

11:03:24  20   IF YOU COULD PLEASE TELL ME WHAT YOU MEAN BY THAT.

21      A.   WHEN OUR PRODUCT MANAGERS NEEDED TO HAVE

22   WORK DONE WITH AN OUTSIDE VENDOR -- WHETHER IT WAS

23   GETTING SOMETHING DRAWN, A DESIGN, SOMETHING SEWN --

24   THEY WOULD HAVE TO GET THOSE PEOPLE PAID.  THEY HAD

11:03:42  25   STARTED WHERE THEY WOULD GIVE ME INVOICES, AND I

30

EXHIBIT 23 PAGE 424

| | | |
|---|---|---|
| 11:03:44 | 1 | WOULD HAVE TO GET THOSE INVOICES PAID.  SO I HANDLED |
| | 2 | MAKING SURE THOSE -- OUR VENDORS STAYED HAPPY. |
| | 3 | Q.   WHEN YOU WERE THE MARKETING COORDINATOR |
| | 4 | BACK IN THAT TIME PERIOD -- |
| 11:04:02 | 5 | A.   MM-HMM. |
| | 6 | Q.   -- DID YOU HAVE ANY RESPONSIBILITY OR ANY |
| | 7 | INVOLVEMENT IN SETTING UP ARRANGEMENTS WITH NEW |
| | 8 | VENDORS WHO CAME TO MGA? |
| | 9 | A.   I DID. |
| 11:04:13 | 10 | Q.   AND WHAT WERE YOUR RESPONSIBILITIES IN |
| | 11 | THAT REGARD? |
| | 12 | A.   PART OF WHAT I WOULD TRY TO DO IS IF I |
| | 13 | FOUND NEW PEOPLE THAT WE HADN'T WORKED WITH, I WOULD |
| | 14 | BRING THEM IN TO SHOW US SOME OF THEIR -- WHAT THEY |
| 11:04:25 | 15 | HAD DONE.  SO IF WE NEEDED SOMEBODY, SAY, WHO COULD |
| | 16 | PAINT OR SCULPT, I WOULD TRY TO FIND OTHER RESOURCES |
| | 17 | SO WE WEREN'T USING THE SAME PEOPLE ALL THE TIME. |
| | 18 | IF THEY HAPPENED TO -- WE STARTED WORKING WITH THEM, |
| | 19 | I WOULD MAKE SURE THEY GOT SET UP IN OUR SYSTEM AS A |
| 11:04:43 | 20 | VENDOR SO THAT WE COULD ACCEPT INVOICES FROM THEM. |
| | 21 | MR. JENAL:  LET ME JUST ENCOURAGE THE |
| | 22 | WITNESS TO KIND OF SLOW DOWN SO THAT THE COURT |
| | 23 | REPORTER -- |
| | 24 | THE DEPONENT:  OH, SORRY. |
| 11:04:54 | 25 | MR. JENAL:  -- CAN KEEP UP. |

31

EXHIBIT _23_ PAGE _425_

BY MR. ZELLER:

    Q.   WHEN YOU SAY THAT YOU WERE INVOLVED IN SETTING UP IN MGA'S SYSTEM THE NEW VENDORS, WHAT DID THAT INVOLVE?

    A.   GENERALLY, WHAT I WOULD DO IS GET THEIR INFORMATION:  THEIR NAME, THEIR PHONE NUMBER, IF THEY HAD A BUSINESS.  WE HAD A 1099 FORM THAT NEEDED TO BE FILLED OUT, GETTING THAT TO ACCOUNTING SO THAT THEY COULD BE SET UP IN OUR COMPUTER SYSTEM.

    Q.   BACK IN THAT 2000 TIME PERIOD, WERE THESE RESPONSIBILITIES THAT YOU JUST MENTIONED FOR VENDORS FOR ALL CATEGORIES OR VENDORS, OR WERE THERE CERTAIN PRODUCT CATEGORIES THAT YOU DEALT WITH?

    A.   FOR ALL VENDORS THAT DEALT WITH PRODUCT DEVELOPMENT.

    Q.   SO BACK IN THE 2000 TIME PERIOD, THAT INCLUDED DOLLS?

    A.   CORRECT.

    Q.   AND THEN AT SOME POINT IT INCLUDED BRATZ?

    A.   YES, CORRECT.

    Q.   YOU MENTIONED THAT YOU WOULD OR DID GET THE INFORMATION THAT WAS NECESSARY FROM THE VENDORS --

    A.   MM-HMM.

    Q.   -- AND ALSO TO GET ACCOUNTING, YOU SAID,

32

EXHIBIT 23 PAGE 426

11:06:33  1   "SET UP IN OUR COMPUTER SYSTEM."  WHAT DO YOU MEAN

2   BY GETTING ACCOUNTING -- OR TO GET ACCOUNTING TO SET

3   THEM UP IN THE COMPUTER SYSTEM?

4        A.   OUR COMPUTER SYSTEM WAS GREAT PLANES.

11:06:46  5   EVERYONE THAT DEALT WITH US AND NEEDED TO BE PAID BY

6   US HAD TO BE SET UP IN OUR ACCOUNTING SOFTWARE.  WE

7   WOULD SET THEM UP WITH A VENDOR CODE SO IF I NEEDED

8   TO DO A REQUISITION FOR THEM, I HAD A CODE THAT I

9   COULD PUT IN AND THEIR -- MEANING WE DIDN'T HAVE TO

11:07:04  10   KEEP REPUTTING THEIR INFORMATION.  I DIDN'T NEED TO

11   GET THEIR ADDRESS AND THEIR PHONE NUMBER AND THEIR

12   TAX I.D. NUMBER OR SOCIAL SECURITY NUMBER EVERY TIME

13   I DEALT WITH THEM.  IT WAS ALREADY IN THE COMPUTER.

14        Q.   BACK IN THE 2000 TIME PERIOD, WHO IS IT

11:07:18  15   THAT ASSIGNED THE VENDOR CODE?

16        A.   BARBARA MALCOLM.

17        Q.   AND WOULD BARBARA IN THAT TIME PERIOD

18   COMMUNICATE THE VENDOR CODE TO YOU, OR DID IT GO TO

19   ACCOUNTING OR SOMEPLACE ELSE?

11:07:33  20        A.   SHE WAS ACCOUNTING.  SHE WOULD LET ME KNOW

21   WHAT THE VENDOR CODE WAS.

22        Q.   MAYBE IF YOU COULD HELP CLARIFY SOMETHING

23   FOR ME, THEN, ON THIS FRONT.

24             YOU GOT THE INFORMATION FROM THE VENDORS

11:07:46  25   IN ORDER TO HELP SET THEM UP, AND THEN YOU

33

EXHIBIT 23 PAGE 427

DEPOSITION OF KERRI BRODE - 30(B)(6)

11:07:48　1　COMMUNICATED THAT INFORMATION TO BARBARA MALCOLM IN

2　ACCOUNTING?

3　　　A.　YES.

4　　　Q.　WAS THERE ANYONE ELSE WHO YOU SENT THAT

11:07:55　5　INFORMATION TO?

6　　　A.　NO.

7　　　Q.　IN THAT TIME PERIOD, OF COURSE.

8　　　A.　NO.

9　　　Q.　I'M JUST TALKING ABOUT THAT TIME PERIOD.

11:08:01　10　　　A.　NO.

11　　　Q.　THEN BARBARA MALCOLM CREATED A VENDOR CODE

12　THAT THEN SHE SHARED WITH YOU; IS THAT CORRECT?

13　　　A.　THAT'S CORRECT.

14　　　Q.　AND THEN WOULD YOU LET THE VENDOR KNOW

11:08:10　15　WHAT THE VENDOR CODE WAS?

16　　　A.　THEY DIDN'T NEED IT.

17　　　Q.　THEY NEVER GOT IT?

18　　　A.　THEY DIDN'T -- I DON'T BELIEVE THEY EVER

19　GOT IT.  IT WASN'T SOMETHING THAT I WOULD SHARE WITH

11:08:18　20　THEM.  I KNEW THAT THEY WERE SET UP IN THE SYSTEM,

21　SO WHEN I RECEIVED AN INVOICE OR AN ESTIMATE FROM

22　THEM, THAT WAS MORE FOR INTERNAL USE.

23　　　Q.　I SEE.  SO IT WAS SOMETHING YOU USED TO

24　TRACK THE VENDORS?

11:08:31　25　　　A.　YES.

34

EXHIBIT __23__ PAGE428

11:08:40  1      Q.   IS THE PROCESS THAT YOU DESCRIBED A

2   PROCESS THAT WAS USED FOR ALL THE VENDORS DURING THE

3   TIME PERIOD IN 2000 WHEN YOU WERE WORKING FOR MGA?

4      A.   FOR ALL VENDORS THAT I DEALT WITH THROUGH

11:08:51  5   PRODUCT DEVELOPMENT.  I DON'T KNOW IF THERE WAS

6   VENDORS THAT THE COMPANY AS A WHOLE DEALT WITH THAT

7   I DIDN'T HAVE CONTACT WITH.

8      Q.   RIGHT.  I'M JUST ASKING ABOUT THE PROCESS

9   FOR SETTING UP THE VENDORS THAT YOU DEALT WITH.

11:09:03  10      A.   YES.  THAT WAS --

11      Q.   AND THAT WAS TRUE, WHAT YOU JUST DESCRIBED

12   IN TERMS OF THE PROCESS FOR ALL THE VENDORS THAT YOU

13   HAD DEALT WITH?

14      A.   YES.  UNLESS THEY HAD BEEN SET UP IN THE

11:09:13  15   SYSTEM BEFORE I GOT THERE.

16      Q.   RIGHT.  WE'RE ONLY TALKING ABOUT THE NEW

17   VENDORS THAT WERE SET UP.

18      A.   YES.  NEW VENDORS DURING THAT TIME PERIOD.

19      Q.   YOU MENTIONED THAT THE INFORMATION THAT

11:09:29  20   YOU OBTAINED FROM THE VENDORS TO HELP SET THEM UP AS

21   NEW VENDORS INCLUDED THE NAME, THE PHONE NUMBER, AND

22   THEN ALSO INFORMATION THAT WAS NECESSARY FOR THE

23   1099 FORM?

24      A.   YES.

11:09:41  25      Q.   AND WHAT WAS THE INFORMATION THAT WAS

35

EXHIBIT 23 PAGE 429

11:09:43  1    NECESSARY FOR THE 1099 FORM?

2         A.    THE ONLY INFORMATION I RECEIVED FROM THEM

3    THAT WAS ON THAT FORM WAS THEIR TAX I.D. OR SOCIAL

4    SECURITY, THEIR PHONE NUMBER, THEIR ADDRESS, AND

11:09:53  5    THEIR NAME, AND IF THEY HAD A BUSINESS NAME THAT

6    THEY WENT BY.

7         Q.    IS PART OF THE PROCESS OF SETTING UP THE

8    NEW VENDORS -- YOU MENTIONED THAT OBVIOUSLY YOU HAD

9    INVOLVEMENT AND BARBARA MALCOLM HAD INVOLVEMENT.

11:10:18 10         A.    YES.

11         Q.    WAS THERE ANYONE ELSE DURING THAT TIME

12    PERIOD WHO HAD INVOLVEMENT IN THE PROCESS OF SETTING

13    UP THE VENDORS FOR THE PRODUCT DEVELOPMENT AREA?

14         A.    THE PRODUCT MANAGER WOULD LET ME KNOW IF

11:10:30 15    THERE WAS SOMEBODY THAT THEY WERE GOING TO BE

16    WORKING WITH, AND IF THEY WEREN'T IN THE SYSTEM WHEN

17    I WOULD TRY TO ENTER THE REQUISITION, THEN I KNEW

18    THAT WE NEEDED TO SET THEM UP AS A VENDOR.

19         Q.    BACK IN THE 2000 TIME PERIOD, DID YOU

11:10:53 20    COMMUNICATE THE INFORMATION TO GET NEW VENDORS SET

21    UP TO BARBARA MALCOLM BY E-MAIL?

22         A.    YES.

23         Q.    WERE THERE OTHER WAYS IN WHICH YOU DID IT?

24         A.    NO.  IT WAS GENERALLY THROUGH E-MAIL.

11:11:24 25         Q.    IS BARBARA MALCOLM STILL WITH MGA?

36

EXHIBIT  23  PAGE 430

| | | |
|---|---|---|
| 11:11:26 | 1 | A.   YES, SHE IS. |
| | 2 | Q.   I'M SORRY? |
| | 3 | A.   YES, SHE IS. |
| | 4 | Q.   HOW LONG HAS SHE BEEN WITH MGA, DO YOU |
| 11:11:30 | 5 | KNOW? |
| | 6 | A.   I DON'T KNOW. |
| | 7 | Q.   WAS SHE THERE WHEN YOU STARTED? |
| | 8 | A.   YES, SHE IS -- SHE WAS. |
| | 9 | Q.   IS SHE STILL IN ACCOUNTING? |
| 11:11:39 | 10 | A.   SHE STILL IS. |
| | 11 | Q.   BACK IN THAT TIME PERIOD WHEN YOU WERE |
| | 12 | THE -- IN THE POSITION -- I'VE SORT OF LOST TRACK |
| | 13 | NOW OF ALL YOUR TITLES.  I APOLOGIZE. |
| | 14 | BACK WHEN YOU WERE THE POSITION OF |
| 11:12:10 | 15 | MARKETING COORDINATOR AT MGA, AT LEAST WITH RESPECT |
| | 16 | TO THE PRODUCT DEVELOPMENT SIDE OF THE COMPANY, WAS |
| | 17 | THERE ANYONE ELSE OTHER THAN YOURSELF WHO HELD THAT |
| | 18 | POSITION IN SETTING UP THE VENDORS? |
| | 19 | A.   NO. |
| 11:12:26 | 20 | Q.   SO YOU WERE IT? |
| | 21 | A.   I WAS IT. |
| | 22 | Q.   WHAT I'D LIKE TO DO IS ALSO GET A SENSE |
| | 23 | OF, JUST GENERALLY SPEAKING, HOW THINGS WORKED IN |
| | 24 | TERMS OF THE PROCESSING THAT YOU WERE INVOLVED IN -- |
| 11:12:51 | 25 | A.   MM-HMM. |

37

EXHIBIT 23  PAGE 431

11:12:51  1     Q.    -- OF THE VENDOR INVOICES --

2     A.    OKAY.

3     Q.    -- AND THE -- KIND OF THE ORDER PROCESS SO

4 THAT WHEN WE START GOING THROUGH SOME OF THESE

11:12:57  5 DOCUMENTS, WE CAN HOPEFULLY HAVE A BETTER

6 UNDERSTANDING OF THEM.

7           GENERALLY SPEAKING, IN THE 2000 TIME

8 PERIOD WHEN A VENDOR -- AND FOR PRESENT PURPOSES, BY

9 THE WAY, WE'LL ONLY TALK ABOUT THE VENDORS WHO YOU

11:13:12  10 DEALT WITH ON THE PRODUCT DEVELOPMENT SIDE, IF THAT

11 WILL --

12     A.    OKAY.

13     Q.    -- HELP, AND I'M FOCUSING ON THE 2000 TIME

14 PERIOD.

11:13:18  15     A.    OKAY.

16     Q.    DURING THAT TIME PERIOD, PRIOR TO THE TIME

17 THAT A VENDOR BEGAN WORK, DID A VENDOR NEED TO HAVE

18 A VENDOR I.D. NUMBER AT LEAST INTERNALLY?

19     A.    THEY NEEDED TO HAVE -- IN ORDER FOR ME TO

11:13:32  20 DO WHAT I NEEDED TO DO, GENERALLY WHAT THE PROCESS

21 WAS WHEN I STARTED WAS THE PRODUCT MANAGER WOULD

22 HIRE THE VENDOR.  THEY WOULD DO THE WORK.  I WOULD

23 GET AN INVOICE.  FROM THAT INVOICE I WOULD GO AND I

24 WOULD PUT IN A REQUISITION BECAUSE I NEEDED TO DO A

11:13:49  25 PURCHASE ORDER IN ORDER TO GET THAT INVOICE PAID.

38

EXHIBIT _23_ PAGE _432_

| | | |
|---|---|---|
| 11:13:53 | 1 | THE REQUISITION -- I NEEDED TO HAVE A VENDOR I.D. IN |
| | 2 | ORDER TO DO THE REQUISITION.  IF I GOT TO THE POINT |
| | 3 | WHERE I WAS PUTTING IN THE REQUISITION WITHOUT A |
| | 4 | VENDOR I.D., THEN I WOULD GO AHEAD AND SET -- |
| 11:14:05 | 5 | CONTACT BARBARA TO SET UP THE VENDOR IN THE SYSTEM. |
| | 6 | ONCE THAT PERSON WAS SET UP, I WOULD GO |
| | 7 | AHEAD AND DO A PURCHASE REQUISITION, GET THAT |
| | 8 | APPROVED, AND THEN I WOULD GIVE THAT TO BARBARA |
| | 9 | MALCOLM.  SHE WOULD TURN THAT INTO A PURCHASE ORDER, |
| 11:14:26 | 10 | AND THEN I WOULD BE ABLE TO PAY THE INVOICE AGAINST |
| | 11 | THE PURCHASE ORDER. |
| | 12 | LATER IN THE SYSTEM, WE WERE -- DECIDED WE |
| | 13 | NEEDED TO START GETTING ESTIMATES BEFORE WORK BEING |
| | 14 | DONE SO WE COULD KEEP A BETTER HANDLE ON OUR |
| 11:14:48 | 15 | EXPENDITURES.  SO AN ESTIMATE WOULD BE SUBMITTED.  A |
| | 16 | PURCHASE REQUISITION WOULD BE DONE THROUGH THE |
| | 17 | ESTIMATE.  A PURCHASE ORDER WOULD BE ISSUED, AND AN |
| | 18 | INVOICE WOULD NOT BE PAID UNLESS IT HAD A PURCHASE |
| | 19 | ORDER THAT HAD ALREADY BEEN ESTABLISHED. |
| 11:15:18 | 20 | MR. ZELLER:  IF YOU COULD PLEASE REPEAT |
| | 21 | THAT PART WHERE SHE WAS TALKING -- STARTING WITH |
| | 22 | LATER STARTED DECIDED -- OR LATER STARTED DECIDING |
| | 23 | THAT WE NEEDED ESTIMATES, FROM SORT OF THAT POINT |
| | 24 | ON. |
| | 25 | /// |

39

A & E Court Reporters          (213) 955-0070          Fax: (213) 955-0077

EXHIBIT 23 PAGE 433

DEPOSITION OF KERRI BRODE - 30(B)(6)

```
 1              [THE DEPOSITION OFFICER READ THE
 2          RECORD AS FOLLOWS:
 3              "LATER IN THE SYSTEM, WE DECIDED WE
 4          NEEDED TO START GETTING ESTIMATES
 5          BEFORE WORK BEING DONE SO WE COULD
 6          KEEP A BETTER HANDLE ON OUR
 7          EXPENDITURES.  SO AN ESTIMATE WOULD BE
 8          SUBMITTED.  A PURCHASE REQUISITION
 9          WOULD BE DONE THROUGH THE ESTIMATE.  A
10          PURCHASE ORDER WOULD BE ISSUED, AND AN
11          INVOICE WOULD NOT BE PAID UNLESS IT
12          HAD A PURCHASE ORDER THAT HAD ALREADY
13          BEEN ESTABLISHED."]
14  BY MR. ZELLER:
15      Q.   AND IF I UNDERSTAND WHAT YOU'RE SAYING
16  CORRECTLY, AT SOME POINT THE VENDOR WAS REQUIRED TO
17  GIVE A QUOTE, AND THEN THE VENDOR WOULD RECEIVE OR
18  AT LEAST INTERNALLY THERE WOULD BE ISSUED A PURCHASE
19  ORDER NUMBER.  AND THAT PURCHASE ORDER NUMBER HAD TO
20  BE ISSUED BEFORE THE TIME THE WORK STARTED?
21      A.   CORRECT.
22      Q.   WHEN DID THAT CHANGE OCCUR?
23      A.   I DON'T REMEMBER THE EXACT TIME FRAME.
24      Q.   DO YOU HAVE A GENERAL RECOLLECTION?
25      A.   IT WAS LATER IN 2000, PROBABLY AROUND
```

40

EXHIBIT __23__ PAGE _434_

DEPOSITION OF KERRI BRODE - 30(B)(6)

```
11:16:47  1    SEPTEMBER OR OCTOBER.
          2         Q.   AND WHO WAS IT THAT, FROM YOUR
          3    UNDERSTANDING, INSTIGATED THAT CHANGE?
          4         A.   I DID.
11:17:08  5         Q.   AND IS THERE SOME DOCUMENTATION THAT
          6    YOU'RE AWARE OF THAT SHOWED WHEN THAT FIRST
          7    OCCURRED?
          8         A.   I -- THERE WAS A POLICY THAT WE WROTE.  I
          9    DON'T REMEMBER IF THERE'S ANYTHING.  LETTERS WERE
11:17:21 10    SENT TO OUR CURRENT VENDORS TELLING THEM THE NEW
         11    POLICY.
         12         Q.   I THINK MAYBE YOU SAID TWO THINGS THERE.
         13    LET ME JUST TRY TO GET AN UNDERSTANDING.  THE FIRST
         14    ONE YOU SAID -- WELL, I'M SORRY.  I'LL START WITH
11:17:33 15    THE SIMPLER ONE, PERHAPS.
         16         AT SOME POINT THE VENDORS WERE NOTIFIED BY
         17    A LETTER OF THE CHANGE IN THE POLICY; IS THAT TRUE?
         18         A.   THAT IS TRUE.
         19         Q.   AND THEN THE FIRST PART OF YOUR ANSWER
11:17:46 20    REFERRED TO A "POLICY THAT WE WROTE."  ARE YOU
         21    REFERRING TO SOME SORT OF INTERNAL WRITTEN POLICY
         22    REGARDING THE PROCESSING OF THE VENDOR WORK ORDERS
         23    AND THE LIKE?
         24         A.   YES.
11:17:57 25         Q.   AND IS THAT SOMETHING THAT WAS IN WRITING
```

41

EXHIBIT  23  PAGE 435

| | | |
|---|---|---|
| 11:17:59 | 1 | IN THE 2000 TIME PERIOD? |
| | 2 | A.   YES, IT WAS. |
| | 3 | Q.   WHO WAS THE PERSON WHO WAS RESPONSIBLE FOR |
| | 4 | WRITING THAT UP? |
| 11:18:06 | 5 | A.   I WROTE IT. |
| | 6 | Q.   AND DID YOU WRITE THAT UP, AT LEAST IN |
| | 7 | SOME VERSION, PRIOR TO THE TIME THERE WAS THIS |
| | 8 | CHANGE THAT YOU DESCRIBED IN HAVING TO HAVE THE |
| | 9 | VENDOR ESTIMATE OR THE VENDOR QUOTE IN GETTING THE |
| 11:18:22 | 10 | PURCHASE NUMBER ISSUED? |
| | 11 | A.   I HAD TALKED TO ISAAC, LETTING HIM KNOW |
| | 12 | THAT WE NEEDED TO GET A BETTER HANDLE AND NOT HAVE |
| | 13 | ALL THESE INVOICES THAT THE WORK HAD ALREADY BEEN |
| | 14 | DONE WITHOUT US -- WE NEEDED TO START BUDGETING |
| 11:18:36 | 15 | BETTER, AND I DISCUSSED WITH HIM THAT WE NEEDED TO |
| | 16 | START GETTING QUOTES AND BEING ABLE TO HAVE AN IDEA |
| | 17 | OF WHAT WE WERE GOING TO SPEND BEFORE GETTING THE |
| | 18 | BILL. |
| | 19 | AND AT THAT TIME HE SAID TO GO AHEAD AND |
| 11:18:48 | 20 | PUT SOMETHING IN WRITING, SO I WROTE UP A POLICY |
| | 21 | THAT THE PRODUCT MANAGERS HAD TO ABIDE BY.  IF THEY |
| | 22 | WANTED TO GET WORK DONE, THEY NEEDED TO GO GET A |
| | 23 | QUOTE, HAVE THE QUOTE APPROVED BEFORE THEY CAN START |
| | 24 | THE WORK. |
| 11:19:05 | 25 | ONCE THAT WAS APPROVED BY ISAAC, THEN WE |

42

EXHIBIT 23 PAGE 436

11:19:07  1    SENT LETTERS OUT TO THE DIFFERENT VENDORS THAT WE

          2    WORKED WITH SAYING, "THIS IS THE NEW POLICY.  YOU

          3    NEED TO START SUBMITTING A QUOTE, AN ESTIMATE, AND

          4    YOU CANNOT START THE WORK UNTIL YOU GET A PURCHASE

11:19:20  5    ORDER NUMBER."

          6         Q.   WERE YOU RESPONSIBLE OR INVOLVED IN THE

          7    LETTER THAT -- OR THE LETTERS, I SHOULD SAY, THAT

          8    WENT OUT TO THE VENDORS ANNOUNCING OR NOTIFYING THEM

          9    OF THE POLICY CHANGE?

11:19:39  10        A.   I WROTE THEM AND I MAILED THEM.

          11        Q.   AND DID THE LETTERS GO OUT TO ALL THE

          12   VENDORS THAT MGA HAD USED UP UNTIL THAT TIME?

          13        A.   THE VENDORS THAT I HAD DEALT WITH.

          14        Q.   RIGHT.  I'M ONLY TALKING --

11:20:02  15        A.   YES.

          16        Q.   -- OF COURSE, ABOUT THE ONES ON THE

          17   PRODUCT DEVELOPMENT SIDE.

          18        A.   THEY DID.

          19        Q.   I JUST WANT TO MAKE THAT CLEAR, THAT I'M

11:20:07  20   NOT TRYING TO ASK YOU ABOUT EVERY VENDOR WHO'S EVER

          21   DONE ANYTHING FOR MGA BUT JUST THE ONES WITHIN YOUR

          22   AREA OF RESPONSIBILITY OF PRODUCT DEVELOPMENT.

          23        A.   YES.

          24        Q.   AND WHERE DID THE LIST COME FROM?

11:20:20  25        A.   OH, I DON'T EVEN REMEMBER.

43

EXHIBIT __23__ PAGE __437__

11:20:22    1        Q.    IS THERE, TO YOUR KNOWLEDGE, A LIST OF MGA

2    VENDORS THAT IS KEPT?

3        A.    THEY ARE IN THE COMPUTER SYSTEM.  THERE IS

4    A WAY TO PULL UP THE VENDORS.  I DON'T REMEMBER

11:20:35    5    WHERE I GOT THE -- WHAT LIST I HAD GONE OFF OF.  I

6    HAD A LIST THAT I HAD KEPT OF THE VENDORS THAT I

7    GENERALLY DEALT WITH.

8        Q.    WAS THAT LIST KEPT IN A PARTICULAR FORMAT?

9        A.    I JUST HAD -- I THINK IT WAS AN EXCEL

11:20:57    10    DOCUMENT.

11        Q.    WERE THERE -- OTHER THAN THE LIST THAT YOU

12    HAD CREATED OF THE VENDORS, THE ONES THAT YOU DEALT

13    WITH, WERE THERE ANY OTHER LISTS OF THE VENDORS THAT

14    YOU WERE AWARE OF DURING THAT TIME PERIOD?

11:21:17    15        A.    NOT THAT I'M AWARE OF.

16        Q.    IF I UNDERSTOOD YOUR PRIOR ANSWER

17    CORRECTLY, THE CHANGE IN THE PRACTICE THAT YOU HAD

18    DESCRIBED EARLIER WHERE THE VENDOR NEEDED TO SUBMIT

19    A QUOTE IN ADVANCE AND GET A PURCHASE ORDER NUMBER

11:21:47    20    IN ADVANCE BEFORE STARTING THE WORK, THAT CHANGE WAS

21    AT APPROXIMATELY THE SAME TIME THAT YOU ACTUALLY SAT

22    DOWN AND WROTE UP THE POLICY; IS THAT TRUE?

23        A.    THAT'S TRUE.

24        Q.    AND THEN PRIOR TO THAT TIME, WAS THE

11:22:05    25    PRACTICE OR PROCEDURE FOR THE VENDORS THAT WE WERE

44

EXHIBIT  23  PAGE 438

| | | |
|---|---|---|
| 11:22:07 | 1 | TALKING ABOUT EARLIER SET DOWN IN ANY SORT OF |
| | 2 | WRITTEN DOCUMENT THAT YOU KNOW OF? |
| | 3 | A.   NOT THAT I KNOW OF. |
| | 4 | Q.   SO THERE WASN'T A MANUAL OR A POLICY |
| 11:22:18 | 5 | STATEMENT OR A MEMO OR ANYTHING LIKE THAT THAT SAID |
| | 6 | THIS IS HOW THE PROCESS WAS SUPPOSED TO WORK? |
| | 7 | A.   NO. |
| | 8 | Q.   THE FIRST ONE THAT YOU'RE AWARE OF IS THE |
| | 9 | ONE THAT YOU WERE DESCRIBING THAT YOU WROTE UP THAT |
| 11:22:29 | 10 | DESCRIBED THE FACT THAT THE VENDORS NEEDED TO SUBMIT |
| | 11 | A QUOTE AND GET A PURCHASE ORDER NUMBER FIRST BEFORE |
| | 12 | STARTING THE WORK, RIGHT? |
| | 13 | A.   CORRECT. |
| | 14 | Q.   AND THEN AT ANY TIME WHEN YOU WERE WITH -- |
| 11:22:45 | 15 | WELL, I'M SORRY.  I'LL STRIKE IT AND ASK IT THIS |
| | 16 | WAY. |
| | 17 | DID SOMEONE TAKE OVER YOUR POSITION AFTER |
| | 18 | YOU LEFT? |
| | 19 | A.   THEY DID. |
| 11:22:53 | 20 | Q.   AND WHO DID? |
| | 21 | A.   NANETTE PEMBLETON.  SHE ACTUALLY TOOK |
| | 22 | OVER -- WHEN SHE HAD STARTED, SHE WASN'T A V.P. OF |
| | 23 | OPERATIONS, BUT SHE TOOK OVER AND THEY HIRED -- |
| | 24 | SOMEBODY ENDED UP REPORTING IN TO HER THAT -- AND I |
| 11:23:10 | 25 | HONESTLY DON'T REMEMBER THE PERSON'S NAME THAT TOOK |

45

EXHIBIT  23  PAGE 439

11:23:13  1    OVER FOR ME.

2        Q.   SO NANETTE WAS THE ONE WHO TOOK OVER YOUR

3    POSITION IN ABOUT THE DECEMBER 2000 TIME PERIOD WHEN

4    YOU WERE THE MARKETING COORDINATOR?

11:23:27  5        A.   OH, WAIT.   NO.   THAT POSITION ENDED UP

6    GOING TO HER LATER.   THE MARKETING COORDINATOR WHEN

7    I LEFT IT, UNTIL THEY WERE ABLE TO HIRE SOMEONE, I

8    KIND OF DID A LOT OF THE SAME POSITIONS.   I DID A

9    LOT OF THE INVOICING STILL AFTERWARDS UNTIL THEY

11:23:45  10   WERE ABLE TO HIRE SOMEONE, AND THEN SOMEONE -- THEY

11   FINALLY BROUGHT IN AND BASICALLY MADE A DEPARTMENT

12   OF THINGS I HAD DONE.

13       Q.   I SEE.   SO YOU HAD TWO JOBS?

14       A.   KIND OF.   THERE WERE MANY HATS.

11:23:57  15       Q.   IF YOU COULD, THEN, PERHAPS TELL ME ABOUT

16   HOW LONG AFTER DECEMBER OF 2000, WHEN YOUR FORMAL

17   TITLE AT LEAST CHANGED FROM MARKETING COORDINATOR,

18   HOW LONG DID YOU CONTINUE TO DO AT LEAST SOME OF THE

19   FUNCTIONS OF A MARKETING COORDINATOR?

11:24:10  20       A.   I HONESTLY DON'T REMEMBER.

21       Q.   WAS IT A MATTER OF MONTHS?   YEARS?

22       A.   A COUPLE MONTHS.   IT WASN'T YEARS.

23       Q.   AND THEN DID NANETTE PEMBLETON AT SOME

24   POINT TAKE OVER YOUR POSITION?

11:24:27  25       A.   THEY ENDED UP -- THERE WAS A PERSON HIRED

46

EXHIBIT  23  PAGE 440

DEPOSITION OF KERRI BRODE - 30(B)(6)

11:40:30  1   OMITTED.

2       Q.   YOU DON'T KNOW WHAT THAT INFORMATION IS,

3   THOUGH, RIGHT?

4       A.   IT WOULD BE AN ADDRESS AND A PHONE NUMBER.

11:40:35  5       Q.   DO YOU KNOW FOR SURE?

6       A.   YES.

7       Q.   DO YOU KNOW WHAT ELSE -- WHAT OTHER KINDS

8   OF INFORMATION, IF ANY, ARE OMITTED FROM THIS PAGE?

9       A.   NO.

11:40:47  10       Q.   DO YOU KNOW WHAT THE CONTENT OF THE

11   INFORMATION WAS THAT'S OMITTED HERE?

12       A.   THERE WOULD HAVE BEEN AN ADDRESS ON HERE

13   AND THERE WOULD HAVE BEEN HIS PHONE NUMBER.

14       Q.   RIGHT.  AND I'M ASKING YOU WHAT WAS THE

11:40:57  15   ADDRESS AND PHONE INFORMATION SPECIFICALLY THAT WAS

16   OMITTED HERE.

17       A.   I DO NOT KNOW.  IT WAS CARTER BRYANT'S

18   PHONE NUMBER AND ADDRESS, BUT I DO NOT KNOW WHAT

19   THAT PHONE NUMBER AND ADDRESS IS.

11:41:08  20       Q.   YOU'D HAVE TO SEE THE DOCUMENT?

21       A.   I WOULD HAVE TO SEE IT.

22       Q.   JUST ONE OTHER THING ABOUT EXHIBIT 306.

23   THAT WAS PART OF THE PROCESS OF SETTING UP VENDORS

24   THAT WE TALKED ABOUT PREVIOUSLY, RIGHT?

11:41:47  25       A.   CORRECT.

54

EXHIBIT 23 PAGE 441

11:41:48  1        Q.    THAT'S WHAT IT RELATES TO, ANYWAY,

2   SPECIFICALLY WITH RESPECT TO CARTER BRYANT?

3        A.    CORRECT.

4             MR. ZELLER:   LET'S PLEASE MARK AS

11:41:59  5   EXHIBIT 367 A ONE-PAGE DOCUMENT WHICH IS AN E-MAIL

6   FROM BARBARA MALCOLM TO KERRI BRODE DATED

7   DECEMBER 7, 2000, AND BEARS BATES NO. MGA -2627.

8             [MATTEL'S EXHIBIT 367 WAS MARKED

9             FOR IDENTIFICATION BY THE DEPOSITION

10            OFFICER AND IS ATTACHED HERETO.]

11            MR. JENAL:   I'M GOING TO OBJECT THAT THIS

12   DOCUMENT IS NOT ON THE LIST OF DOCUMENTS

13   SPECIFICALLY CALLED OUT IN THE DEPOSITION NOTICE FOR

14   WHICH THIS WITNESS IS HERE, AND THUS IT'S OUTSIDE

11:42:41  15   THE SCOPE OF THIS DEPOSITION.   UNLESS THERE IS SOME

16   WAY TO TIE THIS DIRECTLY TO THE DOCUMENTS THAT ARE

17   NOTICED FOR THIS DEPOSITION AND THE TOPICS THEREIN,

18   THE WITNESS WILL NOT BE ANSWERING QUESTIONS ON THIS

19   DOCUMENT.

11:42:55  20            MR. ZELLER:   WELL, IT DEFINITELY RELATES

21   TO THE DOCUMENTS THAT ARE NOTICED HERE, SUPPORTED BY

22   THE NOTICE.

23            MR. JENAL:   WELL, I'LL GIVE YOU A REAL

24   SHORT LEASH TO ESTABLISH THAT FOUNDATION BECAUSE

11:43:03  25   IT'S NOT --

55

EXHIBIT _23_ PAGE _442_

11:43:04  1        MR. ZELLER:  I DON'T THINK IT'S YOUR CALL

2  TO GIVE ME A LEASH, BUT I --

3        MR. JENAL:  -- IT'S NOT APPARENT ON THE

4  FACE OF THE DOCUMENT.

11:43:08  5        MR. ZELLER:  -- I -- HOPEFULLY WE'LL GET

6  THROUGH THIS QUICKLY BECAUSE WHAT WE'RE TALKING

7  ABOUT --

8     Q.   AND YOU UNDERSTAND THE CONTEXT OF WHAT

9  WE'RE TALKING ABOUT IS THE PROCESS THAT WAS USED

11:43:14  10  BACK IN 2000 CONCERNING -- THAT WAS USED THERE

11  WITHIN MGA, AND YOU WERE INVOLVED IN IT IN SETTING

12  UP NEW VENDORS, RIGHT?

13     A.   CORRECT.

14     Q.   AND DIRECTING YOUR ATTENTION TO WHAT WE'VE

11:43:25  15  MARKED AS EXHIBIT 367, IS THIS AN E-MAIL THAT YOU

16  SENT TO BARBARA MALCOLM ON OR ABOUT DECEMBER 7TH,

17  2000?

18        MR. JENAL:  OBJECTION.  OUTSIDE THE SCOPE.

19        I'LL DIRECT THE WITNESS NOT TO ANSWER THE

11:43:36  20  QUESTION.

21        MR. ZELLER:  YOU'RE INSTRUCTING HER NOT TO

22  ANSWER?

23        MR. JENAL:  I'M INSTRUCTING THE WITNESS

24  NOT TO ANSWER THE QUESTION.

25  ///

56

A & E Court Reporters     (213) 955-0070     Fax: (213) 955-0077

EXHIBIT  23  PAGE 443

11:43:41   1   BY MR. ZELLER:

2        Q.   ARE YOU GOING TO FOLLOW THAT INSTRUCTION?

3        A.   YES, I AM.

4        Q.   DIRECTING YOUR ATTENTION TO EXHIBIT 367,

11:43:46   5   IS ANY OF THIS YOUR HANDWRITING?

6             MR. JENAL:  OBJECTION.  OUTSIDE THE SCOPE.

7             INSTRUCT THE WITNESS NOT TO ANSWER.  AND

8   I'LL SIMPLIFY THE PROCESS A LITTLE.  SHE'S NOT GOING

9   TO ANSWER ANY QUESTIONS ON THIS EXHIBIT.

11:43:58  10             MR. ZELLER:  WELL, THEN, COUNSEL, I GUESS

11   WE'RE ADJOURNING AND SHE CAN COME BACK ANOTHER DAY,

12   BECAUSE THIS DIRECTLY RELATES TO THE PROCESS THAT

13   IMPLICATES THE DOCUMENTS THAT WE HAVE IN THE NOTICE.

14             MR. JENAL:  THE NOTICE --

11:44:08  15             MR. ZELLER:  SO YOU CAN TAKE YOUR CHANCES

16   ON THAT, AND WE WILL BE BACK.  THE PROCESS OF

17   SETTING UP NEW VENDORS IS ABSOLUTELY AT ISSUE IN THE

18   NOTICE.  IT IS PART OF THOSE DOCUMENTS THAT WE'RE

19   GOING TO BE ASKING ABOUT, AND THEY ARE SPECIFICALLY

11:44:19  20   INDICATED IN THE NOTICE.

21             MR. JENAL:  AND I ADVISE YOU, COUNSEL --

22             MR. ZELLER:  AND FRANKLY IF YOU'RE GOING

23   TO WASTE OUR TIME INSTRUCTING ON THESE SORT OF

24   THINGS WHERE IT'S PART OF THAT PROCESS, PART OF THE

11:44:33  25   DOCUMENTS, THEN WE ARE WASTING OUR TIME HERE AND WE

57

EXHIBIT 23 PAGE 444

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA     )
                        )  SS.
COUNTY OF ORANGE        )

    I, J'ANA SIEGERS, HEREBY CERTIFY:

    I AM A DULY QUALIFIED CERTIFIED SHORTHAND

REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

CERTIFICATE NUMBER CSR 10845 ISSUED BY THE COURT

REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL

FORCE AND EFFECT.  [BUS. & PROF. §8016]

    I AM NOT FINANCIALLY INTERESTED IN THIS ACTION

AND AM NOT A RELATIVE OR EMPLOYEE OF ANY ATTORNEY OF

THE PARTIES, OR OF ANY OF THE PARTIES.  [CIV. PROC.

§2025(K)(1)]

    I AM AUTHORIZED TO ADMINISTER OATHS OR

AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

PROCEDURE, SECTION 2093(B), AND PRIOR TO BEING

EXAMINED, THE DEPONENT WAS FIRST DULY SWORN BY ME.

[CIV. PROC. §2025(R)(1)]

    I AM THE DEPOSITION OFFICER THAT

STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS

A TRUE RECORD OF THE TESTIMONY GIVEN.  [CIV. PROC.

§2025(R)(1)]

A & E Court Reporters        (213) 955-0070        Fax: (213) 955-0077

EXHIBIT  23  PAGE 445

1    I HAVE NOT AND SHALL NOT OFFER OR PROVIDE ANY

2    SERVICES OR PRODUCTS TO ANY PARTY'S ATTORNEY OR

3    THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

4    ACTION WITHOUT FIRST OFFERING SAME TO ALL PARTIES OR

5    THEIR ATTORNEYS ATTENDING THE DEPOSITION AND MAKING

6    SAME AVAILABLE AT THE SAME TIME TO ALL PARTIES OR

7    THEIR ATTORNEYS.  [CIV. PROC. §2025(K)(2)]

8    I SHALL NOT PROVIDE ANY SERVICE OR PRODUCT

9    CONSISTING OF THE DEPOSITION OFFICER'S NOTATIONS OR

10   COMMENTS REGARDING DEMEANOR OF ANY DEPONENT,

11   ATTORNEY, OR PARTY PRESENT AT THE DEPOSITION TO ANY

12   PARTY OR ANY PARTY'S ATTORNEY OR THIRD PARTY WHO IS

13   FINANCING ALL OR PART OF THE ACTION, NOR SHALL I

14   COLLECT ANY PERSONAL IDENTIFYING INFORMATION ABOUT

15   THE DEPONENT AS A SERVICE OR PRODUCT TO BE PROVIDED

16   TO ANY PARTY OR THIRD PARTY WHO IS FINANCING ALL OR

17   PART OF THE ACTION.  [CIV. PROC. §2025(K)(3)]

18

19   DATED:  _January 24, 2007_

20

21

22

23   _Jana Siegler_

24

25

EXHIBIT __23__ PAGE __446__

**EXHIBIT 24**

**Paula Treantafelles**

| | |
|---|---|
| **From:** | Kerri Legg |
| **Sent:** | Friday, October 20, 2000 5:35 PM |
| **To:** | 'steve linker'; Liz Hogan |
| **Cc:** | Colleen O'Higgins; Rachel Harris; Paula Treantafelles |
| **Subject:** | RE: Packaging Estimate: Brats -revised10/19/00 |

Steve,

The information outlined in this letter is the new purchasing policy for MGA Entertainment. This policy will help ensure prompt payment of invoices. Please use the following as a guideline when accepting jobs from employees of MGA Entertainment.

1. Prior to starting any job for MGA, a quote must be submitted to the person responsible with a copy sent to my attention. Quotes may be faxed to (818) 894-8094. All quotes should contain all aspects of the job including modifications, revisions and samples.
2. If we accept the quote, a Purchase Order will be processed and forwarded to you prior to you starting the job. Until the vendor receives a Purchase Order no work should be started. Invoices received without a Purchase Order number issued before the start of job will not be paid.
   At the completion of the job, an invoice needs to be mailed to my attention referencing the Purchase Order Number. Invoices should be sent to: MGA Entertainment, 16730 Schoenborn Street, North Hills, CA 91343 attn: Kerri Legg. All invoices will be paid Net 30 terms.
4. In the rare circumstances of a deposit being paid prior to the start of a job, an invoice will be required at the completion of the job in order for the balance to be paid.

We have received your quote for the packaging of our Bratz line. However, it has not been accepted as we feel it is high. Please do not proceed with any work on this project until you receive a Purchase Order from me. At that time you will know that we have accepted your proposed costing. Please look at your quote to see where you can lower your price and forward a new quote to Paula and myself as soon as possible.

If you have any questions, please call Paula at 818-894-2525 ext. 104 or Rachel at ext 134.

Regards,

Kerri L. Legg
Marketing Coordinator
MGA Entertainment
16730 Schoenborn Street
North Hills, CA 91343
(818) 894-2525 ext 123
fax: (818) 894-8094
klegg@mgae.com

-----Original Message-----
From: steve linker [mailto:link67@earthlink.net]
Sent: Friday, October 20, 2000 5:09 PM

9/8/2006

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

MGA0008032

EXHIBIT __24__ PAGE __447__

To: Liz Hogan; paula treanntafelles; Rachel Harris; Kerri Legg
Subject: Re: Packaging Estimate: Brats -revised10/19/00

Paula-

Per our conversation yesterday regarding the below quote for Brats Packaging, we (Penny Arcade, Inc.) will need a third of the cost upfront and the rest upon completion of each phase of the project (minus a third of each phase from the upfront).

Considering that our quote ranges between $65k (low) and $85k (high), we'll use the median of the low and high quote (which is $75k) and start with a third of that ($25k).

With this agreement, it solidifies both parties commitments (Penny Arcade, Inc. and MGA) to the Brats packaging project until its completion.

If you have any questions or comments please feel free to call me @(310)395.1205, or Liz @(310)392.5303.

Thanks,
Steve

on 10/19/00 9:43 AM, Liz Hogan at lizhogan@earthlink.net wrote:

**Packaging Estimate: Brats** (small doll line)
    4 Sku's - 12.99 Retail  (9" dolls)
    4Sku's - 4.99 Retail  (Dress Packs)
    1 Sku  -  9.99 Retail (Hair Pack)
    1 Sku  - 14.99 Retail (carrying case) - no packaging?

**Dieline:**
box development (pencil skectches) - 600.00
dieline/ 3 structures (engineered, w/mock-up)  - 1050.00
(1 round of revisions included)
Total: 1,650.00

**Phase 1**
trade dress exploration, research and concepting /3 unique directions
includes:
product shots FPO (digital) - 1,500.00
logo development - 5,000.00 -7,,500 (ave. 6,000.00)
tag line/burst copy and fonts - 1,500.00 - 2,500.00
color palette exploration-pms chips - 600.00
background patterns/design/research  - 6,000.00 -8,500.00
support art/icons - 4,000.00 - 4,500.00
Total: 18,600.00 - 25,000.00

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

9/8/2006                                    MGA0008033

EXHIBIT  24  PAGE  448

-meet to review status btwn 11/07-14

**Phase 2**
(MGA to make comments -style/direction is chosen)

logo finals - 4,000.00 - 6,000.00
stylized illustrations (girl poses) production ready - 8,000.00 - 10,000.00
art, icons/element - 1,000.00 - 3,000.00
copy approved - 2,500.00
product and kid photoshoot - 11,500.00-15,000.00
(includes model fees, supplies, hi-res scan, art direction)
MGA legal copy, safety copy, logos, UPC provided -3,000.00
set 9 box dielines up/ build 3 dielines (illustrator) - 1,300.00
print outs, mock ups - 4,000.00 - 4,500.00
Total: 35,300.00 - 45,300.00

-status review 12/01-07
-date approved samples will be ready for photoshoot???

**Phase 3**
set all 9 boxes/ backercards for print production
clean-up, spell check, final approvals MGA
FMA includes hi res scans from photoshoot,
layered files provided on disk to MGA and
print outs, final mock ups
press proof -optional LA - 350.00
Total: 9,450.00 -12,850.00

-FMA due TBA
Total: 65,000.00 - 84,800.00

*all mock-ups will be created to scale
no rush fee's are included

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

MGA0008034

EXHIBIT __24__ PAGE __449__