**EXHIBIT 1**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4     -------------------------------

5     MATTEL, INC., a Delaware          )

6     Corporation,                      )

7                 Plaintiff,            )

8                 vs.                   )  No. CV 04 9059

9     CARTER BRYANT, an individual;     )      NM (RNBx)

10    and DOES 1 through 10,            )  VOLUME I

11    Inclusive,                        )

12                Defendants.           )

13    -------------------------------)

14    (COMPLETE CAPTION ON NEXT PAGE.)

15

16        CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18        Videotaped 30(b)(6) Deposition of

19    JILL NORDQUIST, taken at 400 South

20    Hope Street, Los Angeles, California,

21    commencing at 9:44 A.M., Tuesday,

22    July 31, 2007, before Wendy S. Schreiber,

23    CSR No. 3558, RPR, CLR.

24

25    PAGES 1 - 303

**EXHIBIT 1-7**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   give me your best estimation of when the

2   conversation took place?

3        A.   All I remember it was approximately two

4   weeks prior to him actually physically leaving

5   Mattel.                                              02:06PM

6        Q.   How long was this conversation?

7        A.   Ten minutes.

8        Q.   I'd like you to give me your best

9   recollection of what any -- everybody said during

10  this particular conversation.                        02:06PM

11       A.   Okay.

12       Q.   So we can proceed in any way you'd like but

13  probably the best way to do it is proceed

14  chronologically from the first thing that is said

15  through the conversation so you can tell me          02:07PM

16  everything you remember.   Okay?

17       A.   Okay.

18       Q.   So what is it that you recall being said

19  during this conversation with Mr. Bryant?

20       A.   Kitty and I went over to Carter's cube      02:07PM

21  because we had just heard that he had resigned and I

22  asked him point-blank if he was going to a

23  competitive doll company to which he responded with

24  no and I said, "Where are you going?"  And he said

25  he wasn't going to say.  And then I told him that if  02:07PM

                                                              124

**EXHIBIT 1-8**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    he worked for me and resigned without saying where

2    he was going that I personally would have him leave

3    immediately, and he didn't comment.  And we asked

4    him what he would be doing and he said he was going

5    to go somewhere that would allow him to have more          02:07PM

6    creative control and input and that he would be

7    spending a fair amount of time in Asia and that's --

8    that was I believe the conversation.

9        Q.   Did Kitty Hammons say anything during this

10   conversation?                                              02:08PM

11       A.   I think she probably may have interjected a

12   word or two.

13       Q.   But you don't remember anything as you sit

14   here now?

15       A.   Not specifically.                                 02:08PM

16       Q.   You say that you went to his cube because

17   you just had heard he resigned.

18       A.   Correct.

19       Q.   Who informed you of that?

20       A.   I had been at my desk in my cube at the           02:08PM

21   Tower and had been on the phone with I believe it

22   was Mina Mirkazemi discussing other business issues

23   and at the end of the conversation she said, "Oh,

24   did you guys hear?  Carter just resigned."

25       Q.   What did you say in response?                     02:09PM

                                                                125

**EXHIBIT 1-9**

**EXHIBIT 2**



# ANNUAL RETIREMENT GUIDE

*The McGraw-Hill Companies*

# BusinessWeek

www.businessweek.com

JULY 28, 2003

## STOCK VS. OPTIONS
THE NEW EXEC COMP GAME

## STRATEGIES
▶ YAHOO!
▶ GENERAL MILLS
▶ MATTEL

## GE
MEET CHARLENE BEGLEY, A RISING STAR

## INVESTING
HOW OUR WALL STREET COLUMN PERFORMED

# CITI'S NEXT ACT

**CHUCK PRINCE,** Sandy Weill's top troubleshooter, is the unlikely choice to become CEO. Does he have the right stuff to lead the world's most important bank? PAGE 30

#BXBBGDB ***CR LOT 0016A*C033
#JLI2121G091 0#300116      BX003676
Illlilliladadll.l.lllll.ldl.lldl.ll.dlll.dl.llll.l.l.ll
071994
MAR 22 04   0975
T099
GARY JOLICOPUR
2121 GATES AVE B
REDONDO BEACH  CA  90278-2007

M 0074054

**EXHIBIT 2-10**

stead, regular uniform fabric may sport nano-size umbrellas that open to seal the cloth's pores, making it impervious to airborn chemicals and pathogens.

In both cases, a key objective is to take a load off soldiers' backs. Today, they lug 60 pounds or more into battle, depending upon which weapon they carry, and the so-called marching load is almost twice as heavy. In five years, the Army wants to trim the combat load to 40 pounds, and then to 15 pounds with the Future Warrior outfit. MIT's Vest predicts that armored vests, which weigh 28 pounds now, will end up "at around eight pounds, maybe even five."

Artificial muscles that could enable soldiers to leap tall walls, if not buildings, are in the works, too. One candidate is made from polypyrrole. It flexes when jolted by electricity, then relaxes when the juice is turned off. So far, though, its reactions are much too slow.

Even with the best armor, wounds are inevitable. So when a soldier is hit in an arm or leg, special fibers in the uniform would constrict into a tourniquet. This will be a real life-saver, because half of all battlefeild deaths are due to massive blood loss before wounded soldiers can be treated. In addition, sensors would provide the soldier's vital signs and location to medics via radio. Until the Future Warrior garment is ready, soldiers will wear an adhesive chest patch fitted with sensors and a tiny radio. It's being developed by MIT partner CIMIT (Center for Integration of Medicine & Innovative Technology) in Cambridge, Mass.

To satisfy its industrial partners and avoid chewing up money needlessly, the new institute will be "run on a business model, with regular milestone reviews," says Edwin L. "Ned" Thomas, the MIT materials-science professor tapped as its head. It will have a staff of 40 MIT scientists from eight departments, plus 100-odd graduate students and visiting researchers from the Army and industry.

Thomas admits that some wish-list items may never materialize. But that's okay—the idea is to infuse army research with new thinking. So the Pentagon plans to announce, starting in August, more research centers at other universities, focused on such areas as biotechnology and detecting landmines. In the same spirit, to supplement its $1.2 billion research effort, the Army will funnel $25 million to small, innovative companies that probably never dreamed of getting a Pentagon contract. The fund's top priority? Finding better ways to generate and store power for the Army's high-tech gadgets. It's easy to see why: A brigade of 1,500 troops goes through 120 tons of batteries a year. And that's before they hit their invisibility buttons.

*By Otis Port in Cambridge, Mass.*

# The Corporation

## COMMENTARY
### By Christopher Palmeri

# TO REALLY BE A PLAYER, MATTEL NEEDS HOTTER TOYS

The Bratz pack has invaded the Gabrielle house. The line of trendy dolls burst on the scene two years ago, offering girls a hipper alternative to that old standby, Barbie. Think Jennifer Lopez to Barbie's Reese Witherspoon. Joan Gabriele, a Hollywood (Fla.) mother of two, now has eight Bratz dolls in her home. Her daughters, ages 6 and 8, rarely touch their Barbies. "Barbie is pretty much a thing of the past," she says. "They like Bratz better."

That's bad news for Barbie's maker, Mattel Inc.—and for the three-year-old turnaround efforts of CEO Robert A. Eckert, the ex-president of Kraft Foods Inc. who replaced the embattled Jill E. Barad. The El Segundo (Calif.) toy giant counts on Barbie for about one-third of its revenues and more of its profits. But Mattel says U.S. Barbie sales declined 2% last year and 14% in this year's first quarter. The overall doll category, says market researcher NPD Group Inc., dropped only 3% in the quarter.

Give Eckert, 48, his due: He pulled Mattel out of its tailspin after its disastrous $3.8 billion acquisition of Learning Co. He got rid of the money-losing computer-game maker and slashed costs. His goal: to bring the stability of a consumer-products company to the hit-driven toymaker. And using such practices as computer-aided design to speed up product development and just-in-time inventory management, he succeeded.

But now it looks like Eckert is learning a valuable lesson: Mattel is selling toys, not soap or cornflakes. Good brand management goes only so far in a business that caters to children's whims. Like it or not, the key to success is launching innovative products and promoting the heck out of them. If you don't do it, your competitors will.

Eckert's strategy has been great for Mattel's bottom line. Profits last year, before special charges, were a healthy $455 million, and the stock has nearly doubled, to $20, since Eckert arrived in May, 2000. But top-line growth has sputtered. U.S. revenues, $3.4 billion in 2002, have declined marginally in the past few years. Total 2002 sales of $4.9 billion crept up from $4.6 billion in 2000—thanks to overseas expansion.

While Eckert continues to build on the massive Barbie franchise that Barad constructed, he now knows that he needs hot new toys. Recycling old characters like Sesame Street's Elmo just won't be enough. "We need to do a better job on the top line," he says. "The good news is it's only spring training, and we have a long season ahead of us."

To that end, Eckert has begun an ambitious push. Between now and Christmas, he hopes to launch 250 new toys, including dozens of Hot Wheels models and Flavas, a Bratz-like hip-hop posse with baggy jeans and serious bling-bling. Originally, half of these toys weren't scheduled until 2004.



## FIRST CAME BRATZ...

| | |
|---|---|
| MAKER | MGA Entertainment |
| DEBUT | 2001 |
| NAMES | Yasmin, Sasha, Cloe, Jade, and Meygan |
| MOTTO | The girls with a passion for fashion |
| HER RIDE | Late-night stretch limo |

**EXHIBIT 2-11**

M 0074055

# BusinessWeek

That should help boost sales. But it's even more important that Mattel prove it can respond to nimble upstarts as well as traditional big rivals like Hasbro Inc. After all, it took the company more than a year to launch a competitor to MGA Entertainment's Bratz. My Scene Barbie didn't hit stores until last October and has yet to make a dent in Bratz's success. At its Santa Monica (Calif.) store recently, Toy 'R' Us Inc. devoted just a sliver of the shelf space to My Scene that it did to Bratz. And My Scene dolls were being offered at 2 for 1. "It's not really catching ground," says Sean P. McGowan, toy industry analyst at Harris Nesbitt Gerard Inc.

Mattel will start tossing in a cell phone with 300 free minutes if you buy four of the $13.99 dolls. It also plans to add accessories and boy versions—Hudson, River, and Bryant.

Barbie isn't the only Mattel stalwart under attack. Its Fisher-Price unit, long the king of preschool, is losing sales to newcomer LeapFrog Enterprises Inc., whose electronic interactive books have captured 19% of the $2.9 billion preschool toy and electronic learning aid markets. Eckert is counting on a successful launch in August for Power-Touch, Mattel's version of LeapFrog's popular interactive book. PowerTouch is operated by pointing a finger at an image or a word, instead of the stylus used in LeapFrog's original products. That's key for younger kids. "It's much easier for her to use," says Christopher Coye, a Los Angeles-area parent whose 4-year-old tested a PowerTouch. Still, LeapFrog releases a finger-operated system in August, too.

Over the long term, Eckert puts at risk one of the strongest toy companies around if he can't instill innovation and rapid reaction in his much-tightened organization. To his credit, he is making it crystal clear that he doesn't want ideas to linger in the pipeline. When Matchbox brand managers mentioned this year that they had designed a toy firehouse that could be shipped with no assembly required, Eckert told them to get it out by fall. "Why wait?" he says. "If you've got it, sell it." And not a moment too soon: Sales of Mattel's Hot Wheels and Matchbox cars fell 6% in the first quarter, thanks to competition for boys' attention from action figures like Hasbro's resurgent G.I. Joe and Transformers.

The question is how much Eckert needs to tweak his model. He probably cut back too much, for instance, on marketing. In 1998, Mattel's advertising and promotional spending totaled $631 million, or 18.8% of sales. By last year, it had fallen to $552 million, or 11.2% of sales. Aggressive television marketing boosted sales of Hot Wheels cars in Spain last year, and a strong new campaign could help Mattel toys here.

Mattel won't live or die on every new toy it develops. But it can't just rely on Barbies, either. "Like they say in business school—no risk, no reward," says Isaac Larian, CEO of privately held MGA. He should know: He got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers. As Eckert is finding out, sometimes the best ideas are right in front of you.

*Palmeri covers toys from Los Angeles.*

**...THEN, MY SCENE BARBIE**

| | |
|---|---|
| MAKER | Mattel |
| DEBUT | 2002 |
| NAMES | Barbie, Madison, Chelsea, and Nolee |
| MOTTO | My city. My style. My scene. |
| HER RIDE | Vespa motorscooter |

Data: MGA Entertainment, Mattel

## Manage your account online

Now you can manage your subscription through the Internet. You may change your delivery address, check your account status, renew your subscription, pay your invoice, report a missing or damaged copy, or suspend delivery of your magazine through our Customer Service site. You may go directly to www.businessweek.com/service.htm or follow these simple steps:

1. Go to www.businessweek.com.

2. Scroll down the left side listings until you reach the "Customer Service" link.

3. Click on the "Customer Service" link.

4. Scroll down below and click on US/Canadian subscribers link.

NOTE: You will ▓▓▓▓▓▓▓ number, which appears on the label of your magazine.

For individual subscriptions, changes, or inquiries:
Phone: (800) 635-1200
Email: bwcustomerservice@neodata.com

Education Department
Phone: (800) 843-7352
Fax: (800) 876-9416
Email: bw_group@businessweek.com
Web Site:
www.resourcecenter.businessweek.com

**EXHIBIT 2-12**

M 0074056

**EXHIBIT 3**

# Factiva

**Dow Jones & Reuters**

Weekend Plus

**Bratz packers are what's cool in doll world**

Denise I. O'Neal
897 words
5 March 2004
Chicago Sun-Times
North City Zone
55
English

Copyright (c) 2004 Bell & Howell Information and Learning Company. All rights reserved.

Bratz dolls are leaving America's sweetheart -- **Barbie** -- eating their dust.

Who are these fly girls with the funky wardrobe and devoted tween following?

In 2001, MGA Entertainment introduced Cloe, Sasha, Yasmin and Jade. The fashion divas have since skyrocketed to success. Four boy Bratz have been added to the line: Dylan, Eitan, Koby and Cameron. New friends on occasion will appear in exclusive themed sets.

Isaac Larian, CEO of MGA Entertainment, explains why he decided to have dolls make brief appearances in the line.

"Just like in any neighborhood, new friends arrive and others move on," he says. "Children have to adjust to old friends exiting and new friends arriving in their lives."

More than a fad product imitating life through the eyes of tweens, Larian wanted to incorporate aspects of real life and values associated with the real world in his dolls.

"We wanted a respectable product that reflected the lifestyle of schoolgirls and fashionable trends, but also one that represented clean fun with learning values," he says.

The Bratz are moving into another medium this year, starring in their first direct-to-DVD movie titled, "The Bratz Go Hollywood." The movie is set for a late-summer release. The dolls also will star in an animated feature film, which is expected to be released in late 2005.

**Doll** products new for 2004 include Bratz Petz cats Brigitte, Kendall, Jolie and Daphne; Bratz Wild Life, an exclusive set featuring Nevra, Meyghan and Fianna; Bratz Girls Nite Out, with Cloe, Sasha, Yasmin, Jade and Dana preparing for Saturday night fun; Sun-kissed Summer, with Cloe, Yasmin, Sasha, Jade and Dana dressed in beach attire; Best Friends Beach Party, with friends Calista and Noelle spending a day at the beach; Best Friends Pajama Party, with Brianne and Zana in a themed slumber party setting, and Flower Fairies, featuring Rose, Daisy and Sunflower, a trio of scented dolls.

Larian, along with his brother and brother-in-law, founded ABC Electronics, a trading company dealing in consumer electronics, in 1982. In the late '80s, the company began focusing primarily on hand-held electronic games and changed its name to Micro Games of America.

**M 0070398**

**EXHIBIT 3-13**

When Larian's daughter was 7, he noticed she had become bored with **Barbie** dolls. He decided to again change the focus of his company, wanting to create a **doll** product for girls ages 7 to 13. The dolls would have to be urban dolls representing America's multi- ethnicity. They also had to reflect the trends and attitudes of the tween generation.

"We were looking for a new toy to challenge **Barbie**. Something that would span girls' interest in dolls for a few more years," says Larian.

Larian began shopping around for interested vendors. Getting negative response because of the company name, Larian once again changed the company's name, shortening it to MGA Entertainment. That done, Larian needed a name for his dolls.

His creative team decided the name should be catchy and not have more than six letters. When looking at sketches and pitching ideas, someone said the dolls look like little brats. Keeping with today's trend of making names more "cool" by changing the spelling, MGA executives decided to replace the "s" with a "z."

The Bratz were born and have been making big strides in the **doll** world ever since. A team of more than 15 designers are responsible for making certain the dolls always sport the latest fashions, accessories and hair styles.

For Larian and his creative team, not only have they struck gold with their product but they are having fun with the dolls as well.

"We are like children in a candy store -- everything is exciting," says Larian. "We don't have plans laid out for the Bratz. We come up with new ideas as we go along and we are having fun doing it."

To keep on top of what tweens are interested in, MGA polls children in the dolls' targeted age group. That formula, along with the company's strong sense of ethics and responsibility to children, have turned the Bratz into one of the best-selling products worldwide.

Larian also is compelled to produce a product that is affordable for all.

"I think children are very precious gifts, and it's our job in the toy industry to look beyond pricing to create products to stretch children's imagination and to not cheat any child out of the opportunity to be able to enjoy products," says Larian.

Bratz dolls are available in most toy stores. The company's Web site also has a free Bratz Fan Club that children can join. For more information, visit www.bratzpack.com.

EVENTS: The Winnetka Antiques Fair takes place this weekend at the Winnetka Community House. Fifty dealers from across the country will showcase their wares. Dealers from England and Portugal also will be on hand. Hours for the event are 10 a.m. to 8 p.m. today, 10 a.m. to 6 p.m. Saturday and 11 a.m. to 5 p.m. Sunday. Admission is $12, good for all three days. The Winnetka Community House is at 620 Lincoln, Winnetka. For more information, call (847) 446-0537.

The popular line of Bratz dolls include Cloe, Yasmin, Jade, Dana and Sasha.

Document CHI0000020040305e0350000r

© 2004 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

**EXHIBIT 3-14**

M 0070399

**EXHIBIT 4**

**Immigrant's Creative Company Shakes Up Toy Industry**

By JEFF WEISS; Contributing Reporter
1,098 words
29 March 2004
San Fernando Valley Business Journal
English
2004 San Fernando Valley Business Journal.  All rights reserved.

Large Business Award - MGA Entertainment, North Hills

Only 16 years old, with a mere $750 in his pocket, and with parents across the globe in Iran, Isaac Larian never expected to eventually be the founder of one of the fastest growing toy companies in the world.

Initially undecided whether to emigrate to the United States or to Israel, Larian opted to pursue the American dream. The Business Journal's recipient of the family business Best Large Company award, MGA Entertainment, is the end product of Larian's hard work, determination, and foresight in capitalizing upon opportunity.

Yet before becoming a toy mogul, Larian set out to forge a career in the civil engineering industry before realizing his true talents lay elsewhere.

"I came here to get a civil engineering degree because I thought I'd be a civil engineer and go back to Iran and build infrastructure," Larian said. "I graduated in 1978 from Cal State Los Angeles but I never worked as an engineer. Shortly after graduating, the (Iranian) revolution broke out and I discovered that engineering wasn't for me. I was more of an entrepreneur."

The following year Larian and his brother Farhad founded MGA as a consumer electronics company. Their first foray into the toy industry didn't come until 1987 when Isaac saw the opportunity to manufacture Nintendo's hand-held electronic games.

"I'm an entrepreneur and in 1987 I saw an opportunity to become the distributor for Nintendo's hand-held games. I just saw opportunity. Most entrepreneurs do that," Larian said.

After two years in the hand-held video game industry, MGA left the toy game and returned to consumer

Page 229      © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

M 0101133

**EXHIBIT 4-15**

electronics. Returning in 1993 to produce Mighty Morphin Power Rangers accessories, MGA never left the toy industry, having its first breakthrough item with 1997's wildly successful Singing Bouncing Baby Doll.

"Singing Bouncing Baby was our first doll and it was a huge hit," Larian said. "We ended up winning Family Fun Toy of the Year which is the Oscars of the toy industry. We ended up doing in excess of a million pieces," said Larian.

Introducing Bratz

But MGA's greatest success came later, with the introduction of 2001's Bratz dolls. Against all odds, Larian pioneered a line of dolls able to undercut the success of Barbie, the only company to do so since Barbie's 1959 debut.

However, the modest Larian is quick to acknowledge others for contributing to the company's success. A close knit family, Larian's sister, Shirin Makabi, is the company's director of travel and expenses. Shirin's husband, Eli Makabi, is MGA's vice-president in charge of traffic in sales. In addition, the Makabis co-own the business with Larian. But Larian family involvement does not stop there; Larian's children have played a crucial role in MGA's development.

"My oldest son, 17-year-old Jason, is very creative and a music writer. He has come up with some of our popular toys," Larian said. "He came up with Commandobot—a robot that was the first ever robot toy to work on voice recognition. It was a fantastic seller that was featured in Wired magazine. It was Jason's idea for Bratz."

Larian's other children have also been key to product development.

"Yasmin, my 15-year-old daughter, is involved in the business as well. She's particularly interested in fashion and focus groups. One of the Bratz is named after her," Larian said. "My 10-year-old son, Cameron, is also the namesake for one of the boy Bratz. Cameron comes up with different product ideas. One of our best ideas was a winter wonderland Bratz line. We were on a family ski vacation and he said 'Dad, you should do a Bratz winter break.' So we did it and it sold wonderfully."

Thanking the employees

Larian also credits the company's 430 employees for much of MGA's success.

"Our success is due to the passion of the people we have working for us. Each one has contributed to our success because they are passionate about the company and winning."

Page 230      © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

M 0101134

**EXHIBIT 4-16**

With business booming, a Bratz licensing deal with 20th Century Fox has been inked. A Bratz DVD and a Bratz feature film are soon on the way.

"The Bratz are a true phenomenon that has taken the toy/doll industry by storm," Jim Gianopulos, chairman of Fox Filmed Entertainment, said. "They are more than just toys; they reflect the cultural diversity and contemporary style that kids relate to. That kind of success and impact on young people make the company a natural in a major motion picture, and we look forward to turning the Bratz figures into major motion picture stars."

MGA's projected revenue for 2004 is $1 billion and the company has openings for 110 employees in a variety of positions. Although MGA's success is now assured, there were obstacles along the way.

"I noticed some discrimination when I first got into the business world. I think that after living here for 33 years, there is unfortunately discrimination whether you're Jewish, Persian, black or whatever," Larian said. "But it made me stronger to go out and fight. People become resilient and they get angry and they need to turn that anger into positive energy."

Larian has certainly come a great distance from being a teenager with inclinations towards civil engineering and less than a thousand dollars in his pocket. Thanks to MGA, Barbie's pedestal seems a little less secure.

"I'm having a lot of fun and enjoying what I'm doing here right now and I think as long as you have fun at your job, it's a great thing," Larian said. "I believe that in life you have to have passion for what you do and if you lose that passion you shouldn't do it. My vision is for MGA to become a multibillion-dollar entertainment company and specialize in other things besides just toys."

Looking back on the whirlwind rise of MGA, Larian still seems a bit surprised by the amount of success he's encountered.

"My life is proof that dreams come true. You can't give up. They were definitely moments of self-doubt. I just didn't want to fail, I always had that desire to win," Larian said. "We've made history by unseating Barbie and for a small San Fernando Valley company to do that is a miracle."

Document SFVBJ00020041020e03t0003p

     © 2005  Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

**EXHIBIT 4-17**

M 0101135

**EXHIBIT  5**

RECEIVED

APR 0 2 2007

1   DALE M. CENDALI (admitted *pro hac vice*)
    DIANA M. TORRES (S.B. #162284)
2   JAMES P. JENAL (S.B. #180190)
    O'MELVENY & MYERS LLP
3   400 South Hope Street
    Los Angeles, CA 90071-2899
4   Telephone: (213) 430-6000
    Facsimile: (213) 430-6407
5   Email: jjenal@omm.com

6   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
7   JACOBS, WEIL & SHAPIRO LLP
    10250 Constellation Boulevard, 19th Floor
8   Los Angeles, CA 90067
    Telephone: (310) 553-3000
9   Facsimile: (310) 556-2920
    Email: pglaser@chrisglase.com

10
    Attorneys for Plaintiff
11  MGA Entertainment, Inc.

12
                    UNITED STATES DISTRICT COURT
13                  CENTRAL DISTRICT OF CALIFORNIA
14                        EASTERN DIVISION

15  CARTER BRYANT, an individual,      Case No. CV 04-09049 SGL (RNBx)
                                        (consolidated with CV 04-9059 & 05-2727)
16                  Plaintiff,
                                        MGA ENTERTAINMENT, INC.'S
17          v.                          RESPONSES TO MATTEL, INC.'S
                                        THIRD SET OF REQUESTS FOR
18                                      ADMISSION TO MGA
    MATTEL, INC., a Delaware            ENTERTAINMENT, INC.
19  Corporation,

20                  Defendant.

21  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
22  MGA ENTERTAINMENT, INC. v.
    MATTEL, INC.,
23

24

25

26

27

28
                                        MGA'S RESPONSES TO MATTEL'S THIRD SET
                                        OF REQUESTS FOR ADMISSION TO MGA

                                        7. 30

                    **EXHIBIT 5-18**

1   Subject to and without waiving the foregoing general and specific
2   objections, MGA responds as follows to the request: MGA admits that BRYANT
3   and MGA entered into an agreement on or about October 4, 2000, copies of which
4   have been produced in this litigation.  Except as noted above, MGA denies the
5   request.
6
7   **REQUEST FOR ADMISSION NO. 183:**
8   Admit that, prior to July 1, 2003, MGA had not issued any press
9   release that identified BRYANT as the creator of BRATZ.
10
11  **RESPONSE TO REQUEST FOR ADMISSION NO. 183:**
12  MGA incorporates by reference the above-stated general objections as
13  if fully set forth herein.  MGA specifically objects to this request on the grounds
14  that it is vague and ambiguous, particularly in its use of the phrase "identified
15  BRYANT as the creator of BRATZ."
16  Subject to and without waiving the foregoing general and specific
17  objections, MGA responds as follows to the request: MGA has made a reasonable
18  inquiring and the information known or readily obtainable by MGA is insufficient
19  to enable MGA to admit or deny the request.  On that basis, MGA denies the
20  request.
21
22  **REQUEST FOR ADMISSION NO. 184:**
23  Admit that MGA is not aware of any press report or publication that
24  identified BRYANT as the creator of BRATZ prior to July 15, 2003.
25
26  **RESPONSE TO REQUEST FOR ADMISSION NO. 184:**
27  MGA incorporates by reference the above-stated general objections as
28  if fully set forth herein.  MGA specifically objects to this request on the grounds

- 119 -

MGA'S RESPONSES TO MATTEL'S THIRD SET
OF REQUESTS FOR ADMISSION TO MGA

**EXHIBIT 5-19**

1  that it is vague and ambiguous, particularly in its use of the phrase "identified

2  BRYANT as the creator of BRATZ."

3          Subject to and without waiving the foregoing general and specific

4  objections, MGA responds as follows to the request: MGA has made a reasonable

5  inquiring and the information known or readily obtainable by MGA is insufficient

6  to enable MGA to admit or deny the request. On that basis, MGA denies the

7  request.

8

9  **REQUEST FOR ADMISSION NO. 185:**

10          Admit that the first press report or publication that identified

11  BRYANT as the creator of BRATZ was the *Wall Street Journal* article entitled

12  "Dolled Up: To Lure Older Girls, Mattel Brings in Hip-Hop Crowd" and published

13  on July 18, 2003.

14

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 185:**

16          MGA incorporates by reference the above-stated general objections as

17  if fully set forth herein. MGA specifically objects to this request on the grounds

18  that it is vague and ambiguous, particularly in its use of the phrase "identified

19  BRYANT as the creator of BRATZ."

20          Subject to and without waiving the foregoing general and specific

21  objections, MGA responds as follows to the request: MGA has made a reasonable

22  inquiring and the information known or readily obtainable by MGA is insufficient

23  to enable MGA to admit or deny the request. On that basis, MGA denies the

24  request.

25

26  **REQUEST FOR ADMISSION NO. 186:**

27          Admit that, as of December 21, 2006, one of the factories in China that

28  manufactured BRATZ dolls for or on behalf of MGA was the Hua Tai 4K factory.

- 120 -

MGA'S RESPONSES TO MATTEL'S THIRD SET
OF REQUESTS FOR ADMISSION TO MGA

**EXHIBIT 5-20**

1    <u>RESPONSE TO REQUEST FOR ADMISSION NO. 256:</u>

2            MGA incorporates by reference the above-stated general objections as

3 if fully set forth herein.  MGA specifically objects to this request on the grounds

4 that the request seeks information not relevant to any claim or defense of any party

5 in this action.  MGA specifically objects to this request on the grounds that it seeks

6 information not reasonably expected to be in MGA's possession.

7            Subject to and without waiving the foregoing general and specific

8 objections, MGA responds as follows to this request:  MGA has made a reasonable

9 inquiry and the information known or readily obtainable by MGA is insufficient to

10 enable MGA to admit or deny this request.  On that basis, MGA denies the request.

11

12

13     Dated:  March 30, 2007           O'MELVENY & MYERS LLP

14

15

16                                 By:  Diana M. Torres
                                Attorneys for MGA Entertainment, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

- 154 -

**EXHIBIT 5-21**

**PROOF OF SERVICE**

1

2      I, C. Kelley Canning, declare:

3      I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles,

4   California 90071-2899. On March 30, 2007, I served the within document(s):

5   **MGA ENTERTAINMENT, INC.'S RESPONSES TO MATTEL, INC.'S THIRD SET OF REQUESTS FOR ADMISSION TO MGA**

6   **ENTERTAINMENT, INC.**

7   ☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set

8   forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited

9   with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served,

10  service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

11

12  Michael T. Zeller, Esq.
Timothy Alger, Esq.

13  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

14  865 South Figueroa Street, 10th Floor

15  Los Angeles, CA 90017

16  Keith A. Jacoby, Esq.                Patricia Glaser, Esq.
LITTLER MENDELSON, P.C.        CHRISTENSEN, GLASER, FINK, JACOBS,

17  2049 Century Park East,          WEIL & SHAPIRO, LLP
                              10250 Constellation Blvd.,

18  Fifth Floor                       19th Floor
Los Angeles, CA 90067         Los Angeles, CA 90067

19

20      I declare under penalty of perjury under the laws of the United States that the

21  above is true and correct.

22      Executed on March 30, 2007, at Los Angeles, California.

23

24                             *C. Kelley Canning*

25                              C. Kelley Canning

26

LA2:827618

27

28

MGA'S RESPONSES TO MATTEL'S THIRD SET OF
REQUESTS FOR ADMISSION TO MGA;
PROOF OF SERVICE

**EXHIBIT 5-22**

**EXHIBIT  6**

**COPY**

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 90378)
2 |   Michael T. Zeller (Bar No. 196417)
   865 South Figueroa Street, 10th Floor
3 | Los Angeles, California 90017
   Telephone:   (213) 443-3000
4 | Facsimile:    (213) 443-3100

5 | Attorneys for Plaintiff
   Mattel, Inc.

6 |

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2004

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
      SUE GABB

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | FOR THE COUNTY OF LOS ANGELES

10 |

11 | MATTEL, INC., a Delaware corporation,          CASE NO. ___ BC314398

12 |                    Plaintiff,

13 |

14 |          v.

15 |

16 | CARTER BRYANT, an individual; and
   DOES 1 through 10, inclusive,

17 |

18 |                    Defendants.

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

COMPLAINT FOR:

(1)   BREACH OF CONTRACT;
(2)   BREACH OF FIDUCIARY
      DUTY;
(3)   BREACH OF DUTY OF
      LOYALTY;
(4)   UNJUST ENRICHMENT; AND
(5)   CONVERSION

07209/579342.1

COMPLAINT

**EXHIBIT 6-24**

1         Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter

2 Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as

3 "defendants") and alleges as follows:

4

5                               <u>Parties</u>

6

7         1.     Mattel is a corporation organized and existing under the laws of the

8 State of Delaware and has its principal place of business in El Segundo, California.

9         2.     Mattel is informed and believes, and on that basis alleges, that defendant

10 Bryant is an individual currently residing in Springfield, Missouri.

11         3.     The true names and capacities of defendants sued herein as Does 1

12 through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such

13 fictitious names. Mattel will amend this Complaint to allege their true names and capacities

14 when the same are ascertained.

15         4.     Mattel is informed and believes, and on that basis alleges, that at all

16 times relevant herein, defendants, and each of them, were acting in concert and active

17 participation with each other in committing the wrongful acts alleged herein, and were the

18 agents of each other, and in doing the things alleged herein, each defendant was acting

19 within the course and scope of his, her or its agency and was subject to and under the

20 supervision of, and was acting with the knowledge of, his, her or its co-defendants.

21

22                       <u>Jurisdiction and Venue</u>

23

24         5.     During the time of the acts complained of herein, Bryant was employed

25 by Mattel in, and was a resident of, Los Angeles County. Bryant's contracts with Mattel that

26 are at issue in this action were executed, performed and breached by Bryant in Los Angeles

27 County. In addition, defendants committed the tortious conduct alleged herein while

28 physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

                                      -2-

COMPLAINT

**EXHIBIT 6-25**

1  defendants' other wrongful acts in Los Angeles County.  Accordingly, this Court has

2  personal jurisdiction over defendants.

3      6.    Venue is proper pursuant to Code of Civil Procedure §§ 393 and 395(a),

4  as the causes of action arose in Los Angeles County, the contractual obligations at issue were

5  incurred, were to be performed and were breached by Bryant in Los Angeles County, and

6  Bryant does not currently reside in California.

7

8                                  Factual Background

9

10     7.    Mattel is a long standing and successful independent manufacturer and

11 marketer of toys, dolls, games and stuffed toys and animals.  Mattel was founded in 1945 by

12 Elliot and Ruth Handler and Harold "Matt" Mattson.  The name of the company was created

13 by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating

14 from the Handlers' garage in Southern California, the company greatly expanded its

15 operations following World War II and soon began to thrive as its reputation for producing

16 high-quality toys spread.  During the next several decades, Mattel became world famous for

17 producing high-quality products at reasonable prices.  Today, some of Mattel's most famous

18 brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19     8.    Critical to Mattel's success, and to the livelihood of its employees, is

20 Mattel's ability to design and develop new products.  Mattel invests many millions of dollars

21 in product design and development annually, and it introduces hundreds of new products

22 each year.  In El Segundo, California alone, Mattel maintains a 180,000 square-foot design

23 center that houses more than 850 designers, sculptors, painters and other artists, whom

24 Mattel pays to work exclusively and full-time to create the products that Mattel sells and on

25 which Mattel's business depends.

26     9.    Defendant Bryant was employed by Mattel from September 1995

27 through April 1998, and then again from January 1999 through October 2000, as a product

28 designer at Mattel's design center in El Segundo, California.

07209/579342.1

-3-

COMPLAINT

**EXHIBIT 6-26**

10.    On January 4, 1999, upon starting his second term of employment by Mattel, and as a condition of and in consideration for his employment, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employee Agreement").  Among other things, Bryant agreed that he would not, without Mattel's express written consent, "engage in any employment or business other than for [Mattel], or invest in or assist (in any manner) any business competitive with the business or future business plans of [Mattel]."  Bryant further acknowledged that he held a position of trust with Mattel.   In addition, Bryant assigned to Mattel all rights, title and interest in "inventions," including without limitation "designs," that he conceived or reduced to practice during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement with Mattel is attached as Exhibit A.

11.    Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant specifically agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. The only conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time subsequently) concerned freelance work that is unrelated to the conduct alleged herein.  A true and correct copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B.

12.    In late November 2003, Mattel learned that Bryant had secretly aided, assisted and worked for a Mattel competitor, including without limitation by entering into an agreement with the competitor, during the time Bryant was employed by Mattel pursuant to the above-referenced agreements and was being paid by Mattel as a product designer. Bryant's agreement with the competitor obligated Bryant to provide product design services to the competitor on a "top priority" basis. Bryant's agreement also provided, among other

-4-

COMPLAINT

**EXHIBIT 6-27**

1  things, that Bryant would receive royalties and other consideration for sales of products on

2  which Bryant provided aid or assistance; that all work and services furnished by Bryant to

3  the competitor under the agreement purportedly would be considered "works for hire"; and

4  that all intellectual property rights to preexisting work by Bryant purportedly would be

5  assigned to the competitor. In addition, while Bryant was employed by Mattel, Bryant and

6  the other defendants converted, misappropriated and misused Mattel property and resources

7  for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8          13.    During the time that he was employed by Mattel and thereafter, Bryant

9  concealed these actions from Mattel, including without limitation by failing to notify his

10  supervisor of his conflict of interest regarding the competitor and by making affirmative

11  misrepresentations to Mattel management upon his departure from Mattel. Because of

12  Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to

13  suspect that Bryant had worked for the competitor while still employed by Mattel until late

14  November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's

15  agreement with the competitor and saw that the date of the agreement predated Bryant's

16  departure from Mattel.

17          14.    As a consequence, Bryant breached his contracts with Mattel and

18  violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have

19  unlawfully aided and abetted his violation of such duties; and each of the defendants has

20  been unjustly enriched and engaged in acts of conversion.

21

22                              **FIRST CLAIM FOR RELIEF**

23                              (Breach of Contract)

24

25          15.    Mattel repeats and realleges each and every allegation set forth in

26  paragraphs 1 through 14, above, as though fully set forth at length.

27          16.    Pursuant to his Mattel Employment Agreement, and for good and

28  valuable consideration, Bryant agreed that he would not, without Mattel's express written

-5-

COMPLAINT

**EXHIBIT 6-28**

consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs," that he conceived or reduced to practice during his employment by Mattel. In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant further promised that he would notify his superior immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

17.    The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

18.    Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel, without the express written consent of Mattel.

19.    As a consequence of Bryant's breach, Mattel has suffered and will in the future continue to suffer damages in an amount to be proven at trial. Such damages include, without limitation, the amounts paid by the competitor to Bryant during his Mattel employment; the amounts paid by the competitor to Bryant as a result of the work he performed for the competitor during his Mattel employment; the amount that Mattel paid Bryant during the time he wrongfully worked for the competitor; the value of information and intellectual property owned by Mattel which Bryant provided to the competitor; the value of the benefits the competitor obtained from Bryant during the time he was employed by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of the work he performed for the competitor during his Mattel employment.

**EXHIBIT 6-29**

20.    Furthermore, Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

21.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 20, above, as though fully set forth at length.

22.    Bryant held a position of trust and confidence with Mattel. In his position, Bryant had access to and was entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of his job assignments and duties. In his position, Bryant also represented Mattel in its dealings with third parties and, in his actions in the course and scope of his employment with Mattel, was an agent of Mattel. Bryant confirmed his relationship of trust with Mattel in the Employee Agreement. Bryant thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant might bring to Mattel.

23.    Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor. As alleged

COMPLAINT

**EXHIBIT 6-30**

1   above, Bryant also breached the aforementioned duty by using Mattel property and resources

2   for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3         24.    The other defendants, acting with full knowledge of Bryant's obligations

4   to Mattel, aided and abetted Bryant in such conduct.

5         25.    As a direct and proximate result of defendants' wrongful conduct,

6   Mattel has incurred damages in an amount to be determined at trial.

7         26.    Defendants acted with malice, fraud and oppression, and in conscious

8   disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9   against defendants in an amount to be determined at trial.

10        27.    Furthermore, defendants' conduct has caused, and unless enjoined will

11   continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12   money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13   is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or

14   restraining defendants from continuing to benefit from such breach.

15

16                      **THIRD CLAIM FOR RELIEF**

17                      (Breach of Duty of Loyalty)

18

19         28.    Mattel repeats and realleges each and every allegation set forth in

20   paragraphs 1 through 27, above, as though fully set forth at length.

21         29.    As an employee of Mattel, Bryant owed a duty of undivided loyalty to

22   Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist

23   a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant

24   was required to always give preference to Mattel's business over his own, similar interests

25   during the course of his employment with Mattel.

26         30.    Bryant breached his duty of loyalty to Mattel in that, while employed

27   by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including

28   without limitation by entering into an agreement with a Mattel competitor. As alleged

1    above, Bryant also breached the aforementioned duty by using Mattel property and resources

2    for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3         31.    The other defendants, acting with full knowledge of Bryant's obligations

4    to Mattel, aided and abetted Bryant in such wrongful conduct.

5         32.    As a direct and proximate result of defendants' wrongful conduct,

6    Mattel has incurred damages in an amount to be determined at trial.

7         33.    Defendants acted with malice, fraud and oppression, and in conscious

8    disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9    against defendants in an amount to be determined at trial.

10        34.    Furthermore, defendants' conduct has caused, and unless enjoined will

11    continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12    money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13    is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or

14    restraining defendants from continuing to benefit from such breach.

15

16                    FOURTH CLAIM FOR RELIEF

17                        (Unjust Enrichment)

18

19        35.    Mattel repeats and realleges each and every allegation set forth in

20    paragraphs 1 through 34, above, as though fully set forth at length.

21        36.    Defendants, by the aforementioned conduct, unfairly used and diverted

22    Mattel property, resources and opportunities for the benefit of, and to aid and assist,

23    themselves, all without authorization by or payment to Mattel for the same. Defendants have

24    been unjustly enriched as a result.

25        37.    Mattel is entitled to an award of all such amounts by which defendants

26    have been unjustly enriched in an amount to be determined at trial.

27

28

07209/579342.1

-9-

COMPLAINT

**EXHIBIT 6-32**

1    38.    Defendants acted with malice, fraud and oppression, and in conscious

2    disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages

3    against defendants in an amount to be determined at trial.

4    39.    Furthermore, defendants' conduct has caused, and unless enjoined will

5    continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

6    money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel

7    is entitled to an order restraining defendants from any further unjust enrichment.

8

9                        FIFTH CLAIM FOR RELIEF

10                              (Conversion)

11

12    40.    Mattel repeats and realleges each and every allegation set forth in

13    paragraphs 1 through 39, above, as though fully set forth at length.

14    41.    Mattel was entitled to, inter alia, Bryant's exclusive services and the

15    exclusive ownership of his inventions as a Mattel product designer.  However, Bryant

16    provided such services, and purported to grant rights to such inventions, to a competitor

17    during the time of his exclusive Mattel employment.  All such services and the inventions

18    and work product resulting from such services, including without limitation ideas, concepts,

19    rights, designs, proprietary information, and other intellectual property and intangible

20    property created by Bryant during the term of the aforesaid agreements, were the property

21    of Mattel.  Such services and property were provided by Bryant to others, including

22    defendants, and used by them.

23    42.    Defendants wrongfully converted Mattel property and resources by

24    asserting ownership thereto and by appropriating and using Mattel's property and resources

25    for their own benefit and gain and for the benefit and gain of others, without the permission

26    of Mattel.

27

28

07209/579342.1                          -10-

**EXHIBIT 6-33**

43.     As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages.  Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Mattel hereby respectfully requests that this Court:

A.     Award Mattel its damages;

B.     Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C.     Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D.     Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E.     Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F.     Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and

**EXHIBIT 6-34**

1         G.     Award such other and further relief as this Court deems just and proper.

2

3    DATED:  April 27, 2004          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

4

5                  By _____

6                     Michael T. Zeller

7                     Attorneys for Plaintiff
                      Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/579342.1

-12-

COMPLAINT

**EXHIBIT 6-35**

Exhibit A

**EXHIBIT 6-36**

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patent, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for it and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement. In addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _____    MATTEL, INC. By _____
                                                                       Signature

Employee Name (print)  CARTER H. BRYANT        Name of Witness (print)  TERESA NEWCOMB

Date  01/04/99

EXHIBIT **A** PAGE 13

EXHIBIT 6-37

Exhibit B

**EXHIBIT 6-38**

# CONFLICT OF INTEREST QUESTIONNAIRE

BRYANT, CARTER H.        PROJECT DESIGNER

Name (Last, First, M.I.)          Job Title                    Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES  ● NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES  ● NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES  ● NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES  ○ NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES  ○ NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES  ● NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES  ● NO   7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES  ● NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES  ● NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

4, 5, freelance design & artwork in 1998,
from appr. 5/98 - 11/98 for the Ashton Drake
galleries.

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

_(signature)_                              01/04/98

Signature                                  Date

## EXHIBIT B PAGE 14

**EXHIBIT 6-39**

**EXHIBIT 7**



CALENDARED

RECEIVED

JAN 16 2007

P-Send

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 12 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION        BY DEPUTY

FILED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

CARTER BRYANT,

        Plaintiff,

v.

MATTEL, INC.,

        Defendant.

and related actions.

CASE NO. CV-04-9049-SGL

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND

      This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

      Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant. The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire"). Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

(142)

1-12

EXHIBIT 7-40

1  resources in creating and/or developing the BRATZ dolls or whether he continued

2  to develop his BRATZ design while still working in Mattel's employ. In either event,

3  the rights to the BRATZ dolls could become the property of Mattel, either through

4  infringement or through operation of the agreements noted above. The case was

5  later removed to this Court and was assigned the case number CV-04-9059. MGA

6  Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to

7  protect its rights to Bratz dolls" that were at stake in the action. Mattel, Inc. v.

8  Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a

9  significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual

10  property, i.e., the Bratz creations, were decided in the absence of MGA").

11      In the interim, Bryant filed a declaratory judgment action in this Court,

12  seeking for the Court to declare that his BRATZ doll creations did not infringe

13  Mattel's copyright in its Toon Teens products. See Court's July 18, 2006, Order at

14  3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel

15  products,' . . . the substance of his allegations all address the product 'Toon

16  Teens'"). The declaratory judgment action was assigned the case number CV-04-

17  9049.

18      MGA then filed an action against Mattel in this Court broadening the scope

19  of the controversy beyond that concerned with the ownership rights to the BRATZ

20  doll line. MGA's complaint asserted various Lanham Act claims and their California

21  state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of

22  competition-by-intimidation and serial copycatting of MGA's products." (Compl.

23  ¶ 7). In essence, although the prior actions were concerned with ownership in the

24  rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there

25  had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.

26  MGA's complaint did make mention of other products that were affected by Mattel's

27  alleged predatory business practices, but by far the largest portion of its complaint

28  concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

2

**EXHIBIT 7-41**

1  line of BRATZ dolls.[1]

2      By Order dated June 19, 2006, the Court consolidated all three cases "for all

3  purposes" as they "involve[d] a number of common issues of law and fact."  As the

4  Court later noted in its August 10, 2006, Order:  "At its heart, this case asks the

5  question:  Who owns the rights to the Bratz dolls?"  Resolution of this question lies

6  at the heart of or, at the very least, affects many of the other claims set forth in

7  each of the three respective cases.  For instance, even though the allegations in

8  05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ

9  dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot

10  many of those allegations.  It is hard to imagine how it is unlawful for a company to

11  thwart or otherwise undermine the marketing of a product it owns.  Thus, if Mattel

12  owned the rights to the BRATZ dolls, many of the allegations in the 05-2727

13  complaint would become moot.  That said, such consolidation did not do away with

14  the distinctions that do exist between the three cases.  As the Court highlighted in

15  its consolidation order, when either party files a pleading in the case, "the first

16  paragraph of [that] document . . . shall inform the Court to which case(s) the

17  document relates."

18      On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,

19  04-9049, finding there existed no reasonable apprehension of an imminent

20  copyright infringement claim being filed against him by Mattel based on Mattel's

21  Toon Teen intellectual property.  See Court's July 18, 2006, Order at 4.  The

22  Court's Order was predicated entirely upon counsel for Mattel's representation

23  during oral argument that it "will not maintain that Bratz infringes the copyright in

24  Toon Teens."  Owing to this representation, the Court, in dismissing the declaratory

25  judgment action, made clear that any future "claim by Mattel of copyright

26  _____

27  [1] That the marketing of the BRATZ dolls lies at the heart of the issues between the rival doll makers in the 05-2727 case is best illustrated by the Court's discussion of those allegations in its August 26, 2005, Order, Granting in Part and Denying Part Mattel's Motion to Strike portions of MGA's complaint.

28

3

**EXHIBIT 7-42**

1    infringement based on the Toon Teens product is barred by counsel's

2    representation."  July 18, 2006, Order at 4.

3          Presently before the Court is Mattel's request for leave to file an amended

4    complaint in the 04-9059 action.  The complaint broadens considerably the nature

5    of the action from its genesis in state court.  Whereas before the complaint simply

6    sought to litigate alleged contractual and fiduciary breaches by Bryant while in the

7    employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay

8    claim to the BRATZ doll line), the amended complaint adds five more defendants

9    and nine new legal claims, alleging a wide range of commercial disputes between

10   the rival doll makers that spans three countries.  For instance, the amended

11   complaint now contains RICO claims, a misappropriation of trade secrets claim,

12   and various aiding and abetting claims all stemming from allegations that MGA

13   cherry-picked certain high-ranking Mattel executives in foreign markets (many also

14   named as defendants in the amended complaint) or designers (namely, Bryant),

15   and then enticed or encouraged those same individuals to steal various trade and

16   proprietary secrets (be it sales plans, sales projections, customer profiles, or

17   intellectual property) from Mattel and hand them over to MGA before going to work

18   at MGA.

19         Moreover, the amended complaint expands upon the existing breaches of

20   contract and fiduciary duty claims in the original complaint by expanding the

21   universe of former employees (namely, the cherry-picked executives) to whom

22   those claims now apply.

23         Finally, Mattel now makes plain what was always lurking in its original

24   complaint — a copyright claim, but one directed not only to Bryant but also to MGA,

25   MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.

26   Moreover, Mattel characterizes its copyright claim somewhat differently from that at

27   issue in Bryant's declaratory relief action: "The Amended Complaint does not

28   include a claim for infringement of copyrights in Toon Teens, but rather

4

**EXHIBIT 7-43**

1   infringement of copyrights in Bratz." (Reply to MGA Opp. at 11).  Toward that end,

2   Mattel has recently filed copyright registrations with the U.S. Copyright Office

3   claiming ownership in various BRATZ doll design drawings penned by Bryant.

4   A.      ANALYSIS

5           Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6   pleading has been served, "a party may amend the party's pleading only by leave of

7   court or by written consent of the adverse party; and leave shall be freely given

8   when justice so requires."  With no consent to Mattel's proposed filing proffered by

9   MGA and Bryant, determining whether to grant Mattel leave to file an amended

10  complaint is gauged by looking to the familiar formulation of factors set forth by the

11  Supreme Court in Forman v. Davis:

12              In the absence of any apparent or declared
                reason—such as undue delay, bad faith or dilatory
13              motive on the part of the movant, repeated failure to
                cure deficiencies by amendments previously allowed,
14              undue prejudice to the opposing party by virtue of
                allowance of the amendment, futility of amendment,
15              etc.—the leave sought should, as the rules require, be
                'freely given.' Of course, the grant or denial of an
16              opportunity to amend is within the discretion of the
                District Court, but outright refusal to grant the leave
17              without any justifying reason appearing for the denial is
                not an exercise of discretion; it is merely abuse of that
18              discretion and inconsistent with the spirit of the Federal
                Rules.
19

20  371 U.S. 178, 182 (1962).

21          MGA and Bryant offer the following reasons for denying Mattel leave to

22  amend:  (1) Mattel has long known of the factual predicates underlying its copyright

23  and intentional interference claims but delayed in asserting them; (2) the proposed

24  amendment to add the copyright claim and the intentional interference claims

25  (against the new defendants) are futile because they are barred by the applicable

26  statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27  because of its prior public disavowal of an intent to assert such a claim; and (4)

28  MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

**EXHIBIT 7-44**

1   suit because of alleged spoliation of evidence issues involving Mattel's ZEUS

2   computer system used by doll designers at Mattel and its e-mail system.  None of

3   these arguments are persuasive.

4         1.   <u>Awareness of Factual Predicate for Copyright and Intentional</u>

5            <u>Interference Claims</u>

6         MGA argues that Mattel has long known about the factual predicate for its

7   recently added copyright claim, observing that, "[o]ver four years ago, in August

8   2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant

9   created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'

10  that project — while still employed at Mattel." (MGA Opp. at 9).  Similarly, MGA

11  argues that Mattel has long known of the factual predicate for its intentional

12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own

13  admission, it learned in November 2003 — more than three years ago — that

14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at

15  Mattel." (MGA Opp. at 11-12).

16        At the outset it must be observed that "[m]ere delay in proffering an

17  amendment does not justify denying leave to amend." <u>Sierra Club v. Union Oil Co.</u>

18  <u>of California</u>, 813 F.2d 1480, 1493 (9th Cir. 1987), <u>vacated on other grounds by</u>,

19  485 U.S. 931 (1988), <u>and reinstated by</u>, 853 F.2d 667 (9th Cir. 1988).  Seizing upon

20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would

21  require discovery to be reopened after summary judgment motions have been filed"

22  has the Ninth Circuit found the denial of leave "justified" based on the passage of

23  time alone. (Reply to MGA Opp. at 3).  That is incorrect.  There is a line of cases

24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should

25  know of the facts underlying the amendment when the original complaint is filed,

26  the motion to amend may be denied." <u>Sierra Club</u>, 813 F.2d at 1493 (citing <u>Jordan</u>

27  <u>v. County of Los Angeles</u>, 669 F.2d 1311, 1324 (9th Cir. 1982)).  And, recently, the

28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

6

**EXHIBIT 7-45**