**MATTEL V. CARTER BRYANT
AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|------------------------------------------|-----------|
| 7. | Handwritten Notes | July 25, 2004 | Michael Moore | -- | Attorney notes regarding attorney client meeting. | Attorney Client Privilege<br><br>Attorney Work Product |
| 8. | Mattel In-House Legal Document | 2001 | Product Legal Administration | -- | Document regarding product licensing. | Attorney Client Privilege<br><br>Attorney Work Product |
| 9. | Licensor Approval Form | June 13, 2000 | Jennifer Klausner | Bruce Brown | Document regarding product licensing. | Attorney Client Privilege<br><br>Attorney Work Product |
| 10. | Licensor Approval Form | June 13, 2000 | Jennifer Klausner | Marty Garcia | Document regarding product licensing. | Attorney Client Privilege<br><br>Attorney Work Product |
| 11. | Licensor Approval Form | June 13, 2000 | Elisabeth Edwards | Jennifer Klausner | Document regarding product licensing. | Attorney Client Privilege<br><br>Attorney Work Product |
| 12. | Attorney Notes | November 20, 2003 | Michael Moore | -- | Attorney notes regarding Cityworld. | Attorney Client Privilege<br><br>Attorney Work Product |

**EXHIBIT 9-90**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|-------------------------------------------|-----------|
| 13. | Attorney Notes | November 19, 2003 | Michael Moore | -- | Handwritten notes regarding Cityworld. | Attorney Client Privilege<br><br>Attorney Work Product |
| 14. | Attorney Notes | November 18, 2003 | Michael Moore | -- | Handwritten notes regarding Cityworld. | Attorney Client Privilege<br><br>Attorney Work Product |
| 15. | Attorney Notes | November 18, 2003 | Michael Moore | -- | Handwritten notes regarding Cityworld call. | Attorney Client Privilege<br><br>Attorney Work Product |
| 16. | Memorandum | September 26, 2003 | Adelle Jones | Michael Moore | Memorandum containing attorney work product regarding Cityworld. | Attorney Client Privilege<br><br>Attorney Work Product |
| 17. | Attorney Notes | September 18, 2003 | Michael Moore | -- | Attorney notes regarding Cityworld. | Attorney Client Privilege<br><br>Attorney Work Product |
| 18. | Email | May 11, 2000 | Stephanie Ayala | Liz Arriola | Email regarding legal and licensing issues. | Attorney Client Privilege<br><br>Attorney Work Product |

**EXHIBIT 9-91**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|---|---|---|---|---|---|---|
| 19. | Email | January 18, 2000 | Jennifer Klausner | Mina Mirkazemi Christina Tomiyama Liz Arriola Melanie Chabra Pam Roberts | Email regarding licensor approval. | Attorney Client Privilege<br><br>Attorney Work Product |
| 20. | Email | May 10, 2000 | Jennifer Klausner | Deborah Ava<br><br>cc: Mark Donham Mary Ellen Trimble Joann Green Ron Langsdorf Stephanie Ayala Liz Arriola Anna Ziss Patton | Email regarding packaging. | Attorney Client Privilege<br><br>Attorney Work Product |

**EXHIBIT 9-92**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

**SUPPLEMENTAL PRIVILEGE LOG**

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|------------------------------------------|-----------|
| 21. | Email | May 10, 2000 | Jennifer Klausner | Deborah Ava<br><br>cc: Mark Donham<br>Mary Ellen Trimble<br>Joann Green<br>Ron Langsdorf<br>Stephanie Ayala<br>Liz Arriola<br>Anna Ziss<br>Patton | Email regarding packaging. | Attorney Client Privilege<br><br>Attorney Work Product |
|  | Email | May 10, 2000 | Deborah Ava | Jennifer Klausner<br><br>cc: Mark Donham<br>Mary Ellen Trimble<br>Joann Green<br>Ron Langsdorf<br>Stephanie Ayala<br>Liz Arriola<br>Anna Ziss<br>Patton |  |  |
| 22. | Email | November 11, 2003 | Richelle Savage | Michael Zeller<br><br>cc: Michael Moore | Email regarding letters from Cityworld (attached letters produced). | Attorney Client Privilege<br><br>Attorney Work Product |

**EXHIBIT 9-93**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

**SUPPLEMENTAL PRIVILEGE LOG**

**FEBRUARY 23, 2007**

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|---|---|---|---|---|---|---|
| 23. | Redacted Document<br><br>M 0012680-M 0012696 | January 7, 1995 - December 30, 1995 | -- | -- | Contractor List - Budget Center #, Total Billed, Budget Center Sub-total, contractor name/title redacted. | Attorney Client Privilege (and also non-responsive) |
| 24. | Redacted Document<br><br>M013842-M013847 | June 11, 1996<br><br>June 11, 1996 | Bill Bertini<br><br>Cathy A. Takemura | Cathy A. Takemura<br><br>Wendy Chisam - Planning | Email regarding legal and licensing issues / Legal advice redacted. | Attorney Client Privilege<br><br>Attorney Work Product |
| 25. | Redacted Document<br><br>M014357 | June 28, 2000 | Human Resources | Hastey Sullivan | Memo regarding salary increase / Salary data redacted. | Third-Party Privacy<br><br>Non-responsive |
| 26. | Redacted Document<br><br>M014358 | August 3, 1998 | Human Resources | Hastey Sullivan | Memo regarding salary increase / Salary data redacted. | Third-Party Privacy<br><br>Non-responsive |
| 27. | Typed Notes | Undated | Karen Ewing | -- | Counsel comments on draft press release and attorney handwritten notes. | Attorney Client Privilege<br><br>Attorney Work Product |
| 28. | Email | | Karen Ewing | Sally Dail | Email string containing counsel's comments on draft advertising copy. | Attorney Client Privilege<br><br>Attorney Work Product |

**EXHIBIT 9-94**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|---|---|---|---|---|---|---|
| 29. | Email (Redacted) M0074400 | Undated | De Anda, Richard | Kaye, Alan | Communication regarding former employee / Excerpts reflecting opinion of legal counsel redacted. | Attorney Client Privilege<br><br>Attorney Work Product |
| 30. | Email | April 28, 2003 | Shuttleworth, Tiffany J | Meyer, Cynthia B | Email string containing communication with legal counsel regarding My Scene video. | Attorney Client Privilege |
| 31. | Legal Markings Document | May 5, 2003 | Product Legal Administration | -- | Prepared by legal counsel regarding packaging. | Attorney Client Privilege<br><br>Attorney Work Product |
| 32. | Email (Redacted) M0074518 | July 16, 2003 | Park, Cassidy L. | Moore, Michael | Communication with legal counsel regarding former employee / Communication with legal counsel redacted. | Attorney Client Privilege |
| 33. | Facsimile with Attachments | July 30, 2003 | Iser, Lawrence Y. (counsel at Greenberg Glusker) | De Anda, Richard | Communication by legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |
| 34. | Email | August 4, 2003 | Nelson, Lisa | Fisher, Yvonne<br>Hooks, Brian | Communication with legal counsel regarding advertising. | Attorney Client Privilege |
| 35. | Email | September 8, 2003 | De Anda, Richard | Moore, Michael | Communication with legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |

**EXHIBIT 9-95**

**MATTEL V. CARTER BRYANT
AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|------------------------------------------|-----------|
| 36. | Advertising Review Form | October 24, 2003 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Patel, Tina | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 37. | Advertising Review Form | December 5, 2003 | International & Regulatory Law Group | Luk, Isaac | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 38. | Advertising Review Form | December 11, 2003 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Kuchem, Kara | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 39. | Advertising Review Form | December 16, 2003 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Kuchem, Kara | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 40. | Email with Attachments | December 16, 2003 | Fisher, Yvonne | Leavitt, Margaret-Ann Weitekamp, Rosina Grove, Norma Haag, Debbie Gomez, Jean Kuchem, Kara | Communication by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 41. | Email | January 12, 2004 | Leavitt, Margaret-Ann | Fisher, Yvonne | Email string containing communication with legal counsel regarding advertising. | Attorney Client Privilege |

**EXHIBIT 9-96**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|------------------------------------------|-----------|
| 42. | Affidavit | January 14, 2004 | Bruck, Lisa P | Product Legal Department | Communication with legal counsel regarding advertising. | Attorney Client Privilege |
| 43. | Affidavit | January 14, 2004 | Bruck, Lisa P | Product Legal Department | Communication with legal counsel regarding advertising. | Attorney Client Privilege |
| 44. | Email | January 14, 2004 | Leavitt, Margaret-Ann | Sutherland, Jessica Fisher, Yvonne | Email string containing communication with legal counsel regarding advertising. | Attorney Client Privilege |
| 45. | Memo | January 17, 2004 | Leavitt, Margaret-Ann | Pallet-Bruck, Lisa | Communication containing advice from legal counsel on advertising. | Attorney Client Privilege |
| 46. | Memo | January 17, 2004 | Leavitt, Margaret-Ann | Pallet-Bruck, Lisa | Communication containing advice from legal counsel on advertising. | Attorney Client Privilege |
| 47. | Email | January 29, 2004 | Fisher, Yvonne | Welch, Merle Leavitt, Margaret-Ann Weitekamp, Rosina Grove, Norma Cabasso, Marian Hanahan, Jeanne Haag, Debbie Gomez, Jean Kuchem, Kara | Email string containing communication by legal counsel regarding advertising. | Attorney Client Privilege |
| 48. | Affidavit | February 2, 2004 | Bruck, Lisa P | Product Legal Department | Communication with legal counsel regarding advertising. | Attorney Client Privilege |
| 49. | Advertising Review Form | April 28, 2004 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Kuchem, Kara | Prepared by legal counsel regarding advertising. | Attorney Client Privilege<br><br>Attorney Work Product |

**EXHIBIT 9-97**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|------------------------------------------|-----------|
| 50. | Investigative Log (Redacted) M0074405 | June 17, 2003 - May 10, 2004 | De Anda, Richard | -- | Investigative Log / Entry reflecting communication with legal counsel redacted. | Attorney Client Privilege |
| 51. | Chronological Record (Redacted) M0074372 | March 15, 2002 - June 21, 2004 | De Anda, Richard | -- | Chronological Record / Entry reflecting communication with legal counsel redacted. | Attorney Client Privilege / Attorney Work Product |
| 52. | Email with Attachments | August 30, 2004 | Neumann, Jeanette | Tonche, Lila | Communication with and documents prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 53. | Advertising Review Form | August 31, 2004 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Kuchem, Kara | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 54. | Advertising Review Form | August 31, 2004 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Kuchem, Kara | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 55. | Advertising Review Form | September 10, 2004 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Kuchem, Kara | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |

**EXHIBIT 9-98**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|------------------------------------------|-----------|
| 56. | Advertising Review Form | September 10, 2004 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Kuchem, Kara | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 57. | Investigative Log (Redacted) M0074945 | September 20, 2004 | De Anda, Richard | – | Investigative Log / Entry reflecting communication with legal counsel redacted. | Attorney Client Privilege / Attorney Work Product |
| 58. | Advertising Review Form | October 5, 2004 | International & Regulatory Law Group | Haag, Debbie Gomez, Jean Kuchem, Kara | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 59. | Memo with Attachments | October 28, 2004 | Neumann, Jeanette | Tonche, Lila | Communication with and documents prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 60. | Advertising Review Form | October 28, 2004 | International & Regulatory Law Group | Luk, Isaac | Prepared by legal counsel regarding advertising. | Attorney Client Privilege / Attorney Work Product |
| 61. | Email | November 3, 2004 | Tonche, Lila | McCarthy, Lori | Communication by legal counsel regarding commercials. | Attorney Client Privilege |

**EXHIBIT 9-99**

MATTEL V. CARTER BRYANT
AND CONSOLIDATED CASES

SUPPLEMENTAL PRIVILEGE LOG

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|-------------------------------------------|-----------|
| 62. | Typed Notes | November 5, 2004 | International & Regulatory Law Group | -- | Prepared by legal counsel regarding advertising. | Attorney Client Privilege<br><br>Attorney Work Product |
| 63. | Email | October 28, 2005 | Thomas, Jill | De Anda, Richard | Communication by legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |
| 64. | Email | October 28, 2005 | Zeller, Michael T. | Thomas, Jill<br>De Anda, Richard<br>O'Connor, Brian | Communication by legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |
| 65. | Email | October 28, 2005 | Zeller, Michael T. | Thomas, Jill<br>De Anda, Richard<br>O'Connor, Brian | Communication by legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |
| 66. | Email | November 3, 2005 | Thomas, Jill | De Anda, Richard<br>O'Connor, Brian | Communication by legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |
| 67. | Email | November 7, 2005 | De Anda, Richard | Ravelo, Oany | Communication reflecting communication with legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |

**EXHIBIT 9-100**

**MATTEL V. CARTER BRYANT**
**AND CONSOLIDATED CASES**

**SUPPLEMENTAL PRIVILEGE LOG**

FEBRUARY 23, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege |
|-----|---------------|------|-------------|-----------------|------------------------------------------|-----------|
| 68. | Letter | November 8, 2005 | Ristuccia, Alphonse V. | Zeller, Michael T. | Communication with legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |
| 69. | Letter | November 22, 2005 | Ristuccia, Alphonse V. | Krebs, Tania | Communication with legal counsel regarding former employee. | Attorney Client Privilege<br><br>Attorney Work Product |

2064397_V2 2 23 07 Consolidated Supplemental Priv Log (Final-Served).XLS          Page 13 of 13

**EXHIBIT 9-101**

BLUEBIRD (888) 4
OFFICE SUPPLIES   www.blue/b

**EXHIBIT 10**

Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, California 94111
Telephone:    (415) 774-2611
Facsimile:    (415) 982-5287

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>       Plaintiff,<br><br>     v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>       Defendant. | CASE NO. C 04-09049 SGL (RNBx)<br>JAMS Reference No. 1100049530<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727<br><br>**ORDER RE IN CAMERA REVIEW OF GLOBAL SECURITY FILES** |
| CONSOLIDATED WITH<br>MATTEL, INC. v. BRYANT and<br>MGA ENTERTAINMENT, INC. v. MATTEL,<br>INC. | |

## I. INTRODUCTION

On May 15, 2007, Mattel, Inc. ("Mattel") submitted for *in camera* review fourteen documents from Mattel's Global Security files that were redacted or withheld from production on the grounds of the attorney-client privilege and the work product doctrine. Mattel also submitted a privilege log and the declaration of Richard De Anda in support of its claims of privilege. Having reviewed the documents, privilege log and declaration of Mr. De Anda, Mattel's claims of

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

1

EXHIBIT 10-102

1  privilege are sustained as to privilege log entries 29, 33, 35, 51, 57, 63, 64, 65, 66, 67, 68, and 69,

2  and overruled as to privilege log entries 32 and 50.

3                                    II. DISCUSSION

4  A. Claims Based Upon Work Product Doctrine

5        Although Mattel withheld the disputed documents based upon both the attorney-client

6  privilege and work product doctrine, Mr. De Anda's declaration addresses only the elements of

7  the attorney-client privilege.  He does not assert that any of the fourteen documents in dispute

8  were prepared in anticipation of litigation.  Decl. of Mr. De Anda at ¶7.  Therefore the claims of

9  privilege based upon the work product doctrine are overruled as to all of the fourteen documents

10 in dispute.

11 B. Claims Based Upon Attorney-Client Privilege

12       Mattel claims that each of the fourteen documents at issue is protected by the attorney-

13 client privilege.  The attorney-client privilege protects an attorney's communication of legal

14 advice to his client, as well as the client's communication of information to the attorney "to

15 enable him to give sound and informed advice."  Upjohn Co. v. United States, 449 U.S. 383, 390

16 (1981).  The protection extends only to communications; however, it does not extend to the facts

17 underlying privileged communications.  Id. at 395-96.  The Ninth Circuit has described the

18 elements of the attorney-client privilege as follows: "(1) When legal advice of any kind is sought

19 (2) from a professional legal adviser in his or her capacity as such, (3) the communications

20 relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance,

21 permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the

22 protection be waived."  United States v. Martin, 278 F.3d 988, 999 (9th Cir.2002).  The party

23 asserting the privilege has the burden of establishing that the privilege applies to a particular

24 document or set of documents.  In re Grand Jury Investigation, 974 F.2d 1068, 1070 (9th Cir.

25 1992).

26       When a party withholds information otherwise discoverable under the Federal Rules of

27 Civil Procedure by claiming that it is privileged or subject to protection as trial preparation

28 material, "the party shall make the claim expressly and shall describe the nature of the documents,

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

                                                                                              2

EXHIBIT 10-103

1    communications, or things not produced or disclosed in a manner that, without revealing

2    information itself privileged or protected, will enable other parties to assess the applicability of

3    the privilege or protection." Fed.R.Civ.P. 26(b)(5).

4         Mr. De Anda states in his declaration that privilege log entries 29, 33, 35, 50, 51, 57, 63,

5    64, 65, 66, and 67 "constituted or recorded confidential communications between me and either

6    in-house counsel for Mattel or outside counsel for Mattel in which counsel conveyed to me legal

7    advice." Decl. of Mr. De Anda at ¶7. A review of the documents confirms Mr. De Anda's

8    representations as to all of these privilege log entries, except entry 50. Privilege log entry 50 is an

9    "investigative log," which Mattel produced in redacted form. The portion that has been redacted

10   consists of a one line entry which indicates that Mr. De Anda may have had a meeting with

11   certain individuals at Mattel, including Mattel's in-house counsel. The one line entry does not

12   contain the substance of any communication whatsoever, much less the substance of a

13   confidential attorney-client privileged communication. Accordingly, Mattel's claims of attorney-

14   client privilege are sustained as to privilege log entries 29, 33, 35, 51, 57, 63, 64, 65, 66, and 67,

     and overruled as to privilege log entry 50.

15        Mr. De Anda states in his declaration that the e-mail identified as privilege log entry 32

16   "was a confidential communication between Mr. Cassidy Park, a Mattel employee, and in-house

17   counsel for Mattel." Decl. of Mr. De Anda at ¶7. Mattel produced privilege log entry 32 in

18.  redacted form. The redacted portion consists of a single line, "FYI, attached is Mercedeh's

19   resume." Mattel has failed to establish that this single line of text is a confidential attorney-client

20   communication for the purpose of giving or receiving legal advice. Therefore, Mattel's claim of

21   privilege is overruled as to privilege log entry 32.

22        The last two documents in dispute are privilege log entries 68 and 69. Mr. De Anda states

23   in his declaration that entries 68 and 69 "are communications from a private investigator to

24   outside counsel for Mattel relating to work that investigator performed at counsel's request."

     Decl. of Mr. De Anda at ¶7. There are circumstances under which communications between a

25   client's attorney and a third party who assists the attorney in rendering legal advice are protected

26   by the attorney-client privilege. See e.g. U.S. v. Kovel, 296 F.2d 918 (2nd Cir. 1961). It appears

27

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                                            3

EXHIBIT 10-104

1    these transmittal letters were communications made for the purpose of giving legal advice.

2    Therefore, Mattel's claims of privilege are sustained as to privilege log entries 68 and 69.

3                         IV. CONCLUSION

4        For the reasons set forth above, Mattel's claims of work product are overruled as to all of

5    the fourteen documents in dispute.  Mattel's claims of attorney-client privilege are sustained as to

6    privilege log entries 29, 33, 35, 51, 57, 63, 64, 65, 66, 67, 68, and 69, and overruled as to

7    privilege log entries 32 and 50.  Mattel shall produce privilege log entries 32 and 50 without

8    redactions within ten 10 days.

9        Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

10   Master, Mattel shall file this Order with the Clerk of Court forthwith.

11

12   Dated: July 10, 2007

13                                   HON. EDWARD A. INFANTE (Ret.)
                                       Discovery Master

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

                                                                   4

**EXHIBIT 10-105**

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on July 11, 2007,
I served the attached ORDER RE IN CAMERA REVIEW OF GLOBAL SECURITY FILES
in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Michael C. Keats, Esq. | O'Melveny & Myers LLP | mkeats@omm.com |
| Kendall Burr, Esq. | O'Melveny & Myers LLP | kburr@omm.com |
| Melanie Bradley, Esq. | O'Melveny & Myers LLP | mbradley@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that
the above is true and correct.

Executed on July 11, 2007, at San Francisco, California.

_Sandra Chan_

Sandra Chan

**EXHIBIT 10-106**

**EXHIBIT 11**

7/18/03 WSJ A1                                                                            Page 2
7/18/03 Wall St. J: A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Friday, July 18, 2003

Dolled Up: To Lure Older Girls, Mattel Brings In
Hip-Hop Crowd
---
It Sees Stalwart Barbie Lose Market Share, So
'Flavas' Will Take on the 'Bratz'
---
Battle of the Big Heads
By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8- to 12- year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**EXHIBIT 11-107**

M 0012536

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 3

that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories, she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet — they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**EXHIBIT 11-108**

M 0012537

7/18/03 WSJ A1                                                                        Page 4
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips, as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights -- meaning separate molds -- and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self- expression," she says.

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**EXHIBIT 11-109**                              M 0012538

7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11 body piercings and her mud wrestling-themed MTV video called "Dirty."It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."

---- INDEX REFERENCES ----

COMPANY:          KB Holdings LLC (KBTY); Mattel Inc (MATL)

NEWS SUBJECT:          (Marketing (C31); Market Share (C313); Corporate/Industrial News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice - Consumer Products (REQRCP); Editor's Choice - Industry Trends/Analysis (REQR))

INDUSTRY:          (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

REGION:          (North American Countries (NAMZ); United States (USA); United States - California (USCA); Northeast U.S. (USE); United States - Massachusetts (USMA); Western U.S. (USW))

OTHER INDEXING:    Marketing; Market Share; Page-One Story; Content Types; Corporate/Industrial News; United States - California; United States - Massachusetts; United States; Northeast U.S.; Western U.S.; North American Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores; Consumer Products;

Media; Consumer Cyclical; Newswire More Code; Newswire End Code; All Entertainment & Leisure; Limited Product Specialty Retailers; Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index; S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

Word Count: 2217

7/18/03 WSJ A1

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**EXHIBIT 11-110**                    M 0012539

**EXHIBIT 12**

1



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

| | |
|---|---|
| CARTER BRYANT, INDIV, | ) |
| PLAINTIFF, | ) |
| VS. | ) NO. ED CV 04-09049 |
| | ) (LEAD LOW NUMBER) |
| MATTEL, INC., | ) |
| DEFENDANTS. | ) |
| AND RELATED ACTIONS, | ) |

**CERTIFIED COPY**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, JANUARY 8, 2007

10:26 A.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
(951) 274-0844
CSR11457@SBCGLOBAL.NET

1-8-07          ED CV 04-09049

**EXHIBIT 12-111**

2

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

 4

 5                       QUINN EMANUEL
                         BY:  JOHN B. QUINN
 6                       BY:  MICHAEL T. ZELLER
                         865 S. FIGUEROA STREET,
 7                       10TH FLOOR
                         LOS ANGELES, CALIFORNIA  90017
 8                       (213) 624-7707

 9

10   ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
     CARTER BRYANT:
11
                         LITTLER MENDELSON
12                       BY:  KEITH A. JACOBY
                         2049 CENTURY PARK EAST,
13                       FIFTH FLOOR
                         LOS ANGELES, CALIFORNIA  90067
14                       (310) 553-0308

15

16   ON BEHALF OF MGA ENTERTAINMENT:

17                       O'MELVENY & MYERS LLP
                         BY:  DALE CENDALI
18                       BY:  DIANA M. TORRES
                         400 SOUTH HOPE STREET
19                       LOS ANGELES, CALIFORNIA  90071-2899
                         (213) 430-6000
20

21

22

23

24

25
```

1-8-07              ED CV 04-09049

**EXHIBIT 12-112**

3

```
 1         RIVERSIDE, CALIFORNIA; MONDAY, JANUARY 8, 2007; 10:26 A.M.

 2                           --oOo--

 3              THE CLERK:  CALLING CALENDAR ITEM NUMBER 6, IN THE

 4    MATTER OF PLAINTIFF CARTER BRYANT VERSUS DEFENDANT MATTEL,

 5    INC., CASE NUMBER 04-9049.                                    10:25

 6              MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES.

 7              MR. QUINN:  GOOD MORNING, YOUR HONOR.

 8              JOHN QUINN AND MIKE ZELLER APPEARING FOR PLAINTIFF

 9    MATTEL.

10              THE COURT:  MR. QUINN, GOOD MORNING.               10:26

11              MS. CENDALI:  GOOD MORNING, YOUR HONOR.

12              DALE CENDALI FROM O'MELVENY & MYERS REPRESENTING MGA

13    AND ISAAC LARIAN.  WITH ME IS MY COLLEAGUE DIANA TORRES.

14              THE COURT:  GOOD MORNING.

15              MR. JACOBY:  GOOD MORNING, YOUR HONOR.             10:26

16              KEITH JACOBY REPRESENTING CARTER BRYANT.

17              THE COURT:  GOOD MORNING.

18              WE'RE ON CALENDAR FOR MATTEL'S MOTION FOR LEAVE TO

19    AMEND THE COMPLAINT IN THE -9059 MATTER, WHICH WAS THE FIRST OF

20    THE TWO MATTERS FILED HERE.                                  10:26

21              THE COURT HAS REVIEWED ALL OF THE PAPERS AND

22    SUBMISSIONS.

23              MR. QUINN, I GUESS THE PRIMARY ISSUE I'D LIKE TO

24    ADDRESS IS THE ISSUE THAT YOU RAISE ABOUT THE FACT THAT WE

25    DON'T HAVE A SCHEDULING ORDER IN THIS CASE.  AND THAT NEEDS TO 10:26
```

**EXHIBIT 12-113**

4

1   BE RECTIFIED.  AND I'VE BEEN TRYING TO THINK CONCEPTUALLY OF

2   WHAT'S THE BEST WAY TO STRUCTURE THESE TWO CASES.

3        TO MY WAY OF THINKING, THE FIRST ISSUE THAT WOULD BE

4   MOST HELPFUL TO RESOLVE, I THINK, WOULD BE THE OWNERSHIP OF

5   BRATZ; WHO OWNS BRATZ; WHETHER IT IS MATTEL OR WHETHER IT IS      10:27

6   MGA AND BRYANT; WHO OWNS BRATZ?

7        THAT SEEMS TO BE THE GRAVAMEN OF THE -9059 CASE.

8        NOW, THE -2727 CASE, YOU HAVE ALL OF THE VARIOUS

9   COMMERCIAL DISPUTES WHICH STEM FROM THAT, BUT IN LARGE MEASURE,

10  ONCE WE ESTABLISH THE OWNERSHIP OF BRATZ, IT WOULD SEEM THAT     10:27

11  MANY OF THOSE ISSUES MIGHT FALL INTO LINE.

12        WHAT YOU'RE PROPOSING TO AMEND THE -9059 CASE WITH,

13  AS YOU BASICALLY CONCEDE IN YOUR PAPERS, IS ALSO A DEFENSE TO

14  THE -2727 CASE.  AND I GUESS TO MY WAY OF THINKING, WHY ISN'T

15  THIS BETTER BROUGHT OR MORE CLEANLY BROUGHT AS AN AMENDED        10:27

16  ANSWER AND COUNTERCLAIM ON THE -2727 CASE, INSTEAD OF

17  COMPLICATING WHAT OTHERWISE WOULD BE A FAIRLY STRAIGHTFORWARD

18  -9059 CASE ADDRESSING THE OWNERSHIP ISSUES?

19        SO THAT'S KIND OF WHERE I'M GOING AT THIS POINT,

20  BECAUSE A LOT OF THE ISSUES AND TERMS -- AND I'LL ADDRESS        10:28

21  THESE, CERTAINLY, WITH THE DEFENSE AND GIVE THEM AN

22  OPPORTUNITY -- THE PREJUDICE ON THE DELAY, THE VARIOUS OTHER

23  FACTORS, I THINK, RULE PROBABLY IN FAVOR OF ALLOWING THE

24  AMENDMENT.  BUT THE FACTOR THAT'S REALLY STOPPING ME OR HOLDING

25  ME UP FROM DOING THAT WOULD BE THE WAY THIS KIND OF COMPLICATES  10:28

5

1    HOW I SEE THE STRUCTURE OF THIS CASE GOING FORWARD.

2        IF YOU WOULD ADDRESS THAT PRIMARY ISSUE, I'D

3    APPRECIATE IT, AND THEN I'LL CERTAINLY HEAR FROM THE DEFENSE AS

4    WELL.

5        MR. QUINN:  YES, YOUR HONOR.                           10:28

6        THE COURT:  DID MY QUESTION MAKE SENSE?

7        MR. QUINN:  YES, THE QUESTION DID MAKE SENSE, YOUR

8    HONOR.

9        I THINK IT IS TRUE THAT THERE ARE ELEMENTS OF THE

10   PROPOSED AMENDED COMPLAINT WHICH WOULD BE IN THE DEFENSE, WOULD   10:28

11   BE IN THESE CONSOLIDATED PROCEEDINGS IN ANY EVENT, WITH RESPECT

12   TO THE COMPLAINTS THAT MGA FILED.  BUT THAT'S NOT TRUE OF ALL

13   OF THE CLAIMS.

14       IT'S PARTICULARLY TRUE WITH RESPECT TO THE TRADE

15   SECRETS CLAIM, WHICH REALLY WOULD COME UP BY WAY OF DEFENSE TO   10:29

16   MANY OF THE THINGS THAT MGA ALLEGES.

17       BUT I THINK AT THE CORE, I WOULD SAY THERE'S TWO

18   BASIC PROBLEMS WITH TRYING TO SIMPLY BIFURCATE THE CASE, AND I

19   DON'T MEAN THAT IN A TECHNICAL SENSE.

20       THE COURT:  I UNDERSTAND.                              10:29

21       MR. QUINN:  THERE'S TWO ISSUES; FIRST, THE BASIC

22   ISSUE OF COPYRIGHT INFRINGEMENT, WHICH IS THE CORE ISSUE

23   RELATING, OBVIOUSLY, TO BRATZ.  AND BOTH CARTER BRYANT AND MGA,

24   IF THE AMENDMENT WERE ALLOWED, WOULD BE DEFENDANTS TO THAT

25   COPYRIGHT INFRINGEMENT CASE; SO THAT'S GOING TO -- T'S        10:29

1-8-07          ED CV 04-09049

**EXHIBIT 12-115**

6

```
 1   IMPOSSIBLE JUST TO BIFURCATE THE CASE AND FOCUS SIMPLY ON
 2   OWNERSHIP.  WE HAVE TO INCLUDE COPYRIGHT INFRINGEMENT.
 3         MAYBE THAT IS PART OF WHAT THE COURT HAD IN MIND IN
 4   TERMS OF OWNERSHIP.
 5         THE COURT:  LET ME ASK YOU ABOUT YOUR COPYRIGHT       10:30
 6   INFRINGEMENT CLAIM.
 7         WHAT IS YOUR PRIMARY ARGUMENT?  IS IT THAT
 8   CARTER BRYANT WAS EXPOSED AT MATTEL TO INFORMATION THAT HE THEN
 9   TOOK AND COPIED AT MGA?  OR WHAT MATERIAL IS IT THAT HE WAS
10   EXPOSED TO?  IS IT THE TEEN TOONS?                          10:30
11         MR. QUINN:  YOUR HONOR, THE FOCUS OF THE COPYRIGHT
12   INFRINGEMENT CLAIM IS REALLY ON THE BRATZ -- CERTAIN DRAWINGS
13   THAT MR. BRYANT HIMSELF CREATED FOR THE DOLL WHILE HE WAS
14   WORKING FOR MATTEL AND WHILE HE WAS A PARTY TO A CONTRACT WITH
15   MATTEL WHERE HE AGREED THAT ANYTHING OF THAT NATURE WHICH HE   10:30
16   CREATED WHILE HE WORKED FOR MATTEL WOULD BE OWNED BY MATTEL.
17   SO WHOLLY APART FROM -- AND I'M -- PUTTING COMPLETELY ASIDE THE
18   ISSUE OF WHETHER HE MAY HAVE BEEN EXPOSED TO OTHER THINGS THAT
19   INSPIRED HIM.  THAT MAY WELL TURN OUT TO BE THE CASE.  BUT WHAT
20   WE ARE ALLEGING AT CORE, YOUR HONOR --                      10:31
21         THE COURT:  YOU TOLD ME THE LAST TIME, HOWEVER, THAT
22   THE TOONS TEEN --
23         MR. QUINN:  WE'RE NOT SUING FOR COPYRIGHT
24   INFRINGEMENT WITH RESPECT TO TOONS TEEN, THAT'S CORRECT.  THE
25   COURT'S MEMORY IS EXCELLENT ON THAT.  WE'RE STILL NOT ASSERTING  10:31
```

**EXHIBIT 12-116**

7

1   THAT.

2          BUT HE CREATED THESE DRAWINGS.  HE HAD A CONTRACT

3   THAT SAID THAT ANY SUCH DESIGNS YOU CREATE, WE OWN.  YOUR

4   HONOR, OUR POSITION IS THAT THE BRATZ DRAWINGS, THE

5   THREE-DIMENSIONAL BRATZ PRODUCT, IS A WORK THAT IS DERIVATIVE          10:31

6   OF THOSE DRAWINGS WHICH WE OWN.

7          THE COURT:  SO IT'S ALSO INTERTWINED WITH THIS ISSUE

8   OF THE OWNERSHIP OF BRATZ?

9          MR. QUINN:  IT'S PART OF THE OWNERSHIP OF BRATZ, TO

10  BE SURE.                                                              10:31

11         BUT ALSO WHAT WE FOUND -- AND A LOT OF THIS RELATES

12  TO EVENTS --

13         THE COURT:  AND WOULDN'T, THEN, IF THE FIRST PHASE,

14  AS I DESCRIBE IT, AS A BIFURCATED TRIAL, ESTABLISHED OWNERSHIP

15  OF BRATZ IN MGA, WOULDN'T THAT UNDERMINE OR RESOLVE THE               10:31

16  COPYRIGHT ISSUES AS WELL?

17         MR. QUINN:  IF THE COURT FOUND THAT THEY WERE -- IF

18  IT WERE DETERMINED THAT HE DID NOT CREATE THESE DRAWINGS WHILE

19  HE WORKED AT MATTEL, THAT MATTEL HAD NO CLAIM TO OWNERSHIP OF

20  THE DRAWINGS, THEN IT WOULD BE HARD FOR ME TO SEE HOW A              10:32

21  COPYRIGHT CLAIM COULD BE PURSUED.

22         THE COURT:  AND CONVERSELY, IF THE COURT WERE TO

23  FIND -- IF WE ULTIMATELY FOUND THAT THEY WERE MATTEL'S, THAT

24  WOULD -- IF NOT RESOLVE, IT WOULD GO A LONG WAY IN RESOLVING

25  THE COPYRIGHT CLAIM AS WELL.                                         10:32

8

1       MR. QUINN:  I THINK IT WOULD.  THAT WOULD OBVIOUSLY

2   BE A KEY ELEMENT OF THE COPYRIGHT CLAIM.

3       THE COURT:  AGAIN, DOESN'T THIS SUGGEST HOLDING OFF

4   ON THE COPYRIGHT AND PUTTING THAT IN THAT -2727 CASE?

5       MR. QUINN:  I THINK THAT WOULD BE VERY DIFFICULT TO          10:32

6   DO, YOUR HONOR.

7       THE COURT:  WHY IS THAT?

8       MR. QUINN:  BECAUSE IT RELATES TO ISSUES THAT ARE

9   ISSUES IN THE CASE -- I MEAN, THE OWNERSHIP OF BRATZ HAS GOT TO

10  BE DETERMINED; WHEN HE CREATED THAT; WHETHER IT'S A DERIVATIVE      10:32

11  WORK.  THOSE ARE COPYRIGHTS.  THOSE WILL BE GOVERNED BY ISSUES

12  OF COPYRIGHT LAW.  AND IN THE ABSTRACT, DECIDING WHO OWNS

13  BRATZ, FIRST YOU HAVE TO DECIDE, WELL, WHAT'S BRATZ?  ARE WE

14  TALKING ABOUT THESE DRAWINGS, OR ARE WE TALKING ABOUT THE LATER

15  THREE-DIMENSIONAL EMBODIMENT WHICH IS ULTIMATELY SOLD TO THE       10:33

16  PUBLIC AS THE DOLL?

17      I DON'T SEE HOW THAT ISSUE CAN BE BIFURCATED.

18      BUT I GUESS ANOTHER ISSUE, AND PERHAPS A MORE

19  IMPORTANT ISSUE, YOUR HONOR, IS THAT SINCE THE ORIGINAL

20  COMPLAINT WAS FILED, WE HAVE FOUND -- AND THERE HAVE BEEN A        10:33

21  SERIES OF EVENTS THAT ARE SET FORTH IN THE COMPLAINT -- THAT

22  THE WHOLE EPISODE WITH RESPECT TO MR. BRYANT AND THE ORIGINAL

23  CREATION OF BRATZ WAS JUST ONE OF A SERIES OF EVENTS WHICH HAVE

24  HAPPENED.  THE ALLEGATIONS RELATING TO THE EVENTS IN MEXICO,

25  WHERE THERE WAS A WHOLESALE THEFT OF VIRTUALLY ALL OF MATTEL'S     10:34

9

1   INTELLECTUAL PROPERTY THAT WAS THERE, AND THE INFORMATION COMES

2   BACK TO THE UNITED STATES; THE SITUATION IN CANADA, WHERE AN

3   EMPLOYEE LEFT AND TOOK A THUMB DRIVE AND HAD ALL OF THAT

4   INFORMATION WITH HER; THE SITUATION OF MR. BRAUR, WHO TOOK WITH

5   HIM ALL OF -- VARIOUS TRADE SECRET INFORMATION, CERTAIN CONTACT         10:34

6   -- SENSITIVE CONTACT INFORMATION RELATING TO CUSTOMERS.  ALL OF

7   THAT, YOUR HONOR, IS A PATTERN OF RACKETEERING ACTIVITY.  IT'S

8   A RICO CLAIM.  AND THAT HAS TO BE ADDRESSED IN ONE PROCEEDING.

9        THERE'S A SUGGESTION IN THE OPPOSITION TO THE MOTION

10  BY MR. BRYANT THAT REALLY THIS IS UNFAIR TO HIM, FOR HIS CASE          10:34

11  TO BE PRESENTED AS PART OF THIS LARGER PATTERN OF EVENTS.

12       I THINK THE ANSWER TO THAT IS, IF THERE IS A RICO

13  CLAIM, IF THERE IS A PATTERN OF RACKETEERING ACTIVITY, IT'S NOT

14  AN ANSWER FOR ANY ONE PARTICIPANT IN THE ENTERPRISE TO SAY, I'M

15  PREJUDICED FOR THIS CASE AND MY CASE TO BE PRESENTED AS PART OF        10:35

16  THIS LARGER ENTERPRISE.  THAT'S SORT OF IN THE NATURE OF A RICO

17  CLAIM.  YOU CAN'T BIFURCATE IT.

18       THE COURT:  I UNDERSTAND.  AND I UNDERSTAND THAT

19  THESE ISSUES NEED TO BE PRESENTED AND LITIGATED.  I GUESS I'M

20  TRYING TO -- WHAT I WANT TO SEGUE INTO ULTIMATELY IS A SENSIBLE        10:35

21  SCHEDULING OF THESE MATTERS.  I DON'T WANT THESE CASES --

22  THEY'VE GONE ON FOR QUITE SOME TIME NOW, AND I KNOW THE COURT

23  HAS APPROVED A SPECIAL MASTER FOR DISCOVERY.  I HAVE A REAL

24  FEAR THAT THIS CASE IS GOING TO DRAG ON LONGER THAN IT SHOULD,

25  AND I'M TRYING TO PUT A CAP ON IT WHILE, AT THE SAME TIME,             10:35

1-8-07          ED CV 04-09049

**EXHIBIT 12-119**

10

1   CERTAINLY GIVE YOU AN OPPORTUNITY TO LITIGATE ANY ISSUES THAT

2   YOU NEED TO LITIGATE.

3            SO YOU SUGGEST THAT WE BRING THE COPYRIGHT CLAIM IN

4   THE FIRST?

5            MR. QUINN:  IT'S VERY HARD FOR ME TO SEE HOW THAT          10:35

6   GETS BIFURCATED OUT.

7            THE COURT:  HOW DO YOU PROPOSE, THEN -- EXPLAIN TO ME

8   YOUR THEORY OF HOW THESE TWO CASES SHOULD BE LITIGATED.

9            MR. QUINN:  LITIGATED OR TRIED?

10           THE COURT:  TRIED.                                         10:36

11           MR. QUINN:  BECAUSE WE DISCUSSED THIS ISSUE A LITTLE

12  BIT EARLIER --

13           THE COURT:  RIGHT.

14           MR. QUINN:  -- AND THE COURT SUGGESTED WE CAN DEFER

15  THAT TO ANOTHER DAY.                                               10:36

16           THE COURT:  AND MAYBE THAT DAY HAS ARRIVED.

17           MR. QUINN:  YOUR HONOR, ONE THING I'LL SAY IN

18  RESPONSE IS, THE COURT KNOWS THIS CASE WAS STAYED FOR A LITTLE

19  OVER A YEAR WHILE IT WAS UP IN THE NINTH CIRCUIT, AND IT'S BEEN

20  BACK AND DISCOVERY HAS BEEN PROCEEDING, IN SOMEWHAT FITS AND      10:36

21  STARTS.  THERE HAVE BEEN SOME PROBLEMS.

22           JUST, FOR EXAMPLE, THIS LAST WEEKEND, WE GOT INITIAL

23  DISCLOSURES, RULE 26 INITIAL DISCLOSURES, FROM MGA, AND WE

24  EXCHANGED THOSE DISCLOSURES.  SO IN SOME WAYS, IT'S AT AN EARLY

25  STAGE.                                                            10:36

**EXHIBIT 12-120**

11

1          IN TERMS OF WHAT THE TRIAL LOOKS LIKE, I THINK, GIVEN

2    HOW EARLY IT IS IN DISCOVERY AND WHAT NEEDS TO BE DONE, I THINK

3    IT'S MAYBE TOO EARLY FOR US TO TRY TO SHAPE OUT THE CONTOURS OF

4    THE TRIAL IN TERMS OF WHO GOES FIRST, WHETHER ONE JURY HEARS

5    ALL CLAIMS, WHETHER WE TRY TO BIFURCATE THE CLAIMS AND HAVE          10:37

6    DIFFERENT JURIES HEAR DIFFERENT CLAIMS.  I WOULD SUBMIT THAT

7    WHOLE SUBJECT IS BETTER APPROACHED FURTHER ALONG THE LINE WHEN

8    THERE'S ACTUALLY BEEN SOME FACTUAL DEVELOPMENT AND RECORD IN

9    THE MATTER.

10         I THINK IT PROBABLY WILL SHAKE OUT THAT THERE ARE              10:37

11   SOME ISSUES THAT ARE MAYBE UNRELATED TO OTHER ISSUES AND MAYBE

12   AMENABLE TO SOME SEPARATE TYPE OF PROCEEDING, BUT AT BOTTOM,

13   ALL OF THE CLAIMS IN ONE WAY OR -- WELL, NOT ALL OF THE

14   CLAIMS -- ALMOST ALL OF THE CLAIMS IN THIS CASE IN ONE WAY OR

15   ANOTHER RELATE TO BRATZ.                                            10:37

16         THE COURT:  I THINK THAT'S WHAT I STARTED THIS

17   CONVERSATION WITH.

18         LET ME HEAR FROM THE DEFENSE FOR A FEW MOMENTS.

19         MS. CENDALI:  THANK YOU, YOUR HONOR.

20         MR. QUINN'S ARGUMENT IS NOTABLE FOR TWO THINGS.  ONE,         10:37

21   HE ADMITS THAT THEIR COPYRIGHT CLAIM IS COMPLETELY DEPENDENT ON

22   OWNERSHIP.  AS YOU'VE HEARD, THEY'RE NOT CLAIMING THAT TOONS

23   TEEN WERE COPYRIGHTED.  THEY ALSO ARE NOT PUTTING IN -- OFTEN

24   IN A COPYRIGHT CASE, SOMEONE PUTS IN, HEY, I OWN A COPYRIGHT TO

25   SOME MATTEL WORK.  AND ALTHOUGH MATTEL HAS PRODUCED A LOT OF        10:38

**EXHIBIT 12-121**

12

1   BARBIE DOLLS OVER THE YEARS AND HAS MANY COPYRIGHT

2   REGISTRATIONS FOR THOSE, NOTABLY MATTEL CAN'T POINT TO A SINGLE

3   THING THAT MATTEL HAS CREATED THAT IT CLAIMS THAT CARTER BRYANT

4   AND MGA STOLE.  ITS ONLY CLAIM, THE ONLY COPYRIGHT REGISTRATION

5   IT'S SUING ON, ARE THE DRAWINGS OF BRATZ THAT MR. BRYANT          10:38

6   ALLEGEDLY MADE, SO IT'S A TOTALLY DEPENDENT COPYRIGHT CLAIM,

7   WHICH GOES TO YOUR REASON THAT THE OWNERSHIP ISSUES ARE WHAT

8   THEY ARE.

9            SECOND, THE OTHER THING THAT'S NOTABLE IS THAT

10  MR. QUINN CONTINUES TO DANCE AROUND THE ISSUE OF WHAT THEY'RE     10:38

11  CLAIMING.  JUDGE MANELLA BECAME FRUSTRATED BY THIS TACTIC, AS

12  YOU MIGHT BE ABLE TO SEE IN HER ULTIMATE DENIAL OF THE REMAND

13  ORDER THE SECOND TIME AROUND, IN THE SENSE THAT THEY STILL HAD

14  NOT ANSWERED YOUR QUESTION:  WHAT ARE YOU CLAIMING?  ARE YOU

15  CLAIMING THAT MR. BRYANT JUST DID THIS ON HIS OWN IN THE          10:39

16  EVENING AND THAT SOMEHOW THAT GIVES THEM THE RIGHT TO IT,

17  REGARDLESS, UNDER THEIR CONTRACT?  OR ARE YOU GOING TO TRY TO

18  BACK-DOOR A COPYRIGHT-LIKE CLAIM IN SAYING THAT HE WAS INSPIRED

19  BY TOONS TEEN?  AND NOW IT SOUNDS LIKE THEIR LATEST THEORY IS

20  DIVA STARS.                                                       10:39

21           THE COURT:  HE'S UNEQUIVOCALLY SAID THAT IT'S NOT

22  BECAUSE HE WAS INSPIRED BY TOONS TEEN.  THAT'S OFF THE TABLE.

23           MS. CENDALI:  WELL, I'M GLAD TO HEAR THAT, BUT WHAT

24  WE HAVEN'T HEARD IS WHETHER HE'S ARGUING IT WAS INSPIRED BY

25  DIVA STARS.  AND IN THE SUMMER OF 2004, 30(B)(6) REQUESTS WERE    10:39

1-8-07          ED CV 04-09049

**EXHIBIT 12-122**

13

1    SERVED ASKING THEM TO PRODUCE A WITNESS TO SPEAK ON PERSONS

2    MOST KNOWLEDGEABLE ABOUT WHETHER MR. BRYANT WAS INSPIRED BY

3    THIS SIMILARITY OR THAT SIMILARITY, OR ARE YOU CLAIMING HE

4    COPIED THIS, ARE YOU CLAIMING HE COPIED THAT.

5              THE COURT:  WHAT I THINK I JUST HEARD FROM MR. QUINN    10:40

6    WAS THAT THE COPYRIGHT CLAIM IS PRIMARILY BASED ON DRAWINGS

7    THAT MR. BRYANT DID WHEN HE WAS AT MATTEL AND THEN TOOK

8    THOSE -- THAT PURSUANT TO THE CONTRACT BETWEEN BRYANT AND

9    MATTEL, THAT WHEN HE WENT AND REPRODUCED THOSE AS BRATZ DOLLS,

10   THAT THAT ALL OF A SUDDEN BECAME A COPYRIGHT VIOLATION.    10:40

11             MS. CENDALI:  THAT MUCH IS CLEAR.  BUT WHAT ISN'T

12   CLEAR IS WHETHER THEY INTEND TO ARGUE THAT MR. BRYANT WAS

13   INSPIRED BY SOMETHING HE SAW AT MATTEL THAT WE HAVEN'T GOTTEN A

14   CHANCE TO --

15             THE COURT:  HE LEFT SOME WIGGLE ROOM OPEN ON THAT    10:40

16   ONE.

17             MS. CENDALI:  THAT'S RIGHT.  AND THAT'S BEEN THE

18   NATURE OF DISCOVERING THEIR POSITIONS TODAY, IS THEY HAVE

19   CONTINUED TO, THROUGHOUT THIS CASE, INITIALLY SAY, WELL, WE

20   DON'T KNOW IF IT'S WORTH 75,000, WE DON'T KNOW IF BRATZ ARE AT    10:40

21   STAKE, WE'RE NOT ASSERTING COPYRIGHT.  THE EXHIBITS TO THE

22   TORRES DECLARATION THAT -- NO MORE THAN 25 TIMES DID THEY SAY,

23   OH, WE'RE CERTAINLY NOT ASSERTING COPYRIGHT INFRINGEMENT IN

24   THIS CASE.  AND NOW HERE'S WHERE THEY ARE.

25             THE COURT:  LET ME SHIFT THE TRACK ON YOU FOR A    10:41

**EXHIBIT 12-123**

14

1   SECOND, COUNSEL, AND GET TO THE MOTION THAT'S BEFORE THE COURT

2   RIGHT NOW.

3        THERE HAS BEEN DELAY IN BRINGING THIS, BUT

4   ULTIMATELY, I HAVE TROUBLE SEEING THE PREJUDICE.  THE

5   SPOLIATION OF EVIDENCE STRIKES THE COURT, AFTER LOOKING AT ALL    10:41

6   OF THE EVIDENCE THAT YOU HAVE SUBMITTED IN SUPPORT OF YOUR

7   ARGUMENT THERE, AS SOMEWHAT CONJECTURAL.  AT THE END OF THE

8   DAY, I'M NOT CONVINCED THAT I SHOULD NOT GRANT LEAVE TO ALLOW

9   THIS IN SOMEWHERE.  I'M NOT SURE NECESSARILY THAT IT SHOULD BE

10  AN AMENDED COMPLAINT.  PERHAPS, IT SHOULD BE AN AMENDED ANSWER.   10:41

11       I'D LIKE TO GIVE YOU AN OPPORTUNITY TO ADDRESS THE

12  SUBSTANCE OF THIS MOTION FIRST, AND THEN IF YOU WOULD, ADDRESS

13  THE COURT'S QUESTION ABOUT HOW THIS CASE, FROM YOUR

14  PERSPECTIVE, SHOULD BE TRIED.  IS WHAT THE COURT IS SUGGESTING

15  ABOUT TRYING THE ISSUE OF OWNERSHIP OF BRATZ FIRST -- DOES THAT   10:42

16  MAKE SENSE TO YOU OR NOT?  I'D LIKE TO HEAR ON THAT.

17       MS. CENDALI:  SO YOU'D LIKE ME TO ADDRESS THE MERITS

18  OF THEIR MOTION FIRST?

19       THE COURT:  THEIR MOTION.  AND THEN SEGUE INTO THE

20  LARGER ISSUE OF HOW WE SHOULD TRY THIS CASE.                      10:42

21       MS. CENDALI:  OKAY.

22       GOING TO THE ISSUE OF THE MERITS, AS THE COURT IS

23  AWARE IN SOLOMON, THEY DON'T HAVE A MANDATORY RIGHT TO BE ABLE

24  TO AMEND.  IT'S IN THE COURT'S DISCRETION.  AND THE FOUR

25  FACTORS ARE UNDUE DELAY, PREJUDICE, FUTILITY, AND BAD FAITH.      10:42

**EXHIBIT 12-124**

15

1    AND THEY ARE IN THE 'OR.'  THEY'RE NOT ALL OF THEM; ANY ONE OF

2    THEM COULD SURVIVE.

3            IN THIS SITUATION, EVERY SINGLE FACTOR IS IN PLACE

4    WITH REGARD TO THEIR COPYRIGHT INFRINGEMENT AND THEIR TORTIOUS

5    INTERFERENCE CLAIMS, AT LEAST WITH REGARD TO MGA AND LARIAN.                    10:42

6            LET'S TALK ABOUT UNDUE DELAY, BECAUSE AS JACKSON SAID

7    IN THE NINTH CIRCUIT, IN DETERMINING WHETHER THERE'S DELAY,

8    COURTS LOOK TO WHETHER THE MOVING PARTY KNEW OR SHOULD HAVE

9    KNOWN THE FACTS AND THEORIES RAISED BY THE AMENDMENT IN THE

10   ORIGINAL PLEADING.                                                              10:43

11           SO YOU'VE GOT TO LOOK BACK AT THE ORIGINAL PLEADING.

12           AND THE AMENDMENT IS NOT VIEWED FAVORABLY WHEN THE

13   PLAINTIFF KNEW THE FACTS AND THEORIES SINCE THE INCEPTION.  AND

14   THE NINTH CIRCUIT, EVEN IN THE ACURA CASE, WENT ON TO

15   SPECIFICALLY SAY, IF SOMEBODY IS PLAYING A TACTICAL GAME IN                     10:43

16   CHOOSING NOT TO DO SOMETHING, THAT'S REALLY NOT GOING TO BE

17   FAVORED.

18           NOW, LET'S LOOK AT TORRES EXHIBIT G.

19           TORRES EXHIBIT G IS THE ANONYMOUS LETTER THAT WAS

20   SENT IN AUGUST OF 2002 TO MATTEL'S CEO, BOB ECKERT.  AND THINK                  10:43

21   HOW MUCH IT EXACTLY TRACKS BOTH THEIR ORIGINAL COMPLAINT AND

22   THE AMENDED COMPLAINT.

23           "I HAVE INFORMATION MATTEL SHOULD INVESTIGATE.  IN

24   2000, A MATTEL EMPLOYEE BY THE NAME OF CARTER BRYANT WAS

25   WORKING WITH MATTEL TO DESIGN DOLLS.  ONE OF THE DOLLS HE WAS                   10:44

1-8-07          ED CV 04-09049

**EXHIBIT 12-125**

16

```
1    WORKING ON CREATING WAS THE BRATZ DOLLS."  IT GOES ON TO SAY,
2    "WHILE HE WAS WORKING WITH MATTEL AND WORKING TO CREATE THESE
3    DOLLS, HE WORKED OUT A DEAL WITH MGA THAT LET HIM COLLECT MONEY
4    IN EXCHANGE FOR THESE DOLLS BEING HIS."
5            MGA KNEW THAT CARTER WAS AN EMPLOYEE WITH MATTEL AND    10:44
6    THAT IT WAS WRONG TO PAY HIM TO STEAL THIS PRODUCT FROM MATTEL.
7            THE COURT:  COUNSEL, I WOULD HATE TO HAVE SOMEONE
8    BRING A COMPLAINT BASED ON AN ANONYMOUS LETTER.  I MEAN, THE
9    LANGUAGE IN THE LETTER ITSELF STATES THAT THIS IS SOMETHING
10   MATTEL SHOULD INVESTIGATE.  MR. QUINN'S POSITION IS TO SATISFY   10:44
11   THE RULE 11 REQUIREMENT.  THAT'S EXACTLY WHAT THEY DID, AND
12   THAT'S WHAT THEY HAVE BEEN DOING, AND NOW THEY'RE SATISFIED,
13   FROM THEIR PERSPECTIVE, THAT THE INFORMATION IS TRUE.
14           MS. CENDALI:  WELL, FIRST OFF, YOUR HONOR, THIS
15   LETTER IS NOT TRUE.  BUT TO BE CLEAR -- JUST TO BE CLEAR THAT    10:44
16   MR. ECKERT DIDN'T JUST PUT IT IN A BOX, HE ASKED HIS HEAD OF HR
17   TO HAVE HIS HEAD OF SECURITY INVESTIGATE IT.  WHAT THEY DID
18   BEYOND THAT WE DON'T KNOW BECAUSE THEY REFUSE TO ANSWER
19   QUESTIONS AND TO PRODUCE A PRIVILEGE LOG ABOUT IT.
20           BUT WHAT WE DO KNOW IS, ON APRIL 27, 2004, THEY WERE    10:45
21   ABLE TO FILE THE ORIGINAL COMPLAINT IN THIS ACTION AGAINST
22   MR. BRYANT; SO CLEARLY, THEY HAD SATISFIED THEIR DUE DILIGENCE
23   OBLIGATIONS --
24           THE COURT:  WITH RESPECT TO THAT ASPECT, RIGHT.  BUT
25   I CERTAINLY KNOW THAT O'MELVENY & MYERS WOULD NOT FILE A        10:45
```

**EXHIBIT 12-126**

17

1  COMPLAINT BASED ON AN ANONYMOUS LETTER FROM SOMEBODY SUGGESTING

2  THAT THERE IS A COPYRIGHT INFRINGEMENT.

3          MS. CENDALI:  WELL, IF THEY INVESTIGATE IT AS THEY

4  SHOULD, BECAUSE THERE IS A DUTY OF INQUIRY WITH REGARD TO

5  ALLEGATIONS.  THEY WERE ON INQUIRY NOTICE AT THIS TIME.  AND        10:45

6  THEN LET'S TAKE A LOOK AT WHAT THEIR ACTUAL COMPLAINT ENDED UP

7  SAYING THAT THEY FILED AGAINST --

8          THE COURT:  COUNSEL, I UNDERSTAND:  IT SAID THE

9  SAME -- I UNDERSTAND YOUR ARGUMENT.  THERE'S NOTHING WHICH

10 REFUTES THE POSITION OF MR. QUINN THAT IT TOOK HIM THAT LONG,       10:46

11 THIS MUCH TIME, TO REASONABLY AND DILIGENTLY INVESTIGATE THIS.

12         MS. CENDALI:  BUT THIS IS THE POINT I WANT TO MAKE,

13 YOUR HONOR, AND IT'S IN PARAGRAPHS 12, 19, 23, 30, 36, AND 41

14 OF THE ORIGINAL COMPLAINT.  WHAT I'M TRYING TO SAY IS THAT THE

15 ORIGINAL COMPLAINT ALLEGED AT ITS TIME -- THOUGH IT DIDN'T NAME     10:46

16 MGA AND LARIAN BY NAME, THEY ADMITTED THAT THEY HAD A COPY OF

17 HIS CONTRACT WITH MGA.  IT SAID MGA ON IT.  IT WAS SIGNED BY

18 MR. LARIAN.  AND WHAT DID THEY SAY?

19         THEY DIDN'T JUST SAY THINGS ABOUT BRYANT.  THEY SAID

20 THAT, IN PARAGRAPH 12, "MATTEL LEARNED THAT BRYANT HAD SECRETLY     10:46

21 AIDED, ASSISTED AND WORKED FOR A MATTEL COMPETITOR, INCLUDING

22 WITH THAT LIMITATION BY ENTERING INTO AN AGREEMENT.  IN

23 ADDITION, WHILE BRYANT WAS EMPLOYED, BRYANT AND THE OTHER

24 DEFENDANTS CONVERTED MISAPPROPRIATE AND MISUSED MATTEL

25 PROPERTY."  IT GOES ON TO SAY THAT IT --                           10:47

1-8-07              ED CV 04-09049

**EXHIBIT 12-127**

18

1       THE COURT:  COUNSEL, YOU DO SET THESE FORTH IN YOUR

2  PAPERS, AND I HAVE READ THEM.

3       MS. CENDALI:  LET ME MOVE ON.

4       THE COURT:  PLEASE.

5       MS. CENDALI:  I'M GOING TO TRY TO MAKE THE POINT, IS          10:47

6  THAT WHEN YOU LOOK TO, AS THE NINTH CIRCUIT SUGGESTS, WHAT WAS

7  SAID IN THE ORIGINAL COMPLAINT, CLEARLY IN THE ORIGINAL

8  COMPLAINT, THEY'RE EXPRESSING THE SAME THEORIES IN THE

9  ANONYMOUS LETTER AND THE SAME THEORY THAT THEY'RE NOW TRYING TO

10 BRING IN UNDER A DIFFERENT NAME.                                 10:47

11      AND IN TERMS OF PREJUDICE, YOUR HONOR'S QUESTION,

12 WELL, FIRST OFF, THERE'S THE UNDENIABLE PREJUDICE THAT IF THEY

13 HAD SIMPLY SAID FROM THE BEGINNING WHAT THEY WERE DOING WAS

14 THAT THEY WERE PLANNING TO GO AFTER THE RIGHTS TO BRATZ, THAT

15 THEY WERE TRYING TO CLAIM COPYRIGHT TO BRATZ, WHICH IS IN THE    10:47

16 BODY OF THE ORIGINAL COMPLAINT -- AND THEN THEY'RE SAYING THAT,

17 OH, WE DIDN'T LEARN DISCOVERY ADDITIONAL FACTS.

18      BUT, YOUR HONOR, I THINK WHEN YOU READ THIS FAIRLY,

19 YOU'LL SEE THAT THE ADDITIONAL THINGS THAT THEY LEARNED IN

20 DISCOVERY ARE JUST DETAILS, THE THEORY, THAT BRYANT WAS WORKING  10:47

21 WITH MGA WHILE HE WAS STILL AT MATTEL AND CONVERTING INTANGIBLE

22 PROPERTY.  ALL OF THAT WAS EXPRESSED HERE.  THEY'RE JUST TRYING

23 TO POINT TO DISCOVERY TO EXCUSE THE FACT THEY DIDN'T SUE MGA

24 AND LARIAN ORIGINALLY.

25      AND WHY DIDN'T THEY?                                        10:48

**EXHIBIT 12-128**

19

1        EVEN THE NINTH CIRCUIT ASKED THIS AT ONE POINT:

2   "WELL, WE WOULDN'T EVEN HAVE THIS COMPLICATED ARGUMENT ABOUT

3   DIVERSITY IF YOU WOULD HAVE JUST SUED MGA."  BUT FOR WHATEVER

4   REASON, THEY DIDN'T DO IT.

5        AND THE REASON THAT WE HAVE SAID, THAT THEY NEVER                10:48

6   REALLY DENIED -- THE REASON IS THAT THEY WANTED TO PURSUE STATE

7   COURT DISCOVERY, WHERE YOU DON'T HAVE TEN DEPOSITION LIMITS;

8   YOU DON'T HAVE THE SEVEN-HOUR RULE.  THEY COULD FERRET OUT A

9   CLAIM WITH REGARD TO MR. BRYANT.  WELL, AT THE SAME TIME, WHEN

10  WE TRIED TO ANTICIPATE AND ASK THEM QUESTIONS ABOUT THE          10:48

11  COPYRIGHT STUFF, THEY WOULD BE ABLE TO SAY, WE'RE NOT GOING TO

12  RESPOND TO THAT, BECAUSE WE'RE NOT TALKING ABOUT COPYRIGHT;

13  WE'RE TALKING ABOUT STATE LAW CLAIMS.  THAT RESULT HAS BEEN

14  THAT MEMORIES HAVE FADED.  THE SUPREME COURT IN CUBRIC

15  RECOGNIZES THAT, THAT THERE HAS BEEN SPOLIATION.  IT SHOULD BE    10:49

16  NOTED, LEAVING ASIDE YOUR HONOR'S COMMENTS ON THE ZOOL SYSTEM,

17  THEY HAVE DELAYED -- AS EXHIBIT K TO THE TORRES DECLARATION

18  INDICATES, THEY HAVE DELAYED THE E-MAIL DEPOSITION UNTIL

19  JANUARY 17TH.  THE DEPOSITION WAS SUPPOSED TO BE SCHEDULED LONG

20  IN ADVANCE OF THIS ARGUMENT.  AND THEY'VE PURPOSELY DELAYED      10:49

21  THAT.  SO I SUSPECT YOU'RE GOING TO BE HEARING A LOT MORE ABOUT

22  SPOLIATION.  SO WE BELIEVE THAT THERE HAS, IN FACT, CLEARLY

23  BEEN PREJUDICE.

24        BUT EVEN GOING BEYOND THAT, BEYOND THE PREJUDICE

25  POINT, THERE'S ALSO THE FUTILITY POINT.  AND THE FUTILITY        10:49

1-8-07                    ED CV 04-09049

**EXHIBIT 12-129**

20

1    POINT --

2           THE COURT:  THAT'S YOUR STATUTE OF LIMITATIONS

3    ARGUMENT.

4           MS. CENDALI:  -- IS THE STATUTE OF LIMITATIONS.

5           AND THERE'S TWO SEPARATE STATUTE OF LIMITATIONS          10:50

6    POINTS.

7           THE COURT:  I UNDERSTAND YOUR ARGUMENT ON THE STATUTE

8    OF LIMITATIONS, COUNSEL.

9           IS THERE ANYTHING IN ADDITION TO WHAT YOU PUT IN YOUR

10   PAPERS ON THAT?                                                10:50

11          MS. CENDALI:  WELL, THE MAIN THING IS THAT ONE OF THE

12   PURPOSES OF THE STATUTE OF LIMITATIONS IS TO PUT SOME SORT OF

13   TIME LIMIT ON THE INVESTIGATION.  WE'RE NOW IN 2007, TRYING TO

14   DEAL WITH EVENTS OF A CREATION OF A WORK IN 1998 TO 2000.

15          I GUESS ONE OF THE THINGS THAT I WANTED TO EMPHASIZE     10:50

16   WITH REGARD TO THE STATUTE OF LIMITATIONS POINT THAT ISN'T IN

17   THE PAPERS IS, ONE, THEY'VE MADE SOME ARGUMENT, 'WELL, THERE'S

18   A CONTINUING -- BECAUSE OF COPYRIGHT LAWS, YOU CAN HAVE A

19   CONTINUING INFRINGEMENT'; THAT THAT SOMEHOW MAKES THEIR ACTIONS

20   TIMELY.  BUT THE LAW, YOUR HONOR -- AND THEY PUT THIS IN THEIR  10:50

21   REPLY PAPERS -- THE LAW, YOUR HONOR, IS TO THE CONTRARY.

22          IF YOU'RE CLAIMING OWNERSHIP, OWNERSHIP IS SOMETHING

23   THAT IS TIME-BARRED.  IF YOU'RE SUING ON -- IF THEY WERE SUING

24   US FOR COPYING A BARBIE DOLL, THEN THERE MIGHT BE THE ARGUMENT,

25   WELL, WE DIDN'T SUE YOU UNTIL FIVE YEARS, SO WE CAN REACH       10:51

              1-8-07              ED CV 04-09049

**EXHIBIT 12-130**

21

BACK TO --

     THE COURT:  I UNDERSTAND YOUR ARGUMENT.

     MS. CENDALI:  ZOOL AND FORT NOXEN CASES DEAL WITH THAT.

     BUT THE OTHER ARGUMENT THAT RELATES TO THIS, IN ADDITION, ON THE STATUTE OF LIMITATIONS FRONT IS THE FACT THAT -- IT ALSO RELATES TO THEIR BAD FAITH -- IS THAT THEY'RE NOT JUST TRYING TO BRING WHAT WE BELIEVE ARE TIME-BARRED CLAIMS, BUT THEY'RE TRYING TO DO IT UNDER THE GUISE OF SUBSTITUTING THE DOE DEFENDANTS.

     IN OTHER WORDS, THEY KNOW THEY HAVE A STATUTE OF LIMITATIONS PROBLEM, SO THEY THINK, WELL, THE WAY OF GETTING AROUND THAT IS, WE PLED SOME DOES IN STATE COURT, SO WE'RE JUST GOING TO NOW SUBSTITUTE MGA AND MR. LARIAN FOR THE UNNAMED COMPETITORS.

     THE COURT:  AND THAT WOULD SUCCESSFULLY DEFEAT THE STATUTE OF LIMITATIONS PROBLEM, IF IT WAS ALLOWED.

     MS. CENDALI:  IT'S POSSIBLE THAT IT MIGHT.  I'D HAVE TO COMPLETELY THINK THROUGH IT.  BUT THAT'S CLEARLY THEIR ARGUMENT.

     BUT THE PROBLEM IS, THAT'S A COMPLETELY IMPROPER USE OF DOE UNDER BOTH THE FEDERAL AND STATE RULES.  UNDER THE FEDERAL LAW, RULE 15 (C) PERMITS THE RELATION BACK ONLY IN CASES IN WHICH THERE HAS BEEN A MISTAKE AS TO THE PARTY WHO OUGHT TO HAVE BEEN SERVED.  THAT'S CLEARLY NOT THE CASE.  THERE

10:51
10:51
10:51
10:52
10:52

**EXHIBIT 12-131**

22

1   WAS NO DOUBT AS TO WHETHER BRATZ WAS MADE BY HASBRO.  EVERYONE

2   KNEW THAT WAS THE COMPETITOR.

3        MOREOVER, THE FEDERAL RULES OF CIVIL PROCEDURE

4   REQUIRES THAT THE SUMMONS BE SERVED IN 120 DAYS.  AND YOUR

5   HONOR'S OWN STANDING ORDER SAYS WHEN CASES ARE REMOVED FROM     10:52

6   STATE COURT, THEY HAVE 120 DAYS TO SERVE THE SUMMONS OF A DOE

7   DEFENDANT.  THEY HAVEN'T DONE THAT.

8        THE COURT:  THAT'S MY ORDER.  NOT JUDGE MANELLA'S.

9        MS. CENDALI:  EXCUSE ME, YOUR HONOR.  YOUR OWN

10  STANDING ORDER, WHICH IS OPERABLE HERE.                         10:52

11       MOREOVER, AS THE RENDAL-SPORANZA (SP) CASE, 107 F.3RD

12  913, 917 INDICATES; THAT WHEN THERE'S A MISTAKE AS TO THE

13  PARTY'S LIABILITY, THAT DOES NOT RELATE BACK.  SO WHAT WE'RE

14  TALKING ABOUT HERE IS THEM ATTEMPTING TO FIND SOME ABILITY TO

15  USE THE FACT THAT THEY IMPROPERLY USED THE DOES TO BEGIN WITH   10:53

16  TO PROVIDE A CRUTCH TO THEM ON STATUTE OF LIMITATIONS.

17       BUT EVEN UNDER STATE LAW, I WANT TO POINT OUT, THE

18  STATE LAW STATUTE SECTION CALIFORNIA CODE OF CIVIL PROCEDURE

19  474, WHEN THEY DID THE DOES ORIGINALLY, THAT WAS IMPROPER,

20  BECAUSE THE STATUTE BY ITS FACE SAYS YOU HAVE TO BE IGNORANT OF 10:53

21  THE NAME OF THE DEFENDANT AT THE TIME YOU FILED IT.  HERE, THE

22  WHOLE GRAVAMEN OF THEIR CASE WAS THE CONTRACT BETWEEN

23  CARTER BRYANT AND MGA, WHICH THEY HAD, WHICH WAS SIGNED BY

24  MR. LARIAN.  THEY WEREN'T IGNORANT OF EVERYTHING.  THEY

25  TACTICALLY CHOSE TO ENGAGE IN THE CONDUCT THAT THEY DID FOR     10:54

23

1   THEIR OWN BENEFIT.  THEY HAD BEEN SANCTIONED IN 2003 IN THE

2   (UNINTELLIGIBLE) MATTEL HAD IN THE ROCKY MOUNTAIN CASE FOR

3   ALMOST $2 MILLION.  THEY PROBABLY DID NOT WANT TO DEAL WITH

4   FEDERAL COURT DISCOVERY, AND THEY SAW THE STATE COURT AS A WAY

5   OUT FOR THEM.                                                    10:54

6          I JUST THINK THAT THIS COURT SHOULD NOT REWARD THAT

7   KIND OF GAMESMANSHIP.  AND THE LATEST GAMESMANSHIP IS WHAT WE

8   SEE BEFORE YOU TODAY.  BECAUSE NOT ONLY DO THEY WANT TO

9   BELATEDLY AMEND THE COMPLAINT TO ASSERT THESE CAUSES OF

10  ACTION -- AND I POINT OUT -- WELL, I DIDN'T ADDRESS IT BECAUSE   10:54

11  YOUR HONOR SEEMED TO BE FAMILIAR WITH THE BRIEF -- BUT THERE'S

12  COMPLETELY NO JUSTIFICATION WITH THE TORTIOUS INTERFERENCE

13  CLAIMS AGAINST MR. RON BRAUR, WHICH WERE FILED IN -- THEY KNEW

14  HE WAS LEAVING ON SEPTEMBER 17TH OF 2004.  IT'S A TWO-YEAR

15  STATUTE FOR TORTIOUS INTERFERENCE.                              10:55

16         BUT LEAVING THAT ASIDE IS THAT INSTEAD OF DOING THE

17  LOGICAL THING, WHICH IS, 'YOU KNOW WHAT, WE HAVE THESE CLAIMS,

18  WE WANT TO TRY TO ASSERT THEM; WE'LL BRING SOME OF THEM IN THE

19  BRYANT CASE, AND WE'LL BRING THE RICO AND THE TRADE SECRETS AND

20  THE WORLDWIDE CONSPIRACY CLAIMS IN THE AFFIRMATIVE PLACE THAT    10:55

21  MGA HAS SERVED AGAINST MATTEL.'

22         THAT WOULD HAVE BEEN THE LOGICAL THING TO DO, BECAUSE

23  THEIR CLAIMS ABOUT TRADE SECRETS MISAPPROPRIATION, WHICH I

24  CAN'T EMPHASIZE TO YOU ENOUGH, YOUR HONOR, ARE FALSE, AND --

25         THE COURT:  I SEE YOUR POSITION ON THAT.                  10:55

**EXHIBIT 12-133**

24

1      MS. CENDALI:  OKAY.

2         THE COURT:  WHERE DO WE GO FROM HERE, COUNSEL?  WHERE

3   DO YOU SUGGEST WE LITIGATE OR TRY THE CASE?

4         MS. CENDALI:  OBVIOUSLY, WE WOULD PREFER THAT YOUR

5   HONOR NOT GRANT THE AMENDMENT.  IF YOUR HONOR, HOWEVER, CHOOSES          10:55

6   TO GRANT THE AMENDMENT, WE THINK TWO THINGS SHOULD HAPPEN:  ONE

7   IS THAT THE AMENDMENTS THAT THEY'RE SEEKING, THE PROPOSED

8   COMPLAINT, TO THE EXTENT THAT IT PLEADS THESE TRADE SECRETS AND

9   RICO AND CURRENT COPYRIGHT INFRINGEMENT-TYPE CLAIMS, THAT ALL

10  OF THAT SHOULD BE PUT AS COUNTERCLAIMS; THEY ARE PERMITTED TO          10:56

11  AMEND THEIR COUNTERCLAIMS IN THE MGA VERSUS MATTEL CASE.

12  BECAUSE THEN, EFFECTIVELY, YOU'LL HAVE THE OWNERSHIP ISSUES

13  ABOUT WHAT HAPPENED IN 1998 TO 2000.

14        THE COURT:  SO YOU AGREE WITH THE COURT THAT THE

15  OWNERSHIP ISSUE SHOULD BE ADDRESSED FIRST?                            10:56

16        MS. CENDALI:  I DON'T KNOW IF IT SHOULD BE ADDRESSED

17  FIRST IN THE SENSE OF -- I THINK THAT YOUR HONOR WAS RIGHT IN

18  CONSOLIDATING EVERYTHING RIGHT NOW AND THESE ISSUES OF, AS WE

19  TALKED ABOUT, FADING MEMORIES AND THE LIKE.  I THINK THAT ONCE

20  SUMMARY JUDGMENT MOTIONS, WHICH I SUSPECT WILL INEVITABLY BE          10:56

21  FILED, ARE FILED AND YOUR HONOR HAS A BETTER SENSE OF THE

22  FRAMING OF THINGS -- BUT WHAT I DON'T WANT TO DO IS -- IF YOU

23  WERE TO PERMIT THEM TO AMEND THESE RECENT EVENTS OF MEXICO AND

24  CANADA AND ALL OF THE REST OF IT INTO THE BRYANT CASE, THEY

25  WOULD USE THAT, I THINK, AS A LEG UP ON BEING ABLE TO ARGUE, AS       10:57

1-8-07              ED CV 04-09049

**EXHIBIT 12-134**

25

1   YOU HEARD MR. QUINN SAY, 'OH, IT'S ALL PART OF A PATTERN; WE

2   WANT TO DIRTY THE WATERS; WE WANT TO MUDDY THE WATERS --'

3          THE COURT:  WHY NOT TRY THE OWNERSHIP ISSUE FIRST?

4          MS. CENDALI:  IT MAY MAKE SENSE TO DO THAT, YOUR

5   HONOR.  I'D HAVE TO SPEAK, FRANKLY, TO MY CLIENT TO RECONSIDER       10:57

6   IT.  BUT I THINK THAT WE CERTAINLY NEED TO DO DISCOVERY ON

7   EVERYTHING.  ALL I'M SAYING IS THAT WHEN WE GET TO SUMMARY

8   JUDGMENT, IT MAY BE CLEARER WHAT YOU WANT TO DO.

9          I JUST DON'T THINK IT'S RIGHT FOR THEM TO BE ABLE TO

10  DO TWO THINGS; A, AMEND IT ALL, BUT, B, IF YOU'RE GOING TO          10:57

11  AMEND, IT SHOULD NOT BE PERMITTING THEM TO SUBSTITUTE THESE AS

12  THE DOE DEFENDANTS.  WE HAVE A RIGHT TO OUR STATUTE OF

13  LIMITATIONS DEFENSES.  AND, TWO, SOME OF THIS BELONGS IN THE

14  OTHER CASE.

15         THE COURT:  THE MGA CASE.                                    10:58

16         MR. JACOBY, DO YOU WISH TO ADD ANYTHING FROM

17  MR. BRYANT'S PERSPECTIVE?

18         MR. JACOBY:  VERY BRIEFLY.

19         WELL, MR. BRYANT NEVER WORKED IN CANADA, AND HE NEVER

20  WORKED IN MEXICO, AND NONE OF THE RICO PREDICATE ACTS ARE          10:58

21  ALLEGED AGAINST HIM.  SO WE AGREE WITH THE COURT THAT THESE

22  SHOULD BE PLED AS PART OF THE COUNTERCLAIM TO THE MGA

23  AFFIRMATIVE CASE AND NOT PART OF THE BRYANT CASE.  AND IT WOULD

24  CAUSE GREAT PREJUDICE, WHICH IS ONE OF THE FOUR FACTORS UNDER

25  RULE 15, IF MR. BRYANT'S CASE WAS MUDDIED BY ALL OF THESE AFTER    10:58

26

1   EFFECTS.  SO WE AGREE WITH THAT COMPLETELY.

2          THE COURT:  HOW DO YOU RESPOND TO MR. QUINN'S POINT,

3   THOUGH, THAT -- ASSUMING THE TRUTH OF THE ALLEGATIONS, WHICH

4   I'M ONLY DOING FOR THE PURPOSES OF THIS ARGUMENT -- THAT THAT

5   REALLY ISN'T A DEFENSE IN THE RICO MATTER?                          10:58

6          I MEAN, IF YOU WERE CAUGHT UP IN A RICO CONSPIRACY OF

7   SOME SORT, THE FACT THAT YOUR CO-CONSPIRATORS ARE DOING ALL OF

8   THESE OTHER THINGS AND THAT MAKES YOU LOOK BAD, THAT'S PART OF

9   THE PRICE ONE PAYS.

10         MR. JACOBY:  WELL, THE PROOF IS IN THE PUDDING ON THE        10:59

11  EXHIBITS WHERE THEY ATTACH ALL OF THE E-MAILS THAT ARE PART OF

12  THE WIRE -- THE PREDICATE ACTS.  NONE OF THEM ARE TO OR FROM

13  CARTER BRYANT.  HE'S THERE IN NAME, BUT HE'S NOT THERE IN

14  REALITY.  HE'S NOT EVEN AN EMPLOYEE OF MGA.  THERE'S NO

15  QUESTION WHERE CARTER BRYANT'S ROLE IS IN THIS.  AND THE COURT      10:59

16  IS SPOT ON THAT THE JACKPOT ISSUE IS THE ISSUE OF OWNERSHIP.

17         AND WITH RESPECT, I JUST WANT TO TOUCH VERY, VERY

18  BRIEFLY ON TWO OTHER ISSUES.  WITH RESPECT TO THE BRAUR ISSUE,

19  MY LAW FIRM REPRESENTED MR. BRAUR IN THE LAWSUIT BROUGHT BY

20  MATTEL.  THAT LAWSUIT WAS BROUGHT IN STATE COURT.  IF THE COURT     10:59

21  LOOKED AT THE COMPLAINT IN THE BRAUR LAWSUIT, THE ALLEGATIONS

22  ARE ALMOST IDENTICAL TO THE ALLEGATIONS THAT ARE IN THIS

23  AMENDED COMPLAINT, AND MATTEL IS JUST REPACKAGING THEM HERE IN

24  THIS LAWSUIT, AGAIN TO TRY TO MUDDY THE WATERS AGAINST

25  CARTER BRYANT.  THEY WOULDN'T HAVE THE TEMERITY TO NAME             10:59

1-8-07                    ED CV 04-09049

**EXHIBIT 12-136**

27

1   MR. BRAUR BECAUSE THEY DISMISSED THAT LAWSUIT.  THE DEMURE WAS

2   SUSTAINED.  IT WENT UP ON APPEAL.  THEY DIDN'T AMEND.

3            AND WITH RESPECT TO THE COPYRIGHT, ONE OF THE RULE 15

4   FACTORS IS BAD FAITH.  AND I MUST SAY THAT WHEN IT WAS ABOUT

5   50 DEGREES HOTTER OUTSIDE, WE ALL STOOD HERE AND MR. QUINN AND        11:00

6   MR. ZELLER SAID CARTER BRYANT HAS NOTHING TO FEAR; THERE IS NO

7   COPYRIGHT CLAIM THAT HE HAS TO FEAR.  THEY PUT IT IN THEIR

8   PAPERS.  IN THEIR POST-SUPPLEMENTAL BRIEFS, THEY WROTE THAT

9   THERE IS NO ACTUAL CONTROVERSY AND, HENCE, NO CASE OF

10  CONTROVERSY AS TO THE COPYING CLAIM, BECAUSE MATTEL HAS NEVER          11:00

11  EVER THREATENED, LET ALONE TAKEN ANY SUCH COPYRIGHT ACTION.

12  YES, THE FOCUS WAS ON TOONS TEEN, BUT WE TALKED ABOUT OTHER

13  MATTEL WORK.

14           HERE WE ARE SEVEN MONTHS LATER, AND CARTER BRYANT IS

15  BEING SUED FOR COPYRIGHT.  AND THAT'S PREJUDICE.  THAT IS             11:00

16  PREJUDICE.  AND THE STATUTE OF LIMITATIONS ARGUMENT IS WHERE

17  THE PREJUDICE LIES.  AND STATUTE OF LIMITATIONS ARE A TRICKY

18  BUSINESS; THEY'RE CRUEL BUT FAIR.  AND HERE WE ARE IN 2007, SIX

19  AND A HALF YEARS AFTER THIS PRODUCT WAS AT THE MARKET, AND HE'S

20  BEING SUED FOR COPYRIGHT, SOMETHING THEY SWORE UP AND DOWN TO         11:00

21  JUDGE MANELLA, TO JUDGE ALLERCON, TO THE NINTH CIRCUIT, THAT IT

22  WASN'T GOING TO HAPPEN BECAUSE THE CASE DIDN'T EVEN BELONG IN

23  FEDERAL COURT.  AND THAT COUNTS AND THAT SHOULD BE CONSIDERED

24  BY THIS COURT.

25           THE COURT:  THANK YOU, COUNSEL.                              11:01

1-8-07              ED CV 04-09049

**EXHIBIT 12-137**

28

1        MR. QUINN, I'LL ALLOW YOU TO RESPOND BRIEFLY.

2        I THINK I UNDERSTAND YOUR ARGUMENTS.

3        MR. QUINN:  THE RECORD IS THAT WE NEVER REPRESENTED

4  THAT THERE WOULD NEVER BE A COPYRIGHT INFRINGEMENT CLAIM.  IN

5  FACT, MR. JACOBY REQUESTED US TO ENTER INTO A STIPULATION THAT    11:01

6  THERE WOULD BE NO CLAIM OF COPYING OF ANYTHING, AND WE SAID,

7  'NO, WE CAN ONLY DO IT AS TO COPYRIGHT WITH RESPECT TO TOONS

8  TEEN.'

9        MR. JACOBY IS MISTAKEN ABOUT THE PREDICATE ACTS

10  REGARDING MR. BRYANT.  IF THE COURT LOOKS AT EXHIBIT C, THE    11:01

11  PROPOSED AMENDED COMPLAINT, THERE ARE SPECIFIC E-MAILS THAT ARE

12  TO CARTER BRYANT WHICH ARE ALLEGED TO BE USE OF THE WIRES IN

13  CONNECTION WITH MAIL FRAUD.  WE ALSO HAVE E-MAILS THAT WE CAN

14  ADD TO THAT THAT ARE FROM CARTER BRYANT.  WE ALSO PLEAD

15  VIOLATIONS OF THE TRAVEL ACT AND COMMERCIAL BRIBERY BY    11:01

16  CARTER BRYANT.  WE HAVE PLED, WE BELIEVE, A CLAIM OF A RICO

17  VIOLATION TO WHICH MR. BRYANT IS A DEFENDANT, AND HOW THAT GETS

18  BIFURCATED AND HAVE SEPARATE RICO DEFENDANTS SEPARATELY TRIED,

19  I DON'T KNOW.  I DON'T THINK THAT'S THE WAY TO TRY THAT TYPE OF

20  ISSUE.    11:02

21        I THINK BOTH -- FROM WHAT I HEAR FROM MGA, BOTH MGA

22  AND MATTEL ARE IN AGREEMENT THAT IT IS PERHAPS PREMATURE FOR

23  THE COURT TO TRY TO MAKE DECISIONS NOW ABOUT EXACTLY WHAT THE

24  TRIAL WILL LOOK LIKE IN THIS CASE.

25        THE COURT:  WE NEED TO SET SOME KIND OF -- I'M JUST    11:02

1-8-07        ED CV 04-09049

**EXHIBIT 12-138**

29

1   NOT GOING TO ALLOW THIS CASE TO GO ON INDEFINITELY.  THERE'S

2   GOT TO BE A TIME FRAME, EVEN IF THAT TIME FRAME IS SOMEWHAT

3   ARTIFICIAL IN THE SENSE THAT WE DON'T KNOW EXACTLY WHAT IT'S

4   GOING TO LOOK LIKE AT TRIAL.  BUT THERE NEEDS TO BE AN END IN

5   SIGHT.

6           MR. QUINN:  I UNDERSTAND, YOUR HONOR.  AND AS I

7   INDICATED, WE JUST EXCHANGED INITIAL DISCLOSURES, SOMEWHAT

8   SURPRISINGLY.  WE JUST -- AND I WON'T GET INTO THE BACKGROUND

9   ON THAT, BUT WE JUST --

10          THE COURT:  IT'S PROBABLY BEST THAT YOU DON'T.

11          MR. QUINN:  -- INITIAL DISCLOSURES LAST FRIDAY AND

12  OVER THE WEEKEND.

13          WHAT I WOULD SUGGEST, YOUR HONOR, IS THAT COUNSEL BE

14  ORDERED TO CONFER WITH RESPECT TO A PROPOSED SCHEDULE, WHICH

15  PRESUMABLY WOULD INCLUDE A STATUS CONFERENCE AT SOME POINT DOWN

16  THE ROAD, AFTER THE PARTIES HAVE COMPLETED RULE 26 REQUIREMENTS

17  AND FILED A REPORT, AND THAT WE THEN COME BACK TO THE COURT AND

18  SEE IF WE CAN REACH AN AGREEMENT ON THE SCHEDULE.

19          THE COURT:  WELL, LET ME RULE ON THIS MOTION HERE,

20  WHICH, I THINK, WILL LARGELY SHAPE WHERE THE CASE GOES FROM

21  HERE.  AND I AM GOING TO CONSIDER SUGGESTIONS FROM BOTH SIDES

22  ON THIS, AND WE'LL GO FROM THERE.  I'LL TRY TO GIVE YOU AS MUCH

23  GUIDANCE AS I CAN.

24          MR. QUINN:  THANK YOU, YOUR HONOR.

25  /  /  /

11:02

11:03

11:03

11:03

**EXHIBIT 12-139**

30

1

2

CERTIFICATE

3

4

5   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

8

9                                                    7-9-07
10   THERESA A. LANZA, RPR, CSR                        DATE
     OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 12-140**

**EXHIBIT 13**

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Duane R. Lyons (Bar No. 125091)
  (duanelyons@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT, an individual,

           Plaintiff,

        v.

MATTEL, INC., a Delaware corporation,

           Defendant.

MGA ENTERTAINMENT, INC. a California corporation,

           Plaintiff,

        v.

MATTEL, INC., a Delaware corporation, and DOES 1-10,

           Defendants.

CASE NO. CV 04-9049 SGL (RNBx)

Consolidated With Case No. 04-9059 and Case No. 05-2727

MATTEL, INC.'S SECOND AMENDED ANSWER IN CASE NO. 05-2727 AND COUNTERCLAIMS FOR:

1. COPYRIGHT INFRINGEMENT;
2. VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
3. CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
4. MISAPPROPRIATION OF TRADE SECRETS;
5. BREACH OF CONTRACT;
6. INTENTIONAL INTERFERENCE WITH CONTRACT;
7. BREACH OF FIDUCIARY DUTY;
8. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;
9. BREACH OF DUTY OF LOYALTY;

**CONFIDENTIAL FILED UNDER SEAL, PURSUANT TO PROTECTIVE ORDER**

**Volume I**

CLERK, U.S. DISTRICT COURT
JUL 12 2007
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION   BY DEPUTY

**EXHIBIT 13-141**

c7-12-c7

SECOND AMENDED ANSWER AND COUNTERCLAIMS