1   because he had not signed it.  Brawer was unwilling to complete or sign the form

2   that sought to confirm that Brawer understood his ongoing obligations under the

3   Code of Conduct, which included the obligation to preserve the confidentiality of

4   Mattel's proprietary and trade secret information.

5          66.   On October 1, 2004, Brawer's final day of employment with

6   Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7   Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8          67.   Upon joining MGA, Brawer became its Executive Vice-

9   President of Sales and Marketing.  In that role he was responsible for MGA's sales

10  worldwide.  As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13         68.   Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel.  That representation was false.   On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return.  Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21         69.   Mattel has recently learned that Brawer has been using that

22  contact information on a regular basis, including within recent months.  Since

23  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

24  and by electronic mail.  Based on his knowledge of Mattel's operations and the

25  roles of certain Mattel employees, he has targeted certain Mattel employees who

26  have broad access to Mattel proprietary information in an effort to induce and

27  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

28  Mattel confidential information and trade secrets.  Brawer has done so by

2154363.2

1  promising these Mattel employees salaries 25 percent or more higher than they earn
2  at Mattel and stating to them that they should not be concerned by legal action
3  taken by Mattel to protect its trade secrets and its rights because such claims are
4  hard to prove and easy to defeat.

5  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6      70.   In an effort to increase its market share and sales in Canada and
7  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,
8  projects, advertising and strategy, not only for Canada, but the United States and
9  the rest of the world.

10      71.   Janine Brisbois was a Director of Sales for the Girls Division in
11  Canada.  Mattel hired her as a National Account Manager in August 1999.  When
12  she was hired as a Mattel employee, Brisbois agreed that she would preserve and
13  would not disclose Mattel's proprietary or confidential information.  For example,
14  Brisbois agreed:

15      You must keep Mattel's Proprietary Information confidential,
16      and you may only use or disclose such information as necessary
17      to perform your job responsibilities in accordance with Mattel
18      policies.  Your obligation to keep Mattel's Proprietary
19      Information confidential will continue even after any termination
20      of your employment with your employer.

21      . . .

22      Mattel takes steps to maintain the secrecy and confidential nature
23      of Mattel's Proprietary Information and, if a competitor
24      discovered Mattel's Proprietary Information, it could
25      significantly damage Mattel and your Employer.

26      72.   While with Mattel, Brisbois had responsibility for Mattel's
27  account with TRU and later had responsibility for Mattel's Wal-Mart account.  In
28  her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

**EXHIBIT 13-189**

Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

73.    On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA.  Mattel is informed and believes that in that position Brisbois has responsibility for MGA's accounts with both TRU and Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she was "taking anything."  Brisbois responded, "No."  Both during and after her exit interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's confidential and proprietary information.

74.    Mattel is informed and believes that Brisbois spoke with Isaac Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day that she spoke with Mr. Larian and four days before she resigned, Brisbois copied approximately 45 Mattel documents on to a USB or "thumb" drive with the volume label "BACKPACK."  On information and belief, Brisbois removed the thumb drive from Mattel Canada's office by concealing it in her backpack or gym bag the last time that she left that office.  These documents contained Mattel trade secret and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-190**

1      • a document containing the product launch dates and related advertising
2        for all Mattel new products between Fall 2005 and Spring 2006.

3       75.   After Mattel discovered that Brisbois had copied these sensitive
4 documents to a thumb drive, Mattel notified Canadian law enforcement authorities.
5 Canadian law enforcement authorities recovered from Brisbois a thumb drive with
6 the volume label "BACKPACK" containing the documents that Brisbois had
7 copied from Mattel's computer system.  Mattel later learned that while she was
8 working as a Vice President of Sales at MGA, Brisbois accessed and modified
9 documents on that thumb drive.

10       76.   After joining MGA, Brisbois repeatedly traveled to MGA's
11 offices in Van Nuys, California and met with Larian and Brawer.  In February,
12 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City
13 offices and that at least three MGA employees were under criminal investigation,
14 MGA nonetheless issued a press release trumpeting its 2005 performance, with
15 Larian himself concluding, "Our international teams in Mexico and Canada have
16 done a fantastic job."

17 **VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**
18      **JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**
19      **FOR THE BENEFIT OF MGA**

20       77.   In the past few years, MGA has hired directly from Mattel's
21 United States operations at least 25 employees, from Senior Vice-President level to
22 lower level employees.  On information and belief, many of these employees were
23 specifically targeted and recruited by MGA, including by Larian and Brawer, based
24 on the Mattel confidential and proprietary information they could access.  Many of
25 these employees had access to information that Mattel considers to be highly
26 proprietary and confidential.  Mattel believes that some of those former Mattel
27 employees may be observing their obligations not to misappropriate, disclose or
28 use Mattel's confidential and proprietary information.  Mattel is informed and

-51-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 13-191**

believes, however, that certain additional employees accessed, copied and took from Mattel confidential and proprietary information, including Mattel's strategic plans; business operations, methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins; and customer requirements. The misappropriated confidential and proprietary information included information that these Mattel employees were not authorized to access. On information and belief, the misappropriated confidential and proprietary information taken from Mattel is being disclosed to and used by MGA for the benefit of MGA and to the detriment of Mattel.

## VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT MATTEL'S PRODUCTS

78. Counter-defendants have engaged in other illegal practices in their efforts to compete unfairly with Mattel. Larian has a practice of sending e-mail messages to a "Bratz News" distribution list that Larian created or that was created for him. Mattel is informed and believes that the recipients of e-mail messages sent to the "Bratz News" distribution list include members of the media as well as representatives of many of Mattel's most significant customers.

79. On May 12, 2006, Larian sent an e-mail message to the "Bratz News" distribution list that included a reference to Mattel's updated MY SCENE MY BLING BLING product with real gems. Mattel had not publicly announced this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel had guarded the identification of this particular product.

80. Shortly thereafter, Larian engaged in a campaign of calling Mattel's most significant customers, including but not limited to Target and TRU, regarding the MY SCENE MY BLING BLING product with real gems. In an effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING BLING product with real gems, Larian knowingly made false factual statements about that product to each retailer. As of the writing of this Second Amended

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-192**

1    Answer and Counterclaims, Mattel is aware that Larian represented to each retailer
2    that each was the only retailer to purchase the product and that Mattel would not be
3    supporting the product with television advertising.  At the time that Larian made
4    these statements, he knew them to be false.  As a result of Larian's
5    misrepresentations, at least one retailer cancelled its order for 75,000 units of the
6    MY SCENE MY BLING BLING product with real gems.  Only after Mattel
7    learned of Larian's misrepresentations and was able to correct them was Mattel able
8    to assure the retailer that Larian's representations were false and to persuade the
9    retailer to reinstate the order.
10            81.    Such conduct is not an isolated incident.  MGA and Larian, in an
11   effort to gain an unfair competitive advantage, repeatedly issued false and
12   misleading press releases.  In these press releases, MGA and Larian have
13   misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis
14   Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market
15   share of Mattel's BARBIE products.

**CLAIMS FOR RELIEF**

**First Counterclaim**

**Copyright Infringement**

**(Against MGA, MGA Entertainment (HK) Limited,**

**Larian, Bryant and Does 4 through 10)**

21            82.    Mattel repeats and realleges each and every allegation set forth in
22   paragraphs 1 through 81, above, as though fully set forth at length.
23            83.    Mattel is the owner of copyrights in works that are fixed in
24   tangible media of expression and that are the subject of valid, and subsisting,
25   copyright registrations owned by Mattel.  These include, without limitation, the
26   works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-
27   378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-
28

2154363.2

-53-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 13-193**

378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

84.   Counter-defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization.  Counter-defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

85.   Counter-defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made without Mattel's consent and for commercial purposes and the direct financial benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately failed to exercise their right and ability to supervise the infringing activities of others within their control to refrain from infringing Mattel's copyrighted works and have failed to do so in order to deliberately further their significant financial interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-defendants have engaged in direct, contributory and vicarious infringement of Mattel's copyrighted works.

86.   By virtue of defendants' infringing acts, Mattel is entitled to recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of suit and attorneys' fees, and all other relief permitted under the Copyright Act.

87.   Counter-defendants' actions described above have caused and will continue to cause irreparable damage to Mattel, for which Mattel has no remedy at law.  Unless Counter-defendants are restrained by this Court from continuing their infringement of Mattel's copyrights, these injuries will continue to occur in the future.  Mattel is accordingly entitled to injunctive relief restraining Counter-defendants from further infringement.

## Second Counterclaim

### Violation of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against All Counter-defendants)

88.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.   Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise").  The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).  In addition, beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, were employed by and associated-in-fact with a second enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "Bratz Criminal Enterprise").

90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by

EXHIBIT 13-195

1   means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully

2   and knowingly conduct and participate, directly and indirectly, in the conduct of

3   the MGA Criminal Enterprise's affairs and, in the case of MGA, MGA

4   Entertainment (HK) Limited, Larian, Bryant, and certain of the Doe Counter-

5   defendants, the Bratz Criminal Enterprise's affairs, through a pattern of

6   racketeering activity.  Their actions include multiple, related acts in violation of:

7   18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512

8   (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and

9   foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. §

10   506(a)(1)(A) (criminal copyright infringement).

11        91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

12   Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

13   Brisbois, and the Other Former Employees, and each of them, shared the common

14   purpose of enabling MGA to obtain confidential, proprietary and otherwise

15   valuable Mattel property through improper means in order to assist MGA in

16   illegally competing with Mattel domestically and throughout the world.

17        92.   The MGA Criminal Enterprise and Bratz Criminal Enterprise as

18   described herein are and have been at all relevant times continuing enterprises

19   because, among other reasons, each is designed to and did unlawfully acquire the

20   confidential business information and property of Mattel and incorporated this

21   information and property into MGA's ongoing business, marketing strategies and

22   business methods, practices and processes.  The conduct of each enterprise

23   continues through the date of this Second Amended Answer and Counterclaims and

24   is ongoing by virtue of MGA's continuing use of Mattel's information and property,

25   all to the detriment of Mattel.

26        93.   The pattern of racketeering activity, as defined by 18 U.S.C.

27   §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

28   of continuing criminal activity.  This activity consists of multiple acts of

-56-

2154363.2

EXHIBIT 13-196

1  racketeering by each member of the MGA Criminal Enterprise and Bratz Criminal
2  Enterprise, is interrelated, not isolated and is perpetrated for the same or similar
3  purposes by the same persons.  This activity extends over a substantial period of
4  time, up to and beyond the date of this Second Amended Answer and
5  Counterclaims.  These activities occurred after the effective date of 18 U.S.C.
6  §§ 1961 *et seq.*, and the last such act occurred within 10 years after the commission
7  of a prior act of racketeering activity.  These racketeering activities included
8  repeated acts of:

9        (a)  <u>Mail Fraud</u>:  Counter-defendants MGA, MGA Entertainment
10            (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and
11            Does 4 through 10, aided and abetted by each other and some or
12            all of the remaining members of the MGA Criminal Enterprise,
13            having devised a scheme or artifice to defraud Mattel of its
14            confidential trade secret information and property by conversion,
15            false representations, concealment and breaches of fiduciary duty,
16            did for the purpose of furthering and executing such a scheme or
17            artifice to defraud, deposited or caused to be deposited matters or
18            things to be sent or delivered by the Postal Service, or any private
19            or commercial interstate carrier, or took or received matters or
20            things therefrom, or knowingly caused matters or things to be
21            delivered by mail or such carrier according to the direction
22            thereon, or at the place at which it is directed to be delivered by
23            the person to whom it is addressed, in violation of 18 U.S.C.
24            § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in
25            the foregoing paragraphs and as evidenced by, among other
26            things, the true and correct copies of communications and other
27            evidence included in Exhibit C;
28

154363.2

-57-

**EXHIBIT 13-197**

(b) <u>Wire Fraud</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as evidenced by, among other things, the true and correct copies of communications and other evidence included in Exhibit C;

(c) <u>Tampering With a Witness, Victim or Informant</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal more than one record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, including this action, including without limitation by:

   i.   altering Bryant's contract with MGA relating to Bratz to conceal evidence that Bryant faxed the contract from the BARBIE COLLECTIBLES department of Mattel, using a fax

-58-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

21543363.2

**EXHIBIT 13-198**

machine owned by Mattel and while Bryant was employed by Mattel;

    ii.   altering numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings even though the drawings were not created in August 1998; and

    iii.   destroying electronic and other evidence, including by destroying evidence previously contained on Carter Bryant's and Isaac Larian's computer hard drives.

    Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d)   <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e)   <u>Criminal Copyright Infringement</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-199**

1  each other and some or all of the remaining members of the MGA

2  Criminal Enterprise, willfully infringed Mattel's copyrights,

3  including with respect to documents containing Mattel trade

4  secret and confidential information, for purposes of commercial

5  advantage and private financial gain, all in violation of 18 U.S.C.

6  § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater

7  particularity in the foregoing paragraphs.

8      94.   The persons alleged herein to have violated 18 U.S.C. § 1962(c)

9  are separate from, though employed by or associated with, MGA, the MGA Group,

10  the Bryant Group, the Mexican Group and the Canadian Group.

11      95.   MGA had a role in the racketeering activity that was distinct

12  from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

13  and did benefit, from the activity of its employees and agents alleged herein, and

14  thus was not a passive victim of racketeering activity, but an active perpetrator.

15      96.   Mattel has been injured in its business or property as a direct

16  and proximate result of the Counter-defendants' and the other enterprise members'

17  violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts

18  constituting the pattern of racketeering activity.

19      97.   As a result of the violations of 18 U.S.C. § 1962(c), by MGA,

20  MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,

21  Does 4 through 10, Brawer, Trueba, Vargas, Brisbois and the Other Former

22  Employees, Mattel has suffered substantial damages, in an amount to be proved at

23  trial.  Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its

24  general and special compensatory damages, plus interest, costs and attorneys, fees,

25  incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(c).

26

27

28

2154363.2

-60-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 13-200**

### Third Counterclaim
**Conspiracy To Violate the Racketeer**
**Influenced And Corrupt Organizations Act**
**(18 U.S.C. §§ 1962(d) and 1964(c))**
**(Against All Counter-defendants)**

98.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 97, above, as though fully set forth at length.

99.   Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

100.   These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.   Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.   In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

101.   The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

**EXHIBIT 13-201**

1  U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of
2  18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of
3  racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and
4  acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17
5  U.S.C. § 506(a)(1)(A).
6        102.  Counter-defendants and the other members of the MGA Criminal
7  Enterprise schemed to defraud Mattel and steal its property and trade secret
8  information by means of false representation, breaches of fiduciary duty,
9  conversation and concealment, as more fully set forth in the foregoing paragraphs.
10       103.  In furtherance of this unlawful conspiracy, and to effect its
11  objectives, Counter-defendants and various co-conspirators committed numerous
12  overt acts, including but not limited to those set forth in the foregoing paragraphs.
13       104.  Mattel has been injured in its business or property as a direct and
14  proximate result of the Counter-defendants' and the other enterprise members'
15  violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts
16  constituting the pattern of racketeering activity.
17       105.  As a result of the conspiracies between and among all Counter-
18  defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has
19  suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18
20  U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special
21  compensatory damages, plus interest, costs and attorneys, fees, incurred by reason
22  of Counter-defendants' violations of 18 U.S.C. § 1962(d).

23                    **Fourth Counterclaim**
24                **Misappropriation of Trade Secrets**
25         **(Against Counter-defendants MGA, MGA de Mexico,**
26                **Larian, Machado and Does 4 through 10)**
27       106.  Mattel repeats and realleges each and every allegation set forth in
28  paragraphs 1 through 105, above, as though fully set forth at length.

2154363.2

-62-

107. As used herein, "Trade Secret Material" shall mean the documents, materials and information stolen by Machado, Trueba, Vargas, Brisbois, the Other Former Employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants, the Trade Secret Materials gave Mattel a significant competitive advantage over its existing and would-be competitors, including MGA. This advantage, as to MGA, has now been compromised as a result of Counter-defendants' unlawful activities.

108. Mattel made reasonable efforts under the circumstances to maintain the confidentiality of the Trade Secret Materials, including by having employees and consultants who may have access the Trade Secret Materials sign confidentiality agreements that oblige them not to disclose the Trade Secret Materials or characteristics of the Trade Secret Materials; by limiting the circulation of said materials within Mattel; by protecting and limiting access to computers with log-in identifications and passwords; by limiting each employee's access to electronic files to those that the particular employee needs to access; by educating employees on the nature of Mattel's information that is confidential and proprietary; and by reminding employees on a regular and periodic basis of their obligation to protect and maintain Mattel's confidential and proprietary information.

109. Mattel's Trade Secret Materials derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

110. Counter-defendants have illegally obtained the trade secret materials, as set forth above, and through other means of which Mattel is presently unaware.

111. Counter-defendants have used and disclosed Mattel's Trade Secret Materials without Mattel's consent and without regard to Mattel's rights, and

-63-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-203**

1  without compensation, permission, or licenses for the benefit of themselves and

2  others.

3        112. Counter-defendants' conduct was, is, and remains willful and

4  wanton, and was taken with blatant disregard for Mattel's valid and enforceable

5  rights.

6        113. Counter-defendants' wrongful conduct has caused and, unless

7  enjoined by this Court, will continue in the future to cause irreparable injury to

8  Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel

9  is therefore entitled to a permanent injunction restraining and enjoining Counter-

10  defendants, and each of them, as well as their agents, servants, and employees, and

11  all persons acting thereunder, in concert with, or on their behalf, from further using

12  in any manner Mattel's trade secrets.

13        114. In addition, as a proximate result of Counter-defendants'

14  misconduct, Mattel has suffered actual damages, and Counter-defendants have been

15  unjustly enriched.

16        115. The aforementioned acts of the Counter-defendants were willful

17  and malicious, including in that Counter-defendants misappropriated Mattel's trade

18  secrets with the deliberate intent to injure Mattel's business and improve their own.

19  Mattel is therefore entitled to enhanced damages. Mattel is also entitled to

20  reasonable attorney's fees.

21                    **Fifth Counterclaim**

22                    **Breach of Contract**

23                    **(Against Bryant)**

24        116. Mattel repeats and realleges each and every allegation set forth in

25  paragraphs 1 through 115, above, as though fully set forth at length.

26        117. Pursuant to his Employment Agreement, Bryant agreed that he

27  would not, without Mattel's express written consent, engage in any employment or

28  business other than for Mattel or assist in any manner any business competitive

2154363.2

-64-

**EXHIBIT 13-204**

1   with the business or future business plans of Mattel during his employment with

2   Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further assigned to

3   Mattel all right, title and interest in "inventions," including without limitation

4   "designs" and other works that he conceived, created or reduced to practice during

5   his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire,

6   Bryant certified that, other than as disclosed, he had not worked for any competitor

7   of Mattel and had not engaged in any business venture or transaction involving a

8   Mattel competitor that could be construed as a conflict of interest.  Bryant further

9   promised that he would notify his supervisor immediately of any change in his

10  situation that would cause him to change any of the foregoing certifications or

11  representations.

12          118.  The Employment Agreement and the Conflict Questionnaire are

13  valid, enforceable contracts, and Mattel has performed each and every term and

14  condition of the Employment Agreement and Conflict Questionnaire required to be

15  performed by Mattel.

16          119.  Bryant materially breached the foregoing contracts with Mattel,

17  in that, among other things, he secretly aided, assisted and worked for a Mattel

18  competitor during his employment with Mattel without the express written consent

19  of Mattel.

20          120.  As a consequence of Bryant's breach, Mattel has suffered and

21  will, in the future, continue to suffer damages in an amount to be proven at trial.

22  Such damages include, without limitation, the amounts paid by the competitor to

23  Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

24  his Mattel employment; the amount that Mattel paid Bryant during the time he

25  wrongfully worked with MGA; the value of information and intellectual property

26  owned by Mattel which Bryant provided to MGA; the value of the benefits that

27  MGA obtained from Bryant during the time he was employed by Mattel; and the

28

21543363.2

-65-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 13-205**

value of the benefits that MGA obtained from Bryant as a result of the work he
performed for or with MGA during his Mattel employment.

121.   Bryant's conduct has caused, and unless enjoined will continue to
cause, irreparable injury to Mattel that cannot be adequately compensated by
money damages and for which Mattel has no adequate remedy at law.  Bryant
specifically acknowledged in his Employment Agreement that his breach of the
Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be
entitled to injunctive relief to enforce this Agreement, in addition to damages and
other available remedies."  Accordingly, Mattel is entitled to orders mandating
Bryant's specific performance of his contracts with Mattel and restraining Bryant
from further breach.

### Sixth Counterclaim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

122.   Mattel repeats and realleges each and every allegation set forth in
paragraphs 1 through 121, above, as though fully set forth at length.

123.   Valid agreements existed between Mattel and Bryant, Brawer,
Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,
the "Mattel Employees")

124.   At all times herein mentioned, MGA, Larian and Does 4 through
10 knew that the Mattel Employees had a duty under their agreements not to work
for or assist any competitor of Mattel, such as MGA.  In addition, at all times
mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had
assigned to Mattel, and was obligated to disclose to Mattel all inventions, including
designs and other works, created, conceived or reduced to practice during their
employment with Mattel.

125. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

126. As a direct and proximate result of Counter-defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

127. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128. Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Seventh Counterclaim

### Breach of Fiduciary Duty

### (Against Bryant and Machado)

129. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties. In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel. They confirmed their relationship of trust with Mattel in respective employee agreements. Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests

2154363.2

-67-

**EXHIBIT 13-207**

1  or that would deprive Mattel of any opportunities, profit or advantage which Bryant
2  or Machado might bring to Mattel.

3        131. Bryant breached his fiduciary duty to Mattel in that, while
4  employed by Mattel, he secretly aided and assisted a competitor of Mattel,
5  including without limitation by entering into an agreement with a Mattel
6  competitor. As alleged above, Bryant also breached the aforementioned duty by
7  using Mattel property and resources for the benefit of, and to aid and assist, himself
8  personally and MGA.

9        132. Machado breached his fiduciary duty to Mattel, in that while
10 employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
11 among other things, misappropriating Mattel trade secret and proprietary
12 information and providing said information to officers of MGA. Machado also
13 breached the aforementioned duty by using Mattel property and resources for the
14 benefit of, and to aid and assist, himself personally and MGA.

15       133. As a direct and proximate result of Counter-defendants' wrongful
16 conduct, Mattel has incurred damages in an amount to be determined at trial.

17       134. Counter-defendants acted with malice, fraud and oppression, and
18 in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
19 award of exemplary damages against Counter-defendants in an amount to be
20 determined at trial.

21       135. Furthermore, Counter-defendants' conduct has caused, and unless
22 enjoined will continue to cause, irreparable injury to Mattel that cannot be
23 adequately compensated by money damages and for which Mattel has no adequate
24 remedy at law. Accordingly, Mattel is entitled to an order restraining further
25 breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants
26 from continuing to benefit from such breach.

27
28

### Eighth Counterclaim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

136. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA .

138. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) held positions of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to taking confidential trade secret information from Mattel's premises and providing that information to a competitor.

139. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their fiduciary duties to Mattel, knowing that their conduct would constitute breaches of their fiduciary duties to Mattel.

140. As a direct and proximate result of Counter-defendants' efforts, the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has incurred damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

2154363.2

**EXHIBIT 13-209**

141. In taking the aforesaid actions, MGA, Larian and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Ninth Counterclaim
### Breach of Duty of Loyalty
### (Against Bryant and Machado)

142. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 141, above, as though fully set forth at length.

143. As employees of Mattel, Bryant and Machado owed a duty of undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not compete with Mattel or assist a competitor of Mattel during their employment with Mattel. Pursuant to this duty, Bryant and Machado were required to always give preference to Mattel's business over their own, similar interests during the course of their employment with Mattel.

144. Bryant and Machado breached their duty of loyalty to Mattel in that, while employed by Mattel, they secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into agreements with a Mattel competitor. As alleged above, they also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, themselves personally and the competitor of Mattel.

145. As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

146. Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against Counter-defendants in an amount to be determined at trial.

147. Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

148. In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

<u>Tenth Counterclaim</u>

**Aiding and Abetting Breach of Duty of Loyalty**

**(Against MGA, Larian and Does 4 through 10)**

149. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel. MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-211**

1  Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

2  Mattel during their Mattel employment.

3          152.  Despite such knowledge, Counter-defendants MGA, Larian and

4  Does 4 through 10 intentionally and without justification solicited, encouraged,

5  aided and abetted and gave substantial assistance to the Mattel Employees to

6  breach their duties of loyalty to Mattel, knowing that their conduct would constitute

7  breaches of their duties of loyalty to Mattel.

8          153.  As a further consequence of Counter-defendants' efforts, Mattel

9  has suffered injury and is entitled to compensatory damages in an amount to be

10  proven at trial.

11          154.  In taking the aforesaid actions, MGA, Larian and Does 4 through

12  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

13  rights.  Accordingly, Mattel is entitled to recover exemplary damages from

14  Counter-defendants in an amount to be determined at trial.

15          **Eleventh Counterclaim**

16          **Conversion**

17          **(Against All Counter-defendants)**

18          155.  Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 154, above, as though fully set forth at length.

20          156.  Counter-defendants wrongfully converted Mattel property and

21  resources by appropriating and using them for their own benefit and gain and for

22  the benefit and gain of others, without the permission of Mattel.

23          157.  Mattel was entitled to, among other things, the exclusive right

24  and enjoyment in property and tangible materials owned by Mattel, including

25  without limitation such proper and materials that were created by Bryant while he

26  was a Mattel product designer.  Such property was taken by Bryant from Mattel to

27  further his own interests and, in at least some instances, provided by Bryant to

28  Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

-72-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-212**

158.  In addition, Counter-defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices.  Counter-defendants did so without Mattel's permission and continue to possess them.

159.  As a direct and proximate result of Counter-defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160.   As a result of Counter-defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered, which is not measured by the value of the property misappropriated, but includes the lost profits that Mattel suffered as a result of the conversion or, alternatively, the profits generated by the Counter-defendants that would not have been generated but for the conversion.  Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to Counter-defendants' acts of conversion.

161.  Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

162.  Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining Counter-defendants from further conversion of Mattel property and resources and/or restraining Counter-defendants from continuing to benefit from such conversion.

**Twelfth Counterclaim**

**Unfair Competition**

**(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

**(Against All Counter-defendants)**

163. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164. Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165. By engaging in the foregoing conduct, Counter-defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166. As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial. No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining Counter-defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-214**

### Thirteenth Counterclaim

### Declaratory Relief

### (Against All Counter-defendants)

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and Counter-defendants regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1. For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived,

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-215**

1    created or reduced to practice by Bryant during the term of his Mattel employment

2    and/or by any others then-employed by Mattel, as well as in all derivatives

3    prepared therefrom, and that Mattel is the true owner of the foregoing;

4              2.    For a declaration that any agreement between Bryant, on the one

5    hand, and MGA or any person or entity, on the other hand, in which Bryant

6    purported to assign any right, title or interests in any work that he conceived,

7    created or reduced to practice while a Mattel employee, including but not limited to

8    the Bratz designs, is void and of no effect;

9              3.    For an Order enjoining and restraining Counter-defendants, their

10   agents, servants and employees, and all persons in active concert or participation

11   with them, from further wrongful conduct, including without limitation from

12   imitating, copying, distributing, importing, displaying, preparing derivatives from

13   and otherwise infringing Mattel's copyright-protected works;

14             4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other

15   applicable law, impounding all of Counter-defendants' products and materials that

16   infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

17   by which copies of the works embodied in Mattel's copyrights may be reproduced

18   or otherwise infringed;

19             5.    For an Order mandating that Counter-defendants return to Mattel

20   all tangible items, documents, designs, diagrams, sketches or any other

21   memorialization of inventions created or reduced to practice during Bryant's

22   employment with Mattel as well as all Mattel property converted by Counter-

23   defendants;

24             6.    For an Order mandating specific performance by Bryant to

25   comply with and satisfy Bryant's contractual obligations to Mattel;

26             7.    That Mattel be awarded, and Counter-defendants be ordered to

27   disgorge, all payments, revenues, profits, monies and royalties and any other

28   benefits derived or obtained as a result of the conduct alleged herein, including

2154363.2

-76-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 13-216**

1   without limitation of all revenues and profits attributable to Counter-defendants'

2   infringement of Mattel's copyrights under 17 U.S.C. § 504;

3          8.    For an accounting of all profits, monies and/or royalties from the

4   exercise of ownership, use, distribution, sales and licensing of Bratz;

5          9.    For the imposition of a constructive trust over Bratz, including

6   without limitation registrations and applications for registrations relating thereto

7   made or filed by Counter-defendants and third parties, and all profits, monies,

8   royalties and any other benefits derived or obtained from Counter-defendant's

9   exercise of ownership, use, sale, distribution and licensing of Bratz;

10        10.   That Mattel recover its actual damages and lost profits;

11        11.   That Counter-defendants be ordered to pay exemplary damages

12  in a sum sufficient to punish and to make an example of them, and deter them and

13  others from similar wrongdoing;

14        12.   That Counter-defendants be ordered to pay treble its general and

15  special damages, plus interest, costs and attorney's fees incurred by reason of

16  Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

17        13.   That Counter-defendants be ordered to pay double damages due

18  to their willful and malicious misappropriation of Mattel's trade secrets with

19  deliberate intent to injure Mattel's business and improve its own;

20        14.   That Counter-defendants pay to Mattel the full cost of this action

21  and Mattel's attorneys' and investigators' fees; and

22

23

24

25

26

27

28

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-217**

1        15.   That Mattel have such other and further relief as the Court may

2    deem just and proper.

3

4    DATED:  July 12, 2007         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5

6               By _John Quinn (BAP_

7                  John B. Quinn
              Attorneys for Defendant and Counter-
8                  claimant Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

154363.2

-78-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 13-218**

## DEMAND FOR JURY TRIAL

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  July 12, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By  _John Quin 180_
John B. Quinn
Attorneys for Defendant and Counter-
claimant Mattel, Inc.

-79-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 13-219**

**EXHIBIT 14**

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION

 4     ------------------------------          Certified Copy
 5     CARTER BRYANT, an individual,  )

 6              Plaintiff,            )

 7         vs.                        )  No. CV 04-09049 SGL

 8     MATTEL, INC., a Delaware       )  (RNBx) (c/w CV

 9     Corporation,                   )  04-9059 & 05-2727)

10              Defendant.            )

11     ------------------------------)

12     CONSOLIDATED WITH MATTEL, INC.,)

13     v. BRYANT and MGA             )

14     ENTERTAINMENT, INC., v. MATTEL,)

15     INC.                          )

16     ------------------------------

17

18         Videotaped 30(b)(6) deposition of

19         FRED T. KAWASHIMA, taken at 400 South

20         Hope Street, Los Angeles, California,

21         commencing at 10:27 A.M., Wednesday,

22         January 17, 2007, before Wendy S.

23         Schreiber, CSR No. 3558, RPR, CLR.

24

25     PAGES 1 - 280
```

EXHIBIT 14-220

```
 1   clarify that, which you've given me the opportunity

 2   to.

 3        Q.   So I have to confess now I'm confused.   So

 4   as Mattel's 30(b)(6) designee on the E-mail systems

 5   between 1998 and 2000, what is Mattel's best          03:10PM

 6   understanding of what the tape rotation policy was?

 7        A.   Between '98 and 2000?

 8        Q.   Correct.

 9        A.   It changed.

10        Q.   Where did it start and where did it end up  03:11PM

11   in that time period?

12        A.   Based on what I was told by Karen Sagawa it

13   was a 30-day E-mail retention.

14        Q.   Let me --

15             MR. COREY:   Let's talk about tape rotation  03:11PM

16   first.   Then we'll talk about E-mail retention next.

17             THE WITNESS:   Understood.

18   BY MR. JENAL:

19        Q.   Yeah.   So please answer the question with

20   regards to tape rotation.                            03:11PM

21        A.   Ninety days.

22        Q.   Ninety days the entire time period or did

23   that change?

24        A.   I believe that changed.

25        Q.   So explain to me where it started -- what it 03:11PM
                                                          157
```

**EXHIBIT 14-221**

```
 1   was as of '98 and how it changed through 2000.

 2       A.   It started -- '98 it was a 90-day tape

 3   rotation.  In 2000 it was a 30-day tape rotation

 4   plus or minus a couple of days.  It depends on the

 5   month.                                        03:11PM

 6       Q.   And for E-mail retention what is your

 7   understanding on behalf of Mattel as to what the

 8   E-mail retention period was in '98 through 2000?

 9       A.   In '98 it was 30 days.  In 2000 was 90 --

10   '98 30 days.  2000 90 days.                   03:12PM

11       Q.   So if I understand the import of what you

12   just told me, in 2000 I would keep E-mails in my in

13   box on the server for 90 days before they would be

14   deleted, correct?

15       A.   Yes.                                 03:12PM

16       Q.   But an E-mail that was -- well, let's back

17   up.  So now let's talk about this tape rotation that

18   you're talking about.  Let's go back to 1998 and

19   you've just testified that in 1998 it was a 90-day

20   tape rotation, correct?                       03:13PM

21       A.   Yes.

22       Q.   What do you mean by a 90-day tape rotation?

23       A.   Tapes were backed up on a daily basis and

24   the tapes were sent off site.  So after a course of

25   90 days the -- so it's a first in, first out   03:13PM
                                                       158
```

**EXHIBIT 14-222**

```
 1              THE WITNESS:  Yes.
 2    BY MR. JACOBY:
 3        Q.   Could you tell me the other companies you
 4    worked for?
 5              MR. COREY:  Same objection.              04:39PM
 6              THE WITNESS:  While I was with Microsoft I
 7    worked for Mattel, TRW, DreamWorks, Antelope Valley
 8    Hospital, TCW.  There's other companies I just don't
 9    recall but, you know, those are the main -- those
10    are the big ones.  I mean, I spent a lot of time at  04:39PM
11    Disney.  Did I say Disney?
12    BY MR. JACOBY:
13        Q.   Did any of those other companies have the
14    same auto-delete protocol that Mattel had?
15              MR. COREY:  Again, you can answer that to  04:40PM
16    the extent you're not bound by any confidentiality
17    obligations with respect to the other companies.
18              THE WITNESS:  Actually, that's a good point.
19    That particular question I cannot answer.
20    BY MR. JACOBY:                                      04:40PM
21        Q.   You can answer it "yes" or "no."  Are you
22    aware of other companies that did not have --
23    without naming the companies --
24              MR. COREY:  You can answer that "yes" or
25    "no."                                               04:40PM
                                                            215
```

**EXHIBIT 14-223**

1              THE WITNESS:  Yes.

2     BY MR. JACOBY:

3         Q.   So there were other companies that did have

4     the auto-delete protocol that you worked with?

5         A.   Yeah, they used Mailbox Manager, yes, that's    04:40PM

6     correct.

7         Q.   Did other companies have archiving systems

8     that -- that allowed E-mails to be overwritten

9     within 90 days?

10             MR. COREY:  Objection:  vague and ambiguous.    04:40PM

11     BY MR. JACOBY:

12        Q.   Sure.  I'm talking about the backup tapes

13     now.  Did any of the other companies you worked for

14     have a backup system that only retained E-mails for

15     a period of 30 to 90 days?                              04:41PM

16             MR. COREY:  If you can just clarify whether

17     you're talking about the backup tape rotation or the

18     E-mail retention policy.

19             MR. JACOBY:  I'm talking about the backup

20     tapes.                                                  04:41PM

21             MR. COREY:  Thank you.

22             THE WITNESS:  So you're referring to the

23     backup tape rotation?

24     BY MR. JACOBY:

25        Q.   Let me withdraw it and ask it a different       04:41PM
                                                                216

**EXHIBIT 14-224**

```
 1    way.
 2            Did any of the other companies you worked
 3    for keep all the tapes and not overwrite them?
 4       A.   No.
 5       Q.   So all the companies you worked for had some   04:41PM
 6    overwriting?
 7       A.   They had a rotation policy write process.
 8       Q.   Was Mattel's rotation typical or atypical
 9    based on your experience?
10       A.   I'm sorry?                                       04:41PM
11       Q.   Based on your experience was Mattel's
12    rotation typical or atypical?
13       A.   Typical.
14       Q.   Did you ever participate in any -- you said
15    that there were some people who would -- between '98    04:41PM
16    and 2000 who would be angry that you couldn't
17    retrieve E-mails because they had been auto-deleted
18    and overwritten in the tape backup; is that correct?
19       A.   That is between '98 and 2000.  Yes, I've
20    overheard people talking about that, yes.               04:42PM
21       Q.   How common a complaint was that?
22       A.   Oh, not common at all.
23       Q.   Did the IT department ever have meetings
24    like department meetings?
25            MR. COREY:  Between '98 and 2000?               04:42PM
                                                                 217
```

**EXHIBIT 14-225**

```
 1    testimony.
 2              THE WITNESS:  The project didn't ask me to
 3    look into those E-mails as you referred.  It had to
 4    do -- it was part of the process to evaluate and
 5    ascertain why replication wasn't occurring, E-mail      05:26PM
 6    slowness, between Asia and El Segundo and/or
 7    Phoenix, North America sites.  So in the process you
 8    look at queues, why are they backed up and you have
 9    to delve deeper to see what was actually queuing up.
10    BY MR. JACOBY:                                          05:27PM
11        Q.   Why does Mattel -- why did Mattel from '98
12    through 2000 have an E-mail auto-delete system?
13    What is its purpose?
14              MR. COREY:  Objection:  mischaracterizes his
15    testimony as to what the system is.                     05:27PM
16              THE WITNESS:  Why did they have -- why did
17    they employ -- why did they enable that system?
18    BY MR. JACOBY:
19        Q.   Yeah.
20        A.   The primary reason is to manage the space      05:27PM
21    growth.
22        Q.   Explain to me the nature of that problem as
23    it existed from '98 through 2000.
24        A.   If you rely on the user population to
25    perform their own housekeeping, they won't.  They'll    05:27PM
                                                                 256
```

**EXHIBIT 14-226**

1    just let E-mail grow and grow and grow consuming

2    valuable disk space which will eventually impede

3    performance and shut the server down.

4        Q.   Was it your recommendation to have -- let me

5    ask this.  Did Microsoft Mail have an auto-delete      05:28PM

6    system?

7        A.   No.

8        Q.   So auto-delete was something that came into

9    being when you moved to the 5.0 Exchange?

10       A.   Yes, Mailbox Manager was supposed to feature 05:28PM

11   auto 5.0.

12       Q.   Do you know who recommended the 30-day auto

13   delete?

14       A.   I don't know the person.  I believe it

15   probably emanated from the project team.              05:28PM

16       Q.   Did you participate in meetings where the

17   pros and cons of enabling the auto delete were

18   discussed?

19       A.   No.

20       Q.   Do you know if anyone -- do you know if such 05:28PM

21   a meeting occurred?

22       A.   No, I cannot testify to that.

23       Q.   So tell me what you know about how the

24   decision came to pass that Mattel would, in fact,

25   use auto-delete and would, in fact, set it at 30      05:28PM

                                                           257

**EXHIBIT 14-227**

```
 1    STATE OF CALIFORNIA   ) ss:
 2    COUNTY OF LOS ANGELES )
 3
 4         I, WENDY S. SCHREIBER, CSR No. 3558, do
 5    hereby certify:
 6
 7         That the foregoing deposition of FRED T.
 8    KAWASHIMA was taken before me at the time and place
 9    therein set forth, at which time the witness was
10    placed under oath and was sworn by me to tell the
11    truth, the whole truth, and nothing but the truth;
12         That the testimony of the witness and all
13    objections made by counsel at the time of the
14    examination were recorded stenographically by me,
15    and were thereafter transcribed under my direction
16    and supervision, and that the foregoing pages
17    contain a full, true and accurate record of all
18    proceedings and testimony to the best of my skill
19    and ability.
20         I further certify that I am neither
21    counsel for any party in said action, nor am I
22    related to any party to said action, nor am I in any
23    way interested in the outcome thereof.
24
25
                                                      277
```

Veritext National Court Reporting Services
213 623-5005

**EXHIBIT 14-228**

1          IN WITNESS WHEREOF, I have subscribed my
2    name this 29th day of January, 2007.
3
4
5
6    _____
7    WENDY S. SCHREIBER, CSR No. 3558, RPR
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    278

EXHIBIT 14-229

**EXHIBIT 15**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION          Certified Copy

4

5     -------------------------------

6     MATTEL, INC., a Delaware          )

7     Corporation,                      )

8                   Plaintiff,          )

9              vs.                      ) No. CV 04-9059

10    CARTER BRYANT, an individual;     )   NM (RNBx)

11    and DOES 1 through 10,            ) VOLUME II

12    Inclusive,                        )

13                   Defendants.        )

14    -------------------------------   )

15    (COMPLETE CAPTION ON NEXT PAGE.)

16

17       CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19    Continued Videotaped 30(b)(6) Deposition

20    of FRED T. KAWASHIMA, taken at 400 South

21    Hope Street, Los Angeles, California,

22    commencing at 9:57 A.M., Tuesday,

23    June 19, 2007, before Wendy S. Schreiber,

24    CSR No. 3558, RPR, CLR.

25    PAGES 281 - 517                              281

EXHIBIT 15-230

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Is there any policy at Mattel about not

2  deleting E-mails out of PST files?

3    A.    I recall very vividly that there is an

4  E-mail that was sent out by Bob Normile who is the

5  head of our Legal department and the reason why I          12:01PM

6  remember that is on April the 18th of '05 probably

7  the first and last time I ever saw an E-mail sent by

8  him and it was sent to all Mattel employees around

9  the world to -- to preserve information having to do

10  with this litigation and to not delete them, to         12:01PM

11  preserve them, and since it was sent to everyone it

12  was -- it just struck me as being very, very

13  important, as very critical that we don't do that.

14  So that's why it was sent to everybody.

15    Q.    When was the last time you looked at this     12:02PM

16  April 18th, 2005 E-mail?

17    A.    It was on that day when I read it.

18    Q.    You haven't looked at it since?

19    A.    Verbatim, no.

20    Q.    At all?                                          12:02PM

21    A.    No.

22    Q.    Have you looked at that E-mail at all since

23  April 18th, 2005?

24    A.    No.

25    Q.    Do you still have that E-mail?                   12:02PM

                                                                   366

**EXHIBIT 15-231**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Changed such as?

2    Q.   Changed in any way.

3    A.   Not to my knowledge, no.

4    Q.   In the functionality in the Mailbox Manager

5    such that you can -- I think you had testified        01:35PM

6    previously that you can adjust or configure that on

7    a mailbox-by-mailbox basis; is that correct?

8         MR. COREY:  Objection:  vague as to time.

9    BY MR. JENAL

10   Q.   Currently.                                        01:36PM

11   A.   Currently?  No, you cannot.

12   Q.   So if I had a mailbox on the Exchange server

13   at Mattel and for some reason I demanded to have 180

14   days' retention of my E-mails, is it your testimony

15   that that functionality simply doesn't exist within   01:36PM

16   Mailbox Manager?

17   A.   There isn't a place within the configuration

18   of Mailbox Manager where it allows you to place

19   exceptions to the policy.

20   Q.   Can I have multiple policies?                     01:36PM

21   A.   The policy we have in place are global

22   policies.  You're asking if we can put a separate

23   policy in?  Possibly.

24   Q.   When you say "possibly," do you know whether

25   that functionality exists within Mailbox Manager      01:37PM
                                                           381

**EXHIBIT 15-232**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.    Yes.

2     Q.    Did 5.0 have that same approach; that you

3  could have exceptions to the general policy?

4     A.    Based on my recollection, I believe so.

5     Q.    But in 2003 I think it was your testimony     01:46PM

6  that Mailbox Manager doesn't allow for exceptions in

7  the same way that 5.0 and 5.5 had allowed exceptions

8  to the policy, correct?

9     A.    That's correct.

10

11

12

REDACTED

19

20

21

22

23

24                                                      :47PM

25                                                      389

CONFIDENTIAL - ATTORNEYS' EYES ONLY



REDACTED

:48PM

**EXHIBIT 15-234**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    yes, that is what you're telling me, I could not

2    have multiple?

3        A.    It is possible -- well -- you need to ask

4    more specific questions.

5                                                    )2PM

6

7

8

9                                                    2PM

10

11

12

13

14                                          01:53PM

15            REDACTED

16

                                                     ?M

21

22

23

24                                          01:53PM

25                                              394

**EXHIBIT 15-235**



CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

2

3

4

5                        1:53PM

6

7

8

9

10                   01:53PM

11

12

13

14

15                   54PM

16       REDACTED

17

18

19

2

23

24                 01:54PM

25                   395

**EXHIBIT 15-236**



CONFIDENTIAL - ATTORNEYS' EYES ONLY

4

5

6

7

8

9

1

1

1

01:54PM

01:55PM

REDACTED

16

17

18

19

20

21

22

23

24

2

01:55PM

01:55PM

396

**EXHIBIT 15-237**

CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 4
 5                    REDACTED
 6
 7
 f
 
10              (Brief recess.)                    01:57PM
11       VIDEO OPERATOR:  Back on the record at 2:03.
12       MR. JENAL:  Can I have the last question
13  read back, please?
14          (The pending question was read as follows
15                                                 01:56PM
16
17
18
19
20              REDACTED                           02:03PM
21
22
23
24
                                                   02:04PM
25                                                   397
```

**EXHIBIT 15-238**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

2

3

:04PM

REDACTED

10

11

12

1:

1

1

02:04PM

16

17

2

2

22

23

24

2:05PM

25

398

**EXHIBIT 15-239**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

REDACTED

**EXHIBIT 15-240**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15        REDACTED

16

17

18

19

20

21

22

23

24

25

EXHIBIT 15-241



1
2
3
4
5  PM
6
7
8
9  PM
10
11
12
13
14
15  PM
16
17
18
19  PM
20
21
22
23
24  PM
25  401

REDACTED

**EXHIBIT 15-242**



1

2

3

4

5               PM

6

7

8

9

10           PM

11

12

13

14         PM

15    REDACTED

16

17

18

19

20          2:09PM

21

22

23

24        02:09PM

25         402

**EXHIBIT 15-243**



REDACTED

Veritext National Deposition & Litigation Services
213 623-5005

**EXHIBIT 15-244**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  wouldn't adhere to their operating procedure?

2       MR. COREY:  Objection:  assumes facts.

3       THE WITNESS:  I don't believe it's a

4  automated process.  It's a manual process.

5  BY MR. JENAL:                              04:02PM

6       Q.   Which is a manual process, sorry?

7       A.   Deletion, removal of the account.

8       Q.   So it requires some human being to

9  physically go in and per the procedure at the end of

10  14 days delete the E-mail account and its contents    04:02PM

11  and delete the M drive folder and its contents?

12       A.   That is my understanding.

13       Q.   Okay.  But at least since April of 2005 that

14  E-mail would still be preserved because all of the

15  backups for the mailbox servers have been preserved,   04:03PM

16  correct?

17       A.   Yes, all 4,200 tapes.

18       Q.   It's up to 4,200 tapes currently?

19       A.   That is my -- that is what I've been told.

20       Q.   How many tapes does it take to do an      04:03PM

21  instance of a backup on the Exchange server at

22  Mattel in El Segundo?

23       A.   I've been told anywhere between three to six

24  tapes.

25       Q.   And how often are those backups performed in 04:03PM

475

**EXHIBIT 15-245**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    El Segundo?

2        A.    Nightly.

3        Q.    And are those full backups nightly?

4        A.    That's correct, full.

5        Q.    And how long has it been the practice to          04:03PM

6    perform full backups of the Exchange servers at

7    Mattel in El Segundo?

8        A.    Can I look at the deposition?  I think Karen

9    Sagawa had mentioned -- mentioned something about

10   that on the date.                                           04:04PM

11       Q.    Let's save it for a break if we get there

12   but just as you sit here today what's your best

13   estimate of how long that's been the policy?

14       A.    Full backup?

15       Q.    I don't mean policy in the strict sense.          04:04PM

16   The procedure --

17           MR. COREY:  You mean practice?

18           MR. JENAL:  The practice and procedure at

19   Mattel.

20           THE WITNESS:  My best estimation is at least 04:04PM

21   since year 2000.

22       Q.    But both the practice of maintaining all of

23   these backup tapes as well as the procedures that

24   you've just described by Ms. Martel and Ms. Dawsey's

25   groups those were all implemented after April 18th        04:05PM
                                                                 476

**EXHIBIT 15-246**