1   conduct, Mattel pirates and exploits, by subliminal or conscious association with

2   MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3       111.  Mattel has particularly and deliberately poached upon the commercial

4   magnetism of MGA's "BRATZ" and the success of "BRATZ".  Mattel's conduct

5   has been intentional and willful, and is calculated specifically to trade off the

6   goodwill that MGA has developed in its successful "BRATZ" line.

7       112.  By its acts, including its intentional imitation of the distinctive features

8   of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9   well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10  total image of the "BRATZ" line, imitation of other MGA products, packaging and

11  advertising, and other conduct alleged herein, Mattel has engaged in unfair

12  competition under both federal and California state law.

13      113.  Mattel has also willfully and maliciously used its power, influence and

14  intimidation to threaten certain retailers, suppliers, licensees, distributors and

15  manufacturers so as to limit, if not prevent, MGA from doing business with these

16  retailers, suppliers, licensees, distributors and manufacturers, using its power and

17  influence to intimidate and manipulate industry bodies.  Mattel has further used its

18  power and influence to attempt to, if not actually, intimidate and threaten MGA's

19  current and potential employees so as to cause MGA competitive injury.

20      114.  Alone, in combination, or in totality, Mattel's actions discussed and

21  alleged herein constitute unfair competition and unfair business practices within the

22  meaning of federal law, California statutory law and/or California common law.

23      115.  As a result of its conduct, Mattel has derived substantial monetary and

24  non-monetary benefit and business advantage.  Mattel has also wrongfully diverted

25  profits away from MGA and to Mattel and, on information and belief, deprived

26  MGA of the patronage of a large number of actual and potential customers.

27      116.  MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

34

**EXHIBIT 16-283**

1    117.  Monetary relief alone, however, is not adequate to address fully the

2    irreparable injury that Mattel's actions have caused and will continue to cause

3    MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent

4    injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from

5    engaging in acts of unfair competition and unfair business practices.

6    118.  MGA is further entitled to relief whereby Mattel is ordered to pay

7    restitution for damages resulting from Mattel's unfair competition and unfair

8    business practices.

9    **THIRD CLAIM FOR RELIEF**

10   **(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330**

11   **and California Common Law)**

12   119.  MGA repeats and realleges the allegations contained in paragraphs 1

13   through 118 of this Complaint and incorporates them by reference as though fully

14   and completely set forth herein.

15   120.  The look and trade dress of the MGA products referenced herein are

16   distinctive and famous, and have been since before Mattel launched its similar

17   versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and

18   dilution of the distinctive look of MGA's products and trade dress, which

19   previously served as a unique source identifier for MGA, within the meaning of the

20   Lanham Act, California Business and Professions Code § 14330 and/or California

21   common law.

22   121.  Mattel's conduct has been intentional and willful, calculated

23   specifically to trade on MGA's goodwill and reputation and to cause dilution of

24   MGA's famous marks, particularly those connected with MGA's famous and

25   successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky

26   Fashion Makeover Head" and "BRATZ PETZ" line.

27   122.  MGA has been damaged by, and Mattel has profited from, Mattel's

28   wrongful conduct in an amount to be proven at trial.

35

**EXHIBIT 16-284**

123.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

### FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.  MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.  As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

### PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.   That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.   using confusingly similar trade dress;

    b.   improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.   engaging in unfair competition and unfair business practices; and

    d.   diluting MGA's trade dress;

2.   For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.   For the disgorgement of all profits derived by Mattel for its acts of:

    a.   false designation of origin or affiliation;

**EXHIBIT 16-285**

b.  unfair competition and unfair business practices; and

c.  dilution;

4.  For costs of suit and reasonable attorneys' fees;

5.  For punitive and/or exemplary damages as a result of Mattel's willful and malicious conduct to the extent allowable by law; and

6.  For such other and further relief as the Court deems just and proper.

Dated:  April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: _____
Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

37

**EXHIBIT 16-286**

1

## DEMAND FOR JURY TRIAL

2

3        MGA hereby demands a jury trial on all triable issues.

4

5    Dated:        April 13, 2005                PATRICIA GLASER
                                                 CHRISTENSEN, MILLER, FINK,
6                                                JACOBS, GLASER, WEIL &
                                                 SHAPIRO LLP
7
                                                 DALE M. CENDALI
8                                                DIANA M. TORRES
                                                 PAULA E. AMBROSINI
9                                                O'MELVENY & MYERS LLP

10
                                                 By: _____
11                                                   Diana M. Torres
                                                 Attorneys for Plaintiff
12                                               MGA ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

EXHIBIT 16-287

## DEMAND FOR JURY TRIAL

MGA hereby demands a jury trial on all triable issues.

Dated:      April 13, 2005

                               PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

                               DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: _____
                               Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

38

**EXHIBIT 16-288**

1

## DEMAND FOR JURY TRIAL

2

3   MGA hereby demands a jury trial on all triable issues.

4

5 Dated:   April 13, 2005     PATRICIA GLASER
                 CHRISTENSEN, MILLER, FINK,
6                  JACOBS, GLASER, WEIL &
                 SHAPIRO LLP

7                 DALE M. CENDALI
                 DIANA M. TORRES
8                 PAULA E. AMBROSINI
                 O'MELVENY & MYERS LLP

9

10                By:

11                Diana M. Torres
                Attorneys for Plaintiff
12                MGA ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

**EXHIBIT 16-288**

**EXHIBIT 17**

O

## O'MELVENY & MYERS LLP

BEIJING
CENTURY CITY
HONG KONG
IRVINE SPECTRUM
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899
U.S.A.

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
527436-08

WRITER'S DIRECT DIAL
(213) 430-6556

WRITER'S E-MAIL ADDRESS
dtorres@omm.com

April 16, 2005

**VIA FACSIMILE AND U.S. MAIL**

Robert Normile, Esq.
General Counsel
Mattel, Inc.
333 Continental Boulevard
El Segundo, California 90245

Re:   *MGA Entertainment, Inc. v. Mattel, Inc.*

Dear Mr. Normile:

On Wednesday, April 13, 2004, our client MGA Entertainment, Inc. filed suit against Mattel, Inc. in the Central District of California and served on Mattel's agent for service of process.

Given the retention of documents required of litigants, this letter is to request that Mattel immediately suspend any document retention or destruction policy, including, but not limited to, the deletion of emails or other electronic records, and take any and all measures necessary, including retaining archival documents in storage and backing-up and/or mirroring electronic records and metadata, to ensure the retention of all documents and things that may be potentially discoverable in or relevant to the lawsuit.

This would include, without limitation, documents mentioning or relating to the "Bratz" product lines, including "Bratz Petz;" other MGA product lines, including "4-Ever Best Friends," "Mommy's Little Patient," and "Alien Racers;" the "My Scene" product lines, including "My Scene" pets; other Mattel product lines, including "We 3 Friends," "Little Mommy Potty Training Baby|Doll," and "AcceleRacerS;" documents mentioning or relating to the conception, design, development, production, marketing, packaging, advertising, and sale and offer for sale of any such product lines; documents relating to Mattel's dealings with actual or potential retailers, distributors, licensees, or any other person or entity , including third party vendors, manufacturers, suppliers, or media and financial contacts, regarding, relating to or mentioning any such products; documents relating to Mattel's dealings with CARU, NPD, trade

**EXHIBIT 17-289**

O'MELVENY & MYERS LLP
Robert Normile, Esq., April 16, 2005 - Page 2

organizations, industry watchdog groups and similar entities; and documents relating to focus groups, market research, market testing and similar studies relating to any of the product lines mentioned in the complaint. Mattel should also ensure retention of all physical materials and things relating to any of the product lines mentioned in the complaint, including, without limitation, physical molds and tooling, concept drawings, designs and artwork, product specifications, sculpts, prototypes, packaging concepts, product photographs, FMAs, production schedules and production samples, and any other materials which relate to the conception, design, development, production, marketing, packaging, licensing, advertising, sale and offer for sale of any of the product lines mentioned in the complaint.

This list is illustrative only and, by no means, inclusive. It is not meant or intended in any way to limit or confine the scope or breadth of documents and things that Mattel is obligated to retain, nor is it meant or intended in any way to limit or restrict the methods and means by which Mattel is obligated to effect the retention. On the contrary, MGA requests that Mattel employ and implement all means and methods necessary and appropriate to ensure the retention of its documents and things, and that Mattel notify all of Mattel's employees to take all necessary and appropriate steps to ensure that no documents or things, including electronic records and physical materials, are intentionally or inadvertently destroyed, including notes, calendars, planners, and documents or materials that employees may have off-site, at home or on personal computers.

We trust that Mattel will take its obligations in this regard seriously, and act appropriately.

Very truly yours,

*Diana M. Torres (A.H)*

Diana M. Torres
of O'MELVENY & MYERS LLP

**EXHIBIT 17-290**

**EXHIBIT 18**

**quinn emanuel** trial lawyers | los angeles

May 3, 2005

**BY FACSIMILE**
**AND U.S. MAIL**

Diana M. Torres, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071-2899

MGA Entertainment, Inc. v. Mattel, Inc.

Dear Ms. Torres:

As Michael Zeller informed you previously by e-mail message, this firm is representing Mattel in the above-referenced case.  Please direct all future communications regarding the case to us.

I write to respond to the April 16, 2005 letter that you sent to Robert Normile, Mattel's General Counsel.  Mattel is aware of its obligations to preserve evidence and will comply with them.  As discussed further below, Mattel likewise expects MGA to comply with its obligations to preserve evidence in this case and in the Bryant case.

Consistent with the allegations in MGA's complaint, Mattel has taken steps to ensure the preservation of all documents relating to the accused Mattel products and the third-party organizations referenced in the complaint.  These consist of the following categories of documents, information or tangible items in its possession, custody or control:

1.   The MY SCENE product line, including packaging and advertising relating thereto.
2.   The WEE 3 FRIENDS product line, including packaging and advertising relating thereto.
3.   "Acceleracers" products.

quinn emanuel urquhart oliver & hedges, llp

**EXHIBIT 18-291**

4.  The "Little Mommy Potty Training Baby Doll."
5.  Communications regarding MGA to or from any of the following organizations: TIA. CARU or NPD.
6.  Communications with MGA.
7.  TIA voting procedures.

By agreeing to preserve the foregoing general categories of documents, Mattel does not concede that they are relevant or discoverable, and reserves any and all objections that may be asserted during the course of discovery and/or trial.

In your letter, MGA appears to ask that Mattel suspend all its long-standing, lawful policies regarding the preservation or destruction of documents. Mattel, as explained above, has taken steps to preserve those documents and information in the categories set forth above, consistent with its obligations under the applicable law. The expense and burden of suspending all Mattel's retention policies and preserving all documents, information or tangible items simply to ensure the preservation of irrelevant documents and information, as MGA is apparently demanding, would be prohibitively expensive and unjustified.

To take just one example, Mattel has investigated the cost of preserving in perpetuity each and every e-mail message in and out of its El Segundo Campus, the vast majority of which could have no conceivable bearing on MGA's claims. The cost of preserving these e-mail messages is hundreds of thousands of dollars a year; that cost goes up by multiples if the e-mail messages are to be retained in a format that reduces the difficulty in retrieving them. This cost would greatly increase if applied to all of Mattel's e-mail servers worldwide. Because each allegation in the complaint relates to past conduct and the vast majority of the e-mail messages traveling through Mattel's networks are neither relevant nor discoverable, Mattel will not agree to incur this significant cost on a going-forward or on-going basis.

Mattel has approximately 25,000 employees in 36 countries. These employees generate innumerable pages of documents on a daily basis, the vast majority of which have nothing to do with the allegations in the complaint. For example, approximately 80,000 e-mail messages alone are transmitted over Mattel's exchange servers each day. Mattel's policy, like that of other major U.S. companies, is to retain e-mail messages for 90 days on its servers. Although Mattel has taken steps to preserve e-mail messages within the categories described above, irrelevant and non-discoverable e-mail messages will be treated consistent with Mattel's existing policy, and there is no reasonable basis for insisting that Mattel's normal policies be changed.

We invite MGA's agreement, by May 4, 2005, that Mattel's retention of the above categories of documents is sufficient. If MGA does not so agree, then Mattel will seek guidance from the Court. In that connection, Mattel will also ask the Court to require MGA to bear the cost of its overbroad document retention requests.

Mattel likewise expects MGA to comply with its obligation to preserve relevant and discoverable documents, information or tangible things in its possession, custody or control. Mattel expects

**EXHIBIT 18-292**

MGA not to deface, destroy or engage in destructive testing of evidence, including original drawings, as we believe MGA or Carter Bryant has done in the Bryant case. As MGA is well aware, its obligation to preserve evidence was triggered not by this letter, but by its reasonable anticipation that evidence in its possession, custody or control may be relevant or discoverable in anticipated litigation. Accordingly, we expect that MGA has not destroyed and will preserve on an ongoing basis any relevant or discoverable evidence relating to the allegations in the complaint. Please confirm, in writing, that MGA has preserved all relevant and discoverable evidence and that it will continue to comply with those obligations as these actions move forward.

If you have any questions regarding the foregoing, please do not hesitate to call.

Best regards.

Jon Corey

07975/065112.1

**EXHIBIT 18-293**

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**PALM SPRINGS**
45-025 Manitou Drive, Suite 8
Indian Wells, CA 92210
(760) 345-4757
Facsimile: (760) 345-2414

**LOS ANGELES**
865 So. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**NEW YORK**
335 Madison Avenue, 17th Floor
New York, NY 10017-4611
(212) 702-8100
Facsimile: (212) 702-8200

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

### LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:**  May 3, 2005

**NUMBER OF PAGES, INCLUDING COVER:** 4

**TO/COMPANY:**

| NAME | PHONE NO. | FAX NO. |
|------|-----------|---------|
| Diane M. Torres, Esq.<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, California 90017-2899 | 213-430-6000 | 213-430-6407 |

**FROM:**  Jon Corey

**RE:**

**MESSAGE:**



| CLIENT #:  7975 | ROUTE/<br>RETURN TO:  Samantha-6 | ☒ CONFIRM FAX<br>☒ INCLUDE CONF. REPORT |
|---|---|---|
| OPERATOR: | | CONFIRMED? ☐ NO ☐ YES: |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3863 AS SOON AS POSSIBLE.

**EXHIBIT 18-294**

Confirmation Report — Memory Send

```
                                    Page        : 001
                                    Date & Time: May-03-05  02:43pm
                                    Line 1      : 2136240643
                                    Line 2      :
                                    Machine ID  : QUINN EMANUEL
```

| | | |
|---|---|---|
| Job number | : | 945 |
| Date | : | May-03  02:41pm |
| To | : | ☎76039※07975※12134306407 |
| Number of pages | : | 004 |
| Start time | : | May-03  02:41pm |
| End time | : | May-03  02:43pm |
| Pages sent | : | 004 |
| Status | : | OK |

Job number    : 945          *** SEND SUCCESSFUL ***

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

LOS ANGELES
865 So. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

NEW YORK
335 Madison Avenue, 17th Floor
New York, NY 10017-4611
(212) 702-8100
Facsimile: (212) 702-8200

SAN DIEGO
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

PALM SPRINGS
45-025 Manitou Drive, Suite 8
Indian Wells, CA 92210
(760) 345-4797
Facsimile: (760) 345-2414

SAN FRANCISCO
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

SILICON VALLEY
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

LOS ANGELES OFFICE

FACSIMILE TRANSMISSION

DATE:  May 3, 2005                    NUMBER OF PAGES, INCLUDING COVER: 4

| TO/COMPANY: | NAME | PHONE NO. | FAX NO. |
|---|---|---|---|
| | Diane M. Torres, Esq.<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, California 90017-2899 | 213-430-6000 | 213-430-6407 |

FROM:  Jon Corey

RE:

MESSAGE:

| CLIENT #:  7975 | ROUTE/<br>RETURN TO:  Samantha-6 | ☒ CONFIRM FAX<br>☒ INCLUDE CONF. REPORT |
|---|---|---|
| OPERATOR: | CONFIRMED?  ☐ No  ☐ Yes: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3843 AS SOON AS POSSIBLE.

EXHIBIT 18-295

**EXHIBIT 19**

**quinn emanuel** trial lawyers | los angeles
865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

June 11, 2007

**VIA FACSIMILE AND U.S. MAIL**

Michael Keats, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036

Re:    Mattel, Inc. v. Bryant

Dear Mr. Keats:

I write in response to your June 7, 2007 letter to Mr. Alger regarding Mattel's preservation of electronic mail messages. Mattel has not "willfully allowed the destruction of evidence." Your suggestion that Mattel's conduct "has irreparably prejudiced the rights of MGA in this litigation" is surmise without any factual basis, no more. You will find that Mattel has more than complied with its obligations to preserve evidence. I am available to meet and confer with you at 10:00 a.m. on Wednesday, June 13, 2007 to discuss this. Or, alternatively, you can listen in on the deposition of Mattel designee, Mr. Kawashima, who will testify about electronic mail preservation between 1998 and the present on June 14, 2007.

I encourage you to review the correspondence between the parties on this subject before our meeting, including my letter to Ms. Torres dated May 3, 2005, to which neither Ms. Torres nor anyone else from your firm responded or expressed any disagreement. I further encourage you to speak with your colleagues about conversations between them and Mr. Zeller about the preservation of electronic information.

MGA's threat to file a motion to dismiss or sanctions before you have any understanding of the steps that Mattel has taken to preserve electronic information is unfounded. If MGA proceeds with such a motion, then Mattel will seek an award of the fees and costs incurred in opposing

**quinn emanuel urquhart oliver & hedges, llp**
NEW YORK | 355 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-1146

07209/2139526.1

**EXHIBIT 19-296**

such a motion, as it would be both factually baseless and premature given MGA's failure to meet and confer. For example, MGA may not draw any adverse inference because neither Mr. Kawashima or Ms. Marine testified about e-mail preservation. As you are well aware, Ms. Marine has no involvement with Mattel's e-mail system other than a user, and Mr. Kawashima would have testified on Mattel's electronic mail preservation a couple of weeks ago had the trial in which I was engaged not stretched longer than anticipated. And, Mattel is producing Mr. Kawashima on the date that MGA represented it was first available.

Separately, pursuant to Paragraph 5 of the Order Appointing a Discovery Master, please be prepared to discuss the steps that MGA has taken to preserve its electronic information, including electronic mail messages. Mattel has noted the paucity of electronic mail messages in MGA's production to date. Please be prepared to explain whether Mattel can expect additional electronic mail messages to be produced, or whether the electronic mail messages produced to date are all the only electronic mail messages that MGA has preserved.

If you have any questions regarding the foregoing, please do not hesitate to call.

Best regards,

Jon Corey

JDC:jcl
07209/2139526.1

cc:    Diana Torres, Esq.

07209/2139526.1                                   2

**EXHIBIT 19-297**

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
335 Madison Avenue, 17th Floor
New York, NY 10017
(212) 849-7000
Facsimile: (212) 849-7100

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100



## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

**DATE:**    June 11, 2007

**NUMBER OF PAGES, INCLUDING COVER: 3**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Michael Keats, Esq.<br>Times Square Tower<br>7 Times Square<br>New York, NY. 10036 | (212) 326-2000 | (212) 326-2061 |

**FROM:**    Jon Corey

**RE:**    Mattel, Inc. v. Bryant

**MESSAGE:**

Please see attached.

| 20107/2069660.1 | | ROUTE/<br>RETURN TO: | Mia Alber --3rd Floor | ☒ CONFIRM FAX |
|---|---|---|---|---|
| CLIENT # | 7209 | | | ☒ INCLUDE CONF. REPORT |
| OPERATOR: | *wxlu* | | CONFIRMED?   ☐ NO  ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

EXHIBIT 19-298

06/11/2007 11:58 FAX  12134433100          QEUOH-LAO-2                              ☒001

```
********************
***   TX REPORT   ***
********************

TRANSMISSION OK

TX/RX NO                2632
RECIPIENT ADDRESS       9414#007209#12123262061
DESTINATION ID
ST. TIME                06/11 11:57
TIME USE                01'06
PAGES SENT              3
RESULT                  OK
```

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
335 Madison Avenue, 17th Floor
New York, NY 10017
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE

# FACSIMILE TRANSMISSION

**DATE:**    June 11, 2007          **NUMBER OF PAGES, INCLUDING COVER: 3**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Michael Keats, Esq.<br>Times Square Tower<br>7 Times Square<br>New York, NY 10036 | (212) 326-2000 | (212) 326-2061 |

**FROM:**    Jon Corey

**RE:**    Mattel, Inc. v. Bryant

**MESSAGE:**

Please see attached.

**EXHIBIT 19-299**

BLUEBIRD OFFICE SUPPLIES (888) 477-070 www.bluebirdonline.biz

**EXHIBIT 20**

CONFIDENTIAL - ATTORNEYS EYES ONLY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

**ORIGINAL**

**CONFIDENTIAL**

CARTER BRYANT, an individual, )
)
        Plaintiff, )
)
    vs. )
)
MATTEL, INC., a Delaware )
Corporation, )
)
        Defendant. )
)
CONSOLIDATED WITH MATTEL, )
INC., v. BRYANT and MGA )
ENTERTAINMENT, INC. v. MATTEL,)
INC. )
_____)

No. CV 04-09049 SGL
(RNBx) (c/w CV
04-9059 & 05-2727)

VOLUME

**ATTORNEYS
EYES ONLY**

-- CONFIDENTIAL - ATTORNEYS EYES ONLY --

VIDEOTAPED DEPOSITION OF JULIA MARINE

Los Angeles, California

Thursday, September 21, 2006

Reported by:
Marceline F. Noble
CSR No. 3024
JOB No. 919809B

1

I

**EXHIBIT 20-300**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    thing, you're stuck with it forever.

2         Okay.  The workstations that had Greek God

3    names, however, this is -- this is -- Zeus here is

4    not a workstation, right, this is a server?

04:08   5    A   Yes.

6    Q   Okay.  Give me a sense here how -- what was

7    the -- what was your thought process here in why this

8    became known as Zeus?

9    A   Well, we'd already used Star Trek names and

04:08  10    we'd already used Mattel toy names so this seemed

11   like a good idea.

12   Q   Okay.  So it's -- it's -- the folks in the

13   department sitting around, we got us a new server,

14   come in and we have to have a name for the thing.

04:09  15   Right?

16   A   Yes.

17   Q   Did you get to name it because you were

18   going to be the person responsible for it or was it

19   sort of pick a name out of a hat or -- how did that

04:09  20   happen?

21   A   There were only a few of us and we just

22   talked and thought that was good.

23   Q   Okay.  And at the time that Zeus was

24   installed in 1994, 1995 time frame, give me some

04:09  25   sense of the capacities, capabilities of that server.

42

**EXHIBIT 20-301**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1       A    I don't remember how much disc space it had.

2       Q    Ballpark.

3       A    It seemed like a lot at the time.  It was --

4       Q    It always does at the time.

04:09   5       A    It was probably -- I wouldn't be surprised

6  if it was less than a hundred gig.

7       Q    And this was designed to operate as a file

8  server; is that correct?

9       A    Yes.

04:10   10      Q    Designed to do any other functions besides

11  operating as a file server?

12      A    It also ran a product data management

13  system.

14      Q    Product --

04:10   15      A    At that -- at that time.

16      Q    Product data management system.  And what

17  data management system was that?

18      A    Metaphase.

19      Q    And what is Metaphase?  Or what was

04:10   20  Metaphase?

21      A    A product data management system.

22      MR. COREY:  Good answer.

23      THE WITNESS:  Circulate.

24  BY MR. JENAL:

04:10   25      Q    But effective.

43

**EXHIBIT 20-302**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1           Who is the vendor of Metaphase?

2       A   Control Data at that time.

3       Q   And what is your understanding of the

4   functionality of a product data management system?

04:11   5       A   You could track released -- it's for

6   documentation of product.  You could release product

7   diagrams to it and then it would be available for

8   people to search from.

9       Q   Is that like -- when you say product

04:11   10  diagrams, what do you mean by a product diagram?

11      A   Data.  Pro engineer files, engineering data.

12      Q   Okay.  What sort of files would be -- were

13  being kept on Zeus when it was first introduced?

14      A   It would have been engineering, Alias, the

04:12   15  U4IA stuff we talked about, the data management

16  software and the associated database, unigraphics

17  data.  That's all that's coming to mind.

18      Q   What was that last word?

19      A   Unigraphics?  U-n-i-g-r-a-p-h-i-c-s.

04:12   20  Q   And what is that?

21      A   That is another CAD package.  It's used --

22  it was used by tooling engineers.  And our model

23  shop.

24      Q   "CAD" being?

04:12   25  A   Computer-aided design.

44

EXHIBIT 20-303

CONFIDENTIAL - ATTORNEYS EYES ONLY

1     450, and that was around 1998.  I believe that in

2     2002 it changed to a Sun V 880.  Then in 2004, it

3     changed to a Sun 480; in 2005, it changed to a Sun

4     490.

04:14   5        Q    And that's what it is today?

6        A    Yes.

7        Q    Okay.  So the name stayed the same but the

8     hardware changed?

9        A    Yes.

04:14   10       Q    Okay.  And let's say I'm a user and I've got

11    a bunch of files up on Zeus in 1997 and now it's

12    going to cut over to the new box, the Sun E 450 in

13    sometime in 1998, thereabouts; correct?

14       A    Yes.

04:15   15       Q    Would it be the case that all of the files

16    that were previously on Zeus migrated across to the

17    new server?

18       A    Yes.

19       Q    Okay.  Was there ever a time when one of

04:15   20    these migrations occurred where certain categories of

21    files, whether by users or by groups or some other

22    means, were not migrated across to the next

23    generation?

24       A    Not to my knowledge.

04:15   25       Q    Okay.  So, as far as you know, files that

46

**EXHIBIT 20-304**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    were intended to be retained as a system migrated

2    from one hardware platform to another, those files

3    would all be migrated across?

4        A   Everything, yes.

04:15   5        Q   Okay.  So in the '98 to 2000 time frame is

6    when you're dealing with the Sun E 450, thereabouts?

7        A   Not me personally.

8        Q   Who personally was involved with that system

9    in that time frame?

04:16  10        A   People who are no longer with the company.

11           Do you want their names?

12        Q   I do.

13        A   Okay.  Mark Sackett, S-a-c-k-e-t-t, and Mike

14    Messina, M-e-s-s-i-n-a.

04:16  15        Q   Do you know when Mr. Sackett left Mattel?

16        A   He left in 2002.

17        Q   Do you know where he went?

18        A   I do not.

19        Q   Do you know if he's still in the Southern

04:17  20    California area?

21        A   I believe he is.

22        Q   What's the basis for that belief?

23        A   Our -- a vendor that we deal with has

24    mentioned his name as having seen him or something.

04:17  25        Q   Who -- who is the vendor that mentioned him?

47

EXHIBIT 20-305

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          Q    -- all right, that's the time period that

2    you were working with Zeus --

3          A    Yes.

4          Q    -- correct?

04:22    5          And so that's -- it's basically it's initial

6    system functionality.

7          A    Yes.

8          Q    Okay.  And then once you moved over in '96

9    to the Unix server administration department, am I to

04:23  10    understand that you didn't have any further direct

11    responsibility for the Zeus system?

12          A    That's correct.   Until 2003.

13          Q    I see.

14          And in 2003, you were still in that same

04:23  15    department in 2003?

16          A    Yes.

17          Q    Okay.  So did that department simply take on

18    the responsibility for administering the Zeus system?

19          A    Yes.

04:23  20          MR. COREY:  Can we take a quick break --

21          MR. JENAL:  Sure.

22          THE VIDEOGRAPHER:  We are off the record at

23    4:23 p.m.

24          (Short recess.)

04:33  25          THE VIDEOGRAPHER:  We are back on the record

52

**EXHIBIT 20-306**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    administration department --

2         A    Yes.

3         Q    -- correct?

4         A    Yes.

04:35    5    Q    But in 1996, that department had no

6    responsibilities with regards to Zeus.

7         A    Yes.

8         Q    And then that remained the case with regards

9    to Zeus until 2003; is that correct?

04:35    10    A    Yes.

11         Maybe I should clarify that.

12         Q    Please do.

13         A    Yes.  In '96, those were two separate

14    departments, as you said.  At some point they became

04:35    15    the same department, but there was still no overlap.

16    So while technically people in my department

17    administered Zeus, specifically Mark Sackett and Mike

18    Messina, I had no involvement.

19         Q    Okay.

04:36    20    A    And that was around, I'm not sure, 2001.

21         Q    The antecedent to that, the merging

22    essentially of those two departments was around 2001?

23         A    Yes.

24         Q    Okay.  But you had not had any direct

04:36    25    involvement with the administration of Zeus since

54

**EXHIBIT 20-307**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    roughly 1996?

2        A    Correct.

3        Q    Okay.  And did that change in 2003?  Did you

4    take on personally some responsibilities for the

04:36  5    administration of Zeus?

6        A    Yes.

7        Q    Okay.  And does that continue to this day?

8        A    Yes.

9        Q    Okay.  In the time period between 1996,

04:36  10   let's say, and 2001, do you have any direct personal

11   knowledge as to how the Zeus system was operated or

12   maintained?

13       A    No.

14       Q    Is it fair to say that the only information

04:37  15   that you have about how the Zeus system was operated

16   or maintained between 1996 and 2001 comes from your

17   recent conversation with Mr. Messina?

18            MR. COREY:  Objection.  Mischaracterizes the

19   testimony.

04:37  20            THE WITNESS:  I -- I guess so.  I could also

21   infer from what I see in 2003.

22            For instance, it was no longer a

23   Silicon Graphics box.  Therefore, it had been

24   changed.

25   ///

EXHIBIT 20-308

CONFIDENTIAL - ATTORNEYS EYES ONLY

1        A    I don't know.

2        Q    How much was it in 1999?

3        A    I -- I don't know the -- the amounts in

4   those other dates.

04:39   5        Q    Okay.  If I were to ask you specific

6   questions with regards to the usage, capacity, user

7   base, et cetera, of the Zeus system in the 1998 to

8   2000 time frame, would you have knowledge as to that?

9        A    Not specific knowledge, no.

04:40  10        Q    Okay.  What about if I were to ask you with

11   regards to backups that were performed on that

12   system, on the Zeus system between 1998 and 2000,

13   would you have direct knowledge as to what backups

14   were performed?

04:40  15        A    No.

16        Q    What about if I asked you as to the total

17   number of PCs that could be connected to the Zeus

18   system in the 1998 to 2000 time frame, would you have

19   knowledge as to that?

04:40  20        A    Well, I have no knowledge of any

21   limitations.

22        Q    Right.  But I'm asking -- my interest would

23   be more specific; that is, within the installation at

24   Mattel, how many PCs were actually being connected up

04:41  25   so as they could access the Zeus system between 1998

58

Esquire Deposition Services
800.640.2461

**EXHIBIT 20-309**

1

2          I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, do hereby certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth; that

6    any witnesses in the foregoing proceedings, prior to

7    testifying, were placed under oath; that a verbatim

8    record of the proceedings was made by me using machine

9    shorthand which was thereafter transcribed under my

10   direction; further, that the foregoing is an accurate

11   transcription thereof.

12         I further certify that I am neither financially

13   interested in the action nor a relative or employee of

14   any attorney of any of the parties.

15         IN WITNESS WHEREOF, I have this date subscribed

16   my name.

17                         OCT 0 4 2006

18   Dated:   _____

19

20         _____

21              Marceline F. Noble
                CSR No. 3024

22

23

24

25

**EXHIBIT 20-310**

**EXHIBIT 21**

CONFIDENTIAL ATTORNEYS EYES ONLY

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA CERTIFIED

3            EASTERN DIVISION           COPY

4

5    CARTER BRYANT, an individual,   )

6              Plaintiff,            )
                                     )
7              vs.                   ) No. CV 04-09049 SGL
                                     ) (RNBx) (c/w CV
8    MATTEL, INC., a Delaware        ) 04-9059 & 05-2727)
     Corporation,                    )
9                                    )   VOLUME II
               Defendant.            )
10                                   )
     CONSOLIDATED WITH MATTEL, INC.,)
11   v. BRYANT and MGA              )     CONFIDENTIAL
     ENTERTAINMENT, INC., v. MATTEL,)
12   INC.                           )     ATTORNEYS
13                                        EYES ONLY

14

15        CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

17      VIDEOTAPED 30(b)(6) DEPOSITION OF JULIA MARINE

18            Los Angeles, California

19          Wednesday, November 8, 2006

20

21

22

23   Reported by:

24      WENDY S. SCHREIBER
        CSR No. 3558, RPR, CLR
25      Job No. 920755

                                                      75

EXHIBIT 21-311

CONFIDENTIAL ATTORNEYS EYES ONLY

1   from Zeus which was approximately from 2002.  Is

2   there anything else that you know that you did or

3   that you're aware that anyone else did to retain

4   data from that time period?

5           MR. COREY:  Objection:  mischaracterizes her   10:51AM

6   testimony.

7           Go ahead and answer the question.

8           THE WITNESS:  I'm not aware.

9   BY MS. GLAD:

10      Q.   Did you do anything else?  You said that      10:51AM

11  they had an off-site backup that they kept from

12  2002.  Did you do anything?

13      A.   I wasn't working on the server at that point

14  so I had no documentation to save.

15      Q.   Do you know if the person who was            10:51AM

16  responsible for it at that time did anything?

17      A.   They are not at the company.

18      Q.   And this would have been Mike Messina?

19      A.   Yes.

20      Q.   Anyone else?                                  10:51AM

21      A.   Mark Sackett.

22      Q.   Anyone else other than those two?

23      A.   No.

24      Q.   Who handles -- during the '98 to 2000 time

25  period who handled the backups of the Zeus drive?     10:52AM

106

Esquire Deposition Services
800-640-2461

**EXHIBIT 21-312**

CONFIDENTIAL ATTORNEYS EYES ONLY

1     A.   Mark Sackett.

2     Q.   And did anyone else help him at all?

3     A.   I don't know if Mike Messina helped him. If

4   anyone helped him, it would have been Mike.

5     Q.   And has the way that you've done the backups    10:52AM

6   changed at all?  Did it change in that '98 to 2000

7   time frame?

8     A.   That I don't know.

9     Q.   Do you know anyone who would know?

10     A.   At Mattel?  No.                                10:52AM

11     Q.   Is there someone outside of Mattel that

12   would know?

13     A.   Mark Sackett would know.

14     Q.   When they're done with -- you said that they

15   keep the daily backups for a month, the weeklies for   10:53AM

16   two to three months.  What -- are they recycled

17   after that?  What happens?

18     A.   Yes, they get reused.

19         MR. COREY:  Again, between '98 and 2000?

20         MS. GLAD:  Yes, between '98 and 2000.           10:53AM

21     Q.   Now, if an employee leaves -- or during the

22   '98 to 2000 time period, if an employee left, was

23   there anything that was done special with regard to

24   the backing up of the Zeus drive during that time or

25   any data he had stored on Zeus?                        10:53AM

107

EXHIBIT 21-313

CONFIDENTIAL ATTORNEYS EYES ONLY

1        MR. COREY:  Objection:  vague and ambiguous.

2        THE WITNESS:  There would have been no

3   difference to the backups.

4   BY MS. GLAD:

5        Q.   Is anything at all done differently?  Other   10:53AM

6   than just the backups, is anything done in terms --

7   with that individual's laptop or PC?

8        MR. COREY:  Objection:  scope.

9        THE WITNESS:  I don't know what is done with

10  the PCs.                                              10:54AM

11  BY MS. GLAD:

12       Q.   What about if an employee is investigated

13  during the '98 to 2000 time period?  Is there

14  anything that was done differently in terms of

15  backing up the information on Zeus?                   10:54AM

16       MR. COREY:  Objection:  vague and ambiguous.

17       THE WITNESS:  I'm not aware of anything.

18  BY MS. GLAD:

19       Q.   Is there any reason why the weekly and

20  monthly backups would be done differently during     10:54AM

21  that '98 to 2000 time period?

22       A.   Not that I'm aware of.

23       Q.   During that '98 to 2000 time frame, were

24  there any kind of automatic purging of files or

25  data?                                                 10:54AM

108

Esquire Deposition Services
800-640-2461

**EXHIBIT 21-314**

CONFIDENTIAL ATTORNEYS EYES ONLY

1    A.    No, otherwise it wouldn't keep growing.

2    Q.    What about -- strike that.

3          If you wanted to restore information, how

4    would you do that during that '98 to 2000 time

5    frame?                                          10:55AM

6          MR. COREY:  To restore from a backup tape?

7          MS. GLAD:  From the backup tape.

8          THE WITNESS:  I would use the backup

9    software to do that.

10   Q.    What software is that?                     10:55AM

11   A.    Net Backup.

12   Q.    Can you tell me how that process would work?

13   A.    You would call up the program, the software

14   program, and you give it a path and a date range and

15   it will show you what's available to restore and    10:55AM

16   then you tell it to restore it.

17   Q.    Okay.  And can you do that user by user?

18   A.    It's by location on the server, not user.

19   Q.    So by location on the server you're talking

20   like the whole entire department, that folder?     10:56AM

21   A.    A path name, any path.

22   Q.    Is there anything else that was done to

23   archive that information during the '98 to 2000 time

24   frame other than the regular backups?

25   A.    I don't know of anything.                   10:56AM

                                                        109

EXHIBIT 21-315

CONFIDENTIAL ATTORNEYS EYES ONLY

1    Q.   Is there anyone else who would know if

2  anything was ever done?

3    A.   Mark or Mike.

4    Q.   Pardon me?

5    A.   Mark Sackett or Mike.                    10:56AM

6    Q.   Do you know if there was ever any call to

7  restore the 2002 backup tape?

8    A.   Not that I know of, no.

9    Q.   Have you -- during that '98 to 2000 time

10 frame, do you know if there was cause to restore any  10:57AM

11 of the backup tapes during that time?

12   A.   You mean a file?

13   Q.   A file, a path, what have you.

14   A.   I wouldn't know.

15        MR. COREY:  It may help -- there's a         10:57AM

16 difference between restoring a file and restoring a

17 terabyte of information and so I think that -- well,

18 I've said enough.  Objection:  vague and ambiguous.

19        THE WITNESS:  I don't -- I don't know.

20 BY MS. GLAD:                                     10:57AM

21   Q.   If I wanted -- from that '98 to 2000 time

22 period if I wanted to find the files or the data

23 stored by a particular user is that possible?

24   A.   Well, if the files are on the server now,

25 you mean?                                        10:58AM

110

**EXHIBIT 21-316**

CONFIDENTIAL ATTORNEYS EYES ONLY

1    Q.   If they're on the server now or if they're

2    on that backup tape from 2002.

3         (Whereupon Mr. Messiha joined the

4         deposition proceedings.)

5         MR. COREY:  Now you've got two questions.   10:58AM

6    Ask about the backup tape.  I mean, pick a question.

7    BY MS. GLAD:

8         Q.   If you wanted -- on the backup tape from

9    2002 that included the information during that '98

10   to 2000 time period, if you wanted to find all the   10:58AM

11   files or data stored from a particular individual,

12   could you do that?

13        A.   Wow.  Not easily.  You'd have to restore it

14   somewhere, all of it, or -- yeah, you'd have to

15   restore it.                                          10:59AM

16        Q.   So you couldn't restore just for that

17   particular user?

18        A.   I could not.  Those -- those backups are

19   expired so our backup system has no knowledge of

20   what's on those tapes.                               10:59AM

21        Q.   The 2002 backup is expired?

22        A.   Yes.

23        Q.   And -- so with that Net Backup software you

24   couldn't do the same thing with that tape as you

25   could with, say, a backup from a month ago?          11:00AM

                                                              111

EXHIBIT 21-317

CONFIDENTIAL ATTORNEYS EYES ONLY

1    A.   Right, not easily.  It doesn't know what's

2  on those tapes anymore.

3    Q.   Does the Net Backup software provide any

4  kind of an index or anything to say at all what's on

5  that backup tape?                                    11:00AM

6        MR. COREY:  Again, between '98 and 2000?

7        MS. GLAD:  Correct.

8        THE WITNESS:  No, not what we have, no.

9    Q.   And is there an easy way to get that kind of

10  information?                                         11:00AM

11   A.   Not easy, no.

12   Q.   You said that you would have to restore the

13  entire thing?

14   A.   You're looking -- yeah, we have no

15  knowledge -- we have no idea what's on those -- what  11:00AM

16  specifically is on those tapes so you would have to

17  read them all into a Net Backup software to recreate

18  its database and even then it's not sorted by a

19  date, like file dates.

20   Q.   How is it sorted?                              11:01AM

21   A.   It's by location on the server.  This is a

22  point-in-time backup so it would be files created

23  and modified any time up until the point the backup

24  was taken.

25   Q.   And if you knew that the particular person   11:01AM

112

EXHIBIT 21-318

CONFIDENTIAL ATTORNEYS EYES ONLY

1   hardware.  You need the software -- the license for

2   the backup software.  You need the disk space to

3   restore it to and then you have to start reading in

4   all those tapes.

5   BY MS. GLAD:                                    11:19AM

6       Q.   You said that you don't have that in the

7   design center.  Do you have that hardware anywhere

8   else in the company?

9       A.   DLT?  No, no.

10      Q.   At what point did you get rid of the     11:19AM

11  hardware?

12      A.   Once the last backups -- DLT backups expired

13  so it would have been a couple years ago probably.

14      Q.   Can you narrow it down any more than that?

15      A.   No.                                      11:19AM

16      Q.   Is there any way for you to find out the

17  specific date or an approximate date?

18          MR. COREY:  The specific date that the --

19  they no longer used the DLT tape drives?

20          MS. GLAD:  That you got rid of the hardware. 11:19AM

21          MR. COREY:  Vague and ambiguous.  I'm trying

22  to find out what "hardware" means.

23  BY MS. GLAD:

24      Q.   Yeah, the DLT.

25      A.   The DLT hardware?  Yeah, I could ask my    11:19AM

119

**EXHIBIT 21-319**

CONFIDENTIAL ATTORNEYS EYES ONLY

STATE OF CALIFORNIA    ) ss:

COUNTY OF LOS ANGELES )


      I, WENDY S. SCHREIBER, C.S.R. No. 3558, do

hereby certify:


      That the foregoing deposition of JULIA

MARINE was taken before me at the time and place

therein set forth, at which time the witness was

placed under oath and was sworn by me to tell the

truth, the whole truth, and nothing but the truth;

      That the testimony of the witness and all

objections made by counsel at the time of the

examination were recorded stenographically by me,

and were thereafter transcribed under my direction

and supervision, and that the foregoing pages

contain a full, true and accurate record of all

proceedings and testimony to the best of my skill

and ability.

      I further certify that I am neither

counsel for any party in said action, nor am I

related to any party to said action, nor am I in any

way interested in the outcome thereof.

149

EXHIBIT 21-320

1        IN WITNESS WHEREOF, I have subscribed my name

2  this *13th* day of *November*                , 2006.

3

4

5

6    _____

7    WENDY S. SCHREIBER, CSR No. 3558, RPR, CLR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 21-321**

**EXHIBIT 22**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3         EASTERN DIVISION                    Certified Copy

4

5    ------------------------------

6    MATTEL, INC., a Delaware          )

7    Corporation,                      )

8              Plaintiff,              )

9         vs.                          )  No. CV 04-9059

10   CARTER BRYANT, an individual;     )  NM (RNBx)

11   and DOES 1 through 10,            )  VOLUME III

12   Inclusive,                        )

13             Defendants.             )

14   ------------------------------    )

15   (COMPLETE CAPTION ON NEXT PAGE.)

16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19   Continued Videotaped 30(b)(6) Deposition

20   of JULIA MARINE, taken at 400 South Hope

21   Street, Los Angeles, California, commencing

22   at 10:05 A.M., Tuesday, June 26, 2007,

23   before Wendy S. Schreiber, CSR No. 3558,

24   RPR, CLR.

25

26   PAGES 151 - 259                                      151

EXHIBIT 22-322

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. COREY:  Objection:  mischaracterizes her

2     testimony.

3          THE WITNESS:  Yeah, I don't know --

4          MR. COREY:  Scope -- let me finish my

5     objections.  Scope.                                11:48AM

6          THE WITNESS:  Yeah, I don't know the

7     retentions when I wasn't doing it.

8     BY MR. JENAL:

9     Q.   But when you resumed in 2003, were you aware

10    of any tape backup retentions longer than two years   11:48AM

11    on Zeus?

12         MR. COREY:  Objection:  scope.

13         THE WITNESS:  I'm not aware.

14    BY MR. JENAL:

15    Q.   To your knowledge there were no backups        11:48AM

16    longer than two years when you resumed your

17    responsibilities to administer Zeus in 2003?

18         MR. COREY:  Objection:  calls for

19    speculation, lacks foundation, assumes facts and

20    scope.                                              11:48AM

21         THE WITNESS:  Yeah, I'm sorry, I just don't

22    know.

23    BY MR. JENAL:

24    Q.   You were unaware of the existence in 2003 of

25    any backup tapes older than two years, correct?     11:49AM

239

EXHIBIT 22-323

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        MR. COREY:  Objection:  mischaracterizes her

2  testimony, calls for speculation, assumes facts and

3  scope.

4        THE WITNESS:  Yeah, I don't think -- I don't

5  think so.  I don't know.                          11:49AM

6  BY MR. JENAL:

7     Q.   And you testified that a 2002 backup set was

8  provided to Legal.  Did you yourself provide it to

9  Legal, this backup set?

10    A.   No.                                       11:49AM

11    Q.   Who did?

12    A.   That would have been --

13        MR. COREY:  Objection:  scope.  Sorry.

14        THE WITNESS:  That would have been the

15  person responsible for sending tapes off site.    11:50AM

16  BY MR. JENAL:

17    Q.   Who is that?

18    A.   That's Vic Glover.

19    Q.   I'm sorry?

20    A.   Vic Glover.                               11:50AM

21    Q.   Is Mr. Glover still with Mattel?

22    A.   Yes.

23    Q.   Apart from this 2002 backup set, are you

24  aware of any other backup set of tapes for the Zeus

25  server that have been provided to Legal?          11:50AM
                                                        240

**EXHIBIT 22-324**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    2001?

2           MR. COREY:  Objection:  scope.

3           THE WITNESS:  I'm sorry, I don't know of old

4    backups like this.

5    BY MR. JENAL:                                          11:53AM

6      Q.  And we've talked about --

7           MR. COREY:  You don't need to apologize.

8    You can just answer the question.

9    BY MR. JENAL:

10     Q.  We've talked about a backup from 2002 so     11:53AM

11   we'll set that aside for the moment.  Are you aware

12   of whether Mattel has preserved backup tapes of the

13   Zeus file server from 2003?

14          MR. COREY:  Objection:  scope and asked and

15   answered.                                              11:53AM

16          THE WITNESS:  I know that we are preserving

17   some of the tapes that are coming off -- in from off

18   site that we're not reusing them but I don't know

19   the dates on those.

20   BY MR. JENAL:                                          11:53AM

21     Q.  Is Mattel -- let me ask this differently.

22          You don't know the dates that those tapes

23   cover that are being preserved as they come back

24   from off site?  Is that what you're telling me?

25          MR. COREY:  Objection:  scope.               11:54AM

                                                               244

**EXHIBIT 22-325**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              THE WITNESS:  Correct.

2    BY MR. JENAL:

3        Q.   In what way are those tapes being preserved

4    presently at Mattel?

5              MR. COREY:  Objection:  speculation and        11:54AM

6    scope.

7              THE WITNESS:  I just know we're not reusing

8    them.

9    BY MR. JENAL:

10       Q.   Do you know where they -- where those tapes    11:54AM

11   are being kept?

12             MR. COREY:  Same objections.

13             THE WITNESS:  No.

14   BY MR. JENAL:

15       Q.   Do you know whether those tapes pertain to     11:54AM

16   backups of the Zeus server?

17             MR. COREY:  Same objections.

18             THE WITNESS:  I do know that -- that there

19   are backups of the Zeus server that are -- that

20   those tapes are not being reused.                       11:54AM

21   BY MR. JENAL:

22       Q.   Do you know whether that was in response to

23   the communication from the Legal department that was

24   received regarding -- regarding this litigation?

25             MR. COREY:  Objection:  scope, calls for      11:55AM

                                                             245

**EXHIBIT 22-326**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA   ) ss:

 2    COUNTY OF LOS ANGELES )

 3

 4          I, WENDY S. SCHREIBER, CSR No. 3558, do

 5    hereby certify:

 6

 7          That the foregoing deposition of JULIA

 8    MARINE was taken before me at the time and place

 9    therein set forth, at which time the witness was

10    placed under oath and was sworn by me to tell the

11    truth, the whole truth, and nothing but the truth;

12          That the testimony of the witness and all

13    objections made by counsel at the time of the

14    examination were recorded stenographically by me,

15    and were thereafter transcribed under my direction

16    and supervision, and that the foregoing pages

17    contain a full, true and accurate record of all

18    proceedings and testimony to the best of my skill

19    and ability.

20          I further certify that I am neither

21    counsel for any party in said action, nor am I

22    related to' any party to said action, nor am I in any

23    way interested in the outcome thereof.

24

25                                                    257
```

EXHIBIT 22-327

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1           IN WITNESS WHEREOF, I have subscribed my
2      name this 9th day of July, 2007.
3
4
5
6
7      _____
8      WENDY S. SCHREIBER, CSR No. 3558, RPR
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    258
```

**EXHIBIT 22-328**

**EXHIBIT 23**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION                    **Certified Copy**

4

5       ------------------------------

6    MATTEL, INC., a Delaware          )

7    Corporation,                      )

8               Plaintiff,             )

9               vs.                    ) No. CV 04-9059

10   CARTER BRYANT, an individual;     )  NM (RNBx)

11   and DOES 1 through 10,            ) VOLUME I

12   Inclusive,                        )

13              Defendants.            )

14   ------------------------------    )

15   (COMPLETE CAPTION ON NEXT PAGE.)

16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19      Videotaped 30(b)(6) Deposition of RODNEY H.

20   PALMER, JR., taken at 400 South Hope Street,

21   Los Angeles, California, commencing at

22   1:39 P.M., Tuesday, June 26, 2007, before

23   Wendy S. Schreiber, CSR No. 3558, RPR, CLR.

24

25   PAGES 1 - 137

                                                                1

**EXHIBIT 23-329**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the campus that it's connected to.

2    BY MR. JENAL:

3        Q.   You told us that that system changed in 2006

4    but apart from simply changing to an entirely

5    different system, was there any for lack of a better      02:26PM

6    term evolutionary changes to the Nortel switch

7    itself over that ten-year period?

8            MR. COREY:  Objection:  scope.

9            THE WITNESS:  No.

10   BY MR. JENAL:                                             02:26PM

11       Q.   So whatever functionality it had when it was

12   installed in 1996, that's the same functionality it

13   had when it was retired in 2006; is that correct?

14           MR. COREY:  Objection:  vague, compound and

15   scope.                                                    02:27PM

16   BY MR. JENAL:

17       Q.   Is that correct?

18       A.   That's correct.

19       Q.   What functionality did the Nortel switch --

20   if I just call it the Nortel switch, you'll             02:27PM

21   understand what I'm talking about, correct?

22       A.   Yes.

23       Q.   What functionality did the Nortel switch

24   have for the purpose of keeping track of phone calls

25   that were made from a particular desktop phone?         02:27PM

                                                               43

**EXHIBIT 23-330**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. COREY:  Objection:  assumes facts and

2    vague.

3          THE WITNESS:  When you say "functionality,"

4    within the system?

5    BY MR. JENAL:                                    02:27PM

6      Q.   Correct.

7      A.   Within the system it had a data output from

8    the main processor to an outside resource.

9      Q.   Let's see if we can break that down just a

10   little bit.  What do you mean by an outside      02:28PM

11   resource?

12     A.   We had a PC with a software program called

13   Micro Call that would collect the data.

14     Q.   So there was some sort of port on the Nortel

15   switch that could be connected up to a PC and you  02:28PM

16   had a PC running this Micro Call software; is that

17   correct?

18     A.   Correct.

19     Q.   What was the nature of the connection

20   between the switch and the PC?                   02:28PM

21         MR. COREY:  Objection:  vague, calls for

22   speculation.

23         THE WITNESS:  A hard wire.

24   BY MR. JENAL:

25     Q.   Is it like an ethernet connection?  What   02:28PM

                                                      44

EXHIBIT 23-331

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    kind of a connection?

 2        A.    Direct connection.  Cable.

 3        Q.    Is there some sort of protocol that was used

 4    to transmit that data?

 5             MR. COREY:  Objection: speculation, scope.   02:29PM

 6             THE WITNESS:  I don't know of any special

 7    protocol.  It was a direct connection.

 8    BY MR. JENAL:

 9        Q.    What port on the PC would that connect to?

10        A.    The communications port.              02:29PM

11        Q.    Serial port?

12        A.    Serial port.

13        Q.    You're familiar with the nomenclature RS

14    232?

15        A.    Yes.                                   02:29PM

16        Q.    Is this an RS 232 connection?

17        A.    Yes.

18        Q.    When was the PC with the Micro Call software

19    installed at Mattel in El Segundo?

20        A.    That I do not know.  It was before I was  02:29PM

21    there.

22        Q.    So when you came, it was already in place?

23        A.    I believe so.

24        Q.    And you got to Mattel in 1996, correct?

25        A.    Correct.                               02:30PM
```

                                                        45

**EXHIBIT 23-332**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    On the Nortel?

2      Q.    On the Nortel switch.

3      A.    Correct.

4      Q.    My question then was focused on the software

5  that's running on the PC which you told me is          02:31PM

6  something called Micro Call, correct?

7      A.    Correct.

8      Q.    You just said, and perhaps there was some

9  confusion, that you had yearly upgrades for that

10  software.  Are you talking about yearly upgrades for  02:31PM

11  the Micro Call software?

12      A.    Correct.

13      Q.    So my question was:  Did the functionality

14  of that software, of the Micro Call software, evolve

15  over time?                                            02:32PM

16          MR. COREY:  Thank you, Counsel.

17          THE WITNESS:  No, nothing changed.

18  BY MR. JENAL:

19      Q.    Did the PC that the Micro Call software was

20  running on, did that change over time?                02:32PM

21      A.    I can't tell you exactly when but it has

22  changed.

23      Q.    What's your best estimate of when that PC

24  was changed?

25      A.    Probably around 2003.                       02:32PM

47

**EXHIBIT 23-333**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              VIDEO OPERATOR:  We are back on the record

2      at 2:51 p.m.

3      BY MR. JENAL:

4         Q.   Mr. Palmer, you realize you're still under

5      oath?                                          02:52PM

6         A.   Yes.

7         Q.   You said a little while ago that part of the

8      change that was done was so that you could store

9      your archives off the system and on a network drive.

10     Do you remember telling me that?                02:52PM

11        A.   Yes.

12        Q.   And when did that happen?

13        A.   When we made the change it was in 2003.

14        Q.   Prior to that time were there archives

15     associated with the Micro Call system?         02:52PM

16        A.   Yes.

17        Q.   Where were those archives stored?

18        A.   On tape.

19        Q.   And how far back in time do the tape

20     archives for the Micro Call system exist at Mattel?  02:52PM

21        A.   Probably back to 2003.  Excuse me, 2000.

22        Q.   What's the basis for that belief?

23        A.   We had a tape rotation system.

24        Q.   How long is the tape rotation system?

25        A.   Three years.                           02:53PM
```

                                                        51

**EXHIBIT 23-334**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    archived backup provided to Legal or were copies of
 2    tapes provided to Legal?
 3        A.   I believe it was the actual tapes.
 4        Q.   Did your area retain copies of those Micro
 5    Call archived tapes?                              02:58PM
 6        A.   No.
 7        Q.   If there was an archived tape from 2000,
 8    what is your expectation as to how far back in time
 9    that archived tape would reflect call collection
10    data?                                             02:59PM
11             MR. COREY:  Go ahead.  No objection.
12             THE WITNESS:  I believe it would go to the
13    beginning of the year.
14    BY MR. JENAL:
15        Q.   What's the basis for that belief?        02:59PM
16        A.   None.  That's what I believe it would be.
17        Q.   Were you familiar with the functionality of
18    the Micro Call system as it existed in 2000?
19        A.   The functionality, yes.
20        Q.   What information would the Micro Call system 02:59PM
21    collect as to telephone calls in 2000?
22        A.   The data from PBX?  Is that what you're
23    looking for?
24        Q.   Yes.
25        A.   The date and time of the call, duration,  03:00PM
```

**EXHIBIT 23-335**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    extension making the call, the phone number that was

2    called.

3        Q.   Anything else?

4        A.   That's pretty much it.

5        Q.   And then you said -- I'm going to ask you      03:00PM

6    what information did the Micro Call system collect.

7    You referred specifically to data from the PBX.  Was

8    there data that the Micro Call system would collect

9    from any other data source other than the PBX in

10   2000?                                                  03:01PM

11       A.   No.

12       Q.   Does the Micro Call system today as it

13   exists at Mattel collect information from any other

14   source other than the Cisco switch?

15       A.   No.                                           03:01PM

16            MR. JENAL:  Can we go off the record for

17   just a moment, please.

18            VIDEO OPERATOR:  We're off the record at

19   3:01.

20                    (Brief recess.)                       03:07PM

21            VIDEO OPERATOR:  We are back on the record

22   at 3:07.

23   BY MR. JENAL:

24       Q.   Mr. Palmer, we were talking about the data

25   that was collected on the Micro Call system.  Do you  03:07PM

                                                              56

**EXHIBIT 23-336**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   remember that discussion?

2          MR. COREY:  And the witness wants to make

3   one clarification before we start.

4          MR. JENAL:  Great.

5          THE WITNESS:  On the tapes the archives were   03:07PM

6   done monthly.  We would cycle and do an archive

7   every month, not -- I didn't want to sound like one

8   tape did the whole year.

9   BY MR. JENAL:

10      Q.   Okay.  We'll walk through that more        03:07PM

11  systematically so we can nail it down but I

12  appreciate the clarification.

13          You told us that the data collected by the

14  Micro Call system from -- in 2000 would have been

15  the Nortel switch, correct?                         03:08PM

16      A.   Correct.

17      Q.   And that data would have included the date,

18  the time of the call, the duration of the call, the

19  originating extension and the number called; is that

20  correct?                                            03:08PM

21      A.   Correct.

22      Q.   What about if a call came in to a particular

23  extension from outside of Mattel?  Would that be

24  recorded in any way?

25      A.   It would only be recorded as an incoming    03:08PM

                                                          57

**EXHIBIT 23-337**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    call.

2         Q.   But there would be a record of it?

3         A.   It would just show incoming call. It

4    wouldn't show any phone numbers or anything like

5    that.                                              03:08PM

6         Q.   But it would record the date and time?

7         A.   Yes.

8         Q.   And the duration?

9         A.   I believe so.

10        Q.   Did that functionality ever change at all   03:08PM

11   such that more information was made available

12   regarding incoming phone calls being logged?

13        A.   On the Nortel system?

14        Q.   Yeah, through the Nortel system onto Micro

15   Call.                                              03:09PM

16        A.   No.

17        Q.   Did that capability change with the Cisco

18   switch?

19        A.   Yes.

20        Q.   What information was gathered or collected   03:09PM

21   by the Micro Call system through the Cisco switch in

22   addition to the data we already talked about?

23        A.   Incoming calls the -- if the caller ID was

24   available, it would collect that data.

25        Q.   Any other information?                   03:09PM
```

**EXHIBIT 23-338**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   another location or if the phone moved to another

2   location, there may not be a jack number.  We'd have

3   to look at the number that's inputted.

4   BY MR. JENAL:

5       Q.   Can you tell in the database when the          03:45PM

6   entries have been changed?

7       A.   No.

8       Q.   There's nothing that reflects like the -- a

9   last modified date on the database?

10          MR. COREY:  Or you can rely on your joint       03:45PM

11   defense agreement and ask Carter where he sat.

12          MR. JENAL:  That's just an aside.

13      Q.   You can answer the question.

14      A.   Why don't you restate it.

15      Q.   On the individual entries in the user          03:45PM

16   database is there some field that would indicate

17   when the record was last changed?

18      A.   I don't believe so.

19      Q.   Let me ask you just for a minute about the

20   backups that would take place.  Back in 2000 what      03:45PM

21   would have been the backup regime for the Micro Call

22   system?

23      A.   Normally on a monthly basis we would archive

24   the data that's on the PC to a tape backup.

25      Q.   And when you use the term "archive" in this    03:46PM

86

**EXHIBIT 23-339**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   context, do you mean that that data for that month

2   would be taken off the PC and stored solely on the

3   backup tape or simply a copy of that data would be

4   placed on the backup tape?

5       A.   It would be placed solely on the backup        03:46PM

6   tape.

7       Q.   So there'd be no data actually on the Micro

8   Call PC older than essentially the month's worth of

9   data; is that right?

10      A.   That's correct.                                03:46PM

11      Q.   And then how long would those monthly backup

12  tapes have been preserved as of 2000?

13          MR. COREY:  Objection:  asked and answered.

14          Go ahead and answer the question.

15          THE WITNESS:  It would have been three          03:47PM

16  years, I believe.

17  BY MR. JENAL:

18      Q.   So if -- let's suppose that we had a big

19  aching need to recover data that was on the Micro

20  Call system as it existed in the year 2000.  I think  03:47PM

21  you said that at some point the backups were

22  provided to the Legal department, correct?

23      A.   Correct.

24      Q.   Assuming that the kind folks in the Legal

25  department handed you those tapes back again so you    03:47PM

87

EXHIBIT 23-340

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        MR. COREY:  Objection:  mischaracterizes the

2    witness' testimony.

3        THE WITNESS:  Which way do you mean system?

4    BY MR. JENAL:

5        Q.  Well, leaving the archive tapes aside          03:50PM

6    because archived tapes are different from a computer

7    system, they're archived tapes, correct?

8        A.  Correct.

9        Q.  And the Micro Call system that's connected

10    to the Nortel switch you testified at least back in    03:50PM

11    the 2000 time period that kept one month's worth of

12    call records at a time on that database, correct?

13        MR. COREY:  Objection:  mischaracterizes the

14    witness' testimony.

15        THE WITNESS:  Say it again.                        03:51PM

16    BY MR. JENAL:

17        Q.  I thought you told me that back in 2000 this

18    archived process essentially moved the data off the

19    Micro Call PC and onto archived backup tape storage

20    such that that month's data was no longer resident    03:51PM

21    on the Micro Call system.  Is that correct?

22        MR. COREY:  Same objections.

23        THE WITNESS:  That's correct.

24    BY MR. JENAL:

25        Q.  So what I'm asking is:  Is there any other     03:51PM

· 90

EXHIBIT 23-341

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  computer system at Mattel that would have kept call

2  records as collected by the Micro Call system for

3  any period longer than one month at a time such that

4  they'd be accessible, you could query it, you could

5  generate reports, et cetera?                    03:51PM

6      A.   We had a backup PC that would collect the

7  data in the event the primary we had to reboot it

8  for patches or whatever, but the nature of the

9  database and the nature of the PCs that we had we

10 had to update them for every month -- not update   03:52PM

11 them but archive the data every month.  We'd only

12 archive the main system.  The other system would

13 just run first in, first out and it would only hold

14 about a month's worth of data.

15     Q.   I see.  So if you didn't archive it first  03:52PM

16 in, first out, the older data simply just gets

17 pushed off and falls on the floor basically, right?

18 It goes into the bit bucket?

19     A.   It depends on the call volume but --

20     Q.   How much volume could be maintained at any  03:52PM

21 given time on the Micro Call database?

22     A.   Maximum would be about two, two and a half

23 months.

24     Q.   I see.  Is that just a disk space capacity

25 issue?                                          03:53PM

                                                      91

**EXHIBIT 23-342**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Yes.

2    Q.   Is that something you could solve simply by

3  putting more disk space on the PC or is that a

4  limitation of the software?

5    A.   That was the limitation of the PC.     03:53PM

6    Q.   So if you got a big PC with lots of storage,

7  lots of disk space, you could keep much longer time

8  periods of call data; is that correct?

9    A.   Yes.

10    Q.   When you moved to a new PC in about 2003,   03:53PM

11  did that expand the amount of time that you could

12  keep call data live on the Micro Call computer?

13    A.   Correct.

14    Q.   How long was the data available as of that

15  transition to the new PC?                03:53PM

16    A.   Four to five months on the PC.

17    Q.   And then you mentioned that you moved to

18  archiving the data up on a network server, correct?

19    A.   Correct.

20    Q.   When that change occurred, would you be able 03:53PM

21  to generate reports like this directly off of the

22  network server or would you still have to do a

23  restore process?

24    A.   It's a restore process.

25    Q.   It's just now you don't have to go to tapes, 03:54PM

92

**EXHIBIT 23-343**