CONFIDENTIAL                                             141

1    and kind of gave me the idea.  There was a Paris Blues ad.   01:49

2    There was -- 17 Magazine had a Steve Madden ad.  There was

3    an ad for the Dixie Chicks' album and it said "Chicks with

4    Attitude" on it, and it all just kind of came together and

5    it all just kind of really struck me when I drove by that   01:49

6    high school.

7   Q  Can you place this in a month in 1998?

8   A  It was in late August.

9   Q  And do you recall the high school?

10   A  I believe it was Kickapoo High.   01:49

11   Q  Kickapoo?

12   A  Uh-huh.

13   Q  Is that here in Springfield?

14   A  Yes.

15   Q  And there is a street that you were driving on that   01:50

16    actually fronts right on this high school?

17   A  Yes.

18   Q  And do you recall what the name of that street is?

19   A  I think it's Primrose.

20   Q  So school was in session in late August?   01:50

21   A  Yes, as far as I know.

22   Q  And did these kids seem to be coming out of school?

23   A  Yeah.  They seemed like they were getting out of school,

24    going to their cars, whatever.

25   Q  It wasn't just one or two kids?  There was a whole bunch   01:50

EXHIBIT 14 PAGE 183

CONFIDENTIAL                                    187

1    O'Melveny said they needed to be here at this deposition.    03:04

2              MR. WICKHAM:  I would disagree with that.

3              MS. CENDALI:  This involves the negotiations

4    between MGA and a designer for MGA's very valuable

5    property.  I think it's a trade secret.    03:05

6              MR. QUINN:  It's not a trade secret whether

7    or not his lawyer had created a draft of an agreement,

8    which is a -- calls for a yes or no answer.

9    Q  (By Mr. Quinn)  So you get to answer.

10   A  No.    03:05

11   Q  As of the time of this conversation your lawyer had not

12   created any draft agreement for you?

13   A  No.

14   Q  Had your lawyer -- did your lawyer ever create any draft

15   agreement for you?    03:05

16   A  No.

17   Q  Did your lawyer review draft agreements created by

18   somebody else?

19             MR. WICKHAM:  Now you're getting into

20   privileged areas.  In order to avoid the witness    03:05

21   disclosing attorney-client privileged communications, I

22   want to briefly talk to the witness outside the room and

23   then I will know better at that point in time whether to

24   object and instruct, just to object, or to allow him to

25   answer the question, but I do need a brief break strictly    03:06

**EXHIBIT 14 PAGE 184**

CONFIDENTIAL                                    188

1   for purposes of preserving any privilege.                    03:06

2           MR. QUINN:   I don't see how under any

3   stretch of the imagination that question calls for

4   confidential communications, and I object to taking a

5   break with a witness with a question pending.  They're not    03:06

6   following my advice.

7           (Break in proceedings.)

8           MR. WICKHAM:   Earlier in the deposition

9   session I had repeated our offer to make a limited waiver

10  of the attorney-client privilege, limited to the              03:09

11  transaction pursuant to which Mr. Bryant secured advice

12  from Ms. Wang in connection with the negotiation of and

13  ultimately the consummation of the agreement with MGA.  I

14  will once again make that offer as long as and on the

15  condition that that limited waiver of the privilege would     03:10

16  not and shall not be construed by Mattel or any party to

17  this case as an any broader waiver of the privilege.  I

18  reiterate that offer, and to the extent that you take me

19  up on it, then we can proceed.  If you still continue to

20  choose not to accept that offer with regard to the pending    03:10

21  question, I'd object and instruct on the attorney-client

22  privilege basis.

23          MR. QUINN:   Yeah.  I mean, the problem with

24  the offer is that we don't think you can waive the

25  privilege in part in the circumstances the way that you       03:10

EXHIBIT 14 PAGE 185

CONFIDENTIAL                                                    192

1   Q   Was there ever any other draft of the agreement created                03:14

2       other than that first draft that you got on or about

3       September 18th?

4               MR. WICKHAM:   Objection, lacks foundation,

5       call for speculation.                                                  03:14

6   A   I don't know.  I don't remember.

7   Q   (By Mr. Quinn)  Did you ever see any draft of an agreement

8       between you and MGA other than that first draft that MGA

9       sent to you on or about September 18th?

10              MR. WICKHAM:   Objection, lacks foundation,                     03:15

11      calls for speculation.

12              MR. QUINN:   Just how -- the question asked

13      him whether he saw something.  How could he possibly --

14      that possibly lack foundation?

15              MR. WICKHAM:   Counsel, you're talking about                    03:15

16      events that occurred four years ago.  If you could tell me

17      every single thing that you reviewed in calendar year 2000

18      without speculating, I would be very impressed with your

19      memory, but I would appreciate instead that you not

20      comment on my objections, that you simply just ask your                 03:15

21      questions, allow me to make my objections, and we can

22      proceed.

23              MR. QUINN:   Basically I think I've done

24      that, but he's perfectly -- he's shown us many times he's

25      perfectly capable of saying if he doesn't recall.                       03:15

**EXHIBIT 14 PAGE 186**

CONFIDENTIAL                                    193

1   Q   (By Mr. Quinn)  Sir, you understand I'm not asking you to          03:16

2       make something up and tell me something if you don't

3       recall it?  Do you understand that?

4   A   Yes.  Can you restate the question?                                03:16

5   Q   Sure.  I'm asking you whether you ever saw any draft of an         03:16

6       agreement between you and MGA other than this draft that

7       MGA provided around September 18th.

8                   MR. WICKHAM:  Asked and answered.  Asked and

9       answered.

10  Q   (By Mr. Quinn)  Remind me.  What was the answer?                   03:16

11                  MR. WICKHAM:  He said he didn't recall,

12      Counsel.

13                  MR. QUINN:  No.  That's what you said.

14                  MR. WICKHAM:  No.  That's what he said.  You

15      see, you don't like the answers to his questions at times         03:16

16      and so you re-ask the same question four or five times, as

17      the record will reflect.

18  Q   (By Mr. Quinn)  Go ahead.

19  A   I don't recall.

20  Q   Is it your recollection that the agreement -- or that the         03:16

21      form of agreement that you received from MGA on or about

22      September 18th ended up being the agreement which you

23      signed?

24  A   For the most part, yes.

25  Q   Were there some differences between the form of agreement         03:17

EXHIBIT 14 PAGE 187

CONFIDENTIAL                                    206

Q   How did it come about that you signed an agreement?  Did      03:32
    somebody send it to you?

          MS. CENDALI:  Objection, vague.

A   Yeah.  What do you mean specifically?

Q   (By Mr. Quinn)  How did you -- let's start with, how did      03:32
    you get the form of agreement that you signed?

A   I don't remember.  I think it might have been an E-mail.

Q   From who?

A   From MGA's offices.

Q   And when you got that, you understood that this was the       03:32
    final form of agreement?

A   Yes.

Q   And you understood that you were to sign it?

A   Yes.

Q   And so they E-mailed it to you and did you, in fact, sign     03:32
    it?

A   Yes.

Q   And did you sign one copy or more than one copy?

A   I don't recall.

Q   All right.  The copy or copies that you signed, what did      03:33
    you do with them?

A   I believe I faxed it over to MGA's attorneys.

Q   Did you keep a copy?

A   Yes.

Q   And then after that did you give notice to Mattel that you    03:33

EXHIBIT 14 PAGE 188

CONFIDENTIAL                                    236

1   calls for speculation.                                    04:24

2   A   I don't remember.

3   Q   (By Mr. Quinn)  I'm just trying to find out whether your

4       decision to have her start working on the sculpt was

5       driven by some particular goal in terms of when the Bratz    04:24

6       project would be ready.

7                   MS. CENDALI:  Objection, mischaracterizes --

8                   MR. WICKHAM:  That completely --

9                   MS. CENDALI:  -- his testimony as to whether

10      he had any decision.                                    04:25

11                  MR. WICKHAM:  And Mr. Bryant didn't have Ms.

12      Leahy start on working anything and he's made that clear

13      throughout the day.

14                  MR. QUINN:  That's a nice piece of

15      testimony, Counsel.                                    04:25

16  Q   (By Mr. Quinn)  You can answer the question.

17  A   I don't recall.  I don't recall why I had -- why I had her

18      start when she did.

19  Q   All right.

20  A   Or if it was even -- I don't even remember if it was my    04:25

21      direction for her to start.

22  Q   You know, if -- was there some time pressure if the Bratz

23      doll was going to be ready in time for the Hong Kong and

24      New York toy fairs?

25                  MR. WICKHAM:  Objection, lacks foundation.    04:25

EXHIBIT 14 PAGE 189

CONFIDENTIAL                                    270

1      not to respond.                                                          09:14

2    Q   (By Mr. Quinn)  Is it true that as of September 2000 you

3        knew that the Bratz dolls would be made in Hong Kong?

4               MS. CENDALI:  Objection.

5    A   I don't remember if I knew that or not.                               09:14

6    Q   (By Mr. Quinn)  Just don't know one way or the other?

7    A   No.

8    Q   Is it true that in September of 2000 you knew that a large

9        order would be placed for hair for the Bratz dolls?

10              MS. CENDALI:  Objection, mischaracterizes                       09:14

11       his testimony.

12              MR. WICKHAM:  Objection, lacks foundation.

13              MR. QUINN:  Which of his testimony did that

14       mischaracterize?

15              MS. CENDALI:  Well, do you want to read it                      09:14

16       back from yesterday?

17              MR. QUINN:  Can you remember sitting here?

18              MS. CENDALI:  Yes, I can.

19              MR. QUINN:  Okay.

20              MS. CENDALI:  And I believe what he said                        09:14

21       yesterday was the things in September of 2000, things were

22       preliminary, he was hopeful, and that he was not -- and I

23       don't remember him testifying with regard to the things

24       that you've put in your question.

25              MR. QUINN:  That's why I'm asking the                           09:15

EXHIBIT 14 PAGE 190

CONFIDENTIAL                                          271

```
 1         question because he didn't.                          09:15
 2    Q    (By Mr. Quinn)  So is it true that as of September of 2000
 3         that you knew a large order would be placed for hair with
 4         a supplier --
 5              MR. WICKHAM:  Objection --                       09:15
 6    Q    (By Mr. Quinn)  -- for the Bratz doll?
 7              MR. WICKHAM:  Objection, lacks --
 8              MS. CENDALI:  Objection, mischaracterizes
 9         his testimony about his conversations with Universal Hair.
10    A    I don't think that that was my understanding at that time.  09:15
11         I was -- I was just hopeful that the Bratz project would
12         go forward.  I didn't know whether or not this would even
13         be the vendor that they would use for hair.
14    Q    (By Mr. Quinn)  Did you tell anybody that MGA would place
15         a large order for hair with a vendor?                 09:15
16    A    I don't remember.
17    Q    You might have, you might not have, you just don't
18         recall?
19    A    I don't recall.
20    Q    So my statement is correct?                           09:15
21    A    Yes.
22    Q    Are you aware of any focus groups or market research that
23         was done relating to the Bratz doll?
24    A    Yes.
25    Q    And what are you aware of in that regard?             09:16
```

EXHIBIT 14 PAGE 191

CONFIDENTIAL                                         276

| | | | |
|---|---|---|---|
| 1 | Q | And was her response positive, that, yes, she could? | 09:22 |
| 2 | A | Yes. | |
| 3 | Q | And did she end up doing that? | |
| 4 | A | Yes. | |
| 5 | Q | Did she show you fabric art or, you know, potential ideas | 09:22 |
| 6 | | for fabric art? | |
| 7 | A | Yes. | |
| 8 | Q | And you gave her some comments on that? | |
| 9 | A | Yes. | |
| 10 | Q | When did you first contact her about the Bratz project? | 09:22 |
| 11 | | MR. WICKHAM:  Objection, asked and answered. | |
| 12 | Q | (By Mr. Quinn)  Let me ask a different question.  When did | |
| 13 | | you first speak to her on the subject of the Bratz | |
| 14 | | project? | |
| 15 | | MR. WICKHAM:  Objection, asked and answered. | 09:22 |
| 16 | A | I don't remember what my answer was earlier. | |
| 17 | Q | (By Mr. Quinn)  Actually, you haven't been asked that | |
| 18 | | question.  I'm asking a different question. | |
| 19 | | MR. WICKHAM:  No.  You did ask that | |
| 20 | | question.  You asked it.  He said October, then you asked | 09:23 |
| 21 | | it again.  He said actually that probably is -- my | |
| 22 | | recollection on November is mistaken, that it was probably | |
| 23 | | after -- you know, later than October. | |
| 24 | | MR. QUINN:  Douglas, I think when we look | |
| 25 | | at -- when we all look at the record I think we're going | 09:23 |

EXHIBIT 14 PAGE 192

CONFIDENTIAL                                            284

```
 1        Goddess line as well.  Is that -- were the Gods friends    09:35
 2        with Barbie?
 3   A    Excuse me.  No.  It was Barbie as these Goddesses.
 4   Q    I see.  Did MGA ever commission you to do any drawings?
 5   A    Well, as I stated yesterday, they asked me to do some     09:35
 6        faces for this angel project.
 7   Q    Right.  Did they ever commission you to do any drawings
 8        other than that?
 9   A    No, not that I recall.
10   Q    Did they ever commission you to do any drawings for Bratz? 09:35
11                  MR. WICKHAM:  I'll object to the extent it
12        calls for a legal conclusion in terms of the
13        interpretation of his contract with MGA.  If you
14        understand -- and ambiguous.  If you understand his
15        question in this context, you know, you should respond.  09:36
16   A    I'm not sure that I do understand your question.
17   Q    (By Mr. Quinn)  Before I had asked you about whether they
18        commissioned you to do any drawings and you referred --
19        you said, yes, the angel project.  Do you recall telling
20        me that?                                                  09:36
21   A    Yes.
22   Q    So I'm using "commission" in the same sense in which you
23        answered that question.  Okay?
24                  MS. CENDALI:  I object to the extent -- are
25        you talking about his contract with MGA or something else? 09:36
```

EXHIBIT 14 PAGE 193

**CONFIDENTIAL**                                    347

```
 1   A   I don't --                                            11:32
 2               MR. WICKHAM:  Are you referring to Exhibit 5
 3       or in any of the exhibits?
 4               MR. QUINN:  Anywhere.  I mean, if there's
 5       one in this particular exhibit that we could look at, that   11:32
 6       would be helpful.
 7   A   Well, I think in one of the previous exhibits we -- we
 8       definitely have one.
 9               MR. WICKHAM:  Why don't you try Exhibit 3.
10   A   Yes.  The first -- second page of Exhibit 3.           11:33
11   Q   (By Mr. Quinn)  Uh-huh.  I see what you're referring to.
12       We've received in -- in this case from your counsel that
13       copy of the 1998 notebook pages that we looked at.
14   A   Yes.
15   Q   And as I understand it, you don't have the original of   11:33
16       that.
17   A   They've been --
18               MR. WICKHAM:  Objection, mischaracterizes
19       the witness's testimony.  The witness has testified that
20       the notebook itself is no longer -- he doesn't know    11:33
21       whether the notebook itself is still available.
22               MR. QUINN:  Swear that man.  Swear the
23       counsel, please, if he's going to testify.
24   Q   (By Mr. Quinn)  Now, I understand you don't have the
25       notebook.  That was what I understood you testified to.   11:34
```

EXHIBIT _14_ PAGE _194_

CONFIDENTIAL                                366

1    A    This was a page that I had just made some notes to myself          11:57
2         of who might be doing what on the project.                    -
3    Q    Who might be doing what on the project.  Is this all in
4         your handwriting?
5    A    Yes.                                                              11:58
6    Q    And when did you write this?
7    A    I don't recall exactly when I wrote this.
8    Q    Where did you get the -- I mean, the information at the
9         top appear to be -- are those costs or prices or what are
10        they?                                                            11:58
11   A    Yes.  I think those were directions from Paula.
12   Q    Regarding cost or retail price or what?
13   A    Regarding retail price.
14   Q    And then these are just your ideas about people who might
15        be used to work on --                                           11:58
16            MS. CENDALI:  Objection --
17   Q    (By Mr. Quinn)  -- the project?
18            MS. CENDALI:  -- mischaracterizes his
19        testimony.
20   Q    (By Mr. Quinn)  And the idea you had for sculpting was         11:58
21        Margaret Leahy?
22            MS. CENDALI:  Objection --
23            MR. WICKHAM:  Objection, mischaracterizes --
24            MS. CENDALI:  -- mischaracterizes.
25            MR. WICKHAM:  -- the witness's testimony.

EXHIBIT 14 PAGE 195

CONFIDENTIAL                                                      367

1          MS. CENDALI:  He did not say these were his          11:58

2     ideas, Counsel.  You know that you're adding that to his

3     question.  Do you want to read back what he previously

4     said?

5          MR. QUINN:  Well, he just said these were          11:58

6     his ideas as to who would work on the project.

7  Q   (By Mr. Quinn)  Is that right?

8          MR. WICKHAM:  Objection --

9          MS. CENDALI:  That is not --

10          MR. WICKHAM:  -- mischaracterizes the

11     witness's testimony.

12          MS. CENDALI:  -- what he said.  Would you

13     please read back for the record when he was originally

14     asked what these -- what this document was and what he

15     responded with regard to what page 325 was.          11:59

16          MR. QUINN:  I'm -- I'm just going to ask my

17     question.

18  Q   (By Mr. Quinn)  Are -- are these your ideas as to who

19     would work on this project?

20          MR. WICKHAM:  Objection, mischaracterizes          11:59

21     the witness's testimony.

22  Q   (By Mr. Quinn)  You can answer.

23  A   This was something that -- this entire page was something

24     that Paula and I had discussed.

25  Q   All right.          11:59

EXHIBIT 14 PAGE 196

CONFIDENTIAL                                            368

```
 1    A    So these were just things that she and I had thrown around    11:59
 2         as to who might do what, so it wasn't just my idea.
 3    Q    It was the two of you?
 4    A    Yes.
 5    Q    You and Paula?                                                11:59
 6    A    Yes.
 7    Q    The two of you's ideas about who might work on the
 8         project?
 9              MR. WICKHAM:   Objection, mischaracterizes
10         the witness's testimony.                                      11:59
11    Q    (By Mr. Quinn)  Is that true, sir?
12              MS. CENDALI:   Asked and answered,
13         mischaracterizes his testimony.  He had previously said
14         before you tried to get him to change his answer -- and
15         I'd like it to be read back by the court reporter -- that     11:59
16         this was his writing down of who he thought was going to
17         be doing what.  You are now adding to his answer that
18         these were his suggestions when he made very clear that
19         these were not his suggestions --
20              MR. QUINN:   You're just --
21              MS. CENDALI:   -- and you were tampering with
22         that.  I ask it to be read back, your original question
23         and his original response.
24              MR. QUINN:   We're going to have to throw you
25         out of the deposition, ma'am.  We're going to have to go      12:00
```

EXHIBIT 14 PAGE 197

CONFIDENTIAL                                                369

| | |
|---|---|
| 1 | to court and ask to have you excluded because you're just | 12:00 |
| 2 | disrupting this process. |
| 3 | MS. CENDALI:  Because you are not willing to |
| 4 | let the witness read it back, Counsel?  What do you want |
| 5 | to do?  It's your witness. | 12:00 |
| 6 | MR. WICKHAM:  Will the reporter please read |
| 7 | back the original question and the witness's original |
| 8 | response when he was -- when he said these are who -- who |
| 9 | might be doing what. |
| 10 | COURT REPORTER:  "QUESTION:  325?  ANSWER: |
| 11 | This was a page that I had just made some notes to myself |
| 12 | of who might be doing what on the project." |
| 13 | Q   (By Mr. Quinn)  Okay.  So -- |
| 14 | MR. WICKHAM:  So your characterizations |
| 15 | concerning what this is and your repeated attempting to | 12:02 |
| 16 | put words into the witness's mouth is improper and this is |
| 17 | another example of you mischaracterizing the witness's |
| 18 | testimony.  You had asked earlier what are some examples |
| 19 | of that.  This is an example of that.  I would ask that |
| 20 | you cease putting words in the witness's mouth, cease | 12:02 |
| 21 | mischaracterizing the witness's testimony.  Ask the man |
| 22 | questions, let him answer questions, but don't rewrite his |
| 23 | testimony in whatever fashion that you have and hope and |
| 24 | pray that he's going to be adopting your statements. |
| 25 | MR. QUINN:  What was read was exactly what I | 12:02 |

**EXHIBIT 14 PAGE 198**

CONFIDENTIAL                                      370

```
 1        said.                                              12:02

 2                    MR. WICKHAM:  No, it's not.

 3                    MR. QUINN:  His ideas as to who might work

 4        on the project.

 5                    MR. WICKHAM:  No, that's not --

 6                    MR. QUINN:  Let's --

 7                    MR. WICKHAM:  -- what he said, Counsel.

 8                    MR. QUINN:  Let's go ahead.

 9                    MR. WICKHAM:  That is not what he said.  The

10        witness just read it again.                        12:02

11                    MR. QUINN:  All right.  Well, let's -- let's

12        proceed with the questions.

13                    MR. ZELLER:  And surely you've already given

14        him the answer to the question by now since it's been

15        repeated several times, so --                      12:03

16                    MR. WICKHAM:  We haven't given him any

17        answer to any question.  It is Mr. -- Mr. Quinn who is

18        trying to testify.  Maybe you should be sworn, Mr. Quinn.

19                    MR. QUINN:  Well, maybe I should.

20    Q   (By Mr. Quinn)  So package, it says Sue.  Who is that?  12:03

21    A   I believe that says Sue Iri.

22    Q   Can you spell her last name for us?

23    A   I think it's I-R-I.

24    Q   And is that somebody you knew?

25    A   Yes.                                               12:03
```

EXHIBIT 14 PAGE 199

<u>CONFIDENTIAL</u>                                    427

1    that says "description of document."  Below that it says     03:11

2    copies of 17 initial concept and design drawings of the

3    Bratz dolls made by Mr. Bryant in the year 2000.  Do you

4    see that?

5  A  Yes.                                                        03:11

6  Q  Is that a true statement?

7  A  No.

8  Q  It's not true because?

9  A  It's not true because most of these drawings were made in

10    1998.                                                        03:11

11 Q  Other than your counsel, did you ever talk to anyone about

12    the dates on these drawings?  I don't want to inquire into

13    any communications with your counsel, so just set that

14    aside.  In answering my question exclude any

15    communications that you've had with your counsel.  Do you   03:12

16    understand what I'm saying?

17 A  Yes.

18 Q  Bearing that in mind, did you ever talk to anyone about

19    the dates on these drawings?

20         MR. WICKHAM:  Mr. Quinn, clarification.                03:12

21    You've got page 1 of Exhibit 10, which I don't know if

22    you've asked him if he had ever seen this before, but I

23    suspect if you laid a foundation concerning the first page

24    of Exhibit 10, the witness would say that he's never seen

25    this before today.  If you're asking him has he seen the    03:12

EXHIBIT 14 PAGE 200

CONFIDENTIAL                                                      428

1    dates on the first page of Exhibit 1 (sic), so be it.  If        03:12

2    you're asking him the dates on any of the drawings that

3    are under the first page of Exhibit 10, that's a different

4    question, and to the extent that there are different dates

5    on different documents, then all of that renders your         03:12

6    question hopelessly vague, confusing, and ambiguous.  If

7    you want to ask him that question, of course you're

8    entitled to, but to fix the ambiguity you have to go

9    through page by page, or if there's multiple pages --

10   multiple dates on multiple pages, you have to go date by     03:13

11   date, except to the extent you've already inquired on

12   certain things.

13   Q    (By Mr. Quinn)  So let's set aside the first page.  My

14        question really was directed dates on drawings.

15   A    Okay.                                                    03:13

16   Q    Putting aside any communications you've had with your

17        counsel, did you ever discuss with anyone the dates on any

18        of these drawings?

19              MR. WICKHAM:  Objection, ambiguous,

20        overbroad, vague, and to the extent that he's already      03:13

21        asked specific questions about specific dates on the

22        document, it's asked and answered multiple times over.

23   A    I don't recall discussing these dates.

24   Q    (By Mr. Quinn)  Did you ever talk to any attorneys in Hong

25        Kong about the dates on these documents?                   03:13

EXHIBIT 14 PAGE 201

CONFIDENTIAL                                             433

1    Q    (By Mr. Quinn)  Well, I mean, did you submit the Bratz to          03:18

2         some type of fashion doll design contest in late 1999?

3    -                  MS. CENDALI:  Objection, asked and answered.

4    A    If there was some sort of contest, I was unaware of it,

5         but I did not even show the line to Mr. Larian until 2000.        03:19

6    Q    (By Mr. Quinn)  So so far as your knowledge goes, this is

7         not a true statement?

8                       MR. WICKHAM:  Objection, mischaracterizes

9         the witness's testimony, lacks foundation, calls for

10        speculation.                                                      03:19

11   A    I wouldn't be able to say if this was true or not.

12   Q    (By Mr. Quinn)  It might be true, in other words?

13                      MR. WICKHAM:  Objection, lacks foundation,

14        calls for speculation, mischaracterizes the witness's

15        testimony.                                                        03:19

16   A    I don't know if this is true or not.

17                      MR. QUINN:  Okay.  We need to change the

18        tape here, so we'll go off the record for that purpose.

19                      VIDEOGRAPHER:  We're off the record.  Time's

20        3:19.                                                             03:19

21                       (Break in proceedings.)

22                      VIDEOGRAPHER:  We're back on the record.

23        Time's 3:21.

24   Q    (By Mr. Quinn)  So have you ever discussed with anyone

25        that account of how Mr. Larian came to choose Bratz?             03:21

EXHIBIT 14 PAGE 202

CONFIDENTIAL                                      434

| | | |
|---|---|---|
| 1 | | MR. WICKHAM:  Objection.  To the extent that | 03:21 |
| 2 | | you've had any discussions with your lawyers, I instruct |
| 3 | | you not to respond.  To the extent that you've had any |
| 4 | | discussions other than with attorneys, you can and should |
| 5 | | respond.  I will also object on the grounds that it lacks | 03:21 |
| 6 | | foundation, calls for speculation since the witness has |
| 7 | | already said that he didn't read the article that counsel |
| 8 | | claims is a Wall Street Journal article. |
| 9 | A | I didn't read the article.  I haven't spoken with anybody |
| 10 | | about those statements that Mr. Merritt -- Mr. Larian | 03:22 |
| 11 | | made. |
| 12 | Q | (By Mr. Quinn)  Have you discussed that article at all |
| 13 | | with anybody other than your counsel? |
| 14 | A | Mr. Larian told me that there was going to be an article |
| 15 | | appearing in the Wall Street Journal. | 03:22 |
| 16 | Q | When did he tell you that? |
| 17 | A | He told me I think a couple of days, maybe a few days |
| 18 | | before it came out. |
| 19 | Q | And did he call you up to give you this advice? |
| 20 | | MR. WICKHAM:  Objection, mischaracterizes | 03:22 |
| 21 | | the witness's testimony. |
| 22 | A | He called me up to tell me that the Wall Street Journal |
| 23 | | was going to be running an article regarding Bratz. |
| 24 | Q | (By Mr. Quinn)  And did he say anything about that |
| 25 | | particular passage that we read about how he came to | 03:22 |

EXHIBIT 14 PAGE 203

CONFIDENTIAL                                    436

1    and this is Number 1558 through 1569.                         03:24
2    Q  (By Mr. Quinn)  I'll call your attention, sir, to the page
3       that's Bates numbered 1562.
4    A  Okay.
5    Q  And if you'll look at the -- if you look at the -- on the    03:25
6       front page it recites that this is an affidavit of Isaac
7       Larian.  Do you see that?
8    A  Yes.
9    Q  And then on page 1562 on numbered paragraph 13 it says --
10      and I quote -- the Bratz dolls were first exhibited in the   03:25
11      U.S.A. in November 2000.  Is that a true statement so far
12      as you know?
13              MR. WICKHAM:  Objection, calls for a legal
14      conclusion, lacks foundation, calls for speculation.
15   A  I have no knowledge of that.                                03:25
16   Q  (By Mr. Quinn)  Do you have any knowledge of any
17      exhibition of the Bratz dolls in the U.S.A. in November of
18      2000?
19              MR. WICKHAM:  Objection, lacks foundation,
20      calls for speculation, calls for a legal conclusion.        03:25
21   A  I have no knowledge of that.
22   Q  (By Mr. Quinn)  It says they were further exhibited in
23      Hong Kong in January 2001.  Is that a true statement?
24   A  To the best of my knowledge, yes.
25   Q  But so far as your knowledge, you're not aware -- so far    03:26

EXHIBIT 14 PAGE 204

CONFIDENTIAL                                          437

```
 1    as you know there was no exhibition in the U.S.A. of Bratz     03:26
 2    dolls in November 2000, correct?
 3                    MR. WICKHAM:  Objection, lacks foundation,
 4    calls for a -- calls for a legal conclusion and calls for
 5    speculation as to what, A, this document is and, B, if        03:26
 6    indeed this is an affidavit from Mr. Larian, what Mr.
 7    Larian meant by that statement.
 8                    MS. CENDALI:  Also mischaracterizes his
 9    testimony.
10  Q  (By Mr. Quinn)  Your turn.                                    03:26
11  A  I have no knowledge.
12  Q  You have no knowledge of a public exhibition?
13  A  No.
14  Q  Or of any exhibition in the U.S.A. in November 2000?
15                    MR. WICKHAM:  Lacks foundation, calls for a    03:26
16    legal conclusion, mischar -- speculation.
17                    MS. CENDALI:  And objection,
18    mischaracterizes his testimony.
19  A  I'm not aware one way or another if the dolls were
20    exhibited in the U.S.A.                                        03:26
21  Q  (By Mr. Quinn)  You know of no such exhibition that you
22    can tell me about; is that true?
23                    MS. CENDALI:  Objection --
24                    MR. WICKHAM:  Objection.
25                    MS. CENDALI:  -- mischaracterizes his          03:27
```

EXHIBIT _14_ PAGE _205_

CONFIDENTIAL                                    438

| | | |
|---|---|---|
| 1 | testimony.  You already testified about the possible | 03:27 |
| 2 | retailer show, Counsel.  Are you excluding that or not? | |
| 3 | MR. QUINN:  Throw a lifesaver to the witness | |
| 4 | and remind him of some testimony. | |
| 5 | MS. CENDALI:  I don't want to confuse the | 03:27 |
| 6 | witness.  That's why I said mischaracterizes his | |
| 7 | testimony.  I was hoping you would. | |
| 8 | Q    (By Mr. Quinn)  So are you aware of any exhibition of the | |
| 9 | Bratz dolls in November 2000 in the U.S.A.? | |
| 10 | MR. WICKHAM:  Objection -- | 03:27 |
| 11 | MS. CENDALI:  Same objection. | |
| 12 | MR. WICKHAM:  -- lacks foundation, calls for | |
| 13 | a legal conclusion, calls for speculation, asked and | |
| 14 | answered 14 times. | |
| 15 | A    There is -- I have no knowledge one way or another. | 03:27 |
| 16 | Q    (By Mr. Quinn)  It says then that the Bratz dolls were | |
| 17 | first publicly made available for sale at the retail level | |
| 18 | in August 2001 in the U.S.A.  Do you see that? | |
| 19 | A    Yes. | |
| 20 | Q    Is that true so far as you know? | 03:28 |
| 21 | MR. WICKHAM:  Objection, lacks foundation, | |
| 22 | calls for speculation. | |
| 23 | A    To the best of my knowledge they were introduced sometime | |
| 24 | in the summer of 2001. | |
| 25 | MR. QUINN:  Next in order? | 03:28 |

EXHIBIT _14_ PAGE _206_

CONFIDENTIAL                                              441

1    enclosed Confidential Information and Inventions Agreement      03:31
2    and it wasn't enclosed?  Do you remember doing that?
3              MR. WICKHAM:  Objection, lacks foundation.
4    A   I remember calling Lynne to tell her thank you for the
5        offer, but I don't remember saying anything to the extent  03:31
6        of what you've just said.
7    Q   (By Mr. Quinn)  You don't recall ever telling her that
8        something that was referred to in the letter had not been
9        enclosed.  Is that a true statement?
10             MR. WICKHAM:  Objection, mischaracterizes          03:31
11       the exhibit, asked and answered, mischaracterizes the
12       witness's testimony.
13             MS. CENDALI:  Objection.  The document
14       speaks for -- your statement mischaracterizes the
15       document.                                                   03:31
16   A   I'm sorry.  Could you repeat your question?
17   Q   (By Mr. Quinn)  Do you recall calling her and saying I
18       don't have a Confidential Information and Inventions
19       Agreement?
20             MS. CENDALI:  Counsel, are you representing       03:32
21       that that was one of the forms that was enclosed with this
22       letter?
23             MR. QUINN:  I'm just asking my question.
24   Q   (By Mr. Quinn)  Did you call her and ask about that?
25             MS. CENDALI:  Then I object for foundation        03:32

EXHIBIT _14_ PAGE _207_

CONFIDENTIAL                                442

```
 1        because you haven't even ascertained whether or not -- you      03:32

 2        haven't even stated whether it was even included in -- on

 3        the forms that came with this.

 4   Q    (By Mr. Quinn)  Did you call her and ask her that?

 5              MR. WICKHAM:  Objection, lacks foundation.              03:32

 6   A    I called her and I told her thank you for the offer

 7        letter, but I don't recall saying anything of the nature

 8        of this form was not included or that form was not

 9        included.

10   Q    (By Mr. Quinn)  Now, you -- I take it that you received      03:32

11        this document, Exhibit 13, while you were still residing

12        in Kimberling, Missouri, and before you moved back to Los

13        Angeles.  Is that true?

14   A    Yes.

15   Q    Do you recall what date you actually moved from Missouri     03:32

16        to Los Angeles?

17   A    I think -- well, I drove out.  I think I left the day

18        after Christmas.

19   Q    When you -- I think you told me you did read this letter

20        when you received it?                                        03:33

21   A    Yes.

22   Q    And did you understand that the offer would be contingent

23        on satisfactory verification as to information regarding

24        various employers?

25              MR. WICKHAM:  Objection, lacks foundation,             03:33
```

EXHIBIT _14_ PAGE _208_

CONFIDENTIAL                                                    445

```
 1        calls for speculation.                                    03:35
 2    A   I don't think that that was my understanding at the time.
 3    Q   (By Mr. Quinn)  As you sit here now is it your
 4        understanding that the offer was contingent, among other
 5        things, on your signing some type of an agreement?        03:36
 6                    MR. WICKHAM:  Objection, lacks foundation,
 7        calls for speculation, mischaracterizes the witness's
 8        testimony.
 9    A   Can you please restate your question?
10    Q   (By Mr. Quinn)  As you read that now do you understand    03:36
11        that what this is saying is that your offer of employment
12        would be contingent on your signing some type of an
13        agreement?
14                    MS. CENDALI:  Objection, asked and answered,
15        harassment.                                               03:36
16    A   I understand this, yes, now.
17    Q   (By Mr. Quinn)  And when you -- do you have any reason to
18        think that when you read this back in 1998 that you would
19        not have understood that your employment offer was
20        conditioned on your signing some type of an agreement?    03:36
21                    MS. CENDALI:  Objection.
22    A   I don't think that I understood that at the time, no.
23    Q   (By Mr. Quinn)  So did you -- are you saying that you
24        didn't -- you didn't have any understanding when you read
25        this that you were going to be asked to sign some type of 03:37
```

EXHIBIT _14_ PAGE _209_

CONFIDENTIAL                                                446

1    an agreement?  Is that what you're telling us?                    03:37
2                MR. WICKHAM:  Objection, asked and answered
3    five times over.  Do you want him to restate what he just
4    said to you?  Could the reporter please reread Mr.
5    Bryant's last statement.                                         03:37
6                COURT REPORTER:  "ANSWER:  I don't think
7    that I understood that at the time, no."
8  Q  (By Mr. Quinn)  So at the time you didn't have any
9    understanding that you were being told you needed to sign
10   some kind of an agreement.  Is that a true statement?           03:37
11               MR. WICKHAM:  Objection, mischaracterizes
12   the witness's testimony, asked and answered several times
13   over.  I'll instruct the witness not to respond, and,
14   Counsel, let me just ask you.  With regard to what you've
15   marked as Exhibit 13, are you making a representation that    03:37
16   this was the letter that was sent to Mr. Bryant?  Because
17   from what I understand of the documents that were produced
18   by your client, there were, like, two or three different
19   versions of this very same letter in those documents, and
20   I haven't compared each of the different ones except I        03:38
21   noticed that some had different dates on them.  Do you
22   know whether, in fact, Exhibit 13 was sent to Mr. Bryant?
23   If Exhibit 13 was sent to Mr. Bryant, were the attachments
24   that were enclosed with Exhibit 13, and are you making
25   representations that the inventions agreement was even        03:38

EXHIBIT _14_ PAGE _210_

CONFIDENTIAL                                    447

1    included in this?                                             03:38

2              MR. QUINN:  Counsel, I'm just a lawyer.  I

3    mean, I --

4              MR. WICKHAM:  Are you making any of those

5    representations, sir, or are you -- are you presenting        03:38

6    confusing exhibits to the witness to purposely confuse the

7    witness?

8              MR. QUINN:  I'm not -- I'm representing to

9    you I'm not doing that, but I'm not represent -- I'm

10   not -- I don't work in HR.  I'm a lawyer.  My name's John    03:38

11   Quinn and I represent Mattel in this case and that's about

12   all I'm prepared to represent to you, so to quote my

13   colleague here, let's continue with the deposition.

14             MS. CENDALI:  So you're not representing

15   whether this was actually sent to Mr. Bryant and you're     03:38

16   not representing what forms were attached were sent along

17   with this and whether the inventions agreement was even

18   included in this packet; is that right?

19 Q  (By Mr. Quinn)  Do you have some reason to believe that

20   you would have --                                            03:39

21             MR. WICKHAM:  Mr. Quinn is not responding to

22   your question, Ms. Cendali.

23 Q  (By Mr. Quinn)  Do you have any reason to believe that you

24   would have a better understanding of these words "that

25   your offer's contingent upon the signing of a Confidential   03:39

EXHIBIT _14_ PAGE _211_

1   Information and Inventions Agreement" today than it would    03:39

2   be back in 1998?

3           MR. WICKHAM:  Lacks foundation, calls for

4   speculation, asked and answered 14 times, and I instruct

5   the witness not to respond.    03:39

6           MR. QUINN:  He wasn't asked that question.

7           MR. WICKHAM:  Counsel, I'm not going to

8   quibble with you.  You've been through this document up,

9   down, sideways.  You don't like the witness's response and

10  you have been asking and reasking it.  You said that you    03:39

11  want to move on with the deposition.  I join in that

12  desire.

13          MR. QUINN:  I hadn't asked that question,

14  so, you know, I really would like an answer to the

15  question.    03:39

16          MR. WICKHAM:  Well, you're -- you're

17  referring to an exhibit and you're asking him to believe

18  that this is the specific document that was sent to him

19  and, therefore, your question is misleading, and if you

20  say that you don't want to mislead the witness, then it's    03:40

21  not fair to be asking about a document unless you know

22  that this was one that, in fact, was sent to him.

23  Moreover, you've asked and reasked the same question

24  several times over.  We just had the witness respond to

25  that question.  Could the reporter please reread Mr.    03:40

EXHIBIT _14_ PAGE _212_

CONFIDENTIAL                                    449

1    Bryant's last response.                                    03:40

2              MR. QUINN:  He hasn't answered this

3    question, and the question I have is whether he has some

4    reason to believe that he has a better knowledge today of

5    the words that this offer is contingent upon satisfactory   03:40

6    verification of all employment as to previous employers

7    and academic institutions attended, eligibility to work in

8    the United States, and the signing of a Confidential

9    Information and Inventions Agreement, closed quote,

10   whether he has a better understanding of what that means    03:40

11   today than he would have had in 1998.

12             MR. WICKHAM:  So you're asking him to

13   speculate what his understanding or what the quality of

14   his memory was in 1998 as opposed to 2004.

15             MR. QUINN:  That might be -- that might       03:41

16   be --

17             MR. WICKHAM:  I would say that that is --

18             MR. QUINN:  That might be an answer.

19             MR. WICKHAM:  -- that that is -- that that

20   is speculation.  In addition, you are attempting to      03:41

21   represent to him that this specific document that you are

22   quoting from and quoting to him and having him to attempt

23   to adopt is, in fact, the letter that was sent to him, and

24   I know from the production of your client's documents that

25   there were several letters that look very similar to this.   03:41

EXHIBIT _14_ PAGE _213_

CONFIDENTIAL                                                    450

1    I haven't compared them to see whether some had that          03:41

2    clause in there and some did not.  You haven't answered

3    the question whether even that confidentiality agreement

4    was even attached to this, so your question is hopelessly

5    asking him to speculate and to guess, and if you don't       03:41

6    want him guessing at the deposition and I don't want him

7    guessing at the deposition, then I'd ask that you either

8    probe and lay your foundation to see whether or not he has

9    a basis to even answer your question.  Otherwise he's

10   guessing but he's given you a response.                       03:42

11 Q   (By Mr. Quinn)  Mr. Bryant, do you have any reason as you

12   sit here today that -- any reason you can identify for me

13   that you believe you would have a better understanding

14   today than you would have in 1998 as to what it means to

15   say your offer is contingent on the signing of a             03:42

16   Confidential Information and Inventions Agreement?

17                MS. CENDALI:  Objection, asked and answered.

18                MR. WICKHAM:  Asked and answered,

19   potentially invades the attorney-client privilege, and to

20   the extent that you've had communications with your          03:42

21   lawyers on these subjects in 2004, then I instruct you not

22   to respond with regard to any of those communications.

23   Would the reporter please read back Mr. Bryant's last

24   statement on this subject.

25                MR. QUINN:  He hasn't answered this              03:43

EXHIBIT _14_ PAGE _214_

CONFIDENTIAL                                            451

1    question.

2                    MR. WICKHAM:  I'm asking the reporter to

3    reread the record, Counsel.  Are you denying me that

4    request?

5                    MR. QUINN:  Well, if he hasn't testified on          03:43

6    this subject before, what's she going to do, go search

7    through the record to find something that doesn't exist?

8                    MS. CENDALI:  I believe that he did testify

9    to that.

10                    MR. QUINN:  I'd like an answer to the             03:43

11    question.

12                    MR. WICKHAM:  Would the reporter please read

13    back Mr. Bryant's last response.

14                    (Pause in proceedings.)

15                    MR. QUINN:  Reading your long speeches.

16                    COURT REPORTER:  "ANSWER:  I don't think

17    that I understood that at the time, no."

18    Q    (By Mr. Quinn)  Okay.  So my question's different.  My

19    question is --

20                    MR. QUINN:  Are we still on?                       03:45

21                    VIDEOGRAPHER:  Uh-huh.

22    Q    (By Mr. Quinn)  Do you have any reason to believe that --

23    that you can identify for me as to how you would -- or why

24    you would understand the words better today than you would

25    back in 1998 and the words that I'm referring to are "this      03:45

EXHIBIT 14 PAGE 215

CONFIDENTIAL                                           452

1   offer is contingent upon the signing of a Confidential        03:45

2   Information and Inventions Agreement"?

3            MS. CENDALI:  Asked and answered.

4            MR. WICKHAM:  Asked and answered multiple

5   times over.                                                   03:45

6   A   The only reason I would have any better understanding of

7   it would be because of this case.

8   Q   (By Mr. Quinn)  Nothing other than that?

9   A   No.

10  Q   You obviously knew what an agreement was back in 1998?     03:45

11  A   I think I had some vague idea.

12  Q   All right.  And if somebody told you that a job offer was

13  conditioned on your signing an agreement back in 1998, you

14  would understand that?

15           MR. WICKHAM:  Objection, lacks foundation,           03:46

16  calls for speculation, improper hypothetical, incomplete

17  hypothetical.

18           MS. CENDALI:  Form.

19  Q   (By Mr. Quinn)  Your turn.

20  A   Can you repeat the question?                               03:46

21  Q   If somebody told you that your -- a job offer was

22  conditioned on your signing an agreement, you would

23  understand what that meant --

24           MR. WICKHAM:  Objection, lacks foundation,

25  calls for speculation.                                        03:46

EXHIBIT _14_ PAGE _216_

CONFIDENTIAL                                          463

```
1    A    I don't recall that I understood that.                    04:07

2    Q    Do you recall that you did not understand those words?

3    A    I don't recall one way or the other.

4    Q    Then it goes on to say, and any other material, whether

5         written or oral, collectively, the Bryant work product.    04:07

6         Did you understand that that was defining the term that

7         would be defined as the Bryant work product?

8                   MR. WICKHAM:  Objection, calls for a legal

9         conclusion, calls for speculation, lacks foundation,

10        potentially infringes on the attorney-client privilege.    04:08

11        If you had an understanding concerning this paragraph or

12        the individual words of this paragraph and you've gained

13        that understanding solely from having obtained legal

14        advice, then I'll instruct you not to respond.  If you

15        understand what the word "all" means or what the word       04:08

16        "results" mean or what the word "and" means and if you can

17        get a dictionary and go through and define each of those

18        terms individually, then, you know, we can go and do that.

19        If you only have an understanding of the import of this

20        language in here through advice of your legal counsel, I    04:08

21        would instruct you not to respond.

22   A    That's how I came to an understanding of this paragraph

23        was through legal counsel.

24   Q    (By Mr. Quinn)  So before you got legal counsel you didn't

25        have any understanding of what those words that I just      04:09
```

EXHIBIT 14 PAGE 217

CONFIDENTIAL                                              471

1   A   Yes.                                                    04:20

2   Q   Did you -- I mean, apart from anything any lawyer told

3       you, did you have any understanding back in 2000 about

4       what an irrevocable assignment was?

5                   MR. WICKHAM:  Okay.  Asked and answered.    04:20

6       You've already asked about this paragraph extensively and

7       he's indicated that his sole understanding of this

8       paragraph dealt with what he was -- information that he

9       had obtained from Ms. Wang.  Now you're trying to splice

10      it up into individual words and you're questioning on him  04:20

11      in that manner is one that is designed to invade the

12      attorney-client privilege.  I instruct the witness not to

13      respond.

14                  MR. QUINN:  I didn't ask him about the whole

15      paragraph before.                                       04:20

16                  MR. WICKHAM:  You're --

17                  MR. QUINN:  Now you're interrupting me.  I

18      didn't ask him about the whole paragraph before and I

19      explicitly carved out of my question what he was told by

20      an attorney, so I think I'm entitled to know whether he   04:20

21      had any understanding apart from what any attorney may

22      have told him about what an irrevocable assignment is.

23      Hasn't been asked before.

24                  MR. WICKHAM:  Okay.  Mr. Quinn, the witness

25      has already testified that his understanding concerning   04:21

EXHIBIT _14_ PAGE _218_

CONFIDENTIAL

472

1    paragraph 3(a) and the document generally is        04:21

2    information -- his understanding was based solely on the

3    legal advice that he obtained.  Having said that, you are

4    now trying to say, well, what about this word and what

5    about this sentence and so on and so forth for something   04:21

6    that he already has indicated is something was based

7    solely on advice of counsel.  Your question, therefore, is

8    one that does seek to invade the attorney-client

9    privilege.  I instruct him not to respond.

10            MR. QUINN:  Okay.  You know, we're going to        04:21

11   be back here because that's -- that's not what he said and

12   that's not what I asked.

13            MR. WICKHAM:  Well, I --

14            MR. QUINN:  We're all going to come back.

15            MR. WICKHAM:  I'm not going to quibble with

16   you over --

17            MR. QUINN:  After Monday we're going to come

18   back again.

19            MR. WICKHAM:  I'm not going to quibble with

20   you as to what he said.  I recall what he did say.         04:21

21            MR. QUINN:  Okay.  Next?

22            MR. WICKHAM:  And just to be clear, the

23   reason why I didn't take issue when you had asked him

24   about "work made for hire" is because during his prior

25   testimony when he was referring to the angel face          04:22

EXHIBIT _14_ PAGE _219_

CONFIDENTIAL                                              477

```
1        a recollection that you entered into some kind of         04:28

2        modification agreement with MGA in May of 2000.

3    A   Yes, I recall that I did.

4    Q   And in your understanding what was the purpose of that

5        agreement?                                                04:28

6                    MR. WICKHAM:  If your understanding of the

7        purpose of the agreement was -- came solely from your

8        attorneys, I instruct you not to respond.

9    A   Okay.  My understanding came from my attorneys.

10   Q   (By Mr. Quinn)  So is it true that you had no             04:28

11       understanding of what the purpose of this document was

12       except what your lawyers told you?

13   A   Yes.

14   Q   You know, I think I misspoke.  I said a year 2000

15       modification, and if you look back at the signature page, 04:28

16       it was actually in May of 2004.

17   A   Yes.

18   Q   But your answer would still be the -- you knew what I

19       meant?

20   A   Yes, I knew what you meant.                               04:29

21   Q   That it was modified in 2004?

22   A   Yes.

23   Q   Can you tell me what the circumstances were leading up to

24       this modification of your agreement?

25   A   I don't recall.                                           04:29
```

EXHIBIT _14_ PAGE _221_

CONFIDENTIAL                                                    478

| | | |
|---|---|---|
1   Q   And do you have any understanding at all as to what the          04:29
2       purpose of the new agreement was?
3   ·               MS. CENDALI:   Asked and answered.
4                   MR. WICKHAM:   Attorney-client privilege.
5       Instruct the witness not to respond.  The witness has          04:29
6       already said that his sole understanding of the -- this
7       agreement came from counsel.
8                   MR. QUINN:   You know, actually, it's kind of
9       a fine point but a contracting party can't shield
10      examination about his understanding of his contract by          04:29
11      saying I only know what the lawyer told me because
12      otherwise there's no way to examine a contracting party
13      about his understanding and intent.
14                  MR. WICKHAM:   If you were suing to enforce
15      this contract I might be willing to engage in a dialogue       04:30
16      with you on that at some other time, but to the extent
17      that you're asking questions that seek to invade his
18      attorney-client privilege with respect to a contract
19      between he and MGA Entertainment, Inc., I will
20      respectfully disagree.  In any event, there's no need to.      04:30
21      I instruct the witness not to respond.
22  Q   (By Mr. Quinn)  Who was the attorney who gave you an
23      understanding of this agreement?
24  A   The only person I remember having any conversation with
25      about this at all was -- I believe it was Daphne, Daphne      04:30

**EXHIBIT _14_ PAGE _222_**

CONFIDENTIAL                                            479

```
1     Gronich.                                              04:30
2   Q  Now, this is a contract between you and MGA, right?
3   A  Yes.
4   Q  And she's MGA's lawyer?
5   A  Yes.                                                 04:30
6   Q  She's not your lawyer?
7   A  No.
8   Q  All right.  So what did Ms. Gronich tell you was the
9      purpose of this agreement?
10           MR. WICKHAM:  I'm going to instruct the        04:31
11     witness not to respond and I'm going to take a break
12     because --
13           MR. QUINN:  He's answering questions and we
14     don't want that to happen.
15           MR. WICKHAM:  No.  No.  It's late in the       04:31
16     day.  It's 4:30.  The witness is tired and I want to be
17     sure --
18   Q  (By Mr. Quinn)  Are you tired?  Are you tired, Mr. Bryant?
19           MR. WICKHAM:  I want to be sure that the
20     witness --
21   A  Yes, I am tired.
22           MR. WICKHAM:  -- does not violate his
23     attorney-client privilege, and I suspect that you would do
24     the same in your -- in the same circumstances.  We're
25     going to take a break for purposes of --
```

EXHIBIT _14_ PAGE _223_

CONFIDENTIAL                                              480

```
 1              MR. QUINN:  We're going to learn now that --    04:31
 2              MR. WICKHAM:   -- preservation of the
 3      privilege.
 4              MR. QUINN:  We're going to learn now that
 5      Daphne is his lawyer?                                    04:31
 6              MR. WICKHAM:  Counsel, come on.
 7              MR. QUINN:  Well, indeed, come on.
 8      VIDEOGRAPHER:  Off the record.  Time's 4:31.
 9              (Break in proceedings.)
10              VIDEOGRAPHER:  Back on the record.  Time's   04:36
11      4:37.
12   Q  (By Mr. Quinn)  Okay.  So what understanding did you have
13      about what the purpose of this agreement that's Exhibit
14      17?
15   A  Well --                                                 04:37
16              MR. WICKHAM:  Mr. Bryant has a clarification
17      of his prior response.
18   A  I need to make a clarification.  I'm exhausted and I'm not
19      thinking clearly.  The attorney who advised me on this
20      document was my attorney Larry McFarland.               04:37
21   Q  (By Mr. Quinn)  And is Larry an attorney here in Missouri
22      or Los Angeles or where?
23   A  He is an attorney in Los Angeles.
24   Q  And how long has he been your attorney?
25   A  Roughly about two years.                                04:37
```

EXHIBIT _14_ PAGE _224_

CONFIDENTIAL                                                      531

1              MR. WICKHAM:  Objection, lacks foundation,    11:25

2       calls for speculation.

3   A   I don't know.  As best I can remember, probably.

4   Q   (By Mr. Quinn)  I mean, the reason I ask that and the

5       reason I thought that was true is because I understand   11:25

6       that you gave her the document that's numbered 278 as

7       something to aid her in doing the second sculpt.

8   A   To the best of my recollection, yes.

9   Q   I mean, do you have a recollection that Margaret had

10      actually started on the second sculpt before you gave her   11:25

11      the document or the drawing that's numbered 278?

12             MR. WICKHAM:  Objection, lacks foundation,

13      calls for speculation.

14  A   I wouldn't know.  I don't know.

15  Q   (By Mr. Quinn)  But insofar as your best recollection is   11:26

16      concerned, she would have started on the second sculpt

17      after you gave her the drawing that's numbered 278?

18             MR. WICKHAM:  Objection, lacks foundation,

19      calls for speculation.

20  A   Well, that would seem to be the logical progression of   11:26

21      things, but I don't remember exactly how it happened.

22  Q   (By Mr. Quinn)  But the best of your recollection -- I

23      mean, I understand your memory's not perfect.  The best --

24      the best recollection you have as you sit here today is

25      that she started on the second sculpt after you gave her   11:26

EXHIBIT _14_ PAGE _225_

CONFIDENTIAL                                    532

1    the drawing numbered 278?                                    11:26

2              MR. WICKHAM:  Okay.  That mischaracterizes

3    the witness's testimony.  He hasn't said that, so to the

4    extent that you're trying to put words in your mouth,

5    that's a mischaracterization of his testimony.  Asked and    11:26

6    answered twice now.

7              MR. QUINN:  I put words in my own mouth all

8    the time.

9  A  I'm sorry.  Can you restate your question?

10 Q  (By Mr. Quinn)  Sure.  The best of your -- I understand    11:26

11   that your memory is not -- nobody's memory is perfect

12   years later, but the best of your recollection is that

13   Margaret started on the second sculpt after you gave her

14   the drawing that's numbered 278?

15             MR. WICKHAM:  Objection, lacks foundation,         11:27

16   calls for speculation, mischaracterizes the witness's

17   testimony.

18 A  I don't know if she started on it after I gave her this or

19   before.

20 Q  (By Mr. Quinn)  Let me go back to the Exhibit 19, Mr.       11:27

21   Bryant.

22 A  Uh-huh.

23 Q  This last page, MGA number 9 --

24 A  Yes.

25 Q  -- what would you call this?  I'm just -- to have a         11:27

EXHIBIT _14_ PAGE _226_

CONFIDENTIAL                                561

1       creation but I did not expect it to be a verbatim sculpt.        12:09

2   Q   (By Mr. Quinn)  I know but I'm -- in terms of guide in the

3       creation, that's what we're trying to put the parameters

4       around as to what you had -- in what respect it would

5       guide her in the creation.  My question to you is, was it        12:09

6       your understanding that this drawing would be used by her

7       to guide her in the creation of the body?

8                   MS. CENDALI:  Objection.

9                   MR. WICKHAM:  Objection, lacks foundation,

10      calls for speculation, mischaracterizes the witness's            12:09

11      testimony, asked and answered multiple times.

12  Q   (By Mr. Quinn)  Your turn.

13                  MS. CENDALI:  Asked and answered.  He's

14      answered this question about five times now and you're

15      still trying get a different answer.                             12:09

16                  THE WITNESS:  Can you read back what I said

17      last time?

18                  COURT REPORTER:  ANSWER:  I expected that it

19      would guide her in the creation but I did not expect it to

20      be a verbatim sculpt.                                            12:09

21  A   Okay.  Same answer.

22  Q   (By Mr. Quinn)  Well, this is a slightly different

23      question.  I'm focusing on the look of the body, and I

24      understand that you didn't intend it to be a verbatim

25      sculpt.  You've told me that you expected to make her own        12:10

EXHIBIT _14_ PAGE _227_

CONFIDENTIAL                                         564

```
 1        there any other way in which you communicated to Margaret      12:12
 2        the overall feeling that you wanted to see in the doll?
 3    A   Just through the drawing.
 4    Q   Did you have -- do you recall -- as you think about it
 5        now, do you ever recall any discussions with her about the     12:12
 6        overall feeling that you wanted to get from the doll?
 7                    MR. WICKHAM:  Objection, vague as to time,
 8        asked and answered multiple times last week.
 9    A   I think that I just communicated to her that I wanted it
10        to feel young.  I wanted them to be -- to feel like a very     12:13
11        young teenager.  I just wanted them to be
12        disproportionate.
13    Q   (By Mr. Quinn)  In your view did the second -- you did
14        ultimately see the second sculpt, correct?
15    A   Yes.                                                           12:13
16    Q   In your view did the second sculpt look substantially
17        similar to what you've drone -- drawn here as indicated on
18        278?
19                    MR. WICKHAM:  Objection.
20                    MS. CENDALI:  Objection, calls for a legal         12:14
21        conclusion.  "Substantially similar" is a term of
22        copyright law.
23    A   It was close to the drawing.
24    Q   (By Mr. Quinn)  Was it substantially similar in your view?
25                    MR. WICKHAM:  Objection.                          12:14
```

EXHIBIT _14_ PAGE _228_

CONFIDENTIAL                                    565

1          MS. CENDALI:  Objection, calls for a legal          12:14

2    conclusion.  Are you instructing him not to answer?

3          MR. QUINN:  Are you asking him to?

4          MS. CENDALI:  I'm asking --

5          MR. QUINN:  You're just unbelievable, Ms.          12:14

6    Cendalis.  It's just incredible --

7          MS. CENDALI:  Could you --

8          MR. QUINN:  -- that you would do that.

9          MS. CENDALI:  -- please get somebody's name

10   right, Mr. Quinn.                                          12:14

11         MR. QUINN:  Well, I apologize if I'm

12   misstating your name but you are so disrupting this thing

13   and you don't have a right to be here, and now telling

14   counsel on the record that you're hinting to him that you

15   want him to instruct not to answer, it's just totally out   12:14

16   of line.

17         MS. CENDALI:  Counsel --

18         MR. QUINN:  I'll go back to my question.

19  Q  (By Mr. Quinn)  In your view was the second sculpt that

20   you saw substantially similar to this drawing that we've    12:14

21   marked as 278?

22         MR. WICKHAM:  Objection, calls for a legal

23   conclusion, lacks foundation, calls for speculation,

24   ambiguous.  Instruct the witness not to respond.

25         MR. QUINN:  And the basis for that                   12:15

EXHIBIT _14_ PAGE _229_

CONFIDENTIAL                                          578

```
 1              MS. CENDALI:  Objection, asked and answered,    12:37
 2     mischaracterizes his testimony.
 3  A  That was the best way that I knew how to communicate was
 4     through drawing.
 5  Q  (By Mr. Quinn)  And in that fashion, by giving her that   12:37
 6     drawing, including that head, was that one way you gave
 7     input on the look of the head of the second Bratz doll?
 8              MR. WICKHAM:  Objection, asked and answered
 9     multiple times.
10  A  What did I say last time?                               12:38
11  Q  (By Mr. Quinn)  You want the last question and answer
12     reread?
13  A  Yes.
14              MR. QUINN:  Why don't we do that.
15              COURT REPORTER:  "I'm noticing in Exhibit 5     12:37
16     the page that's numbered 278, it does have -- on that head
17     there are oversized eyes and oversized lips.  Would you
18     agree with that?  ANSWER:  Yes."
19              (Discussion off the record.)
20              COURT REPORTER:  "QUESTION:  Was one way        12:37
21     that you had some input on the look of the head of the
22     second Bratz sculpt giving Margaret this page that's
23     numbered 278?   ANSWER:  That was the best way that I knew
24     how to communicate was through drawing."
25  Q  (By Mr. Quinn)  And I really think the answer was implicit 12:39
```

EXHIBIT _14_ PAGE _230_

CONFIDENTIAL

593

1    A    Pretty much the entire paragraph is unintelligible.  I'm    12:58

2         not a lawyer.  This is all written in legalese.

3    Q    (By Mr. Quinn)  All right.  Let's -- let's break it down.

4         The first phrase, "as used in this agreement" -- do you    12:58

5         see that phrase?

6    A    Yes.

7    Q    Do you understand those words?

8    A    Not really.

9    Q    So you don't understand, quote, as used in this agreement,    12:59

10        closed quote?

11                   MR. WICKHAM:  Objection, asked and answered.

12                   MS. CENDALI:  Badgering the witness.

13   A    No.

14   Q    (By Mr. Quinn)  Then it goes on to -- do you understand    12:59

15        here that -- is it your understanding that this paragraph

16        provides a definition of the term, quote, inventions,

17        closed quote?

18                   MR. WICKHAM:  Objection, lacks foundation,

19        calls for speculation as to the proper interpretation of    12:59

20        this document.

21   A    I don't understand this paragraph.

22   Q    (By Mr. Quinn)  So it would be true to say you don't have

23        an understanding whether or not this subparagraph is a

24        definition of the term "inventions"; is that true?

25                   MR. WICKHAM:  Objection, asked and answered.    12:59

EXHIBIT _14_ PAGE _231_

CONFIDENTIAL                                    594

```
 1    A   I don't understand what this paragraph is about at all.      12:59
 2    Q   (By Mr. Quinn)  Okay.  If we can go up to the top, sir, it
 3        says, quote, I acknowledge that Mattel, Inc., the company,
 4        operates in a competitive environment.  Do you -- do you
 5        feel like you understand what I've read there?               01:00
 6    A   Yes.
 7    Q   And that it enhances its opportunities to succeed by
 8        establishing certain policies.  Do you understand that?
 9    A   Yes.
10    Q   Including those included in this agreement.  Do you see      01:00
11        that?
12    A   Yes.
13    Q   It says, this agreement is designed to make clear that,
14        one, I will maintain the confidentiality of the company's
15        trade secrets.  Do you understand that?                      01:00
16            MR. WICKHAM:  Okay.  Objection, vague as to
17        time.  You're asking him does he understand that now or
18        did he -- did he understand this back in November of 1995?
19    Q   (By Mr. Quinn)  Do you understand it now?
20            MS. CENDALI:  And I also object to the                   01:00
21        extent you're asking him for legal -- his understanding of
22        legal principles and calling for a legal conclusion.
23    A   I think I understand it basically now.
24    Q   (By Mr. Quinn)  Then it says, two, I will use those trade
25        secrets for the exclusive benefit of the company.  Do you   01:01
```

EXHIBIT _14_ PAGE _232_

CONFIDENTIAL                                    595

1   understand that?                                          01:01

2          MR. WICKHAM:  Objection, calls for a legal

3   conclusion, lacks foundation, ambiguous as to the term

4   "trade secrets" in the context of this witness's

5   examination.                                              01:01

6   A   Yeah.  I'm not sure I fully understand what it means by

7       "trade secrets."

8   Q   (By Mr. Quinn)  Other than those two words, do you

9       understand that three little I passage that I just read to

10      you?                                                  01:01

11         MS. CENDALI:  Objection to being able to

12  parse anything with regard to taking out words or not

13  taking out words.  Objection to form.  Objection to time.

14  A   Basically, yes.

15  Q   (By Mr. Quinn)  And then three little I's it says,    01:01

16      inventions that I create will be owned by the company.  Do

17      you understand that?

18         MR. WICKHAM:  Objection, lacks foundation,

19  calls for speculation, ambiguous.  Instruct the witness

20  not to respond to the extent that your understanding of    01:02

21  this phrase is based on advice of counsel.

22  A   I think I basically understand that now, yes.

23  Q   (By Mr. Quinn)  And what does it mean to you where it says

24      that this agreement is designed to make clear that

25      inventions I create will be owned by the company?  What    01:02

EXHIBIT _14_ PAGE _233_

CONFIDENTIAL                                                                601

```
 1    question and have it read back.  You're trying to change     01:08

 2    his answer.

 3              MR. QUINN:  Well, I mean, if that -- I'll

 4    live with that if that's the answer.  If that's the

 5    answer, that he had no understanding about what this        01:08

 6    meant, then I'll live with that.

 7  Q  (By Mr. Quinn)  Is that true, that you had -- at the time

 8    you signed this you had no understanding what the first

 9    paragraph meant?

10              MS. CENDALI:  Asked and answered.                  01:08

11              MR. WICKHAM:  Asked and answered.

12  A  I had no understanding of what this entire document meant,

13    including the first paragraph.

14              (Pause in proceedings.)

15  Q  (By Mr. Quinn)  Would it be true, sir, that -- I           01:09

16    understand what you just told me, that -- and your answer

17    literally was that you didn't understand any of this

18    document at the time you first signed it.  If I go phrase

19    by phrase in this document, would your answer remain the

20    same, that at the time you had no understanding about what  01:09

21    any phrase in this document meant?

22              MS. CENDALI:  Objection.

23  Q  (By Mr. Quinn)  I'm trying to see if we have a short --

24    -shortcut available to us or whether we need to do that --

25    go phrase by phrase.                                        01:09
```

EXHIBIT _14_ PAGE _234_

CONFIDENTIAL                                                        602

1            MR. WICKHAM:  Just tell him yes and we can        01:09

2    move on.  Okay?  I take that back.  I'm not telling him --

3    the witness to respond.  Mr. Bryant, listen to counsel's

4    question and respond on your own.  I do not intend on

5    conveying anything other than that.                       01:09

6            MR. QUINN:  No.  I --

7            MR. WICKHAM:  But I would also say that the

8    question has been asked and answered and I think that you

9    already have an answer to your question.

10           MR. QUINN:  You -- you may well be right on        01:09

11   that one, as much as I hate to admit it, although I would

12   appreciate your helping me try to speed this up.

13   Q   (By Mr. Quinn)  I understand your testimony to be that at

14       the time you signed this you had no understanding of this

15       document.                                              01:10

16   A   That's correct.

17   Q   And if I go through this phrase by phrase, that will

18       remain your answer as to each phrase, that back then when

19       you signed this, you didn't understand what any of the

20       phrases in this document meant, correct?               01:10

21   A   That's correct.

22           MR. QUINN:  Do we have any more documents?

23           MR. ZELLER:  Oh, sure.

24           MR. QUINN:  I would be disappointed if the

25       answer were no.                                        01:10

EXHIBIT _14_ PAGE _235_

CONFIDENTIAL                                    617

1              MR. QUINN:  We're talking about the ones          02:12

2    that weren't here.  I take it there are no more originals

3    here today in your car or otherwise.  Is that true?

4              MR. WICKHAM:  The originals that were here

5    last Friday --                                              02:13

6              MR. QUINN:  Are still here?

7              MR. WICKHAM:  -- are available for your

8    further inspection if you so choose.

9              MR. QUINN:  All right.  And there are no

10   additional ones that you've brought?                        02:13

11             MR. WICKHAM:  I have not brought any

12   additional ones and there is nothing in the deposition

13   notice that had compelled that at all or even requested

14   that and the only request that I'm familiar with was Mr.

15   Corey's letter that had been sent to Mr. Jacoby after I     02:13

16   had already left for Missouri.

17             MR. QUINN:  Well, we can argue about that if

18   we need to at some other time but we won't be able to

19   complete this deposition until, among other things, we

20   have a chance to examine the witness with respect to all    02:13

21   the originals.

22             MR. WICKHAM:  Okay.  But there was nothing

23   in the deposition notice that called for production of

24   documents despite your ability and right to request that

25   under the Code of Civil Procedure, which is what the        02:13

EXHIBIT _14_ PAGE _236_

CONFIDENTIAL                                                    639

1   Q    (By Mr. Quinn)  -- that you --

2              MS. CENDALI:  -- a legal conclusion.

3   Q    (By Mr. Quinn)  -- that you don't understand?

4              MS. CENDALI:  Objection, asked and answered,

5        calls for a legal conclusion, time frame.                    02:40

6   A    I just don't understand that sentence.

7   Q    (By Mr. Quinn)  It says -- it goes on.  The next sentence,

8        it says this agreement is designed to make clear that.  Do

9        you understand that much?

10  A    Yes.                                                         02:40

11  Q    And then one little I, I will maintain the confidentiality

12       of the company's trade secrets.  Do you understand that?

13             MR. WICKHAM:  Objection.  To the extent that

14       you have an understanding of this language or this

15       document based on advice of counsel, I instruct you not to  02:40

16       respond.

17  A    Well, then I'm not going to respond.

18  Q    (By Mr. Quinn)  Is it true that you have no understanding

19       of this sentence that I just read other than what your

20       attorneys have told you?                                     02:41

21             MS. CENDALI:  Asked and answered.

22  A    Yes.

23  Q    (By Mr. Quinn)  Okay.  Second item, it says I will use

24       those trade secrets for the exclusive benefit of the

25       company.                                                     02:41

**EXHIBIT _14_ PAGE _237_**

CONFIDENTIAL                                                    645

1   A   Uh-huh.

2   Q   My question to you there is, are there any words there                    02:47

3       that you did not understand without the aid of counsel?

4   A   There are not any words that I didn't understand.  I just

5       didn't understand the way they were put together without          02:47

6       the aid of counsel.

7   Q   Was it your understanding, sir, that in this first

8       paragraph we've been reading from at the time you signed

9       this that you were making certain promises to Mattel?

10              MR. WICKHAM:  Objection, asked and answered.              02:48

11              MS. CENDALI:  Objection, mischaracterizes

12      his testimony.  He's already plainly testified that he did

13      not --

14              MR. QUINN:  Are you going to tell him how

15      you want him to testify now, Counsel?                             02:48

16              MS. CENDALI:  Yes, because it's misleading.

17      When a witness answers -- when a witness answers that he

18      doesn't even remember signing a document and then a lawyer

19      then says -- ignores that and asks him the question, you

20      know, presupposing that he does remember signing, I don't        02:48

21      think that's proper.  You have to at a minimum lay your

22      foundation.

23   Q   (By Mr. Quinn)  Sir, addressing your attention to the

24      first paragraph there, when you signed this did you

25      understand that you were making certain promises to             02:48

**EXHIBIT 14 PAGE 238**

1    Mattel?                                                           02:48

2              MR. WICKHAM:  Objection, mischaracterizes

3    the document.

4  A  I did not understand this document at all.  I don't even

5    remember reviewing it.  I don't remember signing it.  I       02:48

6    don't remember being given a chance to take it home and

7    look at it.  I don't remember having the chance to have a

8    lawyer look at it.  I didn't understand it.  I was simply

9    told sign this agreement so that you can start work and I

10   needed a job.                                                   02:49

11 Q  (By Mr. Quinn)  And specifically you didn't have any

12   understanding as to the first paragraph as to whether or

13   not you were making promises; is that true?

14             MS. CENDALI:  Asked and answered.

15 A  I did not understand the first paragraph or any other        02:49

16   paragraphs on this page.

17             MR. WICKHAM:  Could the reporter please mark

18   that -- those two prior responses.  We may need to come

19   back to them.

20 Q  (By Mr. Quinn)  Next in order would be Exhibit 26.  We       02:49

21   marked as Exhibit 26 a one-page document Bates number

22   M 1621.  Mr. Bryant, is this your signature on this

23   document?

24 A  Yes.

25 Q  And you dated this January 4, '98?                            02:50

EXHIBIT _14_ PAGE _239_

CONFIDENTIAL                                                    650

1    A    I don't understand it now either.                          02:53

2    Q    (By Mr. Quinn)  Do you have any understanding of that

3         sentence which is not based on what your attorneys have

4         told you?

5              MS. CENDALI:  Asked and answered.  He said            02:53

6         he doesn't understand it.

7    A    I don't understand these -- I don't understand that

8         sentence.

9    Q    (By Mr. Quinn)  Okay.  So even putting aside what your

10        attorneys told -- putting aside what your attorneys told   02:53

11        you, you have no understanding of that sentence, correct?

12             MR. WICKHAM:  Objection, asked and answered.

13        Could the reporter please read back the witness's last

14        response.

15   Q    (By Mr. Quinn)  Is that true?  You don't understand it?    02:54

16             MR. WICKHAM:  Would the reporter please read

17        back the witness's prior response.

18             COURT REPORTER:  ANSWER:  I don't understand

19        that sentence.

20   Q    (By Mr. Quinn)  With or without the help of lawyers, you   02:54

21        have no understanding of the sentence; is that true?

22             MR. WICKHAM:  Objection, asked and answered.

23        Instruct the witness not to respond with regard to any

24        understanding that you received from counsel.

25   A    I don't understand that sentence at all.                   02:54

EXHIBIT _14_ PAGE _240_

CONFIDENTIAL

651

1          MR. QUINN:  Actually, that question just    02:54

2   called for a yes or no answer and it doesn't call for any

3   attorney-client communications.

4  Q  (By Mr. Quinn)  I mean, the question is, with or without

5   the benefit of legal advice, it's true that you have no    02:55

6   understanding of what that means?

7          MR. QUINN:  He can tell me, yes, I

8   understand it, and then we've closed the loop.  We

9   understand his understanding is based solely on what

10   counsel has told him.  That's the end of inquiry, but you    02:55

11   really can't tell him that he can't answer the question I

12   posed.

13          MS. CENDALI:  Counsel --

14          MR. QUINN:  It does not --

15          MR. WICKHAM:  Wait.  Wait.  Counsel --

16          MR. QUINN:  It does not -- it does not get

17   into the substance of any confidential communication.

18          MR. WICKHAM:  Time-out, Counsel.  He

19   answered the question.  Okay.  I gave him an instruction.

20   He answered your question.  Please move on.    02:55

21          MR. QUINN:  What I'm trying to find out is

22   whether there is anything behind the invocation of

23   privilege, whether he has an understanding with the advice

24   of counsel.

25          MS. CENDALI:  Could you please read back    02:55

EXHIBIT _14_ PAGE _241_

CONFIDENTIAL                                652

1   the -- before this colloquy the last four questions and          02:55

2   answers in which case he clearly stated, regardless of

3   what counsel said, that he doesn't understand the question

4   today.

5           MR. QUINN:  I'll accept that.  I'll accept              02:55

6   that if that's his testimony.

7           MS. CENDALI:  Well, read it -- read it back.

8           MR. QUINN:  Well, that's -- that's a waste

9   of time.  If that's -- if that's what you're telling me,

10  I'll accept that.                                                02:56

11          MS. CENDALI:  The record speaks for itself.

12  I don't want to testify.  He's already answered those

13  questions.

14          MR. WICKHAM:  He's -- he's answered the

15  question.                                                        02:56

16          MR. QUINN:  With or without the advice of

17  counsel he has no understanding; is that true?  See, the

18  problem is you've given an instruction and then I don't

19  know if he's withholding something based on --

20          MS. CENDALI:  It wasn't based on the                    02:56

21  instruction.  Read it back.

22          MR. WICKHAM:  Could the reporter just read

23  back his last response.

24          MS. CENDALI:  The three or four questions

25  before that.                                                     02:56

EXHIBIT _14_ PAGE _242_

CONFIDENTIAL                                    653

1            MR. WICKHAM:  His last response.                    02:56
2            MR. QUINN:  No.  We're not going to do that.
3      I mean, you don't have a standing to ask that anything be
4      read back and this is a new delaying tactic just to have
5      things read back.                                            02:56
6            MR. WICKHAM:  Mr. Quinn --
7            MR. QUINN:  You -- you understand what I'm
8      saying.
9            MR. WICKHAM:  He's answered the question.
10     He really has and you're just -- you keep on asking it and    02:56
11     reasking it.  He said he doesn't understand it.  He said
12     he doesn't understand it.
13           MR. QUINN:  What I couldn't understand is
14     whether he's saying he doesn't understand it putting aside
15     what counsel has told him, that the only understanding he     02:56
16     has is based on what counsel has told him.  That's what
17     I -- I don't know.
18           MR. WICKHAM:  And I'm not going to have him
19     testify whether -- you know, having -- having been --
20     Counsel, he's answered the question.                          02:57
21           MR. QUINN:  No.  I don't want to get into
22     the substance of what counsel told him.  What I'm trying
23     to find out is does he have an understanding -- it really
24     calls for a yes or no answer.  It will be the end of the
25     inquiry.

EXHIBIT 14 PAGE 243

CONFIDENTIAL                                                          682

1      called MGA Entertainment, closed quote.  Do you see that?      03:46

2    A  Yes.

3    Q  And that's what you wrote?

4    A  That's what I wrote.

5    Q  Was that a true statement?                                    03:46

6    A  I think a truer statement would have been that I was

7       simply trying to connect the two parties.  I was not

8       working for MGA at the time.

9    Q  So is this statement that you wrote to Kinuyo not a true

10      statement?                                                    03:47

11                 MR. WICKHAM:  Objection.  It

12      mischaracterizes the document.  It mischaracterizes the

13      witness's intent, lacks foundation.

14   Q  (By Mr. Quinn)  Your turn.

15   A  No, I don't think it's a false statement, but I was not       03:47

16      working with MGA at the time.

17   Q  So you were not -- it's your testimony that as of

18      September 18th you were not working with MGA

19      Entertainment?

20                 MR. WICKHAM:  It's his testimony that he          03:47

21      wasn't employed by MGA.  Using the term "working" in the

22      manner in which he's used it in this document has yet to

23      be brought out for you -- by you by virtue of a

24      foundation.

25                 MR. QUINN:  So you're coaching him?               03:47

EXHIBIT _14_ PAGE _245_

CONFIDENTIAL                                                        683

1           MR. WICKHAM:  He's already -- he's already                        03:47

2      provided his explanation of the answer.

3           MR. QUINN:  So you're throwing him a life

4      raft here?  I mean, you're telling him how to answer?

5           MR. WICKHAM:  You're trying to deliberately                       03:47

6      mislead him.

7           MR. QUINN:  No.  You're -- you're on the

8      record coaching him in an extraordinary way.

9           MR. WICKHAM:  Your questions are

10     deliberately misleading, Counsel, and the witness has                  03:48

11     already responded.

12  Q  (By Mr. Quinn)  I just want to make sure the record's

13     clear, Mr. Bryant.  Is it true that the company you were

14     working with as of September 18th was MGA Entertainment?

15          MR. WICKHAM:  Objection, asked and answered.                      03:48

16  A  I was not working with MGA.  I was simply trying to

17     provide a connection.

18  Q  (By Mr. Quinn)  So this statement that you wrote here

19     is -- it's not entirely accurate.  Would you agree with

20     that?                                                                  03:48

21          MR. WICKHAM:  Objection, mischaracterizes

22     the witness's testimony.

23          MS. CENDALI:  Asked and answered.

24  A  No, I wouldn't say that it was entirely inaccurate.  I was

25     not gainfully employed by MGA at the time.                            03:48

EXHIBIT _14_ PAGE _246_

CONFIDENTIAL                                              703

1    are indecipherable because so much of the information was        04:26

2    redacted.  You wanted to see them.  Here they are.

3                 MR. WICKHAM:  Okay.  Well, this is helpful

4    in showing what it is.  Thank you.

5    Q  (By Mr. Quinn)  Well, let me go back to my question, and I    04:27

6    guess what I really want to -- need to learn is what the

7    royalties are that you've received from MGA.

8                 MS. CENDALI:  What is the proper relevance?

9                 MR. QUINN:  Damages.

10   Q  (By Mr. Quinn)  It's your turn.                               04:27

11                THE WITNESS:  Am I allowed to answer?

12                MS. CENDALI:  Do you want to take a break

13   and consider it?

14                MR. WICKHAM:  Yeah.  Well, I've got to

15   make -- I've got to make a telephone call.  Let's go off        04:27

16   the record.

17                MR. QUINN:  Let's go off the record.

18                VIDEOGRAPHER:  Off the record.  Time's 4:28.

19                (Break in proceedings.)

20                VIDEOGRAPHER:  Back on the record.  Time's          04:37

21   4:37.

22                MR. QUINN:  I think we had a pending issue.

23                MR. WICKHAM:  Yeah.  I want to reserve all

24   of our positions that I believe have been the subject of

25   responses, discovery requests, objections of that nature.       04:37

EXHIBIT 14 PAGE 247

CONFIDENTIAL                                        705

```
 1                 MS. CENDALI:  I don't think anyone knows for      04:39
 2      certain, actually.
 3                 MR. QUINN:  This seems --
 4                 MR. WICKHAM:  Could be 2001.
 5                 MS. CENDALI:  I think it might be 2001 since       04:39
 6      the product wasn't even released until June of 2000.
 7                 MR. ZELLER:  2001.
 8                 MS. CENDALI:  2001.
 9    A  Yeah.  Yeah.
10                 MS. CENDALI:  I think you're safer --              04:39
11    A  2001.  That's right.
12    Q  (By Mr. Quinn)  That would be -- make more sense.
13    A  Yeah, 2001.  Not -- yeah.
14    Q  Unless, you know, you sold your dummy as an historic
15       object or something.                                        04:40
16                 MR. WICKHAM:  Yeah.  Don't think so.
17    Q  (By Mr. Quinn)  The archetypical Bratz.  All right.  So
18       your best recollection is is that the royalty payments you
19       received in 2001 were roughly $200,000?
20    A  That's right.                                                04:40
21    Q  And then the other question that I've been permitted to
22       ask you is what the total royalty payments are that you
23       have received to date with respect to Bratz products.
24                 MR. WICKHAM:  Your best estimate.
25    A  My best estimate is about 10 million.                       04:40
```

EXHIBIT _14_ PAGE _248_

CONFIDENTIAL                                706

```
 1              MR. QUINN:  And any query beyond that        04:40
 2    you've -- at this point, at least, you would instruct him
 3    not to answer?
 4              MR. WICKHAM:  That's correct, and not only
 5    because it's the proper subject of expert testimony, also  04:40
 6    that it may lack foundation that he hasn't done an
 7    accounting of that information, and subject to all of our
 8    objections, you know, we would be willing to entertain
 9    appropriate interrogatories on the subject at the
10    appropriate time if it calls for expert testimony.        04:41
11  Q  (By Mr. Quinn)  Mr. Bryant, can you tell us what kinds of
12    documents that you receive or accountings you receive --
13    this is a question now not directed to the contents of the
14    documents but to the types of statements or accountings or
15    things that you get from MGA, and we've got one here that  04:41
16    we've marked which I assume is -- I'm just guessing that
17    it's a royalty statement of some kind or maybe the stub of
18    a check.
19  A  Yes.  In addition to the check I get a rundown of each
20    product and how much its earned and how much I get paid on  04:41
21    that product.
22  Q  And that rundown, I mean, do -- is there a name for that?
23  A  Other than royalty statement, I don't know.
24  Q  How often do you get a royalty statement?
25  A  Quarterly.                                               04:42
```

EXHIBIT _14_ PAGE _249_

CONFIDENTIAL                                                    261

DEPONENT'S SIGNATURE PAGE

RE:  Mattel, Inc., vs. Carter Bryant, et al.
     Carter Bryant vs. Mattel, Inc.
     Case No. CV 04-9059 DDP (AJWx)
     Deposition taken on November 4, 2004

          I do hereby certify that the foregoing is a true and
correct transcript of the deposition in the foregoing-styled
and numbered cause, and I now sign the same as true and
correct, with the exception of the corrections which I have
noted on the correction sheet provided.

                                   _____
                                        CARTER BRYANT

          Subscribed and sworn to before me this __2nd__ day of
_____, 20_05_.

                                   _____
                                        Notary Public

My Commission Expires:
_Dec. 31, 2008_                    

EXHIBIT 14 PAGE 250

NOTARIAL CERTIFICATE

STATE OF MISSOURI    )
                     )  ss.
COUNTY OF GREENE     )


        I, Sherrie L. Hunt, Certified Court Reporter, and
Notary Public within and for the State of Missouri, do
hereby certify that on November 4, 2004, pursuant to Notice,
the above witness, CARTER BRYANT, was by me first duly sworn
to testify the truth, the whole truth, and nothing but the
truth in the case aforesaid; and that the deposition by him
was reduced to writing by me in stenotype, and thereafter
transcribed by me, and is fully and accurately set forth in
the preceding pages; that presentment by me to the witness for
signature was waived; and that the deposition will be
thereafter by the witness read, signed, and sworn to on or
before the date of trial.

        I do further certify that I am not related to, nor
attorney for, nor employed by any of the said parties, nor
otherwise interested in the event of said action.


        Sherrie L. Hunt
        Notary Public
        Greene County
        State of Missouri
        My Commission Expires May 17, 2005

                                Sherrie L. Hunt
                                Certified Court Reporter
                                C.C.R. Number 1027
                                Notary Public


My commission expires:  May 17, 2005


Costs:  To Plaintiff and Cross-Defendant $1,399.25
        To Defendants and Cross-Complainant $422.65


            COURT REPORTERS OF THE MIDWEST, INC.
                      P.O. Box 4282
            Springfield, MO 65808 (417) 889-2079


EXHIBIT _14_ PAGE _251_

<u>Confidential; Subject to Protective Order</u>

CORRECTIONS TO THE DEPOSITION OF

CARTER BRYANT

VOLUME I

RE:   Mattel, Inc., vs. Carter Bryant, et al.
Carter Bryant vs. Mattel, Inc.
Case No. CV 04-9059 NM (RNBx)
Deposition taken on November 4, 2004

| <u>Page/Line</u> | <u>Change Requested</u> |
|---|---|
| 86:5 | Delete: "I may have." Insert: "I don't recall." |
| 124:1 and 3 | Delete: "No." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 131:19 | Delete: "No, I did not." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 132:3 | Delete: "I don't remember telling anybody that, no." Insert: "Other than my communications with Universal, I don't recall telling anybody that." |
| 132:18 | Delete: "To the best of my recollection that's true." Insert: "To the best of my recollection, other than my communications with Universal, that's true." |
| 195:24 | Insert: "I also received expense reimbursements from MGA and an advance against royalties." |
| 252:24 | Delete: "No." Insert: "No. I interpreted your question as asking whether I was employed by MGA at that time and the answer is no." |
| 253:20 | Delete: "I don't remember that, no." Insert: "Other than my communications with Universal, I don't remember that." |
| 253:22 | Delete: "That – as far as I can remember that never happened." Insert: "Other than my communications with Universal, as far as I can remember, that never happened." |

EXHIBIT _14_ PAGE _252_

CONFIDENTIAL                                                  494

DEPONENT'S SIGNATURE PAGE

RE: Mattel, Inc., vs. Carter Bryant, et al.
    Carter Bryant vs. Mattel, Inc.
    Case No. CV 04-9059 DDP (AJWx)
    Deposition taken on November 5, 2004

         I do hereby certify that the foregoing is a true and

correct transcript of the deposition in the foregoing-styled

and numbered cause, and I now sign the same as true and

correct, with the exception of the corrections which I have

noted on the correction sheet provided.

                    _____
                              CARTER BRYANT

         Subscribed and sworn to before me this _2nd_ day of

_____Mach_____, 200_5_.

                    _____
                              Notary Public

My Commission Expires:

_Dec. 31, 2008_



EXHIBIT _14_ PAGE _254_