11:46:44  1    A. Dana Goldstein and Lisa Tawil.
          2    Q. You specifically remember communicating it
          3  to them?
          4    A. Yes, because they are part of my team.
11:46:53  5    Q. And did they respond in any way?
          6    A. I don't remember. I'm sure they did but I
          7  don't remember what they said.
          8    Q. Did they disagree with you?
          9    MR. RANSOM: Objection.
11:47:07 10    THE WITNESS: I don't remember.
         11  BY MR. FREEBORN:
         12    Q. Did you have this conversation with them
         13  simultaneously or were these independent
         14  conversations?
11:47:17 15    A. I don't remember.
         16
         17
         18
         19
11:47:39 20              *Redacted*
         21
         22
         23
         24
11:47:52 25
                                                         138

---

11:51:29  1
          2
          3
          4
11:52:57  5
          6
          7
          8
          9              *Redacted*
11:53:04 10
         11
         12
         13
         14
11:53:04 15
         16
         17
         18
         19
11:54:07 20
         21
         22              *Redacted*
         23
         24
11:54:29 25
                                                         140

---

11:47:54  1
          2              *Redacted*
          3
          4
11:48:04  5
          6
          7              *Redacted*
          8
          9
11:50:37 10
         11
         12
         13
         14
11:50:52 15
         16
         17
         18              *Redacted*
         19
11:51:09 20
         21
         22
         23
         24
11:51:26 25
                                                         139

---

11:54:30  1
          2
          3
          4
11:54:37  5
          6
          7
          8              *Redacted*
          9
11:54:45 10
         11
         12
         13
         14
11:55:18 15
         16    Q. Are you aware of any communications by
         17  retailers to MGA about impacts which the Happy Meal
         18  dolls may have on retail sales?
         19    A. No.
11:55:58 20
         21
         22
         23              *Redacted*
         24
11:56:25 25
                                                         141

                                                          36

EXHIBIT 12 PAGE 327

nfidential - Attorney's Eyes Only

| | |
|---|---|
| 11:56:27 1 | 11:59:10 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 11:56:37 5 | 11:59:18 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 11:56:47 10 | 11:59:26 10 |
| 11 | 11 |
| 12 | 12 |
| 13 *Redacted* | 13 *Redacted* |
| 14 | 14 |
| 11:57:00 15 | 11:59:38 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 11:57:45 20 | 11:59:51 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 11:57:51 25 | 12:00:04 25 |
| 142 | 144 |

11:57:56 1
2
3
4
11:58:02 5
6
7
8
9
11:58:15 10
11
12
13 *Redacted*
14
11:58:37 15
16
17
18
19
11:58:53 20
21
22
23
24
11:59:09 25

143

12:00:05 1
2    *Redacted*
3
4
12:00:05 5       EXAMINATION
6   BY MR. RANSOM:
7       Q. If you could grab Exhibit 28 please.
8       A. Okay.
9       Q. And this was the presentation from the
12:00:34 10  licensor black and white meeting; is that correct?
11       A. Yes.
12       Q. Do you recall any discussion at this
13  meeting about head or waist articulation?
14       A. No.
12:00:43 15       Q. Did MGA agree at this meeting that the
16  Bratz premiums could feature 360 degree head
17  articulation or any waist articulation?
18       A. I don't remember.
19       Q. Okay. Do you recall speaking with Kathy
12:01:07 20  Pyle of McDonald's in late June or early July about
21  waist articulation?
22       A. Yes.
23       Q. And can you tell me what you recall in that
24  regard?
12:01:20 25       A. I remember having a couple phone

145

37

EXHIBIT 12 PAGE 328

nfidential - Attorney's Eyes Only

12:05:33 1 tested the dolls to see whether they could make the
2 waist move?
3    A. I don't remember.
4    Q. And did you test the dolls presented at
12:05:39 5 that meeting to see whether you could make the head
6 rotate 360 degrees?
7    A. I did not, no.
8    Q. Okay. Do you recall any discussion at that
9 meeting about waist articulation or head
12:05:49 10 articulation?
11    A. No.
12    Q. Okay. At any time did you ever advise any
13 person from McDonald's or The Marketing Store that
14 MGA would accept or approve waist articulation in
12:06:03 15 the Bratz premiums?
16    A. No.
17    Q. At any time did you ever advise any person
18 from McDonald's or The Marketing Store that MGA
19 would accept or approve head articulation that went
12:06:14 20 more than shoulder to shoulder?
21    A. No.
22    Q. You testified I think at the beginning of
23 your deposition about your experience in licensing.
24 Whether at MGA or any of your other jobs have you
12:06:29 25 ever participated in facilitating or licensing a

150

12:07:24 1
2
3
4
12:07:30 5                    *Redacted*
6
7
8
9
12:07:41 10
11
12    (Whereupon, at the hour of 12:07 p.m., the
13    proceedings were concluded.)
14                    -oOo-
15
16
17
18
19
20
21
22
23
24
25

152

12:06:32 1 Happy Meal promotion?
2    A. No.
3    Q. How about any other quick service
4 restaurant promotion?
12:06:37 5    A. No.
6    Q. Were you ever involved in licensing a
7 premium product as opposed to a retail product?
8    A. No.
9    Q. So that Bratz Happy Meal promotion was your
12:06:48 10 first and only experience involving a premium
11 product licensing; is that correct?
12    A. Yes.
13    Q. Okay. One second.
14      Okay. That's all I have. Thank you very
12:07:03 15 much for indulging me, and I'm at seven minutes for
16 the record.
17
18
19
12:07:14 20                    *Redacted*
21
22
23
24
12:07:21 25

151

12:07:43 1                    DECLARATION
2
3
4
12:07:43 5      I hereby declare I am the deponent in the
6 within matter; that I have read the foregoing
7 deposition and know the contents thereof, and I
8 declare that the same is true of my knowledge except
9 as to the matters which are therein stated upon my
12:07:43 10 information or belief, and as to those matters, I
11 believe it to be true.
12      I declare under the penalties of perjury of the
13 State of California that the foregoing is true and
14 correct.
12:07:43 15      Executed on the _____ day of _____
16 2003, at _____, California.
17
18
19
12:07:43 20    _____
                    W I T N E S S
21
22
23
24
25

153

39

EXHIBIT 12 PAGE 329

Confidential - Attorney's Eyes Only                    MGA 0067020

```
12:07:43   1   STATE OF CALIFORNIA    )
                                       ) SS.
           2   COUNTY OF LOS ANGELES   )
           3
           4        I, Vance L. Jarvis, Certified Shorthand
12:07:43   5   Reporter, Certificate No. 9014, for the State of
           6   California, hereby certify:
           7        I am the deposition officer that
           8   stenographically recorded the testimony in the
           9   foregoing deposition;
12:07:43  10        Prior to being examined the deponent was
          11   first duly sworn by me;
          12        The foregoing transcript is a true record
          13   of the testimony given;
          14        Before completion of the deposition, review
12:07:43  15   of the transcript [ ] was [ ] was not requested.  If
          16   requested, any changes made by the deponent (and
          17   provided to the reporter) during the period allowed
          18   are appended hereto.
          19
12:07:43  20   Dated_____
          21
          22
          23            _____
          24
          25
                                                       154
```

LegaLink - Los Angeles
800-826-0277   818-986-5270   Fax 818-783-7310   www.legalink.com

EXHIBIT 12 PAGE 320

Confidential - Attorney's Eyes Only

MGA 00G7010

*Redacted*

EXHIBIT 12 PAGE 331

Confidential - Attorney's Eyes Only

MGA 0867011

Page 2

*Redacted*

EXHIBIT 12 PAGE 332

nfidential - Attorney's Eyes Only

Page 3

*Redacted*

EXHIBIT 12 PAGE 333

nfidential - Attorney's Eyes Only

Page 4

*Redacted*

EXHIBIT 12 PAGE 334

Page 5

*Redacted*

EXHIBIT 12 PAGE **335**

MGA 0067015

Confidential - Attorney's Eyes Only

Page 6

*Redacted*

EXHIBIT 12 PAGE 336

Confidential - Attorney's Eyes Only

MGA 0367016

*Redacted*

EXHIBIT 12 PAGE 337

ifidential - Attorney's Eyes Only

Page 8

*Redacted*

EXHIBIT 12  PAGE 338

nfidential - Attorney's Eyes Only

Page 9

*Redacted*

EXHIBIT 12 PAGE 339

Confidential - Attorney's Eyes Only

Page 10

*Redacted*

EXHIBIT 12 PAGE 340

nfidential - Attorney's Eyes Only

*Redacted*

EXHIBIT 12 PAGE 341

Confidential   Attorney's Eyes Only

MGA 0967021

Page 12

*Redacted*

EXHIBIT 12 PAGE 342

Onfidential   Attorney's Eyes Only

MGA 0867022

*Redacted*

EXHIBIT 12 PAGE 343

**EXHIBIT 13**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| McDONALD'S CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  03 C 1026 |
| | ) | |
| v. | ) | The Hon. Robert W. Gettleman |
| | ) | |
| MGA ENTERTAINMENT, INC., f/k/a/ | ) | |
| ABC INTERNATIONAL TRADERS, | ) | Magistrate Judge Arlander Keys |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF ISAAC L. LARIAN

I, Isaac L. Larian, hereby state and declare as follows:

1.      I am the Chief Executive Officer of MGA Entertainment, Inc. ("MGA").  I submit this Declaration in support of MGA's Motion for Temporary Restraining Order and Preliminary Injunction and in opposition to the Motion for Temporary Restraining Order and Preliminary Injunction filed by McDonald's Corporation ("McDonald's").  The facts stated in this declaration are true of my own personal knowledge except for those stated on information and belief, as to which I am informed and believe they are true.

**Background Regarding MGA**

2.      In 1979, I founded MGA, formerly known as ABC International Traders, Inc., as a consumer electronics business.  In the 1980s, MGA entered the toy business by obtaining exclusive rights to sell Nintendo handheld LCD games in the United States.  MGA went on to develop and license innovative children's toys and products, including Hello Kitty and Power Rangers. Over the years, the company's product line has featured award winning fashion dolls and accessories, remote control action vehicles, special feature plush toys, interactive dolls,

Confidential - Attorney's Eyes Only

EXHIBIT _12_ PAGE _344_

MGA 0866371

24.     These four options (correcting the unapproved features of the BRATZ doll, substitution of excess inventory, advancement of future promotions, and continuation of existing promotions) show that McDonald's has numerous alternatives.  Nor is the time for making such changes too short, as McDonald's claims.  For example, when McDonald's has had to recall Happy Meal promotional items, McDonald's has instructed customers to return the recalled Happy Meal toy in exchange for a replacement toy.  (*See* Group Exhibit H).

*Redacted*

9

EXHIBIT 12 PAGE 345

Confidential - Attorney's Eyes Only

MGA 0866379

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _11th_ day of February, 2003.

Isaac Larian

Confidential - Attorney's Eyes Only

EXHIBIT 13 PAGE 346

MGA 0866380

D

EXHIBIT 13 PAGE 347

Confidential - Attorney's Eyes Only

MGA 0866387

Page 1

*Redacted*

*Redacted*

*Redacted*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Redacted*

EXHIBIT 13 PAGE 348

Confidential - Attorney's Eyes Only

MGA 0866388

Page 3 of 4

Page 2

*Redacted*

*Redacted*

*Redacted*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Redacted*

EXHIBIT 13   PAGE 349

Confidential - Attorney's Eyes Only

MGA 0866389

Page 4 of 4

*Redacted*                                                        Page 3

*Redacted*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Redacted*

Confidential - Attorney's Eyes Only

EXHIBIT *13* PAGE **350**

MGA 0866390

E

EXHIBIT 13 PAGE 351

Confidential - Attorney's Eyes Only

MGA 0866391

The Five Dumbest Things on Wall Street This Week

*Redacted*

*Redacted*

*Redacted*

**Confidential - Attorney's Eyes Only**

EXHIBIT 13 PAGE 352

MGA 0866392

The Five Dumbest Things on Wall Street This Week

*Redacted*

*Redacted*

*Redacted*

**Confidential - Attorney's Eyes Only**

EXHIBIT 13 PAGE 353

MGA 0866393

The Five Dumbest Things on Wall Street This Week

*Redacted*

*Redacted*

*Redacted*

)3

Confidential - Attorney's Eyes Only

EXHIBIT 13 PAGE 384

MGA 0866394

The Five Dumbest Things on Wall Street This Week

*Redacted*

*Redacted*

*Redacted*

EXHIBIT 13 PAGE 355

Confidential - Attorney's Eyes Only

MGA 0866395

F

Confidential - Attorney's Eyes Only

EXHIBIT 13 PAGE 356

MGA 0866396

FOCUS - 41 of 49 DOCUMENTS

*Redacted*

*Redacted*

  

EXHIBIT 13  PAGE 357

Confidential - Attorney's Eyes Only

MGA 0866397

G

Confidential - Attorney's Eyes Only

EXHIBIT 13 PAGE 358

MGA 0866398

*Redacted*

*Redacted*

Confidential - Attorney's Eyes Only

EXHIBIT 13 PAGE 359

MGA 0866399

H

EXHIBIT 13 PAGE 360

Confidential - Attorney's Eyes Only

MGA 0866400

FOCUS – 46 of 49 DOCUMENTS

*Redacted*

*Redacted*







EXHIBIT *13* PAGE *36*

Confidential - Attorney's Eyes Only

MGA 0866401

Page 1

FOCUS - 41 of 49 DOCUMENTS

*Redacted*

*Redacted*



Confidential - Attorney's Eyes Only

EXHIBIT *13* PAGE *342*



MGA 0866402

Redacted                                                    Page 1 of 2

# NEWS from CPSC

## U.S. Consumer Product Safety Commission

Office of Information and Public Affairs                    Washington, DC 20207

*Redacted*

*Redacted*

Confidential - Attorney's Eyes Only

EXHIBIT 13 PAGE 363 

MGA 0866403

*Redacted*

*Redacted*

EXHIBIT 13 PAGE 364

Confidential - Attorney's Eyes Only

MGA 0866404

*Redacted*

Page 2 of 2

*Redacted*

*Redacted*

EXHIBIT *13* PAGE **365**

Confidential - Attorney's Eyes Only

MGA 0866405

FOCUS – 3 of 49 DOCUMENTS

*Redacted*

*Redacted*

  



EXHIBIT 13 PAGE 366

Confidential - Attorney's Eyes Only

MGA 0866406

FOCUS - 1 of 1 DOCUMENT

*Redacted*

*Redacted*

  

EXHIBIT *13* PAGE **367**

Confidential - Attorney's Eyes Only

MGA 0866407

*Redacted*

*Redacted*



EXHIBIT 13 PAGE 368

Confidential - Attorney's Eyes Only

MGA 0866408

Confidential - Attorney's Eyes Only

EXHIBIT *13* PAGE 369

MGA 0866409

McDonald's - Merchandise

*Redacted*

*Redacted*

**Confidential - Attorney's Eyes Only**



MGA 0866410

McDonald's - Merchandise

*Redacted*

*Redacted*

Confidential - Attorney's Eyes Only


EXHIBIT *13* PAGE **37**

MGA 0866411

McDonald's - Merchandise

Page 3 of 5

*Redacted*

*Redacted*

EXHIBIT /3 PAGE 372

Confidential - Attorney's Eyes Only

MGA 0866412

McDonald's - Merchandise

*Redacted*

*Redacted*

EXHIBIT *13* PAGE **373**

Confidential - Attorney's Eyes Only

MGA 0866413

McDonald's - Merchandise

*Redacted*

*Redacted*

EXHIBIT **13** PAGE **314**

Confidential - Attorney's Eyes Only

MGA 0866414

**EXHIBIT 14**

390

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3     MC DONALD'S CORPORATION,       )

 4          Plaintiff,                )
                                      ) No. 03 C 1028
 5          vs.                       ) Chicago, Illinois
                                      ) March 18, 2003
 6     MGA ENTERTAINMENT, INC.,       ) 2:00 p.m.
                                      )
 7          Defendant.                )

 8

 9     TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION

10     BEFORE THE HONORABLE ROBERT W. GETTLEMAN

11
       APPEARANCES:
12     For the Plaintiff:     FREEBORN & PETERS
                              311 South Wacker Drive
13                            Suite 3000
                              Chicago, Illinois 60606-6677
14                            BY: MR. MICHAEL D. FREEBORN
                                  MR. JOHN Z. LEE
15                                MS. JENNIFER L. FITZGERALD
                                  MR. RICHARD A. FIORE
16
       For the Defendant:     SIDLEY, AUSTIN, BROWN & WOOD
17                            Bank One Plaza
                              10 South Dearborn Street
18                            Chicago, Illinois 60603
                              BY: MR. RICHARD J. O'BRIEN, JR.
19                                MS. ANNE E. REA
                                  MR. PAUL E. VEITH
20                                MS. ELLEN S. ROBBINS

21     ALSO PRESENT:         MR. JEROME KRULEWITCH and
                             MS. HEATHER SMEDSTAD, In-House
22                           Counsel, McDonald's Corporation

23
       Official Court Reporter:   JENNIFER S. COSTALES, CRR, RMR
24                            219 South Dearborn Street
                              Room 1706
25                            Chicago, Illinois 60604
                              (312) 427-5351
```

392

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13              Redacted
14
15
16
17
18
19
20
21
22
23
24
25
```

391

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13       Redacted
14
15
16
17
18
19
20
21
22
23
24
25
```

393

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13              Redacted
14
15
16
17
18
19
20
21
22
23
24
25
```

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14  PAGE 375

Confidential - Attorney's Eyes Only

MGA 0866274

**394**

*Redacted*

**396**

Everything I have to say falls in one of three categories: Either what we did was approved; or to the extent they claim a breach, it can't be anything more than an immaterial breach; and, third, the predicament we are in imposes on us irreparable harm and in contrast imposes on them no harm whatsoever.

Let me start with approval. There are about a half dozen points I want to make here.

First, MGA was informed at the outset that the stopper solution wouldn't lock the waist of these dolls.

Second, they had at least four opportunities to review the effectiveness of that stopper on August 9, August 30, November 15, and November 26.

Third, their witness, Lisa Tawil, admitted that articulation had been satisfactorily addressed and resolved as

**395**

**397**

early as August 9.

Fourth, the Goldstein e-mail, which is attached to the Tawil approval forms, reflected that and confirmed it.

Fifth, their own 30(b)(6) witness designated to speak for the organization on communications between MGA and McDonald's said that MGA never communicated that McDonald's had failed to meet the expectations of MGA regarding neck or waist articulation.

THE COURT: Who is that?

MR. FREEBORN: That's Victoria O'Connor, Your Honor.

And as if all of that were not enough, the sixth point on approval is that the December 12th voice mail and e-mail said that there would be no further review or comment on any remaining samples.

JENNIFER COSTALES, CRR, RMR

Confidential - Attorney's Eyes Only

EXHIBIT **14** PAGE **376**

MGA 0866275



**398**

 

**399**

4  And then she participates with TMSW in exploring some
5  alternatives. She asks if we could use a harder shore of PVC.
6  And I'm told that the word "shore" is a term of art, and it
7  describes, you know, a quantity of the material PVC. Or she
8  asks if a second option of molding one piece instead of two
9  might be feasible. And that begins a discussion of some of
10  these alternatives. And after exploring all of the
11  alternatives, it was ultimately decided to incorporate a stopper
12  in the dolls so that they would now only feature arm and neck
13  articulation.
14  And if we move ahead a couple of exhibits to
15  Plaintiff's Exhibit 63, Plaintiff's Exhibit 63 is an August 4th
16  e-mail and an August 5th e-mail.
17  In the August 4th e-mail, Kathy Pyle of McDonald's lays
3  out for Victoria O'Connor of MGA that it's McDonald's intention
24  to eliminate the waist articulation by incorporating a stopper.
25  And O'Connor then in the same e-mail or the same

*Redacted*

**400**

1  exhibit, this is the e-mail that O'Connor writes on August the
2  5th, expresses her thanks to McDonald's for agreeing to this
3  solution.
4  Now, the next exhibit that becomes important here is --
5  THE COURT: Just hold on one second.
6  MR. FREEBORN: I'm sorry.
7  THE COURT: Okay.
8  MR. FREEBORN: I will note parenthetically here,
9  although it has more to do with materiality than anything else,
10  Victoria O'Connor recognizes even at this point before the
11  stopper has been implemented, it has just been talked about, not
12  yet implemented, she says, quote, "I understand that McDonald's
13  wants to produce a high quality product that will reflect the
14  Bratz brand. We believe this has already been achieved and are
15  satisfied thus far," unquote.
16  I'm going to address that further in a few minutes.
17  But we submit that what that suggests is the addition or the
18  loss of that stopper has nothing material to do with whether
19  this brand is injured.
20  What's important for the moment is O'Connor is
21  expressing her thanks for McDonald's agreeing to do this.
22  Then --
23  THE COURT: She also says they'll eliminate the waist
24  articulation.
25  MR. FREEBORN: Understand.

**401**

1  After having said that it won't, that it won't lock, it
2  won't lock the waist, we've told them that it won't lock the
3  waist, but we're going to give them dolls that have the stopper
4  inside it so they can test it out and see to what extent it
5  satisfies their needs.
6  And the first opportunity to do that is --
7  THE COURT: Now, wait a minute. Wait a minute. Go
8  back. Where does she say it won't lock the waist?
9  MR. FREEBORN: We told them that in Plaintiff's Exhibit
10  45 and 47. In the e-mail from Rebecca Morris to Lisa Tawil
11  dated July 9th, paragraph 5.
12  THE COURT: On which one?
13  MR. FREEBORN: Oh, I'm sorry, it's numbered differently
14  in each one. In Plaintiff's Exhibit 45, paragraph 3, the second
15  sentence, it says, "In addition, please note that it is not
16  feasible to lock the waist without having to change the body
17  material from PVC to ABS."
18  And so the stopper method is an alternative to that
19  change of material, because they didn't want to make that change
20  in the material.
21  THE COURT: All right.
22  MR. FREEBORN: So the first opportunity we have to show
23  them the use of this stopper in lieu of a change in material
24  from PVC to ABS is a meeting on August the 9th in MGA's offices
25  in North Hills, California. That's described in a conference

JENNIFER COSTALES, CRR, RMR

Confidential - Attorney's Eyes Only

EXHIBIT 14 PAGE 377

MGA 0866276

**402**

1  report that we've marked as Plaintiff's Exhibit 66. And it was
2  testified to I believe last Thursday.
3      And at that meeting, we presented what were called,
4  quote, "work like-looks like models." And these models had
5  stoppers in place. And as the exhibit states under overall
6  comments, quote, "TMS pointed out that all doll waists are now
7  non-articulated as requested."
8      This meeting was attended by six MGA representatives
9  including O'Connor, Tawil, and Goldstein. Larian, of course,
10  was not there. Tawil was. Tawil was also in that witness
11  chair. And Tawil admitted, although it took a little while,
12  admitted that she picked up one of these dolls, had the
13  opportunity to look at it, and she acknowledged that it was
14  true, it was a true statement that the dolls were
15  non-articulated with that stopper.
16      After the August 9 meeting, O'Connor e-mails TMSW on
17  Monday, August the 12th. And now in addition to Tawil's
18  testimony in the witness chair here, O'Connor says on August
19  12th --
20      THE COURT: The exhibit number?
21      MR. FREEBORN: I'm sorry, Your Honor, this is
22  Plaintiff's Exhibit 68.
23      THE COURT: Go ahead.
24      MR. FREEBORN: She says in this e-mail to Rebecca
25  Morris on August 12th, "We are not anticipating additional

**403**

1  changes to the sculpts from what we covered in our meeting on
2  Friday. However, we must await for Isaac's return on August 22
3  before e-mailing you the product approval forms." She finishes
4  by saying, "Your team has done a fantastic job," exclamation
5  point.
6      This, we submit, suggests that what we've done so far
7  with the stopper as an alternative to the change in material is
8  more than meeting their expectations.
9      Now, the subsequent meeting with Larian that she refers
10  to in this exhibit as going to take place by August the 22nd
11  gets delayed a couple of times, and it isn't until ultimately
12  three weeks after the August 9 meeting, the afternoon of August
13  30th, that this takes place. And that's described in
14  Plaintiff's Exhibit 76.
15      In Plaintiff's Exhibit 76, which is an e-mail of August
16  the 30th from Ms. Goldstein, the person who ultimately gave
17  final approval to the dolls here but was apparently too busy to
18  come to the hearing, she says, "Unfortunately, our meeting with
19  Isaac was pushed back again to this afternoon. We will have
20  comments on the second sculpt review models to you by the end of
21  day."
22      And then in Plaintiff's Exhibit 77, the very next one,
23  an e-mail written about six and a half hours later in the
24  afternoon of August the 30th, Dana Goldstein says, she e-mails
25  Rebecca Morris of TMSW the comments on the works like-looks like

**404**

1  model which has been submitted to MGA earlier. And this e-mail,
2  Plaintiff's Exhibit 77, as expected makes no comments at all
3  about articulation. Why? Because as Lisa Tawil testified here,
4  from August 9th forward, MGA considered that their expectations
5  regarding articulation had been satisfied.
6      So up to this point, after twice reviewing the works
7  like-looks like models, on August 9, O'Connor, Tawil, Goldstein,
8  and three other MGA employees and then on August 30, Larian
9  himself, we've got approval of those models and their use of the
10  stopper, and we're ready to move on to the revised -- excuse
11  me -- to the pre-production models.
12      TMSW then sends pre-production samples which
13  incorporate the stopper solution in early November. Tawil gives
14  MGA's comments by an e-mail of November the 15th, which is
15  marked as Plaintiff's Exhibit 90. And in this exhibit there is
16  at the top a general comment. It says "General comments to be
17  applied to all dolls." And she says "all the heads should move
18  from shoulder to shoulder only." And then in the next line she
19  says, "all waists should have no articulation."
20      But she testified here that this was not an indication
21  that the samples received to that point had failed to comply
22  with those expectations. Rather, that was just a general
23  reminder. And she further testified that she was not intending
24  to convey to Ms. Camphausen, Julie Camphausen, the witness who
25  testified here for TMSW, she was not, Tawil was not intending to

**405**

1  convey to her that they take some action to correct a deficiency
2  that she had observed in the articulation of these dolls. And
3  that testimony appears in the transcript of this proceeding page
4  179.
5      So after providing all of the August 30 comments on
6  issues other than articulation, what we have is MGA's Tawil and
7  Goldstein having a conference call on September 3rd to discuss
8  the other issues. That's what was referred to in the exhibit
9  immediately preceding this one, Plaintiff's Exhibit 82. Again,
10  no reference to articulation and certainly no expression of
11  dissatisfaction with the stopper solution.
12      So now we're up to the November pre-production samples.
13  And Tawil admitted when she was here that she had the
14  opportunity on multiple occasions to look at dolls to see if
15  they met MGA's expectations regarding neck or waist
16  articulation. She said so at the transcript page 175.
17      So far as she was concerned by August 9th, that issue
18  had been satisfactorily addressed and resolved. She said that
19  at transcript page 175.
20      And then she said that during the entire period from
21  September, which is this September 3 conference call, through
22  December of 2002, she had received additional pre-production
23  samples, but she never found a doll that failed to meet MGA's
24  expectations regarding neck or waist articulation. She said so
25  at transcript page 176.

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 378

Confidential - Attorney's Eyes Only

MGA 0866277



**406**

1    And so it is no surprise that Camphausen when she was
2    in the witness chair testified that she knew that the general
3    comments at the top of Plaintiff's Exhibit 90 weren't meant to
4    suggest that TMSW had failed to meet those expectations for two
5    reasons.  She testified that she had had a telephone
6    conversation with Dana Goldstein the day before and had gone
7    through all those comments as well, and nothing Dana Goldstein
8    said included anything about articulation.  And, secondly, she
9    testified that in any event, she looked at all those dolls and
10   had satisfied herself that they did what the stopper was
11   supposed to do and were satisfactory to send on.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**407**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**408**

1
2
3
4
5
6
7
8    THE COURT:  Wait.  234 to 241 were the samples that
9    were sent with the November 28 letter?
10       MR. FREEBORN:  Yes, sir.
11       THE COURT:  Okay.
12       MR. FREEBORN:  Dana Goldstein says in response after
13   they have looked at them, she sends the e-mail and says, "They
14   look so good."  And then she lists a few comments having to do
15   with hair being cut evenly, face color appearing too orange,
16   things like that, minor aesthetic improvements that need to be
17   made, but, of course, no comment whatsoever regarding
18   articulation.
19       Lisa Tawil is copied on this e-mail.  And in the next
20   exhibit, Plaintiff's Exhibit 95, Tawil e-mails Goldstein back
21   thanking her for handling the comments.  But she likewise makes
22   no comment regarding articulation and certainly doesn't say to
23   Goldstein:  "Gee, you should have mentioned something about
24   articulation."  Why?  Because all of MGA's expectations had by
25   that point been met on articulation with the use of this stopper

**409**

1    solution.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21   Now, the contract between the parties here contemplates
22   under Section 7 that production can commence upon approval of
23   final pre-production samples.  Those words actually appear in
24   the contract.  That's consistent with the various phases, the
25   approval phases that had been set forth by TMSW with MGA at the

JENNIFER COSTALES, CRR, RMR

Confidential - Attorney's Eyes Only

EXHIBIT 14  PAGE 379

MGA 0866278

```
410
 1   outset. And so since the final approval of these pre-production
 2   samples has now been obtained, production commences.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
412
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
411
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
413




                    Redacted
```

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 380

Confidential - Attorney's Eyes Only

MGA 0866279

**414**

*Redacted*

18 And Lisa Tawil also acknowledged, again, after some
19 difficulty, that there is nothing in this e-mail that suggests
20 that the final samples of the dolls that TMS was going to
21 receive were going to be samples that were intended for further
22 review and comment by MGA.
23 So we now have August 9, August 30, November 15,
24 November 26, and if all that wasn't enough, we've got a final
25 e-mail on December the 12th that tells MGA: Look, these things

**416**

1 MR. FREEBORN: All right. It's at page 115 and 116. I
2 asked her, quote, "Did you at any time after this e-mail of
3 August 12, 2002" -- that's the one where she says, you know,
4 we've looked at your August 9 works-like models. They look
5 fine. I ask her then, "Did you at any time after this e-mail of
6 August 12 through the end of 2002 have any belief that
7 McDonald's or TMSW had failed to meet MGA's expectations
8 regarding neck or waist articulation?
9 She answers "No."
10 And then I say, "And I gather that at no time
11 subsequent to this e-mail of August 12 through the end of 2002
12 did MGA communicate to McDonald's or TMSW that MGA believed they
13 had failed to meet MGA's expectations regarding neck or waist
14 articulations?"
15 Again she says "No."
16 And during this period, Sidley's counsel in Los Angeles
17 was objecting to the scope, because she's only designated as a
18 30(b)(6) witness on communications to McDonald's. And so I
19 said, "Let me break it down to address counsel's concern. And
20 here is the key question: At no time from your e-mail of August
21 12, 2002 until the end of 2002 did MGA communicate to McDonald's
22 any belief that MGA's expectations regarding neck or waist
23 articulation had not been met?
24 "No."
25 So their 30(b)(6) witness captures all of that in one

**415**

1 are going to production.
2 What happens after that? A thunder of silence until
3 the end of January 2003. Tawil received the e-mail from Julie
4 Camphausen that we've marked as Plaintiff's Exhibit 104. She
5 acknowledged that when she was on the witness stand. And she
6 doesn't really dispute anything that was said in the e-mail.
7 She doesn't have any recollection of the voice mail that's
8 there, and so Julie Camphausen's description of that voice mail
9 stands unrebutted.
10 So what we have here at the end of January 2003, what
11 we have is long after ordering a steak well done, MGA says, you
12 know, instead we wanted it rare. And actually, it's not all of
13 MGA that says that, it is just one person, it's Isaac Larian.
14 He's the only one that expresses dissatisfaction when the final
15 samples arrive in the end of January.
16 And all of what I've just described is summarized and
17 captured in one brief exchange with MGA's 30(b)(6) witness,
18 Victoria O'Connor. She testified during her deposition at pages
19 134 and 135 -- or excuse me, that's a separate reference I
20 wanted to give to the Court. But she testified in her 30(b)(6)
21 deposition, which we gave in our deposition excerpts to the
22 Court the other day.
23 THE COURT: Page?
24 MR. FREEBORN: Pardon me?
25 THE COURT: I want the page.

**417**

1 question and one answer.
2 Now, what can MGA say in response to all of this? They
3 say basically two things. First, they have got a deception
4 argument, and then they have got an argument about a checked
5 box.
6 They say that a statement made in July that the stopper
7 would be easy to overturn was not passed on to MGA so that they
8 would know that. But we told them that the stopper would not
9 lock. We knew that MGA was in the toy business. We knew we
10 were going to give them the doll so that they could look at them
11 themselves and satisfy themselves whether they were easy or
12 difficult to overturn. They saw those dolls, and they said
13 nothing.
14 It would be one thing if what we said to MGA was: You
15 want us to put the stopper in? Okay. We'll go ahead and do
16 that. And then the next thing that happens is we give them
17 sealed bags, and they don't have a chance to look at it. That
18 is not what happened here. There is no deception here.
19
20
21
22 *Redacted*
23
24
25

JENNIFER COSTALES, CRR, RMR

Confidential - Attorney's Eyes Only

EXHIBIT 14   PAGE 381

MGA 0866280

418

Redacted

14    I want to comment just briefly on the style guide.  As
15  Your Honor knows from the testimony of both Tawil and Larian,
16  the style guide represents dolls that all of which articulate.
17  And more importantly, paragraph 7-D of the contract between the
18  parties, which is marked as Plaintiff's Exhibit 1, says that the
19  style guide depicts all required uses of the property and the
20  trademarks.
21        Now, because an articulating doll is the required use,
22  nothing we did here could be a breach, much less a material
23  breach.  It's like if McDonald's licenses them to use the golden
24  arch, but then says "Oh, by the way, you can't paint it yellow,"
25  that's what is happening here.  We've got a required use that's

419

1  specified in the form of a doll that articulates, and nothing
2  that we have done could constitute a breach much less a material
3  breach.

420

Redacted

22        MR. FREEBORN:  If we accept what MGA says, that this
23  stopper does not eliminate waist articulation, and we say the
24  agreement was we're going to put a stopper in there that
25  wouldn't lock, you know, we told you it wouldn't lock, it's just

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 382

Confidential - Attorney's Eyes Only

MGA 0866281



**422**

1  a stopper, if they are successful in convincing Your Honor that
2  the fact that it doesn't, that it doesn't lock is a breach, for
3  example, and that these dolls, you know, spin like a top, and we
4  dispute that as well, and the Court can satisfy itself that the
5  stopper does have the appropriate effectiveness, but even if one
6  were to conclude that this stopper is totally ineffective, my
7  point is that such a breach is not necessarily a material breach
8  under the contract. And I have about a half a dozen things I
9  just want to touch on that point to that.
10
11
12            *Redacted*
13
14
15
16      And we have the Camphausen testimony that these dolls,
17  there is no material difference between the pre-production
18  samples and the production samples.
19      And we have Larian's testimony that no retailer has
20  told him and he has no other data indicating that these dolls,
21  these Happy Meal dolls will in any way cannibalize the retail
22  sales of the MGA dolls.
23
24            *Redacted*
25

**424**

1  would be a material breach. And without that definition, what
2  they have done here is contrary to the contract.
3
4
5
6
7
8
9
10
11
12
13
14            *Redacted*
15
16
17
18
19
20
21
22
23
24
25

**423**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**425**

1
2
3
4            *Redacted*
5
6
7
8
9      And so the definition of material breach comes out of
10  the contract before it is signed. So you have the contract that
11  deals with what constitutes a material breach. You also have
12  Isaac Larian himself and the false statements in his first
13  declaration establishing this. The falsity of those statements
14  not only impeaches his credibility, but it actually proves our
15  point:
16      The fact that he did not, that he did not eliminate
17  waist articulation in the Lil' Bratz dolls to avoid competing
18  with the full-size Bratz dolls indicates that MGA did not
19  consider such articulation material in cannibalization among the
20  different dolls.
21      Apart from his statements on this issue on materiality,
22  his actions speak louder than words. If this rotation or this
23  articulation was so material, it would have been in the letter
24  regarding the deal points that we've marked as Plaintiff's
25  Exhibit 15 back in March of 2002. It would have been in the

**JENNIFER COSTALES, CRR, RMR**

Confidential - Attorney's Eyes Only

EXHIBIT 14 PAGE 383

MGA 0866282

**426**

1  contract, which we marked as Plaintiff's Exhibit 6. It would
2  have been mentioned to MGA employees before June. And, yet,
3  Victoria O'Connor testified in her deposition and Larian's
4  declaration itself; paragraph 18, says McDonald's didn't know
5  anything about this before July.
6      If it was so material, Tawil and Goldstein would have
7  focused on it instead of focusing on fashion and clothes and
8  makeup and things like that. Those, after all, are what give
9  these dolls their appeal.
10     If it was so material, Larian would have made sure that
11  his people did focus on it instead of those fashions and those
12  clothes. He said that Tawil and Goldstein had the authority to
13  approve these things. But Tawil and Goldstein say throughout,
14  Tawil on the witness stand and Goldstein in her deposition, that
15  they weren't focused on articulation.
16     The bottom line is, Larian says this is a material
17  breach, but nobody else does. The contract doesn't, and nobody
18  else in this case does.
19     And this gets me back to the point I was making a
20  little while ago about O'Connor in her e-mail --
21     THE COURT: It's been a long half hour.
22     MR. FREEBORN: I'm sorry, Your Honor. Let me cut to
23  the chase here.
24     The final point I wanted to make has to do with the
25  fact that Victoria O'Connor says not only that these dolls will

**427**

1  not cannibalize the retail dolls. She says that at pages 132
2  through 138 of her deposition.
3      We also have Camphausen saying that there is no
4  material difference. And we have Larian saying that there is no
5  retailer who has expressed any concern. We have Larian saying
6  that MGA has no data to back up their claim that there will be
7  any cannibalization. He hasn't asked anybody to.
8      And the final thing I would say on this materiality
9  issue, the Court itself can look at the retail dolls and see
10  what's material in this marketplace. You can see from those
11  retail dolls we marked yesterday as Plaintiff's Exhibits 255 and
12  256, the ones that are still in the containers that came from
13  Toys-R-Us, what MGA features on those boxes is they have got
14  brushable hair, they have got changes of clothes. There is no
15  mention of articulation or posability. The retail consumer
16  can't even see those features before they buy the dolls. How
17  could those possibly be considered by MGA as material?
18     THE COURT: Well, because they buy the dolls, the kid
19  plays with the dolls, and then they buy another doll. I mean,
20  little girls don't have just one doll.
21     MR. FREEBORN: Very good point, Your Honor.
22     THE COURT: I mean, they sell, they sell -- in fact,
23  I'm sorry Mr. Larian isn't here, because there was one question
24  I wanted to ask him. Maybe you could stipulate to it. How many
25  dolls does MGA sell?

**428**

1      MR. VEITH: How many different kinds?
2      THE COURT: No. How many units do they sell, did they
3  sell in 2001, 2002, do they project in 2003?
4      MR. O'BRIEN: I don't have the units number at hand,
5  Your Honor, but they sold $190 million worth in 2002. And the
6  prices for Lil' Bratz are 6.99. The prices for --
7      THE COURT: Was that the retail value?
8      MR. O'BRIEN: Yes, Your Honor. And the prices for the
9  big Bratz are about 14 bucks. So I dare say that it's a lot of
10  dolls.
11     MR. FREEBORN: Your Honor's touching on the final
12  point I wanted to make on this. Daddy goes into Toys-R-Us with
13  two girls. One has got a Happy Meal doll that rotates at the
14  waist. Another one doesn't have a Happy Meal that rotates at
15  the waist. In the analysis by Dr. Kerr which the Court heard,
16  the but-for analysis to figure out whether there is going to be
17  any cannibalization, how likely is it that the little girl that
18  has the doll that articulates and has the opportunity to
19  persuade daddy to get out his credit card and buy her another
20  doll is going to say: No. I'm okay.
21     These two girls are going to ask for every doll they
22  can get. And the reason is they like to have multiple dolls.
23  They like to collect them. And even if daddy says, "No, you
24  don't need that doll, because you've already got a Happy Meal
25  doll," isn't she going to point out to him just as sweetly as

**429**

1  she can, "But this one is neater. Look, it has more clothes.
2  You can brush her hair," all these sorts of things that
3  distinguish these retail dolls from what the Happy Meal dolls
4  will be.
5      Now, the final category that I want to talk about, and
6  I'll be very short on this, has to do with the fact there is
7  immense irreparable harm to us as a result of the predicament
8  that MGA has put us in, and there is virtually no irreparable
9  harm to them.
10
11
12
13
14
15
16
17                    *Redacted*
18
19
20
21
22
23
24
25

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 384

Confidential - Attorney's Eyes Only

MGA 0866283

430

1
2
3          *Redacted*
4
5
6          There is going to be untold damage to good will if that
7  happens. And in contrast, they suffer no harm. Remember what
8  Victoria O'Connor says, there is not going to be any
9  cannibalization of these dolls in the first place. She's the
10  witness that has no bias, no interest in this case. She's under
11  oath. She has no reason to say what Isaac Larian wants her to
12  say.
13          And if past experience with McDonald's is any guide,
14  the promotion will result in increased MGA sales here. If not
15  and if we happen to be wrong on that, they can recover damages
16  later. In fact, Isaac Larian himself said so. He said nothing
17  at all about damages to MGA's good will, just lost sales and
18  shelf space, all of which is measurable in dollars.
19          And for that reason, they have no irreparable injury in
20  contrast to the enormous irreparable injury we would suffer.
21  Thank you, Your Honor, for your patience.
22          THE COURT: Thank you.
23          MR. O'BRIEN: May I, Judge?
24          THE COURT: Sure.
25          MR. O'BRIEN: I too have some documents I'm going to

431

1  refer to, a smaller subset though, Your Honor, almost razor
2  thin.
3          I submit to the Court that Your Honor can resolve the
4  motions pending before you by answering the following questions:
5          First, does the license agreement here give MGA the
6  right to approve all uses of the property at all stages?
7          Second, are MGA's approval rights merely a contractual
8  right, or are they also a condition of McDonald's license to use
9  Bratz?
10          Third, did MGA, in fact, give final approval for the
11  distribution of dolls that used the so-called stopper solution
12  to satisfy MGA's requirements with respect to waist and neck
13  articulation?
14          And, finally, is either party here poised to suffer
15  irreparable harm should the Court not exercise its equitable
16  powers to grant injunctive relief?
17          With respect to the first two of those questions, Your
18  Honor, the nature of MGA's approval rights and whether they make
19  this just a contract case or a contract case plus a copyright
20  case, we submit both those questions, Your Honor, are questions
21  of law. We submit this is true because the license agreement is
22  unambiguous. You got both sides to concede that point
23  yesterday. The resolution of these two questions simply call on
24  the Court to construe the agreement.
25          We submit to you that answering the first legal

432

1  question is easy. The license agreement unambiguously gives MGA
2  the right to approve all uses of its Bratz property.
3          THE COURT: Would that have given them a right to say:
4  Well, we want the faces to be purple or orange or green?
5          MR. O'BRIEN: Yes, Your Honor.
6          THE COURT: Really? Okay.
7          MR. O'BRIEN: Yes, Your Honor.
8          And they have those approval rights at all stages of
9  the development of the dolls. Indeed, McDonald's own witnesses
10  conceded that the license agreement gives MGA approval rights
11  for all uses and at all stages.
12          And McDonald's witnesses also testified that they
13  admitted that final production is such a stage in the process.
14  For example, Ms. Camphausen testified to that at the transcript
15  at 93 and Ms. Pyle in the transcript at 131.
16          The second question, Your Honor, as to whether this is
17  merely a contract case versus a contract case plus a copyright
18  case is as easy as the first. Your Honor, the answer to
19  the question turns on whether MGA's approval rights were a
20  condition of the grant of the license or not. It is the grant
21  of the license that gives McDonald's the right to use the Bratz
22  property.
23          So we submit to you the only logical way to read the
24  agreement is that MGA's right to approve all uses means that
25  those approval rights are a condition to use. The grant of a

433

1  license allows use, and you can't have use under the contract
2  without MGA first giving approval. You recall that Mr. Larian
3  testified that he would have never entered into this agreement
4  without those approval rights.
5          Mr. Freeborn spent some time on the parol evidence with
6  respect to whether or not the contract was going to include a
7  definition of materiality, sort of preordained in the contract
8  or not in order to supplant the law on that, I suppose. Well,
9  Mr. Larian testified that he was willing to concede that point,
10  because he knew he had the safety of these absolute approval
11  rights.
12          The third of the four questions that I think Your Honor
13  needs to decide in order to resolve these motions is the key
14  factual dispute on which the Court has now received evidence,
15  and that question is whether MGA, in fact, approved the
16  McDonald's dolls that McDonald's now wants to use in its Happy
17  Meal promotion.
18          We think that factual question, Your Honor, has two
19  subparts. And the first is whether MGA approved of the proposed
20  stopper solution to meet MGA's demands concerning articulation.
21  And the second part of that is whether MGA ever gave final
22  approval for McDonald's to begin mass production of these dolls.
23          We submit to Your Honor the evidence only supports the
24  conclusion at this stage that MGA approved neither. While these
25  two factual questions are hotly contested, these two ultimate

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 385

Confidential - Attorney's Eyes Only

MGA 0866284

**434**

1  factual questions, the record facts we submit to you that are
2  material to their resolution are undisputed. And they include
3  the following, Your Honor.
4      First, that McDonald's and The Marketing Store knew
5  that MGA had approval rights at all stages. Camphausen
6  testified to that. Pyle testified to that.
7      Second, both parties understood and agreed that MGA --
8  that these dolls would have no waist articulation and limited
9  neck articulation. In fact, McDonald's knew that satisfying
10  MGA's articulation demands was a condition of approval of the
11  dolls. Ms. Pyle, for example, testified that MGA's approval on
12  articulation was a condition of McDonald's use. That's her
13  testimony in the transcript at 134.
14      And she also testified, Your Honor, that McDonald's
15  knew that MGA would never, ever approve a doll with full waist
16  and neck articulation. That's her testimony in the transcript
17  at 132 and 134.
18      This business we heard during the hearing and today at
19  argument about the style guide somehow trumping all of this,
20  Your Honor, I submit is a lawyer's argument. You never heard a
21  single witness from McDonald's or The Marketing Store testify
22  that by virtue that something in the style guide, they felt free
23  to ignore, override, and not abide by MGA's instructions with
24  respect to neck and waist articulation.
25      THE COURT: But the contract says it, paragraph 7-D

**435**

1  says the style guide will govern all uses of the property.
2      MR. O'BRIEN: It says "Licensor shall furnish to
3  McDonald's a style guide which depicts all required uses of the
4  property."
5      THE COURT: So?
6      MR. O'BRIEN: I don't think that's the same thing, Your
7  Honor.
8      THE COURT: Really?
9      MR. O'BRIEN: And what the style guide does, as Mr.
10  Larian testified, was give you examples of art.
11      THE COURT: That's not what it says in the contract.
12      MR. O'BRIEN: How are doing the package --
13      THE COURT: It says uses, all uses of the contract. Go
14  back to your original grant of the license. And the grant is to
15  use the property, exactly the same words used in paragraph 7-D.
16  That's why I brought it up when you guys didn't, I brought it
17  up, because I read that contract. I looked at the style guide,
18  you know, the one that they gave me, which apparently was some
19  version of it, whether it was the actual version or not, but it
20  doesn't really matter, because materially they don't change at
21  all.
22      In fact, at the very beginning of the style guide,
23  Exhibit 135, Plaintiff's 135, and in yours as well, Defendant's
24  117, it has all these legal notices and everything else. I
25  mean, this is an important document to your client. This is

**436**

1  highly confidential. It shouldn't be shown to anybody or
2  anything else. This is meant to be a very important document.
3  And yet these people seem to consider it, you know, to be
4  something altogether different. I don't know why that happens.
5  But the contract is very clear, this is supposed to be the
6  document that's supposed to cover all the uses of the property.
7      MR. O'BRIEN: Well, Your Honor --
8      THE COURT: And it doesn't.
9      MR. O'BRIEN: I'm sorry?
10      THE COURT: And it doesn't. That's why I say your
11  client has absolutely no right, would have no right had it
12  happened, this is a hypothetical, I realize, to say: Well,
13  these dolls should be purple or green or something like that.
14      That would be totally contrary to this style guide,
15  which is the artwork and shows the color of these dolls and the
16  styles of these dolls and everything else. I mean, that's what
17  it is meant to do. I mean, otherwise they would be totally at
18  your mercy. I mean, that wasn't the intent of this contract.
19      MR. O'BRIEN: Well, they're not totally at our mercy,
20  Your Honor, insofar as the law says that a licensor such as MGA
21  in this situation can't exercise approval rights in bad faith.
22  But the law says that is the only limitation on approval rights
23  in a contract like this, that the party act in good faith. And
24  we submit, Your Honor, that there has been no evidence that Mr.
25  Larian or MGA acted in bad faith in exercise of their approval

**437**

1  rights here.
2      Mr. Larian testified that style guide is also used for
3  people putting together jigsaw puzzles and t-shirts and is given
4  to all the licensees for all the licensed products.
5      So I understand the interpretation Your Honor is
6  advancing of 7-D, but I don't think there has been any testimony
7  in the record that anybody construes 7-D to somehow limit the
8  approval rights conferred in the contract or as to be the end
9  all and be all as to what these dolls would look like.
10      Not only did you not hear any testimony --
11      THE COURT: Well, I think if you had put in this style
12  guide "No licensee is to have an articulated waist or neck,"
13  that would have, that would have done it for you. I mean, you
14  would have had it there. But you didn't, your client didn't.
15      MR. O'BRIEN: Nor was there any testimony, Your Honor,
16  that when the parties were going through the approval process
17  what they were doing was sitting down with the style guide in
18  hand and comparing whether or not what was being produced
19  conformed with the style guide.
20      I make that point, Your Honor, because it seems clear
21  from the record that neither party in this case was taking the
22  position that that was the end all and be all in terms of what
23  could be approved here or what could be used here.
24      THE COURT: Well, I tend to agree with you. The people
25  in the field didn't talk to the lawyers, I guess. I don't know.

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 386

Confidential - Attorney's Eyes Only

MGA 0866285

**438**

1  But that's what it says. There is no interpretation of 7-D. It
2  is as plain as a bell. I mean, it's absolutely clear.
3       MR. O'BRIEN: Well, how do you read 7-C, Your Honor?
4  It says we have approval rights at all uses and all stages. Why
5  would --
6       THE COURT: You have to read them together. Read them
7  together. They have to prove it consistent, that's what the
8  contract says to me, they have to prove it consistent with the
9  style guide.
10      So going back to my hypothetical, if they had wanted to
11 mess up McDonald's by saying "We want you to put out a green
12 doll," you know, they would have been within their rights to say
13 no.
14      MR. O'BRIEN: The style guide, Your Honor, provides,
15 for example, that all the dolls will have clothing, not just a
16 jacket, will have multiple clothing to change. The style guide
17 doesn't provide for a hat. All of the McDonald's premiums have
18 hats. I mean, it is clear, Your Honor, that no one, no one was
19 operating under the belief that the style guide was what
20 controlled here.
21
22
23                    *Redacted*
24
25

**439**

1
2
3
4
5
6
7
8
9
10
11
12
13                   *Redacted*
14
15
16
17
18
19
20
21
22
3
24
25

**440**

1       And in that document, Mr. Rupert Fung of The Marketing
2  Store writes to Amy Seibert, quote, "On non-articulated waist
3  issue, please give emphasized to the licensor that the waist
4  will be easily turned at less than one pound torque. Otherwise
5  they may reject on the final product. Thanks."
6       Now, that's back in August, early August of 2002, Your
7  Honor.
8       THE COURT: This is what now, PX what?
9       MR. O'BRIEN: Defendant's Exhibit 32, Your Honor.
10      THE COURT: Okay.
11      MR. O'BRIEN: It's also undisputed, Your Honor, that
12 McDonald's and The Marketing Store repeatedly represented to MGA
13 that the stopper solution would eliminate waist articulation.
14 An example of that admission from McDonald's is the Pyle
15 testimony in the transcript at 136 and also Defendant's Exhibit
16 30, which I'll come back to in a minute.
17      But it's also undisputed, Your Honor, that McDonald's
18 nor The Marketing Store ever shared, ever shared with MGA what
19 they knew to be the limits of the stopper solution. Kathy Pyle
20 testified to that in the transcript at 136.
21      And Ms. Morris testified that The Marketing Store, in
22 fact, never told MGA anything, quote, "remotely like," close
23 quote, what The Marketing Store and McDonald's knew to be the
24 limitations of the stopper. And that's Ms. Morris' testimony in
25 the transcript at 116.

**441**

1       It is also undisputed, Your Honor, that MGA saw several
2  samples of the dolls after MGA was told that the stopper
3  solution would eliminate waist articulation.
4       And it is undisputed that when MGA last sent in
5  approval forms, it did not check the approval box or the running
6  change box on the form.
7       And it is undisputed, Your Honor, that The Marketing
8  Store checked the running change box on those forms next to
9  Ms. Tawil's signature without MGA's authorization or knowledge.
10      And it is undisputed, Your Honor, that checking that
11 box was what was necessary for McDonald's to go to mass
12 production.
13      And finally, it is undisputed that no one from The
14 Marketing Store or McDonald's ever told MGA that McDonald's was
15 going into mass production in mid-December 2002.
16      With these undisputed facts as background, how does the
17 Court resolve the question of whether MGA approved the stopper
18 solutions that's in the dolls that McDonald's mass produced?
19      Your Honor, we submit to you that common sense, if
20 nothing else, tells you that in order for the Court to answer
21 that question, it stands to reason that the Court has to first
22 determine whether MGA knew of the limitations of the stopper.
23 How can MGA be found to have agreed to something without
24 disclosure of the material facts?
25      MGA after all was being told that the stopper would

**JENNIFER COSTALES, CRR, RMR**

Confidential - Attorney's Eyes Only

EXHIBIT 14 PAGE 387

MGA 0866286

**442**

1  eliminate articulation.  "Eliminate" does not mean limit a
2  little bit.  "Eliminate" according to the dictionary, I looked
3  it up, means to get rid of.
4        And Ms. O'Connor, who Mr. Freeborn points to
5  selectively from some of her deposition testimony testified that
6  the way she understood McDonald's representation in that August
7  4 e-mail chain was that is Defendant's Exhibit 30 was that
8  articulation would be gotten rid of.  And that's her deposition
9  testimony at pages 146 to 147.
10       She testifies on those same pages that as a result of
11  McDonald's representations to her, she understood that there
12  would be no movement of any kind.
13       Now, there has been some suggestion, Your Honor, that
14  the stopper really does, in fact, eliminate articulation.  But
15  that's nonsense, Your Honor.  Your Honor has seen the dolls.
16  They are easily overturned.
17       And The Marketing Store made sure that McDonald's
18  understood this.  I would refer you to Ms. Seibert's testimony
19  at pages 164 and '65 of her deposition.  She testifies there
20  that she made sure that McDonald's understood that this stopper
21  could be easily overturned, because she knew it was material
22  information for McDonald's to know.
23       But the problem here, Your Honor, why we're all here is
24  that no one made sure that MGA understood this.  Certainly when
25  MGA was insisting on the elimination of articulation, the fact

**443**

1  that the stopper could be easily overcome to allow full
2  articulation is extremely material information.  But McDonald's
3  and The Marketing Store purposely elected not to disclose that
4  to MGA.  They elected not to disclose what they knew to be the
5  limitations.
6        Ms. Pyle didn't do so even though, according to
7  Ms. Seibert's deposition testimony, Ms. Pyle has represented to
8  The Marketing Store that she would take care of it.  She would
9  tell the licensor at the upcoming August 9 meeting about the
10  limitations of the stopper.  And that's Ms. Seibert's deposition
11  testimony at pages 87 and 88.
12       Nevertheless, Ms. Pyle testified in this courtroom that
13  not at that meeting or at any other time did she share what she
14  knew to be the limitations of this stopper, limitations which
15  The Marketing Store and McDonald's knew that if they were not
16  emphasized to the licensor, the licensor may reject the final
17  product, which is again why we're here.
18       But perhaps worse yet, Your Honor, the very reason
19  McDonald's chose not to tell us about the stopper's limitations
20  was because it could be easily overturned because McDonald's
21  wanted to enhance the play value of the dolls.  That's exactly
22  why we wanted to eliminate articulation, Your Honor.  In other
23  words, they approved the stopper solution for the very reason
24  that they knew we wanted to eliminate the articulation.
25       Under the contract, I submit, Your Honor, it's MGA and

**444**

1  not McDonald's that gets to decide on the play value of these
2  dolls.
3        And Ms. Pyle didn't disclose what she knew, even though
4  The Marketing Store and McDonald's assumed, rightfully so, that
5  the very reason, the very reason MGA was insisting on no
6  articulation was because of concerns over cannibalization of
7  sales.  That's Ms. Seibert's deposition testimony at pages 97
8  and 98.
9
10
11
12
13
14
15
16
17                         *Redacted*
18
19
20
21
22
23
24
25

**445**

JENNIFER COSTALES, CRR, RMR

Confidential - Attorney's Eyes Only

EXHIBIT 14 PAGE 388

MGA 0866287



**446**

*Redacted*

15 　MR. O'BRIEN: There is nothing in the record as to MGA
16 communicating to McDonald's that they wanted to reduce the
17 articulation in order to decrease play value. But as I said a
18 moment ago, their only internal documents assume that the reason
19 we were demanding this limited articulation was to reduce play
20 value to prevent cannibalization of sales.
21 　THE COURT: Show me that document.
22 　MR. O'BRIEN: That's actually Ms. Seibert's deposition
23 testimony at pages 97 and 98. I could read it to you if you'd
24 like?
25 　Beginning on page 97, line 16:

**448**

1 　MR. KRULEWITCH: We object. The evidence showed what
2 it showed. I mean, you heard from Mr. Larian.
3 　THE COURT: I did, I heard from him yesterday. I was
4 surprised to hear that, too. I don't have the transcript.
5 Maybe you do. I don't. But I can tell you.
6 　. Lil' Bratz, he says, let me see, 2003, the Micro Bratz.
7 　MR. FREEBORN: Page 343, Your Honor.
8 　THE COURT: I don't have it.
9 　MR. FREEBORN: Page 343.
10 　THE COURT: I said I don't have it. Nobody gave me a
11 copy.
12 　MR. FREEBORN: Your Honor, I asked him the question:
13 "When did you first introduce the Micro Bratz or Lil'
14 Bratz dolls to the consumer?
15 　"Answer: The Micro Bratz dolls hit retail shelves, I
16 believe somewhere in July of 2002."
17 　MR. O'BRIEN: Well, there is documents from April --
18 　THE COURT: Well, that's my memory.
19 　MR. O'BRIEN: -- internal TMS documents where it is
20 indicated that they understood there was going to be a product,
21 Lil' Bratz 699, and they would be shocked if they were allowed
22 to cannibalize it.
23 　MR. KRULEWITCH: That's not in the record, Judge. We
24 object.
25 　MR. VEITH: It's in our brief, Mr. Krulewitch.

**447**

1 　"I'm asking about the context of the Bratz program.
2 Have you heard the word 'cannibalized' used?
3 　"Answer: Yes, at internal TMS discussions.
4 　"Question: In what context was 'cannibalized' used in
5 internal TMS discussions?
6 　"Answer: At the beginning, around start-up. And other
7 people -- and people were surprised we could copy retail so
8 closely because of the risk of cannibalization that most
9 licensors usually bring up."
10 　THE COURT: Wasn't she talking about the Lil' Bratz
11 that came out after the contract was signed in July? And she
12 was so surprised and very happily surprised when the Lil' Bratz
13 came out, because it's the same size as the McDonald's toy, and
14 she's saying: We never get to make a doll the same size as the
15 real thing, because we always have to make these little dolls
16 for these little bags that they give out with these Happy Meals,
17 and so we always have to reduce the sizes. And here they're
18 coming out with a new doll the same size as ours. That's great
19 for us.
20 　MR. O'BRIEN: Lil' Bratz came out before the contract
21 was signed, Your Honor.
22 　THE COURT: July.
23 　MR. O'BRIEN: No. It came out before then. In fact,
24 there is an April -- it was called Micro Bratz. It had a
25 different name.

**449**

1 　THE COURT: All right. All right. Let's all settle
2 down here. Let's all settle down.
3 　The fact is, and this is what I remember from the
4 testimony and from her deposition, which I read and didn't see
5 it, but I read it very carefully, that she said she was really
6 surprised when they came out. The first she knew about it, I
7 believe, was in July when it hit the shelves, and that she was
8 very happily surprised to see a doll the same size as the Happy
9 Meal doll come out, because it was something that she doesn't
10 always -- that they don't always get a chance to do.
11 　So when they're talking about cannibalizing, they may
12 be talking about the articulation, too, but they're also talking
13 about the size of the doll. That part I'd have to go back and
14 read, and I will.
15 　MR. KRULEWITCH: Judge, for the record also at the
16 start-up point, you'll recall that the dolls were permitted to
17 articulate. I mean, that's a whole different segment that we're
18 talking about when we're talking about cannibalization.
19 　MR. O'BRIEN: Well, if you'll let me read to where I
20 was getting, I'll explain.
21 　My point was, we started all of this, Your Honor, when
22 I said that they knew internally or assumed internally that the
23 reason that Mr. Larian and MGA was insisting on the limited
24 articulation was because he was concerned about cannibalization
25 of sales. And she goes on to say:

JENNIFER COSTALES, CRR, RMR

Confidential - Attorney's Eyes Only

EXHIBIT 14 PAGE 389

MGA 0866288

**450**

1  "Do you recall any more detail about discussions of
2  this concept of cannibalization?
3  "Answer: We discussed it from time to time throughout
4  development. Internally we were speculating on why MGA wanted
5  to eliminate articulation in the waist or limit it in the head.
6  We speculated that was the reason, was a concern of
7  cannibalization."
8  That's on page 98 of her deposition.
9  THE COURT: All right. Go ahead.
10  MR. O'BRIEN: The suggestion here, Your Honor, by MGA's
11  lawyers is that, excuse me, McDonald's lawyers is that MGA
12  should have known of the limitation of the stopper since we got
13  these several round of samples.
14  But surely, Your Honor, that argument can't carry the
15  day when, one, MGA insisted on the elimination of articulation.
16  McDonald's and The Marketing Store knew the stopper could be
17  easily overturned. Internal Marketing Store documents indicate
18  that MGA may disapprove the final product unless the stopper
19  limitations are emphasized to MGA. McDonald's withheld from MGA
20  these limitations, its knowledge about these limitations for the
21  very same reasons. MGA wanted no articulation. And McDonald's
22  continued, continued to represent to MGA that the stopper was
23  eliminating articulation.
24  In other words, Your Honor, how can McDonald's make
25  affirmative misrepresentations to MGA and withhold material

**451**

1  information and then prevail on this point simply because MGA
2  did not on its own discover that those representations were not
3  true? We submit, Your Honor, that such a result would be
4  inequitable and unfair. It would be inequitable and unfair to
5  penalize MGA for failing to discover earlier than it did that
6  MGA had been deceiving it. Such an outcome would in essence
7  reward McDonald's for having been successful in its deception of
8  MGA.
9  MGA's reliance on McDonald's's representations that the
10  stopper would eliminate waist articulation was justified and
11  simply excuses any failure of MGA to discover that deception on
12  their own.
13  You heard a lot of argument from Mr. Freeborn about how
14  Ms. Tawil testified that she was satisfied with the solution to
15  articulation as to August 9th. Well, he didn't give a complete
16  account of that testimony. What she testified to was she was
17  satisfied with their representation that they would eliminate
18  it.
19  The problem is, Your Honor, she believed them. She
20  trusted them. She testified that she didn't test every sample
21  that came across for articulation. There were lots of things
22  that were being examined, eye color, hair. She thought at the
23  end of the day as her experience dictates, she would get final
24  samples and be able to inspect and show to Mr. Larian dolls that
25  incorporated all of their comments and suggestions.

**452**

1  THE COURT: I'm going to have to take about a
2  five-minute break here. I think we could probably all use it.
3  (Recess.)

*Redacted*

**453**

*Redacted*

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 390

Confidential - Attorney's Eyes Only

MGA 0866289

454

1
2
3
4
5
6
7
8
9
10
11
12
13 *Redacted*
14
15
16
17
18
19
20
21
22
23
24
25

456

1  confusion. You've already given final approval. You gave that
2  back on December 2. We checked the box next to your name,
3  Ms. Tawil. Don't you guys understand any of this? Why is she
4  talking about final approval?
5
6
7
8
9
10
11
12
13                                                          ; 2nd?
14
15
16
17
18
19
20
21
22
23
24
25

455

1
2
3
4
5
6
7  *Redacted*
8
9
10
11
12
13
14         And if you look at that e-mail, Defendant's Exhibit 74,
15  it's one of the few I handed up to you, Ms. Camphausen writes in
16  response to an e-mail from Ms. Kagan. And Ms. Kagan says,
17  "Thank you, Julie." That's Ms. Camphausen's first name.
18  "Please advise when we will actually receive actual dolls for
19  final approval."
20         This, if nothing else, tells The Marketing Store that
21  at least MGA believes it has not given final approval. Why else
22  is she asking for samples in order to give final approval on
23  December 11, 2002?
24         But when Ms. Camphausen writes back, she says the thing
25  she says. But did she say: Hey, wait a minute. There is some

457

1
2
3
4
5         *Redacted*
6
7
8
9
10
11
12
13
14
15         So when the samples arrive at the end of January in
16  these polybags, MGA thinks we're finally getting the final
17  samples to sign off on. Lo and behold, they open the bag, and
18  they have got full waist and neck articulation. And I think
19  Your Honor knows the rest of the story.
20
21
22
23
24
25

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 391

Confidential - Attorney's Eyes Only

MGA 0866290

458

460

1 Mr. Larian sincerely believes that the added play value
2 created by the articulation to dolls that already have a fair
3 amount of play value will have a domino detrimental impact on
4 the soaring success of the Bratz brand.  And whether he is right
5 about that or not is not as important as whether he genuinely
6 believes it to be the case.
7  And having listened to Mr. Larian carefully, I dare say
8 the Court cannot question the genuineness, indeed, the passion
9 with which he holds these beliefs.  After toiling in the toy
10 business for 20 years with only modest success, MGA and Mr.
11 Larian have now hit it big with their Bratz.  And Mr. Larian
12 thinks much bigger things are yet to come with Bratz.  That's
13 why he zealously protects and oversees all uses of the brand.
14 The Court should not let McDonald's substitute its judgment here
15 for Mr. Larian's.
16  With respect to McDonald's alleged irreparable harm, as
17 I said a moment ago, I submit that this record shows it is all
18 self-inflicted.  It never got final approval.  It never got
19 approval for its solution to the articulation problem with full
20 disclosure.
21  Moreover, McDonald's will not suffer irreparable harm
22 because it has plenty of inventory on hand for the May 2003 time
23 slot.  Ms. Gross testified that it has on hand 87 million toys,
24 girl specific and gender neutral, and that 32.5 of those are
25 ones for which McDonald's has already secured licensor approval.

459

461

1
2
3
4    *Redacted*
5
6
7
8 Finally, with respect to McDonald's claim of
9 irreparable harm, even if Happy Meal sales in May turn out to be
10 lower than they had expected, McDonald's measures that harm.  It
11 has been measuring it for years.  That is, McDonald's has
12 sophisticated data collection and analysis that quantifies the
13 success of each and every Happy Meals promotion.
14
15
16 Mr. Larian explained to this Court why he was so
17 adamant about articulation.  And if you remember Defendant's
18 Exhibit 26-A, Your Honor, that's an August e-mail exchange
19 internal to MGA.  Mr. Larian was prepared to walk away in
20 August, no questions asked, if McDonald's refused to eliminate    *Redacted*
21 the articulation.  I submit to Your Honor that's also the
22 quintessential proof of materiality.  Too much play value, full
23 neck and waist articulation, threaten to cannibalize sales,
24 especially with a doll that otherwise so much resembles the
25 retail version.

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 392

Confidential - Attorney's Eyes Only

MGA 0866291

462

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Redacted*

*Redacted*

464

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Redacted*

463

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Redacted*

465

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Redacted*

**JENNIFER COSTALES, CRR, RMR**

EXHIBIT 14 PAGE 393

Confidential - Attorney's Eyes Only

MGA 0866292

466

*Redacted*

1
2     "And the reason you don't believe they will result in
3  cannibalization is why?"
4         She said, "I think I already answered that. But just I
5  think girls will want to collect everything Bratz."
6         So there is not going to be any injury to them.
7         THE COURT: Her former boss apparently disagrees with
8  her.
9
10        MR. FREEBORN: He's the only one in the company who
11  does. There is no other witness in that company who says they
12  feel that way. And when the decision was made to insist on
13  non-articulation, that decision was made by Mr. Larian himself
14  and no one else.
15
16
17
18
19
20                     *Redacted*
21
22
23
24
25

468

*Redacted*

467

*Redacted*

469

*Redacted*

JENNIFER COSTALES, CRR, RMR

Confidential - Attorney's Eyes Only

EXHIBIT 14 PAGE 394

MGA 0866293

470

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

472

1  MR. O'BRIEN: This is tighter than some of the other
2  ones they've given us.
3  THE COURT: All right. Then let me get one of the
4  pre-productions, too.
5  MR. O'BRIEN: Actually I didn't turn this very hard,
6  Judge. It's all the way around.
7  THE COURT: She's no longer a virgin, I guess, huh?
8  Give it to Mr. Freeborn. Give it to Mr. Freeborn.
9  It's getting late, folks. All right.
10  MR. KRULEWITCH: Judge, those pre-productions are our
11  only ones though, so --
12  THE COURT: I'm going to put it back.
13  MR. KRULEWITCH: No, no. I just --
14  THE COURT: I have taken Jade Nightlife out. Final
15  approval, it says "Final approved model."
16  MR. FREEBORN: Your Honor, we'd suggest you take out
17  one that is Yasmin so you can see one that has the same body
18  shape.
19  THE COURT: Well, while I've got Jade here --
20  MR. FREEBORN: All right.
21  THE COURT: -- because I've got another little Jade,
22  and I'm sort of fond of her.
23  I'm turning the neck. It is basically the same as the
24  other one. And the waist, you know, I could overcome it. I
25  don't know if it's a pound. I'm not an engineer. But it is

471

1
2
3  *Redacted*
4  THE COURT: May the record reflect that my trusty
5  assistant here has given me the box of dolls. I'm picking one
6  up, it's marked 242, at random. It is Yasmin. Everybody see
7  it?
8  If some of my childhood friends could see me playing
9  with dolls now, they would never believe it.
10  This is not pre-production, is it?
11  MR. FREEBORN: No. That is a production sample.
12  THE COURT: That's actual production?
13  MR. FREEBORN: Yes, sir.
14  THE COURT: All right. I'm going to take Yasmin out of
15  her little bed, and I'm going to turn it. The head turns 180
16  degrees. And there is a definite resistance at about that
17  point. And then I could overcome that resistance very easily.
18  The waist, the waist is very stiff. The waist is very
19  stiff. Let me give it to Mr. O'Brien and let him.
20  Now, don't turn it 360. Just test the resistance and
21  then give it to Mr. Freeborn.
22  We have a visiting judge here from Seattle who is in
23  the jury box. Maybe we could swear him in as an expert neutral
24  and let him test it.
25  MR. KRULEWITCH: We have 36 million of them, Judge.

473

1  fairly stiff, pretty much like the one you have there, Yasmin.
2  And but it can be overcome pretty easily.
3  Do you want me to find a Yasmin pre-production?
4  MR. FREEBORN: Your Honor, we're satisfied. To the
5  extent the Court wants to continue, that's fine with us, too.
6  THE COURT: Well, it's more fun than reading some of
7  those cases. Well, this --
8  MR. KRULEWITCH: There is two different Yasmins, Judge.
9  THE COURT: Yes. Is this a pre-production here?
10  MR. KRULEWITCH: Yes.
11  MR. FREEBORN: Yes, Your Honor.
12  MR. KRULEWITCH: There are two from Creata and six from
13  The Marketing Store, so they're in different types of bags.
14  They do not have the correct polybag. There is a little receipt
15  in them that shows when they were produced.
16  THE COURT: Well, I don't know who this is, 238.
17  Sasha.
18  Can I have that back, please?
19  MR. FREEBORN: Sure.
20  THE COURT: I'm just going to do one more here, Sasha.
21  This one the head seems to turn a lot more easily.
22  MR. KRULEWITCH: That's the pre-production sample.
23  THE COURT: The pre-production. The waist is pretty
24  stiff, but about the same as the others.
25  MR. FREEBORN: So what would that suggest is that --

JENNIFER COSTALES, CRR, RMR



EXHIBIT 14 PAGE 395

MGA 0866294

474

1  THE COURT: Do you want to see it, anybody?
2  MR. KRULEWITCH: We'd ask Mr. O'Brien not to break this
3  one, Judge. This is our only pre-production sample.
4  MR. O'BRIEN: I didn't break it.
5  THE COURT: I'm sure he will be careful.
6  MR. O'BRIEN: The neck turns all the way around.
7  THE COURT: The neck doesn't have any — the neck looks
8  like it has been played with.
9  MR. FREEBORN: So here is an example of where the
10  pre-production sample if approved by MGA would have indicated to
11  us that the production samples as long as they are stiffer than
12  that are okay.
13  THE COURT: Well, I know your argument. Okay.
14  MR. FREEBORN: Your Honor, the final thing I would say
15  has to do with these arguments about unclean hands and the like.
16  It's no coincidence that MGA first communicated to
17  McDonald's its insistence on non-articulation in July of 2002
18  when they were beginning to market the Micro Bratz or the Lil'
19  Bratz dolls, which did not exist at the time they got us signed
20  up on this promotion. This is an insistence that is motivated
21  not by a good faith belief that there will be cannibalization of
22  the full-size dolls that we licensed, but, rather, a new product
23  that they began marketing after our contract was signed.
24  THE COURT: But obviously began planning long before.
25  MR. FREEBORN: Perhaps they did. But they didn't tell

475

1  us anything about that. And so it's in effect a bait and switch
2  on their part. And it does constitute what we think is a bad
3  faith insistence on this non-articulation. Nevertheless, we
4  agreed to do it.
5
6
7
8
9
10
11
12
13
14
15  *Redacted*
16
17
18
19
20
21
22
23
24
25

476

1
2  *Redacted*
3
4
5  And at the end of the day, if those ended up being the
6  only options with full disclosure to MGA, the waist articulation
7  could be easily or the stopper could be easily overcome, he had
8  another option available to him, the one he was prepared to
9  exercise when McDonald's was pushing back and resisting on the
10  articulation point, and that is to walk away. He would have
11  been within his rights to do that.
12  There has been some more testimony and Your Honor has
13  pointed out that — excuse me — more argument, and Your Honor
14  has pointed out that Lil' Bratz was not introduced into the
15  market until July. Well, Ms. Selbert testified that back in
16  April of 2002, a period she called the start-up of all this,
17  they were aware that Lil' Bratz was coming into the marketplace.
18  Two more points. Mr. Freeborn features Ms. O'Connor's
19  testimony on cannibalization. I think the complete answer to
20  that is suggested in a comment that Your Honor made that it
21  really didn't matter what her views were. The CEO and owner of
22  the company, who has 20 years of experience in the toy business
23  versus her three has a dramatically different view, and he had
24  the final say so.
25  And, finally, Your Honor, we heard some more argument

477

1  about the when question, when did we tell them about
2  articulation. And I thought we had cleared that up and put that
3  matter to bed.
4  As Ms. Pyle testified under oath, it didn't matter one
5  whit when we told them, provided we told them before production,
6  because they had to agree to it under the terms of the license.
7  Thank you, Your Honor.
8
9
10
11
12
13
14
15
16  *Redacted*
17
18
19
20
21
22
23
24
25

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 396

Confidential - Attorney's Eyes Only

MGA 0866295

**478**

```
 1
 2
 :
 4
 5
 6
 7
 8
 9
10
11            Redacted
12
13
14
15
16
17
18
19
20
21
22
23        But the other point, Your Honor, is they say they
24   didn't make any change after approval of pre-production.  That's
25   a little disingenuous, because when we approve pre-production,
```

**480**

```
 1   If those comments had been incorporated.  The e-mail before that
 2   from Ms. Tawil says "There shall be no waist and neck
 3   articulation."
 4        THE COURT:  Are you telling me none of your people took
 5   these little critters out of the bags and looked at them up
 6   close?
 7        MR. O'BRIEN:  They looked at them up close for a lot of
 8   things other than neck and waist articulation, Your Honor.
 9        THE COURT:  But if waist and neck articulation were so
10   important to them, wouldn't that be one of the first things they
11   would do?
12        MR. O'BRIEN:  The testimony has been that they weren't
13   testing for that, Your Honor.
14
15
16
17
18
19
20
21
22
23
24
25
```

**479**

```
 1   we'd had a representation made to us that the neck and waist
 2   articulation was going to be eliminated.  That representation
 3   was untrue.
 4        What we approved, if we approved anything, was a doll
 5   that did not have full articulation at the waist and did not
 6   have full articulation at the neck.  So maybe it's a matter of
 7   semantics that —
 8        THE COURT:  So how do you get around the item in that
 9   November 29th e-mail that says "Yasmin Nightlife okay as
10   submitted"?
11        Ms. Seibert said:  I took that to mean that doll didn't
12   have to be changed at all, nothing.  It was okay just as it is
13   without any other changes.
14        And that doll, as we just saw, has the stopper, and you
15   can turn the waist.  I think you did it yourself.
16        MR. O'BRIEN:  Because we weren't checking for the
17   articulation, because we assumed we were going to get final
18   production samples that eliminated the articulation.
19        THE COURT:  Well, apparently somebody looked at Yasmin
20   Nightlife and thought it was just fine.
21        MR. O'BRIEN:  The testimony was, Your Honor, if you
22   look at that e-mail, too, they're talking about particular
23   comments that are being responded to, eyelash, hair.  And what
24   the parties were doing on each and every case was responding to
25   the comments that had been submitted the last time around to see
```

**481**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13            Redacted
14
15
16
17
18
19
20
21
22
23
24
25
```

JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 397

Confidential - Attorney's Eyes Only

MGA 0866296



JENNIFER COSTALES, CRR, RMR

EXHIBIT 14 PAGE 398

Confidential - Attorney's Eyes Only

MGA 0866297

*Redacted*

EXHIBIT 14 PAGE 399

Confidential - Attorney's Eyes Only

MGA 0866298

*Redacted*

EXHIBIT 14 PAGE 400

Confidential - Attorney's Eyes Only

*Redacted*

EXHIBIT 14 PAGE 401

Confidential - Attorney's Eyes Only

MGA 0866300

*Redacted*

Confidential - Attorney's Eyes Only

EXHIBIT 14 PAGE 402

MGA 0866301

*Redacted*

EXHIBIT 14 PAGE 403

Confidential - Attorney's Eyes Only

MGA 0866302

*Redacted*

EXHIBIT 14 PAGE 404

Confidential - Attorney's Eyes Only

MGA 0866303

*Redacted*

EXHIBIT 14 PAGE 405

Confidential - Attorney's Eyes Only

MGA 0866304

*Redacted*

EXHIBIT 14 PAGE 406

Confidential - Attorney's Eyes Only

MGA 0866305

*Redacted*

Confidential - Attorney's Eyes Only

EXHIBIT  H  PAGE 407

MGA 0866306

*Redacted*

EXHIBIT 14 PAGE 408

Confidential - Attorney's Eyes Only

MGA 0866307

*Redacted*

EXHIBIT 14 PAGE 409

Confidential - Attorney's Eyes Only

MGA 0866308

*Redacted*

EXHIBIT 14 PAGE 40

Confidential - Attorney's Eyes Only

MGA 0866309

*Redacted*

EXHIBIT 14 PAGE 41

Confidential - Attorney's Eyes Only

MGA 0866310

*Redacted*

EXHIBIT 14 PAGE 42

Confidential - Attorney's Eyes Only

MGA 0866311

*Redacted*

JENNIFER COSTALES, CRR, RMR

*Redacted*

EXHIBIT 4 PAGE 43

Confidential - Attorney's Eyes Only

MGA 0866312

**EXHIBIT 15**

,IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| McDONALD'S CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| MGA ENTERTAINMENT, INC. f:k a | ) | |
| ABC INTERNATIONAL TRADERS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>DECLARATION OF KATHY PYLE</u>

*Redacted*

4.     On April 19, 2002, months before the License was even finalized, representatives from McDonald's, its toy design and manufacturing agency, The Marketing Store Worldwide ("TMSW"), and MGA had a conference call to discuss the broad parameters of a "Bratz" doll line Happy Meal promotion.

EXHIBIT 15 PAGE 44

Confidential - Attorney's Eyes Only

MGA 0866703

5.   It was necessary to start the design process as soon as possible so that McDonald's would have sufficient time to design and implement the promotion for May 2003.

6.   On June 26, 2002, TMSW presented MGA with the preliminary sculpt/fashion review. At that meeting, MGA provided numerous comments regarding the models and proposed designs. As of that date, all eight "Bratz" dolls were to feature articulation (i.e., movement) of the head, arms, and waist.

7.   Subsequently, MGA sent TMSW an e-mail requesting that the dolls have no waist articulation. McDonald's was concerned that this would reduce the "play value" of the premiums but, at MGA's request, McDonald's investigated options for addressing MGA's concerns that were available given the late stage of the design process.

8.   In response to MGA's request that the dolls have no waist articulation, McDonald's proposed two possible alternatives:  (1) manufacturing the dolls using ABS plastic; or (2) incorporating a "stopper" in each doll.

9.   MGA rejected the use of ABS plastics and later agreed to the "stopper" approach in an e-mail dated August 5, 2002.  (See Ex. A.)

10.   MGA has recently refused to honor its obligation to review, comment on, and approve point-of-purchase displays and other promotional materials, claiming that there are premium issues.

11.   McDonald's has expended considerable time, money, and resources to develop the dolls in conformity with MGA's requests, including the sheen of a doll's skin color to the length of her eyelashes.

EXHIBIT _15_ PAGE _415_

Confidential - Attorney's Eyes Only                                      MGA 0866704

12.    The "Bratz" point-of-purchase displays must be reviewed, approved, and submitted no later than February 24, 2003 in order to be available by April 2003.

13.    Advertisements require three to four months to develop and finalize.

I declare under penalty of perjury, as provided in 28 U.S.C. Section 1746, that the foregoing is true and correct.  Executed on February 10, 2003.

Kathy Pyle

Kathy Pyle
Director of Retail Execution
McDonald's Corporation

Confidential - Attorney's Eyes Only

EXHIBIT 15 PAGE 414

MGA 0866705

**EXHIBIT 16**