1    28.   Bryant also made affirmative misrepresentations to Mattel
2  management and employees immediately before his departure from Mattel on
3  October 20, 2000.  For example, during his last few weeks at Mattel, Bryant told
4  his co-workers and supervisors that he was going to leave Mattel for "non-
5  competitive" pursuits.  Bryant's representations to his supervisors and his co-
6  workers were false.  Bryant knew at the time that those representations were false
7  and made those false statements to conceal from Mattel the fact that he was already
8  working with MGA and that he had contracted with MGA to assign Bratz works to
9  MGA and to provide design and development services to MGA, a Mattel
10 competitor.

11    29.   As a result of the efforts of Bryant and other Mattel employees
12 working on Bratz (which were done without Mattel's knowledge), the Bratz dolls
13 had been designed and were far along in development during the time that Bryant
14 was employed by Mattel and prior to the time that Bryant left Mattel on
15 October 20, 2000.  Not only did Bryant create and develop designs for the dolls as
16 well as other aspects of the products such as their fashion accessories during the
17 time he was employed by Mattel, but MGA showed Bratz prototypes and/or
18 product to both focus groups and retailers in November 2000, less than three weeks
19 after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these
20 meetings while Bryant was still employed by Mattel.

21    30.   Bryant and MGA employees also repeatedly and continuously
22 communicated with employees of MGA Entertainment (HK) Limited on subjects
23 such as design and manufacturing of Bratz.  On information and belief, at all
24 material times, MGA Entertainment (HK) Limited has maintained regular and
25 continuous contacts with persons in the County of Los Angeles; it regularly has
26 shipped products that it manufactures, or that are manufactured for it, to the County
27 of Los Angeles; and such products have been distributed to retailers and sold to
28 consumers in the County of Los Angeles.   EXHIBIT 2   PAGE 57

209/2035941.2

-34-

AMENDED ANSWER AND COUNTERCLAIMS

31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001.  By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32.   Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world.  Mattel is informed and believes that MGA also licenses Bratz to third parties.  Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto.  MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

33.   Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel.  Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

34.   Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom.  Counter-defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the Counter-defendants.

EXHIBIT __2__ PAGE __58__

1    35.  Bryant and MGA deliberately and intentionally concealed facts

2    sufficient for Mattel to suspect or to know that it was the true owner of Bratz.

3    Their acts of concealment include, but are not limited to, concealing the fact that

4    Bryant conceived, created, designed and developed Bratz while employed by

5    Mattel, including by tampering with and defacing documents which showed that, in

6    fact, Bryant was a Mattel employee while he was working for and with MGA;

7    concealing the fact that Bryant worked with and assisted MGA during the time

8    Bryant was employed by Mattel and was compensated for that assistance;

9    concealing that Bryant was providing consulting services to MGA; concealing

10   Bryant's role in Bratz by falsely claiming that Larian and others were the creators

11   of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among

12   other things, filing fraudulent registrations and/or amendments to registrations with

13   the United States Copyright Office claiming MGA as the author of Bratz as a work

14   for hire and altering relevant dates on such documents to further obscure the true

15   facts of when the works were created.

16   36.  Because of Bryant's and MGA's acts of concealment and Bryant's

17   misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had

18   worked with MGA, or assisted MGA, while he still employed by Mattel until

19   approximately November 24, 2003, when Mattel received, through an unrelated

20   legal action, a copy of Bryant's agreement with MGA which showed that the date

21   of Bryant's agreement with MGA predated Bryant's departure from Mattel.  It was

22   then, as a result, that Mattel learned for the first time that Bryant had secretly aided,

23   assisted and worked for and with MGA while employed at Mattel and in violation

24   of his Mattel Employment Agreement.  Specifically, Bryant's agreement with

25   MGA obligated Bryant to provide product design services to MGA on a "top

26   priority" basis.  Bryant's agreement with MGA also provided that Bryant would

27   receive royalties and other consideration for sales of products on which Bryant

28   provided aid or assistance; that all works and services furnished by Bryant under

EXHIBIT  2   PAGE 59

-36-

1   the agreement, including those he purportedly provided while still a Mattel

2   employee, purportedly would be considered "works for hire" of MGA; and that all

3   intellectual property rights to preexisting works by Bryant, including Bratz designs,

4   purportedly were assigned to MGA.

5   **IV.   MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6          37.   On information and belief, in or about late 2003 or early 2004,

7   MGA decided to open business operations in Mexico.  Faced with the difficult task

8   of developing an overall strategy for expanding into a market in which it had only a

9   nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10  and business information for the Mexican market and materials related to Mattel's

11  worldwide business strategies.  As detailed below, MGA and Larian approached

12  three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13  steal Mattel's most sensitive business planning materials, and then hired them to

14  assist in establishing and running MGA's new Mexican subsidiary.

15         **A.     MGA Hires Three Senior Mattel Employees in Mexico**

16         38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior

17  Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18  confidence.  He was employed at Mattel Mexico from April 1, 1997 until April 19,

19  2004.  His duties included short, medium and long-term marketing planning,

20  generating product sales projections, and assisting in creation of the media plan.  In

21  his position, Machado had access to highly confidential and sensitive marketing

22  and product development information.  Machado had an employment agreement

23  with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24  information.  Mattel's policies also required Machado to protect Mattel's

25  proprietary information and not to disclose it to competitors.

26         39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing

27  Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28  She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

EXHIBIT   2   PAGE  60

1   Like Machado, her duties included short, medium and long-term marketing

2   planning, generating product sales projections, and assisting in creation of the

3   media plan.  In her position, Trueba had access to highly confidential and sensitive

4   marketing and product development information.  Trueba had an employment

5   agreement with Mattel in which she agreed to maintain the confidentiality of

6   Mattel's protected information.  Mattel's policies also required Trueba to protect

7   Mattel's proprietary information and not to disclose it to competitors.

8         40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing

9   Manager with Mattel Mexico, a position of trust and confidence.  He was employed

10   at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was

11   responsible for ensuring that point-of-sale promotions were carried out, analyzing

12   the results of such promotions, negotiating promotion budgets, and generally

13   managing promotional activities.  Vargas also had access to highly confidential and

14   sensitive marketing and product development information.  Vargas had an

15   employment agreement with Mattel in which he agreed to maintain the

16   confidentiality of Mattel's protected information.  Mattel's policies also required

17   Vargas to protect Mattel's proprietary information and not to disclose it to

18   competitors.

19         41.   Beginning in late 2003 or early 2004, Machado, Trueba and

20   Vargas began planning to leave Mattel Mexico to join MGA.  In connection with

21   that plan, and with the encouragement of Larian and other MGA officers operating

22   in the United States, they began accessing, copying and collecting proprietary

23   Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and

24   Vargas each resigned their positions with Mattel, effective immediately.  They

25   stated that they had been hired by a Mattel competitor, but refused to identify that

26   competitor.  In fact, they had been offered and accepted employment by MGA to

27   establish and run MGA's new operation in Mexico.

EXHIBIT 2   PAGE 61

28

1    **B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade**

2               **Secret Marketing and Sales Documents for MGA's Benefit**

3          42.    Following these resignations, Mattel discovered that Machado,

4  Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA

5  personnel, including Larian, for over three months prior to their resignations.  The

6  primary vehicle for these communications in furtherance of their "plot" was an

7  America Online e-mail account with the address <plot04@aol.com>.  On

8  information and belief, during this time, Machado, Trueba and Vargas supplied

9  Larian with certain Mattel confidential and proprietary information in order to

10  prove their value to MGA and to improve their negotiating position vis-à-vis their

11  respective employment contracts with MGA.

12        43.    In March 2004, Machado, Trueba and Vargas were making plans

13  to travel from Mexico to Los Angeles to meet with MGA personnel in person prior

14  to resigning their positions at Mattel.  Also, by at least March 3, 2004, Machado,

15  Trueba and Vargas were discussing with MGA personnel, including Larian,

16  specific details regarding setting up MGA offices in Mexico City.  On information

17  and belief, prior to their resignations, Larian and others at MGA directed Machado,

18  Trueba and Vargas to steal virtually all Mattel confidential and proprietary

19  information that they could access and bring it with them to MGA.  This was

20  reflected in, among things, e-mail messages that Mattel had discovered after

21  Machado, Trueba and Vargas had resigned.  For example, on March 22, 2006,

22  approximately one month before they resigned, Machado, Trueba and Vargas wrote

23  an e-mail message from the <plot04@aol.com> e-mail account addressed to

24  Larian, MGA's General Manager Susan Kuemmerle and another MGA officer

25  Thomas Park.  In that e-mail message, Machado, Trueba and Vargas sought to

26  prove their value in this endeavor to MGA by writing: "Attached you will find our

27  analysis for future discussion.  We will be available during the nights of the week

28  after 16:30 Los Angeles time . . . ."  In another e-mail message, showing that the

EXHIBIT 2   PAGE 62

209/2035941.2

1  participants intentionally sought to maximize the damage to Mattel from their

2  conduct, Kuemmerle wrote to Larian and Park:  "Gustavo, Mariana and Pablo want

3  to resign (all at the same time, and you can believe my smile!) next Wednesday."

4        44.    Beginning on April 12, 2004, a week before his resignation and

5  after numerous communications and meetings with Larian and other MGA

6  personnel, Machado began transferring additional Mattel confidential and

7  proprietary information to a portable USB storage device (also know as a "thumb

8  drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the

9  last business day before he gave notice, Machado copied at least 70 sensitive

10  documents to the portable USB storage device.

11        45.    Starting on April 12, 2004, Vargas also copied a host of

12  confidential and proprietary materials to a portable USB storage device, including

13  sales plans, sales projections and customer profiles.

14        46.    On April 16, 2004, Trueba also copied Mattel confidential and

15  proprietary information to a portable USB storage device connected to her Mattel

16  computer.

17        47.    With full knowledge that she was going to leave Mattel for a

18  competitor, Trueba also took steps to increase further her access to Mattel's

19  confidential information shortly before her resignation.  For example, just four days

20  before leaving, Trueba went out of her way to seek to attend a meeting at which

21  Mattel personnel analyzed BARBIE programs for the United States, Canada and

22  South America.  Two days before her resignation, she contacted both a Mattel

23  employee located in El Segundo, California and Mattel's advertising agency to

24  request updated confidential information about advertising plans for BARBIE.  On

25  information and belief, Trueba acted at the direction of MGA and Larian and did so

26  in order to obtain further information that would allow MGA to obtain unfair

27  competitive advantage over Mattel.

EXHIBIT  2    PAGE  63

28

48. Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere. They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49. The stolen data was not limited to the Mexican market. The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world. Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo. Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy. On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50. MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico. In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

1   market share by 90 percent over the prior year. This increase came at the expense

2   of Mattel, which lost market share during 2004 in Mexico and was forced to

3   increase its advertising and promotional spending to offset further losses.

4       51.   Machado, Trueba and Vargas attempted to conceal their

5   widespread theft of Mattel's proprietary information. For example, Machado ran a

6   software program on his Mattel personal computer in an attempt to erase

7   information, including information that would reveal the addresses to which he had

8   sent, or from which he had received, e-mail messages. On information and belief,

9   for the same purpose Machado also damaged the hard drive of the personal

10  computer that he used at Mattel.

11      52.   On information and belief, on April 19, 2004, immediately after

12  Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

13  to Los Angeles to meet with MGA personnel, including Larian, in person.

14      53.   Mattel notified Mexican authorities about the theft of its trade

15  secret and confidential information. On October 27, 2005, the Mexican Attorney

16  General Office obtained a search warrant from the Mexican Federal Criminal

17  Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities

18  found and seized from MGA's offices both electronic and paper copies of a large

19  number of documents containing Mattel trade secrets, including those that Mattel

20  discovered through its forensic investigations, plus many others that Mattel had not

21  known had been stolen.

22      54.   Based on Machado's "performance" in Mexico, Isaac Larian

23  subsequently promoted Machado and he was transferred to MGA's main office in

24  Van Nuys, California. On information and belief, Machado currently resides in the

25  County of Los Angeles, California.

26

27                          EXHIBIT  2   PAGE 65

28

V.    **MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.    On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.    In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
> We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

EXHIBIT 2   PAGE 66

209/2035941.2

-43-

1      information is not likely to be kept secret, such as planes,

2      restaurants and elevators.  The obligation to preserve confidential

3      information continues even after employment ends.

4   The Code of Conduct applied to Brawer and required that he meet his obligations

5   under the Code of Conduct.

6      57.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7   President position over customer marketing, a position of trust and confidence.   In

8   his executive position, Brawer was provided access to information that was both

9   sensitive and confidential, including, but not limited to, detailed information related

10  to development, manufacture, marketing, pricing, shipping, and performance of

11  Mattel's then-current and anticipated future product lines, and other confidential

12  business plans between Mattel and its most significant retail customers.

13     58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14  Human Resources, asked Brawer whether he was discussing potential employment

15  with MGA.  Brawer denied that he had been in contact with MGA and represented

16  that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17  its employees, including Brawer, the importance of protecting Mattel's confidential

18  and proprietary materials and information.

19     59.   On March 18, 2004, in response to a survey from the President of

20  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22  protection of it's [sic] intellectual property," reflecting Brawer's clear

23  understanding that Mattel required its proprietary information to be kept

24  confidential.

25     60.   In April 2004, Mattel promoted Brawer to Senior Vice

26  President/General Manager.  The General Manager position also is an executive

27  position of trust and confidence.  The role of a General Manager is to lead a cross-

28  functional "Customer Business Team."  Each General Manager is accountable for a

EXHIBIT  2   PAGE 67

-44-

1  strategic partnership with a key Mattel retailer, covering all aspects of the business,

2  including both traditional toy sales and retail development of licensed products.

3         61.   In or about late May 2004, Brawer began performing General

4  Manager duties, working with one of Mattel's major retail customer accounts.

5  Thereafter, Brawer began receiving information related not only to the Senior Vice

6  President, Customer Marketing position that he still formally held, but also began

7  receiving detailed information related to his role as General Manager.  Brawer

8  began requesting and analyzing detailed information related to Mattel and its four

9  key retail accounts.

10         62.   On September 15, 2004, Brawer left work at noon for observance

11  of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders

12  and other materials.  Several hours after his departure, Brawer instructed his

13  assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers

14  and to provide it to him, falsely claiming he needed it for a meeting

15         63.   On September 17, 2004, Brawer returned to Mattel and

16  immediately informed his supervisor that he was leaving Mattel, effective October

17  1, 2004, to work for competitor MGA.

18         64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer

19  reminding him of his continuing obligation to preserve the confidentiality of

20  Mattel's proprietary information and trade secrets not only through October 1,

21  2004, but continuing beyond the termination of his employment.

22         65.   At his exit interview on September 29, 2004, Mattel reminded

23  Brawer that he had ongoing duties of confidentiality to Mattel, even after the

24  termination of his employment.  Brawer was given a copy of his Original

25  Confidentiality Agreement, which he had signed on April 22, 1996, and another

26  copy of the Code of Conduct.  During the exit interview, however, Brawer noted

27  that he had not signed the Code of Conduct, which he intended and Mattel

28  understood to mean that Brawer believed he was not bound by Mattel's policy

EXHIBIT 2 PAGE 68

1    because he had not signed it.  Brawer was unwilling to complete or sign the form

2    that sought to confirm that Brawer understood his ongoing obligations under the

3    Code of Conduct, which included the obligation to preserve the confidentiality of

4    Mattel's proprietary and trade secret information.

5            66.    On October 1, 2004, Brawer's final day of employment with

6    Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7    Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8            67.    Upon joining MGA, Brawer became its Executive Vice-

9    President of Sales and Marketing.  In that role he was responsible for MGA's sales

10   worldwide.  As part of those responsibilities, Brawer had and continues to have

11   responsibility for MGA's accounts with the same retailers that he worked with

12   while at Mattel.

13           68.    Brawer represented during his Mattel exit interview that he had

14   returned all proprietary information to Mattel.  That representation was false.   On

15   information and belief, Brawer removed proprietary and trade secret information

16   from Mattel that he did not return.  Mattel is informed and believes that Brawer did

17   not return to Mattel, for example, the information contained in his contacts file.

18   The contacts file included contact information for Mattel customers, most notably

19   TRU, and extensive contact information for Mattel employees, including titles, e-

20   mail addresses and telephone numbers.

21           69.    Mattel has recently learned that Brawer has been using that

22   contact information on a regular basis, including within recent months.  Since

23   leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

24   and by electronic mail.  Based on his knowledge of Mattel's operations and the

25   roles of certain Mattel employees, he has targeted certain Mattel employees who

26   have broad access to Mattel proprietary information in an effort to induce and

27   encourage them to join MGA and to steal or otherwise wrongfully misappropriate

28   Mattel confidential information and trade secrets.  Brawer has done so by

EXHIBIT  2  PAGE  69

-46-

1  promising these Mattel employees salaries 25 percent or more higher than they earn

2  at Mattel and stating to them that they should not be concerned by legal action

3  taken by Mattel to protect its trade secrets and its rights because such claims are

4  hard to prove and easy to defeat.

5  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6         70.  In an effort to increase its market share and sales in Canada and

7  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,

8  projects, advertising and strategy, not only for Canada, but the United States and

9  the rest of the world.

10         71.  Janine Brisbois was a Director of Sales for the Girls Division in

11  Canada.  Mattel hired her as a National Account Manager in August 1999.  When

12  she was hired as a Mattel employee, Brisbois agreed that she would preserve and

13  would not disclose Mattel's proprietary or confidential information.  For example,

14  Brisbois agreed:

15        You must keep Mattel's Proprietary Information confidential,

16        and you may only use or disclose such information as necessary

17        to perform your job responsibilities in accordance with Mattel

18        policies.  Your obligation to keep Mattel's Proprietary

19        Information confidential will continue even after any termination

20        of your employment with your employer.

21        . . .

22        Mattel takes steps to maintain the secrecy and confidential nature

23        of Mattel's Proprietary Information and, if a competitor

24        discovered Mattel's Proprietary Information, it could

25        significantly damage Mattel and your Employer.

26         72.  While with Mattel, Brisbois had responsibility for Mattel's

27  account with TRU and later had responsibility for Mattel's Wal-Mart account.  In

28  her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

-47-

EXHIBIT  2    PAGE  70

1  Mattel confidential and proprietary information regarding Mattel's future product

2  lines, advertising and promotional campaigns and product profitability.

3        73.   On September 26, 2005, Brisbois resigned from Mattel to take a

4  position as Vice President of Sales at MGA. Mattel is informed and believes that

5  in that position Brisbois has responsibility for MGA's accounts with both TRU and

6  Wal-Mart. During Brisbois' exit interview she was specifically asked whether she

7  was "taking anything." Brisbois responded, "No." Both during and after her exit

8  interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's

9  confidential and proprietary information.

10        74.   Mattel is informed and believes that Brisbois spoke with Isaac

11  Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he

12  called Ms. Brisbois at her home. Mattel subsequently learned that on the same day

13  that she spoke with Mr. Larian and four days before she resigned, Brisbois copied

14  approximately 45 Mattel documents on to a USB or "thumb" drive with the volume

15  label "BACKPACK." On information and belief, Brisbois removed the thumb

16  drive from Mattel Canada's office by concealing it in her backpack or gym bag the

17  last time that she left that office. These documents contained Mattel trade secret

18  and proprietary information, and included:

19      •   a document containing the price, cost, sales plan and quantity of every

20          Mattel product ordered by every Mattel customer in 2005 and 2006;

21      •   the BARBIE television advertising strategy and information concerning

22          sales increases generated by television advertisements;

23      •   competitive analysis of Mattel vis-à-vis its competitors in Canada;

24      •   an analysis of Mattel's girls business sales beginning in 2003 and

25          forecasts through 2006;

26      •   profit and loss reviews for Mattel's products being sold in Wal-Mart,

27          including margins and profit in not only Canada, but in the United

28          States and Mexico; and      EXHIBIT _2_ PAGE _71_

209/2035941.2              -48-

1          • a document containing the product launch dates and related advertising

2          for all Mattel new products between Fall 2005 and Spring 2006.

3          75.    After Mattel discovered that Brisbois had copied these sensitive

4    documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

5    Canadian law enforcement authorities recovered from Brisbois a thumb drive with

6    the volume label "BACKPACK" containing the documents that Brisbois had

7    copied from Mattel's computer system.  Mattel later learned that while she was

8    working as a Vice President of Sales at MGA, Brisbois accessed and modified

9    documents on that thumb drive.

10          76.    After joining MGA, Brisbois repeatedly traveled to MGA's

11   offices in Van Nuys, California and met with Larian and Brawer.  In February,

12   2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City

13   offices and that at least three MGA employees were under criminal investigation,

14   MGA nonetheless issued a press release trumpeting its 2005 performance, with

15   Larian himself concluding, "Our international teams in Mexico and Canada have

16   done a fantastic job."

17   **VII.  MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**

18   **JOINT MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**

19   **FOR THE BENEFIT OF MGA**

20          77.    In the past few years, MGA has hired directly from Mattel's

21   United States operations at least 25 employees, from Senior Vice-President level to

22   lower level employees.  On information and belief, many of these employees were

23   specifically targeted and recruited by MGA, including by Larian and Brawer, based

24   on the Mattel confidential and proprietary information they could access.  Many of

25   these employees had access to information that Mattel considers to be highly

26   proprietary and confidential.  Mattel believes that some of those former Mattel

27   employees may be observing their obligations not to misappropriate, disclose or

28   use Mattel's confidential and proprietary information.  Mattel is informed and

1  believes, however, that certain additional employees accessed, copied and took

2  from Mattel confidential and proprietary information, including Mattel's strategic

3  plans; business operations, methods and systems; marketing and advertising

4  strategies and plans; future product lines; product profit margins; and customer

5  requirements.  The misappropriated confidential and proprietary information

6  included information that these Mattel employees were not authorized to access.

7  On information and belief, the misappropriated confidential and proprietary

8  information taken from Mattel is being disclosed to and used by MGA for the

9  benefit of MGA and to the detriment of Mattel.

10  **VIII.  LARIAN MAKES MISREPRESENTATIONS TO RETAILERS**

11  **ABOUT MATTEL'S PRODUCTS**

12  78.   Counter-defendants have engaged in other illegal practices in

13  their efforts to compete unfairly with Mattel.  Larian has a practice of sending e-

14  mail messages to a "Bratz News" distribution list that Larian created or that was

15  created for him.  Mattel is informed and believes that the recipients of e-mail

16  messages sent to the "Bratz News" distribution list include members of the media

17  as well as representatives of many of Mattel's most significant customers.

18  79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz

19  News" distribution list that included a reference to Mattel's updated MY SCENE

20  MY BLING BLING product with real gems.  Mattel had not publicly announced

21  this product at the time that Larian sent his May 12, 2006 e-mail.  In fact, Mattel

22  had guarded the identification of this particular product.

23  80.   Shortly thereafter, Larian engaged in a campaign of calling

24  Mattel's most significant customers, including but not limited to Target and TRU,

25  regarding the MY SCENE MY BLING BLING product with real gems.  In an

26  effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

27  BLING product with real gems, Larian knowingly made false factual statements

28  about that product to each retailer.  As of the writing of this First Amended

EXHIBIT 2   PAGE 73

1   Complaint, Mattel is aware that Larian represented to each retailer that each was

2   the only retailer to purchase the product and that Mattel would not be supporting

3   the product with television advertising.  At the time that Larian made these

4   statements, he knew them to be false.  As a result of Larian's misrepresentations, at

5   least one retailer cancelled its order for 75,000 units of the MY SCENE MY

6   BLING BLING product with real gems.  Only after Mattel learned of Larian's

7   misrepresentations and was able to correct them was Mattel able to assure the

8   retailer that Larian's representations were false and to persuade the retailer to

9   reinstate the order.

10         81.    Such conduct is not an isolated incident.  MGA and Larian, in an

11   effort to gain an unfair competitive advantage, repeatedly issued false and

12   misleading press releases.  In these press releases, MGA and Larian have

13   misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis

14   Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market

15   share of Mattel's BARBIE products.

16                          **CLAIMS FOR RELIEF**

17                          <u>**First Counterclaim**</u>

18                          **Copyright Infringement**

19              **(Against MGA, MGA Entertainment (HK) Limited,**

20                   **Larian, Bryant and Does 4 through 10)**

21         82.    Mattel repeats and realleges each and every allegation set forth in

22   paragraphs 1 through 81, above, as though fully set forth at length.

23         83.    Mattel is the owner of copyrights in works that are fixed in

24   tangible media of expression and that are the subject of valid, and subsisting,

25   copyright registrations owned by Mattel.  These include, without limitation, the

26   works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-

27   378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-

28

EXHIBIT ___2___ PAGE ⁷⁴

1    378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-

2    378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

3         84.    Counter-defendants have reproduced, created derivative works

4    from and otherwise infringed upon the exclusive rights of Mattel in its protected

5    works without Mattel's authorization.  Counter-defendants' acts violate Mattel's

6    exclusive rights under the Copyright Act, including without limitation Mattel's

7    exclusive rights to reproduce its copyrighted works and to create derivative works

8    from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

9         85.    Counter-defendants' infringement (and substantial contributions

10   to the infringement) of Mattel's copyrighted works is and has been knowingly made

11   without Mattel's consent and for commercial purposes and the direct financial

12   benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately

13   failed to exercise their right and ability to supervise the infringing activities of

14   others within their control to refrain from infringing Mattel's copyrighted works

15   and have failed to do so in order to deliberately further their significant financial

16   interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-

17   defendants have engaged in direct, contributory and vicarious infringement of

18   Mattel's copyrighted works.

19        86.    By virtue of defendants' infringing acts, Mattel is entitled to

20   recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of

21   suit and attorneys' fees, and all other relief permitted under the Copyright Act.

22        87.    Counter-defendants' actions described above have caused and

23   will continue to cause irreparable damage to Mattel, for which Mattel has no

24   remedy at law.  Unless Counter-defendants are restrained by this Court from

25   continuing their infringement of Mattel's copyrights, these injuries will continue to

26   occur in the future.  Mattel is accordingly entitled to injunctive relief restraining

27   Counter-defendants from further infringement.

28

EXHIBIT 2   PAGE 75

7209/2035941.2

## Second Counterclaim

### Violation of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against All Counter-defendants)

88.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.   Beginning at various times from approximately 1999 through the filing of this First Amended Complaint, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise").  The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).

90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.  Their actions include multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and foreign travel to aid

-53-

EXHIBIT 2   PAGE 76

1  racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal

2  copyright infringement).

3      91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

4  Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

5  Brisbois, and the Other Former Employees, and each of them, shared the common

6  purpose of enabling MGA to obtain confidential, proprietary and otherwise

7  valuable Mattel property through improper means in order to assist MGA in

8  illegally competing with Mattel domestically and throughout the world.

9      92.   The MGA Criminal Enterprise as described herein is at all

10  relevant times a continuing enterprise because, among obvious reasons, it is

11  designed and did unlawfully acquire the confidential business information and

12  property of Mattel and incorporated this information and property into MGA's

13  ongoing business, marketing strategies and business methods, practices and

14  processes.  The conduct of the enterprise continues through the date of this First

15  Amended Complaint and is ongoing by virtue of MGA's continuing use of Mattel's

16  information and property, all to the detriment of Mattel.

17      93.   The pattern of racketeering activity, as defined by 18 U.S.C.

18  §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

19  of continuing criminal activity.  This activity consists of multiple acts of

20  racketeering by each member of the MGA Criminal Enterprise, is interrelated, not

21  isolated and is perpetrated for the same or similar purposes by the same persons.

22  This activity extends over a substantial period of time, up to and beyond the date of

23  this First Amended Complaint.  These activities occurred after the effective date of

24  18 U.S.C. §§ 1961 *et seq.,* and the last such act occurred within 10 years after the

25  commission of a prior act of racketeering activity.  These racketeering activities

26  included repeated acts of:

27      (a)   Mail Fraud:  Counter-defendants MGA, MGA Entertainment

28           (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and

209/2035941.2

-54-

EXHIBIT 2   PAGE 77

1         Does 4 through 10, aided and abetted by each other and some or

2         all of the remaining members of the MGA Criminal Enterprise,

3         having devised a scheme or artifice to defraud Mattel of its

4         confidential trade secret information and property by conversion,

5         false representations, concealment and breaches of fiduciary duty,

6         did for the purpose of furthering and executing such a scheme or

7         artifice to defraud, deposited or caused to be deposited matters or

8         things to be sent or delivered by the Postal Service, or any private

9         or commercial interstate carrier, or took or received matters or

10        things therefrom, or knowingly caused matters or things to be

11        delivered by mail or such carrier according to the direction

12        thereon, or at the place at which it is directed to be delivered by

13        the person to whom it is addressed, in violation of 18 U.S.C.

14        § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in

15        the foregoing paragraphs and as set forth in Exhibit C;

16    (b)   Wire Fraud:  Counter-defendants MGA, MGA Entertainment

17        (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and

18        Does 4 through 10, aided and abetted by each other and some or

19        all of the remaining members of the MGA Criminal Enterprise,

20        having devised a scheme or artifice to defraud Mattel of its

21        confidential and trade secret information and property by

22        conversion, false representations, concealment and breaches of

23        fiduciary duty, did for the purpose of furthering and executing

24        such a scheme or artifice to defraud, transmit and cause to be

25        transmitted by means of wire communications in interstate or

26        foreign commerce, writing, signs, signals, pictures or sound, in

27        violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with

28        EXHIBIT  2  PAGE  78

1    greater particularity in the foregoing paragraphs and as set forth

2    in Exhibit C;

3    (c)    Tampering With a Witness, Victim or Informant:  Counter-

4           defendants MGA, MGA Entertainment (HK) Limited, MGA de

5           Mexico, Larian, Bryant, Machado and Does 4 through 10, aided

6           and abetted by each other and some or all of the remaining

7           members of the MGA Criminal Enterprise, did corruptly alter,

8           destroy, mutilate, or conceal a record, document, or other object,

9           or attempted to do so, with the intent to impair the object's

10          integrity or availability for use in an official proceeding.  Such

11          actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as

12          alleged with greater particularity in the foregoing paragraphs;

13   (d)    Interstate and Foreign Travel in Aid of Racketeering Enterprises:

14          Counter-defendants MGA, MGA Entertainment (HK) Limited,

15          MGA de Mexico, Larian, Bryant, Machado and Does 4 through

16          10, aided and abetted by each other and some or all of the

17          remaining members of the MGA Criminal Enterprise, traveled in

18          interstate and foreign commerce, or used the mail or any facility

19          in interstate or foreign commerce, with the intent to promote,

20          manage, establish, carry on and facilitate the promotion,

21          management, establishment and carrying on of unlawful activity,

22          *i.e.* bribery, in violation of the laws of the State of California,

23          *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and

24          18 U.S.C. § 2, as alleged with greater particularity in the

25          foregoing paragraphs;

26   (e)    Criminal Copyright Infringement: Counter-defendants MGA,

27          MGA Entertainment (HK) Limited, MGA de Mexico, Larian,

28          Bryant, Machado and Does 4 through 10, aided and abetted by

EXHIBIT 2  PAGE 79

1     each other and some or all of the remaining members of the MGA

2     Criminal Enterprise, willfully infringed Mattel's copyrights,

3     including with respect to documents containing Mattel trade

4     secret and confidential information, for purposes of commercial

5     advantage and private financial gain, all in violation of 18 U.S.C.

6     § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater

7     particularity in the foregoing paragraphs.

8         94.   The persons alleged herein to have violated 18 U.S.C. § 1962(c)

9 are separate from, though employed by or associated with, MGA, the MGA Group,

10 the Bryant Group, the Mexican Group and the Canadian Group.

11         95.   MGA had a role in the racketeering activity that was distinct

12 from the undertaking of those acting on its behalf. MGA also attempted to benefit,

13 and did benefit, from the activity of its employees and agents alleged herein, and

14 thus was not a passive victim of racketeering activity, but an active perpetrator.

15         96.   Mattel has been injured in its business or property as a direct

16 and proximate result of the Counter-defendants' and the other enterprise members'

17 violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts

18 constituting the pattern of racketeering activity.

19         97.   As a result of the violations of 18 U.S.C. § 1962(c), by the MGA

20 Group, the Bryant Group, the Mexican Group and the Canadian Group, Mattel has

21 suffered substantial damages, in an amount to be proved at trial. Pursuant to 18

22 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

23 compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

24 of Counter-defendants' violations of 18 U.S.C. § 1962(c).

25

26

27                                         EXHIBIT 2   PAGE 80

28

**Third Counterclaim**

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Counter-defendants)**

98.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 97, above, as though fully set forth at length.

99.    Beginning at various times from approximately 1999 through the filing of this First Amended Complaint, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

100.    These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.

101.    The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A).

EXHIBIT 2   PAGE 81

102. Counter-defendants and the other members of the MGA Criminal Enterprise schemed to defraud Mattel and steal its property and trade secret information by means of false representation, breaches of fiduciary duty, conversation and concealment, as more fully set forth in the foregoing paragraphs.

103. In furtherance of this unlawful conspiracy, and to effect its objectives, Counter-defendants and various co-conspirators committed numerous overt acts, including but not limited to those set forth in the foregoing paragraphs.

104. Mattel has been injured in its business or property as a direct and proximate result of the Counter-defendants' and the other enterprise members' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

105. As a result of the conspiracies between and among all Counter-defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has suffered substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys, fees, incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(d).

### Fourth Counterclaim

#### Misappropriation of Trade Secrets

#### (Against Counter-defendants MGA, MGA de Mexico, Larian, Machado and Does 4 through 10)

106. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 105, above, as though fully set forth at length.

107. As used herein, "Trade Secret Material" shall mean the documents, materials and information stolen by Machado, Trueba, Vargas, Brisbois, the Other Former Employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants, the Trade Secret Materials gave Mattel a significant competitive advantage over its

EXHIBIT 2   PAGE 82

1   existing and would-be competitors, including MGA.  This advantage, as to MGA,

2   has now been compromised as a result of Counter-defendants' unlawful activities.

3          108.  Mattel made reasonable efforts under the circumstances to

4   maintain the confidentiality of the Trade Secret Materials, including by having

5   employees and consultants who may have access the Trade Secret Materials sign

6   confidentiality agreements that oblige them not to disclose the Trade Secret

7   Materials or characteristics of the Trade Secret Materials; by limiting the

8   circulation of said materials within Mattel; by protecting and limiting access to

9   computers with log-in identifications and passwords; by limiting each employee's

10  access to electronic files to those that the particular employee needs to access; by

11  educating employees on the nature of Mattel's information that is confidential and

12  proprietary; and by reminding employees on a regular and periodic basis of their

13  obligation to protect and maintain Mattel's confidential and proprietary

14  information.

15         109.  Mattel's Trade Secret Materials derive independent economic

16  value from not being generally known to the public or to other persons who can

17  obtain economic benefit from their disclosure.

18         110.  Counter-defendants have illegally obtained the trade secret

19  materials, as set forth above, and through other means of which Mattel is presently

20  unaware.

21         111.  Counter-defendants have used and disclosed Mattel's Trade

22  Secret Materials without Mattel's consent and without regard to Mattel's rights, and

23  without compensation, permission, or licenses for the benefit of themselves and

24  others.

25         112.  Counter-defendants' conduct was, is, and remains willful and

26  wanton, and was taken with blatant disregard for Mattel's valid and enforceable

27  rights.

EXHIBIT  2   PAGE 83

28

113.  Counter-defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Mattel.  Mattel has no adequate remedy at law for such wrongs and injuries.  Mattel is therefore entitled to a permanent injunction restraining and enjoining Counter-defendants, and each of them, as well as their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from further using in any manner Mattel's trade secrets.

114.  In addition, as a proximate result of Counter-defendants' misconduct, Mattel has suffered actual damages, and Counter-defendants have been unjustly enriched.

115.  The aforementioned acts of the Counter-defendants were willful and malicious, including in that Counter-defendants misappropriated Mattel's trade secrets with the deliberate intent to injure Mattel's business and improve their own.  Mattel is therefore entitled to enhanced damages.  Mattel is also entitled to reasonable attorney's fees.

### Fifth Counterclaim

### Breach of Contract

### (Against Bryant)

116.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 115, above, as though fully set forth at length.

117.  Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire,

EXHIBIT 2 PAGE 84

1    Bryant certified that, other than as disclosed, he had not worked for any competitor

2    of Mattel and had not engaged in any business venture or transaction involving a

3    Mattel competitor that could be construed as a conflict of interest.  Bryant further

4    promised that he would notify his supervisor immediately of any change in his

5    situation that would cause him to change any of the foregoing certifications or

6    representations.

7            118.  The Employment Agreement and the Conflict Questionnaire are

8    valid, enforceable contracts, and Mattel has performed each and every term and

9    condition of the Employment Agreement and Conflict Questionnaire required to be

10   performed by Mattel.

11           119.  Bryant materially breached the foregoing contracts with Mattel,

12   in that, among other things, he secretly aided, assisted and worked for a Mattel

13   competitor during his employment with Mattel without the express written consent

14   of Mattel.

15           120.  As a consequence of Bryant's breach, Mattel has suffered and

16   will, in the future, continue to suffer damages in an amount to be proven at trial.

17   Such damages include, without limitation, the amounts paid by the competitor to

18   Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

19   his Mattel employment; the amount that Mattel paid Bryant during the time he

20   wrongfully worked with MGA; the value of information and intellectual property

21   owned by Mattel which Bryant provided to MGA; the value of the benefits that

22   MGA obtained from Bryant during the time he was employed by Mattel; and the

23   value of the benefits that MGA obtained from Bryant as a result of the work he

24   performed for or with MGA during his Mattel employment.

25           121.  Bryant's conduct has caused, and unless enjoined will continue to

26   cause, irreparable injury to Mattel that cannot be adequately compensated by

27   money damages and for which Mattel has no adequate remedy at law.  Bryant

28   specifically acknowledged in his Employment Agreement that his breach of the

EXHIBIT 2   PAGE 85

1   Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

2   entitled to injunctive relief to enforce this Agreement, in addition to damages and

3   other available remedies." Accordingly, Mattel is entitled to orders mandating

4   Bryant's specific performance of his contracts with Mattel and restraining Bryant

5   from further breach.

### Sixth Counterclaim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

9       122.  Mattel repeats and realleges each and every allegation set forth in

10   paragraphs 1 through 121, above, as though fully set forth at length.

11       123.  Valid agreements existed between Mattel and Bryant, Brawer,

12   Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,

13   the "Mattel Employees")

14       124.  At all times herein mentioned, MGA, Larian and Does 4 through

15   10 knew that the Mattel Employees had a duty under their agreements not to work

16   for or assist any competitor of Mattel, such as MGA.  In addition, at all times

17   mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had

18   assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

19   designs and other works, created, conceived or reduced to practice during their

20   employment with Mattel.

21       125.  Despite such knowledge, Counter-defendants MGA, Larian and

22   Does 4 through 10 intentionally and without justification solicited, induced and

23   encouraged the Mattel Employees to breach their contracts with Mattel.

24       126.  As a direct and proximate result of Counter-defendants' efforts

25   and inducements, the Mattel Employees did breach their contracts with Mattel.

26       127.  As a result of said breaches, Mattel has suffered damages and

27   will imminently suffer further damages, including the loss of its competitive

28   position and lost profits, in an amount to be proven at trial.

EXHIBIT 2  PAGE 86

128.  Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

**Seventh Counterclaim**

**Breach of Fiduciary Duty**

**(Against Bryant and Machado)**

129.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130.  Bryant and Machado held positions of trust and confidence with Mattel.  In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties.  In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel.  They confirmed their relationship of trust with Mattel in respective employee agreements.  Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant or Machado might bring to Mattel.

131.  Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided and assisted a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor.  As alleged above, Bryant also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

EXHIBIT 2  PAGE 87

132.  Machado breached his fiduciary duty to Mattel, in that while employed by Mattel, he secretly aided and assisted a competitor of Mattel by, among other things, misappropriating Mattel trade secret and proprietary information and providing said information to officers of MGA.  Machado also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

133.  As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

134.  Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of exemplary damages against Counter-defendants in an amount to be determined at trial.

135.  Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

### Eighth Counterclaim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

136.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

EXHIBIT 2 PAGE 88

1  best interests, including but not limited to secretly developing and designing Bratz

2  while employed by Mattel and by secretly assisting Larian and MGA .

3         138.  At all times herein mentioned, MGA, Larian and Does 4 through

4  10 knew that the Mattel Employees (excluding Bryant) held positions of trust and

5  confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4

6  through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary

7  duty to Mattel not to take any action that would be contrary to Mattel's best

8  interests, including but not limited to taking confidential trade secret information

9  from Mattel's premises and providing that information to a competitor.

10        139.  Despite such knowledge, Counter-defendants MGA, Larian and

11 Does 4 through 10 intentionally and without justification solicited, encouraged,

12 aided and abetted and gave substantial assistance to the Mattel Employees to breach

13 their fiduciary duties to Mattel, knowing that their conduct would constitute

14 breaches of their fiduciary duties to Mattel.

15        140.  As a direct and proximate result of Counter-defendants' efforts,

16 the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has

17 incurred damages in an amount to be proven at trial.  Mattel, therefore, is entitled to

18 recover compensatory damages in an amount to be determined at trial.

19        141.  In taking the aforesaid actions, MGA, Larian and Does 4 through

20 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

21 rights.  Accordingly, Mattel is entitled to recover exemplary damages from

22 Counter-defendants in an amount to be determined at trial.

### Ninth Counterclaim

### Breach of Duty of Loyalty

### (Against Bryant and Machado)

26        142.  Mattel repeats and realleges each and every allegation set forth in

27 paragraphs 1 through 141, above, as though fully set forth at length.

28

EXHIBIT 2   PAGE 89

209/2035941.2

-66-

1      143. As employees of Mattel, Bryant and Machado owed a duty of

2  undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not

3  compete with Mattel or assist a competitor of Mattel during their employment with

4  Mattel. Pursuant to this duty, Bryant and Machado were required to always give

5  preference to Mattel's business over their own, similar interests during the course of

6  their employment with Mattel.

7      144. Bryant and Machado breached their duty of loyalty to Mattel in

8  that, while employed by Mattel, they secretly aided, assisted and worked for a

9  competitor of Mattel, including without limitation by entering into agreements with

10  a Mattel competitor. As alleged above, they also breached the aforementioned duty

11  by using Mattel property and resources for the benefit of, and to aid and assist,

12  themselves personally and the competitor of Mattel.

13      145. As a direct and proximate result of Counter-defendants' wrongful

14  conduct, Mattel has incurred damages in an amount to be determined at trial.

15      146. Counter-defendants acted with malice, fraud and oppression, and

16  in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an

17  award of punitive damages against Counter-defendants in an amount to be

18  determined at trial.

19      147. Furthermore, Counter-defendants' conduct has caused, and unless

20  enjoined will continue to cause, irreparable injury to Mattel that cannot be

21  adequately compensated by money damages and for which Mattel has no adequate

22  remedy at law. Accordingly, Mattel is entitled to an order restraining further

23  breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-

24  defendants from continuing to benefit from such breach.

25      148. In breaching their duty of loyalty to Mattel, Bryant and Machado

26  acted with malice, fraud and oppression, and in conscious disregard of Mattel's

27  rights. Accordingly, Mattel is entitled to recover exemplary damages from

28  Counter-defendants in an amount to be determined at trial.

EXHIBIT 2   PAGE 90

**Tenth Counterclaim**

**Aiding and Abetting Breach of Duty of Loyalty**

**(Against MGA, Larian and Does 4 through 10)**

149.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150.  MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer.  MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel.  MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151.  MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel.  MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel Employees (excluding Bryant) not to compete with Mattel or assist a competitor of Mattel during their Mattel employment.

152.  Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their duties of loyalty to Mattel, knowing that their conduct would constitute breaches of their duties of loyalty to Mattel.

153.  As a further consequence of Counter-defendants' efforts, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

EXHIBIT 2    PAGE 91

1    154. In taking the aforesaid actions, MGA, Larian and Does 4 through

2    10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

3    rights.  Accordingly, Mattel is entitled to recover exemplary damages from

4    Counter-defendants in an amount to be determined at trial.

5                               **Eleventh Counterclaim**

6                                    **Conversion**

7                        **(Against All Counter-defendants)**

8    155. Mattel repeats and realleges each and every allegation set forth in

9    paragraphs 1 through 154, above, as though fully set forth at length.

10   156. Counter-defendants wrongfully converted Mattel property and

11   resources by appropriating and using them for their own benefit and gain and for

12   the benefit and gain of others, without the permission of Mattel.

13   157. Mattel was entitled to, among other things, the exclusive right

14   and enjoyment in property and tangible materials owned by Mattel, including

15   without limitation such proper and materials that were created by Bryant while he

16   was a Mattel product designer.  Such property was taken by Bryant from Mattel to

17   further his own interests and, in at least some instances, provided by Bryant to

18   Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

19   158. In addition, Counter-defendants wrongfully converted Mattel's

20   property by removing the Trade Secret Materials in electronic and paper form from

21   Mattel's offices.  Counter-defendants did so without Mattel's permission and

22   continue to possess them.

23   159. As a direct and proximate result of Counter-defendants' wrongful

24   conversion of Mattel property, including those relating to Bratz and Mattel's Trade

25   Secret Materials, Mattel has incurred damages.  Mattel, therefore, is entitled to

26   recover compensatory damages in an amount to be determined at trial.

27   160. As a result of Counter-defendants' acts of conversion, Mattel is

28   entitled to damages in an amount sufficient to indemnify Mattel for the loss

EXHIBIT 2 PAGE 92

AMENDED ANSWER AND COUNTERCLAIMS

1    suffered, which is not measured by the value of the property misappropriated, but

2    includes the lost profits that Mattel suffered as a result of the conversion or,

3    alternatively, the profits generated by the Counter-defendants that would not have

4    been generated but for the conversion.  Only such a measure of damages would

5    fully and fairly compensate Mattel for the injury it suffered due to Counter-

6    defendants' acts of conversion.

7            161.  Counter-defendants performed the aforementioned conduct with

8    malice, fraud and oppression, and in conscious disregard of Mattel's rights.

9    Accordingly, Mattel is entitled to recover exemplary damages from Counter-

10   defendants in an amount to be determined at trial.

11           162.  Furthermore, Counter-defendants' conduct has caused, and unless

12   enjoined will continue to cause, irreparable injury to Mattel that cannot be

13   adequately compensated by money damages and for which Mattel has no adequate

14   remedy at law.  Accordingly, Mattel is entitled to an order restraining Counter-

15   defendants from further conversion of Mattel property and resources and/or

16   restraining Counter-defendants from continuing to benefit from such conversion.

17                          **Twelfth Counterclaim**

18                          **Unfair Competition**

19          **(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

20                      **(Against All Counter-defendants)**

21           163.  Mattel repeats and realleges each and every allegation set forth in

22   paragraphs 1 through 162, above, as though fully set forth at length.

23           164.  Section 17200 of the California Business and Professions Code

24   prohibits unfair competition, including "any unlawful, unfair or fraudulent business

25   act or practice . . . ."

26           165.  By engaging in the foregoing conduct, Counter-defendants have,

27   individually and in combination, engaged in unlawful, unfair and/or fraudulent acts

28   of unfair competition in violation of both the common law of the state of California

EXHIBIT __2__  PAGE __93__

-70-

1  and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without

2  limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code*

3  § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

4  Such conduct also included, without limitation, MGA's and Larian's disparagement

5  of Mattel's products and misrepresentations as alleged above.

6        166. As a result of the aforementioned conduct, Mattel has suffered

7  damages and will imminently suffer further damages, including but not limited to

8  lost profits in an amount to be proven at trial. No adequate remedy at law exists for

9  the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel

10  is entitled to an injunction enjoining Counter-defendants' continued wrongful acts.

11  Mattel is also entitled to recover compensatory and exemplary damages pursuant to

12  the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

**Thirteenth Counterclaim**

**Declaratory Relief**

**(Against All Counter-defendants)**

13

14

15

16        167. Mattel repeats and realleges each and every allegation set forth in

17  paragraphs 1 through 166, above, as though fully set forth at length.

18        168. As shown in the foregoing paragraphs above, an actual

19  controversy exists between Mattel and Counter-defendants regarding Counter-

20  defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

21        169. Accordingly, Mattel seeks a declaration of the Court that

22  Counter-defendants have no valid or protectable ownership rights or interests in

23  Bratz, and that Mattel is the true owner of the same, and further seeks an

24  accounting and imposition of a constructive trust over Bratz, including without

25  limitation registrations and applications for registrations relating thereto made or

26  filed by Counter-defendants and third parties, and over all revenues and other

27  monies or benefits derived or obtained from MGA's and Bryant's purported

28  ownership, use, sale, distribution and licensing of Bratz.

EXHIBIT 2  PAGE 94

170.  Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

## Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1.     For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived, created or reduced to practice by Bryant during the term of his Mattel employment and/or by any others then-employed by Mattel, as well as in all derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

2.     For a declaration that any agreement between Bryant, on the one hand, and MGA or any person or entity, on the other hand, in which Bryant purported to assign any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect;

3.     For an Order enjoining and restraining Counter-defendants, their agents, servants and employees, and all persons in active concert or participation with them, from further wrongful conduct, including without limitation from imitating, copying, distributing, importing, displaying, preparing derivatives from and otherwise infringing Mattel's copyright-protected works;

4.     For an Order, pursuant to 17 U.S.C. § 503(a) and other applicable law, impounding all of Counter-defendants' products and materials that infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

1    by which copies of the works embodied in Mattel's copyrights may be reproduced

2    or otherwise infringed;

3           5.    For an Order mandating that Counter-defendants return to Mattel

4    all tangible items, documents, designs, diagrams, sketches or any other

5    memorialization of inventions created or reduced to practice during Bryant's

6    employment with Mattel as well as all Mattel property converted by Counter-

7    defendants;

8           6.    For an Order mandating specific performance by Bryant to

9    comply with and satisfy Bryant's contractual obligations to Mattel;

10          7.    That Mattel be awarded, and Counter-defendants be ordered to

11   disgorge, all payments, revenues, profits, monies and royalties and any other

12   benefits derived or obtained as a result of the conduct alleged herein, including

13   without limitation of all revenues and profits attributable to Counter-defendants'

14   infringement of Mattel's copyrights under 17 U.S.C. § 504;

15          8.    For an accounting of all profits, monies and/or royalties from the

16   exercise of ownership, use, distribution, sales and licensing of Bratz;

17          9.    For the imposition of a constructive trust over Bratz, including

18   without limitation registrations and applications for registrations relating thereto

19   made or filed by Counter-defendants and third parties, and all profits, monies,

20   royalties and any other benefits derived or obtained from Counter-defendant's

21   exercise of ownership, use, sale, distribution and licensing of Bratz;

22          10.   That Mattel recover its actual damages and lost profits;

23          11.   That Counter-defendants be ordered to pay exemplary damages

24   in a sum sufficient to punish and to make an example of them, and deter them and

25   others from similar wrongdoing;

26          12.   That Counter-defendants be ordered to pay treble its general and

27   special damages, plus interest, costs and attorney's fees incurred by reason of

28   Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

EXHIBIT 2   PAGE 96

AMENDED ANSWER AND COUNTERCLAIMS

13. That Counter-defendants be ordered to pay double damages due to their willful and malicious misappropriation of Mattel's trade secrets with deliberate intent to injure Mattel's business and improve its own;

14. That Counter-defendants pay to Mattel the full cost of this action and Mattel's attorneys' and investigators' fees; and

15. That Mattel have such other and further relief as the Court may deem just and proper.

DATED:  January 12, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _John Quinn (BK)_

John B. Quinn
Attorneys for Defendant and Counter-claimant Mattel, Inc.

EXHIBIT 2   PAGE 97

209/2035941.2

-74-

AMENDED ANSWER AND COUNTERCLAIMS

1

### DEMAND FOR JURY TRIAL

2

3          Mattel, Inc. respectfully requests a jury trial on all issues triable

4   thereby.

5

6   DATED:  January 12, 2007          QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
7

8                                      By _John Quinn / BM_____
9                                        John B. Quinn
                                         Attorneys for Defendant and Counter-
10                                       claimant Mattel, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT  2   PAGE  98

EXHIBIT 2 PAGE 99

**Exhibit A**

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (a) I will maintain the confidentiality of the Company's trade secrets; (b) I will use those trade secrets for the exclusive benefit of the Company; (c) inventions that I create will be owned by the Company; (d) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (e) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below, including Information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees at any right, title and interest in such Inventions, and at my right, title and interest in any patent, copyright, patent application or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my right in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or education to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development" of the employer; or (2) result from any work performed for the employer for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it so the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continued employment by the Company; or to my employment for any particular term."

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all prior agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _____     Signature _____

Employee Name (print)   CARTER H. BRYANT     Name of Witness (print)   TERESA NEWCOMB

Date   01/04/99

EXHIBIT   2   PAGE   100

M 0001622

EXHIBIT 2    PAGE 101

Exhibit B

## CONFLICT OF INTEREST QUESTIONNAIRE

Name (Last, first, M.I.) ___BRYANT, CARTER H.___   Job Title ___PROJECT DESIGNER___   Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflict of Interest. Then answer the questions by checking the correct answer. Base your answer on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond," option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES  ● NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES  ● NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES  ● NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES  ○ NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES  ○ NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES  ● NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES  ● NO   7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES  ● NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES  ● NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

_4, 5, freelance design & artwork in 1998._
_from appx 5/98 - 11/98 for the Ashton Drake_
_galleries_

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized persons. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature ___Carter H. Bryant___   Date ___01/04/98___

M 0001621

EXHIBIT 2 PAGE 102

EXHIBIT B PAGE 77

EXHIBIT 2 PAGE 103

Exhibit C

# EXHIBIT C

## CURRENTLY KNOWN PREDICATE ACTS BY DEFENDANTS RE MAIL AND WIRE COMMUNICATIONS

| Date | Type of Communication | Bates Reference (if applicable) |
|---|---|---|
| 4/15/2001 | Email from Isaac Larian (MGA) Aldo Horvat (GIG ITALY) | |
| 3/28/2001 | Email from Stephen Lee (MGA Hong Kong) to Earlylight (vendor) | MGA000746 |
| 4/15/2001 | Email from Isaac Larian Stephen Lee and Stanley Li | MGA000747 |
| 4/11/2001 | Email from Isaac Larian to Stephen Lee | MGA000748-750 |
| 4/10/2001 | Email from Isaac Larian to Pedro Feist (Concentra) | MGA000766-767 |
| 4/5/2001 | Email from Dave Malacrida (MGA) to Gary Cogland | MGA001027-29 |
| 4/3/2001 | Email from Isaac Larian to John Young | MGA001030-32 |
| 1/9/2000 | Email from Martin Hitch (MGA Hong Kong) to Pedro Feist | MGA001040-44 |
| 4/2/2001 | Email from Isaac Larian to Ron Stover | MGA001061-64 |
| On or about 4/3/2001 | Fed Ex shipment from Isaac Larian to Ron Stover | MGA001099-1100 |
| 4/2/2001 | Email from Isaac Larian to Craig Cunningham (Eckerd Drugs) | MGA001099-1100 |
| 3/28/2001 | Email from Isaac Larian to Stephen Lee | MGA001105 |
| On or about 3/28/2001 | Letter from Isaac Larian sent to Ron Stover | MGA001113-14 |
| 4/18/2001 | Email from Victoria O'Connor (MGA) to Avi Kreisel (Kreisel Dist.) | MGA001116-17 |
| 4/17/2001 | Email from Isaac Larian to Stephen Lee and Stanley Li | MGA001208-09 |
| On or about 4/18/2001 | Shipment from Stephen Lee to Isaac Larian | MGA001213-14 |
| 4/4/2001 | Email from Isaac Larian to John Young | MGA001219-20 |
| 3/10/2001 | Email from Isaac Larian to John Young | MGA001278-82 |
| 6/12/2003 | Facsimile transmission from MGA Entertainment to Jessie Ramirez | MGA001289-90 |
| 10/4/2000 | Email from David Rosenbaum (attorney for MGA) to Anne Wang (attorney for Carter Bryant) | MGA001310 |
| | | MGA001320-29 |

EXHIBIT 2 PAGE 104

EXHIBIT C

| | | | |
|---|---|---|---|
| 1 | 10/26/2000 | Email from Mercedeh Ward (MGA) to Samuel Wong, Cecilia Kwok and Franki Tsang (MGA Hong Kong) | MGA000012-13 |
| 2 3 | 10/25/2000 | Email from Mercedeh Ward Samuel Wong, Cecilia Kwok and Franki Tsang | MGA000015-17 |
| 4 | 10/30/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000019-21 |
| 5 6 | 11/3/2000 | Email from Mercedeh Ward to Victor Lee and Paula Treantafelles | MGA000043-45 |
| 7 | 11/4/2000 | Email from Isaac Larian to Carter Bryant and Paula Treantafelles | MGA000046-47 |
| 8 | 11/11/2000 | Email from Judy Rich to Cecilia Kwok and Mercedeh Ward | MGA000049 |
| 9 | 11/15/2000 | Emails between Paula Treantafelles and Samuel Wong and Franki Tsang | MGA000071-74 |
| 10 | 12/8/2000 | Email from Mercedeh Ward to Cecilia Kwok and Samuel Wong | MGA000077-81 |
| 11 | On or about 12/23/2000 | Package sent from MGA Hong Kong to MGA Los Angeles per instructions from MGA Los Angeles | MGA000089-90 |
| 12 13 | 12/15/2000 | Email from Paula Treantafelles to Samuel Wong and Mercedeh Ward | MGA000091-92 |
| 14 | 12/16/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000097-104 |
| 15 | 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000109-112 |
| 16 | On or about 12/16/2000 | Package of fabric swatches sent from MGA Los Angeles to MGA Hong Kong | MGA000113-122 |
| 17 18 | On or about 12/20/2000 | Package of samples sent from MGA Los Angeles to MGA Hong Kong | MGA000124-125 |
| 19 | 12/20/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000124-125 |
| 20 | 12/12/2000 | Fed Ex shipment from MGA Los Angeles to Cecilia Kwok | MGA000131-132 |
| 21 | 12/19/2000 | Email from Mercedeh Ward to Cecilia Kwok and Wendy Reed | MGA000131-132 |
| 22 | 12/20/2000 | Email from Paula Treantafelles to Jimmy Cheng, Samuel Wong, Cecilia Kwok | MGA000140-141 |
| 23 | 12/10/2000 | Email from Mercedeh Ward to Sarah Halpern | MGA000147-149 |
| 24 | 12/22/2000 | Email from Mercedeh Ward to Samuel Wong and Judy Rich | MGA000190 |
| 25 | 12/22/2000 | Email from Paula Treantafelles to Samuel Wong, Judy Rich and Mercedeh Ward | MGA000197-199 |
| 26 | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000211 |
| 27 | 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000212-217 |
| 28 | | | |

EXHIBIT  2  PAGE 105          EXHIBIT  C  PAGE 79

209/2035941.2

AMENDED ANSWER AND COUNTERCLAIMS

| | | | |
|---|---|---|---|
| 1 | 12/27/2000 | Email from Paula Treantafelles to Franki Tsang et al. | MGA000212-217 |
| 2 | 12/26/2000 | Email from Paula Treantafelles to Carter Bryant | MGA000219 |
| 3 | 12/27/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000234-236 |
| 4 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000249-250 |
| 5 | 12/27/2000 | Email from Paula Treantafelles to Cecilia Kwok and Mercedeh Ward | MGA000253 |
| 6 7 | 12/27/2000 | Email from Paula Treantafelles to Samuel Wong | MGA000254, 256 |
| | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000322 |
| 8 9 | 12/29/2000 | Email from Paula Treantafelles to Carter Bryant and Mercedeh Ward | MGA000333 |
| 10 | 1/16/2001 | Email from Paula Treantafelles to Samuel Wong et al. | MGA000366-368 |
| 11 | 1/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000369-370 |
| 12 | 1/18/2001 | Email from Paula Treantafelles to Cecilia Kwok, Judy Rich and Carter Bryant | MGA000371-378 |
| 13 14 | 1/18/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok and Samuel Wong | MGA000379-381 |
| 15 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000406-414 |
| 16 | 9/27/2000 | Email from Paula Treantafelles to Franki Tsang and Judy Rich | MGA000422 |
| 17 | 10/5/2000 | Email from Isaac Larian to Carter Bryant | MGA000423 |
| 18 | 10/18/2000 | Email from Mercedeh Ward to Franki Tsang and Victor Lee | MGA000425-426 |
| 19 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000482 |
| 20 21 | 12/22/2000 | Email from Isaac Larian to Franki Tsang, Mercedeh Ward and Paula Treantafelles | MGA000524-528 |
| 22 | 12/20/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000530-531 |
| 23 24 | 10/26/2000 | Email from Paula Treantafelles to Cecilia Kwok, Isaac Larian, and Carter Bryant | MGA000539-541 |
| 25 | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok | MGA000539-541 |
| 26 | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok and Isaac Larian | MGA000539-541 |
| 27 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok, Samuel Wong, and Judy Rich | MGA000545 |
| 28 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000546-547 |

EXHIBIT 2 PAGE 106

-80-

EXHIBIT C PAGE 80

AMENDED ANSWER AND COUNTERCLAIMS

| | | | |
|---|---|---|---|
| 1 | 2/26/2001 | Email from Paula Treantafelles to Samuel Wong, Cecilia Kwok, and Carter Bryant | MGA000548 |
| 2 | | | |
| 3 | 2/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000549 |
| 4 | 2/26/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000550 |
| 5 | 2/24/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000551 |
| 6 | | | |
| 7 | 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000554 |
| 8 | 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000556-557 |
| 9 | 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000558 |
| 10 | | | |
| 11 | 2/23/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000560 |
| 12 | 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000561 |
| 13 | On or about 2/20/2001 | Fed Ex shipment from Carter Bryant to Cecilia Kwok | MGA000566 |
| 14 | | | |
| 15 | 2/20/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000566 |
| 16 | 2/19/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000568 |
| 17 | 2/19/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000569-570 |
| 18 | 2/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000571-572 |
| 19 | 2/16/2001 | Emails from Paula Treantafelles to Cecilia Kwok | MGA000573, 574, 576, 582, 589-90 |
| 20 | 2/16/2001 | Emails from Paula Treantafelles to Carter Bryant | MGA000575, 579, 588 |
| 21 | | | |
| 22 | 2/12/2001 | Email from Lon Ross (MGA) to Carter Bryant et al. | MGA000583-587 |
| 23 | 2/5/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok et al. | MGA000599 |
| 24 | 2/5/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000600 |
| 25 | 2/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000602 |
| 26 | | | |
| 27 | 2/3/2001 | Email from Paula Treantafelles to Cecilia Kwok and Judy Rich | MGA000603-05 |
| 28 | 2/2/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000606 |

EXHIBIT 2 PAGE 107    EXHIBIT C PAGE 81

'209/2035941.2

AMENDED ANSWER AND COUNTERCLAIMS

| | | |
|---|---|---|
| 1/31/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000608 |
| 1/30/2001 | Email from Paula Treantafelles to Carter Bryant and Judy Rich | MGA000609 |
| On or about 1/30/2001 | Shipment from MGA Los Angeles to Carter Bryant | MGA000609 |
| 1/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000610 |
| 1/24/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000611 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Samuel Wong | MGA000612 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000613 |
| 3/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000617 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000618 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000620 |
| 3/6/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000621-622 |
| 3/6/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000625-626 |
| 3/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000625-626 |
| 3/3/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000634 |
| On or about 3/2/2001 | Fed Ex shipment from MGA Los Angeles to MGA Hong Kong | MGA000634 |
| 4/10/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000635 |
| 4/7/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000635 |
| 4/30/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000654 |
| 5/14/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000655 |
| 5/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000656-664 |
| 5/9/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000666 |
| 10/20/2000 | Email from Kerri Legg (MGA) to Steve Linker and Liz Hogan | MGA0008032 |
| | Letter from Mattel de Mexico employee to Thomas Park and Isaac Larian (MGA) | |
| 3/30/2004 | Letter to Carlos Gustavo Machado Gomez from Isaac Larian | |
| 3/30/2004 | Letter to Mariana Trueba Almada from Isaac Larian | |

EXHIBIT 2  PAGE 108

EXHIBIT C  PAGE 82

-82-

AMENDED ANSWER AND COUNTERCLAIMS

| | | |
|---|---|---|
| 1 | 3/30/2004 | Letter to Pablo Vargas San Jose from Isaac Larian |
| 2 | | Email from Pablo Vargas San Jose to Mattel de Mexico |
| 3 | | |
| 4 | 4/15/2004 | Email from Karla Papayanopulos Carvajal to Mariana Trueba Almada |
| 5 | 1/25/2004 | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez |
| 6 | | |
| 7 | 4/15/2004 | Email from Therese Wilbur to Carlos Gustavo Machado Gomez |
| 8 | 4/15/2004 | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez attaching confidential documents |
| 9 | | |
| 10 | 3/15/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 11 | | |
| 12 | 3/16/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 13 | 3/22/2004 | Email from "plot04@aol.com" to Isaac Larian copying Susana Kuemmerle and Thomas Park |
| 14 | | |
| 15 | 3/22/2004 | Email from Isaac Larian to "plot04@aol.com" copying Susana Kuemmerle and Thomas Park |
| 16 | 3/23/2004 | Email from Marlene Parker (MGA) to Isaac Larian and "plot04@aol.com" |
| 17 | | |
| 18 | 3/30/2004 | Email from Thomas Park to "plot04@aol.com" copying Isaac Larian |
| 19 | 4/2/2004 | Email from Maria de Carmen Mendez to Isaac Larian, Thomas Park, and Susana Kuemmerle |
| 20 | | |
| 21 | 4/4/2004 | Email from Maria de Carmen Mendez to Susana Kuemmerle |
| 22 | 4/7/2004 | Email from Maria de Carmen Mendez to Thomas Park |
| 23 | | |
| 24 | 4/12/2004 | Email from Thomas Park to "plot04@aol.com" |
| 25 | 4/14/2004 | Email from "plot04@aol.com" to Isaac Larian and Thomas Park |
| 26 | 4/14/2004 | Email from Isaac Larian to "plot04@aol.com", Thomas Park and Daphne Gronich |
| 27 | | |
| 28 | | |

EXHIBIT 2 PAGE 109

EXHIBIT C PAGE 83

AMENDED ANSWER AND COUNTERCLAIMS

| | | |
|---|---|---|
| 1 | 4/14/2004 | Email from "plot04@aol.com" to Thomas Park copying Isaac Larian and Susana Kuemmerle |
| 2 | | |
| | 4/14/2004 | Email from Susana Kuemmerle to Isaac Larian and Thomas Park copying "plot04@aol.com" |
| 3 | | |
| 4 | 4/15/2004 | Email from Jean Paul Farah to "plot04@aol.com" copying Daphne Gronich |
| 5 | | |
| | 4/15/2004 | Email from "plot04@aol.com" to Thomas Park copying Jean Paul Farah and Isaac Larian |
| 6 | | |
| 7 | 4/12/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 8 | | |
| | 4/15/2004 | Email from "plot04@aol.com" to Jean Paul Farah copying Daphne Gronich and Isaac Larian |
| 9 | | |
| 10 | 4/15/2004 | Email from Mariana Trueba Almada to Andrea Ramirez |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

EXHIBIT __2__ PAGE __110__

EXHIBIT __C__ PAGE __84__

AMENDED ANSWER AND COUNTERCLAIMS

109/2035941.2

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is Now Legal Service, 1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

On January 12, 2007, I served true copies of the following document(s) described as **MATTEL, INC.'S AMENDED ANSWER IN CASE NO. 05-2727, AND COUNTERCLAIMS** on the parties in this action as follows:

Diana M. Torres, Esq.
**O'MELVENY & MYERS, LLP**
400 S. Hope Street
Los Angeles, CA 90071

Keith Jacoby, Esq.
**LITTLER MENDELSON**
2049 Century Park East, 5th Floor
Los Angeles, CA 90067

**BY PERSONAL SERVICE:** I delivered such envelope(s) by hand to the office of the person(s) being served.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 12, 2007, at Los Angeles, California.

_____
NOW LEGAL -- Dave Quintana

EXHIBIT  2   PAGE 111

07209/2035966.1

**Exhibit 3**

**MGA ENTERTAINMENT**
16730 Schoenborn Street
North Hills, California  91343

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement").  The parties' agreement is as follows:

1.  <u>Retention as Consultant/Services</u>: MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products").  Bryant will render his services at such locations and times as may be reasonably designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant.  In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant.  It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder.  Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached as Exhibit "A" to this Agreement, and is incorporated herein by reference.

2.  <u>Term/Exclusivity</u>: The Term shall commence on the date of this Agreement.  MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant.  During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3.  <u>Ownership</u>:

(a)     All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof).  MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised.  MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

N00005EE2.DOC/2 / 10/04/2000  03:05 PM]

1

EXHIBIT  3    PAGE  112

...ents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute. Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents. If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)     Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine. Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.     **Compensation/Costs:**                                    REDACTED

(a)     For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of _____ Dollars ($_____) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of _____ Dollars ($_____) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)     MGA shall pay to Bryant a royalty of _____ percent ( %) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services. As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances). MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00000662.DOC;2 / 10/04/2000  22:05 PM}

2

EXHIBIT 3   PAGE 113

...ing on Bryant, shall constitute an account stated, and shall not be subject to any question for ...eason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to ...GA within two (2) years after the date rendered.  No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)     All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent.  In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations.  Reimbursement shall be at the actual cost of such item without any mark-up.

(d)     Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis.  Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable).  MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)     MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales.  MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell.  Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant.  Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.     <u>Warranties and Indemnity</u>:  Bryant represents, warrants and agrees that:

(a)     he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)     neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)     the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

[C0X066C2.DOC/2 / 10/04/2000  03:05 PM]

3

EXHIBIT _3_  PAGE _114_

..opyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property

(d)     he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

(e)     he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.      **Default/Termination:**

(a)     In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

(b)     Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.      **Confidentiality:**

(a)     Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order.)

(b)     Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

(c)     Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{00006662.DOC2 / 10/04/2000   03:05 PM}

4

EXHIBIT **3**   PAGE **115**