1    secure information with court action." *In re Lane*, 302 B.R. 75, 79-80 (D. Idaho

2    2003). In other words, good faith "mandates a *genuine attempt* to resolve the

3    discovery dispute through non-judicial means." *Id.* (emphasis added). Mattel's

4    conduct does not evidence any genuine attempt to resolve the issue at all and does not

5    comply with the requirements of the Rule, or meet its policy and purpose.

6            Indeed, Mattel still refuses to explain what more it wants, even in its

7    motion. It appears, therefore, that Mattel's request is a thinly veiled attempt to obtain

8    access to irrelevant (but competitively sensitive) information that MGA legitimately

9    redacted. Mattel does not, and cannot, contest the propriety of the redactions and so,

10   instead, has simply disguised its effort by calling it a request to inspect originals.

11   Alternatively, if this is not Mattel's goal, the only other additional things that Mattel

12   could be asking for are the originals of a variety of tangible things that are pictured

13   in e-mail attachments from many years ago.  If it were even possible for MGA to

14   identify and locate the pictured objects – some or all of which may not even exist –

15   Mattel has not shown that its supposed need to view them justifies the immense

16   burden and expense that it would place on MGA to perform the search.  While MGA

17   attempted, in good faith, to conduct a meaningful discussion with Mattel to try to

18   reach an amicable solution, MGA's efforts were for naught.  Mattel ignored MGA's

19   efforts entirely and should be sanctioned for its lack of good faith compliance with

20   the Rules.

21

22           **2.    Mattel Will Not Permit MGA to See the Declarations and**
                      **Exhibits that Mattel Has Referenced in its Portion of the**
23                    **Joint Stipulation.**

24           Mattel should also be sanctioned because it refuses to permit MGA to

25   see the Declarations and Exhibits that Mattel has referenced in its portion of the Joint

26   Stipulation.  Indeed, this is the *second* time that Mattel has served MGA with an

27   unfinished Joint Stipulation containing references such as "Zeller Decl. ¶ __," with

28   blanks in place of citations, and unaccompanied by the declarations or exhibits that

EXHIBIT 15  PAGE 241

35

JOINT STIPULATION

1  are incorporated by reference. (Ambrosini Decl. ¶¶ 6-7 & Ex. D.) Mattel steadfastly

2  maintains that it is allowed to refer to and cite declarations and exhibits in its Joint

3  Stipulation without telling MGA what those declarations say, without telling MGA

4  what those exhibits are, and without providing MGA with the declarations and

5  exhibits, until *after* MGA responds to Joint Stipulation, signs the Joint Stipulation

6  and Mattel files the Joint Stipulation. (Ambrosini Decl. ¶ 8 & Exs. F, G, & H.)

7         This has forced MGA to draft its response based on incomplete

8  information. For example, at note 32 of Ex. D to the Ambrosini Declaration, Mattel

9  cites a declaration that purportedly lists a range of Bates-numbered documents that

10  are neither identified in the Joint Stipulation itself nor provided as an exhibit. MGA

11  is left to guess what those unidentified Bates-numbered documents might be. Worse

12  yet, under Mattel's procedure, MGA will not know this information until *after* the

13  Joint Stipulation is sent to the court, which is then too late for MGA to take the

14  information into account in its response. That leaves MGA at a distinct disadvantage

15  because MGA is forced to respond to incomplete information. Further, it will not

16  have an opportunity to respond in the Joint Stipulation once Mattel has completed and

17  filed the Stipulation, its declarations and exhibits. MGA has now begun to reference

18  this problem when it signs the Joint Stipulations.

19         The Local Rules surely do not condone this practice. On the contrary,

20  the Local Rules require the moving party to provide its "portion of the stipulation,"

21  not a rough draft of that portion or an incomplete version thereof. *See* C.D. Cal. Loc.

22  R. 37-2.2. Certainly, Mattel's undisclosed declarations and exhibits are part of the

23  Joint Stipulation and must accompany it when Mattel's portion is served. That is

24  clearly the tone of the rule and, indeed, is the only interpretation that makes logical

25  sense. Otherwise, MGA does not have a fair opportunity to respond to Mattel's

26  positions, because it is not fully informed of what those positions are. Worse yet,

27  Mattel has an unfair opportunity to put whatever it wants in its declarations, after it

28

EXHIBIT 15   PAGE 242

JOINT STIPULATION

1   receives MGA's papers and after MGA's opportunity to address the issue in the Joint

2   Stipulation has passed.

3            Mattel's gamesmanship should not be tolerated.  *Marchand v. Mercy*

4   *Med. Ctr.*, 22 F.3d 933, 936 (9th Cir. 1994) (stating that parties "should focus on the

5   goal of the Rules, full and efficient discovery, not evasion and word play").  This

6   motion is but one more example of Mattel's scorched earth and patently unreasonable

7   discovery practices in this case to date.  Perhaps Mattel is trying to create issues

8   where there are none, in the hope that the Court will simply get tired of its tactics and

9   ignore the discovery disputes, thereby giving Mattel free reign to engage in even

10  more unreasonable and unacceptable tactics with impunity.  The Court should not

11  reward Mattel for its behavior by permitting this to occur.  MGA respectfully requests

12  that the Court deny Mattel's request for sanctions[83] and, instead, impose sanctions on

13  Mattel's counsel for bringing a frivolous motion and unreasonably multiplying the

14  proceedings in this case.  28 U.S.C. § 1927 ("Any attorney . . . who so multiplies the

15  proceedings in any case unreasonably and vexatiously may be required by the court

16  to satisfy personally the excess costs, expenses, and attorneys' fees reasonably

17  incurred because of such conduct.").

18           MGA also requests that Mattel be ordered to pay the fees and expenses

19  that MGA reasonably incurred in responding to Mattel's frivolous motion, in the

20  amount of $5,000.  (Ambrosini Decl. ¶ 13.)

21

22

23

24        [83]  Mattel has come nowhere near showing that MGA acted "recklessly or in bad

25  faith" to justify its requests for sanction against MGA under 28 U.S.C. § 1927.  *See In re
    Integrated Circuit Sys., Inc. v. Realtek Semiconductor Co.*, No. C00-4035 MMC(BZ), 2002

26  WL 532122, at *1 (N.D. Cal. Apr. 5, 2002) (sanctions under § 1927 "requires a finding that

27  a party acted recklessly or in bad faith") (citing *Pacific Harbor Capital, Inc. v. Carnival
    Airlines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000).  Mattel's request for sanctions under

28  Rule 37(a)(4) is similarly unauthorized because Mattel failed to make "a good faith effort
    to obtain the disclosure or discovery without court action." Fed. R. Civ. P. 37(a)(4)(A).



DATED: February 17, 2005

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP

By _Jon D. Corey/sra_____
    Jon D. Corey
    Attorneys for Plaintiff/Counter-Defendant
    Mattel, Inc.

DATED: February __, 2005

LITTLER MENDELSON, P.C.

By_____
    Keith A. Jacoby
    Attorneys for Defendant and Counter-
    Claimant Carter Bryant

DATED: February __, 2005

O'MELVENY & MYERS, LLP

By_____
    Paula Ambrosini
    Attorneys for Defendant
    MGA Entertainment Inc.

38

JOINT STIPULATION

EXHIBIT 15 PAGE 244

Received:   2/17/05   2:30P/
FEB-17-2005 14:26 FROM:LITTLER MENDELSON   310 553 5583        TO:12136240643        P.2/2
310 553 5583 -> JetFax   20;   Page 2

DATED: February __, 2005          QUINN EMANUEL URQUHART
                                  OLIVER & HEDGES, LLP

                                  By_____
                                     Jon D. Corey
                                     Attorneys for Plaintiff/Counter-Defendant
                                     Mattel, Inc.

DATED: February 17, 2005          LITTLER MENDELSON, P.C.

                                  By  _____
                                     Keith A. Jacoby  Douglas A. Wickham
                                     Attorneys for Defendant and Counter-
                                     Claimant Carter Bryant

DATED: February __, 2005          O'MELVENY & MYERS, LLP

                                  By_____
                                     Paula Ambrosini
                                     Attorneys for Defendant
                                     MGA Entertainment Inc.

*Joint stipulation Re
Mattel's motion to
Compel Production of
Originals*

38

EXHIBIT 15   PAGE 245          JOINT STIPULATION

Maria Albert - DOC.pdf

1   DATED: February ___, 2005   QUINN EMANUEL URQUHART
2                               OLIVER & HEDGES, LLP
3
4                               By:_____
                                    Jon D. Corey
5                                   Attorneys for Plaintiff/Counter-Defendant
                                    Mattel, Inc.
6
7   DATED: February ___, 2005   LITTLER MENDELSON, P.C.
8
9                               By:_____
                                    Keith A. Jacoby
10                                  Attorneys for Defendant and Counter-
                                    Claimant Carter Bryant
11
12  DATED: February 17th, 2005   O'MELVENY & MYERS, LLP
13
14                              By: _____
15                                  Paula Ambrosini
                                    Attorneys for Defendant
16                                  MGA Entertainment Inc.*
17
18  *Signed with the caveat that because Mattel has refused to provide MGA with the
    declarations and exhibits referenced in Mattel's portion of this Joint Stipulation,
19  MGA's portion of the Joint Stipulation cannot and does not take into consideration
    or respond to any such material. MGA signs this Joint Stipulation, therefore,
20  reserving the right to respond to any material it has not yet been able to review or
    consider, and to move to strike such material as appropriate.
21
22
23
24
25
26
27
28
                                   -38-
                                                        JOINT STIPULATION

EXHIBIT 15   PAGE 246

**Exhibit 16**

| | |
|---|---|
| **From:** | Jacoby, Keith A. [KJacoby@littler.com] |
| **Sent:** | Friday, October 06, 2006 10:37 AM |
| **To:** | Michael T Zeller; Wickham, Douglas A. |
| **Cc:** | John Quinn; Jon Corey; Torres, Diana; Cendali, Dale |
| **Subject:** | RE: Originals |

We have not torn the pages out of the book.  That is the procedure we are proposing. If it is unacceptable, we will give you dates to meet and confer.

*Keith A. Jacoby, Esq.*

*Littler Mendelson, P.C.*

*2049 Century Park East*

*Fifth Floor*

*Los Angeles, California 90067*

*ph. (310) 553-0308*

*direct (310) 772-7284*

*fax (310) 553-5583*

*kjacoby@littler.com*

-----Original Message-----
**From:** Michael T Zeller [mailto:michaelzeller@quinnemanuel.com]
**Sent:** Friday, October 06, 2006 10:34 AM
**To:** Jacoby, Keith A.; Wickham, Douglas A.
**Cc:** John Quinn; Jon Corey; Torres, Diana; Cendali, Dale
**Subject:** RE: Originals

John has been traveling and will respond separately later today to your email on the draft stipulation.

Your proposal on the originals is neither workable nor what we're entitled to.  Bratz-related documents in a spiral notebook make the other pages discoverable since those surrounding pages may have dates, impressions and other information on them that could tend to show when the Bratz-related documents were created.  I presume neither you nor Bryant have in fact torn pages out of the spiral notebook containing Bratz documents, since that clearly would constitute spoliation of evidence, and in no way would we or have we agreed to such a procedure.

Michael T. Zeller
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

EXHIBIT 16  PAGE 247

1/19/2007

Message

Page 2 of 4

Direct: (213) 443-3180
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: michaelzeller@quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Jacoby, Keith A. [mailto:KJacoby@littler.com]
**Sent:** Friday, October 06, 2006 10:26 AM
**To:** Michael T Zeller; Wickham, Douglas A.
**Cc:** John Quinn; Jon Corey; Torres, Diana; Cendali, Dale
**Subject:** RE: Originals

I do have a proposal. The primary issue is that most of the remaining originals reside in a spiral notebook. We will agree to make those documents available for inspection as follows: We will show you the cover of the notebook so you can see where the documents came from. We will then turn out each page from the notebook that was produced so you may inspect-copy it. The remaining pages of the notebook (the other side of the spiral binder) will remain in a manila folder, and those pages may not be inspected.

If that is acceptable, we can arrange a date for the inspection.

Neither you nor John responded to my email on Tuesday in which I reiterated Bryant's position on the Mattel stip. Do you intend to move forward on your motion or are we going to try to resolve the three remaining issues?

Keith A. Jacoby, Esq.

Littler Mendelson, P.C.

2049 Century Park East

Fifth Floor

Los Angeles, California 90067

ph. (310) 553-0308

direct (310) 772-7284

fax (310) 553-5583

kjacoby@littler.com

1/19/2007

EXHIBIT 16 PAGE 249

-----Original Message-----
**From:** Michael T Zeller [mailto:michaelzeller@quinnemanuel.com]
**Sent:** Friday, October 06, 2006 10:05 AM
**To:** Jacoby, Keith A.; Wickham, Douglas A.
**Cc:** John Quinn; Jon Corey; Torres, Diana; Cendali, Dale
**Subject:** Originals

Keith, as you know, at the June 20 meet and confer session before Judge Block, and in order to resolve a Mattel motion, all parties stipulated on the record that they would produce originals for inspection and photographing within 15 days of a request by another party. We have been asking now for months for Bryant to so produce specified originals. We nevertheless still have not been provided with all of the originals we have long been asking Bryant for. At least two letters we sent you on the subject were ignored. Then, pursuant to Judge Block's procedures, I emailed you asking for proposed dates when you and MGA's counsel were available to meet and confer in Judge Block's chambers about these unproduced originals. In response, you did not provide any proposed dates, but instead said you'd be making a "proposal." To date, however, we have received neither defendants' counsel's availability nor any such proposal.

Please provide me by the end of the day defendants' counsel's availability for a meet and confer session on the originals in Judge Block's chambers. If I don't receive it, we will contact his chambers and obtain a date, which is also in accordance with Judge Block's procedures in these circumstances where our requests for available dates have gone unheeded.

Michael T. Zeller
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3180
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: michaelzeller@quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

----

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this document (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

EXHIBIT 16   PAGE 249

To reply to our email administrator directly, send an email to
postmaster@littler.com

Littler Mendelson, P.C.
http://www.littler.com

----

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this document (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

To reply to our email administrator directly, send an email to
postmaster@littler.com

Littler Mendelson, P.C.
http://www.littler.com

EXHIBIT 16    PAGE 250

**Exhibit  17**

| | |
|---|---|
| **From:** | Jacoby, Keith A. [KJacoby@littler.com] |
| **Sent:** | Wednesday, October 11, 2006 1:50 PM |
| **To:** | John Quinn; Michael T Zeller |
| **Cc:** | Cendali, Dale; 'Torres, Diana'; Wickham, Douglas A. |
| **Subject:** | Mattel v. Bryant - Handling of originals |

Regarding the handling of the originals, I am reviewing the notebooks again and giving more thought on how they can be handled in an inspection, and I would ask that you give a little more thought to our position on the production of the pictures you have been taking of these originals. In my view, there is no basis for Mattel to create quasi-evidence and potential exhibits by taking pictures of our originals, and at the same time refuse to give us copies because it is allegedly work product. All due respect, that is a ridiculous position. Does Mattel intend to waive this "privilege" later on and use the documents at trial, or as exhibits at some later date? Will witnesses be allowed to see them prior to their depositions? I understand MGA has done one inspection, and I think we should reach a three way agreement on this point .From my perspective, the documents should be exchanged.

*Keith A. Jacoby, Esq.*

*Littler Mendelson, P.C.*

*2049 Century Park East*

*Fifth Floor*

*Los Angeles, California 90067*

*ph. (310) 553-0308*

*direct (310) 772-7284*

*fax (310) 553-5583*

*kjacoby@littler.com*


----

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this document (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended

EXHIBIT __17__ PAGE __251__

recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

To reply to our email administrator directly, send an email to postmaster@littler.com

Littler Mendelson, P.C.
http://www.littler.com

EXHIBIT  17    PAGE  252

**Exhibit  18**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

December 21, 2006

<u>VIA FACSIMILE AND U.S. MAIL</u>

Douglas Wickham, Esq.
Keith A. Jacoby, Esq.
Littler Mendelson, P.C.
2049 Century Park East, 5th Floor
Los Angeles, California 90067

Re:     <u>Mattel v. Bryant</u>

Dear Counsel:

I write to follow up on Judge Infante's direction at the recent scheduling hearing to determine when you are available to meet and confer regarding (a) Mattel's Motion to Compel Bryant to Produce Documents; (b) Mattel's Motion to Compel Bryant to Produce Originals for Inspection; and (c) Bryant's Motion to Overrule Objections Asserted at the Kaye and Driskill Depositions. As I understand the Judge's direction, the parties are to meet and confer by December 30, 2006. If you have any questions regarding the foregoing, please do not hesitate to call.

Best regards,

Jon Corey

JC:jcl
07209/2022780.1

EXHIBIT 18   PAGE 253

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

12/21/2006 15:50 FAX  21362401          QEUOH-LAO-2                          @001

```
        *********************
        ***   TX REPORT   ***
        *********************

   TRANSMISSION OK

   TX/RX NO              1455
   RECIPIENT ADDRESS     9414#07209#13105535583#
   DESTINATION ID
   ST. TIME              12/21 15:49
   TIME USE              00'37
   PAGES SENT            2
   RESULT               OK
```

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
# FACSIMILE TRANSMISSION

DATE:     December 21, 2006                    NUMBER OF PAGES, INCLUDING COVER:

| NAME/COMPANY | PHONE NO. | FAX NO. |
| --- | --- | --- |
| *Keith A. Jacoby, Esq.*<br>Littler Mendelson | (310) 772-7284 | (310) 553-5583 |
| *Douglas Wickham, Esq.*<br>Littler Mendelson | 310.553.0308 | 310.553.5583 |

FROM:     Jon Corey

RE:       *Mattel, Inc. v. MGA Entertainment, Inc.*

MESSAGE:

EXHIBIT 18   PAGE 254

**Group Send Report**

Page        : 001
Date & Time: 12-21-2006   03:19pm
Line 1     : 2136240643
Line 2     :
Machine ID : QUINN EMANUEL

Job number        :   689

Date              :   12-21   03:16pm

Number of pages   :   002

Start time        :   12-21   03:16pm

End time          :   12-21   03:19pm

Successful nbrs.

    Fax numbers

☎#9414#07209#12134306407#
☎13105535583#

Unsuccessful nbrs.                                                      Pages sent

EXHIBIT __18__ PAGE __255__

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:**   December 21, 2006

**NUMBER OF PAGES, INCLUDING COVER:**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| *Keith A. Jacoby, Esq.*<br>Littler Mendelson | (310) 772-7284 | (310) 553-5583 |
| *Douglas Wickham, Esq.*<br>Littler Mendelson | 310.553.0308 | 310.553.5583 |

**FROM:**   Jon Corey

**RE:**   *Mattel, Inc. v. MGA Entertainment, Inc.*

**MESSAGE:**



FAXED
DEC 2 1 2006

EXHIBIT 18    PAGE 256

| 07209/2022895.1 | | | | |
|---|---|---|---|---|
| CLIENT # | 7209 | ROUTE/<br>RETURN TO: | Johanna Lopez-10th | ☐ CONFIRM FAX<br>☐ INCLUDE CONF. REPORT |
| OPERATOR: | | | CONFIRMED? | ☐ NO ☐ YES: _____ |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.**

**Exhibit 19**

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG 1 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

                    Plaintiff,

v.

MATTEL, INC.,

                    Defendant,

and related actions.

CASE NO. CV 04-9049 SGL (RNBx)

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply. For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

AUG 1 1 2006

BY                      044

EXHIBIT 19   PAGE 257

(73)

> A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate.

The appointment of an expert by a federal court is a rare occurrence. Much of this stems from a concept "[d]eeply ingrained" in the common law "that it is the responsibility of the parties to produce the evidence while the court looks on to assure that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 706.02[1], at 706-6 (2nd ed. 2006). The reluctance of courts to intrude into the evidence-gathering function normally assigned to counsel is borne out of "the fear of ex parte communications between the court and its expert," as well as the unseemliness of "[c]ollecting a share of the expense [for the work performed by the court appointed expert] from a party who has been damaged by the expert's report." Id. at 706-6, 706-7. As a result of these institutional concerns, "experts are usually appointed only in exceptional cases that present unwieldy, complex, or technical issues" or where "there is a need for an impartial, independent assessment of a disputed issue." Id. § 706.02[3], at 706-8 706-9.

Here, Mattel seeks for the court to appoint experts in the fields of questioned document examination, ink chemistry analysis, and paper chemistry analysis in order to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-version of the BRATZ-related contract between . . . Carter Bryant and MGA Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ drawings bearing a fax header date of April 10, 2000," as well as "(5) any other documents that cannot be sampled or tested without destroying the sample tested or analyzed." (Mattel's Mot. Appt. Expert, Preface at 2). The reason proffered for such an appointment is two-fold: First, a generalized concern that, because the documents sought to be examined are "highly relevant" to the litigation, having a neutral expert perform the testing on the same may obviate a battle of the experts that would make

2

EXHIBIT 19   PAGE 258

1   the jury's function of sorting out the truth much more arduous; and second, concerns,

2   deduced during discovery, about the possible spoilation of key documents in the case

3   by MGA/Bryant and their counsel.

4   A.    AVERTING A BATTLE OF THE EXPERTS

5          Mattel's argument that the Court should appoint an expert because otherwise

6   each side will perform "separate, partisan destructive analyses of separate samples of

7   the documents" with "wide divergence" of opinion "virtually assured" is not well-

8   founded. (Mattel's Mot. Appt. Expert at 18, 20).  Explicit in Mattel's argument is that

9   this feared divergence in each side's retained expert's opinions has yet to materialize.

10  This is not surprising as it appears that discovery in this case is in its nascent stage,

11  owed largely to the fact that the Court had earlier stayed the case while Mattel

12  appealed the denial of its motion to remand the case to state court.  Mattel's argument

13  instead is that the Court should appoint an expert now to avoid the possibility that

14  there may be such wide divergence in each side's privately retained expert in the

15  future.  Needless to say from the jabs each party took at the credibility and even

16  trustworthiness of the other side's retained expert during the oral argument on this

17  motion (one going so far as to label the competing ink chemistry experts as being the

18  modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19  be more easier to imagine occurring here than in ordinary cases.  Nevertheless, such

20  divergence, even if likely, is still that – a possibility, not an inevitability.

21          In those cases where an expert has been appointed by a court on account of

22  the excessive partisanship in the expert opinions retained by counsel, the rationale for

23  the appointment was based on the fact that the feared wide divergence in opinion had

24  already materialized.  See Students of California Sch. for the Blind v. Honig, 736 F.2d

25  538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26  safety claims on the basis of evidence presented at trial, so he reopened the case and

27  appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28  site"), vacated on other grounds, 471 U.S. 148 (1985); Eastern Air Lines, Inc. v.

3

EXHIBIT  19    PAGE  259

1    <u>McDonnell Douglas Corp.</u>, 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2    706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3    experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4    Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5          In no instance uncovered by the Court's research (or by Mattel's citation to

6    authority) has a court appointed an expert because of a fear, even one that is well-

7    founded, that such wide divergence in privately-retained expert testimony <u>may</u>

8    materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9    experts by courts would expand exponentially, limited only by a court's assessment of

10   how partisan the experts in a given case may become in the future.  Such a

11   proliferation has not occurred precisely because courts generally require that the

12   divergent "horse" be placed before the expert witness "cart."  <u>See</u> FED. R. EVID. 706

13   advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14   Unless and until this feared divergence in opinion becomes reality, the Court finds that

15   the potential (which itself cannot be quantified at this point) for its occurrence does not

16   warrant the Court's intrusion into the adversarial process through the appointment of

17   an expert at this stage.

18   B.    SPOILATION OF EVIDENCE

19         The question is much closer with respect to Mattel's other reason for the Court

20   to appoint an expert in this case:  Concern that opposing counsel or their clients may

21   have destroyed or altered key documents in the case.  Mattel's basis for such concern

22   is predicated on three facts uncovered during discovery.

23         1.    Evidence of spoilation

24         Before being deposed Bryant was asked to bring all his original BRATZ design

25   drawings.  When he arrived at his deposition, however, Bryant only had in his

26   possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27   "contained holes where plugs apparently had already been removed.  Bryant

28   acknowledged . . . that his drawings had no holes in them when he gave them to his

4

EXHIBIT 19     PAGE 260

1   lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2   Specifically, at Bryant's deposition the following exchange took place between Bryant

3   and counsel for Mattel:

4         Q.   (By Mr. Quinn) I wanted to ask you about one of
           these original drawings that were produced today.
5                . . . .
           – what we're talking about here.  This is – the Post-It
6         says that's Bryant – that's the original of Bryant
           192, Bates number 192, which has the heads on it,
7         and this is one of the originals that your counsel was
           kind enough to have shipped here today for us to
8         look at.

9         A.   Yes

10        Q.   And we were just looking at these this afternoon and
           we notice[d] that there's a bunch of holes on the
11        page, including in the signature, as if somebody
           were taking ink samples.

12        A.   Uh-huh.
13
          Q.   Do you see that?
14
          A.   Yes.
15
          Q.   Do you know anything about why those holes were
16        made or how or when?

17        A.   I have no idea what those are.

18        Q.   I mean, when you had – when you had possession
           of this document did it have those holes in it?
19
          A.   Not that I remember.
20
          Q.   You certainly never had anything to do with that?
21
          A.   No.  I don't know anything about those holes.
22
          Q.   And, similarly, if you wouldn't mind holding this up to
23        the camera, this is the original of Bryant 210 and it's
           also – if you take a look at it, I think you'll see it has
24        some of those holes in it, although not as many as
           the last one we looked at.  Again, you don't know
25        anything about how or why those holes got put on
           there?
26
          A.   I don't.
27

28   (Decl. Michael T. Zeller, Ex. 7 at 161-163).

5

EXHIBIT 19 PAGE 261

1      Mattel has submitted the declaration of a questioned document analysis expert,

2   Lloyd Cunningham, who has opined that the holes described in the document

3   mentioned above are consistent with those that would be generated by taking

4   microplug samples to perform analysis of the ink found on a document.  (Decl. Lloyd

5   Cunningham ¶ 5).  Bryant and MGA eventually conceded (although at first refusing to

6   do so under the veil of work-product privilege) that they tested some of the original

7   BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8   Speckin.  (Response to Order to Show Cause ("Response") at 1-2).

9      Mr. Speckin states that in June, 2004, he performed a series of tests "on

10   various 'Bratz' documents" at the request of MGA's counsel.[1]  (Decl. Erich J. Speckin

11   ¶ 8).  Those tests included examining the documents in question under an infrared

12   light as well as performing sidelight testing, which involves "visually inspecting a

13   document by holding a side light up to the document at an oblique angel . . . to

14   determine preliminarily whether the document contains impressions, or markings

15   impressed upon the document by drawing and writing done on a sheet of paper laid

16   on top of the document being tested."  (Decl. Erich J. Speckin ¶¶ 9, 10).  Mr. Speckin

17   also performed an electrostatic detection apparatus to see if there was indented

18   impressions on the documents.  (Decl. Erich J. Speckin ¶ 11).  Finally, Mr. Speckin

19   "performed ink identifications tests" on the documents.  (Decl. Erich Speckin ¶¶ 12-

20   13).  Such testing involved Mr. Speckin removing "very small microplug samples from

21   the document at issue and testing the microplug."  (Decl. Erich Speckin ¶13).

22   Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23   original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24   it averred from what parts of the documents that were tested was the microplug taken.

25   Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27   ———————————

28     [1] At the time the testing was done by Mr. Speckin, Bryant had already been sued by Mattel for violating the terms of the invention agreement he signed when he worked for them from 1999 to 2000.  (Response at 1).

EXHIBIT 19 PAGE 262

1   sufficient material for another expert to test the exact same <u>documents</u>," but admits

2   that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3   Erich J. Speckin ¶14).

4          Another episode brought to light during discovery causing Mattel concern

5   relates to MGA's handling of the original Bryant/MGA contract before the inception of

6   the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7   testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8   Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9   between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14       Q.      . . . Was there ever anything that you were asked to
                 do that you — made you feel kind of uncomfortable?
15

16       A.      Yes.

                              . . . .

17       Q.      And what was that?

18       A.      When the original contract was executed by Carter
                 Bryant, it was sent to me <u>via</u> fax, and on the top of
19               the fax listed the phone number from where it was
                 faxed, which said "Barbie Collectibles," and at one
20               point my boss, Isaac Larian, asked me to white that
                 out and send it to a lawyer, Patty Glaser.
21

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26       Q.      Were you ever asked to change the date on any
                 agreements between Mr. Bryant and MGA?
27

28       A.      No.

7

EXHIBIT 19 PAGE 263

Q.  Are you aware of anybody being asked to change the date on any of those agreements?

A.  No.

Q.  I mean, do you have any reason to believe that any agreement that was entered into between Mr. Bryant and MGA had a date altered or changed?

A.  No.

Q.  You never heard that from – from any source?

A.  No.

(Decl. Paula E. Ambrosini, Ex. 3).

Finally, Mattel speculates that a drawing of some BRATZ doll accessories faxed on April 10, 2000, had the fax header altered, much in the same manner described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the fields on the fax header for the sender's name and the sender's telephone number are missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

---

[2] Mattel speculates that the time sheets produced by MGA for one of its employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked on projects called "Angel" or "Prayer Angel," when in fact she was working at the time painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at 3). The basis for this speculation is based on the fact that the initial disclosure by MGA of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then, on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21). Within a couple of weeks after Rhee's production of invoices to Mattel, MGA supplemented its earlier production of Rhee's time sheets showing that during the mid-to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer Angels" and was not involved in any BRATZ-related work until after Bryant's departure from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time sheets were altered is allegedly bolstered by the fact that Rhee testified during her deposition that the only work she performed in mid-to-late 2000 was on BRATZ and that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was nothing but a cover or code word for BRATZ-related work. This argument is hard to accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel" for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60, 362). It is not until December, 2000, that any of the invoices submitted by Rhee show

8

EXHIBIT 19 PAGE 264

1   facsimile machines normally insert senders' names and numbers as a matter of

2   course, and indeed is required by law [to do so], it appears likely that the document

3   was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."

4   (Mattel's Mot. Appt. Expert at 10). The premise underlying Mattel's concern on this

5   topic is not unreasonable. The law requires such information to be found on any

6   document, like the one in question, that has been faxed. Additionally, the testimony

7   elicited from Ms. O'Connor that MGA altered the fax header for other documents

8   related to BRATZ from the same time period leads to an obvious inference that other

9   documents where spaces on other fax headers are absent suffered a similar fate.

10       2.    Analysis

11          a.    Microplug Ink Testing

12       Bryant and MGA begin by downplaying the significance of the spoliation issue

13   in this case. With respect to the holes on some of the original BRATZ design

14   drawings produced at Bryant's deposition, they note that, even with these holes,

15   nothing prevents Mattel from performing its own testing on the remaining portions of

16   the drawings on the document. "Indeed, the very fact that Mattel is asking for court-

17   appointed experts to perform ink and paper testing only underscores the fact that

18   nothing has been 'destroyed.'" (Joint Opp. at 2). Mr. Speckin makes similar assertions

19   in his declaration, stating that the fact that the same microplug cannot be tested "is

20   entirely irrelevant because there is more than enough ink on each of the documents I

21   tested to allow numerous microplug samples to be extracted and tested by different

22   experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23   ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25

26   her doing work on the BRATZ doll, well after Bryant had left Mattel. (Decl. Michael T. Zeller, Ex. 21 at 367, 370, 373). To accept Mattel's argument, not only would MGA

27   have had to alter the invoices it produced in the supplemental production, but the documents produced by Rhee would also have to be similarly altered. An alternative

28   and just as plausible explanation is that Rhee is simply mistaken as to when she began performing work on the BRATZ project.

EXHIBIT __19__ PAGE __265__

1   that fact is entirely irrelevant because, unlike in a situation where the entire object is

2   destroyed during the testing, there is more than enough ink on each of the documents

3   Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4   (emphasis added))).  This argument is not persuasive.  This is not a case where

5   everyone concedes that the documents in question were created at one point in time,

6   but dispute what that date may have been.  In such a circumstance all the ink

7   markings on the documents are comparable to one another as it is conceded that all

8   the marks came from one point in time.

9        Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10   periodically touched up or made refinements/additions to those drawings, adding more

11   marks in 1999 and 2000 during the time he was employed by Mattel.   An ink mark

12   from one part of the document is not necessarily comparable to another set of ink

13   markings found elsewhere on the document.  One ink mark on a drawing could have

14   been made in 1998, for example, while another ink mark found on the same drawing

15   could have been put there sometime later.  In taking microplug samples from one of

16   these ink markings without the ability of the other side to test the same mark would

17   forever foreclose a potential avenue of crucial evidence in this case.  It is on that point

18   that taking microplug samples of the marks on these drawings is akin to the spoilation.

19   Therefore the fact that another expert could test other parts of the document does not

20   mean that key relevant evidence found on that document has not been destroyed.  As

21   MGA and Bryant make clear spoilation of evidence occurs through the "destruction or

22   significant alteration of evidence, or the failure to preserve property for another's use

23   as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire &

24   Rubber Co., 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25        At this point, it should not be lost that the documents in question are not

26

27      [3] The Court does not mean to suggest that Mattel's theory is correct.  Instead, the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  complete destruction of a document would amount to spoilation under the particular circumstances in this case.

EXHIBIT 19   PAGE 266

1    peripheral to the case.  At its heart, this case asks the question:  Who owns the rights

2    to the Bratz dolls?  Bryant asserts that he came up with the idea for the Bratz dolls

3    while on a break from his employment at Mattel in 1998, and that he sold his idea to

4    MGA when he went to work for them in October, 2000.  Mattel claims, among other

5    things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while

6    he was working for them from January, 1999, to October, 2000, and that pursuant to

7    an inventions agreement he signed with the Mattel when he went to work for them,

8    that idea now belongs to Mattel.  As this clash of factual contentions makes clear, the

9    dating of the original BRATZ drawings and the markings contained thereon is a

10   fundamental, perhaps despositive, issue to this case.  That there are serious

11   questions concerning the handling of these critical documents certainly causes the

12   Court much concern about whether the truth seeking functions of the adversarial

13   system have been fundamentally compromised in this case.  As Mattel rightly notes,

14   "The adversarial process is not an end in itself; its value is in its ability to promote a

15   search for truth."  (Mattel's Reply at 9).

16        Bryant and MGA concede that the sections that were holed out contained

17   markings, be they handwritten dates or other words or letters, that may be crucial to

18   the case.  Indeed, one of the drawings – Bryant 192 – had a portion of the signature

19   line sampled.  What is left unclear is whether, for those portions of the document

20   where ink or signatures were sampled, enough of the same part of the document in

21   question (meaning the same mark) remains to be sampled by Mattel.  For instance, is

22   there enough of the signature line from Bryant 192 left to sample, or has too much of it

23   already been sampled?  In that sense, MGA's and Bryant's argument that nothing has

24   been destroyed by the microplug testing procedure because other parts of the

25   document still exist is misplaced.  Indeed, MGA and Bryant later admit that the

26   circumstances allowing for "multiple experts [to] remove multiple microplugs and test

27   the exact same paper and ink" is dependent upon there being the same exact paper

28   and ink there to test.  (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

EXHIBIT 19  PAGE 267

1   The continued existence of the "exact same pen stroke" is the very issue that is now

2   left open because of the holes in some of Bryant's original BRATZ design drawings.

3   Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4   remaining on the original drawing for Mattel to test? None of these questions have

5   been addressed by MGA, Bryant, or Mr. Speckin in their papers.  Instead, they simply

6   make the observation that there remain other ink markings on the same drawings for

7   Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8   Court that Mattel has not been prejudiced by MGA's actions.

9          Given the absence of any representation by them on this point, the Court

10   pressed MGA's counsel about the same at oral argument:

11          THE COURT:  And part of your argument is that
        while a small portion of the small portion of the page may
12        be gone, as you in your most recent papers concede is
        gone, there are other portions of the page that can be
13        tested.  The concern I have, I guess – and maybe you can
        clear this up for me – I've seen some of the drawings and I
14        have a pretty good mental image of what the drawings look
        like.  But there is also writing on these drawings,
15        signatures, copyright registration indications; some are
        large, some are small.  As I gather from the plaintiff, from
16        Mattel, the concern is that these different drawings or
        writings were done at different times.  And I guess I can
17        understand why when those drawings or writings were
        done could be significant from an evidentiary standpoint.
18        So the concern is not so much there's another part of the
        paper that can be tested; it's whether or not the particular
19        marking in question has been so damages as to not permit
        a full further testing on that particular marking.  Does my
20        question make sense?

21          MS. CENDALI: Yes, it does, your Honor.  And I
        anticipated that.  Significant, we thought, in their papers
22        was that . . . they cited to the fact that Mr. Bryant admitted
        in his deposition that there were holes in some of the
23        documents that he didn't know how they got there
        originally.  As an example, if you look at part of Zeller,
24        Exhibit 17, Bates number Bryant 201, that's an example of
        one of the documents that's been tested.

25          THE COURT: One second so I have that in front of
26        me.  Okay.

27          MS. CENDALI: There are many many others that were
        submitted that were also submitted to this type of ink
28        testing, but this is just an example of one of them.  And if

EXHIBIT  19  PAGE 268