**Exhibit 1**

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Plaintiff Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. CV 04-09059 and Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | [PUBLIC REDACTED] DECLARATION OF MICHAEL MOORE IN SUPPORT OF MATTEL, INC.'S OPPOSITION TO MGA ENTERTAINMENT, INC.'S MOTION FOR TERMINATING SANCTIONS |
| Defendant. | |
| AND CONSOLIDATED CASES | Date:   August 27, 2007 |
| | Time:   10:00 a.m. |
| | Place:   Courtroom 1 |
| | Discovery Cut-off:  January 14, 2008 |
| | Pre-trial Conference:  April 7, 2008 |
| | Trial Date: April 29, 2008 |

07209/2191062.6

DECLARATION OF MICHAEL MOORE

## DECLARATION OF MICHAEL MOORE

I, Michael Moore, declare as follows:

1.     I make this declaration in support of Mattel's Opposition to MGA Entertainment, Inc.'s Motion for Terminating Sanctions. I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.     I have been a Mattel employee since December 2000. I am currently Senior Counsel in Mattel's Legal Department.

3.     I have been personally involved with the collection and preservation of evidence in not only Bryant v. Mattel and the consolidated cases, but with other litigation (to which MGA and Bryant were not parties) involving Mattel products and product lines known as MY SCENE and DIVA STARZ.

4.     On November 24, 2003, I, with outside counsel, received a copy of Carter Bryant's contract with MGA dated "as of September 18, 2000" from a party in litigation with MGA in the Hong Kong courts (in a case to which Mattel was not a party). A true and correct copy of that contract is attached as Exhibit 1.

5.     I personally participated in and supervised the investigation, collection and preservation of documents that relate to the basis of Mattel's claims in this litigation. I personally have spent hundreds of hours beginning in 2003 searching for, collecting and preserving documents, including electronic data, in connection with this litigation. All told, the legal personnel working at or on behalf of Mattel alone have devoted many thousands of hours beginning in and since 2003 searching for, collecting and preserving documents, including electronic data, in connection with this litigation. Throughout the process, on an on-going basis whenever a Mattel employee was identified as having potentially pertinent information, outside counsel and I instructed those Mattel employees who potentially could have had Bryant related documents to collect them and give them to me. Because the efforts have been considerable, it is difficult to summarize in a

1   Declaration the entirety of what Mattel has done to preserve documents, including
2   electronic data, in connection with this litigation, this Declaration focuses on certain
3   categories of examples of such preservation efforts.

4         6.    Mattel employed Carter Bryant, most recently, from January 4,
5   1999 to October 21, 2000.  During that time he worked in Mattel's "Barbie
6   Collector" group.  Because Mattel has an e-mail retention policy of 90-days on its e-
7   mail servers and had a 30-day rotation policy for e-mail server backup tapes, any e-
8   mail message that Carter Bryant authored or received or was related to him would
9   not have been on either an e-mail server or a backup tape 120-days after he quit, by
10  mid-February 2001.  Nevertheless, starting in 2003 and more than once, I searched
11  for old e-mail server backup tapes, but located none in any location where they were
12  usually stored.

13        7.    Mattel employees, however, also store e-mails older than 90 days
14  in other places, including by printing them out, saving them on personal hard drives
15  or saving them on network data servers (as opposed to e-mail servers).  During its
16  numerous and repeated searches, Mattel located certain e-mail messages on which
17  Carter Bryant was an addressee and preserved them.  A true and correct copy of
18  examples of these e-mail messages are attached as Exhibit 2.  Mattel searched for,
19  identified and preserved e-mails relating to Bryant that it could locate.

20
21                      REDACTED
22
23

24        8.    The efforts to search, collect and preserve e-mails relating to
25  Bryant aimed to encompass, among other things, (i) e-mails written by, to or
26  mentioning current or former employees, including Carter Bryant, Cassidy Park,
27  Ann Driskill, Lily Martinez, Mercedeh Ward, Margaret Hatch-Leahy, and certain
28

                                   DECLARATION OF MICHAEL MOORE

1  third parties, including Isaac Larian and any other persons using an MGA e-mail

2  address; and (ii) e-mails discussing Bratz and MGA.

3         9.    Mattel also collected and preserved relevant documentary files

4  and created forensic images of hard drives on the personal computers of those

5  employees who were believed to have potentially pertinent information who still

6  worked at Mattel, including, the hard drives of Ann Driskill, Cassidy Park and Lily

7  Martinez.  Mattel additionally preserved approximately 130 hard drives that Mattel's

8  IT department had in its possession from prior years.

9         10.    I identified, collected and preserved Mattel's electronic telephone

10  records for the El Segundo campus, which included archive tapes containing the

11  phone logs generated by Mattel's MicroCall software.  The archive tapes that were

12  located are currently preserved in a secure, off-site location.  Although I, along with

13  others assisting me, also searched for them in 2003, we were unable to locate

14  archive tapes containing such phone logs for October 2000 or December 2000.

15         11.    I also initiated a search for backup tapes for the data server

16  commonly known at Mattel as Zeus beginning in 2003.  As a result of the searches,

17  Mattel located and has preserved various archived LTO and DLT back up tapes

18  from its Zeus server.  Some older Zeus backup tapes were separately discovered in

19  Mattel's Data Center, located in Phoenix, Arizona.  These backup tapes were

20  delivered to me and are from the time periods April, May, August, September and

21  December 1998, January and February 1999, February, March, April, May, June,

22  July, August and December 2000 and January 2001.  I have also received Zeus

23  backup tapes for later periods.  All of the Zeus backup tapes that have been provided

24  to me are currently preserved in a secure, off-site storage facility.

25         12.    In 2002, Mattel released a new fashion doll line called MY

26  SCENE.  In early 2003, Simba Toys & Co. GmbH KG ("Simba") began to market

27  and sell knock-offs of MY SCENE dolls at a toy fair in Nuremberg, Germany.

28  Beginning by no later than approximately Spring 2003, I instructed Mattel

07209/2191062.6

-4-

DECLARATION OF MICHAEL MOORE

1  employees known to me to have worked on designs for Mattel's MY SCENE dolls

2  to gather and preserve documents related to the development of MY SCENE for

3  purposes of litigation against Simba.

4         13.    Mattel filed its action against Simba on July 25, 2003 in the

5  United Kingdom.  A true and correct copy of that complaint is attached as Exhibit 3.

6  Mattel and Simba had an expedited trial in October 2003 in London, England.

7  Mattel prevailed.  All materials that were collected for the Simba litigation have

8  also been preserved for this litigation.

9         14.   In 2002, an individual named Gustavo Duarte Viveros pursued

10  an action in Mexico against Mattel de Mexico claiming that Mattel's DIVA STARZ

11  doll line infringed copyrights in drawings he allegedly created.  After abandoning

12  that action, Duarte Viveros sued Mattel in the Central District of California in

13  October 2004, claiming that Mattel's DIVA STARZ doll line infringed the copyright

14  in his drawings and constituted idea theft.

15         15.   In connection with the Duarte Viveros litigation, Mattel collected

16  and preserved existing documents, electronic files, e-mail and tangible items

17  (making up in excess of 70 boxes) related to DIVA STARZ, including e-mails and

18  other documents of Mattel employees who worked on DIVA STARZ, such as

19  designers Maureen Mullen, Rene Pasko, Joni Pratte and Rob Hudnut, and from

20  various third parties who worked on the project, such as Steve Linker.  In

21  connection with this effort as well, Mattel collected and preserved pertinent existing

22  electronic files from the Zeus server and back-up tapes as well as from the hard

23  drives and other electronic media used by numerous individuals.  All materials that

24  were collected for the Duarte Viveros litigation have also been preserved for this

25  litigation.

26         16.   Beginning in 2005, during the course of defending Duarte

27  Viveros' claims, Mattel discovered certain documents and designs for the DIVA

28  STARZ project that were never publicly released and that pre-date the release of

-5-

DECLARATION OF MICHAEL MOORE

1   Bratz, but that appear to share certain common elements with the Bratz dolls.

2   Attached as Exhibit 4 are true and correct copies of examples of such documents,

3   bates labeled M 0016585-M 0016586.001, M 0016817, M 0016504, TP 0008, TP

4   0009 and TP 0011.

5         I declare under penalty of perjury under the laws of the United States of

6   America that the foregoing is true and correct.

7         Executed on August 13, 2007, at Los Angeles County, California.

8

9

10                   Michael Moore

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit  1**

**MGA ENTERTAINMENT**
16730 Schoenborn Street
North Hills, California  91343

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160ᵗʰ Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

1.    <u>Retention as Consultant/Services</u>: MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

2.    <u>Term/Exclusivity</u>: The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3.    <u>Ownership</u>:

    (a)    All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

(00006662.DOC/2 / 10/04/2000  03:05 FM)                    1

M 0001547

p. 7

...ents in MGA's r...e or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute. Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents. If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)    Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine. Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.    Compensation/Costs:

REDACTED

(a)    For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of ...                 dollars ($          ) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of ...           dollars ($          ) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)    MGA shall pay to Bryant a royalty of        percent (   %) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services. As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances). MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final.

[00000682.DOC/2 / 1904/2000 03:05 PM]

2

M 0001548



⌐ing on Bryant, shall constitute an account stated, and shall n⌐. oe subject to any question for ⌐eason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to ⌐jA within two (2) years after the date rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)    All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent. In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)    Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis. Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable). MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)    MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales. MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell. Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant. Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.    Warranties and Indemnity: Bryant represents, warrants and agrees that:

(a)    he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)    neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)    the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

[CCCCEEE2.DOC/2 / 10/04/2000 03:05 PM]

3

M 0001549

p.⁷

...opyrights, mask ...rk rights, trade secrets, rights of privacy ' other intellectual property

(d)      he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

(e)      he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.    Default/Termination:

(a)      In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

(b)      Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.    Confidentiality:

(a)      Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

(b)      Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

(c)      Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{0C006662.DOC/2 / 10/04/2000 03:05 PM}                                        4

M 0001550

p. 10

equitable relief in the nature of injunction and to all other available relief, at law and/or in

3.     **Notices:** All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time. All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid. Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 160th Street, Gardena, California 90247.

9.     **Independent Contractor/No Partnership/Third Party Beneficiary:** Bryant's relationship with MGA is that of an independent contractor. Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name. Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties. In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship. Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise. This Agreement shall not be construed to be for the benefit of any third party.

10.    **Services Rendered Deemed Special, etc.:** Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.    **General Provisions:**

       (a)    This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law. Any such assignment shall not relieve such Party of its obligations hereunder.

       (b)    The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

       (c)    A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof. All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

       (d)    Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of or in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

[C0006662.DOC;2 / 10/04/2000  03:53 PM]                5

M 0001551

p. 11

(e)    This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction of the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)    This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained. No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)    Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____

CARTER _____

REDACTED

Social Security Number

{00006662.DOC/2 / 10/04/2000 03:05 PM}

6

M 0001552

p. 12

**Exhibit 2**

| | |
|---|---|
| **From:** | Mirkazemi, Mina |
| **Sent:** | Thursday, October 21, 1999 11:10 AM |
| **To:** | Bryant, Carter; Fonseca, Heather; Ruggeri, Ronnie; Regan-Metts, Pam E; Vandenberg, Janet; Hammons, Kitti; Wong, Mary Y (CPI); Magbanua, Maricor; Mo, Ann; Chabra, Melony |
| **Cc:** | Green, Joann; Donham, Mark S; Ayala, Stephanie; Tomiyama, Christina; Lloyd, Patti; McDonald, Myrna A; Yamamoto, Mark; Cunanan, Dana; Donham, Mark S |
| **Subject:** | RE: BA703 CE Hollywood Brb #1 (2000) |

We will use the round stand for the Hollywood series #19364

| | |
|---|---|
| **From:** | Chabra, Melony |
| **Sent:** | Wednesday, October 20, 1999 1:39 PM |
| **To:** | Bryant, Carter; Fonseca, Heather; Ruggeri, Ronnie; Regan-Metts, Pam E; Vandenberg, Janet; Mirkazemi, Mina; Hammons, Kitti; Wong, Mary Y (CPI); Magbanua, Maricor; Mo, Ann |
| **Cc:** | Green, Joann; Donham, Mark S; Ayala, Stephanie; Tomiyama, Christina; Lloyd, Patti; McDonald, Myrna A; Yamamoto, Mark; Cunanan, Dana |
| **Subject:** | BA703 CE Hollywood Brb #1 (2000) |

Transfer occurred today 10/20 on the BA703 CE Hollywood Barbie #1 - Opening Night Doll. Please find schedule attached.
<<File: CE Hollywood Night.xls>>
Schedule is soft goods limited with Swatch Release due 10/22.

Mina M. to follow-up & advise team which doll stand will be included.  No cost or schedule impact.

Please let me know if you have any questions.

Thanks,
*MELONY CHABRA*
*x4563*

**Confidential - Attorneys Eyes Only**

M 0068291

p. 13

*Notes -*
*PTF mtg 8/11*

**Alderete, Michele**

| | |
|---|---|
| **From:** | Lloyd, Patti |
| **Sent:** | Thursday, August 10, 2000 10:49 AM |
| **To:** | Dieudonne, Michelle; Roberts, Pam; Scruggs, Stephanie; Vandenberg, Janet; Nagele, Jan (Barbie Collectibles); Best, Robert; Bryant, Carter; Jimenez, Katiana; Paulino, Denise; Zuckerman, Sharon; Monteagudo, Carmen; Kyaw, Sheila; Liao, YuHeng; Briant, Susanne; Anzoategui, Carol; Ruggeri, Ronnie; Polzin, Victoria M.; Jung, Penny; Sipos, Lauri; Walker, April; Hoffman-Briggs, Hoi; Donham, Mark S; Tomiyama, Christina; Alderete, Michele; Mirkazemi, Mina |
| **Cc:** | Driskill, Ann; Shimoda, Robin C; Richardson, Ruby N; Le, Ha; Wolf, Hiroe; Fong, Ei; Shaw, Jennifer; Church, Audrey; Fieraru, Argentina; Longsdorf, Ron; Arriola, Liz |
| **Subject:** | RE: PTF Product Notes |

I put this on the working meeting schedule for Fri from 10 to 11.  I think we should start out with a smaller discussion team of the PA's & Michelle, Planning, Ruby, Wendy, Mina and Tina to determine feasibility before we initiate any changes.
Hope this works for everyone.

| | |
|---|---|
| **From:** | Mirkazemi, Mina |
| **Sent:** | Wednesday, August 09, 2000 11:53 AM |
| **To:** | Dieudonne, Michelle; Roberts, Pam; Scruggs, Stephanie; Vandenberg, Janet; Nagele, Jan (Barbie Collectibles); Best, Robert; Bryant, Carter; Jimenez, Katiana; Paulino, Denise; Zuckerman, Sharon; Monteagudo, Carmen; Kyaw, Sheila; Liao, YuHeng; Briant, Susanne; Anzoategui, Carol; Ruggeri, Ronnie; Polzin, Victoria M.; Jung, Penny; Sipos, Lauri; Walker, April; Hoffman-Briggs, Hoi; Donham, Mark S; Tomiyama, Christina; Alderete, Michele |
| **Cc:** | Driskill, Ann; Shimoda, Robin C; Richardson, Ruby N; Le, Ha; Wolf, Hiroe; Fong, Ei; Shaw, Jennifer; Church, Audrey; Lloyd, Patti; Fieraru, Argentina; Longsdorf, Ron; Arriola, Liz |
| **Subject:** | RE: PTF Product Notes |

As you all know these dolls are all at different stages of development and some of the changes are going to have schedule impacts.  I think we need to look at the impact before any changes are made to the product.

Patti, Liz, Michelle
can we get together ?

| | |
|---|---|
| **From:** | Tomiyama, Christina |
| **Sent:** | Wednesday, August 09, 2000 11:17 AM |
| **To:** | Dieudonne, Michelle; Roberts, Pam; Scruggs, Stephanie; Vandenberg, Janet; Nagele, Jan (Barbie Collectibles); Best, Robert; Bryant, Carter; Jimenez, Katiana; Paulino, Denise; Zuckerman, Sharon; Monteagudo, Carmen; Kyaw, Sheila; Liao, YuHeng; Briant, Susanne; Anzoategui, Carol; Ruggeri, Ronnie; Polzin, Victoria M.; Jung, Penny; Sipos, Lauri; Walker, April; Hoffman-Briggs, Hoi; Donham, Mark S |
| **Cc:** | Driskill, Ann; Shimoda, Robin C; Mirkazemi, Mina; Richardson, Ruby N; Le, Ha; Wolf, Hiroe; Fong, Ei; Shaw, Jennifer; Church, Audrey; Lloyd, Patti; Fieraru, Argentina; Longsdorf, Ron |
| **Subject:** | PTF Product Notes |
| **Importance:** | High |

A few follow-up notes from PTF, edited by Ann Driskill, Robin Shimoda, and Tina Tomiyama.

In general, the product looked FABULOUS.  These are just general heads-up notes to those who are working on these products, so that we can follow up on the changes that are necessary.  Please feel free to pass on these notes to anyone who needs a copy.

**Disney Summer Ariel**
      The hairstyle was changed just before PTF; it should look similar to the 1999 "Wind" doll, with flowing curves of hair "blowing" off to the doll's left side.  But the PTF samples (both in and out of package) looked more like a big football-shaped blob of hair.  When we tried to regroom them we discovered that the hair had been *sewn into* that blob shape. *will do h for app dif*

**Princess of the World - India**
      The bindhi dot on her forehead was reddish brown (correct) on the display sample, but it was pale coral red (incorrect) on the packed-out sample.
      The sari was sewn onto both samples in a completely incorrect drape.  Argentina re-draped the sari to follow the viability photo, which we will send to HKSG to follow for production. *no action — packout issue*

Page 1

CONFIDENTIAL ATTORNEYS EYES ONLY
M 0013208

*p.14*

**Princesses of the World: Inca:**
Ron was disappointed in the look of the fabric art; wanted to know if it could still be improved. *No action*

**Birthday Wishes #3**
We sent three samples but only two "gift bags" were found (after a lot of searching). No big deal for PTF; we left a gift bag out of the package sample, but a third gift bag should be made up eventually so that we have complete samples. *okay*

**Wizard of Oz porcelain Scarecrow:**
Changed his glove color to a pale cream shade rather than the light grey specified in the style guide (which looked too blue). *licensor prefers agrey.*

**HI End Ferrari:**
Earring jewelry needs attention – "diamond" studs appear oversized, sticking way out of ears, especially when the drop is added.
Important to know that "horse" ornament in head must be positioned at a slant, the same slant as the logo art. I.e., the horse's four feet should not all be level; the horse should be standing on his hind feet with his body at about a 45° angle and his forefeet in the air. This will require repositioning the attachment on the back of the piece. *No issue.*

**Fashion Hound:**
The pearl necklace needs to lay flat around the seam of the turtle neck collar. The snap at the back of the neckline was removed and the collar sewn, closed by hand, in order for the pearls to lay flat. ① *sew on fashion - Revise Pattern Pds.*
② *review pearls*

**Scarlett #1:**
We wanted to show the hat on the doll, but discovered that the ribbons were sewn on the brim of the hat 3/8" out from the crown, in such a way that they stood way out from the head when tied. Argentina re-stitched the ribbon to the crown only, not stitched to the brim. *N issue*

**Goldilocks:**
Even after thinning and heat-setting, she still had way too much hair. We slipped a clear elastic around her hair at neck level, which helped restrain the mane. Consider changing specs / changing packout. *okay — address @ packout*

**1970's:**
The way she was packed out in the box made her look bent over and in pain. It is specially important that the upraised arm (with the "peace fingers") not be forced back to the level of the insert (i.e., add a 1/2" twist of plas-tie between elbow and insert).
The '70's kerchief/hat was not placed correctly. It should be down over the hairline a little, not behind it, back on the head. Ideally, a better pattern shape would make the tying and placement easier, or it's too late for the change. *Fix @ packout*

**Fairy #2:**
Was on the wrong color body; when will we have Nostalgic color bellybutton bodies? Same body needed for "Cher". *ensure it matches a production*

**Princess and the Pea:**
Please review face paint all along the way from designer original to PTF sample. It appears to have lost a lot of attractiveness, and possibly some of the charm could still be restored. *review — no action*

**Elvis Eagle Jumpsuit:**
We stuck cotton pads down the sides of his costume but he still looked pretty skinny, the costume was awfully tight.

Page 2

CONFIDENTIAL ATTORNEYS EYES ONLY
M 0013209

*p. 15*

**Bride #2:**

All of the brides dresses were **very** low-cut, and since they were displayed on a lower shelf, the "buzzoomage" was magnified. Argentina put a shirring stitch on the underside of the top edge of the yoke and pulled the stitch to curve slightly over the bust, and then was steamed after it was dressed on the doll. I suggest the ribbon be sewn onto the bodice at the neckline edge, rather than from the armhole edge. *ARSG aware eyed*

**James Dean:**

The collar was steamed to slightly curve away from his face, so as not to stand straight upward.

**Lucy and Ricky Giftset:**

The Lucy earrings had to be unbent so that the stud went straight into her ear. They had been bent so that the stud faced totally forward as you look at the doll. This looks wrong in most cases, though we've been doing it fairly often. We really need to start using tiny studs that aren't too thick - like Frankenstein knobs.

Page 3

CONFIDENTIAL ATTORNEYS EYES ONLY
M 0013210

*p.16*

**Contreras, Patricia**

| | |
|---|---|
| **From:** | Hammons, Kitti |
| **Sent:** | Thursday, May 20, 1999 5:59 PM |
| **To:** | Contreras, Patricia; Wittenberg, Mark S; Bryant, Carter; Vandenberg, Janet |
| **Cc:** | Fonseca, Heather; Daley, Judy; Mirkazemi, Mina; Driskill, Ann |
| **Subject:** | RE: HSN Emerald |

Shani long neck tooling is available for the a/m doll.

*Kitti Hammons*

| | |
|---|---|
| **From:** | Vandenberg, Janet |
| **Sent:** | Thursday, May 20, 1999 10:07 AM |
| **To:** | Contreras, Patricia; Wittenberg, Mark S; Bryant, Carter; Hammons, Kitti |
| **Cc:** | Fonseca, Heather; Daley, Judy; Mirkazemi, Mina; Driskill, Ann |
| **Subject:** | RE: HSN Emerald |
| **Importance:** | High |

Patricia,
The only cost reductions that are being done are to the jewelry. We should have a response back from CMO tomorrow with new quote for jewelry. We will be using the long neck tooling. We are developing new tooling for a medium neck for the Shani body and we would like to use it on this doll if it will be ready in time.

Mark,
Can you please advise status of medium neck development for Shani body.

Carter,
Will the package be ready for transfer next Tuesday, 5/25?

Kitti,
Please confirm that the Shani long neck tooling will be available for this doll. It is currently at MHK being used on Mackie Goddess of Africa, Toy# 22044.

Thank you all in advance for your help,
Janet

| | |
|---|---|
| **From:** | Contreras, Patricia |
| **Sent:** | Wednesday, May 19, 1999 4:37 PM |
| **To:** | Daley, Judy; Vandenberg, Janet; Bryant, Carter |
| **Cc:** | Fonseca, Heather |
| **Subject:** | HSN Emerald |

Please let me know if cost reductions have been made. We received cost on 5/6/99 with a PM of 62.8% and OP of 38.3%.

Final cost is due 5/25/99 with transfer scheduled for 6/1/99.

Please advise if we are still holding to the above dates.

Thanks,
Patricia

CONFIDENTIAL ATTORNEYS EYES ONLY
M 0013339

p.17

**Contreras, Patricia**

| | |
|---|---|
| From: | Vandenberg, Janet |
| Sent: | Thursday, May 20, 1999 10:07 AM |
| To: | Contreras, Patricia; Wittenberg, Mark S; Bryant, Carter; Hammons, Kitti |
| Cc: | Fonseca, Heather; Daley, Judy; Mirkazemi, Mina; Driskill, Ann |
| Subject: | RE: HSN Emerald |

Patricia,
The only cost reductions that are being done are to the jewelry. We should have a response back from CMO tomorrow with new quote for jewelry. We will be using the long neck tooling. We are developing new tooling for a medium neck for the Shani body and we would like to use it on this doll if it will be ready in time.

Mark,
Can you please advise status of medium neck development for Shani body.

Carter,
Will the package be ready for transfer next Tuesday, 5/25?

Kitti,
Please confirm that the Shani long neck tooling will be available for this doll. It is currently at MHK being used on Mackie Goddess of Africa, Toy# 22044.

Thank you all in advance for your help,
Janet

| | |
|---|---|
| From: | Contreras, Patricia |
| Sent: | Wednesday, May 19, 1999 4:37 PM |
| To: | Daley, Judy; Vandenberg, Janet; Bryant, Carter |
| Cc: | Fonseca, Heather |
| Subject: | HSN Emerald |

Please let me know if cost reductions have been made. We received cost on 5/6/99 with a PM of 62.8% and OP of 38.3%.

Final cost is due 5/25/99 with transfer scheduled for 6/1/99.

Please advise if we are still holding to the above dates.

Thanks,
Patricia

CONFIDENTIAL ATTORNEYS EYES ONLY
M 0013340

p. 18

## Vandenberg, Janet

| | |
|---|---|
| **From:** | Wittenberg, Mark S |
| **Sent:** | Friday, May 21, 1999 8:31 AM |
| **To:** | Contreras, Patricia; Bryant, Carter; Hammons, Kitti; Vandenberg, Janet |
| **Cc:** | Fonseca, Heather; Daley, Judy; Mirkazemi, Mina; Driskill, Ann |
| **Subject:** | RE: HSN Emerald |

Hi

Final wax should be here next Wednesday, if approved we should be able to release Pro/e files on 7/30.

Regards,

# Mark S Wittenberg
Fashion Doll Engineering

---
| | |
|---|---|
| **From:** | Vandenberg, Janet |
| **Sent:** | Thursday, May 20, 1999 10:07 AM |
| **To:** | Contreras, Patricia; Wittenberg, Mark S; Bryant, Carter; Hammons, Kitti |
| **Cc:** | Fonseca, Heather; Daley, Judy; Mirkazemi, Mina; Driskill, Ann |
| **Subject:** | RE: HSN Emerald |
| **Importance:** | High |

Patricia,
The only cost reductions that are being done are to the jewelry. We should have a response back from CMO tomorrow with new quote for jewelry. We will be using the long neck tooling. We are developing new tooling for a medium neck for the Shani body and we would like to use it on this doll if it will be ready in time.

Mark,
Can you please advise status of medium neck development for Shani body.

Carter,
Will the package be ready for transfer next Tuesday, 5/25?

Kitti,
Please confirm that the Shani long neck tooling will be available for this doll. It is currently at MHK being used on Mackie Goddess of Africa, Toy# 22044.

Thank you all in advance for your help,
Janet

---
| | |
|---|---|
| **From:** | Contreras, Patricia |
| **Sent:** | Wednesday, May 19, 1999 4:37 PM |
| **To:** | Daley, Judy; Vandenberg, Janet; Bryant, Carter |
| **Cc:** | Fonseca, Heather |
| **Subject:** | HSN Emerald |

Please let me know if cost reductions have been made. We received cost on 5/6/99 with a PM of 62.8% and OP of 38.3%.

Final cost is due 5/25/99 with transfer scheduled for 6/1/99.

Please advise if we are still holding to the above dates.

Thanks,
Patricia

CONFIDENTIAL - ATTORNEYS EYES ONLY

M 0049078

p.19

Exhibit 3

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit 4**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**