1   MGA has also allegedly hired at least 25 other Mattel employees, some of

2   whom have provided MGA with Mattel's confidential information.  (AAC ¶ 77.)

3   **D.    Larian's Communications Regarding Mattel's New Product Line**

4        On May 12, 2006, Larian sent an email message to an email distribution list

5   that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING

6   BLING") which Mattel had not yet made public.  (AAC ¶ 79.)  The distribution of the

7   email included members of the media and many of Mattel's most significant

8   customers.  (AAC ¶ 78.)  Soon after sending the email, Larian began calling these

9   significant customers and making false representations about the product;

10  specifically, Larian told each that it was the only retailer to purchase the product

11  and that Mattel would not be supporting the product with television advertising.

12  (AAC ¶ 80.)

13  **E.    Exhibit C**

14       In Exhibit C to the AAC, Mattel references a number of communications,

15  numbering well over one hundred, that it contends constitutes predicate acts of mail

16  fraud or wire fraud.  Exhibit C does not describe the contents of those

17  communications.

18                          **II. Counterclaims Asserted**

19       Based on these allegations, Mattel asserts the following counterclaims:

20  (1) Copyright Infringement, including willful, vicarious, and contributory

21  infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant;

22  (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as

23  authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate

24  acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a

25  violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted

26  against all defendants; (4) state-law misappropriation of trade secrets against MGA,

27  MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant

28  only and based on certain employment agreements between Bryant and Mattel;

6

EXHIBIT 17 , PAGE 735

1  (6) intentional interference with contract, asserted against MGA and Larian and

2  based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted

3  against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty,

4  asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted

5  against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty,

6  asserted against MGA and Larian; (11) conversion, asserted against all counter-

7  defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof.

8  Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for

9  declaratory relief.

10     **III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim**

11         The parties have moved to dismiss a number of Mattel's counterclaims on

12  various grounds.  The Court addresses each claim in turn, considering at all times

13  the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

14  A.     Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

15         In lieu of an answer, a party may, as the counter-defendants have here, file a

16  motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a

17  motion may be made where the pleader has "fail[ed] to state a claim upon which

18  relief can be granted." Id.  In deciding a Rule 12(b)(6) motion, the Court must also

19  consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and

20  plain statement of the claim showing that the pleader is entitled to relief" or, when

21  the claim at issue avers fraud or mistake, the motion must be considered in

22  conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded

23  with particularity. See 5A Charles A. Wright & Arthur Miller, Federal Practice and

24  Procedure, §1356 (1990); James Wm. Moore, Moore's Federal Practice, Vol. 2

25  § 12.34[1][c].

26         In bringing a motion pursuant to Rule 12(b)(6), the moving party has the

27  burden of persuading the Court that the complaint has failed to state a claim upon

28  which relief can be granted. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406,

EXHIBIT  17 , PAGE  736

1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991). In considering the motion, "courts must consider the complaint in its entirety," and read it in the light most favorable to the plaintiff, accepting as true all factual allegations in the complaint, as well as reasonable inferences to be drawn therefrom. Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL 1773208, at *9 (June 21, 2007); Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). However, the Court need not accept any unwarranted deductions of fact, or conclusory legal statements cast in the form of factual allegations. See Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

Generally, a court cannot consider evidence in deciding a Rule 12(b)(6) motion; however, a court may consider exhibits attached to the complaint as well as documents that are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions." Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994). Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are also properly considered. Mir v. Little Company of Mary Hospital, 844 F.2d 646, 649 (9th Cir. 1988).

**B.    RICO Claims**

The counter-defendants devote most of their motions to the sufficiency of the allegations regarding Mattel's RICO claims. The Court's analysis begins, as it must when considering a federal statute, with the language of that statute. The substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Id. Conspiracies to violate this substantive prohibition are themselves prohibited by

8

1 § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to

2 violate any of the provisions of subsection (a), (b), or (c) of this section." Id. Many

3 of these terms are defined by the statutory language, including "racketeering

4 activity," "enterprise," and "pattern of racketeering activity":

5      (1) "racketeering activity" means . . . (B) any act which is

6 indictable under any of the following provisions of title 18, United

7 States Code: . . . section 1341 (relating to mail fraud), section 1343

8 (relating to wire fraud), . . . section 1512 (relating to tampering with a

9 witness, victim, or an informant), . . . section 1952 (relating to

10 [interstate and foreign travel or transportation in aid of racketeering

11 enterprises]), [and] section 2319 (relating to criminal infringement of a

12 copyright)[.]

13      . . . .

14      (4) "enterprise" includes any individual, partnership,

15 corporation, association, or other legal entity, and any union or group

16 of individuals associated in fact although not a legal entity;

17      (5) "pattern of racketeering activity" requires at least two acts of

18 racketeering activity, one of which occurred after the effective date of

19 this chapter and the last of which occurred within ten years (excluding

20 any period of imprisonment) after the commission of a prior act of

21 racketeering activity[.]

22 18 U.S.C. § 1961.

23      In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the

24 Court measures the sufficiency of alleged predicate acts of wire fraud and mail

25 fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court

26 measures the sufficiency of all other predicate acts by the more lenient standard set

27 forth in Rule 8(a). Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or

28 mistake, the circumstances constituting fraud or mistake shall be stated with

9     **EXHIBIT __17__ , PAGE __738__**

1   particularity. Malice, intent, knowledge, and other condition of mind of a person

2   may be averred generally.") _with_ Fed. R. Civ. P. 8(a) ("A pleading which sets forth a

3   claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim

4   showing that the pleader is entitled to relief . . . ."); _see_ Lancaster Community Hosp.

5   v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule

6   9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has

7   repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the

8   predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9          In order to state its claim under § 1962(c), Mattel "must allege (1) conduct

10  (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing

11  injury to [its] business or property." Ove v. Gwinn, 264 F.3d 817, 825 (9th Cir.

12  2001) (internal quotation marks and citation omitted). Here, counter-defendants'

13  motions challenge the first, second, fourth, and fifth elements.

14         1.    "Conduct or Participate"

15         Bryant contends that his role in any alleged scheme or enterprise is too

16  tenuous to constitute the "conduct" necessary to impose RICO liability. In order to

17  have RICO liability imposed upon him, a defendant must "conduct or participate,

18  directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of

19  racketeering activity . . . ." 18 U.S.C. § 1962(c). The United States Supreme Court

20  has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,

21  179 (1993), wherein it noted:

22         [T]he word "participate" makes clear that RICO liability is not limited to

23         those with primary responsibility for the enterprise's affairs, just as the

24         phrase "directly or indirectly" makes clear that RICO liability is not

25         limited to those with a formal position in the enterprise, but some part

26         in directing the enterprise's affairs is required.

27  Id. Here, Mattel has alleged that Bryant secretly developed Bratz while employed

28  by Mattel and using Mattel's resources and employees, that he concealed that fact

EXHIBIT 17, PAGE 739

when he had a duty to disclose it, and that he did these things in order to facilitate the development of the Bratz concept by Mattel's direct competitor, in violation of, *inter alia*, criminal copyright law. These allegations, if proven to be true, are sufficient to impose RICO liability on Bryant.

### 2.   Enterprise

Bryant's motion challenges the sufficiency of the allegations regarding a RICO enterprise. That enterprise is alleged to be an "association-in-fact" enterprise comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and others. (AAC ¶ 89.) Mattel alleges that counter-defendants participated in or conducted the affairs of the association-in-fact enterprise through a pattern of racketeering activities, including, as detailed in the AAC, predicate acts of mail fraud, wire fraud, evidence tampering, interstate and foreign travel to aid racketeering activities, and criminal copyright infringement. (AAC ¶ 90.) The counter-defendants' goal is alleged to have been to "execut[e] or attempt to execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information . . . ." (AAC ¶ 90.)

A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive analysis of the sufficiency of allegations regarding a RICO enterprise necessary to state a claim. See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th Cir. 2007) (designated for publication). That decision provides the blueprint for the Court's present analysis.

Odom involved an alleged scheme involving consumers who purchased computers from Best Buy retail stores. Id. at 543. The computers would include a Microsoft compact disc that the cashier would scan; the consumer's credit card was also scanned for purchase. Id. The credit card information was transmitted to Microsoft, and Microsoft would, at some point, begin making unauthorized charges to the credit card used to purchase the computer, ostensibly for Microsoft's provision of internet services. Id. Odom brought substantive RICO and RICO

1  conspiracy claims based on these allegations. Id. at 544.

2       The Ninth Circuit first noted the evidenced judicial resistance to RICO in the

3  lower courts, contrasted with the Supreme Court's four reversals of such narrow

4  readings of RICO. Id. at 545-47 (citing United States v. Turkette, 452 U.S. 576

5  (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate

6  businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481

7  (1985) (rejecting notion that RICO could be used to impose civil liability only where

8  the defendant had been criminally convicted and that such liability was limited to a

9  narrow measure of damages); National Organization for Women v. Scheidler, 510

10  U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when

11  the acts of a RICO enterprise had an economic motive); and Cedric Kushner

12  Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no

13  RICO claim was stated where president and sole shareholder of a corporation was

14  alleged to have associated with his wholly owned corporation as a RICO

15  "enterprise," and relying on fact that person and corporation were separate legal

16  entities). In Odom, the Ninth Circuit understandably viewed these four holdings as

17  a "general instruction that we should not read the statutory terms of RICO

18  narrowly." Odom, 486 F.3d at 547 (internal citation omitted).

19       In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading

20  and proving an "associated-in-fact" enterprise such as the one alleged here:

21       The definition of "enterprise" in the text of RICO is fairly

22  straightforward. In its entirety, the definition is as follows: "'enterprise'

23  includes any individual, partnership, corporation, association, or other

24  legal entity, and any union or group of individuals associated in fact

25  although not a legal entity." 18 U.S.C. § 1961(4). As is evident from

26  the text, this definition is not very demanding. A single "individual" is

27  an enterprise under RICO. Similarly, a single "partnership," a single

28  "corporation," a single "association," and a single "other legal entity"

12     EXHIBIT 17, PAGE 741

are all enterprises.  At issue in this case is the last kind of enterprise listed in the definition -- a "group of individuals associated in fact."  It is undisputed that a corporation can be an "individual" for purposes of an associated-in-fact enterprise.

Id. at 548.

The Ninth Circuit acknowledged that "enterprise" must be something greater than merely a pattern of racketeering activity; however, the court rejected the notion that an enterprise must have a particular ascertainable organizational structure.  Id. at 551 ("We take this opportunity to join the circuits that hold that an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise.") (citations omitted).  A party need only set forth factual allegations of "a group of persons associated together for a common purpose of engaging in a course of conduct," "evidence of an ongoing organization, formal or informal," and "evidence that the various associates function as a continuing unit." Id. at 552 (internal citations and quotation marks omitted).

As for the common purpose, it was met in Odom, where the plaintiff had alleged the following:

> [D]efendants had the common purpose of increasing the number of people using Microsoft's Internet Service, and doing so by fraudulent means.  Best Buy furthered this common purpose by distributing Microsoft Internet Trial CD's and conveying its customers' debit and credit card information to Microsoft.  Microsoft then used the information to activate customer accounts.

Id.  Here, Mattel has alleged the common purpose of attempting to defraud Mattel and steal its trade secrets.  Mattel's many factual allegations, detailed herein, support this alleged common purpose.

As for the "ongoing organization" requirement, the Ninth Circuit in Odom noted that the plaintiffs had met that element, which was met where the

13

EXHIBIT 17 , PAGE 742

organization was alleged to be "a vehicle for the commission of two or more predicate crimes." Id. (internal quotation marks and citation omitted).  The Ninth Circuit noted the following factual allegations:

> Microsoft and Best Buy established mechanisms for transferring plaintiffs' personal and financial information from Best Buy to Microsoft. That information then allowed Microsoft to activate plaintiffs' Internet accounts without their knowledge or permission. These mechanisms enabled Microsoft to bill plaintiffs improperly for MSN services in 2001, 2002 and 2003.

Id.  Here, plaintiffs have alleged that the counter-defendants coordinated their many efforts at depriving Mattel of its proprietary information and its intellectual property. The allegations regarding common use of the "plot04@aol.com" email address to transfer confidential Mattel information to MGA support the finding of an "ongoing organization."  So, too, do the allegations regarding the repeated communications between Bryant and MGA.

The "continuing unit" requirement does not appear to the Court to mandate that the organization continues to this day;[2] rather, the requirement is related to the notion that RICO was not meant to address discrete instances of fraud or criminal conduct.  "[T]he continuity requirement focuses on whether the associates' behavior was 'ongoing' rather than isolated activity."  Id. at 553 (internal quotation marks and citation omitted).  Related to that concern, it is also clear to the Court that this requirement is related to the duration of the racketeering activities.  See id. ("An almost two-year time span is far more than adequate to establish that Best Buy and Microsoft functioned as a continuing unit.").  Here, the allegations do not reveal that the conduct complained of was mere isolated activity; rather, Mattel sets forth allegations of racketeering activity that spanned a period of three years.  The

---

[2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue of its continued use of Mattel's information and property.

14

EXHIBIT 17, PAGE 743

allegations describe a scheme consisting of corporate warfare between competitors that has been waged over a long period of time and waged on a number of fronts, both foreign and domestic. The "continuing unit" requirement is therefore satisfied.

Accordingly, the Court finds that Mattel has sufficiently pleaded the existence of a RICO enterprise.

### 3. Predicate Acts of Racketeering Activity

#### a. Mail Fraud and Wire Fraud

The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, . . . shall be fined under this title or imprisoned not more than 20 years, or both.

Id. The Ninth Circuit has described the elements of mail fraud as "(1) proof of a scheme to defraud; (2) using or causing the use of the mails to further the fraudulent scheme; and (3) specific intent to defraud." United States v. Rogers, 321 F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).

The criminal prohibition against wire fraud is similar:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

EXHIBIT 17, PAGE 744

1  18 U.S.C. § 1343. The Ninth Circuit has described the elements of wire fraud as

2  "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and

3  (3) a specific intent to deceive or defraud." United States v. Shipsey, 363 F.3d 962,

4  971 (9th Cir. 2004) (citations omitted).

5      As all parties acknowledge, the predicate acts of mail fraud and wire fraud

6  must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b). Specifically,

7  Mattel must detail "the time, place, and manner of each act of fraud, [and it must

8  set forth] the role of each defendant in each scheme." Lancaster Community

9  Hosp., 940 F.2d at 405. This standard applies in RICO actions alleging predicate

10  acts of mail fraud. Id.

11      Here, Mattel sets forth allegations of predicate acts of mail fraud and wire

12  fraud referenced in Exhibit C to the AAC. However, these alleged predicate acts

13  are insufficiently pleaded because they fail to adequately describe the contents of

14  the communications; specifically, they fail to detail time, place and manner of "each

15  act of fraud." The substantive RICO claim is therefore dismissed to the extent it is

16  premised on those communications. Mattel is **GRANTED** leave to amend the RICO

17  claim based on this insufficiency; Mattel must attach to the Second Amended

18  Answer and Counterclaims ("SAAC") copies of the referenced communications.

19  The contents of packages referenced in Exhibit C must be described in order to

20  meet the Rule 9(b) requirements.

21      At oral argument, counsel for MGA argued that the substance of many, if not

22  all of the communications, cannot be read to further a scheme to defraud. That

23  argument will be considered another day, after Mattel files the SAAC. However, the

24  Court takes the opportunity today to note that, given the broad scope of the alleged

25  scheme to defraud, including the criminal copyright infringement allegations,

26  otherwise innocuous and routine communications regarding day-to-day operations

27  and product development may be found to be in furtherance of that scheme. See

28  Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL

16        EXHIBIT  17 , PAGE  745

1  1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,

2  "courts must consider the complaint in its entirety").

3      Counter-defendants also argue that Mattel failed to plead each defendant's

4  role in furtherance of the scheme to defraud. As interpreted by the Ninth Circuit,

5  the Rule 9(b) standard clearly requires that a plaintiff so plead. Lancaster

6  Community Hosp., 940 F.2d at 405. However, the Court will view the

7  communications alleged to constitute mail and wire fraud in conjunction with all the

8  allegations set forth regarding the alleged scheme in the counterclaims. See Flood

9  v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at *14 (M.D. Pa., Aug. 24,

10 2004) (applying the principle that reasonable inferences in favor of a plaintiff must

11 be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough

12 Plaintiffs' Complaint does not expressly identify how each particular mail or wire

13 communication furthered the scheme, the Complaint clearly alleges facts which

14 create an unquestionable inference that the alleged communications furthered the

15 scheme.").

16     Counter-defendants also argue that, because the emails alleged to

17 constitute wire fraud were sent among individuals physically located in the same

18 state, Mattel will not be able to establish the interstate nature of the

19 communications. See 18 U.S.C. § 1343 (setting forth the requirement that

20 communications be transmitted "in interstate or foreign commerce"). Mattel has

21 alleged that the communications were transmitted in interstate or foreign

22 commerce. (AAC ¶ 93(b).) This suffices at the pleadings stage; however,

23 eventually Mattel will be called upon to support these allegations with evidence.

24 See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly

25 holding that wire fraud must be supported, at the summary judgment stage, by

26 evidence of interstate wire fraud).

27     The Court dismisses the RICO claim to the extent it is based on the alleged

28 predicate acts of mail fraud and wire fraud because those acts are not pleaded with

17

EXHIBIT 17, PAGE 746

1  particularity as required by Rule 9(b).  Mattel is **GRANTED** ten days' leave to file a

2  SAAC that incorporates and attaches and/or describes the communications and the

3  contents of packages referenced in Exhibit C.

4      **b.    Evidence Tampering**

5      Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6  remaining predicate acts are governed by the more lenient pleading standards of

7  Rule 8(a).  See Slade v. Gates, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8  Cal., Oct. 11, 2002).  The Court considers the sufficiency of those remaining

9  allegations pursuant to this Rule.

10     The criminal prohibition against tampering with evidence is found at 18

11  U.S.C. § 1512:

12          Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13          record, document, or other object, or attempts to do so, with the intent

14          to impair the object's integrity or availability for use in an official

15          proceeding . . . shall be fined under this title or imprisoned not more

16          than 20 years, or both.

17  Id.  Mattel's opposition makes clear that its evidence tampering allegations are

18  based upon two categories of documents:  The first category of documents,

19  perhaps composed of only one multi-page document, involves the alleged alteration

20  of Bryant's contract with MGA to remove a fax header showing that the date of its

21  execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22  The second category of documents are those filed with the United States Copyright

23  Office, which are alleged to omit the disclosure that certain Bratz drawings were

24  "works for hire," and which are alleged to have had alterations made to certain

26     [3]  The AAC merely alleges that counter-defendants Bryant and MGA

27  "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a
   Mattel employee while he was working for and with MGA . . . ."  (AAC ¶ 35.)

28  However, it is clear from other filings by the parties that, at a minimum, this
   allegation refers to MGA's contract with Bryant.

18        EXHIBIT 17 , PAGE 747

relevant dates.  (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

As to the first category, a predicate act is sufficiently alleged.  Mattel has alleged that a document was altered in a manner designed to conceal critical evidence, highly relevant to the present official proceeding, regarding the timing of the execution of the document.

Conversely, it is unclear whether Mattel has alleged a predicate act with respect to the second category of documents.  The issue of whether submitting fraudulent registrations and "altering relevant dates" on documents submitted to the United States Copyright Office has not been fully briefed by the parties; the issue was framed in this manner only upon the filing of the reply.[4]  Therefore, the Court reserves this issue for a later date, and anticipates that it will be addressed by the parties in a motion to dismiss the SAAC.

### c.   Travel Act Violation

Federal criminal law prohibits interstate or foreign travel to aid in racketeering activities.  18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a violation of § 1962 as a RICO predicate act).  In relevant part, the criminal prohibition states:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform . . . [such an act,] shall be fined under this title, imprisoned not more than 5 years, or both . . . .

> . . . .

> As used in this section . . . "unlawful activity" means . . .

---

[4] The Court does not view this failure as the fault of any party.

19

EXHIBIT 17 , PAGE 748

1   extortion, bribery, or arson in violation of the laws of the State in which

2   committed or of the United States . . . .

3   Id. Mattel alleges that Bryant and others traveled in interstate commerce to commit

4   commercial bribery in violation of California's prohibition against commercial

5   bribery, which in relevant part provides:

6         (a) Any employee who solicits, accepts, or agrees to accept

7   money or any thing of value from a person other than his or her

8   employer, other than in trust for the employer, corruptly and without

9   the knowledge or consent of the employer, in return for using or

10   agreeing to use his or her position for the benefit of that other person,

11   and any person who offers or gives an employee money or any thing

12   of value under those circumstances, is guilty of commercial bribery.

13   Cal. Penal Code § 641.3. Several allegations support a violation of § 641.3(a),

14   which in turn supports a violation of 18 U.S.C. § 1952. Mattel has alleged that

15   Bryant, while still employed by Mattel, entered into a contract with MGA to provide

16   design services to MGA on a "top priority" basis, and used Mattel property,

17   employees, and resources to develop and design the Bratz concept.

18         Counter-defendants argue that the requirement under California's

19   commercial bribery statute that a violator act "corruptly" is not met because Bryant

20   did not intend to injure Mattel. Such an intent is not required; rather it is sufficient

21   that Bryant is alleged to have intended to defraud Mattel. See Cal. Penal Code

22   § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure *or* defraud")

23   (emphasis added).

24         d.    **Criminal Copyright Violations**

25         The parties dispute the relevant pleading standard that governs the

26   allegations which underlie the criminal copyright violation claim. Counter-

27   defendants would have the Court apply the more exacting Rule 9(b) standards

28   because, in their assessment, the claim "sounds in fraud." Mattel, however,

20      EXHIBIT 17, PAGE 749

1   contends that there is no reason to depart from the more lenient Rule 8(a) standard

2   generally applied to copyright claims because, in its assessment, the claims "sound

3   in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

4        The recent Ninth Circuit case on this issue, cited by both parties, stands for

5   the unremarkable proposition that, consistent with Rule 9(b), all *averments* of fraud

6   must be pleaded with particularity, regardless of whether fraud is an essential

7   element of the claim to which the averment relates. See Vess v. Ciba-Geigy Corp.

8   USA, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all *averments*

9   of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

10   with particularity.") (emphasis added).

11        Considering Rules 8(a), 9(b), and the teachings of Vess, a spectrum

12   emerges. At the left end of this spectrum are claims that do not involve any

13   allegations of fraud. Those need only satisfy Rule 8(a)'s "short and plain

14   statement" standard. At the opposite end of the spectrum are claims based solely

15   on fraud, and the facts underlying such a claim must be alleged with particularity

16   pursuant to Rule 9(b). Lying closer to the Rule 9(b) end of the spectrum is a

17   category of claims discussed in Vess:

18        In cases where fraud is not a necessary element of a claim, a

19        plaintiff may choose nonetheless to allege in the complaint that the

20        defendant has engaged in fraudulent conduct. In some cases, the

21        plaintiff may allege a unified course of fraudulent conduct and rely

22        entirely on that course of conduct as the basis of a claim. In that

23        event, the claim is said to be "grounded in fraud" or to "sound in

24        fraud," and the pleading of that claim as a whole must satisfy the

25        particularity requirement of Rule 9(b).

26   Vess, 317 F.3d at 1103-04 (internal citations omitted). It is into this category MGA

27   contends that the allegations of criminal copyright claims fit, and MGA therefore

28   contends that all allegations regarding the criminal copyright claims must be

21        EXHIBIT 17, PAGE 750

1  pleaded with particularity.

2  However, <u>Vess</u> sets up another category, lying closer to the Rule 8(a) part of

3  the spectrum (but nevertheless requiring pleading with some particularity):

4  In other cases, however, a plaintiff may choose not to allege a

5  unified course of fraudulent conduct in support of a claim, but rather

6  to allege some fraudulent and some non-fraudulent conduct.  In such

7  cases, only the allegations of fraud are subject to Rule 9(b)'s

8  heightened pleading requirements. . . . The rule does not require that

9  allegations supporting a claim be stated with particularity when those

10  allegations describe non-fraudulent conduct.

11  [In other words,] in a case where fraud is not an essential

12  element of a claim, only allegations ("averments") of fraudulent

13  conduct must satisfy the heightened pleading requirements of Rule

14  9(b).  Allegations of non-fraudulent conduct need satisfy only the

15  ordinary notice pleading standards of Rule 8(a).

16  <u>Id.</u> at 1104-05.

17  Whether fraud is an essential element of criminal copyright infringement

18  must be determined by reference to the statutory language and any interpretative

19  case law.  In relevant part, the prohibition against criminal copyright infringement

20  provides:  "Any person who violates section 506(a) (relating to criminal offenses) of

21  title 17 shall be punished as provided [herein] in and such penalties shall be in

22  addition to any other provisions of title 17 or any other law."  18 U.S.C. § 2319.  In

23  turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully

24  infringes a copyright shall be punished as provided under section 2319 of title 18, if

25  the infringement was committed . . . for purposes of commercial advantage or

26  private financial gain . . . ."  17 U.S.C. § 506(a)(1)(A).  The elements of the offense

27  are easily gleaned from the straightforward statutory language:  "Criminal

28  infringement of copyright has three elements: (1) infringement of a copyright

22    EXHIBIT 17 , PAGE 751

1  (2) done wilfully (3) for purposes of commercial advantage or private financial gain."

2  United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3      Clearly, fraud is not an essential element of a criminal copyright claim, taking

4  it out of the category at the far end of the spectrum described above, and

5  necessitating an inquiry into whether Mattel has chosen to incorporate a fraud

6  element into its criminal copyright claim. The AAC at ¶ 93(e) reveals that the

7  criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's

8  copyrights, including with respect to documents containing Mattel trade secret and

9  confidential information . . . ." The Opposition fills in more details regarding this

10  claim, noting that the criminal copyright claim is premised upon the Bratz-related

11  works, Bratz-derivative works, and works contained within Mattel's allegedly

12  purloined trade secrets and confidential information. (Mattel Opposition to MGA's

13  Motion at 5).

14      These allegations do not "allege a unified course of fraudulent conduct and

15  rely entirely on that course of conduct as the basis of a claim" such that the claim

16  could be said to "sound in fraud" and therefore require pleading with particularity as

17  to the entire claim. The allegations establish that much of the conduct complained

18  of consists of simple copying of the Bratz-related works or the creation of Bratz-

19  derivative works. Such allegations are unrelated to allegations of fraud. Therefore,

20  if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it

21  falls in the category described by Vess as those claims in which a claimant chooses

22  to "allege some fraudulent and some non-fraudulent conduct." Id. at 1104.

23      When one considers that the alleged predicate acts of criminal copyright

24  infringement are but a small part of a larger, and singular, claim brought pursuant to

25  RICO, it is evident that the RICO claim falls neatly into the category of claims that

26  are based partly on fraudulent and partly on non-fraudulent conduct. The Court

27  has already found that certain fraudulent conduct -- that supporting the alleged

28  predicate acts of mail fraud and wire fraud -- is insufficiently pleaded. The current

23

EXHIBIT 17, PAGE 752

focus, however, is whether the allegations supporting the predicate acts of criminal copyright infringement involve fraudulent conduct.

Here, there are two types of works allegedly infringed.  The first type is the Bratz-related and Bratz-derivative works.  The second type is Mattel's other trade secrets and confidential information.  Both types are alleged -- with particularity -- to have been procured by MGA through fraudulent conduct, but the criminal copyright infringement predicate acts do not implicate that fraudulent conduct.  Rather, they implicate only questions of whether counter-defendants wilfully infringed Mattel's works for commercial advantage or private financial gain.  Here, Mattel has sufficiently alleged predicate acts of criminal copyright infringement by alleging that MGA and other counter-defendants willfully infringed its copyrights for purposes of gaining commercial advantage and private financial gain.  As Mattel correctly contends, state of mind, in this instance willfulness, may be pleaded generally.  See Ferguson Beauregard/Logic Controls v. Mega systems, LLC, 350 F.3d 1327, 1343 (Fed. Cir. 2003).

### 4.    Injury to Business or Property

"Recovery under RICO is limited to those injuries flowing from predicate acts . . . ."  Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1117 (9th Cir. 1999) (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497 (1985)).  Here, Mattel has alleged damages flowing from the alleged acts of racketeering activity.  (AAC ¶ 96).  Damages easily flow from theft of trade secrets and confidential information committed by a direct competitor and from infringement of copyrights that are alleged to have been used to make millions -- if not billions -- of dollars.

Counter-defendants argue that Mattel lacks standing to sue on behalf of its subsidiaries.  This issue arises because many of the allegations of the thefts of trade secrets involve actions taken in Mexico or Canada by employees of Mattel's foreign subsidiaries.  Mattel argues that it is not attempting to sue for damages incurred by its subsidiaries; rather, Mattel alleges that much of the confidential

1   information stolen by the employees of Mattel's subsidiaries belonged not to

2   Mattel's subsidiaries, but to Mattel itself.  Based on these allegations, Mattel may

3   sue for damages it sustained.  Mattel may not sue for damages incurred by its

4   foreign subsidiaries.

5          5.   **Ruling on Motions to Dismiss**

6          The Motions to Dismiss the RICO claims are **GRANTED** in part.  As set forth

7   herein, the alleged predicate acts of mail fraud and wire fraud are insufficiently

8   alleged, and Mattel is **GRANTED** leave to amend the AAC.

9   C.   **Trade Secrets**

10         MGA contends that Mattel has failed to plead its trade secrets with sufficient

11  particularity to comply with its duties under Cal. Code Civ. P. § 2019.210, which

12  provides:

13             In any action alleging the misappropriation of a trade secret

14         under the Uniform Trade Secrets Act . . . , before commencing

15         discovery relating to the trade secret, the party alleging the

16         misappropriation shall identify the trade secret with reasonable

17         particularity subject to any orders that may be appropriate under

18         Section 3426.5 of the Civil Code [involving in camera reviews and

19         sealing of court documents].

20  Id.  Based on the unambiguous language of the statute, the Court agrees with

21  Mattel's characterization of this requirement as one related to discovery rather than

22  related to pleading.

23         The Court also agrees that, by identifying documents in discovery by Bates-

24  stamp number, Mattel has complied with the dictates of § 2019.210. See

25  Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal.App.4th 826, 835-36,

26  (2005) (internal quotation marks and citations omitted) ("[Reasonable particularity]

27  means that the plaintiff must make some showing that is reasonable, i.e., fair,

28  proper, just and rational[,] . . . under all of the circumstances to identify its alleged

EXHIBIT 17, PAGE 754

1   trade secret in a manner that will allow the trial court to control the scope of

2   subsequent discovery, protect all parties' proprietary information, and allow them a

3   fair opportunity to prepare and present their best case or defense at a trial on the

4   merits."). MGA's complaints regarding the volume of documents so identified, and

5   their skepticism of Mattel appropriately attaching such an identification to many of

6   those identified documents, are not properly addressed at this stage of the

7   proceedings.

8           The motion to dismiss the trade secrets claim on this basis is therefore

9   **DENIED.**

10  **D.    Duplicative State-Law Claims**

11          Bryant's motion to dismiss Mattel's duplicative state-law claims is **DENIED.**

12  The state-law counterclaims asserted against Bryant in the AAC admittedly overlap

13  with the claims asserted against him in the 04-9059 case, however, the factual

14  allegations underlying the claims asserted in the AAC are broader in scope than

15  those underlying the claims asserted in the 04-9059 case.

16          **IV. Motion to Dismiss for Lack of Personal Jurisdiction**

17          MGA Mexico challenges this Court's exercise of personal jurisdiction over it.

18  As set forth below, the Court concludes that it may, consistent with California law

19  and the federal Due Process Clause, exercise specific personal jurisdiction over

20  this admittedly foreign corporation.

21  **A.    The Constitutional Exercise of Personal Jurisdiction**

22          Where a party moves to dismiss a claim for lack of personal jurisdiction, the

23  party asserting the claim bears the burden of demonstrating that jurisdiction is

24  appropriate. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir.

25  2004). However, in opposing a motion to dismiss for lack of personal jurisdiction,

26  the party asserting the claim need only make a *prima facie* showing of jurisdictional

27  facts. Id. Disputed facts are to be resolved in favor of the exercise of personal

28  jurisdiction. Id.

26

**EXHIBIT 17, PAGE 755**

1  Because there is no applicable federal statute governing personal

2  jurisdiction, the Court applies the law of the state in which the district court sits. Id.

3  (citations omitted). "Because California's long-arm jurisdictional statute is

4  coextensive with federal due process requirements, the jurisdictional analyses

5  under state law and federal due process are the same." Id. at 800-01 (citations

6  omitted). In order for a court's exercise of personal jurisdiction over a nonresident

7  defendant to be constitutionally permissible, the defendant must have "minimum

8  contacts" with the forum state "such that the exercise of jurisdiction does not offend

9  traditional notions of fair play and substantial justice." Id. at 801 (internal quotation

10  marks and citation omitted).

11  Personal jurisdiction may be either general or specific. For general personal

12  jurisdiction to apply, a defendant (or here, a counter-defendant) "must engage in

13  continuous and systematic general business contacts . . . that approximate a

14  physical presence in the forum state." Id. (internal quotation marks and citations

15  omitted).

16  To determine whether it has specific personal jurisdiction over a nonresident

17  defendant, the Court employs a three-part test:

18      (1) The non-resident defendant must purposefully direct his

19      activities or consummate some transaction with the forum or resident

20      thereof; or perform some act by which he purposefully avails himself

21      of the privilege of conducting activities in the forum, thereby invoking

22      the benefits and protections of its laws; (2) the claim must be one

23      which arises out of or relates to the defendant's forum-related

24      activities; and (3) the exercise of jurisdiction must comport with fair

25      play and substantial justice, i.e. it must be reasonable.

26  Id. at 802.

27  The party asserting the claim bears the burden of establishing the first two

28  parts of the test. Id. If that party establishes the first two parts, then the burden

EXHIBIT 17, PAGE 756

1    shifts to the party resisting the Court's exercise of personal jurisdiction "to present a

2    **compelling case** that the exercise of jurisdiction would not be reasonable." Id.

3    (emphasis added).

4        The first part of the test is satisfied by either "purposeful availment" or

5    "purposeful direction." Id. Purposeful availment is shown when a defendant avails

6    itself of the privilege of doing business in a forum state, usually met when the

7    defendant took some action in the forum, such as executing or performing a

8    contract there. Id. By virtue of such actions, a defendant "purposefully avails itself

9    of the privilege of conducting activities within the forum State, thus invoking the

10    benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

11    When taking advantage of these "benefits and protections," a defendant must also

12    "submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz,

13    471 U.S. 462, 476 (1985).

14        By contrast, purposeful direction, involves actions by the defendant outside

15    of the forum state but that are directed at the forum. Schwarzenegger, 374 F.3d at

16    803. The purposeful direction analysis is derived from a three-part "effects test"

17    that finds its roots in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783

18    (1984). Pursuant to this analysis, the defendant must "have (1) committed an

19    intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

20    defendant knows is likely to be suffered in the forum state." Id.; Schwarzenegger,

21    374 F.3d at 803. All three parts of the test must be satisfied. The second part of

22    the effects test is described by the Ninth Circuit as the "express aiming"

23    requirement, and requires that the counter-defendants "expressly aimed" its

24    intentional act at California. See Schwarzenegger, 374 F.3d at 806. Specifically,

25    "express aiming" is found where the defendant is alleged to have engaged in

26    wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident

27    of the forum state." Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082,

28

28    EXHIBIT __17__, PAGE __757__

1087 (9th Cir. 2000).[5]

Assuming that the party asserting a claim can establish that the party resisting the Court's exercise of personal jurisdiction has met either the purposeful availment or express aiming part of the three-part test regarding the exercise of specific personal jurisdiction, courts next consider whether the claim arises out of or relates to the forum-related activities. In making this determination, the Court considers whether the contacts with the forum gave rise to the claims asserted, employing a "but for" standard. See Doe v. Unocal Corp., 248 F.3d 915, 924 (9th Cir. 2001).

Once the purposeful availment/express aiming and relatedness requirements are established, the burden shifts to the party resisting the Court's exercise of jurisdiction to show that exercise of jurisdiction is unreasonable. In determining reasonableness, the Court considers seven factors:

1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts of law between the forum and defendant's home jurisdiction; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum.

---

[5] What constitutes, or doesn't constitute, "express aiming" is best illustrated by example. For instance, in Pebble Beach Co. v. Caddy, 453 F.3d 1151 (9th Cir. 2006), no express aiming was found where the owner of a bed-and-breakfast in England (overlooking a pebbly beach) used the term "pebblebeach," the name of a famous golf course located in California, on its web site. Id. at 1153, 1156-57. The Ninth Circuit acknowledged that it might be foreseeable that the defendant's use of the web site might have some effect on California, but noted that mere foreseeability of effect in a forum state is not enough to constitute express aiming. Id. at 1157. In contrast to Pebble Beach is the case of Panavision Intern., L.P. v. Toeppen, 141 F.3d 1316, 1321 (9th Cir. 1998), in which the Ninth Circuit found that the express aiming requirement was met where a defendant registered plaintiff's marks as Internet domain names in order to force a California plaintiff to pay him money.

29

EXHIBIT 17 , PAGE 758

1  Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991) (internal citation

2  omitted).  No factor is dispositive and the Court must balance all seven.  Id.

3  (internal citation omitted).

**B.     MGA Mexico's Contacts with the Forum State**

The AAC alleges that Issac Larian and other MGA officers, while in

California, executed a plot to target three high-level employees of Mattel Mexico,

and entice them to steal Mattel's trade secrets.  In written offers of employment to

these three individuals, Issac Larian held himself out to be the CEO of MGA

Mexico.  This plot was facilitated by a number of cross-border communications

among the participants as well as travel to the United States by the targeted

employees.

**C.     The Court May Exercise Personal Jurisdiction over MGA Mexico**

The AAC repeatedly alleges that Larian, who held himself out to be MGA

Mexico's CEO, and who was designated as MGA Mexico's "legal agent" in Mexican

registration document actively sought to induce others to access and steal Mattel's

trade secrets while located in the California.  See Velázquez Decl. Exs. A-C; Salem

Decl. Ex. B.  This constitutes purposeful availment.

To the extent that any of the actions taken in Mexico by the three Mexican

employees may be imputed to Mattel Mexico, there is also purposeful direction.

The alleged actions taken on behalf of MGA Mexico were specifically engineered to

result in the alleged illegal acquisition of trade secrets belonging to Mattel, a

California resident.[6]

The relatedness requirement is also clearly met.  The contacts with

California involve actions allegedly taken in order to further the illegal acquisition of

Mattel's trade secrets, leading to the present claims against MGA Mexico for

misappropriation of trade secrets and the related RICO claims.

---

[6]  The AAC alleges the theft of trade secrets belonging not only to Mattel's

Mexican subsidiary, but also to Mattel itself, which is a California corporation.

30

EXHIBIT 17, PAGE 759

1    The burden, therefore, is on MGA Mexico to show that the exercise of

2  jurisdiction is unreasonable.[7] As noted previously, the Court considers seven

3  factors. The first factor the Court considers is the defendant's purposeful

4  interjection. For the reasons the Court has found purposeful availment and

5  purposeful direction, this factor favors the exercise of personal jurisdiction.

6    MGA Mexico argues, without elaboration, that the burden of defending itself

7  in California is "significant." However, the assumption underlying this argument is

8  that the present action is more properly litigated by MGA's and Mattel's Mexican

9  subsidiaries. This assumption misses the point of Mattel's claim against MGA

10  Mexico; Mattel, the parent company, was itself injured by MGA's Mexico's alleged

11  misappropriation of its own trade secrets because the alleged misappropriation was

12  not limited to trade secrets belonging to its Mexican subsidiary. The argument

13  based on this faulty assumption is therefore unconvincing. In order to show

14  unreasonableness, the burden on the defendant must be great. See Panavision,

15  141 F.3d at 1323 ("A defendant's burden in litigating in the forum is a factor in the

16  assessment of reasonableness, but unless the inconvenience is so great as to

17  constitute a deprivation of due process, it will not overcome clear justifications for

18  the exercise of jurisdiction.") (internal quotation marks and citation omitted).

19    As to the third and seventh factors, regarding conflicts of law and the

20
21    [7] In its reply, MGA Mexico declares that it "made a 'compelling case' in
   support of its motion to dismiss that it would be unreasonable to force it to litigate
22  in this forum." MGA Mexico Reply at 10. However, MGA Mexico's motion papers
   fail to acknowledge that they bear the burden on this issue. See MGA Mexico's
23  Memorandum of Points and Authorities at 10 ("Finally, Mattel has failed to satisfy
   the third element required for specific jurisdiction -- that the exercise of jurisdiction
24  over the defendant would be reasonable."). As Mattel accurately predicted in its
   opposition papers, MGA Mexico implicitly acknowledged its burden in the reply,
25  and used the occasion to improperly present additional arguments for the first
   time. Although the Court ordinarily would not consider such arguments, it does so
26  here because it does not change the Court's ultimate conclusion. See In re Intuit
   Privacy Litigation, 138 F.Supp.2d 1272, 1275 n.3 (C.D. Cal. 2001) ("this court
27  does not consider arguments raised anew for the first time in a reply brief as to do
   so would unfairly deny the non-moving party an opportunity to respond.").

28

31                EXHIBIT  17 , PAGE  760

1   existence of an alternative forum, MGA Mexico makes veiled references to the

2   criminal action in Mexico as constituting a choice of forum made by Mattel,

3   apparently implying that Mattel, having chosen to pursue criminal charges in

4   Mexico, should be precluded from invoking the power of this Court. It appears to

5   the Court that MGA Mexico has failed to fully and clearly articulate this argument

6   because it is untenable. Whether Mexican authorities pursue criminal charges

7   based on the same conduct underlying the claims in this action is irrelevant to

8   whether this Court may constitutionally exercise personal jurisdiction over MGA

9   Mexico. Therefore, MGA Mexico's argument on this issue is unpersuasive.

10      The fourth factor, the interest in adjudicating the dispute, weighs in favor of

11  the exercise of personal jurisdiction, as does the sixth, the plaintiff's interest in

12  convenient and effective relief.

13      MGA Mexico argues that the fifth factor weighs in its favor when the Court

14  considers that the site of injury, which it does not believe is California, is the most

15  efficient forum. However, this argument is premised on the rejected assumption

16  that the present action is more properly litigated between MGA's and Mattel's

17  Mexican subsidiaries.

18      On balance, a consideration of the reasonableness factors reveals that MGA

19  Mexico has fallen far short of establishing the "compelling case" necessary to

20  render the Court's exercise of personal jurisdiction unreasonable.

21      The Court concludes that Mattel has established the first two parts of the

22  specific personal jurisdiction test, and that MGA Mexico has failed to establish that

23  the Court's exercise of personal jurisdiction over it is otherwise unreasonable.

24  Accordingly, the Court **DENIES** MGA Mexico's motion to dismiss.

25  **V. MGA's and Bryant's Motions Regarding**

26  **the Discovery Master's March 7, 2007, Order**

27      MGA and Bryant seek review of a decision that resolved discovery disputes

28  that arose during Bryant's deposition, and that was rendered by the Court-

32

EXHIBIT 17 , PAGE 761

1    appointed discovery master, Judge Edward A. Infante (Ret.), on March 7, 2007.

2    The Court's order appointing Judge Infante provides that his orders resolving

3    discovery disputes shall be reviewed in the same manner as those made by a

4    magistrate judge of this Court.

5         Pursuant to Fed. R. Civ. P. 72(a), when the parties object to the ruling of a

6    magistrate judge on a non-dispositive manner, such as a discovery dispute, the

7    district judge may modify or set aside only those portions of the magistrate judge's

8    order that are "clearly erroneous or contrary to law." Id.

9         The "clearly erroneous" language refers to factual findings. See e.g.,

10   Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension

11   Trust, 508 U.S. 602, 622 (1993) (discussing the clearly erroneous standard).  Here,

12   there were no explicit factual findings or legal conclusions made by Judge Infante

13   regarding the relevant rulings; therefore, the Court reviews the record presented to

14   Judge Infante to determine whether his rulings are contrary to law. See March 7,

15   2007, Order.

16        Questions that do not seek the substance of attorney-client communications

17   generally do not implicate the attorney-client privilege. United States v. Carrillo,16

18   F.3d 1046, 1050 (9th Cir. 1994) (finding no violation of the attorney-client privilege

19   where prosecutor, who asked whether a criminal defendant had consulted with his

20   attorney during a recess in order to raise an inference of attorney coaching of

21   testimony during the trial, stopped short of asking defendant the substance of

22   defendant's communications with his attorney).  Therefore, questions such as the

23   one addressed by objection No. 38, asking whether Bryant talked to counsel for

24   MGA during a break from his deposition, are not subject to objection based on the

25   attorney-client privilege. This conclusion is consistent with Judge Infante's Order.

26        Mattel's question regarding who is paying Bryant's legal fees, addressed by

27   objection No. 42, is likewise not objectionable.  MGA and Bryant argue that state

28   law applies; however, because the present consolidated actions involve both

33

EXHIBIT 17 , PAGE 762

1  federal and state-law claims, the federal law of privilege applies.  Agster v.

2  Maricopa County, 422 F.3d 836, 839-40 (9th Cir. 2005) ("Where there are federal

3  question claims and pendent state law claims present, the federal law of privilege

4  applies.").  To that end, consistent with federal privilege law, fee-payment

5  arrangements are relevant to credibility and bias, and if asked in discovery, Bryant

6  must disclose who is paying his legal fees.  See United States v. Blackman, 72 F.3d

7  1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the

8  fee arrangement between attorney and client are not protected from disclosure by

9  the attorney-client privilege.").  This conclusion is also consistent with Judge

10  Infante's Order.

11        However, in this case, the joint-defense privilege protects from disclosure the

12  substance of certain statements made by Bryant and his attorneys in the presence

13  of attorneys representing MGA.  "The joint defense privilege protects

14  communications between an individual and an attorney for another when the

15  communications are 'part of an on-going and joint effort to set up a common

16  defense strategy.'"  United States v. Bay State Ambulance and Hosp. Rental

17  Service, Inc., 874 F.2d 20, 28 (1st Cir. 1989) (internal quotation marks and citation

18  omitted).  Generally, to rely on the joint-defense privilege, a party must establish

19  three elements:  "(1) [T]he communications were made in the course of a joint

20  defense effort, (2) the statements were designed to further the effort, and (3) the

21  privilege has not been waived."  Id.

22        The Court finds the first element was met.  The Court, based on its review of

23  the record pending before Judge Infante, is satisfied that the parties had in place at

24  the time of Bryant's deposition, and have in place today, a valid joint-defense

25  agreement.  The Court also finds that the second element was met.  Mattel cannot

26  seriously contend that MGA's interests are not aligned with Bryant's in this action,

27  or that counsels' thorough preparation of Bryant for his deposition was not designed

28  to further the joint defense effort.  Finally, as for the third element, there is no

34

EXHIBIT 17, PAGE 763

suggestion in the record that any party has waived the attorney-client privilege.

Accordingly, the Court holds that Judge Infante's rulings on Objection Nos. 39 and 50 are contrary to law to the extent those rulings require Bryant to divulge the substance of his communications with counsel for MGA.

### VII. Conclusion

In the manner set forth more fully herein, the Court makes the following rulings:

1.     Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189): **GRANTED IN PART AND DENIED IN PART.**

2.     Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and XI (docket # 191):  **GRANTED IN PART AND DENIED IN PART.**

3.     Motion of MGA Mexico to Dismiss Mattel's Amended Answer and Counterclaims (docket # 266):  **DENIED.**

4.     Motion of MGA Objecting to Discovery Master's March 7, 2007, Order (docket # 308):  **GRANTED IN PART AND DENIED IN PART.**

5.     Motion of Carter Bryant Objecting to Discovery Master's March 7, 2007, Order (docket # 306):  **GRANTED IN PART AND DENIED IN PART.**

Mattel is **GRANTED** ten days' leave to amend the AAC in conformity with this Order.  The Counter-defendants shall answer or otherwise respond to the SAAC no later than thirty days after the filing of the SAAC.

35

EXHIBIT  17 , PAGE  764

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Motion Re Trial Structure (docket #462) has been the subject of further briefing by the parties and is set for further oral argument on July 2, 2007.  Ruling on that matter is **DEFERRED** pending oral argument.

DATE:  June 27, 2007

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

36

EXHIBIT 17, PAGE 765

**om:**   Name:   United States District Court
312 North Spring Street
Los Angeles, CA 90012
Voice Phone:   (213) 894-5474

**o:**   Name:   Michael Zeller
Company:

865 S Figueroa St, 10th Floor,
City/State:   Los Angeles, CA 90017-2543
Fax Number:   213-443-3100

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**



## Automated Document Delivery Service

*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

**x Notes:**

se 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

*rsuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search arrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

*Western Division:   CrimIntakeCourtDocs-LA@cacd.uscourts.gov*
*Southern Division:   CrimIntakeCourtDocs-SA@cacd.uscourts.gov*
*Eastern Division:   CrimIntakeCourtDocs-RS@cacd.uscourts.gov.*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for hich you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

te and time of transmission:           Wednesday, June 27, 2007 3:04:20 PM
mber of pages including this cover sheet: 37

EXHIBIT 17 , PAGE 766

**Exhibit  18**

**PRIORITY SEND**
& ENTERED

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES – GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                    Date:  July 2, 2007

Title:    CARTER BRYANT -v- MATTEL, INC.
            AND CONSOLIDATED ACTIONS
=================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          Jim Holmes                          Theresa Lanza
          Courtroom Deputy Clerk              Court Reporter

ATTORNEYS PRESENT FOR CARTER          ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker                         John B. Quinn
                                      Brett Dylan Proctor
                                      Michael T. Zeller

ATTORNEYS PRESENT FOR MGA:

Dale M. Cendali
Patricia Glaser

PROCEEDINGS:    MINUTE ORDER

          As set forth more fully herein, the Court hereby makes the following ruling regarding matters
heard on July 2, 2007:

(1)    The Court **GRANTS** Mattel's Motion re Trial Structure (docket #462);

(2)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Motion re Discovery Master's
       May 15, 2007, Order (docket #505);

(3)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Ex Parte Application

MINUTES FORM 90                                    Initials of Deputy Clerk _JH_
CIVIL – GEN                          1              Time: 01/15

EXHIBIT 18, PAGE 767

regarding date of production of documents (docket #545); and

(4)   The Court **DENIES** MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508).

(5)   The Court **DENIES** the parties' oral request for modification of pretrial and trial dates.

(1)   Motion re Trial Structure (docket #462)

Previous orders of the Court specified that the claims and counterclaims brought in this action will be tried in two phases. The parties have agreed, in large part, to a refinement of the Court's mandate that all issues regarding the ownership of Bratz shall be tried in Phase 1. Where the parties differ is upon a proposal by Mattel that the Phase 1 be bifurcated into two sub-phases, with Mattel's copyright infringement claim (its first counterclaim in the 05-02727 case) and all Phase 1 damages being tried after all the other issues. Phase 1(a) would be limited to issues surrounding Carter Bryant's employment with Mattel, and how those issues impact the ownership of certain original Bratz drawings, while Phase 1(b) would address approximately two-hundred Bratz products that are potentially derivative of the original drawings. This approach has the appeal of limiting Phase 1(a) to discrete issue of the ownership of the original Bratz drawings. A finding that Bryant owns these original drawings in Phase 1(a) has the potential to eliminate the need for Phase 1(b).

Accordingly, **THE COURT ADOPTS MATTEL'S MODIFICATION OF DEFENDANTS' PROPOSAL**, as set forth at 8-9 of its Memorandum Regarding Trial Structure, filed June 20, 2007. Phase 1(a) and Phase 1(b) (if necessary) will be tried to the same jury.

(2)   MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505), and
(3)   MGA's Ex Parte Application regarding date of production of documents (docket #545).

The Discovery Master's May 15, 2007, Order compels production of documents regarding ink, paper, and chemical analysis and documents relating to unreleased MGA products. The order required that documents be produced no later than the end of May.

The Court reviews the Discovery Master's orders under the "clearly erroneous" or "contrary to law" standard set forth in Fed. R. Civ. P. 72(a).

The Discovery Master's order compels the production of only non-privileged documents. Therefore, MGA's arguments that the Discovery Master's order requires production of documents in violation of the attorney-client privilege are misplaced. If the only responsive documents are privileged, then MGA need not produce them, but must produce a privilege log.

MGA acknowledges that it has raised an argument before the Court that was not raised

MINUTES FORM 90
CIVIL – GEN

2

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT 18 , PAGE 768

before the Discovery Master, namely, that Mattel has failed to establish that there are "exceptional circumstances" that allow Mattel to "discover facts known or opinions held by an expert . . . who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(B). MGA contends that the Discovery Master's order is contrary to law based on this standard, and that it was incumbent upon Mattel to raise it below. The Court disagrees. Mattel would be required to establish that exceptional circumstances existed if MGA objected to production on that grounds. A party seeking production cannot be expected to rebut all arguments that could possibly be raised by a party resisting production. MGA has not convinced the Court that the Discovery Master's failure to require Mattel to rebut an argument that was not raised by MGA is contrary to law.

MGA contends that the Discovery Master's order compelling production of documents regarding unreleased products is contrary to law. Relevant to that determination is a balancing test required to be applied by the Ninth Circuit when trade secrets are requested by a competitor in discovery. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) ("Specifically, in this case we must balance the risk to [defendant] of inadvertent disclosure of trade secrets to competitors against the risk to [plaintiff] that protection of [defendant's] trade secrets [will] impair[] prosecution of [plaintiff's] claims.").

Here, the documents sought are of a particularly sensitive nature. They represent some of the most secretive documents maintained by MGA, and they are being ordered to be produced to MGA's fierce competitor. The Discovery Master recognized the sensitive nature of the documents and entered a strict protective order that severely limits access to those documents and that goes well beyond the normal "attorney eyes only" designation.

MGA argues that unreleased products are irrelevant to the issue of who owns the original Bratz drawings. That is clear. However, MGA's argument attempts to limit the discovery to issues involved in Phase 1 of the trial. There has been no bifurcation of discovery.

Mattel correctly points out that these documents are relevant to a number of its other claims. Specifically, if they show unreleased products that are similar to Mattel's unreleased products, the documents would be highly probative of Mattel's misappropriation of trade secrets claim. Moreover, these documents could be relevant to Mattel's RICO claims based on alleged acts of criminal copyright infringement.

Balancing tests are inherently subjective and particularly susceptible to varying interpretation by individual judicial officers. This Court, upon considering this issue from the outset, may very well have weighed the evidence differently and reached a contrary result. However, this Court is bound by the standard of review, and MGA's motion falls far short of convincing the Court that the Discovery Master's order is contrary to law.

The parties have a long history regarding the production of documents ordered in the May 15, 2007, Order, which is set forth in their papers and which need not be repeated here. Counsel for MGA represented that the remaining documents could be produced no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which could be produced no

EXHIBIT  18 , PAGE  769

later than two weeks after that date. Accordingly, the Court **ORDERS** that MGA complete the document production set forth in the Discovery Master's May 15, 2007, order no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which shall be produced no later than August 14, 2007.

Accordingly, the Court **GRANTS** in part MGA's motion re the Discovery Master's May 15, 2007, Order, extending the document production date as set forth above. The Motion is **DENIED** in all other respects.

Likewise, the Court **GRANTS** in part MGA's ex parte application re date of production of documents, extending the document production date as set forth above. The application is **DENIED** in all other respects.

(4)    MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508)

The Discovery Master's May 16, 2007, Order compelled the Rule 30(b)(6) depositions of witnesses on the topics of MGA's net worth, prior sworn statements, and ink, paper, and chemical analysis performed by MGA.

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters *known or reasonably available* to the organization.

Fed. R. Civ. P. 30(b)(6) (emphasis added). "The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation." Sanders v. Circle K Corp., 137 F.R.D. 292, 294 (D. Ariz. 1991) (internal citation omitted). Another purpose of Rule 30(b)(6) is aptly described by the District Court for the District of Columbia:

> [The purpose of Rule 30(b)(6) is to] prevent[] serial depositions of various witnesses without knowledge within an organization and eliminating 'bandying', which is the name given to the practice in which people are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to the organization itself.

Alexander v. F.B.I., 186 F.R.D. 148, 152 (D.D.C. 1999) (citing the 1970 Advisory Committee Notes to Rule 30(b)(6)).

The Discovery Master's order compelling Rule 30(b)(6) depositions in the specified

Initials of Deputy Clerk _jh_____
Time: 01/15

EXHIBIT 18 , PAGE 770

categories serve both these purposes and is not contrary to law.

Although MGA's net worth may not be known to it, MGA does not contend that the information is not readily available. That net worth is generally the subject of expert testimony at trial -- a proposition disputed by neither Mattel nor the Court -- does not render it an improper subject for a Rule 30(b)(6). Therefore, the Discovery Master's ruling on this issue is not contrary to law.

MGA likewise does not contend that information regarding prior sworn statements are not readily available to it. Although contending that this is not an appropriate subject for a Rule 30(b)(6) deposition, MGA fails to cite authority in support of that contention. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

The ink, paper, and chemical analysis topic is likewise a proper subject of a Rule 30(b)(6) deposition. To the extent that such a deposition has the potential to encroach upon information protected by the work-product privilege, then that objection must be made on a question-by-question basis. MGA may not make a blanket objection and justify its refusal to produce a Rule 30(b)(6) designee on this topic based on that blanket objection. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

Accordingly, the Court **DENIES** MGA's motion re the Discovery Master's May 16, 2007, Order.

(5)    Oral Request for Modification of pretrial and trial dates.

Although no motion or ex parte application on the subject was pending before the Court, the parties made an oral request at the hearing to continue certain pretrial and trial dates. A discussion ensued and it became apparent that no final agreement was reached by the parties regarding extending these dates. Accordingly, the Court **DENIES** the parties' oral request for modification of pretrial and trial dates. The Court will consider counsels' stipulation regarding extensions of those dates only where all counsel unqualifiedly stipulate to those dates. Until the scheduling order is modified by the Court, the dates previously set by the Court remain in effect. In addition, the Court is unlikely to entertain a continuance of the Phase 1 trial past April, 2008.

IT IS SO ORDERED.

EXHIBIT 18 , PAGE 771

Exhibit  19

## Scott Kidman

| | |
|---|---|
| **From:** | Scott Kidman |
| **Sent:** | Friday, September 21, 2007 4:35 PM |
| **To:** | Charron, William |
| **Subject:** | RE: Larian RFP responses |

Dear Bill,

I called your office and left a message but have not heard back.

As you are aware, this is an insufficient response. Not only does your email give no hint as to which requests Larian belatedly claims he is willing to produce documents in response to, but it gives no commitment to provide supplemental response withdrawing the improper objections and no indication as to when Larian intends to produce documents. Thus, even now, Larian has obviously not moved forward in complying with his discovery obligations in any material way. Indeed, Mattel served its request for production to Larian more than 3 months ago and Mattel has still not received a single document. As I indicated during our meet and confer discussions, we needed a firm commitment that Larian would supplement his written responses by yesterday and needed to begin, as of yesterday, producing responsive documents. When we spoke on Wednesday, I informed you that Mattel was moving forward with a motion to compel. Two days later, after lengthy discussions, you send me a vague, two sentence email that cures none of the deficiencies in Larian's responses or rectifies his months of stonewalling. If Larian has supplemental responses to serve today and documents to produce today, please let me know immediately, but anything less at this point only serves to confirm that a motion is necessary.

---

**From:** Charron, William [mailto:WCharron@OMM.com]
**Sent:** Friday, September 21, 2007 3:42 PM
**To:** Scott Kidman
**Cc:** Charron, William
**Subject:** Larian RFP responses

Dear Scott,

I just called you at your office and left a voice mail. I confirm there are several categories of documents we are willing to produce in response to the RFPs to Isaac Larian. Please call at your convenience to discuss.

Best regards,

Bill

EXHIBIT _19_, PAGE _772_

**Exhibit 20**

## Scott Kidman

| | |
|---|---|
| **From:** | Charron, William [WCharron@OMM.com] |
| **Sent:** | Sunday, September 23, 2007 1:19 AM |
| **To:** | Scott Kidman |
| **Cc:** | Charron, William |
| **Subject:** | Meet-and-Confer re Larian's Response to Mattel's 1st RFPs |

Dear Scott,

I write in furtherance of the parties' meet-and-confer efforts pertaining to Isaac Larian's responses to Mattel's First Requests for Production. Per our agreement last evening, this email confirms that Isaac Larian will serve supplemental responses on Tuesday, September 25, 2007. For each of the responses listed, Larian's supplemental responses will state that he will produce all non-privileged or otherwise protected documents as detailed below. For those request numbers not followed by any parenthetical explanation, Larian will produce all non-privileged or protected documents that are responsive to the requests. This also confirms that Larian's supplemental responses will not be limited to "relevant, non-objectionable documents," nor will they state he will only produce his "personal documents" - rather Larian will produce documents within his possession, custody or control. Finally, with regard to the production deadline, as we agreed last evening, Larian will complete his production of documents set out below by October 24, 2007, and Mattel will not move to compel a different production deadline for those requests.

Best regards,

Bill

---

1-2 (consistent with the May 15, 2007 order, Larian will produce responsive documents prepared, written, transmitted or received before January 1, 2001, as well as responsive documents referring to any time prior to January 1, 2001)

3, 4, 5, 6, 7, 8, 9, 10, 11, 12

13 & 15 (consistent with the May 15, 2007 order, Larian will produce responsive communications from before January 1, 2001)

16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31

32 (consistent with the May 15, 2007 order, Larian will produce responsive communications from before June 1, 2001)

33 (consistent with MGA's responses to Mattel's First Requests for Production, Larian will documents sufficient to identify when Larian or MGA first contacted any manufacturer, or any contemplated, proposed or potential manufacturer, for the manufacture of ANGEL)

34

35 (consistent with MGA's responses to Mattel's First Requests for Production, Larian will produce documents sufficient to show when and where Angel was first marketed for sale by Larian or MGA to any wholesaler, distributor and/or retailer)

36, 37, 38, 39, 40

Exhibit **20** Page **773**

41 (consistent with the May 15, 2007 order, Larian will produce responsive communications from before June 1, 2001)

42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60

61 (consistent with the May 15, 2007 order, Larian will produce responsive communications from before January 1, 2001)

62 (consistent with the May 15, 2007 order, Larian will produce responsive documents created, received or transmitted prior to January 1, 2001)

63-68 (consistent with the May 15, 2007 order Larian will produce documents pertaining to services performed before January 1, 2001, and will also produce responsive documents pertaining to work done on Bratz or Angel)

69-76 (Larian will produce responsive documents pertaining to work done on Bratz or Angel before December 31, 2001)

77, 78

79 (consistent with the August 13, 2007 order, Larian will produce documents relating to focus groups for MGA CONTESTED PRODUCTS and MATTEL CONTESTED PRODUCTS, as those terms are defined in Mattel's First Requests for Production regarding Claims of Unfair Competition)

80 (Larian will produce responsive documents relating or referring to Bratz or Angel)

81 (Larian will produce responsive documents relating or referring to Bratz, Angel, or Bryant)

82-92 & 94-97 (consistent with the May 15, 2007 order Larian will produce all responsive documents relating to work done prior to January 1, 2001, and will also produce all responsive documents pertaining to work related to Bratz or Angel done up to December 31, 2001)

93 (Larian will produce any responsive agreement or contract that is presently in effect)

98-101 (consistent with the May 15, 2007 order Larian will produce all responsive documents pertaining to work done prior to January 1, 2001, and will also produce responsive documents pertaining to work done relating to Bratz or Angel up to December 31, 2001)

102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112

113-115 (Larian will produce all responsive documents pertaining to Bratz, Angel or Bryant)

116, 117, 118, 119, 120, 121, 122

123-125 (consistent with the May 15, 2007 order Larian will produce all responsive documents that refer or relate to Bratz)

126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138

139-146 (consistent with the May 15, 2007 order Larian will produce all responsive documents relating to payments made before January 1, 2001, and also will produce documents pertaining to payments related to Bratz or Angel made up to December 31, 2001)

147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 179

181 (consistent with the May 15, 2007 order Larian will produce all responsive documents pertaining to communications made prior to January 1, 2001)

Exhibit 20 Page 774

Page 3 of 3

182, 183, 184

185 (consistent with the May 15, 2007 order, Larian will make available for inspection all responsive tangible items produced, created, authored, conceived of or reduced to practice prior to January 1, 2001)

186, 187, 188, 189, 193, 200, 201, 202, 203, 204, 205, 206

210, 211, 212, 213 (Larian will produce responsive documents pertaining to the retention or destruction of documents or digital information relevant to this action)

214, 215, 216, 217, 218, 219, 220

221 (Larian will produce responsive documents relating to this action)

226

229-268 & 270 (Larian will produce documents consistent with the parties' agreement concerning the same requests to MGA in Mattel's Mattel's Second Set of Requests for Production to MGA, as reflected in MGA's Supplemental Responses to those requests)

271

272-273 (Larian will produce documents sufficient to show the ownership of MGA Entertainment HK Limited and MGAE de Mexico, S.r.l. de C.V.)

274-275 (Larian will produce documents in compliance with the parties' agreements governing the production of electronic documents and metadata)

276 (Larian will produce responsive documents and make responsive tangible things available for inspection)

---

BILL CHARRON
O'MELVENY & MYERS LLP
1999 AVENUE OF THE STARS, 7TH FLOOR
CENTURY CITY, CA 90067-6035
DIRECT DIAL (310) 246-8462
FAX (310) 246-6779
WCHARRON@OMM.COM

This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

Exhibit 20 Page 715

9/26/2007

**Exhibit 21**

# O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

April 30, 2007

OUR FILE NUMBER
0527436-8

WRITER'S DIRECT DIAL
(213) 430-6584

WRITER'S E-MAIL ADDRESS
jjenal@omm.com

**VIA E-MAIL AND U.S. MAIL**

Scott Kidman, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

     **Re:**   *Bryant v. Mattel, Inc and Consolidated Actions.*
           *Case No. CV 04-09049 SGL (RNBx)*

Dear Scott:

Your letter of April 25, 2007 purports to "confirm" what took place during our meet and confer at your offices on April 19, 2007 regarding MGA's responses to the 256 requests for admission contained in Mattel's Third Set of RFAs and MGA's responses to the 42 requests for admission contained in Mattel's Fourth Set of RFAs. Unfortunately, both the tenor and the content of your letter departs sharply from what occurred during our meeting. In particular, the strident and argumentative tone of your letter contrasts poorly with the far more cooperative spirit that was actually present during our meeting. Such a departure suggests that your participation at our meeting and your subsequent letter were more an attempt to "create a record" than a sincere effort to resolve a legitimate dispute.

While that recent history suggests that yet another otherwise avoidable discovery motion from Mattel is inevitable, nevertheless allow me to take you up on your offer to let you know if we have "any different understanding of our discussion."

**The Definition of "BRATZ" and 'BRATZ WORK" and**
**Request Nos. 141-163, 165-170, 173-180 and 183-185**

Mattel complains that:

> There is nothing about these terms that requires the
> contemporaneous existence of a physical doll and they cannot
> fairly be read to include such a limitation. MGA's undisclosed and
> unilaterally imposed restrictions on these terms are improper and

Exhibit 21  Page 776

O'MELVENY & MYERS LLP
Scott Kidman, Esq., April 30, 2007 - Page 2

its responses to the requests employing these terms are completely inadequate.

The only problem with this complaint is that it ignores the plain language of the definitions that Mattel, not MGA, created.  Here are the definitions, which were omitted from your letter:

> 4. **"BRATZ" means any doll or any portion thereof** that is now or has ever been known as, or sold or marketed under, the name "Bratz" (regardless of what such doll is or has been also or previously called) or that is now or has ever been sold or marketed as part of the "Bratz" line, and all prototypes, models, samples and versions of such doll or any portion thereof.

> 5. **"BRATZ WORK means any representation of BRATZ,** whether in whole or in part, whether two-dimensional or three-dimensional, and whether in tangible, digital, electronic or other form, including but not limited to all works, designs, artwork, sketches, drawings, illustrations, representations, depictions, blueprints, schematics, diagrams, images, photographs, sculptures, prototypes, models, samples, reductions to practice, developments, inventions and/or improvements, as well as all other items, things and DOCUMENTS in which any of the foregoing are or have been expressed, embodied, contained, fixed or reflected in any manner, whether in whole or in part.

By its own terms, the definition of "BRATZ" requires the existence of a doll or a portion thereof that has been known as "Bratz".  MGA's "limitation" is nothing more than the straight-forward application of Mattel's own definition.  During the meet and confer we discussed this and suggested that Mattel was, of course, free to propound additional RFAs (as it will no doubt do) with a revised definition that does not tie itself to an actual doll known as "Bratz".   In the meantime, MGA will stand by its plain language interpretation of Mattel's definition.

### Request Nos. 1 - 135 of Mattel's Third Set of RFAs

MGA has deferred responding to these RFAs because we believe our objection based upon CCP section 2019.210 is entirely justified; but, in any event, the issue has been fully briefed before Judge Larson who will, in due course, issue his ruling.  If he agrees with MGA, there will be no need for a supplemental response until such time as Mattel comes into compliance.  If Judge Larson rules against MGA on the 2019.210 issue, or if he concludes that we are right about its applicability to this case, but determines that Mattel is in compliance, MGA will provide supplemental responses.

Exhibit 21 Page 777

O'MELVENY & MYERS LLP
Scott Kidman, Esq., April 30, 2007 - Page 3

However, until we see Judge Larson's ruling on the multiple motions to dismiss, we cannot indicate the manner in which MGA will respond.

**Request Nos. 136-139**

We appreciate Mattel's willingness to compromise on the substitution of "told" for "represented to" and in reliance on that compromise, MGA will supplement its response to these RFAs on May 4, 2007.

**Request Nos. 183-185**

We agree that MGA will supplement these RFAs on May 4, 2007.

**Request Nos. 186 - 190**

MGA stands by its objections. In light of the position taken by Mattel in seeking a protective order regarding Polly Pockets discovery, we believe that Judge Infante will be disinclined to compel discovery on matters entirely unrelated to Mattel's claims or defenses in this matter.

In your letter you directed us to paragraphs 78 - 81 and 165 of Mattel's Counterclaims. However, Paragraphs 78-81 of Mattel's Counterclaims relate solely to alleged comments by Isaac Larian regarding Mattel's MyScene Bling Bling dolls with real gems. Paragraph 165 refers to allegations of bribery by MGA of Carter Bryant, allegations of misappropriation of Mattel's trade secrets, and allegations of MGA and Isaac Larian's disparagement of Mattel's products as described in the Counterclaims. Mattel's Counterclaims only describe Isaac Larian's alleged comments related to the MyScene Bling Bling dolls with real gems. There are no descriptions of any comments regarding Mattel's manufacturing practices, let alone factories in China. Consequently, RFAs 186-190 are not relevant to any of Mattel's asserted claims.

Additionally, your assertion that these RFAs are somehow relevant to defending against MGA's damages claim is far too attenuated to justify this discovery, particularly given that MGA's damages based on Mattel's unfair competition predate the report at issue by many years.

**Request Nos. 192, 193, 199, 200, 206, 207, 213, 214, 222-224, 226, 228, 230, 232, 234, 236, 238, 240**

Contrary to the suggestion in your letter, these RFAs are not akin to contention interrogatories which ask a party to state the bases for *its own contentions.* Rather, these RFAs ask for strictly legal conclusions, using copyright terms of art *for which MGA would have no basis to answer other than after an analysis by one of its lawyers*. In particular, requests 192, 199, 206, 213, 222, 223, 226, 228, 230, 232, 234, 236, 238, and 240 all ask MGA to admit that a particular work, subject to the identified copyright registration, is a "derivative work" from some other work, identified or not. Requests 193, 200, 207, 214, and 224 ask whether a particular work, subject to the identified copyright registration, is "substantially similar" to some other

Exhibit 21  Page 778

O'MELVENY & MYERS LLP
Scott Kidman, Esq., April 30, 2007 - Page 4

work.  MGA has made no such contentions in this litigation, and your reference to cases discussing "particular allegations in a complaint" or citing Rule 11 are inapposite.  MGA will stand by its prior responses.

### Request Nos. 1-28 of Mattel's Fourth Set of RFAs

Your letter fails to reflect MGA's explanation, repeated at our meet and confer, that the exhibits that are subject to these requests do not bear Bates numbers and there is nothing on the documents to identify their provenance.  MGA however, did not simply deny on that basis, but made a good faith comparison of the subject exhibits to documents in its files and indicated that the documents appeared to be copies of the originals in MGA's files.

### Request Nos. 32 - 37

Going beyond what we agreed to do at the meet and confer, MGA will provide supplemental responses to these requests on May 4, 2007.

In closing, I appreciated the positive atmosphere that was present at our meet and confer session and I hope that we will be able to continue along those lines going forward without the unnecessary posturing that unfortunately dominated your April 19th letter.

Best regards,

James P. Jenal
for O'MELVENY & MYERS LLP

cc:     Douglas A. Wickham, Esq.
        Michael Page, Esq.

LA2:829673.2

Exhibit 21 Page 779