EXHIBIT 1

  

**SEND**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA - Eastern Division
### CIVIL MINUTES - GENERAL

Case No.   CV 04-09059 SGL(RNBx)                          Date:  February 12, 2007
Title:     MATTEL, INC. -v- CARTER BRYANT, DOES 1-10, INCLUSIVE
           **Consolidated Action**
           CV 05-02727 SGL(RNBx)    MGA ENTERTAINMENT v. MATTEL, INC.,
====================================================================
PRESIDING:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                            Theresa Lanza
Courtroom Deputy Clerk               Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

John B. Quinn and Michael Zeller for  Diana M. Torres for MGA
Mattel                                Keith A. Jacoby for Carter Bryant

PROCEEDINGS:     SCHEDULING CONFERENCE PURSUANT TO FRCP 16(b)

     The Court convened a scheduling conference pursuant to FRCP 16(b).   Court and counsel discussed case management and thereafter the court set the following schedule:  See attachment "Schedule of Trial and Pretrial Dates."

     Counsel stipulated pursuant to Local Rule 16-14, to settlement procedure #3, to a retired judicial officer or other private or non-profit dispute resolution body for mediation type settlement proceedings. The Court approves the request and refers this case to an outside Mediator to act as the Settlement Officer.  Counsel are directed to contact such outside Mediator to schedule a settlement conference as soon as the parties believe such a conference would be fruitful. The cut-off to complete the mandatory settlement procedures under Local Rule 16-14, is December 3, 2007, in Case No. CV 04-09059-SGL (RNBx) Mattel, Inc. v. Carter Bryant, and the cut-off to complete the mandatory settlement procedures under Local rule 16-14, is April 21, 2008, in Case No. CV 05-02727 SGL (RNBx) MGA Entertainment v. Mattel, Inc.

     The Court further ordered that in both Case No. CV 04-09049-SGL (RNBx), Mattel, Inc. v. Carter Bryant, and Case No. CV 05-02727 SGL (RNBx), MGA Entertainment v. Mattel, Inc.:

     1.   Non-Expert Depositions are limited to a total of 24 for each side for both cases.
     2.   Expert Depositions are limited to a total of 20 for each side for both cases.
     3.   Interrogatories are limited to 50 for each side for both cases.

     IT IS SO ORDERED.

MINUTES FORM 90                                          Initials of Deputy Clerk: jh
CIVIL – GEN                 Page 1        FEB 2 2 2007    00/30

                  EXHIBIT __ PAGE 4

RightFAX                2/  /2007 3:16    PAGE 003/00      Fax Server

## SCHEDULE OF TRIAL AND PRETRIAL DATES

CASE NAME:     MGA ENTERTAINMENT, INC. V. MATTEL, INC., et al.,

CASE NO:       CV 05-2727-SGL (RNBx)

| Matter | Time | Court Order |
|---|---|---|
| Jury Trial Date | 9:30 am | 07/01/08 |
| Estimated Length of Trial | | |
| (Hearing on Motions in Limine; Hearing on Disputed Jury Instructions | 10:00 am | 06/23/08 |
| Final Pretrial Conference, LR 16-7 Motions in Limine to be filed | 11:00 am | 06/02/08 |
| Lodge Pretrial Conference Order, LR 16-6 to 16-6.2; File Contentions of Fact and Law, LR16-2.8; Exhibit & Witness Lists, LR 16-4 to 16-5; File Status Report regarding Settlement; File Rule 26(e)(1) Supplementation File Agreed Upon Set of Jury Instructions and Verdict Forms LR 49-1 to 49-2, 51-1 to 51-5.1; File Joint Statement regarding Disputed Instructions, Verdicts, etc. | | 05/19/08 |
| Last date to conduct Settlement Conference | | 04/21/08 |
| Last date for hearing motions, LR 7.2, et seq. | 10:00 am | 04/07/08 |
| Discovery cut-off | | 03/03/08 |
| Last date to Amend Pleadings or Add Parties | | Closed |

## ADDITIONAL MATTERS TO BE DETERMINED AT SCHEDULING CONFERENCE

LR 16-14.4 Settlement Selection:      ☐ 1. CT/USMJ              ☑ 3. Outside ADR
to be discussed
                                       ☐ 2. Attorney Settlement Panel   ☐

DOE Dismissal:             Complaint Filed: 04/13/05        SET DATE
                           Dismissal Date:                 to be discussed

RightFAX                    2/    '2007 3:16    PAGE 001/00.    Fax Server

From:      Name:        United States District Court
                        312 North Spring Street
                        Los Angeles, CA  90012
           Voice Phone: (213) 894-5474


To:        Name:        Michael Zeller
           Company:
                        865 S Figueroa St, 10th Floor,
           City/State:  Los Angeles, CA 90017-2543
           Fax Number:  213-443-3100



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


## Automated Document Delivery Service
*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

ax Notes:

ase 2:05-CV-02727 : MGA ENTERTAINMENT INC V. MATTEL INC ET AL


*Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

*Western Division:  CrimIntakeCourtDocs-LA@cacd.uscourts.gov*
*Southern Division:  CrimIntakeCourtDocs-SA@cacd.uscourts.gov*
*Eastern Division:  CrimIntakeCourtDocs-RS@cacd.uscourts.gov*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*f you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

ate and time of transmission:          Thursday, February 22, 2007 3:14:36 PM
umber of pages including this cover sheet:  03


EXHIBIT ⌐ PAGE 6

EXHIBIT 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                    EASTERN DIVISION                 Certified Copy
 4
 5     -------------------------------
 6     MATTEL, INC., a Delaware          )
 7     Corporation,                      )
 8                    Plaintiff,         )
                vs.                      )  No. CV 04-9059
 9     CARTER BRYANT, an individual;     )        (RNBx)
10     and DOES 1 through 10,            )
11     Inclusive,                        )
12                    Defendants.        )
13     -------------------------------)
14     (COMPLETE CAPTION ON NEXT PAGE.)
15
16        CONFIDENTIAL - ATTORNEYS' EYES ONLY
17
18        Videotaped 30(b)(6) deposition of SANDY
19     YONEMOTO, taken at 400 South Hope Street,
20     Los Angeles, California, commencing at
21     10:19 A.M., Wednesday, May 30, 2007,
22     before Wendy S. Schreiber, CSR No. 3558,
23     RPR, CLR.
24
25     PAGES 1 - 188
```

EXHIBIT 2 PAGE 7

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION

 4    ------------------------------

 5    MATTEL, INC., a Delaware        )

 6    Corporation,                    )

 7              Plaintiff,            )

 8              vs.                   )  No. CV 04-9059

 9    CARTER BRYANT, an individual;   )     NM (RNBx)

10    and DOES 1 through 10,          )

11    Inclusive,                      )

12              Defendants.           )

13    ------------------------------  )

14    CARTER BRYANT, on behalf of     )

15    himself, all present and        )

16    former employees of Mattel,     )

17    Inc., and the general public,   )

18              Counter-Claimants,    )

19              vs.                   )

20    MATTEL, INC., a Delaware        )

21    Corporation,                    )

22              Counter-Defendant.    )

23    ------------------------------

24

25
```

2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4       FOR THE PLAINTIFF:

 5

 6         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 7         BY:  MICHAEL ZELLER, ESQ.

 8         865 South Figueroa Street, Tenth Floor

 9         Los Angeles, California 90017

10         (213) 443-3000

11         mzeller@quinnemanuel.com

12

13                    -AND-

14

15         MATTEL, INC.

16         BY:  MICHAEL MOORE, ESQ.

17         333 Continental Boulevard

18         El Segundo, California 90245-5012

19         (310) 252-2000

20         michael.moore@mattel.com

21

22

23

24

25
                                                    3
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR THE DEFENDANT AND COUNTERCLAIMANT

 4        CARTER BRYANT:

 5

 6            KEKER & VAN NEST LLP

 7            BY:  CHRISTA MARTINE ANDERSON, ESQ.

 8            710 Sansome Street

 9            San Francisco, Califonria 94111-1704

10            (415) 391-5400

11            Canderson@kvn.com

12

13

14        FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16            O'MELVENY & MYERS LLP

17            BY:  JAMES JENAL, ESQ.

18            400 South Hope Street

19            Los Angeles, California 90071-2899

20            (213) 430-6000

21            jjenal@omm.com

22

23        ALSO PRESENT:

24

25            RYAN GULINO, VIDEO OPERATOR
                                                              4
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MR. ZELLER:  The question is vague.

2              THE WITNESS:  I believe Mr. Bryant's Exit

3    Interview Report came from files.

4    BY MS. ANDERSON:

5       Q.    Did you collect that report from your files  10:34AM

6    to provide to attorneys?

7       A.    Yes.

8       Q.    Did you do anything else to collect any kind

9    of documentation to provide for attorneys in regard

10   to the Bryant/Mattel lawsuit?                          10:34AM

11             MR. ZELLER:  The question is vague.

12             THE WITNESS:  No.

13   BY MS. ANDERSON:

14      Q.    Did you instruct anyone to collect documents

15   for production in this case?                           10:34AM

16      A.    No, I did not.

17      Q.    Do you have any knowledge aside from

18   information you solely know from your attorneys

19   about what was done to collect documents from your

20   department in relation to this case?                   10:35AM

21             MR. ZELLER:  The question is vague.

22             THE WITNESS:  No, I do not.

23             (Exhibit 23 previously marked.)

24   BY MS. ANDERSON:

25      Q.    I'm going to show you what has been marked   10:35AM

                                                           17
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  as Exhibit 23 in this case.  Have you ever seen this

2  document before?

3          MR. ZELLER:  Do you have an extra copy of

4  that?

5          MS. ANDERSON:  Yes.  Sorry about that.     10:36AM

6          THE WITNESS:  I've not seen this particular

7  document, no.

8      Q.  Do you have any knowledge about the

9  circumstances under which Mr. Bryant came to work

10 for Mattel in or around 1995?                        10:36AM

11     A.  No, I do not.

12     Q.  Do you have any knowledge about Mattel's

13 practices in regard to orientation of employees in

14 or around 1995?

15     A.  No, I did not at that time.                  10:36AM

16     Q.  When did you first begin to work for Mattel?

17     A.  1995.

18     Q.  What month did you start working at Mattel?

19     A.  It was June of 1995.

20     Q.  What was your first position with Mattel?     10:37AM

21     A.  It was in Human Resources.  I can't recall

22 my exact title.  I believe it was administrator, HR

23 administrator.

24     Q.  What office did you report to?  What

25 location of Mattel did you report to when you first   10:37AM

                                                          18

EXHIBIT 2  PAGE 12

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    came to work for Mattel?

 2         A.    In El Segundo.

 3         Q.    That's where you still work today, correct?

 4         A.    That's correct.

 5         Q.    To whom did you report when you first came    10:37AM

 6    to work for Mattel?

 7         A.    Jenene Wilson.

 8         Q.    What was her title at the time?

 9         A.    Director, Human Resources.

10         Q.    What were your job responsibilities when you  10:37AM

11    first came to work for Mattel?

12         A.    Basically assist Ms. Wilson with her HR

13    generalist responsibilities.

14         Q.    What's an HR generalist?

15         A.    It's an HR professional that supports         10:38AM

16    various portions of the organization.

17         Q.    Were you an HR generalist when you first

18    came to Mattel?

19         A.    I was in the function because I reported to

20    Ms. Wilson, but I was at the administrator level.       10:38AM

21         Q.    When you say "administrator," do you mean

22    more a secretarial role?

23         A.    There was a little bit of that but it was

24    assisting Ms. Wilson with projects/assignments as

25    such.                                                   10:38AM
```

                                                                19

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    from working with the Girls Design and Development

2    group to working with the Corporate Development

3    group?

4        A.   A new opportunity basically.

5        Q.   Was that a promotion?                        10:46AM

6        A.   I believe I stayed at the same title when I

7    moved over.

8        Q.   Did your title ever change from HR

9    consultant?

10       A.   Yes.                                          10:46AM

11       Q.   What was your next title at Mattel?

12       A.   Manager, Human Resources.

13       Q.   How long -- strike that.

14            What's your best recollection of when you

15   started being a manager of Human Resources?          10:47AM

16       A.   Approximately 2003.

17       Q.   For how long were you manager of Human

18   Resources?

19       A.   Approximately two years.

20       Q.   To whom did you report in that role?         10:47AM

21       A.   At first it was John Staines and then Lissa

22   Inzer.

23       Q.   How do you spell Staines?

24       A.   S-t-a-i-n-e-s.

25       Q.   What was Lissa's last name?                  10:47AM

25

EXHIBIT 2 PAGE 14

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Inzer. | |
| 2 | Q.    I-n-z-e-r? | |
| 3 | A.    Correct. | |
| 4 | Q.    How, if at all, did your job | |
| 5 | responsibilities change from moving from HR | 10:48AM |
| 6 | consultant to manager of HR? | |
| 7 | A.    With the manager title I was the generalist | |
| 8 | for the -- in partnership with John Staines, the | |
| 9 | generalist for the Finance organization. | |
| 10 | Q.    What was the next position you held at | 10:48AM |
| 11 | Mattel? | |
| 12 | A.    Senior manager.  Senior manager, HR | |
| 13 | Communications I think they called it. | |
| 14 | Q.    When did you start that position? | |
| 15 | A.    That was early in 2005. | 10:48AM |
| 16 | Q.    How long did you hold that position? | |
| 17 | A.    I still hold that position today.  It's been | |
| 18 | retitled to senior manager, HR Operations. | |
| 19 | Q.    What are -- strike that. | |
| 20 | How did your job responsibilities change | 10:49AM |
| 21 | from being manager of HR to being senior manager? | |
| 22 | A.    I became responsible for a department within | |
| 23 | HR. | |
| 24 | Q.    Which department? | |
| 25 | A.    HR Operations. | 10:49AM |

26

EXHIBIT 2 PAGE 15

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    What does HR Operations do?

 2      A.    HR Operations provides internal support for

 3  our HR organization.

 4      Q.    Give me some examples of what you mean by

 5  providing internal support.                        10:49AM

 6      A.    For instance, we are responsible for HR

 7  global communications so any time, you know, we have

 8  an HR program or initiative, my team is responsible

 9  for designing, creating, disseminating that

10  information. .                                      10:50AM

11      Q.    Anything else?  Any other examples?

12      A.    Another example is that we also oversee our

13  HR portal, our internal portal, Web site, so my team

14  also manages that portal content, Design Center and

15  such.                                               10:50AM

16      Q.    Who do you report to in your senior manager

17  position?

18      A.    My current position?  Michelle Charmello.

19      Q.    How do you spell that?

20      A.    C-h-a-r-m-e-l-l-o.                         10:50AM

21      Q.    Before we set aside Exhibit 23, what you

22  have before you, do you have any information about

23  any statements made by Mattel to Mr. Bryant in

24  connection with his signing Exhibit 23?

25      A.    No, I do not.                              10:51AM
                                                              27
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   don't know.

2          With that in mind, aside from what one can

3   plainly read from the face of Exhibit 414, do you

4   have any information about the circumstances under

5   which Carter Bryant's personal leave was canceled in      10:58AM

6   or around 1997?

7      A.   No, I do not.

8      Q.   And aside from what one can simply read from

9   the face of Exhibit 414, do you have any information

10  about circumstances under which Mr. Bryant may have      10:58AM

11  gone on a reduced-hour schedule?

12          MR. ZELLER:   Other than what she talked

13  about in terms of the procedures?

14          MS. ANDERSON:   Yes, other than what you've

15  already testified to.                                    10:59AM

16          THE WITNESS:   No, I do not.

17          (Exhibit 25 previously marked.)

18  BY MS. ANDERSON:

19     Q.   I'm going to show you what has been marked

20  previously as Exhibit 25.   Have you ever seen          10:59AM

21  Exhibit 25 before?

22     A.   Yes, I have.

23     Q.   When was the first time you saw Exhibit 25?

24     A.   A couple of weeks ago.

25     Q.   Who is Teresa Newcomb?                          11:00AM

33

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Ms. Newcomb works in our Corporate Staffing

2   department.

3      Q.   Do you understand that to be her signature

4   on Exhibit 25?

5      A.   Yes.                                    11:00AM

6      Q.   Do you know what her position was in January

7   of 1999?

8      A.   No, I couldn't tell you exactly.

9      Q.   Do you have any knowledge about -- strike

10   that.                                           11:00AM

11          Do you have any knowledge about the rehiring

12   of Carter Bryant in or around January of 1999?

13      A.   No, I do not.

14      Q.   Just to be clear, as a 30(b)(6)

15   representative did you do anything to gather any   11:00AM

16   information about the circumstances under which

17   Carter Bryant was rehired in January of 1999?

18      A.   No, I did not.

19      Q.   Did you -- strike that.

20          Do you have knowledge about Mattel's       11:01AM

21   practices with respect to having employees sign

22   agreements in the form that is reflected in Exhibit

23   25?

24      A.   Can you clarify what you mean by -- I'm not

25   sure I understand your question.                 11:01AM

                                                        34

EXHIBIT 2 PAGE 18

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.   Sure.  As a preface, is Mr. Bryant the only

2  person that you're aware of who signed an agreement

3  in the form that's reflected in Exhibit 25?

4     A.   No.  This is provided to all employees

5  coming into the company.                          11:01AM

6     Q.   And during what period of time was Exhibit

7  25 the standard form of agreement that employees

8  would sign when entering the company?

9          MR. ZELLER:  Objection:  assumes facts not

10 in evidence, misstates the witness' testimony.     11:02AM

11         THE WITNESS:  Can you please repeat the

12 question?

13 BY MS. ANDERSON:

14    Q.   Sure.  You said that the form of agreement

15 reflected in Exhibit 25 is an agreement that's      11:02AM

16 provided to all employees coming into the company,

17 right?

18    A.   That's correct.

19    Q.   During what period of time did Mattel

20 provide this form of agreement to all employees     11:02AM

21 coming into the company?

22    A.   That would be during their onboarding.

23    Q.   What does "onboarding" mean?

24    A.   When they first begin with the company,

25 begin their employment with the company.            11:02AM

35

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.    During what period of time did Mattel use

2    this form of agreement to onboard employees?

3            MR. ZELLER:   Just so I'm clear, I haven't

4    been objecting to this being outside the scope of

5    the designation since I assume you're looking to        11:03AM

6    find out what her areas of knowledge are but so it's

7    clear, the onboarding procedures as she talks about

8    is not within the scope of her designation, but you

9    can go ahead.

10           THE WITNESS:   Okay.  Beyond the fact that       11:03AM

11   this form has been dated by Mr. Bryant in '99 I can

12   speak to the fact that it was used in '99, but I

13   don't have full knowledge as to exactly when this

14   form was in use.

15           MS. ANDERSON:   You know, I don't want to        11:03AM

16   get into a long colloquy on the record but I do

17   think this relates to the subject matters we're

18   talking about and I'm trying to figure out what her

19   scope of knowledge is.  I know you have an objection

20   and you've stated it and I just want you to know       11:03AM

21   that I'm being silent to try to move it along, not

22   because I sort of acquiesce in your position.

23           MR. ZELLER:   Well, I don't want to get into

24   a colloquy but just two quick points.

25           No. 1, we had extensive discussions, and I      11:03AM
                                                                36

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    know this was before you were involved, with Carter

2    Bryant's counsel about the scope of these topics and

3    everything else because they're phrased in legal

4    conclusionary terms and so we had extensive

5    discussions and negotiations about what the meaning    11:04AM

6    of those topics were.

7         No. 2, we have said that Sandy is here to

8    talk about the exit interview.  I mean, that's what

9    she participated in with respect to Mr. Bryant.

10   You're, again, free to explore any areas you want    11:04AM

11   but just so it's clear, we have designated her

12   because she has information about issues that are

13   part and parcel of those topics as they were

14   negotiated and narrowed and understood through that

15   process.    11:04AM

16        MS. ANDERSON:  Sure, and I understand there

17   may come a day when we have to fight about it but I

18   just want you to know I understand you're putting

19   your objections on the record.  I'm still going to

20   ask the questions.    11:04AM

21        MR. ZELLER:  Sure.

22        MS. ANDERSON:  I'm not going to argue back

23   to you for the rest of the deposition about scope.

24   It's something we can argue about later.

25        MR. ZELLER:  I understand.    11:04AM

37

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. ANDERSON:

2        Q.   So talking about Mattel and the use of the

3    form that's in Exhibit 25, do you have knowledge

4    based on your long experience in the HR department

5    about what period of time did Mattel use the form        11:05AM

6    that's reflected in Exhibit 25?

7            MR. ZELLER:   Asked and answered.

8            THE WITNESS:   As I stated previously, I can

9    speak to the fact that the form was used in 1999

10   because Mr. Bryant did date it, but I don't have the     11:05AM

11   knowledge of the time frame from beginning to end of

12   when it was used.

13   BY MS. ANDERSON:

14       Q.   Can you give me any reasonable estimation of

15   the time period during which the form that's            11:05AM

16   reflected in Exhibit 25 was used by Mattel?

17           MR. ZELLER:   Asked and answered.

18           THE WITNESS:   No, I cannot.

19   BY MS. ANDERSON:

20       Q.   Do you have any recollection as you sit here 11:05AM

21   today about when, if ever, Mattel stopped using

22   Exhibit 25's format and moved on to a different

23   format for Confidential Information and Inventions

24   Agreements?

25       A.   Can you restate that question?              11:05AM

                                                              38

EXHIBIT 2 PAGE 22

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   course of his employment at Mattel?

 2           MR. ZELLER:  Outside the designation.

 3           THE WITNESS:  Mr. Bryant along with all

 4   employees would have received code of conduct -- the

 5   code of conduct document while he was at Mattel.     01:19PM

 6   BY MS. ANDERSON:

 7      Q.   When you say that Mr. Bryant would have

 8   received the code of conduct training -- strike

 9   that.

10           When you say that Mr. Bryant would have     01:19PM

11   received the code of conduct document while he was

12   at Mattel, on what do you base that statement?

13      A.   That was our practice.  That would have been

14   a company practice to provide that to our employees.

15      Q.   Who do you understand to have been           01:19PM

16   responsible for providing that document to Mattel

17   employees during the time period 1995 through the

18   end of 2000?

19           MR. ZELLER:  The question is overbroad,

20   outside the designation.                             01:20PM

21           THE WITNESS:  I know the code of conduct was

22   a partnership between our Legal and HR department so

23   I can't recall the exact disseminator of the

24   information.

25   BY MS. ANDERSON:                                     01:20PM
                                                              86
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   Do you have an understanding based on your

 2   experience at Mattel as to when employees typically

 3   received a copy of this code of conduct document

 4   that you refer to?

 5             MR. ZELLER:  Outside the designation.      01:20PM

 6             THE WITNESS:  Are you referring to a certain

 7   time frame?

 8   BY MS. ANDERSON:

 9        Q.   I'm talking about the time period 1995 to

10   the end of 2000, and I'm trying to assess whether    01:21PM

11   there is some particular juncture during an

12   employee's employment at which Mattel would

13   typically give this document to the employee.

14             MR. ZELLER:  Same objections.

15   BY MS. ANDERSON:                                     01:21PM

16        Q.   Do you understand my question?

17        A.   Yes.  I don't recall at what time -- well, I

18   do know that it was provided.  I don't recall

19   exactly at what point it was normally distributed.

20        Q.   So you're not sure if it was at the very    01:21PM

21   inception of the employment, correct?

22             MR. ZELLER:  Same objections.

23             THE WITNESS:  I'd have to go back and check.

24   I don't recall exactly the time frame of when it was

25   provided for employees.                              01:22PM
                                                             87
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            (Exhibit 14 previously marked.)

 2   BY MS. ANDERSON:

 3       Q.   I'm going to show you what was previously

 4   marked as Exhibit 14 in this case.  Have you ever

 5   seen Exhibit 14 before?                          01:22PM

 6       A.   Yes, I have.

 7       Q.   When was the first time you saw this?

 8       A.   Maybe as part of the preparation for this

 9   deposition.

10       Q.   Do you believe you saw it at any time prior  01:23PM

11   to preparing for your deposition?

12            MR. ZELLER:  You mean this particular letter

13   or the format?

14            MS. ANDERSON:  The letter itself.

15            THE WITNESS:  No, I do not recall seeing it  01:23PM

16   prior.

17   BY MS. ANDERSON:

18       Q.   Do you believe by December of 1998 that you

19   were reporting to Lynn Robinson?

20       A.   By the end of 1998, yes, I believe I was    01:23PM

21   reporting to Lynn at that time.

22       Q.   In 1998 and 1999 did you have an

23   understanding of what was the typical onboarding

24   procedure used with respect to Mattel employees?

25            MR. ZELLER:  Outside the designation.       01:24PM
                                                           88
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          THE WITNESS:  I was not part of that

2     process.  I could not speak to it accurately for

3     you.

4     BY MS. ANDERSON:

5          Q.   And in 2000 did you have an understanding of    01:24PM

6     what was the typical exiting process used with

7     respect to employees who were voluntarily

8     terminated?

9          MR. ZELLER:  Asked and answered.

10         THE WITNESS:  Yes, I was well aware of the    01:24PM

11    exit interview practices.

12    BY MS. ANDERSON:

13         Q.   I know I have asked you questions about

14    practices and what you did with respect to exit

15    interviews but I want to be clear I'm asking a    01:24PM

16    question that's broader than that.  And for now I'd

17    just like to know "yes" or "no" so I don't make you

18    go through repeating all of the stuff you already

19    told me about exit interviews.

20         So here's my question.  Do you have an    01:24PM

21    understanding of the process that Mattel followed

22    with respect to employees who were departing Mattel

23    on a voluntary termination basis?

24         MR. ZELLER:  This is asked and answered.

25    The question is vague.    01:25PM

                                                              89

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              THE WITNESS:  Can you please repeat the

2     question?

3     BY MS. ANDERSON:

4          Q.    Sure.  Do you have an understanding of the

5     process that Mattel followed with respect to          01:25PM

6     employees who were departing Mattel on a voluntary

7     termination basis in the year 2000?

8              MR. ZELLER:  Asked and answered and vague.

9              THE WITNESS:  I'm not sure what you mean by

10    "process."                                            01:25PM

11    BY MS. ANDERSON:

12         Q.    Practice.  How about is that?  Do you have

13    an understanding of the practices that Mattel

14    followed with respect to employees who were

15    departing Mattel on a voluntary termination basis in  01:25PM

16    the year 2000?

17             MR. ZELLER:  The question is vague.  Also

18    asked and answered repeatedly.

19             THE WITNESS:  I am aware of the exit -- of

20    our practice during the exit interview process.       01:26PM

21    BY MS. ANDERSON:

22         Q.    Do you have any knowledge about any other

23    aspect of Mattel's practices with respect to

24    employees who are departing on a voluntary

25    termination basis aside from the exit interview       01:26PM

                                                            90

EXHIBIT 2  PAGE 27

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    process which you have already described?

 2           MR. ZELLER:  This is already answered as

 3    well.  The question is also vague.

 4           THE WITNESS:  I'm not sure I understand what

 5    you mean by -- when you just say "process."        01:26PM

 6    BY MS. ANDERSON:

 7      Q.   Let me give you an example to help inform

 8    your answer.

 9           Is there any practice that Mattel followed

10    once an employee gave notice that they intended to  01:26PM

11    leave?  Is there any practice that Mattel followed

12    with respect to collecting documentation after

13    receiving such notice?  Was there any practice that

14    Mattel followed with respect to making certain

15    payments or doing anything with respect to wrapping 01:26PM

16    up the employee's employment aside from the exit

17    interview process which you've already told me

18    about?

19           MR. ZELLER:  This question is at least in

20    part asked and answered repeatedly and the question 01:27PM

21    is also vague and compound.

22           MS. ANDERSON:  It wasn't a question.  It was

23    a listing of a bunch of examples for the witness to

24    help the witness understand the purpose of my

25    question.  And now I'll be happy to restate it.     01:27PM
```

91

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.   Aside from the exit interview process that

2   you've already described, do you have any knowledge

3   of any other aspects of Mattel's practices with

4   respect to employees who were departing on a

5   voluntary termination basis in the year 2000?          01:27PM

6          MR. ZELLER:   This is asked and answered and

7   vague.

8          THE WITNESS:   To clarify, if -- when an

9   employee voluntarily terminates and, for instance,

10  informs us they are going to a competitor, they are   01:28PM

11  immediately exited out the same day of notice.   That

12  is a standard practice and has been a standard

13  practice at the company.

14  BY MS. ANDERSON:

15     Q.   Any other practices besides what you've        01:28PM

16  already told me?

17         MR. ZELLER:   Throughout the course of this

18  deposition or just now?   Because the problem with

19  your question is you want her to repeat what she's

20  already told you.                                       01:28PM

21  BY MS. ANDERSON:

22     Q.   Aside from what you have already told us

23  today, are there any other practices that Mattel

24  follows with respect to voluntarily terminating

25  employees?                                              01:28PM

                                                            92

EXHIBIT 2  PAGE 29

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. ZELLER:  The question is vague,
 2     overbroad.
 3              THE WITNESS:  That's all I can recall for
 4     you right now.
 5     BY MS. ANDERSON:                              01:29PM
 6        Q.  If you could bring before you Exhibit 34
 7     which is the Exit Interview Report we talked about.
 8        A.  Okay.
 9        Q.  Drawing your attention to the "Employee's
10     New Job" section, some of those questions appear to   01:29PM
11     have a box that says "No Information."  Do you see
12     that?
13        A.  Yes, I do see that.
14        Q.  What was your understanding of the purpose
15     of those boxes on this form?                   01:29PM
16        A.  That the employee -- the terminating
17     employee that was involved in the exit interview
18     would not have any information to offer related to
19     those particular topics.
20        Q.  As you sit here today, do you have any       01:30PM
21     recollection as to why you didn't check those boxes?
22              MR. ZELLER:  The question is vague.
23              THE WITNESS:  I don't have -- you know, as I
24     stated, I don't have a personal recollection of that
25     meeting to be able to tell you that.           01:30PM
                                                          93
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MS. ANDERSON:

 2        Q.    And drawing your attention if you would to

 3    Exhibit 415 which is an HR Action Notice, do you

 4    have any knowledge as to why this document was

 5    signed in June of 1999?                              01:30PM

 6            MR. ZELLER:  Objection:  assumes facts not

 7    in evidence.

 8            THE WITNESS:  I did not -- I'm not the one

 9    that signed this document so I -- I couldn't explain

10    to you why.                                          01:31PM

11    BY MS. ANDERSON:

12        Q.    Do you note -- in the "Employee's Status"

13    box at the top of the form do you know what the

14    different categories of dates indicate at the top of

15    the form?  The first one, "Hire Date," is hire date  01:31PM

16    the date on which the employee was hired?

17        A.    That is -- yes, that's correct.

18        Q.    And "Rehire Date" is the date in a

19    circumstance where an employee is actually rehired?

20        A.    Yes.                                       01:31PM

21        Q.    How about "Co Seniority"?  What does that

22    date mean?

23        A.    That means company seniority date.

24        Q.    What does that mean?

25        A.    Seniority date, it matches the hire date.  01:31PM
                                                               94
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    It's just the seniority of the employee, the years

 2    of service or seniority the employee has with the

 3    company.

 4        Q.    What does "Service Date" mean on this form?

 5        A.    The service date I believe has to do with      01:32PM

 6    benefits.

 7        Q.    Do you have any understanding of what

 8    relationship that date has to benefits?

 9        A.    I'd have to go back and check for you on

10    that.  I don't have that information right now.         01:32PM

11        Q.    And "Expected RTW" at the end of that long

12    line of dates, do you see that?

13        A.    Yes.

14        Q.    Do you know what that date indicates?

15        A.    "Expected RTW" means expected return to        01:32PM

16    work.

17        Q.    Do you have an understanding of what "return

18    to work" means in the context of an HR Action Notice

19    form?

20              MR. ZELLER:  The question is overbroad,        01:33PM

21    outside the designation.

22              THE WITNESS:  Return to work on this form

23    means when an employee is -- the date indicates the

24    day the employee is coming back to work in the

25    office.                                                  01:33PM
```

95

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    BY MS. ANDERSON:

2        Q.    After what kind of event are you referring

3    to?

4        A.    Usually it's some sort of leave of absence.

5        Q.    Do you have any understanding as to why this   01:33PM

6    form reflects June 30th, 1998 as a return to work

7    date for Carter Bryant?

8        A.    No, I was not involved in this particular

9    transaction.

10       Q.    If you could have before you Exhibit 25 and   01:34PM

11   Exhibit 27 which are the Employee Confidential

12   Information and Inventions Agreement and the

13   Proprietary Information Checkout on Mr. Bryant.

14       A.    Twenty-five you said?

15       Q.    Twenty-five and 27.                             01:34PM

16       A.    Oh, there it is.  Okay.

17       Q.    Do you have before you Exhibit 25?

18       A.    Yes.

19       Q.    Drawing your attention to the middle of the

20   page, this agreement states "Any provision in this   01:34PM

21   agreement requiring me to assign my rights in any

22   invention does not apply to an invention which

23   qualifies under the provision of Section 2870 of the

24   California Labor Code."  Do you see that?

25       A.    Yes, I do.                                       01:35PM
                                                                   96
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Do you see where that section then goes on

2   to quote some language from that section?  Do you

3   see that?

4      A.    Yes.

5      Q.    Did you ever discuss the provisions of this    01:35PM

6   Labor Code section with employees when you conducted

7   exit interviews?

8      A.    This particular section on this agreement as

9   we just talked about is handled through onboarding

10  and as we talked about again earlier during the exit    01:35PM

11  interview my practice was to review the Proprietary

12  Information Checkout form with the employee and the

13  exit -- and the Exit Interview Report form with the

14  employee and go through those two business records

15  along with what my standard practice was for the        01:36PM

16  whole exit interview process.

17             MS. ANDERSON:  Move to strike as

18  nonresponsive.

19     Q.    Did you ever discuss with employees during

20  the exit interview process the provisions of Section    01:36PM

21  2870 of the California Labor Code as described in

22  the Employee Confidential Information and Inventions

23  Agreement?

24             MR. ZELLER:  This is asked and answered.

25  The question is also vague.                             01:36PM

                                                                97

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        THE WITNESS:  As part -- as I stated, as

2   part of the exit interview process when explaining

3   to the employee about the proprietary information

4   checkout form I did -- again, part of my practice

5   was to remind them of their responsibilities to the        01:37PM

6   company which included reminding them that they

7   signed certain agreements when they came on board.

8   BY MS. ANDERSON:

9        Q.   Did you ever make mention during any exit

10  interview of any employee Section 2870 of the              01:37PM

11  California Labor Code as referenced in the Employee

12  Confidential Information and Inventions Agreement?

13       MR. ZELLER:  The question is now asked and

14  answered for the third time and it's vague.

15       THE WITNESS:  Again, as part of my practice     01:37PM

16  doing exit interviews I -- I explain to the

17  employees about their responsibilities regarding the

18  agreement in which the section you're referring to

19  is on and reminding them of their responsibilities

20  to that agreement.                                         01:38PM

21  BY MS. ANDERSON:

22       Q.   What responsibilities did you explain to

23  exiting employees -- strike that.

24            What responsibilities did you identify to

25  exiting employees that the exiting employees had         01:38PM

                                                               98

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    under Section 2870 of the California Labor Code

2    which is described in this provision 2(c) on the

3    Employee Confidential Information and Inventions

4    Agreement?

5             MR. ZELLER:  This question is now asked and      01:38PM

6    answered repeatedly not only this afternoon but

7    earlier today and it's argumentative and framed as a

8    legal question.

9    BY MS. ANDERSON:

10        Q.   Let me help you out, Ms. Yonemoto.  Can you    01:38PM

11   identify anyplace on the Proprietary Information

12   Checkout form which is Exhibit 27 that talks about

13   the rights of employees under Section 2870 of the

14   California Labor Code?

15            MR. ZELLER:  The question calls for a legal      01:39PM

16   conclusion and really is grossly improper for that

17   reason alone.

18            THE WITNESS:  I don't feel I have the

19   expertise to be able to tell you -- to speak to that

20   section in terms of your question here.  I can only    01:39PM

21   tell you again what my practice was when

22   communicating to an employee during an exit

23   interview process or meeting.

24   BY MS. ANDERSON:

25        Q.   Did you ever tell any exiting employee in     01:39PM

99

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   words or substance that the Employee Confidential

2   Information and Inventions Agreement didn't require

3   them to assign their rights in inventions that fell

4   within the provisions of California Labor Code 2870?

5        MR. ZELLER:  This is now repeatedly asked        01:40PM

6   and answered and the question is hopelessly vague

7   and framed as a legal contention.

8        THE WITNESS:  I'm not -- I'm not quite sure

9   how to answer it other than the response I've given

10  you already.                                          01:40PM

11       MS. ANDERSON:  Move to strike as

12  nonresponsive.

13       Q.   Did you ever tell any exiting employee

14  during an exit interview that there were some things

15  as to which the employee did not have an obligation   01:41PM

16  to assign rights to Mattel?

17       MR. ZELLER:  This is asked and answered

18  repeatedly.

19       THE WITNESS:  During the exit interview by

20  taking them through the Proprietary Information       01:41PM

21  Checkout form I believe -- and, again, this is just

22  a standard practice -- I believe I made it very

23  clear as to what the purpose of this form was and

24  how it related to an employee's responsibility to

25  basically turn over anything -- anything he or she    01:42PM

                                                          100

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   made, created, designed during the period of his or

2   her years of service with the company because that

3   belonged to Mattel and then we reviewed the rest --

4   I asked the employee to read the rest of the form

5   and if they had any questions, they were free to        01:42PM

6   ask.

7   BY MS. ANDERSON:

8        Q.   Did you ever tell any exiting employee that

9   there were exceptions to the kinds of things that

10  were covered under the Employee Confidential           01:42PM

11  Information and Inventions Agreement as pertained to

12  what things the employee had to assign to Mattel?

13          MR. ZELLER:  This is repeatedly asked and

14  answered to the point of harassment.  If you

15  continue to ask it after this time, I'm moving for a  01:42PM

16  protective order.

17          MS. ANDERSON:  I look forward to the judge

18  reviewing the failure of this witness to answer any

19  single one of these questions.

20          MR. ZELLER:  They're framed as a legal          01:43PM

21  contention.  It will be interesting to see what your

22  witnesses do with legal contention questions.  If

23  you think --

24          MS. ANDERSON:  Tell me, Mr. Zeller, is a

25  question preceded by "did you tell" something that     01:43PM

                                                                  101

EXHIBIT 2 PAGE 38

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   asks for a legal conclusion?

 2          MR. ZELLER:  You're asking her to interpret

 3   whether it would fall within the ambit of telling

 4   people what that section means.

 5          MS. ANDERSON:  Absolutely not.              01:43PM

 6          MR. ZELLER:  That is what your question is.

 7          MS. ANDERSON:  You can argue that before the

 8   judge.

 9   Q.    Would you like the question back?

10   A.    Yes, please.                                01:43PM

11   Q.    Did you ever tell any exiting employee that

12   there were exceptions to the kinds of things that

13   were covered under the Employee Confidential

14   Information and Inventions Agreement that pertained

15   to the things that employees had to assign to       01:43PM

16   Mattel?

17          MR. ZELLER:  Asked and answered repeatedly

18   now, vague, framed as a legal contention.

19          THE WITNESS:  During the exit interview

20   session or meeting again, part of my practice was to  01:44PM

21   review the Proprietary Information Checkout form

22   with the employee, give the employee ample time to

23   read the -- read the checkout form and if the

24   employee had any questions or did not understand any

25   portion of this document, they were free to ask.     01:44PM
                                                          102
```

EXHIBIT 2 PAGE 39

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        MS. ANDERSON:  Move to strike as

2  nonresponsive.  We'll just have to come back.

3        Q.   Are you aware of any instances in which any

4  Mattel employee worked on any designs at home on

5  their own free time without instruction from Mattel?  01:44PM

6        MR. ZELLER:  It's outside the scope of the

7  designation, vague, lacks foundation.

8        THE WITNESS:  You mean, other than what I'm

9  currently aware of regarding Mr. Bryant?  No, I did

10 not have any knowledge of that.                       01:46PM

11 BY MS. ANDERSON:

12       Q.   When you say other than what you're

13 currently aware of regarding Mr. Bryant, exactly

14 what are you referring to?  Actually, let me

15 rephrase it just in case there's any confusion here.  01:46PM

16       Aside from information you solely know from

17 your lawyers and that your lawyers are treating as

18 privileged, do you have any information about any

19 situation in which a Mattel employee performed work

20 on their own time relating to designs without        01:46PM

21 instruction from Mattel?

22       A.   Besides Mr. Bryant's situation I do not

23 recall any other Mattel employees that I knew of --

24 can you restate that last part of your question?  I

25 want to make sure I answer that accurately.           01:48PM

                                                         103

EXHIBIT 2  PAGE 40

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    The question had been:  Are you aware of any

2    instances in which any Mattel employee worked on any

3    designs at home on their own free time without

4    instruction from Mattel?

5           MR. ZELLER:  That wasn't the last question    01:48PM

6    you asked though.

7    BY MS. ANDERSON:

8      Q.    Here we go.  The question was:  Aside from

9    information you solely know from your lawyers and

10   that your lawyers are treating as privileged, do you   01:49PM

11   have any information about any situation in which a

12   Mattel employee performed work on their own time

13   relating to designs without instruction from Mattel?

14     A.    And to just go back, besides what I've

15   learned about Mr. Bryant, no, I can't speak to any     01:49PM

16   other employees.

17     Q.    And the information that you learned about

18   Mr. Bryant is information you purely know from

19   speaking with your lawyers; is that true?

20          MR. ZELLER:  Any information?              01:49PM

21          MS. ANDERSON:  Information responsive to the

22   question.

23          MR. ZELLER:  The question is vague.

24          THE WITNESS:  Can you please restate?  I'm

25   sorry.                                          01:50PM

                                                     104

EXHIBIT 2 PAGE 41

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   deposition for that case?

2         MR. ZELLER:  The question is vague, lacks

3   foundation.

4         THE WITNESS:  I don't know how to answer

5   that.  I would have to defer to legal counsel to          02:32PM

6   tell you if that's --

7   BY MR. JENAL:

8      Q.   Fair enough.  What was the nature of what

9   you were being asked to testify about?  I take it

10  you were a witness on behalf of Mattel, correct?         02:32PM

11     A.   Yes.

12     Q.   What were you being asked to testify about

13  on behalf of Mattel?

14     A.   The circumstances surrounding the

15  termination of both Mr.and Mrs. Hastey.                  02:32PM

16     Q.   Did you have personal knowledge of those

17  circumstances?

18     A.   Yes.  Some knowledge, yes.

19     Q.   Did you handle the exit interviews for those

20  two employees?                                            02:33PM

21     A.   In the Hastey case it fell into a different

22  situation where the company was handling a reduction

23  in force situation and they were included as part of

24  that reduction in force so there is a different

25  procedure regarding those instances.                     02:33PM

128

EXHIBIT _2_ PAGE 42

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Right.  But regardless of the different

2  setting were you involved in the exit interviews for

3  those two employees?

4         MR. ZELLER:  Objection: mischaracterizes

5  the witness' testimony as to settings.        02:33PM

6         THE WITNESS:  In a reduction in force

7  situation we don't refer to it as an exit interview

8  because it's a completely different situation.  And

9  saying that, yes, I was in the final meeting with

10 Debbie Hastey.  I believe I was also in the final    02:34PM

11 meeting with Mr. Hastey as well.

12 BY MR. JENAL:

13   Q.   And I take it from your answer that those

14 final meetings were somehow different from exit

15 interviews; is that correct?                  02:34PM

16   A.   Yes.

17   Q.   What's the difference between those final

18 meetings versus the exit interviews you've described

19 previously?

20   A.   At -- just very quickly, in the exit      02:34PM

21 interview it's handled with an employee that has

22 voluntarily terminated and we've discussed the

23 various practices that I go through during that type

24 of meeting.

25         With the reduction of force situation that   02:34PM

                                                      129

EXHIBIT 2 PAGE 43

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   is handled differently.  The employee -- I'm sorry,

2   let me step back.  The supervisor of the employee

3   that's being terminated that day and myself -- I'm

4   the HR person -- would meet with the employee so

5   there would be three people in that meeting.  That        02:35PM

6   would be one of the differences.  And typically

7   on -- with the reduction of force situation Mattel's

8   practice has been to include a severance discussion

9   as part of that meeting and the employees are asked

10  to exit the company -- or the site that very same         02:35PM

11  day immediately after the meeting.

12      Q.   Do you recall what year that meeting took

13  place with the Hasteys?

14      A.   I would have to look back at records.  I

15  would totally be guessing if I gave you a year right       02:36PM

16  now.  I'd have to look back at records.

17      Q.   I'm not looking for a total guess but I'd

18  like your best approximation as to what year that

19  was.

20      A.   I believe it was early in -- I believe it         02:36PM

21  was early in 2001 around the same time my supervisor

22  passed away.

23      Q.   When you say "reduction in force," that's

24  basically the same as a layoff, correct?

25      A.   I think the language employees might use is        02:36PM

                                                                 130

EXHIBIT 2  PAGE 44

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   a layoff but, yes, we would refer to it as a

2   reduction in force.

3       Q.   How many people were laid off at the time,

4   at the time that the Hasteys were laid off, do you

5   know?                                        02:37PM

6       A.   I don't recall the exact number or I don't

7   even recall an approximate number right now.  I'd

8   have to -- I'd have to look up records or something.

9       Q.   Were there other lawsuits filed to your

10  knowledge regarding that layoff?             02:37PM

11      A.   No, not to my knowledge.

12      Q.   Was it more than ten people who were laid

13  off at that time?

14      A.   I could safely say it was above ten.  I

15  don't know exactly how many though.          02:37PM

16      Q.   More than 100?

17      A.   Sorry, I'd have to check my -- or check the

18  records to really give you an accurate answer on

19  that.  I'm not trying to be evasive, I just really

20  can't recall the actual number.              02:37PM

21      Q.   In your experience at Mattel have there been

22  layoffs in excess of 100 people at a time?

23      A.   I'd have to check again.  I'd have to check

24  records, but I would say it could at one instance at

25  least it was probably close to that number, yes.  02:38PM

                                                     131

EXHIBIT 2  PAGE 45

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Close to that number or in excess of that

2  number?

3    A.    I'd have -- sir, I'd have to check the

4  records.  I don't want to misspeak.  I want to

5  answer your question but I really don't have that          02:38PM

6  recollection for me to give you an exact number.

7    Q.    What's the largest layoff that you can

8  recall at Mattel in your time there?

9    A.    Again, I would need more information from

10 you to be able to answer that question accurately          02:38PM

11 for you.

12   Q.    Has Mattel ever laid off 1,000 people at a

13 time?

14       MR. ZELLER:  For the record, this is all

15 outside the scope of the designation.                      02:38PM

16       THE WITNESS:  Again, I can't speak to that.

17 I would have to look back at records.  I can't speak

18 to that.

19 BY MR. JENAL:

20   Q.    Would that catch your attention if Mattel            02:39PM

21 were to lay off 1,000 people at a time?

22   A.    It catches my attention if Mattel is going

23 to have a layoff in general no matter the amount of

24 people.

25   Q.    But as you sit here you have no recollection 02:39PM

                                                               132

EXHIBIT _2_ PAGE 46

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of an approximate figure of the largest layoff that

2    Mattel has had since you've been in the HR

3    department there?

4        A.    Yeah.  No, I don't -- I don't have a number

5    in mind.  I would have to look.  I would have to go        02:39PM

6    back and look.

7        Q.    Could you find Exhibit 415 over there,

8    please.

9        A.    Okay.

10       Q.    This is the HR Action Notice that we were        02:39PM

11   talking about before.  Do you remember that?

12       A.    Yes, I do.

13       Q.    I'm just curious about a couple of things on

14   this document.  There's -- in the middle of the

15   column that's titled "New Data" there's a stamp         02:40PM

16   there that says "Received By" and at least I can't

17   read the date but underneath it then it says

18   "Records Office."  Do you see that?

19       A.    Yes, I do.

20       Q.    Do you know what the Records Office is at       02:40PM

21   Mattel?

22       A.    Yes, the Records Office is an office that

23   houses employee files or regularly known as

24   personnel files.

25       Q.    Is that in HR?                                 02:40PM

                                                               133

EXHIBIT 2 PAGE 47

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   The Records Office?

2      Q.   Yes.

3      A.   Yes, it's in the HR department.

4      Q.   Is it the common practice in and about 1999

5   to your knowledge that an HR Action Notice would at      02:40PM

6   least eventually get routed to the Records Office?

7           MR. ZELLER:  Outside the designation, lacks

8   foundation, vague.

9           THE WITNESS:  At the point of completion of

10   this form the HR Action Notice is a document that      02:41PM

11   would normally be filed in the employee file.

12   BY MR. JENAL:

13      Q.   And that would be in the Records Office?

14      A.   Yes.

15      Q.   Do you also have Exhibit 416 there?  It's      02:41PM

16   another HR --

17      A.   Yes, I do.

18      Q.   I believe this was the HR Action Notice that

19   corresponded to Carter Bryant's termination,

20   correct?                                               02:41PM

21      A.   Yes, it is.

22      Q.   I don't see a "Received By" Records Office

23   stamp on Exhibit 416.  Do you?

24      A.   No, I do not.

25      Q.   Is it your expectation that this document      02:42PM

                                                                134

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JENAL:

2         Q.   In the time when you were doing exit

3    interviews for Mattel, if you had wanted to find

4    this information for a particular employee, is that

5    something you could have asked people to run a query      02:55PM

6    if you will to PeopleSoft and get this information

7    returned to you?

8              MR. ZELLER:   Lacks foundation, vague.

9              THE WITNESS:   I could have asked someone in

10   Employee Services to do a print screen such as this       02:56PM

11   if I needed it, yes.

12   BY MR. JENAL:

13        Q.   So let me ask you this.   If you wanted --

14   let's say back in 2000 if you had wanted to get a

15   listing of every employee who is terminated for           02:56PM

16   other position, right, term OTP -- right -- could

17   you have asked somebody in Employee Services to have

18   run that kind of a query and give you that kind of

19   report?

20             MR. ZELLER:   Lacks foundation, vague,          02:56PM

21   outside the designation.

22             THE WITNESS:   I would have to go back and

23   find out if it had that capability.   I want to be

24   able to give you an accurate answer.   I think I'd

25   have to go back and look but, again, if that's a          02:56PM

                                                               145

EXHIBIT 2  PAGE 49

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  request I had, I would have requested it of our

2  Employee Services group.

3  BY MR. JENAL:

4       Q.   I take it you never made such a request?

5       A.   Not that I can recall.                          02:57PM

6       Q.   I think you told us previously that prior to

7  preparing for this deposition you had not spoken

8  with anyone about Carter Bryant since 2000 when you

9  had the exit interview session.  Is that correct?

10           MR. ZELLER:  Misstates the witness'           02:57PM

11  testimony.

12  BY MR. JENAL:

13       Q.   If I misstated it I don't mean to.  So if

14  that's not correct, please correct me.

15       A.   Can you reread your question so I make sure  02:57PM

16  I answer it correctly?

17       Q.   We know that you spoke with Carter Bryant

18  during his exit interview in October of 2000,

19  correct?

20       A.   Yes, during his exit interview I did speak   02:57PM

21  with him.

22       Q.   But you don't have a present recollection of

23  that actual event, you know it because you can see

24  the records that reflect that, correct?

25       A.   I don't have a personal recollection but I   02:57PM

146

EXHIBIT 2  PAGE 50

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    do have the business records and his words on those

2    records that I could refer to.

3        Q.    Precisely.  Since that time did you speak to

4    anyone about Carter Bryant in 2001?

5        A.    Honestly besides -- besides talking with        02:58PM

6    Legal -- our legal counsel, I did not discuss

7    Mr. Bryant with -- with anyone else.

8        Q.    I'm not interested in the substance of your

9    conversations with legal counsel but when was the

10   first time that you spoke with Legal about Carter       02:58PM

11   Bryant?

12       A.    I don't have an exact date for you.  It's

13   probably been -- let me think.  It's probably been a

14   few years maybe but I don't have an exact date that

15   I can recall.                                           02:59PM

16       Q.    Do you recall someone in Legal -- let's

17   leave Legal aside for just a moment.

18            Aside from someone in the Legal department

19   at Mattel or outside lawyers, has anyone else ever

20   come to -- have you ever spoken with anyone else        02:59PM

21   about Carter Bryant since this exit interview?

22            MR. ZELLER:  Sorry, can I have the question

23   read back?

24            MR. JENAL:  Yeah.

25       Q.    Since the exit interview leaving aside         02:59PM

147

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Mattel's Legal department or outside counsel, have

2   you spoken with anyone else about Carter Bryant?

3        A.   No, no.

4        Q.   Do you know who Richard Deanda is?

5        A.   Yes, I know who Mr. Deanda is.          03:00PM

6        Q.   Who is he as far as Mattel is concerned?

7        A.   He is Vice President -- I don't know the

8   exact title -- but of our security area, Security

9   department.

10       Q.   Do you know what the role of the Security   03:00PM

11  department is at Mattel?

12            MR. ZELLER:   The question lacks foundation,

13  outside the designation.

14            THE WITNESS:   Generally they're there to use

15  that term again provide security to the company.   03:00PM

16  They are the ones -- the greeters at the company to

17  insure that employees who are coming on premises are

18  there for a specific reason.   But beyond that, I

19  mean, I would have to refer to some kind of job

20  description to give you a more conclusive          03:00PM

21  explanation.   Go ahead.

22  BY MR. JENAL:

23       Q.   Are you aware of -- you referred to it as a

24  Security department so I'll refer to it in that

25  term, okay?   Is that fair?                        03:01PM

                                                           148

EXHIBIT  2  PAGE 52

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    Yes, Security.

2      Q.    Are you aware of the Security department

3  conducting investigations of former Mattel

4  employees?

5           MR. ZELLER:  Objection as to form, outside      03:01PM

6  the designation.

7           THE WITNESS:  I don't have a specific

8  recollection about investigations regarding former

9  employees.  I don't have a specific recollection

10  right now.                                              03:01PM

11  BY MR. JENAL:

12     Q.    You don't have a recollection of someone

13  from the Security department coming and speaking to

14  you about an investigation that was ongoing into the

15  conduct of former Mattel employees?                    03:01PM

16           MR. ZELLER:  This is asked and answered.

17           THE WITNESS:  I can't specifically recall a

18  specific meeting with them regarding that.  I'm not

19  sure what else you want me to say.  I don't recall a

20  specific meeting right now or a specific             03:02PM

21  recollection right now.

22  BY MR. JENAL:

23     Q.    Is there anything that would help refresh

24  your recollection?

25     A.    If you are asking me about someone specific, 03:03PM

149

EXHIBIT _2_ PAGE 53

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   if you want to provide that information.  I don't

2   have -- you know, in my years with the company I've

3   -- especially in the generalist function I probably

4   met with Security on occasions but I cannot

5   specifically recall for you right now a particular          03:03PM

6   meeting that you're asking about.

7       Q.   Isn't it true, Ms. Yonemoto, that in 2002

8   folks from the Security department interviewed you

9   about Carter Bryant?

10      A.   I do not have a personal memory of that.          03:03PM

11      Q.   When folks from the Security department come

12  and interview you about former Mattel employees, do

13  you make any record regarding those interviews?

14          MR. ZELLER:  Assumes facts not in evidence.

15          THE WITNESS:  Well, as I stated that I don't 03:04PM

16  recall the actual meeting, if the Security -- to

17  answer your question, if the Security department

18  called me to talk about whomever, I guess it would

19  depend on the nature of the meeting whether or not I

20  would take any notes.  I couldn't answer that for          03:04PM

21  you.  It would depend on the circumstances I guess.

22  BY MR. JENAL:

23      Q.   Do you recall sitting here ever having taken

24  notes with regard to such a meeting?

25      A.   Sitting with Security?                            03:04PM

                                                                150

EXHIBIT 2 PAGE 54

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Correct.

2    A.    I do not recall that, sir, no.

3    Q.    Is that something you would put on your

4  calendar?

5    A.    The meeting?                                   03:05PM

6    Q.    If you had a meeting with the Security

7  department, is that something that would appear on

8  your calendar?

9         MR. ZELLER:  Assumes facts not in evidence,

10  hypothetical.                                          03:05PM

11        THE WITNESS:  I mean, I think in general

12  most people put meetings on their calendar.  I don't

13  know if all meetings are on people's calendars.

14  BY MR. JENAL:

15    Q.    I'm not asking about all meetings on all     03:05PM

16  people's calendars, Ms. Yonemoto.  I'm asking about

17  would it be your practice to put meetings with the

18  Security department on your calendar?

19        MR. ZELLER:  Same objections.

20        THE WITNESS:  Again, I would hope that I        03:05PM

21  would have put meetings that I was scheduled to

22  attend on my calendar.  I can't say for a fact that

23  all meetings that I've been called to were on my

24  calendar but I would have done my best to put them

25  on my calendar.                                        03:06PM

151

EXHIBIT _2_  PAGE 55

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JENAL:

2        Q.   Are you aware of litigation referred to as

3    Gunther-Wahl versus Mattel?

4        A.   That doesn't sound familiar to me.

5        Q.   Gunther-Wahl versus Mattel is a lawsuit that   03:06PM

6    was filed against Mattel by an individual who -- a

7    couple of individuals who made a pitch for a product

8    to Mattel and then later alleged that Mattel stole

9    their idea for their product.  Does that refresh

10   your recollection?                                       03:06PM

11          MR. ZELLER:  Assumes facts not in evidence,

12   mischaracterizes the record.

13          THE WITNESS:  No, I don't have a

14   recollection of that.

15   BY MR. JENAL:                                            03:06PM

16       Q.   Are you aware that Carter Bryant was deposed

17   in that litigation in 2003?

18       A.   No, I was not aware of that.

19       Q.   Were you ever asked to assist Mattel in

20   locating Carter Bryant in 2003?                          03:06PM

21       A.   In locating him?  No, I don't recall that.

22       Q.   Does HR keep records of the location of

23   former employees?

24          MR. ZELLER:  Outside the designation, lacks

25   foundation, vague.                                       03:07PM

                                                             152

EXHIBIT 2 PAGE 56

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   STATE OF CALIFORNIA   ) ss:

2   COUNTY OF LOS ANGELES )

3

4         I, WENDY S. SCHREIBER, CSR No. 3558, do

5   hereby certify:

6

7         That the foregoing deposition of SANDY

8   YONEMOTO was taken before me at the time and place

9   therein set forth, at which time the witness was

10  placed under oath and was sworn by me to tell the

11  truth, the whole truth, and nothing but the truth;

12        That the testimony of the witness and all

13  objections made by counsel at the time of the

14  examination were recorded stenographically by me,

15  and were thereafter transcribed under my direction

16  and supervision, and that the foregoing pages

17  contain a full, true and accurate record of all

18  proceedings and testimony to the best of my skill

19  and ability.

20        I further certify that I am neither

21  counsel for any party in said action, nor am I

22  related to any party to said action, nor am I in any

23  way interested in the outcome thereof.

24

25

                                                    184

CONFIDENTIAL - ATTORNEYS' EYES ONL.

1          IN WITNESS WHEREOF, I have subscribed my

2     name this 7th day of June, 2007.

3

4

5

6     _____

7     WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

185

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    I N D E X

 2                  VOLUME I

 3

 4   WEDNESDAY, MAY 30, 2007

 5

 6   WITNESS                        EXAMINATION

 7

 8   SANDY YONEMOTO

 9

10      (By Ms. Anderson)               6

11      (By Mr. Jenal)                113

12      P. M. Session                 80

13

14

15

16

17

18

19

20

21

22

23

24

25
                                       186
```

EXHIBIT 2 PAGE 59

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    DEPOSITION EXHIBITS
 2                    SANDY YONEMOTO
 3
 4     NUMBER              DESCRIPTION           IDENTIFIED
 5     Exhibit 413   Notice of Deposition of Plaintiff     13
 6                   and Counter-Defendant Mattel, Inc.
 7
 8     Exhibit 414   Medical Leave of Absence, M0001627    28
 9
10     Exhibit 415   HR Action Notice dated 6/22/99,       42
11                   M 0001606
12
13     Exhibit 416   HR Action Notice dated 10/12/00       52
14
15     Exhibit 417   Plaintiff Mattel, Inc.'s             72
16                   Objections and Supplemental
17                   Responses to Defendant's First
18                   Set of Interrogatories
19
20     Exhibit 418   Job Summary Print Screen, M0001667    80
21
22     Exhibit 419   Exit Interview Report, M 0096210     154
23                   and M 0096211
24
25
```

187

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

PREVIOUSLY-MARKED EXHIBITS

2

3          NUMBER          IDENTIFIED

4            14              88

5            23              17

6            24              28

7            25              33

8            26              39

9            27              57

10           34              57

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

188

EXHIBIT  2  PAGE 61

**EXHIBIT  3**