CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION                  Certified Copy

 4       --------------------------------

 5    MATTEL, INC., a Delaware          )

 6    Corporation,                      )

 7              Plaintiff,              )

 8              vs.                     )  No. CV 04 9059

 9    CARTER BRYANT, an individual;     )      NM (RNBx)

10    and DOES 1 through 10,            )  VOLUME I

11    Inclusive,                        )

12              Defendants.             )

13       --------------------------------)

14    (COMPLETE CAPTION ON NEXT PAGE.)

15

16        CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18        Videotaped 30(b)(6) Deposition of

19    JILL NORDQUIST, taken at 400 South

20    Hope Street, Los Angeles, California,

21    commencing at 9:44 A.M., Tuesday,

22    July 31, 2007, before Wendy S. Schreiber,

23    CSR No. 3558, RPR, CLR.

24

25    PAGES 1 - 303
```

Confidential - Attorneys' Eyes Only

EXHIBIT 3  PAGE 62

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION

 4

 5    ------------------------------

 6    MATTEL, INC., a Delaware           )

 7    Corporation,                       )

 8              Plaintiff,               )

 9              vs.                      ) No. CV 04-9059

10    CARTER BRYANT, an individual;      )    NM (RNBx)

11    and DOES 1 through 10,             )

12    Inclusive,                         )

13              Defendants.              )

14    ------------------------------     )

15    CARTER BRYANT, on behalf of        )

16    himself, all present and           )

17    former employees of Mattel,        )

18    Inc., and the general public,      )

19              Counter-Claimants,       )

20              vs.                      )

21    MATTEL, INC., a Delaware           )

22    Corporation,                       )

23              Counter-Defendant. )

24    ------------------------------

25
```

EXHIBIT 3  PAGE 63

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   APPEARANCES OF COUNSEL:

 2

 3       FOR THE PLAINTIFF:

 4

 5          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 6          BY:   JON E. COREY, ESQ.
 7          865 South Figueroa Street, Tenth Floor
 8          Los Angeles, California 90017
 9          (213) 443-3000
10          Jcorey@quinnemanuel.com
11

12                     -AND-
13

14       MATTEL, INC.
15       BY:   JILL E. THOMAS, ESQ. (A.M. Session)
16             MICHAEL MOORE, ESQ.   (P.M. Session)
17       333 Continental Boulevard
18       El Segundo, California 90245-5012
19       (310) 252-2000
20       jill.thomas@mattel.com
21

22

23

24

25
```

                                                                   3

EXHIBIT 3  PAGE 64

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3       FOR THE DEFENDANT AND COUNTERCLAIMANT

 4       CARTER BRYANT:

 5

 6            KEKER & VAN NEST LLP

 7            BY:  CHRISTA MARTINE ANDERSON, ESQ.

 8            710 Sansome Street

 9            San Francisco, California 94111-1704

10            (415) 391-5400

11            cma@kvn.com

12

13

14       FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16            O'MELVENY & MYERS LLP

17            BY:  DIANA TORRES, ESQ.

18            400 South Hope Street

19            Los Angeles, California 90071-2899

20            (213) 430-6000

21            dtorres@omm.com

22

23       ALSO PRESENT:

24

25            RYAN GULINO, VIDEO OPERATOR

                                                      4
```

EXHIBIT _2_ PAGE 65

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        LOS ANGELES, CALIFORNIA; TUESDAY, JULY 31, 2007

 2                        9:44 A.M.

 3

 4             VIDEO OPERATOR:   Good morning.   We are on

 5   the record at 9:44 a.m. on July 31st, 2007 for the    09:44AM

 6   30(b)(6) videotaped deposition of Jill Nordquist.

 7   We are taping this deposition at 400 South Hope

 8   Street, 18th Floor, in Los Angeles on behalf of the

 9   defense in the action entitled Mattel, Incorporated

10   versus Carter Bryant, et al.   The case number is     09:44AM

11   CV 04-9059 NM.

12             My name is Ryan Gulino.   I am the legal

13   videographer from Veritext National Deposition and

14   Litigation Services located at 550 South Hope

15   Street, Suite 1775, in Los Angeles.                    09:45AM

16             This is tape No. 1 of Volume 1.   Would

17   counsel please identify yourselves for the record.

18             MS. ANDERSON:   Christa Anderson, Keker &

19   VanNest, for Carter Bryant.

20             MS. TORRES:   Diana Torres, O'Melveny &      09:45AM

21   Myers, for MGA Entertainment.

22             MR. COREY:   Jon Corey on behalf of Mattel.

23             MS. THOMAS:   Jill Thomas, in-house counsel

24   for Mattel.

25   ////
```

5

EXHIBIT 3  PAGE 66

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    JILL NORDQUIST,

 2   having been first placed under oath, testified as

 3   follows:

 4

 5                    EXAMINATION

 6   BY MS. ANDERSON:

 7       Q.   Good morning, Ms. Nordquist.

 8       A.   Good morning.

 9       Q.   Have you ever had your deposition taken

10   before?                                      09:45AM

11       A.   No.

12       Q.   I assume you've probably gotten some

13   instruction in regard to how our deposition is going

14   to run today but just in case I'm going to give you

15   some of the basic ground rules.  Okay?       09:45AM

16       A.   Okay.

17       Q.   First of all, although we're in a relatively

18   informal setting of a conference room you understand

19   that the testimony you give today has the same force

20   and effect as if you are giving it in a court of  09:46AM

21   law?

22       A.   Yes.

23       Q.   And do you understand that the court

24   reporter is transcribing everything we say here

25   today, okay?                                 09:46AM
```

                                                      6

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   What was the name of that former employee?

2      A.   Mariana Trueba.

3      Q.   This document that you signed, was it a

4  declaration?

5      A.   I don't -- I didn't go to law school.  I        09:53AM

6  don't know --

7           MR. COREY:  Objection:  vague and ambiguous.

8           THE WITNESS:  Okay.

9  BY MS. ANDERSON:

10     Q.   The document that you signed, do you know        09:53AM

11  whether it was a document that was submitted to a

12  court?

13     A.   I don't know if it went on to a court.

14     Q.   Did Mattel's lawyers ask that you prepare

15  it?                                                       09:53AM

16          MR. COREY:  Objection:  vague and ambiguous.

17  I'm going to instruct the witness not to answer

18  that.

19  BY MS. ANDERSON:

20     Q.   When you reviewed this document, were you        09:53AM

21  reviewing it for purposes of preparing yourself as a

22  Rule 30(b)(6) witness today?

23          MR. COREY:  Objection:  vague and ambiguous.

24  BY MS. ANDERSON:

25     Q.   You can answer.                                  09:54AM

                                                             13

EXHIBIT 3  PAGE 68

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. COREY:  I don't think she understands

2   what that means.

3          MS. ANDERSON:  No speaking objections.

4   Q.   You can answer the question.

5   A.   I don't understand the question.          09:54AM

6   Q.   Okay, I'm happy to try to rephrase it.

7          Do you know -- strike that.

8          You said that you've seen Exhibit 413

9   before, correct?

10   A.   Correct.          09:54AM

11   Q.   And do you understand that you're here today

12   designated as a Mattel representative under Rule

13   30(b)(6) for certain of the topics --

14   A.   Correct.  Yes, I do understand that.

15   Q.   Do you know which topics you are designated   09:54AM

16   on?

17   A.   Yes.

18   Q.   Okay, which ones?

19   A.   So topic No. 2, topic No. 3, topic No. 4,

20   topic No. 5 and topic No. 55.          09:54AM

21   Q.   And are you prepared to testify on those

22   subjects today?

23   A.   Yes.

24          MR. COREY:  And to be clear, just so the

25   record is clear, she's one of the designees that   09:55AM

14

EXHIBIT 2 PAGE 69

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Mattel has offered on these topics.  Mattel has also

 2    offered other designees to testify in regard to that

 3    topic so I just want to make sure that it's clear

 4    that she's not the only designee for these topics.

 5         MS. ANDERSON:  We understand.  I see that        09:55AM

 6    you all have designated other witnesses as well.  We

 7    understand that.

 8         MR. COREY:  I just want to make sure that's

 9    perfectly clear.

10         MS. ANDERSON:  We understand.                    09:55AM

11    Q.   Now, in regard to these topics and preparing

12    for your deposition as a Rule 30(b)(6)

13    representative, did you try to educate yourself with

14    knowledge that Mattel may hold but that you didn't

15    have within your own personal knowledge?             09:55AM

16    A.   Can you rephrase that?

17    Q.   Sure.  I'm assuming you've been designated

18    as a Rule 30(b)(6) witness because you know some

19    information that may be relevant to these topics; is

20    that correct?                                         09:55AM

21    A.   That's correct.

22    Q.   Besides the things that you already know of

23    your own personal knowledge, did you go out and try

24    to educate yourself with other information that you

25    might not have known already to sit here and testify 09:56AM
                                                             15
```

EXHIBIT 3  PAGE 70

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Ms. Nordquist's experience I guess is what I'm

2   referring to here.

3        MR. COREY:   And her experience is in

4   Collector and I understand that's what you're

5   talking about now.  And if that's -- can you just      10:12AM

6   clarify for her?  I'd appreciate it.

7        MS. ANDERSON:   Sure, let me clarify for the

8   record.

9        Q.   Have you always only worked in Barbie

10  Collectibles?                                           10:12AM

11       A.   No.

12       Q.   So what we'll do is we'll come back to this

13  after we've gone through your whole history and then

14  we can talk about the open areas and figure out

15  where they are, okay?                                   10:12AM

16       MR. COREY:   Thank you, Counsel.

17       MS. ANDERSON:   Sure.

18       Q.   Do you know how many people reported to

19  Kathy Casey when you were reporting to her as

20  associate marketing manager in Barbie Collectibles?    10:12AM

21       A.   I believe it was just myself and one other

22  woman.

23       Q.   And when you were acting as associate

24  marketing manager at Barbie Collectibles, did you

25  ever participate in any other employee's performance   10:13AM

                                                              28

EXHIBIT 3 PAGE 71

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    reviews at Mattel?

2        A.    As an associate?

3        Q.    Right.

4        A.    No.

5        Q.    And the other person who reported to Kathy          10:13AM

6    Casey at the time, what was her name?

7        A.    Laura Lum.

8        Q.    How do you spell her last name?

9        A.    L-u-m.

10       Q.    After your position as associate marketing          10:13AM

11   manager at Barbie Collectibles, did you get a new

12   position at Mattel?

13       A.    Yes.

14       Q.    All right.  And what was the new position?

15       A.    Marketing Manager, Barbie Collectibles.            10:13AM

16       Q.    For how long did you hold that position?

17       A.    Approximately two years.

18       Q.    So would that be from 1998 until around

19   2000?

20       A.    Roughly.                                            10:14AM

21       Q.    Okay.  To whom did you report in that new

22   position?

23       A.    For part of that time I reported to Kathy

24   and then Kathy moved out of the group and I reported

25   to Susanne Schlundt.                                          10:14AM

                                                                      29

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    Can you spell that last name?

 2      A.    Yes, S-c-h-l-u-n-d-t.

 3      Q.    What was Ms. Schlundt's title at the time,

 4   if you know?

 5      A.    At the beginning I think she was a Senior      10:14AM

 6   Manager and then I -- she got promoted to Director

 7   shortly thereafter.  I don't know the exact dates.

 8      Q.    Did anybody report to you during the time

 9   frame that you were Marketing manager?

10      A.    Yes.                                            10:15AM

11      Q.    Who reported to you?

12      A.    There were several different people during

13   that time period.  There was a person by the name of

14   Scott Turner and there was a person by the name of

15   Lindsey Selan and then there was a person by the        10:15AM

16   name of Kitty Hammons and I'm not sure the others if

17   I was a Senior Manager before the additional people

18   reported to me.

19      Q.    Okay.  Did you have supervisory authority

20   over anyone else besides these folks that you listed    10:16AM

21   as reporting to you during that time?

22      A.    I had input on our admins' duties and

23   performance.

24      Q.    Anybody else over whom you had supervisory

25   authority?                                              10:16AM
```
                                                            30

EXHIBIT 3  PAGE 73

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    Brad Armistead.

 2      Q.    What's his title?

 3      A.    Senior Director.

 4      Q.    Of Consumer Products?

 5      A.    Yes.                                    10:52AM

 6      Q.    And who reports to you?

 7      A.    There are right now three women reporting in

 8   to me.

 9      Q.    And what are the names?

10      A.    Laura Takaragawa.  Do you need me to spell   10:52AM

11   that?

12      Q.    That might be appreciated.

13      A.    T-a-k-a-r-a-g-a-w-a.

14      Q.    And two others?

15      A.    Jennifer Baca and Chanel Fojas.          10:52AM

16      Q.    How do you spell that last name?

17      A.    F-o-j-a-s.

18      Q.    Have we covered all of your positions at

19   Mattel at this point?

20      A.    I think so.                             10:53AM

21            MS. ANDERSON:  Why don't we take a quick

22   break because it's been a little over an hour.

23            THE WITNESS:  Okay.

24            VIDEO OPERATOR:  We're off the record at

25   10:53.                                          10:53AM
```

EXHIBIT 3 PAGE 74

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                (Brief recess.)

 2           VIDEO OPERATOR:   11:07 we are back on the

 3    record.

 4    BY MS. ANDERSON:

 5        Q.   Ms. Nordquist, I'd like to change focus now   11:07AM

 6    from your history at Mattel and we're going to talk

 7    a little bit about questions relating to Carter

 8    Bryant.  Do you know someone named Carter Bryant?

 9        A.   Yes.

10        Q.   When was the first time you met Carter        11:07AM

11    Bryant?

12        A.   I don't know the exact date but it was -- I

13    think it was around '99 through 2000.  I believe

14    I -- I think that was the time frame.

15        Q.   Had you heard of him before you met him?      11:07AM

16        A.   Can you be more specific?

17        Q.   Sure.  Had anyone referenced his name to you

18    prior to your actually meeting him?

19        A.   Yes.

20        Q.   Was it shortly before your actually meeting   11:08AM

21    him or a long time in advance of your first meeting

22    him?

23        A.   It was shortly before to introduce him.

24        Q.   Okay.  And who introduced you to Carter

25    Bryant?                                                11:08AM
                                                               56
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.    The Design Team.

2       Q.    Did someone in particular on the Design Team

3    introduce you to Mr. Bryant?

4       A.    Carter joined the Collector Design Team and

5    I believe that Ann Driskill announced his joining of    11:08AM

6    the team to those of us in Marketing.

7       Q.    Who was Ann Driskill at the time?  What was

8    her title?

9       A.    Director of Design for Barbie Collectibles.

10      Q.    And what did you -- strike that.              11:08AM

11            When Ann Driskill announced Mr. Bryant

12   joining the team, did she inform you about what his

13   role would be in the Design team?

14      A.    I can't recall the specific introduction she

15   made.                                                  11:09AM

16      Q.    Can you give me your best recollection?

17      A.    That he was joining the Design Team; that he

18   would be another designer on our business.

19      Q.    At the time did you know how many people

20   participated in the Design Team when Mr. Bryant        11:09AM

21   joined?

22            MR. COREY:  In Collector?

23            MS. ANDERSON:  Yes, in Collector.  Excuse

24   me.

25            THE WITNESS:  Can you just rephrase so I'm     11:09AM

                                                              57

EXHIBIT 3  PAGE 76

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   clear on what the question is?

2     Q.   Sure.  You've said that Ms. Driskill told

3   you that Mr. Bryant would be joining the Design

4   Team, right?

5     A.   Correct.                     11:09AM

6     Q.   My question is:  Do you know approximately

7   how many people were already members of the Design

8   Team at that point?

9     A.   Yes.

10     Q.   How many?                     11:10AM

11     A.   I don't know the exact number off the top of

12   my head.  I could try to name everyone I remember.

13     Q.   If you can give me your best estimate of how

14   many people there were in the Design Team, that

15   would be great.                 11:10AM

16     A.   There were probably between five and seven

17   that were in the same capacity that he was.

18     Q.   Now, if you could name them for me that

19   would be great.

20     A.   Robert Best, Katiana Jimenez, Sharon      11:10AM

21   Zuckerman, Mina Mirkazemi, Heather Fonseca.  There

22   were other people that were on the Design Team but

23   they were not the same -- they weren't prelim

24   designers which is what he was.

25     Q.   What's a prelim designer?          11:11AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    The person who creates the original sketches
 2   and/or 3D concepts of a doll.
 3      Q.    What's a 3D concept of a doll?
 4      A.    A prototype of a doll.
 5      Q.    Do you recall the first time you actually    11:11AM
 6   personally met Mr. Bryant?
 7      A.    No.
 8      Q.    Do you -- strike that.
 9            Did you meet with Mr. Bryant on more than
10   one occasion in the course of your work at Mattel?   11:12AM
11      A.    Yes.
12      Q.    How frequently would you meet with
13   Mr. Bryant during the course of your work at Mattel?
14      A.    Almost daily.
15      Q.    And during what period of time were these    11:12AM
16   almost daily meetings with Mr. Bryant?
17            MR. COREY:  Objection:  vague.  Vague as to
18   time.  What time during the day or what duration --
19   what duration of time?
20            MS. ANDERSON:  I'll clarify.               11:12AM
21      Q.    Did you understand that at some point in
22   time Mr. Bryant ceased working at Mattel?
23      A.    Yes.
24      Q.    Do you recall approximately when that was?
25      A.    When he -- when he resigned?              11:12AM
```

                                                              59

EXHIBIT 3   PAGE 78

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q. | Yes. |
| 2 | A. | Or when he actually left the building? |
| 3 | Q. | When he left the building. |
| 4 | A. | Yes, I remember when he left. |
| 5 | Q. | When was that?                    11:12AM |
| 6 | A. | I don't remember the exact date but I think |

it was in the either end of summer or fall of I

guess that would be I think it was 2000 at that

point.

    Q.   Did you ever speak with Mr. Bryant again   11:13AM

after he left Mattel?

    A.   No.

    Q.   So the only period of time that you ever had

contact with Mr. Bryant was between the time that

you first met him in 1999 or 2000 and the time that   11:13AM

he left Mattel's employment in the fall of 2000,

correct?

    A.   Yes.

    Q.   So in that time frame is it your testimony

that you met with him on an almost daily basis?   11:13AM

    A.   Yes.

    Q.   And did these meetings typically occur in a

particular location?

    A.   Yes.

    Q.   Where?   11:13AM

60

EXHIBIT 3  PAGE 79

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   We had standing meetings that took place

2    regularly that would occur mostly in conference

3    rooms in the Design Center.  We also had meetings

4    that were not -- I'm sorry, so there were the

5    standing what we called working meetings in          11:14AM

6    conference rooms in the Design Center.  There were

7    also meetings in the Design Center in the

8    presentation room when the designers would present

9    the dolls.  And we also had meetings at the working

10   table outside of his cubicle.                         11:14AM

11       Q.   Were these meetings attended only by

12   yourself and Mr. Bryant?

13       A.   No.

14       Q.   Who -- was there a group of people who

15   typically would attend the meetings you attended     11:15AM

16   with Mr. Bryant?

17       A.   Yes.

18       Q.   Who were the people involved in this group?

19       A.   They varied by type of meeting.  If we were

20   meeting directly outside of his cube at the working  11:15AM

21   table, it could be as many as ten people or as few

22   as two or three people.  If we had working meetings

23   in the conference rooms, it could also be as many as

24   10 or 12 people and as few as maybe three people.

25   And the approvals and concept presentation meetings  11:15AM

                                                          61

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   in the presentation room were generally attended by

2   anywhere from five or six people up to 30 people.

3       Q.   How many times in the course of Mr. Bryant's

4   work at Mattel did you attend a meeting in the

5   presentation room with him?                          11:16AM

6       A.   His course of work at Mattel that I knew him

7   or his total course of work at Mattel?

8       Q.   That you knew him.

9       A.   So can you ask the question again?  I'm

10  sorry, I forgot.                                      11:16AM

11      Q.   How many times in the course of work --

12  strike that.

13           How many times in the course of Mr. Bryant's

14  work at Mattel did you attend a meeting in the

15  presentation room with him?                           11:16AM

16      A.   In the presentation room?

17      Q.   Uh-huh.

18      A.   The approvals meetings regularly took place

19  every week, I believe, if I recall correctly and

20  there were usually prep meetings prior to the         11:16AM

21  approval meetings.  So it could be sometimes two

22  times a week.

23      Q.   And what was the purpose of these approvals

24  meetings that you attended with Mr. Bryant?

25      A.   The designers would show concept boards      11:17AM

                                                          62

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    and/or doll prototypes to management for their

2    approval.

3        Q.    Did Mr. Bryant present such things at those

4    meetings?

5        A.    Yes.                                      11:17AM

6        Q.    And did other designers do so as well in the

7    presentation room meetings?

8        A.    Yes.

9        Q.    And were the other designers who were

10   presenting ideas the folks that you listed as being   11:17AM

11   the five to seven people on the Design Team?

12       A.    Yes, in addition to Ann Driskill there may

13   have been other designers.  Those are the ones that

14   I can remember right now.

15       Q.    In regard to the meetings in the conference  11:17AM

16   rooms you talked about, approximately how many such

17   meetings did you attend with Mr. Bryant?

18       A.    Ever or on a weekly basis?

19       Q.    However you can best give me your assessment

20   of how often that happened.                          11:18AM

21       A.    Working meetings at that time I believe -- I

22   don't know for sure -- I believe they took place on

23   Tuesdays and Wednesdays.  They were regular standing

24   meetings and if -- because there were other

25   designers that worked on dolls we would address      11:18AM

63

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    whatever dolls needed to be addressed during that

2    week.  So sometimes I would meet with him both of --

3    sometimes the working meetings during that week

4    would -- on both days would involve him and then

5    maybe there would be a week where only one of the        11:18AM

6    days involved him.

7        Q.  And in regard to the meetings outside of

8    Mr. Bryant's cubicle, how often did you attend those

9    meetings with Mr. Bryant?

10       A.  That varied anywhere from one to three times  11:19AM

11   per week.

12       Q.  How long were your typical meetings with

13   Mr. Bryant that occurred right outside of his cube?

14           MR. COREY:  Objection:  mischaracterizes her

15   testimony.  I assume you're including -- never mind.  11:19AM

16           THE WITNESS:  Can you ask the question

17   again?

18   BY MS. ANDERSON:

19       Q.  Sure.  You've testified that some of the

20   meetings you had with Mr. Bryant were outside of his  11:19AM

21   cubicle, right?

22       A.  Correct.

23       Q.  My question is:  Approximately how long in

24   duration were those kinds of meetings that occurred

25   outside of his cubicle?                                11:19AM

64

EXHIBIT 3 PAGE 83

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1       A.    They would range.  They could be ten minutes

2    and they could be as long as an hour and a half

3    maybe depending on the topic.

4       Q.    And how about the meetings in conference

5    rooms?  Approximately how long did those meetings      11:20AM

6    usually last?

7       A.    I think they were scheduled for probably, if

8    I remember correctly, an hour.  Sometimes we used

9    the full hour, sometimes we didn't.

10       Q.    And how about the presentation room           11:20AM

11    meetings?  Approximately how long did they last?

12       A.    They varied depending on the agenda anywhere

13    from 30 minutes to six hours sometimes or even a

14    full day of approvals.

15       Q.    Did the typical presentation room meeting     11:20AM

16    last a whole day or was that unusual?

17       A.    I'd say maybe periodically we would have an

18    all-day approval meeting.

19       Q.    And what is the period that this is

20    periodically occurring on?                             11:21AM

21       A.    Maybe once a quarter or twice a year.

22       Q.    And you said that at the presentation room

23    meetings the designers would show concept boards or

24    doll prototypes for approval, correct?

25       A.    Yes.                                          11:21AM
```
                                                              65

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    What was the subject matter that was covered

2   in the conference room meetings?  Was it the same as

3   in the presentation room meetings or different?

4      A.    Both.

5      Q.    Okay.  Can you be more specific?            11:21AM

6      A.    The meetings in the presentation theater

7   were for approvals specifically.  When we met in

8   the -- and we were presenting to management.

9           The conference room meetings generally were

10  not attended by management and it was when the team    11:21AM

11  would work together to prepare the dolls to be

12  presented to management and some of the topics would

13  come up in front of management and some were too

14  detailed or minutia that were of no bearing on

15  management's approval of a concept.                    11:22AM

16     Q.    And how about the meetings in front of

17  Mr. Bryant's cube?  What was the general purpose of

18  those kinds of meetings?

19     A.    Sometimes they overlapped with the working

20  meetings that took place in the conference rooms.      11:22AM

21     Q.    And was the overall thrust of the meetings

22  outside the cube and in the conference rooms to be

23  getting ready for the approval meetings?

24     A.    Some were.

25     Q.    And besides getting ready for approval       11:22AM

66

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    meetings what kinds of things were handled in the

 2    conference room meetings and the meetings outside

 3    the cubicle?

 4         A.   The basic steps we took to get a doll from

 5    design to market.                              11:23AM

 6         Q.   Did you ever work with Mr. Bryant on any

 7    particular projects as part of the Design Team?

 8         A.   Yes.

 9         Q.   And which projects did you work with him on?

10         A.   He designed -- I don't remember every doll   11:23AM

11    he designed.  I remember working with him on the

12    direct mail dolls that were inspired by jewelry and

13    gemstones.  I remember working with him on the

14    Carter Bryant Grand Entrance doll.  Those are the

15    specific dolls I can recall right now.           11:24AM

16         Q.   And what was the name of the direct mail

17    dolls that were inspired by jewelry and gemstones?

18         A.   I remember -- I don't remember the segment

19    name but I think the individual dolls' names were

20    the Dutchess of Diamonds and Empress of Emeralds,   11:24AM

21    the something of Sapphires, something of Rubies.

22         Q.   This will probably be one of the only

23    depositions in my entire life we'll have all of

24    those words in one sentence.

25              Now, tell me in relation to the direct mail   11:24AM
                                                        67
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    dolls that are inspired by the jewelry and gemstones

2    what was the nature of how you and Mr. Bryant worked

3    together with respect to those?

4         MR. COREY:  Objection:  narrative.

5    BY MS. ANDERSON:                                    11:25AM

6         Q.    Let me rephrase it if you are at all

7    confused.

8         A.    Yeah.

9         Q.    I assume when you say that you worked with

10   Mr. Bryant on certain projects it means that you       11:25AM

11   interfaced with him in relation to those projects,

12   correct?

13        A.    Yes.

14        Q.    And what was the nature of your interaction

15   with respect to working on those projects?           11:25AM

16        MR. COREY:  Objection:  vague and ambiguous

17   and narrative.

18        THE WITNESS:  Can you be more specific?

19   BY MS. ANDERSON:

20        Q.    Well, I can give you an example of what I    11:25AM

21   suspect your answer might include but there may be

22   more that I do not know about.  You just told me

23   that you had meetings with Mr. Bryant from time to

24   time.

25        A.    Correct.                                   11:25AM

                                                           68

EXHIBIT _3_ PAGE 87

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       Q.    And you described where they were so I'm

 2   assuming part of what you did in interacting with

 3   Mr. Bryant to work on these dolls was to participate

 4   in meetings with him, correct?

 5       A.    Correct.                                11:25AM

 6       Q.    Besides participating in meetings with him

 7   about these projects that you recall, do you recall

 8   anything else you did in terms of working with

 9   Mr. Bryant with respect to these doll projects?

10       A.    As the Marketing person, it was my job to   11:26AM

11   provide my design counterpart with the strategic

12   direction of the product concept that they would

13   then interpret from a design perspective; i.e.,

14   design the doll, and then I would work also with

15   that in -- they would preview the doll to me before   11:26AM

16   they showed it to our joint management.  We would

17   work together to make sure that it was within costs.

18   We would discuss what we envisioned it would -- how

19   it would be packaged.  I had to -- before they could

20   design I would have to provide them with price       11:26AM

21   points and margin information.

22       Q.    Anything else?

23       A.    Quota, what we projected the number of units

24   we would sell, how we might market it in terms of

25   advertising, where it would be sold, who we thought   11:27AM
```

EXHIBIT 3  PAGE 88

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the consumer would be, when it needed to be

2    available in the marketplace.  I would also get

3    detailed descriptions once dolls were approved from

4    the designers to assist when I would either write

5    copy that I would use when I would present the dolls    11:27AM

6    to retailers or to give input to our team that wrote

7    the copy for the catalog.

8         Q.    Anything else?

9         A.    Direction for how we wanted to photograph

10   the doll for the catalog, how we wanted to display    11:28AM

11   the doll to show it to retailers.

12        Q.    And when you say that this was -- strike

13   that.

14              You testified earlier before you gave this

15   long list of the things that you were doing as a    11:28AM

16   marketing person were those all things that you were

17   directly communicate with Mr. Bryant or with others

18   at Mattel?

19              MR. COREY:  Objection:  vague and ambiguous

20   and compound.    11:28AM

21   BY MS. ANDERSON:

22        Q.    Well, let me be clear.  Let me rephrase it.

23              You gave a long list of the things that you

24   did --

25        A.    Correct.    11:28AM

                                                          70

EXHIBIT 3  PAGE 89

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.     -- as a Marketing person in working on these

2   doll projects, correct?

3      A.     Correct.

4      Q.     Some of the things you listed were items

5   such as getting input on cost issues, true?          11:29AM

6      A.     Yes.

7      Q.     Was that the kind of thing that you

8   addressed with Mr. Bryant?

9      A.     Yes.

10     Q.     Okay.  And when you say that you gave       11:29AM

11   strategic direction on the product concept to people

12   on the Design Team, what do you mean by that?

13     A.     Marketing would develop a line list and part

14   of the line list included the rationale as to why we

15   were creating a specific SKU and the rationale        11:29AM

16   included the positioning of the product which we

17   would communicate to the design counterpart so that

18   they would understand the purpose of the product so

19   that when they were designing it they could design

20   it according to the strategic direction.             11:30AM

21          VIDEO OPERATOR:  Could we go off the record?

22          MS. ANDERSON:  Sure.

23          (Discussion held off the record.)

24          VIDEO OPERATOR:  Thank you.

25   /  /  /                                              11:30AM

71

EXHIBIT 3 PAGE 90

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MS. ANDERSON:

 2       Q.   Did Ann Driskill usually participate in the

 3   meetings you had with Carter Bryant?

 4       A.   Some.

 5       Q.   Some.   When you say "some," do you mean          11:31AM

 6   most?

 7            MR. COREY:   Objection:  mischaracterizes her

 8   testimony.

 9            THE WITNESS:  No, not most.

10   BY MS. ANDERSON:                                           11:31AM

11       Q.   Was there anybody at Mattel on the Design

12   Team who typically also attended any meetings you

13   had with Mr. Bryant?

14            MR. COREY:   Objection:  mischaracterizes her

15   testimony.                                                 11:31AM

16            THE WITNESS:  Can you be more specific?

17   BY MS. ANDERSON:

18       Q.   Well, earlier I had asked you approximately

19   how many people would typically attend these

20   meetings --                                                11:31AM

21       A.   Oh, right.

22       Q.   -- and your answer suggested that it was a

23   group that could be as big as 10 to 12 or as small

24   as two to three for the most part, right?

25       A.   Correct.                                          11:31AM
                                                                    72
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    Definitely one time and maybe one other

2    time.

3    Q.    When was the one time you definitely

4    remember?

5    A.    I remember the meeting but not the date.    11:45AM

6    Q.    Who was present?

7    A.    All of the designers, all of Marketing, our

8    President, Planning, Costing, probably members of

9    the Development team.

10    Q.    Was this one of those presentation room    11:45AM

11    meetings?

12    A.    Correct.

13    Q.    And what particular product was at issue

14    with respect to Mr. Bryant in the course of this

15    presentation meeting?    11:45AM

16    A.    He was creating a glamour doll.  I don't

17    remember the specific name of the SKU.

18    Q.    And you recall that this doll was not

19    approved during the meeting?

20    A.    Our President said that it -- it wasn't    11:46AM

21    princess but it wasn't prom either and it was just

22    plain ugly and he stormed out of the meeting crying

23    and went home for the day.

24         MR. COREY:  That is Bryant, not the

25    President?    11:46AM

82

EXHIBIT 2 PAGE 92

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          THE WITNESS:   Sorry.   The President made the

2    comment and Carter after hearing the comment from

3    our President stormed out of the meeting crying and

4    didn't return to the office that day.

5    BY MS. ANDERSON:                                    11:46AM

6        Q.    What time of day was the meeting?

7        A.    I'm not certain.   They usually took place in

8    the middle of the day.

9        Q.    But you don't recall specifically on this

10   one?                                                11:46AM

11       A.    I don't recall specifically.

12       Q.    And you say that Mr. Bryant was crying and

13   then stormed out of the meeting; is that right?

14       A.    That's correct.

15       Q.    For how long after this comment by the       11:47AM

16   President do you say that Mr. Bryant was crying

17   during the meeting?

18       A.    It was during the meeting.   She made a

19   comment.   He got choked up.   His eyes welled up with

20   tears and he started to cry and then ran out the      11:47AM

21   door.

22       Q.    So you said that his eyes welled up with

23   tears and he choked up and started to cry.   When you

24   say "cry," do you mean audibly sobbing or do you

25   mean his eyes were welled up with tears?            11:47AM

83

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.    I mean that he cried but in terms of sobbing

2   I would not say that he was sobbing.

3       Q.    Could you hear any kind of sounds coming out

4   of him when he was crying as you've described?

5       A.    Yes.                                          11:48AM

6       Q.    What kinds of sounds?  If it wasn't sobbing

7   sounds, what kinds of sounds were they?

8       A.    Sounds of crying.

9       Q.    Can you be specific because you've told me

10  he wasn't sobbing so was he wailing?  What was he     11:48AM

11  doing?

12      A.    As a parent I know and recognize different

13  types of crying and there's a difference between

14  when my child sobs which is loud and extremely

15  emotional and then there are crying where it's        11:48AM

16  (indicating) and it was more of the latter.

17      Q.    So the sound you just made is that what you

18  say that he was doing during the meeting?

19      A.    Yes.

20      Q.    For how long did he make that sound during   11:48AM

21  the meeting before he left the room?

22            MR. COREY:  Can I offer a word because

23  otherwise the transcript is going to be very

24  confused.

25            MS. ANDERSON:  No, I don't want you to.      11:49AM

84

EXHIBIT ⁊  PAGE 94

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Go ahead.

 2           MR. COREY:  Okay, we're just going to refer

 3    to the --

 4           MS. ANDERSON:  We have a video so we're real

 5    lucky.                                           11:49AM

 6           THE WITNESS:  He started to cry and it was

 7    audible and there were tears produced and others in

 8    the room recognized that he was crying and he ran

 9    out of the room and I cannot recall the exact

10    duration of time but I would -- I remember it being  11:49AM

11    very quick, like a matter of seconds.

12      Q.   And when you say he ran out of room, was he

13    running or was he just moving quickly out of the

14    room?

15      A.   I would classify it as running.            11:49AM

16      Q.   Okay.  How big of a room was it?

17      A.   It's deeper than this room.

18      Q.   By how much?

19           MR. COREY:  Okay --

20           MS. ANDERSON:  We're going to get an        11:50AM

21    estimate, Counsel.  Don't worry.

22           MR. COREY:  I'm just trying to keep a clean

23    transcript.

24           THE WITNESS:  I would say -- I would say

25    that looking at this room that the presentation room 11:50AM

                                                          85
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   is probably -- if you took this room and cut it in

2   half and added it to the length of this room, that

3   would be maybe the approximate length of the Barbie

4   presentation room.  So it was longer.  And it was

5   also -- it's also wider.                    11:50AM

6   BY MS. ANDERSON:

7       Q.   Approximately how many feet long?

8       A.   From the podium where he was presenting to

9   the exit door?

10      Q.   Yes.                                11:50AM

11      A.   Without a tape measure, I mean, I can't give

12  you an exact measurement.

13      Q.   All I need is your best estimation.

14      A.   Can you tell me how big this room is?

15      Q.   I can't.                            11:50AM

16      A.   If I knew how big this room was, I could do

17  the math and I could probably give you that answer.

18           MR. COREY:  Maybe we can step it off at a

19  break.

20           MS. ANDERSON:  Yeah, we'll figure it out at  11:51AM

21  a break.  You can clarify it at a break.

22      Q.   When you say that the President made this

23  comment about Mr. Bryant's proposal and Mr. Bryant

24  got upset, did he leave immediately after this

25  comment?                                     11:51AM

                                                      86

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.    Within a matter of seconds, I believe.

2        Q.    Was the comment made while Mr. Bryant was at

3    the podium?

4        A.    Yes.

5        Q.    And was the door anywhere near -- strike        11:51AM

6    that.

7              Was the door at the opposite end of the room

8    as the podium?

9        A.    Yes.

10       Q.    Is that incident the basis for your comment      11:51AM

11   before that you thought that Mr. Bryant was overly

12   sensitive?

13       A.    No.

14       Q.    What was the basis for your comment before

15   that you thought Mr. Bryant was overly sensitive?        11:52AM

16       A.    Prior to that incident there were other

17   meetings during which Carter would get very

18   defensive.  When Ron Longsdorf was the -- I believe

19   the Senior Vice President of Barbie Collectibles at

20   the time, when Ron would make comments about his        11:52AM

21   work or when Marketing or our President would make

22   comments that was just the most dramatic incident.

23       Q.    What was the name of the President at the

24   time?

25       A.    Adrienne Fontanella.                           11:52AM

                                                                    87

EXHIBIT 3  PAGE 97

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.    Is that A-d-r-i-e-n-n-e?

2        A.    Yes.

3        Q.    That's my daughter's name.   Nobody ever

4    spells their name that way.

5        A.    She's a woman.                          11:53AM

6        Q.    I know.   That's how I knew how to spell it.

7              So the meeting that you remember Mr. Bryant

8    crying at, approximately how many people were in

9    attendance?

10       A.    It was a big meeting.   If I remember       11:53AM

11   correctly, it probably was attended by 20 people.

12       Q.    Was this room in which the meeting occurred

13   filled by all 20 people?   Was it -- was the room

14   completely filled in terms of people seated around

15   the table?                                       11:53AM

16       A.    Do you mean like was there room for other

17   people?   Was it at full capacity?   I don't really

18   understand the question.

19       Q.    Well, was there a big table in this room?

20       A.    Yes.                                    11:53AM

21       Q.    And was it just one table in the room?

22       A.    No.

23       Q.    We'll come back after and figure out how big

24   this room was.

25             MR. COREY:   I think you guys are missing   11:54AM

88

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    each other about which meeting you're talking about.

2            MS. ANDERSON:  We'll clarify it after a

3    break and you can pace the room and figure it out.

4            MR. COREY:  No, no, no.  That's not what I'm

5    saying.  I think the witness is talking about a          11:54AM

6    different meeting than you're talking about now

7    because I think you're talking about two different

8    rooms.

9            MS. ANDERSON:  I've only been talking

10   about -- just now I was talking about the meeting at     11:54AM

11   which Mr. Bryant cried and I was asking how many

12   people were in attendance and I believe that was

13   what the witness understood.

14       Q.   Right?

15       A.   Yes.                                              11:54AM

16           MS. ANDERSON:  Why don't we take a break

17   because the tape is running out but let's just stay

18   put so we don't....

19           VIDEO OPERATOR:  This is the end of tape 1.

20   We are off the record at 11:54 a.m.                       11:54AM

21               (Brief recess.)

22           VIDEO OPERATOR:  We are back on the record

23   at 11:59 a.m.  This is the beginning of tape 2 of

24   Volume 1 of the 30(b)(6) deposition of Jill

25   Nordquist.                                                12:00PM

                                                                89

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. ANDERSON:

2      Q.   Okay.  So we went off the record and you had

3   a chance to try to estimate how big the room was by

4   pacing it.  Do you have now an estimation of what

5   you think the size of the room was where you say          12:00PM

6   Mr. Bryant cried during a meeting in the

7   presentation room?

8      A.   Yes.

9      Q.   And what's your estimate?

10     A.   My estimate is that the room was               12:00PM

11  approximately 45 feet in length from the front of

12  the room to the back of the room and approximately

13  30 feet from side to side or across.

14     Q.   And I think you indicated there was more

15  than one table in that room during that meeting.        12:00PM

16     A.   There are multiple six-foot-long tables that

17  are set up in a rectangle and they -- with chairs

18  around it and then people face the podium.

19     Q.   And the podium is where you say Mr. Bryant

20  was standing when he started to cry, right?            12:01PM

21     A.   Correct.

22     Q.   And the door exiting the room is on the

23  other end of the room; is that correct?

24     A.   That's correct.

25     Q.   And is the door exiting the room on one of    12:01PM

90

EXHIBIT ϧ PAGE 100

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the longer sides of the room or on one of the

2    shorter sides of the room?

3              MR. COREY:  Objection:  vague and ambiguous.

4              THE WITNESS:  I'm sorry?

5    BY MS. ANDERSON:                                  12:01PM

6        Q.   Sure.  The room is a rectangle, correct?

7        A.   Correct.

8        Q.   Because the two of the sides are long and

9    two are short, correct, by comparison?

10       A.   Yes.                                      12:01PM

11       Q.   Was the door to exit the room on one of the

12   longer sides of the rectangle or on one of the

13   shorter sides?

14       A.   The exit door was on one of the shorter

15   sides, however, the point at which you enter the    12:02PM

16   room, it wasn't a perfect rectangle, it was like a

17   rectangle with a little bit of an L I guess you

18   would call it.  So you would enter the room -- enter

19   and exit the room from let's say the extra --

20   another extra 10 to 20 feet so in order to come into  12:02PM

21   the room and walk all the way to the podium you

22   would be making an L and to go from the podium back

23   out of the room you would be making that L again.

24       Q.   And the L -- the long part of the L, is that

25   walking the full length of the long side of the      12:02PM

                                                          91

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    conference room?

2        A.    That's correct.

3        Q.    And I know you said you don't remember

4    exactly when this meeting was but can you give me

5    your best estimation as to whether it was closer to        12:02PM

6    the beginning or the end of the period of time that

7    you were working with Mr. Bryant?

8        A.    I think it was probably later in his time

9    as -- as a Collector designer.

10       Q.    Do you remember approximately how long it       12:03PM

11   was after that meeting that Mr. Bryant left Mattel's

12   employment?

13       A.    I don't remember.

14       Q.    Did you have any discussions with anybody at

15   Mattel after that meeting at which Mr. Bryant got         12:03PM

16   upset with anybody else at Mattel?  Let me rephrase

17   that question because the -- some of those phrases

18   were in the wrong place.

19           MR. COREY:  Thank you.

20   BY MS. ANDERSON:                                          12:03PM

21       Q.    Did you ever discuss with any other Mattel

22   employees what happened at the meeting at which you

23   say Mr. Bryant was crying?

24       A.    Yes.

25       Q.    With whom did you discuss that?               12:04PM

                                                                    92

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    background before Mattel?

2        A.    What I knew of his background was that where

3    he was most immediately before Mattel.

4        Q.    And where was that?

5        A.    At the Franklin Mint.                                    12:30PM

6        Q.    Did you ever have any discussions with

7    Mr. Bryant -- strike that.

8            Now would probably be a good time to take a

9    break since it's 12:30 and I'm about to start on

10   something I can't finish in five minutes.                         12:31PM

11           MR. COREY:   That's fine.

12           VIDEO OPERATOR:   We are off the record at

13   12:31 p.m.

14

15           (At the hour 12:31 p.m. the luncheon

16       recess was taken.)

17

18

19

20

21

22

23

24

25

                                                                        109

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            (At the hour of 1:43 p.m. the following
 2        proceedings were had at the same place with
 3        the same persons present.)
 4
 5            VIDEO OPERATOR:  We are back on the record    01:43PM
 6    at 1:43 p.m.
 7
 8                EXAMINATION (Resumed)
 9    BY MS. ANDERSON:
10        Q.    Good afternoon.  Earlier we were talking    01:43PM
11    about the projects that you remember working with
12    Mr. Bryant on.  Do you recall that testimony?
13        A.    Yes.
14        Q.    And one of the projects you mentioned was
15    that you worked with him on a Carter Bryant Grand    01:43PM
16    Entrance doll.  Do you recall that?
17        A.    Yes.
18        Q.    What is a Grand Entrance doll?
19        A.    We developed what we thought was going to be
20    a series of dolls that would be designed by a        01:44PM
21    specific designer and what made them different than
22    other dolls that were designed by a specific
23    designer is that they would also include a photo of
24    the designer on the package and a booklet inside of
25    the package about that designer.                     01:44PM
                                                           110
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   When you say that you developed what you

2    thought would end up being a series of dolls, when

3    did you first roll out that line of dolls?

4    A.   The Grand Entrance doll was the first in the

5    series and the irony is that we internally referred    01:44PM

6    to it as the Grand Exit doll because it was released

7    after Carter had already resigned.

8    Q.   So the only Grand Entrance doll that was

9    ever made by Mattel is the one that Carter Bryant

10   was working on?                                         01:45PM

11   A.   No.

12   Q.   Okay.

13   A.   I think, I'm not certain, that there may

14   have been one by Katiana that came directly after.

15   Q.   So Carter Bryant had been the person        01:45PM

16   selected to design the first Grand Entrance doll?

17   A.   Correct.

18   Q.   And that doll was supposed to have his name

19   on the package?

20   A.   Yes.                                              01:45PM

21   Q.   And was it sold that way ultimately?

22   A.   Yes.

23   Q.   And how was Mr. Bryant selected for being

24   the person to have a Grand Entrance doll created

25   with respect to his name?                              01:45PM

111

EXHIBIT 3   PAGE 105

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        MR. COREY:  Objection:  speculation.

2        THE WITNESS:  We decided to develop a series

3    showcasing designers because we had one designer,

4    Robert Best, who had a huge fan base and a big

5    following and we thought it would be fun for the          01:46PM

6    collector community to be able to engage with other

7    designers and to have interest in designers other

8    than just Robert.

9    BY MS. ANDERSON:

10       Q.  Who was responsible for selecting Carter          01:46PM

11   Bryant to have his name associated with the first of

12   these Grand Entrance dolls?

13       MR. COREY:  Same objection.

14       THE WITNESS:  I don't remember who

15   ultimately made that decision.                            01:46PM

16   BY MS. ANDERSON:

17       Q.  Were you involved in the decision to develop

18   this series of dolls?

19       A.  Yes.

20       Q.  And who else was involved besides yourself?       01:46PM

21       A.  I believe that the Marketing team ranging

22   from myself and the people who reported to me and

23   the person I reported to as well as Ann Driskill and

24   Ron Longsdorf all agreed that it would be a neat

25   concept for collectors.                                   01:47PM

                                                              112

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. ANDERSON:

2        Q.    To deciding to start to have this Grand

3    Entrance doll.

4        A.    Well, as with all the other dolls that we

5    talked about earlier, there's other parameters          01:52PM

6    involved in determining if we're going to do a doll

7    including costing and pricing and all of those other

8    things, so those were also factored in and therefore

9    once we decided on the theme and thought that it

10   would be a good series, we had to make sure that we     01:52PM

11   hit the right costs and price and all that other

12   stuff before it actually went into play.

13       Q.    Okay.  And it was yourself, Ann Driskill and

14   Ron Longsdorf who were involved in deciding on the

15   theme of the Grand Entrance doll, true?                 01:53PM

16       A.    Yes.

17       Q.    Do you recall having any discussions with

18   anyone about the decision to have the first Grand

19   Entrance doll be one associated with Carter Bryant's

20   name?                                                   01:53PM

21       A.    I was involved in conversations that brought

22   up starting a series with Carter.

23       Q.    Okay.  What conversations were those?

24       A.    I believe that Ann and/or Ron recommended

25   that we start with Carter.                              01:53PM

                                                            114

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   What did they say in that regard?

2    A.   I don't remember specifics other than that

3  they recommended that they thought it would be a

4  good choice.  The one specific I do remember was

5  because we were going to be including his photograph   01:54PM

6  as part of the packaging and the little booklet that

7  came inside that he was cute looking.

8    Q.   Are the other members of the Design Team not

9  cute?

10       MR. COREY:  Objection:  calls for              01:54PM

11  speculation.  Should we designate this portion of

12  the transcript subject to the protective order so

13  they can't see it?

14       THE WITNESS:  I think some of them are cute

15  and I think others are not as attractive.

16  BY MS. ANDERSON:                                      01:54PM

17   Q.   Which ones would be consider to be cute?

18   A.   I thought that Robert was attractive --

19       MR. COREY:  Again, we won't tell your

20  husband.

21       THE WITNESS:  That's all right.              01:54PM

22  BY MS. ANDERSON:

23   Q.   Robert who?

24   A.   Best.

25   Q.   Robert Best.  Who else?              01:54PM

115

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    I think it's pretty much universally agreed

2   that Katiana is beautiful and that's -- I would say

3   those were the cute or attractive designers.

4    Q.    Aside from what you've already told me, do

5   you recall any other conversations on the subject of    01:55PM

6   why Carter Bryant was selected for the first Grand

7   Entrance doll?

8    A.    I don't remember.

9    Q.    How about discussions relating to the

10  selection of Katiana for the second Grand Entrance      01:55PM

11  doll?  Do you recall any of those discussions?

12   A.    I remember knowing that we weren't going to

13  start the series with Robert because Robert had

14  already created a name for himself and I remember

15  that after Carter the natural next person would be      01:55PM

16  Katiana.

17   Q.    Because she was cute and one of the

18  designers?

19   A.    Because she I think was just the next

20  natural person.                                         01:55PM

21   Q.    Okay.  But can you tell me why --

22   A.    I don't remember the conversations we had

23  about this doll that took place seven years ago.

24   Q.    Okay.  Setting aside what you remember about

25  actual conversations, as you sit here today, what is    01:56PM

116

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   your recollection about why Katiana was selected for

2   the second of the Grand Entrance dolls?

3       A.    I think probably based on her experience and

4   her style.

5       Q.    When you say based on her experience and her   01:56PM

6   style, what do you mean?

7       A.    Professionally she had gone to design

8   school.  Personally she came from a family that was

9   Puerto Rican and I think that was something that was

10  important to her and that she believed had an impact   01:56PM

11  on who she was as a designer.

12      Q.    Did her skill as a designer have anything to

13  do with her being selected?

14      A.    Yes.

15      Q.    What effect did it have on her being         01:57PM

16  selected?

17      A.    She was selected to have a doll with her

18  name on it.

19      Q.    I understand.  My question is you said that

20  her skill as a designer had something to do with her   01:57PM

21  being selected to do the second Grand Entrance doll

22  and my question is what about her skills contributed

23  to her being selected?

24          MR. COREY:  Objection:  asked and answered.

25          THE WITNESS:  So are you asking what           01:57PM

117

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ever received?

2        A.    As a child and as an adult I've taken art

3    classes.  During high school I took art history.

4    During college I had what would have qualified as a

5    minor in art history.                              02:02PM

6        Q.    Besides classes in art history, have you

7    ever taken any kind of classes or courses in

8    actually creating artwork?

9        A.    Yes.

10       Q.    What ones are those?                      02:02PM

11       A.    I've taken ceramics, I've taken water color,

12   I've taken sculpture.

13       Q.    Anything else?

14       A.    I think as a child I probably took some

15   basic drawing.                                     02:02PM

16       Q.    Besides classes you took as a child, did you

17   ever take any formal educational classes in

18   ceramics, water colors or sculpture?

19       A.    What do you mean by "formal"?

20       Q.    Like at a college or university.          02:03PM

21       A.    Yes.

22       Q.    Where did you take these classes?

23       A.    I took -- I know during my time during

24   undergraduate at Occidental I took a couple of art

25   classes and I believe I took -- when I was in high   02:03PM

121

EXHIBIT __ PAGE 111

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   school took a class through UCLA Extension in I

2   think that was painting.   And then I also took

3   ceramics courses after college on the weekends or in

4   the evenings as a -- it's just something that was of

5   interest to me.                                02:03PM

6       Q.   And how about the sculpture class?   Where

7   was that?

8       A.   In high school.

9       Q.   And the water colors class, where was that?

10      A.   I think that was part of the UCLA Extension. 02:04PM

11   I think it was -- it was painting.   I think we

12   focused on water color.   I'm not sure if acrylics

13   were involved or not.

14      Q.   Any other sort of training in art creation

15   classes besides what you've already told me?       02:04PM

16      A.   Oh, photography.   Sorry.   I taught

17   photography.   I took photography all through high

18   school, had considered at one point going to Brooks

19   and was a camp counselor and actually taught

20   photography.                                   02:04PM

21      Q.   Anything else besides the things you've

22   listed for me?

23      A.   I think -- as far as I remember, I think

24   that's everything.

25      Q.   Did there ever come a point in time where  02:04PM

                                                         122

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you had any communications with Carter Bryant on the

2    subject of his considering or deciding to leave

3    Mattel?

4         A.    Yes.

5         Q.    When was the first time you had any such      02:05PM

6    conversation?

7         A.    The day he resigned.

8         Q.    What day was that?

9         A.    I don't remember the date or the day of the

10   week.                                                     02:05PM

11        Q.    Where did this conversation take place?

12        A.    In his cubicle.

13        Q.    Was anybody else present?

14        A.    Yes.

15        Q.    Who else?                                      02:05PM

16        A.    Kitty Hammons.

17        Q.    Anybody else?

18        A.    No.

19        Q.    Were you all in or around this cubicle?

20        A.    Inside his cubicle.                            02:05PM

21        Q.    You can all fit in there?

22        A.    Yeah.

23        Q.    Can you give me -- strike that.

24              I understand you don't remember the specific

25   day that this conversation took place but could you       02:06PM

                                                                    123

EXHIBIT 3  PAGE 113

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    give me your best estimation of when the

2    conversation took place?

3        A.    All I remember it was approximately two

4    weeks prior to him actually physically leaving

5    Mattel.                                              02:06PM

6        Q.    How long was this conversation?

7        A.    Ten minutes.

8        Q.    I'd like you to give me your best

9    recollection of what any -- everybody said during

10   this particular conversation.                        02:06PM

11       A.    Okay.

12       Q.    So we can proceed in any way you'd like but

13   probably the best way to do it is proceed

14   chronologically from the first thing that is said

15   through the conversation so you can tell me          02:07PM

16   everything you remember.   Okay?

17       A.    Okay.

18       Q.    So what is it that you recall being said

19   during this conversation with Mr. Bryant?

20       A.    Kitty and I went over to Carter's cube      02:07PM

21   because we had just heard that he had resigned and I

22   asked him point-blank if he was going to a

23   competitive doll company to which he responded with

24   no and I said, "Where are you going?"  And he said

25   he wasn't going to say.  And then I told him that if  02:07PM

                                                            124

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   he worked for me and resigned without saying where

 2   he was going that I personally would have him leave

 3   immediately, and he didn't comment.  And we asked

 4   him what he would be doing and he said he was going

 5   to go somewhere that would allow him to have more        02:07PM

 6   creative control and input and that he would be

 7   spending a fair amount of time in Asia and that's --

 8   that was I believe the conversation.

 9        Q.   Did Kitty Hammons say anything during this

10   conversation?                                            02:08PM

11        A.   I think she probably may have interjected a

12   word or two.

13        Q.   But you don't remember anything as you sit

14   here now?

15        A.   Not specifically.                              02:08PM

16        Q.   You say that you went to his cube because

17   you just had heard he resigned.

18        A.   Correct.

19        Q.   Who informed you of that?

20        A.   I had been at my desk in my cube at the        02:08PM

21   Tower and had been on the phone with I believe it

22   was Mina Mirkazemi discussing other business issues

23   and at the end of the conversation she said, "Oh,

24   did you guys hear?  Carter just resigned."

25        Q.   What did you say in response?                  02:09PM
```

125

EXHIBIT 3  PAGE 115

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   No, I hadn't heard that.

2    Q.   What, if anything, did she say in return

3    after you made that comment?

4    A.   She said, "Yes, he's -- it's true."

5         And I believe I asked her where he was going   02:09PM

6    and she said that he wouldn't say.

7    Q.   What else, if anything, did Mina Mirkazemi

8    say during this conversation in relation to Carter

9    Bryant?

10   A.   That was the extent that related to Carter.   02:09PM

11   Q.   What else, if anything, did you say during

12   this conversation in relation to Carter Bryant?

13   A.   That I was going to ask him myself.

14   Q.   Okay.  Anything else?

15   A.   No.                                            02:10PM

16   Q.   How is it that Kitty Hammons came to be with

17   you as you went to the cubicle to talk to

18   Mr. Bryant?

19   A.   Kitty and I were on our way to one of those

20   working meetings that we had regularly in the Design   02:10PM

21   Center so we stopped at Carter's cube before we went

22   to the meeting.

23   Q.   Did Kitty Hammons -- strike that.

24        Did you inform Kitty Hammons of what you had

25   just learned about Mr. Bryant's resignation before   02:10PM

                                                         126

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you arrived at Mr. Bryant's cubicle?

2        A.    Yes.

3        Q.    What did you tell her?

4        A.    I don't remember verbatim.  I believe it was

5    something to the extent of I hung up the phone.          02:11PM

6    Kitty sat across from me and I said, "I just -- Mina

7    just told me that Carter resigned."

8        Q.    And did she say anything in response?

9        A.    I think she asked the same question

10   everybody asks which is "Where is he going?"             02:11PM

11       Q.    And you said --

12       A.    I said, "Mina said they didn't know.  He

13   wouldn't say."

14       Q.    Between the time that you had this

15   conversation with Mina Mirkazemi on the phone and        02:11PM

16   the time that you arrived at Carter Bryant's

17   cubicle, did you have any conversations with anyone

18   else about Carter Bryant besides Kitty Hammons?

19       A.    No.

20       Q.    Was the first question that you asked --       02:11PM

21   strike that.

22            Was the first thing that was said when you

23   met Carter Bryant in his cubicle a question to the

24   effect of "Are you going to a competitive doll

25   company"?                                                02:12PM

                                                              127

EXHIBIT 3 PAGE 117

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.    That was if not the first question probably

2  the second question.

3     Q.    Do you remember saying anything else before

4  that?

5     A.    I think I probably said, "Where are you     02:12PM

6  going?"

7     Q.    And his response to that first question of

8  where are you going was what?

9     A.    "I'm not saying."

10    Q.    Did you tell him during this conversation     02:12PM

11 that if he worked for you you would have him leave

12 immediately?

13    A.    No, my exact words were if he had worked for

14 me and resigned and hadn't said where he was going

15 that I would then have him leave immediately.     02:12PM

16    Q.    And it's your testimony that he didn't say

17 anything in response to that comment?

18    A.    Correct.

19    Q.    Aside from what you've already told me about

20 your recollection of what Mr. Bryant said during     02:12PM

21 that conversation, do you recall him saying anything

22 else?

23    A.    No.

24    Q.    I know you said that this conversation

25 lasted about ten minutes but what you've told me so     02:13PM

                                                                128

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    far doesn't sound like it would take ten minutes to

2    have that conversation.  Do you have any further

3    recollection of anything else that was said during

4    this conversation?

5         A.    I don't have any further recollection.      02:13PM

6         Q.    Do you still believe that ten minutes is an

7    accurate estimate of how long the conversation

8    lasted?

9         A.    It's hard to say because I don't remember if

10   Kitty interjected or not.                              02:13PM

11        Q.    Do you -- strike that.

12              Would you characterize this conversation as

13   having been a pleasant conversation?

14        A.    I think it was commensurate with other

15   conversations we had had.                              02:13PM

16        Q.    I'm going to reiterate the question.

17              Would you characterize this particular

18   conversation as having been a pleasant conversation?

19        A.    Yes.

20        Q.    How would you describe Mr. Bryant's demeanor 02:14PM

21   during the conversation?

22        A.    Similar to his general demeanor.

23        Q.    And how would you describe that?

24        A.    Private, timid, not saying a lot.

25        Q.    And that was how he normally was with you?  02:14PM

                                                            129

EXHIBIT ___ PAGE 119

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   A.   Yes.

2   Q.   Did you have a positive working relationship

3   with Carter Bryant?

4   A.   Yes.

5   Q.   How is it you understand the phrase          02:14PM

6   "positive working relationship"?

7   A.   We got along.  We didn't fight.  I had no

8   personal issue with him.  I don't believe he had a

9   personal issue with me.  If he did, he never told

10  me.  Our meetings were cordial.  We -- we -- I think  02:15PM

11  we worked well together.

12  Q.   You said earlier that you told him during

13  the meeting that if he had worked for you you would

14  have him leave immediately, right?

15  A.   Correct.                                       02:15PM

16  Q.   Is that your normal practice to have an

17  employee leave immediately if they won't tell you

18  where they're going?

19  MR. COREY:  Objection:  assumes facts, lacks

20  foundation, calls for speculation.                    02:15PM

21  THE WITNESS:  I've never had somebody resign

22  without telling me where they were going.  I had

23  previously worked at a company where people said

24  where they were going when they were leaving and if

25  they chose not to identify where they were going it   02:15PM

                                                            130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    was common practice that they would then ask to

2    be -- would then be asked to leave.

3    BY MS. ANDERSON:

4        Q.    Where was that company?

5        A.    Dep Corporation.                              02:16PM

6        Q.    At the time that you had this conversation

7    with Mr. Bryant, were you aware of any practice at

8    Mattel with respect to how to handle a situation

9    where an employee was leaving but refused to say

10   whether they were going to a competitor?            02:16PM

11           MR. COREY:  Objection:  calls for

12   speculation.

13           THE WITNESS:  Carter was not my employee so

14   it wasn't my decision to make.

15           MS. ANDERSON:  Move to strike as           02:16PM

16   nonresponsive.

17       Q.    My question to you is not about Mr. Bryant

18   in particular.

19       A.    Okay.

20       Q.    It's just background.  Now I'll ask the    02:16PM

21   question.

22           In the same time frame that you were having

23   this conversation with Mr. Bryant were you aware of

24   there being any general practice at Mattel with

25   respect to how to handle a situation where an        02:16PM

                                                               131

EXHIBIT 3 PAGE 121

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   employee was resigning but was refusing to tell you

2   whether they were going to go to a competitor?

3          MR. COREY:  Objection:  calls for

4   speculation.

5          THE WITNESS:  I don't know of any such          02:17PM

6   policy at Mattel about how to handle that sort of

7   situation.

8   BY MS. ANDERSON:

9      Q.   Is that something -- strike that.

10         If you were going to try to find out what     02:17PM

11  Mattel's practices are, if any, with regard to that

12  kind of situation, would you check with Human

13  Resources?

14         MR. COREY:  Objection:  speculation.

15         THE WITNESS:  If -- if I had an employee      02:17PM

16  reporting to me directly and I had a question as to

17  how to handle their resignation, I would contact my

18  boss or HR or Legal, if necessary.

19  BY MS. ANDERSON:

20     Q.   Following the conversation that you had with 02:17PM

21  Mr. Bryant, did you discuss with anyone else the

22  subject matter of the conversation you had with

23  Carter Bryant?

24     A.   Yes.

25     Q.   With how many people did you discuss that    02:17PM

                                                              132

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   subject?

2       A.    Kitty because she had been with me and I

3   mentioned it to Ron when I saw him shortly

4   thereafter.

5       Q.    Anyone else?                                    02:18 PM

6       A.    Not that I remember right now.

7       Q.    When was the conversation with Kitty that

8   concerned the subject matters that were discussed

9   during the Carter Bryant meeting where he confirmed

10  his resignation?                                          02:18 PM

11      A.    When we left his cube and we walked on to

12  our meeting that we were going to in the Design

13  Center in the first place, we discussed right after

14  we left his cube what we had just discussed.

15      Q.    Did you just repeat to each other what you    02:18 PM

16  had just heard?

17      A.    That's -- I'd say yes.

18      Q.    Do you remember discussing anything else

19  besides repeating to each other what you had just

20  heard in the conversation with Mr. Bryant?              02:19 PM

21      A.    I remember not believing his -- not

22  believing he was telling me everything.

23      Q.    That's what you told Kitty?

24      A.    Uh-huh, yes.

25      Q.    What else, if anything, did you discuss with 02:19 PM

                                                            133

EXHIBIT 3 PAGE 123

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    sure if he reported in to Heather at that point or

2    in to Ann Driskill.

3        Q.   Did you ever discuss with Ann Driskill the

4    subject of whether Carter Bryant should continue

5    working at Mattel after he gave his notice?          02:27PM

6        A.   No.

7        Q.   Do you recall having considered telling her

8    but decided not to?

9            MR. COREY:  Objection:  speculation.

10            THE WITNESS:  All I remember was making a     02:27PM

11   comment to Ron.

12   BY MS. ANDERSON:

13       Q.   When you say that you weren't sure whether

14   Carter was reporting to Heather at the time or

15   whether he was reporting to Ann Driskill, are you    02:27PM

16   referring to Heather Fonseca?

17       A.   Yes.

18       Q.   As a person who supervises employees at

19   Mattel, do you receive any training about what to do

20   when an employee gives notice?                        02:28PM

21       A.   I don't know that I've been trained

22   specifically on that.  I don't think so.

23       Q.   Generally speaking, have you ever been

24   educated on any particular practices that you as a

25   supervisor are supposed to follow if and when an     02:28PM

                                                              139

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   employee gives notice?

2        A.    I don't believe so.

3        Q.    Are there any written guidelines that you're

4   aware of that dictate what supervisors at Mattel are

5   supposed to do when an employee gives notice?          02:28PM

6             MR. COREY:   Objection:   speculation.

7             THE WITNESS:   I don't know if such

8   information exists.

9   BY MS. ANDERSON:

10       Q.    On the occasions where employees have given  02:29PM

11  you notice that they intend to leave Mattel do you

12  ever make it a practice to contact anyone in Human

13  Resources after you receive that notice?

14       A.    Absolutely.

15       Q.    Is that sort of a regular thing that you do? 02:29PM

16       A.    Generally what I've done in the past of the

17  people who have resigned directly to me I've -- if

18  they had a resignation letter that they handed at

19  the time of telling me I would take that letter and

20  I would go find my supervisor and tell him or her    02:29PM

21  that So-and-So resigned and here's their letter and

22  then I would call HR after and tell them that the

23  person had resigned and I would hand deliver the

24  person's letter if they had it prepared already.

25       Q.    Anything else that is part of your normal   02:30PM

                                                           140

EXHIBIT 3   PAGE 125

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    practice on how to handle when an employee resigns

2    who is within your report?

3        A.    For the people that have reported to me in

4    the past and have told me they are resigning I

5    usually ask them where they were going, when they          02:30PM

6    were planning on leaving, when -- you know, they

7    were happy.  If -- I mean, in most cases I don't

8    think I ever had a situation where it was -- where

9    people withheld information and I think it was up

10   front and I always wished them well and then we            02:30PM

11   would discuss a transition plan for the next person.

12       Q.    Has anyone -- strike that.

13            In your experience of having received

14   resignation notices periodically from employees,

15   have any of those employees told you that they were        02:30PM

16   going to go work for a competitor?

17       A.    Let me think through all the people that

18   have resigned.  No, I don't think anyone has gone to

19   a competitor.

20       Q.    Did you have any communications with Carter      02:31PM

21   Bryant following the meeting in the cubicle you just

22   described in which you asked him whether he was

23   going to a competitor?

24       A.    Yes.

25       Q.    What communications with Carter Bryant did       02:31PM

141

EXHIBIT 3 PAGE 126

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you have following that cubicle meeting?

2        A.   We still had work to do so we continued to

3    have our regularly-scheduled working meetings on

4    doll development.

5        Q.   Those meetings continued until the day he          02:31PM

6    left, physically left working at the building,

7    correct?

8        A.   Those meetings continued after he left.

9        Q.   With Carter Bryant?

10       A.   No.   I mean, projects -- work still had to        02:31PM

11   be done regardless if the person who was working on

12   it was still there.

13       Q.   Right.   I just want to focus you.   I'm only

14   talking about communications you had directly with

15   Carter Bryant so now we'll reframe the question for        02:32PM

16   you so there's no confusion.   Okay?

17            So during the period of time from the

18   meeting you had with Carter Bryant in the cubicle

19   until two weeks later when he physically left

20   employment at Mattel, did you have any                     02:32PM

21   communications with Carter Bryant on the subject of

22   his leaving?

23       A.   No.

24       Q.   Did you have -- strike that.

25            Did you ever have any communications with         02:32PM

142