CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Carter Bryant on the subject of MGA?

2       A.   No.

3       Q.   Did you ever have any conversations with

4   Carter Bryant on the subject of any other company

5   that sells dolls?                                    02:32PM

6       A.   As it relates to him leaving or just in

7   general?

8       Q.   In general.

9       A.   Oh, of course.  Yes.

10      Q.   And what companies do you recall discussing  02:33PM

11  with Carter Bryant in that regard?

12      A.   A wide range of companies.  Just based on

13  our day-to-day business we would -- we were in the

14  collector doll business so a lot of our

15  conversations about competitors related to that    02:33PM

16  industry so we would talk about the Franklin Mint,

17  the Bradford Exchange, Danbury Mint, Robert Tonner,

18  the Jean dolls, Madame Alexander.

19      Q.   Any others ones that you recall as you sit

20  here?                                                02:33PM

21      A.   I think we discussed other collectibles and

22  other collectible companies or companies that make

23  collectibles other than dolls.

24      Q.   So non-doll collectible companies?

25      A.   Correct.                                    02:33PM

                                                         143

EXHIBIT 3  PAGE 128

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Besides the communications you had with

2    Mr. Bryant just generally relating to the ongoing

3    work that he had been doing at the time that he gave

4    his resignation, did you have any other discussions

5    with Carter Bryant that related in any way to his          02:34PM

6    departure from Mattel?

7              MR. COREY:  Objection:  asked and answered.

8              THE WITNESS:  Can you -- I guess I'm not

9    clear on the question.

10   BY MS. ANDERSON:                                            02:34PM

11     Q.    I just want to make sure -- I want to give

12   you another background so it makes it clear what

13   I've asking.

14          I know that you had just general day-to-day

15   work that was ongoing in relation to the projects          02:34PM

16   that Mr. Bryant was working on at the time, right?

17   And I know you had meetings that continued until he

18   left in that regard.  I'm trying to find out whether

19   you have given me your best recollection as to

20   whether you had any discussions with Carter Bryant        02:35PM

21   that related in any way to his leaving Mattel during

22   that two-week period from when you had the

23   discussion in the cubicle until he actually left

24   Mattel's physical employment.

25             MR. COREY:  Objection:  asked and answered.     02:35PM

                                                                144

EXHIBIT  3  PAGE 129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          THE WITNESS:  My recollection of the two

 2   weeks or whatever the exact time was that transpired

 3   from the time he resigned until the time he left

 4   consisted of me confronting him directly on the day

 5   that I heard he was leaving and asking him if he was    02:35PM

 6   going to a competitor -- competitive doll company,

 7   to which he responded no, and after that I did not

 8   press any further but continued to communicate with

 9   him on business-related matters.

10   BY MS. ANDERSON:                                        02:35PM

11        Q.    Do you know who sat near Mr. Bryant when he

12   was working at the Design Center during the time

13   period that you knew him at Mattel?

14        A.    Yes.

15        Q.    Who sat near him?                            02:36PM

16        A.    There was the working table that I mentioned

17   that was in the middle.  Carter was right outside of

18   the working table in a cube.  There may have been a

19   sample maker whose name I thought started with a B

20   but I don't remember because he wasn't somebody that   02:36PM

21   I worked with directly.  I know that Robert was in a

22   corner.  I know that Nini who was Robert's sample

23   maker sat on the other end.  I believe that

24   Heather's cube was somewhere over here.  And then on

25   the -- directly across from Carter with the working   02:36PM
                                                              145
```

EXHIBIT 3  PAGE 130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    table being in the middle was I believe Sharon

2    Zuckerman and Katiana on that side.

3        Q.    I'm just going to give you a piece of paper

4    so you can draw this for me just so we have sort of

5    a general layout of where these folks are sitting.    02:37PM

6        MR. COREY:  Don't you have one -- just a

7    second.

8        THE WITNESS:  I don't remember --

9        MR. COREY:  Hold on just a second.

10       MS. ANDERSON:  Should we put that exhibit    02:37PM

11   sticker on it now -- so that we have it?

12       (Deposition Exhibit 543 was marked

13       for identification and is annexed hereto.)

14   BY MS. ANDERSON:

15       Q.    So I'm showing you a blank page, Exhibit    02:37PM

16   543.  If you could just generally draw the layout

17   that you were describing with your hand motions

18   earlier as to where Mr. Bryant's cubicle was located

19   and where other people were located during the time

20   you were working with him.    02:37PM

21       MR. COREY:  And just to be clear, you

22   want -- you just want the area around Mr. Bryant's

23   cubicle at what period of time of time?

24       MS. ANDERSON:  This time frame that the

25   witness worked with Mr. Bryant which doesn't appear    02:38PM

146

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   to have been particularly long.

2         MR. COREY:  Do you want the time where he

3   gave notice?

4         MS. ANDERSON:  Let me ask the witness.

5     Q.   Was the location of where people sat          02:38PM

6   different over time when you were working with

7   Carter Bryant?

8     A.   Over the course of the many years I've been

9   at Mattel people have moved around quite a bit.

10    Q.   Right.  But do you recall when Carter Bryant  02:38PM

11  was there whether the location of various people in

12  that particular area where Carter Bryant was

13  located, whether that layout changed a lot?

14    A.   It did change and a lot of that had to do

15  with if people left or joined the group.           02:38PM

16    Q.   How about if you could draw for me what you

17  recall to be the location of where people sat in,

18  say, September 2000.

19        Are we done?

20    A.   Yeah.                                         02:40PM

21        MR. COREY:  Can you put September 2000 on

22  there and then can you identify direction?

23        THE WITNESS:  Yeah.  Oops, I wrote 2007.

24  September of 2000?  I'm trying to remember what year

25  it was.                                             02:40PM

                                                        147

EXHIBIT 3  PAGE 132

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. ANDERSON:

2        Q.   Don't worry, it won't be subject to artistic

3    critique.

4        A.   Good, because clearly drawing wasn't

5    something that I was proficient at.  I guess this      02:40PM

6    would be -- if this is Mariposa so I guess this

7    would be north.

8            MR. COREY:  If streets are easier, put

9    streets on.

10           THE WITNESS:  This isn't exactly the front      02:41PM

11   of the building because you come in and turn.

12           MR. COREY:  Just for orientation purposes.

13           THE WITNESS:  This would be Mariposa

14   over here and this would be Continental over here.

15   And I don't know the name of that -- oh, Maple.      02:41PM

16   This would be Maple.  So this would be north, south,

17   west, east.  I think Penny and Hoi sat over here or

18   it could have been flipped.

19   BY MS. ANDERSON:

20       Q.   Are we done?                                02:42PM

21       A.   I think so.

22       Q.   I'll just ask some questions to make sure I

23   understand this.

24           MR. COREY:  Can we get some copies made

25   quickly if you're going to ask her questions about   02:42PM

                                                              148

EXHIBIT 3  PAGE 133

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that so we're all looking at the same thing?

2         MS. ANDERSON:   Sure.   I'll ask another

3    question while we're waiting.

4         Q.   Did you ever have any communications with

5    Carter Bryant on the subject of whether or not he      02:43PM

6    did any kind of creative work on his own time even

7    during his period of employment at Mattel?

8         A.   No.

9         Q.   Did you have any communications with anyone

10   else on the subject of whether or not Carter Bryant    02:43PM

11   did creative work on his own time even during the

12   period of time that he was employed by Mattel?

13        A.   No.

14        Q.   Setting aside conversations you had with

15   Mattel's lawyers, did you ever have any                02:43PM

16   communications with anyone about the subject of

17   whether or not Carter Bryant did any work for any

18   Mattel competitor during the period of time that he

19   was an employee of Mattel?

20        A.   No.                                          02:43PM

21        Q.   Did any of the other designers that you ever

22   worked with while you were at Mattel ever report to

23   you that they had done creative work on their own

24   time?

25        MR. COREY:   Objection:   vague and ambiguous. 02:44PM

                                                                149

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          THE WITNESS:  Can you be more specific or

2    rephrase it?

3    BY MS. ANDERSON:

4       Q.   I'll give you an example which maybe will

5    help explain.  Did any designer ever come to you and      02:44PM

6    say, "Hey, on my own time this weekend I did this

7    following creative piece of work"?  That would be an

8    example.  So I'll repeat the question now.

9          Did any of the other designers that you've

10   worked with while you were at Mattel ever report to      02:44PM

11   you that they had done creative work on their own

12   time?

13         MR. COREY:  Same objection.

14         THE WITNESS:  So when you say during my time

15   at Mattel, during any of the ten years that I've         02:45PM

16   worked at Mattel?

17   BY MS. ANDERSON:

18      Q.   Yeah.  Has that ever happened?

19      A.   Yes.

20      Q.   On how many occasions?                           02:45PM

21      A.   Very little -- very few.

22      Q.   Could you put a number to it?  Estimate it?

23      A.   Three, four times maybe.

24      Q.   Do you recall who came to you to tell you

25   that?

                                                              02:45PM

                                                              150

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   They -- when these occasions happened, it
2  wasn't as if someone sought me out to say, "Hey, I
3  did this on the side," so I wanted to clarify that
4  they did not, in fact, come to me to report that.
5    Q.   Okay.                                    02:45PM
6    A.   I remember being in the cube of Lori Sipos
7  who also worked in Collector Design -- I think she
8  was a visual designer -- and saw photographs of
9  beautiful puppets that she had made and she told me
10  that it was a hobby of hers on the side.          02:46PM
11    Q.   The puppets or the photos?
12    A.   The puppets.  She made puppets.  That was
13  her hobby.
14    Q.   How do you spell Sipos?
15    A.   S-i-p-o-s.                               02:46PM
16    Q.   And when did this conversation occur?
17    A.   I don't know exactly but probably at some
18  point during the five years I worked on Collector so
19  at some point between 1997 and 2002.
20    Q.   And who else do you recall telling you that  02:46PM
21  they had done some creative work on their own time?
22    A.   Robert had shared with me a sketch and a
23  photograph of a dress he designed for his sister for
24  her wedding.
25    Q.   Is that Robert Best?
                                                   02:47PM
                                                      151

EXHIBIT 3  PAGE 136

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Yes.

2    Q.   And when did that communication occur?

3    A.   I think it was around 2000 or 2001.  And he

4 later decided to use the dress that he designed for

5 his sister as a dress on a collector doll and we          02:47PM

6 named the doll after his sister.

7    Q.   What was the doll called?

8    A.   Marie Therese.  I think her real name is

9 Teresa.

10   Q.   What other occasions do you recall someone      02:48PM

11 coming to you to tell you they had done creative

12 work on their own time?

13   A.   I've had probably a couple of co-workers who

14 knit or have other -- or make jewelry that they

15 would show their jewelry or stuff they had knitted    02:48PM

16 or crocheted.

17   Q.   Do you remember their names?

18   A.   I mean, there's a handful of people.  I knit

19 personally, too, so some of us would share with each

20 other the stuff we had been working on.  I have        02:48PM

21 somebody who reports to me now who has reported to

22 me for the last year and a half who makes jewelry

23 and she shows that to us.

24   Q.   What's her name?

25   A.   Her name is Jennifer Baca.  And I also have    02:48PM

152

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    an employee that I mentioned earlier, Lindsey

2    Hollingsworth, who made jewelry that she would show

3    to us.

4        Q.    Is there anybody at Mattel that you

5    understand you're supposed to report this kind of          02:49PM

6    information to concerning creative work done on the

7    side while employed at Mattel?

8            MR. COREY:   Objection:   speculation and

9    compound?

10           THE WITNESS:   My understanding of Mattel          02:49PM

11   policy is that you should probably make somebody

12   aware if you're going to actually make money off of

13   something, but the people that I've referenced

14   were -- had hobbies.

15   BY MS. ANDERSON:
                                                                02:49PM
16       Q.    Who is it that you believe you're supposed

17   to tell if you're going to make money off something

18   creative that you did on your own time while

19   employed at Mattel?

20           MR. COREY:   Objection:   speculation.             02:50PM

21           THE WITNESS:   It's my understanding that if

22   I wanted to do something else that I would profit

23   off of while I was employed by Mattel that I should

24   probably check with HR or Legal or my supervisor to

25   make sure there was no conflict of interest.               02:50PM

                                                                153

EXHIBIT 3  PAGE 138

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. ANDERSON:

2        Q.   Are you aware as to whether or not any of

3    the people that you identified before actually made

4    any money off of any of the creative work that they

5    did on the side?                              02:50PM

6            MR. COREY:  Objection:  speculation.

7            THE WITNESS:  I don't know.

8    BY MS. ANDERSON:

9        Q.   Did you ask them?

10       A.   I remember asking Lori specifically on the   02:50PM

11   puppets because I was so impressed by how amazing

12   they were if she sold them and I remember her

13   telling me that it was just a hobby.

14       Q.   Of the people that you identified -- Lori

15   Sipos, Robert Best, Jennifer Baca and Lindsey    02:51PM

16   Hollingsworth -- did any of those people report to

17   you?

18       A.   Yes.

19       Q.   Which ones reported to you?

20       A.   Lindsey reported to me when I was still in   02:51PM

21   Barbie Marketing probably around 2004 and 2005 or

22   maybe 2005, and Jennifer Baca has been reporting to

23   me since approximately May of '06.

24       Q.   Is it correct to say that you did not report

25   any of these people to anyone else for having      02:52PM

154

EXHIBIT 3 PAGE 139

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  potentially violated any kind of conflict of

2  interest rules relating to Mattel?

3       MR. COREY:  Objection:  assumes facts,

4  mischaracterizes her testimony.

5       THE WITNESS:  Can you rephrase?          02:52PM

6  BY MS. ANDERSON:

7    Q.   I'm happy to rephrase it.

8         The four people that we just listed --

9    A.   Uh-huh.

10   Q.   -- do you believe they were doing anything   02:52PM

11 wrong with respect to this side creative work that

12 they showed you?

13      MR. COREY:  Objection:  speculation and

14 potentially legal conclusion.

15      THE WITNESS:  What I was aware of were      02:52PM

16 people's hobbies that had nothing to do with Mattel

17 therefore I didn't even think they were anything

18 beyond hobbies.

19 BY MS. ANDERSON:

20   Q.   Did you think there was anything wrong with  02:52PM

21 what they were doing?

22      MR. COREY:  Same objection.

23      THE WITNESS:  I knit when I'm not at work so

24 if somebody else chooses to make jewelry or knit

25 when they're not at work, I think that it's okay to   02:53PM

155

EXHIBIT 3  PAGE 140

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    have a pastime or a hobby.

2    BY MS. ANDERSON:

3        Q.   So you didn't find there to be anything

4    wrong with what they were doing; is that correct?

5        A.   That's correct.                                    02:53PM

6             MR. COREY:   Same objections.

7             You need to give me a chance to make an

8    objection before you answer the question.

9    BY MS. ANDERSON:

10       Q.   Did you ever see any of the jewelry that     02:53PM

11   Jennifer Baca or Lindsey Hollingsworth made?

12       A.   Yes.

13       Q.   Did they bring it in to work to show you?

14       A.   Each of them have given me a gift that they

15   made.                                                       02:53PM

16       Q.   Do you still have those pieces of jewelry?

17       A.   Yes.

18       Q.   Are they necklaces or bracelets?  What are

19   they?

20       A.   Lindsey made this for me which is a chain    02:53PM

21   that has garnets on it and it holds my Medic Alert

22   tag.

23            And for my birthday this year Jennifer made

24   me a necklace that I'm not wearing.

25       Q.   Did you ever ask Jennifer Baca or Lindsey    02:54PM

                                                                 156

EXHIBIT 3 PAGE 141

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  Hollingsworth if they were selling any of their

2  jewelry?

3      A.   I've asked Jennifer if she's ever sold her

4  jewelry.

5      Q.   And what did she say?                        02:54PM

6      A.   That she -- it's a hobby; that she likes to

7  make presents for people.

8      Q.   Did she say that she never sold her jewelry?

9      MR. COREY:  Objection: asked and answered.

10     THE WITNESS:  I remember specifically asking  02:54PM

11  her when she gave me my necklace -- when she made me

12  the necklace I said, "Oh, this is so beautiful.  You

13  know, you're really talented."  And I think I may

14  have asked her if she's -- or if she does it

15  frequently and I think she said she likes to make   02:54PM

16  presents for people but I don't know that I've ever

17  asked like "Do you sell your jewelry?"

18  BY MS. ANDERSON:

19     Q.   Did you ever ask that question of Lindsey

20  Hollingsworth?
                                                        02:55PM
21     A.   No.

22     Q.   Okay.

23     MR. COREY:  We've been going over an hour.

24  Do you want to take a break --

25     MS. ANDERSON:  Okay, let me just ask one        02:55PM

                                                        157

EXHIBIT __3__ PAGE 142

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   question and I'll wrap that up and then we can

2   break.

3       Q.   Are you aware of any written document that

4   you've ever seen that lays out what you believe to

5   be Mattel's policy about what one can and cannot do      02:55PM

6   in one's free time as a Mattel employee?

7       MR. COREY:   Objection:   calls for

8   speculation and lacks foundation.

9       THE WITNESS:   My understanding of Mattel

10  policy is that if you are unclear as to what you         02:55PM

11  should or shouldn't be doing that you should check

12  with somebody.

13  BY MS. ANDERSON:

14      Q.   But are you aware of any written documents

15  that advise employees about what they are and are

16  not permitted to engage in on their free time?           02:56PM

17      MR. COREY:   Same objection.

18      THE WITNESS:   My understanding is that

19  Mattel's guidelines are specific to what you're

20  doing while you're at Mattel.   I'm not sure about        02:56PM

21  like free time.   I'm not -- you know, I really don't

22  know about that.

23  BY MS. ANDERSON:

24      Q.   And did you ever have to sign any kind of

25  written employment agreements in connection with         02:56PM

                                                              158

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    your job at Mattel?

2        A.    Yes.

3        Q.    Did you have like a non-disclosure agreement

4    you had to sign?

5        A.    Yes.

02:56PM

6        Q.    A confidentiality agreement?

7        A.    Yes.

8        Q.    Is it one document that you've had to sign?

9        A.    I've -- over the course of the ten years

10   I've been employed by Mattel I believe I've signed a   02:56PM

11   handful of documents.

12       Q.    And did you sign an inventions agreement?

13       A.    It doesn't sound familiar to me.

14       Q.    You remember a confidentiality agreement but

15   you don't remember an inventions agreement?   02:57PM

16       A.    That's correct.

17       Q.    Did you sign a Conflict of Interest

18   Questionnaire?

19       A.    Yes.

20       Q.    Did you sign a few of them?   02:57PM

21       A.    I think that I signed -- I don't know if it

22   was a few.  I think it was maybe a couple.  I don't

23   know if it was -- what the exact number if I signed

24   it -- signed two, signed three.  I really don't

25   remember the exact number.

02:57PM

159

EXHIBIT 3  PAGE 144    Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    MS. ANDERSON:  All right, let's take a
2  break.
3    VIDEO OPERATOR:  This is the end of tape 2
4  of Volume 1 of the deposition of Jill Nordquist.
5  We're off the record at 2:57 p.m.                02:57PM
6         (Brief recess.)
7    VIDEO OPERATOR:  We're back on the record at
8  3:12 p.m.  This is the beginning of tape 3 of Volume
9  1 of a 30(b)(6) videotaped deposition of Jill
10  Nordquist in the matter of Mattel, Inc. versus      03:13PM
11  Carter Bryant, et al.
12  BY MS. ANDERSON:
13    Q.   Now that we have some copies, let's go back
14  to your drawing just so that I can make sure that I
15  understand the drawing.                             03:13PM
16         We're looking at Exhibit 543 and you've
17  drawn sort of a general layout.  Is this a room in
18  the Design Center?
19    A.   It's an area within the Design Center.
20    Q.   So it's like an area in a very large floor   03:13PM
21  of the Design Center?
22    A.   Yes.
23    Q.   And the working table in the middle of the
24  picture, is that the working table where you would
25  have some of these meetings with Carter in the open  03:13PM

160

EXHIBIT 7 PAGE 145         Veritext National Deposition & Litigation Services
                                    866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    area you described?

2        A.    Correct.

3        Q.    Carter's cube you have as you look at the

4    page on the bottom left.  Do you see that?

5        A.    Correct.
                                                    03:13PM
6        Q.    And right next to that was another cube?

7        A.    Correct.

8        Q.    But you don't remember who was sitting

9    there?

10       A.    Correct.
                                                    03:13PM
11       Q.    And above that you wrote "Robert's cube."

12   Do you see that?

13       A.    Yes.

14       Q.    Is that Robert Best?

15       A.    Yes.
                                                    03:14PM
16       Q.    And to the right of Robert's cube is Nini's

17   cube?

18       A.    Yes.

19       Q.    What is the full name of Nini?

20       A.    I think her last name is Tun.
                                                    03:14PM
21       Q.    Do you know how to spell that?

22       A.    I think it's T-u-n.

23            MR. COREY:  Is that N-i-n-i or N-i-m-i?

24            THE WITNESS:  N-i-n-i.

25   /   /   /
                                                    03:14PM
                                                      161

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. ANDERSON:

2        Q.    Do you recall what her job was at the time

3    of September 2000?

4        A.    She was Robert's -- Robert Best's sample

5    maker.                                              03:14PM

6        Q.    And I see you wrote three cubes next to that

7    and above it you wrote "Heather and Mina sat

8    somewhere in here;" is that right?

9        A.    Correct.

10       Q.    Heather and Mina are some of the designers    03:14PM

11   you listed earlier today, correct?

12       A.    Correct.

13       Q.    Below that sort of in the middle right-hand

14   side of the page it has "Sharon's cube."

15       A.    Correct.                                   03:15PM

16       Q.    What's Sharon's last name?

17       A.    Zuckerman.

18       Q.    Below that is "Katiana's cube," right?

19       A.    Yes.

20       Q.    And that's one of the other designers you    03:15PM

21   already identified, right?

22       A.    Yes.

23       Q.    And below that is an empty cube.  Do you

24   remember whether anyone was sitting there?

25       A.    I don't remember if someone was sitting      03:15PM

                                                            162

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    there at that time.

2        Q.   At the bottom of the page you have written

3    "Mariposa."  What is that supposed to indicate?

4        A.   Jon had asked for me to identify for you the

5    direction north, south, east, west.  Mariposa is the      03:15PM

6    street that runs west to east from El Segundo down

7    into the Mattel campus.

8        Q.   And "Penny" and "Hoi" you have written above

9    there.

10       A.   Correct.
                                                              03:15PM
11       Q.   Who are those folks?

12       A.   I don't know what their exact titles were.

13   They supported Design with sample making and

14   development duties.

15       Q.   Do you remember their last names?
                                                              03:16PM
16       A.   I believe Penny's last name is Jung which

17   was J-u-n-g, I believe, and Hoi Hoffman.

18       Q.   How, if at all, did this layout differ in

19   January of 1999 in the Design Center?

20       A.   To the best of my recollection some of the      03:16PM

21   people may not have necessarily been on the

22   Collector Design team so some of these cubes may

23   have been filled by other individuals or may have

24   been vacant.

25       Q.   Do you remember what the layout of this area    03:16PM

                                                              163

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    was like in January of 1999?

2        A.    The basic layout was the same but in terms

3    of the exact individuals....

4        Q.    Do you remember where Carter Bryant was

5    located in terms of cubes in January of 1999?          03:17PM

6        A.    No.

7        Q.    Do you know when he first started to sit in

8    this cube that's here on the bottom left of your

9    picture as you've drawn?

10       A.    No.
                                                            03:17PM

11       Q.    Do you remember any Mattel employees who sat

12   near to Carter Bryant in the Design Center who are

13   not already identified on Exhibit 543 at any time?

14       A.    The only time that I knew where Carter's

15   cube was was during this time in question when I       03:17PM

16   actually had reason to go visit him in his cube.

17   There are other people who sat in the Collector area

18   that supported Collector like project administrators

19   and development people.

20       Q.    You said that the only time you knew where    03:18PM

21   Carter's cube was was during the time when you had

22   reason to go visit him in his cube.  When was that

23   time that that first started that you started to

24   visit him in his cube?

25       A.    When we were -- when he was officially in      03:18PM

                                                            164

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Collector Design and when we started working on

2    projects together.

3         Q.   And do you remember when that was?

4         A.   I don't remember exactly.

5         Q.   Could you give me your best recollection?    03:18PM

6         A.   Well, I went out on maternity at some point

7    near the end of January of '99 and gave birth in

8    February of '99 and probably returned to work at

9    some point in March of '99 so it would be sometime

10   after March or April.

                                                            03:19PM

11        Q.   And at that point this was the layout as you

12   best recall it as described on Exhibit 543?

13        A.   No, this is as I remember it closer to his

14   departure.

15        Q.   Do you have a recollection of Carter Bryant    03:19PM

16   sitting in some other cube location different than

17   the cube location you have identified on Exhibit

18   543?

19        A.   In the time that I worked with him I only

20   remember him sitting near the working table.

                                                            03:19PM

21        Q.   Do you have a recollection of other people

22   who sat near Carter's cube earlier than September of

23   2000 but who aren't depicted on Exhibit 543?

24             MR. COREY:  Objection:  vague and ambiguous.

25             THE WITNESS:  I'm not clear on the question.  03:19PM

                                                            165

EXHIBIT 7  PAGE 150

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. ANDERSON:

2       Q.   Well, I'm trying to assess whether you

3    remember anyone else sitting near Carter Bryant in

4    maybe an earlier time frame than September 2000 but

5    who aren't depicted on here because as of September      03:20PM

6    of 2000 they no longer sat near him.  So with that

7    preface I'll ask my question.

8            Do you recall anybody else who sat near

9    Carter Bryant who is not depicted on Exhibit 543 but

10   who sat near him at an earlier time frame than         03:20PM

11   September 2000?

12           MR. COREY:  Objection:  vague and ambiguous.

13           THE WITNESS:  I don't know.

14   BY MS. ANDERSON:

15      Q.   You don't remember as you sit here?           03:20PM

16      A.   My recollection is -- is closer to the time

17   that he left.

18      Q.   And the person where it says "Name Unknown"

19   next to Carter's cube, do you recall whether that

20   was the person that you understood to be Carter's      03:20PM

21   sample maker?

22      A.   I don't know if it was Carter's sample

23   maker.  It was -- I think it was a sample maker.  I

24   don't recall who -- which sample maker supported

25   everyone with the exception of Nini.                   03:21PM

                                                              166

EXHIBIT  3  PAGE 151

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Did you ever see in the history of your

2    employment with Mattel any copies of any agreements

3    that Carter Bryant signed?

4    A.    No.

5    Q.    Did you ever participate in any kind of          03:21PM

6    personnel review regarding Carter Bryant?

7    A.    No.

8    Q.    Setting aside general conversations you

9    might have had about whether and how you were going

10   to roll out the Grand Entrance doll after Carter          03:22PM

11   left Mattel, did you have any discussions with

12   anyone else about Carter Bryant's departure from

13   Mattel?  And I exclude from my questions

14   conversations you had exclusively with Mattel

15   lawyers, okay?                                             03:22PM

16   A.    So are you asking -- I'm sorry, so if you

17   can just repeat the question.

18   Q.    Sure.  Setting aside conversations with

19   Mattel's lawyers, setting aside the sort of general

20   conversations you described earlier that you had          03:22PM

21   over whether and when and how you were going to roll

22   out the Grand Entrance doll when Carter had already

23   left Mattel, did you have any other discussions with

24   anyone else about Carter Bryant leaving Mattel after

25   Carter had actually departed Mattel's employment?         03:23PM

                                                               167

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. COREY:  Objection:  asked and answered.

2          THE WITNESS:  I don't -- I don't recall.

3          (Exhibit 417 previously marked.)

4    BY MS. ANDERSON:

5          Q.   I'm going to show you something that's          03:23PM

6    already been marked in this case as Exhibit 417 and

7    it looks dauntingly large but I'm not going to ask

8    you about much that's in here.  So I'm showing you a

9    copy of Exhibit 417 which is Mattel's objections and

10   responses to certain interrogatories that we served     03:23PM

11   in this case.

12         A.   Uh-huh.

13         Q.   And I'll represent to you this is a document

14   we received from Mattel's lawyers.  If I could draw

15   your attention to a page that is actually page 39       03:24PM

16   but for some reason it doesn't say 39 on the page so

17   you'll have to find page 40 to be able to find page

18   39.

19         MR. COREY:  That's very odd.

20         MS. ANDERSON:  It's very strange.               03:24PM

21         THE WITNESS:  I see it.

22         Q.   Interrogatory No. 10, do you see where

23   that -- it says interrogatory 10 at the top there.

24         A.   Yes.

25         Q.   And interrogatory 10 asks "State all facts   03:24PM

                                                             168

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   knew what they were.

2   BY MS. ANDERSON:

3       Q.   And you don't have any personal knowledge of

4   contractual obligations that he signed onto as a

5   Mattel employee, correct?                          03:35PM

6       A.   I do not.

7       Q.   Are you aware of any non-contractual duties

8   or obligations that Mr. Bryant had during his

9   employment at Mattel?

10          MR. COREY:  Calls for a legal conclusion.    03:35PM

11          THE WITNESS:  I don't know anything about

12   his employment circumstances or contracts.

13   BY MS. ANDERSON:

14       Q.   Are you aware of anything that Mr. Bryant

15   did or didn't do in the course of his work at Mattel  03:35PM

16   that you thought was improper?

17          MR. COREY:  Hold on just a second.

18          THE WITNESS:  I thought it was improper that

19   he lied to me when he left when he denied going to a

20   competitor when he, in fact, was going to a

21   competitor.                                         03:36PM

22   BY MS. ANDERSON:

23       Q.   Is there anything else besides that that you

24   believe was something that Mr. Bryant did that was

25   improper during the course of his employment at     03:36PM

                                                        178

EXHIBIT 3 PAGE 154

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Mattel?

2        A.    Not that I was made aware of.

3        Q.    What kind of -- strike that.

4            Did Mr. Bryant have access to any kind of

5    confidential or proprietary information while he was    03:36PM

6    at Mattel?

7        A.    Yes.

8        Q.    What kind of confidential or proprietary

9    information do you have knowledge that Mr. Bryant

10   was given access to while he was employed at Mattel?    03:36PM

11       A.    Everything that we worked on was

12   confidential.  Our entire doll line, I mean, it was

13   our livelihood, how we made our revenue so our doll

14   line was confidential.

15           He also sat in the Design Center which is a    03:37PM

16   highly-confidential area and had access to the

17   entire lay of the land of the Design Center.

18       Q.    Do you have any knowledge as you sit here

19   today of Mr. Bryant having done anything improper

20   with respect to any confidential information that    03:37PM

21   Mr. Bryant had access to while he was at Mattel?

22           MR. COREY:  Objection:  calls for a legal

23   conclusion and vague and ambiguous.

24           THE WITNESS:  The only improper confidential

25   information that I was aware of was when he lied to    03:37PM

179

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    me about where he was going after.  That's all I

2    know about.

3    BY MS. ANDERSON:

4        Q.   Do you have an opinion as you sit here today

5    as to Mr. Bryant's reputation for honesty?          03:38PM

6        A.   I have an opinion based on my own betrayal

7    by Carter in that he lied to me when I confronted

8    him directly on where he was going.

9        Q.   What is your opinion about Mr. Bryant's

10   character in regard to truthfulness?                03:38PM

11       A.   Prior to him lying to me about where he was

12   going I had no -- that -- that was never a question.

13       Q.   Meaning you had no reason to question his

14   character for truthfulness prior to that time?

15       A.   Meaning I never really had anything specific 03:39PM

16   as it related to truth -- what was true versus what

17   was false.

18       Q.   And what is your opinion today about

19   Mr. Bryant's character for truthfulness?

20       A.   Well, he lied to me so I would not consider  03:39PM

21   him the most forthright or honest person.

22       Q.   And is the basis for that opinion the

23   conversation that you had with Carter Bryant in his

24   cubicle about his resignation from Mattel?

25       A.   Yes, specifically to when I asked him if he  03:39PM

                                                           180

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    was going to a competitive doll company.

2        Q.    Do you have any other basis for your opinion

3    besides that communication?

4        A.    No.

5        Q.    Do you have any knowledge about the --      03:40PM

6    strike that.

7            Do you have any knowledge about Mr. Bryant's

8    reputation for truthfulness in the community?

9        A.    In what community?

10       Q.    In any community.                           03:40PM

11       A.    No.

12           MS. ANDERSON:   Let me check my notes for one

13    minute and I'll be done, okay?

14       Q.    You said earlier that you signed a number of

15    different iterations of employment agreements since   03:40PM

16    you've been at Mattel; is that right?

17       A.    That's correct.

18       Q.    When was the last time you signed an

19    employment agreement for your employment at Mattel?

20           MR. COREY:   Objection:   mischaracterizes her 03:41PM

21    testimony.

22           THE WITNESS:   I think the most recent

23    document that we were asked to sign was in May or

24    June so one to two months ago.  Well, we're almost

25    in August so it was either May or June.  Within the   03:41PM

181

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    last few months.

2    BY MS. ANDERSON:

3        Q.    Do you recall whether you were asked to sign

4    a new one in the year 2000?

5        A.    I don't remember exact --                    03:41PM

6        Q.    Do you recall what years you signed the

7    revised employment agreements?

8            MR. COREY:  Objection:  mischaracterizes her

9    testimony.

10            THE WITNESS:  I remember that every time      03:41PM

11    that I've been asked to sign a confidentiality

12    agreement or code of conduct agreement that I signed

13    it.

14            (Exhibit 389 previously marked.)

15   BY MS. ANDERSON:                                       03:41PM

16       Q.    I'm going to show you one document.  I'm

17   going to show you what has been marked as Exhibit

18   389 to another deposition in this case and my only

19   question to you will be to ask you to sort of review

20   this exhibit and tell me if you recognize whether    03:42PM

21   you were asked to sign any of these forms of

22   agreements over the course of your tenure at Mattel.

23   I'll represent to you that this is a collection of

24   different forms of employee agreements at Mattel

25   that was produced by Mattel's lawyers to us in this   03:42PM

                                                           182

EXHIBIT 2  PAGE 158

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. ANDERSON:

2      Q.   Did you ever meet someone named Richard

3   Irmen, I-r-m-e-n?

4      A.   Offhand I don't know.

5      Q.   Did you ever come to be introduced to Carter   03:46PM

6   Bryant's significant other at any point in time?

7      A.   No.

8      Q.   And as you sit here today, do you recall

9   what specific work Carter Bryant worked on in the

10  last two weeks he was at Mattel?                        03:47PM

11     A.   No.

12        MS. ANDERSON:   Subject to any possible

13  follow-up I'm done.  Shall we go off the record so

14  we can switch positions?

15        VIDEO OPERATOR:   Off the record at 3:47.   03:47PM

16           (Brief recess.)

17        VIDEO OPERATOR:   The time is 3:56 p.m.  We

18  are back on the record.

19

20           FURTHER EXAMINATION                    03:56PM

21  BY MS. TORRES:

22     Q.   Good afternoon, Ms. Nordquist.  I represent

23  MGA and I have some questions that I'd like to ask

24  you that pertain particularly to MGA but I have a

25  couple quick follow-ups on Carter Bryant.        03:56PM

                                                     185

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1         When did you first learn that Carter Bryant

2    was involved in any way with Bratz?

3         A.    Around the time that Bratz launched in I

4    think it was the summer of 2001 when I -- I think

5    when we first learned about the launch of Bratz I        03:57PM

6    heard from people in the Design Center that Carter

7    was working there.

8         Q.    More than one person?

9         A.    Yes.

10        Q.    Do you remember who?

                                                              03:57PM

11        A.    I don't.

12        Q.    Do you remember what anybody said?

13        A.    I just remember people saying that he was

14   working at MGA on Bratz.

15        Q.    Do you recall -- was it a -- scratch that.    03:57PM

16        Do you remember what people's sentiments

17   were?  Were they happy for him?  Were they not happy

18   for him?  Anything about what they were -- what

19   their sentiments were with respect to his working at

20   MGA on Bratz?

                                                              03:58PM

21        A.    I don't remember exact sentiments of other

22   people.  I just remember my own unhappiness that he

23   had lied to me less than a year prior.

24        Q.    Do you remember people expressing surprise?

25        A.    I think people were surprised based on the   03:58PM

                                                              186

EXHIBIT 7  PAGE 160

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    fact that he had said he was going to be spending a

2    lot of time in Asia and that he wasn't going to a

3    competitor and yet he was working just up the 405.

4        Q.    Aren't most toys -- don't most toy companies

5    in America manufacture their products in Asia?        03:58PM

6            MR. COREY:  Objection:  speculation.

7            THE WITNESS:  I know where Mattel

8    manufactures its toys.

9    BY MS. TORRES:

10       Q.    And that's in Asia?

11       A.    Yes.                                         03:58PM

12       Q.    Do you think it was -- in your view was it

13   fairly well known in the summer of 2001 after --

14   when Bratz first launched that Carter was involved

15   with Bratz?                                            03:59PM

16           MR. COREY:  Objection:  speculation, vague

17   and ambiguous.

18           THE WITNESS:  I don't think it was widely

19   known.

20   BY MS. TORRES:

21       Q.    Why do you say that?                         03:59PM

22       A.    I think the only reason I had learned was

23   because someone had mentioned it to me because they

24   knew him because I had worked with him the year

25   prior.                                                 03:59PM

                                                            187

EXHIBIT  7  PAGE 161

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Did you then tell anybody else that you had

2  learned that Carter was involved with Bratz around

3  the time of its launch?

4           MR. COREY:  Objection:  mischaracterizes her

5  testimony.                                        03:59PM

6           THE WITNESS:  At the immediate launch of --

7  of Bratz I'm not sure in relation to when it hit the

8  market to when I learned that he was working at MGA

9  on Bratz.  I know that at some point within the time

10 frame of it being out on the market I had mentioned  04:00PM

11 to the -- to Ann Parducci when I saw her carrying a

12 Bratz doll one day that I said, "Oh, you realize

13 that's what Carter is working on now?"

14 BY MS. TORRES:

15      Q.   Did Ms. Parducci respond to you in any way?  04:00PM

16      A.   Yes, she was surprised.

17      Q.   What did she say?

18      A.   She looked surprised and she said something

19 to the effect of "Really?"

20      Q.   Was she carrying a Bratz doll at work?     04:00PM

21      A.   Yes.

22      Q.   Do you know why she was carrying a Bratz

23 doll at work?

24      A.   It's my understanding that she went out to

25 retail and purchased one.                           04:01PM

                                                         188

EXHIBIT 3  PAGE 162

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   As part of her job?

2      A.   I don't know what --

3           MR. COREY:  Calls for speculation.

4  BY MS. TORRES:

5      Q.   Was it your understanding that she went out    04:01PM

6  to retail and purchased one as part of what I

7  understand to be called competitive shopping?

8           MR. COREY:  Objection:  calls for

9  speculation.

10          THE WITNESS:  I don't know under what guise    04:01PM

11 she was purchasing a Bratz doll.

12 BY MS. TORRES:

13     Q.   Yes.  So you don't know whether she was just

14 purchasing it because she liked it or for work?

15     A.   That's correct.
                                                           04:01PM
16     Q.   Did Ms. Parducci say anything else to you at

17 that time?

18     A.   No.

19     Q.   Did you have any conversations at or around

20 that time with anyone other than Ms. Parducci about    04:01PM

21 the fact that Carter Bryant was working on Bratz?

22     A.   I don't remember the exact time frame but I

23 definitely did make contact with Kitty Hammons, the

24 person who had been with me at the time that I first

25 spoke with Carter about his leaving, because I was     04:02PM

                                                               189

EXHIBIT 3  PAGE 163

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  shocked and felt betrayed that he had gone to a

2  competitor despite saying he wasn't and that here

3  was his product in the marketplace.

4      Q.   And do you recall your conversation with

5  Ms. Hammons?                                          04:02PM

6      A.   I just recall telling her that there was a

7  new doll line out and that Carter had worked on

8  it -- or was working on it and was at this other

9  company.

10      Q.   Do you remember Ms. Hammons' response?      04:02PM

11      A.   I don't remember the exact -- the exact

12  words but I think the sentiment was similar to my

13  own of being surprised.

14      Q.   Do you recall anything else about that

15  conversation?                                         04:02PM

16      A.   No.

17      Q.   Did you have any other conversations at or

18  around the time Bratz first launched with anyone

19  about the fact that Carter Bryant was working on

20  Bratz?                                                04:03PM

21      MR. COREY:  Objection: mischaracterizes her

22  testimony.

23      THE WITNESS:  The only conversations that I

24  remember were with Kitty because we both had worked

25  directly with Carter and then when I saw Ann         04:03PM

                                                          190

EXHIBIT 3  PAGE 164

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   carrying the doll and letting her know that it was

2   Carter's.

3   BY MS. TORRES:

4      Q.   Since that time -- at any point since that

5   time have you had discussions with anyone other than   04:03PM

6   counsel for Mattel about the fact that Carter was

7   working on Bratz?

8      A.   Since -- I don't remember specific

9   conversations.  Over the last few years since it's

10  been in the news I know people have asked me if I   04:04PM

11  know anything about it but I haven't spoken to

12  anybody because obviously it's a pretty sensitive

13  matter.

14     Q.   Do you recall talking to anybody even

15  generally about the fact that Carter Bryant was

16  working on the Bratz dolls at any time prior to the   04:04PM

17  lawsuit in this case?

18        MR. COREY:  Objection:  vague and ambiguous.

19        THE WITNESS:  I'm not sure I understand the

20  time frame.   04:04PM

21  BY MS. TORRES:

22     Q.   Do you -- well, at some point in time you

23  became aware that there was a lawsuit between Carter

24  Bryant and Mattel, correct?

25     A.   Correct.   04:04PM

191

EXHIBIT 2  PAGE 165

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Do you recall when you first learned that?

2    A.   No, I don't.

3    Q.   Do you recall seeing a press release by

4    Mattel about the lawsuit?

5    A.   Yes.                                      04:04PM

6    Q.   Do you recall when you saw it?

7    A.   No.

8    Q.   When you saw the press release issued by

9    Mattel about the lawsuit, is it your understanding

10   that the lawsuit had just -- had just been        04:05PM

11   initiated?

12   A.   I -- I remember reading the press release.

13   I don't remember that much in terms of specifics, in

14   terms of how much time had elapsed.

15   Q.   Do you think it was within a matter of days? 04:05PM

16       MR. COREY:  Objection:  calls for

17   speculation.

18       THE WITNESS:  I don't know.

19   BY MS. TORRES:

20   Q.   Well, let me ask you this.  Did you first   04:05PM

21   hear about the lawsuit more than a year ago?

22   A.   Yes.

23   Q.   Did you first hear about it more than two

24   years ago?

25   A.   I think it was around two years ago         04:05PM

                                                      192

EXHIBIT 7 PAGE 166

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. TORRES:

2        Q.   Diva Starz are electronic dolls, correct?

3        A.   Yes.

4        Q.   Or at the time they were launched.

5        A.   Yes.

                                                    04:10PM

6        Q.   And their clothing was plastic, correct?

7        A.   Correct.

8        Q.   And their feet were large because they

9    contained batteries, correct?

10       A.   I don't know why they were -- I thought that 04:10PM

11   was the aesthetic; that they had big feet so they

12   could stand.  I don't know -- I didn't -- I don't

13   know where the batteries were housed.

14       Q.   And the dolls talked, correct?

15       A.   Yes.

                                                    04:10PM

16       Q.   When you looked at the -- when you first saw

17   a Bratz doll and thought to yourself that there were

18   similarities between the Bratz doll and Diva Starz,

19   did you believe that the Bratz dolls were in any way

20   copied from Diva Starz?

                                                    04:11PM

21       A.   Yes.  I thought they looked like they were a

22   knockoff of Diva Starz.

23       Q.   Did you report that to anybody?

24       A.   I believe I said it out loud but I did not

25   formally report it.

                                                    04:11PM

                                                       196

EXHIBIT 3  PAGE 167

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Have you ever reported -- well, have you

2    ever thought that some Mattel product had been

3    copied or knocked off in any way other than Diva

4    Starz?

5    A.    Yes.                                            04:12PM

6    Q.    What product was that?

7    A.    A product that was manufactured by Simba in

8    Europe.

9    Q.    And did you report that to anybody?

10    A.    Yes.                                           04:12PM

11    Q.    Who did you report it to?

12    A.    Michael Moore.

13    Q.    Why did you report it to Mr. Moore?

14    A.    Because we have IP policies that are in

15    place that instruct us to report any wrongdoings or   04:12PM

16    anything we think violates our intellectual

17    property.

18    Q.    And so when you believe there's been a

19    wrongdoing or a violation of your intellectual

20    property you follow Mattel's policies and report it   04:12PM

21    to its in-house counsel, correct?

22    A.    Yes.

23    Q.    You mentioned earlier that you recall

24    sending E-mails to Carter Bryant.  Did you use

25    E-mail frequently in the 1999, 2000 time period?      04:13PM

197

EXHIBIT 3 PAGE 168

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.    Yes.

2     Q.    Have you used it frequently since that time?

3     A.    Yes.

4     Q.    Increasingly so?

5     A.    Yes.                                          04:13PM

6     Q.    Since -- well, since you've been at Mattel

7     do you -- have you had a practice of storing or

8     retaining E-mail?

9     A.    Yes.

10    Q.    What's your practice?

11    A.    My personal practice?                         04:13PM

12    Q.    Yes.

13    A.    I have my in box and I have folders that --

14    that I've named based on projects that I work on and

15    I file things from my in box in those folders if I   04:14PM

16    feel that -- or, you know, I file them based on

17    whatever the subject matter is.

18    Q.    And they're divided typically by project?

19    A.    Typically.

20    Q.    Do you also store E-mails that you send in    04:14PM

21    those folders?

22    A.    Yes.

23    Q.    Or is it just --

24    A.    Not as frequently but, yes, I do -- I do

25    store mail.                                         04:14PM

                                                          198

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Do you know whether those folders are on

2    your hard drive or are they folders stored on the

3    network?

4         MR. COREY:  Objection:  calls for

5    speculation.
                                                04:14PM

6         THE WITNESS:  I don't.  I'm not a tech

7    queen, I'm sorry.

8    BY MS. TORRES:

9    Q.    Did you create your own folders?

10   A.    Yes.
                                                04:15PM

11   Q.    How did you create them?

12   A.    I think they're called local folders.  Right

13   click, add folder, rename, like that kind of thing.

14        MR. COREY:  See, you are a tech queen.

15   BY MS. TORRES:
                                                04:15PM

16   Q.    Do you know -- well, when it asks you for

17   the name, does it also indicate to you what drive

18   it's going to be filed -- saved on?

19   A.    I don't think so.  I don't know.

20   Q.    Do you store any documents on -- on any      04:15PM

21   network server at Mattel?

22        MR. COREY:  Objection:  vague and ambiguous.

23        THE WITNESS:  Yeah, can you specify what

24   network is?

25   /   /   /
                                                04:15PM
                                                199

EXHIBIT 3 PAGE 170

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. TORRES:

2       Q.   You have a desktop or a laptop, correct?

3       A.   Correct.

4       Q.   Which is it, a laptop?

5       A.   Right now I have a laptop.                    04:15PM

6       Q.   If you're not at work and your laptop isn't

7   plugged into the Internet, you -- do you have

8   documents that you've stored on your own computer?

9       A.   Yes.

10      Q.   And that's on your computer's hard drive?   04:16PM

11      A.   Yes.

12      Q.   When you are at work in the office and your

13  laptop is hooked up, are there documents that are

14  not stored on your own computer or on your own

15  laptop?                                              04:16PM

16          MR. COREY:   Her documents?

17  BY MS. TORRES:

18      Q.   Yes, that you can access.

19      A.   Like in a common place?

20      Q.   Yes.                                         04:16PM

21      A.   And are you saying specifically to them

22  being like my documents or just any documents that I

23  access?

24      Q.   First, any documents.

25      A.   Yes, there are certain places where I access 04:16PM

200

EXHIBIT �257 PAGE 171

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    documents of a shared or common nature.

2        Q.   What type of documents are those?

3        A.   Well, those documents are still within --

4    the shared drives are specific or exclusive to a

5    group of people.                                04:17PM

6            MR. COREY:  And I'll object belatedly vague

7    as to time.

8    BY MS. TORRES:

9        Q.   Has that always been the case since you've

10   been at Mattel?                                 04:17PM

11       A.   Yes.

12       Q.   That there are shared drives that are

13   specific or exclusive to a group of people.

14       A.   Yes.

15       Q.   And what drives do you have access to?   04:17PM

16           MR. COREY:  Again, vague as to time.

17           THE WITNESS:  What drives do I have access

18   to right now?

19   BY MS. TORRES:

20       Q.   Yeah.

21       A.   There's a shared drive that the Consumer   04:17PM

22   Products group has access to which is a group of

23   people I work with and I have another private drive

24   that just a handful of us have access to.

25       Q.   And was there a shared drive that you had   04:18PM

201

EXHIBIT _3_ PAGE 172

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   access to when you were in -- when you were I think

2   it was Director, but I could be wrong, of Marketing

3   for Barbie?

4       A.   Yes.

5       Q.   Prior to joining the Consumer Products          04:18PM

6   group, you did exclusively marketing for Barbie and

7   Barbie Collectibles, correct?

8       A.   I had -- when I first got to Mattel I worked

9   the first five years on Collector and then after

10  that moved into International and Main Line           04:18PM

11  Domestic.

12      Q.   When you were in -- when you did marketing

13  for the Collectors group --

14      A.   Yes.

15      Q.   -- did you have -- was there a shared drive   04:18PM

16  that you had access to?

17      A.   Yes.

18      Q.   And did you also have a private drive?

19      A.   Yes.

20      Q.   Who had -- do you know who had access to      04:19PM

21  those drives?

22      A.   Yes.

23      Q.   Who?

24      A.   My private drive me and the shared drive was

25  just the Collector group.                             04:19PM

                                                          202

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.    And that included the Design team?

2       A.    No.

3       Q.    Just Marketing?

4       A.    Yes.

5       Q.    Did you have access to the -- to the -- let    04:19PM

6    me ask you this.

7             Did the Collector -- the design people in

8    Collectors have access to any server that you also

9    had access to?

10      A.    No.                                            04:19PM

11      Q.    Do you recall what -- well, did the server

12   that you had access to when you were doing marketing

13   for Collectors have a name?

14            MR. COREY:  Objection:  vague and ambiguous.

15   Do you mean server or shared drive?  You switched --   04:20PM

16   you switched subjects.

17   BY MS. TORRES:

18      Q.    Fair enough.  Did you refer to the shared

19   drive at that time by a name or a letter or anything

20   like that?                                             04:20PM

21      A.    Yes.

22      Q.    What did you refer to it as?

23      A.    We referred to it as the G drive but

24   everybody at Mattel has their own version of what

25   the G drive is.  I think that's where IT just         04:20PM

203

EXHIBIT 3  PAGE 174

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    automatically puts a group but my G drive wouldn't

2    necessarily be the same as your G drive.

3        Q.    Have you ever heard of something called the

4    Zeus server?

5        A.    Yes.                                          04:20PM

6        Q.    What is that?

7        A.    It is a place where Packaging and Design

8    have assets stored that are of a design-related

9    nature.

10       Q.    Did you have access to the Zeus server?      04:21PM

11       A.    When?

12            MR. COREY:  Vague as to time.

13   BY MS. TORRES:

14       Q.    When you were in Barbie Collectibles.

15       A.    No.                                           04:21PM

16       Q.    Did you have access to -- have you had

17   access to the Zeus server at any time?

18       A.    Yes.

19       Q.    When?

20       A.    I had access to Zeus when I was in           04:21PM

21   International so that I could provide packaging

22   assets and verify packaging assets for

23   multi-language packaging for our international

24   subsidiaries, and I have access to it right now in

25   my capacity as a Consumer Products person who has to  04:21PM

                                                             204

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    access logos and other assets for my licensees.

2        Q.   Your understanding that access -- well, are

3    there shared drives on the Zeus server as well?

4            MR. COREY:  Objection:  calls for

5    speculation.                                    04:22PM

6            THE WITNESS:  I don't know if I understand.

7    BY MS. TORRES:

8        Q.   You can go in and -- you can go currently

9    and access assets on the Zeus server, correct?

10       A.   Yes.                                   04:22PM

11       Q.   And those are assets that somebody else may

12   have put on the Zeus server, correct?

13       A.   Correct.

14       Q.   So in that respect you have access to at

15   least part of the Zeus server that is shared with   04:22PM

16   others?

17       A.   Yes.

18       Q.   Can anyone access the Zeus server at Mattel?

19       A.   No.

20       Q.   Are there criteria by which it is determined 04:22PM

21   who can access what on the Zeus server?

22       A.   Yes.

23       Q.   What is your understanding of those

24   criteria?

25           MR. COREY:  Objection:  speculation.    04:22PM

205

EXHIBIT 7  PAGE 176

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     THE WITNESS:  My understanding with regard

2   to -- in regards to access to shared drives is that

3   you have to fill out paperwork that gets signed by

4   your supervisor and includes justification as to why

5   you need it to fulfill your work duties.          04:23PM

6   BY MS. TORRES:

7     Q.   And once you're given access to the Zeus

8   server can you access anything or just projects that

9   you're working on?

10     MR. COREY:  Objection:  speculation.          04:23PM

11     THE WITNESS:  I don't know.

12   BY MS. TORRES:

13     Q.   Can you access anything on the Zeus server

14   right now?

15     A.   I don't know.                            04:23PM

16     Q.   You don't know because you've never tried?

17     A.   I've only accessed things that are relevant

18   to my job.

19     Q.   Have you ever heard from anyone that access

20   to -- certain access on the Zeus server is          04:24PM

21   restricted?

22     A.   I don't know.

23     Q.   You just don't know one way or the other?

24     A.   Yeah, I don't know.

25     Q.   Did you retain -- did you retain E-mails in  04:24PM

                                                          206

EXHIBIT 3 PAGE 177

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   folders -- strike that.

2          Have you retained your folders from projects

3   that you worked on back in 1999 and 2000?

4      A.   No.

5      Q.   What happened to them?                    04:25PM

6      A.   When I moved onto -- each time I moved to a

7   different business I would have those folders

8   transferred to the next person who was going to take

9   on my old role.

10     Q.   Was that typically the practice at Mattel or 04:25PM

11  was that just your practice?

12         MR. COREY:  Objection:  speculation.

13         THE WITNESS:  I don't know how other people

14  transitioned their job responsibilities.

15  BY MS. TORRES:                                    04:25PM

16     Q.   Did anyone ever tell you that that was the

17  appropriate thing to do?

18     A.   I don't -- I don't know.

19     Q.   Who took your place in Barbie Collectors

20  when you transferred to International?            04:25PM

21     A.   They brought in an outside person by the

22  name of Deanna Kangas.

23     Q.   Is Ms. Kangas still at Mattel?

24     A.   No.

25     Q.   Do you know who took her position?       04:26PM

                                                      207

EXHIBIT 3   PAGE 178

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    Elizabeth Grampp.

2      Q.    Is Ms. Grampp still at Mattel?

3      A.    Yes, she is.

4      Q.    Is she still in that position?

5      A.    Yes, she is.                              04:26PM

6      Q.    Do you know whether Ms. Grampp still has

7  your old E-mail files?

8            MR. COREY:   Objection:   speculation.

9            THE WITNESS:   I don't know.

10  BY MS. TORRES:                                     04:26PM

11     Q.    And each time you changed positions at

12  Mattel did you follow the same practice of

13  transferring your E-mail folders to the person

14  taking your job?

15     A.    Yes.                                      04:26PM

16     Q.    Who took your job when you left

17  International?

18     A.    Jeff Ackerman.

19     Q.    Is Mr. Ackerman still in that position?

20     A.    No, he's not.                             04:27PM

21     Q.    Do you know who has -- who took over for

22  Mr. Ackerman?

23     A.    I don't remember offhand.

24     Q.    Do you know who has that position now?

25     A.    I know who's in International Barbie      04:27PM

                                                       208

EXHIBIT 3  PAGE 179

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Marketing but I don't believe there's somebody at

2    the exact same title and level.

3         Q.   Who's in International Marketing now?

4         A.   The VP of International -- I'm not sure if

5    it's specific to Barbie or all of Girls -- is a          04:27PM

6    gentleman by the name of Andres Amezquita and he has

7    a couple of people that report in to him.

8         Q.   I have no doubt that you will have to spell

9    that for the court reporter.

10        A.   Okay.                                           04:27PM

11        Q.   Who took your position in Domestic Marketing

12   for Barbie?

13        A.   It was divided across -- between two people.

14        Q.   Who are those people?

15        A.   Sarah Buzby and Simon Waldron.                  04:28PM

16        Q.   Is Ms. Buzby still at Mattel?

17        A.   Yes, she is.

18        Q.   And is she still in that position?

19        A.   I'm not sure if it's the exact same position

20   but there are elements thereof that remain the same.     04:28PM

21        Q.   And Mr. Wallen I believe you said?

22        A.   Waldron.

23        Q.   Is he still at Mattel?

24        A.   Yes.

25        Q.   Is he still in the same position?              04:28PM

                                                                    209

EXHIBIT 3 PAGE 180

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     A.   No.
 2     Q.   Where is he?
 3     A.   To the best of my knowledge he's in Hot
 4  Wheels Marketing.
 5     Q.   Do you know who took his position?      04:29PM
 6     A.   Yes, Lori Pantell.
 7     Q.   And is she still in that position?
 8     A.   Yes.
 9     Q.   Did you split your folders when you left
10  Barbie Marketing between Ms. Buzby and Mr. Waldron?  04:29PM
11     A.   Yes.
12     Q.   You testified earlier that you had reviewed
13  a document that you signed in this case in
14  connection with your deposition prep, correct?
15         MR. COREY:  Objection:  mischaracterizes her 04:30PM
16  testimony.
17  BY MS. TORRES:
18     Q.   Let me ask you then the open-ended question.
19  Did you review a document that you signed in this
20  case in connection with your deposition prep?  04:30PM
21     A.   Yes.
22     Q.   Do you know why you signed it, signed that
23  document?
24         If we're referring to the one regarding
25  Mariana Trueba --                             04:30PM
                                                    210
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Yes.

 2      A.   -- yes, I know why I signed it.

 3      Q.   Why did you sign it?

 4      A.   Because just prior to her leaving Mattel she

 5   asked me for confidential information.              04:30PM

 6      Q.   What confidential information did she ask

 7   you for?

 8      A.   She asked me for the -- I believe it was the

 9

10                                                       04:31PM

11

12                    REDACTED

13

14

15                                                       04:31PM

16

17

18

19                    REDACTED

20                                                       04:31PM

21

22

23

24

25      Q.   At that time did it include the My Scene    04:32PM
                                                             211
```

EXHIBIT 3  PAGE 182

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    head of International and I also had mentioned it to

2    a -- someone who worked for me who had previously

3    also worked in International.

4         Q.   And who was that?

5         A.   Vivianne Waisman.                          04:44PM

6         Q.   Did you actually mention to Therese Wilbur

7    that Ms. Trueba had asked you for a copy of this

8    report?

9         A.   I'm not sure -- at some point I did.  I'm

10   not sure if I told her that day or -- or later.      04:44PM

11        Q.   What did you tell her?  Just that Ms. Trueba

12   had asked for it?

13        A.   Yes.

14        Q.   Did Ms. Wilbur say anything in response?

15        A.   I don't remember.                          04:44PM

16        Q.   What about -- do you remember anything about

17   your conversation with Ms. Waisman?

18        A.   Yes.

19        Q.   What do you remember?

20        A.   I remember that we discussed Mariana's      04:45PM

21   request for information after we learned that she

22   had left Mattel and gone to MGA because we had both

23   been asked for confidential information.

24        Q.   Had Ms. Waisman also been asked by

25   Ms. Trueba?                                          04:45PM

219

EXHIBIT 3  PAGE 183

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    Yes.  I don't know about what specifically

2  but she had been contacted.

3      Q.    And you learned this after Ms. Trueba had

4  been -- had left Mattel?

5      A.    Yes.                                    04:45PM

6      Q.    Did you discuss Ms. Trueba's request with

7  anybody other than Ms. Waisman or Ms. Wilbur?

8      A.    With counsel.

9      Q.    Was your conversation with counsel at about

10  the same time as your conversation with Ms. Waisman?  04:46PM

11      A.    My conversation with Ms. Waisman is what

12  prompted me to inform Michael Moore that I was --

13          MR. COREY:  Don't disclose any

14  communications that you had with Mr. Moore.  You can

15  say that you had a conversation with him.          04:46PM

16          THE WITNESS:  Okay.

17          MR. COREY:  But the substance of the

18  communications are out of bounds.

19          THE WITNESS:  Okay.

20  BY MS. TORRES:                                    04:46PM

21      Q.    And this was at or about the time Ms. Trueba

22  left Mattel?

23      A.    Yes.

24      Q.    Has anyone ever asked you to retain

25  documents for purposes of this litigation?        04:47PM

                                                        220

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    Which litigation?

2    Q.    Let's talk about the first litigation, the

3   one against Carter Bryant.  Did anyone ask you to

4   retain documents for that litigation?

5    A.    I don't recall if I was asked specifically    04:47PM

6   related to Carter.

7    Q.    Do you recall being asked to retain

8   documents at a later point in time?  For example,

9   when MGA filed its suit against Mattel.

10    A.    I remember being asked to retain documents    04:47PM

11   over the course of the last several years.

12    Q.    Who asked you to retain documents?

13    A.    I believe an E-mail went out or -- I don't

14   know if it was an E-mail or if it was a memo went

15   out requesting that E-mails pertaining to certain    04:48PM

16   matters be retained.

17    Q.    Do you know what matters -- do you recall

18   what matters those were?

19    A.    I don't remember all of them.  I think it

20   was related -- I don't know exactly.    04:48PM

21    Q.    Do you recall it being related to the -- the

22   copycatting issues that you referenced when

23   Ms. Anderson was questioning you at the beginning of

24   the day today?

25        MR. COREY:  Objection:  asked and    04:48PM

221

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    answered -- excuse me, objection:  calls for

2    speculation.

3            THE WITNESS:  I believe it was in reference

4    to retaining documents that included ones pertaining

5    to the copycatting, but I'm not sure if it was          04:49PM

6    exclusive to those documents.

7    BY MS. TORRES:

8        Q.   And that was the first time that you were

9    asked to retain documents for purposes of these

10   litigations?                                            04:49PM

11           MR. COREY:  Objection:  mischaracterizes her

12   testimony.

13           THE WITNESS:  I don't -- I don't know.

14   BY MS. TORRES:

15       Q.   Is that the first time you recall?             04:49PM

16       A.   I believe it's the first time I recall.

17       Q.   Has anyone ever asked you to turn over

18   documents for purposes of any of these litigations?

19       A.   Yes.

20       Q.   And when was that?                             04:49PM

21       A.   In the last two to three years.

22       Q.   And did you do that?

23       A.   Yes.

24       Q.   Did you personally review your own files?

25           MR. COREY:  Objection:  vague and ambiguous. 04:50PM

222

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. TORRES:

2        Q.   For purposes of turning over documents did

3    you review files?

4        A.   Yes.

5        Q.   You personally as opposed to an assistant?    04:50PM

6        A.   Oh, yes, of course.

7        Q.   Did you review your E-mail folders?

8        A.   Yes.

9        Q.   And what types of documents did you review

10   your E-mail folders for?                               04:50PM

11       A.   Anything pertaining to certain brands or

12   subject matters that were needed.

13       Q.   Do you recall what brands or subject matters

14   those were?

15       A.   Wee 3 Friends.                                04:51PM

16       Q.   Anything else?

17       A.   I'm not sure.

18       Q.   When you say you're not sure, do you mean

19   you don't remember?

20       A.   I don't remember.                             04:51PM

21       Q.   Do you recall whether or not you turned over

22   any documents or E-mails rather relating to My

23   Scene?

24       A.   I don't remember.

25       Q.   You don't remember doing so or you don't     04:51PM

                                                            223

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    remember whether or not you did so?

2        A.    I'm sorry, ask that again.

3        Q.    You don't remember and therefore you don't

4    believe you did turn over -- review and turn over

5    E-mails relating to My Scene or you don't remember          04:52PM

6    whether you did or not so it's possible you did and

7    it's possible you didn't?

8            MR. COREY:  Objection:  vague and ambiguous.

9            THE WITNESS:  I don't remember if I was

10   asked for E-mails specifically related to My Scene          04:52PM

11   and so I wouldn't know.  I don't know.

12   BY MS. TORRES:

13       Q.    So you don't -- because you don't remember

14   whether you were asked you don't remember whether,

15   in fact, you did turn over E-mails relating to My           04:52PM

16   Scene?

17       A.    Correct.

18       Q.    Do you have a belief one way or the other as

19   to whether or not you turned over E-mails relating

20   to My Scene?                                                04:52PM

21       A.    I don't.

22       Q.    Do you have any estimate as to how many

23   E-mails you send in a day?

24           MR. COREY:  Objection:  vague as to time.

25           THE WITNESS:  During what period of time?        04:53PM

                                                                224

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MS. TORRES:

 2        Q.    Currently.

 3        A.    Oh, currently?  One hundred maybe.

 4        Q.    Did you -- is that approximately the same

 5    number of E-mails you sent three years ago?          04:53PM

 6        A.    No.

 7        Q.    Do you have any estimate as to how many

 8    E-mails you sent about three years ago?

 9        A.    It could have been more.

10        Q.    It could have been more?                    04:53PM

11        A.    Absolutely.

12        Q.    Why do you say that?

13        A.    My current role is limited to specific

14    categories and specific people with whom I work.  In

15    years prior when I worked on the doll side I also     04:53PM

16    had interaction with people at locations outside of

17    the Mattel building but that were also employed by

18    Mattel.

19        Q.    So therefore you needed to communicate with

20    them by E-mail more than you currently do?  Let me    04:53PM

21    rephrase that.

22              So is it fair to say that in 2004 your need

23    to communicate with people by E-mail was greater

24    than it is today?

25        A.    There was a need to have more E-mail        04:54PM

                                                            225
```

EXHIBIT 2  PAGE 189

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    communication based on people being on different

2    time zones and in other countries.

3        Q.    Is that true for in 2002 as well?

4        A.    2002 would be even more so because my job

5    was in International.                                    04:54PM

6        Q.    Do you have any estimate as to how many

7    E-mails you sent in 2002?  Would it have been double

8    what you send today?

9        A.    It could have been.

10       Q.    And do you know how many E-mails you        04:54PM

11   received in 2002?

12       A.    On a daily basis?

13       Q.    Yes.

14       A.    It could be as many as 300.

15       Q.    Okay.  Is it possible that you sent as many 04:54PM

16   as 300 in 2002 per day?

17       A.    No.

18       Q.    It could have been 200, probably wasn't 300?

19       A.    Correct, it was -- there was no way I could

20   have responded to every single E-mail.                  04:55PM

21       Q.    And what about in 2000?  Do you have any

22   estimate as to how many E-mails you sent in the year

23   2000?

24       A.    It would have been less.

25       Q.    Less than it is today or less than it was in 04:55PM

226

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  2002?

2      A.    Less than in 2002.

3      Q.    Approximately the same amount as today or

4  more?

5      A.    I don't know, maybe around the same as          04:55PM

6  today, a little bit more maybe in 2000.

7      Q.    Did you -- did you receive -- in 2000 did

8  you receive approximately the same amount of E-mails

9  as you do today?

10      A.    In 2000 since I was working with the doll     04:56PM

11  team and all the functional areas it may have been

12  more than today.

13      Q.    How many do you receive today?

14      A.    On a daily basis?

15      Q.    On a daily basis, yeah.                        04:57PM

16      A.    My guess is around 100.

17      Q.    So you send and receive about 100 today?

18      A.    That's my best guess.

19           MR. COREY:   You send 100 and receive 100?

20           MS. TORRES:   Yes.                              04:57PM

21      Q.    And when you were doing marketing for Barbie

22  Collectibles, did you frequently communicate with

23  the Design team by E-mail?

24      A.    Well, "design" is kind of vague.

25      Q.    Designers -- designers.                        04:57PM

227

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    Designers specifically?  Some, yes.

2    Q.    And I think you testified earlier that

3  Carter Bryant was among those you sent E-mails to.

4    A.    That I sent to, yes.

5    Q.    When you moved from the Barbie Collectibles  04:58PM

6  group to -- to International, had the My Scene line

7  been launched?

8    A.    I'm not sure of the exact date.

9    Q.    Do you recall that the My Scene line was

10  launched in late 2002?                            04:58PM

11   A.    Yes.

12   Q.    Do you recall being on the core team for My

13  Scene at that time?

14       MR. COREY:  Objection:  vague and ambiguous.

15       MS. TORRES:  Let me rephrase it.            04:59PM

16   Q.    Do you recall a My Scene task force?

17   A.    Yes.

18   Q.    What was that?

19   A.    It was a group of people from different

20  areas that worked on different aspects of the My   04:59PM

21  Scene product line.

22   Q.    And that task force was formed before My

23  Scene was launched?

24       MR. COREY:  Objection:  speculation.

25       THE WITNESS:  I don't know the exact timing  04:59PM

                                                         228

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of when it was launched.

2    BY MS. TORRES:

3        Q.    Was -- what was the purpose of the task

4    force?

5            MR. COREY:  Same objection.                    04:59PM

6            THE WITNESS:  I was a part of the task force

7    when I came back from maternity leave in June of

8    2002.  I'm not sure when it was formed prior to my

9    coming back or what its original purpose was.

10   BY MS. TORRES:                                          05:00PM

11       Q.    And so as of June 2002 the My Scene dolls

12   had not yet been launched, correct?

13       A.    I don't believe so.  I'm not sure of the

14   exact date.

15       Q.    Do you recall the purpose of the task force   05:00PM

16   when you joined it in June of 2002?

17           MR. COREY:  Objection:  calls for

18   speculation.

19           THE WITNESS:  I remember my purpose on the

20   task force.

                                                             05:00PM

21   BY MS. TORRES:

22       Q.    Okay.  What was your purpose?

23       A.    To represent International.

24       Q.    In what way?

25       A.    To launch My Scene in our international       05:00PM

                                                             229