CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    It was a collaboration.  Predominantly I

2  designed the logo and Steve Linker did the

3  illustrations.

4    Q.    And you said it was a distorted font.  What

5  is the underlying font?                          12:03PM

6    A.    I knew you were going to ask me what the

7  name of this font was.  I'm sorry, I do not

8  remember.  I'm sitting here because I knew that was

9  coming.

10   Q.    Whatever the name of the font is is it      12:03PM

11  correct that you started with a

12  commercially-available font?

13   A.    Yes.

14   Q.    And then you distorted it in some way?

15   A.    I started with a font that Mattel owned and  12:04PM

16  distorted it.

17   Q.    When you say "a font that Mattel owned,"

18  what do you mean?

19   A.    I mean that we can only use fonts that

20  Mattel has purchased to use on our products.       12:04PM

21   Q.    So you've licensed -- you've licensed this

22  font for use from someone; is that correct?

23        MR. ZELLER:  The question is vague, calls

24  for a legal conclusion.

25        THE WITNESS:  This font was in our archive   12:04PM

79

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   that was available to me.  Where it came from, I

2   knew that I was allowed to use it.

3   BY MR. PAGE:

4        Q.   I see.  Do you have any knowledge as to

5   whether this was, A, a font that was created at          12:04PM

6   Mattel, B, a font that was created by someone else

7   and purchased for exclusive use by Mattel or, C, a

8   font that was created by someone else that Mattel is

9   among the people who can use it?

10       A.   I have no idea where this font came from.     12:04PM

11       Q.   You just know that it's in the book of fonts

12  you can use?

13       A.   Correct.

14       Q.   In what way did you modify this font, if at

15  all?                                                     12:05PM

16       A.   The font was pulled for depth to create the

17  three-dimensional look and rounded and I'm sure I

18  tweaked it in other little artist ways.

19       Q.   So the font originally was a two-dimensional

20  font?                                                    12:05PM

21       A.   Correct.

22       Q.   And to the extent it's slightly rounded and

23  wrapped you did that?

24       A.   Yes, we did.

25       Q.   And otherwise it's using the font that was    12:05PM

80

EXHIBIT 4   PAGE 262

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    available to you?

2          MR. ZELLER:  Mischaracterizes the witness'

3    testimony.

4          THE WITNESS:  Correct.

5    BY MR. PAGE:                                    12:05PM

6       Q.   You also said earlier that the look of the

7    doll -- strike that.

8          When you first looked at the Bratz doll, you

9    said that the look of the doll was similar to Diva

10   Starz; is that correct?                         12:06PM

11      A.   I believe I said that when I looked at it it

12   had some similarities, yes.

13      Q.   What similarities did you recognize at the

14   time?

15      A.   The immediate similarities that come to mind 12:06PM

16   were it had a big head and big feet.

17      Q.   Anything else?

18      A.   Without seeing the two dolls together I

19   couldn't tell you what.

20      Q.   I'm just asking what you remember noticing 12:07PM

21   then, not what you would list if you looked at them

22   today.  .

23      A.   The two that came -- that immediately come

24   to recollection are big head, big feet.

25      Q.   Did you think at the time you saw a Bratz   12:07PM

81

EXHIBIT _4_ PAGE 263    text National Deposition & Litigation Services
                             213 623-5005

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that the Bratz doll looked similar to any other

 2    Mattel product or just Diva Starz?

 3        A.   That's pretty general because we do a lot of

 4    dolls.

 5        Q.   I'm asking you what you thought at the time. 12:07PM

 6    Did you go, gosh, that also looks like Barbie or a

 7    Hot Wheels or any other Mattel product or were you

 8    struck solely by its similarity to Diva Starz?

 9        A.   My recollection I would say because I

10    specifically worked on Diva Starz that I focused on   12:07PM

11    Diva Starz.

12        Q.   My question was a little more general than

13    that.  Did you at the time think that Bratz had

14    similarities to any other Mattel product?

15        A.   I don't recall thinking about another        12:08PM

16    product.

17        Q.   Did you do anything to bring -- strike that.

18             When you looked at Bratz and went, "Wow,

19    they knocked us off," did you tell anybody other

20    than the people who were standing around you at the   12:08PM

21    time?

22        A.   I discussed it with my manager, Sue Davis.

23        Q.   Tell me about that discussion.

24        A.   We showed her the package.

25        Q.   When you say "we," who do you mean?          12:08PM
```
                                                              82

EXHIBIT 4 PAGE 264

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     A.    It was probably Cesar and myself.
 2     Q.    When you showed her the package, what did
 3  you say?
 4     A.    "They knocked us off."
 5     Q.    Anything more than that?              12:08PM
 6     A.    I don't remember the whole conversation.
 7     Q.    Do you recall any -- do you know whether Sue
 8  Davis brought that concern to anyone else's
 9  attention?
10     A.    I know that she intended to.           12:09PM
11     Q.    How do you know that?
12     A.    Because that's what she told me.
13     Q.    What did she say?
14     A.    She said, "I'm going to take this to Kelly."
15     Q.    Do you remember anything specific?  Do you  12:09PM
16  know whether she, in fact, took this to Kelly?
17     A.    I don't know what Sue Davis did.
18     Q.    Do you have any information beyond that
19  conversation as to what Sue Davis did?
20     A.    I know that it was taken to a higher level.  12:09PM
21  To whom it was taken, I don't.
22     Q.    How do you know it was taken to a higher
23  level?
24     A.    Because I was told it was.
25     Q.    And who told you that?                 12:09PM
                                                        83
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    It was discussed, I'm sure, in a team

2    meeting.

3      Q.    Do you know who told you that?

4      A.    I could not recall.

5      Q.    Did you ever do any work on Tune Teens?      12:10PM

6      A.    No, I did not.

7      Q.    Are you familiar with the Tune Teens project

8    at all?

9      A.    The only information I had about Tune Teens

10   was when I was asked about it yesterday.             12:10PM

11     Q.    That's the part you're not supposed to tell

12   me.

13     A.    Sorry.

14     Q.    Quite all right.  Do you know when you saw

15   the Bratz doll for the first time?                   12:10PM

16     A.    I believe I answered earlier that it would

17   have been sometime mid -- late summer, early fall.

18     Q.    Of?

19     A.    Of, what, '99.

20     Q.    Did I ask the wrong question?                12:10PM

21     A.    I apologize.

22     Q.    I meant Bratz.

23     A.    And I said Diva Starz.  I apologize.  I saw

24   it when it was brought in from being purchased after

25   we had already released Bratz or Diva Starz.  Now    12:11PM

84

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      I'm confused.

2             MR. ZELLER:   Evidence of confusion right

3      here.

4      BY MR. PAGE:

5         Q.   I'll represent to you that Bratz was        12:11PM

6      released in 2001.

7         A.   Okay.

8         Q.   When you first saw the Bratz doll, do you

9      know when you first saw it?

10        A.   I don't know when I first saw it.          12:11PM

11        Q.   Do you know what season?

12        A.   I don't.

13        Q.   Do you have an impression as to whether it

14     was a brand-new product or not at the time you saw

15     it?                                                 12:11PM

16        A.   I believe it was a brand-new product at the

17     time.

18        Q.   Had you ever heard it mentioned before you

19     saw it?

20        A.   I don't believe I had ever heard Bratz     12:11PM

21     mentioned before I saw it.

22        Q.   So as best you know it was shortly after

23     Bratz was first released to the public?

24        A.   To my knowledge it would be shortly after it

25     was released to the public.                        12:12PM
```

85

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.    When you say "probably," do you mean to the

2    extent it used elements that had been previously

3    used with Diva Starz or did you do new art for the

4    Fashion Diva Starz packaging?

5       A.    I believe that I scanned fabric to work on        12:14PM

6    the outer carton and then replicated it.

7       Q.    What do you mean scanned fabric?  You

8    literally put it on a scanner?

9       A.    Correct, literally put a piece of fabric on

10   a scanner.                                                  12:14PM

11      Q.    I see.  So that the artwork would match the

12   fabric?

13      A.    Correct.

14      Q.    Were you involved at all in the design of

15   the Fashion Diva Starz?                                     12:14PM

16      A.    The design of the package?

17      Q.    No, the design of the doll.

18      A.    No, I am the package designer at that time.

19      Q.    Was the first time you became aware of the

20   Fashion Diva Starz project when it was presented to         12:15PM

21   you as something that was ready to have packaging

22   done for it?

23      A.    Yes, to the best of my recollection.

24      Q.    And when was that to the best of your

25   recollection?  I know that's hard.                          12:15PM

                                                                     87

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. ZELLER:  And this is outside the scope

2     of the designation just for the record.

3          THE WITNESS:  To give a time line, it would

4     have been the large doll Diva Starz, the Mini Diva

5     Starz and then the Fashion Diva Starz.          12:15PM

6     BY MR. PAGE:

7          Q.   How long after the release of the Mini Diva

8     Starz were the Fashion Diva Starz released?

9          A.   I don't know actual length of time.  I know

10    that the Fashion Diva Starz I want to say were our    12:15PM

11    third -- if I remember correctly, were in the third

12    wave of Diva Starz that we did.

13         Q.   When you say "third wave," what do you mean?

14    What's the first wave?

15         A.   The first wave is the large dolls and then   12:15PM

16    the Minis.

17         Q.   When you say then "the Minis," are you

18    referring --

19         A.   The Mini Diva Starz.

20         Q.   Are you saying they were also in the first   12:16PM

21    wave?

22         A.   They were not -- I did not work on the Mini

23    Diva Starz simultaneously with the large electronic

24    Diva Starz.

25         Q.   I see.  You're talking in terms of sequence  12:16PM

88

EXHIBIT 4 PAGE 269

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of when you worked on things?

2         A.   Correct.

3         Q.   Were the large -- the first Diva Starz, the

4    large dolls, and Mini Diva Starz first released in

5    the same season, the same year, let's put it that       12:16PM

6    way?

7              MR. ZELLER:  When you say "released" here,

8    you're talking about on shelf?

9              MR. PAGE:  Yeah, on shelf.

10             THE WITNESS:  You know, that's difficult       12:16PM

11   because I don't remember ship dates.  Dates are not

12   my -- as you I'm sure have realized, dates are not

13   my strong suit.

14             MR. PAGE:  What's your anniversary?

15             THE WITNESS:  Same as my husband's birthday. 12:16PM

16             MR. PAGE:  Two with one stone.  Brilliant.

17             THE WITNESS:  The Diva Starz large dolls

18   first wave released approximately in April and I

19   know that the Minis came after that.  I'd like to

20   say they were in the first season on shelf with the     12:17PM

21   large dolls but, you know, I honestly it's a blur.

22        Q.   When you say "April," of what year?

23        A.   It must have been April of 2000.

24        Q.   And the Fashion Diva Starz, when were they

25   on shelf?                                                12:17PM

                                                              89

EXHIBIT 4 PAGE 270

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1       A.    After April of 2000.

2       Q.    How long after?

3       A.    I would say probably a year after.

4             MR. PAGE:  I'm told we need to change tape

5    so it's time for a break whether we like it or not.    12:18PM

6             VIDEO OPERATOR:  This is the end of tape 1.

7    We are off the record at 12:17 p.m.

8                  (Brief recess.)

9             VIDEO OPERATOR:  We're back on the record at

10   12:30 p.m.  This is the beginning of tape 2 of          12:30PM

11   Volume 1 of the deposition of Joni Pratte in the

12   Mattel, Incorporated versus Carter Bryant, et al.

13   BY MR. PAGE:

14      Q.    When projects are under development at

15   Mattel, prior to their release do they ever sort of     12:30PM

16   get published to the general population at Mattel in

17   any way?

18            MR. ZELLER:  Can I have the question back?

19            MR. PAGE:  It's a vague question but I'm

20   going to narrow it down.                                12:30PM

21            (The pending question was read as follows:

22              "Q.    When projects are under

23            development at Mattel, prior to

24            their release do they ever sort of

25            get published to the general                   12:30PM
                                                               90
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   this drawing that you haven't already told me?

2        A.   I know nothing about this drawing that I

3   haven't already told you.

4        Q.   If you could take a look at Exhibit 385, the

5   list of topics.  Take a look at No. 13.  Thirteen          12:51PM

6   asks for testimony concerning all acts, omissions,

7   circumstances and/or evidence showing or tending to

8   show that any product sold at any time by MGA under

9   the trade name Bratz originated from, is derived

10  from, is based on, copies, incorporates or is           12:51PM

11  substantially or confusingly similar to any design

12  or work product owned at any time by Mattel or

13  created by Bryant during the time Bryant was working

14  for Mattel.  Other than matters which we've already

15  discussed today, are you aware of any information       12:52PM

16  covered by that topic?

17       A.   I have no information on Carter Bryant.

18       Q.   This is a little broader than Carter Bryant.

19  Do you have any reason to believe that any MGA

20  product is derived from or is based on or copies or     12:52PM

21  incorporates or is substantially or confusingly

22  similar to any design or work product at any time

23  owned by Mattel other than matters you've already

24  told me about?

25            MR. ZELLER:   The question is vague since      12:52PM

                                                              104

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   it's phrased consistent with this topic which we've

2   objected to in its form.

3        THE WITNESS:  The only comment I have is

4   when I saw the Bratz package is that I thought that

5   we had been knocked off.                          12:53PM

6   BY MR. PAGE:

7     Q.   Are you aware of any facts that you haven't

8   told me about that indicate or make you believe that

9   MGA copied anything from Diva Starz in creating

10  Bratz?                                            12:53PM

11       MR. ZELLER:  The question is overbroad,

12  vague.

13       THE WITNESS:  I don't have any information

14  about MGA.  I don't know what MGA did or did not do.

15       MR. PAGE:  Why don't we let you guys get to 12:53PM

16  lunch.

17       VIDEO OPERATOR:  We're off the record at

18  12:53 p.m.

19

20       (At the hour 12:53 p.m. the luncheon

21    recess was taken.)

22

23

24

25

                                                      105

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              (At the hour of 1:56 p.m. the following

2         proceedings were had at the same place with

3         the same persons present.)

4

5              VIDEO OPERATOR:  We're back on the record at   01:55PM

6    1:56 p.m.

7

8                   EXAMINATION (CONTINUING)

9

10             (Deposition Exhibit 423 was marked        01:56PM

11        for identification and is annexed hereto.)

12   BY MR. PAGE:

13        Q.   Let me mark as Exhibit 423 -- Exhibit 423 is

14   a one-page document, M 0034342.  Have you ever seen

15   this document before?                              01:56PM

16        A.   Off the top of my head, no.

17        Q.   Do you recognize the handwriting?

18        A.   I do not recognize the handwriting.

19        Q.   Are you confident it's not yours?

20        A.   Yes.                                      01:57PM

21        Q.   I've had people say, gosh, I can't tell if

22   it's my own.

23        A.   No, I'm confident it's not mine.

24        Q.   Do you recognize any of the phrases on this

25   page as names that were suggested for Diva Starz?   01:57PM
                                                          106
```

EXHIBIT 4 PAGE 274

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. ZELLER:  Objection to the form of the
 2       question.
 3            THE WITNESS:  It's difficult to read the
 4       writing on some of these.  Girlz is a name that came
 5       up with a Z on Diva Starz, I believe, because we're        01:57PM
 6       always looking for a way to change a common word
 7       into an unusual word.
 8       BY MR. PAGE:
 9            Q.   Do you recognize anything else on this page
10       as phrases that were considered for -- phrases or          01:57PM
11       words that were considered as names for Diva Starz?
12            MR. ZELLER:  Same objection.
13            THE WITNESS:   I do recognize one or two,
14       What's Ups and Gabbalicious.  We used a lot of
15       "licious" in Diva Starz.                                   01:58PM
16       BY MR. PAGE:
17            Q.   A lot of "licious."  You can ask her how to
18       spell that.
19            So looking at this is it your expectation
20       that this is -- that this is a list or set of notes        01:58PM
21       that someone created in the course of choosing names
22       for Diva Starz?
23            MR. ZELLER:  Lacks foundation.
24            THE WITNESS:   I couldn't say that this is a
25       list of names that would be chosen for Diva Starz          01:58PM
                                                                    107
```

EXHIBIT 4 PAGE 275

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    because when I look at it it looks like a list of

2    names that could be chosen for Barbie also.

3    BY MR. PAGE:

4        Q.   Has the phrase "Chick Chats" been used --

5    been considered for a product other than Diva Starz?  01:59PM

6           MR. ZELLER:  Lacks foundation.

7           THE WITNESS:  I don't know if Chick Chats

8    has ever been considered for anything.

9    BY MR. PAGE:

10       Q.   So as you sit here today, you don't know one  01:59PM

11   way or the other whether this document was prepared

12   in relation to Diva Starz as opposed to another

13   product?

14       A.   Correct.

15           (Deposition Exhibit 424 was marked            01:59PM

16       for identification and is annexed hereto.)

17   BY MR. PAGE:

18       Q.   Let me mark as Exhibit 424 a one-page

19   document Bates-numbered M 0034359.  I apologize if

20   this has been previously marked.  I'm not sure.  Do   02:00PM

21   you recognize this document?

22       A.   I don't recognize this document

23   specifically.  I do recognize the logos.  I have

24   seen these before.

25       Q.   Where have you seen these before?           02:00PM

108

EXHIBIT __4__ PAGE 276

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    I've seen these while employed at Mattel.

2    Q.    In what context did you see these?

3    A.    In relation to Diva Starz while Maureen

4    Mullen's group was working on them.

5    Q.    Do you know who created these?              02:00PM

6    A.    They're either Liz Hogan or Steve Linker's

7    is my understanding.

8    Q.    Is this something that someone asked Steve

9    or Liz to create?

10   A.    I did not ask them.  I only know what I      02:00PM

11   asked them to create.

12   Q.    This morning you were talking about

13   instances in which designers sometimes do up a logo

14   for a name that they're pushing.  Is this one of

15   those instances?                                    02:01PM

16   A.    I don't know.  I didn't make this request.

17   Q.    Who other than you would have been making

18   requests to Steve Linker or Liz in connection with

19   Diva Starz?

20   A.    The Product Design team would have           02:01PM

21   requested -- may have requested them to do a logo

22   because they may not have had a graphic artist

23   available to them to do logos for their boards.

24   Q.    Anybody other than the Design team?

25         MR. ZELLER:  Asked and answered.             02:01PM

109

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  I -- I don't know who would
 2    have, you know.
 3            (Deposition Exhibit 425 was marked
 4        for identification and is annexed hereto.)
 5    BY MR. PAGE:                                    02:01PM
 6        Q.   We'll mark this as Exhibit 425.  Exhibit 425
 7    is a two-page document Bates No. M 0033828, I
 8    believe, and 829.  Can you tell -- have you ever
 9    seen this document before?
10        A.   I haven't seen this document.           02:02PM
11        Q.   Do you know what it is?
12        A.   I do.  It's logo explorations.
13        Q.   As near as I can tell, other than the Bates
14    numbers the two pages are identical except that
15    there's an X through the top picture on the second   02:03PM
16    page.  Just looking at the first page the top of the
17    three objects is labeled "Diva Girls Original Swatch
18    (from Joni)."  What is an original swatch?
19        A.   It's the original gradient swatch is what I
20    will assume that is for the package.             02:03PM
21        Q.   What is a gradient swatch?
22        A.   It's the background color that was used on
23    the original Diva Starz package.
24        Q.   So it's not a swatch of cloth, it's --
25        A.   It's a swatch of art.                   02:03PM
```

110

EXHIBIT 4  PAGE 278

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   The second one is labeled "Diva Girls" with

 2    an S, new swatch, but has a logo that's Diva Girlz

 3    with a Z.  Do you recall any product ever being

 4    referred to as Diva Girls either with an S or a Z?

 5             MR. ZELLER:   The question is vague as to      02:03PM

 6    "product."

 7             THE WITNESS:   There's a lot -- Mattel does a

 8    lot of products but these look like logo

 9    explorations that were done for Diva Starz.

10    BY MR. PAGE:                                            02:04PM

11        Q.   Do you recall other than looking at this any

12    consideration of Diva Girls either with a Z or S as

13    a name for Diva Starz?

14        A.   Looking at this it does jar my memory that

15    "Girlz" was possibly to be used.                        02:04PM

16        Q.   Do you know who created these logos?

17        A.   My actual guess is me.

18        Q.   The font in which -- actually, the third one

19    is labeled "George swatc."  Do you know what that

20    means?                                                  02:04PM

21        A.   I don't.  One of the things that when you

22    use a gradient that's created in Illustrator it

23    needs to be taken into Photo Shop to smooth and that

24    may have been what happened with this swatch.

25        Q.   What does George have to do with that?         02:05PM
```
111

4 PAGE 279

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1.    A.    He may have been the person that did it.

2     Q.    Who is George?

3     A.    He would have been a Photo Shop expert.

4     Q.    Is that just a guess or do you, in fact,

5     recall there being a Photo Shop expert being George?   02:05PM

6     A.    That is a guess.

7     Q.    Did you have anybody working on the

8     Packaging team for Diva Starz named George?

9     A.    Not that I remember.  We do have a George

10    that works in Packaging that may have helped me.   02:05PM

11    Q.    And that's George who?

12    A.    Fong.

13    Q.    The second -- the two -- strike that.

14          There's one logo that contains four pictures

15    of girls.  Do you know who did the artwork for those   02:05PM

16    faces?

17    A.    They look like -- in looking at this, and

18    it's not a very good copy, they look like the faces

19    that Steve Linker did.

20    Q.    There's one font in that set -- in the   02:06PM

21    middle section with the faces and then what appears

22    to be two different versions of a second font in the

23    lower one.  Are either of these the fonts that you

24    eventually used to create the Diva Starz logo?

25    A.    I believe the bottom -- the third one is the   02:06PM

112

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  best of your ability what that interview process was

2  like.

3      A.    I came to the Mattel Design Center and

4  checked in with now who I know as Sherrie and waited

5  for Chris, met with her in one of the front                02:18PM

6  conference rooms in front of the Design Center.  She

7  reviewed my portfolio, said "Thank you very much"

8  and I left.

9      Q.    When she reviewed your portfolio, did she

10  ask you anything about who owned the rights to any       02:18PM

11  of the materials you were showing her?

12      A.    I couldn't -- I couldn't tell you what she

13  asked me and what she didn't.  I reviewed each of

14  the things that I did in my portfolio with her.

15      Q.    At any time did she ask you whether you had    02:19PM

16  received permission from ESPN, for example, to be

17  showing these materials to her?

18      A.    I can't recall.

19      Q.    I take it that you later heard back from her

20  and she hired you?                                        02:19PM

21      A.    I did later hear back from her and, yes --

22  actually, she did not hire me, another manager hired

23  me.

24      Q.    I see.  Who was that other manager?

25      A.    Skip Hopkins.                                   02:19PM

121

EXHIBIT 4   PAGE 281

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    Did you have to go through a subsequent
 2   interview process with Skip Hopkins?
 3        A.    I did.
 4        Q.    Was that similar to the first one?
 5        A.    No.                                      02:19PM
 6        Q.    Describe the interview process with Skip
 7   Hopkins.
 8        A.    He didn't review my portfolio.
 9        Q.    What did he do?
10        A.    We talked, said Chris had recommended me and 02:19PM
11   would I be interested in a temporary position.
12        Q.    And?
13        A.    I said yes.
14        Q.    I assume you said yes.  Did he do
15   anything -- strike that.                            02:20PM
16              Did he review your work at all or did he
17   simply rely on Chris?
18        A.    I believe he simply relied on Chris.
19        Q.    At any point in the process did anybody ask
20   you to do any drawings or examples?                 02:20PM
21        A.    I don't believe so.
22        Q.    Have you always been an artist?
23        A.    Yes.
24              MR. ZELLER:   "Always" is a long time.
25              THE WITNESS:   Actually, yes.            02:20PM
                                                           122
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. PAGE:

 2        Q.   In what way?

 3        A.   I've always done art.

 4        Q.   Just since a kid you've always been drawing?

 5        A.   Correct.                                    02:20PM

 6        Q.   Has any of your work been -- well, that's

 7    sort of -- prior to working for the book publisher

 8    had any of your work been published in any way?

 9        A.   Yes.

10        Q.   In what way?                                02:21PM

11        A.   While I was in school at El Camino I won a

12    contest as a student designer and had a poster that

13    traveled around the country in an art show.

14        Q.   What sort of poster?

15        A.   It was a poster that was done in photo shop 02:21PM

16    that was a collection of images and drawings that I

17    did and put together.

18        Q.   Has any other of your work been published in

19    any way other than in connection with your jobs?

20        A.   Prior to Mattel?                            02:21PM

21        Q.   Yeah, prior to Mattel.

22        A.   Yes.

23        Q.   What work?

24        A.   Basketball books and soccer banners and

25    other school -- school-type related items.  I also   02:22PM
```
                                                                 123

did invitations for the American Cancer Society for some different functions.
Q. Do you continue to do -- do art outside of work?
A. Yes. 02:22PM
Q. What sorts of things?
A. While my daughters were in high school I did a magazine of the whole volleyball program, created invitations. I've created birthday party invitations, wrapping paper, basketball books, 02:22PM basketball mugs, logos.
Q. When you were doing these things like basketball books, wrapping paper, party and birthday invitations, how do you go about telling Mattel about them? 02:23PM
A. When I was doing the volleyball book that was for the high school, I actually let my manager, Sue Davis, know that I was working on this project.
Q. Why did you do that?
A. Because it's my responsibility to tell them 02:23PM if I'm doing outside art.
Q. And why is that your responsibility?
A. Because I'm an artist working for a company that I do art.
Q. So you told Sue Davis about your -- let me 02:23PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    make sure I have it right.  You told Sue Davis about
2    the volleyball book?
3       A.   Yes.
4       Q.   Did you show it to her?
5       A.   Yes.                                        02:23PM
6       Q.   Did you fill in any form to report it?
7       A.   No.
8       Q.   Have you shown her everything else you've
9    ever drawn outside of work?
10      A.   I have not shown her everything that I've    02:24PM
11   ever drawn outside of work, no.
12      Q.   Don't you think you have an obligation to?
13      A.   No, I don't believe I do have an obligation
14   to show her everything that I've ever drawn outside
15   of work.                                            02:24PM
16      Q.   How do you decide which things you need to
17   show her?  Let me put it a different way.  What made
18   the volleyball book different?
19           MR. ZELLER:  Objection:  mischaracterizes
20   the witness' testimony.                             02:24PM
21   BY MR. PAGE:
22      Q.   If you don't have an obligation to show her
23   everything you do outside of work, how is it you
24   decided that you needed to show her the volleyball
25   book?                                               02:24PM
                                                         125
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MR. ZELLER:  Mischaracterizes the witness'
2    testimony.
3    BY MR. PAGE:
4         Q.   You can answer.
5         A.   The reason that I showed her was is because  02:24PM
6    I was doing a large program and she knew that my
7    girls were playing volleyball and wanted to know
8    what I was doing so -- and I shouldn't say she
9    wanted to know what I was doing.  I had talked about
10   it so much she wanted to see it.                      02:25PM
11        Q.   It was just showing a supervisor or
12   co-worker what you were working on?
13             MR. ZELLER:  It mischaracterizes the
14   witness' testimony.
15             THE WITNESS:  No, I showed her -- I made    02:25PM
16   sure that it didn't conflict with what I was working
17   on so that they could see that it was sports
18   related, not anything that I would ever do at
19   Mattel.
20   BY MR. PAGE:                                          02:25PM
21        Q.   So you showed it to her because it was not
22   related to something you were doing at Mattel?
23             MR. ZELLER:  Mischaracterizes the witness'
24   testimony.
25             THE WITNESS:  I showed it to her so that    02:25PM
                                                           126
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    there could be no misinterpretation that I was doing

2    something that I might do at Mattel.

3    BY MR. PAGE:

4        Q.   When you were first hired at Mattel, what

5    did you do to -- if anything, to disclose to Mattel    02:25PM

6    any artwork you created prior to working at Mattel?

7            MR. ZELLER:  Objection to form, vague.

8            THE WITNESS:  I'm not -- I'm not actually

9    clear on what you -- what kind of answer you're

10   looking for.                                            02:26PM

11   BY MR. PAGE:

12       Q.   A truthful one.  When you first started

13   working at Mattel, did you go through any process of

14   disclosing to Mattel work that you had done prior to

15   Mattel?                                                 02:26PM

16       A.   I showed my portfolio.

17       Q.   Other than showing your portfolio -- I

18   assume your portfolio didn't contain every piece of

19   art you ever created.

20       A.   My portfolio does not contain every piece of  02:26PM

21   work I've ever created.

22       Q.   It was obviously the ones you picked to show

23   off what you can do, correct?

24       A.   Correct.

25       Q.   Other than showing Mattel your portfolio,     02:26PM

127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    did you do anything to disclose to Mattel work that

2    you had created prior to coming to work for Mattel?

3             MR. ZELLER:   The question is vague.

4             THE WITNESS:   It's a very difficult question

5    to answer.   I don't know that there was any reason      02:26PM

6    for me to show every piece of art I'd ever done to

7    Mattel before coming to work there.

8    BY MR. PAGE:

9        Q.   I'm not trying to imply there was.   I'm just

10   asking if you did.   If you did anything to show         02:27PM

11   Mattel work that you had done other than that which

12   was in the portfolio you brought to your interview.

13       A.   I don't believe that I showed them work

14   other than what was in the portfolio.

15       Q.   At any point since you've been employed with   02:27PM

16   Mattel have you shown them work you've created prior

17   to being employed for Mattel other than the

18   portfolio you've testified to?

19       A.   Can I repeat the question back to you to

20   make sure I understand it?                                02:27PM

21       Q.   Yeah.

22       A.   So you're asking me since I've been at

23   Mattel have I shown them anything that I did prior

24   to working for Mattel?

25       Q.   Other than the portfolio you showed in the     02:27PM

128

Veritext Nati...                                    ...ervices
EXHIBIT 4   PAGE 288

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    interview.

2        A.    You know, I don't know.  I have not

3    specifically brought any artwork in to show.

4        Q.    Let me make sure I have this right.  From

5    2004 to 2007 you were -- until two weeks ago what          02:28PM

6    was your job position?

7        A.    I'm sorry?

8        Q.    I'm forgetting the beginning of this

9    deposition.  You testified that your job changed at

10   roughly the end of 2004 until about two weeks ago.         02:28PM

11   What was your job in that period of time?

12       A.    No, the facts are incorrect there.

13       Q.    Okay.  Help me out.

14       A.    When I left -- when I was no longer a

15   Packaging designer, I became a Product Development         02:28PM

16   designer.

17       Q.    Right.

18       A.    And I am currently a Product Design manager.

19       Q.    I see.  But you've only been a manager for

20   about two weeks?                                           02:29PM

21       A.    In title, yes.

22       Q.    Does that mean in practical terms you were

23   serving in that function prior to the title?

24       A.    Yes.

25       Q.    For how long?                                    02:29PM

                                                               129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Approximately a year.

2    Q.   Is it accurate to say that you are in a

3  group that did not have a manager so you filled that

4  position sort of de facto?

5    A.   No, that is not correct.                02:29PM

6    Q.   Okay.  Who was the manager for the past

7  year?

8    A.   The manager of the group that I was in --

9  the director of the group that I was in is Catherine

10 Dimas.                                           02:29PM

11   Q.   Is there a reason why she wasn't functioning

12 as the manager?

13        MR. ZELLER:  Assumes facts not in evidence,

14 mischaracterizes the witness' testimony.

15        THE WITNESS:  I did not say she was not    02:29PM

16 functioning as a manager.

17 BY MR. PAGE:

18   Q.   Were you both functioning as manager for

19 that year?

20   A.   Yes.                                      02:29PM

21   Q.   In the course of that year in which you were

22 at least partially functioning as manager have there

23 been any instances in which any of the people in

24 your group came to you to show you work they had

25 created outside of work?                         02:30PM

                                                      130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.    No.

2     Q.    If someone in your group creates something

3  outside of work that -- is there a procedure in

4  place whereby they would tell you about it?

5         MR. ZELLER:  Outside the scope of the        02:30PM

6  designation, improper hypothetical.

7         THE WITNESS:  There are procedures for

8  bringing work in that is done outside.

9  BY MR. PAGE:

10    Q.    What are those procedures?                 02:30PM

11    A.    You have to inform your management and they

12 are responsible for making sure that it falls within

13 the guidelines.

14    Q.    How do you know about that procedure?

15    A.    From our code of conduct and -- there's    02:30PM

16 another name for it.  It's our corporate policy.  We

17 get a handbook that tells us what we're allowed to

18 do and what not to do.

19    Q.    The employee handbook has a provision that

20 tells people what to do about work they create       02:31PM

21 outside of work?

22    A.    It's understood in the handbook -- I

23 understand the handbook as to having -- yes, telling

24 us that we -- you know, work that we do outside

25 needs to be brought in to Mattel if there are any    02:31PM
                                                        131

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    conflicts.

2        Q.    Your testimony is that's in the handbook?

3        MR. ZELLER:  Mischaracterizes the witness'

4    testimony.

5        THE WITNESS:  My testimony is the way I          02:31PM

6    understand what is written in the handbook is that

7    if there is any question of conflict that it's to be

8    brought in.

9        MR. PAGE:  Okay.  I think I'm going to pass

10    it to Jim.
                                                          02:31PM
11        MR. JENAL:  Why don't we go off the record.

12        VIDEO OPERATOR:  We're off the record at

13    2:31.

14             (Brief recess.)

15        VIDEO OPERATOR:  We're back on the record at  02:45PM

16    2:45.

17

18             FURTHER EXAMINATION

19    BY MR. JENAL:

20        Q.    Good afternoon, Ms. Pratte.  My name is Jim  02:45PM

21    Jenal.  I am an attorney here at O'Melveny and I

22    represent MGA Entertainment in this lawsuit.

23             You realize you're still under oath,

24    correct?

25        A.    Yes, I do.
                                                          02:46PM
                                                             132

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    In talking to my colleague here you were

2   mentioning I think a number of different types of

3   art that you've done since you've been a Mattel

4   employee outside of your work at Mattel.  Do you

5   recall that testimony?                          02:46PM

6      A.    I did mention that I had done art outside of

7   Mattel while I was at Mattel.

8      Q.    I don't mean this to be an exhaustive list

9   but you talked about I think a basketball book,

10  correct?                                        02:46PM

11     A.    A -- yeah, a small, little brochure book

12  with the teams names in it.

13     Q.    And I think you said something about like

14  invitations for children's parties or birthday

15  parties, something like that?                   02:46PM

16     A.    My daughter's birthday party.

17     Q.    And wrapping paper?

18     A.    For my daughter's kids.

19     Q.    Excellent.  Let me ask you do you know

20  whether Mattel sells invitations?               02:46PM

21     A.    I don't know whether they -- Mattel

22  specifically sells invitations.  I do know that they

23  sell -- that there is a license that sells Barbie

24  invitations.

25     Q.    What about wrapping paper?  Do you know if  02:47PM

133

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  Mattel or someone through a license with Mattel

2  sells wrapping paper?

3       MR. ZELLER:  Calls for a legal conclusion.

4       THE WITNESS:  I'm assuming that since there

5  is Barbie wrapping paper on the market that there is   02:47PM

6  a licensor that does that.

7  BY MR. JENAL:

8    Q.   You don't know whether it's a licensor or

9  Mattel per se or do you know?

10   A.   I don't know specifically.                      02:47PM

11   Q.   So it could be Mattel itself or it could be

12 a third party, you don't have personal knowledge of

13 that?

14   A.   I don't believe that Mattel -- I believe

15 it's a licensor.                                        02:47PM

16   Q.   But I take it that unlike the basketball

17 book when you created invitations or wrapping paper

18 you didn't bring that to the attention of anyone at

19 Mattel, correct?

20   A.   Unless one of their children or they were    02:47PM

21 invited I probably did not bring the invitation in.

22   Q.   Same thing for the wrapping paper?

23   A.   Probably everybody got wrapping paper from

24 me at Mattel that I created.

25   Q.   Sorry, I'm not sure I followed that last     02:48PM

134

Veritex  ation Services
EXHIBIT 4  PAGE 294

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    answer.

2        A.   I apologize.  I have a tendency to create my

3    own wrapping paper therefore when I give a gift,

4    which I do often, I have a tendency to wrap it in

5    paper that I've made.                          02:48PM

6        Q.   Fair enough.  Apart from presenting

7    invitations to invitees or wrapping paper as part of

8    gifts to recipients of gifts from you, did you make

9    any disclosures to Mattel of either invitations that

10   you created or wrapping paper?                 02:48PM

11           MR. ZELLER:  The question is hopelessly

12   vague.

13           THE WITNESS:  It is quite broad.  I mean, do

14   you want to narrow it down or --

15   BY MR. JENAL:                                  02:48PM

16       Q.   Well, we'll take them one at a time.

17       A.   Okay.

18       Q.   All right.  And here's all I'm getting at,

19   right?  I think you had said at some point, and this

20   won't be an exact quote, but I think you said    02:48PM

21   something to the effect of you had a -- you had felt

22   a duty to disclose to your supervisor the work that

23   you were doing on the basketball book because you

24   were an artist doing art at Mattel.  Is that a fair

25   paraphrase of what you said?                   02:49PM

                                                        135

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MR. ZELLER:  Mischaracterizes the witness'
2   testimony.
3              MR. PAGE:  Volleyball.
4   BY MR. JENAL:
5       Q.   Is it volleyball?  I'm sorry, I thought it    02:49PM
6   was basketball.
7       A.   Volleyball.
8       Q.   I sit corrected.  The problem you sit over
9   there, your mind turns to mush.  Usually not that
10  fast.                                                  02:49PM
11             It was a volleyball book that you had
12  disclosed to your supervisor at Mattel; is that
13  correct?
14      A.   I did disclose a volleyball book that I
15  worked on to my supervisors at Mattel, yes.  That      02:49PM
16  way they knew that I wasn't using Mattel resources
17  or anything that I worked on while I was at Mattel.
18      Q.   But you didn't make a similar type of
19  disclosure with regards to invitations or wrapping
20  paper; is that correct?                                02:50PM
21             MR. ZELLER:  The question is vague as to
22  "similar."
23             THE WITNESS:  I wouldn't say that I brought
24  every piece of art in to show that I ever did while
25  I was at Mattel.                                       02:50PM
                                                           136
```

BY MR. JENAL:
Q. Did you ever use Mattel resources to create any of this art?
A. I did not.
Q. If you had used Mattel resources to scan something, to take home to work on, something like that, for wrapping paper, is that something you would feel that you should disclose to Mattel? 02:50PM
A. That would be very improper.
Q. That would be very improper. So to your knowledge and at least for your purposes you've never made use of Mattel scanners, for example, to scan an image for personal use? 02:50PM
A. To my knowledge I have never used Mattel's scanners to do something for outside Mattel. 02:50PM
Q. Let me ask you something. Do you have any -- do you know who MGA Entertainment is?
A. I believe they produce the Bratz dolls.
Q. Amongst other things, right?
A. I actually don't know everything that they produce. 02:51PM
Q. Neither do I. I just know that they make things other than Bratz dolls.
Were you aware that they make things other than Bratz dolls? 02:51PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.    I believe they have a line of dolls that are

2  fairytale based.

3      Q.    Do you have any friends at MGA?

4      A.    I have acquaintances.

5      Q.    What's the nature of those acquaintances?    02:51PM

6      A.    They're people that formally worked for

7  Mattel that now work for MGA.

8      Q.    How many such acquaintances do you have?

9      A.    Two that I can remember.

10     Q.    Who are they?                                02:51PM

11     A.    Dawan Whitaker and Dennis Soy.

12     Q.    And Mr. Whitaker, how do you know him?

13     A.    Mrs. Whitaker.

14     Q.    Oh, I'm sorry, it was Donna?

15     A.    Dawan, D-a-w-a-n.                            02:51PM

16     Q.    Great.  Thank you.  I heard it as Don.  My

17  apologies.

18           Ms. Whitaker?

19     A.    Uh-huh.

20     Q.    This is someone you used to work with at     02:52PM

21  Mattel?

22           MR. ZELLER:  Needless to say just so I'm not

23  constantly interrupting, obviously all this stuff is

24  outside the scope of the designation but so it's a

25  matter of record.                                    02:52PM
```

                                                             138

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.   Is it your understanding at a strategy

2   meeting the costing person would not be expected to

3   make a presentation?

4          MR. ZELLER:  Assumes facts not in evidence.

5          THE WITNESS:  Not necessarily.          04:24PM

6   BY MR. JENAL:

7     Q.   Did the product that's identified here as 6"

8   Collectibles, do you know whether that was ever

9   released into the market or launched into the

10  market?                                         04:24PM

11    A.   I don't know what particular segment this --

12  this was.

13    Q.   In December of 2000 what products were you

14  working on for their packaging with regards to Diva

15  Starz?                                          04:24PM

16    A.   I was working on the Diva Starz dolls, the

17  Mini Diva Starz and accessories.

18    Q.   How tall were the Mini Diva Starz?

19    A.   Six inches.

20    Q.   So that leads you to believe that this is a  04:24PM

21  reference to Mini Diva Starz?

22    A.   Correct.

23    Q.   On the second page there's references to

24  Nikki as Jennifer, Tia as Brandy, Alexa as Brittany,

25  Miranda as Gwen.  Do you see that?              04:25PM

                                                   204

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   Yes, I do.

 2      Q.   Is that consistent with this being a

 3  description of what would become Mini Diva Starz?

 4           MR. ZELLER:  The question is vague.

 5           THE WITNESS:  Yeah, I don't understand what   04:25PM

 6  kind of answer you're looking for.

 7  BY MR. JENAL:

 8      Q.   Isn't there -- well, back on the prior page

 9  under "More Details and Play Pattern" it says "Each

10  doll is inspired by Girl's favorite Pop singers."     04:25PM

11  Do you see that?

12      A.   Yes, I do.

13      Q.   Is that consistent with what was the play

14  patterns for Mini Diva Starz?

15           MR. ZELLER:  The question is vague, outside   04:25PM

16  the scope of the designation.

17.          THE WITNESS:  I'm not the product designer.

18  I don't know -- I can only go by what the product

19  designer wrote as to her intent.  I don't know what

20  her intent was.                                       04:26PM

21  BY MR. JENAL:

22      Q.   Were Mini Diva Starz -- was the packaging on

23  the Mini Diva Starz something that you created?

24      A.   Yes, I worked on the packaging for Mini Diva

25  Starz.                                                04:26PM
                                                            205
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Did the packaging on the Mini Diva Starz

 2   relate back to the pop stars that are identified

 3   here:  Gwen Stefani, Brittany Spears, et cetera?

 4           MR. ZELLER:  Can I have the question read

 5   back, please?                                    04:26PM

 6           (The pending question was read as follows:

 7              "Q.   Did the packaging on

 8           the Mini Diva Starz relate back

 9           to the pop stars that are identified

10           here:  Gwen Stefani, Brittany Spears,     04:26PM

11           et cetera?")

12           MR. ZELLER:  The question is vague, outside

13   the designation.

14           THE WITNESS:  The packaging related to the

15   Diva Starz brand.                                04:26PM

16   BY MR. JENAL:

17      Q.   Did it reference, for example -- did it

18   reference Alexa as Brittany?

19      A.   No, it did not I don't believe.

20      Q.   Were you familiar with the marketing on the  04:27PM

21   Mini Diva Starz?

22           MR. ZELLER:  The question is vague.  Outside

23   the designation.

24           THE WITNESS:  Packaging is my specialty, not

25   marketing.                                       04:27PM
                                                         206
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. JENAL:
 2      Q.   Fair enough.  Were you familiar with the
 3   marketing for Mini Diva Starz?
 4      A.   No, I was not.
 5           MR. ZELLER:  Same objections.              04:27PM
 6   BY MR. JENAL:
 7      Q.   Not at all?
 8           MR. ZELLER:  The question is argumentative,
 9   asked and answered.
10           THE WITNESS:  No.                          04:27PM
11   BY MR. JENAL:
12      Q.   Ms. Pratte, you've referred a couple of
13   times to wanting to be able to look at the actual
14   packaging associated with the Diva Starz products.
15   I have marked as Exhibit 431 a somewhat less than   04:28PM
16   expert photograph of the packaging, at least the
17   front packaging in part of that, but what I'd really
18   like you to look at -- this is simply so we have
19   something to put in the record -- is the product
20   itself.  Will you take a look at that.              04:28PM
21           MR. ZELLER:  I object to the failure to
22   produce Exhibit 431 by MGA.
23           MR. JENAL:  Exhibit 431 is a
24   commercially-sold product.  It's not MGA's property
25   other than purchasing it at Target.                 04:29PM
                                                          207
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA   ) ss:
 2   COUNTY OF LOS ANGELES )
 3
 4        I, WENDY S. SCHREIBER, CSR No. 3558, do
 5   hereby certify:
 6
 7        That the foregoing deposition of JONI
 8   PRATTE was taken before me at the time and place
 9   therein set forth, at which time the witness was
10   placed under oath and was sworn by me to tell the
11   truth, the whole truth, and nothing but the truth;
12        That the testimony of the witness and all
13   objections made by counsel at the time of the
14   examination were recorded stenographically by me,
15   and were thereafter transcribed under my direction
16   and supervision, and that the foregoing pages
17   contain a full, true and accurate record of all
18   proceedings and testimony to the best of my skill
19   and ability.
20        I further certify that I am neither
21   counsel for any party in said action, nor am I
22   related to any party to said action, nor am I in any
23   way interested in the outcome thereof.
24
25
```

225

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        IN WITNESS WHEREOF, I have subscribed my

2    name this 7th day of June, 2007

3

4

5

6    _____

7    WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

226

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                      I N D E X

 2                      VOLUME I

 3

 4   FRIDAY, JUNE 1, 2007

 5

 6   WITNESS                         EXAMINATION

 7

 8   JONI PRATTE

 9

10       (By Mr. Page)                       6

11       (By Mr. Jenal)                    132

12        P. M. Session                    106

13

14

15   START VIDEOTAPE #1:   Page    5

16   START VIDEOTAPE #2:   Page   90

17   START VIDEOTAPE #3:   Page  170

18

19

20

21

22

23

24

25
                                               227
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              DEPOSITION EXHIBITS
 2                 JONI PRATTE
 3
 4    NUMBER          DESCRIPTION          IDENTIFIED
 5
 6    Exhibit 420  Document entitled "Chat Names",    65
 7                 M 0034364 through M 0034365
 8
 9    Exhibit 421  Production Sheets, M 0633816 and   77
10                 M 0633817
11
12    Exhibit 422  Illustrations, M 0016816 through   99
13                 M 0016824
14
15    Exhibit 423  Handwritten Notes, M 0034342      106
16
17    Exhibit 424  Logos, M 0034359.                 108
18
19    Exhibit 425  Swatches, M 0033828 and M 0033829 110
20
21    Exhibit 426  Illustrations, M 0038924 through  173
22                 M 0038938
23
24
25
                                              228
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           DEPOSITION EXHIBITS (CONTINUED)
 2                    JONI PRATTE
 3
 4   NUMBER              DESCRIPTION            IDENTIFIED
 5
 6   Exhibit 427   Letter dated 2/22/99 to Mazzocco      174
 7                 from Kislevitz, M 0034338 through
 8                 M 0034339
 9
10   Exhibit 428   Illustrations, M 0033683 through      176
11                 M 0033796
12
13   Exhibit 429   Logo and Miscellaneous Items,         187
14                 M 0034343 through M 0034350
15
16   Exhibit 430   Illustrations, M 0034366,             194
17                 M 0034369, M 0034382, M 0034385,
18                 M 0034393, M 0034400, M 0034402,
19                 M 0034421
20
21   Exhibit 431   Product Definition, M 0041036         200
22                 and M 0041037
23
24   Exhibit 432   Alexa Box Packaging                   208
25
                                                      229
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          DEPOSITION EXHIBITS (CONTINUED)

 2                    JONI PRATTE

 3

 4    NUMBER            DESCRIPTION          IDENTIFIED

 5
                                                  209
 6    Exhibit 433  Nikki Box Packaging

 7
                                                  215
 8    Exhibit 434  Nikki Box Packaging

 9

10

11

12          PREVIOUSLY-MARKED EXHIBITS

13            NUMBER      IDENTIFIED

14             385            7

15             314           62

16

17

18

19

20

21

22

23

24

25
                                                  230
```

EXHIBIT 4  PAGE 308

Veritext National Deposition & Litigation Services

**EXHIBIT 5**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
3                  EASTERN DIVISION            Certified Copy
4
5      -------------------------------
6      MATTEL, INC., a Delaware        )
7      Corporation,                    )
8                     Plaintiff,       )
9                     vs.              ) No. CV 04-9059
10     CARTER BRYANT, an individual;   )    NM (RNBx)
11     and DOES 1 through 10,          ) VOLUME I
12     Inclusive,                      )
13                     Defendants.     )
14     ---------------------------- )
15     (COMPLETE CAPTION ON NEXT PAGE.)
16
17        CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19        Videotaped 30(b)(6) Deposition of
20        ROBERT K. HUDNUT, JR., taken at
21        400 South Hope Street, Los Angeles,
22        California, commencing at 9:35 A.M.,
23        Friday, July 13, 2007, before Wendy S.
24        Schreiber, CSR No. 3558, RPR, CLR.
25     PAGES 1 - 238
```

1

ONFIDENTIAL - ATTORNEYS' EYES    Y

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                    EASTERN DIVISION
 4
 5       -----------------------------
 6       MATTEL, INC., a Delaware           )
 7       Corporation,                       )
 8                    Plaintiff,            )
 9                    vs.                    ) No. CV 04-9059
10       CARTER BRYANT, an individual;  )     NM (RNBx)
11       and DOES 1 through 10,             )
12       Inclusive,                         )
13                    Defendants.           )
14       -----------------------------  )
15       CARTER BRYANT, on behalf of    )
16       himself, all present and       )
17       former employees of Mattel,    )
18       Inc., and the general public,  )
19                    Counter-Claimants, )
20                    vs.                    )
21       MATTEL, INC., a Delaware           )
22       Corporation,                       )
23                    Counter-Defendant. )
24       -----------------------------
25
```

                                                    2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4        FOR THE PLAINTIFF:

 5

 6            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 7            BY:  DIANE C. HUTNYAN, ATTORNEY AT LAW

 8            865 South Figueroa Street, Tenth Floor

 9            Los Angeles, California 90017

10            (213) 443-3000

11            dianehutnyan@quinnemanuel.com

12

13                    -AND-

14

15            MATTEL, INC.

16            BY:  MICHAEL MOORE, ESQ.

17            333 Continental Boulevard

18            El Segundo, California 90245-5012

19            (310) 252-2000

20            michael.moore@mattel.com

21

22

23

24

25
                                                          3
```

EXHIBIT __5__ PAGE 311

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3         FOR THE DEFENDANT AND COUNTERCLAIMANT

 4         CARTER BRYANT:

 5

 6              KEKER & VAN NEST LLP

 7              BY:  MICHAEL H. PAGE, ESQ.

 8              710 Sansome Street

 9              San Francisco, California 94111-1704

10              (415) 391-5400

11              mhp@kvn.com

12

13

14         FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16              O'MELVENY & MYERS LLP

17              BY:  JAMES PAUL JENAL, ESQ.

18              400 South Hope Street

19              Los Angeles, California 90071-2899

20              (213) 430-6000

21              jjenal@omm.com

22

23    ALSO PRESENT:

24

25              DAVID WEST, VIDEO OPERATOR
```

4

ONFIDENTIAL - ATTORNEYS' EYES ＿LY

```
1     LOS ANGELES, CALIFORNIA; FRIDAY, JULY 13, 2007

2                    9:35 A.M.

3

4          VIDEO OPERATOR:  Good morning.  We are now

5    on the record.  The date today is July 13th, 2007      09:35AM

6    and the time is 9:35 a.m.  My name is David West

7    with Veritext of Los Angeles, California.  We're

8    providing video services at O'Melveny & Myers LLP at

9    400 South Hope Street, 18th Floor, Los Angeles,

10   California.                                             09:35AM

11         This is the recorded testimony of Rob Hudnut

12   in the matter of Mattel, Inc. versus Carter Bryant

13   and consolidated.  It is in United States District

14   Court, Central District of California, Eastern

15   Division.  The case number CV-04-9059 NM.              09:36AM

16         Counsel will now introduce themselves for

17   the record.

18         MR. JENAL:  Good morning.  My name is Jim

19   Jenal with O'Melveny & Myers.  I'm counsel for MGA

20   Entertainment, Inc. in this litigation, and just to    09:36AM

21   note for the record this is actually a 30(b)(6)

22   deposition of Mattel, Inc.

23         MR. PAGE:  Michael Page, Keker & VanNest,

24   representing Carter Bryant.

25         MS. HUTNYAN:  Diane Hutnyan of Quinn Emanuel 09:36AM
```

5

EXHIBIT 5 PAGE 313

ONFIDENTIAL - ATTORNEYS' EYES ..LY

1    representing Mattel.

2         MS. HAULER:  Bridget Hauler of Quinn Emanuel

3    representing Mattel.

4         MR. MOORE:  Michael Moore, in-house counsel

5    for Mattel.                                      09:36AM

6         VIDEO OPERATOR:  Thank you.  Ms. Court

7    Reporter, would you please swear in the witness and

8    we will begin.

9

10                ROBERT K. HUDNUT, JR.,              09:36AM

11        having been first placed under oath, testified

12        as follows:

13

14                    EXAMINATION

15   BY MR. JENAL:

16        Q.   Good morning, Mr. Hudnut.

17        A.   Good morning.

18        Q.   My name is Jim Jenal.  I'm an attorney here

19   at O'Melveny and we represent MGA as we mentioned in

20   the introductions here.                          09:37AM

21        Have you ever had your deposition taken

22   before, sir?

23        A.   No, I haven't.

24        Q.   Let me -- you've probably had an opportunity

25   to discuss some of this with your counsel in      09:37AM

                                                            6

EXHIBIT 5 PAGE 314

ONFIDENTIAL - ATTORNEYS' EYES    Y

```
 1    Simian and the Space Monkeys.  I wrote for something

 2    called The Blanket Show.  I co-wrote our first

 3    Barbie movie called "Barbie and the Nutcracker" and

 4    I think that was pretty much it.

 5        Q.   Let's go back to those if we can for just a    09:44AM

 6    minute.  When was the Mighty Max series?

 7        A.   It was 1993 to '95.

 8        Q.   Did you do that as an independent contractor

 9    essentially writing this on your own or did you do

10    that working directly as an employee for some          09:45AM

11    company?

12        A.   I was an independent writer and producer at

13    that point and the work was done through a studio

14    called Film Roman.

15        Q.   And Captain Simian, when was that?             09:45AM

16        A.   '95, '96.  I was part of a company called

17    Monkey Shine Productions and we did the work through

18    Hallmark Entertainment.

19        Q.   Was Monkey Shine Productions something that

20    was put together for that series?                       09:45AM

21        A.   Right.  That's right.

22        Q.   And then I think you said something about

23    something called The Blanket Show.

24        A.   The Blanket Show.

25        Q.   What was that?                                 09:45AM
                                                                 13
```

EXHIBIT 5  PAGE 315

CONFIDENTIAL - ATTORNEYS' EYES ·LY

1    A.   That was a show designed to help kids get

2  ready for bed at night.

3    Q.   When was that?

4    A.   That was in 1996, '97.  We did that for MTM

5  Productions.  I did it as an independent allied with    09:46AM

6  another independent producer and we worked with Bill

7  Melendez Productions, the fellow who did all the

8  Charlie Brown animation.

9    Q.   You mentioned that you had taken a class in

10 myth and screenwriting.                                 09:46AM

11   A.   Uh-huh.

12   Q.   What was that class about?

13   A.   It was put on by a fellow named Christopher

14 Vogler.  He's written a book called The Writer's

15 Journey.  He was very interested in -- and is very      09:46AM

16 interested in the Joseph Campbell's of The Hero's

17 Journey and he -- his book was -- is a terrific book

18 about the difference stages of the hero's journey

19 and how that can be applied to script writing.

20   Q.   Was that theory of the hero's journey, if       09:47AM

21 you will, was that something that you were ever able

22 to actually apply in work that you did?

23   A.   Yes.

24   Q.   In what areas do you think that was applied?

25   A.   I applied it in the Mighty Max work.  I         09:47AM

                                                          14

EXHIBIT 5 PAGE 316

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   applied it in the work I do today.  He has a -- he
 2   has a wonderful chart in his book that lays out the
 3   different stages of the journey and I use that as
 4   reference when I think about scripts and think about
 5   structure.  It's a very useful structure.  George     09:47AM
 6   Lucas uses the same structure.
 7        Q.   And then you mentioned that you also took a
 8   course in sitcom writing.
 9        A.   Yes.  It was an attempt to develop more of a
10   sense of humor.  I don't think it went very well.     09:47AM
11        Q.   Judging from most sitcoms you probably had a
12   wrong premise to start with.
13             Did you ever write for sitcoms?
14        A.   No.
15        Q.   So I take it your goal in taking that class  09:48AM
16   wasn't so much to position yourself to write for
17   sitcoms?
18        A.   Well, I was interested in that as a
19   potential career path and I decided that wasn't a
20   good fit for me.                                       09:48AM
21        Q.   All right.  So let's see if we can fill in a
22   couple of gaps.
23             When you graduated from Princeton in '83,
24   what did you do?
25        A.   I went to work at Benton & Bowles in         09:48AM
                                                               15
```

EXHIBIT 5 PAGE 317

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   New York, a big ad agency, in the account management
2   program.
3       Q.   And how long were you at Benton & Bowles?
4       A.   Fourteen or 15 months, I think.
5       Q.   Did you go there straight out of college?   09:48AM
6       A.   Yes.
7       Q.   What was your position at Benton & Bowles?
8       A.   I was an assistant account executive working
9   on products like Nabisco -- brands like Nabisco and
10  Procter and Gamble.                                   09:49AM
11      Q.   And doing what sort of things for those
12  brands?
13      A.   Budgeting, looking at -- I remember
14  attending one set of focus groups in Cincinnati
15  listening to mothers talking about containment and   09:49AM
16  diapers.
17      Q.   That would stick with you.  Was your
18  involvement with the focus group, was that just as
19  an observer or were you involved in actually setting
20  up the focus group?                                   09:49AM
21      A.   As an observer.
22      Q.   Where did you go after Benton & Bowles?
23      A.   To Foote, Cone & Belding in Los Angeles.
24      Q.   Can you spell that?
25      A.   Foote with an E on the end, Cone like the   09:49AM
                                                          16

ONFIDENTIAL - ATTORNEYS' EYES    Y

1    animation was Mighty Max which is in the '93 to '95
2    time period.  Is that correct?
3        A.   Yes, but I'm realizing I need to correct
4    myself.  The first class I took was I think August
5    of '92, shortly after I left Mattel.  And I believe    10:06AM
6    the second one was in the summer of '93.  Just --
7        Q.   You had described three courses.  Were those
8    in chronological sequence?
9        A.   They were, yes.
10       Q.   So it's your recollection at least that the   10:06AM
11   animation writing class was probably somewhere in
12   August of '92?
13       A.   That's correct.
14       Q.   And that the myth and screenwriting course
15   would have been somewhere in the summer of '93?        10:06AM
16       A.   I think that's right.
17       Q.   Lawyers always ask questions in depositions
18   as everyone had perfect recollection of events that
19   happened 15 years ago.  It's just what we do.  I
20   apologize for the annoyance factor that's inherent     10:06AM
21   in that.
22       A.   No problem.
23       Q.   So when you left Mattel, I take it you
24   didn't have the Mighty Max project lined up.  That
25   wasn't something that you were aware that you would     10:07AM
                                                                29

EXHIBIT __5__ PAGE 319

ONFIDENTIAL - ATTORNEYS' EYES    LY

1   be doing?

2        A.    That's correct.

3        Q.    And then that came out of your preparing by

4   taking the writing class.  How did you get -- how

5   did you make that transition from walked out the          10:07AM

6   door, going to write, taking a class, now have a

7   project that's actually going to run.

8        A.    It's so funny.  I feel like we're on a date

9   or something.

10       Q.    I don't think I've ever had a deponent say     10:07AM

11  that before.  Why don't you all just go.

12       A.    When I was at Mattel, we had been pitched

13  the concept Mighty Max as a toy line by a company

14  called Blue Bird Toys based in the UK and I thought

15  the toys were marvelous and several months after I        10:08AM

16  left Mattel I called the fellow who had taken my

17  place who had previously reported to me and we were

18  just catching up and I asked him what was happening

19  with Mighty Max and whether there would be a

20  television series based on that because I thought it       10:08AM

21  was perfect for all the Joseph Campbell stuff that I

22  was interested in, too.  And he said, "No, we're not

23  planning to do a television series."

24            So I called my former boss and I said, "You

25  know, I think I can turn this into a television            10:08AM

30

EXHIBIT ___5___ PAGE 320

.ONFIDENTIAL - ATTORNEYS' EYES ..Y

1    series."

2           And he said, "Well, we're not going to put

3    up a nickel so knock yourself out."

4           So I then contacted the Blue Bird Toys folks

5    in the UK and said, "I bet I can make a television        10:08AM

6    series out of this."

7           And they said, "We're not going to put up a

8    shilling so knock yourself out."

9           So I did some -- some development work and

10   wrote up some ideas and -- and ultimately pitched         10:08AM

11   the series along with some of the models of the toys

12   to the company Film Roman and they liked the idea.

13   So then I started working with them to find a

14   broadcaster, which we did, and the show came to be.

15       Q.   Was the -- were the Mighty Max toys -- you        10:09AM

16   mentioned that these were created by the Blue Bird

17   Toys folks in the UK, correct?

18       A.   They were the ones who brought them to us,

19   that's right.

20       Q.   Did Mattel actually then take that idea and       10:09AM

21   make it a product line?

22           MS. HUTNYAN:  Objection: vague.

23           THE WITNESS:  Mattel ultimately did a

24   license with Blue Bird and -- and sold the toys.

25   /  /  /                                                    10:09AM

                                                               31

EXHIBIT  5  PAGE 321

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MR. JENAL:

2       Q.   The -- taking that license from Blue Bird

3   and selling the toys, did Mattel actually

4   manufacture the toys or did Blue Bird manufacture

5   the toys?                                        10:10AM

6            MS. HUTNYAN:  Objection:  calls for

7   speculation.

8            You can answer.

9            THE WITNESS:  I don't know.

10  BY MR. JENAL:                                    10:10AM

11      Q.   But it was Mattel that was selling the

12  Mighty Max toys in the United States at least,

13  correct?

14      A.   That's right.

15      Q.   Were those toys on the shelves at the time  10:10AM

16  you were pitching the idea for making the T.V.

17  series?

18           MS. HUTNYAN:  Objection:  calls for

19  speculation.

20           THE WITNESS:  I don't recall but I don't  10:10AM

21  think so.

22  BY MR. JENAL:

23      Q.   So that was still something that was -- it

24  in itself was in development while you were trying

25  to develop the idea of the T.V. series?          10:10AM

                                                        32

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    That's correct.

 2      Q.    Do you know if the -- I take it the T.V.

 3   series ran in the United States?

 4      A.    Yes, it did.

 5      Q.    Did it also run in the UK?              10:10AM

 6      A.    I think it did.

 7      Q.    Do you know if the running of the television

 8   series in the U.S. or the premiering of the

 9   television series in the U.S. coincided with the

10   product going onto the shelves or was it after the   10:11AM

11   product went on the shelves?

12           MS. HUTNYAN:  Objection:  vague and

13   ambiguous.

14           THE WITNESS:  I don't recall.

15   BY MR. JENAL:                                    10:11AM

16      Q.    And then you mentioned that the Mighty Max

17   series, you worked on that through '95, correct?

18      A.    Yes, I think my work on it continued into

19   '95.

20      Q.    Did the show continue to run after you were  10:11AM

21   no longer working on it?

22           MS. HUTNYAN:  Objection:  calls for

23   speculation.

24           THE WITNESS:  I worked on all 40 episodes

25   that were created.                               10:11AM
```

                                                          33

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MR. JENAL:

2       Q.   So as far as the content of the shows

3   regardless of when they actually aired, you were

4   responsible -- you were involved with all of the

5   creation of that content; is that correct?                    10:12AM

6           MS. HUTNYAN:  Objection:  misstates

7   testimony, calls for speculation.

8           THE WITNESS:  I was involved in certain

9   parts of it.  I wasn't involved in everything.

10  BY MR. JENAL:                                                  10:12AM

11      Q.   Sure.  And why don't you explain for us what

12  your involvement actually was in the creation or

13  development of the Mighty Max series other than what

14  you've told us so far.

15      A.   I was the co-executive producer on the             10:12AM

16  series and I also wrote some episodes -- I think --

17  I'm trying to think.  I was involved in the creation

18  of all the stories, the breaking of the stories and

19  the evaluating of the scripts.  I think I ultimately

20  had one script where I was credited as the writer.          10:12AM

21  I had story by on some of the other scripts but as

22  the co-executive producer I would review the

23  premises and then the outlines and then the scripts.

24  I would also look at the storyboards that were

25  created and give notes where I thought I could help        10:13AM

                                                                     34

EXHIBIT S PAGE 324

ONFIDENTIAL - ATTORNEYS' EYES   LY

1   make them better.

2       Q.   You made a distinction and I just want to

3   make sure that I understand it because you said that

4   you wrote some episodes and then you said that you

5   had script credit, I think, on one episode.  What's      10:13AM

6   the distinction?

7       A.   I'm trying --

8           MS. HUTNYAN:  Objection:  misstates

9   testimony.

10           You can answer.      10:13AM

11  BY MR. JENAL:

12      Q.   Just so you know, I'm really not trying to

13  misstate anything so please correct me if I get

14  something wrong.  I'm just trying to understand what

15  you had told me.      10:13AM

16      A.   Yes.  I'm trying to remember clearly also.

17      Q.   Sure.

18      A.   I know that -- that in the first season of

19  13 episodes I wrote a show called "Bring Me the Head

20  of Mighty Max" and it was part of a trilogy that we      10:14AM

21  did involving our villain whose name was Skullmaster

22  and this was the middle of those three shows and so

23  I remember clearly getting that -- having my name as

24  a writer on that -- on that story -- on that

25  episode.  But I did work with the story development      10:14AM

                                                        35

ONFIDENTIAL - ATTORNEYS' EYES ⎯LY

1    of all of them.  So I think -- I think the accurate

2    statement is that that was -- that was my script

3    credit from Mighty Max.

4        Q.   But apart from that episode that you had

5    script credit, what was your involvement with the          10:14AM

6    creation of the other scripts on the remaining 39

7    episodes?

8            MS. HUTNYAN:  Objection:  compound, calls

9    for speculation.

10           THE WITNESS:  I'm sorry, if you could help      10:14AM

11   narrow down which question.

12   BY MR. JENAL:

13       Q.   I think you have told us there were 40

14   episodes.

15       A.   Yes.                                             10:15AM

16       Q.   And that you had script credit on the one we

17   just talked about?

18       A.   Yes.

19       Q.   I was asking what was your involvement with

20   regard to the scripts for the other 39 episodes?          10:15AM

21       A.   I would help come up with the ideas for the

22   stories and then would -- would help them travel

23   from premise to outline to script.

24       Q.   Did that involve editing scripts that other

25   people would create in the first instance?               10:15AM

                                                                  36

EXHIBIT  5  PAGE 326