CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.    Making notes on them, yes.

2       Q.    When you were -- when your involvement with

3   Mighty Max was over, did you go directly into

4   Captain Simian?  Was there a break in between?  How

5   did that work?                                        10:15AM

6       A.    I'm trying to remember the exact chronology

7   but my relationship with Blue Bird Toys was a good

8   one and so I brought them, along with two partners,

9   the idea for Captain Simian and the Space Monkeys

10  and Blue Bird liked the idea so that got the ball     10:16AM

11  rolling.

12      Q.    And how many episodes of Captain Simian were

13  created?

14      A.    I'm pretty certain it was 26.

15      Q.    And what was your involvement with the       10:16AM

16  creation of those episodes?

17      A.    I was one of the executive producers on that

18  series and so I would review all of the -- similar

19  to on Mighty Max I would review the premises and the

20  outlines and the scripts and help come up with the    10:16AM

21  stories that we -- that we told.

22      Q.    Did you have script credit on any of the 26

23  episodes for Captain Simian?

24      A.    Yes, there's one called A Clockwork Orange

25  and that was my story.                                10:17AM

                                                          37

EXHIBIT  5  PAGE 327

CONFIDENTIAL - ATTORNEYS' EYES    LY

```
 1      Q.   Any others?

 2      A.   No.   There may have been story credits --

 3   story by here and there but I don't -- I don't

 4   remember.

 5      Q.   But you were otherwise involved in the        10:17AM

 6   manner that you described as one of the executive

 7   producers in all 26 of the episodes?

 8      A.   That's correct.

 9      Q.   And then -- and then you said that you went

10   to something called The Blanket Show.  Could you       10:17AM

11   explain to us how you went from Captain Simian to

12   The Blanket Show.

13      A.   The Blanket Show was an idea that originated

14   with a fellow who became a friend of mine named

15   Steve Mackall.  It was Steve's idea.  And we          10:17AM

16   developed it further together and pitched it to a

17   great many companies and eventually found interest

18   in it from first Bill Melendez Productions and then

19   together with Bill Melendez we brought it to MTM

20   Entertainment and they decided to fund an episode of  10:18AM

21   that.

22      Q.   How many episodes were ultimately created?

23      A.   Just one.

24      Q.   Was that intended to be a series or was that

25   intended to be a single-episode program?              10:18AM
```

EXHIBIT 5  PAGE 328

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MS. HUTNYAN:  I think I was extraordinarily

2    clear.  If you'd like to read back on your screen,

3    maybe review it, then you can answer my question.  I

4    just want to know if you are going to take the

5    position that responses as to what he did within his  11:45AM

6    preparation for his deposition won't constitute a

7    waiver of any kind.  I just want that reassurance

8    that it doesn't.  My understanding is that in

9    countless depositions before this you've agreed to

10   that so I'm not really sure why you're giving me a   11:45AM

11   hard time.  It seems like a no brainer.

12             MR. JENAL:  The question has never come up,

13   Counsel, so --

14             MS. HUTNYAN:  I've read it in deposition

15   transcripts.  Maybe you need to read up.            11:45AM

16             MR. JENAL:  I think I've read more

17   transcripts in this case than you have.  It hasn't

18   come up in my experience.  Let's just go and ask a

19   question.

20             MS. HUTNYAN:  Anything that relates to your  11:46AM

21   deposition preparation we need to find that out

22   before we answer questions related to it.

23             THE WITNESS:  Okay.

24   BY MR. JENAL:

25        Q.  So I was asking if you could turn to page 4  11:46AM
                                                        91
```

1  of Exhibit 385.  Do you see that?

2      A.    Yes.

3      Q.    And is it your understanding that you've

4  been designated today to testify on behalf of Mattel

5  as to some of the topics in this deposition notice?    11:46AM

6      A.    That's correct.

7      Q.    And my understanding as to the topics that

8  you've been designated on is as follows:  It's

9  topics 2 through 8 that appear here on page 4, topic

10  11 which appears on the next page, topic 13 also on    11:46AM

11  that page and topic 24 which is on page 6 of Exhibit

12  385.  Is that your understanding as well, sir?

13      MS. HUTNYAN:  No, there's -- that's not what

14  he's been designated on.  He said 2 through 8, 11,

15  what and 24?    11:47AM

16      MR. JENAL:  11, 13 and 24.

17      MS. HAULER:  No, my understanding is 2

18  through 7 and 11.

19      MS. HUTNYAN:  Portions of those.

20      MR. JENAL:  Your understanding is what,    11:47AM

21  Bridget?

22      MS. HAULER:  Two through 7 and 11.

23      MS. HUTNYAN:  And the portions of those that

24  specifically relate to the scripts that he's worked

25  on within those categories.    11:47AM

92

ONFIDENTIAL - ATTORNEYS' EYES   Y

1         MR. JENAL:  And the basis for -- let's take

2    those in two steps, all right, because the notes

3    that I have from the meet and confer with Judge

4    Infante included 2 through 8, 11, 13 and 24.

5         MS. HAULER:  I can double-check but mine was   11:47AM

6    I had 2 through 7 from the same so I'll

7    double-check.  I'll have someone check it and E-mail

8    us back, but that was not mine.

9         MR. JENAL:  That's fine, Bridget.  Let's --

10        MR. PAGE:  Let's just look at it at a break.   11:48AM

11        MR. JENAL:  Yeah, we'll resolve that part of

12    the question on a break.

13        Q.   You understand then at least you agree as to

14    2 through 7 and 11; is that correct?

15        MS. HUTNYAN:  With the qualification that I   11:48AM

16    mentioned.

17        MR. JENAL:  Right, and we'll get to that in

18    just a second.

19        Q.   That's -- your understanding is that's the

20    designation?                                       11:48AM

21        A.   That is my understanding.

22        MR. JENAL:  Okay.  And then the second part

23    of this was a limitation as to what, Counsel?

24        MS. HUTNYAN:  It's only the portions of

25    those topics that deal with his knowledge as to the   11:48AM

                                                         93

EXHIBIT  5  PAGE 331

1    scripts that might be pertinent to those topics.  So

2    it's not those entire topics.

3         MR. JENAL:  And is there some communication

4    that establishes that restriction?

5         MS. HAULER:  Yes, the same as it's been the    11:48AM

6    same for every Diva Starz person that's been

7    deposed.

8         MR. JENAL:  Sorry --

9         MS. HAULER:  I couldn't tell you off the top

10   of my head exactly where that comes from but if you   11:48AM

11   look at the transcript for RenT Pasko, Kislap, Joni

12   Pratte, it's been the same practice for every single

13   one of those witnesses.

14        MR. JENAL:  Okay.  Just so I'm clear and the

15   record is clear that practice being what?  I'm just   11:48AM

16   not sure what you meant by that.

17        MS. HAULER:  That it's basically his

18   personal knowledge regarding his work on Diva Starz.

19   BY MR. JENAL:

20        Q.   Okay.  Is that your understanding as well,   11:49AM

21   sir, that you're here today to testify as to your

22   personal knowledge with regards to these topics as

23   they pertain to Diva Starz?

24        A.   Yes.

25        Q.   Just so that the record is clear.  So let me 11:49AM

                                                              94

EXHIBIT 5 PAGE 332

ONFIDENTIAL - ATTORNEYS' EYES  Y

1    ask you this.  If you would turn to page 4, topic 2,

2    which is all contractual and non-contractual duties

3    and obligations Bryant owned or performed for Mattel

4    during his employment with Mattel and thereafter, do

5    you see that?                                    11:49AM

6        A.   Yes, I did.

7        Q.   What did you do to prepare today to testify

8    on behalf of Mattel as to that topic?

9        A.   Is that an okay question?

10            MR. PAGE:  If it isn't, she'll tell you.    11:49AM

11            MS. HUTNYAN:  Do you agree that questions as

12   to his preparation for his 30(b)(6) designation

13   testimony is not -- I'm sorry, that his responses do

14   not constitute a waiver of some kind?

15            MR. JENAL:  Well, insofar as that question    11:50AM

16   doesn't implicate any attorney-client privilege I

17   don't know how it could be a waiver of anything.

18   I'm asking what he did to prepare to testify on

19   behalf of the corporation for which he's been

20   designated.                                      11:50AM

21            MS. HUTNYAN:  Okay, so you agree that it's

22   not a waiver.  That was easy.  Okay, it's not a

23   waiver.  Can you just repeat the question for me?

24            (The pending question was read as follows:

25            "Q.   What did you do to prepare         11:49AM

                                                          95

EXHIBIT 5 PAGE 333

ONFIDENTIAL - ATTORNEYS' EYES   .Y

1    property belonging to Mattel that Bryant provided to

2    any third party including MGA from 1995 to the

3    present.  My question to you sir, as Mattel's

4    30(b)(6) designee on topic No. 7 are you aware of

5    any facts regarding services and property belonging      12:12PM

6    to Mattel that Bryant provided to any third party

7    including MGA from 1995 to the present?

8           MS. HUTNYAN:  Objection:  calls for a legal

9    conclusion, calls for speculation by a lay witness,

10   outside the scope of the designation.                    12:12PM

11          THE WITNESS:  My understanding is I'm here

12   to talk about Diva Starz and what I know about that.

13   So how that applies or doesn't apply to No. 7 I

14   leave to the lawyers to figure out.

15          MR. JENAL:  Why don't we go off the record     12:12PM

16   and take our lunch break now.

17          VIDEO OPERATOR:  12:13 we're off the record.

18

19          (At the hour 12:13 p.m. the luncheon

20      recess was taken.)

21

22

23

24

25

                                                              113

EXHIBIT 5  PAGE 334

ONFIDENTIAL - ATTORNEYS' EYES    JY

```
1              (At the hour of 1:18 p.m. the following
2        proceedings were had at the same place with
3        the same persons present.)
4
5              VIDEO OPERATOR:  We're back on the record at    01:17PM
6        1:18.
7              MS. HUTNYAN:  Before we get started why
8        don't I just do some housekeeping.
9              MR. JENAL:  Okay.
10             MS HUTNYAN:  Okay.  I'd just like to put on    01:18PM
11       the record that the witness will be answering
12       questions that relate to what he turned over or what
13       he retained in response to requests from counsel but
14       not questions as to the requests themselves, the
15       communications from counsel.                          01:18PM
16             Also, I would just like to add for the
17       record that we have provided again some of the
18       materials that were related to earlier M 98320 and
19       21 and 98318 and 19 pertaining to Mr. Hudnut's
20       employment so that counsel can use it at the          01:19PM
21       deposition.
22             MR. JENAL:  I appreciate that.  And then
23       also we had discussed the topics that Mr. Hudnut was
24       here to testify on and the prior understanding had
25       been topics 2 through 7 and 11.  And I believe that   01:19PM
```
                                                                        114

EXHIBIT 5  PAGE 335

ONFIDENTIAL - ATTORNEYS' EYES   .Y

```
 1   we have now managed to go back and clarify that in

 2   addition to those topics Mr. Hudnut is also here as

 3   Mattel's 30(b)(6) representative on topics 8, 13 and

 4   24.  Is that correct?

 5          MS. HAULER:  Yes.                          01:19PM

 6          MS. HUTNYAN:  I thought it was 11?

 7          MR. JENAL:  Yes, 2 through 7, 11 where the

 8   ones we had agreed on previously --

 9          MS. HUTNYAN:  Oh, okay.  Sorry.  Right.

10          MR. JENAL:  And the ones we've just now       01:19PM

11   added are 8, 13 and 24.

12          MS. HUTNYAN:  Okay.  Again, specifically the

13   subset of facts that he has in his own knowledge

14   relating to the scripts that relate to all those

15   topics.                                          01:20PM

16

17                  EXAMINATION (Resumed)

18   BY MR. JENAL:

19      Q.   So given those clarifications for the

20   record -- and I don't want to spend a lot of time re   01:20PM

21   plowing old ground -- but there were a few instances

22   where there were questions where I believe you

23   declined to answer at the advice of counsel

24   pertaining to things you may have done with regards

25   to locating or searching for documents in            01:20PM

                                                          115
```

ONFIDENTIAL - ATTORNEYS' EYES   LY

```
1    conjunction with this litigation.  Let me go back to

2    that.

3              Did you do anything to search for documents

4    related to a project known as Tune Teens in

5    conjunction with this litigation?                    01:20PM

6       A.   I don't recall searching for that.

7       Q.   Did you do anything to search for documents

8    related to Diva Starz?

9              MS. HUTNYAN:  Objection:  asked and

10   answered.                                            01:20PM

11             You can answer.

12             THE WITNESS:  I don't recall precisely when

13   but I -- I know that I have been asked for documents

14   involving Diva Starz and that I've provided them.

15   BY MR. JENAL:                                        01:21PM

16      Q.   Okay.  And I think you testified that part

17   of that was a box -- or some boxes -- strike that.

18   -- not boxes but some documents that were in

19   off-site storage that you had retrieved, correct?

20      A.   That's correct.                              01:21PM

21      Q.   Could you describe for me what, if anything,

22   you did to look for electronic documents related to

23   Diva Starz.

24      A.   I don't have a specific recollection of the

25   time I would have done it but at the request of      01:21PM
                                                          116
```

EXHIBIT 5 PAGE 337

ONFIDENTIAL - ATTORNEYS' EYES  _Y

```
 1    BY MR. JENAL:

 2        Q.   Do you know whether within Mattel in 2000

 3    when you were working in the -- within the confines

 4    of the broader Diva Starz project, do you know

 5    whether it was envisioned that Diva Starz would      02:57PM

 6    compete with Barbie?

 7             MS. HUTNYAN:  Objection:  lacks foundation,

 8    mischaracterizes the testimony of the witness, calls

 9    for speculation, outside the designation.

10             THE WITNESS:  Could you repeat the question, 02:57PM

11    please?

12             MR. JENAL:  I think so.

13        Q.   In 2000 you were working on the Diva Starz

14    entertainment project, correct?

15        A.   Correct.                                     02:57PM

16        Q.   And in the course of that work you

17    interacted with other people who were involved in

18    the broader Diva Starz project as we've described

19    those terms previously, correct?

20        A.   That's correct.                              02:57PM

21        Q.   In the course of that work that you did in

22    the 2000 time frame on the Diva Starz entertainment

23    project did you ever become aware as to whether or

24    not Diva Starz, the dolls, were expected to compete

25    with Barbie, the dolls, for sales?                    02:58PM
                                                                180
```

EXHIBIT 5  PAGE 338

ONFIDENTIAL - ATTORNEYS' EYES   .Y

```
 1            MS. HUTNYAN:  Objection:  calls for
 2   speculation, lacks foundation, outside the
 3   designation, calls for a legal conclusion.
 4            THE WITNESS:  Again, I'm not sure if I
 5   started in late '99 and whether it carried over into   02:58PM
 6   2001 but I don't -- I don't know whether there was
 7   any strategic goal of competing or not competing
 8   with Barbie.
 9   BY MR. JENAL:
10       Q.   Do you know whether there was a concern at    02:58PM
11   Mattel in the 2000 time frame that projects -- doll
12   projects not compete with Barbie?
13            MS. HUTNYAN:  Objection:  calls for
14   speculation, lacks foundation, outside the
15   designation, vague.                                     02:58PM
16            THE WITNESS:  Could you rephrase that,
17   please, or help me with that again?
18   BY MR. JENAL:
19       Q.   In the 2000 time frame did you have any
20   understanding of the significance of the Barbie line   02:59PM
21   to Mattel as a product line?
22            MS. HUTNYAN:  Objection:  calls for
23   speculation, vague, outside the designation.
24   BY MR. JENAL:
25       Q.   Your turn.                                     02:59PM
```
                                                                 181

EXHIBIT 5 PAGE 339

ONFIDENTIAL - ATTORNEYS' EYES    Y

```
 1        A.    Barbie is a significant brand for Mattel.

 2   I'm aware of that.

 3        Q.    So my question to you was:  Were you

 4   aware -- in the time frame of 2000 or so were you

 5   aware of any policy at Mattel, however that might be    02:59PM

 6   expressed, of not creating products that would

 7   compete with Barbie?

 8             MS. HUTNYAN:  Objection:  outside the

 9   designation, calls for speculation.

10             THE WITNESS:  Aware of a policy against       02:59PM

11   that?  No, I'm not aware of a policy at that time.

12   BY MR. JENAL:

13        Q.    Did you ever hear anyone say we can't go

14   forward with this project because to do so would

15   compete with sales for Barbie?                          03:00PM

16             MS. HUTNYAN:  Same objection.

17             THE WITNESS:  I don't recall ever hearing

18   something like that.

19   BY MR. JENAL:

20        Q.    Are you aware of any projects that were      03:00PM

21   developed and then canceled because of a concern

22   that that product might compete with Barbie?

23             MS. HUTNYAN:  Asked and answered.  Same

24   objections.

25             THE WITNESS:  I'm not aware of any -- any     03:00PM
                                                            182
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    such project.

2    BY MR. JENAL:

3        Q.   Are you familiar with changes to the

4    appearance of the Diva Starz dolls in the time

5    period since 2000?                                    03:00PM

6            MS. HUTNYAN:  Objection:  vague, ambiguous,

7    calls for speculation.

8            THE WITNESS:  What -- what sorts of changes

9    and occurring in -- on the toy shelf or in the --

10   BY MR. JENAL:                                         03:00PM

11       Q.   In the product that's released to the

12   public, correct.  Are you aware of any changes in

13   the appearance of those dolls in the time period say

14   between 2000 when they first were on the shelves and

15   say 2002?                                             03:01PM

16           MS. HUTNYAN:  Same objection.  Calls for

17   speculation, vague, compound.

18           THE WITNESS:  When I was part of the

19   discussions of the Diva Starz business and its

20   development, the entertainment project and how it    03:01PM

21   relates to the brand, we recognized early on that

22   when one -- one of the main reasons a toy company

23   will create a television series is to drive a great

24   number of projects -- of products and oftentimes if

25   you look through the toy business a lot of those      03:01PM
                                                            183
```

EXHIBIT ___5___ PAGE 341

ONFIDENTIAL - ATTORNEYS' EYES ᴏᴎLY

```
 1        Q.   Do you have a recollection of ever having
 2   filled out this Section G?
 3        A.   Of filling out this specific Section G?
 4        Q.   Yes.
 5        A.   No, I don't have a recollection of filling    04:13PM
 6   out this specific Section G but I have my side
 7   letter which had all the prior art that I created
 8   before Mattel.
 9        Q.   Okay.  So aside from the side letter, do you
10   recall ever executing a document -- an Employee         04:13PM
11   Confidential Information and Inventions Agreement
12   for Mattel that had some carve-out if you will such
13   as what is contemplated by Section G here as a
14   disclosure of prior inventions or the side letter
15   that you had previously created which was Exhibit      04:14PM
16   479?
17        A.   I don't remember ever filling out a list
18   like that, again, because I have this
19   previously-existing list that had been agreed and
20   that to me was clear.                                  04:14PM
21             MR. JENAL:  Why don't we go off the record.
22             VIDEO OPERATOR:  4:14 off the record.
23                  (Brief recess.)
24             VIDEO OPERATOR:  The time is 4:20.  We are
25   back on the record.                                    04:20PM
                                                              229
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MR. PAGE:  Michael Page on behalf of Carter

2    Bryant.  Mr. Hudnut has had to leave for a child

3    care emergency.  Apparently his child was otherwise

4    going to be standing at a bus stop.  While I'm

5    certainly sympathetic to that, obviously Mr. Bryant    04:20PM

6    is entitled to have had some testimony from

7    Mr. Hudnut.  By my count we've had about 4 hours and

8    40 minutes on the record and so I need to object to

9    having been precluded from asking him questions.

10   But to the extent that Mattel is willing to cover     04:20PM

11   our additional costs in coming back I guess there's

12   not much we can do about it.

13             MS. HUTNYAN:  Are you done?

14             MR. PAGE:  Excuse me.  No -- go ahead.

15             MS. HUTNYAN:  What is the actual count?      04:21PM

16             VIDEO OPERATOR:  I don't know.

17             MS. HUTNYAN:  I don't know that that's the

18   actual count.  We are here on time and we took a

19   short -- very short lunch.  We have been here all

20   day.  We've taken short breaks -- a few breaks and    04:21PM

21   we've tried to get through the testimony as quickly

22   as possible but counsel didn't even get to the

23   relevant topics until almost midday and so, you

24   know, as I believe you've made clear a child care

25   emergency -- you know, if he needs to be brought      04:21PM
                                                              230
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    back I can't imagine what you still need to question

 2    him on but if you do then I suppose we can work

 3    something out offline but as far as covering costs I

 4    think it's kind of absurd.  You come down here for a

 5    lot depositions.  Maybe you can tack it on to          04:21PM

 6    something else.

 7            And if you want to do the cost game then we

 8    should reinitiate our conversations about the

 9    inspections that we've had to go up to San Francisco

10    with staff for.                                        04:21PM

11            Anything else?

12            MR. PAGE:  Yes.

13            MS. HUTNYAN:  Anything else on our side?

14            MR. PAGE:  If we're going to get into the we

15    took a short break, we took a long break game, your   04:22PM

16    first break was from 10:38 to 10:49.  Your second

17    break was from 11:16 to 11:29.  Lunch was an hour

18    and two minutes.  There was a break from 2:16 to

19    2:33 and a break from 3:32 to 3:45.  By my count

20    we've had four hours and 40 minutes of testimony.     04:22PM

21    We've sat through depositions where your counsel

22    kept our witnesses in a room until after 8:00

23    o'clock p.m. insisting on getting the full seven

24    hours and we have accommodated that.

25            I understand that Mr. Hudnut's child care     04:22PM
                                                                231
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    STATE OF CALIFORNIA    ) ss:

2    COUNTY OF LOS ANGELES )

3

4           I, WENDY S. SCHREIBER, CSR No. 3558, do

5    hereby certify:

6

7           That the foregoing deposition of ROBERT K.

8    HUDNUT, JR. was taken before me at the time and

9    place therein set forth, at which time the witness

10   was placed under oath and was sworn by me to tell

11   the truth, the whole truth, and nothing but the

12   truth;

13          That the testimony of the witness and all

14   objections made by counsel at the time of the

15   examination were recorded stenographically by me,

16   and were thereafter transcribed under my direction

17   and supervision, and that the foregoing pages

18   contain a full, true and accurate record of all

19   proceedings and testimony to the best of my skill

20   and ability.

21          I further certify that I am neither

22   counsel for any party in said action, nor am I

23   related to any party to said action, nor am I in any

24   way interested in the outcome thereof.

25

235

CONFIDENTIAL - ATTORNEYS' EYES 'LY

1          IN WITNESS WHEREOF, I have subscribed my

2    name this 20th day of July, 2007.

3

4

5

6    _____

7        WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

236

EXHIBIT 5 PAGE 346

**EXHIBIT 6**

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4

5     -----------------------------------

6     CARTER BRYANT, an individual,        )        **Certified Copy**

7                    Plaintiff,            )

8               vs.                        )  No. CV 04-09049 SGL

9     MATTEL, INC., a Delaware             )  (RNBx)  (c/w CV

10    Corporation,                         )  04-9059 & 05-2727)

11                Defendant.               )

12    ----------------------------------)

13    CONSOLIDATED WITH MATTEL, INC.,      )

14    v. BRYANT and MGA ENTERTAINMENT,     )

15    INC., v. MATTEL, INC.                )

16    -----------------------------------

17

18         Transcript of Proceedings before

19         the Honorable Edward A. Infante,

20         via conference call, commencing at

21         9:29 A.M., Wednesday, April 4, 2007

22         before Cathryn L. Baker, CSR No. 7695.

23

24

25    PAGES 1 - 33

1

EXHIBIT __6__ PAGE 347

1          JUDGE INFANTE:  That's right.  Pick a day in

2     early June.  And if you got a motion to bring, I'll hear

3     it whenever you want.

4          MR. COREY:  Pick a date --

5          MR. JACOBY:  Jim, does that work for you?

6          MR. JENAL:  Yes, it does.

7          MR. JACOBY:  Okay.  So if you get us a date in

8     June.

9          MR. COREY:  What dates do you guys have

10    available in June?

11         MR. JENAL:  I'm unavailable the 5th through

12    the 10th, but that's probably not crucial because I

13    suspect Diana will cover this anyway.  So either before

14    that or after that would be preferable on my front.

15         MR. JACOBY:  The only dates -- I'll give you

16    my blackout dates in June.  June 6, 7, 8 and 11, the

17    20th.  Those are my only blackout dates right now.

18         MR. COREY:  So if I get a date during the week

19    of June 18th, other than the 20th, that should work?

20         MR. JACOBY:  We'll make it work.

21         MR. JENAL:  Week of June 18th, that's fine.

22         MR. JACOBY:  And you need new dates for Jules.

23    Do you want similar availability dates for Nordquist?

24         MR. COREY:  Mr. Jenal, do you have other

25    blackout dates in June?  And I'll get dates for

                                                              26

EXHIBIT  6  PAGE 348

1   Ms. Nordquist and Mr. Palmer in June.

2           MR. JACOBY:  I thought he was May 25th.

3           MR. COREY:  That's right.  You're right.  We

4   tentatively put him at the 25th.

5           JUDGE INFANTE:  You just need some dates for

6   Ms. Nordquist.

7           MR. JENAL:  And we also -- three other people,

8   Patty Howard, Sarah Mazes and Dean Stefan, we don't have

9   dates for either.

10          MR. COREY:  And these are all third parties,

11   and Ms. Morris advised me that they would likely be

12   duplicative of Mr. Hudnut's testimony.  You may want to

13   take them individually anyway but --

14          JUDGE INFANTE:  Well, the question is whether

15   you're designating them.

16          MR. COREY:  At this point with Mr. Hudnut

17   testifying, I don't think it will be necessary to

18   designate them.

19          JUDGE INFANTE:  Okay.

20          If Mr. Hudnut doesn't have adequate knowledge,

21   then we'll re-examine the issue.

22          MR. COREY:  Exactly.

23          MR. JENAL:  What was Ms. Nordquist on?

24          MR. COREY:  On topics 2 through 7.

25          MR. JACOBY:  Have we now covered all the

27

EXHIBIT  6  PAGE 349

1  topics that are addressed by the order?

2          MR. COREY:  My understanding is that we have.

3          MR. JACOBY:  Okay.  So, your Honor, would you

4  like one of us to draft a proposed schedule that will

5  then be memorialized in an order?  Can we assume these

6  depositions will start at 9:30 unless we've agreed to do

7  it in the afternoon?

8          JUDGE INFANTE:  What's your normal practice?

9          MR. JACOBY:  That's our normal practice, 9:30

10  to 10:00.

11          JUDGE INFANTE:  That's fine.

12          MR. JACOBY:  And I presume, Jon, they'll all

13  be at Quinn Emanuel?  No, I guess they're our depos, so

14  they'll either be at O'Melveny or Century City.  I'm

15  fine if they're all at O'Melveny since you're both

16  downtown.  Are there any that you want in Century City

17  because of witness convenience?

18          MR. COREY:  I can't say that -- I can say

19  that -- give me just a second to look through this.

20  Downtown should be fine, with the potential exception of

21  Ms. Ross.

22          MR. JENAL:  We have a San Francisco office,

23  that's no problem.

24          MR. JACOBY:  As do we.  Okay.  Let me go over

25  the names again, I've created a list, to make sure I

28

EXHIBIT 6 PAGE 350

1    have it right.   Topic 49 and 50 is Ms. Lissa Freed,

2    formerly Ms. Enzer, on May 3rd.   Topic 41 is Jules

3    Andres on May 17.   Topics 2 through 7, 54, 56 and 22 is

4    Sandy Yonemoto on May 9 and 10.   Topics 2 through 7 is

5    Joni Pratt on the afternoon of May 2nd in Los Angeles.

6    Topics 2 through 7 is Congchangco Kislap on April 24th.

7    2 through 7, Rob Hudnut on May 31st.   2 through -- is it

8    Renee Pasko?

9             MR. COREY:  Yes.

10             MR. JACOBY:  On May 18th.   E-mail retention

11    1998 to the present, Fred Kawashima, May 22.   The

12    document management at the design center, Julia Marine,

13    May 23rd.   Phone logs, Rob Palmer, May 25.   Topics 22,

14    23, Ivy Ross, tentatively the week of June 18, other

15    than the 20th.   Topics 2 through 7, Jill Nordquist on a

16    yet-to-be-determined date.

17             MR. COREY:  And I'll try to get Ms. Nordquist

18    during that same week.

19             MR. JACOBY:  So we'll do that the same week.

20    And potential witnesses to supplement topics 2 through 7

21    are Patty Howard, and who are the other two?

22             MR. COREY:  Sarah Maizes, M-a-i-z-e-s.

23             MR. JACOBY:  And?

24             MR. COREY:  Dean Stefan, S-t-e-f-a-n.

25             MR. JACOBY:  Dean, like Dean --

                                                      29

EXHIBIT 6  PAGE 351

1          MR. COREY: Yeah, like D-e-a-n.

2          MR. JACOBY: Okay. And we're not going to set

3     dates for them yet, we're going to wait until Rob Hudnut

4     testifies and see if we will need them.

5          MR. COREY: Correct.

6          MR. JENAL: Can I get one clarification on --

7     is it Ms. Yonemoto, is she covering 54 through 56?

8     Previously you had designated Ivy Ross on 55.

9          MR. COREY: Ivy Ross and -- let me take a step

10    back. Some of the witnesses that have been designated

11    will also be addressing topics other than the ones set

12    forth in the order. For example, Kislap and Pasko will

13    likely be addressing topics 10 through 11 as well, which

14    relates to Diva Starz. Ivy Ross will also addressing

15    topic 55, as well as Jill Nordquist. But within the

16    next couple of days I can provide you with the

17    additional designations that people -- the additional

18    topics that these people will address, in addition to

19    those covered by the order.

20         MR. JACOBY: Can we agree by -- do you need

21    till Friday or Monday to give us those additional

22    topics? My understanding is you're doing that because

23    you're in the process of meeting and conferring. I

24    think we had a motion that was on the runway for the

25    remaining topics. So you're trying to eliminate those

30

1   issues by designating these people on additional topics?

2           MR. COREY:  I have repeatedly invited someone

3   from your office to continue that meeting of counsel

4   with me, and in connection with that meeting of counsel

5   we addressed some topics that we came to an agreement

6   on, and those include topics 10 and 11 related to Diva

7   Starz.

8           MR. JACOBY:  Why don't you do this, do you

9   need till close of business Friday or Monday?

10          MR. COREY:  Actually, I'm going to get on a

11  plane and I'm not going to be back until Friday, so

12  Monday will be preferable.

13          MR. JACOBY:  How about by close of business

14  Monday you'll give us any additional topics these people

15  or additional people are going to testify on.  And then

16  I'll commit to having another meet and confer with you

17  to deal with the remaining topics, and we'll hold off on

18  filing that motion until that happens.  And that meet

19  and confer will be next week.

20          MR. COREY:  That should be fine.

21          MR. JACOBY:  Okay.  Is there anything else?

22          JUDGE INFANTE:  This is Judge Infante.  I must

23  say, the motion for sanctions is denied without

24  prejudice.  The order of January 30th is modified to

25  extend the time within which to complete the depositions

31

1    regarding that order until, let's say, June 26th, 2007.

2              MR. COREY:  Thank you, your Honor.

3              JUDGE INFANTE:  You may prepare a stipulation

4    and order for me to sign and I'll be glad to sign it.

5              MR. JACOBY:  Thank you for your time this

6    morning, your Honor.

7              MR. COREY:  Thank you.

8              JUDGE INFANTE:  Thank you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

32

1   STATE OF CALIFORNIA      )   ss

2   COUNTY OF LOS ANGELES    )

3

4           I, CATHRYN L. BAKER, CSR No. 7695, do

5   hereby certify

6           That the foregoing transcript of proceedings

7   was taken before me at the time and place therein set

8   forth;

9           That the hearing was recorded stenographically

10  by me, was thereafter transcribed under my direction and

11  supervision and that the foregoing is a true record of

12  same.

13          I further certify that I am neither counsel

14  for nor related to any party to said action, nor in

15  any way interested in the outcome thereof.

16          IN WITNESS WHEREOF, I have subscribed my

17  name this 23rd day of April, 2007.

18

19

20  _____

21          CATHRYN BAKER, CSR No. 7695

22

23

24

25

33

EXHIBIT  6  PAGE 355

**EXHIBIT  7**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**