1 | Stipulation and Protective Order pursuant to a motion brought in accordance with the

2 | rules of the Court.

3

4 | **IT IS SO STIPULATED.**

5

6 | DATED: December 22, 2004     QUINN EMANUEL URQUHART
                                     OLIVER & HEDGES, LLP

7

8 |     By _Jon Corey_____

9 |       Jon Corey
                          Attorneys for Plaintiff

10 |       Mattel, Inc.

11 | DATED: December __, 2004     LITTLER MENDELSON

12

13 |     By_____

14 |       Douglas A. Wickham
                          Attorneys for Defendant

15 |       Carter Bryant

16 | DATED: December __, 2004     O'MELVENY & MEYERS, LLP

17

18 |     By_____

      Diana M. Torres
                          Attorneys for Interventor-Defendant

19 |       MGA Entertainment, Inc.

20

21

22 | **IT IS SO ORDERED.**

23 | DATED: _1/4/05_____

24 |                **ROBERT N. BLOCK**
                                         THE HONORABLE ROBERT N. BLOCK
                                         United States Magistrate Judge

25

26

27

28

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _363_

1 | Stipulation and Protective Order pursuant to a motion brought in accordance with the
2 | rules of the Court.

3

4 |     **IT IS SO STIPULATED.**

5

6 | DATED: December __, 2004        QUINN EMANUEL URQUHART
7 |                                 OLIVER & HEDGES, LLP

8
9 |                                 By_____
                                    Jon Corey
10 |                                Attorneys for Plaintiff
                                    Mattel, Inc.

11
12 | DATED: December 21, 2004        LITTLER MENDELSON

13 |                                 By_____
14 |                                 Douglas A. Wickham
                                     Attorneys for Defendant
15 |                                 Carter Bryant

16 | DATED: December __, 2004        O'MELVENY & MEYERS, LLP

17
18 |                                 By_____
                                     Diana M. Torres
19 |                                Attorneys for Intervenor-Defendant
                                    MGA Entertainment, Inc.

20

21 |        **IT IS SO ORDERED.**

22

23

24 | DATED: _____          _____
                                    THE HONORABLE ROBERT N. BLOCK
25 |                                United States Magistrate Judge

26

27

28

07272/625581.2                          -17-

                                                        PROTECTIVE ORDER

EXHIBIT 16 PAGE 364

1    Stipulation and Protective Order pursuant to a motion brought in accordance with the

2    rules of the Court.

3

4    **IT IS SO STIPULATED.**

5

6    DATED: December ___, 2004      QUINN EMANUEL URQUHART

7                                    OLIVER & HEDGES, LLP

8

9                                 By _____

                                   Jon Corey

10                                Attorneys for Plaintiff

                                 Mattel, Inc.

11

12    DATED: December ___, 2004      LITTLER MENDELSON

13

14                                 By _____

                                   Douglas A. Wickham

15                                Attorneys for Defendant

                               Carter Bryant

16    DATED: December ___, 2004      O'MELVENY & MEYERS, LLP

17

18                                 By _____

                                 Diana M. Torres

19                                Attorneys for Intervenor-Defendant

                               MGA Entertainment, Inc.

20

21        **IT IS SO ORDERED.**

22

23

24    DATED: _____          _____

                                   THE HONORABLE ROBERT N. BLOCK

25                                United States Magistrate Judge

26

27

28

EXHIBIT 16 PAGE 365

# EXHIBIT A

## ASSURANCE OF COMPLIANCE

I, _____, under penalty of perjury under the laws of the United States of America, declare and state as follows:

I reside at _____, in the City/County of _____ and State/Country of _____;

I have read the annexed Stipulated Protective Order, ("Protective Order") dated _____ in the action entitled *Mattel, Inc. v. Carter Bryant*, Case No. CV 04-9059 NM (RNBx), which currently is pending in the United States District Court for the Central District of California; that I am fully familiar with and agree to comply with and be bound by the provisions of that Protective Order;

I will not divulge to persons other than those specifically authorized by the Protective Order, and will not copy or use any Litigation Materials designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" except solely as permitted by the Protective Order; and

I consent to the jurisdiction of the United States District Court for the Central District of California for the purpose of enforcing said Protective Order, enjoining any violation or threatened violation of the Protective Order or seeking damages for the breach of said Protective Order.

_____
(Signature)

07272/625581.2

PROTECTIVE ORDER

EXHIBIT *16* PAGE *366*

**PROOF OF SERVICE**

1013A(3) CCP Revised 5/1/88

**STATE OF CALIFORNIA** )
**COUNTY OF LOS ANGELES** )

I am employed in the county of Los Angeles State of California. I am over the age of 18 and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90012.

On December 22, 2004, I served the foregoing document described as

**STIPULATED PROTECTIVE ORDER; AND [PROPOSED] ORDER**

on all interested parties in this action:

**SEE ATTACHED SERVICE LIST**

[ ]   By placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed as follows:

[ ]   **BY MAIL**

[ ]   I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

[ ]   As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]   **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s) set forth above on this date.

Executed on December 22, 2004, at Los Angeles, California.

[X]   (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Ivana Maiorano
Print Name

Signature

EXHIBIT 16 PAGE 367

Robert F. Millman, Esq.
Douglas A. Wickham, Esq.
Keith A. Jacoby, Esq.
Littler Mendelson
A Professional Corporation
2049 Century Park East, 5th Floor
Los Angeles, California 90067-3107
Phone: 310-553-0308
Fax: 310-553-5583

Diana M. Torres, Esq.
O'Melveney & Meyers
400 S. Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax: 213-430-6407

Daniel J. Warren, Esq.
Sutherland, Asbill & Brennan
999 Peachtree Street NE
Atlanta, GA  30309-3996
Phone: 404-853-8698
Fax: 404-853-8806

-2-

EXHIBIT 16 PAGE 368

**Exhibit  17**

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   MATTHEW M. WERDEGAR - #200470
5  mwerdegar@kvn.com
   JOHN E. TRINIDAD - #250468
6  jtrinidad@kvn.com
   AUDREY WALTON-HADLOCK- #250574
7  awaltonhadlock@kvn.com
   710 Sansome Street
8  San Francisco, CA  94111-1704
   Telephone:  (415) 391-5400
9  Facsimile:  (415) 397-7188

10 Attorneys for Plaintiff
   CARTER BRYANT

11

12

13              UNITED STATES DISTRICT COURT

14             CENTRAL DISTRICT OF CALIFORNIA

15                    EASTERN DIVISION

16

17 CARTER BRYANT, an individual,      Case No. CV 04-09049 SGL (RNBx)
                                      (consolidated with CV 04-9059 & 05-
18              Plaintiff,            2727

19      v.                            [PROPOSED] ORDER GRANTING
                                      IN PART MGA ENTERTAINMENT
20 MATTEL, INC. a Delaware            INC.'S AND CARTER BRYANT'S
   Corporation,                       JOINT NOTICE OF MOTION TO
21                                    COMPEL RE: MATTEL'S
                Defendant.            BANDYING OF 30(B)(6)
22                                    WITNESSES

23 CONSOLIDATED WITH MATTEL,
   INC., v. BRYANT and MGA
24 ENTERTAINMENT, INC. v.
   MATTEL, INC.

25

26

27

28

408784.01

EXHIBIT 17 PAGE 369

1    Having considered MGA Entertainment Inc.'s and Carter Bryant's Joint

2    Motion to Compel re: Mattel's Bandying of 30(b)(6) witnesses (the "Motion") and

3    all other papers and arguments submitted in support of or opposition to the Motion,

4    and finding good cause therefore,

5    **IT IS HEREBY ORDERED THAT:**

6    1.    The Motion is **GRANTED** as to Topics 2-8, 11-13, and 24 of

7          Carter Bryant's Rule 30(b)(6) Notice of Deposition.  Accordingly,

8          Mattel shall produce, at its own expense, properly educated and

9          adequately prepared Rule 30(b)(6) witnesses to testify competently

10         as to Mattel's knowledge on Topics 2 – 8, 11 – 13, and 24.  Mattel

11         shall produce no more than one competent witness on any one

12         topic.

13   2.    The Motion is **DENIED** as to topics 41 and "Zeus."

14   3.    Failure to comply with this order may result in preclusion of

15         evidence offered by Mattel at trial, pursuant to Federal Rules of

16         Civil Procedure 37.

17   4.    All motions for monetary sanctions are **DENIED,** because the

18         Court would find it is unjust under the circumstances of this case to

19         award such monetary sanctions.    Any reporter or videographer

20         costs incurred in connection with the deposition of a witness on

21         Topics 2-8, 11-13 and 24 shall be borne by Mattel.

22   5.    Mattel shall comply with this order by January 28, 2008.

1

408784.01

EXHIBIT 17 PAGE 370

1    Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a

2 Discovery Master, Carter Bryant shall file this Order with the Clerk of the Court

3 forthwith.

4    **IT IS SO ORDERED.**

5 Dated: January __11__, 2008

6

7    By: _Edward A. Infante_

8       HON. EDWARD A. INFANTE
        Discovery Master

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING MGA ENTERTAINMENT INC.'S AND CARTER BRYANT'S JOINT
NOTICE OF MOTION TO COMPEL RE: MATTEL'S BANDYING OF 30(B)(6) WITNESSES
CASE NO. CV 04-09049 SGL (RNBx)

408784.01

EXHIBIT _17_ PAGE _371_

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 11, 2008, I served the attached ORDER GRANTING IN PART MGA ENTERTAINMENT INC.'S AND CARTER BRYANT'S JOINT NOTICE OF MOTION TO COMPEL RE: MATTEL'S BANDYING OF 30(B)(6) WITNESSES in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 11, 2008, at San Francisco, California.

_____
Sandra Chan

EXHIBIT 17 PAGE 372

Exhibit 18

CALENDARED

```
 1          UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA

 3               EASTERN DIVISION
                                          Certified Copy
 4     ------------------------------------

 5   MATTEL, INC., a Delaware Corporation,  )

 6                  Plaintiff,              )

 7       vs.                               ) No. CV 04-9059

 8   CARTER BRYANT, an individual; and     ) NM (RNBx)

 9   DOES 1 through 10, Inclusive,         )

10                  Defendants.            )

11     ------------------------------------)

12   CARTER BRYANT, on behalf of himself,  )

13   All present and former employees of   )

14   Mattel, Inc., and the general public, )

15                  Counter-Claimants,     )

16       vs.                               )

17   MATTEL, INC., a Delaware corporation, )

18                  Counter-Defendant.     )

19     ------------------------------------

20          Deposition of JULIA JENSEN, taken at

21       7 Times Square, New York, New York,

22       commencing at 10:15 a.m., Friday,

23       June 8, 2007, before Morene

24       Korenman-Bangel, Notary Public.

25   PAGES 1 - 191
```

1

EXHIBIT 18 PAGE 373

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4

 5        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6        BY: TIMOTHY L. ALGER, ESQ.

 7        865 South Figueroa Street, 10th Floor

 8        Los Angeles, California 90017

 9        (213) 443-3000

10        timalger@quinnemanuel.com

11

12    FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:

13

14        O'MELVENY & MYERS LLP

15        BY: MICHAEL C. KEATS, ESQ.

16            KENDALL BURR, ESQ.

17        7 Times Square

18        New York, New York 10036

19        (212) 408-2400

20        mkeats@omm.com

21        kburr@omm.com

22

23    ALSO PRESENT:

24        MICHAEL MOORE, ESQ., MATTEL, INC.

25        ILYA TALEYSNIK, VIDEOGRAPHER
```

2

EXHIBIT _18_ PAGE _374_

1            THE VIDEOGRAPHER:  This is Ilya Taleysnik,

2    member of the national legal video association for

3    Veritext NY.  We are on record at 10:18 a.m. on June

4    8th, 2007.  We are here for the case of Mattel, Inc.,

5    versus Carter Bryant and Carter Bryant versus Mattel,

6    Inc.

7            The witness today is Julia Jensen.

8            We are at the location of O'Melveny & Myers

9    at 7 Times Square in New York City.  Would the

10   attorneys please state their appearances for the

11   record.

12           MR. KEATS:  Michael Keats of O'Melveny &

13   Myers for MGA, and with me today is Kendall Burr of our

14   office.

15           MR. ALGER:  Timothy Alger from the law firm

16   of Quinn Emanuel in Los Angeles on behalf of the

17   witness, and Mattel, Inc.

18           MR. MOORE:  Michael Moore, in-house counsel

19   for Mattel.

20           THE VIDEOGRAPHER:  Thank you.  Will the

21   court reporter please swear in the witness.

22           JULIA JENSEN,

23    having been first duly sworn by the Notary

24    Public, was examined and testified as

25    follows:

3

EXHIBIT _18_ PAGE _375_

1

2      Q.      Right.

3      A.      To the best of my memory now.

4      Q.      Do you have any reason to think that you

5  might be wrong about that?

6      A.      No, not other than memory is memory.

7      Q.      Right.

8              It's possible she could have talked about it

9  with you before that last call?

10     A.      I highly doubt that's the case.

11             (Pause.)

12             MR. KEATS:  All right.  Thank you.  I'm

13  sorry this was done when you're two and a half weeks

14  away.

15             THE WITNESS:  That's fine.

16             MR. KEATS:  But we appreciate your time.

17             MR. ALGER:  Thank you.

18             THE VIDEOGRAPHER:  End tape 4, off the

19  record 3:31 p.m.

20                  (TIME NOTED: 3:31 P.M.)

21

22             (Exhibits retained by counsel.)

23

24

25

187

EXHIBIT _18_ PAGE _376_

1   STATE OF NEW YORK      )

2                          SS:

3   COUNTY OF NEW YORK    }

4

5        I, MORENE KORENMAN-BANGEL, a Shorthand Reporter

6   and a Notary Public within and for the State of New

7   York, do hereby certify that the foregoing deposition of

8   JULIA JENSEN was taken before me on the 8th day of June

9   2007.

10       That the said witness was duly sworn before the

11  commencement of his testimony; that the said testimony

12  was taken stenographically by me and then transcribed.

13       I am not related by blood or marriage to any of

14  the said parties, nor interested directly or indirectly

15  in the matter in controversy, nor am I in the employ of

16  any of the counsel.

17       IN WITNESS WHEREOF, I have hereunto set my hand

18  this 21st day of June 2007.

19

20

21            *Moren Korenman-Bangel*

22            MORENE KORENMAN-BANGEL

23

24

25
                                                    189

EXHIBIT 18 PAGE 377

**Exhibit  19**

1

# CERTIFIED COPY

2   UNITED STATES DISTRICT COURT
    CENTRAL DISTRICT OF CALIFORNIA
3   EASTERN DIVISION
    ------------------------------------------X
4   CARTER BRYANT, an individual,

5                          Plaintiff,

6                          Case No. CV 04-9049

7            -against-

8   MATTEL, INC., a Delaware corporation,

9                          Defendant.
    ------------------------------------------
10  AND CONSOLIDATED CASES
    ------------------------------------------X
11                      180 Maiden Lane
                        New York, New York
12
                        DATE: September 28, 2007
13                      TIME: 10:32 a.m.

14

15          DEPOSITION of MAUREEN TKACIK, taken

16  pursuant to the Federal Rules of Civil Procedure,

17  and Subpoena, held at the above-mentioned time and

18  place before Karen D. Williams, a Notary Public of

19  the State of New York.

20

21

22

23  ATKINSON-BAKER, INC.
    COURT REPORTERS
24  (800) 288-3376
    www.depo.com
25  FILE NO.:  A10825B

1

EXHIBIT 19 PAGE 378

1

2    A P P E A R A N C E S:

3

4          KEKER & VAN NEST, LLP
                   Attorney for Plaintiff
5                  710 Sansome Street
                   San Francisco, California 94111
6          BY:     (Not present)

7

8          DOW JONES & COMPANY, INC.
                   Attorney for Defendant
                   The Wall Street Journal
9                  200 Liberty Street
                   New York, New York 10281
10         BY:     STUART D. KARLE, ESQ.

11

12         LAW OFFICES OF JAMES W. SPERTUS
                   Attorney for Defendant
                   Carlos Gustavo Machado Gomez
13                 12100 Wilshire Boulevard
                   Suite 620
14                 Los Angeles, California 90025
           BY:     (Not Present)

15

16         STROOCK & STROOCK & LAVAN, LLP
                   Attorney for Defendant
17                 Mattel, Inc.
                   2029 Century Park East
18                 Los Angeles, California 90067
           BY:     MICHAEL J. NIBORSKI

19

20

21

22

23

24

25

                                                          2

EXHIBIT _19_ PAGE _379_

```
1

2    A P P E A R A N C E S:

3

4          O'MELVENY & MYERS
                   Attorney for Defendant
5                  MGA Entertainment, Inc.,
                   MGA Entertainment, (HK), LTD.,
6                  Isaac Larian and
                   MGAE de Mexico, S.R.I. de C.V.
7                  Times Square Tower
                   7 Times Square
8                  New York, New York 10036
          BY:      DALE M. CENDALI, ESQ.
9

10

11         O'MELVENY & MYERS
                   Attorney for Defendant
12                 MGA Entertainment, Inc.,
                   MGA Entertainment, (HK), LTD.,
13                 Isaac Larian and
                   MGAE de Mexico, S.R.I. de C.V.
14                 Times Square Tower
                   7 Times Square
15                 New York, New York 10036
          BY:      KENDALL J. BURR, ESQ.

16

17

18

19

20

21

22

23

24

25
```

3

EXHIBIT 19 PAGE 380

1

2

3

4

5          IT IS HEREBY STIPULATED AND AGREED, by

6    and between the attorneys for the respective

7    parties herein, that the sealing and filing of the

8    within deposition be waived.

9

10

11          IT IS FURTHER STIPULATED AND AGREED

12    that this deposition may be signed and sworn to

13    before any officer authorized to administer an oath

14    with the same force and effect as if signed and

15    sworn to before the officer before whom said

16    deposition is taken.

17

18

19          IT IS FURTHER STIPULATED AND AGREED

20    that all objections, except as to form, are

21    reserved to the time of trial.

22

23

24

25

EXHIBIT _19_ PAGE _381_

```
 1                          TKACIK
 2   M A U R E E N    T K A C I K, having first been
 3   duly sworn by a Notary Public of the State of New
 4   York, was examined and testified as follows:
 5   BY THE REPORTER:
 6         Q      Please state your name for the record.
 7         A      Maureen Tkacik.
 8         Q      What is your address?
 9         A      65-67 Rivington, Apartment 7, New York,
10   New York 10002.
11
12   EXAMINATION BY
13   MR. NIBORSKI:
14         Q      Good morning, Miss Tkacik.
15         A      Good morning.
16         Q      Could you tell us where you are
17   currently employed?
18         A      I am currently employed by Gawker
19   Media.
20         Q      And is that here in New York?
21         A      Yes.
22         Q      And were you previously employed by the
23   Wall Street Journal?
24         A      I was.
25         Q      And approximately what time period were
```

5

EXHIBIT _19_ PAGE _382_

```
1                        TKACIK
2    you employed by the Journal?
3         A    May 2001 through August or September of
4    2003.
5         Q    And following your time at the Journal,
6    did you then go to Gawker Media?
7         A    I worked at Philadelphia Magazine in
8    between, and free-lanced for several publications.
9         Q    And where did you work prior to the
10   Wall Street Journal as a reporter, if anything?
11        A    I worked for Time Magazine in Asia, in
12   Hong Kong.  I worked at the Philadelphia Daily News
13   in Philadelphia and I worked at the Washington
14   Times in Washington, D.C. and I worked for a web
15   company called Asia Wise in Hong Kong.
16        Q    Can you just give us a brief background
17   about your education?
18        A    I went to University of Pennsylvania
19   for two years.  I dropped out.  I took some
20   graduate classes at George Mason's -- at George
21   Mason University School of Public Policy, and
22   that's the extent.
23        Q    And what was your job title while you
24   worked at the The Wall Street Journal?
25        A    My specific job title was reporting
```

6

EXHIBIT 19 PAGE 383

```
 1                         TKACIK

 2    assistant or assistant reporter, something like

 3    that.

 4         Q      And could you describe your job duties

 5    while you were there?

 6         A      I had to cover, it was somewhat -- and

 7    I had a few companies that I had to cover.  I had

 8    to cover, generally, youth oriented consumer

 9    products firms.  So, that would be toy companies

10    like Mattel and footwear, the footwear companies,

11    some youth retailers.  There was a crop of

12    companies that I had to keep track of.

13         Q      Thank you.  I am going to show you what

14    we are going to mark as Exhibit 1.  This is a July

15    18, 2003 article from The Wall Street Journal.  I

16    have copies for the witness and counsel.

17                     (Whereupon, the aforementioned

18                     article was marked as Plaintiff's

19                     Exhibit 1 for identification as of this

20                     date by the Reporter.)

21    BY MR. NIBORSKI:

22         Q      Miss Tkacik, could I have you take a

23    look at what's been marked as Exhibit 1?

24         A      Yes.

25         Q      Do you recognize this?
```

EXHIBIT *19* PAGE *384*

TKACIK

1

2     A     I do.

3     Q     And what is it?

4     A     It is a story that I wrote, that I

5  think is why I am here.

6     Q     And just for the record, this is a Wall

7  Street Journal article dated July 18, 2003

8  entitled, "To Lure Older Girls, Mattel Brings in

9  Hip-Hop Crowd."

10    A     Correct.

11    Q     And this is an article that you wrote?

12    A     Yes.

13    Q     And if I could have you turn to the

14  second page, you will see a highlighted paragraph.

15          Do you see that?

16    A     Yes.

17    Q     Could I have you read that out loud,

18  please?

19    A     "Isaac Larian, chief executive of MGA,

20  says he had never heard of a project similar to the

21  Bratz at Mattel.  He says he chose Mr. Bryant's

22  idea for the Bratz over several others after

23  holding a sort of fashion-doll design contest in

24  late 1999."

25    Q     And did you interview Isaac Larian in

8

EXHIBIT 19 PAGE 385

```
 1                        TKACIK
 2   preparation for writing this article?
 3       A    Yes.
 4       Q    And you would agree, wouldn't you, that
 5   the article attributes certain statements to
 6   Mr. Larian?
 7                   MS. CENDALI:  Objection.
 8       A    I am not sure what -- that statement
 9   that is highlighted, I would say that that is
10   attributed to Isaac Larian.
11       Q    And again, turning to the highlighted
12   paragraph, the --
13                   MR. KARLE:  And we are staying on
14           that paragraph?
15                   MR. NIBORSKI:  Yes.
16       Q    The second sentence reads, "He says he
17   chose Mr. Bryant's idea for the Bratz over several
18   others after holding a sort of fashion-doll contest
19   in late 1999."  Did I read that correctly.
20       A    You missed the word design.  It's
21   fashion-doll design contest.
22       Q    Fair enough.  Let me repeat it.  He
23   says he chose Mr. Bryant's idea for the Bratz over
24   several others after holding a sort of fashion-doll
25   design contest in late 1999; is that correct?
```

9

EXHIBIT 19 PAGE 386

```
 1                        TKACIK

 2        A     Yes.

 3        Q     And did Mr. Larian tell you that

 4   statement during your interview?

 5        A     Yes.

 6        Q     Following the publication of your

 7   article, did anybody from MGA ever contact you and

 8   ask for a correction or retraction or anything from

 9   the article?

10        A     No.

11        Q     Did Mr. Larian ever contact you and

12   asked for a correction or retraction or anything

13   from the article?

14        A     No.

15                     MR. KARLE:  Just let him finish.

16        Q     Did you ever learn that anyone

17   contacted The Wall Street Journal and asked for a

18   correction or retraction or anything in the

19   article?

20        A     No.

21                     MR. NIBORSKI:  I have only one

22                     more exhibit and this is just for

23                     housekeeping purposes.  This is just the

24                     deposition notice which I would like to

25                     make an exhibit to the deposition.
```

10

EXHIBIT _19_ PAGE _387_

```
1                        TKACIK
2              MR. KARLE:  Did you ask her if
3         she has seen it?
4              MR. NIBORSKI:  That's all right.
5         This is just for the deposition.
6      A    Miss Tkacik, this is an amended
7  deposition notice which I am handing you.  This is
8  just for the record, just to include this as part
9  of the transcript.  This would be marked as Exhibit
10 2.
11             (Whereupon, the aforementioned
12        Notice of Deposition was marked as
13        Plaintiff's Exhibit 2 for identification
14        as of this date by the Reporter.)
15             MR. NIBORSKI:  And finally, I
16        would like to mark as Exhibit 3 the
17        subpoena for this deposition, which
18        again is just for the record.
19             MS. CENDALI:  The amended
20        subpoena?
21             MR. NIBORSKI:  This is the
22        original subpoena.
23             (Whereupon, the aforementioned
24        subpoena was marked as Plaintiff's
25        Exhibit 3 for identification as of this
```

11

EXHIBIT _19_ PAGE _388_

```
 1                        TKACIK
 2              date by the Reporter.)
 3                   MR. NIBORSKI:  And I have no more
 4              questions.
 5   EXAMINATION BY
 6   MS. CENDALI:
 7         Q     Ms. Tkacik, the original Exhibit 3
 8   subpoena in this case asks for you to appear at the
 9   office of Quinn Emanuel, a law firm representing
10   Mattel.  Have you ever had any contacts with the
11   Quinn Emanuel law firm?
12         A     I don't think so.
13         Q     Do you have any idea why Quinn Emanuel,
14   I represent to you is Mattel's normal counsel in
15   this case, is not taking your deposition today?
16         A     No.
17         Q     You say that you left University of
18   Pennsylvania, when was that?
19         A     1998.
20         Q     And did you begin work in journalism
21   after you left Pennsylvania?
22         A     Directly following that.
23         Q     And the job that you mentioned that you
24   had prior to working for The Wall Street Journal,
25   were they full-time jobs or free-lance jobs?
```

                                                    12

EXHIBIT 19 PAGE 389

TKACIK

1

2      A      Full time.  They were all full-time

3  jobs.

4      Q      When you were working for The Wall

5  Street Journal from May 2001 to August/September

6  2003, where were you living?

7      A      I was living in Los Angeles.

8      Q      Am I correct that prior to having

9  written the article reflected in Exhibit 1, you had

10  previously wrote several other articles about

11  Mattel for The Wall Street Journal?

12      A      True.  Yes, you are correct in saying

13  that.

14      Q      Let me show you some of these articles?

15              MS. CENDALI:  Let's mark as

16              Exhibit 4 an article dated February 1,

17              2001.

18              (Whereupon, the aforementioned

19              2/1/02 article was marked as Plaintiff's

20              Exhibit 4 for identification as of this

21              date by the Reporter.)

22  BY MS. CENDALI:

23      A      It's 2002.

24      Q      Right.  Do you recognize that?

25              MR. KARLE:  Take a look at it

13

EXHIBIT _19_ PAGE _390_

```
                              TKACIK
 1
 2                 first.

 3         Q     Miss Tkacik, do you recognize Exhibit 4

 4  as a copy of an article you wrote for The Wall

 5  Street Journal on February 1, 2002 about Mattel?

 6                     MR. KARLE:  Objection.  It was

 7                 published.

 8                     MS. CENDALI:  Published.  Thank

 9                 you.

10         A     When you say do you recognize, I

11  recognize my name, and it looks like a story that I

12  wrote, but I don't remember writing it.

13         Q     On the first page of Exhibit 4, there

14  is a quote from a Mr. Eckert.

15                 Do you see that?

16         A     Okay.  Yes.

17         Q     Did you interview Mr. Eckert for this

18  article?

19         A     It looks as though I listened in on a

20  conference call, and, so, I imagine that I did not

21  actually interview him, that these are remarks that

22  he made in the context of an earnings call with

23  analysts.

24         Q      Did you know who Mr. Eckert was at the

25  time?
```

14

EXHIBIT _19_ PAGE _391_

```
1                    TKACIK
2       A     Yes.  He was the chief executive of
3  Mattel, and still is.
4       Q     Have you ever had a conversation with
5  Mr. Eckert?
6       A     Yes.
7       Q     Under what circumstances?
8       A     I don't remember.  But covering, in the
9  context of covering Mattel for The Wall Street
10 Journal.
11      Q     Did you have a conversation with
12 Mr. Eckert in connection with Exhibit 1 to your
13 deposition, the July 2003 Wall Street Journal
14 article?
15      A     I don't remember.
16      Q     Let me show you what we will mark as
17 Exhibit 5, an article dated February 7, 2002 from
18 The Wall Street Journal by Maureen Tkacik.
19                 (Whereupon, the aforementioned
20                 2/7/02 article was marked as Plaintiff's
21                 Exhibit 5 for identification as of this
22                 date by the Reporter.)
23 BY MS. CENDALI:
24      Q     Do recognize Exhibit 5 as an article
25 you wrote about Mattel in The Wall Street Journal
```

15

EXHIBIT _15_ PAGE _392_

```
                              TKACIK
 1
 2   that was published on February 7, 2002?

 3        A     Yes.

 4        Q     And in this article, the last

 5   paragraph, there is a quote from a Rob Hudnut of

 6   Mattel.

 7              Do you see that?

 8        A     I do.

 9        Q     Did you interview Mr. Hudnut for this

10   article?

11        A     Yes.  Well, I should rephrase that.  I

12   am partially assuming that I did because I did the

13   story, and I quoted him.  But I do recall this

14   particular person, I wouldn't remember his name is

15   Rob Hudnut, but based on the fact that I generally

16   try to report accurately, I would say yes.

17        Q     Let me show you what we will mark as

18   Exhibit 6, a Wall Street Journal article with your

19   byline dated February 8, 2002.

20                   (Whereupon, the aforementioned

21                   2/8/02 article was marked as Plaintiff's

22                   Exhibit 6 for identification as of this

23                   date by the Reporter.)

24   BY MS. CENDALI:

25        Q     Do you recognize that as a copy of an
```

16

EXHIBIT _19_ PAGE _393_

1                        TKACIK

2    article you wrote for The Wall Street Journal about

3    Mattel?

4         A    Yes.

5         Q    And did you interview anyone in Mattel

6    for this article?

7         A    Yes.

8         Q    Who?

9                   MR. KARLE:  Excuse me.  You mean

10              who is identified in the story or are

11              you asking --

12                  MS. CENDALI:  Yes.

13        Q    Who did you interview?  From what you

14   see quoted here, who did you interview for this

15   article?

16                  MR. KARLE:  Read through it.

17        A    Well, again, I do have fairly decent

18   memory of doing this story, and although, again, I

19   don't think, I would not remember her name as Amy

20   Boylan, but Amy Boylan, a designer at Mattel, she

21   was my primary interview, and now that I see her

22   name, I recall interviewing her.

23        Q    And how did it come to be, as reflected

24   in Exhibits 4, 5 and 6 you wrote three articles

25   about Mattel the same week?

                                                    17

EXHIBIT 19 PAGE 394

TKACIK

1

2          MR. KARLE:  You are asking about

3      the editorial judgment that led to that?

4          MS. CENDALI:  I am asking if for

5      some reason she wrote these articles

6      about Mattell in the same week.

7          MR. KARLE:  If you are asking

8      about news judgment that led to this, I

9      don't understand the relevance to the

10     article we are brought here for.  And I

11     am not going to let you inquire into

12     editorial decisions made.  If you want

13     to ask what her judgment is about these

14     things, that's fine.  But if you are

15     asking why The Wall Street Journal

16     published these, I instruct the witness

17     not to answer that question.

18  Q    Is it fair to say that because of your

19  being assigned at The Wall Street Journal you made

20  it a point to get to know Mattel well?

21         MR. KARLE:  Objection to the form

22     of the question.

23         THE WITNESS:  Should I say

24     anything?

25         MR. KARLE:  You can answer the

18

EXHIBIT 19 PAGE 395

```
 1                          TKACIK
 2              question.
 3       A      I tried to, when I had a company that I
 4    needed to cover, and especially if it was a public
 5    company like Mattel, that have, you know, pretty --
 6    they have a lot of people working in PR and
 7    investor relations and they have a constant flow of
 8    news, but I had a few companies that I needed to
 9    keep track of, and Mattel at the time was a pretty
10    large company, both market capital and revenue
11    wise, so I did -- yes, I did make it a point to get
12    to now know all of the companies that I was
13    assigned to cover, specifically, the public ones
14    because they were the biggest, and investors care
15    about public companies and what they are doing.
16    And you know, another thing that I would say is
17    just that, that a lot of times I would, stories
18    would run close together when they weren't
19    necessarily written close together, it was -- one
20    of these was a news story about earnings and one
21    was another news story.  And this was more of a
22    feature story that I, you know, that was kind of
23    evergreen.  So I don't imagine that -- I imagine
24    that it was simply coincidental.
25                    MR. KARLE:  When you said this,
```

EXHIBIT _19_ PAGE _396_

```
1                          TKACIK
2            you meant Exhibit 6?
3                   THE WITNESS:  Yes.  I didn't mean
4            Exhibit 6 was a feature.
5        Q    So is it fair to say in the course of
6    your work covering, I think you said consumer
7    products?
8        A    Youth targeted consumer products and
9    retail firms is generally how you would phrase the
10   companies that I covered.
11       Q    So is it fair to say as part of your
12   work in covering youth products and consumer
13   products, you made a point to get to know Mattel?
14       A    I would -- that's fair to say; I
15   suppose.
16       Q    Let me mark as Exhibit 7, another
17   article in The Wall Street Journal with your byline
18   about Mattel dated April 3, 2003.
19                   (Whereupon, the aforementioned
20            4/3/03 article was marked as Plaintiff's
21            Exhibit 7 for identification as of this
22            date by the Reporter.)
23   BY MS. CENDALI:
24       Q    Is that a copy of another article you
25   wrote?
```

20

EXHIBIT _19_ PAGE _327_

TKACIK

1

2      A      Yes.

3      Q      And in this article, did you report --

4  it states in the first line that Mr. Eckert's 2002

5  pay jumped to 11.9 million dollars?

6      A      Yes, that's what it states.

7      Q      And you have no reason to believe that

8  that's not true?

9      A      Yes, I don't.

10     Q      So, turning to Exhibit 1, the first

11 exhibit that we started with today.

12     A      Uh-huh.

13     Q      Is it true that prior to writing the

14 article reflected in Exhibit 1, you would have

15 various interviews with people at Mattel for other

16 articles?

17     A      Yes.

18     Q      Is it true that Mattel contacted you to

19 get you interested in writing the article that

20 became Exhibit 1?

21     A      No.  No.

22     Q      Do you know a Julie Jensen at Mattel?.

23     A      There was a PR person there by that

24 name, but I thought her name was Julia.

25     Q      Did Julia Jensen contact you to

EXHIBIT 19 PAGE 398

1                              TKACIK

2    encourage you to write an article about Flavas for

3    Mattel, about Mattel's launch of the Flavas

4    product?

5         A    No.  There was a -- generally, the

6    initial genesis of this was they have a sort of toy

7    fair at Mattel where they show new lines, new

8    products to retailers, and so I had gone to that

9    and seen the Flavas.  But the story itself -- and I

10   was thinking about writing about the Flavas.  But

11   it was only -- but I thought, you know, it was only

12   when I learned about a more interesting story that

13   I, you know, this became a story in the journal.

14        Q    When you say you learned about a more

15   interesting story, what do you mean?

16        A    When I learned about the more

17   interesting angle of the companies, I think I would

18   say corporate culture, I don't remember the story

19   that specifically, but I would describe it more as

20   a story about a corporate culture that, you know,

21   was, had been very Barbie centric rather corporate,

22   a business model that was dependent on this one

23   kind of brand and how it was changing.  And I

24   didn't, Mattel had not provided me with any of that

25   information nor did they, you know, did they, did

                                                      22

EXHIBIT 18 PAGE 399

```
 1                        TKACIK
 2   Julia Jensen or anybody else there seek to.
 3        Q    Matt Bousquette is one of the people
 4   listed that you interviewed for this article; is
 5   that right?
 6                  MR. KARLE:  When you say listed,
 7             you mean someone identified in the
 8             story?
 9                  MS. CENDALI:  Yes.
10        Q    Matt Bousquette is one of the people
11   that is quoted in this article as someone you spoke
12   to; is that right?
13        A    Yes.
14        Q    And he is someone you spoke to?
15        A    Yes.
16        Q    Let's turn to the third paragraph of
17   the article, where is says, "Mattel Inc. hopes that
18   the dolls are hip enough to take on the Bratz."
19   You see that?
20        A    Uh-huh.
21        Q    It says, "the Flavas (pronounced
22   Flay-vuhs like flavors) is a set of six dolls
23   brought from design to production in just three
24   months, represent a striking gamble for the giant
25   toy company."
```

23

EXHIBIT 19 PAGE 400

```
 1                          TKACIK

 2              Do you see that?

 3       A     Yes.

 4       Q     Did people at Mattel identified in this

 5  article tell you that the Flavas was developed in

 6  just three months?

 7       A     Yes.

 8       Q     Do you recall them saying to you that

 9  it was possible to develop a new doll line in a

10  short period of time if one wanted to?

11       A     I don't remember specifically that.

12       Q     But that was the gist of what they were

13  telling you?

14       A     That has to be assumed.

15       Q     Was Mr. Bousquette the person who told

16  you that?

17       A     I don't know.

18       Q     In your article, you state in the next

19  paragraph, But Mattel, which had become accustomed

20  to its buxom blonde dominating the market, has

21  watched in alarm as Barbie has been challenged, a

22  smaller toy maker's Bratz, a line of big-headed

23  pouty-lipped characters.  Do you see that?

24       A     Uh-huh.

25       Q     Did someone at Mattel tell you that?
```

24

EXHIBIT 19 PAGE 401

TKACIK

1

2      A    No.  That is the sort of background --

3  nobody ever told me on the record, you know, nobody

4  phrased it in that way.  It was a conventional

5  wisdom gleaned probably, I imagine, but I don't

6  know, from speaking with analysts, watching the,

7  you know, speaking with retailers and speaking off

8  the record with employees.

9      Q    Going to the next paragraph in Exhibit

10  1, you write, "After trying and failing to defeat

11  the Bratz with a trendier Barbie last year, Mattel

12  has come up with a radical battle plan."  Do you

13  see that?

14      A    Uh-huh.

15      Q    What were you referring to when you

16  referred, to "trying and failing to defeat the

17  Bratz with a trendier Barbie last year"?

18      A    There was a Barbie that they had put on

19  the market called My Scene Barbie.  My Scene Barbie

20  had large heads and more cartoonish features.

21      Q    Did Mattel tell you that they had

22  failed to defeat Bratz with My Scene?

23      A    No.

24      Q    Did people at Mattel tell you that the

25  My Scene doll was intended to compete with Bratz?

TKACIK

1

2          A     No.

3          Q     Turning to two paragraphs down in the

4     article, you write, "Mattel now concedes Barbie has

5     gradually lost touch with some young girls' lives,

6     "Barbie began as a great girl who was simply a

7     reflection of popular culture, but in the past

8     few years, we had sort of put her on a pedestal,"

9     says Matt Bousquette, president of the newly

10    created Mattel Brands unit."

11               Do you see that?

12         A     Yes.

13         Q     Is that an accurate quote of what he

14    said?

15         A     Yes.  I remember that conversation.

16         Q     Did that conversation take place in

17    person or on the phone?

18         A     I don't remember.

19         Q     Do you remember that you met

20    Mr. Bousquette in your life?

21         A     Yes, I met him a few times.

22         Q     You interviewed him several times for

23    articles?

24         A     You know, at least twice, three times.

25         Q     It goes on to say, "which consolidated

26

EXHIBIT 19 PAGE 403

```
 1                        TKACIK

 2   the boys and girls toys division, we're taking her

 3   off that pedestal."  Do you see that?

 4        A    Yes.

 5        Q    Again, is that an accurate quote of

 6   Mr.  Bousquette?

 7        A    Yes.

 8        Q    The article also discusses in the next

 9   paragraphs that Barbie had began appealing to

10   younger girls while Bratz appealed to an older

11   girl.

12             Do you see that?

13        A    I see that.

14        Q    Was that something that people at

15   Mattel told you for your interview for this

16   article?

17             MR. KARLE:  Interviewed and

18             attributed and identified in the

19             article?

20             MS. CENDALI:  That's right.

21             MR. KARLE:  Or you are asking

22             beyond that?

23        Q    I am asking only about sources that you

24   have attributed in the article.

25        A    This statement is attributed to an
```

27

EXHIBIT _19_ PAGE _404_

TKACIK

1

2    analyst, so, that would not be attributed to

3    Mattel.

4        Q    I am asking you, though, when you spoke

5    to Mr. Bousquette?

6        A    Whether he said that?

7        Q    Yes.

8                MR. KARLE:  Let her ask the

9            question.  It's much easier for the

10           report.

11       Q    You spoke on the record to

12   Mr. Bousquette and Ivy Ross at Mattel for this

13   article; is that right?

14       A    Yes.

15       Q    Did either of them discuss the fact

16   that Bratz appealed to an older market than Barbie?

17       A    I don't know.

18       Q    It could have, may not have; you just

19   don't remember?

20       A    They might have, yes.  They might have.

21   I don't remember them addressing the issue of Bratz

22   directly very often or saying that name.

23       Q    What do you remember them saying about

24   Bratz?

25       A    I don't remember.

28

EXHIBIT 19 PAGE 405

TKACIK

1

2     Q     Were you told by Miss Ross or

3  Mr. Bousquette that Flavas was intended to appeal

4  to an older audience than Barbie?

5     A     I don't remember.

6     Q     Were you told by either of them that

7  Flavas was intended to compete with Bratz?

8     A     I don't think so.

9     Q     The article goes on to say, The history

10  of the Bratz is intertwined with Mattel."  And it

11  says, "MGA says the Bratz were designed by Carter

12  Bryant, a former member of the Barbie team."

13     A     Uh-huh.

14               MR. KARLE:  If you could say yes

15               or no.

16     A     Yes.  Sorry.

17     Q     Who at MGA told you that?

18     A     I talked to Isaac Larian at MGA, and he

19  told me that.  There were probably other people at

20  MGA who also had told me that.

21     Q     Mr. Larian, when he spoke to you, did

22  he attempt to, in any way, hide Mr. Bryant's

23  involvement with Bratz from you?

24     A     I don't remember.

25     Q     You don't remember him saying anything

29

EXHIBIT 19 PAGE 406

TKACIK

1
2    to that effect, correct?

3        A      Yes, I don't remember.

4        Q      And he told you that Bratz were

5    designed by Carter Bryant; is that right?

6        A      He did.  Yeah, he did, he did say that.

7        Q      You didn't quote Mr. Larian directly on

8    that; is that true?

9        A      Well, this highlighted paragraph is a

10   paraphrase of him, basically, you know, saying

11   that.  So, I didn't quote him -- just because I

12   didn't quote him directly does not mean that he did

13   not say that.

14       Q      Miss Tkacik, do you have any notes

15   reflected of any of the interviews that you did for

16   this article?

17       A      No.

18       Q      Do you have any e-mails reflecting any

19   communications with Mattel or MGA regarding this

20   article?

21       A      No.

22       Q      Prior to your interview with Mr. Larian

23   for this article, had you ever spoken to him

24   before?

25       A      I think so.  I know that a reporter,

30

EXHIBIT 19 PAGE 407

TKACIK

1

2     Lisa Bannon, who covered Mattel before I did had

3     interviewed him extensively.  But I am not sure if

4     I had interviewed him before this article.

5          Q    And isn't it true until this article,

6     you had never written an article about MGA?

7          A    I don't know.  I would characterize the

8     Bratz are named in at least one of those articles,

9     right, I think.

10         Q    Did you interview anyone in MGA prior

11    to this article?

12                   MR. KARLE:  Prior to the work she

13              did for this article?

14                   MS. CENDALI:  Correct.

15         A    Yes.  I am certain.

16         Q    For which article?

17         A    I don't know.  If there are -- you know

18    if you didn't find anything, then I did keep up,

19    just as you said, that I got to know Mattel, I

20    would say the same for Bratz; it was a very

21    important new toy and they had a PR person whose

22    name escapes me now, who I had regular

23    communications with.

24         Q    Can you recall a single article you

25    wrote interviewing anybody at MGA prior to this

31

EXHIBIT 19 PAGE 408

```
                              TKACIK
 1
 2    July 2003 Wall Street Journal article?

 3         A     No.

 4         Q     And you don't have any notes or

 5    anything like that reflecting that you ever had any

 6    such conversations?

 7         A     No.

 8         Q     Is it fair to say that you had had many

 9    more conversations with people at Mattel prior to

10    this article than you had ever had with Bratz

11    people?

12         A     I suppose so.  Mattel is a much larger

13    company with many more divisions.  MGA was a very,

14    had, you know, one brand that was, you know, that

15    was interesting.

16         Q     Now, in this article as we talked

17    about in the portion quoting Mr. Bousquette, you

18    would quote directly from your sources, right?

19              MR. KARLE:  Objection to the form

20              of the question.

21         Q     Well, in this article when we talked

22    about Mr. Bousquette, about how Barbie began as a

23    great girl who was a simple reflection of a popular

24    culture, that was in quotes, right?

25         A     Uh-hmm.  Yes.
```

32

EXHIBIT _19_ PAGE _409_

1          TKACIK

2     Q    And that's because you were directly

3   attempting to write down exactly what was said to

4   you in the interviews; is that right?

5     A    Yes.

6     Q    And in the highlighted paragraph that

7   Mattel's counsel asked you about, the statements

8   allegedly made by Mr. Larian were not in quotes,

9   right?

10    A    No, they are not in quotes.

11    Q    And that's because you weren't

12  intending to literally write down exactly what he

13  said to you, right?

14    A    When you put together a story, you

15  sometimes choose a quote usually if it sounds good.

16  This is a very informational paragraph it has so

17  much space.  I believe that I do quote, I remember

18  at some point, you know, putting a statement by

19  Larian in quotes in this story, but not that

20  particular -- not all of that information; it's

21  incidental.

22    Q    And you were not directly quoting him

23  because you did not, these weren't, as you say

24  earlier, you were paraphrasing, you were not

25  directly quoting any of Mr. Larian's statements to

33

EXHIBIT _13_ PAGE _410_

TKACIK

1

2  you in this paragraph, isn't that true?

3      A    Yes, this is not a direct quote.

4      Q    Now, in here it says, you wrote, "He

5  says he chose Mr. Bryant's idea for the Bratz after

6  several others about holding a sort of fashion-doll

7  contest."

8           Do you see that?

9      A    Yes.

10     Q    Did you ask him what he meant?  Or do

11 you have any understanding of what was meant by

12 this sort of fashion-doll contest?

13     A    Right now no, I don't remember.  I

14 remember talking to him, and, I believe he was

15 overseas at the time.  And he explained it to me.

16 But, there probably just was a rumor story too.

17     Q    So sitting here today, you have no idea

18 what sort of fashion-doll contest that he was

19 referring to, that you are talking about, right?

20     A    No.  I don't remember.  I have no idea

21 who else was involved in this contest or any of the

22 specifics of it.

23     Q    So you don't know anything about the

24 nature of this sort of contest; is that right?

25     A    No.

34

EXHIBIT _19_ PAGE _41_

```
 1                        TKACIK

 2        Q     And you say that Mr. Larian was

 3   overseas when you spoke to him; is that right?

 4        A     I vaguely recall him being overseas.

 5        Q     Do you remember if he was in Asia?

 6        A     I think I remember, because I used to

 7   live in Hong Kong and I think I had a conversation

 8   with him at the time, Oh, where are you staying,

 9   you know, check out this restaurant.

10        Q      Now, when you set up the interview

11   with Mr. Larian, did you tell him in advance you

12   wanted to talk about the origins of Bratz?

13        A     I don't remember.

14        Q     What do you recall saying to MGA as to

15   why you wanted to speak to them?

16        A     I don't remember.

17        Q     Do you know whether Mr. Larian had his

18   calendar in front of him or had done any research

19   in preparation for speaking to you?

20        A     I have no idea.

21        Q     And did you receive any e-mails from

22   MGA in connection with this article?

23        A     I don't remember.

24              MS. CENDALI:  I would like to

25              mark as Exhibit 8 an e-mail exchange,
```

EXHIBIT *19* PAGE *412*

TKACIK

1

2          the bottom of which is an e-mail from

3          Mr. Larian to Miss Tkacik dated July 14,

4          2003.

5               (Whereupon, the aforementioned

6          e-mail was marked as Plaintiff's Exhibit

7          8 for identification as of this date by

8          the Reporter.)

9     Q    Miss Tkacik, do you recognize the

10   oldest e-mail in the chain, the last e-mail on the

11   page as an e-mail you received on or about July 14,

12   2003 from Mr. Larian to you?

13    A    I believe that -- I don't remember it

14   specifically, but I do remember him being -- I

15   remember him specifically saying to me at some

16   point, something about Formal Funk and how Mattel

17   had copied it, but I don't recognize the e-mail.  I

18   think it was one of the talking points.

19    Q    And there is nothing in this e-mail

20   that talks about a Bratz doll contest or when it

21   occurred; is that right?

22    A    Yes.

23    Q    And you are not aware of any written

24   communication of any kind from MGA on that point,

25   correct?

36

EXHIBIT 19 PAGE 413

1                          TKACIK

2          A     I don't know.

3          Q     And the e-mail also says, "Please

4    e-mail me a copy of the article when it's out as I

5    am in the orient. "

6                Do you see that?

7          A     Yes.

8          Q     And does that refresh your recollection

9    that he was, whether he mentioned to you he was in

10   Asia when he was speaking to you?

11         A     Yes, it does refresh.

12         Q     Now, when you spoke to Mr. Larian, did

13   you notice that he had a heavy accent?

14         A     I remember him, he does have an accent.

15   It certainly didn't make him unintelligible.

16         Q     Was it your impression that English was

17   not his first language?

18         A     I didn't really think about it.  He

19   spoke it very well.

20         Q     Do you understand that he came from

21   Iran?

22         A     I understood that he was Persian, but I

23   didn't know -- I don't remember.  I think that at

24   one point I probably talked to him about, you know,

25   when he had come over or what have you, but I have

                                                      37

EXHIBIT 19 PAGE 414

```
 1                      TKACIK
 2   no recollection of that now.
 3        Q     When you lived in Los Angeles, did you
 4   have friends who worked for Mattel?
 5        A     No.
 6        Q     You say in your article after the
 7   highlighted paragraph, "Mr. Larian, who emigrated
 8   to the U.S. from Iran found his company in the late
 9   1970."
10              Do you see that?  It's on Page 2.
11                   MR. KARLE:  It's right after the
12              highlight.
13        A     Okay.
14        Q     Does that refresh your recollection
15   that you understood that he had been born in Iran
16   and only later came to the United States?
17        A     Yes.
18        Q     Now, in your article, on that same Page
19   2, in the paragraph that starts, "The history of
20   the Bratz is intertwined with Mattel."
21              You see that?
22        A     Yes.
23        Q     And it goes on to say, "Inside Mattel,
24   some are convinced the Bratz borrowed liberally
25   from a Mattel project that was scrapped at the
```

38

EXHIBIT _19_ PAGE _415_

```
 1                         TKACIK

 2   testing stage in 1998."

 3              Do you see that?

 4        A    Yes.

 5        Q    Did Mr. Bousquette give you that

 6   information?

 7        A    No.

 8        Q    Did Miss Ross give you that

 9   information?

10        A    No one at Mattel who is quoted in the

11   story gave me that information.

12        Q    Did the people at Mattel who is quoted

13   in the story encourage you to investigate this

14   issue?

15        A    They had no idea.  They were oblivious.

16   My understand was that the people that I quoted in

17   the story were oblivious to that.

18        Q    So you have no idea, the people quoted

19   in the story never told you that they had been

20   involved in an investigation of Carter Bryant the

21   year before; is that right?

22        A    No.  They never told me anything like

23   that.

24        Q    Did you speak to Mr. Bousquette or

25   Miss Ross about Carter Bryant?
```

EXHIBIT _19_ PAGE _416_

TKACIK

2      A      I don't remember.

3      Q      Do you have any recollection of what

4  you said to Miss Ross or Mr. Bousquette, if

5  anything, about Carter Bryant?

6      A      No.  I have very little recollection.

7  And I should rephrase that, my understanding and

8  the way that I took their reactions to this story

9  led me to believe that they were not aware of any

10  of this stuff, or that they might be vaguely aware

11  of it.  But they, it was not -- they weren't very

12  familiar with the specifics.  They didn't seem to

13  be.  They depicted themselves as being unfamiliar

14  with the situation.  The genesis of this story was

15  a coincidence.  And I don't remember talking to

16  anyone who is quoted in this story about Carter

17  Bryant in any sort of way.

18      Q      You said you spoke to them after a

19  reaction to the story, what do you mean?

20      A      When I, I was introduced to the Flavas,

21  I don't remember when, but probably, probably

22  two weeks, three weeks, a month before this story

23  came out, I was flirting with writing a story about

24  them, and I learned about Carter Bryant.  I don't

25  believe that he had been in anything other than

40

EXHIBIT 19 PAGE 417

```
                              TKACIK
```

1

2    trade-type media before, as the designer of his

3    dolls.  I could be wrong.  I tried to get in touch

4    with him to find out more because I really wanted

5    to find out where the Bratz came from.  And when I

6    took the idea, then this information that I learned

7    about the, you know, the genesis of this product

8    being at Mattel, which didn't, you know -- which I

9    believed I took from confidential sources, but

10   believed, especially considering that the toy

11   design industry is very small and centralized in

12   L.A., when I took that piece of information to

13   people at Mattel very shortly before this story

14   came out, they seemed very surprised, and they

15   didn't have a story.  They didn't really say much

16   about it because they didn't seem very familiar, at

17   an executive level.  I think that Ivy Ross was

18   relatively new to Mattel, I believe she had been at

19   other places, so they didn't seem very familiar

20   with the inner workings of design.  That was just

21   my impression.

22        Q    Which people did you speak to that you

23   said were surprised?

24        A    Well, that's, I think that a lot of

25   those conversations were not for attribution.  I am

41

EXHIBIT 19 PAGE 418

```
 1                          TKACIK

 2    having trouble, I don't really want to answer that

 3    question because I believe that in order to get a

 4    fair assessment, to reach that assessment, I had a

 5    lot of conversations that were not for attribution.

 6         Q    Did you promise people confidentiality?

 7         A    I promised many people confidentiality.

 8    There were people in the story --

 9                   MR. KARLE:  That's a yes or no

10              question.

11         A    Yes.  Sorry.

12         Q    Where did you get the information that

13    alleged that Carter Bryant got the idea from Bratz

14    from something at Mattel?

15                   MR. KARLE:  If you obtained that

16              information from anyone that's

17              identified in this story you can answer

18              the question.  If it's someone else --

19         A    I can't answer that.

20         Q    Have you ever heard of a man named

21    Antonio Dianda (phonetic), Richard Dianda, the head

22    of security for Mattel?

23                   MR. KARLE:  If that's not a

24              person identified in this story, I will

25              instruct the witness not to answer.
```

42

EXHIBIT _19_ PAGE _469_

```
 1                        TKACIK
 2      A     I can't answer.
 3                  MS. CENDALI:  I am asking, it has
 4            nothing to do -- she has been covering
 5            this company for a while I want to know
 6            if she ever has heard of Richard Dianda,
 7            the head of security for Mattel.
 8                  MR. KARLE:  But whether she has
 9            heard of him or not is irrelevant,
10            unless she obtained information from
11            him.  He is not identified in the story
12            and, therefore, one could infer that if
13            she identifies him he may or may not be
14            a source of hers.  I can't understand
15            why for matters remotely, unless she
16            would have received information from
17            him, therefore, I am instructing the
18            witness not to answer.
19      Q     Did anyone at Mattel ever tell you that
20   in 2002 they did an investigation as to Carter
21   Bryant and came up with nothing?
22                  MR. KARLE:  Is that specifically
23            as to anyone identified in the story or
24            anyone at all?
25      Q     You have been referring to these
```

43

EXHIBIT 19 PAGE 420

```
1                          TKACIK

2    confidential sources with these people you say you

3    believe, I am asking did anybody tell you -- I am

4    not asking who -- did any of these people tell you

5    that you there was an investigation in 2002 or did

6    they keep that as a secret from you?

7                    MR. KARLE:  And I instruct the

8               witness to -- I'd like to talk to her

9               first if that's okay with you.

10                   MS. CENDALI:  Okay.  Off the

11              record.

12              (Whereupon, an off-the-record discussion

13                   was held.)

14   BY MS. CENDALI:

15        Q    Miss Tkacik, did anyone ever tell you

16   that Mattel had done an internal investigation with

17   regard to Carter Bryant, in 2002?

18        A    No.

19        Q    Did Ivy Ross ever tell you that she was

20   part of this internal investigation?

21        A    No.

22        Q    When this article --  did Miss Ross

23   lead you to believe that she was unfamiliar until

24   you informed her of them, of these claims about

25   Carter Bryant?
```

44

EXHIBIT 19 PAGE 421

```
 1                           TKACIK

 2        A     No.

 3        Q     You said earlier that you thought that

 4   she had evidenced surprise?

 5                   MR. KARLE:  Objection to the form

 6              of the question.

 7        A     I believe that I characterized

 8   surprised as being the reaction from most of the

 9   people at Mattel to whom I spoke.

10        Q     The unidentified people you refuse to

11   name?

12                   MR. KARLE:  Objection to the form

13              of the question.

14        Q     You are not prepared to name any of

15   these people that you said were surprised; is that

16   right?

17                   MR. KARLE:  I am instructing the

18              witness not to identify anybody other

19              than those people who are quoted or

20              identified in the story for either

21              Mattel or MGA or anybody else.

22        Q     So there is no one that you are going

23   to name as those anonymous people?

24                   MR. KARLE:  I will instruct the

25              witness not to answer the question.  If
```

45

EXHIBIT 15 PAGE 422

```
 1                          TKACIK
 2              you ask if she is going to follow my
 3              instruction, then --
 4         Q    Are you going to follow your counsel's
 5    instruction?
 6         A    Yes.
 7         Q    So Miss Ross and Mr. Bousquette never
 8    said that they were surprised about the allegation
 9    about Carter Bryant that's reflected in your
10    article, right?
11         A    I don't remember.
12         Q    And, in fact, you have no information,
13    one way or the other, as to whether Miss Ross and
14    Mr. Bousquette knew all about these allegation the
15    year before and did nothing about it?
16         A    I don't know.
17         Q    You refer to the design world being a
18    close knit world, or something to that effect; is
19    that right?
20         A    I said that the toy design community
21    is, seems to me to be relatively small and that
22    there was a lot of revolving door-type action.
23         Q    Did you the impression that -- you say
24    in the article that you spoke to an ex-designer at
25    Mattel about Carter Bryant's alleged borrowing of
```

```
 1                        TKACIK
 2    Mattel's idea, right?
 3                   MR. KARLE:   Could you point to
 4              where that is in the article?
 5                   MS. CENDALI:   Sure.
 6       Q     If you look at Page 2, the bottom
 7    left-hand column, "The Mattel doll line that was
 8    scrapped wasn't exactly like the Bratz says a long
 9    time designer who worked on the project."
10              Do you see that?
11       A     Yes.
12       Q     Is that someone you interviewed for
13    this article?
14       A     Yes.
15       Q     Was that a current Mattel employee at
16    the time?
17       A     I don't think so.
18                   MR. KARLE:   In the article, and
19              the next sentence appears to say that
20              the designer left Mattel in 2001.
21       Q     Who was that person?
22                   MR. KARLE:   I can either ask the
23              question or you can, is the question,
24              Was that a source who you promised
25              confidentiality in speaking to you?
```

47

EXHIBIT 19 PAGE 424

```
                              TKACIK
1
2               MS. CENDALI:  Yes.
3               MR. KARLE:  It was yes.  Then I
4        instruct the witness not the answer.
5        Q     Did Miss Ross and Mr. Bousquette lead
6   you to that source?
7        A     No.
8        Q     The article goes on to refer to a Lilly
9   Martinez.
10             Do you see that?
11       A     Yes.
12       Q     And did you interview Lilly Martinez
13  for this article?
14       A     No.
15       Q     Have you ever spoken to Lilly Martinez?
16       A     Yes.
17       Q     In what circumstances?
18       A     I believe when the story happened I
19  called Lilly Martinez through the switchboard -- so
20  I would rephrase that -- I spoke to her very
21  briefly and she couldn't talk to me.  So it in was
22  that context.  Later on, in 2005, I met Lilly
23  Martinez.
24       Q     This is after you had left The Wall
25  Street Journal?
```

48

EXHIBIT /S PAGE 425

```
 1                           TKACIK
 2         A     Completely unrelated to this.
 3         Q     What were the circumstances that you
 4   met Lilly Martinez after this?
 5         A     I wanted to do a story on her.
 6         Q     Why?
 7                    MR. KARLE:  For whom?
 8                    THE WITNESS:  The New York Times
 9               Magazine.
10         Q     Did you do such a story?
11         A     No.
12         Q     Why not?
13         A     It just didn't work out.
14         Q     Did it have anything to do with Carter
15   Bryant?
16         A     No.
17         Q     Have you remained in touch with any of
18   the other people that you interviewed for this
19   article since the time you interviewed them?
20         A     I saw them when I was doing that story,
21   or when I was thinking about doing that story.  I
22   did speak again to some people that I had spoken to
23   before.  Other than that, I haven't kept in touch
24   with them at all.
25         Q     So when you were thinking of doing the
```

EXHIBIT 19 PAGE 426

```
1                          TKACIK
2    story in 2005 about Lilly Martinez, you went back
3    and contacted the same unnamed sources that you
4    used in the 2003 article for the Journal?
5                    MR. KARLE:  Objection.
6              Mischaracterizes her testimony.
7         Q     You can answer.
8                    MR. KARLE:  It's a yes or no.
9         A     I don't remember.
10        Q     So, you went back to these same sources
11   again two years later and spoke to them again; is
12   that right?
13                   MR. KARLE:  Objection.
14             Mischaracterizes her testimony.
15             You can answer yes or no.
16        A     I don't remember.
17        Q     Well, the designer who left Mattel in
18   2001, you spoke to that person again in 2005,
19   right?
20        A     No.
21                   MR. KARLE:  Let her finish her
22             question.
23        Q     Which of the unnamed sources you spoke
24   again to in 2005?
25                   MR. KARLE:  Objection.  Instruct
```

50

EXHIBIT _19_ PAGE _427_

TKACIK

2          the witness not answer the question.

3     Q     How many of them did you speak to in

4     2005; do you recall?

5     A     No, I don't.

6               MR. KARLE:  Do you remember if

7               there were any?

8               THE WITNESS:  That I went back

9               to, vaguely, although my memory is hazy,

10              I think that I spoke to one of them.

11    Q     Do you have any notes of this proposed

12    article or your communications with these sources

13    in 2005?

14    A     No.

15    Q     After your article was published, what

16    communications, if any, did you have with Mattel

17    concerning the article?

18    A     I don't remember.

19    Q     Did anyone at Mattel contact you about

20    the allegations regarding Carter Bryant?

21    A     I don't remember.

22    Q     Leaving aside communications with

23    Mattel, did you receive any other response or,

24    reaction to your article?

25    A     I don't remember.

51

EXHIBIT 19 PAGE 428

```
                              TKACIK
```

1                              TKACIK

2        Q     Did you receive any unsolicited phone

3   calls or e-mails or queries about the article?

4        A     I really don't think so, until this,

5   until being, you know, served.

6        Q     Served with your subpoena in this case?

7        A     Yes.

8        Q     Did this unnamed project that

9   Miss Martinez had worked on that you referred to in

10  this article, did that project ever have a name?

11       A     I don't remember.

12       Q     Do you remember whether you were ever

13  told the name of it at the time?

14       A     I don't remember.

15       Q     Have you ever heard of the name Tune

16  Teens before?

17       A     I don't remember.

18       Q     Do you know whether the date that Tune

19  Teens -- you say here that there was a Mattel

20  project that was scrapped at testing stage in 1998.

21            Do you see that?

22       A     Yes.  Yes, I do.

23       Q     Where did you get that information?

24       A     I can't say.

25            MR. KARLE:  In other words, that

52

EXHIBIT 19 PAGE 429

TKACIK

1

2          information was provided via a

3          confidential source?

4               THE WITNESS:  Provided from a

5          confidential --

6               MR. KARLE:  Then I instruct the

7          witness not to answer.

8     Q.   And am I correct you were not provided

9    with any documents confirming that date?

10    A     I don't remember.

11    Q     So sitting here today you don't know

12   whether that date is correct or not, right?

13    A     I vaguely remember going to several

14   unnamed sources and incorporated it.

15               MR. KARLE:  It's a yes or no.

16          Could you read back the question,

17          please.

18               (Whereupon, the record was read

19          back by the Reporter.)

20    A     I don't know.

21    Q     And were you ever shown photos or

22   drawings of this alleged unreleased project?

23    A     I don't know.

24    Q     So, you never had a chance to form an

25   opinion in your own mind of comparing whatever this

53

EXHIBIT 19 PAGE 430

```
1                           TKACIK
2    unreleased project was with the Bratz, this is just
3    information that was told to you, correct?
4          A     I believe that's correct.
5          Q     And the people who told you it to you
6    were friends of Miss Martinez, correct?
7          A     No.
8          Q     Former co-workers of Miss Martinez,
9    correct?
10         A     Yes.
11         Q     Do you like Miss Martinez?
12         A     Do I like her?
13         Q     Yes.
14         A     I don't know her.
15         Q     You said you spoke to her again in
16   2005, right?
17         A     I did.
18         Q     Did you speak to her in person?
19         A     Yes.
20         Q     For how long?
21         A     Half an hour, probably.  I don't
22   remember.
23         Q     How long was your interview with
24   Mr. Bousquette in relation to this article?
25         A     I don't know.
```

                                                          54

EXHIBIT 19 PAGE 431

```
 1                        TKACIK

 2          Q    Can you give me any sense, was it an

 3     hour?  Was it two hours?  Was it ten minutes?

 4          A    It was probably about an hour, probably

 5     about an hour.

 6          Q    And your interview with Miss Ross in

 7     connection with this article, how long was that?

 8          A    I don't know.

 9          Q    Do you recall anything else that

10     Miss Ross said in relation to this article?

11          A    No.

12          Q    Do you recall anything else

13     Mr. Bousquette said in relation to this article?

14          A    No.

15          Q    How long was your conversation with

16     Mr. Larian in relation to this article?

17          A    I don't know.

18          Q    Is it fair to say it was a brief

19     conversation?

20          A    No.  I don't think so.

21          Q    You don't remember?

22          A    No.

23          Q    Could you approximate the length of

24     your conversation with Mr. Larian?

25          A    Half an hour.
```

EXHIBIT _19_ PAGE _432_

```
 1                          TKACIK

 2        Q     And in that conversation, did he speak

 3   about My Scene having ripped off Bratz?

 4        A     Yes.

 5        Q     Did he speak about how well Bratz was

 6   doing in the marketplace?

 7        A     I don't remember.

 8        Q     Did you ever speak to Mr. Larian again

 9   after this one conversation with him?

10        A     I don't remember.

11        Q     Did you ever exchange any e-mails with

12   him after this article came out?

13        A     I don't know.

14        Q     After this article came out, the

15   article of July of 2003, Exhibit 1, did you have

16   any other communication ever with anyone at MGA?

17        A     Yes.

18        Q     What?

19        A     In 2005 when I went to meet Lilly, I

20   went back, I visited MGA, and I spoke to some

21   designers there.  I don't remember any of their

22   names.  I don't remember, I think that I might have

23   met Isaac Larian at the time.  It's all very, I

24   don't really remember it well.

25        Q     That was for the article you never
```

56

EXHIBIT 19 PAGE 433

```
1                          TKACIK
2    wrote; is that right?
3         A     Yes.
4         Q     That was going to be about
5    Miss Martinez, correct?
6         A     There were many.  It was about dolls
7    and toy design, I don't even remember how it was
8    framed.
9         Q     I take it you don't have any friends
10   who work for MGA, right?
11        A     No.
12                    MR. KARLE:  Let's take a
13             five-minute break.
14             (Whereupon, a short break was taken.)
15   BY MS. CENDALI:
16        Q     Turning again back to Exhibit 1, your
17   July article of 2003, on the second page there is a
18   paragraph that says, starts with, "The Mattel dolls
19   were scrapped in testing, current and former
20   designers say, because Mattel had strict quotas
21   that allowed only one "flanker brand" that is a
22   brand that would compete with Barbie for shelf
23   space on the market at a time."
24             Do you see that?
25        A     Yes.
```

57

EXHIBIT 19 PAGE 434

TKACIK

1

2      Q      Was that something Ivy Ross told you?

3      A      I don't know.

4      Q      And it goes on to say, "At the time

5   Mattel chose a product called What's Her Face, a

6   doll with a blank face on which kids could draw

7   expressions.  That doll remains on the market.

8   Mattel declined to discuss its sales."

9              Did you ask Mattel for its sales of

10  What's Her Face?

11     A      I don't remember specifically the

12  article, judging from the article, I did.

13     Q      Did you discuss with Miss Ross or

14  Mr. Bousquette the selection of what's her face?

15     A      I don't remember.

16     Q      It's possible that you did?

17     A      It's possible.

18     Q      And someone who covers or had covered

19  the consumer products industry for youth, was it

20  your impression that Mattel did not like to

21  introduce products that it felt competed with

22  Barbie?

23     A      Yes.

24     Q      Then turning to the last page of the

25  article, from the left-hand column towards the

58

EXHIBIT 19 PAGE 435

```
 1                        TKACIK
 2    bottom, it says, "Mattel no longer has quotas on
 3    how many products can complete with Barbie.  After
 4    sitting through a girls' design-team presentation
 5    in March, Mr. Bousquette seized upon the Flavas as
 6    the ideal dolls to compete for the dollars of Bratz
 7    buyers."
 8              Do you see that?
 9        A    Uh-hmm.
10        Q    Was that something Mr. Bousquette told
11    you?
12        A    Yes -- no.  I don't remember.
13        Q    Did Mr. Bousquette tell you that Flavas
14    was intended to be the ideal dolls to complete for
15    the dollars of Bratz buyers?
16        A    I don't know.
17        Q    You wrote, "After sitting through a
18    girls design-team presentation in March,
19    Mr. Bousquette seized upon the Flavas as the ideal
20    dolls to compete for the dollars of Bratz buyers."
21              Did you get that information from
22    Miss Ross or Mr. Bousquette?
23        A    I don't remember.
24        Q    Is that information accurate?
25        A    I don't know.
```

59

EXHIBIT _19_ PAGE _436_