**II.** **MATTEL'S WITNESS PREPARATION AND DESIGNATION WAS ENTIRELY APPROPRIATE**

    **A.** **Rule 30(b)(6) Does Not Require A Designee to Personally Interview Witnesses or Review Documents; Preparation by Counsel Is Sufficient.**

MGA and Bryant claim that Ms. Yonemoto, Mr. Hudnut, Ms. Pratte, Ms. Jensen, Ms. Pasko and Mr. Ongchangco were not properly prepared because they did not personally interview witnesses and did not review enough documents.[144] But as defendants know, each of these witnesses met with counsel, sometimes on numerous occasions, to prepare for their depositions, and that is enough under the Rules. Rule 30(b)(6) simply does not require witness to speak with anyone other than counsel, and it imposes no obligation upon a designee to personally interview witnesses or review documents. See Reichhold, Inc. v. U.S. Metal Refining Co., No. CIV 03-453, 2007 WL 1428559, at *8 (D.N.J. May 10, 2007) (rejecting argument that witness was not properly prepared because he did not personally conduct interviews (other than meeting with counsel), and instead finding that "Because Rule 30(b)(6) does not require that the corporate designee personally conduct interviews, and requires only that he 'testify as to matters known or reasonably available to the organization,' Defendant has not failed to comply with the Rule.") (quotation and internal citation omitted). That these four witnesses did not engage in a personal fact-finding mission simply has no bearing on their competence as 30(b)(6) witnesses.

Furthermore, Mattel repeatedly told MGA and Bryant that its 30(b)(6) witnesses would be testifying as to their personal knowledge relevant to the

---

[143] 6/15/07 letter, Zeller Dec., Exh. 2.
[144] Motion at 6-8, 10, 12. MGA and Bryant make no such claim as to Ms. Nordquist or Ms. Marine.

EXHIBIT *22* PAGE *486*

1   designated topics, and nothing more.[145]  MGA and Bryant acknowledged and agreed

2   to the designations on that basis and cannot now be heard to complain that the

3   witnesses testified as agreed.[146]

4      **B.**    **Designating Multiple Witnesses for a Topic Under Rule 30(b)(6) Is**

5             **Entirely Acceptable.**

6

7         MGA and Bryant also accuse Mattel of acting improperly for having

8   designated more than one witness on many of the 30(b)(6) topics at issue here.[147]

9   But MGA and Bryant expressly agreed (on multiple occasions) that Mattel had the

10  option to do so, stating:  "Mattel will reserve the right to produce one or more

11  witnesses on a single category, if the scope of the request is broad enough that it

12  would require it.[148]

13        MGA and Bryant's agreement aside, the Federal Rules specifically

14  contemplate that parties may designate multiple witnesses per topic.  The cases cited

15  in MGA's and Bryant's own motion make this very point.  See Alexander v. FBI,

16  186 F.R.D. 137, 141 (D.D.C. 1998) ("the designating party is under the duty to

17  designate more than one deponent if it would be necessary to do so in order to

18  respond to the relevant areas of inquiry that are specified with reasonable

19  particularity by the [deposing party]") (cited by MGA and Bryant, Motion at 19, fns.

20  73, 79, 88, 90); Banks v. Office of the Senate Sergeant-at-Arms, 241 F.R.D. 370,

21  373 (D.D.C. 2007) ("[a] responding party must designate multiple deponents if more

---

22  [145]  Zeller Dec., ¶ 2; See e.g., Pratte Depo Tr., Proctor Dec., Exh. 26, at 8:16-
23  9:6; Pasko Depo Tr., Proctor Dec., Exh. 27, at 10:23-11:12, 26:20-27:12; Yonemoto
24  Depo Tr., Proctor Dec., Exh. 22, at 37:7-15; Ongchangco Depo Tr., Proctor Dec.,
    Exh. 23, at 159:2-160:6; Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 92:7-
25  94:24.
    [146]  See e.g., Pratte Depo Tr., Proctor Dec., Exh. 26, at 8:16-9:6; Pasko Depo Tr.,
26  Proctor Dec., Exh. 27, at 10:23-11:12; Ongchangco Depo Tr., Proctor Dec., Exh. 23,
27  at 159:2-160:6; Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 92:7-94:24.
    [147]  Motion at 4:23-5:12, 17:16-18, 22:11-24:4, 24:18-20.
28  [148]  3/15/05 Tr., Zeller Dec., Exh. 1, at 178:21-24.

EXHIBIT 22 PAGE 487

1 | than one is necessary to respond to all designated topics") (cited by MGA and

2 | Bryant, Motion at 21, fn. 80).  See also U.S. ex rel Fago v. M & T Mortgage Corp.,

3 | 235 F.R.D. 11, 22-23 (D.D.C. 2006) ("the responding entity must designate more

4 | than one deponent if multiple deponents are necessary to respond to all of the

5 | relevant areas of inquiry").  Mattel acted entirely appropriately in designating

6 | multiple witnesses to cover the relevant portions of the deposition topics.

7

8 | **III.    MATTEL'S 30(B)(6) DESIGNEES WERE PREPARED TO AND DID**

9 | **TESTIFY ON THEIR DESIGNATED TOPICS--MGA AND BRYANT**

10 | **SIMPLY DO NOT LIKE WHAT THEY HAD TO SAY.**

11 | Rather than identify any relevant areas of testimony that they have been

12 | denied, defendants instead simply isolate any "I don't know" answers they could

13 | find in the depositions of Mattel's 30(b)(6) witnesses.  But those answers responded

14 | to questions that were irrelevant, called for a legal opinion, were outside the witness'

15 | designation, or were previously covered by another Mattel witness.  Mattel has done

16 | its best to identify what defendants believe they have been denied (which was not an

17 | easy task because defendants did not set out those issues in any organized way in

18 | their motion).  Each of those issues, as best as Mattel could identify them, is

19 | discussed below:

20 | •    "Bryant's involvement in the creation of the Bratz dolls"

21 | (Ongchangco):[149] Defendants complain that Mr. Ongchangco could not testify about

22 | this topic aside from "'allegations' he heard from unnamed and unknown Mattel

23 | employees that Bryant had either copied DIVA STARZ or submitted drawings to

24 | MGA that were allegedly created while he was still at Mattel."[150] But this is not

25 | anything about which Mr. Ongchangco was supposed to testify.  Bryant's

26 | involvement is at the center of this lawsuit, and it is hard to see why Defendants

27 | ─────────────────

[149]   Motion at 7:13-14.

28

07209/2217061.2

EXHIBIT _22_ PAGE _488_

1 think Mr. Ongchangco would have facts about the very activities that Bryant and

2 MGA were trying so hard to conceal from Mattel.  Nor is that a topic Mattel had

3 ever agreed to produce a witness on, given that the facts related to that matter are

4 known to Mattel from the discovery it has received in this case.

5         In any event, numerous other witnesses have already testified about

6 Bryant's involvement, including, for example: Carter Bryant,[151] Isaac Larian,[152]

7 Paula Garcia,[153] Steven Linker[154] and Anna Rhee.[155]

8       •   "Personal knowledge about Carter Bryant" (Ongchangco,

9 Hudnut, Pratte):[156] Defendants do not specify what about Carter Bryant they believe

10 these witnesses should have known, but these witnesses were not designated to

11 testify about Carter Bryant anyhow.  They were designated to testify on one or both

12 of the two narrow topics relating to DIVA STARZ, i.e., the Steve Linker drawings

13 and the DIVA STARZ project names, and that is precisely what they did.[157]

14

15

16   [150]   Motion at 7:14–17.

17   [151]   See e.g., Deposition of Carter Bryant, Volume I, dated November 4, 2004, Proctor Dec., Exh. 16, at 8:15-9:6, 21:25-22:3, 105:19-107:1.

18   [152]   See e.g., Deposition of Isaac Larian, Proctor Dec., Exh. 17, dated July 18,

19 2006, at 107:23-108:8, 111:3-112:21, 114:18-119:2, 125:4-126:3.

20   [153]   See e.g., Garcia Depo Tr., Vol. 1, Proctor Dec., Exh. 15, at 232:23-233:24, 239:10-240:25, 241:25-244:10, 257:10-20, 265:7-268:25.

21   [154]   See e.g., Linker Depo Tr., Proctor Dec., Exh. 21, at 56:21-63:15, 76:21-83:21.

22   [155]   See e.g., Deposition of Anna Rhee, dated February 3, 2005, Proctor Dec.,

23 Exh. 18, at 107:16-108:12, 109:18-110:9, 112:5-114:15, 126:25-128:12, 141:11-142:15, 143:12-144:1.

24   [156]   Motion at 7:20-9:1.

25   [157]   See e.g., Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 160:15-161:25,

26 164:3-166:8, 169:8-14, 178:10-179:23, 185:6-20, 198:3-199:22 (testimony regarding Steve Linker drawings),

27 201:17-210:24, 215:10-25 (testimony regarding DIVA STARZ project names); Pratte Depo Tr., Proctor Dec., Exh. 26, at 100:2-103:5 (testimony regarding Linker drawings), 35:10-39:2, 43:15-18, 45:2-16, 50:15-

28 51:23, 67:10-68:16, 69:4-70:10 (testimony regarding DIVA STARZ project names).

1    •    <u>Whether Bryant was ever exposed to the name "Bratz" (as a</u>

2    <u>name used for the DIVA STARZ project) while a Mattel employee (Pratte):</u>[158]

3    Mattel has never argued that Mr. Bryant had direct exposure to the name "Bratz"

4    while a Mattel employee.  Rather, Mattel contends that Bryant, Paula Garcia and

5    others had access to DIVA STARZ by virtue of their access to the Mattel Design

6    Center, by Ms. Garcia's and other former employees' direct work on the project, and

7    by Ms. Garcia's and other former employees' close relationships with other persons

8    who worked on the DIVA STARZ project.  The fact that Ms. Pratte did not talk

9    about Bryant's "exposure" to the name Bratz while a Mattel employee is a non-

10   starter.  In any event, Ms. Pratte testified about the name "Brats" having been

11   considered by Mattel.[159]

12   •    <u>Facts about Bryant's breach of duty under Mattel's Employee</u>

13   <u>Confidential Information and Inventions Agreement (Yonemoto):</u>[160]  Defendants

14   complain that Ms. Yonemoto did not testify about "basic facts" on this subject

15   matter, but they simply ignore Ms. Yonemoto's designation.  She was produced to

16   talk about Bryant's exit interview--a topic that clearly pertains to his breach of duty

17   under the Inventions Agreement.[161]  Ms. Yonemoto was not supposed to testify to

18   "Bryant's breach" of the Inventions Agreement more broadly, so defendants have no

19   basis to complain.

20          The questions defendants complain that Ms. Yonemoto could not

21   answer were covered by other witnesses or were improper in any event.  For

22   example, defendants asked Ms. Yonemoto:  1) when Mattel stopped using a

23   particular form of Confidential Information and Inventions Agreement;[162] 2)

24
---
25   [158]  Motion at 23:2-11.

26   [159]  Pratte Depo Tr., Proctor Dec., Exh. 26, at 36:10-46:19, 48:20-58:10, 67:23-70:10, 199:2-12.

27   [160]  Motion at 8:7-8.

     [161]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 37:7-9.

28   [162]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 39:1-12.

EXHIBIT 22 PAGE 450

1  whether current employees were ever asked to sign a "new and different" form of

2  Confidential Information and Inventions Agreement;[163] 3) if she ever advised

3  employees regarding the provisions of Section 2870 of the California Labor Code as

4  described in the Employee Confidential Information and Inventions Agreement;[164]

5  and 4) whether Ms. Yonemoto ever told exiting employees that there were

6  "exceptions to the kinds of things that were covered under the Employee

7  Confidential Information and Inventions Agreement as pertained to what things the

8  employee had to assign to Mattel."[165]  To the extent these questions are not

9  grounded in a legal conclusion or simply unintelligible, defendants have already

10  gotten information on them.  For example, Lissa Freed, another of Mattel's 30(b)(6)

11  designees, testified about which Confidential Information and Inventions

12  Agreements were used by Mattel from 1995 to the present, including Exhibit 25,

13  which was the particular Confidential Information and Inventions Agreement

14  defendants complain Yonemoto was not able to testify about.[166]  Freed also testified

15  about the Confidential Information and Inventions Agreement that current

16  employees were asked to sign.[167]  Similarly, Alan Kaye testified as to whether

17  Mattel advised employees as to Section 2870 of the California Labor Code.[168]

18  Mattel could have pointed all of this out to defendants had they met and conferred

19  on these questions and answers, but they did not do so.

20

21

22

23  [163]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 39:20-24.

    [164]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 96:10-103:2.

24  [165]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 101:8-103:2.

    [166]  Deposition Transcript of Lissa Freed ("Freed Depo Tr."), dated May 3, 2007,

25  Proctor Dec., Exh. 19, at 31:10-33:2, 49:5-53:15, 55:2-8, 56:13-24, 57:19-59:9,

26  60:13-22.

    [167]  Freed Depo Tr., Proctor Dec., Exh. 19, at 27:25-29:1, 55:21-56:8.

27  [168]  Deposition Transcript of Alan Kaye, dated December 10, 2004, Proctor

28  Dec., Exh. 20, at 205:4-206:16, 207:13-208:20.

EXHIBIT 22 PAGE 491

1      •    Knowledge about the Conflict of Interest Questionnaire

2  (Yonemoto):[169] The only questions defendants asked Ms. Yonemoto regarding this

3  form dealt with "Mattel's practices with respect to following up on information

4  provided in a Conflict of Interest Questionnaire,"[170] nothing more.  Just because

5  Ms. Yonemoto does not know what Mattel's "practices" were regarding "following

6  up" on this particular form is meaningless.  Bryant's counsel also did not ask

7  Ms. Yonemoto more generally about her knowledge or use of the form in her duties

8  at Mattel, so counsel would have no idea what Ms. Yonemoto knew or did not know

9  about the form.  Ms. Yonemoto tried to describe how she uses the form in her job to

10  describe to starting employees their obligations relating to the form, but counsel cut

11  her off.[171]  In any event, defendants cannot complain of being deprived of

12  information concerning the Conflict of Interest Questionnaire because Lissa Freed,

13  another Mattel witness, has already testified about it at length.[172]

14      •    Information regarding Bryant's exit interview "other than what

15  appeared on the face of Mattel's personnel records" (Yonemoto):[173]  Ms. Yonemoto

16  testified as to facts reasonably available to her since she could not remember

17  Bryant's exit interview amongst the 50 she has conducted at Mattel.[174]  There is no

18  one else at Mattel who has any knowledge about it because she and Bryant were the

19  only ones there.[175]  Ms. Yonemoto's reliance on her handwritten notes on Bryant's

20  exit interview form and her knowledge of exit interview practices was proper.  That

21  is precisely what those records are for in the first place.

22

---

23  [169]  Motion at 23:12-18.
24  [170]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 109:1-113:4.
25  [171]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 118:22-119:21.
     [172]  Freed Depo Tr., Proctor Dec., Exh. 19, at 24:24-27:23, 33:5-35:25, 73:13-
26  75:9.
     [173]  Motion at 14:13-15.
27  [174]  Yonemoto Depo. Tr., Proctor Dec., Exh. 22, at 44:17-45:11, 56:21-59:18.
28  [175]  Yonemoto Depo. Tr., Proctor Dec., Exh. 22, at 60:10-17.

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 492

07209/2217061.2

1   •      <u>When the DIVA STARZ project was first released</u>

2   <u>(Ongchangco);[176] when the DIVA STARZ project began or who conceived of it</u>

3   <u>(Pasko, Ongchangco);[177] and the origins and inspiration for DIVA STARZ</u>

4   <u>(Hudnut).[178]</u> As explained above, DIVA STARZ (and Mini DIVA STARZ) are

5   relevant only because certain DIVA STARZ drawings and names that were

6   considered for the project share common elements with Bratz. Defendants complain

7   that the witnesses indicated they could not testify about the particular facts listed

8   above, but Mattel never agreed to provide a witness on those particular issues, and

9   those issues are irrelevant to the narrow DIVA STARZ issues in this case.[179]

10  Besides, Mr. Ongchangco in fact testified about the time frames within which the

11  name "Brats" was considered;[180] identified many of the key people involved with the

12  project;[181] and testified about the conception and development of the project.[182]

13  Other witnesses testified about this also, and the timing of Mattel's consideration of

14  the relevant names and the creation of the relevant designs are specifically reflected

15

16

17

---

18  [176] Motion at 9:14-15.
    [177] Motion at 10:9-11.
19  [178] Motion at 11:1-2.

20  [179] Moreover, Ms. Pasko stated that she began working on DIVA STARZ in late
    1998 to early 1999 time frame, a time that far pre-dates the launch of Bratz, so how
21  much earlier Mattel was working on DIVA STARZ is meaningless. Pasko Depo
22  Tr., Proctor Dec., Exh. 27, at 28:21-29:4.

23  [180] Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 54:17-56:4, 201:17-210:24,
    215:10-25.

24  [181] Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 18:21-19:16, 21:13-17,
25  26:2-22, 50:24-51:24, 54:1-16. The fact that Mr. Ongchangco did not recall having
    a conversation with Bryant (Motion at 8:3-5) is, of course, completely irrelevant
26  since Mr. Ongchangco did not purport to work with Bryant and was not designated
27  to testify about Bryant's work at Mattel.
    [182] E.g., Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 58:6-62:24, 65:18-
28  68:4, 139:10-20.

EXHIBIT 22 PAGE 493

07209/2217061.2

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

1  in documents that defendants do not contest.[183]  Indeed, virtually all of the

2  depositions of Hudnut and Pratte related to the DIVA STARZ, as did large sections

3  of the deposition of Linker

4          •   The "conception" of Mini DIVA STARZ and when the Mini

5  DIVA STARZ project ended (Ongchangco):[184]  Again, the conception and end date

6  for the Mini DIVA STARZ dolls is not relevant to this case, and Mattel did not

7  agree to provide a witness to testify about those issues.  Mr. Ongchango was

8  designated to and did testify about names Mattel considered for the project,

9  including "Brats," during the 1999 time frame.[185]  He also testified about the

10  development of Mini DIVA STARZ for public sale;[186] and the differences between

11  different "generations" of Mini DIVA STARZ.[187]

12          •   Whether DIVA STARZ was a "fashion doll concept

13  (Hudnut):"[188]  That Mr. Hudnut would not say whether DIVA STARZ was a

14  "fashion doll concept" is completely irrelevant.  He was designated to testify about

15  names that Mattel used - such as "Boyz" - in the DIVA STARZ Entertainment

16  scripts and he did just that.  Besides, when Mr. Hudnut tried to explain how DIVA

17  STARZ has fashion doll aspects, counsel cut him off and then changed the

18  subject.[189]

19

20     [183]  See, e.g., Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 167:24-171:6;

21  Pratte Depo Tr., Proctor Dec., Exh. 26, at 75:20-81:4; Linker Depo Tr., Proctor
   Dec., Exh. 21, at 14:5-16:23; Pasko Depo Tr., Proctor Dec., Exh. 27, at 89:8-99:21.

22     [184]  Motion at 14:4-10.

      [185]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 33:10-22, 54:17-56:4,

23  201:17-210:24, 215:10-25.

24     [186]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 24:24-25:16.

      [187]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 65:18-67:8.

25     [188]  Motion at 10:21-22.

26     [189]  Mr. Hudnut testified that the DIVA STARZ "had lots of fashionable

27  elements to it and when I say them having plastic clothes that you can put on and
   off, that's certainly a fashion doll play pattern, long beautiful hair to comb and play

28  with, so. . . . " Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 177:7-13.  Mr.
   (footnote continued)

1        •    How the Name DIVA STARZ was chosen (Hudnut); how many

2 names were considered for DIVA STARZ (Ongchangco):[190] Mr. Hudnut was not

3 designated to testify about the selection of the name for DIVA STARZ dolls, and

4 Mr. Ongchangco was not designated to testify about the particular number of names

5 considered.[191] Defendants received voluminous testimony about the relevant names

6 that Mattel considered for DIVA STARZ dolls from Mr. Ongchangco, Ms. Pratte,

7 and Ms. Pasko.[192]

8        •    The "definitive" list of individuals present at meetings at which

9 the name for the DIVA STARZ project was discussed (Ongchangco):[193]

10 Mr. Ongchangco testified thoroughly on the subject of the relevant DIVA STARZ

11 names, and described who he thought was present at meetings to the extent he could

12 recall, including, for example, Joni Pratte from Packaging, Maureen Mullen from

13 Preliminary Design, Sue Davis from Packaging and possibly Galit Reisman and

14 Noriko Sata from Marketing.[194] Ms. Pratte also testified about the individuals

15 present at those meetings, including, Steve Linker, Liz Hogan, Maureen Mullen and

16 Richard Oesterheld from Copywriting.[195] Defendants have certainly received

17

18 _____

19 Hudnut was unable to finish his answer because counsel interrupted him before he
finished his answer, and moved on. Id. at 177:13-18.

20   [190]  Motion at 11:15-16.

21   [191]  4/11/07 letter, Corey Dec., Exh. 3, at 1; Hudnut Depo Tr., Vol. I, Proctor
Dec., Exh. 24, at 92:17-25; 93:15-16; 93:24-94:2, 97:13-21.

22   [192]  See e.g., Ongchangco Depo Tr., Proctor Dec., Exh, 23, at 32:12-33:1, 33:14-

23 22, 54:17-56:4, 201:17-210:24, 215:7-25 (testimony regarding DIVA STARZ
project names); Pratte Depo Tr., Proctor Dec., Exh. 26, at 36:10-39:2, 43:15-18,

24 45:2-16, 50:15-51:23, 67:10-68:16, 69:4-70:10 (testimony regarding DIVA STARZ
project names); Pasko Depo Tr., Proctor Dec., Exh. 27, at 91:14-92:20, 96:14-97:12,

25 (testimony regarding DIVA STARZ project names).

26   [193]  Motion at 11:18-20.

27   [194]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 211:20-214:2, 215:22-
217:16, 232:6-234:24.

28   [195]  Pratte Depo Tr., Proctor Dec., Exh. 26, at 38:16-39:22, 42:2-43:2, 61:8-62:4.

1   testimony from Mattel on this issue, and whether the list of individuals is

2   "definitive" or not is irrelevant.

3   • The unidentified sources of statements attributed to Mattel or ex-

4   Mattel employees in a Wall Street Journal article (Jensen):[196] Mattel specifically

5   told defendants that it (Mattel) does not know the identities of these unidentified

6   sources and that its witness (who turned out to be Ms. Jensen) would so testify.[197]

7   Defendants acknowledged all of this on the record.[198]

8   • Jill Nordquist: MGA and Bryant do not specify any complaint at

9   all about Ms. Nordquist's testimony. Her name is mentioned at page 5 of the

10   Motion, but defendants do not criticize her preparation, her testimony, and do not

11   identify any information they believe she should have testified about. The only hint

12   of what defendants may have intended to (but did not) argue regarding

13   Ms. Nordquist is from the portions of her deposition quoted in their so-called

14   Separate Statement.[199] But those questions and answers go to the sort of mind-

15   numbing detail that Bryant's attorney pursued during the entire deposition. Ms.

16   Nordquist's lack of knowledge about work Bryant did before joining Mattel,[200] about

17

18   [196]   Motion at 12:16-13:2.

19   [197]   5/13/05 letter, Corey Dec., Exh. 1, at 2; 3/15/05 Tr., Zeller Dec., Exh. 1, at 353:9-23; 354:19-355:21.

20   [198]   3/15/05 Tr., Zeller Dec., Exh. 1, at 356:12-15; 357:17-24; Jensen Depo Tr.,
21   Proctor Dec., Exh. 29, at 22:23-23:12. Ms. Jensen was very knowledgeable about
     the article, as she was the one who initiated contact with the Wall Street Journal and
22   had many conversations with the reporter about the article. Jensen Depo Tr., Proctor
     Dec., Exh. 29, at 25:21-26:9, 39:3-40:15, 50:3-52:4, 52:18-56:10, 57:17-65:11,
23   65:12-67:5, 67:6-72:14.

24   [199]   MGA and Bryant purport to have filed a "Separate Statement," but the
25   document is nothing more than a regurgitation of the deposition testimony cited in
     the moving papers. It does not lay out MGA and Bryant's arguments or the
26   particular legal issues to be decided by the Court. Mattel files herewith its
     Objections to the Defendants' Separate Statement and has dealt with defendants'
27   failure to specify their arguments as best it could.

28   [200]   Separate Statement at 11:23-26; 14:9-15:7.

07209/2217061.2

EXHIBIT 22 PAGE 496

1  who chose Carter Bryant to have his name associated with the Grand Entrance

2  Doll,[201] and about Mattel's general "practice" where an employee leaves but will not

3  say he or she is going to a competitor,[202] is irrelevant.

4          • <u>Julia Marine</u>.  Mattel gave the best information it had available

5  about the Zeus system during the time periods at issue given that the employees who

6  handled the system during the relevant time period have since left the company.[203]

7  Given the detail that Mattel has provided concerning the data available on Zeus and

8  the backup tapes that are available, it is hard to see what information MGA and

9  Bryant claim they are missing.[204]  Indeed, MGA and Bryant fail to identify any

10  information regarding Zeus that they want but do not have; they simply repeat their

11  "overzealous conviction" that Ms. Marine said no backup tapes exist.[205]  MGA and

12  Bryant full well know which tapes exist for which time periods.  Defendants would

13  simply rather complain than actually do the work to analyze the tapes.  On

14  September 4, 2007, Mattel wrote to MGA and offered to produce Zeus backup tapes

15  for 1998 to 2001.[206]  Defendants did not respond to Mattel's letter.

17  _____

[201]  Separate Statement at 12:7-15.
[202]  Separate Statement at 12:17-14:7.
[203]  Terminating Sanctions Tr., Proctor Dec., Exh. 34, at 82:4-21.
[204]  For example, during the hearing on the motion for terminating sanctions, Mattel told the Court and MGA and Bryant that Zeus backup tapes exist for April, May, August, September and December 1998; January and February 1999; February, March, April, May, June, July, August and December 2000; and January and July 2001, and a complete backup of the Zeus system in 2002 and 2004. Terminating Sanctions Tr., Proctor Dec., Exh. 34, at 40:7-15; 100:5-107:18.  Mattel has also preserved backup tapes for 2003, 2005 and 2006.  Affidavit of Michael Moore in Support of Mattel, Inc.'s Opposition to MGA Entertainment, Inc.'s Motion for Terminating Sanctions Due to Spoliation of Evidence, dated September 10, 2007, at 6:10-11, Notice of Lodging Declarations, Exh. 2; Letter from John Quinn to Patricia Glaser, dated September 4, 2007, Corey Dec., Exh. 4.
[205]  Order on Termination Sanctions, dated August 29, 2007, Proctor Dec., Exh. 13, at 4.

07209/2217061.2

EXHIBIT 22 PAGE 497

## IV.   PRECLUSION AND MONETARY SANCTIONS SHOULD BE SUMMARILY DENIED.

Defendants' request for monetary sanctions in the amount of $32,000 is outrageous.  First, the motion lacks merit for all the reasons discussed above.  Moreover, defendants did not meet and confer over the issues raised in their motion before filing.  They never identified any answers they believed were inadequate or any area of relevant testimony of which they claimed they were deprived.  They did not even identify the witnesses or topics at issue.  The breadth of the issues involved in this motion were simply not sufficiently identified by defendants' oblique reference to abusive "bandying" in their purported July 2, 2007 meet and confer letter, and MGA never agreed to discuss the matter and never sent the letter it promised to send after that.  The transcripts at issue in this motion alone span nearly 2,000 pages.[207]  Mattel offered to do the leg work and review the deposition transcripts if defendants just identified what they believed the issues were.  Defendants filed this motion instead.  If anyone should be sanctioned, it is not Mattel.

Nor should the Court grant any sort of preclusion sanctions.  A preclusion sanction is one of the most severe sanctions a court may impose.  Qualcomm Inc. v. Broadcom Corp., 2007 WL 935617, *2 (S.D. Cal.) ("Of those sanctions a court may select when applying Federal Rule 37, preclusion of evidence is among the most severe.").  Exclusion sanctions are improper absent a showing of undue prejudice.  Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp., 190

---

[206] Corey Dec., ¶ 4.

[207] Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 282; Nordquist Depo Tr., Proctor Dec., Exh. 28, at 303; Hudnut Depo Tr., Vol. II, Proctor Dec., Exh. 25, at 275; Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 188; Pratte Depo Tr., Proctor Dec., Exh. 26, at 230; Pasko Depo Tr., Proctor Dec., Exh. 27, at 222; Jensen Depo Tr., Proctor Dec., Exh. 29, at 191; Marine Depo Tr., Vol. III, Proctor Dec., Exh. 32, at 259; 3/15/05 Tr., Zeller Dec., Exh. 1, at 413.

EXHIBIT 22 PAGE 498

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

07209/2217061.2

1 | F.R.D. 644, 648 (N.D. Cal. 2000) ("Exclusion sanctions based on alleged discovery
2 | violations are generally improper *absent undue prejudice* to the opposing side.").
3 |    Such a severe sanction cannot be justified here, especially since MGA
4 | and Bryant never met and conferred over this motion and have made no effort to
5 | show they have been prejudiced.  Mattel believes it has provided 30(b)(6) witnesses
6 | on the subject matters to which the parties agreed.  If the Court finds that Mattel
7 | should offer further testimony on some relevant topic, Mattel will endeavor to find a
8 | witness to testify about it.  Mattel would have told defendants just that had they
9 | bothered to ask.  Because they failed to do so and because Mattel has produced and
10 | prepared its witnesses in good faith, defendants' request for sanctions should be
11 | denied.

### Conclusion

13 |    For the foregoing reasons, the Discovery Master should deny this
14 | motion in its entirety.

16 | DATED:  September 26, 2007    QUINN EMANUEL URQUHART OLIVER &
17 |              HEDGES, LLP

19 |          By _Dylan Proctor_
20 |          B. Dylan Proctor
         Attorneys for Plaintiff Mattel, Inc.

EXHIBIT 22 PAGE 499

**Exhibit  23**

*Final*

**MGA ENTERTAINMENT**
**16730 Schoenborn Street**
**North Hills, California 91343**

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

1.  **Retention as Consultant/Services:** MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

2.  **Term/Exclusivity:** The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3.  **Ownership:**

(a)  All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

(00006662.DOC/2 / 10/04/2000  03:05 PM)

1

ATTORNEY'S EYES ONLY

BRYANT 00794



DEPOSITION EXHIBIT
15
11-5-04        SH

EXHIBIT 23 PAGE 500

patents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute. Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents. If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)    Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine. Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.    Compensation/Costs:

(a)    For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of _____ hundred dollars ($_____) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of _____ dollars ($_____) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)    MGA shall pay to Bryant a royalty of _____ percent (__%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services. As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable to MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances). MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

[00006562.DOC/27 10/04/2008  03:05 PM]

2

ATTORNEY'S EYES ONLY

BRYANT 00795

EXHIBIT 23 PAGE 501

and binding on Bryant, shall constitute an account stated, and shall not be subject to any question for any reason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to MGA within two (2) years after the date rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)    All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent. In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)    Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis. Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable). MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)    MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales. MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell. Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of MGA Products shall be binding and conclusive upon Bryant. Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.    <u>Warranties and Indemnity</u>:  Bryant represents, warrants and agrees that:

(a)    he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)    neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)    the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

[00006662.DOC/2 / 10/04/2000  03:05 PM]

3

ATTORNEY'S EYES ONLY

BRYANT 00796

EXHIBIT 23 PAGE 502

patents, copyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property rights;

(d)     he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

(e)     he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.     **Default/Termination:**

(a)     In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

(b)     Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.     **Confidentiality:**

(a)     Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

(b)     Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest in or to, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

(c)     Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{00008662.DOC/2/ 10/04/2000  03:05 PM}

4

**ATTORNEY'S EYES ONLY**

**BRYANT 00797**

EXHIBIT 23  PAGE 503

entitled to equitable relief in the nature of injunction and to all other available relief, at law and/or in equity.

8.    **Notices:**  All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time. All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid.  Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067. Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 160ᵗʰ Street, Gardena, California 90247.

9.    **Independent Contractor/No Partnership/Third Party Beneficiary:** Bryant's relationship with MGA is that of an independent contractor.  Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name.  Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties.  In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship.  Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance.  Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise.  This Agreement shall not be construed to be for the benefit of any third party.

10.    **Services Rendered Deemed Special, etc.:**  Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.    **General Provisions:**

    (a)    This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law.  Any such assignment shall not relieve such Party of its obligations hereunder.

    (b)    The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

    (c)    A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

    (d)    Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

[00005662.DOC/2 / 10/04/2000 03:05 PM]

5

ATTORNEY'S EYES ONLY

BRYANT 00798

EXHIBIT 23 PAGE 504

OCT 04 '00 16:51                    81889048094                    PAGE.01

(e)     This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction of the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)     This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained. No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)     Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____
CARTER BRYANT

**REDACTED**
Social Security Number

[0080466Z.DOC2 / 10/04/2000  02:05 PM]

6

** TOTAL PAGE.04 **

ATTORNEY'S EYES ONLY                    81889048094                    mga entertainment                    Oct 04 00 04:38p

BRYANT 00799

EXHIBIT 23 PAGE 505

Exhibit  24

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware Corporation,

        Plaintiff,

      vs.           NO. CV 04-9059 NM (RJBx)

CARTER BRYANT, an individual, and
DOES 1 through 10, Inclusive.

        Defendants.

_____

CARTER BRYANT, on behalf of himself,
all present and former employees of
Mattel, Inc., and the general public.

        Cross-Complaint.

**CERTIFIED
COPY**

      vs.

MATTEL, INC.,
a Delaware corporation.

        Cross-Defendant.

_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPOSITION OF PAULA GARCIA

Thursday, May 24, 2007

Los Angeles, California

VOLUME 1

Reported by:
DAVID OCANAS
CSR No. 12567

JOB NO. 66418

EXHIBIT 24 PAGE 506

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MATTEL, INC., a Delaware Corporation,

 5                  Plaintiff,

 6          vs.              NO. CV 04-9059 NM (RJBx)

 7   CARTER BRYANT, an individual, and
     DOES 1 through 10, Inclusive.
 8
                    Defendants.
 9
     CARTER BRYANT, on behalf of himself,
10   all present and former employees of
     Mattel, Inc., and the general public.
11
                    Cross-Complaint.
12
            vs.
13
     MATTEL, INC.,
14   a Delaware corporation.

15                  Cross-Defendant.

16

17

18       Videotaped Deposition of PAULA GARCIA,

19   Volume 1, taken on behalf of Plaintiff and

20   Cross-Defendant, at 865 South Figueroa Street,

21   Tenth Floor, Los Angeles, California, beginning at

22   10:18 a.m. and ending at 7:08 p.m. on Thursday, May

23   24, 2007 before David Ocanas, Certified Shorthand

24   Reporter No. 12567.

25
```

2

EXHIBIT 24 PAGE 507

```
 1    APPEARANCES:
 2
 3    For Mattel:
 4            QUINN, EMANUEL, URQUHART, OLIVER &
              HEDGES, LLP
 5            BY:  BRIDGET MORRIS
              Attorney at Law
 6            865 South Figueroa Street
              Tenth Floor
 7            Los Angeles, California 90017
              213-624-7707
 8            E-mail:  Michaelzeller@quinnemanuel.com
                       bridgetmorris@quinnemanuel.com
 9
      For MGA Entertainment:
10
              O'MELVENY & MYERS LLP
11            BY:  DIANA M. TORRES
              Attorney at Law
12            400 South Hope Street
              Los Angeles, California 90071-2899
13            (213) 430-6000
              E-mail:  Dtorres@omm.com
14
      For Carter Bryant:
15
              KEKER & VAN NEST
16            BY:  MICHAEL H. PAGE
              Attorney at Law
17            710 Sansome Street
              San Francisco, California 94111-1704
18            (415) 397-7188
              E-mail:  Mhp@kvn.com
19
      Also Present:
20
              MICHAEL MOORE, Mattel
21            JILL THOMAS, Mattel
               DAPHNE GRONICH, MGA Entertainment
22            CRAIG HOLDEN, MGA Entertainment
23
24
25
```

3

EXHIBIT 24 PAGE 508

```
 1      APPEARANCES:  (CONT'D)

 2

 3      Videographer:

 4              CHARLIE GUILLEN
                SARNOFF COURT REPORTERS
 5              AND LEGAL TECHNOLOGIES
                20 Corporate Park
 6              Irvine, California 92606
                (877) 955-3855
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

EXHIBIT 24 PAGE 509

1    on topic 35 which is the one involving -- it

2    says -- it simply says, you may ask questions, you

3    may ask questions of Paula Garcia on these issues.

4         I don't know if it means she's

10:43 5    designated --

6         MS. TORRES:  To the extent that the

7    company has knowledge.

8    BY MR. ZELLER:

9         Q    Is it correct that it's your understanding

10:43 10    that you're here to testify as to certain topics

11    that are listed here in Exhibit 390?

12         A    Yes.

13         Q    And for the record, those topics are 1

14    through 9.

10:44 15         With a limitation your counsel had

16    mentioned on topic 9.

17         Also topics, 10, 12.

18         13, with the limitation that your counsel

19    had mentioned.

10:44 20         And then topics 35 and 36?

21         A    Yes.

22         Q    And you agree and consent to do that on

23    behalf of MGA; is that true?

24         A    Yes.

10:44 25         Q    If you could please tell us your full

EXHIBIT 24 PAGE 510

```
 1    name?

 2         A    Paula Dianthe Garcia.

 3         Q    That's your current name, right?

 4         A    Yes.

10:44 5    Q    Did you previously go by another name?

 6         A    Paula Dianthe Treantafelles.

 7         Q    If you could spell the former last name

 8    for the court reporter please?

 9         A    T-r-e-a-n-t-a-f-e-l-l-e-s.

10:45 10   Q    That was your maiden name?

11         A    Yes.

12         Q    When did you start going by Paula Garcia?

13         A    About three years ago.

14         Q    That was after you were married?

10:45 15   A    Yes.

16         Q    Was it pretty close to the time you got

17    married or was there a period of time when you were

18    still using your maiden name?

19         A    Almost immediately.

10:45 20   Q    Other than Paula Garcia and Paula

21    Treantafelles have you ever had any other last

22    names that you have used?

23         A    No.

24         Q    You are currently employed by MGA; is that

10:45 25   correct?
```

EXHIBIT 24 PAGE 511

```
 1          A    Yes.

 2          Q    What's your current title?

 3          A    Vice-president of Product Design and

 4    Development.

10:46 5     Q    About how long have you had that position?

 6          A    I don't remember exactly.

 7          Q    Was it the last -- were you vice-president

 8    of Product Development -- Design and Development

 9    rather last year in 2006?

10:46 10    A    Yes.

11          Q    Did you have that position in 2005?

12          A    Yes.

13          Q    Did you have that position in 2004?

14          A    Yes, I believe so.

10:46 15    Q    Did you have that position in 2003?

16          A    I don't remember.

17          Q    You're pretty sure you've had that title

18    since at least 2004; is that correct?

19          A    Yes.

10:46 20    Q    In your title, you said that -- your title

21    includes Product Design and Development, what is

22    Product Design and Development?

23          A    Design refers to the concepting and

24    preliminary -- and the creation of a preliminary

10:47 25    design.
```

25

EXHIBIT 24 PAGE 512

```
 1              And development represents the

 2     responsibility of the approval process between

 3     MGA's U.S. and Hong Kong offices for

 4     appropriateness to manufacturing.

 5         Q    So if I understand you correctly,

 6     development starts when there is basically that

 7     approval process that starts between MGA in the

 8     U.S. and MGA in Hong Kong for purposes of

 9     manufacturing?

10              MS. TORRES:  Objection, misstates the

11     witness' testimony.

12              THE WITNESS:  I'm not sure that was

13     correct.

14              Could you please repeat it?

15     BY MR. ZELLER:

16         Q    Sure.

17              I want to make sure I understand.

18              As you're using development, because you

19     said it was part of the responsibility, or part of

20     the approval process and I want to make sure I

21     understand, the development part of Design and

22     Development is when that approval process between

23     MGA in the U.S. and MGA in Hong Kong starts?

24         A    Yes.

25         Q    Has that been your understanding of
```

10:47  5
10:48 10
10:48 15
10:48 20
10:48 25

26

EXHIBIT 24 PAGE 513

1

2

3

4          I, the undersigned, a Certified

5     Shorthand Reporter, do hereby certify:

6          That the foregoing proceedings were

7     taken before me at the time and place herein set

8     forth; that any witness in the foregoing

9     proceedings, prior to testifying, were placed under

10    oath; that a verbatim record of the proceedings was

11    made by me using machine shorthand which was

12    thereafter transcribed under my direction; further,

13    that the foregoing is an accurate transcription

14    thereof.

15         I further certify that I am neither

16    financially interested in the action nor a relative

17    or employee of any attorney of any of the parties.

18         IN WITNESS WHEREOF, I have this

19    date subscribed by name.

20

21    Dated:

          MAY 3 0 2007

22

23         _____

24         DAVID OCANAS

25         CSR No. 12567

EXHIBIT 24 PAGE 314

**Exhibit  25**

CONFIDENTIAL - ATTORNEYS EYES ONLY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

**CERTIFIED COPY**

CONFIDENTIAL

CARTER BRYANT, an individual, )
                            )
         Plaintiff,      )
                            )
     vs.                 ) No. CV 04-09049 SGL
                            ) (RNBx) (c/w CV
MATTEL, INC., a Delaware    ) 04-9059 & 05-2727)
Corporation,                )
                            )
         Defendant.     )
                            )
CONSOLIDATED WITH MATTEL,     ) VOLUME
INC., v. BRYANT and MGA     )
ENTERTAINMENT, INC. v. MATTEL, )
INC.                        )
_____)

**ATTORNEYS EYES ONLY**

-- CONFIDENTIAL - ATTORNEYS EYES ONLY --

VIDEOTAPED DEPOSITION OF JULIA MARINE

Los Angeles, California

Thursday, September 21, 2006

Reported by:
Marceline F. Noble
CSR No. 3024
JOB No. 919809B

1

EXHIBIT 25 PAGE 5/5

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4

5

6   CARTER BRYANT, an individual, )
                                  )
7              Plaintiff,         )
                                  )
8         vs.                     ) No. CV 04-09049 SGL
                                  ) (RNBx) (c/w CV
9   MATTEL, INC., a Delaware      ) 04-9059 & 05-2727)
    Corporation,                  )
10                                )
               Defendant.         )
11  CONSOLIDATED WITH MATTEL,     )
    INC., v. BRYANT and MGA       )
12  ENTERTAINMENT, INC. v. MATTEL,)
    INC.                          )
13  _____)

14

15

16          Videotaped deposition of JULIA MARINE,

17    taken on behalf of Defendants, at 400 South

18    Hope Street, Los Angeles, California,

19    beginning at 3:25 P.M. and ending at

20    5:00 P.M. on Thursday, September 21, 2006,

21    before Marceline F. Noble, RPR, CRR,

22    Certified Shorthand Reporter No. 3024.

23

24

25

EXHIBIT 25 PAGE 516

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    APPEARANCES:

2    For Plaintiff:

3        LITTLER MENDELSON
         BY:  KEITH A. JACOBY, ESQ.
4        2049 Century Park East, 5th Floor
         Los Angeles, California  90067-3107
5        (310) 553-0308

6

7    For Defendant MGA Entertainment, Inc.:

8        O'MELVENY & MYERS LLP
         BY:  JENNIFER GLAD, ESQ.
9            JAMES PAUL JENAL, ESQ.
         400 South Hope Street
10       Los Angeles, California  90071-2899
         (213) 430-6000
11       jglad@omm.con
         jjenal@omm.com
12   For Defendant Mattel, Inc.:

13       QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
         BY:  JON COREY, ESQ.
14       865 South Figueroa Street, 10th Floor
         Los Angeles, California  90017
15       (213) 443-3000
         joncorey@quinnemanuel.com
16

17   Also Present:

18       Paul Bonn, videographer

19

20

21

22

23

24

25

                                                      3

Esquire Deposition Services
800.640.2461

EXHIBIT 25 PAGE 517

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX

WITNESS                                    EXAMINATION

JULIA MARINE


BY MR. JENAL                                    6



EXHIBITS

(NONE)


INFORMATION REQUESTED
(None)
Page


REFERENCE REQUESTED
(None)
Page              Line


INSTRUCTION NOT TO ANSWER
(None).
Page              Line

4

EXHIBIT _25_ PAGE _518_

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    to prepare for your deposition, if anything.

2         A    Well, I met with Jon and Michael Moore a

3    couple of days ago.

4         Q    Jon is Jon Corey?

03:30   5         A    Yes.  Sorry.

6         Q    And Michael Moore, who do you understand him

7    to be?

8         A    He's an attorney for Mattel.

9         Q    Okay.  And you say you met with them a

03:30  10    couple of days ago?

11         A    Yes.

12         Q    For how long did you meet with them?

13         A    A few hours.

14         Q    A few hours.

03:30  15         Aside from that meeting a couple of days

16    ago, did you meet with either Mr. Corey or Mr. Moore

17    prior to that time?

18         A    No.

19         Q    During your meeting with Mr. Corey and

03:30  20    Mr. Moore, did they show you any documents that

21    refreshed your recollection as to any of the issues

22    that you're being asked to testify about today?

23         A    No.

24         Q    Okay.  Apart from the time you spent with

03:31  25    counsel preparing for your deposition, did you do

10

Esquire Deposition Services
800.640.2461

EXHIBIT 25 PAGE 519

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    anything else to prepare for your deposition?

2        A    No.

3        Q    You didn't review any other materials on

4    your own?

03:31  5        A    No.

6        Q    Did you speak with anyone about this

7    deposition other than counsel?

8        A    Other than to tell my manager that I would

9    be doing it.

03:31  10        Q    Other than -- other than telling your

11   manager I'm going to be gone this afternoon?

12        A    Right.  On for this thing, yeah.  But not --

13   not to gather information.

14        Q    Okay.  So I take it you didn't perform any

03:31  15   investigation of your own to look to see if there was

16   information available that would be relevant to this

17   deposition?

18        A    No.

19        Q    Okay.  You didn't look for any backup tapes

03:31  20   or materials of that nature?

21        A    No.

22        Q    Okay.  Could you give me your education

23   post-high school, please.

24        MR. COREY:  Actually -- and before -- before

03:31  25   we get there, I just want to make -- I want to make

EXHIBIT 25 PAGE 520

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    clear, I don't know if you've had an opportunity to

2    look at the 30(b)(6) Deposition Notice.  The topic

3    that Ms. Marine has been designated to testify about

4    is not explicit in the notice, it's the result of the

03:32  5    meeting of counsel that occurred I believe in

6    March of last year.

7            MR. JENAL:  Right.

8            MR. COREY:  And the topic is the Zeus system

9    as it existed between 1998 and 2000.  And I just want

03:32  10   to make sure we're on -- we're all on the same page.

11           MR. JENAL:  That's fine.  That is my

12   understanding.

13           MR. COREY:  Okay.  Perfect.  Because it's

14   not -- it's not driven from the topics that are

03:32  15   identified -- specific topics that are identified on

16   the 30(b)(6) Notice.

17           MR. JENAL:  Fair enough.

18           MR. COREY:  It may be encompassed within

19   some of those but as a result of meeting with counsel

03:32  20   the topics were kind of sliced and diced a little bit

21   differently.

22           MR. JENAL:  That is my understanding as well

23   so I think we're on the same page.

24        Q   That little colloquy aside, can you give me

03:32  25   your education post-high school, please.

EXHIBIT 25 PAGE 521

CONFIDENTIAL - ATTORNEYS EYES ONLY

1        A    Sure.  Bachelor's in math from UC
2   Santa Cruz.
3        Q    And what year was that?
4        A    '83.
03:33 5        Q    Any university or formal education after
6   your Bachelor's degree?
7        A    Other than work-related courses?
8        Q    Leaving those aside for the moment.
9        A    Okay.  That's all.
03:33 10       Q    Did you, in addition to your math field of
11  study, did you study computer science or related
12  subjects as well?
13       A    No.
14       Q    All right.  And then after you got your
03:33 15  Bachelor's degree in 1983, did you go to work at that
16  time?
17       A    Yes.
18       Q    Okay.  For whom did you go to work?
19       A    For Bank of America.
03:33 20       Q    And what was your position at Bank of
21  America?
22       A    It was in the data network department.
23       Q    And would this have been --
24       A    Analyst I guess would be --
03:34 25       Q    Analyst in the data network department?

EXHIBIT 25 PAGE 522

1

2        I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, do hereby certify:

4        That the foregoing proceedings were taken

5    before me at the time and place herein set forth; that

6    any witnesses in the foregoing proceedings, prior to

7    testifying, were placed under oath; that a verbatim

8    record of the proceedings was made by me using machine

9    shorthand which was thereafter transcribed under my

10   direction; further, that the foregoing is an accurate

11   transcription thereof.

12       I further certify that I am neither financially

13   interested in the action nor a relative or employee of

14   any attorney of any of the parties.

15       IN WITNESS WHEREOF, I have this date subscribed

16   my name.

17

18   Dated:     OCT 0 4 2006

19

20

21             Marceline F. Noble
                 CSR No. 3024

22

23

24

25

EXHIBIT 25 PAGE 523

**Exhibit  26**

CONFIDENTIAL ATTORNEYS EYES ONLY

1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA   CERTIFIED

3  EASTERN DIVISION   COPY

4

5  CARTER BRYANT, an individual,   )
                                   )
6           Plaintiff,             )
                                   )
7           vs.                    )  No. CV 04-09049 SGL
                                   )  (RNBx) (c/w CV
8  MATTEL, INC., a Delaware        )  04-9059 & 05-2727)
   Corporation,                    )
9                                  )
            Defendant.             )  VOLUME II
10                                 )
   CONSOLIDATED WITH MATTEL, INC.,)
11 v. BRYANT and MGA               )  CONFIDENTIAL
   ENTERTAINMENT, INC., v. MATTEL,)
12 INC.                            )  ATTORNEYS
13                                    EYES ONLY
14
15         CONFIDENTIAL - ATTORNEYS' EYES ONLY
16
17     VIDEOTAPED 30(b)(6) DEPOSITION OF JULIA MARINE
18            Los Angeles, California
19          Wednesday, November 8, 2006
20
21
22
23  Reported by:
24     WENDY S. SCHREIBER
       CSR No. 3558, RPR, CLR
25     Job No. 920755

75

EXHIBIT 26 PAGE 524

RECEIVED

NOV 1 5 2006

CALENDARED

EXHIBIT 26 PAGE 525

CONFIDENTIAL ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION

 4

 5   CARTER BRYANT, an individual,  )
                                    )
 6           Plaintiff,             )
                                    )
 7           vs.                    ) No. CV 04-09049 SGL
                                    ) (RNBx) (c/w CV
 8   MATTEL, INC., a Delaware       ) 04-9059 & 05-2727)
     Corporation,                   )
 9                                  )
             Defendant.             )
10                                  )
     CONSOLIDATED WITH MATTEL, INC.,)
11   v. BRYANT and MGA             )
     ENTERTAINMENT, INC., v. MATTEL,)
12   INC.                           )

13

14

15

16           Videotaped 30(b)(6) Deposition of

17   JULIA MARINE, taken on behalf of Defendants,

18   at 400 South Hope Street, Los Angeles,

19   California, beginning at 10:09 A.M. and ending

20   at 12:06 P.M., on Wednesday, November 8, 2006,

21   before Wendy S. Schreiber, Certified Shorthand

22   Reporter No. 3558, RPR, CLR.

23

24

25
```

Esquire Deposition Services
800-640-2461

EXHIBIT 26 PAGE 526

CONFIDENTIAL ATTORNEYS EYES ONLY

```
 1    APPEARANCES:

 2

 3        For Plaintiff:

 4

 5        LITTLER MENDELSON
          BY:  DOMINIC J. MESSIHA, ESQ.
 6        2049 Century Park East
          Fifth Floor
 7        Los Angeles, California 90067-3107
          (310) 553-0308
 8

 9    For Defendant MGA Entertainment, Inc.:

10

11        O'MELVENY & MYERS LLP
          BY:   JENNIFER GLAD, ATTORNEY AT LAW
12              JAMES PAUL JENAL, ESQ.
          400 South Hope Street
13        Los Angeles, California 90071-2899
          (213) 430-6000
14        jglad@omm.com
          jjenal@omm.com
15

16

17    For Defendant Mattel, Inc.:

18

19        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
          BY:  JON COREY, ESQ.
20        865 South Figueroa Street, Tenth Floor
          Los Angeles, California 90017
21        (213) 443-3000
          joncorey@quinnemanuel.com
22

23    Video Operator - Tony Bloodworth

24

25
```

77

EXHIBIT 26 PAGE 527

CONFIDENTIAL ATTORNEYS EYES ONLY

1       LOS ANGELES, CALIFORNIA; THURSDAY, NOVEMBER 8, 2006

2                       10:09 A.M.

3

4           VIDEO OPERATOR:  Here begins videotape No. 1

5   in the deposition of Julia Marine, Volume 2, in the        10:09AM

6   matter of Bryant versus Mattel, Inc. and related

7   actions in the U. S. District of California, Central

8   District of California, Eastern Division, case

9   number of which is CV 04-09049 SGL (RNBx).

10          Today's date is November 8, 2006.  The time       10:09AM

11  on the video monitor is 10:09 a.m.  This deposition

12  is being taken at 400 South Hope Street in

13  Los Angeles, California, and was made at the request

14  of the law offices of O'Melveny & Myers.

15          My name is Tony Bloodworth.  I'm a legal           10:09AM

16  videographer here along with the court reporter,

17  Wendy Schreiber, on behalf of Esquire Deposition

18  Services located at 6222 Wilshire Boulevard in

19  Los Angeles.

20          Would counsel and all present please               10:10AM

21  identify yourselves and state whom you represent.

22          MS. GLAD:  Jennifer Glad from O'Melveny &

23  Myers on behalf of MGA Entertainment.

24          MR. JENAL:  Jim Jenal also from O'Melveny

25  for MGA.                                                   10:10AM

Esquire Deposition Services
800-640-2461

EXHIBIT 26 PAGE 528

CONFIDENTIAL ATTORNEYS EYES ONLY

1      MR. COREY:  Jon Corey on behalf of Mattel,

2  Inc.

3      MR. MOORE:  Michael Moore, in-house counsel

4  for Mattel, Inc.

5      VIDEO OPERATOR:  Will the court reporter      10:10AM

6  please swear in the witness.

7

8                  JULIA MARINE,

9  having been first placed under oath, testified as

10 follows:

11

12                  EXAMINATION

13 BY MS. GLAD:

14     Q.   Before we get started, just to correct

15 something for the record, this is actually a            10:10AM

16 30(b)(6) deposition, not the deposition solely of

17 Julia Marine.

18     MR. COREY:  And the topic on which she's

19 been designated to testify just to be clear is the

20 Zeus system between 1998 and 2000.                      10:10AM

21     MS. GLAD:  Correct.

22     Q.   You'll remember last time we kind of went

23 over some ground rules to explain what was going to

24 happen and some of the questions you would be asked.

25 You're reminded that you are under oath.  You're        10:11AM

81

EXHIBIT 26 PAGE 529

CONFIDENTIAL ATTORNEYS EYES ONLY

1   required to give the testimony under oath the same

2   as you are at trial.  That means we're entitled to

3   your best, most truthful testimony.  Do you remember

4   that?

5        A.   Yes.                                          10:11AM

6        Q.   To make things easier for the court reporter

7   we need verbal replies, yes-or-no answers, no

8   gestures, nodding of the head.  And we also need to

9   make sure I'll try not to talk over you, you'll try

10  not to talk over me.  Let each other finish our       10:11AM

11  answers and the questions so the court reporter can

12  get all of our answers down.  Is that correct?

13       A.   Yes.

14       Q.   Again, if you don't understand any of my

15  questions, please let me know and I'll try to         10:11AM

16  rephrase it in a way that you do understand.

17            Again, if your lawyer makes an objection,

18  that's why he's here today.  Unless he specifically

19  tells you not to answer a question you are still

20  allowed to answer that question.                      10:11AM

21            Also, this isn't a marathon.  If you need

22  any breaks, just let me know.  The only thing is if

23  a question is pending, I would ask that you answer

24  the question first and then we'll try to figure out

25  the first place to take a break after that.  Okay?    10:11AM

Esquire Deposition Services
800-640-2461

EXHIBIT 26 PAGE 530

CONFIDENTIAL ATTORNEYS EYES ONLY

1          MR. COREY:  Objection:  vague and ambiguous.

2          THE WITNESS:  There would have been no

3     difference to the backups.

4     BY MS. GLAD:

5          Q.  Is anything at all done differently?  Other      10:53AM

6     than just the backups, is anything done in terms --

7     with that individual's laptop or PC?

8          MR. COREY:  Objection:  scope.

9          THE WITNESS:  I don't know what is done with

10    the PCs.                                                  10:54AM

11    BY MS. GLAD:

12         Q.  What about if an employee is investigated

13    during the '98 to 2000 time period?  Is there

14    anything that was done differently in terms of

15    backing up the information on Zeus?                       10:54AM

16         MR. COREY:  Objection:  vague and ambiguous.

17         THE WITNESS:  I'm not aware of anything.

18    BY MS. GLAD:

19         Q.  Is there any reason why the weekly and

20    monthly backups would be done differently during         10:54AM

21    that '98 to 2000 time period?

22         A.  Not that I'm aware of.

23         Q.  During that '98 to 2000 time frame, were

24    there any kind of automatic purging of files or

25    data?                                                    10:54AM

                                                          108

EXHIBIT 26 PAGE 531

CONFIDENTIAL ATTORNEYS EYES ONLY

1    A.    No, otherwise it wouldn't keep growing.

2    Q.    What about -- strike that.

3          If you wanted to restore information, how

4    would you do that during that '98 to 2000 time

5    frame?                                              10:55AM

6          MR. COREY:  To restore from a backup tape?

7          MS. GLAD:  From the backup tape.

8          THE WITNESS:  I would use the backup

9    software to do that.

10   Q.    What software is that?                        10:55AM

11   A.    Net Backup.

12   Q.    Can you tell me how that process would work?

13   A.    You would call up the program, the software

14   program, and you give it a path and a date range and

15   it will show you what's available to restore and     10:55AM

16   then you tell it to restore it.

17   Q.    Okay.  And can you do that user by user?

18   A.    It's by location on the server, not user.

19   Q.    So by location on the server you're talking

20   like the whole entire department, that folder?      10:56AM

21   A.    A path name, any path.

22   Q.    Is there anything else that was done to

23   archive that information during the '98 to 2000 time

24   frame other than the regular backups?

25   A.    I don't know of anything.                      10:56AM

                                                          109

EXHIBIT 26 PAGE 532

CONFIDENTIAL ATTORNEYS EYES ONLY

1    Q.   Is there anyone else who would know if

2  anything was ever done?

3    A.   Mark or Mike.

4    Q.   Pardon me?

5    A.   Mark Sackett or Mike.                        10:56AM

6    Q.   Do you know if there was ever any call to

7  restore the 2002 backup tape?

8    A.   Not that I know of, no.

9    Q.   Have you -- during that '98 to 2000 time

10  frame, do you know if there was cause to restore any  10:57AM

11  of the backup tapes during that time?

12    A.   You mean a file?

13    Q.   A file, a path, what have you.

14    A.   I wouldn't know.

15      MR. COREY:   It may help -- there's a           10:57AM

16  difference between restoring a file and restoring a

17  terabyte of information and so I think that -- well,

18  I've said enough.   Objection:   vague and ambiguous.

19      THE WITNESS:   I don't -- I don't know.

20  BY MS. GLAD:                                         10:57AM

21    Q.   If I wanted -- from that '98 to 2000 time

22  period if I wanted to find the files or the data

23  stored by a particular user is that possible?

24    A.   Well, if the files are on the server now,

25  you mean?                                            10:58AM

                                                              110

EXHIBIT 26 PAGE 533

CONFIDENTIAL ATTORNEYS EYES ONLY

1    Q.   If they're on the server now or if they're

2    on that backup tape from 2002.

3         (Whereupon Mr. Messiha joined the

4         deposition proceedings.)

5         MR. COREY:  Now you've got two questions.    10:58AM

6    Ask about the backup tape.  I mean, pick a question.

7    BY MS. GLAD:

8    Q.   If you wanted -- on the backup tape from

9    2002 that included the information during that '98

10   to 2000 time period, if you wanted to find all the    10:58AM

11   files or data stored from a particular individual,

12   could you do that?

13   A.   Wow.  Not easily.  You'd have to restore it

14   somewhere, all of it, or -- yeah, you'd have to

15   restore it.                                          10:59AM

16   Q.   So you couldn't restore just for that

17   particular user?

18   A.   I could not.  Those -- those backups are

19   expired so our backup system has no knowledge of

20   what's on those tapes.                               10:59AM

21   Q.   The 2002 backup is expired?

22   A.   Yes.

23   Q.   And -- so with that Net Backup software you

24   couldn't do the same thing with that tape as you

25   could with, say, a backup from a month ago?          11:00AM

                                                          111

EXHIBIT 26 PAGE 534

CONFIDENTIAL ATTORNEYS EYES ONLY

1      A.   Right, not easily.  It doesn't know what's

2  on those tapes anymore.

3      Q.   Does the Net Backup software provide any

4  kind of an index or anything to say at all what's on

5  that backup tape?                                    11:00AM

6           MR. COREY:  Again, between '98 and 2000?

7           MS. GLAD:  Correct.

8           THE WITNESS:  No, not what we have, no.

9      Q.   And is there an easy way to get that kind of

10  information?                                        11:00AM

11     A.   Not easy, no.

12     Q.   You said that you would have to restore the

13  entire thing?

14     A.   You're looking -- yeah, we have no

15  knowledge -- we have no idea what's on those -- what  11:00AM

16  specifically is on those tapes so you would have to

17  read them all into a Net Backup software to recreate

18  its database and even then it's not sorted by a

19  date, like file dates.

20     Q.   How is it sorted?                      .    11:01AM

21     A.   It's by location on the server.  This is a

22  point-in-time backup so it would be files created

23  and modified any time up until the point the backup

24  was taken.

25     Q.   And if you knew that the particular person   11:01AM

EXHIBIT _26_ PAGE _535_

CONFIDENTIAL ATTORNEYS EYES ONLY

1   was in the design center, for example, would that

2   make it any more or less difficult?

3        A.   No.

4        Q.   Is there anything that would make it less

5   difficult?                                          11:01AM

6        A.   Well, if --

7             MR. COREY:  While we're wishing.  Objection:

8   speculation.

9             THE WITNESS:  Yeah, since it's stored by

10  location and not by owner or date knowing whether    11:02AM

11  the person was there or not wouldn't help.

12  BY MS. GLAD:

13       Q.   Is there anything where you could identify

14  or -- strike that.

15            What about documents that are currently on   11:02AM

16  the Zeus server today that are from that '98 to 2000

17  time frame if you wanted to find all documents

18  created or worked on by a particular individual?

19            MR. COREY:  You're asking how she would do

20  that?                                                11:03AM

21  BY MS. GLAD:

22       Q.   How you would go about doing that, yes.

23       A.   It would be time consuming because it's a

24  very big server but certainly we have the

25  modification date files and the owner of the file.   11:03AM

113

EXHIBIT 26 PAGE 536

CONFIDENTIAL ATTORNEYS EYES ONLY

1    You could list that.  It would be very time

2    consuming I guess to go through the whole server to

3    find that.

4        Q.   Time consuming just in terms of processing

5    time of the server or would it also take a lot of          11:03AM

6    man-hours?

7        A.   Processing.

8        Q.   And is there any information that you could

9    be given that would make that easier or less time

10   consuming?                                                 11:04AM

11       A.   A specific location.

12       Q.   Meaning?

13       A.   On the server.

14            MS. GLAD:  Can we go off the record for just

15   one moment?                                                11:04AM

16            VIDEO OPERATOR:  Off the record at 11:04

17   a.m.

18            .        (Brief recess.)

19            VIDEO OPERATOR:  Going back on the record

20   at 11:12 a.m.  Counsel may proceed.                        11:12AM

21   BY MS. GLAD:

22       Q.   You talked about the backup tape of Zeus

23   from approximately 2002.  How big is the backup tape

24   from 2002?

25       A.   I think they hold -- it's tapes.  I think        11:12AM

114

EXHIBIT 26 PAGE 537

CONFIDENTIAL ATTORNEYS EYES ONLY

```
 1   STATE OF CALIFORNIA   ) ss:

 2   COUNTY OF LOS ANGELES )

 3

 4        I, WENDY S. SCHREIBER, C.S.R. No. 3558, do

 5   hereby certify:

 6

 7        That the foregoing deposition of JULIA

 8   MARINE was taken before me at the time and place

 9   therein set forth, at which time the witness was

10   placed under oath and was sworn by me to tell the

11   truth, the whole truth, and nothing but the truth;

12        That the testimony of the witness and all

13   objections made by counsel at the time of the

14   examination were recorded stenographically by me,

15   and were thereafter transcribed under my direction

16   and supervision, and that the foregoing pages

17   contain a full, true and accurate record of all

18   proceedings and testimony to the best of my skill

19   and ability.

20        I further certify that I am neither

21   counsel for any party in said action, nor am I

22   related to any party to said action, nor am I in any

23   way interested in the outcome thereof.

24

25
```

149

EXHIBIT 26 PAGE 538

1          IN WITNESS WHEREOF, I have subscribed my name

2   this *13th* day of *November*                , 2006.

3

4

5

6   _____

7   WENDY S. SCHREIBER, CSR No. 3558, RPR, CLR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT *26* PAGE *539*

**Exhibit 27**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4

5    --------------------------------

6    MATTEL, INC., a Delaware       )

7    Corporation,                   )

8              Plaintiff,           )

9              vs.                  )  No. CV 04-9059

10   CARTER BRYANT, an individual;  )  (NM) (RNBx)

11   and DOES 1 through 10,         )  VOLUME III

12   Inclusive,                     )

13             Defendants.          )

14   ---------------------------- )

15   (COMPLETE CAPTION ON NEXT PAGE.)

16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19     Continued Videotaped 30(b)(6) Deposition

20     of JULIA MARINE, taken at 400 South Hope

21     Street, Los Angeles, California, commencing

22     at 10:05 A.M., Tuesday, June 26, 2007,

23     before Wendy S. Schreiber, CSR No. 3558,

24     RPR, CLR.

25

26   PAGES 151 - 259

151

EXHIBIT 27 PAGE 540

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                  EASTERN DIVISION
 4
 5   --------------------------------
 6   MATTEL, INC., a Delaware         )
 7   Corporation,                     )
 8             Plaintiff,             )
 9             vs.                    ) No. CV 04-9059
10   CARTER BRYANT, an individual; )    NM (RNBx)
11   and DOES 1 through 10,           )
12   Inclusive,                       )
13             Defendants.            )
14   -------------------------------- )
15   CARTER BRYANT, on behalf of      )
16   himself, all present and         )
17   former employees of Mattel,      )
18   Inc., and the general public,    )
19             Counter-Claimants,     )
20             vs.                    )
21   MATTEL, INC., a Delaware         )
22   Corporation,                     )
23             Counter-Defendant. )
24   --------------------------------
25
                                                    152
```

EXHIBIT 27 PAGE 541