CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF:

 4

 5            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6            BY:  JON COREY, ESQ.

 7            865 South Figueroa Street, Tenth Floor

 8            Los Angeles, California 90017

 9            (213) 443-3000

10            jcorey@quinnemanuel.com

11

12                     -AND-

13

14            MATTEL, INC.

15            BY:  MICHAEL MOORE, ESQ.

16            333 Continental Boulevard

17            El Segundo, California 90245-5012

18            (310) 252-2000

19            michael.moore@mattel.com

20

21

22

23

24

25
```

153

EXHIBIT 27 PAGE 542

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

```
1    APPEARANCES OF COUNSEL (CONTINUED):
2
3         FOR THE DEFENDANT AND COUNTERCLAIMANT
4    CARTER BRYANT:
5
6              KEKER & VAN NEST LLP
7              710 Sansome Street
8              San Francisco, California 94111-1704
9              (415) 391-5400
10             (NOT PRESENT)
11
12        FOR DEFENDANT MGA ENTERTAINMENT, INC.:
13
14             O'MELVENY & MYERS LLP
15             BY:  JAMES PAUL JENAL, ESQ.
16             400 South Hope Street
17             Los Angeles, California 90071-2899
18             (213) 430-6000
19             jjenal@omm.com
20
21        ALSO PRESENT:
22
23             WEN BU
24             RYAN GULINO, VIDEO OPERATOR
25
```

154

EXHIBIT 27 PAGE 543

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   meet with counsel in preparation for your

 2   deposition?

 3       A.   One hour maybe.  One or two hours.

 4       Q.   When was that?

 5       A.   Last week.                            10:10AM

 6       Q.   When last week?

 7       A.   Thursday.

 8       Q.   Did you speak with anyone else in

 9   preparation for your deposition?

10       A.   No.                                   10:10AM

11       Q.   Did you review any documents aside from your

12   prior transcript in preparation for your deposition?

13       A.   No.

14       Q.   Did you do any investigation of any sort to

15   prepare yourself for your deposition today?    10:10AM

16       A.   No.

17       Q.   You understand --

18           MR. COREY:  And to be clear, are you

19   excluding the preparation that she did for her prior

20   transcripts?                                   10:10AM

21           MR. JENAL:  Correct.

22           MR. COREY:  Because there's a significant

23   amount -- prior deposition because there's a

24   significant amount of overlap between this subject

25   matter and the subject matters to which she's  10:10AM
                                                       160
```

EXHIBIT 27 PAGE 544

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    testified before.

2         MR. JENAL:  Yes, that's understood.

3    Q.   I was, in fact, not referring to preparation

4    you may have made prior to your previous appearance

5    for deposition but efforts that you made in          10:11AM

6    preparation for this session today.

7    A.   Just -- just meeting -- when I met with the

8    lawyers here.

9    Q.   Okay.  And reviewing your prior transcript?

10   A.   Right.                                           10:11AM

11   Q.   And you understand that you're here today to

12   testify about the Zeus data system for lack of a

13   better way of phrasing it as it was used in the

14   Design Center and elsewhere at Mattel from basically

15   1998 through the present; is that correct?           10:11AM

16        MR. COREY:  Actually, the topic on which

17   she's been designated is narrower than that.  It's

18   the document management system used by designers at

19   the Design Center.

20        MR. JENAL:  I guess we'll explore what the     10:11AM

21   difference is between those two understandings.

22   Q.   But is it your understanding that that's

23   your designation as recited by counsel?

24   A.   Yes.

25   Q.   What document management system do you          10:12AM

161

EXHIBIT _27_ PAGE _545_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    understand to have been used by designers at Mattel?

2        A.   As far as I know, there isn't one.

3        Q.   So in terms of a document management system,

4    is there -- there is a system where designers at

5    Mattel were encouraged to keep documents, correct?    10:12AM

6        A.   A file server, yes.

7        Q.   And that's a file server that we talked

8    about before that's known as Zeus, correct?

9        A.   Correct.

10       Q.   And do you have an understanding as to    10:12AM

11   practices associated with the retention of

12   information on the file server known as Zeus from

13   1998 to the present?

14       A.   I'm not aware of any retention policy.  Is

15   that what --    10:12AM

16       Q.   Backup systems?

17       A.   Backup, certainly.

18       Q.   So let's see if we can kind of recap some of

19   the things I think you told me just so that we have

20   those fresh before us.    10:13AM

21            I think you told us that the Zeus system,

22   the file server that you named Zeus -- correct?

23       A.   Uh-huh, correct.

24       Q.   For the god Zeus; is that right?

25       A.   Yes.    10:13AM

                                                    162

EXHIBIT 27 PAGE 546

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    STATE OF CALIFORNIA    ) ss:
2    COUNTY OF LOS ANGELES )
3
4            I, WENDY S. SCHREIBER, CSR No. 3558, do
5    hereby certify:
6
7            That the foregoing deposition of JULIA
8    MARINE was taken before me at the time and place
9    therein set forth, at which time the witness was
10   placed under oath and was sworn by me to tell the
11   truth, the whole truth, and nothing but the truth;
12           That the testimony of the witness and all
13   objections made by counsel at the time of the
14   examination were recorded stenographically by me,
15   and were thereafter transcribed under my direction
16   and supervision, and that the foregoing pages
17   contain a full, true and accurate record of all
18   proceedings and testimony to the best of my skill
19   and ability.
20           I further certify that I am neither
21   counsel for any party in said action, nor am I
22   related to any party to said action, nor am I in any
23   way interested in the outcome thereof.
24
25
```

257

EXHIBIT 27 PAGE 547

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          IN WITNESS WHEREOF, I have subscribed my

2     name this 9th day of July, 2007.

3

4

5

6

7     _____

8     WENDY S. SCHREIBER, CSR No. 3558, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

258

EXHIBIT 27 PAGE 548

**Exhibit  28**

CONFIDENTIAL - ATTORNEYS EYES ONLY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

**CERTIFIED COPY**

**CONFIDENTIAL**

| | |
|---|---|
| CARTER BRYANT, an individual, ) | |
| Plaintiff, ) | |
| vs. ) | No. CV 04-09049 SGL |
| ) | (RNBx) (c/w CV |
| MATTEL, INC., a Delaware ) | 04-9059 & 05-2727) |
| Corporation, ) | |
| Defendant. ) | |
| CONSOLIDATED WITH MATTEL, ) | |
| INC., v. BRYANT and MGA ) | |
| ENTERTAINMENT, INC. v. MATTEL,) | |
| INC. ) | |

**ATTORNEYS EYES ONLY**

-- CONFIDENTIAL TRANSCRIPT-ATTORNEYS EYES ONLY --

VIDEOTAPED DEPOSITION OF ARNOLDO J. ARTAVIA

Los Angeles, California

Thursday, September 21, 2006

Reported by:
Marceline F. Noble
CSR No. 3024
JOB No. 919809A

EXHIBIT 28 PAGE 549

RECEIVED

OCT 0 6 2006

CALENDARED

EXHIBIT 28 PAGE 550

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4

5

  CARTER BRYANT, an individual, )
6                                )
                Plaintiff,       )
7                                )
          vs.                    ) No. CV 04-09049 SGL
8                                ) (RNBx) (c/w CV
  MATTEL, INC., a Delaware       ) 04-9059 & 05-2727)
9  Corporation,                  )
                                 )
10              Defendant.       )
                                 )
11 CONSOLIDATED WITH MATTEL,     )
   INC., v. BRYANT and MGA       )
12 ENTERTAINMENT, INC. v. MATTEL,)
   INC.                          )
13 _____  )

14

15

16          Videotaped deposition of ARNOLDO J.

17      ARTAVIA, taken on behalf of Defendants, at

18      400 South Hope Street, Los Angeles,

19      California, beginning at 10:08 A.M. and

20      ending at 3:03 P.M. on Thursday, September

21      21, 2006, before Marceline F. Noble, RPR,

22      CRR, Certified Shorthand Reporter No. 3024.

23

24

25

                                                    2

EXHIBIT _28_ PAGE _551_

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    APPEARANCES:

 2    For Plaintiff:

 3        LITTLER MENDELSON
          BY:  KEITH A. JACOBY, ESQ.
 4        2049 Century Park East, 5th Floor
          Los Angeles, California  90067-3107
 5        (310) 553-0308

 6

      For Defendant MGA Entertainment, Inc.:
 7
          O'MELVENY & MYERS LLP
 8        BY:  JENNIFER GLAD, ESQ.
               JAMES PAUL JENAL, ESQ.
 9        400 South Hope Street
          Los Angeles, California  90071-2899
10        (213) 430-6000
          jglad@omm.con
11        jjenal@omm.com

12    For Defendant Mattel, Inc.:

13        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
          BY:  JON COREY, ESQ.
14        865 South Figueroa Street, 10th Floor
          Los Angeles, California  90017
15        (213) 443-3000
          joncorey@quinnemanuel.com
16
      Also Present:
17
          Paul Bonn, videographer
18

19

20

21

22

23

24

25
```

                                                          3

EXHIBIT _28_ PAGE _552_

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
          1          A    I joined Mattel.

          2          Q    And I take it you've been there ever since?

          3          A    Yes.

          4          Q    And what was your title when you came to
10:38     5     Mattel?

          6          A    Originally it was a consultant.

          7          Q    So you weren't a full-time employee at that

          8     point?

          9          A    Correct.

10:38    10          Q    How did you happen to come to Mattel as a

         11     consultant?  At least -- let me back that up.

         12               It appears from the prior work history

         13     you've given me, it sounds like you were a regular

         14     full-time employee at these other places, is that
10:38    15     accurate?

         16          A    That's accurate.

         17          Q    Okay.  So how is it that you came to be

         18     consultant at Mattel?

         19          A    I contacted P. Murphy & Associates and
10:38    20     informed them I was looking for a consulting

         21     opportunity and they presented me with the

         22     opportunity of Mattel and I took it.

         23          Q    Okay.  P. Murphy & Associates, I take it is

         24     some sort of placement firm?
10:39    25          A    Correct.
```

28

EXHIBIT _28_ PAGE _553_

CONFIDENTIAL - ATTORNEYS EYES ONLY

1        Q    Okay.  And how long did you work as a

2    consultant at Mattel?

3        A    Three years.

4        Q    Until '96?

10:39  5     A    Yes.

6        Q    And you -- how did your employment change at

7    that time?

8        A    I was presented with an opportunity to join

9    Mattel as a full-time employee and I liked the place

10:39  10   so I took it.

11       Q    What was your title in '96?

12       A    Technical lead.

13       Q    And what was your job responsibility as

14   technical lead in '96?

10:39  15       MR. COREY:  No.  Just let me object for the

16   record.  We can -- we can -- we can run through this

17   at kind of a survey level.  The witness is here not

18   to designate as to his knowledge about everything.

19   He's here to testify as a corporate designee about a

10:39  20   very discreet topic.  I assume that we're going to

21   get there relatively quickly.

22       MR. JENAL:  We are.

23       Q    What was your job responsibility as a

24   technical lead at Mattel in 1996?

10:40  25       A    I was responsible for designing the -- the

29

Esquire Deposition Services
800.640.2461

EXHIBIT 28 PAGE 554

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    second phase of the development of the TRACS system.

2        Q    When you say the second phase of the TRACS

3    system, that presupposes, at least to me, that there

4    was a first phase that had already been designed.

10:40  5            Is that true?

6        A    That is true.

7        Q    What was -- was there a title given to that

8    first phase of the TRACS system?  Did it go by a

9    name?

10:40  10       A    Other than Phase 1, no.

11       Q    Was Phase 1 of TRACS -- describe for me what

12    was Phase 1 of TRACS.

13       A    Phase 1 of TRACS was to -- had a couple of

14    purposes to it.

10:40  15            One was to move some of the functionality

16    that had been provided by the, what we call the PRM

17    system at the time from the mainframe into a client

18    server environment.  That -- and to add some

19    additional functionality to support that new

10:41  20    functionality that was being moved.

21       Q    What does PRM stand for?

22       A    Project resource management.

23       Q    Okay.  And how long were you as a technical

24    lead?  Let me phrase that differently.

10:41  25            Did your title at some point change from

30

Esquire Deposition Services
800.640.2461

EXHIBIT 28 PAGE 555

CONFIDENTIAL - ATTORNEYS EYES ONLY

1       that of technical lead?

2            A    Yes.

3            Q    Okay.  When did that happen?

4            A    2000.

10:41 5      Q    And what was your title in 2000?

6            A    Manager.

7            Q    As a technical lead, did you have folks

8       reporting to you then?

9            A    No.

10:42 10     Q    As manager, I take it you did?

11           A    Yes.

12           Q    Okay.  How many people reported to you as a

13      manager in 2000?

14           A    Between five to eight.  I don't recall the

10:42 15 exact number.

16           Q    And what was the work of your group?  What

17      were you folks assigned to do?

18           A    Supporting the TRACS system.

19           Q    Let me back up.  When you came in as a

10:42 20 consultant in 1993, were you also working with

21      regards to TRACS at that time?

22                Yes?

23           A    I -- excuse me.

24                No.

10:42 25     Q    Okay.  What did you initially work on when

Esquire Deposition Services
800.640.2461

EXHIBIT 28 PAGE 556

1

2          I, the undersigned, a Certified Shorthand

3     Reporter of the State of California, do hereby certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth; that

6     any witnesses in the foregoing proceedings, prior to

7     testifying, were placed under oath; that a verbatim

8     record of the proceedings was made by me using machine

9     shorthand which was thereafter transcribed under my

10    direction; further, that the foregoing is an accurate

11    transcription thereof.

12         I further certify that I am neither financially

13    interested in the action nor a relative or employee of

14    any attorney of any of the parties.

15         IN WITNESS WHEREOF, I have this date subscribed

16    my name.

17

18    Dated: _____ OCT 0 4 2006 _____

19

20

21         _Marceline F. Noble_
                    Marceline F. Noble
22                  CSR No. 3024

23

24

25

EXHIBIT 28 PAGE 557

Exhibit  29

```
 1              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                   EASTERN DIVISION
 4       --------------------------------
 5    CARTER BRYANT, an individual,   )
 6              Plaintiff,            )
 7         vs.                       ) No. CV 04-09049 SGL
 8    MATTEL, INC., a Delaware       ) (RNBx) (c/w CV
 9    Corporation,                   ) 04-9059 & 05-2727)
10              Defendant.           )
11       ------------------------------)
12    CONSOLIDATED WITH MATTEL, INC.,)
13    v. BRYANT and MGA             )
14    ENTERTAINMENT, INC., v. MATTEL,)
15    INC.                          )
16       --------------------------------
17
18         Videotaped 30(b)(6) deposition of
19    FRED T. KAWASHIMA, taken at 400 South
20    Hope Street, Los Angeles, California,
21    commencing at 10:27 A.M., Wednesday,
22    January 17, 2007, before Wendy S.
23    Schreiber, CSR No. 3558, RPR, CLR.
24
25    PAGES 1 - 280
```

**Certified Copy**

EXHIBIT 29 PAGE 558

```
 1    APPEARANCES OF COUNSEL:

 2

 3       FOR THE PLAINTIFF:

 4          LITTLER MENDELSON

 5          BY:  FRED JACOBY, ESQ.

            2049 Century Park East

 6          Fifth Floor

 7          Los Angeles, California 90067-3107

 8          (310) 553-0308

 9

10       FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:

11          O'MELVENY & MYERS LLP

            BY:  JAMES PAUL JENAL, ESQ.

12               JENNIFER GLAD, ATTORNEY AT LAW

            400 South Hope Street

13          Los Angeles, California 90071-2899

            (213) 430-6000

14          jglad@omm.com

15          jjenal@omm.com

16

17       FOR DEFENDANT MATTEL, INC.:

18          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

19          BY:  JON COREY, ESQ.

20          865 South Figueroa Street, Tenth Floor

21          Los Angeles, California 90017

22          (213) 443-3000

23          joncorey@quinnemanuel.com

24

         ALSO PRESENT:  MICHAEL MOORE

25       VIDEO OPERATOR - DAVID FISCHEL
```

                                                            2

EXHIBIT 29 PAGE 55

```
 1    Inc.

 2          MR. JACOBY:  Fred Jacoby, Littler Mendelson,

 3    representing Carter Bryant.

 4          MR. MOORE:  Michael Moore, in-house counsel

 5    for Mattel.                                    10:29AM

 6          MR. COREY:  Jon Corey, Quinn Emanuel on

 7    behalf of Mattel.

 8

 9                    FRED T. KAWASHIMA,

10      having been first placed under oath, testified

11      as follows:

12

13                      EXAMINATION

14    BY MR. JENAL:

15      Q.   Good morning, Mr. Kawashima.           10:29AM

16      A.   Good morning.

17      Q.   Is that the correct pronunciation?

18      A.   That's correct.

19      Q.   I'll try to get that right throughout the

20    day.                                           10:29AM

21          Could you state and spell your full name for

22    the record, please.

23      A.   Full name first name Fred, F-r-e-d, middle

24    name Toshio, T-o-s-h-i-o, last name Kawashima,

25    K-a-w-a-s-h-i-m-a.                             10:29AM
                                                        4
```

EXHIBIT 21 PAGE 560

```
 1            MR. COREY:  And just before we start, to

 2    make clear, Mr. Kawashima is here being designated

 3    to testify on behalf of Mattel and the topic on

 4    which he is designated is Mattel's E-mail system

 5    primarily located at the El Segundo facility between   10:29AM

 6    1998 and 2000.

 7            MR. JENAL:  Right, and my understanding is

 8    he's also designated on the E-mail procedures and

 9    policies from 1998 to present.

10            MR. COREY:  Correct.  Well, no, that's not    10:30AM

11    correct.  From 1998 to 2000.

12            MR. JENAL:  I actually think --

13            MR. COREY:  No, I'm telling you what the

14    designation is that the witness is here to testify

15    about.  He is not designated to testify on         10:30AM

16    preservation between 2000 and the present.  That's

17    not what he's designated to testify about.

18            MR. JENAL:  In the filing that Mattel made

19    yesterday to Judge Infante, there is the express

20    representation that this witness is here, amongst    10:30AM

21    the topics we just described also, to cover

22    preservation policies from 1998 to the present.

23            MR. COREY:  He's not.  He's not testifying

24    about -- he's not testifying about preservation

25    today.  If you want -- I mean, you will get a        10:30AM
                                                              5
```

EXHIBIT 29 PAGE 561

1    witness for preservation.  It's not this witness and

2    it's not today.

3            MR. JENAL:  So the representation in what

4    is --

5            MR. COREY:  I don't know what representation  10:30AM

6    you're talking about.  If you'd like to pull it out

7    and show it to me, I'll look at it.

8            MR. JENAL:  At a break we'll do that.

9            MR. COREY:  That's fine, but I'm telling you

10   what he's been designated on, what he's here to       10:30AM

11   testify about today.

12           I'd would also like to further note that the

13   noticing party who is Carter Bryant is not taking

14   this deposition.  It's entirely possible that

15   Mr. Bryant may have questions for the witness on      10:31AM

16   this topic and Mattel is operating under the

17   assumption that to the extent that MGA Entertainment

18   is proceeding with this deposition, it will not in

19   the future propound a Rule 30(b)(6) notice on Mattel

20   on this or similar topics as to which Mr. Kawashima   10:31AM

21   or any other witness to whom MGA has previously

22   deposed has testified.

23           MR. JACOBY:  Well, just for the record, at

24   all of the depositions in this case there has

25   basically been an alternating between Bryant and MGA  10:31AM

                                                           6

EXHIBIT 29 PAGE 562

```
 1    as to who goes first in every deposition.  When
 2    Bryant has gone first, MGA has gone second and when
 3    MGA has gone second, Bryant has gone first.  And
 4    this was noticed by Mr. Bryant.  Mr. Jenal asked to
 5    do the questioning first today and I agreed to that      10:31AM
 6    and that's no different from many other depositions
 7    in this case where I started questioning and
 8    Mr. Corey finished it or I started the questioning
 9    and Ms. Sendali finished it.  When Mattel takes
10    depositions, we don't get any pre-notice about          10:32AM
11    whether it's going to be Mr. Zeller, Mr. Quinn or
12    you and --
13          MR. COREY:  That's a completely different
14    issue.  I mean, Mr. Jenal can go ahead and start by
15    asking questions.  It's inconsistent with the           10:32AM
16    federal rules but if that's the way you would like
17    to proceed, that's fine.
18          What we don't want is we don't want for MGA
19    to proceed with questioning on your -- on Bryant's
20    notice and then to get another notice from MGA on        10:32AM
21    the same topics.  That's the issue.  As long as we
22    have an understanding on that, that's fine, let's go
23    ahead with the deposition.
24          MR. JENAL:  I think what ends up happening
25    ultimately with regard to subsequent 30(b)(6)           10:32AM
                                                                    7
```

EXHIBIT 29 PAGE 563

```
 1        Q.     Would you continue your answer, please.

 2               MR. COREY:   Noting the objection.

 3

 4

 5                                                           01:44PM

 6

 7

 8                         REDACTED

 9

10                                                           01:44PM

11

12

13

14

15                                                           01:44PM

16

17

18                         REDACTED

19

20                                                           01:44PM

21

22

23

24

25                                                           01:44PM
                                                                102
```

EXHIBIT 29 PAGE 564

```
1
2                          REDACTED
3
4      Q.   And so I think you said the application
5   would be delivered to the requester.  Do you mean        01:47PM
6   like they'd be given a series of floppy disks or a
7   CD or something like that so they could install the
8   application?
9      A.   That's my understanding, yes.
10     Q.   They would be able to install that on a          01:47PM
11  computer that they themselves owned as opposed to a
12  Mattel computer?
13     A.   Can you ask that again, please?
14     Q.   Let me ask you this.  In the '98 to 2000
15  time frame were there laptop computers made             01:48PM
16  available to Mattel employees in El Segundo?
17     A.   Yes.
18     Q.   Who was allowed -- let me rephrase that.
19  Was there some policy as to who could have laptop
20  computers?
                                                              01:48PM
21          MR. COREY:  Scope.
22          THE WITNESS:  I'm not aware of the policy.
23  BY MR. JENAL:
24     Q.   To your understanding any individual could
25  have requested a laptop computer; is that true?          01:48PM
                                                                 105
```

EXHIBIT 29 PAGE 565

1          MR. COREY:  Objection:  scope.

2          THE WITNESS:  I don't know.

3          MR. COREY:  Give me some time after he asks

4    his question for me to object so the court reporter

5    doesn't -- so we're not talking at the same time.      01:48PM

6    That will help the court reporter out.

7    BY MR. JENAL:

8          Q.   Do you know whether the laptop computers

9    that were made available to at least some employees

10   between '98 and 2000, do you know whether they had   01:49PM

11   the VPN software already installed?

12         A.   I can't confirm that, no.

13         Q.   Who could at Mattel?

14         A.   I'm trying to think of who's left, who from

15   that time period.  You know, I don't know.            01:49PM

16         Q.   Aside from accessing E-mail remotely through

17   the virtual private network, was there any other

18   ability in the '98 to 2000 time frame to remotely

19   access E-mail?

20         A.   Not to my knowledge.                        01:49PM

21         Q.   I think you made reference to this in the

22   context of I think you called it E-mail retention.

23   Another term that I've heard used to describe this

24   is an auto delete function on E-mail.  Are you

25   familiar with that concept?                           01:50PM

                                                          106

EXHIBIT 29 PAGE 566

1    A.    Auto delete?

2    Q.    Correct.

3    A.    That's pretty general so I'm not sure what

4    you refer to.

5    Q.    When you talked about E-mail retention          01:50PM

6    previously, what was your understanding -- what does

7    that term encompass?

8    A.    E-mail retention?

9    Q.    Correct.

10   A.    With respect to Exchange, that's utilizing     01:50PM

11   the Mailbox Manager feature that is enabled that you

12   configure it to delete E-mails in specified folders

13   older than X number of days.

14   Q.    And is that -- that time period, the number

15   of days, is that something that's configurable as       01:50PM

16   part of the Exchange server?

17   A.    It is configurable.

18   Q.    What's the -- do you know what the range on

19   how long that can be -- how short to how long it can

20   be set in the '98 to 2000 time frame?                   01:51PM

21   A.    I -- I am not -- I don't know what the

22   definitive range is.  I remember seeing the dialogue

23   box but I don't remember the exact range.

24   Q.    Let me ask you this.  You said that's in

25   something called Mailbox Manager?                       01:51PM

107

EXHIBIT 27 PAGE 567

1      A.   It's called Mailbox Manager, yes.

2      Q.   Does that imply that I can apply different

3   retention periods to different mailboxes?

4      A.   There is a place where you can enter an

5   exclusion or an exception.                          01:51PM

6      Q.   And this is in the '98 to 2000 time frame?

7      A.   I believe so, yes.

8      Q.   What would be the nature of that exclusion

9   or exception?  What would that look like?  What

10   would I be excluding?                              01:52PM

11      A.   Mailboxes by name.

12      Q.   So I could give a list of specific mailboxes

13   and essentially exclude them from the retention

14   policy?

15      A.   Yes.                                        01:52PM

16      Q.   If I took a mailbox and I excluded it from

17   the retention policy, what would that mean with

18   regards to the retention of those E-mails?  Would

19   that mean that they are never deleted automatically?

20      MR. COREY:  Objection:  compound and            01:52PM

21   speculation.

22   BY MR. JENAL:

23      Q.   Do you understand my question?

24      A.   Rephrase the question, please.

25      Q.   You just testified that the Mailbox Manager  01:52PM

                                                         108

EXHIBIT 29 PAGE J68

1   has functionality that allows me to exclude a list

2   of mailboxes --

3        A.   Yes.

4        Q.   -- from the E-mail retention policy that

5   we're discussing.                                      01:52PM

6        A.   Uh-huh.

7        Q.   That's correct?

8        A.   Yes.

9        Q.   Let's suppose that you and I have mailboxes

10  on that system and let's say the default is a 90-day   01:52PM

11  retention period.  Okay?

12       A.   Yes.

13       Q.   As I understand it from your prior

14  testimony, that would mean that an E-mail that has

15  been kept around for 90 days in my in box is going     01:53PM

16  to be automatically deleted after that time; is that

17  correct?

18            MR. COREY:  Objection:  speculation.

19            THE WITNESS:  On the 91st day any E-mail

20  that's in specified folders or within that time        01:53PM

21  period will be deleted.

22  BY MR. JENAL:

23       Q.   So now let's go back to the Mailbox Manager

24  and let's say that someone enters your mailbox

25  account ID into the Mailbox Manager to exclude it      01:53PM

                                                           109

EXHIBIT 29 PAGE 569

```
 1    from that retention period.

 2        A.   Uh-huh.

 3        Q.   Do you understand that?

 4        A.   Yes.

 5        Q.   Would that mean then that your E-mails would    01:53PM

 6    not be deleted automatically?

 7             MR. COREY:  Objection:  speculation.

 8             THE WITNESS:  Yes.

 9    BY MR. JENAL:

10        Q.   So if I -- back up.                              01:53PM

11             Who at Mattel in '98 to 2000 had the ability

12    to identify mailboxes for exclusion from the E-mail

13    retention policy?

14             MR. COREY:  Who had the rights to do that?

15             MR. JENAL:  Correct.                             01:54PM

16             THE WITNESS:  Who had the administrative

17    rights to affect that configuration change?

18        Q.   Correct.

19        A.   To my knowledge it would be Karen Sagawa and

20    Sergio Hernandez.                                         01:54PM

21        Q.   Do you know whether in the '98 to 2000 time

22    period whether such exclusions were implemented

23    where certain mailboxes were excluded from the

24    retention policy?

25        A.   I do -- I do not know.  I don't know if it       01:54PM
                                                                110
```

EXHIBIT 29 PAGE 570

1    was excluded.

2        Q.    Who at Mattel would know that?

3        A.    The only person who might know may be Sergio

4    Hernandez.

5        Q.    What documentation, if any, would there be    01:54PM

6    of excluding mailboxes from the E-mail retention

7    policy?

8        A.    I'm not aware of any documents that exist.

9        Q.    If a businessperson at Mattel wanted to keep

10   all of their E-mail, never wanted them deleted from    01:55PM

11   their in box, do you know if it's possible for them

12   to make a request and say to somebody in your

13   department or your area and ask to be excluded from

14   the retention policy?

15           MR. COREY:  Objection:  speculation.    01:55PM

16           THE WITNESS:   What time period?

17   BY MR. JENAL:

18       Q.    '98 to 2000.

19       A.    You're asking if -- if someone asked -- made

20   a request if that request would have been fulfilled?    01:55PM

21       Q.    Correct.

22       A.    I do not know.

23       Q.    Do you know if there was a policy to prevent

24   doing that?

25       A.    A policy to prevent?    01:55PM

                                                        111

EXHIBIT 29 PAGE 571

```
 1        Q.    Giving such an exemption.

 2        A.    I'm not aware of any policy.

 3        Q.    Is it possible under the E-mail system as it

 4   existed between '98 and 2000 to have some group of

 5   mailboxes have a retention period of one duration       01:56PM

 6   and another group of mailboxes to have a retention

 7   period of a different duration?  In other words,

 8   could I have some folks whose mail expires or is

 9   deleted after 30 days, somebody else's E-mail isn't

10   deleted until 180 days?                                  01:56PM

11        A.    And you're asking if it's capable -- if it's

12   potential for that?

13        Q.    If the capability existed, correct.

14        A.    Sure, capability -- there's capability to do

15   that.                                                    01:56PM

16        Q.    So the system as it existed between '98 and

17   2000 could be configured to have multiple retention

18   periods applied to give mailboxes?

19        A.    There's potential for that, yes.

20        Q.    To your knowledge in the '98 to 2000 time     01:56PM

21   period was that ever done at Mattel?

22        A.    I do not know.

23        Q.    Again, I take it, if I asked who would know

24   that, your best estimates would be Ms. Sagawa or

25   Mr. Hernandez?                                           01:57PM
                                                                  112
```

EXHIBIT 29 PAGE 572

```
 1        A.    That would be my best guess.

 2        Q.    You never asked them those questions?

 3        A.    No, I did -- have not.

 4              MR. JENAL:  Why don't we take a quick break.

 5    Let's go off the record.                          01:57PM

 6              VIDEO OPERATOR:  Going off the record.  The

 7    time is now 1:57 p.m.

 8                        (Brief recess.)

 9              VIDEO OPERATOR:  Going back on the record.

10    The time is now 2:04 p.m.                          02:05PM

11              (Deposition Exhibit 365 was marked for

12        identification and is annexed hereto.)

13    BY MR. JENAL:

14        Q.   Mr. Kawashima, I've placed in front of you

15    what we've previously asked the court reporter to    02:05PM

16    mark as Exhibit 365.  Would you take a moment to

17    look at this document and then I'll have a question

18    or two for you about it.  And while you're looking

19    at that, I will note for the record that Exhibit 365

20    is titled "Declaration of Sergio Hernandez in        02:05PM

21    Support of Mattel, Inc.'s Motion to Quash Notice of

22    Videotaped Deposition of the Person Most

23    Knowledgeable at Mattel, Inc.-Electronic Discovery

24    and Related Issues."  Have you had a chance to take

25    a look at that, Mr. Kawashima?                       02:05PM
                                                            113
```

EXHIBIT 29 PAGE 573

```
1     A.   May I have a couple minutes?

2     Q.   Sure, go ahead.

3     A.   Okay.

4     Q.   Have you had a chance to review Exhibit 365?

5     A.   Yes, I have.                              02:06PM

6     Q.   Have you seen this document before?

7     A.   It looks familiar, yes.

8     Q.   In what way does this document look

9  familiar?

10    A.   The body of the text.                     02:07PM

11    Q.   Is this one of the documents related to

12 Mr. Hernandez that you reviewed in preparation for

13 your deposition?

14    A.   It appears so.

15    Q.   You may recall that when we were first    02:07PM

16 talking about that I think you had described this as

17 a deposition and I had made reference to this as

18 possibly being a declaration.  Do you see at the top

19 there the second page it says "Declaration of Sergio

20 Hernandez"?                                        02:07PM

21    A.   Yes.

22    Q.   Were the documents that you described

23 previously as depositions, were they of the form of

24 what you see here in Exhibit 365?

25    A.   Yes.                                       02:07PM
                                                      114
```

EXHIBIT 29 PAGE 574

```
1        Q.   Let me ask you this.   In paragraph 3 of
2   Mr. Hernandez's declaration -- now you've got me
3   doing it -- let me jump you to the last page first.
4   You'll notice it's signed there and it says
5   "Executed the 14th day of October, 2004 at          02:08PM
6   El Segundo, California."   Do you see that?
7        A.   Yes.
8        Q.   Do you know -- does that refresh your
9   recollection as to the time period of the other
10  documents from Mr. Hernandez that you reviewed?     02:08PM
11
12
13                    REDACTED
14
15                                                      02:08PM
16
17
18
19
20                                                      02:08PM
21                    REDACTED
22
23
24
25                                                      02:09PM
                                                          115
```

EXHIBIT 29 PAGE 575

```
 1

 2

 3

 4

 5                                                    02:09PM

 6
                         REDACTED
 7

 8

 9

10                                                    02:09PM

11

12

13

14

15                                                    02:09PM

16

17

18

19

20          REDACTED                                  02:10PM

21

22

23

24

25                                                    02:10PM
                                                        116
```

EXHIBIT 29 PAGE 576

```
 1
 2
 3
 4
 5                      REDACTED                        02:10PM
 6
 7
 8
 9
10                                                     02:10PM
11
12
13
14
15                                                     02:10PM
16
17                     REDACTED
18
19
20                                                     02:10PM
21
22
23
24         MR. COREY:   Objection:   mischaracterizes his
25     testimony.                                      02:11PM
                                                       117
```

EXHIBIT 29 PAGE 577

```
 1    BY MR. JENAL:

 2        Q.   Do you recall that testimony, sir?

 3        A.   I said 3,500 -- yes, 3,500 employees -- or

 4    did I say 3,500 mailboxes?

 5        Q.   My understanding is you said employees but    02:11PM

 6    if your testimony is mailboxes, I just want to know

 7    which it is.

 8        A.   I think it was employees, yes.

 9        Q.   And that every one of those employees had an

10    E-mail account, correct?                              02:11PM

11        A.   That is my understanding, yes.

12        Q.   Out of those 3,500 employees, how many

13    computers, whether PCs or Macintoshes, would there

14    have been in the '98 to 2000 time frame supporting

15    those employees?                                      02:11PM

16        A.   I don't know.  I don't know.

17        Q.   Was it -- to your understanding would there

18    have been at least one computer for each of those

19    employees?  Would there have been less?  Would there

20    have been more?  Do you have any understanding        02:12PM

21    either way?

22        A.   My understanding is many computers were

23    shared so it was not a one-to-one correlation.

24        Q.   Mr. Hernandez is saying that as of 2004 his

25    understanding is that the E-mail system makes use of  02:12PM
                                                             118
```

EXHIBIT 29 PAGE 578

```
 1    over 2,300 computers.  Do you know if there were as

 2    many as 2,300 computers supporting the E-mail system

 3    in the '98 to 2000 time frame?

 4         A.   Supporting or accessing the E-mail system?

 5         Q.   Well, let me just use his word.  He said          02:12PM

 6    that the E-mail systems currently use over 2,300

 7    computers and four servers.  So setting aside the

 8    four servers, as of the '98 to 2000 time frame, do

 9    you know whether the E-mail system would have been

10    using as many as 2,300 computers?                           02:12PM

11         A.   That's highly probable.  There's nothing

12    that tells me to -- that will refute that.

13         Q.   Do you know whether the number of employees

14    has declined at Mattel and El Segundo since 1998 and

15    2000?                                                       02:13PM

16              MR. COREY:  Objection:  scope.

17              THE WITNESS:  Yes, it has.

18    BY MR. JENAL:

19         Q.   Do you know to what extent it has?

20              MR. COREY:  Same objection.  Let's get back       02:13PM

21    to '98 or 2000 or we're going to be finished here.

22    BY MR. JENAL:

23         Q.   I'm trying to understand, sir, you know how

24    many computers there would have been in support of

25    the 3,500 employees that had E-mail accounts in the        02:13PM
                                                                        119
```

EXHIBIT 29 PAGE 579

```
 1    '98 to 2000 time frame and I have a marker that as

 2    of 2004 that number was 2,300 computers and I'm just

 3    trying to work backwards from that and your

 4    understanding of what has happened in terms of

 5    employees at Mattel to see if you have a way of          02:13PM

 6    creating for us an accurate estimate of the number

 7    of computers in use for the E-mail system in '98 to

 8    2000.

 9          So my question to you is:  Do you know to

10    what extent the employee count in El Segundo has        02:14PM

11    declined from the 3,500 that you understood there to

12    be in the '98 to 2000 time frame relative to 2004

13    when Mr. Hernandez made his declaration?

14          MR. COREY:  I'm going to object on the

15    grounds of scope, and the question that you have        02:14PM

16    asked has already been answered by the witness with

17    respect to his understanding as to the number of

18    computers that would have existed between 1998 and

19    2000.  That's the last question that's outside the

20    scope of the '98 to 2000 time frame.                    02:14PM

21          You can answer that question.

22          THE WITNESS:  Ask the question again,

23    please.

24    BY MR. JENAL:

25          Q.   In light of what you know about the decline  02:14PM
                                                                   120
```

EXHIBIT 29 PAGE 580

```
 1    in the number of employees at Mattel between the

 2    '98-2000 figure of 3,500 and 2004, what is your

 3    understanding of that decline?  Can you just give it

 4    a number?  How many employees between -- left Mattel

 5    shall we say in El Segundo from the 3,500 in the '98    02:15PM

 6    to 2000 range to 2004?

 7           MR. COREY:  Same objections.

 8           THE WITNESS:  My guess would be --

 9           MR. COREY:  I don't want you to guess.  If

10    you have a basis -- if you have a basis to estimate,    02:15PM

11    you can do that.

12           THE WITNESS:  I can't give you a definitive.

13    BY MR. JENAL:

14       Q.   I understand that.  Your best estimate

15    though would be --                                      02:15PM

16       A.   My best estimate?  Between 2000 and 2004?

17    I'd say maybe 700.

18       Q.   He also goes on in paragraph 3 to refer to

19    "Two generations of E-mail software have been used

20    in the past seven years at that location."  "That      02:15PM

21    location" presumably being El Segundo.  He wrote

22    this or signed this at least in 2004.  And I think

23    you've testified to a series of generations that may

24    have been in place.  Let me back up.

25           What's your understanding of what it means      02:16PM
                                                                 121
```

EXHIBIT 29 PAGE 581

```
 1    to talk about a generation of E-mail software?

 2         A.   My interpretation?

 3         Q.   Correct.

 4         A.   My interpretation is that it's a brand-new

 5    implementation, a new architecture of an E-mail        02:16PM

 6    system, not a minor upgrade.  So it's a brand,

 7    spanking new -- whole new, wholly-written piece of

 8    software.

 9         Q.   Okay.  Would you -- would you consider the

10    change from Exchange 5.0 to 5.5 to be a generational   02:16PM

11    change as you've just described it?

12         A.   No.

13         Q.   In the context of Exchange software are you

14    aware of a generational change between '97 and 2004?

15         A.   Yes.                                          02:17PM

16         Q.   What would that be?

17         A.   Exchange 2003.

18         Q.   So you would essentially group together

19    within the same generation Exchange 5.0 and 5.5; is

20    that correct?                                           02:17PM

21         A.   Yes.

22         Q.   And so the second generation would be

23    Exchange 2003?

24         A.   That's correct.

25         Q.   Okay.  Let me ask you to look at paragraph    02:17PM
                                                              122
```

EXHIBIT 29 PAGE 582

```
 1    5.  In paragraph 5 Mr. Hernandez has declared the

 2   following sentence:   "Mattel maintains the

 3   architecture, operations and other aspects of its

 4   E-mail systems as confidential and does not disclose

 5   that information publicly."  Let me stop there.        02:17PM

 6

 7

 8

 9

10                        REDACTED                          02:18PM

11

12

13

14

15                                                          02:18PM

16

17

18

19

20                                                          02:18PM

21

22                        REDACTED

23

24

25                                                          02:19PM
                                                              123
```

EXHIBIT 29 PAGE 583

1

3

4                    REDACTED

5                                                        :19PM

6

7

8

9

10                                                      02:19PM

11

1?

13

14

15                                                      02:20PM

16      A.   The names of the servers is how you

17   access -- it's one of the ways where you actually

18   can access a server.  You have to have a name or

19   other addressing nomenclature in order to access --

20   to get connected to that server.                    02:20PM

21      Q.   And if someone from Mattel in the '98 to

22   2000 time frame were to have sent say to me an

23   E-mail, wouldn't the names of the server that was

24   used to send that E-mail be revealed in that E-mail?

25      A.   I need to see that E-mail that you received  02:20PM

                                                         124

EXHIBIT 29 PAGE 584

```
 1   and through what, you know, provider that sent it to

 2   you.

 3       Q.   You're familiar with the concept of header

 4   information?

 5       A.   Yes, I do. -- yes, I am.                    02:20PM

 6       Q.   Assuming that the E-mail retained the header

 7   information, would not that header information

 8   indicate the name of the server that had been used

 9   to send the E-mail from Mattel?

10       A.   It depends.                                 02:21PM

11       Q.   In your experience?

12       A.   Some have and some haven't so it depends.

13   It's not black and white.

14       Q.   So the -- let me ask it a different way.

15   Regardless of the Client software that's going to    02:21PM

16   receive the E-mail, did the Exchange server at

17   Mattel between '98 and 2000 strip out the name of

18   the server that sent the E-mail?

19       A.   I do not recall.

20       Q.   Who would know that at Mattel?              02:21PM

21       A.   Best guess, Sergio Hernandez.

22       Q.   What about access points?  What do you mean

23   by that?

24       A.   Oh, point of entry.  Point of entry into the

25   network.                                             02:21PM
                                                          125
```

EXHIBIT 28 PAGE 585

```
 1       Q.   Are you talking about a physical point of

 2  entry or are you talking about a logical point of

 3  entry?  To what are you referring?

 4       A.   Network point of entry.

 5       Q.   A place where I could physically connect to   02:22PM

 6  the network?

 7       A.   No.  What I'm referring to is a point where

 8  you could connect your computer through the Internet

 9  network and attach -- or attempt to attach into our

10  inbound points and try to, you know, move your way      02:22PM

11  through.

12       Q.   If I had the VPN software that you discussed

13  previously, would I be able to make -- to reach

14  those access points?

15       A.   Yes, VPN is also one of the access points.    02:22PM

16  It's an avenue into the network.

17       Q.   Okay.  Do you know what the policy was

18  regarding determination of who would get a copy of

19  the VPN software in the '98 to 2000 time frame?

20            MR. COREY:  Objection:  asked and answered.    02:23PM

21            THE WITNESS:  I am not aware of the policy.

22  BY MR. JENAL:

23       Q.   Who would be aware -- who would know what

24  that policy was at Mattel?

25       A.   I'm not sure.                                  02:23PM
                                                                  126
```

EXHIBIT 29 PAGE 586

```
1        Q.    What about IP address?  What do you mean by
2    that?
3        A.    Well, IP address is every device has a
4    unique IP address similar to everyone's Social
5    Security number.  If you have an IP address, that's    02:23PM
6    a very specific access point.  I mean, a host has an
7    IP address and we try to attach to it and try to
8    gain unauthorized access.
9        Q.    Is it your understanding that the IP
10   addresses of the E-mail servers associated with       02:23PM
11   Mattel's E-mail system are confidential?
12       A.    Generally, yes.
13       Q.    If I knew the name of your E-mail server,
14   isn't it possible for me to find out the IP address
15   associated with that E-mail server?                   02:24PM
16            MR. COREY:  Objection:  speculation.
17            THE WITNESS:  Which E-mail server are you
18   referring to?
19   BY MR. JENAL:
20       Q.    In the 1998 to 2000 time frame, if I knew    02:24PM
21   the name of one of the E-mail servers at Mattel in
22   El Segundo, would I not be able to use that
23   information to determine its IP address?
24            MR. COREY:  Same objection.
25            THE WITNESS:  I'm unclear as to your          02:24PM
                                                            127
```

EXHIBIT 29 PAGE 587

1     Q.    Is it your understanding that that backup

2  would be performed on the same day of the week every

3  week?  So every Monday, every Saturday, something

4  like that?

5     A.    That is the standard.  That would be a          03:15PM

6  standard, yes.

7     Q.    Is it your understanding that that is what

8  was done at Mattel?

9     A.    That is my understanding.

10    Q.    But you don't know what day that was done?     03:15PM

11    A.    No, I can't -- I do not know.

12    Q.    So the weekly backup is performed -- let's

13  say the weekly backup occurs on the 1st of the

14  month, okay?  So I'm going to have backups on the

15  1st and the 8th and the 15th and so on, correct?       03:15PM

16    A.    Yes.

17    Q.    That full backup that occurs on the 1st of

18  the month, once that backup is done, that's of all

19  of the servers associated with the E-mail system,

20  correct?  We're talking El Segundo here, right?        03:16PM

21    A.    I'm not sure if they backed up at that time

22  the other non-mailbox Exchange servers.

23    Q.    So what you're speaking to here are the

24  mailbox servers as opposed to any of the other

25  servers associated with the E-mail system; is that     03:16PM

                                                               160

EXHIBIT 27 PAGE 588

```
 1    correct?
 2              MR. COREY:  Can I get that read back,
 3    please?
 4    BY MR. JENAL:
 5         Q.   You are testifying now on this rotation      03:16PM
 6    policy is talking about backups of the mailbox
 7    servers as opposed to other Exchange-related
 8    servers; is that correct?
 9         A.   Yes.
10         Q.   Is there a separate policy for backups of    03:16PM
11    the other Exchange-related servers that are not
12    mailbox servers?
13         A.   In '98 I'm not sure if they had one for
14    those servers.
15         Q.   So the weekly backup, a full backup -- that  03:16PM
16    would be a full backup of the mailbox servers; is
17    that correct?
18         A.   Yes.
19         Q.   How long is that weekly backup retained in
20    1998?                                                  03:17PM
21         A.   Well, based on the 90-day tape rotation,
22    that one is sent off site and held for approximately
23    90 days and then brought back.
24         Q.   And the daily backups, you said that there
25    were daily incremental backups, correct?              03:17PM
                                                            161
```

EXHIBIT 29 PAGE 589

```
1        A.    Yes, that's my understanding.

2        Q.    When you say "incremental backup," what do

3    you mean by that?

4        A.    Incremental backup after a full backup is

5    performed backs up only those files which change          03:17PM

6    from the full backup when it was taken.

7        Q.    So I do a full backup on the 1st of the

8    month.  That goes off site.  It's going to be kept

9    off site for 90 days, correct?

10       A.    That's correct.                                  03:17PM

11       Q.    On the second of the month I do an

12   incremental backup, correct?

13       A.    Yes.

14       Q.    That backup reflects the changes between the

15   backup that occurred on the 1st and as of the time        03:18PM

16   that I do the backup on the second; is that correct?

17       A.    Yes.

18       Q.    And then that gets sent off site for 90

19   days; is that right?

20       A.    That's correct.                                  03:18PM

21       Q.    Now, on the 3rd I do another incremental

22   backup, correct?

23       A.    Yes.

24       Q.    Am I backing that up on the difference from

25   the 2nd to the 3rd or from the 1st to the 3rd?            03:18PM
                                                                     162
```

EXHIBIT 29 PAGE 590

```
 1       A.    No, that would be a differential if you did

 2    that.    From the 2nd to 3rd it would be incremental.

 3       Q.    So same thing on the 4th, same thing on the

 4    5th, same thing on the 6th, same thing on the 7th

 5    and then on the 8th day instead of God resting we do    03:18PM

 6    another weekly backup?

 7       A.    That's correct.

 8       Q.    So if I want something that was on the

 9    7th -- right?  -- 60 days later -- right?  In other

10    words, let's say someone calls up and says I had      03:18PM

11    this E-mail.  It's gone.  I know I had it as of the

12    7th.  All right?

13       A.    Yes.

14       Q.    In order to get that E-mail that's on the

15    7th, I'd have to restore the backup as of the 1st     03:19PM

16    and then all of the incrementals up to the 7th; is

17    that correct?

18            MR. COREY:  Objection:  speculation.

19            THE WITNESS:  That is correct that you have

20    to -- you have to restore the full backup and all     03:19PM

21    incrementals in sequence.

22    BY MR. JENAL:

23       Q.    So if the E-mail was on the 7th, it arrived

24    on the 7th, I'd have to go through -- in order to

25    get to that incremental and pull that E-mail back,    03:19PM
                                                              163
```

EXHIBIT 27 PAGE 591

```
 1      A.   I do not.

 2      Q.   In 1998 what was the storage capacity of the

 3   mailbox servers?

 4      A.   I don't know.  I don't want to speculate.  I

 5   don't know exactly.                           03:20PM

 6      Q.   What's your best estimate as Mattel's

 7   designee?

 8      A.   It would probably be a couple hundred

 9   gigabytes.

10      Q.   Do you know what it was by 2000?  Again,   03:21PM

11   just the mailbox servers.

12           MR. COREY:  In El Segundo?

13           MR. JENAL:  Yes.

14           THE WITNESS:  My speculation?

15      Q.   No, your best estimate as Mattel's designee. 03:21PM

16      A.   My best estimate in 2000?  Maybe five, 600

17   gigabytes perhaps.

18      Q.   Do you know what kind of media was used for

19   the backups in 1998?

20      A.   I believe they were DLT.                03:21PM

21      Q.   Do you know what the capacity of those DLT

22   tapes would have been in 1998?

23      A.   Perhaps they were between 10 to 20

24   gigabytes, I believe.  Maybe less.

25      Q.   Do you know what the media was in 2000 that 03:22PM
                                                          165
```

EXHIBIT 29 PAGE 592

```
1    STATE OF CALIFORNIA    ) ss:
2    COUNTY OF LOS ANGELES )
3
4          I, WENDY S. SCHREIBER, CSR No. 3558, do
5    hereby certify:
6
7          That the foregoing deposition of FRED T.
8    KAWASHIMA was taken before me at the time and place
9    therein set forth, at which time the witness was
10   placed under oath and was sworn by me to tell the
11   truth, the whole truth, and nothing but the truth;
12         That the testimony of the witness and all
13   objections made by counsel at the time of the
14   examination were recorded stenographically by me,
15   and were thereafter transcribed under my direction
16   and supervision, and that the foregoing pages
17   contain a full, true and accurate record of all
18   proceedings and testimony to the best of my skill
19   and ability.
20         I further certify that I am neither
21   counsel for any party in said action, nor am I
22   related to any party to said action, nor am I in any
23   way interested in the outcome thereof.
24
25
```

277

EXHIBIT 29 PAGE 593

1              IN WITNESS WHEREOF, I have subscribed my

2     name this 29th day of January, 2007.

3

4

5

6     _____

7         WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

278

EXHIBIT 29 PAGE 594

Exhibit  30

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION          Certified Copy

4

5     ------------------------------

6     MATTEL, INC., a Delaware          )

7     Corporation,                      )

8                    Plaintiff,         )

9           vs.                         )  No. CV 04-9059

10    CARTER BRYANT, an individual;     )  NM (RNBx)

11    and DOES 1 through 10,            )  VOLUME II

12    Inclusive,                        )

13                  Defendants.         )

14    ------------------------------   )

15    (COMPLETE CAPTION ON NEXT PAGE.)

16

17       CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19      Continued Videotaped 30(b)(6) Deposition

20    of FRED T. KAWASHIMA, taken at 400 South

21    Hope Street, Los Angeles, California,

22    commencing at 9:57 A.M., Tuesday,

23    June 19, 2007, before Wendy S. Schreiber,

24    CSR No. 3558, RPR, CLR.

25    PAGES 281 - 517

                                              281

EXHIBIT 30 PAGE 595

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4        FOR THE PLAINTIFF:

 5

 6            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 7            BY:  JON COREY, ESQ.

 8            865 South Figueroa Street, Tenth Floor

 9            Los Angeles, California 90017

10            (213) 443-3000

11            joncorey@quinnemanuel.com

12

13                  -AND-

14

15            MATTEL, INC.

16            BY:  MICHAEL MOORE, ESQ.

17            333 Continental Boulevard

18            El Segundo, California 90245-5012

19            (310) 252-2000

20            michael.moore@mattel.com

21

22

23

24

25
                                              282
```

EXHIBIT _30_ PAGE _596_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR THE DEFENDANT AND COUNTERCLAIMANT

 4        CARTER BRYANT:

 5

 6            KEKER & VAN NEST LLP

 7            710 Sansome Street

 8            San Francisco, California 94111-1704

 9            (415) 391-5400

10            (NOT PRESENT)

11

12

13        FOR DEFENDANT MGA ENTERTAINMENT, INC.:

14

15            O'MELVENY & MYERS LLP

16            BY:  JAMES PAUL JENAL, ESQ.

17            400 South Hope Street

18            Los Angeles, California 90071-2899

19            (213) 430-6000

20            jjenal@omm.com

21

22    ALSO PRESENT:

23

24            RYAN GULINO, VIDEO OPERATOR

25
```

283

EXHIBIT _30_ PAGE _597_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. COREY:  John Corey appearing on behalf

 2    of Mattel, Inc.

 3          MR. MOORE:  Michael Moore, in-house counsel

 4    for Mattel.

 5                                                   09:59AM

 6                    FRED T. KAWASHIMA,

 7        having been first placed under oath, testified

 8         as follows

 9

10                EXAMINATION (CONTINUING)

11    BY MR. JENAL

12      Q.   Good morning, Mr. Kawashima.  We've met

13    before, correct?

14      A.   Yes.

15      Q.   And that was I believe last January for your  09:59AM

16    first volume of this deposition, correct?

17      A.   That's correct.

18      Q.   And you were designated by Mattel at that

19    time to testify regarding E-mails -- E-mail systems

20    at Mattel as well as the backup and retention policy  09:59AM

21    for those E-mails.  Do you recall that?

22      A.   Yes, I do.

23      Q.   And --

24          MR. COREY:  Just to be clear, for the period

25    1998 through 2000.                               09:59AM
                                                          285
```

EXHIBIT 30 PAGE 598

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    MR. JENAL:  I was going to get there.

2    Q.    Indeed, as your counsel just indicated,

3  during the prior volume of your deposition that

4  testimony was limited to the time period of 1998 to

5  2000.  Do you recall that?                    09:59AM

6    A.    Yes.

7    Q.    I suspect you've had a chance to talk to

8  counsel about why you're back here today but just to

9  clarify, we're talking about the same set of topics

10  that we discussed back in January.  The difference    10:00AM

11  now is that the time period is up through the

12  present.  Do you understand that?

13    MR. COREY:  That's actually not accurate.

14  He's been designated on E-mail preservation from '98

15  to the present.  The topic is not broader than that.    10:00AM

16    MR. JENAL:  The topic is the resumption of

17  his prior deposition without time limit.  That's the

18  topic.

19    MR. COREY:  No, it's actually not right.

20  You can take -- you can take whatever deposition you    10:00AM

21  like.  The topic that he's been designated to

22  testify on is E-mail preservation between '98 --

23  from 1998 to the present.

24    MR. JENAL:  And the basis for that

25  limitation is what?                            10:00AM

                                                  286

EXHIBIT 30 PAGE 599

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. COREY:  Judge Infante's orders and the
 2     agreement reached by the parties.
 3          MR. JENAL:  Judge Infante's order simply
 4     required you to allow us to have testimony on these
 5     topics for which he had been previously designated      10:01AM
 6     without time limitation.
 7          MR. COREY:  This witness here today is being
 8     produced to testify on the preservation of E-mails
 9     between 1998 and the present.  That was reached --
10     that was an agreement that was reached as reflected,    10:01AM
11     if I recall correctly, in a May 15th letter which
12     was embodied in Judge Infante's order.  This is not
13     the resumption of a prior deposition.
14          MR. JENAL:  We'll figure this out at the
15     break but let's proceed with what we have today.        10:01AM
16     Q.   You understand that the same rules that we
17     had last time still apply?  For example, that the
18     oath that you took is the same oath that you would
19     take in a court of law.  Correct?
20     A.   Yes.                                                10:02AM
21     Q.   You brought something with you today.  What
22     is that, sir?
23     A.   It's a copy of the transcript of my first
24     deposition.
25     Q.   Have you reviewed that transcript?                  10:02AM
                                                                  287
```

EXHIBIT _3 0_ PAGE _5 0 0_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.   Yes, I did.

2       Q.   Was there anything -- in your review of that

3    transcript was there anything that came to mind as

4    being inaccurate?

5       A.   No.                                    10:02AM

6       Q.   At least, and I'm not asking you for

7    individual word choices here or there, but as you

8    have reviewed that transcript nothing stands out in

9    your mind as erroneous that needs correction?

10       A.   Aside from just misspelling of people's    10:02AM

11    names which I made corrections to that previously.

12       Q.   Those are the only changes that you're aware

13    of?

14       A.   That's correct.

15       Q.   When did you find out you were going to be    10:02AM

16    asked to come back for this deposition?

17       A.   Approximately about a month and a half ago.

18       Q.   Have you met with counsel in -- well, since

19    your prior deposition in January of 2007?

20       A.   Within the last several weeks only.    10:03AM

21       Q.   With whom did you meet?

22       A.   With John Corey and Michael Moore.

23       Q.   Anyone else?

24       A.   There are other people that I contacted to

25    corroborate information in preparation for this.    10:03AM

                                                      288

EXHIBIT _30_ PAGE _601_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. COREY:  Jaime would be offended though
 2    if he got ahold of this tape and found out that I
 3    didn't correct it.
 4          MR. JENAL:  Fair enough.  I keep waiting
 5    for you to correct the pronunciation of mine but      10:16AM
 6    that's probably not going to happen.
 7          MR. COREY:  I pronounce it correctly.
 8          MR. JENAL:  I was referring to the
 9    multitudes of other folks who don't but that's all
10    right.                                                10:16AM
11       Q.   Julia Marine, does she report to you?
12       A.   No, she doesn't.
13       Q.   What about Victor Glover?  Does he report to
14    you?
15       A.   No.                                          10:16AM
16       Q.   Jonathan Ouk, does he report to you?
17       A.   Yes.
18       Q.   And Teresa was it Dawsey?
19       A.   That's correct.
20       Q.   Does she report to you?                      10:16AM
21       A.   No.
22       Q.   So -- then let's go to Julia Marine.  What
23    is her title?
24       A.   I believe she is the lead UNIX
25    administrator.                                        10:16AM
                                                               299
```

EXHIBIT 30 PAGE 602

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    UNIX being the operating system?

2      A.    Yes, UNIX operating system and platform of

3    servers and environment.

4      Q.    Why did you speak with Ms. Marine?

5      A.    I needed to confirm when we started           10:17AM

6    preserving all Exchange backup tapes.  Instead of

7    rotating -- rotating them we started to preserve

8    them and not rotate -- rotate them.  So we kept

9    every backup tape.

10     Q.    When did that happen?                          10:17AM

11           MR. COREY:  The conversation or --

12    BY MR. JENAL

13     Q.    You just mentioned that at some point in

14    time -- you spoke with Ms. Marine and at some point

15    in time she confirmed to you that at some point in    10:17AM

16    time Mattel began preserving all backup tapes for

17    E-mail, correct?

18     A.    That's correct.

19     Q.    When did she tell you that occurred?

20     A.    We found that on April 19th, 2005 is when we  10:17AM

21    began to preserve the tapes and not rotate them.

22     Q.    Did she tell you why on April 19th, 2005

23    Mattel began to preserve its backup tapes and not

24    rotate them?

25     A.    No.                                            10:18AM

                                                                300

EXHIBIT _30_ PAGE _603_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Do you know why that happened?

 2      A.   Yes.

 3      Q.   Why did that happen?

 4      A.   We were instructed to start preserving those

 5   tapes by Legal.                                    10:18AM

 6      Q.   And has that been done?

 7      A.   Yes.

 8      Q.   We'll come back to that.

 9           Did you speak with Ms. Marine about any

10   other subject?                                     10:18AM

11      A.   No.

12      Q.   Why did -- why was Ms. Marine the person to

13   ask about the preservation of these E-mail backup

14   tapes?                                  REDACTED

15      A.   We use a backup system called              10:18AM

16   The platform it runs on is UNIX so she manages --

17   she has the master console that manages our

18   slaves -- our slave servers connected to the tape

19   media so essentially she monitors a lot of the

20   backup jobs that we run.                           10:19AM

21      Q.   So as the lead UNIX administrator she's in a

22   position to know how that net backup system

23   operates.  Is that fair?

24      A.   That's correct.

25      Q.   And then she would know about the policies  10:19AM
                                                              301
```

EXHIBIT 30 PAGE 604

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    in place with regards to how that system performs

 2    backups including backups for the E-mail servers; is

 3    that correct?

 4          MR. COREY:  Objection:  speculation,

 5    mischaracterizes the witness' testimony.            10:19AM

 6    BY MR. JENAL

 7       Q.   Go ahead.

 8       A.   She is aware of many of the aspects.

 9       Q.   She's the person that you went to to get the

10    answer to this question so she apparently knew      10:19AM

11    enough to at least answer your questions; is that

12    correct?

13       A.   That's correct.

14       Q.   Or did you have to go and speak with someone

15    further to get further details about the backups on  10:20AM

16    the E-mail servers?

17       A.   No, she -- I went to her to confirm the

18    date.

19       Q.   Was the date the only thing that you were

20    asking her about or were there other details about  10:20AM

21    the E-mail tape backup policy that you were checking

22    with her on?

23       A.   No, that was the only thing I asked her

24    about.

25       Q.   When was that conversation?               10:20AM
                                                          302
```

EXHIBIT 30 PAGE 605

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    It was probably middle of last week, I

2    believe.

3      Q.    Did you ask her any questions about what

4    would actually be preserved in those backup tapes?

5      A.    No.                                         10:20AM

6      Q.    Do you have knowledge as to what would be

7    preserved on those backup tapes apart from your

8    conversation with Ms. Marine?

9      A.    I do know what's on those tapes.

10     Q.    Okay.  We'll come back to that.            10:20AM

11           Who is Victor Glover?

12     A.    Victor Glover is the computer operator down

13   in our Data Center in El Segundo.

14     Q.    When you say he's a computer operator, what

15   do you mean by that?                                10:21AM

16     A.    He currently manages some of the operations

17   in our -- in our Data Center in El Segundo and one

18   of which he does for us is manage the physical tapes

19   in our tape libraries.

20     Q.    Why did you speak with Mr. Glover?         10:21AM

21     A.    I contacted him to -- to also confirm and

22   corroborate what the earliest tape we had for our

23   Exchange backups.

24     Q.    What did he tell you was the earliest tape

25   that you had for your Exchange backups?           10:22AM

                                                            303

EXHIBIT 30 PAGE 606

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.    He could not confirm that because the --

2    there were no dates physically on the tape.

3        Q.    So he had some tapes but the tapes

4    themselves don't have markings that would indicate

5    the time period that they cover?                    10:22AM

6        A.    No, that's not true.

7        Q.    Okay.  So you said that he could not confirm

8    because there were no dates on the tape.  What do

9    you mean by that?

10       A.    Yeah, there are no dates on the tape.  It    10:22AM

11   doesn't have like the month, day and the year on the

12   tapes.

13       Q.    Maybe we're talking past each other.  What

14   kind of tapes are we talking about?

15       A.    They're DLT tapes, cartridges.              10:22AM

16       Q.    Cartridges.  Are you talking about the fact

17   that the cartridges themselves do not have a

18   physical date written on them or are you saying that

19   within the contents that's recorded on the tape

20   electronically it doesn't record -- it doesn't       10:23AM

21   reflect date?

22       A.    All the tape -- tape cartridges have special

23                        REDACTED

24

25   catalogs tapes and that backup in the catalog keeps   10:23AM

                                                            304

EXHIBIT 30 PAGE 607

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   track of what's on those tapes.
 2       Q.   Okay.  And -- so let's see if there's a
 3   sequence here I guess.  Is the question about what's
 4   the oldest backup tape that you have the same
 5   question that you ultimately asked of Julia Marine    10:23AM
 6   or is that a different question?
 7       A.   I also tried to ask him if he knew -- if
 8   there was any way -- if he had any manifest or any
 9   physical logs that he keeps track and he didn't.  He
10   just gave us just the bar code number of the first    10:23AM
11   tape.
12       Q.   So if I understand you correctly, he was
13   able to identify the oldest backup tape that you
14   had; is that correct?
15       A.   Yes.                                          10:24AM
16       Q.   But he could not tell you what the date
17   associated with that tape was?
18       A.   That's correct.
19       Q.   Were you able to find that out?
20       A.   Through Julia Marine.                         10:24AM
21       Q.   Is that the 4/19/2005 date or is it some
22   other date?
23       A.   It's the 4/19/05 date.
24           MR. COREY:  I just want to make clear for
25   the record that what we're talking about now are the  10:24AM
                                                            305
```

EXHIBIT _30_ PAGE _608_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    backup tapes for the Exchange mailbox server.
 2           MR. JENAL:  Right.  That's what I understood
 3    him to be talking about but I appreciate the
 4    clarification.
 5       Q.   Did you speak with Mr. Glover about anything    10:24AM
 6    else?
 7       A.   I asked him to confirm that we -- that we
 8    still had -- you know, where he's storing the tapes
 9    from 4/19/05.
10       Q.   I'm sorry, did you say where he's storing    10:25AM
11    the tapes or that Mattel was restoring the tapes?
12       A.   No, where he was physically keeping the
13    tapes, storing the tapes.
14       Q.   And where is that?
15       A.   Half of them are with our vendor Iron    10:25AM
16    Mountain and the other half are on the racks in our
17    Data Center.
18       Q.   Are they sequestered somehow so as to
19    prevent them -- the ones that are on the racks in
20    the Data Center are they sequestered somehow to    10:25AM
21    prevent them from being overwritten?
22       A.   Can you explain what you mean by
23    "sequestered"?
24       Q.   Set aside?
25       A.   They are physically set aside on a special    10:25AM
                                                              306
```

EXHIBIT 30 PAGE 609

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   rack.

 2        Q.   Is there like signage that says under

 3   penalty of death don't mess with these tapes?

 4        A.   I haven't seen that yet.

 5        Q.   Did you physically see the tapes yourself?   10:25AM

 6        A.   I've seen a rack of tapes but I can't

 7   confirm that those were the Exchange tapes because

 8   Victor Glover does back up to tape other systems so

 9   I'm not -- I don't know how he manages all that.

10        Q.   When you say the tapes, some of them are in   10:26AM

11   Iron Mountain, do you know from what time period the

12   tapes are at Iron Mountain?

13        A.   My understanding is since half of the tapes

14   were there I know that at least 4/19/05.  To what

15   date I don't know.  There were quite a few tapes.   10:26AM

16        Q.   Is it your understanding then that the older

17   tapes are at Iron Mountain; the more recent tapes

18   are at Mattel in El Segundo?

19        A.   That is my understanding.

20        Q.   Did you confirm that understanding with   10:27AM

21   Mr. Glover?

22        A.   Yes.  He's the one that provided that

23   information.

24        Q.   Focusing for a moment on the tapes that are

25   on the rack as you said and at the Data Center in   10:27AM
```

EXHIBIT _30_ PAGE _610_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   El Segundo, when you say "on the rack," literally
 2   what do you mean by that?  Is it like this set of
 3   shelves/racking that the tapes would physically sit
 4   on?
 5      A.   Yes, they're special -- they're special      10:27AM
 6   shelves, racks, made for DLT tapes and they're set
 7   in -- you know, in rows and columns.
 8      Q.   Does Mattel use any kind of robotic tape
 9   library for supporting its backups?
10      A.   They do.                                     10:27AM
11      Q.   Is that the same as or distinct from the
12   kind of shelves that you're talking about?
13      A.   Oh, they're completely different.
14      Q.   So if a tape were in a regular backup
15   rotation at Mattel, would that normally be stored    10:28AM
16   while it's at Mattel in the robotic library?
17      A.   I can't -- I'm not -- I'm not sure how
18   Victor manages all of that for us.
19      Q.   What's your best understanding?
20           MR. COREY:  Objection:  speculation, scope.  10:28AM
21           THE WITNESS:  I understand that there -- the
22   tape libraries we have are quite large.  They hold
23   hundreds of tapes.  We have shelves for the
24   backups -- for backup rotation for all other systems
25   and it's my understanding that he does put new tapes  10:28AM
                                                            308
```

EXHIBIT 30 PAGE 611

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   and also rotates tapes off a separate shelf into the

2   tape libraries when the -- when the timing arises,

3   the schedule permits it.

4   BY MR. JENAL

5      Q.   So the backup tapes that are on the racks at   10:29AM

6   the Data Center at Mattel for the backups of the

7   Exchange mailbox servers I gather from what you're

8   saying that in order for those tapes to be written

9   to it would require a human being to physically take

10   the tapes from the rack and put them into some other   10:29AM

11   system that would allow the computer to read or

12   write to those tapes.  Is that fair?

13           MR. COREY:  Objection:  vague.

14           THE WITNESS:  That's -- that's not how we do

15   it.                                                    10:29AM

16   BY MR. JENAL

17      Q.   Well, let me try it -- let me come at it a

18   different way.

19      A.   Okay.

20      Q.   If you have -- you testified that there are   10:29AM

21   one or more robotic tape libraries at Mattel,

22   correct?

23      A.   That's true, in El Segundo.

24      Q.   In El Segundo, correct.  My understanding of

25   the functionality of such a device is that that is a   10:30AM

                                                           309

EXHIBIT 30 PAGE 612

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    system that can retrieve a tape from a storage

 2    place, load it into a tape drive that could read or

 3    write to that tape and it can do that solely under

 4    the control of the computer itself.  Correct?

 5       A.   Yes.                                    10:30AM

 6       Q.   So no human being needs to physically touch

 7    the tape for the computer to have access to it and

 8    the ability to read and write it, correct?

 9       A.   Yes, however, there's only a finite amount

10    of storage in the tape library.                 10:30AM

11       Q.   Fine, and I understand that.  That's not my

12    point.  I am just -- I'm trying to draw a

13    distinction between if it's in the library, the

14    robotic library, the computer itself can access that

15    tape and read and write to it, correct?          10:30AM

16       A.   Correct.

17       Q.   Without human intervention?

18       A.   Correct.

19       Q.   For the tapes that are on the rack before

20    the computer can read or write to those tapes it    10:31AM

21    would require some human intervention to put the

22    tape from the rack into some other device that would

23    make it accessible to the computer, correct?

24       A.   That is correct.

25       Q.   Do you know why some of those tapes are kept 10:31AM
                                                           310
```

EXHIBIT 30 PAGE 613

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   on the rack at Mattel rather than having them -- let

 2   me back up.  Strike that.

 3            Speaking now again of the tapes that are

 4   from April 19th, 2005 that represent backups that

 5   have been preserved of the Exchange mailbox          10:31AM

 6   servers --

 7       A.   Uh-huh.

 8       Q.   -- you testified that some of those tapes

 9   are at Iron Mountain, some of them are on the rack

10   at Mattel.  Correct?                                 10:32AM

11       A.   That's correct.

12       Q.   Do you know why some of those tapes are

13   being kept on the rack at Mattel instead of being

14   shipped off to Iron Mountain?

15       A.   What Victor told me was the rack contains,  10:32AM

16   can hold up to 2,112 -- 2,112 tapes.  The reason

17   why -- the tapes in Iron Mountain there are over

18   2,000 tapes there for Exchange.  The reason why

19   they're there is because we ran out of space on the

20   rack.  So my assumption is when we run out of        10:32AM

21   tapes -- space on the rack, those tapes will be

22   shipped off to Iron Mountain.

23       Q.   Is that --

24       A.   Also.

25       Q.   Is it your understanding that that shipping 10:33AM
                                                          311
```

EXHIBIT _30_ PAGE _614_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   of tapes then out to Iron Mountain is an incremental

2   process that occurs over time when the shelf space

3   or the rack space at the data center is filled?

4       A.   That is what I -- that is what I presumed

5   based on what Victor told me.                        10:33AM

6       Q.   Another possible explanation would be that

7   some of those tapes are being actively used whereas

8   the ones that are at Iron Mountain are not being

9   actively used.  Do you know if that's the case?

10          MR. COREY:  Objection:  speculation,         10:33AM

11  mischaracterizes the witness' testimony.

12  BY MR. JENAL

13      Q.   I know you didn't say that.  I'm just asking

14  you that's another possibility and I just want to

15  know if you have any knowledge as to whether or not  10:33AM

16  part of the reason why these tapes are still on the

17  rack at Mattel at opposed to in Iron Mountain is

18  because they're in active use of some sort?

19      A.   They are not in active use.

20      Q.   And what's the basis for that statement?    10:33AM

21      A.   When tapes are restored, I'm usually the one

22  since I'm the manager to authorize any restorations

23  of any data onto our servers.  I have not authorized

24  any restoration of data from those tapes.

25      Q.   Do you know if any third-party vendor has    10:34AM

                                                          312

EXHIBIT 30 PAGE 615

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   had access to any of those tapes?

 2        A.   They have -- they have not to my knowledge.

 3            MR. COREY:  And are you referring to the

 4   tapes in the Data Center?

 5            MR. JENAL:  I'm referring to -- sorry, at      10:34AM

 6   this point to the whole collection of tapes that

 7   we've been talking about, all of the backups from

 8   April 19th, 2005.

 9            THE WITNESS:  For Exchange to my knowledge

10   they have not.                                          10:34AM

11        Q.   Could that have happened without your

12   knowledge?

13        A.   There's always a possibility for that.  I

14   would say that it's probably improbable but it's

15   always a possibility.                                   10:35AM

16        Q.   What's the possibility that you have in mind

17   as to how that could happen without your knowledge

18   that some third-party vendor could have had access

19   to those tapes?

20            MR. COREY:  Objection:  speculation.           10:35AM

21            THE WITNESS:  Considering my position and

22   authority that I have and responsibility for all the

23   infrastructure service between the Exchange and

24   specific to the Exchange servers in El Segundo and

25   I'm the one who told Victor Glover and the staff        10:35AM
                                                                313
```

EXHIBIT 30 PAGE 616

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that we will not from 4/19/05 rotate any tapes out,

 2    those tapes are under my jurisdiction and authority

 3    and Victor understands that so that's the premise

 4    of -- basis for my statement.

 5    BY MR. JENAL:                                      10:36AM

 6        Q.   Well, supposing someone, the Legal

 7    department or whatever, wanted to have a vendor

 8    other than Mattel's IT department restore those

 9    tapes.  Would the request for that have to come

10    through you?                                       10:36AM

11            MR. COREY:  Objection:  speculation.

12            THE WITNESS:  Under normal circumstances I

13    would hope so.

14    BY MR. JENAL

15        Q.   Has any such request come to you?         10:36AM

16        A.   No.

17        Q.   Anything else that you talked about with

18    Mr. Glover?

19        A.   That's all I recall.

20        Q.   Who is Jonathan Ouk?                      10:36AM

21        A.   Jonathan Ouk is -- is a Systems Engineering

22    specialist who specializes in supporting our

23    Exchange servers globally.

24        Q.   When you say he specializes in supporting

25    Mattel's Exchange servers globally, what do you mean 10:37AM
                                                         314
```

EXHIBIT 30 PAGE 617

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    by that?
 2         A.    He is my primary lead for -- for that
 3    platform worldwide.
 4         Q.    He reports to you, correct?
 5         A.    That's correct.                        10:37AM
 6         Q.    And why did you speak with Mr. Ouk?
 7         A.    I wanted to confirm my understanding on the
 8    functionality and granular features within the
 9    Mailbox Manager.
10         Q.    Any other reason?                       10:37AM
11         A.    That is the only reason.
12         Q.    Was Mr. Ouk able to confirm your
13    understanding of the functionality and granular
14    features within Mailbox Manager?
15         A.    He did.                                 10:38AM
16         Q.    When did you speak with him?
17         A.    It was last week.
18         Q.    Was he able to confirm that information just
19    by his own knowledge or did he have to look anything
20    up to give you that information?                   10:38AM
21         A.    No, he knew that based on his experience and
22    knowledge of the system.
23         Q.    We'll talk about Mailbox Manager in a little
24    bit.
25               When -- is one of his job functions to   10:38AM
                                                             315
```

EXHIBIT _30_ PAGE _6/8_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   administer the settings of the Mailbox Manager as it

 2   applies to the Exchange servers at Mattel?

 3        MR. COREY:  Objection:  vague as to time.

 4   BY MR. JENAL

 5        Q.   Currently.                              10:39AM

 6        A.   Currently?  Yes.

 7        Q.   There are people who had that responsibility

 8   prior to Mr. Ouk?

 9        A.   Yes.

10        Q.   How long has Mr. Ouk had that              10:39AM

11   responsibility?

12        A.   Probably the last two and a half to three

13   years to my recollection.

14        Q.   Do you know who had that responsibility

15   before Mr. Ouk?                                     10:39AM

16        A.   Yes, I do.

17        Q.   Who is that?

18        A.   A Michael Jhekeire.

19        Q.   How do you spell that?

20        A.   That's a good question.                   10:39AM

21        Q.   I strive to give you good questions.

22        A.   J-h-e-k-e-i-r-e.

23        Q.   Just exactly as it sounds.

24        A.   Jhekeire.  It's a nice -- you think so?  A

25   nice Dutch name.                                    10:39AM
                                                          316
```

EXHIBIT 30 PAGE 6/9

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   It's a very impressive Dutch name indeed.

 2           Is Mr. Jhekeire still at Mattel?

 3      A.   No, he's not.

 4      Q.   He left a couple, three years ago?

 5      A.   Approximately, yes.                      10:40AM

 6      Q.   Do you know where he is today?

 7      A.   Yes, I do.

 8      Q.   Where is that?

 9      A.   He's working for Microsoft.

10      Q.   Your old company?                        10:40AM

11      A.   Yes.

12      Q.   Is he working as a consultant with

13 Microsoft?

14      A.   No, he's not.

15      Q.   What does he do for Microsoft?           10:40AM

16      A.   He is a technical specialist for Exchange.

17      Q.   Do you know where he is residing today?

18      A.   You mean where he's living?

19      Q.   Uh-huh -- yes.

20      A.   I believe somewhere in San Pedro, I think.  10:40AM

21      Q.   He's local still?

22      A.   Yes.

23      Q.   Did you talk to him at all regarding this

24 deposition?

25      A.   No, I did not.                           10:40AM
                                                         317
```

EXHIBIT _30_ PAGE _620_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   When did you last speak with Mr. Jhekeire?

 2      A.   He came by the office maybe within the last

 3 30 days, I believe.

 4      Q.   You stay in touch with him?

 5      A.   He supports us.                          10:41AM

 6      Q.   So he's gone from being a Mattel employee to

 7 a Microsoft employee but he's still providing

 8 support services to Mattel?

 9      A.   From a sales perspective, yes.

10      Q.   Is his job more of a sales position now than 10:41AM

11 a technical one?

12      A.   That's correct.

13      Q.   I see.  So even though the title is

14 technical specialist that's more of a sales role?

15      A.   It's -- it's an arm of the sales -- it's    10:41AM

16 like a systems engineer where he knows the latest

17 product and tries to sell the latest product.

18      Q.   Do you know why he left Mattel?

19      A.   To pursue new challenges and goals.

20      Q.   Did he leave on good terms?              10:41AM

21      A.   Yes.

22      Q.   You mentioned that you spoke with Sergio

23 Hernandez.  Could you remind us who Sergio Hernandez

24 is?

25      A.   Sergio Hernandez is one of my lead systems 10:42AM
                                                       318
```

EXHIBIT 30 PAGE 621

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    engineers.

2        Q.   Do you know if Mr. Hernandez had an

3    opportunity to read the transcript from your prior

4    deposition?

5        A.   Not to my knowledge.                          10:42AM

6        Q.   Did you discuss your prior deposition with

7    Mr. Hernandez?

8        A.   All he knows is I was deposed.

9        Q.   He doesn't know that you threw him under the

10   bus 20 or 30 times during the deposition?            10:42AM

11           MR. COREY:  Objection:  argumentative.

12           You don't have to answer that question.

13   BY MR. JENAL

14       Q.   I'll ask you a different question.  Did you

15   tell him that his name came up multiple times during 10:42AM

16   your prior deposition?

17       A.   I'm not sure if I did.

18       Q.   Smart move.

19           What did you speak to Mr. Hernandez about in

20   preparation for this deposition?                      10:43AM

21       A.   I think it was end of last week.

22       Q.   I'm sorry, my question was what did you

23   speak to him about?

24       A.   Oh, I'm sorry.

25       Q.   That's all right.                             10:43AM

                                                                  319

EXHIBIT _30_ PAGE _622_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    I talked -- I asked him a question
 2   pertaining to what I read in his declaration.  It
 3   was pertaining to an estimation of cost of $900,000
 4   that that was his estimation of how much it would
 5   cost to search all our E-mails in El Segundo.  I        10:44AM
 6   think that's what it was.
 7
 8
 9
10                                                           10:44AM
11
12                      REDACTED
13
14
15                                                           10:44AM
16
17
18
                        REDACTED
19
20                                                           10:45AM
21
22
23
24
25                                                           10:45AM
                                                             320
```

EXHIBIT _30_ PAGE _623_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1
 2
 3
 4                    REDACTED
 5                                          10:45AM
 6
 7
 8
 9
10                                          10:46AM
11                    REDACTED
12
13
14
15                                          10:46AM
16      MR. COREY:  I'm going to instruct the
17  witness not to answer to the extent that that calls
18  for communications with counsel, but if you have
19  information separate than that you can answer the
20  question.                                10:46AM
21      THE WITNESS:  One thing that it will help us
22  do is reduce the amount of storage on our expensive
23  storage devices and move them to less expensive
24  storage for access.
25  /  /  /                                  10:46AM
                                                321
```

EXHIBIT 30 PAGE 626

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   may relate to security measures that Mattel has

 2   undertaken.

 3          MR. JENAL:  Just so that you know, I'm not

 4   asking for communications with counsel.  I'm asking

 5   for what you yourself have done -- what activities      11:15AM

 6   you've performed.

 7          MR. COREY:  Just to be clear, what you're

 8   asking for are physical activities?

 9          MR. JENAL:  Correct.

10          MR. COREY:  Then the same instructions          11:15AM

11   apply.

12   BY MR. JENAL

13      Q.   Go ahead.

14      A.   That's -- I'm not sure I'm -- if I can say.

15      Q.   Why is that?                                    11:15AM

16      A.   Because the activities I performed were of a

17   confidential nature.

18      Q.   Well, there's a protective order in this

19   case which I'm sure your counsel is going to invoke

20   as to the -- no doubt the entirety of this            11:16AM

21   deposition, but -- so as a general matter

22   confidentiality is covered by the protective order.

23   Can you be a little more specific as to what your

24   concern is?

25          MR. COREY:  Let me -- let me go off the         11:16AM
                                                               335
```

EXHIBIT 30 PAGE 625

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   record and let me talk to the witness.  I think the
 2   witness is confused as to what the scope is.
 3           MR. JENAL:  That's fine.  Let's go off the
 4   record.
 5           VIDEO OPERATOR:  We are off the record at      11:16AM
 6   11:16.
 7               (Brief recess.)
 8           VIDEO OPERATOR:  Back on the record at
 9   11:20.
10   BY MR. JENAL:                                          11:20AM
11      Q.  Mr. Kawashima, before we broke for you to
12   confer with counsel you were telling me that you
13   didn't believe you could answer my prior question
14   about your activities in support of Mattel
15   litigation over the last several years because of      11:21AM
16   the confidential nature of those activities.  Can
17   you clarify your answer, please?
18           MR. COREY:  And before you do I'm might
19   clarify the witness had misunderstood the question.
20   So....                                                 11:21AM
21           THE WITNESS:  What counsel had asked me to
22   do in support of this --
23           MR. COREY:  Don't -- just tell him what you
24   did.  Don't tell him what you were asked to do.
25   Just tell him what you did.                            11:21AM
                                                                336
```

EXHIBIT 34 PAGE 626