CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           THE WITNESS:  Yeah, what I -- what I -- what
 2   I did was back up the servers, the tape.
 3   BY MR. JENAL
 4       Q.   Continue.
 5       A.   Our old SYMM frame which is EMC storage      11:21AM
 6   array which was replaced we backed that up in its
 7   totality, backed it up to tape, and we backed it up
 8   to another storage device and we preserved the SYMM
 9   frame as well even though it's not online any
10   longer.                                               11:22AM
11       Q.   Let me see if -- anything else you did in
12   support of the litigation?
13       A.   That's all I can recall.
14       Q.   Let me see if we can break that down.  You
15   said that you backed up the servers to tape.  Are     11:22AM
16   you referring to the Exchange mailbox servers or
17   other servers as well?
18       A.   We -- the Exchange servers we would discuss
19   before, you know, we don't -- we started backing
20   those up and we don't rotate the tapes.  That's part  11:23AM
21   of the activity so we do that on a daily basis
22   backing up the Exchange servers.
23       Q.   Let me see if I can approach this
24   differently.
25           As I understood your testimony, you kind of   11:23AM
                                                          337
```

EXHIBIT 30 PAGE 627

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    referred to what I at least noted as three separate
 2    things and let me just break them down and then we
 3    can talk about them once we understand what we're
 4    actually talking about.
 5              You talked about backing up the server to      11:23AM
 6    tape.  You talked about the old I think you called
 7    it SYMM frame --
 8         A.   Yeah, S-Y-M-M, uh-huh.  That's the old
 9    model.
10         Q.   You backed that up to tape as well as having  11:23AM
11    that copied to another storage device and then you
12    still maintain the old SYMM frame even though it was
13    no longer online, correct?
14         A.   The old -- that's correct.
15         Q.   Okay.  So let me take those one at a time,     11:24AM
16    all right?  Your reference to you backed up the
17    server to tape, I just want to know is that a
18    reference to the Exchange servers or are you
19    referring to servers more globally than that?
20         A.   The Exchange servers in El Segundo.            11:24AM
21         Q.   And you had told us before that Julia Marine
22    was able to confirm for you that as of April 19th,
23    2005 the backup of the Exchange mailbox servers were
24    all being preserved going forward, correct?
25         A.   Yes.                                           11:24AM
                                                                  338
```

EXHIBIT __30__ PAGE __628__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   This backup of the Exchange server to tape
 2   that you just referenced as one of the things you
 3   did in support of litigation, is that separate and
 4   apart from that backup preservation or is it one and
 5   the same thing?                                    11:25AM
 6      A.   It's one and the same.  It's the same thing.
 7      Q.   Okay.  And so I take it then that instance
 8   was on or about April 19th, 2005?
 9      A.   Correct.
10      Q.   You also mentioned then the second thing    11:25AM
11   that you talked about was that you took the old EMC
12   storage, the SYMM frame, and you backed that up to
13   tape, correct?
14      A.   Correct.
15      Q.   And am I to understand that you have         11:25AM
16   preserved that backup since?
17      A.   That backup is preserved.
18      Q.   And when did you do that?
19      A.   How long ago was that?  It seems like it's
20   coming up on two years.                             11:25AM
21      Q.   So that was sometime later than the April
22   19th, 2005 date associated with the preservation of
23   the Exchange mailbox servers?
24      A.   Yes.
25      Q.   And your best recollection is that that's    11:26AM
                                                           339
```

EXHIBIT 36 PAGE 629

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1
 2
 3
 4
 5                                                      11:26AM
 6              REDACTED
 7
 8
 9
10                                              :      11:26AM
11
12
13
14
15                                                     11:27AM
16
17
18              REDACTED
19
20                                                     11:27AM
21
22
23
24
25                                                     11:27AM
                                                          340
```

EXHIBIT 30 PAGE 630

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   I am not sure.  I don't think so but I'm not

 2  sure.

 3      Q.   Do you know if they were handed over to

 4  lawyers for them to take custody of those tapes?

 5      A.   I didn't witness any hand-off so I don't      11:27AM

 6  know.

 7      Q.   Who performed the backup that you're

 8  referring to here of the SYMM frame?

 9      A.   Mike Sclimenti.

10      Q.   Pardon me?                                    11:28AM

11      A.   Mike Sclimenti.

12      Q.   Do you know why the backup was performed of

13  the SYMM frame in -- let's just say for the sake of

14  convenience sometime roughly two years ago?  Do you

15  know why that backup was performed?                    11:28AM

16         MR. COREY:  Object and instruct the witness

17  not to answer to the extent it calls for

18  communications with counsel.

19  BY MR. JENAL

20      Q.   Are you going to answer the question or not? 11:28AM

21  I don't know what the parameters are of what you

22  know.

23      A.   I'm not sure.

24      Q.   Let me ask it a different way.  Was there

25  any business reason for performing the backup that     11:29AM

                                                            341
```

EXHIBIT 30 PAGE 631

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    you've been referring to of the SYMM frame storage
 2    device roughly two years ago apart from a legal
 3    reason?
 4        A.   Data preservation.
 5        Q.   Was the storage device that you're referring  11:29AM
 6    to, this SYMM frame, I think you mentioned that it
 7    is no longer online, correct?
 8        A.   That is correct.
 9        Q.   Does this backup coincide with it being
10    decommissioned from being in active, daily use?       11:29AM
11        A.   Yes.
12        Q.   There we go.  Was it being replaced with
13    some other storage device?
14        A.   The SYMM being replaced?
15        Q.   Was it being replaced in the time period     11:29AM
16    approximately two years ago when this backup was
17    performed?
18        A.   Yes.
19        Q.   Were the files that were on it copied over
20    to a new device that was going to be an active        11:29AM
21    storage device?
22        A.   Yes.
23        Q.   And then you said -- you mentioned that
24    these files in addition to the tape backup were
25    copied to another storage device.  Is that another    11:30AM
                                                              342
```

EXHIBIT _30_ PAGE _632_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   storage device for purposes of preservation or is

 2   that another storage device that was the active

 3   server that replaced the SYMM frame?

 4       A.   It's for preservation.

 5       Q.   So those files, whatever was on the SYMM      11:30AM

 6   frame, those are available if I understand you in

 7   essentially three locations at this point at least.

 8   One would be the tape backup, correct?

 9       A.   Sorry, can you ask -- restate that, please?

10       Q.   Let's back up a second.  As of let's say      11:30AM

11   June 2005, the SYMM frame, I take it, was an active,

12   online storage device for Mattel, correct?

13       A.   Approximately, to my recollection.

14       Q.   Okay.  And I understand we're not dead

15   certain on the date so approximately as of June 2005   11:30AM

16   it was still online, correct?

17       A.   Correct.

18       Q.   And what was -- what type of files were

19   stored on that server?

20           MR. COREY:  Objection:  scope.               11:31AM

21           THE WITNESS:  Business files.

22   BY MR. JENAL

23       Q.   For whom?  What areas of the business of

24   Mattel?

25           MR. COREY:  Same objection.  It's also        11:31AM

                                                               343
```

EXHIBIT 36 PAGE 633

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   vague.
 2           THE WITNESS:  I'm sorry, ask the question
 3   one more time.
 4   BY MR. JENAL
 5       Q.   The SYMM frame, was that -- that was located    11:31AM
 6   in the Data Center in El Segundo?
 7       A.   Correct.
 8       Q.   Did that support any Mattel facilities
 9   outside of El Segundo?
10           MR. COREY:  Objection:  scope.                   11:31AM
11           THE WITNESS:  There might have been but I
12   can't confirm that.
13   BY MR. JENAL
14       Q.   Was it predominantly used to support
15   business activities in El Segundo?                       11:31AM
16       A.   Yes.
17       Q.   Would that have included activities from the
18   Design Center?
19           MR. COREY:  Objection:  scope.
20           THE WITNESS:  Possibly.                          11:32AM
21   BY MR. JENAL
22       Q.   Possibly or, yes, it did?
23       A.   Possibly.  I don't -- I don't know every
24   file that's on that box.
25       Q.   Fair enough.  But -- well, let me ask you       11:32AM
                                                                   344
```

EXHIBIT 30 PAGE 634

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    this.
 2            We had a pleasant conversation with
 3    Ms. Marine about something called as Zeus.  Are you
 4    familiar with Zeus?
 5        A.   I'm aware of -- of Zeus.                11:32AM
 6        Q.   Is Zeus in any way related to this SYMM
 7    frame that you're talking about?
 8        A.   No, it is not.
 9        Q.   They're separate storage devices?
10        A.   Correct.                               11:32AM
11        Q.   Do you know how far back files existed on
12    SYMM frame as of approximately June 2005?
13            MR. COREY:  Objection:  scope.
14            THE WITNESS:  I do not.
15    BY MR. JENAL:                                   11:32AM
16        Q.   Do you know when the SYMM frame was
17    commissioned?
18            MR. COREY:  Same objection.
19            THE WITNESS:  I don't know the specific
20    date.                                           11:33AM
21    BY MR. JENAL
22        Q.   Best estimate?
23        A.   It's hard to answer because I wasn't there
24    when they installed it.  It's prior to me being
25    employed at Mattel.                             11:33AM
                                                         345
```

EXHIBIT 30 PAGE 635

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    You became an employee of Mattel in 2003,

2   correct?

3      A.    That's correct.

4      Q.    Was the SYMM frame device in use when you

5   became an employee in 2003?                        11:33AM

6      A.    Yes.

7      Q.    When did you become an employee in 2003?

8   What month?

9      A.    October.

10      Q.    And you worked as a consultant from        11:33AM

11   Microsoft to Mattel, amongst others, from I think

12   you had told us 1997 through 2003, correct?

13      A.    Yes, on and off.

14      Q.    When the SYMM frame was retired, I think you

15   told us that whatever files were on there were     11:34AM

16   copied onto the new device that was going to become

17   its replacement, correct?

18      A.    Yes.

19      Q.    Your expectation would be likewise that

20   whenever the SYMM frame was commissioned if it was  11:34AM

21   taking the place of a prior server or storage device

22   those files would have also been migrated onto the

23   SYMM frame, correct?

24          MR. COREY:  Speculation.

25          THE WITNESS:  Please ask the question again. 11:34AM

                                                        346

EXHIBIT 30 PAGE 636

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JENAL

 2       Q.   It would be your expectation, would it not,

 3    that whatever device preceded the SYMM frame, when

 4    the SYMM frame was commissioned the data that was on

 5    the device that it was replacing would have been        11:34AM

 6    migrated onto it, correct?

 7            MR. COREY:  Objection:  scope and

 8    speculation.

 9            THE WITNESS:  That's a logical assumption

10    but I wasn't there, again, witnessing that.            11:34AM

11    BY MR. JENAL

12       Q.   So in talking about what files were on the

13    SYMM frame as of roughly June or so 2005, those

14    files to your understanding would have been

15    preserved I think from what you said in three places   11:35AM

16    and let me just see if we can get agreement on what

17    those three places are.

18            The first place would be this tape backup

19    that you've described, correct?

20       A.   Yes.                                            11:35AM

21       Q.   Second would be in the preservation storage

22    system that was -- that had those files copied onto

23    it, correct?

24       A.   Yes.

25       Q.   And the third would be on the SYMM frame       11:35AM
                                                                347
```

EXHIBIT 30 PAGE 637

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   itself which still exists someplace at Mattel; is

 2   that right?

 3       A.   The SYMM frame is not in El Segundo.

 4       Q.   Where is it physically?

 5       A.   I am not sure the location.          11:35AM

 6       Q.   It's under Mattel's possession, custody and

 7   control?

 8       A.   I believe so.

 9       Q.   The preservation system, option No. 2, does

10   that system have a name?                      11:36AM

11       A.   No, it does not.

12       Q.   So if we call it the preservation system for

13   purposes of this deposition, that will work?

14       A.   Sure.  That's fine.

15       Q.   Is that system searchable electronically?  11:36AM

16   Can you do, for example, key word searches on that

17   system to find files?

18       A.   I don't know.

19       Q.   Who would know?

20       A.   I'm not sure.                         11:36AM

21       Q.   Who's responsible for administering that

22   system?

23       A.   I believe it was Evident Data.

24       Q.   Who is Evident Data?

25       A.   My understanding is a company that came in  11:37AM
                                                          348
```

EXHIBIT 3 PAGE 638

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    to help preserve data.

 2        Q.    A company that came in to help preserve data

 3    in the mid-2005 time period or were they present

 4    prior to that?

 5        A.    I don't know about if they were present        11:37AM

 6    prior to that.  I just know that they were asked to

 7    come in to preserve the data.

 8        Q.    And so did they -- was it Evident Data that

 9    performed the tape backup or did your department do

10    that?                                                    11:37AM

11        A.    My department.

12        Q.    Do you know if the tapes were handed off to

13    Evident Data?

14        A.    I can't confirm that.

15        Q.    Is that your expectation?                      11:37AM

16            MR. COREY:  Speculation.

17            THE WITNESS:  That's just an assumption.

18    BY MR. JENAL

19        Q.    Who would know the answer to that?

20        A.    I don't know who would know for sure.          11:37AM

21        Q.    What's your best estimate as to who would

22    know or who could find out?

23        A.    Possibly Mike Sclimenti.

24        Q.    Anyone who is still at Mattel?

25        A.    I'm not aware of anyone at Mattel.             11:38AM
```

                                                                 349

EXHIBIT *30* PAGE *639*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    So you know that a tape backup was

2    performed.   You believe it was Mike Sclimenti who

3    performed that; is that correct?

4      A.    Yes.

5      Q.    And then he left the company, correct,      11:38AM

6    subsequent?

7      A.    Correct.

8      Q.    Who took over his files and records?

9      A.    Up until maybe it's like three, four weeks

10   ago nobody.   We were in search of a replacement.     11:38AM

11     Q.    Do you have a replacement now?

12     A.    We do now.

13     Q.    Who's that?

14     A.    His name is Ron Hicks.

15     Q.    What's Mr. Hicks' title?               11:39AM

16     A.    Systems engineer.

17     Q.    On the preservation system is it your

18   understanding that that system was created and

19   populated with data by Evident Data?

20     A.    That is my understanding.             11:39AM

21     Q.    Is it your understanding that that

22   preservation system is in the custody of Evident

23   Data?

24     A.    That is my assumption.

25     Q.    Do you know that for a fact?           11:39AM

350

EXHIBIT 30 PAGE 640

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   No.

 2      Q.   Who would know that for a fact?

 3      A.   Evident Data.

 4      Q.   Who at Mattel?

 5      A.   I don't know for sure who at Mattel.      11:39AM

 6      Q.   Do you have a contact at Evident Data?

 7      A.   There are -- there's one person I -- a

 8  person's name that I know of.

 9      Q.   Who's that?

10      A.   I believe, if he's still there, it's Peter   11:40AM

11  Garza.

12      Q.   G-a-r-z-a?

13      A.   I believe that's how he spells it.

14      Q.   What is Mr. Garza's title at Evident Data?

15      A.   My understanding is he's one of the         11:40AM

16  principals of the company.

17      Q.   Did he do the work in terms of copying the

18  data off of the SYMM frame and onto this

19  preservation system?

20      A.   I'm not sure.                               11:41AM

21      Q.   Did somebody from your staff work with the

22  folks from Evident Data to perform this copying of

23  the data from the SYMM frame?

24      A.   Yes.

25      Q.   Who on your staff assisted with that?       11:41AM
                                                              351
```

EXHIBIT 30 PAGE 641

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   Mike Sclimenti.

 2      Q.   Anyone else?

 3      A.   Not to my -- not to my knowledge.

 4      Q.   In addition to those backup and preservation

 5   efforts that you've described, did you do anything      11:41AM

 6   else in support of Mattel's litigation and leaving

 7   aside the depositions that you've participated in

 8   now?

 9           MR. COREY:  Objection:  scope.

10           THE WITNESS:  That is all I recall right       11:41AM

11   now.

12   BY MR. JENAL

13      Q.   I believe you testified that as to the

14   backups that have been preserved on the -- the

15   Exchange mailboxes it's your understanding that no     11:42AM

16   restoration of those backup tapes has ever been

17   performed; is that correct?

18      A.   That is my understanding.

19      Q.   Do you know if any searches have ever been

20   made of files on this preservation system to find      11:42AM

21   files responsive to the litigation?

22      A.   I'm not aware -- I'm not aware of that.

23      Q.   Who would know about that?

24           MR. COREY:  Objection:  speculation, scope.

25           THE WITNESS:  I don't know.               11:42AM
                                                            352
```

EXHIBIT 30 PAGE 642

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. JENAL

 2       Q.   Let me shift gears a little bit and ask you

 3   some questions about Mailbox Manager.  I believe you

 4   told us earlier that you had spoken with Jonathan

 5   Ouk regarding the details on Mailbox Manager,          11:43AM

 6   correct?

 7       A.   Correct.

 8       Q.   At your prior deposition there was some

 9   confusion you may recall as to the time periods that

10   were governed by the auto-delete function in Mailbox  11:43AM

11   Manager.  Do you recall that?

12           MR. COREY:  I think that was clarified

13   toward the end of the deposition.

14           THE WITNESS:  Yes, that was clarified.

15   BY MR. JENAL:                                          11:44AM

16       Q.   And your understanding of the clarification

17   is what?

18       A.   What time frame are you referring to?

19       Q.   Well, you talked about at that time there

20   were competing estimates based on different people     11:44AM

21   that you had spoken to, Ms. Sagawa versus

22   Mr. Hernandez.  Do you recall that?

23       A.   Yes.

24       Q.   And I think your counsel is correct.  I

25   think there was some clarification offered toward      11:44AM

                                                                353
```

EXHIBIT 30 PAGE 643

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Did she tell you why?

2      A.   It had to do with protecting and mitigating

3  any IP loss.

4      Q.   Did she tell you anything more specific than

5  that as to what the rationale for the policy was?      02:31PM

6      A.   Nothing specific.  It's just protection of

7  IP.

8      Q.   Are you aware of any instance of Mattel

9  intellectual property being passed through Web-based

10  E-mail without Mattel's permission?                    02:31PM

11      A.   I'm not personally aware of any particular

12  incidences like that I can speak to.

13      Q.   Have you ever heard the allegation of Mattel

14  intellectual property being disseminated through

15  Web-based E-mail without Mattel's permission?          02:31PM

16          MR. COREY:  You can answer that to the

17  extent that your source of knowledge is not from

18  counsel.

19          THE WITNESS:  Am I aware?

20  BY MR. JENAL:                                          02:32PM

21      Q.   Yes.

22      A.   I've heard -- I've heard that it has

23  occurred.

24      Q.   What have you heard?

25          MR. COREY:  Same instruction.                  02:32PM

                                                               419

EXHIBIT 30 PAGE 644

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              THE WITNESS:  Having to do with IP loss

2    through Web-based E-mail.

3    BY MR. JENAL

4       Q.   You haven't heard anything more specific

5    than that even in just general conversations?        02:32PM

6       A.   No.

7       Q.   What about instant messaging?  Is there a

8    policy regarding instant messaging at Mattel?

9       A.   Can you be more specific?

10             MR. COREY:  Objection:  scope.              02:32PM

11   BY MR. JENAL

12      Q.   AOL Instant Messenger, is there a policy

13   about the use of instant messenger systems at

14   Mattel?

15      A.   Yes.                                          02:32PM

16      Q.   What's that policy?

17      A.   We don't -- we don't use it.

18      Q.   You don't use it or you don't permit it?

19      A.   Well, we don't -- we -- we block IM.

20      Q.   When was that policy instituted?             02:33PM

21      A.   Approximately the same time as the Web-based

22   mail.

23      Q.   Was the instruction to implement that policy

24   provided at the same time?  In other words, when you

25   had this conversation with Ms. Day some roughly      02:33PM
                                                          420
```

EXHIBIT _30_ PAGE _645_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    three years ago or so did she tell you that not only

2    Web-based mail but IM also had to be blocked?

3         A.   I don't remember if it was at the same time.

4         Q.   Do you know whether there was a separate

5    incident related to IM as opposed Web-based mail        02:33PM

6    that led to that policy change?

7         A.   I'm not aware of that.

8         Q.   Prior to the institution of the policy

9    against Web-based mail and IM, do you have any

10   understanding of what the number of users at Mattel     02:33PM

11   was for Web-based mail or IM?

12        A.   No, I don't have any idea.

13        Q.   Was there ever any effort made to find out

14   how many people were using Web-based mail prior

15   to -- or ever?                                          02:34PM

16        A.   No.

17        Q.   Was there ever any effort made to determine

18   how many people were using IM?

19        A.   Not to my knowledge, no.

20        Q.   Is it possible in your understanding for      02:34PM

21   Mattel to determine who was using Web-based mail

22   prior to the time the policy was instituted?

23             MR. COREY:  Objection:  scope.

24             THE WITNESS:  Repeat the question, please.

25   /   /   /                                               02:34PM

                                                             421

EXHIBIT 30 PAGE 646

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   out similis.

2       Q.   So as I understand it -- let's just stick

3   with one term and it will make life a little

4   simpler.

5       Let's just talk about policies.  As I          02:39PM

6   understand it, you said that a policy is something

7   that's in writing, it's disseminated to all

8   employees and it's enforced.  Right?  That was your

9   definition.  Can we work with that definition?

10      A.   Sure, but the one last one regarding         02:39PM

11  enforced it's like, you know, someone is actually --

12  you know, there's some level of accountability, you

13  know.  That varies.

14      Q.   So using that definition of a policy, was

15  there a policy at Mattel at any time that you're      02:40PM

16  aware of regarding the use of home computers for

17  accessing Mattel E-mail?

18      A.   There -- there wasn't a policy, no.

19      Q.   Were Mattel employees at any time to your

20  knowledge allowed to access Mattel E-mail by home    02:40PM

21  computers?

22      A.   Yes.

23      Q.   And was there some particular practice that

24  was followed with regards to how that was done?

25      A.   Yes.  What we provided was Outlook Web        02:40PM

                                                          426

EXHIBIT 30 PAGE 647

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    access and that was what we provided users at home
 2    to access their E-mail.
 3         Q.   When was that first provided to Mattel
 4    employees to your knowledge?
 5         A.   Approximately 2003.                          02:40PM
 6         Q.   2003?
 7         A.   Yes.
 8         Q.   Was there any way for Mattel employees to
 9    access Mattel E-mail from home prior to 2003?
10         A.   Yes.                                         02:41PM
11         Q.   What was that?
12         A.   Through -- through our company-provided
13    virtual private network.
14         Q.   And how far back were Mattel employees able
15    to access Mattel E-mail through the virtual private    02:41PM
16    network?
17         A.   I don't -- I can't go too far back since I
18    wasn't there when they rolled it out, but I know
19    that it was there since at least 2000.
20         Q.   Okay.  And between 2000 and 2003 -- and when 02:41PM
21    you say "virtual private network," that's sometimes
22    abbreviated VPN, correct?
23         A.   Correct.
24         Q.   So we'll just go with that shorthand.
25              Between 2000 and 2003, if a Mattel employee  02:42PM
                                                                427
```

EXHIBIT 36 PAGE 648

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    wanted to access Mattel E-mail over the VPN, what

 2    did they have to do to get the software and get set

 3    up in order to allow them to do that?

 4        A.   Make a formal request.

 5        Q.   I'm sorry?                              02:42PM

 6        A.   Make a formal request.

 7        Q.   A formal request to whom?

 8        A.   To IT.

 9        Q.   Was IT responsible for approving or denying

10    those requests?                                 02:42PM

11        A.   At that time, yes.

12        Q.   Did that require the employee's manager or

13    supervisor's approval as well?

14        A.   It involved that, yes.

15        Q.   So the formal request would have to be     02:42PM

16    approved by the employee's supervisor before it

17    would get to IT; is that true?

18        A.   That is my understanding.

19        Q.   In the 2000 to 2003 time period do you know

20    how many users in El Segundo had access to Mattel   02:42PM

21    E-mail from home computers using the VPN?

22            MR. COREY:  Objection:  scope.

23            THE WITNESS:  I don't have that number.

24    BY MR. JENAL

25        Q.   Do you have a best estimate?              02:43PM
                                                         428
```

EXHIBIT 30 PAGE 649

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   That's hard.  I don't know.

2    Q.   Is it more than 1,000?

3    A.   There's something that needs to be -- I need

4  to clarify something.

5    Q.   Okay.                                    02:43PM

6    A.   What do you -- oh, I can't ask you a

7  question.

8    Q.   Go ahead and see if we can clarify this.  I

9  don't know what your confusion is.

10        MR. COREY:  No, you can ask him a question   02:43PM

11  and he then has the option of clarifying his

12  question so we can move things along.

13        THE WITNESS:  When you say "from home," what

14  do you mean by "from home" and from what device from

15  home?                                          02:43PM

16  BY MR. JENAL

17    Q.   At the moment home I mean home is in where

18  the hearth is, right, the personal residence.  Okay?

19  And home computer is what I'm referring to is in a

20  computer that they themselves own.             02:44PM

21    A.   Okay.  Thank you.

22    Q.   Given that clarification do you have any

23  idea in the 2000 to 2003 time frame how many Mattel

24  employees could access Mattel E-mail from home?

25    A.   Based on my understanding of the types of   02:44PM

429

EXHIBIT _30_ PAGE _650_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    devices that could connect, none.

2        Q.    None?  I'm sorry, you said none?

3        A.    Based on my understanding of the guideline

4    and how computers are connected through VPN from

5    people who have their own home computers my          02:44PM

6    understanding was -- was none or very few but I'm

7    not sure who those few people were.

8        Q.    I thought you had testified previously that

9    if someone requested access through the VPN they

10   could get software distributed to them that they     02:45PM

11   could then install that would allow them to have

12   essentially the VPN Client on their computer for

13   purposes of accessing E-mail remotely.  Do you

14   recall that?

15       A.    Yes.                                        02:45PM

16       Q.    Is it your understanding under the guideline

17   that you were referencing here that that was not

18   permitted as to people to install that VPN Client on

19   their home personal computers?

20       A.    My understanding that was not supported on  02:45PM

21   home computers which were not owned by Mattel.

22       Q.    So your understanding was that the VPN was

23   to be installed -- the VPN Client was to be

24   installed only on computers that were owned by

25   Mattel; is that correct?                             02:45PM

                                                          430

EXHIBIT 30 PAGE 651

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.   That was the general guideline.  That's what
2  I was told.
3     Q.   Who told you that?
4     A.   I believe it was Client Services.
5     Q.   And then you testified that after 2003 there 02:46PM
6  was another means by which users could access Mattel
7  E-mail remotely, correct?
8     A.   That's correct.
9     Q.   And what was that?
10    A.   Outlook Web Access.                              02:46PM
11    Q.   Using Outlook Web Access would an individual
12  Mattel employee be able to access their Mattel
13  E-mail from their home computers as we've been
14  discussing those?
15    A.   Yes.                                             02:46PM
16    Q.   Do you know if people since 2003 have taken
17  advantage of that and accessed Mattel E-mail from
18  their home computers?
19    A.   Yes.
20    Q.   Do you know how many?                            02:46PM
21    A.   No.
22    Q.   Is there a way to find out?
23    A.   Possibly.
24    Q.   How would you do that?
25    A.   I may have to reconfigure our IIS server for 02:46PM

431

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    verbose logging and we'd have to increase disk space

 2    to accommodate the log files and would have to parse

 3    through them.

 4         Q.   Does the E-mail server register when someone

 5    logs into Outlook E-mail?                      02:47PM

 6         A.   Yes.

 7         Q.   Is that log kept?

 8         A.   Can you -- kept -- what do you mean by

 9    "kept"?

10         Q.   Is it available to be reviewed?       02:47PM

11         A.   It's a finite log.

12         Q.   So it has so many entries and they fall off

13    one end as new entries come on?

14         A.   Yes.

15         Q.   Within the time frame that those entries   02:48PM

16    remain you would be able to go and review that log,

17    correct?

18         A.   I can review the log, yes.

19         Q.   Does Mr. Eckert have the ability to log into

20    Mattel E-mail from home today?                 02:48PM

21         A.   I believe so.

22         Q.   Did he have it in the 2000 to 2003 time

23    period?

24         A.   I cannot corroborate that.  I do not know.

25         Q.   What's your best estimate?            02:48PM
```

432

EXHIBIT 30 PAGE 653

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. COREY:  Objection:  speculation and

2     scope.

3          THE WITNESS:  I don't know.

4     BY MR. JENAL

5     Q.    Do you know -- strike that.                    02:48PM

6          Do you know whether Mr. DeAnda -- do you

7     know who Mr. DeAnda is?

8     A.    I believe so.

9     Q.    What's his title at Mattel?

10    A.    I believe he -- I believe he's a Vice          02:49PM

11    President of Global Security.

12    Q.    Okay.  Do you know whether Mr. DeAnda can

13    access E-mail from home currently?

14    A.    I can't corroborate that.  I don't know if

15    he can physically do that.                           02:49PM

16    Q.    If he has a home computer, he could do that,

17    correct?

18    A.    It's highly probable.

19    Q.    What about Alan Kaye?  Do you know whether

20    he has the ability to access E-mail from home       02:49PM

21    currently?

22    A.    Well, same answer to that.

23    Q.    Do you know by using Outlook Web Access

24    whether a user can create PST files on their home

25    computer?                                            02:49PM

                                                              433

EXHIBIT 30 PAGE 654

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    They cannot.

 2      Q.    They cannot?

 3      A.    They cannot.

 4      Q.    Is that a limitation of Outlook Web Access

 5   or is that something in the way that you've        02:50PM

 6   configured your systems?

 7      A.    It's a limitation of Outlook Web Access.

 8      Q.    Can I -- can a Mattel user using Outlook Web

 9   Access save E-mail files onto their local computer

10   other than in PST files?                           02:50PM

11      A.    I'm not sure.

12      Q.    So you're -- let me ask it a different way.

13            Is there any policy at Mattel that would

14   prohibit an employee from using Outlook Web Access

15   and saving E-mail on their home computer?           02:50PM

16      A.    No.

17      Q.    So if -- if the technical capability exists

18   there's nothing from Mattel's end that would prevent

19   the user from doing so.  You just don't know whether

20   it's technically possible; is that right?          02:51PM

21            MR. COREY:  Objection:  assumes facts.

22            THE WITNESS:  Please repeat the question.

23   BY MR. JENAL

24      Q.    Sure.  Let's say Mr. DeAnda is sitting at

25   home using Outlook Web Access to look at his E-mail. 02:51PM
                                                         434
```

EXHIBIT 30 PAGE 655

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Okay?  And you don't know whether he does that but

 2    technically there's no prohibition that would

 3    prevent him from doing so, right?

 4        A.   Yes.

 5             MR. COREY:  Wait.  Did you say -- objection: 02:51PM

 6    assumes facts.

 7    BY MR. JENAL

 8        Q.   So if we assume for the moment that

 9    Mr. DeAnda is using Outlook Web Access and looking

10    at his E-mail, if the product -- if the technology    02:51PM

11    allows him some means to save his E-mail, there

12    would be nothing on Mattel's end of this process on

13    its server configuration or its policies or

14    practices that would prohibit that from occurring,

15    correct?                                              02:51PM

16             MR. COREY:  Objection:  speculation, assumes

17    facts.

18             THE WITNESS:  Assuming that there is no --

19    there is no policy that states you can't do that I

20    don't know if you can.                                02:52PM

21    BY MR. JENAL

22        Q.   Right, because you don't know whether

23    accessing E-mail through Outlook Web access gives

24    you that functionality, right?

25             MR. COREY:  Can I get that read back?         02:52PM
                                                            435
```

EXHIBIT 30 PAGE 656

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JENAL

2       Q.    You don't know -- let me ask it directly.

3             Do you know whether Outlook Web Access gives

4    an end user the functionality to locally save E-mail

5    that they are pulling up?                        02:52PM

6             MR. COREY:  Objection:  scope.

7             THE WITNESS:  I cannot confirm that right

8    now.  I don't know.

9    BY MR. JENAL

10      Q.    As you sit here you just don't know,      02:52PM

11   correct?

12      A.    Yes, I do not know.

13      Q.    Assume for the moment that it does allow you

14   that capability somehow, save as or whatever.  Okay?

15   With me so far?                                  02:52PM

16      A.    Yes.

17      Q.    If that's true that the functionality is

18   present, it's also true, isn't it, that there is

19   nothing implemented at Mattel that would prevent

20   that user from saving that E-mail?              02:52PM

21            MR. COREY:  Objection:  assumes facts, scope

22   and speculation.

23            THE WITNESS:  If you're making all those

24   assumptions and you're assuming that technically you

25   can, which I'm not sure if you can, it's possible.   02:53PM

                                                          436

EXHIBIT 30 PAGE 657

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JENAL

2        Q.    What if -- what if a user has the Outlook

3    Client, right, built onto their -- or installed on

4    their home computer, okay?  Right?  Are you with me

5    so far?                                          02:53PM

6        A.    Yes.

7        Q.    There's a capability in Outlook to remotely

8    access E-mail directly.  Are you familiar with that

9    capability?

10       A.    Within native to Outlook?  Is that what   02:53PM

11   you're saying?

12       Q.    That if I have native Outlook, right,

13   Outlook 2003 and I start up that application, I can

14   connect -- if servers are configured properly, I can

15   connect directly to that server over the Internet.   02:53PM

16   Are you aware of that capability?

17       A.    I'm aware of a capability similar to what

18   you're referring to.

19       Q.    Okay.  Is that capability available at

20   Mattel?                                             02:54PM

21       A.    Do you know what that capability is called?

22       Q.    You said you were familiar with a capability

23   similar to that.

24       A.    Similar, yes.

25       Q.    Okay.  What are you -- what is the name of   02:54PM

                                                          437

EXHIBIT 30 PAGE 658

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   the similar capability to which you are referring?

2       A.   It sounds like what you are alluding to is

3   RPC or HTTP.

4       Q.   I think that's exactly correct.  All right.

5   So do you know whether RPC -- which stands for what,   02:54PM

6   by the way?

7       A.   RPC is a remote program call.

8       Q.   And HTTP is the --

9       A.   It's hypertext transport protocol.

10      Q.   So RPC over HTTP, do you know whether that   02:54PM

11  capability is supported at Mattel?

12      A.   Our Exchange systems do support -- can

13  support that.

14      Q.   Can support that or do support that?

15      A.   It can and we have tested it.          02:55PM

16      Q.   Is it turned on at Mattel presently?

17      A.   I'm not sure if we disabled it.  It was on

18  for testing.

19      Q.   When was it tested?

20      A.   Approximately a year ago I would -- I      02:55PM

21  think -- I recall.

22      Q.   But as you sit here today, you don't know

23  whether that has -- that feature has been enabled at

24  Mattel's Exchange servers?

25      A.   They were testing it on one server.       02:55PM

                                                    438

EXHIBIT 30 PAGE 659

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Which server was that?

 2      A.   I don't remember which one it was.

 3      Q.   And what was the results of the test?

 4           MR. COREY:  Objection:  scope.

 5           THE WITNESS:  RPC over HTTP was working.    02:55PM

 6  BY MR. JENAL

 7      Q.   Was --

 8           MR. COREY:  Can we take a break when you get

 9  a chance?  We've been going about an hour.

10           MR. JENAL:  Yeah.  We'll wrap this in just a 02:56PM

11  second.

12      Q.   Who would you contact to find out whether

13  that capability of RPC over HTTP was implemented on

14  the exchanger servers at Mattel, turned on?

15           MR. COREY:  Other than for testing purposes? 02:56PM

16           MR. JENAL:  Other than for testing purposes.

17           THE WITNESS:  Who would I contact to confirm

18  it was enabled?

19      Q.   Correct.

20      A.   Currently enabled?                           02:56PM

21      Q.   Correct.

22      A.   Still on?

23      Q.   Yes.

24      A.   Okay.  I would contact Jonathan Ouk.

25      Q.   I actually do think it's highly relevant to  02:56PM
                                                          439
```

EXHIBIT 30 PAGE 660

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  get an answer to this question so let's take a break

2  and if you could try to contact Mr. Ouk and get an

3  answer to that question, I would appreciate it.

4  Let's go off the record.

5           VIDEO OPERATOR:  This is the end of tape 2.   02:56PM

6  We are off the record at 2:56 p.m.

7                    (Brief recess.)

8           VIDEO OPERATOR:  We're back on the record at

9  3:16 p.m.  This is the beginning of tape 3 of Volume

10  2 of the 30(b)(6) deposition of Fred Kawashima in   03:16PM

11  the matter of Mattel, Incorporated versus Carter

12  Bryant, et al.

13  BY MR. JENAL

14      Q.   Mr. Kawashima, you realize you're still

15  under oath?                                         03:16PM

16      A.   Yes, I do.

17

18

19

20                                                      03:17PM

21                    REDACTED

22

23

24

25                                                      03:17PM

                                                        440

EXHIBIT 30 PAGE 661

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | 03:17PM |
| 6 | REDACTED | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | 03:17PM |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | 03:17PM |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | REDACTED | |
| 20 | | 03:18PM |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | Q.   And that's based on your conversation just | 03:18PM |

441

EXHIBIT 30 PAGE 662

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    could leave the company, right?  They could be

 2    fired, they could leave voluntarily.  I guess they

 3    could have a regular old retirement.  Lots of ways

 4    they could leave.  Let's pick one.  Let's just say

 5    they voluntarily choose to leave the company.  Okay?    03:41PM

 6       A.   Okay.

 7            MR. COREY:  And it will speed things along I

 8    can tell you that the process that he'll testify

 9    about is the same regardless of how a person leaves

10    the company.                                            03:41PM

11            MR. JENAL:  Well, we'll take a look at that.

12       Q.   Let's assume that the employee leaves the

13    company.  Are you familiar with the fact that Mattel

14    has an exit interview process when employees are

15    leaving?                                                03:41PM

16       A.   I do understand that there is a process.

17       Q.   We've been told by other witnesses that when

18    an employee says I'm going to leave and they give,

19    say, two-week's notice, if they also disclose that

20    they're going to work for a competitor they're         03:41PM

21    essentially asked to leave the building that day.

22    Are you familiar with that practice at Mattel?

23            MR. COREY:  Objection:  scope.

24            THE WITNESS:  I'm not aware of that

25    practice.                                               03:42PM
                                                                 460
```

EXHIBIT _30_ PAGE _663_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. JENAL

 2       Q.   Has anyone in your department to your

 3   knowledge ever left the company to go work for a

 4   competitor?

 5       A.   Not to my knowledge, no.              03:42PM

 6

 7

 8

 9              REDACTED

10                                                  03:42PM

11

12

13

14

15                                                 03:43PM

16

17

18

19

20                                            I    03:43PM

21              REDACTED

22

23

24

25                                                 03:44PM
                                                      461
```

EXHIBIT _30_ PAGE _664_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   How long has the process that you just
 2  described been in place at Mattel?
 3      A.   I think it's been around since sometime in
 4  2005.
 5      Q.   Do you understand that that is the practice   03:44PM
 6  that was instituted after the April 18th, 2005
 7  E-mail from Mattel's general counsel that you
 8  testified about earlier?
 9      A.   I believe there's -- I believe there is some
10  correlation to that but I'm not totally sure.          03:44PM
11      Q.   You didn't ask Ms. Martel that question?
12      A.   No, I just asked her about her process.
13      Q.   Let me step through this just a little bit
14  if I can.  You said that when she finds out that an
15  employee has been terminated who has any information   03:45PM
16  which is relevant.  Relevant to what?
17      A.   Oh, I'm not sure I can answer that.  I'm not
18  the one who designates who -- which employee's data
19  needs to be preserved or not.
20      Q.   Who does that?  Who makes that designation?   03:45PM
21      A.   I believe Michael Moore does.
22      Q.   Anyone other than Mr. Moore?
23      A.   Not to my knowledge.
24      Q.   Do you know how often that's been done since
25  2005?                                                  03:45PM
                                                              462
```

EXHIBIT 30 PAGE 665

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   I don't have a number, no.

2      Q.   Who would have a number?

3      A.   I would assume that Laura Martel may have a

4   better estimate than me.

5      Q.   And then you said that when she's advised to   03:46PM

6   do this -- so she's -- just so we're clear, she's

7   not making the determination as to who is relevant

8   or who has relevant information or not.  That's

9   somebody in Legal to your understanding, correct?

10     A.   That's my understanding.                       03:46PM

11     Q.   Is that understanding from Ms. Martel?

12     A.   I'm assuming so.

13     Q.   I'm asking what the source of your

14   understanding is that the relevancy determination is

15   made by Legal?                                        03:46PM

16     A.   Can we back up one, please?

17     Q.   Sure.

18     A.   Can you repeat the question?  Perhaps I

19   didn't answer that correctly regarding Laura Martel.

20     Q.   It's your understanding, is it not, that the   03:47PM

21   determination of whether the information that a

22   particular user who's leaving the company might have

23   had, whether that's going to be relevant and thus

24   preserved, your understanding is that that

25   determination is made by someone, perhaps Mr. Moore,  03:47PM

                                                          463

EXHIBIT 30 PAGE 666

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  in the Legal department at Mattel, correct?

2      A.   That's my understanding, yes.

3      Q.   I was asking you what is the basis for that

4  understanding?

5      A.   That Mr. Moore -- that Michael Moore is the    03:47PM

6  one who makes the determination?

7      Q.   Yes.  What's the basis for that belief?

8          MR. COREY:  He's asking how you know that.

9          THE WITNESS:  Yes.  Based on what Laura

10  Martel has told me she sends -- her group sends       03:47PM

11  Michael Moore a termination list on a daily basis by

12  just informing him of these are the people who have

13  left the company.  He looks at the list and

14  determines which users that he wants to preserve

15  data for.                                             03:48PM

16  BY MR. JENAL

17     Q.   Do you know does Ms. Martel keep a record of

18  which users -- which terminating employee's data is

19  preserved?

20     A.   I don't know.                                 03:48PM

21

22

23              REDACTED

24

25                                                        03:48PM

                                                            464

EXHIBIT 3U PAGE 667

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   }
 2
 3
 4
 5                                              03:48PM
 6
 7              REDACTED
 8
 9
10                                              03:49PM
11
12
13
14
15                                              03:49PM
16
17
18         REDACTED
19
20                                              03:49PM
21
22
23
24   Q.   Who has access to that server?
25   A.   She indicated that only a very few people do 03:49PM
                                                      465
```

EXHIBIT 30 PAGE 668

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    in her group, I believe.  I don't know who the
 2    members are.
 3        Q.   Do you have access to that server?
 4        A.   The server or the folder?
 5        Q.   Well, so far up until now you've been          03:50PM
 6    referring to the server so --
 7        A.   Oh, it's a folder on the server.
 8        Q.   Okay.  Do you have access to the server?
 9        A.   I have access -- I'm sorry, what do you mean
10    by that, "access to the server"?                        03:50PM
11        Q.   I presumably don't have access to that
12    server.  I can't sit here in my office and dial up
13    that server.  Do you have access to that server?
14        A.   Well, there's physical access, there's
15    access to logging into the desktop, there's access     03:50PM
16    to folders, drives.
17        Q.   Logical access such that you can see what's
18    the contents of that server.
19        A.   My user account does not have access to that
20    server, only folders designated for my user account.   03:50PM
21        Q.   Do you have access to the folder in question
22    where Ms. Martel's group copies these exported PST
23    files?
24        A.   I can't answer that because I don't know
25    what folder that would be.                              03:51PM
                                                                  466
```

EXHIBIT 30 PAGE 669

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   She didn't tell you?

2    A.   No, she didn't tell me.

3    Q.   Is that folder subject to a backup routine?

4    A.   My understanding the entire server is backed

5  up.                                              03:51PM

6    Q.   Is there any separate backup procedure as it

7  applies to that folder?

8    A.   Not to my knowledge.

9    Q.   Okay.  Aside from the things that you told

10 me that Ms. Martel's group does with regards to the  03:51PM

11 user's account and mailbox, does she or her group do

12 anything with regards to the user's individual

13 desktop computer?

14    A.   It is my understanding that she doesn't do

15 anything to the desktop -- to the desktop computers.  03:52PM

16    Q.   So in particular if an employee had saved

17 E-mails to a PST file on their local computer, is

18 there any corresponding effort to preserve those

19 E-mails?

20    A.   That's when I'm referring to Teresa Dawsey  03:52PM

21 and what she does.  Those actions that are performed

22 by her group is what -- what is done to preserve

23 data.

24    Q.   Okay.  So then let's talk about that.  So

25 Ms. Martel's group is basically dealing with things  03:52PM

                                                    467

EXHIBIT 30 PAGE 670

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1
 2
 3
 4
 5                                                    03:52PM
 6                    REDACTED
 7
 8
 9
10                                                    03:53PM
11
12
13
14   based on what she's told me is they make a ghost
15   image and they preserve that file which is the image   03:53PM
16   of the hard drive and its contents onto a server,
17   one of our servers.
18       Q.   Is this the same server and folder that we
19   were talking about for where the PST files off of
20   the Exchange server are saved?                        03:53PM
21       A.   I don't know.  I don't know where she puts
22   it.
23       Q.   Did she work off of the same relevant
24   employees' list that Ms. Martel works off of for
25   deciding whose data to retain?                        03:54PM
                                                             468
```

EXHIBIT 30 PAGE 671

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    It is my understanding.

2

3

4

5                                                      03:54PM

6                    REDACTED

7

8

9

10                                                     03:54PM

11

12

13

14

15      Q.    Lots of things are possible.  I'm asking    03:54PM

16   whether it's your understanding that that's what it

17   does or not.

18      A.    I'm not an expert on that.  That is my

19   estimation.

20      Q.    It's your estimation that it would capture   03:55PM

21   the deleted file information?

22      A.    Yes, yes, that is my estimation.

23      Q.    Do some employees at Mattel have both

24   desktop computers and company-issued laptop

25   computers?                                            03:55PM

                                                            469

EXHIBIT 30 PAGE 672

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Some people do.

 2

 3

 4

 5                                          )3:55PM

 6

 7              REDACTED

 8

 9

10                                          03:56PM

11

12

13        MR. COREY:  Hold on just a second.  Fine.

14        THE WITNESS:  Will you repeat that, please?

15  BY MR. JENAL:                           03:56PM

16     Q.   Well, you've been testifying about things

17  that occur as employees leave the company for

18  certain employees, correct?

19     A.   Yes.

20                                          03:56PM

21

22              REDACTED

23

24

25                                          03:56PM
                                            470
```

EXHIBIT 30 PAGE 673

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   My question to you was:  Are you aware of
 2   Mattel ever making such ghost copies of hard drives
 3   of the employees while they're still employees of
 4   Mattel?
 5      A.   While they're still employees of Mattel.  I   03:57PM
 6   can't point to any particular occurrence of that.
 7      Q.   Have you ever heard of that occurring?
 8           MR. COREY:  Objection:  speculation.
 9           THE WITNESS:  Perhaps in passing.  I can't
10   recall.                                              03:57PM
11   BY MR. JENAL
12      Q.   For employees who aren't on this relevant
13   people list is there anything done to your knowledge
14   to preserve their E-mails when they leave the
15   company?                                             03:58PM
16      A.   When they're not on the list?  The -- the
17   normal procedure based on what Laura Martel has told
18   me when someone is -- leaves the company terminated
19   that the standard procedure is to disable their AD
20   account, hide their mailbox and in 14 days they      03:58PM
21   delete the account and delete the mailbox and their
22   M drive.
23      Q.   And I think you said the M drive is an area
24   up on the network where users are encouraged to save
25   work files so that they'll be automatically backed   03:58PM
                                                          471
```

EXHIBIT 30 PAGE 674

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    up, correct?

 2         A.   The M drive is where their personal folders

 3    are, yes.

 4         Q.   So if an employee who was not on this

 5    relevant person list, for lack of a better term of      03:58PM

 6    art, leaves the company, then after 14 days their

 7    E-mail and their files that were on the M drive will

 8    have been deleted, correct?

 9         A.   That is my understanding.

10         Q.   And aside from a tape backup of that how      03:59PM

11    long is the M drive backed up, do you know?

12              MR. COREY:   Objection:  vague and ambiguous.

13              MR. JENAL:   Yeah, it's an awful question.

14         Q.   You testified that since April of 2005 that

15    all of the backups for the Exchange mailbox servers     03:59PM

16    have been retained, correct?

17         A.   Correct.

18         Q.   And I think you said also that there are

19    backups done of the file servers where users have an

20    M drive and their personal folders are kept,            03:59PM

21    correct?

22         A.   Yes.

23         Q.   How long -- strike that.

24              After April of 2005 was any policy change

25    made regarding retention of backup tapes that would     04:00PM
```
                                                                    472

EXHIBIT 30 PAGE 675