CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    apply to the contents of the M drive for users?

 2         A.   Not to my knowledge.

 3         Q.   Now, how long are the backups for the

 4    servers that support the users' M drives -- how long

 5    are those backups retained?                          04:00PM

 6         A.   I believe it's for about a month.

 7         Q.   So files that the user saves in the M drive,

 8    those will -- if a user puts some files in the M

 9    drive and then deletes them, there will be a record

10    or a backup of that for approximately 30 days?       04:00PM

11    That's your understanding?

12         A.   Correct.

13         Q.   And it could be recovered within that time

14    period?

15         A.   Yes.                                        04:00PM

16         Q.   After that time period there would be no way

17    that you're aware of to recover those files; is that

18    correct?

19         A.   That is my understanding, yes.

20         Q.   And then the same thing would apply then to  04:01PM

21    the files of an employee who leaves the company but

22    is not on this relevant person list.  Their files

23    will be -- that are on the M drive, those files will

24    be deleted after 14 days and after 30 days of tape

25    rotation thereafter there will be no way to recover    04:01PM
```

473

EXHIBIT 30 PAGE 676

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA     ) ss
 2    COUNTY OF LOS ANGELES )
 3
 4          I, WENDY S. SCHREIBER, CSR No. 3558, do
 5    hereby certify
 6
 7          That the foregoing deposition of FRED T.
 8    KAWASHIMA was taken before me at the time and place
 9    therein set forth, at which time the witness was
10    placed under oath and was sworn by me to tell the
11    truth, the whole truth, and nothing but the truth;
12          That the testimony of the witness and all
13    objections made by counsel at the time of the
14    examination were recorded stenographically by me,
15    and were thereafter transcribed under my direction
16    and supervision, and that the foregoing pages
17    contain a full, true and accurate record of all
18    proceedings and testimony to the best of my skill
19    and ability.
20          I further certify that I am neither
21    counsel for any party in said action, nor am I
22    related to any party to said action, nor am I in any
23    way interested in the outcome thereof.
24
25
```

Veritext National Deposition & Litigation Services
213 623-5005

EXHIBIT 30 PAGE 677

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          IN WITNESS WHEREOF, I have subscribed my

2     name this 29th day of June, 2007.

3

4

5

6     _____

7        WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

515

EXHIBIT 30 PAGE 678

**Exhibit 31**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      EASTERN DIVISION          Certified Copy

4      -------------------------------

5   MATTEL, INC., a Delaware           )

6   Corporation,                       )

7            Plaintiff,                )

8            vs.                       ) No. CV 04-9059 NM

9   CARTER BRYANT, an individual;      )    (RNBx)

10   and DOES 1 through 10,            ) VOLUME III

11   Inclusive,                        )

12            Defendants.              )

13   -----------------------------------)

14   (COMPLETE CAPTION ON NEXT PAGE.)

15

16        CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18      Continued Videotaped 30(b)(6) Deposition

19      of FRED T. KAWASHIMA, taken at 400 South

20      Hope Street, Los Angeles, California,

21      Commencing at 1:52 P.M., Thursday,

22      September 13, 2007, before Wendy S.

23      Schreiber, CSR No. 3558, RPR, CLR.

24

25   PAGES 518 - 675

518

Veritext National Deposition & Litigation Services
866 299-5127

EXHIBIT 31 PAGE 679

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF:

 4

 5            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6            BY:  JON COREY, ESQ.

 7            865 South Figueroa Street, Tenth Floor

 8            Los Angeles, California 90017

 9            (213) 443-3000

10            joncorey@quinnemanuel.com

11

12                -AND-

13

14            MATTEL, INC.

15            BY:  MICHAEL MOORE, ESQ.

16            333 Continental Boulevard

17            El Segundo, California 90245-5012

18            (310) 252-2000

19            michael.moore@mattel.com

20            (NOT PRESENT)

21

22

23

24

25
```

519

EXHIBIT _31_ PAGE _680_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR THE DEFENDANT AND COUNTERCLAIMANT

 4    CARTER BRYANT:

 5

 6            KEKER & VAN NEST LLP

 7            710 Sansome Street

 8            San Francisco, California 94111-1704

 9            (415) 391-5400

10            (NOT PRESENT)

11

12        FOR DEFENDANT MGA ENTERTAINMENT, INC.:

13

14            O'MELVENY & MYERS LLP

15            BY:  DIANA M. TORRES, ESQ.

16                 JAMES PAUL JENAL, ESQ.

17            400 South Hope Street

18            Los Angeles, California 90071-2899

19            (213) 430-6000

20            jjenal@omm.com

21

22    ALSO PRESENT:

23

24            VIDEO OPERATOR - MIKE RUBIO

25
```

520

EXHIBIT 31 PAGE 681

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    LOS ANGELES, CALIFORNIA; THURSDAY, SEPTEMBER 13, 2007

 2                       1:52 P.M.

 3              -       -       -

 4

 5         VIDEO OPERATOR:  We're on the record.  I am      01:51PM

 6    Mike Rubio, your videographer, and I represent

 7    Veritext LLC in Los Angeles, California.  I'm a

 8    notary public.  I'm not financially interested in

 9    this action nor am I a relative or employee of any

10    attorney or any of the parties.                       01:51PM

11         The date is September 13th, 2007.  The time

12    is 1:52 p.m.  This deposition is taking place at the

13    offices of O'Melveny & Myers in Los Angeles,

14    California.

15         This is case No. CV 04-9059 NM entitled         01:52PM

16    Mattel versus Carter Bryant.  The deponent is

17    Mr. Fred Kawashima.  This is Volume 3.  This

18    deposition is being taken on behalf of the

19    defendant.  The court reporter is Ms. Wendy

20    Schreiber from Veritext LLC in Los Angeles,          01:52PM

21    California.

22         Counsel will now please introduce

23    themselves.

24         MS. TORRES:  Diana Torres, O'Melveny &

25    Myers, for MGA Entertainment, Inc.                    01:52PM

                                                               521
```

EXHIBIT _31_ PAGE _682_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. JENAL:  Jim Jenal also for MGA

 2    Entertainment, Inc.

 3              MR. COREY:  Jon Corey on behalf of Mattel.

 4              Before we start I think to be clear

 5    Mr. Kawashima is a designated Mattel employee.  I       01:53PM

 6    think you read that it was Mr. Kawashima's

 7    deposition.

 8              (Whereupon Mr. Kawashima remains under

 9         oath by the court reporter.)

10

11              EXAMINATION (CONTINUING)

12    BY MS. TORRES:

13       Q.   Good afternoon, Mr. Kawashima.

14       A.   Good afternoon.

15       Q.   You understand that this is a continuation    01:53PM

16    of your prior deposition, correct?

17              MR. COREY:  Of the topic that he was

18    designated on at the most immediately-preceding

19    deposition.

20    BY MS. TORRES:                                          01:53PM

21       Q.   With your counsel's clarification do you

22    understand that this is a continuation of the

23    preceding deposition on the topic on which you were

24    designated at that deposition?

25       A.   I do.                                           01:54PM
                                                                  522
```

EXHIBIT _31_ PAGE _683_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. COREY:  But to be clear, it's a

 2     deposition that's being conducted within the scope

 3     and parameters of Judge Infante's order where

 4     Mr. Kawashima was instructed to come back and to

 5     answer I believe nine or ten questions as to which      01:54PM

 6     an instruction had been asserted and to allow

 7     counsel for MGA to ask more follow-up with respect

 8     to those questions.  It's not broader than that.

 9          MS. TORRES:  He's designated on what he's

10     designated on according to the order.                   01:54PM

11          MR. COREY:  It's not a question of

12     designation, it's a question about what you're

13     allowed to ask him within the scope of that order.

14          MS. TORRES:  We'll take it one question at

15     a time.                                                 01:54PM

16     Q.   Mr. Kawashima, you understand that you're

17     under oath?

18     A.   I do.

19     Q.   Is there any reason that you can't give your

20     best testimony today?                                   01:54PM

21     A.   No.

22     Q.   Have there been any changes in your

23     employment status since your last deposition in June

24     of this year?

25     A.   There has not been.                                01:55PM
                                                                  523
```

EXHIBIT _31_ PAGE _684_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Has there been any change in your title --
 2  your job title since your last deposition?
 3      A.   No.
 4      Q.   Has there been any change in your job
 5  responsibilities since your last deposition?        01:55PM
 6      A.   No.
 7      Q.   Has there been any change in who you report
 8  to since your last deposition?
 9      A.   No.
10      Q.   Did you do anything to prepare for this     01:55PM
11  deposition today?
12      A.   Yes.
13      Q.   What did you do?
14      A.   Met with counsel and just to review the
15  case.                                               01:55PM
16      Q.   Who did you meet with?
17      A.   I met with Jon Corey and Michael Moore.
18      Q.   And do you anticipate today relying on any
19  information that you received from either Mr. Corey
20  or Mr. Moore in answering the questions on which    01:56PM
21  you're here to testify to today?
22      A.   I'm sorry --
23           MR. COREY:  Objection:  vague.
24           THE WITNESS:  Yeah.
25  /   /   /                                           01:56PM
                                                            524
```

EXHIBIT _31_ PAGE _685_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you didn't already know?

2        A.    No.

3        Q.    Did you do anything else to prepare for your

4    deposition?

5        A.    I tried to review my prior deposition from    01:57PM

6    June.

7        Q.    Anything else?

8        A.    I talked to one of my engineers who is

9    responsible for -- for Exchange just to confirm

10   something that I knew about the system.              01:57PM

11       Q.    Did you do anything else?

12       A.    Not that I recall.

13       Q.    Did you speak to anybody else besides this

14   one engineer?

15       A.    And the two attorneys?  Not to my          01:57PM

16   recollection, no.

17       Q.    Did you exchange any E-mails with anyone

18   else to prepare for your deposition?

19       A.    No.

20       Q.    Did you have any phone calls with anyone    01:58PM

21   else to prepare for your deposition?

22       A.    Aside from those three?  No.

23       Q.    Who was the engineer you spoke to?

24       A.    Jonathan Ouk, O-u-k.

25       Q.    How long did you speak to Mr. Ouk?         01:58PM

                                                          526

EXHIBIT _31_ PAGE _686_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    Maybe two minutes.

2      Q.    Did you call him?  Let me ask you this.  Was

3  your conversation with Mr. Ouk in person or over the

4  telephone?

5      A.    It was over the telephone.                    01:58PM

6      Q.    Did you call him or did he call you?

7      A.    I called him.

8      Q.    Why did you call him?

9           MR. COREY:  Objection:  asked and answered.

10          THE WITNESS:  To confirm information as I      01:58PM

11  indicated before, the same piece of information.

12  BY MS. TORRES:

13     Q.    What piece of information were you looking

14  to confirm when you called Mr. Ouk?

15     A.    Configuration of the Exchange system.         01:59PM

16          MR. COREY:  Before we get too much further

17  I'm going to designate this Confidential -

18  Attorneys' Eyes Only.

19  BY MS. TORRES:

20     Q.    What specifically about the configuration of 01:59PM

21  the Exchange system did you call Mr. Ouk to confirm?

22     A.    About when a particular storage group was

23  created.

24     Q.    When a particular storage group was created?

25     A.    Right.                                        01:59PM

                                                              527

EXHIBIT _31_ PAGE _687_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    What is a storage group?

2      A.    It is an entity that on Exchange server that

3    houses multiple databases that house multiple

4    mailboxes.

5      Q.    When you say it's an entity on the Exchange   02:00PM

6    server that houses multiple databases that houses

7    multiple mailboxes, are you saying that the entity

8    on the Exchange server houses multiple databases

9    which in turn house multiple mailboxes or does the

10   Exchange server house multiple mailbox databases?   02:00PM

11             MR. COREY:  Objection:  vague and ambiguous.

12             THE WITNESS:  I don't know to get into too

13   much technical detail but to answer your question

14   it's a hierarchical system.

15   BY MS. TORRES:                                       02:00PM

16     Q.    What is that hierarchical system?

17     A.    Storage group is the highest level that

18   resides on Exchange server.  Within the storage

19   group you have a collection of databases.  Each

20   database has a collection of mailboxes.            02:01PM

21     Q.    Now, you said you called Mr. Ouk to confirm

22   when a particular storage group was created.  Is

23   there a name for that particular storage group?

24     A.    It's all -- it's all numerically ordered and

25   named in sequential order.  There is but I'm not    02:01PM

                                                            528

EXHIBIT _31_ PAGE _688_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   sure what number it is.  It could be like storage

2   group 5 or something like that.  I don't remember.

3       Q.   How did you refer to it when you called Mr.

4   Ouk?

5       A.   The storage group that had -- that has a          02:01PM

6   particular policy associated with it.

7       Q.   The storage group that has what policy

8   associated with it?

9       A.   A particular policy associated with it.

10      Q.   And what policy is that?                          02:02PM

11      A.   Mailbox Manager policy.

12      Q.   What did Mr. Ouk tell you?

13      A.   Well, he confirmed that this policy was on

14   that storage group.

15           MR. COREY:  I think your question was about       02:02PM

16   the date.

17   BY MS. TORRES:

18      Q.   Yes.

19      A.   Oh, I'm sorry.  Can you ask the question

20   again, please?                                            02:02PM

21      Q.   Sure.  You said you spoke to Mr. Ouk to

22   confirm when a particular storage group was created.

23      A.   Yes.

24      Q.   And my question is:  What did Mr. Ouk tell

25   you?                                                      02:03PM

                                                                 529

EXHIBIT _31_ PAGE _689_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.   Oh, he confirmed the date.

2       Q.   What was that date?

3       A.   May 18, 2005.  Can I clarify something?

4       Q.   Yes.

5       A.   It was a combination.  The question had to      02:03PM

6    do with a storage group and a policy.  The question

7    was when the policy was created so I correct myself.

8       Q.   Okay.  So you called him -- you called Mr.

9    Ouk so we're clear to confirm when a particular

10   policy was implemented with respect to the Mailbox      02:03PM

11   Manager -- with respect to the storage policy --

12   with respect to the storage group?

13          MR. COREY:  Objection:  vague and ambiguous.

14          MS. TORRES:  You're right, that really was.

15      Q.   You said earlier you spoke to Mr. Ouk to       02:04PM

16   confirm when a particular storage group was created.

17   You just clarified your answer to say that you were

18   talking about a policy.  Which is it?  Did you call

19   him to find out when the storage group was created

20   or did you call him to find out when the policy was    02:04PM

21   implemented?

22      A.   Actually, it was the policy on that storage

23   group.  I apologize.

24      Q.   And what is that policy?

25      A.   It's a Mailbox Manager policy.              02:04PM

                                                              530

EXHIBIT 31 PAGE 690

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.   Can you be more specific?

2     A.   Yes.  It had -- it pertained to E-mail

3  retention policy and duration of that policy for

4  mailboxes.

5     Q.   What is the E-mail retention policy that you   02:05PM

6  just referred to in your last answer?

7     A.   For that particular storage group and that

8  policy, the policy is for re -- the E-mail retention

9  policy is set for indefinite.

10    Q.   Are there particular users whose mailboxes   02:05PM

11 are stored in the databases that are on -- that are

12 in that storage group?

13         MR. COREY:  Objection:  vague.

14         THE WITNESS:  There are no specific users in

15 that storage group.                                  02:06PM

16 BY MS. TORRES:

17    Q.   But there are users in the storage group?

18         MR. COREY:  Objection:  mischaracterizes his

19 testimony, vague.

20         THE WITNESS:  No, there is -- no, there      02:06PM

21 aren't users in the storage group.

22 BY MS. TORRES:

23    Q.   What do you mean by there are no specific

24 users in the storage group?

25    A.   There are -- there are mailboxes in the      02:06PM

                                                              531

EXHIBIT 31 PAGE 691

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    storage group.

 2        Q.    Do those mailboxes belong to specific users?

 3        A.    No.

 4        Q.    Who do they belong to?

 5        A.    They belong to a resource.              02:06PM

 6        Q.    What's the resource?

 7        A.    It's the same resource that a conference

 8    room or a group calendar is associated with.

 9    It's -- it's an account in that directory.

10        Q.    Are the accounts used by individuals?    02:06PM

11        A.    No.

12            MR. COREY:  Objection:  vague.

13    BY MS. TORRES:

14        Q.    Are the accounts accessed by any

15    individuals?                                      02:07PM

16        A.    Yes.

17        Q.    Who are they accessed by?

18        A.    Which accounts are we referring to?  Can you

19    clarify?

20        Q.    Any of the accounts that are -- that have   02:07PM

21    mailboxes on the storage group that you've been

22    referring to.

23            MR. COREY:  Objection:  vague and ambiguous.

24            THE WITNESS:  Are there users -- please ask

25    the question again.                               02:07PM
```

532

EXHIBIT _31_ PAGE _692_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MS. TORRES:

 2       Q.   You're telling me that there were mailboxes.

 3   The mailboxes are stored in databases, correct?

 4       A.   Yes.

 5       Q.   And the databases are on the storage group,    02:07PM

 6   correct?

 7       A.   That is correct.

 8       Q.   You also told me that the mailboxes are not

 9   assigned to specific individuals.

10       A.   That is correct.                               02:08PM

11       Q.   But you've told me that there are

12   individuals who access those mailboxes, correct?

13       A.   That's correct.

14       Q.   I'm asking you who are -- is there a group

15   of individuals that access those mailboxes?           02:08PM

16       A.   Can you define "group"?

17       Q.   One or more persons.  More than one person.

18       A.   My understanding there is.

19       Q.   What group is that?  Can you describe it?

20       A.   They're people in the law department.          02:08PM

21       Q.   Are the mailboxes -- you said the mailboxes

22   are not assigned to individuals.  Are they assigned

23   by some other category or are they defined by some

24   other category?

25            MR. COREY:  I'll object to the first          02:09PM
                                                                 533
```

EXHIBIT _31_ PAGE _693_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    question.  The last question is --
 2    BY MS. TORRES:
 3        Q.   Let me ask the question.  Are they defined
 4    by some other category?
 5        A.   Active directory is what houses all the      02:09PM
 6    accounts.  An account is created and associated to a
 7    mailbox.  The mailbox in question an account was
 8    created.  An account is a resource account assigned
 9    to that mailbox.
10        Q.   Do you know the names of any of those         02:09PM
11    resource accounts?
12        A.   Yes, I do.
13        Q.   What are they?
14        A.   I believe they're generic names.
15        Q.   What do you mean you believe they're generic 02:10PM
16    names?
17        A.   They're not -- they're not designated with
18    any special descriptor.
19        Q.   That wasn't my question.  My question was:
20    Do you know the names of any of those resource        02:10PM
21    accounts?
22        A.   I believe I do.
23        Q.   My next question was:  What are they?
24        A.   I believe one of them is called Donahue and
25    the other one is called Bunion.                       02:10PM
                                                            534
```

EXHIBIT 31 PAGE 694

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Are there more than two?

2    A.   No.

3    Q.   Does Donahue pertain to a person?

4    A.   Not to my knowledge.

5    Q.   Do you know why it's called Donahue?          02:11PM

6    A.   I do not.

7    Q.   Is it called Donahue as a code name?

8    A.   Not that I'm aware of.

9    Q.   Can you think of any reason why that --

10   well, let me ask you this.  What does Donahue       02:11PM

11   represent, if anything?

12   A.   I don't know.

13   Q.   Are there specific individuals who can

14   access the -- well, strike that.

15        Is there more than one mailbox that's          02:11PM

16   associated with the resource called Donahue?

17   A.   No.

18        MR. COREY:  Objection:  vague and ambiguous.

19        THE WITNESS:  I'm sorry.  No.

20   BY MS. TORRES:                                       02:11PM

21   Q.   You understood my question?

22   A.   You asked if there was more than one

23   resource assigned to that mailbox.

24   Q.   No, more than one mailbox assigned to the

25   resource called Donahue.                             02:12PM

                                                          535

EXHIBIT 31 PAGE 695

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MR. COREY:  Same objections.

2              THE WITNESS:  No, there isn't.

3    BY MS. TORRES:

4        Q.   Did you understand my question?

5        A.   More than one mailbox assigned to the        02:12PM

6    account called Donahue.  It's impossible within an

7    active directory.

8        Q.   But there is one mailbox assigned to the

9    account called Donahue, correct?

10       A.   Yes.                                          02:12PM

11       Q.   You said the other resource was called

12   Bunion?

13       A.   That is my understanding.

14       Q.   Is there any -- do you have any reason -- do

15   you have any knowledge as to why that resource is      02:12PM

16   called Bunion?

17       A.   I do not.

18       Q.   And is there one mailbox assigned to the

19   resource called Bunion?

20             MR. COREY:  Objection:  vague and ambiguous  02:12PM

21   and assumes facts.

22             THE WITNESS:  As I mentioned before, there's

23   only one account that can be assigned to a mailbox.

24   BY MS. TORRES:

25       Q.   So if I say the mailbox named Donahue,        02:13PM
                                                            536
```

EXHIBIT 31 PAGE 696

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   you'll understand that it's the mailbox that's

2   assigned to the resource called Donahue?

3         MR. COREY:  Objection:  mischaracterizes --

4   I'm sorry.

5   BY MS. TORRES:                                02:13PM

6         Q.   I was going to say is that a fair way to

7   refer to it?

8         A.   Well, are you referring to the mailbox or

9   you want to refer to the account?  What's your

10  intent?                                       02:13PM

11        Q.   I want to refer to the mailbox.

12        A.   Okay.

13        Q.   And the mailbox you said is under the

14  account name Donahue or Bunion?

15        MR. COREY:  Objection:  vague and ambiguous. 02:13PM

16        THE WITNESS:  The resource account owns the

17  mailbox.

18  BY MS. TORRES:

19        Q.   Let me ask you this.  Does the resource

20  account own anything but a mailbox?           02:13PM

21        A.   It can.

22        Q.   Does it?

23        A.   Not that I'm aware of.

24        MR. COREY:  Are we going to get to the

25  question sometime soon?                       02:14PM

                                                  537

EXHIBIT _31_ PAGE _697_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MS. TORRES:  Certainly, but I think we are.
 2       Q.   Do you know -- I take it there are E-mails
 3   in the mailboxes that are assigned to the account
 4   name Donahue, correct?
 5       A.   It is my understanding, yes.              02:14PM
 6       Q.   Do you know what E-mails are in that
 7   mailbox?
 8            MR. COREY:  Objection:  vague.
 9            THE WITNESS:  You mean like specifically
10   what E-mails?                                      02:14PM
11   BY MS. TORRES:
12       Q.   Do you know anything about the E-mails that
13   are in the mail box that's assigned to the Donahue
14   account?
15       A.   Anything like?  I'm sorry, I'm not -- can  02:14PM
16   you be more specific?
17       Q.   Do you know anything about them?  "Yes" or
18   "no"?
19            MR. COREY:  Objection:  argumentative and
20   vague.                                             02:14PM
21            THE WITNESS:  Like the content?  The name of
22   them?  I'm sorry, I'm having --
23   BY MS. TORRES:
24       Q.   Do you know anything about the source of the
25   E-mails that are in the mail box assigned to the   02:15PM
                                                        538
```

EXHIBIT 31 PAGE 698

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Donahue account?

2        A.   Specifically, no.

3        Q.   Do you know anything generally about the

4    source of those E-mails?

5        A.   I guess I'm having a hard time when you mean    02:15PM

6    "anything"?  Like I'm not understanding when you

7    mean "anything."

8        Q.   What do you know about the E-mails that are

9    in the mail box that's assigned to the Donahue

10   account?                                              02:15PM

11       A.   That they're based on matching criteria.

12       Q.   Such as key words?

13       A.   That is my understanding.

14       Q.   They're not in there because they all come

15   from the same person, correct?                        02:15PM

16       A.   That is my understanding.

17       Q.   And they're not in there because they're all

18   to the same person, correct?

19       A.   That is my understanding.

20       Q.   They were sent there by some software or      02:15PM

21   some protocol that you have; is that correct?

22       A.   That is my understanding, yes.

23       Q.   And the same would be true for Bunion -- for

24   the E-mails in the mail box assigned to the Bunion

25   account, correct?                                     02:16PM

                                                              539

EXHIBIT _31_ PAGE _699_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           MR. COREY:  Objection:  vague,

2    mischaracterizes the testimony.

3           THE WITNESS:  I need to think about it

4    because those are two different mailboxes.

5    BY MS. TORRES:                                02:16PM

6       Q.   What's the difference between the two

7    mailboxes?

8       A.   I believe one receives the -- the E-mails

9    based on criteria and the other one is E-mails which

10   are copied from one mailbox to the other.       02:16PM

11      Q.   Which one is the mailbox that receives

12   E-mails based on certain criteria?

13      A.   You know, I don't -- I'm not 100 percent.

14      Q.   Is the -- who would know that?

15      A.   I believe the law department would.    02:17PM

16      Q.   Anyone in particular in the law department?

17      A.   I believe so.

18      Q.   Who?

19      A.   I believe that -- that Michael Moore may

20   know that.                                     02:17PM

21      Q.   Anyone else in the legal department that you

22   believe who knows that information?

23      A.   To my understanding that -- that belongs to

24   the law department.

25      Q.   Now, you said one of them receives E-mail  02:17PM

                                                        540

EXHIBIT 31 PAGE 70

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   based on certain criteria and the other contains

2   E-mail that are copied from one mailbox to the

3   other.

4       A.   That is my understanding, yes.

5       Q.   When you say "copied from one mailbox to the   02:18PM

6   other," do you mean copied from either Bunion to

7   Donahue or Donahue to Bunion as the case may be, or

8   do you mean copied from other mailboxes to either

9   the Bunion or the Donahue mailbox?

10      A.   Other mailboxes other than the two that      02:18PM

11  we're talking about?

12      Q.   Yes.

13      A.   No, they're copied from one of those two to

14  the other.

15      Q.   Do you know the criteria on which one is     02:18PM

16  copied -- let me ask -- let me ask a different

17  question.

18           Is it true that they do not contain the same

19  set of E-mails?  In other words, Bunion and Donahue

20  are not identical in their content.                  02:18PM

21      A.   I'm not privy to what exactly is copied from

22  one to the other.

23      Q.   Is it your understanding that there are

24  differences in the content of the mailboxes?

25      A.   Differences such as?                         02:19PM

                                                         541

EXHIBIT 31 PAGE 701

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   Whether all of the E-mails are in --

 2             MR. COREY:  One thing that I think would

 3   help is if you ask him about content or if there's a

 4   difference between receipt of the E-mails.  I think

 5   that's a starting point.                          02:19PM

 6   BY MS. TORRES:

 7        Q.   Okay, I will ask the question that your

 8   counsel just suggested.  Is there a difference

 9   between the receipt of the E-mails?

10        A.   The receipt of the E-mails?  I would say  02:19PM

11   that the -- the mailbox that it is copied into, it

12   could be a subset of what's in the primary from

13   which it was copied from.  It could be the entire or

14   it could be a subset.  I am not sure because I

15   don't -- I'm not involved in that.                02:20PM

16        Q.   Who is involved in that?

17        A.   The law department.

18        Q.   Anyone in particular in the law department

19   or would it be Michael Moore?

20        A.   He -- he may be directly or indirectly    02:20PM

21   involved in that.  I believe -- I'm not involved in

22   the day-to-day occurrences of that.

23        Q.   Do you know who is?

24        A.   Who is involved in day-to-day?

25        Q.   Yes.                                     02:20PM
                                                        542
```

EXHIBIT 31 PAGE 702

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   If anyone would know, it would be Michael
 2  Moore.
 3      Q.   Is there any software that you're aware of
 4  that's used to place or to send E-mails into the
 5  mailbox that receives them based on certain        02:21PM
 6  criteria?
 7           MR. COREY:  Objection:  vague and ambiguous.
 8           THE WITNESS:  Software?
 9  BY MS. TORRES:
10      Q.   Yes.                                       02:21PM
11      A.   Residing where?
12      Q.   Residing anywhere.
13      A.   Anywhere?  We have a gateway that receives
14  all inbound E-mail and one of the functionalities --
15  functions that it serves is content management.     02:21PM
16      Q.   Is there a name for that gateway?
17      A.   We refer to it as IMSS.
18      Q.   Does IMSS stand for anything?
19      A.   Yes, it does.
20      Q.   What does it stand for?                    02:22PM
21      A.   Interscan Messaging Security Suite.
22      Q.   Interscan Messaging Security Suite?
23      A.   That is correct.
24      Q.   What is the function of Interscan Messaging
25  Security Suite?                                     02:22PM
                                                            543
```

EXHIBIT _31_ PAGE _703_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           MR. COREY:  Objection:  scope.

2           THE WITNESS:  It performs four functions.

3     The primary is E-mail relay for all inbound E-mail

4     to Mattel.  The second is it's anti-virus checking

5     of E-mails, anti-spyware and content management.          02:22PM

6     BY MS. TORRES:

7       Q.    What do you mean by "content management"?

8       A.    Content management is it manages -- and it

9     depends on how you have it configured.  It can look

10    at content of inbound E-mail and perform a series of   02:23PM

11    rudimentary functions or actions based on the

12    criteria that you set.

13      Q.    Do you know how the IMSS gateway is

14    configured at Mattel with respect to content

15    management?                                             02:23PM

16      A.    I have a basic understanding of that, yes.

17      Q.    What is your understanding?

18          MR. COREY:  Objection:  scope.

19          THE WITNESS:  The content management is set

20    up with specified key words and inbound E-mails        02:23PM

21    are -- are inspected based on the criteria and

22    actions are performed based on the matching

23    criteria.

24    BY MS. TORRES:

25      Q.    Does the gateway manage content only with      02:24PM

EXHIBIT _31_ PAGE 70.4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    respect to inbound E-mails or does it also have any

2    functionality whatsoever with respect to outbound

3    E-mails?

4        A.   We have another gateway that's configured

5    for outbound.                                    02:24PM

6        Q.   What's the name of that gateway?

7        A.   It's currently IMSS.

8        Q.   So there are two gateways called IMSS?

9             MR. COREY:  Objection:  mischaracterizes the

10   witness' testimony.                              02:24PM

11            THE WITNESS:  They are not called IMSS.

12   That is the software that they use.

13   BY MR. JENAL:

14       Q.   Fair enough.  Do the gateways themselves

15   have any names?                                  02:24PM

16       A.   Yes, they do.

17       Q.   What are their names?

18       A.   We have multiple names.  We have multiple

19   gateways.  Which ones are you referring to?

20       Q.   I'm referring to the ones that we've been  02:25PM

21   talking about that have any content management

22   functionality.

23       A.   We have those gateways in six locations.

24       Q.   What are the names of those gateways?  What

25   do you refer to them as?                         02:25PM

                                                        545

EXHIBIT _31_ PAGE _70.5_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.   The inbound gateways, the one in Phoenix

2   which is our primary, the -- I believe the name of

3   that server is PHXMX60 Baker.

4          MR. JENAL:   6B?

5          THE WITNESS:   That's correct, 60B.          02:26PM

6   BY MS. TORRES:

7     Q.   60 Baker or 60B.   And you said that's the

8   primary inbound gateway?

9     A.   For Mattel, that's correct.

10     Q.   Does that inbound gateway pertain to E-mail   02:26PM

11   only coming into the El Segundo facility?

12     A.   The primary gateway receives E-mail for all

13   of Mattel.

14     Q.   All of Mattel worldwide?

15     A.   Correct.                                      02:26PM

16     Q.   You said you had multiple gateways.   What

17   others are there?

18     A.   We have a secondary gateway inbound.   This

19   was -- the time frame that we're talking about is --

20   can we scope that?   I want to make sure that I'm     02:27PM

21   referring to the right time frame for the IMSS.

22     Q.   Let me ask you this.   Did you have -- did

23   Mattel have the IMSS software on its gateway servers

24   prior to May of 2005?

25     A.   Yes.                                          02:27PM

                                                          546

EXHIBIT _31_ PAGE _706_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.    And did that software perform content

2    management functions?

3        A.    It's my understanding, yes.

4        Q.    How long has Mattel had this setup?

5              MR. COREY:  Objection:  vague.  The content    02:27PM

6    management function or the IMSS installed?  You've

7    got two questions.  You need to clarify this.

8              MS. TORRES:   Fair enough.

9        Q.    How long has Mattel had the IMSS software

10   installed?                                              02:27PM

11       A.    IMSS?  Since December of 2003.

12       Q.    And at that time did the IMSS software

13   perform any content management function?

14       A.    Starting December of '03?

15       Q.    Yes.                                          02:28PM

16       A.    I believe it did.

17       Q.    Is that a "yes"?

18       A.    It is my understanding, yes, that it did.

19       Q.    Did Mattel have any software prior to

20   December of 2003 when it implemented the IMSS          02:28PM

21   software that had any content management

22   functionality?

23       A.    For inbound E-mail?

24       Q.    For inbound E-mail.

25       A.    Not that I recall.                           02:29PM

                                                            547

EXHIBIT 31 PAGE 707

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Is there someone at Mattel who would know

2   that information better than you would -- better

3   than you do?

4      A.   Possibly Jonathan Ouk.

5      Q.   How sure are you that Mattel did not have      02:29PM

6   software that had content management functionality

7   prior to December of 2003?

8      A.   How sure am I?

9      Q.   Yeah.

10     A.   How do you want me to rate that?  By           02:30PM

11  percentage or probability?  Like 100 percent sure?

12  Ninety percent sure?  It's my understanding that

13  they didn't but that's the best of my recollection.

14  I was not -- I was not privy to anything like that.

15  It is my understanding that they did.  I'm not aware  02:30PM

16  that they had any.

17     Q.   I'm trying to -- what I'm trying to get at

18  is are you just not sure or are you fairly sure that

19  they didn't?

20     A.   Well, I'm not 100 percent sure.               02:30PM

21     Q.   But close?

22     A.   Well, you know, I'm not 100 percent sure

23  that they did but to the best of my understanding

24  they did.

25     Q.   We were talking about time frames before.      02:30PM

                                                           548

EXHIBIT 31 PAGE 708

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1            MR. COREY:  And we still haven't gotten to

2    the questions yet.

3            MS. TORRES:  I think this all deals with the

4    questions.

5            MR. COREY:  That wasn't what you're allowed   02:31PM

6    to inquire about, was it?

7            MS. TORRES:  Oh, I think it is.

8            MR. COREY:  So you're following up on

9    questions that haven't been asked yet?  Is that what

10   you're saying?                                        02:31PM

11           MS. TORRES:  No, I think I'm following -- I

12   think I'm following up on questions that deal with

13   the information on which you instructed him not to

14   answer.  And if you want to represent to me that I'm

15   not, you can go ahead and do so but I don't think     02:31PM

16   you can.

17      Q.   Let me ask you this.  Getting back to -- you

18   said you have a secondary inbound gateway.

19      A.   Yes.

20      Q.   And on that secondary inbound gateway is      02:31PM

21   IMSS installed with the same content management

22   functionality?

23      A.   Yes.

24      Q.   Is it a redundant system?

25      A.   It's a fail over.                             02:32PM
```

549

EXHIBIT 31 PAGE 709

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Are there any other inbound gateways?

2    A.   No.

3    Q.   Where is the secondary inbound gateway

4  located?

5    A.   In El Segundo.                              02:32PM

6    Q.   How many outbound -- how many gateways do

7  you have that deal with outbound E-mail traffic?

8    A.   We have six.

9    Q.   Six that deal with outbound?

10   A.   Yes.                                        02:32PM

11   Q.   Where are those located?

12   A.   We have one in Phoenix, one in El Segundo,

13  one in Middleton, Wisconsin, one in Kowloon, China,

14  one in Amstelveen, Netherlands.

15   Q.   I've got Phoenix, El Segundo, Middleton,    02:33PM

16  Wisconsin, China, Netherlands --

17   A.   Just five.   Sorry.

18   Q.   Is one of these considered the primary

19  inbound gateway?

20        MR. COREY:   Outbound?                      02:33PM

21  BY MS. TORRES:

22   Q.   I'm sorry, outbound.   Is one of these

23  considered the primary outbound gateway?

24   A.   For?

25   Q.   For Mattel.                                 02:33PM

550

EXHIBIT _31_ PAGE _710_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    No.

 2      Q.    Is more than one considered a primary

 3  outbound gateway?

 4           MR. COREY:  Objection:  vague.

 5           THE WITNESS:  The way you're phrasing it,    02:33PM

 6  no.

 7  BY MS. TORRES:

 8      Q.    What is the -- what geographic area does the

 9  outbound gateway in Phoenix serve?

10      A.    You want to know all the geographic regions? 02:34PM

11      Q.    Yes.

12      A.    To the best of my recollection, it's

13  Phoenix, it's the majority of the Latin America

14  countries that we service and perhaps the Tokyo

15  office, I believe.                                    02:34PM

16      Q.    What geographic area or areas does the

17  outbound gateway in El Segundo service?

18           MR. COREY:  Objection:  scope.

19           THE WITNESS:  El Segundo.

20  BY MS. TORRES:                                        02:35PM

21      Q.    El Segundo only?

22      A.    To my knowledge, yes.

23      Q.    What geographic regions does the outbound

24  gateway in Middleton, Wisconsin serve?

25           MR. COREY:  Objection:  vague and ambiguous  02:35PM
```

                                                              551

EXHIBIT 31 PAGE 711

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   in scope.

2          THE WITNESS:  I believe it services the

3   American Girl locations.

4   BY MS. TORRES:

5      Q.   The same question for China.                    02:35PM

6          MR. COREY:  Same objections.

7   BY MS. TORRES:

8      Q.   Let me stop.  Do you understand my

9   questions?

10     A.   I believe you're asking me that of the five   02:35PM

11  outbound -- I think that's what you're asking me is

12  for each of the outbound gateways, IMSS gateways,

13  what locations are using it.  Is that what you're

14  asking?

15     Q.   Yes.                                            02:36PM

16     A.   It's based on my answers is what I'm

17  thinking that you're asking.

18     Q.   That is what I'm asking.

19         MR. COREY:  Same objection.

20  BY MS. TORRES:                                           02:36PM

21     Q.   For the outbound gateway in China what

22  locations are using it?

23         MR. COREY:  Same objection.

24         THE WITNESS:  Are you referring to the one

25  in Kowloon?                                              02:36PM

                                                            552

EXHIBIT 3( PAGE 7(2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MS. TORRES:

 2       Q.   Yes.

 3       A.   I believe it services the Kowloon, Hong Kong

 4   and our mainland China sites and possibly some of

 5   the southeast Asia sites.                          02:36PM

 6       Q.   What locations use the IMSS gateway that's

 7   in the Netherlands?

 8            MR. COREY:  Same objections.

 9            THE WITNESS:  The one in Amstelveen?

10   BY MS. TORRES:                                     02:37PM

11       Q.   Yes.

12       A.   I believe that's the European locations.

13       Q.   With respect to inbound E-mail, you said

14   that you had two gateways, correct?

15       A.   That's what I said.                       02:37PM

16       Q.   And one of them is the -- I think you called

17   it a fail-over gateway, correct?

18       A.   Yes.

19       Q.   Are there any similar fail-over gateways for

20   outbound E-mail?                                   02:37PM

21            MR. COREY:  Objection:  vague and scope.

22            THE WITNESS:  Well, it's -- the

23   functionality is not as what you're trying to -- how

24   you're presenting it.  There is no IMSS fail over

25   for outbound the way that you're comparing it to the 02:38PM

                                                             553
```

EXHIBIT 31 PAGE 713

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    inbound.

 2    BY MS. TORRES:

 3        Q.   Why is that?

 4            MR. COREY:  Objection:  scope.  Do you

 5    understand what the topic is?                    02:38PM

 6            MS. TORRES:  Uh-huh.

 7            MR. COREY:  What is it?

 8            THE WITNESS:  I'm having a little difficulty

 9    understanding some of your questions because they're

10    not specific enough.                             02:38PM

11    BY MS. TORRES:

12        Q.   If something happens to the gateway in

13    El Segundo, the outbound IMSS gateway that has the

14    content management functionality on its software, do

15    outbound E-mails get rerouted through some other      02:39PM

16    gateway?

17            MR. COREY:  Objection:  scope.

18            THE WITNESS:  They're supposed to be.

19    BY MS. TORRES:

20        Q.   You started to tell me that you had spoken   02:39PM

21    to Mr. Ouk about the -- about the policy that was

22    implemented in May of 2005, correct?

23        A.   Yes.

24        Q.   What policy is that?

25            MR. COREY:  Objection:  asked and answered.  02:39PM
                                                            554
```

EXHIBIT 31 PAGE 714

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          THE WITNESS:  As I mentioned before, it had

2     to do with the Mailbox Manager retention policy.

3     BY MS. TORRES:

4          Q.    And the policy that was implemented at that

5     time was that the Donahue and Bunion mailboxes would          02:39PM

6     have an indefinite document retention period; is

7     that correct?

8          A.    E-mail retention period.

9          Q.    E-mail retention period.

10         A.    That's correct.                                     02:40PM

11         Q.    Did you talk to Mr. Ouk at all about the

12    criteria by which E-mails are routed to either the

13    Donahue or the Bunion mailboxes?

14         A.    No.

15         Q.    Do you know those criteria?                         02:40PM

16         A.    No.

17         Q.    Who does?

18         A.    The law department.

19         Q.    Michael Moore again?

20         A.    That is my understanding.                           02:40PM

21         Q.    You said earlier you had a very rudimentary

22    understanding of the content management software on

23    the IMSS servers.

24         MR. COREY:  Objection:  mischaracterizes his

25    testimony.                                                     02:41PM

                                                                     555

EXHIBIT 31 PAGE 715

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MS. TORRES:

 2       Q.   Is that what you said?

 3       A.   Well, I have a basic understanding of it.  I

 4   don't manage it day-to-day.  That's why I have my

 5   staff.                                          02:41PM

 6       Q.   Describe for me fully what your

 7   understanding is of the content management.

 8           MR. COREY:  Objection:  scope.

 9   BY MS. TORRES:

10       Q.   Of the content management functionality?  02:41PM

11       A.   Well, as I -- I believe I mentioned that

12   before that, you know, when an E-mail comes in if it

13   matches the criteria, then an action is performed

14   based on the rule set that's created.

15       Q.   Are you familiar with the current rule set  02:41PM

16   in place?

17           MR. COREY:  Objection:  asked and answered.

18           THE WITNESS:  It hasn't changed.  It's the

19   same one.

20   BY MS. TORRES:                                  02:42PM

21       Q.   Same one as on May 18th, 2005?

22       A.   It's the same -- the rule set is if it

23   matches, it performs an action and that's pretty

24   much consistent with what it does today.

25       Q.   Has that been the rule set since         02:42PM
                                                           556
```

EXHIBIT _31_ PAGE _716_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    approximately December of 2003 when the software was

2    implemented?

3          MR. COREY:  Objection:  vague and ambiguous.

4    When you say "rule set," are you referring to the

5    key word criteria or are you referring to the          02:42PM

6    actions undertaken by the software because I think

7    you're missing each other.

8          MS. TORRES:  No, I'm talking about the rule

9    set, the actions.

10         MR. COREY:  Okay --                               02:42PM

11         THE WITNESS:  I believe the rule and the

12   actions are essentially the same.

13   BY MS. TORRES:

14     Q.   You've also mentioned in several of your

15   answers the key word criteria that's used by this      02:42PM

16   software to determine whether or not a particular

17   inbound or outbound E-mail is sent to either the

18   Donahue or the Bunion accounts.  Do you recall that?

19         MR. COREY:  You said that -- objection:

20   vague and ambiguous.                                    02:43PM

21   BY MS. TORRES:

22     Q.   You've told me that inbound and outbound

23   E-mail that meet certain key word criteria are sent

24   to either the Donahue or the Bunion E-mail accounts,

25   correct?                                                02:43PM

                                                             557

EXHIBIT 31 PAGE 717

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   I believe they are sent to just one of the

 2   two.

 3      Q.   One of the two.  You just don't know which

 4   one?

 5      A.   I don't.  I don't know 100 percent, no, I     02:43PM

 6   don't.

 7      Q.   Are you familiar at all with that key word

 8   criteria?

 9      A.   Familiar in what regard?

10      Q.   Do you know what the key words are?          02:43PM

11           MR. COREY:  You can answer that "yes" or

12   "no."

13           THE WITNESS:  No.

14   BY MS. TORRES:

15      Q.   You don't?                                   02:43PM

16      A.   I don't.

17      Q.   Do you know any of the key words?

18           MR. COREY:  You can answer that "yes" or

19   "no."

20           THE WITNESS:  Yes.                           02:44PM

21   BY MS. TORRES:

22      Q.   What are the key words that you know?

23           MR. COREY:  I'm going to instruct you not to

24   answer on privilege grounds.

25   /   /   /                                            02:44PM

                                                              558
```

EXHIBIT _31_ PAGE _718_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MS. TORRES:
 2        Q.   Were the Bunion and Donahue accounts created
 3    at the same time?
 4        A.   No.
 5        Q.   Do you know when they were created?        02:44PM
 6        A.   I don't recall specifically, no.
 7        Q.   Do you recall generally when they were
 8    created?
 9        A.   Generally in what term?  What sense?  What
10    duration?  Like by year?  By day?  By month?        02:44PM
11        Q.   Let's try by year.  Do you know what year
12    either of those accounts were created?
13        A.   It would just be a guess.  I'm not sure.
14        Q.   What's your best guess?
15        A.   My best guess?  For which one?             02:45PM
16        Q.   Either one.  What's your best guess for when
17    Donahue was created?
18             MR. COREY:  Let's take a break for a minute.
19             MS. TORRES:  Let me get his answer.
20             MR. COREY:  Sure.  That's fine.            02:45PM
21             THE WITNESS:  Best guess?  Best guess is '04
22    or '05.
23             MS. TORRES:  Okay, counsel has called for a
24    break.
25             VIDEO OPERATOR:  2:45 we're going off the   02:45PM
                                                                559
```

EXHIBIT _31_ PAGE _719_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    record.

 2                    (Brief recess.)

 3             VIDEO OPERATOR:  We're back on the record.

 4    The time is 3:03 p.m.

 5             MR. COREY:  Before we start, Mr. Kawashima   03:03PM

 6    is going to clarify one or two things.

 7             THE WITNESS:  I wanted to clarify that when

 8    the IMSS rule at that time, it sends the same E-mail

 9    to both the mailboxes, so I stand corrected.  It

10    sends it to the Bunion and the Donahue mailbox, the   03:04PM

11    same E-mail.  And the Bunion one was created on

12    3/19/2004.  That's a pristine mailbox.  And the

13    Donahue one was created on 4/19/2006 and that's the

14    working mailbox.

15    BY MS. TORRES:                                        03:05PM

16        Q.   Did you obtain that information during the

17    break?

18        A.   I did.

19        Q.   From whom did you obtain it?

20        A.   Jonathan Ouk.                                03:05PM

21        Q.   Did you call Mr. Ouk?

22        A.   Yes, I did.

23        Q.   Did you speak to Mr. Ouk about anything

24    other than what you've just told us?

25        A.   I did not.                                   03:05PM
                                                                560
```

EXHIBIT _31_ PAGE _720_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   You testified before the break that the rule
 2  set that we've been talking about hasn't changed
 3  since the SM -- IMSS software was implemented.
 4      A.   Generally speaking the -- what the rule
 5  does, if it finds something it generally, you know,   03:05PM
 6  forwards it to one of these mailboxes.  That --
 7  generally speaking that function hasn't changed.
 8      Q.   Has it changed in any way?
 9      A.   The second mailbox was created and so in
10  that sense a second mailbox was added to the rule,   03:06PM
11  but the same function.  It was the same function
12  though.
13      Q.   If the software was implemented in December
14  of '03 but the first of those two mailboxes was not
15  established until March of '04, to what mailbox were   03:06PM
16  E-mails forwarded prior to March 19th of '04 when
17  the Bunion mailbox was set up?
18      A.   I believe there were some interim mailboxes
19  that were created temporarily.
20      Q.   Do you know the names of those mailboxes?   03:06PM
21      A.   I recall two of them.
22      Q.   What are the names that you recall?
23      A.   One was called Legal and the other one was
24  called TMS.
25      Q.   Did TMS stand for anything?   03:07PM
                                                         561
```

EXHIBIT _31_ PAGE _721_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   I think it did but I don't know what it -- I
2  don't recall what it stood for.

3      Q.   Do you know who had access to the legal
4  mailbox?  Was it the legal department?

5      A.   Yes, I believe they did -- same, legal        03:07PM
6  department.

7      Q.   Anyone else?

8      A.   Not to my knowledge.

9      Q.   Do you know who had access to the TMS
10  mailbox?                                               03:07PM

11      A.   I believe the same -- the same people.

12      Q.   Were they -- were these mailboxes in place
13  at the same time?

14      A.   The -- which ones?

15      Q.   Was the legal mailbox in place at the same   03:07PM
16  time as the TMS mailbox?

17      A.   Yes.

18      Q.   Did one precede the other?

19      A.   Yes.

20      Q.   Which came first?                            03:08PM

21      A.   Legal.

22      Q.   Was legal established in December of '03
23  when the IMSS software was implemented?

24      A.   I believe so.

25      Q.   Do you know whether the legal mailbox still  03:08PM

                                                           562

EXHIBIT 31 PAGE 722

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   exists?

2        A.   It does not.

3        Q.   Does the -- did the TMS mailbox take the

4   place of the legal mailbox?

5        A.   It did.                                    03:08PM

6        Q.   Were the contents of the legal mailbox

7   migrated to the TMS mailbox?

8        A.   I believe it was.

9        Q.   Do you know if the TMS mailbox still exists?

10       A.   I believe it does not.                     03:08PM

11       Q.   Do you know where the contents of the TMS

12  mailbox are now?

13       A.   I believe they were migrated to -- to

14  Bunion.

15       Q.   Do you know what retention policy applied to 03:08PM

16  the legal mailbox when it was in existence?

17       A.   I believe I do.

18       Q.   What retention policy was that?

19       A.   I believe it was a standard default

20  retention policy.                                     03:09PM

21       Q.   The standard default retention policy was 90

22  days auto-delete?

23            MR. COREY:  Objection:  vague and ambiguous.

24            THE WITNESS:  It -- it probably acquired

25  the -- the default policy of mailbox retention of 90  03:09PM

                                                              563

EXHIBIT 31 PAGE 723

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    days.

2    BY MS. TORRES:

3         Q.   What do you mean it probably acquired the

4    default policy of mailbox retention of 90 days?

5         A.   I was thinking of the location of it and it    03:09PM

6    probably -- it probably did -- based on that storage

7    group location it probably did acquire that policy.

8         Q.   So, in other words, the 90-day auto-delete

9    policy that you discussed at your prior deposition

10   in June applied to the legal mailbox that was in       03:10PM

11   existence in December 2003, correct?

12        MR. COREY:  Objection:  mischaracterizes his

13   testimony.

14        THE WITNESS:  It did.

15   BY MS. TORRES:                                          03:10PM

16        Q.   When did the legal mailbox cease existing?

17        A.   I don't remember.

18        Q.   Do you remember --

19        A.   I don't recall.

20        Q.   Do you remember any -- do you remember the    03:10PM

21   year in which it ceased existing?

22        A.   Well, it would have to have been between

23   December of '03 and 3/19/04.  That's the best of my

24   recollection of that.

25        Q.   Were there any -- do you know why the Legal   03:10PM

564

EXHIBIT 31 PAGE 724

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    mailbox ceased to exist or was replaced by a mailbox

2    called TMS?

3        A.    I believe I do.

4        Q.    Why?

5            MR. COREY:  Objection:  scope.                    03:11PM

6            THE WITNESS:  I believe at that time that

7    mailbox being named legal we found that E-mails that

8    were looked at in that mailbox some E-mails had a

9    read receipt associated with it and so by opening

10   the E-mail the sender received a read receipt from    03:11PM

11   legal.

12   BY MS. TORRES:

13       Q.    Was that problematic?

14           MR. COREY:  Objection:  calls for

15   speculation.                                            03:11PM

16           THE WITNESS:  We thought so.

17   BY MS. TORRES:

18       Q.    Why did you think so?

19           MR. COREY:  Other than the obvious?

20           THE WITNESS:  Well, the law department told  03:12PM

21   us that it was an issue.

22   BY MS. TORRES:

23       Q.    The law department did not want the senders

24   of the E-mails that found their way into the legal

25   mailbox to receive read receipts from the Mattel      03:12PM

                                                              565

EXHIBIT 31 PAGE 725

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    legal department.  Is that fair?

2        A.    That is my understanding.

3        Q.    Where was the TMS mailbox -- scratch that.

4              What -- did the 90-day auto-delete policy

5    apply to the TMS mailbox?                          03:12PM

6        A.    Yeah, the mail manager E-mail retention

7    policy also applied to TMS.

8        Q.    The 90-day auto-delete?

9        A.    Yes, the Mailbox Manager retention policy.

10       Q.    Do you know why the TMS mailbox was replaced 03:13PM

11   by the Bunion mailbox?

12       A.    Let me think about that.  You know, I'm not

13   exactly sure.

14       Q.    Do you have any knowledge as to why the TMS

15   mailbox was replaced by the Bunion mailbox?        03:13PM

16       A.    I'm not exactly sure what the issue was like

17   it was for Legal.  That was kind of obvious.  I'm

18   not sure.

19       Q.    Who would know that?

20       A.    Perhaps the law department.              03:13PM

21       Q.    Anyone else?

22       A.    It's just a guess.  Maybe Jonathan Ouk was

23   involved.  I'm not sure.  I know the law department

24   did.

25       Q.    You were not involved in replacing the TMS 03:14PM

                                                         566

EXHIBIT 31 PAGE 726

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    mailbox with the Bunion mailbox?

2         A.    I did not do the work.

3         Q.    Did you supervise the work?

4         A.    In the respect that my staff performed the

5    work and they report to me.                          03:14PM

6         Q.    It was your staff that performed the work?

7         A.    That's correct.

8         Q.    What document -- what E-mail retention

9    policy applied to the Bunion mailbox prior to May

10   18th, 2005?                                           03:14PM

11        A.    I'm sorry, can you ask that question again?

12        Q.    Sure.  What E-mail retention policy applied

13   to the Bunion mailbox prior to May 18th, 2005?

14        A.    I believe it was the 90-day mailbox

15   retention policy.                                     03:15PM

16        Q.    And then beginning May 18th, 2005 that

17   policy was changed so that E-mails in that mailbox

18   were retained indefinitely; is that true?

19        A.    That is my understanding, yes.

20        Q.    Do you know why that was changed?          03:15PM

21        A.    My understanding is to -- to prevent -- as

22   an assurance that no E-mails would be -- would be --

23   that all E-mails would be retained.

24        Q.    Prior to May 18th, 2005, were there any

25   other mailboxes at Mattel that had an indefinite      03:16PM

                                                           567

EXHIBIT _31_ PAGE _727_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    retention policy?

2        A.    Not to my knowledge.

3        Q.    As of May 18th, 2005 -- after May 18th,

4    2005, were there any other mailboxes that had -- to

5    which an indefinite retention policy applied?          03:16PM

6            MR. COREY:   Can I get that read back?

7            THE WITNESS:   Thank you.   The Donahue one.

8    Yes, the Donahue one.

9    BY MS. TORRES:

10       Q.    Any others?                                   03:16PM

11       A.    No, not to my knowledge.

12       Q.    As Mattel's 30(b)(6) representative on

13   E-mail retention from 2000 to the present, is it

14   your testimony that the only two mailboxes that had

15   indefinite retention policies applied to them are      03:17PM

16   the Bunion and Donahue mailboxes?

17       A.    Yes.

18       Q.    And is it your testimony as Mattel's

19   30(b)(6) representative on E-mail retention from

20   2000 to the present that those mailboxes, the Bunion   03:17PM

21   and Donahue mailboxes, had indefinite retention

22   policies only after May 18th, 2005?

23       A.    That is my study, yes.

24       Q.    That is your testimony?

25       A.    That is.                                      03:17PM
                                                             568

EXHIBIT _31_ PAGE _728_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.   What, if anything, was done to retain E-mail

2   in the legal mailbox after 90 days?

3           MR. COREY:   Objection:   vague and ambiguous.

4           THE WITNESS:   After 90 days?

5   BY MS. TORRES:                                    03:18PM

6       Q.   Yes.

7       A.   What was done after 90 days?

8       Q.   Let me repeat my question.

9           What, if anything, was done by Mattel to

10  retain E-mail that was sent to the legal mailbox      03:18PM

11  longer than 90 days?

12          MR. COREY:   Same objections.

13          THE WITNESS:   E-mails were moved out of that

14  mailbox prior to 90 days.

15  BY MS. TORRES:                                    03:18PM

16      Q.   Where were they moved to?

17      A.   I believe they were moved to PST files.

18      Q.   Were there criteria on which it was

19  determined -- let me ask a different question.

20          Were all E-mails in the legal mailbox moved   03:19PM

21  to PST files before the expiration of 90 days?

22      A.   I can't answer that since I didn't perform

23  the function and I was not involved in that -- that

24  activity.

25      Q.   Did you do anything to find out whether all   03:19PM

                                                          569

EXHIBIT _31_ PAGE _729_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    E-mails that were sent to the legal mailbox by

2    virtue of the content management functionality of

3    the IMSS software were retained longer than 90 days?

4        A.   Did I -- did I perform any action to

5    determine that?  Is that what you're asking?        03:19PM

6        Q.   Yes.

7        A.   No, there wasn't anything to warrant that.

8    It wasn't my job.

9        Q.   What do you mean that's not your job?

10       A.   Once it hits the mailbox it's -- it's the   03:19PM

11   person managing the mailboxes responsibility.

12       Q.   You understand as I think you testified

13   earlier that you are here to talk about Mattel's

14   retention of E-mail from 2000 to the present,

15   correct?                                             03:20PM

16       A.   Yes.

17            MR. COREY:  That mischaracterizes the scope

18   of what the witness is here to talk about and you

19   know that.  The witness is here to talk about the

20   ten questions that were within the scope -- which we 03:20PM

21   haven't made it to yet -- the ten questions that

22   were within the scope of the judge's order and

23   reasonable follow-up.

24   BY MS. TORRES:

25       Q.   Mr. Kawashima, you were instructed not to  03:20PM

                                                         570

EXHIBIT _31_ PAGE _730_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    answer several questions at your prior deposition,

2    correct?

3        A.   Yes.

4        Q.   And those questions pertained to the content

5    management functionality of the IMSS software,          03:20PM

6    correct?

7            MR. COREY:  No.  If you want to get the

8    questions out, we can look at the questions.  He's

9    not here -- he's not going to answer questions about

10   what -- should we have him look at the transcript?    03:20PM

11   Should I read the questions into the record?

12           MS. TORRES:  No.

13           MR. COREY:  You don't want to know what the

14   questions are?

15           MS. TORRES:  Are you going to have a           03:21PM

16   speaking objection?  If you are, I'm going to

17   request that Mr. Kawashima leave the room.

18           MR. COREY:  I've made my objection.

19           MS. TORRES:  Okay.  Then you can be quiet.

20       Q.   Can you answer my question?                   03:21PM

21       A.   Would you mind repeating it, please?

22       Q.   Sure.  The questions on which you were

23   asked -- you were instructed not to answer dealt

24   with the subject of Mattel's retention policies --

25   well, they dealt with the content management          03:21PM

                                                              571

EXHIBIT 31 PAGE 731

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    functionality of the IMSS software and the Bunion

2    and Donahue mailboxes; isn't that right?

3         MR. COREY:  I'm going to object on the

4    grounds that it mischaracterizes the questions and

5    the transcripts and I've made my offer to counsel to    03:21PM

6    put the questions and answers on the record.  The

7    witness should not be expected to characterize

8    something that we have in a document in front of us.

9         THE WITNESS:  As I recall the questions that

10   I didn't answer, they were more of a -- a broader     03:22PM

11   nature, not specific like the ones you're asking.

12   BY MS. TORRES:

13        Q.  But they were generally about the process by

14   which Mattel retained E-mails through the

15   functionality we've been describing whereby they    03:22PM

16   get -- they get identified through certain criteria

17   that is keyed into the IMSS software and sent over

18   to the Donahue or Bunion mailboxes; is that right?

19        MR. COREY:  That is a complete

20   mischaracterization of the questions which I will    03:22PM

21   read.

22        MS. TORRES:  You can follow up whenever you

23   want.

24        MR. COREY:  It's not a follow-up issue.

25   It's a characterization of something we have before    03:23PM

                                                        572

EXHIBIT 31  PAGE 732

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    us.

 2         MS. TORRES:  Mr. Corey --

 3         MR. COREY:  Would you like me to read them?

 4         MS. TORRES:  No, I don't.  I'm asking the

 5    witness his understanding of the topics on which he    03:23PM

 6    was instructed not to answer and I'm entitled to an

 7    answer on that.

 8         MR. COREY:  You're making factual

 9    misrepresentations.

10         MS. TORRES:  We will get Judge Infante on      03:23PM

11    the phone right now and I will ask this witness to

12    step out of the room.

13         MR. COREY:  That's fine, because you have

14    had an hour and a half with the witness and we have

15    not yet once gotten to one of the questions that the   03:23PM

16    witness is back to be called to answer.  So if you

17    want to get the judge on the phone, that's fine, but

18    I'm not going to sit here and let you make factual

19    mischaracterizes about the questions and impose an

20    obligation upon the witness to answer those           03:23PM

21    questions.  If you have an argument, let's make an

22    argument to the judge but you don't put the witness

23    in the middle of it.

24    BY MS. TORRES:

25         Q.  You were asked to answer the question what   03:23PM
```

573

EXHIBIT 31 PAGE 733

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    retention policies regarding E-mail are in place at

2    Mattel today.  Can you recall that?

3          MR. COREY:  Can you tell us where you are

4    reading from, Counsel?

5    BY MS. TORRES:                                    03:24PM

6     Q.   Do you recall being asked about the

7    retention policies that are in place at Mattel

8    today?

9          MR. COREY:  Are you reading from someplace

10   specific, Counsel, or not?  Can I get the question   03:24PM

11   read back, please?

12         MS. TORRES:  It's a basic question.

13         THE WITNESS:  I recall that there were

14   questions asked of that nature.

15   BY MS. TORRES:                                    03:24PM

16    Q.   Were you instructed not to answer about any

17   of those questions?

18         MR. COREY:  That's the same objection.  The

19   witness answered all kinds of questions about

20   Mattel's retention policy.                        03:24PM

21         MS. TORRES:  I'm not asking him whether he

22   answered any or was instructed not to answer all.

23   I'm asking him if he was instructed -- if the

24   general subject matter of the questions on which he

25   was instructed not to answer dealt with the       03:24PM

                                                        574

EXHIBIT 31 PAGE 734

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   retention policy in place at Mattel today.
 2           MR. COREY:  Objection:  vague and ambiguous
 3   and argumentative.
 4           THE WITNESS:  There were questions asked
 5   that were specific to some semblance of the content    03:25PM
 6   management that I did not answer.
 7   BY MS. TORRES:
 8      Q.   What semblance of the content management did
 9   you not answer?
10           MR. COREY:  Would you like --                  03:25PM
11   BY MS. TORRES:
12      Q.   What aspects of the content management at
13   Mattel were you instructed not to answer about?  Was
14   it -- let me finish.  Did it deal with the Bunion
15   and Donahue E-mail accounts?                           03:25PM
16           MR. COREY:  I'm going to put the questions
17   in front of the witness.
18           MS. TORRES:  No, you're not.
19           MR. COREY:  I am.  And I'm giving him pages
20   341, 377, 387 --                                       03:26PM
21           MS. TORRES:  We're going to stop the
22   deposition then and we'll get Mr. -- we'll get Judge
23   Infante on the phone.
24           MR. COREY:  Okay, that's fine.
25           MS. TORRES:  Mr. Kawashima, will you step      03:26PM
```

EXHIBIT 31 PAGE 735

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    out of the room.
 2              VIDEO OPERATOR:  Are we going off the
 3    record?
 4              MR. TORRES:  We'll go off the record until
 5    we can see whether Judge Infante is available.    03:26PM
 6              VIDEO OPERATOR:  It's 3:26 -- 3:26 and this
 7    is the end of tape 1.
 8                          (Brief recess.)
 9              VIDEO OPERATOR:  We're back on the record.
10    The time is 3:32 p.m. and this is the beginning of   03:32PM
11    tape 2.  Counselor?
12    BY MS. TORRES:
13        Q.  At your prior deposition you were asked
14    about the multiple retention policies that could be
15    used or employed on the Exchange server at Mattel    03:32PM
16    today, correct?
17              MR. COREY:  Objection:  mischaracterizes his
18    testimony.
19    BY MS. TORRES:
20        Q.  Were you asked about multiple retention       03:33PM
21    policies at your last deposition?
22        A.  I recall that -- I recall a question asked
23    if there was more than one.
24        Q.  And you testified that there were -- there
25    was more than one.                                    03:33PM
                                                            576
```

EXHIBIT 31 PAGE 736

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.   Correct.

2      Q.   In fact, based on your testimony today there

3   are two, correct?

4      A.   Yes.

5      Q.   One being 90-day auto-delete and the        03:33PM

6   other -- which applies only to two mailboxes, the

7   Bunion and Donahue --

8           MR. COREY:  Objection:  mischaracterizes --

9           MS. TORRES:  I'm not finished.

10     Q.   -- being an indefinite retention policy,     03:33PM

11  correct?

12          MR. COREY:  Objection:  mischaracterizes his

13  testimony.

14          THE WITNESS:  Yes.  The first policy is the

15  90-day mailbox retention and the second one has no   03:33PM

16  retention period.  It's indefinite.

17  BY MS. TORRES:

18     Q.   And there are no other policies, correct?

19     A.   That is correct.

20     Q.   You were asked at the last deposition        03:33PM

21  whether there were certain groups of employees for

22  whom one policy applies and the other -- you were

23  asked at the prior deposition whether there were

24  certain groups of employees for whom one policy or

25  the other applies, correct?                          03:34PM
                                                         577
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. COREY:  Are you reading from someplace
 2   specific, Counsel?
 3          MS. TORRES:  I'm reading from his
 4   deposition.  I don't have the page number but it's
 5   in there and you know it's one of the questions.      03:34PM
 6          MR. COREY:  And I'm just trying to follow
 7   along.
 8          MS. TORRES:  2:05 p.m.
 9          MR. COREY:  That's page 399 at 18 through
10   21.                                                   03:34PM
11          THE WITNESS:  Please ask the question again.
12   BY MS. TORRES:
13      Q.  You were asked at your prior deposition
14   whether there were groups of employees for whom one
15   policy applied and other groups of employees for      03:34PM
16   whom the other policy applied, correct?
17      A.  Yeah.  I'm not sure if it was phrased that
18   way but I recall a question similar to that.
19          MR. COREY:  And, again --
20   BY MR. TORRES:                                        03:35PM
21      Q.  The question was:  "Are there certain groups
22   of employees for whom one policy applies and the
23   other applies for the remainder of the employees?"
24          "MR. COREY:  Same instruction."
25          MR. COREY:  And I've put in front of the       03:35PM
                                                               578
```

EXHIBIT 31 PAGE 738

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    witness the question that was just read.

2              THE WITNESS:  Yes.

3    BY MS. TORRES:

4       Q.    Are there certain groups of employees for

5    whom one policy applies but not the other?          03:35PM

6       A.    To -- in reference to this and to the

7    question that was asked about group of employees,

8    specifically I would say it's a yes-and-a-no

9    question.

10      Q.    And it's a yes-and-a-no question because the 03:35PM

11   employees to whom the policy applies -- well, the

12   policy doesn't apply by individual, correct?  The

13   policy applies by mailbox.

14      A.    By storage group.

15      Q.    By storage group.                          03:36PM

16      A.    That's correct.

17      Q.    And the storage group -- the only storage

18   group to which anything other than the 90-day

19   retention or 90-day auto-delete applies are the

20   Donahue and Bunion -- are the mailbox -- the storage 03:36PM

21   group that houses the Donahue and Bunion mailboxes,

22   correct?

23              MR. COREY:  Can I get that read back?

24              (The pending question was read as follows:

25              "Q.    The only storage group          03:36PM

                                                        579

EXHIBIT 31 PAGE 739

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            to which anything other than the
 2            90-day retention or 90-day auto-delete
 3            applies are the storage groups that
 4            houses the Donahue and Bunion mailboxes,
 5            correct?")                              03:36PM
 6            THE WITNESS:  Yes.
 7  BY MS. TORRES:
 8     Q.   This is not -- you didn't talk about the
 9  Bunion and Donahue mailboxes at your last
10  deposition, did you?                             03:37PM
11     A.   No, I did not.
12     Q.   You did not because you were instructed not
13  to answer questions that would have required you to
14  disclose the existence of the Bunion and Donahue
15  mailboxes; isn't that correct?                   03:37PM
16            MR. COREY:  Objection:  argumentative.
17            THE WITNESS:  I am not sure if that would
18  have led to that but --
19            MR. COREY:  And calls for speculation.
20  BY MS. TORRES:                                   03:37PM
21     Q.   But if you had identified the employees to
22  whom the retention policies applied your answer
23  would have been -- your answer would have been what?
24            MR. COREY:  Objection:  calls for
25  speculation and assumes facts.                   03:38PM
                                                          580
```

EXHIBIT 3 1 PAGE 740

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  I'm sorry, I'm a little

 2   confused on that question when you ask employees --

 3   would you mind rephrasing the question, please?

 4   BY MS. TORRES:

 5       Q.   Sure.  Are there employees for whom one      03:38PM

 6   policy applies?  I believe you told me no, right?

 7            MR. COREY:  Objection:  vague and ambiguous

 8   and mischaracterizes his testimony.

 9            THE WITNESS:  I'm sorry --

10            MR. COREY:  I think you need to refer to     03:38PM

11   which specific policy.

12            MS. TORRES:  Fair enough.

13       Q.   Are there employees for whom the indefinite

14   retention policy applies?

15       A.   Are there employees?                         03:38PM

16       Q.   Yes.

17            MR. COREY:  Objection:  vague and ambiguous.

18   BY MS. TORRES:

19       Q.   And your answer to me a few minutes ago, I

20   believe, was no, correct?                             03:38PM

21            MR. COREY:  Same objections.

22            THE WITNESS:  Would you mind if I restate

23   what I think you said or what you're trying --

24   BY MS. TORRES:

25       Q.   Go ahead.                                    03:38PM
```

EXHIBIT 31 PAGE 741

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Would you mind?

2      Q.   Sure.

3      A.   Are you asking me if there are employees

4  that the no E-mail retention policy holds?

5           MR. COREY:  Did you say "holds"?          03:39PM

6           THE WITNESS:  I'm sorry, I believe that's a

7  bad word.  That doesn't apply to that E-mails are

8  held indefinitely.  Are there employees that have

9  mailboxes that have E-mails indefinitely?

10 BY MS. TORRES:                                       03:39PM

11     Q.   Right.  And the answer to that question is

12 no, correct?

13     A.   That is correct.

14     Q.   The only mailboxes to which anything other

15 than the 90-day retention policy applies you've told 03:39PM

16 me are Donahue and Bunion, correct?

17     A.   That is correct.

18     Q.   Stepping back to the period prior to the

19 time in which there was more than one retention

20 policy for E-mails --                                03:40PM

21     A.   Stepping back?

22          MR. COREY:  In time?

23          MS. TORRES:  Stepping back in time, yes.

24     Q.   Prior to May 18th, 2005, there was only one

25 retention policy for E-mails, correct?             03:40PM

                                                        582

EXHIBIT 31 PAGE 742