CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Yes.

2      Q.   And that retention policy --

3      A.   Excuse me, do you mind if I write that down

4   the date?

5      Q.   Sure.                                    03:40PM

6      A.   That's why I keep looking down here.  I want

7   to make sure I've got the right --

8      Q.   I believe that's the date you gave us in the

9   beginning.

10     A.   It is.  I just want to make sure that I      03:40PM

11  don't get the dates mixed up and say something --

12          MR. COREY:  We have a number of dates

13  floating around now.

14          THE WITNESS:  Right.  Okay, I'm sorry.

15  Can you ask the question again, please?            03:41PM

16  BY MS. TORRES:

17     Q.   Prior to the implementation of the

18  indefinite retention on the Bunion -- on the Bunion

19  mailbox, what was done to the E-mails in that

20  mailbox to retain them for more than 90 days, if    03:41PM

21  anything?

22     A.   My understanding is that they were moved to

23  PST files for retention.

24     Q.   Were they all moved to PST files for

25  retention?                                         03:41PM

EXHIBIT 31 PAGE 743

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    I cannot confirm that because I don't know

2  what the process they used to determine what E-mails

3  were relevant or not.

4    Q.    Is it your understanding that there is

5  someone or some group of people who review the          03:42PM

6  E-mails or who prior to May 18th, 2005 reviewed the

7  E-mails in the Bunion mailbox to determine whether

8  or not they were -- they should be moved to a PST

9  file?

10    A.    It's -- it was my understanding that someone 03:42PM

11  from the law department did that.

12    Q.    Is it your understanding that someone from

13  the law department reviewed the E-mails in the

14  Bunion mailbox to determine whether they were

15  relevant to this litigation?                            03:42PM

16    A.    That is my understanding, yes.

17    Q.    Is it your understanding that someone from

18  the law department reviewed those E-mails for any

19  other purpose?

20    A.    I don't know everything they were looking     03:42PM

21  for.

22    Q.    Do you know anything they were looking for?

23    A.    Do I know anything they were looking for?

24    Q.    Yeah.

25    A.    Aside from -- from this case?  I'm not --      03:43PM

584

EXHIBIT 31 PAGE 794

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    I'm not aware of that.  I can't confirm either way

2    because I wasn't involved in that.

3        Q.   Do you know any details whatsoever about the

4    type of E-mails they were looking for as it pertains

5    to this case?                                03:43PM

6            MR. COREY:  You can answer that "yes" or

7    "no."  It's actually vague as well.

8    BY MS. TORRES:

9        Q.   Do you have any information whatsoever about

10   the type of E-mails that the people in the law    03:43PM

11   department were looking for when they reviewed the

12   E-mails in the Bunion mailbox prior to May 18th,

13   2005?

14           MR. COREY:  And you can answer that "yes" or

15   "no."                                        03:44PM

16           THE WITNESS:  Yes.

17   BY MS. TORRES:

18       Q.   What information do you know?

19           MR. COREY:  I'm going to instruct you not to

20   answer on privilege grounds.                 03:44PM

21   BY MS. TORRES:

22       Q.   Is that information -- is the information

23   that you know something you obtained from counsel?

24           MR. COREY:  You can answer that "yes" or

25   "no."                                        03:44PM

585

EXHIBIT 31 PAGE 745

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1            THE WITNESS:  I would say yes.
2   BY MS. TORRES:
3        Q.   Is there any information that you know about
4   the type of E-mails that the people in the law
5   department were looking for when they reviewed the      03:44PM
6   E-mails in the Bunion mailbox prior to May 18th,
7   2005 that did not come from counsel?
8        A.   Information that did not come from counsel?
9   No.
10       Q.   Have you yourself ever reviewed any of the      03:44PM
11  E-mails in the Bunion mailbox?
12       A.   No.
13       Q.   Have you yourself ever reviewed any of the
14  E-mails in any of the PST files that contain E-mails
15  that were once in the Bunion mailbox?                    03:45PM
16       A.   No.
17       Q.   Has anyone in your department reviewed any
18  of the E-mails in any of the PST files that contain
19  E-mails that were once in the Bunion mailbox?
20       A.   Not to my knowledge.                           03:45PM
21       Q.   Is there anyone in your department who has
22  reviewed E-mails in the Bunion mailbox?
23       A.   Not to my knowledge.
24       Q.   Is it fair to say that you do not know what
25  E-mails are in the PST files that we've been talking     03:45PM
                                                             586
```

EXHIBIT _31_ PAGE _746_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   about?

2       A.   Is it fair to say that that's a good

3   assumption?  Yeah, I don't know what's in those

4   mailboxes.

5           MR. COREY:  The PST files.                03:46PM

6           THE WITNESS:  I'm sorry, I stand corrected.

7   Yes, I don't know what's in those PST files.

8   BY MS. TORRES:

9       Q.   So you don't know what E-mails have been

10  retained by Mattel in those PST files?           03:46PM

11      A.   That is correct, I do not know what E-mails

12  are being retained.

13      Q.   But someone at Mattel does?

14      A.   I believe so.

15      Q.   And you believe it's the legal department?  03:46PM

16      A.   That's my understanding, yes.

17      Q.   Michael Moore?

18      A.   He's the one I've been working with, yes.

19      Q.   Did you ask Mr. Moore what E-mails are in

20  the PST files?                                   03:47PM

21          MR. COREY:  Objection:  scope.

22          THE WITNESS:  No, I have not.

23  BY MS. TORRES:

24      Q.   Did you do anything to find out what E-mails

25  are in the PST files that were created to store  03:47PM

587

EXHIBIT _31_ PAGE _747_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   E-mails from the Bunion mailbox prior to May 18th,

2   2005?

3      A.   I have not.

4          MR. COREY:  Same objection.

5   BY MS. TORRES:                                    03:47PM

6      Q.   You talked a little earlier about the -- you

7   talked a little earlier about the criteria by which

8   E-mails are sent to the Bunion and Donahue

9   mailboxes, correct?

10         MR. COREY:  Just to be clear, are you        03:47PM

11  talking about the rule action or are you talking

12  about the key words?

13         MS. TORRES:  I'm talking about the key word

14  criteria.

15         MR. COREY:  Thank you, Counsel.             03:47PM

16  BY MS. TORRES:

17     Q.   Do you recall we -- you mentioned earlier

18  that there are key word criteria by which the

19  software sends E-mails to the Bunion and Donahue

20  mailboxes.  Do you recall that?                    03:48PM

21     A.   Yes.

22     Q.   And I believe you testified earlier that you

23  know some of the key words but not all of them.  Is

24  that accurate?

25     A.   I know a few.                              03:48PM

                                                        588

EXHIBIT 31 PAGE 748

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.   You know a few.  Do you believe that there
2   are more that you don't know?

3          MR. COREY:  Objection:  speculation.

4          THE WITNESS:  I believe I do.  I'm sorry, I
5   don't know -- I only know a few.  That's all I know.   03:48PM
6   Sorry.

7   BY MS. TORRES:

8     Q.   But do you know whether there are, in fact,
9   more key words that you just don't know?

10         MR. COREY:  Objection:  calls for              03:48PM
11  speculation.

12         THE WITNESS:  That is my understanding.
13  BY MS. TORRES:

14    Q.   Have you ever seen a list of those key
15  words?
                                                          03:48PM
16    A.   I may have a long time ago but it was just
17  in passing.

18    Q.   From where did you learn or from whom did
19  you learn the key words that you do know?

20    A.   From whom?
                                                          03:49PM
21    Q.   Yes.

22    A.   From the law department.

23    Q.   From Mr. Moore?

24    A.   I think so, yes.

25    Q.   Is there anyone else in the law department   03:49PM

                                                          589

EXHIBIT __31_ PAGE _749_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   with whom you've discussed the key word criteria by

2   which E-mails are sent to the Bunion and Donahue

3   mailboxes?

4        MR. COREY:  Objection:  assumes facts and

5   mischaracterizes his testimony.                    03:49PM

6        THE WITNESS:  E-mails to the law department?

7   BY MS. TORRES:

8     Q.   Yeah.

9        MR. COREY:  Same objections.

10       THE WITNESS:  Not to my knowledge.           03:50PM

11   BY MS. TORRES:

12    Q.   Does the length -- or does the number of key

13   words used by the IMSS software impair in any way

14   the performance of that software with respect to

15   content management?                               03:50PM

16       MR. COREY:  Objection:  vague and ambiguous

17   and scope.

18       THE WITNESS:  Are you -- are you asking if

19   the length of the key word list affects the

20   performance or accuracy -- I won't put words in your   03:50PM

21   mouth -- of the content management as it resides and

22   functions on the IMSS server?

23   BY MS. TORRES:

24    Q.   Yes.

25    A.   To my knowledge --                          03:50PM

                                                         590

EXHIBIT _31_ PAGE _750_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      MR. COREY:  Objection:  scope.

2      THE WITNESS:  To my knowledge it does not.

3  BY MS. TORRES:

4      Q.   I may have asked you this before and I

5  apologize if I did.  Do you know the names of the        03:51PM

6  PST files that have been created from E-mails that

7  came out of the Bunion mailbox?

8      A.   I do not.

9      Q.   Do you know whether there's more than one?

10     A.   I'm assuming there are more than one.        03:51PM

11     Q.   Why do you assume there are more than one?

12     A.   The mere fact of the -- the size and

13  quantity.  PSTs can hold a finite amount.

14     Q.   Do you know how many -- do you know what the

15  capacity of the PST files is?                            03:51PM

16     MR. COREY:  Objection:  scope.

17     THE WITNESS:  I believe the ones that they

18  are using can go up to 16 gigabytes.

19  BY MS. TORRES:

20     Q.   And you have reason to believe there are        03:52PM

21  more than 16 gigabytes of E-mail that have been --

22  or that have been sent -- put in PST files from the

23  Bunion mailbox?

24     MR. COREY:  Objection:  vague.

25     THE WITNESS:  I have suspicions that they        03:52PM

591

EXHIBIT 31 PAGE 751

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   definitely exceed the 16 gigabytes.

2   BY MS. TORRES:

3       Q.   When they are moved from -- or when they

4   were moved from the Bunion mailbox to the PST files,

5   did they retain -- they retain any meta data or any     03:52PM

6   information other than the source recipients and

7   contents and subject line?

8       A.   E-mails were -- weren't moved out of the

9   Bunion, they were moved out of the Donahue.

10      Q.   Okay.                                           03:53PM

11      A.   But in terms of the meta data such as?

12      Q.   When they were sent.

13      A.   Oh, that's not meta data per se.   That's

14  just basic information that's part of the E-mail.

15  That's not altered pertaining to sent and received      03:53PM

16  dates, time stamps, things like that.

17      Q.   What about when they are read?

18      A.   I don't -- when they're read, I believe it

19  does acquire that information.

20      Q.   The PST file requires --                        03:53PM

21      A.   When read from an Outlook Client, I believe

22  it does.

23      Q.   You said that the PST files are created from

24  E-mails that are moved from the Donahue mailbox,

25  correct?                                                03:54PM

                                                                592

EXHIBIT 31 PAGE 752

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Well, PST files are created manually.   Then

2    files are moved manually into the PST file.

3      Q.   But you said they're moved from the Donahue

4    mailbox, not the Bunion mailbox; is that right?

5      A.   That is my understanding, yes.          03:54PM

6      Q.   The Donahue mailbox did not exist until 2006

7    I believe you said, correct?

8      A.   Yes, 4/19/06.

9      Q.   Was anything done between May 18th, 2005 --

10   well, actually, was anything ever done to preserve   03:55PM

11   E-mails from the Bunion mailbox --

12          MR. COREY:  Objection:  asked and answered.

13   BY MS. TORRES:

14     Q.   -- prior to the establishment of the Donahue

15   mailbox?                                           03:55PM

16          MR. COREY:  Objection:  asked and answered.

17          THE WITNESS:  They were moved to PST files

18   for retention.

19   BY MS. TORRES:

20     Q.   So there were -- there were E-mails in the   03:55PM

21   Bunion mailbox that were moved to PST files,

22   correct?

23     A.   During that time period, yes.

24     Q.   During the time period in which the Donahue

25   mailbox did not exist?                             03:55PM

593

EXHIBIT 31 PAGE 753

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.    Yes, that's my understanding.

2       Q.    And now that the Donahue mailbox exists the

3   Bunion mailbox remains pristine and is not touched

4   by reviewers; is that correct?

5       A.    Yes, that's my understanding.              03:55PM

6       Q.    Do you know whether the key word list that's

7   used to determine which E-mails get sent to the

8   Bunion and Donahue mailboxes has changed over time?

9           MR. COREY:  You can answer that "yes" or

10  "no."                                                03:56PM

11          THE WITNESS:  Yes.

12  BY MS. TORRES:

13      Q.    You do know?

14      A.    Yes.

15      Q.    Has it changed over time?                  03:56PM

16          MR. COREY:  You can answer that "yes" or

17  "no."

18          THE WITNESS:  Yes.

19  BY MS. TORRES:

20      Q.    Has it grown over time?  In other words, has  03:56PM

21  the list expanded?

22          MR. COREY:  You can answer that "yes" or

23  "no."

24          THE WITNESS:  Actually, I -- I believe that

25  the list has changed in size.  I know at one point   03:57PM

                                                         594

EXHIBIT 31 PAGE 754

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    it was large and then was small but I don't know

2    what state it's in today.

3    BY MS. TORRES:

4        Q.   At what point was it large?  What point in

5    time?                                              03:57PM

6        A.   When I say "large," I mean -- you know, I

7    can't answer that.  I don't know the time frame.

8        Q.   When you say "at one point it was large,"

9    what do you mean?  There were a lot of key words on

10   the list?                                          03:57PM

11       A.   It's just -- it's my assumption based on

12   what I -- just what I've been told in passing.  It's

13   more a relative size thing.  I don't know what the

14   count is since I never see the list except for that

15   one time early on in the discussion of this.       03:58PM

16       Q.   Without telling me the contents of the list

17   can you describe the list?  Was it multiple pages?

18   Was it one page?  What do you recall about the list?

19           MR. COREY:  The time that he saw it?

20           MS. TORRES:  Yes.                           03:58PM

21           THE WITNESS:  That one time I saw it?

22       Q.   Yeah.

23       A.   It was just one page.

24       Q.   Did it have one column of key words or did

25   it have multiple columns?                          03:58PM

                                                        595

EXHIBIT _31_ PAGE _755_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   I think it was just one column.

2      Q.   Do you recall when you saw it?

3      A.   I couldn't give you specifics.  I don't

4  know -- I couldn't give you a date and time or

5  anything like that.                              03:59PM

6      Q.   Could you give me a year?

7      A.   Maybe '04.  That's my best guess.

8      Q.   Was it early in '04?

9      A.   You know, I can't tell you.  I don't know.

10     Q.   Were there any changes to either the rule  03:59PM

11  set or the key word criteria that resulted from the

12  change in Outlook, the change in Outlook -- in the

13  versions of Outlook that Mattel used?

14          MR. COREY:  Objection:  vague and ambiguous.

15          THE WITNESS:  Are you asking if Outlook had  04:00PM

16  any -- anything to do with us -- or the law

17  department making changes to the key word list --

18  BY MS. TORRES:

19     Q.   Uh-huh.

20     A.   -- or the rules?  No, Outlook has nothing to  04:00PM

21  do with it.

22     Q.   It's completely independent?

23     A.   That's correct.

24     Q.   You were asked at your prior deposition at

25  2:06 p.m. "Do you know when that second E-mail      04:00PM

596

EXHIBIT 31 PAGE 756

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    retention policy was implemented at Mattel

2    El Segundo?"  And you were instructed not to answer.

3          MR. COREY:  Just for the record that's

4    400 -- page 400, lines 13 through 16, and I'm

5    putting that in front of the witness.          04:01PM

6    BY MS. TORRES:

7       Q.   Is the answer to that question the May 18th,

8    2005 date that you gave me earlier today?

9       A.   Yes.

10      Q.   And that's the date that you got from Mr.   04:01PM

11   Ouk?

12      A.   That is correct.

13      Q.   In preparation for this deposition, correct?

14      A.   That's correct.

15      Q.   You were asked also "Do you know whether   04:01PM

16   that was implemented in response to Mr. Normile's

17   E-mail?"

18          MR. COREY:  That's also on page 400 at lines

19   18 through 19.

20   BY MS. TORRES:                                    04:01PM

21      Q.   And you were instructed not to answer.  Do

22   you see that?

23      A.   Yes, I do.  I'm trying to recollect that.

24   Can you give me a minute?

25      Q.   Sure.                                     04:01PM

                                                       597

EXHIBIT 31 PAGE 757

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   I don't recall if that was related.

2    Q.   You don't know whether the change in policy

3  or the implementation of the indefinite retention

4  policy for the Donahue -- well, it would only be the

5  Bunion E-mail box at that time -- was brought about    04:02PM

6  by Mr. Normile's E-mail sent April 18th, 2005; is

7  that correct?

8    A.   I can't -- I can't confirm that it was

9  created because of that.  I do not recall

10  conclusively.  I don't know.                          04:02PM

11    Q.   What's your best understanding as to why

12  there was a change in policy with respect to E-mail

13  retention on or about May 18th, 2005?

14      MR. COREY:  Objection:  mischaracterizes the

15  testimony, vague and ambiguous.                       04:03PM

16      THE WITNESS:  Based on your question my

17  understanding is the reason why the second policy

18  was created the -- the mailbox was getting pretty

19  big and they were moving the files -- the E-mails

20  over to the PST and it was creating a lot of PST      04:03PM

21  files.  PST files can grow up to 16 gigabytes as I

22  mentioned.  It's hard to manage.  So I believe a

23  decision was made to keep all the mail on the server

24  but in order for it not to get -- you know, for it

25  to be retained indefinitely another policy would      04:04PM

598

EXHIBIT _31_ PAGE _758_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   have to be created to exempt it and I believe

2   that's -- that's what the driving reason to do

3   this -- create the second policy.  To my

4   recollection that's what -- was one of -- that was

5   one of the reasons.                          04:04PM

6       Q.   Are there any other reasons that you're

7   aware of?

8       A.   No, that's the only one that comes to mind.

9       Q.   You testified at your prior deposition 4:46

10  p.m. --                                      04:04PM

11          MR. COREY:  Did you say 4:46?

12          MS. TORRES:  Uh-huh.

13      Q.   You were asked "Leaving aside changes to

14  Mailbox Manager retention policies dictated as a

15  result of Mattel's secretive investigation     04:05PM

16  processes, are you aware of any changes ever made to

17  those mailbox retention policies based on this

18  litigation?"

19          MR. COREY:  Can you hold it for just one

20  second, Counsel?  Okay, and that's 497, 25 through  04:05PM

21  498, 4.

22  BY MS. TORRES:

23      Q.   Do you see that testimony?

24          MR. COREY:  And I'll object that it's

25  argumentative.                               04:05PM

                                                      599

EXHIBIT 31 PAGE 759

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MS. TORRES:  Too late.

2          MR. COREY:  I can object to this one.  I'm

3    not sure what the question is.

4    BY MS. TORRES:

5       Q.   The question is actually do you see that          04:06PM

6    testimony?

7          MR. COREY:  That's really argumentative.

8          THE WITNESS:  I need to see the full context

9    of the question.

10         MR. COREY:  The witness only has in front of 04:06PM

11   him page 498.

12         MS. TORRES:  Fair enough.

13         MR. COREY:  So that he doesn't have the

14   first line.

15         THE WITNESS:  Okay, let me read this.  Can   04:06PM

16   you give me a couple of minutes, please?

17         MS. TORRES:  Certainly.

18      A.   Okay.  Please ask the question again.

19      Q.   Sure.

20         MR. COREY:  Do you see it?                    04:08PM

21         THE WITNESS:  Yeah, I see -- you're pointing

22   out a conflict of what I'm testifying to.

23         MR. COREY:  Just answer the question.

24   BY MS. TORRES:

25      Q.   Go ahead.                                   04:08PM

                                                          600

EXHIBIT 31 PAGE 760

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.   Well --

2           MR. COREY:  No question pending.

3           THE WITNESS:  I'm sorry, I see it.  I see

4   the information here.

5   BY MS. TORRES:                                   04:08PM

6      Q.   And it says here "Are you aware of any

7   changes ever made to those mailbox retention

8   policies based on this litigation?"

9           "A.   Any changes to the 90-day?

10   retention?                                        04:08PM

11          "Q.   Correct.

12          "A.   There was a change due to this

13   litigation."

14          Do you see that?

15     A.   I see that.                                04:09PM

16     Q.   What change was there made due to this

17   litigation?

18     A.   I believe I was thinking about the second

19   policy that was created.

20     Q.   But now you're saying the second policy that 04:09PM

21   was created was not due to this litigation; is that

22   right?

23          MR. COREY:  Objection:  mischaracterizes his

24   testimony.

25          THE WITNESS:  The second policy was created  04:09PM
                                                          601
```

EXHIBIT 31 PAGE 761

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    so that E-mails would be retained on the server

2    because the PSTs were growing too numerous and too

3    large.

4    BY MS. TORRES:

5        Q.    And is it your testimony that that change    04:09PM

6    was made for reasons that have nothing to do with

7    this litigation?

8            MR. COREY:  Objection:  mischaracterizes his

9    testimony.

10           THE WITNESS:  No, it does have to do with it 04:10PM

11   because we needed to retain the E-mails.

12   BY MS. TORRES:

13       Q.    You were retaining them anyway in PST files,

14   correct?

15       A.    Yes, but they were getting too big and it    04:10PM

16   was unmanageable and so we put them on the server.

17       Q.    Where were the PST -- where are the PST

18   files created -- stored?

19       A.    I don't know.

20       Q.    You don't know whether they're stored on the 04:10PM

21   server?

22       A.    I do not know.

23       Q.    Do you know who set up the PST files?

24       A.    The law department.

25       Q.    The law department.  Not your department?   04:10PM

                                                            602

EXHIBIT _31_ PAGE _762_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   That is correct.

2    Q.   You said immediately following that

3  testimony that you were not aware of any global

4  changes that were made to the 90-day Mailbox Manager

5  policy.  Do you see that?                      04:11PM

6    A.   Yes, I do.

7    Q.   Is that testimony accurate?

8    A.   Yes, I'm not aware of any global changes

9  made to the 90-day Mailbox Manager policy, yes.  I'm

10  not aware of any changes.                     04:11PM

11    Q.   Are you aware of any other changes besides

12  global changes to the 90-day Mailbox Manager policy?

13    A.   No.

14    Q.   No?

15    A.   No, I'm not aware of any other changes made   04:11PM

16  to that policy.

17         MS. TORRES:  So we're clear, Mr. Corey, are

18  you instructing him not to answer on the grounds of

19  privilege any questions about the specific key words

20  used to determine which E-mails go to the Bunion and   04:12PM

21  Donahue mailboxes for preservation?

22         MR. COREY:  Yes, I am.  And I understand

23  that that is the same position that MGA has taken.

24         MS. TORRES:  MGA is not being deposed here

25  so I'm not commenting on whether or not that's MGA's   04:13PM

                                                       603

EXHIBIT 31 PAGE 763

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    position.

2         MR. COREY:  And I'm not asking you to

3    comment on it.  I just understand that that's the

4    position the parties have taken consistently.

5    BY MS. TORRES:                                    04:13PM

6         Q.   Do you know whether the key words used to

7    determine which messages go to the Donahue and

8    Bunion E-mail mailboxes are the same for inbound and

9    outbound E-mail?

10        A.   Is the key word list the same for        04:13PM

11   inbound/outbound?

12        Q.   Yes.

13        A.   Yes.

14        Q.   Yes, it is?

15        A.   It is the same.                          04:13PM

16        Q.   Are there E-mails in the Bunion and Donahue

17   mailboxes that are from people outside of Mattel?

18        A.   My understanding is because it's coming in

19   from our inbound gateway into the Internet we all --

20   those E-mails are all from the outside.            04:14PM

21        Q.   And the same is true, there are E-mails in

22   the Bunion and Donahue mailboxes that have been sent

23   from people at Mattel to people not at Mattel,

24   correct?

25        A.   If they match the criteria for the outbound, 04:14PM

604

EXHIBIT 31 PAGE 764

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that would be the case.

2         Q.   You said earlier that you believe there are

3    multiple PST files that have been created as a

4    result of the legal department's review of the

5    E-mails in the Donahue and previously Bunion          04:15PM

6    mailboxes, correct?

7         A.   That is what my understanding is, yes.

8         Q.   Do you have any estimate as to how many

9    there are?

10        A.   How many PSTs?  I do not.                     04:15PM

11        Q.   Do you have any estimate as to how many

12   actual mail messages there are approximately in any

13   of the PST files?

14        A.   I don't have any idea.

15        Q.   Do you have any way to estimate how many     04:15PM

16   mail messages there are approximately in 16

17   gigabytes of storage?

18        A.   No, because it's a function of the size of

19   the E-mail and any attachment that comes in.

20        Q.   Is the rule set that's used by the IMSS      04:16PM

21   software the same for all of -- for all of the

22   gateways?  In other words, all of the gateway

23   servers, do they contain the same rule set?

24        MR. COREY:  And I'm going to ask you to

25   clarify it.  Are you talking about the key words or    04:16PM

                                                                605

EXHIBIT _31_ PAGE _765_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   are you talking about the functionality?

2          MS. TORRES:  I'm talking about the

3   functionality.

4          MR. COREY:  Thank you, Counsel.

5          THE WITNESS:  They are the same.        04:16PM

6   BY MS. TORRES:

7      Q.   They are the same?

8      A.   They're the same.

9      Q.   Are the key words that are used in

10  connection with the software, the IMSS software, the   04:17PM

11  same key words used on all servers, all gateway

12  servers?

13     A.   They are.

14     Q.   So every E-mail that goes out of any Mattel

15  company is checked for certain key words and if they   04:17PM

16  match those key words a copy is sent to the Bunion

17  and Donahue mailboxes, correct?

18     A.   That is what it's supposed to do, yes.

19     Q.   Do you know whether or not there has been

20  any point in time in which that functionality has    04:17PM

21  not worked since it was implemented?

22     A.   I am not aware of that, no.

23     Q.   Is there any other software --

24         MR. COREY:  Can we take -- can we take a

25  break for just one second?                            04:18PM

                                                           606

EXHIBIT 31 PAGE 766

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      VIDEO OPERATOR:  4:18 we're going off the

2  record.

3                    (Brief recess.)

4      VIDEO OPERATOR:  We're back on the record.

5  The time is 4:25.  Counselor?                    04:25PM

6  BY MS. TORRES:

7     Q.   Mr. Kawashima, is there any other software

8  used by Mattel today to do content management or

9  otherwise detect messages containing key words?

10      MR. COREY:  Objection:  scope.              04:25PM

11      THE WITNESS:  We've used from time to time

12  the Nexus tracking search capability from within

13  Exchange.

14  BY MS. TORRES:

15     Q.   Could you describe that capability.       04:26PM

16     A.   It's pretty basic where if you look for any

17  key word or a sender or recipient or a date range

18  the key words would only have to be in the subject

19  line and we would make a best guess as to where it

20  emanated from and then we would run it from that    04:26PM

21  server, the Exchange server, and it would try to

22  find that message and it would just -- the only

23  thing that it tells you is time stamp, to, from and

24  a subject line.

25     Q.   When you say it's the functionality -- basic 04:27PM

607

EXHIBIT _31_ PAGE _767_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    functionality or capability on Exchange, are you

2    talking about a functionality or capability that

3    allows you to search content of messages or just the

4    logs that are created when messages go in or out of

5    the Mattel gateways?                                04:27PM

6        A.    Exchange servers have a message tracking log

7    and the only thing that it's -- it retains is the

8    sender, recipient, time stamp and subject line.

9        Q.    Are those logs called SMTP logs?

10       A.    No, they're message-tracking logs.         04:27PM

11       Q.    Are they called anything other than

12   message-tracking logs?

13       A.    No, that's what they normally are referred

14   to.

15       Q.    What was the purpose of -- of tracking or of 04:28PM

16   searching E-mail or of searching those logs?  Was it

17   to locate messages that might be relevant to this

18   litigation and retain them?

19           MR. COREY:  Objection:  vague and ambiguous

20   and compound.                                        04:28PM

21           THE WITNESS:  It was used just to see if

22   a -- it was just another means to find if a

23   particular message -- you know, a key word in the

24   subject line was sent.  You know, who sent it, where

25   it went, where did it go to, but it was just in the   04:28PM

                                                              608

EXHIBIT _31_ PAGE _76_ 8

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   subject line only.

2   BY MS. TORRES:

3       Q.   Were the domains of the sender or recipients

4   also checked?

5       A.   Yes, that's part of the sender/receiver          04:29PM

6   recipient.

7       Q.   It's not just the subject line, it's any

8   field within those logs?

9       A.   Yeah, it was pretty limited.  It's the

10  date -- you know, the time stamp, the sender's          04:29PM

11  E-mail address, the recipient's E-mail address, the

12  subject line, you know, which servers that it

13  traversed before it was delivered, if any.

14      Q.   When you say which servers it traversed

15  before it was delivered, if any, do you mean servers    04:29PM

16  other than Mattel servers?

17      A.   Well, it could be.  If you're sending from

18  one server and say I'm on one server and you're on

19  another server, it will say that it moved it from

20  server A to server B because they had to, you know,     04:30PM

21  deliver it.  So it will note that it was delivered

22  to server A at a certain time.

23      Q.   Understood.  The servers that it traversed

24  may be servers within Mattel?

25      A.   Uh-huh.                                          04:30PM

                                                            609

EXHIBIT 31 PAGE 769

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   My question is:  Did the log also contain

2    information about servers that were traversed

3    outside of Mattel?

4      A.   Oh, no.  No, just within Mattel.

5      Q.   Do you know when this type of content          04:30PM

6    management was employed?

7           MR. COREY:  Objection:  mischaracterizes the

8    testimony and vague and ambiguous.

9           THE WITNESS:  The message tracking?

10   BY MS. TORRES:                                        04:30PM

11     Q.   Yeah.

12     A.   We wouldn't categorize that as a content

13   management system.  It's message tracking.  The

14   primary reason why it's built into the Exchange is

15   to use it as a troubleshooting tool to ensure that   04:31PM

16   if someone complained that, hey, I didn't get a

17   message, we could prove that it was delivered at a

18   certain time and it hit certain servers.

19     Q.   I understand that the message tracking was

20   used -- message tracking is a functionality within   04:31PM

21   Exchange that exists independent of anything that

22   you do to it manually, correct?

23     A.   That I do --

24          MR. COREY:  Objection:  vague.

25          THE WITNESS:  It's inherent.                   04:31PM

                                                           610

EXHIBIT _31_ PAGE _770_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    BY MS. TORRES:

2        Q.   It's inherent in the system.  But when I

3    asked you a few minutes ago whether there was any

4    other software that Mattel uses today to do content

5    management or otherwise detect key words in messages    04:31PM

6    going in or out of Mattel, you said that there were

7    certain searches done on the message-tracking log

8    from time to time.  Is that -- am I recalling that

9    correctly?

10       A.   When I said "time to time," that is true.    04:32PM

11   We don't rely on it very often.

12       Q.   Was there any -- were there any searches

13   performed on the message tracking logs prior to the

14   implementation of the IMSS software in December of

15   2003?                                                  04:32PM

16           MR. COREY:  Can I get that read back?

17           (The pending question was read.)

18           THE WITNESS:  Yes.

19   BY MS. TORRES:

20       Q.   By whom were those searches performed?        04:32PM

21       A.   Who actually did the work?

22       Q.   Yeah.

23       A.   There was one person that no longer works

24   for Mattel.

25       Q.   Anyone else?                                  04:33PM

                                                            611
```

EXHIBIT 31 PAGE 771

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    I think that a Sergio Hernandez and Jonathan

2    Ouk may have performed some of those searches.

3      Q.    Anyone else?

4      A.    I think I may have done one or two myself.

5      Q.    Anyone else?                                    04:33PM

6      A.    I think that's it that I recall.

7      Q.    Who is the one person no longer at Mattel

8    that you just mentioned?

9      A.    His name was Michael Jhekeire.

10     Q.    Can you spell his last name?                     04:33PM

11           MR. COREY:  Yeah, can you spell his last

12    name?

13           THE WITNESS:  I could be mean and say no.

14    G -- I have to think about this.

15    BY MS. TORRES:                                          04:34PM

16     Q.    You're under oath, remember that?

17           MR. COREY:  And this is a tough one.

18           THE WITNESS:  G-h -- it's a Dutch name --

19    G-h-e-k -- I think it's i-e-r-e.  That's close.

20    That's 99 percent close.                                04:34PM

21    BY MS. TORRES:

22     Q.    When did Mr. Jhekeire leave Mattel?

23     A.    At least one year ago, if not a year and a

24    half.  Approximately between a year and a year and a

25    half ago, I think.                                      04:34PM

                                                                  612

EXHIBIT _31_ PAGE _772_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.    Did Mr. Jhekeire report to you directly or

2  indirectly?

3       A.    Directly.

4       Q.    Do you know where Mr. Jhekeire went after he

5  left Mattel?                                           04:34PM

6       A.    Yes, I do.

7       Q.    Where did he go?

8       A.    He went to Microsoft.

9       Q.    Did Mr. Jhekeire leave Mattel voluntarily to

10  your knowledge?                                        04:35PM

11      A.    Yes, he did.

12      Q.    Is Mr. Jhekeire still at Microsoft?

13      A.    To my knowledge he still is.

14      Q.    When is the last time you talked to him?

15      A.    Maybe four months ago.  Three to four months 04:35PM

16  ago.

17      Q.    And is he located in the Southern California

18  area or is he outside of Southern California?

19      A.    He's still within Southern California.

20      Q.    Do you know where the Microsoft office is?   04:35PM

21      A.    It's -- I think it's next door.  It's here,

22  one of these towers.

23      Q.    Downtown Los Angeles?

24      A.    Yes.

25      Q.    Do I recall correctly that you came from     04:35PM

                                                            613

EXHIBIT _31_ PAGE _773_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Microsoft?

2       A.   Do I have to answer that?

3       Q.   Yes.

4       A.   Yes, I did.

5           MR. COREY:  There's no shame in that.        04:35PM

6           THE WITNESS:  Depends on who you're talking

7   to.

8   BY MS. TORRES:

9       Q.   Does Mr. Jhekeire to your knowledge work in

10  the same facility that you worked at for Microsoft?   04:36PM

11          MR. COREY:  Objection:  vague.

12          THE WITNESS:  Same facility?

13  BY MS. TORRES:

14      Q.   Same building.

15      A.   Well, it's kind of peculiar.  I was a        04:36PM

16  consultant -- that was where I was supposed to

17  report to but never -- I always worked outside so we

18  reported to the same office.

19      Q.   You had the same business address but you

20  didn't necessarily go there?                          04:36PM

21      A.   Thank you.  Yes.

22      Q.   And do you recall what that business address

23  was?

24      A.   I think it was -- you know, it's like 422

25  Colorado Avenue, Santa Monica.  Oh, I'm sorry, ask    04:37PM

614

EXHIBIT _31_ PAGE _774_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    the question again.

2        Q.   Do you recall the business address at

3    Microsoft to which -- you know, that used to be your

4    business address?

5        A.   Because it moved.  When I worked at          04:37PM

6    Microsoft they were in Santa Monica on Colorado

7    Avenue.

8        Q.   And they moved downtown to the best of your

9    knowledge?

10       A.   Yes, about a year, year and a half ago,      04:37PM

11   something like that.

12       Q.   Does Mr. Jhekeire -- is he consultant with

13   Microsoft now?

14       A.   No.

15       Q.   Does he do any work for Mattel?             04:37PM

16       A.   No, he is a technical specialist and he

17   services Mattel as one of his customers.

18       Q.   He does?

19       A.   Yes.

20       Q.   Do you know what searches Mr. Jhekeire did   04:37PM

21   on the message-tracking logs?

22           MR. COREY:  You can answer that "yes" or

23   "no."

24           THE WITNESS:  No.

25   /   /   /                                            04:38PM
```

EXHIBIT 31 PAGE 775

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. TORRES:

2        Q.   You don't?

3        A.   Not specifically, no.

4        Q.   Do you know generally?

5        A.   I only know that he was doing it in support   04:38PM

6    of the law department.   That's all I know.

7        Q.   Do you know how frequently he performed

8    those searches?

9        A.   It appeared to me that it was -- it was

10   often.                                                   04:38PM

11       Q.   Did he perform those searches at any time

12   after December of 2003?

13       A.   Possibly.

14       Q.   To the best of your recollection -- well,

15   you said you searched -- you yourself performed some     04:39PM

16   key word searches on the message-tracking logs,

17   correct?

18       A.   I think I may have.

19       Q.   Do you recall when?

20       A.   Years ago.   It's been so long ago I don't      04:39PM

21   remember the actual year or date.

22       Q.   Was it prior to the implementation of the

23   IMSS software?

24       A.   No, it was after.

25       Q.   It was after.   Do you recall why you           04:39PM

                                                             616

EXHIBIT 31 PAGE 776

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 performed key word searches on the message-tracking

2 logs after the implementation of the IMSS software?

3     A.   You know, it may have been in support of

4 another department.

5     Q.   What do you mean by "another department"?   04:39PM

6     A.   Like another department that wanted to get

7 information.  It wasn't a lot -- I don't only do

8 things for the law department.  It was another

9 department.

10     Q.   Did your searches have anything to do with   04:40PM

11 this case, this litigation?

12     A.   Really, I don't remember.

13     Q.   Did you find any -- were there any hits when

14 you ran your searches?

15     A.   There might have been one.  It was -- yeah,   04:40PM

16 there might have been one.

17     Q.   Did you do anything with that one hit?

18     A.   I might have passed the information on to

19 the requester.

20     Q.   You just don't remember one way or the   04:40PM

21 other?  Are you speculating or do you actually

22 recall?

23     A.   No, I recall running it and then doing a

24 screen shot and then just sending it off, well, this

25 is what I found.  That's about it.   04:40PM

        617

EXHIBIT 31 PAGE 777

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   Do you remember what was in that screen
 2   shot?
 3        A.   No, I do not.
 4        Q.   Do you remember what you searched for?
 5        A.   Specifically, no, I do not.          04:40PM
 6        Q.   Do you remember generally what you searched
 7   for?
 8        A.   It was -- I think it was a user name and
 9   maybe the E-mail address it was sent to.
10        Q.   Do you remember the user name?          04:41PM
11        A.   No.
12        Q.   Do you remember who asked you to do this
13   search?
14        A.   I think it was someone in the Security
15   department.                                      04:41PM
16        Q.   Do you remember who?
17        A.   No, I don't.
18        Q.   Do you have any recollection about the
19   circumstances under which you were requested to do
20   this search?                                     04:41PM
21        A.   I was not aware of it, no.
22             MR. COREY:  Ask the question again.
23   BY MS. TORRES:
24        Q.   Do you have any recollection about the
25   circumstances under which you were requested to do  04:41PM
                                                         618
```

EXHIBIT 31 PAGE 778

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    this search?

2        A.    Do I have a recollection of the

3    circumstances?

4        Q.    Yeah.

5        A.    No.                                    04:41PM

6        Q.    But to the best of your recollection you did

7    a screen shot and brought that screen shot to the

8    requester?

9        A.    I E-mailed it to him.

10       Q.    Did you do anything else with that E-mail?   04:42PM

11       A.    No.

12       Q.    Did you get a response from the person to

13   whom you sent it?

14       A.    I don't recall specifically.

15       Q.    Do you recall generally?                04:42PM

16       A.    Maybe they sent an E-mail saying thank you

17   but, you know, it's like -- but, no, I do not

18   specifically remember getting a reply.

19       Q.    Do you know whether Mr. Jhekeire was

20   performing searches for the legal department in    04:42PM

21   connection with this litigation?  When I say

22   "searches," I'm talking about searching on the

23   message-tracking logs.

24       A.    I believe he was.

25       Q.    For this litigation?                    04:42PM

                                                            619

EXHIBIT 31 PAGE 779

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   That's my understanding.

2      Q.   Do you know what -- do you know whether or

3  not Mr. Jhekeire got any hits in connection with his

4  searches?

5      A.   I can't validate that or not.  I do not          04:43PM

6  know.

7      Q.   You don't know?

8      A.   No.

9      Q.   You don't know what, if anything, was

10  done -- well, do you know whether or not any E-mails     04:43PM

11  were preserved as a result of the key word searches

12  performed by Mr. Jhekeire on the message-tracking

13  logs?

14          MR. COREY:  Objection:  assumes facts.

15          THE WITNESS:  I don't know.                      04:43PM

16  BY MS. TORRES:

17      Q.   You don't know?

18      A.   I don't know.

19      Q.   Did you do anything to find out as Mattel's

20  30(b)(6) representative on E-mail retention since        04:43PM

21  2000 whether or not there were any E-mails preserved

22  as a result of the searches done on the

23  message-tracking logs by anyone?

24      A.   I cannot confirm that -- that any messages

25  were -- were preserved after providing, you know,       04:44PM

                                                                620

EXHIBIT 31 PAGE 780

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   information to whoever asked for it.  I don't know

2   what they did with it.

3       Q.   Did you do anything to find out that

4   information?  In other words, did you ask anybody or

5   did you do any investigation as Mattel's 30(b)(6)     04:44PM

6   representative on E-mail retention since 2000

7   whether or not there are any E-mails preserved as a

8   result of the searches done by anyone on the

9   message-tracking logs?

10      A.   No, I didn't pursue or ask any questions     04:44PM

11  pertaining to that.

12      Q.   Is it your testimony as Mattel's 30(b)(6)

13  representative that Mattel does not know whether any

14  E-mails were preserved as a result of the searches

15  done by anyone on the message-tracking logs?         04:44PM

16      MR. COREY:  Objection:  assumes facts, calls

17  for speculation.

18      THE WITNESS:  I'm not privy to what other --

19  other departments or people do with information we

20  provide them so I can't testify what they did with   04:45PM

21  them.

22  BY MS. TORRES:

23      Q.   That doesn't answer my question.  My

24  question is this.  Is it your testimony as Mattel's

25  30(b)(6) representative that Mattel does not know     04:45PM

621

EXHIBIT 31 PAGE 781

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    whether any E-mails were preserved for this

2    litigation as a result of the searches done by

3    anyone on the message-tracking logs?

4         MR. COREY:  Same objections.

5         THE WITNESS:  I'm sorry, but that's kind of   04:45PM

6    vague when you say "Mattel."  Can you be more

7    specific?

8    BY MS. TORRES:

9         Q.   You understand you're Mattel's

10   representative today, correct?                      04:45PM

11        A.   Yes.

12        Q.   And you understand that you're speaking and

13   giving testimony on behalf of the corporation,

14   Mattel, Inc., correct?

15        A.   That's my understanding, yes.            04:45PM

16        Q.   And so in that capacity giving testimony on

17   behalf of Mattel, Inc. is it your testimony that you

18   speaking as Mattel do not know whether any E-mails

19   were preserved for this litigation as a result of

20   the searches done by anyone on the message-tracking  04:46PM

21   logs?

22        MR. COREY:  Objection:  assumes facts, calls

23   for speculation.

24        THE WITNESS:  You know, you're asking me to

25   testify on what other departments are doing with    04:46PM

                                                          622

EXHIBIT 31 PAGE 782

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    information we provide.  I know that E-mails have

2    been retained which are pertinent to this case.

3    Specific to what was discovered in the tracking log,

4    I was not privy to those specific E-mails that were

5    acquired, if any at all.  If they were, I'm just          04:46PM

6    making an assumption that they retained them, you

7    know, but I cannot speak on behalf of the company

8    saying whether they did or did not.

9            MR. COREY:  Let's take a break.

10           MS. TORRES:  Okay.                                 04:47PM

11           VIDEO OPERATOR:  4:47.  We're going off the

12   record.  This is the end of tape 2.

13                   (Brief recess.)

14           VIDEO OPERATOR:  We're on the record.  The

15   time is 5:07 and this is the beginning of tape 3.        05:07PM

16   Counselor?

17   BY MS. TORRES:

18       Q.  Mr. Kawashima, you've told me about the IMSS

19   software and the software that resides on the

20   Exchange server through which you can search the          05:08PM

21   message logs.  Is there any other software that

22   Mattel has used for purposes of tracking and

23   subsequently preserving E-mails?

24           MR. COREY:  Objection:  mischaracterizes his

25   testimony.                                                 05:08PM

                                                                      623

EXHIBIT 31 PAGE 783

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           THE WITNESS:  I wouldn't consider this a

2    tool but it's a log -- SMTP log file that's on our

3    Exchange Internet gateway.

4    BY MS. TORRES:

5        Q.    And how does the SMTP log file differ from      05:08PM

6    the message-tracking log that you described earlier?

7        A.    The message-tracking log -- I'm sorry, the

8    SMTP log that's on the Internet mail service

9    Exchange server -- and I have to explain that when

10   the IMSS receives the E-mail, it -- it passes it to    05:09PM

11   the first server in the -- within the Exchange

12   environment it passes it to is the IMSS, Internet

13   Mail Server service, which is the Exchange server,

14   also known as a bridge net server.  It receives it

15   in its native SMTP form.  It has to convert it to an   05:09PM

16   Exchange format before it sends it but during that

17   process you can set -- there's different levels of

18   logging from minimal to like verbose.  There's one

19   called archiving where it will take all the

20   pertinent information of an E-mail and all the         05:10PM

21   details of that header information, body of the

22   text, and all those little cryptic information as

23   part of a -- the RFC for an E-mail and put it into a

24   log -- into a log file and it kind of time-stamps it

25   with a file name.  Those -- those -- all those log     05:10PM

                                                              624

EXHIBIT 31 PAGE 784

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    files are in a folder that can be searched because

2    they're all text base.  So you can run a search

3    against those E-mails which are numerous and then

4    extract those and preserve them.  I know it's a long

5    explanation.                                    05:10PM

6        Q.    You said all those log files are in a folder

7    that can be searched or cannot be?

8        A.    They can be because they're all just simple

9    text.

10       Q.    Is there any parts of the E-mail that are    05:11PM

11   not searchable?

12       A.    Attachments.

13       Q.    So you can search the entire contents of the

14   E-mail with that type of -- with that -- in that

15   type of log or using that type of log?            05:11PM

16           MR. COREY:  Object because it

17   mischaracterizes his testimony and vague and

18   ambiguous.

19           THE WITNESS:  The -- anything -- any E-mail

20   that is in a text form, any pieces of -- or portions   05:11PM

21   after an E-mail that's not text base usually is

22   displayed in a bunch of gibberish.

23   BY MS. TORRES:

24       Q.    So little icons or sometimes you see a

25   smiley face in an E-mail, that can't be searched    05:12PM

625

EXHIBIT _31_ PAGE _785_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   because it's not text based?

2       A.   That's correct.

3       Q.   You referred to this type of log as a

4   particular type of log and I can't recall what it

5   is.  What type of log is this that you're talking          05:12PM

6   about now?

7       A.   Oh, it's an SMTP log.

8       Q.   It's an SMTP log but you said that it's

9   archiving --

10      A.   Oh, that's the logging level that you can          05:12PM

11  set for and it's -- I think it's the most verbose.

12  I think it's called archiving or archival, you know.

13  I'm not sure why they call it that but that's the

14  most verbose.

15      Q.   And does Mattel create archival SMTP logs?       05:12PM

16      A.   Does Mattel create --

17      Q.   Are there -- are the SMTP logs that are

18  created by Mattel's servers or by Mattel's systems,

19  are they the type of archival logs that you've just

20  referred to?                                                05:13PM

21      A.   Yeah, I just am a little confused because

22  that's what we're talking about.

23      Q.   Yeah.

24      A.   Yeah, those logs are SMTP logs.  I wouldn't

25  categorize -- I don't want to call them archival          05:13PM

                                                                   626

EXHIBIT 31 PAGE 786

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  because that's just the logging level.

2      Q.   That's the logging level?

3      A.   Right, but it's very verbose.  Verbose logs.

4      Q.   My question is because you said that they

5  can be set at that level and I guess my question        05:13PM

6  really is are they set at the archival level so that

7  the logs are very verbose?

8          MR. COREY:  Objection:  vague as to time.

9          THE WITNESS:  Yeah, what time frame?

10  BY MS. TORRES:                                          05:14PM

11     Q.   Well, let's start with now.  Are they

12  currently set at the archival level?

13     A.   No.

14     Q.   Were they set at the archival level prior to

15  May 15th of 2005?                                       05:14PM

16     A.   I don't believe so.

17     Q.   Do you know when they became set to the

18  archival level?

19     A.   I believe it was prior to December of '03.

20     Q.   Do you recall -- do you know when prior to     05:14PM

21  December of '03 they were set to the archival level?

22     A.   No, I couldn't tell you that.  I don't know.

23     Q.   Do you know when they stopped being set to

24  the archival level?

25     A.   My best guess it would be probably prior --    05:15PM

627

EXHIBIT 31 PAGE 787

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      I mean, after December of '03.

2          Q.   Is there any better estimate than after

3      December of '03?

4          A.   No, because I couldn't give one to you.

5          Q.   Is it your understanding that they were --    05:15PM

6      that the logs were no longer set to the archival

7      level because of the implementation of the IMSS

8      software?

9          A.   That is my understanding, yes.

10         Q.   Did Mattel retain those archival logs?      05:15PM

11         A.   Yes.  As a matter of fact, I just had a

12     conversation with Michael Moore to confirm.

13         Q.   What did -- when did you have that

14     conversation?

15         A.   During the break.                            05:16PM

16         Q.   How long did the conversation last?

17         A.   Oh, I think like five minutes.

18         Q.   What did Mr. --

19             MR. COREY:  What was the question?  Did

20     Mattel retain the logs?                               05:16PM

21             MS. TORRES:  Yes.

22             MR. COREY:  Okay.

23     BY MS. TORRES:

24         Q.   That was the question you answered, correct?

25     Did Mattel retain the logs, the logs that were        05:16PM

                                                              628

EXHIBIT 31 PAGE 788

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    created at the archival level?

 2        A.   Anything that was pertinent they retained.

 3        Q.   What do you mean by "anything that was

 4    pertinent"?

 5        A.   Anything that related to the -- the case my   05:16PM

 6    understanding is that's what they kept.

 7        Q.   Do you know how it was determined what was

 8    related to the case?

 9             MR. COREY:  You can answer that "yes" or

10    "no."                                                  05:16PM

11             THE WITNESS:  No.

12    BY MR. TORRES:

13        Q.   Do you have any understanding as to who

14    would know how it was determined what was pertinent

15    on those logs to the case?                             05:17PM

16        A.   Yes.

17        Q.   Who?

18        A.   It would be Michael Moore.

19        Q.   Did you call Mr. Moore during the break?

20        A.   Yes, I did.                                   05:17PM

21        Q.   I assume you didn't see him in person.

22        A.   Yes.

23        Q.   And I assume he didn't call you because

24    presumably he wouldn't know you were on break so you

25    called him?                                            05:17PM
                                                             629
```

EXHIBIT 31 PAGE 789

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   I called him, yes.

2      Q.   Why did you call him?

3      A.   To confirm about the -- you know, retaining

4    information.  I just wanted to make sure that -- I

5    wanted to corroborate that things which we              05:17PM

6    discovered were the things that he, you know,

7    retained if it were pertinent to the case.  It was a

8    follow on to the questions you asked.

9      Q.   And what did Mr. Moore tell you?

10     A.   Yes, he has retained -- he retained any          05:18PM

11   information -- all E-mails which are pertinent to

12   this case.

13     Q.   But he did not tell you, I take it, what he

14   considered to be pertinent to this case?

15     A.   That's correct.                                  05:18PM

16     Q.   So you don't know what E-mails were

17   preserved for purposes of this case other than those

18   that Mr. Moore considered to be pertinent?

19          MR. COREY:  Can I have that read back?

20          (The pending question was read.)               05:18PM

21          MR. COREY:  Objection:  speculation.

22          THE WITNESS:  I apologize.  Repeat your

23   question again.

24   BY MS. TORRES:

25     Q.   The question is:  So you don't know what        05:18PM
                                                            630

EXHIBIT 31 PAGE 790

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   E-mails were preserved for purposes of this case
 2   other than E-mails that Mr. Moore considered to be
 3   pertinent?
 4       A.   Yes, I don't know.
 5       Q.   But your understanding is that someone at    05:19PM
 6   Mattel knows and that person is likely to be
 7   Mr. Moore, it's just not you?
 8       A.   That is correct.
 9           MR. COREY:  The criteria that were used to
10   be clear.  Your question didn't have a subject.      05:19PM
11           MS. TORRES:  The subject was what E-mails
12   were preserved.
13           MR. COREY:  I know, but you had an undefined
14   pronoun in your question.  I just want to make sure
15   the record is clear.                                 05:19PM
16           MS. TORRES:  I appreciate you trying to
17   qualify but I'm not sure what you're trying to
18   qualify -- I'm sorry, wrong word.  -- clarify.
19           MR. COREY:  What was the question?
20           MS. TORRES:  The first question was:  "So    05:19PM
21   you don't know what E-mails were preserved for
22   purposes of this case other than E-mails that
23   Mr. Moore considered to be pertinent?"
24           "A.   Yes, I don't know.
25           "Q.   But your understanding is             05:20PM
                                                          631
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        that someone at Mattel knows?

2            And the answer to that question

3    is the subject or the object.

4        "Q.   And that person is likely to

5    be Mr. Moore.  It's just not you?          05:20PM

6        "A.   That is correct."

7        MR. COREY:  I just want to clarify --

8    BY MS. TORRES:

9    Q.   Is that accurate?

10       MR. COREY:  -- that it relates to the   05:20PM

11   E-mails that were preserved?

12       MS. TORRES:  Yes.  Now I will get to your

13   question.

14   Q.   Do you know what criteria Mr. Moore used to

15   determine what E-mails were pertinent to this case?   05:20PM

16       MR. COREY:  You can answer that "yes" or

17   "no."

18       THE WITNESS:  No.

19   BY MS. TORRES:

20   Q.   You don't know one way or the other?   05:20PM

21   A.   No.

22   Q.   But presumably Mr. Moore knows?

23   A.   That's a fair assumption, yes.

24   Q.   Did Mr. Moore tell you anything other than

25   he preserved the E-mails that he believed to be   05:21PM

632

EXHIBIT _31_ PAGE _792_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    pertinent to this case during your conversation just

2    now?

3        A.    Did he -- sorry, one more time.

4        Q.    Did Mr. Moore tell you anything other than

5    that he preserved the E-mails that he believed to be    05:21PM

6    pertinent to this case?

7        A.    No.

8        Q.    Did you have -- did your conversation during

9    the break with Mr. Moore pertain to any other

10   subject matter?                                          05:21PM

11       A.    No.

12       Q.    How long did the conversation last?

13       A.    It must have been about five minutes, I

14   suppose.

15       Q.    Did you tell Mr. Moore anything?  Did you     05:22PM

16   tell Mr. Moore anything about your testimony today?

17   Just "yes" or "no."

18       A.    Is it -- I'm sorry, is it fair for me to ask

19   a question?  I mean, anything about the testimony.

20   I asked him a question about, you know, like the        05:22PM

21   tracking logs and, you know, being the

22   representative and him -- and him retaining E-mails

23   that were pertinent.

24       Q.    Okay.

25       A.    That was the scope of what I discussed with   05:22PM

633

EXHIBIT 31 PAGE 793

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    him.

2        Q.    And tell me everything you recall that

3    Mr. Moore told you in response to your questions.

4        A.    Oh, he said that -- that when he received

5    the -- the information whether from the logs or the          05:23PM

6    message tracking that he preserved all pertinent

7    information.

8        Q.    Did he say it in those words or are you

9    paraphrasing?

10       A.    No, it was -- it wasn't verbatim in the           05:23PM

11   sense that that's what he said but he said, yes, he

12   preserved all pertinent information.   That -- that

13   in itself is what he said.

14       Q.    Do you remember the exact words that he used

15   a few minutes ago during your conversation?                 05:23PM

16       A.    Verbatim?   No.

17       Q.    Do you remember anything specific during

18   your five-minute conversation that Mr. Moore said

19   other than that he preserved all pertinent

20   information?                                                 05:23PM

21       A.    No, we talked about the log files.   You

22   know, that was just confirming that the log files

23   that were on the SMTP was my understanding of what

24   SMTP log files were so we were on the same page on

25   that which I described to you what they were.   You          05:24PM

                                                                    634

EXHIBIT 31 PAGE 794

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    know, the verbose logging and what they contained

2    and he confirmed that, yes, I saw the body of text

3    and he went through and reviewed them and retained

4    anything that was pertinent.

5        Q.   He himself, Mr. Moore?                    05:24PM

6        A.   He was speaking as if it was him, yes.

7        Q.   Did he give you any sense as to the volume

8    of E-mail that he reviewed or the volume of E-mails

9    reflected on the SMTP logs that he reviewed?

10       A.   I think he said a lot.                    05:24PM

11       Q.   Was he any more specific than "a lot"?

12       A.   No, it was just a lot.

13       Q.   Did he tell you what he did with any of

14   those -- any of the -- well, did he describe for you

15   or do you know from any source whether or not the    05:25PM

16   E-mail messages themselves that were reflected on

17   the log were preserved?

18            MR. COREY:  Objection:  vague.

19            THE WITNESS:  Are you referring to going to

20   that mailbox and preserving the E-mail?             05:25PM

21   BY MS. TORRES:

22       Q.   I'm referring to any method of preservation

23   known to man or to you.

24       A.   Well, actually, we didn't discuss that in

25   the conversation.                                   05:25PM

                                                         635

EXHIBIT 31 PAGE 795

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. COREY:  How about known to Mattel?

 2          THE WITNESS:  And -- and to Mattel?  That's

 3  a possibility that they could have done that.  They

 4  had the wherewithal to do that.  And -- I'm sorry.

 5  BY MS. TORRES:                                    05:25PM

 6     Q.   No, finish.

 7     A.   And understanding the process of the law

 8  department it's customary to -- to do that.

 9     Q.   What do you mean by "understanding the

10  process of the law department it's customary to do  05:26PM

11  that"?

12     A.   Well, you know, I've been working with the

13  law department for -- for a number of years and, you

14  know, they're very strict about preserving pertinent

15  information.  So when there's something pertinent,   05:26PM

16  there are requests made of my group to -- to assist

17  in, you know, preserving that information.  It's

18  consistent.

19     Q.   Has Mr. Moore ever made a request of anyone

20  in your group to preserve E-mails as a result of     05:26PM

21  anything found on an SMTP log?

22     A.   Personally I can't testify that -- I wasn't

23  part of that conversation that happened.  More than

24  likely I'd say that would have happened but I wasn't

25  privy to any conversations like that between my      05:27PM
```

636

EXHIBIT _31_ PAGE _796_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    staff and him.

2        Q.   Do you know if, in fact, any such

3    conversation actually occurred?

4        A.   It's probably highly likely that it did.

5        Q.   The question is not how likely it is, my          05:27PM

6    question is do you know of a conversation?  Do you

7    have any knowledge, either firsthand knowledge or

8    knowledge you learned as a -- you know, in

9    connection with your role as a 30(b)(6) witness,

10   that a conversation took place between Michael Moore   05:27PM

11   and anyone in your department in which Mr. Moore

12   asked one or more persons in your department to

13   preserve E-mails that were identified through any

14   review or search of the SMTP logs?

15       A.   I can't -- I can't testify to that as an        05:28PM

16   eyewitness.  No, I cannot.

17       Q.   Can you testify to that as a 30(b)(6)

18   witness?

19           MR. COREY:  That means as a Mattel

20   representative.                                          05:28PM

21           MS. TORRES:  Yes.

22           THE WITNESS:  That Michael Moore asked one

23   of my staff to -- to preserve E-mails?  That I can.

24   BY MS. TORRES:

25       Q.   You cannot?                                     05:28PM

                                                                   637

EXHIBIT _31_ PAGE _797_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   No, I can as a -- as a representative?

2      Q.   Yes.

3      A.   And understanding the process and what I've

4   seen in the past, even though I can't specify date

5   and time and the specifics of any request I know the      05:28PM

6   process is consistent and I know what happens so I

7   can say that it probably did happen.

8      Q.   Is your testimony based solely on your

9   understanding of what typically happens in

10  connection with the legal department's review of        05:29PM

11  SMTP logs or is it based on some other information?

12     A.   Well, it's based on my understanding of

13  their process, the number of times that we've

14  actually extracted E-mails per request of several

15  departments.  The law department is one of them.  So      05:29PM

16  it's not abnormal, it's more of a standard operating

17  procedure that we are used to doing.  So in that

18  regard I'm very confident that if there's an E-mail

19  that needs to be preserved that they would have

20  asked to do it in that fashion.                           05:30PM

21     Q.   Fair enough.  Did you do anything as a

22  Mattel representative to confirm that, in fact, any

23  E-mails were preserved as a result of Michael

24  Moore's or the legal department's review of the

25  archival SMTP logs?                                       05:30PM

                                                              638

EXHIBIT 31 PAGE 798

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.    That's a long question there.  Did I do

2    anything to confirm that an E-mail was preserved

3    based on the SMTP log?  So are you implying -- are

4    you directly indicating that an action was performed

5    to go get that E-mail?  Can I testify as a fact?  I        05:31PM

6    can testify as a representative that that is the

7    standard operating procedure.

8        Q.    I understand what the standard operating

9    procedure is because you've said that several times.

10   My question is whether, in fact, you know for a fact    05:31PM

11   that the standard operating procedure was followed

12   here and that any E-mails were actually preserved

13   that were identified by Michael Moore or someone

14   else in the legal department as a result of

15   reviewing the SMTP logs that we've been talking        05:31PM

16   about.

17       A.    I'm confident that they probably did that.

18       Q.    I don't care what you're confident that they

19   probably did.  I'm asking you whether as Mattel's

20   representative it's your testimony that, in fact,        05:31PM

21   they did?

22            MR. COREY:  They were preserved.

23            THE WITNESS:  That they were preserved?

24   BY MS. TORRES:

25       Q.    Yes.                                            05:32PM

                                                                639

EXHIBIT _31_ PAGE _799_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Based on my knowledge I would say yes.

2    Q.   What knowledge are you basing it on?

3  Anything other than standard operating procedure?

4    A.   It's empirical knowledge of just working

5  with them throughout the years and what they -- what    05:32PM

6  they have done.  I'm not there to witness every

7  single action they perform so you're asking me to

8  be -- to testify to everything that they do.  I

9  can't do that.  But I know what they do in terms of

10 being consistent in what they do.                       05:32PM

11   Q.   You know what they do as part of the

12 standard operating procedure, correct?

13   A.   I'm fairly aware of that.

14   Q.   Yes.  Do you know whether the standard

15 operating procedure was, in fact, followed in this      05:32PM

16 case and as a result E-mails were actually preserved

17 that were identified from the SMTP logs?

18   A.   Based on my conversation with Michael during

19 the break, he confirmed that any pertinent E-mails

20 that were found in SMTP logs are preserved.             05:33PM

21   Q.   He told you that the E-mails were preserved,

22 not just the logs themselves?

23   A.   I know we were talking about the logs and we

24 were talking about E-mail.  He says that he

25 preserved any pertinent information pertaining to       05:33PM
                                                          640

EXHIBIT _31_ PAGE _800_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    those logs.  From my recollection that's what I --

2    that's part of what I recall.

3         Q.   But you don't recall him saying whether or

4    not he preserved the actual E-mails as opposed to

5    the pertinent information from the logs?          05:33PM

6         A.   I don't think he may have worded it the way

7    that you have but the sense that I got was, yeah,

8    that he has all the pertinent E-mails and

9    information, whether it's the logs or the E-mails.

10        Q.   You say that's the sense you got but every   05:34PM

11   time I've asked you this question as to what he told

12   you you've told me that he told you that he

13   preserved pertinent information pertaining to the

14   logs.  So my question is just designed to find out

15   whether or not you have any confirmation as Mattel's   05:34PM

16   representative that the specific E-mails themselves

17   were preserved and not just pertinent information

18   from the logs?

19        A.   Based on what he told me, it is my

20   understanding that any information that's pertinent   05:34PM

21   that he discovered from the logs that what they

22   normally do is follow up and get the E-mails from

23   the mailboxes that he has.

24        Q.   Did he tell you that that's what he did;

25   that they would follow up and get the E-mails from   05:35PM

                                                          641

EXHIBIT _31_ PAGE _801_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the mailboxes?

2        A.   Not in those words.

3        Q.   What words did he use?

4        A.   That he -- that he keeps all pertinent

5    information, E-mails and logs, so that's my                05:35PM

6    understanding that that's -- they look at the

7    mailbox and extract pertinent E-mails.

8        Q.   And that's what he said to you; that I keep

9    all -- or Mattel keeps all pertinent information,

10   both E-mails and logs?                                      05:35PM

11       A.   That's what I believe I understood.

12       Q.   That's what you understood.  Is that what he

13   told you?

14       A.   He used the words "E-mails and logs."

15       Q.   He did?                                            05:35PM

16       A.   Yes.

17       Q.   Did he give you any sense as to the quantity

18   of E-mails?  Oh, you told me it was a lot; is that

19   right?

20       A.   Uh-huh, it's a lot.                                05:36PM

21           MR. COREY:  Objection:  mischaracterizes his

22   testimony.

23   BY MS. TORRES:

24       Q.   Let me ask you this question then from

25   scratch.                                                    05:36PM

                                                                642

EXHIBIT _31_ PAGE _802_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1         Did he give you any sense as to the quantity

2    of E-mails that he -- well, did he give you any

3    sense as to the quantity of E-mails that he

4    preserved in connection with his review of the logs?

5         A.   He didn't give a numerical value.          05:36PM

6              MR. COREY:  Did you say did or did not?

7              THE WITNESS:  He did not give me a number.

8    BY MS. TORRES:

9         Q.   What did he say about the quantity of

10   E-mails that he has preserved as a result of a        05:36PM

11   review of the logs?

12        A.   He -- he retained and preserved all

13   pertinent E-mails, logs -- information.

14        Q.   But did he say anything about how many

15   those -- how many E-mails there were that he          05:37PM

16   preserved?

17        A.   No, he didn't.

18        Q.   Nothing?

19        A.   He didn't say 100 or 1,000.

20        Q.   Did he give you any measure at all?         05:37PM

21        A.   "A lot" and "all."

22        Q.   He used the words "a lot" and "all"?

23        A.   I believe he did also -- we talked about the

24   actual logs that were extracted and they were in

25   folders by the week and he says there are a lot of    05:37PM
                                                           643

EXHIBIT 31 PAGE 803

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    them in there that he has to go through.

2        Q.    Is the search that's performed on the -- or

3    that was performed on the SMTP log, is it still

4    being performed today?

5        A.    No.  As I indicated, we turned it off        05:37PM

6    sometime after December of '03.

7        Q.    Was the search that was performed prior to

8    December -- prior to the time it was turned off in

9    December of '03 done on a weekly basis?

10       A.    I believe so since the actual folders that    05:38PM

11   were collected were dated by week.

12       Q.    Do you know when Mattel began conducting

13   searches on the SMTP archival logs?

14       A.    I don't recall.  I don't know.

15       Q.    Do you have any information about when        05:38PM

16   Mattel began searching the SMTP logs that we've been

17   discussing?

18       A.    I couldn't tell you how many months or when

19   it started.

20       Q.    Could you tell me what year?                  05:38PM

21       A.    I believe it was in '03.

22       Q.    And what -- what do you base that answer on?

23       A.    The -- the amount of interaction that I've

24   had with the law department.

25       Q.    What do you mean by that?                     05:39PM

644

EXHIBIT _31_ PAGE _809_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. COREY:  And don't disclose any
 2    communications between you and counsel.
 3          THE WITNESS:  The amount of requests that
 4    were made of my staff and myself.
 5    BY MS. TORRES:                              05:39PM
 6       Q.   You started as a Mattel employee in
 7    September of 2003; is that correct?
 8       A.   October of '03.
 9       Q.   Did you interact with the law department at
10    all prior to the time you became a Mattel employee?  05:39PM
11          MR. COREY:  Objection:  scope.  I'm not sure
12    what this has to do with anything.  We've been here
13    a really long time and I've given you a really
14    long -- I've been lenient.  Are we about finished?
15          THE WITNESS:  Not that I recall.        05:39PM
16          MS. TORRES:  If he doesn't remember when it
17    started and he can't possibly remember if it started
18    prior to October 2003, my question is is there --
19    I'm trying to find out if he has any relevant
20    information prior to October of 2003.          05:40PM
21          MR. COREY:  He's answered the question.
22    BY MS. TORRES:
23       Q.   To your knowledge was Mattel reviewing the
24    SMTP logs prior to your becoming a Mattel employee?
25       A.   I don't know.                        05:40PM
                                                      645
```

EXHIBIT _31_ PAGE _805_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   You don't know one way or the other?

2      A.   No, I wasn't -- I wasn't there -- I wasn't

3   privy to that information.

4      Q.   Did you do anything as -- did you do

5   anything in preparation for your deposition today to    05:40PM

6   find out when Mattel began reviewing the SMTP logs

7   for information in E-mails that may be pertinent to

8   this case?

9          MR. COREY:  Objection:  scope.

10          THE WITNESS:  Pertaining to when we were    05:41PM

11   reviewing -- did I do anything to prepare to testify

12   as to when we started reviewing the SMTP logs?  That

13   particular one, no.

14   BY MS. TORRES:

15      Q.   Did you do anything to learn when Mattel    05:41PM

16   began retaining E-mail based on its review of SMTP

17   logs?

18          MR. COREY:  Objection:  scope.

19          THE WITNESS:  No, I don't -- I didn't do

20   anything -- I didn't do anything actually regarding    05:41PM

21   that.

22   BY MS. TORRES:

23      Q.   And you don't know when Mattel began

24   retaining E-mail based on its review of the SMTP

25   logs?                                              05:42PM

                                                            646

EXHIBIT _31_ PAGE _806_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. COREY:  Objection:  scope.

2          THE WITNESS:  I only recall what transpired

3    since the time that I started full time at Mattel.

4    BY MS. TORRES:

5          Q.   And you don't know anything about Mattel's          05:42PM

6    practices with respect to retaining E-mail prior to

7    the time that you started at Mattel?

8          A.   I can't testify to that.  I don't know.

9          MR. COREY:  Objection:  scope.

10   BY MS. TORRES:                                                  05:42PM

11         Q.   You can't testify as the company's

12   representative as to what Mattel did to retain

13   E-mail prior to October 2003 when you became a

14   Mattel employee?

15         MR. COREY:  Objection:  scope and                        05:42PM

16   mischaracterizes his testimony.

17         THE WITNESS:  I can't testify as to what

18   their practices were prior to October 2003.

19   BY MS. TORRES:

20         Q.   Is there any other software or methodology          05:43PM

21   by which Mattel reviews E-mails for purposes of

22   retaining them for this litigation?

23         A.   Ask the question one more time, please.

24         Q.   Is there any other software or methodology

25   by which Mattel reviews E-mails for purposes of               05:43PM

                                                                    647

EXHIBIT 31 PAGE 807

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    retaining them for this litigation?

2        A.    Currently or -- what time frame are we

3    speaking to?

4             MR. COREY:  For purposes of the litigation.

5    BY MS. TORRES:                                    05:43PM

6        Q.    For purposes of the litigation at any point

7    in time.

8        A.    Let me think about that just to make sure

9    I --

10            MR. COREY:  And I'll object on scope        05:43PM

11   grounds.

12            THE WITNESS:  The only thing that I can

13   think of is it's -- it uses the same rule set.  We

14   just -- we replaced the IMSS with another type of

15   gateway but it performs the same function.          05:44PM

16   BY MS. TORRES:

17       Q.    What type of gateway do you --

18       A.    It's called an Ironport.

19       Q.    Iron Port, two words?

20       A.    It's one.                                 05:44PM

21       Q.    When did you do that?  When did Mattel do

22   that?

23       A.    I'd say about six months ago.  It's been an

24   incremental upgrade.

25       Q.    Did that change have anything to do with the 05:44PM

                                                         648

EXHIBIT _31_ PAGE _808_