CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    litigation?

2        A.    No, this is more for performance.

3        Q.    When you say "performance," do you mean

4    performance pertaining to functionality other than

5    the content management that we've been discussing          05:45PM

6    today?

7        A.    It's able to process more E-mails since we

8    get more E-mails and spam.

9        Q.    Is there anything -- any other software or

10   methodology by which Mattel reviews E-mails for           05:45PM

11   purposes of this litigation?

12           MR. COREY:  Objection:  scope.

13           THE WITNESS:  I can't think of anything

14   else.

15   BY MS. TORRES:                                            05:45PM

16       Q.    Does Mattel employ -- does Mattel employ any

17   key stroke logging software?

18           MR. COREY:  Objection:  asked and answered

19   and scope.

20           THE WITNESS:  No.                                 05:45PM

21           MR. COREY:  Now we're plowing old ground.

22   Are we finished?  The witness has been asked these

23   questions before.  Actually, twice.

24           MS. TORRES:  I won't ask that question then.

25   We're done.  He said no.                                  05:46PM

                                                                    649

EXHIBIT  31  PAGE  809

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   Can you -- does Mattel do anything to

2    monitor inbound or outbound E-mail to -- through any

3    account used by a Mattel employee other than a

4    Mattel account?

5            MR. COREY:  Objection:  scope, vague and      05:46PM

6    ambiguous and this has also been asked and answered

7    as Mr. Jenal can confirm.  Come on, Jim.

8            MR. JENAL:  Not for this.  That question was

9    not asked.

10           MR. COREY:  Absolutely.                       05:46PM

11           THE WITNESS:  Can you ask that question in a

12   different way or just repeat it?  I want to make

13   sure I understand what you're asking.

14   BY MS. TORRES:

15       Q.   I know that you testified that people now    05:46PM

16   cannot access -- people at Mattel cannot now access

17   third-party E-mail accounts, right?  I do know you

18   were asked that at your last deposition.

19       A.   Okay, you're referring to Web-based mail --

20   accessing Web-based mail inside Mattel external to    05:47PM

21   the Internet?  Is that what you're talking about?

22       Q.   Yes.

23       A.   We block -- we block that.

24       Q.   Is there any way you can configure Outlook

25   to send -- the Outlook on Mattel's computers to send  05:47PM

                                                           650

EXHIBIT _31_ PAGE _810_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    or receive E-mail from a third-party service

2    provider like AOL?

3           MR. COREY:  Objection:  scope, asked and

4    answered.  We're about done.

5           MS. TORRES:  No, we're not.                    05:47PM

6           MR. COREY:  Yeah, we actually are.

7           THE WITNESS:  Like AOL?  Like receive

8    E-mails with the AOL --

9    BY MS. TORRES:

10     Q.    Into Outlook.                                 05:47PM

11          MR. COREY:  Same objections.

12          THE WITNESS:  What I understand what you're

13   asking -- what you're stating is if someone who has

14   an XYZ AOL.com address sending it to a valid Mattel

15   employee, that Mattel employee will receive it.  Is  05:47PM

16   that what you're asking in part?

17   BY MS. TORRES:

18     Q.    No, no, I'm sorry.

19     A.    Then I don't understand the question.

20     Q.    Well, let me -- let me just ask a blanket     05:48PM

21   question and maybe you'll say no in which case we

22   can move on.

23          Is there any way that Mattel monitors

24   E-mails that are sent to or from -- by a Mattel

25   employee from a Mattel -- a non-Mattel E-mail         05:48PM
                                                               651

EXHIBIT _31_ PAGE _811_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    account?

2            MR. COREY:  Objection:  asked and answered

3    and scope.

4            THE WITNESS:  Okay, are you saying that a

5    Mattel employee --                                    05:48PM

6            MR. COREY:  And assumes facts.  If you don't

7    understand the question, just tell her you don't

8    understand the question.

9            THE WITNESS:  I don't understand the

10   question.                                             05:48PM

11   BY MS. TORRES:

12       Q.   At any point in time has Mattel been able to

13   monitor the contents of -- not just the contents but

14   any aspect of E-mails that are sent by a Mattel

15   employee through any account other than a Mattel      05:49PM

16   account in any way that you haven't already told me

17   today?

18           MR. COREY:  Same objections and assumes

19   facts and mischaracterizes the witness' testimony.

20           THE WITNESS:  I guess I'm having a hard time  05:49PM

21   understanding the question.  Technically speaking

22   I'm getting confused.

23   BY MS. TORRES:

24       Q.   Technically speaking you're getting

25   confused?                                             05:49PM

                                                           652

EXHIBIT 31 PAGE 812

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    Well, the way that you're presenting it.

 2              MR. COREY:  Do you have anything else within

 3    the scope of what you're allowed to inquire about?

 4              MS. TORRES:  Yeah, I do, actually.

 5              (Deposition Exhibit 700 was marked          05:49PM

 6         for identification and is annexed hereto.)

 7    BY MS. TORRES:

 8        Q.    I'm going to ask the court reporter to mark

 9    as Exhibit 700 the Affidavit of Michael Moore In

10    Support of Mattel, Inc.'s Opposition to MGA           05:49PM

11    Entertainment, Inc.'s Motion for Terminating

12    Sanctions Due to Spoliation of Evidence.

13              MR. COREY:  Do you have a copy for me,

14    Counsel?

15              MS. TORRES:  Of course I do.  Sorry.        05:50PM

16        Q.    Have you ever seen this document before?

17        A.    I have not.

18        Q.    Did you ever see what you believe to be a

19    prior version of this affidavit?

20        A.    I have not.                                 05:51PM

21        Q.    Was any -- were you asked any information --

22    were you asked to provide any information for

23    purposes of an affidavit or document that you

24    understood that was going to be filed with the court

25    concerning Mattel's preservation practices in the    05:51PM
                                                              653
```

EXHIBIT 31 PAGE 813

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   past month?

2       A.   I don't recall anything like that.

3       Q.   There is a discussion in here -- turning to

4   page 10 -- I'm sorry, paragraph 10, page 4 -- do you

5   see paragraph 10?                                    05:52PM

6       A.   Yes.

7       Q.   -- that discusses the review of SMTP logs

8   that you've been testifying about for the past

9   however many minutes.  Do you see that?  That's the

10  same review of SMTP logs that -- that you've been    05:52PM

11  testifying about, correct?

12      A.   It appears so.

13      Q.   It says that some E-mail message -- that

14  Mattel used SMTP logs to collect some E-mail

15  messages received by Mattel employees from specific  05:53PM

16  locations on the Internet including MGAE.com.  Do

17  you see that?

18      A.   I see that.

19      Q.   Do you know whether there were any other

20  domains that were -- that were searched for on the   05:53PM

21  SMTP logs?

22          MR. COREY:  You can answer that question

23  "yes" or "no."

24          THE WITNESS:  There were any other domains?

25  Yes.                                                 05:53PM
                                                          654

EXHIBIT _31_ PAGE _814_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MS. TORRES:
 2       Q.   You do know that there were other domains?
 3       A.   Yes.
 4       Q.   Do you know what domains those were?
 5            MR. COREY:  I'm going to instruct the        05:53PM
 6   witness not to answer on attorney-client privilege
 7   and attorney work product grounds.
 8            MS. TORRES:  It's a yes-or-no question.  Do
 9   you know what those domains were?
10            MR. COREY:  I thought that was the first     05:54PM
11   question he answered.
12            MS. TORRES:  No.
13            MR. COREY:  I thought the next question was
14   do you know what -- what are those domains.
15            MS. TORRES:  The first question was:  Do you 05:54PM
16   know that there were other domains?
17            MR. COREY:  That's fine.  I'll withdraw the
18   objection.  You can answer it "yes" or "no."
19   BY MS. TORRES:
20       Q.   Do you know what those domains were or --    05:54PM
21   yes or no.  Do you have information about the
22   domains that were searched in the SMTP logs other
23   than MGAE.com?
24       A.   I can only testify to one other one.
25       Q.   You can only testify to one other one?       05:54PM
                                                           655
```

EXHIBIT 31 PAGE 815

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   Yes.

 2      Q.   And you know what it is and if I ask -- if I

 3  ask him what it is you're going to instruct him not

 4  to answer?

 5           MR. COREY:  Yes.                           05:54PM

 6  BY MS. TORRES:

 7      Q.   From whom did you obtain the information

 8  about what domain -- what other domain was searched

 9  for?

10      A.   This goes back to when we set up the system. 05:54PM

11  It's when I -- when I saw a list early on, a short

12  list.  That's the only thing I recall is there

13  wasn't -- MGA wasn't the only one, dot com.  So

14  that's where my -- that's -- that's how I answered

15  it.                                                 05:55PM

16      Q.   Okay.  So when you testified earlier that

17  you saw a list of search terms, were you referring

18  to a list of search terms that were used in

19  connection with the SMTP logs or were you referring

20  to search terms that were used in connection with    05:55PM

21  the IMSS?

22      A.   IMSS.

23      Q.   With respect -- do you know whether the

24  search terms used to -- used in connection with the

25  IMSS software were the same search terms used in     05:55PM
                                                            656
```

EXHIBIT 31 PAGE 816

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    connection with searching the SMTP logs?

 2              MR. COREY:  You can answer that "yes" or

 3    "no."

 4              THE WITNESS:  Do I know?

 5    BY MS. TORRES:                                    05:56PM

 6        Q.   Yeah.

 7        A.   No.

 8        Q.   You don't know one way or the other?

 9        A.   No, I don't know what they used.

10        Q.   But you do know that there is at least one  05:56PM

11    more domain that was searched for on the SMTP logs

12    and you do know what that one domain is?

13              MR. COREY:  Objection:  mischaracterizes his

14    testimony.

15              THE WITNESS:  Let me clarify.  I may have   05:56PM

16    got confused with the IMSS.

17    BY MS. TORRES:

18        Q.   Okay.

19        A.   I don't -- I didn't see any list pertaining

20    to the SMTP log search criteria.                  05:56PM

21        Q.   And no one has ever told you what the SMTP

22    search log criteria is?

23        A.   To my knowledge, no.

24              MR. COREY:  And so I think -- permit me, if

25    I may, the testimony you can give about seeing the  05:57PM
                                                          657
```

EXHIBIT 31 PAGE 817

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    other domain name related to the IMSS log key words?

2          THE WITNESS:   That is correct.

3    BY MS. TORRES:

4       Q.   Paragraph 11 says "Beginning on or about

5    December 23, 2003 Mattel implemented an automated    05:57PM

6    security tool that monitored E-mail messages into

7    Mattel and that were sent from Mattel's E-mail

8    system."  Do you see that?

9       A.   I do.

10      Q.   Is that the IMSS security -- or IMSS    05:57PM

11   software that you've been testifying about today?

12      A.   It is.

13      Q.   Going back to paragraph 10 and the testimony

14   you gave about the SMTP logs, did those logs pertain

15   to all E-mail that went in or out of Mattel    05:57PM

16   worldwide?

17      A.   What I recall is there's a few logs -- this

18   could have been outbound but I recall the inbound.

19      Q.   Do you know whether outbound E-mails --

20   whether logs of outbound E-mails were searched by    05:58PM

21   Mattel prior to the implementation of the IMSS

22   software?

23      A.   I don't recall.  I don't remember.  I don't

24   recall that.

25      Q.   And so, therefore, you don't know whether or 05:58PM

                                                         658

EXHIBIT _31_ PAGE _818_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    not outbound E-mails were retained prior to the

2    implementation of the IMSS software?

3        A.    Only the fact that based on how they

4    operate, you know, they probably would have but I

5    cannot -- I can't testify to that because I don't          05:59PM

6    know for a fact.

7        Q.    You can't testify to that either in your

8    individual capacity or as a 30(b)(6) representative,

9    correct?

10       A.    For the outbound?                                 05:59PM

11       Q.    Yes.

12       A.    Only as a 30(b)(6), if there were logs on

13   the outbound, then they probably would have

14   collected that information.

15       Q.    But SMTP logs are only for inbound, correct? 05:59PM

16   Inbound E-mails.

17       A.    No.

18       Q.    SMTP logs are for inbound and outbound

19   E-mails?

20       A.    It can be if you set it up that way.             05:59PM

21       Q.    How were they set up at Mattel prior to the

22   implementation of the ISS logs -- or IMSS software?

23            MR. COREY:  Objection:  assumes facts and

24   scope.

25            THE WITNESS:  As I mentioned before, right,  06:00PM

                                                          659

EXHIBIT _31_ PAGE _819_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   SMTP logs can be set at different levels and is

2   inherent to the Exchange IMSS server.  So you can

3   set log-in levels at anywhere between low to high.

4   BY MS. TORRES:

5       Q.   Does the level of at which you set the log          06:00PM

6   determine whether it logs both inbound and outbound

7   E-mail?

8           MR. COREY:  Objection:  assumes facts.

9           THE WITNESS:  No.

10  BY MS. TORRES:                                               06:00PM

11      Q.   So do you know whether or not the SMTP logs

12  that were generated and searched at Mattel prior to

13  late December 2003 when the IMSS software was

14  implemented reflected both inbound and outbound

15  E-mail?                                                      06:01PM

16          MR. COREY:  Objection:  scope.

17          You've got until 6:15, Counsel.

18          I'm sorry, go ahead and answer the question.

19          THE WITNESS:  Based on my understanding of

20  the Exchange servers and what was requested I can           06:01PM

21  say fairly confidently that the verbose logging for

22  inbound/outbound was set.

23          MR. COREY:  And you've got until 6:15 and

24  then we're going to leave and you can explain to

25  Judge -- if you're not going to finish by then, you         06:01PM

                                                                  660

EXHIBIT _31_ PAGE _820_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  can explain to Judge Infante why the three and a

2  half to four hours was not sufficient to follow up

3  on the ten questions.

4  BY MS. TORRES:

5       Q.    Looking at the rest of paragraph 11 that you  06:01PM

6  didn't read starting with the second sentence --

7  actually, it's the third sentence -- "If an E-mail

8  message contains key words in the security tool,

9  make a copy of the E-mail and deliver it to a

10 separate mailbox."  That's the Bunion and Donahue     06:02PM

11 mailboxes that you testified about earlier?

12      A.    It appears so, yes.

13      Q.    And actually at this time it would be just

14 the Bunion mailbox, correct?

15           MR. COREY:  Objection:  mischaracterizes the  06:02PM

16 testimony.

17           THE WITNESS:  No.

18 BY MS. TORRES:

19      Q.    Oh, it would have been the Legal mailbox?

20      A.    Yes.                                         06:02PM

21      Q.    And then subsequently the TMS mailbox?

22      A.    Yes.

23      Q.    And then subsequently the Bunion mailbox?

24      A.    Yes, Bunion and Donahue.

25      Q.    And now Bunion and Donahue.                  06:02PM

661

EXHIBIT 31 PAGE 821

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           Has Mattel used at any time any software to

 2  locate for purposes of this litigation E-mails that

 3  are stored in PST files -- that may have been stored

 4  in PST files prior to the implementation of the

 5  review of the SMTP logs?                           06:03PM

 6           MR. COREY:  Can I get that read back?

 7           THE WITNESS:  Thank you.

 8           (The pending question was read as follows:

 9              "Q.   Has Mattel used at any

10           time any software to locate for        06:02PM

11           purposes of this litigation E-mails

12           that are stored in PST files -- that

13           may have been stored in PST files prior

14           to the implementation of the review of

15           the SMTP logs?")                        06:03PM

16           MR. COREY:  Objection:  scope and vague and

17  ambiguous.

18  BY MS. TORRES:

19      Q.   Let me rephrase it.  It is actually vague.

20           Prior to the -- has Mattel ever used any   06:03PM

21  software or methodology to search for E-mails stored

22  in PST files either on the network or in local hard

23  drives for purposes of this litigation?

24           MR. COREY:  Objection:  scope, calls for

25  speculation.                                        06:04PM
                                                          662
```

EXHIBIT 31 PAGE 822

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          THE WITNESS:   You're asking if we have a

2    tool that goes out to PST files to do searches?

3    BY MS. TORRES:

4       Q.    Correct.

5       A.    No.                                          06:04PM

6       Q.    Has Mattel used any software or any

7    methodology to preserve E-mails from PST files that

8    were stored in PST files prior to the implementation

9    of the review of the SMTP logs?

10         MR. COREY:   Objection:   scope.   It's also    06:04PM

11   vague and ambiguous.   Do you need the question

12   again?

13         THE WITNESS:   No.   Yeah, why not.   I'm

14   getting tired so I want to make sure that I get it

15   right.                                                06:04PM

16   BY MS. TORRES:

17      Q.    Has Mattel used any software or any

18   methodology to preserve E-mails from PST files where

19   those E-mails were stored in the PST files prior to

20   the implementation of the review of the SMTP logs?   06:04PM

21         MR. COREY:   Objection:   vague and ambiguous

22   and scope.

23         THE WITNESS:   That sounds like the other

24   question do we have any methodology or tools that

25   take E-mail from PSTs and preserves them.   You mean  06:05PM

                                                              663

EXHIBIT 31 PAGE 823

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  to search for them and to preserve them?

2  BY MS. TORRES:

3      Q.    To preserve them without searching for them.

4  I just wanted to make sure that we were covered.

5          MR. COREY:  To preserve them separate and    06:05PM

6  apart from being in a PST file?

7          MS. TORRES:  Yes.

8          THE WITNESS:  I know that what Mattel does

9  is when they find PST files which are pertinent --

10  and have pertinent E-mail in them they preserve them  06:05PM

11  but a -- but a tool -- there's no tool.  Methodology

12  is more manual.

13  BY MS. TORRES:

14     Q.    A manual review of the PST files?

15     A.    Of some.  Usually --                        06:06PM

16     Q.    Do you know -- sorry.

17     A.    Usually they're on laptops that they -- you

18  know, that they acquire.

19     Q.    From whom?

20          MR. COREY:  Objection:  scope.               06:06PM

21          THE WITNESS:  Some mini -- mini laptop that

22  they deem pertinent to the case whatever that

23  criteria would be.

24  BY MS. TORRES:

25     Q.    Do you know of any such laptops?            06:06PM

                                                          664

EXHIBIT _31_ PAGE _824_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. COREY:  Objection:  scope.
 2              THE WITNESS:  Do I know like the name of the
 3    laptop or who does it belong to?
 4    BY MS. TORRES:
 5      Q.   Yeah.                                    06:06PM
 6      A.   No.
 7      Q.   Are there any folders in the Bunion mailbox
 8    or is it just one big in box?
 9      A.   Any folders other than the standard folders?
10    Not that I'm aware of.                          06:07PM
11      Q.   Are there any folders in the Donahue mailbox
12    other than the in box?  In other words, any
13    subfolders under the in box or any archives?
14      A.   I don't know.  I don't -- I've never looked
15    at -- I can't say I've looked at them.          06:07PM
16      Q.   Do you know whether any E-mails have been
17    sent from either the Bunion or the Donahue E-mail
18    boxes?
19      A.   I can't answer that.  I don't know.
20      Q.   Do you know of any other Mattel security    06:07PM
21    measures that you're aware of that pertain in any
22    way to the review or preservation of E-mails?
23      A.   No.
24      Q.   Did you do anything in connection with the
25    preparation for your deposition today that would   06:08PM
                                                        665
```

EXHIBIT _31_ PAGE _825_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   inform you about any information you've provided at

2   your prior depositions or that you didn't know,

3   sorry, at your prior depositions?

4          MR. COREY:  Objection:  compound.  I don't

5   even know how he can answer that question, and we're   06:08PM

6   not going to go through question by question.

7          Answer the question if you can.

8          THE WITNESS:  I guess I'm confused

9   because -- please ask the question again.

10  BY MS. TORRES:                                         06:08PM

11     Q.   There were questions at your prior

12  depositions that you didn't know the answers to,

13  correct?

14         MR. COREY:  I'll stipulate that there may

15  have been one.                                         06:08PM

16         THE WITNESS:  Yes.

17  BY MS. TORRES:

18     Q.   What did you do?

19         MR. COREY:  That wasn't the question.

20         THE WITNESS:  What did I do about what?         06:09PM

21         MS. TORRES:  Let's go off the record for a

22  second.

23         VIDEO OPERATOR:  6:09 we're going off the

24  record.  This is the end of tape 3.

25                 (Brief recess.)                         06:11PM
                                                              666

EXHIBIT _31_ PAGE _826_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   STATE OF CALIFORNIA   ) ss:

2   COUNTY OF LOS ANGELES )

3

4       I, WENDY S. SCHREIBER, CSR No. 3558, do

5   hereby certify:

6

7       That the foregoing deposition of FRED T.

8   KAWASHIMA was taken before me at the time and place

9   therein set forth, at which time the witness was

10  placed under oath and was sworn by me to tell the

11  truth, the whole truth, and nothing but the truth;

12      That the testimony of the witness and all

13  objections made by counsel at the time of the

14  examination were recorded stenographically by me,

15  and were thereafter transcribed under my direction

16  and supervision, and that the foregoing pages

17  contain a full, true and accurate record of all

18  proceedings and testimony to the best of my skill

19  and ability.

20      I further certify that I am neither

21  counsel for any party in said action, nor am I

22  related to any party to said action, nor am I in any

23  way interested in the outcome thereof.

24

25

672

EXHIBIT _31_ PAGE _827_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        IN WITNESS WHEREOF, I have subscribed my

2   name this 26th day of September, 2007.

3

4

5

6   _____

7        WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

673

EXHIBIT 31 PAGE 828

**Exhibit  32**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3             EASTERN DIVISION

**Certified Copy**

4

5     ------------------------------

6     MATTEL, INC., a Delaware        )

7     Corporation,                    )

8              Plaintiff,             )

9              vs.                    )  No. CV 04-9059

10    CARTER BRYANT, an individual;   )  NM (RNBx)

11    and DOES 1 through 10,          )  VOLUME I

12    Inclusive,                      )

13              Defendants.           )

14    ------------------------------  )

15    (COMPLETE CAPTION ON NEXT PAGE.)

16

17         CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19    Videotaped 30(b)(6) Deposition of RODNEY H.

20    PALMER, JR., taken at 400 South Hope Street,

21    Los Angeles, California, commencing at

22    1:39 P.M., Tuesday, June 26, 2007, before

23    Wendy S. Schreiber, CSR No. 3558, RPR, CLR.

24

25    PAGES 1 - 137

1

EXHIBIT 32 PAGE 829

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4

 5     -------------------------------

 6     MATTEL, INC., a Delaware          )

 7     Corporation,                      )

 8               Plaintiff,              )

 9               vs.                     ) No. CV 04-9059

10     CARTER BRYANT, an individual;     )   NM (RNBx)

11     and DOES 1 through 10,            )

12     Inclusive,                        )

13               Defendants.            )

14     -----------------------------    )

15     CARTER BRYANT, on behalf of       )

16     himself, all present and          )

17     former employees of Mattel,       )

18     Inc., and the general public,     )

19               Counter-Claimants,     )

20               vs.                     )

21     MATTEL, INC., a Delaware          )

22     Corporation,                      )

23               Counter-Defendant. )

24     -------------------------------

25
```

2

EXHIBIT 32 PAGE 830

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF:

 4

 5            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6            BY:  JON COREY, ESQ.

 7            865 South Figueroa Street, Tenth Floor

 8            Los Angeles, California 90017

 9            (213) 443-3000

10            jcorey@quinnemanuel.com

11

12                          -AND-

13

14            MATTEL, INC.

15            BY:  MICHAEL MOORE, ESQ.

16            333 Continental Boulevard

17            El Segundo, California 90245-5012

18            (310) 252-2000

19            michael.moore@mattel.com

20

21

22

23

24

25
```

                                                                    3

EXHIBIT 32 PAGE 831

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2


 3         FOR THE DEFENDANT AND COUNTERCLAIMANT

 4    CARTER BRYANT:


 5


 6            KEKER & VAN NEST LLP

 7            710 Sansome Street

 8            San Francisco, California 94111-1704

 9            (415) 391-5400

10            (NOT PRESENT)

11


12


13    FOR DEFENDANT MGA ENTERTAINMENT, INC.:

14


15            O'MELVENY & MYERS LLP

16            BY:  JAMES PAUL JENAL, ESQ.

17            400 South Hope Street

18            Los Angeles, California 90071-2899

19            (213) 430-6000

20            jjenal@omm.com

21


22    ALSO PRESENT:

23            WEN BU

24            RYAN GULINO, VIDEO OPERATOR

25
```

4

EXHIBIT 32 PAGE 832

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   objections to questions that I'm asking and that's

2   his right.  He's creating his portion of the record.

3   But unless he directs you not to answer the question

4   you still have to provide me with an answer.  Do you

5   understand that?                                  01:44PM

6       A.   Yes.

7       Q.   I don't anticipate this being a terribly

8   long deposition today but at any event this is not

9   meant to be an endurance contest.  We will take some

10  breaks.  If at any time you want a break for          01:44PM

11  whatever reason, you just have to ask for it.  My

12  only qualification to that would be that if there's

13  a question pending, I'd appreciate getting an answer

14  to my question before we take the break.  Is that

15  fair?                                              01:44PM

16      A.   Yes.

17          MR. COREY:  Unless I instruct you otherwise

18  or do otherwise.

19          MR. JENAL:  In which case then we'll have a

20  big food fight which, you know, you don't have to     01:44PM

21  worry much about and the lawyers will hash it out

22  and then you get to answer my questions.

23          MR. COREY:  Mr. Jenal knows there's

24  circumstances where that's appropriate.

25          MR. JENAL:  One can only hope.           01:44PM

                                                           9

EXHIBIT 32 PAGE 833

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Is there anything, Mr. Palmer, that would

2  interfere with your ability today to provide your

3  best and most truthful testimony?

4      A.   No.

5          (Exhibit 385 previously marked.)          01:45PM

6  BY MR. JENAL:

7      Q.   Let me show you what has been previously

8  marked various and sundry times but recently as

9  Exhibit No. 385 and my question to you, Mr. Palmer,

10  is have you ever seen Exhibit 385 before?          01:45PM

11     A.   No.

12     Q.   Would you turn to what is page 10 in Exhibit

13  385 and there's a set of numbered topics on that

14  page.  About a third of the way down is No. 47.  Do

15  you see that?                                       01:45PM

16     A.   Yes.

17     Q.   Do you understand that you are here today to

18  testify as to certain matters on behalf of Mattel,

19  Inc. as its designee?

20     A.   Yes.                                        01:46PM

21     Q.   Topic No. 47 which is my understanding of

22  the topic that you've been designated on reads as

23  follows:  "Mattel's phone log system and the

24  maintenance, storage and ability to retrieve phone

25  logs from an individual extension such as the log    01:46PM

10

EXHIBIT 32 PAGE 834

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    produced by Mattel as document control Nos.

2    M 0001808-24 including Bryant's phone logs for

3    Extension 6099 for October 2000."

4            Is it your understanding, Mr. Palmer, that

5    that is the subject matter upon which you've been          01:46PM

6    designated to testify today on behalf of Mattel?

7        A.   It's my understanding I'm supposed to be

8    here for phone logs.

9            MR. COREY:   And I believe that the

10   designation from Mr. Palmer as agreed to by the            01:47PM

11   parties in this document in Judge Infante's order is

12   Mattel's phone logs.

13   BY MR. JENAL:

14       Q.   Let me ask you this.   What did you do to

15   prepare for your deposition today?                         01:47PM

16       A.   Just reviewed a couple of what would be

17   invoices or just some research.

18       Q.   Could you be a little more specific?   What

19   invoices did you look at?

20       A.   Just would be what would be in our normal         01:47PM

21   phone logs for what we have, verify how long we keep

22   them.

23       Q.   Anything else?

24       A.   No.

25       Q.   What did you do to verify how long phone          01:47PM

11

EXHIBIT _32_ PAGE _835_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   logs are kept?

2       A.   I work with a lady that's in my group.

3       Q.   Who's that?

4       A.   Donna Kanehl.

5       Q.   Can you spell that last name, please?          01:48PM

6       A.   K-a-n-e-h-l.

7       Q.   Did you speak to anyone else in preparation

8   for your deposition today?

9       A.   No.

10      Q.   Did you meet with counsel prior to your         01:48PM

11  deposition today?

12      A.   Yes.

13      Q.   How many times did you meet with counsel?

14      A.   Twice.

15      Q.   When were those occasions?                      01:48PM

16      A.   Yesterday and last Thursday.

17      Q.   How long did you meet with counsel last

18  Thursday?

19      A.   A half-hour to an hour.

20      Q.   Did you meet at Mattel or did you meet at       01:49PM

21  counsel's offices?

22      A.   Mattel.

23      Q.   And how long did you meet with counsel

24  yesterday?

25      A.   About a half-hour.

                                                            01:49PM
                                                            12

EXHIBIT 32 PAGE 836

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    STATE OF CALIFORNIA    ) ss:
2    COUNTY OF LOS ANGELES )
3
4         I, WENDY S. SCHREIBER, CSR No. 3558, do
5    hereby certify:
6
7         That the foregoing deposition of RODNEY H.
8    PALMER, JR. was taken before me at the time and
9    place therein set forth, at which time the witness
10   was placed under oath and was sworn by me to tell
11   the truth, the whole truth, and nothing but the
12   truth;
13        That the testimony of the witness and all
14   objections made by counsel at the time of the
15   examination were recorded stenographically by me,
16   and were thereafter transcribed under my direction
17   and supervision, and that the foregoing pages
18   contain a full, true and accurate record of all
19   proceedings and testimony to the best of my skill
20   and ability.
21        I further certify that I am neither
22   counsel for any party in said action, nor am I
23   related to any party to said action, nor am I in any
24   way interested in the outcome thereof.
25
```

135

EXHIBIT _32_ PAGE _837_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        IN WITNESS WHEREOF, I have subscribed my

2   name this 9th day of July, 2007.

3

4

5

6

7   WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

136

Veritext National Deposition & Litigation Services
866 299-5127

EXHIBIT _32_ PAGE _838_

**Exhibit  33**

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California 94111
    Telephone:    (415) 774-2611
4   Facsimile:    (415) 982-5287

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                          EASTERN DIVISION

11

12  | CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx) |
    | | JAMS Reference No. 1100049530 |
13  | Plaintiff, | |
14  | | Consolidated with |
    | v. | Case No. CV 04-09059 |
15  | | Case No. CV 05-2727 |
    | MATTEL, INC., a Delaware corporation, | |
16  | | **ORDER GRANTING IN PART AND** |
    | Defendant. | **DENYING IN PART MATTEL'S** |
17  | | **MOTION TO ENFORCE COURT'S** |
    | | **DISCOVERY ORDERS AND TO** |
18  | | **COMPEL; TO OVERRULE** |
    | | **PURPORTEDLY IMPROPER** |
19  | | **INSTRUCTIONS; AND FOR** |
    | | **SANCTIONS** |
20  | | |
21  | CONSOLIDATED WITH | |
    | MATTEL, INC. v. BRYANT and | |
22  | MGA ENTERTAINMENT, INC. v. MATTEL, | |
    | INC. | |
23

24

25

26

27

28

Bryant v. Mattel, Inc.,                                                    1
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 839

## I. INTRODUCTION

On December 5, Mattel, Inc. ("Mattel") submitted a "Motion to (1) Enforce Court's Discovery Orders and to Compel; (2) to Overrule Improper Instructions; and (3) for Sanctions." Mattel's motion challenges the sufficiency of the testimony provided by four of MGA Entertainment Inc.'s Rule 30(b)(6) witnesses, Lisa Tonnu, Kenneth Lockhart, Rebecca Harris, and Spencer Woodman, on sixteen separate topics identified in Mattel's Second Notice of Deposition of MGA. MGA submitted an opposition on December 18, 2007. Mattel submitted a reply on December 26, 2007. The matter was heard on January 3, 2008. Having considered the motion papers and comments of counsel at the hearing, Mattel's motion to compel is granted in part and denied in part, and the request for sanctions is granted in part.

## II. BACKGROUND

On May 16, 2007, MGA was ordered to produce Rule 30(b)(6) designees for all topics identified in Mattel's Second Notice of Deposition of MGA, except Topic Nos. 25 and 26, on or before June 30, 2007. Mattel's Second Notice of Deposition includes many topics relevant to the case, including, *inter alia*, the development of Bratz before it was made available for purchase; when and whom MGA first offered Bratz for sale; who first manufactured, shipped and distributed Bratz; Bratz revenues and profits; MGA's access to Mattel's earlier DIVA STARZ project that allegedly had elements which subsequently appeared in Bratz; the identity of persons who worked on Bratz and payments made to them; fee and indemnification agreements; MGA's testing and handling of original Bratz drawings; MGA's sworn statements pertaining to Bratz's creation and development; and MGA's evidence preservation and collection. On July 2, 2007, the district court rejected MGA's objections to the May 16, 2007 Order.

MGA designated four different witnesses to testify on the topics identified in Mattel's Second Notice of Deposition of MGA. First, MGA designated Kenneth Lockhart to testify on Topic Nos. 38, 39 and 42. He testified on June 14-15, 2007.

Second, MGA designated Lisa Tonnu to testify on Topic Nos. 24-25, 31, 37, 39 (in part), 40 and 41. She testified on July 19, 2007. In the meantime, Mattel moved for an order compelling MGA to produce witnesses for deposition and sanctions because MGA did not

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

2

EXHIBIT 33 PAGE 840

1 | produce witnesses on certain topics as required by the May 16, 2007 Order.  On August 14, 2007,

2 | Mattel's motion was granted in part and denied in part and MGA was ordered, once again, to

3 | produce witnesses to testify on several topics.  On September 24-25, 2007, Mattel deposed Ms.

4 | Tonnu further on Topic Nos. 21, 24-26, 31, 39, 40 and 41.

5 |      Third, MGA designated Rebecca Harris to testify on Topic Nos. 11, 13, 14, 19, 22-23 and

6 | 27-28.  Ms. Harris' deposition was scheduled, but unilaterally cancelled by MGA, on two

7 | different occasions.  MGA ultimately produced Ms. Harris on July 20, 2007.

8 |      Fourth, MGA designated Spencer Woodman to testify on Topic No. 34.  He testified on

9 | October 9, 2007.

10 |      In September of 2007, the parties exchanged several meet and confer letters regarding

11 | purported deficiencies in the witnesses' depositions.  In mid October, MGA notified Mattel that it

12 | had retained new counsel who would be responding to Mattel's letters.  After a month-long stay

13 | that MGA obtained as a result of its substitution of counsel, the parties met and conferred on

14 | November 16, 2007 and again on November 21, 2007.  MGA offered to produce Ms. Tonnu

15 | again, but only on some of the topics for which she had been designated previously, and only

16 | during the second week of January 2008.  The parties continued to exchange letters; however,

17 | they were apparently unable to resolve any issues before Mattel filed the instant motion on

18 | December 5, 2007.

19 |      Mattel essentially contends that MGA's witnesses were not sufficiently knowledgeable to

20 | provide complete testimony on the 30(b)(6) topics at issue, and furthermore, that MGA's counsel

21 | obstructed the depositions by making improper objections and instructing witnesses not to

22 | answer.  Accordingly, Mattel seeks the following eight categories of relief:  (1) an order enforcing

23 | the May 16, 2007 and August 14, 2007 Orders and compelling MGA to comply therewith by

24 | designating and producing fully prepared witnesses to testify on Topic Nos. 11, 13, 14, 19, 21-25,

25 | 27, 28, 31, 34 and 39-41 in Mattel's Second Notice of Deposition of MGA on dates of Mattel's

26 | selection; (2) an order overruling each of the purportedly improper instructions not to answer

27 | questions interposed at the deposition of MGA designees Spencer Woodman and compelling

28 | Woodman or other such person selected by MGA as its designee to provide complete testimony

EXHIBIT _33_ PAGE _841_

on Topic No. 34; (3) an order compelling MGA to produce documents that MGA designee Kenneth Lockhart identified during his June 14, 2007 deposition as documents which he reviewed and relied upon to refresh his recollection in preparation for his deposition; (4) an order overruling each of the purportedly improper instructions not to answer questions interposed at the deposition of MGA designee Lisa Tonnu; (5) an order reopening the deposition of MGA designee Lisa Tonnu based on a purported "complete reversal of testimony" made through written "changes" to her deposition transcript; (6) an order compelling Rebecca Harris to sit for the completion of her deposition and/or compelling such person selected by MGA as its designee to complete the testimony on topics for which Harris was previously designated; (7) an order imposing monetary sanctions ($10,000) for MGA's alleged willful violations of the May 16, 2007 and August 14, 2007 Orders, for MGA's allegedly improper instructions not to answer deposition questions and for MGA's alleged improper coaching, harassing and obstructionist conduct at the September 24-25, 2007 deposition of Lisa Tonnu and at the October 9, 2007 deposition of Spencer Woodman; and (8) a report and recommendation to Judge Stephen G. Larson that recommends the imposition of preclusion sanctions, that certain facts related to the topics compelled be deemed admitted, and/or that MGA be found in contempt for MGA's allegedly willful and repeated violations of the Orders.

MGA opposes the motion, contending that it substantially complied with its obligation to produce witnesses knowledgeable on each of the topics at issue and that Mattel has had a full and fair opportunity to conduct its examinations. According to MGA's calculations, the four witnesses testified intelligently for nearly 36 hours over five deposition days. MGA also explains that its counsel instructed witnesses not to answer two types of questions, namely questions that invaded MGA's work product protection or attorney-client privilege, and questions that exceeded the scope of Topic No. 34. MGA also contends that Mattel is not entitled to additional time to depose Ms. Harris in particular because Mattel's counsel wasted time and badgered the witness. MGA acknowledges, however, that Ms. Tonnu did change her testimony and that there are some deficiencies in its witnesses' testimony that justify additional deposition time. Indeed, MGA points out that prior to the filing of the instant motion, MGA agreed to produce witnesses to

1    provide additional testimony on Topic Nos. 21, 24, 25, 31, 34 and 40.  Further, after the filing of

2    the motion, MGA agreed to produce witnesses to provide additional testimony on Topic No. 39.

3    MGA contends that Mattel's motion to compel additional testimony with respect to topics on

4    which MGA has already agreed to provide additional testimony is premature and should be

5    denied.

III. STANDARDS

6

7        Depositions of a corporation are governed by Rule 30(b)(6) of the Federal Rules of Civil

8    Procedure, which provides in pertinent part that:

9            In its notice or subpoena, a party may name as the deponent a public or
         private corporation, a partnership, an association, a governmental agency, or other
10       entity and must describe with reasonable particularity the matters for examination.
         The named organization must then designate one or more officers, directors, or
11       managing agents, or designate other persons who consent to testify on its behalf;
         and it may set out the matters on which each person designated will testify. . . .
12       The persons designated must testify about information known or reasonably
         available to the organization. .

13

14   Fed.R.Civ.P. 30(b)(6) (effective Dec. 1, 2007).  Rule 30 also provides that the examination and

15   cross-examination of a deponent proceed as they would at trial under the Federal Rules of

16   Evidence.  Fed.R.Civ.P. 30(c)(1).  Further, "[a]n objection at the time of the examination--

17   whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking

18   the deposition, or to any other aspect of the deposition--must be noted on the record, but the

19   examination still proceeds; the testimony is taken subject to any objection."  Fed.R.Civ.P.

20   30(c)(2).  "An objection must be stated concisely in a nonargumentative and nonsuggestive

21   manner. A person may instruct a deponent not to answer only when necessary to preserve a

22   privilege, to enforce a limitation ordered by the court, or to present a motion under Rule

23   30(d)(3)."  Id.

24       Rule 30(d)(1), Fed.R.Civ.P., provides that a deposition is limited to one day of seven

25   hours, unless otherwise stipulated or ordered by the court.  "The court must allow additional time

26   consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5

EXHIBIT 33 PAGE 843

1  person, or any other circumstance impedes or delays the examination."[1]  Fed.R.Civ.P. 30(d)(1).

2  Furthermore, sanctions may be imposed —including the reasonable expenses and attorney's fees

3  incurred by any party--on a person who impedes, delays, or frustrates the fair examination of the

4  deponent.  Fed.R.Civ.P. 30(d)(2).

5  ## IV. DISCUSSION

6  A. Mattel's Request for Relief No. 1:  Mattel seeks an order enforcing the May 16, 2007 and

7  August 14, 2007 Orders and compelling MGA to comply therewith by designating and producing

   fully prepared witnesses to testify on Topic Nos. 11, 13, 14, 19, 21-25, 27, 28, 31, 34 and 39-41 in

   Mattel's Second Notice of Deposition of MGA on dates of Mattel's selection.

8

9      Mattel contends that MGA's witnesses were inadequately prepared and failed to provide

10  sufficient testimony on sixteen of the topics identified in the Second Notice of Deposition of

11  MGA.  Each of the sixteen 30(b)(6) topics at issue is addressed separately below.

        **Topic No. 11:**  The exhibition, or proposed, offered, contemplated or requested exhibition,
12      of BRATZ or any BRATZ DESIGN to any third party prior to June 30, 2001, including
        without limitation each instance in which BRATZ or any BRATZ DESIGN was marketed,
13      offered for sale, pitched, shown or disclosed to, or otherwise discussed with or
        communicated to, any retailer, wholesaler or distributor and the DOCUMENTS that
14      REFER OR RELATE thereto.

15      Mattel contends that Ms. Harris lacked sufficient knowledge on this topic.  In particular,

16  Mattel contends that Ms. Harris could not confirm what form of Bratz or Bratz design ("sculpts")

17  was first exhibited to third parties prior to June 30, 2001.

18      MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on

19  this topic.  More specifically, MGA contends that Ms. Harris testified about the first exhibition,

20  sale and distribution of Bratz, including presentations to Target stores, and the first sale,

21  distribution and shipment of Bratz under an agreement with Bandai in Spain.  MGA contends that

22  it is not reasonable to expect MGA to have investigated specifically what type of Bratz "sculpts"

23  were shown at particular exhibitions.

24  _____

25  [1] Rule 26(b)(2), Fed.R.Civ.P., provides that the court shall limit the frequency or extent of use of the discovery methods if the court determines that "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party

26  seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case,

27  the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."  Fed.R.Civ.P. 26(b)(2).

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

6

EXHIBIT 33 PAGE 844

1   Furthermore, MGA points out that Mattel has taken the deposition of MGA HK on the

2   subject of the initial manufacture of Bratz. More specifically, MGA contends that Mattel took the

3   deposition of the head of MGA's Hong Kong operations, Edmond Lee, for two full days, and

4   questioned him about the first manufacture of Bratz by Early Light. Therefore, MGA contends

5   that Mattel has had a full and fair opportunity to examine MGA regarding the first manufacture of

6   Bratz.

7   A review of the transcript confirms that Ms. Harris was not reasonably prepared for her

8   deposition, especially in light of the importance of the timing of the creation of Bratz. For

9   example, she could not specify what was shown to retailers during the year 2000. She testified

10  that MGA used "boards" (i.e. sketched drawings) to show retailers Bratz during the year 2000

11  based upon a telephone conversation she had with Paula Garcia during a break. Mattel is entitled

12  to delve into more detail about these "boards," and such information should be reasonably

13  available to MGA. Ms. Harris testified that Julie Chemo likely attended presentations during the

14  year 2000. Therefore, Mattel is entitled to an order compelling MGA to produce a witness to

15  provide complete testimony on Topic No. 11.

16  **Topic No. 13:** COMMUNICATIONS prior to June 30, 2001 between YOU and any
    manufacturer, distributor, wholesaler, retailer, or any contemplated, proposed or potential
17  manufacturer, distributor, wholesaler or retailer, that REFER OR RELATE TO BRATZ or
    any BRATZ DESIGN.

18  Mattel contends that Ms. Harris' testimony was wholly inadequate. In particular, Mattel

19  contends that Ms. Harris had no knowledge concerning early MGA communications with Bandai,

20  which distributed Bratz in the first market in which it was allegedly sold. Ms. Harris did not have

21  any knowledge or information as to when MGA and Bandai first had any type of contact or

22  communication regarding Bratz. Similarly, Ms. Harris did not have any knowledge or

23  information as to when MGA first had contact with a company called J.H.N. regarding the sale of

24  Bratz in Australia.

25  MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on

26  Topic No. 13, as described above in connection with Topic No. 11. Accordingly, MGA objects to

27  any further examination on Topic No. 13.

28  A review of the deposition transcript confirms that Ms. Harris provided significant

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 3 7 PAGE 8 45

1  testimony on Topic No. 13. However, as Mattel points out, her testimony lacked many details

2  relevant to when Bratz was developed. For example, Ms. Harris was unable to testify as to any

3  communications or negotiations between MGA and Bandai leading up to the execution of written

4  agreements. Indeed, Ms. Harris did not know when MGA and Bandia first had any contact

5  regarding Bratz. Furthermore, MGA did not conduct a reasonable investigation to prepare Ms.

6  Harris for Topic No. 13. Among other things, MGA made no effort to determine whether the

7  former MGA HK employee known to have been directly involved in the first discussions with

8  Bandai (Martin Hitch) had retained any documents responsive to this topic. Nor did Ms. Harris

9  speak to Isaac Larian and Jim Olmstead, both of whom authored emails referencing existing

10  distributorship deals in Europe and Australia. Therefore, Ms. Harris did not fulfill MGA's duty to

11  produce a witness to testify on information known or reasonably available to MGA. Mattel is

12  entitled to an order compelling MGA to produce a witness to provide complete testimony on

   Topic No. 13.

13          **Topic No. 14:** When and where BRATZ was first manufactured, shipped, distributed and

14          sold, and the IDENTITIES and roles of PERSONS involved therein.

15          Mattel contends that Ms. Harris did not have any knowledge regarding the identity or role

16  of any person who was involved in the first manufacture of Bratz dolls by Early Light. Mattel

17  also contends that Ms. Harris had no knowledge as to the date when manufacturing began for the

18  first Bratz dolls. Furthermore, Mattel contends that MGA should not be permitted to rely on the

19  testimony given by MGA HK's corporate designee to evade providing testimony on this topic

20  because that designee's testimony was deficient.

21          MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on

22  Topic No. 14, as described above in connection with Topic No. 11. Accordingly, MGA objects to

23  any further examination on Topic No. 14.

24          A review of the deposition transcript confirms that Ms. Harris did not have any knowledge

25  regarding the identity or role of any person at MGA who first had contact with Early Light, the

26  first manufacturer of Bratz dolls. Nor did she know the identity of any person at MGA or at Early

27  Light who was involved in the first manufacture of Bratz dolls. Furthermore, Ms. Harris stated

28  that she did not undertake any investigation to uncover these facts. Ms. Harris also had no

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8

EXHIBIT 33 PAGE 8 46

1    information or knowledge regarding the date when manufacturing began for the first Bratz dolls.

2    Ms. Harris testified that personnel in MGA's Hong Kong affiliate coordinated with Early Light.

3    Thus, the information sought by Mattel is reasonably available to MGA. That Mattel also seeks

4    testimony from MGA's Hong Kong affiliate does not excuse MGA from producing a witness

5    sufficiently knowledgeable on Topic No. 14. Therefore, Mattel is entitled to an order compelling

6    MGA to produce a witness to provide complete testimony on Topic No. 14.

7        **Topic No. 21**: YOUR knowledge of, and access to, non-public MATTEL DIVA STARZ project information and DESIGNS prior to June 30, 2001.

8

9        Mattel contends that Ms. Tonnu was not sufficiently prepared to provide testimony, as

10   evidenced by the fact that two other MGA employees, Paula Garcia and Margaret Leahy, testified

11   that they had "access" to non-public DIVA STARZ information.

12       MGA contends that Ms. Tonnu prepared for her deposition by speaking with five MGA

13   employees, including Paula Garcia. Based upon that investigation, Ms. Harris testified that the

14   five employees did not work on DIVA STARZ. MGA explains that Ms. Garcia merely testified

15   that when she was at Mattel she often spoke to co-workers at Mattel who happened to work on the

16   DIVA STARZ, that those co-workers may have mentioned the existence of the project and that

17   they told Ms. Garcia it was confidential. MGA contends that Ms. Garcia's testimony does not

18   establish "access to" DIVA STARZ information, but the opposite – that the employees did not

19   share details with Ms. Garcia and told her the project was confidential. MGA acknowledges,

20   however, that Ms. Garcia testified that on one occasion she saw a sketch of a DIVA STARZ character.

21       Nevertheless, MGA represents that during the meet and confer process MGA designated

22   Ms. Tonnu to provide further testimony on Topic No. 21, and that she will be deposed on January

23   9, 2008. MGA represents that Ms. Tonnu will be prepared to testify whether each former Mattel

24   employee now employed by MGA had "access to" DIVA STARZ information while employed by Mattel.

25       A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently

26   prepared to testify on Topic No. 21. Ms. Tonnu did not know what DIVA STARZ was.

27   Furthermore, she was not sufficiently informed of the identities of the MGA employees and

28

EXHIBIT 33 PAGE 847

1   contractors who had access to or worked on DIVA STARZ.  For example, Ms. Tonnu was

2   uninformed of Ms. Garcia's and Ms. Leahy's knowledge and access to DIVA STARZ

3   information while employed by Mattel.  Such information was known or reasonably available to

4   MGA.  Therefore, Mattel is entitled to an order compelling MGA to produce a knowledgeable

5   witness to provide complete testimony on Topic No. 21.

6        **Topic No. 24**:  Any indemnification and fee arrangement that YOU and/or BRYANT has

7   sought proposed, requested or obtained in connection with this ACTION.

8        Mattel contends that MGA's designee, Lisa Tonnu, was not sufficiently prepared to

9   testify, despite having been produced twice to testify on this topic.  For example, Mattel points

10  out that Ms. Tonnu did not know why MGA agreed to pay Carter Bryant's attorneys' fees or how

11  much MGA had paid or whether Littler Mendelson's fees had been paid in full.  Mattel's Motion

12  at pp. 14-15.  Furthermore, Mattel points out that Ms. Tonnu did not make any effort to find out

13  the answers to these questions.

14       MGA contends that Ms. Tonnu substantially discharged MGA's obligation to provide

15  testimony in response to this topic.  MGA contends that Ms. Tonnu reviewed responsive

16  documents and was able to identify the agreements in her deposition.  Further, MGA contends

17  that Ms. Tonnu spoke to MGA's in-house counsel about the agreements and was able to identify

18  the individuals involved in the negotiations of those agreements.

19       MGA acknowledges, however, that Ms. Tonnu was not able to testify regarding the

20  specifics of those negotiations or the terms of those agreements.  MGA represents that prior to the

21  filing of this motion, it designated in-house counsel Sam Khare to provide additional testimony on

    this topic and that Mattel will depose him on January 8, 2008.

22       A review of the deposition transcript confirms that Ms. Tonnu was not prepared to testify

23  as to information known or reasonably available to MGA.  For example, Ms. Tonnu did not know

24  why MGA agreed to pay Bryant's fees, did not know how much MGA had paid in fees, and did

25  not know whether MGA had paid Littler Mendelson's fees in full.  Accordingly, Mattel is entitled

26  to an order compelling MGA to produce a knowledgeable witness to provide complete testimony

27  on Topic No. 24.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

10

EXHIBIT _33_ PAGE _848_

1   **Topic No. 25:**  YOUR revenues and profits from BRATZ, including without limitation, YOUR gross and net profits, and YOUR costs associated therewith.

2

3   Mattel contends that Ms. Tonnu lacked the most basic information called for by this topic.

4   For example, Mattel contends that Ms. Tonnu testified that: she did not recall nor could she

5   provide an estimate of how much distribution revenue MGA derived from the Bratz brand

6   between 2001 and the end of 2006; she did not know and could not provide a best estimate for the

7   episodic costs or production costs associated with the distribution revenue; she did not know who

8   in the company could provide this information; she did not know and could not provide a range

9   for how much licensing revenue MGA had received for licensing anything associated with the

10  Bratz brand between 2001 and the end of 2006; she did not know and could not estimate how

11  much revenue the Bratz movie generated; she did not know how much revenue MGA had earned

12  from the Bratz brand; and she did not know how much profit MGA had generated from the Bratz

    brand.

13      MGA contends that it substantially discharged its obligation to provide testimony on this

14  topic.  More specifically, MGA contends that Ms. Tonnu testified with the aid of Exhibit 660, a

15  143-page report summarizing the units sold from 2001 to 2006 organized by "stock-keeping-unit"

16  or "SKU."  MGA contends that Ms. Tonnu prepared for her deposition by speaking with MGA's

17  Director of Finance, Anisse Evans, regarding Exhibit 660.

18      In the meet and confer process, MGA's counsel offered to provide Mattel with source

19  information from which the profitability of Bratz products at the SKU level could be derived and

20  to produce Ms. Tonnu for follow-up testimony regarding that source financial information so that

21  Mattel's experts would be in a position to draw their own conclusions and opinions as to MGA's

22  profits from Bratz.  MGA represents that Mattel has agreed to depose Tonnu on this topic on

23  January 9, 2008.  MGA also represents that it has produced more than 27,700 pages of source

24  financial information that will be the "starting point" from which MGA's and Mattel's experts

25  will analyze the profitability of Bratz products.  MGA represents that Ms. Tonnu will be prepared

26  to discuss the source financial information produced to Mattel at her continued deposition.

27      A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently

    prepared to provide testimony on Topic No. 25.  Ms. Tonnu could not identify, generally or by

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

                                                                                11

EXHIBIT 33 PAGE 849

1   product, Bratz revenues, costs, or gross or net profits.  Furthermore, MGA has failed to provide

2   any explanation for why Ms. Tonnu was not educated on the source financial information before

3   her deposition.  Accordingly, Mattel is entitled to an order compelling MGA to produce a

4   knowledgeable witness to provide complete testimony on Topic No. 25.

5   **Topic No. 27:**  The payment of money or anything of value that YOU have made or
    offered to make to, for or on behalf of Elise Cloonan, or that has been requested, sought or
6   received by, for or on behalf of Elise Cloonan, and the timing, manner, amount(s) and
    reasons therefore.

7

8   Ms. Cloonan was Carter Bryant's roommate at some point.  Bryant testified that he

9   showed her early drawings prior to showing them to MGA.  She is not and never has been an

10  employee of MGA.

11  Mattel contends that Ms. Harris' testimony was incomplete because she only searched for

12  evidence of payment by reviewing vendor files and MGA's electronic purchase order files, and

13  did not review the individual documents within each account payable vendor file.  Mattel also

14  contends that Ms. Harris was not sufficiently prepared because she had no knowledge or

15  information as to who was paying her legal fees in this case.

16  MGA contends that it discharged its obligation to testify on Topic No. 27, emphasizing

17  that Ms. Harris unequivocally represented on behalf of MGA that MGA made no payments to,

18  had no agreements with and had no communications with Elise Cloonan.  Furthermore, MGA

19  points out that Mattel took the deposition of Elise Cloonan on December 14, 2007, and she

20  confirmed that she had received no payments from and had no communications with MGA.

21  A review of the transcript confirms that Ms. Harris' preparation for and testimony

22  regarding Topic No. 27 was adequate.  Furthermore, the burden and expense of conducting a

23  deposition on this topic substantially outweigh the potential relevance of the testimony sought.

24  Mattel's motion is denied with respect to Topic No. 27.

25  **Topic No. 28:**  COMMUNICATIONS between YOU and Elise Cloonan that REFER OR
    RELATE TO BRYANT, MATTEL, BRATZ and/or Anna Rhee, including
26  DOCUMENTS that REFER OR RELATE TO such COMMUNICATIONS.

27  Mattel contends that Ms. Harris's testimony was insufficient because she admitted she did

28  not have any knowledge or information as to what systems or hard drives in MGA were searched

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

12

EXHIBIT 3 3 PAGE 850

1    for e-mails referencing Elise Cloonan.

2        MGA contends that Mattel is not entitled to further examination on Topic No. 28 because

3    Ms. Harris substantially discharged MGA's obligation to testify on the topic, as described above

4    in reference to Topic No. 27 above.

5        A review of the transcript confirms that Ms. Harris' preparation for and testimony

6    regarding Topic No. 28 was adequate.  Furthermore, the burden and expense of conducting a

7    deposition on this topic substantially outweigh the potential relevance of the testimony sought.

8    Mattel's motion is denied with respect to Topic No. 28.

9        **Topic No. 31:** The IDENTITY of each PERSON who, at any time since January 1, 1998, has performed any work or services for, by or on behalf of YOU while such PERSON was employed by MATTEL, the nature and timing of each such PERSON's work or services and the amount(s) paid by YOU to each such PERSON.

10

11        Mattel contends that the first time MGA produced Ms. Tonnu to testify, she lacked any

12    personal knowledge regarding this topic and that MGA failed to educate her properly on the topic.

13    Ms. Tonnu testified that she spoke to an accounts payable clerk, Ms. Brooks, who had "a list of

14    vendors and the dates in which they were either employed or freelancing with Mattel, and she

15    cross-referenced that in her research." Tonnu Tr. at 147:5-148:20.  Mattel points out, however,

16    that Ms. Tonnu testified that she did not know who prepared the list; did not see the criteria used

17    to prepare the list; did not know who the vendors or freelance people were on the list; and did not

18    know whether the list included all former Mattel employees who were working at MGA.  MGA

19    produced Ms. Tonnu for a second time regarding Topic No. 31, however, Mattel contends that she

20    was still unprepared.

21        MGA contends that it has substantially discharged its obligation to provide testimony on

22    this topic.  MGA explains that Ms. Tonnu testified on this topic based on a review of MGA

23    business records.  MGA explains that to prepare for the deposition, it prepared a list of MGA

24    employees who were former Mattel employees, including the dates each person was employed by

25    Mattel.  Next, Ms. Brooks searched MGA's accounting records reflecting payments to outside

26    vendors for any evidence of a payment to a former Mattel employee on the list during the period

27    of that person's Mattel employment, or with respect to work or services performed during that

28    period.  MGA contends that Ms. Tonnu testified about this search and the results of the search

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

EXHIBIT 33 PAGE 85(

1  leading to the identification of three instances of payments to former Mattel employees while the

2  employee was still at Mattel.

3        Nevertheless, MGA represents that prior to the filing of this motion, it designated Ms.

4  Tonnu to provide additional testimony on this topic. Specifically, MGA is prepared to produce

5  Ms. Tonnu to testify regarding whether former Mattel employees may have performed work or

6  services for MGA during their employment with Mattel without being paid for those services.

7  Ms. Tonnu's deposition is scheduled for January 9, 2008.

8        A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently

9  prepared to testify on Topic No. 31. Notably, Ms. Tonnu admitted that she did not know whether

10  any person has at any time since 1998 performed work or services for MGA while that person

11  was a Mattel employee. Further, she testified that she did not speak with or ask any of the former

12  Mattel employees who were working at MGA whether they had provided work or services for

13  MGA while they were Mattel employees. Instead, Ms. Tonnu only knew whether or not

14  payments were made to the former Mattel employees while they were still employees of Mattel.

15  Furthermore, the list of former Mattel employees provided by Ms. Brooks was incomplete

16  because it did not include twelve former Mattel employees. Accordingly, Mattel is entitled to an

17  order compelling MGA to produce a witness to provide complete testimony on Topic No. 31.

18        **Topic No. 34:** Other than those previously filed and served in this ACTION or in which
Mattel, Inc.'s counsel in this ACTION was in attendance, the testimony, transcripts,
declarations, affidavits and other sworn written statements of any other type by or from
YOU or made on YOUR behalf that REFER OR RELATE TO BRATZ THAT REFER
OR RELATE TO the time period prior to June 30, 2001 (regardless of when such
testimony or sworn statement was taken, given, signed, made or filed).

19        Mattel contends that Mr. Woodman had not been adequately prepared for his deposition

20  and lacked the most basic knowledge on the topic. Mattel points out that Mr. Woodman had been

21  employed with MGA for less than one year and that his responsibilities had been limited to the

22  administration of licensing contracts and royalties. Further, Mattel contends that in preparation

23  for his deposition, Mr. Woodman "did no more than review a selection of sworn statements

24  previously made by others, review transcripts of Carter Bryant's deposition testimony, and speak

25  'for a few minutes' with one other person besides counsel." Mattel's Consolidated Separate

26  Statement, p.130.

1      Mattel also contends that Mr. Woodman was not sufficiently prepared to testify regarding

2  "sworn statements in MGA's many submissions to the Copyright Office or Patent and Trademark

3  Office," and sworn testimony from the "Art Attacks" trial. Id. Further, Mattel contends that

4  MGA's counsel improperly instructed Mr. Woodman not to answer certain questions on the basis

5  that Topic No. 34 did not include sworn statements made in connection with the "Art Attacks"

6  matter or statements made in various submissions to the Copyright Office or Patent and

7  Trademark Office. Counsel also instructed Mr. Woodman not to answer certain questions about

8  sworn statements that related to Topic No. 33 and statements that MGA believed did not

9  sufficiently relate to conduct prior to June 30, 2001. Topic No. 33 seeks testimony on

10  applications for registration and the registrations for copyright, patent, trademark or any other

11  right that refer or relate to Bratz or Bratz designs, sought, made or obtained by, for or on behalf of

12  MGA or Bryant, including communications pertaining thereto.

13      MGA contends that Mattel is not entitled to any further testimony on this topic. MGA

14  explains that Mr. Woodman reviewed 30-50 sworn statements, read the transcript of the

15  depositions of Carter Bryant and Victoria O'Connor, MGA's former Vice President of Licensing,

16  and interviewed Leon Djiguerian in MGA's Product Development. MGA further asserts that Mr.

17  Woodman answered questions as to the completeness or incorrectness of many factual statements

18  contained in the sworn statements placed in front of him by Mattel's counsel. Thus, MGA

19  contends that Mattel obtained exactly the testimony it sought. In MGA's view, Mr. Woodman's

20  testimony regarding the correctness or incorrectness of factual statements identified from the

21  sworn statements is binding on MGA. MGA also contends that Mr. Woodman was not required

22  to investigate the preparation, review and approval of MGA's various sworn statements because

23  such information would be protected from disclosure by the attorney-client privilege and work

24  product doctrine.

25      MGA next contends that most of the documents shown to Mr. Woodman were not "sworn

26  statements," but rather (i) copyright registrations and certificates that include a statement that the

27  application is "correct to the best of my knowledge," (ii) certificates of registration issued by the

28  USPTO, and (iii) an office action summary by the USPTO. Nevertheless, MGA implicitly

1  acknowledges that Mr. Woodman did not provide sufficient testimony as to certain applications

2  for registrations containing declarations by Isaac Larian documents (Exhibits 580-584, 590), a

3  declaration by Bryant (Exhibit 502), and an application and amendment referred to in the Bryant

4  declaration (Exhibits 500, 548), and one additional declaration by Isaac Larian, by agreeing to

5  produce Sam Khare to testify regarding these documents.  Mattel is scheduled to depose Mr.

6  Khare on January 8, 2008.

7      MGA contends that prior counsel properly objected to certain questions as outside the

8  scope of Topic No. 34.  In particular, MGA contends that questions directed at statements that did

9  not refer or relate to the time period prior to June 30, 2001 are outside the scope of Topic No. 34.

10  Further, MGA contends that where a sworn statement relates in part to the time period before

11  June 30, 2001, and in part to other time periods, the scope of Topic No. 34 is limited by its own

12  terms to that portion of the statement that relates to the specified time period.  MGA also contends

13  that sworn testimony taken at the Art Attacks trial is outside the scope of Topic No. 34 because

14  Mattel's counsel was present at that trial.

15      MGA represents that its present counsel does not condone the instructions not to answer

16  made by prior counsel, and will not attempt to justify those instructions.  Nevertheless, MGA

17  contends that Mattel was not deprived of any discoverable testimony by those instructions

18  because the disputed questions sought information outside the scope of Topic No. 34.  More

19  specifically, MGA represents that each exhibit that was excluded from Mr. Woodman's testimony

20  on the grounds that it was not a "sworn statement" was the subject of examination of MGA's

21  designees on Topic No. 33, Bryan Armstrong and Sam Khare.  MGA also contends that

22  resumption of a deposition on Topic No. 34 beyond what MGA has agreed to provide is

23  unwarranted because Mattel obtained two full days of 30(b)(6) testimony on Topic No. 33.

24      A review of the deposition transcript confirms that Mr. Woodman was not sufficiently

25  prepared to provide testimony on Topic No. 34.  Mr. Woodman did no more than review the

26  sworn statements made by others and the transcripts of Carter Bryant's deposition.  For the sworn

27  statements he did review, Mr. Woodman offered little information beyond what was apparent on

28  the face of the documents.  For example, Mr. Woodman did not know who authorized submitting

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

16

EXHIBIT _33_ PAGE _854_

1    the sworn statement.  Ultimately, Mr. Woodman only testified as to whether or not a particular

2    sworn statement was consistent with deposition testimony of Carter Bryant.  Furthermore, Mr.

3    Woodman admitted that the testimony he gave had nothing to do with MGA's current beliefs, was

4    not based on any investigation, and had nothing to do with the actual correctness or incorrectness

5    of any of the sworn statements.  Mr. Woodman admitted that no matter what inconsistencies

6    existed between Carter Bryant's testimony and MGA's sworn statements, Mr. Woodman always

7    presented Carter Bryant's testimony as to the facts as "true."  Thus, Mr. Woodman failed to

8    testify as to information known or reasonably available to MGA.  Mr. Woodman's lack of

9    preparedness alone justifies re-opening Topic No. 34.  Furthermore, MGA cannot rely on blanket

10   claims of privilege to preclude testimony on Topic No. 34.

11          A further deposition on Topic No. 34 is also justified in light of the admittedly improper

12   instructions not to answer, and MGA's acknowledgement that Mr. Woodman did not provide

13   testimony as to Exhibits 500, 502, 548, 580-584, 590.  MGA shall abide by its agreement to

     produce a witness to testify on these exhibits.

14          MGA's interpretation of Topic No. 34 as excluding statements not made under oath or

15   penalty of perjury, and as excluding any portion of a statement under oath that does not refer or

16   relate to the time period prior to June 30, 2001, is overly technical.  There is, however, a clear

17   overlap between Topic No. 34 and Topic No. 33, which is not at issue in this motion.  When the

18   deposition on Topic No. 34 is resumed, MGA's corporate designee is not required to provide

19   further testimony on statements that were the subject of examination of MGA's designees on

20   Topic No. 33.

21          MGA's interpretation of Topic No. 34 as excluding testimony from the Art Attacks trial is

22   appropriate.  Mattel does not contest that its counsel attended the Art Attacks trial.  Topic No. 34

23   clearly excludes any proceeding attended by Mattel's counsel.  When the deposition on Topic No.

24   34 is resumed, MGA's corporate designee is not required to provide further testimony with

25   respect to the Art Attacks trial.

26          **Topic No. 39:** The preservation, collection, destruction, removal, transfer, loss or
27          impairment of YOUR DOCUMENTS and DIGITAL INFORMATION in connection with
            the ACTION and/or any DOCUMENTS requested by MATTEL in the ACTION.
28
                                                                                                    17

EXHIBIT 33 PAGE 855

MGA designated two individuals to testify on this topic:  Kenneth Lockhart to testify on electronic evidence; and Lisa Tonnu, to testify on documentary evidence.  Mattel contends that both designees were unable to provide substantive testimony.

Mattel points out that Mr. Lockhart did not know whether the MGA's "PST files" had been searched; whether e-mails had been deleted from the exchange mailbox between late 2004 and the present; whether MGA's "snap servers" had been searched; whether keywords were used to search "PST" files; and what user files were searched.  Further, Mattel contends that Mr. Lockhart was not aware of the location of any hard drive or any image of any hard drive that had been preserved for litigation purposes.

MGA contends that Mr. Lockhart substantially discharged MGA's obligation on Topic 39 with respect to electronic documents.  MGA represents that Mr. Lockhart prepared extensively for his testimony by speaking with various individuals and that he testified at length about the configuration of MGA's computer systems and MGA's policies, practices and procedures for the retention and preservation of electronic documents.

Nevertheless, MGA is willing to produce a witness to testify on its behalf regarding the collection of electronic documents in connection with this action in order to shore up the one area of Mr. Lockhart's testimony that MGA agrees was lacking.

As for Ms. Tonnu, Mattel contends that MGA made no discernible effort to educate her concerning the topic.  Ms. Tonnu testified that she did not know whether MGA has a document retention policy.  Mattel also contends that MGA's counsel instructed Ms. Tonnu not to answer any questions about MGA's preservation and collection of documents based upon unfounded claims of attorney-client privilege.[2]

MGA produced Ms. Tonnu a second time to testify on Topic No. 39, however Mattel contends that her testimony remained deficient.  For example, Ms. Tonnu testified that she prepared for the deposition by speaking with Rich Daniels, MGA's counsel, and by reviewing a

//

---

[2] The instructions not to answer are discussed in a separate section of this Order.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

18

EXHIBIT 33 PAGE 857

1   declaration prepared by Daphne Gronich, MGA's General Counsel on the subject of document

2   preservation. Mattel points out, however, that Ms. Tonnu never spoke with Ms. Gronich, and

3   therefore was unable to provide any information beyond what was stated in the four corners of the

4   declaration. In particular, Mattel contends that Ms. Tonnu did not know whether any documents

5   at the MGA campus had been searched for responsive documents. Nor did Ms. Tonnu know what

6   documents were stored at MGA's three off-site facilities and could not confirm whether they had

7   been searched for documents responsive to Mattel's requests.

8          MGA contends that Ms. Tonnu testified fully and completely regarding MGA's

9   preservation of documents in connection with this action. Indeed, MGA contends that the

10  Gronich declaration, which had already been provided to Mattel, contains detailed information

11  regarding MGA's document preservation efforts. MGA also points out that Tonnu testified,

12  based on her investigation and MGA's general policy (that documents generated by employees in

13  the ordinary course of business should not be destroyed and the wide distribution of document

14  preservation notices to MGA employees), that MGA did not knowingly destroy any documents

    potentially relevant to this action.

15         MGA acknowledges, however, that Ms. Tonnu was not able to testify regarding the actual

16  collection of documents for production in this action. MGA represents that it is willing to

17  produce an additional witness to discuss the collection of hard copy and electronic documents in

18  connection with this action.

19         A review of the deposition transcripts confirms that MGA's witnesses provided a

20  significant amount of testimony on this topic, and in particular regarding document preservation.

21  The one area where they were glaringly deficient was regarding document "collection."

22  Accordingly, MGA is ordered to abide by its agreement to produce a witness to testify further

23  with respect to the "collection" of hard copy and electronic documents. In all other respects,

24  MGA is in substantial compliance with Topic No. 39, and the burden and expense of re-opening a

25  deposition on the entirety of Topic No. 39 outweighs the likely benefit of the testimony Mattel

    seeks.

26         **Topic No. 40:** The preservation, collection, destruction, removal, transfer, loss or

27

28
                                                                                    19

EXHIBIT 33 PAGE 857

1   impairment of YOUR DOCUMENTS and DIGITAL INFORMATION since January 1, 1999 that

2   REFER OR RELATE TO MATTEL (including without limitation to any MATTEL product, plan

3   or information) that YOU received in any manner from any PERSON who was at the time an

4   employee of MATTEL or who had previously been an employee of MATTEL.

5       This topic appears to be based, at least in part, upon Mattel's allegations that former

6   Mattel employee Ron Brawer, former Mattel employees in Mattel's offices in Mexico; and a

7   former Mattel employee located in Canada improperly provided MGA with documents containing

8   Mattel trade secrets.

9       Mattel contends that MGA made no discernible effort to educate Ms. Tonnu on Topic No.

10  40, and therefore she was unable to answer whether MGA has or has had in its possession any (1)

11  Mattel strategic plans, (2) any sales or profit information of Mattel, (3) any documents related to

12  Mattel's advertising strategy, (4) any documents relating to the results of Mattel's advertising, (5)

13  documents related to Mattel's pre-release line lists, and (6) documents related to Mattel's strategy

14  with respect to specific customers.  MGA produced Ms. Tonnu a second time, however, Mattel

15  contends that her testimony remained deficient.  In particular, Mattel complains that MGA spoke

16  with only two former employees about the documents described above, when there are many

17  more former Mattel employees working at MGA.

18      MGA contends that Ms. Tonnu spoke with the three individuals at MGA who would be

19  most knowledgeable about the allegations against MGA and testified as to any documents they

20  brought with them from Mattel:  Ron Brawer, Susana Kuemmerle and Janine Brisbois.  MGA

    contends that Ms. Tonnu's preparation to testify on Topic 40 was reasonable.

21      Nevertheless, MGA represents that it has agreed to provide additional testimony through

22  Ms. Tonnu to address Mattel's concerns, and that her deposition will take place on January 9,

23  2008.

24      A review of the deposition transcript indicates that Ms. Tonnu did not prepare sufficiently

25  for her testimony.  Ms. Tonnu spoke to only three individuals.  Clearly, there are far more sources

26  of information reasonably available to MGA, namely the many more former Mattel employees

27  now employed at MGA.  MGA made no effort to determine what Mattel documents, if any, these

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

20

EXHIBIT 33 PAGE 858

1    individuals possess.  Therefore, Mattel is entitled to an order compelling MGA to produce a

2    witness to provide complete testimony on Topic No. 40.

3        **Topic No. 41:** The testing or sampling from DOCUMENTS that REFER OR RELATE
         TO BRATZ or BRYANT, including without limitation such testing or sampling in

4        connection with any ink, paper or chemical analysis performed or attempted to be
         performed to date, any DOCUMENTS that REFER OR RELATE thereto and all results

5        and reports relating thereto.

6        Mattel deposed Ms. Tonnu on this topic on two separate occasions.  Mattel contends that

7    in each instance, she was unprepared to given any meaningful testimony regarding any ink, paper

8    or chemistry testing performed on Bratz documents.  In particular, Mattel contends that Ms.

9    Tonnu's preparation for her deposition was inadequate because she did not speak to the MGA

10   litigation consultant who performed the testing, Mr. Speckin, but merely read his declaration.

11       Furthermore, Mattel contends that MGA's counsel improperly instructed Ms. Tonnu not to

12   answer questions based upon unfounded claims of work product protection.  Mattel explains that

13   it is not seeking information concerning Mr. Speckin's opinions or the results of his test on Bratz

14   documents.  Instead, Mattel contends that it is seeking factual information concerning the

15   handling and shipment of original Bratz documents, as well as the specific documents that were

16   tested.  In Mattel's view, the factual circumstances surrounding Mr. Speckin's testing are not

17   protected from discovery by the work-product doctrine.

18       Moreover, Mattel contends that MGA provided Mattel's counsel with a list identifying the

19   documents that Mr. Speckin tested and allowed Ms. Tonnu to testify about the identification of

20   documents, thereby waiving any work product protection with respect to the identification of

21   documents.  Mattel also contends that Mr. Speckin's declaration, which was submitted in the

22   case, already discloses the types of tests conducted and therefore any privilege that may have

23   applied has been waived with respect to this subject.

24       MGA contends that it complied with this topic and that Mattel is not entitled to any further

25   examination because further questioning about the testing performed by Mr. Speckin would

26   violate MGA's attorney work product protection.  Mr. Speckin is one of MGA's non-testifying

27   experts.  MGA objects to any further questioning regarding Mr. Speckin's selection of which

28   documents to test, how the documents were handled, which tests were performed on the

1   documents, how they were shipped and how they were stored.  MGA contends that further

2   questioning on these subjects would necessarily reveal the mental impressions, legal theories, and

3   conclusions of MGA's counsel and its non-testifying experts formed in anticipation of litigation

4   with Mattel.  Further, MGA contends that Mattel has not carried its heavy burden to demonstrate

5   the "exceptional circumstances" required to invade MGA's work product.

6          A review of the deposition transcript confirms that Ms. Tonnu was not reasonably

7   prepared to testify on Topic No. 41.  Ms. Tonnu did not speak with Mr. Speckin or anyone

8   involved in the testing.  She had only read Mr. Speckin's declaration.  Therefore, she clearly was

9   not in a position to testify as to information known or reasonably available to MGA.  On this basis

10  alone, Mattel is entitled to an order compelling MGA to produce a witness to testify fully on

    Topic No. 41.

11

12         As for MGA's claims of work production protection, Judge Larson has already indicated

13  that questions of privilege regarding the testing of the Bratz documents must be handled on a

    question-by-question basis.  The questions at issue are set forth in Mattel's Separate Statement

14  No. 2, and are discussed below in connection with Mattel's Request for Relief No. 4.

15

16  B. Mattel's Request for Relief No. 2:  Mattel seeks an order overruling each of the purportedly
    improper instructions not to answer questions interposed at the deposition of MGA designees
17  Spencer Woodman (Instruction Nos. 46-57) and compelling Woodman or other such person
    selected by MGA as its designee to provide complete testimony on Topic No. 34.

18         Mattel identifies each instance of allegedly improper instructions in its Separate Statement

19  No. 2.  In each instance identified by Mattel, MGA's counsel instructed the witness not to answer

20  questions about matters that counsel believed exceeded the scope of the deposition.  The

21  instructions not to answer were not based upon a claim of privilege, and therefore were clearly

22  improper.

23         Furthermore, as stated previously, MGA has acknowledged that some questions fell within

24  the scope of Topic No. 34 and should be answered.  To that end, MGA has agreed to produce a

25  corporate designee to provide supplemental testimony as to Exhibits 500, 502, 548, 580-584, 590.

26  MGA shall abide by its agreement to produce a witness to testify on these exhibits.

27         Nevertheless, many of the questions identified in the Separate Statement No. 2 for which

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

                                                                                            22

EXHIBIT 33 PAGE 860