1   an improper instruction not to answer was given clearly exceeded the scope of the deposition

2   notice.  MGA is not required to provide further testimony as to those questions.  For example, the

3   question regarding the Art Attacks trial that Mattel's counsel attended (Instruction No. 46) exceed

4   the scope of Topic No. 34, and do not require any further testimony.  MGA is also not required to

5   provide further testimony as to documents that have been the subject of questioning during the

6   30(b)(6) deposition on Topic No. 33.[3]

7   C. Mattel's Request for Relief No. 3:  Mattel seeks an order compelling MGA to produce
    documents that MGA designee Kenneth Lockhart identified during his June 14, 2007 deposition

8   as documents which he reviewed and relied upon to refresh his recollection in preparation for his
    deposition.

9        Mattel seeks an order compelling MGA to produce documents that Mr. Lockhart

10  identified during his deposition as documents which he reviewed and relied upon to refresh his

11  recollection in preparation for his deposition.

12       MGA contends that the documents Mattel seeks are privileged e-mail communications

13  from MGA's General Counsel to MGA employees regarding their document preservation

14  obligations in light of the present action.  MGA contends that its privilege log demonstrates that

15  the documents are protected by both the attorney-client privilege and the work product doctrine.

16  Furthermore, MGA contends that Mr. Lockhart was required to review the privileged emails

17  because they related to MGA's preservation of documents in connection with this action and they

18  were reasonably available to MGA.

19       Moreover, MGA contends that waiver of the attorney-client privilege and work product

20  doctrine is not automatic where a witness refreshes his recollection with privileged prior to a

21  deposition.  In re Managed Care Litig., 415 F.Supp.2d 1378 (S.D. Fla. 2006); Medtronic Xomed,
    Inc. v. Gyrus ENT LLC, 2006 WL 786425, at *1, 3, 6-7 (M.D. Fla. March 27, 2006).

22       MGA's bare bones privilege log, unaccompanied by any supporting declarations, is

23  insufficient to establish the attorney-client privilege and the work product doctrine.  Further,

24  although there appears to be a split in authority, the weight of authority supports a finding of

25

26  _____

27  [3] MGA represents that virtually all of the questioning quoted in Mattel's Separate Statement No. 2 at
    Instruction Nos. 47-57 was covered in the deposition on Topic No. 33.  However, MGA's representation cannot be
    confirmed by the excerpts of the deposition transcript submitted in connection with this motion.

28

EXHIBIT 33 PAGE 861

waiver.  See e.g. United States ex rel. Bagley v. TRW Inc., 212 F.R.D. 554, 565-566 (C.D. Cal. 2003) (requiring disclosure of documents reviewed by relator in preparing for his deposition based upon waiver of work product protection); U.S. v. 22.80 Acres of Land, 107 F.R.D. 25-26 (N.D. Cal. 1985) (work product waived where deponents used documents to refresh recollection); Ehrlich v. Howe, 848 F.Supp. 482, 493 (S.D. N.Y. 1994) ("when [c]onfronted with the conflict between the command of Rule 612 to disclose materials used to refresh recollection and the protection afforded by the attorney-client privilege . . . the weight of the authority holds that the privilege is waived."); Marshall v. United States Postal Service, 88 F.R.D. 348, 350 (D. D.C. 1980) ("[I]t is apparent that once a document is used to refresh the recollection of a witness, privileges as to that document have been waived.").

Furthermore, the interests of justice compel production of the e-mail documents used by Mr. Lockhart to refresh his recollection.  MGA acknowledges that Mr. Lockhart was required to review the e-mails because they related to MGA's preservation of documents.  Mr. Lockart testified that the e-mails refreshed his recollection as to what MGA employees had been requested to preserve.  Accordingly, MGA is ordered to produce the e-mails reference in Mr. Lockhart's deposition.

D. Mattel's Request for Relief No. 4.  Mattel seeks an order overruling each of the purportedly improper instructions not to answer questions interposed at the deposition of MGA designee Lisa Tonnu.

In Mattel's Separate Statement No. 2, Mattel identifies each purported instance of improper objections and/or instructions not to answer for which it seeks a ruling.  Each instance of allegedly improper conduct is discussed below.

Instruction Nos. 1-5

Mattel's counsel posed a series of questions regarding Mr. Larian's trusts.  In each instance, MGA's counsel instructed Ms. Tonnu not to answer.  MGA's counsel objected to the question on privilege and privacy grounds, and objected that the question exceeded the scope of deposition.

The privilege objections are overruled because MGA has failed to establish the requisite

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

24

EXHIBIT 33 PAGE 862

elements of any applicable privilege.  The privacy objections are overruled since there is a protective order in place to address Mr. Larian's privacy concerns regarding his personal finances. The remaining objections do not justify an instruction not to answer.  See Fed.R.Civ.P. 30(c)(2) (an objection must be noted on the record, but the examination still proceeds and the testimony is taken subject to any objection).  Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 1-5.

### Instruction No. 6

In this excerpt, the witness wanted to clarify her testimony regarding voucher payments, which prompted Mattel's counsel to ask a series of questions about what prompted her make the clarification, including "that's what counsel told you at the break?"; "[h]ow was your recollection refreshed"; and "[d]id Mr. Jenal tell you what the dates were?"  MGA's counsel objected on privilege grounds and instructed the witness not to answer.

The objections are overruled.  The attorney-client privilege protects an attorney's communication of legal advice to his client, as well as the client's communication of information to the attorney "to enable him to give sound and informed advice."  Upjohn Co. v. United States, 449 U.S. 383, 390 (1981).  In this instance, the question posed did not require the witness to disclose the substance of an attorney-client communication.  Instead, the questions posed called for the disclosure of underlying facts to which Mattel is entitled.  See Upjohn, supra at 395 (finding that the attorney-client privilege does not preclude disclosure of factual information and that the privilege does not protect facts communicated to an attorney).

Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction No. 6.

### Instruction Nos. 7-20 and 23

In each of these excerpts, Mattel's counsel posed questions regarding testing performed on Bratz drawings.  MGA's counsel objected to the questions based upon the work product doctrine and instructed the witness not to answer.

The work product objections are overruled.  The work product doctrine, now codified in

EXHIBIT 33 PAGE 863

part in Rule 26(b)(3) of the Federal Rules of Civil Procedure, provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial. The party claiming work product immunity has the burden of establishing its elements by competent evidence. In re Kidder Peabody Securities Litigation, 168 F.R.D. 459, 462 (S.D. N.Y. 1996).

In the instant case, all of the questions posed to the witness take one of four forms: "do you know whether" or "do you know who" or "do you know what" or "do you know why." The questions thus call for a simple "yes" or "no" response that did not require divulging any information protected by the work product doctrine.

Even if the questions are construed to require substantive responses beyond "yes" or "no," the information sought is factual (what test was conducted, how documents were stored, whether the documents were handled with cotton or latex gloves, who was with the expert when he performed his tests, what precautions he took). The questions do not require the witness to divulge the mental impressions, the legal theories, or conclusions of Mr. Speckin.

Moreover, Rule 26(b)(4)(B), Fed.R.Civ.P., provides that a party may discover facts known or opinions held by an non-testifying expert upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means. In the instant case, there is no other practicable means for Mattel to obtain information about the handling, shipping and testing of original Bratz documents while in Mr. Speckin's possession. Mr. Speckin is a non-testifying expert. The manner in which Mr. Speckin transported, analyzed, tested or otherwise used the original Bratz drawings is uniquely within his knowledge and plainly relevant. The original Bratz drawings are a key piece of evidence in this case. Mattel needs information concerning what, if any, changes, damage, or other alterations were made to the original Bratz drawings. Mattel is not seeking information regarding Mr. Speckin's opinions or the results of his tests. Rather, Mattel is seeking only information regarding the handling of the original Bratz documents and more precise identification information for the specific documents that were handled by Mr. Speckin.

MGA objects to providing information concerning Mr. Speckin's testing, the testing conditions, the selection of which drawings to test and other logistics. MGA, however, has

already disclosed the types of tests performed by Mr. Speckin in a declaration submitted to the court, and has provided Mattel with a list identifying the documents that Mr. Speckin tested, although the list did not identify the documents by Bates numbers.  Therefore, MGA has waived any work product protection to which it may have been entitled with respect to the identification of the original Bratz drawings that were subjected to testing and which tests were performed.

Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 7-20 and 23.

### Instruction Nos. 21-22

In these excerpts, Mattel's counsel asked Ms. Tonnu whether she could identify or describe any of the documents that were tested by Mr. Speckin.  MGA's counsel objected to the questions based upon the work product doctrine and instructed the witness not to answer

The objections are overruled.  As discussed immediately above, the questions call for factual information that is not protected by the work product doctrine.  Even if the work product doctrine applied, the protection has been waived.  Furthermore, this case presents exceptional circumstances under which it is impracticable for Mattel to obtain the information sought by other means.  Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 21-22.

### Instruction Nos. 24-26

In these excerpts, Mattel's counsel asked the witness (1) what Ms. Garcia told her about Diva Starz and (2) whether Ms. Garcia told the witness she had access to Diva Starz information while she was at Mattel.  MGA's counsel objected to the questions to the extent the witness' conversations with Ms. Garcia occurred in the presence of counsel and instructed the witness not to answer.

The objections are overruled.  The questions do not require the witness to divulge the substance of any privileged communication.  Instead, the questions call for factual information to which Mattel is entitled.

Bryent v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 865

1   Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

2   responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 24-

3   26.

4   <u>Instruction No. 27</u>

5   In this excerpt, Mattel's counsel asked the witness twice whether MGA had access to

6   Mattel internal information regarding Diva Starz prior to February 1st, 2000.  MGA's counsel

7   made a speaking objection, which clearly violated Rule 30(c)(2), Fed.R.Civ.P.  However, the

8   questions do not need to be repeated because the witness provided responses.

9   <u>Instruction No. 28</u>

10   In this excerpt, Mattel's counsel asked, "MGA is denying that it had access to internal

11   information about Mattel's Diva Starz project prior to September 1st, 2000?"  MGA's counsel

12   objected on the grounds that the question calls for a legal conclusion, calls for the disclosure of

13   privileged information, and exceeds the scope of the deposition.  Counsel also instructed the

     witness not to answer.

14   The objections are overruled.  The question does not call for a legal conclusion and MGA

15   has failed to establish the elements of the attorney-client privilege.

16   Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

17   responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 28.

18   <u>Instruction Nos. 29-34</u>

19   In these excerpts, Mattel's counsel asked as series of questions regarding whether MGA

20   knew Mattel was considering using the name "Brats" and "Boyz" in connection with the Diva

21   Starz project and whether MGA knew Mr. Linker worked on the project.  MGA's counsel made

22   several objections including the following:  assumes facts not in evidence; misstates the witness'

23   prior testimony; compound; outside the scope of the deposition; improper as to form; lacks

24   foundation; vague and ambiguous; calls for speculation; argumentative; and asked and answered.

25   MGA's counsel objected to one question (Instruction No. 30) on the additional ground that it may

26   call for attorney-client communications.  MGA's counsel also instructed the witness not to

27   answer.

28

EXHIBIT 33 PAGE 86

The repeated instructions not to answer were clearly improper. Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 29-34.

<u>Instruction No. 35</u>

In this excerpt, the witness indicated that she did not know whether Mr. Linker worked on the Bratz project. Mattel's counsel then asked, "But you don't know one way or the other?" MGA's counsel objected to the question, asserting that it had been asked and answered and was argumentative. MGA's counsel also instructed the witness not to answer.

The instruction not to answer was clearly improper. Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction No. 35.

<u>Instruction No. 36</u>

In this excerpt, Mattel's counsel asked, "Did you have a conversation with Mr. Jenal about the net worth or the valuation of the company?" MGA's counsel objected on privilege grounds and instructed the witness not to answer.

The objection is overruled. The question calls for a "yes" or "no" answer and does not require the witness to divulge the substance of a privileged communication.

Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction No. 36.

<u>Instruction No. 37</u>

In this excerpt, Mattel's counsel asked, "What did Mr. Daniels tell you about the net worth or valuation of the company?" MGA's counsel objected on privilege grounds.

The objection is sustained. As phrased, the question potentially calls for the disclosure of the substance of a privileged communication.

<u>Instruction Nos. 38-40</u>

In these excerpts, MGA's counsel instructed the witness not to answer. The instruction was not based upon a claim of privilege, and therefore was improper. MGA's counsel also made an improper speaking objection. Accordingly, MGA shall produce a knowledgeable 30(b)(6)

1    designee to provide complete responses to the questions identified in Mattel's Separate Statement

2    No. 2 as Instruction Nos. 38-40.

3                                    Instruction No. 41

4        In this excerpt, Mattel's counsel asked the witness to identify the litigation for which

5    Exhibit 660 was prepared.  MGA's counsel objected to the question as calling for work product

6    and instructed the witness not to answer.

7        The work product objection is overruled.  The question calls for the disclosure of facts, not

8    work product.  Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide

9    complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction

     No. 41.

10                                   Instruction Nos. 42-44

11       In these excerpts, Mattel's counsel posed more questions about the litigation for which

12   Exhibit 660 was prepared, including the identity of the parties to the litigation and whether the

13   litigation was ongoing.  MGA's counsel objected on privilege and work product grounds.

14       The objections are overruled.  The questions call for the disclosure of facts, not work

15   product.  Further, MGA has failed to establish that the questions require the witness to disclose

16   the substance of a privileged communication.  Accordingly, MGA shall produce a knowledgeable

17   30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate

18   Statement No. 2 as Instruction Nos. 42-44.

19                                   Instruction No. 45

20       In this excerpt, Mattel's counsel asked whether an attorney by the name of Mr. Daniels

21   wrote a document.  The work product objection by MGA's counsel is overruled.  The "yes" or

22   "no" question calls for the disclosure of facts, not work product.  Accordingly, MGA shall

23   produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions

24   identified in Mattel's Separate Statement No. 2 as Instruction No. 45.

25   E. Mattel's Request for Relief No. 5:  Mattel seeks an order reopening the deposition of MGA
     designee Lisa Tonnu based on a purported "complete reversal of testimony" made through written
26   "changes" to her deposition transcript.

27       Ms. Tonnu made changes to her deposition transcript after her deposition was completed.

28

1   Counsel asked Ms. Tonnu whether any documents had been collected from MGA's Filenet

2   storage facility, to which she responded "no"; whether Mr. Daniels told her that he was going to

3   collect documents from Filenet, to which she responded "yes"; and whether the documents at

4   Filenet contained any documents responsive to Mattel's request, to which she responded "no."

5   Later, Ms. Tonnu revised her deposition transcript and reversed each of her answers.

6       Mattel contends that Ms. Tonnu's initial answers in the negative precluded a line of

7   questioning into, for example, who collected documents, which documents were collected and

8   how.

9       MGA contends that the changes Ms. Tonnu made do not justify re-opening a deposition.

10  Nevertheless, MGA has no objection to follow-up questions about Ms. Tonnu's revision when she

    is deposed again in January.

11      In light of MGA's lack of opposition, MGA shall make Ms. Tonnu available for follow-up

12  questioning regarding the revisions to her deposition testimony.

13  F. Mattel's Request for Relief No. 6:  Mattel seeks an order compelling Rebecca Harris to sit for

14  the completion of her deposition and/or compelling such person selected by MGA as its designee

    to complete the testimony on topics for which Harris was previously designated.

15      Mattel seeks an additional day to depose Ms. Harris.  Mattel contends that it needs more

16  than the 7-hours it has already deposed Ms. Harris to complete its questioning on all topics for

17  which she was designated.  Mattel emphasizes that Ms. Harris is designated to testify on nine

18  separate topics, each of which pertains to issues at the heart of the litigation, including the origin,

19  creation, design and development of Bratz prior to June 30, 2001; relevant contracts concerning

20  Carter Bryant and Bratz; payments made to Bryant and other financial information relating to

21  Bratz; and third parties who were involved in or otherwise have knowledge about the creation,

22  design and development of Bratz.

23      In addition to the topics already discussed above in Section "A" to this Order, Mattel

24  contends that it did not have sufficient time to depose Ms. Harris on Topic Nos. 19, 22 and 23,

25  which are set forth below:

26      **Topic No. 19:**  Each agreement or contract between YOU and any PERSON other than
        BRYANT that REFERS OR RELATES TO BRATZ or BRATZ DESIGNS that REFERS
27      OR RELATES to the time period prior to December 31, 2001 (regardless of when such
        agreement or contract was negotiated or executed), including without limitation the timing
28      thereof, the negotiations, drafts and COMMUNICATIONS that REFER OR RELATE

31

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 869

thereto, and any actual or proposed amendments thereto.

**Topic No. 22:** The payment of money or anything of value by or for YOU or on YOUR behalf that has been made to, for or on behalf of BRYANT (a) for work, services or activities performed by BRYANT prior to January 1, 2001 (regardless of when such payment was actually made), (2) for DESIGNS CREATED by BRYANT prior to January 1, 2001 (regardless of when such payment was actually made) or (c) in connection with BRATZ or any BRATZ DESIGN at any time, including amount(s) thereof and the reasons therefore,

**Topic No. 23:** The payment of royalties to, for or on behalf or BRYANT made by or for YOU or on YOUR behalf, including the timing, manner and amounts of such payments and the reasons therefore.

MGA contends that Mattel has not made the required showing that additional time is "needed to fairly examine the deponent" or that "the deponent, another person, or any other circumstance impedes or delays the examination." Fed.R.Civ.P. 30(d)(1). Furthermore, MGA contends that Mattel wasted much of the 7-hours with Ms. Harris by asking questions outside the topics for which she was designated and badgering the witness.

As discussed already above, Ms. Harris was not sufficiently prepared to testify on several topics and did not discharge MGA's duty to produce a witness to testify as to information known or reasonably available to MGA. Her lack of preparedness alone justifies additional deposition time. The relatively large number of topics for which Ms. Harris was designated (Topic Nos. 11, 13, 14, 19, 21, 22, 23, 27 and 28), also justifies additional deposition time to enable Mattel to fairly examine the deponent. Many of the topics for which Ms. Harris was designated are highly relevant to the case. Mattel has identified a few instances where Mattel was inefficient in conducting her deposition; however, the deposition generally proceeded at a reasonable pace. Accordingly, Mattel is granted an additional four hours to complete the deposition of Ms. Harris on all of the topics for which she was designated, except Topic Nos. 27 and 28 which were discussed previously.

G. Mattel's Request for Relief No. 7:  Mattel seeks an order imposing sanctions for MGA's alleged willful violations of the May 16, 2007 and August 14, 2007 Orders, for MGA's allegedly improper instructions not to answer deposition questions and for MGA's alleged improper coaching, harassing and obstructionist conduct at the September 24-25, 2007 deposition of Lisa Tonnu and at the October 9, 2007 deposition of Spencer Woodman in the amount of $10,000.

Sanctions are appropriate based upon MGA's failure to produce 30(b)(6) designees who were reasonably prepared to testify on seven out of the sixteen topics at issue, namely Topic Nos.

EXHIBIT 33 PAGE 870

1   21, 24, 25, 31, 34, 39 and 40.  By agreeing to provide supplemental testimony on these topics,

2   MGA implicitly acknowledges that the witnesses provided insufficient testimony.  Further,

3   MGA's counsel also repeatedly flouted Rule 30(c)(2), Fed.R.Civ.P., and prior orders prohibiting

4   instructions not to answer for reasons other than privilege.  Accordingly, pursuant to Rule

5   30(d)(2) and 37(b), Fed.R.Civ.P., sanctions are imposed in the amount of $6,000.

6   H. Mattel's Request for Relief No. 8:  Mattel seeks a report and recommendation to Judge
    Stephen G. Larson that recommends the imposition of preclusion sanctions, that certain facts

7   related to the topics compelled be deemed admitted, and/or that MGA be found in contempt for
    MGA's allegedly willful and repeated violations of the Orders.

8       As previously stated at the December 14, 2007 hearing, it is premature to consider

9   preclusion sanctions and contempt at this time.  If Mattel intends to pursue such sanctions, it may

10  do so only after the close of Phase 1 discovery.

11                      V. CONCLUSION

12      For the reasons set forth above, it is hereby ordered as follows:

13      1.      No later than January 30, 2008, MGA shall produce witnesses who are prepared to

14  testify about information known or reasonably available to MGA in accordance with Rule

15  30(b)(6), Fed.R.Civ.P., and to provide complete testimony on the following topics as specified

16  herein:  Topic Nos. 11, 13, 14, 19, 21-25, 31, 34 (with limitations noted herein) 39 (with

17  limitations noted herein), 40 and 41.  Mattel's motion is denied as to Topic Nos. 27 and 28.

18      2.      MGA's 30(b)(6) designee Spencer Woodman shall provide full and complete

19  responses to each of the questions identified in Mattel's Separate Statement No. 2 that are

20  identified herein as requiring a further response because the objections have been overruled

21  and/or the instructions not to answer have been found improper, and the question seeks relevant

22  and privileged information to which Mattel is entitled.

23      3.      MGA shall produce the e-mails that MGA designee Kenneth Lockhart identified

24  during his June 14, 2007 deposition as documents which he reviewed and relied upon to refresh

25  his recollection in preparation for his deposition.  Mattel is also permitted to conduct reasonable

26  follow-up questioning regarding those documents.

27      4.      MGA's 30(b)(6) designee Lisa Tonnu shall provide full and complete responses to

28  each of the questions identified in Mattel's Separate Statement No. 2 that are identified herein as

EXHIBIT 33 PAGE 871

requiring a further response because the objections have been overruled and/or the instructions not to answer have been found improper, and the question seeks relevant information to which Mattel is entitled.

5.    In addition to the deposition testimony authorized above, Mattel is granted leave to depose Ms. Tonnu regarding the changes she made to her deposition transcript.

6.    Mattel is granted additional time to complete a full and fair examination of Ms. Harris on all of the topics for which she was designated, except Topic Nos. 27 and 28.  The deposition of Ms. Harris shall not exceed four (4) hours.

7.    Mattel's request for monetary sanctions is granted in part pursuant to Fed.R.Civ.P. 37(b).  MGA shall pay sanctions in the amount of $6,000 no later than February 11, 2008.

8.    Mattel's request for preclusion sanctions and/or a finding of contempt is denied without prejudice.

Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master, Mattel shall file this Order with the Clerk of Court forthwith.

Dated:  January 8, 2008

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

34

EXHIBIT 33 PAGE 872

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 9, 2008, I served the attached ORDER GRANTING IN PART AND DENYING IN PART MATTEL'S MOTION TO ENFORCE COURT'S DISCOVERY ORDERS AND TO COMPEL; TO OVERRULE PURPORTEDLY IMPROPER INSTRUCTIONS; AND FOR SANCTIONS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 9, 2008, at San Francisco, California.

Sandra Chan

EXHIBIT 32 PAGE 873

**Exhibit  34**

**CONFORMED COPY**

FILED

2007 APR 18 PM 11: 07

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY _____

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California 94111
   Telephone:    (415) 774-2611
4  Facsimile:    (415) 982-5287

5

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9                         EASTERN DIVISION

10

11  CARTER BRYANT, an individual,          CASE NO. C 04-09049 SGL (RNBx)
                                           JAMS Reference No.1100049530
12          Plaintiff,

13      v.                                 Consolidated with
                                           Case No. CV 04-09059
14  MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

15          Defendant.                     **ORDER GRANTING IN PART AND
                                           DENYING IN PART MATTEL'S
16                                         MOTION FOR PROTECTIVE ORDER
                                           REGARDING "POLLY POCKET"
17  CONSOLIDATED WITH                      DOCUMENTS**
    MATTEL, INC. v. BRYANT and
18  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
19

20

21                      I. INTRODUCTION

22       On March 30, 2007, Mattel, Inc. ("Mattel") submitted its Motion For Protective Order

23  Regarding "Polly Pocket" Documents.  Pursuant to Rule 26(c), Fed.R.Civ.P., Mattel seeks a

24  protective order to limit the scope of MGA Entertainment, Inc.'s ("MGA") and Carter Bryant's

25  ("Bryant") subpoenas for production of documents relating to Polly Pocket to only those

26  documents that relate to a single Polly Pocket commercial identified by MGA in an interrogatory

27

28

EXHIBIT 34 PAGE 874

04/19/07

1   response.  On April 6, 2007, MGA submitted its opposition brief, and on April 11, 2007, Mattel
2   submitted a reply brief.  The matter was heard via telephonic conference on April 19, 2007.
3   Having considered the motion papers and comments of counsel at the hearing, Mattel's motion
4   for a protective order is granted in part and denied in part.[1]

5                                    II. BACKGROUND

6          This consolidated action includes MGA's claims for unfair competition against Mattel.
7   Among other things, MGA alleges that Mattel has engaged in "serial copycatting" of MGA
8   products, packaging and advertising, including Bratz dolls and other Bratz products, Bratz
9   packaging and Bratz television commercials.

10         On March 7, 2007 and March 12, 2007, MGA and Bryant issued subpoenas to three of
11  Mattel's advertising agencies:  Young & Rubicam Brands, Peterson Milla Hooks, Inc., and
12  Ogilvy & Mather Worldwide.  The subpoenas seek, among other things, documents relating to
13  Mattel's products, including the Polly Pocket line of products.  See Request Nos. 3, 4, 7, 12, 13,
14  and 14.  The subpoenas define Polly Pocket as "each image, character, logo, doll, toy, accessory,
15  product, packaging or other thing or matter that is or has ever been manufactured, marketed or
16  sold by MATTEL, or others under license by MATTEL, as part of a line of goods or merchandise
17  commonly known as, or sold and marketed under the POLLY POCKET trademark or trade
18  dress." The requests at issue are set forth below:

19         Request No. 3:  All DOCUMENTS REFERRING OR RELATING TO any focus
20              group for "MY SCENE," "POLLY POCKET," or "ACCELERACERS" products
21              and which also REFER OR RELATE TO "BRATZ," "ALIEN RACERS," or
22              MGA.

23         Request No. 4:  All DOCUMENTS REFERRING OR RELATING TO any
24              participant comments from any focus group for "MY SCENE," "POLLY

25  _____

26        [1]  Pursuant to the Order for Appointment Of A Discovery Master, dated December 6, 2006, the undersigned
27  is authorized to resolve disputes regarding third party subpoenas.  See Order at 3-4, 6.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                        2

EXHIBIT 34 PAGE 875

1  POCKET," or "ACCELERACERS" products and which also REFER OR

2  RELATE TO "BRATZ," "ALIEN RACERS," or MGA.

3  Request No. 7: All DOCUMENTS REFERRING OR RELATING TO any

4  MARKET RESEARCH REFERRING OR RELATING TO "MY SCENE,"

5  "POLLY POCKET," or "ACCELERACERS" or MATTEL, and which also

6  REFER OR RELATE TO "BRATZ," "ALIEN RACERS," or MGA.

7  Request No. 12: All DOCUMENTS REFERRING OR RELATING TO proposed

8  or actual advertisements for "MY SCENE," "POLLY POCKET," OR

9  "ACCELERACERS" products and which also REFER OR RELATE TO

10  "BRATZ," "ALIEN RACERS," or MGA.

11  Request No. 13: All DOCUMENTS REFERRING OR RELATING TO

12  directives, suggestions, or instructions from MATTEL to create advertisements

13  for "MY SCENE," "POLLY POCKET," OR "ACCELERACERS" products using

14  elements that are similar to or the same as elements used in advertisements for

15  "BRATZ," "ALIEN RACERS," or MGA products.

16  Request No. 14: Copies of all advertisements for "BRATZ," "ALIEN RACERS,"

17  or MGA products that YOU consulted or reviewed to create advertisements for

18  "MY SCENE," "POLLY POCKET," or "ACCELERACERS" products.

19  (collectively referred to hereinafter as the "Polly Pocket Requests"). See Decl. of B. Dylan

20  Proctor in Support of Mattel's Motion for Protective Order, Exs. 1-3.

21  Mattel served objections to the subpoenas and requested a meet and confer with MGA and

22  Bryant regarding the scope of the Polly Pocket Requests. The parties met and conferred on

23  March 27, 2007. MGA asserted that the Polly Pocket Requests sought information relevant to

24  MGA's claims that Mattel has serially copied and imitated MGA's commercials. MGA pointed

25  out that it is currently aware of at least one Polly Pocket commercial that copied elements from a

26  MGA Bratz commercial. More specifically, in response to a contention interrogatory, MGA

27  identified twenty-two separate instances of alleged serial copycatting and imitating, one of which

28  was that "Mattel filmed a 'Polly Pocket' commercial in the same mall and featuring the same

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT 34 PAGE 876

1   escalator as appeared in a previous 'Bratz' commercial." See MGA's Second Supplemental

2   Responses to Mattel's First Set of Interrogatories re Claims of Unfair Competition, Response to

3   Interrogatory No. 6.   MGA asserted that it was entitled to discovery to determine whether

4   Mattel's advertising agencies have documents evidencing plans, strategies or intentions to

5   copycat or imitate MGA commercials for this or any other Polly Pocket commercials in the past

6   or future.  Further, MGA asserted that the Polly Pocket Requests sought only those documents

7   that specifically related to MGA and its products.  In contrast, Mattel asserted that the Polly

8   Pocket Requests were overbroad, seeking information far beyond the Polly Pocket commercial

9   identified in MGA's interrogatory response.  The parties later exchanged meet and confer letters,

10  but were unable to resolve their dispute.

11         In this motion, Mattel contends that it is entitled to a protective order because the Polly

12  Pocket Requests are overbroad, seeking documents that have no connection or relevance to the

13  claims or defenses in the case, other than the single television commercial identified in MGA's

14  interrogatory response.  Mattel also contends that MGA and Bryant should not be permitted to

15  engage in a fishing expedition for potential claims involving Polly Pocket products.  Furthermore,

16  Mattel contends that its Polly Pocket line of dolls is in direct competition with MGA's doll

17  products, and that MGA and Bryant are not entitled to issue sweeping subpoenas for the improper

18  purpose of discovering Mattel's confidential focus group and market research documents relating

19  to competing products and other matters that are not even alleged to be at issue.  Accordingly,

20  Mattel seeks an order limiting the scope of the Polly Pocket Requests to only those Polly Pocket

21  documents that relate to the television commercial MGA claims that Mattel copied.

22         MGA and Bryant contend that Mattel has not demonstrated the requisite "good cause" for

23  a protective order.  They contend that there has been no showing that a protective order is

24  necessary to avoid annoyance, embarrassment, oppression or undue burden or expense.  Further,

25  they contend that the Stipulated Protective Order is sufficient to address Mattel's confidentiality

26  concerns.  MGA and Bryant also contend that the Polly Pocket Requests are narrowly tailored to

27  seek documents relevant to the claims that Mattel has serially imitated and copycatted MGA's

28  advertising for Bratz and other products.  Further, they contend that the Polly Pocket Requests

EXHIBIT 34 PAGE 877

1 | target documents that specifically relate to MGA or its products. Lastly, MGA and Bryant object
2 | to limiting discovery to the one Polly Pocket commercial referenced in MGA's interrogatory
3 | response. They contend that such a limitation would prevent them from obtaining documents
4 | "that reveal Mattel's plans to copy or imitate MGA commercials for other 'Polly Pocket'
5 | commercials and related efforts by Mattel's ad agencies to effectuate or evaluate these plans,
6 | simply because the plans are non-public and about which MGA and Bryant could not possibly
7 | have any actual knowledge." Opposition at p.7.

### III. DISCUSSION

Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). Fishing expeditions to discover new claims, however, are not permitted. See Fed.R.Civ.P. 26(b)(1); Rivera v. NIBCO, Inc., 364 F.3d 1057, 1072 (9th Cir. 2004) ("District courts need not condone the use of discovery to engage in 'fishing expeditions.'"); Bernstein v. Travelers Ins. Co., 447 F.Supp.2d 1100, 1102 (N.D. Cal. 2006) (citing Rule 26(b), Advisory Committee's Note to Amendments Effective December 1, 2000) (Congress' changes in the language of Rule 26(c), substituting the words "claim or defense" for the phrase "subject matter involved in the pending action," were intended to target discovery that swept far beyond the claims and defenses of the parties and that seemed designed not to fairly litigate the issues presented by the pleadings but to develop new claims or defenses.). Furthermore, Rule 26(c), Fed.R.Civ.P., provides, in pertinent part, that upon motion and for good cause shown, "the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including that certain matters not be inquired into, that the scope of the disclosure or discovery be limited to certain matters, or that a trade secret or other confidential research, development or commercial information not be revealed or be revealed only in a designated way." Fed.R.Civ.P. 26(c).

Polly Pocket is not mentioned in either MGA's or Bryant's complaint or any of the other pleadings filed in this consolidated action. Rather, MGA's complaint alleges that Mattel's

EXHIBIT 34 PAGE 878

1   advertising and marketing schemes for two of its products – "My Scene" and "AcceleRacers" –

2   have "serially imitated" MGA's advertising.  MGA's complaint does not even reference the Polly

3   Pocket line of dolls or other Polly Pocket products.

4        The only proffered justification for the Polly Pocket Requests is an interrogatory response

5   in which MGA claims that one of Mattel's Polly Pocket commercials was allegedly filmed in the

6   same mall using the same escalator as an MGA Bratz commercial. [2]  The bulk of the Polly Pocket

7   Requests (Nos. 3, 4, 7, 12, 14), however, are far broader than the commercial identified by MGA.

8   The definition for Polly Pocket includes not just commercials, but "each image, character, logo,

9   doll, toy, accessory, product, and packaging that is or has ever been manufactured, marketed or

10  sold by Mattel as part of a line of goods or merchandise known as, or sold and marketed under the

11  Polly Pocket trademark or trade dress.  Furthermore, MGA and Bryant seek all Polly Pocket focus

12  group documents, including participant comments which relate to Bratz, MGA or Alien Racers.

13  They seek all "market research" referring or relating to Polly Pocket and which also relate to

14  Bratz, MGA, or Alien Racers, where "market research" is defined as "any type of research, study,

15  survey or analysis of consumers or potential consumers of a product or potential product

16  including, without limitation, focus groups, consumer surveys, market analyses, behavioral

17  analyses and consumer research."  They also seek all documents relating to proposed or actual

18  advertisements for Polly Pocket dolls which also relate to Bratz, MGA or Alien Racers.  MGA

19  and Bryant also seek copies of all advertisements for Bratz, Alien Racers, or MGA products that

20  were consulted or reviewed to create any and all advertisements for Polly Pocket products.  These

21  requests are clearly overbroad, extending far beyond the single Polly Pocket commercial that

22  MGA has contended is actionable.  The Federal Rules of Civil Procedure do not permit MGA and

23

24  _____

25  [2]  Like MGA's complaint, MGA's response to Mattel's contention interrogatory regarding the alleged serial imitating and copycatting focus primarily on Mattel's "My Scene" and "Accelracers" products.

26       See MGA's Second Supplemental Responses to Mattel's First Set of Interrogatories re Claims of Unfair Competition

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                                                                          6

EXHIBIT 34 PAGE 879

1   Bryant to use broad discovery requests, untethered to a claim or defense, to fish for new claims.

2   Rivera v. NIBCO, Inc., supra.  Because Request Nos. 3, 4, 7, 12, and 14 extend far beyond the

3   permissible scope of discovery under Rule 26, Fed.R.Civ.P., there is good cause to issue the

4   requested protective order limiting their scope to the Polly Pocket commercial identified in

5   MGA's interrogatory response.

6        In contrast, however, Request No. 13 is reasonably tailored to documents relevant to

7   MGA's unfair competition claim.  Evidence of directives, suggestions, or instructions from Mattel

8   to its advertising agencies to create advertisements for Polly Pocket using elements that are

9   similar to or the same as elements used in advertisements for "BRATZ," "ALIEN RACERS," or

10  MGA products could establish that Mattel intentionally used the same mall and escalator to

11  produce the Polly Pocket commercial identified in MGA's interrogatory response.  Therefore,

12  Mattel's motion is denied with respect to Request No. 13.

13                            IV. CONCLUSION

14       For the reasons set forth above, Mattel's motion for a protective order is granted in part

15  and denied in part.  Request Numbers 3, 4, 7, 12, and 14 of MGA's and Bryant's subpoenas to

16  Young & Rubicam Brands, Peterson Milla Hooks, Inc., and Ogilvy & Mather Worldwide relating

17  to Polly Pocket are hereby limited in scope to Polly Pocket documents relating to the single Polly

18  Pocket television commercial identified in MGA's interrogatory response.  Mattel's motion is

19  denied as to Request No. 13.

20       Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

21  Master, Mattel shall file this Order with the Clerk of Court forthwith.

22  Dated: April 19, 2007

23                                    HON. EDWARD A. INFANTE (Ret.)

24                                         Discovery Master

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                    7

EXHIBIT 34 PAGE 880

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on April 19, 2007,

I served the attached ORDER GRANTING IN PART AND DENYING IN PART

MATTEL'S MOTION FOR PROTECTIVE ORDER REGARDING "POLLY POCKET"

DOCUMENTS" in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messina Esq | Littler Mendelson | dmessina@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| Benjamin Kim Esq. | O'Melveny & Myers LLP | bjkim@omm.com |
| Hamid Jabbar Esq. | O'Melveny & Myers LLP | hjabbar@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrismill.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on April 19, 2007, at San Francisco, California.

Sandra Chan

EXHIBIT 34 PAGE 881

**Exhibit 35**

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____   Send _____
Entered _____   Closed _____
JS-5/JS-6 _____   JS-2/JS-3 _____
Scan Only _____   Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

JUN 27 2007

EASTERN DIVISION
BY _____ DEPUTY

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY JIM HOLMES DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | CASE NO. CV 04-09049 SGL |
| Plaintiff, | CONSOLIDATED WITH |
| v. | CV 04-09059 SGL |
| | CV 05-02727 SGL |
| MATTEL, INC., | |
| Defendant, | ORDER RE MOTIONS HEARD ON JUNE 11, 2007 |
| AND CONSOLIDATED ACTIONS | |

Presently before the Court is a multitude of motions filed by a number of parties in these consolidated cases. The factual allegations underlying the present actions are expansive and complex. They are set forth below only to the extent necessary for the Court's consideration of the present motions. At their essence, although involving a number of other legal and factual issues, these cases involve the rights to certain fashion dolls.

The present motions, six in total, focus on four basic issues: Two of the motions, filed by certain counter-defendants, address the sufficiency of the allegations made by Mattel, Inc. ("Mattel") in its counterclaims; most notably, these motions challenge the sufficiency of the allegations which underlie Mattel's claims based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

Docket No. 577

EXHIBIT 35 PAGE 882

§§ 1961-1968 ("RICO").  Another motion challenges the Court's exercise of personal jurisdiction over a foreign corporation, MGAE de México, S.R.L. de C.V. ("MGA Mexico").  Two additional motions seek review of a ruling, issued by a court-appointed discovery master, overruling objections made during a party's deposition that were based on the attorney-client and joint-defense privileges.  A final motion heard on June 11, 2007, addresses the Court's scheduling order that divided the issues to be tried in these consolidated cases into two phases.  This last motion will be addressed in a separate order.

The Court has reviewed the parties' filings regarding these motions and held a hearing on June 11, 2007.  For the reasons and in the manner set forth more fully herein, the Court makes the following rulings regarding these motions:

1.     Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):[1] **GRANTED IN PART AND DENIED IN PART.**

2.     Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and XI (docket # 191):  **GRANTED IN PART AND DENIED IN PART.**

3.     Motion of MGA Mexico to Dismiss Mattel's Amended Answer and Counterclaims (docket # 266):  **DENIED.**

4.     Motion of MGA Objecting to Discovery Master's March 7, 2007, Order (docket # 308):  **GRANTED IN PART AND DENIED IN PART.**

5.     Motion of Carter Bryant Objecting to Discovery Master's March 7, 2007, Order (docket # 306):  **GRANTED IN PART AND DENIED IN PART.**

---

[1] Joining in this Motion were MGA Entertainment (HK) Ltd. ("MGA Hong Kong"), Carter Bryant ("Bryant"), and MGA Mexico.

EXHIBIT 35 PAGE 883

# I. Factual Allegations

The following allegations appear in the Amended Answer and Counterclaims ("AAC"):

## A.   Bryant's Employment by Mattel

Carter Bryant was hired at Mattel as a Barbie product designer in January 1999.  (AAC ¶ 21.)  At that time, Bryant signed an "Employee Confidential Information and Inventions Agreement," wherein he agreed not to assist or work for a Mattel competitor while employed by Mattel and that the designs and inventions he created while employed by Mattel were Mattel property.  (AAC ¶¶ 22-23.)  Bryant also executed a "Conflict of Interest Questionnaire" wherein he certified that, other than as disclosed, he had not worked for a Mattel competitor in the past year, had not engaged in a business transaction with a Mattel competitor that could create a conflict of interest, and that he would inform Mattel immediately if such an event occurred.  (AAC ¶¶ 24-25.)  While still employed by Mattel, Bryant used Mattel property and resources to develop and design the Bratz concept.  (AAC ¶ 26.)  Bryant also allegedly enlisted other Mattel employees to perform work on the Bratz line, in some cases, falsely informing those employees that they were working on a Mattel project.  (AAC ¶ 27.)

## B.   MGA's Involvement in Bryant's Conduct

MGA knew of and encouraged Bryant's misappropriation of Mattel property and resources.  (AAC ¶ 33.)  Bryant made affirmative misrepresentations to Mattel, including that he was leaving Mattel for "non-competitive" pursuits.  (AAC ¶ 28.)  Bryant and MGA concealed from Mattel that Bryant developed Bratz while employed by Mattel, that Bryant worked with MGA during the time he was employed by Mattel, and that Larian and others, not Bryant, were the creators of Bratz.  (AAC ¶ 35.)  Prior to his departure from MGA, Bryant entered into a contract with MGA to provide design services to MGA on a "top priority" basis.  (AAC ¶ 36.)

Bryant left Mattel's employ on October 20, 2000; three weeks later, MGA

3

EXHIBIT 35 PAGE 884

1   showed the Bratz prototypes to focus groups and retailers. (AAC ¶ 29.) Soon

2   thereafter, MGA showed the Bratz line to retailers at the Hong Kong Toy Fair in

3   January, 2001, and then began manufacturing and selling the dolls to retailers for

4   an annual revenue in the excess of $500 million. (AAC ¶¶ 31-32.)

5   C.   **Proprietary Information**

6       1.   **Mexico**

7       Counter-defendant Carlos Gustavo Machado Gomez ("Machado"), nonparty

8   Mariana Trueba Almada ("Trueba"), and nonparty Pablo Vargas San Jose

9   ("Vargas") were upper-level employees at Mattel Mexico. (AAC ¶¶ 38-40.) In the

10   three months before all three simultaneously resigned from Mattel Mexico on April

11   19, 2004, they were in contact with MGA via an email account with the address

12   "plot04@aol.com". (AAC ¶ 42.) The three former employees allegedly used this

13   account to supply MGA with confidential and proprietary Mattel information. (AAC

14   ¶ 42.) The three also copied various proprietary Mattel documents onto USB flash

15   drives prior to resigning. (AAC ¶ 44-46.) Shortly before her departure, Trueba

16   increased her access to Mattel's confidential information and attended a meeting at

17   which Mattel personnel analyzed Barbie programs for the United States, Canada,

18   and South America. (AAC ¶ 47.)

19       Among them, Machado, Trueba, and Vargas stole documents containing

20   information regarding Mattel's future products, production and shipping costs, sales

21   information, customer information, marketing information, and strategic research

22   information both in Mexico and worldwide. (AAC ¶ 48.) The stolen data was not

23   limited to the Mexican market; rather, the information stolen had the potential, and

24   in fact did, give MGA an unfair competitive advantage in the United States and

25   around the world. (AAC ¶ 49.)

26       In an attempt to conceal his actions, Machado ran a software program on his

27   Mattel computer in order to erase information pertaining to his contact with MGA.

28   (AAC ¶ 51.) When Mattel alerted Mexican authorities about the theft, they seized

4

EXHIBIT _35_ PAGE _885_

1   from MGA's Mexico City offices, pursuant to a search warrant, a large number of

2   documents containing Mattel trade secrets and confidential information.  (AAC

3   ¶ 53.)

4        Shortly after the theft, Machado, Trueba, and Vargas traveled to Los

5   Angeles to meet face-to-face with MGA personnel.  (AAC ¶ 52.)

6        **2.**    <u>**Canada**</u>

7        Jane Brisbois was the Director of Sales for the Girls Division in Canada.

8   (AAC ¶ 71.)  When she was hired in 1999, she agreed to preserve and not disclose

9   Mattel's proprietary information.  (AAC ¶ 71.)  While still employed by Mattel,

10   Brisbois spoke with Larian on September 22, 2005.  (AAC ¶ 74.)  That same day,

11   Brisbois copied approximately 45 Mattel documents containing Mattel trade secret

12   information into a USB flash drive that she took from the Mattel Canada office.

13   (AAC ¶ 74.)  The files taken by Brisbois included documents regarding Mattel sales,

14   advertising strategies, market analyses, product launch dates, and profit margins in

15   Canada, Mexico, and the United States.  (AAC ¶ 74.)  Four days later, she resigned

16   from Mattel.  (AAC ¶ 74.)

17        When Mattel learned of Brisbois' misappropriation of Mattel documents, it

18   notified Canadian law enforcement officials, who were able to recover the flash

19   drive and the documents from Brisbois.  (AAC ¶ 75.)

20        **3.**    <u>**United States**</u>

21        Ron Brawer was Mattel's Senior Vice President and General Manager.

22   (AAC ¶ 55.)  On September 17, 2004, Brawer informed Mattel that he was leaving

23   Mattel to work for MGA.  (AAC ¶ 63.)  During Brawer's exit interview, he falsely

24   represented that he had returned all proprietary information to Mattel; specifically,

25   Brawer took the information in his contacts file which included contact information

26   for Mattel customers and Mattel employees.  (AAC ¶ 68.)  Brawer has since used

27   the contact information to induce certain Mattel employees to join MGA and

28   misappropriate Mattel trade secrets.  (AAC ¶ 69.)

EXHIBIT 35 PAGE 886

1   MGA has also allegedly hired at least 25 other Mattel employees, some of

2   whom have provided MGA with Mattel's confidential information.  (AAC ¶ 77.)

3   **D.   Larian's Communications Regarding Mattel's New Product Line**

4   On May 12, 2006, Larian sent an email message to an email distribution list

5   that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING

6   BLING") which Mattel had not yet made public.  (AAC ¶ 79.)  The distribution of the

7   email included members of the media and many of Mattel's most significant

8   customers.  (AAC ¶ 78.)  Soon after sending the email, Larian began calling these

9   significant customers and making false representations about the product;

10  specifically, Larian told each that it was the only retailer to purchase the product

11  and that Mattel would not be supporting the product with television advertising.

12  (AAC ¶ 80.)

13  **E.   Exhibit C**

14  In Exhibit C to the AAC, Mattel references a number of communications,

15  numbering well over one hundred, that it contends constitutes predicate acts of mail

16  fraud or wire fraud.  Exhibit C does not describe the contents of those

17  communications.

18  **II. Counterclaims Asserted**

19  Based on these allegations, Mattel asserts the following counterclaims:

20  (1) Copyright Infringement, including willful, vicarious, and contributory

21  infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant;

22  (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as

23  authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate

24  acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a

25  violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted

26  against all defendants; (4) state-law misappropriation of trade secrets against MGA,

27  MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant

28  only and based on certain employment agreements between Bryant and Mattel;

6

EXHIBIT 35 PAGE 887

1   (6) intentional interference with contract, asserted against MGA and Larian and

2   based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted

3   against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty,

4   asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted

5   against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty,

6   asserted against MGA and Larian; (11) conversion, asserted against all counter-

7   defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof.

8   Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for

9   declaratory relief.

10   **III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim**

11     The parties have moved to dismiss a number of Mattel's counterclaims on

12   various grounds.  The Court addresses each claim in turn, considering at all times

13   the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

14   **A.** <u>Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)</u>

15     In lieu of an answer, a party may, as the counter-defendants have here, file a

16   motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a

17   motion may be made where the pleader has "fail[ed] to state a claim upon which

18   relief can be granted." <u>Id.</u>  In deciding a Rule 12(b)(6) motion, the Court must also

19   consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and

20   plain statement of the claim showing that the pleader is entitled to relief" or, when

21   the claim at issue avers fraud or mistake, the motion must be considered in

22   conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded

23   with particularity. <u>See</u> 5A Charles A. Wright & Arthur Miller, <u>Federal Practice and</u>

24   <u>Procedure</u>, §1356 (1990); James Wm. Moore, <u>Moore's Federal Practice</u>, Vol. 2

25   § 12.34[1][c].

26     In bringing a motion pursuant to Rule 12(b)(6), the moving party has the

27   burden of persuading the Court that the complaint has failed to state a claim upon

28   which relief can be granted.  <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406,

EXHIBIT 35 PAGE 888

1  1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991).  In considering the motion,

2  "courts must consider the complaint in its entirety," and read it in the light most

3  favorable to the plaintiff, accepting as true all factual allegations in the complaint, as

4  well as reasonable inferences to be drawn therefrom.  Tellabs, Inc. v. Makor Issues

5  & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL 1773208, at *9 (June 21, 2007);

6  Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).  However, the Court need not

7  accept any unwarranted deductions of fact, or conclusory legal statements cast in

8  the form of factual allegations.  See Western Mining Council v. Watt, 643 F.2d 618,

9  624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

10       Generally, a court cannot consider evidence in deciding a Rule 12(b)(6)

11  motion; however, a court may consider exhibits attached to the complaint as well as

12  documents that are not physically attached to the complaint but "whose contents

13  are alleged in [the] complaint and whose authenticity no party questions."  Branch v.

14  Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994).

15  Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are

16  also properly considered.  Mir v. Little Company of Mary Hospital, 844 F.2d 646,

17  649 (9th Cir. 1988).

18  **B.    RICO Claims**

19       The counter-defendants devote most of their motions to the sufficiency of the

20  allegations regarding Mattel's RICO claims.  The Court's analysis begins, as it must

21  when considering a federal statute, with the language of that statute.  The

22  substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

23            It shall be unlawful for any person employed by or associated

24       with any enterprise engaged in, or the activities of which affect,

25       interstate or foreign commerce, to conduct or participate, directly or

26       indirectly, in the conduct of such enterprise's affairs through a pattern

27       of racketeering activity or collection of unlawful debt.

28  Id.  Conspiracies to violate this substantive prohibition are themselves prohibited by

8

EXHIBIT 35 PAGE 889

1  § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to

2  violate any of the provisions of subsection (a), (b), or (c) of this section." Id.  Many

3  of these terms are defined by the statutory language, including "racketeering

4  activity," "enterprise," and "pattern of racketeering activity":

5          (1) "racketeering activity" means . . . (B) any act which is

6      indictable under any of the following provisions of title 18, United

7      States Code: . . . section 1341 (relating to mail fraud), section 1343

8      (relating to wire fraud), . . . section 1512 (relating to tampering with a

9      witness, victim, or an informant), . . . section 1952 (relating to

10     [interstate and foreign travel or transportation in aid of racketeering

11     enterprises]), [and] section 2319 (relating to criminal infringement of a

12     copyright)[.]

13                                . . . .

14         (4) "enterprise" includes any individual, partnership,

15     corporation, association, or other legal entity, and any union or group

16     of individuals associated in fact although not a legal entity;

17         (5) "pattern of racketeering activity" requires at least two acts of

18     racketeering activity, one of which occurred after the effective date of

19     this chapter and the last of which occurred within ten years (excluding

20     any period of imprisonment) after the commission of a prior act of

21     racketeering activity[.]

22  18 U.S.C. § 1961.

23          In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the

24  Court measures the sufficiency of alleged predicate acts of wire fraud and mail

25  fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court

26  measures the sufficiency of all other predicate acts by the more lenient standard set

27  forth in Rule 8(a).  Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or

28  mistake, the circumstances constituting fraud or mistake shall be stated with

9

EXHIBIT 3J PAGE 890

1    particularity. Malice, intent, knowledge, and other condition of mind of a person

2    may be averred generally.") with Fed. R. Civ. P. 8(a) ("A pleading which sets forth a

3    claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim

4    showing that the pleader is entitled to relief . . . ."); see Lancaster Community Hosp.

5    v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule

6    9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has

7    repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the

8    predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9        In order to state its claim under § 1962(c), Mattel "must allege (1) conduct

10    (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing

11    injury to [its] business or property." Ove v. Gwinn,  264 F.3d 817, 825 (9th Cir.

12    2001) (internal quotation marks and citation omitted).  Here, counter-defendants'

13    motions challenge the first, second, fourth, and fifth elements.

14       1.    **"Conduct or Participate"**

15        Bryant contends that his role in any alleged scheme or enterprise is too

16    tenuous to constitute the "conduct" necessary to impose RICO liability.  In order to

17    have RICO liability imposed upon him, a defendant must "conduct or participate,

18    directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of

19    racketeering activity . . . ." 18 U.S.C. § 1962(c).  The United States Supreme Court

20    has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,

21    179 (1993), wherein it noted:

22        [T]he word "participate" makes clear that RICO liability is not limited to

23        those with primary responsibility for the enterprise's affairs, just as the

24        phrase "directly or indirectly" makes clear that RICO liability is not

25        limited to those with a formal position in the enterprise, but some part

26        in directing the enterprise's affairs is required.

27    Id. Here, Mattel has alleged that Bryant secretly developed Bratz while employed

28    by Mattel and using Mattel's resources and employees, that he concealed that fact

EXHIBIT 35 PAGE 891

1    when he had a duty to disclose it, and that he did these things in order to facilitate

2    the development of the Bratz concept by Mattel's direct competitor, in violation of,

3    *inter alia*, criminal copyright law.  These allegations, if proven to be true, are

4    sufficient to impose RICO liability on Bryant.

5          2.    **Enterprise**

6          Bryant's motion challenges the sufficiency of the allegations regarding a

7    RICO enterprise.  That enterprise is alleged to be an "association-in-fact" enterprise

8    comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and

9    others.  (AAC ¶ 89.)  Mattel alleges that counter-defendants participated in or

10   conducted the affairs of the association-in-fact enterprise through a pattern of

11   racketeering activities, including, as detailed in the AAC, predicate acts of mail

12   fraud, wire fraud, evidence tampering, interstate and foreign travel to aid

13   racketeering activities, and criminal copyright infringement.  (AAC ¶ 90.)  The

14   counter-defendants' goal is alleged to have been to "execut[e] or attempt to

15   execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or

16   otherwise confidential and proprietary information . . . ."  (AAC ¶ 90.)

17         A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive

18   analysis of the sufficiency of allegations regarding a RICO enterprise necessary to

19   state a claim.  See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th

20   Cir. 2007) (designated for publication).  That decision provides the blueprint for the

21   Court's present analysis.

22         Odom involved an alleged scheme involving consumers who purchased

23   computers from Best Buy retail stores.  Id. at 543.  The computers would include a

24   Microsoft compact disc that the cashier would scan; the consumer's credit card was

25   also scanned for purchase.  Id.  The credit card information was transmitted to

26   Microsoft, and Microsoft would, at some point, begin making unauthorized charges

27   to the credit card used to purchase the computer, ostensibly for Microsoft's

28   provision of internet services.  Id.  Odom brought substantive RICO and RICO

EXHIBIT 35 PAGE 892

1    conspiracy claims based on these allegations. Id. at 544.

2        The Ninth Circuit first noted the evidenced judicial resistance to RICO in the

3    lower courts, contrasted with the Supreme Court's four reversals of such narrow

4    readings of RICO.  Id. at 545-47 (citing United States v. Turkette, 452 U.S. 576

5    (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate

6    businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481

7    (1985) (rejecting notion that RICO could be used to impose civil liability only where

8    the defendant had been criminally convicted and that such liability was limited to a

9    narrow measure of damages); National Organization for Women v. Scheidler, 510

10   U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when

11   the acts of a RICO enterprise had an economic motive); and Cedric Kushner

12   Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no

13   RICO claim was stated where president and sole shareholder of a corporation was

14   alleged to have associated with his wholly owned corporation as a RICO

15   "enterprise," and relying on fact that person and corporation were separate legal

16   entities).  In Odom, the Ninth Circuit understandably viewed these four holdings as

17   a "general instruction that we should not read the statutory terms of RICO

18   narrowly."  Odom, 486 F.3d at 547 (internal citation omitted).

19       In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading

20   and proving an "associated-in-fact" enterprise such as the one alleged here:

21           The definition of "enterprise" in the text of RICO is fairly

22       straightforward.  In its entirety, the definition is as follows: "'enterprise'

23       includes any individual, partnership, corporation, association, or other

24       legal entity, and any union or group of individuals associated in fact

25       although not a legal entity." 18 U.S.C. § 1961(4).  As is evident from

26       the text, this definition is not very demanding.  A single "individual" is

27       an enterprise under RICO.  Similarly, a single "partnership," a single

28       "corporation," a single "association," and a single "other legal entity"

12

EXHIBIT 35 PAGE 893

1  are all enterprises.  At issue in this case is the last kind of enterprise

2  listed in the definition – a "group of individuals associated in fact."  It is

3  undisputed that a corporation can be an "individual" for purposes of

4  an associated-in-fact enterprise.

5  Id. at 548.

6       The Ninth Circuit acknowledged that "enterprise" must be something greater

7  than merely a pattern of racketeering activity; however, the court rejected the notion

8  that an enterprise must have a particular ascertainable organizational structure.  Id.

9  at 551 ("We take this opportunity to join the circuits that hold that an

10  associated-in-fact enterprise under RICO does not require any particular

11  organizational structure, separate or otherwise.") (citations omitted).  A party need

12  only set forth factual allegations of "a group of persons associated together for a

13  common purpose of engaging in a course of conduct," "evidence of an ongoing

14  organization, formal or informal," and "evidence that the various associates function

15  as a continuing unit."  Id. at 552 (internal citations and quotation marks omitted).

16       As for the common purpose, it was met in Odom, where the plaintiff had

17  alleged the following:

18       [D]efendants had the common purpose of increasing the

19       number of people using Microsoft's Internet Service, and doing so by

20       fraudulent means.  Best Buy furthered this common purpose by

21       distributing Microsoft Internet Trial CD's and conveying its customers'

22       debit and credit card information to Microsoft.  Microsoft then used the

23       information to activate customer accounts.

24  Id.  Here, Mattel has alleged the common purpose of attempting to defraud Mattel

25  and steal its trade secrets.  Mattel's many factual allegations, detailed herein,

26  support this alleged common purpose.

27       As for the "ongoing organization" requirement, the Ninth Circuit in Odom

28  noted that the plaintiffs had met that element, which was met where the

EXHIBIT 35 PAGE 894

1   organization was alleged to be "a vehicle for the commission of two or more
2   predicate crimes." Id. (internal quotation marks and citation omitted).  The Ninth
3   Circuit noted the following factual allegations:

4           Microsoft and Best Buy established mechanisms for
5       transferring plaintiffs' personal and financial information from Best Buy
6       to Microsoft. That information then allowed Microsoft to activate
7       plaintiffs' Internet accounts without their knowledge or permission.
8       These mechanisms enabled Microsoft to bill plaintiffs improperly for
9       MSN services in 2001, 2002 and 2003.

10  Id. Here, plaintiffs have alleged that the counter-defendants coordinated their many
11  efforts at depriving Mattel of its proprietary information and its intellectual property.
12  The allegations regarding common use of the "plot04@aol.com" email address to
13  transfer confidential Mattel information to MGA support the finding of an "ongoing
14  organization." So, too, do the allegations regarding the repeated communications
15  between Bryant and MGA.

16          The "continuing unit" requirement does not appear to the Court to mandate
17  that the organization continues to this day;[2] rather, the requirement is related to the
18  notion that RICO was not meant to address discrete instances of fraud or criminal
19  conduct.  "[T]he continuity requirement focuses on whether the associates'
20  behavior was 'ongoing' rather than isolated activity." Id. at 553 (internal quotation
21  marks and citation omitted).  Related to that concern, it is also clear to the Court
22  that this requirement is related to the duration of the racketeering activities. See id.
23  ("An almost two-year time span is far more than adequate to establish that Best
24  Buy and Microsoft functioned as a continuing unit.").  Here, the allegations do not
25  reveal that the conduct complained of was mere isolated activity; rather, Mattel sets
26  forth allegations of racketeering activity that spanned a period of three years.  The

27  _____
28          [2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue
    of its continued use of Mattel's information and property.

14

EXHIBIT 3J PAGE 895

1  allegations describe a scheme consisting of corporate warfare between competitors

2  that has been waged over a long period of time and waged on a number of fronts,

3  both foreign and domestic. The "continuing unit" requirement is therefore satisfied.

4          Accordingly, the Court finds that Mattel has sufficiently pleaded the existence

5  of a RICO enterprise.

6      **3.**    **Predicate Acts of Racketeering Activity**

7          **a.**    **Mail Fraud and Wire Fraud**

8      The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:

9          Whoever, having devised or intending to devise any scheme or

10     artifice to defraud, . . . for the purpose of executing such scheme or

11     artifice or attempting so to do, places in any post office or authorized

12     depository for mail matter, any matter or thing whatever to be sent or

13     delivered by the Postal Service, or deposits or causes to be deposited

14     any matter or thing whatever to be sent or delivered by any private or

15     commercial interstate carrier, or takes or receives therefrom, any such

16     matter or thing, . . . shall be fined under this title or imprisoned not

17     more than 20 years, or both.

18  Id. The Ninth Circuit has described the elements of mail fraud as "(1) proof of a

19  scheme to defraud; (2) using or causing the use of the mails to further the

20  fraudulent scheme; and (3) specific intent to defraud." United States v. Rogers, 321

21  F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).

22      The criminal prohibition against wire fraud is similar:

23          Whoever, having devised or intending to devise any scheme or

24     artifice to defraud, . . . transmits or causes to be transmitted by means

25     of wire, radio, or television communication in interstate or foreign

26     commerce, any writings, signs, signals, pictures, or sounds for the

27     purpose of executing such scheme or artifice, shall be fined under this

28     title or imprisoned not more than 20 years, or both.

EXHIBIT 35 PAGE 896

1   18 U.S.C. § 1343.  The Ninth Circuit has described the elements of wire fraud as

2   "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and

3   (3) a specific intent to deceive or defraud."  United States v. Shipsey, 363 F.3d 962,

4   971 (9th Cir. 2004) (citations omitted).

5       As all parties acknowledge, the predicate acts of mail fraud and wire fraud

6   must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b).  Specifically,

7   Mattel must detail "the time, place, and manner of each act of fraud, [and it must

8   set forth] the role of each defendant in each scheme."  Lancaster Community

9   Hosp., 940 F.2d at 405.  This standard applies in RICO actions alleging predicate

10  acts of mail fraud.  Id.

11      Here, Mattel sets forth allegations of predicate acts of mail fraud and wire

12  fraud referenced in Exhibit C to the AAC.  However, these alleged predicate acts

13  are insufficiently pleaded because they fail to adequately describe the contents of

14  the communications; specifically, they fail to detail time, place and manner of "each

15  act of fraud."  The substantive RICO claim is therefore dismissed to the extent it is

16  premised on those communications.  Mattel is **GRANTED** leave to amend the RICO

17  claim based on this insufficiency; Mattel must attach to the Second Amended

18  Answer and Counterclaims ("SAAC") copies of the referenced communications.

19  The contents of packages referenced in Exhibit C must be described in order to

20  meet the Rule 9(b) requirements.

21      At oral argument, counsel for MGA argued that the substance of many, if not

22  all of the communications, cannot be read to further a scheme to defraud.  That

23  argument will be considered another day, after Mattel files the SAAC.  However, the

24  Court takes the opportunity today to note that, given the broad scope of the alleged

25  scheme to defraud, including the criminal copyright infringement allegations,

26  otherwise innocuous and routine communications regarding day-to-day operations

27  and product development may be found to be in furtherance of that scheme.  See

28  Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484,  2007 WL

EXHIBIT 35 PAGE 897

1   1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,

2   "courts must consider the complaint in its entirety").

3        Counter-defendants also argue that Mattel failed to plead each defendant's

4   role in furtherance of the scheme to defraud.  As interpreted by the Ninth Circuit,

5   the Rule 9(b) standard clearly requires that a plaintiff so plead.  Lancaster

6   Community Hosp., 940 F.2d at 405.  However, the Court will view the

7   communications alleged to constitute mail and wire fraud in conjunction with all the

8   allegations set forth regarding the alleged scheme in the counterclaims.  See Flood

9   v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at *14 (M.D. Pa., Aug. 24,

10  2004) (applying the principle that reasonable inferences in favor of a plaintiff must

11  be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough

12  Plaintiffs' Complaint does not expressly identify how each particular mail or wire

13  communication furthered the scheme, the Complaint clearly alleges facts which

14  create an unquestionable inference that the alleged communications furthered the

15  scheme.").

16       Counter-defendants also argue that, because the emails alleged to

17  constitute wire fraud were sent among individuals physically located in the same

18  state, Mattel will not be able to establish the interstate nature of the

19  communications.  See 18 U.S.C. § 1343 (setting forth the requirement that

20  communications be transmitted "in interstate or foreign commerce").  Mattel has

21  alleged that the communications were transmitted in interstate or foreign

22  commerce.  (AAC ¶ 93(b).)  This suffices at the pleadings stage; however,

23  eventually Mattel will be called upon to support these allegations with evidence.

24  See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly

25  holding that wire fraud must be supported, at the summary judgment stage, by

26  evidence of interstate wire fraud).

27       The Court dismisses the RICO claim to the extent it is based on the alleged

28  predicate acts of mail fraud and wire fraud because those acts are not pleaded with

EXHIBIT 35 PAGE 898

1  particularity as required by Rule 9(b).  Mattel is **GRANTED** ten days' leave to file a

2  SAAC that incorporates and attaches and/or describes the communications and the

3  contents of packages referenced in Exhibit C.

4       **b.**   **Evidence Tampering**

5       Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6  remaining predicate acts are governed by the more lenient pleading standards of

7  Rule 8(a).  See Slade v. Gates, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8  Cal., Oct. 11, 2002).  The Court considers the sufficiency of those remaining

9  allegations pursuant to this Rule.

10       The criminal prohibition against tampering with evidence is found at 18

11  U.S.C. § 1512:

12       Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13       record, document, or other object, or attempts to do so, with the intent

14       to impair the object's integrity or availability for use in an official

15       proceeding . . . shall be fined under this title or imprisoned not more

16       than 20 years, or both.

17  Id.  Mattel's opposition makes clear that its evidence tampering allegations are

18  based upon two categories of documents:  The first category of documents,

19  perhaps composed of only one multi-page document, involves the alleged alteration

20  of Bryant's contract with MGA to remove a fax header showing that the date of its

21  execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22  The second category of documents are those filed with the United States Copyright

23  Office, which are alleged to omit the disclosure that certain Bratz drawings were

24  "works for hire," and which are alleged to have had alterations made to certain

25

26  ─────────────────────

27      [3] The AAC merely alleges that counter-defendants Bryant and MGA "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a Mattel employee while he was working for and with MGA . . . ."  (AAC ¶ 35.)

28  However, it is clear from other filings by the parties that, at a minimum, this allegation refers to MGA's contract with Bryant.

EXHIBIT 3J PAGE 899

relevant dates.  (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

As to the first category, a predicate act is sufficiently alleged.  Mattel has alleged that a document was altered in a manner designed to conceal critical evidence, highly relevant to the present official proceeding, regarding the timing of the execution of the document.

Conversely, it is unclear whether Mattel has alleged a predicate act with respect to the second category of documents.  The issue of whether submitting fraudulent registrations and "altering relevant dates" on documents submitted to the United States Copyright Office has not been fully briefed by the parties; the issue was framed in this manner only upon the filing of the reply.[4]  Therefore, the Court reserves this issue for a later date, and anticipates that it will be addressed by the parties in a motion to dismiss the SAAC.

c.    **Travel Act Violation**

Federal criminal law prohibits interstate or foreign travel to aid in racketeering activities.  18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a violation of § 1962 as a RICO predicate act).  In relevant part, the criminal prohibition states:

Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform . . . [such an act,] shall be fined under this title, imprisoned not more than 5 years, or both . . . .

. . . .

As used in this section . . . "unlawful activity" means . . .

---

[4] The Court does not view this failure as the fault of any party.

19

EXHIBIT 35 PAGE 900

1    extortion, bribery, or arson in violation of the laws of the State in which

2    committed or of the United States . . . .

3    Id. Mattel alleges that Bryant and others traveled in interstate commerce to commit

4    commercial bribery in violation of California's prohibition against commercial

5    bribery, which in relevant part provides:

6        (a) Any employee who solicits, accepts, or agrees to accept

7        money or any thing of value from a person other than his or her

8        employer, other than in trust for the employer, corruptly and without

9        the knowledge or consent of the employer, in return for using or

10       agreeing to use his or her position for the benefit of that other person,

11       and any person who offers or gives an employee money or any thing

12       of value under those circumstances, is guilty of commercial bribery.

13   Cal. Penal Code § 641.3. Several allegations support a violation of § 641.3(a),

14   which in turn supports a violation of 18 U.S.C. § 1952. Mattel has alleged that

15   Bryant, while still employed by Mattel, entered into a contract with MGA to provide

16   design services to MGA on a "top priority" basis, and used Mattel property,

17   employees, and resources to develop and design the Bratz concept.

18       Counter-defendants argue that the requirement under California's

19   commercial bribery statute that a violator act "corruptly" is not met because Bryant

20   did not intend to injure Mattel. Such an intent is not required; rather it is sufficient

21   that Bryant is alleged to have intended to defraud Mattel. See Cal. Penal Code

22   § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure *or* defraud")

23   (emphasis added).

24       d.    **Criminal Copyright Violations**

25       The parties dispute the relevant pleading standard that governs the

26   allegations which underlie the criminal copyright violation claim. Counter-

27   defendants would have the Court apply the more exacting Rule 9(b) standards

28   because, in their assessment, the claim "sounds in fraud." Mattel, however,

EXHIBIT 35 PAGE 901

1   contends that there is no reason to depart from the more lenient Rule 8(a) standard

2   generally applied to copyright claims because, in its assessment, the claims "sound

3   in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

4          The recent Ninth Circuit case on this issue, cited by both parties, stands for

5   the unremarkable proposition that, consistent with Rule 9(b), all **averments** of fraud

6   must be pleaded with particularity, regardless of whether fraud is an essential

7   element of the claim to which the averment relates.  See Vess v. Ciba-Geigy Corp.

8   USA, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all **averments**

9   of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

10  with particularity.") (emphasis added).

11         Considering Rules 8(a), 9(b), and the teachings of Vess, a spectrum

12  emerges.  At the left end of this spectrum are claims that do not involve any

13  allegations of fraud.  Those need only satisfy Rule 8(a)'s "short and plain

14  statement" standard.  At the opposite end of the spectrum are claims based solely

15  on fraud, and the facts underlying such a claim must be alleged with particularity

16  pursuant to Rule 9(b).  Lying closer to the Rule 9(b) end of the spectrum is a

17  category of claims discussed in Vess:

18              In cases where fraud is not a necessary element of a claim, a

19          plaintiff may choose nonetheless to allege in the complaint that the

20          defendant has engaged in fraudulent conduct.  In some cases, the

21          plaintiff may allege a unified course of fraudulent conduct and rely

22          entirely on that course of conduct as the basis of a claim.  In that

23          event, the claim is said to be "grounded in fraud" or to "sound in

24          fraud," and the pleading of that claim as a whole must satisfy the

25          particularity requirement of Rule 9(b).

26  Vess, 317 F.3d at 1103-04 (internal citations omitted).  It is into this category MGA

27  contends that the allegations of criminal copyright claims fit, and MGA therefore

28  contends that all allegations regarding the criminal copyright claims must be

21

EXHIBIT 35 PAGE 802

1  pleaded with particularity.

2  However, <u>Vess</u> sets up another category, lying closer to the Rule 8(a) part of

3  the spectrum (but nevertheless requiring pleading with some particularity):

4  In other cases, however, a plaintiff may choose not to allege a

5  unified course of fraudulent conduct in support of a claim, but rather

6  to allege some fraudulent and some non-fraudulent conduct.  In such

7  cases, only the allegations of fraud are subject to Rule 9(b)'s

8  heightened pleading requirements. . . . The rule does not require that

9  allegations supporting a claim be stated with particularity when those

10  allegations describe non-fraudulent conduct.

11  [In other words,] in a case where fraud is not an essential

12  element of a claim, only allegations ("averments") of fraudulent

13  conduct must satisfy the heightened pleading requirements of Rule

14  9(b).  Allegations of non-fraudulent conduct need satisfy only the

15  ordinary notice pleading standards of Rule 8(a).

16  <u>Id.</u> at 1104-05.

17  Whether fraud is an essential element of criminal copyright infringement

18  must be determined by reference to the statutory language and any interpretative

19  case law.  In relevant part, the prohibition against criminal copyright infringement

20  provides:  "Any person who violates section 506(a) (relating to criminal offenses) of

21  title 17 shall be punished as provided [herein] in and such penalties shall be in

22  addition to any other provisions of title 17 or any other law."  18 U.S.C. § 2319.  In

23  turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully

24  infringes a copyright shall be punished as provided under section 2319 of title 18, if

25  the infringement was committed . . . for purposes of commercial advantage or

26  private financial gain . . . ."  17 U.S.C. § 506(a)(1)(A).  The elements of the offense

27  are easily gleaned from the straightforward statutory language:  "Criminal

28  infringement of copyright has three elements: (1) infringement of a copyright

22

EXHIBIT 35 PAGE 903

1    (2) done wilfully (3) for purposes of commercial advantage or private financial gain."

2    United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3        Clearly, fraud is not an essential element of a criminal copyright claim, taking

4    it out of the category at the far end of the spectrum described above, and

5    necessitating an inquiry into whether Mattel has chosen to incorporate a fraud

6    element into its criminal copyright claim.  The AAC at ¶ 93(e) reveals that the

7    criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's

8    copyrights, including with respect to documents containing Mattel trade secret and

9    confidential information . . . ."  The Opposition fills in more details regarding this

10   claim, noting that the criminal copyright claim is premised upon the Bratz-related

11   works, Bratz-derivative works, and works contained within Mattel's allegedly

12   purloined trade secrets and confidential information.  (Mattel Opposition to MGA's

13   Motion at 5).

14       These allegations do not "allege a unified course of fraudulent conduct and

15   rely entirely on that course of conduct as the basis of a claim" such that the claim

16   could be said to "sound in fraud" and therefore require pleading with particularity as

17   to the entire claim.  The allegations establish that much of the conduct complained

18   of consists of simple copying of the Bratz-related works or the creation of Bratz-

19   derivative works.  Such allegations are unrelated to allegations of fraud.  Therefore,

20   if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it

21   falls in the category described by Vess as those claims in which a claimant chooses

22   to "allege some fraudulent and some non-fraudulent conduct."  Id. at 1104.

23       When one considers that the alleged predicate acts of criminal copyright

24   infringement are but a small part of a larger, and singular, claim brought pursuant to

25   RICO, it is evident that the RICO claim falls neatly into the category of claims that

26   are based partly on fraudulent and partly on non-fraudulent conduct.  The Court

27   has already found that certain fraudulent conduct -- that supporting the alleged

28   predicate acts of mail fraud and wire fraud -- is insufficiently pleaded.  The current

23

EXHIBIT 35 PAGE 804