**Exhibit 1**

ORIGINAL

1   DIANA M. TORRES (S.B. #162284)
    JAMES P. JENAL (S.B. #180190)
2   WILLIAM J. CHARRON (S.B. #220518)
    O'MELVENY & MYERS LLP
3   400 South Hope Street
    Los Angeles, California 90071-2899
4   Telephone: (213) 430-6000
    Facsimile: (213) 430-6407
5   Email: dtorres@omm.com

6   DALE M. CENDALI (admitted pro hac vice)
    JOHANNA SCHMITT (admitted pro hac vice)
7   O'MELVENY & MYERS LLP
    Times Square Tower
8   7 Times Square
    New York, New York 10036
9   Telephone: (212) 326-2000
    Facsimile: (212) 326-2061
10  Email: dcendali@omm.com

11  PATRICIA GLASER (S.B. # 55668)
    CHRISTENSEN, GLASER, FINK, JACOBS,
12  WEIL & SHAPIRO LLP
    10250 Constellation Boulevard, 19th Floor
13  Los Angeles, CA 90067
    Telephone:   (310) 553-3000
14  Facsimile:   (310) 556-2920
    Email: pglaser@chrisglase.com
15
    Attorneys for Plaintiff
16  MGA Entertainment, Inc.

17          UNITED STATES DISTRICT COURT

18          CENTRAL DISTRICT OF CALIFORNIA

19                                    Case No.  CV 04-09049 SGL (RNBx)
                                      (consolidated with CV 04-9059 & 05-2727)
20  CARTER BRYANT, an individual,
                       Plaintiff,     **MGA ENTERTAINMENT, INC.'S**
21         v.                         **FOURTH SUPPLEMENTAL**
                                      **RESPONSE TO INTERROGATORY**
22  MATTEL, INC., a Delaware          **NO. 1 OF MATTEL, INC.'S FIRST SET**
    Corporation,                      **OF INTERROGATORIES RE CLAIMS**
23                     Defendant.     **OF UNFAIR COMPETITION**
                                      **ATTORNEY'S EYES ONLY**
24
                                      Judge:  Hon. Stephen G. Larson
25  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and        Discovery Cut-Off:  March 3, 2008
26  MGA ENTERTAINMENT, INC. v.
    MATTEL, INC.
27
    **PROPOUNDING PARTY:**      MATTEL, INC.
28  **RESPONDING PARTY:**       MGA ENTERTAINMENT, INC

    CONFIDENTIAL                 MGA'S FOURTH SUPPLEMENTAL RESPONSE TO
                                 INTERROGATORY NO. 1 OF MATTEL'S FIRST SET
                                 OF INTERROGATORIES   EXHIBIT 1 PAGE 2

7.     MGA objects to Mattel's definitions of "MGA," "YOU," and "YOUR" as overbroad and unduly burdensome, vague and ambiguous, and on the grounds that the definitions call for legal conclusions.

8.     MGA objects to Mattel's definition of "IDENTIFY" on the grounds that Mattel's instructions in this regard are overbroad, compound and unduly burdensome.

9.     MGA objects to Mattel's definition of "CONTESTED MGA PRODUCTS" as overbroad, compound and unduly burdensome.

10.     MGA objects to Mattel's definition of "EMBODIMENT" as overbroad, compound and unduly burdensome.

12.     MGA objects to this interrogatory to the extent that its subparts, including those arising from the "definitions" and "instructions," actually constitute separate interrogatories, thereby bringing the number of Mattel's interrogatories to well over the 25 interrogatories allowed under the Federal Rules of Civil Procedure.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

IDENTIFY, fully and separately, each and every PERSON who was involved in the marketing, advertising, promotion, licensing, offering for sale, conception, origin, creation, design, development, sculpting, engineering, reduction to practice, tooling or painting of, or who otherwise produced or contributed to any EMBODIMENT of the CONTESTED MGA PRODUCTS, including without limitation by fully and separately describing each such PERSON's role and the start and end dates of such PERSON's involvement.

**RESPONSE TO INTERROGATORY NO. 1:**

MGA incorporates by reference the above-stated general objections as if fully set forth herein. MGA also specifically objects to this interrogatory on the ground that it is unduly burdensome and oppressive and to the extent it seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence and is, thus, overbroad, including, without limitation, seeking the identity of "each and every" person

MGA'S FOURTH SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 1 OF MATTEL'S FIRST SET
OF INTERROGATORIES   EXHIBIT _____ PAGE _____

1   involved in any way with the "marketing, advertising, promotion, licensing, offering for

2   sale, conception, origin, creation, design, development, sculpting, engineering, reduction

3   to practice, tooling or painting of, or who otherwise produced or contributed to any

4   EMBODIMENT of the CONTESTED MGA PRODUCTS." MGA also objects to this

5   interrogatory on the grounds that it is compound in seeking the identities of "each and

6   every" person involved in any way with the "marketing, advertising, promotion, licensing,

7   offering for sale, conception, origin, creation, design, development, sculpting,

8   engineering, reduction to practice, tooling or painting of, or who otherwise produced or

9   contributed to any EMBODIMENT" of many different products (e.g., "Bratz" dolls,

10  "Bratz Petz," the "Bratz Funky Fashion Makeover Head," "4-Ever Best Friends" products,

11  "Mommy's Little" doll products, and Alien Racers products), product packaging,

12  advertisements, etc., and is, in reality, not one but many interrogatories. MGA also

13  objects to this interrogatory on the grounds that it seeks confidential, proprietary or

14  commercially sensitive information, the disclosure of which would be inimical to the

15  business interests of MGA. MGA also objects to this interrogatory on the grounds that it

16  seeks information that is not in the possession, custody or control of MGA.

17      Subject to and without waiving the foregoing, MGA responds as follows: Vast

18  numbers of persons have been involved in the "marketing, advertising, promotion,

19  licensing, offering for sale, conception, origin, creation, design, development, sculpting,

20  engineering, reduction to practice, tooling or painting of, or who otherwise produced or

21  contributed to any EMBODIMENT of the CONTESTED MGA PRODUCTS," including

22  hundreds of MGA employees, contractors, distributors, retailers, advertisers, licensees and

23  others. Identifying each such person is impracticable. Nonetheless, various persons

24  responsive to this interrogatory are identified in documents produced or to be produced by

25  MGA in discovery. In addition, persons responsive to this interrogatory include, but are

26  not limited to:

27      Maggie Bermudez (MGA Manager of Product Design, at MGA from April 2002 to

28  May 2005; she worked as lead designer for "4-Ever Best Friends" dolls during her term of

1   worked on product development and coordination of "Bratz Petz" plush toys from

2   approximately November 2002 until July 2005; all communications should be made

3   through counsel of record for MGA);

4       Gerimi Burleigh (Senior Graphic Designer in Boys Toys at MGA; employed at

5   MGA since July 2002; co-creator and designer of "Alien Racers" toy racing vehicles;

6   wrote the stories and created overall theme for "Alien Racers"; started designing "Alien

7   Racers" at least as early as June 2003 and stopped working on Alien Racers in

8   approximately June 2005; all communications should be made through counsel of record

9   for MGA);

10       Yuval Caspi (MGA's Vice President, Boys Toys, at MGA since August 1999;

11   oversaw the development and design of "Alien Racers" toy racing vehicles at least as

12   early as November 2002 until approximately December 2005; all communications should

13   be made through counsel of record for MGA);

14       Steve Cheng (Senior Designer at MGA since April 2002; worked on design of

15   "Bratz Formal Funk Super Stylin' Runway Disco" from approximately September 2002 to

16   March 2003; all communications should be made through counsel of record for MGA);

17       Maureen Mullen Chianese (former freelance designer for MGA; worked on

18   Mommy's Little Patient" doll since at least as early as July 2001 until approximately May

19   2002; last known contact information 2847 Fillmore St. #2, San Francisco, CA 94123,

20   (415) 606-2619);

21       Sarah Chui (Chinese name is Chui Mei Wah, MGA Entertainment (HK) Limited

22   Design Director, employed from September 1, 1999 to the present; designer who works on

23   a wide variety of products and packaging including "Bratz" products; MGA was unable to

24   ascertain Ms. Chui's exact dates of work on specific "Bratz" products after a diligent

25   inquiry; all communications should be made through counsel of record for MGA

26   Entertainment (HK) Limited);

27       Nick Contreras (MGA's Vice President of Customer Marketing since November

28   2004; involved with marketing of MGA products including all "Bratz" products since he

CONFIDENTIAL                    - 7 -        MGA'S FOURTH SUPPLEMENTAL RESPONSE TO
                                             INTERROGATORY NO. 1 OF MATTEL'S FIRST SET
                                             OF INTERROGATORIES   EXHIBIT _____ PAGE _____

1    contact information is 15794 Midwood Drive, Unit 6, Granada Hills, CA 91344 (818)

2    360-1266);

3        Marcy George (MGA's Domestic Director of Licensing, employed by MGA since

4    April 2003; handles licensing of "Bratz" brand and line of products in Canada and U.S.

5    since she started at MGA; all communications should be made through counsel of record

6    for MGA);

7        Sarah Halpern (former freelancer for MGA; did the artwork for the fashions for

8    "first generation" "Bratz" fashion dolls; dates of her work for MGA are indicated in

9    invoices and other documents previously produced to Mattel at SH 1-131 and MGA 82,

10   105-107, 4645-46, 168-69, 5050-52, 5080-82, 186, 191-93 5083-96, 362-63, 5291-92,599,

11   4434, 4506, 4527-78; Ms. Halpern should be contacted through her counsel Larry

12   McFarland, Esq.);

13       Christopher Hardouin (Project Manager at MGA from June 2001 to July 2004;

14   product development manager for "Alien Racers" toy racing vehicles under Ninette

15   Pembleton from at least as early as November 2002 until he left MGA in July 2004; Mr.

16   Hardouin is currently working at Mattel);

17       Rebecca Harris (sales administrator at MGA since July 1994; involved with sales of

18   all MGA products during her employment at MGA; all communications should be made

19   through counsel of record for MGA);

20       Rachel Harris (former Manager of Creative Services and Product Design at MGA;

21   employed by MGA from October 2000 to October 2001; last known contact information

22   is 2221 S. Primrose, Monrovia, CA 91016, (626) 303-4330; worked on design of

23   packaging of "Bratz" fashion dolls, including "first generation" "Bratz" fashion dolls, at

24   least as early as November 2000 until she left MGA);

25       Jill Hatch (MGA's Senior Director, National Sales; since the start of her

26   employment at MGA in September 2006, she sells all MGA products to Target; all

27   communications should be made through counsel of record for MGA);

28

CONFIDENTIAL                          - 10 -         MGA'S FOURTH SUPPLEMENTAL RESPONSE TO
                                                     INTERROGATORY NO. 1 OF MATTEL'S FIRST SET
                                                     OF INTERROGATORIES   EXHIBIT _1_ PAGE _7_

1    last known contact information is Room 2705, Block H, Luk Yeung Sun Chuen, Tsuen

2    Wan, New Territories);

3        Isaac Larian (the President and CEO of MGA; all communications should be made

4    through counsel of record for MGA);

5        Margaret Leahy (Senior Sculptor at MGA from April 2005 to March 2007; as a

6    freelancer, Ms. Leahy sculpted "4-Ever Best Friends" dolls and female "Bratz" fashion

7    dolls; dates of her work on "Bratz" are listed on invoices and other documents previously

8    produced to Mattel at MGA 5050-52, MGA 1414-31, and UB 23, 28, 30, 42, and 81; Ms.

9    Leahy also worked on "4-Ever Best Friends" dolls from at least as early as March 2003

10    until approximately April 2004, "Bratz Winter Wonderland" from at least as early as

11    January 2003 until approximately January 2004, "Bratz Formal Funk" in approximately

12    December 2002 and "Mommy's Little Patient" in approximately February 2004; Ms.

13    Leahy may be contacted through her counsel Larry McFarland, Esq.);

14        Edmond Lee (Chinese name is Lee Chun Ming, MGA Entertainment (HK) Limited

15    Managing Director; employed from September 16, 2000 to the present; worked on quality

16    assurance of "Bratz" products from approximately January 2001 to November 2002; all

17    communications should be made through counsel of record for MGA Entertainment (HK)

18    Limited);

19        Diana Luna (Director of International Licensing at MGA; handles licensing of

20    "Bratz" brand internationally (primarily responsible for Latin America, Asia Pacific and

21    Middle East) from August 2002 to the present; started at MGA in July 2001 as an import

22    manager of all MGA products; in August 2002, moved to licensing department; all

23    communications should be made through counsel of record for MGA);

24        Dave Malacrida (MGA's VP of Public Relations since August 1999; handles press

25    releases and other public communications about MGA and its products; all

26    communications should be made through counsel of record for MGA);

27        Veronica Marlow (former freelancer for MGA; helped create the three dimensional

28    sewn fashion samples for "Bratz" fashion dolls from October 2000 until approximately

CONFIDENTIAL       - 12 -     MGA'S FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1 OF MATTEL'S FIRST SET OF INTERROGATORIES    EXHIBIT   PAGE X

1   December 2005; Ms. Marlow may be contacted through her counsel Larry McFarland,

2   Esq.);

3        Jennifer Maurus (former sales manager at MGA; handled sales of "Bratz" fashion

4   dolls, including "first generation" "Bratz" fashion dolls in 2001; employed at MGA from

5   June 1999 to December 2001; last known contact information is 314 N. Stanley Avenue,

6   #3, Los Angeles, CA 90036, (323) 933-2662);

7        Zachary Mellion (former Senior Graphic Designer at MGA; employed from July

8   2002 to March 2006; designed "Alien Racers" logo from at least as early as August 2003

9   until approximately October 2003; continued to develop the "Alien Racers" logo and

10  other graphics for "Alien Racers" until approximately the end of 2005; last known contact

11  information is 1426 Point View Street Apt 6, Los Angeles, CA 90035);

12       Melissa Nerell (former Product Designer at MGA, employed from March 2003 to

13  August 2004; designer for "Bratz Petz" and related character art; last known contact

14  information is 1335 North Vista Apt 3, Los Angeles, CA 94649 323-653-0898; at present,

15  MGA is unable to determine her precise dates of work on "Bratz Petz," but as discovery is

16  ongoing, MGA will supplement its response when it discovers this information);

17       Victoria O'Connor (MGA's Vice President of Licensing at MGA from April 1999

18  to February 2003; last known contact information is 1340 Glenwood Road, #23, Glendale,

19  CA 91201, (626) 293-1985; involved in the negotiation of MGA's contract with Carter

20  Bryant and with licensing of "Bratz" from the spring of 2001 until she left MGA);

21       Charles O'Connor (former Senior Copywriter at MGA from November 2000 to

22  May 2005; last known contact information is 677 S. Lake Avenue, #F, Pasadena, CA

23  91106, (626) 440-9553; beginning in November 2000, he was copywriter for "Bratz"

24  products, including "first generation" "Bratz" fashion dolls and packaging, "Bratz Winter

25  Wonderland" products, "Bratz Formal Funk" products; "Bratz Sun-Kissed Summer"

26  products; "Bratz Formal Funk Super Stylin' Runway"; "Bratz Funky Fashion Makeover"

27  heads; and "Bratz Petz" products and packaging; and he was copyrighter for "4-Ever Best

28  Friends" dolls);

CONFIDENTIAL                              - 13 -        MGA'S FOURTH SUPPLEMENTAL RESPONSE TO
                                                       INTERROGATORY NO. 1 OF MATTEL'S FIRST SET
                                                       OF INTERROGATORIES  EXHIBIT   1   PAGE  9

1      Elaine Yip (Chinese name is Yip Yi Ling; MGA Entertainment (HK) Limited

2  Product Development Director, employed from October 29, 2002 to the present; MGA

3  currently is investigating the nature of Ms. Yip's work on "Bratz"; all communications

4  should be made through counsel of record for MGA Entertainment (HK) Limited).

5          AS TO OBJECTIONS ONLY:

6

7

8  Dated:  July 31, 2007                     O'MELVENY & MYERS LLP

9

10

11                              WILLIAM CHARRON
                            Attorneys for MGA Entertainment, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MGA'S FOURTH SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 1 OF MATTEL'S FIRST SET
OF INTERROGATORIES   EXHIBIT _1_   PAGE _1C_

**Exhibit 2**

# ORIGINAL

1  DIANA M. TORRES (S.B. #162284)
   JAMES P. JENAL (S.B. #180190)
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, CA  90071-2899
   Telephone:  (213) 430-6000
4  Facsimile:  (213) 430-6407
   Email:      jjenal@omm.com
5
   DALE M. CENDALI (admitted *pro hac vice*)
6  O'MELVENY & MYERS LLP
   Times Square Tower, 7 Times Square
7  New York, New York 10036
   Telephone:  (212) 326-2000
8  Facsimile:  (212) 326-2061

9  PATRICIA GLASER (S.B. #55668)
   CHRISTENSEN, GLASER, FINK, JACOBS,
   WEIL & SHAPIRO, LLP
10 10250 Constellation Boulevard, 19th Floor
   Los Angeles, CA  90067
11 Telephone:  (310) 553-3000
   Facsimile:  (310) 557-9815
12
   Attorneys for MGA Entertainment, Inc.
13

14          UNITED STATES DISTRICT COURT
15          CENTRAL DISTRICT OF CALIFORNIA
                    EASTERN DISTRICT
16

17 CARTER BRYANT, an individual,        Case No.  CV 04-09049 SGL (RNBx)
              Plaintiff,                (consolidated with CV 04-9059 & 05-2727)
18
        v.                             MGA'S THIRD SUPPLEMENTAL
19 MATTEL, INC., a Delaware            RESPONSES TO MATTEL'S
   Corporation,                        SECOND SET OF
20                                     INTERROGATORIES
              Defendant.
21                                     ATTORNEYS' EYES ONLY

22 CONSOLIDATED WITH
   MATTEL, INC. v. BRYANT and          Judge:  Hon. Stephen G. Larson
23 MGA ENTERTAINMENT, INC. v.
   MATTEL, INC.                         Discovery Cut-Off:  March 3, 2008
24

25 PROPOUNDING PARTY:     MATTEL, INC.

26 RESPONDING PARTY:      MGA ENTERTAINMENT, INC.

27 SET NUMBER:            TWO

28
                              8/22

EXHIBIT 2 PAGE 11

6.     MGA objects to Mattel's definitions of "MGA", "YOU", "YOUR", "AFFILIATES", "BRYANT" and " "PERSON", "PERSONS", "BRATZ", "EMBODIMENT", "SWORN STATEMENT", "IDENTIFY", "IDENTITY", and "ANGEL" as overbroad and unduly burdensome, vague and ambiguous and on the grounds that the definitions call for legal conclusions.

7.  MGA objects to Mattel's definitions of "any" and "REFER OR RELATE TO" on the grounds and to the extent they are overbroad and unduly burdensome and/or vague and ambiguous in the context of the interrogatories as written and as those interrogatories would be plainly understood absent Mattel's definitions.

8.  To the extent MGA responds to an interrogatory, it does so without waiving or intending to waive but rather, on the contrary, preserving and intending to preserve, its contention that anything Mr. Bryant did on weekends, evenings, vacation and any other time outside ordinary business hours was not done while he was working for Mattel.  MGA's response may not be taken as an admission that the information it provides in its response in any way reflects or evidences work performed by Mr. Bryant while he was working for Mattel or that MGA adopts or agrees with any fact or legal conclusion assumed, presumed or contained in Mattel's interrogatory.

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 5:

IDENTIFY, fully and separately, each and every PERSON who was involved in the conception, origin, creation, design, development, sculpting, engineering, reduction to practice, tooling or painting of, or who otherwise produced or contributed to any EMBODIMENT of BRATZ before December 31, 2001, including without limitation by fully and separately describing each such PERSON's role and the start and end dates of such PERSON's involvement.

3

EXHIBIT 2  PAGE 12

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

MGA incorporates by reference each and every General Objection as if fully set forth herein and the Specific Objections to this Interrogatory earlier stated in MGA's first, first supplemental and second supplemental responses to this Interrogatory as well as the same responses.  Subject to, and without waiving the foregoing objections, MGA responds as follows with regard to work on Bratz dolls prior to December 31, 2001:

Carter Bryant created the first "Bratz" drawings in approximately August 1998 and added color to them sometime in 1999; Bryant created rough sketches for evening wear that were never used for any "Bratz" dolls in July 2000; Bryant created designs for fashion in December 2000; Bryant created a sketch for a headpiece (bandana) in December 2000; Bryant created sketches of shoe designs in December 2000; Bryant created sketches of removable scalp and removable footwear for Bratz in December 2000; Bryant created various face sketches in December 2000 and January 2001; Bryant continued work for MGA past December 31, 2001 as detailed in his deposition, to which MGA refers in answer to this question as per Rule 33(d).

Margaret Leahy created a preliminary sculpt in late September 2000; a rough sculpt was created and completed on or about October 25, 2000; additional dates of her work on Bratz are listed on invoices and other documents previously produced to Mattel at MGA 5050-52, MGA 1414-31; and UB 23, 28, 30, 42, and 81; Ms. Leahy continued work with MGA past December 31, 2001.

A new sculpt was created starting in or about late October 2000, the engineering of which was worked on by Mercedeh Ward, whose work at MGA ended in early 2001.

Anna Rhee painted faces for Bratz in November 2000 and continued to do freelance face painting for MGA past December 31, 2001.

Sarah Halpern worked on graphics and trims for Bratz fashion dolls; dates of her work for MGA are indicated in invoices and other documents previously produced

4

EXHIBIT _2_ PAGE _13_

1   to Mattel at SH 1-131 and MGA 82, 105-07, 4645-46, 168-69, 5050-52, 5080-82, 186,

2   191-93 5083-96, 362-63, 5291-92,599, 4434, 4506, 4527-78.

3       Veronica Marlow worked on fashion samples for Bratz from October 2000 and

4   continued working on the same past December 31, 2001.

5       Cecilia Kwok worked on the engineering of Bratz fashion dolls and continued

6   to work on the same for MGA Entertainment (HK) Limited past December 31, 2001.

7       Paula Garcia oversaw the design, creation and development of "Bratz" fashion

8   dolls from October 2000 and past December 31, 2001.

9       David Dees worked as a freelance render artist, making 2D drawings of "Bratz"

10   character art look 3D, for MGA from approximately November 2000 and past

11   December 31, 2001.

12       Stephen Tarmichael worked as a freelance hair rooter for MGA, rooting hair for

13   "Bratz" fashion dolls, from approximately January 2001 and past December 31, 2001.

14       Edmond Lee worked on quality assurance in MGA HK, including that for the

15   "Bratz" products from approximately January 2001 and past December 31, 2001.

16       Franki Tsang was involved with the engineering of "Bratz" fashion dolls. MGA

17   is currently investigating the nature of Mr. Tsang's work on Bratz prior to 2002, and

18   so reserves its right to supplement pursuant to this investigation. His work for MGA

19   continued past December 31, 2001.

20       Samuel Wong was involved with the engineering of "Bratz" fashion dolls from

21   October 2000 through December 31, 2001.

22       Stephen Lee was the Managing Director of MGA HK in 2000 and continue in

23   that role past December 31, 2001. In that capacity Mr. Lee oversaw the development

24   and engineering of the Bratz fashion dolls during that time.

25       William Ragsdale and Wendy Ragsdale may have worked on design and print-

26   work for BRATZ in late 2000 and spring 2001. MGA is currently investigating the

27   nature of their work on Bratz and so reserves its right to supplement pursuant to this

28   investigation. MGA's investigation to date indicates Mr. Ragsdale's work began in

5

EXHIBIT 2 PAGE 14

1    November 2000 and Ms. Ragsdale's work continued through May 2001.

2        MGA expressly reserves the right to amend or supplement this interrogatory

3    response to include additional information.

4    **INTERROGATORY NO. 6:**

5        IDENTIFY, fully and separately, each and every PERSON who was involved in

6    the conception, origin, creation, design, development, sculpting, engineering,

7    reduction to practice, tooling or painting of, or who otherwise produced or contributed

8    to any EMBODIMENT of ANGEL, including without limitation by fully and

9    separately stating each such PERSON's role and the start and end dates of such

10    PERSON'S involvement.

11    **THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

12        MGA incorporates by reference each and every General Objection as if fully set

13    forth herein and the Specific Objections to this Interrogatory earlier stated in MGA's

14    first, first supplemental and second supplemental responses to this Interrogatory as

15    well as the same responses.

16        Subject to and without waiving the foregoing, MGA responds as follows: Paula

17    Treantafelles Garcia began working on the creation and development "Prayer Angels"

18    line in the Spring of 2000 as a product manager.  Third-party vendors Amy Myers (the

19    creation of "Prayer Angels" through sketching, hairstyles, fashions and related

20    concepts until approximately May 2000), Veronica Marlow (the creation of "Prayer

21    Angels" through sketching, hairstyles, fashions and related concepts beginning in or

22    about May 2000) and Anna Rhee (face-painting services beginning in or about May

23    2000) also worked on the "Prayer Angels" line.  Carter Bryant sketched some faces

24    and hairstyles for the "Prayer Angels" line in late August 2000 that were not

25    ultimately used.  Documents that may support or bear on MGA's response have been

26    or will be produced by MGA in discovery, including, but not limited to, the

27    documents Bates numbered MGA000706-08, MGA000710-12, MGA000714-16,

28    MGA000718-28, MGA000734, MGA0007363-8026 and MGA0008963-8968.  These

EXHIBIT 2 PAGE 15

1  documents include the vendor file of Amy Myers as well as emails, requisitions,

2  purchase orders and other related financial information regarding the "Prayer Angels"

3  line.

4      Jonathan Buford provided limited assistance with the engineering function of

5  "Prayer Angels" during a late-2000 trip to Hong Kong.  MGA is currently

6  investigating the nature of Mr. Buford's work and so reserves its right to supplement

7  pursuant to this investigation.  MGA's investigation to date indicates that Mr. Buford

8  worked on "Prayer Angels" in August 2000.

9      Sandra Bilotto was the sculptor for "Prayer Angels" during 2000, in particular

10  she sculpted the first "Prayer Angels" head.  MGA is currently investigating the nature

11  and length of Ms. Bilotto's work and so reserves its right to supplement pursuant to

12  this investigation.

13      MGA's investigation as to the nature and timing of the work of its Hong Kong

14  employees on "Prayer Angels" is ongoing.  Accordingly, MGA expressly reserves the

15  right to amend or supplement this interrogatory response to include additional

16  information.  MGA's investigation to date indicates that the following Hong Kong

17  employees were involved in "Prayer Angels" beginning in May 2000: Franki Tsang,

18  Jimmy Cheng, Cecilia Kwok, Samuel Wong, Stanley Li.

19      MGA expressly reserves the right to amend or supplement this interrogatory

20  response to include additional information, as is its right and obligation under the

21  Federal Rules.

22

23  **INTERROGATORY NO. 9:**

24      IDENTIFY, fully and separately, each and every SWORN STATEMENT that

25  REFERS OR RELATES TO the conception, origin, creation, design, development,

26  sculpting, engineering, tooling or painting of BRATZ.

27  **THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

28      MGA incorporates by reference each and every General Objection as if fully set

7

EXHIBIT 2  PAGE 11 0

foregoing. MGA's investigation is ongoing. Accordingly, MGA expressly reserves the right to amend or supplement this interrogatory response to include additional information, as is its right and obligation under the Federal Rules.

**INTERROGATORY NO. 11:**

State, fully and separately, the number for each and every telephone, including without limitation each office, home and cell phone number, in the name of, for the benefit of or for the account of Isaac Larian and any other telephone that Isaac Larian used from January 1, 1998 through the present, and IDENTIFY each and every carrier (including without limitation any long-distance carrier) for each such number.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

MGA incorporates by reference each and every General Objection as if fully set forth herein and the Specific Objections to this Interrogatory earlier stated in MGA's first, first supplemental and second supplemental responses to this Interrogatory.

Subject to, and without waiving the foregoing objections, MGA responds as follows: (310) 271-7575; (310) 271-7578; (818) 326-6666; (818) 894-2525; (818) 894-3150; (818) 894-1267; (818) 357-8489; 852 9405-4387; 852 2732-9200.

AS TO OBJECTIONS ONLY:

Dated: August 21, 2007                    O'MELVENY & MYERS LLP

William J. Charron
Attorneys for MGA Entertainment, Inc.

9

**Exhibit 3**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION


CARTER BRYANT, an individual,

               Plaintiff,

     - against -      CASE NO.: CV 04-5049 SGL

MATTEL, INC., a Delaware corporation,


             Defendant.

**CERTIFIED COPY**

------------------------------

AND CONSOLIDATED ACTIONS.

------------------------------

CONFIDENTIAL ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF NANA ASHONG,

taken by Respective Parties, pursuant to Subpoena,

at the offices of Quinn Emanuel, 51 Madison Avenue,

22nd Floor, New York, New York, on Monday, January

28, 2008, commencing at 9:39 a.m., before Chandra D.

Brown, a Registered Professional Reporter and Notary

Public within and for the State of New York.


JOB No. 81553

EXHIBIT 3 PAGE 18

```
 1        A P P E A R A N C E S :

 2

 3                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM,LLP
                      Attorneys for the Plaintiff
 4                    Four Times Square
                      New York, NY 10036
 5                    By: PAUL M. ECKLES, ESQ.

 6

 7

                      QUINN EMANUEL URQUHART OLIVER &
 8                    HEDGES, LLP
                      Attorneys for the Defendant
 9                    865 South Figueroa Street, 10th Floor
                      Los Angeles, CA 90017-2543
10                    By: MICHAEL T. ZELLER, ESQ.

11

12

13       ALSO PRESENT:

14              Chad Ackerman

15

16

17

18

19

20

21

22

23

24

25
```

                                                                 2

EXHIBIT 3 PAGE 19

|    |                                                            |
|----|------------------------------------------------------------|
| 1  | FEDERAL STIPULATIONS                                       |
| 2  | IT IS HEREBY STIPULATED AND AGREED by and                 |
| 3  | between the attorneys for the respective parties          |
| 4  | hereto, that all rights, including the right to           |
| 5  | object to any questions, except as to form, or to         |
| 6  | move to strike any testimony is reserved;                 |
| 7  | IT IS FURTHER STIPULATED AND AGREED that                  |
| 8  | the attorneys for the respective parties hereto,          |
| 9  | that the failure to object to any questions, or to        |
| 10 | move to strike testimony at this examination shall        |
| 11 | not be a bar or waiver to make such motion at, and        |
| 12 | is reserved for trial of this action;                     |
| 13 | IT IS FURTHER STIPULATED AND AGREED that                  |
| 14 | the within examination may be sworn to by the             |
| 15 | witness being examined before a Notary Public other       |
| 16 | than the Notary Public before whom this examination       |
| 17 | was begun with the same force and effect as though        |
| 18 | signed and sworn to in Court;                             |
| 19 | IT IS FURTHER STIPULATED AND AGREED that                  |
| 20 | the filing and certification of the original of this      |
| 21 | examination shall be and the same are hereby waived.      |
| 22 |                                                            |
| 23 |                                                            |
| 24 |                                                            |
| 25 |                                                            |

3

EXHIBIT 3 PAGE 20

09:38:14   1           THE VIDEOGRAPHER:  This is Tape No. 1 of

2      the videotaped deposition of Ms. Nana Ashong

3      taken by defendant in the matter of

4      Carter Bryant, plaintiff, v. Mattel, Inc.,

09:38:30   5      defendant in the United States District Court,

6      Central District of California, Eastern

7      Division, Number CV 04-9049SGL.

8           This deposition is being held at Quinn

9      Emanuel, 51 Madison Avenue, 22nd floor, New

09:38:57  10      York, New York, on Monday, January 28, 2008.

11      The time is 9:39 a.m.

12           My name is Chad Ackerman from the firm of

13      Sarnoff Reporting and I'm the legal video

14      specialist.  The Court Reporter is

09:39:18  15      Ms. Chandra Brown in association with Sarnoff

16      Reporting.

17           For the record, will counsels please

18      introduce themselves?

19           MR. ZELLER:  Mike Zeller for Mattel.

09:39:31  20           MR. ECKLES:  Paul Eckles from Skadden,

21      Arps for the MGA parties.

22           THE VIDEOGRAPHER:  Now, will the court

23      reporter please swear in the witness.

24   N A N A   A S H O N G, called as a witness, having

09:39:39  25           been first duly sworn by a Notary Public of the

4

EXHIBIT 3 PAGE 21

15:45:09  1    BY MR. ZELLER:

2         Q    Have you looked at Exhibit 4915?

3         A    I have.

4         Q    Do you recognize this as an e-mail that

15:46:16  5    you sent to Victoria O'Connor on or about May 22,

6    2001?

7         A    Yes.

8         Q    You'll see that it has a list of what you

9    described in the e-mail as being elements of the --

15:46:25 10    of the Bratz line right now.  Do you see that?

11         A    Yes.

12         Q    Then there is a list.  That's what the

13    list is of?

14         A    Yes.

15:46:37 15         Q    You'll see that this of course has the

16    various bullet points?

17         A    Yes.

18         Q    Where did you obtain the information that

19    you put down as these bullet points?  Is it

15:46:49 20    something you put together from various sources or

21    is it something that you obtained from somewhere

22    else?

23         A    This is something that I would have put

24    together in conjunction with Paula.  A number of

15:47:05 25    these things would have been already listed, I

209

EXHIBIT _3_ PAGE 22

| | | |
|---|---|---|
| 15:47:07 | 1 | believe, the miscellaneous design, the actual logos, |
| | 2 | those were things that were recently added.  One or |
| | 3 | two of the exclamation point styles may have been |
| | 4 | new to the list but there was an existing core list |
| 15:47:23 | 5 | of elements including the names.  The name Bratz, |
| | 6 | Bratz Pack, et cetera. |
| | 7 | Q     You'll agree with me that as of May 22, |
| | 8 | 2001, you understood that one element, one aspect of |
| | 9 | the Bratz line was this -- this term "Angel," right? |
| 15:47:45 | 10 | MR. ECKLES:  Objection.  Vague.  Calls for |
| | 11 | speculation.  Calls for legal conclusion. |
| | 12 | A     It was the name associated with a logo |
| | 13 | associated with one of the characters. |
| | 14 | Q     You understood by this time of May 22, |
| 15:48:06 | 15 | 2001 that -- that Angel was -- was an element of the |
| | 16 | Bratz line? |
| | 17 | MR. ECKLES:  Same objection.  Leading. |
| | 18 | Asked and answered. |
| | 19 | A     Yes.  It was a -- a potential -- I -- I |
| 15:48:31 | 20 | don't believe we ever used any of those four -- |
| | 21 | actively used any of those four names but I -- it |
| | 22 | may have happened.  The Angel, Kool Kat, Bunny Boo |
| | 23 | and Pretty Princess.  I don't know the extent to |
| | 24 | which those were actually used. |
| 15:48:48 | 25 | Q     Well, the -- the designs were used, right? |

210

EXHIBIT _3_ PAGE _23_

15:48:53    1          A     Yes.

2          Q     How is it that the word "Angel" became

3     associated with that -- with that design?

4                MR. ECKLES:  Objection as to form.

15:49:01    5          A     It was simply a creative evolution of the

6     appearance of that character, a logo was created to

7     associate with that character and it was a set of

8     angel wings and was simplified in that manner.

9                MR. ZELLER:  Let's please mark as

15:49:33   10     Exhibit 4916 --

11                MR. ECKLES:  If you're going to move on to

12     another exhibit, could we take a short break?

13                MR. ZELLER:  Sure.

14                THE VIDEOGRAPHER:  The time is 3:49 p.m.

15:49:50   15     and we're going off the record.

16                (Whereupon, a short recess was taken.)

17                THE VIDEOGRAPHER:  The time is 4:07 p.m.

18     We are back on the record.

19                MR. ZELLER:  Let's please mark as

16:07:47   20     Exhibit 4916 a two-page document bearing Bates

21     Numbers MGA0861087 through '88.  The top of the

22     first page is an e-mail from Isaac Larian to

23     Fred Larian dated May 5, 2001.

24                (Whereupon, the aforementioned two-page

16:08:03   25     document bearing Bates Numbers MGA0861087

211

EXHIBIT 3 PAGE 24

16:08:03 1      through '88, was marked as Defendant's Exhibit

2      4916 for identification as of this date by the

3      reporter.)

4  BY MR. ZELLER:

16:08:36 5      Q     What I would like to really focus your

6  attention on with respect to Exhibit 4916 is the

7  part where it says original message from you to

8  Fred Larian, Martin Hitch, Paula Treantafelles,

9  Victoria O'Connor on April 30, 2001, and then the

16:08:51 10  rest of your message which continued on to the

11  second page.

12      A     Yes.

13      Q     Do you recognize the portion that begins

14  "original message" about halfway down the first page

16:09:05 15  of Exhibit 4916 as an e-mail that you sent on or

16  about April 30, 2001 to Fred Larian, Martin Hitch,

17  Paula Treantafelles and Victoria O'Connor?

18      A     Yes.

19      Q     You'll see that you addressed this set

16:09:18 20  starting with "Hello Fred."  That's Fred Larian?

21      A     Yes.

22      Q     You say, "I just wanted to recap our

23  earlier conversation and provide you with a listing

24  of elements for protection."  Do you see that?

16:09:33 25      A     Yes.

212

EXHIBIT 3  PAGE 25

16:09:33   1         Q     In this, are the elements for protection
           2    that you're referencing here in connection with
           3    Bratz?
           4         A     Yes.
16:09:40   5         Q     The listing of Bratz elements for
           6    protection are those that are listed starting at the
           7    bottom of the first page of this Exhibit 4916 and
           8    continuing on to the second page; is that right?
           9         A     Yes.
16:09:53  10         Q     It begins under this heading where it says
          11    in Class 28, dolls and dolls accessories, in
          12    Class 35, licensing services; is that correct?
          13         A     Yes.
          14         Q     Turning your attention to the list itself,
16:10:07  15    you will see that the first element that you list
          16    there for Bratz is Angel, A-N-G-E-L, right?
          17         A     Yes.
          18         Q     Further down you will see that there is a
          19    reference to miscellaneous design and then in
16:10:20  20    parenthesis, angel wings and halo icon, closed
          21    parenthesis.
          22               Do you see that?
          23         A     Yes.
          24         Q     Now, the most miscellaneous design that
16:10:29  25    you're referring to here, that's the angel wings and

                                                                    213

16:10:32  1      the halo you were talking about earlier, right?

2          A    Yes.

3          Q    You'll agree with me that by this time,

4      April 30 of 2001, one element that people were

16:10:47  5      considering at least internally within MGA in terms

6      of protecting the Bratz property was the term

7      "Angel," right?

8          A    Yes.

9          Q    That's a term that by the time you were

16:11:08 10      working there at MGA you associated as a possible

11      name in connection with the Bratz line; is that

12      true?

13              MR. ECKLES:   Objection.   Leading.   Vague

14          and ambiguous.

16:11:20 15          A    It was a nickname for an existing

16      character

17          Q    Which character was it a nickname for?

18          A    Cloe.

19          Q    Directing your attention further down the

16:11:37 20      second page of Exhibit 4916, you see that heading

21      where it says "for copyright"?

22          A    Yes.

23          Q    Then the first bullet point is actual

24      dolls, right?

16:11:47 25          A    Yes.

214

EXHIBIT 3 PAGE 27

1    CERTIFICATION

2    STATE OF NEW YORK    )

3                              :  SS.:

4    COUNTY OF NEW YORK  )

5               I, CHANDRA D. BROWN, a Notary Public for

6    and within the State of New York, do hereby certify:

7               That the witness whose examination is

8    hereinbefore set forth was duly sworn and that such

9    examination is a true record of the testimony given

10   by that witness.

11              I further certify that I am not related to

12   any of the parties to this action by blood or by

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15              IN WITNESS WHEREOF, I have hereunto set my

16   hand the 7th day of January, 2008.

17

18              *Chandra D. Brown*

19              CHANDRA D. BROWN, RPR

20

21

22

23

24

25

EXHIBIT 3 PAGE 28

**PAGES INTENTIONALLY LEFT BLANK**

EXHIBIT 3 PAGE 29

**PAGES INTENTIONALLY LEFT BLANK**

EXHIBIT _3_ PAGE _30_

**Exhibit 4**

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

Case No. CV 05-02727

Expert Report of Peter S. Menell

February 11, 2008

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 4 PAGE 31

*Confidential*

## EXPERT REPORT OF PROFESSOR PETER S. MENELL

### Introduction

1. My name is Peter S. Menell. I am a Professor of Law at the University of California at Berkeley School of Law. I also serve as Executive Director of the Berkeley Center for Law and Technology. This section of the Report summarizes my academic training, professional experience, scholarly writings, and professional activities relating to the issues for which my analysis and opinions have been requested in this matter. My qualifications are more fully set forth in my curriculum vitae, which is attached as Appendix A to this Report.

2. *Academic Training.* My educational training includes an S.B. from the Massachusetts Institute of Technology, a J.D. from Harvard Law School, and a Ph.D. (Economics) from Stanford University. I developed a strong interest in intellectual property while in law school. I wrote my third year paper, a requirement for graduation from Harvard Law School, under the guidance of then Judge, now Supreme Court Justice, Stephen G. Breyer on intellectual property protection for computer software. That paper, "Tailoring Legal Protection for Computer Software," was awarded first prize for Harvard Law School in the Nathan Burkan Memorial Competition, a leading competition for copyright scholarship. The paper was later published in the *Stanford Law Review*, a leading scholarly publication.

3. *Professional Experience.* Following law school, I spent a year clerking for the Honorable Jon O. Newman of the U.S. Court of Appeals for the Second Circuit. Judge Newman is particularly noted for his intellectual property jurisprudence and I had the opportunity to work on several important copyright and trademark matters during that year. See, e.g., *Salinger v. Random House, Inc.,* 811 F.2d 90 (2d Cir. 1987); *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971 (2d Cir. 1987). Fifteen years after the clerkship, I had the privilege to contribute an article honoring Judge Newman's copyright jurisprudence for a symposium celebrating his first 30 years on the federal bench. See Peter S. Menell, Envisioning Copyright Law's Digital Future, 46 *New York Law School Law Review* 63 (2003).

4. Following my clerkship, I went directly into legal academia, where I have remained throughout my career. I joined the faculty at the University of California at Berkeley School of Law in 1990 and was promoted to full professor in 1994. Apart from a year-long visit to teach at Stanford Law School, a Winter term visit to teach at Harvard Law School, and several shorter visits elsewhere (Swiss Federal Institute of Technology (ETH) (annual visits to lecture on U.S. intellectual property law since 1997) and University of Toronto (Distinguished Visiting Professor to teach an intensive course on U.S. intellectual property law)), I have been based at the UC-Berkeley School of Law, where my principal activities have been legal scholarship (focusing principally on intellectual property law and policy), teaching (focusing principally in the areas of intellectual property law and entertainment law over the past decade), and developing the Berkeley Center for Law and Technology (an intellectual property-focused

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 4  PAGE 32

research and public policy institute). I have also devoted substantial time and energy to educating judges about intellectual property law, worked directly on public policy relating to intellectual property, lectured widely on intellectual property law issues, and consulted on a wide variety of intellectual property matters.

5. *Legal Scholarship.* Much of my academic career has focused on the study of intellectual property law and policy. I have authored or co-authored more than two dozen articles on many aspects of the field. I have written nearly 20 articles relating to copyright law. I wrote the chapter of Nimmer on Copyright relating to bankruptcy treatment of copyrights. In addition, I am co-author of two leading texts on intellectual property law: Intellectual Property in the New Technological Age (Aspen Law & Business, 1st ed. 1997, 2nd ed. 2000, 3rd ed. 2003, 4th ed. 2006, 4th rev. ed., 2007) and Software and Internet Law (Aspen Law & Business, 1st ed. 2000, 2nd ed. 2003, 3rd ed. 2006). Both of these volumes have been the best selling texts in their field since their first edition. I am currently under contract to write or edit four additional books in the fields of intellectual property and entertainment law. In conjunction with the Federal Judicial Center, I am also co-authoring a manual for judges on patent case management. In addition, I founded and have supervised publication of the Annual Review of Law & Technology, a compendium of student-authored comments on the leading developments in intellectual property, antitrust, and cyberlaw published by the *Berkeley Technology Law Journal.* The 11th edition of the Annual Review of Law & Technology is scheduled for publication in May 2008.

6. *Intellectual Property Teaching at UC-Berkeley School of Law.* For the past decade, I have taught an annual survey course on intellectual property law, a writing workshop on law and technology (that results in the Annual Review of Law & Technology), and a course on intellectual property in the entertainment industries. I have also organized a workshop on Intellectual Property Scholarship.

7. *Other Intellectual Property Teaching.* For the past decade, I have taught annual intensive courses on U.S. intellectual property law at the ETH Zürich (Eidgenössische Technische Hochschule Zürich; also known as the Swiss Federal Institute of Technology), one of the leading European technology universities. I have also lectured frequently at Congresses for the European Intellectual Property Institutes Network (EIPIN), Seoul National University's Center for Law & Technology, and Tel Aviv University. I have also organized most of the Federal Judicial Center's intellectual property programs since 1997, including an annual three-day intensive program held at UC-Berkeley in the spring. I discuss these courses in more detail below in the section on "Judicial Education."

8. *Berkeley Center for Law and Technology.* Upon arriving at the University of California at Berkeley in 1990, I began developing an institute for the study of intellectual property law. That vision came to life in 1995 with the founding of the Berkeley Center for Law & Technology (BCLT). BCLT's mission is to "foster the beneficial and ethical advancement of technology by promoting the understanding and guiding the development of intellectual property and related fields of law and policy as they intersect with business, science, and technology." I have served as one of BCLT's directors since its founding and also managed the daily operations of BCLT as

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 17 PAGE 33

Executive Director from 2000-05. BCLT has developed a wide range of research, education, and public policy programs. It has built an unparalleled academic program on intellectual property, enabling UC-Berkeley to garner U.S. News & World Reports' top ranking for intellectual property programs for the past decade. BCLT has sponsored leading conferences on salient public policy issues at the intersection of law and technology, including software innovation, new business models for transacting intellectual property on the Internet, digital rights management, electronic commerce, the intersection of intellectual property and antitrust, and patent reform. BCLT has also established affiliations with other intellectual property and technology institutes around the world.

9. *Judicial Education.* In 1997, I was invited by the Federal Judicial Center to organize a three day conference for 40 federal judges entitled "The Landscape of Intellectual Property Law." The program was among the highest rated educational programs ever offered by the FJC. I have since organized more than two dozen educational programs on intellectual property attended by more than 800 federal jurists. The FJC has made the BCLT/FJC three day program one of its annual activities. The 10th Annual Conference – now entitled "Intellectual Property in the New Technological Age" – is scheduled for May 2008. I am currently working on a patent case management judicial guide that the Federal Judicial Center will be publishing in 2008. David Nimmer and I are in the formative stages of developing an analogous judicial guide for copyright case management.

10. *Public Policy.* Throughout the past two decades, I have worked to guide jurists and policy makers in developing and applying intellectual property law. I served as an adviser to the Office of Technology Assessment, a research arm of Congress, on two important studies: Copyright and Home Copying: Technology Challenges Law (Oct. 1989) and Finding a Balance: Computer Software, Intellectual Property and the Challenge of Technological Change (1992). I have also co-authored amicus briefs in several leading copyright cases. See Karjala & Menell, Applying Fundamental Copyright Principles in Lotus Development Corp. v. Borland International Inc., 10 *High Technology Law Journal* 177 (1995); Sega Enterprises Ltd. v. Accolade, Inc., Civil Action No. 92-15655 (N.D. Cal.), reprinted in 33 *Jurimetrics* 147 (Fall 1992); Indirect Copyright Liability: A Re-examination of Sony's Staple Article of Commerce Doctrine, 20 *Berkeley Technology Law Journal* 511 (2005). I have advised the federal and several state governments on various intellectual property matters. I serve as a consultant to the State governments on intellectual property and antitrust issues in the ongoing litigation between the U.S. Department of Justice and various states against Microsoft Corporation. I served as an expert witness for the Internal Revenue Service in Microsoft Corporation v. Commissioner, Dkt. No. 16878-96, in which I was qualified by the U.S. Tax Court as an expert in intellectual property law. I have also consulted on intellectual property matters for the U.S. Patent and Trademark Office, the Federal Trade Commission, Federal Judicial Center, and various district courts.

11. *Public Speaking.* Over the years, I have given more than 100 lectures on intellectual property issues – including keynote and principal addresses for the American Intellectual Property Law Association, the U.S. Copyright Office (in its Copyright Office Comes to

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 4 PAGE 34

California series), the Copyright Society, the USC Entertainment Law and Business conference (the leading annual entertainment law conference in the United States), and the European Intellectual Property Institutes Network (EIPIN) annual series of conferences.

12. *Consulting and Expert Witness Work.* I have consulted on a wide range of intellectual property matters over the past decade. I have also served as an expert witness in approximately half a dozen intellectual property-related matters over that same time period.

13. I have conducted the copyright tutorial and prepared this report on behalf of MGA at my current billing rate of $700 per hour.

## Scope of Report

14. Through its counsel (Skadden, Arps, Slate, Meagher & Flom LLP), MGA has asked me to address several matters relating to its ongoing litigation against Mattel, Inc. These tasks fall into three areas: (1) copyright tutorial – provide its doll and face painting experts with an understanding of the copyright doctrines relating to protection and infringement; (2) copyright infringement analysis – assess whether the Bratz dolls and related packaging art would infringe copyright in any of Carter Bryant's sketches if in fact they were owned by Mattel; and (3) employee agreements – interpret the scope of the 1999 Mattel "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" signed by Carter Bryant.

15. *Summary of Analysis and Conclusions.*
A. Copyright Infringement Analysis. From the standpoint of copyright protection, Carter Bryant's sketches lie in the upper regions of the abstractions pyramid. His concepts do not attract copyright protection. His sketches reflect a mix of relatively detailed soft goods elements (clothing and accessory) and largely rudimentary hard goods elements. The doll features attract relatively modest protection. When the sketches are subjected to successive filters of copyright law's limiting doctrines (originality, merger, scènes à faire, functionality), many of the hard goods elements of Carter Bryant's fall away entirely or fade in significance. The anatomical aspects of the sketches, the standard poses, the aspects of the art based on human features, well-known techniques), and prior art that was widely available and to which Carter Bryant acknowledges he was exposed leaves a rather modest residue of copyright protection in the basic doll design. The strongest claim to copyright lies in the compilation of elements. But since the individual elements themselves attract relatively modest (if any) protection, the compilation itself only enjoys protection against "bodily appropriation" or "virtual identity." As the comparisons show, MGA's Bratz blank and face paint do not reflect anywhere near that level of similarity. The elements differ quite significantly from the Bryant sketches. And the compilation itself reflects many prior art aspects (other fashion dolls, the Spice Girls) and scènes à faire. Based on these considerations, I do not believe that MGA's Bratz dolls infringe copyright in the Carter Bryant doll sketches.
B. Given its standard form nature, Mattel's strong relative bargaining power vis á vis its employees, and the take-it-or-leave-it basis on which it offered its 1999 "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT," the agreement

-4-

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 4 PAGE 35

constitutes a contract of adhesion. Therefore, any ambiguity is interpreted against the drafter. With respect to the trade secret provision, I concluded that the agreement was ambiguous at best with regard to Carter Bryant's obligations to treat the Bratz concept as a Mattel trade secret (if, in fact, it was conceived while he was in Mattel's employ). As a result, I concluded that it should be interpreted narrowly (i.e., in Carter Bryant's favor). With regard to the invention assignment provision, I concluded that the text of the provision limited the assignment obligation to technological inventions and therefore did not cover Carter Bryant's artistic concept and purely aesthetic sketches. This interpretation was reinforced by the nature of Mattel's business, its patenting activities, and changes that it made to the scope of the invention assignment provisions in 2004.

## I. Copyright Tutorial for MGA's Doll and Face Painting Experts

16. *Rationale for the Copyright Tutorial.* Based upon more than two decades teaching and researching copyright law, I have come to believe that subject matter experts (such as artists, musicologists, and computer scientists) cannot properly perform their functions in copyright trials unless they appreciate several key aspects of copyright law – mainly the thresholds, limiting doctrines, and scope of copyright protection, the standard for infringement, and, in some cases, the defenses to copyright infringement. In cases involving well-trodden areas of creativity, copyright law demands experts, judges, and juries to engage in a particularly subtle form of analysis. Take, for example, a music copyright case. The plaintiff wrote and recorded a song in a particular genre – such as rhythm and blues. The defendant wrote and recorded a song that sounds similar – it may have familiar background rhythm, instrumentation, use of bridges and choruses, and a lyrical phrase or two. A jury might conclude upon a quick listen that the two compositions are similar – maybe even substantially similar. But the test for copyright is more nuanced than that. The jury must filter out the unprotected elements from the plaintiff's work in making the comparison. Basic rhythm patterns, common instrumentation, standard uses of bridges and choruses, and short phrases are not protectable, nor are standard compilations of such elements. This can be a challenge in that few people have the ability to conduct such filtering in real time. As the Second Circuit has noted,

> The "substantial similarity" that supports an inference of copying sufficient to establish infringement of a copyright is not a concept familiar to the public at large. It is a term to be used in a courtroom to strike a delicate balance between the protection to which authors are entitled under an act of Congress and the freedom that exists for all others to create their works outside the area protected by infringement.

See *Warner Brothers v. American Broadcasting Cos.*, 720 F.2d 231, 245 (2d Cir.1983). Furthermore, subject matter experts who are not versed in the subtleties of copyright law can easily confuse the issues. The problem is exacerbated by the adversary system. To the extent that art, literary, computer software, or music experts are exposed to copyright law, it is often by the lawyers who have hired them. Such lawyers have an obligation to represent their clients zealously. In my experience, this duty can impinge upon the comprehensiveness and balance of

-5-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _4_ PAGE 36

the presentation of copyright principles. Hence, there is a constructive role for a detached copyright expert to play in explaining the applicable concepts to subject matter experts.

17. I had the opportunity to play such a role in a software copyright case last year that was resolved through a JAMS arbitration. I worked closely with a leading computer software professor who later served as a technical expert to the three arbitrator tribunal. In this way, he did not learn about copyright law from advocates but rather someone who teaches copyright law to students and judges on a regular basis. I based my presentation to him on the same materials that I have developed for teaching federal judges. The three arbitrator panel permitted both of us to testify. The computer software expert could focus on the application of the legal concepts that he had learned from me and the opposing counsel could cross-examine me regarding what I presented to the subject matter expert. In my view (and apparently the view of the arbitrators given their ultimate determinations), this process enhanced the objectivity of the subject matter expert while providing opposing counsel with a fair opportunity to probe the basis for the subject matter expert's understanding of copyright concepts. It also provided the tribunal with the benefit of someone who has a wide range of experience studying and working on copyright matters.

18. The MGA attorneys asked me to perform the same roles in this case. They asked me to use the materials that I use in Federal Judicial Center programs and my other teaching to instruct Robert Tonner, MGA's doll expert, and Tina Tomiyama, MGA's face painting expert, about copyright infringement analysis. We held this session on the afternoon of Thursday, January 3rd, at the law offices of Skadden, Arps, Slate, Meagher & Flom LLP in Los Angeles. I conducted the session in much the same manner that I teach copyright law to a wide range of audiences. I used the same powerpoint slides as the basis for an interactive lecture. I explained the concepts, used illustrations, and engaged the audience in questions and discussion. The formal presentation lasted about two and a half hours. I also met with Robert Tonner the next morning and early afternoon as we examined various sculpts and other materials relating to the creation of the Bratz line of dolls.

19. In the remainder of this section of the report, I will for completeness purposes summarize the presentation that I made to Mr. Tonner and Ms. Tomiyama. (For purposes of trial testimony, I would focus on the issues of most pertinence in this case.) I drew upon the materials that I have developed over the past decade for teaching copyright law. Those slides are included in Appendix B to this report. I should note that the main infringement analysis chart (Slides [B2], [B4], and [B25]) was developed in conjunction with David Nimmer, author of the leading copyright treatise, and Lon Sobel, a professor at Southwestern Law School and the editor of the Entertainment Law Reporter. David often co-teaches the FJC copyright programs with me. Lon has also participated in several of these programs. In addition, the three of us have lectured together to a wide range of audiences throughout the country.

20. *Introduction.* As suggested above, the challenge in teaching copyright's infringement test is that most people's naive assumption about copyright protection is that it is really just a plagiarism test – if one work looks like a prior work, then there is infringement. And in some

-6-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 4 PAGE 37

cases, that test will achieve the correct answer. If someone were to a publish a book that was identical or nearly identical to J.K. Rowling's "Harry Potter and the Philosopher's Stone," it would almost certainly be a copyright infringement. Similarly, if someone were to produce a comic strip with nearly identical likenesses of Charlie Brown, Lucy, and Snoopy, it would also almost certainly be a copyright infringement. But as we move away from the realm of complex and highly imaginative works of authorship into more crowded fields of creativity (such as popular music), more limited ranges of creativity (such as still art drawing, conceptual or minimalist graphic art, map-making, and anatomically-based toys), or more artistically constrained mediums of expression (such as computer programs that will run on particular communication platforms), then the plagiarism approach diverges from copyright law's multi-layered framework for separating the protectable from the unprotectable and systematic analysis of infringement.

21. One of the copyright questions posed by this litigation – and the one of most relevance to Mr. Tonner's and Ms. Tomiyama's analysis – is whether MGA's Bratz dolls infringe the drawings that Carter Bryant sketched prior to October 19, 2000. Since Mr. Tonner and Ms. Tomiyama will play a role in explicating the applicability of several of copyright law's limiting doctrines, I sought to provide them with both a clear understanding of the overarching copyright infringement framework as well as illustrations of the most pertinent limiting doctrines.

22. *Infringement Analysis.* As reflected in the main infringement Slide [B2], the basic test for copyright infringement involves three principal overarching elements: (1) actual copying of (2) copyright protected expression resulting in (3) substantial similarity.

23. *Actual Copying.* Copyright protects authors and artists against copying, not merely similarity. Thus, a defendant can successfully defend a claim of copyright infringement by establishing that he or she independently created an identical work to the plaintiff's work. While this is rare in the context of complex works in which there is a wide range of artistic choice, it can occur in more constrained areas of expression. The plaintiff bears the burden of proving copying by direct evidence and/or circumstantial evidence (access and probative similarity).

24. *Copyright Protected Material.* Factual copying alone does not violate copyright law as the copyist may merely be reproducing elements that were not protected or making such modest use as to fall below the "substantial similarity" threshold for infringement. Copying as a legal matter requires proof that the defendant's work is substantially similar to original protected expression of the copyright owner. The analysis proceeds in three stages, often referred to as Abstraction, Filtration, and Comparison. See generally *Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693, 706-12 (2d Cir. 1992); see also *Nichols v. Universal Pictures Co.*, 45 F.2d 119 (2d Cir.1930) (L. Hand, J.), *cert. denied*, 282 U.S. 902 (1931); Nimmer on Copyright §13.03. First, the copyrighted work must be dissected into its constituent elements. In the case of a graphic such as the Bryant sketches, that would involve examining the individual characters, the character features, and the compilation of elements. In the second stage of the analysis, each element (and compilation) would then be evaluated to determine whether they reflected original protectable expression. Elements lacking in originality (e.g., derived from prior art) or lying

-7-

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 4 PAGE 2

outside the scope of copyright protection (such as ideas, scènes à faire, elements serving functional purposes) would be filtered out of the work for purposes of the infringement analysis, leaving only the protected expression (which can include original compilations of elements). In stage 3 of the analysis, the allegedly infringing work is compared with the protected expression embodied in the plaintiff's work to determine whether there is substantial similarity of the protected expression.

25. This analytic framework traces back to Judge Learned Hand's seminal explication in *Nichols v. Universal Pictures Co.*, 45 F.2d 119 (2d Cir.1930). This case reflects the challenge of comparing a later work (a film) that has various thematic similarities to and may well have been inspired by a successful play, but yet is not infringing under a proper application of copyright principles. I have long used this case to illustrate the nature of the abstraction and filtration stages of infringement analysis. The case dates back to the 1920s and relates to the controversies over intermarriage and prejudice among religious communities in the great melting pot that was New York City (and America) at the time (and in many respects, still today).

26. *Nichols v. Universal Pictures Co.*: *The Plaintiff's Work* ("Abie's Irish Rose"). The plaintiff, Anne Nichols, had scripted "Abie's Irish Rose," a poignant story about the son of a widowed Orthodox Jew (Abraham or "Abie" Levy) who had fallen in love with an Irish Catholic girl (Rose Murphy) while serving in the army in France. They both knew of Abie's father's deep objections to marrying outside of the Jewish faith. Nonetheless, they secretly wed and then introduced the bride to Abie's father as an Orthodox Jew in the hopes that he would be enchanted. Abie's father falls for the ruse and arranges for his rabbi to perform a Jewish marriage ceremony. But just as the ceremony is completed, Rose's widowed, devoutly Catholic father arrives from his home in California with a priest. When the ruse is uncovered, the fathers lose their composure and the scene turns ugly. Meanwhile, the rabbi and the priest, who happened to be old friends, try to reconcile the families but without success. The fathers disown their children and vow to dissolve the marriage. But after a year, they learn that the children have brought a child into the world. In the final scene, both fathers coincidentally arrive bearing gifts on Christmas for their grandchild. In fact, the couple had given birth to an adorable set of twins; one of whom is placed in each of the grandfather's arms by the rabbi and the priest, who had arrived to aid in the reconciliation. The play ends on a hopeful note, with the grandson named for Rose's father and the granddaughter named for Abie's deceased mother. The play reflects both the raging social tension of the time (especially in New York City, the hub of European immigration) and the hope for religious, racial, and ethnic harmony. It enjoyed great commercial success on Broadway, running for over 2,000 performances between 1922 and 1927. See Slides [B5] and [B6].

27. *Nichols v. Universal Pictures Co.*: *The Allegedly Infringed Work* ("The Cohens and the Kellys"). Following the success of Abie's Irish Rose, Universal Pictures released "The Cohens and the Kellys" in 1926, set in New York City and revolving around the same theme of intermarriage between Jewish and Irish immigrant families. In this work, the daughter (Nannie) of a Jewish clothing merchant (Nathan Cohen) falls in love with Terry Kelly, the son of an Irish policeman, who lives across the hall in an East Side tenement. The families have long feuded

-8-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 1 PAGE 39

and both families vehemently oppose the relationship. As the plot unfolds, Nathan averts bankruptcy by an unexpected inheritance of $2,000,000 from a distant relative that is communicated to him by a strange lawyer. The Cohens move to a fashionable neighborhood, partially in the hope that Nannie's attraction to Terry will subside. But while Nathan is on a trip to Florida, Nannie and Terry secretly wed and give birth to a child. Upon his return, Nathan shuns Terry, accusing him of marrying Nannie for their fortune. After recriminations, Nannie leaves with the baby to live with Terry's family. Nathan is despondent, at which point the lawyer returns and informs Nathan that he has just discovered that the $2,000,000 which Cohen received rightfully belonged to Kelly, who was the nearest relative of Sadie Greenbaum. The lawyer offers to keep this information secret if Cohen agrees to split the fortune with him. Cohen's sense of honor is awakened and he refuses, instead running to Kelly's flat to explain the mistake. There he finds his family and young grandchild. He confesses that he has been a "stubborn old fool." As he is about to depart, Kelly reminds him of the grandchild and, through the pacifying influence of their respective wives, offers to share the inheritance and enter into partnership. The film ends happily with reconciliation. See Slides [B5] and [B6].

28. Although there was no literal copying of any of the dialogue from "Abie's Irish Rose," Nichols identified numerous similarities as the basis for her claim: motivating idea, emotional themes, basic characters, arc of plot development, and the clash of interactive forces. Given the success of Nichols' play, audiences for "The Cohens and the Kellys" would understandably perceive similarity to "Abie's Irish Rose." Yet, since copyright protection does not extend to ideas but rather is limited to the expressions of ideas, to conclude that "The Cohens and the Kellys" infringed "Abie's Irish Rose" would greatly hamper the freedom of future authors, artists, and filmmakers to work in the shadow of original works.

29. Nichols v. Universal Pictures Co.: *Judge Learned Hand's Resolution.* While recognizing that copyright protection extends beyond the literal text of a work, Judge Hand nonetheless offered a powerful principle for dealing with those "troublesome" cases where a subsequent creator takes thematic elements from a copyrighted work:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended. Nobody has ever been able to fix that boundary, and nobody ever can.

45 F.2d 119, 121 (citation omitted). As reflected in Slide [B7], this framework can usefully be presented as a pyramid of abstractions. At the top of the pyramid lies the main idea of the work – the highest level of abstraction. As we descend, greater granularity can be discerned – the general plot outline, subplots, general characters and scenes, specific character elements, and finality, the actual text of the play (or artistic choices in a graphic work). As Judge Hand

-9-

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 4 PAGE 40