emphasizes, protection does not apply to abstract ideas and the precise line of demarcation depends on case-by-case analysis. In the *Nichols* case, Judge Hand found that the stories were in fact "quite different," with

> [t]he only matter common to the two [being] a quarrel between a Jewish and an Irish father, the marriage of their children, the birth of grandchildren and a reconciliation.
>
> If the defendant took so much from the plaintiff, it may well have been because her amazing success seemed to prove that this was a subject of enduring popularity. Even so, granting that the plaintiff's play was wholly original, and assuming that novelty is not essential to a copyright, there is no monopoly in such a background. Though the plaintiff discovered the vein, she could not keep it to herself; so defined, the theme was too generalized an abstraction from what she wrote. It was only a part of her "ideas."
>
> Nor does she fare better as to her characters. It is indeed scarcely credible that she should not have been aware of those stock figures, the low comedy Jew and Irishman. The defendant has not taken from her more than their prototypes have contained for many decades. If so, obviously so to generalize her copyright, would allow her to cover what was not original with her. But we need not hold this as matter of fact, much as we might be justified. Even though we take it that she devised her figures out of her brain de novo, still the defendant was within its rights.

*Id.* at 122. Slide [B8] traces out several of the limiting doctrines reflected in Judge Hand's analysis – the idea-expression dichotomy (articulated in the Supreme Court's *Baker v. Selden* decision and codified in section 102(b) of the Copyright Act of 1976), the merger doctrine (denying copyright protection for expression when there is only one or but a few ways of expressing an idea), and the scènes à faire doctrine (derived from French for "scenes to be done"). Slide [B9] fleshes out the scènes à faire doctrine – "incidents, characters or settings which are as a practical matter indispensable, or at least standard in the treatment of a given topic." *Atari, Inc. v. North American Phillips Consumer Electronics*, 672 F.2d 607, 616 (7th Cir. 1982)). Slide [B10] illustrates the principle, noting that without this doctrine, the creators of Hill Street Blues, the first modern police drama revolving around the activities of a busy urban police station, might have been able to block production of NYPD Blue and Law and Order, both of which draw upon similar incidents, characters, and settings.

30. Judge Hand's framework has proven critical to the delicate balance between competition and the recognition of property rights in authorship to promote creativity. Each generation anew has revisited the themes that Anne Nichols so poignantly explored. We see this basic thematic structure in the successful 1972-73 CBS television series Bridget Loves Bernie, in which a struggling young Jewish cab driver/aspiring playwright Bernie Steinberg, whose parents ran a modest family delicatessen, fell in love with Bridget Fitzgerald, the Irish Catholic daughter of wealthy parents. The couple eloped to the disappointment of both sets of parents and the show revolves around the ongoing tensions. (Notwithstanding the show's popularity (ranked fifth for

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 4 PAGE 41

the season), CBS cancelled it after one season as a result of hate mail objecting to the inter-religious theme.) A few decades later, the theme reemerged in ABC's hit series (1997-2002), Dharma and Greg, in which Greg's wealthy, blue blood Episcopalian Republican parents object to their son's marriage to Dharma, the Jewish daughter of hippie parents. One can discern the basic plot elements from "Abie's Irish Rose" yet again in "Meet the Fockers," a 2004 film revolving around a Jewish-Catholic marriage.

31. *Further Illustrations.* These same concepts apply as well to other settings. Slide [B11] illustrates the works at issue in *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003), in which the first artist to encase a jellyfish in a clear glass sculpture sought to prevent others from using this basic idea (encapsulating a jelly fish in an oval vessel). As that court noted,

> Our case law suggests, and we hold today, that a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship. See Metcalf, 294 F.3d at 1074; Apple Computer, Inc., 35 F.3d at 1446. See also Feist, 499 U.S. at 358 ("[T]he principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection.").

Id. at 811. Slide [B12] is based on a French case in which the publisher of a cartoon book about a clownfish (Pierrot) brought suit against Pixar for alleged infringement of the Pierrot graphic work in the film "Finding Nemo." Pixar's successful defense was that its work was derived from something found in nature – namely, the clownfish. Even if Pixar had seen Pierrot, the scope of protection for that work would be extremely limited given its inspiration.

32. *Originality.* The clownfish example also brings the requirement of originality into play. To the extent that an artist bases his work on things found in nature or in prior art, then those aspects lack originality and are excluded from copyright protection. Slides [B13]-[B19] illustrate this copyright limitation. Slide [B13] traces the originality requirement to court decisions reading the use of the word "Authors" in the Intellectual Property Clause of the Constitution as a limitation on congressional power. Copyrights may only be accorded those who originate. In the Feist decision, the Supreme Court characterized the originality requirement as "the *sine qua non*" of copyright protection. See *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). As reflected on Slide [B14], Congress codified this requirement in the Copyright Act of 1976, incorporating the two pronged test reflected in jurisprudence – that a work reflect both independent creation and a "modicum" of creativity. As indicated in the House Report, the threshold is relatively low – not requiring novelty, ingenuity, or esthetic merit. See H.R. Rep. 94-1476 p. 51 (1976). Slides [B15] and [B16] motivate three important corollaries of the originality requirement: (1) that facts are not protectable (since they exist and are merely discovered); (2) that theories derived from facts are not protectable; and (3) that research is not protectable. Slide [B15] illustrates *A. A. Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir.), *cert. denied*, 449 U.S. 841 (1980), in which the court denied copyright protection for a historian's extensive research supporting a theory for the destruction of the Hindenburg – that a

-11-

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 4 page 42

"rigger" on the Hindenburg crew sabotaged the Hindenburg to please his lady friend, a suspected communist dedicated to exploding the myth of Nazi invincibility. Thus, Universal Studios violated no copyright interest in Hoehling's book "Who Destroyed the Hindenburg?" when it produced a film based on this theory. The court explains that:

> the hypothesis that Eric Spehl destroyed the Hindenburg is based entirely on the interpretation of historical facts, including Spehl's life, his girlfriend's anti-Nazi connections, the explosion's origin in Gas Cell 4, Spehl's duty station, discovery of a dry-cell battery among the wreckage, and rumors about Spehl's involvement dating from a 1938 Gestapo investigation. Such an historical interpretation, whether or not it originated with Mr. Hoehling, is not protected by his copyright and can be freely used by subsequent authors.

Id. at 978-79. The court goes on to note that "[t]he same reasoning governs Hoehling's claim that a number of specific facts, ascertained through his personal research, were copied by appellees." Id. at 979. Slide [B16] illustrates *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365 (5th Cir. 1981), in which the author of a novel detailing a sensational kidnapping in which the victim was buried alive in an underground casket equipped with life support equipment for 83 hours alleged that a made-for-television movie dramatizing the events infringed copyright in the book. The court overturned a verdict finding infringement because the jury was erroneously instructed that the labor or research by an author is protected by copyright law. Slide [B17] presents two other originality-based doctrines: (1) that rhythm is typically not protected and (2) that words and short phrases are denied copyright protection. Slides [B18]-[B19] present the Supreme Court's *Feist* case, which holds that compilations of facts, even if the result of tremendous effort, are not protectable unless they are sufficiently original. Thus, a massive phone directory organized alphabetically is not copyrightable whereas my own list of the top twenty restaurants in Berkeley would be. But others would be free to develop their own restaurant lists. Slide [B20] introduces the useful article doctrine, which allows protection for elements of two and three dimensional works only to the extent that the expressive aspects are separable from the functional or useful characteristics. It also notes the exclusion of typefaces from copyright protection. Slide [B21] uses the metaphor of a radiating target to illustrate the contours of copyright protection. At the target's bull's-eye lies highly expressive creativity in which the author or artist has broad range of expressive parameters to choose from. The scope of copyright protection diminishes as authors and artists move away from that core. Completely outside of copyright protection are facts, scènes à faire, and theories.

33. With that background in place, we are ready to move on to the next step in the analysis of "copyright protected expression." Slide [B22] illustrates that both "Abie's Irish Rose" and "The Cohens and the Kellys" can be broken down into the various levels of abstraction alluded to by Judge Hand. On the bottom left side of the slide, the structure of "Abie's Irish Rose" is represented by blue shaded elements. On the bottom right side of the slide, the structure of "The Cohens and the Kellys" is superimposed over the top of "Abie's Irish Rose" with the differences reflected in pink. As can be seen, there is quite a bit of similarity at the higher, more abstract levels of abstraction and relatively little overlap (similarity) at the lower levels. The challenge is

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT __ PAGE __

deciding whether there is "substantial similarity of copyright protected expression." To do so first requires filtration of the unprotected elements.

34. *Filtration*. Slides [B23] and [B24] illustrate metaphorically the filtration process. In essence, the court must sift the Plaintiff's work though a colander that is specially designed to catch the unprotected elements: unoriginal aspects, expression of ideas that are severely limited in terms of the number of ways in which they can be expressed, scènes à faire, facts, historical events, and ideas. Slide [B24] reflects the result of that process in the *Nichols* case. The colander has removed the ideas and unoriginal aspects (e.g., religious clash, religious ceremonies). What is left in the bowl below are copyright protected elements, as reflected in the pyramid format. Note that the top and significant portions of the middle layers of the pyramid have been filtered out, whereas much of the granular text remains. But even at the bottom level, there may be gaps, due to unoriginal text and stage direction (such as the religious traditions and prayers in the marriage ceremonies). I like to refer to this resulting image as resembling the dental structure of hockey players, with many of the top teeth and one or two bottom teeth missing.

35. *Comparison: "Substantial Similarity"* – After filtration comes the comparison stage of the analysis. The ease with which the substantial similarity framework can be applied varies across factual scenarios. It is easiest to apply in contexts in which the copyrighted work at issue involved substantial unconstrained or only minimally constrained creative effort and the defendants have reproduced the entirety of the work or a significant expressive element (literal similarity). The substantial similarity doctrine is much more difficult to apply where the plaintiff's work can best be characterized as "thin" (due to relatively modest creativity coupled with limiting doctrines constraining the scope of protection) or where the defendant's work only weakly imitates the plaintiff's work. The courts have used sliding scale approaches to balancing these competing considerations – the robustness of the plaintiff's copyright protection on the one hand and the extent of copying on the other. Where copyright protection is robust, then substantial similarity will suffice to establish infringement. But where copyright protection is thin – for example, because the range of artistic creativity is tightly constrained by prior art or functional limitations – then courts require a high degree of similarity. The last column of Slide [B25] summarizes these principles. Slide [B26] illustrates the sliding scale concept, with works that have a broad effective range of creativity – such as the authoring of novels and unconstrained artistic painting – subject to the "substantial similarity" standard and highly constrained works – such as functional works, works that imitate things found in nature, or works in which choice is limited – analyzed under the "virtual identity" standard.

36. *Compilations of Unprotected Elements: Virtual Identity*. Slide [B27] illustrates the works at issue in the *Harper House v. Thomas Nelson*, 889 F.2d 197 (9th Cir. 1989). The plaintiff sought to assert copyright in the organization of its "Day Runner"® organizer – a series of calendars, forms, charts, and related materials for recording and organizing information. While accepting the district court's finding that copyright subsisted in this compilation of materials, the court emphasized that "compilations that consist largely of uncopyrightable elements receive only limited protection. As with factual compilations, copyright infringement of compilations

-13-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 4   PAGE 44

consisting largely of uncopyrightable elements should not be found in the absence of 'bodily appropriation of expression.'" (citing *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 573 (9th Cir.1987)). See Slide [B28]. Slide [B29] highlights the ways in which use of the term "copying" can obfuscate copyright infringement analysis. In its closing argument, Harper House's counsel "exploited the negative connotation to copying, urging the jury to use their basic sense that when given a homework assignment at school, one should not copy the work of another student – 'change a word here, change a word there, put it on a different size paper and hand it in as your own." The court's admonition highlights the concern that I emphasized at the outset of this section of the report, see paragraph 16, with equating plagiarism with copyright infringement. Copyright law allows use of unprotected elements as well as fair use. The court notes that "given the negative connotations to 'copying,' there was an obvious risk of an improper verdict for plaintiffs, and a need for further instructions to protect legitimate activity and avoid the suffocation of competition." 889 F.2d at 207.

37. *Application of the Substantial Similarity Framework to the* Nichols *Case*. Slide [B30] characterizes the nature of the final comparison in the *Nichols* case. Note that what is compared is not the entirety of "Abie's Irish Rose," but rather only the protectable elements. It is easier to see in this format that "The Cohens and the Kellys" is only modestly similar to protected elements of "Abie's Irish Rose." The regions of blue in "The Cohens and the Kellys" pyramid (i.e., the areas of similarity with "Abie's Irish Rose") are largely unprotected (white in the filtered "Abie's Irish Rose" pyramid). This representation helps to visualize the conceptual and subtle framework that Judge Hand endorsed and applied.

38. *Illustrations*. Slides [B31] - [B54] illustrate the application of this framework to various familiar and challenging contexts. I use these slides to provide the audience the opportunity to test out their understanding of the copyright infringement framework. In my experience, this is the best way of developing analytical intuition for copyright infringement analysis. Slides [B31] - [B32] relate to the controversy that erupted over Alice Randall's novel, "The Wind Done Gone," which tells the story of Margaret Mitchell's classic novel, "Gone With the Wind," from the perspective of slaves on the plantation. Slide [B33] provides the backdrop for discussing the British copyright infringement case brought against Dan Brown, author of the 2003 blockbuster novel, "The Da Vinci Code," by two of the authors of the 1982 novel, "The Holy Blood and the Holy Grail." Slides [B34] - [B37] explore the application of the infringement framework to graphic works. Slides [B36] - [B37] concern a controversial and provocative August 1991 Vanity Fair cover photograph in which the actress Demi Moore appears nude and nearly nine months pregnant. Paramount Pictures spoofed the photograph by superimposing Leslie Neilsen's head on a similarly proportioned and posed model for an advertising poster for its 1994 film Naked Gun 33⅓: The Final Insult, which prompted a copyright infringement lawsuit. In assessing the third statutory factor – "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" – of the fair use defense (17 U.S.C. §107), the court conducted a filtering analysis because the statute focuses on the "protected elements" of the plaintiff's work. See *Leibovitz v. Paramount Pictures*, 137 F.3d 109 (2d Cir. 1998). In so doing, Judge Newman noted that the key elements of the pose were derived from prior paintings and sculptural works – dating back to " 'Venus' of Willendorf," circa 25,000-20,000 B.C." and

-14-

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT __ PAGE __

Botticelli ("Birth of Venus") – depicting nude and pregnant women in a "gesture of modesty" pose. See *id.* at 111, 115-16.  Slides [B38]-[B39] illustrate the challenge of filtration and comparison in the context of musical compositions.  They require the audience to compare musical compositions while at the same time ignoring features – such as rhythm, short phrases, and unoriginal progressions.  Slide [B40] examines three-dimensional works.  Slides [B41]-[B54] illustrate how infringement analysis applies to the context of computer software, a particularly constrained medium of expression.

## II. Copyright Infringement Analysis – Whether the Bratz Dolls Infringe Copyright in Carter Bryant's Sketches

39. *Application of these Concepts to the Present Case.*  In this section, I apply the principles set forth in Section I to the present dispute.  In order to avoid the factual disputes relating to the time period in which Carter Bryant came up with and drew the Bratz sketches and whether Margaret Leahy and other MGA sculptors and artists "copied" from Carter Bryant's sketches, I base the analysis of this section of the report on the express assumptions that copyrights in the sketches are owned by someone other than MGA and that MGA's artists saw Carter Bryant's sketches before conducting their own work.  I will be skipping over the "factual copying" element of the copyright infringement framework and focus my analysis of whether MGA's Bratz dolls are "substantially similar" to copyright-protected expression in Carter Bryant's sketches.  As with Section I of this report, my analysis is illustrated through a series of slides, reproduced in Appendix C.

40. *Basis for the Analysis.*  In preparing this analysis, I have drawn upon the following sources: (1) Carter Bryant Sketches; (2) Carter Bryant's Deposition Testimony; (3) MGA's Bratz dolls; (4) the blank form for MGA's Bratz dolls; (5) sculpts leading up to the final Bratz doll blank; (6) Draft Report of Mary Bergstein, Art/Popular Culture Historian; (7) Draft Report of Robert Tonner, Fashion Doll Designer, Sculptor, and History Expert; (8) Draft Report of Christina (Tina) Tomiyama, Fashion Doll Face Painting Expert, Fashion Doll Industry Expert, and Doll Product Manager; (9) Slide Presentation by Robert Tonner (presented to MGA Experts on January 3, 2008 at Skadden, Arps, Slate, Meagher & Flom LLP's Los Angeles office); (10) Prior Art and Popular Culture Material (Seventeen Magazine (August 1998 edition)); image searches on the Internet; on-line resources about specific artists, dolls, and popular culture); and (11) my own knowledge of popular culture.

41. *Avoiding the Plagiarism Trap.*  As discussed in Section I of the report, copyright protection does not track the moral intuition relating to plagiarism.  Rather, copyright analysis requires a systematic process to avoid hampering the freedom of expression and competition.  See Paragraphs 16 and 36.  Slide [C1] shows Carter Bryant's sketches of the Jade character on the left and MGA's Jade doll on the right.  Copyright law does not protect a name.  Nor does it protect many aspects of Carter Bryant's sketches.  Yet, without careful instruction, a jury may naturally be led to think that the Jade doll "copies" Bryant's sketches.  Such a conclusion would, in my opinion, overlook what is in fact protected in the sketches and to what extent those elements or compilations of elements are substantially similar or possibly virtually identical to

-15-

CONFIDENTIAL – ATTORNEYS EYES ONLY
EXHIBIT 14 PAGE 46

the Jade doll.

42. *The Abstraction Framework.* Slide [C2] begins the analysis with Judge Learned Hand's classic statement of the copyright infringement framework. Drawing upon Mary Bergstein's model of the process of developing visual and sculptural art, Slide [C3] presents the levels of abstraction applicable in the context of fashion dolls. The top of the pyramid – the highest level of abstraction – contains the concepts animating the work. These ideas are excluded from copyright protection. At the next level lies sketches of the concept(s). Mary Bergstein refers to them as "'notes' on paper." They lack significant detail or expression. The next level of the abstractions waterfall consists of studies. Here, the artist is engaged in more detailed illustration, typically observing the concepts from multiple vantage points. They are still rather inchoate and copyright protection is typically judged thin at this level. Next come drawings, which are detailed expressions of the concepts. Drawings provide the basis for models and finally, in the case of fashion dolls, three-dimensional sculpts with face paint. As Robert Tonner explained during our meeting, even fully detailed drawings provided to different sculptors can result in quite different dolls. In his report, he notes that:

> Many companies produce dolls made to represent the same characters. One of the most popular characters is Scarlett O'Hara from the movie Gone with the Wind. World Doll in the 1980's, Mattel, the Franklin Mint and Tonner Doll have all done portraits of the actress, Vivian Leigh, who portrayed Scarlett in the Movie. Each of the dolls look markedly different although they are all supposed to portray the same person. The point being, that each sculptor brings his/her personal style to a project – even one as specific as Scarlett O'Hara.

At the bottom of the pyramid – where a detailed fashion doll has been sculpted and painted – copyright protection can be significantly more robust, depending, of course, on the extent to which the sculptor and face painter have departed from prior art sources.

43. *Levels of Abstraction: Carter Bryant's Sketches.* As Mary Bergstein and Tina Tomiyama have expressed, Carter Bryant's illustrations prior to October 19, 2000 of the Bratz doll can best be characterized as sketches, at least with regard to the doll features (body, face, and hair). (Tina Tomiyama notes that the illustrations of the "soft goods" – the fashions being worn by the dolls (Carter Bryant's area of expertise and passion) – are more detailed, and could be characterized as drawings. But as I understand the dispute, there is not any serious disagreement about infringement of particular fashions. In any case, such fashions changed periodically.) Slide [C4] shows that the doll features (as opposed to "soft goods") of Carter Bryant's illustrations sit quite high in the pyramid of abstractions. Carter Bryant's conception reflected three principal elements: (1) attitude: sassy, bratty fashion dolls (2) ethnic/racial orientation: an ensemble of four friends reflecting different racial and ethnic backgrounds; and (3) doll features: a disproportionately large head (relative to human dimensions and some (but not all) fashion dolls) with large eyes and particularly large feet. Apart from the clothing fashions, the illustrations were rather rudimentary. The sketches provided only a frontal (or slightly angled) view. Therefore, the depth of facial features cannot be perceived. The facial elements are particularly

-16-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

inchoate and stylized. Tina Tomiyama notes that the sketches were not "instructional," but rather conceptual. She sees them more as carrying forward the idea of sassy, multi-racial girls, not a detailed expression. Furthermore, she does not consider the sketches to have been realistic in terms of the constraints of fashion doll manufacturing and functionality. Robert Tonner noted that the sketches did not provide much guidance to a sculptor. They were not schematic in nature, but rather high concept. He did not feel that they would provide much constraint on a sculptor. Rather, the sculptor would need to bring a lot of their own creativity to the job of building a doll.

44. *Filtration.* With the abstraction stage complete, Slide [C5] begins the analysis of filtration. The abstraction pyramid has been lowered into the filtration colander. In this stage of the analysis, I explore the various limiting doctrines aimed at determining the copyright-protected elements of Carter Bryant's illustration. As a preliminary observation, I will note that the illustrations are near the top of the pyramid. Copyright protection is quite thin at that altitude. Nonetheless, there may be enough expression for copyright to subsist, at least against slavish copying. Slides [C6]-[C19] provide a basis for assessing the principal limiting doctrines that come into play in the filtration stage of the analysis: originality, merger, scènes à faire, unprotectability of functional features (including inseparable expressive features of useful articles).

45. As developed in his deposition testimony, Carter Bryant has spent much of his life studying fashion illustration, fashion design, and fashion dolls. From a young age, he competed with his mother to read the latest fashion magazines. Growing up in the 1970s and 1980s, he was exposed to the various waves of popular culture from television, magazines, and formal study of fashion design. He studied fashion illustration following high school. He worked in the fashion doll industry through the 1990s. Thus, he was exposed to a wide range of influences. From a copyright standpoint, he was not operating in a "clean room" when he made the Bratz sketches. Rather, he acknowledges his interest in reflecting cultural trends as well as the profound influence of those who came before him. He was not interested in creating extra terrestrial beings. Rather, he sought to create a fashion doll that would appeal to girls and provide a substrate for him to pursue his interest in fashion design.

46. *Prior Widely-Known Character Illustration.* Drawing upon Robert Tonner's historical look at character art, Slides [C6]-[C7] contain several of the more influential sources for cartoon illustrators of Carter Bryant's generation. Marvin Fleischer created the Betty Boop character in a series of films released by Paramount Pictures in the early 1930s. At the time, her overt sexual appeal created quite a stir and attracted large audiences. The character was modeled after Helen Kane, a popular singer in the 1920s and actress for Paramount Pictures. As illustrated in Slide [C6], Betty Boop's features were exaggerated – disproportionately large head, large round eyes with distinct eye lashes, hour-glass figure, long legs. Slide [C7] contains examples of break-through Japanese anime art that became popular in the United States. The "Speed Racer" cartoon series derives from Tatsu Yoshida's "Mach GoGoGo" series developed in Japan in the 1960s. Yoshida based the character on the U.S. films "Viva Las Vegas" and the James Bond film, "Goldfinger." Trans-Lux acquired the U.S. rights, recorded voice-overs, and licensed the

-17-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT *4* PAGE *64*

cartoon series for broadcast in the United States. Its mix of fiendish conspiracies, action, fast cars, and sparkling eyes captivated American youth. I have emphasized the eye illustration, as it provided inspiration for many later animators and illustrators. The other half of Slide [C7] reflects another anime series that successfully crossed the Pacific Ocean, this time in the mid 1990s. Sailor Moon featured a collection of characters. It builds around an imaginative story of a middle school girl who, led by a talking cat, takes on a plot by the Dark Kingdom to destroy the Earth. Sailor Moon is joined by several friends in her adventures.

47. *Prior Fashion Dolls.* Carter Bryant was deeply influenced by prior fashion dolls. Slides [C8] and [C9] illustrate several fashion dolls that enjoyed commercial success in the 1980s and 1990s. Bryant was free to use the unprotected elements of such dolls, and he did so liberally in his drawings. Doll shapes and facial elements are entitled to rather thin protection due to the anatomical basis for their design (all artists are free to represent the human form), social views of attractiveness (aesthetic functionality), and some basic doll designs being in the public domain. As reflected in Mattel's litigation against Radio City Music Hall and the Goldberger Doll Manufacturing Company, copyright protection in a crowded field like fashion dolls is quite limited. "[I]f the facial features of two dolls were similar not only to each other, but also to those of numerous other dolls available on the market, the similarity would be relatively unlikely to support the inference that the defendant copied from the plaintiff. The defendant might equally have copied from any of the other similar dolls. Alternatively, an observation that features of a work are ubiquitous within an industry might lead a court to doubt that those features are original to the plaintiff." See *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135 (2d Cir. 2004). Bryant's sketches of the torso, arms, legs, and some facial elements undoubtedly draw from this prior work.

48. *Doll Illustration Art.* Robert Tonner and Mary Bergstein both point to the great influence that Margaret Keane had upon doll illustrators. Her 1981 work, "Ladies in Waiting" (Slide [C10]) brought new sensibilities to face illustration: the bulbous, mesmerizing eyes, disproportionate head. Some of her earlier drawings were the inspiration for Allison Katzman's "Blythe" line of dolls, featuring eyes that changed color with the pull of a string attached to the back of the head. See Slide [C11]. These dolls, manufactured by Kenner, were quite popular in the 1970s and continue to attract collector attention. See Slide [C12].

49. *Fashion Illustration.* As Robert Tonner and Tina Tomiyama explained at our January 3, 2008 meeting, Carter Bryant used fairly standard poses in his sketches of the Bratz dolls. Given his training, love of fashion model runway poses, and experience, Bryant did not innovate the poses reflected in his illustrations. Rather, he used well-worn poses. Slide [C13] captures the highly constrained aspects of fashion illustration and some of that prior art. The left side of the slide shows that fashion drawing is largely about human anatomy and common body, leg, foot, and hand positions, all constrained by the human form. I have included on the right side of the slide fashion illustrations from magazines from the 1930s. One can see aspects of these images (and their stock nature) in Carter Bryant's sketches. As Tina Tomiyama emphasized, Carter Bryant innovated in the fashions, not the poses or the body details.

-18-

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 4 PAGE 69

50. *Popular Culture circa 1998.* Slides [C14]-[C19] provide a sense of the broader cultural influences in the 1998-2001 time frame – when Carter Bryant developed the sketches and MGA designed the first generation of the Bratz line of dolls. Bryant specifically acknowledges drawing on some of these materials. Mary Bergstein, Tina Tomiyama, and Robert Tonner all see fashion and doll designers as being heavily influenced by trends in popular culture. They specifically see these influences in Carter Bryant's work. Slide [C14] shows the coming of age of strong, female friend-based television series in the mid to later 1990s. The three female lead characters in the hit television series Friends emphasized female bonding. As Mary Bergstein explains, Ally McBeal was almost a live fashion doll that could appeal to adults and young girls alike. She was also closely associated with sassy female supporting actresses. Sex and the City brought the female bond to a new level. It also revealed an assertiveness and sexuality never before seen in television history. In the music field, the Spice Girls were a major new influence. See Slide [C15]. They brought the multi-racial element, as well as assertiveness. They were not the first female-driven ensemble group (e.g., the Go-Go's came before), but they specifically appealed to a younger audience and fashion played a big role in their image and marketing. The Spice Girls also arose in the merchandising age – with the role of MTV, movie spinoffs, and, of course, a line of dolls brought out by Galoob Toys (later bought by Hasbro). See Slide [C16]. These dolls were a large hit in the 1997 and 1998 Christmas holiday seasons. Slides [C17]-[C18] show several of the advertisements from the August 1998 issue of Seventeen Magazine, which Carter Bryant specifically recalls as an inspiration for his Bratz sketches. Several of the images in that issue bear a close resemblance to the concepts and even some of the rudimentary details in Bryant's sketches. The Steve Madden advertisement on Slide [C17] captures the attitude, large feet, and out-thrust hips. The Kristi ad also uses an upward camera angle to similar effect. The character in the Paris Blues ad – large, anime-like eyes, body language, body proportions, large feet, sassy fashion sense – could almost join Bryant's sketch of the Bratz ensemble without much change. The Coca Cola ad reflects the attitude and cartoon-like head and body features of Bryant's illustrations. And the Cover Girl ad shows a multi-racial ensemble reminiscent of Carter Bryant's conception. Slide [C18] takes the ensemble concept further: the Dixie Chicks' "Chicks with Attitude" slogan; the cool, self-confident, defiant girls on the left and lower right; and the fashion illustrations on the upper right. These concepts and images were clearly in the public consciousness (and in the places that fashion and doll designers would be looking) in the 1998-2000 period.

51. *Lara Croft and Angelina Jolie.* Another salient female image of this period was the fashion model as action hero, reflected in the Lara Croft computer game series (introduced in 1996), comic books, novels, and films. See Slide [C19]. Lara is an intelligent, athletic, and risk-taking woman who, somewhat like Indiana Jones, travels the world in pursuit of priceless archeological artifacts. She was famously portrayed in the comic book-like 2001 film by Angelina Jolie, who came to represent the new face of beauty. Even before her portrayal in this film, Jolie's large, penetrating eyes, swollen lips, and multi-ethnic features defined a new ideal at this time, which has followed the same trajectory of the Bratz doll line.

52. *Filtration Factors.* Slide [C20] shows metaphorically the filtration process. The colander catches the concepts underlying Carter Bryant's sketches – an ensemble of sassy, multi-cultural

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT *4* PAGE *50*

dolls with disproportionately large heads, eyes, and feet, and voluptuous lips. Thus the top level of the pyramid is filtered out and much of the sketches as well. The sketch art is not particularly detailed in many of the elements – the body pose, many aspects of the body dimensions, an ensemble of multi-racial dolls, and the individual facial features. Furthermore, few of these elements are original to Carter Bryant. The colander collects Steve Madden's large feet, standard fashion poses, the Spice Girls (and their multi-racial doll line), Margaret Keane's influential facial illustration, the Speed Racer and Paris Blues anime eye shape, Betty Boop's large head and big eyes, and Angelina Jolie's piercing eyes and protruding lips. Moreover, functional constraints, scènes à faire, and the merger doctrine exclude protection for many aspects of Bryant's sketches. At best, there is only modest protection for a few details and perhaps the compilation of elements, but these would be protected only against "bodily appropriation" – what the Ninth Circuit call "virtual identity." As reflected in the "bowl" of protectable expression, there is a veneer of protection for the sketch-level body art. To illustrate the effects of the filter, I have air brushed out much of the facial and body features. What protectable expression exists in Carter Bryant's sketches relates significantly to the fashions, which are quite detailed. Thus, unlike many of the doll elements, they significantly survive the filter, as does the spiky hair style for one version of Jade.

53. *Comparison.* The next series of slides undertakes a detailed comparison of Carter Bryant's sketches to the first generation Bratz doll. (All versions of Bratz dolls are based on the same sculpt. Face painting and body tones enable one doll shape to provide the basis for four distinctive looks.) Slide [C21] illustrates the nature of the comparison. As explained in Section I of the report, the purpose of the filtration step is to prevent an author or artist from being able to assert control over unprotectable aspects of a work. Thus, the appropriate comparison is not between the plaintiff's work (in this case, the Carter Bryant sketches) and the defendant's work (in this case, the Bratz dolls), but rather the protected elements of the plaintiff's work (the air brushed out image) and the defendant's work. As reflected in the pyramid on the right, there is overlap between Carter Bryant's Jade sketch and MGA's Jade doll at some of the higher levels of the pyramid. But much of that similarity is filtered out, leaving rather modest similarity of *protected* expression. The slides that follow illustrate this point. Furthermore, the sketches simply do not provide anywhere near the detailed body and facial features of MGA's Bratz doll.

54. *Body Elements.* Slide [C22] compares the two principal Carter Bryant body sketches with comparable views of the MGA Bratz blank sculpt. It is important to recognize that the rudimentary detail of Bryant's sketches and the fact that much of what Bryant does reflect in this sketch should be filtered out based on prior art (fashion dolls, fashion illustration, human body), scènes à faire (fashion doll characteristics), and functionality (joint characteristics). Nonetheless, there are significant differences between the sketches and the blank sculpt. Slide [C23] illustrates several of the differences. The two-dimensional width of the waist on the sketch is approximately half of the width of the waist on the sculpt (compare the mid-section red and blue lines). The separation between the thighs (red) is about one-third the separation of the sculpt. The left leg angle of the sketch is set at a significant angle (red line) whereas the angle of the sculpt is nearly vertical (blue line). Slide [C24] compares a partial profile angle. The two look quite different for several reasons. First the sculpt simply does not bend in the way shown

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 11 PAGE 51

on the sketch. Thus, the sculpt cannot accommodate thrust-forward hips or a turned waist. Second, the legs of the sculpt are symmetrical and therefore cannot resemble the pose of the sketch. The sculpt arms are significantly longer.

55. *Feet*. Slide [C25] focuses on the foot size and shape of the sketch and sculpt. Even though the sketch appears to be wearing shoes, the sculpt foot size is much smaller than suggested by the sketch. In addition the shape of the sculpt foot is much more slender. As reflected by the red line, the ankle width on the sketch is much narrower than the sculpt.

56. *Legs*. Slide [C26] compares the leg dimensions. The sketch positions the knee cap substantially higher up the leg than reflected in the sculpt. This reflects the oversized foot concept that inspired the drawings. In its design, however, MGA chose a less exaggerated foot and lower leg. The sketch depicts a more adult-shaped leg, with a wider upper thigh region, whereas the sculpt comes closer to more common and youthful leg dimensions.

57. *Arms*. Slide [C27] compares the arm dimensions. The arms of the sculpt are considerably longer in relationship to other body dimensions. Whereas the tips of the fingers in sketch reach just below the hip region, the hands of the sculpt extend nearly to the knee. The elbow bends are also different. The sculpt has a much longer bicep region.

58. *Hands*. Slide [C28] shows the hands and wrist angles to be significantly different. The sketch has bent wrists with the thumb separated from the fingers. The sculpt reflects a nearly flat wrist, thumb and fingers in parallel, and less separation between the thumb and forefinger.

59. *Torso*. Slides [C29]-[C30] compare the torso regions. Slide [C29] shows that the sculpt has a a significantly more pronounced chest region and rounded abdomen. Slide [C30] shows that whereas the sketch features a triangular crotch region, the sculpt has a rectangular shape. It also shows quite a different ratio of shoulder width to hip width. The sculpt has broader shoulders.

60. *Head Shape*. Slide [C31] compares the major contours of the head region. The dimensions are quite different, as reflected in the width between the eyes (narrower on the sculpt), distance from the middle of the mouth to the ear (much longer on the sculpt), and size of the forehead (much larger on the sculpt). More generally, the Bryant sketch suggests a more mature face, whereas the sculpt is baby-faced and more full-cheeked. The sketch provides little indication of the depth of the facial features. The sculpt reveals significant three-dimensionality – especially in the eye cavities, cheek region, and chin shape.

61. *Facial Features: Eye*. Slide [C32] provides a study of the face painted eye. The right side of the slide contains the sculpt eye. The left side of the slide provides different eye images drawn from Carter Bryant's sketch (third from the top), prior art (first image – Japanese anime (Speed Racer); second image – (Paris Blues ad)), and an actual eye (belonging to Angelina Jolie). The purpose of this exercise is to make several points. First, the Carter Bryant sketch must be substantially discounted by the influence of prior art. Second, the depiction of the sketched eye owes much to the human form, also limiting the degree of protectable expression. And third,

-21-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 4 PAGE 52

that the Bratz Jade eye is more closely similar, or least as similar, to the Paris Blues and Angelina eyes as it is to the Carter Bryant sketch.

62. *Facial Features: Eyes.* Slides [C33]-[C34] reveal substantial differences between the sketched eyes and the eyes on the finished doll. The sketch has no lower lashes, different eye height, different relationship between the eye brow and the inside corner of the eye. In many respects, the Bratz doll eyes are more like Angelina Jolie's eyes than the eyes in the Bryant sketch. Slide [C34] highlights four regions of the Bratz doll eye that bear no similarity to the Bryant sketch. Region a shows lower brow lashes (or eye liner) on the Bratz doll, whereas the Bryant sketch has no corresponding lashes. Region b shows a wide, rounded left eye and pupil on the Bratz doll, whereas Bryant sketched a more angular, narrower opening. Region c shows the positioning and coloration of the eye brow. The left edge of the right brow in Bryant's sketch is directly above the inner corner of the eye, whereas it is set toward the middle of the eye on the MGA doll. Furthermore, Bryant uses black coloring; the doll uses brown. Region d shows a different lash effect. Whereas the sketch has thicker, more concentrated lashes on the outer rim of the eye, the doll shows lashes toward the middle. These are just a few of the many differences. The point is that the MGA face painters did not follow the Bryant sketches but rather made their own artistic choices.

63. *Facial Feature: Lips.* Slide [C35] compares MGA's Jade doll lips with Carter Bryant's sketch (middle), the lips of the character depicted in the Paris Blues advertisement, and a photograph of Angelina Jolie's lips. The Jade doll lips differ significantly from the Bryant sketch in terms of shape (ratio of top lip to bottom lip, no opening on the doll, curvature at the top of the lips (rounded in the sketch versus indented on the doll), color shading). In many respects, the Bratz doll mouth is closer to the photograph of Angelina Jolie's plump lips than to Carter Bryant's rather basic illustration.

64. *Facial Features: Concept.* When the entire face of the set of dolls is considered, it appears that MGA's creative artists evolved the concept away from the more clearly distinctive racial appearance toward an inter-racial mixture. All of the dolls have a more ambiguous multi-cultural sensibility. Mary Bergstein explains this point more fully.

65. *Compilation of Elements.* Although the individual elements do not in my opinion reflect significant (and certainly not substantial) similarity to copyright protected elements of Carter Bryant's sketches, there remains the question of whether the compilation of elements in the sketches has been improperly appropriated. But here again, many aspects of a compilation claim fail to survive filtration. Fashion dolls, multi-racial collections of fashion dolls (Spice Girls), large head/large eyes/large feet (Margaret Keane, Blythe, Speed Racer, Steve Madden, Paris Blues), piercing eyes and large lips (Lara Croft, Angelina Jolie) can all be found in various permutations. As explained in Section I of the report, compilations of largely unprotected elements are subject to a much higher threshold for similarity – "bodily appropriation" or virtual identity. I do not believe that the similarities between the overall compilation of elements in MGA's individual Bratz dolls reflect even substantial similarity to any protected compilation in Bryant's sketches. In any case, they do not rise to the level of bodily appropriation.

-22-

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 4 PAGE 53

66. *Summary of AFC Analysis.* I assumed for purposes of this analysis that MGA's creative artists worked from Carter Bryant's concepts. Some members of the creative team saw Carter Bryant's sketches and worked with his input. Yet, these materials were conceptual and abstract. They did not provide the type of detailed "blueprints" or instructional direction that significantly constrained their expression of Bryant's concepts. Furthermore, as Mary Bergstein explains, the concepts evolved in the production process. The idea of multi-racial/ethnic dolls morphed through MGA's creative process into inter-racial/ethnic dolls. The highly exaggerated feet and body language transformed into prettier, more naturally proportioned bodies. Carter Bryant's emphasis on fashions remained, but they do not find expression in the sculpts and face paint. From the standpoint of copyright protection, Carter Bryant's sketches lie in the upper regions of the abstractions pyramid. His concepts do not attract copyright protection. His sketches reflect a mix of relatively detailed soft goods elements (clothing and accessory) and largely rudimentary hard goods elements. Thus, the doll features attract relatively modest protection. When the sketches are subjected to successive filters of copyright law's limiting doctrines (originality, merger, scènes à faire, functionality), many of the hard goods elements of Carter Bryant's fall away entirely or fade in significance. The anatomical aspects of the sketches, the standard poses, the aspects of the art based on human features, well-known techniques), and prior art that was widely available and to which Carter Bryant acknowledges he was exposed leaves a rather modest residue of copyright protection in the basic doll design. The strongest claim to copyright lies in the compilation of elements. But since the individual elements themselves attract relatively modest (if any) protection, the compilation itself only enjoys protection against "bodily appropriation" or "virtual identity." As the comparisons show, MGA's Bratz blank and face paint do not reflect anywhere near that level of similarity. The elements differ quite significantly from the Bryant sketches. And the compilation itself reflects many prior art aspects (other fashion dolls, the Spice Girls) and scènes à faire. Based on these considerations, I do not believe that MGA's Bratz dolls infringe copyright in the Carter Bryant doll sketches.

### III. Analysis of the 1999 Mattel "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" Signed by Carter Bryant

67. It is my understanding that the parties dispute whether Carter Bryant prepared the "Bratz Sketches" in 1998, prior to his rejoining Mattel in early 1999, or while employed by Mattel after January 4, 1999. MGA has asked to me to provide my opinion on two questions: (1) whether Mattel's "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" (hereinafter "1999 Agreement"), which Carter Bryant signed on January 4, 1999, would provide for Mattel to own a trade secret for the Bratz line of fashion dolls if Bryant conceived the idea between January 4, 1999 and his departure from Mattel on October 19, 2000; and (2) whether the 1999 Agreement would provide for Mattel to own copyright (or any other intellectual property rights) in the Bratz sketches if they were in fact created between January 4, 1999 and his departure from Mattel on October 19, 2000.

68. *General Basis for Opinion.* Over the course of my career, I have analyzed a wide range of employment and licensing agreements in the entertainment and technology industries. This has included teaching about assignment agreements in courses on entertainment law and intellectual

-23-

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT __4__ PAGE 54

property law, examining hundreds of intellectual property licensing agreements in the course of consulting and expert work, and studying cases, treatises, and industry form books on employment, licensing, trade secrets, and assignment agreements for scholarship on the termination of transfers provisions of the Copyright Act, a casebook comprising a series of case files on entertainment law, and articles on the intersection of intellectual property and bankruptcy law.

69. *Specific Basis for Opinion.* In conducting this analysis, I have drawn upon the following sources: (1) 1999 Mattel agreement; (2) other Mattel employment agreements; (3) deposition testimony of Carter Bryant, Tim Kilpin, Alan Kaye, Ann Driskill, Anna Rhee, Sandy Yonemoto, Lissa Freed, Veronica Marlow, Adrian Fontanella, Ivy Ross, Maureen Tafoya, Teresa Newcomb; (4) Expert Report of Christina Tomiyama; (5) treatises and cases on California contract law and the interpretation of employment agreements; (6) U.S. Patent and Trademark Office records relating to Mattel's patents; and (7) general intellectual property, entertainment law, and IP licensing books, treatises, and form books.

70. *Legal Standard.* In interpreting written employment agreements (as well as written contracts generally), California courts look to the objective manifestations of the parties' intent, including the words used in their agreement as well as extrinsic evidence, including: the circumstances surrounding the formation of the agreement; the nature, purpose, and subject matter of the contract; and the parties' subsequent conduct.[1] See *People v. Shelton*, 37 Cal. 4th 759, 767, 37 Cal. Rptr. 3d 354 (2006); *Wolf v. Superior Court*, 114 CA4th 1343, 1356, 8 CR3d 649 (2004); *De Anza Enters. v Johnson*, 104 CA4th 1307, 1315, 128 CR2d 749 (2002); see generally George W. Kuney and Donna C. Looper, California Law of Contracts §5.1 (2007). Where the terms of a contract are uncertain, California Civil Code §1654 provides, following the doctrine of *contra preferentem* (interpreting ambiguous agreements against the drafter), that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." See *Powerine Oil Co., Inc. v Superior Court*, 37 C4th 377, 33 CR3d 562 (2005). This rule applies with particular force in the context of "contracts of adhesion" – in which a party with strong bargaining power drafts and offers a standardized contract on a "take-it-or-leave-it" basis. See *Badie v Bank of America*, 67 CA4th 779, 79 CR2d 273 (1998); *Neal v. State Farm Ins. Cos.*,188 CA2d 690, 695, 10 CR 781 (1961); see generally George W. Kuney and Donna C. Looper, California Law of Contracts §5.73 (2007). Even beyond this interpretive convention, California courts impose two further limitations on contracts of adhesion. First, a provision that "does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him." Second, under principles of equity, unduly oppressive or "unconscionable" provisions are not enforceable. See *Cubic Corporation v. Marty*, 185

---

[1] California courts construe the parol evidence rule narrowly. Extrinsic evidence is admissible to explain the meaning of a written contract as long as it is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible," even if no ambiguity is apparent on the face of the document. See *PG&E v G.W. Thomas Drayage & Rigging Co., Inc.*, 69 C2d 33, 37, 69 CR 561 (1968).

-24-

CONFIDENTIAL – ATTORNEYS EYES ONLY
EXHIBIT 4 PAGE 55

Cal.App.3d 438, 229 Cal.Rptr. 828, 1 U.S.P.Q.2d 1709 (Cal. Ct. App. 1986).

71. *Formation of the 1999 Agreement.* As a threshold matter, it is my opinion that the 1999 Agreement is a contract of adhesion. Under California law, a "contract of adhesion" is a standardized contract that is drafted and presented by a party having superior bargaining power to another on a take-it-or-leave-it basis. The 1999 Agreement is a pre-printed form contract specifying terms. It does not include spaces for filling in or altering the specified terms. The only area for writing contains two signature lines, one for the employee and one for the company representative. Carter Bryant stated that he was not given an opportunity to read the agreement. In his words, "[w]e were basically just instructed to sign the paperwork to begin work." See Deposition of Carter Bryant, 30:21-31:25. Teresa Newcomb signed Bryant's 1999 Agreement on behalf of Mattel on January 4, 1999. At the time of her deposition in this matter (in 2008), she was a Senior Recruiter at Mattel. She testified that it was her understanding that the confidentiality and inventions agreement was not negotiable. See Deposition of Teresa Newcomb, 110:13-113:12. Lissa Freed, a Director of Human Resources at Mattel since 2001 testified that the "Employee Confidential Information and Inventions Agreement" is a standard form that new Mattel employees sign. See Deposition of Lissa Freed, 18:10-24:21.

72. *Summary of the 1999 Agreement.* The 1999 Agreement begins with a preamble summarizing the principal obligations. Section 1 sets forth the "Trade Secret" provisions. Section 2 contains the "Ownership of Inventions" provisions. Section 3 addresses "Conflicts with Other Activities." Section 4 includes various provisions relating to: modification, termination, and waiver; severability; remedies; and choice of law.

73. *The Trade Secret Provisions.* Section 1 of the 1999 Agreement is entitled "Provisions Related to Trade Secrets." For purposes of determining whether Mattel might have owned a trade secret for the Bratz line of fashion dolls (under the assumption that Bryant conceived the idea during the term of the agreement), the pertinent language provides:

    (a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

    (b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors, and other persons and entities with whom the Company does business.

    (c) I will not disclose or use at any time either during or after my employment

-25-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _4_ PAGE _510_

with the Company, any Proprietary information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary information.

(d)   Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable, and other materials (including all copies) in my possession, custody or under my control containing or disclosing Proprietary information.

74. *Analysis of the Trade Secret Provisions of the 1999 Agreement.* Subsection (a) contains an acknowledgment that "Proprietary information" includes "information" that an employee may develop or discover "as a result of" employment with Mattel. Subsection (b) defines "Proprietary Information" to mean "any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors, and other persons and entities with whom the Company does business." This definition tracks the definition of a "trade secret" in the Uniform Trade Secrets Act.

75. *Application of Trade Secret Provisions of the 1999 Agreement to Carter Bryant's Bratz Fashion Doll Idea.* Under the assumption that Carter Bryant came up with the Bratz idea between January 4, 1999 and October 19, 2000, the question arises whether this idea falls within the general definition of "Proprietary Information" and whether he developed it "as a result of" his employment with Mattel. If so, then he may not "disclose or use [it] at any time either during or after [his] employment with the Company . . . except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing." See Subsection (1)(c). Furthermore, he would be obliged to "deliver to the Company all tangible, written, graphical, machine readable, and other materials (including all copies) in [his] possession, custody or under my control containing or disclosing [such] information" upon his termination. See Subsection (1)(d).

76. *Interpretation of "As a Result of My Employment with the Company" in the 1999 Agreement.* A critical threshold question in evaluating whether or not Carter Bryant had any trade secret obligations vis à vis Mattel with regard to his Bratz idea is understanding what is meant by the phrase "as a result of my employment with the Company" in subsection 1(a) of the 1999 Agreement. California Civil Code §1644 requires contract language to be given its ordinary common meaning unless it is clear that the parties intended a special or technical meaning. There is no reason to believe that this phrase was intended to be given special or technical meaning. In my opinion, the ordinary meaning of "as a result of my employment with the company" is at best ambiguous as applied to Bryant's development of the Bratz concept. "As a result of my employment with the Company" would certainly cover ideas or projects that fell

-26-

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT ___4___ PAGE 51

directly within an employee's job responsibilities. Thus, had Bryant been a doll designer working in a flanker brand division, then he would have not been at liberty to develop a new doll line on his own. But as Tina Tomiyama, who worked with Carter Bryant at Mattel during the time period in question, reports, the Bratz "sketches were entirely unrelated to the work Carter was asked to do in the Barbie® Collectibles group." Expert Report of Christina (Tina) Tomiyama. Furthermore, Carter Bryant was a "soft goods" designer, not a doll designer. Tomiyama further notes that many of Mattel's creative employees in the Design Center pursued personal artistic projects and developed their art portfolio in their spare time.

77. *Interpretation of Ambiguous Terms.*  California Civil Code §1654 provides that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." This rule applies with special force in the case of contracts of adhesion. Therefore, it is my opinion that the phrase "as a result of my employment with the Company" would be construed narrowly if Bryant's conception of the Bratz idea were determined to have occurred during the term of the 1999 Agreement.

78. *The Inventions Ownership Provision.*  Section 2 of the 1999 Agreement is entitled "Ownership of Inventions." For purposes of determining ownership of intellectual property in the Bratz sketches (under the assumption that they were prepared during the term of the agreement), the pertinent language provides:

> (a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents, and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

> (b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

I believe that both ordinary and technical meaning suggest that this "inventions" ownership provision does not cover expressive artistic drawings but rather technological works.

79. *Analysis of Inventions Ownership Provisions of the 1999 Agreement: Ordinary Meaning.*  Section 2(a) refers to "inventions," which section 2(b) defines as including, "but not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable." California courts typically consult a dictionary to determine ordinary meaning. See *People ex rel Lockyer v. R.J. Reynolds Tobacco*

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 4 PAGE 58

*Co.*, 116 CA4th 1253, 1263, 11 CR3d 317 (2004).   Standard dictionary definitions refer to: "a device, contrivance, or process originated after study and experiment," *Merriam-Webster Dictionary* (on-line edition); and "a new device, method, or process developed from study and experimentation: the phonograph, an invention attributed to Thomas Edison," *American Heritage Dictionary* (on-line edition).   Thus, the ordinary meaning of the word "invention" in the context of the 1999 Agreement relates to technological innovation.   This interpretation is reinforced by the list of topics covered in section 2(b), all of which relate to technological creativity.   By contrast, if this agreement was intended to cover artistic creativity of the types that Carter Bryant and other fashion illustrators would recognize, it would refer to pictorial or graphic works, artistic creativity, and/or works of authorship.

80. *Analysis of Inventions Ownership Provisions of the 1999 Agreement: Technical Meaning.* Civil Code §1645 provides that: "[t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."[2]  Viewing the terms in Sections 2(a) and (b) of the Mattel Inventions Agreement from a technical perspective, they cover the general subject matter of the Patent Act, as opposed to expressive graphic works that fall more squarely within copyright law's domain (with a caveat for designs and computer programs, which I address below).   Beginning with the U.S. Constitution, the Intellectual Property Clause distinguishes between "Writings" and "Discoveries," the former relating to copyright subject matter and the latter corresponding to patent subject matter.   See U.S. Constitution, Art. I, Sec. 8, Cl. 8.   In delineating the permissible subject matter of the Patent Act, Section 101 states "[w]hoever *invents* or *discovers* any new and useful *process*, machine, manufacture, or composition of matter, or any new and useful *improvement* thereof." (Emphasis added).   This provision thus covers four of the terms listed in Section 2(b): "inventions," "discoveries," "processes," and "improvements."   The term "developments" is closely related to "improvements."   It also arises in the context of "research and *development*," a term associated with technological innovation.   The term "know-how" is synonymous with tacit trade secret knowledge, which has specialized meaning in technology industries.   "Data," "computer programs," and "formulae" all have strong technological associations.   The last remaining term, "designs," is somewhat more ambiguous, being associated with both technological (structural design, machine design) and artistic (fashion, art) activities.   Taking all of the terms listed in subsection 2(b) together, however, reinforces the technological interpretation of "design."   In my experience, with the exception of "design," these terms are not commonly used in art-oriented workplaces or agreements – such as advertising, animation, film, theatrical, or literary fields.   Subsection 2(a) bolsters this patent-oriented,

---

[2] See *Denver D. Darling, Inc. v. Controlled Env'ts Constr., Inc.*, 89 CA4th 1221, 1236, 108 CR2d 213 (2001) (allowing admission of parol evidence to explain when, in the context of a building contract, the concrete surfaces in a cold-storage facility would be required to meet a high degree of flatness); *Rosen v State Farm Gen. Ins. Co.*, 30 C4th 1070, 135 CR2d 361 (2003) (holding that a homeowner's insurance policy that defined the term "collapse" to mean "actually fallen down or fallen into pieces" did not provide coverage for the imminent collapse of two decks).

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 4 PAGE 59

technological meaning through the reference to "all inventions *conceived and reduced to practice*." The terms "conception" and "reduction to practice" derive clearly from Section 102(g) of the Patent Act. Such technical terms of art are used in determining who was the first to invent in a priority battle for ownership of utility patents. By contrast, the Copyright Act does not talk in terms of "inventions" but rather of "authorship." Section 102(b) of the Copyright Act expressly excludes any "idea, procedure, process, system, method of operation, concept, principle, or discovery" from copyright protection.

81. *"whether patentable or unpatentable."* The final clause of the definition of subsection 2(b) – "whether patentable or unpatentable" – reinforces the technological focus of the invention ownership provision. The first part of the clause is clear – "patentable." Utility patents fall on the technology side of the technology/art divide. One could quibble that the availability of "design patents" reaches into the more artistic domain. Having done an exhaustive review of all 1,225 patents held by Mattel, I can say with confidence that Mattel has not pursued design patents on the types of expressive art reflected in Carter Bryant's Bratz sketches. To the contrary, the overwhelming majority of the design patents are toy or device related. Mattel has not used design patents to protect its core fashion design franchises. The second part of the final clause – unpatentable – can be interpreted in one of two ways: (1) like patentable things but not necessarily meeting the technical requirements for patentability (i.e., not novel, obvious); or (2) any creativity, whether or not like patentable things. The latter interpretation would mean that the entire clause was superfluous. By stating "whether patentable or unpatentable," the clause most plausibly indicates that the definition of "invention" is not limited to things that meet the requirement of the Patent Act, although it is limited to the technologically-oriented terms set forth.

82. *Understanding the reference to "copyrights" and "copyright applications" in subsection 2(a).* The reference to "copyrights" and "copyright applications" in subsection 2(a) creates some tension with the "technology" limitation on inventions. In my view, however, that tension is removed by recognizing that computer programs are eligible for both patent and copyright protection. And Mattel had in fact entered markets for computer-related games and toys by the mid-1990s.

83. *Circumstantial evidence of the meaning of "inventions": Mattel's business and patenting activity.* California courts will consider a wide range of evidence bearing on the meaning of a contract term. If Mattel was limited to the "Barbie" and fashion dolls, then the "technological" interpretation of "invention" might seem odd. It is important to recognize that Mattel is a broad-based toy company, with many technologically oriented divisions. It is common for legal departments in large enterprises to standardize invention assignment agreements and to have all employees in the enterprise sign the form, if it bears little connection to the work of that employee. The University of California has all professors – whether in hard sciences, law, or English – assign their "inventions" made within the scope of their employment over to the University. Yet this clause does not extend to copyrightable works. A review of Mattel's extensive patent portfolio (1,226 patents) reveal a wide range of patenting acitivity, although little related to fashion dolls. Those relatively rare patents that even mention "fashion dolls"

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 4 PAGE 60

(including a rare design patent) do not relate to the "soft goods"-type of work that Carter Bryant was engaged in. The fashion doll-related patents principally relate to mechanical features of the dolls, and not their visual or artistic characteristics.

84. *Circumstantial evidence of the meaning of "inventions": Subsequent Changes to Mattel's Standard Form Inventions Agreement.* California courts will consider parties' subsequent behavior in interpreting contractual terms. In March 2004, Mattel substantially rewrote its "Employee Confidentiality and Inventions Agreement" to cover:

> (b)  Disclosure of Inventions; Ownership and Assignment of My Mattel Inventions.
>
> > (i)  Disclosure of All Inventions. I will promptly disclose in confidence to Mattel all inventions, discoveries, improvements, developments, designs, works, original works of authorship, ideas, know-how, formulas, processes, methods, software programs, databases, mask works, and trade secrets, whether or not patentable, copyrightable, or protectable as trade secrets (collectively, "Inventions") . . .
>
> (c)  Assignment of Mattel's Proprietary Rights. In addition to the assignment of My Mattel Inventions to Mattel set forth in Section 2(b)(ii), I agree to assign to Mattel, and do hereby irrevocably assign to Mattel, in perpetuity and without any limitation or reservation of rights, all of my right, title, and interest in and to (i) all worldwide patent rights, copyrights, trade mark rights, good will, mask work rights, trade secret rights, and other intellectual property rights in and to My Mattel Inventions, and (ii) all Moral Rights in and to all of the foregoing (all of the foregoing, "Mattel's Proprietary Rights"). . . .

Note that the new definition of "inventions" specifically encompasses "original works of authorship" and expands the final clause to state "whether or not patentable, copyrightable, or protectable as trade secrets." This agreement specifically refers to assignment of "copyrights." These changes imply that the prior definition either did not cover copyrightable expression or, at a minimum, that the prior language was ambiguous with regard to ownership of expressive works.

85. *Ambiguous Terms.* As explained above, I consider the 1999 Agreement invention assignment clause to exclude the Bratz sketches even if they were done by Carter Bryant during the period he was employed at Mattel. At a minimum, the scope of the inventions clause is ambiguous as it relates to such works. California Civil Code §1654 provides that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." This rule applies with special force in the case of contracts of adhesion. Therefore, it is my opinion that the 1999 Agreement does not extend to the Bratz sketches. Furthermore, I do not believe that such a broad interpretation of the inventions assignment provision would "fall

-30-

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT __11__ PAGE __61__

within the reasonable expectations of the weaker or 'adhering' party." See *Cubic Corporation v. Marty*, 185 Cal.App.3d 438, 229 Cal.Rptr. 828, 1 U.S.P.Q.2d 1709 (Cal. Ct. App. 1986).

86. *Ineligibility of Bryant's Bratz Concept or Sketches for Utility Patent Protection circa 2000.* Based on my understanding of patent law, I do not believe that the concept or sketches for the Bratz dolls could have received a utility patent. It is doubtful that the Patent Office would seriously consider a patent application for fashion dolls apart from any mechanical or other technological features. Utility patents are not available for purely aesthetic features of articles of manufacture. There were no technological features in the Bratz concept or sketches.

87. I continue to review materials relating to this matter and reserve the right supplement my report as appropriate.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of February, 2008, at Berkeley, California.

_____

Peter S. Menell

-31-

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT ___ PAGE ___

**Exhibit 5**

**MGA Entertainment, Inc. v. Mattel, Inc., et al.**

Case No. CV 05-02727

Expert Report of Mary Bergstein

February 11, 2008

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT 5 PAGE 63

1

Mary Bergstein
Report for Skadden Arps
11 February 2008

In October 2007 Michelle Campana of Skadden Arps, counsel for MGA, contacted me with regard to serving as an expert witness. On behalf of Skadden Arps Ms. Campana asked me to study the written and visual material pertinent to a lawsuit regarding Bratz dolls. As established in a written contract, I am being compensated at $250 per hour for this work.

I am qualified as an art historian, connoisseur of sculpture, and critic of art and visual culture. Visual culture is the branch of art history that looks at everyday images and objects, including "non-art" images and popular culture: toys, clothing, graphics, photography, and advertising. I use images from modern and contemporary visual culture, including dolls (such as "Barbie") in my class lectures in a variety of ways (fig.1).

Trained in the history of Italian Renaissance sculpture (PhD Columbia 1987), the human figure has long been at the center of my research. A copy of my curriculum vitae, including professional lectures and publications, is attached here in a separate document.

**CONFIDENTIAL –
ATTORNEYS EYES ONLY**

2

I currently head the department of History of Art and
Visual Culture at the Rhode Island School of Design in
Providence, where I have been a faculty member from fall
1990 to present, now at the rank of Full Professor. My
students at RISD are BFA (Bachelor of Fine Arts) or MFA
(Master of Fine Arts) candidates, along with some who are
studying for B.Arch (Bachelor of Architecture) or M.Arch
(Master of Architecture) degrees.  Students belong to one
of 21 different studio majors including some that are
pertinent to this case, namely: Industrial Design, Apparel
Design, Illustration, and Graphic Design. In addition to
traditional classroom teaching, my courses also directly
involve the collections (especially drawings, prints, and
sculpture) of the RISD Museum of Art, where I have also
collaborated on exhibitions. Previous to my position at
RISD I taught at the rank of Lecturer at Princeton
University, Department of Art History and Archaeology, from
1986 to 1990, and as a Preceptor at Columbia University
1985-6.

I have not given prior testimony in this case; nor have I
given testimony as an expert witness in any other cases.
(In this report I am referring to a number of MGA Bratz
dolls that I have seen in stores, on-line, in images
provided by Skadden Arps, and in advertisements.  And I am

CONFIDENTIAL –
ATTORNEYS EYES ONLY                MSV

EXHIBIT 5 PAGE 65

3

writing with Bratz <u>Girlfriendz</u> "Nite Out" Cloe and Sasha before me.)

<u>My understanding of the lawsuit</u>:

My understanding of this lawsuit is that Mattel claims ownership of a set of sketches made by Carter Bryant, a former employee, which he testified to have made in August 1998, during an interval in which he was not under contract to Mattel.

Because Mattel claims ownership of these sketches, the original "brainstorm" for the Bratz fashion dolls, Mattel claims to have an ownership interest in Bratz dolls, which were and are produced by MGA.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

4

## Carter Bryant's First Idea for Bratz:

Based on my review of the visual material, there is supportive evidence that Bryant's sketches were made in August 1998, inspired, as he said, by some advertising art in the August 1998 issue of *Seventeen* magazine, as well as direct observation of young girls on their own local "turf" (fig.2).

In the practice of art history and museum connoisseurship, drawings are classified under the following categories: sketches, studies, drawings, and models. Sketches are "notes" on paper; studies imply deeper and more detailed observation and investigation prior to a fully developed drawing, drawings are fully executed works on paper to any end (either for their own sake or preparatory to a final product), and two-dimensional models are fully executed and finished preparations for a work of painting, sculpture, or architecture. In the case of a public or private commission, a model is typically presented to the patron for approval before the final work is executed. For several years I have taught a seminar entitled "Leonardo's Drawings" (Leonardo da Vinci 1452-1519) in which undergraduate students learn to work with this nomenclature. Contemporary fine artists on commission typically follow the same procedure, working from sketch to

CONFIDENTIAL –
ATTORNEYS EYES ONLY

5

study, to drawing, to a final model presented to the client.

The Bryant images under discussion here are sketches. These sketches represent a kind of "thinking on paper," and Bryant later firmed up the drawing, reinforcing contour-lines, adding some color, and clarifying some of the details, so that the sketches could be "read" more easily. Still, these images were never fully executed to the state of finished drawings or models; the changes made post facto neither added to nor detracted from Bryant's sketches.

As the name implies, these very first "Bratz" of Carter Bryant's sketches rejected the feminine ideal of, say, Mattel's "Barbie," and traditional femininity gave way to a more defiant, or "spunky" or "funky" kind of attitude in the teen-aged female characters. These girls have attitude --- an attitude of rebellion and adolescent indifference, especially if contrasted against the more demure, if sexier, "Barbie" ideal (fig.3).

There are obvious ways in which "Bratz" were meant to function in pre-teen society as a kind of "anti-Barbie." Mattel's "Barbie," for instance, can be characterized as a kind of hand-held fertility fetish, who, like the famous

CONFIDENTIAL – ATTORNEYS EYES ONLY

6

"Venus" of Willendorf (ca. 28,000 BC), is unable to stand on her own tiny feet (**Fig.4**). Bratz, instead, have proportionately large feet that allow the figure to stand on her own.

Bryant's "Bratz" had large, blocky feet with huge, "Doc Martens" type shoes and stood in a defiant stance: a swiveling shot-hip kind of pose --- a pigeon-toed, knees-together, sway-backed posture. Such postures are to some extent based on the stock exaggerated slouch of certain runway poses; they also belong to the tradition of fashion illustration, where human proportions are almost always exaggerated in one way or another, most commonly with long, attenuated legs (**fig.5**).

In Carter Bryant's configuration the area of the neck and tiny chest are exaggeratedly small, almost non-existent. The waist opens out into immensely long legs composed, not of flesh and bone, but of enormous flamboyant trousers and shoes. This posture mimics the assertive stance of the model in a Steve Madden ad in Seventeen (**fig.6**) and several other graphic images in that August 1998 issue. These include the ad for "Gadzooks" jeans, "Just Nikki" fashions, the Sanrio "Hello Kitty" advertisement, the photographic view of a model in an ad for leg-depilation (Warner-Lambert

**CONFIDENTIAL – ATTORNEYS EYES ONLY**

7

Co.) and for "Paris Blues" jeans, among several others (fig.7).

Bryant's original 'Bratz' postures transgress the traditionally demure, respectable, "Miss America" sort of feminine ideal, and are activated into a kind of dance of defiance (**fig.8**). The faces, too, are animated, and one figure even seems to be shouting. These (**fig.9**) are girl "rascals" ready to run, jump, and shout. Bryant's idea of "Chicks with Attitude" was inspired by a photographic ad in <u>Seventeen</u> for the Dixie Chicks' "Wide Open Spaces." Here the concept of "attitude" amounts to a kind of "bubble-gum feminism" as exemplified by the "Spice Girls" song "Wannabe" of 1996:

**"If you wanna be my lover, you gotta get with my friends, Make it last forever, friendship never ends."**

In fact, Noelle Howey coined the term "bubble-gum feminism" with regard to the "Spice Girls" mentality; this too appeared in the August 1998 issue of <u>Seventeen</u> (p. 132).

There is no doubt that the concept of "girls with attitude" was very much in the fashion-magazine culture around the turn of the twenty-first century, especially as seen in the August 1998 magazine that Bryant cites as his inspiration.

CONFIDENTIAL –
ATTORNEYS EYES ONLY


EXHIBIT 5 PAGE 70

8

The implied narrative of Bryant's "Bratz" is that these are
four teen-aged girlfriends who hang together in their
rebellious stance, experimenting with make-up, clothes,
hairstyles, cute childish accessories and back-packs
(fig.10), in the "Hello Kitty" vein, and other slightly
off-beat fashion ideas. Hairstyles range from sleek short
cuts, to long, fine quasi-dreadlocks, to a puffy short
bouffant: Carter Bryant intended these varied hairstyles to
be popped on and off like wigs as part of the dolls'
costume. Jade, Lupé, Hallidae, and Zöe were vaguely
characterized as Asian, Latina, African-American, and
Anglo, respectively (fig.11). They were meant to have more
or less the same sculptured head but different face-paint,
although in Bryant's sketch (fig.12) the eyes and eyelids
of the characters have four different shapes, suggesting
different sculpture as well as different paint, presumably
related to their specific ethnicities.

MGA's Bratz

The creative development of the concept of Bratz dolls
began to move in a new direction, in my view, the day
Carter Bryant walked into Isaac Larian's office at MGA to
meet with Larian and Paula Garcia to pitch his idea
(September 1, 2000). During that interview, the Bratz

CONFIDENTIAL –
ATTORNEYS EYES ONLY

9

product as eventually designed and produced by MGA (fig.13) began to take shape.

Spurred by the presence of Larian's twelve-year-old daughter, Jasmin, who responded positively to the Bratz idea, MGA began to design a product that was quite different in its expression from Bryant's original sketches. Bratz became fashion-dolls that were unique in the toy market --- a set of dolls for the twenty-first century --- trendy, cool, inter-ethnic, inter-racial friends, <u>gamine</u> girls who were born fully formed in response to the tired "Miss-America" look of Mattel's "Barbie."

You see, whereas Mattel's "Barbie" started out singular and white, the Bratz dolls were conceived from their launch as a quartet of inter-ethnic, inter-racial types (fig.14). It is precisely this significant departure from the "Barbie" ethos that seems to have driven the Bratz dolls' success in the toy market.

These differences cut deeply through American culture. Indeed, Barbie's whiteness has been the subject of serious cultural commentary (fig.15).

CONFIDENTIAL –
ATTORNEYS EYES ONLY

Exhibit 5 PAGE 72

10

The contemporary photographer David Levinthal, well known
for his mysterious and slightly weird looking set-up
photographs of dolls and figurines, for example, made some
photo-series works about Barbie and her cultural persona.
He is the author of Barbie Millicent Roberts (New York:
Pantheon, 1998). Levinthal began posing the dolls Barbie
and "G.I. Joe" as lovers while in an MFA program at Yale
University (1972), where he wanted to critique the idea of
race in America. His photographs at this time began to
critique "the idea of Barbie as the Aryan virgin." (Lord,
271-72).

At this point it is pertinent to quote verbatim from the
sociologist Mary F. Rogers, "White-skin Barbie," in her
book Barbie Culture in the "Core Cultural Icons" series
(Sage Publications: London, Thousand Oaks CA, New Delhi,
1999), pp. 47-57.

> p. 47: "Although Barbie has had friends of
> color since the 1960's and has herself been
> marketed in African-American, Asian, and
> Hispanic versions over the past fifteen
> years, Barbie is stubbornly white. [ … ]
> Barbie is also fundamentally blond. [ … ]
> No matter what racial or ethnic identity she

CONFIDENTIAL –
ATTORNEYS EYES ONLY

11

adopts, Barbie strikes me as white-
identified, as a beneficiary of white-skin
privilege, as cultural evidence of white
domination."

Rogers goes on to develop her analysis of Barbie as
fundamentally and persistently white in the chapter
entitled "White-skin Barbie." She establishes without a
doubt that even beyond the aesthetic characteristics of the
dolls as objects, the whole phenomenon of "Barbie Culture"
foregrounds white privilege and a white aesthetic (Rogers,
pp. 47-57). Bratz, instead, departed once and for all from
the enduring whiteness of Barbie culture in doll design.
Clearly Bratz and their related accessories have evolved
from their first release to present under the care of MGA's
many designers and employees. If the MGA Bratz are slightly
more sexualized than Carter Bryant's early sketches, they
are also more feminine and demure in their total attitude
(fig.16). They can be characterized as dream girls rather
than defiant punks wearing homemade outré fashion. Pretty
dream girls were apparently more appealing than eccentric
gamines to the pre-pubescent girls who acquire them.  They
no longer resemble the middle-school or high-school art
students that Bryant reports to have observed while hanging
around his parents' town.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

MSV

EXHIBIT 5 PAGE 14

12

Jasmin set the trend in more ways than one. Whereas the name "Lupé" (Lupe) can only be construed as Latina, Yasmin, as well as being the name of the CEO's young daughter was a deliciously multi-cultural name, which signaled what I will call the "inter-ethnic" nature of the Bratz as they were developed (fig.17). Yasmin is derived from the word for jasmine in Persian and Arabic. It was a popular name among various populations around 2000: Muslim girls from South Asia or the Middle East, African-American, Jewish, Latina, and Anglo girls were given this name, and it remained popular as Jasmine, Yasmin or even Jazzmine. A good example of this is the film _Yasmin_ (released in the UK in 2004 and the US in 2005) starring the beautiful Archie Panjabi as Yasmin, a Pakistani girl who lives between two cultures in the wake of 9/11.

With Jasmin Larian and her namesake doll, the idea of race and ethnicity became very flexible in the implied Bratz narrative. With the addition of Yasmin the four Bratz friends (now called Cloe, Sasha, Yasmin, and Jade) became, with the launch of the line in 2001, inter-ethnic and inter-racial in a way that reflected and actually embodied the reality of American urban girls (fig.18). These new dolls also had the advantage of advancing a global appeal.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

13

Given their new names, they could be imagined as Mediterranean, Middle-Eastern, African, Chinese, Eastern European, or Latin American. Multiculturalism became the rule rather than the exception in the world of Bratz.

In a New York Times article of 2003, New York City parents praised the inter-ethnic look of Bratz. One mother, Miriam Arond, who was also editor in chief of Child magazine, stated that: "Multiculturalism is one of these dolls' very positive aspects, a very nice way of helping children all over the country realize that people look many different ways." Another mother, Anna Scolara said, "They represent so many different cultures that co-exist in the city." She praised the realistic resemblance of Bratz to real "New York girls." (fig.19)

Dolls that really look like "New York girls"! This is a far cry from Mattel's (1979) "fiesta-style" Hispanic Barbie --- a stereotyped Latina wearing a lace mantilla and a rose, among other accoutrements. M. G. Lord described Hispanic Barbie as "a refugee from an amateur production of Carmen" (Lord, 108). No wonder she did not appeal to real American girls, Hispanic or other.

CONFIDENTIAL –
ATTORNEYS' EYES ONLY

14

I should add that my personal experience comes to bear on this aspect of the Bratz story. When I look at my classes of talented first-year students at the Rhode Island School of Design in 2008, the young women simply cannot be individuated according to race or ethnicity. The South Asian and Middle Eastern influx into the U.S. population is only a part of what contributes to this "blended" look, where the "Barbie-like" white/Anglo model no longer dominates the aesthetic.

Inter-ethnicity seems to be a great part of the Bratz appeal, as it mirrors the urban populations of the USA. Skin tones for each Bratz character vary. For example, Jade can be purchased with pale, light, or tan skin, and the newer dolls can have prominent facial beauty-marks with any shade of skin.

Their outfits are decidedly urban and trendy, but with more of a "Sex-and-the-City" (another narrative of four friends!) flavor than had interested Bryant in his sketches. "Sex and the City," which ran from 1998-2004 on cable TV dealt with four women in their mid-thirties, and to be sure, Bratz present a more juvenile, less polished, iteration of "sex-and-the-city" fashion. The large, interchangeable feet of Bratz dolls are now wearing

CONFIDENTIAL –
ATTORNEYS EYES ONLY