15

strapped, glittery, high-heals. But this does not mean that post-Bryant Bratz swung back to the "Barbie" or "Miss Revlon" ideal by any means.

Bratz products were first designed and produced by MGA in 2000-2001. Since 2000, when Carter Bryant brought the idea of Bratz to MGA, numerous highly skilled MGA employees have worked on the dolls. The MGA Bratz product differs substantially, therefore, in form, content, and narrative fantasy, from the working sketches made by Bryant.

Let me describe some of the most salient ways in which MGA Bratz differ in expression from the thoughts Bryant first put on paper. The inter-ethnic aesthetic of Bratz was created by the sculpture and painting of the dolls produced by MGA. This was not apparent in Bryant's sketches, where the characters nod to multi-ethnicity rather than inter-ethnicity. Each doll has the exact same sculptured physiognomy on a head that is proportionately larger than the body.

<u>Eyes</u>: The eyes are a good place to begin (fig.20). Bratz dolls have large, made-up, eyes with huge irises. The eyes flair up and away from the nose like elongated "butterfly wings," almost wrapping around the top of the face.  Unlike

CONFIDENTIAL –
ATTORNEYS EYES ONLY

16

the rounded heavy-lidded eyes sketched by Bryant in 1998, Bratz eyes are like long, almond-shaped "wings" with attenuated, delicately colored eyelids and with irises of various subtle colors. These eyes are slightly other-worldly, i.e. not quite naturalistic enough to be the eyes associated with Asian, Anglo, African, or Latin identity, but at the same time suitable to all those ethnicities and more.  (Before moving on to the next comparison, I should state that Carter Bryant's sketches don't convey a coherent idea of what the individual dolls would look like. This is because of their status as sketches that were made when Mr. Bryant was first playing with his ideas on paper.)

Mouth: The genius of Bratz resides most distinctively in the design of the mouth (fig.21), which, unlike the actively expressive (even shouting) mouths of Bryant's 1998 drawings, hovers in suppression of emotion between a semi-smile and a semi-pout. Only the position (moveable) of the doll's head can make the Bratz doll look "happier" or "sadder." These serene bee-stung lips (the mouth is almost as tall as it is wide) communicate a calm, demure femininity, a femininity greatly modified from Bryant's sketches of kids with attitude.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

It is no coincidence that the Bratz mouth is suitable to girls (dolls) of any ethnicity or mixture: African, East Asian, Latina, Mediterranean, South Asian, Middle Eastern, or Anglo. Lipstick colors are harmonized with skin and eye colors to stimulate the children's imagination to create various individualized "characters".

Little girls for whom racism does not exist can identify with any or all of the Bratz, enhancing their possibilities for imaginative play, creating individual Bratz "characters" within the fun-and-fashion narrative. Surely this easy inter-ethnicity accounts in great part for the Bratz success as a cultural phenomenon in twenty-first century America.

Hair: Another important feature of MGA's Bratz is that the dolls' hair is a centerpiece of the toy (fig.22).  Whereas Bryant's original sketches featured, for instance, short sleek dark hair with little pigtails and spiked bangs, the Bratz all have "big," "Hollywood" type hair coiffed in a traditionally feminine style --- a style more suitable to Angelina Jolie than to a rebellious middle-school art student.  The hair is abundant, somewhat curly, full, and below-waist length. In Bratz Girlfriendz, for example Cloe has streaked blonde and platinum hair parted on the right

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 5 PAGE 80

side and Sasha has rich brown hair with auburn streaks, parted in the center. The hair is the most "touchable" part of the toy --- a pleasure for children to comb and style. Both Cloe and Sasha come equipped with proportionately huge hairbrushes, clearly one of the main attractions of the doll for child consumers (fig.23).

## Bratz and the Public Domain

Much as Bratz were originally inspired by Mr. Bryant's sketches and developed by the creative design staff of MGA, certain of the Bratz general traits were in the public domain prior to Carter Bryant's ideas: Bryant's sketches belong to a larger tradition that has been "in the culture" of media and toy representations for several decades and continues to find expression in the present.

The large, sparkling eyes of Bryant's Bratz belong to an idea that dates back at least to 1930 (fig.24), when Max Fleischer invented the "Betty Boop" character --- supposedly a sixteen-year-old girl --- for screen animation. (As some of us can remember, the big-eyes scheme was continued by Disney in the "Bambi" character of 1942 and other animated cartoons.) The most significant American fashion-doll before Barbie was "Miss Revlon" (fig.25) produced by Ideal Toy and Novelty Corporation from 1956-59.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 5 PAGE 81

19

Revlon dolls wore cocktail dresses, had distinct breasts, red polish on their fingernails and toes, and (pre-Barbie) feet shaped to wear high-heels. The name "Revlon" is, because of the cosmetics company of the same name, charged with associations to glamour and make-up. Miss Revlon also had big round sparkling glass eyes, which opened and closed, like those of a traditional baby-doll.

In the 1960s, paintings by Margaret Keane (fig.26), today considered pure kitsch, featured poor waif-like children with huge eyes and pathetic expressions. Japanese animé (animated film) developed figures with large eyes --- eyes that were not perceived as particularly "Western" by their Japanese audiences, but just sparkly and cute, for both human and non-human characters. "Hello Kitty," for example, a model for Carter Bryant's cute back-packs in the early drawings, was (in Japan since 1977 and in the USA since 1991) a children's animé series. The Japanese animé "Sailor Moon" (fig.27) of the 1990s featured perky, naïve-looking girls with big eyes. It centered upon a leading magic girl, Sailor Moon, whose adventurous fairy tales took place in the inter-galactic realm of fantasy and science fiction.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

20

Other such images also thrived in the media culture before 1998. Lisa Frank designed fantasy images for very young girls, beginning in 1979, to be applied to stickers, toys, clothing, and notebooks.  Her work included the idea of three best girlfriends (Lisa, Carrie, and Mara) far in advance of Carter Bryant's four best girlfriends. Lisa Frank's girls have huge eyes, rainbow-colored wings, halos, and slim bodies. Predominant colors are pink and lavender. Lisa Frank's cuddly characters are based on children's fantasies. They exist in a world of pastel-colored flying unicorns, rabbit-ballerinas, and tip-toed dolphins. Her graphic designs for girls are sugary sweet, and there is virtually no sexualization of any of the characters. Nevertheless Wikipedia (cit. Lisa Frank) states that:

> "Lisa Frank's influence on pop culture has
> been considerable, with her highly
> recognized style spawning many imitators.
> The popular Bratz line of toys are
> stylistically imitative of Lisa Frank's
> work."

The "Blythe" character, a doll created by Kenner in 1972, and revived in photography by Gina Garan in 1997, is also a fashion-doll <u>gamine</u> with huge eyes (fig.28). Indeed, the

CONFIDENTIAL –
ATTORNEYS EYES ONLY

21

eyes apparently proved to be somewhat spooky to children and the doll never caught on. Garan's revival of Blythe appealed to adults, who purchased them in limited editions as by Hasbro as "Neo-Blythe." Garan's work with Blythe brings to mind the "lowbrow art" phenomenon of Pop Surrealism as it flourished in the 1990s. Photo essays like This is Blythe (New York: Chronicle Books, 2000) play with the dark side of cute femininity, posing Blythe as a character in situations of an implied narrative of loneliness or even danger. Here is postmodernism in one of its most lurid, kitschy guises.

We recognize this postmodern feature of "implied narrativity" rather than straight-out narrative in serious, "high" art (especially contemporary painting and photography) as well as in "Pop Surrealism." This is Blythe (2000) is an example of implied narrativity derives from the contemporary mania for "set-up" photography, like that of the post-modern photographers Cindy Sherman and David Levinthal.

To further understand the Zeitgeist of the turn of the century in the continuum of gamine, wide-eyed, trendy female characters, we may turn to the television (FOX) comedy-drama (running from 1997-2002) called Ally McBeal

CONFIDENTIAL –
ATTORNEYS EYES ONLY

22

(fig.29). In my personal experience, young teenage girls in the 1990s adored this series, which starred Calista Flockhart as a young, fashionable, slender --- fetchingly anorectic --- lawyer. The multi-ethnic cast included (Asian American) Lucy Liu as "Ling" and (African American) Lisa Nicole Carson as "Renee." Despite the fact that Ally McBeal (the Calista Flockhart character) is an attorney, the characters behaved like flighty teenagers. The Flockhart and Liu characters looked so much like high-school or college-girls hovering on the edge of bulimia and anorexia nervosa that the actresses had to defend themselves to the press as non-anorectic. They were fashion dolls come-to-life in a dramatic, comedic, terribly unrealistic, setting.

All of the phenomena described above, from Betty Boop to Blythe to Ally McBeal, are quite individual from one another in terms of their ultimate meaning. They supply different fantasies to their consumers and viewers, from the cuddly magic of Lisa Frank to the depressing profanity of Pop Surrealism. Nevertheless, they were all in the culture when Mr. Bryant made his original Bratz sketches (fig.30).


Conclusion:

CONFIDENTIAL –
ATTORNEYS EYES ONLY

23

To sum up my observations (fig.31), I would posit that Carter Bryant's sketches, as original as they were in some ways in the ideas they communicated, drew from material already in the culture, particularly as represented in the August 1998 issue of Seventeen, as is consistent with his previous testimony. But nothing is conceived in a void, and I have pointed to Betty Boop, Bambi, Revlon dolls, Blythe, Sailor Moon, Lisa Frank's illustrations, Margaret Keane's paintings, "Sex and the City," and "Ally McBeal" as historical precedents for the Bratz idea.

Bratz were developed by MGA by with Bryant's drawings as an initial inspiration. From their launch, Bratz were defined in contrast to the "Barbie" stereotype (fig.32). But they also departed from Carter Bryant's sketches in significant ways including in their physical manifestationn their physical manifestation and in the "cultural aesthetic" they spawned. Bratz created a new fashion-doll type and fashion-doll narrative that was immensely successful with American girls in the twenty-first century.

Mary Bergstein --- 11 February 2008

CONFIDENTIAL –
ATTORNEYS EYES ONLY


EXHIBIT 5 PAGE 46

02/11/2008  09:33     401-454-6586          RISD LIBERAL ARTS                PAGE  01/01

paintings, "Sex and the City," and "Ally McBeal" as historical precedents for the Bratz idea.

Bratz were developed by MGA by with Bryant's drawings as an initial inspiration. From their launch, Bratz were defined in contrast to the "Barbie" stereotype (fig.32). But they also departed from Carter Bryant's sketches in significant ways including in their physical manifestation their physical manifestation and in the "cultural aesthetic" they spawned. Bratz created a new fashion-doll type and fashion-doll narrative that was immensely successful with American girls in the twenty-first century.

*M. Bergstein*          *11. 2. 2008*
_____

Mary Bergstein --- 11 February 2008

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 5 PAGE 87

**Exhibit 6**

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

## Case No. CV 05-02727

### Expert Report of Debora Middleton

### February 11, 2008

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 6 PAGE 88

**DEBORA MIDDLETON**

**MGA EMPLOYEE/EXPERT WITNESS RE: TWO-DIMENSIONAL CHARACTER ART:
WITNESS REPORT**

I am an employee of MGA Entertainment, Inc. ("MGA").  Currently my title is
Director of Creative Development, and I have had this position since 2007.  Prior to that, I was
Director of Character Art from 2005 to 2007.  My first position with MGA was Character Art
Manager, which title I held from July 2003 to 2005.  As Character Art Manager and Director of
Character Art, I was directly responsible for all Bratz two-dimensional character art. As Director
of Creative Development, I am no longer responsible for the creation of Bratz two-dimensional
character art, but I continue to be familiar with the Bratz two-dimensional character art actually
used.

In connection with the legal claims asserted by Mattel against MGA relating to
Bratz, outside counsel for MGA has requested that I review Bratz two-dimensional character art
used since the introduction of the brand, and determine whether the said art was copied or
appropriated from drawings made by Carter Bryant prior to his leaving his employment at Mattel
(which I understand was on or about October 19, 2000).  In this connection, although I am not a
lawyer and do not interface with lawyers on a routine basis, I understand the concept of artwork
being copied or appropriated from an earlier work on the one hand, or being an independent
creation on the other.  With respect to Mr. Bryant's early drawings, they have been provided to
me by counsel.

Because I do not write reports of this type as part of my regular responsibilities,
and also because I did not feel that I had the time to write a report, I asked counsel to draft a
report for me.  I then reviewed that draft and made all necessary changes.  I note that before



CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT _____ PAGE _____

counsel prepared the first draft of this report, I had several in-person meetings and telephone conversations with MGA's lawyers to explain my views and conclusions.

For this work, I am not receiving any additional compensation over and above my ordinary compensation from MGA. I have not authored any publications within the last ten years, nor have I given prior testimony, either as a fact witness or as an expert witness, in this or any other cases during the past four years.

## Data and Information Considered

The documents/ information I have considered in connection with the assignment described above is as follows:

- Carter Bryant's "pitch book" (materials which, I understand, Mr. Bryant showed to Isaac Larain and Paula Garcia on September 1, 2000) (Bryant 00262-272; Deposition Exhibit 1), and his tracing paper drawings (Deposition Exhibit 1330).

- Carter Bryant's November 2000 drawings, Deposition Exhibits 1107-1110.

- The two-dimensional character art on the packaging for each of the four "first generation" Bratz dolls (i.e., those introduced to the market in 2001). (See, e.g., MGA-TI-000476; MGA-TI-000477; MGA-TI-000484; MGA-TI-000487.)

- Subsequent Bratz two-dimensional character art from inception to the present, based on my on-the-job exposure to said art while employed at both Klasky Csupo and MGA. This artwork can be reviewed by reference to MGA's Bratz style guides, and I did briefly review said guides to confirm my recollections.

- The Bratz Template (discussed below).

- Selected character art files from MGA's archives.

2

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT _6_ PAGE _90_

### Qualifications and Experience

A copy of my CV is attached as <u>Exhibit 1</u>. I attended Champlain College during the years 1983-1984, studying fine art. In 1984, I transferred to Sheridan College, where I took a three-year animation course. I graduated from Sheridan in 1987 with a diploma in animation.

After graduation, I worked at Bluth Animation from 1988 to 1992 as an animator on feature-length animated films. In 1992, I joined Rich Animation, where I was Lead Effects animator on a feature-length animated film. I left Rich Animation in 1994, and alternated between freelance and full-time work from 1994 to 2001. During this period, I worked on special effects for feature-length animated films for Warner Brothers and Disney and on commercials for companies including Warner Brothers Classics, Duck Soup, and Klasky Csupo. I worked on commercials as a freelance artist.

During the years 2001-2003, I was employed by Klasky Csupo, as a full-time employee on their features, and a freelance artist on commercials. While I was at Klasky Csupo, I worked on two-dimensional character artwork of the Bratz brand for animated commercials.

In July 2003, I began to work for MGA. While at Klasky Csupo, I had learned that MGA was looking for an art manager, and my supervisor at Klasky Csupo recommended me to Aileen Storer, an MGA employee. When I was hired to be MGA's Character Art Manager, I was, in effect, the entire "department" and my responsibilities included interfacing with Klasky Csupo, which was still developing Bratz artwork for MGA. However, I came to the conclusion that because of the explosive growth of the Bratz line, and to be in a position to maintain stricter controls, MGA needed its own in-house art department. MGA management agreed, and, about three or four months after I joined MGA, I began to build MGA's art team. At its peak size

3

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 6 PAGE 91

under my supervision, MGA's in-house art department had more than 15 employees (with back-up help from time-to-time from freelance artists.)

In approximately December, 2004, the art department was divided into two teams: one preparing the artwork for all Bratz-branded products and the other for all non-Bratz-branded products. Currently, as Director of Creative Development, I oversee and help direct the creation of Bratz movies.

### Background on Bratz Artwork

Two-dimensional Bratz character artwork can be used on MGA's Bratz doll product packaging, on various promotional materials, and in MGA's style guides. Style guides are distributed to MGA's licensees and contain the official artwork that MGA's licensees are required to use for licensed products and/or the packaging for licensed products.

Bratz dolls are typically produced in two "seasons," spring and fall, and during each season multiple themes are introduced. New two-dimensional character art is continuously being developed to correspond with these themes. Consequently, every year, hundreds of different individual Bratz character art drawings are created.

Because of creative and manufacturing cycles, two-dimensional character art is developed approximately one year in advance of the introduction of any particular Bratz doll product. Thus, for example, as of now (early February, 2008), MGA is working on two-dimensional character art for Spring 2009 Bratz doll products and likely will complete this artwork by June 2008.

Bratz two-dimensional character artwork that actually appears on product packaging and licensed products is hand drawn initially and then computer vectored and rendered. The development of this artwork is a multi-step process involving concept, fashion

4

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT _6_ PAGE _92_

design, rough sketch, clean-up (a clean-up artist cleans-up the hand sketches and scans them), vector and render computer imaging, which produces clean lines, fill color and complex shading.

To explain in greater detail, a sketch artist creating an initial sketch may work from a concept illustration, other pre-approved Bratz two-dimensional character art, or inspiration boards or "tear sheets" from magazines or other sources of inspiration, a template for proportions, discussed below, and a suggested pose.  (See, e.g., Exhibit 2, an example of a tear sheet showing a suggested pose a sketch, and final character art.)  After the initial sketch is completed, it is scanned and recreated using Illustrator and Photoshop programs.  The scanning results in a simple black-line drawing being transferred from paper to the computer. A Vector/Render artist then must create full-color artwork over this black line drawing.  The software programs used are either Illustrator for vector (line art with solid, flat color) or Photoshop for render (more dimensional and shaded in appearance).  (See Exhibit 3, an example of vector artwork, and Exhibit 4, an example of render artwork.)

Over the years, Bratz two-dimensional artwork has evolved and changed considerably.  This is discussed in greater details below.

### The Development of a Template

As the Bratz line grew, we were creating for each season more and more different two-dimensional art files.  Because so many different artists and art directors were working on Bratz two-dimensional artwork, it was becoming more difficult to maintain consistent standards. Eventually, the art team concluded that MGA needed to adopt an agreed-upon proportion for its Bratz characters, to be set forth in a template.  Templates are commonly used for two-dimensional character art.  Indeed, a template is necessary for animation work because the sizes and proportions of characters must be consistent for that medium.  Model sheet is the term used

CONFIDENTIAL –
ATTORNEYS EYES ONLY

in animation for a template or size proportion guide. Due to the type of work I did while at Klasky Csupo, I did not use or come in contact with a template but I know that they must have used one for this reason.

In mid-2004, the MGA character art team created three different proposed templates, reflecting three different proportions. (Exhibit 5.) Isaac Larian, Paula Garcia, and Aileen Storer selected one from among these three to serve as the Bratz two-dimensional character art template (I will refer to it as the "Bratz Template"). (See Exhibit 6.) The Bratz Template is approximately 3 2/3 heads tall, and is a rough, outlined, mannequin-like form.

The Bratz Template was implemented beginning in late 2004/early 2005, and was used for the first time on the Bratz Dynamite theme. (See Exhibit 7.) Following the selection of the Bratz Template, we were able to have more consistent artwork which facilitated the approval process.

### Comparison of Bratz Artwork and Carter Bryant's "Pre-MGA" Drawings

I first met personally with MGA's outside counsel on January 4, 2008 (we had had one prior phone discussion) to discuss my being able to address the two-dimensional character art issues. As of that date, I had never seen Carter Bryant's drawings from the period before he left Mattel (October 19, 2000), or his drawings from November 2000. In that initial meeting, I was shown what has been referred to as Carter's "pitch book" (Exhibit 8). My immediate reaction was that it did not resemble the two-dimensional Bratz artwork that I was responsible for as of August, 2003 when I joined MGA as an employee. Since that meeting, I was provided with copies of other of Mr. Bryant's pre–October 19, 2000 drawings.

I note that, during the time that I have worked for MGA, I have seen very few of Carter's contemporaneous drawings. They were on 2 or 3 occasions provided to me for purposes

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT __6__ PAGE 9__

of looking at the fashions, not for guidance with respect to character art. I was usually given fashion sketches for directions. These sketches were created by MGA fashion designers.

In conducting the analysis requested by MGA's lawyers, I first made observations regarding Carter's "pre-MGA" drawings referenced above.  In my opinion, these drawings are merely a representation of an idea, not artwork that a professional character artist would produce for professional purposes, and not artwork that could have been used in a context where professional character art was needed, such as on product packaging, promotional materials, animation, or licensed products. Carter's drawings are hand-sketched the way concept art is usually created; the "hero shot" drawing (the group drawing) has a very different proportions and look than the drawings of individual characters, there is no consistency, e.g., the group drawing reflects more "animated" action-like poses, the individual drawings are very stiff as if of mannequins and thus totally inappropriate for character art.  These differences help illustrate that these sketches are only concepts; these sketches are not high enough quality to stand up to print specifications for packaging or publishing; MGA's minimum standard for print quality art is 300 "dpi," meaning there are 300 digital pixels per inch. This level of quality assures that the image will stand up when scaled (made larger) or printed. You cannot get this level of quality by simply scanning in a hand-drawn sketch.  These drawings show a direction for fashion, evoke an attitude and convey a sense of proportion, nothing more.

I next compared the two-dimensional character art I was working on in July, 2003 with the character art on the first-generation Bratz packaging.  There were, by July 2003 already significant differences.  For example, if you compare First Generation Cloe with the version marketed in 2004 (i.e. drawn in July, 2003) (Exhibit 9) some differences are as follows: Proportions have changed drastically.  The Cloe created in June 2003 has more elegant, human

7

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _12_ PAGE _25_

proportions and a more realistic human structure. Her head and feet have gotten much smaller. Her face shape is more refined, meaning there is a structure under her face features. The first generation Cloe is " clunky", the roundness of the top part of her head goes into a straight line down the side of her face to a point at her chin. It does not have the sweeping more refined elegant lines that Cloe from the Spring 2004 line has. This piece of art has subtle curving lines that define her cheek and chin area. Her lip size and shape have completely changed. In general her lips are smaller in proportion to the rest of her face. The top lip has a center dip and a point in the center of the opening edge. Her bottom lip has lost the square-ness and is rounded (½ of an oval). Her eyes are larger and shaped differently. She has more upper eyelid showing and less iris. A larger area of whites of the eyes is visible. The spacing of the eyes is closer together and the eyes are angled on the face more acutely. She has a more feminine quality to her hands, arms and legs.

There were even more differences when Cloe on 2004 packaging is compared to the Bryant pre-MGA drawings.  (See Exhibit 10.) The proportions and shape language are drastically different. The 2004 packaging character art is much taller and leaner. Her feet and hands have more human proportions, the Bryant pre-MGA drawings had extremely exaggerated feet proportions and thick masculine hands, the head is very big compared to the rest of the body. Cloe from Spring 2004 has a feminine quality that is not evident in the Bryant artwork. Cloe's head is more in proportion to the rest of her body and a clear oval shape lies under all the face features.  Carter's head shape is more of a heart.  The lip shape is also very different from the Bryant pose. The top lip of Cloe has less volume then the bottom one. (Carter's is almost the complete opposite.) Cloe's lips also end at each corner in a line that helps show her expression. Her eyes are more open showing a lot more whites of the eyes and the eye shape is completely

8

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _Ce_ PAGE _96_

different. Cloe's eyes sit differently on her face. The corners of the eyes angle up at her ears and the line of the eye that runs along the nose is more elongated. Her eye brows are also more delicate.

In view of the foregoing, I can say with confidence that the two-dimensional character art I was working on as of July 2003 was not copied from or appropriated from Mr. Bryant's drawings. I have not gone back to examine the pre-August, 2003 art work in any detail, as it is difficult to determine where to "draw the line."

To illustrate the continued development of the two-dimensional Bratz character art, I will make observations regarding Cloe as of 2004-2007 (i.e., artwork developed in 2003-2006) (see Exhibit 11). I note that the character art continues to evolve as time passes. The artwork does take on a higher lever of sophistication. More detail is added to the fashion and hair in the line art stage as well as the final color stage. The art styles also become considerably more detailed, complicated and complex as detail and new techniques are introduced. Self color lines are used on many occasions in a given season, i.e.: the outline is a color line and not standard black. Particularly from the 2005 artwork (the artwork created in 2004) onwards, there are a wider range of art styles being implemented. Per Bratz program some seasons have as many as 6 new art techniques that would not be repeated. In other words, they are unique to a specific program. The Passion 4 Fashion art style was trying to achieve an over exposed look reminiscent of old photographs. The saturation of the color was pulled out and gray shadowing was added to give the look of a tinted photograph. The Movie Starz line was trying to capture a dreamy Hollywood feeling, an using a soft focus look with the lines being virtually invisible. In general the face features become more refined as time passes. The top lip becomes considerably smaller and the bottom lip spreads out horizontally. The eye shape changes and becomes less

9

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT 6 PAGE 27

angular. The pupil and iris become much larger in the eye shape.  Overall the artwork evolved to a higher level.

## Summary of Conclusions

In sum, my opinions are as follows:

- Bratz two-dimensional artwork has evolved continuously since the launch of Bratz in very significant and sophisticated ways.

- As of at least the time that I joined MGA as an employee in July,  2003, Bratz two-dimensional character art then being developed was materially different from Carter Bryant's "pre-MGA" drawings.  In other words, that two-dimensional Bratz character art, used on packaging introduced to the market in Spring, 2004, was not a copy of or an appropriation of Carter Bryant's drawings, nor were any subsequent versions of any two-dimensional Bratz art.

- Carter Bryant's materials contained in his "pitch book" were merely a representation of an idea, not artwork that a professional character artist would produce for professional purposes, and not artwork that could have been used in a context where professional character art was needed, such as on product packaging, promotional materials, animation, or licensed products.

Debora Middleton
February 8, 2008

10

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT /0  PAGE 98

## DEBORA MIDDLETON REPORT

### INDEX TO EXHIBITS

| | |
|---|---|
| Exhibit 1 | Copy of my CV |
| Exhibit 2 | "Tear Sheet" example |
| Exhibit 3 | Examples of vector artwork (Illustrator files) with and without background |
| Exhibit 4 | Examples of render artwork (Photoshop files) with and without background |
| Exhibit 5 | Three proposed Bratz character templates |
| Exhibit 6 | The Bratz Template with character art and proportion guide |
| Exhibit 7 | Example of Bratz Dynamite theme character art |
| Exhibit 8 | Carter Bryant's "hero shot" (Bryant 00262) |
| Exhibit 9 | First generation Cloe packaging character art and example of July 2003 Cloe character art for Spring 2004 |
| Exhibit 10 | "Zoe" character art from Carter Bryant's "hero shot" and example of July 2003 Cloe character art for Spring 2004 |
| Exhibit 11 | Examples of Cloe character art from 2003 through 2007 |

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _Ce_ PAGE _95_

**Exhibit 7**

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

## Case No. CV 05-2727

### Expert Report of Paul K. Meyer

February 11, 2008

_Paul K. Meyer_

Paul K. Meyer

CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT 7 PAGE 100

Expert Report of Paul K. Meyer

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................... 2

   A. Navigant Consulting, Inc. / Qualifications............................................................. 2

   B. Assignment............................................................................................................. 3

   C. Discovery Has Not Been Completed ..................................................................... 3

   D. The Accused Property Subject To Copyright Protection........................................ 4

II.  SUMMARY OF OPINIONS ..................................................................................... 5

III.  MATTEL AND MGA ............................................................................................... 7

IV.  OPINIONS ................................................................................................................ 8

   A. MGA Deductible Expenses..................................................................................... 8

   B. Apportionment Factors And Considerations........................................................ 11

      1. Design Of The Doll ........................................................................................ 15

      2. Themes Associated With The Dolls ................................................................ 19

      3. Fashions Sold With The Dolls ........................................................................ 24

      4. Accessories Sold With The Dolls ................................................................... 28

      5. Characters Associated With The Doll Line ..................................................... 30

      6. Packaging In Which The Dolls Are Sold........................................................ 35

      7. MGA's Branding, Marketing And Advertising Efforts................................... 38

   C. Apportionment Approaches ................................................................................. 42

      1. Apportionment Approach: Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll ........................................... 43

      2. Apportionment Approach: Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line.......................................................................................... 47

      3. Apportionment Approach: Work tasks to develop the original Bratz doll ....................... 48

      4. Apportionment Approach: MGA's Bratz product development contributions ................. 50

      5. Apportionment Approach: MGA's "licensing in" and "licensing out" royalty rates ........ 50

      6. Apportionment Approach: MGA's investments in the Bratz product line...................... 51

      7. Apportionment Approach: Sales variation among Bratz products .................................. 52

      8. Summary Of Apportionment Analyses............................................................ 54

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 7 PAGE 101

Expert Report of Paul K. Meyer

I. **INTRODUCTION**

    A.    **Navigant Consulting, Inc. / Qualifications**

1.    I am a Managing Director at Navigant Consulting, Inc ("NCI") and a co-leader of NCI's national intellectual property practice. NCI is an international business, economic, financial and damages consulting company that provides services to business entities, individuals and counsel. NCI has approximately 2,000 professionals in over forty offices throughout the United States, Canada, Europe and China.

2.    I am a Certified Public Accountant, Certified Fraud Examiner and accredited in business valuation (CPA-ABV). I am a Consulting Professor at Stanford University in the Graduate School of Engineering, where I have been co-teaching accounting, quantitative methods and financial issues for over fifteen years. I am also a member of the Advisory Board for the McIntire School of Commerce at the University of Virginia. I graduated from the University of Virginia in 1979.

3.    Before joining NCI in February 2004, I was co-founder and President of Tucker Alan Inc. Tucker Alan Inc. was a business, economic, financial and damages consulting company with approximately 350 employees and 13 offices in the United States. Prior to founding Tucker Alan Inc. in July 1994, I was employed by Peterson Consulting, an international consulting firm. At Peterson Consulting, I held various positions including Executive Vice President and Member of the Board of Directors. Before joining Peterson Consulting in 1981, I worked for an international public accounting and consulting firm.

4.    I am experienced in financial, economic, damage, valuation and accounting matters related to the scope of my work, analysis and study on this matter. I have analyzed and prepared numerous claims for lost profits, reasonable royalties, increased costs and other financial and economic impacts, including matters involving intellectual property misappropriation and infringement. I have also analyzed hundreds of agreements relating to the licensing of intellectual property, determined reasonable royalty rates for the use of intellectual property, and valued intellectual property on numerous occasions. These matters have involved both litigation and non-litigation assignments. I have consulted on matters involving toys, games, rights of publicity and professional sports property licensing and merchandising.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 7 PAGE 102

steps are critical in the development of a Bratz doll and contribute to MGA's generation of Bratz sales and profits.

41.   The "design of the doll" refers to a variety of developmental steps, each of which involves substantial creative contributions.   These steps include:   (a) Carter Bryant's drawings, both before and after his departure from Mattel, (b) the sculpts for the Bratz dolls created by Margaret Leahy, (c) the engineering concepts that allowed for production of the doll, (d) the face painting of the dolls by Anna Rhee, and (e) the Bratz dolls hair rooting and hairstyling by Steve Tarmichael.   All of these doll development steps were overseen by Ms. Garcia.   Mr. Tonner recognizes the importance of Ms. Garcia's role in this process.[41]

42.   First, Mr. Bryant's drawings provided inspiration and guidance for the creation of the Bratz dolls.[42]   I understand that a portion of these drawings were prepared by Mr. Bryant prior to his consulting agreement with MGA.[43]   In addition, I understand that the drawings Mr. Bryant created after he entered his agreement with MGA reflected an effort by Mr. Bryant and Ms. Garcia to "soften" Mr. Bryant's original drawings.[44]   Ms. Garcia concluded that while Mr. Bryant's original drawings could serve as inspiration for a fashion doll line that appealed to an older group of girls, those drawings were too extreme for a mainline fashion doll.   The drawings had to be softened considerably before they could be sold successfully to 7 to 10 year old girls.[45]   Moreover, I understand that the postures and shapes of the characters in Mr. Bryant's original drawings could not be replicated in a doll.   Thus, the drawings Mr. Bryant created while working with MGA were designed to help MGA create bodies for the Bratz characters that could be translated into a doll.

43.   Second, the sculpts for the Bratz dolls created by Margaret Leahy represented a substantial creative contribution beyond Mr. Bryant's drawings.   I understand that the sculpting process

---

[41] "Ms. Treantafelles [Garcia] was perhaps the most important person in the development of the project.   She took an idea from an untested, unknown clothing designer (who was not a doll designer) and worked with an extremely talented staff to develop a market changing doll."   Expert Witness Report by Robert Tonner, February 8, 2008, p. 16.
[42] Discussions with Paula Garcia.
[43] I further understand that there is considerable dispute in this case about whether the drawings prepared by Mr. Bryant were prepared while Mr. Bryant was employed by Mattel and whether Mattel has some ownership interest in those drawings.   I am offering no opinion on this subject.   I also understand that the parties dispute whether the drawings are subject to copyright protection.   See Expert Report of Professor Peter S. Menell, February 10, 2008.
[44] See Deposition of Carter Bryant, November 5, 2004, p. 279-280.
[45] Based on discussions with Paula Garcia, for example, the portfolio drawings for one of Mr. Bryant's characters were so extreme as to look "gangster-like."

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**Exhibit 8**

# Expert Report of
# Dr. Erich Joachimsthaler

In the matter of

Carter Bryant v. Mattel and consolidated cases

February 11, 2008

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 8 PAGE 104

Entertainment is looser and more fluid than in larger companies that manages brands much like they manage financial assets using procedures, policies, guidelines and rules, for example. The more fluid system benefits from allowing decision making to be intuitive and creative not formal; fast-paced rather than lengthy with enormous time lapses; and less bureaucratic and hierarchical. It is my opinion that the success of Bratz in the market place had as much to do with the ideas around the brand as with the way it was managed proactively at MGA Entertainment. In the following section, I will describe my analysis of how MGA Entertainment built specific brand assets that together make up the strength of the Bratz brand. I also discuss how the Bratz brand has been built overtime through a powerful set of brand-building programs and marketing activities.

## C. The Strength of the Bratz Brand and its Development from 2001 until Today

63. The concept of *brand equity* emerged in the late 1980s and is based on the idea that a brand provides a quantifiable value to a company's success. This value is greater than the sum of its tangible assets (i.e., product, design and distribution capabilities). Brand equity is defined as the set of assets or liabilities that add or subtract from the value provided by a product or service.[97] The brand's equity – its ability to contribute to operation profit – is a function of its power to acquire and retain customers. It is a strategic variable to be built and enhanced by new innovations, advertising, promotions and other brand-building activities.

64. An assessment of a brand's equity focuses not just on any or all aspects of the brand but those that influence consumer response or brand performance in the market place. The most

---

[97] David A. Aaker, *Managing Brand Equity*, The Free Press, New York, NY 1991; David A. Aaker and Erich Joachimsthaler, *Brand Leadership: The Next Level of the Brand Revolution* , The Free Press, New York, NY 2000.

34

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 8 PAGE 105

commonly measure is the price premium, that is, the ability of a brand to charge a higher price than an unbranded equivalent charges.[98] While price premium may be a common measure of the outcome of brand equity, from a practical and a managerial perspective, it is important to decompose brand equity into the different components. David A. Aaker and I began to conceptualize these components of brand equity early on, as described in our book *Brand Leadership*. The conceptualization that we described in the book consists of at least five "asset dimensions:" awareness, associations, perceived quality, loyalty or affinity and other proprietary brand assets such as trade relationships.

*Awareness*

65. Brand awareness refers to the consumers' familiarity with the brand and its branding elements (*e.g.* name, logo, etc.). Awareness is an important asset dimension but not the most important; brands must have strong, favorable and unique associations with loyal customers to sustain brand strength. Without awareness, a brand would have little hope of establishing the other *asset dimensions* of brand strength. Therefore, awareness is a necessary but not sufficient element of brand strength. Awareness is generated through meaningful exposures to the brand. This can be achieved, for example, through advertising (TV, print, radio) or other forms or channels. Successful brand builders often utilize a variety of other brand-building programs such as complementary product offerings, giveaways, promotions, websites, point-of-purchase distribution, and tradeshows. Awareness or familiarity creates value because extant empirical research has shown "before one can like something they must

---

[98] David A. Aaker, *Managing Brand Equity*, The Free Press, New York, NY 1991; David A. Aaker, *Building Strong Brands*, New York, NY, The Free Press, 1996; Erich Joachimsthaler and Paul Green (1994), "Conjoint Analysis Takes the Guess Work Out of Pharmaceutical Marketing Decisions," *IESE Publication No.: MN-284* and also Manjoy K. Agarwal and Vithala Rao (1996), "An Empirical Comparison of Consumer-Based Measures of Brand Equity, *Marketing Letters*, 7 (3), 237-47.

35

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 8 PAGE 106

be aware of it and have assessed some critical attributes".[99] Awareness and familiarity also makes future brand-building efforts more effective and less costly.

66. MGA Entertainment uses traditional awareness-building programs to promote the Bratz brand to consumers. The brand was initially introduced through television commercials in the fall of 2001 using a media budget of $2.5 million and has been promoted on an on-going basis since then.[100] The early commercials seemed to hit the mark as research on Bratz concluded: "[Bratz advertising appeared to] be on target with attitude, a passion for fashion and intrusive techniques."[101] In a departure from traditional doll advertising, media content included aspirational girl settings, interactions with live talent (featuring boys) and the Bratz featured as a group of friends rather than one start doll.[102] These techniques were the beginning to showcasing the Bratz dolls and their "strong accessories."[103] Other brand-building programs included (a) print media with Nickelodeon magazine, popular among tweens, printing stories about the dolls, and the Bratz Magazine, launched in 2005, distributed in the UK, Australia and New Zealand, winning the best-selling award in the UK.[104]; (b) radio with the broadcasting of a youth-focused satellite radio with regular on-air giveaways; (c) CDs released by Universal Music; (d) television and the movies with a brand new TV series launched in 2001 and the Bratz Movie "Bratz Passion 4 Fashion Diamondz" released in September 26, 2006; and finally (e) interactive media with a video game and the numerous websites and online communities featuring Bratz, such as the Be-Bratz.com,

---

[99] Robert B. Zajonc (1980), Feeling and Thinking: Preferences Need No Inferences, *American Psychologist*, 35(February), 151-171.
[100] ABC International Traders, Inc., Business Plan Copy #1, March 2001, MGA 0047162
[101] The Bratz Brief, November 14, 2003, M 0079765 at M0079769
[102] 2003/2004 Mattel Girls Toys Competitive, MGA Entertainment, O&M 000001
[103] Brand Comparison Chart, M 0065305
[104] Bratz press release, "Bratz Magazine Wins Best Sellers Award For Best ABC Debut in the United Kingdom", February 27, 2007.

CONFIDENTIAL – ATTORNEY'S ONLY

EXHIBIT 8 PAGE 107

launched in 2007, where girls can read about and interact with their doll in cyberspace. All of these brand-building activities contributed to the creation of a "Bratz world" that extended far beyond merely the doll.[105]

67. In addition to specific brand-building programs, the physical presence of the Bratz doll on shelves contributes to its high awareness.  The packaging and store displays create awareness by introducing clear messages, unique shapes and specific bright colors.[106]  The type of package for a toy product is important, giving impetus to many toy companies to invest in initiatives designed to drive sales momentum, such as more "open packaging."[107]  Bratz has taken an "innovative" approach, with "unique pyramid shape" packaging.[108]  The packaging's clear structure allows for almost the entire product to be seen on all sides and lets the doll and the accessories to shine through.  Furthermore, "the Bratz front packaging has more callouts than My Scene and always has a handle."[109]  Although the use of a handle on a package seems like a small feature, it makes a big difference with the young consumer.  Focus groups have shown that young girls "are more attracted to structures with furry handles", giving the girls storage capability and portability."[110]  Bratz's packaging has, in fact, garnered several awards:  *Create Magazine*'s Editor's Pick Winner for best packaging for Bratz Genie Magic and Bratz Rodeo.

68. In addition to the design of the package, the placement and order in the aisles is also essential.   The packages are lined from smaller to bigger sizes and allow for systematic decision-making and hanging displays make it easier to differentiate the products and create

---

[105] My Scene Competitive Overview, August 27, 2003, M 0082139
[106] Competitive Overview, August 27, 2003, M 0072014
[107] Mattel 10K filed March 8, 2005 at 23
[108] *Ibid*
[109] My Scene vs. Bratz Dolls, Competitive Analysis and Recommendations, M 0086622
[110] Mattel Worldwide Consumer Research 2004, My Scene waves B & C, Focus Group Report, October 13, 2003 M 0747909

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 8 PAGE 108

a visual flow from segment to segment.[111]   The bright, metallic colors of the consistent shelf tags, wallpaper, and packaging of the Bratz dolls enhance their edgy and trendy personalities, and create strong impact at the shelf.  In fact, Mattel talks about the need to change their packaging strategy[112] and color palette and structure[113] because it is not sufficiently "hip/cool/edgy".[114]  Other doll brands argue that packaging is an important element on which they have to work harder in order to match Bratz.[115]  By extending the Bratz branding to the store shelves, MGA Entertainment has created a whole consumer experience.

69. The Bratz dolls have achieved high awareness, especially among tweens. Global awareness tests in 2006 and 2007 indicate that the Bratz dolls hold an average of 60% unaided awareness worldwide and 71% in the US, as opposed to My Scene Barbie that averages 21% worldwide and 20% in U.S. Research shows that in 2006 girls held the Bratz brand in strong position as second most top-of-mind doll, especially in Spain, U.K., and Canada and in 2007 Bratz dolls were the most top-of-mind in the UK and Canada.[116]  In a 2006 survey conducted for MGA Entertainment, 50% of girls said they played with Barbie and 50% of girls said they played with Bratz dolls.  Furthermore, the Bratz brand in 2006 was the second best known among mothers internationally[117]

70. As I said before, achieving awareness is an important step in creating brand equity, but it is not enough.  The insurance company *Aflac* is a case that illustrates this important fact. The company uses a duck as a brand character which pronounces the word Aflac in advertising in

---

[111] Barbie Retail Experience, M0065511
[112] The house is on fire! Packaging Improvements to Save Barbie M0082011
[113] My Scene Competitive Overview, August 27, 2003, M 0082139
[114] Barbie Retail Experience M 0065497
[115] My Scene Go Forward Strategy M 0085691
[116] Bratz International A&U US, UK, & Canada, November 2007, pg. 65 MGA 3823970; Bratz International A&U December 2006 study, MGA 0295483
[117] A&U December 2006 study p. 35 – 64 MGA 0295483

38

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 8 PAGE 109

a unique tone of voice. The company has reported phenomenal 85% brand awareness associated with this symbol. However, while many consumers know the duck and know the sounds of the Aflac name, they still do not know what products or services the company offers or what the company stands for. This creates a situation where there is a lot of familiarity and awareness but not real brand equity because awareness does not translate to additional sales.[118]

### Associations

71. A second fundamental asset dimension of a brand is for it to have strong, favorable and unique brand associations. Brand associations are anything 'linked' in memory to the brand.[119] An association can be a visual image (Ronald McDonald for *McDonald's*), a feature (*iPod*'s distinctive design and use of color), an attribute (*Volvo*'s safety), a gesture (*Allstate*'s hand gesture associated with the tagline: You are in good hands with *Allstate*), or a benefit (*Crest*'s cavity prevention). Such associations form the core of how consumers evaluate a brand on an ongoing basis. A brand has value when the associations that consumers hold about the brand are strong, favorable, and unique.[120]

72. The Bratz brand has achieved strong, meaningful associations amongst girls and mothers. According to an A&U study conducted in 2006 with tween girls and their mothers, Bratz is considered the "coolest-looking" and most fashionable doll when compared to Barbie, Mary-Kate and Ashley, Jam 'n Glam, and Fashion Polly. Among the positive associations, Bratz were seen as fashionable, cool, and fun or exciting.[121] Furthermore, in the 2007 A&U Study,

---

[118] Lisa Sanders, "CMO Says: Shut the Duck Up", *Advertising Age*, February 19, 2007.
[119] David A. Aaker, *Managing Brand Equity*, New York, NY, The Free Press, 1991.
[120] Kevin Lane Keller, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, Third Edition, Pearson Prentice Hall, Upper Saddle River, NJ, 2008.
[121] Bratz International A&U Tracking Study, 2006, Prepared by C&R Research. MGA 0295483

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 8  PAGE 110

justify their purchase[216] I also discussed the issue of gifting. Because the purchase is some times a gift purchase, it is my experience that this also increases the price premium.

118.    Fashion and dolls are affordable luxuries. An important trend in today's society is the growing expectations of consumers. All consumers seek luxuries. It is also called the mass-tige concept, a word comprised of mass and prestige. This trend has been rampant over the years and has affected every category of the business, ranging from beauty to fashion to coffee.[217] Starbucks is a quintessential example of this trend where consumers today are willing to pay $4 for a coffee that used to essentially cost a few cents to produce. Fashion dolls are an affordable luxury for parents. I believe every parent in this country has $20 in the pocket for a doll for their own child, every day of the week – even in the recession! This massive trend toward seeking reward and pleasure through buying affordable luxuries drives the price premium for fashion dolls up.

119.    Absent of extensive empirical research, it is difficult to put a precise estimate of the price premium of Bratz. However, I believe that my analysis of the strength of the Bratz brand, the role of the brand in consumer decision making and the specific analyses of the price premium, it is reasonable to estimate a range of price premiums for Bratz. I conclude that the price premium that the Bratz brand can realize over an unbranded equivalent ranges from 50% to 70%.

**F. The Responses of Mattel and MGA Entertainment to a Changing Toy Industry and the Root Causes of the Growth of the Bratz Brand**

---

[216] The Bratz Brief, p. 5 M0079765
[217] Michael Silverstein, *Trading Up: The New American Luxury*, Portfolio, 2005

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT  8  PAGE 111

**Exhibit 9**

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

## Case No. CV 05-02727

Expert Report of Robert Tonner

February 11, 2008

CONFIDENTIAL -- ATTORNEYS EYES ONLY

**Expert Witness Report**
**By Robert Tonner**

The Lawyers for MGA contacted me in late summer of 2007 about a lawsuit between Mattel and MGA. I have never testified as an expert witness in any other case and I am being paid for my time spent on this case in the amount of $250.00 per hour.

Naturally, being a doll manufacturer, I've known about MGA and Mattel and their products for many years and I've had the opportunity to meet a few of the Mattel designers over the years. Ann Driskill (who, I believe, is a project manager at Mattel) and I worked together for a short time on Seventh Avenue. I've never done any business with Mattel, although they put in an offer to buy my company in 1999. (I turned them down.) Although in my travels over the years in the doll/toy worlds I might have met people who worked at MGA, I don't recall ever meeting either Mr. Bryant or Mr. Larian.

## Published Articles

1) *DOLLS* article about personal inspiration, 2003
2) *Haute Doll* article about the history Fashion Toni dolls, Oct 2005
3) *Haute Doll* article about early fashion dolls, 2004
4) Wrote "Robert Tonner Inspirations" 2006 (book)

## Biography

I was born and raised in Bluffton, Indiana, and even as a small child I had an interest in fashion dolls.

After three years of college I left for New York City in 1973. I received a full scholarship to attend Parsons School of Design to study fashion design. I graduated from Parsons in 1975 with a Bachelor of Fine Arts degree.

After graduating from Parsons, I worked in the garment center in New York City as a fashion designer. I had a great career in the market that spanned eighteen years. Of those eighteen, I was a designer for Blassport, the sportswear division of Bill Blass, for eight years. During my time in the garment center I also did a line of clothing under my own label. In addition to designing, I taught a fashion design class at Parsons, part time, for three years in the early 1980's.

I started sculpting as a hobby around 1981 or 1982 and soon started sculpting dolls. At that time, I sought out and found doll making and collecting organizations. I joined the Manhattan Toy and Doll Collectors Club in the late seventies and became President in the mid-eighties. During the eighties, I continued my sculpting and made one-of-a-kind dolls at nights and on weekends. I was elected into the National Institute of American Doll Artists in 1988 and I spent four years (1991-1995) as standards chairman and two years as President (1995 to 1997).

After tiring of the garment center in the late eighties, I left to start my own doll company, Robert Tonner Doll Design, in 1991 and showed my first line at New York City's Toy Fair in February, 1992.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

As I built my company in the 1990's, I also did freelance design work for other manufacturers. I sculpted a doll for Madame Alexander in 1992 and designed and sculpted The Magic Attic dolls for the Georgetown Collection in 1995.

Robert Tonner Doll Design eventually became Tonner Doll Company Inc. and my company is considered a leader the field of collectible dolls. During the past sixteen years, I have won many awards and received acknowledgement from the doll and collectible industries.

- "Little Girl in a Duffle Coat" and porcelain Superman chosen for the permanent collection of the Museum of Decorative Arts at the Louvre in Paris.
- Peoples Choice Award, Disney Doll and Teddy Convention, 1999
- *The Robert Tonner Story, Dolls and Dreams*, published by Portfolio Press, 2000
- Modern Doll Convention, Lifetime Achievement Award, 2002
- United Federation of Doll Clubs Philanthropic Award, 2003
- Tonner department opens in FAO Schwarz in New York, Las Vagas, 2004
- Collectors United Industry Leadership Award, 2006
- Jones Publishing Crystal Award for Industry Leadership, 2007
- Cover stories and/or articles about my work in *DOLLS* Magazine, *Doll Reader, Contemporary Doll Collector, Doll Castel News, Disneyana, Toy Fair, Doll UK, UFDC Doll News, Mune Cas* (Spain), *Action Figure Digest, Fashion Doll Quarterly, Haute doll, Playthings, Toy Fare*, and *Toy Book*.
- Coverage in mainstream press: *People, Newsweek* and *The New York Times*
- Since 1993 I have received over fifty awards from the industry's top collector magazines, *DOLLS* and *Doll Reader* (DOTY Award and DOLLS Award of Excellence)
- Opened Tonner Company Store, our first retail store, December 2007.

In addition to industry acknowledgement for my design work, I am also well known for my charity work with dolls. In 1996, I conceptualized Dolls Have Heart, a gala event benefiting AmFar. Demi Moore hosted and the event raised over $350,000.00. Tonner Fashion dolls were dressed by every famous designer working at the time and auctioned at the event. I used the template for the AmFar event in London benefiting Action on Addiction. As a result of our donations, I have appeared on the Today show during their annual Toy Drive for the past seven years.

I was asked to be the keynote speaker at IDEX, an industry trade show, in 2004. I gave my speech, "Observations of a Reluctant Businessman".

**Why I Am Considered an Expert Witness**
Over the years, I have become an historian of the modern fashion doll, in part because I lived though it. As a small child, I was very aware of the fashion dolls on the shelves of the toy stores (also in that day, the dime store and hardware stores). Growing up, I paid attention to the dolls being produced and the companies producing them. During high school, I was less interested but my interest in dolls returned shortly after I graduated from college. As my desire to make dolls developed, I started collecting fashion dolls (with a focus on Barbie) and studied their history and eventually began researching dolls that represent a fashion figure in the modern period. Over the past few years I have been asked to speak on the history of the modern fashion doll numerous times by various doll clubs and organizations.

2

CONFIDENTIAL –
ATTORNEYS EYES ONLY

I define the modern fashion doll as "made of plastic with a sculpted bust and a
sculpted high heeled foot, dressed in teenage or adult fashion."

## Unique Qualifications

*I know how a doll is made.* Although there are other doll artists who have developed
companies in the past, Tonner Doll Company Inc. is probably the most well known artist-
run company currently. I am a doll sculptor and I have designed dolls from start to
finish. I have finished waxes to ready the sculpt for the mold making process. I have
engineered joints. I have first hand experience in mold making, casting and firing of
porcelain dolls. My company sells or has sold dolls made of porcelain and rotational and
injection molded plastics. I've overseen production in the US and in the Far East
(China). I know the intricacies of clothing design and fabrics (18 years of fashion design
in New York City) and can and have made clothing patterns and first samples for dolls. I
have knowledge of the wig and hair fibers that are currently used on dolls and I have
styled and designed rooting patterns for doll production. I've made doll shoes. I have
created packaging design for our dolls.

*I have designed dolls for both the collectible and mass markets.* Although the main
focus of my doll career has been in the collectible market, I have designed dolls for
children. In 1986, I did freelance doll clothing design for Coleco, makers of the Cabbage
Patch dolls. For the Georgetown Collection in the mid 90's, I designed and sculpted the
Magic Attic dolls created as a competitor of the American Girl doll. For Tonner Doll
Company, I designed and sculpted a princess doll for the mass market to coincide with
the movie "Ella Enchanted".

*I have worked with and know many doll designers.* In addition to my extensive
knowledge of commercial doll making, I have worked with many doll artists. For the
Tonner Doll Company, I work with outside doll designers and sculptors. I was standards
chairman for the National Institute of American Doll Artists ("NIADA"), a forty year old
doll artist organization, considered one of the most prestigious in the world. My
responsibility was to screen applicants for admission by judging their work in portfolio
form. Admission standards to NIADA are very high; out of the dozens of applicants each
year only a very few made it in. I was also President of NIADA for two years, and I am
still a member.

*I know the doll business.* The Tonner Doll Company Inc. is almost seventeen years
old and is arguably one of most successful in the field.

*I am considered an expert on modern fashion doll history.* Although there are many
artists who have started their own companies, few, if any have grown their company to
the size of the Tonner Doll Company Inc. Fewer still, if any, know fashion doll history
as I do. In addition, while there may be doll historians who have as much or more
knowledge of the modern fashion doll, I know of no other who also manufactures dolls.
I am often asked to speak to industry and collector groups on the subject.

*I am considered an expert because of my unique mix of knowledge and experience.*

3

CONFIDENTIAL –
ATTORNEYS EYES ONLY

**Company History**

After three years and three different colleges as a pre-med student, I moved to New York City in 1973 to finish my college education at Parsons School of Design under full scholarship. I graduated in 1975 at the top of my class and immediately went to work on Seventh Avenue in New York—the hub of American fashion design. After three years as an assistant to an up-and-coming designer, I was hired by Bill Blass to head up his sportswear division, Blassport. I was thrilled to be there and did very well. About six years later, I was hired away to start a line under my own name. The line was well received, but under-capitalized. I then worked for the Leslie Fay Company designing sportswear, and eventually went back to Blass. After eighteen years in fashion, I felt it was time for a change.

I started sculpting as a hobby in the early eighties always with the goal in mind of designing a doll. I finished my first doll in 1983 and although I was working in an intense business (fashion design) at the time, I spent much of my free time at night and on weekends developing my skills.

By the late eighties I was in my mid-thirties and was tired of working for other people—I felt I was no longer doing work that I was really proud of. Designing to please a boss or store buyers was starting become less and less tolerable. So, in 1991, I left the garment center and moved to upstate New York to start my new business. Although it had crossed my mind to start a clothing business, my real passion was dolls.

I taught myself how to make molds and cast porcelain, and once I was accomplished enough, I felt I had the knowledge to start the doll business.

I started my Company in the spring of 1991 with the thought of showing my dolls at the International Toy Fair in New York City in February, 1992. I did accomplish that goal—I brought a line of 12 porcelain dolls that I had made myself. I booked just a little over $100,000 in sales during the five day show. I considered Toy Fair a great success and began to build my business. I hired part-time help in the beginning and added full time help by 1994.

Although at the time my porcelain dolls were popular, the expense of the dolls ($250 to $1500) limited the market I could reach. By 1993, I was experimenting with vinyl and produced my first vinyl doll. Using vinyl, I was able to lower the price of the doll as well as make it more "playable".

In 1993 I added "Alice in Wonderland" to my line. The character is in the public domain and I quickly realized how much a famous name could help my sales. This realization prompted me to look at licensing other well known characters. We were too small for the big studios to take seriously, so I looked for characters that had been overlooked or put aside. I found two: Betsy McCall, a beloved character from McCall's magazine during the 50's and 60's, and Little Orphan Annie. Annie dolls had been produced in the past, but had never done well for larger toy companies. However, both dolls did well for us and I have included licensed products on the line since.

With the Betsy McCall doll, I reluctantly took production over to China. Although we had grown at a great pace, we were still a small company and dealing with the Far East

4

CONFIDENTIAL –
ATTORNEYS EYES ONLY

was intimidating. As it turned out, it was to be one of the best moves I've made. My dolls could be produced at competitive prices.

Nineteen ninety nine was a tremendous year for Tonner Doll Company. I introduced the doll that I had wanted to make since I started making dolls. The doll was named Tyler Wentworth and she was a 16 inch vinyl and hard plastic fashion doll with a story line inspired by my years as a fashion designer. The sale of those dolls changed the company overnight. Sales tripled and Tonner Doll became one of the leading collectible doll companies in the United States.

As my company became more successful, I added to my licensed products with Star Wars from Lucas Films and Titanic dolls from Universal. However, the next big breakthrough for my company was when we were granted the license for Harry Potter from Warner Brothers. Although Harry Potter dolls had been produced by Mattel and tested by Madame Alexander, my understanding was that the dolls did not perform for those companies. After the first two or three films, Warner Brothers was willing to try my lesser known company. Our Harry Potter dolls were a hit for us and that success led to licensing deals with Warner Brothers for the Wizard of Oz, Gone With the Wind and DC Comic heroes such as Wonder Woman and Superman. We were offered Disney lines such as Pirates of the Caribbean and Narnia, along with the classic properties such as Mary Poppins and Sleeping Beauty. Marvel licensed Spiderman to us and we are currently working on New Line Cinema's Golden Compass.

In 2002 I purchased the Effanbee Doll Company out of bankruptcy. Effanbee had existed since 1910 and remains a venerable contributor to the doll industry.

In 2006, I formed Wilde Imagination, a direct marketing company that currently sells a unique line of collectible dolls directly to consumers via e-commerce and mail order. **(Exhibit #1, Tonner Company Products)**


### A Condensed History of the Modern Fashion Doll

The American doll industry is relatively young. During the late nineteenth century, a majority of doll manufacturing was done in Europe, with Germany and France as industry leaders. Most doll heads were made of porcelain or papier-mâché with composition or wooden bodies. The dolls that originated in France were known for their exquisitely sculpted faces; the dolls were highly stylized and could be very expensive. The German doll manufacturers became competitive with France when they later introduced real looking (rather than stylized) dolls into the market.

At the time, American doll manufacturing was almost nonexistent. The majority of dolls were imported from Europe. A few companies did produce dolls at the time, but even fewer did their own sculpting. Doll heads and bodies would often be brought in from Europe to be dressed and sold in America.

However, all this changed during WWI. Importing from Europe became more and more difficult, so toy and novelty companies began to look to produce their own designs. The early American dolls looked similar to their European counterparts, but soon, the American-made dolls took on a look and direction of their own that dominated doll making for decades.

CONFIDENTIAL – ATTORNEYS EYES ONLY

Because of the shortage of dolls during WWI, new doll companies were born. Effanbee and Ideal were probably the best known and Effanbee is still in existence today.

Around 1912, the use of composition became the most popular material for doll making. Made of wood pulp, glues and fillers, it was considered more durable for doll making than the previous porcelain.

During the second decade of the twentieth century highly stylized character dolls were popular. Dolls such as Raggedy Ann, The Campbell Kids and Kewpies did well for their manufacturers. Effanbee produced some of the first "Mama" dolls starting in 1918. The dolls were so named because of a simple voice box that said "mama" when the doll was hugged or rocked.

In the twenties, doll manufacturing in America became a thriving business. The Bye-Lo Baby was extremely popular. Made to look like a real newborn baby, the doll was revolutionary for its time. During the latter part of the decade, the Effanbee doll Company introduced Patsy, a fourteen inch composition doll, who is generally considered to be the first with an extensive wardrobe and accessories.

During this period, the only doll that could be considered a fashion doll representing an adult was the boudoir doll. Made by various companies, they were very long and very thin and were used and sold more as decorations for the bedroom or parlor rather than as toys.

The 1930's was a decade of celebrity dolls. The Shirley Temple doll by Ideal dominated toy shelves, and the licensed characters such as dolls from Gone With the Wind, Snow White and The Wizard of OZ were the best sellers. Baby dolls remained very popular. Effanbee followed up on the success of their Patsy with the Dy-Dee Baby, a doll that could wet her diaper. The forties bought huge changes to the doll world. The technical advances and especially the use of plastics during WWII changed the way dolls were made from then on. Near the end of the decade, nearly all dolls brought to market were made of plastics. In the early fifties, economically, America was doing very well and the parents of the baby boomers had more disposable income than ever before. The toy industry boomed.

Fashion dolls were almost nonexistent during the first half of the last century. The dolls produced before 1950, with a very few exceptions, were dolls representing babies or girls. Doll play seemed to be geared toward "nurturing" or "playmate" type of play patterns. After 1950 a new type of play pattern emerged and girls began to look to the future and aspirational play became popular—hence the advent of fashion dolls.

Sensing a market for a doll body that represented an adult female, Madame Alexander developed her Cissy doll in 1955. Cissy was unique in the doll world because of two things; her adult-like sculpted bust line and her permanently arched feet that were meant to accommodate high heeled shoes. The doll was revolutionary and the "inspired by" dolls entered the market in 1956. Almost every company had their versions of the adult fashion doll, with the Ideal Toy Company the most successful with their Revlon Doll. At the time, if a doll was successful, the company would produce the doll in numerous sizes. The most popular sizes of these dolls were the 10" and the 18" sizes. Hundreds of different fashion doll styles were introduced into the marketplace in the next few years and while baby dolls and child dolls were still around, the fashion doll rained supreme.

In 1959, Mattel introduced their truly groundbreaking doll, Barbie. Ruth Handler and her husband Elliot started making toys around 1945. In the mid-fifties Ruth Handler,

6

CONFIDENTIAL –
ATTORNEYS EYES ONLY

inspired by watching her daughter, Barbie, play with grown up paper dolls, convinced her husband to develop a very grown up fashion doll. The Barbie sculpt was inspired by Lilli, a character in a German newspaper. As the story goes, Lilli was sculpted to be a sort of "naughty" toy for grown men and was sold in tobacco shops and bars. Although Lilli's look was slightly softened for Barbie, Mattel's market research confirmed that mothers hated the doll but little girls loved her. Ruth Handler decided to bet on the girls. Unique television advertising (on the Mickey Mouse Club) made Barbie the hottest doll around. It would be three years before Mattel's production of the doll would catch up with the demand.

For the competing companies at that time, mainly Ideal and American Character, it was business as usual. Barbie was certainly popular, so they decided to react as they always had—they would develop their own fashion dolls. At the time, Ideal was the biggest doll company; it had many popular dolls, such as Shirley Temple and Patty Playpal. The Revlon doll was no longer selling, so Ideal first tried a Barbie knockoff, Mitzi. Mitzi had a look similar to Barbie, but she was not nearly as well made. Girls could tell the difference and stayed away from the doll. Ideal then tried a 16" doll called Jackie; it had Barbie proportions, but again, it could not compete. In 1962, Ideal tried again to go after Barbie with Tammy. The Tammy doll had a much less developed body (more like a young teen than an adult woman) and was allegedly in answer to parents concerns about Barbie's more mature shape. Tammy did rather well for the first couple of years but by 1966 she was all but off the shelves. During this period, due to superior design, marketing and manufacturing, not a single company could compete with Mattel in the fashion doll world.

During the seventies and eighties, many companies tried to compete with Barbie with various strategies. In 1985, Hasbro introduced Jem. Jem was aimed at the Barbie audience and was introduced with a fully formed world. She had a somewhat unique look (although she still had a Barbie "feel") and an unusual story line about a rock band; she even had Saturday morning cartoons to enhance and promote the product. However, within that same year, Mattel introduced its Barbie and the Rockers line with a similar rock music focus. Barbie again won the battle. Hasbro countered a year or so later with its very tame Maxi doll. Maxi had the feel of a bland Barbie and didn't last.

In the 1980's there was a boom in doll collecting. Baby boomers started to take another look at the dolls they grew up with, and were interested in having those dolls again. Mattel and Madame Alexander benefited from this new view of their products; more and more adults started collecting dolls. Collectors were open to all kinds of new products and small doll companies sprang up seemingly overnight.

The fashion doll industry changed drastically in the 1990's. Collectors looked for alternatives to Barbie and found it in Aston Drake's Gene doll. Although Gene owed a lot to the original Barbie marketing, it was not a Barbie look-a-like—Gene was 16" tall and had her own stylized face. Collectors loved the doll and many gave up Barbie collecting for Gene. Gene's character was a glamorous movie star—Mattel countered with their Barbie Hollywood Movie Star collection. In 1999 Tonner Doll entered the fashion doll market with Tyler Wentworth (she's a fashion designer) and an extensive wardrobe. Again, collectors responded well and this time Mattel's response was its Silkstone Fashion Designer Barbie. She was a vintage looking doll with high fashion clothing.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

The marketplace was changing.  Collectors were looking for something more than Barbie and the toy market gave them multiple new choices.
**(Exhibit #2, Samples of Dolls from Fashion Doll History)**


## Bratz versus Barbie

I've always enjoyed checking out the new dolls in the toy aisles, and of course, I've known about the Bratz dolls since 2001.  I remember seeing the product in the stores and what caught my eye was its great packaging and design.  I was also intrigued by the proportions of the doll.

I began to hear of a "feud" between Barbie and Bratz (or Mattel and MGA) some time later.  And, I can't say I was surprised when I first heard that Mattel was "not happy" about the Bratz doll.  Barbie was and had been the number one fashion doll for decades, and she did not take kindly to new dolls in her fashion doll aisle.

When I was contacted by lawyers for MGA in the summer of 2007, I learned that there were legal issues pertaining to Carter Bryant and his creation of the Bratz line.  I have no in-house lawyer; actually, I try to stay away from lawyers.  However, because of my interest in the fashion doll industry, I was intrigued.  Once I came to understand what the case was about I agreed to testify as an expert on behalf of MGA.  I have great respect for Mattel—it's a great company; however, after hearing Mr. Bryant's story about the creation of the Bratz line, his story rang true to me.  I have had the opportunity to read Mr. Bryant's deposition and I have been asked to comment on Mr. Bryant's story about how he came up with the idea for Bratz, as well as the role that MGA played.


## "Inspired by" or "copying"

In toy design, as in fashion design, new, commercial ideas are highly coveted and valuable things.  True, breakout, market-changing ideas are rare.

There is a long history in the toy industry of dolls that were "inspired by" or, in some cases, downright copied.  With every hit doll, imitations were on the store shelves in a short amount of time.  An early example of a doll that inspired many imitations was the Shirley Temple doll from Ideal.  When the doll came out in the 30's, there were imitations on the shelves within a few months.  At times, these imitators were sculpted by the same artist who did the original.  **(Exhibit #3, Shirley Temple)**  Rarely did a copy hurt the original.  In the case of the Shirley Temple doll, Ideal had the right to the name— no other company did, so they definitely had the advantage.

The American doll industry was born in and around New York City.  Practically all the manufacturers worked with the same vendors.  The vinyl and plastic factories worked with a number of competing doll companies. At times, the plastic molding company would have a body sculpt created and sell it to a number of different doll makers.  Heads were usually proprietary, but not always.  With overlapping resources and vendors, it was difficult, at best, to keep secrets.  At that time, manufacturers accepted this fact and unless a doll was a line-for-line copy, they looked the other way.  A company was able to differentiate itself from others by hair and clothing design and/or unique gimmicks.

8

CONFIDENTIAL –
ATTORNEYS EYES ONLY

This accepted way of doing business changed in 1959 with Mattel. Mattel took its production overseas and, because it was in California, was able to better protect its ideas. The competing companies at the time, such as Ideal, did respond as they always had and made dolls to compete with the new star doll, Barbie. Many tries later, Ideal succumbed to Mattel's superior design and marketing. Ideal was not the only one. Competitor after competitor closed its door when they could no longer compete with the Barbie machine.

Dolls that change the direction of the category are rare. Mattel, with Barbie changed the way fashion dolls looked and with that change, took over the market. In one of the rarest moves in modern doll history, Mattel followed Barbie with another groundbreaking doll—Chatty Cathy. Chatty Cathy was an 18" doll who could "speak". The gimmick was great but the real change was the look of the doll. She looked like a real little girl; she had slightly protruding teeth, freckles and a natural lip color. This was revolutionary in mass market dolls. Over the next few decades there were few, if any, dolls that were true breakouts. The one that does come to mind is the Cabbage Patch line of dolls. And then Bratz. **(Exhibit #4, Milestone Dolls)**

## Design Inspiration

During my days in the fashion business I was asked many times by people who weren't in the business, just how designers all come up with the same ideas at the same time. For example, if all the designers raised or lowered hemlines simultaneously, it would look to an outsider as if all the designers got together to make these decisions. Of course, that never happened. Fashion designers, just like toy designers, are exposed to the same set of cultural influences. They all watch television, listen to music, see movies, see or listen to the news, pay attention to all popular culture, and they usually watch what the competition is doing.

The same is true for doll design. A good doll designer needs to know what's going on in the world. A doll designer, especially one working in the mass market, must also be able to anticipate what children and collectors are going to want. This ability to anticipate potential desire for a product is what good design is all about.

Just as fashion designers create similar products at the same time, doll designers do also. A recent example of "great minds thinking alike" happened just this past year. The Madame Alexander Doll Company used their 21 inch fashion doll, Cissy, as a pirate. A few months later, Barbie did The Pirate Barbie Doll, and at the Tonner Doll Company, we will show our pirate doll at Toy Fair this year. All three companies are showing pirate fashion dolls at about the same time because that is what we all hear about. The Pirates of the Caribbean movie was a huge hit. Did Mattel copy Madame Alexander? Did we copy either one? I wouldn't presume to answer the first question, but we didn't need to copy anyone. We knew that a pirate doll was the right thing to do at this time in fashion and I assume the Mattel designers knew it too. The pirate dolls are just one example of many. **(Exhibit #5, Pirates)**

In 1998, when Mr. Bryant said that he came up with the idea for the Bratz dolls, there were a lot of changes happening in the fashion world as well as in the doll world. Fashion for teenagers and young adults was originating on the street. Kids would put together what they thought was "cool" and many times it had nothing to do with the fashion design originating in the fashion capitals. Seventh Avenue was starting to bring

CONFIDENTIAL –
ATTORNEYS EYES ONLY