the pant silhouette closer to the body, but on the street, kids bought and wore bigger and bigger jeans and pants. The rejection of dictated fashion gave the kids on the street a unique look.

Shoes and boots at that time were big and clunky, and models were photographed in such a way as to exaggerate the look. Hair styles were all over the place, from short cuts to long straight or curly hair. The young women in the magazines and on the runways were becoming thinner and thinner. Because of the "shrinking" body of the models, their heads and feet tended to seem bigger. The fashion proportion was changing.

The new fashion proportion was picked up not just in the fashion magazines, but also in the ads in those magazines. Most notably were the Steve Madden ads in which, at first, illustrations would be drawn with oversized feet and heads, and later real models would be digitally altered to have extremely oversized heads and feet and a tiny, shrunken body. The Steve Madden ads weren't the only ads to use this new proportion. In the *Seventeen* magazine issue that Mr. Bryant references as an inspiration for Bratz, there were many ads that had the proportion of Mr. Bryant's original sketches for the dolls. In that same *Seventeen* magazine, the Paris Blues jeans ad could have been mistaken for an early Bratz drawing. Coke also used an illustration in its advertising that had this same new look. **(Exhibit #6, 1998 *Seventeen Magazine*)**

Whereas I know for a fact that fashion designers don't get together to plan what's going to be the new look of the season, I'm also reasonably sure that the ad agencies don't get together either so they can make similar ads. They all sense what's in the air and respond in their art work, using the pop cultural references that they've been exposed to.

The exaggerated proportion of a large head, big feet and tiny body was very much in the public awareness in 1998. Mr. Bryant did not invent this proportion; he just acknowledged or pointed it out in his drawings.

As a doll designer, you couldn't help but notice this proportion—I did. I recognized it and thought it would make a great doll shape—I just didn't have the resources at the time to do anything about it. I would have been greatly surprised if all of the talented doll designers out there weren't aware of this new proportion and thinking the same thing.

In conjunction with this new fashion proportion there was an emerging new, young attitude. Hip-Hop bands and girl group rock bands, such as The Spice Girls, were extremely popular. The young women in these groups were edgier and more "in your face", and they were being covered in the teen magazines. **(Exhibit #7, Spice Girls and Dixie Chicks)**

Edgy, in your face pop culture celebrities were very much in the public awareness. Mr. Bryant did not invent this attitude; again, he just acknowledged and brought attention to it in his drawings.

## Components of Doll Design

### The Idea

Direction changing doll ideas are almost always the inspiration of single person. Ruth Handler, the creator of Barbie, is a perfect example. She did not invent the fashion doll, she did not invent high fashion paper dolls—she didn't even invent the "look" of Barbie.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

What Ms. Handler did was to take the cultural elements around her and put them together in a unique way. It was the idea that was unique—not the doll.

The same example can be made of another Mattel product, American Girl. The American Girl doll was the concept of Pleasant Roland, founder of the Pleasant Company. Ms. Roland created an extremely successful company by putting together elements that were in the public awareness in a relatively new way. Ms. Roland took a German designed doll that had been around for a few years, coupled it with books and extra clothing and accessories and sold it through catalogues. None of the products that were designed for American Girl were unique. Dolls with books had been around for decades (Raggedy Ann) as were dolls with extra outfits and accessories (Patsy, Ginny and Barbie). Catalogue marketing was certainly nothing new in the late eighties. However, all these elements were put together in an uncommon and extremely tasteful way. So again, it was the idea (in this case, marketing) that was unique, not the doll.

Mr. Bryant tells much the same kind of story as did Ruth Handler. He knew about the current styles. He knew of the "modern" attitude of the current teenage girl. Just as Ruth Handler described her dawning awareness of the play patterns of her daughter, Mr. Bryant described his moment of "ah hah!" when, after seeing the teens in the school yard with all their attitude, he came up with the name for his idea, Bratz.

This is the way a new idea happens. It is a "perfect storm" of cultural influences and inspiration.

<u>Presenting the Idea</u>

A new idea has to be conveyed to the persons who can fund the development and get a doll out into the public. I understand that Mattel designers occasionally present tear sheets (pictures from magazines) to their project managers or design directors to communicate the idea of a new look (whether it's for a doll face or an outfit). I'm sure some Mattel designers sketch, and I can imagine those designers showing another manufacturer's doll as an example to get an idea across—all these methods are used. Mr. Bryant happens to be a gifted artist. The way he was able to present his idea was through an illustration. The illustration was not a schematic—it was not a technical drawing. Mr. Bryant's drawing of the Bratz characters was his way of communicating an idea; in essence, he drew a "tear sheet".

Mr. Bryant communicated the attitude for his characters with his illustrations. Many years before, Mattel did the same thing with Barbie. Barbies, in the early sixties, came packed with what is called a "cross-sell" booklet. The booklet showed various outfits that could be purchased for a child's Barbie doll. The illustrations of Barbie and her friends were not accurate depictions of the dolls—there was no way they could bend or move as they were sometimes drawn. The purpose of those illustrations was to suggest a fun, high fashion "mood". The purpose of Mr. Bryant's original sketches was the same—to evoke a mood. **(Exhibit # 7a, Barbie Illustration)**

One other thing can be said about Mr. Bryant's sketches—as he drew them, the four characters changed. Their proportions changed—they became longer, with smaller hips. This is again to my point—he presented an idea, and not an exact doll design.

I understand that there is some question as to how relevant it was that Mr. Bryant added color to his sketches sometime after he originally drew them. In my opinion, adding color to sketches means very little. His was not a color concept, it was a doll idea.

CONFIDENTIAL –
ATTORNEYS EYES ONLY

The only value color could add was to make his presentation look more interesting. As far as I know, Mr. Bryant may have used any color marker or pencil that he happened to have at his desk at the time and I have not heard or read anywhere that color was important to his idea. **(Exhibit #8, Carter Bryant Pitch Book)**

## The Sculpt

The Bratz doll is beautifully stylized and sculpted. It is a very professional sculpt—well balanced, highly stylized, and very appealing and like nothing in the market at that time. The fact is that Carter Bryant did not sculpt the doll—he merely presented the concept.

The importance of the sculptor and what he/she brings to a doll cannot be over emphasized. Just as the idea or concept of a new doll is crucial, so is the ability and sensibility of the sculptor.

Many companies produce dolls made to represent the same characters. One of the most notable popular characters is Scarlett O'Hara from the movie Gone With the Wind. World Doll in the 1980's, Mattel, The Franklin Mint and Tonner Doll have all done portraits of the actress, Vivian Leigh, who portrayed Scarlett in the movie. Each of the dolls look markedly different although they are all supposed to portray the same person. The point being, that each sculptor brings his/her personal style to a project—even one as specific as Scarlett O'Hara. **(Exhibit #9, Scarlett Doll Sculpts)**

Superman is another character that has many defining features, but with each sculptor, he can look vastly different. I have had the opportunity to do a sculpt of the Superman character on two different occasions. Although I sculpted both, they do not look alike. I attribute this difference to the fact that I brought a different set of cultural references to the project (they were done a decade apart) and that I worked with two different sets of people who each saw Superman in their own unique way. The art directors for each doll had a lot to say. **(Exhibit #10, Superman Doll Sculpts)**

Scarlett O'Hara and Superman are not the only two examples. There are countless examples of the same character being sculpted by different persons at different companies with entirely different results. Other examples are Dorothy from the Wizard of Oz, Lucile Ball, Little Orphan Annie, Harry Potter and any of the Disney characters to name just a few.

If Mr. Bryant had given this project to any other sculptor (even one from Mattel) there is no way that it would have looked the same and, therefore, may or may not have been successful.

In addition, the tone of the doll was changed during sculpting. In comparing Mr. Bryant's original sketches with the final sculpt, I see important differences. The shape of the head is the most drastic change. Although the sculptor achieved a stylized sculpt that superficially resembles the illustration, the sculpt has a more childlike quality. Mr. Bryant's sketch shows a character with a more adult head whereas the sculpt has a bigger, slightly protruding forehead which is much more childlike. The tone was changed from more of an adult look to that of a younger look. The contrast of the young face shape and the dramatic makeup resulted in a startling, new image in fashion dolls. **(Exhibit #11, Blank Bratz Doll vs Carter Bryant Sketch)**

12

CONFIDENTIAL – ATTORNEYS EYES ONLY

## Fashion Design

During the period that Carter Bryant worked at Mattel in 1999 and 2000, Mattel focused on glamorous type fashion for Barbie. Glamorous fashion dolls were popular in the collector market—Mattel knew this and that knowledge was reflected in the high style and luxurious looks that dominated its Barbie designs. These glamorous designs were certainly not what real teen-agers wore. "Celebration Barbie", "Flamingo Barbie" and even Mr. Bryant's own "Grand Entrance Barbie" are all glamour dolls in ball gowns. Mattel also focused on fantasy with its "Barbie Angel" doll. Other than a doll like its "Nsync Barbie" the teenager was all but ignored. **(Exhibit #12, Glamour Barbies)**

Of course the Mattel designers knew what was going on in teen fashion—all good designers would—but that knowledge was just loosely applied to Barbie. In contrast MGA's focus was on teen age style—and it got it just right.

In looking at Mr. Bryant's "pitch book", the clothing reflected what was going on in teen fashion—the sketches got the idea across, but the final, manufactured fashions changed dramatically as the line developed. Although the look of the doll was somewhat revolutionary in 2001 compared to other dolls on the market, in retrospect, it was just the start of the look of the Bratz line. In other words, it was a jumping off place for the MGA designers. The focus—that of teen age fashion—was important in developing the Bratz message, not the styles in the original illustration.

I had the opportunity to look over a vast amount of the Bratz dolls that MGA has produced since 2001 and I noticed two things; first, the fashion design is truly amazing and spot on and second, it's changed dramatically over the years. Whoever was responsible for the clothing design is highly talented and/or had great direction. Doll clothing design is the result of dozens of decisions—the weight of the fabric, how a fabric will lay, how the fabric will respond in such a small size, how will the colors work together, how are the fabrics going to be finished, to name just a few. It takes a knowledgeable design director to be able to work with and put together all the elements for even a relatively successful design. MGA had an extremely talented project manager for the Bratz project. **(Exhibit #13, Bratz Product)**

I understand that MGA appears to have worked quickly to get Bratz out to the market and did clothing for the dolls that reflected Mr. Bryant's concept, but the real development of the dolls came the next year. This is a typical line development timetable—a line often gets better the second year. From what I have seen, Mr. Bryant seems to be a very talented designer, and I understand that he's done design work for MGA during the past five years. The work consistently gets better (and it started off at a very high level).

Not to down play Mr. Bryant's clothing design on the first year dolls, but it was more about how Bratz was positioned in the marketplace (the fact that they were teenagers with a "bratty" attitude) than what the dolls were wearing.

## The Face Design

A talented face designer or painter is essential for a winning doll product. He/she must know the anatomy; they must know eye and mouth shape and how to balance color and the features for the desired look. I believe a good face painter can enhance a doll, but a great face painter can turn an ordinary doll into a spectacular doll. The combination of

13

CONFIDENTIAL –
ATTORNEYS EYES ONLY

a great face painter with a great sculpt can create doll magic. The artist who designed the Bratz way used his/her own artistry to create a very new look for Bratz.

Hair Design

I have compared Mr. Bryant's hair design for the Bratz dolls with the doll product that eventually was sold in the market place. Mr. Bryant's idea for removable skull caps, designed to change hair style and color, was not used. Also, the styles that he illustrated in his original sketches were a little edgier than the styles that made it to market. The final hair styles were age and character appropriate styles that reflected the softened version of dolls that, from my information of the process, was as a result of the project manager's input.

The Project Manager

I understand that the project manager for Bratz was Paula Treantafelles. I believe that this project headed by anyone else could have, and in my opinion probably would have, been a disaster. Ms. Treantafelles, from what I understand, was responsible for pulling together a team to do this project. Every decision she made turned Bratz into the winning product it is. I believe it takes a singular vision and a very high taste level to develop a product like Bratz.

The Packaging Design

The packaging design for the Bratz line was new, innovative and unique. It set the standard for toy packaging that is still being imitated today. There were two revolutionary features of the Bratz packaging that set the product apart from its competition. One was the trapezoidal shape of the box and the second, and probably the most important, was the clear plastic at the top of the box that allowed light onto the dolls face. I have no idea who was responsible for the initial packaging concept, but it showed creative, out of the doll box, thinking.

At the time, MGA's designer out-designed Mattel. **(Exhibit #14, Bratz Packaging)**

The Marketing

Mattel has almost always been on top of the competition. I believe through rather unique circumstances, MGA was able to get Bratz into the market rather quietly, test it, and then ramp up before Mattel realized what was happening. Mattel seemed to have been distracted by the disastrous purchase of the Learning Company in 1999 and fallout from that purchase in 2000. As a result, MGA was able to debut and promote Bratz (the product got off to a great start in Spain) while Mattel was otherwise occupied.

**Prior Art**

When I was a small child in the 1950's, the dolls on the shelves were generally all sculpted by or inspired by the same sculptor, Bernard Lipfert. In 1959, when Barbie was introduced, she was shockingly original for the American market. She was beautifully done and the baby boomer children loved the way she looked. Mr. Bryant, however, grew up with different set of references. He grew up with Barbie and that look of a doll was nothing unusual. He also grew up with things in the popular culture such as Japanese Anime (such as Speed Racer), the artwork of Margaret Keane, the Kenner doll

CONFIDENTIAL – ATTORNEYS EYES ONLY

Blyth, just to name a few. All of these works portrayed people with larger heads and big eyes, and in many cases, smaller bodies—very similar to the Bratz dolls. Did he see all this? There is no way I can really know, but these things were out there, the feeling was in the air, and on some level Mr. Bryant, as are all good designers, was influenced by the prior art (television, artwork, toys, ads, etc.) in the market place.
**(Exhibit #15, Prior Art)**

### Why Bratz?

When Bratz was introduced in 2001, it was a breath of fresh air in the commercial doll world. Bratz was the first truly new look in the fashion doll world in almost forty years. The quirky proportions did not try to emulate Barbie—they were unique. Bratz dolls are multi-cultural without over emphasizing ethnic differences. The name and the attitude are extremely important to the target market. And, last but certainly not least, Bratz was extremely well designed by the team Ms. Treantafelles pulled together.

### Diva Starz and Toon Teens

In 1999, Mattel was working on a doll line called Toon Teens (a product in work while Mr. Bryant was working at Mattel) and in 2000 Mattel introduced doll products called Diva Starz. I understand that Mattel alleges that Mr. Bryant was inspired by or copied these dolls. Mr. Bryant could have easily developed Bratz without seeing either of those products, or any product that Mattel had on the market or was developing. The change of the fashion proportion was in the air. Just as the designers for Diva Starz and Toon Teens felt it, so did Mr. Bryant. Further, when comparing Toon Teens and Diva Starz with the Bratz sketch, I believe that it is more likely that the Mattel products were not Mr. Bryant's inspiration. The focus on teen fashion and especially the new attitude were just not as evident in the Mattel products as they were in the *Seventeen* magazine that Mr. Bryant states to be his inspiration.

Interestingly, although the Mattel designers recognized the new proportion in their Diva Starz dolls, they were not able to make the line a long term success. I assume that in order to accommodate the mechanism that allowed Diva Starz to "talk" and move her eyes, the designers traded a pleasing design form for function. MGA did not include anything in the Bratz design that interfered with the sculpt. In addition, I believe the element that Mr. Bryant added to the new proportion (the "bratty" attitude) as well as Ms. Treantafelles taste level made Bratz a hit. Every choice in the design and marketing of Diva Starz and Bratz would determine how each would ultimately do in the marketplace.

And again, even more important than the look of the doll, was the change of attitude. It is my opinion that Mattel would not have produced a doll with a "bratty" attitude and therefore could never have come out with a line like Bratz.
**(Exhibit #16, Diva Starz and Toon Teens)**

### The Time It Takes to Make a Doll Prototype

CONFIDENTIAL –
ATTORNEYS EYES ONLY

I understand that in this case there is some question about MGA being able to develop a new doll in the short amount of time from early October, 2000 and have it ready to show at Hong Kong Toy Fair in January of 2001. Was it possible? The answer is absolutely, yes. Realistically, the individual steps in making a doll for mass production do not take all that long. The reason it can take a year plus to get a doll to market is because of the bureaucracy that each company has in place to create and test a new doll product. How fast or how slowly a design comes to fruition, usually depends on the powers that be to make decisions. If a product is desired to make a certain date, then it's up to those decision makers to push it along. With talented, professional people (which MGA certainly had), a new product prototype can come together pretty quickly, and certainly within three to four months. It would be a tight schedule, but absolutely doable.

A unique sculpt can be done in as little as a few hours—and of course, it all depends on the sculptor. I have sculpted a rough doll (head and body) in as little as two days. In the product development process, the next step would be approval by the project manager. When I design a doll, that takes no time—either I like it or not; if I like it, I proceed with the wax work/ engineering. If a project manager is focused on the project, comments and/or changes could be made in very little time.

The next step would be to mold the original sculpt to put into wax for refinement. Depending on how complicated the wax clean up is, a doll could be finished in a matter of a few days to a couple of weeks.

Once the wax is done, a rotational master mold can be made in as little as seven to ten days. In my experience, injected molded parts take sixty to ninety days for production, but there are numerous ways to produce a prototype body in a very short amount of time without using the production molds. (Also, this is not to say that injection molds couldn't be used—personally, I've never wanted to throw the money at it to get it done faster).

Of course, the product is not finished until face paint, hair rooting, clothing design and package design are done. All these steps can and are usually done while the doll body is being readied for mold making. These finishing steps are usually done simultaneously and can take as little as a few minutes for something like hair rooting.

**Two Very Important People**

Undeniably Mr. Bryant was important in the development of the Bratz line. However, there were two other people who were even more important: Mr. Larian and Ms. Treantafelles. Mr. Larian had the money, the manufacturing capabilities, and the good sense to let those who he hired do the job they were hired to do. Ms. Treantafelles was perhaps the most important person in the development of the project. She took an idea from an untested, unknown clothing designer (who was not a doll designer) and worked with an extremely talented staff to develop a market changing doll.

Over the years, I have witnessed what seemed to be a good ideas flop and mundane ideas do well—and it's all because of the creative people (sculptors, designers, etc.) involved. Couple the right creative people with funds to do a project properly, and there's a chance that it might work. Again, Mr. Larian and Ms. Treantafelles were those right people.

Further, it is my opinion that MGA, at the time, was probably the only company that could have turned Bratz into a hit.

CONFIDENTIAL – ATTORNEYS EYES ONLY

16

**Mattel and the Doll World**

Mattel, over the years, has rightfully protected its Barbie property. There are numerous examples of a competing toy company trying to knock Barbie off her shelf. Time and time again, Barbie was able to stop the challenge with great design and marketing efforts. However, Bratz did not enter the Barbie world. The Bratz dolls are not about blonde hair and blue eyes, they are not about sweetness and light, and they were not sculpted to look like or be confused with Barbie. Mattel used the approach to counter Bratz that always worked for them in the past. To knock a competitor's doll off the shelf, they used fine design and imaginative ideas. For the first time, however, this approach did not work. They tried to capture the "coolness" and "attitude" of the Bratz line with Flavas, an extremely ill advised and badly carried out line of "Hip Hop" dolls that were heavily criticized. Shortly before Flavas, Mattel countered Bratz doing something that competing companies had always done to them; they came out with something very similar to Bratz—the My Scene dolls.

My Scene dolls are a beautifully designed and sculpted answer to the Bratz line. Relying heavily on the Bratz look, Mattel was able to design and market their new dolls in a relativity short amount of time. On close examination, the My Scene dolls make use of the standard Barbie body with one change—the head. To get the new doll proportion to compete with the Bratz dolls, Mattel made the head oversized and brilliantly made "shoes" with the oversized feet sculpted in the shoes to create the look. Mattel could use the same Barbie foot, but just slip on this new "shoe" to change the proportion of the doll. **(Exhibit # 17, My Scene Foot)**

I thought the initial look of the line of dolls was great. The line had a similar look to Bratz, but at the same time, they made it their own. However, although the look and packaging of the dolls was interesting it still wasn't as new looking as the Bratz dolls. As a result of trying to compete, in my opinion, My Scene later started to look more and more like Bratz.

Throughout Barbie's history, Mattel has aggressively gone after just about every company that dares to try to compete with Barbie. Major players in toys, such as Hasbro and Kenner, could not stand up to Mattel's tactics. I believe that they had every right to do so—Barbie belongs to Mattel and they have every right to protect their product. The difference with the Bratz line is the MGA did not try to go after Barbie. MGA developed its own brand. Barbie for all intents and purposes "owns" blonde hair and blue eyes— MGA doesn't care. MGA developed a line that's more relevant to today's older girls and they didn't do it by "going into Barbie's backyard". Therefore, the Mattel tactic has not, and in my opinion, can not work.

Although Mattel probably has some of the most talented people working in dolls today, MGA has been able to out design and out market them.

**General Comments**

The following is a list of documents and resources I used in preparing this report.

17

CONFIDENTIAL – ATTORNEYS EYES ONLY

Note: It would be impossible to list everything that has contributed to my general knowledge of fashion design, doll design and doll manufacturer over the past thirty plus years. However, in addition to my general knowledge, I have reviewed dozens of Bratz, My Scene, and Diva Starz dolls as well as pictures of Mattel's prototype dolls for Toon Teens.

**Books**
1) <u>Toy Wars</u> by G Wayne Miller; Times Books, NY, NY; cpy. 1998
2) <u>I Had That Doll!</u> By the editors of Doll Reader; Park Lane Press, Avenel, NJ; cpy. 1996
3) <u>More Twentieth Dolls from Bisque to Vinyl</u> by Johana Gast Anderton; Athena Publishing Co., North Kansas City, MO; cpy. 1974
4) <u>This is Blythe</u> by Gina Garan; Chronicle Books LLC, San Francisco, CA; cpy. 2000

**Web Sites**
1) http://www.lapassiondesbratz.simulatus.info/
2) http://www.about.com Doll Collecting, The Barbie Start Page

**Court Documents**
1) Affidavit of Daphne Gronich
2) Mattel v. Bryant MGA Complaints Notebook
3) Transcript of portion of trial, Art Attacks Ink, LLC, vs. MGA
4) Excerpts From Interrogatory Responses In Which a Party Has Provided a Statement on Its Position
5) Exhibits from Carter Bryant Deposition, November 2004
6) Carter Bryant's Deposition 11/4/2004
7) Expert Report of John Steven Baulch
8) 2005 Barbie Spring Line Review, April 15, 2004
9) Margaret Leahy's Deposition 12/12/2007
10) Carter Bryant's Deposition, rough draft, 1/23/2008
11) Carter Bryant's Deposition, rough draft, 1/25/2008
12) Color version, pitch book
13) Color version, Exhibit 1107, 1108,1109, 1110
14) Exhibit 1330
15) August 1998 issue of Seventeen Magazine

**Other**
1) Portions of Seventeen and other fashion magazines from 1998
2) Met with Margaret Leahy's lawyer to view original Bratz sculpts and prototypes.
3) Heard from expert witness Peter S. Menell
4) Heard from expert witness Tina Tomiyama

CONFIDENTIAL –
ATTORNEYS EYES ONLY

## Conclusion

1) I believe that Mr. Bryant's accounting of his inspiration is true, for the reasons discussed above.  I believe that his inspiration for Bratz happened when and how he said it did.
2) Whereas the importance of a new idea cannot be denied, the same idea, without the help of a very talented staff, could have been a flop.  I believe that the original idea for Bratz was only one part of what made a very successful doll program.
3) There was absolutely enough time for MGA to create the Bratz doll prototypes for the Hong Kong Toy Fair in 2001.
4) It is my opinion that although the illustrations that Mr. Bryant did for his pitch book certainly inspired the line, the Bratz dolls are not copies of that work.


Date:  February 8, 2008

By: _____

CONFIDENTIAL –
ATTORNEYS EYES ONLY

**Exhibit  10**



All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

JUNE 2000
Contract date : 9/18/2000

M 0001489



8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date. 9/5/00

M 0001490



All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date · 9/15/00

M 0001491



8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date. 9/18/00

M 0001492



© 1998

All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/18/00

M 0001493



All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date - 9/18/00

M 0001494



© 

8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date 9/18/00

M 0001495



8/1998

All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Current date   9/18/00

M 0001496



8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date. 9/18/00

M 0001497



All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/15/00

M 0001498



All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/18/00

M 0001499



All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO
Contract dated 9/18/c..



All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/18/00

M 0001501



DOLL PIECE COUNT*

HAIRSTYLE #1

LONG TEE

SHORT TEE

JEANS

SNEAKERS

HAIRSTYLE #2

MARY JANES

TOTAL PIECES*

· LONG SLEEVED TEE SHIRT
· CUFFED "JEANS"
· SHORT SLEEVED TEE SHIRT
· SKIRT
· POP-ON/OFF SNEAKERS
· POP-ON/OFF MARY JANES
· BACKPACK
· LONG HAIRSTYLE "WIG" (POP-ON/OFF)
· SHORT HAIRSTYLE "WIG" (POP-ON/OFF)
· DOLL BODY/HEAD

* DESIGN SUBJECT TO CHANGE

DRAWINGS NOT TO ACTUAL SIZE

M 0001502

BODY



NOT ACTUAL
SIZE

ACTUAL DOLL
HEIGHT (WITH HEAD)
APPX. 9½" - 10"

M 0001503



To give Zoe a whole new look for night, change her short dark brown hairstyle to her long blonde hairdo (included), change her pants to a skirt (also included) and change her sneakers to platform sandals (you get those too!)

M 0001504



FACES
SAME HEAD BUT
DIFF FACE PAINT

— NOT ACTUAL SIZE —

M 0001505

**Exhibit 11**

CALENDARED
RECEIVED

DEC 2 8 2007

1  THOMAS J. NOLAN (Bar No. 066992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, CA 90071-3144
3  Telephone:  (213) 687-5000
   Facsimile:  (213) 687-5600
4  E-mail:     tnolan@skadden.com

5  RAOUL D. KENNEDY (Bar No. 40892)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  Four Embarcadero Center, Suite 3800
   San Francisco, CA 94111
7  Telephone:  (415) 984-6400
   Facsimile:  (415) 984-2698
8  E-mail:     rkennedy@skadden.com

9  Attorneys for Counter-Defendants,
   MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT
10 (HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.V.

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                   EASTERN DIVISION

13 CARTER BRYANT, an individual    )  CASE NO. CV 04-9049 SGL (RNBx)
                                   )
14              Plaintiff,         )  Consolidated with Case No. 04-9059
                                   )  and Case No. 05-2727
15                                 )
        v.                         )
16                                 )  **MGA'S EIGHTH SET OF**
   MATTEL, INC., a Delaware        )  **REQUESTS FOR THE**
17 corporation                     )  **PRODUCTION OF**
                                   )  **DOCUMENTS AND THINGS**
18              Defendant.         )  **IN CASE NO. 05-2727**
                                   )
19                                 )
                                   )
20                                 )  Honorable Stephen G. Larson
                                   )  Courtroom 1
21                                 )
   Consolidated with MATTEL, INC. v. )
22 BRYANT and MGA                  )
   ENTERTAINMENT, INC. v.          )
23 MATTEL, INC.                    )
                                   )

24 **PROPOUNDING PARTY:    MGA ENTERTAINMENT, INC.**

25 **RESPONDING PARTY:     MATTEL, INC.**

26 **SET NUMBER:           EIGHT**

27 **NOs.:                 770-797**

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiff MGA Entertainment, Inc. ("MGA") requests that defendant Mattel, Inc. ("Mattel") produce all DOCUMENTS and tangible things described, in accordance with the Definitions and Instructions set forth below, at 9:00 a.m. on January 28, 2007, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Los Angeles, California 90071.

## DEFINITIONS

As used in these Requests:

1. "ACTION" shall mean this action now consolidated under Case No. 04-9049 before the Hon. Stephen Larson and formerly Mattel v. Bryant, Inc., first filed in Los Angeles County Superior Court; Bryant v. Mattel, Inc.; and MGA Entertainment, Inc. v. Mattel, Inc.; and all counterclaims, cross-claims and defenses therein.

2. "ADVERTISING" means and refers to notice that is broadcast or published by MGA or any person, agent or representative acting on its behalf to the general public or any specific market segments for the purpose of attracting customers or supporters and includes material placed on the internet, at trade shows or at a point of sale.

3. "ALLEGED COPYRIGHTED WORKS" means the copyrighted works alleged in paragraph 83 of MATTEL'S Second Amended Answer in Case No. 05-2727 and Counterclaim in THIS ACTION.

4. "BARBIE" means and refers to each image, character, logo, doll, toy, styling head, plush toy, play set, accessory, product, packaging or any other thing that is or has ever been manufactured, marketed or sold by YOU, or others under licensed by YOU, as part of a line of goods or merchandise commonly known as, or sold and marketed under the name "Barbie."

1    5.    "BRATZ" means and refers to each image, character, logo, doll,
2  fashion doll, plush toy, styling head, toy, accessory, product, packaging, theme, or
3  other thing or matter that is or has ever been manufactured, marketed or sold by
4  MGA, or others under license, as part of a line of goods or merchandise commonly
5  known as, or sold and marketed under the "Bratz" trademark or trade dress.

6    6.    "BRYANT" means Carter Bryant individually.

7    7.    "COLLECTIBLES GROUP" means "Barbie Collectibles" as
8  understood by Lisa S. Freed in her deposition of May 3, 2007, referenced at 128:18-
9  25.

10    8.    "COMMUNICATION[S]" means any transmission of information from
11  one person or entity to another, including, without limitation, by personal meeting,
12  conversation, letter, telephone, facsimile or electronic mail.  Each request that
13  encompasses information relating in any way to communications to, from or within a
14  business or corporate entity is hereby designated to mean, and should be construed to
15  include, all communications by and between representatives, employees, agents or
16  servants of the business or corporate entity.

17    9.    "CONFLICT OF INTEREST QUESTIONNAIRE" shall mean any form
18  of employment agreement concerning, *inter alia*, relations, if any, between Mattel's
19  employees, suppliers, and/or competition, whether known by the title "Conflict of
20  Interest Questionnaire" or any other title, including without limitation the form of
21  Conflict of Interest Questionnaire entitled "Conflict of Interest Questionnaire"
22  executed by BRYANT on or about January 4, 1999.

23    10.    "COUNTERCLAIMS" or "COUNTERCLAIM" means Mattel, Inc.'s
24  Second Amended Answer and Counterclaims for: 1. Copyright Infringement; 2.
25  Violation of the Racketeer Influenced and Corrupt Organizations Act; 3. Conspiracy
26  to Violate the Racketeer Influenced and Corrupt Organizations Act; 4.
27  Misappropriation of Trade Secrets; 5. Breach of Contract; 6. Intentional Interference

28

1  with Contract; 7. Breach of Fiduciary Duty; 8. Aiding and Abetting Breach of

2  Fiduciary Duty; 9. Breach of Duty of Loyalty; 10. Aiding and Abetting Breach of

3  Duty of Loyalty; 11. Conversion; 12. Unfair Competition; and 13. Declaratory Relief

4  filed July 12, 2007, in MGA v. Mattel, Inc., CV 05-02727, including any amendment

5  or supplement thereto.

6      11.   "DOCUMENT[S]" incorporates the full meaning of Federal Rule of

7  Civil Procedure 34, and shall be construed in the broadest sense to mean any and all

8  writings, tangible things and property, of any kind, that are now or that have been in

9  YOUR actual or constructive possession, custody or control, including, but not

10  limited to, any handwritten, typewritten, printed, drawn, charted, taped, filmed,

11  punched, copied, recorded, transcribed, graphic or photographic matter of any kind

12  or nature, in, through, or from which information may be embodied, translated,

13  conveyed or stored, whether an original, a draft or copy, however produced or

14  reproduced, whether sent or received or neither, including, but not limited to, notes,

15  memoranda, correspondence, letters, facsimiles and facsimile transmittals, reports,

16  inter- and intra-office COMMUNICATIONS, work papers, work sheets, work

17  records, ledgers, graphs, indexes, advertisements, brochures, price lists, cost sheets,

18  estimating sheets, bills, bills of lading, bids, time cards, receipts, purchase orders,

19  telephone records, telegrams, telexes, literature, invoices, contracts, purchase orders,

20  estimates, recordings, transcriptions of recordings, records, books, pamphlets,

21  periodicals, publications, papers, tapes, DVDs, video CDs, video, audio and digital

22  recordings, television commercials, story boards, website or other spot

23  advertisements, movies, movie trailers, prototypes, products, diaries, calendars,

24  charts, drawings, sketches, messages, photographs and data contained in or

25  accessible through any electronic data processing system, including, but not limited

26  to, computer databases, data sheets, data processing cards, computer files and tapes,

27  computer disks, CD-ROMs, computer metadata, microfilm, microfiche, electronic

28

1  mail, website and web pages and transcriptions thereof and all other

2  memorializations of any conversations, meetings and conference, by telephone or

3  otherwise.  The term DOCUMENT also means every copy of a DOCUMENT, where

4  such copy is not an identical duplicate of the original, whether because of deletions,

5  underlinings, showing of blind copies, initialing, signatures, receipt stamps,

6  comments, notations, differences in stationery or any other difference or

7  modification of any kind.

8       12.   "EMPLOYEE INVENTIONS AGREEMENT" shall mean any form of

9  Mattel employment agreement concerning, *inter alia*, (i) ownership of inventions,  (ii)

10  trade secrets and/or (iii) conflicts, whether known by the title "Employee

11  Confidential Information and Inventions Agreement" or any other title, including

12  without limitation the form of Employee Inventions Agreement entitled "Employee

13  Confidential Information and Inventions Agreement" executed by BRYANT on or

14  about January 4, 1999.

15       13.   "LARIAN" means MGA's Chief Executive Officer Isaac Larian.

16       14.   "MATTEL," "YOU," or "YOUR" means the party Mattel, Inc. and any

17  of its past or present officers, directors, employees, parents, subsidiaries, divisions,

18  affiliates, predecessors-in-interest, and joint venture partners.

19       15.   "MATTEL'S INITIAL DISCLOSURES" means Mattel, Inc.'s

20  Consolidated (1) Initial Disclosures Relating to MGA's Unfair Competition Claims,

21  and (2) Second Supplemental Initial Disclosures Relating to Mattel's Claims Against

22  Bryant and MGA, dated January 5, 2007 and any supplemental or amendment

23  thereto.

24       16.   "MATTEL LITIGATION" shall mean the action now pending in the

25  U.S. District Court for the Central District of California (Eastern District),

26  consolidated under Case No. 04-9049 SGL (RNBx) before the Hon. Stephen Larson

27  and formerly Mattel v. Bryant, Inc., first filed in Los Angeles County Superior Court;

28

1  <u>Bryant v. Mattel, Inc.</u>; and <u>MGA Entertainment, Inc. v. Mattel, Inc.</u>; and all

2  counterclaims, cross-claims and defenses therein.

3      17.   "MGA" means MGA Entertainment, Inc. and any of its past or present

4  officers, directors, employees, parents, subsidiaries, divisions, affiliates,

5  predecessors-in-interest, and joint venture partners.

6      18.   "MGA LAWSUIT" means any lawsuit, litigation, arbitration or other

7  legal proceeding to which MGA is or was a party, excluding this ACTION.

8      19.   "MY SCENE" means and refers to each image, character, logo, doll,

9  fashion doll, toy, styling head, plush toy, play set, accessory, product, packaging or

10  any other thing that is or has ever been manufactured, marketed or sold by YOU, or

11  others under licensed by YOU, as part of a line of goods or merchandise commonly

12  known as, or sold and marketed under the name "My Scene."

13      20.   "MY SCENE DOLL" means any fashion doll that is or has ever been

14  distributed, marketed, sold or offered for sale under the name "My Scene" or as part

15  of the "My Scene" line, including separate themes.

16      21.   "MY SCENE LICENSE" means any license that REFERS OR

17  RELATES TO any MY SCENE PRODUCT.

18      22.   "MY SCENE PRODUCT" means any product, whether two-

19  dimensional or three-dimensional, and whether in tangible, digital, electronic or

20  other form: (i) that is or has ever been distributed, marketed or sold under the name

21  "My Scene" or as part of the "My Scene" line; (ii) that depicts, incorporates,

22  embodies, consists of or REFERS OR RELATES TO MY SCENE; and/or (iii) that

23  is or has ever been distributed, marketed or sold in any packaging that includes the

24  name "My Scene" or depicts, incorporates, embodies, consists of or REFERS OR

25  RELATES TO MY SCENE.

26      23.   "PERSON[S]" means any or all entities, including but not limited to,

27  any or all individuals, single proprietorships, associations, companies, firms,

partnerships, joint ventures, corporations, employees or former employees, or any other business, governmental, or labor entity, and any divisions, departments, or other units thereof.

24. "REFERRING OR RELATING TO" should be construed in the broadest possible sense to mean concerning, consisting of, referring to, relating to, describing, discussing, constituting, evidencing, containing, reflecting, mentioning, pertaining to, citing, summarizing, analyzing or bearing any logical or factual connection with the matter discussed.

25. "RELEVANT TIME PERIOD" means the period from January 1, 1998 through the present.

26. "SKU #" means Stock Keeping Unit number.

27. "S:\MATTEL" means MATTEL's file server(s) on which electronic files are kept, including, but not limited to, pathways such as file://S:\Mattel\Larian\Larian%202000-2002.htm.

28. "THIS ACTION" refers to the MATTEL LITIGATION, including *Mattel, Inc. v. Bryant*, Case No. CV 04-9059 SGL (RNBx), filed on April 27, 2004 and all cases consolidated or coordinated therewith.

29. The singular form includes the plural, and vice versa.

30. The terms "any" and "all" are interchangeable.

31. The terms "and" and "or" shall be construed disjunctively and conjunctively, and each shall include the other whenever such dual construction will serve to bring within the scope of any Request, DOCUMENTS that would otherwise not be within its scope.

## INSTRUCTIONS

1. YOU are instructed to produce all non-privileged DOCUMENTS in YOUR possession, custody or control. A DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR physical possession, or if, as a practical matter,

1  YOU have the ability, upon request, to obtain possession of the DOCUMENT or a
2  copy thereof from another person or entity who has physical possession of the
3  DOCUMENT.

4      2.    YOU are instructed to produce all non-privileged DOCUMENTS
5  responsive to these Requests to the extent YOU have not previously produced them
6  to MGA.

7      3.    If any DOCUMENT or category of DOCUMENTS is not produced in
8  full, please state with particularity the reason or reasons it is not being produced in
9  full.

10     4.    Each DOCUMENT is to be produced as it is kept in the usual course of
11  business, including all file folders, binders, notebooks, and other devices by which
12  such DOCUMENTS may be organized, separated, or identified.

13     5.    Each DOCUMENT maintained or stored electronically in native,
14  electronic format is to be produced with all relevant metadata intact and in an
15  appropriate and useable electronic manner.

16     6.    Unless otherwise noted, these Requests seek DOCUMENTS from
17  January 1, 1995, to the present.

18     7.    These Requests impose a continuing obligation subsequent to your
19  initial production to the full extent provided for in Rule 26(e) of the Federal Rules of
20  Civil Procedure.

21
22
23
24
25
26
27
28

## REQUESTS FOR PRODUCTION

**REQUEST NO. 770**

All EMPLOYEE INVENTIONS AGREEMENTS signed by any person identified in MATTEL'S INITIAL DISCLOSURES or MATTEL'S response(s) to any interrogatory served in THIS ACTION.

**REQUEST NO. 771**

All CONFLICT OF INTEREST QUESTIONNAIRES signed by any person identified in MATTEL'S INITIAL DISCLOSURES or MATTEL'S response(s) to any interrogatory served in THIS ACTION.

**REQUEST NO. 772**

All DOCUMENTS REFERRING OR RELATING TO any instance in which any provision of an EMPLOYEE INVENTIONS AGREEMENT was breached or alleged to be breached by any person identified in MATTEL'S INITIAL DISCLOSURES or MATTEL'S response(s) to any interrogatory served in THIS ACTION.

**REQUEST NO. 773**

All DOCUMENTS REFERRING OR RELATING TO any instance in which any provision of a CONFLICT OF INTEREST QUESTIONNAIRE was breached or

1  alleged to be breached by any person identified in MATTEL'S INITIAL

2  DISCLOSURES or MATTEL'S response(s) to any interrogatory served in THIS

3  ACTION.

4

5

6  **REQUEST NO. 774**

7     The complete MATTEL personnel file for each PERSON identified in

8  MATTEL'S INITIAL DISCLOSURES or MATTEL'S response(s) to any

9  interrogatory served in THIS ACTION.

10

11

12  **REQUEST NO. 775**

13

14     All dolls, models, molds, casts, samples, packaging, ADVERTISING,

15  photographs, CDs, DVDs, tapes, or other tangible items or things that comprise or

16  relate to a BRATZ product or accessory.

17

18

19  **REQUEST NO. 776**

20     All DOCUMENTS REFERRING OR RELATING to any purchase or

21  acquisition by MATTEL of a BRATZ product or accessory, including but not limited

22  to, all invoices, receipts, and purchase orders.

23

24

25

26

27

28

**REQUEST NO. 777**

All DOCUMENTS REFERRING OR RELATING TO MATTEL'S solicitation of and/or request for a presentation, proposal, bid and/or pitch relating to the advertising, marketing, and/or branding of MATTEL'S MY SCENE brand from Young & Rubicam Brands.

**REQUEST NO. 778**

All DOCUMENTS REFERRING OR RELATING TO MATTEL'S solicitation of and/or request for a presentation, proposal, bid and/or pitch relating to the advertising, marketing, and/or branding of MATTEL'S MY SCENE brand from any branding, advertising, or marketing agency.

**REQUEST NO. 779**

All DOCUMENTS REFERRING OR RELATING TO a presentation, proposal, bid and/or pitch made by Young & Rubicam Brands to MATTEL in the fall of 2003 in connection with MATTEL'S review and/or selection of an advertising agency for Mattel's MY SCENE brand.

**REQUEST NO. 780**

All DOCUMENTS REFERRING OR RELATING TO a presentation, proposal, bid and/or pitch made by any branding, advertising, or marketing agency to

1   MATTEL in connection with MATTEL'S review and/or selection of an advertising

2   agency for Mattel's MY SCENE brand.

3

4

5   **REQUEST NO. 781**

6       All litigation documents filed and/or served by any of the parties in <u>Mattel, Inc.</u>

7   <u>v. Woolbro (Distributors) Ltd, Simba-Toys (Hong Kong) Ltd, Simba Toys GMBH &</u>

8   <u>Co KG</u>, HC 03 CO 2684 (High Court of Justice, Chancery Division), including but

9   not limited to pleadings, motions, briefs, discovery responses, disclosures, and expert

10   reports.

11

12

13

14   **REQUEST NO. 782**

15       MATTEL'S trial presentation materials (including any and all demonstrative

16   exhibits) in <u>Mattel, Inc. v. Woolbro (Distributors) Ltd, Simba-Toys (Hong Kong) Ltd,</u>

17   <u>Simba Toys GMBH & Co KG</u>, HC 03 CO 2684 (High Court of Justice, Chancery

18   Division), including but not limited to Mattel, Inc.'s trial exhibits or presentations

19   relating to similarities and/or differences between the various dolls at issue in said

20   litigation.

21

22

23   **REQUEST NO. 783**

24       Documents identified as Exhibits 31, 32, 33, and 34 in the "Index to Bundle 6

25   Claimant's Disclosure" (M0097406- M0097408) in <u>Mattel, Inc. v. Woolbro</u>

26

27

28

1  (Distributors) Ltd, Simba-Toys (Hong Kong) Ltd, Simba Toys GMBH & Co KG,

2  HC 03 CO 2684 (High Court of Justice, Chancery Division).

3

4

5  **REQUEST NO. 784**

6  All transcripts for each day and/or portion of a day of trial and/or analogous

7  proceeding before the court in Mattel, Inc. v. Woolbro (Distributors) Ltd, Simba-

8  Toys (Hong Kong) Ltd, Simba Toys GMBH & Co KG, HC 03 CO 2684 (High Court

9  of Justice, Chancery Division).

10

11

12  **REQUEST NO. 785**

13

14  One sample, including packaging, of each of the following dolls sold in

15  MATTEL'S MY SCENE line for each of the years 2001-2007: Barbie, Madison,

16  Kennedy, Chelsea, Nolee, Kenzie, and Delancey.

17

18

19  **REQUEST NO. 786**

20  All DOCUMENTS REFERRING OR RELATING TO the Young and

21  Rubicam Brand Asset Valuator, or any other valuation of the BARBIE, MY SCENE

22  or BRATZ brand.

23

24

25

26

27

28

**REQUEST NO. 787**

All DOCUMENTS REFERRING OR RELATING to any survey, focus group, consumer research or other market research (whether conducted by MATTEL or any third party) concerning MY SCENE, BRATZ, or BARBIE, including but not limited to the focus groups discussed on page 114 of the deposition of Kumi Croom and the consumer research conducted by Mattel Worldwide Consumer Research group (or any third party) discussed beginning on page 132 of the deposition of Kumi Croom.

**REQUEST NO. 788**

All ad test reports (or other similar reports evaluating the efficacy of advertising) regarding any MY SCENE or BRATZ product, including but not limited to the ad test reports referenced on pages 118-129 of the deposition of Kumi Croom.

**REQUEST NO. 789**

All DOCUMENTS REFERRING OR RELATING TO any investigation or surveillance of MGA, BRATZ, Carter Bryant, any member of Carter Bryant's family, Isaac Larian, any member of Isaac Larian's family, Jeanne Galvano, or Richard Irmen, including but not limited to all investigative files, reports and summaries.

**REQUEST NO. 790**

All DOCUMENTS REFERRING OR RELATING TO any interpretation by Mattel, or position taken by MATTEL regarding the meaning, of the EMPLOYEE INVENTIONS AGREEMENT.

**REQUEST NO. 791**

All DOCUMENTS REFERRING OR RELATING TO any interpretation by Mattel, or position taken by MATTEL regarding the meaning, of the CONFLICT OF INTEREST QUESTIONNAIRE.

**REQUEST NO. 792**

All DOCUMENTS REFERRING OR RELATING TO any trademark search or trademark clearance concerning products ultimately offered for sale under the MY SCENE brand, including but not limited to any trademark search for "Bryant" or "Carter" or "Carter Bryant."

**REQUEST NO. 793**

All DOCUMENTS REFERRING OR RELATING TO any patent, trademark, or copyright application or registration concerning products ultimately offered for sale under the MY SCENE brand.

**REQUEST NO. 794**

All DOCUMENTS REFERRING OR RELATING TO any patent, trademark or copyright application or registration concerning any BRATZ product, including but not limited to the ALLEGED COPYRIGHTED WORKS.

**REQUEST NO. 795**

Copies of the deposit materials for the ALLEGED COPYRIGHTED WORKS.

**REQUEST NO. 796**

All DOCUMENTS REFERRING OR RELATING TO any ADVERTISING for any of MGA's BRATZ line of dolls or accessories that YOU contend infringe MATTEL's copyrights.

**REQUEST NO. 797**

All DOCUMENTS REFERRING OR RELATING TO any alleged misrepresentations by MGA or Isaac Larian or any alleged disparagement of YOUR company, goods, products or services as alleged in paragraphs 79 through 81 of YOUR COUNTERCLAIMS.

1

2

3
DATED:      December 28, 2007

4

5
                              SKADDEN, ARPS, SLATE, MEAGHER &
6                             FLOM, LLP

7

8
                              _____
9                             Robert J. Herrington

10                            Attorneys for Counter-Defendants, MGA
11                            ENTERTAINMENT, INC., ISAAC LARIAN,
                              MGA ENTERTAINMENT (HK) LIMITED,
12                            AND MGAE de MEXICO S.R.L. de C.V.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 12**

# LIVENOTE | World Service℠

*A new perspective on court reporting.*

CONFORMED

## United States District Court
## Central Division of California

Deposition of

Liliana Martinez

May 20, 2005

Mattel, Inc.,

v.

Carter Bryant, an individual
and MGA Entertainment

ORIGINAL

A LiveNote World Service Transcript.  Reported by CLSP, Network Deposition Services
LiveNote Inc. • 221 Main Street; Suite # 1250, San Francisco, California 94105 • 1-800-LIVENOTE

Martinez, Liliana 5/20/2005

1    Q.    When was that?

2    A.    I believe that was of '99.

3    Q.    Did anything in particular happen in or

4    around of '99 that led to your change in status?

5    A.    No.  There was a req opening.

6    Q.    Did your job title change in September of

7    1999?

8    A.    Yes.

9    Q.    What did it change to?

10   A.    I was a designer.

11   Q.    And what were your duties and

12   responsibilities at that time?

13   A.    Pretty much the same thing.  I just was

14   able to have my own projects as well, too, 'cause I

15   was still supporting.

16         MR. ZELLER:  If I can just interject for a

17   second, this is fine because it's background and

18   it's fairly straightforward, but you want to make

19   sure that she finishes the question before you begin

20   your answer.  It makes it easier on the court

21   reporter, too.

22         THE WITNESS:  Sorry.

23   Q.    BY MS. CENDALI:  What was your starting

24   salary at Mattel?

25   A.    I think 40,000 a year.

**Martinez, Liliana 5/20/2005**

1      Q.    And just to be clear, was that when you

2   became in September 1999 a full-time employee?

3      A.    Yes.

4      Q.    When you were a temp, what were you paid?

5      A.    I was paid $15 an hour.

6      Q.    Did you do any trial projects for Mattel

7   prior to being hired?

8           MR. ZELLER:  Object.  The question is

9   vague.

10          THE WITNESS:  Can you rephrase the

11  question?

12     Q.    BY MS. CENDALI:  Sure.  Before you were

13  hired as a temp, did they ask you to do any try-out

14  projects before they hired you?

15     A.    No.

16     Q.    Who did you report to after you became a

17  full-time employee in September 1999?

18     A.    Debbie Meyer.

19     Q.    Were you in a particular group at Mattel?

20     A.    Debbie Meyer's group.

21     Q.    And what did that group work on?

22     A.    We worked on a variety of products.

23     Q.    Did you work on both Barbie and non-Barbie

24  products?

25     A.    Yes.

**Page 18**

counsel, nor am I financially interested in the outcome

of this action.

IN WITNESS WHEREOF, I have subscribed my name

this 5th day of June        , 2005.

*Judith Schlussel*

JUDITH SCHLUSSEL, CSR No. 4307

**Exhibit 13**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

Certified Copy

4

5     ------------------------------

6     MATTEL, INC., a Delaware                )

7     Corporation,                            )

8               Plaintiff,                    )

9               vs.                           )  No. CV04-9059

10    CARTER BRYANT, an individual;           )  NM (RNBx)

11    and DOES 1 through 10,                  )  VOLUME I

12    Inclusive,                              )

13              Defendants.                   )

14    ------------------------------          )

15    (COMPLETE CAPTION ON NEXT PAGE.)

16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY  .

18

19    Videotaped Deposition of ADRIENNE FONTANELLA,

20    taken at 300 South Grand Street, Los Angeles,

21    California, commencing at 9:10 A.M.,

22    Wednesday, January 16, 2008, before

23    Wendy S. Schreiber, CSR No. 3558, RPR, CLR.

24

25    PAGES 1 - 260

1