**Exhibit 1**

CERTIFIED COPY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL, )<br><br>PLAINTIFF, )<br><br>V. )<br><br>MATTEL, INC., A DELAWARE<br>CORPORATION, )<br><br>DEFENDANTS. )<br><br>_____<br><br>AND CONSOLIDATED ACTION (S). ) | CASE NO.<br>CV 04-9040 SGL (RNBX)<br><br>CONSOLIDATED WITH<br>CASE NO. 04-9059<br><br>CASE NO.  05-2727 |

# TELEPHONIC TRANSCRIPT OF PROCEEDINGS

# FEBRUARY 11, 2008



COURT REPORTERS

REPORTED BY:
ANGELA DUPRE
CSR NO. 7804
JOB NO. 08AD008

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT _____ 1 _____

PAGE _____ 3 _____

1    COURT.

2            THE SITUATION IS THE SAME FOR MR. BRYANT.

3    HE ALSO FILED VERY SUBSTANTIAL ADDITIONAL

4    RESPONSES, SO I QUESTION WHETHER WE REALLY EVEN

5    HAVE A TIMELY MOTION BEFORE US.

6            ON A PROCEDURAL FRONT ALSO, ON

7    FEBRUARY 4, JUDGE LARSON CLARIFIED, AND THAT

8    CLARIFICATION WAS NEEDED, THAT PHASE II DISCOVERY

9    IS BIFURCATED.  AND I SUBMIT, AT LEAST AS TO

10   QUESTIONS 43, 44, 48, 49, 50, ARE CLEARLY ALL

11   PHASE II, AND THERE MAY BE PORTIONS OF SOME OF THE

12   OTHERS THAT ARE AS WELL.

13           TO THE EXTENT THE COURT WILL ADDRESS THE

14   SUBSTANTIVE COMPLAINTS, I THINK THEY CAN BE

15   GROUPED.  THE BIGGEST ONE IS THE CONTENTION

16   INTERROGATORIES, IF I CAN CALL THEM THAT, ASKED FOR

17   ALL FACTS, EVIDENCE, ET CETERA, THAT YOU'RE GOING

18   TO RELY UPON AT THE TIME OF TRIAL.

19           I THINK IF THE COURT LOOKS PARTICULARLY

20   AT THE SUPPLEMENTAL RESPONSES THAT HAVE BEEN FILED

21   SINCE THIS MOTION WAS FILED, THE NAMES OF ALL

22   WITNESSES, THE CATEGORIES OF DOCUMENTS, THEORIES,

23   THEMES, ET CETERA, ARE SET FORTH, FULLY COMPLYING

24   WITH THE CASE.

25           MATTEL KEEPS COMPLAINING THAT THEY'RE

34

EXHIBIT _____ 1

PAGE _____ 4

1   A FEW THIS MORNING.  I'VE TAKEN A COUPLE UNDER

2   SUBMISSION.

3        I REALLY THINK THAT THERE NEEDS TO BE A

4   BETTER EFFORT WITH RESPECT TO MEETING AND

5   CONFERRING.  I AM HEREBY ORDERING THE PARTIES, IN

6   PERSON, AN IN-PERSON MEETING, TO MEET AND CONFER

7   WITH RESPECT TO ALL PENDING MOTIONS.

8        A LOT OF THESE MOTIONS GOT FILED ON THE

9   VERY LAST DAY OF DISCOVERY IN JANUARY.  THERE ARE A

10  NUMBER OF THINGS THAT ARE MOVING TARGETS, BECAUSE

11  AS WE SAW THIS MORNING, JUDGE LARSON HAS STAYED THE

12  DISCOVERY AS TO PHASE II, AND I BELIEVE THAT I'M

13  HEREBY ORDERING YOU, PURSUANT TO RULE 37, FEDERAL

14  RULES OF CIVIL PROCEDURE AND LOCAL RULES OF THE

15  MUNICIPAL OF CALIFORNIA, TO CONDUCT AN IN-DEPTH

16  MEET AND CONFER SESSION, IN PERSON, REMAINING ALL

17  PENDING MOTIONS, AND REPORT BACK TO ME EITHER BY

18  JOINT LETTERS OR INDIVIDUAL LETTERS, THE

19  DISPOSITION OF ANY MOTION.

20       WHEN I RECEIVE THAT, I'LL BE GLAD TO GIVE

21  YOU A HEARING.  AND I'D LIKE TO KNOW CLEARLY WHAT

22  REMAINS IN ISSUE AT THAT POINT.

23       ARE THERE ANY QUESTIONS REGARDING THAT?

24  MR. KENNEDY:  NOT HERE, YOUR HONOR.

25  MR. ALGER:  YOUR HONOR, TIM ALGER, FOR MATTEL.

56

EXHIBIT ____1____

PAGE ___5___

EXHIBIT ___1___

PAGE ___6___

**Exhibit 2**

1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7  CARTER BRYANT, ET. AL.,          )
                                    )
8                    PLAINTIFFS,    )
                                    )
9            VS.                    )   NO. ED CV 04-09049
                                    )   (LEAD LOW NUMBER)
10  MATTEL, INC., ET. AL.,          )
                                    )
11                   DEFENDANTS.    )   MOTION; OSC HEARING
    _____)
12  AND CONSOLIDATED ACTIONS,       )
    _____)
13

14

15       REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17         MONDAY, FEBRUARY 25, 2008

18               11:24 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24            3470 12TH STREET, RM. 134
           RIVERSIDE, CALIFORNIA  92501
25               951-274-0844
             WWW.THERESALANZA.COM

FEBRUARY 25, 2008                    BRYANT V. **EXHIBIT** 2

                                     **PAGE** 7

7

1   IT WAS GOING TO BE AN ALL-OUT WAR, AND ALL ATTRIBUTING IT TO

2   THE SUCCESS OF BRATZ.

3          THE COURT:  I NEVER THOUGHT I'D HEAR THE WORD

4   'GENOCIDE' AND 'BARBIE' IN THE SAME SENTENCE.  BUT YOU HAVE

5   SUCCEEDED IN DOING THAT.

6          MR. NOLAN:  ACTUALLY THOSE AREN'T MY WORDS; THOSE

7   WERE THE WORDS WITHIN THE DEPARTMENT AT MATTEL.

8          NOW, MATTEL IS PROJECTING, OBVIOUSLY, A DIFFERENT

9   FRONT IN THIS LAWSUIT, AND UNDER THE EXPERT BRANDING REPORTS

10  THAT WERE SUBMITTED BY BOTH SIDES, BOUSQUETTE, AS WELL AS OUR

11  EXPERT REPORTS, IT ALL GOES TO A PROPORTIONALITY OF WHAT WILL

12  BE THE COPYRIGHT DAMAGES, IF ANY, THAT IS ALIGNED TO MATTEL.

13         THE COURT:  PUTTING ASIDE THE SUBSTANCE OF THE

14  TESTIMONY FOR A MOMENT, WHAT I INDICATED TO YOU, CERTAINLY, WAS

15  THAT DURING THIS MONTH OF FEBRUARY, WHICH WE ARE ABOUT TO RUN

16  OUT, THAT THE FOCUS SHOULD BE ON PHASE ONE AND THAT I TRUSTED

17  THAT COUNSEL WOULD BE ABLE TO WORK THAT OUT AMONGST THEMSELVES,

18  AND THAT IF THERE WAS STILL SOME OVERLAP WITH PHASE ONE AND

19  PHASE TWO, THAT COULD GO FORWARD AS WELL, BUT LET'S TRY TO GET

20  PHASE ONE DEPOSITIONS.

21         LET ME ASK MR. QUINN.

22         IF MR. NOLAN IS SAYING THIS IS A PHASE ONE WITNESS

23  FOR HIM, WHY WAS THE DEPOSITION CANCELLED?

24         MR. QUINN:  YOUR HONOR, MR. COREY IS PREPARED TO

25  ADDRESS THAT, IF THAT'S ALL RIGHT.


FEBRUARY 25, 2008              BRYANT V. MATTEL   EXHIBIT 2

                                         PAGE 96

1           THE COURT:  THAT'S FINE.

2           MR. COREY:  IT WAS CANCELLED FOR THE REASON THAT IT'S

3   A PHASE TWO DEPOSITION.

4           THE COURT:  THAT'S NOT YOUR CALL TO MAKE.  THAT'S

5   MR. NOLAN'S CALL TO MAKE.  I'M NOT GOING TO HAVE MR. NOLAN

6   DECIDING YOUR WITNESS LIST OR WITNESS ORDER, AND I'M NOT GOING

7   TO HAVE YOU DECIDING HIS.

8           HOW COULD YOU KNOW WHAT HE'S GOING TO BE DOING IN

9   PHASE ONE?

10          MR. COREY:  IF I MAY, BECAUSE HE'S TOLD ME WHAT HE'S

11  GOING TO DO -- LET ME TAKE A STEP BACK.

12          BECAUSE I KNOW FROM HIS INITIAL DISCLOSURES EXACTLY

13  WHAT HE IDENTIFIED WITH RESPECT TO MR. BOUSQUETTE.

14          IF I MAY READ, YOUR HONOR.

15          "MGA BELIEVES MR. BOUSQUETTE IS A FORMER PRESIDENT OF

16  MATTEL BRANDS.  MR. BOUSQUETTE MAY POSSESS KNOWLEDGE OF

17  MATTEL'S SERIAL COPYING OF MGA'S DISTINCTIVE TRADE DRESS,

18  TRADEMARKS, PRODUCT PACKAGING, THEMES, IDEAS AND ADVERTISING.

19  MATTEL'S DELUSION OF MGA'S FAMOUS MARKS; MATTEL'S INTERFERENCE

20  WITH MGA'S ADVERTISING EFFORTS; MATTEL'S THREATS AND

21  INTIMIDATION OF RETAILERS, SUPPLIERS, LICENSEES, DISTRIBUTORS,

22  MANUFACTURERS AND FORMER EMPLOYEES AND FREELANCERS; MATTEL'S

23  IMPROPER INFLUENCE OF STANDARD SETTING AND INDUSTRY

24  ORGANIZATIONS; MATTEL'S MANIPULATION OF MGA'S RETAIL DISPLAYS

25  AND OTHER ASPECTS OF MATTEL'S UNCLEAN HANDS."

EXHIBIT 2

PAGE 9

FEBRUARY 25, 2008                    BRYANT V. MATTEL

33

1           MR. COREY:  I TOLD HIM, YEAH, I TOLD HIM HE DIDN'T

2   HAVE TO APPEAR BECAUSE HE WAS PHASE TWO AND THE COURT HAD

3   STAYED IT.

4           THE COURT:  LET'S BE CAREFUL ON THIS, COUNSEL.

5           MR. COREY:  THE LAST POINT IS THAT I BELIEVE

6   MR. NOLAN REFERRED TO AN AGREEMENT THAT MR. BOUSQUETTE HAS WITH

7   MATTEL THAT'S ATTACHED AS AN EXHIBIT TO MR. HERRINGTON'S

8   SUPPLEMENTAL DECLARATION.

9           THAT AGREEMENT HAS EXPIRED.

10          THANK YOU, YOUR HONOR.

11          THE COURT:  ALL RIGHT.  I'LL BE ISSUING AN ORDER.

12  THIS IS ONE OF THOSE ORDERS THAT YOU'LL BE LOOKING FOR THAT

13  WILL ACTUALLY BE OF SUBSTANCE AND NOT JUST A SEALING, COUNSEL.

14          YOU'RE GOING TO TURN IN A PROPOSED ORDER?

15          MR. QUINN:  YES, YOUR HONOR.

16          THE COURT:  ANYTHING FURTHER?

17          MR. COREY:  NO, YOUR HONOR.

18                      CERTIFICATE

19

20  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
21  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
22  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

23

24

25  THERESA A. LANZA, RPR, CSR
    FEDERAL OFFICIAL COURT REPORTER

                                        2-29-08
                                        DATE

                                        EXHIBIT  2

                                        PAGE  10

    FEBRUARY 25, 2008          BRYANT V. MATTEL

**Exhibit 3**

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

Case No. CV 05-2727

Expert Report of Paul K. Meyer

February 11, 2008

_Paul K. Meyer_
Paul K. Meyer

CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT ___3___

PAGE ___11___



Expert Report of Paul K. Meyer
_____

Rebuttal Report. My opinions in this Report may be supplemented, amended or revised based upon the ultimate determination of the scope of the accused property, if any, that Mattel owns.

12.   For purposes of this Report, I have accepted certain assumptions as to the scope of the accused property allegedly owned by Mattel. The accused property is assumed to include drawings Carter Bryant created prior to his departure from Mattel that allegedly are subject to copyright protection.[3] This Report specifically addresses damages issues relevant to the copyright infringement claims. My opinions in this Report may be supplemented, amended or revised based upon the ultimate determination of the scope of the accused copyrighted property, if any, that Mattel owns.

## II. SUMMARY OF OPINIONS

13.   In this Report, I express opinions related to damages asserted by Mattel in connection with copyright claims it asserts in this matter. I understand damages for copyright infringement may be based on the plaintiff's actual damages and/or the defendant's profits, to the extent they are not duplicative of plaintiff's actual damages, if any. When measuring the defendant's profits from any infringing products, the copyright statute provides that, "...the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." (emphasis added)[4] Determining the elements of profit attributable to factors other than the copyrighted work is referred to as apportionment of profit.

14.   The opinions in this Report include (a) an initial analysis of MGA's deductible expenses in connection with the development, production and sale of Bratz-related products, and (b) the determination of the elements of profit attributable to factors other than the copyrighted work. I provide apportionment percentages indicating the split of profits between the accused copyrighted property and other factors.[5]

_____

[3] Mattel states in its Second Amended Answer And Counterclaims that "Mattel is the owner of copyrights in works that are fixed in tangible media expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel. These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273." Mattel's Second Amended Answer And Counterclaims, July 12, 2007, p. 53-54.
[4] 17 U.S.C. § 504(b).
[5] If experts on behalf of Mattel put forth a claim for lost sales and profits, I will address any such claim in my Rebuttal Report.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 3
5
PAGE 12

Expert Report of Paul K. Meyer

15. MGA's deductible expenses in connection with the production and sale of Bratz-related products include (1) expenses that are tracked by MGA to a specific product, such as the manufacturing cost of a product,[6] (2) relevant expenses allocated to subsets of MGA products, such as selling discounts and allowances for SKU-related sales, and (3) other relevant expenses, such as general and administrative expenses. The results of my initial analysis of deductible expenses are described in Section A below and summarized on **ATTACHMENTS 4** and **5**.

16. Factors other than the accused copyrighted property that contribute to the profits generated by the sale of Bratz-related products by MGA include, but are not limited to: (1) design of the doll; (2) development of the characters associated with the doll line; (3) development of themes associated with the dolls; (4) development of fashions sold with the dolls; (5) development of accessories sold with the dolls; (6) packaging in which the dolls are sold; and (7) MGA's branding, marketing and advertising efforts.[7] MGA's significant contributions to the generation of sales and profits of the Bratz fashion doll line are addressed in detail in Section B (Apportionment Factors And Considerations) below.

17. In developing percentages to apportion MGA's profits attributable to the accused copyrighted property, I have considered and analyzed the following apportionment approaches:

   1. Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll;

   2. Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line;

   3. Work tasks to develop the original Bratz doll;

   4. MGA's Bratz product development contributions;

   5. MGA's "licensing in" and "licensing out" royalty rates;

   6. MGA's investments in the Bratz product line; and

   7. Sales variation among Bratz products.

18. Based on the information available to date, my apportionment analysis indicates that approximately 14.3% to 25.0% of MGA's profits earned from sales of allegedly infringing

---

[6] Products are often referred to as "SKUs," or Stock Keeping Units. Each finished product sold by MGA is assigned a unique SKU number for purposes of management and accounting within MGA.

[7] MGA's branding efforts have played a significant role in the success of Bratz. I understand that another expert retained on behalf of MGA, Dr. Erich Joachimsthaler, Ph.D., is addressing the importance of branding in his expert report.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT __3__

PAGE __13__

6

Expert Report of Paul K. Meyer

products are attributable to the accused copyrighted property.[8] My apportionment approaches are described in Section C (Apportionment Approaches) below and in the related ATTACHMENTS.

## III. MATTEL AND MGA

19. MGA[9] is a privately-held company founded by Isaac Larian in 1979 as a small consumer electronics business in the San Fernando Valley.[10] In 1987, MGA entered the toy business when it began marketing handheld video games featuring licensed Nintendo characters.[11] MGA later began marketing products for other popular licensed properties, such as the Power Rangers and Hello Kitty.[12] In 2001, MGA introduced a new line of dolls known as Bratz, multi-ethnic fashion dolls that "sport[ed] a fresh new urban and contemporary look and fashion."[13] Today, in addition to Bratz, MGA sells a variety of toys, dolls and games, such as Yummi-Land Ice Cream Pop Girls, Storytime Princess Collection, Rescue Pets and Big Fish Lil' Fish.[14]

20. Mattel was incorporated in 1948 and is headquartered in El Segundo, California.[15] In 1959, Mattel introduced the first Barbie doll.[16] According to its public filings, Mattel designs, manufactures and markets a broad variety of toys worldwide through its Mattel Girls & Boys Brands, its Fisher-Price Brands and its American Girl Brands.[17] The US segment of the Mattel Girls & Boys Brands includes Barbie fashion dolls and accessories, My Scene, Barbie Collector

---

[8] I understand that other experts retained on behalf of MGA will address substantial differences between the Bratz doll and the drawings included in the accused copyrighted property, as alleged. One of the factors identified as important to the success of Bratz is the "design of the doll." In this Report, I do not attempt to split the category "design of the doll" between the various functions that contribute to doll design, including the accused copyrighted property, new drawings, sculpt, face paint and hair, as examples. If such a split were performed, it would reduce apportionment percentages summarized in Section C related to the accused copyrighted property.

[9] Until 2002, MGA conducted business under the name ABC International Traders, Inc. "Independent Auditors' Report" of MGA Entertainment, Inc, Deloitte & Touche LLP, October 8, 2002, MGA7352-62 at 52.

[10] MGA's Complaint For False Designation of Origin, Affiliation, Association or Sponsorship; Unfair Competition; Dilution; and Unjust Enrichment ("MGA's Complaint"), April 13, 2005, p. 2.

[11] MGA's Complaint, April 13, 2005, p. 2.

[12] MGA's Complaint, April 13, 2005, p. 2.

[13] MGA's Complaint, April 13, 2005, p. 2. A third party research firm acknowledged that "[c]ompared to Barbie, Bratz dolls are seen by tweens and buyers for chains such as Toys 'R' Us as having more style, being more edgy, and consequently offering more interest to older girls." "The U.S. Tweens Market," Packaged Facts, April 2003, p. 18.

[14] http://www.mgae.com/Fall_2007_Product_Pages/Products/Brandsindex.asp.

[15] Mattel, Inc. Form 10-K for the period ended December 31, 2006, p. 3.

[16] http://www.mattel.com/about_us/history/default.asp?f=true.

[17] Mattel, Inc. Form 10-K for the period ended December 31, 2006, p. 3.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

7

EXHIBIT 3

PAGE 14

**Expert Report of Paul K. Meyer**

### Many People From MGA Contributed To Bratz Sales And Profits

32.  The success of the Bratz product line is attributable to significant contributions made by MGA in the development, launch and growth of the Bratz product line. The development of the Bratz product line was a collaborative effort involving contributions from numerous people working on various aspects of product development.[29, 30]

33.  For example, Veronica Marlow, a pattern maker and seamstress, worked to develop the Bratz fashions. As Ms. Marlow explained in her deposition, "the final product ended up being a product of many people working on the project...the [final] doll turn[ed] out to be different than his [Mr. Bryant's] original idea, because a lot of people had input on the doll."[31] Likewise, Margaret Leahy, the sculptor who developed the first Bratz-related sculpts, testified that "Carter [Bryant] initially came up with a design, and Paula [Garcia] carried it out...She was responsible for the final product and the way it looked on the shelves...You can have a good sculpt, but if you have a paint, bad hair, bad fashions, bad pack out and bad marketing, it won't go anywhere. Paula was the mastermind behind making Bratz what it is and putting it all together."[32] Similarly, Isaac Larian confirmed that the development of the Bratz doll "was a collaboration."[33]

---

February 10, 2008, p. 4, 22. To the extent the Court accepts certain positions of Dr. Menell, this may put downward pressure on the apportionment percentages summarized in Section C.

[28] I understand that Robert Tonner, Tina Tomiyama and others will testify on behalf of MGA that the Bratz doll as actually designed and developed includes significant differences and enhancements over the accused copyrighted property. Expert Reports of Robert Tonner and Tina Tomiyama. In his expert report, Mr. Tonner states that "the importance of the sculptor and what he/she brings to a doll cannot be over emphasized. Just as the idea or concept of a new doll is crucial, so is the ability and sensibility of the sculptor....the tone of the doll was changed during sculpting. In comparing Mr. Bryant's original sketches with the final sculpt, I see important differences. The shape of the head is the most drastic change. Although the sculptor achieved a stylized sculpt that superficially resembles the illustration, the sculpt has a more childlike quality." In addition, Mr. Tonner states, "I believe a good face painter can enhance a doll, but a great face painter can turn an ordinary doll into a spectacular doll. The combination of a great face painter with a great sculpt can create doll magic. The artist [Anna Rhee] who designed the Bratz way used his/her own artistry to create a very new look for Bratz." Expert Witness Report by Robert Tonner, February 8, 2008, p. 12-14: In her expert report, Ms. Tomiyama comments that the Bratz sculpt was "a very fine piece of work," and that it allowed the face painter "considerable freedom to create faces with different configurations, different eye shapes, different lip fullness, etc. Thus, each of the Bratz characters can be differentiated via the face paint, even though all four initial characters used the same sculpt." Ms. Tomiyama also states, "Certainly to the face designer, the face paint is the key component of the appeal of the doll...most of the 'personality' of the doll is conveyed by the face paint." Expert Report of Tina Tomiyama, February 8, 2008, p. 7-8. To the extent the Court accepts positions of Mr. Tonner and Ms. Tomiyama on these issues, this may put downward pressure on the apportionment percentages summarized in Section C.

[29] Discussions with Paula Garcia and Aileen Storer.

[30] Mr. Tonner concludes in his expert report, "Whereas the importance of a new idea cannot be denied, the same idea, without the help of a very talented staff, could have been a flop. I believe that the original idea for Bratz was only one part of what made a very successful doll program." Expert Witness Report by Robert Tonner, February 8, 2008, p. 19.

[31] Deposition of Veronica Marlow, December 28, 2007, p. 177.

[32] Deposition of Margaret Leahy, December 12, 2007, p. 205-206.

[33] Deposition of Isaac Larian, July 18, 2006, p. 127-128.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT __3__

PAGE __15__

12

Mr. Larian testified that Carter Bryant, Veronica Marlow, Paula Garcia and "the Hong Kong team" were all involved in the development of the fashions for the Bratz dolls. Carter Bryant also testified that Mercedeh Ward, Paula Garcia, Veronica Marlow, Anna Rhee and Steve Tarmichael worked on the development of the Bratz project.[34]

34.     Based on my review of this and other deposition testimony, production schedules produced in this matter and discussions with Paula Garcia, I understand that at least twelve people provided creative contributions into the initial Bratz doll. These individuals include Carter Bryant, Margaret Leahy, Veronica Marlow, Mercedeh Ward, Anna Rhee, Aileen Storer, Paula Garcia, Charles O'Connor, Sarah Halpern, Steve Tarmichael, David Dees and Rachel Harris. These people and their roles in the development of the initial Bratz dolls are summarized on ATTACHMENT 6.

35.     Subsequent to the initial Bratz dolls, MGA has continued to create new Bratz characters, themes, fashions and packaging. Consequently, MGA has continued to devote substantial resources to create new Bratz products and expand the Bratz product line. These efforts have involved continuing creative contributions from these and other individuals.[35]

### Many Factors Contributed To Bratz Sales And Profits

36.     Bratz's success derives from a combination of numerous aspects beyond the scope of the accused copyrighted property. Mattel, which analyzed the success of the Bratz doll line, has attributed Bratz's success to a variety of factors. For example, a presentation included in Mattel's documents entitled, "My City, My Style, My Scene: Competitive Analysis" dated August 2003, identifies factors that contributed to the success of the Bratz product line. Under the heading, "Why Is Bratz Successful?," the following reasons were listed:

- "Brand name is easy for girls to pronounce and they understand meaning
- Appeals to older girls who have outgrown Barbie
- Hip, cool, fun, trendy image
- Color scheme is appealing and creates presence
- Fashions and accessories are 'over the top' hip

---

[34] Deposition of Carter Bryant, November 5, 2004, p. 278. See also Deposition of Carter Bryant, November 5, 2004, p. 281-282.
[35] Discussions with Paula Garcia.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT ___3___        13

PAGE ___16___

Leahy's second sculpt resulted in a "more neutral pose" with a straighter, slimmer body, a narrower torso, narrower legs, longer arms and more "ambivalent" features in its face, all of which Mr. Bryant believed were "significant" changes.[59]   According to Ms. Garcia, the new sculpt had a different head, lips, ears, eyes and "the angularity in the face was changed."[60]

49.    Fourth, after the sculpt is prepared, I understand that face painting, hair rooting and hairstyling are applied to the doll head, or rotocast. These are additional creative contributions. Anna Rhee had primary responsibility for the Bratz face paint. Ms. Rhee added facial features to the doll including the skin tone, eyes, mouth, nose and ears as well as other creative elements such as makeup. Mr. Bryant confirmed that the Bratz doll ended up with a face design that Ms. Rhee had come up with.[61]   Steve Tarmichael was responsible for the hair of the Bratz doll which includes creative elements such as hair styling, coloring and rooting to the rotocast.

### 2.    Themes Associated With The Dolls

50.    Based on discussions with Paula Garcia and Robert Tonner and reviewing documents produced in this case, as well as the review of research and deposition testimony in this matter,   I understand that fashion dolls are marketed with various themes.  For example, Barbie themes have included "California Girl," "Princess World," "Fairy World," "Kelly World," "Happy Family," "Pop" and "Essentials."[62]   Bratz themes have included "Sun-Kissed Summer," "Wintertime Wonderland" and "Formal Funk," as examples.[63]

51.    The themes associated with fashion dolls play a large role in MGA's generation of Bratz sales and profits.   Sales of themed Bratz products vary significantly, demonstrating that theme selection plays an important role in the success of a Bratz fashion doll.  This concept is further described in Section C.7.

52.    An MGA presentation titled, "Bratz, Fashion Doll Competition," listed as one of Bratz's strengths: "Themes lend to Bratz strong and sexy personas, which allow characters to exude confidence, individuality, femininity, and overall girl power emotion."[64]

---

[59] Deposition of Carter Bryant, November 4, 2004, p. 122; Deposition of Carter Bryant, November 5, 2004, p. 352.
[60] Deposition of Paula Garcia, October 10, 2007, p. 1298.
[61] Deposition of Carter Bryant, November 4, 2004, p. 116.
[62] "Barbie 2004 Marketing Plan," October 28, 2003, M0284970-96 at 85.
[63] MGA's Complaint, April 13, 2005, p. 19.
[64] "Bratz, Fashion Doll Competition," MGA0212249-60 at 53.

EXHIBIT ___3___        19

PAGE ___17___

Expert Report of Paul K. Meyer

6.   **Packaging In Which The Dolls Are Sold**

100.   Based on discussions with Paula Garcia, Aileen Storer, Steffen Smith and Robert Tonner and the review of business and marketing documents produced in this matter, as well as research and review of deposition testimony in this matter, I understand that packaging is important to MGA's generation of Bratz sales and profits.

101.   MGA devotes significant resources to developing and producing packaging for Bratz dolls. According to Ms. Garcia, packaging accounts for approximately one-third of the total product cost, with the cost for more intricate packages accounting for over 40% of the total product cost. I understand that Packaging consists of two primary creative processes: (a) package design consisting of the package shape, graphics and product placement, and (b) copy that conveys attributes of the product.[157]

102.   Aileen Storer, with assistance from others, developed the initial trapezoidal package shape for the Bratz products and has continued to develop award-winning, innovative packaging designs.[158] Ms. Storer developed the concept of including handles on the Bratz products, which also served as items for the consumer on certain packages.[159]   Additionally, Ms. Storer developed the Bratz logo.[160]   Charles O'Connor developed the copy for the Bratz products and is credited for creating the "Passion for Fashion" tag line.[161]

103.   Key elements of MGA's packaging of Bratz products consist of using innovative shapes, such as a trapezoid, and clear packaging offering superior visibility of the package contents, and using unique colors and lettering printed directly to the plastic package.[162]

104.   Mr. Kilpin, Mattel's former Senior Vice President of Design & Marketing for Girls, testified that he liked the Bratz packaging because of how the packaging displayed a Bratz doll's accessories, "I thought they displayed the piece count nicely."[163]

105.   Documents produced by Mattel emphasize the effect of the Bratz packaging on the success of the Bratz dolls.   A presentation entitled, "My City, My Style, My Scene: Competitive Analysis"

---

[157] Discussions with Paula Garcia and Aileen Storer.
[158] Discussions with Aileen Storer.
[159] Discussions with Aileen Storer.
[160] Discussions with Aileen Storer.
[161] Discussions with Paula Garcia; Deposition of Carter Bryant, November 5, 2004, p. 287.
[162] Discussions with Paula Garcia and Aileen Storer.
[163] Deposition of Timothy Kilpin (rough), January 25, 2008, p. 295-296.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

35

EXHIBIT 3

PAGE 18



Expert Report of Paul K. Meyer

159.   **TABLE VII** below provides a summary of the various apportionment methods and the resulting apportionment percentages.

**TABLE VII – Summary Of Apportionment Approaches And Percentages**

| Apportionment Approach | Profit Apportionment Percentage |
|---|---|
| 1.   Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll | 15.4% |
| 2.   Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line | Approx. 15.0%[231] (3.0% of net sales) |
| 3.   Work tasks to develop the original Bratz doll | 22.3% |
| 4.   MGA's Bratz product development contributions | 14.3% |
| 5.   MGA's "licensing in" and "licensing out" royalty rates | 25.0% |
| 6.   MGA's investments in the Bratz product line | 24.3% |
| 7.   Sales variation among Bratz products [232] | TBD |
| Range[233, 234, 235, 236] | 14.3% - 25.0% |

---

[231] For illustrative purposes, assuming a MGA profit margin of 20.0% would yield an apportionment percentage of 15.0%.

[232] As Mattel has not identified the accused products in this case, my apportionment calculations in this section would be based on additional information produced by Mattel. Accordingly, at this time, I have not calculated an apportionment percentage for this factor.

[233] The range of apportionment percentages of 14.3% to 25.0% is reasonable when considered in the context of the "25% Rule," which indicates a starting point is generally 25.0% of operating profits. See Section C, paragraph 124.

[234] I understand that Peter Menell, Ph.D., a professor of law at UC Berkeley and an expert for MGA, will testify that MGA's Bratz dolls do not infringe copyright in the Carter Bryant doll sketches. To the extent the Court accepts certain positions of Dr. Menell, this may put downward pressure on apportionment percentages summarized above in Section C, indicating percentages on the lower end of the range may be more appropriate under those circumstances. See Section B, paragraph 31.

[235] I understand that Robert Tonner, Tina Tomiyama and others will testify on behalf of MGA that the Bratz doll as actually designed and developed includes significant differences and enhancements over the accused copyrighted property. See additional observations in Section B, paragraph 31. To the extent the Court accepts positions of Mr. Tonner and Ms. Tomiyama on these issues, this may put downward pressure on the apportionment percentages summarized above in Section C, indicating percentages on the lower end of the range may be more appropriate under those circumstances.

[236] I have considered the importance of branding in Section B.7 (MGA's Branding, Marketing and Advertising Efforts). I understand that Erich Joachimsthaler, an expert retained on behalf of MGA, will testify that MGA developed the Bratz brand, and that the Bratz brand is an <u>extremely significant contributor</u> to MGA's success, sales and profits (e.g., allowing Bratz to obtain product pricing advantages). To the extent the Court accepts positions of Mr. Joachimsthaler on these issues, this may put downward pressure on the apportionment percentages summarized above in Section C, indicating percentages on the lower end of the range may be more appropriate under those circumstances.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**Exhibit 4**

# Expert Report of
# Dr. Erich Joachimsthaler

In the matter of

Carter Bryant v. Mattel and consolidated cases

February 11, 2008

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ___4___

PAGE ___20___

b.  MGA Entertainment has applied many principles of proactive brand management that provided the organizational setting to create, build and nurture a strong brand identity for Bratz.

c.  Bratz has developed into a strong brand through a series of successful innovations and powerful brand-building programs. Since its launch, the major dimensions of brand strength that constitute brand equity have strengthened. This should allow Bratz to realize a significant price premium over an unbranded equivalent.

d.  The nature of the consumer decision-making process in toys, and particular dolls is such that the brand has a significant impact on consumer purchase decisions.

e.  Based on the strength of the Bratz brand and the role of this brand in consumer decision making for fashion dolls, I conclude that the price premium that Bratz can realize over an unbranded equivalent ranges from about 50% to 70% in the categories of fashion dolls and accessories.

f.  Mattel, the incumbent market leader, did not respond to the changing market conditions for many reasons that are internal to Mattel, and Mattel like most mature organizations, would not have been able to seize an "opportunity hidden in plain sight." In contrast, MGA Entertainment was able to capture the market opportunity and grow the overall market for fashion dolls.

12. Bratz and Barbie were brands I was quite familiar with even prior to being retained. I am the father of three children, a boy and two girls. My daughters (ages 13 and 11) have played with Bratz and Barbie dolls for sometime and I have been to stores where Bratz products are sold.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ___U___

PAGE ___21___

Executed this 11th day of February, 2008:

Erich Joachimsthaler

83

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ___4___

PAGE ___22___

**Exhibit 5**

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,    )
                                   )
            PLAINTIFF,    )
                                   )
       V.                 )    NO.  CV 04-9040 SGL (RNBX)
                                   )
MATTEL, INC., A DELAWARE    )
CORPORATION,    )
                                   )
          DEFENDANTS.    )
                                   )
AND CONSOLIDATED ACTION (S).    )

# C O N F I D E N T I A L

**(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)**

## DEPOSITION OF MARGARET LEAHY

## DECEMBER 12, 2007



**REPORTED BY:**
BETH FELIX
CSR NO. 12766
JOB NO. 07AE738-BF

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT ___5___

PAGE ___23___

| | | |
|---|---|---|
| 1 | Q   IS THAT ALL YOUR HANDWRITING? | 15:42:08 |
| 2 | A   UH-HUH. | 15:42:11 |
| 3 | Q   THAT'S A YES? | 15:42:11 |
| 4 | A   YES. | 15:42:12 |
| 5 | Q   SO YOU SAID THAT YOU NEEDED TO LOOK AT YOUR | 15:42:14 |
| 6 | BOOK IN ORDER TO DETERMINE WHEN IT IS THAT YOU STARTED | 15:42:17 |
| 7 | WORKING ON THAT FIRST SCULPT FOR BRATZ, SO, PLEASE, | 15:42:20 |
| 8 | TELL ME NOW THAT YOU HAVE YOUR BOOK IN FRONT OF YOU | 15:42:28 |
| 9 | MARKED AS 1132 AND 1133 WHEN THAT WAS? | 15:42:33 |
| 10 | A   IT SAYS SEPTEMBER 29 HERE WHERE CARTER IS | 15:42:40 |
| 11 | CRITIQUING THE SCULPT ON PAGE 00078.01.  IT'S THE FIRST | 15:42:46 |
| 12 | PAGE AFTER THE FIRST PAGE. | 15:42:58 |
| 13 | Q   SO, PLEASE, TELL US WHAT THAT MEANS? | 15:42:59 |
| 14 | A   THAT MEANS HE WAS CRITIQUING MY SCULPT.  IT | 15:43:02 |
| 15 | TOOK ME TWO DAYS TO DO THE SCULPT, SO THAT WOULD HAVE | 15:43:08 |
| 16 | BEEN TWO OR THREE DAYS BEFORE SO THE 26TH OR THE 27TH, | 15:43:12 |
| 17 | SOMEWHERE AROUND THAT TIME. | 15:43:19 |
| 18 | Q   SO THEN IF I UNDERSTAND THE CHRONOLOGY | 15:43:21 |
| 19 | CORRECTLY, YOU RECEIVED -- YOU HAD THAT INITIAL MEETING | 15:43:24 |
| 20 | WITH CARTER BRYANT AT YOUR HOUSE? | 15:43:29 |
| 21 | A   UH-HUH. | 15:43:31 |
| 22 | Q   YOU BEGAN DOING THE FIRST BRATZ SCULPTURE | 15:43:32 |
| 23 | WITHIN A DAY OF WHEN YOU HAD THAT INITIAL MEETING, AND | 15:43:36 |
| 24 | THEN WITHIN, APPROXIMATELY, TWO DAYS AFTER THAT YOU | 15:43:40 |
| 25 | COMPLETED THE FIRST SCULPT, WHICH YOU BELIEVE WAS ON OR | 15:43:44 |

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT 6

PAGE 24

| | | |
|---|---|---|
| 1 | ABOUT SEPTEMBER 29TH, 2000? | 15:43:49 |
| 2 | A   RIG,HT TWO DAYS AFTER THAT OR ONE DAY AFTER | 15:43:51 |
| 3 | THAT.  IT WAS A VERY QUICK RENDERING. | 15:43:54 |
| 4 | Q   YOU'LL SEE HERE THAT THERE ARE VARIOUS | 15:44:01 |
| 5 | COMMENTS UNDERNEATH WHERE IT SAYS, "FIONA," AND NEXT TO | 15:44:05 |
| 6 | IT AS WELL? | 15:44:09 |
| 7 | A   RIGHT. | 15:44:10 |
| 8 | Q   IF YOU CAN, PLEASE, READ WHAT THOSE COMMENTS | 15:44:10 |
| 9 | ARE. | 15:44:12 |
| 10 | A   IT SAYS, "HEAD BIGGER 2.575, SMALLER WAIST, | 15:44:13 |
| 11 | SMALLER HIPS AND THIGHS AND ANKLES, NECK LONGER, | 15:44:21 |
| 12 | THICKNESS," SOMETHING OR RATHER.  I DON'T KNOW WHAT | 15:44:27 |
| 13 | THAT SAYS AFTER THAT. | 15:44:30 |
| 14 | Q   OKAY. | 15:44:32 |
| 15 | A   "AND FEET BULKIER ON TOP."  THEN IT SAYS, | 15:44:32 |
| 16 | "PAULA TREANTAFELLES, EXTENSION 104." | 15:44:39 |
| 17 | Q   WHY IS THERE A NOTATION ABOUT PAULA | 15:44:46 |
| 18 | TREANTAFELLES? | 15:44:50 |
| 19 | A   SHE WAS WORKING ON THE PROJECT AS WELL ON | 15:44:50 |
| 20 | BEHALF OF M.G.A. | 15:44:52 |
| 21 | Q   THIS CRITIQUE THAT YOU MENTIONED THAT OCCURRED | 15:44:53 |
| 22 | ON OR ABOUT SEPTEMBER 29TH, 2000, OF THE FIRST BRATZ | 15:44:54 |
| 23 | SCULPT THAT YOU DID, MR. BRYANT WAS THAT? | 15:45:00 |
| 24 | A   YES. | 15:45:03 |
| 25 | Q   YOU WERE THERE, OF COURSE? | 15:45:04 |

162

EXHIBIT   6

PAGE   25

| | | |
|---|---|---|
| 1 | Q   AND WHY DO YOU SAY THAT? | 16:30:47 |
| 2 | A   I THINK I REMEMBER TALKING TO HIM ABOUT IT. | 16:30:50 |
| 3 | Q   DID YOU TELL HIM BEFORE YOU WERE DOING IT OR | 16:30:55 |
| 4 | AFTER? | 16:30:59 |
| 5 | A   HE TOLD ME HOW TO DO IT. | 16:31:00 |
| 6 | Q   SO IT MICHAEL HEBDEN WHO INTRODUCED YOU TO | 16:31:04 |
| 7 | ILANA RAYNES SO THAT YOU COULD DO WORK FOR A MATTEL | 16:31:10 |
| 8 | COMPETITOR WHEN YOU WERE THERE AT MATTEL? | 16:31:15 |
| 9 | A   THAT'S NOT WHY HE INTRODUCED ME TO ILANA | 16:31:18 |
| 10 | RAYNES. | 16:31:21 |
| 11 | Q   WELL, WE'RE TALKING ABOUT SPECIFICALLY | 16:31:22 |
| 12 | INSTANCES IN WHICH YOU TOLD OR YOU DISCUSSED THIS WORK | 16:31:26 |
| 13 | FOR COMPETITORS WHILE YOU WERE STILL EMPLOYED BY | 16:31:31 |
| 14 | MATTEL.  YOUR ANSWER ABOUT MICHAEL HEBDEN SEEMED TO | 16:31:35 |
| 15 | SUGGEST THAT HE WAS THE ONE WHO ENABLED OR FACILITATED | 16:31:40 |
| 16 | OR SOMEHOW SET UP YOUR WORK WITH ILANA RAYNES? | 16:31:43 |
| 17 | A   HE DIDN'T SET IT UP.  I DIDN'T MAKE A LOT OF | 16:31:47 |
| 18 | MONEY BACK THEN, AND I NEEDED TO PAY THE BILLS, AND HE | 16:31:51 |
| 19 | SUGGESTED A WAY OF GETTING FREE-LANCE WORK. | 16:31:57 |
| 20 | Q   SO MICHAEL HEBDEN WAS THE ONE WHO SAID TO YOU | 16:32:02 |
| 21 | WHY DON'T YOU TRY GETTING FREE-LANCE WORK THROUGH ILANA | 16:32:06 |
| 22 | RAYNES? | 16:32:10 |
| 23 | A   NO.  HE NEVER SAID ILANA.  HE NEVER SAID | 16:32:10 |
| 24 | ANYBODY SPECIFICALLY. | 16:32:14 |
| 25 | Q   HE JUST TOLD YOU TO GO OFF AND GET FREE-LANCE | 16:32:14 |

185

EXHIBIT __5__

PAGE __26__

| | | |
|---|---|---|
| 1 | WORK? | 16:32:18 |
| 2 | A    WELL, HE SUGGESTED A WAY OF DOING IT. | 16:32:18 |
| 3 | Q    AND HOW DID HE DO THAT? | 16:32:21 |
| 4 | A    WELL, JUST LIKE I TOLD YOU, TALK TO THE | 16:32:23 |
| 5 | VENDORS WHO ARE DOING WORK AND SEE IF THEY HAVE EXTRA | 16:32:26 |
| 6 | WORK THAT THEY CAN'T DO. | 16:32:31 |
| 7 | Q    DID YOU HAVE ONE CONVERSATION WITH MR. HEBDEN | 16:32:36 |
| 8 | ABOUT THIS OR MORE THAN ONE? | 16:32:40 |
| 9 | A    PROBABLY, MORE THAN ONE, BUT I CAN'T TELL YOU | 16:32:42 |
| 10 | HOW MANY. | 16:32:44 |
| 11 | Q    WHEN DID THOSE CONVERSATIONS OCCUR? | 16:32:45 |
| 12 | A    I DON'T REMEMBER. | 16:32:47 |
| 13 | Q    YOU CAN'T TELL ME A YEAR? | 16:32:48 |
| 14 | A    I CAN'T TELL YOU. | 16:32:50 |
| 15 | Q    WHERE DID THEY TAKE PLACE? | 16:32:53 |
| 16 | A    IN THE DEPARTMENT. | 16:32:56 |
| 17 | Q    THERE IN THE MATTEL DESIGN CENTER? | 16:32:59 |
| 18 | A    YES. | 16:33:01 |
| 19 | Q    SO THEN OTHER THAN THE FREE-LANCE JOB THAT YOU | 16:33:08 |
| 20 | MENTIONED FOR HANNA-BARBERA AND THE WORK THAT YOU DID | 16:33:13 |
| 21 | THROUGH ILANA RAYNES -- WELL, I'M SORRY.  I'LL TRY IT | 16:33:17 |
| 22 | THIS WAY: | 16:33:23 |
| 23 | DURING THE TIME THAT YOU WERE DOING THAT | 16:33:25 |
| 24 | FREE-LANCE WORK THAT YOU DESCRIBED WHILE YOU WERE | 16:33:28 |
| 25 | EMPLOYED BY MATTEL THROUGH HANNA-BARBERA AND THROUGH | 16:33:31 |

186

EXHIBIT    5

PAGE    27

| | | |
|---|---|---|
| 1 | ILANA RAYNES, YOU WERE AWARE THAT WAS INCONSISTENT WITH | 16:33:34 |
| 2 | YOUR MATTEL EMPLOYMENT AGREEMENT; IS THAT TRUE? | 16:33:38 |
| 3 | A    YES. | 16:33:41 |
| 4 | Q    AND YOU KNEW THAT AT THE TIME? | 16:33:41 |
| 5 | A    YES. | 16:33:43 |
| 6 | Q    PRIOR TO THE TIME THAT YOU TOOK ON ANY OF | 16:33:52 |
| 7 | THOSE JOBS, DID YOU GO AND GET APPROVAL FROM ANY MATTEL | 16:33:54 |
| 8 | EXECUTIVE IN WHICH YOU SAID SPECIFICALLY YOU WERE GOING | 16:33:59 |
| 9 | TO BE WORKING ON THOSE PROJECTS FOR A COMPETITOR? | 16:34:02 |
| 10 | A    NO. | 16:34:06 |
| 11 | Q    DID YOU EVER DISCLOSE TO ANYONE SENIOR VICE | 16:34:10 |
| 12 | PRESIDENT LEVEL OR ABOVE THERE AT MATTEL THAT YOU WERE | 16:34:16 |
| 13 | DOING THIS WORK? | 16:34:20 |
| 14 | MR. MC FARLAND:  OBJECT TO THE | 16:34:21 |
| 15 | CHARACTERIZATION OF THE LEVEL AND THE LACK OF | 16:34:22 |
| 16 | FOUNDATION AS TO WHAT MR. HEBDEN'S TITLE WAS, WHO WAS | 16:34:24 |
| 17 | HER SUPERVISOR. | 16:34:28 |
| 18 | THE WITNESS:  CAN YOU ASK THAT QUESTION AGAIN? | 16:34:30 |
| 19 | MR. ZELLER:  IF WE CAN READ IT BACK. | 16:34:32 |
| 20 | (RECORD READ.) | 16:34:43 |
| 21 | THE WITNESS:  NO. | 16:34:43 |
| 22 | BY MR. ZELLER: | 16:34:57 |
| 23 | Q    WHAT WAS, APPROXIMATELY, THE OVERALL TIME | 16:34:57 |
| 24 | PERIOD WHEN YOU WERE DOING THIS WORK FOR COMPETITORS | 16:35:03 |
| 25 | WHILE EMPLOYED BY MATTEL?  ARE WE TALKING A MATTER OF | 16:35:09 |

187

EXHIBIT   5

PAGE   26

| | | |
|---|---|---|
| 1 | WEEKS?  A MATTER OF MONTHS?  LONGER? | 16:35:14 |
| 2 | A   HERE AND THERE THROUGHOUT THE WHOLE COURSE OF | 16:35:16 |
| 3 | WORKING AT MATTEL. | 16:35:18 |
| 4 | Q   DID YOU DO SOME OF THE WORK THAT 2000 -- WORK | 16:35:19 |
| 5 | FOR COMPETITORS WHILE EMPLOYED BY MATTEL? | 16:35:24 |
| 6 | A   POSSIBLY. | 16:35:28 |
| 7 | Q   DURING THE TIME THAT YOU WERE OUT ON FAMILY | 16:35:29 |
| 8 | LEAVE, DID YOU DO ANY WORK FOR MATTEL COMPETITORS? | 16:35:31 |
| 9 | A   NO, I DID NOT.  I DIDN'T DO ANY WORK AT ALL. | 16:35:35 |
| 10 | Q   OTHER THAN YOURSELF, DO YOU KNOW ANY PERSON | 16:35:53 |
| 11 | THERE AT MATTEL WHO WAS A MATTEL EMPLOYEE BY NAME WHO | 16:35:56 |
| 12 | WAS, ALSO, DOING WORK FOR A COMPETITOR AT THE SAME | 16:36:01 |
| 13 | TIME? | 16:36:05 |
| 14 | A   I DON'T KNOW ANYBODY BY NAME. | 16:36:14 |
| 15 | Q   DURING THE TIME WHEN YOU WERE WORKING ON THIS | 16:36:24 |
| 16 | PROJECT FOR HANNA-BARBERA, DID YOU DO ANY OF THAT WORK | 16:36:27 |
| 17 | AT THE MATTEL DESIGN CENTER? | 16:36:32 |
| 18 | A   NO. | 16:36:34 |
| 19 | Q   YOU DID IT ALL AT HOME? | 16:36:36 |
| 20 | A   YES. | 16:36:39 |
| 21 | Q   DID YOU USE ANY MATTEL SUPPLIES FOR IT? | 16:36:40 |
| 22 | A   NO. | 16:36:43 |
| 23 | Q   AND HOW DO YOU KNOW? | 16:36:44 |
| 24 | A   BECAUSE THE PENELOPE PIT STOP HAD ALREADY BEEN | 16:36:46 |
| 25 | SCULPTED AND THEY JUST WANTED ME TO FIX IT. | 16:36:54 |

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT 5

PAGE 29

| | | |
|---|---|---|
| 1 | Q   WITH RESPECT TO THE PROJECTS THAT YOU DID | 16:36:57 |
| 2 | THROUGH ILANA RAYNES, DID YOU DO ANY OF THAT WORK AT | 16:36:59 |
| 3 | THE MATTEL DESIGN CENTER? | 16:37:02 |
| 4 | A   NO. | 16:37:05 |
| 5 | Q   DID YOU USE ANY MATTEL SUPPLIES FOR THAT? | 16:37:05 |
| 6 | A   I MIGHT HAVE USED SOME WAX. | 16:37:09 |
| 7 | Q   WAX THAT YOU OBTAINED FROM THE MATTEL DESIGN | 16:37:11 |
| 8 | CENTER? | 16:37:15 |
| 9 | A   YES. | 16:37:15 |
| 10 | Q   THE WAX THAT YOU'RE REFERRING TO IS THE WAX | 16:37:16 |
| 11 | FOR THE SCULPTING YOU USED ON THOSE PROJECTS FOR | 16:37:18 |
| 12 | COMPETITORS? | 16:37:21 |
| 13 | A   YES. | 16:37:21 |
| 14 | Q   DID YOU TELL ANYONE AT MATTEL AT THE SENIOR | 16:37:26 |
| 15 | VICE PRESIDENT LEVEL OR ABOVE THAT YOU WERE TAKING | 16:37:29 |
| 16 | THOSE MATTEL SUPPLIES TO USE ON THOSE PROJECTS? | 16:37:33 |
| 17 | A   NO. | 16:37:36 |
| 18 | Q   DID YOU GET PERMISSION FROM ANYONE? | 16:37:37 |
| 19 | A   NO. | 16:37:39 |
| 20 | Q   WHERE DID YOU GET THE WAX, MORE SPECIFICALLY, | 16:37:39 |
| 21 | FROM THE DESIGN CENTER? | 16:37:42 |
| 22 | A   WELL, THE WAX WAS MADE IN THE MODEL SHOP. | 16:37:44 |
| 23 | Q   SO YOU WENT TO THE MODEL SHOP TO GET IT? | 16:37:49 |
| 24 | A   NO.   IT WAS ALWAYS -- WE HAD IT IN THE | 16:37:53 |
| 25 | SCULPTING DEPARTMENT. | 16:37:56 |

189

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT __5__

PAGE __30__

| | | |
|---|---|---|
| 1 | Q   AND THAT'S WHERE YOU GOT THE WAX THAT YOU WERE | 16:38:05 |
| 2 | TALKING ABOUT WAS WAX THAT WAS ALREADY THERE IN THE | 16:38:08 |
| 3 | SCULPTING DEPARTMENT AS OPPOSED TO GOING TO THE MODEL | 16:38:11 |
| 4 | SHOP TO GET IT? | 16:38:14 |
| 5 | A   YES. | 16:38:16 |
| 6 | Q   DO YOU REMEMBER WHAT KIND OF WAX IT WAS? | 16:38:16 |
| 7 | A   IT WAS THE MATTEL WAX. | 16:38:19 |
| 8 | Q   PLEASE, TELL US WHAT YOU MEAN BY "THE MATTEL | 16:38:22 |
| 9 | WAX." | 16:38:26 |
| 10 | A   IT'S WAX THAT THEY FORMULATED TO SCULPT DOLLS | 16:38:27 |
| 11 | OUT OF AND TOYS. | 16:38:31 |
| 12 | Q   AS OF THE TIME THAT YOU LEFT MATTEL, DID YOU | 16:38:41 |
| 13 | HAVE ANY OF THAT MATTEL WAX? | 16:38:44 |
| 14 | A   CHRIS GAVE ME A BUCKET BEFORE I LEFT. | 16:38:46 |
| 15 | Q   CHRIS SESTO? | 16:38:51 |
| 16 | A   UH-HUH. | 16:38:52 |
| 17 | Q   THAT'S A YES? | 16:38:53 |
| 18 | A   YES. | 16:38:54 |
| 19 | Q   AND DID YOU END UP USING THAT MATTEL WAX FOR | 16:38:59 |
| 20 | ANY OF THE WORK THAT YOU DID AFTER YOU LEFT MATTEL? | 16:39:03 |
| 21 | A   NO, BECAUSE HE JUST GAVE ME A LITTLE BIT. | 16:39:06 |
| 22 | Q   WHAT HAPPENED TO THAT WAX? | 16:39:14 |
| 23 | A   IT GOT USED UP WHEN I DID THE QUEEN OF HEARTS | 16:39:16 |
| 24 | WITH MY FRIEND. | 16:39:20 |
| 25 | Q   I'M SORRY.  YOU DID THE? | 16:39:21 |

190

EXHIBIT 5

PAGE 31

1   STATE OF CALIFORNIA       )

2                             ) SS.

3   COUNTY OF LOS ANGELES     )

4

5       I, BETH FELIX, CERTIFIED SHORTHAND REPORTER,

6   CERTIFICATE NO. 12766, FOR THE STATE OF CALIFORNIA,

7   HEREBY CERTIFY:

8       THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT

9   THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME THE

10  DEPONENT WAS PLACED UNDER OATH BY ME;

11      THE TESTIMONY OF THE DEPONENT AND ALL OBJECTIONS

12  MADE AT THE TIME OF THE EXAMINATION WERE RECORDED

13  STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED.

14  THE FOREGOING TRANSCRIPT IS A TRUE AND CORRECT

15  TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

16      I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR

17  NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN ANY WAY

18  INTERESTED IN THE OUTCOME THEREOF;

19      IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED MY

20  NAME THIS 12TH OF DECEMBER, 2007.

21

22                    *Beth Felix*

                      BETH FELIX

23

24

25

314

EXHIBIT ____5____

PAGE ____32____

**Exhibit 6**

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Duane R. Lyons (Bar No. 125091)
  (duanelyons@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT, an individual,

                    Plaintiff,

          v.

MATTEL, INC., a Delaware
corporation,

                    Defendant.

_____

MGA ENTERTAINMENT, INC. a
California corporation,

                    Plaintiff,

          v.

MATTEL, INC., a Delaware
corporation, and DOES 1-10,

                    Defendants.

CASE NO. CV 04-9049 SGL (RNBx)

Consolidated With Case No. 04-9059 and Case No. 05-2727

MATTEL, INC.'S SECOND AMENDED ANSWER IN CASE NO. 05-2727 AND COUNTERCLAIMS FOR:

1. COPYRIGHT INFRINGEMENT;
2. VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
3. CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
4. MISAPPROPRIATION OF TRADE SECRETS;
5. BREACH OF CONTRACT;
6. INTENTIONAL INTERFERENCE WITH CONTRACT;
7. BREACH OF FIDUCIARY DUTY;
8. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;
9. BREACH OF DUTY OF LOYALTY;

CONFIDENTIAL FILED UNDER SEAL, PURSUANT TO PROTECTIVE ORDER

EXHIBIT 6

Volume I

PAGE 23

CLERK, U.S. DISTRICT COURT

JUL 12 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION     BY DEPUTY

CONFORMED COPY

SECOND AMENDED ANSWER AND COUNTERCLAIMS

209/2154363.3

1  the agreement, including those he purportedly provided while still a Mattel

2  employee, purportedly would be considered "works for hire" of MGA; and that all

3  intellectual property rights to preexisting works by Bryant, including Bratz designs,

4  purportedly were assigned to MGA.

5  **IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6          37.   On information and belief, in or about late 2003 or early 2004,

7  MGA decided to open business operations in Mexico. Faced with the difficult task

8  of developing an overall strategy for expanding into a market in which it had only a

9  nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10  and business information for the Mexican market and materials related to Mattel's

11  worldwide business strategies. As detailed below, MGA and Larian approached

12  three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13  steal Mattel's most sensitive business planning materials, and then hired them to

14  assist in establishing and running MGA's new Mexican subsidiary.

15  **A.    MGA Hires Three Senior Mattel Employees in Mexico**

16          38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior

17  Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18  confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19,

19  2004. His duties included short, medium and long-term marketing planning,

20  generating product sales projections, and assisting in creation of the media plan. In

21  his position, Machado had access to highly confidential and sensitive marketing

22  and product development information. Machado had an employment agreement

23  with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24  information. Mattel's policies also required Machado to protect Mattel's

25  proprietary information and not to disclose it to competitors.

26          39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing

27  Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28  She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

2154363.2

EXHIBIT 6

34

1 | Like Machado, her duties included short, medium and long-term marketing
2 | planning, generating product sales projections, and assisting in creation of the
3 | media plan.  In her position, Trueba had access to highly confidential and sensitive
4 | marketing and product development information.  Trueba had an employment
5 | agreement with Mattel in which she agreed to maintain the confidentiality of
6 | Mattel's protected information.  Mattel's policies also required Trueba to protect
7 | Mattel's proprietary information and not to disclose it to competitors.
8 |      40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9 | Manager with Mattel Mexico, a position of trust and confidence.  He was employed
10 | at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was
11 | responsible for ensuring that point-of-sale promotions were carried out, analyzing
12 | the results of such promotions, negotiating promotion budgets, and generally
13 | managing promotional activities.  Vargas also had access to highly confidential and
14 | sensitive marketing and product development information.  Vargas had an
15 | employment agreement with Mattel in which he agreed to maintain the
16 | confidentiality of Mattel's protected information.  Mattel's policies also required
17 | Vargas to protect Mattel's proprietary information and not to disclose it to
18 | competitors.
19 |      41.   Beginning in late 2003 or early 2004, Machado, Trueba and
20 | Vargas began planning to leave Mattel Mexico to join MGA.  In connection with
21 | that plan, and with the encouragement of Larian and other MGA officers operating
22 | in the United States, they began accessing, copying and collecting proprietary
23 | Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and
24 | Vargas each resigned their positions with Mattel, effective immediately.  They
25 | stated that they had been hired by a Mattel competitor, but refused to identify that
26 | competitor.  In fact, they had been offered and accepted employment by MGA to
27 | establish and run MGA's new operation in Mexico.
28 |

2154363.2

-40-

EXHIBIT    6

PAGE    35

**B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.    Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.    In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

-41-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT

1    participants intentionally sought to maximize the damage to Mattel from their

2    conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want

3    to resign (all at the same time, and you can believe my smile!) next Wednesday."

4           44.   Beginning on April 12, 2004, a week before his resignation and

5    after numerous communications and meetings with Larian and other MGA

6    personnel, Machado began transferring additional Mattel confidential and

7    proprietary information to a portable USB storage device (also know as a "thumb

8    drive") that he connected to his Mattel computer. On Friday, April 16, 2004, the

9    last business day before he gave notice, Machado copied at least 70 sensitive

10   documents to the portable USB storage device.

11          45.   Starting on April 12, 2004, Vargas also copied a host of

12   confidential and proprietary materials to a portable USB storage device, including

13   sales plans, sales projections and customer profiles.

14          46.   On April 16, 2004, Trueba also copied Mattel confidential and

15   proprietary information to a portable USB storage device connected to her Mattel

16   computer.

17          47.   With full knowledge that she was going to leave Mattel for a

18   competitor, Trueba also took steps to increase further her access to Mattel's

19   confidential information shortly before her resignation. For example, just four days

20   before leaving, Trueba went out of her way to seek to attend a meeting at which

21   Mattel personnel analyzed BARBIE programs for the United States, Canada and

22   South America. Two days before her resignation, she contacted both a Mattel

23   employee located in El Segundo, California and Mattel's advertising agency to

24   request updated confidential information about advertising plans for BARBIE. On

25   information and belief, Trueba acted at the direction of MGA and Larian and did so

26   in order to obtain further information that would allow MGA to obtain unfair

27   competitive advantage over Mattel.

28

48.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.   The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.   MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

-43-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___

PAGE ___

1   market share by 90 percent over the prior year. This increase came at the expense

2   of Mattel, which lost market share during 2004 in Mexico and was forced to

3   increase its advertising and promotional spending to offset further losses.

4       51.   Machado, Trueba and Vargas attempted to conceal their

5   widespread theft of Mattel's proprietary information. For example, Machado ran a

6   software program on his Mattel personal computer in an attempt to erase

7   information, including information that would reveal the addresses to which he had

8   sent, or from which he had received, e-mail messages. On information and belief,

9   for the same purpose Machado also damaged the hard drive of the personal

10   computer that he used at Mattel.

11       52.   On information and belief, on April 19, 2004, immediately after

12   Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

13   to Los Angeles to meet with MGA personnel, including Larian, in person.

14       53.   Mattel notified Mexican authorities about the theft of its trade

15   secret and confidential information. On October 27, 2005, the Mexican Attorney

16   General Office obtained a search warrant from the Mexican Federal Criminal

17   Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities

18   found and seized from MGA's offices both electronic and paper copies of a large

19   number of documents containing Mattel trade secrets, including those that Mattel

20   discovered through its forensic investigations, plus many others that Mattel had not

21   known had been stolen.

22       54.   Based on Machado's "performance" in Mexico, Isaac Larian

23   subsequently promoted Machado and he was transferred to MGA's main office in

24   Van Nuys, California. On information and belief, Machado currently resides in the

25   County of Los Angeles, California.

26

27

28

2154363.2

-44-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _____ ᗺ

PAGE _____ 39

1       15.   That Mattel have such other and further relief as the Court may

2   deem just and proper.

3

4   DATED:  July 12, 2007                QUINN EMANUEL URQUHART OLIVER &
                                         HEDGES, LLP
5

6                                 By_____
                                     John B. Quinn
7                                    Attorneys for Defendant and Counter-
                                     claimant Mattel, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                          EXHIBIT ___6___

27                                          PAGE ___40___

28

                                    -78-
                       SECOND AMENDED ANSWER AND COUNTERCLAIMS

**Exhibit 7**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL, ) | |
| PLAINTIFF, ) | |
| V. ) | NO. CV 04-9040 SGL (RNBX) |
| MATTEL, INC., A DELAWARE ) CORPORATION, ) | |
| DEFENDANTS. ) | |
| ───────────────────── ) | |
| AND CONSOLIDATED ACTION (S). ) | |
| ───────────────────── ) | |

# C O N F I D E N T I A L

### (ATTORNEYS' EYES ONLY)

## DEPOSITION OF PAULA GARCIA

## VOLUME IV

## OCTOBER 10, 2007



REPORTED BY:
J'ANA SIEGERS
CSR NO. 10845
JOB NO. 07AE634-JS

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT ____7____

PAGE ____41____

| | | |
|---|---|---|
| 03:26:23 | 1 | HAD WITH CHRIS LYNCH SINCE THE TIME THAT YOU LEFT |
| 03:26:29 | 2 | MATTEL IN APRIL OF 2000 THAT YOU HAVEN'T TOLD ME |
| 03:26:31 | 3 | ABOUT? |
| 03:26:31 | 4 | MS. TORRES:  OBJECTION.  ASKED AND |
| 03:26:32 | 5 | ANSWERED. |
| 03:26:33 | 6 | THE DEPONENT:  NOT THAT I REMEMBER, NO. |
| 03:26:38 | 7 | BY MR. ZELLER: |
| 03:26:42 | 8 | Q.  WHAT PROJECTS DID CHRIS LYNCH WORK ON WHEN |
| 03:26:44 | 9 | SHE WAS AT MATTEL AND YOU WERE AT MATTEL THAT YOU |
| 03:26:47 | 10 | WERE THE PLANNER ON? |
| 03:26:55 | 11 | MS. TORRES:  OBJECTION.  VAGUE. |
| 03:27:02 | 12 | THE DEPONENT:  I REMEMBER A HELLO KITTY |
| 03:27:03 | 13 | DOLL IN PARTICULAR THAT SHE WORKED ON. |
| 03:27:15 | 14 | BY MR. ZELLER: |
| 03:27:15 | 15 | Q.  ANYTHING ELSE? |
| 03:27:17 | 16 | A.  NOTHING THAT COMES TO MIND RIGHT NOW. |
| 03:27:22 | 17 | Q.  WERE YOU EVER THE PLANNER ON ANY PROJECTS |
| 03:27:24 | 18 | THAT MAUREEN MULLEN WORKED ON WHEN SHE WAS AT |
| 03:27:26 | 19 | MATTEL? |
| 03:27:27 | 20 | A.  YES. |
| 03:27:28 | 21 | Q.  WHICH ONES? |
| 03:27:29 | 22 | A.  THE HELLO KITTY DOLL. |
| 03:27:31 | 23 | Q.  THAT'S IT? |
| 03:27:34 | 24 | MS. TORRES:  OBJECTION.  ASKED AND |
| 03:27:34 | 25 | ANSWERED. |

1146

EXHIBIT ___7___

PAGE    42

| | | |
|---|---|---|
| 03:27:47 | 1 | THE DEPONENT:  YES, THAT COME TO MEMORY. |
| 03:27:49 | 2 | BY MR. ZELLER: |
| 03:27:50 | 3 | Q.  HAVE YOU EVER HEARD OF AN ELLIOT RUDELL, |
| 03:27:52 | 4 | R-U-D-E-L-L? |
| 03:28:00 | 5 | A.  NO. |
| 03:28:01 | 6 | Q.  EARLIER YOU TOLD ME ABOUT THE CONVERSATION |
| 03:28:09 | 7 | THAT YOU HAD WITH MAUREEN MULLEN WHERE YOU AND HER |
| 03:28:15 | 8 | TALKED ABOUT DIVA STARZ, AND THAT WAS AT SOME POINT |
| 03:28:19 | 9 | BEFORE YOU LEFT MATTEL; IS THAT CORRECT? |
| 03:28:21 | 10 | A.  YES. |
| 03:28:22 | 11 | Q.  OTHER THAN YOUR CONVERSATION WITH MAUREEN |
| 03:28:23 | 12 | MULLEN, WERE THERE ANY OTHER SOURCES FROM WHICH YOU |
| 03:28:27 | 13 | WERE AWARE THAT THE DIVA STARZ PROJECT WAS GOING ON |
| 03:28:30 | 14 | THERE AT MATTEL WHEN YOU WERE THERE?  AND AGAIN, |
| 03:28:34 | 15 | REGARDLESS OF WHAT DIVA STARZ WAS CALLED AS A |
| 03:28:38 | 16 | PROJECT AT THAT TIME. |
| 03:28:39 | 17 | MS. TORRES:  OBJECTION, LACK OF |
| 03:28:39 | 18 | FOUNDATION, CALLS FOR SPECULATION, AND VAGUE. |
| 03:28:49 | 19 | THE DEPONENT:  CAN I PLEASE HAVE THE |
| 03:28:50 | 20 | QUESTION REPEATED? |
| | 21 | (THE DEPOSITION OFFICER READ THE |
| | 22 | RECORD AS FOLLOWS: |
| | 23 | "QUESTION:  OTHER THAN YOUR |
| | 24 | CONVERSATION WITH MAUREEN MULLEN, |
| | 25 | WERE THERE ANY OTHER SOURCES FROM |

1147

|  |  |
|---|---|
| 1 | *WHICH YOU WERE AWARE THAT THE* |
| 2 | *DIVA STARZ PROJECT WAS GOING ON THERE* |
| 3 | *AT MATTEL WHEN YOU WERE THERE?  AND* |
| 4 | *AGAIN, REGARDLESS OF WHAT DIVA STARZ* |
| 5 | *WAS CALLED AS A PROJECT AT THAT* |
| 6 | *TIME.")* |
| 03:29:10  7 | THE DEPONENT:  YES, I BELIEVE SO. |
| 03:29:11  8 | BY MR. ZELLER: |
| 03:29:11  9 |     Q.   WHAT WERE THE OTHER SOURCES? |
| 03:29:12  10 |     A.   I BELIEVE THAT I HAD -- AND I DON'T |
| 03:29:15  11 | REMEMBER THE SPECIFICS OF THE CONVERSATION, BUT I |
| 03:29:18  12 | REMEMBER A -- I BELIEVE THAT WE HAD A -- I HAD A |
| 03:29:23  13 | CONVERSATION WITH MY BOSS AT THE TIME, WHO I BELIEVE |
| 03:29:27  14 | WAS NAMED AT THAT TIME PAM BREW. |
| 03:29:35  15 |     Q.   AND YOU AND SHE HAD TALKED ABOUT THE |
| 03:29:38  16 | DIVA STARZ PROJECT, AGAIN SETTING ASIDE WHATEVER IT |
| 03:29:40  17 | WAS CALLED AT THAT PARTICULAR MOMENT? |
| 03:29:42  18 |     A.   YES. |
| 03:29:45  19 |     Q.   THIS IS PAM BREW WHO ALSO IS KNOWN AS PAM |
| 03:29:49  20 | PERETZ? |
| 03:29:50  21 |     A.   YES. |
| 03:29:50  22 |     Q.   AND SHE WAS YOUR SUPERVISOR WHEN YOU WERE |
| 03:29:53  23 | A PLANNER AT MATTEL? |
| 03:29:54  24 |     A.   YES. |
| 03:29:55  25 |     Q.   WHAT DID YOU AND SHE TALK ABOUT IN |

1148

EXHIBIT _____ 7

PAGE _____ 44

03:29:57  1    CONNECTION WITH DIVA STARZ?

03:30:02  2        A.   MY MEMORY IS VERY VAGUE, BUT I BELIEVE

03:30:05  3    THAT THE CONVERSATION WAS -- I BELIEVE SHE HAD JUST

03:30:14  4    LEFT A MEETING -- A DESIGN REVIEW MEETING WHERE THAT

03:30:20  5    THE MENTIONED PRODUCT WAS PRESENTED, AND I REMEMBER

03:30:28  6    HER IDENTIFYING IN ONE WAY, SHAPE, OR FORM THAT IT

03:30:34  7    WAS WELL-RECEIVED AND IDENTIFIED TO BE A PRIORITY

03:30:38  8    SKU AND THAT IT WAS SUPPOSED TO BE KEPT -- WELL, I

03:30:45  9    SHOULD SAY THAT IT WAS GOING TO BE ON A FAST TRACK

03:30:49  10   OF DEVELOPMENT, SOME -- YOU KNOW, AND THAT -- I

03:30:55  11   ALSO -- AND I DON'T -- I BELIEVE THAT IT WAS IN THIS

03:30:58  12   CONVERSATION, BUT I CANNOT BE SURE, THAT IT WAS

03:31:00  13   ALSO -- IT WAS ALSO REFERENCED THAT IT WAS SORT OF A

03:31:06  14   QUIET -- LIKE IT WAS A -- NOT A CONFIDENTIAL, BUT IT

03:31:09  15   WAS MEANT TO BE A VERY CONFIDENTIAL PROJECT,

03:31:14  16   SOMETHING THAT WAS SUPPOSED TO BE KEPT A BIT QUIET.

03:31:26  17       Q.   WAS THERE ANYTHING ELSE THAT YOU AND PAM

03:31:28  18   BREW DISCUSSED IN THAT CONVERSATION ABOUT

03:31:30  19   DIVA STARZ?

03:31:31  20       A.   NOT THAT I CAN REMEMBER.

03:31:34  21       Q.   SO THERE MIGHT HAVE BEEN MORE, BUT YOU'RE

03:31:35  22   NOT SURE?

03:31:38  23       A.   YES.

03:31:40  24       Q.   SO THEN OTHER THAN THE CONVERSATIONS THAT

03:31:45  25   YOU HAD WITH MAUREEN MULLEN AND THEN THE

                                                            1149

EXHIBIT _____7_

PAGE _____45

| | | |
|---|---|---|
| 03:31:48 | 1 | CONVERSATION THAT YOU HAD WITH PAM BREW -- ALSO |
| 03:31:51 | 2 | KNOWN AS PAM PERETZ -- THAT YOU JUST DESCRIBED, WERE |
| 03:31:58 | 3 | THERE ANY OTHER SOURCES OF AWARENESS FOR YOU THAT |
| 03:31:59 | 4 | THE DIVA STARZ PROJECT WAS GOING ON WHEN YOU WERE AT |
| 03:32:01 | 5 | MATTEL? |
| 03:32:03 | 6 | MS. TORRES:   OBJECTION.   VAGUE. |
| 03:32:07 | 7 | THE DEPONENT:   NOT THAT I CAN REMEMBER. |
| 03:32:10 | 8 | BY MR. ZELLER: |
| 03:32:11 | 9 | Q.   WHEN YOU WERE THERE AT MATTEL, DID YOU |
| 03:32:13 | 10 | EVER SEE ANY TWO-DIMENSIONAL ARTWORK THAT WAS |
| 03:32:16 | 11 | RELATED TO THE DIVA STARZ PROJECT?   AGAIN, SETTING |
| 03:32:19 | 12 | ASIDE WHAT THE NAME OF IT WAS AT THE TIME. |
| 03:32:23 | 13 | A.   YES, I BELIEVE I DID. |
| 03:32:26 | 14 | Q.   WHAT KIND OF ARTWORK WAS IT? |
| 03:32:31 | 15 | A.   I VAGUELY REMEMBER SOME CHARACTER ART. |
| 03:32:37 | 16 | Q.   AND WHERE DID YOU SEE IT? |
| 03:32:42 | 17 | A.   I CAN'T REMEMBER. |
| 03:32:42 | 18 | Q.   WAS IT IN RENEE PASKO'S CUBE? |
| 03:32:48 | 19 | A.   IT'S POSSIBLE.   I DON'T REMEMBER. |
| 03:32:50 | 20 | Q.   YOU CAN'T EXCLUDE THAT POSSIBILITY? |
| 03:33:00 | 21 | A.   I CAN'T REMEMBER. |
| 03:33:01 | 22 | Q.   MY QUESTION IS A LITTLE BIT DIFFERENT. |
| 03:33:03 | 23 | YOU CAN'T TELL ME -- YOU CAN'T EXCLUDE |
| 03:33:06 | 24 | THAT YOU SAW THAT CHARACTER ART IN RENEE PASKO'S |
| 03:33:10 | 25 | CUBE THERE AT MATTEL; IS THAT TRUE? |

1150

| | | |
|---|---|---|
| 03:33:18 | 1 | A.   NO. |
| 03:33:19 | 2 | Q.   IT'S NOT TRUE? |
| 03:33:21 | 3 | A.   NO, I CAN'T EXCLUDE IT. |
| 03:33:44 | 4 | Q.   DID YOU SEE THAT CHARACTER ART ON ONE |
| 03:33:46 | 5 | OCCASION OR MORE THAN ONE OCCASION? |
| 03:33:48 | 6 | A.   I BELIEVE ONE OCCASION. |
| 03:33:54 | 7 | Q.   AND WHEN YOU SAY IT WAS CHARACTER ART, |
| 03:33:56 | 8 | WERE THESE DESIGN DRAWINGS OF SOME KIND? |
| 03:33:59 | 9 | MS. TORRES:   OBJECTION.   VAGUE. |
| 03:34:06 | 10 | THE DEPONENT:   I -- I THINK THE -- I THINK |
| 03:34:09 | 11 | THE ACHIEVED LOOK WAS THROUGH SKETCH. |
| 03:34:11 | 12 | BY MR. ZELLER: |
| 03:34:13 | 13 | Q.   AND WHEN YOU SAY "SKETCH," IT COULD BE A |
| 03:34:15 | 14 | FINISHED DRAWING AS WELL? |
| 03:34:17 | 15 | A.   YES. |
| 03:34:36 | 16 | MR. ZELLER:   PLEASE MARK AS EXHIBIT 1113 A |
| 03:34:37 | 17 | ONE-PAGE DOCUMENT BEARING BATES NUMBER M 0079181. |
| 03:34:43 | 18 | THE TOP PAGE -- OR EXCUSE ME -- THE TOP PORTION OF |
| 03:34:45 | 19 | THIS IS AN E-MAIL FROM CHERYL BAILEY TO VARIOUS |
| 03:34:49 | 20 | RECIPIENTS DATED SEPTEMBER 10TH, 1998, WITH AN |
| 03:34:53 | 21 | ATTACHED E-MAIL FROM PAULA TREANTAFELLES DATED |
| 03:34:57 | 22 | AUGUST 27, 1998. |
| | 23 | /// |
| | 24 | /// |
| | 25 | /// |

1151

A & E Court Reporters        (213) 955-0070        Fax: (213) 955-0077

EXHIBIT _____ 1

JT

1          *(DEFENDANT'S EXHIBIT 1113 WAS*

2          *MARKED FOR IDENTIFICATION BY THE*

3          *DEPOSITION OFFICER AND IS BOUND*

4          *SEPARATELY.)*

5          *(DISCUSSION HELD OFF THE RECORD.)*

03:36:01   6          MS. TORRES:   I'M GOING TO, ON THE RECORD,

03:36:02   7   REQUEST THAT YOU DROP THE "ATTORNEYS' EYES ONLY"

03:36:04   8   DESIGNATION FROM THIS DOCUMENT.

03:36:06   9          MR. ZELLER:   WE CAN TALK ABOUT IT RATHER

03:36:07   10  THAN USING UP THE WITNESS'S TIME ON THAT.

03:36:10   11         Q.   HAVE YOU HAD A CHANCE TO TAKE A LOOK AT

03:36:12   12  EXHIBIT 1113?

03:36:15   13         A.   SORRY.   LET ME READ IT.

03:36:21   14         Q.   SURE.

03:37:14   15         A.   OKAY.

03:37:29   16         Q.   HAVE YOU HAD A CHANCE TO LOOK AT

03:37:30   17  EXHIBIT 1113?

03:37:31   18         A.   YES.

03:37:34   19         Q.   DO YOU RECOGNIZE THIS DOCUMENT AS

03:37:37   20  INCLUDING AN E-MAIL EXCHANGE THAT YOU HAD WITH

03:37:40   21  JUDITH TAN, T-A-N, CHERYL BAILEY, PAM PERETZ AND

03:37:45   22  J. KIRK DAVIS ON OR ABOUT AUGUST 27, 1998?

03:37:50   23         A.   YES.

03:37:51   24         Q.   AND YOU'LL SEE THAT THE PORTION YOU HAVE,

03:37:53   25  IT SAYS:

1152

EXHIBIT _____

PAGE _____ 48

1            DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA      )
                              )   SS.
4    COUNTY OF ORANGE         )

5

6         I, J'ANA SIEGERS, HEREBY CERTIFY:

7         I AM A DULY QUALIFIED CERTIFIED SHORTHAND

8    REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

9    CERTIFICATE NUMBER CSR 10845 ISSUED BY THE COURT

10   REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL

11   FORCE AND EFFECT.  [FED. R. DIV. P. 28(A)].

12        I AM AUTHORIZED TO ADMINISTER OATHS OR

13   AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

14   PROCEDURE, SECTION 2093(B) AND PRIOR TO BEING

15   EXAMINED, THE DEPONENT WAS FIRST DULY SWORN BY ME.

16   [FED. R. CIV. P. 28(A), 30(F)(1)].

17        I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY OR

18   COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE

19   OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, NOR AM I

20   FINANCIALLY INTERESTED IN THIS ACTION.

21   [FED. R. CIV. P. 28].

22        I AM THE DEPOSITION OFFICER THAT

23   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

24   FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS

25   A TRUE RECORD OF THE TESTIMONY GIVEN BY THE

                                                    1328

EXHIBIT _____ 7

PAGE        49

1   DEPONENT.   [FED. R. CIV. P. 30(F)(1)].

2       BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

3   THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.   IF

4   REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

5   PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

6   ARE APPENDED HERETO.   [FED. R. CIV. P. 30(E)].

7

8

9   DATED:   OCTOBER 23, 2007.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                               1329

EXHIBIT _____ 1

55

**Exhibit 8**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**