CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    accurate depiction of the file that was opened and

2    kept and titled 02-115?

3         MR. GORDON:  Objection; misstates the

4    witness' testimony.

5         THE WITNESS:  All I'm saying, Counsel, is          01:22:35

6    there are certain documents in here that I don't

7    recognize, and I have no idea how they got to be

8    part of this packet.

9         Q.  BY MR. MUMFORD:  Are you disputing this is

10   the file named 02-115?                                 01:22:46

11        A.  No, sir, I'm not.  What I'm saying is that

12   the last time I had custody of the file, it did not

13   contain some of the pages that are in this packet of

14   information.

15        Q.  Let's go through those pages that you         01:23:04

16   recognize from the last time that you had custody of

17   this file, please.  Can you point them out to me.

18        A.  Well, any of the pages that say redacted, I

19   can't speak to because I don't know what they are.

20        Q.  You didn't make those redactions?            01:23:21

21        A.  No.  I did not.

22        Q.  Do you know what is contained on those

23   pages?

24        A.  No, sir, I don't.

25        Q.  Did you keep -- did you keep files in your    01:23:31
                                                            111

EXHIBIT ___15___

PAGE ___297j___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   department that had redacted pages?

2      A.   No, sir.  While I was there, I had no files

3   that had pages that had redacted -- that were just a

4   blank page with the word redacted on it.

5      Q.   Okay.                                        01:23:52

6      A.   The one marked 74310 is what I had referred

7   to as a face sheet for an incident report.

8      Q.   And are you saying this was in the file the

9   last time you saw it?

10     A.   Yes, sir.  This appears to be the document    01:24:15

11  that was generated by myself.  And there is a black

12  square on it.  And I recognize the handwriting at

13  the top.  It appears to be my writing.

14     Q.   Just to clarify, you're at page M 0074310?

15     A.   Yes, sir, that's correct.                     01:24:49

16     Q.   You're referring to the black, sort of dark

17  box --

18     A.   Yes.

19     Q.   -- in the upper right-hand corner?

20          MR. GORDON:  Just two matters.  One, we're    01:24:59

21  designating this as Attorneys' Eyes Only deposition.

22  So are you one of the --

23          MR. NOLAN:   I'm an attorney.

24          MR. GORDON:  Are you counsel of --

25          MR. NOLAN:  -- with Skadden Arps.  Tom        01:25:16
                                                              112

EXHIBIT ___15___

PAGE ___297k___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   much time.  But I would -- it would be a wild guess,

2   and I would guess they were all probably about the

3   same amount of time.

4       Q.   You base that on the fact that you wouldn't

5   have written it down had it just been briefer?          02:24:58

6           MR. GORDON:  Objection; vague and ambiguous

7   as to brief and misstates his testimony.

8           THE WITNESS:  I don't recall a specific

9   amount of time I would have been there.  You know,

10  if I showed up, for example, there's two entries      02:25:17

11  here that are on Saturdays.  If I showed up, for

12  example, and this is speculation, on a particular

13  day and the parking lot was empty and the place was

14  closed up and lights were out, there would be no

15  reason to sit there for a while, in my opinion.        02:25:36

16          So in that circumstance, it could be less

17  than a half hour.  But I don't know.  I don't

18  recall -- I don't recall the, what was occurring on

19  the date that I indicated that I had checked that

20  address, nor do I know the time that I checked that   02:25:54

21  address from this log.

22      Q.   BY MR. MUMFORD:  Generally, at Mattel, what

23  were the hours that you worked?

24      A.   A normal workday with no activity would be

25  Monday through Friday 8 to 5.  But I never worked a   02:26:12

                                                          153

EXHIBIT _____15____

PAGE _____2971____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    normal day.   It was a rare day when I was there from

2    8 to 5.

3        Q.   Why was that?

4        A.   It is kind of like being a fireman.   Things

5    happened at the worst times.   When does your                     02:26:28

6    plumbing break at home?   It breaks on a Saturday

7    night.   You know, so people would report things late

8    in the day, and for solvability, if you want to try

9    to solve anything, the best time is not to let a lot

10   of time lapse.   So if things happened, I would start   02:26:46

11   working on them and I would do things nights,

12   weekends, early mornings, things like that.

13       Q.   Because sometimes those are better times to

14   solve something?

15       A.   Yes.   That's correct.                          02:26:58

16       Q.   Did you punch a clock?

17       A.   No, I did not.

18       Q.   How did you keep track of your time?

19       A.   I was salaried.

20       Q.   How did the company keep track of your         02:27:09

21   time?

22       A.   They paid me a paycheck every two weeks.

23       Q.   Did they have a review every so often to

24   review your work with you?

25       A.   Yes.                                            02:27:21
                                                                       154

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   How often?

2    A.   Annual reviews.

3    Q.   Did the subject of how much time you were

4  working ever come up?

5    A.   No.  They let me work as long as I wanted          02:27:31

6  to.  They never stopped me.  It's all free time.

7    Q.   What are you saying, it's all free time?

8    A.   Well, if I'm working for the company,

9  they're paying me a certain amount of money.  If I'm

10  doing 40 hours or if I'm doing 60 hours, I'm getting    02:27:52

11  the same rate, so it doesn't cost any more for them

12  for me to work longer.  I liked investigations so I

13  worked investigations, if they had a possibility of

14  being solved.

15    Q.   What was your average number of hours that       02:28:13

16  you would work a week?

17    A.   Depends if I was in the country or out of

18  the country.

19    Q.   If you were in the country?

20    A.   Probably 60.                                      02:28:28

21    Q.   How about if you were out of the country?

22    A.   A lot more.  I would work around the clock

23  if I could just so I could get the thing finished

24  and get back home.  I mean I would work seven days a

25  week out of the country, if I could.  If I was         02:28:45

155

EXHIBIT    15

PAGE    297 n

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   working on something where there was nobody there,

2   you sit in the hotel.  That's why I got to dislike

3   hotels.

4       Q.    When you were in the country, it was

5   because what, you wanted to go home?                    02:29:04

6           MR. GORDON:  Objection; vague and

7   ambiguous.

8           THE WITNESS:  No, I don't understand.

9       Q.   BY MR. MUMFORD:  I·didn't mean to suggest

10  other than you said approximately 60 hours a week     02:29:16

11  when you were in the country.

12      A.    That's correct.

13      Q.    It was more when you were out.

14      A.    When I was here in Southern California,

15  there were at least 12-hour days usually.  When I     02:29:30

16  was out of Southern California, I worked the case,

17  not the clock.  I could care less what time it was.

18      Q.    Got you.  Okay.  So the fact that you

19  checked out MGA headquarters May 4th, 2002, on a

20  Saturday, that's probably an indication of the        02:29:58

21  seriousness that you were working this

22  investigation?

23          MR. GORDON:  Objection; lack of foundation.

24  Calls for speculation and vague and ambiguous.

25          THE WITNESS:  I don't recall why I went on    02:30:20
                                                                  156

EXHIBIT  15

PAGE  2970

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  a Saturday.  It would be speculation.  And it's just

2  doing investigations, any investigation, it's normal

3  to check places of business at normal business hours

4  and at not normal business hours.  That's just a

5  normal part of any investigation if there's a          02:30:41

6  business being investigated.  So that would not --

7  to answer your question, no, it would not, based

8  upon what we have here, indicate the seriousness of

9  the case.  It would indicate an attempt to try to

10  solve a case.                                          02:30:56

11      Q.   But it would indicate that you didn't just

12  consider the case frivolous.  Isn't that correct?

13      A.   That's correct.  Yes.

14      Q.   And you checked it out again on June 22nd?

15      A.   Yes, sir, that's correct.                     02:31:13

16      Q.   For approximately the same amount of time,

17  half hour to an hour?

18      A.   I have no way of knowing from this note.  I

19  don't know.  It's unlikely that would be at the same

20  time of day as the 5-4 entry, but I have no           02:31:26

21  independent recollection of it.  So I couldn't

22  really tell you how long I was there.

23      Q.   But your practice, again, would have been

24  what?

25      A.   Well, as I said, if it was closed down, it    02:31:45
                                                                157

15

EXHIBIT _____

PAGE _____ 297 p

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   looked like there was no activity there, I wouldn't
 2   have been there very long.  If it looked like there
 3   was activity and there was a promise of gaining some
 4   information or evidence, then I may have stayed
 5   longer.  But I have no independent recollection of     02:31:57
 6   what occurred on that particular day six years ago.
 7        Q.   Does it indicate anything that you went on
 8   two Saturdays in a row?
 9        A.   Nothing more than I went on two Saturdays.
10        Q.   And what's the next time that you went to    02:32:22
11   investigate MGA headquarters?
12        A.   On July 3rd of '02, on a Wednesday, and
13   again checked that address with negative results.
14        Q.   Any recollection of that investigation?
15        A.   No, sir.                                      02:32:45
16        Q.   But it would have been your practice,
17   again, to spend about a half hour to what, to an
18   hour again?
19        A.   Again, it would depend on the activity at
20   that location.  If it looked promising, I would have   02:32:57
21   stayed.  If it was closed up, I would not have
22   stayed.
23        Q.   But the fact that you wrote down, that you
24   logged it again as you checking it out probably
25   indicates that you stayed a significant amount of      02:33:14
                                                                 158
```

15

EXHIBIT _____

PAGE   217 a

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   time there to observe?

 2       A.   I have no way of knowing that from the

 3   entry, sir.  I couldn't tell from that entry.

 4       Q.   If you just passed by, would you just say

 5   passed by?                                           02:33:26

 6       A.   I wouldn't -- I would not just pass by.  I

 7   would loiter in an area for a minimum of a few

 8   minutes to however long it looked like to make an

 9   assessment of whether it was promising to take a

10   further look at what's going on.                     02:33:46

11       Q.   You would have done that based on your

12   experience as an investigator?

13       A.   Yes.  But it would not have been just

14   driving by without stopping.

15       Q.   The handwriting 7-3-02 and prior, that's    02:34:08

16   your handwriting, correct?

17       A.   Yes, sir, it is.

18       Q.   Whose handwriting does it belong to after

19   that?  Do you recognize it?

20       A.   The entry 7-22-03 and 6-21-04 appear to be  02:34:25

21   DeAnda's entries, appear to be his handwriting.

22       Q.   Did you discuss this case with Mr. DeAnda

23   in those time periods?

24       A.   What time periods, sir?

25       Q.   7-22-03 or June 21st, '04?                  02:34:48
                                                               159
```

EXHIBIT   15

PAGE   297 v

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   I don't know if I did.   I don't have any

2  recollection of discussing it with him during those

3  time periods.   Just from the way the log changes at

4  7-3, it's likely that I gave the log to him, whether

5  he requested -- I don't recall if he requested or I          02:35:14

6  gave it to him.   It's likely the log, the case file

7  went from him to me somewhere between 7-3 and 7-22,

8  but I have no independent recollection of what day

9  within there or if there was a conversation or

10  discussion or meeting or anything related to that.          02:35:28

11    Q.   But the case stayed open though, correct?

12    A.   This would indicate to me that the case

13  stayed open, yes.

14    Q.   The 6-21, 2004 entry, can you read what's

15  after that?                                                 02:35:44

16    A.   The Page 0074373 says executive

17  biographies.   0074374, Isaac Larian.   Is that what

18  you're talking about?

19    Q.   I'm going back to the log itself.   What is

20  written in at the point in the log where it says          02:36:06

21  June 21st, 2004?

22    A.   6-24-04, is that what you're referring to?

23    Q.   Yes, exactly.

24    A.   The words are "update Isaac Larian

25  background."                                                02:36:21

                                                                      160

15

EXHIBIT _____

PAGE _____ 2975

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Why would you update Isaac Larian

2    background?

3         MR. GORDON:  Objection; lack of foundation.

4    Calls for speculation.  Vague and ambiguous as to

5    you.                                              02:36:31

6         THE WITNESS:  It's not my entry.  I don't

7    know why that was done.

8    Q.   BY MR. MUMFORD:  You didn't discuss it with

9    anyone?

10   A.   To my knowledge, I did not discuss it with   02:36:37

11   anyone.  I don't believe I was involved in the case

12   at that date.  I don't have an independent

13   recollection of it.

14   Q.   You previously testified that you did not

15   recognize certain pages in this file from 74373 to  02:36:49

16   74396.  You remember that?

17   A.   Yes, sir, I do.

18   Q.   Does this entry suggest to you that the

19   date at which these, the background on Mr. Isaac

20   Larian, and perhaps some of these pages were added   02:37:17

21   to the file?

22        MR. GORDON:  Objection; lack of foundation.

23   Calls for speculation.

24        THE WITNESS:  Could you ask that question

25   again, sir.                                          02:37:36

                                                         161

15

EXHIBIT _____

PAGE _____ 297+

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   BY MR. MUMFORD:  Does this entry suggest to

2  you the date at which the background information on

3  Mr. Larian, perhaps some of these pages were added

4  to the file?

5         MR. GORDON:  Same objection; lack of                02:37:46

6  foundation.  Calls for speculation.

7         THE WITNESS:  I have no way of knowing when

8  they were added to the file.

9    Q.   BY MR. MUMFORD:  Do the pages 74373 to

10  74396 reflect background on Mr. Larian?                    02:38:01

11    A.   These pages appear to, yes, sir.

12    Q.   Can we go back further up on this log; you

13  meeting with Cassidy Park on March 28th, 2002.

14  There's a time entry below that of 1500.  What does

15  that refer to?                                             02:38:45

16    A.   Well, that would -- the entry 1500 would

17  indicate the same date, which would be March 28th,

18  at that time, I contacted someone in Human Resources

19  and requested the personnel file on a person named

20  Bryant.                                                    02:39:08

21    Q.   What does that say next to 1500?

22    A.   1500, says "checked with HR for Bryant's

23  file.  Term date 10-20-00."  And then it says "the

24  file is in off-site storage-requested it be

25  retrieved."                                                02:39:33
                                                                  162

EXHIBIT ___15___

PAGE ___297u___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Q.   Who requested it?

2   A.   That would have been me.

3   Q.   So you would have, on March 28th, you would

4   have requested the personnel file of Carter Bryant?

5   A.   Yes, sir.                                    02:39:46

6   Q.   Do you remember what that personnel file

7   contained?

8       MR. GORDON:  Objection; assumes facts.

9       THE WITNESS:  I don't know that I ever got

10  it.  I have no entry here indicating that I ever      02:39:58

11  received that file.

12  Q.   BY MR. MUMFORD:  How long would it take to

13  get a file from off-site storage in this time frame?

14      MR. GORDON:  Objection; vague and

15  ambiguous.  Lack of foundation.  Calls for            02:40:10

16  speculation.

17      THE WITNESS:  I have no idea.  Sometimes it

18  took a long time to get documents is all I can tell

19  you.  But I don't know if there was an average

20  amount of time or not, but I have no indication here  02:40:25

21  that I received his personnel file.

22  Q.   BY MR. MUMFORD:  Are you denying that you

23  saw Mr. Bryant's personnel file as part of this

24  investigation?

25  A.   No, sir.  What I'm saying is that I have no    02:40:44
                                                          163

EXHIBIT _____

PAGE _____ 297 v

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  recollection of seeing his file and I have no

2  indication that I documented receiving it from

3  anyone.  All I can refer to is on 3-28 that I asked

4  somebody to get it and was told that it's in

5  off-site storage, so it was not available on that          02:41:00

6  date.  I don't know that it was subsequently brought

7  from off-site storage to Mattel or that I ever saw

8  it.  I have no recollection of seeing it.

9      Q.   Would it help to see the next sentence

10  that's been redacted?                                       02:41:17

11      MR. GORDON:  Objection; calls for

12  speculation.  Lack of foundation.

13      THE WITNESS:  I don't know.

14      Q.   BY MR. MUMFORD:  Was it typical that you

15  would request an employee's, a former employee's         02:41:50

16  personnel file as part of an investigation into that

17  employee?

18      A.   Yes, it was.

19      Q.   What's typically contained in a personnel

20  file?                                                       02:42:03

21      A.   Name, employment status, addresses,

22  emergency notification information, contact

23  information, things like that.

24      Q.   What about their contracts and agreements

25  with the company?                                           02:42:24
                                                                  164

15

EXHIBIT _____

PAGE _____ 297w

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA        ) ss:
 2   COUNTY OF LOS ANGELES      )
 3
 4      I, JUDITH SCHLUSSEL, C.S.R. No. 4307, do hereby
 5   certify:
 6
 7      That the foregoing deposition testimony of
 8   ROBERT SIMONEAU was taken before me at the time and
 9   place therein set forth, at which time the witness
10   was placed under oath and was sworn by me to tell
11   the truth, the whole truth and nothing but the
12   truth;
13      That the testimony of the witness and all
14   objections made by counsel at the time of the
15   examination were recorded stenographically by me,
16   and were thereafter transcribed under my direction
17   and supervision, and that the foregoing pages
18   contain a full, true and accurate record of all
19   proceedings and testimony to the best of my skill
20   and ability.
21      I further certify that I am neither counsel for
22   any party to said action, nor am I related to any
23   party to said action, nor am I in any way interested
24   in the outcome thereof.
25
                                                    260
```

15

EXHIBIT _____

PAGE _____ 297 X

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        IN WITNESS WHEREOF, I have subscribed my name

2    this 8th day of February, 2008.

3

4

5        _Judith Schlussel_

6        JUDITH SCHLUSSEL, CSR No. 4307

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                                    261

EXHIBIT _____

PAGE          _297y_

**EXHIBIT 16**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3223**

WRITER'S INTERNET ADDRESS
**timalger@quinnemanuel.com**

January 31, 2008

Michael H. Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(Via Federal Express)

Thomas J. Nolan, Esq.
Robert J. Herrington, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Ave., Suite 3400
Los Angeles, CA 90071
(Via Messenger)

Mark E. Overland, Esq.
Overland Borenstein Scheper
& Kim, LLP
300 South Grand Avenue, Suite 2750
Los Angeles, CA 90071-3144
(Via Messenger)

Re:  MGA Entertainment, Inc. v. Mattel, Inc.

Dear Counsel:

I have learned that defendants used in recent depositions a version of a document that Mattel demanded <u>three times</u> be promptly returned to Mattel and all copies destroyed pursuant to Section 13 of the Stipulated Protective Order.

The document in question is M 0073472, which, as originally produced, was improperly redacted. We previously provided a properly redacted copy of M 0073472 to the parties. Attached is another copy, which is Bates numbered M 0073472B. This should be the only version of the document used by the parties in this action.

Section 13 of the Stipulated Protective Order mandates that a "receiving Party *shall promptly* return to the producing Party . . . [an] inadvertently disclosed document and all copies of such document" (emphasis added). Further, the California Supreme Court recently reiterated that "[w]hen a lawyer who receives materials that obviously appear to be subject to an attorney-client

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4751 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

**EXHIBIT** __16__

**PAGE** __218__

07209/2374164.1

Michael H. Page, Esq.
Thomas J. Nolan, Esq.
Mark E. Overland, Esq.
January 31, 2008
Page 2

privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged." *Rico v. Mitsubishi Motors Corp.*, 68 Cal. Rptr. 3d 758, 766 (2007) (quoting *State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal. App. 4th 644, 656-57 (1999)).

Mattel demanded that the improperly redacted document be returned and all copies destroyed in letters dated June 20, June 26, and July 20, 2007. Despite this, defendants tried to use the original document in depositions, in violation of the Protective Order. Indeed, MGA's counsel represented on July 6, 2007 that all copies of the document would be returned or destroyed. MGA's representation of compliance with the Protective Order has now been shown to be demonstrably incorrect by MGA's continued retention and use of the document.

Mattel again demands that defendants comply with the Protective Order and return the version of M 0073472 that was not properly redacted and destroy all copies, including deposition exhibits. We also expect the required certification of compliance. Should MGA not comply, Mattel will seek an order from the Court enforcing the Protective Order and imposing sanctions. Please consider this a request to meet and confer under paragraph 5 of the Discovery Master Stipulation in advance of such a motion in the event that MGA fails to comply.

Please be advised that Mattel reserves the right to seek sanctions against MGA for its past violation of the Protective Order and its unquestionably false prior certification.

I look forward to your prompt response.

Very truly yours,

Timothy L. Alger

Enclosure

EXHIBIT __14__
PAGE __299__

CHRONOLOGICAL RECORD

CASE NO: 02- 115

PAGE      OF

| DATE | TIME | INVESTIGATION |
|------|------|---------------|
| 3/15/02 | | Rec'd Case - Opened Invs. |
| 3/20 | | Met W/ Ivy Ross On This Case & Discussed TP Protection Program. |
| 3/28 | | Met W/ Cassidy Park To Get More Info On M&A Issue. She Suggested [REDACTED] As Illustrator/Former Employee Who May Have Personalized Design Of Lilly Martinez And Created "Bratz" Dolls For MGA. |
| | 1500 | Checked W/HR For Bryant's File Term Date 10/20/00. File Is In Offsite Storage - Requested To Be Retrieved. |

REDACTED

| DATE | TIME | INVESTIGATION |
|------|------|---------------|
| 3/9 | THU | Checked Schoenborn Add For Leads - Neg. |
| 4/26 | FRI | Checked Schoenborn Add - Neg Results |
| 5/1 | SAT | " " " " " |
| 6-22 | SAT | Checked Schoenborn Add - Neg |
| 7-3-02 | WED | " " " " " |

REDACTED

| DATE | TIME | INVESTIGATION |
|------|------|---------------|
| 6/8/04 | | Up Date Isaac Larian Background. |

CONFIDENTIAL

M 0074372

EXHIBIT 16

PAGE 360

**EXHIBIT 17**