UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES – GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                                                           Date:  May 27, 2008
Title:         CARTER BRYANT -v- MATTEL, INC.

<u>Consolidated With Related Actions</u>:
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC.,  v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Gina Guzman
            Courtroom Deputy Clerk

<u>ATTORNEYS PRESENT FOR CARTER BRYANT</u>:        <u>ATTORNEYS PRESENT FOR MATTEL</u>:

None Present                                                                          None Present


<u>ATTORNEYS PRESENT FOR MGA</u> AND
<u>ISAAC LARIAN</u>:

None Present

PROCEEDINGS:    **ORDER RE STATUTE OF LIMITATIONS DEFENSE**

     Each of the remaining parties to this action, Mattel and MGA, seek summary judgment on the issue of statute of limitations.  Crucial to resolution of this issue, is application of California's "discovery rule," which can delay the accrual of a claim.  Both parties have offered evidence in support of their positions.[1]  For its part, Mattel contends that its claims against Carter Bryant arose on November 24, 2003, and that its claims against the MGA entities, including MGA CEO Isaac Larian, arose on November 4, 2004, the date of Carter Bryant's deposition, at which he testified regarding MGA and Larian's involvement in his actions.

---

    [1] Although he is no longer a party, the Court discusses at length the timeliness of the claims asserted against Carter Bryant because it is relevant to the Court's relation-back analysis of the claims asserted against MGA.

At oral argument and in its briefs, MGA argues at length that Mattel's claims against Bryant accrued some time shortly after Bryant left Mattel's employ in October, 2000. In support of this argument, MGA offered evidence that Mattel has always believed that it took nine months to bring a doll through the stages of development and to market. From that knowledge, in MGA's view, the sudden appearance of the Bratz dolls at a toy fair in Tokyo in January, 2001, should have aroused their suspicions.

MGA cites to the deposition of Bryant's co-worker, who had suspicions at the time Bryant resigned that Bryant was going to work for a competitor based on her subjective belief that Bryant would not pursue any other vocation other than doll designer.

MGA contends that Mattel could have looked at Bryant's phone records and determined that he had called MGA a number of times during the month pre-dating his resignation.

There is evidence that one of Bryant's co-workers believed it was "common knowledge," sometime in 2001, that Bryant probably designed Bratz.

The undisputed facts establish that in August, 2002, an anonymous letter was sent to Mattel's CEO stating that Bryant had designed Bratz. This letter is the first indication that Bryant may have worked on Bratz during the period of his employment with Mattel. See Zeller Decl. Ex. 63 ("While he was working with Mattel and working to create these dolls he worked out a deal with MGA that let him collect a large sum of money each year from MGA in exchange for his secrecy about the dolls and the fact that they are rightly Mattel dolls.").

The undisputed facts also establish that on July 18, 2003, the Wall Street Journal published an article entitled "Dolled Up: To Lure Older Girls, Mattel Brings In Hip-Hop Crowd." In that article, MGA's CEO Isaac Larian is attributed with a statement that Carter Bryant was the creator of Bratz. The article states:

> Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for Bryant over several others after holding a sort of fashion-doll design contest in late 1999.

Zeller Decl. Ex. 118.

At the close of the second hearing, held on May 19, 2008, MGA offered, for the first time, evidence in the form of a time line that showed that a "claim" from a lawsuit filed in Hong Kong by MGA was received by Mattel on September 23, 2003. See Bogorad Supp. Decl. Ex. 145. A copy of court documents from that litigation shows that MGA claimed ownership of Bratz fashion dolls and that, more specifically, at issue were "17 design drawings of various fashion dolls between the years 1998 and 2000." Id. at Ex. 143. Exhibit 143 is a ten-page document captioned as "STATEMENT OF CLAIM" and appears to the Court to be, under Hong Kong law, the equivalent of a complaint. MGA's ownership to the 17 drawings referenced in the "STATEMENT OF CLAIM"

was based on Bryant's creation of the design drawings during a time period that includes his employment at Mattel.  Id.

Also at this time, MGA offered a letter, dated October 17, 2003, from Mattel's Hong Kong counsel to Mattel, that discusses the propriety of providing to Mattel certain documents relating to the City World litigation.  Within this letter, certain key details of the "STATEMENT OF CLAIM" were referenced.  See Supp. Bogorad Ex. 146 ("One of the exhibits referred to in such Affirmation was a set of coloured drawings described as '17 initial concept and design drawings of the Bratz dolls made by Mr. Carter Bryant in the year 2000.'").

After being given an opportunity to respond to this last-minute evidence, Mattel offered as evidence the documents it received on September 23, 2003, and that evidence did not include the document marked as Ex. 143.  See Supp. Moore Decl. Ex. A.  The documents Mattel received do not include any reference to Carter Bryant or the dates of creation of the 17 drawings.  See id.  Instead, it consists of a copy of a "writ of summons" in that same litigation.

In responding to this evidence, counsel for MGA first incorrectly contended that the declaration of in-house counsel, Michael Moore, did not deny receiving a copy of the City World claim setting forth this key language.  Compare Reply at 1 ("**Mr. Moore, the only witness offered by Mattel, does *not* deny that Mattel took possession of a copy of the City World claim on or about September 23, 2003**.") (emphasis in the original) with Supp. Moore Decl. ¶ 3 (attaching as Exhibit A all documents received from Mattel's Hong Kong counsel on September 23, 2003; noting that public access to court files in Hong Kong is limited; and verifying that the materials attached as Exhibit A (which does not include the key language regarding Carter Bryant's creation of Bratz drawings) "were the only ones relating to MGA's litigation that Mattel's Hong Kong counsel were allowed to obtain from the Hong Kong court files").

More disturbingly, however, counsel for MGA next lobbed unsubstantiated assaults on Mr. Moore's truthfulness.  Counsel states that the documents "appear to have been doctored or manipulated in some fashion."  Reply at 2.  Counsel does so because the fax itself has an anomalous pagination in the fax header line wherein the first ten pages are numbered "01, 02 . . . 10," and the numbers thereafter are numbered "11/46, 12/46 . . . 46/46."  Supp. Moore Ex. A.

This Court has indicated on a number of occasions, most strikingly in connection with its consideration of Mattel's motion to disqualify counsel for MGA, that it will not countenance unsubstantiated dispersions cast upon opposing counsel.  Where there is *evidence* of unethical behavior, the Court expects to be made aware of that evidence; where, however, there is mere *speculation* of such behavior, no legitimate purpose is served by its airing.

Nevertheless, focusing on the additional evidence offered by MGA on May 19, 2008, the time line produced in connection with the Simpson-Taylor deposition makes reference to a City World "claim" that was received by Mattel on September 23, 2003.  Although this time line stops short of acknowledging that the document entitled "STATEMENT OF CLAIM" was received in

September, it is nevertheless sufficient to controvert Moore's declaration regarding whether the "STATEMENT OF CLAIM" was in fact received on this date.  Moreover, the October 17, 2003, letter raises an inference regarding the full scope of Mattel's pre-November 23, 2003, knowledge of the contents of the "STATEMENT OF CLAIM."

It is uncontroverted that Mattel first received a copy of the Bryant-MGA contract, the effective date of which pre-dated the effective date of Bryant's resignation from Mattel, on November 24, 2003.

Where a plaintiff advances a state-law claim under California law, federal courts apply the California "discovery rule" to determine whether the state-law claim is time-barred.  See, e.g., Orkin v. Taylor, 487 F.3d 734, 741 (9th Cir. 2007).

The Court's analysis begins with the unremarkable proposition that "[a] plaintiff must bring a claim within the limitations period after accrual of the cause of action."  Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 806 (Cal. 2005) (citation omitted).  To apply this unremarkable proposition, however, the Court must determine what the California Supreme Court means by "accrual of the cause of action."

In that regard, the California Supreme Court has stated that, "[g]enerally speaking, a cause of action accrues at the time when the cause of action *is complete with all of its elements*," id. at 807 (emphasis added) (citation omitted), a phrase which itself must be expounded upon further to ascertain its meaning.  When applying the discovery rule, those "elements" are not "specific legal element[s] of a particular cause of action"; rather, they are the "'generic' elements of wrongdoing, causation, and harm."  Id. (citation omitted).

The definition of those terms gives a more comprehensive understanding to the California Supreme Court's statement that "the 'discovery rule' . . . postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  Id. (citation omitted).  In turn, "[a] plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements."  Id. (internal quotation marks and citation omitted).  Further refined, where a plaintiff has **knowledge** of at least one of the three generic elements, and **suspicion** of the remaining generic elements, the claim has accrued and the limitations period has begun to run.  Id. (citation omitted).

This rule is designed to require plaintiffs to diligently investigate their potential claims.  See id. at 808.  To that end, in the context of a personal injury action, the California Supreme Court has stated that "plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation."  Id.  Of course, this statement must itself be viewed with the definition of "injury" the California Supreme Court considered:  "At common law, the term 'injury,' as used in determining the date of accrual of a cause of action, means both a person's physical condition and its negligent cause. . . . Thus, physical injury alone is often insufficient to trigger the statute of limitations."  Id. at 808 n.2 (internal quotation marks and citation omitted).

This requirement of diligence, stated otherwise, prohibits California plaintiffs from passively waiting for the facts supporting their claim to find them and places on them an affirmative requirement to investigate:

> Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1111 (Cal.1988).

The Jolly court discussed two examples in explaining this standard. First, it cited to Miller v. Bechtel Corp., 33 Cal.3d 868, 874 (Cal.1983), which held time barred the fraud claim of a plaintiff who had suspicions that the value of her husband's stock was understated at the time of their dissolution agreement, but who failed to assert her claim until years later when the stock was sold. Id. In that case, the plaintiff's lawyer sought information, both before the dissolution and within a few months thereafter, regarding the method by which the stock was valued. Id. at 875. When the response was not forthcoming, the lawyer chose not to pursue this inquiry further, and thus plaintiff was charged with knowledge of the facts the investigation would have uncovered – that the stock was valued by the price attributed to it in the shareholders' agreement rather than by any objective valuation. Id.

Second, the Jolly court cited to Gray v. Reeves, 76 Cal.App.3d 567 (Cal. App.1977), which held that a plaintiff's claim based on his use of a prescription drug arose when the plaintiff understood the nature of his injury (deterioration of the hip socket) and the probable cause thereof (the use of the prescription drug prednisone) as well as the identity of the prescribing doctor and the drug's manufacturer.

Although the discovery rule has been largely developed in tort cases, the rule has also been applied in cases involving contract claims. See e.g., April Enterprises, Inc. v. KTTV, 147 Cal.App.3d 805, 832 (1983) ("Specifically, we hold the discovery rule may be applied to breaches which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time."); Intermedics, Inc. v. Ventritex, Inc., 775 F.Supp. 1258, 1266-67 (N.D. Cal. 1991).

Thus, California's discovery rule is easily understood in the abstract; moreover, it is often easily applied in particular factual situations. Here, however, this Court's application of the rule in this case is not so clear cut, and the Court must consider the premises underlying the parties' respective analysis of this issue.

In substance, MGA contends that Mattel was on notice as early as February, 2001, of a potential claim that Carter Bryant breached the confidentiality provision of his contract by borrowing from or plagiarizing certain non-public Mattel projects. This date coincides with the display of the Bratz dolls at a New York Toy Fair and "speculation in the media started about

alleged similarities between the BRATZ and Mattel's internal projects." MGA Motion at 18. Alternatively, MGA posits March 15, 2002, the beginning date of an internal Mattel investigation into MGA and Larian's involvement in Bryant's creation and development of Bratz, as the date Mattel's current claims accrued.

Mattel, on the other hand, contends that MGA is essentially arguing that a claim Mattel chose not to bring – that Bratz infringed on the Mattel projects of Toon Teens and Diva Starz – is time barred. Mattel points out that it has previously disavowed, and that it continues to disavow, any intent to assert such a claim. Rather, Mattel contends that it is bringing a different claim, a claim that Mattel has rights to Bratz pursuant to the Inventions Agreement based on Bryant's actions during the period of his employment with Mattel.

In determining, under California law, which of the parties' diametrically opposed positions represent the better approach, the Court is guided by the California Supreme Court case cited above, Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 806 (Cal. 2005). In that case, a plaintiff, suffering from complications following gastric bypass surgery, sued for medical malpractice. Id. at 802. During the course of discovery, she learned, through the testimony provided at the deposition of her surgeon, that she had a potential claim against the manufacturer of a surgical stapler. Id. at 804. Specifically, the plaintiff's surgeon testified that he had found on previous occasions that the particular stapler had caused post-surgery leaks. Id. When the plaintiff amended the complaint to assert a products liability claim, the trial court, on statute of limitations grounds, sustained a demmurrer without leave to amend, reasoning that "when a plaintiff sues based on knowledge or suspicion of negligence, . . . the statute of limitations begins to run as to all defendants, including manufacturers possibly liable under products liability theories." Id.

The Court of Appeal reversed, and the California Supreme Court affirmed the reversal. Id. at 812, 816. In doing so, the California Supreme Court rejected, as inconsistent with its precedent, the so-called "the Bristol-Myers Squibb rule that all claims arising from an injury accrue simultaneously, even if based upon distinct types of wrongdoing, is inconsistent with the generic elements approach . . . ." Id. at 815.

From this discussion, a parallel begins to emerge that MGA's position is like that of the demurring defendant who seeks to dismiss a products liability claim on the basis of plaintiff's discovery of a different claim of medical malpractice, and Mattel's position is like that of the plaintiff who seeks to assert the that products liability claim. In a sense, however, this analogy goes nowhere, as MGA's position is that the claim Mattel asserts in the current action is not different from the potential claim for which it was on notice of in 2001. After all, both would be based on breach of contract and/or copyright claims, both would involve the same defendants, and both would result in the same type of injury.

However, the Fox Court's elaboration on the rule it enunciates convinces the Court that Mattel's position is the stronger one. After discussing the application of its rule in the more narrow situation presented by the overlap of medical malpractice and products liability claims at issue in the case before it, the Fox Court explained:

> More broadly stated, if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim.

Id. at 813.  In analyzing the discovery rule, the term "wrongdoing" is used not in a technical or legal sense, but in its everyday meaning. Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1111 (1988) ("In this context, 'wrong,' 'wrongdoing,' and 'wrongful' are used in their lay understanding.").

Here, on one hand, we have a breach of contract claim or copyright infringement claim based on alleged copying or "borrowing" of Mattel's undisputed rights in Toon Teens and/or Diva Starz to create Bratz that perhaps Mattel was on notice of as early as 2001, and which Mattel admittedly investigated as early as 2002, but upon which Mattel ultimately chose not to file suit. On the other hand, we have the claims asserted here, for breach of contract and copyright infringement, based on Mattel's (disputed) ownership rights to the Bratz drawings pursuant to Bryant's employment agreement with Mattel and in light of the (disputed) fact that Carter Bryant created these works during the period of his employment with Mattel.  Applied to the present case, in the Court's view, the question the Court must ask is whether the first type of claim is based on qualitatively different type of "wrongdoing" – as that term might be understood by lay persons – than that which gives rise to the present claims.

Thus framed, the Court considers the two claims:  Although they are similar in that they both include the wrongdoing of the failure to keep one's promise to maintain confidentiality, they are qualitatively different, however, in that the former situation involves the alleged taking of rights known to Mattel while the latter involves the alleged concealment of certain creations that belong to Mattel in the first instance in order to facilitate the taking of rights unknown to Mattel.  This fundamental difference leads the Court to the conclusion that the latter claims, those asserted here, involve a different element of "wrongdoing" than do the unasserted claims based on Toon Teens and/or Diva Starz.

The burden of proof on the discovery rule issue is on Mattel.[2]  Examining the claim Mattel asserts, rather than the claim Mattel chose not to assert, the Court must determine whether Mattel had knowledge of any one of the three generic elements of wrongdoing, causation, or damages, coupled with suspicion of the remaining generic elements.  This determination cannot be made on the undisputed record before the Court.

Rather, MGA has raised triable issues of fact precluding summary judgment on the statute of limitations issue.  Any of the following could be the date upon which MGA claims against Carter

---

[2]  See Fox, 35 Cal.4th at 803 (imposing upon a plaintiff that seeks to take advantage of the discovery rule a requirement that it "plead[] and prove[] that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action).

Bryant accrued: The July 18, 2003, Wall Street Journal article; the September 23, 2003, date of receipt of the City World "claim"; the October 17, 2003, date of counsel's letter to Mattel regarding the City World litigation; or the November 24, 2003, date of receipt of the MGA-Bryant agreement that pre-dated Bryant's resignation of his employment.[3]

The accrual of a copyright claim, as the parties recognize, approximates the state-law standard discussed herein. See Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004) ("Thus, . . . the statute of limitations does not prohibit recovery of damages incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances."). Accordingly, the Court makes the same conclusion regarding the accrual date of Mattel's copyright claim against Carter Bryant as it does regarding the accrual date of Bryant's state-law claims.

As stated earlier, although Bryant is no longer a party to this action, the parties recognize, as does the Court, that the timeliness of the claims asserted against Carter Bryant is relevant because of the potential that Mattel's claims against the MGA entities and Isaac Larian may, pursuant to Fed. R. Civ. P. 15(c), relate back to those claims. Mattel embraces the concept of relation back; MGA rejects it.

Although such distinction has not been particularly important at other points in this litigation, the Court has referred to the MGA entities and Isaac Larian collectively as MGA. More specifically, as to Phase 1, there are two separate MGA entities: MGA Entertainment, Inc. and MGA Entertainment HK Limited. There is also MGA's CEO, Isaac Larian. This distinction is important to the Court's analysis of relation back.

MGA Entertainment, Inc., but not Isaac Larian or the other MGA entity, intervened in this action on December 7, 2004. Therefore, based on the status of MGA Entertainment, Inc., as a party, the standard for whether the claims relate back differs from that governing the relation back of claims against MGA Entertainment HK Limited. See infra. As this Court has noted before, the Phase 1 claims against MGA sought to be asserted by Mattel on November 20, 2006, which arise out of the same factual allegations as do the claims asserted by Mattel against Carter Bryant on April 27, 2004, relate back to the date that complaint was filed. See Court's Jan. 12, 2007, Order at 13-15. The Court does not revisit that issue now.

MGA argues that "some courts have dis-allowed 'relation back' of claims against intervening *defendants*." MGA Opp. at 25 n.21 (emphasis in the original). However, in support of this argument, MGA cites a two-page Texas appellate court decision which does not cite to or interpret Fed. R. Civ. P. 15(c), Davis v. Outdoor Equip. Co., 551 S.W.3d 72, 73 (Tex. Ct. App. 1977), which the Court finds unpersuasive.

As to the new parties sought to be added on November 20, 2006 (MGA Entertainment HK

---

[3] The analysis is slightly different for the conversion claim. See infra at 9-10.

Limited and Isaac Larian), MGA challenges the timeliness of the amendment to add these parties based on whether their identities were known to Mattel at an earlier date. The Court has already held that the claims against them relate back to the April, 2004, complaint. See Court's Jan. 12, 2007, Order at 15-16 n.5. The Court will not revisit that issue either.

The Court rejects the proposition, however, that the claims against both MGA entities did not arise until the date of Carter Bryant's deposition. Whatever the date on which the claims against Carter Bryant arose is ultimately found to be, the August 2002 anonymous letter should have given Mattel a suspicion of that MGA Entertainment, Inc., participated in any wrongdoing by Carter Bryant. See Zeller Decl. Ex. 63 (alleging that Carter Bryant "worked out a deal with MGA that let him collect a large sum of money each year from MGA in exchange for his secrecy about the dolls").

The same is not true as to MGA Entertainment HK Limited and as to Isaac Larian, whom the anonymous letter did not implicate. Therefore, the claims against these defendants arose no earlier than November 4, 2004.

Intentional interference with contractual relations is subject to a two-year statute of limitations. MGA contends that the claim accrues upon the breach of contract, and therefore argues that the claim was untimely before it was asserted against Carter Bryant. They make a similar argument regarding Mattel's conversion claim, which carries with it a three-year statute of limitations.

However, the statute of limitations for breach of contract is tolled during a period of fraudulent concealment. Gryczman v. 4550 Pico Partners, Ltd., 107 Cal.App.4th 1, 5 (2003). The rationale for such tolling easily extends to intentional interference with contractual relations claim, which includes the element of a breach of a contract. The limitations period is likewise tolled during a period of fraudulent concealment as to a conversion claim. AmerUS Life Ins. Co. v. Bank of America, 143 Cal.App.4th 631, 639 (2006) ("To the extent our courts have recognized a 'discovery rule' exception to toll the statute, it has only been when the defendant in a conversion action fraudulently conceals the relevant facts or where the defendant fails to disclose such facts in violation of his or her fiduciary duty to the plaintiff.") Mattel has raised a triable issue of fact as to whether the evidence of the breach and the tortious interference thereof was fraudulently concealed from them before the July 18, 2003, Wall Street Journal article.

The Court will permit further briefing from the parties on the limited issue of what further conclusions regarding the timeliness of each claim should be drawn as a result of this Order. The parties' simultaneous briefs shall be limited to seven pages in length, and shall not re-argue any point upon which the Court has ruled in this Order or its previous two summary judgment Orders. The briefs shall be e-filed no later than 8:30 a.m., Thursday, May 29, 2008, and a courtesy copy must be provided to chambers at the same time. The parties shall also file, as exhibits thereto, their revised proposed special interrogatories on the issue of statute of limitations.

**IT IS SO ORDERED.**