Received:  2/ 7/05   6:14PM;       310 553 5583 -> JetFax   920;  Page 19
FEB-07-2005 18:12 FROM:LITTLER MENDELSON   310 553 5583      TO:12136240643        P.19/31

*facts* that the adverse party's lawyer has learned, or the persons from whom he has learned such facts, or the existence or non-existence of documents, even though such documents themselves may not be subject to discovery." <u>Nutmeg Insurance Co. v. Atwell, Vogel & Sterling, et al.</u>, 120 F.R.D. 504, 509 (W.D. La. 1988)(*citing* 8 Wright & Miller, Federal Practice & Procedure, § 2023, at 194 (1970))(emphasis added); <u>Resolution Trust Corp.</u>, 73 F.3d at 266 ("Because the work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions, it does not protect *facts* concerning the creation of work product or *facts* contained within work product.") (emphasis added). The following excerpts from the Kaye deposition are illustrative:

> Q: What input have you given during your tenure of employment about these form of Agreements?
>
> Mr. Zeller: To the extent that those were communications from counsel concerning the content of those agreements I would instruct the witness not to disclose those.
>
> Mr. Jacoby: Well, I'm asking what you said, what your input is, and that's asking for what you say. I would suggest to you that that's not privileged. Because saying something to a lawyer doesn't make it privileged.

(Jacoby Decl., ¶  ).

* * * *

> Q: Was it your practice in 2002 to consult with legal before referring an investigation to either H.R. or Worldwide Security?
>
> Mr. Zeller: You are talking about with respect – with respect to a specific incident?
>
> Mr. Jacoby: To any incident. I'm asking for his practice.
>
> Mr. Zeller: Well, but then that goes back to the point I was making earlier. To the extent that the practice is predicated upon communications with counsel and advice that you have received from counsel, you should exclude that from your answer. And the substance of that should not be disclosed.

(Jacoby Decl., ¶  ).

Similarly, Mattel's improper instructions deprived Bryant of his ability to elicit facts relevant to his contention that Mattel allowed the destruction of key emails in

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107
310.553.0308

18.

CASE NO. 04-9059 NM (RNBx)

EXHIBIT  1
PAGE  21

Received: 2/ 7/05 6:14PM; 310 553 5583 -> JetFax 20; Page 20
FEB-07-2005 18:12 FROM:LITTLER MENDELSON   310 553 5583   TO:12136240643   P.20/31

this case through its dubious document retention system and failed to take steps to preserve all e-mails concerning Bryant and the investigation into his alleged wrongdoing. The following excerpts from the deposition of Alan Kaye are illustrative.

> Q: And so if a person with an email account at Mattel is separated [from employment], is there any practice that Mattel has to gather up and retain the emails that the person has on their system at the point of separation?
>
> Mr. Zeller: Again, I'm going to instruct the witness to exclude from his answer information that he has received from or communications with counsel.
>
> * * * *
>
> Q: Based on your 28 years of experience could you describe the basic elements of an internal investigation. I mean, I can walk you through it if you like. Is it typical in an internal investigation that interviews are done[?]
>
> Mr. Zeller: First of all, this is clearly asking for privileged information. Because if you laid the foundation, what you would find out is obviously these things, as you know, Mr. Jacoby, are done in connection with counsel including the practices that are followed.
>
> * * * *
>
> Q: And so it's true, then, that Mattel has used in its internal investigations electronic documents that are older than four months old, including emails?
>
> Mr. Zeller: I'm going to instruct the witness not to answer the question.
>
> Mr. Jacoby: On what basis?
>
> Mr. Zeller: <u>On the grounds of privilege and work product.</u>

(Jacoby Decl., ¶ )(emphasis added).

Clearly, Mattel's overbroad and blanket assertions of the attorney-client privilege were not only improper, but were also a deliberate attempt to thwart Bryant's ability to obtain relevant facts and testimony necessary to defend this case and prosecute his cross-claims. See In re Bevill, Bresler & Schulman Asset Mgt. Corp., 805 F.2d 120, 123 (3rd Cir. 1986) (overbroad and blanket assertions of the attorney-

19.   CASE NO. 04-9059 NM (RNBx)

EXHIBIT 1
PAGE 22

Received:   2/ 7/05   6:15P      310 553 5583 -> JetFax 920;   Page 21
FEB-07-2005 18:12 FROM:LITTLER MENDELSON   310 553 5583   TO:12136240643   P.21/31

client privilege are inappropriate). Further, the party who asserts the privilege has the burden of proving that **each question** elicits a privileged or work-product communication. See In re Arthur Treacher's Franchise Litigation, 92 F.R.D. 429, 437 (E.D. Pa. 1981); cf. Conoco, Inc. v. United States Dept. of Justice, 687 F.2d 724, 730 (3rd Cir. 1982). Mattel's overbroad and vague assertions of the privilege, however, have wholly failed to satisfy its burden. See In re Arthur Treacher's Franchise Litigation, 92 F.R.D. at 437 (an objection and refusal to answer must be predicated on a sufficient demonstration that the matter inquired about is privileged); Swarthmore Radiation Oncology v. Lapes, 1993 U.S. Dist. LEXIS 17059 *8 (E.D. Pa. November 15, 1993) (blanket objections are of no avail when unsupported by evidence that privilege or work product protection applies).

     5.    **Mattel Corrupted The Driskill And Kaye Depositions By Interposing Lengthy Speaking Objections And Coaching The Witnesses.**

In addition to improperly instructing Driskill and Kaye not to answer legitimate questions, Mattel's attorneys frequently interrupted important questions with "objections" that were transparently designed to coach the witness, to suggest the desired response and, indeed, to outright re-frame the question to Mattel's liking. (Jacoby Decl., ¶ ). An attorney may not, however, object to questions in such a way as to coach the witness or suggest an answer. American Directory Service Agency v. Beam, 131 F.R.D. 15, 18 (D.D.C. 1990) (counsel "coached" responses, frequently instructed witnesses not to answer, and made vexatious requests for clarification that "prevented the elicitation of meaningful testimony and needlessly added to the expense of this litigation," thus warranting sanctions). Such conduct justifies granting Bryant's motion to redepose the witness. This did not stop Mattel from doing so, however.

Q:    Do you have an understanding of what the term "reduced to practice" means?

Received: 2/7/05 6:15P    310 553 5583 -> JetFax 20;  Page 22
FEB-07-2005 18:13 FROM:LITTLER MENDELSON    310 553 5583    TO:12136240643    P.22/31

1  A:  You're asking as used in Exhibit 50 [the Inventions and Assignments Agreement]; right?

2  Q:  No. In general.

3  Mr. Zeller:  Well, the question is vague and ambiguous and lacks foundation.

4

5  Mr. Jacoby:  Do you?

6  Mr. Zeller:  There's no context to it. What context are you talking about?

7  Mr. Jacoby:  In any context. Do you know what the term "reduced to practice" means?

8

9  Mr. Zeller:  The question is grossly improper. Why don't you give a context, counsel. Are you talking about in agreements? In some agreement that she signed?

10

11  Mr. Jacoby:  You can answer.

12  Mr. Zeller:  Do you understand the question? I mean in terms of what context he's asking about?

13  The witness:  Not really.

14  (Jacoby Decl., ¶  ).

15  Q:  Okay. The Bratz dolls don't look like Barbie dolls. That's true, isn't it?

16

17  Mr. Zeller:  I'm going to object. The question is overbroad. Lacks foundation. Vague and ambiguous.

18  The witness:  They're not the same doll.

19  Q:  How are they different as a general proposition?

20

21  Mr. Zeller:  The question lacks foundation. What Barbie doll are you talking about? And in what respect?

22  Mr. Jacoby:  Well, can you — can you describe for me specific features of the Bratz dolls that aren't found in any Barbie doll?

23

24  Mr. Zeller:  I'm going to object. The question lacks foundation. You haven't established that the witness has seen every Barbie doll. And you still haven't described what aspect of these dolls you're asking about.

25

26  (Jacoby Decl., ¶  ).

27  Q:  Is there a policy to not explain [the Employee Agreement] to employees unless they ask questions?

28

Received: 2/ 7/05 6:15PM
FEB-07-2005 18:13 FROM:LITTLER MENDELSON   310 553 5583   TO:12136240643   P.23/31

1     Mr. Zeller: The question is confused.

2     The witness: I don't understand it. Is there -- one more time.

3     Mr. Jacoby: In other words, is it the policy of H.R. to have employees sign these agreements without explanation from H.R. unless the employee affirmatively asks questions?

5     Mr. Zeller: Objection as to the term "policy."

6     The witness: Again -- "policy," yeah.

7     (Jacoby Decl., ¶  ).

8     In several instances, Mattel's deliberately lengthy and disruptive speaking objections even caused the witness to forget the pending question:

10     Q: Do you have any reason to believe -- is there any fact that you have in your brain that suggests that you didn't sign the same form of Inventions and Assignment Agreement as [??] Carter Bryant?

13     Mr. Zeller: This assumes facts not in evidence, counsel. She's already testified that she doesn't recall this particular form. And moreover, when you say same one as Carter Bryant, you're talking about a particular one in January of 1999. And there is absolutely no foundation for you to suggest to the witness that she must have signed this particular form. You haven't established anything along those lines. To suggest to the witness that you have is -- completely lacks foundation.

17     Mr. Jacoby: You can answer.

18     The witness: I've kind of forgotten the question again.

19     Mr. Jacoby: Okay. Well, that's why your attorney's [sic] objecting the way he is.

20     (Jacoby Decl., ¶  ).

21     In this manner, Mattel prevented Bryant from conducting a fair examination of the witnesses. As one District Court has aptly observed:

> Depositions have been unduly prolonged, if not unfairly frustrated, by lengthy objections and colloquy, often suggesting how the deponent should respond ... objections and colloquy by lawyers tend to disrupt the question-and-answer rhythm of a deposition and obstruct the witnesses's testimony. Since most objections, such as those grounded on relevance and materiality, are preserved for trial, they need not be made. As for those objections which would be waived if not made immediately, they should be stated pithily.

\* \* \* \*

22.      CASE NO. 04-9059 NM (RNBx)

EXHIBIT ____
PAGE 25

Received: 2/7/05 6:16PM    310 553 5583 -> JetFax    20;   Page 24
FEB-07-2005 18:13 FROM:LITTLER MENDELSON   310 553 5583    TO:12136240643    P.24/31

> The underlying purpose of a deposition is to find out what a witness saw, heard, or did —what the witness thinks. *A deposition is not meant to be a question-and-answer conversation between the deposing lawyer and the witness.* There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers. The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record. *It is the witness, not the lawyer who is the witness.*

Hall, 150 F.R.D. at 530 (emphasis added); see also American Directory Service Agency, 131 F.R.D. at 18. For this reason, Bryant should be allowed to further question the witnesses, and sanctions should be imposed.

### 6. Bryant Should Be Permitted To Further Question Driskill And Kaye On Certain Subjects.

Specifically, Bryant requests an Order compelling Driskill and Kaye each to re-appear for deposition and provide further testimony in subject areas in which Bryant was unable to conduct a fair examination. These subject areas include:

- The witnesses' knowledge and understanding of Mattel's employment agreements and employment documents including, but not limited to, its Confidential Information and Inventions Agreement and Conflict of Interest Questionnaire
- Driskill's observations regarding the similarities and differences between "Bratz" dolls and Mattel property and products.
- The witnesses' knowledge of, and involvement in, Mattel's investigation or inquiry into any alleged wrongdoing by Bryant.
- The witnesses' knowledge and understanding of Mattel's employment policies and practices.

**B. Mattel's Position**

TBA

EXHIBIT ____1____

PAGE ____26____

23.    CASE NO. 04-9059 NM (RNBx)

LITTLER MENDELSON

Received:   2/ 7/05   6:16P         310 553 5583 -> JetFax  20;   Page 25
FEB-07-2005 18:14 FROM:LITTLER MENDELSON   310 553 5583   TO:12136240643   P.25/31

## VI.

### ISSUE NUMBER TWO

Should a Discovery Special Master be appointed for the limited purpose of supervising future depositions in this case, to halt Mattel's abusive practices and avert the need for further motion practice?

**C.   Bryant's Position**

"The ends of justice compel the appointment of a Discovery Special Master to preside over all pending and future depositions in this case, lest there be repetition of these obstructive tactics, further delay, waste, expense, and still more needless burdens cast upon this congested court." Shapiro v. Freeman, 38 F.R.D. 308, 312 (S.D.N.Y. 1965). Local Rule 53-1 expressly authorizes the appointment of a master pursuant to Federal Rule of Civil Procedure 53. Rule 53 authorizes the Court to appoint a master to aid in performing specific functions in a pending action, including supervising discovery.

Indeed, Mattel benefits from its abusive discovery tactics in so many ways that it is not likely to stop its wrongful conduct without a Discovery Special Master. Obviously, Mattel's tactics hamper Bryant's defense and increase the expense and burden of the defense of this action. In addition to this, however, Mattel reaps further rewards even if it is ultimately compelled to provide additional discovery. Its behavior allows it to get a sneak preview of Bryant's questioning. Once it obtains a road-map of the deposition, without permitting witnesses to answer the hardest questions, it then has weeks of additional time to prepare its witnesses to respond to these questions *after* Bryant has completed the time-consuming motion process. Bryant is, thus, deprived of spontaneous, unrehearsed, uncoached responses from the witnesses. In effect, Mattel gets to see Bryant's deposition outline, before the deposition. The only way Bryant will be able to elicit facts, untainted by weeks of rehearsal, is through the appointment of a Discovery Special Master. Bryant is entitled to no less.

24. EXHIBIT __1__   CASE NO. 04-9059 NM (RNBx)

PAGE __27__

Received:  2/ 7/05  6:16PM   310 553 5583 -> JetFax  20;  Page 26
FEB-07-2005 18:14 FROM:LITTLER MENDELSON   310 553 5583    TO:12136240643    P.26/31

One of the purposes of deposition is to "freez[e] a witness's testimony at an early stage of the proceedings, before that witness's recollection of the events at issue either has faded or has been altered by intervening events, other discovery, *or the helpful suggestions of lawyers.*" Hall, 150 F.R.D. at 530 (emphasis added). Indeed, District Courts commonly appoint Discovery Special Masters or referees to supervise depositions in situations where "Rambo litigation" tactics, similar to those used by Mattel, are employed. For instance, in Van Pilsum v. Iowa State University of Science and Technology, 152 F.R.D. 179, 180-181 (S.D. Iowa 1993), the District Court appointed a special master to preside over all future depositions because plaintiff's counsel, John Barrett:

> repeatedly took it upon himself to restate Defendants' counsel's questions in order to "clarify" them for the Plaintiff. Mr. Barrett consistently interrupted Mr. Young and the witness, interposing "objections" which were thinly veiled instructions to the witness, who would then incorporate Mr. Barrett's language into her answer ... [c]ounsel for both parties engage in extensive colloquy which interrupted the flow of the deposition, and made for inefficient use of everyone's time. Mr. Barrett repeatedly objected to the form of Mr. Young's questions ... In fact, of the 4025 lines of transcript, only seventy percent contain questions by Mr. Young and answers by [the witness]. The balance of the discussion is discussion, argument, bickering, haranguing, and general interference by Mr. Barrett ... and response by Mr. Young ...
>
> The style adopted by Mr. Barrett, and responded to in kind by Mr. Young, has become "Rambo Litigation." It does not promote the "just, speedy, and inexpensive determination of every action," as is required by Fed.R.Civ.P. 1. This style, which may prove effective out of the presence of the court, and may be impressive to clients as well as ego-gratifying to those who practice it, will not be tolerated by this court. *Merely because depositions do not take place in the presence of a judge does not mean lawyers can forget their responsibilities as officers of the court. They should conduct themselves accordingly.*

Id. at 180-181 (emphasis added). In addition to appointing a special master, the District Court in Van Pilsum granted the defendant's motion to compel and for request for sanctions.[8] Id.

---

[8] The court further ordered Mr. Barrett to personally pay for half of the cost of the plaintiff's initial deposition. The court also ordered that the cost of the discovery master for the completion of plaintiff's deposition be borne solely by Mr. Barrett personally. Id. at 181.

Received: 2/7/05 6:17P    310 553 5583 -> JetFax ;20;  Page 27
FEB-07-2005 18:15 FROM:LITTLER MENDELSON   310 553 5583    TO:12136240643    P.27/31

1  The result should be the same here. See also <u>United States of America v.
2  Montrose Chemical Corporation of California</u>, 980 F. Supp. 1112, 1114 (C.D. Cal.
3  1997)("the Special Master is charged with the duty and responsibility to superintend
4  ... all discovery matters, including the taking of depositions, and to decide all
5  questions and disputes with reference thereto. The Special Master may also determine
6  in his discretion to be personally present at any discovery proceedings."); <u>601 West 26
7  Corp. v. Solitron Devices, Inc.</u>, 291 F. Supp. 882, 887 (S.D. N.Y. 1968)("[t]he case in
8  chief would seem to require a substantial amount of discovery and inspection, which,
9  in light of the nature of the allegations in the complaint and counterclaim, is likely to
10  be acrimonious and grudging. The Court, anticipating the numerous problems will
11  arise in the course of discovery and inspection, grants plaintiff's motion with respect
12  to ... the appointment of a special master as follows ... to superintend the taking of
13  depositions ... and to preside at the taking with power" to rule on any objection to a
14  question made or on behalf of any party or witness). Given Mattel's pervasive
15  "Rambo" style obstructive tactics during the depositions of Driskill and Kaye, and in
16  the interests of justice, a Discovery Special Master should be appointed to preside
17  over all pending and all future depositions in this matter. Fed. R. Civ. P. 53. Under
18  Local Rule 53-2, the "master's fees and expenses, when approved by the Court, shall
19  be paid as the Court orders."

20  D.  **Mattel's Position**
21  TBA

## V.

### ISSUE NUMBER THREE

24  Should sanctions be imposed on Mattel for deliberately having engaged in
25  abusive tactics during the depositions of Driskill and Kaye and requiring Bryant to
26  seek court intervention to resolve the issue?

27  E.  **Bryant's Position**
28  Mattel, not Bryant, should bear the expense of Mattel's behavior. Federal Rule