EXHIBIT 8

FILED

1  DALE M. CENDALI
   (of counsel, not admitted in California)
2  DIANA M. TORRES (S.B. #162284)
   PAULA E. AMBROSINI (S.B. #193126)
3  O'MELVENY & MYERS LLP
   400 South Hope Street
4  Los Angeles, CA 90071-2899
   Telephone: (213) 430-6000
5  Facsimile: (213) 430-6407
   email:     dtorres@omm.com
6
7  PATRICIA GLASER (S.B. # 55668)
   CHRISTENSEN, MILLER, FINK,
   JACOBS, GLASER, WEIL &
8  SHAPIRO LLP
   10250 Constellation Boulevard, 19th Floor
9  Los Angeles, CA 90067
   Telephone: (310) 553-3000
10 Facsimile: (310) 556-2920

11 Attorneys for Plaintiff
   MGA Entertainment, Inc.
12

13
                    UNITED STATES DISTRICT COURT
14
                   CENTRAL DISTRICT OF CALIFORNIA
15
                         CV 05-02727 CBM (RZx)
16 MGA ENTERTAINMENT, INC.,              Case No.
17                Plaintiff,              COMPLAINT FOR FALSE
                                          DESIGNATION OF ORIGIN,
18       v.                               AFFILIATION, ASSOCIATION OR
                                          SPONSORSHIP (15 U.S.C. § 1125
19 MATTEL, INC., a Delaware               (a)); UNFAIR COMPETITION (15
   Corporation, and DOES 1-10,            U.S.C. § 1125 (a), Cal. Bus. & Prof.
20                                        Code § 17200 et seq. and California
                  Defendants.             Common Law); DILUTION (15
21                                        U.S.C. § 1125 (c), Cal. Bus. & Prof
                                          Code § 14330 and California Common
22                                        Law); AND UNJUST ENRICHMENT

23                                        **DEMAND FOR JURY TRIAL**
24
25
26
27
28

EXHIBIT  8

PAGE  91

Plaintiff MGA Entertainment, Inc. for its complaint against Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

**PARTIES**

1. Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2. MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3. MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained. MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein. MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel. Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

**JURISDICTION AND VENUE**

4. Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law. This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

EXHIBIT 8
PAGE 92

1  subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.
2  Section 1367(a).
3      5.    This Court has specific personal jurisdiction over Mattel, as it has
4  purposefully committed, within the State of California, the acts from which these
5  claims arise and/or has committed tortious acts outside California, knowing and
6  intending that such acts would cause injury to MGA within the state. The Court
7  also has general personal jurisdiction over Mattel, as it conducts continuous,
8  systematic and routine business within the State of California and the County of
9  Los Angeles.
10     6.    Venue is proper in the United States District Court for the Central
11 District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

## FACTUAL BACKGROUND

14     7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of
15 competition-by-intimidation and serial copycatting of MGA's products, which
16 Mattel has used in an unbridled effort to cause confusion in the market place and
17 eliminate MGA as a competitor in the toy and fashion doll market long dominated
18 and controlled by Mattel.
19     8.    MGA is a privately-held company in the San Fernando Valley that
20 began in 1979 as a small consumer electronics business. In 1987, the company
21 made its first foray into the toy business when it secured rights to market handheld
22 LCD games featuring licensed Nintendo® characters. Building on that small
23 success, the company began marketing products for popular licensed properties
24 such as the "Power Rangers"® and "Hello Kitty"®. This little-known but
25 successful company, however, was propelled into the limelight after its daring
26 release in June 2001 of an innovative line of fashion dolls called "BRATZ".
27 "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and
28 contemporary look and fashion. At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT   8

PAGE   93

sales were in a slump, Mattel was in turmoil, and the market was ripe for something new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that has been able to seriously challenge "Barbie" for market share, and begin to loosen Mattel's 50-year iron-fisted grip on the fashion doll market.

9. Mattel has not taken kindly to the challenge. Either unable or unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel has, instead, taken a more expeditious approach, resorting to unfair and anti-competitive business practices. Wielding its substantial clout and influence in the toy industry, Mattel has tried to muscle MGA out of business. MGA is informed and believes that Mattel has intimidated, coerced and threatened retailers, licensees, suppliers and others in the industry – both in the U.S. and internationally – in order to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA from obtaining licensees, contracts and supplies for its products. Mattel has also serially imitated and copy-catted the look of MGA products, trade dress, trademarks, themes, ideas, advertising and packaging, including for the "BRATZ" line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-competitive conduct and to recover the extensive damage that Mattel's illicit behavior has caused, and continues to cause, MGA. Mattel's own website states: "As the global leader in the toy industry, we believe that how we achieve success is just as important as the success itself." It also proclaims that "unwavering integrity defines our corporate culture on every level, guiding how we work and how we do business." Mattel's own corporate governance standards require it to "play by the rules," complete fairly and be a good corporate citizen. Mattel's actions, however, speak louder than its words.

3

EXHIBIT 6
PAGE 94

## Mattel History and Performance

10. Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11. Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12. Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13. Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us
2   and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase
3   Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later,
4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of
5   the "American Girl" doll collection. And in December 1998, Mattel announced
6   plans to fork out a monumental $3.5 billion to buy the Learning Company,
7   followed quickly by Mattel's purchase, in March 1999, of a software company,
8   Purple Moon.

9       14.    Despite these acquisitions, the company continued to struggle. The
10  retail environment and buying patterns had unquestionably changed, but Mattel had
11  not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary
12  profit-generator was still "Barbie." But "Barbie" had grown stale, and sales
13  languished. Posting additional losses in the first quarter of 1999, Mattel announced
14  that it would lay off 3,000 employees -- 10% of its work force.

15      15.    Mattel's stock plummeted again in late 1999, dropping 30% on
16  Mattel's announcement that it would fall as much as 55% short of analysts' earning
17  estimates for the third quarter. Mattel blamed its troubles primarily on its
18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out
19  to be a disaster fraught with licensing and distribution problems, bad debt, high
20  product returns and high advertising costs.

21      16.    By early 2000, Mattel's stock had crashed to as low as $8 per share,
22  and some analysts considered Mattel vulnerable to a takeover. Investors clamored
23  for Ms. Barad's resignation, and got their wish.

24      17.    Jill Barad resigned from Mattel in February 2000.

25      18.    For three months, the company was without a permanent chief
26  executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23
27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited
28

5

EXHIBIT __8__
PAGE __96__

with reviving its ailing cheese business. Investors looked for him to do the same for Mattel.

19. Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

20. The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds, closed factories in the United States, shipped production to Mexico, and sold off the Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an industry that had become increasingly driven by consumer whims and fads, and the hot, must-have toys of the moment, Mattel remained disinterested in devoting its resources to searching for or developing a new blockbuster toy. Mr. Eckert's business plan was not to diversify, but to build upon and expand sales of its existing brands. Mattel was, after all, still generating billions in revenue despite the decline of "Barbie." And so, Mattel remained committed to its age-worn icon and its two other core brands, Fisher-Price and Hot Wheels, with each of the three accounting for approximately a third of the company's sales.

21. Then came the competition – MGA's "BRATZ".

**"BRATZ" Dolls Revolutionize The Fashion Doll Market**

22. "BRATZ" challenged "Barbie's" half-century domination of the fashion-doll market like nothing ever before had been able to do.

23. MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong Kong Toy Fair in January 2001, while continuing to finalize the product throughout that spring. Finished products were first shipped in May 2001. MGA introduced the line to consumers in June 2001.

6

EXHIBIT 8
PAGE 97

24. Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25. At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT 6

PAGE 98

26. Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

| MGA's "BRATZ" | Mattel's "Barbie" |
|---|---|
|  |  |

27. Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28. The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT 8
PAGE 99

2004, including the Suppliers Performance Award by Retail Category (the "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing Today/Apparel Merchandising.

29. Although but a tiny fraction of Mattel's size, with "BRATZ", MGA was able to chip away at Mattel's stranglehold on the fashion doll market, gaining shelf space and market share as "Barbie" sales remained flat or, at times, declined.

30. The competition that MGA (once a licensee of Mattel!) and "BRATZ" posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had once enjoyed a 90% share of the fashion doll market in 1997, that share had already slipped to 85% or less by the time of the release of "BRATZ". With the company still struggling under Mr. Eckert to overcome prior years of declining sales and mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

**Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

31. Mattel was not poised to nimbly respond to "BRATZ" with a new, creative product of its own – indeed, it had been antithetical to Mattel's corporate culture and mentality for Mattel to even conceive that a product might vie for shelf space with "Barbie", let alone be available for sale to consumers mere months after first being shown to retailers. Mattel had to take a more expeditious route.

32. Instead of fairly competing, Mattel waged war against MGA using a wide-array of tortious, unfair and anti-competitive practices including systematic, serial copycatting and intellectual property infringement, aided by intimidation, threats and other acts of unfair competition and anti-competitive conduct, all with one goal in mind – to banish MGA from the market – or minimize its ability to capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT 6

PAGE 100