MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Han had been so informed.

- On May 20, 2005, Mattel sent a letter to MGA regarding Jim Huntley, warning MGA that Mr. Huntley had signed an ECII Agreement with Mattel requiring that Mr. Huntley maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Huntley had been so informed.

- On June 13 and July 5, 2005, Mattel sent a letter to MGA regarding Michael Hinh, warning MGA that Mattel had advised Mr. Hinh that he had ongoing confidentiality and fiduciary duties to Mattel and that Mattel would pursue all available remedies against Mr. Hinh and MGA if those duties were violated. Mattel further warned MGA that Mr. Hinh had signed an ECII Agreement with Mattel, requiring that Mr. Hinh maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information, and that Mattel "vigorously enforces" such agreements, including by seeking all available remedies.

- On August 1, 2005, Mattel sent a letter to MGA regarding Harvey Scott, warning MGA that Mr. Scott had signed an ECII Agreement with Mattel requiring that Mr. Scott maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Scott had been so informed.

EXHIBIT 9
PAGE 141

- On August 16, 2005, Mattel sent a letter to MGA regarding Jier Su, warning MGA that Mr. Su had signed an ECII Agreement with Mattel requiring that Mr. Su maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Su had been so informed.

- On March 27, 2006, Mattel sent a letter to MGA regarding Jorge Castilla, warning MGA that Mr. Castilla had signed an ECII Agreement with Mattel requiring that Mr. Castilla maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Castilla had been so informed.

- On May 15, 2006, Mattel sent a letter to MGA regarding Daniel Cooney, warning MGA that Mr. Cooney had signed an ECII Agreement with Mattel requiring that Mr. Cooney maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Cooney had been so informed.

- On August 21, 2006, Mattel sent a letter to MGA regarding John Bloodworth, warning MGA that Mr. Bloodworth had signed a Confidentiality and No Conflict Agreement and a Confidentiality and Non-Disclosure Agreement with Mattel requiring that Mr. Bloodworth maintain the secrecy of personnel information, forecasts, financial data,

business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Bloodworth had been so informed.

- On September 5, 2006, Mattel sent a letter to MGA regarding Jill Hatch, warning MGA that Ms. Hatch had signed an ECII Agreement with Mattel requiring that Ms. Hatch maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Hatch had been so informed.

- On September 29, 2005, Mattel sent a letter to MGA regarding Janine Brisbois, warning MGA that Ms. Brisbois had signed a proprietary rights agreement with Mattel requiring that Ms. Brisbois maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Brisbois had been so informed.

- On November 27, 2006, Mattel sent a letter to MGA and Leland Ratleff, warning that Mr. Ratleff had signed an Employee Patent and Confidence Agreement with Mattel requiring that Mr. Ratleff maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Ratleff had been so informed.

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES    NO. CV 04-9049 SGL (RNBx)

EXHIBIT 7
PAGE 143

- On December 21, 2006, Mattel sent a letter to MGA regarding Jill Larson, warning MGA that Ms. Larson had signed a Employee Patent and Confidence Agreement with Mattel requiring that Ms. Larson maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Larson had been so informed.

Mattel has threatened and warned a number of companies not to license MGA properties or risk retribution in that Mattel would cease relations with the company or decline to renew its licensing agreements.

- In September 2002, Morten Geschwendtner of Kidz Entertainment informed Sandrine de Raspide that Euromic was under tremendous pressure from Mattel not to sign an agreement for "Bratz."
- Neils Bucholst of Euromic sent a letter, dated December 4, 2002, to Mitchell Kamarck, then-General Counsel of MGA. The letter stated that, on or around May 28, 2002, a regional manager of Mattel told Mr. Bucholst that she was upset about rumors indicating that Euromic had signed up with MGA/Kidz Entertainment on Bratz and told him "point blank" that Mattel would discontinue relations with Euromic if Euromic did not stop dealing with MGA/Kidz Entertainment. Mr. Bucholst told her that Euromic had no intention of stopping its co-operation with MGA/Kidz Entertainment. Mattel continued to urge Euromic to stop its dealings with MGA/Kidz Entertainment, but Euromic "stood firm." In the fall of 2002, the regional manager of Mattel informed Euromic, without explanation, that its contract with Mattel would not be prolonged.

EXHIBIT 9

PAGE 144

- In September 2003, Stephen Graham of Character Licensing and Marketing informed Sandrine de Raspide that Mattel was "absolutely adamant that [CLM was] not to take on Bratz." Mr. Graham stated that Mattel is "obviously extremely threatened by Bratz and they said that if any Barbie licensees sign on for Bratz they will take away Barbie."
- In June 2002, Hayley Sussman of Endemol U.K. plc informed Sandrine de Raspide that a number of companies, including Smith & Brooks (apparel manufacturer), Zeon (watch manufacturer) and Gemma International (greeting card licensee), were uncomfortable about proceeding with a "Bratz" license because they are concerned about losing their "Barbie" licenses.
- In or around September 2002, Hayley Sussman informed MGA that Smith & Brooks (an apparel manufacturer) would love to manufacture "Bratz" apparel but were "too scared to take the risk" of losing its license from Mattel, which constitutes 50% of its business.
- In September 2002, Morten Geschwendtner informed MGA that Mattel threatened or tried to pressure Egmont, Eurornic, MV Sports, and Hart Concepts not to license "Bratz."
- In October, 2002, Muki Agami, the managing director of JNH Israel (a licensee of "Barbie"), visited MGA's showroom in Hong Kong and advised MGA that he had received a call from the President of Sea Port (the licensing agent for "Barbie" in Europe), warning Mr. Agami that he will lose the "Barbie" license if he takes the "Bratz" license.
- In November 2002, Kate Kilmo of Random House told MGA that Egmont told her that Mattel threatened to terminate its license if it licensed "Bratz."
- In January 2006, Melvin Thomas of The Licensing Company informed MGA that Egmont had told him that it did not want to move forward

15

EXHIBIT 4 PAGE 145

with publishing rights to "Bratz" because it would affect Egmont's relationship with Mattel.

- In May 2006, Morten Geschwendtner informed MGA that Egmont did not want to move forward with "Bratz" publishing rights in the United Kingdom and Germany, because Egmont does huge business with Mattel in over 15 countries.
- In January 2007, Frank Knau of Egmont in Germany denied a request by MGA to start a "Bratz" magazine in Germany on the grounds that, "we have a long term business relation with Mattel re Barbie. Mattel considers Bratz as a direct competitor to Barbie and hence we would not like to irritate our good relation with Mattel by publishing a Bratz magazine in competition to our Barbie magazine."
- In May 2005, Larry Rosen, CEO of Rose Art Industries, Inc., informed MGA that Mattel had cancelled all foreign and "Fun¬Dough" agreements due to "Bratz."
- In February 2005, Peter Carrero (an employee of ITC in Brazil) informed MGA about Candide, an electronics company that was interested in developing its own line of "Bratz" toys as well as importing "Bratz" products from MGA. Candide also had a "Barbie" licensing program. Susana Kuemmerle indicated that Candide wanted to do electronics only, that MGA's pricing did not work for Candide, and that Candide was not interested in MGA's toy line. In the same email Ms. Kuemmerle also mentioned that she was informed that the order from Mattel was "do whatever is necessary, no matter the cost, but do not let Bratz penetrate the market."

On information and belief, Mattel has threatened and warned raw good suppliers and toy manufacturers not to supply goods to MGA or to make MGA products or they would lose business from Mattel.

EXHIBIT 9
PAGE 146

16

- On information and belief, in 2001, Mattel pressured Saran, a Japanese doll hair supplier, not to supply doll hair to MGA.
- In June or July 2003, Mattel informed Francis Choi of Early Light of its new policy, namely that Mattel will not assign products for Early Light to manufacture if Early Light makes "Bratz" products or products from other customers that compete directly with similar Mattel products.

In February 2004, MGA was informed by Cory Schwartz of ConsumerQuest, a market research firm, that Mattel asked him not to work with MGA. In March 2005, Nick Austin of Vivid Entertainment, Inc., a U.K. "Bratz" distributor, informed MGA of aggressive pricing by Mattel in Europe, stating that "Our spies tell us that El Segundo has authorized Mattel UK to 'burry us' and that this blitz of heavy TV coupled with 25% off is just the start!" In addition, Mr. Austin informed MGA that Vivid was taking out a full page advertisement in the trade press to "shout about our 56.6% share because the trade mags will not cover in editorial because Mattel has frightened the[m] off with threats of cutting their ad spend in the magazines."

Mattel also engaged in unfair practices relating to NPD as well as consumer organizations, including TIA and CARU. NPD is the leading supplier of sales statistics and data in the toy industry, which are vital for efficient product-line management by toy manufacturers. Without these statistics and data, it is difficult for toy companies to assess and measure the relative success of their products in key categories. NPD is a subscription service and places restrictions on the use of its information and statistics by subscribers. Both Mattel and MGA subscribe to NPD's services. Mattel has more influence on NPD than does MGA because it generates substantially more subscription revenue for NPD due to the fact that it sells a broader range of toy products. Mattel has improperly influenced NPD to employ a double standard and not enforce the same rules against Mattel that NPD enforces against MGA. In September 2003, Mattel pressured NPD to terminate MGA's subscription when MGA allegedly violated the terms of its NPD agreement by improperly

17

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES     NO. CV 04-9049 SGL (RNBx)

1  referring to Mattel when publicly disclosing NPD data in a press release. Mattel
2  publicly disclosed NPD information on Mattel's comparative standing relative to
3  other companies in an earnings conference call and in a press release in September of
4  2004, but NPD did not take similar action against Mattel.
5        Mattel also pressured NPD into changing product classifications in order to
6  manipulate the data and artificially preserve Mattel's market share rankings in the
7  fashion doll category, thus lowering MGA's ranking and harming MGA's sales. In
8  February 2004, NPD announced proposed changes to doll categories, combining Mini
9  Dolls and Mini Doll Accessories into one category and placing fashion dolls packaged
10 with an accessory in the Accessory category provided that the accessory is of greater
11 or equal value within the set. In early 2005, Mattel lobbied NPD to get "Bratz Babyz"
12 placed out of the fashion doll category. In May 2006, NPD announced category
13 changes, which would place larger dolls such as Mattel's "American Girls" dolls in
14 the fashion doll category.
15       MGA believes that Mattel has improperly used its influence to induce CARU
16 to place onerous restrictions on MGA advertisements and require MGA to amend
17 aspects of its commercials that have gone unchallenged in other parties' commercials.
18 CARU is the toy industry's independent self-regulatory body in charge of maintaining
19 standards in advertising. CARU's approval is considered critical within the toy
20 industry to avoid regulatory action by the Federal Trade Commission. Mattel is a
21 major contributor to CARU's budget and thus has influence over CARU. Mattel has
22 influenced CARU to initiate (or has initiated on its own) proceedings against MGA
23 for techniques used in MGA's commercials that have also been employed in Mattel's
24 own commercials for "Barbie" and other products, such as alleged insufficient use of
25 hands to manipulate and move the dolls, use of a human hand and arm to manipulate
26 the doll that was allegedly improperly camouflaged by a person wearing a dark sleeve
27 against a dark background, use of computer graphics in which it was allegedly
28 impossible for a child to discern what was reality and what was computer-generated

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES      NO. CV 04-9049 SGL (RNBx)

EXHIBIT 4 PAGE 148

fantasy, and allegedly showing dolls holding items when in reality dolls could not hold any items without adhesives. To MGA's knowledge, CARU has never initiated proceedings or undertaken an informal inquiry against Mattel for Mattel's use of these same or similar techniques. While MGA was able to defeat many of Mattel's baseless allegations, CARU found against MGA on the following issues: (1) CARU recommended that MGA disclose that the "Bratz" dolls could not actually hold items in its "Rock Angelz" commercial; (2) CARU found that MGA used improper computer graphics in its "Big Bratz Babyz" commercial; and (3) CARU found against MGA on the claims of insufficient hand usage for certain scenes in its "Genie Magic" and "Big Bratz Babyz" commercials. As a result, MGA has been forced to incur unnecessary costs for reshooting, reproducing and reediting its commercials.

Further, in the Spring of 2005, CARU issued an inquiry about MGA's Bratz.com website to comply with COPPA and instructed MGA to respond to make changes to its website in excess of restrictions imposed on Mattel and others. In March 2002, Margo Eldridge informed Isaac Larian that CARU has questioned MGA's "Mermaid" commercial, and as it was the first time that CARU had every questioned any commercial Ms. Eldridge had done since 1978, she believes the inquiry was due to Mattel's improper influence. In addition, CARU has drafted press releases regarding the outcome of Mattel's challenges against MGA, which exhibit a negative bias towards MGA and a positive bias toward Mattel. In May 2006, CARU drafted press releases regarding the "Big Bratz Babyz" and "Ponyz" decisions, which created the misimpression that CARU found for Mattel on the majority of Mattel's challenges, when in reality, CARU had rejected most of Mattel's challenges. Further, in June 2006, CARU drafted a press release regarding Mattel's challenges against the packaging for MGA's "Bratz Campfire" dolls, which put a negative slant on the decision.

Mattel also engaged in unfair business practices in connection with the TIA Toy-of-the Year awards. Each year since 2000, the TIA presents the Toy-of-the-Year

19