Bratz project; Carter Bryant's August and September 1998 drawings that he called "Bratz" (including, but not limited to, those drawings identified by Carter Bryant in Exhibit 5 of his deposition as being sketched in August 1998); all of Carter Bryant's sketches and/or modifications of sketches relating to Bratz concepts which were made by him after January 4, 1999 and prior to October 21, 2000, Carter Bryant's August and September 1998 drawings that he called "Bratz" (including, but not limited to, those drawings identified by Carter Bryant in Exhibit 5 of his deposition as being sketched in August 1998); publicly available materials that Bryant identified in his deposition testimony as inspiring his conception of a line of dolls in August or September of 1998, including but not limited to the August 1998 issue of *Seventeen Magazine*; Mattel's Brand Directional Outlines; analyses and assessments of Mattel's marketing strategies prepared and/or produced by Young and Rubicam Brands and Peterson Milla Hooks; Mattel's Marketing Department assessments of Mattel's advertising and branding strategies; Mattel's Creative Briefs; documents generated by Mattel Worldwide Consumer Research relating to any aspect of the market for fashion dolls, including without limitation Bratz, My Scene, and Barbie; each and every document, prototype, and sample produced by Margaret Leahy, including documents and items marked as exhibits at her deposition and those not marked as exhibits at her deposition; castings produced by Veronica Marlow at her deposition, including photographs of such castings marked at her deposition; invoices submitted from Carter Bryant, Veronica Marlow, Anna Rhee, Victoria O'Connor, and other invoices submitted by freelancers for work performed on the Bratz project; all of Carter Bryant's sketches and/or modifications of sketches relating to Bratz concepts which were made by him after January 4, 1999 and prior to October 21, 2000.

    G.   <u>Information Readily Ascertainable</u>

    MGA Defendants cannot be liable, either on their own account or by association with other defendants, for misappropriation of information that was readily ascertainable by proper means at the time of the alleged acquisition or use.

EXHIBIT 9 PAGE 168

1. Such information includes, but is not limited to, the identity of suppliers, manufacturers, distributors and retailers; contact information for the same; and sales, marketing and media data. In particular, the identity of suppliers of doll hair is not trade secret or otherwise legally protected information. To date, Mattel has never provided a complete account of what trade secret or confidential information it alleges the MGA Defendants misused or misappropriated.

Discovery is ongoing and the MGA Defendants reserve the right to supplement this response and, consistent with its obligations under Federal Rule of Civil Procedure 26(e), the MGA Defendants will supplement this response if they receive additional responsive information, including but not limited to information regarding the bases for Mattel's misappropriation, conversion, and any similar contentions.

### H. Acts or Omissions of Others

Mattel's damages, if any, were caused by Mattel's own acts or omissions in not drafting an enforceable Inventions Agreement that covers Carter Bryant's work and in not acting on its alleged claims in a timely fashion. Mattel's damages, if any, were also caused by Mattel's own commercial failures. In addition, even if Bryant had presented his Bratz idea to Mattel (which he was not obligated to do), Mattel would not have pursued it or achieved success in the market. Mattel avoids producing products that would potentially "cannibalize" its Barbie sales, and carefully restricts its so-called "flanker" brands to avoid such cannibalization. Mattel also resists "edgy" product ideas like Bryant's Bratz idea, and has "watered down" such ideas in the past. For example, in part for these reasons, Mattel has not achieved commercial success at all comparable to that of Bratz with either its My Scene or Flavas products. Mattel also decided not to proceed to market with the Toon Teens project, in part due to Mattel's market research and focus groups indicating that some of the very features Mattel claims Bratz shares with Toon Teens meant that the dolls would not appeal to girls.

EXHIBIT 9

PAGE 169

1  The following persons have knowledge of facts and circumstances regarding
2  the foregoing: Lilly Martinez, Elise Cloonan, Kislap Onchangco, and Cassidy Park;
3  other current and former Mattel employees, freelancers, or contractors involved in
4  fashion doll development and marketing, including but not limited to Toon Teens, My
5  Scene, and Flavas; current or former employees and contractors of Mattel's outside
6  marketing and advertising agencies, including Young & Rubicam Brands, including
7  but not limited to Kumi Croom, Peterson Milla Hooks, Brian Hooks, and Ogilvy &
8  Mather Worldwide.

9  The following documents are relevant to the foregoing: Mattel documents
10 related to development and marketing of flanker products; documents produced by
11 Mattel's outside marketing and advertising agencies, including Young & Rubicam
12 Brands, including but not limited to Kumi Croom, Peterson Milla Hooks, Brian
13 Hooks, and Ogilvy & Mather Worldwide; M12536-39, M14279-82, M14264-72,
14 PMH002340-48; Deposition Transcripts of Kumi Croom, Lilly Martinez, Elise
15 Cloonan, Kislap Onchangco, and Cassidy Park.

16 Discovery is ongoing and the MGA Defendants reserve the right to supplement
17 this response and, consistent with its obligations under Federal Rule of Civil
18 Procedure 26(e), the MGA Defendants will supplement this response if they receive
19 additional responsive information.

I. Estoppel

21 Mattel's counterclaims are barred in whole or in part by the equitable doctrine
22 of estoppel because, among other things, Mattel intentionally delayed taking legal
23 action against MGA or Carter Bryant for several years after the launch of Bratz in the
24 belief that Mattel would be able to drive Bratz (and as a result, drive MGA) out of the
25 market for fashion dolls and/or the belief that Mattel did not have any rights under the
26 "Inventions Agreement" as against Bryant, based on its own interpretations of the
27 "Inventions Agreement," and on the advice that Mattel received from in-house and
28 outside counsel. As a result, Mattel only took legal action well after MGA had

EXHIBIT "1" PAGE 170

1 invested substantial amounts of capital and creative and innovative efforts into the
2 Bratz line of dolls and had experienced enormous success in the marketplace.
3       A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's
4 human resources representative he was leaving because an "[o]pportunity arose; had
5 to take it." Mattel has acknowledged that employees leaving under similar
6 circumstances to work for an unnamed competitor have "caused Mattel to begin
7 investigating their activities."
8       Furthermore, numerous Mattel employees knew and/or believed in the summer
9 of 2001 that Carter Bryant was involved in the development and introduction of the
10 Bratz line. This knowledge and/or these beliefs by Mattel employees went well
11 beyond mere "rumor and innuendo," as has been suggested by Mattel. In its
12 interrogatory responses, Mattel also asserts that Bryant used several "other Mattel
13 employees" to work on the Bratz dolls so that they "had been designed and were far
14 along in development during the time that Bryant was employed by Mattel."
15       Shortly after Bratz dolls were in retail stores in the United States in or about
16 September 2001, Mattel knew or was on notice that Carter Bryant was involved in the
17 development of that line. Mattel now asserts in this lawsuit that the idea for Bratz
18 was a violation of rights that Mattel had in a proposed flanker brand called "Toon
19 Teens," which Mattel was developing in the summer of 1999, but never introduced to
20 market. In this connection, during 2001, Toon Teens samples were taken out of
21 storage by Mattel employees and delivered to Mattel's legal department for analysis
22 of possible copyright infringement and other claims against Bryant and MGA.
23       Mattel knew Bryant's role in Bratz and was investigating possible claims *at*
24 *least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party
25 sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was
26 "grilling" her, "like somebody put her up to it," about whether "Carter [was] the
27 designer on the doll or what was [MGA employee and former Mattel employee] Paula
28

EXHIBIT 7 PAGE 171

41
MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES      NO. CV 04-9049 SGL (RNBx)

[Garcia's] involvement" in Bratz. Leahy testified that she told the Mattel employee that "Carter initially came up with a design and Paula carried it out."

Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002. Mattel's internal investigative files confirm that Mattel commenced an official investigation into whether Bryant stole the Bratz idea in March 2002. Mattel admitted that in 2002 it investigated "rumor and innuendo that Bryant may be working with MGA on Bratz," including whether "Bryant … plagiarized [Mattel product] 'Toon Teens' and created Bratz dolls for MGA" and whether Bryant helped MGA create Bratz "[w]hile he was working with Mattel." Mattel's CEO Robert Eckert received an "anonymous letter" on or about August 5, 2002 that alleged that Bryant helped MGA create Bratz while working for Mattel. As part of an official investigation requested by Mattel CEO Robert Eckert in August 2002 as to whether Bryant helped MGA create Bratz "[w]hile he was working with Mattel," Mattel's head of security, Richard De Anda, wrote that he had been "aware of this situation and … working on it for several months" but it was in the hands of Mattel's attorneys. Testimony from former Mattel employee Elise Cloonan confirms that by at least late 2001, Mattel's lawyers were conducting an investigation involving Bryant's work on Bratz in the design department.

On March 15, 2002, Mattel opened an investigative file on MGA and Isaac Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had recently hired a number of former Mattel employees and was reportedly manufacturing products that appeared to be Mattel designs.

Mattel has also forfeited any right it may have had to enforce Paragraph 3-a of the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel, acquiescence, and waiver. MGA is informed and believes that it was common knowledge at Mattel that many Mattel employees employed in the Mattel design center worked on a freelance basis for third parties, including Mattel competitors, and/or on their own projects with the anticipation that such projects eventually would

EXHIBIT 4
PAGE 172

1  be offered for sale to third parties, including Mattel competitors. Mattel employees
2  performed non-Mattel work while employed by Mattel and Mattel acquiesced to this
3  moonlighting. For example, Robert Best developed a fashion line while employed at
4  Mattel. Best disclosed this to Mattel and was not terminated. Joni Pratt created
5  volleyball and basketball books for her daughter's high school outside of work, along
6  with invitation and wrapping paper. Pratt testified that she showed these works to her
7  supervisor at Mattel so there could be no misunderstanding that it was not related to
8  her work at Mattel. Pratt has not disclosed everything she has drawn outside of work
9  and testified that she does not feel she has an obligation to show her supervisors
10 everything she has drawn outside of work. Lori Sipos, a designer at Mattel, created
11 puppets as a hobby while she worked at Mattel. Sipos told Jill Nordquist about her
12 hobby when showing her one of her puppets, but she did not tell Nordquist about the
13 puppets in an effort to "report" her work. Nordquist testified that she was informed
14 about the designs other people created outside of work in the course of sharing
15 hobbies and not as part of an effort to report their works. Veronica Marlow helped
16 Dianne Gavin develop a line of handbags while both were employed at Mattel. At her
17 deposition, Veronica Marlow testified that Isabel Cabrera, Beatrice Morales, and
18 Maria Elena Salazar worked with her on fashions for Bratz while they were employed
19 by Mattel. Additionally, some of Mattel's sample makers made wedding gowns and
20 did nails on the weekends and evenings and some of Mattel's hair rooters worked in
21 hair salons on weekends. During her deposition, Margaret Leahy testified that her
22 Mattel supervisor, Michael Hebden, suggested to her while she was working for
23 Mattel, that she seek out moonlighting work. During her deposition, Elise Cloonan
24 testified that the practice was so widespread that there was even a name for it at
25 Mattel: a "G-job." Indeed, Richard De Anda, Mattel's Vice President of Global
26 Security, testified at his deposition that he also moonlighted as an expert witness and
27 consultant while working for Mattel. De Anda further testified that he does not
28 believe that Mattel owns or has a claim on the work he does for himself. Despite

EXHIBIT 7
PAGE 173

knowledge of this activity, Mattel rarely, if ever, enforced any rights it may have had to prohibit such moonlighting.

Issues concerning this defense are currently the subject of outstanding discovery requests. In particular, Mattel has staunchly refused to provide discovery that would address when, in fact, Mattel first had reason to suspect Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's alleged "true owner[ship] of Bratz," in spite of numerous interrogatory requests, document requests, requests for admission, and deposition notices. Defendants' concerns regarding Mattel's discovery abuses have recently been addresses in multiple motions to compel both before Judge Infante and Judge Larson. Indeed, on January 3, 2008, Judge Infante overruled all of Mattel's objections and compelled discovery relevant to Defendants' statute of limitations and laches defenses. Factual investigation and discovery is ongoing and the MGA Defendants reserve the right to supplement this response and, consistent with its obligations under Federal Rule of Civil Procedure 26(e), the MGA Defendants will supplement this response if they receive additional responsive information.

The following persons have knowledge of facts and circumstances regarding the foregoing: Richard De Anda; Robert Eckert; Alan Kaye; Michele McShane; Robert Normile; Margaret Leahy; Elise Cloonan; Veronica Marlow; Ilana Raynes; Michael Hebden; Frederick Jackson; Ray Moore; Joe Benet; Carolyn Oros; Hung Lee; Diana Troup; Cynthia Young; Margo Michelle; Kitty Black-Perkins; Janet Unalp; Debbie Meyer; Carol Spencer; Jennifer Kiernan; Bill Kelly; Steve McAdam; Howie Jesser, Ken Smith; Michael Moore; Jill Thomas; Tom Hodges; Julie Ashe Nobles; Morris Batay; Bruce Ryniker; Larry Wood; Eric Ostendorf; Steve Ryniker; Melody Hansen; Carter Bryant; Anna Rhee; Joe Feldman; Janet Blaser; Bill Greening; Roxanna Powell; Ken O'Leary; Lily Martinez; Cassidy Park; Ivy Ross; Joe Franke; Ann Driskill; Robert Best; Anne Olson; Dennis Soai; Kislap Ongchango; Nick Patean; Jerry Richardson; Spencer Davis; Bill Martinez; Barbara Meyer; Larry

44

EXHIBIT 9 PAGE 174

1  Clayton; Elon Dancer; Maury Kessel; Chris McAdam; Michael Norgren; Chris Sesto;
2  Paul Sesto; Michael Hastey; Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis;
3  Tim Correa; Doc O'Connor; Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina
4  Mirkazemi; Mercedeh Ward; Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice
5  Morales; Pedro Salazar; Maria Elena Salazar; Roger Simoneau, Jill Nordquist, Joni
6  Pratt, Tina Tomiyama, and Evelyn Viohl.

   The following documents may be relevant to the foregoing: Transcript from the Deposition of Margaret Leahy, Transcript from the Deposition of Elise Cloonan, Transcript from the Deposition of Alan Kaye, Transcript from the Deposition of Richard De Anda, Transcript from the Deposition of Ann Driskill, Transcript from the Deposition of Jill Nordquist, Transcript from the Deposition of Veronica Marlow, Transcript from the Deposition of Joni Pratt, Mattel's Responses and Supplemental Responses to Defendants' Interrogatories, Mattel's Internal Investigative Files regarding its investigations into Carter Bryant, MGA, or Isaac Larian, all Mattel worldwide consumer research reports produced by Mattel, internal marketing documents analyzing the performance of Bratz in the marketplace, M0001654-55, M0074397-74402, and M0074307-0074396.

   J.  Acquiescence

   Mattel's counterclaims are barred in whole or in part by acquiescence because, Mattel intentionally delayed taking legal action against MGA or Carter Bryant for several years after the launch of Bratz in the belief that Mattel would be able to drive Bratz (and as a result, drive MGA) out of the market for fashion dolls and/or the belief that Mattel did not have any rights under the "Inventions Agreement" as against Bryant, based on its own interpretations of the "Inventions Agreement," and on the advice that Mattel received from in-house and outside counsel. As a result, Mattel only took legal action well after MGA had invested substantial amounts of capital and creative and innovative efforts into the Bratz line of dolls and had experienced enormous success in the marketplace.

EXHIBIT 4 PAGE 175

A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's human resources representative he was leaving because an "[o]pportunity arose; had to take it." Mattel has acknowledged that employees leaving under similar circumstances to work for an unnamed competitor have "caused Mattel to begin investigating their activities."

Furthermore, numerous Mattel employees knew and/or believed in the summer of 2001 that Carter Bryant was involved in the development and introduction of the Bratz line. This knowledge and/or these beliefs by Mattel employees went well beyond mere "rumor and innuendo," as has been suggested by Mattel. In its interrogatory responses, Mattel also asserts that Bryant used several "other Mattel employees" to work on the Bratz dolls so that they "had been designed and were far along in development during the time that Bryant was employed by Mattel."

Shortly after Bratz dolls were in retail stores in the United States in or about September 2001, Mattel knew or was on notice that Carter Bryant was involved in the development of that line. Mattel now asserts in this lawsuit that the idea for Bratz was a violation of rights that Mattel had in a proposed flanker brand called "Toon Teens," which Mattel was developing in the summer of 1999, but never introduced to market. In this connection, during 2001, Toon Teens samples were taken out of storage by Mattel employees and delivered to Mattel's legal department for analysis of possible copyright infringement and other claims against Bryant and MGA.

Mattel knew Bryant's role in Bratz and was investigating possible claims *at least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was "grilling" her, "like somebody put her up to it," about whether "Carter [was] the designer on the doll or what was [MGA employee and former Mattel employee] Paula [Garcia's] involvement" in Bratz. Leahy testified that she told the Mattel employee that "Carter initially came up with a design and Paula carried it out."