EXHIBIT 11

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    discharged from the Marine Corps in '68.  And then

 2    my first job out of the Marine Corps was actually

 3    the Los Angeles Police Department and that was in

 4    May of '68 I joined the Los Angeles Police

 5    Department.                                    09:28AM

 6         Q.   And how long did you remain employed by the

 7    Los Angeles Police Department?

 8         A.   Twenty years and approximately six months.

 9         Q.   So you retired in 1988?

10         A.   Yes.                                 09:28AM

11         Q.   What month?

12         A.   November.

13         Q.   What was your rank when you retired in

14    November 1998?

15         A.   I was a Detective III which is a detective  09:28AM

16    supervisor.

17         Q.   Where were you assigned?

18         A.   West L.A. Homicide.

19         Q.   How long were you a Detective III?

20         A.   Probably -- I can't remember.  Probably    09:28AM

21    around ten years I would say.

22         Q.   And were you always during those ten years

23    assigned to West L.A. Homicide or did you have other

24    assignments?

25         A.   I had other assignments initially.  When I  09:29AM
                                                            13
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   was promoted from Detective II to Detective III, I

 2   first was assigned to the -- what we would call the

 3   sex table which is the rapes basically and the --

 4   rapes and juvenile cases and I was there for

 5   approximately two months, if that.  Then I moved       09:29AM

 6   into the homicide.  At the time the homicide unit

 7   consisted of both homicide, aggravated assaults and

 8   robberies.

 9       Q.   During the time at the Los Angeles Police

10   Department you attended numerous training sessions     09:30AM

11   concerning various matters including how to conduct

12   investigations?

13       A.   Yes.

14       Q.   And how to interview witnesses?

15       A.   Yes.                                          09:30AM

16       Q.   And how to preserve evidence?

17       A.   Yes.

18       Q.   Did you during the course of your career

19   conduct interviews of witnesses to alleged crimes?

20       A.   Numerous.                                     09:30AM

21       Q.   Give me in the grossest estimate if you

22   could of how many interviews of witnesses you think

23   you've conducted while you were an employee of the

24   Los Angeles Police Department.

25            MR. COREY:  Objection:  vague.  Of anyone or  09:30AM
                                                                14
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   of victims?

 2            MR. NOLAN:   Of anybody.

 3            MR. COREY:   You had said victims.

 4   BY MR. NOLAN:

 5       Q.   I apologize.  Victims, witnesses, just the    09:30AM

 6   number of interviews you've conducted.

 7       A.   I would think at a low level if you would

 8   take one or two a day would probably be pretty

 9   accurate.  On a high level would be upwards of ten

10   and that would be extremely high.  I would say        09:31AM

11   any -- I would say maybe an average of you would say

12   two a day would be probably reasonable.  So two a

13   day times how many days I was actually employed

14   which was probably 200 days times 20, you know,

15   should give us a pretty accurate amount.  So into     09:31AM

16   the tens of thousands.

17       Q.   Tens of thousands of interviews?

18       A.   Probably.

19       Q.   During the course of those interviews did

20   you take notes?                                       09:31AM

21       A.   Sometimes I would and sometimes I wouldn't.

22   Depended.

23       Q.   Depended on what?

24       A.   Depending on the -- depending on the

25   individual that I was interviewing.  If it was -- if  09:31AM
                                                              15
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   it was a victim, I may or may not depending on --

 2   it's very difficult to say.  It depends on the

 3   circumstance at that moment.

 4       Q.    I confess I was a former prosecutor at the

 5   U.S. Attorney's Office so I can understand why          09:32AM

 6   there's some times when you wouldn't take notes.

 7   For instance, maybe when your partner is taking

 8   notes, correct?

 9       A.    That's true.

10       Q.    When you took notes, however, did you         09:32AM

11   maintain those notes for use in later stages of the

12   investigation?

13       A.    Yes.

14       Q.    After you left the Los Angeles Police

15   Department where did you go to work or how were you     09:32AM

16   employed?

17       A.    Well --

18             MR. COREY:  Objection:  vague.

19             MR. NOLAN:  Obviously it was.  You don't

20   even get credit for that objection.                     09:32AM

21             MR. COREY:  I've got to take them where they

22   come.

23   BY MR. NOLAN:

24       Q.    I'm sorry, Mr. De Anda, let me try to

25   rephrase it.                                            09:32AM
                                                                16
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            What did you do after you retired from the
 2   Los Angeles Police Department?  Did you go to work?
 3       A.   Actually, I was working prior to my
 4   retirement.
 5       Q.   Okay.  Tell me about that.              09:33AM
 6       A.   I -- I -- if I may, let me back up one
 7   second to clarify this.
 8            In working homicide I basically did not take
 9   payment in cash for my overtime.  I basically booked
10   the overtime.  I had over a year's worth of overtime  09:33AM
11   on the books, okay?  So when I decided -- I was
12   offered a position with Columbia Savings and Loan in
13   July of 1988 and I had a discussion with my
14   supervisor at the time and I wanted to try this to
15   see if I want to retire so I said I'm going to run   09:33AM
16   my time for a while.  So I stayed at -- it was a
17   very difficult decision for me at the time because I
18   really enjoyed working for the police department.
19   It was a -- it was a very exciting and very
20   rewarding job.  And so they agreed and I took a      09:34AM
21   position with Columbia Savings and Loan and
22   unfortunately somewhere in November they said,
23   "Richard, you have to make up your mind because
24   we're holding this position open."  So I decided,
25   well, okay, we'll just let the time run and I gave   09:34AM
                                                             17
```

EXHIBIT \_\_\_\_\_11\_\_\_\_\_

PAGE \_\_\_\_\_238\_\_\_\_\_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    them a time in November, I don't remember the exact
 2    date, and then my time lapsed and I retired.
 3         Q.   What were your responsibilities or the type
 4    of work that you were doing at Columbia Savings and
 5    Loan while you were still technically employed by      09:34AM
 6    the Los Angeles Police Department?
 7         A.   I was -- I was the Vice President of
 8    Security and Investigations during that period of
 9    time.
10         Q.   Now, after you made the difficult decision   09:35AM
11    to retire from the Los Angeles Police Department,
12    did you go to work -- did you continue to work at
13    Columbia Savings and Loan Association?
14         A.   I did.
15         Q.   And for how long did you stay employed at    09:35AM
16    Columbia Savings and Loan?
17         A.   I want to say through March of 1991, I
18    believe.
19         Q.   And then what occurred in March of 1991?
20    Did you change positions or employment?               09:35AM
21         A.   No, the government decided to take control
22    of Columbia Savings and they downsized.
23         Q.   So it was a forced downsize by the
24    government?
25         A.   Yes.                                         09:35AM
                                                                18
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    Investigative and security services.

 2      Q.    And did you have a company?

 3      A.    Yes.

 4      Q.    What was the name of the company?

 5      A.    Very clever, Richard De Anda & Associates.    09:40AM

 6            MR. NOLAN:   We're going to go off record at

 7      the request of the videographer.

 8            VIDEO OPERATOR:   9:40 off the record.

 9                   (Brief recess.)

10            VIDEO OPERATOR:   Back on the record at 9:50. 09:50AM

11      BY MR. NOLAN:

12      Q.    Okay, we're back on the record after some

13      audio malfunctions.

14            When we left, we were talking about your

15      business which you identified as Richard De Anda &   09:51AM

16      Associates, correct?

17      A.    That's correct, Inc.

18      Q.    Actually, the name of the company is Richard

19      N. De Anda & Associates, correct?

20      A.    Yes.                                           09:51AM

21      Q.    You go by the middle initial N.?

22      A.    Yes, I do.

23      Q.    What type of investigative services did you

24      offer through Richard N. De Anda & Associates?

25      A.    I offered investigative services to           09:51AM
                                                              23
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   corporate clients, to individuals and to law firms
 2   and others that I can't recall right now.
 3       Q.   And I understand that there's probably a
 4   wide range of services that you offered but could
 5   you just summarize what type of services they        09:52AM
 6   included.  Background searches?  Did you run
 7   background searches for people?
 8       A.   I may have but that was not -- I may have
 9   but as I recall that may have only been in
10   conjunction with a case but it was very rare if I     09:52AM
11   did.
12       Q.   What was the main thrust of the services
13   that you would offer to -- to your clients?
14            MR. COREY:  Objection:  vague.
15            THE WITNESS:  Basically investigating issues 09:52AM
16   that had occurred mainly if they had a significant
17   loss.  For instance, I do recall a case with a
18   significant bank, a financial institution, that
19   suffered a sizable loss in excess of $20 million.  I
20   investigated that.  I had several financial          09:53AM
21   institutions as clients, I had several law offices
22   that I would investigate -- assist them with cases.
23   I would do expert witness testimony.  A wide range
24   of investigative services but mainly case work as
25   opposed to individual background work.               09:53AM
                                                             24
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    Did you have employees?
 2            MR. COREY:  Vague as to time.
 3            MR. NOLAN:  That's a point well taken.
 4      Q.    When you started the business, and let's say
 5   through the first five years of it, did you have      09:53AM
 6   employees?
 7      A.    I didn't have employees that I paid income
 8   taxes.  They were not employees.
 9      Q.    Would it be fair to say that if you needed
10   help on any of the matters that you had been          09:54AM
11   retained on there would be a pool of former LAPD
12   officers who were providing similar services and
13   that if you needed it you could call on them to
14   assist you in that regard?
15      A.    Yes.                                          09:54AM
16      Q.    So if you had to do surveillance, for
17   instance, if you didn't have any employees -- did
18   you have to do any surveillance for a client?
19      A.    Oh, yes.  Yes, insurance companies mainly.
20      Q.    And tell me how you would arrange for the    09:54AM
21   surveillance if you were the only employee.
22            MR. COREY:  Objection:  vague and
23   mischaracterizes the testimony.
24            Go ahead.
25            THE WITNESS:  Surveillance was typically     09:54AM
                                                              25
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    carried out by other investigators who had their own

 2    company and I would solicit them to surveil.  They

 3    were more apt and equipped to surveil.  I was more

 4    or less the broker between the insurance company and

 5    the investigative services.                        09:55AM

 6    BY MR. NOLAN:

 7        Q.   Were there any particular individuals or

 8    companies that you utilized in carrying out the

 9    surveillance jobs that you can recall for us?  Any

10    names of them?                                     09:55AM

11             MR. COREY:  Vague as to time.

12    BY MR. NOLAN:

13        Q.   I'm talking about from 1991 on.

14        A.   Yes.

15        Q.   What were the names -- what were their names 09:55AM

16    that you can recall?

17        A.   I can recall they were Greg Braun, Jeff

18    Latourneau.  There may have been others that I can't

19    recall at this time.  In fact, I'm certain that

20    there were.                                        09:56AM

21        Q.   Were those former LAPD officers?

22        A.   Greg Braun was a former LAPD officer.  Jeff

23    Latourneau was not.

24        Q.   How do you spell both of their last names?

25        A.   Latourneau is L-a-t-o-u-r-n-e-a-u and Braun 09:56AM
                                                          26
```

EXHIBIT _____ 11

PAGE _____ 243

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    is B-r -- B-r-a-u -- B-r-a-u I think it was.

 2        Q.   At any time were you ever licensed as a

 3    private investigator?

 4        A.   Yes.

 5        Q.   And when did you first obtain your license   09:56AM

 6    as a private investigator?

 7        A.   I want to say the seventies but I can't

 8    recall it's been so long.  I don't -- I don't recall

 9    the -- the -- the year even but it's been some time.

10        Q.   But you were licensed by the State of       09:57AM

11    California; is that correct?

12        A.   Yes.

13        Q.   And are you still licensed as a private

14    investigator in the State of California?

15        A.   Yes.                                        09:57AM

16        Q.   Under the name of Richard N. De Anda &

17    Associates?

18        A.   Yes.

19        Q.   Is -- what's the status of Richard De Anda &

20    Associates today?  Does it still exist?              09:57AM

21        A.   Yes.

22        Q.   Does it have any employees?

23        A.   No, it does not.

24        Q.   What -- what is the purpose of Richard N. De

25    Anda & Associates?  In other words, what type of    09:57AM
                                                              27
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    business does it do?

 2      A.    Today?

 3      Q.    Today.

 4      A.    Very little, if any, however I have a

 5    long-term client that I've had since the seventies    09:57AM

 6    on retainer and basically I still receive a retainer

 7    from this client and I do occasional expert witness

 8    testimony and that's about the -- that's about the

 9    extent of it.

10      Q.    And what's the name of this client that is a 09:58AM

11    long-term client that has you under retainer?

12      A.    The Jacmar Company.

13      Q.    And what type of business is the Jacmar

14    Company engaged in?

15      A.    Food services.                                09:58AM

16      Q.    And generally can you tell us what type of

17    services you render for Jacmar Company?

18            MR. COREY:   I'm sorry, is it Jacmar or

19    Jacbar?

20            THE WITNESS:   Mar, M-a-r.  J-a-c-m-a-r,   I   09:58AM

21    provide services of basically when they have an

22    issue and/or with regards to a theft or a loss or an

23    employee issue, I will give them some counsel,

24    provide them some counsel on the best approach and

25    which way to manage it.  Also proactively I -- I      09:59AM
                                                               28
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   will assist them or give them direction on ways to

 2   prevent issues from occurring.

 3   BY MR. NOLAN:

 4       Q.   And in that latter part which I'm interested

 5   in is that more or less like doing a security audit   09:59AM

 6   for them?

 7           MR. COREY:  Mischaracterizes the testimony.

 8           THE WITNESS:  I don't -- from my

 9   understanding of a security audit I would say that I

10   haven't done one for them in years.                   09:59AM

11   BY MR. NOLAN:

12       Q.   How many years?

13       A.   From when I first started so probably

14   decades.

15       Q.   So they've been a client of yours for how    09:59AM

16   many years?

17       A.   Probably 30 years.

18       Q.   Now, you started working for Mattel in the

19   year 1997, November of 1997, correct?

20       A.   That's correct.                              10:00AM

21       Q.   Okay.  So from November 1997 through today,

22   Richard N. De Anda & Associates has remained in

23   business, correct?

24       A.   Yes.

25       Q.   And during that period of time, November of  10:00AM
                                                                29
```

EXHIBIT _____ 11

PAGE _____ 246

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    1997 through today, has Richard N. De Anda &

2    Associates provided services to any client other

3    than Jacmar?

4         MR. COREY:  Can I?  What was the first date?

5         MR. NOLAN:  November of 1997.              10:00AM

6    Q.   What I'm trying to do just in case the

7    record is not clear but more importantly to make

8    certain you and I are on the same page all I'm

9    talking about is from the time you started working

10   at Mattel for this purposes of this question through   10:00AM

11   today.  What other clients have you done work for

12   through Richard N. De Anda & Associates?

13   A.   I'm trying to think back.  Since -- during

14   this period of time I would have provided services

15   for law firms, two that I can think of --           10:01AM

16   Q.   I'll stop you midway if I could but if you

17   need to go further -- but what are the names of

18   those two law firms?

19   A.   John Coleman & Associates and Morrow,

20   Bernsapian.  It's a last name with about 25 letters   10:01AM

21   in it out of Glendale, and I may have provided

22   services for others that I just can't think of right

23   now.

24   Q.   But there were other clients other than Jac

25   Mar and these two law firms that you provided        10:01AM
                                                          30

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   services through Richard N. De Anda & Associates for

 2   the period November 1997 through today, correct?

 3        A.   There may have been a couple of others.  I

 4   just can't recall their names now.

 5        Q.   What -- what was the nature of the work that  10:02AM

 6   you provided to the two law firms that you've

 7   identified?

 8        A.   Expert witness and investigative services.

 9        Q.   By the way, for the work that you did

10   through Richard De Anda & Associates for any of the   10:02AM

11   clients during the period of November 1997 through

12   today were you paid for those services?

13        A.   Yes.

14        Q.   And how do you -- and who received the

15   payment?  Richard N. De Anda & Associates, the        10:02AM

16   entity?

17        A.   Yes.

18        Q.   Rather than you individually?

19        A.   Yes.

20        Q.   Is Richard De Anda & Associates a           10:02AM

21   corporation or is it a dba?

22        A.   It's a corporation.

23        Q.   And do you recall, approximately, best

24   estimate, when you first set up that corporation?

25        A.   Many years ago.  I don't recall to be very  10:03AM
                                                               31
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    honest with you.

 2        Q.   I appreciate that.  I'm just trying to keep

 3    it still balanced.

 4             So let's use Columbia Savings and Loan as a

 5    period of your life -- a slice of your life.  Do you      10:03AM

 6    think that you had formed Richard De Anda &

 7    Associates, Inc. prior to your employment at

 8    Columbia Savings and Loan or was it after you left

 9    Columbia Savings and Loan?

10             MR. COREY:  Objection: speculation.               10:03AM

11    BY MR. NOLAN:

12        Q.   Your best estimate.

13        A.   I'm trying to balance this in my mind as to

14    when.  So I would say it was either during --

15    just -- it was in that period of time.  It could          10:03AM

16    have even have been prior to but it was -- it was in

17    that period of time.  I could have been still with

18    the police report, just leaving, I could have been

19    at Columbia Savings or I could have been just

20    leaving Columbia Savings but I remember it was in         10:03AM

21    that period of time or towards the end of my career

22    with the police department or somewhere in that

23    time.

24        Q.   Could it also have been at or about the time

25    that you applied for your license as a private           10:04AM
                                                                 32
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    investigator?
 2        A.   No, I believe it came after.  I'm certain it
 3    came after.
 4        Q.   So during this ten-year period of time of
 5    November 1997 through today, do I understand your      10:04AM
 6    testimony that Richard N. De Anda & Associates, Inc.
 7    had no employees other than yourself?
 8            MR. COREY:  Objection: mischaracterizes his
 9    testimony.
10    BY MR. NOLAN:                                          10:04AM
11        Q.   By the way, I hate that objection because it
12    sounds like I'm trying to trick you.  I'm not.  I'm
13    just trying to -- if that's not correct; obviously
14    just tell me.
15            Do you recall ever having other employees?    10:04AM
16        A.   No, I don't.
17        Q.   So during that period of time if you had
18    assignments that you took on -- or did you ever take
19    on assignments from any of these clients where you
20    needed somebody to assist you in discharging the      10:04AM
21    services for which you were engaged?
22        A.   I'm not certain but I don't believe so.  I
23    don't believe so.
24        Q.   And does Richard De Anda, Inc. file tax
25    returns?                                               10:05AM
                                                                33
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     A.    Oh, yes.

 2     Q.    Does it have a tax I. D. number?

 3     A.    Yes.

 4     Q.    What's your Social Security number?

 5           MR. COREY:  I'm going to designate this      10:05AM

 6     portion of the transcript as Confidential -

 7     Attorneys' Eyes Only.  I'm going to ask counsel why

 8     you need his Social Security number.

 9           MR. NOLAN:  I'm just curious.  Do you treat

10     his Social Security number as confidential?        10:05AM

11           MR. COREY:  I think he does.

12           MR. NOLAN:  Can I just ask him that

13     question?

14           MR. COREY:  Sure.

15     BY MR. NOLAN:                                      10:05AM

16     Q.    Do you believe that your Social Security

17     number, your personal Social Security number, is

18     confidential to you?

19     A.    That's not a yes-or-no answer, and if I may

20     explain --                                         10:05AM

21     Q.    Of course.

22     A.    Because medical records -- a variety of

23     different records require your Social Security

24     number.  I do not give it for the purposes of just

25     giving it out to the general public so for that    10:06AM
                                                              34
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    reason I would say yes.  However, if it is required
 2    in a -- for a business relationship and/or a medical
 3    relationship or other relationships that require
 4    it -- and I don't know that this -- in this here
 5    requires it because I don't see you giving me a loan    10:06AM
 6    or checking my heart.  So I would say under these
 7    circumstances I would consider it confidential.
 8         Q.   I'm not available for the first service in
 9    terms of giving a loan.  I could probably help you
10    out with your heart if it gets that tense later on     10:06AM
11    but hopefully it won't.  Okay.  No, this is a
12    serious question.  So, no, I respect that.
13              So, in other words, if you're not applying
14    for a loan or providing it for a medical purpose you
15    would treat your Social Security number               10:06AM
16    confidential, correct?
17         A.   .Or employment where it was required or
18    other -- or other legitimate issues where it's
19    required.
20         Q.   What's your personal residence address?     10:07AM
21         A.          ___  REDACTED
22         Q.   Are you married?
23         A.   Yes.
24         Q.   How long have you been married?
25         A.   Many years.  I should know this answer.     10:07AM
                                                                  35
```

EXHIBIT _____ _//___

_252_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Thirty-seven years, maybe 38.

 2        Q.   And your wife's name?

 3        A.   Nancy.

 4        Q.   Do you have children?

 5        A.   Yes.                                  10:07AM

 6        Q.   How old?

 7        A.   Thirty-seven and 33.

 8        Q.   And what are their names?

 9        A.   Jeff and Jamie.

10        Q.   Would you consider your wife's social   10:07AM

11    security number to be confidential as well?

12        A.   Under the same circumstances, yes.

13        Q.   So if I asked you that question for your

14    wife or your children, you'd give me the same answer

15    that you did in response to the question I asked you  10:07AM

16    about your Social Security number, correct?

17        A.   Yes.

18             MR. COREY:  I would be surprised if you knew

19    your wife's Social Security number.  I don't.

20             THE WITNESS:  I don't either.          10:08AM

21    BY MR. NOLAN:

22        Q.   During the time that you were employed or

23    have been employed at Mattel; that is, November of

24    1997 -- let me back up and clear up something.

25             Prior to going to work at Mattel in November 10:08AM
                                                           36
```

EXHIBIT _____ *11*

PAGE _____ *253*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    1997, did you ever do any consulting work for Mattel

 2    in your capacity as a private investigator or in any

 3    capacity?

 4        A.   No, I did not.

 5        Q.   How -- can you explain to us in your own    10:08AM

 6    words how it -- how it is that you became employed

 7    by Mattel in November 1997?

 8        A.   Yes.  I was approached by Alan Kaye who is

 9    the Senior Vice President of Human Resources who

10    approached me with an opportunity at Mattel.         10:09AM

11        Q.   Now, had you known Mr. Kaye before that?

12        A.   Yes.

13        Q.   How did you know Mr. Kaye?

14        A.   I met Mr. Kaye at Columbia Savings.

15        Q.   And what were the circumstances by which you 10:09AM

16    met Alan Kaye at Columbia Savings and Loan?

17        A.   I believe it was in the latter part of '88 I

18    reported to him at Columbia Savings.

19        Q.   What was Alan Kaye's position at Columbia

20    Savings at that time?                                10:09AM

21        A.   Senior Vice President of Human Resources.

22        Q.   Approximately when did Alan Kaye -- strike

23    that.

24             After you left Columbia Savings and Loan

25    after it was taken over by the government and forced  10:10AM
                                                               37
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    to downsize, did you continue to have communications
 2    with Alan Kaye?
 3        A.   Yes.
 4        Q.   Were they basically social or business?
 5        A.   Both.                                    10:10AM
 6        Q.   So tell me a little bit about Alan Kaye's
 7    experience after he leaves Columbia Savings.  I
 8    assume he leaves Columbia Savings at or about the
 9    same time as you?
10        A.   Sometime after.  I don't know when but    10:10AM
11    sometime after.
12        Q.   So describe to me the business nature of
13    your contacts with Alan Kaye after you leave
14    Columbia Savings and Loan.
15        A.   He, I believe, took a position with Kaufman 10:10AM
16    Broad and I don't know when the timing of this but
17    sometime after he left Columbia Savings and he had
18    contacted me on a few occasions to perform
19    investigative services and to provide some advice
20    with regards to security matters.                 10:11AM
21        Q.   And so that the record is clear, could you
22    spell Kaufman Broad, is it?
23        A.   Is it -- is it K-a-u-f?  I'm not certain of
24    the spelling of it.  B-r -- Kaufman Broad, the
25    builder.  KB.                                     10:11AM
                                                            38
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    It's KB Homes?

 2      A.    Yeah, it's KB Homes.

 3      Q.    Can you describe for me generally the type

 4  of investigations that you conducted for Alan Kaye

 5  while he was employed at Kaufman Broad also known as   10:12AM

 6  KB Homes?

 7      A.    It was personal in nature for the CEO.

 8      Q.    Who was the CEO at the time of KB Homes?

 9      A.    Bruce Karatz.

10      Q.    How do you spell his last name?               10:12AM

11      A.    Karatz.  It's with a K, too.  It's not how

12  it sounds.  I'm a terrible speller, I'll admit to

13  that.  I'm not certain of the correct spelling.

14      Q.    And when you say they were personal-type

15  services, can you generally give me a description      10:12AM

16  without invading his privacy?

17            MR. COREY:  Do you want to step outside for

18  just one second to talk about this?

19            THE WITNESS:  No, it's fine, I think.  It's

20  fine.  He's no longer married to her so...             10:12AM

21            MR. COREY:  I guess that's the answer to the

22  question.

23            THE WITNESS:  It doesn't have anything to do

24  with that.

25            MR. COREY:  But are the proceedings final?   10:13AM
                                                              39
```

EXHIBIT _____ //

PAGE _____ 256

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    That's the real question.

 2          THE WITNESS:  They had issues with intruders

 3    in their home, okay, and that was -- that was one of

 4    the main issues with regards to the personal issues

 5    and there were others but I can't recall off the top   10:13AM

 6    of my head.

 7    BY MR. NOLAN:

 8       Q.   Now, you refer to the fact that he's no

 9    longer married to that -- to his wife -- then wife.

10    Were you involved at all in doing any investigation    10:13AM

11    for him during the course of the divorce

12    proceedings?

13       A.   No.

14       Q.   Other than intruders in the house, what

15    other type of personal investigative services were     10:13AM

16    you called upon by Mr. Kaye to perform?

17       A.   I know there were others, I just can't

18    remember at this point in time.

19       Q.   Now, at some point in time Mr. Kaye leaves

20    KB Homes and goes to work at Mattel, correct?          10:14AM

21       A.   That's my understanding.

22       Q.   And at or about that time did he tell you

23    that he was leaving KB Homes to go to work at

24    Mattel?

25       A.   I don't recall if I had a conversation with    10:14AM
                                                                   40
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    him or not about that.

 2        Q.   But, anyway, during the time after you leave

 3    Columbia Savings and Loan and when you go to work at

 4    Mattel you not only maintained a professional

 5    relationship with Alan Kaye as you've described but      10:14AM

 6    you also maintained a social relationship with him?

 7    Would that be fair?

 8        A.   That would be fair.

 9        Q.   Describe the nature of the social

10    relationship.  Would you go to dinner with him?          10:14AM

11        A.   I attended his wedding.  I don't know if I

12    ever went to dinner with him.  Maybe lunch, maybe

13    breakfast.

14        Q.   Had Alan Kaye been working at Mattel for a

15    period of time before he approached you to come to       10:15AM

16    work with him at Mattel?

17        A.   Yes.

18        Q.   So it wasn't that he immediately -- he left

19    KB Homes and immediately asked you to join him at

20    Mattel?                                                  10:15AM

21        A.   Correct.

22        Q.   While he was at Mattel before you were

23    hired, did Alan Kaye or anybody at Mattel ask you to

24    do investigative services, provide services of any

25    nature to Mattel?                                        10:15AM
                                                                    41
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    say something in excess of three inches worth.

 2         Q.   And did you review each of those documents?

 3         A.   Some more thoroughly than others.

 4         Q.   Did some of those documents help refresh

 5    your recollection as to some of the events that have   11:10AM

 6    occurred over the past five to seven years?

 7         A.   Sure.  Absolutely.

 8         Q.   Do you recall which documents you looked at

 9    in particular that refreshed your recollection?

10         A.   An E-mail that I had sent Alan Kaye back in   11:10AM

11    2000, an anonymous letter, a contract signed by

12    Carter Bryant, some of my department's investigative

13    case books dealing with cases regarding the theft of

14    intellectual property and business records by former

15    Mattel employees who took positions with MGA.  I'm     11:11AM

16    sure there were others but I don't recall at the

17    time.

18         Q.   Let's step back for just a minute.  Do you

19    hold any patents?

20         A.   You know, I may.  I may hold one.  I don't    11:11AM

21    know -- it's been so long I don't know the --

22         Q.   Is that for a stun gun?

23         A.   Yes.

24         Q.   Tell me the circumstances about that patent

25    application if you would.                               11:12AM
                                                                 77
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.    I forgot about that.  It's going to take a

2   minute.

3     Q.    That's okay.  It happens to me, too.

4     A.    Because it's tucked away back there.  And,

5   actually, it's not a stun gun because it doesn't          11:12AM

6   shoot a projectile.  It is a -- it's a device -- go

7   ahead.

8     Q.    Go ahead.  It's a device --

9     A.    It's a device -- I'm trying to even think

10  when we designed this and the circumstances.  Oh, I       11:12AM

11  remember now.  Okay.  This is something that I had

12  thought about years ago and actually those drawings

13  aren't mine but they're close to it.

14    Q.    We'll get into that.

15    A.    I know.  I on a trip back from Bogota,            11:13AM

16  Columbia for a client after I left Columbia Savings

17  and Loan -- not to confuse the two -- ran into a

18  gentleman on a plane who was an engineer and we

19  began a conversation that led to an idea that I've

20  always had of making a self-defense device but          11:13AM

21  mainly for women as opposed to men to empower them

22  but to have it small because most of the devices

23  that are out -- at the time were out for sale were

24  large and cumbersome and I wanted to make this as

25  small as a regular fountain pen per se that women        11:14AM
                                                                  78

EXHIBIT _____ 11

PAGE _____ 260

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   could use to stop an assailant.  And so that was the

 2   premise of it.  And I'm not certain if you know what

 3   a cubaton is -- never heard of it?

 4        Q.   No.  If that's a question, I'm answering it,

 5   no, I don't know.  So follow up.  What is it?        11:14AM

 6        A.   A cubaton is basically -- it's an ancient

 7   weapon that is probably no longer than six inches

 8   and probably no -- much more in diameter than about

 9   a half-inch or so and it is used as a fighting baton

10   that you put in your hand and what it does when you   11:14AM

11   strike someone -- if you strike someone with the

12   surface of your fist it displaces the energy.  If

13   you strike someone with this baton at the butt of it

14   it -- it focuses the energy on the smaller area

15   where it therefore makes it that much more intense.   11:15AM

16   So to have something of that device that a woman

17   would carry but wouldn't -- they would not have to

18   use it as a swinging weapon but if we could somehow

19   energize it and that was the whole idea of it.  Not

20   to shoot a projectile like most stun guns do but to   11:15AM

21   actually had someone been accosted you could touch

22   them with it.  And we designed it and it -- we

23   stopped after we actually received a patent on it

24   and it has about a joule's worth of energy, and a

25   joule is an electrical measurement of current,        11:15AM
                                                              79
```

EXHIBIT _____ _11_

PAGE _____ _261_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    however, we stopped to the point in time where we

 2    needed human testing.  Figured it was not worth the

 3    exposure or the cost at that time to move forward

 4    into human testing unless we had a willing

 5    participant.  We couldn't find one.  I'm not going      11:16AM

 6    to do it.

 7        Q.    Who -- who -- you don't have an engineering

 8    background other than the mechanical engineering

 9    course that you took in college but I assume that

10    nothing about that course that you took helped you      11:16AM

11    design this particular patented weapon, correct?

12              MR. COREY:  Objection:  assumes facts.

13              THE WITNESS:  I'm sorry, I don't quite

14    understand the question.

15    BY MR. NOLAN:                                           11:16AM

16        Q.    Let me approach it a different way.  I

17    apologize, it was inartful on my part.

18              You indicated previously you did not do the

19    drawings that were submitted for the patent

20    application, correct?                                   11:16AM

21        A.    Not those drawings, no.

22        Q.    Who assisted you in filling out the patent

23    application?

24              MR. COREY:  Objection:  vague.  I'm sorry,

25    the application itself?                                 11:17AM
                                                                 80
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. NOLAN:  Yes.

 2            THE WITNESS:  As I recall, there was a

 3  service -- an individual who offered his service for

 4  the patent and that's -- we paid a fee and that

 5  individual as I recall completed the -- the proper    11:17AM

 6  documents and submitted them.

 7  BY MR. NOLAN:

 8      Q.   Did you also have an engineer that you were

 9  working with?

10      A.   Define "engineer."                           11:17AM

11      Q.   Did you have anybody that was helping you

12  build a prototype of this object that you were

13  seeking to get patented?

14      A.   The prototype is my design but to build the

15  actual prototype?  Yes.                               11:18AM

16      Q.   And do you recall who that was?

17      A.   No.

18           (Deposition Exhibit 1189 was marked

19   for identification and is bound separately.)

20  BY MR. NOLAN:                                         11:18AM

21      Q.   I'd like to mark as next in order -- and I

22  believe the next in order, Jon, is 1189; is that

23  correct, based on where they finished in

24  Ms. Galvana's deposition last night.

25           MR. COREY:  Yeah, I'll trust that.           11:18AM
                                                            81
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1            MR. NOLAN:  This is a document that I'll

2    mark as Exhibit 1189.  It bears patent No.

3    Des 351,640.  I'll have the reporter mark it.

4            THE WITNESS:  So what do you think?

5    BY MR. NOLAN:                                    11:19AM

6       Q.   Okay.  So my question is, sir, do you

7    recognize this drawing -- this document?

8       A.   I do.

9       Q.   And could you describe it for me?

10      A.   Well, it's a rendering of the device, the  11:19AM

11   electric stun weapon device that I designed.

12      Q.   Did you -- did you do the drawing that's

13   depicted on page 1 or page 2 of Exhibit 1189?

14      A.   I did not.

15      Q.   Did you physically construct the prototype  11:19AM

16   of this electronic stunning weapon before it was

17   submitted to the patent office?

18           MR. COREY:  Can I get that back?

19           (The pending question was read as follows:

20              "Q.   Did you physically               11:19AM

21           construct the prototype of this

22           electronic stunning weapon before it

23           was submitted to the patent office?")

24   MR. COREY:  Go ahead.

25           THE WITNESS:  I'm trying to think which came  11:20AM
                                                            82
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1   first.  You know, I honestly cannot answer that

 2   accurately.  I don't know which came first.

 3   BY MR. NOLAN:

 4     Q.    Fair.  Did you actually build this yourself,

 5   this stunning weapon?                              11:20AM

 6     A.    When you say "yourself," are you referring

 7   to me physically building this?

 8     Q.    Yes.

 9     A.    No, I did not -- well, I'm trying to answer

10   your question accurately.                          11:20AM

11     Q.    If that changes, by the way, for any of my

12   questions where you're not going to try to answer it

13   accurately you can also point that out for me.

14          MR. COREY:  Or if something that Mr. Nolan

15   says jogs your memory and you have more accurate   11:21AM

16   questions -- accurate answers.

17          THE WITNESS:  I would only answer your

18   questions as accurately as possible and as honestly

19   as possible.  My intent here is I will only tell you

20   the truth today -- but I did build a prototype -- I   11:21AM

21   built several prototypes is what I'm referring to

22   and I don't want to misstate myself of this item.  I

23   did not -- I did build -- I did build this but in a

24   very crude form and much larger than it is but the

25   actual proto -- and, once again -- once again, I'm   11:21AM
                                                              83

EXHIBIT _____ *11*

PAGE _____ *265*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   not an engineer so I can't define what a prototype

 2   is with regards to this.  I built many iterations of

 3   it, however, the final iteration that was done by

 4   a -- and I'm not even certain what you'd call him

 5   but it's a machinist I guess it would be.  I don't      11:22AM

 6   know if he's -- I wouldn't call him an engineer, I

 7   would call him a machinist who takes a drawing that

 8   I produced with measurements that I produced and he

 9   then created a working model of this item.

10       Q.   Was that Dale Hollis?                           11:22AM

11       A.   No, Dale Hollis was my partner in this.

12       Q.   Now, you see here on this U. S. patent

13   you're listed as one of the inventors, Richard N.

14   De Anda and Dale R. Hollis.  That's your partner?

15       A.   Yes.                                            11:22AM

16       Q.   And you knew you were being listed as the

17   inventor?

18       A.   Yes.

19       Q.   Now, when you went to work at Mattel, did

20   you have to fill out various forms -- employment        11:22AM

21   agreements, HR type of documents?

22       A.   Yes.

23       Q.   Did you review the documents before you

24   signed them?

25       A.   Yes.                                            11:23AM
                                                                   84
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   As you sit here today, do you recall not

2  reading any particular document before you signed

3  it?

4         MR. COREY:   Objection:  vague and

5  speculation.                                      11:23AM

6         THE WITNESS:   I cannot be that precise what

7  I did ten years ago.  Sorry.

8  BY MR. NOLAN:

9    Q.   Okay.

10   A.   If I did or didn't read every line or every  11:23AM

11 word, I cannot be that precise.

12   Q.   Were you -- do you recall whether or not you

13 were asked by Mattel to list any inventions that you

14 may have had before coming to work at Mattel?

15   A.   No, I don't.                                11:23AM

16   Q.   Do you recall ever telling Mattel that you

17 had a patent -- a U.S. patent on an invention?

18   A.   I can't recall either way.  I may have had a

19 discussion with Alan Kaye on a very casual basis but

20 I can't recall.  I've talked to others about this   11:24AM

21 invention way back when but, honestly, I had

22 forgotten all about this in the last five years.  I

23 even forgot that it was even existent to be very

24 honest with you.

25   Q.   So it's possible you never told Mattel that  11:24AM
                                                          85

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    you were an inventor of an item that had been

 2    patented; is that correct?

 3            MR. COREY:  Objection:  speculation.

 4            THE WITNESS:  It's possible either way that

 5    I may have or may have not.  Once again, this was      11:24AM

 6    not a significant event in my life.  It was just a

 7    device that I was interested at that time in

 8    creating and since has just -- I have no interest in

 9    it or lost interest in it.  But I have discussed it

10    with others over the years but I -- today I could      11:25AM

11    sit here and tell you I don't even know who those

12    others are.  I know of a few people I've talked

13    about it to but there's many others I just can't

14    recall.

15    BY MR. NOLAN:                                          11:25AM

16        Q.   But you have no recollection of filling out

17    a form at Mattel and formally disclosing to them

18    that you were the holder of a U.S. patent of an

19    invention, correct?

20            MR. COREY:  Objection:  assumes facts.        11:25AM

21            THE WITNESS:  That is correct.

22    BY MR. NOLAN:

23        Q.   Now, I also -- we talked about this.  I just

24    want to close the loop on something.  You know,

25    during this ten-year period of time that you've been  11:25AM
                                                                86
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   hours during the week?

2       A.   It depends on the attorney.  Once I

3   understand the attorney, who it is, I can tell you

4   exactly or I can tell you --

5       Q.   Matthew Biren, B-i-r-e-n, and Marc Katzman   11:30AM

6   of Bel Air.

7       A.   Right.  I do recall.  It was in the evening

8   hours on my way from Mattel to home.

9       Q.   And you got paid for those meetings,

10  correct?                                            11:30AM

11      A.   Yes.

12      Q.   By the way, when you reviewed with your

13  attorneys in preparation for this deposition, did

14  you review the patent application?

15      A.   Did not.                                    11:30AM

16      Q.   Did you review any of the expert reports

17  that you prepared for these law firms where you

18  served as an expert witness while you've been the

19  Vice President and Global Director of Security at

20  Mattel?                                             11:30AM

21      A.   Did not.

22          MR. NOLAN:  Thanks.  Why don't we take our

23  break now.

24          VIDEO OPERATOR:  Thank you.  11:30 we're off

25  the record.                                         11:30AM
                                                            90

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              (At the hour of 12:32 p.m. the following

 2         proceedings were had at the same place with

 3         the same persons present.)

 4

 5              VIDEO OPERATOR:  The time is 12:32.  We are   12:31PM

 6    back on the record.  This is tape No. 2 of the

 7    deposition of Richard De Anda.  All parties may

 8    continue.

 9

10                    EXAMINATION (Resumed)              12:32PM

11    BY MR. NOLAN:

12         Q.   Thank you.  Before we took our lunch break

13    we were talking about your work as an expert

14    witness.  I want to put a document in front of you

15    we'll mark as Exhibit 1190.                        12:32PM

16              (Deposition Exhibit 1190 was marked for

17         identification and is bound separately.)

18    BY MR. NOLAN:

19         Q.   Do you have that, sir?

20         A.   Yeah, I do.                              12:33PM

21         Q.   Mr. De Anda, why don't you take a look at

22    this document which I'll represent to you was

23    published off of the Internet and describes a

24    shooting in a city parking lot behind a nightclub

25    and there were allegations of inadequate security.  12:33PM
                                                              92
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    The victim was a paraplegic as a result of injury

2    sustained at the time and there was a stipulated

3    judgment and a structured settlement.  The case is

4    entitled Valentine vs. Nayarit Restaurant and

5    Nightclub, California, Los Angeles Superior Court          12:33PM

6    No. BC 209989, November 2000.

7              In reading this description that was

8    published by the Trial Lawyers of America, is it --

9    first of all, does it refresh -- do you have a

10   memory of testifying in this case?                         12:35PM

11       A.   I don't believe I did testify in this

12   matter.

13       Q.   Are you -- do you see in the fourth

14   paragraph it says "Plaintiff's expert witnesses

15   include Richard De Anda, security..."?  Do you know       12:35PM

16   if -- is that a reference to you?

17       A.   Yes, it is.

18       Q.   So you did meet with Marc Katzman,

19   K-a-t-z-m-a-n, of Bel Air, California along with --

20   well, do you recall meeting with Marc Katzman?            12:35PM

21       A.   I do.

22       Q.   In the body of this description it says --

23   in the second paragraph -- I think the third

24   paragraph says "Plaintiff supplied expert testimony

25   that these guards were obligated to intervene when        12:35PM
                                                                  93

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    the confrontation was developing and that this
2    intervention likely would have prevented the
3    shooting."
4              Did I read that correctly?
5         A.   I'm sorry, I wasn't following you at the    12:36PM
6    time.  I'm sorry, where are you now?
7         Q.   It says "Plaintiff supplied expert testimony
8    that these guards were obligated to intervene when
9    the confrontation was developing and that this
10   intervention likely would have prevented the         12:36PM
11   shooting."
12             Do you see that?
13        A.   Yes.
14        Q.   And I've read that correctly, correct?
15        A.   Yes.                                        12:36PM
16        Q.   And you see on the bottom that plaintiff's
17   counsel was listed as including Marc Katzman?
18        A.   Yes.
19        Q.   And is that -- does that refresh your
20   recollection that Mr. Katzman or his partner,        12:36PM
21   Mr. Biren, supplied expert testimony regarding the
22   level of care provided by the security guards at the
23   parking lot?
24        A.   I'm trying to think back, it's been so long.
25   I can't recall -- first of all, I do know that I did  12:36PM
                                                           94
```

EXHIBIT _____ 11

PAGE _____ 272

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   not testify in a court of law.  That's my
 2   recollection on this matter.  I -- I can't recall --
 3   I can't recall -- I have no recollection of a
 4   deposition.  I think I did do a declaration and had
 5   a consultation with either -- I think with          12:37PM
 6   Mr. Katzman.
 7       Q.   Do you have any knowledge as to how
 8   Mr. Katzman located or identified you as an expert
 9   witness for use in that case?
10       A.   I don't, I'm sorry.                          12:37PM
11       Q.   Do you advertise your services as an expert
12   witness?
13       A.   No.
14       Q.   Do you mention to some of your colleagues,
15   former LAPD types or anybody, that you are available 12:38PM
16   to testify as an expert witness on security
17   measures?
18       A.   No.
19       Q.   On how many occasions have you qualified as
20   an expert witness, sir?                               12:38PM
21           MR. COREY:  Objection:  vague and ambiguous.
22           THE WITNESS:  In a court of law?
23   BY MR. NOLAN:
24       Q.   Yes.  When I say "in a court of law" just so
25   we understand in the context of a lawsuit and, you   12:38PM
                                                            95
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    know, litigation proceedings whether or not it went

 2    to verdict or not.

 3              MR. COREY:  I'll still object on vagueness

 4    and ambiguity grounds.

 5              THE WITNESS:  I would say more than five,      12:38PM

 6    less than ten.  And that's just an estimate because

 7    I really don't have -- I really can't recall other

 8    than I would say that that's probably a fair

 9    estimate.  Maybe more but I would say that staying

10    at ten would be pretty accurate.                        12:39PM

11    BY MR. NOLAN:

12         Q.   And were --

13         A.   I'm sorry, as far as the high number goes

14    but five would probably be also right so I'm not

15    certain.                                                12:39PM

16         Q.   I understand.  I suppose that the best way

17    to determine -- well, let me ask it this way.  Did

18    you get paid each time you served as an expert

19    witness?

20              MR. COREY:  Objection:  vague and ambiguous.  12:39PM

21              If I may, Tom, every time he -- you're

22    asking questions that are about when he testified in

23    a court of law and when he was qualified as an

24    expert.  Are you limiting your question to that or

25    any time?  Do you see what I'm saying?                  12:39PM
                                                                   96
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. NOLAN:  Yeah.  No, no, thank you for

 2    clarifying that.  We'll limit it to first, you know,

 3    in connection with the lawsuit.  Let's put it that

 4    way.

 5        Q.    In connection with the lawsuit when you      12:40PM

 6    appeared or consulted as an expert witness have you

 7    been paid for those services?

 8        A.    Every time that I consulted as an expert did

 9    I receive compensation for it?  And I would say --

10    once again, you have to understand the question and   12:40PM

11    the question is when I was engaged as the expert --

12    expert for the case or when I was approached to be

13    and reviewed the case?

14        Q.    Both.

15        A.    Okay.  Then the answer is, no, I was not     12:40PM

16    compensated every time.

17        Q.    On how many occasions did you consult but

18    did not get paid?

19        A.    A handful possibly.

20        Q.    And why didn't you get paid for those        12:40PM

21    consultations, if you know?

22        A.    Either because I declined to serve as their

23    expert because I felt either the case had very

24    little merit or it was a situation that I did not

25    want to become involved in or the law office failed   12:41PM
```

97

EXHIBIT ___11___

PAGE ___275___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    to fund my nonrefundable retainer.

2        Q.    Let's talk about the financial arrangements.

3    First of all, do you charge by the hour?

4        A.    Yes.

5        Q.    And how much is your hourly fee to appear as   12:41PM

6    a consulting expert?

7        A.    $250 an hour, four-hour minimum for

8    testimony and depositions.

9        Q.    And so do you charge a nonrefundable

10   retainer of $1,000?                                        12:41PM

11       A.    $2,000.

12       Q.    And on how many occasions in the past ten

13   years have you been paid a nonrefundable retainer of

14   $10,000 -- I'm sorry, $2,000?

15       A.    To be fair to the question, the             12:42PM

16   nonrefundable retainer has changed over the years

17   the amount.  So to answer your question --

18       Q.    I appreciate -- you know what?  I

19   appreciate -- let me -- let me, if I might, rephrase

20   based on that.                                             12:42PM

21            How many times in the last ten years,

22   between November of 2000 -- I'm sorry, between

23   November of 1997 and today's date -- all right?

24   -- that you've been paid a nonrefundable retainer no

25   matter what the amount is in exchange for consulting    12:42PM
                                                                   98

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    services that you've offered to law firms?

 2         A.    I would say that probably six'ish is

 3    probably a good number.  Give or take one or two I

 4    would say that's probably accurate.

 5         Q.    And recognizing the margin of error there,    12:43PM

 6    that this is your best estimate, on how many

 7    occasions did you have to give a deposition?

 8         A.    I would say probably four or five.

 9    Probably.

10         Q.    Again, this is over the ten-year period of    12:43PM

11    time -- approximate ten-year period of time?  We're

12    talking about November 1997 through today's date?

13         A.    That's correct.  And, once again, it's hard

14    for me to -- what I'm trying to do in my mind is

15    kind of figure out what cases -- what law firm so     12:44PM

16    I'm being as accurate as I possibly can.

17         Q.    Of course.  And I recognize that.  Now --

18              MR. COREY:  And these are the depositions

19    for which he's being paid or which he's acting as an

20    expert.                                                 12:44PM

21    BY MR. NOLAN:

22         Q.    Are there -- in addition to these matters

23    that you've just identified, there are other

24    occasions where you've been approached and consulted

25    and either did not get paid or give a deposition; is   12:44PM
                                                               99
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that correct?

 2        A.   Yes.

 3        Q.   Do you keep a calendar for Richard N.

 4    De Anda & Associates?

 5        A.   No, I do not.                          12:44PM

 6        Q.   Where do you maintain the files and records

 7    for Richard De Anda & Associates?

 8        A.   In a file cabinet that I have in my home but

 9    it really consists of very little to nothing.

10        Q.   Do you keep any records or calendars with   12:45PM

11    respect to the consulting services that you offer in

12    your offices at Mattel?

13        A.   No.

14        Q.   Have you ever taken a phone call at Mattel

15    concerning any of these matters that you offer       12:45PM

16    yourself out as a consultant on?

17             MR. COREY:  Objection:  vague and ambiguous.

18             THE WITNESS:  I may have taken a phone call,

19    yes.

20    BY MR. NOLAN:                                        12:45PM

21        Q.   Do you recall whether or not any law firms

22    or clients have ever sent to you material either by

23    E-mail or facsimile at Mattel in connection with any

24    of these matters that you work on through Richard

25    De Anda & Associates?                                12:46PM
                                                              100
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    I don't recall if that has happened.
 2      Q.    It's possible, though?
 3      A.    It's possible.
 4      Q.    Do you have a separate E-mail address?
 5      A.    Yes.                                    12:46PM
 6      Q.    And what's that E-mail address?
 7      A.    It's -- let's see, it's changed again
 8  because of the services.  It's Richard -- excuse me,
 9  I'm sorry, it's RichDeAnda@roadrunner.com.
10      Q.    And is that the same E-mail address you've   12:46PM
11  had during the entire time that you've been
12  providing services for Richard N. De Anda &
13  Associates while employed at Mattel?
14      A.    No, it's not.
15      Q.    How many different E-mail addresses have you  12:46PM
16  had?
17      A.    I'm not certain.  It could be four depending
18  on the service.  The services have changed.
19      Q.    Of course.
20      A.    And --                                   12:46PM
21      Q.    Every time it changes you unfortunately have
22  to get a new address.
23      A.    Exactly.
24      Q.    But it is possible that during this period
25  of time, November 1997 through today's date, while   12:46PM
                                                          101
```

EXHIBIT  11

PAGE  279

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    doing work for clients under the -- under the name

 2    of Richard De Anda & Associates it's possible you

 3    took phone calls while at Mattel, correct?

 4              MR. COREY:  Objection:  speculation.

 5              THE WITNESS:  I could have.  I do recall      12:47PM

 6    speaking to -- I have relationships beyond the

 7    business relationships with clients and I do

 8    sometimes receive phone calls, yes.

 9    BY MR. NOLAN:

10       Q.   And in those conversations you would have      12:47PM

11    talked about business as well, correct?

12              MR. COREY:  Objection.

13              THE WITNESS:  Could have.

14              MR. COREY:  Assumes facts not in evidence

15    and speculation.                                        12:47PM

16    BY MR. NOLAN:

17       Q.   It's also possible that you received either

18    by E-mail or -- well, let's not make this compound.

19              It's possible that you received E-mail

20    correspondence from these clients while at Mattel,      12:47PM

21    correct?

22              MR. COREY:  Same objections.

23              THE WITNESS:  Excuse me, very unlikely but I

24    may have because I don't provide my E-mail

25    address -- Mattel E-mail address out to private         12:48PM
                                                                  102
```

EXHIBIT _____ 11

PAGE _____ 280

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    clients.  However, there are -- I do have friendship

 2    relationships with my clients that I believe may

 3    have my E-mail and it may have -- to be as accurate

 4    as possible, there could have been E-mails back and

 5    forth.                                          12:48PM

 6    BY MR. NOLAN:

 7        Q.   Is there a way that you could check your

 8.   E-mails to determine whether or not over the past

 9    ten years -- approximate ten years that you've

10    received E-mails at Mattel -- at your Mattel address  12:48PM

11    in connection with your side line business of

12    Richard N. De Anda & Associates?

13           MR. COREY:  Objection:  mischaracterizes the

14    testimony and calls for speculation.

15           THE WITNESS:  That would be very difficult.  12:48PM

16    I don't believe the retention of ten years' worth of

17    E-mails would -- is -- is anywhere to be found.

18.   BY MR. NOLAN:

19        Q.   And it's possible that in addition to

20    possibly having E-mail exchanges back and forth on    12:49PM

21    your Mattel address that you would have received

22    mail sent to you or delivered to you at your Mattel

23    offices in connection with some of these clients?

24           MR. COREY:  Assumes facts, calls for

25    speculation.                                    12:49PM
                                                         103
```

EXHIBIT ____ 11____

PAGE ____ 281

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  I say I have no independent
 2    recollection but my feeling is I could have.
 3    BY MR. NOLAN:
 4       Q.   And is it also possible that you could have
 5    received facsimiles sent to you -- do you have a fax   12:49PM
 6    machine at Mattel or access to one?
 7       A.   Yes.
 8       Q.   And have you -- is it possible that similar
 9    to mail deliveries or E-mails that you could have
10    received facsimile messages back and forth with        12:49PM
11    these clients?
12            MR. COREY:  Objection:  speculation, assumes
13    facts.
14            THE WITNESS:  I don't recall a facsimile.
15    BY MR. NOLAN:                                           12:50PM
16       Q.   Is it possible?
17       A.   Anything is possible but I do not recall
18    that happening.
19       Q.   Well, in some of these cases you had to
20    prepare an expert report, correct?                      12:50PM
21       A.   Yes.
22       Q.   And did you -- where did you prepare these
23    expert reports?
24       A.   At my home office.
25       Q.   Using which computer?                           12:50PM
                                                                 104
```

EXHIBIT _____ 11

PAGE _____ 282

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    My computer, my personal computer.

 2      Q.    Do you have more than one computer at home?

 3      A.    No, I have one.

 4      Q.    So any expert reports that you prepared for

 5   Richard De Anda & Associates, did you save those on    12:50PM

 6   your home computer?

 7      A.    Some have been saved, yes.  Some --

 8      Q.    Are they saved on -- I'm sorry.

 9      A.    Let me finish, please.

10      Q.    I apologize.                                   12:50PM

11      A.    Some have been saved.  Others have been

12   deleted.  Others were on computers that I no longer

13   own or have possession of.

14      Q.    For those -- for those expert reports that

15   you prepared that may have been on other computers,     12:50PM

16   would you have printed out a hard copy and

17   maintained that hard copy in your files at home?

18           MR. COREY:  Objection:  speculation.

19           THE WITNESS:  I could have.  I'm not certain

20   to be honest with you.                                 12:51PM

21   BY MR. NOLAN:

22      Q.    Did you review any of these expert reports

23   with your counsel prior to the deposition?

24      A.    No, I did not.

25      Q.    Did you review with your counsel any of the   12:51PM
                                                                105
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    business records of Richard De Anda & Associates?
 2        A.    I did not.
 3        Q.    Does the law firm of Quinn Emanuel represent
 4    you in your capacity as the only employee at Richard
 5    De Anda & Associates?  No offense intended.          12:51PM
 6            MR. COREY:  Objection:  mischaracterizes the
 7    testimony.
 8            THE WITNESS:  No, they do not.
 9    BY MR. NOLAN:
10        Q.    Are you an officer of Richard De Anda &      12:51PM
11    Associates?
12        A.    I am the officer.
13        Q.    As the officer of Richard De Anda &
14    Associates, did you ever disclose to Quinn Emanuel
15    the existence of Richard N. De Anda & Associates?     12:51PM
16        A.    I can't recall.
17        Q.    It's possible you didn't?
18        A.    It's possible I did.
19        Q.    You don't have any independent recollection
20    of telling them about that, correct?                 12:52PM
21        A.    I could have.  I don't -- I don't -- I don't
22    recall.  It may have been in passing but I may have.
23        Q.    During the lunch break that you had with
24    Mr. Corey, did you have discussions with him about
25    your activities at Richard De Anda & Associates?     12:52PM
                                                                106
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    If we did, I couldn't hear it.  It was too
 2   noisy.  I couldn't hardly hear anything.  My hearing
 3   is not that good anymore.  We had some discussions
 4   but -- we may have -- actually, you were gone most
 5   of the time.  Not really.                        12:52PM
 6      Q.    Do you have any objection to producing to us
 7   copies of Richard De Anda & Associates business
 8   records?
 9      A.    I would have to confer with my clients.
10   It's private information and so I'd have to confer   12:53PM
11   with my clients.
12      Q.    What about if, you know, you redacted the
13   name of a client let's say to protect the innocent
14   or the guilty, however it may be, and produced it in
15   that format so that it wouldn't breach any          12:53PM
16   confidentiality?  You wouldn't have any objection to
17   producing that to us, would you?
18          MR. COREY:  Objection:  speculation.
19          THE WITNESS:  I would have to refer to --
20   I'd have to confer with my clients.  It's the right  12:53PM
21   thing to do.
22   BY MR. NOLAN:
23      Q.    Of course.  And those clients would include
24   the various law firms that you've worked for?
25      A.    Yes.                                       12:53PM
                                                            107
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    As well as Jacmar?

 2      A.    Yes.

 3      Q.    And other clients that you may have done

 4   consulting work for, correct?

 5      A.    That I may have that I recall, yes.        12:54PM

 6      Q.    Are you authorized to accept subpoena for

 7   Richard N. De Anda & Associates?

 8      A.    Yes.

 9      Q.    What about tax returns?  You said you

10   prepare and file tax returns each year for Richard    12:54PM

11   De Anda & Associates.

12      A.    I do.

13      Q.    Do you maintain copies of those tax returns?

14      A.    Yes.

15      Q.    Would you have any objection to producing     12:54PM

16   those tax returns to us?

17      A.    I would have to confer with counsel -- my

18   counsel -- with regards to that.

19      Q.    And who is that counsel?

20      A.    I haven't appointed one yet.                 12:54PM

21      Q.    Fair.  Thank you, sir.

22            Okay, let's go back to Mattel, your

23   employment at Mattel.  The first day did you sign an

24   employment agreement?

25      A.    I believe I did.                             12:54PM
                                                               108
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Did you -- do you have an employment

 2   contract at Mattel?

 3      A.   Contract?  No.  Well, excuse me.

 4           MR. COREY:  Objection.  Objection:  vague.

 5   BY MR. NOLAN:                                    12:54PM

 6      Q.   What was vague about it?

 7      A.   I wish I did.  A contract as to -- as to --

 8      Q.   A term of employment, for instance.

 9      A.   A term of employment.  So, in other words,

10   they're offering me employment for X amount of years  12:55PM

11   for X amount.  I do not have that form of contract,

12   no, I do not have a contract.

13      Q.   So do you consider yourself much like all

14   the other employees of Mattel an employee at will?

15      A.   I do.  Yes, I do.                         12:55PM

16      Q.   Do you recall whether or not you signed any

17   employment agreement or documents upon being hired

18   at Mattel concerning conflicts of interest?

19      A.   I'm certain I did but I have no independent

20   recollection at this moment.                       12:55PM

21      Q.   Does Mattel have a policy regarding

22   conflicts of interest of its employees?

23           MR. COREY:  Vague as to time.

24   BY MR. NOLAN:

25      Q.   While you were employed at Mattel.         12:56PM
                                                          109
```

EXHIBIT ___

PAGE ___ 287

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     A.    Yes.

 2     Q.    And are -- what's your understanding as

 3   to -- well, let me ask it this way.  Is that

 4   conflicts of interest policy printed and provided to

 5   each employee?                                   12:56PM

 6           MR. COREY:  Objection:  speculation.

 7   BY MR. NOLAN:

 8     Q.    If you know.

 9     A.    I believe it's contained in the employee

10   handbook.                                        12:56PM

11     Q.    So, you know, I was looking at a bunch of

12   stuff in preparation for this deposition and I know

13   that one of your jobs, okay, is to protect the

14   intellectual property rights of Mattel.  Is that a

15   fair statement?                                  12:56PM

16     A.    Yes.

17     Q.    I want to ask you this, sir.  And in

18   connection with that if you find any information,

19   rumor or innuendo that someone is violating --

20   copying Mattel's intellectual property rights --   12:56PM

21   your department is in charge of conducting the

22   investigation to see if there's any truth to that,

23   correct?

24           MR. COREY:  Objection:  vague and ambiguous

25   and speculation.                                 12:57PM
                                                          110
```

EXHIBIT _____ 11 _____

PAGE _____ 288 _____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  I'm sorry --

 2   BY MR. NOLAN:

 3      Q.   It's annoying.  I'm sorry.

 4      A.   It interrupted my train of thought.  I'm

 5   sorry, could you repeat the question again?        12:57PM

 6            MR. NOLAN:  Sure.  Wendy, do you mind

 7   rereading?

 8            (The pending question was read as follows:

 9                 "Q.   I want to ask you this, sir.

10                 And in connection with that if you     12:56PM

11                 find any information, rumor or innuendo

12                 that someone is violating -- copying

13                 Mattel's intellectual property rights --

14                 your department is in charge of

15                 conducting the investigation to        12:56PM

16                 see if there's any truth to that,

17                 correct?")

18            MR. COREY:  Same objections.

19            THE WITNESS:  Yes, that falls in one of the

20   departments that would have responsibility for that,  12:57PM

21   yes.

22   BY MR. NOLAN:

23      Q.   And which department is that?

24      A.   My department is the Global Security

25   department investigations.                          12:57PM
                                                            111
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Because I was responding -- I was reacting

2    to "yes, that falls in one of the departments," and

3    I was just curious to which department it was.

4           So that's in the Global Security department,

5    correct?                                              12:58PM

6      A.    Now you've totally confused me so try this

7    again.

8      Q.    Sure.  Which department at Mattel is

9    responsible for conducting investigations into

10   allegations, rumors or innuendoes concerning the      12:58PM

11   misappropriation of Mattel's intellectual property?

12     A.    Well, there's not just one department that

13   could have that possible responsibility.  My

14   department is one of the departments that could have

15   that responsibility.                                   12:58PM

16     Q.    Okay, now I understand your answer.  Thank

17   you.  And that department is the Global Security

18   department, correct?

19     A.    Yes.

20     Q.    Okay.  Now, what other departments could      12:58PM

21   have that responsibility?

22     A.    Well, depending on -- on -- on the situation

23   and how it's brought forth, Legal could possibly

24   have the responsibility to research and analyze the

25   information that constituted the theft of             12:59PM
                                                               112

EXHIBIT ___11___

PAGE ___290___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    intellectual property.  Audit could find it and then

2    have a responsibility.  HR -- excuse me, our Human

3    Resources department could possibly.  And -- and we

4    could even work collectively.  There could be others

5    that right at this moment I can't think of.          12:59PM

6         Q.    How is it determined which particular

7    department at Mattel would handle a particular

8    accusation or allegation, innuendo or rumor about

9    the theft of intellectual property?

10        A.    That's a very good question.             12:59PM

11             MR. COREY:  Objection:  narrative.

12             MR. NOLAN:  So that's the second good one.

13   That's cool.

14        Q.    So tell me how would you answer that?

15        A.    There's no -- I'm not aware of any written   01:00PM

16   guidelines as to who handles what, where, when and

17   in some cases it just depend on if it's in

18   conjunction with another issue or case of actually

19   who is handling or who is managing it at that time.

20   So it's a very difficult question to answer as       01:00PM

21   absolute, I think, because there is no hard, fast

22   guidelines.  I'm sorry, I hope that helps you

23   understand but I don't think it does.

24        Q.    No, no, it's helpful.  I appreciate that.  I

25   guess what I take from it and make certain I        01:01PM
                                                          113

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    understand this to be correct there's no formalistic

2    policy, in other words, that would dictate, all

3    right, this particular rumor or innuendo would be

4    handled by Legal and this one would be handled by HR

5    and this type would be handled by Audit; is that          01:01PM

6    correct?

7        A.   Well, to some degree.  It would -- it would

8    depend.  If there is obviously a situation that

9    immediately -- and if we're only -- if we're

10.  exclusively talking about intellectual property --        01:01PM

11   are we?

12       Q.   For this question.

13       A.   For this question.  Okay.  I think part of

14   that would be in the manner that it's found that we

15   have an issue and who finds it, but we would confer.      01:01PM

16   I confer with Legal unfortunately on a daily basis

17   pretty much and -- with regards to issues and -- or

18   ongoing matters.

19       Q.   While you've been employed at Mattel for the

20   past ten years, November of 1997 through now, have        01:02PM

21   you attended any seminars with respect to corporate

22   security measures?

23       A.   I have attended a seminar in Las Vegas with

24   ASIS, American Society of Industrial Security, and I

25   think I have attended meetings -- one or two              01:02PM
                                                                 114

EXHIBIT ___11___

PAGE ___292___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   looking in that benefit section to determine whether

2   or not they can copy other competitors' property,

3   right?

4       A.   Not in that section, no.  And then on page

5   964, "Tax Saver Plans" --                          01:52PM

6       Q.   How about that?  Would you expect them to

7   look there?

8       A.   Not necessarily, no.  In "Short Term

9   Disability" there, "Long Term Disability," "Extended

10  Benefits," no.  "Other Programs and Services," not    01:52PM

11  necessarily.

12          Okay.  So those sections that we've

13  identified are the sections that I would like to

14  review to answer your question.

15      Q.   Sure.  Let's go to the first one, "Employee  01:53PM

16  Records," on page 5.  Why don't you take a look at

17  that and tell me whether or not that gives you

18  any -- any sense that that conduct is prohibited at

19  Mattel.

20      A.   All right.  No, it does not appear to be on  01:53PM

21  page 5.

22      Q.   So the next one you wanted to take a look at

23  was "Secondary Employment" on page 7.  Why don't you

24  take a look at that if you could, Mr. De Anda.

25      A.   Okay.  Okay.                               01:53PM
                                                          138

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Anything in that section that tells you not

2   to copy anybody's property?

3    A.   No, it does not.

4    Q.   While we're on that, can I ask you a

5   different type of question --                      01:54PM

6    A.   Sure.

7    Q.   -- now that we're talking about secondary

8   employment?  I see here that secondary employment is

9   not prohibited, it's only discouraged by Mattel; is

10  that correct?                                       01:54PM

11   A.   I don't know that I've read the word

12  "discouraged."

13   Q.   Okay.  Did I read that incorrectly?

14   A.   I'm looking for the word "discouraged."

15   Q.   Oh.  It says "The nature of the Company's    01:55PM

16  business requires the complete commitment of

17  full-time employees.  Accordingly, outside jobs are

18  discouraged."

19        Do you see that?  Did I read that right?

20   A.   Why am I missing that?                        01:55PM

21   Q.   Second line.

22   A.   Oh, I passed it, that's why.  I was looking

23  down further.  Yes.  Yes, I do.  That's correct.

24   Q.   So would you describe Richard N. De Anda &

25  Associates as secondary employment?                01:55PM
                                                        139

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    Yes, I would.

 2      Q.    So that employment is discouraged by your

 3   employer, correct?

 4      A.    According to this, yes.

 5      Q.    So let's go on.  It says "Employees must      01:55PM

 6   discuss the appropriateness of any secondary job

 7   with their supervisors and obtain approval in

 8   writing before accepting such outside employment."

 9            Do you see that?

10      A.    Yes, I do.                                    01:56PM

11      Q.    Did I read that correctly?

12      A.    Yes, you did.

13      Q.    Do you have anything in writing from Mattel

14   authorizing you to provide consulting services with

15   respect to security issues or appearing as an expert  01:56PM

16   witness?  Do you have anything in writing from

17   Mattel allowing you to do that?

18      A.    No, I don't believe I do.

19      Q.    Okay.  And then -- okay, so the next section

20   that you wanted to look at, sir -- oh, you wanted to  01:56PM

21   add "Re-Employment."  It's on the same page.  This

22   is one that you had the thumb on but I didn't want

23   to cut you off.

24      A.    Oh, that's right.

25      Q.    But take a look at it.  See if there's        01:56PM
                                                              140
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    anything there that illuminates us on this issue.

2        A.   I've read it.

3        Q.   Is there anything that would prohibit -- I'm

4    sorry.  Is there anything in there that would

5    indicate to an employee of Mattel that they're not          01:57PM

6    allowed to copy competitors' products?

7        A.   No.

8        Q.   So I think the next one -- and if I'm wrong,

9    Jon, correct me -- but I think the next one was on

10   the next page for Mr. De Anda under "Standards of           01:57PM

11   Conduct" at page 23.

12           MR. COREY:  That's what I have.

13           MR. NOLAN:  Is that what you have?

14       Q.   So let's look at page 23, the "Standards of

15   Conduct," and I'd ask you to review those standards         01:57PM

16   of conduct and tell me where you would find a

17   directive to employees of Mattel that they should

18   not copy competitors' products for use in Mattel's

19   business.

20       A.   No.                                                02:01PM

21       Q.   It's not there either, right?

22       A.   No, it's not.

23       Q.   I just wanted to see if there were any other

24   sections in this booklet that you wanted to look at.

25           MR. COREY:  Yeah, there was one more.  It           02:01PM
                                                                     141

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   conclusion.

 2          THE WITNESS:  As I sit here today, I do not

 3   have a recollection -- not that I did not hear it --

 4   I don't recall ever hearing that.  That doesn't mean

 5   that I may or may not have.  As we sit here today,     02:15PM

 6   ten years is a long time.

 7   BY MR. NOLAN:

 8      Q.   Of course.

 9          MR. COREY:  Had you finished your answer?

10          THE WITNESS:  That's fine.                      02:16PM

11   BY MR. NOLAN:

12      Q.   It's your deposition.  I don't mean to cut

13   you off.

14      A.   I understand that.  Once again, I -- I as I

15   sit here today am only telling you the truth and to    02:16PM

16   the best of my ability and I do not have memory of

17   someone approaching me and telling me that someone

18   in Mattel has been copying a competitor's product.

19      Q.   Going back to the expert reports that you've

20   prepared under Richard N. De Anda & Associates,        02:16PM

21   Inc., in those instances where you've prepared

22   expert reports those expert reports would have

23   included a provision that talked about what your

24   background is in the field of security, correct?

25          MR. COREY:  Objection:  vague and compound.     02:16PM
                                                                 152
```

EXHIBIT _____ 11

PAGE _____ 297

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. NOLAN:
 2       Q.   Let me put it this way.  Do you include in
 3    your reports an area where you set forth the
 4    qualifications that you believe make you qualified
 5    to appear and testify as an expert?              02:17PM
 6       A.   Yes, I do.
 7       Q.   And in that section of qualifications you
 8    list your employment at Mattel, don't you?
 9       A.   I don't know if I refer to my curriculum
10    vitae or I refer to Mattel.                      02:17PM
11       Q.   But your curriculum vitae includes a
12    reference to your employment at Mattel, yes?
13       A.   Yes, it does.  And that's why I'm saying I'm
14    uncertain -- to answer your question as accurately
15    as possible, you're asking me if I include that in  02:17PM
16    my description that makes me an expert witness.  I
17    don't know that I identify Mattel but I know that my
18    curriculum vitae does have Mattel in it and I don't
19    know if I refer or have referred to my curriculum
20    vitae.  I may have.  I'm not certain.            02:18PM
21       Q.   As you sit here, do you recall ever being
22    asked to appear as a witness and a lawyer not asking
23    you, by the way, how are you qualified, Richard, to
24    be an expert?
25       A.   Asking me -- not asking me how I'm not     02:18PM
                                                           153
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    qualified?

 2        Q.    Yeah.   What makes you an expert?

 3              MR. COREY:   Objection:   vague.

 4    BY MR. NOLAN:

 5        Q.    In other words, you know, people when they    02:18PM

 6    call you up and say, hey, we want you as our expert,

 7    by the way, what makes you an expert, do you have

 8    those kind of conversations?

 9        A.    But to answer your first question, yes, I

10    have, actually.   There's all types of lawyers and       02:18PM

11    actually I have had lawyers especially when I'm

12    deposed not even enter into that area.

13        Q.    But have you ever concealed your employment

14    from Mattel from anybody that's asking you to serve

15    or provide consulting services to them either as an     02:19PM

16    expert or through Richard N. De Anda & Associates,

17    Inc.?

18        A.    No, I never have.

19        Q.    Are you familiar with the term sometimes

20    used it's called moonlighting?                           02:19PM

21        A.    Yes.

22        Q.    Now, while you were at the LAPD, officers,

23    patrol and detectives would from time to time

24    moonlight, correct?

25        A.    Yes.                                           02:19PM
                                                                  154
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   So we have a working definition of

 2   "moonlighting," what would you -- help me out.  What

 3   do you think the term "moonlighting" means?  It's

 4   not a pejorative term, correct?

 5      A.   Correct.                                    02:19PM

 6      Q.   Okay, I don't mean it to be a pejorative

 7   term.  Do you understand that?

 8      A.   I understand that.

 9      Q.   So just tell me what you would consider a

10   working definition for us in this deposition for    02:19PM

11   moonlighting.

12           MR. COREY:  Objection.  Generally or at

13   LAPD?

14           MR. NOLAN:  Generally.

15      Q.   I want to get to a definition that you and I 02:20PM

16   can work with in this deposition on moonlighting --

17   on the term "moonlighting."

18      A.   Yes.  The first question was at LAPD and Jon

19   said now you want to expand it to just moonlighting

20   in general?                                          02:20PM

21      Q.   Well, we we're going to do it both ways.

22   Because, you know, I've got you for some time.

23   Let's just break it up and be clear about it.

24           Moonlighting at LAPD, what was meant by that

25   term?                                               02:20PM
                                                            155
```

A. Working at not necessarily another capacity but working either for an employer or in a variety of capacities to earn money other than for the Los Angeles Police Department. So working somewhere else for compensation. 02:20PM

Q. Now, would you agree with me that -- okay. Let's build this a little bit differently.

Take it out of the realm of LAPD. Does moonlighting -- the term "moonlighting" take on a different connotation let's say in connection with 02:21PM the employment at Mattel? How would you describe moonlighting?

A. Basically the same. I think the distinction I make in moonlighting, and if I may qualify this, in my own opinion while I was with LAPD if -- if I 02:21PM was engaged in a protection detail that -- I think this is the most simplest way to identify this. If I was involved in a protection detail of some individual and receiving compensation for -- from that individual, which I have for my company at the 02:21PM time may have had for entertainment corporations who had functions or parties that needed armed off-duty LAPD, that would be provided to them, I would say that that is moonlighting.

If I built a house while I was working for 02:22PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    LAPD on my own and sold that house, I would not

2    necessarily classify that as moonlighting.  So

3    that's the distinction I want to make.

4         Q.   I understand.

5         A.   So I would say --                          02:22PM

6         Q.   So let me follow up on something if I might.

7    Were you finished?  Okay, go ahead, finish your

8    question -- your answer.

9         A.   So I would say the same issues apply as

10   moonlighting.  Basically I would classify what I am    02:22PM

11   doing on my second job as moonlighting.  If I -- my

12   other avenues of income I would not necessarily look

13   at it as investments or what have you as

14   moonlighting.

15        Q.   Right, but the work that you do as an expert  02:23PM

16   witness and also providing consulting services

17   through Richard N. De Anda & Associates, Inc., you

18   would agree with me is moonlighting, correct?

19        A.   In my opinion I would say yes.

20        Q.   Does your department investigate accusations  02:23PM

21   that Mattel employees are moonlighting?

22        A.   We could have.  We could have but I'm not

23   certain.  I can't recall a set of circumstances -- I

24   would say that's a very strong possibility that we

25   have over the years.                                  02:24PM
                                                              157

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    All right, hold that thought for just a

 2   minute.  Let me ask you a different question.

 3            I'm talking about you.  You're an at will

 4   employee, yes?

 5      A.    Yes.                                    02:24PM

 6      Q.    And what are your hours of employment?

 7      A.    That's a very interesting question.

 8            MR. COREY:  According to the handbook or

 9   practically worked?

10            MR. NOLAN:  I'm just asking him -- I thought 02:25PM

11   you were going to tell me that's a good question.

12   That would have been three.  That would have been

13   three today but --

14            MR. COREY:  I think that would have been

15   four.                                           02:25PM

16   BY MR. NOLAN:

17      Q.    Here's the question.  Let me be really clear

18   about this and I apologize.  I'm not trying to make

19   light of any of this --

20      A.    No, I understand.  I'm not either        02:25PM

21      Q.    -- nor be disrespectful to you.

22            Tell me what your hours of employment are at

23   Mattel.

24            MR. COREY:  Objection:  vague.

25            THE WITNESS:  It's not -- it's not a very 02:25PM
                                                        158
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    simple question to answer and I'll explain why.

 2    BY MR. NOLAN:

 3        Q.   Sure.

 4        A.   Because at Mattel as a Vice President with

 5    the approval of my supervisor and my workload I        02:25PM

 6    have, first of all, granted no vacation time,

 7    however, I can have as much vacation time as I want.

 8        Q.   That's a good thing, right?

 9        A.   No, it's a terrible thing.

10        Q.   You seemed anxious about that because I       02:26PM

11    could eliminate -- go ahead.

12        A.   I'm just trying to give you the best answer

13    I can.  There is no -- there is no scheduled hours

14    per se.  I choose to work 8:00 to 5:00 sometimes.

15    Sometimes I work 4:00 in the morning to 12:00 at       02:26PM

16    night.  Sometimes I come in at 10:00 depending and

17    will work until 4:00 or 3:00 or 2:00 depending.

18    There is -- what I try to do is to be consistent I

19    should say between 8:00 and 5:00.  That is never so.

20    It is usually -- my time is usually 7:00 to about      02:26PM

21    7:00, my time.

22        Q.   Okay.  So let's just take your consistent

23    pattern when you try to stay consistent and it's

24    from 7:00 in the morning until 7:00 --

25        A.   6:00 or 7:00 at night, yes, or even later.    02:27PM
                                                                159
```

EXHIBIT ____11____

PAGE ____304____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   So during that time that's Mattel time?

 2           MR. COREY:  Objection:  mischaracterizes the

 3      testimony.

 4           THE WITNESS:  During that time is usually

 5      time that I am at Mattel.  I do take home -- excuse    02:27PM

 6      me, I do take work home with me and I typically will

 7      work on the weekends on certain projects or tasks

 8      that I need to complete so -- and when I travel,

 9      which I do more than I care to, I work basically

10      24/7 and the same at home because it's a global       02:27PM

11      company and you're having calls constantly from

12      different regions of the world.  So I can't answer

13      it absolute to you.  I don't know what I'm going to

14      be doing next week but I know I'm not going to be

15      working 8:00 to 5:00.                                 02:28PM

16      Q.   Let me ask you this.  When you write your

17      expert reports --

18      A.   Yes.

19      Q.   -- are you on Richard N. De Anda &

20      Associates' time or are you on Mattel time?           02:28PM

21      A.   I'm on Richard De Anda's time.

22      Q.   How can you tell?

23      A.   Because I do it usually at house -- at my

24      home.  I mean, that's where I do it.  I do it at

25      home on the weekends before my wife wakes up.         02:28PM
                                                                  160
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   So whenever you can fit it in?

2      A.   Right.  And to help you understand what the

3   reports are, the reports are very simple.  It's

4   simply a form letter that I have that all I do is

5   change the address or the -- who I'm sending it to          02:28PM

6   and ship it out.  It takes me five minutes, if that.

7      Q.   But you still get to charge the

8   nonrefundable retainer, right?

9      A.   Absolutely, before I'm appointed.

10      Q.   Before you're appointed.  I understand.          02:28PM

11         So if I understand correctly, this idea of

12   whether or not when you're at home you're working

13   for Mattel or you're working for Richard N. De Anda

14   & Associates kind of gets blurred at times.  Would

15   you agree with me?                                          02:29PM

16         MR. COREY:  Objection: mischaracterizes the

17   testimony.

18         THE WITNESS:  It's not blurred at all.  I

19   know what I'm -- when I'm at home working for Mattel

20   it's typically the weekends or -- I don't -- for          02:29PM

21   instance, just to clarify to make sure there's a

22   clear understanding, I do not take a Wednesday off

23   and I'm working at home.  I'm at Mattel.  Working at

24   home for Mattel is typically the weekends, holidays.

25   For instance, Mattel is going on a hiatus starting          02:29PM
                                                                   161

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   next week.  I will be working at home with regards

2   to Mattel projects.  I probably won't come into the

3   office a few times during that hiatus.

4       Q.  But during that hiatus and/or a weekend if

5   there was an assignment for Richard N. De Anda &        02:29PM

6   Associates, Inc., you would feel free to work on

7   that project, correct?

8       A.  Yes, yes.

9       Q.  And you don't believe that Mattel owns or

10  has a claim to the work that you do for Richard N.     02:30PM

11  De Anda & Associates, Inc., correct?

12      MR. COREY:  Objection:  calls for a legal

13  conclusion.

14      THE WITNESS:  That is correct.

15      MR. NOLAN:  Okay, let's change tapes.            02:30PM

16  We're just going to change tapes.  Do you need to

17  take a restroom break?

18      THE WITNESS:  How did you know?

19      VIDEO OPERATOR:  We're off the record at

20  2:30.                                                  02:30PM

21                  (Brief recess.)

22      VIDEO OPERATOR:  The time is 2:42 p.m.  We

23  are back on the record.  This is tape No. 3 of the

24  deposition of Richard De Anda.  All parties may

25  continue.                                              02:43PM
                                                           162