**EXHIBIT 1**

CONFIDENTIAL                                          1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA


MATTEL, INC., a Delaware corporation, )   CASE NO.
                                      )   CV 04-9059 DDP (AJWx)
                 Plaintiff,           )
                                      )
          vs.                         )
                                      )
CARTER BRYANT, an individual, and     )
DOES 1 through 10, inclusive,         )
                                      )
                 Defendants.          )
_____ )
CARTER BRYANT, on behalf of himself,  )
all present and former employees of   )
Mattel, Inc., and the general public, )
                                      )
                 Cross-Complainant,   )
                                      )
          vs.                         )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
                 Cross-Defendant.     )


### VOLUME I

THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Thursday, November 4, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

EXHIBIT __1__

PAGE____5____

CONFIDENTIAL                                        2

A P P E A R A N C E S

For Plaintiff and                MR. JOHN B. QUINN
Cross-Defendant:                 MR. MICHAEL T. ZELLER
                                 MS. TANIA KREBS
                                 Quinn, Emanuel, Urquhart,
                                   Oliver & Hedges
                                 865 South Figueroa Street
                                 10th Floor
                                 Los Angeles, California 90017

For Defendants and               MR. DOUGLAS A. WICKHAM
Cross-Complainant:               Littler Mendelson
                                 2049 Century Park East
                                 5th Floor
                                 Los Angeles, California 90067

Also Present:                    Ms. Dale M. Cendali
                                 Mr. Michael Moore

Videotaped by:                   Mr. Donald Gifford
                                 Mr. Donald Gifford, II
                                 1528 East Glenwood
                                 Springfield, Missouri 65804

I N D E X

WITNESS:  CARTER BRYANT                            Page
Direct Examination by Mr. Quinn ..................   4
Notarial Certificate and Costs ...................  262

* * *

E X H I B I T S

DEPOSITION EXHIBIT         DESCRIPTION              IDENTIFIED
                            (NONE)

Phonetic spelling:   (Ph.)
Exactly as stated:   (Sic)

EXHIBIT __1__

PAGE __6__

<u>CONFIDENTIAL</u>                                          47

| | | |
|---|---|---|
| 1 | | Marlow? | 10:2 |
| 2 | A | Mr. Irmen. |
| 3 | Q | Irmen.  Thank you. |
| 4 | A | Actually, there were also Elise Cloonan and Ramona Prince. |
| 5 | Q | Elise Clooman? | 10:2! |
| 6 | A | Cloonan. |
| 7 | Q | Cloonan.  Anyone else? |
| 8 | A | That's all I can remember at this time. |
| 9 | Q | All right.  So the only people as far as your memory |
| 10 | | serves today that you showed the Bratz materials to prior | 10:29 |
| 11 | | to the time of your presentation to MGA in late August |
| 12 | | were Ms. Cloonan, Mr. Prince, Mr. Irmen, Veronica Marlow, |
| 13 | | and your mother; is that true? |
| 14 | A | And also Alaska Momma, who was an artist representative. |
| 15 | Q | I'm sorry? | 10:29 |
| 16 | A | Alaska Momma. |
| 17 | Q | Could you spell the last name, please. |
| 18 | A | I think it was M-O-M-M-A. |
| 19 | Q | Is that the total universe now of people -- |
| 20 | A | Yes. | 10:30 |
| 21 | Q | -- who you showed these materials to before the MGA |
| 22 | | meeting in late August? |
| 23 | | MR. WICKHAM:  Also the witness said that he |
| 24 | | believes that his mother had shown it to his father, so to |
| 25 | | the extent that that is indirect showing it to him, your | 10:30 |

EXHIBIT ___1___

PAGE___7___

CONFIDENTIAL                                          48

1         question is underinclusive.

2    Q    (By Mr. Quinn)  Have I now identified everybody who you

3         showed these materials to --

4    A    Yes.

5    Q    -- prior to the presentation to MGA in late August?

6    A    Yes.

7    Q    And who is Elise Cloonan?

8    A    She was a friend of mine.  She was also my roommate when

9         I -- when I moved back to California.

10   Q    When you moved back in -- at the end of 1998?

11   A    Yes.

12   Q    You roomed with her?

13   A    Yes.

14   Q    And where had you met her?

15   A    I met her at Mattel.

16   Q    And was she a Mattel employee at the time you showed this

17        to her?

18   A    Yes.

19   Q    Can you tell me when it was approximately that you showed

20        the Bratz materials to Elise Cloonan?

21   A    I think it was sometime in the spring.

22   Q    Sometime in the spring of 1999?

23   A    Yes.

24   Q    And what exactly was it that you showed her?

25   A    I showed her my template, my master drawings.

EXHIBIT ___1___

PAGE ___8___

CONFIDENTIAL                                              49

```
 1   Q   And can you describe those for us, please.                    10:3
 2   A   They were basically pen and ink drawings done on tracing
 3       paper.
 4   Q   And how many of them were there?
 5           MR. WICKHAM:  How many total drawings were                 10:3
 6       there or how many did he show to Ms. Cloonan?
 7           MR. QUINN:  I'm going to ask -- I'm going to
 8       ask both questions.  Thank you.
 9   Q   (By Mr. Quinn)  Take them in whichever order you like.
10   A   Okay.  I think there were about 13 drawings.                   10:31
11   Q   And did you show her all 13?
12   A   I don't recall.
13   Q   What was your purpose in showing these drawings to Elise?
14   A   I think I was just sharing some of my work that I had done
15       when I was in Missouri and that just happened to be one of    10:32
16       the things that I had done.
17   Q   Was this just something that you were sort of sharing with
18       a friend?
19   A   Yes.
20   Q   I mean, were you sharing it with her with the idea that,       10:32
21       you know, this is something that Mattel might want to pick
22       up and pursue?
23           MR. WICKHAM:  Objection, lacks foundation.
24   Q   (By Mr. Quinn)  Was that your purpose in sharing it with
25       her?                                                           10:32
```

EXHIBIT ___1___

PAGE ___9___

CONFIDENTIAL                                              244

1    some way in the marketplace?                                    04:35

2                  MS. CENDALI:  Objection.

3                  MR. WICKHAM:  Objection, lacks foundation,

4    calls for speculation, ambiguous.

5  A    Can you restate that question?                               04:35

6  Q    (By Mr. Quinn)  Did you think that Bratz -- part of the

7    reason you didn't present this to people was that you

8    thought that, well, people would regard it as detracting

9    from Barbie in the marketplace?

10                 MS. CENDALI:  Objection.                          04:35

11                 MR. WICKHAM:  Objection, lacks foundation,

12   calls for speculation, ambiguous.

13 A    I think I just thought that it would get lost within the

14   system, that it would be something that would never see

15   the light of day.                                               04:35

16 Q    (By Mr. Quinn)  He's scribbling.  Pause in proceedings.

17   And is that what you thought to yourself at the time,

18   that, you know, if I propose this, this will just get

19   lost?

20 A    Yes.                                                         04:36

21 Q    And this isn't something -- you thought to yourself this

22   isn't something that Mattel's going to be interested in?

23 A    That's right.

24 Q    Because of Barbie?

25 A    I think so, yes.                                             04:36

EXHIBIT ___1___

PAGE ___10___


CONFIDENTIAL                                      245

```
 1                    (Pause in proceedings.)                    04:36
 2    Q   (By Mr. Quinn)  So at Mattel did they have contests for
 3        doll -- non-Barbie dolls?
 4                    MR. WICKHAM:  Objection.
 5    Q   (By Mr. Quinn)  Do you recall that?                     04:36
 6                    MR. WICKHAM:  Asked and answered.
 7    A   I don't recall them ever having contests.
 8    Q   (By Mr. Quinn)  Prior to October 20th, 2000 --
 9    A   Yes.
10    Q   -- did you have a computer at home?                     04:37
11    A   I did eventually get a home computer, but I'm not sure
12        when I got it.  I don't know if it was prior to October
13        20th.
14    Q   But in around that time frame you did get a home computer?
15    A   Yes.                                                    04:37
16    Q   Do you recall what kind of computer it was?
17    A   It was just a regular PC.
18    Q   Is it true, sir, that you had never had a computer at home
19        before?
20    A   I never had one at my home.                             04:37
21    Q   Had you had one at home before that you used even if it
22        wasn't owned by you?
23    A   Yes.  I had -- well, when I was roommates with Elise
24        Cloonan she had a computer that I would use occasionally.
25    Q   Any others?                                             04:38
```

EXHIBIT  1

PAGE  11

CONFIDENTIAL                                        246

```
 1   A   When I lived with my parents in '98 they had a computer        04:38

 2       that I would use occasionally.

 3   Q   So do you still have the computer that you acquired in

 4       October of 2000 or thereabouts?

 5   A   I think it's been given to my niece.                           04:38

 6   Q   What is your niece's name?

 7   A   Brook Lind.

 8   Q   L --

 9   A   I-N-D.

10   Q   All right.  And where does she reside?                         04:38

11   A   She lives in Springfield.

12   Q   What are her parents' names?

13   A   Amber Telford and -- I'm sorry.  Amber Telford and Jerry

14       Lind.

15   Q   And how old is she?                                            04:38

16   A   She is -- let's see.  I think she's 23.

17   Q   Do you know whether she still has that computer?

18   A   I believe she does.

19   Q   Do you know whether anybody has looked at that computer to

20       see if there's any information on it relating to Bratz?       04:39

21            MR. WICKHAM:  Objection, attorney-client

22       privilege, attorney work product.  To the extent you have

23       any understanding from your attorneys, I instruct you not

24       to respond.

25   A   Okay.                                                          04:39
```

EXHIBIT ___1___

PAGE ___12___

CONFIDENTIAL                                    247

```
 1    Q   (By Mr. Quinn)  Put you in a pickle, huh?  Do you have      04:39
 2        anything you can tell me?
 3    A   About the computer?
 4    Q   Yeah, and as to whether anybody's looked at it.
 5               MR. WICKHAM:  Same objection, same               04:39
 6        instruction.
 7               THE WITNESS:  Can you repeat your objection,
 8        Doug?  I'm sorry.
 9               MR. WICKHAM:  If -- if you only have
10        information on that subject from your attorneys, then you   04:39
11        should not respond to the question.
12    A   Okay.  Then I'm not going to respond.
13    Q   (By Mr. Quinn)  And that's because of your lawyer's
14        instruction?
15    A   Yes.                                                    04:40
16    Q   What you know on that subject you learned from your
17        lawyers?
18    A   Yes.
19    Q   Other than this computer that you acquired in or about
20        October of 2000 in which you gave to your niece, have   04:40
21        you -- since you left Mattel have you owned any other
22        computers?
23    A   Yes.
24    Q   What other computers have you owned?
25    A   I currently own a laptop PC.                            04:40
```

EXHIBIT __1__

PAGE __13__

CONFIDENTIAL                                    248

1   Q   When did you acquire that?                                    04:40

2   A   I bought that in -- I think it was November of 2001.

3   Q   And you still use that one?

4   A   Yes.

5   Q   When was it that you gave the other computer to your         04:40

6       niece?

7   A   Oh, I think about a year ago.

8   Q   So we're talking November of 2003, roughly?

9   A   Roughly.

10  Q   Were there any other computers that you've owned since you   04:41

11      left Mattel?

12  A   No.

13  Q   Did you ever hear of the Zeus system at Mattel?

14  A   No.

15  Q   Is that a name you ever heard of?                            04:41

16  A   (Shakes head).

17  Q   Mr. Bryant, sir, the agreement that you signed with MGA

18      back on October 4th, 2000 --

19  A   Yes.

20  Q   -- did you read that agreement before you signed it?         04:42

21  A   Yes.

22  Q   Obviously it was acceptable to you?

23  A   There were some things in there that I had hoped to be

24      able to change.

25  Q   But on balance you decided it was an acceptable deal?        04:42

EXHIBIT ___1___

PAGE ___14___

CONFIDENTIAL
249

```
1    A    Yes.                                                        04:42
2    Q    And signed it?
3    A    Yes.
4    Q    Did you consider that your -- that agreement with
5         Mattel -- or, I mean, with MGA was unfair or unreasonable?  04:42
6    A    No.
7    Q    Did you ever sign any other agreement with MGA other than
8         that one that you signed on October 4th?
9              MR. WICKHAM:  I'm going to object and
10        instruct on confidentiality grounds presently.  I'll do    04:42
11        some research on that and tomorrow I may decide to remove
12        the instruction, but for the time being I will object and
13        instruct but I will revisit this issue tomorrow.
14   Q    (By Mr. Quinn)  Just to narrow down our focus here, did
15        you ever sign any other agreement relating to Bratz with   04:43
16        MGA other than that October 4, 2000, agreement?
17             MR. WICKHAM:  I'll have the same objection
18        and same instruction but also I will revisit that issue
19        tomorrow.
20   Q    (By Mr. Quinn)  Did you ever sign an agreement with MGA    04:43
21        which had a date on it which you knew was phony?
22             MS. CENDALI:  Objection.
23   A    No.
24   Q    (By Mr. Quinn)  Did you ever sign an agreement with MGA
25        relating to Bratz that, you know, you knew was            04:43
```

EXHIBIT ___1___

PAGE ___15___

CONFIDENTIAL                                    261

DEPONENT'S SIGNATURE PAGE

RE:  Mattel, Inc., vs. Carter Bryant, et al.
     Carter Bryant vs. Mattel, Inc.
     Case No. CV 04-9059 DDP (AJWx)
     Deposition taken on November 4, 2004

     I do hereby certify that the foregoing is a true and

correct transcript of the deposition in the foregoing-styled

and numbered cause, and I now sign the same as true and

correct, with the exception of the corrections which I have

noted on the correction sheet provided.

                         _____
                              CARTER BRYANT

     Subscribed and sworn to before me this __2nd__ day of

__March_____, 20_05_.

                         _____
                              Notary Public

My Commission Expires:

__Dec. 31, 2008__



CECILY THOMAS-MCKOY
Commission # 1539977
Notary Public - California
Los Angeles County
My Comm. Expires Dec 31, 2008

EXHIBIT ___1___
PAGE ___16___

<u>CONFIDENTIAL</u>                                          262

NOTARIAL CERTIFICATE

STATE OF MISSOURI      )
                       )  ss.
COUNTY OF GREENE       )


          I, Sherrie L. Hunt, Certified Court Reporter, and
Notary Public within and for the State of Missouri, do
hereby certify that on November 4, 2004, pursuant to Notice,
the above witness, CARTER BRYANT, was by me first duly sworn
to testify the truth, the whole truth, and nothing but the
truth in the case aforesaid; and that the deposition by him
was reduced to writing by me in stenotype, and thereafter
transcribed by me, and is fully and accurately set forth in
the preceding pages; that presentment by me to the witness for
signature was waived; and that the deposition will be
thereafter by the witness read, signed, and sworn to on or
before the date of trial.

          I do further certify that I am not related to, nor
attorney for, nor employed by any of the said parties, nor
otherwise interested in the event of said action.


            Sherrie L Hunt
            Notary Public            _____
            Greene County           Sherrie L. Hunt
            State of Missouri        Certified Court Reporter
      My Commission Expires May 17, 2005   C.C.R. Number 1027
                                     Notary Public


My commission expires:  May 17, 2005


Costs:   To Plaintiff and Cross-Defendant $1,399.25
         To Defendants and Cross-Complainant $422.65


            COURT REPORTERS OF THE MIDWEST, INC.
                     P.O. Box 4282
            Springfield, MO 65808 (417) 889-2079


EXHIBIT ___1___
PAGE ___17___

<u>Confidential; Subject to Protective Order</u>

CORRECTIONS TO THE DEPOSITION OF

CARTER BRYANT

VOLUME I

RE:   Mattel, Inc., vs. Carter Bryant, et al.
      Carter Bryant vs. Mattel, Inc.
      Case No. CV 04-9059 NM (RNBx)
      Deposition taken on November 4, 2004

| Page/Line | Change Requested |
|---|---|
| 86:5 | Delete: "I may have." Insert: "I don't recall." |
| 124:1 and 3 | Delete: "No." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 131:19 | Delete: "No, I did not." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 132:3 | Delete: "I don't remember telling anybody that, no." Insert: "Other than my communications with Universal, I don't recall telling anybody that." |
| 132:18 | Delete: "To the best of my recollection that's true." Insert: "To the best of my recollection, other than my communications with Universal, that's true." |
| 195:24 | Insert: "I also received expense reimbursements from MGA and an advance against royalties." |
| 252:24 | Delete: "No." Insert: "No. I interpreted your question as asking whether I was employed by MGA at that time and the answer is no." |
| 253:20 | Delete: "I don't remember that, no." Insert: "Other than my communications with Universal, I don't remember that." |
| 253:22 | Delete: "That – as far as I can remember that never happened." Insert: "Other than my communications with Universal, as far as I can remember, that never happened." |

EXHIBIT   1

PAGE   18

253:25                   Delete: "No." Insert: "Other than my communications with Universal, no that I remember."

2

EXHIBIT 1

PAGE 19

**EXHIBIT 2**

CONFIDENTIAL                                      264

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, )<br>      )<br>          Plaintiff,                )<br>      )<br>      vs.                           )<br>      )<br>CARTER BRYANT, an individual, and     )<br>DOES 1 through 10, inclusive,         )<br>      )<br>          Defendants.               ) | CASE NO.<br>CV 04-9059 DDP (AJWx) |

_____
CARTER BRYANT, on behalf of himself,  )
all present and former employees of   )
Mattel, Inc., and the general public, )
                                      )
          Cross-Complainant,          )
                                      )
      vs.                             )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
          Cross-Defendant.            )

VOLUME II

THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Friday, November 5, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.

COURT REPORTERS OF THE MIDWEST, INC.       EXHIBIT 2
              P.O. Box 4282
Springfield, MO 65808 (417) 889-2079       PAGE 20

CONFIDENTIAL                                                        265

A P P E A R A N C E S

For Plaintiff and            MR. JOHN B. QUINN
Cross-Defendant:             MR. MICHAEL T. ZELLER
                             MS. TANIA KREBS
                             Quinn, Emanuel, Urquhart,
                                Oliver & Hedges
                             865 South Figueroa Street
                             10th Floor
                             Los Angeles, California 90017

For Defendants and          MR. DOUGLAS A. WICKHAM
Cross-Complainant:          MS. DIBA RASTEGAR
                             Littler Mendelson
                             2049 Century Park East
                             5th Floor
                             Los Angeles, California 90067

Also Present:               Ms. Dale M. Cendali
                             Mr. Michael Moore

Videotaped by:              Mr. Donald Gifford
                             Mr. Donald Gifford, II
                             1528 East Glenwood
                             Springfield, Missouri 65804

I N D E X

WITNESS:  CARTER BRYANT                              Page

Direct Examination (Cont.) By Mr. Quinn .........    267

Notarial Certificate and Costs .................    495

* * *

Phonetic spelling:  (Ph.)
Exactly as stated:  (Sic)

EXHIBIT _2_____

PAGE _21_____

CONFIDENTIAL                                    301

1   A   Yes.                                                              09:59

2   Q   And if I asked you the questions I asked you before about

3       when you put that date on there and why you did it, your

4       answers would be the same?

5   A   Yes.                                                             09:59

6   Q   That you just don't recall?

7   A   I don't recall.

8   Q   I'm going to guess about which was the evening -- I forgot

9       what you called it.  Evening fashion?

10  A   Evening fashion.                                                 10:00

11  Q   The one on -- the third one -- or the fourth one, 225, I'm

12      from Pasadena and that looks like a Rose Queen to me,

13      except for the bare midriff.  We wouldn't permit that, but

14      the evening fashion I would guess is 232, third to the

15      last page?                                                       10:00

16              MR. WICKHAM:  Are you going to start with

17      225?

18              MR. QUINN:  No.  I'm looking at 232.

19  A   That was a rough sketch of page 225, actually.

20  Q   (By Mr. Quinn)  All right.  Why don't you tell me which        10:00

21      are the ones that you refer to as evening fashion since

22      I'm not going to be able to guess this.

23  A   225 --

24  Q   Okay.

25  A   -- 228 and 232 is a rough sketch of the 225.                    10:01

EXHIBIT __2_____

PAGE __22_____

CONFIDENTIAL                                            302

1    Q   All right.  So those are the ones that are the evening          10:01

2        fashion --

3    A   Yes.

4    Q   -- in this collection?  And yesterday you told us that

5        you -- you know, between your first meeting with the MGA        10:01

6        representatives and your second meeting with the MGA

7        representatives you created four additional evening

8        fashion designs.  Do you recall telling us that?

9               MR. WICKHAM:  Objection, mischaracterizes

10       the witness's testimony.                                        10:01

11   A   No.  I think what I said was that I created them before

12       either of those meetings.

13   Q   (By Mr. Quinn)  All right.  You just added them to the

14       booklet?

15   A   Yes.                                                            10:01

16   Q   When did you create those evening fashion designs?

17   A   Those were created in 2000.

18   Q   And can you tell us when in 2000 they were created?

19   A   Sometime before the pitch.  I'm going to say maybe July.

20   Q   Can you tell us how many evening fashion designs in total       10:02

21       you created in the year 2000?

22   A   There were four.

23   Q   So we've got two of them here?

24   A   Yes.

25   Q   And a third, which is a prior rendering of one of the           10:02

EXHIBIT __2__

PAGE __2-3__

CONFIDENTIAL                                            303

| | | |
|---|---|---|
| 1 | | other two? | 10:02 |
| 2 | A | Right. |
| 3 | | MR. QUINN:  Do you got anything else? |
| 4 | Q | (By Mr. Quinn)  I said we're going to look at documents. |
| 5 | | I'll ask the reporter to mark as Exhibit 4 another | 10:02 |
| 6 | | collection of drawings bearing Bates numbers Bryant 238 |
| 7 | | through 261.  Can you identify Exhibit 4 for us? |
| 8 | A | Yes.  These were drawings that I created after I had left |
| 9 | | Mattel's employment.  Some of them were created in |
| 10 | | December and some of them were created in January, I | 10:03 |
| 11 | | believe. |
| 12 | Q | December 2000 and January 2001? |
| 13 | A | Yes. |
| 14 | Q | Is Exhibit 4 a -- is this a copy of a particular |
| 15 | | collection of drawings that you created or are these just | 10:03 |
| 16 | | more random drawings from a certain time period? |
| 17 | A | These are rather random drawings.  Some of them are |
| 18 | | drawings that I had done for the package design.  Some of |
| 19 | | them are drawings that I had done for a presentation that |
| 20 | | Paula was giving. | 10:04 |
| 21 | Q | Paula was giving to who? |
| 22 | A | I don't recall.  I think an internal sales meeting. |
| 23 | Q | So you had different purposes in doing different of these |
| 24 | | drawings? |
| 25 | A | Yes. | 10:04 |

EXHIBIT ___2___

PAGE ___24___

CONFIDENTIAL                                    458

1    not interrupt me in the middle of my speaking.          03:51

2              MR. ZELLER:  You were interrupting me.

3              MR. WICKHAM:  You were being extremely rude,

4    Counsel, and unprofessional.

5              MR. ZELLER:  The unprofessional behavior,     03:51

6    Counsel, is this tantrum --

7              MR. WICKHAM:  You're interrupting me again,

8    Mr. Zeller.

9              MR. ZELLER:  -- that is being thrown by

10   MGA's counsel because we will not run out there and copy 03:51

11   two pages for her.

12             MR. WICKHAM:  Mr. Zeller, you're

13   interrupting me again.  I'd ask that you refrain from

14   doing to.  With regard to the agreement, I sat in Ms.

15   Torres's conference room where you had agreed that MGA   03:51

16   would be attending the deposition.  Well, Mr. Quinn and

17   Mr. Zeller have decided to walk away.  We're off the

18   record.

19             MR. ZELLER:  We're trying to discuss

20   something substantive as opposed to listening to your   03:51

21   speeches.

22             (Break in proceedings.)

23             VIDEOGRAPHER:  Back on the record.  Time's

24   4:02.

25   Q    (By Mr. Quinn)  I wanted to ask you about one of these  04:02

EXHIBIT ___2___

PAGE ___25___

CONFIDENTIAL                                    459

1    original drawings that were produced today.

2              MR. QUINN:  I assume you don't want us

3    marking them as exhibits, so maybe we can come up with

4    some other way of identifying exactly what we're talking

5    about.

6              MR. WICKHAM:  I believe that there's

7    Post-its on them that have the Bates numbers from which --

8    to which they correspond.

9    Q   (By Mr. Quinn)  And, actually, maybe we can just hold this

10   up, if you could hold it up in front of the camera, there

11   will then be no mistaking about --

12             MR. QUINN:  Can you see that?

13   Q   (By Mr. Quinn) -- what we're talking about here.  This

14   is -- the Post-it says that's Bryant -- that's the

15   original of Bryant 192, Bates number 192, which has the

16   heads on it, and this is one of the originals that your

17   counsel was kind enough to have shipped here today for us

18   to look at.

19   A   Yes.

20   Q   And we were just looking at these this afternoon and we

21   notice that there's a bunch of holes on the page,

22   including in the signature, as if somebody were taking ink

23   samples.

24   A   Uh-huh.

25   Q   Do you see that?

EXHIBIT ___2___

PAGE ___26___

CONFIDENTIAL

460

1   A   Yes.

2   Q   Do you know anything about why those holes were made or

3   how or when?

4   A   I have no idea what those are.

5   Q   I mean, when you had -- when you had possession of this

6   document did it have those holes in it?

7   A   Not that I remember.

8   Q   You certainly never had anything to do with that?

9   A   No.  I don't know anything about those holes.

10   Q   And, similarly, if you wouldn't mind holding this up to

11   the camera, this is the original of Bryant 210 and it's

12   also -- if you take a look at it, I think you'll see it

13   has some of those holes in it, although not as many as the

14   last one we looked at.  Again, you don't know anything

15   about how or why those holes got put on there?

16   A   I don't.

17             MR. WICKHAM:  Please be sure that they get

18   back in the right place.

19             MR. QUINN:  Okay.  Can we go to the next

20   exhibit in order.

21   Q   (By Mr. Quinn)  Mark as Exhibit 15 an agreement with a

22   heading of "MGA Entertainment" dated as of September 18th,

23   2000.  Let me ask you if it is a copy of the agreement

24   that you entered into with MGA.

25   A   Yes.

04:08
04:08
04:03
04:04
04:04
04:05

EXHIBIT ___2___

PAGE___27___

CONFIDENTIAL                                461

```
 1    Q    And this, for the record, bears Bates numbers Bryant 794    04:05
 2         through 799, and I take it on the last page that's your
 3         signature.  Is it, sir?
 4    A    Yes, it is.
 5    Q    And before you signed this document, obviously you read    04:05
 6         it?
 7    A    Yes.
 8    Q    You understood it?
 9    A    I think I understood it once I had some legal counsel on
10         it.                                                         04:05
11    Q    But do you recall that when you first read it through
12         there were some terms in there that confused you?
13    A    I think there were, yes.
14    Q    And what were those?
15    A    I don't --                                                  04:05
16              MS. CENDALI:  Objection.
17    A    I don't remember exactly what the terms were that confused
18         me, but, I mean, I'm not a lawyer, so reading this over
19         was just sort of generally confusing.
20    Q    (By Mr. Quinn)  All right.  For example, sir, if you look   04:05
21         under "ownership," paragraph 3, little A on the first
22         page --
23    A    Yes.
24    Q    I'll just read that first sentence to you.  It says, all
25         rights and proceeds of the services provided by Bryant     04:06
```

EXHIBIT  2

PAGE  28

CONFIDENTIAL                                                    494

DEPONENT'S SIGNATURE PAGE


RE:  Mattel, Inc., vs. Carter Bryant, et al.
     Carter Bryant vs. Mattel, Inc.
     Case No. CV 04-9059 DDP (AJWx)
     Deposition taken on November 5, 2004


     I do hereby certify that the foregoing is a true and
correct transcript of the deposition in the foregoing-styled
and numbered cause, and I now sign the same as true and
correct, with the exception of the corrections which I have
noted on the correction sheet provided.

                          _____
                               CARTER BRYANT


     Subscribed and sworn to before me this  2nd  day of
_Mach_____, 2005.

                          _____
                               Notary Public


My Commission Expires:

_Dec. 31, 2008_           


EXHIBIT ___2___

PAGE ___27___

<u>CONFIDENTIAL</u>                                            495

NOTARIAL CERTIFICATE

STATE OF MISSOURI    )
                     )  ss.
COUNTY OF GREENE     )

     I, Sherrie L. Hunt, Certified Court Reporter, and Notary Public within and for the State of Missouri, do hereby certify that on November 5, 2004, pursuant to Notice, the above witness, CARTER BRYANT, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid; and that the deposition by him was reduced to writing by me in stenotype, and thereafter transcribed by me, and is fully and accurately set forth in the preceding pages; that presentment by me to the witness for signature was waived; and that the deposition will be thereafter by the witness read, signed, and sworn to on or before the date of trial.

     I do further certify that I am not related to, nor attorney for, nor employed by any of the said parties, nor otherwise interested in the event of said action.

Sherrie L. Hunt
Notary Public
Greene County
State of Missouri
My Commission Expires May 17, 2005

Sherrie L. Hunt
Certified Court Reporter
C.C.R. Number 1027
Notary Public

My commission expires:  May 17, 2005

Costs:  To Plaintiff and Cross-Defendant $1,344.45
        To Defendants and Cross-Complainant $430.85

COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

EXHIBIT 2
PAGE 30

**Confidential: Subject to Protective Order**

CORRECTIONS TO THE DEPOSITION OF

CARTER BRYANT

VOLUME II

---

RE:   Mattel, Inc., vs. Carter Bryant, et al.
      Carter Bryant vs. Mattel, Inc.
      Case No. CV 04-9059 NM (RNBx)
      Deposition taken on November 5, 2004

| Page/Line | Change Requested |
|-----------|------------------|
| 346:6 | Delete: "Yes, I believe I did." Insert: "I am not sure." |
| 422:14 | Add: "or August." after "June." |

EXHIBIT _____ 2 _____

PAGE _____ 31 _____

**EXHIBIT 3**

CONFIDENTIAL

497

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware corporation, )  CASE NO.
)  CV 04-9059 DDP (AJWx)
Plaintiff, )
)
vs. )
)
CARTER BRYANT, an individual, and )
DOES 1 through 10, inclusive, )
)
Defendants. )

CARTER BRYANT, on behalf of himself, )
all present and former employees of )
Mattel, Inc., and the general public, )
)
Cross-Complainant, )
)
vs. )
)
MATTEL, INC., a Delaware corporation, )
)
Cross-Defendant. )

VOLUME III
THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Monday, November 8, 2004,
at 10:27 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.

COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

EXHIBIT ___3___

PAGE ___32___

CONFIDENTIAL                                                    498

## A P P E A R A N C E S

For Plaintiff and    MR. JOHN B. QUINN
Cross-Defendant:     MR. MICHAEL T. ZELLER
           MS. TANIA KREBS
           Quinn, Emanuel, Urquhart,
            Oliver & Hedges
           865 South Figueroa Street
           10th Floor
           Los Angeles, California 90017

For Defendants and    MR. DOUGLAS A. WICKHAM
Cross-Complainant:    Littler Mendelson
           2049 Century Park East
           5th Floor
           Los Angeles, California 90067

Also Present:      ** Ms. Dale M. Cendali
          ** Mr. Michael Moore

Videotaped by:     Mr. Donald Gifford
           Mr. Donald Gifford, II
           1528 East Glenwood
           Springfield, Missouri 65804

** Not continuously present.


## I N D E X

WITNESS:  CARTER BRYANT       Page
Direct Examination (Cont.) By Mr. Quinn .......... 500
Notarial Certificate and Costs ................... 727

* * *


ANSWERS REQUESTED TO BE MARKED:  PAGE  LINE
             646   4
             646   15


Phonetic spelling:  (Ph.)
Exactly as stated:  (Sic)

EXHIBIT __3__

PAGE __33__

CONFIDENTIAL                                              526

1   handbook?                                                    11:05

2   A   I think we were.

3   Q   In this orientation session?

4   A   Yes.

5   Q   Do you recall anything else that you were given besides an   11:05

6       employee handbook and these forms?

7   A   I don't recall.

8   Q   Between the time that you had started as a temporary

9       employee and the time of this orientation, had you

10      received any other kinds of forms that they wanted you to   11:05

11      sign relating to employment at Mattel?

12  A   Not that I can recall.

13  Q   Or any other literature relating to employment at Mattel

14      during that time period?

15              MR. WICKHAM:  Objection, vague, ambiguous.          11:05

16  A   Not that I can recall.  I hate to ask for a break so early

17      in the session, but could we take a break for just a

18      moment?

19  Q   (By Mr. Quinn)  Sure.

20  A   Okay.  Thank you.

21              VIDEOGRAPHER:  Off the record.  Time's              11:06

22      11:06.

23              (Break in proceedings.)

24              VIDEOGRAPHER:  We're back on the record.

25      Time is 11:19.                                             11:19

EXHIBIT ___3_____

PAGE ___34_____

CONFIDENTIAL                                                              527

1              MR. QUINN:  As I said when we were off the          11:19
2       record, I object to the length of the breaks.  The witness
3       said he needed to use the restroom and, of course, I have
4       no problem with that, but then counsel uses that to go
5       talk to him and woodshed him -- and woodshed him and --    11:19
6       for ten minutes and that's not helpful in trying to get
7       this deposition done expeditiously.
8    Q  (By Mr. Quinn)  Let me show you --
9              MR. WICKHAM:  One quick thing for the
10      record.  If I haven't already done so or if it's not clear  11:19
11      on the record, this deposition transcript also will be
12      entirely designated as confidential under the existing
13      protective order in this case.
14   Q  (By Mr. Quinn)  Let me show you a page from Exhibit 5, Mr.
15      Bryant.                                                     11:20
16   A  Uh-huh.
17   Q  It's Bates number Bryant 278.  We looked at that --
18   A  Yes.
19   Q  -- last Friday, and you told me that -- that image there
20      was used in creating the second sculpt for the Bratz.  Do  11:20
21      you recall that?
22   A  Yes.
23   Q  And I think you told me that's something that you wrote
24      and that you then gave to Margaret Leahy?
25   A  I illustrated this, yes.                                    11:20

                                                    3

CONFIDENTIAL                                              528

1    Q    Illustrated it as opposed to wrote?                        11:20

2    A    Some of the writing that's on this page is not mine.

3    Q    Okay.  But the drawing of the figure there is -- that's

4         something you drew?

5    A    Yes.                                                        11:20

6    Q    And to guide her in her sculpting?

7    A    Yes.

8    Q    And that became the -- that was used for the second sculpt

9         of Bratz?

10   A    Yes.                                                        11:20

11   Q    Which became the final sculpt?

12              MR. WICKHAM:  Objection, lacks foundation,

13        mischaracterizes the witness's testimony.

14   A    This was the closest drawing that I had done to what

15        became the final sculpt, yes.                              11:21

16   Q    (By Mr. Quinn)  I mean, the sculpt that was created from

17        this drawing, did that become the final sculpt?

18   A    To the best of my knowledge.

19   Q    It did?

20   A    Yes.                                                        11:21

21   Q    All right.  Let me show you a photograph and we will mark

22        this as --

23              MR. QUINN:  What are we up to?  Does anybody

24        remember?

25   Q    (By Mr. Quinn)  I guess this would be Exhibit 19.  I'm     11:21

EXHIBIT ___3___

PAGE ___36___

CONFIDENTIAL                                                529

```
 1          going to hand you a document -- three-page document        11:21
 2          bearing Bates numbers MGA 7 through 9 --
 3     A    Okay.
 4     Q    -- which we're marking as Exhibit 19, and if you would
 5          take a look at the last page, MGA 9 --                     11:22
 6     A    Yes.
 7     Q    -- and the question I'd ask you is whether that is --
 8          appears to you to be images of the -- what we've referred
 9          to as the second sculpt of Bratz?
10               MR. WICKHAM:  Objection, lacks foundation,            11:22
11          calls for speculation.
12     A    I believe this was the second sculpt in progress.
13     Q    (By Mr. Quinn)  Were there any -- when you say it's in
14          progress, you're indicating to us that that's not the
15          final version of the second sculpt?                       11:22
16     A    No, it was not.
17     Q    And how can you tell that?
18     A    I can tell because it looks to me as though the hands were
19          not finished.  We ended up not using this ball joint
20          configuration in the leg, so the torso was slightly       11:23
21          resculpted, and I believe the legs were resculpted.
22     Q    So are those the only differences between what we're
23          looking at here on this page MGA 9 and what became the
24          final sculpt?
25               MR. WICKHAM:  Objection, lacks foundation.            11:23
```

EXHIBIT ___3___

PAGE___37___

CONFIDENTIAL                                        542

| | | | |
|---|---|---|---|
| 1 | Q | Were you asked to sign any agreements with the company? | 11:40 |
| 2 | | MR. WICKHAM:  Objection, lacks foundation. | |
| 3 | A | I don't recall. | |
| 4 | Q | (By Mr. Quinn)  One way or the other? | |
| 5 | A | No. | 11:40 |
| 6 | Q | Did you read the materials -- I mean, we've talked about | |
| 7 | | the benefits.  Were there other documents that were not | |
| 8 | | related to benefits that you were given? | |
| 9 | | MS. CENDALI:  Objection, asked and answered. | |
| 10 | A | There may have been. | 11:41 |
| 11 | Q | (By Mr. Quinn)  You just don't recall? | |
| 12 | A | I don't recall. | |
| 13 | Q | So if I asked you if you read anything else, you wouldn't | |
| 14 | | really recall? | |
| 15 | | MR. WICKHAM:  Objection, lacks foundation. | 11:41 |
| 16 | A | No, I wouldn't. | |
| 17 | Q | (By Mr. Quinn)  And you recall no other occasion during | |
| 18 | | this first period of your employment at Mattel where you | |
| 19 | | were asked to sign any agreements or documents; is that | |
| 20 | | true? | 11:41 |
| 21 | A | I'm sorry.  What -- what was your question? | |
| 22 | Q | Yeah.  Still focusing on the first -- the first period of | |
| 23 | | your employment -- | |
| 24 | A | Yes. | |
| 25 | Q | -- with Mattel.  You don't recall any other occasion | 11:41 |

EXHIBIT  3
PAGE  38

·CONFIDENTIAL                              543

```
 1    during that first period where you were asked to sign any        11:41

 2    documents or agreements?

 3                 MR. WICKHAM:  Objection, asked and answered,

 4    compound --

 5  A  I don't.

 6                 MR. WICKHAM:  -- lacks foundation.

 7                 THE WITNESS:  Sorry.

 8  A  I don't recall any other times.

 9  Q  (By Mr. Quinn)  Did you maintain the documents you got

10    relating -- let me withdraw that.  Did you -- when you            11:42

11    left that orientation session that day, did you take with

12    you copies of any of the materials that you had received?

13  A  I don't remember.

14  Q  One way or the other?

15  A  No.                                                              11:42

16  Q  Do you recall whether or not they gave you copies of any

17    of the documents you had received or signed?

18  A  I don't remember.

19  Q  Again, one way or the other?

20  A  No.                                                              11:42

21  Q  Do you recall that you maintained a collection or file

22    somewhere at your home or at work of things that you had

23    received relating to your employment at Mattel?

24                 MR. WICKHAM:  Objection, ambiguous,

25    overbroad, vague as to time.                                      11:42
```

EXHIBIT ___3___

PAGE___39___

CONFIDENTIAL                                                  544

| | | | |
|---|---|---|---|
| 1 | A | I don't recall if I did or not. | 11:42 |
| 2 | Q | (By Mr. Quinn)  Who was your supervisor during your -- the | |
| 3 | | first period of your employment at Mattel? | |
| 4 | A | Cassidy Park. | |
| 5 | Q | And was she your supervisor during the entire first | 11:43 |
| 6 | | period? | |
| 7 | A | Yes. | |
| 8 | Q | What projects did you work on under her direction? | |
| 9 | A | Oh, gosh.  Well, there were a number of projects.  There | |
| 10 | | was Teen Skipper.  There was an Avon Barbie project. | 11:43 |
| 11 | | There was a Bicyclin' Stacie project.  There were a lot of | |
| 12 | | projects.  There was a cowboy project.  Oh, gosh.  That's | |
| 13 | | all I can remember off the top of my head right now. | |
| 14 | Q | What was your role -- just to pick one of these -- in | |
| 15 | | the -- since I like bicycling -- the Bicyclin' Stacie | 11:44 |
| 16 | | project? | |
| 17 | A | What was my role? | |
| 18 | Q | (Nods head). | |
| 19 | A | Basically just to take the idea and design the costumes | |
| 20 | | and kind of come up with some of the -- | 11:44 |
| 21 | | MR. QUINN:  Excuse you. | |
| 22 | A | -- come up with some of the colors for the bicycles, come | |
| 23 | | up with their hairstyles. | |
| 24 | Q | (By Mr. Quinn)  Who is Stacie?  Is Stacie -- I hate to | |
| 25 | | reveal my ignorance, but is she a Barbie sidekick or -- | 11:44 |

EXHIBIT   3
PAGE   40

CONFIDENTIAL                                    545

1   A   She is, like, Barbie's little sister or something.          11:44

2   Q   Okay.  And when you were given that assignment, I mean,

3       basically what did -- what did they ask you to do?

4   A   Well, basically what they would ask me to do was to take

5       the assignment and, as I said, come up with the costume,   11:45

6       come up with the hairstyles, work with the model maker to

7       make it so that the doll could actually ride on the bike,

8       and when she would ride the bike, her legs would look like

9       they were pedaling.  That's about all I can remember.

10  Q   You began by saying that you would take the assignment.     11:45

11      What I'm trying to understand exactly is in broad terms

12      what it means when you get the assignment.

13  A   Uh-huh.

14              MS. CENDALI:  Asked and answered.

15  Q   (By Mr. Quinn)  What does that mean?                        11:45

16  A   Basically it means here's the assignment, here are your

17      parameters, now complete the project.

18  Q   And the assignment would be the description of those

19      different tasks that you just told us, the hair, the

20      colors for the bike, the clothes or whatever?               11:46

21  A   Yes.

22  Q   You said you would work with the model maker.  What's

23      involved in that?

24  A   When we would work with the model maker, the model maker

25      would be the one who would kind of come up with the very    11:46

EXHIBIT ___3___

PAGE ___41___

CONFIDENTIAL                                                          726

DEPONENT'S SIGNATURE PAGE

RE:  Mattel, Inc., vs. Carter Bryant, et al.
     Carter Bryant vs. Mattel, Inc.
     Case No. CV 04-9059 DDP (AJWx)
     Deposition taken on November 8, 2004

        I do hereby certify that the foregoing is a true and

correct transcript of the deposition in the foregoing-styled

and numbered cause, and I now sign the same as true and

correct, with the exception of the corrections which I have

noted on the correction sheet provided.

                        _____
                                CARTER BRYANT


        Subscribed and sworn to before me this _2nd_ day of

_March_____, 20_05_.

                        _____
                                Notary Public


My Commission Expires:

_Dec. 31, 2008_____



EXHIBIT ___3_____

PAGE _____42_____

**CONFIDENTIAL**                                                     727

NOTARIAL CERTIFICATE


STATE OF MISSOURI      )
                       )  ss.
COUNTY OF GREENE       )


     I, Sherrie L. Hunt, Certified Court Reporter, and Notary Public within and for the State of Missouri, do hereby certify that on November 8, 2004, pursuant to Notice, the above witness, CARTER BRYANT, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid; and that the deposition by him was reduced to writing by me in stenotype, and thereafter transcribed by me, and is fully and accurately set forth in the preceding pages; that presentment by me to the witness for signature was waived; and that the deposition will be thereafter by the witness read, signed, and sworn to on or before the date of trial.

     I do further certify that I am not related to, nor attorney for, nor employed by any of the said parties, nor otherwise interested in the event of said action.


> Sherrie L. Hunt
> Notary Public
> Greene County
> State of Missouri
> My Commission Expires May 17, 2005

                     Sherrie L. Hunt
                     Certified Court Reporter
                     C.C.R. Number 1027
                     Notary Public


My commission expires:  May 17, 2005


Costs:  To Plaintiff and Cross-Defendant $1,243.65
        To Defendants and Cross-Complainant $420.00


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079


EXHIBIT ___3___

PAGE ___43___

**EXHIBIT  4**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

    Plaintiff,

  vs.

MATTEL INC., a
Delaware Corporation,

    Defendant.

No. C04-09049 SGL (RNBx)
Consolidated with
No. CV 04-09059
    CV 05-2727

**CERTIFIED**
**COPY**

_____

AND CONSOLIDATED ACTIONS.

_____

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF CARTER BRYANT

San Francisco, California

Wednesday, January 23, 2008

Volume 4

Reported by:
JODI L. BOSETTI
CSR No. 11316, RPR

JOB No. 81227

EXHIBIT ___4___

PAGE ___44___

1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                    EASTERN DIVISION

3

4    CARTER BRYANT, an individual,

5           Plaintiff,

6      vs.                        No. C04-09049 SGL (RNBx)
                                  Consolidated with
7    MATTEL INC., a              No. CV 04-09059
     Delaware Corporation,            CV 05-2727

8           Defendant.

9

10

12   AND CONSOLIDATED ACTIONS.

13

14

15       Deposition of CARTER BRYANT, Volume 4, taken

16   on behalf of Mattel, Inc., at 50 California Street,

17   22nd Floor, San Francisco, California, beginning at

18   12:05 p.m. and ending at 3:33 p.m., on Wednesday,

19   January 23, 2008, before JODI L. BOSETTI, Certified

20   Shorthand Reporter No. 11316.

21

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT  4

PAGE  45

CARTER BRYANT, V. 4                              01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    APPEARANCES:
 2
 3    For Mattel Corporation:
 4            QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
              BY:  JOHN QUINN
 5                 BRIDGET A. HAULER
                   MICHAEL T. ZELLER
 6            Attorneys at Law
              865 S. Figueroa Street, 10th Floor
 7            Los Angeles, California 90017-2543
              (213) 443-3000
 8
 9    For Carter Bryant:
10            KEKER & VAN NEST LLP
              BY:  MATTHEW M. WERDEGAR
11                 REBEKAH PUNAK
              Attorneys at Law
12            710 Sansome Street
              San Francisco, California 94111-1704
13            (415) 391-5400
14
      For MGA Corporation:
15
16            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
              BY:  MICHELLE M. CAMPANA
              Attorney at Law
17            Four Times Square
              New York 10036-6522
18            (212) 735-3000
19
      Videographer:
20
              RAY TYLER
21            SARNOFF COURT REPORTERS AND LEGAL
              TECHNOLOGIES
22            450 Sansome Street, Suite 1550,
              San Francisco, California 94111
23            (415) 274-9977
24
25
```

731

EXHIBIT ___4___

PAGE ___46___

12:09 1    A    I don't remember.

12:09 2    MR. QUINN:  We'd ask that those videotapes be

12:09 3  preserved.  We're going to need those.

12:09 4    MR. WERDEGAR:  I'll state an objection that I

12:09 5  think any such videotapes would constitute work

12:09 6  product, but obviously we can meet and confer about

12:09 7  that issue after this deposition.

12:09 8  BY MR. QUINN:

12:09 9    Q    Do you know where those videotapes are now?

12:09 10   A    No.

12:09 11   Q    Do you have copies of any?

12:09 12   A    No.

12:09 13   Q    Are you familiar with the computer program or

12:10 14  computer software called Evidence Eliminator?

12:10 15   A    Yes.

12:10 16   Q    And what is that?

12:10 17   MR. WERDEGAR:  Objection.  Lacks foundation.

12:10 18   THE WITNESS:  What I remember from that program

12:10 19  is that it was a -- some sort of a -- like a window

12:10 20  washer kind of a program, something that would help

12:10 21  your computer run faster, remove pop ups.

12:10 22  BY MR. QUINN:

12:10 23   Q    And where did you acquire that understanding

12:10 24  of what the software does?

12:10 25   A    I believe it was some kind of an Internet

738

EXHIBIT __4__

PAGE ___47___

12:10  1   advertisement or something that kind of explained what

12:10  2   it did.

12:10  3        Q    Is that how you learned about the existence

12:10  4   of Evidence Eliminator?

12:10  5        A    To the best of my recollection, yes.

12:10  6        Q    You read an advertisement on the Internet?

12:10  7        A    Something to that extent, yes.

12:10  8        Q    Did you acquire one or more copies of the

12:11  9   Evidence Eliminator software?

12:11 10        A    Yes.

12:11 11        Q    Was there a Readme file?

12:11 12        A    A Readme file?

12:11 13        Q    Yes.

12:11 14        A    I don't remember.

12:11 15        Q    Was there a file that you received that

12:11 16   described -- on the program that described what it was

12:11 17   and what it did?

12:11 18        A    I don't remember.

12:11 19        Q    Did you -- did you read on the Internet,

12:11 20   other than this advertisement that you saw, did you go

12:11 21   to a site and read some description of Evidence

12:11 22   Eliminator?

12:11 23        A    No.

12:11 24        Q    Did you ever install Evidence Eliminator on

12:11 25   any computer?

EXHIBIT    4

PAGE    48

12:11 1     A  Yes.

12:11 2     Q  What computer or computers did you install it

12:11 3  on?

12:11 4     A  I believe I installed it on one of my desktop

12:11 5  computers and also on one of my laptops.

12:11 6     Q  And it's your testimony that your reason for

12:11 7  doing this was just to make your computer run

12:12 8  smoother?

12:12 9     A  Yes.

12:12 10     Q  And what do you mean by that, making your

12:12 11  computer run smoother?

12:12 12    MR. WERDEGAR:  I'm going to object that that

12:12 13  misstates prior testimony.

12:12 14  BY MR. QUINN:

12:12 15     Q  Your turn.

12:12 16     A  My understanding was that it would just help

12:12 17  your Internet connections move faster, it would

12:12 18  restrict pop ups and unwanted ads.  Basically that's

12:12 19  kind of what my understanding was.

12:12 20     Q  And you learned that from reading the

12:12 21  advertisement?

12:12 22     A  Yes.

12:12 23     Q  Did it also come with some type of

12:12 24  instructions, either on the cover or anything, that

12:12 25  accompanied the software?

740

EXHIBIT __4__

PAGE __49__

```
12:12  1        MR. WERDEGAR:  Objection.  Assumes facts.
12:12  2        THE WITNESS:  I don't remember there being any
12:12  3   software.  I just remember downloading the program
12:12  4   from the Internet.
12:12  5   BY MR. QUINN:
12:12  6        Q    When was it that you installed this program
12:12  7   on those two computers?
12:12  8        MR. WERDEGAR:  Objection.  Compound.
12:13  9        THE WITNESS:  I believe it was in 2002.
12:13 10   BY MR. QUINN:
12:13 11        Q    Did you install it on both computers on
12:13 12   roughly the same time?
12:13 13        A    I don't remember.
12:13 14        Q    Well, do you recall there being some gap in
12:13 15   time between the time that you installed it on the
12:13 16   desktop and the time you installed it on the laptop?
12:13 17        A    I think there was a gap in time.
12:13 18        Q    Can you approximate how long that gap was?
12:13 19        A    No.
12:13 20        Q    Were you having problems with your computers
12:13 21   running smoothly at the time that you downloaded
12:13 22   Evidence Eliminator?
12:13 23        A    Yes.
12:13 24        Q    And can you describe what those problems
12:13 25   were?
```

EXHIBIT ___4___

PAGE ___50___

12:13  1        A    Mainly just that the connections were slow, I

12:13  2   was getting a lot of pop ups, a lot of spam.  So yeah,

12:13  3   I wanted to make my computer run more efficiently.

12:14  4        Q    Did it work?

12:14  5        A    Somewhat.

12:14  6        Q    Was it your understanding that Evidence

12:14  7   Eliminator would delete some information that was on

12:14  8   the computers?

12:14  9        A    I don't really recall.

12:14 10        Q    Did Evidence Eliminator delete some

12:14 11   information that was on the computers?

12:14 12        MR. WERDEGAR:  Objection.  Vague and ambiguous,

12:14 13   lacks foundation, and vague as to the term

12:14 14   "information."

12:14 15        THE WITNESS:  Yeah, what do you mean by

12:14 16   information?

12:14 17   BY MR. QUINN:

12:14 18        Q    Any type of data, any type of electronic data

12:14 19   that was on the hard drives of those computers.  Did

12:14 20   you find that after you ran the program, any type of

12:14 21   data had been eliminated?

12:14 22        MR. WERDEGAR:  Same objections.

12:14 23        THE WITNESS:  You know, I think there was data

12:15 24   that was eliminated.  I don't recall what data.

12:15 25   BY MR. QUINN:

EXHIBIT ___4___

PAGE ___81___

12:15 1      Q    That was going to be my next question.  You

12:15 2  have no recollection at all as to what data was

12:15 3  eliminated?

12:15 4      A    No.

12:15 5      Q    Was anything related to the Bratz doll

12:15 6  eliminated?

12:15 7      A    No.

12:15 8      Q    Is this one of those programs that you can

12:15 9  download on the Internet for free or was there a

12:15 10  charge for it?

12:15 11      A    I believe there was a charge for it.

12:15 12      Q    Do you recall what it was?

12:15 13      A    No.

12:15 14      Q    Do you recall how it was that you came across

12:15 15  this advertisement on the Internet?  For example, were

12:15 16  you looking for something that would help your

12:15 17  computer run smoother?

12:15 18      A    No.

12:15 19      Q    You don't recall how you came across it?

12:16 20      A    Well, I think that it was some kind of a --

12:16 21  it was either a pop-up ad or something that showed up

12:16 22  on the Internet, but I don't remember exactly.

12:16 23      Q    Well, do you recall that at the time you were

12:16 24  encountering these problems with your computer running

12:16 25  smoothly and you decided to see whether you could find

743

EXHIBIT 4

PAGE 52

12:16 1    something that could help address that problem?  Do

12:16 2    you have a recollection of that?

12:16 3        MR. WERDEGAR:  Objection.  Asked and answered,

12:16 4    misstates prior testimony.

12:16 5        THE WITNESS:  No, I wasn't actively looking for

12:16 6    anything.

12:16 7    BY MR. QUINN:

12:16 8        Q   So it would be your recollection that you

12:16 9    sort of came across this just by happenstance; is that

12:16 10   true?

12:16 11       THE WITNESS:  Yes.

12:16 12       MR. WERDEGAR:  Objection.  Misstates prior

12:16 13   testimony.  You can answer.

12:16 14       THE WITNESS:  That's true.

12:16 15   BY MR. QUINN:

12:17 16       Q   Did the title of the program, Evidence

12:17 17   Eliminator, did that give you any pause or concern in

12:17 18   deciding to use that program in order to make your

12:17 19   computer run more smoothly?

12:17 20       MR. WERDEGAR:  Objection.  Vague and ambiguous.

12:17 21       THE WITNESS:  I don't think I really thought

12:17 22   about it one way or another.

12:17 23   BY MR. QUINN:

12:17 24       Q   Do you recall having any concern that if you

12:17 25   ran this program called Evidence Eliminator, it might

744

EXHIBIT __4__

PAGE __53__

12:17 1    actually eliminate some data that was on your

12:17 2    computer?

12:17 3       A   I'm sorry, what now?

12:17 4       Q   Do you recall having any concern at the time

12:17 5    that if you ran this program called Evidence

12:17 6    Eliminator on your computer, it might actually

12:17 7    eliminate some data from the computer?

12:17 8       A   No.  I assumed that whatever data was being

12:17 9    deleted was basically just junk anyway.

12:18 10       Q   And what was the basis for that assumption?

12:18 11       A   I don't really remember.

12:18 12       Q   Did you talk to anyone -- before you

12:18 13    installed the program and ran it, did you talk to

12:18 14    anyone about the program?

12:18 15       A   No.

12:18 16       Q   Other than your attorneys, have you spoken to

12:18 17    anyone about the program since?

12:18 18       A   No.

12:18 19       Q   Now, you told me when we spoke before that

12:18 20    you gave the desktop to your niece in approximately

12:18 21    October of 2000.  Do you recall that?

12:18 22    MR. WERDEGAR:  Objection.  Misstates prior

12:18 23    testimony.

12:18 24    BY MR. QUINN:

12:18 25       Q   Well, what's your best recollection as to

EXHIBIT _4_

PAGE _54_

12:18 1    when you gave the desktop to your niece?  I thought it

12:18 2    was October of 2000, but correct me if I'm wrong.

12:19 3         A    No, that's when I bought the computer.

12:19 4         Q    That's when you bought it, okay.

12:19 5              And what would be your best recollection as

12:19 6    to when you gave it to your niece?

12:19 7         A    When did I give that to her?  I don't

12:19 8    remember right offhand.

12:19 9         Q    Can you tell me the year?

12:19 10        A    No.

12:19 11        Q    Well, let's see if we can ballpark it.  Can

12:19 12   you tell me approximately how long you had the desktop

12:19 13   after you had acquired it in October of 2000?

12:19 14        A    Well, I think that I had it for about two

12:19 15   years.

12:19 16        Q    So after roughly two years, you gave it to

12:19 17   your niece; is that true?

12:19 18        A    Well, I'm just -- I'm kind of estimating, but

12:19 19   I think it was something like that.

12:19 20        Q    After you gave that desktop to your niece,

12:20 21   did you ever use that desktop again?

12:20 22        A    No.

12:20 23        Q    Did you have access to it?

12:20 24   MR. WERDEGAR:  Objection.  Vague as to "access."

12:20 25   THE WITNESS:  Yeah, I am not sure what you mean

EXHIBIT ___4_____

PAGE ___55_____