DEPOSITION OF SAMIR K. KHARE

1    THE HEADING "TRANSFER," DO YOU SEE THE WORD

2    "ASSIGNMENT"?

3         A.    I DO.

4         Q.    WHAT'S YOUR UNDERSTANDING OF WHAT

5    THAT'S REFERRING TO?

6         A.    THAT'S SIMPLY A SPACE FOR ASSIGNMENT

7    INFORMATION TO BE RECORDED.

8         Q.    WHAT'S THE SIGNIFICANCE OF THE WORD

9    "ASSIGNMENT" IN THIS BOX HERE?

10        MS. TORRES:  OBJECTION; VAGUE, CALLS FOR A

11   LEGAL CONCLUSION.

12        THE DEPONENT:  I DON'T KNOW.

13   BY MR. ZELLER:

14        Q.    DO YOU HAVE ANY KNOWLEDGE OR

15   INFORMATION AS TO WHETHER OR NOT THIS INFORMATION

16   WHERE IT SAYS "ASSIGNMENT," IS TRUE AND CORRECT?

17        MS. TORRES:  OBJECTION; CALLS FOR A LEGAL

18   CONCLUSION.

19        THE DEPONENT:  I COULDN'T TELL YOU ONE WAY OR

20   ANOTHER IF THE ABSENCE OF INFORMATION IS CORRECT OR

21   INCORRECT.

22   BY MR. ZELLER:

23        Q.    I'M SORRY.  YOU CANNOT?

24        A.    NO.

25        Q.    MY STATEMENT IS CORRECT, YOU CANNOT?

257

EXHIBIT 13

PAGE 171

DEPOSITION OF SAMIR K. KHARE

1      A.      CORRECT.

2      Q.      DIRECTING YOUR ATTENTION TO THE LAST

3  PAGE OF EXHIBIT 507, YOU STATED, IN SUBSTANCE, THAT

4  THIS DRAWING WAS USED ON ARTWORK AT SOME POINT; IS

5  THAT CORRECT?

6      A.      YES.

7      Q.      WAS IT USED FOR ANYTHING ELSE?

8      A.      NOT TO MY KNOWLEDGE, NO.

9      Q.      WAS THIS DRAWING THAT'S HERE ON THE

10  LAST PAGE OF EXHIBIT 507 USED IN CONNECTION WITH THE

11  CREATION OF BRATZ DOLLS IN ANY WAY?

12      MS. TORRES:  OBJECTION; BEYOND THE SCOPE, CALLS

13  FOR SPECULATION.

14      THE DEPONENT:  NO.  THAT -- THAT'S SIMPLY

15  IMPOSSIBLE.  YOU CAN'T GO FROM A 2-D FLAT DRAWING TO

16  A 3-D DOLL.  YOU SIMPLY CAN'T.

17  BY MR. ZELLER:

18      Q.      AND WHAT'S THE BASIS FOR THAT

19  STATEMENT?

20      A.      WELL, JUST WORKING WITH DOLLS AND

21  COMPARING A DOLL TO THIS, THIS DOESN'T GIVE YOU ANY

22  DIMENSIONS AT ALL.  IF YOU RECALL THE -- THE PATENTS

23  THAT WE WERE LOOKING AT EARLIER, THERE WERE MULTIPLE

24  VIEWS AND ANGLES OF THOSE ITEMS.

25              SPECIFICALLY, THE DESIGN PATENTS, THEY

258

EXHIBIT ___13___

PAGE ___172___

1  SHOWED YOU DIFFERENT DIMENSIONS SO YOU CAN VISUALIZE

2  THE ITEM ON VARIOUS DIFFERENT AXES.  THIS IS A

3  VERY -- THIS IS A -- AS FLAT AS YOU CAN GET IN TERMS

4  OF THE DRAWING.  AND THERE'S NO WAY FOR YOU TO TAKE

5  THIS AND DETERMINE WHAT THE DIMENSIONS WOULD BE FOR

6  A THREE-DIMENSIONAL OBJECT.  YOU SIMPLY DON'T

7  CAPTURE ENOUGH DETAIL IN THIS.

8           THAT'S JUST ME OBSERVING.  I'M NOT AN

9  EXPERT HERE IN THE FIELD.  I'M NOT A DOLL EXPERT,

10  NOT EVEN AN ARTIST, BY ANY STRETCH OF THE

11  IMAGINATION.  BUT COMPARING INFORMATION WE'VE LOOKED

12  AT HERE TODAY, WHEN YOU'RE TRYING TO CAPTURE A

13  THREE-DIMENSIONAL OBJECT, YOU NEED MULTIPLE VIEWS OF

14  IT TO ACTUALLY UNDERSTAND THE -- THE DIFFERENT

15  DIMENSIONS.

16     Q.     IS IT THE CASE THAT YOU'RE TESTIFYING,

17  AS MGA'S REPRESENTATIVE WITH RESPECT TO THIS

18  COPYRIGHT REGISTRATION, THAT THE DOLLS WERE NOT

19  BASED, IN WHOLE OR IN PART, ON THIS DRAWING?

20     MS. TORRES:  I'M GOING TO OBJECT TO THE FORM OF

21  THE QUESTION IN THAT IT ASSUMES FACTS NOT IN

22  EVIDENCE AND MISCHARACTERIZES THE 30(B)(6)

23  DESIGNATION, BUT YOU CAN ANSWER.

24     THE DEPONENT:  THE DOLLS WERE NOT BASED ON THE

25  TWO-DIMENSIONAL ARTWORK.

                                                    259

EXHIBIT ___13___

PAGE ___173___

DEPOSITION OF SAMIR K. KHARE

```
1   BY MR. ZELLER:
2        Q.      IN ANY WAY?
3        A.      IN ANY WAY.
4        Q.      AND CORRECT ME IF I'M WRONG, BUT IT'S
5   YOUR TESTIMONY THAT THIS DRAWING WHICH IS HERE ON
6   THE LAST PAGE OF EXHIBIT 507, THAT THIS WAS USED FOR
7   THE PACKAGING ARTWORK IN CONNECTION WITH BRATZ?
8        A.      MY STATEMENT EARLIER WAS THAT THIS
9   DRAWING FORMED THE LOOSE BASIS FOR CHARACTER ART
10  WHICH IS DEVELOPED, SUBSEQUENTLY ENDED UP ON THE
11  PACKAGING.
12       Q.      AND FOR NOTHING ELSE?
13       A.      CORRECT.
14       Q.      I'LL SHOW YOU WHAT WAS PREVIOUSLY
15  MARKED AS EXHIBIT 508.  THIS IS A TWO-PAGE DOCUMENT.
16  IT IS A FORM CA FOR THE SASHA DRAWING REGISTRATION.
17            DO YOU RECOGNIZE WHAT WE MARKED AS
18  EXHIBIT 508?
19            (WITNESS EXAMINED A DOCUMENT.)
20       THE DEPONENT:  I DO.
21  BY MR. ZELLER:
22       Q.      IS THIS A CORRECTION FORM THAT MGA
23  SUBMITTED TO THE COPYRIGHT OFFICE ON OR ABOUT MARCH
24  28, 2005 AS IT PERTAINED TO THE REGISTRATION WE'VE
25  MARKED AS EXHIBIT 507?
```

260

EXHIBIT 173

PAGE 173.001

DEPOSITION OF SAMIR K. KHARE

1      A.     YES.   OUTSIDE COUNSEL PREPARED AND

2   SUBMITTED THIS DOCUMENT.

3      Q.     DIRECTING YOUR ATTENTION TO THE FIRST

4   PAGE OF EXHIBIT 508, DO YOU SEE IN FIELD B WHERE IT

5   SAYS THAT THE INCORRECT INFORMATION, THE "DATE OF

6   PUBLICATION OF FEBRUARY 12, 2001" AND THEN CORRECTS

7   IT TO SAY, QUOTE:  "AT LEAST AS EARLY AS MAY 21,

8   2001," END QUOTE?

9             DO YOU SEE THAT?

10     A.     I DO.

11     Q.     WHAT WAS THE BASIS FOR THE CORRECTION

12  HERE AS REFLECTED IN EXHIBIT 508 THAT THE DATE OF

13  PUBLICATION FOR THIS DRAWING, WHICH IS THE LAST PAGE

14  OF EXHIBIT 507, WAS PUBLISHED AT LEAST AS EARLY AS

15  MAY 21, 2001?

16     A.     THE BASIS FOR THAT CORRECTION IS FOUND

17  ON EXHIBIT 616, THE FIRST PAGE OF THAT.  THAT IS THE

18  SHIPMENT INVOICE DATE.

19     Q.     ANYTHING ELSE?

20     A.     NO.

21     Q.     DO YOU HAVE ANY KNOWLEDGE OR

22  INFORMATION AS TO HOW IT CAME TO MGA'S ATTENTION

23  THAT THE DATE OF PUBLICATION AS ORIGINALLY LISTED

24  WAS -- WAS INCORRECT?

25     MS. TORRES:  I'M GOING TO OBJECT AND INSTRUCT

261

EXHIBIT __13__

PAGE __173.002__

DEPOSITION OF SAMIR K. KHARE

1      MR. ZELLER:  -- WOULD BE AGREEABLE --

2      THE REPORTER:  PENALTY OF PERJURY?

3      MR. ZELLER:  -- TO GIVING MORE TIME.  BUT I

4  CAN'T POSSIBLY IMAGINE THAT THE WITNESS WOULD HAVE

5  ANYTHING ELSE TO DO.

6      THE VIDEOGRAPHER:  THIS IS THE END OF TAPE

7  NO. 5 AND MARKS THE CONCLUSION OF TODAY'S DEPOSITION

8  OF SAM KHARE.  THE TIME IS 9:27 P.M.  WE ARE OFF THE

9  RECORD.

10

11          (WHEREUPON, AT THE HOUR OF

12          9:27 P.M., THE PROCEEDINGS WERE

13          ADJOURNED.)

14                  -oOo-

15

16

17

18

19

20

21

22

23

24

25

                                                    429

EXHIBIT  13

PAGE  174

DEPOSITION OF SAMIR K. KHARE

1              DECLARATION OF DEPONENT

2

3        I CERTIFY UNDER PENALTY OF PERJURY UNDER THE

4    LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING

5    IS TRUE AND CORRECT.

6

7

8

9    EXECUTED _____, ON _____.
                   (PLACE)              (DATE)

10

11

12                           _____
                             (SIGNATURE OF DEPONENT)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              430

A & E COURT REPORTERS   (213) 955-0070   FAX:  (213) 955-0077

EXHIBIT 13

PAGE 175

```
 1   STATE OF CALIFORNIA      )
                              )    SS.
 2   COUNTY OF LOS ANGELES    )

 3

 4        I, PAMELA S. HARRIS, CERTIFIED SHORTHAND

 5   REPORTER, CERTIFICATE NO. 3909, FOR THE STATE OF

 6   CALIFORNIA, HEREBY CERTIFY:

 7             THE FOREGOING PROCEEDINGS WERE TAKEN

 8   BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH,

 9   AT WHICH TIME THE DEPONENT WAS PLACED UNDER OATH BY

10   ME;

11             THE TESTIMONY OF THE DEPONENT AND ALL

12   OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

13   RECORDED STENOGRAPHICALLY BE ME AND WERE THEREAFTER

14   TRANSCRIBED;

15             THE FOREGOING TRANSCRIPT IS A TRUE AND

16   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

17             I FURTHER CERTIFY THAT I AM NEITHER

18   COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION

19   NOR IN ANY WAY INTERESTED IN THE OUTCOME

20   THEREOF.

21             IN WITNESS WHEREOF, I HAVE HEREUNTO

22   SUBSCRIBED MY NAME THIS ___17___ DAY OF

23   September, 2007.

24

25                        _Pamela S. Harris_
                          PAMELA S. HARRIS, CSR NO. 3909
```

EXHIBIT __13__

PAGE __176__

**EXHIBIT 14**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
                              )
           PLAINTIFF, )
                              )    CASE NO.
     V. )    CV 04-9040 SGL (RNBX)
                              )
MATTEL, INC., A DELAWARE )
CORPORATION, ET AL., )
                              )
       DEFENDANTS. )
_____ )
                              )
AND CONSOLIDATED ACTION (S). )
_____ )

# C O N F I D E N T I A L

(THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL,
ATTORNEYS' EYES ONLY)

## DEPOSITION OF ISAAC LARIAN

## VOLUME II

## MARCH 26, 2008



REPORTED BY:
PAULA PYBURN
CSR NO. 7304
JOB NO. 08AE226-PP

COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT 14

PAGE 177

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| CARTER BRYANT, AN INDIVIDUAL, | ) ) ) | |
| | ) | CASE NO. |
| PLAINTIFF, | ) | CV 04-9049 SGL(RNBX) |
| | ) | |
| V. | ) | CONSOLIDATED WITH |
| | ) | CASE NO. 04-9059 |
| MATTEL, INC., A DELAWARE | ) | AND |
| CORPORATION, | ) | CASE NO. 05-2727 |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |
| | ) | |
| AND CONSOLIDATED ACTION(S) | ) | |
| _____ | ) | |

CONFIDENTIAL ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF ISAAC
LARIAN, VOLUME II, TAKEN ON BEHALF
OF MATTEL, INC., AT 10250
CONSTELLATION BOULEVARD, 19TH FLOOR,
LOS ANGELES, CALIFORNIA, COMMENCING
AT 9:34 A.M., WEDNESDAY, MARCH 26,
2008, BEFORE PAULA A. PYBURN, C.S.R.
7304, R.P.R., C.L.R.

261

EXHIBIT 14

PAGE 178

```
 1   APPEARANCES OF COUNSEL:
 2   FOR M.G.A. ENTERTAINMENT, INC.:
 3     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       BY:  THOMAS J. NOLAN, ESQ.
 4     300 SOUTH GRAND AVENUE
       LOS ANGELES, CALIFORNIA 90071-3144
 5     (213) 687-5000
       TNOLAN@SKADDEN.COM
 6
 7   FOR DEFENDANT MATTEL, INC.:
 8     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       BY:  MICHAEL T. ZELLER, ESQ.
 9             AND
       BY:  JON COREY, ESQ.
10             AND
       BY:  BRIDGET A. HAULER, ESQ.
11     865 SOUTH FIGUEROA STREET
       10TH FLOOR
12     LOS ANGELES, CALIFORNIA 90024
       (213) 443-3000
13     MICHAELZELLER@QUINNEMMANUEL.COM
       JONCOREY@QUINNEMMANUEL.COM
14     BRIDGETHAULER@QUINNEMMANUEL.COM
15
     FOR CARTER BRYANT:
16
       KEKER & VAN NEST LLP
17     BY:  CHRISTA MARTINE ANDERSON, ESQ.
            (PAGES 276 - 517)
18     710 SANSOME STREET
       SAN FRANCISCO, CALIFORNIA 94111
19     (415) 391-5400
       CANDERSON@KVN.COM
20
21   ALSO PRESENT:
22     STEVEN TOGAMI,
            J.T.V. LITIGATIONS SERVICES, INC.
23     JEANINE PISONI,
            GENERAL COUNSEL, M.G.A. ENTERTAINMENT, INC.
24
25
```

262

EXHIBIT _14_

PAGE _179_

```
1                          I N D E X
2
3    WITNESS:          EXAMINED BY:              PAGE:
4    ISAAC LARIAN
5                     MR. ZELLER                  265
6
7
     EXHIBITS FOR IDENTIFICATION:   (BOUND SEPARATELY)
8
     NUMBER:
9
     4941     EMAIL CHAIN, MGA 3805091, 1 PAGE    270
10
     4942     EMAIL CHAIN, MGA 3801558 AND        275
11            MGA 3801559, 2 PAGES
12   4943     EMAIL CHAIN, MGA 0143307 - MGA      288
              0143309, 3 PAGES
13
     4944     EMAIL CHAIN, MGA 0142614 -  MGA     296
14            0142616, 3 PAGES
15   4945     MGA PRIVILEGE LOG (REVISED)         477
              JANUARY 23, 2008, 242 PAGES
16
     4946     ISAAC LARIAN TOTAL INCOME PER TAX   498
17            RETURN YEARS 1999-2006,
              MGA 3787278, 1 PAGE
18
     4947     ISAAC AND ANGELA LARIAN NET WORTH   498
19            AS OF MARCH 14, 2005,
              MGA 3787275 - MGA 3787277 AND
20            MGA 3787279, 4 PAGES
21
22   QUESTIONS UNANSWERED BY WITNESS:
23
                       (NONE)
24
25
```

263

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT ___14___

PAGE ___180___

```
 1        LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 28, 2008

 2                            9:34 A.M.

 3

 4            THE VIDEO TECHNICIAN:  GOOD MORNING.  WE                    09:34:09

 5    ARE BACK ON THE RECORD AT 9:34 A.M.  TODAY'S DATE IS

 6    MARCH 26TH, 2008, THIS IS TAPE NO. 1 OF VOLUME II

 7    FOR THE CONTINUED DEPOSITION OF ISAAC LARIAN IN THE

 8    ACTION ENTITLED "CARTER BRYANT VS. MATTEL, INC.,"

 9    AND CONSOLIDATED CASES.

10            MAY WE PLEASE HAVE INTRODUCTIONS FOR THE             09:34:30

11    RECORD, BEGINNING WITH THE WITNESS.

12            THE WITNESS:  ISAAC LARIAN.

13            MR. NOLAN:  TOM NOLAN, SKADDEN ARPS, ON

14    BEHALF OF M.G.A. AND ISAAC LARIAN.

15            MS. PISONI:  JEANINE PISONI, GENERAL                 09:34:41

16    COUNSEL FOR M.G.A.

17            MR. ZELLER:  MIKE ZELLER FOR MATTEL.

18            MS. HAULER:  BRIDGET HAULER FOR MATTEL.

19            MR. COREY:  JON COREY ON BEHALF OF MATTEL.

20            THE REPORTER:  RAISE YOUR RIGHT HAND,                09:35:04

21    PLEASE.

22            DO YOU SOLEMNLY AFFIRM THE TESTIMONY YOU

23    ARE ABOUT TO GIVE IN THIS DEPOSITION SHALL BE THE

24    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

25            THE WITNESS:  I DO.                                  09:35:05
```

264

EXHIBIT 14

PAGE 181

EXAMINATION

BY MR. ZELLER:

1
2
3    Q.   GOOD MORNING.

4    A.   GOOD MORNING.

5    Q.   YOU HAVE OF COURSE BEEN THROUGH THIS                    09:35:07

6   PROCESS BEFORE, SO LET ME JUST GIVE YOU A VERY BRIEF

7   REMINDER THAT IF DURING THE COURSE OF THE DAY I ASK

8   YOU ANY QUESTION THAT IS UNCLEAR IN ANY WAY, JUST

9   PLEASE SPEAK UP AND I WILL BE HAPPY TO REPHRASE IT

10   OR WE CAN HAVE THE COURT REPORTER READ IT BACK.                09:35:22

11   A.   OKAY.

12   Q.   IN THE 2004 TIME PERIOD DID YOU SPEAK WITH

13   A JOURNALIST NAMED PALMERI?

14   A.   IT COULD BE POSSIBLE, I DON'T REMEMBER.

15   Q.   DO YOU RECALL TALKING WITH A BUSINESS WEEK               09:35:36

16   REPORTER ABOUT BRATZ AT SOME POINT?

17   A.   I DO.

18   Q.   AND I APOLOGIZE, I ACTUALLY SAID 2004, I

19   MEANT 2003, SO LET ME CLEAR SOMETHING UP.

20        DO YOU RECALL SPEAKING WITH A BUSINESS WEEK              09:35:46

21   REPORTER IN THE 2003 TIME PERIOD?

22   A.   I DON'T REMEMBER WHEN I SPOKE TO HIM.

23   Q.   DO YOU RECALL THERE BEING AN ARTICLE THAT

24   CAME OUT IN BUSINESS WEEK ABOUT BRATZ IN THE 2003

25   TIME PERIOD?                                                   09:36:02

265

EXHIBIT __14__

PAGE __182__

```
 1    BY MR. ZELLER:
 2        Q.   I'M SORRY, DID YOU ANSWER?
 3        A.   I DIDN'T EVEN HEAR YOUR QUESTION.
 4             MR. ZELLER:   OH.  SORRY.
 5             IF YOU CAN READ IT BACK, PLEASE.              01:46:47
 6             (THE RECORD WAS READ BY THE COURT
 7             REPORTER AS FOLLOWS:
 8             "Q.   WAS IT YOUR UNDERSTANDING THAT
 9             IF MR. BRYANT DID THOSE DRAWINGS
10             DURING THE TIME PERIOD WHEN HE WAS
11             EMPLOYED BY MATTEL THAT THEY BELONG
12             TO MATTEL?")
13             THE WITNESS:  NO.
14             MR. NOLAN:   SAME OBJECTIONS.
15             THE WITNESS:  NO.                             01:47:04
16    BY MR. ZELLER:
17        Q.    THEN WHY WAS IT OF ANY INTEREST TO YOU AS
18    TO WHEN THE DRAWINGS WERE CREATED?
19        A.    BECAUSE KNOWING THE HISTORY OF MATTEL, THEY
20    WILL USE ANY EXCUSE WHATSOEVER TO SUE PEOPLE, AND I    01:47:16
21    DIDN'T WANT TO BE IN A LAWSUIT WITH MATTEL, AND YET
22    HERE I AM.
23        Q.    IS IT TRUE THAT AS OF THE TIME THAT CARTER
24    BRYANT MADE HIS INITIAL PRESENTATION TO YOU IN 2000
25    THAT YOU WERE CONCERNED THAT MATTEL WOULD SUE OVER     01:47:36
```

437

EXHIBIT ___14___

PAGE ___183___

1   BRATZ?

2       A.   YEAH, I'M -- EVERYBODY IN THE TOY INDUSTRY

3   IS AFRAID THAT WHEN IS MATTEL GOING TO HIRE QUINN

4   EMANUEL TO SUE THEM AGAIN.

5           MR. NOLAN:   THAT'S FREE ADVERTISING, MIKE.          01:47:51

6           THE WITNESS:   EXACTLY.   YOU CAN PUT IT ON

7   YOUR WEBSITE.

8           MR. NOLAN:   OH, YOU CAN TAKE THAT OUT OF

9   THAT PORTION OF THE TRANSCRIPT.

10          MR. ZELLER:   THAT'S ALL RIGHT.   I CAN SHOW          01:47:56

11  THAT TO MY CLIENT.

12      Q.   WELL, MY -- MY QUESTION WAS A VERY SPECIFIC

13  ONE:   WERE YOU CONCERNED AS OF THE TIME OF THAT

14  MEETING THAT YOU HAD, THE INITIAL MEETING YOU HAD

15  WITH CARTER BRYANT, THAT MATTEL BRING LITIGATION          01:48:07

16  OVER OWNERSHIP OF BRATZ?

17      A.   I DON'T RECALL MY STATE OF MIND AS -- AS OF

18  THAT TIME.

19          MR. ZELLER:   WE NEED TO CHANGE TAPE.   GO

20  OFF THE RECORD.                                          01:48:23

21          THE VIDEO TECHNICIAN:   THIS IS THE END OF

22  TAPE NO. 2.   GOING OFF THE RECORD AT 1:48 P.M.

23          (A RECESS WAS TAKEN FROM 1:48 TO 2:03.)

24          THE VIDEO TECHNICIAN:   THIS IS THE START OF

25  TAPE NO. 3.   GOING BACK ON THE RECORD AT 2:03 P.M.       02:03:51

438

EXHIBIT __14__

PAGE __184__

```
 1    BY MR. ZELLER:

 2        Q.   WE WERE TALKING ABOUT THAT FIRST MEETING

 3    THAT YOU HAD WITH CARTER BRYANT IN WHICH HE SHOWED

 4    YOU CERTAIN DRAWINGS.

 5             DO YOU RECALL THAT?                        02:04:03

 6        A.   YES, I DO.

 7        Q.   NOW, DURING THAT MEETING DID YOU TELL

 8    CARTER BRYANT THAT IF HE HAD MADE ANY OF THOSE

 9    DRAWINGS THAT HE WAS SHOWING YOU DURING THE TIME HE

10    WAS A MATTEL EMPLOYEE THAT M.G.A. DID NOT WANT THEM?  02:04:15

11        A.   I DON'T RECALL HAVING THAT -- HAVING SAID

12    THAT.

13        Q.   WAS THAT EVER CONVEYED TO HIM?

14        A.   I DON'T KNOW.  I DON'T THINK SO.

15        Q.   IS ANY ASPECT OF THIS LITIGATION COVERED BY  02:04:25

16    INSURANCE IN YOUR VIEW?

17        A.   I -- I DON'T KNOW.  THAT'S A GOOD QUESTION.

18             MR. NOLAN:  CALLS FOR A LEGAL CONCLUSION.

19    BY MR. ZELLER:

20        Q.   DO YOU HAVE --                             02:04:42

21             THE WITNESS:  DO YOU KNOW?

22    BY MR. ZELLER:

23        Q.   -- A POLICY -- I'M SORRY, GO AHEAD.

24             THE WITNESS:  IS IT?

25             MR. NOLAN:  DO YOU HAVE AN INSURANCE POLICY  02:04:47
```

439

EXHIBIT ___14___

PAGE ___185___

1   SO LET'S JUST STAY ON THE RECORD, AND IF YOU NEED TO

2   LOOK AT OTHER PORTIONS OF IT, YOU MAY.

3        THE WITNESS:  OKAY.  I'LL DO THE BEST I

4   CAN.  BUT IF THERE'S GOING TO BE QUESTIONS -- IF

5   THERE ARE GOING TO BE QUESTIONS IN OTHER PARTS, I AM      02:50:22

6   GOING TO TAKE --

7        (SIMULTANEOUS SPEAKING.)

8        THE REPORTER:  WAIT.  ONE AT A TIME,

9   PLEASE.

10        MR. NOLAN:  I'M SORRY.      02:50:27

11   HE'S GOING TO IDENTIFY -- HE'S GOING TO

12   IDENTIFY THEM FOR US --

13        THE WITNESS:  OKAY, BUT IF I HAVE QUESTIONS

14   I'M GOING TO TAKE MY TIME TO READ THIS TO ANSWER IT.

15        MR. NOLAN:  I UNDERSTAND.  NOBODY'S ASKING      02:50:32

16   YOU TO RUSH.

17        THE WITNESS:  WHEN IT COMES MY FIVE HOURS,

18   I WILL LEAVE.

19        GO AHEAD.

20        MR. NOLAN:  IN A SIMILAR SITUATION, MIKE,      02:50:39

21   WITH MR. ECKERT, JON WOULDN'T LET US GO OFF THE

22   RECORD WHILE HE READ SOMETHING, SO -- AND IT WAS A

23   LONG DOCUMENT, IT WAS AN EARNINGS CALL.

24        BUT LET'S GO ON, LET'S TRY TO MOVE ALONG

25   WITH THIS.      02:50:53

479

EXHIBIT _14_

PAGE _185.001_

```
 1    BY MR. ZELLER:

 2        Q.   WOULD YOU PLEASE LOOK AT PAGE 42 OF THIS

 3    EXHIBIT.

 4        A.   GO AHEAD.

 5             BY THE WAY, I HAVE NEVER SEEN THIS EXHIBIT       02:51:05

 6    EVER IN MY LIFE.

 7        Q.   RIGHT.   I -- I'D ASSUMED THAT YOU HAD NOT

 8    SEEN THIS DOCUMENT, BUT I HAVE -- I JUST HAVE

 9    QUESTIONS ABOUT YOUR UNDERSTANDING AS TO WHAT

10    SOMETHING IS REFERRING TO, THAT'S ALL.                   02:51:14

11        A.   OKAY.

12        Q.   SO ON PAGE 42 OF THIS EXHIBIT, YOU SEE THE

13    ENTRIES THAT ARE LOG NO. 374 AND 375?

14        A.   374 AND 375.

15        Q.   RIGHT.                                          02:51:32

16        A.   YES, I DO.

17        Q.   YOU'LL SEE THAT THERE'S A REFERENCE IN THE

18    "FROM" FIELD TO YOU, ISAAC LARIAN?

19        A.   FROM WHO TO ME?

20        Q.   FROM, THE "FROM" FIELD?                         02:51:45

21        A.   YES.

22             MR. NOLAN:   WHERE IT STAYS "FROM."

23             THE WITNESS:   RIGHT.

24    BY MR. ZELLER:

25        Q.   SEE WHERE IT SAYS, "FROM ISAAC LARIAN"?         02:51:50
```

480

EXHIBIT _14_

PAGE _105.002_

```
 1        A.    RIGHT.

 2        Q.    AND THIS IS TO PATTY GLASER?

 3        A.    UH-HUH.

 4        Q.    RIGHT?  DO YOU SEE THAT?

 5        A.    I DO.                              02:51:56

 6        Q.    AND YOU'LL SEE THAT THE TOP ENTRY, 374, HAS

 7   A DATE OF JUNE 29TH, 2001.

 8        A.    YES.

 9        Q.    AND THEN IN THE DOCUMENT/REDACTION

10   DESCRIPTION FIELD, DO YOU SEE WHERE IT SAYS --     02:52:07

11        A.    I'M SORRY, YOU'RE GOING TOO FAST FOR ME.

12        Q.    ON THE FAR RIGHT-HAND SIDE THERE'S A

13   COLUMN --

14        A.    RIGHT.

15        Q.    -- THAT SAYS "DOCUMENT/REDACTION          02:52:15

16   DESCRIPTION"?

17        A.    RIGHT.

18        Q.    AND IT'S -- YOU WILL SEE THE DESCRIPTION

19   HERE FOR THAT EMAIL WHERE IT SAYS, "EMAIL MESSAGE

20   REQUESTING LEGAL ADVICE REGARDING MATTEL          02:52:24

21   LITIGATION."

22        A.    I SEE THAT.

23        Q.    SO MY QUESTION IS, IS THE MATTEL LITIGATION

24   THAT'S BEING REFERENCED HERE BY YOUR

25   UNDERSTANDING --                               02:52:35
```

481

EXHIBIT ___14___

PAGE ___1815.003___

1      A.   UH-HUH.

2      Q.   -- THE INFORMATION THAT YOU HAD RECEIVED

3   WHERE MATTEL WAS TELLING BUYERS THAT IT WAS GOING TO

4   SUE M.G.A. OVER BRATZ?

5      A.   IT COULD BE.  I DON'T KNOW.  I GOT TO          02:52:52

6   READ -- READ THAT DOCUMENTATION.  IT'S VERY

7   POSSIBLE.

8      Q.   WELL, LET ME TRY IT THIS WAY.  IN THIS TIME

9   PERIOD BACK IN 2001, BACK IN -- IN JUNE AND EARLY

10  JULY OF 2001, CAN YOU THINK OF ANY OTHER INSTANCES     02:53:08

11  THAT PERTAIN TO POTENTIAL MATTEL LITIGATION THAT

12  INVOLVE BRATZ OTHER THAN THE ONE THAT YOU WERE

13  TELLING ME ABOUT?

14     A.   I CAN'T.  BUT THERE COULD BE, BUT I CAN'T.

15     Q.   ALL RIGHT.  THAT'S THE ONE YOU REMEMBER?       02:53:21

16     A.   WHAT DO I REMEMBER?

17     Q.   THE -- THE INSTANCE OF -- OF POTENTIAL

18  LITIGATION BY MATTEL, THAT'S THE ONE THAT YOU RECALL

19  FROM THAT TIME PERIOD?

20     A.   I REMEMBER WHAT MATTEL HAS BEEN TELLING        02:53:30

21  BUYERS, THAT THEY'RE GOING TO SUE M.G.A. BECAUSE

22  THEY THINK THEY OWN BRATZ.

23          MR. NOLAN:  YOU'RE REFERRING TO 2001, MIKE?

24          MR. ZELLER:  THAT'S CORRECT.

25          MR. NOLAN:  BECAUSE IN HIS EARLIER -- IN       02:53:40

                                                    482

EXHIBIT _____14_____

PAGE _____183.004_____

```
 1    HIS ANSWER HE DID SAY 2002 AND 2001.

 2           MR. ZELLER:  WELL, THIS IS PART OF WHY I

 3    WAS TRYING TO GET IT CLEARED UP.

 4           (SIMULTANEOUS SPEAKING.)

 5           MR. NOLAN:  THAT'S WHAT I -- I ASSUMED YOU          02:53:49

 6    WERE, I JUST WANTED TO MAKE CERTAIN.  REMEMBER, HE

 7    ADDED THIS ADDITIONAL TIME PERIOD.

 8           MR. ZELLER:  RIGHT.

 9      Q.   AND SINCE THE OTHER ENTRIES ARE ACTUALLY

10    THE SAME AS THESE TWO, THAT'S ALL I HAVE ON THAT.          02:54:00

11      A.   OH, YOU DON'T WANT ME TO READ THE WHOLE

12    BOOK, OKAY.

13           SOMEBODY PUT THIS BACK TOGETHER.  I'M

14    SORRY, I'M NOT VERY GOOD AT THIS.

15           MR. NOLAN:  WHAT -- WHAT DID WE MARK THIS          02:54:17

16    AS?

17           THE WITNESS:  49- --

18           MR. NOLAN:  I'M SORRY?

19           THE WITNESS:  IT SAYS 4945.  IS THAT THE

20    ONE?                                                      02:54:25

21           MR. NOLAN:  WE ARE ON --

22           MR. ZELLER:  YEAH, 4945.

23           MR. NOLAN:  THANK YOU.

24           THE WITNESS:  CAN YOU FIND OUT HOW MUCH

25    MORE TIME WE HAVE LEFT?  BECAUSE I GOT TO MAKE A          02:54:33
```

1  STATE OF CALIFORNIA )

2  COUNTY OF RIVERSIDE )  SS.

3

4       I, PAULA A. PYBURN, CSR NO. 7304, R.P.R.,

5  C.L.R., IN AND FOR THE STATE OF CALIFORNIA, DO

6  HEREBY CERTIFY:

7       I AM THE DEPOSITION OFFICER THAT

8  STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

9  FOREGOING DEPOSITION;

10       PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST

11  DULY SWORN BY ME;

12       THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF

13  THE TESTIMONY GIVEN.

14       BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

15  THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF

16  REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

17  PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

18  ARE APPENDED HERETO.

19

20  DATED *March 27, 2008*.

21

22

23       *Paula A. Pyburn*

24  PAULA A. PYBURN
    C.S.R. NO. 7304, R.P.R.
    CERTIFIED LIVENOTE REPORTER

25                                    EXHIBIT  14

                                      PAGE  186

A & E COURT REPORTERS  (213)955-0070  FAX: (213)955-0077

EXHIBIT 15

1

1          IN THE UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4   CARTER BRYANT, an individual, )

5                     Plaintiff, )

6        vs.                      )      Case No.

7   MATTEL, INC., a Delaware      ) CV 04-09049 SGL

8   corporation,                  )      (RNBx)

9                     Defendant. )

10

11          CONFIDENTIAL - ATTORNEYS' EYES ONLY

12

13          The videotaped deposition of

14   STEVEN LINKER, called as a witness for examination,

15   taken pursuant to the Federal Rules of Civil

16   Procedure of the United States District Courts

17   pertaining to the taking of depositions, taken

18   before PAULINE M. VARGO, a Notary Public within and

19   for the County of DuPage, State of Illinois, and a

20   Certified Shorthand Reporter of said state, C.S.R.

21   No. 84-1573, at Suite 4000, One IBM Plaza, Chicago,

22   Illinois, on the 13th day of September, A.D. 2006,

23   at 9:50 a.m.

EXHIBIT __15__

PAGE __187__

2

```
 1          PRESENT:

 2                  LITTLER MENDELSON,

 3                  (2049 Century Park East, 5th Floor,

 4                  Los Angeles, California  90067.3107,

 5                  310.712.7314), by:

 6                  MR. DOUGLAS A. WICKHAM,

 7                      appeared on behalf of the Plaintiff

 8                      Carter Bryant;

 9

10                   MATTEL, INC.,

11                  (333 Continental Boulevard,

12                  El Segundo, California  90245.5012,

13                  310.252.6733), by:

14                  MR. MICHAEL MOORE,

15                  Senior Counsel,

16                      -and-

17                  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP,

18                  (865 South Figueroa Street, 10th Floor,

19                  Los Angeles, California  90017.2543,

20                  213.443.3000), by:

21                  MR. MICHAEL T. ZELLER,

22                  MS. TANIA KREBS,

23                      appeared on behalf of Defendant

24                      Mattel, Inc.;
```

EXHIBIT _15_

PAGE _188_

3

```
 1       PRESENT (Continued):

 2               O'MELVENY & MYERS, LLP,

 3               (Times Square Tower,

 4               7 Times Square,

 5               New York, New York  10036,

 6               212.326.2000), by:

 7               MS. DALE M. CENDALI,

 8                   appeared on behalf of Intervenor

 9                   MGA Entertainment;

10

11               BERMAN, MAUSNER & RESSER,

12               (11601 Wilshire Boulevard, Suite 600,

13               Los Angeles, California  90025,

14               310.473.3333), by:

15               MR. LAURENCE M. BERMAN,

16                   appeared on behalf of the Deponent.

17

18

19

20

21

22

23

24
```

EXHIBIT ___15___

PAGE ___189___

4

1        ALSO PRESENT:

2             MR. MICHAEL A. HALL,

3                 Paralegal, Littler Mendelson;

4             MR. CARTER BRYANT.

5

6        VIDEOGRAPHER:

7             MR. JOSEPH BURKE,

8             Esquire Deposition Services.

9

10       REPORTED BY:

11           PAULINE M. VARGO,

12  09:46:12      C.S.R. No. 84-1573.

13

14

15

16

17

18

19

20

21

22

23

24

EXHIBIT  15

PAGE  190

42

```
 1   10:39:25   image?

 2   10:39:26      A.    Yeah.

 3   10:39:26      Q.    Is that also supposed to be or was,

 4   10:39:28   rather, B-r-a-t-s?

 5   10:39:30      A.    Yes.

 6   10:39:34      Q.    Is this part of what you created for

 7   10:39:37   Mattel and then sent to Mattel?

 8   10:39:40      A.    Yes.

 9   10:39:42      MS. CENDALI:   And again I object to the

10   10:39:44   leading questions.

11   10:40:10      MR. BERMAN:   Whenever it's convenient for you,

12   10:40:12   can you take a break?

13   10:40:13      MR. ZELLER:   Sure.   I was about to change

14   10:40:16   topics, so if you want to take a couple minutes.

15   10:40:19      THE VIDEOGRAPHER:   Go off the record?

16              MS. CENDALI:   Go off.

17   10:40:20      THE VIDEOGRAPHER:   Go off the record at 10:44.

18   10:59:23               (WHEREUPON, a recess was had.)

19   10:59:23      THE VIDEOGRAPHER:   We are back on the video

20   10:59:25   record at 10:59 with Tape No. 2.

21   10:59:34      MR. ZELLER:   Let's please mark as Exhibit 317

22   10:59:36   a one-page document bearing Bates number M16482.

23   10:59:42   It depicts various designs.

24               (WHEREUPON, a certain document was
```

EXHIBIT  15

PAGE  191

43

```
                              marked Deposition Exhibit No. 317,

  2                           for identification, as of 9/13/06.)

  3    11:00:09  BY MR. ZELLER:

  4    11:00:10       Q.   Do you recognize what's depicted here as

  5    11:00:12  Exhibit 317?

  6    11:00:13       A.   Yes.

  7    11:00:14       Q.   What are these?

  8    11:00:16       A.   These are logo variations and color

  9    11:00:21  variations for Chat Brats, Chat Room for the Diva

 10    11:00:28  Starz lines.

 11    11:00:29       Q.   Did you create these?

 12    11:00:30       A.   I created these.

 13    11:00:32       Q:   Did you create them for Mattel?

 14    11:00:33       A.   I created them for Mattel, yes.

 15    11:00:36       Q.   Approximately what time period did you

 16    11:00:38  create these designs that are shown here as part of

 17    11:00:41  Exhibit 317?

 18    11:00:42       A.   Late 1999.

 19    11:00:44       Q.   And did that include the ones that show

 20    11:00:48  on the left side and the right side the word

 21    11:00:51  "Brats," B-r-a-t-s?

 22    11:00:53       A.   Yes.

 23    11:00:57       Q.   Now I really am moving on to a new

 .4    11:01:02  subject.  At some point did you have contact with
```

EXHIBIT  15

192

```
 1   11:01:08   anyone at MGA?

 2   11:01:12      A.   Yes.

 3   11:01:13      Q.   What was your first contact with anyone

 4   11:01:15   at MGA?

 5   11:01:16      A.   I received a call from Paula

 6   11:01:23   Treantafelles regarding she had called and

 7   11:01:27   introduced herself, and she told me she knew who I

 8   11:01:33   was from work that she has seen that I worked on

 9   11:01:36   the Diva Starz at Mattel and through Maureen

10   11:01:40   Mullen, said she referred me, and she asked me if I

11   11:01:43   was available for freelance work.  She said she was

12   11:01:47   fond of my work and she said "Could you come in to

13   11:01:49   do some packaging, graphics and logo design."

14   11:01:57      Q.   Was this a face-to-face meeting or a

15   11:01:59   phone call?

16   11:02:00      A.   This was a phone call.

17   11:02:03      Q.   And Ms. Treantafelles called you?

18   11:02:07      A.   Yes.

19   11:02:08      Q.   Approximately when was this?

20   11:02:10      A.   Approximately probably the summer of

21   11:02:12   2000, early like before summer, early summer,

22   11:02:17   somewhere in there.

23   11:02:33      MR. ZELLER:  Let's please mark as Exhibit 318

 4   11:02:37   a two-page document -- I am sorry.  Actually, just
```

EXHIBIT __15__

```
 1   11:02:40   one page.  Strike that.  Let's please mark as

 2   11:02:44   Exhibit 318 a one-page document bearing Bates

 3   11:02:47   number SL 00063.

 4                          (WHEREUPON, a certain document was

 5                          marked Deposition Exhibit No. 318,

 6   11:03:07               for identification, as of 9/13/06.)

 7   11:03:07       MS. CENDALI:  Do we have copies?

 8   11:03:12       MS. KREBS:  Yeah.  That's in the Linker

 9   11:03:13   production that you all have.

10   11:03:14       MR. BERMAN:  I gave you these ones myself.

11                  MS. CENDALI:  Right.  I know that.  I am just

12   11:03:16   trying to figure out what you want.  So we will

13   11:03:17   have to just separately pull them out to make the

14   11:03:21   exhibit.

15   11:03:21       MR. BERMAN:  There is not any separate to do.

16   11:03:23   There is just pieces of paper.  Do you want me to

17   11:03:25   find it for you?

18   11:03:26       MS. CENDALI:  I will be able to find it.

19   11:03:29       MS. KREBS:  It's probably in the bottom there.

20                  MS. CENDALI:  63?

21                  MR. BERMAN:  It should be, yeah.

22   11:03:32       MS. CENDALI:  It's a one-page exhibit?

23   11:03:34       MR. ZELLER:  That's right.  SL 63.

24              BY MR. ZELLER:
```

EXHIBIT  15

194

47

| | | |
|---|---|---|
| 1 | 11:05:05 | A.    Yes. |
| 2 | 11:05:06 | Q.    You had mentioned that you said it was |
| 3 | 11:05:08 | sometime in the summer of 2000? |
| 4 | 11:05:10 | A.    Yes. |
| 5 | 11:05:12 | Q.    I take it that you received this phone |
| 6 | 11:05:15 | call from Paula Treantafelles prior to the August |
| 7 | 11:05:20 | 12th date, which reflects here your first work? |
| 8 | 11:05:24 | A.    Right, so it was probably within a week |
| 9 | 11:05:26 | or so before August 12th. |
| 10 | 11:05:29 | Q.    You say probably.  Is it -- |
| 11 | 11:05:32 | A.    You talk, you talk on the phone, you |
| 12 | 11:05:36 | touch base and you set up a time to meet, so |
| 13 | 11:05:41 | this -- okay.  I am sorry. |
| 14 | 11:05:42 | Q.    One thing I want to be clear about in |
| 15 | 11:05:43 | this deposition is I don't want you to guess.  If |
| 16 | 11:05:45 | you have a best recollection about something -- |
| 17 | 11:05:47 | A.    Okay. |
| 18 | 11:05:48 | Q.    -- that's why I am asking.  So when you |
| 19 | 11:05:49 | say probably, I just want to make sure is this |
| 20 | 11:05:51 | something -- |
| 21 | 11:05:52 | A.    Right. |
| 22 | 11:05:52 | Q.    -- that's your best recollection. |
| 23 | 11:05:54 | A.    Well, my best recollection is, yes, |
| 24 | 11:05:56 | that my first meeting with her was based on this |

EXHIBIT 15

PAGE 195

48

```
 1   11:05:59   project.   So seeing that on this invoice with the

 2   11:06:03   project start date for me on my sketches was

 3   11:06:05   August 12th, then that's the time when I met her.

 4   11:06:09      Q.    What project does Exhibit 318 relate to?

 5   11:06:12      A.    A logo design for one of their toys

 6   11:06:16   called Hoppity.

 7   11:06:18      Q.    Was that the first project you ever

 8   11:06:20   worked on for MGA?

 9   11:06:21      A.    Yes, it is.

10   11:06:24      Q.    And if you could please tell us just

11   11:06:26   generally speaking what was Hoppity?

12   11:06:30      A.    Hoppity was a doll that bounced on a

13   11:06:33   ball, and they needed a -- she needed or they

14   11:06:39   needed, I don't know how to refer it, but MGA

15   11:06:41   needed a better logo design that showed more action

16   11:06:47   and graphic elements.

17   11:06:51      Q.    Prior to the time that

18   11:06:55   Miss Treantafelles made that first phone call to

19   11:06:58   you in the summer of 2000, did you know

20   11:07:02   Miss Treantafelles?

21   11:07:03      A.    No.

22   11:07:03      Q.    Had you ever heard of her before then?

23   11:07:06      A.    No.

24   11:07:17      Q.    Returning for a moment to Exhibit 318,
```

EXHIBIT 15

PAGE 196

49

11:07:20   it shows, of course, as we had mentioned or talked

11:07:23   about these various dates in August.  Did you have

11:07:26   any face-to-face meetings with Paula Treantafelles

11:07:30   in this time period up through August 25th, 2000?

11:07:33       A.   Yes.

11:07:34       Q.   If you could please tell us when you

11:07:36   recall first meeting her face-to-face?

11:07:39       A.   When I first met her, she reviewed my

11:07:47   portfolio.  She showed me some of the projects they

11:07:51   were working on in-house, and we discussed this

11:07:54   particular project and directions as far as what

11:08:00   she wanted to see and what she wanted me to work

          on.

11:08:04       Q.   And can you give us a time period when

11:08:07   you had that first meeting?

11:08:09       A.   Yes.   That first meeting was before

11:08:12   August 12th of 2000.

11:08:23       Q.   So if I understand, you had an initial

11:08:27   meeting with Miss Treantafelles before you started

11:08:31   doing any actual work?

11:08:32       A.   Yes.

11:08:40       Q.   And then on or about August 12th, 2000,

11:08:44   is when you first started doing actual work on

11:08:46   Hoppity?

EXHIBIT  15

PAGE  197

50

| | | |
|---|---|---|
| 1 | 11:08:46 | A.      Correct. |
| 2 | 11:08:48 | MS. CENDALI:  Objection to form. |
| 3 | | BY MR. ZELLER: |
| 4 | 11:09:03 | Q.      Did you do any work on Hoppity after |
| 5 | 11:09:07 | August 25th, 2000? |
| 6 | 11:09:09 | A.      No. |
| 7 | 11:09:13 | Q.      After you did work on Hoppity, did you |
| 8 | 11:09:16 | have any conversations with anyone at MGA about |
| 9 | 11:09:22 | further work or potential work for MGA? |
| 10 | 11:09:24 | A.      Yes. |
| 11 | 11:09:26 | Q.      What happened next then in that regard? |
| 12 | 11:09:30 | A.      Paula contacted me about a couple of |
| 13 | 11:09:35 | jobs that she had in line for packaging, one that |
| 14 | 11:09:43 | could start and the other one was a rush or a new |
| 15 | 11:09:48 | concept that they wanted to get started on. |
| 16 | 11:09:54 | Q.      What were these two projects? |
| 17 | 11:09:58 | A.      The first one was Samantha Scooter, and |
| 18 | 11:10:02 | the other one at the time wasn't given a name, so I |
| 19 | 11:10:05 | didn't know what it was, but eventually, I mean, it |
| 20 | 11:10:10 | was the Bratz. |
| 21 | 11:10:15 | Q.      This was a phone call that she made to |
| 22 | 11:10:17 | you? |
| 23 | 11:10:18 | A.      Yes. |
| 24 | 11:10:20 | Q.      And approximately when was that phone |

EXHIBIT 15

PAGE 198

61

| | | | |
|---|---|---|---|
| 1 | 11:23:21 | A. | Yeah, they were together. |
| 2 | 11:23:28 | Q. | Was she someone who was working for MGA? |
| 3 | 11:23:30 | A. | Sorry? |
| 4 | 11:23:31 | Q. | Was she someone who was working for MGA |
| 5 | 11:23:34 | as far as you knew? |
| 6 | 11:23:35 | A. | No, I don't know. |
| 7 | 11:23:42 | Q. | I would like to ask you a few questions |
| 8 | 11:23:44 | about this meeting that you had at Starbucks on or |
| 9 | 11:23:48 | about October 10th or 11, 2000.  Was this meeting |
| 10 | 11:23:54 | about Bratz? |
| 11 | 11:23:55 | A. | Yes. |
| 12 | 11:23:57 | Q. | Please tell me what it is that you can |
| 13 | 11:24:00 | recall being discussed at this meeting about Bratz? |
| 14 | 11:24:05 | A. | We discussed packaging direction and -- |
| 15 | 11:24:11 | well, we mostly talked with Paula.  She expressed |
| 16 | 11:24:16 | what she was looking for as far as direction and |
| 17 | 11:24:18 | piece count as far as what she would like to see us |
| 18 | 11:24:24 | do for packaging and gave us kind of like rough |
| 19 | 11:24:30 | time lines on when she needed stuff done, but |
| 20 | 11:24:36 | before all that, she presented the concept to us or |
| 21 | 11:24:39 | they presented it to us. |
| 22 | 11:24:41 | Q. | I am sorry.  You say before that she |
| 23 | 11:24:43 | presented the concept? |
| 24 | 11:24:44 | A. | Before telling us what she wanted, she |

EXHIBIT 15

PAGE 199

```
 1   11:24:47   presented the concept.  We needed to see the
 2   11:24:50   concept first before we could talk about packaging.
 3   11:24:53        Q.    Please tell me what you mean when you
 4   11:24:56   say that she presented it to you.
 5   11:24:57        A.    At this meeting we were shown the
 6   11:25:02   concept of Bratz, the dolls.
 7   11:25:07        Q.    What were you shown?
 8   11:25:09        A.    We were shown artboards, illustrations
 9   11:25:12   of dolls and their features as far as what the
10   11:25:19   dolls do and what they represent.
11   11:25:27        Q.    At this meeting on or about October 10th
12   11:25:31   or 11th, 2000, did anyone refer to this project as
13   11:25:37   being Bratz by name?
14   11:25:39        A.    Yes.
15   11:25:44        Q.    Was that the first time that you heard
16   11:25:48   anyone at MGA use the word "Bratz," B-r-a-t-z, to
17   11:25:54   describe the project, that is, the MGA project?
18   11:25:58        A.    The term "Bratz" was used by MGA or
19   11:26:02   Paula at the meeting, yes.
20   11:26:04        Q.    Well, I am driving at something a little
21   11:26:06   bit different.
22   11:26:07        A.    Okay.
23   11:26:07        Q.    Was that the first time that you heard
 4   11:26:09   the term "Bratz" in connection with the MGA
```

EXHIBIT 15

PAGE 200

```
 1   11:26:12   project?

 2   11:26:12        A.     Yes, yes.

 3   11:26:14        Q.     So prior to that time, you didn't hear

 4   11:26:17   the name from MGA?

 5   11:26:19        A.     No.

 6   11:26:24        Q.     Did Mr. Bryant say or do anything at

 7   11:26:27   this meeting?

 8   11:26:29        A.     Not much.

 9   11:26:32        Q.     Well --

10   11:26:33        A.     He presented -- it was his -- he brought

11   11:26:36   the portfolio with the images.

12   11:26:39        Q.     When you say "the images," you are

13   11:26:42   referring to the artboards and the illustrations

14   11:26:44   and the things you mentioned earlier?

15   11:26:46        A.     Yes.

16   11:26:51        Q.     Did you know Mr. Bryant before this

17   11:26:53   meeting?

18   11:26:53        A.     Yes.

19   11:26:53        Q.     How did you know him?

20   11:26:55        A.     We worked at Mattel at the same time in

21   11:27:00   1996 before I left, so I knew him from there.

22   11:27:06        Q.     Did you and Mr. Bryant talk about Mattel

23   11:27:08   at all during the meeting?

24   11:27:12        A.     Briefly.  I think I asked him when he
```

EXHIBIT 15

PAGE 201

64

| | | |
|---|---|---|
| 1 | 11:27:15 | left or, you know, because I was no longer there, |
| 2 | 11:27:18 | so I assumed he was no longer there, and he said he |
| 3 | 11:27:21 | had just quit, so that was about it. |
| 4 | 11:27:25 | Q.    Mr. Bryant said he had quit? |
| 5 | 11:27:27 | A.    Yes. |
| 6 | 11:27:29 | Q.    Quit Mattel? |
| 7 | 11:27:29 | A.    Or he left.  He was no longer there. |
| 8 | 11:27:32 | That's all I know from that meeting, that he was no |
| 9 | 11:27:34 | longer with Mattel. |
| 10 | 11:27:59 | Q.    Was there anything that happened in |
| 11 | 11:28:03 | between the meeting that you had that you described |
| 12 | 11:28:07 | at Starbucks on or about October 10th or 11th, |
| 13 | 11:28:13 | 2000, and then the time that the October 12th, 2000 |
| 14 | 11:28:17 | e-mail was sent, which we marked as Exhibit 320, as |
| 15 | 11:28:20 | it pertains to Bratz, or was the next thing that |
| 16 | 11:28:23 | happened that you sent the e-mail or Liz sent the |
| 17 | 11:28:26 | e-mail with your participation? |
| 18 | 11:28:29 | A.    When we left, I know that we prepared |
| 19 | 11:28:31 | this e-mail, because we had a lot of questions, and |
| 20 | 11:28:34 | also, we were starting to work on quotes for the |
| 21 | 11:28:38 | job because that's typically what we do and we knew |
| 22 | 11:28:41 | this was a big job, so we started bouncing back |
| 23 | 11:28:46 | ideas, but primarily we left there with these |
| 24 | 11:28:50 | questions and wanted to set up a secondary meeting |

EXHIBIT __15__

PAGE ____202____

| | | |
|---|---|---|
| 1 | 11:43:54 | I tried as hard as I could to get the |
| 2 | 11:43:56 | documents produced at the time.  I had to walk in |
| 3 | 11:44:00 | the rain.  So, you know, I got here at 8:30, and no |
| 4 | 11:44:02 | one was here.  So to the extent that that reflects |
| 5 | 11:44:05 | how I -- my tone, I apologize.  So let's go on. |
| 6 | 11:44:09 | MS. CENDALI:  It is -- it is very clear -- |
| 7 | 11:44:11 | MR. BERMAN:  Let's go on. |
| 8 | 11:44:13 | MS. CENDALI:  Please don't interrupt me, |
| 9 | 11:44:14 | counsel.  It is very clear that our calls were not |
| 10 | 11:44:17 | returned.  It's very clear that I suspect your |
| 11 | 11:44:20 | calls to Mr. Zeller were returned. |
| 12 | 11:44:23 | MR. ZELLER:  Are you quite finished?  Can we |
| 13 | 11:44:25 | now -- |
| 14 | 11:44:25 | MS. CENDALI:  Let's continue. |
| 15 | 11:44:32 | MR. ZELLER:  Thank you. |
| 16 | 11:44:33 | MR. WICKHAM:  I will note for the record that |
| 17 | 11:44:34 | the deposition notice says 9:30. |
| 18 | 11:44:37 | MR. ZELLER:  And the documents say 8:30.  It's |
| 19 | 11:44:39 | on the same subpoena, if I may. |
| 20 | 11:44:48 | THE REPORTER:  I have to mark the document. |
| 21 | 11:44:48 | MR. ZELLER:  Let me re-identify it.  I will |
| 22 | 11:44:50 | start again so we can pick up fresh.  Let's please |
| 23 | 11:44:55 | mark as Exhibit 323 a multi-page document bearing |
| 24 | 11:45:02 | Bates numbers SL 13 through SL 63 consisting of |

EXHIBIT ___15

PAGE ___207.001

77

| | | |
|---|---|---|
| 1 | 11:45:12 | drawings and other materials. |
| 2 | | (WHEREUPON, a certain document was |
| 3 | | marked Deposition Exhibit No. 323, |
| 4 | 11:46:49 | for identification, as of 9/13/06.) |
| 5 | | BY MR. ZELLER: |
| 6 | 11:46:50 | Q.   Do you recognize what's been marked as |
| 7 | 11:46:53 | Exhibit 323 or any portion of it? |
| 8 | 11:46:55 | A.   Yes. |
| 9 | 11:46:56 | Q.   What are these pages? |
| 10 | 11:47:02 | A.   Well, there is a combination of stuff, |
| 11 | 11:47:05 | but for the most part, this was the package that |
| 12 | 11:47:09 | was provided to me at the October 19th meeting at |
| 13 | 11:47:18 | MGA, excluding SL 00015.  That is a poster from the |
| 14 | 11:47:25 | final product that I had put into the envelope just |
| 15 | 11:47:31 | for cross-reference when I bought the toy.  So that |
| 16 | 11:47:38 | is a poster that wasn't anywhere near or part of |
| 17 | 11:47:44 | the package that was at MGA when I went there on |
| 18 | 11:47:49 | October 19th. |
| 19 | 11:47:50 | Q.   I am sorry.  The other things were in |
| 20 | 11:47:53 | Exhibit 323? |
| 21 | 11:47:54 | A.   Everything -- all these other things, |
| 22 | 11:47:56 | yes, they were all part of the package, but like I |
| 23 | 11:48:00 | said, this was at a later date.  This is something |
| 24 | 11:48:05 | I threw into the envelope, just in my files. |

EXHIBIT  15

PAGE  202.002

78

```
1   11:48:10      Q.    Then let's maybe break this down a
2   11:48:13   little bit.
3              A.    Okay.
4   11:48:14      Q.    You have been referring to a package?
5   11:48:17      A.    Yes.
6   11:48:19      Q.    Did you receive a package at the
7   11:48:21   October 19, 2000 meeting?
8   11:48:24      A.    I did.
9   11:48:24      Q.    And who did you get that from?
10  11:48:26      A.    I got it from MGA, Paula or the group
11  11:48:30   that was working on this, but pretty much Paula and
12  11:48:33   her design team as far as --
13  11:48:37      Q.    And you received those materials while
14  11:48:39   you were actually at MGA's offices?
15  11:48:41      A.    While I was in the meeting, they gave me
16  11:48:44   this yellow envelope.
17  11:48:49      Q.    So then just so the record is clear on
18  11:48:51   this, what you received from MGA was pages starting
19  11:48:59   SL 16 through SL 63 on October 19th, 2000?
20  11:49:09      MS. CENDALI:  Mischaracterizes his testimony.
21           BY THE WITNESS:
22  11:49:13      A.    Yes.  This is all stuff that was put in
23           there.
24  11:49:25   BY MR. ZELLER:
```

EXHIBIT ___15___

PAGE ___002.003___

79

```
11:49:25    Q.    And then the first two pages of

11:49:30  Exhibit 323, that's an envelope?

11:49:33    A.    Yes.

11:49:36    Q.    And does this envelope relate to the

11:49:40  materials that you received from MGA on October 19,

11:49:43  2000?

11:49:45    A.    Yes, it is.

11:49:47    Q.    And how is it related?

11:49:52    A.    How is it related?  This envelope held

11:49:55  all the images.  All these images were in the

11:50:02  envelope.  Can you rephrase the question?

11:50:04    Q.    Well, I guess one thing I am trying to

11:50:05  ask is, were you given this, these materials that

11:50:10  we were discussing in an envelope from MGA?

11:50:12    A.    Yes.

11:50:13    Q.    In other words, MGA provided the

11:50:14  envelope?

11:50:15    A.    Yes, and it was addressed on the second

11:50:16  page, SL 00014, to Steve and Liz from Bratz or with

11:50:21  the "Bratz" in quotes.

11:50:25    Q.    So this was the -- SL 14 was the front

11:50:31  of the envelope that contained the other materials?

11:50:34    A.    Yes.

11:50:37    Q.    Is this your handwriting on SL 14?
```

EXHIBIT ___15___

PAGE ___202.004___

80

| | | | |
|---|---|---|---|
| 1 | 11:50:39 | A. | No. |
| 2 | 11:50:43 | Q. | And then is the first page, SL 13, is |
| 3 | 11:50:47 | that part of the same envelope? | |
| 4 | 11:50:48 | A. | It's part of the same envelope. |
| 5 | 11:50:50 | Q. | This is the back? |
| 6 | 11:50:52 | A. | Yes, it is. |
| 7 | 11:50:53 | Q. | And then is this your handwriting on |
| 8 | 11:50:57 | this first page of 323? | |
| 9 | 11:50:58 | A. | Yes, it is.  That's mine. |
| 10 | 11:51:04 | Q. | When did you make those notes? |
| 11 | 11:51:05 | A. | I made that after the product was |
| 12 | 11:51:07 | already on the shelf.  When I go through my files, | |
| 13 | 11:51:14 | I just pretty much sketched it out on that to call | |
| 14 | 11:51:17 | out what was in the folder in my files, but this is | |
| 15 | 11:51:22 | after, way after the meeting. | |
| 16 | 11:51:29 | Q. | Well, maybe if we could walk through a |
| 17 | 11:51:31 | few of these pages here that are part of 323, | |
| 18 | 11:51:41 | starting with SL 16. | |
| 19 | 11:51:44 | A. | Yeah. |
| 20 | 11:51:45 | Q. | This was one of the pages you received |
| 21 | 11:51:47 | on October 19, 2000, from MGA? | |
| 22 | 11:51:50 | A. | Yes. |
| 23 | 11:51:51 | Q. | Had you seen this particular drawing |
| 24 | 11:51:54 | prior to that time? | |

EXHIBIT ___15___

PAGE ___202.005___

255

1      STATE OF ILLINOIS )

2                        )   SS:

3      COUNTY OF DuPAGE  )

4                      I, PAULINE M. VARGO, a Notary Public

5      within and for the County of DuPage, State of

6      Illinois, and a Certified Shorthand Reporter of

7      said state, C.S.R. No. 84-1573, do hereby certify:

8                      That previous to the commencement of the

9      examination of the witness, the witness was duly

10     sworn to testify the whole truth concerning the

11     matters herein;

12                     That the foregoing deposition transcript

13     was reported stenographically by me, was thereafter

14     reduced to typewriting under my personal direction

15     and constitutes a true record of the testimony

16     given and the proceedings had;

17                     That the said deposition was taken

18     before me at the time and place specified;

19                     That I am not a relative or employee or

20     attorney or counsel, nor a relative or employee of

21     such attorney or counsel for any of the parties

22     hereto, nor interested directly or indirectly in

23     the outcome of this action.

.4

EXHIBIT __15__

PAGE ____203____

256

```
 1              IN WITNESS WHEREOF, I do hereunto set my

 2      hand and affix my seal of office at Chicago,

 3      Illinois, this 22nd day of September, 2006.

 4

 5

 6              Notary Public, DuPage County, Illinois.

 7              My commission expires July 27, 2007.

 8

 9      C.S.R. Certificate No. 84-1573

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

EXHIBIT 15

PAGE 204

**EXHIBIT 16**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
)
PLAINTIFF, )
)
V. )          NO. CV 04-9040 SGL (RNBX)
)
MATTEL, INC., A DELAWARE )
CORPORATION, )
)
DEFENDANTS. )
_____ )
)
AND CONSOLIDATED ACTION (S). )
_____ )

# C O N F I D E N T I A L

(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN
DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)

# DEPOSITION OF VERONICA MARLOW

# DECEMBER 28, 2007



A&E
COURT REPORTERS

REPORTED BY:
PAULA A. PYBURN
CSR NO. 7304
JOB NO. 07AE765-PP

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT 16

PAGE 205

1    RECEIVED THE SECOND CASTING, PHOTOGRAPHS WE'VE

2    MARKED AS EXHIBIT 1231.

3         MR. MCFARLAND:  OKAY.  I WOULD JUST OBJECT

4    THAT THERE ARE DOCUMENTS THAT -- THAT SET FORTH

5    THESE DATES, BUT YOU CAN GIVE YOUR BEST          05:29:45

6    RECOLLECTION.

7         THE WITNESS:  LIKE I SAID, I WORK WITH

8    PEDRO AND I WORK WITH ISABEL CABRERA.

9    BY MR. ZELLER:

10        Q.   RIGHT.  AND I'M -- I'M TRYING TO FIND OUT,   05:29:56

11   IS THERE ANYONE ELSE WHO YOU HIRED ON OR HAD -- YOU

12   HAD WORK FOR YOU IN CONNECTION WITH THE BRATZ

13   PROJECT OTHER THAN THOSE TWO DURING THAT TIME

14   PERIOD?

15        A.   NO.                                     05:30:06

16        Q.   JUST THOSE TWO?

17        A.   YEAH.

18        Q.   AND WHERE DOES -- DOES SHE GO BY "ANA" OR

19   "ISABEL"?

20        A.   BOTH.  I CALL HER ISABEL, BUT SOME PEOPLE  05:30:16

21   CALL HER ANA, ANITA.

22        Q.   WHERE DOES MS. CABRERA LIVE?

23        A.   HAWTHORNE.  I THINK IT'S HAWTHORNE.

24        Q.   AND HAD SHE EVER DONE ANY WORK FOR YOU

25   PRIOR TO THE BRATZ PROJECT?                        05:30:37

                                                        287

EXHIBIT 16

PAGE 206

```
 1      A.   THINK.  NO, I DON'T RECALL.

 2      Q.   HOW IS IT YOU -- YOU CAME TO HIRE HER ON?

 3      A.   I CALLED AND ASK HER IF SHE WILL BE

 4   INTERESTED IN HELPING ME OUT.

 5      Q.   DID YOU GET HER NAME FROM SOMEONE?          05:31:00

 6      A.   NO.  FROM HER.  I -- I KNEW HER FROM MATTEL

 7   WHEN I WORK AT MATTEL.

 8      Q.   I SEE.  SO MS. CABRERA WAS AT -- WAS AT

 9   MATTEL AT SOME POINT?

10      A.   YES.                                        05:31:19

11      Q.   DO YOU HAVE A GENERAL UNDERSTANDING AS TO

12   WHAT SHE DID AT MATTEL?

13      A.   SHE'S A SEAMSTRESS.

14      Q.   AND I TAKE IT YOU CALLED HER UP TO -- TO

15   GET HER ONTO THE PROJECT?                           05:31:43

16      A.   YES.

17      Q.   WAS SHE STILL AT MATTEL AT THAT TIME?

18      A.   YES.

19      Q.   DID YOU CALL HER AT MATTEL OR DID -- DID

20   YOU CALL HER AT HOME?                               05:31:51

21      A.   AT HOME.  I -- I -- SHE'S MY FRIEND, SO I

22   HAD HER PHONE -- HOME PHONE NUMBER.

23      Q.   SO YOU CALLED HER AT HOME AND ASKED HER TO

24   WORK ON BRATZ?

25      A.   YES.                                        05:31:59
```

288

EXHIBIT __16__

PAGE __207__

1          MR. MCFARLAND:  OBJECTION; MISSTATES HER

2    TESTIMONY.

3          THE WITNESS:  I DIDN'T SAY TO WORK ON

4    BRATZ.  I ASK -- I TOLD HER I HAD SOME WORK, IF SHE

5    WAS WILLING TO HELP ME.                                05:32:13

6    BY MR. ZELLER:

7          Q.   AND DID SHE IN FACT DO WORK ON THE BRATZ

8    PROJECT?

9          A.   YES, SHE DID.

10         Q.   WHAT DID SHE DO?                            05:32:24

11         A.   SHE WOULD SEW THE OUTFITS.

12         Q.   HOW LONG DID SHE WORK ON THE BRATZ PROJECT

13   FOR YOU?

14         A.   SHE WORKED FROM THAT PERIOD UNTIL THEY --

15   UNTIL I STOPPED WORKING FOR BRATZ.                     05:32:49

16         Q.   I SEE.  SO THE -- THE WHOLE TIME PERIOD YOU

17   WERE DOING WORK FOR M.G.A. ON BRATZ, YOU HAD HER

18   DOING WORK FOR YOU?

19         A.   YES.

20         Q.   THAT WAS ON THE BRATZ PROJECT?              05:33:00

21         A.   THAT'S CORRECT.

22         Q.   DID YOU EVER TELL HER IT WAS THE BRATZ

23   PROJECT?

24         A.   NO, I DID NOT AT FIRST.

25         Q.   WELL, WHEN I SAY "EVER," I MEANT EVER.      05:33:08

289

EXHIBIT 16

PAGE 208

```
 1        A.   EVER, OH, NO, EVER, BUT NOT --

 2        Q.   AT SOME POINT YOU TOLD HER?

 3        A.   YES.

 4        Q.   WHEN DID YOU FIRST TELL HER?

 5        A.   WELL, ACTUALLY SHE TOLD ME.  BECAUSE AFTER      05:33:17

 6   THE BRATZ CAME OUT. SHE START SEEING BRATZ DOLLS ALL

 7   OVER MATTEL IN DIFFERENT CUBICLES, AND SHE

 8   RECOGNIZED THE FASHIONS THAT SHE HAD WORK ON.  AND

 9   SO, YOU KNOW, SHE TOLD ME THAT SHE HAD SEEN THEM,

10   THAT IT WAS ALL OVER THE PLACE, THE DESIGNER HAD      05:33:43

11   TAKEN THEM OUT OF THE BOX, WAS LOOKING AT THE

12   FASHIONS AND STUFF LIKE THAT.

13        SO I SAID THAT'S RIGHT.

14        Q.   DO YOU HAVE -- DO YOU HAVE RECORDS SHOWING

15   THE PARTICULAR FASHIONS THAT SHE WORKED ON?          05:33:58

16        A.   RECORDS?

17        Q.   YES.

18        A.   SHE WORKS ON -- ON MOST OF THEM, I WOULD

19   SAY.  SO --

20        Q.   SHE WORKED ON MOST OF THE BRATZ FASHIONS?    05:34:12

21        A.   YES.

22        Q.   DID SHE WORK ON ALL THE BRATZ FASHIONS THAT

23   YOU WORKED ON?

24        A.   LIKE I SAID, MOST OF THEM.

25        Q.   AND -- AND MY PARTICULAR QUESTION IS, THEN,   05:34:21
```

290

EXHIBIT ___16___

PAGE ___209___

1         MR. MCFARLAND:  ASKED AND ANSWERED.

2         THE WITNESS:  NO, I DIDN'T.

3    BY MR. ZELLER:

4         Q.   YOU ONLY TALKED TO HER AT HOME?

5         A.   YES.                                    05:39:06

6         Q.   DID YOU EVER CALL HER ON HER CELL PHONE?

7         A.   COUPLE TIMES, BUT NOT DURING THE DAY.

8         Q.   AND IS THERE A REASON YOU DIDN'T CALL HER

9    DURING THE DAY?

10        A.   BECAUSE SHE WOULD BE BUSY WORKING, I DIDN'T   05:39:21

11   WANT TO BOTHER HER.  AND I WOULD BE SEEING HER AT

12   NIGHT, WHY WOULD I CALL HER.

13        Q.   ANY OTHER REASON?

14        A.   NO.

15        Q.   DID YOU EVER TELL ANYONE AT M.G.A. THAT YOU   05:39:30

16   HAD MS. CABRERA WORKING ON BRATZ FASHIONS?

17        A.   NO.

18        Q.   WAS THERE A REASON FOR THAT?

19        A.   WAS NONE OF THEIR BUSINESS.  THEY CONTRACT

20   ME, AND I WOULD PUT WHATEVER -- WHOEVER I WANTED TO   05:39:48

21   WORK ON THE PROJECT.  I DIDN'T HAVE TO TELL THEM WHO

22   WAS -- WAS WORKING FOR ME.

23        Q.   DID ANYONE AT M.G.A. EVER ASK YOU?

24        A.   UH-HUH, MEL WOODS.

25        Q.   OTHER -- OTHER THAN MEL WOODS, WE'VE TALKED   05:40:08

                                                    295

EXHIBIT ___16___

PAGE ___210___

```
 1   ABOUT THAT.
 2              (SIMULTANEOUS SPEAKERS.)
 3              (INTERRUPTION IN PROCEEDINGS.)
 4              THE REPORTER:  I'M SORRY, WAIT.  YOU GUYS,
 5   I CAN'T -- YOU GUYS ARE ALL YELLING AND I CAN'T TAKE        05:40:10
 6   DOWN FIVE PEOPLE AT ONCE.
 7              MR. ZELLER:  LET ME REPHRASE THE QUESTION.
 8              MS. ANDERSON:  WE'RE YELLING HAPPILY, FOR
 9   THE RECORD.
10              MR. ZELLER:.  I WILL REPHRASE THE QUESTION.     05:40:24
11        Q.   OTHER THAN THE INCIDENT WITH MEL WOODS THAT
12   YOU HAD DESCRIBED PREVIOUSLY, DID ANYONE AT M.G.A.
13   EVER ASK YOU ABOUT WHO YOU HAD WORKING ON BRATZ
14   FASHIONS?
15        A.   NO.                                              05:40:39
16        Q.   DID CARTER BRYANT EVER ASK YOU?
17        A.   NO, NOT THAT I RECALL.
18        Q.   DO YOU KNOW OR HAVE AN UNDERSTANDING AS TO
19   WHETHER OR NOT CARTER KNOWS MS. CABRERA?
20        A.   HE DOES KNOW HER.                                05:40:53
21        Q.   AND WHAT'S YOUR UNDERSTANDING AS TO HOW HE
22   KNOWS HER?
23        A.   BECAUSE SHE WORK IN THE SAME GROUP THAT HE
24   DID.
25        Q.   AND WHEN YOU SAY "THE SAME GROUP," ARE YOU       05:41:05
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT 16

PAGE 211

1    TALKING ABOUT WHEN HE WAS WORKING IN COLLECTORS?

2        A.   COLLECTORS, YES.

3            MR. PLEVAN:  I'M SORRY?  I --

4            THE WITNESS:  WHEN HE WORK FOR THE

5    COLLECTORS GROUP AT MATTEL.                          05:41:16

6            MR. PLEVAN:  THANK YOU.

7            THE WITNESS:  SHE ALSO WORKS FOR THE

8    COLLECTORS GROUP AT MATTEL.  OKAY.

9    BY MR. ZELLER:

10       Q.   DID YOU EVER HAVE MS. CABRERA SIGN ANYTHING    05:41:29

11   LIKE A CONTRACT OR AN AGREEMENT REGARDING THE WORK

12   THAT SHE DID ON -- ON BRATZ FASHIONS?

13       A.   SHE WOULD SIGN THE -- THE RECEIPT WHEN I

14   PAID HER, THAT SHE GOT PAID FOR IT, FOR THE WORK SHE

15   DID.  NO CONTRACT.                                 05:41:46

16       Q.   SO THERE WAS NEVER AN AGREEMENT AS TO WHO

17   OWNED THE WORK THAT SHE DID; IS THAT CORRECT?

18           MR. MCFARLAND:  OBJECTION; CALLS FOR A

19   LEGAL CONCLUSION AND ASSUMES FACTS NOT IN EVIDENCE.

20           THE WITNESS:  CORRECT.                       05:41:59

21   BY MR. ZELLER:

22       Q.   NOW, DID YOU MENTION THAT THERE WERE SOME

23   KIND OF RECEIPTS?

24       A.   I -- WE PROVIDE TO YOU ALL THE TIME SHEETS.

25   I PROVIDE TO YOU ALL THE TIME SHEETS AND ALL THE --   05:42:12

297

EXHIBIT 16

PAGE 212

```
1        A.   YES.
2        Q.   WHICH OF THE DOLLS DID SHE WORK ON THE

3   FASHIONS FOR OF THAT FIRST WAVE OF -- OF BRATZ

4   DOLLS?
5        A.   I'M TRYING TO THINK.                        05:48:58

6             MR. MCFARLAND:  DON'T GUESS.

7             THE WITNESS:  I KNOW SHE WORK ON SOME OF

8   THEM.  I DON'T KNOW SPECIFIC ON IT.

9   BY MR. ZELLER:
10       Q.   DID YOU OR -- STRIKE THAT.                  05:49:25

11            DID YOU AND MS. CABRERA EVER DISCUSS ANY

12  CONCERN AMONG YOURSELVES AS TO THE FACT THAT SHE WAS

13  WORKING FOR MATTEL AND ALSO WORKING ON BRATZ

14  FASHIONS?
15       A.   ONLY AFTER SHE FOUND OUT THAT I -- WE WERE  05:49:37

16  WORKING ON THE -- ON THE BRATZ, WHEN SHE START

17  SEEING THE DOLLS AT THE DESIGN CENTER.

18       Q.   AND WHAT IS IT THAT YOU AND -- AND SHE

19  DISCUSSED ON THAT?
20       A.   YOU KNOW, SHE WAS REALLY SURPRISED THAT SHE 05:49:51

21  SAW ALL THOSE FASHIONS, AND JUST WAS TELLING ME THAT

22  THE DESIGNERS WERE DISSECTING THE DOLLS AND, YOU

23  KNOW, STUDYING REALLY CLOSELY THE OUTFITS AND STUFF

24  LIKE THAT.  SO SHE JUST START TALKING ABOUT THE

25  BRATZ.                                                05:50:16
```

305

EXHIBIT __16__

PAGE __213__

1    Q.   DID SHE EVER EXPRESS ANY CONCERN THAT

2  MATTEL WOULD FIND OUT?

3    A.   NO.  THAT SHE WAS WORKING ON THE BRATZ?

4    Q.   RIGHT.

5    A.   NO.                         05:50:26

6    Q.   WERE YOU EVER CONCERNED ABOUT THAT?

7    A.   NO.

8    Q.   SO IF I UNDERSTAND YOU CORRECTLY, YOU DON'T

9  SEE ANYTHING WRONG WITH A MATTEL EMPLOYEE WORKING ON

10  THE BRATZ FASHIONS; IS THAT TRUE?         05:50:37

11    A.   YEAH, THAT'S TRUE.

12    Q.   NOTHING TROUBLING AT ALL ABOUT IT TO YOU?

13    A.   NO.

14    Q.   HOW MANY PEOPLE HAVE YOU HAD DO WORK FOR

15  YOU WHILE THEY WERE EMPLOYED BY MATTEL WHEN YOU WERE   05:50:49

16  NOT A MATTEL EMPLOYEE?

17    A.   I HAD ISABELLE CABRERA AND LATER ON

18  BEATRICE MORALES.

19    Q.   AND WHAT DID YOU HAVE HER WORK ON?

20    A.   ON BRATZ.                   05:51:09

21    Q.   AND WHAT WAS YOUR GENERAL UNDERSTANDING OF

22  WHAT IT IS THAT BEATRICE MORALES DID AT MATTEL?

23    A.   SHE'S ALSO A SEAMSTRESS, AND ISABELLE'S

24  FRIEND AND -- AND WE NEEDED HELP, AND ISABEL

25  SUGGESTED TO INVITE BEATRICE TO COME AND HELP US   05:51:29

306

EXHIBIT 16

PAGE 214

```
 1      Q.   WERE YOU INTRODUCED TO MS. MORALES THROUGH
 2    ISABEL, OR DID YOU KNOW HER INDEPENDENTLY?
 3      A.   I WAS INTRODUCED TO MS. MORALES THROUGH
 4    ISABEL.
 5      Q.   I'M SORRY, I DIDN'T CATCH THAT.                05:51:50
 6      A.   I WAS INTRODUCED TO MRS. MORALES THROUGH
 7    ISABEL.
 8      Q.   AND DID MS. MORALES WORK ON BRATZ FASHIONS
 9    AS WELL?
10      A.   YES.                                           05:52:07
11      Q.   AND WHAT TIME PERIOD DID SHE DO THAT?
12      A.   IT WAS A YEAR OR SO AFTER THE BRATZ CAME
13    OUT.
14           YOU HAVE THE DATES, BY THE WAY, YOU HAVE
15    HER SIGNED RECEIPTS AND TIME SHEET AND THAT ALL,      05:52:22
16    SO...
17      Q.   I TAKE IT THESE ARE ALL DOCUMENTS YOU GAVE
18    TO YOUR COUNSEL?
19      A.   YES.
20      Q.   YOU HAD MENTIONED THAT MS. MORALES WORKED      05:52:35
21    ON THE BRATZ FASHIONS A YEAR OR SO AFTER THE BRATZ
22    FIRST CAME OUT?
23      A.   YES.
24      Q.   AND FOR HOW LONG DID SHE WORK ON THE BRATZ
25    FASHIONS?                                             05:52:51
```

307

EXHIBIT 16

PAGE 215

```
 1        A.   UNTIL I QUIT.  UNTIL I QUIT BRATZ.

 2        Q.   WHERE IS IT THAT MS. MORALES LIVES?

 3        A.   IT'S HAWTHORNE, THAT AREA.  I'M --

 4        Q.   I'M SORRY WHERE?

 5        A.   HAWTHORNE.                              05:53:14

 6        Q.   HAWTHORNE?

 7        A.   I BELIEVE IT IS HAWTHORNE.  IT'S AROUND

 8   THAT NEIGHBORHOOD.

 9        Q.   OTHER THAN MS. CABRERA AND MS. MORALES WHO

10   YOU HAVE DISCUSSED SO FAR, ARE THERE ANY OTHER      05:53:34

11   PERSONS WHO YOU HIRED ON TO DO WORK FOR YOU WHILE

12   THEY WERE MATTEL EMPLOYEES AND YOU WERE NOT WORKING

13   FOR MATTEL?

14        A.   NO.

15        Q.   SO THOSE ARE THE TWO?                   05:53:44

16        A.   YEAH.

17        Q.   THE ONLY TWO?

18        A.   YES.

19        Q.   HAVE YOU DISCUSSED THIS LAWSUIT WITH

20   MS. CABRERA?                                      05:54:03

21        A.   NO.

22        Q.   HAVE --

23        A.   EXCEPT THAT AFTER I KNEW THAT I WAS GOING

24   TO HAVE THIS DEPOSITION I TOLD HER, I WARNED HER,

25   LOOK, YOUR NAME IS GOING TO COME UP, I GAVE TO MY  05:54:14
```

308

EXHIBIT ___16___

PAGE ___316___

```
 1    LAWYER ALL THE PAPERWORK THAT I HAVE WITH THE TIME

 2    SHEET, YOUR NAME AND ALL THAT.

 3         Q.   AND WHEN DID YOU DO THAT?

 4         A.   IT WASN'T TOO LONG AGO I TOLD HER THAT.

 5         Q.   THE LAST COUPLE MONTHS?                     05:54:34

 6         A.   YEAH.

 7         Q.   OTHER THAN THAT, HAVE YOU EVER HAD ANY

 8    CONVERSATIONS WITH HER ABOUT THIS LAWSUIT?

 9         A.   NO.

10         Q.   OR ANY COMMUNICATIONS OF ANY KIND?        05:54:42

11         A.   COMMUNICATION?

12              MR. MCFARLAND:  ABOUT THE LAWSUIT.

13              THE WITNESS:  ABOUT THE LAWSUIT?

14    BY MR. ZELLER:

15         Q.   RIGHT.                                     05:54:49

16         A.   YEAH, NO, I DID NOT.

17         Q.   I JUST WANT TO MAKE SURE THERE WEREN'T

18    EMAILS OR SOMETHING LIKE THAT.

19         A.   OKAY, NO, NO, NO, THERE'S NONE OF THAT.

20         Q.   HAVE YOU EVER SPOKEN WITH MS. MORALES ABOUT  05:54:57

21    THIS LAWSUIT?

22         A.   YES, I DID.

23         Q.   AND WHEN DID YOU TALK WITH HER FOR THE

24    FIRST TIME ABOUT THE LAWSUIT?

25         A.   AT THE SAME TIME THAT I TALKED TO ISABEL    05:55:07
```

309

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT __16__

PAGE __217__

1      A.    OKAY.

2      Q.    ACTUALLY, I HAVE A SLIGHTLY BETTER COPY.

3            MR. MCFARLAND:   DO YOU WANT ME TO TAKE THIS

4      ONE?

5            MR. ZELLER:   YES, WHY DON'T YOU TAKE THAT       07:18:03

6      ONE.

7      Q.    THAT'S A PRETTY DIRECT PRINTOFF, SO THAT

8      MIGHT BE A LITTLE SHARPER FOR YOU.

9            FOR PURPOSES OF OUR QUESTION YOU CAN IGNORE

10     THE FIRST PAGE OF EXHIBIT 912.                         07:18:13

11     A.    OKAY.

12     Q.    AND I WOULD LIKE TO ASK YOU TO LOOK THROUGH

13     THE PHOTOGRAPHS --

14     A.    UH-HUH.

15     Q.    -- THAT ARE PART OF EXHIBIT 912 HERE, AND        07:18:18

16     ASK YOU IF YOU RECOGNIZE ANY OF THESE AS BEING THE

17     PAINTED BRATZ DOLLS THAT -- THAT YOU HAD RECEIVED

18     AND -- AND GAVE BACK TO M.G.A. AT SOME POINT FOR --

19     FOR USE ON THE -- AT THE HONG KONG TOY FAIR?

20     A.    YES.                                              07:18:39

21     Q.    THESE ARE --

22     A.    YEAH, THESE ARE IT.

23     Q.    AND WHEN YOU SAID THAT THERE WERE WIGS THAT

24     YOU HAD WORKED ON, ARE THEY THE -- THE WIGS THAT ARE

25     DEPICTED ON THE DOLLS HERE?                            07:18:50

362

EXHIBIT ___16___

PAGE ___218___

```
1        A.   YES.

2        Q.   ON ALL FOUR OF THEM?

3        A.   YES, ALL FOUR OF THEM.

4        Q.   DID YOU DO THE -- THE WORK ON THESE WIGS

5   YOURSELF, OR DID YOU HAVE SOMEONE HELP?              07:18:58

6        A.   I DID THEM MYSELF.

7        Q.   IN FACT, LET ME ASK YOU THIS MORE

8   GENERALLY.   YOU'VE OBVIOUSLY TOLD ME SO FAR ABOUT

9   PEDRO SALAZAR, ANA ISABEL CABRERA, AND BEATRICE

10  MORALES --                                           07:19:26

11       A.   UH-HUH.

12       Q.   -- AS HELPING YOU OR DOING WORK FOR YOU ON

13  THE BRATZ PROJECT; RIGHT?

14       A.   RIGHT.

15       Q.   IS THERE ANYONE ELSE WHO YOU HAD WORK FOR   07:19:32

16  YOU ON THE BRATZ PROJECT?

17       A.   I'M -- I'M GLAD YOU MENTIONED THAT, BECAUSE

18  I FAILED TO TELL YOU THAT PEDRO SALAZAR'S WIFE,

19  MARIA ELENA SALAZAR, ALSO WORK ON SOME OF THESE

20  FASHION, BECAUSE SHE WAS HELPING HER HUSBAND, AND AT  07:19:49

21  THE TIME SHE WAS WORKING FOR MATTEL.

22       Q.   MARIA SALAZAR WAS?

23       A.   YEAH, MARIA ELENA SALAZAR.

24       Q.   OH, I'M SORRY, MARIA ELENA?

25       A.   ELENA, YEAH.   IT'S WEIRD YOU SAY MARIA     07:20:04
```

363

EXHIBIT ___16___

PAGE___219___

```
 1    SALAZAR, BECAUSE I ALWAYS CALLED HER MARIA ELENA,

 2    SO...

 3        Q.   AND HOW IS IT YOU KNOW THAT MARIA ELENA

 4    SALAZAR HELPED PEDRO ON THE -- THE BRATZ FASHIONS?

 5        A.   BECAUSE WHEN I GO THERE, WORK WITH THEM THE      07:20:23

 6    WEEKENDS -- NOT WHEN I WOULD GO DURING THE -- DURING

 7    THE WEEK, BECAUSE SHE WAS WORKING AT MATTEL, BUT ON

 8    THE WEEKENDS SHE WOULD BE THERE AND SHE WOULD PITCH

 9    IN AND HELP OUT A LITTLE BIT.

10        Q.   DID SHE SIGN ANY OF THE -- THE RECEIPTS OR      07:20:41

11    TIME SHEETS?

12        A.   YES, SHE DID.

13        Q.   DID PEDRO ALSO DO THAT?

14        A.   YES, HE DID.

15        Q.   DID EITHER PEDRO SALAZAR OR MARIA ELENA         07:20:48

16    SALAZAR SIGN ANY KIND OF WRITTEN AGREEMENT WITH YOU

17    CONCERNING THEIR WORK ON BRATZ?

18        A.   NO.

19        Q.   OTHER THAN I THINK WHAT YOU DESCRIBED

20    PREVIOUSLY, THE -- THE RECEIPTS AND THE -- THE TIME      07:21:07

21    SHEETS, IS THERE ANY OTHER DOCUMENTATION THAT YOU

22    HAVE THAT REFLECTS THE WORK THAT THEY DID?

23        A.   NO.

24        Q.   BY THE WAY, WHEN YOU WERE -- WHEN YOU PAID

25    THESE FOUR VENDORS THAT WE'VE TALKED ABOUT, PEOPLE       07:21:24
```

364

EXHIBIT 16

PAGE 220

```
 1                    DECLARATION OF WITNESS

 2

 3      I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS

 4   OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS

 5   TRUE AND CORRECT.

 6

 7

 8   EXECUTED AT            , ON
                 (PLACE)              (DATE)
 9

10

11             (SIGNATURE OF WITNESS)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

422

EXHIBIT __16__

PAGE ___221___