```
 1   STATE OF CALIFORNIA    )

 2   COUNTY OF RIVERSIDE.    )  SS.

 3

 4       I, PAULA A. PYBURN, CSR NO. 7304, R.P.R., C.L.R., IN

 5   AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

 6       I AM THE DEPOSITION OFFICER THAT STENOGRAPHICALLY

 7   RECORDED THE TESTIMONY IN THE FOREGOING DEPOSITION;

 8       PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST DULY

 9   SWORN BY ME;

10       THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE

11   TESTIMONY GIVEN.

12       BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF THE

13   TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF REQUESTED,

14   ANY CHANGES MADE BY THE DEPONENT (AND PROVIDED TO THE

15   REPORTER) DURING THE PERIOD ALLOWED ARE APPENDED HERETO.

16

17   DATED _____:

18

19

20

     PAULA A. PYBURN
21   C.S.R. NO. 7304, R.P.R.
     CERTIFIED LIVENOTE REPORTER
22

23

24

25
```

EXHIBIT 16
PAGE 788

**EXHIBIT 17**

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION        **Certified Copy**

4        -------------------------

5    CARTER BRYANT, an          )

6    individual,               )

7                   Plaintiff,  )

8        vs.                    ) No. CV 04-9049 SGL

9    MATTEL, INC., a           )      (RNBx)

10   Delaware corporation,      )

11                   Defendant.  )

12                              )

13   Consolidated with          )

14   MATTEL, INC. V. BRYANT     )

15   & MGA ENTERTAINMENT,       )

16   INC. V. MATTEL, INC.       )

17   -------------------------

18        Videotaped Deposition of MARK MENZ,

19        taken at 400 Capitol Mall, 30th Floor,

20        Sacramento, California, commencing

21        at 9:58 a.m., Thursday, March 13,

22        2008, before WENDY E. ARLEN,

23        CSR No. 4355, RMR, CRR.

24

25   Pages 1 - 163

                                               1

EXHIBIT ___17___

223

```
 1    APPEARANCES OF COUNSEL:

 2

 3         FOR THE PLAINTIFF:

 4

 5              KEKER & VAN NEST LLP

 6              BY: MICHAEL H. PAGE, ESQ.

 7              710 Sansome Street

 8              San Francisco, California  94111-1704

 9              415.391.5400

10              E-mail:  mpage@kvn.com

11

12         FOR THE DEFENDANT:

13

14              QUINN EMANUEL

15              BY: CHRISTOPHER TAYBACK, ESQ.

16              865 South Figueroa Street, 10th Floor

17              Los Angeles, California  90017

18              213.443.3000

19              christayback@quinnemanuel.com

20

21         ALSO PRESENT:

22              Sean McAleer, Videographer

23

24

25

                                                        2
```

EXHIBIT __17__

224

```
 1        A.   If I am reading this correctly, it is
 2   set to overwrite the file names, yes.
 3        Q.   Okay.  So is it your testimony that
 4   you think that from the data you've seen these
 5   9400 files were actually deleted in the amount of   10:26AM
 6   time you found one by one on Mr. Bryant's
 7   computer and then overwritten individually?
 8        MR. TAYBACK:  I'm going to object to the
 9   form of the question, vague and confusing.  You
10   can answer.                                          10:26AM
11        Q.   MR. PAGE:  Do you understand the
12   question?
13        A.   There were 9400 file names or folder
14   names that were overwritten by Evidence
15   Eliminator that were on this machine.  There        10:26AM
16   would have been associated with those file names
17   or folder names data as well.  May have been, you
18   know, zero, may have been a huge file.  We don't
19   know because since Evidence Eliminator was run,
20   the only remnants we have is the fact that it        10:27AM
21   have -- we have these 9400 file names and folders
22   that were overwritten.  And something was
23   associated with those file names.  We don't know
24   because it's gone.
25        Q.   MR. PAGE:  That wasn't my question.        10:27AM
                                                             27
```

EXHIBIT __17__

PAGE __225__

```
 1    Are you familiar with the safe shutdown procedure
 2    in Evidence Eliminator?
 3        A.   Yes.
 4        Q.   Okay.  Under that procedure, when one
 5    does a safe shutdown of one's computer, Evidence   10:27AM
 6    Eliminator goes out and looks on the hard drive
 7    for any previously deleted files, correct?
 8        A.   Correct.
 9        Q.   Regardless of when they were deleted
10    and not at the time they were deleted, correct?   10:27AM
11        A.   Correct.
12        Q.   And for each one it finds, it
13    overwrites the file name, correct?
14        A.   Correct.
15        Q.   Okay.  How do I cause Evidence   10:28AM
16    Eliminator to do that physically?
17        A.   At that moment?
18        Q.   Any time I want to.  Suppose I have
19    it running on my computer, running in background.
20    How do I tell Evidence Eliminator go find all the 10:28AM
21    deleted files and overwrite them?
22        A.   By setting up the configuration --
23        Q.   No.
24        A.   -- of Evidence Eliminator.
25    Physically you don't have to do anything.  The   10:28AM
                                                        28
```

EXHIBIT __17__

226

```
 1     program does that for you.
 2          Q.    When?
 3          A.    But you have to tell the program to
 4     do it at some point.
 5          Q.    And how do I tell the program to do      10:28AM
 6     it?
 7          A.    By having -- setting up the
 8     configuration.
 9          Q.    Assume that the configuration is
10     already set up.  Assume that the configuration   10:28AM
11     was set up the day I installed it two years ago.
12          A.    All right.
13          Q.    Right?  I'm sitting at my computer.
14     Evidence Eliminator is running in the background.
15     All it's doing is cleaning Internet files.  How   10:28AM
16     do I tell it to go look for all the deleted files
17     in my computer and overwrite the file names?  How
18     do I cause that process to actually start?
19          A.    You don't.  It does it automatically.
20     It does that automatically depending on what the  10:29AM
21     configuration is.
22          Q.    Over and over and over again
23     constantly?
24          A.    If it's configured for that, yes.
25          Q.    Was it configured for that in this     10:29AM
                                                             29
```

EXHIBIT 17

PAGE 227

```
 1          A.   You can do this either on

 2     installation the first time you run it, or you

 3     can go back in the configuration and make the

 4     change whenever you want.

 5          Q.   Right.  And if you flip to the next    11:46AM

 6     page, this shows a user having checked eliminate

 7     swap file, correct?

 8          A.   Yes.

 9          Q.   I assume if one does that on

10     installation as is recommended, that will make a  11:47AM

11     change in the config.dat file?

12          A.   Yes.

13          Q.   Okay.  And if you looked -- do you

14     know whether the config.dat file on the laptop

15     had that option chosen?                           11:47AM

16          A.   At the time that they imaged the

17     drive?

18          Q.   Yes.

19          A.   Which is the only one we have.  Yes,

20     swap -- yes, swap looks like it's selected.       11:47AM

21          Q.   And that's about 15 entries down on

22     the first page of 4527 where it says --

23          A.   Right.

24          Q.   -- chkwinswap=1?

25          A.   Yes.                                    11:47AM
                                                              84
```

EXHIBIT 17

228

```
 1          Q.   Other than this change, you're not
 2     aware of anything in the config.dat file on the
 3     laptop, Exhibit 4527, that is a change from the
 4     out-of-the-box default other than that one
 5     option, correct?                              11:48AM
 6          MR. TAYBACK:  Objection, asked and
 7     answered.
 8          THE WITNESS:  Yeah, I -- again, it varies
 9     with what -- I've seen variations.  So...
10          Q.   MR. PAGE:  Okay.  You just don't     11:48AM
11     know.
12          A.   I don't know at this point.
13          Q.   Is Evidence Eliminator ever marketed
14     as a means to cause your computer to run better
15     or faster?                                     11:48AM
16          A.   All the advertising that I have been
17     associated with or seen with Evidence
18     Eliminator -- and this is going over, again,
19     quite a large -- a large period of time -- it's
20     always been advertised as a way to wipe -- to be  11:48AM
21     a wipe tool and to wipe evidence off your machine
22     you don't want someone seeing.
23          It's not been advertised primarily as a
24     tool to make your system, i.e., run better.  When
25     you look at the advertising that's been sent out, 11:49AM
                                                        85
```

EXHIBIT 17

229

1    hence, the name, Evidence Eliminator, the fact

2    that it goes to the process of going out and

3    overwriting files is a wiping tool.  It's

4    eliminating evidence from the drive.

5         To make a system -- the only -- again, the    11:49AM

6    advertising that I've seen, and as I read through

7    even their own advertising here, you know, it's

8    talking about defeating forensic equipment, it

9    talks about deleting and overwriting cache

10   histories and what have you.                        11:49AM

11        Occasionally you'll see a piece of

12   advertising that that will have a testimonial or

13   something that will talk about how it made their

14   system faster, but I've never seen anyone use it

15   for that purpose ever.  It's always for getting    11:49AM

16   rid of data on the drive.  And, in fact, the way

17   it works, it would make your system run slower

18   because, again, it's a wiping tool, not a

19   cleaning tool.

20        Q.   So to repeat my question, have you       11:50AM

21   ever seen Evidence Eliminator marketed as a tool

22   to make your PC run faster?

23        MR. TAYBACK:  Objection, asked and

24   answered.

25        MR. PAGE:  You're half right.                 11:50AM
                                                            86

EXHIBIT __17__

230

```
1            MR. TAYBACK:  You can answer the question.

2            THE WITNESS:  I have never seen it

3       advertised as a tool to make your PC run faster

4       as the primary reason to buy it.

5            Q.   MR. PAGE:  Okay.  Let me ask the        11:50AM

6       question again.  Have you ever seen it marketed

7       as a tool to make your PC run faster?  Without

8       the word primarily in my question.

9            MR. TAYBACK:  Objection, asked and

10      answered.                                          11:50AM

11           MR. PAGE:  No, he wrote a new question and

12      answered it.  I'd like him to answer mine.

13           Q.   Have you ever seen --

14           MR. TAYBACK:  Objection, asked and

15      answered.                                          11:50AM

16           Q.   Have you ever seen Evidence

17      Eliminator marketed as a tool to make your PC run

18      faster?

19           A.   And I have to ask what do you

20      actually mean by marketed?                         11:50AM

21           Q.   Contained in marketing material

22      distributed by the manufacturer.

23           A.   Yes, I have seen Evidence Eliminator

24      make -- again, in the side bar talking about part

25      of their advertising material that it made the     11:51AM
                                                              87
```

EXHIBIT ___17___

PAGE ___231___

```
1              REPORTER'S CERTIFICATE

2

3          I certify that the witness in the

4     foregoing deposition,

5              MARK MENZ,

6     was by me duly sworn to testify in the

7     within-entitled cause; that said deposition was

8     taken at the time and place therein named; that

9     the testimony of said witness was reported by

10    me, a duly Certified Shorthand Reporter of the

11    State of California authorized to administer

12    oaths and affirmations, and said testimony was

13    thereafter transcribed into typewriting.

14          I further certify that I am not of

15    counsel or attorney for either or any of the

16    parties to said deposition, nor in any way

17    interested in the outcome of the cause named in

18    said deposition.

19          IN WITNESS WHEREOF, I have hereunto

20    set my hand this 14th day of March, 2008.

21

22

23    _____
      WENDY E CARLEN
24    Certified shorthand Reporter
      State of California
25    Certificate No. 4355
```

160

EXHIBIT 17

232

**EXHIBIT 18**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

--oOo--



CARTER BRYANT, an individual,

     Plaintiff,

vs.                   No. CV 04-9049 SGL (RNBx)

MATTEL, INC., a Delaware
Corporation,

     Defendants.

_____/

Consolidated with MATTEL, INC.,
v. BRYANT and MGA ENTERTAINMENT,  No. 04-9059 NM (RNBx)
INC., v. MATTEL, INC.,

_____/

-- CONFIDENTIAL, ATTORNEYS' EYES ONLY --

Videotaped Deposition of

PAUL K. MEYER

_____

Monday, March 31, 2008

Reported by:
Leslie Rockwood
CSR No. 3462
Job No. 79584

1

EXHIBIT 18

PAGE 233

RECEIVED

APR 0 7 2008

EXHIBIT ___18___

PAGE ___234___

```
1                          APPEARANCES:

2

3    For the Plaintiff MATTEL, INC.:

4             Robert P. Feldman, Esq.
              Quinn Emanuel Urquhart Oliver & Hedges
5             555 Twin Dolphin Drive, Suite 650
              Redwood Shores, California 94065
6             (650) 801-5000
              Email: bobfeldman@quinnemanuel.com
7

8

9    For the Defendant MGA ENTERTAINMENT, INC., and ISSAC
     LARIAN and THE WITNESS:
10
              Carl A. Roth, Esq.
11            Skadden Arps Slate Meagher & Flom LLP
              300 South Grand Avenue
12            Los Angeles, California 90071
              (213) 687-5000
13            Email: croth@skadden.com

14

15   Also present:  Carrie Hillen, CRA International
                    Colin Choi, Navigant Consulting
16

17

18   The Videographer:  Marty Majdoub

19

20

21

22

23

24

25
```

ESQUIRE DEPOSITION SERVICES
800.770.3363

EXHIBIT  18

PAGE  235

```
 1   if someone were to tell you that the drawings were the
 2   work of genius?
 3              MR. ROTH:  Vague and ambiguous.
 4              THE WITNESS:  I'm okay with that.
 5        Q.  BY MR. FELDMAN:  The same thing, if someone
 6   were to tell you that the drawings represented something
 7   unique?
 8              MR. ROTH:  Vague and ambiguous.
 9              THE WITNESS:  I certainly have seen those
10   references, and I've considered those, and I would
11   understand that to be the case.
12        Q.  BY MR. FELDMAN:  It doesn't change anything
13   about your willingness to accept her statement?
14        A.  No, because it's always in context.  I think
15   that's what's hard about this case is that they may be
16   viewed as unique, and Mr. Bryant may be viewed as a
17   talented person, but it doesn't mean that there's not a
18   whole lot of inspiration in the public record between
19   1997 and the year 2000 that provided for a lot of things
20   that are actually pretty commonplace every day.  And I
21   think at some point what really becomes important is a
22   business deciding they're going to do this, and they're
23   going to actually do this with vigor and energy and get
24   out to the market like this and make a commitment, and
25   that's what MGA did.
```

153

EXHIBIT  18

PAGE  236

1      Q.   So would it change your opinion if it turns

2  out that many of the same people worked on other projects

3  together and they weren't as successful as Bratz?

4          MR. ROTH:  Vague and ambiguous.

5          THE WITNESS:  I would understand that's how

6  things happen every day in business, things happen that

7  work and things happen that don't work, and that's part

8  of the process of learning.

9          Q.   BY MR. FELDMAN:  So it would not change your

10 opinion if you were to learn that many of the same people

11 who worked on Bratz worked on other projects that were

12 not nearly as successful?

13         MR. ROTH:  Vague and ambiguous.

14         THE WITNESS:  That would not surprise me.

15         Q.   BY MR. FELDMAN:  Have you formed an opinion

16 about whether the Bratz accessories would be sold if

17 there were no Bratz dolls sold?

18         MR. ROTH:  Vague and ambiguous.

19         THE WITNESS:  I don't follow that question.

20         Q.   BY MR. FELDMAN:  You know what Bratz

21 accessories are; right?

22         A.   Right.

23         Q.   If there had never been any Bratz dolls,

24 would any of those accessories have been sold?

25         A.   Well, are we setting up a hypothetical where

154

EXHIBIT __18__

PAGE ___237___

1    there's no -- in the hypothetical, there's no Bratz

2    fashion doll?

3         Q.  Right.

4         A.  I think if we take your hypothetical to just

5    the black and white, if we just assume that for whatever

6    reason, there's no Bratz fashion doll, from my

7    perspective, I don't see why there would be accessories

8    available to be sold to a company and to be part of such

9    a fashion doll line because it would not be a fashion

10   doll line.

11             I don't believe that's a reasonable

12   assumption there's no Bratz fashion doll because I

13   believe the record indicates that I've looked at there's

14   all kinds of reasons why it would be.  It's also, I don't

15   believe, a proper way of looking at the intellectual

16   property, that is, we're looking at this apportionment of

17   profits attributable, and we're not looking at this issue

18   of is there a fashion doll or not.  I don't believe

19   that's part of the analysis.

20        Q.  Would the fashions for the Bratz doll have

21   been sold if there hadn't been a Bratz doll?

22        A.  Once again, if we are assuming that

23   there's -- in your hypothetical, there's no fashion doll,

24   I don't see why there would be fashion sold for a doll

25   that didn't exist.

                                                          155

EXHIBIT  18

PAGE  238

1          Q.  Okay.  Would you look at your opening report,

2   I think it's either page or paragraph 81.  I'm not sure.

3   Yeah, paragraph 81.

4          Are you with me?

5          A.  Yes.

6          Q.  Have you read this -- this whatever it's

7   called, survey or study or report that's referred to in

8   paragraph 81?

9          A.  One moment.

10         Q.  Sure.

11         A.  I have seen the survey, yes.

12         Q.  Have you studied it?

13         MR. ROTH:  Vague and ambiguous.

14         THE WITNESS:  I believe I've looked through

15  it and considered it, and when you say studied, do you

16  mean like have I read it and gone through it?  Yes.

17         Q.  BY MR. FELDMAN:  Who wrote it?

18         A.  Who wrote the -- I'd have to pull it out and

19  see if it's referenced.  I believe it was either done by

20  Bratz or on behalf of Bratz.

21         Q.  Do you know who the authors, like the human

22  being authors were?

23         A.  That's 117.  Let me pull that out.

24         I believe the study was done by C & R

25  Research Services, under contract to Bratz, and my

                                                          156

EXHIBIT __18__

PAGE __239__

1    issues at this point in time.

2         Q.   Would you look at paragraph 117 of your

3    opening report, please.

4         I have reference particularly to the first

5    sentence of paragraph 117.  Do you have that in mind?

6         A.   Yes.

7         Q.   In that sentence you wrote:  "One reason the

8    Bratz dolls resonated with girls is that MGA has been

9    able to establish Bratz as a lifestyle through its

10   licensing program."

11        Is that what you wrote?

12        A.   Yes.

13        Q.   And is it correct that generally what you're

14   saying is that the licensing program helped to drive

15   Bratz sales, sales of Bratz dolls?

16        A.   I guess it sort of goes hand-in-hand with the

17   branding and advertising and the marketing.  At some

18   point in time when you become positioned where there's

19   high demand for your proprietary content to license,

20   you're able to earn those -- those royalties.

21        The products then that are sold then become

22   more available to your consumers who are buying fashion

23   dolls.  And so it assists in the sales of the fashion

24   dolls.  It expands the products that can be levered in

25   the marketplace without you taking the risk of contract

172

1    manufacturing, things like that.

2        Q.  So, in other words, the sale of licensed

3    products to some extent at least drives the sales of

4    dolls; is that what you're saying?

5        A.  There's probably many aspects to it, but it

6    would be my position that as you become -- if you do your

7    licensing appropriately, and it's quality licensed

8    product, then the extension becomes more of a lifestyle

9    for this tween market, then, that would assist in the

10   sale of additional fashion dolls.

11       Q.  And it's correct that the sales of the

12   fashion dolls makes the licensing program possible;

13   right?

14           MR. ROTH:  Vague and ambiguous.

15           THE WITNESS:  It would be my understanding

16   that certainly -- and this may go back to your prior

17   guess.  I mean, it -- the fashion doll success leads to

18   additional licensing opportunities.

19       Q.  BY MR. FELDMAN:  There's a -- a subject I'm

20   sure you know even more about than you know about fashion

21   dolls.  Are you ready?

22           MR. ROTH:  Going to be hard to top.

23       Q.  BY MR. FELDMAN:  Are you ready, Mr. Meyer?

24       A.  Whenever you are.

25       Q.  Are you familiar with something called the

                                                          173

ESQUIRE DEPOSITION SERVICES
800.770.3363

EXHIBIT  18

PAGE  241

```
 1   25-percent rule?

 2          A.   Yes, I'm familiar with that rule.

 3          Q.   Well familiar; right?

 4          A.   Yes.  It's been certainly around the

 5   intellectual property valuation space for many decades.

 6          Q.   Thank you.

 7          A.   Probably before my time.

 8          Q.   Have you ever criticized it?

 9          A.   I have criticized it when it's been used

10   improperly.  And so when -- it would probably be a more

11   straightforward way to really focus on my criticisms is

12   when someone takes operating profits and applies the

13   25-percent rule and then sort of leaves it there, and

14   then this happens.  And so I've given testimony in

15   Federal Court where it -- it can't be used in all

16   circumstances.  And when it's used, it's sort of like you

17   have to use it carefully and be responsible.

18          And as I say, be responsible.  And that it's

19   a starting point.  So you could use it, and then you'd

20   have to be very focused on adjusting it downwards, if

21   need be, to fit the intellectual property in your subject

22   matter.

23          And so I'm in a situation now where if you go

24   back and look at my testimony, I've used it when I feel

25   it's appropriate and made the adjustments, and I've given
```

ESQUIRE DEPOSITION SERVICES
800.770.3363

EXHIBIT  18

PAGE  242

1    issue and analysis; is that correct?

2             MR. ROTH:   Objection to the extent it

3    misstates testimony.

4             THE WITNESS:   I believe that although one may

5    try to separate the two, I think that there are some

6    practical overlaps.   And that's what I'm trying to

7    just -- to ventilate that.

8             So I don't think it's as easy as saying the

9    apportionment's independent of causation when you're

10   talking about sales drivers, because I don't believe that

11   it's appropriate to be alluding to sales drivers when

12   really the test is the profits attributable to the

13   accused property.   And so I see an overlap.   And that may

14   just be how I view damages differently in an intellectual

15   property case than maybe others.

16        Q.   BY MR. FELDMAN:   Okay.   Then am I correct

17   that you regard apportionment and causation as

18   overlapping?

19        A.   I believe that unless there's clear

20   communication, there can be some overlapping or there can

21   be some misleading information provided to the trier of

22   fact.   And I believe that if there's good communication

23   and if maybe -- and it's clear under that assumption, you

24   wouldn't have that problem.   But I can see how that --

25   you could quickly end up having that problem if you don't

ESQUIRE DEPOSITION SERVICES
800.770.3363

EXHIBIT  18

PAGE  243

1    keep those really clear.

2         Q.  Okay.  So then would you favor the jury with

3    an answer to this:  Do you think that in the absence of

4    the sale of Bratz dolls any Bratz fashions would have

5    been sold?  Tell the ladies and gentlemen of the jury

6    what the answer to that question is.

7              MR. ROTH:  Argumentative.

8              THE WITNESS:  What I would say to them is

9    that I don't believe that that's the test that we have to

10   value intellectual property in this case.

11        Q.  BY MR. FELDMAN:  Nonetheless, if you could

12   answer the question.

13        A.  Well, then what I would say is that if you're

14   telling me would you sell fashions if you don't have

15   fashion dolls, I can't tell the jury that.

16        Q.  Same question with respect to accessories.

17        A.  I'd have the same answer.

18        Q.  Thank you.

19             Would you look at page 22 of your rebuttal

20   report.  I already asked you that one.  Sorry.

21             As I said, I'm going to take a moment so I

22   don't trouble you to repeat yourself.  Okay?

23        A.  That's fine.  Thank you.

24        Q.  Mr. Meyer, is there some way that you can

25   tell me whether -- in English, not numbers, whether the

231

1    costs on Exhibits 4.1, 4.2 and 4.3 were different in any

2    way other than because the -- in any way other than the

3    proportion of, if you will, accused revenue to overall

4    revenue was on those schedules?

5              MR. ROTH:  Vague and ambiguous.

6         Q.   BY MR. FELDMAN:  Does that make sense?

7         A.   I'm not certain.  I think what -- I mean, if

8    you're asking me have I allocated the operating costs

9    based on sales, yes, I have done that for all the reasons

10   I've stated.

11        Q.   And if the proportion of sales -- as we know,

12   the proportion of sales on figures -- attachments 4.1,

13   4.2 and 4.3 change; right?

14        A.   Well, proportion -- it's based on the nominal

15   dollars, and so as the sales increase over time, then the

16   costs are allocated against those increasing sales under

17   what I believe I've proven, which is that basically all

18   these costs have varied and then driven at the operating

19   line.

20             As I mentioned, if you look at the cost of

21   goods and the molding and add production, add media,

22   royalty expense, those are done differently.  But the

23   ones that are approached from the standpoint of the

24   allocation against net sales are done on a proportional

25   basis -- and I ran the regressions which said that

232

EXHIBIT    18

PAGE    245

1

2          I, the undersigned, a Certified Shorthand

3  Reporter of the State of California, do hereby

4  certify:

5          That the foregoing proceedings were taken

6  before me at the time and place herein set forth; that

7  any witnesses in the foregoing proceedings, prior to

8  testifying, were placed under oath; that a verbatim

9  record of the proceedings was made by me using machine

10 shorthand which was thereafter transcribed under my

11 direction; further, that the foregoing is an accurate

12 transcription thereof.

13         I further certify that I am neither

14 financially interested in the action nor a relative or

15 employee of any attorney of any of the parties.

16         IN WITNESS WHEREOF, I have this date

17 subscribed my name.

18

19 Dated: _____APR 0 2 2008_____

20

21

22 _____

23 Leslie Rockwood
   Certified Shorthand Reporter
   State of California
24 Certificate No. 3462

25

EXHIBIT 18
PAGE 246

**EXHIBIT 19**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., A DELAWARE CORPORATION,

          PLAINTIFF,

      V.

CARTER BRYANT, AN INDIVIDUAL, AND DOES 1 THROUGH 10, INCLUSIVE,

          DEFENDANTS.

NO.  CV 04-9059 DDP (AJWX)

# C O N F I D E N T I A L

## ATTORNEYS' EYES ONLY

### (PAGES 84 - 124, 160 - 165, 169 - 172, 181 – 202, 217 - 252)

# DEPOSITION OF VICTORIA O'CONNOR

# DECEMBER 6, 2004



COURT REPORTERS
700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
PAULA A. PYBURN
CSR. NO. 7304
JOB NO. 04AE373-PP

EXHIBIT 19

PAGE 247

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4
    MATTEL, INC., A DELAWARE    )
 5  CORPORATION,                )
                                )
 6            PLAINTIFF,         )
                                )
 7       VS.                    )    NO. CV 04-9059 DDP
                                )         (AJWX)
 8  CARTER BRYANT, AN           )
    INDIVIDUAL, AND DOES 1      )
 9  THROUGH 10, INCLUSIVE,      )
                                )
10            DEFENDANTS.        )
    _____)
11                              )
    AND RELATED                 )
12  CROSS-ACTION.               )
    _____)
13
14             C O N F I D E N T I A L
15      (PURSUANT TO STIPULATED PROTECTIVE ORDER,
      THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL)
16
17   (PAGES 1-83, PAGES 125-159, PAGES 166-168, PAGES
               173-180 AND PAGES 203-216)
18
19  DEPOSITION OF VICTORIA O'CONNOR, TAKEN ON BEHALF OF
20  THE PLAINTIFF AND CROSS-DEFENDANT AT 865 SOUTH
21  FIGUEROA STREET, 10TH FLOOR, LOS ANGELES,
22  CALIFORNIA, COMMENCING AT 9:46 A.M., MONDAY,
23  DECEMBER 6, 2004, BEFORE PAULA A. PYBURN, CSR 7304,
24  RPR.
25
```

2

EXHIBIT 19

PAGE 248

```
 1   APPEARANCES OF COUNSEL:
 2
 3   FOR THE PLAINTIFF AND CROSS-DEFENDANT:
 4       QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
         BY:   JOHN B. QUINN, ESQ.
 5                    AND
             MICHAEL T. ZELLER, ESQ.
 6                    AND
             TANIA KREBS, ESQ.
 7       865 SOUTH FIGUEROA STREET, 10TH FLOOR
         LOS ANGELES, CALIFORNIA 90017-2543
 8       (213) 443-3000
 9
10   FOR THE DEFENDANTS AND CROSS-COMPLAINANT:
11       LITTLER MENDELSON
         BY:   KEITH A. JACOBY, ESQ.
12       2049 CENTURY PARK EAST, 5TH FLOOR
         LOS ANGELES, CALIFORNIA 90067-3107
13       (310) 553-0308
14
15   FOR DEFENDANT IN INTERVENTION, MGA ENTERTAINMENT:
16       O'MELVENY & MEYERS LLP
         BY:   DIANA M. TORRES, ESQ.
17       400 SOUTH HOPE STREET
         LOS ANGELES, CALIFORNIA 90071-2899
18       (213) 430-6000
19
20   ALSO PRESENT:
21       RICHARD DANIELS, MGA SENIOR COUNSEL
         MICHAEL MOORE, MATTEL SENIOR COUNSEL
22       SHERRI MULFORD, VIDEOGRAPHER
         JILL E. THOMAS, MATTEL ASSISTANT GENERAL COUNSEL
23
24
25
```

A&B COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT   19
249

```
1                        I N D E X
2   DEPONENT:            EXAMINED BY:              PAGE:
3   VICTORIA O'CONNOR    MR. QUINN                   7
4                        MR. JACOBY                 203
5
6
7
    EXHIBITS FOR IDENTIFICATION:
8
                            (NONE)
9
10
11
    QUESTIONS UNANSWERED BY DEPONENT:
12
                            (NONE)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

EXHIBIT  19
PAGE  250

```
 1       LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 6, 2004
 2                       9:46 A.M.
 3
 4          THE VIDEO TECHNICIAN:  GOOD MORNING.  WE
 5    ARE ON THE RECORD AT 9:46 A.M., TODAY'S DATE IS          09:46AM
 6    MONDAY, DECEMBER 6TH, 2004, MY NAME IS SHERRI
 7    MULFORD, I'M A VIDEO TECHNICIAN EMPLOYED BY JTV
 8    LITIGATION SERVICES, LOCATED IN LOS ANGELES,
 9    CALIFORNIA.  WE ARE TAPING THESE PROCEEDINGS AT 865
10    SOUTH FIGUEROA STREET, 10TH FLOOR, LOS ANGELES,          09:47AM
11    CALIFORNIA.  THIS IS TAPE 1 FOR THE VIDEOTAPED
12    DEPOSITION OF VICTORIA O'CONNOR IN THE ACTION
13    ENTITLED "CARTER BRYANT VS. MATTEL, INC." ON BEHALF
14    OF THE DEFENDANT.  THE CASE NUMBER IS CV 04-9049 NM
15    (RNBX).                                                  09:47AM
16          MAY I PLEASE HAVE INTRODUCTIONS FOR THE
17    RECORD.
18          MR. QUINN:  MY NAME IS JOHN QUINN AND I
19    REPRESENT THE PLAINTIFF IN THIS CASE, MATTEL.  WITH
20    ME IS MY PARTNER, MIKE ZELLER, AND COLLEAGUE, TANIA      09:47AM
21    KREBS.
22          MR. JACOBY:  KEITH JACOBY FOR CARTER
23    BRYANT.
24          MS. TORRES:  DIANA TORRES FOR DEFENDANT
25    IN -- IN INTERVENTION MGA ENTERTAINMENT, INC., AND       09:47AM
```

EXHIBIT 19
PAGE 251

```
 1    WITH ME IS RICH DANIELS FROM MGA.

 2           MR. JACOBY:  JOHN, CAN I GET CLARIFICATION?

 3    I THINK THE CASE CAPTION SHE READ WAS FOR THE DEC

 4    RELIEF CLAIM.  I BELIEVE THE DEPO IS BEING TAKEN

 5    PURSUANT TO THE MAIN MATTEL ACTION.              09:48AM

 6           MR. QUINN:  SHALL WE FINISH THE

 7    INTRODUCTIONS?

 8           MR. JACOBY:  SURE.

 9           MR. MOORE:  MICHAEL MOORE, IN-HOUSE COUNSEL

10    FOR MATTEL, INC.                                 09:48AM

11           MS. THOMAS:  AND JILL THOMAS, IN-HOUSE

12    COUNSEL FOR MATTEL, INC.

13           THE WITNESS:  VICTORIA O'CONNOR, WITNESS.

14           MR. QUINN:  WHATEVER CAPTION YOU'D LIKE ON

15    IT, KEITH, IT'S FINE WITH ME IF IT'S ON IT, AND IF  09:48AM

16    YOU WANT TO JUST TELL THE REPORTER AT SOME POINT

17    DURING THE DAY WHAT CAPTION YOU WOULD LIKE TO HAVE

18    ON IT, IT'S FINE WITH US.

19           MR. JACOBY:  THANK YOU.

20           THE VIDEO TECHNICIAN:  THANK YOU.         09:48AM

21           MS. REPORTER, PLEASE SWEAR IN THE WITNESS.

22           MR. QUINN:  SHE HAS TO DO HER THING NOW.

23    ///

24    ///

25    ///
```

6

EXHIBIT 19

PAGE 852

```
 1                    VICTORIA O'CONNOR,

 2          DEPONENT, WAS AFFIRMED AND EXAMINED AND

 3                 TESTIFIED AS FOLLOWS:

 4

 5          DEPOSITION OFFICER:  DO YOU SOLEMNLY AFFIRM

 6     THAT THE TESTIMONY YOU ARE ABOUT TO GIVE IN THIS

 7     DEPOSITION SHALL BE THE TRUTH, THE WHOLE TRUTH, AND

 8     NOTHING BUT THE TRUTH, SO HELP YOU GOD?

 9          THE DEPONENT:  I DO.

10

11                      EXAMINATION

12     BY MR. QUINN:

13       Q.   OKAY.  GOOD MORNING, MS. O'CONNOR.

14       A.   GOOD MORNING.

15       Q.   HAVE YOU EVER HAD THE PRIVILEGE OF HAVING      09:48AM

16     YOUR DEPOSITION TAKEN BEFORE?

17       A.   I HAVE.

18       Q.   ONCE, MORE THAN ONCE, A THOUSAND TIMES?

19       A.   MORE THAN ONCE.

20       Q.   SO DO YOU FEEL COMFORTABLE THAT YOU'RE       09:48AM

21     FAMILIAR WITH THE PROCEDURE?

22       A.   I DO.

23       Q.   I WON'T GO THROUGH SOME OF THE ADMONITIONS

24     OR SPEECHES THAT LAWYERS OFTEN GIVE TO WITNESSES,

25     THEN, AT THE BEGINNING OF THE DEPOSITION.           09:49AM
```

7

EXHIBIT 19

PAGE 253

```
 1   WHEN I WAS EMPLOYED DURING MGA, IS THAT -- THE ONLY
 2   THING I WAS -- I WAS UNDERSTOOD, THAT THIS -- THAT'S
 3   NOW NULL AND VOID BECAUSE OF THE SUBPOENA; THAT THE
 4   ONLY THING THAT WOULD BE PRIVILEGED WOULD BE ANY
 5   CONVERSATIONS I HAD WITH COUNSEL DURING MY TENURE AT     09:53AM
 6   MGA.
 7        MR. QUINN:   I'M SURE COUNSEL WILL AGREE
 8   WITH ME THAT INFORMATION THAT IS CONFIDENTIAL --
 9   SETTING ASIDE ATTORNEY-CLIENT PRIVILEGED
10   INFORMATION, ATTORNEY -- INFORMATION THAT IS            09:53AM
11   OTHERWISE CONFIDENTIAL IS SUBJECT TO DISCOVERY AND
12   YOU HAVE TO ANSWER.
13        WE HAVE IN PLACE IN THIS CASE AN
14   AGREED-UPON -- WHAT'S CALLED A STIPULATED PROTECTIVE
15   ORDER, WHICH PROVIDES THAT IF THERE IS CONFIDENTIAL     09:53AM
16   INFORMATION, IT CAN BE TREATED IN A CERTAIN WAY, SO
17   IT CAN ONLY BE USED FOR THE PURPOSE OF THIS CASE AND
18   CAN'T BE DISCLOSED TO OTHER PEOPLE, AND IF WE GET TO
19   SOMETHING LIKE THAT, COUNSEL MIGHT WELL SAY, I WANT
20   THIS QUESTION AND ANSWER TO BE PART OF THE             09:53AM
21   CONFIDENTIALITY PROVISIONS OF THE PROTECTIVE ORDER,
22   AND THEN THE PROTECTIVE ORDER PROVIDES THAT, YOU
23   KNOW, THERE'S LIMITATIONS ON USE.  BUT IN ESSENCE,
24   WHAT YOU SAID IS RIGHT.
25        THE WITNESS:   OKAY.                              09:54AM
```

12

EXHIBIT  19

PAGE  253.001

```
 1    BY MR. QUINN:

 2        Q.   LET ME BEGIN THEN WITH YOUR -- YOUR

 3    PREVIOUS ASSOCIATION WITH MGA.  AS I UNDERSTAND IT,

 4    YOU WERE EMPLOYED BY MGA DURING SOME TIME PERIOD?

 5        A.   YES.                                        09:54AM

 6        Q.   COULD YOU TELL US WHAT TIME PERIOD THAT

 7    WAS?

 8        A.   APRIL 5TH, 1999, THROUGH FEBRUARY 15TH,

 9    2003.

10        Q.   SO IS THAT -- IF I HEARD YOU CORRECTLY,    09:54AM

11    THAT'S A LITTLE BIT SHORT OF FOUR YEARS; IS THAT

12    RIGHT?

13        A.   CORRECT.

14        Q.   DURING THAT TIME PERIOD DID -- AT MGA WAS

15    THERE AN IN-HOUSE LAWYER ON STAFF AT MGA?          09:54AM

16        A.   DURING WHICH TIME?

17        Q.   DURING THE -- THE PERIOD THAT YOU WERE

18    EMPLOYED THERE.

19        A.   THE ENTIRE TIME?

20        Q.   YES.                                        09:54AM

21        A.   NO.

22        Q.   AT ANY POINT --

23        A.   YES.

24        Q.   -- DURING THE TIME YOU WERE EMPLOYED?

25             CAN YOU TELL ME WHAT -- ROUGHLY WHEN IT WAS 09:55AM
```

13

EXHIBIT 19

PAGE 253002

```
 1    THAT THERE WAS AN IN-HOUSE LAWYER AT MGA?

 2         A.   I DON'T RECALL WHICH YEAR.

 3         Q.   CAN YOU TELL US ROUGHLY, APPROXIMATELY?

 4         A.   MAYBE THE END OF 2001 OR 2002.

 5         Q.   THE END OF ONE OF THOSE TWO YEARS --          09:55AM

 6         A.   YES.

 7         Q.   -- OR --

 8         A.   END OF 2001 OR BEGINNING OF 2002.

 9         Q.   SO BEFORE WHENEVER THAT WAS, EITHER END OF

10    2001 OR BEGINNING OF 2002, IS IT TRUE THAT THERE WAS     09:55AM

11    NOT AN IN-HOUSE LAWYER ON STAFF AT MGA?

12         A.   YES.

13         Q.   AND AFTER THAT PERIOD THERE WAS AN IN-HOUSE

14    LAWYER ON STAFF?

15         A.   YES.                                           09:55AM

16         Q.   WHAT WAS THAT INDIVIDUAL'S NAME?

17         A.   I DON'T REMEMBER HER NAME.

18         Q.   WELL, WAS IT A HER?

19         A.   IT WAS A HER.

20         Q.   AND WHATEVER HER NAME WAS, DID SHE -- DID      09:56AM

21    SHE HAVE A -- WAS SHE LIKE GENERAL COUNSEL, IS THAT

22    HOW SHE WAS REFERRED --

23         A.   YES.

24         Q.   -- TO?

25              AND DID SHE REMAIN IN THAT POSITION OF         09:56AM
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT ___19___

PAGE ___253.003___

```
 1      Q.   YES.  YOU STILL --

 2      A.   OKAY.

 3      Q.   -- HAVE TO ANSWER THE QUESTION.

 4      A.   CAN YOU BE MORE SPECIFIC?

 5      Q.   NO, NOT REALLY.  WAS THERE EVER ANYTHING          09:59AM

 6  THAT YOU WERE ASKED TO DO THAT YOU -- MADE YOU FEEL

 7  KIND OF UNCOMFORTABLE?

 8      A.   YES.

 9           MS. TORRES:  OBJECTION.  VAGUE.

10           MR. JACOBY:  SAME OBJECTION.                      09:59AM

11  BY MR. QUINN:

12      Q.   AND WHAT WAS THAT?

13      A.   WHEN THE ORIGINAL CONTRACT WAS EXECUTED BY

14  CARTER BRYANT, IT WAS SENT TO ME VIA FAX, AND ON THE

15  TOP OF THE FAX LISTED THE PHONE NUMBER FROM WHERE IT      10:00AM

16  WAS FAXED, WHICH SAID "BARBIE COLLECTIBLES," AND AT

17  ONE POINT MY BOSS, ISAAC LARIAN, ASKED ME TO WHITE

18  THAT OUT AND SEND IT TO A LAWYER, PATTY GLASER.

19           MS. TORRES:  NOW I'M GOING TO INSTRUCT THE

20  WITNESS NOT TO ANSWER WITH RESPECT TO ANY                 10:00AM

21  COMMUNICATIONS SHE MAY HAVE HAD WITH COUNSEL FOR

22  MGA.

23           MR. QUINN:  WELL, WE'LL GET TO THAT AS TO

24  WHETHER YOU CAN ACTUALLY MAKE THAT INSTRUCTION, BUT,

25  I MEAN, AT THIS POINT --                                  10:00AM
```

                                                                    18

EXHIBIT _19_

PAGE _255.001_

1    Q.    DID YOU DO WHAT HE ASKED, DID YOU -- DID

2    YOU WHITE OUT THE LINE THAT SAID "BARBIE

3    COLLECTIBLES"?

4    A.    YES.

5    Q.    DID YOU HAVE ANY DISCUSSION WITH MR. LARIAN    10:01AM

6    AS TO WHY HE WANTED YOU TO WHITE THAT LINE OUT?

7    A.    I DON'T RECALL.

8    Q.    ARE YOU SAYING THAT YOU DON'T RECALL THE

9    SUBSTANCE OF THE DISCUSSION, OR THAT YOU DON'T

10   RECALL WHETHER YOU DISCUSSED THAT SUBJECT AT ALL?    10:01AM

11   A.    I -- I DON'T RECALL THE SUBSTANCE.

12   Q.    SO YOU DO KNOW YOU DISCUSSED THAT

13   INSTRUCTION WITH MR. LARIAN; YOU JUST DON'T RECALL

14   THE SUBSTANCE; IS THAT TRUE?

15   A.    YES.    10:01AM

16   Q.    DID YOU DISCUSS THAT WITH MR. LARIAN ONCE

17   OR MORE THAN ONCE, THAT INSTRUCTION TO WHITE OUT THE

18   "BARBIE COLLECTIBLES" HEADING ON THE DOCUMENT?

19   A.    I DON'T RECALL.

20   Q.    DID YOU EVER DISCUSS THAT SUBJECT WITH    10:01AM

21   ANYBODY ELSE AT MGA?

22   MS. TORRES:  I'M GOING TO INSTRUCT THE

23   WITNESS NOT TO ANSWER TO THE EXTENT IT INVOLVES

24   CONVERSATIONS WITH COUNSEL.

25   THE WITNESS:  I DON'T RECALL.    10:01AM

19

EXHIBIT ___19___

PAGE ___255 002___

```
 1    BY MR. QUINN:

 2        Q.   DID YOU EVER DISCUSS THAT SUBJECT -- I'M

 3    JUST ASKING -- ASKING ABOUT THE SUBJECT NOW, NOT ANY

 4    OF THE CONTENT -- WITH ANY ATTORNEY FOR MGA?

 5            MS. TORRES:  THAT SAME -- SAME INSTRUCTION.      10:02AM

 6            THE WITNESS:  I ACTUALLY DON'T RECALL.

 7    BY MR. QUINN:

 8        Q.   WHY -- WHY WAS IT A CONCERN TO YOU THAT

 9    THIS CONTRACT SIGNED BY CARTER BRYANT AND WHEN IT

10    CAME OVER THE FAX IT HAD THE HEADING AT THE TOP OF      10:02AM

11    "BARBIE COLLECTIBLES," WHY WAS THAT OF CONCERN TO

12    YOU?

13        A.   BECAUSE --

14            MS. TORRES:  OBJECTION.  MISSTATES THE

15    WITNESS'S TESTIMONY.                                    10:02AM

16    BY MR. QUINN:

17        Q.   GO AHEAD.

18        A.   I WAS CONCERNED BECAUSE HE WAS STILL

19    EMPLOYED AT MATTEL AT THE TIME THE CONTRACT WAS

20    EXECUTED.                                               10:02AM

21        Q.   DID YOU EXPRESS THAT CONCERN TO ANYBODY AT

22    MGA?

23        A.   I'M SURE I DID, BUT I DON'T RECALL SPECIFIC

24    CONVERSATIONS.

25        Q.   OKAY.  EVEN THOUGH YOU DON'T RECALL           10:02AM
```

                                                                    20

EXHIBIT ___19___

PAGE ___255 003___

```
 1   SPECIFIC CONVERSATIONS, CAN YOU IDENTIFY FOR ME A

 2   CLASS OF PEOPLE WHO YOU BELIEVE YOU DISCUSSED THAT

 3   WITH?

 4       A.   WHAT DO YOU MEAN BY "CLASS"?

 5       Q.   WELL, A GROUP, THE PEOPLE WHO YOU -- YOU        10:03AM

 6   BELIEVE YOU DISCUSSED IT WITH, EVEN IF YOU CAN'T

 7   RECALL THE SPECIFICS OF THE DISCUSSION.

 8           MR. JACOBY:  OBJECTION.  ASSUMES FACTS NOT

 9   IN EVIDENCE.

10           THE WITNESS:  IT WAS PROBABLY ONE OR TWO        10:03AM

11   INDIVIDUALS; I DON'T REMEMBER IT BEING MORE THAN

12   THAT.

13   BY MR. QUINN:

14       Q.   ALL RIGHT.  AND WHO -- WHO ARE THE ONE OR

15   TWO INDIVIDUALS THAT YOU'RE THINKING OF THAT YOU       10:03AM

16   PROBABLY DISCUSSED IT WITH?

17       A.   ISAAC LARIAN AND PAULA TREANTAFELLES,

18   SPELLED T-R-E-A-N-T-A-F-E-L-L-E-S.

19       Q.   AND THAT'S THE BEST OF YOUR RECOLLECTION?

20       A.   YES.                                           10:03AM

21       Q.   DO YOU BELIEVE THAT YOU DISCUSSED THE FACT

22   THAT MR. BRYANT WAS STILL EMPLOYED BY MATTEL WITH

23   MR. LARIAN ONCE OR MORE THAN ONCE?

24       A.   I'M SORRY, REPEAT THE QUESTION.

25       Q.   DO YOU BELIEVE THAT YOU DISCUSSED THE FACT     10:04AM
```

21

EXHIBIT 19

PAGE 855.004

```
 1    THAT MR. BRYANT WAS STILL EMPLOYED BY MATTEL WHEN HE

 2    SIGNED THIS CONTRACT WITH MR. LARIAN ONCE OR MORE

 3    THAN ONCE?

 4        A.    MORE THAN ONCE.

 5        Q.    AND DO YOU RECALL THE SUBSTANCE OF ANY OF        10:04AM

 6    THOSE CONVERSATIONS?

 7        A.    NO.

 8        Q.    CAN YOU GIVE ME APPROXIMATION OF HOW MANY

 9    TIMES YOU DISCUSSED WITH MR. LARIAN THE FACT THAT IT

10    WAS TROUBLESOME TO YOU THAT MR. BRYANT WAS SIGNING       10:04AM

11    THIS CONTRACT WHILE HE WAS STILL EMPLOYED BY MATTEL?

12          MS. TORRES:   OBJECTION.   MISSTATES THE

13    WITNESS'S TESTIMONY.

14          THE WITNESS:   I DON'T THINK I SAID IT WAS

15    TROUBLESOME.                                             10:04AM

16    BY MR. QUINN:

17        Q.    ALL RIGHT.   HOW WOULD -- HOW WOULD YOU

18    DESCRIBE IT?   IT WAS OF CONCERN TO YOU?

19          MR. JACOBY:   OBJECTION.   ASKED AND

20    ANSWERED.                                                10:04AM

21          MS. TORRES:   SAME OBJECTION.

22          THE WITNESS:   I DON'T RECALL WHAT -- WHAT

23    THE SUBSTANCE OF OUR CONVERSATION WAS.   I DON'T

24    THINK I SAID TO MR. LARIAN, "I'M CONCERNED THAT"...

25    ///                                                      10:05AM
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT ___19___

PAGE ___255.005___

```
 1   BY MR. QUINN:

 2        Q.   ALL RIGHT.

 3        A.   I DON'T RECALL.

 4        Q.   ALL RIGHT.  CAN YOU TELL ME WHY IT WAS THAT

 5   YOU TALKED TO MR. LARIAN ON THIS SUBJECT, THAT IS        10:05AM

 6   THE -- THE FACT THAT MR. BRYANT WAS SIGNING THIS

 7   CONTRACT AT THE TIME HE WAS STILL EMPLOYED BY

 8   MATTEL?

 9        A.   CAN YOU REPEAT THE QUESTION AGAIN?

10        Q.   WHY WAS IT THAT YOU DISCUSSED WITH           10:05AM

11   MR. LARIAN THE FACT THAT MR. BRYANT SIGNED HIS

12   CONTRACT WHILE HE WAS STILL EMPLOYED BY MATTEL?

13        A.   I DISCUSSED IT BECAUSE I WAS UNCOMFORTABLE.

14        Q.   AND -- AND WHY -- WHY IS IT THAT YOU WERE

15   NOT COMFORTABLE?                                        10:05AM

16        A.   BECAUSE HE WAS WORKING FOR OUR COMPETITOR.

17        Q.   WERE YOU CONCERNED THAT THIS MIGHT BE

18   IMPROPER, FOR HIM TO BE SIGNING A CONTRACT WITH MGA

19   WHILE HE WAS WORKING FOR A COMPETITOR?

20             MS. TORRES:  OBJECTION.  VAGUE.              10:05AM

21             THE WITNESS:  I DIDN'T KNOW IF IT WAS

22   IMPROPER OR I DIDN'T KNOW WHAT THE LAW STATED, BUT I

23   WAS CONCERNED ABOUT IT.

24   BY MR. QUINN:

25        Q.   WAS IT AFTER YOU BROUGHT THIS SUBJECT UP     10:06AM
```

23

EXHIBIT ___19___

PAGE ___255.004___

```
 1   WITH MR. LARIAN THAT HE TOLD YOU TO WHITE THAT OUT?
 2        A.   I DON'T RECALL.
 3        Q.   DOES IT SEEM MOST LIKELY TO YOU THAT HE
 4   PROBABLY -- THE -- THE SEQUENCE WAS YOU POINTED OUT
 5   TO HIM -- LET ME ASK THIS QUESTION.              10:06AM
 6             IS IT TRUE THAT THE EXECUTED CONTRACT WAS
 7   FAXED BY MR. BRYANT TO YOU?
 8        A.   I'M ASSUMING THAT IT WAS MR. BRYANT WHO
 9   FAXED IT TO ME, BUT I WASN'T ACTUALLY THERE WHEN HE
10   FAXED IT, SO I CAN'T SAY.                        10:06AM
11        Q.   OBVIOUSLY YOU WEREN'T ON THE OTHER --
12        A.   RIGHT.
13        Q.   -- THE SENDING FAX MACHINE.
14             ON THE -- WHERE WAS THE FAX MACHINE WHERE
15   THIS WAS RECEIVED?                               10:07AM
16        A.   AT MGA.
17        Q.   YES.  AND -- AND DID IT -- WAS IT ROUTED TO
18   YOU FROM THAT RECEIVING FAX MACHINE AT MGA?
19        A.   YES.
20        Q.   AND SO FAR AS YOU KNOW, WERE YOU THE FIRST  10:07AM
21   PERSON AT MGA TO SEE THAT FAX?
22        A.   AS FAR AS I KNOW, YES.
23        Q.   I MEAN, WAS THE FAX ADDRESSED TO YOU?
24        A.   I DON'T RECALL.
25        Q.   HAD THERE BEEN SOME PREVIOUS DISCUSSION OR  10:07AM
```

24

EXHIBIT 19
PAGE 255.007

```
1    UNDERSTANDING THAT MR. LARIAN, AFTER HE SIGNED THE

2    CONTRACT -- I'M SORRY.

3           HAD THERE BEEN SOME PRIOR DISCUSSION OR

4    UNDERSTANDING THAT MR. BRYANT, AFTER HE SIGNED THE

5    CONTRACT, WAS TO FAX IT TO YOU?                          10:07AM

6       A.   YES.

7       Q.   DOES IT SEEM TO YOU THAT THE MOST LIKELY

8    SEQUENCE WAS FIRST YOU RECEIVED THE CONTRACT AND

9    THEN YOU HAD A DISCUSSION WITH MR. LARIAN?

10          MR. JACOBY:  OBJECTION.  LACKS FOUNDATION.      10:07AM

11          MS. TORRES:  OBJECTION.  VAGUE.

12          THE WITNESS:  I DON'T RECALL THE SEQUENCE.

13   BY MR. QUINN:

14      Q.   WELL, IS -- IS THERE ANY WAY THAT YOU COULD

15   HAVE KNOWN THAT THIS FAX WOULD HAVE A FAX LINE AT      10:07AM

16   THE TOP SAYING "BARBIE COLLECTIBLES" BEFORE YOU

17   ACTUALLY RECEIVED IT?

18      A.   NO.

19      Q.   SO DOES IT SEEM MOST LIKELY YOU LEARNED

20   THAT FROM THE FAX?                                     10:08AM

21      A.   YES.

22      Q.   AND OBVIOUSLY YOU DISCUSSED THAT FAX LINE

23   WITH MR. LARIAN AFTER YOU RECEIVED THE FAX?

24          MS. TORRES:  OBJECTION.  VAGUE AS TO TIME.

25   AFTER -- RIGHT AFTER OR AFTER --                       10:08AM
```

                                                                    25

EXHIBIT ___19___

PAGE ___255.008___

```
 1   BY MR. QUINN:

 2       Q.   ANY TIME AFTER.

 3       A.   AFTER AT SOME TIME, YES.

 4       Q.   AND THEN YOU'VE ALSO SAID AT SOME POINT

 5   MR. LARIAN TOLD YOU TO WHITE THAT OUT.                10:08AM

 6       A.   YES.

 7       Q.   AND HE WOULD HAVE TOLD YOU THAT AFTER YOU

 8   CALLED HIS ATTENTION TO THE FAX LINE?

 9       A.   YES.

10       Q.   DID YOU MAKE ANY RESPONSE TO HIM WHEN HE     10:08AM

11   TOLD YOU TO WHITE THAT OUT?

12       A.   I DON'T RECALL.

13       Q.   AT ANY TIME WHILE YOU WERE EMPLOYED BY MGA

14   DID YOU DISCUSS WITH ANYONE AT MGA THE FACT THAT

15   MR. LARIAN HAD INSTRUCTED YOU TO WHITE THAT OUT?      10:09AM

16       A.   I DON'T RECALL.

17       Q.   TO THIS DAY, I MEAN PRIOR TO THIS

18   CONVERSATION THAT YOU AND I ARE HAVING RIGHT NOW IN

19   THIS DEPOSITION, HAVE YOU EVER TOLD ANYONE ABOUT

20   MR. LARIAN'S INSTRUCTION TO WHITE THAT OUT?           10:09AM

21       A.   I DON'T KNOW FOR A FACT THAT I DID.

22       Q.   AS YOU THINK ABOUT IT, DO YOU BELIEVE IT'S

23   LIKELY THAT YOU DID TELL THAT TO ANYBODY?

24       A.   IT'S LIKELY.

25       Q.   IS THERE SOMEBODY WHO YOU HAVE IN MIND WHO   10:09AM
```

26

EXHIBIT __19__

PAGE __265.009__

```
 1    YOU THINK YOU PROBABLY TOLD IT TO?

 2        A.   IT COULD HAVE BEEN HIS ASSISTANT AT THE

 3    TIME, BUT I DON'T REMEMBER FOR A FACT.

 4        Q.   WHAT WAS HIS ASSISTANT'S NAME?

 5        A.   DIDI BROWN, D-I-D-I.                        10:09AM

 6        Q.   AND DO YOU -- YOU'RE JUST NOT SURE WHETHER

 7    OR NOT YOU DISCUSSED IT WITH DIDI BROWN; IS THAT

 8    TRUE?

 9        A.   CORRECT.

10        Q.   ALL RIGHT.  IS THERE SOMEBODY ELSE WHO     10:10AM

11    YOU'RE THINKING ABOUT WHO YOU MIGHT HAVE AT ANY TIME

12    PRIOR TO THIS MOMENT TOLD ABOUT MR. LARIAN'S

13    INSTRUCTION TO WHITE OUT THAT FAX LINE?

14            MS. TORRES:  OBJECTION.  CALLS FOR

15    SPECULATION.                                         10:10AM

16            THE WITNESS:  I DON'T REMEMBER FOR A FACT

17    WHO I TOLD.

18    BY MR. QUINN:

19        Q.   ALL RIGHT, I'M GOING BEYOND FACT NOW.

20        A.   OKAY.                                       10:10AM

21        Q.   I'M GOING BEYOND WHAT YOU'RE CERTAIN ABOUT.

22    SO ARE THERE SOME OTHER PEOPLE THAT YOU THINK YOU

23    MIGHT HAVE TOLD THAT TO?

24        A.   YES.

25        Q.   WHO'S THAT?                                 10:10AM
```

                                                                27

EXHIBIT 19

PAGE 255 010

```
 1    NAME OF CARTER BRYANT?

 2        A.   YES.

 3        Q.   AND DID YOU HAVE ANY DEALINGS WITH A

 4    PRODUCT KNOWN AS BRATZ?

 5        A.   YES.                                    09:59AM

 6        Q.   WERE YOU EVER ASKED TO DO ANYTHING RELATING

 7    TO CARTER BRYANT OR HIS RELATIONSHIP WITH MGA THAT

 8    MADE YOU KIND OF UNCOMFORTABLE?

 9            MR. JACOBY:  OBJECTION.  VAGUE.

10            MS. TORRES:  OBJECTION.  VAGUE, AND I'M    09:59AM

11    GOING TO DESIGNATE FROM HERE ON IN AS SUBJECT TO THE

12    CONFIDENTIALITY AND PROTECTIVE ORDER.

13            MR. QUINN:  THAT'S FINE, THAT'S THE PRO- --

14    PROTECTIVE ORDER I WAS TELLING YOU ABOUT.

15            THE WITNESS:  OKAY.                        09:59AM

16    BY MR. QUINN:

17        Q.   SO THIS CAN'T BE SHARED EXCEPT WITH A

18    CERTAIN LIMITED CLASS OF PEOPLE INVOLVED IN THIS

19    CASE, AND IF IT GETS FILED WITH THE COURT -- I THINK

20    IT HAS TO BE FILED UNDER SEAL; IS THAT RIGHT?       09:59AM

21            MR. ZELLER:  THAT'S CORRECT.

22    BY MR. QUINN:

23        Q.   SO IT'S BASICALLY FOR -- WHAT YOU'RE GOING

24    TO SAY NOW IS JUST --

25        A.   BUT IT STILL CAN BE ANSWERED?            09:59AM
```

                                                                17

EXHIBIT   19

PAGE   254

```
 1      Q.    YES.  YOU STILL --

 2      A.    OKAY.

 3      Q.    -- HAVE TO ANSWER THE QUESTION.

 4      A.    CAN YOU BE MORE SPECIFIC?

 5      Q.    NO, NOT REALLY.  WAS THERE EVER ANYTHING        09:59AM

 6   THAT YOU WERE ASKED TO DO THAT YOU -- MADE YOU FEEL

 7   KIND OF UNCOMFORTABLE?

 8      A.    YES.

 9            MS. TORRES:  OBJECTION.  VAGUE.

10            MR. JACOBY:  SAME OBJECTION.                    09:59AM

11   BY MR. QUINN:

12      Q.    AND WHAT WAS THAT?

13      A.    WHEN THE ORIGINAL CONTRACT WAS EXECUTED BY

14   CARTER BRYANT, IT WAS SENT TO ME VIA FAX, AND ON THE

15   TOP OF THE FAX LISTED THE PHONE NUMBER FROM WHERE IT     10:00AM

16   WAS FAXED, WHICH SAID "BARBIE COLLECTIBLES," AND AT

17   ONE POINT MY BOSS, ISAAC LARIAN, ASKED ME TO WHITE

18   THAT OUT AND SEND IT TO A LAWYER, PATTY GLASER.

19            MS. TORRES:  NOW I'M GOING TO INSTRUCT THE

20   WITNESS NOT TO ANSWER WITH RESPECT TO ANY               10:00AM

21   COMMUNICATIONS SHE MAY HAVE HAD WITH COUNSEL FOR

22   MGA.

23            MR. QUINN:  WELL, WE'LL GET TO THAT AS TO

24   WHETHER YOU CAN ACTUALLY MAKE THAT INSTRUCTION, BUT,

25   I MEAN, AT THIS POINT --                                10:00AM
```

18

EXHIBIT   19

____   255

```
 1        Q.   DID YOU DO WHAT HE ASKED, DID YOU -- DID

 2   YOU WHITE OUT THE LINE THAT SAID "BARBIE

 3   COLLECTIBLES"?

 4        A.   YES.

 5        Q.   DID YOU HAVE ANY DISCUSSION WITH MR. LARIAN    10:01AM

 6   AS TO WHY HE WANTED YOU TO WHITE THAT LINE OUT?

 7        A.   I DON'T RECALL.

 8        Q.   ARE YOU SAYING THAT YOU DON'T RECALL THE

 9   SUBSTANCE OF THE DISCUSSION, OR THAT YOU DON'T

10   RECALL WHETHER YOU DISCUSSED THAT SUBJECT AT ALL?     10:01AM

11        A.   I -- I DON'T RECALL THE SUBSTANCE.

12        Q.   SO YOU DO KNOW YOU DISCUSSED THAT

13   INSTRUCTION WITH MR. LARIAN; YOU JUST DON'T RECALL

14   THE SUBSTANCE; IS THAT TRUE?

15        A.   YES.                                         10:01AM

16        Q.   DID YOU DISCUSS THAT WITH MR. LARIAN ONCE

17   OR MORE THAN ONCE, THAT INSTRUCTION TO WHITE OUT THE

18   "BARBIE COLLECTIBLES" HEADING ON THE DOCUMENT?

19        A.   I DON'T RECALL.

20        Q.   DID YOU EVER DISCUSS THAT SUBJECT WITH       10:01AM

21   ANYBODY ELSE AT MGA?

22             MS. TORRES:  I'M GOING TO INSTRUCT THE

23   WITNESS NOT TO ANSWER TO THE EXTENT IT INVOLVES

24   CONVERSATIONS WITH COUNSEL.

25             THE WITNESS:  I DON'T RECALL.                10:01AM
```

19

EXHIBIT   19

PAGE   056

```
 1   STATE OF CALIFORNIA      )
                              )   SS.
 2   COUNTY OF LOS ANGELES    )

 3        I, PAULA A. PYBURN, CERTIFIED SHORTHAND

 4   REPORTER, CERTIFICATE NUMBER 7304, RPR, FOR THE

 5   STATE OF CALIFORNIA, HEREBY CERTIFY:

 6             THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE

 7   ME AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH

 8   TIME THE DEPONENT WAS PLACED UNDER OATH BY ME;

 9             THE TESTIMONY OF THE DEPONENT AND ALL

10   OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

11   RECORDED STENOGRAPHICALLY BY ME AND WERE THEREAFTER

12   TRANSCRIBED;

13             THE FOREGOING TRANSCRIPT IS A TRUE AND

14   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

15             I FURTHER CERTIFY THAT I AM NEITHER COUNSEL

16   FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN

17   ANY WAY INTERESTED IN THE OUTCOME THEREOF.

18             IN WITNESS WHEREOF, I HAVE HEREUNTO

19   SUBSCRIBED MY NAME THIS ____ DAY OF_____,

20   2006.

21

22

23

24

25
```

A & E COURT REPORTERS   (213)955-0070   FAX: (213)955-0077

EXHIBIT ___ 19

PAGE ___ 257

**DEPOSITION CORRECTION SHEET**

CASE NAME: MATTEL v. CARTER BRYANT

DEPOSITION OF: VICTORIA O'CONNOR

DEPOSITION DATE: 12/6/04

I declare under **penalty of perjury** that I have read the foregoing 143 pages of my deposition testimony, taken on 12/6/04 at 865 S. FIGUEROA ST. 10th FL., LOS ANGELES, California, and that the same is a **true record and testimony** given by me at the time and place hereinabove set forth, with the following exceptions:

**PAGE # : LINE #    CORRECTION/CHANGES TO BE MADE**

73 : 5   FROM  YOU

175      TO    I

  : 11   FROM  CAMI

         TO    KAMI

  :      FROM

         TO

  :      FROM

         TO

  :      FROM

         TO

  :      FROM

         TO

  :      FROM

         TO

  :      FROM

         TO

_____        1/7/05
SIGNATURE OF DEPONENT                    DATE

                                  EXHIBIT  19

                                  PAGE   258

## DEPOSITION CORRECTION SHEET

CASE NAME: _MATTEL_ v. _CARTER BRYANT_

DEPOSITION OF: _VICTORIA O'CONNOR_

DEPOSITION DATE: _12/6/04_

I declare under **penalty of perjury** that I have read the foregoing _109_ pages of my deposition testimony, taken on _12/6/04_ at _865 S. FIGUEROA ST. 10th FL., LOS ANGELES_, California, and that the same is a **true record and testimony** given by me at the time and place hereinabove set forth, with the following exceptions:

**PAGE # : LINE #    CORRECTION/CHANGES TO BE MADE**

_162_ : _4_   FROM _FRANKIE_
              TO _FRANKI_

_172_ : _13_   FROM _CAMi_
              TO _KAMi_

_173_ : _13_   FROM _CAMi_
              TO _KAMi_

_193_ : _14_   FROM _CAMi_
              TO _KAMi_

_220_ : _25_   FROM _iR_
              TO _———_

_243_ : _17_   FROM _GEM_
       _21_    TO _JEM_

       :      FROM _____
              TO _____

       :      FROM _____
              TO _____

_Victoria O'Connor_
SIGNATURE OF DEPONENT

_1/7/05_
DATE

PAGE _19_

**EXHIBIT 20**

1  　　　　UNITED STATES DISTRICT COURT

2  　　　　CENTRAL DISTRICT OF CALIFORNIA

3

4  - - - - - - - - - - - - - - - - - - - - - - - - - -

5  CARTER BRYANT, an individual, ) No. CV

6  　　　　　　　　　Plaintiff,　　) 04-9049 SGL (RNBx)

7  　　　　vs.　　　　　　　　　)

8  MATTEL, INC., a Delaware,　　) Consolidated with

9  corporation,　　　　　　　　) No. CV-04-09059

10  　　　　　　　　Defendant.　) No. CV 05-02727

11  - - - - - - - - - - - - - - - - - - - - - - - - - -

12

13

14  　　　Videotaped Deposition of RALPH OMAN,

15  　　　at 1440 New York Avenue, Northwest,

16  　　　Washington, D.C., commencing at

17  　　　10:00 a.m., Monday, March 31, 2008,

18  　　　before KAREN YOUNG, Notary Public.

19

20

21

22

23

24

25  PAGES 1 - 83

EXHIBIT 20
260

```
 1     APPEARANCES OF COUNSEL:

 2         FOR THE PLAINTIFF:

 3             QUINN EMANUEL URQUHART OLIVER &

 4             HEDGES, LLP

 5             BY:  MICHAEL T. ZELLER, ESQ.

 6             865 South Figueroa Street, 10th Floor

 7             Los Angeles, California 90017

 8             michaelzeller@quinnemanuel.com

 9             (213) 624-3180

10

11         FOR THE DEFENDANT:

12             SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

13             BY:  KENNETH A. PLEVAN, ESQ.

14             Four Times Square

15             New York, New York 10036

16             kenneth.plevan@skadden.com

17             (212) 735-3410

18             SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

19             BY:  PHILIP W. MARSH, ESQ.

20             1440 New York Avenue, Northwest

21             Washington, D.C. 20005-2111

22             pmarsh@skadden.com

23             (202) 371-7167

24

25         ALSO PRESENT: CONWAY BARKER, VIDEOGRAPHER.
```

                                                            2

EXHIBIT _30_

PAGE _261_

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  In the United States
 3    District Court, Central District of California,
 4    Eastern Division, in the matter of Carter Bryant
 5    versus Mattel, Incorporated and other consolidated
 6    actions, Case Number CV 04-9049 SGL.  This is the
 7    deposition of Ralph Oman.  Today's date is March
 8    31st, 2008.  The location of the deposition is
 9    Skadden Arps, 1440 New York Avenue, Northwest,
10    Washington, D.C.  Will counsel please identify
11    yourselves and state whom you represent?
12              MR. PLEVAN:  Ken Plevan from Skadden Arps
13    for MGA.
14              MR. MARSH:  Philip Marsh from Skadden Arps
15    for MGA.
16              MR. ZELLER:  Mike Zeller for Mattel.
17              THE VIDEOGRAPHER:  The court reporter is
18    Karen Young.  The videocamera operator is Conway
19    Barker, both on behalf of Veritext.  This deposition
20    commences at 10:02.  Please swear in the witness.
21    Whereupon,
22                   RALPH OMAN,
23           called for examination by counsel for
24           Defendant and having been duly
25           sworn by the Notary Public, was examined
                                                      3
```

EXHIBIT ___20___

PAGE ___262___

```
 1              and testified as follows:

 2                        -   -   -

 3                      EXAMINATION

 4   BY MR. PLEVAN:

 5       Q.     Good morning, Mr. Oman.

 6       A.     Good morning, Mr. Plevan.

 7       Q.    Mr. Oman, we will start by marking a copy,

 8   what I believe to be a copy of your expert report

 9   without the attachments, and Ms. Young, I'm told

10   that the first number today should be 4700.

11                              (Exhibit 4700

12                               was marked for

13                               identification.)

14           BY MR. PLEVAN:

15       Q.    Mr. Oman, if you would look at Exhibit

16   4700, which we've just marked, and confirm that this

17   is a copy of your report without its attachments?

18       A.     Yes, it is.

19       Q.    And it's dated February 11th, 2008 and has

20   your signature on the last page.

21       A.     Yes, it does.

22       Q.     Now, approximately how many times have you

23   been an expert witness before in a lawsuit?

24       A.     Fourteen or 15 times.

25       Q.     Over what period of years?
                                                        4
```

EXHIBIT _20_

PAGE _263_

```
1      A.    It refers to the applicant who was seeking
2  a patent for his or her invention.
3      Q.    Do you use the word "authorship" to refer
4  to inventors who are seeking patent protection for
5  something?
6           MR. ZELLER:  You mean in his report or
7  just generally?
8           BY MR. PLEVAN:
9      Q.    At any time do you use the word
10 "authorship" to refer to patent subject matter?
11          MR. ZELLER:  The question is vague.
12     A.    There are many instances when a particular
13 work of authorship could qualify for both a patent
14 and a trademark, so I suppose in describing a
15 computer program that represents considerable
16 authorship, it would also represent an invention if
17 certain aspects of it were eligible for patent
18 protection.
19     Q.    How did you use the phrase "authorship" in
20 this report?  Do you recall?
21     A.    Well, I think in this case since I was
22 focusing on copyright office procedures, I probably
23 was talking in terms of copyrightable authorship in
24 those normal areas of creativity that tend toward
25 the copyright side of the spectrum rather than the
```

30

EXHIBIT    20

PAGE    264

1   patent side of the spectrum.

2      Q.    Is the term "sophisticated company" a term

3   of art in copyright law?

4      A.    Not that I'm aware of.

5      Q.    Is it a term of art in patent law, to your

6   knowledge?

7      A.    Not that I'm aware of.

8      Q.    And that's the kind of phrase that we

9   would -- I take it you wouldn't find in a copyright

10  office circular; is that correct?

11          MR. ZELLER:  The question's overbroad.

12     A.    I can't think of an instance where we used

13  "sophisticated remitter" because it's laden with

14  values I suppose, but it is a way of describing

15  large corporations that have teams of legal experts

16  or legal technicians who know the system, know the

17  law and do these things routinely on a daily basis,

18  to distinguish the sophisticated remitter from the

19  poet or the artist who files maybe one registration

20  or two registrations for copyright in a lifetime and

21  is not sophisticated in terms of the process for

22  seeking a patent or seeking a copyright.

23     Q.    Do you consider Mattel to be a

24  sophisticated company?

25     A.    Yes, I would.

                                                    31

EXHIBIT ___20___

PAGE ___265___

1      Q.    Do you know how many lawyers worked at MGA
2   in the year 2001?
3      A.    I don't recall seeing any specific -- a
4   number in any of the materials that I've seen but
5   there are frequent references to -- in Mr. Larian's
6   affidavits to his lawyers.  Daphne Gronich is an
7   experienced and very sophisticated lawyer.  It's a
8   list of names that I recall but I didn't ever
9   remember forming an opinion as to the number --
10   total number of lawyers that MGA had either in house
11   or relied upon routinely to handle these matters.
12      Q.    When did Ms. Gronich join MGA?
13      A.    I have no idea.
14      Q.    And your -- the basis for your concluding
15   that she was a sophisticated lawyer was what?
16      A.    Yes.
17      Q.    Is what?  I'm sorry.
18      A.    Oh, okay.
19      Q.    I'm sorry, Mr. -- I think I let my voice
20   drop.  The basis for your concluding that she was a
21   sophisticated lawyer was what?
22      A.    I've been aware of her reputation.  I
23   think she was president of the copyright society
24   chapter in Los Angeles.  She was the daughter of a
25   very famous copyright lawyer for the Motion Picture

                                                    32

EXHIBIT 20

PAGE 766

```
 1        Q.    And these related to dates of creation?

 2        A.    Among other things, dates of creation were

 3   one of the -- one of the anomalies that I noted.

 4        Q.    And what dates did you have specific

 5   reference to?

 6        A.    I can't recall off the top of my head.

 7   I'm sorry, but there seemed to be a general effort

 8   to change the date for reasons that escape me.

 9        Q.    Do you remember any of the dates?

10        A.    2002.

11        Q.    Was that a date it was changed to or

12   changed from?

13        A.    Your question asked me if I remember one

14   of the dates.  I didn't -- don't recall the context.

15   I'd have to refresh my recollection on the dates.  I

16   don't have one of the -- one of the CAs, capital C,

17   capital A, forms, which would indicate the changes.

18        Q.    Is there a reason you did not include the

19   specific dates that were changed in your expert

20   report?

21        A.    I don't recall not including them

22   specifically.  I just remembered there being changes

23   in the dates.

24        Q.    Well, do you see any of the dates that you

25   have reference to in your expert report now as we

                                                      63
```

EXHIBIT ___ 20

PAGE ___ 207

```
1    look at it?
2         A.    No.  I was making a general statement
3    there.  I was not talking specifics.  I was just
4    only aware of the fact that the dates were being
5    changed in the CA forms, and at the time I wrote my
6    report, I would have been focused on those specific
7    dates but I didn't think they had any specific
8    relevance.  At least nothing that I was able to
9    fathom.
10        Q.    So at the time you were writing this
11   report, you would have had the dates in front of
12   you, the documents with the dates in front of you.
13        A.    Yes.
14        Q.    And you therefore could have at that time
15   included the specific dates in the report that you
16   wrote.
17        A.    I imagine I could have and I didn't.
18        Q.    And I'm asking you do you recall why you
19   did not.
20        A.    No, I didn't actually attach any -- not
21   having the big picture in the entire legal
22   proceeding, I did not attach any specific
23   significance to one date being changed from one to
24   another, but I suspect that there are reasons that
25   I'm not aware of.
                                                      64
```

EXHIBIT __20__

PAGE __268__

1      Q.    Any other reason why as you sit here now

2    you have for not having included the specific dates

3    to which you had reference?

4      A.    No, I actually can't think of why I didn't

5    include a specific date or specific dates.

6              MR. PLEVAN:   Can we take a break?

7              THE VIDEOGRAPHER.   Off the record at

8    11:50.

9                   (Recessed at 11:50 a.m.)

10                   (Reconvened at 12:06 p.m.)

11             THE VIDEOGRAPHER:   This is the beginning

12    of Tape 2 in the deposition of Mr. Oman, on the

13    record at 12:06.

14             BY MR. PLEVAN:

15      Q.    Mr. Oman, what, if anything, did you do to

16    prepare for today's deposition?

17      A.    Can you repeat the question please?

18      Q.    Yes.   What, if anything, did you do to

19    prepare for today's deposition?

20      A.    I reviewed my expert report, I reviewed

21    the materials that I had, and I reviewed some

22    materials that I had not had previously, and I

23    discussed several points with Mr. Zeller.

24      Q.    Approximately how many hours did you spend

25    reviewing materials?

                                                      65

EXHIBIT ___ 70

PAGE ___ 769

```
1   week for three days and then in the Philippines the
2   week of the 15th, but in complete communication with
3   my office so it shouldn't be a problem.
4              MR. ZELLER:  Okay.  Well, if there's a
5   problem --
6              MR. PLEVAN:  I just suggested it because
7   Jon had suggested it.
8              MR. ZELLER:  That's fair.
9              MR. PLEVAN:  And obviously reserve the
10  right to read it and make corrections.
11             MR. ZELLER:  Okay.
12             MR. PLEVAN:  All right?  Thank you.  Off
13  the record.
14             THE VIDEOGRAPHER:  This deposition
15  concludes at 12:30 and consists of two tapes.
16             (Whereupon, at 12:30 p.m., the taking of
17  the instant deposition ceased.)
18
19
20
21
22
23
24
25
                                                      80
```

EXHIBIT 20

PAGE 210