```
 1              CERTIFICATE OF DEPONENT
 2          I have read and examined the foregoing 80
 3     pages and find the answers contained therein with
 4     changes made by me, if any, to be true and correct.
 5
 6
 7
 8                    _____
 9                        RALPH OMAN
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                      81
```

EXHIBIT __20__

PAGE __271__

```
 1   UNITED STATES OF AMERICA   )
 2                              ss:
 3   DISTRICT OF COLUMBIA       )

 4

 5           I, KAREN C. YOUNG, a Notary Public within

 6   and for the District of Columbia, do hereby certify

 7   that the witness whose deposition is hereinbefore

 8   set forth was duly sworn and that the within

 9   transcript is a true record of the testimony given

10   by such witness.

11           I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto set my

16   hand this 2nd day of April, 2008.

17

18

19

20           Karen C. Young

21

22

23

24   My Commission Expires:

25   July 31, 2009
                                                       82
```

EXHIBIT   20

272

**EXHIBIT 21**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA

 3           EASTERN DIVISION                Certified Copy

 4   -------------------------------

 5   MATTEL, INC., a Delaware          )

 6   Corporation,                      )

 7            Plaintiff,               )

 8            vs.                      )  No. CV 04-9059

 9   CARTER BRYANT, an individual;     )     NM (RNBx)

10   and DOES 1 through 10,            )  VOLUME I

11   Inclusive,                        )

12            Defendants.              )

13   -------------------------------   )

14   (COMPLETE CAPTION ON NEXT PAGE.)

15

16     CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18     Videotaped 30(b)(6) Deposition of

19   RENE PASKO, taken at 400 South Hope

20   Street, Los Angeles, California,

21   commencing at 10:05 A.M., Wednesday,

22   June 13, 2007, before Wendy S.

23   Schreiber, CSR No. 3558, RPR, CLR.

24

25   PAGES 1 - 222
```

1

EXHIBIT 21

PAGE 273

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION

 4

 5     -------------------------------

 6   MATTEL, INC., a Delaware        )

 7   Corporation,                    )

 8              Plaintiff,           )

 9              vs.                  ) No. CV 04-9059

10   CARTER BRYANT, an individual;   )    NM (RNBx)

11   and DOES 1 through 10,          )

12   Inclusive,                      )

13              Defendants.          )

14   ----------------------------- )

15   CARTER BRYANT, on behalf of     )

16   himself, all present and        )

17   former employees of Mattel,     )

18   Inc., and the general public,   )

19              Counter-Claimants, )

20              vs.                  )

21   MATTEL, INC., a Delaware        )

22   Corporation,                    )

23              Counter-Defendant. )

24   -----------------------------

25
                                                    2
```

EXHIBIT _*21*_

PAGE _*274*_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF:

 4

 5           QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6           BY:  MICHAEL ZELLER, ESQ.

 7           865 South Figueroa Street, Tenth Floor

 8           Los Angeles, California 90017

 9           (213) 443-3000

10           mzeller@quinnemanuel.com

11

12              -AND-

13

14        MATTEL, INC.

15        BY:  MICHAEL MOORE, ESQ.

16        333 Continental Boulevard

17        El Segundo, California 90245-5012

18        (310) 252-2000

19        michael.moore@mattel.com

20

21

22

23

24

25
```

3

EXHIBIT __71__

PAGE __275__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR THE DEFENDANT AND COUNTERCLAIMANT

 4    CARTER BRYANT:

 5

 6            KEKER & VAN NEST LLP

 7            BY:  JOHN TRINIDAD, ESQ.

 8            710 Sansome Street

 9            San Francisco, California 94111-1704

10            (415) 391-5400

11            jtrinidad@kvn.com

12

13        FOR DEFENDANT MGA ENTERTAINMENT, INC.:

14

15            O'MELVENY & MYERS LLP

16            BY:  DIANA TORRES, ESQ.

17                 JENNIFER GLAD, ESQ.

18            400 South Hope Street

19            Los Angeles, California 90071-2899

20            (213) 430-6000

21            dtorres@omm.com

22            jglad@omm.com

23

24    ALSO PRESENT:

25            DAVID WEST, VIDEO OPERATOR
```

                                                    4

EXHIBIT ___21___

PAGE ___274___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  project?

2          MR. ZELLER:  This is asked and answered.

3          THE WITNESS:  Late 1998, early 1999.

4  BY MS. TORRES:

5      Q.   Was that after the project that was called   02:04PM

6  Chat Girls in the mid to late 1998 time period was

7  canceled?

8      A.   I believe it was.

9      Q.   You don't believe that you were working on

10  both projects at the same time?                        02:05PM

11     A.   Correct.

12     Q.   Do you know when work on the project that

13  was called Diva Starz in the late 1998 time period

14  and thereafter started?

15     A.   Are you asking for like a specific date     02:05PM

16  besides 1998?

17     Q.   Okay.  Well, let me ask you this.  Did -- is

18  your best estimate as to when work started on a

19  project that became known as Diva Starz started late

20  1998?                                                  02:05PM

21          MR. ZELLER:  You're asking about work at

22  Mattel, I assume?

23          MS. TORRES:  Yes, work at Mattel.

24          THE WITNESS:  I believe it was late '98,

25  early 1999 but I can't pinpoint an exact date that   02:05PM

90

EXHIBIT   21

PAGE      277

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    it began.
 2    BY MS. TORRES:
 3        Q.   And this project was also submitted by
 4    Kiscom, correct?
 5        A.   Yes.                                      02:06PM
 6        Q.   Was it the same -- was the contact person at
 7    Kiscom the same contact person you referenced
 8    earlier, Andy I want to say Kislovitz?
 9        A.   I am not entirely sure that Andy Kislovitz
10    was the contact for what was called Chat Girls in    02:06PM
11    late '98 -- mid to late 1998, but he was the contact
12    in the beginning of the Diva Starz project in late
13    '98, early '99.
14        Q.   Did you start work on the project that was
15    known as Diva Starz at that time when it first came   02:07PM
16    in to Mattel?
17        A.   I had -- I worked on it somewhat when it
18    came in, when it first came in.
19        Q.   What do you mean by that?
20        A.   Well, I was working -- Maureen Mullen was    02:07PM
21    handling certain aspects of it and at some point I
22    was brought onto the project to help her with it.
23        Q.   Was that project called Diva Starz at the
24    time?
25        A.   It wasn't.                                   02:08PM
                                                            91
```

EXHIBIT  21

PAGE  278

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Do you know what it was called?

 2      A.   The way I remember it is that it was

 3   presented as Cool Talk'n Teens by the inventor.

 4      Q.   Was that name, Cool Talk'n Teens, used at

 5   Mattel as well or was it just used by the inventor?   02:08PM

 6      A.   I believe we referred to it as Cool Talk'n

 7   Teens at that specific time period, when it first

 8   came in.

 9      Q.   For how long was it referred to as Cool

10   Talk'n Teens at Mattel?                               02:09PM

11      A.   That I don't know.

12      Q.   At some point, I take it, it was no longer

13   referred to as Cool Talk'n Teens?

14      A.   Correct.

15      Q.   What was it referred to next?               02:09PM

16      A.   There were a number of names that it was

17   called.  At one point it was called Chat Girls.

18      Q.   I was afraid you were going to say that.

19      A.   That's going back to the thing.  Yeah.  So

20   it might have been referred to as Chat Girls next.   02:10PM

21      Q.   Do you remember how long it was referred to

22   as Chat Girls?

23      A.   I really don't remember.

24      Q.   When you first started working on the

25   project that was called Cool Talk'n Teens in the     02:10PM
                                                            92
```

EXHIBIT ___ *21*

PAGE ___ *271*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    of course, we won't even go into the repeated orders
2    it took to get Mr. Bryant to be deposed.
3           MS. TORRES:  Are you done?  We're off the
4    record.
5           VIDEO OPERATOR:  Off the record 7:09.         07:09PM
6
7               (TIME NOTED:  7:09 P.M.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                      216
```

EXHIBIT ___21___

PAGE ___280___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       I declare under penalty of perjury

2    under the laws of the State of California

3    that the foregoing is true and correct.

4       Executed on _____,

5    2007, at _____,

6    California.

7

8

9

10        _____

11          RENE PASKO

12

13

14

15

16

17

18

19

20

21

22

23

24

25

217

EXHIBIT ___21___

PAGE ___280___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  STATE OF CALIFORNIA   ) ss:

2  COUNTY OF LOS ANGELES )

3

4      I, WENDY S. SCHREIBER, CSR No. 3558, do

5  hereby certify:

6

7      That the foregoing deposition of RENE

8  PASKO was taken before me at the time and place

9  therein set forth, at which time the witness was

10  placed under oath and was sworn by me to tell the

11  truth, the whole truth, and nothing but the truth;

12      That the testimony of the witness and all

13  objections made by counsel at the time of the

14  examination were recorded stenographically by me,

15  and were thereafter transcribed under my direction

16  and supervision, and that the foregoing pages

17  contain a full, true and accurate record of all

18  proceedings and testimony to the best of my skill

19  and ability.

20      I further certify that I am neither

21  counsel for any party in said action, nor am I

22  related to any party to said action, nor am I in any

23  way interested in the outcome thereof.

24

25

218

EXHIBIT  21

PAGE  281

**EXHIBIT 22**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      UNITED STATES DISTRICT COURT          **Certified Copy**

2      CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION

4

5    ----------------------------------

6    CARTER BRYANT, an individual,      )

7                   Plaintiff,          )

8       vs.                             ) Case No.

9    MATTEL, INC., a Delaware           ) CV 04-9049

10   Corporation,                       ) SGL (RNBx)

11                   Defendants.        )

12   CONSOLIDATED WITH MATTEL, INC.,    ) Case No.

13   V. BRYANT and MGA ENTERTAINMENT,   ) 04-9059

14   INC., v. MATTEL, INC.              ) NM (RNBx)

15   ----------------------------------

16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19   VIDEOTAPED DEPOSITION OF CAROL A. SCOTT, Ph.D.

20            THURSDAY, APRIL 3, 2008

21

22

23

24

25   PAGES 1 - 288

                                                          1

EXHIBIT ___22___

PAGE ___782___

CALENDARED

RECEIVED

APR 1 0 2008

EXHIBIT __22__

PAGE ___283___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1
 2
 3
 4
 5
 6
 7
 8
 9          Videotaped Deposition of CAROL A. SCOTT,
10          Ph.D., taken on behalf of MGA Entertainment
11          Inc., at 525 University Avenue, Palo Alto,
12          California, commencing at 10:00 a.m.,
13          Thursday, April 3, 2008, before Cynthia
14          Manning, CSR No. 7645.
15
16
17
18
19
20
21
22
23
24
25
                                                        2
```

EXHIBIT __22__

PAGE ___784___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3      FOR PLAINTIFF MATTEL, INC.:

 4

 5          QUINN EMANUEL URQUHART OLIVER & HEDGES

 6          BY:  SCOTT B. KIDMAN, ESQ.

 7          865 South Figueroa Street, 10th Floor

 8          Los Angeles, California 90017

 9          213.624.7707

10          sbk@quinnemanuel.com

11

12      FOR DEFENDANT MGA ENTERTAINMENT, INC. and

13      ISAAC LARIAN:

14

15          SKADDEN ARPS SLATE MEAGHER & FLOM LLP

16          BY:  CARL A. ROTH, ESQ.

17              RYAN WEINSTEIN, ESQ.

18          300 South Grand Avenue

19          Los Angeles, California 90071

20          213.687.5000

21          croth@skadden.com

22          rweinstein@skadden.com

23

24

25
                                                   3
```

EXHIBIT _____ 22

PAGE _____ 285

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   that?                                        11:53:34

 2       A.   Right.

 3       Q.   Can you identify any of those other Bratz

 4   products for me, the specific product?

 5            MR. KIDMAN:   Objection; vague and     11:53:40

 6   ambiguous.

 7            THE WITNESS:   I believe we may have listed

 8   some of them in the financials in the back, but some

 9   examples of what I would be talking about would

10   be -- thinking of things that I saw yesterday.    11:53:53

11   There were heads.  You can see a head that has some

12   different hair things.  I saw hair pieces.  So I

13   believe on some Bratz dolls you can take the hair

14   off and put another piece of hair on, some things

15   with the hair.  I saw a storage bin, collapsable    11:54:14

16   storage bin.  I saw something that couldn't possibly

17   have been, but appeared to be like a laptop

18   computer.  It must have been like a play computer of

19   some kind.  I don't think it could possibly be a

20   functioning computer on the bottom shelf of Target.  11:54:34

21   I saw various types of Bratz dolls.  And I saw --

22       Q.   "Types," what do you mean by that?

23       A.   "Types," some with magic hair, some without

24   magic hair I think.  I saw small Bratz, bigger

25   Bratz.  I saw some -- I can't remember what the name   11:54:55
                                                           68
```

EXHIBIT __22__

PAGE __286__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of them would be, but some other versions of dolls    11:55:01

2    that have the Bratz name on them.  So there are a

3    variety of other merchandise, just a lot of it out

4    there.

5        Q.  Anything else?    11:55:13

6        A.  That's all I recall seeing yesterday.

7        Q.  Well, other than your visit to the store

8    yesterday, do you have any other information about

9    what other Bratz products are sold by MGA?

10        A.  Well, because we've been through the    11:55:31

11    financials, so those SKUs and things are listed in

12    there.

13        Q.  The SKUs are listed where?

14        A.  Well, I believe they are listed in the

15    financial documents that Tim Hoffman has gone    11:55:40

16    through for me.

17        Q.  Okay.  Can you point those out to me?

18        A.  Well, I don't know if this is what it is or

19    not, but Tim has gone through the database.  That's

20    how he looked at the sales figures that are later in    11:55:51

21    here and -- let's just see.

22        So if you look at Exhibit 4A, you'll see at

23    least some categories.

24        Q.  That's Exhibit 4A to your initial report?

25        A.  That's correct.  And --    11:56:23

    69

EXHIBIT ____22____

PAGE_____287____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Q.  Could you explain what Exhibit 4A is?          11:56:28

2          A.  Oh, good.  And Exhibit 4B, it looks like C.

3     Yeah, there is all kinds of stuff -- and various

4     Exhibit 4's.

5              So Exhibit 4A, and it's showing the revenue    11:56:47

6     for -- it's called "Bratz Brand Product Sales by

7     Profit Center" as the revenues.  So it's from 2001

8     to 2006.  And along the left-hand side you'll see

9     various profit centers that were taken from I

10    believe data provided by some MGA.  And so there is    11:57:11

11    categories like accessories, might be a general

12    category, but later on we'll give you some examples:

13    Home decor, stationery, fashion dolls, fashion-doll

14    accessories, small/mini dolls, small/mini dolls

15    accessories, and so on.                                11:57:30

16             And then Exhibit 4B gives the quantity of

17    those, as opposed to the revenue.  And then 4C gives

18    you some examples of what would be in those

19    categories.

20             So accessories -- goodness -- Bratz           11:57:49

21    tattoos, 24-piece assortment; Bratz stylin'

22    slippers, Bratz keychain assortment, Bratz movin',

23    groovin' cards.

24             And then for the other categories -- there

25    is lots of examples in here.                           11:58:06

                                                                70

EXHIBIT  22

PAGE  288

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. ROTH:                                    17:34:01

 2       Q.  Are you familiar with Form 10-Ks?

 3       A.  Oh, yeah.

 4       Q.  What are they?

 5       A.  Well, 10-Ks are documents that companies   17:34:10

 6   are required to file with the Securities and

 7   Exchange Commission.  And usually 10-Ks are filed, I

 8   don't -- this doesn't appear to be the entire 10-K.

 9   Most 10-Ks that I've seen are quarterly reports of

10   financial results and they do contain a commentary   17:34:29

11   and this one some of the commentary, but doesn't

12   have any financial reports -- results attached to

13   it.

14       Q.  And the second page of this -- excuse me,

15   the third page of this document has a 23 sort of   17:34:47

16   toward the middle and there is a subheading "Gross

17   Profit."

18           Do you see that?

19       A.  Yes.

20       Q.  And there is a reference in the last   17:34:57

21   sentence there to "initiatives designed to drive

22   sales momentum, such as more open packaging."

23           See that?

24       A.  Yes.

25       Q.  So does that suggest that Mattel had a   17:35:07
                                                    244
```

EXHIBIT ___22___

PAGE ___289___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   sales initiative for their dolls around packaging?     17:35:11

 2          MR. KIDMAN:  Objection; vague and

 3   ambiguous, lacks foundation.

 4          THE WITNESS:  Well, what it says is that

 5   they had -- they had more open packaging to let      17:35:22

 6   people see the dolls better and they thought that

 7   was a good thing.

 8   BY MR. ROTH:

 9       Q.  And do you agree?

10       A.  Could be.                                    17:35:34

11          MR. ROTH:  Why don't we -- we're getting

12   close to the end.  Why don't we take a break, see

13   where we are at, and see if I can organize myself

14   and hit the final stretch.

15          All right?                                     17:35:56

16          MR. KIDMAN:  All right.

17          THE WITNESS:  Sure.

18          THE VIDEOGRAPHER:  We're off the record.

19   The time is 5:36 p.m.

20          (Recess taken)                                 17:36:53

21          THE VIDEOGRAPHER:  We're back on the

22   record.  The time is 5:49 p.m.

23   BY MR. ROTH:

24       Q.  Okay.  Ms. Scott, would you in the normal

25   course of your work ever be asked either in the      17:49:27
                                                            245
```

EXHIBIT __22__

PAGE __290__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   litigation context or the consulting context at      17:49:32

 2   CrossField to measure the various attributes of a

 3   product that enhance or detract from the brand of

 4   the product?

 5        MR. KIDMAN:  Objection; vague and               17:49:49

 6   ambiguous.

 7        THE WITNESS:  Well, I hope they would

 8   phrase the question a little bit more clearly for

 9   me, because I'm not entirely sure what that means,

10   but would I ever be asked to examine attributes of a  17:50:02

11   brand, sure.

12   BY MR. ROTH:

13     Q.  No, what I mean is, in connection with the

14   work that you do for a client, would you be asked to

15   take a look at a client's brand and then to           17:50:13

16   understand what is enhancing that brand or maybe

17   detracting from that brand?

18     A.  You know, I might be asked to do some

19   consumer research to understand positives and

20   negatives, yes.                                       17:50:31

21     Q.  So the following things are helping you,

22   helping your brand, the following things are hurting

23   your brand?

24     A.  Right, yes.

25     Q.  And you might do research to try to             17:50:39
                                                           246
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   determine that?                                      17:50:42

2       A.  Yes.

3       Q.  Okay.  So -- and it's your professional

4   opinion that the design of a product is an attribute

5   of a product that might affect a brand; is that       17:50:50

6   right?

7       A.  Yes.

8           MR. KIDMAN:  Objection; vague.

9   BY MR. ROTH:

10      Q.  So the design of a product might enhance or   17:50:57

11  detract from the brand of that product; is that

12  right?

13      A.  Yes.

14      Q.  And how would you go about determining

15  whether or not the design of the product enhances or  17:51:13

16  detracts from the brand of the product?

17      A.  Well, you know, there is a series of steps

18  that you could go through, and, again, you know,

19  designing studies on the fly is probably not the

20  best way to design them, but I can give you a couple  17:51:28

21  of initial thoughts.

22          You know, there is everything from the very

23  simple questioning about asking people about certain

24  attributes, but probably at some point you would

25  want to do some experimentation where -- you know,   17:51:47
                                                         247

EXHIBIT   22

PAGE   292

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    after you do the kind of -- you know, I might start    17:51:51

2    with some focus groups, where people might tell me

3    about the product; whatever you want to say, tell me

4    about the product.

5         And then on the basis of that that I might    17:52:01

6    get from them, elicit some notions about attributes

7    that stand out to them that they comment upon.  And

8    then I might design some more, you know, pointed

9    questions in that direction to see what I get with

10   the self-explicated kind of a question about tell me    17:52:14

11   what you like or don't -- what does look good or

12   what doesn't, what's gotten in your way with this

13   product.  There might be a variety of ways to ask

14   that question.

15        And then at some point I would probably    17:52:29

16   want to do some experimentation, where based upon

17   what they're telling me I could create different

18   treatments, if you will.  So I could create a

19   product that has this design, a product that has

20   that design, and then do some experimentation to see    17:52:44

21   which one consumers respond to better.

22        Because sometimes they can't always tell

23   you, you know.  Some things are kind of not -- I

24   don't want to say subliminal, but sometimes we're

25   not -- our rational self takes over and we don't    17:53:02
                                                         248
```

EXHIBIT  22

PAGE  293

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA  )

 2                              :ss

 3    COUNTY OF SAN MATEO  )

 4         I, CYNTHIA MANNING, CSR No. 7645, a

 5    Certified Shorthand Reporter of the State of

 6    California, do hereby certify:

 7         That the foregoing proceedings were taken

 8    before me at the time and place herein set forth;

 9    that any witnesses in the foregoing proceedings,

10    prior to testifying, were placed under oath; that a

11    verbatim record of the proceedings was made by me

12    using machine shorthand which was thereafter

13    transcribed under my direction; further, that the

14    foregoing is an accurate transcription thereof.

15         I further certify that I am neither

16    financially interested in the action, nor a relative

17    or employee of any attorney of any of the parties.

18         IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    DATED: April 7, 2008

22

23

24

25         CYNTHIA MANNING, CSR No. 7645
```

                                              281

EXHIBIT __22__

PAGE __294__

**EXHIBIT 23**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                ---o0o---            **Certified Copy**

5   CARTER BRYANT, an individual,

6              Plaintiff,

7      vs.                          Case No.

8   MATTEL, INC., a Delaware         CV 04-9049

9   Corporation,                     SGL (RNBx)

10

11              Defendants.      /

    CONSOLIDATED WITH MATTEL, INC.,    Case No.

12  V. BRYANT and MGA ENTERTAINMENT,    04-9059

13  INC., v. MATTEL, INC.          /    NM (RNBx)

14

15

16       CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18   VIDEOTAPED DEPOSITION OF MICHAEL J. WAGNER

19           FRIDAY, MARCH 21, 2008

20

21

22

23

24

25   PAGES 1 - 310

                                              1

EXHIBIT   23

PAGE   295

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   APPEARANCES OF COUNSEL:

 2

 3      FOR PLAINTIFF MATTEL, INC.:

 4         QUINN EMANUEL URQUHART OLIVER & HEDGES

 5         BY:  ROBERT P. FELDMAN, ESQ.

 6         555 Twin Dolphin Drive, Suite 560

 7         Redwood Shores, California 94065

 8         650.801.5000

 9         bobfeldman@quinnemanuel.com

10

11      FOR DEFENDANT MGA ENTERTAINMENT, INC. and ISAAC

12      LARIAN:

13         SKADDEN ARPS SLATE MEAGHER & FLOM LLP

14         BY:  CARL A. ROTH, ESQ.

15            RYAN WEINSTEIN, ESQ.

16            PATRICK HAMMON, ESQ.

17         300 South Grand Avenue

18         Los Angeles, California 90071

19         213.687.5000

20         croth@skadden.com

21         rweinstein@skadden.com

22         phammon@skadden.com

23

24

25
                                                    2
```

EXHIBIT ___23___

PAGE ___296___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3       FOR DEFENDANT and COUNTERCLAIMANT CARTER BRYANT:

 4          KEKER & VAN NEST LLP

 5          BY:  MATTHEW M. WERDEGAR, ESQ.

 6          710 Sansome Street

 7          San Francisco, California 94111

 8          415.397.7188

 9          mwerdegar@kvn.com

10          (NOT PRESENT)

11

12

13       Also present:  Deepak Jain, Navigant Consulting

14                      Daniel Stroud, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

3

EXHIBIT 23

PAGE 297

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.   Monies that they could recover based on     10:01:03

2    the cause of action they had filed.

3     Q.   Did you have an understanding what those

4    causes of action were?

5     A.   Generally.     10:01:10

6     Q.   Okay.  Can you let me know what that

7    understanding was?

8     A.   I recall that they had copyright

9    infringement claims.  I think they had some breach

10   of fiduciary duty claims, some employment claims.     10:01:25

11   I think those are generally the ones that I recall.

12    Q.  And then did you put together a team of

13   people that you work with to focus on the case?

14    A.   I did.

15    Q.   Okay.  And who are those people?     10:01:43

16    A.   The two principle people are Bonnie

17   Goldsmith and Carrie Hillen.

18    Q.   Okay.  And they were people that you

19   discussed this case with in the summer of 2007?

20    A.   Yes.     10:02:06

21    Q.   Okay.  And did you come up with a game

22   plan or a strategy in terms of how you would

23   approach the damages question in this case?

24    A.   At some point in the process I did.

25    Q.   When did you come up with that?     10:02:18
                                                          8

EXHIBIT 23

PAGE 298

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   You know, my memory would have to be          10:02:21
 2   refreshed to tell me exactly, but it would be
 3   sometime between the summer and the fall --
 4        Q.   Okay.
 5        A.   -- of 2007.                                    10:02:26
 6        Q.   Okay.  And what was your general approach
 7   to the questions that were presented to you?
 8        A.   Well, it was my understanding that the
 9   principle remedy that Mattel was seeking, or would
10   be seeking, would be a disgorgement of the profits   10:02:39
11   of the various defendants related to the sales of
12   the Bratz products.
13        So the game plan was to collect the
14   information and it would have to come from the
15   counterdefendants --                                    10:02:53
16        Q.   Mm-hmm.
17        A.   -- as to information I could use to make
18   those calculations.
19        Q.   Okay.  What do you mean by "disgorgement"?
20        A.   A return of the profits that were earned      10:03:06
21   to Mattel.
22        Q.   Profits earned by who?
23        A.   It would be -- well, the entities that I
24   calculated that return would be MGA, Carter Bryant
25   and Mr. Larian.                                         10:03:22
                                                                    9
```

EXHIBIT 23

PAGE 299

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   You're a lawyer; is that right?        10:03:26

 2        A.   I have an active license to practice law

 3    in California.

 4        Q.   And you hold yourself out as an expert in

 5    copyright law?                                   10:03:35

 6        A.   No.

 7        Q.   Have you ever represented in the course of

 8    a deposition to opposing counsel that you were, in

 9    fact, an expert in a copyright law?

10        A.   I don't believe so.                     10:03:49

11        Q.   But you are an active member of the bar?

12        A.   I am.

13        Q.   So when you use the word "disgorgement",

14    you understand what that means in the context of

15    copyright law; is that right?                    10:04:06

16        A.   I believe that I do.

17        Q.   Okay.  Now, you indicated that

18    disgorgement was the principle remedy that you

19    understood that Mattel was interested in; is that

20    right?                                           10:04:20

21        A.   Yes.

22        Q.   Okay.  Was there any other remedy that you

23    understood Mattel was interested in?

24        A.   No.

25        Q.   And you've submitted two reports in this  10:04:40
                                                            10
```

EXHIBIT 23

PAGE 300

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              THE VIDEOGRAPHER:  We're off the record.     14:15:24
 2    The time is 2:15 p.m.
 3              (Discussion off the record)
 4              THE VIDEOGRAPHER:  We're back on the
 5    record.  The time is 2:16 p.m.                         14:16:34
 6              MR. ROTH:  So we've just had a short
 7    conversation for clarity sake.
 8              MR. FELDMAN:  And economy sake.
 9              MR. ROTH:  And hoping to avoid the
10    struggle and given the shortness of life.              14:16:47
11              MR. FELDMAN:  And your voice.
12    BY MR. ROTH:
13        Q.  Is there a certain duplication to the
14    profits generated by the sale of Bratz, on the one
15    hand, and the distributions to Mr. Larian, on the      14:16:58
16    other hand, from the sale of Bratz?
17        A.  Yes.
18        Q.  Okay.  Yes?
19        A.  Yes.
20        Q.  Could you elaborate on that?                   14:17:06
21        A.  They're really the same dollars or profits
22    that are earned from the activity of selling Bratz
23    products and they shouldn't be awarded twice.  If
24    MGA pays Mattel from MGA for those profits, I don't
25    think it can also collect them from Mr. Larian.        14:17:31
                                                                  132
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    And vice versa. .If they can't get them from MGA,      14:17:34
 2    they can get it them from Mr. Larian, but they
 3    can't get it both times.
 4        Q.   Okay.  We spoke just a moment ago about
 5    the income approach.  Could you explain what that      14:17:50
 6    is?
 7        A.   Yes.  It's using some measure of income,
 8    and I've used cash flow, and trying to predict or
 9    estimate what that will be for a number of years in
10    the future after my valuation date, and then trying   14:18:04
11    to determine what is the present value of that cash
12    flow.  And then for the period beyond the period
13    for which I have projected, I used what's called a
14    terminal of value to estimate the present value of
15    all future cash flows as well.                        14:18:19
16        Q.   What's the "terminal value"?  What is
17    that?
18        A.   The terminal value is the value of the
19    company at the end or terminus of the period that
20    you are analyzing.                                    14:18:30
21        Q.   And how does the income approach work?
22        A.   Well, the income approach works by
23    estimating some measure of income and then using
24    mathematics to bring that back to a present value
25    at an appropriate risk-adjusted rate.                 14:18:49
                                                                  133
```

EXHIBIT    23

PAGE    302

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  Okay.  So are the future cash flows that        14:18:52

2    you're discounting back to present the same as

3    MGA's future profits?

4      A.  Yes, as measured by cash flow.  And it's

5    isolated to what I'm estimating for Bratz, not for        14:19:11

6    the rest of their business.

7      Q.  Right.

8          Now, you went through 2010 and then you

9    calculated the terminal value.

10     A.  I did.                                              14:19:27

11     Q.  Why did you stop it at 2010?

12     A.  That was, I think, a reasonable period for

13   me to project in the future.

14     Q.  And you assumed a 2 percent growth rate?

15     A.  For the two years in the future, yes.            14:19:37

16     Q.  And what about for the periods beyond the

17   two years?

18     A.  My assumption was that it was 2 percent

19   into perpetuity.

20     Q.  And what's the basis upon which you            14:19:50

21   determined that the 2 percent growth rate was

22   appropriate?

23     A.  I think, to be honest, even though I think

24   it's being misconstrued by Mr. Meyer, is

25   conservatism.  I mean, that is an extremely low        14:20:01

134

EXHIBIT 23

PAGE 303

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    future grow rate for a company.  And if I look at          14:20:05

2    what analysts are estimating for other companies

3    that I think are most comparable to MGA, they're

4    projecting growth rates significantly in excess of

5    that.  But if I increase the growth rate, my value          14:20:18

6    will increase correspondingly.

7         Q.  Okay.  And are you familiar with MGA's

8    results, for instance, for 2007?

9         A.  Only through October.

10         Q.  Okay.  And what were those results?              14:20:34

11         A.  That they were down 18 percent -- between

12    18 and 19 percent from the year earlier.

13         Q.  And how did you figure that into your

14    calculation?

15         A.  Well, I assumed that that behavior would         14:20:43

16    continue for November and December 2008.

17         Q.  Okay.

18         A.  And then from that point, that low point,

19    I assumed they would basically grow at an inflation

20    rate, which is really no growth at all.                   14:20:56

21         Q.  And did you look at any industry data to

22    determine what experts expected in terms of growth

23    of the toy industry?

24         A.  Not beyond what's already in my report.  I

25    didn't look at the industry in total.  I looked at        14:21:11

                                                                   135

EXHIBIT 23

PAGE 304

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  the companies that I thought were the biggest            14:21:13

2  competitors of MGA and saw that those were

3  generally forecasting revenue growth in excess of

4  that.  I am aware now, based on Mr. Meyer's

5  rebuttal report, that he has some industry report       14:21:28

6  that is apparently forecasting a 5 percent decline

7  in the total industry.  But there are many

8  companies that will exceed that, among them the

9  leaders; others will have significantly greater

10 losses of sales than that.  And I still think that      14:21:45

11 my analysis is reasonable, but I guess to be

12 responsive to your question, no.

13      Q.  And the 2 percent growth rate that we're

14 talking about, that's for the Bratz product line?

15      A.  That's the Bratz product line.                  14:21:59

16      Q.  Okay.  What other companies in the

17 industry did you look at?

18      A.  Well, they're listed in my report.  I

19 think there is about 15 different companies,

20 possibly, that we considered.                            14:22:12

21      Q.  Well, did you consider Mattel?

22      A.  Yes.

23      Q.  Hasbro?

24      A.  Yes.

25      Q.  A company called RC2 Corp?                       14:22:21
                                                             136

23

305

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    inflation-adjusted growth rate of zero was                14:26:48

2    appropriate.

3           MR. ROTH:   I'd like to mark as next in

4    order Schedule 12.0 behind Tab B2.

5           (Deposition Exhibit No. 4567 was marked          14:27:03

6           for identification)

7           MR. FELDMAN:   Thank you.

8    BY MR. ROTH:

9        Q.   And do you see in the notes at the bottom

10   of the table, page 79?                                     14:27:31

11       A.   I do.

12       Q.   The sentence, "I excluded LeapFrog," will

13   you read that into the record?

14       A.   "I excluded LeapFrog due to negative

15   growth rates over time and JAKKS Pacific due to         14:27:45

16   significant growth in the earlier years resulting

17   from acquisitions."

18       Q.   What did you mean by that sentence?

19       A.   The LeapFrog -- and I actually, to be

20   honest, don't recall reviewing this note or             14:28:02

21   thinking about it when I made my decision.  What

22   this means, excluded from the schedule of the

23   analysis of toy industry growth rates was

24   apparently endemic to that company.  They weren't

25   doing well for a while, which is not the type of        14:28:15
                                                                    140

EXHIBIT   23

PAGE   306

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    company I think measures your client who has been        14:28:18

 2    extremely successful over time.  Even in spite of

 3    the fact that the industry has been declining 5

 4    percent a year, has been having extraordinary

 5    growth rates over time until 2007.                        14:28:29

 6          And then JAKKS Pacific, their results are

 7    explained not necessarily from operations but from

 8    acquisitions.  It would be unfair to include them.

 9       Q.  And in this schedule under "Net sales" and

10    "Operating Income," "Net Income," you list Hasbro,        14:28:45

11    Mattel and RC2 Corp?

12       A.  That's correct.

13       Q.  So you're relying on those three

14    companies?

15       A.  Yes.                                               14:28:54

16       Q.  Now, do you -- having seen Mr. Meyer's

17    report, do you intend to do any research into the

18    industry publications to make a determination about

19    what is expected in terms of future growth in the

20    toy industry?                                             14:29:34

21       A.  No.  I think what I have done is far

22    superior to what he has done.  He has taken an

23    overall industry rate and applied it to one of the

24    top four companies in the industry.  I think it's

25    more appropriate to look at comparable companies in       14:29:45
                                                                      141
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the industry that have similar characteristics to        14:29:47

2    the company I'm measuring, not some overall

3    industry average that includes a bunch of losers as

4    well as the winners.

5         Q.   Okay.                                           14:29:59

6              MR. ROTH:   I'd like to mark as next in

7    order a multipage document, Bates-numbered

8    MGA3823970 through '4075.

9              (Deposition Exhibit No. 4568 was marked

10             for identification)                             14:30:31

11             MR. FELDMAN:   Thank you.

12   BY MR. ROTH:

13        Q.   Have you ever seen this document before?

14        A.   Yes, but I have not looked at it in

15   detail.                                                  14:30:45

16        Q.   Well, do you know if there are any other

17   comprehensive studies of MGA's business that have

18   been produced by MGA in this case?

19        A.   No.

20        Q.   So why did you not look at this in detail?     14:31:13

21        A.   Because it was only brought to my

22   attention recently.  I think this week is the first

23   time I have actually personally seen this document,

24   and I have not had enough time to really focus on

25   what it's saying.                                        14:31:28
                                                                 142

EXHIBIT ___23___

PAGE ___308___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   I apologize for mispronouncing his name      14:32:01
 2   again, but Mr. Schoton --
 3        A.   Schoton.
 4        Q.   Schoton.  I know I'm going to hear about
 5   that left and right.                                   14:32:12
 6             MR. FELDMAN:  I actually think, if you
 7   don't mind my saying it, it's "Schoton."
 8             MR. ROTH:  "Schoton"?
 9             MR. FELDMAN:  I think so.
10             MR. ROTH:  "Schoton."  Okay.  Hopefully      14:32:18
11   we'll get it corrected before he reads the
12   transcript.
13        Q.   In your conversation with Mr. Schoton, did
14   you discuss the effect of the Hannah Montana --
15   introduction of that doll line into the                14:32:33
16   marketplace?
17        A.   Yes.
18        Q.   What did he say about that?
19        A.   He said that they have had significant
20   success against Barbie very recently.                  14:32:43
21        Q.   Did he say anything about the effect that
22   that doll has had on Bratz?
23        A.   No, I don't recall him saying that.
24        Q.   Did you ask about that?
25        A.   Well, I think inferentially, because I       14:32:57
                                                                143
```

EXHIBIT __23__

PAGE __309__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    other elements of value that they have added.        15:55:02

 2         Q.   Okay.  So did you do an apportionment

 3    analysis in this case?

 4         A.   I did.

 5         Q.   And have you critiqued Mr. Meyer's          15:55:10

 6    apportionment analysis?

 7         A.   I have.

 8         Q.   So you have a view about the appropriate

 9    apportionment in this case?

10         A.   If apportionment is appropriate and the     15:55:18

11    court rules that it should be done, I have my

12    opinion as to what it should be.

13         Q.   Do you have an opinion as to whether

14    apportionment is appropriate?

15         A.   No, I think that's more of a legal issue    15:55:29

16    that I'm not asked to address.

17         Q.   For purposes of your apportionment

18    analysis, what did you assume the infringing

19    activity was?

20         A.   The use of Mattel's copyrights.            15:55:46

21         Q.   Now, you, in terms of your apportionment,

22    your affirmative apportionment analysis, you

23    analyze comparable companies; is that right?

24         A.   Yes.

25         Q.   Could you explain that analysis?           15:56:12
                                                                 197
```

EXHIBIT ___23___

PAGE ___310___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Yes.  I.looked at a number of different      15:56:15

 2   possible yardsticks to use, and the principle

 3   method I have used is looking at three companies

 4   and looking at what the normal return is for those

 5   three companies.  And that's Hasbro, Mattel and       15:56:31

 6   JAKKS.  And saying that these are companies that

 7   are major players in the toy industry, that heavily

 8   promote their products, have well-known brands, and

 9   what type of return do they get on the sales of

10   their products, and have concluded that your client   15:56:54

11   should get that return as well.  And then subtract

12   that return from the actual profits I've calculated

13   to determine the amount that is attributable to the

14   copyrights.

15        Q.   Okay.  So you've determined what you         15:57:12

16   believe the profits are that have been generated by

17   Bratz, correct?

18        A.   Yes.

19        Q.   And then you've taken a look at three

20   companies:  Hasbro, JAKKS and Mattel.  Is that        15:57:23

21   right?

22        A.   Yes.

23        Q.   And you've looked at the profits that they

24   generally, through their operations, generate; is

25   that right?                                            15:57:34
                                                              198
```

EXHIBIT __23__

PAGE __3\1__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.   Yes.                                    15:57:35

2        Q.   And that's what you mean by "return"?

3        A.   Correct.

4        Q.   And you've decided that MGA should be able

5    to retain the same level of profits as those three   15:57:43

6    companies but no more?

7        A.   Correct.

8        Q.   And that anything above that is

9    profitability that is somehow associated with the

10   infringing activity?                             15:57:55

11       A.   Correct.

12       Q.   And what's the relationship between those

13   excess profits and the infringing activity?

14       A.   That I think I have accounted for the

15   normal type of value that is generated by a      15:58:06

16   company, a successful company, in promoting its

17   branded products.  So I have already taken into

18   consideration all the things that Mr. Meyer is

19   attempting to measure and subtract out of the

20   profits and then the residual left over is what's   15:58:23

21   unexplained and, therefore, attributable to the

22   copyrights.

23       Q.   So you don't know what generates the

24   excess profits, but you can't explain it based on

25   what you've seen; therefore, you attribute it to    15:58:39
                                                         199
```

EXHIBIT   23

PAGE   312

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA  )
 2        :ss
 3   COUNTY OF SAN MATEO  )
 4        I, CYNTHIA MANNING, CSR No. 7645, a
 5   Certified Shorthand Reporter of the State of
 6   California, do hereby certify:
 7        That the foregoing proceedings were taken
 8   before me at the time and place herein set forth;
 9   that any witnesses in the foregoing proceedings,
10   prior to testifying, were placed under oath; that a
11   verbatim record of the proceedings was made by me
12   using machine shorthand which was thereafter
13   transcribed under my direction; further, that the
14   foregoing is an accurate transcription thereof.
15        I further certify that I am neither
16   financially interested in the action, nor a
17   relative or employee of any attorney of any of the
18   parties.
19        IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21
22   DATED: March 25,2008
23
24
25                    CYNTHIA MANNING, CSR No. 7645
                                                  299
```

**EXHIBIT 24**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,   )
                                )
                    PLAINTIFF,  )
                                )    CASE NO.
        V.                      )    CV 04-9040 SGL (RNBX)
                                )
MATTEL, INC., A DELAWARE        )    CONSOLIDATED WITH
CORPORATION,                    )    CASE NO. 04-9059
                                )
                    DEFENDANTS. )    CASE NO.  05-2727
                                )
AND CONSOLIDATED ACTION (S).    )
                                )

# C O N F I D E N T I A L

(ATTORNEYS' EYES ONLY)

## DEPOSITION OF FARHAD LARIAN

## VOLUME I

## FEBRUARY 4, 2008



COURT REPORTERS

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
PAULA PYBURN
CSR NO. 7304
JOB NO. 08AE084-PP

EXHIBIT __24__

PAGE __314__

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, AN          )
INDIVIDUAL,               )
                         )  CASE NO.
         PLAINTIFF,       )  CV 04-9049 SGL(RNBX)
                         )
    V.                    )  CONSOLIDATED WITH
                         )  CASE NO. 04-9059
MATTEL, INC., A DELAWARE  )          AND
CORPORATION,             )  CASE NO. 05-2727
                         )
         DEFENDANT.       )
_____)
                         )
AND CONSOLIDATED ACTION(S) )
_____)


         CONFIDENTIAL ATTORNEYS' EYES ONLY
         VIDEOTAPED DEPOSITION OF FARHAD
         LARIAN, VOLUME I, TAKEN ON BEHALF OF
         MATTEL, INC., AT 10250 CONSTELLATION
         BOULEVARD, 20TH FLOOR, LOS ANGELES,
         CALIFORNIA, COMMENCING AT 9:39 A.M.,
         MONDAY, FEBRUARY 4, 2008, BEFORE
         PAULA A. PYBURN, C.S.R. 7304,
         R.P.R., C.L.R.

1

EXHIBIT ___24___

PAGE ___315___

```
 1   APPEARANCES OF COUNSEL:
 2   FOR M.G.A. ENTERTAINMENT, INC.:
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      BY:  JOSE R. ALLEN, ESQ.
 4    FOUR EMBARCADERO CENTER
      SAN FRANCISCO, CALIFORNIA 94111
 5    (415) 984-6400
      JRALLEN@SKADDEN.COM
 6
 7   FOR DEFENDANT MATTEL, INC.:
 8    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      BY:  MICHAEL T. ZELLER, ESQ.
 9              AND
      BY:  BRIDGET A. HAULER, ESQ.
10    865 SOUTH FIGUEROA STREET
      10TH FLOOR
11    LOS ANGELES, CALIFORNIA 90017
      (213) 443-3000
12    MICHAELZELLER@QUINNEMMANUEL.COM
      BRIDGETHAULER@QUINNEMMANUEL.COM
13
14   FOR CARTER BRYANT:
15    KEKER & VAN NEST LLP
      BY:  CHRISTA MARTINE ANDERSON, ESQ.
16         (WHERE INDICATED)
      710 SANSOME STREET
17    SAN FRANCISCO, CALIFORNIA 94111
      (415) 391-5400
18    CANDERSON@KVN.COM
19
20
21
22
23
24
25
```

                                                        2

EXHIBIT __24__

PAGE __310__

```
 1    APPEARANCES OF COUNSEL:   (CONTINUED)
 2    FOR THE WITNESS:
 3     CHRISTENSEN, GLASER, FINK, JACOBS,
       WEIL & SHAPIRO, LLP
 4     BY:  PATRICIA GLASER, ESQ.
              (WHERE INDICATED)
 5              AND
       BY:  ALISA MORGENTHALER LEVER, ESQ.
 6              AND
       BY:  JIM SCHREIR, ESQ.
 7              (WHERE INDICATED)
       10250 CONSTELLATION BOULEVARD
 8     NINETEENTH FLOOR
       LOS ANGELES, CALIFORNIA 90067
 9     (310) 553-3000
10
       ALSO PRESENT:
11
       RICHARD DANIELS,
12           IN-HOUSE COUNSEL, M.G.A. ENTERTAINMENT, INC.
       JOSH SHAPIRO
13           M.G.A. ENTERTAINMENT, INC. (WHERE INDICATED)
       STEVEN TOGAMI,
14           J.T.V. LITIGATIONS SERVICES, INC.
15
16
17
18
19
20
21
22
23
24
25
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT __24__

PAGE __317__

1    REVIEWED IN A DAY?

2            MS. MORGENTHALER LEVER:  OBJECTION; VAGUE

3    AND AMBIGUOUS, ASSUMES FACTS NOT IN EVIDENCE, LACK

4    OF FOUNDATION.

5            MR. ALLEN:  JOIN.                              10:35:14

6            THE WITNESS:  IT DEPENDS ON THE PERSON, IT

7    DEPENDS HOW MANY PEOPLE, IT DEPENDS -- YEAH, IT

8    COULD HAVE BEEN REVIEWED IN ONE DAY.

9    BY MR. ZELLER:

10       Q.    AND WHAT WAS THE QUANTITY OF WHAT YOU HAD     10:35:21

11   GIVEN YOUR ATTORNEY BY THAT TIME?

12       A.    SOME BOXES.

13       Q.    HOW MANY?

14       A.    DON'T REMEMBER.

15       Q.    MORE THAN ONE?                               10:35:32

16       A.    YEAH, MORE THAN ONE.  PROBABLY 10 TO 12.

17       Q.    ISN'T IT TRUE THAT BY THAT TIME YOU HAD

18   GIVEN YOUR ATTORNEY A U.S.B. DEVICE THAT CONTAINED

19   EMAILS?

20            MS. MORGENTHALER LEVER:  OBJECTION.           10:35:44

21            THE WITNESS:  YES, I HAD.

22   BY MR. ZELLER:

23       Q.    DO YOU KNOW WHERE THAT U.S.B. DEVICE IS

24   TODAY?

25       A.    PROBABLY AT MY HOME.                         10:35:52

53

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT __24__

PAGE __318__

1      Q.    AND THOSE -- THAT U.S.B. DEVICE HAD STORED

2  ON IT EMAILS FROM M.G.A.; CORRECT?

3      A.    YES.

4      Q.    AND THAT INCLUDED EMAILS FROM THE 2000-2001

5  TIME PERIOD?                                    10:36:18

6          MS. MORGENTHALER LEVER:  OBJECTION; CALLS

7  FOR SPECULATION, LACK OF FOUNDATION.

8          THE WITNESS:  IT PROBABLY DID.

9  BY MR. ZELLER:

10     Q.    THAT'S YOUR -- YOUR RECOLLECTION?        10:36:23

11     A.    YES.

12     Q.    SOME OF THOSE EMAILS PERTAINED TO BRATZ;

13  CORRECT?

14          MR. ALLEN:  OBJECTION.

15          MS. MORGENTHALER LEVER:  OBJECTION; CALLS   10:36:30

16  FOR SPECULATION, LACK OF FOUNDATION.

17          THE WITNESS:  I BELIEVE IT DID, YES.

18  BY MR. ZELLER:

19     Q.    AND I TAKE IT AT SOME POINT THAT U.S.B.

20  DEVICE THAT YOU GAVE TO YOUR ATTORNEY -- I ASSUME IT   10:36:43

21  WAS BOB WILSON WHO YOU GAVE THE U.S.B. DEVICE --

22     A.    I DON'T REMEMBER IF IT WAS BOB OR THE OTHER

23  ATTORNEY.

24     Q.    IT WAS SOMEONE AT HIS FIRM?

25     A.    THERE WERE TWO FIRMS INVOLVED, SO -- COULD   10:36:54

54

EXHIBIT __24__

PAGE ___319___

1   THESE EMAILS ON IT OR MORE THAN ONE?

2       A.   ONE.

3       Q.   SO AT SOME POINT IN 2005 YOU GOT IT BACK

4   FROM YOUR ATTORNEYS.  AND YOU'VE BEEN IN POSSESSION

5   OF IT SINCE THEN?                                    10:38:13

6       A.   THE U.S.B. DRIVE, YES.

7       Q.   HAVE ANY COPIES OF IT BEEN MADE?

8       A.   NO.

9       Q.   IN CONNECTION WITH THIS LAWSUIT WITH MATTEL

10  DID YOU GIVE THE U.S.B. DEVICE TO YOUR ATTORNEYS?    10:38:26

11      A.   NO.

12      Q.   DID YOU PRINT OFF ANY EMAILS FROM THAT

13  U.S.B. DEVICE AND GIVE THEM TO YOUR ATTORNEYS?

14      A.   THERE ARE NO EMAILS ON THAT U.S.B. DRIVE.

15      Q.   I'M SORRY?                                   10:38:37

16      A.   THERE ARE NO EMAILS ON THAT DRIVE ANYMORE.

17      Q.   WHAT HAPPENED TO THEM?

18      A.   I ERASED THEM.

19      Q.   WHEN DID YOU DO THAT?

20      A.   SOON AFTER I DROPPED THE LAWSUIT -- OR THE   10:38:43

21  ARBITRATION.

22      Q.   AND WHY DID YOU ERASE THEM?

23      A.   I HAD DROPPED MY ARBITRATION, I WANTED TO

24  MOVE ON, I WAS CONCERNED THAT MY ATTORNEY HAD --

25  THAT YOU HAD SEEN DOCUMENTS THAT MAY HAVE BEEN        10:39:02

56

EXHIBIT __24__

PAGE __320__

1   PRIVILEGED OR CONFIDENTIAL, AND I SIMPLY DID NOT

2   WANT TO BE DEPOSED.

3       Q.    AND WERE YOU THE ONE WHO PERSONALLY ERASED

4   THE EMAILS FROM THE U.S.B. DRIVE?

5       A.    YES, I AM.                                    10:39:24

6       Q.    DID ANYONE ELSE HELP YOU WITH THAT?

7       A.    NO.

8       Q.    IS THAT SOMETHING YOU DISCUSSED WITH ANYONE

9   AT M.G.A. --

10      A.    NO.                                           10:39:32

11      Q.    -- AT ANY TIME?

12      A.    NO.

13      Q.    AT ANY TIME?

14      A.    NEVER.

15      Q.    YOU DID -- YOU ERASED THE EMAILS THAT WE'VE   10:39:34

16  BEEN TALKING ABOUT FROM THE U.S.B. DRIVE AFTER YOU

17  RECEIVED THE LETTERS FROM MY LAW FIRM THAT WE TALKED

18  ABOUT EARLIER ASKING YOU TO PRESERVE DOCUMENTS;

19  RIGHT?

20          MS. MORGENTHALER LEVER:   OBJECTION --         10:39:52

21          THE WITNESS:   THAT'S NOT WHAT I SAID.

22          MS. MORGENTHALER LEVER:   OBJECTION; ASSUMES

23  FACTS NOT IN EVIDENCE, LACK OF FOUNDATION.

24          MR. ALLEN:   JOIN.

25  ///                                                    10:39:57

57

EXHIBIT   24

PAGE   321

BY MR. ZELLER:

1   Q.   ISN'T IT TRUE THAT THAT HAPPENED?

2   A.   THAT'S NOT WHAT I SAID, NO.

3   Q.   I'M NOT ASKING YOU WHAT YOU SAID.

4   A.   NO, IT'S NOT TRUE.                           10:40:04

5   Q.   IT'S NOT TRUE.  AND WHY DO YOU SAY IT'S NOT

6   TRUE?

7   A.   BECAUSE I DID IT SHORTLY AFTER I DROPPED

8   THE ARBITRATION.

9   Q.   HOW LONG?                                    10:40:10

10  A.   WITHIN A COUPLE OF DAYS.

11  Q.   HAVE YOU PUT ANYTHING ON THAT U.S.B. DRIVE

12  SINCE THE TIME YOU ERASED IT?

13  A.   YES.

14  Q.   WHAT HAVE YOU PUT ON IT?                     10:40:20

15       MS. MORGENTHALER LEVER:  OBJECTION; CALLS

16  FOR -- LACK -- INVADES THE WITNESS'S PRIVACY.

17       THE WITNESS:  PICTURES, MUSIC, FILES

18  RELATED TO MAYBE TAX RETURNS.  MAYBE MOVIES.  MY

19  DAUGHTER'S HOMEWORK.                              10:40:55

20  BY MR. ZELLER:

21  Q.   DO YOU KNOW IF THERE ARE ANY DELETED FILES

22  THAT ARE STILL ON THAT U.S.B. DEVICE?

23       MS. MORGENTHALER LEVER:  OBJECTION; VAGUE

24  AND AMBIGUOUS.                                    10:41:12

58

EXHIBIT ___24___

PAGE ___322___

```
 1            THE WITNESS:  IT'S POSSIBLE.
 2   BY MR. ZELLER:
 3       Q.    AND DO YOU REMEMBER WHAT YOU USED, WHAT
 4   PROGRAM YOU USED TO ERASE THE EMAILS FROM THE U.S.B.
 5   DEVICE?                                                    10:41:24
 6       A.    WINDOWS EXPLORER.
 7       Q.    ANYTHING ELSE?
 8       A.    NO.
 9       Q.    AS OF THE TIME WHEN YOU ERASED THOSE EMAILS
10   FROM THE U.S.B. DEVICE THAT WE'VE BEEN TALKING           10:41:38
11   ABOUT, YOU WERE AWARE THAT MATTEL WAS INVOLVED IN A
12   LAWSUIT WITH M.G.A.; RIGHT?
13            MS. MORGENTHALER LEVER:   OBJECTION; LACK OF
14   FOUNDATION, ASSUMES FACTS NOT IN EVIDENCE.
15            MR. ALLEN:  JOIN.                                10:41:51
16            THE WITNESS:  I'VE BEEN -- I'VE KNOWN
17   M.G.A. AND MATTEL HAVE BEEN INVOLVED SINCE 2004.
18   BY MR. ZELLER:
19       Q.    SO THAT WAS -- THAT WAS PRIOR TO THE TIME
20   THAT YOU ERASED THE EMAILS FROM THE U. -- U.S.B.         10:41:59
21   DEVICE; RIGHT?
22       A.    MATTEL'S INVOLVEMENT IN THE LAWSUIT WITH
23   M.G.A. --
24       Q.    RIGHT.
25       A.    -- IS PRIOR TO THE TIME I ERASED THE           10:42:05
```

59

EXHIBIT  24

PAGE  323

```
 1    WOULD HAVE BEEN SOME OF THE CATEGORIES THAT RELATED
 2    TO BRATZ.
 3           I THINK I ALSO HAD THE PLEADING -- SOME OF
 4    THE PLEADINGS FROM MATTEL VERSUS M.G.A. OR CARTER
 5    BRYANT, THAT WHOLE CASE, AND ALSO THE ART ATTACKS        10:48:01
 6    CASE.
 7    BY MR. ZELLER:
 8       Q.   WERE THERE OTHER CATEGORIES RELATING TO
 9    BRATZ THAT WAS ON THE U.S.B. DEVICE?
10       A.   I HAD DONE SOME TRADEMARK SEARCHES, SO -- I      10:48:18
11    MENTIONED THE TRADEMARKS, I THINK.  NOT THAT I
12    RECALL.
13       Q.   DO YOU THINK THAT THERE WERE OTHER
14    CATEGORIES, YOU JUST CAN'T REMEMBER WHAT THEY ARE?
15           MS. MORGENTHALER LEVER:   OBJECTION --          10:48:32
16           THE WITNESS:  IF I DON'T RECALL, I DON'T
17    RECALL.
18           MS. MORGENTHALER LEVER:   -- MISSTATES THE
19    WITNESS'S TESTIMONY.
20           MR. ZELLER:   WHAT EXHIBIT ARE WE ON?            10:48:43
21       Q.   OTHER THAN THE U.S.B. DEVICE, AT ANY TIME
22    SINCE 2000 HAVE YOU DISCARDED OR GOTTEN RID OF ANY
23    INFORMATION ABOUT BRATZ?
24       A.   YES.
25       Q.   WHAT ELSE HAVE YOU GOTTEN RID OF?               10:49:22
```

65

EXHIBIT __24__

PAGE __324__

```
1      A.   SOME OF THE BOXES THAT I RECEIVED BACK FROM

2   MY ATTORNEY.

3      Q.   WHICH ATTORNEYS?

4      A.   RICHARD KELLNER AND ROB SMITH -- BOB SMITH.

5      Q.   AND DID YOU GET THOSE BOXES BACK FROM YOUR          10:49:48

6   ATTORNEYS AFTER YOU HAD DISMISSED YOUR -- YOUR

7   ARBITRATION PROCEEDING AGAINST --

8      A.   YES.

9      Q.   -- ISAAC?

10     A.   YES.                                                10:49:58

11     Q.   AND WHEN DID YOU GET RID OF THOSE BOXES?

12     A.   WITHIN A FEW DAYS OF GETTING THEM BACK FROM

13   MY ATTORNEY.

14     Q.   WAS THIS ABOUT THE SAME TIME WHEN YOU

15   ERASED THE INFORMATION FROM THE U.S.B. DEVICE?          10:50:15

16     A.   YES.

17     Q.   AND HOW DID YOU DISCARD THE -- THE BOXES?

18     A.   I THREW THEM IN THE TRASH.

19     Q.   WAS THAT AT HOME OR SOMEWHERE ELSE?

20     A.   HOME.                                              10:50:26

21     Q.   WAS THAT THE 10 TO 12 BOXES THAT YOU

22   MENTIONED EARLIER OR A DIFFERENT SET OF BOXES?

23          MS. MORGENTHALER LEVER:   OBJECTION;

24   MISSTATES THE WITNESS'S TESTIMONY, LACK OF

25   FOUNDATION.                                              10:50:40
```

66

EXHIBIT _24_

page _325_

```
 1           THE WITNESS:  IT WAS SOME OF THOSE 10 -- 10
 2   TO 12 BOXES.
 3   BY MR. ZELLER:
 4       Q.   WHAT WAS IN THE BOXES THAT YOU GOT RID OF?
 5       A.   I DON'T REMEMBER EXACTLY.  THE EMAILS I          10:50:55
 6   THINK WERE SOME OF THEM.
 7       Q.   THE EMAILS THAT YOU DESCRIBED EARLIER THAT
 8   PERTAINED TO BRATZ?
 9       A.   NOT ONLY TO BRATZ.  LUCASFILM MATTER,
10   WHATEVER I HAD.  IT WASN'T JUST BRATZ.               10:51:21
11       Q.   BUT IT INCLUDED BRATZ?
12       A.   IT INCLUDED BRATZ, YES.
13       Q.   AND DID ANYONE ASSIST YOU IN DISCARDING
14   THOSE BOXES THAT -- OF THOSE MATERIALS THAT WE'VE
15   BEEN TALKING ABOUT?                                  10:51:41
16       A.   PROBABLY OUR HOUSEKEEPER.
17       Q.   ANYONE ELSE?
18       A.   I'M NOT SURE IF MY WIFE HELPED ME OR NOT.
19       Q.   ANYONE ELSE?
20       A.   NO.                                         10:51:52
21       Q.   AND DID YOU MAKE THE DECISION TO ERASE THE
22   INFORMATION FROM THE U.S.B. DEVICE AT THE SAME TIME
23   YOU DECIDED TO DISCARD THE BOXES?
24       A.   YES.
25       Q.   NOW, OTHER THAN, AS WE'VE TALKED ABOUT,      10:52:07
```

67

EXHIBIT _24_

PAGE _326_

1    AND AMBIGUOUS TO THE TERMS "THOSE EMAILS."

2         THE WITNESS:   THERE MAY HAVE BEEN OTHER

3    FILES OTHER THAN JUST EMAILS.

4    BY MR. ZELLER:

5         Q.   WHAT OTHER -- WHAT OTHER FILES DID YOU COPY     10:54:33

6    FROM M.G.A.'S COMPUTERS THAT ENDED UP ON THE U.S.B.

7    DEVICE?

8         A.   I THINK THE -- THE WORD DOCUMENT OF THE

9    CARTER BRYANT AGREEMENT.   I REMEMBER ONE FORECAST.

10   THERE MAY HAVE BEEN SOME SPREADSHEETS.                    10:55:05

11        WERE THERE ANY OTHERS?   DON'T RECALL.

12   ROYALTY CALCULATIONS, ROYALTY PAYMENTS.

13        Q.   ANY OTHERS YOU CAN REMEMBER?

14        A.   MAYBE SOME FILES RELATED TO SHIPPING.

15        Q.   I'M SORRY -- OH, SHIPPING?                      10:55:46

16        A.   SHIPPING.   THOSE ARE THE ONES I RECALL.

17        Q.   I THINK YOU HAD MENTIONED ONE CATEGORY OF

18   THE FILES THAT YOU REMEMBER RELATED TO THE CARTER

19   BRYANT AGREEMENT?

20        A.   YES.   I HAD THE WORD DOCUMENT OF A CARTER      10:56:01

21   BRYANT AGREEMENT.

22        Q.   I'M SORRY, YOU'RE SAYING "THE WORD

23   DOCUMENT"?

24        A.   YEAH, MICROSOFT WORD.

25        Q.   OH, THE WORD DOCUMENT.                          10:56:09

70

EXHIBIT  24

PAGE  327

```
 1          AND THAT WAS THE CARTER BRYANT AGREEMENT

 2   RELATING TO BRATZ?

 3       A.   YES.

 4       Q.   THEN YOU HAD MENTIONED THAT THERE WERE

 5   OTHER CATEGORIES OF -- OF ADDITIONAL FILES IN       10:56:23

 6   ADDITION TO THE EMAILS THAT YOU HAD COPIED FROM

 7   M.G.A.'S COMPUTERS THAT ENDED UP ON THAT U.S.B.

 8   DRIVE.  DID ANY OF THOSE OTHER CATEGORIES PERTAIN TO

 9   BRATZ?

10          MS. MORGENTHALER LEVER:   OBJECTION; VAGUE      10:56:37

11   AND AMBIGUOUS.

12          THE WITNESS:   NOT THAT I RECALL.

13   BY MR. ZELLER:

14       Q.   WHAT DID THE ROYALTY --

15       A.   YEAH, THE ROYALTIES, YEAH, THOSE WOULD       10:56:46

16   HAVE, AND THE -- AND PROBABLY SOME OF THE

17   SPREADSHEETS, THE SHIPPING SPREADSHEETS, THEY WOULD

18   HAVE HAD BRATZ ON THEM.

19       Q.   AND FOCUSING ON THE TIME WHEN YOU COPIED --

20   ACTUALLY, LET ME ASK ONE QUESTION SO THAT WE'RE ON    10:57:10

21   THE SAME PAGE FIRST.

22          IT'S YOUR BEST ESTIMATE THAT YOU HAD COPIED

23   THE EMAILS AND THOSE OTHER FILES THAT WE'VE BEEN

24   TALKING ABOUT FROM M.G.A.'S COMPUTERS IN THE 2003 OR

25   2004 TIME PERIOD?                                      10:57:25
```

71

EXHIBIT ___2A___

PAGE ___328___

1   UNDERSTAND.   SO JUST FOCUSING ON THE EMAILS FOR A

2   MOMENT.

3       A.   YES.

4       Q.   WERE THOSE EMAILS THAT YOU COPIED ONTO THE

5   U.S.B. DRIVE, WERE THEY -- WERE THEY ON A LAPTOP            10:59:21

6   THAT YOU HAD, OR DID YOU -- DID YOU COPY THEM FROM

7   SOME M.G.A. COMPUTERS?

8           MS. MORGENTHALER LEVER:   ASKED AND

9   ANSWERED.

10          THE WITNESS:   THEY WOULD HAVE FIRST GONE TO        10:59:32

11   MY LAPTOP, AND THEN FROM THE LAPTOP TO THE U.S.B.

12   DRIVE.

13   BY MR. ZELLER:

14       Q.   AND SO YOU -- DID YOU HOOK UP YOUR LAPTOP

15   TO M.G.A.'S SYSTEM AND THEN YOU COPIED THE EMAILS TO       10:59:39

16   YOUR -- YOUR LAPTOP?

17          MS. MORGENTHALER LEVER:   OBJECTION; VAGUE

18   AND AMBIGUOUS AS TO TIME.

19          THE WITNESS:   WHILE I WAS -- WHILE I WAS

20   CONSULTING FOR M.G.A. I WOULD DOWNLOAD THE EMAILS, I       10:59:49

21   HAD AN M.G.A. EMAIL ACCOUNT, SO THEY STAYED ON THE

22   LAPTOP.

23   BY MR. ZELLER:

24       Q.   IS IT PART -- PART OF WHAT I GUESS I'M

25   TRYING TO FIGURE OUT IS THIS:   WE TALKED EARLIER          11:00:01

74

EXHIBIT 24

PAGE 329

1  ABOUT HOW SOME OF THE EMAILS THAT WERE ON THE U.S.B.

2  DRIVE WERE FROM THE 2000 AND 2001 TIME PERIOD;

3  RIGHT?

4      A.    RIGHT.

5      Q.    DID YOU OBTAIN THE COPIES OF THOSE EMAILS          11:00:09

6  THAT ENDED UP ON THE U.S.B. DEVICE FROM M.G.A.'S

7  SYSTEM, OR DID YOU -- DID YOU COPY THOSE FROM A

8  LAPTOP THAT YOU HAD, THOSE EARLIER TIME PERIOD

9  EMAILS?

10     A.    ALL OF THOSE OF EMAILS --                          11:00:25

11         MS. MORGENTHALER LEVER:   CALLS FOR

12  SPECULATION.

13         THE WITNESS:   ALL OF THOSE EMAILS WOULD

14  HAVE COME FROM M.G.A.'S COMPUTER TO MY LAPTOP, AND

15  THEN FROM THE LAPTOP TO THE U.S.B. DRIVE.            11:00:30

16  BY MR. ZELLER:

17     Q.    AND HOW IS IT THAT THOSE FILES ENDED UP ON

18  YOUR LAPTOP?   DID YOU PUT THEM THERE OR SOMEBODY

19  ELSE?

20     A.    I PUT THEM THERE.                                  11:00:38

21     Q.    AND HOW DID YOU GO ABOUT DOING THAT?

22     A.    THE EMAILS I WOULD DOWNLOAD, I WOULD SYNC

23  WITH M.G.A.'S COMPUTER, AND THAT WOULD DOWNLOAD ALL

24  THE EMAILS TO -- THAT WERE FROM ME TO MY COMPUTER.

25         SOME OF THE FILES I WOULD GO ONLINE, OR IF     11:00:54

75

EXHIBIT __24__

PAGE __330__

```
 1   I WAS AT M.G.A. I WOULD HOOK UP MY COMPUTER AND I
 2   WOULD EXPLORE USING WINDOWS EXPLORER AND GET THE
 3   FILES.
 4        Q.   WAS THERE A PARTICULAR M.G.A. SYSTEM DRIVE
 5   THAT YOU WERE -- YOU WERE LOOKING IN FOR THOSE OTHER      11:01:10
 6   FILES?
 7        A.   THERE WERE A COUPLE OF SHARED DRIVES WHERE
 8   THOSE FILES WERE KEPT.  MAYBE MORE THAN A COUPLE.
 9        Q.   WAS ONE OF THEM THE X: DRIVE?
10        A.   X: DRIVE, I THINK I RECALL THAT CLEARLY.  I    11:01:23
11   DON'T KNOW IF THERE WAS A Y: DRIVE.  THERE WAS AN
12   M.G.A. HONG KONG DRIVE.  I DON'T KNOW IF THAT WAS
13   THE X: DRIVE OR -- I DON'T KNOW WHAT THEY CALLED IT.
14        Q.   ANY OTHER DRIVES THAT YOU CAN RECALL
15   SEARCHING TO -- TO LOCATE THOSE -- THOSE EMAILS OR       11:01:41
16   FILES?
17        A.   I THINK THERE WAS A FOLDER UNDER MY NAME
18   THAT WAS SHARED, AND AS -- AS I SAID, M.G.A. HONG
19   KONG'S FOLDER, THOSE ARE THE ONES I REMEMBER.
20        Q.   YOU DON'T REMEMBER ANY OTHERS?                 11:01:59
21        A.   NO.  X: AND Y: SOMEHOW RING A BELL.
22        Q.   YOU MENTIONED THAT THERE WAS A -- A FOLDER
23   UNDER YOUR NAME THAT WAS SHARED.
24        A.   YES.
25        Q.   WAS THAT SOMETHING THAT YOU KNEW ABOUT WHEN    11:02:13
```

76

EXHIBIT 24

PAGE 331

1  THE -- THE PARTNERSHIP WAS DISSOLVED?

2      A.   DON'T RECALL.   COULD -- COULD HAVE BEEN

3  VERY CLOSE.

4      Q.   AND WHY WAS THE -- THE PROPERTY SOLD?

5      A.   M.G.A. WAS MOVING OUT AND IT WAS GOING TO            11:21:11

6  SIT VACANT, SO WE SOLD IT.

7      Q.   SINCE 2000 HAVE YOU BEEN A PARTNER IN ANY

8  PARTNERSHIP THAT ISAAC LARIAN WAS ALSO A PARTNER IN,

9  OTHER THAN THE SCHOENBORN PARTNERSHIP WE JUST TALKED

10  ABOUT?                                                       11:21:48

11      A.   NO.

12      Q.   HAVE YOU DONE ANY BUSINESS WITH ISAAC

13  LARIAN AT ANY TIMES -- OF ANY KIND, WHETHER FORMAL,

14  INFORMAL -- SINCE THE TIME THAT YOU DISMISSED YOUR

15  ARBITRATION PROCEEDING?                                     11:22:09

16          MS. GLASER:   I'M GOING TO OBJECT TO THE

17  QUESTION ON THE GROUNDS IT'S VAGUE AND AMBIGUOUS.

18          IF YOU CAN ANSWER IT, GO AHEAD.

19          THE WITNESS:   NO.

20  BY MR. ZELLER:                                              11:22:16

21      Q.   WE TALKED EARLIER ABOUT THE -- THE LAPTOP

22  THAT -- THAT YOU HAD THAT YOU USED TO --

23      A.   THAT I HAD.

24      Q.   YOU HAD, RIGHT.   WE'LL -- WE'LL GET TO THAT

25  PART, AND THAT'S WHAT I WAS GOING TO FOLLOW UP ON.          11:22:38

88

EXHIBIT  24

PAGE  332

1   THERE WAS THE LAPTOP THAT WE TALKED ABOUT THAT YOU

2   HAD USED TO COPY THE EMAILS AND THE OTHER FILES THAT

3   WE TALKED ABOUT TO THE U.S.B. DEVICE; RIGHT?

4       A.   YES.

5       Q.   I THINK YOU HAD SAID EARLIER THAT WAS AN          11:22:50

6   M.G.A. COMPUTER?

7       A.   IT WAS -- MAYBE AT ONE POINT IT WAS OWNED

8   BY M.G.A.  I THINK WHEN I LEFT IT BECAME MINE.

9       Q.   WAS IT A LAPTOP THAT WAS PROVIDED TO YOU

10  WHEN YOU WERE AN EMPLOYEE?                               11:23:01

11      A.   YES.

12      Q.   SO THAT WAS SOMETIME IN 2000 OR BEFORE?

13      A.   YES.

14      Q.   DO YOU HAVE AN ESTIMATE AS TO WHEN YOU WERE

15  GIVEN THAT PARTICULAR LAPTOP?  I MEAN FIRST BY          11:23:09

16  M.G.A.

17      A.   NO.

18      Q.   AND I THINK AS YOU WERE MENTIONING YOU TOOK

19  THE LAPTOP WITH YOU AFTER YOU WERE AN EMPLOYEE AND

20  YOU WERE STILL WORKING AS A CONSULTANT?                 11:23:26

21      A.   YES.

22      Q.   AND WHEN DID YOU LAST HAVE THAT LAPTOP --

23  THAT LAPTOP IN YOUR POSSESSION?

24      A.   AUGUST OF 2007.

25      Q.   AND WHAT HAPPENED TO IT IN AUGUST OF 2007?      11:23:35

89

EXHIBIT 24

333

1   SUBPOENA, YOU'RE TALKING ABOUT BY MATTEL IN THIS

2   CASE?

3        A.   YES.

4        Q.   AND IS THAT WHEN YOUR DOCUMENT PRESERVATION

5   OR -- OR DESTRUCTION POLICIES CHANGED?                    11:32:05

6        A.   YES.

7        Q.   AND HOW DID THEY CHANGE?

8        A.   I HAD THINGS THAT I UNFORTUNATELY HAD NOT

9   THROWN AWAY, AND WHEN I WAS SERVED WITH A SUBPOENA I

10  HAD TO PRESERVE THEM.                                     11:32:26

11       Q.   DID YOU HAVE ANY UNDERSTANDING PRIOR TO THE

12  TIME THAT YOU RECEIVED THE SUBPOENA AS TO WHETHER OR

13  NOT YOU HAD ANY OBLIGATION TO PRESERVE DOCUMENTS IN

14  CONNECTION WITH ANY LITIGATION?

15       MS. GLASER:   I'M GOING TO CAUTION YOU THAT         11:32:40

16  YOU SHOULD NOT DISCLOSE INADVERTENTLY ANY

17  INFORMATION YOU MAY -- OR DISCUSSION YOU MAY HAVE

18  HAD WITH SOMEBODY REPRESENTING YOU AS YOUR COUNSEL,

19  BUT OTHER THAN THAT, COUNSEL IS ENTITLED.

20       THE WITNESS:   IS HE ASKING IF I HAD THE            11:32:57

21  UNDERSTANDING?  YES, I HAD THE UNDERSTANDING THAT I

22  WASN'T REQUIRED TO RETAIN ANYTHING.

23  BY MR. ZELLER:

24       Q.   AND WHERE DID YOU OBTAIN THAT UNDERSTANDING

25  THAT YOU WERE NOT REQUIRED TO RETAIN ANYTHING?           11:33:07

98

EXHIBIT 24

PAGE 334

1    A.   THAT IS GOING TO REQUIRE ME TO DIVULGE

2  ATTORNEY-CLIENT PRIVILEGE INFORMATION.

3    Q.   DID ANYONE AT M.G.A. EVER ADVISE YOU THAT

4  YOU NEEDED TO PRESERVE OR KEEP ANY KIND OF

5  INFORMATION SINCE THE YEAR 2000?                    11:33:25

6    A.   I THINK THERE WAS A LETTER FROM AN M.G.A.

7  ATTORNEY ASKING ME THAT I RETURN -- RETURN STUFF TO

8  M.G.A., IF I REMEMBER CORRECTLY.

9    Q.   AND WHEN DID YOU RECEIVE THAT LETTER?

10    A.   DURING THE COURSE OF MY LITIGATION WITH        11:33:40

11  ISAAC.

12    Q.   WAS THE ATTORNEY WHO SENT YOU THAT LETTER

13  DAPHNE GRONICH?

14    A.   I BELIEVE SO.  AND THERE MAY HAVE BEEN A

15  LETTER AFTERWARDS, I THINK, FROM -- I DON'T REMEMBER   11:33:50

16  WHO.  MAYBE FELDMAN'S OFFICE.  THERE MAY HAVE BEEN A

17  LETTER FROM LARRY FELDMAN'S OFFICE.

18    Q.   AND DID THAT LETTER ALSO ASK FOR THE RETURN

19  OF -- OF --

20    A.   I BELIEVE IT DID.                            11:34:18

21    MS. GLASER:  JUST SO THE REPORTER DOESN'T

22  LOSE HER MIND, LET MR. ZELLER GET HIS QUESTION OUT

23  BEFORE YOU ANSWER SO WE GET A COMPLETE TRANSCRIPT.

24    THE WITNESS:  I'M SORRY AGAIN.

25  ///                                                 11:34:30

99

EXHIBIT 24

PAGE 335

```
 1    BY MR. ZELLER:

 2         Q.    SO YOU WERE THE THIRD ONE?

 3         A.    YES.

 4         Q.    NOW, IN BETWEEN THE TIME THAT THE

 5    ARBITRATION STARTED AND THE TIME THAT YOU GOT UP        11:51:58

 6    THERE TO TESTIFY AS THE THIRD WITNESS, DID YOU HAVE

 7    ANY SORT OF COMMUNICATION WITH ISAAC LARIAN?

 8         A.    NO.

 9         Q.    NONE WHATSOEVER, NOT BY EMAIL, NOT BY

10    PHONE, NOT FACE-TO-FACE?                                11:52:12

11         A.    NO.

12         Q.    DID YOU HAVE ANY COMMUNICATION WITH HIS

13    LAWYERS?

14         A.    ME PERSONALLY, NO.

15         Q.    DID HIS LAWYERS HAVE COMMUNICATIONS WITH     11:52:19

16    YOUR LAWYERS AS YOU UNDERSTOOD IT?

17         A.    YES.

18         Q.    WERE THOSE BY YOUR UNDERSTANDING ORAL

19    CONVERSATIONS, OR WERE THEY IN WRITING?

20         A.    ORAL CONVERSATIONS.                          11:52:33

21         Q.    WAS IT YOUR UNDERSTANDING THAT THEY WERE

22    ABOUT SETTLEMENT?

23              MS. GLASER:   I'M GOING TO -- FRED, I'M

24    GOING TO OBJECT ON THE GROUNDS OF ATTORNEY-CLIENT

25    PRIVILEGE WITH RESPECT TO WHAT YOU DISCUSSED WITH       11:52:45
```

A&B COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT ___24___

PAGE ___336___

```
 1          THE WITNESS:  DO I NEED TO TAKE THIS OFF

 2   OR -- I ASSUME?

 3          THE VIDEO TECHNICIAN:  I TURNED IT DOWN.

 4          MS. GLASER:  OKAY, JUST COVER IT WITH

 5   YOUR --                                            11:53:54

 6          (A DISCUSSION WAS HELD BETWEEN THE

 7          WITNESS AND HIS ATTORNEY OFF THE

 8          RECORD.)

 9          MS. GLASER:  OKAY.  SO THIS IS A --

10   MR. LARIAN TELLS ME -- ARE WE BACK ON THE RECORD?  11:54:10

11          THE VIDEO TECHNICIAN:  YES.

12          MS. GLASER:  OR WE WERE STILL ON THE

13   RECORD -- THAT HE MAY HAVE BEEN PRESENT WHEN HIS

14   LAWYER CALLED THE OTHER SIDE, OR -- OR RECEIVED A

15   PHONE CALL FROM THE OTHER SIDE, AND YOU'RE ALLOWED 11:54:24

16   TO -- SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE --

17   WHAT YOU HEARD YOUR LAWYER TELL THE OTHER SIDE.

18          I CAN'T -- I'M NOT TAKING THAT POSITION.

19   SO IF YOU WANT TO DISCLOSE -- YOU'RE ENTITLED TO

20   DISCLOSE -- HE'S ENTITLED TO AN ANSWER, BETTER WAY 11:54:40

21   TO PUT IT, WITH RESPECT TO WHAT YOU HEARD YOUR

22   LAWYER TELL THE OTHER SIDE; NOT WHAT YOUR LAWYER AND

23   YOU DISCUSSED.

24          THE WITNESS:  OKAY.  SO YES, THEY -- THEY

25   DISCUSSED SETTLEMENT.                              11:54:52
```

114

EXHIBIT 24

PAGE 337

```
 1   BY MR. ZELLER:

 2        Q.    AND WHAT DID -- WHAT DID YOU HEAR YOUR --

 3   YOUR ATTORNEYS SAY TO ISAAC LARIAN'S ATTORNEY?

 4        A.    MADE THEM AN OFFER.

 5        Q.    WHAT WAS THE OFFER?

 6        A.    50 MILLION.                              11:55:01

 7             THE REPORTER:  5-0?

 8             THE WITNESS:  YES.

 9   BY MR. ZELLER:

10        Q.    DID YOU HEAR YOUR LAWYER SAY ANYTHING ELSE   11:55:11

11   IN THAT CONVERSATION?

12        A.    NO.

13        Q.    IF I UNDERSTAND WHAT HAPPENED CORRECTLY,

14   AND TELL ME IF I'M -- I'M WRONG ALONG THESE LINES,

15   WHEN YOU GOT UP TO TESTIFY IN THE ARBITRATION, YOU   11:55:31

16   SAID TO THE ARBITRATOR THAT YOU WANT TO DISMISS THE

17   PROCEEDING; RIGHT?

18        A.    YES.

19        Q.    AND THE ARBITRATOR SAID TO YOU THAT YOU

20   SHOULD CONSULT WITH YOUR COUNSEL; RIGHT?           11:55:43

21        A.    YES.

22        Q.    HAD YOU CONSULTED WITH YOUR COUNSEL?

23        A.    NO.

24        Q.    AND AT THAT TIME WHEN THE ARBITRATOR

25   SUGGESTED TO YOU, ADVISED YOU, HOWEVER YOU WANT TO   11:55:53
```

                                                    115

EXHIBIT 24

PAGE 33B

1    CONSULTANT?

2        A.    EMPLOYEE.

3        Q.    ONCE YOU WERE NO LONGER -- WELL, STRIKE

4    THAT.

5              DO YOU KNOW WHETHER OR NOT HE CONTINUED TO          01:40:57

6    BE A DIRECTOR AFTER YOU LEFT AS AN EMPLOYEE OF

7    M.G.A.?

8        A.    I DON'T THINK HE WAS.

9        Q.    IS IT YOUR RECOLLECTION HE -- HE WAS -- HE

10   ENDED HIS POSITION AS DIRECTOR WHILE YOU WERE STILL         01:41:12

11   AN EMPLOYEE?

12       A.    YES.

13       Q.    AND WHAT WERE THE CIRCUMSTANCES UNDER WHICH

14   HIS -- HIS POSITION AS DIRECTOR WAS -- WAS ENDED?

15       A.    I THINK, IF I RECALL, WE DID A -- WHAT DO          01:41:23

16   YOU CALL IT -- NOT AN ELECTION, IN LIEU OF AN

17   ELECTION OF BOARD MEMBERS, STIPULATION?  IS THAT

18   WHAT IT'S CALLED?  AND WE ELECTED MYSELF, ISAAC, AND

19   ELI MAKABI AS DIRECTORS.

20       Q.    DID ELI MAKABI TAKE OVER HIS POSITION AS           01:41:50

21   DIRECTOR?

22       A.    NO, ELI MAKABI WAS A DIRECTOR ALREADY.  SO

23   WE HAD FOUR DIRECTORS; WE WENT TO THREE.

24       Q.    AND DID YOU HAVE AN UNDERSTANDING AS TO WHY

25   HE WAS NOT REELECTED OR CONTINUED TO SERVE AS A             01:42:03

                                                        159

EXHIBIT 24

PAGE 339

1    DIRECTOR?

2       A.   I GUESS HE HAD SERVED HIS PURPOSE.

3       Q.   AND WHAT DO YOU MEAN BY THAT?

4            MS. GLASER:   DON'T SURMISE.   IF YOU KNOW,

5    YOU SHOULD TELL HIM.                                          01:42:19

6    BY MR. ZELLER:

7       Q.   RIGHT.   WHAT'S YOUR UNDERSTANDING ABOUT

8    THAT?

9       A.   ISAAC BROUGHT HIM TO THE BOARD FOR A

10   PURPOSE, AND I GUESS THAT PURPOSE WAS DONE, SO --            01:42:24

11      Q.   AND WHAT WAS HIS -- WHAT WAS YOUR

12   UNDERSTANDING OF WHAT ISAAC'S PURPOSE WAS FOR

13   BRINGING HIM TO THE BOARD?

14      A.   I GUESS TO ELIMINATE SOME OF THE CONFLICT

15   THAT WE HAD.                                                  01:42:35

16      Q.   AND WHEN YOU SAY "WE," YOU'RE TALKING ABOUT

17   BETWEEN YOURSELF AND ISAAC?

18      A.   YES.

19      Q.   WAS IT YOUR -- YOUR UNDERSTANDING OR

20   PERCEPTION THAT LEON WAS BROUGHT ON TO THE BOARD SO          01:42:49

21   HE COULD SIDE WITH ISAAC?

22      A.   FOR THE MOST PART, YES.

23      Q.   DO YOU KNOW IF HE HAS ANY INVOLVEMENT WITH

24   M.G.A. TODAY?

25      A.   I DON'T KNOW.                                         01:43:14

                                                            160

EXHIBIT 24

PAGE 340

1    HIM OR NOT?

2         A.   I THINK I DID, YEAH.

3         Q.   WAS HE AN M.G.A. PRODUCT MANAGER --

4         A.   YES.

5         Q.   -- AS YOU UNDERSTOOD IT?                    01:54:07

6         A.   YES.

7         Q.   DID HE HAVE ANY INFORMATION ABOUT BRATZ

8    THAT HE GAVE YOU?

9         A.   I DON'T THINK SO.

10        Q.   NOW, AT SOME POINT YOU SHARED DRAFT         01:54:12

11   DECLARATIONS WITH -- WITH SOME OF THE PEOPLE THAT

12   YOU WERE IN TOUCH WITH IN CONNECTION WITH YOUR

13   DISPUTES; IS THAT RIGHT?

14        A.   "SHARED" MEANING READING IT TO THEM OR --

15        Q.   OR PROVIDING, WHETHER IT WAS READING IT TO  01:54:29

16   THEM OR PROVIDING THEM A DRAFT?

17        A.   IT'S POSSIBLE.

18        Q.   DO YOU REMEMBER DOING THAT WITH JENNIFER

19   MAURUS, MAURUS?

20        A.   I BELIEVE I DID, YES.                       01:54:39

21        Q.   DO YOU RECALL DOING THAT WITH MARK FRAGEL?

22        A.   DID I SEND HIM A DRAFT?  IT'S POSSIBLE.  I

23   DON'T REMEMBER.

24        Q.   DO YOU REMEMBER DOING THAT WITH BEN TON?

25        A.   I'M SURE I DID WITH BEN TON, YES.           01:54:57

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT 24

PAGE 341

1    Q.    ARE THERE OTHERS YOU CAN REMEMBER DOING

2  THAT WITH?

3    A.    VICTORIA O'CONNOR, ANDREAS.  I THINK THERE

4  WAS SOMEBODY IN MIDWEST, I FORGOT HIS NAME.  MIKE

5  LINGG.  IF I REMEMBER MORE, I'LL TELL YOU.           01:55:39

6    Q.    DO YOU REMEMBER MERCEDEH WARD?

7    A.    YES.

8    Q.    WAS SHE SOMEONE YOU AT SOME POINT PROVIDED

9  A DECLARATION OR ASKED HER TO -- TO SIGN A

10 DECLARATION?                                         01:55:50

11       MS. GLASER:  WAIT A MINUTE, EXCUSE ME.  THE

12 QUESTION'S COMPOUND.  WHICH -- WHICH ONE DO YOU WANT

13 ANSWERED?

14       MR. ZELLER:  WELL, IT'S EITHER.

15       I WILL NARROW IT DOWN ONCE I FIND OUT IF --    01:55:56

16 IF HE -- IF HE DIDN'T, HE DIDN'T.  THEN I DON'T HAVE

17 TO ASK A BUNCH OF FOLLOW-UP QUESTIONS.

18       THE WITNESS:  I NEED A QUICK SECOND.

19       MR. ZELLER:  OKAY.  WHY DON'T WE GO OFF THE

20 RECORD.                                              01:56:16

21       THE VIDEO TECHNICIAN:  THIS IS THE END OF

22 TAPE NO. 2.  GOING OFF THE RECORD AT 1:56 P.M.

23       (A RECESS WAS TAKEN FROM 1:56 TO 2:02.)

24       THE VIDEO TECHNICIAN:  THIS IS START OF

25 TAPE NO. 3.  GOING BACK ON THE RECORD AT 2:02 P.M.   02:02:10

171

EXHIBIT __24__

PAGE __342__

BY MR. ZELLER:

    Q.   WE WERE TALKING ABOUT INSTANCES IN WHICH YOU HAD -- YOU HAD REQUESTED OR ACTUALLY HAD SOME CONTACT WITH FORMER M.G.A. EMPLOYEES FOR PURPOSES OF GETTING DECLARATIONS IN CONNECTION WITH YOUR DISPUTE WITH ISAAC LARIAN.

       DO YOU RECALL THAT?

    A.   YES.

    Q.   MERCEDEH WARD IS SOMEONE WHO ACTUALLY ENDED UP SIGNING A DECLARATION; RIGHT?

    A.   YES.

    Q.   WERE THERE OTHERS WHO ACTUALLY SIGNED?

    A.   I THINK ANDREAS SIGNED, BEN TON SIGNED, AND JENNIFER MAURUS I BELIEVE SIGNED.  I DON'T RECALL IF THERE WERE OTHERS.

    Q.   WERE THESE -- THESE DECLARATIONS SUBMITTED IN CONNECTION WITH -- IN CONNECTION WITH THE ARBITRATION THAT YOU HAD WITH YOUR BROTHER?

    A.   NO.

    Q.   DO YOU -- DO YOU HAVE AN UNDERSTANDING AS TO WHAT HAPPENED WITH THEM?

    A.   I GOT RID OF THEM.

    Q.   YOU GOT RID OF THEM?

    A.   I DISCARDED THEM, YES.

    Q.   AND WHEN DID YOU DO THAT?

02:02:36
02:02:46
02:03:07
02:03:21
02:03:31

172

EXHIBIT 74

PAGE 843

1    A.   SOON AFTER I DROPPED THE ARBITRATION.

2    Q.   WERE THESE SIGNED DECLARATIONS AMONG THE

3  MATERIALS THAT WERE IN THE BOXES YOU TALKED ABOUT

4  DISCARDING?

5    A.   YES.                                          02:03:48

6    Q.   AND IT -- IT'S FAIR TO SAY THAT THE

7  DECLARATIONS THAT YOU TALKED ABOUT, THE ONES THAT

8  PEOPLE SIGNED, NAMELY BEN TON, ANDREAS, AND JENNIFER

9  MAURUS, ALL RELATED TO BRATZ BACK IN THE 2000 TIME

10  PERIOD; IS THAT TRUE?                               02:04:10

11         MS. GLASER:   I OBJECT TO THE QUESTION,

12  ASSUMES FACTS NOT IN EVIDENCE.   NO FOUNDATION.

13         THE WITNESS:   COULD YOU REPEAT THE

14  QUESTION, PLEASE?

15  BY MR. ZELLER:                                      02:04:21

16    Q.   SURE.   WE WERE TALKING ABOUT THESE

17  DECLARATIONS THAT WERE SIGNED --

18    A.   YES.

19    Q.   -- BY BEN TON, BY ANDREAS, BY JENNIFER

20  MAURUS, OR MAURUS.   THOSE DECLARATIONS PERTAINED --  02:04:30

21  OR HAD INFORMATION ABOUT BRATZ BACK IN 2000; IS THAT

22  CORRECT?

23         MS. GLASER:   AND I OBJECT TO THE QUESTION

24  ON THE GROUNDS THERE'S ABSOLUTELY NO FOUNDATION FOR

25  THAT QUESTION, IT ASSUMES FACTS NOT IN EVIDENCE.     02:04:41

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT 24

344

```
 1              THE WITNESS:  I BELIEVE THEY WOULD HAVE,

 2     YES.

 3     BY MR. ZELLER:

 4          Q.   THAT'S YOUR BEST RECOLLECTION?

 5          A.   YES.                                        02:04:51

 6          Q.   THE DECLARATION THAT JENNIFER MAURUS SIGNED

 7     IN CONNECTION WITH YOUR DISPUTES WITH YOUR BROTHER

 8     ISAAC, IT STATED THAT AT THAT KMART PRESENTATION IN

 9     NOVEMBER OF 2000 THAT M.G.A. HAD, QUOTE, SAMPLES,

10     PROTOTYPES, BOARDS, AND PACKAGING, END QUOTE, FOR      02:05:26

11     THE 2001 BRATZ LINE; IS THAT CORRECT?

12          A.   I DON'T KNOW --

13               MR. ALLEN:  OBJECTION.

14               THE WITNESS:  -- WITHOUT SEEING THE

15     DECLARATION.                                           02:05:36

16               MS. MORGENTHALER LEVER:  ALSO OBJECT; THE

17     DOCUMENT SPEAKS FOR ITSELF.

18     BY MR. ZELLER:

19          Q.   DO YOU HAVE ANY REASON TO DOUBT THAT'S WHAT

20     IT SAID?                                               02:05:43

21          A.   IF YOU HAVE IT --

22               MR. ALLEN:  OBJECTION.

23               THE WITNESS:  -- CAN YOU SHOW IT TO ME AND

24     I CAN REFRESH MY MEMORY?

25               THE REPORTER:  YOU NEED TO SPEAK UP JUST A   02:05:48
```

174

EXHIBIT _24_

PAGE _345_

```
 1    STATE OF CALIFORNIA     )

 2    COUNTY OF RIVERSIDE     )   SS.

 3

 4        I, PAULA A. PYBURN, CSR NO. 7304, R.P.R., C.L.R., IN

 5    AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

 6        I AM THE DEPOSITION OFFICER THAT STENOGRAPHICALLY

 7    RECORDED THE TESTIMONY IN THE FOREGOING DEPOSITION;

 8        PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST DULY

 9    SWORN BY ME;

10        THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE

11    TESTIMONY GIVEN.

12        BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF THE

13    TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF REQUESTED,

14    ANY CHANGES MADE BY THE DEPONENT (AND PROVIDED TO THE

15    REPORTER) DURING THE PERIOD ALLOWED ARE APPENDED HERETO.

16

17    DATED  February 8, 2008  .

18

19

20              Paula A. Pyburn

21              PAULA A. PYBURN
                C.S.R. NO. 7304, R.P.R.
22              CERTIFIED LIVENOTE REPORTER

23

24

25
```

EXHIBIT 24

PAGE 345

**EXHIBIT 25**

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1           ARBITRATION BEFORE ADR SERVICES, INC.

2

3

4     In Re Arbitration Between          )

       FARHAD LARIAN,                    )

5                          )

             Claimant,        )

6                          )

          vs.              )  No. 05-2096-ABH

7                          )

       ISAAC LARIAN,              )

8                          )

             Respondent.      )

9     _____)

10

11

12

13

14        Arbitration Proceeding, Volume I, taken at

15     ADR Services, Inc., 1900 Avenue of the Stars,

16     Suite 250, Los Angeles, California, beginning

17     at 10:00 a.m., Wednesday, November 16, 2005,

18     before ANNA B. SACRIPANTI, Certified Shorthand

19     Reporter No. 9533.

20

21

22

23

24

25

Mattel v. MGA II                    Unsigned      EXHIBIT __25__                Page  2
                                                  PAGE __346__

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1    don't recall every saying that.  It's possible.

2        Q    You don't deny it.  You just don't remember

3    either way?

4        A    I don't remember.

5        Q    When was the first time you -- strike that.

6            Is it true, as I've read, that you had a

7    meeting with somebody in Wal-Mart in 1999, and they said

8    that if you could come up with a competitor doll for

9    Barbie they would put on their shelves?

10       A    I don't understand your question.

11       Q    I've read -- and I don't know if it's true or

12   not.  I'm asking.

13           MR. FELDMAN:  Why don't you just ask him if

14   it's true and not tell us what you read.

15   BY MR. WILSON:

16       Q    Is it true that in 1999 you had a meeting with

17   a buyer from Wal-Mart who said that, if you could come

18   up with a doll that could be competitive with Barbie,

19   they would put it on the shelf?

20       A    Not exactly in those words.

21       Q    What were the words?

22       A    His buyer, his name was Ron Stone at Wal-Mart,

23   and I would travel all the way down for years to sell

24   him something, and frankly he would never buy something.

25           So one day I said to him, and he was a buyer

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1    for Barbie, and I said, "Ron, what does it take for me

2    to get some business from you.  I mean, I come all the

3    way down here from LA, ship everything in samples, and

4    you never buy anything from me."

5        So in a sarcastic way he said, "Well, come up

6    with something that competes with Barbie and I'll buy it

7    from you."

8      Q   And did you decide that that was something you

9    wanted to do?

10     A   No.  It was -- I wanted -- of course, I

11   wanted -- everybody in the toy business wanted to have

12   something that competes with Barbie for 45 years,

13   literally every toy company had wished and tried to do

14   that.

15       So to answer your question, did I want to have

16   something that competes with Barbie, of course I did.

17     Q   Did you take any steps to find such a product?

18     A   Looking for a product, yes, talking to my

19   designers, et cetera, not coming -- going back to what

20   he was saying, coming up with a doll line.  I was always

21   looking to come up with a doll line.

22     Q   You had certain kinds of dolls, but you did not

23   have a fashion doll; right?

24     A   That's correct.  Before Bratz, we did not have

25   fashion.

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1      Q   Fashion dolls is what it would take to look

2    Barbie in the eye and take market share away.  Right?

3      A   Yes.  But the good thing about Bratz, it did

4    not start as a fashion doll, to begin with.  It started

5    as a small doll because it is -- Bratz dolls are smaller

6    than Barbie.  Usually fashion dolls are about 11 1/2

7    inches tall, again, because it was very hard to compete

8    and go after Barbie.

9      Q   What was the very first thing you learned in

10   the chain of information that led to Barbie -- pardon

11   me -- Bratz?

12     A   Can you say it again?

13     Q   What was the very first thing that happened

14   that started the chain of events that led to the

15   development of Bratz?

16     A   Sometime in September of 2000, Paula Garcia,

17   now she's called Treantefelles at the time, came to me

18   and said, with Victoria O'Connor, and they said they

19   have seen a concept from a designer, and if I had a few

20   minutes to see it, for a doll, see what I think.  I said

21   sure bring him in.

22       And I remember specifically because my daughter

23   at the time was not in school, she was in my office.  So

24   walks in this guy Carter Bryant with a sketch of

25   something that -- frankly, at the time, I'm not sure if

Mattel v. MGA II                    Unsigned     EXHIBIT ___25___                    Page 163

PAGE  349

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1    I liked it, it looked alien to me, and this is what he

2    thinks we should make a doll out of, and that is where

3    the whole thing began.

4        Q    In September of 2000?

5        A    Sometime in September of 2000.

6        Q    Are you sure it was not before that?

7        A    Absolutely 100 percent sure.

8        Q    Do you have any notes or anything that reflect

9    that first meeting?

10       A    I don't recall that, but frankly I think maybe

11   something -- I can look at the calendar appointments, I

12   don't know.  But I'm sure there is something that show

13   that it was September 2000.  There is no dispute about

14   that, but I know you are disputing it.

15       Q    Victoria and Paula, they brought you Carter

16   Bryant, and you had this meeting.  Correct?

17       A    That's correct.  In that meeting was Victoria

18   O'Connor, Paula, I believe.  There was a woman named

19   Veronica Marlow in that meeting, and again my daughter

20   Jasmine was there.

21       Q    Did you tell Fred about the meeting?

22       A    No, I did not.  I don't know if I did or not.

23   My office may have.  I don't know.  I don't even know if

24   he was in the office.

25       Q    I was going to ask you that.

Mattel v. MGA II                    Unsigned       EXHIBIT __25__                      Page 164

                                                   PAGE __350__

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1    A   I don't recall.

2    Q   Do you recall ever introducing Fred to Carter

3    Bryant?

4    A   I don't recall.

5    Q   Now, after this meeting with Carter Bryant in

6    September, how long did it take before you decided to

7    run with the concept?

8    A   I don't remember exactly.  I said I'll get back

9    to him.  I wanted to hire him as a designer frankly in

10   the company, not to get his concept specifically.  But I

11   think we went back and forth, and we signed an agreement

12   on October 4, 2000.

13   Q   Okay.  Let's mark that agreement as Exhibit 30.

14   This is an unsigned copy, but I don't have a signed copy

15   with me, so.  I assume you folks have a signed copy.

16   A   Do you want me to read this?

17   Q   No, I don't.  I just want to basically show you

18   the agreement, and what I want to ask you is --

19   A   If you represent Fred hasn't changed anything

20   in this, I'll take your word for it.

21   Q   I have no reason to believe he did change it.

22   It looks like it's the same as other things I've seen.

23   But it has a footer down here of October 4, 2000, at the

24   bottom of each page.  Do you see that?

25   A   Are you guys in this courtroom or another

Mattel v. MGA II                    Unsigned        EXHIBIT _25_          Page  165

                                                    PAGE _391_

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1    courtroom?

2       Q   Why does it say dated as of September 18?

3       A   It says, when we asked this question, Dave --

4    what was his name -- David Rosenbaum was the attorney

5    who drafted this agreement first.  So we came to a

6    verbal understanding and told -- again, I lost his name.

7          MR. FELDMAN:  Rosenbaum.

8          THE WITNESS:  David Rosenbaum to prepare the

9    agreement.  And, frankly, we asked him why it's dated

10   September 18, and he says what's when he started

11   drafting an agreement for anybody he put it as of.

12   BY MR. WILSON:

13      Q   Okay.  Is September 18 the date that you

14   reached agreement on the terms with Carter Bryant?

15      A   I did not reach an agreement literally until

16   the eve of October 3rd.

17      Q   The first time you met with Carter Bryant, was

18   the product called Bratz?

19      A   I don't remember what he called it.  I don't

20   remember if it even had a name on it at the time.  I

21   don't remember.

22      Q   So you don't remember whether it was Bratz or

23   not?

24      A   No.

25      Q   And your testimony is that Rosenbaum

1    he can do the trademark work on Bratz, as well as

2    international licensing agreement.

3        And I remember specifically that he came to me

4    and said who prepared this agreement, and I said David

5    Rosenbaum, and he said this is a very well written

6    document.

7        THE ARBITRATOR:  This is what?

8        THE WITNESS:  Very well written document.

9    BY MR. WILSON:

10    Q   And how long after -- was this after the

11    document was signed?

12    A   Definitely it must have been after it was

13    signed.

14    Q   You gave it to him after it had been signed on

15    October 4?

16    A   Either I gave it to him, or I had Victoria or

17    somebody give it to him.

18    Q   You don't remember?

19    A   I don't remember, but definitely for sure he

20    saw the agreement in 2000.

21    Q   Now, Mr. Feldman also said that this deal

22    almost fell apart just before it was signed.  Is that

23    correct?

24    A   That's correct.

25    Q   How did that happen?

Mattel v. MGA II                    Unsigned      EXHIBIT ___29___

                                                  PAGE ___393___          Page  168

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1       A   We -- this was a long shot for us.  So we had

2    three percent royalty for this, with this guy.  Again,

3    competing with fashion dolls, it was a long shot.  And

4    we were paying this guy $5,000 a month for six months,

5    and I think it's in the agreement, $5,500 for another 90

6    days, or 120 days.  I don't remember.

7           We had to make -- he wanted -- at the last

8    minute he came and he says that his royalty has to be

9    based on -- he wanted to have royalty if we license

10   products, we made other products with this, he wanted to

11   get royalty in those products also.

12          And I said to him -- I said actually to

13   Victoria who said it to him that, "No, this is a deal

14   breaker.  This is big risk," and I'm just paraphrasing.

15   I don't remember the exact words, that this is a big

16   risk, we're going to invest a lot of money in it, we can

17   make it happen, we have made it happen because we put a

18   lot of money in it, and if it doesn't happen, it's our

19   risk.  So no, he will not get a royalty.  The only

20   royalty he will get is on the products that he makes or

21   he consults on.

22      Q   This was a different kind of agreement then

23   that MGA had previously entered into.  Correct?

24      A   What do you mean by that?  Every agreement is

25   different.

Mattel v. MGA II                    Unsigned     EXHIBIT  25                    Page  169

                                                 PAGE  334

Arbitration Transcript-Larian v. Larian (Vol. 1)   11/16/2005   10:00:00 AM

1    Q   This agreement gave MGA all the intellectual

2    property rights on the Bratz concept to license out to

3    others.  Correct?

4    A   Would you like me to sit down and read this

5    agreement?

6    Q   You are the guy that negotiated this, I assume.

7    A   No.  David -- I negotiated the royalty rate,

8    and I negotiated that the $5,000 a month and $5,500, and

9    I negotiated that he will not get royalty.  He will get

10   only royalty on the products that he makes the consults.

11   I left the rest of the negotiation to David Rosenbaum

12   who negotiated with his lawyer.

13   Q   You were aware that this agreement gave MGA the

14   right to license the Bratz intellectual property to

15   other people to make products.  Correct?

16   A   That's correct.

17   Q   Now, it's the very first time that MGA had ever

18   done that?

19   A   That's not correct.

20   Q   What other products have you done that?

21   A   Magic Touch Pony.

22   Q   You have all of the intellectual property

23   rights for Magic Touch Pony?

24   A   Again, not the same language as this.

25   Q   I'm talking about the rights.

Arbitration Transcript-Larian v. Larian (Vol. 1)  11/16/2005  10:00:00 AM

1   A   To the best of my recollection, it had.

2   Q   Okay.  And when was that?

3   A   Sometime in '90s, I don't remember the exact

4   date.

5   Q   Okay.

6       MR. WILSON:  Your Honor, this is the time I ask

7   for a break.

8       THE ARBITRATOR:  Okay.  I understand.

9       MR. WILSON:  I probably got another 20 minutes.

10      MR. FELDMAN:  Well, we'll first start with

11  Morad ruling.

12      THE ARBITRATOR:  We're through.

13

14      (The proceeding ended at 4:49 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1               ARBITRATION BEFORE ADR SERVICES, INC.

2

3

4     In Re Arbitration Between          )

      FARHAD LARIAN,                      )

5                           )

             Claimant,          )

6                        )

             vs.           ) No. 05-2096-ABH

7                        )

      ISAAC LARIAN,                   )

8                        )

             Respondent.     )

9     _____)

10

11

12

13

14        Arbitration Proceeding, Volume II, taken at

15     ADR Services, Inc., 1900 Avenue of the Stars,

16     Suite 250, Los Angeles, California, beginning

17     at 10:00 a.m., Thursday, November 17, 2005,

18     before ANNA B. SACRIPANTI, Certified Shorthand

19     Reporter No. 9533.

20

21

22

23

24

25

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1      (Off the record.)

2    BY MR. WILSON:

3      Q   Exhibit 30 is the agreement with Carter Bryant.

4    Correct, sir?

5      A   It is not the signed version, but it's the one.

6      Q   Now, you said you had your first meeting with

7    him in September.  Correct?

8      A   Yes.

9      Q   How soon before September 18 did that

10   agreement -- did that meeting take place?

11     A   I don't remember the exact date.

12     Q   Can you give me an estimate?

13     A   From September 1 to September 18.

14     Q   So it could have been one day, or it could have

15   been 18 days.  Right?

16     A   That's correct.

17     Q   And you just don't remember at all?

18     A   I don't.

19     Q   At the time you first met him, I think I asked

20   you this, maybe I didn't, did he have the name Bratz in

21   mind, or is that something you came up with later?

22     A   I don't recall.

23     Q   How was the name Bratz derived, do you know?

24     A   I think it was one of his suggestions, to the

25   best of my recollection.

Mattel v. MGA II              Unsigned      EXHIBIT _25_                    Page 186

                                            PAGE __358__

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1      Q    And didn't you folks do some sort of an

2    informal focus group to find out whether or not teen

3    girls would react well to that name?

4      A    What we did was we sent drawings to people in

5    the company who had kids, such as Becky Harris,

6    et cetera, asking them to show it to their daughters,

7    and let us know what did they think about the product

8    what did they think about the name.

9      Q    And you did that during this 18-day period?

10     A    I don't know if we did it during the 18-day

11    period or after.

12     Q    And the agreement refers specifically to Bratz,

13    doesn't it?

14     A    It does.

15     Q    Isn't it correct that by September 18, when you

16    gave this assignment to Mr. Rosenbaum, that the name

17    Bratz had been selected?

18     A    It says currently known, yes, currently known.

19     Q    So maybe it could have changed?

20     A    That's correct.

21     Q    Let's mark this Exhibit 32.  This is a

22    multi-page document.

23        Please look at this one and tell me when you

24    are done.

25     A    Okay.

Mattel v. MGA II                    Unsigned          EXHIBIT __25__                    Page  187

                                                      PAGE ___351___

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    with regard to Bratz in terms of developing that

2    product?  For example, were you involved in studying the

3    product and understanding it?

4       A   I saw the concept.  I was the one who saw the

5    concept and gave the green light for them to proceed.

6       Q   In general, without reference to Bratz, was it

7    your practice at the company to be involved in each of

8    the steps that were followed in terms of product

9    development?

10      A   No.

11      Q   Were you, sort of, a hands-off manager and let

12   your people do it?

13      A   Hands-on and hands-off, depending on the

14   situation.

15      Q   What do you put your hands on in the case of

16   Bratz?

17      A   I approved -- I negotiated the contract.  I

18   told you yesterday, I looked at the concept design.

19   And, frankly, I was not sure if that's going to work.

20   So I asked other people to look at it, and then move

21   from there, push to make the product happen, to have

22   something available for Hong Kong.

23      Q   That's in January?

24      A   That's correct.

25      Q   When you gave -- I guess you gave drawings to

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1        MR. FELDMAN:  How did you get a document that

2     doesn't have your clients name on it?

3        MR. WILSON:  I don't know how I got this

4     actually.

5        MR. FELDMAN:  You don't know?

6        THE WITNESS:  Computer expert.

7        Yes.  Go ahead.

8     BY MR. WILSON:

9        Q    This is an E-mail you sent to Carter Bryant

10     with a copy to Paula on October 5, 2000.  Isn't that

11     true?

12        A   I did.

13        Q    And you told Carter that you thought the line,

14     if done properly, would be huge.  Correct?

15        A   It doesn't say properly.

16        Q   I was paraphrasing?

17        A   Let's read it.  It's one paragraph.

18        Q    That's fine.  What you said was, "You are very

19     creative, and I believe this line, if done with focus

20     and strategic thought, would be huge."  Right?

21        A   That's correct.

22        Q   And you believe that as of that date.  Correct?

23        A   Yes.

24        Q   That was the day after the contract got signed,

25     as I understand it?

Mattel v. MGA II                    Unsigned          EXHIBIT __25__          Page  192

                                                       PAGE __361__

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    A   That's correct.

2    Q   And you told Carter to meet with Merceda, who

3   would be starting at MGA next Thursday.  Right?

4    A   Where do you see that?

5    Q   Down at the bottom.

6    A   It doesn't say what you are saying.  Let's read

7   the document.  Also, Merceda will be starting at MGA

8   next Thursday.

9    Q   I'm sorry.  You weren't telling him that he

10   should be working with her?

11    A   I just told him what's on the paper.

12    Q   All right.  Merceda is Merceda War (phonetic).

13    A   That's correct.

14    Q   And she was somebody that used to work at

15   Mattel.  Correct?

16    A   That's correct.

17    Q   So he knew Merceda before this E-mail was sent.

18   Correct?

19    A   I don't know.

20    Q   You did not use her last name, did you?

21    A   I did not.

22    Q   So you understood that he would know who you're

23   talking about?

24    A   Yes.

25    Q   And what was Merceda's role at MGA to be?

Mattel v. MGA II                    Unsigned        EXHIBIT ___25___                    Page  193

                                                    PAGE ___362___

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1       A   I don't recall.

2       Q   You are just -- all right.

3           You may have attended some, but you just don't

4    remember?

5       A   Exactly.

6       Q   Do you typically attend focus groups?

7       A   If I have time.

8       Q   That's one of the things that you were either

9    hands on or hands off with, depending on your schedule?

10      A   That's correct.

11      Q   And you don't remember Bratz at all?

12      A   I don't.

13      Q   There were major presentations made regarding

14   Bratz at Target and Kmart in November of 2000.  Isn't

15   that true?

16      A   No, it's not true.

17      Q   Did Jennifer Morris make a presentation at

18   Kmart in 2000, November 2000?

19      A   She could have.  I don't remember.

20      Q   When you say that is not true that the

21   presentations were made, are you saying that it didn't

22   happen or you just don't remember.

23          MR. FELDMAN:  You said a major presentation.

24   You did not ask if there was presentation.

25          MR. WILSON:  Okay.

Mattel v. MGA II                Unsigned   EXHIBIT   25               Page 195

                                           PAGE   363

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1      MR. FELDMAN:  There's a big difference.

2    BY MR. WILSON:

3      Q   What's the difference between a major

4    presentation and a presentation?

5      A   A major presentation is when you have markups,

6    you have packaging, you have commercial, story line,

7    story boards, media plans, et cetera, you do.

8          But in November of 2000, we were probably going

9    and showing major accounts drawings of everything we

10   were planning to do, and get their input, and I'm sure

11   at that time, that was going to be the case.

12     Q   Bratz would be one of the products that was

13   shown to Kmart?

14     A   Most likely in the board, in the drawing.

15     Q   Right, and Toys R Us also?

16     A   I don't remember.

17     Q   What about Wal-Mart?

18     A   I don't remember.

19     Q   Target, do you remember that?

20     A   I don't remember one way or the other.

21     Q   Do you recall attending any presentations with

22   any of these potential buyers about Bratz in November of

23   2000?

24     A   I don't recall.

25     Q   Let's mark this as Exhibit 34.

Mattel v. MGA II                    Unsigned      EXHIBIT  25          Page  196

                                                  PAGE  364