Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1          And we would provide feedback to whether we

2      thought there was a place for it in the market or what

3      our specific accounts might feel about the product.  We

4      would give sometimes packaging feedback.  We would talk

5      about what size and dimensions the packages would have

6      to be, for example, to fit in our specific account

7      shelving constraints.  We would also provide historical

8      information, sales information that would help determine

9      whether a product was truly viable.

10          Q    Now, do you recall the first time you came in

11      contact with the concept that eventually became Bratz?

12          A    Yes.

13          Q    Why don't you describe for us the circumstances

14      surrounding that first occasion?

15          A    I had a conversation with Paula Treantefelles

16      in her work space.  I don't recall if I was in the

17      general area, and we started talking, or if I went over

18      to her to talk about something else.  But she had a

19      guest at her desk.  She introduced me to him, his name

20      was Carter, and they had some sketches, some artist

21      sketches of fashion dolls.  They showed them to me.  She

22      was telling me about the concept, and she expressed her

23      excitement about it and asked me what I thought of the

24      drawings.

25          Q    Let me stop you right there.  When exactly did

Mattel v. MGA II                    Unsigned        EXHIBIT __25__                    Page  227

                                                    PAGE __365__

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    this first conversation take place?

2      A   I don't know exactly when, but it would have

3    been in the summer of 2000.

4      Q   Would it be in the early summer or late summer?

5      A   I believe it was early summer.

6      Q   And you mentioned the name Paula.  What was

7    Paula's position in the company at the time?

8        (Knock on the door.  Off the record.)

9    BY MR. KELLNER:

10     Q   When was the first time that you received any

11   information that Isaac Larian had knowledge about Bratz?

12     A   When Paula showed me the drawings, she had

13   indicated that she had met with Isaac about the concept.

14     Q   And when she said that -- I'm sorry.

15       When she said that to you about the concept, at

16   that point had the name Bratz been as ascribed to this

17   concept?

18     A   No.

19     Q   Now, you mentioned Carter.  Was Carter Bryant

20   the person you are referring to as Carter?

21     A   Yes.

22     Q   At the time did you know that -- withdrawn.

23       Can you describe what the sketches looked like?

24     A   Yeah.  They were colored pencil sketches on

25   white paper, they looked like fashion designer sketches

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    of clothing.  A few of them, they were elongated image

2    of a woman or a girl, with fashionable clothing on.

3    Their heads were a little bit more exaggerated in size.

4        Q    Can you recall what Paula said to you during

5    that initial conversation about Bratz and anything to do

6    with MGA at all?

7        MR. FELDMAN:  It's really hearsay.  I mean

8    somebody says something to her.  I understand the time,

9    and I didn't object, and I know.

10       THE ARBITRATOR:  I can't tell you if it's for

11   the truth of the matter or some other purpose.

12       MR. KELLNER:  It's more a background

13   information.

14       MR. FELDMAN:  I object.  He's established a

15   date, what conversation regarding Bratz.

16       THE ARBITRATOR:  What are you trying to --

17   what's your offer of proof?

18       MR. KELLNER:  At this point, your honor, as I

19   said this is just background.  I can just keep going.

20       THE ARBITRATOR:  Okay.

21   BY MR. KELLNER:

22       Q    After you had that initial discussion with

23   Paula about Bratz, what was the next contact that you

24   had in connection with this Bratz concept?

25       A    There was a formal product review in September

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    of 2000 in which it was shown to the sales department,

2    and in between the time I first saw the sketches and

3    that formal product review, she and I may have talked

4    about it in passing.

5        Q    Okay.  Why don't you describe what a product

6    review is.

7        A    We were getting ready -- we were getting

8    prepared for the upcoming toy show.  So our product

9    department, the marketing department put together a line

10   review for sale.  So each product manager had all of

11   their products, and they came to -- we were in a

12   conference room, and all the sales managers would be on

13   one side of the table, and they would essentially pitch

14   us the product.  They would give us the product

15   features.  They would give us some background

16   information on, maybe the category the product was in

17   using analysis.  They would show us, if they had

18   samples, they would show us the samples.  If they had

19   markups, they would show us the markups.  If it was just

20   drawings on boards, they would show us those, they would

21   show us the packaging comps, as well.  So, basically, it

22   was just a complete line review of all the products that

23   we were going to be offering to the market.

24       Q    Was Bratz included in that?

25       A    Yes.

Mattel v. MGA II                    Unsigned          EXHIBIT ___25___          Page  230

                                                      PAGE ___368___

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1      Q   And are you sure that this product review took

2    place prior to, let's say, September 30, 2000?

3      A   Yes.

4      Q   And why is that?

5      A   I recall it was in the early to middle of

6    September.  We had to have time to get prepared for the

7    pre-toy shows, and that usually started in October.

8      Q   Maybe we should go through the whole sequence.

9         You talked about the line review.  Is there a

10   sequence of events that toy goes from concept to actual

11   sale at MGA?

12     A   Yes.

13     Q   Why don't you explain that whole sequence of

14   events?

15     A   Okay.  We -- MGA dealt primarily with the mass

16   markets.  We worked on long lead times.  Generally we

17   worked a year ahead of time from when we represent the

18   product to when the product would actually be on the

19   shelves for sale.

20         So the development of a product would be dealt

21   with through marketing and product development side of

22   the business.  And at a certain point, it would be shown

23   to sales, and that would be our line, product line

24   review.  Sales -- excuse me.

25         The product managers would essentially pitch

Mattel v. MGA II                    Unsigned    EXHIBIT __25__            Page  231

                                                PAGE __369__

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    the lines to the salespeople; so we knew what products

2    we were going to be selling.  And then, based on those

3    product line reviews, we would prepare our presentation

4    for our specific customers.

5        And so we had the line review in September, and

6    then the toy fair, which is where most businesses

7    finalize, occurs in January, February.  That would be

8    for that year's fourth quarter.  In January, it's the

9    import toy show in Hong Kong, and in February, it's the

10   American International Toy Show in New York.

11       But the major retailers in our country have a

12   longer lead time, and they can't wait until January or

13   February to see products for the first time so we would

14   do pre-toy shows in the fall so they would know what we

15   had coming up, what our offerings were going to be, they

16   could get a flavor for the product line, they could get

17   an idea of what they might be interested in.

18       So as they are going through the season meeting

19   with all their vendors, they have an idea of what MGA

20   has to offer versus some of our competitors.  We would

21   put preliminary quotes and things of that nature

22   throughout the end of the year.  And then by the time we

23   would meet with them in Hong Kong, it would be more of a

24   finalization of pricing and what the quantities would be

25   and delivery times, and things like that.

Mattel v. MGA II                    Unsigned       EXHIBIT  25                Page 232

                                                   PAGE  870

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1      Q   From the sales marketing perspective, what

2    importance did MGA attribute to the comments that were

3    made by the large chains at this pre-toy show or

4    presentation?

5      A   The major buyers' comments were critical to

6    deciding whether we would move forward with the product.

7          If the big four buyers weren't interested in

8    it, it didn't really make much sense to put resources

9    forward because we needed their volume to justify the

10   tooling cost and production cost and development cost of

11   the product.

12     Q   When was the first time that Isaac Larian

13   expressed any excitement about the Bratz concept?

14       MR. FELDMAN:  You are talking to her?

15       MR. KELLNER:  Yes.

16       THE WITNESS:  At the line review in September,

17   he was present, and he expressed excitement about it

18   then.

19   BY MR. KELLNER:

20     Q   Do you recall anything that he said?

21     A   Not specifically.

22     Q   How about in general?

23     A   Yeah.  In general, he thought that it was going

24   to be a really great item.  He was excited about it.  We

25   were putting a lot of resources toward the product.  He

1    wanted us, the sales, to do our absolute best to get the

2    product positioned and sold into all the major accounts.

3        Q    Okay.  And you actually participated in one of

4    these pre-toy fair presentations involving Bratz.

5    Correct?

6        A    Yes, I did.

7        Q    And do you recall to which chain that was?

8        A    Kmart.

9        Q    And when did that occur?

10       A    November 2000.

11       Q    Do you recall the specific date?

12       A    I believe it was November 9.

13       Q    And was there a particular buyer that you were

14   presenting towards to?

15       A    We presented to all of the Kmart buyers for

16   which we had products.

17       Q    And who did you present Bratz to?

18       A    Paulette Brimm.

19       Q    What was Paulette's position at Kmart?

20       A    She was the buyer responsible for the girls

21   category.

22       Q    And how many products did you present to

23   Paulette at this pre-toy fair presentation?

24       A    Probably about a dozen.

25       Q    And how much, what percentage of time did you

Mattel v. MGA II                    Unsigned  EXHIBIT  25                      Page  234

PAGE  372

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    devote to the presentation of Bratz to Paulette?

2        A   At least half of our meeting with her.

3        Q   Why don't you describe exactly what the

4    presentation was to Paulette at this presentation?

5        A   Sure.  We brought all of the samples of all of

6    the doll products and girl products that would have been

7    appropriate for her to buy.  We set them up in our hotel

8    room.  I was there with Paul Warner, who was my boss,

9    and Paula Treantefelles, the product manager, was there

10   as well, plus our outside sales group outside, sales rep

11   Mark Pregel was present as well.

12        We went through each item, basically showing

13   Paulette the items.  A lot of them were existing

14   products for K-mart.  So she was already familiar with

15   them, and we would show her what the refreshes were on

16   the dolls, for example, maybe we have changed the

17   clothing.  And there were a few new dolls which used

18   similar technology as the existing assortment of dolls

19   we had, and we told her the new features of those.

20        And then as we got to Bratz, Paula

21   Treantefelles did the presentation.  We had story

22   boards, big story boards for each of the four

23   characters.  We had shown to the buyers four ethnicities

24   we were going with originally.  Each one had a specific

25   style attributed to her; so we talked about that and

Mattel v. MGA II                    Unsigned        EXHIBIT __25__                    Page 235

PAGE __373__

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    what their clothes might look like.  Each had a special

2    icon that was going to distinguish them and be carried

3    throughout all the packaging, and as the products line

4    expanded, it included accessories and all kinds of

5    things.

6         The story boards also had -- they had artist

7    renderings on them, and we had some sample clothing.  We

8    talked a lot about -- Paula had talked a lot about the

9    market segment we were trying to break into which was a

10   tween market.  We talked about Barbie and how Barbie was

11   perceived as baby-ish by girls, and older girls, the 8

12   to 12 girls, aren't really into Barbies anymore, but

13   they had a real desire to still have doll-playing in

14   fashion.

15        We talked about how fashionable -- really the

16   primary focus of this product is wanting to appeal to

17   older girls, even college level girls.  We talked about

18   how the packaging was going to be a showcase type

19   packaging so the older girl could keep it on her shelf

20   as a collectible in the package, where the younger girl

21   could take it out and play with it.

22        We talked about the features of the dolls, the

23   luxurious hair, how the features, the face were going to

24   be played up and more prominent, we talked about how we

25   were going to deal with the feet and the shoes.  One of

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    the problems with Barbie is it can't stand, and Bratz

2    were designed so that it could stand up, be

3    freestanding.

4         Paula talked about the focus group and results

5    from the girls in the focus groups, how they felt about

6    it.  We discussed the product name.  We discussed the

7    product tag line.  We discussed the accessories that we

8    were going to have initially to complement the dolls.

9         We talked about -- essentially we did a very

10   long presentation of MGA's commitment to the item and to

11   the potential line that was going to become.  It was a

12   brand new category for MGA we were moving into, and the

13   category was dominated by one other product, which was

14   Barbie.

15        So we needed to, in order to get the buyer to

16   believe in us and to believe in the product, we had to

17   really make a strong pitch that this was going to be a

18   big item for MGA, and it was very viable for them to buy

19   and do it.

20        Q   Let me do a couple of things and try move it

21   along.  You mentioned focus groups.

22        A   Yes.

23        Q   Can you tell me what the focus groups were

24   about with respect to Bratz?

25        A   As I was told --

Mattel v. MGA II                    Unsigned        EXHIBIT  25                Page 237

                                                    PAGE  375

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1          MR. FELDMAN:  Wait, wait, wait.  If she has

2      information that she was there, that's one thing.  If

3      somebody tells her something, that's hearsay.

4          THE ARBITRATOR:  Right.

5      BY MR. KELLNER:

6          Q    What information was related to the buyer with

7      respect to the focus groups.

8          MR. FELDMAN:  This is at the initial meeting?

9          MR. KELLNER:  Correct.

10          THE WITNESS:  We talked -- it was told to the

11      buyer that the girls felt that fashions were very

12      important, that the hair had to be long and luxurious so

13      there could be hair play, the girls really like the name

14      Bratz.  There was a little bit of a concern about the

15      negative connotation of the word Bratz, and it was

16      expressed that the focus group girls preferred that name

17      over the others.

18      BY MR. KELLNER:

19          Q    You mentioned product search.  What product

20      research was done, to your knowledge, with respect to

21      Bratz?

22          A    There's a reporting service for the toy

23      industry, at the time it was called TRSTS, Toy Retail

24      Sales Trend Service.  I think now it's NPD Fun World.

25          MR. WILSON:  Fun World?

Mattel v. MGA II                    Unsigned          EXHIBIT __25__          Page  238

                                                      PAGE __376__

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1       THE WITNESS:  Yeah.  I think that's what it's

2    called.

3       Anyway, we used to subscribe to the TRSTS

4    report, and we would often review them, marketing would

5    review them, sales would review them looking for sales

6    trends.  We did a lot of research just in trade

7    magazines and journals, looking for areas that we

8    could -- a niche market that weren't being filled that

9    we could move into.

10      MGA was, at that point, all electronics.  Every

11   product we had was electronic, and we were looking for

12   other segments of the market to go into, and fashion

13   dolls was one of them that was identified.

14      Q    Going back to focus groups, what importance

15   does focus groups have in the context of sales?

16      A    Well, the focus group results can help validate

17   selling points.

18      Q    And in this case, to your knowledge, did the

19   focus groups validate selling points for Bratz?

20      A    Yes.

21      Q    Can you tell me what those were?

22      A    Yes.

23      MR. FELDMAN:  She wasn't at the focus group.

24   somebody told her.

25      THE ARBITRATOR:  I understand.  That's getting

Mattel v. MGA II                    Unsigned       EXHIBIT        25            Page  239

                                                   PAGE          377

1        MR. FELDMAN:  In 2000.

2        MR. KELLNER:  In 2000.

3        MR. FELDMAN:   Well, let's get some foundation

4    that she's done anything.

5    BY MR. KELLNER:

6        Q   Was there any discussion --

7        MR. FELDMAN:  As a salesperson.  Go ahead.

8        MR. KELLNER:  Counsel.

9        MR. FELDMAN:  Go ahead.

10   BY MR. KELLNER:

11       Q   Was there any discussion about animated series

12   when you made that presentation on November 9?

13       A   I believe there was.

14       Q   What was discussed with the buyers?

15       A   Paula expressed to Paulette, the buyer, that

16   Isaac was talking with production companies about

17   creating an animated series featuring the Bratz

18   characters.

19       Q   Did Isaac ever communicate to you any

20   excitement that he had with respect to Bratz, let's say

21   prior to December 4, 2000, in the context of the

22   company?

23       A   Yes.  That sales presentations, he presented to

24   the whole sales department that he was excited about the

25   product.

Arbitration Transcript-Larian v. Larian (Vol 2) 11/17/2005 10:00:00 AM

1    Q   Was his excitement different about Bratz than

2    any other product in development -- when he had the

3    discussion in front of you, did he do anything that

4    indicated to you that he was more excited about the

5    Bratz product than other products in development?

6        MR. FELDMAN:  Objection.  Calls for

7    speculation.  It's irrelevant what she thought or didn't

8    think about Isaac's state of mind.  If Isaac said

9    something, that's one thing.

10       MR. KELLNER:  And that's what I asked.

11       MR. FELDMAN:  No.  You asked her her view.

12   BY MR. KELLNER:

13       Q   Was there anything that Isaac stated in your

14   presence that would indicate that he had a greater level

15   of excitement for Bratz than other products in

16   development at the time?

17       A   Isaac indicated that he was excited about this

18   product line because it was a completely new avenue for

19   MGA.  It was nonelectronic product.  It was a fashion

20   doll.  It opened up doors to some new buyers at major

21   retailers that we haven't worked with.  He was very

22   eager for us to get out and sell it and use all the

23   tools that the marketing people have given us, including

24   focus groups information and everything else, to get the

25   buyers to buy into and get on board with this product.

Mattel v. MGA II                Unsigned        EXHIBIT ___25___        Page 242

                                                PAGE ___379___

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    It appeared important to him that we get it sold.

2    Q    What was the predominant mode of communication

3    at MGA -- withdrawn.

4        In 2000, what was the predominant mode of

5    communication that you had with Isaac Larian?

6    A    E-mail.

7    Q    And when you e-mailed Isaac about sales issues,

8    did you customarily CC Fred Larian on those issues?

9    A    No.

10    Q    Why not?

11    A    I was never directed to.

12    Q    To your knowledge, did Fred have any

13    involvement with the development of Bratz?

14    A    Not that I'm aware of.

15    Q    In September 2000, do you know where -- what

16    part of the company physically that Fred was working at?

17    A    In the early fall of 2000, he moved down to the

18    warehouse, and he took over David's office, the

19    warehouse manager's office.

20    Q    Is the warehouse on the same floor as the floor

21    that you were working on?

22    A    No.

23    Q    How many floors in the building that you worked

24    at MGA?

25    A    Two.

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1      A   Correct.

2      Q   All of them.  And you'd be happy to sell any

3`   single one of this.  True or false?

4      A   Yeah.  We would like to sell the products.

5      Q   And the more excitement you get, the more you

6   might invest in TV, ads; right?

7      A   A lot of times the TV budgets were initially

8   told to us prior to these meetings as a way to show the

9   customer how --

10     Q   How excited people were?

11     A   -- how committed we were to the product.

12     Q   So on Bratz, what is a four-pack of Caucasian

13   two, Hispanic one, Asian one and open SKU for AF/AM?

14     A   Are you asking me what that means?

15     Q   What does that mean?

16     A   AF is African-American.  What most of the

17   buyers were doing were putting Caucasian and Hispanic in

18   the Asian and under one skew number in assortment so

19   then can be shipped together, and the African-American

20   doll would have kept their own skew number so that when

21   replenishment orders were done, they could fill the

22   African one at the right necessary.

23     Q   You didn't have a doll to show her.  Correct?

24     A   We had a rendering, I told you.

25     Q   Drawings?

Mattel v. MGA II                    Unsigned         EXHIBIT    75          Page  271
                                                     PAGE       381

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1      A   Yes.

2      Q   But no doll?  At that time in November, you had

3   no doll, did you?

4      A   We didn't have a complete doll.

5      Q   Did you have a sculpt?

6      A   I can't be certain.  As I recall, we did, but I

7   can't be certain.

8      Q   May have been after that.  Doesn't the process

9   go from drawings to a sculpt and then to some testing of

10   the product overseas to see if you can get a product

11   made, and then production down the road?

12      A   I'm not sure what you mean by testing.

13      Q   Well --

14      A   I mean, this is a nonelectronic product.  So I

15   don't think there would have been a lot of testing

16   involved.

17      Q   Well, maybe you don't know about it.  Do you

18   know about safety rules?

19      A   Yeah.  That's what I asked you.  I'm not sure

20   what you mean by testing.  If you are talking about to

21   see if the product was going to function properly,

22   that's one kind, or you are talking about the safety

23   testing, of course.

24      Q   When you worked there, were you aware of the

25   production schedules for these dolls?

Mattel v. MGA II                    Unsigned      EXHIBIT     25                    Page  272

PAGE     382

1       Q   You get positive feedback, but that doesn't

2    mean it's going to sell, and it doesn't mean it's going

3    to sell for more than one year if it does sell.

4    Correct?

5       A   Correct.

6       Q   Now, turn to the next page of that document,

7    please.  And you see where it says "I need to get quotes

8    done within the next week; so I need accurate dimensions

9    and images from marketing right away."

10          What does that mean?

11      A   On the quote sheet, you had to put a picture of

12   the products, and the dimensions would have been for

13   packaging because when you are doing import quotes, the

14   packaging, weight, and dimension have an impact on how

15   much it cost to land a product to ship it from the

16   Orient to the retailers' warehouses.

17      Q   And Bratz was going to be made, if it was made

18   at all, in the Orient; correct?

19      A   Correct.

20      Q   They did not even have packaging, did they, at

21   that time in 2000?

22      A   In 2000, we had concepts of packaging.

23      Q   You had concepts, but you did not have a

24   package, did you?  Did you, ma'am?

25      A   I don't know if we had the final package, but

Mattel v. MGA II                    Unsigned   EXHIBIT   25                 Page 276

                                               PAGE   383

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1      we definitely had packaging concepts.

2          Q    Of course.  You had a concept of a doll.  You

3      had a concept of a package.  You had concept of hair.

4      You had concept of clothes.  But you did not have a doll

5      done in a package in the year 2000, did you?

6          A    We did not have a doll then.  We knew the size.

7          Q    Pardon me?

8          A    We knew how big the doll was going to be.

9          Q    How big?

10         A    It was a fashion doll.

11         Q    How big?

12         A    Thirteen inches.

13         Q    Ma'am, it was eight inches.

14             MR. WILSON:  Are you testifying?

15             MR. FELDMAN:   I'm telling you it was eight

16     inches.

17             THE WITNESS:  All right.  Tell me it was

18     eight inches.

19     BY MR. FELDMAN:

20         Q    It did not want to compete with Barbie.  They

21     were afraid to compete with Barbie.  Isn't that true?

22         A    I never heard anyone express fear.

23         Q    Isn't the doll smaller?  Don't you remember

24     that the doll was smaller than the Barbie doll so it

25     wouldn't compete with Barbie?  Didn't you know that?

Mattel v. MGA II                     Unsigned    EXHIBIT ___25_____Page  277

                                                 PAGE ___384___

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    make it a little clear.

2    BY MR. FELDMAN:

3        Q    I didn't know I asked two.

4            Bratz, the face of Bratz with the big lips and

5    hipper doll like that, at that size, was the first doll

6    like that that you know of?

7        A    And it was a hipper, edgier alternative to

8    Barbie.

9        Q    And because it was hipper and edgier than

10   Barbie, which had been tried and true, it had more risks

11   to it as to how it was going to be received.  Correct?

12       A    More risk compared to?

13       Q    More risk than doing a -- it had its risks

14   because of that, not more risk compared to anything.

15   Right?

16       A    It was risky because it was competing with a

17   huge brand.

18       Q    And that huge brand in 2000, without quibbling

19   over exactly, approximately 90 percent of the fashion

20   doll business, is Barbie?

21       A    Absolutely.

22       Q    And in those days, in 2000, Barbie was a

23   vanilla kind of plain girl compared to what Bratz looked

24   like?

25       A    Bratz was different in a few senses.  It was

Mattel v. MGA II                      Unsigned      EXHIBIT ___25___        Page  311

                                                    PAGE      385

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    very fashion forward.  It was heavily reliant upon

2    having current fashion because it was appealing to all

3    the girls, and the ethnic features were played up to

4    fall in line with the more urban trend that we were

5    seeing in our analysis.

6        Q    And, in fact, one of the things that the Kmart

7    lady said to you in that pre-show in November was that

8    that doll, you know, she was a little concerned if it

9    was too edgy.  Right?

10       A    She was concerned specifically about the lips

11   on the black doll, but it was the same face sculpt for

12   all four.

13       Q    The African-American?

14       A    Yes.

15       Q    Thank you.  I have no more.

16           MR. WILSON:  It's important, Isaac said.

17           MR. FELDMAN:  Now I have to ask it.  Thank you.

18   I have nothing further.

19           MR. KELLNER:  I just have very few questions.

20           THE ARBITRATOR:  Okay.  Famous last words.

21

22                    REDIRECT EXAMINATION

23   BY MR. KELLNER:

24       Q    Mr. Feldman stated that there would be evidence

25   that MGA did not want to compete with Barbie.  Did Isaac

1    A   Yes, yes.

2    Q   Let me ask you a question.  There was, I guess,

3    some talk about your employment history.  After you left

4    Maui Toys, what was your next job?

5    A   VP of sales at Atomic Toys.

6    Q   And what business is Atomic Toys in?

7    A   Toys.

8        MR. KELLNER:  That's all I have.

9        THE ARBITRATOR:  That's it.  Thank you.

10       THE WITNESS:  Thank you.

11       (Off the record.)

12       MR. WILSON:  Mr. Larian has indicated he would

13   like to make a statement.  We suggested that he would

14   need to speak with his counsel beforehand.  He has

15   indicated that he doesn't wish to do so.

16       Is that correct?

17       THE WITNESS:  That's correct.

18       MR. WILSON:  Off the record.

19       MR. FELDMAN:  Stay on the record.  I have no

20   idea what is going to be said.

21       THE ARBITRATOR:  Neither do I.

22       MR. FELDMAN:  Obviously, Judge, I have all the

23   respect in the world for you.  I have no idea.

24       MR. WILSON:  We don't either.

25       MR. ISAAC LARIAN:  Let's hear it then.  We'll

Mattel v. MGA II                    Unsigned          EXHIBIT   25                    Page  314
                                                      PAGE      387

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    see.

2         THE ARBITRATOR:  Wait a minute.

3         MR. FELDMAN:  We got to have some ground rules.

4         THE ARBITRATOR:  I understand.  I mean, I've

5    never encountered this, so I'm weening it.

6         Again, I emphasize I'm not here to stifle you,

7    but I'm very concerned that, not with you having the

8    opportunity to speak regardless of what your

9    attorneys -- you have two very, very capable lawyers,

10   and I respectfully say to you that you should talk to

11   them, speak to them, because they are hear to protect

12   you.  Okay?  That's their responsibility.

13        THE WITNESS:  I understand.

14        THE ARBITRATOR:  You are doing it well, and I

15   don't mean to demean you by suggesting that you are not

16   capable of making your own decision or decisions.

17        But what concerns me is not that you choose to

18   speak without permission or approval of your lawyers,

19   but I'm very concerned when you asked to go off the

20   record because that creates a real problem for me.

21        MR. FARHAD LARIAN:   if you want it to be on

22   the record, your Honor, I'll keep it on the record.

23        THE ARBITRATOR:  For some reason -- can we have

24   an understanding -- I don't know how to work this out,

25   but if for some reason, to keep this record as pure as

Mattel v. MGA II                    Unsigned        EXHIBIT ___25___        Page 315

                                                    PAGE ___388___

1    possible, that we reserve the right to seal it or strike

2    it if it's agreed by all the parties.  I don't know what

3    is going to happen.

4         MR. FELDMAN:  I don't either, your Honor.

5         THE ARBITRATOR:  I'm open to suggestions.

6         MR. FELDMAN:  I have to -- if I have a preview

7    of what the subject matter was, I can have better feel

8    for this.

9         THE ARBITRATOR:  You are not going to get one.

10   Let me ask you one last time.  I won't belabor the

11   issue.  Would you feel more comfortable taking a few

12   minutes and just giving your attorneys --

13        THE WITNESS:  No, your Honor.  I want to do

14   this and be done with it.

15        THE ARBITRATOR:  I mean he's a litigant, and he

16   is represented, he chooses not to.  I would feel that if

17   I say I don't want to hear from you, this is his case,

18   and I don't think it's appropriate.

19        On the other hand, I don't know what is going

20   to happen.  And I, being the control freak that I am,

21   I'm concerned that something may take place that is, I

22   don't know if it's going to hurt your case, and I don't

23   want you to hurt your case.

24        THE WITNESS:  I understand perfectly.

25        THE ARBITRATOR:  All right.  It's going to be

Mattel v. MGA II                          Unsigned          EXHIBIT ___25___                 Page 316

PAGE ___389___

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    on the record.

2         MR. FARHAD LARIAN:  When I first learned that

3    Bratz was something, I checked my E-mails.  And I found

4    that he had not told me he had two E-mails.  I brought

5    this up to my uncle, and before that I brought things up

6    to my uncle about evaluation.  And my uncle kept making

7    promises to me and telling me that everything is up and

8    up, and you had a good deal, and he wouldn't show me the

9    appraisal.  Okay?

10        When Isaac first learned that I was

11   complaining, he stopped my access to the information.

12   That raised my suspicion.  When a few months later we

13   had a discussion, "Isaac, show me all the documents.

14   And if it shows that you did not hide something from me,

15   I will apologize to you."

16        Based on what I've seen right now, I am going

17   to give him that apology as far as Bratz is concerned.

18        As far as the appraisal is concerned, I know

19   and I know that he knows that I would like to, I don't

20   know if he had anything to do with it or not, but I know

21   that the appraisal was cooked, and I know that my uncle

22   lied to me about the appraisal.

23        And then they fought to keep the appraisal

24   secret from me.  Isaac fought, vigorously fought to keep

25   the appraisal from me.  That raised my suspicion.  And

Mattel v. MGA II                    Unsigned    EXHIBIT    25                Page  317

                                                PAGE    390

1    then my uncle filed a declaration in court to keep the

2    appraisal from me.  That raised my suspicion.  And,

3    finally, when I talked to the appraiser, I knew what had

4    gone on and the lies that I've -- that had been fed to

5    me.

6        I know Isaac wanted me out.  He knows he wanted

7    me out.  I personally don't feel that I deserve what he

8    did to me.  I don't think a lot of the remarks that he

9    made about me here and yesterday were called for.  I

10    know he knows that those remarks are not true.  I went

11    back, and I helped him in every level anytime he asked

12    me.  And then he -- he used me again.  And I figured

13    that there was something wrong that's why he was hiding

14    something.

15        And just now, based on testimony from Jennifer

16    and from these documents, it doesn't look like he kept

17    Bratz from me.  I know the appraisal was cooked, but

18    maybe that's my own fault.  So I'm going to drop my case

19    and move on and face the consequences.

20        MR. WILSON:  Just for the record, this is being

21    done without advice of counsel.  It is being done

22    against advice that I would give if I were asked.  And

23    as a consequence of this decision, I'm resigning as

24    Mr. Larian's counsel in this matter as of this moment.

25        MR. FARHAD LARIAN:  I understand.

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1       MR. KELLNER:  And I concur that this is without

2    the advice of counsel, and I will be considering our

3    next move shortly.

4       THE ARBITRATOR:  I'm sorry.  I didn't hear you.

5       MR. KELLNER:  I will be considering my firm's

6    next move in short order.

7       THE ARBITRATOR:   What does that mean?

8       MR. KELLNER:  We are not withdrawing as counsel

9    at this point.  The case is dismissed; so I don't know

10    if that --

11       THE ARBITRATOR:  Just give me a few minutes to

12    absorb this.  I mean, I've heard everything and --

13       MR. FARHAD LARIAN:  One more note I want to

14    make.  He said that I've done document sharing with Art

15    Attack and Mattel.  That is not true.  I called Art

16    Attack because he wouldn't give me the information.  I

17    called Art Attack.

18       Mr. Feldman, if I may be heard, please.

19       MR. FELDMAN:  I'm sorry.

20       MR. WILSON:  I called Art Attack because he

21    does not give me the information, and he faxed me the

22    one E-mail that you guys were accusing me that I got

23    from the computer.  It has your Bates number on it.  It

24    was produced in the Art Attack case, and that's where it

25    came from.  It has the fax number of Art Attack, so.

Mattel v. MGA II                          Unsigned      EXHIBIT     75                     Page  319

                                                        PAGE       392

Arbitration Transcript-Larian v. Larian (Vol 2)  11/17/2005  10:00:00 AM

1    the next day, even if you change your mind.   This is

2    the end of the lawsuit.

3         Do you understand that?

4         MR. FARHAD LARIAN:  I understand.

5         THE ARBITRATOR:  Do you have any questions

6    about that at all.

7         MR. FARHAD LARIAN:  No.

8         THE ARBITRATOR:  Okay.  Thank you very much.

9         MR. FELDMAN:  Let me offer a stipulation that

10   both parties are agreeing that only the transcript

11   starting with Fred Larian's statement up until this

12   point needs to be transcribed by the reporter.

13        MR. KELLNER:  That is fine.

14

15        (The arbitration proceeding was concluded

16             at 5:01 p.m.)

17

18             -oOo-

19

20

21

22

23

24

25

Mattel v. MGA II                    Unsigned

EXHIBIT __25__

PAGE __893__

Page 323

**EXHIBIT 26**

# LIVENOTE | **World Service**℠

### *A new perspective on court reporting.*

CALIFORNIA

## United States District Court
## Central Division of California

Deposition of

Liliana Martinez

May 20, 2005

## Mattel, Inc.,

## V.

## Carter Bryant, an individual and MGA Entertainment

ORIGINAL

A LiveNote World Service Transcript. Reported by CLSP, Network Deposition Services
LiveNote Inc. • 221 Main Street, Suite # 1250, San Francisco, California 94105 • 1-800-LIVENOTE

EXHIBIT _24_

PAGE _394_

Martinez, Liliana 5/20/2005

1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    -------------------------------)

5    MATTEL, INC., a Delaware        )

6    Corporation,                    )

7                   Plaintiff,       ) Case No.

8              vs.                   ) CV 04-9059NM (RNBx)

9    CARTER BRYANT, an individual    ) VOLUME I

10   and MGA ENTERTAINMENT, INC.,    )

11   a California Corporation,       )

12   Defendants and                  )

13   Defendants-in-Intervention.     )

14   -------------------------------)

15   AND RELATED COUNTERCLAIMS       )

16   -------------------------------)

17

18        Deposition of LILIANA MARTINEZ, at 1999

19        Avenue of the Stars, Suite 700, Los Angeles,

20        California, 90067, commencing at 8:38 A.M.,

21        Friday, May 20, 2005, before Judith

22        Schlussel, CSR No. 4307.

23

24

25

EXHIBIT ___74___                    Page 1

PAGE ___395___

**Martinez, Liliana 5/20/2005**

1   APPEARANCES OF COUNSEL:

2

3       FOR THE PLAINTIFF:

4

5           QUINN EMANUEL URQUHART OLIVER & HEDGES

6           BY: MICHAEL ZELLER, ESQ.

7           TANIA KREBS, ESQ.

8           865 S. Figueroa Street

9           10th Floor

10          Los Angeles, California 90017

11          213 443-3000

12

13      FOR THE DEFENDANT CARTER BRYANT:

14

15          LITTLER MENDELSON, APC

16          BY: KEITH A. JACOBY, ESQ.

17          2049 Century Park East

18          Fifth Floor

19          Los Angeles, California 90067

20          310 553-0308

21

22

23

24

25

EXHIBIT __ƦƲ _____      Page 2

PAGE ___39Ʋ _____

**Martinez, Liliana 5/20/2005**

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3         FOR THE DEFENDANT-IN-INTERVENTION MGA

4         ENTERTAINMENT, INC.;

5

6              O'MELVENY & MYERS, LLP

7              BY:  DALE M. CENDALI, ESQ.

8              Times Square Tower

9              7 Times Square

10             New York, New York 10036

11             212 326-2000

12                -AND-

13             O'MELVENY & MYERS, LLP

14             BY:  BENJAMIN A. KIM, ESQ.

15             400 S. Hope Street

16             Los Angeles, California 90071

17             213 430-6000

18

19

20    ALSO PRESENT:

21

22             CARTER BRYANT

23             MICHAEL MOORE, Mattel Senior Counsel

24

25

EXHIBIT __76__         Page 3

PAGE __397__

Martinez, Liliana 5/20/2005

1  anything during the time that he was at Mattel that

2  anyone had ever said that made you think he wasn't

3  an honest person?

4      A.   I -- I don't -- can you repeat that.

5      Q.   Sure.  During the time Mr. Bryant was at

6  Mattel, did anyone ever say anything to you that

7  made you think he wasn't an honest person?

8      A.   I don't recall.

9      Q.   Did you ever have a conversation with

10 Carter Bryant about Toon Teens?

11     A.   Yes.

12     Q.   When was that?

13     A.   When Elise brought him over to look at

14 them.

15     Q.   And when did she do that?

16     A.   I don't remember.

17     Q.   At what stage was Toon Teens in at that

18 point?

19     A.   I don't remember.  I think it was after we

20 first presented the first time.

21     Q.   So the accessories and the dolls had

22 already been constructed and the accessories were

23 done; is that right?

24     A.   Yes.

25     Q.   What did -- how did you know that Elise was

EXHIBIT __24_____

PAGE ____398_____

Page 192

**Martinez, Liliana 5/20/2005**

1  bringing Mr. Bryant over to see Toon Teens?

2      A.    I didn't.

3      Q.    Well, what led you to say that?

4      A.    I was in the area where they were and she

5  and him walked over and said "hey, I brought Carter

6  to check out your dolls."

7      Q.    What did -- did Carter say anything to you?

8      A.    Yeah.

9      Q.    What did he say?

10      A.    In regards to that?

11      Q.    With regards to Toon Teens, yes.

12      A.    He said they're cute and that Mattel would

13  be crazy if they don't do them.

14      Q.    Do you recall anything else Mr. Bryant

15  said?

16      A.    No.  I don't recall.

17      Q.    Do you recall anything you said in this

18  conversation?

19      A.    I said "oh, well, you know," I said

20  "thanks, you know, we'll see what happens, we'll see

21  what happens."

22      Q.    Do you recall anything Elise said?

23      A.    No.  She just -- no.  Just look at the

24  dolls.

25      Q.    What happened at the the end of the

EXHIBIT ___76___            Page 193

PAGE ___399___

**Martinez, Liliana 5/20/2005**

1    conversation?

2        A.    Everybody left to their cubicles.  I don't

3    know.  I left to my cubicle.

4        Q.    How long did the conversation last?

5        A.    Not very long.

6        Q.    Other than that one time, are you aware of

7    Carter Bryant having any other contacts with you

8    regarding Toon Teens?

9        A.    Not that I recall.

10       Q.    Other than that one time, are you aware of

11   whether Carter ever saw Toon Teens again?

12            MR. ZELLER:  Object.  The question is vague

13   and ambiguous when you say Toon Teens.  Are you

14   talking about the dolls, the prototypes?

15            THE WITNESS:  In what form?

16       Q.    BY MS. CENDALI:  In any form?

17            MR. ZELLER:  The question is vague and

18   ambiguous and overbroad.

19            THE WITNESS:  And when?  I don't know.  I

20   worked on the dolls for a long time and there were a

21   lot of people had parts of them.  I mean, I don't

22   know.  I don't know.  He could have seen them

23   wherever, whenever.

24       Q.    BY MS. CENDALI:  But you don't know whether

25   in fact that was the case, right?

EXHIBIT ___74_____        Page 194

PAGE____480_____

**Martinez, Liliana 5/20/2005**

1  conversation with Cassidy Park about how you should

2  direct inquiries to the PR department?

3      A.    Because she had contacted me and I told

4  Cassidy this, and my manager Larry Clayton, and she

5  said to, if they contact me again, to have them talk

6  to PR instead.

7      Q.    Do you know whether anybody at Mattel gave

8  an interview for this article?

9      A.    I don't know.

10     Q.    It goes on to say in the next paragraph,

11 "Lily Martinez, a designer who still works at

12 Mattel, came up with the idea for the big doll heads

13 her Mattel colleagues say."  Do you have any idea

14 what colleagues are referred to there?

15     A.    No, I don't.

16     Q.    Did anyone ever tell you that they spoke to

17 the press on your behalf with regard to this

18 article?

19     A.    No.  I don't know anybody that spoke to

20 them about this.

21     Q.    Then it says Mattel declined to comment.

22 Then it says "she even posted her sketch on her

23 cubicle colleagues say."  Did you post a particular

24 sketch about Toon Teens on your cubicle?

25          MR. ZELLER:  This has been asked and

EXHIBIT ___8u_____          **Page 269**

PAGE ___40]_____

**Martinez, Liliana 5/20/2005**

1  answered.

2          THE WITNESS:  I already told you.  At what

3  time, when?  I mean I have all kinds of sketches

4  that I've done on my cubicle.

5      Q.   BY MS. CENDALI:  Okay.

6          MR. JACOBY:  Move to strike as

7  nonresponsive.

8          MS. CENDALI:  I second that.

9      Q.   BY MS. CENDALI:  My question is, this

10  article refers to, appears to refer to a specific

11  sketch on your cubicle.  Was there a specific single

12  sketch that you had posted on your cubicle about

13  Toon Teens?

14          MR. ZELLER:  The question lacks foundation.

15  Also, you're asking her about some interpretation of

16  an article she didn't write which is vague and

17  ambiguous as well.

18          THE WITNESS:  Exactly.  I don't know what

19  sketch they're talking about.  I know there is a

20  specific sketch.  I don't know who this person is

21  that gave this comment so how am I supposed to

22  comment on something I don't even know what they're

23  talking about.

24      Q.   BY MS. CENDALI:  You know whether or not

25  you had a Toon Teens sketch on your cubicle or not?

EXHIBIT __*7u*__

PAGE __*402*__

**Page 270**

**Martinez, Liliana 5/20/2005**

1     A.    Yeah, I have a lot of sketches including a

2  Toon Teens sketch.

3     Q.    In the exhibits that we looked at today, is

4  there any that you can point to as one that you had

5  up on your cubicle?

6     A.    I can't recall.

7     Q.    Then it goes on to say "anyone who passed

8  by her cubicle would see the picture up on the wall

9  says another designer who also left Mattel in 2001."

10  Do you have any understanding as to what, who that

11  designer was?

12     A.    No.  No.

13     Q.    Is this the first time you've ever been

14  mentioned in the Wall Street Journal?

15     A.    To my knowledge.  Yes.

16     Q.    Were you at all curious who had made these

17  comments?

18     A.    Well, yeah.  I was curious who could have

19  possibly like know stuff, but that's it.

20     Q.    Is there a designer who worked on Toon

21  Teens who left Mattel in 2001?

22     A.    I don't recall.  I don't remember.

23     Q.    Is there a designer who worked on Toon

24  Teens who is no longer at Mattel?

25     A.    Is there a designer?

EXHIBIT ___𝘯𝘶_____

PAGE ___403_____

**Page 271**

**Martinez, Liliana 5/20/2005**

1   Q.   That's right.

2   A.   That worked on Toon Teens?

3   Q.   That's right.

4   A.   I'm the designer that worked on Toon Teens.

5   Q.   So to the --

6   A.   See, you're going by what this person

7   wrote.  I don't know what they're saying.  I don't

8   know where she got her facts.  I don't know.

9   Q.   I'm asking you whether anyone who worked

10  on -- when did Debbie Meyer Hastey leave Mattel?

11  A.   I don't remember.

12  Q.   Could it have been in 2001?

13  A.   Maybe.  I don't know.

14  Q.   Who is Sullivan Hastey?

15  A.   A model maker at the time when I started

16  working at Mattel.

17  Q.   Is Sullivan Hastey a different person than

18  Michael Hastey?

19  A.   Yes.  They're -- yes.

20  Q.   Are they brothers?

21  A.   They're brothers.

22  Q.   Which one, if any, is married to Debbie

23  Hastey?

24  A.   Sullivan Hastey.

25  Q.   Did both Sullivan and Michael Hastey work

EXHIBIT _21_                    **Page 272**

PAGE _404_

1    I further certify that I am not a relative or

2  employee or attorney or counsel of any of the parties,

3  nor am I a relative or employee of such attorney or

4  counsel, nor am I financially interested in the outcome

5  of this action.

6

7    IN WITNESS WHEREOF, I have subscribed my name

8  this 5th  day of June         , 2005 .

9

10

11

12  JUDITH SCHLUSSEL, CSR No. 4307

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 2v

PAGE  405

BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdoffice.com

**EXHIBIT 27**

1       IN THE UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3           EASTERN DIVISION

**Certified Copy**

4

5   ---------------------------

6   CARTER BRYANT,          )

7        Plaintiff,      )

8     vs.                 ) CV 04-9049 SGL

9   MATTEL, INC., a Delaware  ) (RNBx)

10  corporation,         ) CV 04-09059

11        Defendant.    ) CV 05-2727

12  ---------------------------

13

14

15     Videotaped deposition of JOHN L. ALEX,

16    taken at 333 West Wacker Drive, Chicago,

17    Illinois, commencing at 9:36 a.m.,

18    Wednesday, April 9, 2008, before

19    Sandra L. Rocca, CSR, CRR, Notary Public.

20

21

22

23

24

25  PAGES 1 - 148

                                                1

EXHIBIT _27_

PAGE _400_

```
1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4

5        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

6        BY:  MR. DAVID W. HANSEN, ESQ.

7        525 University Avenue

8        Palo Alto, CA  94301

9        (650) 470-4560/Fax: (888) 329-1840

10       david.hansen@skadden.com

11

12   FOR THE DEFENDANT:

13

14       QUINN EMANUEL URQUHART OLIVER

15       & HEDGES, LLP

16       BY:  MR. MICHAEL T. ZELLER, ESQ.

17       865 South Figueroa Street, 10th Floor

18       Los Angeles, CA  90017

19       (213) 443-3180/Fax: (213) 624-7707

20       michaelzeller@quinnemanuel.com

21

22   ALSO PRESENT:

23       PATTI PAGE, VIDEOGRAPHER

24

25
                                                    2
```

EXHIBIT __27__

PAGE __407__

```
 1        A.    Well, again it depends on the facts and          10:51:38

 2   circumstances.  So the answer is what I'm relating          10:51:48

 3   to here is a specific situation and that's -- in            10:51:56

 4   that situation, based on the evidence I've seen, I          10:52:01

 5   think there is enough of -- the violation I think          10:52:09

 6   is present on the facts in this case based on the          10:52:13

 7   evidence that's been made available to me.                 10:52:17

 8        Q.    So in this case, it should be construed          10:52:19

 9   to be a knowing and willful misrepresentation?             10:52:21

10        A.    I believe so.                                    10:52:23

11        Q.    Are there circumstances when the -- when        10:52:23

12   the -- when it would not need to be construed that         10:52:28

13   way?                                                        10:52:31

14              MR. ZELLER:  Objection.                          10:52:33

15              THE WITNESS:  Are you talking about the          10:52:34

16   facts here?                                                 10:52:35

17   BY MR. HANSEN:                                              10:52:36

18        Q.    I'm talking about the sentence claims as        10:52:37

19   presented initially and later amended identify             10:52:39

20   subject matter that can only be attributed to a            10:52:44

21   person other than the named inventor, are there            10:52:46

22   circumstances in which that would not be construed         10:52:49

23   as a knowing and willful misrepresentation?                10:52:51

24        A.    Depending on the facts as I understand          10:52:53

25   them in this case, I think it would be very                10:52:58
                                                                  55
```

```
 1   difficult and highly unlikely that it was not a          10:53:01
 2   knowing and willful misrepresentation.                    10:53:06
 3        Q.   And knowing and willful, that requires to       10:53:07
 4   look at the subjective intent?                            10:53:09
 5        A.   That's right.  And again, I'll make clear       10:53:12
 6   about that.  I can't get into the heads of the            10:53:14
 7   people that were doing it, but I can look at the          10:53:17
 8   circumstances and I think under those                     10:53:21
 9   circumstances, you can conclude that there was            10:53:26
10   intent objectively.  But subjectively, I can't            10:53:32
11   answer that question.  I can't make that statement.       10:53:36
12        Q.   And when you say can't get into the heads       10:53:39
13   of the people that were doing it, you're talking          10:53:41
14   about you can't get into the heads in this instance       10:53:43
15   of Mr. Larian or Mr. Bryant, is that right?               10:53:45
16        A.   And probably the attorney too.                  10:53:49
17        Q.   Mr. Rose?                                       10:53:51
18        A.   Yeah.                                           10:53:51
19        Q.   So Mr. Rose may have had a part in all of      10:53:52
20   this?                                                     10:53:55
21        A.   Well, it's possible.  I don't know.  I         10:53:55
22   don't have any facts about him other than what I've      10:53:58
23   seen in the record.  Obviously he's not subject to       10:54:00
24   being deposed anymore.                                   10:54:06
25        Q.   He's dead?                                      10:54:09
                                                                     56
```

1    A.    That's my understanding.    10:54:09

2    Q.    Can you tell me what facts you have    10:54:11

3    regarding Mr. Larian as to his intent?    10:54:14

4    A.    Well, it's my understanding that    10:54:18

5    Mr. Larian has acknowledged that he did not have    10:54:26

6    the idea of -- what do we call it -- replaceable or    10:54:34

7    detachable feet and was not aware of it I thought    10:54:38

8    until such time as it was provided to him in some    10:54:45

9    documents generated by Mr. Bryant.    10:54:50

10    Q.    That was in his most recent deposition?    10:54:56

11    A.    It was in his deposition and I would also    10:54:58

12    -- yes, I think that was in his deposition.  I    10:55:04

13    think he said -- you know, I have to correct myself    10:55:07

14    on that.  Let me think.  I believe he has said he    10:55:11

15    did not -- he first -- I thought he first became    10:55:21

16    aware of the detachable feet when he met with    10:55:25

17    Mr. Bryant which would be sometime in, according to    10:55:29

18    the record at least that I saw, in the 2000 era    10:55:39

19    which was -- and you combine that with the    10:55:44

20    statement under oath of Mr. Bryant that he created    10:55:51

21    the detachable feet and you look at that element as    10:55:57

22    being -- that feature as being an element of the    10:56:07

23    claims.    10:56:11

24    So therefore, it seems to follow that if    10:56:13

25    Mr. Bryant introduced Mr. Larian to the concept of    10:56:20

57

EXHIBIT  27

PAGE  410

| | | |
|---|---|---|
| 1 | Q.   And if Mr. Larian's lawyer told him, | 11:18:53 |
| 2 | right, in connection with the declaration that | 11:18:57 |
| 3 | Mr. Larian signed regarding the '602 patent | 11:19:01 |
| 4 | application that he was the "sole inventor" on that | 11:19:05 |
| 5 | application, would that change your opinion as to | 11:19:09 |
| 6 | Mr. Larian's intent to defraud the Patent Office? | 11:19:11 |
| 7 | MR. ZELLER:  Incomplete hypothetical. | 11:19:14 |
| 8 | THE WITNESS:  On the hypothetical, if you | 11:19:16 |
| 9 | say Mr. Rose told Mr. Larian in my opinion, you're | 11:19:18 |
| 10 | the sole inventor of this invention, then I would | 11:19:30 |
| 11 | not attribute intent to deceive on the part of | 11:19:34 |
| 12 | Mr. Larian there unless, unless there are other | 11:19:40 |
| 13 | facts and circumstances surrounding that activity | 11:19:44 |
| 14 | which could be other representations made by | 11:19:47 |
| 15 | Mr. Larian in other contexts.  I don't know.  I | 11:19:50 |
| 16 | didn't get into those others.  I don't have access | 11:19:54 |
| 17 | to those other facts. | 11:19:56 |
| 18 | But I want to make a point.  I think this | 11:19:58 |
| 19 | is again a pretty careful choice of words.  If he | 11:20:01 |
| 20 | was trying to say -- if he was told he was sole | 11:20:04 |
| 21 | inventor, it seems to me he would be saying | 11:20:08 |
| 22 | according to my lawyer, I can be considered the | 11:20:10 |
| 23 | inventor.  And the fact that he says an inventor at | 11:20:13 |
| 24 | least opens up the suggestion that he's one of | 11:20:18 |
| 25 | other -- you know, one of a group of inventors. | 11:20:23 |

75

```
 1        Q.   Do you have any idea whether Mr. Larian          11:20:27

 2   relied on Mr. Rose, the lawyer, for purposes of            11:20:29

 3   what to do in connection with the '602 application?        11:20:34

 4        A.   All I know is Mr. Rose I think prepared          11:20:37

 5   and filed the application.  So I don't know what           11:20:40

 6   you mean by rely.                                          11:20:44

 7        Q.   Do you know anything about the                   11:20:45

 8   application with respect to -- as relates to               11:20:47

 9   Mr. Larian other than the fact that he signed the          11:20:50

10   declaration?                                               11:20:51

11        MR. ZELLER:  The question's overbroad.                11:20:54

12   Are you talking about his particular involvement in        11:20:58

13   the process?                                               11:21:01

14        MR. HANSEN:  Yes.                                     11:21:02

15        THE WITNESS:  You know, I have some -- I              11:21:10

16   know some things based on what's occurred.  I know         11:21:12

17   for -- that there's no dispute that Mr. Bryant             11:21:17

18   presented the idea of detachable feet in a doll to         11:21:26

19   Mr. Larian.  And Mr. Larian at the time was aware          11:21:35

20   that Mr. Bryant was employed by Mattel.                    11:21:45

21        So it seems to me that again, depending              11:21:55

22   on all the facts and circumstances, a conclusion           11:22:01

23   could be reached that there was an intentional             11:22:05

24   reason to not include Mr. Bryant as an inventor            11:22:10

25   because at the time the idea was created and               11:22:18
                                                                   76
```

EXHIBIT __27__

PAGE __412__

| | | |
|---|---|---|
| 1 | actually reduced to practice by drawings, | 11:22:25 |
| 2 | Mr. Bryant was employed by Mattel.  I know for a | 11:22:30 |
| 3 | fact that Mr. Larian's company ultimately made | 11:22:38 |
| 4 | product with detachable feet.  And I would suggest | 11:22:46 |
| 5 | that again from those facts, the trier of fact | 11:22:54 |
| 6 | might conclude that it was a self-serving statement | 11:22:59 |
| 7 | and may not be, but I'm not going to get into that. | 11:23:04 |
| 8 | I'm not making a judgment.  I think there's enough | 11:23:09 |
| 9 | there for the trier of fact to conclude otherwise. | 11:23:12 |
| 10 | BY MR. HANSEN: | 11:23:15 |
| 11 | Q.    Self-serving for what reason? | 11:23:15 |
| 12 | A.    Well, if Mr. Larian -- I'm sorry, | 11:23:16 |
| 13 | Mr. Bryant invented the feature of a doll having | 11:23:22 |
| 14 | detachable feet while he was an employee of | 11:23:32 |
| 15 | Mattel -- again I'm not testifying on this, I'm not | 11:23:35 |
| 16 | getting into ownership, but it seems to me there's | 11:23:44 |
| 17 | a possibility that one could argue what's in force | 11:23:45 |
| 18 | that Mattel owned that feature and dolls having | 11:23:49 |
| 19 | that feature. | 11:23:53 |
| 20 | Q.    Do you have an opinion on that one way or | 11:23:54 |
| 21 | another? | 11:23:57 |
| 22 | MR. ZELLER:  About the ownership issue? | 11:23:57 |
| 23 | THE WITNESS:  I did not address ownership | 11:24:00 |
| 24 | in my opinion.  I purposely focused on what was | 11:24:02 |
| 25 | done in the Patent Office, but by bringing these | 11:24:06 |

77

EXHIBIT  27

PAGE  413

| | | |
|---|---|---|
| 1 | out, I mean, I have to use this.  You know, I have | 11:24:09 |
| 2 | to -- I'm applying what I view as agreed facts to a | 11:24:12 |
| 3 | situation which could give rise to the suggestion | 11:24:19 |
| 4 | that the failure to include was done intentionally. | 11:24:23 |
| 5 | BY MR. HANSEN: | 11:24:28 |
| 6 | Q.   So you're inferring Mr. Larian's intent | 11:24:28 |
| 7 | based on the circumstances that you're aware of, is | 11:24:32 |
| 8 | that correct? | 11:24:34 |
| 9 | A.   I believe -- what I'm saying is I think a | 11:24:34 |
| 10 | trier of fact could reach that conclusion. | 11:24:37 |
| 11 | Q.   Let's mark -- let's mark the application | 11:24:39 |
| 12 | if we could.  You know what I'm not going to mark | 11:24:50 |
| 13 | it. | 11:24:55 |
| 14 | MR. ZELLER:  It was previously -- | 11:24:55 |
| 15 | MR. HANSEN:  500. | 11:24:56 |
| 16 | MR. ZELLER:  Yes. | 11:24:58 |
| 17 | MR. HANSEN:  Let's just use the one to | 11:24:58 |
| 18 | save some trees which I think is the goal here. | 11:25:02 |
| 19 | (Document marked previously as | 11:25:02 |
| 20 | Exhibit 500 was presented.) | 11:25:02 |
| 21 | BY MR. HANSEN: | 11:25:02 |
| 22 | Q.   This is the '602 application that we've | 11:25:04 |
| 23 | been talking about?  Sorry, let me rephrase it. | 11:25:06 |
| 24 | Can you confirm for me that this is the '602 | 11:25:13 |
| 25 | removable footgear application that we've been | 11:25:16 |
| | | 78 |

1   me to read it into the record?                          12:40:13

2       Q.   Let me read it for you.  Let's move it        12:40:14

3   along.  Paragraph 3.  I'm sorry, I'll try and be        12:40:16

4   clearer.  Three, "I am familiar with the doll           12:40:18

5   designs as shown in the attached drawings from the      12:40:21

6   above-identified patent application."  Do you see       12:40:24

7   that?                                                   12:40:27

8       A.   Uh-huh.                                        12:40:27

9       Q.   Those are the drawings that are attached       12:40:27

10  to Exhibit 502?                                         12:40:29

11      A.   Yes.                                           12:40:30

12      Q.   So Mr. Bryant is saying he's familiar          12:40:31

13  with the drawings that are attached to the              12:40:34

14  declaration?                                            12:40:37

15      A.   Yes.                                           12:40:37

16      Q.   Then he goes on to say, "These dolls have      12:40:38

17  strap type shoes, and the dolls have a snap-on          12:40:42

18  feature at about the ankle of the dolls so the          12:40:46

19  different footgear may be mounted on the doll."         12:40:48

20      A.   That's correct.                                12:40:52

21      Q.   Do you see that?  Have I read that             12:40:52

22  correctly?  Regarding -- the next sentence says,        12:40:54

23  excuse me, "Regarding the strap type shoes, as          12:40:57

24  disclosed in the patent application, the coloring       12:41:00

25  of the skin tone on the exposed areas of the feet       12:41:02

                                                                127

EXHIBIT ___27___

PAGE ___415___

```
 1   are matched to the coloring of the lower legs of    12:41:05
 2   the dolls."  Do you see that?                        12:41:07
 3       A.   Yes, I see that.  I agree that's what it    12:41:09
 4   says.                                                12:41:11
 5       Q.   And that's the configuration that           12:41:11
 6   Mr. Bryant was referring to in connection with       12:41:13
 7   paragraph 4 of his declaration?                      12:41:16
 8           MR. ZELLER:  The question's overbroad.       12:41:18
 9           THE WITNESS:  That's what he refers to.      12:41:20
10   That's correct.  That's what he referenced.          12:41:23
11   BY MR. HANSEN:                                       12:41:25
12       Q.   Do you know what configuration Mr. Bryant   12:41:25
13   had in mind when he signed the declaration?          12:41:27
14           MR. ZELLER:  This is asked and answered.     12:41:30
15           THE WITNESS:  The answer is I don't know     12:41:31
16   what he had in his mind when he signed the           12:41:35
17   application.  But I do know that the examiner         12:41:38
18   referred in the prior art discussion to the doll     12:41:43
19   you have in front of you.  And I do know that that   12:41:48
20   was not introduced as late as Mr. Bryant said.  It   12:41:52
21   was in the first wave or the first introduction of   12:42:00
22   the Bratz doll.                                      12:42:03
23   BY MR. HANSEN:                                       12:42:04
24       Q.   But you don't know what configuration       12:42:04
25   Mr. Bryant had in mind when he signed the            12:42:07
                                                              128
```

EXHIBIT  7-7

PAGE  416

1   declaration?                                          12:42:08

2          MR. ZELLER:  Mischaracterizes the              12:42:09

3   witness' testimony and asked and answered.            12:42:10

4          THE WITNESS:  Yeah, I don't know what he       12:42:11

5   had in mind, but I do know what he was addressing.    12:42:14

6   He was addressing a prior art rejection based on      12:42:19

7   the doll that you have in front of you and excuse     12:42:26

8   me, I don't remember the name.  What is that?         12:42:28

9   BY MR. HANSEN:                                        12:42:30

10     Q.   Jade.                                          12:42:30

11     A.   Jade, okay.  He was on the Jade doll and       12:42:31

12  that's what the examiner was talking about.  And      12:42:34

13  this was presented for the purpose of eliminating     12:42:36

14  that as prior art.  And since it incorrectly -- let   12:42:41

15  me use that word -- it incorrectly references when    12:42:47

16  that doll was introduced, it presents some problems   12:42:49

17  as far as candor to the U.S. Patent and Trademark     12:42:55

18  Office.                                               12:42:58

19     Q.   Assuming your interpretation of the facts      12:42:58

20  is correct, is it possible that Mr. Bryant simply     12:43:01

21  made a mistake in this declaration?                   12:43:03

22          MR. ZELLER:  The question is an               12:43:06

23  incomplete hypothetical.                              12:43:07

24          THE WITNESS:  I don't know.  I think          12:43:08

25  there's enough objective facts here to suggest that   12:43:09

                                                              129

EXHIBIT ___27___

PAGE ___417___

```
 1              I further certify that I am not counsel

 2    for nor related to any of the parties herein, nor

 3    am I interested in the outcome hereof.

 4              In witness whereof, I have hereunto set

 5    my hand and seal of office this 15th day of

 6    April, 2008.

 7

 8

 9

10

11                    [signature]

12         Certified Shorthand Reporter # 84-3435

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                        147
```

EXHIBIT ___77___

PAGE  418

**EXHIBIT 28**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 29**

```
                            arbitration2.txt
 1                     IN THE ARBITRATION OF
 2
 3    FUN 4 ALL CORPORATION, a      ) Case No. (Unnumbered)
 4    Delaware corporation, and     ) Volume II
 5    SCOTT BACHRACH, an individual, )
 6              Claimant/Counterclaim )
 7              Respondent,           )
 8              v.                    )
 9    ABC INTERNATIONAL TRADERS ,INC.)
10    d/b/a/ MGA ENTERTAINMENT, a    )
11    California corporation,        )
12              Respondent/           ) Pages 346 - 652
13              Counter-Claimant.     )
14    -----------------------------)
15
16                   TRANSCRIPT OF PROCEEDINGS
17                  WEDNESDAY, MAY 29, 2002
18                        10:39 A.M.
19
20    REPORTED BY:     SYLVIA P. SHEAR
21                     CSR NO. 3010, RPR
22
23
24
25


page 346
□ 1            Continued Transcript of Proceedings, held
  2    before HONORABLE LAYN R. PHILLIPS, at 1800 Avenue of
  3    the Stars, Conference Room 6A, Los Angeles,
  4    California, on WEDNESDAY, MAY 29, 2002, at 10:39
  5    A.M., before SYLVIA P. SHEAR, CSR No. 3010, RPR.
  6
  7    APPEARANCES:
  8
  9    ARBITRATOR:
 10            HONORABLE LAYN R. PHILLIPS
 11            United States District Judge (Retired)
 12
 13    FOR CLAIMANT/COUNTERCLAIM RESPONDENTS FUN 4 ALL
 14    CORPORATION AND SCOTT BACHRACH:
 15            GREENBERG GLUSKER FIELDS CLAMAN
 16            MACHTINGER & KINSELLA LLP
 17            BY:  DALE F. KINSELLA, ESQ.
 18                 STEPHEN S. SMITH, ESQ.
 19            1900 Avenue of the Stars
 20            Suite 2100
 21            Los Angeles, California  90067-4590
```

                            Page 1

EXHIBIT _____ 21

PAGE _____ 429                    M 0060753

arbitration2.txt

```
22            (310) 553-3610
23
24
25

page 347
□ 1   APPEARANCES (Continued):
  2
  3   FOR RESPONDENT/COUNTER-CLAIMANT ABC INTERNATIONAL
  4   TRADERS, INC. D/B/A MGA ENTERTAINMENT:
  5            CHRISTENSEN, MILLER, FINK, JACOBS,
  6            GLASER, WEIL & SHAPIRO, LLP
  7            BY:   PATRICIA L. GLASER, ESQ.
  8                      (Pages 355-652)
  9                 LARRY S. GREENFIELD, ESQ.
 10                 CAROLINE H. MANKEY, ESQ.
 11                      (Pages 345-355)
 12            2121 Avenue of the Stars
 13            Eighteenth Floor
 14            Los Angeles, California  90067
 15            (310) 553-3000
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25

page 348
□ 1   APPEARANCES (Continued):
  2
  3   FOR THE WITNESS LON ROSS:
  4            WHITE O'CONNOR CURRY GATTI & AVANZADO
  5            BY:  EDWARD E. WEIMAN, ESQ.
  6                      (Pages - 361-393)
  7            10100 Santa Monica Boulevard
  8            Suite 2300
  9            Los Angeles, California 90067
 10            (310) 712-6100
 11
 12
 13
 14   ALSO PRESENT:
 15            ISAAC LARIAN
```

Page 2

EXHIBIT _____29_____

PAGE _____430_____

M 0060754

arbitration2.txt

```
16            SCOTT ALLEN BACHRACH
17
18
19
20
21
22
23
24
25


page 349
□ 1                        I N D E X
 2
 3    CLAIMANT        DIRECT  CROSS   REDIRECT  RECROSS
 4    WITNESSES:
 5    LON ROSS
 6      Mr. Smith       362             391
 7      Ms. Glaser              382
 8                                                393
 9
10
11    RESPONDENT      DIRECT  CROSS   REDIRECT  RECROSS
12    WITNESSES:
13    VICTORIA
14    O'CONNOR
15      Mr. Greenfield  404             618
16                                      633
17                                      639
18
19      Mr. Kinsella            540               629
20                                                634
21                                                644
22
23
24
25


page 350
□ 1                  LOS ANGELES, CALIFORNIA
 2                  WEDNESDAY, MAY 29, 2002
 3                      10:39 A.M.
 4
 5         ARBITRATOR PHILLIPS:  Let's go on the
 6    record.  Let me have counsel enter their appearances
 7    in the Fun 4 All/MGA Arbitration.  First on behalf
 8    of the petitioner.
 9              MR. KINSELLA:  Good morning, Your Honor.
```

Page 3

EXHIBIT _____ 29

PAGE _____ 431

M 0060755

arbitration2.txt
```
16    Treantafelles, Nana Oshang, Scott Bachrach.  Some
17    people were not in attendance for the entire
18    meeting.
19         Q.  Did anyone else come in or out --
20         A.  Yes.
21         Q.  -- during the course of the meeting?
22         A.  I believe Paula Treantafelles might have
23    come in a little late and perhaps left a little
24    early.  I can't quite recall.  Isaac Larian also
25    came in and left.

page 365
□ 1        Q.  Can you tell me is it Nano Oshang?
 2         A.  Nana, N-a-n-a.
 3         Q.  Can you tell me what Nana's position was?
 4         A.  She was an associate product manager.
 5         Q.  Was she one of the product managers you
 6    supervised?
 7         A.  No.
 8         Q.  Who were one of the product managers you
 9    supervised?
10         A.  They came and gone, but their names of the
11    people were Brian Schmit, Andreas Koch, Margo
12    Chazen.
13         Q.  Is that it?
14         A.  Those were direct reports.
15         Q.  Back to this meeting with Mr. Bachrach
16    where he brought the -- well, about Bratz.  Can you
17    tell me what happened at the meeting?
18         A.  Mr. Bachrach had come in with samples of
19    plush that he had made off of a drawing that was
20    given out at the Licensing Show.  He had pitched for
21    the plush rights to the Bratz line.  We reviewed the
22    samples.  We spoke with Mr. Bachrach.
23              All the people that I had mentioned were in
24    attendance.  Nana Oshang, Paula Treantafelles had
25    come in, Victoria O'Connor and myself.  Mr. Larian

page 366
□ 1    came in for a few minutes, said hello to
 2    Mr. Bachrach, looked at the dolls, nodded, said
 3    good-bye and left the meeting.  And we just had a
 4    general meeting about the line.  Mr. Bachrach was
 5    very enthusiastic about it.  We had become very
 6    interested in it as well.
 7         Q.  Did the MGA representatives in attendance
 8    like the sample dolls he had brought to the meeting?
 9         A.  Overall we were surprised because they had
```
Page 12

EXHIBIT _____ 29 _____

PAGE _____ 432 _____

M 0060764