allowed MGA to avoid expending time, money and effort necessary to build a legitimate business, but also allowed MGA to unfairly compete against Mattel by taking Mattel's playbook.

### III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL

21.   Carter Bryant is a former Mattel employee.  Bryant joined Mattel in September 1995, where he worked in Mattel's Design Center as a BARBIE product designer.  In or about April 1998, Bryant resigned his position with Mattel and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

22.   Upon his return to Mattel in January 1999, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employment Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

23.   Pursuant to his Employment Agreement and as a condition of and in consideration for his employment, Bryant agreed, among other things, that he held a position of trust with Mattel, that the designs and inventions he created during his Mattel employment (with certain exceptions not relevant here) were owned by Mattel, and that he would be loyal to the company by agreeing not to assist or work for any competitor of Mattel while he was employed by Mattel.

24.   On January 4, 1999, Bryant also executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest.  Bryant understood what the Conflict Questionnaire required because, among other things, he disclosed on it the freelance work he had performed while in Missouri for Ashton-Drake, which is

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT **6** PAGE **80**

2154363.2

1  unrelated to the conduct alleged herein.  A true and correct copy of the Conflict

2  Questionnaire executed by Bryant is attached hereto as Exhibit B.

3        25.  Pursuant to the Conflict Questionnaire, Bryant also agreed that

4  he would immediately notify his supervisor of any change in his situation that

5  would cause him to change any of the foregoing certifications.  Despite this

6  obligation, at no time did Bryant disclose to Mattel that he was engaging in any

7  business venture or transaction with MGA or any other Mattel competitor.

8        26.  More specifically, while Bryant was employed by Mattel, Bryant

9  and other Counter-defendants misappropriated and misused Mattel property and

10  Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are

11  not limited to, the following:

12        a.  using his exposure to Mattel development programs to

13  create the concept, design and name of Bratz;

14        b.  using Mattel resources, and while employed by Mattel,

15  Bryant worked by himself and with other Mattel employees and contractors to

16  design and develop Bratz, including without limitation by creating drawings and

17  three-dimensional models of Bratz dolls, and fashion designs for the dolls'

18  associated clothing and accessories; and

19        c.  using Mattel resources, and while employed by Mattel,

20  Bryant took steps to assist MGA to produce Bratz dolls.

21        27.  During the time that he was employed by Mattel and thereafter,

22  Bryant concealed these actions from Mattel, including by failing to notify his

23  supervisor of the conflict of interest he created when he began working on MGA's

24  behalf and when he began receiving payments from MGA.  Bryant additionally

25  enlisted other Mattel employees to perform work on Bratz during the time he was

26  employed by Mattel and, by all indications, in at least some cases led them to

27  believe that they were performing work on a project for Mattel.

28

-35-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___B___  PAGE __81__

28.   Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000.  For example, during his last few weeks at Mattel, Bryant told his co-workers and supervisors that he was going to leave Mattel for "non-competitive" pursuits.  Bryant's representations to his supervisors and his co-workers were false.  Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the fact that he was already working with MGA and that he had contracted with MGA to assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

29.   As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these meetings while Bryant was still employed by Mattel.

30.   Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz.  On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

2154363.2

-36-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 6   PAGE 82

31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001. By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32.   Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world. Mattel is informed and believes that MGA also licenses Bratz to third parties. Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million. Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto. MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

33.   Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

34.   Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom. Counter-defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the Counter-defendants.

35.   Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz. Their acts of concealment include, but are not limited to, concealing the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, including by tampering with and defacing documents which showed that, in fact, Bryant was a Mattel employee while he was working for and with MGA; concealing the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel and was compensated for that assistance; concealing that Bryant was providing consulting services to MGA; concealing Bryant's role in Bratz by falsely claiming that Larian and others were the creators of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

36.   Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement. Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis. Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under

-38-

EXHIBIT ___B___ PAGE __84__

1   the agreement, including those he purportedly provided while still a Mattel

2   employee, purportedly would be considered "works for hire" of MGA; and that all

3   intellectual property rights to preexisting works by Bryant, including Bratz designs,

4   purportedly were assigned to MGA.

5   **IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6           37.   On information and belief, in or about late 2003 or early 2004,

7   MGA decided to open business operations in Mexico. Faced with the difficult task

8   of developing an overall strategy for expanding into a market in which it had only a

9   nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10   and business information for the Mexican market and materials related to Mattel's

11   worldwide business strategies. As detailed below, MGA and Larian approached

12   three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13   steal Mattel's most sensitive business planning materials, and then hired them to

14   assist in establishing and running MGA's new Mexican subsidiary.

15       **A.    MGA Hires Three Senior Mattel Employees in Mexico**

16           38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior

17   Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18   confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19,

19   2004. His duties included short, medium and long-term marketing planning,

20   generating product sales projections, and assisting in creation of the media plan. In

21   his position, Machado had access to highly confidential and sensitive marketing

22   and product development information. Machado had an employment agreement

23   with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24   information. Mattel's policies also required Machado to protect Mattel's

25   proprietary information and not to disclose it to competitors.

26           39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing

27   Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28   She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

2154363.2

-39-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT  **B**   PAGE  **85**

Like Machado, her duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan. In her position, Trueba had access to highly confidential and sensitive marketing and product development information. Trueba had an employment agreement with Mattel in which she agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Trueba to protect Mattel's proprietary information and not to disclose it to competitors.

40.     Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing Manager with Mattel Mexico, a position of trust and confidence. He was employed at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was responsible for ensuring that point-of-sale promotions were carried out, analyzing the results of such promotions, negotiating promotion budgets, and generally managing promotional activities. Vargas also had access to highly confidential and sensitive marketing and product development information. Vargas had an employment agreement with Mattel in which he agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Vargas to protect Mattel's proprietary information and not to disclose it to competitors.

41.     Beginning in late 2003 or early 2004, Machado, Trueba and Vargas began planning to leave Mattel Mexico to join MGA. In connection with that plan, and with the encouragement of Larian and other MGA officers operating in the United States, they began accessing, copying and collecting proprietary Mattel documents to take with them. On April 19, 2004, Machado, Trueba and Vargas each resigned their positions with Mattel, effective immediately. They stated that they had been hired by a Mattel competitor, but refused to identify that competitor. In fact, they had been offered and accepted employment by MGA to establish and run MGA's new operation in Mexico.

2154363.2

-40-

**B.      Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.     Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.     In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

-41-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT **6** PAGE **87**

participants intentionally sought to maximize the damage to Mattel from their conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want to resign (all at the same time, and you can believe my smile!) next Wednesday."

44.   Beginning on April 12, 2004, a week before his resignation and after numerous communications and meetings with Larian and other MGA personnel, Machado began transferring additional Mattel confidential and proprietary information to a portable USB storage device (also know as a "thumb drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the last business day before he gave notice, Machado copied at least 70 sensitive documents to the portable USB storage device.

45.   Starting on April 12, 2004, Vargas also copied a host of confidential and proprietary materials to a portable USB storage device, including sales plans, sales projections and customer profiles.

46.   On April 16, 2004, Trueba also copied Mattel confidential and proprietary information to a portable USB storage device connected to her Mattel computer.

47.   With full knowledge that she was going to leave Mattel for a competitor, Trueba also took steps to increase further her access to Mattel's confidential information shortly before her resignation.  For example, just four days before leaving, Trueba went out of her way to seek to attend a meeting at which Mattel personnel analyzed BARBIE programs for the United States, Canada and South America.  Two days before her resignation, she contacted both a Mattel employee located in El Segundo, California and Mattel's advertising agency to request updated confidential information about advertising plans for BARBIE.  On information and belief, Trueba acted at the direction of MGA and Larian and did so in order to obtain further information that would allow MGA to obtain unfair competitive advantage over Mattel.

-42-
SECOND AMENDED ANSWER AND COUNTERCLAIMS
EXHIBIT __B__ PAGE __88__

48.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.   The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.   MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

1  market share by 90 percent over the prior year.  This increase came at the expense

2  of Mattel, which lost market share during 2004 in Mexico and was forced to

3  increase its advertising and promotional spending to offset further losses.

4         51.   Machado, Trueba and Vargas attempted to conceal their

5  widespread theft of Mattel's proprietary information.  For example, Machado ran a

6  software program on his Mattel personal computer in an attempt to erase

7  information, including information that would reveal the addresses to which he had

8  sent, or from which he had received, e-mail messages.  On information and belief,

9  for the same purpose Machado also damaged the hard drive of the personal

10  computer that he used at Mattel.

11         52.   On information and belief, on April 19, 2004, immediately after

12  Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

13  to Los Angeles to meet with MGA personnel, including Larian, in person.

14         53.   Mattel notified Mexican authorities about the theft of its trade

15  secret and confidential information.  On October 27, 2005, the Mexican Attorney

16  General Office obtained a search warrant from the Mexican Federal Criminal

17  Courts for MGA's facilities in Mexico City.  In that search, the Mexican authorities

18  found and seized from MGA's offices both electronic and paper copies of a large

19  number of documents containing Mattel trade secrets, including those that Mattel

20  discovered through its forensic investigations, plus many others that Mattel had not

21  known had been stolen.

22         54.   Based on Machado's "performance" in Mexico, Isaac Larian

23  subsequently promoted Machado and he was transferred to MGA's main office in

24  Van Nuys, California.  On information and belief, Machado currently resides in the

25  County of Los Angeles, California.

26

27

28

EXHIBIT _B_ PAGE _90_

**V.    MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.    On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.    In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
>
> We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

-45-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _6_ PAGE _91_

2154363.2

information is not likely to be kept secret, such as planes, restaurants and elevators. The obligation to preserve confidential information continues even after employment ends.

The Code of Conduct applied to Brawer and required that he meet his obligations under the Code of Conduct.

57. By 2003, Brawer had advanced within Mattel to a Senior Vice President position over customer marketing, a position of trust and confidence. In his executive position, Brawer was provided access to information that was both sensitive and confidential, including, but not limited to, detailed information related to development, manufacture, marketing, pricing, shipping, and performance of Mattel's then-current and anticipated future product lines, and other confidential business plans between Mattel and its most significant retail customers.

58. In December 2003, Alan Kaye, Mattel's Senior Vice President of Human Resources, asked Brawer whether he was discussing potential employment with MGA. Brawer denied that he had been in contact with MGA and represented that he would not talk to MGA. Throughout 2004, Mattel reminded and stressed to its employees, including Brawer, the importance of protecting Mattel's confidential and proprietary materials and information.

59. On March 18, 2004, in response to a survey from the President of Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous protection of it's [sic] intellectual property," reflecting Brawer's clear understanding that Mattel required its proprietary information to be kept confidential.

60. In April 2004, Mattel promoted Brawer to Senior Vice President/General Manager. The General Manager position also is an executive position of trust and confidence. The role of a General Manager is to lead a cross-functional "Customer Business Team." Each General Manager is accountable for a

strategic partnership with a key Mattel retailer, covering all aspects of the business, including both traditional toy sales and retail development of licensed products.

61.   In or about late May 2004, Brawer began performing General Manager duties, working with one of Mattel's major retail customer accounts. Thereafter, Brawer began receiving information related not only to the Senior Vice President, Customer Marketing position that he still formally held, but also began receiving detailed information related to his role as General Manager.  Brawer began requesting and analyzing detailed information related to Mattel and its four key retail accounts.

62.   On September 15, 2004, Brawer left work at noon for observance of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders and other materials.  Several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers and to provide it to him, falsely claiming he needed it for a meeting

63.   On September 17, 2004, Brawer returned to Mattel and immediately informed his supervisor that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.

64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing obligation to preserve the confidentiality of Mattel's proprietary information and trade secrets not only through October 1, 2004, but continuing beyond the termination of his employment.

65.   At his exit interview on September 29, 2004, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment.  Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct.  During the exit interview, however, Brawer noted that he had not signed the Code of Conduct, which he intended and Mattel understood to mean that Brawer believed he was not bound by Mattel's policy

1  because he had not signed it.  Brawer was unwilling to complete or sign the form

2  that sought to confirm that Brawer understood his ongoing obligations under the

3  Code of Conduct, which included the obligation to preserve the confidentiality of

4  Mattel's proprietary and trade secret information.

5        66.    On October 1, 2004, Brawer's final day of employment with

6  Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7  Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8        67.    Upon joining MGA, Brawer became its Executive Vice-

9  President of Sales and Marketing.  In that role he was responsible for MGA's sales

10  worldwide.  As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13        68.    Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel.  That representation was false.  On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return.  Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21        69.    Mattel has recently learned that Brawer has been using that

22  contact information on a regular basis, including within recent months.  Since

23  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

24  and by electronic mail.  Based on his knowledge of Mattel's operations and the

25  roles of certain Mattel employees, he has targeted certain Mattel employees who

26  have broad access to Mattel proprietary information in an effort to induce and

27  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

28  Mattel confidential information and trade secrets.  Brawer has done so by

-48-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _B_ PAGE _94_

1  promising these Mattel employees salaries 25 percent or more higher than they earn

2  at Mattel and stating to them that they should not be concerned by legal action

3  taken by Mattel to protect its trade secrets and its rights because such claims are

4  hard to prove and easy to defeat.

5  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6        70.   In an effort to increase its market share and sales in Canada and

7  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,

8  projects, advertising and strategy, not only for Canada, but the United States and

9  the rest of the world.

10        71.   Janine Brisbois was a Director of Sales for the Girls Division in

11  Canada.  Mattel hired her as a National Account Manager in August 1999.  When

12  she was hired as a Mattel employee, Brisbois agreed that she would preserve and

13  would not disclose Mattel's proprietary or confidential information.  For example,

14  Brisbois agreed:

15        You must keep Mattel's Proprietary Information confidential,

16        and you may only use or disclose such information as necessary

17        to perform your job responsibilities in accordance with Mattel

18        policies.  Your obligation to keep Mattel's Proprietary

19        Information confidential will continue even after any termination

20        of your employment with your employer.

21        . . .

22        Mattel takes steps to maintain the secrecy and confidential nature

23        of Mattel's Proprietary Information and, if a competitor

24        discovered Mattel's Proprietary Information, it could

25        significantly damage Mattel and your Employer.

26        72.   While with Mattel, Brisbois had responsibility for Mattel's

27  account with TRU and later had responsibility for Mattel's Wal-Mart account.  In

28  her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

-49-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT **8**   PAGE **95**

Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

73.   On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA.  Mattel is informed and believes that in that position Brisbois has responsibility for MGA's accounts with both TRU and Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she was "taking anything."  Brisbois responded, "No."  Both during and after her exit interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's confidential and proprietary information.

74.   Mattel is informed and believes that Brisbois spoke with Isaac Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day that she spoke with Mr. Larian and four days before she resigned, Brisbois copied approximately 45 Mattel documents on to a USB or "thumb" drive with the volume label "BACKPACK."  On information and belief, Brisbois removed the thumb drive from Mattel Canada's office by concealing it in her backpack or gym bag the last time that she left that office.  These documents contained Mattel trade secret and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and

2154363.2

-50-
SECOND AMENDED ANSWER AND COUNTERCLAIMS
EXHIBIT  ____  PAGE  ____

- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

75.    After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities. Canadian law enforcement authorities recovered from Brisbois a thumb drive with the volume label "BACKPACK" containing the documents that Brisbois had copied from Mattel's computer system.  Mattel later learned that while she was working as a Vice President of Sales at MGA, Brisbois accessed and modified documents on that thumb drive.

76.    After joining MGA, Brisbois repeatedly traveled to MGA's offices in Van Nuys, California and met with Larian and Brawer.  In February, 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City offices and that at least three MGA employees were under criminal investigation, MGA nonetheless issued a press release trumpeting its 2005 performance, with Larian himself concluding, "Our international teams in Mexico and Canada have done a fantastic job."

**VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA**

77.    In the past few years, MGA has hired directly from Mattel's United States operations at least 25 employees, from Senior Vice-President level to lower level employees.  On information and belief, many of these employees were specifically targeted and recruited by MGA, including by Larian and Brawer, based on the Mattel confidential and proprietary information they could access.  Many of these employees had access to information that Mattel considers to be highly proprietary and confidential.  Mattel believes that some of those former Mattel employees may be observing their obligations not to misappropriate, disclose or use Mattel's confidential and proprietary information.  Mattel is informed and

2154363.2

-51-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _B_ PAGE _97_

believes, however, that certain additional employees accessed, copied and took from Mattel confidential and proprietary information, including Mattel's strategic plans; business operations, methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins; and customer requirements. The misappropriated confidential and proprietary information included information that these Mattel employees were not authorized to access. On information and belief, the misappropriated confidential and proprietary information taken from Mattel is being disclosed to and used by MGA for the benefit of MGA and to the detriment of Mattel.

## VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT MATTEL'S PRODUCTS

78.    Counter-defendants have engaged in other illegal practices in their efforts to compete unfairly with Mattel. Larian has a practice of sending e-mail messages to a "Bratz News" distribution list that Larian created or that was created for him. Mattel is informed and believes that the recipients of e-mail messages sent to the "Bratz News" distribution list include members of the media as well as representatives of many of Mattel's most significant customers.

79.    On May 12, 2006, Larian sent an e-mail message to the "Bratz News" distribution list that included a reference to Mattel's updated MY SCENE MY BLING BLING product with real gems. Mattel had not publicly announced this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel had guarded the identification of this particular product.

80.    Shortly thereafter, Larian engaged in a campaign of calling Mattel's most significant customers, including but not limited to Target and TRU, regarding the MY SCENE MY BLING BLING product with real gems. In an effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING BLING product with real gems, Larian knowingly made false factual statements about that product to each retailer. As of the writing of this Second Amended

2154363.2

-52-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 8  PAGE 98

Answer and Counterclaims, Mattel is aware that Larian represented to each retailer that each was the only retailer to purchase the product and that Mattel would not be supporting the product with television advertising. At the time that Larian made these statements, he knew them to be false. As a result of Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units of the MY SCENE MY BLING BLING product with real gems. Only after Mattel learned of Larian's misrepresentations and was able to correct them was Mattel able to assure the retailer that Larian's representations were false and to persuade the retailer to reinstate the order.

81.    Such conduct is not an isolated incident. MGA and Larian, in an effort to gain an unfair competitive advantage, repeatedly issued false and misleading press releases. In these press releases, MGA and Larian have misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market share of Mattel's BARBIE products.

## CLAIMS FOR RELIEF

### First Counterclaim

### Copyright Infringement

### (Against MGA, MGA Entertainment (HK) Limited, Larian, Bryant and Does 4 through 10)

82.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 81, above, as though fully set forth at length.

83.    Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel. These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-

-53-

2154363.2

1   378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-

2   378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

3          84.   Counter-defendants have reproduced, created derivative works

4   from and otherwise infringed upon the exclusive rights of Mattel in its protected

5   works without Mattel's authorization.  Counter-defendants' acts violate Mattel's

6   exclusive rights under the Copyright Act, including without limitation Mattel's

7   exclusive rights to reproduce its copyrighted works and to create derivative works

8   from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

9          85.   Counter-defendants' infringement (and substantial contributions

10  to the infringement) of Mattel's copyrighted works is and has been knowingly made

11  without Mattel's consent and for commercial purposes and the direct financial

12  benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately

13  failed to exercise their right and ability to supervise the infringing activities of

14  others within their control to refrain from infringing Mattel's copyrighted works

15  and have failed to do so in order to deliberately further their significant financial

16  interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-

17  defendants have engaged in direct, contributory and vicarious infringement of

18  Mattel's copyrighted works.

19         86.   By virtue of defendants' infringing acts, Mattel is entitled to

20  recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of

21  suit and attorneys' fees, and all other relief permitted under the Copyright Act.

22         87.   Counter-defendants' actions described above have caused and

23  will continue to cause irreparable damage to Mattel, for which Mattel has no

24  remedy at law.  Unless Counter-defendants are restrained by this Court from

25  continuing their infringement of Mattel's copyrights, these injuries will continue to

26  occur in the future.  Mattel is accordingly entitled to injunctive relief restraining

27  Counter-defendants from further infringement.

28

2154363.2

-54-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __6__ PAGE __100__

## Second Counterclaim

### Violation of the Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. §§ 1962(c) and 1964(c)
### (Against All Counter-defendants)

88.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.   Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise").  The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).  In addition, beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, were employed by and associated-in-fact with a second enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "Bratz Criminal Enterprise").

90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by

-55-
SECOND AMENDED ANSWER AND COUNTERCLAIMS
EXHIBIT _B_ PAGE _101_

means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the MGA Criminal Enterprise's affairs and, in the case of MGA, MGA Entertainment (HK) Limited, Larian, Bryant, and certain of the Doe Counter-defendants, the Bratz Criminal Enterprise's affairs, through a pattern of racketeering activity. Their actions include multiple, related acts in violation of: 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

91.    MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, shared the common purpose of enabling MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in order to assist MGA in illegally competing with Mattel domestically and throughout the world.

92.    The MGA Criminal Enterprise and Bratz Criminal Enterprise as described herein are and have been at all relevant times continuing enterprises because, among other reasons, each is designed to and did unlawfully acquire the confidential business information and property of Mattel and incorporated this information and property into MGA's ongoing business, marketing strategies and business methods, practices and processes. The conduct of each enterprise continues through the date of this Second Amended Answer and Counterclaims and is ongoing by virtue of MGA's continuing use of Mattel's information and property, all to the detriment of Mattel.

93.    The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity. This activity consists of multiple acts of

1  racketeering by each member of the MGA Criminal Enterprise and Bratz Criminal

2  Enterprise, is interrelated, not isolated and is perpetrated for the same or similar

3  purposes by the same persons.  This activity extends over a substantial period of

4  time, up to and beyond the date of this Second Amended Answer and

5  Counterclaims.  These activities occurred after the effective date of 18 U.S.C.

6  §§ 1961 *et seq.,* and the last such act occurred within 10 years after the commission

7  of a prior act of racketeering activity.  These racketeering activities included

8  repeated acts of:

9       (a)   Mail Fraud:  Counter-defendants MGA, MGA Entertainment

10               (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and

11               Does 4 through 10, aided and abetted by each other and some or

12               all of the remaining members of the MGA Criminal Enterprise,

13               having devised a scheme or artifice to defraud Mattel of its

14               confidential trade secret information and property by conversion,

15               false representations, concealment and breaches of fiduciary duty,

16               did for the purpose of furthering and executing such a scheme or

17               artifice to defraud, deposited or caused to be deposited matters or

18               things to be sent or delivered by the Postal Service, or any private

19               or commercial interstate carrier, or took or received matters or

20               things therefrom, or knowingly caused matters or things to be

21               delivered by mail or such carrier according to the direction

22               thereon, or at the place at which it is directed to be delivered by

23               the person to whom it is addressed, in violation of 18 U.S.C.

24               § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in

25               the foregoing paragraphs and as evidenced by, among other

26               things, the true and correct copies of communications and other

27               evidence included in Exhibit C;

28

2154363.2

-57-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _B_ PAGE _103_

(b)   Wire Fraud:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as evidenced by, among other things, the true and correct copies of communications and other evidence included in Exhibit C;

(c)   Tampering With a Witness, Victim or Informant:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal more than one record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, including this action, including without limitation by:

      i.   altering Bryant's contract with MGA relating to Bratz to conceal evidence that Bryant faxed the contract from the BARBIE COLLECTIBLES department of Mattel, using a fax

-58-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __B__ PAGE _104_

machine owned by Mattel and while Bryant was employed by Mattel;

     ii.    altering numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings even though the drawings were not created in August 1998; and

     iii.    destroying electronic and other evidence, including by destroying evidence previously contained on Carter Bryant's and Isaac Larian's computer hard drives.

Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d)    <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e)    <u>Criminal Copyright Infringement</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT **6** PAGE 105

2154363.2

each other and some or all of the remaining members of the MGA Criminal Enterprise, willfully infringed Mattel's copyrights, including with respect to documents containing Mattel trade secret and confidential information, for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater particularity in the foregoing paragraphs.

94.    The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, MGA, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group.

95.    MGA had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf.  MGA also attempted to benefit, and did benefit, from the activity of its employees and agents alleged herein, and thus was not a passive victim of racketeering activity, but an active perpetrator.

96.    Mattel has been injured in its business or property as a direct and proximate result of the Counter-defendants' and the other enterprise members' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

97.    As a result of the violations of 18 U.S.C. § 1962(c), by MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, Brawer, Trueba, Vargas, Brisbois and the Other Former Employees, Mattel has suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys, fees, incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(c).

### Third Counterclaim

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Counter-defendants)**

98.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 97, above, as though fully set forth at length.

99.    Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

100.    These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.  In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

101.    The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

1   U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

2   18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

3   racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

4   acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

5   U.S.C. § 506(a)(1)(A).

6          102.  Counter-defendants and the other members of the MGA Criminal

7   Enterprise schemed to defraud Mattel and steal its property and trade secret

8   information by means of false representation, breaches of fiduciary duty,

9   conversation and concealment, as more fully set forth in the foregoing paragraphs.

10         103.  In furtherance of this unlawful conspiracy, and to effect its

11  objectives, Counter-defendants and various co-conspirators committed numerous

12  overt acts, including but not limited to those set forth in the foregoing paragraphs.

13         104.  Mattel has been injured in its business or property as a direct and

14  proximate result of the Counter-defendants' and the other enterprise members'

15  violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts

16  constituting the pattern of racketeering activity.

17         105.  As a result of the conspiracies between and among all Counter-

18  defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has

19  suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18

20  U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

21  compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

22  of Counter-defendants' violations of 18 U.S.C. § 1962(d).

23                      **Fourth Counterclaim**

24                **Misappropriation of Trade Secrets**

25        **(Against Counter-defendants MGA, MGA de Mexico,**

26             **Larian, Machado and Does 4 through 10)**

27         106.  Mattel repeats and realleges each and every allegation set forth in

28  paragraphs 1 through 105, above, as though fully set forth at length.

2154363.2

-62-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 6    PAGE 108

107. As used herein, "Trade Secret Material" shall mean the documents, materials and information stolen by Machado, Trueba, Vargas, Brisbois, the Other Former Employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants, the Trade Secret Materials gave Mattel a significant competitive advantage over its existing and would-be competitors, including MGA. This advantage, as to MGA, has now been compromised as a result of Counter-defendants' unlawful activities.

108. Mattel made reasonable efforts under the circumstances to maintain the confidentiality of the Trade Secret Materials, including by having employees and consultants who may have access the Trade Secret Materials sign confidentiality agreements that oblige them not to disclose the Trade Secret Materials or characteristics of the Trade Secret Materials; by limiting the circulation of said materials within Mattel; by protecting and limiting access to computers with log-in identifications and passwords; by limiting each employee's access to electronic files to those that the particular employee needs to access; by educating employees on the nature of Mattel's information that is confidential and proprietary; and by reminding employees on a regular and periodic basis of their obligation to protect and maintain Mattel's confidential and proprietary information.

109. Mattel's Trade Secret Materials derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

110. Counter-defendants have illegally obtained the trade secret materials, as set forth above, and through other means of which Mattel is presently unaware.

111. Counter-defendants have used and disclosed Mattel's Trade Secret Materials without Mattel's consent and without regard to Mattel's rights, and

-63-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT B PAGE 109

2154363.2

1   without compensation, permission, or licenses for the benefit of themselves and

2   others.

3        112. Counter-defendants' conduct was, is, and remains willful and

4   wanton, and was taken with blatant disregard for Mattel's valid and enforceable

5   rights.

6        113. Counter-defendants' wrongful conduct has caused and, unless

7   enjoined by this Court, will continue in the future to cause irreparable injury to

8   Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel

9   is therefore entitled to a permanent injunction restraining and enjoining Counter-

10  defendants, and each of them, as well as their agents, servants, and employees, and

11  all persons acting thereunder, in concert with, or on their behalf, from further using

12  in any manner Mattel's trade secrets.

13       114. In addition, as a proximate result of Counter-defendants'

14  misconduct, Mattel has suffered actual damages, and Counter-defendants have been

15  unjustly enriched.

16       115. The aforementioned acts of the Counter-defendants were willful

17  and malicious, including in that Counter-defendants misappropriated Mattel's trade

18  secrets with the deliberate intent to injure Mattel's business and improve their own.

19  Mattel is therefore entitled to enhanced damages. Mattel is also entitled to

20  reasonable attorney's fees.

21                      **Fifth Counterclaim**

22                      **Breach of Contract**

23                      **(Against Bryant)**

24       116. Mattel repeats and realleges each and every allegation set forth in

25  paragraphs 1 through 115, above, as though fully set forth at length.

26       117. Pursuant to his Employment Agreement, Bryant agreed that he

27  would not, without Mattel's express written consent, engage in any employment or

28  business other than for Mattel or assist in any manner any business competitive

2154363.2

-64-

EXHIBIT __6__ PAGE __110__

1    with the business or future business plans of Mattel during his employment with
2    Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further assigned to
3    Mattel all right, title and interest in "inventions," including without limitation
4    "designs" and other works that he conceived, created or reduced to practice during
5    his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire,
6    Bryant certified that, other than as disclosed, he had not worked for any competitor
7    of Mattel and had not engaged in any business venture or transaction involving a
8    Mattel competitor that could be construed as a conflict of interest.  Bryant further
9    promised that he would notify his supervisor immediately of any change in his
10   situation that would cause him to change any of the foregoing certifications or
11   representations.

12        118.  The Employment Agreement and the Conflict Questionnaire are
13   valid, enforceable contracts, and Mattel has performed each and every term and
14   condition of the Employment Agreement and Conflict Questionnaire required to be
15   performed by Mattel.

16        119.  Bryant materially breached the foregoing contracts with Mattel,
17   in that, among other things, he secretly aided, assisted and worked for a Mattel
18   competitor during his employment with Mattel without the express written consent
19   of Mattel.

20        120.  As a consequence of Bryant's breach, Mattel has suffered and
21   will, in the future, continue to suffer damages in an amount to be proven at trial.
22   Such damages include, without limitation, the amounts paid by the competitor to
23   Bryant during his Mattel employment; the amounts paid by MGA to Bryant during
24   his Mattel employment; the amount that Mattel paid Bryant during the time he
25   wrongfully worked with MGA; the value of information and intellectual property
26   owned by Mattel which Bryant provided to MGA; the value of the benefits that
27   MGA obtained from Bryant during the time he was employed by Mattel; and the
28

2154363.2

-65-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT  B  PAGE  111

1    value of the benefits that MGA obtained from Bryant as a result of the work he

2    performed for or with MGA during his Mattel employment.

3         121. Bryant's conduct has caused, and unless enjoined will continue to

4    cause, irreparable injury to Mattel that cannot be adequately compensated by

5    money damages and for which Mattel has no adequate remedy at law.  Bryant

6    specifically acknowledged in his Employment Agreement that his breach of the

7    Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

8    entitled to injunctive relief to enforce this Agreement, in addition to damages and

9    other available remedies."  Accordingly, Mattel is entitled to orders mandating

10   Bryant's specific performance of his contracts with Mattel and restraining Bryant

11   from further breach.

12                          **Sixth Counterclaim**

13                **Intentional Interference with Contract**

14           **(Against MGA, Larian and Does 4 through 10)**

15        122. Mattel repeats and realleges each and every allegation set forth in

16   paragraphs 1 through 121, above, as though fully set forth at length.

17        123. Valid agreements existed between Mattel and Bryant, Brawer,

18   Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,

19   the "Mattel Employees")

20        124. At all times herein mentioned, MGA, Larian and Does 4 through

21   10 knew that the Mattel Employees had a duty under their agreements not to work

22   for or assist any competitor of Mattel, such as MGA.  In addition, at all times

23   mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had

24   assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

25   designs and other works, created, conceived or reduced to practice during their

26   employment with Mattel.

27

28

-66-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _B_ PAGE _112_

125. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

126. As a direct and proximate result of Counter-defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

127. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128. Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Seventh Counterclaim
### Breach of Fiduciary Duty
### (Against Bryant and Machado)

129. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties. In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel. They confirmed their relationship of trust with Mattel in respective employee agreements. Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests

1  or that would deprive Mattel of any opportunities, profit or advantage which Bryant
2  or Machado might bring to Mattel.

3       131. Bryant breached his fiduciary duty to Mattel in that, while
4  employed by Mattel, he secretly aided and assisted a competitor of Mattel,
5  including without limitation by entering into an agreement with a Mattel
6  competitor. As alleged above, Bryant also breached the aforementioned duty by
7  using Mattel property and resources for the benefit of, and to aid and assist, himself
8  personally and MGA.

9       132. Machado breached his fiduciary duty to Mattel, in that while
10 employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
11 among other things, misappropriating Mattel trade secret and proprietary
12 information and providing said information to officers of MGA. Machado also
13 breached the aforementioned duty by using Mattel property and resources for the
14 benefit of, and to aid and assist, himself personally and MGA.

15      133. As a direct and proximate result of Counter-defendants' wrongful
16 conduct, Mattel has incurred damages in an amount to be determined at trial.

17      134. Counter-defendants acted with malice, fraud and oppression, and
18 in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
19 award of exemplary damages against Counter-defendants in an amount to be
20 determined at trial.

21      135. Furthermore, Counter-defendants' conduct has caused, and unless
22 enjoined will continue to cause, irreparable injury to Mattel that cannot be
23 adequately compensated by money damages and for which Mattel has no adequate
24 remedy at law. Accordingly, Mattel is entitled to an order restraining further
25 breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants
26 from continuing to benefit from such breach.

27
28

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __B__ PAGE __114__

## Eighth Counterclaim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

136. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA.

138. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) held positions of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to taking confidential trade secret information from Mattel's premises and providing that information to a competitor.

139. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their fiduciary duties to Mattel, knowing that their conduct would constitute breaches of their fiduciary duties to Mattel.

140. As a direct and proximate result of Counter-defendants' efforts, the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has incurred damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

EXHIBIT _6_ PAGE _115_

1    141. In taking the aforesaid actions, MGA, Larian and Does 4 through
2  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's
3  rights. Accordingly, Mattel is entitled to recover exemplary damages from
4  Counter-defendants in an amount to be determined at trial.

5                        **Ninth Counterclaim**
6                      **Breach of Duty of Loyalty**
7                   **(Against Bryant and Machado)**

8    142. Mattel repeats and realleges each and every allegation set forth in
9  paragraphs 1 through 141, above, as though fully set forth at length.

10   143. As employees of Mattel, Bryant and Machado owed a duty of
11 undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not
12 compete with Mattel or assist a competitor of Mattel during their employment with
13 Mattel. Pursuant to this duty, Bryant and Machado were required to always give
14 preference to Mattel's business over their own, similar interests during the course of
15 their employment with Mattel.

16   144. Bryant and Machado breached their duty of loyalty to Mattel in
17 that, while employed by Mattel, they secretly aided, assisted and worked for a
18 competitor of Mattel, including without limitation by entering into agreements with
19 a Mattel competitor. As alleged above, they also breached the aforementioned duty
20 by using Mattel property and resources for the benefit of, and to aid and assist,
21 themselves personally and the competitor of Mattel.

22   145. As a direct and proximate result of Counter-defendants' wrongful
23 conduct, Mattel has incurred damages in an amount to be determined at trial.

24   146. Counter-defendants acted with malice, fraud and oppression, and
25 in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
26 award of punitive damages against Counter-defendants in an amount to be
27 determined at trial.

28

2154363.2

-70-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _8_ PAGE _116_

1          147. Furthermore, Counter-defendants' conduct has caused, and unless

2  enjoined will continue to cause, irreparable injury to Mattel that cannot be

3  adequately compensated by money damages and for which Mattel has no adequate

4  remedy at law. Accordingly, Mattel is entitled to an order restraining further

5  breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-

6  defendants from continuing to benefit from such breach.

7         148. In breaching their duty of loyalty to Mattel, Bryant and Machado

8  acted with malice, fraud and oppression, and in conscious disregard of Mattel's

9  rights. Accordingly, Mattel is entitled to recover exemplary damages from

10  Counter-defendants in an amount to be determined at trial.

11         **Tenth Counterclaim**

12      **Aiding and Abetting Breach of Duty of Loyalty**

13      **(Against MGA, Larian and Does 4 through 10)**

14        149. Mattel repeats and realleges each and every allegation set forth in

15  paragraphs 1 through 148, above, as though fully set forth at length.

16        150. MGA, Larian and Does 4 through 10 knew that Bryant, as an

17  employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and

18  Does 4 through 10 knew that this duty included an obligation on the part of Bryant

19  not to compete with Mattel or assist a competitor of Mattel during the term of his

20  employment with Mattel. MGA, Larian and Does 4 through 10 also knew that

21  Bryant was required to give preference to Mattel's business over his own, similar

22  interests or those of Mattel's competitors. or those of Mattel's competitors during

23  the course of his employment with Mattel.

24        151. MGA, Larian and Does 4 through 10 knew that the Mattel

25  Employees (excluding Bryant) were employed by Mattel, and, as employees of

26  Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4

27  through 10 knew that these duties included an obligation on the part of the Mattel

28

1    Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

2    Mattel during their Mattel employment.

3           152.  Despite such knowledge, Counter-defendants MGA, Larian and

4    Does 4 through 10 intentionally and without justification solicited, encouraged,

5    aided and abetted and gave substantial assistance to the Mattel Employees to

6    breach their duties of loyalty to Mattel, knowing that their conduct would constitute

7    breaches of their duties of loyalty to Mattel.

8           153.  As a further consequence of Counter-defendants' efforts, Mattel

9    has suffered injury and is entitled to compensatory damages in an amount to be

10   proven at trial.

11          154.  In taking the aforesaid actions, MGA, Larian and Does 4 through

12   10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

13   rights.  Accordingly, Mattel is entitled to recover exemplary damages from

14   Counter-defendants in an amount to be determined at trial.

15                          **Eleventh Counterclaim**

16                               **Conversion**

17                      **(Against All Counter-defendants)**

18          155.  Mattel repeats and realleges each and every allegation set forth in

19   paragraphs 1 through 154, above, as though fully set forth at length.

20          156.  Counter-defendants wrongfully converted Mattel property and

21   resources by appropriating and using them for their own benefit and gain and for

22   the benefit and gain of others, without the permission of Mattel.

23          157.  Mattel was entitled to, among other things, the exclusive right

24   and enjoyment in property and tangible materials owned by Mattel, including

25   without limitation such proper and materials that were created by Bryant while he

26   was a Mattel product designer.  Such property was taken by Bryant from Mattel to

27   further his own interests and, in at least some instances, provided by Bryant to

28   Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

-72-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _B_ PAGE _118_

1    158. In addition, Counter-defendants wrongfully converted Mattel's

2 property by removing the Trade Secret Materials in electronic and paper form from

3 Mattel's offices. Counter-defendants did so without Mattel's permission and

4 continue to possess them.

5    159. As a direct and proximate result of Counter-defendants' wrongful

6 conversion of Mattel property, including those relating to Bratz and Mattel's Trade

7 Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to

8 recover compensatory damages in an amount to be determined at trial.

9    160. As a result of Counter-defendants' acts of conversion, Mattel is

10 entitled to damages in an amount sufficient to indemnify Mattel for the loss

11 suffered, which is not measured by the value of the property misappropriated, but

12 includes the lost profits that Mattel suffered as a result of the conversion or,

13 alternatively, the profits generated by the Counter-defendants that would not have

14 been generated but for the conversion. Only such a measure of damages would

15 fully and fairly compensate Mattel for the injury it suffered due to Counter-

16 defendants' acts of conversion.

17    161. Counter-defendants performed the aforementioned conduct with

18 malice, fraud and oppression, and in conscious disregard of Mattel's rights.

19 Accordingly, Mattel is entitled to recover exemplary damages from Counter-

20 defendants in an amount to be determined at trial.

21    162. Furthermore, Counter-defendants' conduct has caused, and unless

22 enjoined will continue to cause, irreparable injury to Mattel that cannot be

23 adequately compensated by money damages and for which Mattel has no adequate

24 remedy at law. Accordingly, Mattel is entitled to an order restraining Counter-

25 defendants from further conversion of Mattel property and resources and/or

26 restraining Counter-defendants from continuing to benefit from such conversion.

27

28

2154363.2

-73-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 6   PAGE 119

### Twelfth Counterclaim

**Unfair Competition**

**(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

**(Against All Counter-defendants)**

163.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164.  Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165.  By engaging in the foregoing conduct, Counter-defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.*  Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166.  As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial.  No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining Counter-defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

## Thirteenth Counterclaim

### Declaratory Relief

### (Against All Counter-defendants)

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and Counter-defendants regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1. For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived,

2154363.2

1  created or reduced to practice by Bryant during the term of his Mattel employment

2  and/or by any others then-employed by Mattel, as well as in all derivatives

3  prepared therefrom, and that Mattel is the true owner of the foregoing;

4       2.    For a declaration that any agreement between Bryant, on the one

5  hand, and MGA or any person or entity, on the other hand, in which Bryant

6  purported to assign any right, title or interests in any work that he conceived,

7  created or reduced to practice while a Mattel employee, including but not limited to

8  the Bratz designs, is void and of no effect;

9       3.    For an Order enjoining and restraining Counter-defendants, their

10  agents, servants and employees, and all persons in active concert or participation

11  with them, from further wrongful conduct, including without limitation from

12  imitating, copying, distributing, importing, displaying, preparing derivatives from

13  and otherwise infringing Mattel's copyright-protected works;

14       4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other

15  applicable law, impounding all of Counter-defendants' products and materials that

16  infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

17  by which copies of the works embodied in Mattel's copyrights may be reproduced

18  or otherwise infringed;

19       5.    For an Order mandating that Counter-defendants return to Mattel

20  all tangible items, documents, designs, diagrams, sketches or any other

21  memorialization of inventions created or reduced to practice during Bryant's

22  employment with Mattel as well as all Mattel property converted by Counter-

23  defendants;

24       6.    For an Order mandating specific performance by Bryant to

25  comply with and satisfy Bryant's contractual obligations to Mattel;

26       7.    That Mattel be awarded, and Counter-defendants be ordered to

27  disgorge, all payments, revenues, profits, monies and royalties and any other

28  benefits derived or obtained as a result of the conduct alleged herein, including

21543632

-76-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _B_ PAGE _122_

1    without limitation of all revenues and profits attributable to Counter-defendants'

2    infringement of Mattel's copyrights under 17 U.S.C. § 504;

3         8.    For an accounting of all profits, monies and/or royalties from the

4    exercise of ownership, use, distribution, sales and licensing of Bratz;

5         9.    For the imposition of a constructive trust over Bratz, including

6    without limitation registrations and applications for registrations relating thereto

7    made or filed by Counter-defendants and third parties, and all profits, monies,

8    royalties and any other benefits derived or obtained from Counter-defendant's

9    exercise of ownership, use, sale, distribution and licensing of Bratz;

10        10.    That Mattel recover its actual damages and lost profits;

11        11.    That Counter-defendants be ordered to pay exemplary damages

12   in a sum sufficient to punish and to make an example of them, and deter them and

13   others from similar wrongdoing;

14        12.    That Counter-defendants be ordered to pay treble its general and

15   special damages, plus interest, costs and attorney's fees incurred by reason of

16   Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

17        13.    That Counter-defendants be ordered to pay double damages due

18   to their willful and malicious misappropriation of Mattel's trade secrets with

19   deliberate intent to injure Mattel's business and improve its own;

20        14.    That Counter-defendants pay to Mattel the full cost of this action

21   and Mattel's attorneys' and investigators' fees; and

22

23

24

25

26

27

28

2154363.2

-77-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __B__ PAGE 123

1          15.    That Mattel have such other and further relief as the Court may

2    deem just and proper.

3

4    DATED:  July 12, 2007                QUINN EMANUEL URQUHART OLIVER &
                                          HEDGES, LLP
5

6                                         By_____
7                                            John B. Quinn
                                             Attorneys for Defendant and Counter-
8                                            claimant Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-78-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _B_ PAGE _124_

## DEMAND FOR JURY TRIAL

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  July 12, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By_____
John B. Quinn
Attorneys for Defendant and Counter-claimant Mattel, Inc.

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___B___ PAGE |25|

2154363.2