1    Furthermore, many of these overbroad requests seek publicly available information that is

2    readily accessible to Mattel for which Larian should not be burdened.  To the extent the requested

3    documents and information are not publicly available, such documents and information are

4    marginally, if at all, relevant because they are not likely to have caused Mattel compensable harm.

5    In either case, the burden and expense of searching for and producing responsive documents are

6    unjustified.

7

8    Communications With Mattel Employees: Request No. 198

9        In Request No. 198, Mattel seeks all communications between Larian and any individual

10   while the individual was employed by Mattel.  Mattel contends that this request is directly

11   relevant to Mattel's claims of trade secret theft, and that the relevancy outweighs any purported

12   burden of production.

13       Larian contends that the request is overbroad and unduly burdensome because it is

14   unrestricted as to time and subject matter.  Larian also points out that the court has previously

15   found a similar request overbroad.  Larian further contends that employees in the toy industry are

16   likely to maintain contacts with other toy manufacturers, and that a large corporation such as

17   Mattel is likely to have a high number of employees communicating with MGA or its officers,

18   which makes the request more unduly burdensome and unreasonable than it appears on its face.

19       Unlike other requests regarding communications, Request No. 198 is reasonably tailored

20   to the specific and numerous allegations in the case regarding alleged trade secret theft.  Although

21   the request is not limited by subject matter, it is limited in other respects to seek relevant

22   documents without imposing an undue burden.  The request is limited to communications

23   between Larian (and not MGA or persons acting on his behalf) and individuals employed at

24   Mattel.  The request is also limited to only those communications that took place while the

25   individuals were employed at Mattel.

26       Nevertheless, an additional temporal limit is appropriate to tailor the request to Mattel's

27   allegations of trade secret theft.  The alleged trade secret theft began with Bryant's conduct in

28   1999 and continued to 2005.  Accordingly, Larian shall produce documents responsive to Request

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                    14

EXHIBIT __H__ PAGE __183__

1  No. 198 that are limited to the time frame 1999 to 2005.

2

3  <u>Personal Financial Data:  Request Nos. 207-209 and 269</u>

4       In Request No. 207, Mattel seeks documents sufficient to identify each of Larian's banks

5  or financial institutions and other banking relationships since January 1, 1999.  In Request No.

6  208, Mattel seeks documents sufficient to establish Larian's gross income and sources for such

7  income for each year from 1999 to the present.  In Request No. 209, Mattel seeks Larian's federal

8  and state tax returns for each year from 1999 to the present.  In Request No. 269, Mattel seeks

9  documents sufficient to show or calculate Larian's net worth on a yearly basis for each year from

10  1999 to the present.

11       Mattel contends that Request No. 207 seeks information reasonably calculated to lead to

12  information showing the timing of payments to Bryant and others, which in turn is relevant to the

13  timing of the development of Bratz and issues of credibility.  Mattel contends that Request Nos.

14  208-209 and 269 seek non-privileged information that is directly relevant to Larian's financial

15  condition, which in turn is relevant to damages.  Further, Mattel contends that it is entitled to

16  information regarding the sources of Larian's income to determine whether they are attributable

17  to the alleged misconduct and thus subject to disgorgement.

18       Larian contends that the requested personal financial information is not relevant to the

19  claims or defenses at issue.  More specifically, Larian contends that neither the names of his

20  banks nor his gross income have any bearing upon either compensatory or punitive damages or

21  Mattel's claim for disgorgement of profits.  Larian further contends that there is no support for

22  Mattel's supposition that Larian has siphoned off MGA assets for his own personal benefit.

23       Larian also contends that all three of the requests overlap substantially with requests

24  Mattel previously propounded upon MGA, and that Mattel has failed to justify the duplication or

25  burden posed by these requests to him.  Further, Larian contends that the court has previously

26  found that Mattel was not entitled to obtain tax returns from Bryant, and that Mattel has offered

27  no reason why the same result should not apply here.

28       Mattel's motion to compel responses to Request Nos. 207-208 and 269 is granted.  The

EXHIBIT _H_ PAGE _184_

1  requests are reasonably calculated to lead to the discovery of admissible evidence relevant to
2  several issues in the case.  For example, the requested information is likely to lead to information
3  regarding payments from Larian to Bryant, which is relevant to, among other things, the timing of
4  the creation of Bratz.  The requested information is also likely to show Larian's income and net
5  worth, which are relevant to damages.  Further, Larian has failed to establish that the requests are
6  unduly burdensome.  Although Mattel has sought and obtained broad discovery of financial
7  information from MGA, Mattel is also entitled to seek financial information directly from Larian.

8    Mattel's motion is denied as to Request No. 209, provided that Larian complies with
9  Request Nos. 207, 208 and 269.  In light of the discovery of financial information ordered herein
10 and other requests propounded to MGA, Mattel has not shown a compelling need for Larian's tax
   returns.
11

12 Storage Devices:  Request Nos. 222 and 224
13
14    In Request Nos. 222 and 224, Mattel seeks digital storage devices and documents relating
15 to digital storage devices used by Larian to create, prepare, generate, copy, transmit, receive,
16 delete or modify digital information relating to Bratz, Angel, or Bryant.  Mattel contends that a
17 request for documents under Rule 34, Fed.R.Civ.P., operates as a request for documents stored in
18 electronic form.  Mattel also contends that Rule 34 permits a party to obtain and test computer
   hard drives and other storage devices.
19
20    Larian contends that the requests are overbroad, unduly burdensome, duplicative, and
21 ignore his privilege and privacy interests.  Larian also objects to an inspection of his actual hard
22 drives or other storage devices based upon the Committee Note to Rule 34, Fed.R.Civ.P., which
23 states that the amendment of Rule 34 relating to "electronically stored information is not meant to
24 create a routine right of direct access to a party's electronic information system."  See
25 Fed.R.Civ.P. 34(a)(1), 2006 Adv. Comm. Notes.  Larian contends that there is no justification for
26 an inspection of his electronic devices because there is no allegation that he improperly deleted
   documents.
27
    Mattel's motion to compel documents responsive to Request Nos. 222 and 224 is denied.
28

Bryant v. Mattel, Inc.,                                                          16
CV-04-09049 SGL (RNBx)

EXHIBIT  H  PAGE  185

1   With respect to Request No. 222, Larian correctly notes that Rule 34 was not intended to

2   authorize the routine production of a party's electronic devices.  Mattel attempts to justify

3   Request No. 222 by pointing to various instances of alleged destruction of evidence.  See Mattel's

4   Consolidated Separate Statement at pp. 203-204 (purported destruction of Larian's computer

5   laptops; "wiping" information from the hard drives of Larian's computer laptops every six

6   months; redacting "Barbie Collectibles" from a faxed version of Bryant's Bratz agreement; and

7   destructive testing of Bryant's original Bratz drawings).  However, Mattel fails to explain how

8   these alleged instances of evidence destruction justify Request No. 222, other than to assert that it

9   has a right to inspect Larian's storage devices to ensure that relevant information has not been

10   deleted or permanently destroyed.  Mattel's stated purpose suggests instead that Mattel is

11   launching a fishing expedition in pursuit of new claims, which is not permitted by the Federal

12   Rules of Civil Procedure.  See e.g. Rivera v. NIBCO, Inc., supra.  Furthermore, Mattel's stated

13   purpose for inspecting Larian's storage devices does not justify the breadth of Request No. 222.

14   Among other things, Request No. 222 encompasses every storage device that Larian has used to

15   copy digital information relating to Bratz.  Mattel does not need every CD and DVD containing

16   copies of Bratz-related video and audio content, but that is what the request seeks.

        Request No. 222 is also duplicative because it requests information that is sought in

17   numerous other requests served on Larian as well as MGA.  Mattel has served hundreds of

18   requests for documents and communications relating to Bratz, Angel, and Bryant.  To comply

19   with the requests, Larian was required to search for documents in both hard-copy and electronic

20   form.  Under the circumstances, it is unnecessary for Larian to also produce the requested storage

21   devices.

22        Documents responsive to Request No. 224 are minimally relevant (if at all) to the claims

23   and defenses in the case, and therefore do not justify the burden of production on Larian.

24
25   Bryant's Storage Devices:  Request Nos. 225, 227 and 228

        In Request Nos. 225, 227 and 228, Mattel seeks digital storage devices and documents

26   relating to digital storage devices used by Bryant to create, prepare, generate, copy, transmit,

27
28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                                    17

1   receive, delete or modify digital information relating to Bratz, Angel, or MGA.

2       Larian contends that the requests are improperly directed to him because he does not have

3   personal possession of Bryant's hard drive or storage devices, or other information about those

4   devices.  Mattel's Consolidated Separate Statement at p. 206.  Larian also contends that the

5   requests are overbroad and unduly burdensome for the reasons discussed above in connection

6   with Request Nos. 222 and 224.

7       Mattel's motion to compel documents responsive to Request Nos. 225, 227 and 228 is

8   denied for the reasons already discussed in connection with Request Nos. 222 and 224.

9

10   <u>MGA Hong Kong and MGA Mexico:  Request Nos. 272 and 273</u>

11       In Request Nos. 272 and 273, Mattel seeks documents relating to the ownership of MGA

12   Entertainment HK Ltd. ("MGA Hong Kong") and MGAE de Mexico S.r.l. de C.V. ("MGA

13   Mexico"), both of which are named defendants.  In his supplemental responses, Larian agrees to

14   produce documents sufficient to show the ownership of these entities.

15       Mattel contends that the requests seek information relevant to refute MGA Mexico's

16   personal jurisdiction defense, and which bear on whether the acts of Larian and others are

17   attributable to the entities.  Mattel also contends that Larian's (or MGA's ) ownership interest in

18   these companies is relevant to net worth.  Mattel contends that Larian's supplemental response is

19   inadequate because it would allow Larian to withhold contradictory information and conceal the

20   true ownership of the business entities.  Furthermore, Mattel contends that it is entitled to know

21   the ownership of these entities at times when different allegedly wrongful acts took place and to

22   determine if the ownership structure changed as a means of concealing assets or concealing the

23   payments of commercial bribes.

24       Larian contends that these requests should not be made to him, but to the entities

25   themselves or to MGA.  Further, Larian contends that the requests are duplicative of a request

26   Mattel served on MGA Mexico, another request served on MGA Hong Kong, and another request

27   served on MGA.  Moreover, Larian contends that the requests are overbroad and unduly

28   burdensome, and that at most, he should only have to produce a list of owners.

EXHIBIT __H__  PAGE __187__

1    Mattel contends that Larian cannot avoid his duty to respond to these requests simply by
2    saying that the information is obtainable from another source.  Further, Mattel contends that
3    Larian has failed to establish that the requests are unduly burdensome.
4    Mattel's motion to compel documents responsive to Request Nos. 272-273 is denied
5    pursuant to Rule 26(b)(2), Fed.R.Civ.P., because the requested information is clearly obtainable
6    from another source that is more convenient, less burdensome, or less expensive, namely MGA
7    Mexico and MGA Hong Kong.  The requests are also overbroad and unduly burdensome.

8                              IV. CONCLUSION

9    For the reasons set forth above, it is hereby ordered as follows:

10    1.    At meet and confer sessions held after the filing of this motion, Larian agreed to
11    produce documents in response to Request Nos. 1, 2, 13, 15, 32, 33, 35, 41, 61-76, 82-101, 139-
12    146, 213, 221 and 223.  Accordingly, Larian shall produce, without limitation, all non-privileged
      documents that are responsive to these Requests.

13    2.    With respect to the remaining requests that are at issue in this motion, Larian shall:
14
15           A.    produce, without limitation, all non-privileged documents that are
              responsive to Request Nos.  79, 180, 198 (for the time period 1999-2005), 207, 208 and
16           269; and

17           B.    produce, in accordance with his supplemental responses, non-privileged
18            documents that are responsive to Request Nos. 80, 81, 113-115, 123-125, 179, 181 and
19           209.

20           C.    Larian may produce documents responsive to Request Nos. 179, 180 and
21            181 in redacted form as provided herein.

22           D.    Mattel's motion is denied as to Request No. 178, 190-192, 194-197, 199,
23           209, 222, 224, 225, 227, 228, 272 and 273.

24    3.    Larian shall produce all non-privileged documents that are required by this Order
25    that are in his possession, custody or control and that have not already been produced no later
26    than January 11, 2008.

27    4.    Larian shall produce a privilege log no later than January 15, 2008.

28

EXHIBIT ___H___ PAGE 188

1     5.     Mattel's request for sanctions is denied.

2     Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

3  Master, Mattel shall file this Order with the Clerk of Court forthwith.

4

5  Dated: December 31, 2007

6                               HON. EDWARD A. INFANTE (Ret.)

                                      Discovery Master

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

20

EXHIBIT __H__ PAGE __189__

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 2, 2008, I served the attached ORDER GRANTING IN PART AND DENYING IN PART MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY ISAAC LARIAN; DENYING REQUEST FOR SANCTIONS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 2, 2008, at San Francisco, California.

Sandra Chan

EXHIBIT H PAGE 190

**EXHIBIT  I**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT  J**

**RECEIVED**

JAN 2 5 2008

1  RAOUL D. KENNEDY (Bar No. 40892)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  Four Embarcadero Center, Suite 3800
   San Francisco, CA 94111
3  Telephone: (415) 984-6400
   Facsimile: (415) 984-2698
4
   AMY S. PARK (Bar No. 208204)
5  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   525 University Avenue
6  Palo Alto, California 94025-1902
   Telephone: (650) 470-4511
7  Facsimile: (888) 329-6334
   E-mail:    apark@skadden.com
8
   Attorneys for Counter-Defendants,
9  MGA ENTERTAINMENT, INC.,
   ISAAC LARIAN, MGA ENTERTAINMENT
10 (HK) LIMITED, AND MGAE de MEXICO
   S.R.L. de C.V.
11
                 UNITED STATES DISTRICT COURT
12
                 CENTRAL DISTRICT OF CALIFORNIA
13
                       EASTERN DIVISION
14 CARTER BRYANT, an individual          )  CASE NO. CV 04-9049 SGL (RNBx)
                                         )
15             Plaintiff,                )  Consolidated with Case No. 04-9059
                                         )  and Case No. 05-2727
16        v.                             )
                                         )  OBJECTIONS OF MGA
17 MATTEL, INC., a Delaware              )  ENTERTAINMENT, INC.,
   corporation                           )  ISAAC LARIAN, MGA
18                                       )  ENTERTAINMENT (HK)
               Defendant.                )  LIMITED, AND MGAE DE
19                                       )  MEXICO S.R.L. DE C.V. TO
                                         )  MATTEL INC.'S SUBPOENA
20                                       )  TO BANK OF AMERICA
                                         )
21                                       )
                                         )  Honorable Stephen G. Larson
22                                       )  Courtroom 1
                                         )
23                                       )
                                         )
24 ─────────────────────────────────     )
   Consolidated with MATTEL, INC. v.     )
25 BRYANT and MGA                        )
   ENTERTAINMENT, INC. v.                )
26 MATTEL, INC.                          )
                                         )
27
28 ┌─────────────────────────────────────────────────────┐
   OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
   PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

                    1-25

              EXHIBIT  J   PAGE 91

MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (the "MGA Entities") hereby respond to Plaintiff Mattel's ("Plaintiff") Subpoena for Production of Documents (the "Requests" or the "Subpoena"), served on Bank of America, as follows:

**GENERAL OBJECTIONS**

1.     The MGA Entities object to the Subpoena and each and every Request on the grounds that the Subpoena fails to allow reasonable time for compliance. *See* Fed. R. Civ. P. 45(c)(3)(A)(i). Although the Subpoena states that it was issued on January 15, 2008, Plaintiff did not serve Bank of America until January 17, allowing less than three court days for compliance. Likewise, Plaintiff did not provide the MGA Entities with notice of the Subpoena until the evening of January 24, thus providing them an unacceptable and unreasonable amount of time for response.

2.     The MGA Entities object to the Subpoena and each and every Request on the ground that the Subpoena fails to comply with Rule 45's prior notice requirement, rendering the Subpoena a nullity. Fed. R. Civ. P. 45(b)(1) ("Prior notice of any commanded production of documents and things or inspection of premises before trial *shall* be served on each party in the manner prescribed by Rule 5(b).") (emphasis added).

3.     The MGA Entities object to the Subpoena and each and every Request to the extent that they seek documents that are protected from disclosure by any applicable privilege, doctrine or right, including without limitation the attorney-client privilege, the work product doctrine, the right of privacy, which is protected by virtue of the Ninth Amendment to the United States Constitution, Article 1, Section 1 of the California Constitution, and all other rights and privileges recognized under the constitutional, statutory or decisional law of the United States, the State of California, and all relevant jurisdictions. Nothing done in relation to the Subpoena is intended to or shall operate as a waiver by the MGA Entities, intentionally or

1

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT __J__ PAGE 192

1 otherwise, of the attorney-client privilege, work product doctrine protection, or any
2 other applicable privilege, doctrine or immunity protecting the communications,
3 transactions or records of the MGA Entities or any other person from disclosure.

4          4.     The MGA Entities object to the Subpoena and each and every
5 Request to the extent that they seek documents that are protected from disclosure by
6 the accountant-client privilege.

7          5.     The MGA Entities object to the Subpoena and each and every
8 Request to the extent that they seek documents that are protected from disclosure by
9 applicable federal and state tax return privileges. *See, e.g., Premium Service Corp. v.*
10 *Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir. 1975); *Southern California*
11 *Housing Rights Center. v. Krug*, 2006 U.S. Dist. LEXIS 65330, **9-10 (C.D. Cal.
12 2006); *Aliotti v. Senora*, 217 F.R.D. 496, 498 (N.D. Cal. 2003); *San Francisco Bay*
13 *Area Rapid Transit District v. Spencer*, 2006 U.S. Dist. LEXIS 81681, **3-4 (N.D.
14 Cal. 2006); *see also Webb v. Standard Oil Co.*, 49 Cal. 2d. 509, 513-514 (1957); *Sav-*
15 *On Drugs, Inc. v. Sup. Ct.*, 15 Cal. 3d 1, 6-8 (1975); *Sammut v. Sammut*, 103 Cal.
16 App. 3d 557, 562 (1982).

17          6.     The MGA Entities object to the Subpoena and each and every
18 Request to the extent that they seek the production of documents that contain trade
19 secrets, confidential, commercially sensitive and/or other proprietary or competitive
20 information that is subject to Bank of America's, the MGA Entities', or any other
21 person's constitutional, statutory or common law right of privacy or protection. The
22 MGA Entities object to the production of any such documents to the extent they exist.

23          7.     The MGA Entities object to the Subpoena and each and every
24 Request to the extent that they seek documents that are not relevant to the claims and
25 defenses in this action or are not reasonably calculated to lead to the discovery of
26 admissible evidence. The MGA Entities' response to any Request that seeks
27 documents beyond that scope shall not be deemed an admission or acknowledgment
28

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT __1__ PAGE 193

1 that such Request calls for information relevant to this action and is without

2 prejudice to the MGA Entities' right to contend at any other time that the requested

3 documents are irrelevant, immaterial or otherwise objectionable.

4        8.    The MGA Entities object to the Subpoena and each and every

5 Request insofar as they seek the production of documents that, by reason of public

6 filing, other public availability, or otherwise, are already in Plaintiff's possession,

7 custody or control.

8        9.    The MGA Entities object to the Subpoena and each and every

9 Request (including the Definitions) to the extent that they are overbroad, otherwise

10 unlimited as to time, oppressive, vague, ambiguous, harassing, annoying, redundant,

11 duplicative, overlapping, repetitive or cumulative, and/or otherwise unduly

12 burdensome, thereby rendering the Subpoena unenforceable. *See, e.g.,* Fed. R. Civ.

13 P. 45(c)(l) ("A party or an attorney responsible for the issuance and service of a

14 subpoena shall take reasonable steps to avoid imposing undue burden or expense on

15 a person subject to that subpoena."); *High Tech Medical Instrumentation v. New*

16 *Image Indus.*, 161 F.R.D. 86, 88 (N.D. Cal. 1995) ("[T]he Ninth Circuit has long

17 held that nonparties subject to discovery requests deserve extra protection from the

18 courts.").

19       10.    The MGA Entities object to the Subpoena and each and every

20 Request insofar as they seek the production of documents that are more easily

21 obtained from other entities, including the parties to this action.

22       11.    The MGA Entities object to the Subpoena and each and every

23 Request to the extent they seek production of documents that have already been

24 produced to Plaintiff, whether in these proceedings or any others.

25       12.    The MGA Entities object to the Definitions on the grounds that

26 they are vague, unclear or overbroad and, when applied to the Requests, purport to

27

28

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT ___J___ PAGE 194

1  impose obligations not authorized by Rule 45 of the Federal Rules of Civil Procedure.

2  By way of example only, the MGA Entities object to the following definitions:

3          (a)     The MGA Entities object to the definition of the term

4  "YOU" and "YOUR" as vague, ambiguous, overbroad, and unduly burdensome.

5  The definition includes "Bank of America, and all YOUR parents, subsidiaries,

6  divisions, affiliates or affiliated entities, past or present employees, agents,

7  representatives, independent contractors, any predecessors or successors in interest,

8  and any other PERSON acting on YOUR behalf, pursuant to YOUR authority or

9  subject to YOUR control." In many instances, it is impossible for the MGA Entities,

10  much less Bank of America, to know whether a particular person or entity comes

11  within this definition unless that person or entity at some point in time held himself

12  or herself out as such. The MGA Entities additionally object to these terms because

13  they call for legal conclusions.

14          (b)     The MGA Entities object to the definition of the term

15  "ISAAC LARIAN," as vague, ambiguous, overbroad, and unduly burdensome. The

16  definition purports to include: "all of his current or former employees, agents,

17  representatives, attorneys, accountants, vendors, consultants, independent contractors,

18  predecessors-in-interest and successors-in-interest, relative (whether by blood or

19  marriage), and any other PERSON acting on his behalf, pursuant to his authority or

20  subject to his control." In many instances, it is impossible for the MGA Entities,

21  much less Bank of America, to know whether a particular person or entity comes

22  within this definition unless that person or entity at some point in time held himself

23  or herself out as such. The MGA Entities additionally object to these terms because

24  they call for legal conclusions.

25          (c)     The MGA Entities object to the definitions of the term

26  "ACCOUNT" and "ACCOUNTS" as vague, ambiguous, overbroad, and unduly

27  burdensome. The definition includes "any account of any type, including but not

28

4

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT ___J___ PAGE 195

1 limited to any checking account, savings account, deposit account, credit card
2 account, line of credit account, charge account, and any other account of any type."
3 In many instances, it is impossible for the MGA Entities, much less Bank of America,
4 to know what falls within this definition unless that person or entity at some point in
5 time held himself or herself out as such.  The MGA Entities additionally object to
6 these terms because they call for legal conclusions.

7       13.   The MGA Entities object to the Requests and, in particular, the
8 Instructions, to the extent that they purport to impose any requirements not imposed
9 by the Federal Rules of Civil Procedure.  By way of example only, the MGA Entities
10 object to Instruction d., which purports to require Bank of America to "identify the
11 source of all DOCUMENTS produced, and the person for whom, or department,
12 division or office for which, such DOCUMENTS are maintained."  Federal Rule of
13 Civil Procedure 45(d)(l) requires only that "[a] person responding to a subpoena to
14 produce documents shall produce them as they are kept in the usual course of
15 business or shall organize and label them to correspond with the categories in the
16 demand."

17       14.   The MGA Entities object to the Subpoena and each and every
18 Request to the extent they seek production of documents generated after service of
19 the Subpoena.

20       15.   Except as otherwise stated below, an objection to a specific
21 document Request does not imply that documents responsive to that category exist or
22 that the MGA Entities accept the purported factual predicate for any Request.

23       16.   Without waiving any of the foregoing General Objections, each
24 of which is expressly incorporated into each individual response as if fully stated
25 therein, the MGA Entities object to each and every specific Request for documents,
26 subject to the following additional express reservations of rights:

27

28

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT __J__ PAGE _196_

1         (a)    The right to object on any and all grounds, at any time, to

2 these or any other requests for production and inspection of documents or other

3 discovery procedures involving or relating to the subject matter of the Requests,

4 including by way of a motion to quash or modify the subpoena or a motion for a

5 protective order; and

6         (b)    The right at any time to revise, correct, supplement or

7 clarify any of the responses and objections propounded herein.

8       **SPECIFIC OBJECTIONS AND RESPONSES**

9 REQUEST NO. 1:

10     All DOCUMENTS REFERRING OR RELATING TO ISAAC LARIAN from

11 January 1, 1999 to the present, inclusive.

12 RESPONSE TO REQUEST NO. 1:

13     The MGA Entities incorporate by reference their General Objections as

14 though fully set forth herein. The MGA Entities further object to the extent that this

15 request seeks information that is protected from disclosure under the attorney-client

16 privilege, the work product doctrine and/or the joint interest privilege. The MGA

17 Entities further object to this request to the extent it seeks documents protected by

18 the accountant-client privilege. The MGA Entities further object to the request to the

19 extent that it seeks documents protected from disclosure by applicable federal and

20 state tax return privileges. The MGA Entities further object to this request to the

21 extent that it seeks documents that contain trade secrets, confidential, commercially

22 sensitive and/or other proprietary or competitive information that is subject to the

23 MGA Entities' or any other person's constitutional, statutory or common law right of

24 privacy or protection. The MGA Entities further object that this request calls for the

25 production of documents that are not relevant to a claim or defense in the pending

26 litigation or reasonably calculated to lead to the discovery of admissible evidence.

27 The MGA Entities further object to this request as being overly broad, burdensome

28             6

EXHIBIT __J__ PAGE _197_

1   and harassing to a non-party to the extent that it seeks to force Bank of America to

2   produce documents or information available from parties to the litigation. The MGA

3   Entities further object to this request on the grounds that it is overbroad as to subject

4   matter and time; in particular, the MGA Entities object to the definition of "ISAAC

5   LARIAN" on the grounds that it is overbroad, vague and ambiguous.

6   REQUEST NO. 2:

7       All DOCUMENTS REFERRING OR RELATING TO any ACCOUNTS

8   maintained by YOU that are in the name of, for the benefit of or concern ISAAC

9   LARIAN, including but not limited to statements, monthly statements, daily

10  transaction history reports, monthly transaction history reports, deposit reports,

11  deposit slips, canceled checks, signature cards, and COMMUNICATIONS

12  REFERRING OR RELATING TO such ACCOUNTS, created between January 1,

13  1999 and the present, inclusive.

14  RESPONSE TO REQUEST NO. 2:

15      The MGA Entities incorporate by reference their General Objections as

16  though fully set forth herein.  The MGA Entities further object to the extent that this

17  request seeks information that is protected from disclosure under the attorney-client

18  privilege, the work product doctrine and/or the joint interest privilege.  The MGA

19  Entities further object to this request to the extent it seeks documents protected by

20  the accountant-client privilege.  The MGA Entities further object to the request to the

21  extent that it seeks documents protected from disclosure by applicable federal and

22  state tax return privileges.  The MGA Entities further object to this request to the

23  extent that it seeks documents that contain trade secrets, confidential, commercially

24  sensitive and/or other proprietary or competitive information that is subject to the

25  MGA Entities' or any other person's constitutional, statutory or common law right of

26  privacy or protection.  The MGA Entities further object that this request calls for the

27  production of documents that are not relevant to a claim or defense in the pending

28

7

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT __J__  PAGE __198__

1  litigation or reasonably calculated to lead to the discovery of admissible evidence.

2  The MGA Entities further object to this request as being overly broad, burdensome

3  and harassing to a non-party to the extent that it seeks to force Bank of America to

4  produce documents or information available from parties to the litigation. The MGA

5  Entities further object to this request on the grounds that it is overbroad as to subject

6  matter and time; in particular, the MGA Entities object to the definitions of "YOU,"

7  "ACCOUNTS," and "ISAAC LARIAN" on the grounds that they are overbroad,

8  vague and ambiguous.  The MGA Entities further object on the grounds that this

9  request is vague, ambiguous and overbroad, particularly as to the meaning of

10  "benefit" and "concern."

11  REQUEST NO. 3:

12       DOCUMENTS sufficient to show the account number of all ACCOUNTS

13  maintained by YOU in the name of, for the benefit of or concerning ISAAC

14  LARIAN between January 1, 1999 and the present, inclusive.

15  RESPONSE TO REQUEST NO. 3:

16       The MGA Entities incorporate by reference their General Objections as

17  though fully set forth herein. The MGA Entities further object to the extent that this

18  request seeks information that is protected from disclosure under the attorney-client

19  privilege, the work product doctrine and/or the joint interest privilege. The MGA

20  Entities further object to this request to the extent it seeks documents protected by

21  the accountant-client privilege.  The MGA Entities further object to the request to the

22  extent that it seeks documents protected from disclosure by applicable federal and

23  state tax return privileges.  The MGA Entities further object to this request to the

24  extent that it seeks documents that contain trade secrets, confidential, commercially

25  sensitive and/or other proprietary or competitive information that is subject to the

26  MGA Entities' or any other person's constitutional, statutory or common law right of

27  privacy or protection.  The MGA Entities further object that this request calls for the

28

8

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT ___J___ PAGE 199

1  production of documents that are not relevant to a claim or defense in the pending

2  litigation or reasonably calculated to lead to the discovery of admissible evidence.

3  The MGA Entities further object to this request as being overly broad, burdensome

4  and harassing to a non-party to the extent that it seeks to force Bank of America to

5  produce documents or information available from parties to the litigation. The MGA

6  Entities further object to this request on the grounds that it is overbroad as to subject

7  matter and time; in particular, the MGA Entities object to the definitions of "YOU,"

8  "ACCOUNTS," and "ISAAC LARIAN" on the grounds that they are overbroad,

9  vague and ambiguous.  The MGA Entities further object on the grounds that this

10  request is vague, ambiguous and overbroad, particularly as to the meaning of

11  "benefit" and "concerning."

12  REQUEST NO. 4:

13      All DOCUMENTS showing or relating to any ACCOUNTS held by ISAAC

14  LARIAN or any ACCOUNTS on which ISAAC LARIAN has signatory authority at

15  any other financial institution.

16  RESPONSE TO REQUEST NO. 4:

17      The MGA Entities incorporate by reference their General Objections as

18  though fully set forth herein.  The MGA Entities further object to the extent that this

19  request seeks information that is protected from disclosure under the attorney-client

20  privilege, the work product doctrine and/or the joint interest privilege.  The MGA

21  Entities further object to this request to the extent it seeks documents protected by

22  the accountant-client privilege.  The MGA Entities further object to the request to the

23  extent that it seeks documents protected from disclosure by applicable federal and

24  state tax return privileges.  The MGA Entities further object to this request to the

25  extent that it seeks documents that contain trade secrets, confidential, commercially

26  sensitive and/or other proprietary or competitive information that is subject to the

27  MGA Entities' or any other person's constitutional, statutory or common law right of

28

9

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT __J__ PAGE _200_

1  privacy or protection.  The MGA Entities further object that this request calls for the

2  production of documents that are not relevant to a claim or defense in the pending

3  litigation or reasonably calculated to lead to the discovery of admissible evidence.

4  The MGA Entities further object to this request as being overly broad, burdensome

5  and harassing to a non-party to the extent that it seeks to force Bank of America to

6  produce documents or information available from parties to the litigation. The MGA

7  Entities further object to this request on the grounds that it is overbroad as to subject

8  matter and time; in particular, the MGA Entities object to the definitions of

9  "ACCOUNTS," and "ISAAC LARIAN" on the grounds that they are overbroad,

10  vague and ambiguous.  The MGA Entities further object on the grounds that this

11  request is vague, ambiguous and overbroad, particularly as to the meaning of "other

12  financing."

13

14

15

16  DATED:  January 25, 2008

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP

18  By: _____

Amy S. Park
Attorneys for Counter-Defendants, MGA
ENTERTAINMENT, INC., ISAAC LARIAN,
MGA ENTERTAINMENT (HK) LIMITED,
AND MGAE de MEXICO S.R.L. de C.V.

22

23

24

25

26

27

28

10

OBJECTIONS OF THE MGA ENTITIES TO MATTEL'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS TO BANK OF AMERICA

EXHIBIT __J__ PAGE 201

**EXHIBIT K**

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG 1 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT,<br><br>                    Plaintiff,<br><br>v.<br><br>MATTEL, INC.,<br><br>                    Defendant,<br><br>and related actions. | CASE NO.  CV 04-9049 SGL (RNBx)<br><br>(Consolidated with cases CV-04-9059 and CV-05-2727)<br><br>ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES |

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply. For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

AUG 1 1 2006

BY                    044

(73)

**EXHIBIT N PAGE 204**

EXHIBIT  K  PAGE 202

A witness so appointed shall be informed of the witness'
duties by the court in writing, a copy of which shall be filed
with the clerk, or at a conference in which the parties shall
have opportunity to participate.

The appointment of an expert by a federal court is a rare occurrence. Much of
this stems from a concept "[d]eeply ingrained" in the common law "that it is the
responsibility of the parties to produce the evidence while the court looks on to assure
that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE
§ 706.02[1], at 706-6 (2nd ed. 2006). The reluctance of courts to intrude into the
evidence-gathering function normally assigned to counsel is borne out of "the fear of
ex parte communications between the court and its expert," as well as the
unseemliness of "[c]ollecting a share of the expense [for the work performed by the
court appointed expert] from a party who has been damaged by the expert's report."
Id. at 706-6, 706-7. As a result of these institutional concerns, "experts are usually
appointed only in exceptional cases that present unwieldy, complex, or technical
issues" or where "there is a need for an impartial, independent assessment of a
disputed issue." Id. § 706.02[3], at 706-8 706-9.

Here, Mattel seeks for the court to appoint experts in the fields of questioned
document examination, ink chemistry analysis, and paper chemistry analysis in order
to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-
version of the BRATZ-related contract between . . . Carter Bryant and MGA
Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna
Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ
drawings bearing a fax header date of April 10, 2000," as well as "(5) any other
documents that cannot be sampled or tested without destroying the sample tested or
analyzed." (Mattel's Mot. Appt. Expert, Preface at 2). The reason proffered for such
an appointment is two-fold: First, a generalized concern that, because the documents
sought to be examined are "highly relevant" to the litigation, having a neutral expert
perform the testing on the same may obviate a battle of the experts that would make

2

**EXHIBIT N PAGE 205**

EXHIBIT __K__ PAGE 203

1   the jury's function of sorting out the truth much more arduous; and second, concerns,

2   deduced during discovery, about the possible spoliation of key documents in the case

3   by MGA/Bryant and their counsel.

4   A.    AVERTING A BATTLE OF THE EXPERTS

5         Mattel's argument that the Court should appoint an expert because otherwise

6   each side will perform "separate, partisan destructive analyses of separate samples of

7   the documents" with "wide divergence" of opinion "virtually assured" is not well-

8   founded.  (Mattel's Mot. Appt. Expert at 18, 20).  Explicit in Mattel's argument is that

9   this feared divergence in each side's retained expert's opinions has yet to materialize.

10  This is not surprising as it appears that discovery in this case is in its nascent stage,

11  owed largely to the fact that the Court had earlier stayed the case while Mattel

12  appealed the denial of its motion to remand the case to state court.  Mattel's argument

13  instead is that the Court should appoint an expert now to avoid the possibility that

14  there may be such wide divergence in each side's privately retained expert in the

15  future.  Needless to say from the jabs each party took at the credibility and even

16  trustworthiness of the other side's retained expert during the oral argument on this

17  motion (one going so far as to label the competing ink chemistry experts as being the

18  modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19  be more easier to imagine occurring here than in ordinary cases.  Nevertheless, such

20  divergence, even if likely, is still that – a possibility, not an inevitability.

21        In those cases where an expert has been appointed by a court on account of

22  the excessive partisanship in the expert opinions retained by counsel, the rationale for

23  the appointment was based on the fact that the feared wide divergence in opinion had

24  already materialized.  See Students of California Sch. for the Blind v. Honig, 736 F.2d

25  538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26  safety claims on the basis of evidence presented at trial, so he reopened the case and

27  appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28  site"), vacated on other grounds, 471 U.S. 148 (1985); Eastern Air Lines, Inc. v.

3

**EXHIBIT N PAGE 206**

EXHIBIT K PAGE 204

1  McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2  706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3  experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4  Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5       In no instance uncovered by the Court's research (or by Mattel's citation to

6  authority) has a court appointed an expert because of a fear, even one that is well-

7  founded, that such wide divergence in privately-retained expert testimony may

8  materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9  experts by courts would expand exponentially, limited only by a court's assessment of

10 how partisan the experts in a given case may become in the future.  Such a

11 proliferation has not occurred precisely because courts generally require that the

12 divergent "horse" be placed before the expert witness "cart."  See FED. R. EVID. 706

13 advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14 Unless and until this feared divergence in opinion becomes reality, the Court finds that

15 the potential (which itself cannot be quantified at this point) for its occurrence does not

16 warrant the Court's intrusion into the adversarial process through the appointment of

17 an expert at this stage.

18 B.   SPOILATION OF EVIDENCE

19      The question is much closer with respect to Mattel's other reason for the Court

20 to appoint an expert in this case:  Concern that opposing counsel or their clients may

21 have destroyed or altered key documents in the case.  Mattel's basis for such concern

22 is predicated on three facts uncovered during discovery.

23      1.   Evidence of spoilation

24      Before being deposed Bryant was asked to bring all his original BRATZ design

25 drawings.  When he arrived at his deposition, however, Bryant only had in his

26 possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27 "contained holes where plugs apparently had already been removed.  Bryant

28 acknowledged . . . that his drawings had no holes in them when he gave them to his

4

EXHIBIT  K  PAGE 205

1  lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2  Specifically, at Bryant's deposition the following exchange took place between Bryant

3  and counsel for Mattel:

4          Q.      (By Mr. Quinn) I wanted to ask you about one of
               these original drawings that were produced today.

5                  – what we're talking about here. This is – the Post-It

6                  says that's Bryant – that's the original of Bryant
               192, Bates number 192, which has the heads on it,

7                  and this is one of the originals that your counsel was
               kind enough to have shipped here today for us to

8                  look at.

9          A.      Yes

10         Q.      And we were just looking at these this afternoon and
               we notice[d] that there's a bunch of holes on the

11                 page, including in the signature, as if somebody
               were taking ink samples.

12         A.      Uh-huh.

13         Q.      Do you see that?

14         A.      Yes.

15         Q.      Do you know anything about why those holes were
               made or how or when?

16

17         A.      I have no idea what those are.

18         Q.      I mean, when you had – when you had possession
               of this document did it have those holes in it?

19

20         A.      Not that I remember.

21         Q.      You certainly never had anything to do with that?

22         A.      No.  I don't know anything about those holes.

23         Q.      And, similarly, if you wouldn't mind holding this up to
               the camera, this is the original of Bryant 210 and it's

24                 also – if you take a look at it, I think you'll see it has
               some of those holes in it, although not as many as

25                 the last one we looked at.  Again, you don't know
               anything about how or why those holes got put on

26                 there?

27         A.      I don't.

28  (Decl. Michael T. Zeller, Ex. 7 at 161-163).

**EXHIBIT N PAGE 208**

EXHIBIT __K__ PAGE 206

1    Mattel has submitted the declaration of a questioned document analysis expert,

2  Lloyd Cunningham, who has opined that the holes described in the document

3  mentioned above are consistent with those that would be generated by taking

4  microplug samples to perform analysis of the ink found on a document. (Decl. Lloyd

5  Cunningham ¶ 5). Bryant and MGA eventually conceded (although at first refusing to

6  do so under the veil of work-product privilege) that they tested some of the original

7  BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8  Speckin. (Response to Order to Show Cause ("Response") at 1-2).

9    Mr. Speckin states that in June, 2004, he performed a series of tests "on

10  various 'Bratz' documents" at the request of MGA's counsel.[1]  (Decl. Erich J. Speckin

11  ¶ 8). Those tests included examining the documents in question under an infrared

12  light as well as performing sidelight testing, which involves "visually inspecting a

13  document by holding a side light up to the document at an oblique angel . . . to

14  determine preliminarily whether the document contains impressions, or markings

15  impressed upon the document by drawing and writing done on a sheet of paper laid

16  on top of the document being tested." (Decl. Erich J. Speckin ¶¶ 9, 10).  Mr. Speckin

17  also performed an electrostatic detection apparatus to see if there was indented

18  impressions on the documents. (Decl. Erich J. Speckin ¶ 11). Finally, Mr. Speckin

19  "performed ink identifications tests" on the documents. (Decl. Erich Speckin ¶¶ 12-

20  13). Such testing involved Mr. Speckin removing "very small microplug samples from

21  the document at issue and testing the microplug." (Decl. Erich Speckin ¶13).

22  Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23  original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24  it averred from what parts of the documents that were tested was the microplug taken.

25  Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27    [1] At the time the testing was done by Mr. Speckin, Bryant had already been

28  sued by Mattel for violating the terms of the invention agreement he signed when he
   worked for them from 1999 to 2000. (Response at 1).

6

**EXHIBIT N PAGE 209**

EXHIBIT  K   PAGE 207

1  sufficient material for another expert to test the exact same <u>documents</u>," but admits

2  that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3  Erich J. Speckin ¶14).

4        Another episode brought to light during discovery causing Mattel concern

5  relates to MGA's handling of the original Bryant/MGA contract before the inception of

6  the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7  testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8  Larian, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9  between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14        Q.    . . . Was there ever anything that you were asked to
                do that you — made you feel kind of uncomfortable?

15
        A.    Yes.
16                                      . . . .

17        Q.    And what was that?

18        A.    When the original contract was executed by Carter
                Bryant, it was sent to me <u>via</u> fax, and on the top of
19                the fax listed the phone number from where it was
                faxed, which said "Barbie Collectibles," and at one
20                point my boss, Isaac Larian, asked me to white that
                out and send it to a lawyer, Patty Glaser.
21

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26        Q.    Were you ever asked to change the date on any
                agreements between Mr. Bryant and MGA?
27
        A.    No.
28

7

**EXHIBIT N PAGE 210**

EXHIBIT **K** PAGE 208

1  Q.    Are you aware of anybody being asked to change
       the date on any of those agreements?

2  A.    No.

3  Q.    I mean, do you have any reason to believe that any
       agreement that was entered into between Mr. Bryant
4      and MGA had a date altered or changed?

5  A.    No.

6  Q.    You never heard that from – from any source?

7  A.    No.

8

9  (Decl. Paula E. Ambrosini, Ex. 3).

10      Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11  faxed on April 10, 2000, had the fax header altered, much in the same manner

12  described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13  fields on the fax header for the sender's name and the sender's telephone number are

14  missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2]  As explained by Mattel, "Because

15

16      [2] Mattel speculates that the time sheets produced by MGA for one of its

17  employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
   "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked

18  on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
   painting faces for BRATZ dolls at the direction of Bryant.  (Mattel's Mot. Appt. Expert at

19  3).  The basis for this speculation is based on the fact that the initial disclosure by MGA
   of Rhee's time sheets comprised only 8 pages.  (Decl. Michael T. Zeller ¶ 20).  Then,

20  on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during

21  mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
   departure from Mattel, most notably on June 12, 2000.  (Decl. Michael T. Zeller ¶ 21).

22  Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
   supplemented its earlier production of Rhee's time sheets showing that during the mid-

23  to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer

24  Angels" and was not involved in any BRATZ-related work until after Bryant's departure
   from Mattel.  (Decl. Michael T. Zeller ¶ 22).  Mattel's surmise that the supplemental time

25  sheets were altered is allegedly bolstered by the fact that Rhee testified during her

26  deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
   that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was

27  nothing but a cover or code word for BRATZ-related work.  This argument is hard to
   accept.  First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"

28  for the mid-2000 project she worked on.  (Decl. Michael T. Zeller, Ex. 22 at 356-60,
   362).  It is not until December, 2000, that any of the invoices submitted by Rhee show

8

**EXHIBIT N PAGE 211**

EXHIBIT __K__ PAGE 209

1  you look at the document, you would never know — granted, this is smaller, so the actual drawing is even larger
2  than this, so there's even more ink on the larger drawing than there would be available on this reproduction size.

3      But if you look at it — and I'll represent to you that we
4  didn't test the face; the face is absent before and after the testing — but if you look at it, you couldn't even see that
5  there were any pin pricks to it. If you look very, very carefully at the signature at the bottom, you can maybe see
6  where it says "Ramona Prints; 8-26-99"; that maybe there was like a little tiny hole in one of the little slash marks; that
7  was a teeny little pin prick hole that showed the testing. There's ample amount of ink to do the testing on all of
8  these documents. This is the normal course of procedure that was done.

9

10     When asked by the Court whether it accepted MGA's representation that there

11  was "ample amount of ink" left on the same marks that the microplugs were taken

12  from for further microplug testing, Mattel, in seeming contradiction to its position in its

13  papers, said it did: "I agree with Ms. Cendali. We do not maintain any portion of the

14  ink on a signature or an image has been so obliterated that you couldn't take a plug

15  now on any of it; that's not our point." (Emphasis added).

16     In light of this concession by Mattel, the Court finds that no colorable claim of

17  spoliation has been established at this time vis-à-vis Mr. Speckin's testing of the

18  documents to warrant the appointment of an expert by the Court to investigate the

19  same. See Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga.

20  1998)(sanction warranted where because "defendant's expert has conducted

21  destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22  conditions of the original documents"). If there was any evidence indicating that MGA,

23  Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24  discover crucial information in this case, the Court would be sympathetic to the

25  appointment of an expert to investigate the same. Here, no such evidence exists.

26  The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27  documents that were handled so compromised that Mattel cannot perform the exact

28  same tests on those exact same marks as performed by Mr. Speckin.

13

**EXHIBIT N PAGE 216**

EXHIBIT ___K___ PAGE _214_

1    Indeed, the only basis for spoliation that Mattel has left to argue -- that the

2    passage of time has left the ability to perform any meaningful ink testing at this time

3    problematic -- is an argument that has nothing to do with MGA's conduct, but much

4    more with Mattel's own dereliction.  As the Court understands it, the process of dating

5    when ink was placed on a document has only a limited window of time in which it can

6    be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7    leaving nothing capable of being sampled after that point to test (save to acknowledge

8    that the ink in question was put on the paper some time more than 3 to 4 years ago).

9    Mattel essentially argues that the impossibility of testing ink after a certain period

10   mandates that, if the other side is going to test ink while "fresh" ink remains on the

11   document, that party has an obligation to inform the other side so that they can do the

12   same before the ink "dries out"; failure to do so renders the test performed something

13   that cannot be replicated.[4]  By Mattel's own admission, they knew there had been

14   testing done on the BRATZ original drawings as far back as November, 2004, during

15   Bryant's deposition testimony when they saw some of the original BRATZ drawings

16   (drawings that had been tested by Mr. Speckin five months earlier).  Rather than

17   immediately seeking the production of those documents and having its own expert

18   perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19   anything, either by way of court-pleadings or formal requests made to MGA and

20   Braynt, related to having ink tests performed on the documents.  Nowhere has Mattel

21   _____

22   [4] The basic factual assumption in Mattel's argument may indeed be faulty -- that when MGA tested the ink there was enough "fresh" ink to test.  Mr. Speckin states that

23   "[i]nk takes approximately 3 to 4 years to dry on paper.  Thus, by testing the ink to determine if it is dry, it can be determined whether the document was created within the

24   last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years

25   old." (Decl. Erich J. Speckin ¶ 13).  Given that Mr. Speckin performed his ink dating test in June, 2004, at best he could determine whether the ink had been put on the

26   paper on or after June, 2000.  Beyond that time frame his test could not tell when the now-dried ink was marked on the document.  Given that the relevant period in question

27   in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would appear to be only marginally relevant in adducing proof as to when the BRATZ

28   drawings were made.

14

**EXHIBIT N PAGE 217**

EXHIBIT __K__ PAGE 215

RightFAX                    8/  /2006 3:02    PAGE 016/018     ax Server

1   explained how MGA or Bryant had anything to do with it not having the ability to

2   perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3   was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4   valuable time on account of the stay, it could have at any time filed with this Court an

5   emergency request for relief from the stay to have such tests performed.  All it needed

6   to do was inform the Court that it had only a short period of time to perform the test on

7   account of the fact that ink dries; something which it never did in this case.

8         Mattel's citation to the case Edwardes v. Southampton Hospital Associates,

9   278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  Id. at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned."  Id. at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  on account of the passage of time that has elapsed.  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27         Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

15

EXHIBIT N PAGE 218

EXHIBIT __K__ PAGE 216

1   prejudicing Mattel's ability to pursue lines of potential evidence in this case. The

2   expert declaration submitted by Mattel notes another possible spoliation of the original

3   drawings even if there remained enough of the pertinent portion of the document in

4   question to sample: The sampling process itself may have contaminated the

5   document in question by obliterating potential crucial clues that were on the document

6   or otherwise the sampling process led to the introduction of foreign materials onto the

7   documents themselves which may complicate any future analysis. As explained by

8   Mattel's expert:

9           [P]erforming many such types of testing, even if described
            as "non-destructive," on a particular original document
10          carries the risk that potential evidence on it, including
            indentations in the paper fiber, might be contaminated or
11          destroyed in the process. Furthermore, the order of the
            types of testing to be performed on a given document
12          might have an impact on developing potential evidence
            during subsequent examinations. . . .

13              . . . . [With respect to the original BRATZ drawings
            containing holes in them,] it is possible that the destructive
14          testing performed on the document may have caused
            some form of contamination and/or alteration, which carries
15          the further prospect that subsequent examinations by
            experts may not enable them to develop potential evidence
16          or the same evidence that the other [earlier] expert
            developed.

17

18   (Decl. Lloyd Cunningham ¶¶ 4-5).

19          MGA has rebutted this risk of contamination argument by proffering Mr.

20   Speckin's declaration, the expert who actually performed the tests in question. Mr.

21   Speckin states that he "exercised the utmost care in handling the documents [he]

22   tested," that a number of the tests he performed on the documents "has absolutely no

23   effect on the tested document whatsoever," and that with respect to those tests that

24   could effect the document he followed established procedures in carrying out the test

25   in question. (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13). Nowhere has Mattel

26   proffered any evidence rebutting or calling into question Mr. Speckin's

27   representations. The Court therefore finds that, based on the evidence that is

28   currently before it, Mattel has not established a colorable claim of spoliation by way of

16

**EXHIBIT N PAGE 219**

EXHIBIT __K__ PAGE 217

1    contamination in the tests MGA performed on the documents in question.

2              b.    Alteration of Fax Headers

3         Insofar as O'Connor's deposition testimony relating to the white out of the fax

4    header on the October, 2000, contract between Bryant and MGA, this too is

5    downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6    Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7    Bryant readily admitted that fact at his deposition, which took place *before* Ms.

8    O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)). This argument seeks

9    to compare apples to oranges. While it may be true that *now* there is no dispute by

10   MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11   Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12   was not apparent. It is from that perspective in time – the prologue to the litigation —

13   that O'Connor's deposition testimony is to be judged. And from that perspective her

14   testimony calls into question MGA's handling of relevant documents in its possession.

15        When the contract was first executed there is no indication that MGA and/or

16   Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17   was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18   Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19   fax header clearly indicates that they would not admit to the fact. If MGA mistreated

20   this document where an open issue existed, it is not unreasonable to infer that it may

21   have been just as cavalier with its obligations to maintain the other documents in their

22   possession – say, for instance, the original BRATZ drawings – where similar open

23   issues remained. This concern with MGA's handling of documents in its possession at

24   the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25   footnote to their opposition that the original to this contract, the one which they

26   describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6). Indeed, it

27   has been suggested that MGA and Bryant or their counsel have made representations

28   that they are not sure of the exact whereabouts of a number of the original BRATZ

17

EXHIBIT N PAGE 220

EXHIBIT __K__ PAGE _218_

1    drawings.  (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2    23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3    majority of the originals of BRATZ drawings and sketches, and further claimed not to

4    know where those originals were located")).

5         All that being said, the Court does not find that the alteration of the fax header

6    on the original Bryant/MGA contract warrants the appointment of an expert at this

7    time.  Ms. O'Connor testified that, other than this one instance, she is aware of no

8    other documents that were purposefully altered by MGA.  While the evidence related

9    to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10   more than one document had been tampered with by MGA personnel, the Court has

11   nothing at this time to basis that conclusion on other than speculation and conjecture.

12   Without any tangible, concrete proof that MGA's mishandling of documents was more

13   widespread, the Court is left with what appears simply as an isolated instance of

14   tampering.

15        Accordingly, the motion for appointment of expert witnesses is DENIED.

16        IT IS SO ORDERED.

17

18   DATE:   8-9 —06

19

20                              STEPHEN G. LARSON
                                UNITED STATES DISTRICT JUDGE
21

22

23

24

25

26

27

28

18

EXHIBIT N PAGE 221

EXHIBIT  K  PAGE 219

**EXHIBIT  L**

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

**PRIORITY SEND**
& ENTERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES – GENERAL</u>

Case No.   CV 04-09049 SGL(RNBx)                    Date:  July 2, 2007

Title:      CARTER BRYANT -v- MATTEL, INC.
            AND CONSOLIDATED ACTIONS
==========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                              Theresa Lanza
Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR CARTER            ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker                           John B. Quinn
                                        Brett Dylan Proctor
                                        Michael T. Zeller

ATTORNEYS PRESENT FOR MGA:

Dale M. Cendali
Patricia Glaser

PROCEEDINGS:   MINUTE ORDER

ENTERED
CLERK, U.S. DISTRICT COURT
JUL - 5 2007
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION   BY DEPUTY

DOCKETED ON CM
JUL - 5 2007
BY _____ 164

        As set forth more fully herein, the Court hereby makes the following ruling regarding matters
heard on July 2, 2007:

(1)    The Court **GRANTS** Mattel's Motion re Trial Structure (docket #462);

(2)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Motion re Discovery Master's
       May 15, 2007, Order (docket #505);

(3)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Ex Parte Application

MINUTES FORM 90                                    Initials of Deputy Clerk  Jh
CIVIL – GEN                        1                Time: 01/15

EXHIBIT L G PAGE 220

regarding date of production of documents (docket #545); and

(4)    The Court **DENIES** MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508).

(5)    The Court **DENIES** the parties' oral request for modification of pretrial and trial dates.

(1)    Motion re Trial Structure (docket #462)

        Previous orders of the Court specified that the claims and counterclaims brought in this action will be tried in two phases. The parties have agreed, in large part, to a refinement of the Court's mandate that all issues regarding the ownership of Bratz shall be tried in Phase 1. Where the parties differ is upon a proposal by Mattel that the Phase 1 be bifurcated into two sub-phases, with Mattel's copyright infringement claim (its first counterclaim in the 05-02727 case) and all Phase 1 damages being tried after all the other issues. Phase 1(a) would be limited to issues surrounding Carter Bryant's employment with Mattel, and how those issues impact the ownership of certain original Bratz drawings, while Phase 1(b) would address approximately two-hundred Bratz products that are potentially derivative of the original drawings. This approach has the appeal of limiting Phase 1(a) to discrete issue of the ownership of the original Bratz drawings. A finding that Bryant owns these original drawings in Phase 1(a) has the potential to eliminate the need for Phase 1(b).

        Accordingly, **THE COURT ADOPTS MATTEL'S MODIFICATION OF DEFENDANTS' PROPOSAL,** as set forth at 8-9 of its Memorandum Regarding Trial Structure, filed June 20, 2007. Phase 1(a) and Phase 1(b) (if necessary) will be tried to the same jury.

(2)    MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505), and
(3)    MGA's Ex Parte Application regarding date of production of documents (docket #545).

        The Discovery Master's May 15, 2007, Order compels production of documents regarding ink, paper, and chemical analysis and documents relating to unreleased MGA products. The order required that documents be produced no later than the end of May.

        The Court reviews the Discovery Master's orders under the "clearly erroneous" or "contrary to law" standard set forth in Fed. R. Civ. P. 72(a).

        The Discovery Master's order compels the production of only non-privileged documents. Therefore, MGA's arguments that the Discovery Master's order requires production of documents in violation of the attorney-client privilege are misplaced. If the only responsive documents are privileged, then MGA need not produce them, but must produce a privilege log.

        MGA acknowledges that it has raised an argument before the Court that was not raised

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT __L__ PAGE __221__

before the Discovery Master, namely, that Mattel has failed to establish that there are "exceptional circumstances" that allow Mattel to "discover facts known or opinions held by an expert . . . who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(B). MGA contends that the Discovery Master's order is contrary to law based on this standard, and that it was incumbent upon Mattel to raise it below. The Court disagrees. Mattel would be required to establish that exceptional circumstances existed if MGA objected to production on that grounds. A party seeking production cannot be expected to rebut all arguments that could possibly be raised by a party resisting production. MGA has not convinced the Court that the Discovery Master's failure to require Mattel to rebut an argument that was not raised by MGA is contrary to law.

MGA contends that the Discovery Master's order compelling production of documents regarding unreleased products is contrary to law. Relevant to that determination is a balancing test required to be applied by the Ninth Circuit when trade secrets are requested by a competitor in discovery. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) ("Specifically, in this case we must balance the risk to [defendant] of inadvertent disclosure of trade secrets to competitors against the risk to [plaintiff] that protection of [defendant's] trade secrets [will] impair[] prosecution of [plaintiff's] claims.").

Here, the documents sought are of a particularly sensitive nature. They represent some of the most secretive documents maintained by MGA, and they are being ordered to be produced to MGA's fierce competitor. The Discovery Master recognized the sensitive nature of the documents and entered a strict protective order that severely limits access to those documents and that goes well beyond the normal "attorney eyes only" designation.

MGA argues that unreleased products are irrelevant to the issue of who owns the original Bratz drawings. That is clear. However, MGA's argument attempts to limit the discovery to issues involved in Phase 1 of the trial. There has been no bifurcation of discovery.

Mattel correctly points out that these documents are relevant to a number of its other claims. Specifically, if they show unreleased products that are similar to Mattel's unreleased products, the documents would be highly probative of Mattel's misappropriation of trade secrets claim. Moreover, these documents could be relevant to Mattel's RICO claims based on alleged acts of criminal copyright infringement.

Balancing tests are inherently subjective and particularly susceptible to varying interpretation by individual judicial officers. This Court, upon considering this issue from the outset, may very well have weighed the evidence differently and reached a contrary result. However, this Court is bound by the standard of review, and MGA's motion falls far short of convincing the Court that the Discovery Master's order is contrary to law.

The parties have a long history regarding the production of documents ordered in the May 15, 2007, Order, which is set forth in their papers and which need not be repeated here. Counsel for MGA represented that the remaining documents could be produced no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which could be produced no

EXHIBIT   L   PAGE 222

later than two weeks after that date. Accordingly, the Court **ORDERS** that MGA complete the document production set forth in the Discovery Master's May 15, 2007, order no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which shall be produced no later than August 14, 2007.

Accordingly, the Court **GRANTS** in part MGA's motion re the Discovery Master's May 15, 2007, Order, extending the document production date as set forth above. The Motion is **DENIED** in all other respects.

Likewise, the Court **GRANTS** in part MGA's ex parte application re date of production of documents, extending the document production date as set forth above. The application is **DENIED** in all other respects.

(4)    MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508)

The Discovery Master's May 16, 2007, Order compelled the Rule 30(b)(6) depositions of witnesses on the topics of MGA's net worth, prior sworn statements, and ink, paper, and chemical analysis performed by MGA.

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters *known or reasonably available* to the organization.

Fed. R. Civ. P. 30(b)(6) (emphasis added). "The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation." <u>Sanders v. Circle K Corp.</u>, 137 F.R.D. 292, 294 (D. Ariz. 1991) (internal citation omitted). Another purpose of Rule 30(b)(6) is aptly described by the District Court for the District of Columbia:

> [The purpose of Rule 30(b)(6) is to] prevent[] serial depositions of various witnesses without knowledge within an organization and eliminating 'bandying', which is the name given to the practice in which people are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to the organization itself.

<u>Alexander v. F.B.I.</u>, 186 F.R.D. 148, 152 (D.D.C. 1999) (citing the 1970 Advisory Committee Notes to Rule 30(b)(6)).

The Discovery Master's order compelling Rule 30(b)(6) depositions in the specified

EXHIBIT  ∟  PAGE 223

categories serve both these purposes and is not contrary to law.

Although MGA's net worth may not be known to it, MGA does not contend that the information is not readily available. That net worth is generally the subject of expert testimony at trial -- a proposition disputed by neither Mattel nor the Court -- does not render it an improper subject for a Rule 30(b)(6). Therefore, the Discovery Master's ruling on this issue is not contrary to law.

MGA likewise does not contend that information regarding prior sworn statements are not readily available to it. Although contending that this is not an appropriate subject for a Rule 30(b)(6) deposition, MGA fails to cite authority in support of that contention. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

The ink, paper, and chemical analysis topic is likewise a proper subject of a Rule 30(b)(6) deposition. To the extent that such a deposition has the potential to encroach upon information protected by the work-product privilege, then that objection must be made on a question-by-question basis. MGA may not make a blanket objection and justify its refusal to produce a Rule 30(b)(6) designee on this topic based on that blanket objection. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

Accordingly, the Court **DENIES** MGA's motion re the Discovery Master's May 16, 2007, Order.

(5)    Oral Request for Modification of pretrial and trial dates.

Although no motion or ex parte application on the subject was pending before the Court, the parties made an oral request at the hearing to continue certain pretrial and trial dates. A discussion ensued and it became apparent that no final agreement was reached by the parties regarding extending these dates. Accordingly, the Court **DENIES** the parties' oral request for modification of pretrial and trial dates. The Court will consider counsels' stipulation regarding extensions of those dates only where all counsel unqualifiedly stipulate to those dates. Until the scheduling order is modified by the Court, the dates previously set by the Court remain in effect. In addition, the Court is unlikely to entertain a continuance of the Phase 1 trial past April, 2008.

IT IS SO ORDERED.

EXHIBIT __V__ PAGE 224

**EXHIBIT  M**

**EXHIBIT  N**

**CERTIFIED COPY**

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
                             )
           PLAINTIFF, )
                             )
    V.                        )    NO. CV 04-9040 SGL (RNBX)
                             )
MATTEL, INC., A DELAWARE )
CORPORATION,             )
                             )
          DEFENDANTS. )
                             )
                             )
AND CONSOLIDATED ACTION (S). )

## C O N F I D E N T I A L

**(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)**

## DEPOSITION OF VERONICA MARLOW

## DECEMBER 28, 2007



REPORTED BY:
PAULA A. PYBURN
CSR NO. 7304
JOB NO. 07AE765-PP

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT N PAGE 243

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| CARTER BRYANT, AN | ) | |
| INDIVIDUAL, | ) | |
| | ) | CASE NO. |
| PLAINTIFF, | ) | CV 04-9049 SGL(RNBX) |
| | ) | |
| V. | ) | CONSOLIDATED WITH |
| | ) | CASE NO. 04-9059 |
| MATTEL, INC., A DELAWARE | ) | AND |
| CORPORATION, | ) | CASE NO. 05-2727 |
| | ) | |
| DEFENDANT. | ) | |
| ———————————————— | ) | |
| | ) | |
| AND CONSOLIDATED ACTION(S) | ) | |
| ———————————————— | ) | |

CONFIDENTIAL ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF VERONICA
MARLOW, TAKEN ON BEHALF OF MATTEL,
INC., AT 865 SOUTH FIGUEROA STREET,
10TH FLOOR, LOS ANGELES, CALIFORNIA,
COMMENCING AT 10:14 A.M., FRIDAY,
DECEMBER 28, 2007, BEFORE PAULA A.
PYBURN, C.S.R. 7304, R.P.R., C.L.R.

2

EXHIBIT _N_ PAGE 244

```
 1    APPEARANCES OF COUNSEL:
 2    FOR M.G.A. ENTERTAINMENT, INC.:
 3     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       BY:  KENNETH PLEVAN, ESQ.
 4     FOUR TIMES SQUARE
       NEW YORK, NEW YORK 10036-6522
 5     (212) 735-3000
       KPLEVAN@SKADDEN.COM
 6
 7    FOR MATTEL, INC.:
 8     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       BY:  MICHAEL T. ZELLER, ESQ.
 9     BY:  BRIDGET A. HAULER, ESQ.
       865 SOUTH FIGUEROA STREET
10     10TH FLOOR
       LOS ANGELES, CALIFORNIA 90017-2543
11     (213) 443-3000
       MICHAELZELLER@QUINNEMANUEL.COM
12     BRIDGETHAULER@QUINNEMANUEL.COM
13
      FOR CARTER BRYANT:
14
       KEKER & VAN NEST LLP
15     BY:  CHRISTA MARTINE ANDERSON, ESQ.
       710 SANSOME STREET
16     SAN FRANCISCO, CALIFORNIA 94111
       (415) 391-5400
17     CANDERSON@KVN.COM
18
      FOR THE WITNESS:
19
       KEATS, MCFARLAND & WILSON LLP
20     BY:  LARRY W. MCFARLAND, ESQ.
       BY:  CHRISTIAN C. DOWELL, ESQ.
21     9720 WILSHIRE BOULEVARD
       PENTHOUSE SUITE
22     BEVERLY HILLS, CALIFORNIA 90212
       (310) 777-3749
23     LMCFARLAND@KMWLAW.COM
       CDOWELL@KMWLAW.COM
24
25
```

3

EXHIBIT ___N___ PAGE 245

```
1   ALSO PRESENT:
2    PETER MARLOW
    MICHAEL MOORE, SENIOR COUNSEL, MATTEL, INC.
3    STEVEN TOGAMI, J.T.V. LITIGATION SERVICES, INC.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

EXHIBIT N PAGE 246

```
 1    RECEIVED THE SECOND CASTING, PHOTOGRAPHS WE'VE

 2    MARKED AS EXHIBIT 1231.

 3           MR. MCFARLAND:  OKAY.  I WOULD JUST OBJECT

 4    THAT THERE ARE DOCUMENTS THAT -- THAT SET FORTH

 5    THESE DATES, BUT YOU CAN GIVE YOUR BEST              05:29:45

 6    RECOLLECTION.

 7           THE WITNESS:  LIKE I SAID, I WORK WITH

 8    PEDRO AND I WORK WITH ISABEL CABRERA.

 9    BY MR. ZELLER:

10       Q.   RIGHT.  AND I'M -- I'M TRYING TO FIND OUT,   05:29:56

11    IS THERE ANYONE ELSE WHO YOU HIRED ON OR HAD -- YOU

12    HAD WORK FOR YOU IN CONNECTION WITH THE BRATZ

13    PROJECT OTHER THAN THOSE TWO DURING THAT TIME

14    PERIOD?

15       A.   NO.                                          05:30:06

16       Q.   JUST THOSE TWO?

17       A.   YEAH.

18       Q.   AND WHERE DOES -- DOES SHE GO BY "ANA" OR

19    "ISABEL"?

20       A.   BOTH.  I CALL HER ISABEL, BUT SOME PEOPLE    05:30:16

21    CALL HER ANA, ANITA.

22       Q.   WHERE DOES MS. CABRERA LIVE?

23       A.   HAWTHORNE.  I THINK IT'S HAWTHORNE.

24       Q.   AND HAD SHE EVER DONE ANY WORK FOR YOU

25    PRIOR TO THE BRATZ PROJECT?                          05:30:37
```

287

EXHIBIT __N__ PAGE 247

```
 1        A.    THINK.  NO, I DON'T RECALL.

 2        Q.    HOW IS IT YOU -- YOU CAME TO HIRE HER ON?

 3        A.    I CALLED AND ASK HER IF SHE WILL BE

 4   INTERESTED IN HELPING ME OUT.

 5        Q.    DID YOU GET HER NAME FROM SOMEONE?          05:31:00

 6        A.    NO.  FROM HER.  I -- I KNEW HER FROM MATTEL

 7   WHEN I WORK AT MATTEL.

 8        Q.    I SEE.  SO MS. CABRERA WAS AT -- WAS AT

 9   MATTEL AT SOME POINT?

10        A.    YES.                                        05:31:19

11        Q.    DO YOU HAVE A GENERAL UNDERSTANDING AS TO

12   WHAT SHE DID AT MATTEL?

13        A.    SHE'S A SEAMSTRESS.

14        Q.    AND I TAKE IT YOU CALLED HER UP TO -- TO

15   GET HER ONTO THE PROJECT?                              05:31:43

16        A.    YES.

17        Q.    WAS SHE STILL AT MATTEL AT THAT TIME?

18        A.    YES.

19        Q.    DID YOU CALL HER AT MATTEL OR DID -- DID

20   YOU CALL HER AT HOME?                                  05:31:51

21        A.    AT HOME.  I -- I -- SHE'S MY FRIEND, SO I

22   HAD HER PHONE -- HOME PHONE NUMBER.

23        Q.    SO YOU CALLED HER AT HOME AND ASKED HER TO

24   WORK ON BRATZ?

25        A.    YES.                                        05:31:59
```

288

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT  N  PAGE  248

```
 1              MR. MCFARLAND:  OBJECTION; MISSTATES HER

 2    TESTIMONY.

 3              THE WITNESS:  I DIDN'T SAY TO WORK ON

 4    BRATZ.  I ASK -- I TOLD HER I HAD SOME WORK, IF SHE

 5    WAS WILLING TO HELP ME.                              05:32:13

 6    BY MR. ZELLER:

 7         Q.   AND DID SHE IN FACT DO WORK ON THE BRATZ

 8    PROJECT?

 9         A.   YES, SHE DID.

10         Q.   WHAT DID SHE DO?                           05:32:24

11         A.   SHE WOULD SEW THE OUTFITS.

12         Q.   HOW LONG DID SHE WORK ON THE BRATZ PROJECT

13    FOR YOU?

14         A.   SHE WORKED FROM THAT PERIOD UNTIL THEY --

15    UNTIL I STOPPED WORKING FOR BRATZ.                   05:32:49

16         Q.   I SEE.  SO THE -- THE WHOLE TIME PERIOD YOU

17    WERE DOING WORK FOR M.G.A. ON BRATZ, YOU HAD HER

18    DOING WORK FOR YOU?

19         A.   YES.

20         Q.   THAT WAS ON THE BRATZ PROJECT?             05:33:00

21         A.   THAT'S CORRECT.

22         Q.   DID YOU EVER TELL HER IT WAS THE BRATZ

23    PROJECT?

24         A.   NO, I DID NOT AT FIRST.

25         Q.   WELL, WHEN I SAY "EVER," I MEANT EVER.     05:33:08
```

289

EXHIBIT N PAGE 249

```
 1        A.   EVER, OH, NO, EVER, BUT NOT --
 2        Q.   AT SOME POINT YOU TOLD HER?
 3        A.   YES.
 4        Q.   WHEN DID YOU FIRST TELL HER?
 5        A.   WELL, ACTUALLY SHE TOLD ME.  BECAUSE AFTER        05:33:17
 6   THE BRATZ CAME OUT SHE START SEEING BRATZ DOLLS ALL
 7   OVER MATTEL IN DIFFERENT CUBICLES, AND SHE
 8   RECOGNIZED THE FASHIONS THAT SHE HAD WORK ON.  AND
 9   SO, YOU KNOW, SHE TOLD ME THAT SHE HAD SEEN THEM,
10   THAT IT WAS ALL OVER THE PLACE, THE DESIGNER HAD        05:33:43
11   TAKEN THEM OUT OF THE BOX, WAS LOOKING AT THE
12   FASHIONS AND STUFF LIKE THAT.
13        SO I SAID THAT'S RIGHT.
14        Q.   DO YOU HAVE -- DO YOU HAVE RECORDS SHOWING
15   THE PARTICULAR FASHIONS THAT SHE WORKED ON?           05:33:58
16        A.   RECORDS?
17        Q.   YES.
18        A.   SHE WORKS ON -- ON MOST OF THEM, I WOULD
19   SAY.  SO --
20        Q.   SHE WORKED ON MOST OF THE BRATZ FASHIONS?     05:34:12
21        A.   YES.
22        Q.   DID SHE WORK ON ALL THE BRATZ FASHIONS THAT
23   YOU WORKED ON?
24        A.   LIKE I SAID, MOST OF THEM.
25        Q.   AND -- AND MY PARTICULAR QUESTION IS, THEN,   05:34:21
```

290

EXHIBIT  N  PAGE  250

1    A.   YES.

2    Q.   WHICH OF THE DOLLS DID SHE WORK ON THE

3    FASHIONS FOR OF THAT FIRST WAVE OF -- OF BRATZ

4    DOLLS?

5    A.   I'M TRYING TO THINK.                                    05:48:58

6        MR. MCFARLAND:  DON'T GUESS.

7        THE WITNESS:  I KNOW SHE WORK ON SOME OF

8    THEM.  I DON'T KNOW SPECIFIC ON IT.

9    BY MR. ZELLER:

10   Q.   DID YOU OR -- STRIKE THAT.                              05:49:25

11       DID YOU AND MS. CABRERA EVER DISCUSS ANY

12   CONCERN AMONG YOURSELVES AS TO THE FACT THAT SHE WAS

13   WORKING FOR MATTEL AND ALSO WORKING ON BRATZ

14   FASHIONS?

15   A.   ONLY AFTER SHE FOUND OUT THAT I -- WE WERE             05:49:37

16   WORKING ON THE -- ON THE BRATZ, WHEN SHE START

17   SEEING THE DOLLS AT THE DESIGN CENTER.

18   Q.   AND WHAT IS IT THAT YOU AND -- AND SHE

19   DISCUSSED ON THAT?

20   A.   YOU KNOW, SHE WAS REALLY SURPRISED THAT SHE           05:49:51

21   SAW ALL THOSE FASHIONS, AND JUST WAS TELLING ME THAT

22   THE DESIGNERS WERE DISSECTING THE DOLLS AND, YOU

23   KNOW, STUDYING REALLY CLOSELY THE OUTFITS AND STUFF

24   LIKE THAT.  SO SHE JUST START TALKING ABOUT THE

25   BRATZ.                                                      05:50:16

305

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT N PAGE 251

```
 1        Q.    DID SHE EVER EXPRESS ANY CONCERN THAT

 2   MATTEL WOULD FIND OUT?

 3        A.    NO.   THAT SHE WAS WORKING ON THE BRATZ?

 4        Q.    RIGHT.

 5        A.    NO.                                         05:50:26

 6        Q.    WERE YOU EVER CONCERNED ABOUT THAT?

 7        A.    NO.

 8        Q.    SO IF I UNDERSTAND YOU CORRECTLY, YOU DON'T

 9   SEE ANYTHING WRONG WITH A MATTEL EMPLOYEE WORKING ON

10   THE BRATZ FASHIONS; IS THAT TRUE?                      05:50:37

11        A.    YEAH, THAT'S TRUE.

12        Q.    NOTHING TROUBLING AT ALL ABOUT IT TO YOU?

13        A.    NO.

14        Q.    HOW MANY PEOPLE HAVE YOU HAD DO WORK FOR

15   YOU WHILE THEY WERE EMPLOYED BY MATTEL WHEN YOU WERE    05:50:49

16   NOT A MATTEL EMPLOYEE?

17        A.    I HAD ISABELLE CABRERA AND LATER ON

18   BEATRICE MORALES.

19        Q.    AND WHAT DID YOU HAVE HER WORK ON?

20        A.    ON BRATZ.                                    05:51:09

21        Q.    AND WHAT WAS YOUR GENERAL UNDERSTANDING OF

22   WHAT IT IS THAT BEATRICE MORALES DID AT MATTEL?

23        A.    SHE'S ALSO A SEAMSTRESS, AND ISABELLE'S

24   FRIEND AND -- AND WE NEEDED HELP, AND ISABEL

25   SUGGESTED TO INVITE BEATRICE TO COME AND HELP US.       05:51:29
```

                                                        306

EXHIBIT N PAGE 252

1    Q.   WERE YOU INTRODUCED TO MS. MORALES THROUGH

2    ISABEL, OR DID YOU KNOW HER INDEPENDENTLY?

3    A.   I WAS INTRODUCED TO MS. MORALES THROUGH

4    ISABEL.

5    Q.   I'M SORRY, I DIDN'T CATCH THAT.                    05:51:50

6    A.   I WAS INTRODUCED TO MRS. MORALES THROUGH

7    ISABEL.

8    Q.   AND DID MS. MORALES WORK ON BRATZ FASHIONS

9    AS WELL?

10   A.   YES.                                              05:52:07

11   Q.   AND WHAT TIME PERIOD DID SHE DO THAT?

12   A.   IT WAS A YEAR OR SO AFTER THE BRATZ CAME

13   OUT.

14   YOU HAVE THE DATES, BY THE WAY, YOU HAVE

15   HER SIGNED RECEIPTS AND TIME SHEET AND THAT ALL,        05:52:22

16   SO...

17   Q.   I TAKE IT THESE ARE ALL DOCUMENTS YOU GAVE

18   TO YOUR COUNSEL?

19   A.   YES.

20   Q.   YOU HAD MENTIONED THAT MS. MORALES WORKED          05:52:35

21   ON THE BRATZ FASHIONS A YEAR OR SO AFTER THE BRATZ

22   FIRST CAME OUT?

23   A.   YES.

24   Q.   AND FOR HOW LONG DID SHE WORK ON THE BRATZ

25   FASHIONS?                                              05:52:51

307

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT  N  PAGE 253