3

```
1       PRESENT (Continued):

2            O'MELVENY & MYERS, LLP,

3            (Times Square Tower,

4            7 Times Square,

5            New York, New York  10036,

6            212.326.2000), by:

7            MS. DALE M. CENDALI,

8                 appeared on behalf of Intervenor

9                 MGA Entertainment;


11           BERMAN, MAUSNER & RESSER,

12           (11601 Wilshire Boulevard, Suite 600,

13           Los Angeles, California  90025,

14           310.473.3333), by:

15           MR. LAURENCE M. BERMAN,

16                appeared on behalf of the Deponent.

17

18

19

20

21

22

23

24
```

EXHIBIT R PAGE 348

4

```
 1        ALSO PRESENT:
 2              MR. MICHAEL A. HALL,
 3                    Paralegal, Littler Mendelson;
 4              MR. CARTER BRYANT.
 5
 6        VIDEOGRAPHER:
 7              MR. JOSEPH BURKE,
 8              Esquire Deposition Services.
 9
10        REPORTED BY:
11              PAULINE M. VARGO,
12  09:46:12  C.S.R. No. 84-1573.
13
14
15
16
17
18
19
20
21
22
23
24
```

EXHIBIT R PAGE 349

43

```
 1                    marked Deposition Exhibit No. 317,

 2                    for identification, as of 9/13/06.)

 3    11:00:09  BY MR. ZELLER:

 4    11:00:10      Q.    Do you recognize what's depicted here as

 5    11:00:12  Exhibit 317?

 6    11:00:13      A.    Yes.

 7    11:00:14      Q.    What are these?

 8    11:00:16      A.    These are logo variations and color

 9    11:00:21  variations for Chat Brats, Chat Room for the Diva

10    11:00:28  Starz lines.

11    11:00:29      Q.    Did you create these?

12    11:00:30      A.    I created these.

13    11:00:32      Q:    Did you create them for Mattel?

14    11:00:33      A.    I created them for Mattel, yes.

15    11:00:36      Q.    Approximately what time period did you

16    11:00:38  create these designs that are shown here as part of

17    11:00:41  Exhibit 317?

18    11:00:42      A.    Late 1999.

19    11:00:44      Q.    And did that include the ones that show

20    11:00:48  on the left side and the right side the word

21    11:00:51  "Brats," B-r-a-t-s?

22    11:00:53      A.    Yes.

23    11:00:57      Q.    Now I really am moving on to a new

24    11:01:02  subject.  At some point did you have contact with
```

EXHIBIT R   PAGE 350

44

```
1    11:01:08  anyone at MGA?

2    11:01:12       A.    Yes.

3    11:01:13       Q.    What was your first contact with anyone

4    11:01:15  at MGA?

5    11:01:16       A.    I received a call from Paula

6    11:01:23  Treantafelles regarding she had called and

7    11:01:27  introduced herself, and she told me she knew who I

8    11:01:33  was from work that she has seen that I worked on

9    11:01:36  the Diva Starz at Mattel and through Maureen

10   11:01:40  Mullen, said she referred me, and she asked me if I

11   11:01:43  was available for freelance work.  She said she was

12   11:01:47  fond of my work and she said "Could you come in to

13   11:01:49  do some packaging, graphics and logo design."

14   11:01:57       Q.    Was this a face-to-face meeting or a

15   11:01:59  phone call?

16   11:02:00       A.    This was a phone call.

17   11:02:03       Q.    And Ms. Treantafelles called you?

18   11:02:07       A.    Yes.

19   11:02:08       Q.    Approximately when was this?

20   11:02:10       A.    Approximately probably the summer of

21   11:02:12  2000, early like before summer, early summer,

22   11:02:17  somewhere in there.

23   11:02:33       MR. ZELLER:  Let's please mark as Exhibit 318

24   11:02:37  a two-page document -- I am sorry.  Actually, just
```

EXHIBIT _R_ PAGE 351

1   11:02:40   one page.   Strike that.   Let's please mark as

2   11:02:44   Exhibit 318 a one-page document bearing Bates

3   11:02:47   number SL 00063.

4                        (WHEREUPON, a certain document was

5                        marked Deposition Exhibit No. 318,

6   11:03:07             for identification, as of 9/13/06.)

7   11:03:07       MS. CENDALI:   Do we have copies?

8   11:03:12       MS. KREBS:   Yeah.   That's in the Linker

9   11:03:13   production that you all have.

10  11:03:14       MR. BERMAN:   I gave you these ones myself.

11                    MS. CENDALI:   Right.   I know that.   I am just

12  11:03:16   trying to figure out what you want.   So we will

13  11:03:17   have to just separately pull them out to make the

14  11:03:21   exhibit.

15  11:03:21       MR. BERMAN:   There is not any separate to do.

16  11:03:23   There is just pieces of paper.   Do you want me to

17  11:03:25   find it for you?

18  11:03:26       MS. CENDALI:   I will be able to find it.

19  11:03:29       MS. KREBS:   It's probably in the bottom there.

20                    MS. CENDALI:   63?

21                    MR. BERMAN:   It should be, yeah.

22  11:03:32       MS. CENDALI:   It's a one-page exhibit?

23  11:03:34       MR. ZELLER:   That's right.   SL 63.

24           BY MR. ZELLER:

EXHIBIT _R_ PAGE _352_

```
1   11:03:53      Q.    Mr. Linker, have you had a chance to

2   11:03:55   take a look at Exhibit 318?

3   11:03:57      A.    Yes.

4   11:03:58      Q.    Please tell us what it is.

5   11:03:59      A.    It's an invoice that I sent to Paula

6   11:04:05   Treantafelles for work rendered for her and her

7   11:04:09   company.

8   11:04:10      Q.    You say her company?

9   11:04:11      A.    MGA.

10  11:04:13      Q.    And when is it that you sent this

11  11:04:16   invoice to MGA?

12  11:04:18      A.    Well, seeing that the invoice date is

13  11:04:22   8/31, it was either on that date or the day before

14  11:04:25   or within that time frame.

15  11:04:30      Q.    You will see on the left-hand side of

16  11:04:32   this invoice various dates ranging from August 12,

17  11:04:38   2000, through August 25th, 2000?

18  11:04:43      A.    Yes.  There is a typo.

19  11:04:46      Q.    Are those dates accurate with respect to

20  11:04:50   work that you performed for MGA on this project?

21  11:04:53      A.    Yes, those are correct dates.

22  11:04:56      Q.    To return then for a moment to the phone

23  11:04:59   call, the very first phone call that you received

24  11:05:01   from Paula Treantafelles, do you have that in mind?
```

EXHIBIT R  PAGE 353

1    11:05:05       A.     Yes.

2    11:05:06       Q.     You had mentioned that you said it was

3    11:05:08    sometime in the summer of 2000?

4    11:05:10       A.     Yes.

5    11:05:12       Q.     I take it that you received this phone

6    11:05:15    call from Paula Treantafelles prior to the August

7    11:05:20    12th date, which reflects here your first work?

8    11:05:24       A.     Right, so it was probably within a week

9    11:05:26    or so before August 12th.

10   11:05:29       Q.     You say probably.  Is it --

11   11:05:32       A.     You talk, you talk on the phone, you

12   11:05:36    touch base and you set up a time to meet, so

13   11:05:41    this -- okay.  I am sorry.

14   11:05:42       Q.     One thing I want to be clear about in

15   11:05:43    this deposition is I don't want you to guess.  If

16   11:05:45    you have a best recollection about something --

17   11:05:47       A.     Okay.

18   11:05:48       Q.     -- that's why I am asking.  So when you

19   11:05:49    say probably, I just want to make sure is this

20   11:05:51    something --

21   11:05:52       A.     Right.

22   11:05:52       Q.     -- that's your best recollection.

23   11:05:54       A.     Well, my best recollection is, yes,

24   11:05:56    that my first meeting with her was based on this

EXHIBIT R  PAGE 354

48

| | | |
|---|---|---|
| 1 | 11:05:59 | project.  So seeing that on this invoice with the |
| 2 | 11:06:03 | project start date for me on my sketches was |
| 3 | 11:06:05 | August 12th, then that's the time when I met her. |
| 4 | 11:06:09 | Q.    What project does Exhibit 318 relate to? |
| 5 | 11:06:12 | A.    A logo design for one of their toys |
| 6 | 11:06:16 | called Hoppity. |
| 7 | 11:06:18 | Q.    Was that the first project you ever |
| 8 | 11:06:20 | worked on for MGA? |
| 9 | 11:06:21 | A.    Yes, it is. |
| 10 | 11:06:24 | Q.    And if you could please tell us just |
| 11 | 11:06:26 | generally speaking what was Hoppity? |
| 12 | 11:06:30 | A.    Hoppity was a doll that bounced on a |
| 13 | 11:06:33 | ball, and they needed a -- she needed or they |
| 14 | 11:06:39 | needed, I don't know how to refer it, but MGA |
| 15 | 11:06:41 | needed a better logo design that showed more action |
| 16 | 11:06:47 | and graphic elements. |
| 17 | 11:06:51 | Q.    Prior to the time that |
| 18 | 11:06:55 | Miss Treantafelles made that first phone call to |
| 19 | 11:06:58 | you in the summer of 2000, did you know |
| 20 | 11:07:02 | Miss Treantafelles? |
| 21 | 11:07:03 | A.    No. |
| 22 | 11:07:03 | Q.    Had you ever heard of her before then? |
| 23 | 11:07:06 | A.    No. |
| 24 | 11:07:17 | Q.    Returning for a moment to Exhibit 318, |

EXHIBIT _R_ PAGE 355

49

| | | |
|---|---|---|
| 1 | 11:07:20 | it shows, of course, as we had mentioned or talked |
| 2 | 11:07:23 | about these various dates in August.  Did you have |
| 3 | 11:07:26 | any face-to-face meetings with Paula Treantafelles |
| 4 | 11:07:30 | in this time period up through August 25th, 2000? |
| 5 | 11:07:33 | A.    Yes. |
| 6 | 11:07:34 | Q.    If you could please tell us when you |
| 7 | 11:07:36 | recall first meeting her face-to-face? |
| 8 | 11:07:39 | A.    When I first met her, she reviewed my |
| 9 | 11:07:47 | portfolio.  She showed me some of the projects they |
| 10 | 11:07:51 | were working on in-house, and we discussed this |
| 11 | 11:07:54 | particular project and directions as far as what |
| 12 | 11:08:00 | she wanted to see and what she wanted me to work |
| 13 | | on. |
| 14 | 11:08:04 | Q.    And can you give us a time period when |
| 15 | 11:08:07 | you had that first meeting? |
| 16 | 11:08:09 | A.    Yes.  That first meeting was before |
| 17 | 11:08:12 | August 12th of 2000. |
| 18 | 11:08:23 | Q.    So if I understand, you had an initial |
| 19 | 11:08:27 | meeting with Miss Treantafelles before you started |
| 20 | 11:08:31 | doing any actual work? |
| 21 | 11:08:32 | A.    Yes. |
| 22 | 11:08:40 | Q.    And then on or about August 12th, 2000, |
| 23 | 11:08:44 | is when you first started doing actual work on |
| 24 | 11:08:46 | Hoppity? |

EXHIBIT R   PAGE 356

```
1    11:08:46      A.    Correct.

2    11:08:48      MS. CENDALI:  Objection to form.

3              BY MR. ZELLER:

4    11:09:03      Q.    Did you do any work on Hoppity after

5    11:09:07  August 25th, 2000?

6    11:09:09      A.    No.

7    11:09:13      Q.    After you did work on Hoppity, did you

8    11:09:16  have any conversations with anyone at MGA about

9    11:09:22  further work or potential work for MGA?

10   11:09:24      A.    Yes.

11   11:09:26      Q.    What happened next then in that regard?

12   11:09:30      A.    Paula contacted me about a couple of

13   11:09:35  jobs that she had in line for packaging, one that

14   11:09:43  could start and the other one was a rush or a new

15   11:09:48  concept that they wanted to get started on.

16   11:09:54      Q.    What were these two projects?

17   11:09:58      A.    The first one was Samantha Scooter, and

18   11:10:02  the other one at the time wasn't given a name, so I

19   11:10:05  didn't know what it was, but eventually, I mean, it

20   11:10:10  was the Bratz.

21   11:10:15      Q.    This was a phone call that she made to

22   11:10:17  you?

23   11:10:18      A.    Yes.

24   11:10:20      Q.    And approximately when was that phone
```

EXHIBIT R   PAGE 357

```
1    11:10:22   call made?

2    11:10:24        A.     It was after this invoice and it was

3    11:10:30   before October 3rd, so somewhere in the middle of

4    11:10:39   September.

5    11:10:40        Q.     Of 2000?

6    11:10:41        A.     Of 2000, or late September.

7    11:10:46        MR. ZELLER:  Let's please mark as Exhibit 319

8    11:10:50   a one-page document which appears to be from a

9    11:10:56   planner or diary with the dates of October 2nd,

10   11:11:00   2000, and October 3rd, 2000, and bearing Bates

11   11:11:06   number SL 0002.

12                          (WHEREUPON, a certain document was

13                          marked Deposition Exhibit No. 319,

14   11:11:34               for identification, as of 9/13/06.)

15   11:11:36        MS. CENDALI:  This is 319?

16   11:11:38        MR. ZELLER:  Yes, 319.

17              BY MR. ZELLER:

18   11:11:41        Q.     Do you recognize what's been marked as

19   11:11:44   Exhibit 319?

20   11:11:45        A.     Yes.

21   11:11:45        Q.     What is this?

22   11:11:46        A.     These are some notes in one of my daily

23   11:11:51   planners.

24   11:11:51        Q.     Is all this your handwriting?
```

EXHIBIT R   PAGE 358

52

| | | | |
|---|---|---|---|
| 1 | 11:11:52 | A. | Yes. |
| 2 | 11:11:56 | Q. | I see that there is writing for |

3  11:11:58  October 3rd, 2000?

4  11:12:00     A.    Yes.

5  11:12:01     Q.    These are all entries that you made on

6  11:12:04  or about October 3rd, 2000?

7  11:12:06     A.    Yes.

8  11:12:07     Q.    And if you could please tell us, what do

9  11:12:10  these entries relate to?

10  11:12:11     A.    These relate to taking on a packaging

11  11:12:17  project and getting the breakdown of what they

12  11:12:22  wanted for Scooter Samantha from MGA.

13  11:12:27     MS. CENDALI:  This is clearly attorneys' eyes

14  11:12:31  only and was not a document that should be shared

15  11:12:34  with Mattel, and I object to questioning and/or

16  11:12:42  production of documents that violate MGA's

17  11:12:46  proprietary information.

18       BY MR. ZELLER:

19  11:12:52     Q.    Does this relate to particular work that

20  11:12:55  you did on Scooter Samantha?

21  11:12:58     A.    I didn't do work on it.  I just took

22  11:13:01  down what they needed and what the project

23  11:13:05  consisted of.

24  11:13:06     Q.    And when you say "they," who are you

EXHIBIT R  PAGE 359

76

| | | |
|---|---|---|
| 1 | 11:43:54 | I tried as hard as I could to get the |
| 2 | 11:43:56 | documents produced at the time.  I had to walk in |
| 3 | 11:44:00 | the rain.  So, you know, I got here at 8:30, and no |
| 4 | 11:44:02 | one was here.  So to the extent that that reflects |
| 5 | 11:44:05 | how I -- my tone, I apologize.  So let's go on. |
| 6 | 11:44:09 | MS. CENDALI:  It is -- it is very clear -- |
| 7 | 11:44:11 | MR. BERMAN:  Let's go on. |
| 8 | 11:44:13 | MS. CENDALI:  Please don't interrupt me, |
| 9 | 11:44:14 | counsel.  It is very clear that our calls were not |
| 10 | 11:44:17 | returned.  It's very clear that I suspect your |
| 11 | 11:44:20 | calls to Mr. Zeller were returned. |
| 12 | 11:44:23 | MR. ZELLER:  Are you quite finished?  Can we |
| 13 | 11:44:25 | now -- |
| 14 | 11:44:25 | MS. CENDALI:  Let's continue. |
| 15 | 11:44:32 | MR. ZELLER:  Thank you. |
| 16 | 11:44:33 | MR. WICKHAM:  I will note for the record that |
| 17 | 11:44:34 | the deposition notice says 9:30. |
| 18 | 11:44:37 | MR. ZELLER:  And the documents say 8:30.  It's |
| 19 | 11:44:39 | on the same subpoena, if I may. |
| 20 | 11:44:48 | THE REPORTER:  I have to mark the document. |
| 21 | 11:44:48 | MR. ZELLER:  Let me re-identify it.  I will |
| 22 | 11:44:50 | start again so we can pick up fresh.  Let's please |
| 23 | 11:44:55 | mark as Exhibit 323 a multi-page document bearing |
| 24 | 11:45:02 | Bates numbers SL 13 through SL 63 consisting of |

EXHIBIT R PAGE 360

1   11:45:12  drawings and other materials.

2                       (WHEREUPON, a certain document was

3                       marked Deposition Exhibit No. 323,

4   11:46:49               for identification, as of 9/13/06.)

5        BY MR. ZELLER:

6   11:46:50     Q.   Do you recognize what's been marked as

7   11:46:53  Exhibit 323 or any portion of it?

8   11:46:55     A.   Yes.

9   11:46:56     Q.   What are these pages?

10  11:47:02     A.   Well, there is a combination of stuff,

11  11:47:05  but for the most part, this was the package that

12  11:47:09  was provided to me at the October 19th meeting at

13  11:47:18  MGA, excluding SL 00015.  That is a poster from the

14  11:47:25  final product that I had put into the envelope just

15  11:47:31  for cross-reference when I bought the toy.  So that

16  11:47:38  is a poster that wasn't anywhere near or part of

17  11:47:44  the package that was at MGA when I went there on

18  11:47:49  October 19th.

19  11:47:50     Q.   I am sorry.  The other things were in

20  11:47:53  Exhibit 323?

21  11:47:54     A.   Everything -- all these other things,

22  11:47:56  yes, they were all part of the package, but like I

23  11:48:00  said, this was at a later date.  This is something

24  11:48:05  I threw into the envelope, just in my files.

EXHIBIT ___ PAGE 361

78

| | | |
|---|---|---|
| 1 | 11:48:10 | Q. Then let's maybe break this down a |
| 2 | 11:48:13 | little bit. |
| 3 | | A. Okay. |
| 4 | 11:48:14 | Q. You have been referring to a package? |
| 5 | 11:48:17 | A. Yes. |
| 6 | 11:48:19 | Q. Did you receive a package at the |
| 7 | 11:48:21 | October 19, 2000 meeting? |
| 8 | 11:48:24 | A. I did. |
| 9 | 11:48:24 | Q. And who did you get that from? |
| 10 | 11:48:26 | A. I got it from MGA, Paula or the group |
| 11 | 11:48:30 | that was working on this, but pretty much Paula and |
| 12 | 11:48:33 | her design team as far as -- |
| 13 | 11:48:37 | Q. And you received those materials while |
| 14 | 11:48:39 | you were actually at MGA's offices? |
| 15 | 11:48:41 | A. While I was in the meeting, they gave me |
| 16 | 11:48:44 | this yellow envelope. |
| 17 | 11:48:49 | Q. So then just so the record is clear on |
| 18 | 11:48:51 | this, what you received from MGA was pages starting |
| 19 | 11:48:59 | SL 16 through SL 63 on October 19th, 2000? |
| 20 | 11:49:09 | MS. CENDALI: Mischaracterizes his testimony. |
| 21 | | BY THE WITNESS: |
| 22 | 11:49:13 | A. Yes. This is all stuff that was put in |
| 23 | | there. |
| 24 | 11:49:25 | BY MR. ZELLER: |

EXHIBIT R   PAGE 362

79

| | | |
|---|---|---|
| 1 | 11:49:25 | Q. And then the first two pages of |
| 2 | 11:49:30 | Exhibit 323, that's an envelope? |
| 3 | 11:49:33 | A. Yes. |
| 4 | 11:49:36 | Q. And does this envelope relate to the |
| 5 | 11:49:40 | materials that you received from MGA on October 19, |
| 6 | 11:49:43 | 2000? |
| 7 | 11:49:45 | A. Yes, it is. |
| 8 | 11:49:47 | Q. And how is it related? |
| 9 | 11:49:52 | A. How is it related? This envelope held |
| 10 | 11:49:55 | all the images. All these images were in the |
| 11 | 11:50:02 | envelope. Can you rephrase the question? |
| 12 | 11:50:04 | Q. Well, I guess one thing I am trying to |
| 13 | 11:50:05 | ask is, were you given this, these materials that |
| 14 | 11:50:10 | we were discussing in an envelope from MGA? |
| 15 | 11:50:12 | A. Yes. |
| 16 | 11:50:13 | Q. In other words, MGA provided the |
| 17 | 11:50:14 | envelope? |
| 18 | 11:50:15 | A. Yes, and it was addressed on the second |
| 19 | 11:50:16 | page, SL 00014, to Steve and Liz from Bratz or with |
| 20 | 11:50:21 | the "Bratz" in quotes. |
| 21 | 11:50:25 | Q. So this was the -- SL 14 was the front |
| 22 | 11:50:31 | of the envelope that contained the other materials? |
| 23 | 11:50:34 | A. Yes. |
| 4 | 11:50:37 | Q. Is this your handwriting on SL 14? |

EXHIBIT R PAGE 363

255

STATE OF ILLINOIS )

)  SS:

COUNTY OF DuPAGE  )

        I, PAULINE M. VARGO, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter of said state, C.S.R. No. 84-1573, do hereby certify:

        That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

        That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

        That the said deposition was taken before me at the time and place specified;

        That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

EXHIBIT R PAGE 364

256

```
 1              IN WITNESS WHEREOF, I do hereunto set my

 2      hand and affix my seal of office at Chicago,

 3      Illinois, this 22nd day of September, 2006.

 4

 5

 6              Notary Public, DuPage County, Illinois.

 7              My commission expires July 27, 2007.

 8

 9      C.S.R. Certificate No. 84-1573

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**EXHIBIT S**

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California 94111
   Telephone:    (415) 774-2611
4  Facsimile:    (415) 982-5287

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11

12  CARTER BRYANT, an individual,          CASE NO. CV 04-09049 SGL (RNBx)
                                           JAMS Reference No. 1100049530
13            Plaintiff,

14       v.                                Consolidated with
                                           Case No. CV 04-09059
15  MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

16            Defendant.                   ORDER RE MATTEL'S MOTIONS TO
                                           COMPEL FARHAD LARIAN, KAYE
17                                         SCHOLER AND STERN &
                                           GOLDBERG TO PRODUCE
18                                         DOCUMENTS

19  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
20  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
21

22

23

24                        I. INTRODUCTION

25       The following motions are pending for decision, each of which seeks discovery from non-

26  parties:  Mattel, Inc.'s ("Mattel") (1) Motion to Compel Farhad Larian to Produce Documents; (2)

27  Motion to Compel Kaye Scholer to Produce Documents; and (3) Motion to Compel Stern &

28
    Bryant v. Mattel, Inc.,                                                        1
    CV-04-09049 SGL (RNBx)

                                          EXHIBIT  S   PAGE  366

1  Goldberg to Produce Documents.  Each of the non–parties submitted oppositions.[1]  In addition,

2  MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de

3  Mexico S.R.L. de C.V. (collectively "MGA") submitted oppositions to the motions.  Mattel

4  submitted a consolidated reply on January 3, 2008.  The motions were heard on January 16, 2008,

5  at which time Mattel agreed to hold in abeyance its Motion to Compel Stern & Goldberg to

6  Produce Documents.  This Order, therefore, addresses only Mattel's motions to compel Farhad

7  Larian and Kaye Scholer to produce documents.

8      On January 22, 2008, the parties submitted a Stipulation Regarding Protective Orders to

9  facilitate production of documents responsive to the subpoenas at issue.

10                          II. BACKGROUND

11      Since the inception of MGA in 1979 until December of 2000, Isaac Larian, a defendant

12  herein and MGA's CEO, and his brother Farhad Larian, a non-party, shared ownership and

13  management of MGA.  A dispute developed between the two brothers and in March of 2000,

14  Isaac Larian proposed that Farhad Larian sell his interest in MGA to him.

15      On September 28, 2000, the Larian brothers agreed to have their uncle, Morad Zarabi,

16  arbitrate their dispute and decide a fair value for MGA and also decide which brother should sell

17  his ownership interest to the other.  The brothers' agreement to arbitrate was entered into ten days

18  after the alleged effective date of Carter Bryant's contract purportedly assigning rights to Bratz to

19  MGA.  Isaac Larian did not tell his brother about the contract with Bryant.

20      Mr. Zarabi retained an appraiser, Ernest Dutcher, to value MGA based on "the period

21  ending December 31, 1999."  By December 4, 2000, Mr. Zarabi determined that Farhad Larian

22  should sell his 45% ownership interest in MGA to Isaac Larian and the two entered into an

23  Agreement for Sale of Stock by which Farhad Larian sold his interest for $8.775 million.

24

25

26

27

28

---

[1] Mattel contends that Kaye Scholer's opposition was not timely filed and therefore should not be considered.  Although the opposition was ten days late, Kaye Scholer's brief will nevertheless be considered in the interest of resolving these disputes on the merits.

EXHIBIT __S__  PAGE __367__

1       In the summer of 2002, Farhad Larian complained to Mr. Zarabi that Isaac Larian had

2  allegedly fraudulently concealed Bratz during the negotiations that led to Farhad Larian's sale of

3  MGA stock. Mr. Zarabi oversaw another appraisal of MGA based upon information he gathered

4  in 2002. Mr. Dutcher produced an appraisal on February 13, 2003 that valued MGA as of

5  December 31, 2000 and projected a 2001 revenue growth rate of twenty-five percent (25%) based

6  upon "hot projects that came along." Mattel's Motion at p.4, Ex. 8 to Decl. of Juan Pablo Albán.

7  Other information relied upon by Mr. Dutcher suggests that MGA had expansionary plans in 2000

8  compared to the prior four years.

9       Unable to resolve his disputes through Mr. Zarabi, Farhad Larian sued Isaac Larian,

10  alleging, among other things, that (a) in late 1999 or early 2000, Isaac Larian and MGA became

11  aware of a new product line called Bratz; (b) starting in early 2000 and throughout 2000, Isaac

12  Larian and MGA devised plans to develop and distribute Bratz; and (c) Isaac Larian concealed the

13  plans for Bratz from Farhad Larian and Mr. Zarabi in order to keep the valuation of MGA

14  artificially low. Notably, MGA and Bryant claim in the instant lawsuit that they did not even

15  meet until September 2000.

16       Isaac Larian successfully moved to compel arbitration of Farhad Larian's claims. In early

17  February 2005, Mr. Zarabi declined to serve as arbitrator and the court appointed another

18  arbitrator. A few weeks later, Farhad Larian filed suit against Mr. Zarabi alleging that he

19  conspired with Isaac Larian to conceal facts.

20       The arbitration of Farhad Larian's claims started on November 16, 2005. Two days into

21  the proceedings, however, Farhad Larian dismissed his claims. Isaac Larian sought to recover his

22  attorneys' fees and won an award in excess of $1 million against his brother.

23  <u>Mattel Subpoenas Farhad Larian to Produce Documents</u>

24       On August 31, 2007, Mattel subpoenaed Farhad Larian to appear for deposition and to

25  produce (1) documents relating to the <u>Larian v. Larian</u> disputes; (2) documents related to non-

26  Bratz allegations by Mattel and MGA, primarily related to allegations of trade secret theft; (3)

27  documents relating to Farhad Larian's relationship to MGA, including his position there,

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __5__ PAGE __368__[3]

1   ownership interests, and payments from MGA or Isaac Larian to Farhad Larian; (4) Farhad

2   Larian's knowledge and possession of documents specifically from the instant lawsuit, including

3   his communications with Mattel; and (5) information about the location of responsive documents.

4   The majority of Mattel's requests seek documents in the first category described above.

5        On September 21, 2007, Farhad Larian served responses and objections in which he

6   agreed to produce documents responsive to eleven of Mattel's forty-one document requests.

7   After a brief stay of discovery, counsel for Farhad Larian and Mattel met and conferred beginning

8   on November 20, 2007.  During the meet and confer process, Farhad Larian agreed to produce

9   documents responsive to some, but not all of Mattel's forty-one requests.  On November 21,

10   2007, Farhad Larian produced approximately one red well of documents.

11        The parties held a second meet and confer conference call on November 27, 2007, and

12   were able to resolve their disputes regarding many more, but not all requests.  In particular, the

13   parties were ultimately able to resolve their disputes regarding the requests for documents related

14   to non-Bratz allegations.  At the conclusion of the second meet and confer session, it was agreed

15   that Farhad Larian would make a supplemental production of documents on December 6, 2007,

16   and provide a written supplemental response.  The parties attempted to schedule another meet and

17   confer session, but could not agree upon a date.  On the evening of December 6, 2007, Mattel

18   filed the instant motion.  Mattel seeks an order compelling Farhad Larian to produce documents

19   responsive to every request in its subpoena; overruling each of Farhad Larian's objections; and

20   ordering him to produce a document-by-document privilege log.

21   <u>Mattel Subpoenas Isaac Larian's Attorney –Kaye Scholer</u>

22        On or about September 6, 2007, Mattel also subpoenaed Kaye Scholer, the firm that

23   represented Isaac Larian in the <u>Larian v. Larian</u> proceedings.  The subpoena consisted of thirty-

24   five (35) requests seeking the same five categories of documents it subpoenaed from Farhad

25   Larian.  Kaye Scholer's representation of Isaac Larian included defending him in two related

26   Superior Court actions, two arbitration proceedings and an appeal to the California Court of

27   Appeals, all of which covered a period of several years.  As a result of this representation Kaye

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                        4

EXHIBIT ___S___ PAGE___369___

1   Scholer has accumulated approximately fifty-six (56) boxes of its client's files, including, among

2   other things, correspondence files, pleading files, discovery files, witness preparation files,

3   research files, exhibits, attorney work files, and billing files.

4       On or about September 18, 2007, Kaye Scholer served its objections, asserting, among

5   other things, that the requests are duplicative, unreasonably cumulative, harassing and oppressive.

6   The parties met and conferred on October 11 and 29, 2007.  Kaye Scholer agreed to review the

7   following files for responsive documents:  (1) pleading files; (2) discovery files; and (3)

8   arbitration exhibits.  Kaye Scholer's rationale for limiting its search for responsive documents to

9   these three files was to avoid undue burden because most of the documents in other files would be

10   protected by the work product doctrine and/or the attorney-client privilege.  Kaye Scholer also

11   agreed to produce documents responsive to the majority of Mattel's requests.  However, Kaye

12   Scholer repeatedly informed Mattel that it objected to producing a document-by-document

13   privilege log because it would be unduly burdensome, expensive and inconvenient.

14       In the instant motion, Mattel seeks an order compelling Kaye Scholer to produce

15   documents responsive to every request in its subpoena and overruling Kaye Scholer's objections,

16   including privilege, or alternatively, compelling Kaye Scholer to produce a document-by-

17   document privilege log.

18   <u>Mattel's Other Discovery Efforts</u>

19       Mattel has attempted to obtain documents related to the <u>Larian v. Larian</u> proceedings from

20   MGA and Isaac Larian.  As far as Mattel can ascertain, however, MGA has produced only four

21   documents relating to the <u>Larian v. Larian</u> proceedings and Isaac Larian has produced none.

22       Mattel also searched public filings in the <u>Larian v. Larian</u> and <u>Larian v. Zarabi et al.</u> civil

23   lawsuits.  Mattel found Mr. Dutcher's declaration that included the appraisals described above,

24   however, Mattel was not able to locate any of the raw data on which Mr. Dutcher relied.  Mattel

25   also served subpoenas on third parties involved in the <u>Larian v. Larian</u> proceedings, and met with

26   limited success.

27   //

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __S__ PAGE __370__

### III. STANDARDS

1 Rule 45 of the Federal Rules of Civil Procedure requires third parties to produce

2 documents (and reasonably accessible electronically stored information) that are responsive to a

3 subpoena that a party serves on them.  Fed.R.Civ.P. 45(b), (d).  If the subpoenaed documents are

4 relevant and there is good cause for their production, the subpoena is enforced unless the

5 documents are privileged or the subpoena is unreasonable, oppressive, annoying or embarrassing.

6 The factors to be balanced by the trial court in determining the propriety of a subpoena are the

7 relevance of the discovery sought, the requesting party's need, and the potential hardship to the

8 party subject to the subpoena.  A person withholding subpoenaed information under a claim of

9 attorney-client privilege or protected by the work product doctrine must expressly make the claim

10 and "describe the nature of the withheld documents, communications, or tangible things in a

11 manner that, without revealing information itself privileged or protected, will enable the parties to

12 assess the claim." Fed.R.Civ.P. 45(d)(2).

Rule 45(c)(1), Fed.R.Civ.P., provides that "[a] party or attorney responsible for issuing

and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on

a person subject to the subpoena."  Furthermore, "[t]he issuing court must enforce this duty and

impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--

on a party or attorney who fails to comply." Id.

### IV. DISCUSSION

#### A.  Documents Subpoenaed from Farhad Larian

Mattel contends that each of the categories of documents it seeks from Farhad Larian is

relevant and that there is good cause for production.  First, Mattel contends that the Larian v.

Larian proceedings are relevant because Farhad Larian's allegations about the timing of the

origins and early development of Bratz and MGA's concealment thereof parallel and provide

support for the crux of Mattel's claims in the instant litigation.  Second, Mattel contends that

documents about Farhad Larian's relationship with MGA are relevant to his credibility.  In

particular, Mattel contends that payments from Isaac Larian and/or MGA to Farhad Larian are

EXHIBIT  S  PAGE  371

1   relevant to credibility and possible bias.  Third, Mattel contends that documents relating to this

2   action are clearly relevant, especially in light of MGA and Isaac Larian's threat to disqualify

3   Mattel's counsel based upon purported communications between Mattel's counsel and Farhad

4   Larian.  Fourth, Mattel contends that it seeks information about the location of responsive

5   documents to determine whether Farhad Larian destroyed documents or for another reason no

6   longer has them.

7          Mattel next contends that Farhad Larian has failed to carry his burden of demonstrating

8   that the requests at issue are unreasonable, oppressive, annoying or embarrassing.  Further, Mattel

9   contends that the protective order in place in this lawsuit is sufficient to address Farhad Larian's

10   confidentiality or privacy concerns.  Lastly, Mattel contends that Farhad Larian's privilege log is

11   inadequate because it fails to justify his claims of privilege and work product protection on a

12   document-by-document basis.

13          Farhad Larian contends that Mattel's motion should be denied because Mattel violated its

14   meet and confer obligations by filing the motion before he made his scheduled supplemental

15   production and before the parties' meet and confer discussions had concluded.  According to

16   Farhad Larian, on November 27, 2007, it was agreed that he would make a supplemental

17   production of documents on December 6, 2007, and that he would provide a written supplemental

18   response.  Farhad Larian complied with this agreement and, on December 6, 2007, provided a

19   written supplemental response and, as Mattel acknowledges, approximately six boxes containing

20   approximately 12,000 pages of documents.  Nevertheless, Mattel filed the instant motion on

21   December 6, 2007, without reviewing the supplemental document production and written

22   supplemental response.  Farhad Larian also represents that as of December 6, 2007, the day

23   Mattel filed the instant motion, the parties acknowledged the need for a further meet and confer

24   session, as reflected in the numerous e-mails and correspondence exchanged between counsel.

25   Furthermore, Farhad Larian represents that after Mattel filed the instant motion, he requested that

26   Mattel take the motion off-calendar because his supplemental responses resolved the parties'

27   disputes as to all but three requests and because there was potential for resolving the remaining

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT __S__ PAGE __372__

1   requests as well, but that Mattel refused.

2         Farhad Larian contends that in light of his supplemental production, he is now in full

3   compliance with Mattel's subpoena, except for three requests. He represents that he has produced

4   over 12,000 documents, including all non-privileged documents from the Larian v. Larian matters

5   that relate to Bratz (including its origin), Carter Bryant, Mattel, a fee agreement between Farhad

6   and MGA, and all documents related to appraisals of MGA that are not privileged or otherwise

7   covered by a protective order. He also contends that the privilege log he has produced to Mattel,

8   which describes the withheld documents by category instead of document-by-document, is

9   sufficient to substantiate his claims of privilege and work product protection. As for the three

10  remaining requests, Nos. 23, 24 and 41, Farhad Larian contends that they are overbroad, harassing

11  and cumulative and invade his and his family's privacy.

12               Farhad Larian Has Substantially Complied with the Subpoena

13        Farhad Larian made a substantial supplemental production and provided a supplemental

14  written response on December 6, 2007. Indeed, Mattel acknowledges that it received

15  approximately six boxes of documents from Farhad Larian, which contain approximately 12,000

16  pages of documents. Nevertheless, Mattel contends in its reply brief that there are a few

17  deficiencies in Farhad Larian's production. For example, Mattel contends that Farhad Larian has

18  not produced (1) documents bates stamped "MZ" and "ED"; (2) raw data provided to the

19  appraisers in the Larian v. Larian litigations and the 2000 financial models that Farhad Larian

20  claimed Isaac Larian prepared; (3) three boxes of documents that Farhad Larian's counsel showed

21  Mattel's counsel and upon which MGA's disqualification threats against Mattel's counsel are

22  based; (4) the Dutcher Declaration; and (5) documents responsive to Request Nos. 17-19. Mattel

23  also contends that Farhad Larian has improperly limited its production to only those documents

24  that directly reference Bratz and Carter Bryant.

25        At the hearing, counsel for Farhad Larian confirmed that all responsive documents,

26  including the documents identified in Mattel's reply brief, had been or would be produced after

27  the parties executed the Stipulation Regarding Protective Orders, which has now been

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __S__ PAGE _373_

1  accomplished. Significantly, counsel represented that Farhad Larian did not limit his production

2  to only those documents that directly reference Bratz and Carter Bryant, and that his supplemental

3  responses make this point clear. Counsel for Farhad Larian also represented that all privileged

4  documents have been identified on a privilege log.

5       In light of the December 6, 2007 supplementation, and based upon the representations

6  made by counsel for Farhad Larian at the hearing, Farhad Larian has substantially discharged his

7  obligation to comply with Mattel's subpoena. Therefore, there is no need for an order compelling

8  any further production of documents.

9      <u>Farhad Larian's Objections to the Three Remaining Requests are Justified</u>

10      The only three requests to which Farhad Larian objects are Nos. 23, 24 and 41, which are

11  set forth in full below:

12  <u>Request No. 23</u>: All DOCUMENTS RELATING TO any and all payments of
money or transfers of anything of value that ISAAC LARIAN, his FAMILY
13  MEMBERS and/or MGA have made, have offered or have proposed, promised or
agreed to make, to or for the benefit of YOU or YOUR FAMILY MEMBERS at
14  any time from January 1, 1999 through the present.

15  <u>Request No. 24</u>: All DOCUMENTS RELATING TO any and all payments of
money or transfers of anything of value that any PERSON has made, has offered
16  or has proposed, promised or agreed to make, to or for the benefit of YOU or
YOUR FAMILY MEMBERS and that was related in any way to BRATZ,
17  BRYANT, MGA or this ACTION at any time from January 1, 1999 through the
present.

18

19  <u>Request No. 41</u>: DOCUMENTS sufficient to IDENTIFY since January 1, 1999
through the present (a) each account with any bank or financial institution that
20  YOU have or have had, or that YOU have or have had any legal beneficial
interest in; (b) each telephone subscription service account that YOU have or have
21  had, or that YOU use or have used; and (c) each email account that YOU have or
have had, or that YOU use or have used.

22

23  Farhad Larian contends that Mattel's stated justification for the requests – bias and credibility – is

24  questionable because he is not an adverse witness to Mattel. Farhad Larian represents that MGA

25  has never asked him to testify on the company's behalf. Rather, only Mattel intends to call him as

26  a witness. Farhad Larian asserts that there is no reason for Mattel to impeach its own witness.

27      Furthermore, Farhad Larian contends that even if it is advantageous for Mattel to attack

28

EXHIBIT **S** PAGE **374**'

1  his credibility, the scope of Mattel's requests go far beyond what Mattel is reasonably entitled to

2  receive through discovery.  He contends that pursuant to Rule 26, Fed.R.Civ.P., he should not be

3  subjected to discovery that is burdensome, cumulative, unnecessarily costly, or insufficiently

4  probative to the issues in the litigation to warrant the expense of production.  Furthermore, he

5  contends that the usual restrictions on discovery set forth in Rule 26 should be rigorously applied

6  to protect non-parties such as himself.

7      Farhad Larian contends that the three requests at issue are overbroad and harassing in

8  several respects.  First, he points out that the requests seek documents from 1999, which is five

9  years before this action was filed and six years before MGA was involved in this action.  Farhad

10  Larian contends that payments made to him and his family before this action was filed and before

11  MGA was a party to the case have no relevance to his credibility as a witness in this case.

12  Second, Farhad Larian contends that the requests, as phrased, would include any card that

13  accompanied a gift to anyone in the Larian family, regardless of the dollar value of the gift.

14  Farhad Larian contends that family gifts for birthdays, Chanukah, or general gifts of money

15  between family members, have nothing to do with bias and violate his and his family's privacy

16  rights.  Third, Farhad Larian contends that the requests are overbroad because they would require

17  him to disclose all documents reflecting payments he received as an employee of MGA and its

18  predecessor, a company he was employed by for decades.

19      Furthermore, Farhad Larian contends that he has already produced all non-privileged

20  documents which could potentially show bias, including the amount of money he was paid for his

21  shares of MGA, his consulting agreement with MGA after he sold his shares, and his fee

22  agreement with MGA.  He contends that requiring him to search for and produce additional

23  payment documents would only result in him producing cumulative information, which is not

24  only irrelevant but violates his and his family's right to privacy under the California Constitution.

25  Farhad Larian also contends that it would be far less intrusive for Mattel to question him at a

26  deposition about payments he received from Isaac Larian and MGA than for him to respond to the

27  three requests at issue.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __S__ PAGE __375__

1    Mattel's motion is denied with respect to Request Nos. 23, 24 and 41. The requests seek

2    information that is only minimally relevant to the claims and defenses in the case. Mattel's only

3    stated justification for the discovery is that it is relevant to establish Farhad Larian's credibility

4    and bias. Although impeachment information is discoverable, Mattel is not entitled to the type of

5    unfettered discovery it is now seeking. Rather, Rule 26(b)(2), Fed.R.Civ.P., requires the court to

6    restrict or prevent discovery if (i) the discovery is unreasonably cumulative or duplicative, or is

7    obtainable from some other source that is more convenient, less burdensome, or less expensive;

8    (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the

9    information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely

10   benefit, taking into account the needs of the case, the amount in controversy, the parties'

11   resources, the importance of the issues at stake in the litigation, and the importance of the

12   proposed discovery in resolving the issues. These restrictions are particularly important to

13   consider where the discovery requests are directed at a non-party. See Moon v. SCP Pool Corp.,

14   232 F.R.D. 633, 638 (C.D. Cal. 2005) (citing Dart Indus. Co., Inc. v. Westwood Chem. Co., Inc.,

15   649 F.2d 649 (9th Cir. 1980) (discovery should be "more limited to protect third parties from

16   harassment, inconvenience, or disclosure of confidential information.").

17       Aside from asserting that the requested information is relevant to bias and credibility,

18   Mattel has made no attempt to justify the significant breadth and burden of its requests. The

19   requests are so broad as to include every payment or gift, regardless of amount, made between

20   Farhad and Isaac Larian, their family members and MGA since 1999. The number of years for

21   which Mattel seeks financial information is overbroad. Mattel is seeking documents since 1999,

22   five years before this action was filed and six years before MGA became a party to this action.

23   Mattel fails to explain how any payments MGA or Isaac Larian made to Farhad or his family

24   members before this action was filed or MGA was a party to the action have any bearing on his

25   credibility as a witness in this action. The requests are also overbroad in that they encompass

26   customary gifts between family members and Farhad Larian's routine salary payments, which

27   have only minimal relevance to Farhad Larian's credibility and bias as a witness in this case.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

11

EXHIBIT ____S____  PAGE 376

1    The requests are also cumulative of discovery Farhad Larian has already provided. In
2  particular, Farhad Larian represents that he has already disclosed to Mattel the amount of money
3  he was paid for his shares of MGA, his consulting agreement with MGA after he sold his shares,
4  and his fee agreement with MGA. In light of this production , it is unreasonable to require Farhad
5  Larian to search for and produce gift receipts, cards, and the breadth of other financial documents
6  responsive to Request Nos. 23, 24 and 41. Furthermore, there are other less intrusive and
7  burdensome means of obtaining discovery regarding Farhad Larian's credibility and bias. For
8  example, Mattel may question Farhad Larian about payments he received from his brother and
9  MGA during his deposition.
10    Nor has Mattel justified the intrusive and harassing nature of the requests. Personal
11  financial information is afforded protection by the California Constitution that is also recognized
12  by federal courts. Cal. Const., Art. I, §1; <u>Valley Bank of Nevada v. Superior Court</u>, 15 Cal.3d
13  652, 656 (1975); <u>Kelly v. City of San Jose</u>, 114 F.R.D. 653, 656 (N.D. Cal. 1987) (federal courts
14  should give "some weight" to privacy rights that are protected by state constitutions); <u>Soto v. City</u>
15  <u>of Concord</u>, 162 F.R.D. 603, 616 (N.D. Cal. 1995) (right to privacy in financial information has
16  been recognized by federal courts). When a privacy right is asserted as an objection to discovery,
17  the court must balance the need for the information versus the privacy right asserted. <u>Soto</u>, 162
18  F.R.D. at 616.
19    As discussed previously, there is little to no need for the breadth of financial information
20  sought by Mattel. Many of the documents covered by Request Nos. 23, 24, and 41 have little to
21  no relevance to Farhad Larian's credibility and bias as a witness in this case. Furthermore,
22  Farhad Larian has already produced numerous documents showing payments he received from
23  both his brother and MGA. There are also other less intrusive means for obtaining discovery
24  relating to Farhad Larian's credibility and bias. Furthermore, the scope of these three requests
25  unduly intrude into Farhad Larian's private affairs. The requests are so broad as to include gifts
26  exchanged between family members and Farhad Larian's paycheck stubs, and would require
27  Farhad Larian to disclose every account number he has at a bank or financial institution since
28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

12

EXHIBIT _____S_____ PAGE _____377_____

1    1999. Thus, the balance tips sharply in favor of protecting Farhad Larian's personal financial

2    information.

3            <u>Farhad Larian's Privilege Log is Inadequate</u>

4        Mattel challenges the sufficiency of Farhad Larian's privilege log. At issue is whether

5    Farhad Larian must describe and assert claims of privilege on a document-by-document basis, or

6    whether he may do so categorically. Farhad Larian is withholding approximately one bankers'

7    box of documents based upon claims of privilege and work product protection. Farhad Larian's

8    Opposition at p.20, n. 9.

9        Rule 45(d)(2), Fed.R.Civ.P., requires a party responding to a subpoena to provide

10    sufficient information to enable the party seeking discovery to assess the claims of privilege and

11    work product protection. The "universally accepted" means of claiming that requested documents

12    are privilege is by producing a document-by-document privilege log. <u>Gail v. New England Gas</u>

13    <u>Co., Inc.</u>, 234 F.R.D. 28, 33 (D. R.I. 2007). The advisory comments to the 1993 amendment to

14    Rule 26(b), however, state that a description of documents by category is appropriate where it

15    would be "unduly burdensome" to provide a document-by-document privilege log. Specifically,

16    the advisory comment states, "Details concerning time, persons, general subject matter, etc., may

17    be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous

18    documents are claimed to be privileged or protected, particularly if the items can be described by

19    categories."

20        Farhad Larian relies upon the advisory comments and cases citing the advisory comments

21    to support his contention that as a non-party, it would be unduly burdensome to require a

22    document-by-document privilege log in this case. The cases cited by Farhad Larian, however, are

23    distinguishable from the present case. In <u>SEC v. Thrasher</u>, 1996 WL 125661 (S.D. N.Y. 1996),

24    the Commission sought production of all communications between defense counsel concerning

25    the lawsuit. The court observed that this demand, on it face, sought wholesale production of

26    documents that are ordinarily protected from disclosure. Further, the defendant represented that

27    the requested documents were extremely voluminous and that a document-by-document privilege

28

1   log would be a long and fairly expensive project to undertake.  In <u>Fifty-Six Hope Road Music,</u>

2   <u>Ltd. v. Mayah Collections, Inc.,</u> 2007 WL 1726558 (Nev. 2007), the withheld documents

3   consisted of e-mail communications between plaintiffs and their counsel or between plaintiffs'

4   counsel.  Plaintiffs represented that there were hundreds and perhaps thousands of such email

5   communications which were protected by the attorney-client privilege and work product doctrine.

6           In contrast to the volume of documents at issue in <u>Thrasher</u> and <u>Fifty-Six Hope Road</u>

7   <u>Music</u>, Farhad Larian represents that he has about one bankers' box of privileged documents.

8   Farhad has not established that to produce a privilege log on a document-by-document basis for

9   this volume of documents is unduly burdensome.  Furthermore, even if it were appropriate for

10  Farhad Larian to produce a privilege log that described documents categorically, which it is not,

11  the information provided in Farhad Larian's privilege log is insufficient to enable Mattel to assess

12  the claims of privilege and work product protection as required by Rule 45, Fed.R.Civ.P.  For

13  example, in some instances, Farhad Larian fails to identify the author and recipient of the

14  documents being withheld.  In other instances, Farhad Larian fails to provide the date or date

15  ranges for the documents being withheld.  Therefore, Farhad Larian is ordered to provide a

16  supplemental privilege log that complies with Rule 45.

17  B. Documents Subpoenaed from Kaye Scholer

18          Mattel contends that the documents it seeks from Kaye Scholer are relevant for all the

19  same reasons previously articulated in the context of Mattel's motion to compel Farhad Larian to

20  produce documents.  Mattel contends that its requests are not unreasonable, oppressive, annoying

21  or embarrassing.  Mattel points out that Kaye Scholer has separate case files containing all or the

22  vast majority of responsive documents, which undermines Kaye Scholer's boilerplate burden

23  objections.  Mattel also points out that it offered to alleviate some of the burden to Kaye Scholer

24  by paying for Kay Scholer's copying costs and by providing a paralegal to inspect documents

25  from Kaye Scholer's files with an agreement that the inspection would not result in a waiver of

26  any privileges.  Further, Mattel contends that the protective order in place in this action is

27  sufficient to address any confidentiality concerns Kaye Scholer may have.

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                                          14

    EXHIBIT ____S____ PAGE ___379___

1       Mattel next contends that the documents it seeks from Kaye Scholer are not available from

2   other sources, as evidenced by Mattel's repeated and unsuccessful attempts to seek the same

3   documents from MGA. Indeed, Mattel contends that the documents in Kaye Scholer's possession

4   are in fact documents within MGA's possession, custody and control that should have, but have

5   not yet been, produced pursuant to prior discovery orders obligating MGA and Isaac Larian to

6   produce documents from the <u>Larian v. Larian</u> proceedings. Mattel also points out that it has

7   searched public files and served additional subpoenas on other third parties involved in the <u>Larian</u>

8   <u>v. Larian</u> proceedings. Moreover, Mattel argues that federal law requires Kaye Scholer to comply

9   with the subpoena, even if the evidence sought is obtainable from another source. <u>See e.g. State</u>

10  <u>Farm Mut. Auto. Ins. Co. v. Accurate Medical, P.C.</u>, 2007 WL 2993840 at *1 (E.D. N.Y. 2007).

11      Mattel contends that Kaye Scholer's proposal to search only certain files for responsive

12  documents is unacceptable because it would inevitably exclude relevant documents. In particular,

13  Mattel contends that Kaye Scholer's proposal would exclude relevant documents likely to be

14  found in its correspondence file, such as an August 29, 2003 letter from Isaac Larian to Mr.

15  Zarabi relating to an appraisal of MGA, and a letter from Farhad Larian's attorney to Kaye

16  Scholer detailing the evidence of Isaac Larian's alleged concealment of Bratz. Mattel contends

17  that the relevance of these documents and others that are likely to exist justifies the burden of

18  production on Kaye Scholer.

19      Further, Mattel contends that Kaye Scholer has failed to produce a privilege log in

20  violation of Rule 45(d)(2), Fed.R.Civ.P., and therefore Kaye Scholer has waived any claims of

21  privilege. In the alternative, Mattel requests an order compelling Kaye Scholer to produce a

22  document-by-document privilege log.

23      Kaye Scholer contends that the instant motion is premature, unnecessary and a waste of

24  judicial resources. Kaye Scholer represents that after meeting and conferring in good faith, it

25  agreed to produce documents responsive to thirty of the thirty-five requests, and that the

26  remainder of the requests are grossly overbroad. Further, Kaye Scholer represents that it has

27  completed its review pursuant to the agreement, and is prepared to produce responsive

28  
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

15

EXHIBIT ___S___ PAGE __380__

1   documents. However, Kaye Scholer continues to object to producing a document-by-document

2   privilege log on the grounds that it would be unduly burdensome and expensive. Kaye Scholer

3   emphasizes that Mattel is seeking documents from a law firm, and therefore the vast majority of

4   responsive documents are protected by multiple privileges, including but not limited to the

5   attorney-client privilege and the work product doctrine. Kaye Scholer estimates that it would take

6   in excess of seventy (70) hours to create a document-by-document privilege log for this case, and

7   that the Federal Rules of Civil Procedure do not require Kaye Scholer to undertake such an

8   unreasonable burden. Furthermore, Kaye Scholer contends that the failure to produce a

9   document-by-document privilege log does not result in a per-se waiver of any privilege.

10       MGA also opposes Mattel's motion for several reasons. First, MGA contends that

11   Mattel's requests are overbroad, encompassing documents that are only marginally related, if at

12   all, to the claims and defenses in the case. Second, MGA contends that Mattel's requests are

13   completely duplicative of requests it has served on the parties in the case. In particular, MGA

14   contends that Mattel has sought the Larian v. Larian documents from both MGA Entertainment,

15   Inc. and Isaac Larian. See Mattel's Request No. 41 in Mattel's First Set of Request for

16   Production of Documents and Tangible Things to MGA, and Request Nos. 123-125 in Mattel's

17   First Set of Requests for Documents and Things to Isaac Larian. MGA and Isaac Larian are both

18   under court order to comply with the requests, although Isaac Larian is only required to produce

19   documents that refer or relate to Bratz in response to Request Nos. 123-125. Third, MGA

20   contends that Mattel's requests to Kaye Scholer are much broader than requests Mattel previously

21   served on the parties to this case. Fourth, MGA contends that there is no reason Mattel cannot

22   obtain a complete set of all relevant documents from the Larian v. Larian proceedings without this

23   third-party subpoena. Fifth, MGA contends that the vast majority of documents Mattel seeks

24   from Kaye Scholer are protected by the attorney-client privilege, the work product doctrine, or

25   other privileges, and that it is improper for Mattel to attempt to subpoena these documents and

26   then insist that Kaye Scholer produce a document-by-document privilege log. In summary, MGA

27   contends that Mattel has misused the subpoena process by serving deliberately overbroad and

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

16

EXHIBIT _S_ PAGE _381_

1  burdensome requests in an attempt to harass and intimidate MGA and non-parties.  Accordingly,

2  MGA contends that Mattel's motion should be denied or Mattel's subpoena should be

3  substantially limited in scope.

4        <u>Mattel's Subpoena is Overbroad, Unduly Burdensome and Cumulative</u>

5        Mattel's subpoena to Kaye Scholer is overbroad and is not reasonably tailored to seek

6  documents relevant to the claims and defenses in this case.  Of the thirty-five requests Mattel

7  served on Kaye Scholer, all but one begin with the phrase "all documents" or a similarly broad

8  phrase.  For example, Request Nos. 1-3, which are set forth below, seek virtually all documents

9  relating to lawsuits and/or arbitrations between Isaac Larian and Farhad Larian:

10        <u>Request No. 1</u>:  All DOCUMENTS, including all COMMUNICATIONS,
          RELATING TO any and all arbitration proceedings between FARHAD LARIAN

11        and ISAAC LARIAN, including without limitation all video and/or sound
          recordings, transcripts, exhibits, memoranda, witness statements, declarations,

12        affidavits and sworn testimony given by any PERSON in connection with such
          arbitration proceedings.

13        <u>Request No. 2</u>:  All DOCUMENTS including all COMMUNICATIONS,
          RELATING TO Los Angeles Superior Court Case No. BC301371 filed by

14        FARHAD LARIAN against ISAAC LARIAN and/or any related proceedings,
          including any appeal thereof, and including without limitation all video and/or

15        sound recordings, transcripts, exhibits, pleadings, briefs, memoranda, witness
          statements, declarations, affidavits and sworn proceedings and/or any appeal

16        related to such lawsuit.

17        <u>Request No. 3</u>:  All DOCUMENTS RELATING TO Los Angeles Superior Court
          Case No. BC329501 filed by FARHAD LARIAN against ISAAC LARIAN,

18        MORAD ZARABI and Kambiz Zarabi, and/or any related proceedings and/or any
          appeal of such lawsuit, including without limitation all video and/or sound

19        recordings, transcripts, exhibits, pleadings, briefs, memoranda, witness
          statements, declarations, affidavits and sworn testimony given by any PERSON in

20        connection with such suit and/or related proceedings and/or any appeal related to
          such lawsuit.

21

22  Mattel has not limited the subject matter of these requests (and others) in any way to exclude

23  irrelevant information.  To the contrary, Request Nos. 1-3 are drafted in the broadest possible

24  language, encompassing documents that are only marginally related, if at all, to this case.  As

25  such, Mattel's requests are also unduly burdensome.

26        Furthermore, Mattel's requests are clearly duplicative of other requests propounded to the

27

28  <span style="font-size:small">Bryant v. Mattel, Inc.,<br>CV-04-09049 SGL (RNBx)</span>

17

EXHIBIT __S__ PAGE __382__

1   parties in this action.  In particular, the requests relating to the <u>Larian v. Larian</u> proceedings are

2   duplicative of Mattel's Request No. 41 to MGA and Request Nos. 123-125 to Isaac Larian.

3   During the hearing, counsel for MGA acknowledged that Isaac Larian is required to comply with

4   Request Nos. 123-125, and is prepared to review Kaye Scholer's files for responsive documents

5   to fulfill his responsibility.  Also during the hearing, Kaye Scholer agreed to make its

6   correspondence file available to MGA's counsel for review.

7          In light of Mattel's failure to take reasonable steps to avoid unduly burdening Kaye

8   Scholer and in light of MGA's and Kaye Scholer's representations during the hearing as outlined

9   above, Mattel's motion to compel Kaye Scholer to comply with the full scope of the subpoena is

10  denied.

11              <u>Kaye Scholer's Compromise is Reasonable Under the Circumstances</u>

12         As an alternative to complying with the full scope of the subpoena, Kaye Scholer agreed

13  to review the following files for documents responsive to every one of Mattel's requests except

14  Nos. 1-3, 6 and 10:  (1) pleading files; (2) discovery files; and (3) arbitration exhibits.  Kaye

15  Scholer's Opposition at p.5.  Kaye Scholer's compromise is reasonable under the circumstances.

16  Narrowing the scope of Kaye Scholer's search in this manner will significantly minimize the

17  burden, expense, and inconvenience imposed by the subpoena because, unlike Kaye Scholer's

18  other files, most of the documents in the three files it agreed to search are not likely to be covered

19  by the attorney-client privilege or work product doctrine.  Further, narrowing Kaye Scholer's

20  search in this manner will not significantly deprive Mattel of relevant discovery to which it is

21  entitled because, as stated previously, MGA's counsel represented during the hearing that Isaac

22  Larian is prepared to review Kaye Scholer's documents, including the correspondence file, to

23  comply with Request Nos. 123-125.

24         Accordingly, to the extent it has not already done so, Kaye Scholer shall conduct the

25  agreed upon search of its three files and produce documents responsive to all of Mattel's requests,

26  except Nos. 1-3, 6 and 10.

27  //

28

EXHIBIT ___5___ PAGE __383__ [18]

1    <u>Kaye Scholer Must Produce a Privilege Log in Compliance with Rule 45</u>

2        Mattel contends that Kaye Scholer has waived its claims of privilege by failing to produce

3    any privilege log. The law is clear, however, that the failure to produce a document-by-document

4    privilege log does not result in a per-se waiver of any privilege. <u>See Burlington Northern & Santa</u>

5    <u>Fe Ry. Co. v. U.S. Dist. Court for Dist. Of Mont.</u>, 408 F.3d 1142, 1147 (9th Cir. 2005). In this

6    case, Kaye Scholer raised a legitimate objection to producing a document-by-document privilege

7    log on the grounds that it would impose an undue burden. Under these circumstances, a finding

8    of waiver is unjustified.

9        Nevertheless, Kaye Scholer's claim of undue burden is unpersuasive. Kaye Scholer has

10   acknowledged that most of the documents in the three files it has agreed to search are not likely to

11   be covered by the attorney-client privilege or work product doctrine. Kaye Scholer Opposition at

12   pp. 5 and 9. Indeed Kaye Scholer agreed to search these files precisely because they were not

13   likely to contain privileged documents. Therefore, requiring Kaye Scholer to produce a

14   document-by-document privilege log for documents withheld from these three files should not

15   impose an undue burden. Accordingly, Kaye Scholer is ordered to produce a document-by-

16   document privilege log for documents withheld from the three files it agreed to search.

17                                   V. CONCLUSION

18       For the reasons set forth above, it is ordered as follows:

19       1. Farhad Larian is in substantial compliance with Mattel's subpoena with respect to all of

20   the requests, except Nos. 23, 24 and 41. Request Nos. 23, 24 and 41 are overbroad, unduly

21   burdensome, cumulative, harassing and invade the right of privacy of Farhad Larian and his

22   family. Therefore, Mattel's motion to compel Farhad Larian to produce documents in response to

23   the subpoena is denied.

24       2. Farhad Larian shall produce a document-by-document privilege log to Mattel no later

25   than January 30, 2008.

26       3. Farhad Larian's request for sanctions against Mattel is denied.

27       4. Mattel's subpoena to Kaye Scholer is overbroad, unduly burdensome and cumulative.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT ___S___ PAGE 384

1   Therefore, Mattel's motion to compel Kaye Scholer to produce documents responsive to the

2   subpoena is denied.  Instead, Kaye Scholer is ordered to abide by its agreement to review its

3   pleading files, discovery files, and arbitration exhibits for documents responsive to all of Mattel's

4   requests, except Request Nos. 1-3, 6 and 10.  Kaye Scholer shall produce responsive documents

5   no later than January 30, 2008.

6          5. Kaye Scholer shall also produce a document-by-document privilege log identifying all

7   documents withheld from its pleading files, discovery files, and arbitration exhibits, no later than

8   January 30, 2008.

9          6. Mattel shall abide by its agreement to reimburse Farhad Larian and Kaye Scholer for

10  their copying costs.

11         7. Isaac Larian is granted an extension of time to comply with Request Nos. 123-125.

12  Isaac Larian shall deliver documents responsive to these requests to Mattel no later than 12:00

13  p.m. on January 25, 2008.

14         8. Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

15  Master, Mattel shall file this Order with the Clerk of Court forthwith.

16

17  Dated: January 25, 2008                    /s/Edward A. Infante

18                                          HON. EDWARD A. INFANTE (Ret.)
                                               Discovery Master
19

20

21

22

23

24

25

26

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

EXHIBIT ___S___ PAGE ___385___  20

Case 2:04-cv-09049-SGL-RNB       Document 1699       Filed 01/28/2008       Page 21 of 21

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 25, 2008, I served the attached ORDER RE MATTEL'S MOTIONS TO COMPEL FARHAD LARIAN, KAYE SHOLER AND STERN & GOLDBERG TO PRODUCE DOCUMENTS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Patricia Glaser, Esq. | Christensen, Glaser, Fink, et al. | pglaser@chrisglase.com |
| Scott E. Glzer, Esq. | Christensen, Glaser, Fink, et al. | sglzer@chrisglase.com |
| Alisa Morgenthaler-Lever, Esq. | Christensen, Glaser, Fink, et al. | amorgentaler@chrisglase.com |
| Alan N. Goldberg, Esq. | Stern & Goldberg | agoldberg@sgattys.com |
| Mark Overland, Esq. | Overland, Borenstein, et al. | moverland@obsklaw.com |
| Alexander Cote, Esq. | Overland, Borenstein, et al. | acote@obsklaw.com |
| Bryant S. Delgadillo, Esq. | Kaye Scholer | bdelgadil@kayescholer.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 25, 2008, at San Francisco, California.

_Sandra Chan_
Sandra Chan

EXHIBIT ___5___ PAGE ___386___

**EXHIBIT  T**

CONFORMED COPY

1 | Hon. Edward A. Infante (Ret.)
2 | JAMS
  | Two Embarcadero Center
  | Suite 1500
3 | San Francisco, California  94111
  | Telephone:   (415) 774-2611
4 | Facsimile:    (415) 982-5287

5

6

7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

8

EASTERN DIVISION

9

10

| | |
|---|---|
| 11 | CARTER BRYANT, an individual, | CASE NO. C 04-09049 SGL (RNBx) |
| | | JAMS Reference No. 1100049530 |
| 12 | Plaintiff, | |
| 13 | v. | Consolidated with |
| | | Case No. CV 04-09059 |
| 14 | MATTEL, INC., a Delaware corporation, | Case No. CV 05-2727 |
| 15 | Defendant. | **ORDER MODIFYING PROTECTIVE ORDER** |
| 16 | | |
| 17 | CONSOLIDATED WITH | |
| | MATTEL, INC. v. BRYANT and | |
| 18 | MGA ENTERTAINMENT, INC. v. MATTEL, INC. | |
| 19 | | |

20

## I. INTRODUCTION

21

Presently pending for decision is MGA Entertainment, Inc.'s ("MGA") and Carter

22

Bryant's ("Bryant") "Motion for Clarification Of The Discovery Master's January 25, 2007 Order

23

Or For Protective Order Pursuant to Rule 26(c)."  At issue is whether the January 25, 2007 Order

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

1

1  ("Order") requires Bryant to produce drawings and designs in his possession that he created in

2  2006 or later[1] for products currently under development and not yet released to the public.

3  MGA and Bryant filed their motion on February 23, 2007; Mattel submitted an opposition brief

4  on March 2, 2007; and MGA and Bryant submitted a reply brief on March 7, 2007.  The matter

5  was heard via telephonic conference on March 19, 2007, and taken under submission pending the

6  parties' submission of a stipulated protective order, which was received on April 23, 2007.

7         Having considered the motion papers and comments of counsel at the hearing, and for the

8  reasons set forth below, the motion for clarification of the Order is denied.  There is good cause,

9  however, to modify the current protective order to further limit the disclosure of drawings and

10  designs for MGA products currently under development and not yet released to the public.

11                                II. BACKGROUND

12         The Order that is the subject of this motion granted Mattel's motion to compel Bryant to

13  produce documents responsive to numerous document requests relating to the development of

14  Bratz and other projects that Bryant worked on for MGA.  In ruling on Mattel's motion, the

15  Discovery Master rejected Bryant's relevancy and overbreadth objections to producing

16  documents relating to work that Bryant performed for MGA after the release of the First

17  Generation Bratz dolls on June 30, 2001.

18         Neither party specifically addressed whether Mattel was entitled to drawings and designs

19  for MGA products on which Bryant worked and that are currently under development and not yet

20  released to the public.  Mattel has taken the position that the Order requires production of such

21  documents.

22         During the meet and confer process, MGA and Bryant requested that Mattel "agree to a

23  limitation on the disclosure of product drawings and designs for products in development until

24  after that product has been made available for public sale."  Torres Decl., Ex. A.  Mattel rejected

25

26  _____

27  [1]  MGA and Bryant's Reply Brief at 4:28-5:28, n. 4.

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                                                                                      2

EXHIBIT __T__ PAGE _388_

1  the proposal, asserting that the proposal "would allow Bryant and/or MGA to unilaterally deem

2  something to be 'in development' and thus not produce it, including for designs Bryant previously

3  created and to which Mattel may have rights." Torres Decl., Ex. A. The parties had further

4  discussions regarding the disclosure of drawings and designs for products in development but

5  were unable to reach an agreement.

6       MGA and Bryant now request "a clarification that the Order does not require the

7  production of drawings or designs for products that have not yet been released." MGA and

8  Bryant's Motion at 2:13-15. In the alternative, MGA and Bryant move for a protective order

9  pursuant to Rule 26(c), Fed.R.Civ.P., providing that drawings or designs for products that have

10  not yet been released (1) need not be produced, or (2) shall be produced only after the products

11  have been released to the public, or (3) shall be produced under other very restrictive conditions

12  to protect their confidentiality. MGA and Bryant contend that "[e]ven if some of the 'Bratz'

13  drawings that Bryant created for MGA after June 30, 2001, may be relevant to claims at issue in

14  this action, drawings for unreleased products are not." MGA and Bryant's Motion at 4:28-5:2.

15  Further, they contend that such drawings are highly valuable trade secret documents whose

16  disclosure could severely jeopardize MGA's business.

17       Mattel opposes the motion on numerous grounds. First, it contends that the motion for

18  clarification is, in effect, an improper motion for reconsideration that does not satisfy the

19  standards for reconsideration, and is another attempt to withhold highly probative evidence that

20  bears directly on Mattel's claims and defenses. Mattel contends that the Order clearly requires

21  Bryant to produce his drawings, and that MGA and Bryant are now precluded from withholding

22  documents relating to unreleased products because they failed to raise the issue earlier. Second,

23  Mattel asserts that drawings and designs for unreleased products are relevant to its claims for

24  breach of contract, breach of fiduciary duty, breach of the duty of loyalty, copyright infringement,

25  and misappropriation of trade secrets. Third, Mattel contends that the protective order currently

26  in place, which addresses trade secret information in particular, is adequate to protect MGA and

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SOL (RNBx)

3

EXHIBIT __T__ PAGE __389__

1  Bryant's interests.  Fourth, Mattel contends that the additional protections MGA and Bryant seek

2  under Rule 26(c), Fed.R.Civ.P., would hamstring its ability to investigate and prosecute its claims

3  and defend against MGA's claims.

4  <u>III. DISCUSSION</u>

5  <u>A. The Order Requires Production of Drawings and Designs for Products Not Yet Released</u>

6  The Order clearly requires Bryant to produce all documents in his possession, custody or

7  control relating to Bratz and other products that Bryant has worked on with or for MGA.  Among

8  other things, the Order requires Bryant to produce documents responsive to Mattel's Request Nos.

9  12, 19, 40, 41, and 54.  Request No. 12 seeks production of all documents that refer or relate to

10  work or services that Bryant performed for or on behalf of MGA after October 20, 2000.  <u>See</u>

11  Zeller Decl., Ex. 4.  Request No. 19 seeks production of all documents that refer or relate to

12  designs that Bryant created, authored, produced, conceived of or reduced to practice after October

13  20, 2000 as purported "works-made-for-hire," whether in whole or in part for or on behalf of

14  MGA.  <u>Id.</u>  Request No. 40 seeks production of documents that refer or relate to Bryant's

15  participation in the conception, creation, design, development, sculpting, tooling, production or

16  manufacture of Bratz.  <u>Id.</u>  Request No. 41 seeks production of all documents that refer or relate

17  to designs for Bratz.  <u>Id.</u>  Request No. 54 seeks production of all prototypes, models, samples and

18  tangible items that refer or relate to Bratz.  <u>Id.</u>  Each of these requests covers drawings and

19  designs for Bratz products, regardless of when the drawings and designs were created or whether

20  the products to which they relate have been released.

21  Nowhere does the Order exempt, or even arguably exempt, from production responsive

22  documents relating to products that have not been released.  To the contrary, the Order rejects

23  Bryant's objections based upon relevancy and overbreadth.  In particular, the Order rejects

24  Bryant's "First Generation Bratz" limitation, which sought to limit discovery to only those

25  documents relating to the first dolls sold to the public in the summer of 2001.  Thus, under the

26

27

28

EXHIBIT __T__ PAGE __390__

1    Order, Bryant is required to produce drawings and designs in his possession for products currently

2    under development and not yet released to the public.

3         Because the terms of the Order are clear, MGA's and Bryant's request for clarification of

4    the Order is denied.

5    <u>B.  There is Good Cause to Modify the Protective Order as to Drawings and Designs for Products</u>

6    <u>Not Yet Released</u>

7         In the event that designs and drawings for unreleased products under development are

8    found relevant and within the scope of the Order, MGA and Bryant move in the alternative for a

9    protective order pursuant to Rule 26(c), Fed.R.Civ.P., that would provide additional protections

10   not available under the protective order currently in place.  More specifically, MGA and Bryant

11   seek either (1) an order that the designs and drawings for MGA's unreleased products not be

12   revealed at all; (2) an order delaying production of designs and drawings for MGA's unreleased

13   products until the products are released; (3) an order requiring the designs and drawings to be

14   placed in an escrow for an expert to review and prohibiting the expert from removing or copying

15   the documents; or (4) an order providing that the drawings and designs for unreleased products be

16   produced for inspection by only an independent expert at the offices of MGA's counsel, with no

17   copying, photographing or sketching permitted.  Because there is already a protective order in

18   place, MGA and Bryant's motion is construed as one for modification of the existing protective

19   order.[2]

20                           <u>1. Rule 26 Standards</u>

21        Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

22   discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

23

24

        [2] Mattel's contention that the present motion is an improper motion for reconsideration is without merit. To

25   the extent MGA and Bryant seek protection under Rule 26(c), Fed.R.Civ.P., their motion raises issues that were not
within the scope of Mattel's motion to compel production of documents from Bryant. Furthermore, paragraph 19 of

26   the protective order currently in place provides that a party may, at any time, apply to the Court for a modification of
its terms.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

                                                   5

EXHIBIT __T__ PAGE __391__

1   party." Fed.R.Civ.P. 26(b)(1).  "Relevant information need not be admissible at trial if the

2   discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

3   Even when discovery is permissible under Rule 26(b)(1), however, discovery may be limited

4   pursuant to Rule 26(c), Fed.R.Civ.P., which provides for the issuance of a protective order upon

5   motion by a party that has conferred in good faith in an effort to resolve the dispute without court

6   action, and for good cause shown.  Rule 26(c) provides for "any order which justice requires to

7   protect a party or person from annoyance, embarrassment, oppression or undue burden or

8   expense," including, among other things, "(1) that the disclosure or discovery not be had; (2) that

9   the discovery may be had only on specified terms and conditions, including a designation of the

10  time or place . . . (5) that the discovery be conducted with no one present except persons

11  designated by the court" and "(7) that a trade secret or other confidential research, development,

12  or commercial information not be revealed or revealed only in a designated way."  In general, in

13  determining whether a protective order should issue for trade secrets, the Ninth Circuit requires

14  that a court balance the risk to the disclosing party of inadvertent disclosure of trade secrets to

15  competitors against the risk to the moving party that protection of the trade secret would impair

16  the prosecution of its claims.  Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th

17  Cir. 1992) (upholding protective order granting access to source code and other trade secret

18  materials to only an independent consultant).

19                    2. The Documents At Issue Are Relevant

20          In support of its motion for a protective order, MGA and Bryant contend that drawings

21  and designs for products not yet released to the public are not relevant to any of Mattel's claims.

22  As an initial matter, MGA and Bryant contend that Mattel cannot possibly have suffered a

23  cognizable injury relating to MGA's products that have not yet been released, and that Mattel has

24  never taken the position that such products are relevant.  MGA and Bryant next contend that the

25  drawings and designs for unreleased products are not relevant to Mattel's counterclaim for

26  copyright infringement because that claim is premised on an allegation that Bryant created the

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                      6

EXHIBIT __T__ PAGE __392__

1   original Bratz drawings while still employed at Mattel. MGA and Bryant similarly contend that

2   drawings and designs for products not yet released to the public are not relevant to Mattel's

3   original claim that Bryant breached his confidentiality obligations while still employed by Mattel.

4   Because Mattel's claims are based upon events occurring while Bryant was still employed by

5   Mattel, MGA and Bryant believe that drawings and designs for products currently under

6   development -- over six years after the termination of Bryant's employment at Mattel -- have no

7   relevance. MGA and Bryant further contend that the drawings and designs for products currently

8   under development are not relevant to Mattel's counterclaim for trade secret misappropriation.

9   MGA and Bryant reason that the trade secret claim is based on the alleged theft of business

10  information, not drawings and designs for products.

11         Consistent with the analysis previously set forth in the Order, the Discovery Master finds

12  that drawings and designs for unreleased products are relevant to Mattel's claims against Bryant.

13  Mattel claims that it owns works created by Bryant during his Mattel employment, regardless of

14  whether the works resulted in a Bratz doll released at a particular time. Further, Mattel's

15  complaint alleges that Bryant breached his confidentiality obligations while employed by Mattel.

16  As Mattel points out, Bryant has a continuing obligation not to use Mattel's confidential and

17  proprietary information.

18         Drawings and designs for unreleased products are also relevant to Mattel's copyright

19  infringement claim. It is true, as MGA and Bryant point out, that Mattel claims it owns

20  copyrights in Bratz works created by Bryant while still employed by Mattel. Mattel, however,

21  also asserts that Bryant has infringed Mattel's alleged copyrights in Bratz works through his

22  ongoing conduct of reproducing and creating derivative works.

23         Drawings and designs for unreleased products are also relevant to Mattel's counterclaim

24  for trade secret misappropriation. Among other things, Mattel alleges that MGA stole its future

25  line lists that detail the Barbie products that Mattel anticipated producing in 2004. Drawings of

26  unreleased MGA products that resemble unreleased products on Mattel's line lists may support

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT __J__ PAGE __393__

1   Mattel's allegation of trade secret misappropriation, even if the line list might potentially be

2   outdated. Further, proof of trade secret theft is also relevant to Mattel's defense against MGA's

3   unfair competition claims.[3]

4                   3. The Drawings and Designs Are Entitled to Heightened Protection

5        MGA and Bryant contend that drawings and designs for unreleased products fall squarely

6   within the category of trade secret information and should not be revealed at all, or in the

7   alternative, should not be revealed prior to release of the products. They contend that there is

8   good cause for heightened protection for drawings and designs for unreleased products because

9   any relevance of such drawings and designs is marginal at best, and the potential damage to MGA

10   of any disclosure is substantial. According to MGA and Bryant, there are thirteen lawyers at

11   Mattel's retained law firm who have recently been named in or on briefs submitted by Mattel. In

12   addition, MGA and Bryant estimate that there are numerous other staff members and outside

13   vendors – such as copy services, couriers, court reporters, experts and their respective staffs—

14   who also handle documents in this case on a regular basis. MGA and Bryant contend that the

15   current protective order allows disclosure to each of these groups of people, even for documents

16   restricted as "Confidential – Attorneys' Eyes Only." Moreover, MGA and Bryant contend that

17   Mattel has a practice of summarizing or paraphrasing contents of confidential documents or

18   testimony in briefs and other papers filed with the Court. MGA and Bryant suspect that Mattel

19   may follow this practice with respect to drawings and designs of unreleased products, and thereby

20   release MGA's trade secret information to the public.

21        Mattel opposes any modification of the existing protective order, asserting that the parties

22   contemplated exchanging trade secret information, including "non-public information relating to

23

24         [3]  MGA and Bryant's contention that discovery of drawings and designs for unreleased products is barred

25   unless and until Mattel complies with California Code of Civil Procedure section 2019.210 is without merit. Drawings and designs for unreleased products are relevant to claims other than the trade secret misappropriation

26   claim, such as Mattel's claim for copyright infringement. Furthermore, the case relied upon by MGA and Bryant, Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal.App.4th 826 (2nd Dist. 2005), is distinguishable from the present case in that not all of Mattel's claims are "factually dependent" on the trade secret claim.

27

28   Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

1   product development and design,"[4] and agreed to certain safeguards for trade secret information.

2   Mattel contends that there is little to no risk of unwarranted disclosure of MGA's trade secrets

3   because Mattel's in-house counsel and employees are not permitted to inspect or know the

4   contents of documents designated as "Confidential--Attorneys' Eyes Only." Mattel also denies

5   disclosing MGA's confidential information in briefs filed with the court.

6       Mattel's argument that MGA is limited to the terms of the current protective order is

7   without merit. The current protective order was negotiated by the parties at the inception of the

8   case, well before all of the claims and defenses were established. At that time, the parties did not

9   fully understand or foresee what documents and trade secrets would be relevant and discoverable

10   under Rule 26, Fed.R.Civ.P. Moreover, paragraph 19 of the protective order provides that a party

11   may, at any time, apply to the court for a modification of its terms.

12       On balance, there is good cause for heightened protection for drawings and designs for

13   unreleased products. MGA and Mattel are direct competitors. MGA has submitted the

14   declaration of Paula Garcia to support its claim of trade secrets. Ms. Garcia is the Vice President

15   of Product Design and Development and is responsible for the design and development of Bratz

16   products. She states that "[w]ithout question, a toy manufacturer's unreleased toy concepts . . .

17   are among its most highly valuable trade secrets." Garcia Decl. at ¶4. She states that "[a]lthough

18   such drawings and designs are valuable even after the product's public release, their value is

19   enormous prior to their public release because it is the new ideas and designs that are most likely

20   to generate new sales." Id. She further states that MGA protects its product designs and drawings

21   by using confidentiality agreements, computer passwords, and security guards. She also states

22   that vendors, manufacturers, suppliers and other third parties who may see a product design late in

23   the development process are required to sign strict confidentiality agreements. Ms. Garcia states

24   that "MGA's drawings for some of its yet-unreleased 'Bratz' products are even more closely

25

26      [4] Protective Order at 2-3.

27

28   Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)             9

1   protected." Id. at ¶6. More specifically, she declares that when MGA begins to develop a new

2   Bratz line, only a very limited number of people know about it. Further, Ms. Garcia asserts, "[i]n

3   fact, with respect to some 'Bratz' products, Carter Bryant and I are the only people who know

4.  what the concept is and who see the early product drawings. Even after I approve and we have

5   finalized the concept, only a small number of people on the 'Bratz' development team have

6   exposure to the drawings." Id. Thus, drawings and designs for MGA products not yet released to

7   the public are unquestionably valuable trade secret information.

8          Although the protective order currently in place provides for two tiers of protection, MGA

9   points out that even under the higher "Confidential – Attorneys' Eyes Only" tier, MGA's

10  drawings and designs for unreleased products could be disclosed to at least thirteen of Mattel's

11  lawyers, as well as staff members, and also outside vendors such as copy services, court reporters,

12  experts and their staff. Given the number of people involved in the case, MGA is justifiably

13  concerned about the possibility of inadvertent disclosures of trade secrets that could lead to

14  substantial economic injury.

15         In comparison to the potential risk of harm to MGA, Mattel's need for drawings and

16  designs for unreleased products is relatively small. Mattel's claims and defenses are centered

17  upon Bryant's conduct during his employment at Mattel, which ended in October of 2000, and

18  events leading up to the release of the First Generation of Bratz dolls in the summer of 2001.

19  Although the lawsuit is much broader than the First Generation of Bratz dolls, events occurring

20  after the summer of 2001 become less relevant as more time passes. Approximately six years

21  have passed since the launch of the First Generation Bratz dolls. Furthermore, for purposes of

22  determining damages, drawings and designs for released products are far more relevant than

23  drawings and designs for yet unreleased products. Indeed, as MGA and Bryant point out, it is

24  unlikely that Mattel could have suffered any cognizable injury from MGA products that have not

25  yet been released.

26

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                            10

EXHIBIT __T__ PAGE 396

1        In summary, the potential for inadvertent disclosure under the terms of the existing

2  protective order outweighs Mattel's need for drawings and designs for unreleased products.

3  Accordingly, MGA and Bryant are entitled to additional protective measures to prevent

4  inadvertent disclosure of drawings and designs for unreleased products.

5                  4. Delaying Production of Drawings and Designs Until

6        Products Are Released Would Impair Mattel's Ability To Prosecute Its Claims

7        MGA and Bryant seek a protective order delaying production of drawings and designs for

8  products under development until the products are actually released.  MGA and Bryant anticipate

9  releasing products in the fall of 2007 and the spring of 2008.  MGA and Bryant's Reply at 4:26-

10  28.  MGA and Bryant contend that production of drawings and designs for products under

11  development prior to their release date would impose an unwarranted burden for two reasons.

12  First, MGA and Bryant assert that Mattel's requests are broad.  Second, they contend that

13  requiring production of drawings and designs would be disruptive to the product development

14  process.  They explain that the creative process is fluid, constant, and extremely rapid.  They

15  explain that for some Bratz products, Bryant may create and develop scores of drawings that are

16  modified and improved throughout the development cycle.  Further, MGA often goes back to, or

17  builds on, prior drawings.  MGA and Bryant contend that "to be forced to turn over these

18  drawings throughout the development process before the product line is finalized, particularly as

19  MGA is operating under such short development cycles, would not only substantially compromise

20  the strict confidentiality measures that MGA has in place but would be extremely disruptive to its

21  ability to do business and therefore significantly impact its ability to compete."  MGA and

22  Bryant's Motion at 11:16-22.

23        MGA and Bryant's proposal to delay production until products are released is unworkable.

24  Although MGA anticipates releasing products in the fall of 2007 and the spring of 2008, there is

25  no guarantee that MGA will meet those release dates.  If there are delays in the release dates,

26  Mattel might not have sufficient time to review the drawings and designs and conduct follow up

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

11

EXHIBIT __T__ PAGE __397__

1  discovery under the current schedule.  Trial on Mattel's original claims is scheduled for February

2  of 2008, and trial on MGA's claims and Mattel's counterclaims is scheduled for July of 2008.

3  In light of the trial schedule, any delay beyond June 29, 2007 would unduly prejudice Mattel's

4  ability to prepare for trial.

5  ### 5. Additional Procedures

6      At the hearing, the parties represented that they would submit a stipulation and proposed

7  order with additional terms governing the production of drawings and designs for MGA's

8  products that are under development.  On April 23, 2007, the parties submitted a stipulation and

9  proposed order.  The parties stipulated to define "Subject Documents" as "documents (defined to

10  include both tangible items and electronic data) created after January 1, 2006 that pertain to

11  products which are currently unreleased and scheduled for public release in 2007 or 2008 and

12  that constitute highly sensitive trade secrets of the producing Party." Stipulation and Proposed

13  Order at ¶1.  The main terms of the stipulation are as follows:

14      1. That "Subject Documents" may be withheld from production to the other parties until

15  June 29, 2007.  Id. at ¶2.

16      2. That "Subject Documents" may be designated as "Highly Confidential – Restricted

17  Attorneys' Eyes Only," and that documents so designated "shall not be disclosed in any way to,

18  nor their contents summarized or discussed in substance with, any person other than:  (i) up to

19  three attorneys at the receiving Party's outside law firm; (ii) such independent, outside expert(s)

20  for the receiving Party who outside counsel deems necessary to show such documents for

21  purposes of providing expert opinion or expert testimony; (iii) one assistant or paralegal for each

22  Party . . . (iv) the Court, including the Discovery Master and other personnel identified in

23  paragraphs 6(g) and 7 of the Protective Order; (v) the authors, senders, addressees and

24  designated copy recipients of any document designated 'Highly Confidential – Restricted

25  Attorneys' Eyes Only'; and (vi) such other persons as may be consented to in writing or on the

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

12

EXHIBIT ___T___ PAGE ___398___

1  record by the Party designating such documents 'Highly Confidential – Restricted Attorneys'

2  Eyes Only.'" Id. at ¶3(b).

3          3. That "[d]ocuments designated as 'Highly Confidential – Restricted Attorneys' Eyes

4  Only' shall not be copied except to create one archival file copy, one working copy for the

5  designated attorneys and/or any designated expert, or for use as exhibits at deposition or trial or

6  in filings with the Court, including the Discovery Master." Id. at ¶3(d).

7          4. That "[e]ach receiving Party's original copy set and all copies of Subject Documents,

8  including any copies for use as exhibits or in motion practice, shall be maintained in a secure,

9  locked file at all times when not physically being used by the receiving party's counsel or

10  expert." Id. at ¶3(e); and

11          5. That the producing Party "shall re-designate or de-designate Subject Documents

12  relating to a product within fourteen (14) days of the following events, whichever occurs earlier:

13  (a) the production is first shipped, or (b) the product is first disclosed to a third party without an

14  express confidentiality agreement." Id. at ¶4

15          Good cause appearing, the stipulation is hereby approved and shall be entered as a

16  separate order of the court.

17                          V. CONCLUSION

18          For the reasons set forth above, MGA and Bryant's motion for clarification of the Order is

19  denied.  MGA and Bryant's alternative motion for a protective order pursuant to Rule 26(c),

20  Fed.R.Civ.P., is granted.  The parties shall abide by the terms of the stipulation and order to

21  modify the protective order.

22          Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

23  Master, MGA shall file this Order with the Clerk of Court forthwith.

24  Dated: May 15, 2007

                                    HON. EDWARD A. INFANTE (Ret.)
25                                    Discovery Master

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                    13

EXHIBIT ___T___ PAGE _399_

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 15,

2007, I served the attached ORDER MODIFYING PROTECTIVE ORDER in the within

action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that
the above is true and correct.

Executed on May 15, 2007, at San Francisco, California.

Anthony Sales

EXHIBIT __T__ PAGE __400__