Craig Holden
July 19, 2007
Page 4

We, the undersigned, hereby acknowledge that we have read this document in its entirety, that we know and understand the contents thereof, that we have had an opportunity to consult with others (including other attorneys) concerning its contents and that we are bound by its terms.

Very truly yours,

John W. Keker

JWK/MHP/nsn

Agreed and accepted:

Dated: 7/20/2007

By: _____
        MGA Entertainment, Inc.

398584.01

ATTORNEYS EYES ONLY          CONFIDENTIAL          BRYANT2 000020

EXHIBIT____1____, PAGE____9____



Corporate Office:
16380 Roscoe Blvd.
Van Nuys, CA 91406
USA

Phone: 818.894.2525
Fax: 818.895.0771

## MGA ENTERTAINMENT BILLING POLICY – ALL MATTEL-RELATED LITIGATION

In order to avoid delays in processing and payment, every invoice submitted to MGA should be sent to the Craig Holden, Senior Counsel, MGA Entertainment, via hardcopy and via email (in MS Word format) at CHolden@mgae.com, and must adhere to the guidelines set forth below. If an invoice is prepared in accordance with these guidelines, payment should be expected within 30 days. If payment has not been received within this period, or for general billing questions, please feel free to contact Frank Roca at 1-818-894-2525, via fax at 1-818-895-0771, or by email at froca@mgae.com.

**Unless prior approval has been granted, any variance from this policy may result in the non-payment or return of an invoice so that it can be revised to conform to these policies.**

I.    Underline{General}

1.    All invoices must indicate the specific MGA entity for which services are rendered. Please do not combine work for different MGA entities or in different countries on one invoice.

2.    All invoices must indicate the name of the lawyer or other individual at MGA at whose request the services were rendered and list the name of the person with whom the lawyer is dealing on the specific matter. Do not just refer to "client".

3.    *All invoices must have an invoice number that is unique to that invoice.* The vendor's file/matter number should be included as well.

4.    **All invoices must be dated and should include the date range of the services covered by the bill** (e.g., 12/31/2006, for the period 12/1/2006 through 12/31/2006).

5.    All invoices must be for a specific matter and entity. We cannot process any invoice that contains multiple matters on one invoice or that includes work for several MGA entities. **We will expect you to open up a new matter for billing purposes whenever we ask you to undertake a new project.**

6.    *All invoices (including those from third parties billed via the firm) should be submitted on a monthly basis.* In cases where this is not possible, we require quarterly billing at a minimum.

NOTE: MGA will not pay any fees billed more than 6 months after the date the services were rendered. Also, MGA will not pay for any "soft" costs (internally

ATTORNEYS EYES ONLY          CONFIDENTIAL          BRYANT2 000021

EXHIBIT ___1___, PAGE ___8___

generated charges) which are invoiced more than 60 days after being incurred, or any "hard" costs (externally invoiced charges) which are invoiced to MGA more than 60 days after being invoiced to the firm by the third party vendor.

7.  Do not send multiple copies of invoices to multiple individuals at MGA or send invoices by both email or fax and regular mail.

8.  All invoices must indicate the payment address where the check should be mailed or the bank information needed if wire transfer payment is to be made.

9.  *Invoices must state a US currency amount* to be paid, even if billed in local currency.

10. **MGA does not pay retainers.**

II. **Services Performed**

1.  All invoices must clearly set forth the following:

    a.  *Fees must include a descriptive narrative of the services performed on a day-by-day and task-by-task basis, indicating the name of the billing attorney, the amount of time spent by each attorney on each task (even if on the same day), a detailed description of the services, the attorney's hourly billing rate, and the total cost of the service. Invoices should include actual time spent, accounted for on a one-eighth (.125) of an hour basis. A summary of the hours, by attorney, should be included on the last page of your invoice.*

    b.  There should be no "Block Billing": all billing entries should itemize each task and show the amount of time taken to complete each task, even if the tasks are performed consecutively in time, on the same day. There should be no "block billing" (i.e., lumping together tasks without itemizing how much time each task took).

        (i)  Billing entries should be sufficiently detailed to allow a determination of the nature of the professional service performed. For example, entries for conferences should identify the participants and the subject or purpose of the communication. Entries for drafting or reviewing documents should identify the documents with particularity. Entries that describe drafting or reviewing of correspondence should identify the correspondent and the subject of the correspondence, and entries for legal research should describe the specific issues research and the purpose of the research.

        NOTE: It is not acceptable to submit a single narrative description for all work done during a particular time period, or to simply bill for unidentifiable work, such as "call to opposing counsel."

    c.  *MGA considers the following to be administrative non-billable items:*

2

ATTORNEYS EYES ONLY                    CONFIDENTIAL

BRYANT2 000022

EXHIBIT __1__, PAGE __9__

(i)    Communications regarding billing issues and the negotiation of retainer letters;

(ii)    Review and preparation of responses to audit letters in excess of .5 hours per matter up to a maximum of 2 hours for all matters requiring an audit letter;

(iii)    Preparing matter budgets and/or matter management summaries;

(iv)    File organization and other clerical/secretarial work, including docketing and overtime, as well as administrative work;

        Clerical activities include tasks that do not require legal acumen and may (and should) be effectively performed by support personnel or secretaries. Tasks associated with the day-to-day operation of a law firm are considered to be administrative in nature and, as such, are reflected in the hourly rates charged by the firm. Clerical activities that should not be billed include the time associated with filing, printing and searching for documents, organizing and updating files and databases, retrieving and distributing documents, calendaring events and court dates, photocopying, faxing and scanning, and arranging for the mailing or delivery of documents. Administrative activities include the training and supervision of staff.

(v)    Time charged for file transition between attorneys at the same firm (commonly referred to as "bringing-up-to speed") or for instructing others within the firm to perform a task or supervising more junior personnel. Additionally, all work should be undertaken at the "lowest" level possible, so that clerical services are handled on a non-billable basis, by clerical personnel.

(vi)    Overhead expenses such as word processing, library or factual research other than legal research (addressed elsewhere), space rental, retrieving files from storage, etc. As overhead costs, MGA expects these to be covered by the fees we pay.

d.    Expenses including fax charges, photocopy charges, internal messengers, etc., must be itemized individually on a day-to-day basis and indicate the matter to which they refer and recipients, as appropriate. **Please do not use messenger or overnight delivery services, if not required and do not charge us to send us your bills or communicate with us about billing issues, retainer letters or budgets.** Further, details regarding the charges "per copy" (e.g., 5 cents/page) or "per fax" should be outlined on the bill according to the following schedule:

(i)    *Black and white copies at no more than 10 cents per page*
(ii)    *Color copies at no more than 50 cents per page*
(iii)    *Incoming faxes at no charge and outgoing faxes at actual phone rate charge only.*
(iv)    *Scanning charges at no more than 10 cents per page*

3

ATTORNEYS EYES ONLY

CONFIDENTIAL

BRYANT2 000023

EXHIBIT _____, PAGE __10__

(v)   *We require documentary substantiation for any single cost item exceeding $250.*

VARIATIONS FROM THESE APPROVED AMOUNTS MUST BE PRE-APPROVED.

ADDITIONALLY, FOR LARGE COPYING AND LITIGATION MATTERS, MGA HAS ARRANGED FOR SPECIAL RATES WITH AN APPROVED VENDOR, SO SUCH PROJECTS SHOULD BE COORDINATED WITH THE MGA LEGAL CONTACT WITH WHOM YOU ARE WORKING.

e.   <u>Disbursements and third party costs</u>, including external messengers, filing fees, deposition reporting or videography services, expert fees, travel services, etc. are reimbursed at actual cost, without any mark-up. A copy of the third party's invoice and/or receipts for disbursements should be attached as supporting documentation for any single charge or cumulative charges on a per vendor basis, in excess of $250. MGA does not reimburse for after hours commuting/car service charges or meals other than during approved travel.

PLEASE NOTE THAT YOU SHOULD COORDINATE ANY ORDERS FOR DEPOSITION REPORTING AND VIDEOGRAPHER SERVICES WITH YOUR MGA LEGAL CONTACT, AS MGA HAS SECURED PREFERRED RATES WITH A COMPANY THAT WILL DIRECT BILL MGA. PLEASE DO NOT JUST USE YOUR REGULAR FIRM CONTACT, UNLESS PRE-APPROVED BY MGA.

(i)   <u>Travel:</u> MGA will reimburse only for necessary travel and for coach airfare. All reasonable and documented travel and related expenses must be in accordance with MGA's standard reimbursement policy regarding travel and expense (including permitted class of air travel, approved carriers and approved hotels, at MGA-negotiated rates). While MGA does not pay for **"travel time," it *does* pay for work performed on MGA matters during travel for MGA billed per this policy,** and any reasonable transit/waiting time where work cannot be performed (e.g., waiting at a ticket counter or airport security line).

f.   MGA will only pay for the time of those individuals working on MGA-related matters that it pre-approves. MGA will not pay for any time charged by any attorney who is not pre-approved to work on a specific matter.

g.   Electronic legal research (i.e., Lexis-Nexis or Westlaw): Because O'Melveny & Myers (OMM) has a flat fee arrangement for these research services and does not bill MGA for the costs, you agree to make every effort where practical to have OMM perform legal research. You will also pass on all volume or other discounts and not mark up any vendor fees. MGA must pre-approve any legal research project in excess of 3 hours and/or $750.00.

4

ATTORNEYS EYES ONLY                 CONFIDENTIAL                 BRYANT2 000024

EXHIBIT ___1___, PAGE ___11___

III.    **Litigation/Claims**

1.   *All invoices must indicate an inception of matter to current date total for costs and fees.*

2.   All invoices must be billed at the hourly rates in effect at the time the matter was assigned.  Any increase in rates must be communicated to and approved in writing by MGA prior to any increase in billing rates.

3.   Unless pre-approved, MGA only pays for one individual to attend meetings, court hearings, or depositions.

4.   Unless pre-approved, all insurance matters are subject to the restrictions imposed on MGA by the insurance carrier.  This applies to hourly rates, types of services covered (e.g., no inter-office conferences), and disbursements.

IV.    **Intellectual Property**

1.   <u>Trademark</u> application invoices must indicate the MGA trademark, the class of goods and services, and the territory covered by the application.

2.   <u>Patent</u> application invoices must clearly identify the patent name, the corresponding U.S. patent application number, if any, and the territory covered by the application.

3.   <u>Copyright</u> application invoices must clearly identify the application number and the name of and type of work covered by the application.

4.   <u>Domain name registration</u> invoices must clearly identify the domain name, the billing contact name listed on the domain name registration, and the registration term.

5.   Fee schedules, including standard governmental filing fees, translation costs, if applicable, flat rate (per application) fees, and hourly rates need to be provided on an annual basis or as updated.

V.    **International**

1.   All invoices must be submitted in English. MGA conducts business in English and will not pay for any invoices or time records to be translated into English.  **Please ensure that all those working on MGA matters keep proper records so that invoices can be prepared, with all required details listed above, in English.**

2.   Any invoices for services rendered by foreign or local counsel on behalf of the firm for MGA (e.g., barrister fees) must be submitted to MGA along with the vendor's invoice.  The retainer of such individuals must be pre-approved by MGA.

3.   MGA should be invoiced in a manner providing the best possible tax benefit (e.g., reimbursement for VAT (Value Added Taxes) or GST (Goods and Services

5

ATTORNEYS EYES ONLY                      **CONFIDENTIAL**

BRYANT2 000025

EXHIBIT _____1_____, PAGE ___12___

Taxes)), by using the address of the local MGA office, if any, on the invoice and sending the actual invoice to the corporate office for approval.

6

ATTORNEYS EYES ONLY                 CONFIDENTIAL              BRYANT2 000026

EXHIBIT __I__, PAGE __13__

**Exhibit 2**

Westlaw.                                                          NewsRoom

12/23/06 ABCNIGHTLINE (No Page)                                   Page 1


12/23/06 ABC Nightline (Pg. Unavail. Online)
2006 WLNR 22434503

ABC Nightline
Copyright 2006 American Broadcasting Company

December 23, 2006


NIGHTLINE


[SHOW: ABC Nightline] [AIRDATE: 12/22/06] [AIRTIME: 23:35] [ANCHOR: MARTIN BASHIR]
[ANCHOR LOCATION: NEW YORK, NY USA] [STORY: NIGHTLINE]

TOPIC:

CONTENT:

GRAPHICS: NIGHTLINE

GRAPHICS: BRAWL IN THE DOLLHOUSE

MARTIN BASHIR (ABC NEWS): Tonight on 'Nightline," brawl in the dollhouse.  After
almost 50 years of domination, Barbie is facing brash new competition from the
Bratz dolls.  Billions of dollars are on the line.  It's a toy story where nobody
is playing nice.

GRAPHICS: CHRISTMAS JOURNEY

MARTIN BASHIR (ABC NEWS): A Christmas journey.  Retracing the root historians say
Joseph and Mary would have taken from Nazareth to Bethlehem.  The dangers, the
difficulties, then and today.

GRAPHICS: FANTASY VS REALITY

MARTIN BASHIR (ABC NEWS): Fantasy versus reality.  It seems like the perfect gift
for a romantic holiday season.  So why do so many of us get it wrong?  Tonight, we
take you inside one store that thinks it has the answer.

MATT NEELY (STOCKING FELLA): The 34B should look good.

ANNOUNCER: From the global resources of ABC News, with Terry Moran in Washington,
Martin Bashir and Cynthia McFadden in New York City, this is 'Nightline," December
22nd, 2006.

GRAPHICS: NIGHTLINE: DECEMBER 22, 2006

REPORTER: JOHN BERMAN
REPORTER LOCATION: LOS ANGELES, CA USA

TOPIC:

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT  2  , PAGE  14     M 0062148

CONTENT: BARBIE, BRATZ, MATTEL, MICRO GAMES OF AMERICA, CHUCK SCOTHON

MARTIN BASHIR (ABC NEWS): (Off-camera)  Good evening.  Many of us have spent at
least part of today rushing around the shops looking for that perfect Christmas
present particularly for our children.  Toys are now big business.  Almost $11
billion will be spent on them during the holiday season alone.  And nowhere is the
business more competitive than in the world of dolls.  Yes.  Barbie has long been
the biggest-selling toy doll of all, but now there's a serious challenger.  And in
the fight to be number one nobody's backing down.  Here's ABC's John Berman.

JOHN BERMAN (ABC NEWS): (Voiceover)  In this corner, measuring nine inches tall
with big eyes and even bigger bling, the challenger, Bratz.  And in this corner,
with flowing blond hair and impossibly disproportionate bust, a 47-year undisputed,
undefeated champion from Mattel, Barbie.  Now you might think the world of dolls
isn't the kind of place for a knock down, drag out brawl but you'd be wrong.

ISAAC LARIAN (CEO: Ken is not gonna save Barbie.  Barbie is not gonna save Barbie.
And the leadership that they have at Mattel right now, it's not gonna save Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  You sound like a linebacker on a football
team.  You're like taunting Mattel.

ISAAC LARIAN (CEO: It's good.  It's good for the business.

JOHN BERMAN (ABC NEWS): (Off-camera)  It's good?  Trash talking in the doll
business is good?

ISAAC LARIAN (CEO: I'm not trash talking.  I'm telling - I'm talking about the
facts.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Isaac Larian.  The seemingly nice man who
wants to pummel Barbie.  He is the CEO of Micro Games of America, which makes the
Bratz doll.  He might not strike you as the doll kind of guy.  He came to the US
from Iran with nothing.

ISAAC LARIAN (CEO: I came here in 1971 with a one-way ticket and $750 in my pocket
and a big American dream.  And I have lived the American dream.

JOHN BERMAN (ABC NEWS): (Voiceover)  Larian went from washing dishes to building a
toy company to the American dream on steroids.  Largely due to this big-eyed, big-
headed cartoonish doll.  When Larian first saw the Bratz design in 2001, he thought
they looked like aliens.

JOHN BERMAN (ABC NEWS): (Off-camera)  Do you still they look like aliens?

ISAAC LARIAN (CEO: No.  I think now they look beautiful.  I've grown to like them.

JOHN BERMAN (ABC NEWS): (Voiceover)  Last year's $2 billion in sales can make many
things beautiful.  Larian now says Bratz has a 40% market share and is the number
two doll in the US market.  Number two for now.  Larian claims his Bratz girls are
breathing down the lanky plastic neck of number one.  That would be Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  What's wrong with Barbie?

ISAAC LARIAN (CEO: It's time for her to retire.  She's been around for too long.

JOHN BERMAN (ABC NEWS): (Voiceover)  And you want to help Barbie retire?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __2__ , PAGE __15__

M 0062149

ISAAC LARIAN (CEO: Yes, I would help her retire.  I would throw a party for her.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): He's welcome to
throw a party for Barbie any time he wants, but it won't be a retirement party.
She has been and will remain the number one fashion doll in the industry.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Chuck Scothon.  A senior Mattel executive
and former high school offensive lineman.  His product is the long-legged goliath
of the toy business.  Since she was first created in 1959, Barbie has been an icon
among icons with almost absurd success.  One study found that 90% of American girls
between 3 and 10-years-old owns a Barbie doll.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Now, we're traveling
through the world of fairytopia.

JOHN BERMAN (ABC NEWS): (Voiceover)  Scothon doesn't like to talk about Bratz.  Let
alone the fact that they might pose a challenge.

JOHN BERMAN (ABC NEWS): (Off-camera)  How was it, do you think, this become a
story?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I think a lot of
people like to talk about the underdog and the leadership positions.  I think at
the end of the day it's really about making more out of something than there really
is.

JOHN BERMAN (ABC NEWS): (Voiceover)  But last year, Barbie might have started to
show her age.  Sales dropped 13%, just as Bratz were getting white hot.

JOHN BERMAN (ABC NEWS): (Off-camera)  Is Barbie in danger?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Not in the least.
Barbie has been and will continue to be the number one fashion doll.

JOHN BERMAN (ABC NEWS): (Voiceover)  Barbie has rebounded a bit this year, but
Isaac Larian is not impressed.  He says he has the key to cool.  A multicultural
doll with the edgy sassy attitude girls want these days.

ISAAC LARIAN (CEO: The kids look at Bratz dolls and they think they are teenagers.
And we ask them how old do you think Bratz dolls are?  They say they are teenagers.
And when they look at Barbie doll they think it's old mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  They think mom when they look at Barbie
dolls?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What I would suggest
and say to that is, first of all if Barbie, for some girls, reminds them of their
mothers, I would think of nothing better.  The most important job a woman can have
in many ways is being a mom.

JOHN BERMAN (ABC NEWS): (Voiceover)  There is no mistaking a Bratz doll for a mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  I look at that Bratz doll.  She's wearing,
you know, the leopard skin top, she's got the sequins, she's got the hairs, I mean,
you know, people have compared them to street walkers.  They look a little, you
know, trashy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

M 0062150

EXHIBIT __2__, PAGE _16_

ISAAC LARIAN (CEO: They don't look trashy to me.  And this is - I think trashy is
in the eye of the adults.  When we show these to the little girls, and we have done
that over and over, everybody said they're beautiful.  They never say they look
like a streetwalker.

JOHN BERMAN (ABC NEWS): (Voiceover)  Barbie is clearly going for a different image.
What image, you ask?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): First and foremost,
I would say the Barbie doll is truly based on some great values for little girls.
The courage, inspiration, imaginative play.

JOHN BERMAN (ABC NEWS): (Voiceover)  Whatever that means exactly, Barbie is famous
for having careers like Doctor Barbie and Astronaut Barbie.  The Bratz dolls?
Well, they like...

CARTOON VOICEOVER (GROUP): Shopping.

JOHN BERMAN (ABC NEWS): (Voiceover)  This is their motto.

ISAAC LARIAN (CEO: The girls with the passion for fashion.

JOHN BERMAN (ABC NEWS): (Off-camera)  The girls with the passion for fashion.

ISAAC LARIAN (CEO: Right.

JOHN BERMAN (ABC NEWS): (Off-camera)  What's that about?

ISAAC LARIAN (CEO: They have good fashion.  It's okay to look good.  It's okay, who
said that you have to, who said that girls don't have to look good?

JOHN BERMAN (ABC NEWS): (Off-camera)  And Barbie doesn't look good?  I could tell
you, there are a lot of people who think Barbie looks good.

ISAAC LARIAN (CEO: I don't know.  The consumers who are buying Bratz doll don't
think Barbie is good.

JOHN BERMAN (ABC NEWS): (Voiceover)  If all this is true why hasn't Bratz yet
overtaken Barbie as number one?  According to Larian...

ISAAC LARIAN (CEO: We would have beaten them up this year and year before if they
had not engaged in, what I call, really unfair competition.

JOHN BERMAN (ABC NEWS): (Off-camera)  Really unfair competition?  Those are
fighting words.

ISAAC LARIAN (CEO: They are fighting words.

JOHN BERMAN (ABC NEWS): (Voiceover)  The Barbie-Bratz battle has moved beyond the
Barbie dream house to the courthouse.  Round one.  Mattel filed a lawsuit alleging
that the designer of the Bratz concept came up with the idea when he was working at
Mattel.  Round two, Isaac Larian sued back saying that Mattel tried to corner the
market on doll hair, and more seriously that Mattel ripped off the Bratz concept
for a new line of Barbie dolls.  The MyScene dolls.

JOHN BERMAN (ABC NEWS): (Off-camera) This is, the MyScene Barbies are what has, to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

M 0062151

EXHIBIT __2__ , PAGE __17__

some extent, they're in the center of a little bit of a controversy now because Bratz says these look just like their dolls.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Okay.

JOHN BERMAN (ABC NEWS): (Off-camera)  I mean, don't you see the resemblance between MyScene Barbie and the Bratz doll?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What we see is an evolution to the Barbie brand.  And again, the Barbie brand is made up of dolls that target girls of every age because it's really an evolution of where the Barbie doll has been with a little bit more animated look, but not necessarily something that's been inspired by the competition at all.

JOHN BERMAN (ABC NEWS): (Voiceover)  The cases are still pending, but both companies say they are confident they will win the legal battle, though they say it differently.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I'm not really gonna talk about the legal piece of this.  I have all the confidence in the world that the justice system and that, that our attorneys can work through those issues.

ISAAC LARIAN (CEO: When we're done with Mattel, we will get them for billions of dollars, not only for this, but for defamation.

JOHN BERMAN (ABC NEWS): (Voiceover)  Who will prevail in this doll brawl?  It's one thing to be hot.  Bratz are hot, but another to be iconic.

ISAAC LARIAN (CEO: We're gonna become number one.  I promise you that.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I can't speak to his guarantee.  What I can speak to is I believe that Barbie will continue to be the number fashion doll around the globe.

JOHN BERMAN (ABC NEWS): (Off-camera)  We're talking about dolls.  I mean, shouldn't everyone be able to play nice?

ISAAC LARIAN (CEO: They have gotten away too much with bullying everybody around. And somebody has to stand up to them.  I will.

JOHN BERMAN (ABC NEWS): (Off-camera)  So you're gonna fight them on the schoolyard?

ISAAC LARIAN (CEO: I'm gonna fight, I'm gonna, not in the school schoolyard.  I'm gonna fight them in the courthouse.

JOHN BERMAN (ABC NEWS): (Off-camera)  And with this thing?

ISAAC LARIAN (CEO: With this thing and many other things.  But all 100% the old American fashion way.

JOHN BERMAN (ABC NEWS): (Voiceover)  Merry Christmas.  I'm John Berman for 'Nightline" in Los Angeles.

MARTIN BASHIR (ABC NEWS): (Off-camera)  The doll wars in a store near you.

GRAPHICS: ROAD TO BETHLEHEM

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

M 0062152

EXHIBIT __2__ , PAGE __18__

MARTIN BASHIR (ABC NEWS): (Voiceover)  And just ahead on 'Nightline," retracing the journey that has inspired millions for centuries.  In the footsteps of Joseph and Mary.

GRAPHICS: STOCKING FELLAS

MARTIN BASHIR (ABC NEWS): (Voiceover)  And stocking fellas.  One store's solution to the challenge of buying lingerie.  It's a 'Sign of the times."

ANNOUNCER: ABC News 'Nightline," brought to you by...

COMMERCIAL BREAK

REPORTER: WILF DINNICK
REPORTER LOCATION: NAZARETH, ISRAEL

TOPIC:

CONTENT: CHRISTMAS STORY, CHURCH OF NATIVITY, JESUS, MARY, JOSEPH, ISRAEL

MARTIN BASHIR (ABC NEWS): (Off-camera)  It's easy and commonplace to sentimentalize the Christmas story.  Mary and Joseph, traveling for days on a donkey from their home in Nazareth to Bethlehem.  Mary eventually giving birth to Jesus in a stable because there was no room for them at the inn.  It wasn't an easy journey back then, but imagine making the same trek today in 2006.  Here's ABC's Wilf Dinnick.

WILF DINNICK (ABC NEWS): (Voiceover)  A heavily pregnant woman, traveling across deserts, through ancient cities and river crossings.  The story of a trip inspiring Christians around the world.  The gospel according to Luke says it began in Nazareth, a city where it's believed an angel told Mary she would have a son named Jesus.

WILF DINNICK (ABC NEWS): (Off-camera)  Today, Nazareth is a city of about 70,000 people.  But back in Joseph and Mary's day, it was only a small village of about 1,000.  Now, to get to Bethlehem, it's actually only 65 miles, as the crow flies but Joseph and Mary, they had a complicated route.  We're gonna take the exact same route.  Well, they had a donkey.  We've got this car.

WILF DINNICK (ABC NEWS): (Voiceover)  The Bible does not have details of the journey.  But historians told us, Mary and Joseph probably did not take the direct way to Bethlehem because then, like today, the Middle East was a complicated, sometimes dangerous, place.  From Nazareth they headed east to the Jordan River to avoid hostile territory controlled by the Samaritans who hated Jews.  They crossed the river by foot by the ancient city of Bet She'an.  Then through the Jordan Valley, land that was controlled by Jewish kings, back into Israel, over the Jordan River again and through the ancient city of Jericho passed Jerusalem and then on to Bethlehem.  Steve Pfann sees similarities between today and 2,000 years ago.

STEPHEN PFANN (PRESIDENT): There is an interesting parallel that can be drawn with border crossings, and police at the border, soldiers at the border, questions of taxation and other types of things put more into a modern context.

WILF DINNICK (ABC NEWS): (Voiceover)  So, we drove from Nazareth to the Jordan River.  It was in shallow areas like this where Mary and Joseph simply walked across the river.

ISRAELI SECURITY PERSONNEL (MALE): But you don't understand.  Hey, I'm telling you,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __2__, PAGE __19__

M 0062153

there is a problem.

WILF DINNICK (ABC NEWS): (Voiceover)  But today, crossing the Jordan is not so simple.  We were greeted by Israeli security.

WILF DINNICK (ABC NEWS): (Off-camera)  The security here is so tight in fact that they won't even let us shoot here, even though we have permission.  This is the Jordan Valley and this as far as we can come here because this is now an international border.

WILF DINNICK (ABC NEWS): (Voiceover)  So from here on in, it was hidden cameras only.  Passport checks, departure tax and duty-free.

WILF DINNICK (ABC NEWS): (Off-camera)  And then we have to get on a bus to make the very short trip from Israel to Jordan.  This is how you have to do it in 2006.

WILF DINNICK (ABC NEWS): (Voiceover)  I did manage to sneak a few shots as we crossed the Jordan River.  On the other side, Jordanians were also nervous about our cameras.

WILF DINNICK (ABC NEWS): (Off-camera)  We face yet another delay here.  This is now on the Jordanian side and the security here says we can't actually use the camera, even though we applied for permission weeks ago, they somehow have lost our permission.  So we're trying to go down to the Jordan Valley now, as quickly as we can, and then we'll cross over to the Israeli side.

WILF DINNICK (ABC NEWS): (Voiceover)  The Jordan Valley is flat, perfect for traveling.  In Joseph and Mary's day there would have been hardly anything here.  Today, plenty of busy Arab towns.

WILF DINNICK (ABC NEWS): (Off-camera)  Okay, let's go in.  A lot has changed over the last 2,000 years but one thing that has remained the same is the type of bread made almost exactly the same way as when Joseph and Mary made their journey.

WILF DINNICK (ABC NEWS): (Voiceover)  Then back into Israel, just before the border closes.

WILF DINNICK (ABC NEWS): (Off-camera)  We're now gonna cross the Jordan River for the second time here, where Mary and Joseph would have waded across on their way to Bethlehem.

WILF DINNICK (ABC NEWS): (Voiceover)  Then on to the ancient town of Jericho, it is Palestinian and the Israeli army demands special ID to enter.

WILF DINNICK (ABC NEWS): (Off-camera)  Could I get a falafel with hummus and pita?  Pita, yeah.  Okay.

WILF DINNICK (ABC NEWS): (Voiceover)  This was a chance for Mary and Joseph to rest before the final, grueling leg of the trip, which was a treacherous road that was yet again blocked for us by the Israeli army.

WILF DINNICK (ABC NEWS): (Off-camera)  This is the part of the trip we cannot do by car.  This is the ancient route between Jericho and Bethlehem.  The silence here is amazing, the view is stunning, but it must have been a daunting part of the journey for Mary and Joseph.

WILF DINNICK (ABC NEWS): (Voiceover)  The last stretch of the journey that Mary and

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

M 0062154

EXHIBIT_____2_____, PAGE____20____

12/23/06 ABCNIGHTLINE (No Page)                              Page 8

Joseph took into Bethlehem is now impossible.  Blocked by Israel's security wall.
Even Bethlehem itself is cut off by the wall.  We had to drive through this gate
controlled by Israeli soldiers.

WILF DINNICK (ABC NEWS):  (Off-camera)  We finally arrive in Bethlehem, and that's
the church of the nativity behind us.  Now our trip took 15 hours, we crossed two
international borders and dozens of military checkpoints.  Joseph and Mary's trip
took about a week.

WILF DINNICK (ABC NEWS):  (Voiceover)  But on our trip, we met at least one
historian who believes Joseph and Mary's journey never happened.  The gospel
according to Luke says the couple made the trip to Bethlehem for a Roman census,
but historians now know there was no census at the time.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE): ·I have no problem with the
divinity of Christ.  I have no problem with his birth in Bethlehem.  It's just the
colorful little bits that writers, storytellers, felt inclined to add.  Those, we
can legitimately question.

WILF DINNICK (ABC NEWS):  (Voiceover)  He also believes, like many other historians,
the couple already lived in Bethlehem and went to Nazareth later to look for work.
But don't tell that to anyone here.  In the Church of the Nativity, in this small
spot where it's believed Mary gave birth to Jesus.  For the faithful, a miracle,
after such a grueling journey.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE: It's an extremely good yarn, and
that's why it has survived because people prefer good yarns to the truth.

WILF DINNICK (ABC NEWS):  (Voiceover)  And it is a good story.  And for us, an
amazing journey.  Wilf Dinnick for "Nightline" in Bethlehem.

MARTIN BASHIR (ABC NEWS):  (Off-camera)  The Christmas journey then and now.  And
when we come back, Santa's little helpers like you've never seen them before.  It's
a "Sign of the Times."

GRAPHICS: SIGN OF THE TIMES

COMMERCIAL BREAK

ANNOUNCER: 'Nightline" continues from New York City with Martin Bashir.

REPORTER: NICK WATT
REPORTER LOCATION: LONDON, ENGLAND

TOPIC:

CONTENT: LINGERIE, STOCKING FELLA, MARKS AND SPENCER, MYLA

MARTIN BASHIR (ABC NEWS):  (Off-camera)  It seems like the perfect gift, the sexy
little outfit for the one we love this Christmas.  If only it were that simple.
According to experts, men are simply hopeless at choosing lingerie.  So now, a
department store in Britain is employing Santa's little helpers to guide men away
from any lingerie land mines and, according to ABC's Nick Watt, it's a "Sign of the
Times."

MATT NEELY (STOCKING FELLA): (Inaudible) nice, actually.  You guys doing okay?
Finding everything you want?  Yeah?

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**M 0062155**

EXHIBIT __2__, PAGE __21__

CUSTOMER (MALE): Yeah, we're fine.

CUSTOMER (FEMALE): Yes, thank you.

CUSTOMER (MALE): Thank you, sir.

MATT NEELY (STOCKING FELLA): Give me a shout if you need any more help.

NICK WATT (ABC NEWS): (Voiceover)  Here at Marks and Spencer they noticed a lot of lingerie returned by women after Christmas.  The problem?  Men were buying it. Matt Neely is part of the solution.

MATT NEELY (STOCKING FELLA): We were given all sorts of training about the styles of bra and what function it performs in terms pushing it together or lifting up, or squashing it down.

MATT NEELY (STOCKING FELLA): There we are.

NICK WATT (ABC NEWS): (Voiceover)  Two hundred stocking fellas were sent out to help hapless husbands.

MATT NEELY (STOCKING FELLA): That's quite sweet.

CUSTOMER (MALE): Mm-hmm.

MATT NEELY (STOCKING FELLA): Okay?

CUSTOMER (MALE): No.

MATT NEELY (STOCKING FELLA): You know, if the guys are wandering around not really know what they're doing, or kind of skirting around the outside too afraid to step in.

NICK WATT (ABC NEWS): (Voiceover)  He helps the unromantic.

NICK WATT (ABC NEWS): (Off-camera)  Do you always buy underwear for Christmas?

CUSTOMER (MALE): No.

NICK WATT (ABC NEWS): (Off-camera)  So why this year?

CUSTOMER (MALE): Because I've run out of ideas.

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover)  He helps the clueless.

MATT NEELY (STOCKING FELLA): What color are you looking for?

CUSTOMER (MALE): Well...

NICK WATT (ABC NEWS): (Voiceover)  He even helps those who think they know better.

NICK WATT (ABC NEWS): (Off-camera)  Do you have the right size?

CUSTOMER (MALE): I have the right size, yeah.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

M 0062156

EXHIBIT __2__, PAGE __22__

12/23/06 ABCNIGHTLINE (No Page)                                    Page 10

NICK WATT (ABC NEWS): (Off-camera)  Color?

CUSTOMER (MALE): Well, color is my, my choice really, actually.

MATT NEELY (STOCKING FELLA): Hopefully, the presence of another man in the department will put them at ease.

NICK WATT (ABC NEWS): (Off-camera)  Now, this is Myla, an upmarket lingerie boutique where they have a very different philosophy.  Here, they only employ women.

TAMARA DAVIES (MANAGER: I would say 75% of my customers are men.

NICK WATT (ABC NEWS): (Off-camera)  Are men?

TAMARA DAVIES (MANAGER: Are men.  Male.

NICK WATT (ABC NEWS): (Voiceover)  Men, like Anatoly (PH).

TAMARA DAVIES (MANAGER: Do you know what she likes?  Do you know what color?

CUSTOMER (MALE): Colors, yeah, yeah.

TAMARA DAVIES (MANAGER: Size?

CUSTOMER (MALE): Size, yeah.  I think, it's a must if you - you have to know your woman.

NICK WATT (ABC NEWS): (Voiceover)  But even at Myla, some men aren't quite so sure about the size.

TAMARA DAVIES (MANAGER: So they're like this, or, I mean, as a woman, you know, female working here, we have men come in and said, 'She's your size, what size are you?"

NICK WATT (ABC NEWS): (Voiceover)  So, there's one bonus of a female assistant but it's not male bonding.

NICK WATT (ABC NEWS): (Off-camera)  And how do you put them at ease?

TAMARA DAVIES (MANAGER: Smiling, 'Hello, how are you today?"  Talk about the weather.

NICK WATT (ABC NEWS): (Off-camera)  Bit of humor?

TAMARA DAVIES (MANAGER: A bit of humor, yes.  We do that.

NICK WATT (ABC NEWS): (Off-camera)  Do you flirt a little bit?

TAMARA DAVIES (MANAGER: Yes, a little.

NICK WATT (ABC NEWS): (Off-camera)  Apparently a lot of men end up buying two pairs, something safe and something saucy that they're both gonna enjoy.

NICK WATT (ABC NEWS): (Voiceover)  As Bridget Jones found out in the movie, safe can also be sexy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

M 0062157

EXHIBIT __2__, PAGE __23__

CLIP FROM "BRIDGET JONES'S DIARY"

HUGH GRANT (ACTOR): Oh, absolutely enormous panties.  No, no, don't apologize.  I
like them.  Hello, mommy.

TAMARA DAVIES (MANAGER: Men don't wanna leave here.  I got a guy here in yesterday,
and he was looking around.  He spent about half an hour, and he said to me, 'I
just, I just don't wanna leave.  I wanna stay here forever."

MATT NEELY (STOCKING FELLA): It's a 34B, which will be no good.

NICK WATT (ABC NEWS): (Voiceover)  I wonder if any one's ever said that...

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover)  ...to a stocking fella?  I'm Nick Watt for
"Nightline" in Lingerie Land.

MARTIN BASHIR (ABC NEWS): (Off-camera)  And in case you're wondering, I bought my
wife a rather fetching handbag.  And when we come back, a special look at the
achievements and events of the past year.

COMMERCIAL BREAK

MARTIN BASHIR (ABC NEWS): (Off-camera)  Next week on "Nightline," a look at some
memorable moments and provocative people we've covered during 2006.  The year in
entertainment, power, money and love.  It's all part of our special series
beginning on Christmas Day with the 'Year in Jesus."  We hope you'll join us.  But
that's our report for tonight.  I'm Martin Bashir.  For Cynthia McFadden, Terry
Moran, and all of us at ABC News, good night America and have a very happy and
peaceful Christmas.

FOR INFORMATION ON ORDERING A VIDEO OR TRANSCRIPT COPY OF ABC NEWS OR ABC NEWS NOW
PROGRAMMING, PLEASE VISIT THE SECURE ONLINE ORDER FORM LOCATED AT
WWW.TRANSCRIPTS.TV

                      ---- INDEX REFERENCES ----

COMPANY: MATTEL INC; ABC NEWS; BRATZ F C; REACH TRADE AND MARKETING; ABC

INDUSTRY:  (TV (1TV19); Underwear (1UN06); Entertainment (1EN08); Gen Y
Entertainment (1GE14); TV Programming (1TV26); Games & Toys (1GA85); Gen Y TV
(1GE33); Apparel (1AP19); Consumer Products & Services (1CO62); Children's Apparel
(1CH40); Apparel & Textiles (1AP20))

REGION:  (Americas (1AM92); North America (1NO39); Mediterranean (1ME20); Middle
East (1MI23); USA (1US73); Palestine (1PA37); New York (1NE72); Israel (1IS16);
Arab States (1AR46))

Language:  EN

OTHER INDEXING:  (MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR
(ABC NEWS); MATT NEELY (STOCKING FELLA); ANNOUNCER; MARTIN BASHIR (ABC NEWS); JOHN
BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO;
JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN
(CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN

         © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

M 0062158

EXHIBIT___2___, PAGE___24___

BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CARTOON VOICEOVER (GROUP); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); ANNOUNCER; MARTIN BASHIR (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); STEPHEN PFANN (PRESIDENT; WILF DINNICK (ABC NEWS); ISRAELI SECURITY PERSONNEL (MALE); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE; WILF DINNICK (ABC NEWS); REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE; WILF DINNICK (ABC NEWS); MARTIN BASHIR (ABC NEWS); ANNOUNCER; MARTIN BASHIR (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); CUSTOMER (FEMALE); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; CUSTOMER (MALE); TAMARA DAVIES (MANAGER; CUSTOMER (MALE); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); HUGH GRANT (ACTOR); TAMARA DAVIES (MANAGER; MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS))   (ABC; ABC NEWS; BASHIR; BETHLEHEM; BIBLE; BRATZ; BRAWL; CHRISTMAS; CHRISTMAS JOURNEY; CHUCK; CONTENT; CONTENT: BARBIE; CONTENT: CHRISTMAS; CONTENT: LINGERIE; CYNTHIA MCFADDEN TERRY MORAN; DIARY; DIVISION; DOLLHOUSE; FANTASY; FELLAS; GRAPHICS; GRAPHICS: BRAWL; GRAPHICS: CHRISTMAS; GRAPHICS: FANTASY; GRAPHICS: SIGN; HUGH; ISAAC; JEWISH; JOSEPH; JOURNEY; KEN; LUKE; MARTIN BASHIR; MARY GRAPHICS: STOCKING; MATT; MATTEL; NICK; NIGHTLINE; NIGHTLINE: DECEMBER; PALESTINIAN; SIGN; STOCKING; TAMARA; TERRY MORAN; TOPIC; USA) (Astronaut Barbie; Barbie; Barbies; BRATZ; BRATZ DOLL WARS; Cynthia McFadden; Doctor Barbie; Finding; Hey; Isaac; Isaac Larian; JOHN BERMAN; Jordanians; Largely; Larian; Mary; Matt Neely; MyScene Barbie; Passport; Round; Steve Pfann)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___2___, PAGE __25__

M 0062159

12/23/06 ABCNIGHTLINE (No Page)                              Page 13


Word Count: 5025
12/23/06 ABCNIGHTLINE (No Page)




END OF DOCUMENT




©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.


EXHIBIT __2__, PAGE __26__        **M 0062160**

**Exhibit 3**

CONFIDENTIAL                                    1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


MATTEL, INC., a Delaware corporation, )   CASE NO.
                                      )   CV 04-9059 DDP (AJWx)
                    Plaintiff,        )
                                      )
        vs.                           )
                                      )
CARTER BRYANT, an individual, and     )
DOES 1 through 10, inclusive,         )
                                      )
                    Defendants.       )
_____)
CARTER BRYANT, on behalf of himself,  )
all present and former employees of   )
Mattel, Inc., and the general public, )
                                      )
                    Cross-Complainant,)
                                      )
        vs.                           )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
                    Cross-Defendant.  )


VOLUME 1
        THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Thursday, November 4, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

EXHIBIT 3 , PAGE 27

CONFIDENTIAL                                    261

DEPONENT'S SIGNATURE PAGE


RE:  Mattel, Inc., vs. Carter Bryant, et al.
     Carter Bryant vs. Mattel, Inc.
     Case No. CV 04-9059 DDP (AJWx)
     Deposition taken on November 4, 2004


        I do hereby certify that the foregoing is a true and

correct transcript of the deposition in the foregoing-styled

and numbered cause, and I now sign the same as true and

correct, with the exception of the corrections which I have

noted on the correction sheet provided.

                          _____
                               CARTER BRYANT


     Subscribed and sworn to before me this  2nd  day of

_____, 20 05 .


                          _____
                               Notary Public


My Commission Expires:

Dec. 31, 2008          


EXHIBIT 3 , PAGE 28

CONFIDENTIAL                                      151

```
 1   Q   I'm trying to find -- what's -- I mean, did you just set      02:04
 2       these aside for some period of time?
 3   A   Yes, I did.
 4   Q   And didn't do anything further during that period of time
 5       to try to see if this is something that could be developed   02:04
 6       into a product?
 7   A   No, not during that period of time.
 8   Q   And how -- did that period of time include the rest of
 9       1998, that is to say the period of time when you weren't
10       doing anything with this?                                    02:05
11   A   Yes.
12   Q   When was the next -- first time -- what was the first --
13       next time that you started to do anything with this idea?
14   A   I don't remember the exact month but in '99 I did take
15       them out and looked at them again and I thought they were    02:05
16       still fresh and exciting and I still liked the idea of the
17       project, so I applied color.
18   Q   When you say "applied color," I'm completely ignorant
19       about this.  Does that mean you took the actual drawings
20       you had done before and on those drawings you added color?   02:05
21   A   No.  What I did was take those master drawings that I had
22       done and I used a light box to trace them onto like an
23       illustration board, which is basically just a
24       heavier-weight piece of paper, and then I colored that
25       piece of paper.                                              02:06
```

EXHIBIT __3__, PAGE __29__

<u>CONFIDENTIAL</u>                                    152

1    Q    I see.  "Master drawings" is the term you've used a couple          02:06
2         of times.  What -- what does that mean?
3    A    That's just kind of something that they taught us in
4         college.  It was -- you would create a master drawing,
5         usually on like a tracing paper or an inexpensive thin          02:06
6         paper so that you could use it over and over and over
7         again.  If you wanted to make several different versions
8         of the same drawing, you would have your master drawing,
9         then you wouldn't have to start from scratch every time.
10        You could use that in conjunction with a light box.  You          02:06
11        would lay your master drawing on the light box and then
12        you would lay your final paper on top of that and then
13        that image would come through so that you could draw it
14        multiple times, if need be.
15   Q    And so the original drawings that you did, were they done          02:07
16        on this tissue or light paper?
17   A    Yes.
18   Q    And that's what you're referring to as the master
19        drawings?
20   A    Yes.                                                              02:07
21   Q    And then at some point in 1999 you went through this
22        process with the light box and created color versions of
23        these master drawings?
24   A    Yes.
25   Q    Did you do any entirely new drawings in 1999?                     02:07

EXHIBIT __3__, PAGE __30__

CONFIDENTIAL                                                          153

1    A    No.                                                                          02:07

2    Q    Can you tell me when it was approximately in 1999 that you

3         created these color drawings?

4    A    I don't remember exactly when.  I think it was either in

5         the spring or the summer.                                                    02:07

6    Q    And by then, as I understand it, you were back in Los

7         Angeles?

8    A    Yes.

9    Q    And physically where did you do this work with the light

10        box and adding the color?  Were you at work?  Were you at                    02:08

11        home?  Where were you?

12   A    I was at home.

13   Q    So you had -- you had your own personal light box and

14        equipment so you could do this sort of thing at home?

15   A    Yes.                                                                         02:08

16   Q    And do you still have these -- the originals of these

17        color drawings that you created in 1999?

18   A    I believe they're in MGA's possession now.

19   Q    What was it that had happened in 1999 that had caused you

20        to take these drawings out and create the color versions?                    02:08

21   A    I don't recall any certain event.  I think I just may have

22        been going through my things and found the drawings again

23        and just felt that they were still neat and different, but

24        I don't -- I don't recall any specific event.

25   Q    Did you have an idea at that time that you might now try                      02:09

EXHIBIT ___3___, PAGE _31_

CONFIDENTIAL                                      497

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


MATTEL, INC., a Delaware corporation, )   CASE NO.
                                      )   CV 04-9059 DDP (AJWx)
                    Plaintiff,        )
                                      )
          vs.                         )
                                      )
CARTER BRYANT, an individual, and     )
DOES 1 through 10, inclusive,         )
                                      )
                    Defendants.        )
_____ )
CARTER BRYANT, on behalf of himself,  )
all present and former employees of    )
Mattel, Inc., and the general public, )
                                      )
                    Cross-Complainant, )
                                      )
          vs.                         )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
                    Cross-Defendant.   )


                    VOLUME III
     THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Monday, November 8, 2004,
at 10:27 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.



          COURT REPORTERS OF THE MIDWEST, INC.
                    P.O. Box 4282
          Springfield, MO 65808 (417) 889-2079

EXHIBIT 3 , PAGE 32

CONFIDENTIAL                                    726

DEPONENT'S SIGNATURE PAGE


RE: Mattel, Inc., vs. Carter Bryant, et al.
    Carter Bryant vs. Mattel, Inc.
    Case No. CV 04-9059 DDP (AJWx)
    Deposition taken on November 8, 2004


        I do hereby certify that the foregoing is a true and

correct transcript of the deposition in the foregoing-styled

and numbered cause, and I now sign the same as true and

correct, with the exception of the corrections which I have

noted on the correction sheet provided.

                                  _____
                                          CARTER BRYANT



        Subscribed and sworn to before me this **2nd** day of

**March**_____, 20 **05**.


                                  _____
                                          Notary Public



My Commission Expires:

**Dec. 31, 2008**_____                 


EXHIBIT __3__, PAGE __33__

CONFIDENTIAL                                                                      639

1   Q   (By Mr. Quinn)  -- that you --

2                   MS. CENDALI:  -- a legal conclusion.

3   Q   (By Mr. Quinn)  -- that you don't understand?

4                   MS. CENDALI:  Objection, asked and answered,

5       calls for a legal conclusion, time frame.                          02:40

6   A   I just don't understand that sentence.

7   Q   (By Mr. Quinn)  It says -- it goes on.  The next sentence,

8       it says this agreement is designed to make clear that.  Do

9       you understand that much?

10  A   Yes.                                                               02:40

11  Q   And then one little I, I will maintain the confidentiality

12      of the company's trade secrets.  Do you understand that?

13                  MR. WICKHAM:  Objection.  To the extent that

14      you have an understanding of this language or this

15      document based on advice of counsel, I instruct you not to        02:40

16      respond.

17  A   Well, then I'm not going to respond.

18  Q   (By Mr. Quinn)  Is it true that you have no understanding

19      of this sentence that I just read other than what your

20      attorneys have told you?                                          02:41

21                  MS. CENDALI:  Asked and answered.

22  A   Yes.

23  Q   (By Mr. Quinn)  Okay.  Second item, it says I will use

24      those trade secrets for the exclusive benefit of the

25      company.                                                          02:41

EXHIBIT __3__, PAGE _34_

CONFIDENTIAL                                              640

1              MR. WICKHAM:  Objection.  Go ahead.                    02:41

2              MR. QUINN:  Thank you.

3    Q   (By Mr. Quinn)  Do you understand that sentence?

4              MR. WICKHAM:  Objection, attorney-client

5    privilege.  To the extent that your understanding is based    02:41

6    upon advice of counsel, I instruct you not to respond.

7              MS. CENDALI:  And I also object as to form

8    and the ability to parse phrases and words in an overall

9    legal document.

10   Q   (By Mr. Quinn)  Your turn.                                  02:41

11   A   I'm not going to respond to that.

12   Q   You have no understanding of what that means except for

13       what your attorneys have told you?

14   A   Yes.

15   Q   Are there particular words there that you find confusing   02:42

16       or not intelligible?

17             MS. CENDALI:  Objection to form.  Objection,

18   mischaracterizes his testimony.

19   Q   (By Mr. Quinn)  Your turn.

20             MR. WICKHAM:  Objection, attorney-client           02:42

21   privilege.  To the extent that you have an understanding

22   of any of these terms based on -- of these terms or this

23   sentence based on advice of counsel, I instruct you not to

24   respond.

25   Q   (By Mr. Quinn) `And the question is whether there's        02:42

EXHIBIT 3 , PAGE 35

CONFIDENTIAL                                              641

1     particular words there that you find confusing.                    02:42

2              MR. WICKHAM:  And if he has an understanding

3     of those terms based on advice of counsel, he's not to

4     respond to your question.

5  Q  (By Mr. Quinn)  Your turn.                                         02:42

6  A  I'm going to choose not to respond.

7  Q  All right.  So it's true that every -- every -- is it true

8     that every word in that subparagraph you have no

9     understanding of except what you gained from your lawyers?

10             MS. CENDALI:   Objection --                               02:43

11 Q  (By Mr. Quinn)  Is that true?

12             MS. CENDALI:   -- mischaracterizes his

13    testimony, calls for a legal conclusion, time frame,

14    improper.

15             MR. WICKHAM:  Asked and answered.  The                    02:43

16    witness has responded.  You're harassing and badgering the

17    witness at this point.  Instruct the witness not to

18    respond.  Please move on, Counsel.

19             MR. QUINN:  Thank you.

20 Q  (By Mr. Quinn)  It says that, you know, inventions that I          02:43

21    create will be owned by the company.  Do you have any

22    understanding what those words mean?

23             MR. WICKHAM:  Counsel, I would -- if you --

24    attorney-client privilege.  To the extent your

25    understanding of this phrase, this paragraph, or this             02:43

EXHIBIT _3___, PAGE _36_

**Exhibit 4**

**CONFORMED COPY**

FILED

2007 AUG 15 PM 12: 14

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
EASTERN DIVISION

BY:

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California  94111
   Telephone:    (415) 774-2611
4  Facsimile:    (415) 982-5287

5

6

7

8

9

10

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

11  CARTER BRYANT, an individual,

12        Plaintiff,

13        v.

14  MATTEL, INC., a Delaware corporation,

15        Defendant.

16

17

18  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
19  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
20

21

CASE NO. C 04-09049 SGL (RNBx)
JAMS Reference No. 1100049530

Consolidated with
Case No. CV 04-09059
Case No. CV 05-2727

**ORDER GRANTING MATTEL'S
MOTION FOR AN EXTENSION OF
TIME TO DEPOSE PAULA GARCIA
IN HER INDIVIDUAL CAPACITY
AND AS A 30(b)(6) DESIGNEE;
DENYING REQUEST FOR
SANCTIONS**

22

23            ### I. INTRODUCTION

24        On June 15, 2007, Mattel, Inc. ("Mattel") submitted its "Motion To Enforce The Court's

25  Order To Compel, And For Sanctions."  Specifically, Mattel moves (1) to enforce the Discovery

26  Master's May 16, 2007 Order Granting Mattel's Motion to Compel MGA to Produce Witnesses

27  for Deposition Pursuant to Rule 30(b)(6) by compelling MGA Entertainment, Inc. ("MGA") to

28  produce Paula Garcia for further deposition testimony, or in the alternative, by granting leave for

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __4__, PAGE __37__

1  additional time to depose Ms. Garcia on the topics set forth in Mattel's Rule 30(b)(6) notices[1];

2  (2) to compel Ms. Garcia to answer the questions MGA's counsel instructed her not to answer

3  during her deposition; and (3) for sanctions against MGA in the amount of $5,315.  MGA

4  submitted an opposition on June 25, 2007; and Mattel submitted a reply on June 29, 2007.  The

5  motion was heard on August 13.  Having considered the motion papers and the comments of

6  counsel, Mattel's motion for additional time to depose Ms. Garcia is granted, and the request for

7  sanctions is denied.

## II. BACKGROUND

8

9      In February of 2005 Mattel served a notice of deposition of MGA pursuant to Rule

10  30(b)(6), Fed.R.Civ.P. (the "First Notice").  The parties met and conferred, and by May of 2005

11  MGA named Ms. Garcia as one of the witnesses who would testify on six of the eight topics in

12  the First Notice.  Ms. Garcia has been MGA's product manager for Bratz since the product's

13  inception at MGA, and is, in Mattel's view, one of the most important witnesses in its case.

14      The action was stayed from mid-May of 2005 to mid-May of 2006.  Thereafter, Mattel

15  renewed its attempts to schedule a 30(b)(6) deposition.  In a telephonic conference with the

16  Discovery Master, MGA represented that it would provide Mattel with dates for the deposition.

17  In January of 2007, Mattel was able to depose one of MGA's designees on the First Notice, but

18  not Ms. Garcia due to her unavailability.  For the next couple of months, Mattel continued its

19  efforts to schedule Ms. Garcia's deposition without success.

20      In the interim, in February of 2007, Mattel served its Second Notice of Deposition of

21  MGA pursuant to Rule 30(b)(6), Fed.R.Civ.P. (the "Second Notice").  The parties met and

22  conferred, and MGA identified designees for some but not all of the forty-six topics in the

23  Second Notice.

24      After a couple of months had passed without any witnesses being produced for deposition

25  pursuant to the First and Second Notices, Mattel brought a motion to compel.  On May 16, 2007,

26

27  [1] Mattel does not specify in its motion papers how much additional time it seeks.

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

EXHIBIT __4__, PAGE __38__ [2]

1  the Discovery Master granted Mattel's motion to compel and ordered MGA to, *inter alia*, (1)

2  produce Ms. Garcia for deposition on or before June 15, 2007, in her individual capacity and as a

3  designee on Topics 1-3 and 6-8 of Mattel's First Notice; and (2) make its designees available for

4  deposition for all Topics except Nos. 25 and 26 in Mattel's Second Notice on or before June 30,

5  2007 (the "Order").[2] This is the Order that is the subject of Mattel's motion.

6      After the Court's Order, MGA confirmed Ms. Garcia's designation on the following

7  Topics in Mattel's Second Notice: Topic Nos. 1-8, 9 (to the extent not covered by previously

8  designated testimony), 10, 12, 13 (with respect to manufacturers only), 16 (to the extent not

9  covered by designated portions of Isaac Larian's and Carter Bryant's depositions), 17, 29, 30, 35,

10  and 36.  MGA offered to produce Ms. Garcia for her deposition on May 24 and 25, 2007, or else

11  not until the end of June.  Mattel accepted the May 24 and 25 dates.  The parties agreed that the

12  this deposition would cover Bryant-related issues, and that they would make separate

13  arrangements to depose Ms. Garcia on the unfair competition, trade secrets and RICO issues in

14  the MGA v. Mattel and Mattel v. MGA suits. Zeller Decl., Ex. 10; see also MGA's Opposition

15  at p.6, n. 19.

16      Two days before Ms. Garcia's deposition, MGA produced approximately 7,600 pages of

17  documents.  MGA's counsel, Diana Torres, advised Mattel that MGA was willing to defer her

18  deposition in light of the document production.  Ms. Torres also informed Mattel that by

19  proceeding with the deposition as scheduled, Mattel was "choosing to do so at the risk that later

20  discovery (including the [7,600 pages of documents] may be relevant to her deposition and will

21  not be entitled to call her back for that reason."[3] Zeller Decl., Ex. 10.  Mattel's counsel

22

23  _____

    [2]  During the hearing, the undersigned stated that he did not think the seven-hour limitation on depositions

24  applied to Rule 30(b)(6) depositions, but also commented that it did not make sense to be focusing on such a
    "theoretical" issue, as Ms. Garcia had not yet been deposed.  Zeller Decl., Ex. 8. Mattel's assertion that the
    Discovery Master "ruled" on this issue is erroneous.

25
    [3]  As stated previously, the parties have an agreement, however, that MGA will make Ms. Garcia available

26  for a separate deposition on the unfair competition, trade secrets and RICO issues in the MGA v. Mattel and Mattel
    v. MGA cases. Zeller Decl., Ex. 10; see also MGA's Opposition at p.6, n. 19.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __4__, PAGE __39__ [3]

1    responded by accusing MGA of delaying its document production for tactical reasons.  Mattel's

2    counsel also advised MGA that it was proceeding with Ms. Garcia's deposition as scheduled,

3    and furthermore, that it did not believe it was "waiving" its rights to obtain further discovery

4    regarding the 7,600 pages of documents.

5         Mattel began the deposition of Ms. Garcia in her individual and corporate capacity on

6    Thursday, May 24, 2007.  The next day, MGA's counsel offered to delay the deposition from

7    Friday, May 25, 2007, to Tuesday, May 29, 2007, in light of the recent document production.

8    Mattel's counsel rejected the offer because Mattel did not want to delay Ms. Garcia's deposition

9    any further and because Mattel was prepared to question Ms. Garcia about other documents

10   already produced in the case.

11        Mattel deposed Ms. Garcia for a total of 14 hours and 18 minutes.  Mattel asked MGA to

12   produce Ms. Garcia for at least one more day of deposition, however, MGA refused unless

13   Mattel agreed not to "revisit" topics that had already been covered.  Mattel's Motion at p.3.

14   MGA also indicated that even if it were to produce Ms. Garcia for further questioning, it would

15   probably not agree to produce her for an additional full day.

16        Mattel seeks additional time to depose Ms. Garcia.  Mattel contends that 14 hours and 18

17   minutes was not enough time to cover the 24 topics on which Ms. Garcia was designated, much

18   less to cover Ms. Garcia's personal knowledge of facts central to Mattel's claims against Bryant.

19   According to Mattel, the Discovery Master has ruled that the 7-hour rule does not apply to Rule

20   30(b)(6) depositions, and that MGA's refusal to produce Ms. Garcia for further questioning

21   violates the Order.

22        Even if the 7-hour rule applies, Mattel contends that there is good cause to extend the

23   deposition of Ms. Garcia for a number of reasons.  First, Mattel contends that the deposition

24   progressed slowly because Ms. Garcia regularly asked for questions to be repeated or rephrased

25   and often took long pauses before answering.  Mattel also contends that there were lengthy

26   breaks, after which Ms. Garcia returned with clarifications of her prior testimony that required

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 4 , PAGE 40 [4]

1   further questioning. Mattel also contends that Ms. Garcia was not prepared to answer questions

2   regarding personnel involved in the early phases of the Bratz project.

3        Second, Mattel contends that MGA's counsel improperly instructed Ms. Garcia not to

4   answer questions regarding facts she ostensibly learned from counsel. Third, Mattel contends

5   that MGA's counsel improperly instructed Ms. Garcia not to answer questions about MGA

6   Mexico. Mattel admits that the parties had an agreement to limit the scope of Ms. Garcia's

7   deposition to Bryant-related issues; however, Mattel believes that this agreement did not bar

8   questions about MGA Mexico's contacts with the United States in light of MGA's then-pending

9   motion to dismiss MGA Mexico for lack of personal jurisdiction.[4]

10       Fourth, Mattel contends that it should be permitted to resume the deposition of Ms.

11  Garcia because just two days prior to the deposition, MGA produced approximately 7,600 pages

12  of documents, the bulk of which have Ms. Garcia's name on them and relate to the 2000 and

13  2001 time period. Mattel contends that MGA had no legitimate basis for withholding the

14  documents. Mattel also contends that the production was incomplete insofar as it did not include

15  documents that the Discovery Master ordered MGA to produce. Lastly, Mattel contends that it

16  should be given more time to depose Ms. Garcia because MGA has demanded more deposition

17  time for witnesses on topics that are far less central to this litigation.

18       MGA opposes the motion on numerous grounds. As a preliminary matter, MGA accuses

19  Mattel of using 30(b)(6) depositions as a means to circumvent the district court's order limiting

20  the number of depositions to be taken by each side. At present, the parties are limited to 24

21  depositions per side for the entire consolidated action, including both individual and 30(b)(6)

22  depositions. In MGA's view, Mattel is using 30(b)(6) depositions with excessive numbers of

23  topics to avoid noticing witnesses to testify in their individual capacity. MGA further contends

24  that Rule 30(b)(6) depositions are indeed limited to one seven-hour day, and furthermore, that

25

26  ───────────────

27   [4]  The district court has since denied MGA's motion to dismiss MGA Mexico.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __4__, PAGE __41__ [5]

1   the district court must have intended the limit to apply when he restricted each side to 24

2   depositions.

3          Next MGA contends that Ms. Garcia was deposed on time and in compliance with the

4   Order. According to MGA, Ms. Garcia testified at length about the early development of Bratz,

5   the persons involved in that development process, as well as the other topics for which she had

6   been designated. MGA acknowledges that Ms. Garcia could not recall the names of some of the

7   individuals involved in Bratz; however, MGA believes Mattel could have remedied the situation

8   by simply showing Ms. Garcia documents to refresh her recollection rather than treating the

9   deposition as a memory test.

10         MGA denies engaging in any delay tactics or other forms of obstruction during the

11  deposition. According to MGA, Ms. Garcia requested to have questions rephrased when she did

12  not understand the question. MGA also contends that pauses are appropriate to allow counsel to

13  interject any necessary objections. Furthermore, MGA contends that it properly instructed Ms.

14  Garcia not to answer only when necessary to preserve the attorney-client privilege. MGA also

15  defends its instructions not to answer questions about MGA Mexico because those questions

16  exceeded the agreed upon scope of the deposition. The parties agreed that Ms. Garcia would be

17  made available for one deposition regarding Bryant-related matters and a separate deposition

18  regarding Mattel's counterclaims. MGA considers questions regarding MGA Mexico as

19  irrelevant to Bryant-related matters, and relevant only to Mattel's counterclaims.

20         In MGA's view, Mattel, not MGA is to blame for not completing Ms. Garcia's

21  deposition. MGA asserts that Mattel wasted time by questioning Ms. Garcia on topics not

22  relevant to the litigation, including her addresses for the past year, whether she had any

23  roommates during that time and who they were, and her cell phone bills.

24         MGA also contends that Mattel caused the document production delay by insisting that

25  MGA produce all color documents in a different electronic format than previously requested.

26  Furthermore, MGA contends that it made multiple offers to postpone the deposition to allow

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __4__, PAGE __42__        6

1   Mattel additional time to review the document production.   MGA contends that Mattel chose to

2   move forward with the deposition, and therefore Mattel "has no basis for asserting that MGA's

3   document production was an attempt to prevent Mattel from deposing Ms. Garcia on the topics

4   for which she was designated nor that it had any impact on Mattel's ability to do so." MGA's

5   Opposition, p.6.

6         Lastly, MGA contends Mattel filed the instant motion without meeting and conferring in

7   good faith.  MGA points out that during the meet and confer process, it agreed to produce Ms.

8   Garcia for additional time without the need to resort to motion practice.  More specifically, MGA

9   is prepared to make Ms. Garcia available for an additional four hours, provided that any further

10  questioning "does not revisit already questioned areas of inquiry." MGA's Opposition at p.3.

11                              III. STANDARDS

12        Rule 30(d) of the Federal Rules of Civil Procedure provides the following with respect to

13  the schedule and duration of depositions:

14        (1) Any objection during a deposition must be stated concisely and in a non-
          argumentative and non-suggestive manner.  A person may instruct a deponent
15        not to answer only when necessary to preserve a privilege, to enforce a limitation
          directed by the court, or to present a motion under Rule (d)(4).
16
          (2) Unless otherwise authorized by the court or stipulated by the parties, a
17        deposition is limited to one day of seven hours.  The court must allow additional
          time consistent with Rule 26(b)(2) if needed for a fair examination of the
18        deponent or if the deponent or another person, or other circumstance, impedes or
          delays the examination.
19
          (3) If the court finds that any impediment, delay, or other conduct has
20        frustrated the fair examination of the deponent, it may impose upon the persons
          responsible an appropriate sanction, including the reasonable costs and attorney's
21        fees incurred by any parties as a result thereof.

22

23  The Advisory Committee Notes for Rule 30(d)(2) provide the following guidelines for

24  compliance:

25        Paragraph (2) imposes a presumptive durational limitation of one day of seven
          hours for any deposition.  The Committee has been informed that the overlong
26        depositions can result in undue costs and delays in some circumstances.  This
          limitation contemplates that there will be reasonable breaks during the day for
27        lunch and other reasons, and that the only time to be counted is the time occupied

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __4__ , PAGE __43__      7

by the actual deposition. For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition. The presumptive duration may be extended, or otherwise altered, by agreement. Absent agreement, a court order is needed. The party seeking a court order to extend the examination, or otherwise alter the limitations, is expected to show good cause to justify such an order.

Parties considering extending the time for deposition – and courts asked to order an extension – might consider a variety of factors. For example, if the witness needs an interpreter, that may prolong the examination. If the examination would cover events occurring over a long period of time, that may justify allowing additional time. . . .

It is expected that in most instances the parties and the witness will make reasonable accommodations to avoid the need for resort to the court. The limitation is phrased in terms of a single day on the assumption that ordinarily a single day would be preferable to a deposition extending over multiple days; if alternative arrangements would better suit the parties, they may agree to them. It is also assumed that there will be reasonable breaks during the day. Preoccupation with timing is to be avoided.

The rule directs the court to allow additional time where consistent with Rule 26(b)(2) if needed for a fair examination of the deponent. In addition, if the deponent or another person impedes or delays the examination, the court must authorize extra time. The amendment makes clear that additional time should also be allowed where the examination is impeded by an "other circumstance," which might include a power outage, a health emergency, or other event.

\* \* \*

Paragraph (3) includes sanctions provisions formerly included in paragraph (2). It authorizes the court to impose an appropriate sanction on any person responsible for an impediment that frustrated the fair examination of the deponent. This could include the deponent, any party, or any other person involved in the deposition. If the impediment or delay results from an "other circumstance" under paragraph (2), ordinarily no sanction would be appropriate.

See Advisory Committee Notes on the 2000 Amendments to Fed.R.Civ.P. 30(d).

## IV. DISCUSSION

### A. There Is Good Cause For An Extension Of Time To Depose Ms. Garcia

As a preliminary matter, MGA is in compliance with the Order insofar as it has produced Ms. Garcia for deposition in her individual and corporate capacity by the June 30th deadline.[5] Therefore, Mattel's motion, although styled as motion to compel compliance with

_____

[5] Mattel, however, has filed a separate motion to compel compliance with other portions of the Order.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 4 , PAGE 44      8

1   the Order, is treated herein as motion for additional time to complete the deposition of Ms.

2   Garcia pursuant to Rule 30(d)(2), Fed.R.Civ.P.

3            Applying the standards above, Mattel has demonstrated the requisite good cause to

4   warrant an extension of the "presumptive" 7-hour time limit for depositions. Ms. Garcia is,

5   without question, one of the most important witnesses in this case. She has been the product

6   manager for Bratz since the product's inception at MGA. Therefore, she has considerable

7   knowledge regarding the timing and origins of Bratz, Bryant's involvement with MGA, and the

8   development of Bratz. Ms. Garcia was the first person at MGA with whom Bryant spoke. Ms.

9   Garcia was present when Bryant first presented the idea of Bratz to Mr. Larian. Ms. Garcia also

10  met with Bryant and Margaret Leahy to discuss doll sculpting at a time when Bryant was still

11  employed at Mattel. In addition, another witness, Steve Linker, testified that Ms. Garcia

12  contacted him in September of 2000 to create packaging for Bratz and gave him art boards and

13  illustrations in October of 2000. Ms. Garcia was also involved in naming the Bratz characters.

14           Furthermore, MGA has designated Ms. Garcia on numerous topics. MGA designated

15  Ms. Garcia to testify regarding Topics 1-3 and 6-8 of the First Notice, which are set forth below.

16       Topic 1: The identity of each person involved in the MGA Projects, and the
17       nature and time period(s) of each such person's involvement therein.

18       Topic 2: The conception, design and development of the MGA Projects,
         including without limitation the chronology thereof.

19       Topic 3: The identity of, and the design, development and first sale of, any
20       products resulting from the MGA Projects.

21       Topic 6: The identity of documents and tangible items that relate to the MGA
         Projects.

22       Topic 7: The identity, source and current location of each head that was
23       provided by, for, on behalf of MGA or any of its representatives to Anna Rhee
         for painting prior to October 21, 2000.

24       Topic 8: The identity of each person involved in the conception, design,
25       development, production, sculpting, rotocasting, molding, modeling or
         prototyping of each head that was provided by, for or on behalf of MGA or any
26  //   of its representatives to Anna Rhee for painting prior to October 21, 2000.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __4__, PAGE __45__

1    Zeller Decl., Ex. 1.  MGA also designated Ms. Garcia to testify regarding the following

2    topics in the Second Notice:

3         Topic 1:  The origin, conception, creation, design, sculpting, development,
          engineering, rotocasting, modeling and prototyping of BRATZ and BRATZ

4         DESIGNS CREATED prior to June 30, 2001 (regardless of when or whether
          such was released in any form to the public), including without limitation the

5         timing thereof, the IDENTITY of each PERSON with knowledge thereof, the
          IDENTITY of each PERSON involved therein, and the nature, extent and time

6         period(s) of each such PERSON's involvement.

7         Topic 2:  The circumstances under which BRATZ or any BRATZ DESIGN first
          came to YOUR attention, including without limitation the timing, method and

8         manner thereof and the IDENTITY of each PERSON with knowledge thereof.

9         Topic 3:  The identity of each doll, product, work or item produced, developed,
          manufactured, licensed, sold or offered for sale by or for YOU or on YOUR

10        behalf that was BASED ON any BRATZ DESIGN which BRYANT CREATED.

11        Topic 4:  To the extent not covered by Topic 3, each EMBODIMENT of any
          doll, doll accessory or toy that BRYANT CREATED prior to June 30, 2001.

12

13        Topic 5:  The work, activities and/or services that BRYANT performed for or
          with YOU or on YOUR behalf prior to June 30, 2001.

14        Topic 6:  The origin, conception and creation of DESIGNS that BRYANT
          CREATED prior to June 30, 2001 and in which YOU claim to have, or have ever

15        claimed to have, any right, title or interest (whether in whole or in part).

16        Topic 7:  The identity of, and the design, development, sculpting, development,
          engineering, rotocasting, modeling, prototyping and first sale of, any doll,

17        product, work or item that has been produced, developed, manufactured,
          licensed, sold or offered for sale by, for or on behalf of YOU and that was

18        BASED ON any DESIGN referenced in Topic 6.

19        Topic 8:  Each EMBODIMENT of BRATZ that was CREATED prior to June
          30, 2001 or that was at any time BASED ON any BRATZ DESIGN which was

20        CREATED prior to June 30, 2001.

21        Topic 9:  The DRAWINGS, including without limitation the authorship,
          creation, dissemination and use thereof and the source, meaning, authenticity and

22        timing of any dates thereof.

23        Topic 10:  The IDENTITY of each vendor or third party who performed or
          contributed, or who was considered, solicited, requested, proposed or

24        contemplated by YOU or BRYANT to perform or contribute, any activities,
          work or services in connection with BRATZ or BRATZ DESIGNS prior to June

25        30, 2001, YOUR COMMUNICATIONS therewith, and the nature, extent and
          timing of such activities, work or services.

26

27        Topic 12:  The actual, proposed, requested or contemplated manufacture,
          fabrication or tooling (including the production of molds) of BRATZ, including

28

EXHIBIT  4  , PAGE  46  10

1    without limitation the timing thereof and the IDENTITY of each manufacturer
     and potential manufacturer used, proposed or considered.

2

3    Topic 13:  COMMUNICATIONS prior to June 30, 2001 between YOU and any
     manufacturer, distributor, wholesaler, retailer, or any contemplated, proposed or
     potential manufacturer, distributor, wholesaler or retailer, that REFER OR

4    RELATE TO BRATZ or any BRATZ DESIGN.

5    Topic 16:  COMMUNICATIONS BETWEEN YOU AND BRYANT prior to
     January 1, 2001, including without limitation the content, means and timing of

6    such COMMUNICATIONS, the IDENTITY of the PERSONS who were parties
     thereto and the DOCUMENTS that REFER OR RELATE TO such

7    COMMUNICATIONS.

8    Topic 17:  COMMUNICATIONS that BRYANT made for YOU or on YOUR
     behalf with any PERSON other than YOU that REFER OR RELATE TO

9    BRATZ prior to June 30, 2001.

10   Topic 29:  COMMUNICATIONS made by, for or on behalf of YOU, whether
     directly or indirectly, with Anna Rhee, including without limitation since

11   February 2005(but not including any such COMMUNICATIONS with her legal
     counsel).

12

13   Topic 30:  COMMUNICATIONS between YOU and Veronica Marlow,
     Margaret Hatch (also known as Margaret Leahy and/or Margaret Hatch-Leahy),
     Sarah Halpern, Steve Linker, Liz Hogan and/or Jesse Ramirez that REFER OR

14   RELATE TO BRYANT, MATTEL, BRATZ and/or Anna Rhee, including
     without limitation all DOCUMENTS that REFER OR RELATE TO such

15   COMMUNICATIONS.

16   Topic 35:  COMMUNICATIONS between YOU and Universal Commerce
     Corp., Ltd. prior to June 30, 2001.

17

18   Topic 36:  The source, meaning and authenticity of SL00013-14, including
     without limitation the timing of its creation and the handwriting thereon.

19

20   Zeller Decl., Ex. 3.  The specific topics identified above for which Ms. Garcia has been

21   designated are relevant and proper.  It is unrealistic to require Mattel to cover the number and

22   breadth of topics for which Ms. Garcia has been designated to testify in a matter of fourteen

23   hours.

24       In addition, just two days prior to the scheduled deposition, MGA produced

25   approximately 7,600 pages of documents.  Mattel has reviewed these documents and

26   determined that Ms. Garcia's name appears on the bulk of the documents.  Mattel also

27   determined that a significant portion of the documents pertain to a key period (2000 or the first

28

1  half of 2001) and that some deal with the early development of Bratz while Carter Bryant was
2  still with Mattel. Regardless of where the fault lies for the belated document production, Mattel
3  is entitled to a fair examination of the deponent regarding these 7,600 pages of documents.[6] .

4      Mattel is also entitled to additional time to depose Ms. Garcia because MGA improperly
5  instructed her not to answer questions regarding MGA Mexico. See Zeller Decl., Ex. 9 at
6  439:10-442:6 and 445:14-18. Although the parties had an agreement to limit the scope of Ms.
7  Garcia's deposition to Bryant-related issues, that agreement was never presented to the court for
8  approval and therefore does not have the force and effect of a court order. In the absence of a
9  court order, an instruction not to answer is improper unless necessary to preserve a privilege.
10  See Fed.R.Civ.P. 30(d)(1).

11      In summary, the four factors above provide ample good cause to justify additional time
12  to depose Ms. Garcia.

13  B. Instructions Not To Answer Deposition Questions

14      Mattel next contends that counsel improperly asserted the attorney-client privilege as to
15  certain deposition questions. In opposition, MGA contends that counsel properly instructed Ms.
16  Garcia not to answer to avoid revealing the substance of protected attorney-client
17  communications.

18      The attorney-client privilege protects an attorney's communication of legal advice to his
19  client, as well as the client's communication of information to the attorney "to enable him to give
20  sound and informed advice." Upjohn Co. v. United States, 449 U.S. 383, 390 (1981). The
21  protection extends only to communications; however, it does not extend to the facts underlying
22  privileged communications. Id. at 395-96. The Ninth Circuit has described the elements of the
23  attorney-client privilege as follows: "(1) When legal advice of any kind is sought (2) from a

24  

25  ─────────────────────
       [6]  Furthermore, during the hearing, Mattel indicated that MGA produced more than 100,000 documents
26  after Ms. Garcia's deposition. This production of documents provides additional justification for resuming Ms.
    Garcia's deposition.
27  

28  
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                           12

EXHIBIT  4 , PAGE  48

1    professional legal adviser in his or her capacity as such, (3) the communications relating to that

2    purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently

3    protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be

4    waived." United States v. Martin, 278 F.3d 988, 999 (9th Cir.2002).  The party asserting the

5    privilege has the burden of establishing that the privilege applies.  In re Grand Jury Investigation,

6    974 F.2d 1068, 1070 (9th Cir. 1992).

7        In the first excerpt at issue, counsel, Ms. Torres, interjected an objection and instruction

8    not to answer:

9        Q:  How is it that you learned Carter Bryant was employed by Mattel as of the
10       time that he had this meeting with you and others that you reference as occurring
         on September 1, 2000?

11       Ms. Torres:  I object and instruct the witness not to answer if her answer involves
12       communications with counsel.

         The Witness:  Then I can't answer the question.
13

14   Garcia Depo. at 273:6-14, Zeller Decl., Ex. 9.  This objection is sustained because a response

15   would have necessarily revealed the substance of a protected attorney-client communication.

16       In the next excerpt at issue, Mattel posed another question regarding Mr. Bryant's

17   employment with Mattel:

18       Q:  What facts are you aware of from any source as to whether or not Mr. Bryant
         was still working for Mattel as of September 1, 2000?
19

20       Ms. Torres:  I am going to caution the witness not to disclose attorney-client
         communications.  If you can answer that otherwise, go ahead.

21       The Witness:  Then I can't

22       (Instruction not to answer.)

23       Mr. Page:  I pose an objection as to form.

24       The Witness:  I can't answer the question.

25       Mr. Zeller:  Because of the instruction?

26       The Witness:  Yes.

27   //

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT  4  , PAGE  49

1  Garcia Depo. at 273:20-275:2, Zeller Decl., Ex. 9.  The objection is sustained because of the

2  way the question is phrased.  If the question had been posed differently, without reference to the

3  source of information and called for disclosure of facts only, the objection would have been

4  improper.

5        In the following excerpt, Ms. Garcia was asked how she learned of the arbitration

6  between Isaac and Fred Larian:

7        Q:  At some point, did you come to learn that there was an arbitration or
       litigation between Isaac Larian and Fred Larian?
8
9        A:  Yes.

10       Q:  How did you learn that?

11       (Ms. Torres):  Objection, I'm going to instruct the witness not to answer if she
       learned from counsel.

12       The Witness:  I believe it was – I believe it was through his – Isaac's assistant.

13       Mr. Zeller:  Was it – I'm blanking on her name.  Was it still Dede Brown?  Was
       it still Dede Brown at that time?
14
15       A:  I don't think so, but I'm not sure.

16  Garcia Depo. at 349:7-21; Zeller Decl., Ex. 9.  Ms. Garcia answered the question posed to her

17  and therefore the objection is moot.

18       In the next section, Ms. Garcia also gave a response to the question posed:

19       Q:  So is it fair to say that you don't have any knowledge or information as to
       when it is that Mr. Bryant first created Bratz in any form?

20       Ms. Torres:  Objection, vague, calls for a legal conclusion.

21       The Witness:  Outside of privileged and confidential?

22       Ms. Torres:  I will instruct you not to answer to the extent you have knowledge
       that comes solely from counsel.
23
24       The Witness:  No.

25  Garcia Depo. at 291:12-22, Zeller Decl., Ex. 9.  Because Ms. Garcia gave a response, the

26  objection is moot.

27

28

1        In the following excerpts, Mattel sought to question Ms. Garcia about what caused her to

2    change her testimony after returning from a break in the deposition:

3        A: I don't mean to interrupt. I want to state something before we got started.
    With some more thought during our break, I just wanted to state for the record

4        that I am very sure that Margaret Leahy received the armature engineering
    drawings that I mentioned in my earlier testimony. I originally mentioned I

5        wasn't sure, but I'm very sure she received that sketch.

6        Q: What's your basis for now being very sure of that?

7        A: Taking a few minutes with fresh air and thinking through my memory more
    clearly. My memory is more sharp and more clear.

8

9        Q: Between the time that you gave your prior answers about that particular
    drawing and now, you obviously had discussions with MGA's counsel, is that
    correct?

10

11       A: Yes.

12       Q: Did you discuss with them that particular drawing?

13       Ms. Torres: I instruct the witness not to answer on the grounds of attorney-client
    privilege.

14       (Instruction not to answer.)

15       The Witness: I can't answer that question.

16       (By Mr. Zeller)
    Q: Did you look at the armature drawing that you're referring to?

17

18       A: During the break?

19       Q: Yes.

20       A: No.

21       Q: It's fair to say what you learned about that drawing was told to you by MGA's
    lawyers during the break?

22       Ms. Torres: Objection, misstates the witness' testimony and calls for attorney-
    client privilege communications. If you can answer without revealing attorney-

23       client privileged communications, go ahead.

24       The Witness: I can't answer the question.

25       (By Mr. Zeller)
    Q: Based upon the instruction that your counsel is giving you?

26

27       A: Yes.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 4 , PAGE 51
15

1    Garcia Depo. at 617:16-619:2.  The objections are overruled.  The questions did not require Ms.

2    Garcia to reveal the content of an attorney-client communication.  Rather, the questions posed

3    called for disclosure of underlying facts to which Mattel is entitled.

4                                    IV. CONCLUSION

5            For the reasons set forth above, additional time to depose Paula Garcia in her individual

6    capacity and as a Rule 30(b)(6) designee is necessary for a fair examination pursuant to Rule

7    30(d)(2) and Rule 26(b)(2), Fed.R.Civ.P.  MGA shall make Ms. Garcia available for deposition

8    for an additional fourteen hours.[7]  Upon resumption of her deposition, Ms. Garcia shall provide

9    answers to the two questions where counsel's objections have been overruled.  The deposition

10   shall be held at a mutually agreeable date and time, and shall be completed no later than

11   September 28, 2007.  The motion for sanctions is denied.

12           Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

13   Master, Mattel shall file this Order with the Clerk of Court forthwith.

14

15   Dated: August 14, 2007

16                                          HON. EDWARD A. INFANTE (Ret.)
                                                 Discovery Master
17

18

19

20

21

22

23

24   ─────────────

25       [7] During oral argument, MGA implied it may de-designate Ms. Garcia as to some topics.  Without
     determining whether such a practice is proper or improper, if MGA does de-designate Ms. Garcia as to some topics,
26   it will have no bearing on the finding that fourteen hours are necessary for a full and fair examination of Ms. Garcia
     in her individual and corporate capacities.
27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                         EXHIBIT   4  , PAGE  52

 

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on August 14, 2007, I served the attached ORDER GRANTING MATTEL'S MOTION FOR AN EXTENSION OF TIME TO DEPOSE PAULA GARCIA IN HER INDIVIDUAL CAPACITY AS A 30(b)(6) DESIGNEE; DENYING REQUEST FOR MONETARY SANCTIONS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Michael C. Keats, Esq. | O'Melveny & Myers LLP | mkeats@omm.com |
| Kendall Burr, Esq. | O'Melveny & Myers LLP | kburr@omm.com |
| Melanie Bradley, Esq. | O'Melveny & Myers LLP | mbradley@omm.com |
| Marvin Putnam, Jr., Esq. | O'Melveny & Myers LLP | mputnam@omm.com |
| William Charron, Esq. | O'Melveny & Myers LLP | wcharron@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on August 14, 2007, at San Francisco, California.

_Sandra Chan_
Sandra Chan

EXHIBIT 4   PAGE 53

**Exhibit 5**



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Plaintiff and Cross-
   Defendant Mattel, Inc.

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                      EASTERN DIVISION

13
   CARTER BRYANT, an individual,      CASE NO. CV 04-9049 SGL (RNBx)
14
              Plaintiff,              Consolidated with
15                                    Case No. CV 04-09059
        vs.                          Case No. CV 05-02727
16
   MATTEL, INC., a Delaware          **DISCOVERY MATTER**
17 corporation,
                                     **[To Be Heard By Discovery Master
18            Defendant.             Hon. Edward Infante (Ret.) Pursuant
                                     to the Court's Order of December 6,
19                                   2006]**
   AND CONSOLIDATED CASES
20                                   SEPARATE STATEMENT IN
                                     SUPPORT OF MOTION OF
21                                   PLAINTIFF MATTEL, INC. TO
                                     OVERRULE INSTRUCTIONS NOT
22                                   TO ANSWER DURING THE
                                     DEPOSITION OF CARTER BRYANT,
23                                   TO COMPEL BRYANT TO ANSWER
                                     THOSE QUESTIONS, AND FOR
24                                   SANCTIONS

25                                   Date:  TBA
                                     Time:  TBA
26                                   Place: TBA

27                                   Discovery Cut-Off: None Set
                                     Pre-Trial Conference: None Set
28                                   Trial Date: None Set

77209/2049496.1

-1-

2-1

SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

EXHIBIT 5 , PAGE 54

1        Mattel, Inc. respectfully submits this Separate Statement in Support of

2  its Motion To Overrule Instructions Not To Answer During The Deposition of

3  Carter Bryant, To Compel Bryant To Answer Those Questions, And For Sanctions.

4  For the Discovery Master's convenience, Mattel has grouped the instructions not to

5  answer, including counsel colloquy, according to the improper bases which Bryant's

6  counsel used to assert them.  This Separate Statement lists each instruction in the

7  same sequence as they appear in the [Proposed] Order filed concurrently.  These are

8  all of the improper instructions cited in Mattel's Motion for which Mattel seeks an

9  order overruling them.

10

11  **I.    IMPROPER INSTRUCTIONS BASED ON ATTORNEY-CLIENT**

12  **PRIVILEGE FOR QUESTIONS SEEKING NON-PRIVILEGED**

13  **INFORMATION**

14

15  1.      **PAGE:      17:21 - 18:8**

16        Q  (By Mr. Quinn)  Okay.  Mr. Bryant, at your request we just

17           took a break?

18        A  Yes.

19        Q  And during the break did you speak with your counsel?

20              MR. WICKHAM:  Objection, attorney-client

21        privilege and instruct my witness not to respond.

22              MR. QUINN:  It just calls for a yes or no

23        answer.  It doesn't call for the disclosure of any

24        communication.

25              MR. WICKHAM:  I'm happy to meet and confer

26        with you on this issue at some other point in time.  I'm

27        instructing the witness not to respond.  I request that

28        you please proceed.

7209/2049496.1

-2-

SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

EXHIBIT  5    , PAGE  55

24.   **PAGE:**   **450:11 - 451:19**

Q  (By Mr. Quinn)  Mr. Bryant, do you have any reason as you

sit here today that -- any reason you can identify for me

that you believe you would have a better understanding

today than you would have in 1998 as to what it means to

say your offer is contingent on the signing of a

Confidential Information and Inventions Agreement?

MS. CENDALI:  Objection, asked and answered.

MR. WICKHAM:  Asked and answered,

potentially invades the attorney-client privilege, and to

the extent that you've had communications with your

lawyers on these subjects in 2004, then I instruct you not

to respond with regard to any of those communications.

Would the reporter please read back Mr. Bryant's last

statement on this subject.

MR. QUINN:  He hasn't answered this

question.

MR. WICKHAM:  I'm asking the reporter to

reread the record, Counsel.  Are you denying me that

request?

MR. QUINN:  Well, if he hasn't testified on

this subject before, what's she going to do, go search

through the record to find something that doesn't exist?

MS. CENDALI:  I believe that he did testify

to that.

MR. QUINN:  I'd like an answer to the

question.

-25-
SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

7209/2049496.1

EXHIBIT __5__ , PAGE 56

1          MR. WICKHAM:  Would the reporter please read

2     back Mr. Bryant's last response.

3          (Pause in proceedings.)

4          MR. QUINN:  Reading your long speeches.

5          COURT REPORTER:  "ANSWER: I don't think

6     that I understood that at the time, no."

7     Q  (By Mr. Quinn)  Okay.  So my question's different.  My

8     question is --

9

10   25.   **PAGE:    471:2 - 473:7**

11   Q  Did you -- I mean, apart from anything any lawyer told

12      you, did you have any understanding back in 2000 about

13      what an irrevocable assignment was?

14          MR. WICKHAM:  Okay.  Asked and answered.

15      You've already asked about this paragraph extensively and

16      he's indicated that his sole understanding of this

17      paragraph dealt with what he was -- information that he

18      had obtained from Ms. Wang.  Now you're trying to splice

19      it up into individual words and you're questioning on him

20      in that manner is one that is designed to invade the

21      attorney-client privilege.  I instruct the witness not to

22      respond.

23          MR. QUINN:  I didn't ask him about the whole

24      paragraph before.

25          MR. WICKHAM:  You're --

26          MR. QUINN:  Now you're interrupting me.  I

27      didn't ask him about the whole paragraph before and I

28

-26-
SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

EXHIBIT  5 , PAGE  57

1           MR. WICKHAM:  And just to be clear, the

2      reason why I didn't take issue when you had asked him

3      about "work made for hire" is because during his prior

4      testimony when he was referring to the angel face

5      drawings, he actually used the term "work for hire," which

6      indicated that he actually had some understanding

7      independent of any advice that he may have obtained from

8      Ms. Wang, but as to the contents and substance of this

9      paragraph, he already did testify that he only had

10     understanding as to the -- this information based on the

11     legal advice that he did obtain from Ms. Wang.

12

13   26.   **PAGE:**     **476:9 - 476:24**

14     Q  Do you have a recollection, sir, that in May of 2004 you

15        did enter into an agreement with MGA which modified terms

16        of your agreement with them?

17           MR. WICKHAM:  I'll object that that calls

18     for a legal conclusion and potentially invades the

19     attorney-client privilege.  To the extent that you had any

20     understanding as to the scope, intent, effect or anything

21     as to what Exhibit 17 is or is not from your attorneys,

22     then I instruct you not to respond.  If you have an

23     understanding of what this document is or is not other

24     than from having sought and obtained advice of counsel,

25     you can respond.

26     Q  (By Mr. Quinn)  Do you got all that?

27           MR. WICKHAM:  If you learned it from your

28     lawyers, then you are instructed not to respond.

209/2049496.1

-28-
SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

EXHIBIT __5__, PAGE 58

27.   **PAGE:**   **478:1 - 478:21**

Q   And do you have any understanding at all as to what the

purpose of the new agreement was?

     MS. CENDALI:  Asked and answered.

     MR. WICKHAM:  Attorney-client privilege.

Instruct the witness not to respond.  The witness has

already said that his sole understanding of the -- this

agreement came from counsel.

     MR. QUINN:  You know, actually, it's kind of

a fine point but a contracting party can't shield

examination about his understanding of his contract by

saying I only know what the lawyer told me because

otherwise there's no way to examine a contracting party

about his understanding and intent.

     MR. WICKHAM:  If you were suing to enforce

this contract I might be willing to engage in a dialogue

with you on that at some other time, but to the extent

that you're asking questions that seek to invade his

attorney-client privilege with respect to a contract

between he and MGA Entertainment, Inc., I will

respectfully disagree.  In any event, there's no need to.

I instruct the witness not to respond.

28.   **PAGE:**   **478:22 - 480:7**

Q   (By Mr. Quinn)  Who was the attorney who gave you an

understanding of this agreement?

A   The only person I remember having any conversation with

1    about this at all was -- I believe it was Daphne, Daphne

2    Gronich.

3    Q   Now, this is a contract between you and MGA, right?

4    A   Yes.

5    Q   And she's MGA's lawyer?

6    A   Yes.

7    Q   She's not your lawyer?

8    A   No.

9    Q   All right.  So what did Ms. Gronich tell you was the

10   purpose of this agreement?

11            MR. WICKHAM:  I'm going to instruct the

12   witness not to respond and I'm going to take a break

13   because --

14            MR. QUINN:  He's answering questions and we

15   don't want that to happen.

16            MR. WICKHAM:  No.  No.  It's late in the

17   day.  It's 4:30.  The witness is tired and I want to be

18   sure --

19   Q   (By Mr. Quinn)  Are you tired?  Are you tired, Mr. Bryant?

20            MR. WICKHAM:  I want to be sure that the

21   witness --

22   A   Yes, I am tired.

23            MR. WICKHAM:  -- does not violate his

24   attorney-client privilege, and I suspect that you would do

25   the same in your -- in the same circumstances.  We're

26   going to take a break for purposes of --

27            MR. QUINN:  We're going to learn now that --

28            MR. WICKHAM:  -- preservation of the

f209/2049496.1

-30-
SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

EXHIBIT _____5_____, PAGE ___60___

1    privilege.

2          MR. QUINN:  We're going to learn now that

3    Daphne is his lawyer?

4          MR. WICKHAM:  Counsel, come on.

5          MR. QUINN:  Well, indeed, come on.

6

7    29.   **PAGE:**    **481:14 - 482:1**

8    Q  (By Mr. Quinn)  Okay.  Well -- okay.  Did Daphne say

9    anything to you about this agreement that's Exhibit 17?

10    Did you talk to her about it?

11          MR. WICKHAM:  If you had any -- well, if you

12    had any discussions with Ms. Gronich in connection with

13    your communication in seeking advice from Mr. McFarland,

14    then you should not reveal those conversations.  The

15    attorney-client privilege --

16          MR. QUINN:  That's unintelligible.

17          MR. WICKHAM:  -- the joint defense

18    privilege.  If you had a conversation with Ms. Gronich

19    outside of the presence of Mr. McFarland, then you can

20    respond.

21

22    30.   **PAGE:**    **622:10 - 622:23**

23    Q  (By Mr. Quinn)  Do you think that was unfair or

24    unreasonable?

25          MR. WICKHAM:  Instruct the witness not to

26    respond.  Attorney-client privilege.

27          MR. QUINN:  Oh.  Now he can't even -- he

28

7209/2049496.1

-31-

SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

EXHIBIT __5__, PAGE __61__

1  doesn't even get to say whether or not it's based only on

2  legal advice?  You're just instructing him not to answer?

3      MR. WICKHAM:  Counsel, you examined him

4  extensively on this document at various points in time.

5  He answered some questions and he was instructed in other

6  questions.  You've thoroughly examined him on this

7  document and now you're seeking to invade the

8  attorney-client privilege, so, yes, I'm instructing the

9  witness not to respond.

10

11  **31.**    **PAGE:**    **623:14 - 624:6**

12  Q  (By Mr. Quinn) So let me ask my question.  Do you have

13  any understanding of the words I'm going to read to you

14  that is not based on what your attorneys told you?  Do you

15  understand what I'm asking?  I want you to exclude legal

16  advice.  So excluding anything your lawyers may have

17  imparted to you, do you have any understanding of what

18  this sentence means, quote, during the term of this

19  agreement Bryant will not provide consulting services to

20  any person, firm, or corporation engaged in the design,

21  development, and manufacture and sale of dolls or similar

22  products, closed quote?

23      MR. WICKHAM:  Objection, asked and answered.

24  To the extent that you have any understanding based on

25  advice of counsel, I instruct you not to respond.

26  A  I understand.

27  Q  (By Mr. Quinn)  And what does that mean to you?

28  A  It means during the time that I am working for MGA I am

-32-
SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

EXHIBIT ___5___ , PAGE __62__

1    not to provide consulting services on similar products.

2

3    **32.**    **PAGE:**    **624:7 - 624:21**

4        Q  Did you regard that term as being unfair, unreasonable, or

5        oppressive?

6            MS. CENDALI:  Objection --

7            MR. WICKHAM:  Objection.

8            MS. CENDALI:  -- asked and answered last

9        week.

10       Q  (By Mr. Quinn)  Your turn.

11           MR. WICKHAM:  Objection, calls for a legal

12       conclusion.  If your understanding as to the legal intent

13       and meaning of this term is based on advice of counsel, I

14       instruct you not to respond.

15           MR. QUINN:  He's already said he has an

16       understanding apart from what the lawyers told him.

17           MR. WICKHAM:  That was in response to the

18       prior question, not to the present question, Counsel.

19

20   **33.**    **PAGE:**    **640:15 - 641:6**

21       Q  Are there particular words there that you find confusing

22       or not intelligible?

23           MS. CENDALI:  Objection to form.  Objection,

24       mischaracterizes his testimony.

25       Q  (By Mr. Quinn)  Your turn.

26           MR. WICKHAM:  Objection, attorney-client

27       privilege.  To the extent that you have an understanding

28

7209/2049496.1

-33-
SEPARATE STATEMENT ISO MOTION RE: DEPOSITION OF CARTER BRYANT

EXHIBIT __5__, PAGE _63_