LODGED

@COPY

1   DALE M. CENDALI (admitted *pro hac vice*)
    DIANA M. TORRES (S.B. #162284) 2007 AUG -7  PM 12: 38
2   JAMES P. JENAL (S.B. #180190)
    O'MELVENY & MYERS LLP CLERK, U.S. DISTRICT COURT
3   400 South Hope Street                CENTRAL DIST. OF CALIF.
    Los Angeles, CA 90071-2899              EASTERN DIVISION
4   Telephone:  (213) 430-6000   BY:
    Facsimile:  (213) 430-6407
5   Email:      jjenal@omm.com

6   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
7   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
8   Los Angeles, CA 90067
    Telephone:  (310) 553-3000
9   Facsimile:  (310) 557-9815

10  Attorneys for MGA Entertainment, Inc.

11  CHRISTA M. ANDERSON (S.B. #184325)
    KEKER & VAN NEST, LLP
12  710 Sansome Street
    San Francisco, CA 94111
13  Telephone: (415) 391-5400
    Fax: (415) 397-7188
14
15  Attorneys for Carter Bryant

16              UNITED STATES DISTRICT COURT

17           CENTRAL DISTRICT OF CALIFORNIA

18                   EASTERN DIVISION

19  CARTER BRYANT, an individual,      Case No.  CV 04-9049 SGL (RNBx)
                                       (consolidated with CV 04-9059 & 05-
20               Plaintiff,            2727)

21       v.                           **DISCOVERY MATTER**

22  MATTEL, INC., a Delaware          **[PUBLIC REDACTED]**
    corporation,
23                                    **DECLARATION OF JAMES P.**
                 Defendant.           **JENAL IN SUPPORT OF MGA AND**
24                                    **BRYANT'S JOINT OPPOSITION**
                                      **TO MATTEL'S MOTION TO**
25                                    **MODIFY THE PROTECTIVE**
                                      **ORDER**
26  AND CONSOLIDATED ACTIONS
                                      Hearing Date:   TBD
27                                    Time:           TBD    BY FAX
28

LA2:838637.1

JENAL DECL ISO JT OPPN TO MTN TO
MODIFY PROTECTIVE ORDER CV 04-9049

1
2          I, James P. Jenal, declare and state as follows:

3          1.      I am a counsel in the law firm of O'Melveny & Myers LLP,
4    counsel for MGA Entertainment, Inc. ("MGA"). All of the facts set forth herein are
5    known to me personally, and if called as a witness, I could and would testify
6    competently thereto.

7          2.      Carter Bryant ("Bryant") and MGA have previously brought
8    two different motions to compel Mattel, Inc. ("Mattel") to produce witnesses in
9    accordance with the Rule 30(b)(6) Notice of Deposition that Bryant originally
10   served on Mattel on December 21, 2004. In addition to those two motions, Bryant
11   and MGA had to jointly oppose a third motion – Mattel's recent motion for a
12   protective order that sought to forestall still further the deposition of Ivy Ross.

13         3.      On January 17, 2007, I took the first deposition of Mattel's Rule
14   30(b)(6) designee on its emails systems, Mr. Fred T. Kawashima. Even though by
15   that time both Mattel and MGA had claims against each other that alleged illegal
16   conduct up through the present, counsel for Mattel insisted that Mr. Kawashima
17   was only there to testify about Mattel's email system for the period from 1998
18   through 2000. Attached hereto as **Exhibit 1** are true and correct copies of relevant
19   pages from the first deposition of Mr. Kawashima.

20         4.      It took a second motion and a court-ordered scheduling hearing
21   to get a new date for Mr. Kawashima's resumed deposition. Despite Mattel's
22   representation during the April 4, 2007, hearing that Mr. Kawashima was available
23   for his resumed deposition on May 22, 2007, in fact his second deposition did not
24   occur until June 19, 2007. Attached hereto as **Exhibit 2** are true and correct copies
25   of the relevant pages from the transcript of the Court's hearing from April 4, 2007.

26         5.      Although Mr. Corey's letter to me was dated June 8, 2007, I did
27   not receive a copy of his letter until June 14, 2007. It is my understanding that
28   Bryant's counsel did not receive a copy of Mr. Corey's letter until June 14 as well.

1  Mr. Corey's letter raised, but did not explain in any detail, Mattel's purported

2  concern that Mr. Kawashima's resumed testimony might reveal some of Mattel's

3  "security measures" – even though no such concern had been raised earlier during

4  Mr. Kawashima's prior deposition on the same topics.

5        6.     Neither MGA, nor Bryant for that matter, are aware of any

6  security measures in place or contemplated that would not be adequately protected

7  by designating testimony about them as Attorney's Eyes Only under the original

8  protective order.  Indeed, I defended the deposition of MGA's witness on IT topics,

9  Kenneth Lockhart, who testified at some lengths about security measures at MGA

10  and that testimony was designated as Attorney's Eyes Only.

11        7.     After conferring with my client, on June 15, 2007 I sent an

12  email to Jon Corey, Michael Zeller and Tim Alger of Quinn Emanuel regarding Mr.

13  Corey's letter that I had received the day before.  Attached hereto as **Exhibit 3** is

14  true and correct copy of that email.

15        8.     I heard nothing further from Mattel until the following Monday,

16  June 18, 2007 – the day before Mr. Kawashima's deposition was scheduled to

17  resume.  Mr. Corey's letter offered no new insights as to why its security measures

18  merited extra protection, but he did threaten to "suspend the deposition and move

19  for a protective order."  Mr. Corey's letter did not include a proposed amendment to

20  the protective order, but promised one "under separate cover." Attached hereto as

21  **Exhibit 4** is a true and correct copy of Mr. Corey's letter.

22        9.     In response to Mattel's letter, and in an effort to head off

23  additional motion practice while still allowing the long-delayed deposition of Mr.

24  Kawashima to proceed, I sent Mr. Corey a letter suggesting as a compromise that

25  Bryant and MGA would agree to allow Mattel to designate selected portions of Mr.

26  Kawashima's testimony as subject to the "third-tier" of protection as afforded by

27  the previously amended protective order.  Attached hereto as **Exhibit 5** is a true and

28  correct copy of my letter to Mr. Corey and its email transmittal.

1    10.    Shortly after midnight the morning of Mr. Kawashima's

2  deposition, I received a copy of Mattel's proposed amendment, but that document

3  similarly failed to provide any justification for why these security measures

4  warranted the restrictive protections Mattel was seeking.  Nor did Mr. Corey's

5  email address in any way the proposed compromise that Bryant and MGA had

6  offered the day before.  The next morning at the start of the deposition, I asked Mr.

7  Corey if Mattel was willing to operate under Bryant and MGA's compromise.  He

8  refused, flatly saying that it did not adequately address Mattel's concerns.

9    11.    I took the deposition of Mr. Kawashima on June 19, 2007.

10  While Mr. Corey repeated Mattel's threat to suspend the deposition and seek a

11  protective order, at no time did he do so.  Instead, whenever any question was

12  raised that he deemed might touch upon Mattel's "security measures" he instructed

13  Mr. Kawashima not to answer.  Mr. Corey did so even though he designated the

14  entirety of the Mr. Kawashima's testimony Attorney's Eyes Only.  Attached hereto

15  as **Exhibit 6** are true and correct copies of the relevant pages from the transcript of

16  Mr. Kawashima's deposition.

17    12.    Currently pending before Judge Larson is MGA's motion for

18  terminating sanctions based on Mattel's spoliation of evidence, particularly

19  electronic documents and email, and Mr. Kawashima's testimony is featured

20  prominently in that motion.  Attached hereto as **Exhibit 7** is a true and correct copy

21  of MGA's Memorandum of Points and Authorities in Support of Its Motion for

22  Terminating Sanctions.

23  //

24  //

25  //

26  //

27  //

28  //

JENAL DECL ISO JT OPPN TO MTN TO
MODIFY PROTECTIVE ORDER CV 04-9049

1    13.    I have spent more than 7 hours in preparing the opposition to

2  Mattel's motion.  At my billing rate of $550/hour, MGA has incurred attorney's

3  fees in excess of $3,850.

4

5    I declare under penalty of perjury under the laws of the United States of

6  America that the foregoing is true and correct.  Executed on August 6, 2007, at Los

7  Angeles, California.

8

9

10                                    James P. Jenal

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 1

Kawashima, Fred T

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION

4    ------------------------------

5    CARTER BRYANT, an individual,  )

6          Plaintiff,      )

7        vs.            ) No. CV 04-09049 SGL

8    MATTEL, INC., a Delaware     ) (RNBx) (c/w CV

9    Corporation,          ) 04-9059 & 05-2727)

10         Defendant.      )

11   ------------------------------)

12   CONSOLIDATED WITH MATTEL, INC.,)

13   v. BRYANT and MGA         )

14   ENTERTAINMENT, INC., v. MATTEL,)

15   INC.              )

16   ------------------------------

17

18      Videotaped 30(b)(6) deposition of

19      FRED T. KAWASHIMA, taken at 400 South

20      Hope Street, Los Angeles, California,

21      commencing at 10:27 A.M., Wednesday,

22      January 17, 2007, before Wendy S.

23      Schreiber, CSR No. 3558, RPR, CLR.

24

25   PAGES 1 - 280

None                              Page  1

6

Kawashima, Fred T

1   APPEARANCES OF COUNSEL:

2

3      FOR THE PLAINTIFF:

4      LITTLER MENDELSON

5      BY:  FRED JACOBY, ESQ.

       2049 Century Park East

6      Fifth Floor

7      Los Angeles, California 90067-3107

8      (310) 553-0308

9

10     FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:

11     O'MELVENY & MYERS LLP

       BY:  JAMES PAUL JENAL, ESQ.

12         JENNIFER GLAD, ATTORNEY AT LAW

       400 South Hope Street

13     Los Angeles, California 90071-2899

       (213) 430-6000

14     jglad@omm.com

15     jjenal@omm.com

16

17     FOR DEFENDANT MATTEL, INC.:

18     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

19     BY:  JON COREY, ESQ.

20     865 South Figueroa Street, Tenth Floor

21     Los Angeles, California 90017

22     (213) 443-3000

23     joncorey@quinnemanuel.com

24

       ALSO PRESENT:  MICHAEL MOORE

25     VIDEO OPERATOR - DAVID FISCHEL


None                                          Page  2

7

Kawashima, Fred T

1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 17, 2007

2              10:27 A.M.

3              -   -   -

4

5        VIDEO OPERATOR:  Good morning.  We are on

6    the record at 10:27 a.m. on Wednesday, January 17th,

7    2007 for the videotaped deposition of the 30(b)(6)

8    witness of Mattel, Fred Kawashima.  We are taping

9    this deposition at 400 South Hope Street, 18th

10   Floor, in Los Angeles, California on behalf of the

11   defendant and cross-complainant in the action

12   entitled Bryant versus Mattel, Case No. CV 0409049

13   SGL (RNBx).

14       My name is David Fischel.  I am the legal

15   videographer from Veritext Court Reporting Services

16   located at 550 South Hope Street, Suite 1775,

17   Los Angeles, California.

18       This is tape No. 1 of Volume 1.  Would

19   counsel and all present please identify themselves

20   and state whom they represent.

21       MR. JENAL:  Yes.  Good morning.  My name is

22   Jim Jenal.  I'm with O'Melveny & Myers and I

23   represent MGA Entertainment, Inc.

24       MS. GLAD:  Jennifer Glad.  I'm also with

25   O'Melveny & Myers representing MGA Entertainment,

None                                        Page  3

8

Kawashima, Fred T

1    Inc.

2        MR. JACOBY:  Fred Jacoby, Littler Mendelson,

3    representing Carter Bryant.

4        MR. MOORE:  Michael Moore, in-house counsel

5    for Mattel.

6        MR. COREY:  Jon Corey, Quinn Emanuel on

7    behalf of Mattel.

8

9            FRED T. KAWASHIMA,

10    having been first placed under oath, testified

11    as follows:

12

13            EXAMINATION

14    BY MR. JENAL:

15    Q.  Good morning, Mr. Kawashima.

16    A.  Good morning.

17    Q.  Is that the correct pronunciation?

18    A.  That's correct.

19    Q.  I'll try to get that right throughout the

20    day.

21        Could you state and spell your full name for

22    the record, please.

23    A.  Full name first name Fred, F-r-e-d, middle

24    name Toshio, T-o-s-h-i-o, last name Kawashima,

25    K-a-w-a-s-h-i-m-a.

None                                    Page 4

9

Kawashima, Fred T

1  MR. COREY: And just before we start, to

2  make clear, Mr. Kawashima is here being designated

3  to testify on behalf of Mattel and the topic on

4  which he is designated is Mattel's E-mail system

5  primarily located at the El Segundo facility between

6  1998 and 2000.

7  MR. JENAL: Right, and my understanding is

8  he's also designated on the E-mail procedures and

9  policies from 1998 to present.

10  MR. COREY: Correct. Well, no, that's not

11  correct. From 1998 to 2000.

12  MR. JENAL: I actually think --

13  MR. COREY: No, I'm telling you what the

14  designation is that the witness is here to testify

15  about. He is not designated to testify on

16  preservation between 2000 and the present. That's

17  not what he's designated to testify about.

18  MR. JENAL: In the filing that Mattel made

19  yesterday to Judge Infante, there is the express

20  representation that this witness is here, amongst

21  the topics we just described also, to cover

22  preservation policies from 1998 to the present.

23  MR. COREY: He's not. He's not testifying

24  about -- he's not testifying about preservation

25  today. If you want -- I mean, you will get a

None                                    Page 5

10

Kawashima, Fred T

1   STATE OF CALIFORNIA   ) ss:

2   COUNTY OF LOS ANGELES )

3

4        I, WENDY S. SCHREIBER, CSR No. 3558, do

5   hereby certify:

6

7        That the foregoing deposition of FRED T.

8   KAWASHIMA was taken before me at the time and place

9   therein set forth, at which time the witness was

10  placed under oath and was sworn by me to tell the

11  truth, the whole truth, and nothing but the truth;

12       That the testimony of the witness and all

13  objections made by counsel at the time of the

14  examination were recorded stenographically by me,

15  and were thereafter transcribed under my direction

16  and supervision, and that the foregoing pages

17  contain a full, true and accurate record of all

18  proceedings and testimony to the best of my skill

19  and ability.

20       I further certify that I am neither

21  counsel for any party in said action, nor am I

22  related to any party to said action, nor am I in any

23  way interested in the outcome thereof.

24

25

None                              Page  277

Kawashima, Fred T

1    IN WITNESS WHEREOF, I have subscribed my

2    name this 29th day of January, 2007.

3

4

5

6    _____

7    WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

None                         Page  278

|2

**Exhibit 2**

Transcript of Proceedings

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4

5    ---------------------------------

6    CARTER BRYANT, an individual,    )

7           Plaintiff,        )

8        vs.           ) No. CV 04-09049 SGL

9    MATTEL, INC., a Delaware        ) (RNBx) (c/w CV

10   Corporation,           ) 04-9059 & 05-2727)

11          Defendant.      )

12   ---------------------------------)

13   CONSOLIDATED WITH MATTEL, INC.,  )

14   v. BRYANT and MGA ENTERTAINMENT, )

15   INC., v. MATTEL, INC.        )

16   ---------------------------------

17

18   Transcript of Proceedings before

19   the Honorable Edward A. Infante,

20   via conference call, commencing at

21   9:29 A.M., Wednesday, April 4, 2007

22   before Cathryn L. Baker, CSR No. 7695.

23

24

25   PAGES 1 - 33

Unsigned                                            1

13

Transcript of Proceedings

1   APPEARANCES OF COUNSEL:

2

3      FOR MATTEL, INC.:

4

5         QUINN EMANUEL URQUHART OLIVER & HEDGES

6         BY:  JON COREY, ESQ.

7            BRIDGET MORRIS, ESQ.

8         865 South Figueroa Street

9         10th Floor

10        Los Angeles, California 90017

11        (213) 443-3000

12

13

14     FOR MGA ENTERTAINMENT, INC.:

15

16        O'MELVENY & MYERS LLP

17        BY:  JAMES JENAL, ESQ.

18        400 South Hope Street

19        Los Angeles, California 90071

20        (213) 430-6000

21

22

23

24

25

Unsigned                                        2

14

Transcript of Proceedings

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3

4        FOR CARTER BRYANT:

5

6            LITTLER MENDELSON

7            BY:  KEITH JACOBY, ESQ.

8                ALYA MEYERS, ESQ.

9            2049 Century Park East

10           5th Floor

11           Los Angeles, California 90067

12           (310) 553-0308

13

14

15

16

17

18

19

20

21

22

23

24

25

Unsigned                                        3

15

## Transcript of Proceedings

1  just informed me that two of these individuals actually

2  may be duplicative of what Mr. Hudnut will testify

3  about. I may be getting ahead of myself in designating

4  them.

5      MR. JACOBY: Why don't we keep going with the

6  Mattel people that you have solid dates for because I'd

7  rather commit to as many dates on this call as we can.

8      MR. COREY: That's fine.

9      Fred Kawashima is going to be designated --

10  there are three outstanding topics, as I understand it,

11  with respect to electronic discovery. One is e-mail

12  retention between 1998 and the present. He's available

13  on May 1st through 3rd; May 7th through the 9th; May

14  21st through the 24th; and the 28th through the 31st.

15  And if those dates don't work, I also have dates in June

16  for him.

17      MR. JACOBY: And what topic is that,

18  specifically?

19      MR. COREY: It's the e-mail retention between

20  1998 and the present. There were a number of topics

21  dealing with electronic information, and the scope of

22  those were narrowed consistent with the parties' prior

23  meeting of counsel. And that's one of the topics.

24  Another one of the topics was the document management

25  system used by the designers at Mattel and the design

Unsigned                                          15

16

Transcript of Proceedings

1    center.  And the other one had to do with phone logs

2    that Mattel may have.  And I have designees for each of

3    those three topics.

4         MR. JACOBY:  Jim, since you've been taking the

5    lead on the electronic stuff, why don't you select

6    dates.

7         MR. JENAL:  Are these all, then, Jon, '98

8    through present?

9         MR. COREY:  I know that that's the case with

10   respect to the e-mail, I know that's the case with

11   respect to the documents, the document management system

12   used by the designers.  I cannot recall with respect to

13   the phone logs, whether that's limited to '98 through

14   2000.

15        MR. JENAL:  And who's the designee on the

16   document management system?

17        MR. COREY:  That's Julia Marine.  What I can

18   tell you is, you've taken her deposition before.  There

19   was no formal document management system.  What the

20   designers used was simply the file system, the file

21   management system on the Zeus storage server -- the Zeus

22   data server.  So she'll be appearing to testify about

23   that.  You can go back and look at her testimony and

24   decide whether you want to take her deposition again.

25        MR. JENAL:  Okay.

Unsigned                                          16

17

## Transcript of Proceedings

1   MR. COREY:  And a gentleman by the name of Rod

2   Palmer is going to be designated with respect to the

3   phone logs, but given kind of where we've been, I need

4   to get more dates from him because we're already picked

5   off the dates that he was available.

6   MR. JENAL:  How do you spell his last name?

7   MR. COREY:  Palmer, P-a-l-m-e-r.

8   MR. JENAL:  What were the dates available for

9   Julia?

10   MR. COREY:  Julia is available, essentially,

11   any workday in May between the 1st and the 25th.

12   MR. JENAL:  I'm trying to figure out what we

13   don't have.  What if we did Kawashima on the 21st of

14   May, does that work?

15   MR. COREY:  What day of the week is that?

16   MR. JENAL:  It's a Monday.

17   If the 22nd is better, I'm fine with the 22nd.

18   MR. JACOBY:  The 22nd is better.

19   MR. JENAL:  22nd it is.  And then why don't we

20   do Julia on the 23rd?

21   MR. JACOBY:  That's fine.

22   MR. JENAL:  And then you're going to get back

23   to us the dates for Palmer?

24   MR. COREY:  Yeah.  We have filled in with

25   other witnesses the dates that he was available.  But

Unsigned                                      17

18

Transcript of Proceedings

1    STATE OF CALIFORNIA    )  ss

2    COUNTY OF LOS ANGELES  )

3

4          I, CATHRYN L. BAKER, CSR No. 7695, do

5    hereby certify

6          That the foregoing transcript of proceedings

7    was taken before me at the time and place therein set

8    forth;

9          That the hearing was recorded stenographically

10   by me, was thereafter transcribed under my direction and

11   supervision and that the foregoing is a true record of

12   same.

13         I further certify that I am neither counsel

14   for nor related to any party to said action, nor in

15   any way interested in the outcome thereof.

16         IN WITNESS WHEREOF, I have subscribed my

17   name this 23rd day of April, 2007.

18

19

20   _____

21        CATHRYN L. BAKER, CSR No. 7695

22

23

24

25

Unsigned                                        33

19

**Exhibit 3**

## Jenal, Jim

| | |
|---|---|
| **From:** | Jenal, Jim |
| **Sent:** | Friday, June 15, 2007 2:26 PM |
| **To:** | Jon Corey; Michael T Zeller; Timothy Alger |
| **Cc:** | Michael Page; Torres, Diana; Glad, Jennifer; Cendali, Dale |
| **Subject:** | Your letter re: Kawashima |
| **Importance:** | High |

Jon --

I received your letter, apparently dated June 8, only yesterday (June 14) after the Lockhart depo and I am writing regarding your request for an amendment to the protective order that would apply to the upcoming deposition of Mr. Kawashima. Although you make vague references to "Mattel security measures" there is nothing in your letter that explains why testimony regarding such measures would rise to the level of AEO, let alone some more stringent protection level, such as has only been applied to information about not yet brought to market products.

Indeed, we know from the Mattel security files that have been produced, that while Mattel apparently routinely engages in surveillance of its own employees as well as its competitors, the bulk of those documents could not even be designated AEO and Mattel was forced when pressed to redesignate those files non-AEO.

What could Mr. Kawashima testify about that would be such a trade secret? Doe Mattel monitor the email of all of its employees? Is it engaged in packet sniffing of Internet traffic of its competitors? Is keystroke logging directed at every computer associated with the Mattel domain? These may be embarrassing facts to have to disclose, but they are not trade secrets, and to the extent that they constitute illegal conduct, certainly not protectable at all. At this point we can only speculate as Mattel has not offered any specifics.

Your letter refers to a proposed amendment, but did not provide a copy of same. If Mattel is serious about requesting MGA and Bryant to stipulate to a proposed amendment, please forward a copy to us immediately and we will get you our thoughts.


Jim Jenal
for O'Melveny & Myers LLP

---

IMPORTANT NOTE: This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you for your assistance.

20

**Exhibit 4**

06-18-2007  12:35pm  From-QUINN EMANUEL                    2134433100              T-101  P.001/003  F-484

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

NEW YORK
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

LOS ANGELES
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

SAN FRANCISCO
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

SILICON VALLEY
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

DATE:    June 18, 2007                    NUMBER OF PAGES, INCLUDING COVER: 3

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Michael H. Page, Esq. Keker & Van Nest, LLP | (415) 391-5400 | (415) 397-7188 |
| Diana Torres, Esq. O'Melveny & Myers, LLP | (213) 430-6000 | (213) 430-6407 |
| Jim Jenal O'Melveny & Myers, LLP | (213) 430-6000 | 213-430-6407 |

FROM:      Jon Corey

RE:        *Bryant v. Mattel*

MESSAGE:

---

07209/2119865.1

CLIENT #    7209          ROUTE/
                         RETURN TO:   J. Lopez/10          ☒ CONFIRM FAX
                                                          ☒ INCLUDE CONF. REPORT

OPERATOR:                CONFIRMED?   ☐ NO  ☐ YES: _____

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

21

## quinn emanuel trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

June 18, 2007

<u>VIA FACSIMILE AND U.S. MAIL</u>

Jim Jenal, Esq.
O'Melveny & Myers, LLP
600 South Hope Street
Los Angeles, California 90071

Re:     <u>Mattel, Inc. v. Bryant</u>

Dear Jim:

I write in response to your e-mail message of Friday, June 15, 2007, which responds to my June 8, 2007 letter.

First, MGA's position appears to be that MGA will not agree to an amendment to the protective order until Mattel discloses the exact security measures it seeks to protect (and I will not dignify your unfounded speculation of what those security measures may be with a response). Mattel made no request that MGA disclose its pre-release product documents before considering a whether they warranted a heightened level of protection. Further, requiring the disclosure of specific security measures before MGA will consider Mattel's proposal defeats the purpose of the proposal.

Second, I will send a proposed stipulation under separate cover, but as I have repeatedly explained, Mattel proposes a modification to the operative protective order to allow the designation of certain security measures taken by any party to preserve or maintain the confidentiality of that party's trade secrets and other confidential or proprietary information from that party's competitors as "Highly Confidential-Restricted Attorneys' Eyes Only" as set forth on pages 12 and 13 of Judge Infante's May 15, 2007 Order Modifying Protective Order and in the Stipulation to Modify Protective Order, which Judge Infante "so ordered" on April 23, 2007. MGA has not yet said whether it would consider such a proposal, even conceptually.

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 555 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

06-18-2007   12:35pm   From-QUINN EMANUEL                    2134433100            T-101   P.003/003   F-484

Finally, while Mattel hoped to have this issue resolved before the deposition of Mattel designee Mr. Kawashima, because it is not resolved, please be advised that Mr. Kawashima will not testify about certain Mattel security measures to the extent that they may overlap, if at all, with the questions asked. If necessary, and I hope that it is not, Mattel will suspend the deposition and move for a protective order pursuant to Rule 26 so that Judge Infante may resolve this issue.

If you have any questions regarding the foregoing, please do not hesitate to call.

Best regards,

Jon D. Corey

JDC:jcl
07209/2032533 1

cc:    Diana Torres, Esq. (via facsimile)
       Michael Page, Esq. (via facsimile)

*23*

**Exhibit 5**

**Jenal, Jim**

| | |
|---|---|
| **From:** | Jenal, Jim |
| **Sent:** | Monday, June 18, 2007 6:34 PM |
| **To:** | Jon Corey |
| **Cc:** | Michael Page |
| **Subject:** | Letter re Kawashima depo |

Jon --

The attached letter (also being sent via fax) addresses your letter of earlier today.

Regards...

Jim

24

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

June 18, 2007

OUR FILE NUMBER
527,436-4

### VIA U.S. MAIL AND FACSIMILE (213) 443-3100

WRITER'S DIRECT DIAL
(213) 430-6584

Jon Corey, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 S Figueroa Street
Los Angeles, California 90017

WRITER'S E-MAIL ADDRESS
jjenal@omm.com

Re:   *Mattel, Inc. v. MGA Entertainment, Inc.*

Dear Jon:

I am writing in response to your letter of this day concerning Mattel's desire to apply a level of protection to the upcoming Kawashima deposition that had previously been reserved for the disclosure of documents related to as yet unreleased products. Your letter contains multiple inaccuracies but only one bears addressing at this moment. Contrary to your assertion that "MGA has not yet said whether it would consider such a proposal, even conceptually" –my email to you last Friday expressly requested that your provide us with a copy of Mattel's proposed amendment so that we could evaluate it. (A copy of my email to you is attached.) Despite that request last Friday, and despite your claim in your letter this morning, we have still not seen the proposed amendment – making it difficult to agree to its terms.

Nevertheless, in the interest of moving this forward, and in the hopes of avoiding yet another pointless motion before Judge Infante, MGA would propose the following: during tomorrow's deposition, Mattel may designate selected portions of Mr. Kawashima's testimony in accordance with the existing "third-tier" protections in the parties' previously amended protective order – subject to MGA's right to move for a re-designation of that testimony as provided for in the protective order. We trust that resolve's Mattel's concerns and we anticipate full and complete testimony from Mattel's designee tomorrow.

Best regards,

James P. Jenal
for O'MELVENY & MYERS LLP

LA2:834665.1

25

**Jenal, Jim**

| | |
|---|---|
| **From:** | Jenal, Jim |
| **Sent:** | Friday, June 15, 2007 2:26 PM |
| **To:** | Jon Corey; Michael T Zeller; Timothy Alger |
| **Cc:** | Michael Page; Torres, Diana; Glad, Jennifer; Cendali, Dale |
| **Subject:** | Your letter re: Kawashima |
| **Importance:** | High |

Jon --

I received your letter, apparently dated June 8, only yesterday (June 14) after the Lockhart depo and I am writing regarding your request for an amendment to the protective order that would apply to the upcoming deposition of Mr. Kawashima. Although you make vague references to "Mattel security measures" there is nothing in your letter that explains why testimony regarding such measures would rise to the level of AEO, let alone some more stringent protection level, such as has only been applied to information about not yet brought to market products.

Indeed, we know from the Mattel security files that have been produced, that while Mattel apparently routinely engages in surveillance of its own employees as well as its competitors, the bulk of those documents could not even be designated AEO and Mattel was forced when pressed to redesignate those files non-AEO.

What could Mr. Kawashima testify about that would be such a trade secret? Doe Mattel monitor the email of all of its employees? Is it engaged in packet sniffing of Internet traffic of its competitors? Is keystroke logging directed at every computer associated with the Mattel domain? These may be embarrassing facts to have to disclose, but they are not trade secrets, and to the extent that they constitute illegal conduct, certainly not protectable at all. At this point we can only speculate as Mattel has not offered any specifics.

Your letter refers to a proposed amendment, but did not provide a copy of same. If Mattel is serious about requesting MGA and Bryant to stipulate to a proposed amendment, please forward a copy to us immediately and we will get you our thoughts.

Jim Jenal
for O'Melveny & Myers LLP

IMPORTANT NOTE: This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you for your assistance.

26

**Exhibit  6**

Kawashima, Fred -- Vol. II

1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA

3  EASTERN DIVISION

4

5  ---------------------

6  MATTEL, INC., a Delaware    )

7  Corporation,          .    )

8        Plaintiff,     )

9    vs.          ) No. CV 04-9059

10  CARTER BRYANT, an individual;  )   NM (RNBx)

11  and DOES 1 through 10,     ) VOLUME II

12  Inclusive,          )

13        Defendants.    )

14  --------------------- )

15  (COMPLETE CAPTION ON NEXT PAGE.)    :

16

17    CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19  Continued Videotaped 30(b)(6) Deposition

20  of FRED T. KAWASHIMA, taken at 400 South

21  Hope Street, Los Angeles, California,

22  commencing at 9:57 A.M., Tuesday,

23  June 19, 2007, before Wendy S. Schreiber,

24  CSR No. 3558, RPR, CLR.

25  PAGES 281 - 517

None

27

Kawashima, Fred -- Vol. II

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3        FOR THE DEFENDANT AND COUNTERCLAIMANT

4        CARTER BRYANT:

5

6            KEKER & VAN NEST LLP

7            710 Sansome Street

8            San Francisco, California 94111-1704

9            (415) 391-5400

10           (NOT PRESENT)

11

12

13       FOR DEFENDANT MGA ENTERTAINMENT, INC.:

14

15           O'MELVENY & MYERS LLP

16           BY:  JAMES PAUL JENAL, ESQ.

17           400 South Hope Street

18           Los Angeles, California 90071-2899

19           (213) 430-6000

20           jjenal@omm.com

21

22       ALSO PRESENT:

23

24           RYAN GULINO, VIDEO OPERATOR

25

                              None

                              28

Kawashima, Fred -- Vol. II

1      Q.  And in what instances are there exceptions

2    when are exceptions made, let me put it that way?

3        MR. COREY:  I'm going to object and instruct

4    the witness not to answer to the extent it discloses

5    security measures that Mattel has taken.          01:31PM

6    BY MR. JENAL:

7      Q.  Can you answer the question?

8      A.  No.

9      Q.  And that's no relying on the instruction of

10   your counsel; is that correct?          01:31PM

11     A.  Yes.

12     Q.  You know the answer -- you know the answer

13   as to when exceptions are created; is that right?

14     A.  Yes.

15     Q.  So you could testify as to when exceptions  01:31PM

16   are made to the 90-day E-mail auto-deletion policy

17   but you're not going to relying on the instruction

18   of your counsel; is that correct?

19     A.  It's my understanding -- well, yes.

20       MR. JENAL:  I don't know what the disclosure 01:32PM

21   of security measures at Mattel exception for

22   instructing a witness not to answer comes from.

23   What's the rule that you're relying on for that,

24   Counsel?

25       MR. COREY:  Well, it's Rule 26 and I can    01:32PM

None                                              377

29

Kawashima, Fred — Vol. II

1    existing employees when it occurs?

2        MR. COREY:  Same objections.

3        You can answer that question "yes" or "no."

4        THE WITNESS:  No.

5    BY MR. JENAL:                          01:43PM

6      Q.  What third group does it apply -- is it

7    applied to?

8        MR. COREY:  I'm going to object and instruct

9    the witness not to answer on the grounds that it may

10   disclose Mattel security measures.           01:43PM

11   BY MR. JENAL

12     Q.  Is there a third group of Mattel employees

13   besides present employees and former employees that

14   I'm not aware of?

15       MR. COREY:  The same objection; same        01:44PM

16   instruction.

17       MR. JENAL:  That cannot possibly call for

18   the disclosure of anything even confidential let

19   alone subject to a protective order.

20     Q.  Are you going to follow counsel's        01:44PM

21   instruction and not answer that question?

22     A.  Yes.

23     Q.  Does Mattel have possession of E-mail other

24   than from its own employees?

25       MR. COREY:  Objection:  vague and ambiguous. 01:44PM

None                                      387

30

Kawashima, Fred -- Vol. II

1    THE WITNESS: Can you kind of expound on

2    that question, please? I don't understand it.

3    BY MR. JENAL

4    Q.  We've excluded so far terminated employees

5    and we've excluded active employees and as near as I   01:45PM

6    can tell that exhausts the universe of Mattel

7    employees. So my question to you is: Does Mattel

8    have access to E-mail of individuals who are not

9    Mattel employees?

10    MR. COREY: I'm going to object and instruct   01:45PM

11    the witness not to answer on the same grounds as

12    before.

13   BY MR. JENAL

14    Q.  You're going to follow that instruction?

15    A.  Yes.                          01:45PM

16    Q.  If I recall your testimony correctly, under

17   Exchange Server 2003 I can have more than one policy

18   and apply that to -- the different policies can have

19   different auto-deletion periods, correct?

20    MR. COREY: Objection: vague and ambiguous,   01:45PM

21   mischaracterizes the witness' testimony.

22   BY MR. JENAL

23    Q.  You said that 5.5 allows the functionality

24   in Mailbox Manager to have exceptions to the general

25   policy, correct?                   01:46PM

None                                           388

31

Kawashima, Fred -- Vol. II

1
2           REDACTED
3
4
5
6
7
8           REDACTED
9
10
11
12
13
14
15          REDACTED
16
17
18
19
20
21
22          REDACTED
23
24
25

None                                            399

32

Kawashima, Fred -- Vol. II

1
2
3                                REDACTED
4
5
6
7
8                                REDACTED
9
10
11
12
13
14
15                               REDACTED
16
17
18
19
20
21                               REDACTED
22
23
24
25

                    None                          400

                      33

Kawashima, Fred -- Vol. II

1       MR. COREY: Who did the configuration?

2   BY MR. JENAL

3       Q.  I think you testified that the person who

4   had the ability to implement multiple policies along

5   these lines was Mr. Ouk; is that correct?       02:08PM

6       A.  He's got -- he has the capability and access

7   to do that.

8       Q.  Do you know whether, in fact, he was the

9   person who did that?

10      A.  I am not 100 percent sure.       02:08PM

11      Q.  Presumably you could ask him and find out,

12   right?

13      A.  That's a possibility, yes.

14      Q.  Did the -- do you know where the source of

15   the request to implement the second E-mail retention  02:09PM

16   policy, where that came from?

17       MR. COREY: Same instruction.

18   BY MR. JENAL

19      Q.  Did that occur -- did that request come to

20   you?                                02:09PM

21       MR. COREY: Same instruction.

22   BY MR. JENAL

23      Q.  You're not going to answer that question

24   either?

25      A.  No.                          02:09PM

None                                                    402

34

Kawashima, Fred -- Vol. II

1    retention policies dictated as a result of Mattel's

2    secret investigative processes, are you aware of any

3    changes ever made to those mailbox retention

4    policies based on this litigation?

5        A.  Any changes to the 90-day retention?        04:46PM

6        Q.  Correct.

7        A.  There was a change due to this litigation.

8        Q.  Pardon me?

9        A.  It was changed -- you're asking me if it was

10   changed due to this litigation?        04:46PM

11       Q.  Yes.

12       A.  I'm not aware of any global changes that

13   were made to the 90-day Mailbox Manager policy.

14       Q.  Are you aware of any other changes besides

15   global changes to that policy?        04:47PM

16       MR. COREY:  I'll instruct the witness not to

17   answer on the grounds that it might disclose Mattel

18   security measures.

19       MR. JENAL:  I'm not looking to get into

20   Mattel security measures.  I'm asking if this was        04:47PM

21   ever changed globally -- you said no -- in any other

22   way with regard to this litigation.

23       MR. COREY:  Same objection.

24   BY MR. JENAL:

25       Q.  Are you going to follow that instruction?        04:47PM

None                                                            498

35

Kawashima, Fred -- Vol. II

1      A.  Yes.

2      Q.  Do you know the answer to that question?

3      A.  Yes.

4      Q.  Do you know of any actions taken by Mattel

5   to locate or identify within whatever E-mail it has   04:47PM

6   preserved E-mails to or from Carter Bryant?

7         MR. COREY:  Objection beyond the scope.

8   BY MR. JENAL

9      Q.  You can answer.

10     A.  Your question was any investigations done?   04:48PM

11     Q.  No.  Do you know of any actions of any type

12   taken by Mattel to identify or locate within

13   whatever E-mail it has preserved E-mails to or from

14   Carter Bryant?

15        MR. COREY:  Objection:  scope and assumes   04:48PM

16   facts.

17        THE WITNESS:  I have no knowledge of that.

18   BY MR. JENAL

19     Q.  Who would have knowledge of that, if that

20   was done?                      04:48PM

21     A.  My assumption would be it would emanate from

22   Legal.

23     Q.  I'm sorry?

24     A.  It would emanate from the Legal department.

25     Q.  Have you seen any requests from the Legal   04:49PM

None                                      499

36

Kawashima, Fred -- Vol. II

1    STATE OF CALIFORNIA   ) ss

2    COUNTY OF LOS ANGELES )

3

4         I, WENDY S. SCHREIBER, CSR No. 3558, do

5    hereby certify

6

7         That the foregoing deposition of FRED T.

8    KAWASHIMA was taken before me at the time and place

9    therein set forth, at which time the witness was

10   placed under oath and was sworn by me to tell the

11   truth, the whole truth, and nothing but the truth;

12        That the testimony of the witness and all

13   objections made by counsel at the time of the

14   examination were recorded stenographically by me,

15   and were thereafter transcribed under my direction

16   and supervision, and that the foregoing pages

17   contain a full, true and accurate record of all

18   proceedings and testimony to the best of my skill

19   and ability.

20        I further certify that I am neither

21   counsel for any party in said action, nor am I

22   related to any party to said action, nor am I in any

23   way interested in the outcome thereof.

24

25

                              None                           514

                              37

Kawashima, Fred -- Vol. II

1          IN WITNESS WHEREOF, I have subscribed my

2    name this 29th day of June, 2007.

3

4

5

6          _____

7    WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

None                                            515

38

Kawashima, Fred -- Vol. II

1           I N D E X

2           VOLUME II

3

4     TUESDAY, JUNE 19, 2007

5

6     WITNESS                    EXAMINATION

7

8     FRED T. KAWASHIMA

9

10      (By Mr. Jenal)           285, 373

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

None                                      516

*39*

Kawashima, Fred --- Vol. II

1        DEPOSITION EXHIBITS

2           FRED T. KAWASHIMA

3

4    NUMBER        DESCRIPTION        IDENTIFIED

5

6    Exhibit 470  E-Mail dated 3/23/04 to Larian    507

7            from Parker, M 0059790 through

8            M 0059792

9

10

11

12        QUESTIONS NOT ANSWERED ON ADVICE OF COUNSEL

13           PAGE       LINE

14

15        341        12

16        377        15

17        387        6 & 12

18        388        7

19        399        9

20        400        13 & 18

21        402        19

22        498        14

23

24

25

None                                        517

40

**Exhibit 7**

LODGED

1   DALE M. CENDALI (admitted *pro hac vice*)
    O'MELVENY & MYERS LLP 2007 JUL 24  AM 10: 07
2   400 South Hope Street
    Los Angeles, CA 90071-2899 CLERK U.S. DISTRICT COURT
3   Telephone: (213) 430-6000      CENTRAL DIST. OF CALIF.
    Facsimile: (213) 430-6407           RIVERSIDE
4   Email:     jjenal@omm.com

5   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
6   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
7   Los Angeles, CA 90067
    Telephone: (310) 553-3000
8   Facsimile: (310) 557-9815

9   Attorneys for MGA Entertainment, Inc.

10  JOHN W. KEKER (S.B. #49092)
    KEKER & VAN NEST, LLP
11  710 Sansome Street
    San Francisco, CA 94111
12  Telephone: (415) 391-5400
    Fax: (415) 397-7188
13
    Attorneys for Carter Bryant
14
15          UNITED STATES DISTRICT COURT          BY FAX
            CENTRAL DISTRICT OF CALIFORNIA
16                 EASTERN DIVISION

17  CARTER BRYANT, an individual,    | Case No. CV 04-09049 SGL (RNBx)
18              Plaintiff,           | (consolidated with CV 04-9059 & 05-2727)
19       v.                          | CONFIDENTIAL- FILED UNDER
                                     | SEAL
20  MATTEL, INC., a Delaware         | MGA ENTERTAINMENT, INC.'S
21  Corporation,                     | MOTION FOR TERMINATING
                                     | SANCTIONS AGAINST MATTEL, INC.
                Defendant.           | DUE TO SPOLIATION OF EVIDENCE
22
23  AND CONSOLIDATED ACTIONS        | Hon. Stephen G. Larson
24                                   | Discovery Cut-off: January 14, 2008
                                     | Pre-trial Conference: April 7, 2008
25                                   | Trial Date: April 29, 2008
26                                   | Hearing Date: August 13, 2007
                                     | Hearing Time: 10:00 am
27                                   | Courtroom:   1
28
                                       MGA'S MOTION FOR TERMINATING
                                              SANCTIONS
                                       CV 04-09049 SGL (RNBX)

41

1   DALE M. CENDALI (admitted *pro hac vice*)
    O'MELVENY & MYERS LLP
2   400 South Hope Street
    Los Angeles, CA  90071-2899
3   Telephone:  (213) 430-6000
    Facsimile:   (213) 430-6407
4   Email:      jjenal@omm.com

5   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
6   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
7   Los Angeles, CA  90067
    Telephone:  (310) 553-3000
8   Facsimile:   (310) 557-9815

9   Attorneys for MGA Entertainment, Inc.

10  JOHN W. KEKER (S.B. #49092)
    KEKER & VAN NEST, LLP
11  710 Sansome Street
    San Francisco, CA 94111
12  Telephone: (415) 391-5400
    Fax: (415) 397-7188
13
    Attorneys for Carter Bryant
14
                    UNITED STATES DISTRICT COURT
15            CENTRAL DISTRICT OF CALIFORNIA
                       EASTERN DIVISION
16

17  CARTER BRYANT, an individual,        Case No.  CV 04-09049 SGL (RNBx)
                                         (consolidated with CV 04-9059 & 05-2727)
18                  Plaintiff,
                                         **CONFIDENTIAL- FILED UNDER**
19        v.                             **SEAL**

20  MATTEL, INC., a Delaware             **MGA ENTERTAINMENT, INC.'S**
    Corporation,                         **MOTION FOR TERMINATING**
21                                       **SANCTIONS AGAINST MATTEL, INC.**
                    Defendant.           **DUE TO SPOLIATION OF EVIDENCE**
22

23  AND CONSOLIDATED ACTIONS            Hon. Stephen G. Larson

24                                       Discovery Cut-off:  January 14, 2008
                                         Pre-trial Conference:  April 7, 2008
25                                       Trial Date: April 29, 2008

26                                       Hearing Date: August 13, 2007
                                         Hearing Time: 10:00 am
27                                       Courtroom:    1

28

                                         MGA'S MOTION FOR TERMINATING
                                                   SANCTIONS
                                            CV 04-09049 SGL (RNBX)

42

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................... 1

II.  BACKGROUND ................................................................................ 3

   A.   Mattel Never Suspended Its Auto Delete Policy .......................... 3

   B.   Mattel Was on Notice of Its Claims by 2002 .............................. 4

   C.   The 2003 Investigation and the Wall Street Journal Article ........... 5

   D.   Mattel Sues Bryant and "Does" in 2004 .................................... 6

   E.   MGA's Document Retention Demands ......................................... 7

   F.   Mattel Stonewalls MGA's Efforts to Obtain Discovery about
        Email Preservation ................................................................... 8

   G.   Mattel Perpetrates a Fraud on the Court ..................................... 10

   H.   Discovery Has Revealed Mattel's Spoliation ................................ 11

        (a)   Mattel Overwrote Its Backup Tapes from 2002-2005 ............. 12

        (b)   There Are No Zeus Server Backup Tapes from 1998-2001 ..... 13

        (c)   Mattel "Lost" Carter Bryant's October 2000 Phone
              Records ....................................................................... 14

III. ARGUMENT ................................................................................... 14

   A.   Mattel's Conduct Warrants Terminating Sanctions ....................... 15

        1.   The Court Has Inherent Power To Dismiss Mattel's
             Claims for Spoliation of Evidence ................................... 15

        2.   Mattel Had a Duty To Preserve Evidence At Least As
             Early As March 2002 ................................................... 16

        3.   Mattel's Duty to Preserve Required It to Suspend its
             Routine Document Destruction Policies ............................. 17

        4.   Mattel's Failure to Suspend Auto Delete and Maintain
             Backup Tapes Constitutes "Willfulness, Fault or Bad
             Faith" Warranting Terminating Sanctions ........................... 18

   B.   Mattel's Spoliation Meets The Test Set Forth In Anheuser
        Busch ................................................................................. 20

        1.   The Public's Interest In Expeditious Resolution of
             Litigation and The Court's Ability To Manage Its Docket
             Have Both Been Compromised By Mattel's Conduct ............. 20

        2.   Mattel's Spoliation Has Prejudiced MGA and Bryant ........... 21

        3.   Mattel's Spoliation Warrants Dismissal And Less Drastic
             Sanctions Are Not Appropriate ...................................... 24

   C.   CONCLUSION ................................................................... 25

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

**TABLE OF AUTHORITIES**

Page

**CASES**

*Akiona v. United States,*
  938 F.2d 158 (9th Cir. 1991) ...................................................................16

*Alexander v. Nat'l Farmers Org.,*
  687 F.2d 1173 (8th Cir. 1982) ...........................................................19, 22

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.,*
  69 F.3d 337 (9th Cir. 1995) .........................................................15, 16, 20

*Broccoli v. Echostar Communications Corp.,*
  229 F.R.D. 506 (D. Md. 2005) ...............................................................19

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,*
  2007 WL 684001 (D. Colo. Mar. 2, 2007)...............................................18

*Carlucci v. Piper Aircraft Corp.,*
  102 F.R.D. 472 (S.D. Fla. 1984) .............................................................15

*Cecconi v. Cecconi,*
  2007 Bankr. LEXIS 1323 (Bankr. N.D. Cal. April 17, 2007)...................16

*Computer Associates Int'l. v. American Fundware, Inc.,*
  133 F.R.D. 166 (D. Colo. 1990) .............................................................15

*Convolve, Inc. v. Compaq Computer Corp.,*
  223 F.R.D. 162 (S.D.N.Y. 2004).............................................................20

*DaimlerChrysler Motors v. Bill Davis Racing, Inc.,*
  2005 U.S. Dist. LEXIS 38162 (D. Mich. 2005)......................................18

*Frame v. S-H, Inc.,*
  967 F.2d 194 (5th Cir. 1992) .................................................................15

*Google Inc. v. Am. Blind & Wallpaper Factory, Inc.,*
  2007 U.S. Dist. LEXIS 48309 (N.D. Cal. June 27, 2007)........................21

*Halaco Eng'g Co. v. Costle,*
  843 F.2d 376 (9th Cir. 1988) .................................................................21

*Henry v. Gill Industries, Inc.,*
  983 F.2d 943 (9th Cir. 1993) .................................................................16

*Housing Rights Ctr. v. Sterling,*
  2004 U.S. Dist. LEXIS 28877 (C.D. Cal. Dec. 6, 2004)..........................17

*In re Fitzsimmons,*
  920 F.2d 1468 (9th Cir. 1990) ...............................................................20

*In re Wechsler,*
  121 F. Supp. 2d 404 (D. Del. 2000) .......................................................15

*Leon v. IDX Sys. Corp.,*
  464 F.3d 951 (9th Cir. 2006) ..........................................................passim

*Metropolitan Opera Ass'n, Inc. v. Local 100 Hotel Employees and
  Restaurant Employees Int'l Union,*
  212 F.R.D. 178 (S.D.N.Y. 2003) ............................................................15

- ii -

44

1
2

**TABLE OF AUTHORITIES**
(Continued)

Page

3    *Mosaid Technologies Inc. v. Samsung Elecs. Co., Ltd.*,
       348 F. Supp. 2d 332 (D.N.J. 2004)...................................................20
4
     *National Ass'n of Radiation Survivors v. Turnage*,
5      115 F.R.D. 543 (N.D. Cal. 1987) ...................................................16

6    *Padgett v. City of Monte Sereno*,
       No. C 04-03946 JW, 2007 U.S. Dist. LEXIS 24301 (N.D. Cal.
       March 20, 2007)..........................................................................19
7
     *Residential Funding Corp. v. DeGeorge Fin. Corp.*,
8      306 F.3d 99 (2d Cir. 2002) ...........................................................21

9    *Synanon Church v. United States*,
       820 F.2d 421 (D.C. Cir. 1987),
10     *aff'd* 579 F. Supp. 967 (D.D.C. 1984) ..........................................15

11   *Telectron, Inc. v. Overhead Door Corp.*,
       116 F.R.D. 107 (S.D. Fla. 1987).....................................................21
12
     *UMG Recordings, Inc. v. Hummer Winblad Venture Partners*,
       462 F. Supp. 2d 1060 (N.D. Cal. 2006)......................................19, 21
13
     *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
14     982 F.2d 363 (9th Cir. 1992) ....................................................15, 16

15   *United States v. Kitsap Physicians Serv.*,
       314 F.3d 995 (9th Cir. 2002) .......................................................19
16
     *United States v. Nat'l Medical Enters., Inc.*,
17     792 F.2d 906 (9th Cir. 1986) .......................................................21

18   *Wm. T. Thompson Co. v. General Nutrition Corp.*,
       593 F. Supp. 1443 (C.D. Cal. 1984)............................................15, 17

     *Zubulake v. UBS Warburg LLC*,
       220 F.R.D. 212 (S.D.N.Y. 2003) ...............................................17, 21
19

**OTHER AUTHORITIES**
20
     Quinn Emanuel, Business Litigation Report, *New e-Discovery Rules
       Go Into Effect* (Jan. 2007)...........................................................17
21
     Quinn Emanuel, Business Litigation Report, *Preservation of
22     Electronic Information for Discovery: Emerging Standards* (Nov.
       2004) .................................................................................17, 18
23
     Quinn Emanuel, Business Litigation Report, *Spoliation of Electronic
       Evidence Gives Rise to Adverse Jury Instructions* (April 2005) ...................2
24

**RULES**
25
     Fed. R. Civ. P. 30(b)(6) ......................................................8, 10, 14

26   Fed. R. Civ. P. 37.....................................................................21

27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Mattel, Inc. ("Mattel") cleaned house before it went to war with MGA Entertainment, Inc. ("MGA") by making sure that evidence helpful to Carter Bryant and MGA would not be preserved for trial. As the Court is aware, Mattel has brought claims against MGA and Mr. Bryant purportedly based on events that allegedly occurred nearly a decade ago. In fact, Mattel obtained leave to amend its complaint to assert claims against MGA, in part, by representing to the Court that it had preserved the evidence that would be relevant to those claims. Discovery, however, has revealed Mattel's representations to be a sham: in fact, Mattel has engaged in a deliberate and systematic attempt to destroy relevant evidence, in violation of its legal obligations and in a calculated effort to force defendants to litigate this case on an evidentiary record riddled with gaps Mattel itself created.

Mattel's spoliation of evidence is astonishing both in its scope and in its thoroughness. While Mattel admits that its 25,000 employees exchange more than 80,000 emails daily (or over 20,000,000 per year), Mattel has, to date, produced just *1,200 emails*. Mattel's production of emails is so sparse because, despite conducting a number of substantial investigations since at least early 2002 of the very claims at issue here, *Mattel did not suspend its auto-deletion of email for anyone, even its most obvious potential witnesses, or preserve any email backup tapes.* In fact, Mattel continued to auto-delete email and to recycle backup tapes for an *entire year after Mattel sued Mr. Bryant.* And although one Mattel witness claims that Mattel "probably" preserved a 2002 backup tape for the server used by its design center employees such as Carter Bryant, Mattel disposed of the hardware necessary to review it, and it now admits -- contrary to its counsel's express representations to this Court under oath -- that it has no backup tapes at all (1) for the 1999-2001 period, (2) for 2003 (when the *Wall Street Journal* article was published, in which Mattel first made its allegations public), or (3) for 2004 (when

1    Mattel filed suit).

2         Mattel likewise did nothing to preserve physical documents. Mattel has thus

3    "lost" critical physical documents in this case: the phone records for Mr. Bryant's

4    telephone extension at Mattel for October 2000. These records are significant

5    because Mattel seeks to claim "Bratz" on the theory that he used Mattel resources

6    that very month to help MGA meet key milestones in the development of "Bratz."

7         As Mattel's counsel has written, "[b]y now, all lawyers know — or should

8    know — that bad things can happen if electronic evidence is not preserved."[1] Thus,

9    aware of the consequences of its misdeeds, Mattel attempted a cover-up:

10        • Mattel concealed its internal investigation and other documents that
          reveal that it first was on notice of its claims against Bryant and MGA
11        no later than March 2002, at which time its duty to preserve relevant
          evidence attached.
12
          • Mattel repeatedly and aggressively evaded discovery by refusing for
13        two years to produce witnesses familiar with its electronic document
          preservation efforts.
14
          • When it finally produced those witnesses, Mattel's counsel directed
15        them not to answer questions about post-2000 preservation practices.

16        • Mattel represented to the Court, MGA, and Bryant that there had been
          no spoliation -- representations on which the Court expressly relied[2] --
17        but Mattel's witnesses have since admitted under oath that Mattel has
          no backup tapes for its e-mail servers for 1998 through April 2005.
18

19        The prejudice resulting directly from Mattel's actions cannot be overstated.

20   Mattel is asserting claims based on events that allegedly transpired long ago, in

21   1998-2000. It investigated these very claims when evidence existed and memories

22   were fresh, selectively saving certain evidence and destroying the rest. It then

23   waited years -- until memories had faded -- before bringing its claims.

24

25   [1] Quinn Emanuel, Business Litigation Report, *Spoliation of Electronic Evidence Gives Rise to Adverse Jury Instructions* (April 2005), Ex. 22 to the Declaration of Kendall Burr, dated July 20, 2007 ("Burr Decl.").

26

27   [2] *Bryant v. Mattel, Inc.*, No. CV-04-9049-SGL, slip op., at 13 (C.D. Cal. Jan. 12, 2006) (allowing amendment because no "evidence that the e-mails so deleted from a Mattel employee's inbox are forever lost or, as is far more likely, whether such information remains or is otherwise archived on some backup file on Mattel's computer system").

28

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

*47*

1    Mattel is a large, sophisticated company, with seemingly unlimited resources
2    to conduct scorched-earth litigation.  It has retained prominent outside counsel, and
3    more than 30 lawyers have appeared in this case on its behalf.  Given the attention
4    that Mattel and its lawyers have lavished on this case, Mattel's failure to preserve
5    and produce evidence, and its efforts to conceal its spoliation from the Court,
6    MGA, and Bryant, can lead only to the conclusion that its spoliation was intentional
7    and in bad faith.  Mattel and its counsel sought to obstruct these proceedings,
8    deprive MGA and Bryant of relevant evidence that would support their defenses,
9    and gain an unfair advantage by convincing the Court that it should be allowed to
10   bring its claims long after the underlying facts at issue took place.  Mattel's years of
11   misconduct and brazen misrepresentations warrant the imposition of the most
12   serious sanctions available: dismissal of Mattel's claims against Bryant and MGA.

13   **II.    BACKGROUND**

14   The following facts are based on testimony from Mattel's own witnesses and
15   documents that Mattel was ordered to produce:

16   **A.    Mattel Never Suspended Its Auto Delete Policy**

17   Mattel has an automatic e-mail destruction policy that has been in force since
18   1999, pursuant to which, Mattel's computer systems automatically delete emails
19   from an employee's in-box after 90 days.  *See* Declaration of James P. Jenal, dated
20   July 20, 2007 ("Jenal Decl.") ¶9 Ex. 8 at 355-356.  *Mattel has never suspended*
21   *that policy at any time during this litigation -- not even for key witnesses* of whom
22   it has known for years, like those listed in Mattel's initial disclosures.  *See* Jenal
23   Decl., ¶9, Ex. 8 at 380-381; Declaration of Michael Keats, dated July 20, 2007
24   ("Keats Decl."), ¶5.  The only reason Mattel has proffered for its failure to do so is
25   that it was supposedly too expensive for Mattel, a multi-billion dollar publicly held
26   company, to do so.[3]  *Id.*

---

27   [3] Notably, Mattel seeks hundreds of millions of dollars of damages from Bryant and MGA
28   and has insisted that they incur enormous sums themselves to review and produce
     electronic evidence.  *See* Burr Decl., Ex. 2.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

1   Similarly, Mattel did not retain backup tapes of its email systems from 1998-

2   April 2005. Jenal Decl., ¶3, Ex. 2 at 230-235. Mattel's email systems are backed-

3   up on tapes that are ordinarily kept for 30 days and then recycled. *Id.* ¶7, Ex. 6 at

4   157-158:5. Mattel did not suspend this practice until April 2005, *Id.* ¶9, Ex. 8 at

5   366-369, which again resulted in the destruction of potentially relevant emails.

6   Mattel offers no excuse for this destruction.

7   **B.   Mattel Was on Notice of Its Claims by 2002**

8   Mattel's failure to preserve evidence, in accordance with its legal obligations,

9   is particularly egregious given that Mattel was on notice of its claims against

10   Bryant and MGA since at least March 2002, when it conducted an extensive

11   internal investigation into the allegations that form the basis for this lawsuit. *See*

12   Burr Decl., ¶2. MGA and Bryant were unaware of this investigation until Mattel

13   produced documents concerning the investigation after being compelled to do so by

14   the Discovery Master.[4] *Id.*, ¶2, Ex. 1.

15   Those documents reveal that, in March 2002, Mattel opened a formal

16   investigation in response to information provided by two Mattel employees, Evelyn

17   Viohl and Ivy Ross. *Id.*, ¶4, Ex. 3.   According to Mattel's documents, Ms. Viohl

18   and Ms. Ross told Mattel that MGA had hired a number of former Mattel

19   employees and was manufacturing products they believed were based on Mattel

20   designs. *Id.* Mattel's investigators then set about to obtain information about MGA,

21   Isaac Larian, and Carter Bryant to support those allegations. On March 28, 2002,

22   Mattel employee Cassidy Park suggested to a Mattel investigator that Mr. Bryant, a

23   former employee and Mattel illustrator, had plagiarized the designs of Lily

24   Martinez in creating MGA's "Bratz" dolls. *Id.* ¶5, Ex. 4.   That same day, a Mattel

25   investigator contacted Mattel's human resources department to obtain Mr. Bryant's

26

---

27   [4] Mattel refused to disclose any material documents regarding Mattel's investigation of
MGA, MGA employees, and Mattel employees.  On January 30, 2007, Judge Infante

28   ordered Mattel to produce its investigation files.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

1  file for his investigation.  Mattel also conducted an extensive investigation of MGA

2  and its employees.[5]  *Id.*

3        Five months later, in August 2002, Mattel's CEO Bob Eckert received an

4  anonymous letter reciting the allegations that ultimately formed the basis for

5  Mattel's lawsuit against Mr. Bryant and MGA.  *Id.* ¶6, Ex. 6.  Richard De Anda, the

6  Head of Mattel's Worldwide Security Department, wrote an email to Alan Kaye,

7  Head of Human Resources, in response to Mattel's receipt of the August 2002

8  "anonymous letter," confirming that the allegations raised in the letter had been

9  under investigation for months.  *Id.* ¶6, Ex. 7.  In the email, Mr. De Anda states, "I

10 am aware of this situation and have been working on it for several months.  My

11 frustration in this matter was the genesis of [redacted] *and that is now in the hands*

12 *of [Mattel's General Counsel,] Robert Normile.*"  *Id.* (emphasis added).

13       Thus, Mattel and its General Counsel were on notice of Mattel's claims

14 against Bryant and MGA just months after MGA's "Bratz" dolls first went to

15 market in June 2001.[6]  *See* Burr Decl., Ex. 23.  Yet in spite of Mattel's internal

16 investigation, which began in early 2002 and involved Mattel's General Counsel,

17 Mattel did nothing between 2002-2005 to collect relevant email, to suspend its

18 auto-delete policy, or to preserve back-up tapes of electronic files.

19   **C.    The 2003 Investigation and the *Wall Street Journal* Article**

20       Mattel's focus on MGA and Bryant did not let up after 2002.  In mid-2003,

21 Mattel initiated yet another investigation of MGA.  This investigation, too, involved

22 allegations of misappropriating Mattel's intellectual property and copying of Mattel

---

23 [5] In addition to information about Mr. Bryant and MGA, the March 2002 investigation file
24 contains personal information about Mr. Larian, such as his social security number, age,
   home address, and business address, and similar information for his parents, wife, and
25 children.  Burr Decl. ¶ 5, Ex. 5.  Mattel investigators even probed into details about
   Larian's personal endeavors, including information about Larian's involvement with the
26 Parent-Teacher Association at El Rodeo School and his attendance at the Stephen S. Wise
   Temple, as well as his hobbies.  *Id.*
27 [6] Notwithstanding the facts revealed by its own evidence, Mattel falsely alleges in its
   Amended Answer and Counterclaims and elsewhere, that it only learned of Bryant's
28 association with MGA on November 24, 2003.  Burr Decl. ¶3, Ex. 2.

1   products by MGA employees.  Again, Mattel conducted an FBI-type investigation

2   of MGA and its employees.  Burr Decl. ¶30, Ex. 30.

3        In April 2004, Mattel turned its suspicious eye toward a new employee,

4   Ronald Brawer.  Mattel learned that Brawer had been communicating with MGA

5   and immediately opened a new investigation.  Mattel searched public records using

6   Brawer's social security number, reviewed his e-mails, searched his phone records,

7   and searched his corporate apartment in New York City.  *Id.* ¶31, Ex. 31.  Thus, by

8   that time, Mattel was on notice of potential trade secret claims that it did not

9   ultimately bring until January 2007.  *Id.*, Ex. 2.

10        Mattel also admits that, in mid-2003, it placed a story with the *Wall Street*

11   *Journal* as part of its effort to promote a new product line intended to compete with

12   "Bratz."  Keats Decl. ¶2, Ex. 1.  In doing so, Mattel employees took the opportunity

13   to publish Mattel's theory.  The *Wall Street Journal* reported:

14        Inside Mattel, some are convinced the "Bratz" borrow liberally from a
         Mattel project that was scrapped at the testing stage in 1998...[The
15        "Bratz"] oversized heads - with their pursed lips and cartoonist eyes -
         are "virtually identical" to the heads of the dolls her team created, says
16        the designer, who left Mattel in 2001..."The big heads, the big eyes,
         the big feet - they were all the same" as 'Bratz."
17

18   *Id.* ¶3, Ex. 2.  Julia Jensen, the Mattel employee who placed the article, specifically

19   testified that she exchanged emails with the *Wall Street Journal* reporter who wrote

20   this article yet, to this day, Mattel has not produced any emails reflecting her

21   communications or internal discussions about those communications or about the

22   article itself.  *Id.* ¶4, Ex. 1 at 103-104, 170-171; Ex. 3; Burr Decl. ¶7.  Why?

23   Because Mattel knowingly allowed those emails to be destroyed, even though it

24   was actively investigating MGA and Bryant for the same conduct.

25   **D.   Mattel Sues Bryant and "Does" in 2004**

26        Mattel filed its original complaint against Bryant in April 2004.  *See* Burr

27   Decl., Ex. 8.  That complaint contained, almost verbatim, the allegations that Mattel

28   investigated in 2002.  Yet at no time ***before or for an entire year after*** filing its

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

6

*51*

1   lawsuit did Mattel do anything to suspend its auto-delete policy for possible

2   witnesses or take backup tapes out of circulation.  Jenal Decl., ¶9, Ex. 8 at 366-369.

3       It was only *after* MGA sued Mattel in 2005 (hereinafter "*MGA v. Mattel*")

4   that Mattel started taking email backup tapes out of circulation.  *Id.*   In fact, Mattel

5   concealed the existence of these tapes from MGA until only recently, and admits

6   that it has not searched them and has no intention of doing so.  Keats Decl., ¶¶5-6,

7   Exs. 4-7.  Even if the tapes were searched, the earliest emails on those tapes would

8   date back only to early 2005 -- leaving a gaping evidentiary hole prior to that time.

9   Jenal Decl., ¶9, Ex. 8 at 366-369.

10   **E.**   **MGA's Document Retention Demands**

11       In mid-April, 2005, MGA filed its own suit against Mattel.  In a letter dated

12   April 16, 2005, MGA demanded that Mattel "immediately suspend any document

13   retention or destruction policy, including, but not limited to, the deletion of emails

14   or other electronic records, and take any and all measures necessary, including

15   retaining archival documents in storage and backing-up and/or mirroring electronic

16   records and metadata . . ." Burr Decl., Ex. 12.  Mattel promptly assured MGA that

17   *it would* preserve documents "relating to the accused Mattel products and the third-

18   party organizations referenced in the complaint." *Id.*, Ex. 13.  Mattel went on to

19   explain that it would not suspend its auto-delete policy for *all* of its 25,000

20   employees (a request that MGA never made), because of the purported massive

21   volume of email and other electronic data created by its employees worldwide;

22   according to Mattel's counsel, Mattel processes over 80,000 email messages per

23   day over its servers.[7]  *Id.*  Mattel nonetheless indicated in its response that it was

24   aware of its obligations to preserve evidence, and would comply with them -- which

25   obligations clearly encompass a duty to preserve emails and electronic documents

26

27   ---

[7]  Mattel invited MGA to agree to Mattel's approach to document preservation and threatened to seek intervention from the Court if MGA did not, including requiring MGA to bear the cost of document retention.  Burr Decl., Ex. 13.  Mattel's preservation obligations arise by law, and MGA saw no reason to enter into any such agreement.

28

MGA'S MOTION FOR TERMINATING<br/>SANCTIONS<br/>CV 04-09049 SGL (RNBX)

7

*52*

1  of reasonably likely witnesses. *Id.* MGA sent Mattel another preservation demand

2  on September 5, 2005. *Id.*, Ex. 14. MGA sent these letters to make sure Mattel

3  would retain documents relevant to MGA's claims against Mattel, not knowing that

4  Mattel had chosen not to retain documents concerning the claims Mattel had

5  brought the previous year.

6      **F.**   **Mattel Stonewalls MGA's Efforts to Obtain Discovery about**

7          **Email Preservation**

8        The record is similarly replete with evidence that Mattel actively sought to

9  frustrate MGA's efforts to obtain discovery concerning Mattel's preservation

10  efforts. On December 21, 2004, just days after MGA intervened, Mr. Bryant served

11  a 30(b)(6) deposition notice requesting that Mattel provide designees on the issues

12  of email and document retention. Jenal Decl. ¶4. Mattel refused to do so. At Mr.

13  Bryant's request, he and Mattel met and conferred on March 14 and 15, 2005,

14  regarding Mattel's failure to designate witnesses in response to Bryant's 30(b)(6)

15  notice. *Id.* ¶4. Mattel delayed another two months -- until May 16, 2005 -- before

16  designating its witnesses. *Id.* ¶4. On May 23, 2005, this Court stayed discovery

17  pending Mattel's appeal to the Ninth Circuit of the Court's denial of Mattel's

18  motion to remand, thus saving Mattel from having to produce its Information

19  Technology witnesses for deposition. Burr Decl., Ex. 15.

20        On August 10, 2006, after the stay was lifted, MGA requested deposition

21  dates for Mattel's 30(b)(6) witnesses on, among other topics, Mattel's "Zeus"

22  server (which is used by Mattel doll designers and others in its design center) and

23  its email servers. Jenal Decl. ¶4. On September 12 and November 8, 2006, MGA

24  deposed Julia Marine, the administrator of Mattel's Zeus file server, who testified

25  that, although a backup tape set "probably" from 2002 had been provided to

26  Mattel's legal department, Mattel no longer had the ability to restore and search

27  those tapes for responsive documents because it had disposed of the hardware

28  needed to read the backup tapes. *Id.* ¶2, Ex. 1 at 111-112, 117-119. Ms. Marine

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

1  further testified that she had no idea what was on the 2002 backup tapes. *Id.*

2  Over the next several months, MGA and Bryant sought to depose Mattel's

3  designated witness on its email system. *Id.* ¶ 4. Although Mattel had identified

4  witnesses for *other* electronic information categories on or about August 18, 2006,

5  notably, Mattel had refused to identify a witness or provide a date for a deposition

6  on topics *concerning Mattel's electronic mail. Id.* On three separate occasions

7  throughout the Fall, MGA reiterated, in writing, its previously ignored requests that

8  Mattel schedule the deposition of its "email" designee. *Id.* ¶4, Ex. 3. Mattel finally

9  responded by letter on October 20, 2006, offering David Kayano as its designee and

10  setting the week of December 6 – nearly seven weeks later and nearly four months

11  after being first asked in August 2006 – for a deposition on its electronic mail

12  system and practices. *Id.* Mattel ignored MGA's requests for an earlier date, and

13  when MGA consented to go forward on December 6, Mattel unilaterally cancelled

14  the deposition pending agreement on the appointment of a discovery master. *Id.*

15  Once the parties had reached agreement on a discovery master, Mattel again refused

16  to produce Mr. Kayano on December 6, claiming by letter on December 1 that Mr.

17  Kayano would be unavailable until after January 16, 2007. *Id.* ¶5, Ex. 4. This time,

18  Mattel's excuse for Mr. Kayano's unavailability was that Mattel had recently

19  acquired another company and that Mr. Kayano would be busy working on that

20  acquisition; a press release on Mattel's website stating that the acquisition had been

21  completed on October 3, 2006, *before* Mattel had even designated Mr. Kayano as

22  its witness belied Mattel's assertion, however. *Id.* ¶6, Ex. 5.

23  When Mattel finally produced Mr. Kawashima as a substitute for deposition

24  after the hearing on Mattel's motion for leave to amend, Mr. Kawashima admitted

25  that Mattel had no email backups at all from 1998 through 2000. *Id.* ¶7, Ex.6 at

26  195-198. When MGA tried to question Kawashima about email backups after

27  2000, Mattel's counsel instructed him not to answer, purportedly because, in 2004,

28  well before MGA sued Mattel or Mattel amended its Answer and Counterclaims,

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

*54*

1   the parties had supposedly agreed to limit the 30(b)(6) testimony concerning emails

2   to the period during which Bryant was employed at Mattel. *Id.* at 195-198. MGA

3   disagreed and was forced to file a motion to compel to obtain information about

4   Mattel's post-2000 email preservation efforts. Burr Decl., Ex. 24. Even in the face

5   of a court order, Mattel delayed further, refusing to make Mr. Kawashima available

6   for deposition until June 2007. Jenal Decl., ¶8.

7       **G.**   **Mattel Perpetrates a Fraud on the Court**

8       Mattel's pattern of improper conduct extended to its submissions to the

9   Court. In November 2006, Mattel moved to amend its complaint so that it could

10  bring "aiding and abetting" and copyright infringement claims against MGA, and to

11  assert other claims for misappropriation of trade secrets and RICO violations in the

12  *Bryant* case. MGA opposed Mattel's motion to amend on several grounds,

13  including because the proposed claims related to events of long ago, and also

14  because it appeared that Mattel had not preserved key electronic documents, in two

15  forms – (1) although Mattel had led MGA to believe that it has preserved backup

16  tapes of its Zeus server, it had not preserved hardware capable of reading it;[8] and

17  (2) it appeared that emails were not being preserved. Burr Decl., Ex. 17 at 9:15-

18  10:16, 15:6-15:11. Mattel has more than 25,000 employees and claims that its

19  email server handles 80,000 emails on a *daily* basis, yet had produced virtually no

20  emails. Indeed, to date, Mattel's production has included only a mere 1,200 emails.

21  MGA strongly suspected, and hence argued, that Mattel had purposely delayed the

22  deposition of Mattel's witness on electronic document retention in an effort to

23  deprive MGA and Bryant of evidence to back up their spoliation concerns. *Id.*

24      For its part, Mattel denied that spoliation had occurred. *Id.*, Ex. 18 at 5:1-6:6.

25  To support that denial, Mattel's counsel submitted a sworn declaration claiming

26  that Mattel had backups of the "file server known as Zeus that were created in

27  _____

[8] The Zeus server houses concept data and design drawings. Electronic mail also can be
28  stored on Zeus, but that is not its main function. Jenal Decl ¶ 2, Ex. 1 at 94:5-95:4.

1   1998, 1999, 2000, and at various other times." *Id.*, Ex. 19 at ¶14.

2   Regarding email preservation, Mattel also argued that "equally erroneous is MGA's

3   unexplained assertion that 'email records' have 'disappeared.'" Id., Ex. 18 at 5:25.

4   In conclusion, Mattel argued that MGA could not "identify any relevant evidence

5   that was lost" and that "[t]here had been no spoliation." *Id.* at 6:5-6.

6          Relying in part on Mattel's representation that evidence had been preserved

7   and was readily available, the Court granted Mattel's motion for leave to amend.

8   *Id.* ¶20, Ex. 20.  The Court did not interpret Ms. Marine as saying that information

9   on the Zeus server backup tapes that Mattel may possess had been "'eliminated' or

10  forever lost." *Id.* at 11:19-25.  Turning to MGA's claim that email records were

11  also missing, the Court then noted:

12          MGA next surmises that Mattel's e-mail records have disappeared, not
            because it has any proof on that point, but simply because Mattel has
13          postponed the deposition of the individual most knowledgeable of
            Mattel's email records until after the hearing on Mattel's motion for
14          leave to amend. ...  MGA then makes much of a deposition from a
            Mattel executive, Alan Kaye, who testified that e-mails in his inbox
15          would be automatically deleted if they had remained there for more
            than a certain time period. ...  *Noticeably absent from MGA's*
16          *argument is any evidence that the e-mails so deleted from a Mattel*
            *employee's inbox are forever lost or, as is far more likely, whether*
17          *such information remains or is otherwise archived on some backup file*
            *on Mattel's computer system.*[9]
18

19          The Court determined that "absent concrete proof that spoliation has

20  occurred, nothing in MGA's argument forms a basis for denying Mattel its

21  requested leave to amend." *Id.* at 13:5-13:7.  Mattel's representations to the Court

22  on these issues, however, were demonstrably false.

23  **H.   <u>Discovery Has Revealed Mattel's Spoliation</u>**

24          In spite of Mattel's efforts at concealment, defendants have now uncovered

25  the "concrete proof" of spoliation to which the Court's decision alluded.

26

27

28  [9] *Id.* at 12:16-13:5. (citations omitted) (emphasis supplied).

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

1        (a)    **Mattel Overwrote Its Backup Tapes from 2002-2005**

2        On June 13, 2007, during a meeting about Mattel's deficient document

3 production, Mattel revealed for the first time that it had not suspended its auto

4 delete policy for anyone, and that it either had no back-up tapes or would not search

5 them. Keats Decl. ¶5. When MGA advised Mattel of MGA's serious concerns

6 about these revelations, Mattel scrambled to take back its admission, assuring MGA

7 that a satisfactory explanation would be provided the following week at the long-

8 delayed continuation of the Kawashima deposition. *Id.* at ¶6, Exs. 5-7. Mattel also

9 took the insupportable position that its May 2005 response to MGA's preservation

10 letter relieved it of any obligation to suspend its auto delete policy. *Id.*, Ex. 7.

11       On June 19, 2007, Mr. Kawashima confirmed what Mattel's counsel had told

12 MGA during the June 13, 2007 meet and confer, namely, that Mattel had *not*

13 suspended its auto delete policy for anyone. Mr. Kawashima also revealed that

14 Mattel had only started preserving its back-up tapes on **April 19, 2005** -- a full

15 *three years* after Mattel began its investigation into Bryant, MGA, and the origin of

16 "Bratz," and more than *one year after* Mattel had brought suit against Carter

17 Bryant. Jenal Decl. ¶9, Ex. 8 at 300. Mr. Kawashima further testified that Mattel

18 had not preserved the emails from the year 2000 of Carter Bryant, and key

19 witnesses Mercedeh Ward, Cassidy Park, Lily Martinez, Ann Driskill, Paula

20 Treantafelles or the Diva Starz designers, or emails of Robert Eckert, Alan Kaye,

21 and Richard De Anda from 2002 - 2005, while these very people were investigating

22 the allegations brought here.[10] *Id.* ¶9, Ex. 8 at 493-503.

23       As Mattel watched its spoliation story spill out through Mr. Kawashima's

24 testimony, Mattel once again attempted to stem the tide by instructing him not to

25 answer questions about document retention, purportedly on the ground that a level

26 of confidentiality *beyond attorneys' eyes only* should apply. *Id.* ¶8, Ex. 7.

27

28    
---
[10] Mattel has not searched its post-April 2005 backup tapes either. Jenal Decl. ¶9, Ex. 8 at 311:25-312:24.

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

57

1    Notwithstanding Mattel's last-minute request, and the lack of merit in its position,

2    MGA agreed to treat Mr. Kawashima's answers as Mattel requested, subject to

3    MGA's right to challenge Mattel's newly-invented designation at a later date before

4    the Discovery Master. *Id.* Mattel rejected MGA's proposed accommodation and

5    instructed Mr. Kawashima not to answer on the grounds that his answers might

6    reveal Mattel's "security measures." *Id.*[11]

7           (b)    **There Are No Zeus Server Backup Tapes from 1998-2001**

8           Not only did Mattel fail to suspend its auto delete policy, at the very least, for

9    key witnesses, as it was required by law to do, but Mattel also permitted

10   destruction of relevant backup tapes that would have allowed it to recover the files

11   it had destroyed.  At the continuation of the deposition of Julia Marine on June 26,

12   2007, Ms. Marine testified, on behalf of Mattel, that while Mattel may have

13   retained a backup of the Zeus server in 2002,[12] it had not retained *any other* backup

14   tapes *prior to 2002*.  Jenal Decl. ¶3, Ex. 2 at 230-235.  Ms. Marine's testimony

15   squarely contradicts the sworn declaration Mattel submitted in support of its

16   motion for leave to amend its Answer and Counterclaims, in which Mattel's

17   counsel told this Court that Mattel had backup tapes of the Zeus server "created in

18   1998, 1999, 2000, and 2001 and at various other times."  Burr Decl., Ex. 19 at ¶14.

19

20   [11] Indeed, recent deposition testimony from just one week ago demonstrates that Mattel
     continues to improperly restrict questioning of witnesses regarding the preservation of
21   emails, and is apparently coaching its witnesses during breaks in order to prepare them to
     "clean up the record" when the depositions continue.  Burr Decl. ¶26, Exs. 25-26.
22   [12] Marine's testimony that the oldest preserved backup for Zeus is from "probably 2002"
     is suspect.  She testified that regular off-site backups were rotated on a two to three month
23   cycle until she received an email from Mattel's legal department to preserve documents.
     Jenal Decl. ¶ 2, Ex. 1 at 101:3-16.  Although Marine testified that she had "no idea" when
24   she received that email, Kawashima was absolutely certain it was April 18, 2005.  *Id.* ¶ 9,
     Ex. 8 at 366:1-14:  Thus, it is highly unlikely that Mattel still had a 2002 backup tape in
25   2005 -- unless Mattel had previously set it aside for other reasons as yet unrevealed.  In
     her resumed deposition in June of this year, Marine revealed for the first time that from
26   time-to-time -- literally whenever it seemed to her like a good idea and she had enough
     tapes lying around to do it (*Id.* ¶3, Ex. 2 at 230:17-235:21) -- she would create a backup
27   that would be kept for two years.  She testified that the oldest such backup that she would
     have "might" date back to 2005.  Thus, by her own calculations, her oldest backup tape
28   would date to 2003, not 2002.

                                   MGA'S MOTION FOR TERMINATING
                                                 SANCTIONS
                                   CV 04-09049 SGL (RNBX)

58

1   Ms. Marine specifically stated that she -- as the Zeus server administrator and the
2   person responsible for performing the backups of that server -- was unaware of the
3   existence of *any* backups going back to 2001, let alone for 1998-2000.[13]  Jenal
4   Decl. ¶3, Ex.2 at 230-235.  To this day, Mattel's counsel has not filed anything
5   with the Court to correct the clearly false statements of its counsel.

       (c)   **Mattel "Lost" Carter Bryant's October 2000 Phone Records**

7       MGA long ago requested, but has yet to receive, logs for Carter Bryant's
8   telephone extension at Mattel for the month of October 2000, the month in which
9   he signed his contract with MGA and left Mattel.  Burr Decl. ¶22, Ex. 21.  At the
10   deposition of Rodney Palmer, Jr., Mattel's designated 30(b)(6) witness on Mattel's
11   phone logs, Mr. Palmer testified that Mattel retains data going back to 2000
12   regarding calls placed from Bryant's extension, but that he had no knowledge of
13   what became of the data for October 2000.  Jenal Decl. ¶11, Ex. 9 at 55-57, 103-
14   110. Mr. Palmer believes that these logs must have gotten "lost," even though they
15   were supposedly turned over to Mattel's Legal Department sometime *in the 2003-*
16   *2004* period.  *Id.*  The month of October 2000 is a critical time period relevant to
17   Mattel's claims against Mr. Bryant that he, while still employed at Mattel in
18   October 2000, assisted MGA in meeting important milestones in the development
19   of "Bratz."  Mattel has yet to explain their disappearance.[14]

20   **III.   ARGUMENT**

21       Mattel has engaged in a conscious and systematic effort to destroy evidence
22   relevant to its claims against MGA and Mr. Bryant thereto; and then deliberately
23   sought to conceal its efforts.  Mattel's conduct is in plain violation of its legal

24
25   [13] Mattel still has not searched whatever Zeus backup tapes it claims to have and Ms.
     Marine testified that she had "no idea" what is on them.  Jenal Decl. ¶2, Ex.1 at 111-112.
26   [14] This may not be the only instance of crucial evidence from October 2000 disappearing.
     Mattel claims that it cannot locate any of Bryant's time records after September 8, 2000.
27   Although its 30(b)(6) witness speculated that those records never existed, he conceded
     that they could have been deleted without leaving any record that they had been deleted.
28   Burr Decl., Ex. 27 at 115-16.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

59

1   obligations, is highly prejudicial, and warrants terminating sanctions.

2   **A.    Mattel's Conduct Warrants Terminating Sanctions**

3       **1.    The Court Has Inherent Power To Dismiss Mattel's Claims for Spoliation of Evidence**

4

5       The Court may impose terminating sanctions when "a party has engaged

6   deliberately in deceptive practices that undermine the integrity of judicial

7   proceedings." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (affirming

8   dismissal sanction with prejudice where plaintiff had deleted files from laptop

9   during pendency of litigation); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,

10  69 F.3d 337, 348 (9th Cir. 1995) (affirming dismissal of counterclaim).[15]  The

11  power to terminate is part of the inherent power "necessarily vested in courts to

12  manage their own affairs so as to achieve the orderly and expeditious disposition of

13  cases." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368

14  (9th Cir. 1992) (citation omitted).  This power allows the Court "to levy sanctions

15  in response to abusive litigation practices" like those at issue here, namely,

16  spoliation of evidence. *Id.*; *Leon*, 464 F.3d at 958.  Imposition of dismissal

---

17  [15] Numerous other courts have issued terminating sanctions for the failure to preserve

18  evidence. *See Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984) (entering default judgment where defendant failed to preserve documents

19  that it reasonably should have known were relevant to litigation and responsive to discovery requests); *Metropolitan Opera Ass'n, Inc. v. Local 100 Hotel Employees and*

20  *Restaurant Employees Int'l Union*, 212 F.R.D. 178 (S.D.N.Y. 2003) (granting terminating sanctions where defendants destroyed "a year's worth" of electronic documents from the

21  most relevant time period in the action); *In re Wechsler*, 121 F. Supp. 2d 404, 415 (D. Del. 2000) ("When [document] destruction is willful or in bad faith and intended to

22  prevent the other side from examining the evidence, the court may impose the most severe sanction of all – the outright dismissal of a claim or the entry of a default judgment.");

23  *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 485-86 (S.D. Fla. 1984) (entry of default is an appropriate remedy for litigants who destroy evidence and for remedying the

24  wrong caused to the other side); *Computer Associates Int'l. v. American Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990) (entering default judgment where defendant failed to

25  suspend general practice of destroying previous versions of software code after it should have been aware that litigation over code was imminent); *Synanon Church v. United*

26  *States*, 820 F.2d 421, 427-28 (D.C. Cir. 1987), *aff'd* 579 F. Supp. 967 (D.D.C. 1984) (affirming dismissal based on finding in separate litigation that plaintiff deliberately

27  destroyed documents relevant to claims and potential defenses); *Frame v. S-H, Inc.*, 967 F.2d 194, 203 (5th Cir. 1992) (striking defendant's pleadings where incomplete

28  production indicated that relevant documents and electronic records were destroyed).

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

1   sanctions is appropriate if there is evidence of "willfulness, fault, or bad faith" by

2   the sanctioned party. *See id.* (affirming dismissal of counterclaim where plaintiff

3   was prejudiced by counter-claimant's willful concealment of relevant documents);

4   *Unigard*, 982 F.2d at 368 n.2; *Anheuser-Busch*, 69 F.3d at 348.

5          A party need not demonstrate that spoliation was deliberate or in bad faith to

6   support sanctions, however.  In this Circuit, the moving party need show only that

7   the spoliating party had notice that the destroyed evidence was potentially relevant

8   to the litigation.  *Leon*, 464 F.3d at 959; *Akiona v. United States*, 938 F.2d 158, 161

9   (9th Cir. 1991).  Indeed, a district court need only find "disobedient conduct not

10  shown to be outside the control of the litigant" before ordering dismissal sanctions.

11  *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 948-949 (9th Cir. 1993) (plaintiff

12  offered various explanations for his conduct delaying discovery, but "none

13  persuades that circumstances outside his control caused his transgressions").

14  Dismissal sanctions are available where the conduct to be sanctioned is due to

15  "willfulness, fault, *or* bad faith."  *Id.* at 946 (citation omitted); *Anheuser Busch*, 69

16  F.3d at 348 (emphasis added).  Mattel's conduct warrants terminating sanctions

17  under any of these standards.

18          **2.    Mattel Had a Duty To Preserve Evidence At Least As Early As March 2002**

19

20          A party has a duty to preserve evidence as soon as it is on notice of its

21  potential claims.  *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543,

22  556-57 (N.D. Cal. 1987); *Cecconi v. Cecconi*, 2007 Bankr. LEXIS 1323 *56 (Bankr.

23  N.D. Cal. April 17, 2007) (plaintiff had duty to preserve evidence "as soon as a

24  potential claim is identified") (citation omitted).  Mattel was on notice of the very

25  claims it brings here at least as early as March, 2002 when it began investigating

26  allegations that Mr. Bryant had stolen Mattel designs and given them to MGA to

27  manufacture and produce "Bratz" dolls.  Accordingly, Mattel has had a duty to

28  preserve evidence -- whether helpful to it or not -- since at least March, 2002.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

1
    **3.    Mattel's Duty to Preserve Required It to Suspend its Routine Document Destruction Policies**

2

3        Once a plaintiff reasonably anticipates litigation, it must "suspend its routine

4    document retention and destruction policies and put in place a 'litigation hold' to

5    ensure the preservation of relevant documents." *Housing Rights Ctr. v. Sterling*,

6    2004 U.S. Dist. LEXIS 28877, at *21 (C.D. Cal. Dec. 6, 2004) (quoting *Zubulake v.*

7    *UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("*Zubulake IV*"). Mattel

8    and its counsel were well aware of this obligation. Quinn Emanuel, Business

9    Litigation Report, *New e-Discovery Rules Go Into Effect* (Jan. 2007) ("good faith

10    may require...that a party intervene to suspend certain features of the routine

11    operation of an information system to prevent loss of information"); Quinn

12    Emanuel, Business Litigation Report, *Preservation of Electronic Information for*

13    *Discovery: Emerging Standards* (Nov. 2004) ("at the outset of litigation or "when

14    litigation is reasonably anticipated," party should suspend routine document

15    retention or destruction policy and implement litigation hold). Burr Decl. Exs. 28-

16    29. "While a litigant is under no duty to keep or retain every document in its

17    possession... it is under a duty to preserve what it knows, or reasonably should

18    know, is relevant in the action, is reasonably calculated to lead to the discovery of

19    admissible evidence, is reasonably likely to be requested during discovery, and/or is

20    the subject of a pending discovery request." *Wm. T. Thompson Co. v. General*

21    *Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984).[16] Mattel did not do so.

22

---

23    [16] *Zubulake IV* set forth a party's basic obligations when the duty to preserve arises: (a) a

24    party must "preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably

25    likely to be requested during discovery and/or is the subject of a pending discovery request;" (b) this duty extends to the key individuals in a case – those who are likely to

26    have relevant information – and encompasses documents created by and prepared for them; (c) although a litigation hold need not apply to backup tapes maintained solely for

27    disaster recovery, such a hold should apply to backup tapes used on a regular basis for information retrieval; and (d) to the extent a party can identify backup tapes containing

28    documents of "key players," these tapes, for disaster recovery and information retrieval, should be preserved if the information is not otherwise available. 220 F.R.D. at 217-18.

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

62

1    Beginning in March 2002, Mattel was required to maintain the relevant

2   electronic evidence for individual witnesses, including emails and other electronic

3   documents, and to preserve backup tapes of those witnesses' files related to the

4   litigation if the information was not otherwise available.  *See Cache La Poudre*

5   *Feeds, LLC v. Land O'Lakes, Inc.*, 2007 WL 684001 (D. Colo. Mar. 2, 2007)

6   ("Once a 'litigation hold' has been established, a party cannot continue a routine

7   procedure that effectively ensures that potentially relevant and readily available

8   information is no longer 'reasonably accessible'"); *DaimlerChrysler Motors v. Bill*

9   *Davis Racing, Inc.*, 2005 U.S. Dist. LEXIS 38162 (D. Mich. 2005) (normal

10  procedures for destruction of documents must be suspended when a party is on

11  notice that documents may be relevant to litigation); Quinn Emanuel, Business

12  Litigation Report, *Preservation of Electronic Information for Discovery: Emerging*

13  *Standards* (recommending that companies preserve electronically stored

14  information of key employees even if "inaccessible") (Burr Decl., Ex. 29).

15    Mattel's spoliation of evidence cannot seriously be disputed.  Mattel admits

16  that it did not suspend the automatic deletion of email for potential witnesses at any

17  time, Jenal Decl., ¶9, Ex. 8 at 380:14-381:3, and admits that it maintained no

18  backup tapes for email before April 2005.  *Id.* at 300:12-301:7.  Similarly, while

19  Mattel claims it "probably" has a 2002 back up tape of the "Zeus" server used by its

20  design center employees, *Id.*, ¶2, Ex. 1 at 99:4-15; ¶3, Ex. 2 at 209:1-24, it admits it

21  retained no other back up tape until April 2005 and did not issue a litigation hold

22  memo until April 2005.  *Id.*, ¶9, Ex. 8 at 367:25-369, 404:4-405:16.  Therefore

23  email and data from before April 2005, save for what might be on a 2002 Zeus back

24  up tape Mattel "probably" kept, are permanently lost.  *Id.*

25        **4.   Mattel's Failure to Suspend Auto Delete and Maintain**
              **Backup Tapes Constitutes "Willfulness, Fault or Bad Faith"**
26            **Warranting Terminating Sanctions**

27    A party's destruction of evidence qualifies as willful spoliation if the party

28  has "some notice that the documents were potentially relevant to the litigation be-

18

63

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

1  fore they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995,

2  1001 (9th Cir. 2002) (emphasis added) (internal quotation marks and citation

3  omitted).  Moreover, because "the relevance of . . . [destroyed] documents cannot

4  be clearly ascertained because the documents no longer exist," a spoliating party

5  "can hardly assert any presumption of irrelevance as to the destroyed documents."

6  *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982).  As set forth

7  above, Mattel was well on notice of its claims -- and indeed investigated those

8  claims -- in 2002, yet chose to allow obvious evidence concerning the factual

9  underpinnings of its claims to be destroyed.  Then, in addition to failing to suspend

10  its routine document destruction policies, Mattel actively concealed its failure from

11  both MGA and this Court.  Such conduct is "willful" spoliation.

12  Even if its conduct had not been willful (which it was), Mattel's failure to

13  implement a litigation hold or take adequate measures to preserve evidence

14  constitutes the requisite "fault" warranting terminating sanctions.  *UMG*

15  *Recordings, Inc. v. Hummer Winbald Venture Partners*, 462 F. Supp. 2d 1060,

16  1068 (N.D. Cal. 2006) (deletion of emails in violation of a duty to preserve, even if

17  not willful, can still meet the "fault" standard because such conduct demonstrates

18  gross negligence); *see also Padgett v. City of Monte Sereno*, No. C 04-03946 JW,

19  2007 U.S. Dist. LEXIS 24301 *9 (N.D. Cal. March 20, 2007) ("Whether

20  characterized as willful or negligent, [defendant's] conduct constitutes the kind of

21  "fault" sufficient to warrant sanctions, including dismissal").  Indeed, such a

22  failure, especially for a party clearly on notice of potential litigation, goes beyond

23  mere "fault," and constitutes bad faith, "gross spoliation" warranting severe

24  sanctions.  *Broccoli v. Echostar Communications Corp.*, 229 F.R.D. 506, 510-512

25  (D. Md. 2005) (large corporation with ample financial resources had "clearly acted

26  in bad faith in its failure to suspend its email and data destruction policy" after its

27  duty to preserve electronic documents had been triggered).  *See also Mosaid*

28  *Technologies Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 339 (D.N.J.

1   2004) ("When the duty [to preserve potentially relevant evidence] is triggered, it

2   cannot be a defense to a spoliation claim that the party inadvertently failed to place

3   a 'litigation hold' or 'off switch' on its document retention policy to stop the

4   destruction of that evidence"); *Convolve, Inc. v. Compaq Computer Corp.*, 223

5   F.R.D. 162 (S.D.N.Y. 2004) ("in the world of electronic data, the preservation

6   obligation is not limited simply to avoiding affirmative acts of destruction").

7        Mattel's spoliation was in bad faith and -- at a minimum -- satisfies the

8   "fault" requirement to impose severe sanctions. *See In re Fitzsimmons*, 920 F.2d

9   1468, 1472 (9th Cir. 1990) (misrepresentation of facts to court is bad faith).[17]

10      **B.**    **Mattel's Spoliation Meets The Test Set Forth In *Anheuser Busch***

11        Before issuing terminating sanctions, district courts in this Circuit should

12   consider the following factors: "(1) the public's interest in expeditious resolution of

13   litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the

14   party seeking sanctions; (4) the public policy favoring disposition of cases on their

15   merits; and (5) the availability of less drastic sanctions." *Anheuser-Busch*, 69

16   F.3d at 348; *see also Leon*, 464 F.3d at 958 (applying five-part standard in the

17   context of dismissal sanctions for spoliation of evidence pursuant to the district

18   court's inherent authority to sanction). The district court need not make explicit

19   findings regarding each of these factors. *Id.* Moreover, "the public policy favoring

20   disposition of cases on their merits" is not sufficient to outweigh the other four

21   factors, *Leon*, 464 F.3d at 960-61, all of which weigh in favor of dismissal here.

22        **1.**    **The Public's Interest In Expeditious Resolution of Litigation and The Court's Ability To Manage Its Docket Have Both**

23                   **Been Compromised By Mattel's Conduct**

24        The first two factors weigh strongly in favor of dismissal. Mattel waited

25   more than two years to bring its initial claims against Mr. Bryant and almost five

26   years to bring its claims against MGA and add additional claims against Bryant.

27   _____

28   [17] A timeline in the Appendix to this brief illustrates Mattel's bad faith conduct in failing to preserve electronic evidence.

1   Throughout this time, Mattel knowingly allowed evidence to be destroyed. Then,

2   Mattel made demonstrably false representations to this Court denying its spoliation,

3   and did so for the express purpose of convincing this Court to allow its five-year-

4   old claims to proceed. Mattel's tactic worked -- the Court relied on Mattel's

5   misrepresentations in determining that there would be no prejudice in allowing

6   Mattel to amend its Answer to assert counterclaims against MGA and Bryant. It is

7   difficult to conceive of conduct that more severely interfered with expeditious

8   resolution of litigation or the Court's ability to manage its docket.

9           2.   **Mattel's Spoliation Has Prejudiced MGA and Bryant**

10      Although prejudice is not required for an award of terminating sanctions,[18]

11   this factor, too, favors terminating sanctions. Courts have held that, when a party

12   destroys documents through its own gross negligence, a presumption arises that the

13   documents were relevant and would have supported its adversary's case. *See, e.g.,*

14   *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 109 (2d Cir.

15   2002) ("[A] showing of gross negligence in the destruction or untimely production

16   of evidence may, standing alone, support a finding that the evidence was

17   unfavorable to the grossly negligent party."); *Google Inc. v. Am. Blind & Wallpaper*

18   *Factory, Inc.,* 2007 U.S. Dist. LEXIS 48309 (N.D. Cal. June 27, 2007)

19   ("[S]poliation of evidence raises a presumption that the destroyed evidence goes to

20   the merits of the case, and further, that such evidence was adverse to the party that

21   destroyed it.").[19] Indeed, were the rule otherwise, the guilty party would profit

---

22   [18] *Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 379 (9th Cir. 1988) (finding prejudice

23   optional in awarding sanctions); *United States v. Nat'l Medical Enters., Inc.,* 792 F.2d 906, 912-913 (9th Cir. 1986) (prejudice is not required for a dismissal); *UMG Recordings,*

24   462 F. Supp. 2d at 1075 n.4 (although prejudice might be required for terminating sanctions under Rule 37, prejudice is only an optional consideration for courts granting

25   terminating sanctions pursuant to its inherent power).

  [19] *See also Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 133 (S.D. Fla. 1987)

26   ("[W]hile it is now impossible to determine precisely what or how many documents were destroyed, the bad-faith destruction of a relevant document, by itself, gives rise to a strong

27   inference that the production of the document would have been unfavorable to the party responsible for its destruction."); *Zubulake IV,* 220 F.R.D. at 220 ("When evidence is

28   destroyed in bad faith (*i.e.,* intentionally or willfully), that fact alone is sufficient to

66

1  from its spoliation of evidence by being able to point to the other party's lack of

2  specific evidence -- evidence that the spoliating party made unavailable in the first

3  place. The Ninth Circuit has not endorsed such a rule. *See Leon*, 464 F.3d at 959

4  ("because the relevance of . . . [destroyed] documents cannot be clearly ascertained

5  because the documents no longer exist, a party can hardly assert any presumption of

6  irrelevance as to the destroyed documents").[20] Prejudice must be presumed here.

7       Moreover, the Court need not just presume prejudice here because actual

8  prejudice exists. Despite Mattel's wholesale destruction of evidence, there are

9  guideposts to what Mattel destroyed. The 2002-2005 period is particularly crucial

10 because one of the central themes of Bryant's and MGA's defense is that Mattel

11 deliberately delayed bringing this lawsuit for years because it knew its claims were

12 speculative and it had to win in the marketplace by offering competing products.

13 When Mattel could not compete fairly in the marketplace, it then turned to the

14 courts as a last resort. The deleted email would have told this story, and at a

15 minimum, would have explained Mattel's long delay between its discovery of its

16 claims, and the filing of this lawsuit.

17      The deleted email would also have provided other relevant information. As

18 Mattel was conducting its investigation of MGA and Bryant in 2002 and 2003, its

19 investigators talked to a number of people who are now witnesses in this case. Burr

20 Decl., ¶33, Ex. 32. Mattel's employees and its investigators communicated about

21 and in connection with those investigations by email. Id. ¶34. Ex. 33. Mattel also

22 sponsored an article published in the *Wall Street Journal* in July 2003, in which it

23 was reported that "some" "inside Mattel" were making the allegations Mattel makes

24 in this lawsuit. Mattel employees communicated extensively with the *Wall Street*

25 *Journal* in 2003 to provide information for that article and indeed communicated

26 about that article internally. Keats Decl. ¶4, Ex. 1 at 25:21-24; 26:11-36:7; 78:9-

27 demonstrate relevance").

28 [20] *See also Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205-06 (8th Cir. 1982).

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

67

1  79:15; 92:13-93:18; 114:8-115:6.  Further, Mattel executives made public

2  announcements to Mattel employees on the day Mattel filed its suit against Mr.

3  Bryant.  As Mattel witnesses have conceded, Mattel employees discussed that

4  event, and expressed sympathy for Mr. Bryant and the view that Mattel was wrong.

5  Burr Decl. ¶31, Ex. 31 at 192:15-19; 201:23-202:25; 280:13-24.  In a case such as

6  this, against a behemoth corporation that has listed no fewer than 153 people on its

7  initial disclosures, the content of communications about the subject matter of the

8  litigation and their identification of witnesses with relevant information and

9  sympathetic views towards Mr. Bryant would be enormously helpful.  The

10  destruction of that evidence, in turn, is enormously prejudicial.

11        In sum, the lost email correspondence was relevant to, or likely to lead to the

12  discovery of admissible evidence regarding, among other things: (a) Carter

13  Bryant's employment and work at Mattel, including emails and data that would

14  refute Mattel's claims that he did not meet his employment obligations; (b) Mattel's

15  awareness of "Bratz" and the bases, if any, of its suspicions concerning Bryant's

16  alleged misconduct in developing "Bratz;" (c) the reasons Mattel delayed bringing

17  suit for so many years; (d) Mattel's investigation of its claims against Bryant, MGA

18  and Isaac Larian in 2002; (e) Mattel's 2003 communications with the *Wall Street*

19  *Journal,* in which Mattel employees accused Bryant and MGA of stealing Mattel's

20  designs; (f) the early development of MY SCENE; (g) Mattel's communications

21  with suppliers, retailers, and others to impair MGA's ability to compete.

22        The failure to preserve backup tapes of the Zeus server is also prejudicial.

23  The latest incarnation of Mattel's claims is based on Mattel's theory that Bryant and

24  possibly[21] another MGA employee, Paula Garcia, who left Mattel even before

25  Bryant, were exposed to a Mattel product called "Diva Starz" and used designs

26  from that project to create "Bratz."  Jenal Decl. ¶12.  Mattel bases its allegations

---

[21] The word "possibly" is used because Mattel refuses to make its claims clear, lest it decide to change its theory yet again.

1   regarding Ms. Garcia on three documents (Garcia Dep. Exs. 305, 306, 307) that it
2   miraculously saved from a 10 day period in the summer of 1998 that suggest that
3   Ms. Garcia was assigned (for 10 days, at any rate) to a project that bears no
4   physical resemblance to "Diva Starz" and that Mattel admits was cancelled shortly
5   thereafter but somehow morphed into "Diva Starz." Declaration of Yvonne Garcia,
6   ("Garcia Decl."), ¶2, Ex. 1 at 106:19-109:5, 152:11-156:5, Ex. 2.  Mattel bases its
7   claims regarding Mr. Bryant on the fact that he worked in the design center at
8   Mattel and may have had access to designs through Mattel's Zeus server.  Jenal
9   Decl., ¶10.  Documents on that server detailing the day-to-day development of
10  Mattel's "Diva Starz" project, and the metadata associated with such documents,
11  would demonstrate whether Mr. Bryant or Ms. Garcia even had access to them and
12  could have copied any "Diva Starz" design.  Those design center documents, all of
13  which were available in 2002, *are the very documents Mattel destroyed.*

14      Finally, the prejudice resulting from Mattel's "loss" of Mr. Bryant's October
15  2000 time records is significant.  It is in that very month that Mattel claims Mr.
16  Bryant worked with MGA to complete the sculpt of MGA's "Bratz" dolls.  Those
17  records -- if they were still available -- would help to exonerate Mr. Bryant.

18      ### 3.   Mattel's Spoliation Warrants Dismissal And Less Drastic Sanctions Are Not Appropriate
19

20      Mattel cannot save its claims by pointing to the fifth factor, the supposed
21  availability of less drastic remedies.  First, the District court need only determine
22  the feasibility and appropriateness of less drastic sanctions; even where less drastic
23  remedies are available, the Court need not forego terminating sanctions.  *Leon*, 464
24  F.3d at 960 ("lesser" sanctions of excluding evidence and jury instruction creating
25  presumption inappropriate because they left defendants "equally helpless to rebut
26  any material that plaintiffs might use to overcome the presumption").  Moreover,
27  less drastic sanctions would do nothing to remedy Mattel's misconduct here
28  because MGA and Mr. Bryant have been deprived of evidence necessary to prove

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

69

1    their defenses.  This is particularly true because Mattel waited so long to bring its

2    claims and witnesses' memories have faded.  *See* Garcia Decl., ¶2, Ex. 1 at 42:13-

3    20; 47:2-7; 166:21-24; Burr Decl., ¶32, Ex. 31 at 262:18-263:1; 270:19-25.

4    **C.    CONCLUSION**

5        Long aware that its claims had no merit, Mattel engaged in the deliberate and

6    systematic destruction of relevant evidence in a calculated effort to litigate its

7    claims after memories had faded, on a cherry-picked record that Mattel itself

8    designed.  Mattel's actions -- and its flagrant misrepresentations to this Court -- are

9    precisely the type of conduct that warrants the serious sanction of termination.  For

10   the foregoing reasons, this motion should be granted.

11

12   Dated: July 23, 2007            O'MELVENY & MYERS LLP

13

14                                   By:  Dale M. Cendali
                                     Attorneys for MGA Entertainment, Inc.

15

16   Dated: July 23 2007             CHRISTENSEN, GLASER, FINK,
                                     JACOBS, WEIL & SHAPIRO, LLP

17

18

19                                   By:  Patricia Glaser
                                     Attorneys for MGA Entertainment, Inc.

20

21   Dated: July 23 2007             KEKER & VAN NEST, LLP

22

23

24                                   By:  John W. Keker
                                     Attorneys for Carter Bryant

25

26

27

28

                                     MGA'S MOTION FOR TERMINATING
                            25                       SANCTIONS
                                     CV 04-09049 SGL (RNBX)

70

**PROOF OF SERVICE**

I, Karen A. Nakatsu, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On August 6, 2007, I served the within document(s):

**DECLARATION OF JAMES P. JENAL IN SUPPORT OF MGA AND BRYANT'S JOINT OPPOSITION TO MATTEL'S MOTION TO MODIFY THE PROTECTIVE ORDER**

☒ by causing to be personally served the document(s) listed above to the person(s) listed below.

> Jon Corey, Esq.
> Quinn Emanuel Urquhart Oliver & Hedges, LLP
> 865 South Figueroa Street, 10th Floor
> Los Angeles, CA 90017
> joncorey@quinnemanuel.com

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit and also by sending by electronic mail the document(s) listed above to the person(s) listed below.

Patricia Glaser, Esq.
Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP
10250 Constellation Blvd.
19th Floor
Los Angeles, CA 90067
pglaser@chrisglase.com

Michael H. Page, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111
MPage@KVN.com

James. W. Spertus, Esq.
Law Offices of James W. Spertus
12100 Wilshire Blvd., Suite 620
Los Angeles, CA 90025
jim@spertuslaw.com

1

1    ☒    by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope designated by the carrier, with delivery fees paid or provided for, for delivery the next business day to the person(s) listed below, and placing the envelope for collection today by the overnight courier in accordance with the firm's ordinary business practices. I am readily familiar with this firm's practice for collection and processing of overnight courier correspondence. In the ordinary course of business, such correspondence collected from me would be processed on the same day, with fees thereon fully prepaid, and deposited that day in a box or other facility regularly maintained by FedEx, which is an express carrier.

Sandra Chan
Case Manager
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
schan@jamsadr.com

☒    by sending by electronic mail the document(s) listed above to the person(s) listed below.

Sandra Chan
Case Manager
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
schan@jamsadr.com

Jon Corey, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
joncorey@quinnemanuel.com

Patricia Glaser, Esq.
Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP
10250 Constellation Blvd.
19th Floor
Los Angeles, CA 90067
pglaser@chrisglase.com

Michael H. Page, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111
MPage@KVN.com

James. W. Spertus, Esq.
Law Offices of James W. Spertus
12100 Wilshire Blvd., Suite 620
Los Angeles, CA 90025
jim@spertuslaw.com

2

1         I declare under penalty of perjury under the laws of the United States
2    that the above is true and correct.

3         Executed on August 6, 2007 at Los Angeles, California.

4

5                                       Karen A. Nakatsu

6
7    LA2:833609.1
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3