EXHIBIT 1

RECEIVED

JAN 3 1 2008

CALENDARED

1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Suite 3400
3  Los Angeles, CA  90071
   Tel.: (213) 687-5000/Fax: (213) 687-5600
4
   KENNETH PLEVAN (admitted *pro hac vice*)
5  (kplevan@skadden.com)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  Four Times Square
   New York, NY  10036
7  Tel.: (212) 735-3000 / Fax: (212) 735-2000
8  Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. DE C.V., and Isaac Larian
9
   JOHN W. KEKER (Bar No. 49092)
10 (jkeker@kvn.com)
   CHRISTA M. ANDERSON (Bar No. 184325)
11 (canderson@kvn.com)
   KEKER & VAN NEST LLP
12 710 Sansome St.
   San Francisco, CA  94111-1704
13 Tel.: (415) 391-5400 / Fax: (415) 397-7188
14 Attorneys for Carter Bryant

15            UNITED STATED DISTRICT COURT

16            CENTRAL DISTRICT OF CALIFORNIA

17 CARTER BRYANT, an            )  CASE NO. CV 04-9049 SGL (RNBx)
   individual,                  )
18                              )  Consolidated with Case No. 04-9059 and
                                )  Case No. 05-2727
19              Plaintiff,      )
                                )  **MGA'S AND CARTER BRYANT'S**
20      v.                      )  **OPPOSITION TO MATTEL'S EX**
                                )  **PARTE APPLICATIONS TO**
21 MATTEL, INC., a Delaware     )  **COMPEL ADDITIONAL**
   corporation,                 )  **DEPOSITIONS**
22                              )
           Defendant.           )  Honorable Stephen G. Larson
23                              )  Hearing Date: February 4, 2008
                                )  Time: 10:00 a.m.
24                              )  Place: Courtroom 1
                                )
25 AND CONSOLIDATED             )
   ACTIONS                      )
26                              )
27 **CONFIDENTIAL – ATTORNEY EYE'S ONLY**
   **FILED UNDER SEAL PURSUANT**
28 **TO PROTECTIVE ORDER**

*1730*

EXHIBIT 1

PAGE 2

## OPPOSITION TO EX PARTE APPLICATION

On Monday, the discovery cutoff, Mattel filed sixteen discovery motions, including two ex parte applications relating to depositions. In total, Mattel now has 23 discovery motions and 5 ex parte applications pending. The discovery motions will be heard by the Discovery Master over the next several weeks. Here, this Court must bring an end to Mattel's abusive ex parte application practices. Mission Power Eng'g Co. v. Continental Cas. Co., 883 F. Supp. 488, 489 (C.D. Cal. 1995) ("[T]he abusive use of ex parte motions [in the Central District] has worsened … is detrimental to the administration of justice and … increasingly erode[s] the quality of litigation.").

In its ex parte applications, Mattel seeks two things: (i) permission to take yet more depositions beyond the over 40 depositions the Court allowed in its January 7, 2008 Order, and (ii) permission to take both Phase 1 and Phase 2 depositions through the end of February (including both the additional depositions it now seeks and many of the depositions authorized on January 7, 2008). **In total, Mattel seeks permission to take 32 individual depositions in February:**

- 15 third-parties who Mattel purports to have served (although some of them were "served" less than a week before the cutoff date): (1) Joyce Ng, (2) Gentle Giant Studios, (3) Wachovia Corporation, (4) Moss Adams, (5) Andreas Koch, (6) Christensen Glaser, (7) Amy Myers, (8) Rachel Harris, (9) Kami Gilmour, (10) Ana Cabrera, (11) Beatriz Morales, (12) Maria Salazar, (13) Daphne Gronich, (14) Mel Woods, and (15) NPD Group, Inc.[1]

- 11 third-parties who Mattel admits have not been served: (1) Lucy Arant, (2) Sarah Halpern, (3) Larry McFarland, (4) Peter Marlow, (5) Mercedeh Ward, (6) Carol Witschell, (7) Jeff Weiss, (8) Stephen Lee, (9) Cecilia Kwock, (10) Eric Yip, and (11) Jeanine Brisbois.

- 6 employees of MGA-related parties, most of whom have not been served: (1) Joe Tiongco, (2) Mariana Trueba, (3) Pablo Vargas, (4) Shirin Salemnia, (5) Ricardo Abundis, and (6) Jorge Castilla.

---

[1]     In fact, as Mattel's own declarations demonstrate, Mattel has not served Ms. Gronich. See infra.

EXHIBIT ___1___

PAGE ___3___

1  These 32 depositions are in addition to (a) individual depositions that were not the

2  subject of the January 7, 2008 order that already have been scheduled in February,

3  and (b) numerous Rule 30(b)(6) depositions noticed by each side, some of which are

4  the subject of motion practice in front of either this Court or Discovery Master

5  Infante.

6          On their face, Mattel's applications appear to be little more than another

7  gambit to try to disrupt the trial schedule set by the Court.  In trying to justify its

8  outrageous demands, Mattel attempts to give the impression that MGA has somehow

9  thwarted Mattel in its efforts to take the depositions authorized by the Court's

10 January 7, 2008 Order.  Nothing could be further from the truth.  The vast majority

11 of the witnesses at issue are third-parties, and MGA agreed to appear on any date on

12 or before January 28, 2008 that any witness was available.  MGA appeared at twelve

13 depositions on the "final" day of discovery.  To put Mattel's complaints in

14 perspective, after the January 7, 2008 hearing, there were fifteen business days

15 remaining before the cutoff.  **During those fifteen days, there were 31 days of**

16 **deposition.  Mattel took 18 days of deposition.[2]  MGA took 13 days.[3]**

17         MGA respectfully submits that Mattel's applications are both procedurally and

18 substantively improper and should be denied.  First, Mattel's applications relate

19 strictly to discovery matters that the Court directed to be submitted to Discovery

20 Master Infante.  Indeed, many of the issues raised in Mattel's applications are

21 already pending in front of Discovery Master Infante in the form of motions to quash

22 and motions for a protective order.  Mattel does not even attempt to identify any sort

23 of emergency need for relief that would justify its requests for ex parte relief.

24

25 _____

26 [2]      Declaration of Marcus R. Mumford In Support Of MGA's and Bryant's
   Opposition To Mattel's Ex Parte Applications To Compel Additional Depositions
27 ("Mumford Decl.") ¶ 13.

28 [3]      Mumford Decl. ¶ 14.

EXHIBIT _1_

PAGE _4_

1       <u>Second</u>, as MGA addressed in a motion to quash pending before Discovery

2 Master Infante, seven of the deposition subpoenas Mattel propounded were not

3 authorized by the Court's January 7, 2008 Order.  Mattel has more than exhausted its

4 allotment of 24 depositions.  The only depositions Mattel is now entitled to take are

5 those that the Court approved in its January 7, 2008 Order.  Unsatisfied with the

6 largesse awarded in the January 7, 2008 Order, Mattel has since served seven

7 additional witnesses with subpoenas and now moves <u>ex parte</u> to compel their

8 depositions.  Contrary to Mattel's suggestions in its applications, it knew about every

9 one of these witnesses before the January 7, 2008 hearing.  Indeed, Mattel included

10 two of the witnesses in its moving papers but was <u>not</u> granted leave to take their

11 depositions.  As demonstrated below and in MGA's motion to quash, Mattel's

12 creative attempt to grant itself the right to take still more depositions should be

13 denied.

14       <u>Third</u>, Mattel's desire to take 32 depositions (as well as Rule 30(b)(6)

15 depositions of MGA entities) in February cannot be reconciled with the trial

16 schedule set by the Court.  More immediately, it threatens to crowd out the

17 mediation sessions the parties have planned in February.

18       Given the number of motions pending in front of Discovery Master Infante

19 that relate to depositions, there can be little doubt that there already will be numerous

20 depositions going on throughout February.  But if Mattel's applications are granted,

21 the parties will be double-tracking depositions throughout February and likely into

22 March.  Mattel acts as if the cutoff date set by the Court was nothing more than a

23 suggested date, and that the parties have an absolute right to take every deposition

24 they can conceive of that may have some relevance to the case irrespective of cutoff

25 dates set by the Court.  MGA respectfully submits that discovery cutoff dates are

26 intended to serve a real purpose, and that Mattel's proposal is not what the Court

27 intended when it noted that it would "consider a stipulation of those parties that

28 designates certain Depositions as 'Phase 2' depositions that may be conducted during

EXHIBIT ___1___

PAGE ___5___

1  the month of February."[4]  Put simply: there needs to be an end to fact discovery so

2  the parties can move on with Phase 1 trial preparation, including mediation before

3  Ambassador Prosper and the expert discovery phase.  At a bare minimum, the

4  discovery Mattel seeks, which relates primarily to Phase 2, should be deferred until

5  after the Phase 1 trial.

**ARGUMENT**

6

7  I.    **MANY OF THE ISSUES RAISED BY MATTEL ARE ALREADY**
         **PENDING IN FRONT OF DISCOVERY MASTER INFANTE.**

8

9       MGA moved to quash several subpoenas issued by Mattel because they are

10  improper.  Mattel has issued seven subpoenas that were <u>not</u> authorized in the Court's

11  January 7, 2008 order.  MGA's motion to quash pertains to Daphne Gronich, Joe

12  Tiongco, Mel Woods, NPD Group, Inc., Ana Isabel Cabrera, Beatriz Morales, and

13  Maria Salazar.  MGA also moved to quash or for a protective order as to Rule

14  30(b)(6) deposition notices propounded upon MGA, MGAE Mexico, Wachovia, and

15  Moss Adams.  Although the Court granted Mattel leave to serve those entities with

16  deposition notices, it did not approve the specific topics set forth in those notices,

17  many of which are unduly burdensome, duplicative and cumulative of prior

18  discovery, or lack the "reasonable particularity" required by Federal Rule of Civil

19  Procedure 30(b)(6).

20       As to each of these witnesses, Mattel demonstrates no need for <u>ex parte</u> relief.

21  If Discovery Master Infante denies MGA's motions, the depositions can proceed.[5]

22

23

24

25  [4]    Mumford Decl., Ex. 2 (1/7/2008 Order Granting In Part And Denying In Part
       Mattel's Motion For Leave To Take Additional Discovery).

26  [5]    Contrary to Mattel's accusation that MGA unilaterally canceled these
       depositions, MGA submitted a request to Discovery Master Infante that he "stay" the
27  depositions pending a hearing on the motions to quash.  Discovery Master Infante
       has yet to act on MGA's request.

28

EXHIBIT ___1___

PAGE ___6___

II.   **THE DEPOSITIONS SUBPOENAS ISSUED TO DAPHNE GRONICH, JOE TIONGCO, MEL WOODS, ANA ISABEL CABRERA, BEATRIZ MORALES, MARIA SALAZAR AND NPD GROUP, INC., WERE NOT AUTHORIZED BY THIS COURT'S JANUARY 7, 2008 ORDER.**

As discussed in more detail in MGA's motion to quash, the Court's February 12, 2007 Scheduling Order limited each side to twenty-four depositions. By mid-November 2007, Mattel had used most of its depositions. On November 19, 2007, Mattel moved for leave to take scores of additional depositions. Mattel's motion for additional discovery was set for hearing on January 7, 2008.

On January 7, 2008, the Court granted in part Mattel's motion for additional discovery, permitting it to take over forty additional individual depositions, and to serve two Rule 30(b)(6) deposition notices, one to MGA Entertainment, Inc., and another to MGAE De Mexico, S.R.L. De C.V., and to serve additional interrogatories.[6] But the Court did not grant Mattel's motion in its entirety. Nor did the Court say that Mattel could take all the depositions referenced in its motion. And the Court certainly did not provide Mattel leave to take additional depositions beyond what it had identified in its motion. Instead, the Court approved specific depositions relating to specific issues listed on certain pages of Mattel's motion: "Specifically, the Court grants Mattel's request to take the individual depositions relating to the Bratz claims (set forth in the moving papers at 9-11) and relating to the trade secret and RICO claims (set forth in the moving papers at 13)."[7]

Mattel now argues that, because at the time it _filed_ its motion for additional discovery it had taken only eighteen depositions, the Court must have intended to allow Mattel to take all of the depositions identified in the January 7, 2008 Order

---

[6]   Mumford Decl., Ex. 2 (1/7/2008 Order Granting In Part And Denying In Part Mattel's Motion For Leave To Take Additional Discovery).

[7]   _Id._

EXHIBIT __1__

PAGE __7__

1   plus an additional six depositions of its choosing.  Mattel's argument that it is free to

2   take additional depositions beyond what the Court allowed is inconsistent with the

3   plain language of the Court's Order, its clear meaning, and common sense.  By the

4   time of the hearing, Mattel had already taken twenty-two depositions and scheduled

5   two more.[8]  Given that Mattel is now well over the twenty-four limit set by the Court,

6   the only depositions that it may take are those specifically authorized in the Court's

7   January 7, 2008 Order.  That does not include Daphne Gronich, Joe Tiongco, Mel

8   Woods, Ana Isabel Cabrera, Beatriz Morales, Maria Salazar, and NPD Group, Inc. –

9   all of whom Mattel was aware of in advance of the January 7, 2008 hearing.[9]

10  **III.    MATTEL'S REQUEST TO DEPOSE DAPHNE GRONICH AND JOE
11           TIONGCO SHOULD BE DENIED FOR ADDITIONAL REASONS.**

12          Mattel's sole justification for again asking to take the depositions of Daphne

13  Gronich and Joe Tiongco is that these witnesses supposedly have information

14  relating to "document retention, preservation, and collection." (App. at 11.) Mattel,

15  however, fails to inform the Court that Discovery Master Infante already has ruled

16  that Mattel received complete testimony regarding MGA's document retention and

17  preservation efforts.

18          Mattel served a Rule 30(b)(6) deposition notice on MGA that include a topic

19  seeking testimony regarding:

20

21  _____

22  [8]     After filing its motion, Mattel took the depositions of Margaret Leahy
       (12/12/07), Elise Cloonan (12/14/07), Jeanne Galvano (12/18/07), and Veronica
23  Marlow (12/28/07), and noticed or scheduled the depositions of Farhad Larian and
       Gustavo Machado.  Mumford Decl. ¶¶ 3-7.)
24
    [9]     Additionally, the subpoena and deposition notice for Maria Salazar was not
25  even served until January 23, 2008, less than three business days before the
       deposition was purportedly scheduled.  Mumford Decl., Ex. 13 (Notice of Salazar
26  Subpoena).  The subpoena was not even issued until January 22, 2008.  Id.  As
       Mattel has asserted on previous occasions, Judge Infante's ruling in this case that
27  less than 10 days' notice is presumptively unreasonable.  Mumford Decl., Ex. 14
       (9/17/2007 Infante Hrg. Tr. at 10:20-11:7); id., Ex. 15 (11/16/2007 Kidman Ltr.).
28

EXHIBIT ___1___

PAGE ___8___

Topic 39: The preservation, collection destruction, removal, transfer, loss, or impairment of your documents and digital information in connection with the action and/or any documents requested by Mattel in this action.[10]

MGA designated two individuals to testify on these topics, Kenneth Lockhart and Lisa Tonnu.[11] After conducting depositions of these individuals, Mattel filed a motion to compel seeking additional testimony regarding Topic 39. In all but one respect, Discovery Master Infante denied Mattel's motion, ruling on January 8, 2008 that "A review of the deposition transcripts confirms that MGA's witnesses provided a significant amount of testimony on this topic, and in particular regarding document preservation."[12]

The only area on which Discovery Master Infante concluded Mattel should receive additional information was document "collection." On January 23 and 25, 2008, MGA witness Samir Khare sat for two additional days of deposition during which time he gave extensive testimony regarding Topic 39, including MGA's document collection efforts.[13] Mattel has not asserted or demonstrated that Mr. Khare's testimony was inadequate in any way.

Because Mattel already has received complete testimony regarding MGA's document retention, preservation, and collection, there is no need and no basis to seek additional testimony from Ms. Gronich or Mr. Tiongco regarding these issues. Mattel already has MGA's testimony, and it has not shown that Ms. Gronich or Mr. Tiongco have any special, non-cumulative knowledge. Mattel's renewed request to

---

[10] Mumford Decl., Ex. 3 (1/8/08 Infante Order) at 17-19.

[11] Id. at 18.

[12] Id. at 19.

[13] See, e.g., Mumford Decl. ¶ 11 & Ex. 4; id., Ex. 5 (Khare Tr. at 1023:12-1027:11).

1 seek testimony from these witnesses should be rejected.[14]  At the very least, this is an
2 issue that should be considered by Discovery Master Infante in the context of a
3 motion to quash, given his greater familiarity with the roles of the various witnesses
4 and the discovery that the parties have taken to date.

5    Finally, even if Mattel had received leave to depose Ms. Gronich, there is a
6 more fundamental defect with its ex parte applications.  Mattel failed to serve Ms.
7 Gronich with a deposition subpoena, as required by Rule 45 of the Federal Rules of
8 Civil Procedure.  Former corporate employees – like Ms. Gronich – must be
9 "delivered" a deposition subpoena in order to be required to sit for deposition.  *See*
10 FED. R. CIV. P. 45.  Noticing the deposition of a former corporate employee with the
11 corporation does not itself suffice.  See, e.g., Cameo-Parkway Records, Inc. v.
12 Premier Albums, Inc., 43 F.R.D. 400, 401 (S.D.N.Y. 1967).  Nor does substitute
13 service on the former employee.  See William W. Schwarzer et al., CAL. PRACTICE
14 GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:2275 (Rutter Group 2007)
15 (citing Doe v. Hersemann, 155 F.R.D. 630, 630 (N.D. Ind. 1994) ("[A]bode service,
16 where a document is left at the served individual's dwelling, would not assure
17 delivery to the person [under Rule 45].")).

18    Here, Mattel submitted affidavits from two process servers indicating that they
19 made several unsuccessful attempts to serve Ms. Gronich between January 15, 2008
20 and January 22, 2008.[15]  As a result, at best, the only relief Mattel could conceivably

---

[14]    Mattel cannot demonstrate good cause to depose Ms. Gronich for another reason.  Ms. Gronich is MGA's former general counsel.  As a result, almost any relevant information she knows would be privileged.

[15]    See Mattel App., Wallace Decl. ¶ 2-4; id., Leyva Decl. ¶ 7-8 ("I attempted service again on January 20, 2008, at 7:30 a.m., but no one answered the door.  Ms. Gronich was not home when I returned on January 21, 2008, at 8:00 p.m. and there was no answer at the door during my attempt on January 22, 2008, at 5:00 pm.").

1 obtain would be an order allowing it to take Ms. Gronich's deposition in February --

2 assuming Mattel first serves her with a subpoena.[16]

3 **IV.    MATTEL'S REQUEST TO DEPOSE ANA ISABEL CABRERA AND BEATRIZ MORALES SHOULD ALSO BE DENIED FOR ADDITIONAL REASONS.**

4

5

6      Mattel's sole basis for moving to compel the depositions of Ana Isabel

7 Cabrera and Beatriz Morales is that, without them, its "investigation" will have

8 somehow been "obstruct[ed]." (Mattel's App. at 1.)  Nothing could be further from

9 the truth.  Having claimed that it first learned of these individuals at the deposition of

10 Veronica Marlow on December 28, 2007, Mattel waited until at least January 22,

11 2008, to notice their depositions.[17]  Why the delay of over three weeks with the

12 discovery cutoff approaching?  Because, as MGA and Bryant later discovered,

13 Mattel was in the process of recording and transcribing interviews with Ms. Cabrera

14 and Ms. Morales, seizing boxes of materials from their homes, and securing their

15 cooperation in an "investigation" that it falsely represented as being in their "best

16 interests" until Mattel fired them on or about January 16, 2008.[18]

17      Mattel's arguments and investigatory practices in this matter warrant this

18 Court's scrutiny.  Ms. Cabrera is a Mexican immigrant, and has been a seamstress at

19 Mattel for over 12 years.[19]  Her husband has been in and out of a mental institution

20 for many years, and she took on extra work for Veronica Marlow's company in

21

22

23 [16]    Cf. Mumford Decl,. Ex. 2 (1/7/2008 Order Granting In Part And Denying In Part Mattel's Motion For Leave To Take Additional Discovery at 5 ("Carter Bryant and the MGA defendants are not relieved of the requirement that they serve subpoenas on all these deponents other than the current officers of Mattel ....").

25 [17]    Mumford Decl., Exs. 6-7 (Amended Notice of Cabrera Subpoena; Amended Notice of Morales Subpoena).

26 [18]    See, e.g., Mumford Decl., Ex. 10 (Cabrera Tr. at 176:24-25).

27 [19]    Id. (Cabrera Tr. at 3:7).

28

1  nighttime and weekend hours when her kids went off to college.[20]  She would sew

2  and cut patterns for Veronica Marlow, a third party in this litigation, on the concrete

3  floor of her garage.[21]  According to the partial transcript of the interview provided by

4  Mattel: "I was alone and I say okay, I have something to do.  And I really liked to do

5  it …"[22]   She was interrogated by Mattel for at least two days, January 2 and 3, 2008,

6  and fired on or about January 16.

7        Ms. Morales is also a Mexican immigrant who worked for Mattel on and off

8  from 1998 – as a temporary and then full-time employee but was recently laid off

9  and rehired part-time.[23]  She was approached by Ms. Cabrera, her childhood friend

10  from Mexico, to earn some money for her four kids and to "help her with some

11  projects or for some company… We don't know what we had to do and for who, you

12  know."[24]  It appears Mattel interrogated her on January 14, 2008, and fired her a

13  couple days later.

14        The interviews of Ms. Cabrera and Ms. Morales were conducted by Richard

15  De Anda, Mattel's Vice President of Global Security, and Lissa Freed, Mattel's

16  Director of Human Resources.  De Anda is a former detective with the Los Angeles

17  Police Department, homicide division.[25]  At his recent deposition, De Anda was

18  forced to admit that he had been moonlighting for his own security consulting firm

19  _____

20  [20]    Id. (Cabrera Tr. at 179:12-14).

21  [21]    Id. (Cabrera Tr. at 62:14-19).

22  [22]    Id. (Cabrera Tr. at 180:9-11).

23  [23]    Mumford Decl., Ex. 12 (Morales Tr. at 7:23-10:20).

24  [24]    Id. (Morales Tr. 11:18-24; 38:1-6).

25  [25]    Mumford Decl., Ex. 16 (De Anda Tr. at 13:6-14:8).  De Anda's former

26  colleague in the security department at Mattel recently described his interrogation
   style as "inconsistent" in terms of "aggressiveness": "Sometimes he was Mr.
   Realeasy with somebody and sometimes he was more assertive," and "in the

27  spectrum of things, he was pretty close to the middle."  Mumford Decl., Ex. 17

28  (Simoneau Tr. at 183:3-16 (rough)).

EXHIBIT ___1___

PAGE ___12___

1 | throughout his employment with Mattel, and that he had done so without Mattel's
2 | authorization.[26]  Mattel CEO Robert Eckert recently testified that he was unaware of
3 | De Anda's secondary employment.[27]  And De Anda's former colleague from the
4 | Global Security department described a double-standard in De Anda's department:
5 | while De Anda moonlighted for his security consulting firm, the colleague testified
6 | "that neither I nor the people working for me and also the uniform people could not
7 | be employed in any type of a job that appeared to be in conflict with their work at
8 | Mattel."[28]

9 | De Anda and Freed conducted the interviews of Ms. Cabrera and Ms. Morales
10 | without the assistance of an interpreter, despite the obvious language barrier and over
11 | the protestations of the individuals that they do not speak English well.  Over the
12 | course of the interrogation, Ms. Cabrera came to believe she might go to jail and
13 | expressed anxiety that she was going to have a "heart attack."[29]  She asked: "Do I
14 | have to go to court or something like that? … Because my English is completely …
15 | bad.  Mr. De Anda: You'll be fine."[30]  Ms. Morales' partial transcript is similarly
16 | marked by strained and broken English.

17 | De Anda and Freed conducted the interviews without counsel present and
18 | without advising the seamstresses of any rights they may have had to refuse to
19 | answer the company's questions.  In fact, De Anda and Freed told Ms. Cabrera and
20 | Ms. Morales it was in their "best interests" to keep quiet about the interviews and not

---

[26] Mumford Decl., Ex. 16 (De Anda Tr. 139:4-140:18).

[27] Mumford Decl., Ex. 18 (Eckert Tr. at 150:13-151:3 (rough)).

[28] Mumford Decl., Ex. 17 (Simoneau Tr. at 251:21-252:8 (rough)).

[29] Mumford Decl., Ex. 10 (Cabrera Tr. 174:21-175:9, 176:2-3, 177:4-15).

[30] See id. (Cabrera Tr. at 2:9-21, 3:11-22, 182:24-183:7).

EXHIBIT ___1___

PAGE ___13___

1  tell anyone, even friends and co-workers.[31]  Over Ms. Cabrera's protest, they seized

2  boxes of materials from her garage.  The partial transcript from Mattel reflects Ms.

3  Cabrera's statement: "I don't want to leave here, but if I have to go, I go."[32]  De Anda

4  and Freed reiterated how important it was, in the course of their employment, to

5  answer the company's demands.[33]  At the end of the investigation, however, Mattel

6  fired them.

7       Most significantly, despite employing all manner of interrogation tricks and

8  suggestive questioning, De Anda and Freed could not get Ms. Cabrera or Ms.

9  Morales to give them the statements they were seeking.  De Anda and Freed

10  attempted on several occasions to get the seamstresses to state that they made

11  creative contributions to the work they were asked to do for Veronica Marlow.

12  Despite Ms. Cabrera's insistence from the beginning of the transcript that "[Marlow]

13  give me the pattern and I just sewing,"[34] De Anda formulated his questions to elicit

14  statements that might suggest that Ms. Cabrera somehow "designed" fashions for

15  Bratz, or that she "help[ed] [Marlow] create the patterns."[35]  De Anda came back to

16  this subject on numerous occasions to ask "would it not be accurate if she said that

---

17  [31]  Id. (Cabrera Tr. at 169:12-17 ("What I ask you to do, and I know that you and

18  Marlow are friends, is that you not discuss this with her at this point forward.  Okay?
I don't think it's in your best interest, especially the way that she walked you into

19  this situation.  Okay?"); id. (Cabrera Tr. at 176:24-177:3 ("It's in you best interest
not to talk to you co-workers in collector.... We'll handle that for you."); id. (Cabrera

20  Tr. at 171:19-23 ("When I gonna go back to work? ... This here is so much more
important than anything that you've ever done."); Mumford Decl., Ex. 12 (Morales

21  Tr. at 133:8-20 ("This is more important that my job, ... your job, Lissa's job.... And
you're spending time here, not because we want to, because we have to.").

22
[32]  Mumford Decl., Ex. 10 (Cabrera Tr. at 72:15-16).

23
[33]  Id. (Cabrera Tr. at 44:23-25 ("We just have to see, you know, what kind of

24  employee you are for us, if you're honest or not."); Mumford Decl., Ex. 12 (Morales

25  Tr. at 129:12-16 ("That's kind of your top priority right now ... go home, see if
there's anything else we didn't talk about here that you remember or you find

26  anything.").

[34]  Mumford Decl., Ex. 10 (Cabrera Tr. at 6:22-23).
27
[35]  Id. (Cabrera Tr. at 9:20, 13:13).
28

---

EXHIBIT _1_

PAGE _14_

1  you help her sometimes make the patterns?"[36]  But Ms. Cabrera reiterated: "No.  I

2  tell her what needs to fix it, and she fix it."[37]  Similarly, with Ms. Morales, De Anda

3  insisted "but you were designing?"[38]  Ms. Morales responded: "when I arrive, she's

4  told me how – 'here are the fabrics.  Here are the patterns.'"[39]

5         In other areas, De Anda misrepresented the testimony of Veronica Marlow in

6  an attempt to elicit favorable statements from the seamstresses regarding when they

7  came to understand their work for Marlow involved Bratz.  De Anda falsely stated

8  that Mattel "didn't ask" Marlow for Ms. Cabrera's name at her deposition: "They

9  didn't ask for it.  She gave your name, okay."[40]  In fact, Mattel very clearly asked

10  Marlow "who else" helped her on Bratz fashions.[41]  Referring to Marlow's deposition

11  transcript, which De Anda apparently brought with him into the interrogation room,

12  he also stated falsely that Marlow had testified it was "somewhere in summer of

13  2001 that it became aware – that you became aware that the items were – that you

14  were sewing were for Bratz."[42]  Ms. Cabrera asked "In 2001?" only to have De Anda

15  reiterate his misrepresentation: "That's what she saying here."[43]  In fact, Ms. Marlow

16  did not place a date on when the seamstresses asked if their work was for Bratz.

17  Marlow did not give a date as to when Ms. Cabrera told her that she recognized her

18

19

20

21  [36]  Id. (Cabrera Tr. at 49:20-23).

22  [37]  Id.

23  [38]  Mumford Decl., Ex. 12 (Morales Tr. at 28:7).

24  [39]  Id. (Morales Tr. at 40:18-20).

25  [40]  Mumford Decl., Ex. 10 (Cabrera Tr. at 33:20-21).

26  [41]  Mumford Decl., Ex. 19 (Marlow Tr. at 285:8-16).

27  [42]  Mumford Decl., Ex. 10 (Cabrera Tr. at 66:10-15).

28  [43]  Id.

EXHIBIT ___1___

PAGE ___15___

1  work from all the "Bratz dolls all over Mattel in different cubicles, and [Cabrera]

2  recognized the fashions that she had work on."[44]

3       As the transcripts Mattel produced make apparent, Mattel was investigating

4  these individuals for weeks before disclosing its intent to seek their depositions.  In

5  fact, it appears Mattel sought their depositions only after they could not coerce

6  favorable statements from them under circumstances that were as questionable as

7  they were fruitless.  In addition to the grounds stated above, this Court should reject

8  Mattel's cause to seek these depositions on those other grounds as well.

9       In sum, Mattel's inability to obtain the depositions of Ms. Cabrera and Ms.

10  Morales prior to the discovery cutoff was a problem of its own making.  Having

11  served and noticed their depositions for January 24 and 25, respectively, it was not

12  until two days before the date of the first deposition that Mattel informed MGA,

13  Bryant and counsel for Ms. Cabrera and Morales that it had boxes of Ms. Cabrera's

14  possessions purportedly "provided to Mattel by Ana Isabel Cabrera."[45]  As the

15  transcripts make clear, those boxes were not provided by Ms. Cabrera as much as

16  Mattel seized them.  And contrary to Mattel's description of the boxes as "sealed," it

17  is clear that Mattel reviewed their contents with Ms. Cabrera at length.  Counsel for

18  Ms. Cabrera and Ms. Morales intervened to cancel the depositions in light of the

19  issues raised with respect to the interviews and boxes.[46]  In light of what Mattel had

20  put these individuals' through, their counsel's intervention on January 23, 2008,

21  cancelling the depositions was as foreseeable as it was justified.

22

23

24

25

26  [44]   Mumford Decl., Ex. 19 (Marlow Tr. at 289:4-12).

27  [45]   Mumford Decl., Ex. 20 (1/22/2008 Letter from Michael Zeller at 1).

28  [46]   Mumford Decl. ¶¶ 17-18, Exs. 8-9.

EXHIBIT ___1___

PAGE ___/6___

**V.    MATTEL'S REQUEST TO DEPOSE PABLO VARGAS AND MARIANNA TRUEBA SHOULD ALSO BE DENIED FOR ADDITIONAL REASONS.**

Mattel complains about having to serve a few MGA employees with subpoenas. But it was Mattel's counsel who emphasized the need for strict adherence to service rules at the last hearing: "Now, what we have said in terms of our representations to accept service is very specific. It is Mattel's current directors and officers."[47] MGA has simply followed the same precedent that Mattel established.

Mattel claims that Pablo Vargas and Marianna Trueba, neither of whom has been served with a subpoena and both of whom reside in Mexico and work for MGAE de Mexico S.A. de. C.V., should be compelled to appear in Los Angeles for a deposition because they are purportedly "managing agents" of MGA. Mattel correctly cites the standard that governs whether a corporate employee is a "managing agent" for purposes of Rule 30 of the Federal Rules of Civil Procedure. *See* Mattel's App. at 12 (citing *Reed Paper Co. v. Proctor & Gamble Distrib. Co.,* 144 F.R.D. 2, 4 (D. Me. 1992)); *see also* Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2103 (West 2007) ("Though the question of whether a particular person is a 'managing agent' is to be answered pragmatically on an ad hoc basis, the courts look to see if the individual involved is invested by the corporation with general powers to exercise his discretion and judgment in dealing with corporate matters, whether he or she can be depended upon to carry out the employer's direction to give testimony at the demand of a party engaged in litigation with the employer, and whether he or she can be expected to identify with the interests of the corporation rather than with those of the other parties." (footnotes omitted)).

---
[47]    Mumford Decl., Ex. 1 (1/7/2008 Hrg. Tr. at 58).

1    Mattel conspicuously omits, however, that it carries the burden of

2  demonstrating that Ms. Trueba and Mr. Vargas are "managing agents" of MGA, so

3  that no subpoena is necessary to take their depositions – as its own authority makes

4  clear. *See* Mattel's App. at 13 (citing *In re Am. Honda Motor Co. Dealership*

5  *Relations Litig.*, 168 F.R.D. 535, 541 (D. Md. 1996) (noting that "[p]laintiffs [ ]

6  failed to meet their burden of proof [to] demonstrat[e] that [an individual they sought

7  to depose without a subpoena] is presently a managing agent of Honda Japan," so

8  that a subpoena would be necessary to take his deposition)); *see also Philadelphia*

9  *Indem. Ins. Co. v. Fed. Ins. Co.*, 215 F.R.D. 492, 494 (E.D. Pa. 2003) (noting that the

10  party seeking the deposition of a corporate employee without first serving him or her

11  with a subpoena "[did] not demonstrate" that individual was managing agent, so that

12  a subpoena was necessary).

13    Here, Mattel asserts in wholly conclusory fashion that Ms. Trueba and Mr.

14  Vargas are "managing agents" of MGAE de Mexico S.A. de. C.V. based primarily

15  upon their job titles.  *See* Mattel's App. at 13 ("Here, the Directors of Sales and

16  Marketing are, by virtue of their positions, invested by MGAE de Mexico with

17  powers to exercise judgment and discretion in dealing with corporate matters within

18  their areas of responsibility.").  Contrary to Mattel's bare-bone assertion, however,

19  neither employee has been "invested by the corporation with general powers to

20  exercise his or her discretion and judgment in dealing with corporate matters."

21  Wright, Miller, & Marcus, *supra*, § 2103.  Mr. Vargas reports to Susana Kuemmerle,

22  MGAE de Mexico's Vice President, who in turn reports to Larry Falcon, MGA Vice

23  President of Sales.[48]  Ms. Trueba (whose current job title is "Marketing Manager,"

24  not "Director of Marketing") reports to Gustavo Machado, MGAE de Mexico's

25

26

27  [48]    Declaration of Susana Kuemmerle in Support of MGA's and Bryant's
Opposition to Mattel's *Ex Parte* Applications to Compel Additional Depositions ¶ 4.
28

EXHIBIT ___1___

PAGE ___18___

1  Director of Marketing, who in turn reports to Ms. Kuemmerle.[49]  Neither Mr. Vargas

2  nor Ms. Trueba is authorized by MGAE de Mexico to make *any* significant or

3  material corporate decisions without the approval of either Mr. Machado or Ms.

4  Kuemmerle, and neither is authorized to speak on behalf of MGA de Mexico.[50]  This

5  weighs heavily against a finding their either Mr. Vargas or Ms. Treuba is a

6  "managing agent" of the corporation.  *See* D.E. Evins, WHO IS A "MANAGING

7  AGENT" OF A CORPORATE PARTY (TO CIVIL LITIGATION) WHOSE DISCOVERY-

8  DEPOSITION MAY BE TAKEN UNDER FEDERAL RULES OF CIVIL PROCEDURE OR STATE

9  COUNTERPARTS, 98 AL.R.2d 622 (1964) ("[A] determination that a corporate

10  employee lacked the power to exercise his judgment or discretion in dealing with

11  corporate matters, and that he was subject to the control and direction of higher

12  ranking personnel, generally results in courts holding that the particular individual

13  was not a 'managing agent' ….").

14        Moreover, Ms. Trueba's and Mr. Vargas's interests are not perfectly aligned

15  with those of MGA.  MGA's position is that these employees – if they did in fact

16  take any "trade secrets" with them from Mattel, which MGA denies – did so on their

17  own accord, without the knowledge or encouragement of MGA.  For that reason,

18  both Ms. Trueba and Mr. Vargas are separately represented by counsel.

19  Consequently, Mattel is plainly incorrect in rotely applying the "managing agent"

20  standard to conclude that these witnesses "can clearly be expected to identify with

21  the interests of MGAE de Mexico rather than with those of Mattel."  (Mattel's App.

22  at 13.)  As a result, there is no basis for compelling the deposition of these non-party,

23  foreign citizens solely through the service of a notice of deposition upon MGA.

24

25

26

27  [49]  Id. ¶ 5.

28  [50]  Id. ¶¶ 4-6.

EXHIBIT ___1___

PAGE ___19___

## VI.   MATTEL'S REQUEST TO TAKE OVER THIRTY-TWO DEPOSITIONS IN FEBRUARY SHOULD BE DENIED.

Discovery cutoff dates exist for a reason. If a case is ever to progress from one phase to the next and onward until trial, there need to be real deadlines. Throughout its applications, however, Mattel assumes that the Court's January 7, 2008 Order gave it the absolute right to take every deposition it identified – and more – without regard to when those depositions would take place. Mattel's applications imply that the only real limit on discovery is that of the imagination of the party's lawyers (which, in this case, can be quite vast).

MGA respectfully submits that the import of the Court's January 7, 2008 Order was that Mattel could take as many of the depositions identified in the Court's January 7, 2008 Order as it could, subject to the January 28, 2008 cutoff date, with the possible exception of some Phase 2 depositions if the parties could reach an agreement, which had to be approved by the Court. The reality is that, if Mattel's applications are granted, the parties will be taking fact depositions well into March, if not April. For example, Mattel is just now beginning the procedure to serve witnesses in foreign jurisdictions, such as Canada and Hong Kong.

As to Mattel's difficulties in serving witnesses, it would be unusual if Mattel had not experienced some difficulties in trying to serve over 40 subpoenas in a few week time period. Indeed, MGA and Bryant made that point in opposition to the motion seeking leave to obtain additional discovery. Obviously, this Court's order granting that motion in part contemplated there may be difficulties; it granted leave subject to the discovery cutoff, forcing Mattel to prioritize its discovery efforts. But those difficulties cannot now become a basis for extending the discovery cutoff date.

EXHIBIT _1_

PAGE _20_

VII.   **SEVERAL OF THE DEPOSITIONS IDENTIFIED IN MATTEL'S *EX PARTE* RELATE ONLY TO PHASE II ISSUES, WHICH SHOULD BE DEFERRED UNTIL AFTER THE PHASE I TRIAL.**

Mattel's *ex parte* application also should be denied because several of the deposition they identify are relevant only to Phase II issues.  When Mattel filed its motion seeking leave to take additional depositions, it represented to the Court that several of the depositions related to Phase II issues, including Jorge Castilla, Shirin Salemnia, Ricardo Abundis, Jeanine Brisbois, Carlos Machado Gomez, MGA de Mexico (30(b)(6) deposition), and MGA Entertainment, Inc. (30(b)(6) deposition).[51]

During the hearing on January 7, 2008, Mattel repeated these representations, arguing that "most" of the depositions it was seeking related "just" to Phase II issues and thus would not impact preparations for the Phase I trial during February, March, April and May:

> MOST OF THE DEPOSITIONS THAT WE'VE IDENTIFIED, THAT WE'RE ASKING FOR, YOUR HONOR, RELATE TO PHASE TWO....[52]
>
> ....
> MOST OF THE DEPOSITIONS RELATE TO PHASE TWO MATTERS.[53]
>
> ....
> WE'VE LISTED THE DEPOSITIONS IN OUR PROPOSED FORM OF ORDER THAT WE SUBMITTED TO THE COURT.  I DO THINK WE COULD SIT DOWN AND SAY THIS GROUP -- AND MOST OF THEM ARE – IS TRULY JUST PHASE TWO.[54]

Given Mattel's repeated representations that the Castilla, Selemnia, Abundis, Brisbois, Machado, MGA de Mexico, and MGA depositions relate only to Phase II issues, there is no reason not to defer these depositions until after the completion of

---

[51]   Mattel's 11/20/2007 Mot. For Leave to Serve Additional Discovery at 12-13.

[52]   Mumford Decl., Ex. 1 (1/7/2008 Hrg. Tr. at 11:19-21).

[53]   Id. at 12:14.

[54]   Id. at 30:11-14.

EXHIBIT ___1___

PAGE ___2/___

1  the Phase I trial.  As shown, there already is extensive discovery to be completed in

2  February 2008, including expert reports and any discovery stemming from the 30+

3  motions currently pending before Judge Infante.  Adding any further discovery

4  during February will prejudice MGA by interfering with this already-pending

5  discovery, as well MGA's general trial preparation.  If past practice provides any

6  indication, any additional depositions will only generate additional discovery

7  disputes and additional motions, which will push discovery into March and April and

8  threaten to derail the May 2008 trial date.  **At its core, this appears to be Mattel's**

9  **ploy: disrupt the trial schedule in favor of endless discovery.**

10        Mattel has offered no justification for seeking to conduct these additional

11  depositions in February, which they admit relate only to Phase II issues, during an

12  already packed pretrial schedule.  **But this much is clear: if the leave Mattel now**

13  **seeks is granted to conduct Phase II discovery during the pretrial period of**

14  **Phase I, MGA or Bryant will not be able to try the case in May.**  Thus, to the

15  extent the Court is going to allow Mattel to take these depositions, MGA respectfully

16  submits that they should be deferred until after the Phase I trial.

17                                  **CONCLUSION**

18        For the foregoing reasons, MGA and Bryant respectfully request that the Court

19  deny Mattel's ex parte applications to compel depositions.

20  DATED:  January 30, 2008

21                              SKADDEN, ARPS, SLATE, MEAGHER &
22                              FLOM, LLP

23                              By: _Thomas J. Nolan_____
24                                  Thomas J. Nolan
25                                  Attorney for MGA Entertainment, Inc.

25                              KEKER & VAN NEST LLP
26

27                              By: _Christa Anderson_____
28                                  Christa M. Anderson
                                    Attorney for Carter Bryant

MGA'S AND BRYANT'S OPPOSITION TO MATTEL'S EX PARTE APPLICATIONS TO COMPEL DEPOSITIONS
20

EXHIBIT _1_

PAGE _22_

EXHIBIT 2

# Expert Report of
# Dr. Erich Joachimsthaler

In the matter of

Carter Bryant v. Mattel and consolidated cases

February 11, 2008

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 2

PAGE 23

**Credentials**

I, Erich Joachimsthaler, make the following expert report:

1.  I am the founder and Chief Executive Officer of Vivaldi Partners, a strategic consulting firm with a focus on strategy, marketing and innovation with headquarters in New York and offices in Los Angeles, Munich, Hamburg, Dusseldorf, Zurich, London and Buenos Aires.  I am also a Visiting Professor of Business Administration at IESE Business School, one of the leading European MBA and Executive Programs. I have been a professional in the brand and marketing field for more than 20 years and have provided expert brand and marketing advice to a diverse set of clients in industries such as consumer products, apparel, technology, financial services, entertainment and energy among others. I am over the age of twenty-one and am competent to make this declaration.

2.  Over the past fifteen years, I have been involved in building strong brands for many clients in North America, Europe, and Asia, including those targeting the young population such as Roxy Clothing and Accessories, Levi's Strauss, Adidas, Lucky Brand Jeans, and Frito Lay. I have worked for clients in every area relevant for building strong brands.  I have assessed the value of brands and their potential for development in several hundred situations, and I have led research on brand management.

3.  I have published numerous articles and two books on marketing strategy and building strong brands.  My book, *Brand Leadership: The Next Level of the Brand Revolution,* which I co-authored with David Aaker, was published by The Free Press in January 2000 and has been a top seller among books on brands over the years.  My latest book, *Hidden in Plain Sight: How to Find and Execute Your Next Growth Strategy,* was published by the Harvard

2

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __24__

Business Press in May 2007. It is being translated into 7 languages. I also have published extensively in academic journals such as the *Harvard Business Review, Journal of Marketing Research, Journal of Marketing, Journal of Consumer Research*, and *Sloan Management Review*.

4. I have held faculty positions at the Darden Graduate School of Business Administration at the University of Virginia, the University of Southern California, the University of Houston, and IESE (Instituto Superiores de la Empresa) in Barcelona, Spain, New York, London and Munich. IESE is one of the leading global business schools offering MBA and executive education programs. It ranks among the Top 5 global business schools by *The Economist* and *The Financial Times*.

5. In 1988, I completed a post-doctoral fellowship at the Harvard Business School. I received my Ph.D. in Business Administration, with emphasis on statistics and marketing, from the University of Kansas in 1985, where I also received my Master's Degree of Science, with emphasis in quantitative methods, in 1981. In 1979, I received my Economics Degree from the Fachhochschule Giessen-Friedberg, Germany.

6. I have served as an expert witness in several cases, including *Coty (Davidoff) v. CVS, Exide v. Enersys, Adidas America, Inc. & Adidas-Salomon AG v. Kmart Corporation, adidas America, Inc. & Adidas AG v. Payless ShoeSource, Inc* and *LSU vs Smack Apparel*. A more detailed summary of my training, past experience, and prior testimony appears as an appendix at the end of this testimony.

7. I am being compensated at my normal and customary hourly rate of $700 per hour. My consulting firm is also being compensated for the time spent by its research staff at their normal and customary hourly rates.

3

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT _2_

PAGE _25_

8. My opinion is based on currently available information. I understand that a substantial amount of fact discovery has not been completed and likely will not be completed for another 30-45 days. I anticipate submitting a rebuttal report that takes into account any additional discovery that becomes available after the date of this initial report. I reserve the right to supplement, amend, or revise my opinions and conclusions based on this additional discovery.

**Summary of Issues and Opinions**

9. I have been engaged to render my expert and professional opinion on various aspects of branding of Bratz, and the marketing and business strategy of MGA Entertainment. Specifically, I was asked to consider on behalf of MGA Entertainment the strengths of the Bratz brand, MGA Entertainment's brand-building efforts, and the emergence of new market opportunities and segments over the last decade in the toy industry with a particular focus on doll, fashions and accessories space. I also studied the responses of competitors in these new market spaces. My opinion and analysis are written below.

10. My opinions appear in detail in this document. In order to form these opinions, I considered and relied upon:[1]

    a. Documents produced in this litigation, including:

        i. Internal research and strategic planning documents from MGA Entertainment and Mattel, Inc.

        ii. Product overview of doll lines and licensing programs

---

[1] A complete list of the documents and depositions I considered and relied upon can be found in the appendix.

4

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT _2_

PAGE _26_

    iii.   Marketing, Advertising and Business plans from MGA Entertainment and Mattel, Inc.

    iv.   Annual Reports and documents with growth models, growth potential and quarterly reports

    v.   Depositions taken in this case

  b.  Materials collected and researched by Vivaldi Partners

    i.   Dolls purchased during store check

    ii.   Toy store visits in New York City

    iii.   Analysis of doll websites such as Be-Bratz.com

    iv.   Secondary academic and industry research

    v.   Mattel, Inc. public filings

  c.  Selected discussions with executives of MGA Entertainment

  d.  My own and my colleagues' extant work on conceptual theories, empirical research, and professional work on cognitive psychology, branding and marketing. I applied our frameworks and approaches to understand the situation and context of doll brands and the impact on Bratz and its trademarks and identity.

11. Based on this work, I arrived at several conclusions:

  a.  The Bratz brand creates enormous value to MGA Entertainment and is a significant and absolutely business-essential asset to its success in maintaining a relationship with consumers and sustaining success in the doll market.

5

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT _2_

PAGE _27_

b.  MGA Entertainment has applied many principles of proactive brand management that provided the organizational setting to create, build and nurture a strong brand identity for Bratz.

c.  Bratz has developed into a strong brand through a series of successful innovations and powerful brand-building programs. Since its launch, the major dimensions of brand strength that constitute brand equity have strengthened. This should allow Bratz to realize a significant price premium over an unbranded equivalent.

d.  The nature of the consumer decision-making process in toys, and particular dolls is such that the brand has a significant impact on consumer purchase decisions.

e.  Based on the strength of the Bratz brand and the role of this brand in consumer decision making for fashion dolls, I conclude that the price premium that Bratz can realize over an unbranded equivalent ranges from about 50% to 70% in the categories of fashion dolls and accessories.

f.  Mattel, the incumbent market leader, did not respond to the changing market conditions for many reasons that are internal to Mattel, and Mattel like most mature organizations, would not have been able to seize an "opportunity hidden in plain sight." In contrast, MGA Entertainment was able to capture the market opportunity and grow the overall market for fashion dolls.

12. Bratz and Barbie were brands I was quite familiar with even prior to being retained. I am the father of three children, a boy and two girls. My daughters (ages 13 and 11) have played with Bratz and Barbie dolls for sometime and I have been to stores where Bratz products are sold.

6

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __28__

13. In addition, I have asked a team of consultants to visit various stores in the New York area
    and the vicinity. This visit consisted of a systematic retail audit as I do customarily in my
    work with brands. The team visited ten stores. Three of these stores were large formats that
    typically sell the most popular doll products, five of these were all-purpose drug stores with
    toy aisles and two of them were discount stores that typically sell generic brands.  We
    followed this research up with an online audit of key websites. These included branded
    websites like the Barbie Collector - the official Mattel site for Barbie, Barbie.com, Bratz.com
    – the Official Bratz site, but also social networking websites such as Be-Bratz.com that gave
    insight into the interactions of consumers with dolls, fashions and accessories in their daily
    life.  During the retail audit we focused on several key areas concerning the branded
    environment, including packaging, price, and interactive elements.

**A. The Role of Brands in the Context of the Toy Business as well as the Doll, Fashion and
Accessories Categories**

14. The word brand originates from the Old Norse word "brandr," which means to burn.  Indeed,
    branding or burning was (and is) the method by which farmers mark their livestock to
    identify who owns them.[2] In this sense, a brand is a distinguishing name and/or symbol
    intended to identify services or goods.[3]  This includes thoughts, feelings, emotions and
    experiences about anything that represents that brand such as the style, the logo, the design, a
    color, a gesture, or a package.

---

[2] Kevin L. Keller (2008), *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, 3rd Ed.,
    Englewood Cliffs, NJ: Prentice-Hall, p. 3
[3] David A. Aaker, *Managing Brand Equity*, New York, NY, The Free Press, 1991.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT _2_

PAGE _29_

15. A brand can be distinguished from the product.[4] A brand includes characteristics such as product scope (e.g., Bratz is a fashion doll), product attributes (e.g., Bratz has big heads), quality/value (e.g., Bratz delivers a quality product), uses (e.g., Bratz is fun to play with), and functional benefits (e.g., Bratz helps the tween to learn about fashions). Characteristics are usually grouped in the following way:

    a.  User imagery (those who play with a particular doll, relatively important here is the age and also the social relationships such as other friends who play)

    b.  Origin and heritage (the imaginary background of the doll, is it American or European? What are the cultural roots of the brand?)

    c.  Organizational associations (generally viewed as the company behind a brand but here the concept applies to the context or the world of the doll, does the doll have friends, it is part of a family, etc. What is the world of Bratz versus what is the world of Barbie?)

    d.  Brand personality (any human-like characteristics that are imbued on the brand)

    e.  Symbols (anything that represents the brand: a tagline (Nike: just do it), a color (Barbie's pink), a logo (Disney's scripted logo), a package (the Coke bottle), a musical note (Intel's commercial), product design (Apple's iPod)).

16. These characteristics or dimensions of a brand translate into benefits for consumers beyond functional benefits. A doll, for example, can make a girl feel ambitious and energetic, like they can be what ever they want.[5] A brand potentially delivers:

---

[4] David A. Aaker and Erich Joachimsthaler, *Brand Leadership: The Next Level of the Brand Revolution*, New York, NY, The Free Press, 2000, p. 51-52.
[5] Adult-Size Barbie, *Christian Science Monitor*, Vol. 89, Issue 19, p 20

8

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __30__

    a.  Self-expressive benefits (e.g., driving a MINI car makes me be perceived as youthful with energy and vitality, or playing with a Bratz doll makes me be perceived as cool by my friends).

    b.  Emotional benefits (e.g., driving a Volvo makes me feel safe, or playing with Barbie makes me feel good about myself).

17. A brand is created by these characteristics. When these characteristics are brought together in a powerful manner, a brand touches on the buyers' feelings and emotions. In other words, it creates emotional and self-expressive benefits. Therefore, the definition of the brand and how these characteristics are created have important implications for all aspects of the marketing strategy including pricing, segmentation, communication and sales strategies.[6] The definition of the brand has implications for the entire business strategy including a company's policy towards growth (through brand growth strategies such as licensing or innovation through investments into new products).

18. Product attributes alone seldom distinguish a product meaningfully especially in the context of highly competitive markets with few barriers to entry. Competitors catch up or consumer preferences change. This explains the fact that products tend to have a relatively short life and can quickly become obsolete in the toy industry.

19. A brand on the other hand, can last a very long time when managed properly. A brand outgrows the product. The growth of a brand can be illustrated in the figure below. In essence, the relative sizes of the two circles change over time. The outer circle grows bigger and bigger.  Growing this circle is an important objective for all branding efforts because it is the brand that creates meaning for consumers. When provided with the right set of

---

[6] David A. Aaker, *Building Strong Brands*, New York, NY, The Free Press, 1996.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __31__

characteristics, the brand develops an identity much like a person has an identity. For example, the tagline "Passion for Fashion", the fashions the doll chooses over time, the personalities of the girls, the colors, the packaging and the connotation of the Bratz name create meaning and hence value to consumers and influence on purchase. Over time, physical characteristics like the product design of a doll with a large head merely function as one of many cues to invoke perceptions in consumers' mind. In the field of marketing, the popular adage is: "a product is developed in the factory, a brand is created in consumers' mind." Or as David Ogilvy, the advertising guru, wrote in his book, *Confessions of an Adman*, a "brand is a consumers' idea of a product."[7]



20. Metaphorically speaking, a brand can be viewed much like a box in someone's head. As people receive information about a brand, positive or negative, they file it away in the box labeled with the name of the brand.[8] After repeated exposure to or experience with a brand,

---

[7] David Ogilvy, *Confessions of an Adman*, Southbank Publishing, London, New Ed Edition, 2004.
[8] David A. Aaker, *Building Strong Brands*, New York, NY, The Free Press, 1996.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ___2___

PAGE ___32___

the consumer will have a number of things or information or perceptions about the brand stored in this box.

21. Although brands are generally considered intangible, they are often amongst the most valuable assets of a corporation. Strong brands can be worth several billions.[9] In the latest *Interbrand Brand Valuation Study* of 2007, Coca-Cola was the most valuable brand at $65 billion dollars; Microsoft was the second most valuable brand at $57 billion dollars. A number of the world's most valuable brands come from the young consumer industry, including Disney (ranked 9th with an estimated value of $29 billion), Nike (ranked 31st with an estimated value of $11 billion), Nintendo (ranked 44th with an estimated value of $7 billion), and MTV (ranked 52nd with an estimated value of $7 billion). Other studies confirm the enormous financial value of brands targeting young consumers.[10] According to the *2003 Interbrand Brand Valuation Study*, the 97th most valuable brand was Barbie, valued at $1.8 billion, down from 94th place in 2002 and 84th place in 2001. Barbie disappeared from the *Interbrand* best 100 global brands list in 2004.[11]

22. Particularly in the toy industry and the doll category, brands are of extreme value because of the unique relationship between a brand and young children in terms of intensity and meaning. As the author Juliet B. Schor of the book *Born to Buy* on marketing to kids stated: "These days when kids ask, they ask for particular brands". A 2001 Nickelodeon study found that the average ten year old has memorized 300 to 400 brands. Among eight to fourteen year olds, 92 percent of requests are brand specific, and 89 percent of kids agree that

---

[9] Lev, Baruch, *Intangibles.* Washington, DC: Brookings Institution Press, 2001.
[10] Interbrand, *Best Global Brand 2007*, pp. 14 - 15
[11] Interbrand, *Best Global Brand 2003, 2002, and 2001.*

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT _2_

PAGE _33_

"when I find a brand I like, I tend to stick with it."[12]  A 2000 Griffin Bacal study found that nearly two-thirds of mothers thought their children were brand aware by age three, and one-third said it happened at age two. Kids have clear preferences, they know which brands are cool, they covet them, and they pay attention to the ads for them. Today's tweens are the most brand-conscious generation in history."[13]

*Benefits of a brand to manufacturers and consumers*

23. A brand provides a number of benefits to both the manufacturer and brand owner. Strong brands provide a means of differentiating one product from another.  If you look only at the product itself, toys can be very similar and interchangeable.  A toy car or a plastic doll from one manufacturer can be functionally equivalent to comparable products from another manufacturer.  That is, it serves the same function for the consumer in terms of playing, learning, or enjoying. The branded aspects of the products, such as the name, design, packaging, themes, narratives, or unique product and communications elements, are what invoke in consumers' memory the information he or she has stored about a brand. This collection of perceptions, images, associations, attributes, perceptions, past experiences, feelings, emotions and opinions is what consumers rely on to draw comparisons between brands in order to form preferences, and to make purchase decisions.

24. A second benefit to the manufacturer of a strong brand is sustaining relevance with consumers. I define relevance in terms of the extent to which a consumer absorbs and assimilates a brand into their lives.[14]  Especially for toys targeting 7 -12 year olds, a strong

---

[12] Juliet B. Schor, *Born to Buy*, Scribner, New York, NY, 2004.
[13] Juliet B. Schor, *Born to Buy*, Scribner, New York, NY, 2004, p. 25
[14] Erich Joachimsthaler, *Hidden In Plain Sight: How to Find and Execute your Company's Next Big Growth Strategy*, Harvard Business School Press, Boston, Mass, 2007.

12

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ___2___

PAGE ___34___

brand can help to sustain relevance amid constantly changing tastes and rapid turnover of core customers. The reality of the tween market is that every 5 years a toy company addresses a completely new group of consumers. Toy companies targeting tweens must therefore carefully manage their brands through constant renewal of their brand positioning and user imagery with new consumers. This requires consistent investment in the brand.

25. A third benefit to the manufacturer is that strong brands provide the basis for brand extensions, co-branding and licensing arrangements. Brand extensions involve using an existing brand name to introduce a new product, bring new customers to the brand franchise and increase market coverage.[15] Brand extensions are commonly used in the toy industry to enable companies to access new market segments or new categories. Examples of brand extensions of the Bratz brand include the Bratz Petz and the Lil Bratz lines. Brand extensions and other brand growth strategies are important because they help to create the brand territory, the world of Barbie or the world of Bratz.

26. Co-branding in particular has strong implications for brands by using more than one brand to enhance the overall value proposition, enriching the experience consumers have with the brand through a multiplicity of consumer touchpoints. As I state in my book with David Aaker, *Brand Leadership*, co-branding creates an advantage because of the positive associations it provides of the different brands. An example in the toy space would be the NBA licensing their name with Barbie to create NBA Barbie.[16] In this case, both the NBA and Barbie draw on strengths from each other's brands to create value for the NBA Barbie, which in turn bolsters each of their own brands.

---

[15] Kevin Lane Keller, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, 3rd Ed, Prentice Hall, Upper Saddle River, New Jersey, 2008.
[16] David A. Aaker and Erich Joachimsthaler, *Brand Leadership: The Next Level of the Brand Revolution*, New York: The Free Press, 2000, p. 142.

13

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT _2_

PAGE _35_

27. Furthermore, licensing arrangements and product tie-ins allow for extra revenue to be earned from the strength of the brand. These arrangements make it possible to assist a product in growing into a meaningful franchise that is able to build onto itself, and hence create longevity for its products.  For example, Mattel built a strong lifestyle franchise around the Barbie doll[17], and thus, in my view, extended the timeframe during which their doll product prospered.

28. These arrangements also make it possible for the brand owner to enter new markets without extending its own capabilities beyond its core competency.  For example, Harley Davidson is a well-known example of successful licensing – indeed, a big share of their revenue comes from licensing arrangements for T-shirts, hats, jackets, and other accessories.  The same appears to be true of Bratz.  Bratz uses a brand growth strategy of licensing. It has approximately 2,650 North American licenses.[18]  The Bratz licenses include Bratz Hosiery, Au'Some Candies, Bratz Valentines, Dream Apparel, Bratz Bedding and Bratz Beach Towels.  Royalty income from third parties was approximately $43 million from net sales of $760 million in the year 2006.[19] It helps to build the world of Bratz and contributes its success as a company as it exists today.  A license for a Bratz bag, for example, brings in about $1,000,000 a year.[20]

29. A fourth benefit to manufacturers of strong brands is to gain distribution and establish trade relationships. Retail distribution is highly concentrated in America with Wal-Mart, Target, Toys R' Us, Kmart and KB Toys selling most American toys. The first three alone account

---

[17] Eric Clark, *The Real Toy Story: Inside the Ruthless Battle for America's Youngest Consumers*, The Free Press, New York, New York, 2007, pg. 76
[18] MGA Entertainment, Inc Licensing North America, List of Licensees and Contracts MGA 3765287-3765551
[19] MGA Inc. Consolidated Financial Statements, December 31, 2006.  MGA0868707 at MGA0868714.
[20] MGA Entertainment Domestic Licensing Data, *Payment Log*, June 30, 2007. MGA 3743606-3745687

14

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT _2_

PAGE _36_

for 60%.[21] This level of high retail concentration compares to grocery retailing where the top five retailers account for only 36% of sales.[22]

30. A fifth benefit to the manufacturer of strong brands is building and sustaining competitive advantage over others in the market. Toy companies with a strong orientation toward building brands achieve competitive advantages in the following dimensions: innovation, merchandise, communication, and customer service.  These competitive advantages can translate into greater market share potential, the ability to command price premium, stronger support from the retailers, lower marketing costs, and higher barriers to entry.[23]

31. Strong brands also benefit consumers.  The first benefit of strong brands to the consumer is the reduction in the perceived risk inherent in purchase decisions.  Many toy products carry significant risk of quality and social risk such as peer-group acceptance.  Consumers cope with these social risks by purchasing well-known brands.[24]  As Juliet B. Schor wrote in her book, *Born to Buy:* "Contemporary American tweens and teens have emerged as the most brand-oriented, consumer-involved, and materialistic generation in history. And they top the list globally.....More children here than anywhere else believe that their clothes and brands describe who they are and define their social status."[25]

32. Strong brands deliver emotional benefits to the consumer.  The perception of the brand, combined with the actual features of the piece of clothing, can make a consumer feel sexy, comfortable, trendy or exclusive. The brand of a doll that a girl plays with can create

---

[21] Eric Clark, *The Real Toy Story: Inside the Ruthless Battle for America's Youngest Consumers*, The Free Press, New York, NY 2007.
[22] *The Power of Private Label 2005, A Review of Growth Trends around the World,* Nielsen Report, 2005.
[23] For example: Kevin Lane Keller, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity,* 3rd Ed, Prentice Hall, Upper Saddle River, New Jersey, 2008, p. 7
[24] Kevin Lane Keller, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity,* 3rd Ed, Prentice Hall, Upper Saddle River, New Jersey, 2008.
[25] Juliet B. Schor, *Born to Buy,* New York: Scribner, New York, NY, 2004, p. 13.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __3 7__

emotional feelings for her.  For example, survey research shows that consumers perceive Bratz dolls as "the status to own, edgy, trendy, and fashionable."[26] Specifically, MGA Entertainment's own tracking results of 6 to 11 years old girls show that the top perceptions in 2006 and 2007 are: are fashionable (70%), are for girls your age (68%), fun to play with (64%), something your parents are okay with (53%), and are the coolest (56%).[27] These results are also confirmed in early studies commissioned by Mattel. Bratz wins over Barbie on these attributes: most fashionable clothes, most want to be like, more fun to play with, is cooler than other dolls.[28] Thus, companies operating in the doll categories place a lot of emphasis on the emotional benefits of their brands.

33.   Strong brands also provide self-expressive benefits for consumers.[29]  A self-expressive benefit exists when the brand affects a constituent's self-image portrayed to others. Fashion dolls can evoke a type of statement or personality. A consumer, by shopping at Old Navy, for example, may express to others that they are an "unpretentious" and "frugal" person. Similarly, the purchase of a Lego set from Lego Group for a young child may display the desire to be "creative" and to simply "play well".[30] A girl that plays with a certain brand of dolls may express to others that she is stylish, mature, hip or edgy.[31] As toy items, doll brands offer significant self-expressive benefits to young girls who wish to project a certain image or persona of themselves to others.

---

[26] Brand Comparison Chart, M 0065305
[27] Bratz International A&U Tracking Study, November 2007, Prepared by C&R Research. MGA 3823970-3824055; Bratz International A&U Tracking Study, December 2006, Prepared by C&R Resaerch, MGA 0295483-0295640.
[28] Mattel Worldwide Consumer Research: Girls Monthly Tracking study, 2004. M0082125.
[29] Jennifer Aaker, "The Malleable Self: The Role of Self-Expression in Persuasion," *Journal of Marketing Research,* Winter, 1999.
[30] About Us Corporate Information, Lego Group, http://www.lego.com
[31] Brand Comparison Chart, M 0065305

16

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT _2_

PAGE _38_

34. Because of the benefits of brands to consumers, consumers tend to behave in a positive way toward strong brands. With regard to strong brands, consumers tend to exhibit (a) a greater willingness to consider the brand's products, (b) a greater receptivity to marketing information about a brands' products, (c) a stronger desire or aspiration for the brand's products, (d) a greater loyalty and willingness to purchase the brand again, (e) a greater tolerance toward the brand in case of product failure or problems, (f) a greater willingness to pay for the brand's products, and (g) a greater willingness to recommend the brand to other consumers.

35. In summary, brands provide enormous benefits to manufacturers, like MGA Entertainment, and to consumers especially in the toy industry and the doll, fashion and accessories categories. The brand is a significant and absolutely business-essential asset to MGA Entertainment's success in maintaining a meaningful relationship with consumers and continued success in the future.

## B. Proactive Management of the Bratz Brand at MGA Entertainment

36. Strong brands do not just develop by default; they need to be created, and proactively nurtured and managed over time. Every company that operates in a market where a brand is important has systems, policies, procedures, methodologies and capabilities in place that help to build the brand. In my experience, there are huge differences from one company to another and from one industry to another. The first system to manage brands was developed by Neil McElroy in the early 1930s at Procter & Gamble. Since that time, many companies have adopted this system or components of the system. In the consumer goods industry, these

17

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ____2____

PAGE ____39____

systems have become very sophisticated management systems. In other industries, there is often less sophistication around brand management but some brand-essential components of a good system have been adopted by nearly all firms that are successful in building brands over time.

37. I have analyzed the MGA Entertainment processes, procedures, and activities to manage Bratz, which I call a system, and will describe next my conclusions from this analysis. The information for my analysis comes from my interviews with executives of MGA Entertainment, my research of databases and my review of articles and books that been have written about Bratz.

38. In my book co-written with David Aaker, I describe four major components of a good and proactive system to manage brands: Brand Identity/Position, Brand Architecture, Organizational Structure and Processes and Brand-Building Programs. [32] It is these four major components that at minimum create the basis for the discipline of management toward the practice, investment and development of brands today. There are many forms which these components take depending on the company. In younger and more entrepreneurial companies, the system is more human and often depends on a small circle of people who "get" what the brand stands for. Nike, for example, built a billion dollar brand with a very simple system of managing their brand.  At Nike, a few individuals in key functions of the business knew how to guide and steward the development of the brand during its early years.[33] At more mature companies, the system takes on the bureaucratic complexities of other functions and processes of an organization. Nearly all major consumer goods

---

[32] David A. Aaker and Erich Joachimsthaler, *Brand Leadership: The Next Level of the Brand Revolution*, New York, NY, The Free Press, 2000, Ch. 1
[33] Daniel Roth, "Can Nike Still Do It Without Phil Knight", *Fortune*, April 4, 2005.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __40__

companies have comprehensive systems for managing the brand. I have helped numerous companies to build or improve systems for managing their brands in the course of my career.

39. I will now describe each of the four components of a system of managing a brand. I will use examples from MGA Entertainment and I will show how together, these four components have been a major reason for the success of the Bratz brand in the highly competitive market of fashion dolls.

### Brand Identity System

40. One of the most important aspects for managing a brand is to create and maintain a clear and compelling "brand identity system". A brand identity refers to what a brand stands for and aspires to create in consumers' minds. It defines the set of associations or values that should be mentally linked to the name in consumers' mind.[34] A brand identity defines the vision for a brand from the perspective of the strategist and therefore defines how a brand is created and how it is maintained over time. Over the last 15 years, the development of a brand identity system as a tool has been one of the most important developments in the field of branding. Some also refer to it as the brand DNA, the brand print, the brand intent, the brand story or the brand foundation. David Aaker and I have used the word Brand Identity System because identity defines the distinguishing character of a person. I use the word system because defining a brand requires a system of concepts and elements that fit together in a coherent and logical way.

---

[34] David A. Aaker and Erich Joachimsthaler, *Brand Leadership: The Next Level of the Brand Revolution*, New York, NY, The Free Press, 2000, Ch. 1

19

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 2

PAGE 211

41. The development of the brand identity of Bratz started at MGA Entertainment in the year
    2000.[35] Based on an interview with Paula Garcia, I understand that she came to MGA feeling
    that there was an incredible void in the market for a fashion doll. This void was a function of
    the age compression in the doll market (often referred to as KGOY, or Kids Growing Older
    Younger)[36] which had shrunk the core market of Barbie to 3 to 6 year olds[37], as well as the
    dominant position of Barbie in the fashion doll market.[38] It is also my understanding that,
    being of Greek ethnic descent, Paula Garcia felt there was no variety among fashion dolls she
    could relate to: a doll with ethnic roots that is bought not just as a play piece but as an
    emotion piece. When she saw Carter Bryant's drawings, she was inspired and an idea of the
    Bratz brand began forming in her mind. She intuited that consumers of the age 7-12 live
    diversity everyday in a way that their predecessors didn't. She also understood that they look
    up to teenagers who wear fashions that are trendy, edgy, more relevant, and super cool.[39]
    Barbie overshoots this target because Barbie, as I understand it, is essentially about 26 to 30
    years old, more the age of 7-12 year olds' mothers than their true aspirational reference
    targets which happen to be teenagers that are much closer in age to them.[40] Thus, from a
    brand identity standpoint, Bratz was defined around several differentiating attributes: a
    fashion doll that appeals to 7-12 years, diversity including ethnic diversity, a creative target
    that the market aspires to of 14 years and older – essentially teenagers, and edgy and cool
    fashions. These elements are important in defining the brand identity of Bratz but two

---

[35] Interview with Paula Garcia, January 29, 2008
[36] Julie Tinson and Clive Nancarrow, "GROw"ing up: tweens' involvement in family decision making, *Journal of Consumer Marketing,* (2007)160-170
[37] Eric Clark, *The Real Toy Story: Inside the Ruthless Battle for America's Youngest Consumers,* The Free Press, New York, New York, 2007, pg. 93
[38] In fact, in December 2001, Barbie had a 90% market capture of the doll industry.  Source: Barbie vs. Bratz; MGA 0153682 at MGA0153685
[39] Interview with Paula Garcia, January 29, 2008
[40] *Ibid*

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ___2___

PAGE ___4/2___

additional ones are worth analyzing further: brand personality and symbol. As I noted in my book with David Aaker, these two have generally prominence in creating strong brand identities.[41]

42. Brand personality defines a brand in terms of human-like characteristics. For example, Nike has a personality of being aggressive, athletic, spirited and cool, maybe even American. Brand personality is an important concept because it can help provide the needed differentiation even in markets where the product, its design or attributes are equivalent to others. Brand personality helps in three ways: first, a personality can make the brand interesting and memorable. Second, brand personality can suggest a brand-customer relationship such as being cool or a fun friend or being an authority like a mother or teacher.

43. From the beginning, Bratz was conceived by defining the personality of the brand. As Paula Garcia described it: "it started with assigning the characters and what the personalities were, their styles defined by their fashions first and foremost."[42] Each character had a different personality. While Cloe was excited by animal prints and sparkly fabrics, Jade liked "xtreme" clothing and cats. Sasha and Yasmin had an individual spirit with Sasha liking urban street wear and Yasmin mainly subscribing to the Bohemian look.[43] The attempt was to make a general mapping of the ethnicities of the market but to never call out the obvious, allowing young girls to make their own impressions.[44] Although the girls resembled a mix of Hispanic, Caucasian, Asian and African American, the ethnicities of the dolls were never mentioned or revealed.[45] As Isaac Larian describes, "We decided at the beginning the key

---

[41] *Ibid*
[42] Interview with Paula Garcia, January 29, 2008 and review of various literatures.
[43] Bratz Factsheet, MGA Entertainment, MGA 0178895
[44] *Ibid*
[45] *Ibid*

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __43__

thing was to keep the characters [ethnically] ambiguous.  Not everybody is blond and six foot

two inches and has perfect proportions: We're going to make these dolls multiracial, mix and

match.  That's the way society is."[46]  Thus, the goal was to create characters that were

relevant to tween consumers in ways that previous fashion dolls could not.  They went

beyond the stereotypical images of race, color and ethnicity and took on more trendy,

expressionistic personalities.  Yasmin, for example was earth-toned and very natural, while

the Asian character was created to be more punky, loud and fierce.[47]  The Bratz characters

are about self-expression and attitude.[48]  On the Be-Bratz website, the four Bratz characters

introduce themselves on their own personalized page, emphasizing their individuality with

likes and dislikes and detailing their personality traits ranging from shy and practical to sassy

and drama queen.  While Sasha is more attributable to personalizing the punk style, Cloe's

style resembles the hip hop scene with sparkly fabrics and different prints.[49]  These character

traits aimed at spreading the message about Bratz dolls, that they were fun, trendy and

adhered to an image.[50]  These traits ultimately augment the power of the overall Bratz brand,

and reinforce the notion that Bratz is not just about dolls, but about "an attitude".[51]

44. Although these characters broke stereotypical molds and ideas about body image, Mattel

research shows that the brand image profile of Bratz was highly favorable, and rang true

among young girls.[52]  Today, girls in the age range of 7 and upward immerse themselves in

defining who they are in their own ways. They want to express their identities and

[46] Eric Clark, *The Real Toy Story:  Inside The Ruthless Battle for America's Youngest Consumers*, Free Press, New York, New York, 2007
[47] *Ibid*
[48] *Ibid*
[49] Bratz Factsheet, MGA Entertainment, MGA 0178895
[50] My Scene Competitive Overview, August 27, 2003, M 072025
[51] Kristine Hodgkin, *Short Term Bratz Defense*, Ogilvy, March 14, 2002. M 0253419
[52] Mattel Worldwide Consumer Research 2004 – 2005, M0082100-M0082110, M0080100-M0080110.

22
CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT 2
PAGE 44

personalities. The dolls are a means of helping girls to define who they are and to express it to others.

45. As Eric Clark, the author of *The Real Toy Story* writes: "The character expressions of Bratz stand in stark contrast to the Barbie character which was designed expressively to be nothing in particular, but instead to be a vehicle for little girls' aspirations."[53] Barbie was created to be an all "American" girl: a blond hair, blue eyed beauty. As Clark further observed: "Underpinning Barbie's triumph over rivals has been Ruth Handler's original brilliant decision that the doll should be a blank canvas for a girl to make her whatever she wants."[54] A product of her time, in 1950, the year Barbie was created, young girls yearned to express a part of themselves that their mothers were never privy to in previous years. This way, Barbie won the hearts of all young girls who dreamed of "freedom and purchasing power" and "goods and gadgets".[55] Bratz, like Barbie fifty years before, helps a new generation of tween girls to define who they are by creating their own personality, seeking pride in what they look like, and expressing themselves through fashions, clothes, accessories and the like and finding their independence. Unlike during the Barbie era though, young girls today more strongly influence and make more often purchase decisions, have more of their own money and are very media savvy.[56] Bratz has given these girls the ability to "name and identify with different characters"[57] who seem to be as spunky as excited as they are.

46. A second and important element or concept of a strong brand identity is the *symbol*. As I have noted in my writing before, a symbol or visual elements in general such as logos,

---

[53] Eric Clark, *The Real Toy Story: Inside the Ruthless Battle for America's Youngest Consumers*, The Free Press, New York, NY, 2007.
[54] *Ibid*, pg. 91
[55] *Ibid*
[56] *Ibid*
[57] Mattel Worldwide Consumer Research, November 1, 2004, M 0066490 at M0066492

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ___2___

PAGE ___45___

symbols, trademarks, taglines, colors, brand characters, or design aspects of the physical features of products, labels on the product, packaging or promotional materials[58] provide a sort of "glue" or structure that helps hold the various elements of the brand together into a coherent brand identity system making it easier to gain recognition or recall.[59] In most cases, a brand's overall visual identity results from a combination of several visual elements. For example, FedEx uses a logo, a specific typeface, and a specific orange and purple color combination on a white background to create a visual identity of its brand of overnight delivery service. The company uses this combination of visual elements consistently on various "media" including its signage, its shipping envelopes, its delivery trucks, and its website. In some instances, a single visual element may be a primary carrier of a brand's visual identity. This is the case, for instance, of the distinctive pink that characterizes Barbie products – so much that the 10th floor of Mattel's headquarters is known internally as the "Pink Floor".[60] It is the visual identity that invokes the thoughts, feelings, emotions and past experiences with the brand.

47. In the case of Bratz, a huge number of symbols and visual identity elements come together in a coherent and logical way to create the overall Bratz brand identity. Take, for example, product design, which is important in the fashion doll category.  The Bratz dolls were designed by MGA Entertainment from a unique perspective which sought to express the ethnicities from reality -- as authentic and real as possible while also using different stylization.  According to Paula Garcia, distorting people and objects was a trend sweeping

---

[58] David Aaker and Erich Joachimsthaler, *Brand Leadership: The Next Level of the Brand Revolution*, The Free Press, New York, NY, 2000, p.54
[59] *Ibid*, p.54
[60] Eric Clark, *The Real Toy Story: Inside the Ruthless Battle for America's Youngest Consumers*, The Free Press, New York, NY 2007

24

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT ___2___

PAGE ___46___

the US at the time[61], as illustrated by Steve Madden's ad campaigns.[62] For Bratz, this involved creating oversized heads and huge lips, but keeping them to a "softened" proportion that would still speak to girls of the ages 7 to 12, as Carter Bryant has stated.[63] The big head and somewhat distorted facial features allowed the doll "to go beyond the box" and fashion herself as an expressive and stylistic creation.[64] At the same time, the doll took Barbie's womanly proportions and toned them down, reducing the breast, hips and waist to a more realistic size for 10 year old girls who aspire to be teenagers. The unrealistic nature of the Bratz doll plays into the awkward stage that is characteristic of 7 to 12 year old girls creating a healthy tension between what is not real and at the same time what is expressive and innovative. As Paula Garcia explains, while girls at that age can't be teenagers yet, the Bratz dolls represent what is cool in their life right now and encourage them to celebrate it.[65]

48. Product design is one visual identity element but there are a large number of other symbols for Bratz. In fact, the entire range of visual identity elements creates the brand. These elements range from the unique trapezoid packaging with PVC, the colors, and the tagline (The Girls with a Passion for Fashion), to the music, the font and typography, themes and types of licensed products.[66] These elements create a fresh, innovative, streetwise and rebellious personality while still claiming that the Bratz dolls are angels.[67] The trapezoidal package shape, for example, creates a broad visual impact. From what I understand based on my interview with Steffen Smith, the industry standard is a square or rectangular box,

---

[61] Interview with Paula Garcia, January 29, 2008
[62] Kumi Croom deposition transcript, pg. 85 at line 12
[63] Carter Bryant deposition, pg. 279 at line 19
[64] *Ibid*
[65] *Ibid*
[66] Interview with Steffen Smith, January 31, 2008
[67] Interview with Paula Garcia, January 29, 2008

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __47__

while the trapezoid shape allows for the layering effect, making the package look fuller.[68] This creates value perceptions for young girls. There appears more in the box and this creates value for money perceptions. This is confirmed through research which shows that consumers believe the package holds the "best accessories,"[69] and "have the best accessories" (58%) and "comes with the most items in the box" (58%).[70] One of the Bratz doll comes with a metallic pink mouse and mouse pad, providing girls with an element of trendy technology that they can use while browsing the Be-Bratz.com website. Furthermore, the themes that resonate season to season are creative and bring life to the dolls. The way in which the themes are designed does not lose the identity of the Bratz dolls but instead puts them in different settings always remaining true to the core identity of the brand, such as being edgy.

49. Overall, the Bratz brand identity system is strong with depth and texture. It has a unique structure that extends from interethnic personalities to a huge array of symbols. It appears to be developed from an extreme but realistic and authentic vantage point reflecting the diversity of life in America or the world. It is in sharp contrast to the Barbie identity, which was a "blank canvas for a girl to make her whatever she wants" – as Ivy Ross said, Barbie "isn't anything in particular, so she becomes a vehicle for [the girls'] dreams, their aspirations, their frustrations."[71] Barbie is an identity that is strong on emotional benefits. Barbie makes children feel whatever they want to feel, whether this is to be a successful mother or a successful professional lawyer. Bratz also delivers emotional benefits but appears to be a brand identity that predominantly delivers the benefits of self-expression. It

---

[68] Ibid
[69] Mattel Worldwide Consumer Research, June 10, 2005, M 0080111
[70] Bratz International A&U Tracking Study, November 2007, Prepared by C&R Research, MGA 3823970
[71] Eric Clark, *The Real Toy Story: Inside the Ruthless Battle for America's Youngest Consumers*, Free Press, New York, New York, 2007

26

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __48__

allows tweens to express their individuality and identity and attitude: irreverent, rebellious and cool.

*Brand Architecture*

50. Another important component of a system of managing a brand is the *brand architecture*. Brand architecture is a way to view the brand not as an individual product but as a team that functions together as a unit to create synergy, clarity and leverage. There are several dimensions of brand architecture which I have extensively described in my book and numerous articles. Several important aspects should be highlighted here.

51. First is the brand and sub-brands within a portfolio. From the perspective of a tween consumer, the dolls Cloe, Sasha, Jade and Yasmin can be defined as sub-brands of Bratz. This allows different girls to have different relationships with these dolls.   Some may like one doll in particular. Others may view one particular doll as a good "representation" of one or more of their friends or themselves.[72] Still others may view them as imaginary older sisters. That is, the intensity and meaning of the relationship between these dolls can be very different. This makes these dolls effective sub-brands that together build the Bratz brand in consumers' mind. The dolls create synergies that are helpful for the purposes of brand building.

52. Another level to understand the architecture of brands is to evaluate the themes.  A thematic approach to branding is particularly important when developing not just a doll but a fashion or lifestyle brand. MGA Entertainment went to great lengths to approach the Bratz brand from this perspective. A strong brand builds from creating themes around relevant episodes of life. MGA Entertainment used focus groups to "constantly tapping into their fan base for

---

[72] CNBC Report, *It's War*, http://youtube.com/watch?v=2xxbJejTbuI

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EXHIBIT __2__

PAGE __49__