# EXHIBIT 6

Page 2

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4

5  CARTER BRYANT, AN INDIVIDUAL,   )
                                   )
6              PLAINTIFF,          )
                                   )
7      VS.                         ) NO. CV 04-9049 SGL
                                   )
8  MATTEL, INC., A DELAWARE        )
   CORPORATION,                    )
9                                  )
              DEFENDANT.           )
10                                 )
   _____)
11                                 )
   AND CONSOLIDATED ACTION(S).     )
12 _____)

13

14            C O N F I D E N T I A L

15      (PURSUANT TO PROTECTIVE ORDER, THIS
           TRANSCRIPT HAS BEEN DESIGNATED
16    CONFIDENTIAL FOR ATTORNEYS' EYES ONLY)

17

18      DEPOSITION OF ELISE CLOONAN, TAKEN

19      ON BEHALF OF THE DEFENDANTS, AT

20      865 SOUTH FIGUEROA STREET, 10TH

21      FLOOR, LOS ANGELES, CALIFORNIA,

22      COMMENCING AT 10:11 A.M., FRIDAY,

23      DECEMBER 14, 2007, BEFORE RENEE A.

24      PACHECO, RPR, CSR 11564.

25

Exhibit 6, P. 84

```
 1    APPEARANCES OF COUNSEL:
 2
 3    FOR THE PLAINTIFF CARTER BRYANT:
 4        KEKER & VAN NEST, LLP
          BY:  MATTHEW M. WERDEGAR, ESQ.
 5        710 SANSOME STREET
          SAN FRANCISCO, CALIFORNIA  94111-1704
 6        (415) 391-5400
 7
 8    FOR THE DEFENDANT MATTEL, INC.
 9        QUINN EMANUEL URQUHART OLIVER & HEDGES
          BY:  MICHAEL T. ZELLER, ESQ.
10             BRIDGET HAULER, ESQ.
          865 SOUTH FIGUEROA STREET
11        10TH FLOOR
          LOS ANGELES, CALIFORNIA  90017-2543
12        (213) 443-3000
13
14    FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:
15        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
          BY:  KENNETH A. PLEVAN, ESQ.
16        FOUR TIMES SQUARE
          NEW YORK, NEW YORK  10036
17        (212) 735-3000
18
19    FOR THE DEPONENT:
20        KEATS, MCFARLAND & WILSON, LLP
          BY:  LARRY W. MCFARLAND, ESQ.
21             CHRISTIAN C. DOWELL, ESQ.
          9720 WILSHIRE BOULEVARD
22        PENTHOUSE SUITE
          BEVERLY HILLS, CALIFORNIA 90212
23        (310) 777-3750
          LMCFARLAND@KMWLAW.COM
24        CDOWELL@KMWLAW.COM
25
```

Exhibit 6 , P. 85

Page 4

```
 1    APPEARANCES (CONTINUED):

 2    ALSO PRESENT:

 3        STEVEN TOGAMI - VIDEOGRAPHER

 4        MICHAEL MOORE

 5        JILL THOMAS

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 6, P. 85

Page 313

1          AND, YOU KNOW, CASSIDY WAS -- CASSIDY WAS

2   ACTUALLY VERY GOOD TO ME ABOUT LEAVING.  SHE GAVE

3   ME TIME TO FINISH PROJECTS UP, GET MY PERSONAL LIFE

4   IN ORDER, AND MOVE ON.

5          BUT THE LAST THING SHE SAID TO ME ON THE

6   WAY OUT, SHE SAID, "IF YOU'RE GOING TO THAT COMPANY

7   IN NORTHRIDGE, YOU'RE OUT OF THE DOOR RIGHT NOW."

8       Q.    THIS IS DURING THE CONVERSATION YOU HAD

9   WITH HER ABOUT YOUR LEAVING?

10      A.    YES.

11      Q.    AND WHAT COMPANY IS IN NORTHRIDGE THAT

12  YOU UNDERSTOOD?

13      A.    OH, MGA IS IN NORTHRIDGE.

14      Q.    I THINK YOU MENTIONED ON DIRECT TESTIMONY

15  THAT MR. CARTER -- I'M SORRY -- MR. BRYANT, CARTER

16  BRYANT, WAS A DRESS DESIGNER?

17      A.    FASHION DESIGNER.

18      Q.    A FASHION DESIGNER.

19      A.    YES.

20      Q.    THANK YOU.

21          DID HE DO ANY SCULPTING WORK WHEN HE WAS

22  AT MATTEL, TO YOUR KNOWLEDGE?

23      MR. ZELLER:  THE QUESTION LACKS FOUNDATION.

24      THE DEPONENT:  I DON'T RECALL.

25  ///

Exhibit __6__, P. __87__

Page 314

1    BY MR. PLEVAN:

2        Q.    DID HE DO ANY FACE PAINTING?

3        A.    I DON'T KNOW.

4        Q.    JUST GIVE ME ONE SECOND.

5        A.    OKAY.

6        MR. PLEVAN:  I HAVE NO FURTHER QUESTIONS.

7

8                    EXAMINATION

9    BY MR. WERDEGAR:

10       Q.    HELLO, MS. CLOONAN.

11       A.    HELLO.

12       Q.    I'M MATT WERDEGAR.  WE MET EARLIER TODAY.

13   AND I'M ONE OF CARTER BRYANT'S ATTORNEYS IN THIS

14   LITIGATION.

15            I JUST HAVE A COUPLE MORE QUESTIONS FOR

16   YOU, AND THEN WE'LL -- WE'LL LET YOU GO.

17            JUST A MOMENT AGO MR. PLEVAN WAS ASKING

18   YOU ABOUT PEOPLE THAT YOU WERE AWARE OF AT MATTEL

19   BACK IN THE 2001 TIME FRAME, WHEN YOU FIRST LEARNED

20   ABOUT BRATZ, AND YOU -- YOU TESTIFIED THAT IT WAS

21   COMMON KNOWLEDGE IN THE DESIGN CENTER.

22            DO YOU RECALL THAT LINE OF QUESTIONING?

23       A.    YES.

24       Q.    AND YOU MENTIONED A COUPLE NAMES, AND

25   THEN THERE WAS SOME FOLLOW-UP QUESTIONING ABOUT A

Exhibit 6 , P. 98

Page 315

1    CASSIDY PARK.

2              I JUST WANTED TO MAKE SURE YOU HAD NAMED

3    ALL THE NAMES THAT YOU -- YOU REMEMBER NOW OF

4    PEOPLE THAT YOU RECALL SPEAKING TO ABOUT THE FACT

5    THAT CARTER BRYANT MAY HAVE BEEN INVOLVED IN THE

6    CREATION OF BRATZ BACK IN THAT TIME FRAME.

7         MR. ZELLER:  THE QUESTION IS VAGUE AS TO "BACK

8    IN THAT TIME FRAME."

9    BY MR. WERDEGAR:

10        Q.   AND, AGAIN, JUST TO BE CLEAR, THE TIME

11   FRAME I'M TALKING ABOUT IS BACK IN THE 2001 TIME

12   FRAME WHEN YOU TESTIFIED YOU FIRST -- FIRST BECAME

13   AWARE OF BRATZ.

14        A.   TOWARDS THE END OF 2001, I THINK IT WAS

15   COMMON KNOWLEDGE, THROUGHOUT THE DESIGN CENTER, OF

16   PEOPLE THAT KNEW CARTER.  I --

17              (PUBLIC ADDRESS SYSTEM INTERRUPTION.)

18        THE DEPONENT:  THAT'S OBNOXIOUS.

19              I MEAN, I REMEMBER HAVING CONVERSATIONS

20   ABOUT IT WITH ROXANNA POWELL, BILL GREENING, AND

21   JANET BLASER, BECAUSE I REMEMBER THEM CONSTANTLY

22   GOING "COME ON, COME ON, YOU KNOW, YOU KNEW HIM,

23   YOU HAD TO HAVE KNOWN SOMETHING."

24              BUT, YOU KNOW, LILY AND I -- LILY AND I

25   KNEW ABOUT -- LILY KNEW ABOUT -- I TALKED ABOUT

1    LILY WITH IT.  BILL MARTINEZ, WHO ALSO KNEW CARTER.

2    WHO ELSE?  MICHAEL HASTEY.  ROBERT BEST.  THAT'S

3    PRIMARILY THE PEOPLE THAT I KNEW AND CARTER KNEW.

4            CASSIDY, ANN DRISCOLL.  I REMEMBER

5    TALKING ABOUT JOE FRANKE WITH IT, TOO, BECAUSE HE

6    WAS MY MOTHER'S -- MY MOTHER HAD REPORTED TO HIM.

7    SO WE WOULD TALK EVERY SO OFTEN.

8            THAT'S ALL I CAN REALLY RECALL THE TOP OF

9    MY HEAD HAVING -- YOU KNOW, IN PASSING, THEM ASKING

10   ME JUST -- I GUESS JUST TRYING TO CONFIRM WITH ME

11   IF CARTER HAD REALLY DONE IT, DONE THE BRATZ.

12   BY MR. WERDEGAR:

13      Q.    SO GENERALLY THESE CONVERSATIONS PEOPLE

14   WERE APPROACHING YOU AND ASKING YOU --

15      A.    IS IT --

16      Q.    -- HEY, I'VE HEARD CARTER WAS INVOLVED IN

17   THIS, IS IT -- IS IT TRUE?

18      A.    YES.

19      Q.    WHAT DID YOU -- BEYOND THAT, DID YOU AND

20   LILY TALK AT ALL ABOUT BRATZ BACK IN THAT TIME

21   FRAME AGAIN, WHEN YOU -- WHEN YOU FIRST LEARNED

22   ABOUT BRATZ FROM THE WEBSITE IN 2001?

23      A.    WELL, WE KNEW SOMETHING -- SOMETHING WAS

24   UP, LIKE WE WEREN'T SURE EXACTLY WHAT WAS UP.

25   BECAUSE SOMEONE HAD TAKEN HER DRAWING DOWN IN HER

Exhibit  6 , P. 90

1    OFFICE.  BUT WE HADN'T RELATED THAT TO THE BRATZ.

2            BUT LATER WHEN THEY ASKED HER TO PULL OUT

3    THE TOON TEENS, WE WERE WONDERING IF SOMETHING

4    WAS -- SOMETHING WAS UP.

5            AND THEN ON MY LEAVING, WITH CASSIDY

6    SAYING THAT TO ME, IT KIND OF JUST CLINKED IT IN MY

7    HEAD THAT SOMETHING WAS GOING ON.

8        Q.    AND, AGAIN, THIS IS ALL IN -- CAN YOU PUT

9    A TIME WINDOW ON THE EVENTS YOU'RE JUST DESCRIBING

10   WITH RESPECT TO TOON TEENS?

11       A.    IT -- IT HAPPENED TOWARDS THE END OF

12   2001.  IT WAS -- BECAUSE BY THE TIME 2002 ROLLED

13   AROUND, I WAS KIND OF ON MY WAY OUT OF MATTEL,

14   MENTALLY, PHYSICALLY, AND EVERY WAY POSSIBLE.

15           SO THIS -- THIS STUFF -- I REALLY

16   REMEMBER THIS STUFF HAPPENED TOWARDS THE END --

17   TOWARDS THE END OF 2001.  AND JUST BEING SICK AND

18   TIRED OF HEARING IT, ALL OF IT.

19       Q.    THEN YOU MENTIONED THAT AT ONE POINT IN

20   TIME YOU HEARD FROM LILY THAT THEY HAD COME AND

21   ASKED -- ASKED -- ASKED HER TO PULL -- EXCUSE ME --

22   COME AND ASKED HER TO PULL TOON TEENS BACK.

23           WHO IS THE "THEY" YOU'RE REFERRING TO?

24   MR. ZELLER:  I OBJECT TO THE PREDICATE,

25   MISCHARACTERIZES THE WITNESS 'S TESTIMONY.

Exhibit __6__, P. _91_

# EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT

 2            CEDNTRAL DISTRICT OF CALIFORNIA

 3               EASTERN DIVISION

 4

 5     ---------------------------)

 6     CARTER BRYANT,          )

 7            Plaintiff,   ) No.

 8            vs.         ) CV 04-9049SGL(rnbX)

 9     MATTEL, INC., a Delaware    )

10     corporation,          )

11            Defendant.   )

12     ---------------------------)

13     Consolidated with MATTEL, INC. )

14     v. BRYANT and MGA         )

15     ENTERTAINMENT, INC. V. MATTEL, )

16     INC.             )

17     ---------------------------)

18

19        Deposition of WITNAME, at 300 S. Grand

20     Avenue, Suite 3200, Los Angeles, California 90071,

21     commencing at time A.M., Monday, January 28, 2008,

22     before Judith Schlussel, CSR No. 4307.

23

24

25
```

                                1

Exhibit _7_ , P. _92_ )

1    APPEARANCES OF COUNSEL:

2

3        FOR THE PLAINTIFF:

4

5            FIRM

6            BY: ^, ESQ.

7            Address

8            ^

9            City, California zip

10           telephone

11

12           FOR THE DEFENDANT ^:

13

14           FIRM

15           BY: ^, ESQ.

16           Address

17           ^

18           City, California zip

19           telephone

20

21

22

23

24

25

2

Exhibit __7__, P. _93_

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3    FOR THE COUNTER-DEFENDANTS MGA

4    ENTERTAINMENT, INC., ISAAC LARIAN, MGA

5    ENTERTAINMENT (HK) LIMITED, AND MGAE de

6    MEXICO S.R.L. de C.V:

7

8      SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

9      BY: MARCUS R. MUMFORD, ESQ.

10      300 South Grand Avenue

11      Los Angeles, California 90071-3144

12      213 687-5000

13      mmumford@skadden.com

14

15    ALSO PRESENT:

16

17      ^

18

19

20

21

22

23

24

25          09:22:45

3

Exhibit _7_, P. _94_

1      A.  Incident person would be any person

2    connected to the incident, in this case, it's an

3    allegation.

4      Q.  What does the incident report say under

5    incident person details one of three?          01:51:05

6      A.  Larian, Isaac.

7      Q.  And what does it say after that?

8      A.  It says suspect.

9      Q.  It says person type, suspect, correct?

10     A.  Correct.                  01:51:21

11     Q.  So as of March 15th, 2002, Isaac Larian was

12   a suspect that you were investigating.  Isn't that

13   correct?

14        MR. GORDON:  Objection; misstates the

15   witness' testimony.                  01:51:32

16        THE WITNESS:  I was investigating the

17   allegation as indicated in the narrative that they

18   identified a person named Larian -- excuse me, named

19   Isaac and subsequently was determined to be Isaac

20   Larian.  So the investigation initially was of the     01:51:45

21   allegation.

22     Q.  BY MR. MUMFORD:  Okay.  So the

23   investigation was of the allegation as set forth in

24   the incident narrative?

25     A.  Yes.                      01:51:58

                          126

                 Exhibit _7_, P. _95_

1      Q.  And the suspect was Isaac Larian?

2      A.  He was, in this incident report, was listed

3   as the suspect.

4      Q.  So he was the suspect that Mattel was

5   investigating as of March 15th, 2002?            01:52:14

6          MR. GORDON:  Objection; misstates the

7   witness' testimony.

8          THE WITNESS:  I said he was listed as a

9   suspect, sir.

10     Q.  BY MR. MUMFORD:  He was the suspect that    01:52:37

11  Mattel was investigating in March of 2002, correct?

12     A.  He was listed as a suspect according to the

13   · allegation made by these two people to me.  Yes.

14     Q.  And Mattel had opened up a file and was

15  investigating him, correct?                      01:52:54

16     A.  That's correct, yes.

17     Q.  Do you see under the -- do you see further

18  down the page, under Isaac Larian the details, his

19  home address?

20     A.  Yes.                          01:53:09

21     Q.  His employment details?

22     A.  Yes.

23     Q.  Who obtained those?

24     A.  I don't have an independent recollection,

25  but it appears that if they're on this face sheet, I   01:53:22

127

Exhibit _2_, P. _96_

1    would have done that because I would have completed

2    the whole face sheet.

3        Q.  How would you have obtained those?

4        A.  Database inquiries and background on the

5    allegation.                    01:53:38

6        Q.  So you would have been investigating Isaac

7    Larian, correct?

8        A.  No.  I would still be investigating the

9    allegation.  At that point in time, sir, I would

10   have not known if the allegation was credible or not   01:53:54

11   credible.  It appears on this incident report

12   document I was given the name Isaac with no last

13   name, but a name of a company, so by finding a

14   person by the name Isaac at that company would add

15   some credence to the statement.        01:54:13

16       Q.  So MGA was the suspect as of March 15th,

17   2002?

18       A.  Well, the allegation was MGA Entertainment

19   headed by a person known as Isaac.

20       Q.  So they both were suspects?        01:54:33

21       A.  Yes.

22       Q.  And you obtained Isaac Larian's home

23   address and his employment details from just doing a

24   search?

25       A.  Yes.                    01:54:50

128

Exhibit __7__, P. __97__

# EXHIBIT 8

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4

5    --------------------------------

6    MATTEL, INC., a Delaware        )

7    Corporation,                    )

8              Plaintiff,            )

9         vs.                        ) No. CV 04-9059 NM

10   CARTER BRYANT, an individual;   )     (RNBx)

11   and DOES 1 through 10,          ) VOLUME I

12   Inclusive,                      )

13             Defendants.           )

14   --------------------------------)

15   (COMPLETE CAPTION ON NEXT PAGE.)

16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19      Videotaped deposition of RICHARD N. DE ANDA,

20      taken at 300 South Grand Street, Los Angeles,

21      California, commencing at 9:17 A.M.,

22      Wednesday, December 19, 2007, before

23      Wendy S. Schreiber, CSR No. 3558, RPR, CLR.

24

25   PAGES 1 - 332

Exhibit _l_, P. _92_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                    EASTERN DIVISION
 4
 5    -----------------------------------
 6    MATTEL, INC., a Delaware        )
 7    Corporation,                    )
 8              Plaintiff,            )
 9              vs.                   )  No. CV 04-9059 NM
10    CARTER BRYANT, an individual;   )      (RNBx)
11    and DOES 1 through 10,          )
12    Inclusive,                      )
13              Defendants.           )
14    ----------------------------- )
15    CARTER BRYANT, on behalf of     )
16    himself, all present and        )
17    former employees of Mattel,     )
18    Inc., and the general public,   )
19              Counter-Claimants,    )
20              vs.                   )
21    MATTEL, INC., a Delaware        )
22    Corporation,                    )
23              Counter-Defendant.    )
24    -----------------------------------
25
```

Exhibit _8_ , P. _99_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
1    APPEARANCES OF COUNSEL:

2

3        FOR THE PLAINTIFF:

4

5        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

6        BY:   JON COREY, ESQ.

7        865 South Figueroa Street, Tenth Floor

8        Los Angeles, California 90017

9        (213) 443-3000

10       joncorey@quinnemanuel.com

11

12                    -AND-

13

14       MATTEL, INC.

15       BY:   JILL THOMAS, ESQ.

16       333 Continental Boulevard

17       El Segundo, California 90245-5012

18       (310) 252-2000

19       jill.thomas@mattel.com

20

21

22

23

24

25
```

Exhibit _8_, P. _100_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 27

1    is B-r -- B-r-a-u -- B-r-a-u I think it was.

2        Q.    At any time were you ever licensed as a

3    private investigator?

4        A.    Yes.

5        Q.    And when did you first obtain your license    09:56AM

6    as a private investigator?

7        A.    I want to say the seventies but I can't

8    recall it's been so long.  I don't -- I don't recall

9    the -- the -- the year even but it's been some time.

10       Q.    But you were licensed by the State of    09:57AM

11   California; is that correct?

12       A.    Yes.

13       Q.    And are you still licensed as a private

14   investigator in the State of California?

15       A.    Yes.    09:57AM

16       Q.    Under the name of Richard N. De Anda &

17   Associates?

18       A.    Yes.

19       Q.    Is -- what's the status of Richard De Anda &

20   Associates today?  Does it still exist?    09:57AM

21       A.    Yes.

22       Q.    Does it have any employees?

23       A.    No, it does not.

24       Q.    What -- what is the purpose of Richard N. De

25   Anda & Associates?  In other words, what type of    09:57AM

Exhibit  8 , P. 101

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 28

1    business does it do?

2        A.    Today?

3        Q.    Today.

4        A.    Very little, if any, however I have a

5    long-term client that I've had since the seventies    09:57AM

6    on retainer and basically I still receive a retainer

7    from this client and I do occasional expert witness

8    testimony and that's about the -- that's about the

9    extent of it.

10       Q.    And what's the name of this client that is a 09:58AM

11   long-term client that has you under retainer?

12       A.    The Jacmar Company.

13       Q.    And what type of business is the Jacmar

14   Company engaged in?

15       A.    Food services.                                09:58AM

16       Q.    And generally can you tell us what type of

17   services you render for Jacmar Company?

18            MR. COREY:  I'm sorry, is it Jacmar or

19   Jacbar?

20            THE WITNESS:  Mar, M-a-r.  J-a-c-m-a-r.  I     09:58AM

21   provide services of basically when they have an

22   issue and/or with regards to a theft or a loss or an

23   employee issue, I will give them some counsel,

24   provide them some counsel on the best approach and

25   which way to manage it.  Also proactively I -- I      09:59AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 29

1    will assist them or give them direction on ways to

2    prevent issues from occurring.

3    BY MR. NOLAN:

4        Q.    And in that latter part which I'm interested

5    in is that more or less like doing a security audit    09:59AM

6    for them?

7            MR. COREY:  Mischaracterizes the testimony.

8            THE WITNESS:  I don't -- from my

9    understanding of a security audit I would say that I

10   haven't done one for them in years.                     09:59AM

11   BY MR. NOLAN:

12       Q.    How many years?

13       A.    From when I first started so probably

14   decades.

15       Q.    So they've been a client of yours for how    09:59AM

16   many years?

17       A.    Probably 30 years.

18       Q.    Now, you started working for Mattel in the

19   year 1997, November of 1997, correct?

20       A.    That's correct.                               10:00AM

21       Q.    Okay.  So from November 1997 through today,

22   Richard N. De Anda & Associates has remained in

23   business, correct?

24       A.    Yes.

25       Q.    And during that period of time, November of  10:00AM

Exhibit  P , P. 103

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 30

1   1997 through today, has Richard N. De Anda &

2   Associates provided services to any client other

3   than Jacmar?

4           MR. COREY:  Can I?  What was the first date?

5           MR. NOLAN:  November of 1997.                10:00AM

6       Q.   What I'm trying to do just in case the

7   record is not clear but more importantly to make

8   certain you and I are on the same page all I'm

9   talking about is from the time you started working

10  at Mattel for this purposes of this question through 10:00AM

11  today.  What other clients have you done work for

12  through Richard N. De Anda & Associates?

13      A.   I'm trying to think back.  Since -- during

14  this period of time I would have provided services

15  for law firms, two that I can think of --            10:01AM

16      Q.   I'll stop you midway if I could but if you

17  need to go further -- but what are the names of

18  those two law firms?

19      A.   John Coleman & Associates and Morrow,

20  Bernsapian.  It's a last name with about 25 letters  10:01AM

21  in it out of Glendale, and I may have provided

22  services for others that I just can't think of right

23  now.

24      Q.   But there were other clients other than Jac

25  Mar and these two law firms that you provided        10:01AM

Exhibit  8 , P. 104

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 31

1    services through Richard N. De Anda & Associates for

2    the period November 1997 through today, correct?

3        A.    There may have been a couple of others.   I

4    just can't recall their names now.

5        Q.    What -- what was the nature of the work that    10:02AM

6    you provided to the two law firms that you've

7    identified?

8        A.    Expert witness and investigative services.

9        Q.    By the way, for the work that you did

10   through Richard De Anda & Associates for any of the    10:02AM

11   clients during the period of November 1997 through

12   today were you paid for those services?

13       A.    Yes.

14       Q.    And how do you -- and who received the

15   payment?  Richard N. De Anda & Associates, the    10:02AM

16   entity?

17       A.    Yes.

18       Q.    Rather than you individually?

19       A.    Yes.

20       Q.    Is Richard De Anda & Associates a    10:02AM

21   corporation or is it a dba?

22       A.    It's a corporation.

23       Q.    And do you recall, approximately, best

24   estimate, when you first set up that corporation?

25       A.    Many years ago.  I don't recall to be very    10:03AM

Exhibit  8 , P. 105

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 86

1    you were an inventor of an item that had been

2    patented; is that correct?

3            MR. COREY:  Objection: speculation.

4            THE WITNESS:  It's possible either way that

5    I may have or may have not.  Once again, this was      11:24AM

6    not a significant event in my life.  It was just a

7    device that I was interested at that time in

8    creating and since has just -- I have no interest in

9    it or lost interest in it.  But I have discussed it

10   with others over the years but I -- today I could     11:25AM

11   sit here and tell you I don't even know who those

12   others are.  I know of a few people I've talked

13   about it to but there's many others I just can't

14   recall.

15   BY MR. NOLAN:                                          11:25AM

16      Q.   But you have no recollection of filling out

17   a form at Mattel and formally disclosing to them

18   that you were the holder of a U.S. patent of an

19   invention, correct?

20           MR. COREY:  Objection: assumes facts.         11:25AM

21           THE WITNESS:  That is correct.

22   BY MR. NOLAN:

23      Q.   Now, I also -- we talked about this.  I just

24   want to close the loop on something.  You know,

25   during this ten-year period of time that you've been  11:25AM

Exhibit  8 , P. 106

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

1    working at Mattel as first Director of Security and

2    then Vice President and Director of Global Security

3    for Mattel, when Richard N. De Anda & Associates

4    receive compensation for services rendered to its

5    clients, do you pay that money over to Mattel?        11:26AM

6        A.   No, I do not.

7        Q.   You keep that for yourself?

8        A.   Absolutely.

9        Q.   You're absolutely certain about that?

10       A.   Well, my wife gets -- but, absolutely, I'm   11:26AM

11   certain I keep it for myself and my family.

12       Q.   Do you report that income to Mattel on a

13   yearly basis?

14       A.   No, I do not.

15            MR. NOLAN:  We'll take a break, Wendy, in    11:26AM

16   five minutes, okay?  We're going to run out of tape

17   time in five minutes so if everybody can hold tight

18   for five minutes.

19       Q.   When you get calls from Jacmar to do work

20   for him through Richard N. De Anda services, do you   11:26AM

21   disclose that to Mattel?

22       A.   No, I do not.

23       Q.   When you do work for law firms through

24   Richard N. De Anda & Associates, do you report that

25   to Mattel?                                            11:27AM

Exhibit _8_ , P. _107_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88

1          MR. COREY:  Objection:  vague.  The fact of

2     the work or the income received?

3          MR. NOLAN:  Let me first do the fact of the

4     engagement.

5          MR. COREY:  Because you've been talking          11:27AM

6     about both.  I just want to make sure it's clear.

7          THE WITNESS:  Occasionally -- to answer as

8     accurate as possible -- I have had conversations

9     with Alan Kaye, my direct report who I report to,

10    about maybe a case that I was involved in or are       11:27AM

11    currently involved in, but that would be

12    occasionally.

13    BY MR. NOLAN:

14       Q.  Do you report to Alan Kaye or anybody the

15    amount of money that you receive in exchange for       11:28AM

16    offering expert services to law firms?

17       A.  Nancy De Anda, my wife.

18       Q.  Does she work at Mattel?

19       A.  No.

20       Q.  So the answer to my question is, no, you do     11:28AM

21    not disclose to anybody at Mattel the amount of

22    money that you are paid in compensation for serving

23    as an expert witness in cases for law firms,

24    correct?

25       A.  To this question, yes.                          11:28AM

Exhibit _Q_, P. _108_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 89

```
 1      Q.   Now, in particular there was a case

 2  involving a shooting in a nightclub -- I think it

 3  was somewhere around the year 2000 -- where you

 4  testified as an expert witness.  Do you recall that

 5  case?  It's called Valentine versus Nayarit          11:28AM

 6  Restaurant and Nightclub.

 7      A.   Was -- if I may?

 8      Q.   Of course.

 9      A.   Was this case in Sacramento?

10      Q.   No, I believe it was in Los Angeles County   11:29AM

11  Superior Court, sir, in November of 2000.

12      A.   Yes.

13      Q.   You remember that?

14      A.   I vaguely remember the case.

15      Q.   Was your deposition taken in that case?      11:29AM

16      A.   I don't recall.  To be very honest with you

17  I don't recall.

18      Q.   But you did meet with attorneys in

19  preparation for serving as an expert witness in that

20  case, correct?                                        11:29AM

21      A.   I may have.  Do you know the name of the

22  attorney and I can help you?

23      Q.   I can -- I'll get you the name in just a

24  minute.  What I wanted to ask you though, sir, is do

25  you recall meeting with the attorneys during work     11:29AM
```

Exhibit _8_, P. _109_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1    hours during the week?

2        A.   It depends on the attorney.  Once I

3    understand the attorney, who it is, I can tell you

4    exactly or I can tell you --

5        Q.   Matthew Biren, B-i-r-e-n, and Marc Katzman    11:30AM

6    of Bel Air.

7        A.   Right.  I do recall.  It was in the evening

8    hours on my way from Mattel to home.

9        Q.   And you got paid for those meetings,

10   correct?                                            11:30AM

11       A.   Yes.

12       Q.   By the way, when you reviewed with your

13   attorneys in preparation for this deposition, did

14   you review the patent application?

15       A.   Did not.                                   11:30AM

16       Q.   Did you review any of the expert reports

17   that you prepared for these law firms where you

18   served as an expert witness while you've been the

19   Vice President and Global Director of Security at

20   Mattel?                                             11:30AM

21       A.   Did not.

22           MR. NOLAN:  Thanks.  Why don't we take our

23   break now.

24           VIDEO OPERATOR:  Thank you.  11:30 we're off

25   the record.                                         11:30AM

Exhibit _8_, P. _100_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 97

1           MR. NOLAN:  Yeah.  No, no, thank you for

2    clarifying that.  We'll limit it to first, you know,

3    in connection with the lawsuit.  Let's put it that

4    way.

5        Q.    In connection with the lawsuit when you        12:40PM

6    appeared or consulted as an expert witness have you

7    been paid for those services?

8        A.    Every time that I consulted as an expert did

9    I receive compensation for it?  And I would say --

10   once again, you have to understand the question and    12:40PM

11   the question is when I was engaged as the expert --

12   expert for the case or when I was approached to be

13   and reviewed the case?

14       Q.    Both.

15       A.    Okay.  Then the answer is, no, I was not      12:40PM

16   compensated every time.

17       Q.    On how many occasions did you consult but

18   did not get paid?

19       A.    A handful possibly.

20       Q.    And why didn't you get paid for those         12:40PM

21   consultations, if you know?

22       A.    Either because I declined to serve as their

23   expert because I felt either the case had very

24   little merit or it was a situation that I did not

25   want to become involved in or the law office failed   12:41PM

Exhibit _8_, p. _111_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1    to fund my nonrefundable retainer.

2        Q.   Let's talk about the financial arrangements.

3    First of all, do you charge by the hour?

4        A.   Yes.

5        Q.   And how much is your hourly fee to appear as   12:41PM

6    a consulting expert?

7        A.   $250 an hour, four-hour minimum for

8    testimony and depositions.

9        Q.   And so do you charge a nonrefundable

10   retainer of $1,000?                                       12:41PM

11       A.   $2,000.

12       Q.   And on how many occasions in the past ten

13   years have you been paid a nonrefundable retainer of

14   $10,000 -- I'm sorry, $2,000?

15       A.   To be fair to the question, the            12:42PM

16   nonrefundable retainer has changed over the years

17   the amount.  So to answer your question --

18       Q.   I appreciate -- you know what?  I

19   appreciate -- let me -- let me, if I might, rephrase

20   based on that.                                            12:42PM

21           How many times in the last ten years,

22   between November of 2000 -- I'm sorry, between

23   November of 1997 and today's date -- all right?

24   -- that you've been paid a nonrefundable retainer no

25   matter what the amount is in exchange for consulting  12:42PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 99

1   services that you've offered to law firms?

2       A.   I would say that probably six'ish is

3   probably a good number.   Give or take one or two I

4   would say that's probably accurate.

5       Q.   And recognizing the margin of error there,   12:43PM

6   that this is your best estimate, on how many

7   occasions did you have to give a deposition?

8       A.   I would say probably four or five.

9   Probably.

10      Q.   Again, this is over the ten-year period of   12:43PM

11  time -- approximate ten-year period of time?   We're

12  talking about November 1997 through today's date?

13      A.    That's correct.   And, once again, it's hard

14  for me to -- what I'm trying to do in my mind is

15  kind of figure out what cases -- what law firm so   12:44PM

16  I'm being as accurate as I possibly can.

17      Q.   Of course.   And I recognize that.   Now --

18          MR. COREY:   And these are the depositions

19  for which he's being paid or which he's acting as an

20  expert.                                              12:44PM

21  BY MR. NOLAN:

22      Q.   Are there -- in addition to these matters

23  that you've just identified, there are other

24  occasions where you've been approached and consulted

25  and either did not get paid or give a deposition; is   12:44PM

Exhibit _2_, P. _113_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 100

1    that correct?

2        A.   Yes.

3        Q.   Do you keep a calendar for Richard N.

4    De Anda & Associates?

5        A.   No, I do not.                          12:44PM

6        Q.   Where do you maintain the files and records

7    for Richard De Anda & Associates?

8        A.   In a file cabinet that I have in my home but

9    it really consists of very little to nothing.

10       Q.   Do you keep any records or calendars with   12:45PM

11   respect to the consulting services that you offer in

12   your offices at Mattel?

13       A.   No.

14       Q.   Have you ever taken a phone call at Mattel

15   concerning any of these matters that you offer      12:45PM

16   yourself out as a consultant on?

17           MR. COREY:  Objection:  vague and ambiguous.

18           THE WITNESS:  I may have taken a phone call,

19   yes.

20   BY MR. NOLAN:                                       12:45PM

21       Q.   Do you recall whether or not any law firms

22   or clients have ever sent to you material either by

23   E-mail or facsimile at Mattel in connection with any

24   of these matters that you work on through Richard

25   De Anda & Associates?                               12:46PM

Exhibit __8__, P. __114__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 101

```
1      A.    I don't recall if that has happened.

2      Q.    It's possible, though?

3      A.    It's possible.

4      Q.    Do you have a separate E-mail address?

5      A.    Yes.                                        12:46PM

6      Q.    And what's that E-mail address?

7      A.    It's -- let's see, it's changed again

8   because of the services.  It's Richard -- excuse me,

9   I'm sorry, it's RichDeAnda@roadrunner.com.

10     Q.    And is that the same E-mail address you've   12:46PM

11  had during the entire time that you've been

12  providing services for Richard N. De Anda &

13  Associates while employed at Mattel?

14     A.    No, it's not.

15     Q.    How many different E-mail addresses have you 12:46PM

16  had?

17     A.    I'm not certain.  It could be four depending

18  on the service.  The services have changed.

19     Q.    Of course.

20     A.    And --                                       12:46PM

21     Q.    Every time it changes you unfortunately have

22  to get a new address.

23     A.    Exactly.

24     Q.    But it is possible that during this period

25  of time, November 1997 through today's date, while   12:46PM
```

Exhibit 7, P. 115

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

1    doing work for clients under the -- under the name

2    of Richard De Anda & Associates it's possible you

3    took phone calls while at Mattel, correct?

4         MR. COREY:  Objection:  speculation.

5         THE WITNESS:  I could have.  I do recall     12:47PM

6    speaking to -- I have relationships beyond the

7    business relationships with clients and I do

8    sometimes receive phone calls, yes.

9    BY MR. NOLAN:

10       Q.  And in those conversations you would have     12:47PM

11   talked about business as well, correct?

12        MR. COREY:  Objection.

13        THE WITNESS:  Could have.

14        MR. COREY:  Assumes facts not in evidence

15   and speculation.                                    12:47PM

16   BY MR. NOLAN:

17       Q.  It's also possible that you received either

18   by E-mail or -- well, let's not make this compound.

19            It's possible that you received E-mail

20   correspondence from these clients while at Mattel,   12:47PM

21   correct?

22        MR. COREY:  Same objections.

23        THE WITNESS:  Excuse me, very unlikely but I

24   may have because I don't provide my E-mail

25   address -- Mattel E-mail address out to private     12:48PM

Exhibit _ℓ_, P. _116_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 103

1    clients.  However, there are -- I do have friendship

2    relationships with my clients that I believe may

3    have my E-mail and it may have -- to be as accurate

4    as possible, there could have been E-mails back and

5    forth.                                          12:48PM

6    BY MR. NOLAN:

7        Q.   Is there a way that you could check your

8    E-mails to determine whether or not over the past

9    ten years -- approximate ten years that you've

10   received E-mails at Mattel -- at your Mattel address  12:48PM

11   in connection with your side line business of

12   Richard N. De Anda & Associates?

13       MR. COREY:  Objection:  mischaracterizes the

14   testimony and calls for speculation.

15       THE WITNESS:  That would be very difficult.  12:48PM

16   I don't believe the retention of ten years' worth of

17   E-mails would -- is -- is anywhere to be found.

18   BY MR. NOLAN:

19       Q.   And it's possible that in addition to

20   possibly having E-mail exchanges back and forth on   12:49PM

21   your Mattel address that you would have received

22   mail sent to you or delivered to you at your Mattel

23   offices in connection with some of these clients?

24       MR. COREY:  Assumes facts, calls for

25   speculation.                                    12:49PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 104

1          THE WITNESS:  I say I have no independent

2    recollection but my feeling is I could have.

3    BY MR. NOLAN:

4        Q.   And is it also possible that you could have

5    received facsimiles sent to you -- do you have a fax   12:49PM

6    machine at Mattel or access to one?

7        A.   Yes.

8        Q.   And have you -- is it possible that similar

9    to mail deliveries or E-mails that you could have

10   received facsimile messages back and forth with        12:49PM

11   these clients?

12         MR. COREY:  Objection:  speculation, assumes

13   facts.

14         THE WITNESS:  I don't recall a facsimile.

15   BY MR. NOLAN:                                           12:50PM

16       Q.   Is it possible?

17       A.   Anything is possible but I do not recall

18   that happening.

19       Q.   Well, in some of these cases you had to

20   prepare an expert report, correct?                     12:50PM

21       A.   Yes.

22       Q.   And did you -- where did you prepare these

23   expert reports?

24       A.   At my home office.

25       Q.   Using which computer?                          12:50PM

Exhibit 8 , P. 118

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 139

1      Q.   Anything in that section that tells you not

2   to copy anybody's property?

3      A.   No, it does not.

4      Q.   While we're on that, can I ask you a

5   different type of question --                        01:54PM

6      A.   Sure.

7      Q.   -- now that we're talking about secondary

8   employment?  I see here that secondary employment is

9   not prohibited, it's only discouraged by Mattel; is

10  that correct?                                         01:54PM

11     A.   I don't know that I've read the word

12  "discouraged."

13     Q.   Okay.  Did I read that incorrectly?

14     A.   I'm looking for the word "discouraged."

15     Q.   Oh.  It says "The nature of the Company's    01:55PM

16  business requires the complete commitment of

17  full-time employees.  Accordingly, outside jobs are

18  discouraged."

19          Do you see that?  Did I read that right?

20     A.   Why am I missing that?                        01:55PM

21     Q.   Second line.

22     A.   Oh, I passed it, that's why.  I was looking

23  down further.  Yes.  Yes, I do.  That's correct.

24     Q.   So would you describe Richard N. De Anda &

25  Associates as secondary employment?                   01:55PM

Exhibit  8 , P. 119

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 140

1    A.   Yes, I would.

2    Q.   So that employment is discouraged by your

3 employer, correct?

4    A.   According to this, yes.

5    Q.   So let's go on.  It says "Employees must       01:55PM

6 discuss the appropriateness of any secondary job

7 with their supervisors and obtain approval in

8 writing before accepting such outside employment."

9         Do you see that?

10   A.   Yes, I do.                                       01:56PM

11   Q.   Did I read that correctly?

12   A.   Yes, you did.

13   Q.   Do you have anything in writing from Mattel

14 authorizing you to provide consulting services with

15 respect to security issues or appearing as an expert  01:56PM

16 witness?  Do you have anything in writing from

17 Mattel allowing you to do that?

18   A.   No, I don't believe I do.

19   Q.   Okay.  And then -- okay, so the next section

20 that you wanted to look at, sir -- oh, you wanted to  01:56PM

21 add "Re-Employment."  It's on the same page.  This

22 is one that you had the thumb on but I didn't want

23 to cut you off.

24   A.   Oh, that's right.

25   Q.   But take a look at it.  See if there's         01:56PM

Exhibit _8_, P.126

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 141

1    anything there that illuminates us on this issue.

2        A.   I've read it.

3        Q.   Is there anything that would prohibit -- I'm

4    sorry.  Is there anything in there that would

5    indicate to an employee of Mattel that they're not      01:57PM

6    allowed to copy competitors' products?

7        A.   No.

8        Q.   So I think the next one -- and if I'm wrong,

9    Jon, correct me -- but I think the next one was on

10   the next page for Mr. De Anda under "Standards of       01:57PM

11   Conduct" at page 23.

12           MR. COREY:  That's what I have.

13           MR. NOLAN:  Is that what you have?

14       Q.   So let's look at page 23, the "Standards of

15   Conduct," and I'd ask you to review those standards     01:57PM

16   of conduct and tell me where you would find a

17   directive to employees of Mattel that they should

18   not copy competitors' products for use in Mattel's

19   business.

20       A.   No.                                            02:01PM

21       Q.   It's not there either, right?

22       A.   No, it's not.

23       Q.   I just wanted to see if there were any other

24   sections in this booklet that you wanted to look at.

25           MR. COREY:  Yeah, there was one more.  It       02:01PM

Exhibit 8, P. 121

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 152

1    conclusion.

2         THE WITNESS:  As I sit here today, I do not

3    have a recollection -- not that I did not hear it --

4    I don't recall ever hearing that.  That doesn't mean

5    that I may or may not have.  As we sit here today,    02:15PM

6    ten years is a long time.

7    BY MR. NOLAN:

8         Q.   Of course.

9              MR. COREY:  Had you finished your answer?

10             THE WITNESS:  That's fine.                  02:16PM

11   BY MR. NOLAN:

12        Q.   It's your deposition.  I don't mean to cut

13   you off.

14        A.   I understand that.  Once again, I -- I as I

15   sit here today am only telling you the truth and to   02:16PM

16   the best of my ability and I do not have memory of

17   someone approaching me and telling me that someone

18   in Mattel has been copying a competitor's product.

19        Q.   Going back to the expert reports that you've

20   prepared under Richard N. De Anda & Associates,       02:16PM

21   Inc., in those instances where you've prepared

22   expert reports those expert reports would have

23   included a provision that talked about what your

24   background is in the field of security, correct?

25             MR. COREY:  Objection:  vague and compound. 02:16PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 153

1    BY MR. NOLAN:

2        Q.   Let me put it this way.  Do you include in

3    your reports an area where you set forth the

4    qualifications that you believe make you qualified

5    to appear and testify as an expert?               02:17PM

6        A.   Yes, I do.

7        Q.   And in that section of qualifications you

8    list your employment at Mattel, don't you?

9        A.   I don't know if I refer to my curriculum

10   vitae or I refer to Mattel.                        02:17PM

11       Q.   But your curriculum vitae includes a

12   reference to your employment at Mattel, yes?

13       A.   Yes, it does.  And that's why I'm saying I'm

14   uncertain -- to answer your question as accurately

15   as possible, you're asking me if I include that in  02:17PM

16   my description that makes me an expert witness.  I

17   don't know that I identify Mattel but I know that my

18   curriculum vitae does have Mattel in it and I don't

19   know if I refer or have referred to my curriculum

20   vitae.  I may have.  I'm not certain.               02:18PM

21       Q.   As you sit here, do you recall ever being

22   asked to appear as a witness and a lawyer not asking

23   you, by the way, how are you qualified, Richard, to

24   be an expert?

25       A.   Asking me -- not asking me how I'm not       02:18PM

Exhibit _7_, P. 123

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 157

1    LAPD on my own and sold that house, I would not

2    necessarily classify that as moonlighting.  So

3    that's the distinction I want to make.

4        Q.   I understand.

5        A.   So I would say --                          02:22PM

6        Q.   So let me follow up on something if I might.

7    Were you finished?  Okay, go ahead, finish your

8    question -- your answer.

9        A.   So I would say the same issues apply as

10   moonlighting.  Basically I would classify what I am   02:22PM

11   doing on my second job as moonlighting.  If I -- my

12   other avenues of income I would not necessarily look

13   at it as investments or what have you as

14   moonlighting.

15       Q.   Right, but the work that you do as an expert 02:23PM

16   witness and also providing consulting services

17   through Richard N. De Anda & Associates, Inc., you

18   would agree with me is moonlighting, correct?

19       A.   In my opinion I would say yes.

20       Q.   Does your department investigate accusations 02:23PM

21   that Mattel employees are moonlighting?

22       A.   We could have.  We could have but I'm not

23   certain.  I can't recall a set of circumstances -- I

24   would say that's a very strong possibility that we

25   have over the years.                                 02:24PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 158

1    Q.    All right, hold that thought for just a

2    minute.  Let me ask you a different question.

3           I'm talking about you.  You're an at will

4    employee, yes?

5    A.    Yes.                                02:24PM

6    Q.    And what are your hours of employment?

7    A.    That's a very interesting question.

8           MR. COREY:  According to the handbook or

9    practically worked?

10          MR. NOLAN:  I'm just asking him -- I thought 02:25PM

11   you were going to tell me that's a good question.

12   That would have been three.  That would have been

13   three today but --

14          MR. COREY:  I think that would have been

15   four.                                     02:25PM

16   BY MR. NOLAN:

17   Q.    Here's the question.  Let me be really clear

18   about this and I apologize.  I'm not trying to make

19   light of any of this --

20   A.    No, I understand.  I'm not either     02:25PM

21   Q.    -- nor be disrespectful to you.

22          Tell me what your hours of employment are at

23   Mattel.

24          MR. COREY:  Objection:  vague.

25          THE WITNESS:  It's not -- it's not a very  02:25PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 159

1    simple question to answer and I'll explain why.

2    BY MR. NOLAN:

3        Q.    Sure.

4        A.    Because at Mattel as a Vice President with

5    the approval of my supervisor and my workload I          02:25PM

6    have, first of all, granted no vacation time,

7    however, I can have as much vacation time as I want.

8        Q.    That's a good thing, right?

9        A.    No, it's a terrible thing.

10       Q.    You seemed anxious about that because I         02:26PM

11   could eliminate -- go ahead.

12       A.    I'm just trying to give you the best answer

13   I can.  There is no -- there is no scheduled hours

14   per se.  I choose to work 8:00 to 5:00 sometimes.

15   Sometimes I work 4:00 in the morning to 12:00 at         02:26PM

16   night.  Sometimes I come in at 10:00 depending and

17   will work until 4:00 or 3:00 or 2:00 depending.

18   There is -- what I try to do is to be consistent I

19   should say between 8:00 and 5:00.  That is never so.

20   It is usually -- my time is usually 7:00 to about        02:26PM

21   7:00, my time.

22       Q.    Okay.  So let's just take your consistent

23   pattern when you try to stay consistent and it's

24   from 7:00 in the morning until 7:00 --

25       A.    6:00 or 7:00 at night, yes, or even later.     02:27PM

Exhibit  8 , P. 126

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 160

1      Q.   So during that time that's Mattel time?

2           MR. COREY:  Objection:  mischaracterizes the

3   testimony.

4           THE WITNESS:  During that time is usually

5   time that I am at Mattel.  I do take home -- excuse     02:27PM

6   me, I do take work home with me and I typically will

7   work on the weekends on certain projects or tasks

8   that I need to complete so -- and when I travel,

9   which I do more than I care to, I work basically

10   24/7 and the same at home because it's a global       02:27PM

11   company and you're having calls constantly from

12   different regions of the world.  So I can't answer

13   it absolute to you.  I don't know what I'm going to

14   be doing next week but I know I'm not going to be

15   working 8:00 to 5:00.                                  02:28PM

16      Q.   Let me ask you this.  When you write your

17   expert reports --

18      A.   Yes.

19      Q.   -- are you on Richard N. De Anda &

20   Associates' time or are you on Mattel time?            02:28PM

21      A.   I'm on Richard De Anda's time.

22      Q.   How can you tell?

23      A.   Because I do it usually at house -- at my

24   home.  I mean, that's where I do it.  I do it at

25   home on the weekends before my wife wakes up.         02:28PM

Exhibit __6__ , P. 127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 161

1     Q.   So whenever you can fit it in?

2     A.   Right.  And to help you understand what the

3  reports are, the reports are very simple.  It's

4  simply a form letter that I have that all I do is

5  change the address or the -- who I'm sending it to      02:28PM

6  and ship it out.  It takes me five minutes, if that.

7     Q.   But you still get to charge the

8  nonrefundable retainer, right?

9     A.   Absolutely, before I'm appointed.

10    Q.   Before you're appointed.  I understand.      02:28PM

11         So if I understand correctly, this idea of

12  whether or not when you're at home you're working

13  for Mattel or you're working for Richard N. De Anda

14  & Associates kind of gets blurred at times.  Would

15  you agree with me?                                      02:29PM

16         MR. COREY:  Objection:  mischaracterizes the

17  testimony.

18         THE WITNESS:  It's not blurred at all.  I

19  know what I'm -- when I'm at home working for Mattel

20  it's typically the weekends or -- I don't -- for      02:29PM

21  instance, just to clarify to make sure there's a

22  clear understanding, I do not take a Wednesday off

23  and I'm working at home.  I'm at Mattel.  Working at

24  home for Mattel is typically the weekends, holidays.

25  For instance, Mattel is going on a hiatus starting      02:29PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 162

1    next week.  I will be working at home with regards

2    to Mattel projects.  I probably won't come into the

3    office a few times during that hiatus.

4        Q.   But during that hiatus and/or a weekend if

5    there was an assignment for Richard N. De Anda &        02:29PM

6    Associates, Inc., you would feel free to work on

7    that project, correct?

8        A.   Yes, yes.

9        Q.   And you don't believe that Mattel owns or

10   has a claim to the work that you do for Richard N.      02:30PM

11   De Anda & Associates, Inc., correct?

12        MR. COREY:  Objection:  calls for a legal

13   conclusion.

14        THE WITNESS:  That is correct.

15        MR. NOLAN:  Okay, let's change tapes.            02:30PM

16   We're just going to change tapes.  Do you need to

17   take a restroom break?

18        THE WITNESS:  How did you know?

19        VIDEO OPERATOR:  We're off the record at

20   2:30.                                                   02:30PM

21              (Brief recess.)

22        VIDEO OPERATOR:  The time is 2:42 p.m.  We

23   are back on the record.  This is tape No. 3 of the

24   deposition of Richard De Anda.  All parties may

25   continue.                                               02:43PM

Exhibit  8 , P. 129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 179

1

2          REDACTED

3

4

5

6

7

8

9          REDACTED

10

11

12

13

14

15

16         REDACTED

17

18

19

20

21

22         REDACTED

23

24

25

Exhibit  7 , P. 130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 180

1

2          REDACTED

3

4

5

6

7

8          REDACTED

9

10

11

12

13

14          REDACTED

15

16

17

18

19

20

21          REDACTED

22

23

24

25

Exhibit __ , P. 131

# EXHIBIT 9

1       UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA EASTERN DIVISION

3

4  CARTER BRYANT, AN INDIVIDUAL, )
                  )

5    PLAINTIFF,     )
                  )

6  VS.          )CASE NO. CV 04-9049
                  )

7  MATTEL, INC., A DELAWARE  )
   CORPORATION,      )

8              )
    DEFENDANTS.    )

9              )
              )

10  AND CONSOLIDATED ACTIONS  )

11

12

13    DEPOSITION OF DAVID ROSENBAUM, TAKEN AT 865 SOUTH

14  FIGUEROA STREET, 10TH FLOOR, LOS ANGELES, CALIFORNIA,

15  COMMENCING AT 9:26 A.M., FRIDAY, JANUARY 25, 2008, BEFORE

16  APRIL CRUZ CACULITAN, CERTIFIED SHORTHAND REPORTER NO.

17  12437.

18

19

20

21

22

23

24

25

Exhibit _9_, P. _132_

1  APPEARANCES OF COUNSEL:

2  FOR THE PLAINTIFF CARTER BRYANT:

3      KEKER & VAN NEST
       BY:  MATTHEW M. WERDEGAR, ESQ.
4        TAMAR BUCHAKJIAN
       710 SANSOME STREET
5      TENTH FLOOR
       SAN FRANCISCO, CALIFORNIA 94111-1704
6      (415) 391-5400

7  FOR THE DEFENDANT MATTEL, INC.:

8      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       BY:  SHON MORGAN, ESQ.
9        TAMAR BUCHAKJIAN
       865 SOUTH FIGUEROA STREET
10      TENTH FLOOR
       LOS ANGELES, CALIFORNIA 90017-2543
11      (213) 443-3000

12  FOR THE DEFENDANT M.G.A.:

13      SKADDEN, ARPS, SLATE, MEACHER & FLOM, LLP
       BY:  JASON D. RUSSELL, ESQ.
14      300 SOUTH GRAND AVENUE
       LOS ANGELES, CALIFORNIA 90071-3144
15      (213) 687-5000

16

17  ALSO PRESENT:

18  RICHARD DANIELS, M.G.A.

19

20

21

22

23

24

25

3

1              INDEX

2

3  DEPONENT   JOHNNY MONTENEGRO          PAGE

4  EXAMINATION

5  BY MR. DUNN                    5

6

7  EXHIBITS FOR IDENTIFICATION

8  NO.      DESCRIPTION          PAGE

9  2201     LETTERS BATES NUMBERED DR 00029
            THROUGH DR 00032
10
   2202     E-MAIL DATED 9/19/2000
11
   2203     LETTER DATED 9/18/2000
12
   2204     E-MAIL CHAIN DATED 9/25/2000
13
   2205     E-MAIL CHAIN DATED 9/28/2000
14
   2206     E-MAIL CHAIN DATED 9/29/2000
15
   2207     LETTER DATED 9/18/2000 WITH
16           THE DATE CROSSED OUT

17  2208    LETTER DATED 9/18/2000 BATES
            NUMBER DR 00045 THROUGH DR 00057
18
   2209     LETTER DATED 9/18/2000 BATES
19           NUMBER DR 00035 THROUGH DR 00044

20  2210    LETTER DATED 9/18/2000 BATES
            NUMBER MGA 0047390 THROUGH
21           MGA 0047397

22  2211    E-MAIL CHAIN DATED 2/12/2001

23

24

25

                         4

Exhibit _9_, P. _134_

1      THE WITNESS: I DON'T HAVE AN UNDERSTANDING

2  INDEPENDANT --

3      (SIMULTANEOUS COLLOQUY.)

4  BY MR. MORGAN:

5    Q   WELL, DID YOU ANY CONVERSATION WITH MS. WANG

6  ABOUT THAT WHAT THAT MOO MATERIAL WAS?

7    A   I HAD CONVERSATIONS ABOUT THE ORIGINS OF THE

8  BRAT'S CONCEPT.

9    Q   IS THAT HOW YOU PUT IT TO MS. WANG THE ORIGIN

10  OF THE BRATZ CONCEPT OR WAS THERE SOMETHING MORE

11  SPECIFIC?

12    A   I'M NOT SURE I USED THOSE WORDS SPECIFICALLY.

13    Q   DID YOU REFER TO MS. WANG WITH ANY DRAWING

14  DESIGNS OR PROTOTYPE OF ANYTHING OH OF THAT NATURE?

15    A   I DON'T RECALL IF I DID.

16    Q   DO YOU RECALL IF YOU REFERRED TO ANYTHING

17  TANGIBLE WHEN YOU SPOKE TO HER?

18    A   I DON'T BELIEVE I REFERRED TO ANYTHING

19  SPECIFIC.

20    Q   TO THE THE BEST YOU RECALL DO YOU THINK YOU

21  USED THE WORD CONCEPT?

22      MR. WERDEGAR: OBJECTION ASKED AND ANSWERED.

23      MR. RUSSELL: JOIN.

24      THE WITNESS: I CAN'T RECALL THE SPECIFIC

25  WORDS I USED IN THE CONVERSATION.

                    70

Exhibit _9_, P. _135_

1  BY MR. MORGAN:

2  Q   YOU DID REFER TO BRATZ CORRECT?

3  A   I DID. I REFERRED TO THE WORK THAT HE WAS

4  DOING.

5  Q   AND YOUR TESTIMONY IS WITH RESPECT TO THE

6  WORK THAT HE WAS DOING IS THAT YOU DON'T HAVE ANY

7  INDEPENDENT UNDERSTANDING OF THAT APART FROM WHAT YOU

8  WERE TOLD BY M.G.A. AT THAT TIME?

9  A   I SAID I HAD NO INDEPENDENT UNDERSTANDING OF

10  MATERIALS THAT MAY OR MAY NOT HAVE BEEN DELIVERED AT

11  M.G.A. AT THE TIME.

12  Q   DID YOU HAVE ANY INDEPENDENT UNDERSTANDING OF

13  WHAT WORK MR. BRYANT HAD DONE WITH THE BRATZ CONCEPT AT

14  THAT POINT?

15  MR. WERDEGAR: OBJECTION VAGUE AND AMBIGUOUS.

16  MR. RUSSELL: JOIN.

17  THE WITNESS: ASK THE QUESTION AGAIN PLEASE.

18  Q   AT THAT TIME DURING THIS CONVERSATION WITH

19  MS. WANG HAD YOU HAD ANY INDEPENDENT UNDERSTANDING OF

20  WHAT WORK MR. BRYANT HAD DONE TO DATE IN DEVELOPING THE

21  BRATZ CONCEPT?

22  MR. WERDEGAR: OBJECTION. VAGUE, VAGUE AND

23  AMBIGUOUS.

24  MR. RUSSELL: JOIN.

25  THE WITNESS: I DID NOT HAVE AN UNDERSTANDING

71

Exhibit _9_ , P. _136_

1   AS TO SPECIFIC COMPONENTS OR ITEMS OF HIS WORK PRODUCT,

2   JUST THAT THERE WAS WORK PRODUCT THAT HAD BEEN DONE.

3      Q   AT ANY TIME DURING THIS CONVERSATION WITH MS.

4   WANG DID SHE MENTION WITH ANYMORE SPECIFICITY WHAT SORT

5   OF WORK PRODUCT HE HAD BEEN DEVELOPING?

6      A   I CAN'T RECALL.

7      Q   SO DURING THAT ENTIRE CONVERSATION YOU DON'T

8   RECALL WHETHER ANYBODY MENTIONED DRAWINGS OR PROTOTYPES

9   OR ANYTHING TANGIBLE?

10     A   I SAID I CAN'T RECALL AS IN TERMS OF MY

11  PRESENT RECOLLECTION OF THAT CONVERSATION.

12     Q   OKAY.  SO I THINK YOU SAID AND I'M PAIR

13  FREIGHTING CORRECT ME IF I'M WRONG THAT YOU INQUIRE

14  TODAY MS. WANG ABOUT MR. BRYANT'S DEVELOPMENT OF THE

15  BRATZ CONCEPT CORRECT?

16     MR. WERDEGAR:  CAN I HAVE THE QUESTION READ

17  BACK.

18     THE REPORTER:  YES.

19     (RECORD READ.)

20     THE WITNESS:  IN A GENERAL WAY YES.

21  BY MR. MORGAN:

22     Q   WHAT WAS HER RESPONSE?

23     A   SHE ADVISED ME THAT THE WORK THAT MR. BRYANT

24  HAD DONE IN DEVELOPING WHAT I REFERRED TO AS THE

25  CONCEPT WAS DONE OUTSIDE THE SCOPE OF HIS EMPLOYMENT

72

Exhibit _9_, P. _137_

# EXHIBIT 10

C O N F I D E N T I A L  -  ATTORNEYS' EYES ONLY

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      EASTERN DIVISION

4

5  MATTEL, INC., a Delaware    )
    Corporation,       )
6               )
      Plaintiff,    )
7               )
      vs.       ) No. CV 04-9059 NM
8            ) (RNBx)
    CARTER BRYANT, an individual; )
9  and DOES 1 through 10,   )    VOLUME I
    Inclusive,      )
10            )
      Defendants.   )
11  -----------------------------)
    (COMPLETE CAPTION ON NEXT PAGE.)
12

13

      CONFIDENTIAL - ATTORNEYS' EYES ONLY
14

15

16     Confidential Videotaped

17   Deposition of MAUREEN TAFOYA, taken

18   on behalf of Defendants, at 300 South

19   Grand Street, Los Angeles, California,

20   beginning at 9:28 A.M. and ending at

21   P.M., on Monday, January 28, 2008,

22   before Wendy S. Schreiber, CSR No. 3558,

23   RPR, CLR.

24

25  PAGES 1 -

                    1

Exhibit _10_, P. _138_

CONFIDENTIAL  -  ATTORNEYS' EYES ONLY

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3         EASTERN DIVISION

4

5  MATTEL, INC., a Delaware        )
   Corporation,                    )
6                                  )
         Plaintiff,                )
7                                  )
         vs.                       ) No. CV 04-9059 NM
8                                  ) (RNBx)
   CARTER BRYANT, an individual;   )
9  and DOES 1 through 10,          )
   Inclusive,                      )
10                                 )
         Defendants.               )
11 ------------------------------- )
   CARTER BRYANT, on behalf of     )
12  himself, all present and       )
   former employees of Mattel,     )
13  Inc., and the general public,  )
                                   )
14       Counter-Claimants,        )
                                   )
15       vs.                       )
                                   )
16  MATTEL, INC., a Delaware       )
   Corporation,                    )
17                                 )
         Counter-Defendant.        )

18

19

20

21

22

23

24

25

2

Exhibit __10__, P. _13 5_

C O N F I D E N T I A L  -  ATTORNEYS' EYES ONLY

1   APPEARANCES:

2

3      For the Plaintiff:

4

5      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       BY: B. DYLAN PROCTOR, ESQ.
6      865 South Figueroa Street, Tenth Floor
       Los Angeles, California 90017
7      (213) 443-3000
       dylanproctor@quinnemanuel.com
8
            -and-
9
       MATTEL, INC.
10       BY:  MICHAEL MOORE, ESQ.
       333 Continental Boulevard
11       El Segundo, California 90245-5012
       (310) 252-2000
12       michael.moore@mattel.com

13

14      For the Defendant and Counterclaimant Carter
       Bryant:

15

16

17      KEKER & VAN NEST LLP
         BY:  REBEKAH L. PUNAK, ESQ.
       710 Sansome Street
18       San Francisco, California 94111-1704
       (415) 391-5400
19       rpunak@kvn.com

20

21

22

23

24

25

3 .

Exhibit  10 , P. 140

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  APPEARANCES (Continued):

2

3    For Defendant MGA Entertainment, Inc.:

4

5    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     BY: LANCE ETCHEVERRY, ESQ.
6        JONATHAN D. USLANER, ESQ.
     Four Times Square
7    New York, New York 10036-6522
     (212) 735-3000
8    letcheverry@skadden.com
     juslander@skadden.com
9

10

11
     Video Operator - David West
12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

Exhibit __10__, P. __141__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  asked questions about those forms.

2      Q.  My question is slightly different than that.

3  I'm asking if it was your responsibility to answer

4  any questions that may have arisen regarding those

5  two forms?

6      MR. PROCTOR:  Assumes facts not in evidence.

7      THE WITNESS:  I guess I'd have to speculate

8  because I don't recall ever being asked questions

9  about those forms.

10  BY MR. ETCHEVERRY:

11      Q.  Was there a member of the Legal department

12  present at these orientations who would have

13  answered questions regarding any of these forms?

14      A.  No.

15      Q.  Do you recall actually receiving questions

16  from new hires about whether they, in fact, had to

17  sign, for example, the inventions agreement or the

18  Conflict of Interest Questionnaire?

19      A.  I don't recall any questions about those

20  documents.

21      Q.  I think you indicated before that if you

22  responded to that question the answer would have

23  been yes.  It was your understanding at that time

24  that all new hires were required to sign those

25  documents?

30

Exhibit 10 , P. 142

C O N F I D E N T I A L  -  ATTORNEYS' EYES ONLY

1    A.  I'm sorry, could you repeat that question?

2    Q.  Sure.  Was it your understanding at that

3  time that all new hires of Mattel were obligated to

4  sign the Conflict of Interest Questionnaire and the

5  inventions agreement?

6    A.  Yes.

7    Q.  Was it your understanding that all new hires

8  were obligated to sign the inventions agreement and

9  the Conflict of Interest Questionnaire as written?

10    A.  Well, again, yes, that was my understanding.

11  Nobody ever had questions about those forms so to

12  the best of my knowledge they all signed those

13  forms.

14    Q.  As written?

15    A.  As written.

16    Q.  You don't recall any new hires altering the

17  terms of either of those forms?

18    A.  No, not while I was doing new hire

19  orientation.  I don't recall that at all.

20    Q.  Was it your understanding that either of

21  these forms were negotiable in any way?

22    A.  No.  No, I don't recall that -- that it was

23  negotiable.  They all signed them to the best of my

24  recollection.

25    Q.  Has that understanding changed over time?

31

Exhibit _18_, P. _143_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.  To my knowledge employees sign those forms.

2  You know, can I speak for every form that's ever

3  been signed?  No.

4    Q.  Is your understanding sitting here today

5  that either of those forms are negotiable?

6    A.  Again, I can't speak to how forms are signed

7  today but my understanding is all employees are

8  required to sign those forms.  I don't -- I don't

9  know that they're negotiable but, again, I can't

10  speak to whether they've ever been negotiated.  They

11  were not negotiated to the best of my recollection

12  when I was doing orientation.

13    Q.  So to your understanding today is that those

14  new hires are obligated to sign those forms as

15  they're written and presented to them, correct?

16    MR. PROCTOR:  Asked and answered.

17    THE WITNESS:  Yeah, I think we talked about

18  that.  That to the best of my knowledge employees

19  are asked to sign those forms as is but, again, I

20  can't speak because I'm not doing orientation today.

21  BY MR. ETCHEVERRY:

22    Q.  And I understand correctly, I think, that

23  during the time that you did orientation you weren't

24  aware of anyone negotiating the terms of either of

25  those documents, correct?

32

Exhibit __10__, P. _144_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   time at Mattel who was requested while still

2   /KPWHROEUT add Mattel copies of its con X?

3      A.  While still an active employee?

4      Q.  Yes.

5      A.  I'm not familiar with any.

6      Q.  Are you aware of whether any requests by an

7   active employee for those documents would raise any

8   red flags within the HR department?

9      MR. PROCTOR:  Vague and ambiguous.

10     THE WITNESS:  I can't say since I've never

11  been asked for any.

12  BY MR. ETCHEVERRY:

13     Q.  Are you aware of any policies at Mattel

14  whether written or unwritten that deal with

15  situations where current employees ask for those

16  documents?

17     A.  I'm not aware of any policy.

18     Q.  Are you aware of any requests by non-active

19  employees for their Conflict of Interest

20  Questionnaire or inventions agreement?

21     A.  Yes.

22     Q.  When do you recall that that took place?

23     A.  Dan Cooney actually asked me for copies of

24  his documents.

25     Q.  Other than Mr. Cooney, do you recall any

265

Exhibit __10__, P. _145_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    other circumstances --

2    A.  No.

3    Q.  -- in which --

4    A.  Sorry.

5    Q.  -- in which non-active employees have

6    requested those documents?

7    A.  No, I don't recall any.

8    Q.  Is it your understanding of Mattel policy

9    that the Conflict of Interest Questionnaire and

10   inventions agreement are confidential documents?

11   A.  Yes, that is my understanding.

12   Q.  And by confidential documents, is it your

13   understanding that former employees of Mattel are

14   not to share those documents with any third parties?

15   A.  Yes, that is my understanding.

16   Q.  Are you aware of any written policy dealing

17   with the confidentiality of those documents?

18   A.  I'm sorry, could you repeat that?

19   Q.  Yeah.  Are you aware of any written policy

20   at Mattel concerning whether or not the Conflict of

21   Interest Questionnaire and the inventions agreement

22   are confidential documents?

23   A.  Not specifically, no.  Not to my knowledge

24   anyway.

25       (Deposition Exhibit 2665 was marked

266

Exhibit __10__, P.__146__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    for identification and is bound separately.)

2    BY MR. ETCHEVERRY:

3       Q.  I'd ask that the court reporter mark as the

4    next exhibit in order a single-page document bearing

5    Bates No. M 0098147.  Ms. Tafoya, do you recognize

6    this document?

7       A.  Yes, I do.

8       Q.  Can you tell me what it is?

9       A.  This is Dan Cooney's resignation letter.

10      Q.  You're referring to the E-mail that appears

11   at the bottom of the page, correct?

12      A.  Yes.

13      Q.  Do you recognize the E-mail that appears at

14   the top of the page?

15      A.  Yes.

16      Q.  What is that?

17      A.  That was his supervisor, gene Murtha,

18   forwarding this to to me and Chris Schaden.

19      Q.  Looking at the second paragraph of

20   Mr. Cooney's E-mail he says "I understand there may

21   be some protocols to which I will be required to

22   follow."  Do you see that?

23      A.  Yes.

24      Q.  Did you have an understanding that those

25   were the protocols that applied when an employee was

267

Exhibit 10 , P. 147

# EXHIBIT 11

**My Scene** (360)

**Notes:  vol. 6**
Oct. 24, 2002

| Date/Time/Place: | Thursday, October 24, 2002 / 1:00-2:00 / Catalina Room | | | |
|---|---|---|---|---|
| Attendees: | Marketing<br>• Debbie<br>• Jean<br>• Galite | Design<br>• Cassidy<br>• Barb<br>• Lily<br>• Erika<br>• Izzy | Licensing<br>• Richard<br>• Lisa | Merchandising |
| | Packaging<br>• Monica | Research<br>• Allison | Strat Planning<br>• Matt<br>• Cassandra | PR<br>• Ria<br>• Julia |
| | Creative<br>• Cynthia<br>• Michael<br>• Christie | Promotions<br>• Michelle | Prod. Planning<br>• Gail | Acct. Planning |
| | Website<br>• Marie<br>• Patrick | International<br>• Jill | Retail Planning<br>• Kathy | Agency<br>• Claudine |
| Proposed Agenda: | 1.   My Scene Brand Update<br>    -   Media Update:  Change in TV dates<br>    -   Teen Panel:  Discuss criteria and goals<br><br>2.   Brainstorm My Scene product ideas for Wave 4 and ES 2004 | | | |
| Homework: | My Scene:  How do we continue to innovate within the product line? Outside the doll?<br>    a.   For the Oct. 24 meeting, please bring in a product, image, idea, etc. as inspiration for possible extensions to the My Scene brand.   Where can we go with the Brand/the product and how/how far can we extend? | | | |

1.   **My Scene Brand Update:**

Product:
- "Nolee" approved worldwide
- "Bryant" cleared worldwide as well, but Lily pointed out that the former Mattel designer who is a creator of Bratz was named Bryant.
- 9/1 dolls could have New Year's eve theme

Advertising:
- Doll spots will begin airing Oct. 30, eleven days prior to planned dates.
- For Toy Fair, the My Scene brand spot featuring illustrations will be completed along with the accompanying Barbie webisode.
- Rolling rack with TV monitors need 3-15 sec. VHS loop

Teen Panel:
- Need to determine goals of panel, list of questions and desired criteria of panel participants

PR:
- Nick Jr. magazine (over 1 million readers) mention as one of the hottest toys in 2002

Oct. 24, 2002

Exhibit  11 , P. 148

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0155946

**2.   My Scene Product Brainstorm:**

Places where people did their inspiration shopping:
- Stores:  3rd St. Promenade (Urban Outfitters, Anthropologie, Fred Segal), West LA (Giant Robot), Manhattan Beach (The Bee Hive), West 3rd St. (Paul Frank, Plastica, Zipper)
- Online:  girlshop.com, fifiandromeo.com, puma.com, nike.com

My Scene Product Development:  Plan of action
- What?...determine what My Scene products should be developed
- Who?...which groups will lead which project
- By whom?...developed internally or licensed out?
- Where at retail?...Once product list is determined, need Sales input (Milt) on where it would be placed at retail and which buyers would be approached

What will happen to actual toy product? Evolution plan
- 15 months from now, will the sculpt change?  What kind of changes?  Bigger feet?
- Increase ethnic flavor of dolls?  Balance the reality of lesser selling ethnic dolls with the brand statement of having dolls that are more true to the diversity of population

<div style="margin-left:2em">

Toy Product Ideas
- Tied to the theme, retail cute stuff for the dolls and for the Girl (mirror what is in the My Scene doll package to products available at retail for the Girl to actually use in her world)
    - i.e. for My Scene "Date Scene that features a dog", create real dog collars and accessory for the Girl's pet or "Costume Party," create wigs for both dolls and girls

Girl Product Ideas
- Little undies/t-shirts
- Sweatshirts
- T-shirt packs
- Cosmetic bags
- Room accessories
- Customization kits:  create their own necklace/jewelry, flip flops, belts, accessory packs, bracelets
- Fabric stationary
- Scrap-booking
- Wacky stickers
- Customize your own shoe, lifestyle kits, rubber bands, cards, hair accessories
- Fitness, health diet, yoga mats,
- Little purse with photo holder
- Magnets with teen words
- Picture frames
- Candles, room décor, soap, aromatherapy

Design Ideas
- Luxury logo design motif on product
- Denim

PR/Promotion Ideas
- Editor to design "the look for My Scene girls"
- Work with magazine combining the My Scene illustrations with on-trend real "looks"/clothing
- Teen Panel with fashion expert, Jorge Ramon, Teen People fashion director

</div>

Oct. 24, 2002

Exhibit _11_, P. _149_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0155947

# EXHIBIT 12

HOW DO WE ACCELERATE MY SCENE

LESS IMPORTANT TO BUILD MY SCENE BRAND
MORE IMPORTANT TO STOP BRATZ

GET THEIR          GET THEIR SELL THRU DOWN
MKT SHR           GET RETAILERS TO LOOSE CONFIDENCE
DOWN              KILL BRATZ

MORE MTTN          CREATING RE-
FROM BARBIE        NEWED
HERITAGE           SEGMENT

BUILD MY SCENE                SLOW DOWN BRATZ

                              EXTEND BOGO ON BARBIE

HOW MUCH DAMAGE CAN WE DO TO
BRATZ WITH MY SCENE ?

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

PMH002273

# EXHIBIT 13

• DOLLS ARE STRONG

H MAKE-UP

STYLING COMPACT — DOLL FACE ISN'T
• LOVE CONCEPT.        VERY PRETTY

★ PRODUCT ISSUE

— CAN HAIR BE
   LONGER

— FACE NEEDS MORE
   DIMENSION

LIP GLOSS MAKER — • GOOD ITEM
                  • PRICE IS HIGH FOR
                     SPRING.

MY SCENE

HOLLYWOOD LINDSAY LOHAN —
   • ADD STICKER TO DOLL PKG
   CALLING OUT "SPECIAL EDITION"
   OR "LIMITED EDITION" TO EXPLAIN
   HIGHER PRICE.

LIMO PROMOTION — STICKER NEEDS TO
STAND-OUT MUCH MORE
DON'T MATCH

Confidential - Attorneys Eyes Only

Exhibit 13 , P. 151

M 0069084

# MY SCENE BLING

★ DON'T SET UP MAKING MY SCENE EDGY
  — SOUNDS TOO MUCH LIKE KNOCK OFF

~~STRONG~~
: DOLLS, CAR, STYLING HEAD, PURSE

LESS GOOD
- SPEAKER BAGS — DIFFICULT TO COMMUNICATE
  — AESTHETIC IS NOT SOPHISTICATED
  — CHANGE TO BACKPACK.

- ELECTRONICS — MORE CLEAN, LESS FANCY
  SPARKLE OUR DESIGN

  — PRICES MUST BE
  COMPETITIVE W/ ELECTRONICS
  DEPT.

To sell in Toy aisle
  — CONSIDER CONNECTION
  BACK TO DOLLS /
  — SOMETHING W/ FASHION
  OR OTHER ELEMENT.

Confidential - Attorneys Eyes Only

Exhibit 13, P. 152

M 0069085

# TARGET COMMENTS

- YOUNGER GIRL is #1 PRIORITY
  50% YOUNGER GIRL ON PLANNOGRAM
- MODULARITY is CRITICAL TO MAKE STATEMENT

- PRIORITY FOR WEE 3
  - 3 DOLL SET
  - INDIVIDUAL DOLLS } ALL BRANDED WEE 3 3

- FASHION FEVOR HOME
  - PRICING ISSUES
  - OPP'TY FOR

- MYSCENE
  - PRIORITIZE $8  $11  $12 SEGMENTS

Confidential - Attorneys Eyes Only

Exhibit 14 , P. 153

M 0069086