1                              INDEX

2    WITNESS                              EXAMINATION

3    CARTER BRYANT
     Volume 4

4

5
              BY MR. QUINN                        734

6

7
                            EXHIBITS

8

     DEPOSITION                                   PAGE

9

     1309    Fax relating to raising suspicions and    772
10           offer of employment, Bates No. MGA
             7337-7340

11
     1310    Copy of a check to Sheila Kyaw, Bates     817
12           No. Bryant 1588

13   1311    Swan drawing, Bates No. Bryant 00883      819

14   1312    E-mail string, Bates No.                  861
             KMW-M 007635038

15
     1313    Copy of Carter Bryant's notebook,         881
16           Bates No. 1589-01624

17

18

19

20

21

22

23

24                        EXHIBIT _____4_____

25                        PAGE _____/64_____

                                                        732

CARTER BRYANT, V. 4                    01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

14:20  1          MR. WERDEGAR:  Vague and ambiguous.

14:20  2          THE WITNESS:  I don't remember.

14:20  3     BY MR. QUINN:

14:20  4          Q    She might have, might not have, you just

14:20  5     don't recall?

14:20  6          MR. WERDEGAR:  Misstates prior testimony.

14:20  7          THE WITNESS:  I don't remember.

14:21  8     BY MR. QUINN:

14:21  9          Q    Do you have any information about whether

14:21 10     Gentle Giant ever did any work relating to Bratz?

14:21 11          MR. WERDEGAR:  Objection.  Lacks foundation,

14:21 12     calls for speculation, vague as to "work relating to

14:21 13     Bratz."

14:21 14          THE WITNESS:  No.

14:21 15     BY MR. QUINN:

14:21 16          Q    And do you have a belief as to whether Gentle

14:21 17     Giant did any work relating to Bratz at any time?

14:21 18          MR. WERDEGAR:  Objection.  Asked and answered,

14:21 19     lacks foundation, calls for speculation, vague as to

14:21 20     "belief."

14:21 21          THE WITNESS:  I don't have a belief about that

14:21 22     either way.

14:21 23     BY MR. QUINN:

14:21 24          Q    Do you know where Gentle Giant's business is

14:21 25     located?

EXHIBIT _____ 4

PAGE _____ 165

841

14:21  1       A    No.

14:21  2       MR. WERDEGAR:   Vague as to time.

14:21  3   BY MR. QUINN:

14:21  4       Q    And is it true that you cannot -- there's

14:21  5   simply no information that you can relate to me that

14:21  6   Margaret Lahey gave to you about Gentle Giant; is that

14:21  7   a true statement?

14:21  8       MR. WERDEGAR:   Objection.   Misstates prior

14:22  9   testimony.

14:22 10       THE WITNESS:   You know, I just don't remember her

14:22 11   saying anything specific about Gentle Giant.

14:22 12   BY MR. QUINN:

14:22 13       Q    Or in general?

14:22 14       A    Other than the fact that they make molds,

14:22 15   that's -- I am sorry.

14:22 16       Q    Anything besides that?

14:22 17       A    No.

14:22 18       Q    You told me, when we were last together,

14:22 19   about there was some drawing that you had notarized.

14:22 20   You went to, I think, a woman by the name of Ramona

14:22 21   who you learned was a notary.

14:22 22       A    Yes.

14:22 23       Q    As I recall your testimony, you went to her

14:22 24   house?

14:22 25       MR. WERDEGAR:   Objection.   I would just object to

EXHIBIT ____4____
PAGE ____166____

842

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

CARTER BRYANT, V. 4                                    01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

| | |
|---|---|
| 14:22 1 | the extent you're purporting to summarize his prior |
| 14:22 2 | deposition testimony. |
| 14:22 3 | THE WITNESS:  I don't remember what I said back |
| 14:22 4 | then.  But if, you know, if you could show me the depo |
| 14:23 5 | transcript, I could probably -- |
| 14:23 6 | BY MR. QUINN: |
| 14:23 7 | Q   Well, I'm just trying to short circuit it. |
| 14:23 8 | But let me just ask then.  Do you recall where you and |
| 14:23 9 | she were when she notarized these drawings? |
| 14:23 10 | MR. WERDEGAR:  I am going to object that it's |
| 14:23 11 | asked and answered. |
| 14:23 12 | THE WITNESS:  To the best of my recollection we |
| 14:23 13 | were at her house. |
| 14:23 14 | BY MR. QUINN: |
| 14:23 15 | Q   Right.  And you were present when she did the |
| 14:23 16 | notarizations, correct? |
| 14:23 17 | MR. WERDEGAR:  Objection.  Asked and answered. |
| 14:23 18 | THE WITNESS:  Yes. |
| 14:23 19 | BY MR. QUINN: |
| 14:23 20 | Q   And did she also have a notary book?  You |
| 14:23 21 | know how notaries have these books that you have to |
| 14:23 22 | sign in and entries are made, did she have one of |
| 14:23 23 | those? |
| 14:23 24 | MR. WERDEGAR:  Objection.  Asked and answered. |
| 14:23 25 | THE WITNESS:  To the best of my recollection, |

EXHIBIT _____ 4

PAGE _____ 167

843

14:26  1   numbered.  This is very inconvenient.

14:26  2        MR. WERDEGAR:  And yeah, there's no document

14:26  3   control numbers.  I assume this has been produced in

14:26  4   the litigation.

14:26  5        MR. ZELLER:  It has.  That was marked as an

14:26  6   exhibit at Ramona Price's deposition.  The reason it

14:26  7   doesn't have Bates numbers is she provided the book,

14:26  8   the entirety of the book at her deposition.  So this

14:26  9   is how it was produced to us.

14:26 10   BY MR. QUINN:

14:26 11        Q    Let me -- I mean there's a page you're going

14:26 12   to find your name.  And this is like -- it's like

14:26 13   maybe 20 pages from the back.  20 pages from the back

14:26 14   you're going to find your name Carter Bryant in the

14:26 15   right-hand column under name and address of signer,

14:26 16   and it will be at the top.  If I could show you

14:27 17   Mr. Bryant what that page looks like.

14:27 18        A    All right.

14:27 19        Q    And that's what I would like you to find.

14:27 20        A    Okay.

14:27 21        Q    Are we on the same page?

14:27 22        A    We're not yet.  Okay.  All right.

14:27 23        Q    Do you see where it says there "Carter Bryant

14:27 24   13" -- I don't know if that's 14 or 19, "West 160th

14:27 25   Street, Gardenia, California, 90247"?  Do you see

EXHIBIT _____
PAGE   168

846

14:27 1    that?

14:27 2         A    Yes.

14:27 3         Q    And is that -- is that where you resided at

14:27 4    the time you had her -- you asked her to notarize

14:27 5    these drawings?

14:27 6         A    Yes.

14:27 7         Q    And that's information that you provided to

14:27 8    her then?

14:27 9         A    Yes.

14:27 10        Q    And the next column over it says, "Original

14:27 11   sketches of doll idea, character six total.  Names are

14:27 12   Zoe, Jade, two males, Bloopy, Holiday, from 1998

14:28 13   Missouri."  Do you see that?

14:28 14        A    Yes.

14:28 15        Q    Did I read that correctly?

14:28 16        A    Yes.

14:28 17        Q    And is that information you provided her

14:28 18   then?

14:28 19        A    Yes, to the best of my recollection.

14:28 20        Q    And is this your handwriting?

14:28 21        A    No.

14:28 22        Q    Is this her handwriting?

14:28 23        MR. WERDEGAR:   Objection.   Lacks foundation.

14:28 24        THE WITNESS:   I don't know.

14:28 25   BY MR. QUINN:          EXHIBIT ____ 4

                                  PAGE ____ 169

                                                                   847

14:28 1       Q    Well, did she complete this information at

14:28 2   the time that you had the drawings notarized?

14:28 3       A    I don't remember.

14:28 4       Q    One way or the other?

14:28 5       A    No.

14:28 6       Q    My statement is correct, you just don't know?

14:28 7   She might have, she might not have, you just don't

14:28 8   recall?

14:28 9       A    I really -- yeah, I don't remember.

14:28 10      Q    One way or the other?

14:28 11      A    No.

14:28 12      Q    And then the rest of the information there --

14:29 13  you usually have to sign these books.  Is there a page

14:29 14  opposite this?

14:29 15      MS. HAULER:  Yeah, it's right here.

14:29 16      MR. WERDEGAR:  I think the previous page, the

14:29 17  next page.

14:29 18      MS. HAULER:  The next page.

14:29 19      MR. ZELLER:  It's the one that says 12 in the

14:29 20  upper right-hand corner.

14:29 21      MR. QUINN:  Oh, okay.

14:29 22      MS. HAULER:  It's in the dark area.

14:29 23  BY MR. QUINN:

14:29 24      Q    Okay.  Now if you turn to the next page, do

14:29 25  you see your signature there that you signed in the

EXHIBIT ____4____

PAGE ____170____     848

14:39  1   company"?

14:39  2        MR. QUINN:  And, Counsel, you have all of your

14:39  3   objections.

14:39  4        MR. WERDEGAR:  All right.  Well, so we have a

14:39  5   clean objection, calls for a legal conclusion, lacks

14:39  6   foundation, calls for speculation.  Caution you not to

14:39  7   reveal any attorney-client communications and you

14:39  8   don't need to guess.

14:39  9        THE WITNESS:  I don't know.

14:39 10        MR. QUINN:  Well, we're going to go back and ask

14:39 11   for more time, and I'm going to tell you why we're

14:39 12   going to go back and ask for more time.  I just

14:39 13   offered to stipulate that you had all the same

14:39 14   objections which you stated like three times and

14:39 15   stipulate, and you insisted on saying them again.

14:39 16        MR. WERDEGAR:  Counsel, I'm entitled to object --

14:39 17        MR. QUINN:  Let me finish and then I'll hear you.

14:39 18        MR. WERDEGAR:  Okay.

14:39 19        MR. QUINN:  There is two reasons why you might do

14:39 20   that.  One is to coach him and the other is to waste

14:39 21   time.  Neither reason is a good reason.

14:39 22        MR. WERDEGAR:  Counsel, I'm allowed -- just as

14:39 23   you're allowed to restate your question or to get a

14:39 24   clean question and answer, I'm allowed to make sure

14:39 25   the record accurately reflects the objections I'm

EXHIBIT _____4_____                                    857

PAGE _____171_____      SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
                                        877.955.3855

| | | |
|---|---|---|
| 14:39 | 1 | asserting to the question you just asked.  That's all |
| 14:40 | 2 | I've done.  I've not been making speaking objections |
| 14:40 | 3 | today.  I'm making a clean record with my objections, |
| 14:40 | 4 | which I believe are appropriate to each of your |
| 14:40 | 5 | questions.  That's -- I'm entitled to do that.  It's |
| 14:40 | 6 | customary practice.  And, you know, if you want to go |
| 14:40 | 7 | argue to the discovery master that I've been wasting |
| 14:40 | 8 | time by making appropriate objections, you're welcome |
| 14:40 | 9 | to do so. |
| 14:41 | 10 | BY MR. QUINN: |
| 14:41 | 11 |      Q    Let's take a look at Exhibit 26.  That's the |
| 14:41 | 12 | conflict of interest questionnaire. |
| 14:41 | 13 |           The last sentence on the page, and it says, |
| 14:41 | 14 | and I quote, "I also agree to notify my superior |
| 14:41 | 15 | immediately of any changes in my situation that would |
| 14:41 | 16 | cause me to answer any of the above questions |
| 14:41 | 17 | differently," closed quote.  Do you see that? |
| 14:41 | 18 |      A    I'm sorry, I'm not finding that sentence. |
| 14:41 | 19 |      Q    It's at the bottom.  It's the second to the |
| 14:41 | 20 | last sentence just above your signature. |
| 14:41 | 21 |      A    Okay.  All right. |
| 14:41 | 22 |      Q    It says, and I quote, "I also agree to notify |
| 14:41 | 23 | my superior immediately."  Now do you understand what |
| 14:41 | 24 | I've read so far? |
| 14:41 | 25 |      A    Yes. |

EXHIBIT _____4_____

PAGE _____172_____

858

14:41  1        MR. WERDEGAR:  I'm just going to object that

14:42  2    you're asking about the meaning of a partial sentence.

14:42  3    BY MR. QUINN:

14:42  4        Q    "Of any changes in my situation," do

14:42  5    understand that?

14:42  6        MR. WERDEGAR:  Same objection.

14:42  7        THE WITNESS:  Yes.

14:42  8    BY MR. QUINN:

14:42  9        Q    "That could cause me to answer any of the

14:42 10    above questions differently," do you understand that?

14:42 11        MR. WERDEGAR:  Same objection.

14:42 12        THE WITNESS:  Yes.

14:42 13    BY MR. QUINN:

14:42 14        Q    And do you have any doubt in your mind that

14:42 15    you understand that whole sentence that I just read?

14:42 16        MR. WERDEGAR:  Objection.  Lacks foundation,

14:42 17    calls for speculation, calls for a legal conclusion,

14:42 18    the document speaks for itself.

14:42 19        THE WITNESS:  No.  I understand it.

14:42 20    BY MR. QUINN:

14:42 21        Q    What does it mean?

14:42 22        A    I think it just means that if any of the

14:42 23    information on this questionnaire becomes different,

14:42 24    that, you know, tell your superior.

14:42 25        Q    Is it true that you gave up your rights on

EXHIBIT 4

PAGE 173

859

14:44 1   Bratz in order to get your foot in the door of toy

14:44 2   product inventing?

14:44 3       MR. WERDEGAR:  Objection.  Vague and ambiguous,

14:44 4   lacks foundation, vague as to "gave up your rights on

14:44 5   Bratz."

14:44 6       THE WITNESS:  Yeah, I'm not exactly sure what you

14:44 7   mean.

14:44 8   BY MR. QUINN:

14:44 9       Q   Well, are there particular words I just used

14:44 10  that you're confused by?

14:44 11      A   No.  Can you just ask me the question again.

14:44 12      Q   Is it true that you gave up some rights with

14:44 13  respect to Bratz in order to get your foot in the door

14:44 14  of toy and product inventing?  Is that a true

14:44 15  statement?

14:44 16      MR. WERDEGAR:  Objection.  Lacks foundation,

14:44 17  vague and ambiguous.

14:45 18      THE WITNESS:  I think when I gave up the rights

14:45 19  to Bratz that, yeah, I was excited to get into, you

14:45 20  know, designing product a little bit more

14:45 21  independently.

14:45 22  BY MR. QUINN:

14:45 23      Q   And you wanted to get into toy inventing?

14:45 24      MR. WERDEGAR:  Objection.  Vague as to "toy

14:45 25  inventing."                EXHIBIT _____4_____

                                     PAGE ____174____

14:45  1        THE WITNESS:  I don't remember if that's really

14:45  2    what I was thinking at the time.

14:45  3    BY MR. QUINN:

14:45  4        Q   Well, I'm just asking you now, is that a true

14:45  5    statement, that you wanted to get into toy inventing?

14:45  6        MR. WERDEGAR:  Objection.  Vague as to "toy

14:45  7    inventing."

14:45  8        THE WITNESS:  Well, back then, yes.

14:45  9    BY MR. QUINN:

14:45 10        Q   And what do you mean by "toy inventing"?

14:45 11        A   I'm not sure exactly what I meant, designing.

14:45 12        Q   Designing toys?

14:45 13        A   Right.

14:46 14        MR. QUINN:  What's the next?

14:46 15        THE REPORTER:  1312.

14:46 16            (Deposition Exhibit 1312 marked.)

14:46 17    BY MR. QUINN:

14:46 18        Q   1312 is an e-mail string Bates numbered KMW-M

14:46 19    007635 to 38.  Have you seen this before?

14:46 20        A   I don't remember.

14:46 21        Q   Is this one of the documents you reviewed in

14:46 22    connection with for preparation of your deposition?

14:46 23        A   No.

14:46 24        Q   Take a moment to look at it.  And I'll just

14:46 25    ask you if this appears to be a string of e-mails,

EXHIBIT _____4_____

PAGE ____ / 7 5 ____

14:46 1    communications between you and Peter Marlow?

14:47 2        A    Right.

14:47 3        Q    And if you look at the bottom of the second

14:47 4    page, Bates number 7636, the last full paragraph says,

14:47 5    and I quote, "Many inventors," -- this what is you

14:47 6    wrote, correct?  We're reading now an e-mail that you

14:47 7    wrote to Veronica and Peter Marlow, right?

14:47 8        MR. WERDEGAR:  Objection.  Lacks foundation.

14:47 9        THE WITNESS:  I don't really remember writing

14:47 10   this, but -- 

14:47 11   BY MR. QUINN:

14:47 12       Q    Well, take a moment to satisfy yourself.

14:47 13   While you're doing that, let me just ask -- or if I

14:47 14   could interrupt you for a moment, because it's not

14:47 15   fair to ask you to do both at once.

14:47 16           Do you recall having discussions with the

14:47 17   Marlows about whether Victoria's 10 percent would get

14:47 18   reduced to a written contract?

14:47 19       MR. WERDEGAR:  Objection.  Vague, vague as to

14:48 20   time, lacks foundation, assumes facts.

14:48 21       THE WITNESS:  Veronica's contract?

14:48 22   BY MR. QUINN:

14:48 23       Q    Veronica, yeah.  Sorry.

14:48 24       A    Yes, vaguely.

14:48 25       Q    All right.  And I think you'll see that this

862

EXHIBIT ___4___

PAGE ___176___

14:48 1    e-mail I'm drawing your attention to, it actually

14:48 2    begins, of course, on the first page where you say,

14:48 3    "Hi Veronica and Peter, thank you for your reply,"

14:48 4    blah-blah-blah.

14:48 5        A    Uh-huh.

14:48 6        Q    If you look at that, and my question to you

14:48 7    is, isn't this an e-mail which you wrote to them?

14:48 8        MR. WERDEGAR:  Take as much time you feel you

14:48 9    need to read it.

14:48 10       THE WITNESS:  I don't necessarily remember

14:48 11   writing it, but it -- I mean it appears to be, yes.

14:48 12   BY MR. QUINN:

14:48 13       Q    I mean you don't have any doubt about that,

14:48 14   that you wrote this?

14:48 15       MR. WERDEGAR:  Objection.  Vague, lacks

14:48 16   foundation.

14:48 17       THE WITNESS:  No, I don't have any doubts.

14:48 18   BY MR. QUINN:

14:48 19       Q    All right.  So what you wrote on the second

14:48 20   -- referring now back to the second page, the last

14:49 21   full paragraph, and it says, I quote, quote, "Many

14:49 22   inventors do receive money for life from their

14:49 23   inventions as long as there is a demand for their

14:49 24   product.  But these people have retained their

14:49 25   copyright to the property or the character," paren,

EXHIBIT ____4____

PAGE ____177____

CARTER BRYANT, V. 4                         01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

14:50  1    point as a toy inventor?

14:50  2         MR. WERDEGAR:  Objection.  Vague as to time,

14:50  3    vague as to "toy inventor."

14:50  4         THE WITNESS:  Well, I don't really remember.

14:50  5    BY MR. QUINN:

14:50  6         Q    You might have and you might not, you're just

14:50  7    not sure; is that true?

14:50  8         MR. WERDEGAR:  Objection.  Asked and answered.

14:50  9         THE WITNESS:  I don't remember.

14:50 10    BY MR. QUINN:

14:50 11         Q    Have you ever patented anything?

14:50 12         A    No.

14:50 13         Q    Have you ever made something, created

14:50 14    something which, in your understanding, was

14:50 15    patentable?

14:50 16         MR. WERDEGAR:  Objection.  Calls for a legal

14:50 17    conclusion, vague and ambiguous.

14:50 18         THE WITNESS:  I don't know.

14:50 19    BY MR. QUINN:

14:50 20         Q    Was it your intention, when you gave up your

14:51 21    rights on Bratz, to get your foot in the door of

14:51 22    creating products, only products that were patentable?

14:51 23         MR. WERDEGAR:  Objection.  Lacks foundation,

14:51 24    calls for speculation, calls for a legal conclusion.

14:51 25         MS. CAMPANA:  I add also objection, vague.

EXHIBIT _____4_____

PAGE _____173_____

865

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

14:51  1        THE WITNESS:  I don't think that thought ever

14:51  2  would have entered my mind.

14:51  3  BY MR. QUINN:

14:51  4        Q    Why not?

14:51  5        MR. WERDEGAR:  Objection.  Vague.

14:51  6        THE WITNESS:  I just wouldn't have ever thought

14:51  7  about patent one way or another.

14:51  8        MR. QUINN:  Why don't we take a minute.

14:51  9        MR. WERDEGAR:  Okay.

14:51 10        THE VIDEOGRAPHER:  The time is 2:51.  We're going

14:52 11  off the record.

14:52 12            (Recess.)

15:07 13        THE VIDEOGRAPHER:  The time is 3:07.  We are back

15:07 14  on record.

15:07 15        MR. WERDEGAR:  Either now or at some point

15:07 16  Mr. Bryant wants to clarify one of his earlier

15:07 17  answers.

15:07 18        MR. QUINN:  Okay.

15:07 19        MR. WERDEGAR:  Why don't you do it now, make your

15:07 20  clarification.

15:07 21        THE WITNESS:  Yeah.  I just wanted to say that

15:07 22  earlier you had asked me something about moonlighting,

15:07 23  and moonlighting was actually something that was --

15:07 24  you know, I knew was happening within the company,

15:07 25  just I had that knowledge, you know, through the

EXHIBIT _____ 4

PAGE _____ 179        866

15:08 1    grapevine.  I didn't know any, you know, specific
15:08 2    person who was moonlighting, but --
15:08 3    BY MR. QUINN:
15:08 4        Q    Okay.  And we just took a break?
15:08 5        A    Yes.
15:08 6        Q    And during that break you spoke to your
15:08 7    counsel?
15:08 8        MR. WERDEGAR:  You can answer that yes or no.
15:08 9        THE WITNESS:  Yes.
15:08 10   BY MR. QUINN:
15:08 11       Q    And we come back and the first thing you do
15:08 12   is put on the record a reference to moonlighting,
15:08 13   right?
15:08 14       A    Yes.
15:08 15       Q    Are you saying that I used the term
15:08 16   "moonlighting"?
15:08 17       A    I don't know.  I don't remember if you did or
15:08 18   not, but I thought we had talked about that.
15:08 19       Q    But you don't know anybody who actually did
15:08 20   it by name?
15:08 21       A    I don't know of specific people, no.
15:08 22       Q    You just heard rumors?
15:08 23       A    Yeah, it was rumors, yes.
15:08 24       Q    Will you take a look at Exhibit 15 -- are you
15:08 25   saying that the rumors were that people -- by

EXHIBIT _____ 4 _____

PAGE _____ 180 _____

867

15:08 1    moonlighting do you mean working for other toy

15:08 2    companies?

15:08 3        A    Not just toy companies, but other things in

15:08 4    general.

15:08 5        Q    Like, you know, a doll designer might work at

15:09 6    McDonald's or be a security guard or have another job;

15:09 7    is that what you're referring to?

15:09 8        MR. WERDEGAR:  Objection.  Misstates testimony.

15:09 9        THE WITNESS:  I'm just -- yeah, I'm just

15:09 10   referring to any work other than their work at Mattel.

15:09 11   BY MR. QUINN:

15:09 12       Q    All right.  But in terms of -- are you

15:09 13   telling me that you heard rumors about Mattel

15:09 14   employees who were working on toy products for other

15:09 15   companies or for the benefit of other companies?  Is

15:09 16   that what you're telling me?

15:09 17       A    I believe so, yes.

15:09 18       Q    You heard rumors about that?

15:09 19       A    Yes.

15:09 20       Q    But you can't recall any names?

15:09 21       A    No.

15:09 22       Q    Can you recall what any of the products were?

15:09 23       A    No.

15:09 24       Q    Or the other companies that these employees

15:09 25   were supposedly by rumor working for, can you recall

EXHIBIT _____ 4

PAGE _____ 181                          868

CARTER BRYANT, V. 4                                01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

15:09 1    any of those?

15:09 2        A    Not specifically, no.  It was just kind of a

15:09 3    general rumor.

15:09 4        Q    And it was your understanding -- what you're

15:09 5    telling me is, it was your understanding that at

15:09 6    Mattel it was perfectly okay to do that, to be a

15:09 7    Mattel employee and also work for another toy company

15:10 8    or to create toys to benefit some other company?  That

15:10 9    was perfectly okay?

15:10 10       MR. WERDEGAR:  Objection.  Misstates prior

15:10 11   testimony, argumentative, leading.

15:10 12       THE WITNESS:  Yeah, that's not what I said.  What

15:10 13   I said is that I had heard that, you know, people

15:10 14   moonlighted, but as to whether I thought it was okay,

15:10 15   I mean, you know, I didn't really have an opinion one

15:10 16   way or another.

15:10 17   BY MR. QUINN:

15:10 18       Q    All right.  Did you have an opinion as to

15:10 19   whether Mattel thought it was okay one way or another?

15:10 20       MR. WERDEGAR:  Objection.  Lacks foundation.

15:10 21   BY MR. QUINN:

15:10 22       Q    Just so I'm clear on what you just said, you

15:10 23   just had no opinion yourself as to whether it was okay

15:10 24   for a Mattel employee to do competitive work for

15:10 25   another toy company while they were employed by

EXHIBIT _____ 4

PAGE _____ 182                                         869

15:10  1    Mattel?  You just had no opinion on that; is that

15:10  2    true?

15:10  3        MR. WERDEGAR:  Objection.  Misstates prior

15:10  4    testimony, argumentative, leading.

15:10  5        THE WITNESS:  I didn't really -- I didn't really

15:10  6    have an opinion.

15:10  7    BY MR. QUINN:

15:10  8        Q    Do you now?

15:10  9        MR. WERDEGAR:  I'll just caution you not to

15:10 10    reveal anything you might have learned through

15:10 11    communications with your counsel.

15:11 12        THE WITNESS:  No.

15:11 13    BY MR. QUINN:

15:11 14        Q    If you look, please, at your MGA agreement.

15:11 15    That's Exhibit 15.

15:11 16        A    Okay.

15:11 17        Q    And we looked at this phrase before, numbered

15:11 18    paragraph one on the first page.  The first sentence

15:11 19    where it says, and I quote, "MGA retains Bryant to

15:11 20    provide his services to consult with MGA and advise

15:11 21    MGA on the design and development by MGA of a line of

15:11 22    dolls presently known as Bratz, the MGA products," in

15:11 23    parenthesis.  Do you see that, sir?

15:11 24        A    Yes.

15:11 25        Q    When it refers in this document dated

EXHIBIT _____4_____

PAGE _____783_____          870

15:11 1   September 18th, 2000, where it refers to "a line of

15:11 2   dolls presently known as Bratz," what is referred to

15:11 3   there?

15:11 4        MS. CAMPANA:  Objection.  Calls for speculation.

15:11 5        MR. WERDEGAR:  Yeah, I'm going to object.  It

15:11 6   lacks foundation, calls for speculation, calls for a

15:11 7   legal conclusion, asked and answered, And also object

15:11 8   that it mischaracterizes the document dated

15:12 9   September 18th, 2000.

15:12 10       THE WITNESS:  I'm sorry.  Can you reask that.

15:12 11  BY MR. QUINN:

15:12 12       Q   What's referred to where this agreement, the

15:12 13  line says, quote "Line of dolls presently known as

15:12 14  Bratz"?

15:12 15       MR. WERDEGAR:  Same objections.

15:12 16  BY MR. QUINN:

15:12 17       Q   What's that?

15:12 18       MR. WERDEGAR:  Same objections.

15:12 19       THE WITNESS:  Well, I mean, I don't really -- I

15:12 20  don't really know.  I mean this is, you know, a legal

15:12 21  contract and, you know, what I was giving them were

15:12 22  characters.

15:12 23  BY MR. QUINN:

15:12 24       Q   So do you think it was inaccurate here to

15:12 25  refer to "a line of dolls presently known as Bratz"?

EXHIBIT _____4_____

PAGE ____184____                              871

15:28 1    talking about -- I asked you some questions about that

15:28 2    phrase "line of dolls presently known as Bratz."  Do

15:28 3    you see that?

15:28 4         A    Yes.

15:28 5         Q    And I had asked you what existed, and you

15:28 6    said there were some drawings and there were some

15:28 7    characters, correct?

15:28 8         MR. WERDEGAR:  Objection.  Misstates prior

15:28 9    testimony.

15:28 10        THE WITNESS:  I believe that I said there were

15:28 11   drawings of the characters, yes.

15:28 12   BY MR. QUINN:

15:28 13        Q    All right.  At any time prior to the date of

15:28 14   this agreement, September 18th, 2000, had you told the

15:28 15   people at Mattel about these drawings or characters

15:28 16   that you had created?

15:28 17        MR. WERDEGAR:  I'm going to object as to vague as

15:28 18   to "people at Mattel."  Also I'm going to object to

15:28 19   your characterization of the date of this agreement.

15:28 20   BY MR. QUINN:

15:28 21        Q    Your turn.

15:28 22        A    No.

15:28 23        Q    Either during the time that you were employed

15:29 24   by Mattel or during the hiatus in your employment -- I

15:29 25   guess -- as I recall, you were employed by Mattel

EXHIBIT _____4_____

PAGE _____185_____

15:29 1    during two different periods, correct?

15:29 2        A    That's right.

15:29 3        Q    And is it a true statement that in neither

15:29 4    period that you were employed by Mattel did you tell

15:29 5    anyone at Mattel about these Bratz characters or

15:29 6    drawings?  Is that a true statement?

15:29 7        MR. WERDEGAR:  I'm going to object again as to

15:29 8    vague as to people at Mattel.

15:29 9        MS. CAMPANA:  Object as to "Bratz characters" --

15:29 10   vague as to "Bratz characters," excuse me.

15:29 11   BY MR. QUINN:

15:29 12       Q    Your turn.

15:29 13       A    No, not that I remember.

15:29 14       Q    You don't remember telling anyone at Mattel

15:29 15   about them?

15:29 16       A    No.

15:29 17       Q    My statement is correct?

15:29 18       A    To the best of my recollection, yes.

15:29 19       Q    All right.  And you told us last time at your

15:29 20   -- these drawings that you created, that you were

15:29 21   inspired when you went by the high school.  Do you

15:30 22   recall that, telling us about that?

15:30 23       A    Yes.

15:30 24       Q    Did you ever tell anyone at Mattel that you

15:30 25   had created those drawings?

EXHIBIT __4__

PAGE ___186___

CARTER BRYANT, V. 4                          01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

15:30 1      MR. WERDEGAR:  Again, I'm going to object as

15:30 2  asked and answered and object as vague as to "those

15:30 3  drawings."  Object as vague as to people at Mattel.

15:30 4  BY MR. QUINN:

15:30 5      Q   Your turn.

15:30 6      A   Well, you asked me that just a second ago and

15:30 7  I said no.

15:30 8      Q   Well, I just -- the reason I asked that is I

15:30 9  didn't want there to be any confusion.  I wanted to

15:30 10 make sure that I've covered whatever the drawings, the

15:30 11 drawings that you created, the drawings that you

15:30 12 showed Larian and the drawings that you've created,

15:30 13 you know, in the interval between your Mattel

15:30 14 employment, my understanding is that none of those

15:30 15 drawings did you ever tell anyone at Mattel about; is

15:30 16 that true?

15:30 17     MR. WERDEGAR:  Again, I'm going to object.

15:30 18 Again, it's vague as to "the drawings" and vague as to

15:30 19 people at Mattel.

15:30 20     THE WITNESS:  Let me think.  Outside of Ramona, I

15:30 21 don't think so.

15:30 22 BY MR. QUINN:

15:30 23     Q   And you only spoke to Ramona about it in

15:31 24 connection with your getting the notarization,

15:31 25 correct?

886

EXHIBIT _____4_____

PAGE _____187_____

1

2

3

4

5

6

7

8

9

10          I, CARTER BRYANT, do hereby declare under

11    penalty of perjury that I have read the foregoing

12    transcript; that I have made any corrections as appear

13    noted, in ink, initialed by me, or attached hereto; that

14    my testimony as contained herein, as corrected,

15    is true and correct.

16          EXECUTED this _____ day of _____,

17    20___, at _____, _____.
                              (City)                  (State)

18

19

20

21

22          _____

23          CARTER BRYANT
            VOLUME 4

24
            EXHIBIT _____ 4 _____
25
            PAGE _____ 188 _____

889

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1        I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11        Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [ X ] was not requested.

15        I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: ___JAN 3 0 2008___

22

23                      _____

                JODI L. BOSETTI

24                CSR No. 11316

25

EXHIBIT _____4_____

PAGE _____189_____

# Errata Sheet

**Pg/Ln**                                **Correction**

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

___/___    Change from:_____
           Change to:_____

EXHIBIT ___4___

PAGE ___190___

Signature:_____    Date:_____

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an
individual,

     Plaintiff,

  vs.

MATTEL, INC., a Delaware
Corporation,

     Defendants.

No. CV 04-9049 SGL
(RNBx)

Consolidated with
No. CV 04-09059
   CV 05-2727

---

Consolidated with MATTEL, INC.
vs. BRYANT and MGA ENTERTAINMENT,
INC. vs. MATTEL, INC.

CERTIFIED
COPY

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF CARTER BRYANT

San Francisco, California

Thursday, January 24, 2008

Volume 5

Reported by:
DANA M. FREED
CSR No. 10602

JOB No. 81228

EXHIBIT   5

PAGE   191

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4    CARTER BRYANT, an
     individual,

5
               Plaintiff,

6
          vs.                          No. CV 04-9049 SGL

7                                      (RNBx)

     MATTEL, INC., a Delaware

8    Corporation,                      Consolidated with
                                       No. 04-09059

9          Defendants.                   05-2727

10   _____

     Consolidated with MATTEL, INC.

11   vs. BRYANT and MGA ENTERTAINMENT,
     INC. vs. MATTEL, INC.

12   _____

13

14          Confidential - Attorney's Eyes Only,

15   Videotaped deposition of Carter Bryant, Volume 5,

16   taken on behalf of Mattel, Inc., at 50 California Street,

17   22nd Floor, San Francisco, California, beginning at

18   8:14 a.m. and ending at 3:51 p.m. on Thursday,

19   January 24, 2008, before DANA M. FREED, Certified

20   Shorthand Reporter No. 10602.

21

22

23

24                              EXHIBIT _____ 5

25                              PAGE _____ 192

892

CARTER BRYANT, V.5                                    01/24/08
CONFIDENTIAL ATTORNEYS EYE'S ONLY

```
 1   APPEARANCES:
 2
 3   For CARTER BRYANT, an individual:
 4          KEKER & VAN NEST LLP
            BY:   MATTHEW M. WERDEGAR
 5          Attorney at Law
            710 Sansome Street
 6          San Francisco, California 94111-1704
            415.391.5400
 7
 8   For MATTEL, INC., a Delaware Corporation:
 9          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
            BY:    JOHN QUINN
10                 MICHAEL T. ZELLER
                   BRIDGET A. HAULER
11          Attorneys at Law
            865 Figueroa Street, 10th Floor
12          Los Angeles, California 90017
            213.443.3000
13
14   For MGA Entertainment, Inc., MGA Entertainment (HK)
     Limited, and Isaac Larian:
15
            SKADDEN ARPS SLATE MEAGHER & FLOM LLP
16          BY:   MICHELLE M. CAMPANA
            Attorney at Law
17          Four Embarcadero Center, 38th Floor
            San Francisco, California 94111-5974
18          415.984.6400
19
     VIDEOGRAPHER:
20
            SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
21          BY:  RAY TYLER
            450 Sansome Street, Suite 1550
22          San Francisco, California 94111
            415.274.9977
23
24                         EXHIBIT ___5_____
25                         PAGE __193_____
```

893

1    is third tier, so you want confidential?

2          MR. WERDEGAR:  My understanding is there's

3    three tiers.  There's confidential, there's highly

4    confidential attorneys' eyes only, and there's highly

09:18 5    confidential restricted attorneys eyes only.  And I'm

6    not asking for the restricted, which I think limits

7    counsel on the other side to only two or three of them

8    actually seeing it.

9          MS. HAULER:  Yeah.

09:18 10          MR. WERDEGAR:  I want that middle tier --

11          MS. HAULER:  Okay.

12          MR. WERDEGAR:  -- which is attorneys' eyes

13    only, which means inside Mattel, inside counsel,

14    inside people cannot see it.

09:19 15          MS. HAULER:  Yeah.

16    BY MR. QUINN:

17      Q    So how much have you received from MGA with

18    respect to Bratz?

19          MS. CAMPANA:  Objection; it's vague.

09:19 20          MR. WERDEGAR:  Objection; it's vague.

21          THE WITNESS:  I don't know the total amount.

22    Ballpark probably around $20 million.

23          MR. QUINN:  Just so I can cure an objection,

24    if there is one.  What was vague about my question?

09:19 25          MR. WERDEGAR:  You said a total amount

EXHIBIT 5

PAGE 193.001

```
   1    received.  It was, you know, it was unclear whether
   2    that was including potentially expense reimbursements,
   3    was it asking about royalties, was it asking,
   4    you know, was it purely monetary?  I mean, he was --
09:19 5          MR. QUINN:  All right.
   6             MR. WERDEGAR:  -- seemed to be sweeping at a
   7    universe that could be unclear.
   8    BY MR. QUINN:
   9        Q    So is the number, the approximate --
09:19 10         MS. CAMPANA:  Also vague as to Bratz.
  11    I think they used that relating to Bratz.
  12             MR. QUINN:  I'm sorry?  What's vague with
  13    Bratz?
  14             MS. CAMPANA:  Any products in particular?
09:20 15         MR. QUINN:  Is there any confusion in your
  16    mind what I'm -- what I'm asking you about?
  17             THE WITNESS:  No, I think I understand.
  18    You're just asking about what royalties I have earned
  19    from MGA in general.
09:20 20   BY MR. QUINN:
  21        Q    That was my intention, that was my intention.
  22    So is your approximation of the total royalties would
  23    be $20 million?
  24        A    Right.
09:20 25        Q    Can you tell me how much -- when did you
```

EXHIBIT 5

PAGE 193.002

1    speculation, lacks foundation.  Vague and ambiguous.

2    Vague as to time.

3            THE WITNESS:  Are you asking me if I think

4    I regarded him as a competitor?

12:25 5  BY MR. QUINN:

6        Q    Yeah, yes.

7        A    No.

8            MR. WERDEGAR:  Same objections.

9            THE WITNESS:  No.

12:26 10         MR. QUINN:  Do you want to change that tape?

11           THE VIDEOGRAPHER:  The time is 12:26.  We're

12   going off the record.  This is the completion of Media

13   Number 2.

14           (Off the record.)

01:01 15         (A recess was taken for the noon hour.)

16           THE VIDEOGRAPHER:  Good afternoon.  The time

17   is 1:02 p.m.  We are back on the record.  This will be

18   the beginning of Media Number 3 in the deposition of

19   Carter Bryant, Volume 5.

01:02 20         MR. WERDEGAR:  Mr. Bryant wants to make a

21   brief clarification or correction to his testimony now

22   that we're back on the record.

23           THE WITNESS:  Oh, I had said yesterday that

24   I thought when Audrey Hadlock had come out to my home

01:02 25   that I thought that she had taken an image of my

EXHIBIT

PAGE  194

1090

1    computers.  But I -- what I understand now is that she

2    did not actually take a full image, she just took

3    certain files off the computer.  So it wasn't a full

4    imaging on the computers.

01:02  5    BY MR. QUINN:

6        Q    Audrey Hadlock is somebody who is with the

7    Keker firm?

8        A    Yes.

9        Q    And when she came and -- yesterday you said

01:03 10    that she had imaged three computers.

11        A    I thought that she had, yes, I thought that

12    she had fully imaged them, but what I understand now

13    is that she had just taken certain files off.

14        Q    All right.  And do you know which ones she

01:03 15    took off?

16        A    No, I don't.

17        Q    When you were working at Mattel, did you ever

18    have responsibility for dealing with any vendors?

19            MR. WERDEGAR:  Objection; vague as to time.

01:03 20    Vague as to "responsibility."  Vague as to dealing

21    with vendors.

22            THE WITNESS:  What do you mean exactly?

23    BY MR. QUINN:

24        Q    Did you have any contact or responsibilities

01:03 25    with respect to vendors?    EXHIBIT ____5____

                                      PAGE ____195____

1091

1          MR. WERDEGAR:  Same objections.  Vague and

2     ambiguous.  Vague as to time.

3          THE WITNESS:  Sometimes, yes.

4     BY MR. QUINN:

5          Q    And would you be involved in decisions about

6     what vendors to use?

7          MR. WERDEGAR:  Objection; vague and

8     ambiguous.  Vague as to "decisions."

9          THE WITNESS:  Yes, sometimes.

10    BY MR. QUINN:

11         Q    And would you also have responsibility

12    sometimes for supervising vendors?

13         MR. WERDEGAR:  Objection; vague as to

14    "supervising vendors."  Vague as to time.  Potentially

15    calls for a legal conclusion.

16         THE WITNESS:  I'm not sure exactly what you

17    mean by supervising the vendors.

18    BY MR. QUINN:

19         Q    Well, for example, giving vendors directions?

20         MR. WERDEGAR:  Still objection; vague.  Same

21    objections.

22         THE WITNESS:  Yeah, sometimes.

23    BY MR. QUINN:

24         Q    And reviewing their work?

EXHIBIT _____ 5 _____

25         A    Yes.

PAGE _____ 196 _____

1092

1        Q    And making judgments concerning the adequacy

2   or acceptability of their work?

3             MR. WERDEGAR:  Objection; vague and ambiguous

4   as to "adequacy or acceptability."  Vague as to time.

01:04  5           THE WITNESS:  Yes.

6   BY MR. QUINN:

7        Q    And participating in approval of their

8   invoices for payment?

9             MR. WERDEGAR:  Objection; vague and

01:04 10  ambiguous.

11            THE WITNESS:  Um, I don't remember if I ever

12  reviewed their invoices.

13  BY MR. QUINN:

14       Q    Did you also have responsibility before

01:05 15  overseeing the work of other Mattel employees?

16            MR. WERDEGAR:  Objection; vague and

17  ambiguous.  Vague as to time.  Vague as to "overseeing

18  the work of others."  Potentially calls for a legal

19  conclusion.

01:05 20           THE WITNESS:  Yeah, I'm not sure exactly what

21  you're referring to when you say overseeing.

22  BY MR. QUINN:

23       Q    Say supervising the work of other employees.

24  Did you ever do that?

01:05 25           MR. WERDEGAR:  Same objections.  Vague as to

EXHIBIT _____

PAGE ___197___

1093

1    "supervising."  Potentially calls for a legal conclusion.

2         THE WITNESS:  I wouldn't really necessarily

3    say supervising.  But, you know, I did work with other

4    people, you know, we had pattern makers and sample

01:05 5    makers.  And, you know, I would, of course, you know,

6    review their work, look at it, and, you know, make

7    comments.

8    BY MR. QUINN:

9         Q    Sometimes as part of your job, did you give

01:05 10   directions to other Mattel employees?

11        MR. WERDEGAR:  Objection; vague as to time.

12   Vague as to "directions."

13        THE WITNESS:  Well, again, as I just said,

14   you know, I would work with other people and I would,

01:06 15   you know, give them, you know, let them know what

16   my ideas were and my comments as they worked on

17   things.

18   BY MR. QUINN:

19        Q    Did that include giving them directions as to

01:06 20   what you wanted them to do?

21        MR. WERDEGAR:  Objection; vague as to time.

22   Vague as to "giving them directions."

23        THE WITNESS:  To some extent, yes.

    EXHIBIT _____ 5

24   BY MR. QUINN:

    PAGE ____ 198

01:06 25   Q    And following up on how they carried out

1094

1    those directions, is that something that you did as

2    well?

3              MR. WERDEGAR:  Objection; vague as to

4    "following up."  Vague as to "directions."

01:06 5          THE WITNESS:  I'm not exactly sure what you

6    mean by following up.

7    BY MR. QUINN:

8        Q    Well, you would give some direction and then

9    would you from time to time have responsibility to see

01:06 10   whether your direction had been complied with?

11             MR. WERDEGAR:  Objection; vague as to

12   "complied with."  Vague as to time.

13             THE WITNESS:  Yes.

14   BY MR. QUINN:

01:07 15      Q    Did you get involved in brainstorming

16   sessions while you were at Mattel?

17             MR. WERDEGAR:  Objection; vague and

18   ambiguous.  Vague as to time.  Vague as to "get

19   involved in."  Vague as to "brainstorming sessions."

01:07 20         THE WITNESS:  I would attend brainstorming

21   sessions every now and again, yes.

22   BY MR. QUINN:

23       Q    Where people including yourself would throw

24   out different kinds of ideas for products and things

01:07 25   of that nature?

EXHIBIT _____ 5

PAGE _____ 199

1095

1          MR. WERDEGAR:  Objection; vague as to

2    products or things of that nature.  Vague as to time.

3    Vague and ambiguous.

4          THE WITNESS:  Yeah, during a brainstorm,

01:07 5    I mean, you would talk about ideas or, you know,

6    things that had been successful in the past.  Things

7    like that.

8    BY MR. QUINN:

9       Q   Would you participate in decisions about what

01:07 10   direction Mattel ought to take with a particular

11   product or an idea for a product?

12          MR. WERDEGAR:  Objection; vague as to time.

13   Vague as to decisions Mattel might make with respect

14   to a product or product idea.

01:08 15          MS. CAMPANA:  Objection; compound.

16          THE WITNESS:  Not that I can remember.

17   BY MR. QUINN:

18      Q   Did you contribute to the decision-making

19   process about new Mattel products or how products

01:08 20   might be changed?

21          MR. WERDEGAR:  Objection; vague as to

22   "contribute to the decision-making process."

23   Potentially calls for a legal conclusion.  Vague as to time.

24          THE WITNESS:  Well, again, when we would

01:08 25   have, you know, a brainstorming meeting where,

EXHIBIT _____ 5

PAGE _____ 2 ∞

1096

1

2

3

4

5

6

7

8

9

10      I, CARTER BRYANT, do hereby declare under

11   penalty of perjury that I have read the foregoing

12   transcript; that I have made such corrections as noted

13   herein, in ink, initialed by me, or attached hereto;

14   that my testimony as contained herein, as corrected,

15   is true and correct.

16      EXECUTED this_____day of_____, 2008,

17   at_____,_____.
              (City)                    (State)

18

19

20                    _____

21                    CARTER BRYANT
                      VOLUME 5

22

23

24                    EXHIBIT ____S____

25                    PAGE ____201____

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11         Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [  ] was [ X ] was not requested.

15         I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated:    JAN 2 9 2008
         _____

22

23              _____
                DANA M. FREED
24              CSR No. 10602
                                EXHIBIT _____5_____

25                              PAGE _____202_____

**EXHIBIT 6**

Bryant, Carter re Gunther-Wahl v. Mattel

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

            COUNTY OF LOS ANGELES

2

3

        GUNTHER-WAHL PRODUCTIONS, INC.,  )

4       a corporation; and CANDY WAHL,   )

        an individual,              )

5                           )

            Plaintiffs,         )

6                           )

            vs.           )  Case No. BC 269746

7                           )

        MATTEL, INC., a corporation;    )

8       and DOES 1 through 10,       )

        inclusive,              )

9                           )

            Defendants.       )

10

11

12

13      THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,

14

15      produced, sworn, and examined on Tuesday, September 9,

16      2003, at 1:02 p.m. of that day, pursuant to Notice to

17      Take Deposition at the Law Offices of Blackwell,

18      Sanders, Peper & Martin, 901 St. Louis Street, in the

19      City of Springfield, County of Greene, State of

20      Missouri, before Jill L. Paulsen, CSR, RPR, CCR #0432,

21      and Notary Public, in a certain cause now pending in the

22      Superior Court of the State of California, County of Los

23      Angeles, wherein the parties are as above set forth;

24      taken on behalf of the Defendants.

25

EXHIBIT ___6___

PAGE ___203___

                    Unsigned                         Page i

CONFIDENTIAL - ATTORNEYS EYES ONLY                    M 0061802

Bryant, Carter re Gunther-Wahl v. Mattel

```
 1        A P P E A R A N C E S

 2

 3   For Plaintiffs:   Mr. Scott H. Carr

                       Greene, Broillet, Panish & Wheeler

 4                     100 Wilshire Boulevard

                       Twenty-First Floor

 5                     Post Office Box 2131

                       Santa Monica, CA  90407-2131

 6

     For Defendants:   Mr. Lawrence Y. Iser

 7                     Greenberg, Glusker, Fields, Claman,

                         Machtinger & Kinsella

 8                     1900 Avenue Of The Stars

                       21st Floor

 9                     Los Angeles, CA  90067

10   For the Witness:  Mr. Pete Salsich, III

                       Blackwell, Sanders, Peper & Martin

11                     720 Olive Street, Suite 2400

                       St. Louis, MO  63101

12

     Videotaped by:    Mr. David Cron

13                     Verbatim Video Services

                       1528 East Glenwood

14                     Springfield, MO  65804

15

16

17            I N D E X

18

     Witness:  CARTER BRYANT              Page

19

20   Examination by Mr. Iser                4

21   Examination by Mr. Carr               82

22   Further Examination by Mr. Carr      112

23   Reporter's Certificate and Costs     114

24

25   Phonetic spelling:  (ph.)
```

EXHIBIT _____ 6

PAGE _____ 204

Unsigned                                    Page 2

CONFIDENTIAL - ATTORNEYS EYES ONLY                          M 0061803

Bryant, Carter re Gunther-Wahl v. Mattel

1    Q   And what do they make?

2    A   Oh, they make a range of toys, electronic products,

3        consumer products.

4    Q   Have you done any consulting for Mattel since you

5        left their employ?

6    A   No, I have not.

7    Q   And your reason to leave was your -- voluntarily?

8    A   Yes, it was.

9    Q   When you left Mattel, were you required to sign any

10       confidentiality document?

11   A   I don't recall.

12   Q   Were you given any kind of severance pay at the

13       time you left Mattel?

14   A   No.

15   Q   Have you spoken with Mr. Iser or anyone at his

16       office at any time prior to the deposition

17       beginning today?

18   A   I have not personally, no.

19   Q   Okay.  As of the time the deposition commenced, did

20       you have an understanding as to what the issues

21       were in this case?

22   A   Yes, I did.

23   Q   From where did you obtain that information?

24   A   From the subpoena letter.

25   Q   Anything -- any other source?

EXHIBIT _____6_____

PAGE _____205_____

Unsigned                              Page 88

CONFIDENTIAL - ATTORNEYS EYES ONLY                    M 0061889

Bryant, Carter re Gunther-Wahl v. Mattel

1    A   No.

2    Q   You also indicated that when you were at Mattel,

3        you had heard about the Gunther-Wahl litigation and

4        that it involved fairies, correct?

5    A   Mm-hmm.  That's correct.

6    Q   Is that a "yes"?  Okay.

7        Do you recall from where you heard that?

8    A   No, I don't.

9    Q   Did you hear anything else or have any other

10       knowledge regarding the litigation other than the

11       fact that it involved fairies?

12   A   No, I did not.

13   Q   At what point in time did you learn of the

14       existence of the litigation?

15   A   I don't remember the exact point in time.

16   Q   Do you recall approximately when?

17   A   It might have been sometime in 2000.

18   Q   It was with your second stint with the company?

19   A   Yes, it was.

20   Q   So that would have been sometime between January

21       of '99 and October of 2000?

22   A   That's correct.

23   Q   Okay.  By the way, during the time that you were

24       away from Mattel, you indicated that -- from 1998

25       till January of 1999, you indicated that you had

EXHIBIT ___6___

PAGE ___206___

Unsigned                          Page 89

CONFIDENTIAL - ATTORNEYS EYES ONLY                M 0061890

Bryant, Carter re Gunther-Wahl v. Mattel

1       done some work here in Missouri.  What type of work

2       did you do?

3       A   Oh, I think at the time I was just generally

4       doing -- I think I was actually working in a movie

5       theater.

6       Q   Okay.  Nothing in the design field?

7       A   No.

8       Q   When did you first begin working on the Fairy of

9       the Garden doll?

10      A   I don't exactly recall what specific period of time

11      it was.  It was probably in 1999.

12      Q   Again, it was during your second stint with the

13      company?

14      A   Exactly.

15      Q   Okay.  And could the same be said for the other

16      flower dolls that we'd talked about earlier today,

17      they were all done -- they were all commenced

18      during your second stint with the company?

19      A   Yes.

20      Q   So, again, that would be sometime from January

21      of '99 to October of 2000?

22      A   That's correct.

23      Q   Do you have any further -- can you give us any

24      further time frame or tighter time frame as to when

25      you worked on those dolls?

EXHIBIT ____6____

PAGE ____207____

Unsigned                              Page 90

CONFIDENTIAL - ATTORNEYS EYES ONLY

M 0061891

Bryant, Carter re Gunther-Wahl v. Mattel

1    A   Not without possibly referring back to the document

2        to see if there's any indication.

3    Q   Can you take a look at the document and see if that

4        will refresh your recollection in any respect as to

5        when you worked on any of the four dolls that we've

6        talked about.

7            MR. ISER:  Take a look -- if I might help,

8        take a look at the last four pages of the exhibit.

9            THE WITNESS:  Okay.

10           MR. ISER:  I think we pointed out that

11       they were dated.

12           THE WITNESS:  Yes.

13   A   So looks like it would have been sometime probably

14       around the first of 2000, maybe from January.

15   Q   (By Mr. Carr)  Would that have been the time that

16       you started working on the first, which would be

17       the Rose doll?

18           MR. ISER:  I think he was referring to

19       Fairy of the Garden in the last answer.

20   Q   (By Mr. Carr)  Oh, I'm sorry.  I'm sorry.

21   A   I was referring to Fairy of the Garden.

22   Q   Okay.  Can you give us -- tell us the approximate

23       time frame you began working on the Rose doll?

24           MR. ISER:  I don't think anything was

25       dated.

EXHIBIT _____ 6

PAGE _____ 208

Unsigned                          Page 91

CONFIDENTIAL - ATTORNEYS EYES ONLY

M 0061892

Bryant, Carter re Gunther-Wahl v. Mattel

1     DEPONENT'S SIGNATURE PAGE

2     RE:  Gunther-Wahl Productions and Candy Wahl vs.

       Mattel, Inc., and Does 1 through 10, inclusive

3     Case No. BC 269746; County of Los Angeles

       Deposition taken on September 9, 2003

4

     Page   Line   Change Requested and Reason

5

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17

     I do hereby certify that the foregoing is a true and

18  correct transcript of the deposition in the

     foregoing-styled and numbered cause, and I declare and

19  sign the above true, under penalty of perjury, with the

     exception of the corrections, if any, which I have noted

20  on this page.

21    _____

       CARTER BRYANT

22

     SUBSCRIBED and sworn to before me this _____ day

23  of _____, _____.

24  _____

      NOTARY PUBLIC

25

EXHIBIT ___4____

PAGE ___209____

Unsigned             Page -

**CONFIDENTIAL - ATTORNEYS EYES ONLY**         M 0061916

Bryant, Carter re Gunther-Wahl v. Mattel

1      SUPERIOR COURT OF THE STATE OF CALIFORNIA

               COUNTY OF LOS ANGELES

2

3    GUNTHER-WAHL PRODUCTIONS, INC.,   )

    a corporation; and CANDY WAHL,   )

4    an individual,         )

                  )

5         Plaintiffs,   )

                  )

6     vs.        ) Case No. BC 269746

                  )

7    MATTEL, INC., a corporation; and   )

    DOES 1 through 10, inclusive,   )

8              )

         Defendants.   )

9

10      CERTIFICATE OF OFFICER AND

        STATEMENT OF DEPOSITION CHARGES

11

12    I hereby certify that the deposition of

        CARTER BRYANT

13   was taken on September 9, 2003, on behalf of the

    Defendants.

14

15   COSTS ARE INCURRED AS FOLLOWS:

16   Plaintiffs   $ 167.05

    Defendants   $ 478.26

17

18   On September 16, 2003, the original transcript was

    mailed to:

19       Mr. Carter Bryant

        1303 South Farm Road 115

20      Springfield, MO  65802

21   for the purpose of obtaining signature, after which

    custody of the original transcript is to be transmitted

22   to attorney for the Defendants.

23

24

      Jill L. Paulsen, CSR, CCR #0432

25     Registered Professional Reporter

            Unsigned           Page -

EXHIBIT _____ 6 _____

PAGE _____ 210 _____

CONFIDENTIAL - ATTORNEYS EYES ONLY        M 0061917

**EXHIBIT 7**

**Employee Confidential Information
and Inventions Agreement**

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment by the Company and other good and valuable consideration, I agree that:

1. *Provisions Related to Trade Secrets*

(a)  I acknowledge that the Company possess and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b)  As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation , device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information of the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c)  I will not disclose or use at any time, either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d)  Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information

2. *Ownership of Inventions*

(a)  I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right , title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b)  As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

(c)  Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provisions of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer.  I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d)  I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

CONFIDENTIAL

EXHIBIT _____ 7 _____

PAGE _____ 211 _____

Hudnut

EXHIBIT NO. 478

7/13/07

Wendy S. Schreiber

M 0098318

3. *Conflicts with Other Activities*

(a)   My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time.  I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

4. *Miscellaneous*

(a)   My obligations under this Agreement may not be modified or terminated, in whole or in part, except in a writing signed by a Vice-President of the Company.  Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b)   Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision.  If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c)   My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination.  This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d)   I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e)   Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company.  Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f)   This Agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g)   This Agreement contains the complete agreement between the Company and me concerning the subject matter thereof and supersedes all other agreements and understandings.  This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND
AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE
DURING HIS OR HER EMPLOYMENT.

_____
Employee Signature

MATTEL, INC.

By _____

Robert K. Hudnut Jr.
Employee Name (print)

TERESA NEWCOMB
Name of Witness (print)

5/30/98
Date

# With the exception of Hudnut/Mattel Employment Side Letter

CONFIDENTIAL

EXHIBIT _____ 7 _____

PAGE _____ 2/2 _____

M 0098319

**EXHIBIT  8**

## Wisteria Productions, Inc. 2930 Montana Ave., Santa Monica, CA 90403  310-315-4362/4364 (Fax)

March 17, 1998

Mr. Rick De Herder
Sr. Vice President and General Manager
Mattel Inc.
333 Continental Blvd.
El Segundo, CA  90245

Re:   <u>Side Letter to Mattel/Hudnut Offer Letter and Mattel Employee Confidential
Information and Inventions Agreement</u>

Dear Rick:

Thank you again for offering me the Mattel Vice President and Executive Producer position for
Entertainment and Licensing.  I'm very excited about the job and look forward to working with
you, Ned and the rest of the team.

As we discussed, I have been creating, developing and producing properties for the past five and a
half years, and we need to exclude those properties from the employment agreement.  This letter
will serve to modify the offer letter and Employee Confidential Information and Inventions
Agreement that Matt Tullio sent to me.

The properties I have created, developed or produced prior to starting at Mattel, and which are
therefore excluded, are:

- NFL Rough Racers
- The Blanket Show
- Total Dorks
- The Mighty Clyde (Whoopi Goldberg show)
- Toad Patrol
- High (School) TV
- Calliope
- Team Grace
- The Thirteenth Apostle
- Tales From The Wood
- Children's books:  <u>Adam</u>, <u>The Prince Without A Face</u>, <u>The Basement</u>, <u>Fatima and Atmana</u>

CONFIDENTIAL

Hudnut
EXHIBIT NO. 409
7/3/07
Wendy S. Schreiber

EXHIBIT _____ 8

PAGE _____ 213

M 0098320

**Mr. Rick De Herder**
**Hudnut Side Letter**
**Page 2**

I also disclose that I have a back-end participation in the "Mighty Max" property through Film Roman, and an ownership interest in "Captain Simian & The Space Monkeys" through Monkeyshine Productions.

Mattel acknowledges that I will retain whatever ownership interest I currently have in the properties listed above, and that I may be consulted regarding them from time to time.

Mattel acknowledges that I have previously presented "The NFL Rough Racers" on multiple occasions to Mattel and that if Mattel at some future date decides to pursue and/or sign the license, or any of the other properties listed above, it explicitly will not be deemed a conflict of interest or in any way a violation of the Employee Confidential Information and Inventions Agreement.

Finally, I write children's stories and songs and would like to continue to do so on my own time. Based on our understanding, if I were to publish a children's book that would not violate the conflict of interest policy, but I acknowledge that any book I write could not be turned into a toy property while I am employed by Mattel.

Please call me with any questions.  If none, I will sign the Mattel offer letter and Employee Confidential Information and Inventions Agreement and you can sign this letter, and I will look forward to starting on March 30.

Thank you again.

With best regards.

Yours truly,

Rob Hudnut

_3/19/98_
Agreed and Accepted

cc:  Steve Hartley, Ned Mansour, Matt Tullio

CONFIDENTIAL

EXHIBIT _____ 8

PAGE _____ 2/4

M 0098321

**EXHIBIT 9**

**ATTACHMENT 5**
**CONFLICT OF INTEREST QUESTIONNAIRE**

MAT-3969-D

| NAME (PLEASE TYPE OR PRINT) | BUSINESS TELEPHONE AND EXTENSION | DATE |
|---|---|---|
| Robert K. Hudnut, Jr. | X 2799 | 3/30/95 |
| JOB TITLE   V.P., Executive Producer | DEPARTMENT/MAIL STOP | COMPANY |

**INSTRUCTIONS:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest (Attachment 4). Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**MATTEL SUPPLIER** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**MATTEL COMPETITOR** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**INTEREST** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. YOU MAY DISREGARD MUTUAL INVESTMENT TRUSTS AND PUBLICLY-OWNED CORPORATIONS WHOSE SECURITIES ARE TRADED PUBLICLY, IN WHICH YOU OWN NOT MORE THAN $25,000 IN MARKET VALUE, BUT NOT TO EXCEED 10% OF AN INDIVIDUAL'S NET WORTH.

**RECIPIENT OF ANY COMMISSION, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

| | | |
|---|---|---|
| 1. Have you owned, directly or indirectly, any interest in a Mattel supplier? (See definition above.) | ☒ YES | ☐ NO |
| 2. Have you owned, directly or indirectly, any interest in a Mattel competitor? (See definition above.) | ☐ YES | ☒ NO |
| 3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier? | ☒ YES | ☐ NO |
| 4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor? | ☐ YES | ☒ NO |
| 5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity? | ☐ YES | ☒ NO |

CONTINUED ON REVERSE SIDE

**CONFIDENTIAL**

EXHIBIT _____ 9 _____

PAGE _____ 215 _____

Hudnut
EXHIBIT NO. 480
7/13/07
Wendy S. Schreiber

M 0098322

| | |
|---|---|
| 6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee or representative of or acted for any Mattel supplier in any capacity? | ☒ YES ☐ NO |
| 7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor? | ☒ YES ☐ NO |
| 8. Excepting normal everyday transactions (purchase or toys, etc.,) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance? | ☒ YES ☐ NO |
| 9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel? | ☐ YES ☒ NO |

I certify that I have read Mattel's policies concerning Conflict of Interest (Attachment 4) and the answers to the above questions are true. I understand that failure to answer this Questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged since the date of the last Questionnaire in any capacity which creates a Conflict of Interest.

### SIGNATURE REQUIRED BELOW

SIGNATURE _____    DATE 3/30/98

**IF YOUR ANSWER TO ANY OF THE ABOVE IS "YES" PLEASE EXPLAIN IN THE SPACE BELOW**

Please see Hudnut/Mattel Employment
Side Letter dated March 17, 1998.

CONFIDENTIAL                EXHIBIT ___9___                M 0098323

                           PAGE ___216___

**EXHIBIT 10**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION

4

5    ------------------------------

6    MATTEL, INC., a Delaware          )

7    Corporation,                      )

8              Plaintiff,              )

9              vs.                     ) No. CV 04-9059

10   CARTER BRYANT, an individual;     )    NM (RNBx)

11   and DOES 1 through 10,            )  VOLUME I

12   Inclusive,                        )

13             Defendants.             )

14   --------------------------------  )

15   (COMPLETE CAPTION ON NEXT PAGE.)

16

17     CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19     Videotaped 30(b)(6) Deposition of

20     ROBERT K. HUDNUT, JR., taken at

21     400 South Hope Street, Los Angeles,

22     California, commencing at 9:35 A.M.,

23     Friday, July 13, 2007, before Wendy S.

24     Schreiber, CSR No. 3558, RPR, CLR.

25   PAGES 1 - 238

1

Certified Copy

EXHIBIT 10

PAGE 217

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION

 4

 5     -------------------------------

 6     MATTEL, INC., a Delaware        )

 7     Corporation,                    )

 8                  Plaintiff,         )

 9                  vs.                ) No. CV 04-9059

10     CARTER BRYANT, an individual;   )    NM (RNBx)

11     and DOES 1 through 10,          )

12     Inclusive,                      )

13                  Defendants.        )

14     -------------------------------  )

15     CARTER BRYANT, on behalf of     )

16     himself, all present and        )

17     former employees of Mattel,     )

18     Inc., and the general public,   )

19                  Counter-Claimants, )

20                  vs.                )

21     MATTEL, INC., a Delaware        )

22     Corporation,                    )

23                  Counter-Defendant. )

24     -------------------------------

25
```

2

EXHIBIT 10

PAGE 218

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4       FOR THE PLAINTIFF:

 5

 6            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 7            BY:  DIANE C. HUTNYAN, ATTORNEY AT LAW

 8            865 South Figueroa Street, Tenth Floor

 9            Los Angeles, California 90017

10            (213) 443-3000

11            dianehutnyan@quinnemanuel.com

12

13                      -AND-

14

15       MATTEL, INC.

16       BY:  MICHAEL MOORE, ESQ.

17       333 Continental Boulevard

18       El Segundo, California 90245-5012

19       (310) 252-2000

20       michael.moore@mattel.com

21

22

23

24

25
```
                                                    3

EXHIBIT __10__

PAGE __219__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR THE DEFENDANT AND COUNTERCLAIMANT

 4        CARTER BRYANT:

 5

 6            KEKER & VAN NEST LLP

 7            BY:  MICHAEL H. PAGE, ESQ.

 8            710 Sansome Street

 9            San Francisco, California 94111-1704

10            (415) 391-5400

11            mhp@kvn.com

12

13

14        FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16            O'MELVENY & MYERS LLP

17            BY:  JAMES PAUL JENAL, ESQ.

18            400 South Hope Street

19            Los Angeles, California 90071-2899

20            (213) 430-6000

21            jjenal@omm.com

22

23    ALSO PRESENT:

24

25            DAVID WEST, VIDEO OPERATOR
```

4

EXHIBIT __10__

PAGE __220__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. JENAL:

 2      Q.   And I believe you told us that you didn't

 3   know anything about the project Tune Teens; is that

 4   correct?

 5      A.   I don't have any specific recollection of      03:31PM

 6   that project.

 7           MR. JENAL:  Why don't we take a break.  I'll

 8   check my notes.  I think we're almost close to done

 9   here.

10           VIDEO OPERATOR:  Off the record -- 3:32 off   03:31PM

11   the record.

12                   (Brief recess.)

13           VIDEO OPERATOR:  3:45 we are back on the

14   record.

15   BY MR. JENAL:                                          03:44PM

16      Q.   Mr. Hudnut, you realize your still under

17   oath, correct?

18      A.   Yes, I do.

19           (Deposition Exhibit 478 was marked for

20       identification and is annexed hereto.)

21           (Deposition Exhibit 479 was marked for

22       identification and is annexed hereto.)

23           (Deposition Exhibit 480 was marked for

24       identification and is annexed hereto.)

25   /   /   /
```

208

EXHIBIT __10__

PAGE __221__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JENAL:

 2        Q.   Let me hand you what's been marked as

 3    Exhibits 478, 479 and 480 in your deposition.

 4    Mr. Hudnut, do you have Exhibits 478, 479 and 480 in

 5    front of you?                                      03:45PM

 6        A.   Yes, I do.

 7        Q.   Just for the record Exhibit 478 is a

 8    two-page document bearing Bates No. M 0098318 to

 9    319.

10             Exhibit 479 is also a two-page document    03:45PM

11    bearing Bates Nos. M 0098320 through 321.

12             And Exhibit 480 is also a two-page document

13    bearing Bates No. M 0098322 to 323.

14             If we could start with Exhibit 478, could

15    you tell me what you recognize this exhibit to be.   03:46PM

16        A.   To be Mattel's Employee Confidential

17    Information and Inventions Agreement.

18        Q.   And on the second page of Exhibit 478

19    there's a series of at least a couple of signatures

20    there.  Is the one there on the left yours?          03:46PM

21        A.   Yes, it is.

22        Q.   And then there is another signature for

23    Mattel, Inc. and I believe that's by Teresa Newcomb.

24    Do you see that?

25        A.   I do.                                       03:46PM
                                                              209
```

EXHIBIT __10__

PAGE __222__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Do you have an understanding of who Teresa

2  Newcomb was at Mattel in March of 1998?

3      A.   She was in the Human Resources department.

4      Q.   And then there's some additional handwriting

5  on here.  Is that your handwriting?                    03:47PM

6      A.   Yes, it is.

7      Q.   And there's what appears to be an asterisk

8  next to paragraph 4(g) or miscellaneous paragraph G

9  which says "This agreement contains the complete

10  agreement between the Company and me concerning the    03:47PM

11  subject matter thereof and supersedes all other

12  agreements and understandings.  This Agreement may

13  be executed in counterparts.  This Agreement will be

14  deemed effective as of the start of Employee's

15  employment with the Company."  Do you see that?        03:47PM

16      A.   I do.

17          MS. HUTNYAN:  I think it says "hereof"

18  actually instead of "thereof."

19          MR. JENAL:  Fair enough, "hereof."  Thank

20  you.                                                   03:47PM

21      Q.   Did you write the asterisk next to that?

22      A.   Yes, I did.

23      Q.   Then down at the bottom of the page there's

24  some handwriting.  Could you read that for us,

25  please.                                                03:47PM

                                                            210

EXHIBIT ___10___

PAGE ___223___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   "With the exception of Hudnut/Mattel

2   Employment Side Letter."

3      Q.   And if you look at Exhibit 479 --

4      A.   Yes.

5      Q.   -- could you tell me what you recognize that   03:48PM

6   exhibit to be.

7      A.   This is the side letter to which we just

8   referred.

9      Q.   This is the side letter that the handwriting

10  on the second page of Exhibit 478 is referring?        03:48PM

11     A.   That's correct.

12     Q.   And who wrote Exhibit 479?

13     A.   I did most of the writing.  I had help from

14  an outside lawyer in the drafting of it but -- so me

15  with counsel.                                          03:48PM

16     Q.   Did Mattel have any role in drafting Exhibit

17  479?

18     A.   I negotiated the content of what is here

19  with Mattel prior to starting at Mattel.

20     Q.   And what was your purpose in creating         03:48PM

21  Exhibit 479?

22     A.   Well, I knew because it was my second time

23  at Mattel that there was an Employee Confidential

24  Information and Inventions Agreement.  This had been

25  sent to me ahead of time and -- and I read through    03:49PM

211

EXHIBIT ___10___

PAGE ___224___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    it and I saw -- I saw what it meant in terms of

 2    conflict of interest and ownership of inventions and

 3    because I had been creating intellectual property

 4    for the previous five and a half years I wanted

 5    clarity as to what I had created prior to starting      03:49PM

 6    again at Mattel and since some of these projects

 7    continue to have a life beyond my starting at Mattel

 8    I wanted to be sure those weren't conflicts of

 9    interest.

10        Q.   You mentioned that you had an outside lawyer  03:49PM

11    who assisted you in the drafting of Exhibit 479.

12    Was that somebody you had to find specifically for

13    the purpose of creating Exhibit 479 or is this a

14    lawyer that you had a preexisting relationship with?

15        A.   A preexisting relationship.                   03:50PM

16        Q.   Was this something that you worked with with

17    regards to the intellectual property that you had

18    been creating over the last four or five years?

19        A.   It's someone who had been involved in that,

20    yes.                                                    03:50PM

21        Q.   This was essentially your lawyer who

22    counseled you on such things.  Is that fair to say?

23        A.   I'm trying to think --

24             MS. HUTNYAN:  Objection:  vague.  "Such

25    things," his prior work or this?                        03:50PM

                                                                 212
```

EXHIBIT ___10___

PAGE ___225___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.   Do I have any personal trademarks?

2       Q.   Correct.  Do you yourself own any

3   trademarks?

4       A.   No, not that I can think of.

5       Q.   Did you ever apply for a trademark?       03:53PM

6       A.   I remember with -- with the Space Monkeys

7   project I know that we applied for the -- actually,

8   I'm not sure if we applied for the trademarks

9   through Hallmark or through -- it wasn't through

10  Blue Bird.  I think it was through Hallmark and I     03:53PM

11  can't recall whether or not Monkey Shine was

12  co-named on those copyrights or on the trademarks

13  rather.  I think you had a trademark question.

14      Q.   I did.

15      A.   So I don't specifically recall.  I know     03:54PM

16  Hallmark took the lead and we might have been

17  co-named.

18      Q.   If you would look on the second page of

19  Exhibit 479 --

20      A.   Yes.                                          03:54PM

21      Q.   -- the paragraph that begins "Finally, I

22  write children's stories and songs."  Do you see

23  that?

24      A.   Yes, I do.

25      Q.   "...and would like to continue to do so on   03:54PM

                                                              215

EXHIBIT _10_

PAGE _226_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   my own time.  Based on our understanding, if I were

 2   to publish a children's book that would not violate

 3   the conflict of interest policy, but I acknowledge

 4   that any book I write could not be turned into a toy

 5   property while I am employed by Mattel."            03:54PM

 6          Do you see that?

 7   A.    Yes.

 8   Q.    And I take it that that provision was

 9   acceptable to Mattel?

10   A.    Yes, it was.                                  03:54PM

11   Q.    Have you since March of 1998 continued to

12   write children's stories?

13   A.    Not with -- I have done some writing with my

14   own children but I haven't sent anything off to be

15   published.                                          03:55PM

16   Q.    What about songs?  Have you written any

17   songs for publication since March of 1998?

18   A.    Not outside of my work at Mattel.

19   Q.    Have you done any creative work outside of

20   your work for Mattel that you have sought to either  03:55PM

21   publish or copyright or otherwise commercialize?

22   A.    Since I started in March of '98?

23   Q.    March of '98.

24   A.    I can't -- I can't think of anything, no.

25   Q.    If you would look at Exhibit 480 for just a   03:55PM
                                                         216
```

EXHIBIT __10__

PAGE __227__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    moment.  Do you recognize Exhibit 480?

 2        A.   Yes, I do.

 3        Q.   What is Exhibit 480?

 4        A.   It is Attachment 5 to the Conflict of

 5    Interest Questionnaire.                              03:56PM

 6        Q.   And is that your handwriting at the top?

 7        A.   Yes, it is.

 8        Q.   And then you checked off the boxes that are

 9    reflected here on the first page of Exhibit 480 as

10    well?                                                03:56PM

11        A.   Yes, that's right.

12        Q.   So the first question says "Have you owned,

13    directly or indirectly, any interest in a Mattel

14    supplier?"  And you checked off yes.

15        A.   Uh-huh.                                     03:56PM

16        Q.   What Mattel supplier were you referring to?

17        A.   I was referring to Monkey Shine Productions

18    because the -- we did our initial toy deal with Blue

19    Bird Toys.  Blue Bird then licensed those rights to

20    Mattel.  So I was indirectly a Mattel supplier.      03:56PM

21        Q.   I see.  And so on question No. 3 which you

22    also marked yes which is "Have you been the

23    recipient of any commission, fee, loan, trip, gift,

24    benefit or anything else of value that is derived in

25    any way from a Mattel supplier," what were you       03:57PM
                                                             217
```

EXHIBIT ___10___

PAGE ___228___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   referring to there?

2       A.   Blue Bird Toys is a Mattel supplier and

3   they, for example, had flown me to England to talk

4   about a next -- the evolution of the television

5   series and how that related to the toys.  So that.   03:57PM

6       Q.   And then on question No. 6, you also marked

7   that yes.  "Have you or any relative of yours by

8   blood or marriage been a director, officer,

9   consultant, agent, employee or representative of or

10  acted for any Mattel supplier in any capacity?"  And   03:57PM

11  what were you referring to there?

12      A.   I believe I was referring to the Monkey

13  Shine capacity because we were directly a Mattel

14  supplier and I was an officer in that company.

15      Q.   Were you ever involved with any other     03:58PM

16  supplier of Mattel other than Monkey Shine?

17      A.   Another supplier.

18          MS. HUTNYAN:  Objection:  vague.

19  BY MR. JENAL:

20      Q.   Yes.  Well, "Mattel supplier" is defined in   03:58PM

21  the document so within the meaning of the document

22  were you ever involved --

23          MS. HUTNYAN:  I just meant what time period.

24  Like ever?

25          MR. JENAL:  Well, this is up through the     03:58PM

                                                        218

EXHIBIT _____10_____

PAGE _____229_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    time that you signed this document.

2          THE WITNESS:  Let's see, this was, I'm

3    sorry, which number?  This was --

4          Q.   7.

5          A.   No. 7.  Any activity -- or supplier or      03:58PM

6    competitor.  Let's see, when I was -- I'm trying to

7    think.  When I was -- I'm trying to think of which

8    projects we pitched where from my previous list.  I

9    had taken, for instance, my NFL Rough Racers concept

10   and pitched that to Bandai, for example, while I was   03:59PM

11   an independent producer.  Total Dorks was a project

12   that was in development at Fox Kids and Fox Kids was

13   a company that worked with Mattel.  So those would

14   be the kinds of reasons I would object, yes.

15         Q.   And then at the bottom there's more         03:59PM

16   handwriting there including a signature.  Is that

17   your signature?

18         A.   That's correct.

19         Q.   And then the handwriting underneath it

20   that's yours as well?                                  04:00PM

21         A.   That's correct.

22         Q.   What does that say?

23         A.   Again, with the penmanship.  No.  "Please

24   see Hudnut/Mattel Employment Side Letter dated March

25   17, 1998."                                             04:00PM

                                                            219

EXHIBIT _____ 10

PAGE _____ 230

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   And that's also a reference to what we've

2   marked as Exhibit 479; is that correct?

3      A.   That's correct.

4      Q.   Aside from Exhibits 478 and 480 which are

5   Mattel forms regarding Employee Confidential          04:00PM

6   Information and Inventions Agreement and a Conflict

7   of Interest Questionnaire, since March of 1998 when

8   you signed those two documents have you ever signed

9   any similar documents on behalf of Mattel?

10          MS. HUTNYAN:  Objection:  vague.              04:00PM

11          You can answer.

12          THE WITNESS:  Yeah, which specific kind of

13   document?

14   BY MR. JENAL:

15      Q.   Let's start with the Employee Confidential   04:01PM

16   Information and Inventions Agreement.  Have you ever

17   been asked to -- let's start with that.

18          Have you ever been asked to sign a version

19   of this document since March of 1998?

20      A.   Yes.                                         04:01PM

21      Q.   When was that?

22      A.   I think it was sometime in 2005.

23      Q.   And what was the circumstances under which

24   you were asked to sign a revised version of Exhibit

25   478?                                                 04:01PM

                                                          220

EXHIBIT ___10___

PAGE ___231___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   My recollection is that -- that Mattel had

 2   updated this policy and was seeking our agreement to

 3   it.

 4      Q.   And to the best of your recollection that

 5   was sometime in 2005?                              04:01PM

 6      A.   Or 2006.  I don't -- I don't remember

 7   precisely.

 8      Q.   And did you sign that revised version of the

 9   policy?

10      A.   I did not.                                 04:02PM

11      Q.   Why not?

12      A.   There were some clauses that I was concerned

13   about.

14      Q.   Which clauses in particular were they?

15           MS. HUTNYAN:  Objection.  The document     04:02PM

16   speaks for itself.

17           MR. JENAL:  No, the document doesn't tell me

18   which clauses he objected to.  That was my question.

19           MS. HUTNYAN:  I don't think this is a memory

20   test either so which clauses is your question?     04:02PM

21           THE WITNESS:  I don't remember specifically

22   which clauses.

23   BY MR. JENAL:

24      Q.   What was the nature of those clauses that

25   caused you concern?                                04:02PM

                                                           221
```

EXHIBIT _____10_____

PAGE _____232_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        I declare under penalty of perjury

2    under the laws of the State of California

3    that the foregoing is true and correct.

4        Executed on _____,

5    2007, at _____,

6    California.

7

8

9

10            _____

11            ROBERT K. HUDNUT, JR.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

234

EXHIBIT __10__

PAGE __230__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA    ) ss:
 2   COUNTY OF LOS ANGELES )
 3
 4        I, WENDY S. SCHREIBER, CSR No. 3558, do
 5   hereby certify:
 6
 7        That the foregoing deposition of ROBERT K.
 8   HUDNUT, JR. was taken before me at the time and
 9   place therein set forth, at which time the witness
10   was placed under oath and was sworn by me to tell
11   the truth, the whole truth, and nothing but the
12   truth;
13        That the testimony of the witness and all
14   objections made by counsel at the time of the
15   examination were recorded stenographically by me,
16   and were thereafter transcribed under my direction
17   and supervision, and that the foregoing pages
18   contain a full, true and accurate record of all
19   proceedings and testimony to the best of my skill
20   and ability.
21        I further certify that I am neither
22   counsel for any party in said action, nor am I
23   related to any party to said action, nor am I in any
24   way interested in the outcome thereof.
25
```

235

EXHIBIT __10____

PAGE ___234____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          IN WITNESS WHEREOF, I have subscribed my

2    name this 20th day of July, 2007.

3

4

5

6

7          WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

236

EXHIBIT _____ 10 _____

PAGE _____ 235 _____