**EXHIBIT 11**



**Mattel, Inc.**

333 Continental Boulevard
El Segundo, California 90245-5012
Phone: (310) 252-2000
Telex:   188155 or 188170

December 9, 1998

Mr. Carter Bryant
1-A Sycamore Dr.
Kimberling City, MO 65686

Dear Carter,

We are pleased to extend an offer of employment for the position of Project Designer, and to outline the various benefits that are available to you as a member of the Mattel team.

## Compensation

Your annual base salary will be $60,008, payable on a bi-weekly basis.

## Relocation

You will receive a relocation payment of $7,500, less appropriate federal and state taxes, payable to you no later than 30 days following commencement of your employment.

If you choose to voluntarily terminate your employment with Mattel within one year of your date of hire, you will be required to repay this amount in full.

## Benefits

The following is a brief outline of benefits in which you will be eligible to participate as of your date of hire. Specific details and plan limitations are provided in Summary Plan Descriptions or Plan Documents, and are subject to periodic modification and revision.

You and your qualified dependents, if applicable, will be eligible for the following coverage:

- Medical
- Dental
- Vision
- Prescription
- Life Insurance – 1-1/2 x base salary
- Accidental Death & Dismemberment – 1-1/2 x base salary
- Business Travel Coverage – $1,000,000
- Short & Long-Term Disability

You will be enrolled in the Mattel Personal Investment Plan (PIP), which is a 401(k) savings/retirement plan. The plan offers both Company Automatic and Matching contribution provisions as outlined below:

- Company Automatic Contributions

EXHIBIT 11

PAGE 236

BRYANT 01198
CONFIDENTIAL

The Company will make automatic contributions to your account ranging from 3% to 8% of your salary, based on age.

- Company Matching Provision
  The Company will match up to the first 6% of pay you contribute to your PIP account on a dollar-for-dollar basis up to 2% of your annual salary and on a fifty-cents-on-the-dollar basis for up to the next 4% of your salary.

Of course, this offer is contingent upon satisfactory verification of all information as to previous employers and academic institutions attended, eligibility to work in the United States, and the signing of a Confidential Information and Inventions Agreement. Further, you understand that this letter does not imply employment for a specific term and thus your employment is at will; either you or the Company can terminate it at any time, with or without cause. This letter acknowledges there are no oral or written side agreements or representations concerning the term or conditions of employment. Additional details of your employment relationship are contained in our employment application.

Carter, we are sincerely pleased to extend this offer of employment and look forward to hearing from you soon. If I can answer any questions, please do not hesitate to call me at (310) 252-2535.

Sincerely,

Lynne Robinson
VP, Human Resources

EXHIBIT 11
PAGE 237

2

BRYANT 01199
CONFIDENTIAL

**EXHIBIT 12**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
)
PLAINTIFF, )
)
V. )
)
MATTEL, INC., A DELAWARE )
CORPORATION, ET AL., )
)
DEFENDANTS. )

CASE NO.
CV 04-9040 SGL (RNBX)

# CONFIDENTIAL

## DEPOSITION OF AMY MYERS

## FEBRUARY 22, 2008

REPORTED BY:
PAULA PYBURN
CSR NO. 7304
JOB NO. 08AE142-PP



515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT _____ 12

PAGE _____ 238

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION


CARTER BRYANT, AN                )
INDIVIDUAL,                      )
                                 )
            PLAINTIFF,           )   CASE NO.
                                 )   CV 04-9049 SGL (RNBX)
      V.                         )
                                 )   CONSOLIDATED WITH
MATTEL, INC., A DELAWARE         )   CASE NO. 04-9059
CORPORATION,                     )                AND
                                 )   CASE NO. 05-2727
            DEFENDANTS.          )
_____  )
                                 )
AND CONSOLIDATED ACTIONS.        )
_____  )


C O N F I D E N T I A L


     VIDEOTAPED DEPOSITION OF AMY MYERS,
TAKEN ON BEHALF OF THE MATTEL, INC., AT
601 SOUTH PALOS VERDES AVENUE, CONFERENCE
ROOM 219, SAN PEDRO, CALIFORNIA,
COMMENCING AT 11:42 A.M., FRIDAY,
FEBRUARY 22, 2008, BEFORE PAULA A. PYBURN,
R.P.R., C.L.R., CERTIFIED SHORTHAND
REPORTER, NO. 7304.

2

EXHIBIT 12

PAGE 239

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR M.G.A. ENTERTAINMENT, INC., AND ISAAC LARIAN:

 4            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
              BY:   CARL ALAN ROTH, ESQ.

 5                  ROBERT JAMES HERRINGTON, ESQ.
              300 SOUTH GRAND AVENUE

 6            LOS ANGELES, CALIFORNIA 90071-3144
              (213) 687-5000

 7

 8    FOR MATTEL, INC.:

 9            QUINN EMANUEL URQUHART OLIVER &
              HEDGES, LLP

10            BY:  TAMAR BUCHAKJIAN, ESQ.
              865 SOUTH FIGUEROA STREET

11            10TH FLOOR
              LOS ANGELES, CALIFORNIA 90017

12            (213) 443-3000

13

      ALSO PRESENT:

14

              PETER ACHESON, VIDEO TECHNICIAN

15            J.T.V. LITIGATION SERVICES, INC.

16

17

18

19

20

21

22

23

24

25
```

                                                                    3

EXHIBIT __12__

PAGE __240__

1    A.   IT WAS -- IT HAS TO BE A LONG TIME AGO NOW

2  BECAUSE I HAVEN'T -- LIKE I SAID, I HAVEN'T DONE

3  FREELANCE IN A LONG TIME, BUT...

4         YOU KNOW HOW THESE PLACES ARE.  THEY GIVE

5  YOU A JOB, AND THEN THEY CHANGE THEIR MIND OR          12:59:10

6  WHATEVER.

7         SO I'VE HAD -- HAD, YOU KNOW -- AFTER I WAS

8  THERE, YOU KNOW, BUT THEN AFTER -- YOU KNOW, AFTER I

9  LEFT AFTER A WHILE, DIDN'T BOTHER.  I DIDN'T PURSUE

10  ANYTHING.                                            12:59:27

11    Q.   WHEN'S THE LAST TIME YOU DID FREELANCE

12  WORK?

13         MR. HERRINGTON:  FOR ANYONE?

14         THE WITNESS:  FOR MATTEL OR ANYWHERE?

15  BY MS. BUCHAKJIAN:                                   12:59:36

16    Q.   CORRECT.  FOR ANYONE.

17    A.   MAYBE LAST YEAR I DID A LITTLE.

18    Q.   AND WHO -- AND WHO WAS THAT FOR?

19    A.   IT WAS EITHER FOR JODY OR FUN ZONE, BECAUSE

20  THOSE ARE THE ONLY TWO CLIENTS I WANTED TO KEEP      12:59:57

21  WITH.  I DON'T WANT TO KEEP WITH ANY OF THE REST OF

22  IT.  I WAS BUSY WITH PURSUING OTHER VENTURES.

23    Q.   WHY -- WHY DIDN'T YOU WANT TO KEEP IT?

24    A.   WHY DID I WANT TO NOT DO IT ANYMORE?

25    Q.   WITH THOSE OTHER COMPANIES YOU HAD           01:00:15

61

EXHIBIT   *12*

PAGE   2*41*

1  MENTIONED, LIKE M.G.A. OR -- I THINK THERE WAS ONE

2  OTHER --

3      A.   IT HAD NOTHING TO DO WITH THEM.  IT WAS

4  JUST I DIDN'T WANT TO WORK IN THAT INDUSTRY ANYMORE.

5      Q.   OKAY.                                          01:00:21

6      A.   I WANTED TO DO SOMETHING THAT I FOUND MORE

7  BENEFICIAL.  I WANTED TO HAVE A LITTLE MORE MEANING

8  IN MY LIFE.

9      Q.   IT'S CALLED PREROGATIVE.

10          DID YOU -- WHILE YOU WERE WORKING FOR         01:00:43

11  MATTEL DID YOU WORK FOR ANY OTHER COMPANIES AT THE

12  SAME TIME?

13     A.   NO.

14     Q.   DID YOU EVER DO FREELANCE WORK FOR ANY

15  OTHER COMPANIES WHILE YOU WERE WORKING FOR MATTEL?   01:00:53

16     A.   NO.

17     Q.   DID YOU EVER WORK IN A DEPARTMENT STORE

18  WHILE YOU WERE WORKING FOR MATTEL?

19     A.   NO.

20     Q.   DID IVY ROSS EVER CATCH YOU DOING WORK FOR   01:01:03

21  A DEPARTMENT STORE WHILE YOU WERE WORKING AT MATTEL?

22     A.   I NEVER WORKED FOR IVY ROSS, THAT I COULD

23  RECALL.

24     Q.   AND DID YOU EVER FORMALLY REAPPLY TO DO

25  WORK AT MATTEL AFTER YOU LEFT?                        01:01:30

62

EXHIBIT 12

PAGE 242

1          MR. HERRINGTON:  VAGUE.  I'M NOT SURE WHAT

2     THAT MEANS.

3     BY MS. BUCHAKJIAN:

4          Q.   DID YOU SUBMIT AN APPLICATION TO DO WORK

5     FOR MATTEL?                                              01:01:47

6          MR. HERRINGTON:  AS A FREELANCER, AS AN

7     EMPLOYEE, OR AS A --

8          MS. BUCHAKJIAN:  AS AN EMPLOYEE.

9          THE WITNESS:  NO.

10    BY MS. BUCHAKJIAN:                                       01:01:51

11         Q.   NO.

12         DID YOU SUBMIT AN APPLICATION TO DO

13    FREELANCE WORK FOR MATTEL AFTER YOU LEFT?

14         A.   NO.  AS A -- YOU MEAN AS A VENDOR?

15         Q.   AS A VENDOR OR A FREELANCER.                   01:02:03

16         A.   YEAH.  I -- I MUST HAVE BECAUSE OTHERWISE

17    THEY WOULDN'T HAVE CALLED ME.

18         Q.   OKAY.  AND DO YOU REMEMBER -- I MAY HAVE

19    ALREADY ASKED YOU THIS, SO -- BUT DO YOU REMEMBER

20    WHAT -- WHICH PRODUCT IT WAS IN REGARDS TO?              01:02:18

21         A.   NO.

22         Q.   DO YOU REMEMBER WHO CONTACTED YOU?

23         A.   NO.  BECAUSE, LIKE I SAID, IT SEEMED LIKE

24    PEOPLE WOULD CALL, AND THEN THE THING GOT PULLED ALL

25    THE TIME.  SO I NEVER REALLY REMEMBER EVER FOLLOWING    01:02:33

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT ___12___

PAGE ___243___

1    Q.   HAVE YOU EVER TRIED TO -- TO SELL ANY OF

2    THOSE OR DO ANYTHING WITH THE COLLAGES THAT YOU

3    WOULD DO?

4        A.   NO.

5        Q.   HAVE YOU EVER THOUGHT ABOUT MAYBE TRYING            04:28:04

6    TO -- TO DO KIND OF A SIDE BUSINESS WITH THE

7    COLLAGES OR ANYTHING?

8        A.   NO.   I DON'T WANT TO DO ANYTHING ARTISTIC

9    FOR MONEY EVER AGAIN.

10       Q.   OKAY.   WHEN YOU -- REMEMBER WHEN YOU              04:28:13

11   WERE -- BACK WHEN YOU STARTED AT MATTEL --

12       A.   YES.

13       Q.   LET ME SHOW YOU -- LET ME SHOW YOU A

14   DOCUMENT HERE.

15            TAMAR, I APOLOGIZE.   I DON'T HAVE EXTRA           04:28:50

16   COPIES OF THESE SO IF YOU CAN LOOK OVER -- OVER THE

17   SHOULDER.

18            MS. BUCHAKJIAN:   IT'S OKAY.

19            MR. HERRINGTON:   I THINK YOU KNOW WHAT THEY

20   ARE.                                                        04:28:55

21       Q.   THE FIRST DOCUMENT I'M HANDING YOU HAS BEEN

22   MARKED EXHIBIT 4425 WITH BATES STAMP M 0001638

23   THROUGH -1639.

24            (EXHIBIT 4425 MARKED.)

25            MS. BUCHAKJIAN:   AND THE OTHER DOCUMENT           04:29:04

213

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT _____ 12

PAGE _____ 244

1    I'VE MARKED AS 4426.

2         (EXHIBIT 4426 MARKED.)

3         THE WITNESS:  OKAY.

4    BY MR. HERRINGTON:

5    Q.   NOW, I KNOW THESE AREN'T YOUR CONTRACTS.          04:29:40

6    A.   YEAH.

7    Q.   THESE ARE FORMS THAT MATTEL HAS GIVEN US

8    THAT ARE -- THESE -- THESE TWO ARE SIGNED BY CARTER

9    BRYANT.

10   A.   YEAH.                                             04:29:49

11   Q.   HAVE YOU EVER -- OUR UNDERSTANDING IS

12   MATTEL REQUIRES ALL THEIR EMPLOYEES TO SIGN

13   SOMETHING LIKE THIS.

14   A.   YEAH.

15   Q.   HAVE YOU EVER SEEN CONTRACTS LIKE THIS           04:29:56

16   WHILE YOU WERE AT MATTEL?

17   A.   WELL, I KNOW WHEN YOU FIRST GO IN -- AND

18   THAT'S PRETTY STANDARD WITH ALL THE TOY COMPANIES --

19   IS THAT YOU -- YOU SIGN AN AGREEMENT THAT SAYS

20   YOU'RE NOT GOING TO DO WORK FOR ANOTHER TOY COMPANY    04:30:08

21   WHILE YOU'RE EMPLOYED AT THAT TOY COMPANY.  AND SO

22   YOU'RE NOT GOING TO DO ANY WORK TO PERTAIN TO TOYS

23   WHILE YOU'RE AT THAT COMPANY.  AND WHAT YOU DO THAT

24   DOES PERTAIN TO TOYS IS THEIR PROPERTY.

25        AND THAT'S PRETTY STANDARD, WHAT I BELIEVE        04:30:30

214

EXHIBIT    12

PAGE    245

1    THAT I WOULD HAVE SIGNED THERE OR THE OTHER TWO

2    PLACES AS WELL.

3         Q.   WHEN YOU -- WHEN YOU GOT -- DO YOU REMEMBER

4    SPECIFICALLY SIGNING AN AGREEMENT?

5         A.   WELL, I REMEMBER SIGNING AGREEMENTS, BUT           04:30:40

6    I -- I DON'T REMEMBER WHAT THEY SAID, BUT I WOULD

7    ASSUME THEY SAID SOMETHING LIKE THAT.

8         Q.   HAVE YOU -- DO YOU -- DO YOU REMEMBER HOW

9    THE AGREEMENT WAS PRESENTED TO YOU?  IN OTHER WORDS,

10   I GUESS --                                                  04:30:56

11        MS. BUCHAKJIAN:  OBJECTION; VAGUE.

12   BY MR. HERRINGTON:

13        Q.   WHEN YOU -- WHEN YOU GET TO MATTEL, DO THEY

14   HAND YOU A PACKET -- OUR UNDERSTANDING IS THEY HAND

15   YOU A PACKET OF MATERIALS, BASICALLY, AND THEN ONE          04:31:02

16   OF THESE AGREEMENTS IS IN THERE.

17        A.   YEAH.  YOU HAVE --

18        MS. BUCHAKJIAN:  OBJECTION; CALLS FOR

19   SPECULATION, LACKS FOUNDATION.

20        THE WITNESS:  YOU HAVE AN INITIATION DAY.             04:31:09

21   I FORGET WHAT THEY CALL IT.  INITIATION OR WARMUP

22   DAY, WHATEVER THEY CALL IT.  AND ALL THE PEOPLE THAT

23   THEY HIRED THAT START ON THAT DAY, THEY GIVE YOU THE

24   PACKETS, AND IT EXPLAINS YOUR BENEFITS AND THOSE

25   THINGS AND, YOU KNOW, ALL -- WHATEVER IT IS THAT YOU       04:31:25

215

EXHIBIT ___12___

PAGE ___246___

1    NEED TO START IN A COMPANY, THAT'S WHAT THEY TELL

2    YOU.  AND YOU SIGN AND -- KIND OF LIKE -- YEAH,

3    THAT.

4    BY MR. HERRINGTON:

5        Q.    AND WHEN THEY -- DO YOU REMEMBER GETTING        04:31:39

6    THAT PACKET WITH THE AGREEMENT IN IT FROM MATTEL

7    WHEN YOU STARTED THERE?

8        A.    YEAH.

9        Q.    AND DO YOU REMEMBER WHEN THEY GAVE IT TO

10   YOU -- WELL, WHAT -- IT WAS YOUR UNDERSTANDING THAT       04:31:49

11   YOU HAD TO SIGN THE AGREEMENT TO GET A -- TO GET A

12   JOB THERE?

13       A.    OH.

14           MS. BUCHAKJIAN:  OBJECTION; LACKS

15   FOUNDATION.                                              04:31:56

16           THE WITNESS:  YES.

17           MS. BUCHAKJIAN:  ASSUMES FACTS.

18   BY MR. HERRINGTON:

19       Q.    WAS -- WAS THE AGREEMENT WHEN YOU GOT IT

20   EXPLAINED TO YOU?                                        04:32:00

21           MS. BUCHAKJIAN:  OBJECTION; LACKS

22   FOUNDATION, CALLS FOR SPECULATION.

23           THE WITNESS:  YES.

24   BY MR. HERRINGTON:

25       Q.    WAS THE -- DID YOU MAKE ANY -- DID THEY         04:32:08

216

EXHIBIT ___12___

PAGE ___247___

```
 1   TELL YOU YOU COULD MAKE ANY CHANGES TO THE

 2   AGREEMENT?

 3        A.   NO.

 4        Q.   DID YOU MAKE ANY --

 5        A.   NO.                                      04:32:15

 6        Q.   -- CHANGES?

 7        A.   NO.

 8        Q.   DID YOU -- DID YOU THINK YOU COULD MAKE ANY

 9   CHANGES?

10        A.   NO.                                      04:32:20

11        Q.   DID YOU -- THIS IS -- DO YOU KNOW WHO AT

12   MATTEL DRAFTED THE DOCUMENT, THE AGREEMENT THAT YOU

13   ENDED UP SIGNING?  WAS IT THEIR LAWYERS, DO YOU

14   KNOW?

15             MS. BUCHAKJIAN:  OBJECTION; CALLS FOR      04:32:31

16   SPECULATION, ASSUMES FACTS, LACKS FOUNDATION.

17             THE WITNESS:  I WOULD ASSUME IT WAS THE

18   LAWYERS OR THE H.R. PEOPLE, SOMETHING LIKE THAT.

19   BY MR. HERRINGTON:

20        Q.   DID YOU HAVE ANYBODY THERE WITH YOU, A     04:32:40

21   CONSULTANT OR ANYBODY, ADVISOR, TO HELP YOU

22   UNDERSTAND THE AGREEMENT WHEN YOU SIGNED IT?

23             MS. BUCHAKJIAN:  OBJECTION; CALLS FOR

24   SPECULATION, ASSUMES FACTS, LACKS FOUNDATION.

25             THE WITNESS:  NO.  THEY JUST HAD EVERYBODY  04:32:51
```

                                                         217

EXHIBIT ___12___

PAGE ___248___

1    SIT THERE, AND YOU WERE SUPPOSED TO SIGN IT BECAUSE

2    IT SAYS YOU DON'T -- IF YOU'RE UNDER THEIR EMPLOY,

3    YOU DON'T DO WORK FOR ANOTHER TOY COMPANY.

4         AND IT SOUNDED REASONABLE, YOU KNOW, I

5    MEAN, I -- IT SOUNDED REASONABLE.  I DIDN'T THINK IT          04:33:10

6    WAS UNREASONABLE WHAT THEY WERE ASKING.

7    BY MR. HERRINGTON:

8         Q.   LET ME GO BACK TO -- YOU TALKED ABOUT YOU

9    WERE A DESIGNER WHEN YOU WERE AT HASBRO; RIGHT?

10        A.   YES.                                                04:33:21

11        Q.   AND YOU DID SOME WORK AS A DESIGNER WHEN

12   YOU WERE AT MATTEL?

13        A.   I WAS A DESIGNER AT --

14        Q.   YOU WERE A DESIGNER.

15        A.   -- AT MATTEL.  I WAS A DESIGNER AT HASBRO.          04:33:28

16   AND I WAS A DESIGNER AT THE OTHER PLACE, THOSE

17   CHARACTERS FROM CLEVELAND.

18        Q.   WHEN YOU WERE WORKING AS A DESIGNER, DID

19   YOU -- YOUR JOB WAS BASICALLY TO TRY TO CREATE A NEW

20   PRODUCT; RIGHT?                                               04:33:40

21        A.   YES.

22        Q.   AND WHEN YOU WERE CREATING THAT NEW

23   PRODUCT, DID YOU WORK WITH A TEAM OF OTHER PEOPLE?

24        A.   YES.

25        Q.   AND -- AND HOW BIG WERE THOSE TEAMS?                04:33:47

218

EXHIBIT _____ IV

PAGE _____ 249

1
2

### DECLARATION OF WITNESS

3      I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS
4   OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS
5   TRUE AND CORRECT.
6
7
8   EXECUTED AT                    , ON
            (PLACE)                 (DATE)
9
10
11          (SIGNATURE OF WITNESS)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

252

EXHIBIT ___12___

PAGE ___250___

1   STATE OF CALIFORNIA )

2   COUNTY OF RIVERSIDE )  SS

3

4       I, PAULA A. PYBURN, CSR NO. 7304, R.P.R.,

5   C.L.R., IN AND FOR THE STATE OF CALIFORNIA, DO

6   HEREBY CERTIFY:

7       I AM THE DEPOSITION OFFICER THAT

8   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

9   FOREGOING DEPOSITION;

10       PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST

11   DULY SWORN BY ME;

12       THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF

13   THE TESTIMONY GIVEN.

14       BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

15   THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF

16   REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

17   PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

18   ARE APPENDED HERETO.

19

20   DATED _FEBRUARY 26, 2008_ .

21

22

23           _Paula A. Pyln_

           PAULA A. PYBURN

24        C.S.R. NO. 7304, R.P.R.

        CERTIFIED LIVENOTE REPORTER

25

253

EXHIBIT _12_

PAGE _251_

# EXHIBIT 13

**From:** Peter Marlow (pmarlow@yahoo.com)
**To:** Bryant598@cs.com
**Date:** Wednesday, May 30, 2001 11:59:57 AM
**Subject:** Re: Bratz agreement

Dear Carter,

If Bratz doesn't make you as rich as we hope, we will
be more disappointed for you than for ourselves.
Considering your talent and artistic genius, you
certainly deserve to get rich from this. As our
friend, we root for your success.

And if riches don't come to you from Bratz, we know
that you will get rich from the doors it will open for
you. Of course, because Veronica is not your business
agent, she will get no direct benefit from that. But
we don't care. We love you and hope the best for you.
We'll be fine, rich or poor. Life is too short to
worry about how many things we can accumulate before
we go. We can't take them with us, anyway.

So, please don't be afraid that our friendship hinges
on you making us rich off of Bratz. It's quite alright
either way.

Best Regards,
Peter


--- Bryant598@cs.com wrote:
> Hi Veronica and Peter,
>
> thank you for the reply.
>
> I'm going to attempt to answer your questions about
> the royalties as they
> relate to the Bratz contract (as explained to me by
> my attorneys).
>
> The 45 day clause refers to development time; it
> gives them the right to back
> out within this time frame.
>
> You are right, royalties by definition are
> permanent. However, they are tied
> to copyright and product. When I signed my contract
> with MGA for the Bratz, I
> also signed over the copyright on the Bratz to them
> and now they own it. They
> now have the right to administer the royalties as
> they see fit, which in this
> case, was for 3% of any Bratz product that I help
> them to create. What this

CONFIDENTIAL ATTORNEYS' EYES ONLY   KMW-M 007635

EXHIBIT _____ 13 _____

PAGE _____ 253 _____

> means is that I will receive a (permanent) 3% on
> whichever Bratz product I
> might create for them. However, the shelf life of
> any given toy is only
> around 1 year; one year from the time the retailers
> initially put it on their
> shelves to the time a comparable new product from
> that same line replaces it.
> This is the product I am paid a royalty on, and I
> am paid 'up-front'. In
> other words, once the retailers get the product,
> they pay MGA for it, and
> they in turn, pay me (quarterly). If the toy sells
> well, then the stores
> re-order that particular toy and pay MGA and then
> MGA pays me again. This
> keeps happening until next years' toy comes out and
> the process repeats.
> Sometimes a toy will linger on the shelves for
> around 2 years if the
> retailers have ordered too much inventory and it is
> a slow-mover; they keep
> it around in hopes of selling that inventory out.
> I'm sure you understand
> this process....what I'm trying to say is that the
> product itself is not
> permanent. After MGA begins producing year 2 of a
> line, it will stop
> producing any more of the first years' line. So
> let's say I decided not to
> help MGA continue to produce year 2 of the Bratz
> line; I would only be paid a
> 3% royalty from year one, because the way it's
> worded in my contract says
> that I am paid on MGA Bratz product that I help
> create/consult on. If I want
> to make more money, I need to continue to help them
> create new products. When
> I decide to stop, I will only receive money from the
> last year of product
> that I help create when it is shipped to retailers.
>
> Many inventors do receive money for life from their
> inventions, as long as
> there is a demand for their product, but these
> people have retained their
> copyright to the property or the character (Cabbage
> Patch Kids are a good
> example). I gave up this right on Bratz as a
> trade-off to get my foot in the
> door of toy/product inventing.
>
> Another good example of permanent royalties are of
> course, musical artists.

CONFIDENTIAL ATTORNEYS' EYES ONLY   EXHIBIT _____ 13 _____ KMW-M 007636

PAGE _____ 253 _____

> Usually if an artist gets big, there is a demand for
> their back catalog for
> many many years. The artist continues to make money
> if the stores continue to
> buy their old music as well as the new. And as long
> as the stores continue to
> order an old title, the record company will usually
> continue to produce it.
> I'm sure this is what your attorney was referring to
> as 'permanent' royalties
> (this is also a strong case for having an attorney
> who deals in the toy
> industry and not the entertainment industry;
> entertainers have the
> opportunity to earn much much more than toy
> inventors and I don't want you to
> be disappointed by overblown promises). This is not
> the case with toys, and
> that is why the opportunity to earn royalties from a
> toy that you do not have
> a copyright on is very limited (as I explained
> above). Had I retained the
> copyright to the Bratz, I could easily have walked
> away from it already and
> not had to worry about making money, because I
> could've let them develop the
> next years lines on their own. Retaining a copyright
> is not an easy or
> inexpensive process, though, and given my situation,
> letting MGA have it was
> in my best interest at the time. So I will earn 3%
> on any MGA-produced
> product that I help them create, no more, no less.
> And when it's done, it's
> done. The Bratz may be a huge hit and continue on
> for many years, with or
> without me, and it may have a run of 2 or 3 years
> and the consumer may not
> want it anymore and it will be over.
>
> Well, I just wanted to tell you all this because I
> want it to be very clear
> what to expect. My expectations from the Bratz are
> in line with what I
> understand to be true as explained to me and as I
> have explained them to you.
> I am not expecting or planning on 'money for life'
> from this project (unless
> of course I want to work on it until I'm 80, which I
> don't!) I plan to work
> on this for a few years, make the money I can and
> move on to other things. I
> don't want you to have false assumptions about the
> way this will work, and

CONFIDENTIAL ATTORNEYS' EYES ONLY   EXHIBIT _____ 13 _____   KMW-M 007637

PAGE _____ 254

> then be disappointed or frustrated later.
>
> All my best always,
> Carter

---

Do You Yahoo!?
Get personalized email addresses from Yahoo! Mail - only $35
a year!  http://personal.mail.yahoo.com/

CONFIDENTIAL ATTORNEYS' EYES ONLY

EXHIBIT _____13_____

PAGE _____255_____

KMW-M 007638

# EXHIBIT 14

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          UNITED STATES DISTRICT COURT
 2         CENTRAL DISTRICT OF CALIFORNIA
 3               EASTERN DIVISION
 4                                    Certified Copy
 5    --------------------------------
 6    MATTEL, INC., a Delaware       .)
 7    Corporation,                    )
 8              Plaintiff,            )
 9              vs.                   ) No. CV 04-9059
10    CARTER BRYANT, an individual;   ) NM  (RNBx)
11    and DOES 1 through 10,          ) VOLUME I
12    Inclusive,                      )
13              Defendants.           )
14    --------------------------------)
15    (COMPLETE CAPTION ON NEXT PAGE.)
16
17         CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19         Videotaped Deposition of TERESA NEWCOMB,
20    at 300 South Grand Street, Los Angeles,
21    California, commencing at 9:17 A.M.,
22    Wednesday, January 23, 2008, before
23    Wendy S. Schreiber, CSR No. 3558,
24    RPR, CLR.
25    PAGES 1 - 281
```

1

Veritext National Deposition & Litigation Services
866 299-5127

EXHIBIT \_\_\_\_ 14

PAGE \_\_\_\_ 254

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION

 4        ------------------------------

 5   MATTEL, INC., a Delaware          )

 6   Corporation,                      )

 7              Plaintiff,             )

 8              vs.                     )  No. CV 04-9059

 9   CARTER BRYANT, an individual;     )      NM  (RNBx)

10   and DOES 1 through 10,            )

11   Inclusive,                        )

12              Defendants.            )

13        ------------------------------ )

14   CARTER BRYANT, on behalf of       )

15   himself, all present and          )

16   former employees of Mattel,       )

17   Inc., and the general public,     )

18              Counter-Claimants,    )

19              vs.                     )

20   MATTEL, INC., a Delaware          )

21   Corporation,                      )

22              Counter-Defendant.    )

23        ------------------------------

24

25
                                                    2
```

EXHIBIT ___14___

PAGE ___257___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    APPEARANCES OF COUNSEL:

2

3         For the Plaintiff:

4

5             QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

6             BY:  B. DYLAN PROCTOR, ESQ.

7             865 South Figueroa Street, Tenth Floor

8             Los Angeles, California 90017

9             (213) 443-3000

10            dylanproctor@quinnemanuel.com

11

12                        -and-

13

14           ·MATTEL, INC.

15            333 Continental Boulevard

16            El Segundo, California 90245-5012

17            (310) 252-2000

18            (NOT PRESENT)

19

20

21

22

23

24

25
                                                              3
```

EXHIBIT ___14___

PAGE ___258___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES (Continued):

 2

 3         For the Defendant and Counterclaimant

 4         Carter Bryant:

 5              KEKER & VAN NEST LLP

 6              BY:  JOHN TRINIDAD, ESQ.

 7              710 Sansome Street

 8              San Francisco, California 94111-1704

 9              (415) 391-5400

10              jtrinidad@kvn.com

11

12         For Defendant MGA Entertainment, Inc.:

13              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

14              BY:  LANCE A. ETCHEVERRY, ESQ.

15                   JONATHAN D. USLANER, ESQ.

16              300 South Grand Avenue

17              Suite 3200

18              Los Angeles, California 90017

19              (213) 687-5000

20              letcheverry@skadden.com

21              juslaner@skadden.com

22

23    Also Present:

24              Video Operator - David West

25
```

4

EXHIBIT ____14____

PAGE ____259____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    company's employment policies?

 2            MR. PROCTOR:  Overbroad, vague and

 3    ambiguous.

 4            You can answer.

 5            THE WITNESS:  I do not.                    09:57AM

 6    BY MR. ETCHEVERRY:

 7        Q.   Do you have any role in investigating

 8    alleged violations of the company's policies?

 9        A.   I do not.

10        Q.   Do you have any role in disciplining       09:58AM

11    employees for violations of the company's policies?

12        A.   No, I don't.

13        Q.   You had indicated earlier that it sort of

14    depended upon the individual employee how the offer

15    and acceptance was communicated.  Is there a        09:58AM

16    difference between how executives -- the -- strike

17    that.

18            Is there a difference between how the hiring

19    process works for executives versus non-executives?

20            MR. PROCTOR:  I'll object to the colloquy.  09:58AM

21    Mischaracterizes the testimony.

22            You can answer.

23            THE WITNESS:  No.

24    BY MR. ETCHEVERRY:

25        Q.   In your experience have executives          09:58AM
                                                              42
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    negotiated the terms of their employment more so
 2    than non-executives have?
 3              MR. PROCTOR:  Vague and ambiguous,
 4    overbroad, calls for speculation.
 5              THE WITNESS:  Not to my knowledge.        09:59AM
 6    BY MR. ETCHEVERRY:
 7        Q.    Are you aware of any instances in which
 8    executives or executives-to-be with Mattel have
 9    negotiated the terms of their employment?
10        A.    I have not experienced that.  To my        09:59AM
11    knowledge I don't know.
12        Q.    Do you know -- whether you've personally
13    experienced or not, do you know of any executives
14    who have negotiated the terms of their employment
15    with Mattel?                                         09:59AM
16        A.    I do not.
17        Q.    Do you know of any non-executives who have
18    negotiated the terms of their employment with
19    Mattel?
20        A.    Not that I'm aware.                        09:59AM
21        Q.    Ms. Newcomb, when was the first time you
22    recall hearing or reading the name Carter Bryant?
23        A.    When I -- when I saw the agreement that I
24    witnessed.
25        Q.    Did you have any conversations with        10:00AM
                                                              43
```

EXHIBIT 14

PAGE 259-002

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    employee read the agreement?
 2              MR. PROCTOR:  Asked and answered.
 3              THE WITNESS:  My understanding was to
 4    witness their signature only.
 5    BY MR. ETCHEVERRY:                              03:25PM
 6        Q.   Only.  So with respect to your -- your
 7    obligation was not to ensure that the witness
 8    actually read the document.  Is that what you're
 9    saying?
10              MR. PROCTOR:  Vague and ambiguous, asked and 03:25PM
11    answered.
12              THE WITNESS:  I was instructed to witness
13    their signature.
14    BY MR. ETCHEVERRY:
15        Q.   In doing so did you have any knowledge one   03:25PM
16    way or another as to whether the new employee
17    actually had read the document?
18              MR. PROCTOR:  Overbroad.
19              THE WITNESS:  My understanding was just to
20    witness their signature of this document.            03:25PM
21    BY MR. ETCHEVERRY:
22        Q.   So let's get back to my question.  This will
23    go much more quickly.  My question to you is whether
24    you had any understanding one way or another when
25    you would witness the signature as to whether the   03:25PM
                                                          222
```

EXHIBIT _____ 14

PAGE _____ 260

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    employee had actually read the document?
 2             MR. PROCTOR:  Overbroad.
 3             THE WITNESS:  My understanding was that they
 4    had read the document in order to sign.
 5    BY MR. ETCHEVERRY:                                03:26PM
 6        Q.    How did you form that understanding?
 7        A.    That's my own opinion.
 8        Q.    Did you do anything ever to verify that an
 9    individual employee had read the inventions
10    agreement before signing it?                      03:26PM
11        A.    I did not do anything to verify, no.
12        Q.    Did anyone -- any new employee ever ask you
13    the meaning of the inventions agreement prior to the
14    time that he or she signed it?
15        A.    They did not.                            03:26PM
16        Q.    Do you believe that you would be qualified
17    to instruct a new employee as to the meaning of the
18    inventions agreement if he or she had asked?
19        A.    It was not my role to interpret this.  If
20    they would have questions, I would direct them to   03:26PM
21    the HR manager, the appropriate person.
22        Q.    Has there ever been an occasion where --
23    forgive me if I already asked this -- where a new
24    employee has asked a question about the inventions
25    agreement and you've referred it on to an HR manager  03:27PM
                                                         223
```

EXHIBIT ___14___

PAGE ___261___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    or someone more appropriate to answer it?

2         MR. PROCTOR:   Just for clarification,

3    Counsel, you're talking about asking a question of

4    Ms. Newcomb?

5         MR. ETCHEVERRY:   Yes.                    03:27PM

6         THE WITNESS:   I truly don't recall.  If they

7    had, I would have referred them to their HR person.

8    BY MR. ETCHEVERRY:

9    Q.   But sitting here today you don't recall one

10   way or another whether that ever happened?    03:28PM

11   A.   I don't recall.  I just know what I would

12   have done.

13   Q.   So you're certain that you wouldn't have

14   yourself answered the question if one had been

15   asked?                                         03:28PM

16   A.   I'm certain of that, yes, absolutely.

17   Q.   When you say you would have referred it to

18   someone more appropriate, why is it that you would

19   have referred it to somebody else as opposed to you

20   answering the question yourself?               03:28PM

21   A.   Because I had been instructed to refer any

22   questions to their HR generalist.

23   Q.   Do you feel like you understood the

24   inventions agreement well enough that you could

25   answer questions that new employees had?       03:28PM
                                                     224

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. PROCTOR:  Object to the form.

2          Go ahead.

3          THE WITNESS:  I understood it well enough to

4     sign it as a new employee and what it meant.  As far

5     as interpreting it, I had been instructed not to do      03:28PM

6     that so I didn't.

7     BY MR. ETCHEVERRY:

8       Q.   Do you feel like had you not been instructed

9     you have sufficient knowledge of the terms of this

10    agreement that you could answer questions if posed      03:29PM

11    by a new employee?

12         MR. PROCTOR:  Improper hypothetical,

13    improper opinion.

14         THE WITNESS:  My understanding of this is

15    that it covers the Employee Confidentiality and         03:29PM

16    Inventions Agreement and I understand what that --

17    what that encompasses.  I would not feel -- I would

18    not feel that it was appropriate for me to answer

19    the questions based on the instructions to refer

20    that person to their HR generalist.                     03:29PM

21    BY MR. ETCHEVERRY:

22      Q.   But do you feel like you have a

23    sufficient -- you would have had a sufficient

24    understanding of this agreement putting aside what

25    your instructions were to answer any questions that     03:29PM
                                                                    225

EXHIBIT ____14____

PAGE ____213____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    employees may have as to its terms?
2              MR. PROCTOR:  Asked and answered, improper
3    hypothetical.
4              THE WITNESS:  Again, I understand what the
5    document stands for.                              03:30PM
6    BY MR. ETCHEVERRY:
7         Q.   You would agree with me that understanding
8    what the document stands for in terms of you signing
9    it and understanding what the document stands for in
10   terms of instructing somebody else might be two     03:30PM
11   different levels of comprehension, right?
12             MR. PROCTOR:  Object to the form.  Lacks
13   foundation, improper hypothetical, improper opinion
14   as to what might be.
15             THE WITNESS:  I do not.                  03:30PM
16   BY MR. ETCHEVERRY:
17        Q.   I'm sorry, with all the objections I don't
18   understand what "I do not" means.
19        A.   I do not agree with that.
20        Q.   Who instructed you to refer any questions  03:30PM
21   that you may have to the HR manager?
22        A.   The HR manager.
23        Q.   Who was that?
24        A.   When I first started there?
25        Q.   Whoever has instructed you I'd just like to 03:31PM
                                                        226
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        I declare under penalty of perjury
 2   under the laws of the State of California
 3   that the foregoing is true and correct.
 4       Executed on _____,
 5   2008, at _____,
 6   California.
 7
 8
 9                  _____
10                  TERESA NEWCOMB
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              275
```

EXHIBIT ___14___

PAGE ___265___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    STATE OF CALIFORNIA    ) ss:

2    COUNTY OF LOS ANGELES )

3

4         I, WENDY S. SCHREIBER, C.S.R. No. 3558, do

5    hereby certify:

6

7         That the foregoing deposition of TERESA

8    NEWCOMB was taken before me at the time and place

9    therein set forth, at which time the witness was

10   placed under oath and was sworn by me to tell the

11   truth, the whole truth, and nothing but the truth;

12        That the testimony of the witness and all

13   objections made by counsel at the time of the

14   examination were recorded stenographically by me,

15   and were thereafter transcribed under my direction

16   and supervision, and that the foregoing pages

17   contain a full, true and accurate record of all

18   proceedings and testimony to the best of my skill

19   and ability.

20        I further certify that I am neither

21   counsel for any party in said action, nor am I

22   related to any party to said action, nor am I in any

23   way interested in the outcome thereof.

24

25

                                                  276

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            IN WITNESS WHEREOF, I have subscribed my
 2     name this 4th day of February, 2008.
 3
 4
 5
 6
 7          WENDY S. SCHREIBER, CSR No. 3558, RPR
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    277
```

EXHIBIT ___14___

PAGE ___267___

# EXHIBIT 15

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,  )
                                        )
        PLAINTIFF,  )
                                          )
   V.  )     CASE NO.
                                          )     CV 04-9040 SGL (RNBX)
MATTEL, INC., A DELAWARE  )
CORPORATION, ET.AL.,  )
                                          )
        DEFENDANTS.  )
———————————————————)
                                          )
AND CONSOLIDATED ACTION (S).  )
———————————————————)

# C O N F I D E N T I A L

**(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)**

# DEPOSITION OF CHRISTINA TOMIYAMA

## FEBRUARY 27, 2008



REPORTED BY:
MICHELLE HUTTON
CSR NO. 7322
JOB NO. 08AE154-MH

EXHIBIT _____ 15
PAGE _____ 268

COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,      )
                                   )
                  PLAINTIFF,       )
                                   )   CASE NO.
     VS.                           )   CV 04-9049 SGL (RNBX)
                                   )
MATTEL, INC., A DELAWARE           )   CONSOLIDATED WITH
CORPORATION,                       )   CASE NO. 04-9059 AND
                                   )   CASE NO. 05-2727
                  DEFENDANT.  )
_____)
                                   )
AND CONSOLIDATED ACTIONS.          )
_____)


CONFIDENTIAL

ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF CHRISTINA
TOMIYAMA, TAKEN ON BEHALF OF THE DEFENDANTS
AT 865 SOUTH FIGUEROA STREET, TENTH FLOOR,
LOS ANGELES, CALIFORNIA, COMMENCING AT
8:11 A.M., WEDNESDAY, FEBRUARY 27, 2008,
BEFORE MICHELLE HUTTON, CALIFORNIA C.S.R.
NO. 7322.

2

EXHIBIT _____ 15

PAGE _____ 269

```
 1    APPEARANCES OF COUNSEL:
 2
      FOR MGA ENTERTAINMENT, INC. AND ISAAC LARIAN:
 3
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 4        BY:  KENNETH A. PLEVAN, ESQ.
          300 SOUTH GRAND AVENUE
 5        LOS ANGELES, CALIFORNIA 90071-3144
          (213) 687-5000
 6
 7    FOR MATTEL, INC.:
 8
          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 9        BY:  MICHAEL T. ZELLER, ESQ.
               BRIDGET HAULER, ESQ.
10        865 SOUTH FIGUEROA STREET
          TENTH FLOOR
11        LOS ANGELES, CALIFORNIA 90017
          (213) 624-7707
12
13    ALSO PRESENT:
14        MICHAEL MOORE, SENIOR COUNSEL, MATTEL, INC.
          (PAGES 91 THROUGH 365)
15
          PETER ACHESON, VIDEOGRAPHER
16
17
18
19
20
21
22
23
24
25
```

                                                              3

EXHIBIT ___15___

PAGE ___270___

1    THAT SUBJECT --

2        A.    UH-HUH.

3        Q.    -- IS THAT RIGHT?

4        A. · THAT'S CORRECT.

5        Q.    YOU DON'T HAVE ANY KNOWLEDGE OR INFORMATION        08:40AM

6    FROM ANY SOURCE THAT YOU'VE EVER HAD A CONVERSATION

7    WITH CARTER BRYANT ON THAT SUBJECT; IS THAT CORRECT?

8        A.    THAT IS CORRECT.

9        Q.    DO YOU CONSIDER CARTER BRYANT A FRIEND?

10       A.    AN ACQUAINTANCE RATHER, A COLLEAGUE,               08:40AM

11   SOMEONE THAT I WORKED CLOSELY WITH WHOSE STYLE I

12   ADMIRED A GREAT DEAL, BUT HE'S ANOTHER GENERATION

13   FROM ME.  HE'S YOUNG ENOUGH TO BE MY SON, SO I DON'T

14   KNOW IF WE WOULD HAVE BEEN FRIENDS FRIENDS.

15       Q.    DID YOU EVER SEE HIM SOCIALLY?                     08:40AM

16       A.    NO.

17       Q.    DID YOU EVER ASK TO SEE HIM SOCIALLY?

18       A.    NO.

19       Q.    I THOUGHT YOU'D MENTIONED IN YOUR EXPERT

20   REPORT YOU DID HAVE LUNCH WITH HIM FROM TIME TO           08:41AM

21   TIME.

22       A.    RIGHT.  THAT WAS NOT SOCIAL.  THAT WAS

23   WORKING LUNCHES AT THE TABLE DIRECTLY OUTSIDE HIS

24   OFFICE WHICH IS --

25       Q.    I'M ASKING ANOTHER QUESTION.  I'M NOT            08:41AM

33

EXHIBIT ___15___

PAGE ___271___

```
 1    SUGGESTING THAT'S SOCIAL.

 2        A.   OKAY.

 3        Q.   I WAS ASKING --

 4        A.   THANK YOU.

 5        Q.   -- A SEPARATE QUESTION.  AND SO JUST SO THE      08:41AM

 6    RECORD'S CLEAR HERE, YOU HAD LUNCH WITH HIM WHEN HE

 7    WAS AT MATTEL FROM TIME TO TIME?

 8        A.   THAT IS CORRECT.

 9        Q.   AND IF I UNDERSTOOD WHAT YOU WERE SAYING IN

10    YOUR EXPERT REPORT CORRECTLY, AND TELL ME IF I'M        08:41AM

11    WRONG, YOU HAD -- YOU HAD PRETTY MUCH DAILY

12    INTERACTIONS WITH CARTER BRYANT WHEN BOTH YOU AND

13    CARTER BRYANT WERE IN BARBIE COLLECTOR; IS THAT

14    CORRECT?

15        A.   THAT IS CORRECT.                              08:41AM

16        Q.   AND IF YOU COULD PLEASE JUST DESCRIBE FOR

17    US GENERALLY WHAT WAS THE NATURE OF YOUR

18    INTERACTIONS WITH CARTER BRYANT?

19        A.   VERY GOOD.  CARTER WAS A PRELIMINARY

20    DESIGNER, AND I WAS THE PERSON THAT HE LIASED WITH     08:41AM

21    IN ORDER TO GET THE HAIR AND FACE DONE FOR THEIR

22    PRELIMINARY DOLLS THAT HE HAD TO PRESENT.  HE WOULD

23    WORK WITH OTHER PEOPLE TO GET THE FASHIONS DONE, BUT

24    I WAS THE PERSON THAT HE CAME THROUGH -- TO TO GET

25    THE HAIR AND THE FACE DONE, THE HEADS.                 08:42AM
```

34

EXHIBIT __15__

PAGE __272__

```
 1              SO HE WOULD LET ME KNOW WHAT IT WAS THAT HE

 2     WANTED.  HE'D LET ME KNOW WHAT THE DRESS WAS GOING

 3     TO LOOK LIKE, WHAT STYLE IT WAS, WHETHER IT WAS

 4     SPORTY OR A BALL GOWN OR WHATEVER.  HE WOULD GIVE ME

 5     EXTREMELY BEAUTIFUL DETAILED DRAWINGS OF THE FACE        08:42AM

 6     PAINT THAT HE WANTED, THE HAIR DESIGN THAT HE

 7     WANTED, AND I WOULD WORK WITH THOSE TWO GROUPS, THE

 8     FACE PAINTING GROUP AND THE HAIR DESIGN GROUP, IN

 9     ORDER TO TRY TO GET A HEAD THAT WOULD BE WHAT CARTER

10     WANTED TO PUT ON HIS DOLL.                              08:42AM

11        Q.   IS IT CORRECT THAT AS PART OF THIS PROCESS

12     THAT YOU WERE JUST DESCRIBING, THAT THE PRELIMINARY

13     DESIGNER, IN THIS CASE CARTER BRYANT, PROVIDED

14     DIRECTION FOR HOW THE FACE PAINT FOR THE DOLLS THAT

15     HE OR SHE WAS WORKING ON WERE SUPPOSED TO LOOK?         08:43AM

16        A.   YES, HE DID.

17        Q.   AND THE SAME --

18        A.   HE PROVIDED THAT TO ME.

19        Q.   I'M SORRY?

20        A.   HE PROVIDED THAT DIRECTION TO ME.               08:43AM

21        Q.   AND THE SAME WAS TRUE OF THE HAIR?

22        A.   THAT'S RIGHT.

23        Q.   AND THE SAME WAS TRUE OF THE FASHIONS?

24        A.   HE DIDN'T PROVIDE THAT INFORMATION TO ME.

25        Q.   RIGHT.  I'M NOT -- I'M NOT SUGGESTING HE        08:43AM
```

35

EXHIBIT 15

PAGE 273

1   PROVIDED IT TO YOU, BUT YOU'RE AWARE THAT AS PART OF

2   HIS ROLE THERE AT MATTEL WHEN HE WAS IN COLLECTOR,

3   THAT AS THE PRELIMINARY DESIGNER, HE PROVIDED THE

4   DIRECTION AND THE INSTRUCTIONS AS TO HOW THE

5   FASHIONS FOR THE PARTICULAR DOLL PRODUCT WERE          08:43AM

6   SUPPOSED TO LOOK; IS THAT RIGHT?

7        A.   YES, THAT'S CORRECT.

8        Q.   AND IN DOING SO, HE GAVE DIRECTIONS TO

9   OTHER MATTEL EMPLOYEES; IS THAT RIGHT?

10       A.   WHEN WORKING ON THE FASHIONS, YES, HE WOULD   08:44AM

11  BE WORKING WITH THE SAMPLE MAKERS AND THE PATTERN

12  DESIGNERS.

13       Q.   AND TELLING THEM WHAT HE WANTED THEM TO DO

14  ON THE PROJECT?

15       A.   TELLING THEM OR DRAWING FOR THEM, YES.       08:44AM

16       Q.   AND IF I UNDERSTOOD YOUR ANSWER CORRECTLY

17  WITH RESPECT TO THE HAIR AND FACE, CARTER BRYANT WAS

18  THE ONE WHO PROVIDED THAT DIRECTION AND INSTRUCTION

19  DIRECTLY TO YOU?

20       A.   THAT IS CORRECT.                             08:44AM

21       Q.   BACK DURING THAT TIME PERIOD WHEN YOU WERE

22  WORKING WITH CARTER BRYANT IN BARBIE COLLECTIBLE OR

23  COLLECTOR RATHER, DID YOU ACTUALLY YOURSELF DO ANY

24  OF THE FACE PAINTING OR DID YOU JUST OVERSEE OTHER

25  FACE PAINTERS?                                         08:44AM

36

EXHIBIT ___15___

PAGE ___274___

```
 1        A.    I ACTUALLY DID SOME OF THE FACE PAINTING

 2   MYSELF.   THERE WERE PARTICULAR PROJECTS THAT I HAD A

 3   PASSIONATE INTEREST IN, AND BECAUSE I HAD STARTED IN

 4   THAT FACE PAINTING GROUP, I KNEW HOW TO PAINT.

 5        Q.    DID YOU EVER DO ANY OF THE ACTUAL FACE        08:44AM

 6   PAINTING YOURSELF FOR A CARTER BRYANT PROJECT?

 7        A.    I REALLY CAN'T REMEMBER THAT.   I DON'T

 8   KNOW.   OCCASIONALLY A DESIGNER WOULD ASK IF I COULD

 9   RETOUCH SOMETHING MAYBE THAT HADN'T COME OUT RIGHT

10   THE FIRST TIME.   I DON'T REMEMBER PAINTING ANY OF      08:45AM

11   CARTER'S DESIGNS FROM SCRATCH, BUT IT'S PERFECTLY

12   POSSIBLE THAT I DID, AND IT'S MORE THAN LIKELY THAT

13   I DID SOME RETOUCHING FROM TIME TO TIME ON A HEAD

14   THAT -- RATHER THAN TAKE IT DOWN JUST TO CHANGE AN

15   EYEBROW.                                                08:45AM

16        Q.    AND SO THE RECORD'S CLEAR ON THIS, YOU DID

17   WORK DIRECTLY WITH CARTER BRYANT ON SOME PROJECTS;

18   IS THAT CORRECT?

19        A.    UH-HUH, THAT IS CORRECT.

20        Q.    DID YOU WORK ON ANY PROJECTS WITH CARTER      08:45AM

21   BRYANT OTHER THAN WHEN BOTH OF YOU WERE IN BARBIE

22   COLLECTOR?

23        A.    NO.   IT WAS ONLY WHEN BOTH OF US WERE IN

24   BARBIE COLLECTOR.

25        Q.    I THINK YOU'D MENTIONED THE TERM              08:45AM
```

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT 15

PAGE 275

```
 1    "PRELIMINARY DESIGNER."

 2         A.   YES.

 3         Q.   PLEASE TELL US FOR THE RECORD, JUST

 4    GENERALLY SPEAKING, WHAT YOUR UNDERSTANDING IS OF

 5    WHAT A PRELIMINARY DESIGNER DID IN BARBIE COLLECTOR        08:46AM

 6    BACK IN THE 1999-2000 TIME PERIOD.

 7         A.   THE PRELIMINARY DESIGNER WAS THE FIRST

 8    DESIGNER TO WORK ON THE PROJECT.  THEY GOT THEIR

 9    PROJECTS OFF MATTEL'S BDO, BRAND DIRECTIONAL

10    OUTLINE, AND THEY WERE RESPONSIBLE FOR PRODUCING A         08:46AM

11    3D THAT COULD BE SHOWN TO MARKETING THAT WOULD BE --

12    I BELIEVE AT THAT TIME IT WAS 10 PERCENT WITHIN THE

13    COST THAT WAS -- THAT THE PRODUCT WAS REQUIRED TO BE

14    PRODUCEABLE FOR.  AT THAT POINT THE DOLL WAS

15    TRANSFERRED, TRANSFER WAS A MILESTONE, TO A               08:46AM

16    DEVELOPMENT DESIGNER.

17         Q.   THEY ARE THE ONES WHO ARE FIRST RESPONSIBLE

18    FOR DESIGNING MATTEL PRODUCTS?

19              MR. PLEVAN:  I -- PLEASE.  OBJECT TO THE

20    FORM OF THE QUESTION.  I DON'T KNOW WHO "THEY" IS.        08:46AM

21              MR. ZELLER:  THE PRELIMINARY DESIGNERS.

22              THE WITNESS:  PRELIMINARY DESIGNERS WERE

23    THE FIRST PEOPLE WHO WORKED ON A NEW PROJECT.

24    BY MR. ZELLER:

25         Q.   THEY WERE THE FIRST ONES WHO WERE              08:47AM
```

                                                                    38

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT ___15___

PAGE ___27b___

1    RESPONSIBLE FOR DESIGNING THE MATTEL PRODUCTS?

2        A.    YES.    THEY HAD TO DO THE FIRST

3    THREE-DIMENSIONAL COMPLETE DOLL.

4        Q.    AND THE WAY THAT YOU JUST DESCRIBED WHAT A

5    PRELIMINARY DESIGNER DID BACK IN THAT TIME PERIOD IS        08:47AM

6    CONSISTENT WITH YOUR UNDERSTANDING OF HOW -- OF WHAT

7    CARTER BRYANT DID AT MATTEL; IS THAT TRUE?

8        A.    THAT'S CORRECT.

9        Q.    I DON'T KNOW IF THIS IS SOMETHING YOU EVER

10   RAN ACROSS WHEN YOU WERE THERE AT MATTEL, SO LET ME        08:47AM

11   ASK A PRELIMINARY QUESTION.    WHEN YOU WERE THERE AT

12   MATTEL, DID YOU, YOURSELF DIRECTLY DEAL WITH OUTSIDE

13   VENDORS?

14       A.    I DID A LOT OF THAT DURING MY LAST THREE

15   YEARS WHEN I MANAGED THE FACE DESIGN GROUP.    DURING       08:47AM

16   THE PERIOD OF TIME THAT I WAS IN THE BARBIE

17   COLLECTIBLES, A LITTLE BIT OF IT, PHOTOGRAPHY

18   RETOUCHERS AND -- BUT VERY OCCASIONALLY.

19       Q.    ANY OTHER CATEGORIES OF VENDORS THAT YOU

20   DEALT WITH OTHER THAN THE PHOTOGRAPHY RETOUCHERS?          08:48AM

21       A.    I'M TRYING TO THINK.    I THINK SOME OF THE

22   OTHER DEVELOPMENT DESIGNERS DEALT MORE WITH VENDORS

23   THAN I DID.    I THINK THE ONLY VENDORS THAT I EVER

24   EMPLOYED WERE PHOTOGRAPHIC RETOUCHERS.

25       Q.    DURING THE 1999 AND 2000 TIME PERIOD, DID        08:48AM

39

EXHIBIT _____ 15

PAGE _____ 277

1    CARTER BRYANT HAVE ANY SORT OF DEALINGS WITH OUTSIDE

2    VENDORS ON MATTEL'S BEHALF?

3         A.   I WOULDN'T REALLY KNOW.  I WOULDN'T -- THAT

4    WOULDN'T BE SOMETHING THAT WOULD HAVE COME UP IN

5    GENERAL -- IN MY GENERAL KNOWLEDGE.                     08:48AM

6         Q.   SO YOU'RE NOT SURE ONE WAY OR ANOTHER?

7         A.   I'M NOT SURE ONE WAY OR ANOTHER.

8         Q.   ARE YOU AWARE OF INSTANCES WHEN YOU WERE IN

9    COLLECTOR IN WHICH THE PRELIMINARY DESIGNERS DID

10   DEAL WITH OUTSIDE VENDORS FOR MATTEL?                   08:49AM

11        A.    IT GENERALLY WOULD HAVE BEEN THE

12   DEVELOPMENT DESIGNERS.  LET'S SAY -- MAY I GIVE A

13   HYPOTHETICAL EXAMPLE?

14        Q.    SURE.

15        A.    OKAY.  LET'S SAY THAT A PRELIMINARY         08:49AM

16   DESIGNER HAD DESIGNED SOME JEWELRY, AND THEY HAD

17   SORT OF COBBLED TOGETHER SOMETHING FROM LITTLE BITS

18   AND FINDINGS AND RHINESTONES THAT WERE AROUND

19   MATTEL, BUT NOW THIS JEWELRY NEEDED TO BE MORE

20   FINALIZED SO THAT WE COULD COST IT AND DECIDE WHAT      08:49AM

21   IT REALLY WAS GOING TO LOOK LIKE.  IT'S POSSIBLE

22   THAT THE PRELIMINARY DESIGNER COULD HAVE WORKED WITH

23   A JEWELRY VENDOR, BUT IT'S MORE LIKELY THAT THAT

24   PROCESS WOULD HAVE HAPPENED AFTER TRANSFER AND WOULD

25   HAVE BEEN MANAGED BY THE DEVELOPMENT DESIGNER.          08:49AM

40

EXHIBIT _____ 15

278

```
1              THE WITNESS:  THANK YOU, KEN.

2    BY MR. ZELLER:

3         Q.   AND ONE THING THAT PRELIMINARY DESIGNERS

4    DID IN ADDITION TO THE ROLE THAT WE TALKED ABOUT

5    EARLIER IS IS THAT THEY ALSO WORK WITH THE              08:52AM

6    DEVELOPMENT DESIGNERS; RIGHT?

7         A.   THAT IS CORRECT.

8         Q.   AND THEY GIVE THEM DIRECTION ON HOW THE

9    PRODUCT IS SUPPOSED TO COME OUT ULTIMATELY; IS THAT

10   CORRECT?                                                08:52AM

11        A.   THAT IS CORRECT.

12        Q.   AND THAT WAS TRUE BACK IN THE TIME PERIOD

13   WHEN YOU WERE IN COLLECTOR IN THE 1999-2000 TIME

14   PERIOD?

15        A.   YES.  MAY I QUALIFY THAT A LITTLE BIT?        08:53AM

16        Q.   SURE.

17        A.   THERE WAS ALWAYS A LITTLE BIT OF TENSION.

18   THE DEVELOPMENT DESIGNERS HAD TO COME UP WITH A

19   PRODUCT WITHIN COST, AND OCCASIONALLY A PRELIMINARY

20   DESIGNER WOULD NOT BE ABLE TO LET GO OF A PRODUCT AT    08:53AM

21   TRANSFER, AND THEY WOULD COME BACK AND SAY, "OH, BUT

22   I DON'T LIKE THAT."

23             AND THERE WERE DECISIONS THAT HAD TO BE

24   MADE FOR COSTING REASONS.  MAYBE WE COULDN'T AFFORD

25   FIVE BUTTONS, AND WE HAD TO CUT DOWN TO THREE, AND      08:53AM
```

44

EXHIBIT    15

PAGE    279

1   IT WAS FRUSTRATING FOR THE DEVELOPMENT DESIGNER

2   HAVING MADE THAT DECISION TO HAVE A PRELIMINARY

3   DESIGNER WHOSE RESPONSIBILITY WAS SUPPOSED TO BE

4   OVER BY THAT TIME COMING BACK AND ASKING US --

5   SECOND GUESSING OUR DECISIONS.                          08:53AM

6        Q.   I TAKE IT YOU'VE SEEN FINAL PRODUCTS, THAT

7   IS FINAL DOLL PRODUCTS, THAT CARTER BRYANT WORKED ON

8   WHEN HE WAS AT MATTEL IN COLLECTOR; IS THAT RIGHT?

9        A.   YES.

10       Q.   DO YOU THINK THAT THOSE PRODUCTS WERE        08:54AM

11  CONSISTENT WITH THE VISION THAT HE HAD, AS YOU

12  UNDERSTOOD IT, FOR THOSE PRODUCTS OR DO YOU THINK

13  THEY CAME OUT TOTALLY WRONG?

14       A.   THEY CAME OUT AS CLOSE TO HIS VISION AS WAS

15  CONSISTENT WITH MATTEL'S COSTING REQUIREMENTS.         08:54AM

16       Q.   AND I THINK YOU'LL AGREE WITH ME, THE

17  PRELIMINARY DESIGNERS THERE AT MATTEL BACK IN THAT

18  TIME PERIOD WHEN YOU WERE IN COLLECTOR WERE THE ONES

19  WHO WERE REALLY RESPONSIBLE AS TO HOW THESE PRODUCTS

20  ULTIMATELY LOOKED AND HOW THEY CAME OUT; RIGHT?        08:54AM

21       A.   I WOULDN'T ACTUALLY AGREE WITH YOU.

22       Q.   IN TERMS OF THE APPEARANCE.

23       A.   AT THE TIME OF TRANSFER, THEY REALLY WERE

24  SUPPOSED TO TAKE A BACK SEAT.  SO WHILE THEY DID

25  DESIGN THE ORIGINAL AND WE TRIED TO REMAIN AS          08:55AM

EXHIBIT   15

PAGE   280

```
 1    FAITHFUL TO THEIR ORIGINAL CONCEPT AS WE POSSIBLY

 2    COULD, I WOULDN'T SAY THEY HAD THE RESPONSIBILITY

 3    FOR IT.

 4         Q.   OKAY.  I THINK -- I THINK WE'RE ON THE SAME

 5    PAGE.  I MAY HAVE --                              08:55AM

 6         A.   YEAH.

 7         Q.   -- MISSPOKE WHEN I SAID RESPONSIBILITY

 8    BECAUSE I THINK I UNDERSTAND WHAT YOU'RE SAYING, BUT

 9    LET ME TRY IT THIS WAY, THEN.  ISN'T IT TRUE THAT

10    BACK IN THE TIME PERIOD WHEN YOU WERE WORKING THERE   08:55AM

11    IN BARBIE COLLECTOR IN 1999-2000 THAT ULTIMATELY IT

12    WAS THE PRELIMINARY DESIGNER'S VISION THAT OTHER

13    PEOPLE AS PART OF THE DEVELOPMENT PROCESS AND PART

14    OF THE DESIGN PROCESS WERE TRYING TO BE FAITHFUL TO

15    SO THAT WHEN THE PRODUCT ULTIMATELY CAME OUT, IT WAS   08:55AM

16    FAITHFUL TO THE VISION OF THE PRELIMINARY DESIGNER?

17         A.   YES, I THINK THAT'S A FAIR STATEMENT.  WE

18    DID TRY TO KEEP IT AS CLOSE AS POSSIBLE TO THE WAY

19    THAT IT HAD BEEN ORIGINALLY DESIGNED.

20         Q.   BY THE PRELIMINARY DESIGNER?              08:55AM

21         A.   BY THE PRELIMINARY DESIGNER, YES.

22         Q.   YOU'LL AGREE WITH ME BACK IN THE 1999-2000

23    TIME PERIOD THAT ONE LINE OF BUSINESS THAT MATTEL

24    WAS IN WAS DOLLS?

25         A.   THAT'S CORRECT.                           08:56AM
```

46

EXHIBIT _____15_____

PAGE _____281_____

1      Q.    TOYS?

2      A.    THAT'S CORRECT.

3      Q.    WHAT ELSE?

4      A.    LET'S SEE, WE HAD BOYS TOYS AND GIRLS TOYS

5  AT THAT TIME.  UNDER BOYS TOYS THERE WERE CARS AND        08:56AM

6  RACING SETS.  THERE WERE LICENSED PRODUCT, MALE

7  ACTION TOYS.  THERE WAS AN ELECTRONICS GROUP.  THERE

8  WAS A GAMES AND PUZZLES GROUP.

9           AND UNDER THE GIRLS SIDE THERE WAS BARBIE,

10  AND THEN THERE WAS ANOTHER SORT OF CATCHALL THAT WAS      08:57AM

11  CALLED GIRLS THAT DID BABY DOLLS AND OTHER PRODUCT

12  DESIGN FOR GIRLS THAT DIDN'T FALL INTO THE FASHION

13  DOLL GROUP, AND THEN BARBIE, OF COURSE, HAD MAIN

14  LINE BARBIE AND COLLECTIBLE BARBIE.  MAIN LINE

15  APPEALED TO CHILDREN AND COLLECTIBLE TO ADULTS.          08:57AM

16      Q.    IF I UNDERSTOOD WHAT YOU SAID THERE AT THE

17  END, YOU SEEM TO BE SAYING THAT MAIN LINE BARBIE

18  DOLLS WERE FOR CHILDREN, AND COLLECTOR DOLLS WERE

19  FOR ADULTS?

20      A.    GENERALLY SPEAKING, YES.                      08:57AM

21      Q.    BUT IT'S NOT ALWAYS TRUE?

22      A.    MATTEL'S COLLECTIBLES GROUP, FOR EXAMPLE,

23  DID CERTAIN DOLLS THAT WERE INTENDED TO BE PLAYED

24  WITH BY CHILDREN BUT VERY OFTEN MARKETED TO THEIR --

25  THOSE CHILDREN'S PARENTS OR AUNTIES OR GRANDPARENTS.     08:57AM

47

EXHIBIT ____ 15

PAGE ____ 282

```
 1       Q.   AND SO IT'S TRUE -- AND BY THE WAY, JUST SO

 2   WE'RE ON THE SAME PAGE BECAUSE I -- IF I RECALL

 3   THINGS CORRECTLY, I THINK THE TERMINOLOGY MAY HAVE

 4   CHANGED OVER TIME.

 5       A.   UH-HUH.

 6       Q.   AT ONE TIME IT WAS BARBIE COLLECTIBLES?

 7       A.   YES.

 8       Q.   AND THEN ANOTHER TIME IT'S BEEN BARBIE

 9   COLLECTOR?

10       A.   I DON'T REMEMBER THE BARBIE COLLECTOR.   WE      08:58AM

11   PROBABLY USE THAT IN SPEECH A GREAT DEAL, BUT BARBIE

12   COLLECTIBLES WAS THE LOGO THAT APPEARED ON ALL THE

13   PACKAGES.

14       Q.   AND THAT'S THE TERM YOU WOULD NORMALLY USE?

15       A.   I WOULD SAY I WORK FOR THE BARBIE            08:58AM

16   COLLECTIBLES GROUP.   WE MIGHT ALSO SAY I WORK FOR

17   THE BARBIE COLLECTOR GROUP, BUT THAT WOULD JUST BE

18   VERNACULAR.

19       Q.   SO IF I UNDERSTAND YOUR TESTIMONY

20   CORRECTLY, THEN, SOME DOLLS THAT BARBIE COLLECTIBLES   08:58AM

21   DID --

22       A.   UH-HUH.

23       Q.   -- WERE POTENTIALLY FOR CHILDREN TO PLAY

24   WITH; RIGHT?

25       A.   THAT IS CORRECT.                             08:58AM
```

48

EXHIBIT 15

PAGE 282.001

1      Q.   AND THAT WAS TRUE IN THE 1999-2000 TIME

2    PERIOD; CORRECT?

3      A.   THAT'S RIGHT.

4      Q.   AND ALSO YOU'RE AWARE THAT BACK IN THAT

5    TIME PERIOD, 1999-2000, BARBIE MAIN LINE PRODUCED        08:58AM

6    DOLLS THAT PEOPLE ALSO COLLECTED?

7      A.   YES.   WE -- WE VIEWED WITH THAT A JAUNDICED

8    EYE, BUT THEY DID, YES.

9      Q.   ARE THERE -- CAN YOU THINK OF SOME OF THE

10   EXAMPLES OF THE DOLLS THAT BARBIE COLLECTIBLES           08:59AM

11   WORKED ON THAT WERE MORE GEARED TO CHILDREN?

12     A.   WELL, THE DOLLS OF THE WORLD SERIES HAD

13   ALWAYS BEEN INTENDED TO INTRODUCE CHILDREN TO

14   GEOGRAPHY, AND THEY WOULD HAVE LITTLE STORIES ABOUT

15   THE CHARACTERS.   I THINK WE COVERED A GREAT DEAL OF     08:59AM

16   THE WORLD.   I DID A MAP AT ONE POINT AND DOTTED ALL

17   THE COUNTRIES THAT WE HAD DONE DOLLS OF THE WORLD

18   FOR WHICH WAS VERY USEFUL WHEN WE HAD TO COME UP

19   WITH ADDITIONAL COUNTRIES.

20     Q.   ALSO SOME OF THE CELEBRITY DOLLS?               08:59AM

21     A.   LET'S SEE, I CAN'T THINK OF ANY

22   SPECIFICALLY THAT WERE AIMED AT CHILDREN.   THE DOLLS

23   LIKE THE I LOVE LUCY DOLL AND MARILYN MONROE, THOSE

24   WERE DEFINITELY AIMED FOR ADULTS.

25     Q.   WERE YOU AWARE OF THE DESTINY'S CHILD            09:00AM

49

EXHIBIT 15
PAGE 282.002

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

```
 1   BEYONCE DOLL?
 2        A.   YES, OKAY.  I REMEMBER THE BEYONCE.  I
 3   DON'T KNOW IF THAT WAS AT THAT TIME OR MAYBE A
 4   LITTLE BIT LATER.  AGAIN, I WOULD SAY THAT WAS
 5   REALLY AIMED AT MUCH MORE FOR ADULTS THAN CHILDREN.    09:00AM
 6        Q.   AND WHAT'S THAT BASED ON?
 7        A.   BEYONCE HERSELF AND THE FACT THAT SHE WAS
 8   WEARING A FAIRLY SEXY OUTFIT AND THAT IT WAS A
 9   PACKAGE NOT DESIGNED TO APPEAL TO CHILDREN.  IT
10   WASN'T PINK.  IT DIDN'T HAVE A LOT OF BRIGHT, FLASHY    09:00AM
11   GRAPHICS ON IT.  IT WAS DEFINITELY IN THE COLLECTOR
12   LINE OF PACKAGING.
13        Q.   YOU'LL AGREE WITH ME THAT BACK IN THE
14   1999-2000 TIME PERIOD THAT ONE LINE OF BUSINESS THAT
15   MATTEL WAS IN WAS DOLLS FOR BOTH CHILDREN AND         09:01AM
16   ADULTS?
17        A.   YES, I WOULD AGREE.
18        Q.   AS PART OF YOUR RESPONSIBILITIES THERE WHEN
19   YOU WERE AT MATTEL, DID YOU EVER DEAL WITH THE
20   MARKETING DEPARTMENT?                                 09:01AM
21        A.   YES.
22        Q.   AND GENERALLY SPEAKING, WHAT WERE YOUR
23   INTERACTIONS WITH THE MARKETING DEPARTMENT?
24        A.   I PARTICIPATED IN THE MEETINGS WHERE WE
25   PRESENTED DESIGN CONCEPTS TO THE MARKETING           09:01AM
```

EXHIBIT 15

PAGE 282 003

```
 1    DEPARTMENT.  I ALSO WENT OCCASIONALLY TO A

 2    BRAINSTORM THAT WOULD SOMETIMES BE SPEARHEADED BY

 3    DESIGN AND OTHER TIMES BY MARKETING TRYING TO COME

 4    UP WITH IDEAS FOR FUTURE YEARS' PRODUCTS, AND I

 5    WORKED WITH MARKETING IN COST REDUCTION MEETINGS          09:02AM

 6    WHERE WE WOULD TAKE THE PRELIMINARY DOLL AND TRY TO

 7    FIGURE OUT IF WE COULD REALLY AFFORD TO DO IT LIKE

 8    THAT.

 9        Q.   YOU MENTIONED THE TERM "BRAINSTORM."

10        A.   UH-HUH.                                          09:02AM

11        Q.   FOR THE REST OF US WHO ARE NOT IN YOUR

12    BUSINESS, WHAT'S A BRAINSTORM IN THE TERMINOLOGY

13    YOU'RE USING?

14        A.   A BRAINSTORM IS GETTING A GROUP OF PEOPLE

15    TOGETHER, GROUP OF CREATIVE PEOPLE OR MARKETING         09:02AM

16    PEOPLE SOMETIMES, TOO, WHICH THAT DOESN'T MEAN THEY

17    AREN'T CREATIVE, GETTING THEM ALL TOGETHER IN A ROOM

18    FOR A FAIRLY LENGTHY TIME, FOUR HOURS AT LEAST,

19    MORE -- A DAY IS FAR BETTER, TO TRY TO COME UP WITH

20    IDEAS.                                                  09:02AM

21             THE MARKETING PEOPLE WOULD BRING TO THE

22    TABLE WHAT COLLECTORS SAID THAT THEY WERE INTERESTED

23    IN.  THIS IS INFORMATION THAT THEY CULLED FROM

24    LETTERS THAT THEY GOT FROM COLLECTORS AND -- OR FROM

25    SALES INFORMATION, AND WE IN THE DESIGN SIDE WOULD       09:03AM
```

51

EXHIBIT 15

PAGE 282.004

1    BRING VISUAL IDEAS, WHAT WAS HOT AND TRENDY AT THE

2    TIME, WHAT WE THOUGHT MIGHT BE A SALEABLE PRODUCT.

3         SOMETIMES WE'D SUGGEST SOMETHING, AND

4    MARKETING WOULD SAY, "EEEW, NO.  NEESH MARKETING,

5    NEVER," BUT THE IDEA WAS IN A BRAINSTORM THAT YOU          09:03AM

6    PUT ALL THE IDEAS ON THE TABLE AND YOU DID THE

7    SORTING OUT LATER ON.

8         Q.   AND BY CATEGORY WHO WERE THE OTHER

9    PERSONNEL THERE AT MATTEL BACK IN THE '99-2000 TIME

10   PERIOD WHEN YOU WERE IN COLLECTOR WHO PARTICIPATED          09:03AM

11   IN THESE BRAINSTORMS OTHER THAN THE MARKETING

12   PEOPLE?

13        A.   IT WOULD DEPEND ON WHO CALLED IT.  IF

14   DESIGN CALLED IT, IT WOULD INCLUDE THE PRELIMINARY

15   DESIGNERS AND THE DEVELOPMENT DESIGNERS, MAYBE NOT          09:03AM

16   ALL OF THEM AT ANY ONE GIVEN TIME BUT A SPECIFIC

17   GROUP.

18        WHO ELSE WOULD BE INCLUDED?  I THINK IT WAS

19   JUST DESIGN AND MARKETING.  I DON'T REALLY REMEMBER

20   COST ENGINEERS OR THE PRACTICAL PEOPLE BEING                09:04AM

21   INVOLVED.

22        Q.   BACK IN THE 1999-2000 TIME PERIOD, ONE

23   THING THAT PRELIMINARY DESIGNERS DID, AS YOU

24   UNDER -- AS YOU KNOW --

25        A.   UH-HUH.                                           09:04AM

52

EXHIBIT 15
PAGE 282.005

```
 1        Q.   -- FROM YOUR PERSONAL EXPERIENCE THERE IS

 2   PARTICIPATE IN THESE BRAINSTORMS YOU DESCRIBED.

 3        A.   THAT IS CORRECT.

 4        Q.   AND IF I UNDERSTOOD YOU CORRECTLY, ONE

 5   PURPOSE OF THESE BRAINSTORMS, IN FACT, MAYBE THE        09:04AM

 6   PRINCIPAL PURPOSE OF THE BRAINSTORMS IS TO COME UP

 7   WITH IDEAS, CONCEPTS, DESIGNS FOR FUTURE PRODUCTS OF

 8   THE COMPANY; IS THAT RIGHT?

 9        A.   THAT'S RIGHT.

10        Q.   DID CARTER BRYANT PARTICIPATE IN THOSE        09:04AM

11   BRAINSTORMS BACK IN THE 1999-2000 TIME PERIOD WHEN

12   HE WAS IN COLLECTIBLES?

13        A.   I DON'T SPECIFICALLY REMEMBER HIS BEING IN

14   ANY OF THE BRAINSTORMS THAT I WAS IN.  I DON'T -- I

15   CAN'T SAY FOR SURE WHETHER HE PARTICIPATED.            09:05AM

16        Q.   YOU WOULDN'T BE SURPRISED TO LEARN THAT HE

17   DID; RIGHT?

18        A.   I WOULDN'T BE SURPRISED AT ALL.

19        Q.   IN FACT, YOU CONSIDER HIM TO BE A VERY

20   CREATIVE PERSON?                                       09:05AM

21        A.   YES, AND IT WOULD BE VERY REASONABLE THAT

22   HE WOULD PARTICIPATE IN A BRAINSTORM.

23        Q.   NOW, BACK IN THE 1999-2000 TIME PERIOD, DID

24   YOU PARTICIPATE YOURSELF IN BRAINSTORM SESSIONS

25   WHERE NO CONSTRAINTS WERE PLACED UPON IN TERMS OF      09:05AM
```

53

EXHIBIT 15

PAGE 282.006

1     A.   NO.

2     Q.   DURING THE TIME THAT YOU WERE EMPLOYED BY

3  MATTEL, DID YOU HAVE ANY REASON TO BELIEVE, THINK,

4  SUSPECT THAT CARTER BRYANT WORKED ON BRATZ WHEN HE

5  WAS EMPLOYED BY MATTEL?               11:29AM

6     A.   NO.

7     Q.   IF I UNDERSTOOD WHAT YOU SAID EARLIER

8  CORRECTLY, YOU WORKED WITH CARTER BRYANT ON ALMOST A

9  DAILY BASIS WHEN YOU WERE BOTH THERE AT MATTEL

10  COLLECTIBLES; RIGHT?                 11:29AM

11     A.   THAT IS RIGHT.

12     Q.   IS IT TRUE HE NEVER SAID TO YOU IN WORDS OR

13  SUBSTANCE THAT HE WAS WORKING WITH MGA WHILE

14  EMPLOYED BY MATTEL?

15     A.   THAT IS TRUE.               11:30AM

16     Q.   IS IT ALSO TRUE THAT HE NEVER SAID TO YOU

17  DURING THAT ENTIRE TIME PERIOD IN WORDS OR SUBSTANCE

18  THAT HE WAS WORKING ON A DOLL PROJECT, A NON-MATTEL

19  DOLL PROJECT CALLED BRATZ WHILE HE WAS EMPLOYED BY

20  MATTEL?                               11:30AM

21     A.   THAT IS TRUE, WE NEVER HAD A CONVERSATION

22  LIKE THAT.

23     Q.   DO YOU HAVE ANY EXPLANATION AS TO WHY HE

24  DIDN'T TELL YOU ANY OF THIS INFORMATION DURING THE

25  TIME YOU WERE WORKING TOGETHER?         11:30AM

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT 15

PAGE 283

```
 1        A.    HE -- I CAN'T IMAGINE THAT EMPLOYEES WOULD
 2   GO AROUND TELLING OTHER EMPLOYEES THAT THEY WERE
 3   WORKING ON OUTSIDE PROJECTS.  IT JUST SIMPLY WASN'T
 4   DONE.
 5        Q.    WHY NOT?                                    11:30AM
 6        A.    BECAUSE I THINK ALL OF US WERE AWARE OF THE
 7   FACT THAT MATTEL WAS TRYING TO CLAIM WITH THEIR
 8   INVENTIONS AGREEMENT SOME RIGHTS TO WHAT WE DID WITH
 9   OUR -- OUR OWN TIME.  I THINK IT WOULD HAVE BEEN
10   CONSIDERED A BIT DANGEROUS TO HAVE LOOSE LIPS AND GO   11:30AM
11   AROUND TALKING ABOUT THE OUTSIDE PROJECTS THAT YOU
12   HAD DONE FOR SOMEONE ELSE.
13             NOW, WE OFTEN TALKED ABOUT THE OUTSIDE
14   PROJECTS THAT WE DID THAT WEREN'T INTENDED FOR
15   SOMEONE ELSE OR HADN'T BEEN SOLD TO.  WE TALKED       11:31AM
16   ABOUT OUR OWN PAINTINGS OR OUR OWN CREATIVE
17   ENDEAVORS.  THAT WOULD BE A SUBJECT OF NORMAL
18   CONVERSATION, BUT SOMETHING THAT HAD BEEN DONE FOR
19   ANOTHER COMPANY WOULD NOT HAVE BEEN A SUBJECT OF
20   GENERAL CONVERSATION.                                 11:31AM
21        Q.    AND THAT'S -- WHAT YOU JUST DESCRIBED WAS
22   TRUE AS OF THE 1999-2000 TIME PERIOD?
23        A.    THAT'S CORRECT.
24        Q.    ARE YOU AWARE OF ANY INFORMATION THAT WOULD
25   SUGGEST CARTER BRYANT WAS UNAWARE THAT WHILE HE WAS   11:31AM
```

149

EXHIBIT _____ 15

PAGE _____ 284

1    EMPLOYED BY MATTEL, IT WAS WRONG FOR HIM TO WORK

2    WITH A MATTEL COMPETITOR?

3         MR. PLEVAN:  OBJECT TO THE ASSUMPTION IN

4    THERE THAT THAT WAS WRONG, THAT ANYTHING HE DID WAS

5    WRONG.  IF YOU UNDERSTAND THE QUESTION, PLEASE          11:31AM

6    ANSWER IT.

7         THE WITNESS:  IT'S A VERY CONVOLUTED

8    QUESTION SO COULD WE -- COULD WE BREAK IT DOWN INTO

9    CLAUSES?  AM I AWARE THAT CARTER WAS AWARE THAT SOME

10   OF WHAT HE DID MIGHT HAVE COME INTO CONFLICT WITH       11:32AM

11   WHAT MATTEL WANTED FROM THEIR EMPLOYEES?  IS THAT

12   WHAT YOU WERE GENERALLY SAYING?

13   BY MR. ZELLER:

14        Q.   DO YOU HAVE ANY REASON TO DOUBT --

15        A.   OKAY.                                         11:32AM

16        Q.   -- THAT CARTER BRYANT WAS AWARE DURING THE

17   TIME HE WAS EMPLOYED BY MATTEL THAT IT WAS WRONG FOR

18   HIM TO BE WORKING WITH A MATTEL COMPETITOR WHILE

19   EMPLOYED BY MATTEL?

20        MR. PLEVAN:  OBJECT TO THE ASSUMPTION THAT         11:32AM

21   IT WAS WRONG WHAT HE DID.  LET'S HAVE THE QUESTION

22   READ BACK.

23        (RECORD READ AS FOLLOWS:

24        "Q.   DO YOU HAVE ANY REASON TO DOUBT

25        THAT CARTER BRYANT WAS AWARE DURING THE

150

1        MR. PLEVAN:  IS THIS THE CONVENIENT TIME

2    WE'VE BEEN WAITING FOR?

3        MR. ZELLER:  WELL --

4        THE WITNESS:  IF WE ARE ABOUT TO MOVE ON --

5        MR. ZELLER:  -- I DON'T KNOW IF SHE WAS

6    DONE --

7        THE WITNESS:  YEAH.

8        MR. ZELLER:  -- BUT YEAH, GO AHEAD

9        THE WITNESS:  IF WE ARE ABOUT TO MOVE ON TO

10   A SLIGHTLY DIFFERENT SUBJECT, I WOULD LIKE TO TAKE A    03:26PM

11   BREAK NOW.

12       MR. ZELLER:  I'M SORRY.  THE FIRST THING I

13   WAS ASKING IS JUST WERE YOU DONE WITH YOUR ANSWER?

14       THE WITNESS:  YES, I WAS DONE WITH MY

15   ANSWER.  SORRY.                                        03:26PM

16       MR. ZELLER:  YES.  IT'S A FINE TIME TO TAKE

17   A BREAK, THEN.

18       THE WITNESS:  THANK YOU VERY MUCH.  I

19   APPRECIATE THAT.

20       THE VIDEOGRAPHER:  THIS CONCLUDES VIDEOTAPE         03:26PM

21   NO. 3.  THE TIME IS 3:27 P.M., AND WE ARE OFF THE

22   RECORD.

23       (RECESS TAKEN.)

24       THE VIDEOGRAPHER:  THIS BEGINS VIDEOTAPE

25   NO. 3.  THE TIME IS 3:44 P.M., AND WE'RE ON THE        03:41PM

EXHIBIT  15

```
 1   RECORD.

 2   BY MR. ZELLER:

 3       Q.   DO YOU KNOW A RAMONA PRINCE?

 4       A.   NO.  THAT NAME'S NOT FAMILIAR.

 5       Q.   JACQUELINE PRINCE?                      03:41PM

 6       A.   NO.

 7       Q.   IF I TOLD YOU SHE WAS SOMEONE WHO WORKED ON

 8   THE STAFF THERE IN BARBIE COLLECTIBLES, WOULD THAT

 9   REFRESH YOUR RECOLLECTION AS TO WHETHER YOU KNOW

10   HER?                                             03:41PM

11       A.   NO, I'M SORRY, IT WOULDN'T.

12       Q.   DO YOU KNOW IF YOUR HUSBAND HAS WORKED WITH

13   HER?

14       A.   JACQUELINE PRINCE?

15       Q.   RIGHT.                                  03:41PM

16       A.   NOT THAT I KNOW OF.

17       Q.   I TAKE IT YOU DON'T HAVE ANY MEMORY OF

18   HAVING ANY COMMUNICATIONS WITH HER AT ANY TIME ABOUT

19   MGA, CARTER BRYANT, OR THIS LAWSUIT?

20       A.   THAT'S CORRECT.                         03:42PM

21       Q.   DO YOU KNOW A ROXANNA POWELL?

22       A.   THAT NAME RINGS A VERY VAGUE BELL, BUT I

23   CAN'T REMEMBER THE CONTEXT.

24       Q.   DO YOU REMEMBER HER FROM MATTEL?

25       A.   I WOULD HAVE TO GUESS THAT THAT'S WHERE I  03:42PM
```

EXHIBIT __15__

```
 1    ENCOUNTERED THE NAME.
 2         Q.   HOW CLEAR IS THAT BELL THAT RINGS?
 3         A.   IT'S REAL LOST IN THE MIDST OF TIME.  I'M
 4    SORRY, SIR.  IF YOU ASK ME TO PUT A FACE TO THAT
 5    NAME OR TO RECOGNIZE HER IF I WALK PAST HER ON THE      03:42PM
 6    STREET, I'D HAVE TO SAY I COULDN'T DO THAT.
 7         Q.   YOU DON'T HAVE ANY MEMORY OF WORKING WITH
 8    HER AT MATTEL; IS THAT RIGHT?
 9         A.   THAT'S CORRECT, I DON'T.
10         Q.   DO YOU HAVE ANY MEMORY OF EVER DISCUSSING     03:42PM
11    CARTER BRYANT, MGA OR THIS LAWSUIT WITH HER?
12         A.   NO, I DON'T.
13         Q.   DO YOU KNOW A SARAH HALPERN?
14         A.   YES, I DO KNOW SARAH.
15         Q.   AND HOW DO YOU KNOW HER?                      03:42PM
16         A.   I WORKED WITH HER IN THE BARBIE
17    COLLECTIBLES GROUP.
18         Q.   AND GENERALLY SPEAKING, WHAT WAS THE NATURE
19    OF THE WORK YOU DID WITH HER IN THE COLLECTIBLES
20    GROUP?                                                  03:43PM
21         A.   SHE AND I WERE THE FIRST TWO DEVELOPMENT
22    DESIGNERS IN THE NEWLY FORMED COLLECTIBLES GROUP
23    BACK IN 1995, AND WE DECIDED BETWEEN THE TWO OF US
24    THAT BECAUSE SARAH HAD A MUCH BETTER BACKGROUND IN
25    FASHION, THAT SHE WOULD HANDLE THE DEVELOPMENT IN       03:43PM
```

EXHIBIT _____ 15

PAGE _____ 288        290

```
 1    THOSE AREAS, AND BECAUSE MY BACKGROUND WAS IN
 2    PAINTING AND SCULPTING, THAT I WOULD HANDLE THE
 3    DEVELOPMENT IN THOSE AREAS.  SO WE KIND OF SPLIT UP
 4    THE RESPONSIBILITY.  IT WAS AN UNUSUAL WAY TO DO IT.
 5    NORMALLY A DEVELOPMENT DESIGNER WAS JUST DESIGN --    03:43PM
 6    WAS JUST ASSIGNED TO A PRODUCT, BUT WE HAD BOTH
 7    WORKED ON ALL THE PRODUCTS.
 8        Q.   HAVE YOU EVER HAD ANY COMMUNICATIONS WITH
 9    HER ABOUT CARTER BRYANT?
10        A.   NO.                                          03:43PM
11        Q.   HAVE YOU EVER HAD ANY COMMUNICATIONS WITH
12    HER ABOUT MGA?
13        A.   NO.
14        Q.   HAVE YOU EVER HAD ANY COMMUNICATIONS WITH
15    HER ABOUT THIS LAWSUIT?                               03:44PM
16        A.   NO.
17        Q.   DO YOU KNOW IF SHE'S HAD ANY INVOLVEMENT
18    WITH BRATZ?
19        A.   I DON'T KNOW.  I PROBABLY SHOULD MENTION
20    THAT MY HUSBAND WORKED ON A PROJECT WITH HER HUSBAND  03:44PM
21    JUST IN THE NATURE OF FULL DISCLOSURE.
22        Q.   WHAT KIND OF PROJECT WAS IT?
23        A.   IT WAS A MOVIE.
24        Q.   WAS IT -- WHAT WAS THE COMPANY IT WAS FOR?
25        A.   GOSH, I DON'T REMEMBER THAT.  I DON'T EVEN   03:44PM
```

EXHIBIT _____ 15

1

2

3                              * * *

4

5        I DO HEREBY DECLARE UNDER PENALTY OF PERJURY

6    THAT I HAVE READ THE FOREGOING TRANSCRIPT; THAT I

7    HAVE MADE ANY CORRECTIONS AS APPEAR NOTED; THAT MY

8    TESTIMONY AS CONTAINED HEREIN, AS CORRECTED, IS TRUE

9    AND CORRECT.

10       EXECUTED THIS _____ DAY OF _____,

11   20___, AT _____, _____.

                (CITY)                    (STATE)

12

13

14

15                      _____

                        CHRISTINA TOMIYAMA

16

17

18

19

20

21

22

23

24                  EXHIBIT ___15_____

25                  PAGE ____290_____

                                                      366

```
 1   STATE OF CALIFORNIA     )

 2   COUNTY OF RIVERSIDE     )

 3

 4         I, the undersigned, a Certified Shorthand

 5   Reporter of the State of California, do hereby certify:

 6         That the foregoing proceedings were taken before

 7   me at the time and place herein set forth; that any

 8   witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14         I further testify that I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date subscribed

18   my name.

19

20   Dated:   MARCH 3, 2008

21

22

23

24                          _____
                            Michelle Hutton, CSR
25   EXHIBIT  15            Certificate No. 7322

     PAGE  291
```

# EXHIBIT 16

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  UNITED STATES DISTRICT COURT
2  CENTRAL DISTRICT OF CALIFORNIA
3  EASTERN DIVISION

Certified Copy

4  --------------------------------
5  MATTEL, INC., a Delaware          )
6  Corporation,                      )
7           Plaintiff,               )
8           vs.                      )  No. CV 04-9059
9  CARTER BRYANT, an individual;     )     NM (RNBx)
10 and DOES 1 through 10,            )  VOLUME I
11 Inclusive,                        )
12          Defendants.              )
13 --------------------------------  )
14 (COMPLETE CAPTION ON NEXT PAGE.)
15
16   CONFIDENTIAL - ATTORNEYS' EYES ONLY
17
18   Videotaped 30(b)(6) Deposition of
19   RENE PASKO, taken at 400 South Hope
20   Street, Los Angeles, California,
21   commencing at 10:05 A.M., Wednesday,
22   June 13, 2007, before Wendy S.
23   Schreiber, CSR No. 3558, RPR, CLR.
24
25   PAGES 1 - 222

1

EXHIBIT 16
PAGE 292

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                   EASTERN DIVISION
 4
 5        -------------------------------
 6        MATTEL, INC., a Delaware          )
 7        Corporation,                      )
 8                    Plaintiff,            )
 9                    vs.                   ) No. CV 04-9059
10        CARTER BRYANT, an individual;     )    NM (RNBx)
11        and DOES 1 through 10,            )
12        Inclusive,                        )
13                    Defendants.           )
14        ------------------------------- )
15        CARTER BRYANT, on behalf of       )
16        himself, all present and          )
17        former employees of Mattel,       )
18        Inc., and the general public,   )
19                    Counter-Claimants, )
20                    vs.                   )
21        MATTEL, INC., a Delaware          )
22        Corporation,                      )
23                    Counter-Defendant. )
24        -------------------------------
25
```

                                                          2

EXHIBIT ____16____

PAGE ____293____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3       FOR THE PLAINTIFF:

 4

 5           QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6           BY:  MICHAEL ZELLER, ESQ.

 7           865 South Figueroa Street, Tenth Floor

 8           Los Angeles, California 90017

 9           (213) 443-3000

10           mzeller@quinnemanuel.com

11

12               -AND-

13

14           MATTEL, INC.

15           BY:  MICHAEL MOORE, ESQ.

16           333 Continental Boulevard

17           El Segundo, California 90245-5012

18           (310) 252-2000

19           michael.moore@mattel.com

20

21

22

23

24

25
                                                            3
```

EXHIBIT ___16___

PAGE ___294___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    APPEARANCES OF COUNSEL (CONTINUED):
2

3         FOR THE DEFENDANT AND COUNTERCLAIMANT
4    CARTER BRYANT:
5

6              KEKER & VAN NEST LLP
7              BY:   JOHN TRINIDAD, ESQ.
8              710 Sansome Street
9              San Francisco, California 94111-1704
10             (415) 391-5400
11             jtrinidad@kvn.com
12

13        FOR DEFENDANT MGA ENTERTAINMENT, INC.:
14

15             O'MELVENY & MYERS LLP
16             BY:   DIANA TORRES, ESQ.
17                   JENNIFER GLAD, ESQ.
18             400 South Hope Street
19             Los Angeles, California 90071-2899
20             (213) 430-6000
21             dtorres@omm.com
22             jglad@omm.com
23

24        ALSO PRESENT:
25             DAVID WEST, VIDEO OPERATOR
```

4

EXHIBIT   16

PAGE   295

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that's before like a concept approval, correct?

2        Q.    Correct.

3        A.    Okay.

4        Q.    After -- in your business unit in 1998 at

5    Mattel, after a product had received the informal        11:18AM

6    approvals that you just talked about by your

7    manager, your director and the Marketing team, how

8    long did it typically take to get concept approval?

9        A.    That's a little difficult to remember but

10   if -- if there was a model being made, it could take   11:19AM

11   anywhere from a month to three months.

12       Q.    And if a model was not being made?

13       A.    The same amount of time depending on the

14   complexity.

15       Q.    So that's one month to three months after    11:19AM

16   the informal approvals?

17       A.    Correct.

18       Q.    After a product or design had received

19   concept approval, what happened?

20       A.    Do you mean like what would happen to the     11:20AM

21   product after that milestone?

22       Q.    Yes.   Yes.

23       A.    Again, it would vary from project to project

24   but at that point any changes that are requested are

25   made.   New models are typically made that reflect      11:20AM

                                                                49

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the changes.  Cost reductions are done.  Let's see,

2    what else?  Oh, and information is usually sent to

3    Hong Kong if it hasn't been sent already.

4        Q.    Were models typically made prior to concept

5    approval at that time?                              11:21AM

6              MR. ZELLER:  I assume we're still talking

7    about the same context of the prior questions?

8              MS. TORRES:  Yes.

9              THE WITNESS:  The time period?

10             MR. ZELLER:  Uh-huh.                        11:21AM

11             THE WITNESS:  I can't say typically.  I have

12   to say it would depend on the project.  Sometimes

13   yes, sometimes no.

14   BY MS. TORRES:

15       Q.    Were you involved as -- as a senior designer 11:21AM

16   in the 1998 time period, were you involved in the

17   concept-approval process?

18       A.    Of anything?

19       Q.    Yeah, of the products that you worked on.

20       A.    Of the products that I worked on?  Yes.      11:21AM

21       Q.    What was your role?

22       A.    As a designer, I would usually present the

23   product.

24       Q.    Would you present the type of information

25   that was considered in connection with the concept    11:22AM

                                                            50

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  approval that you mentioned earlier: the rough

2  cost, the package and the sketch or a 3-D model?

3      A.   My only role really is to present the actual

4  model and its design, anything visual. I would not

5  be presenting costs or packaging.                    11:22AM

6      Q.   Who would be presenting costs?

7      A.   Typically the Costing engineer would be

8  discussing that. Sometimes it would come from

9  Marketing. Sometimes the planner gets involved in

10  that conversation.                                   11:23AM

11     Q.   As a designer at that time period -- in that

12  time period, were you ever consulted about rough

13  costs?

14     A.   "Consulted" meaning?

15     Q.   By the cost -- by whoever was going to        11:23AM

16  present the rough cost for concept approval.

17     A.   Do you mean like at any point -- was I

18  consulted at any point in time during the project or

19  during that meeting?

20     Q.   Prior to the concept approval meeting.        11:23AM

21     A.   I was very involved in costing.

22     Q.   What was your involvement?

23     A.   Well, since I'm designing the product it's

24  my job to make sure that what I'm designing fits

25  into the requirements set for the project. So, you   11:23AM

51

EXHIBIT 16

PAGE 290

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    know, if I'm supposed to design a product that costs

2    $4, I have to make sure that what I'm designing will

3    fit in that so I will meet regularly with my Costing

4    people to make sure that what I'm designing is

5    actually going to fit in the costs.                    11:24AM

6        Q.    How would you know that?

7        A.    How would I know?  Lots of experience and

8    also using the resources that I have.

9        Q.    What type of resources?

10       A.    My Costing engineer, my Engineering          11:24AM

11   partners.  If it has soft goods, I consult with my

12   Soft Goods engineers.

13       Q.    And would they look at other similar

14   products to get an estimate of costs?

15       A.    We would look at our own past prior projects 11:24AM

16   that were in the same price point to -- as a gauge

17   for us to visually gauge what -- that what we're

18   working on will be in the ballpark.

19       Q.    Was rough cost in your experience at that

20   time always a factor in the concept-approval          11:25AM

21   process?

22       A.    The rough cost?

23       Q.    Yes.

24       A.    Yes.

25       Q.    You also mentioned packaging.  Were you     11:25AM

                                                            52

EXHIBIT 16

PAGE 299

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  involved at all in presenting the packaging for

2  concept approval?

3      A.   I was not.

4      Q.   Were you consulted in any way about what the

5  packaging would look like for the products that you    11:25AM

6  were on?

7      A.   In a very limited way.

8      Q.   In what way?

9      A.   Well, if -- if I'm designing a $4 toy, a $4

10  toy has to fit in a $4 toy box so I would usually    11:26AM

11  meet with my packaging engineers and make sure that

12  what I was designing would fit in the package and

13  also make sure that, you know, what I was creating

14  had ways to be attached to the package.

15      Q.   How did you get assignments in that time    11:26AM

16  period? Were they given to you by your supervisor?

17      A.   Yeah -- yes, pretty much.

18      Q.   When you -- when you received assignments,

19  were you also told what the target cost would be?

20      A.   Usually.                                    11:26AM

21      Q.   Do you recall ever being given an

22  assignment, you know, in the 1998 time period or

23  even in the 1998 to 2000 time period where you were

24  not given a target cost?

25      A.   We were almost always given a range.        11:27AM

                                                         53

EXHIBIT ___16___

PAGE ___300___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          I declare under penalty of perjury

2     under the laws of the State of California

3     that the foregoing is true and correct.

4          Executed on _____,

5     2007, at _____,

6     California.

7

8

9

10

11                    _____

12                         RENE PASKO

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    217

EXHIBIT ____16____

PAGE ____30/____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA    ) ss:

 2    COUNTY OF LOS ANGELES )

 3

 4           I, WENDY S. SCHREIBER, CSR No. 3558, do

 5    hereby certify:

 6

 7           That the foregoing deposition of RENE

 8    PASKO was taken before me at the time and place

 9    therein set forth, at which time the witness was

10    placed under oath and was sworn by me to tell the

11    truth, the whole truth, and nothing but the truth;

12           That the testimony of the witness and all

13    objections made by counsel at the time of the

14    examination were recorded stenographically by me,

15    and were thereafter transcribed under my direction

16    and supervision, and that the foregoing pages

17    contain a full, true and accurate record of all

18    proceedings and testimony to the best of my skill

19    and ability.

20           I further certify that I am neither

21    counsel for any party in said action, nor am I

22    related to any party to said action, nor am I in any

23    way interested in the outcome thereof.

24

25
```

                                                          218

EXHIBIT _____ 16

PAGE _____ 302

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            IN WITNESS WHEREOF, I have subscribed my

 2    name this 22nd day of June, 2007.

 3

 4

 5

 6    _____

 7    WENDY S. SCHREIBER, CSR No. 3558, RPR

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                    219
```

EXHIBIT ___16___

PAGE ___303___

# EXHIBIT 17

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
                             )
          PLAINTIFF, )
                             )
     V.                      )    NO. CV 04-9040 SGL (RNBX)
                             )
MATTEL, INC., A DELAWARE )
CORPORATION,             )
                             )
         DEFENDANTS. )
_____ )
                             )
AND CONSOLIDATED ACTION (S). )
_____ )

# CONFIDENTIAL

(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN
DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)

## DEPOSITION OF ELISE CLOONAN

## DECEMBER 14, 2007



REPORTED BY:
RENEE PACHECO
CSR NO. 11564
JOB NO. 07AE756-RP

EXHIBIT _____ 12

PAGE _____ 304

COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,      )
                                   )
          PLAINTIFF)               )
                                   )
     VS.                           )  NO. CV 04-9049 SGL
                                   )
MATTEL, INC., A DELAWARE           )
CORPORATION,                       )
                                   )
               DEFENDANT.          )
                                   )
_____    )
                                   )
AND CONSOLIDATED ACTION(S).        )
_____    )


C O N F I D E N T I A L

(PURSUANT TO PROTECTIVE ORDER, THIS
TRANSCRIPT HAS BEEN DESIGNATED
CONFIDENTIAL FOR ATTORNEYS' EYES ONLY)


DEPOSITION OF ELISE CLOONAN, TAKEN
ON BEHALF OF THE DEFENDANTS, AT
865 SOUTH FIGUEROA STREET, 10TH
FLOOR, LOS ANGELES, CALIFORNIA,
COMMENCING AT 10:11 A.M., FRIDAY,
DECEMBER 14, 2007, BEFORE RENEE A.
PACHECO, RPR, CSR 11564.

EXHIBIT _____ 17

PAGE _____ 305

2

```
 1     APPEARANCES OF COUNSEL:
 2
 3     FOR THE PLAINTIFF CARTER BRYANT:
 4          KEKER & VAN NEST, LLP
            BY:  MATTHEW M. WERDEGAR, ESQ.
 5          710 SANSOME STREET
            SAN FRANCISCO, CALIFORNIA  94111-1704
 6          (415) 391-5400
 7
 8     FOR THE DEFENDANT MATTEL, INC.
 9          QUINN EMANUEL URQUHART OLIVER & HEDGES
            BY:  MICHAEL T. ZELLER, ESQ.
10               BRIDGET HAULER, ESQ.
            865 SOUTH FIGUEROA STREET
11          10TH FLOOR
            LOS ANGELES, CALIFORNIA  90017-2543
12          (213) 443-3000
13
14     FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:
15          SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
            BY:  KENNETH A. PLEVAN, ESQ.
16          FOUR TIMES SQUARE
            NEW YORK, NEW YORK  10036
17          (212) 735-3000
18
19     FOR THE DEPONENT:
20          KEATS, MCFARLAND & WILSON, LLP
            BY:  LARRY W. MCFARLAND, ESQ.
21               CHRISTIAN C. DOWELL, ESQ.
            9720 WILSHIRE BOULEVARD
22          PENTHOUSE SUITE
            BEVERLY HILLS, CALIFORNIA 90212
23          (310) 777-3750
            LMCFARLAND@KMWLAW.COM
24          CDOWELL@KMWLAW.COM      EXHIBIT ____17____
25
                                    PAGE ____306____
```

                                                                    3



1    APPEARANCES (CONTINUED):

2    ALSO PRESENT:

3        STEVEN TOGAMI - VIDEOGRAPHER

4        MICHAEL MOORE

5        JILL THOMAS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT _____ 17

PAGE _____ 307

4

1   WORKED AT MATTEL, THAT YOU WEREN'T ALLOWED TO WORK

2   FOR MATTEL COMPETITORS WHILE YOU WERE A MATTEL

3   EMPLOYEE?

4        A.   YES.

5        Q.   AND YOU WERE AWARE THAT THAT WAS                    01:28:33

6   SOMETHING THAT WASN'T ALLOWED UNDER YOUR EMPLOYMENT

7   AGREEMENT; RIGHT?

8        A.   RIGHT.

9        MR. MCFARLAND:   OBJECTION; CALLS FOR A LEGAL

10  CONCLUSION.                                                   01:28:40

11           GO AHEAD.

12  BY MR. ZELLER:

13       Q.   AND THAT'S SOMETHING THAT YOU UNDERSTOOD

14  FROM THE DAY THAT YOU STARTED THERE AT MATTEL; IS

15  THAT TRUE?                                                    01:28:46

16       A.   I UNDERSTOOD THAT BEFORE I STARTED THERE.

17       Q.   SO THE WHOLE TIME YOU WERE AT MATTEL YOU

18  UNDERSTOOD THAT?

19       A.   YES.

20       Q.   AND -- AND YOU ALSO UNDERSTOOD THAT --             01:28:52

21  WELL, LET ME STEP BACK FOR A MINUTE.

22           I TAKE IT THAT WHEN YOU WERE THERE AT

23  MATTEL AS A DESIGNER, YOU CAME UP WITH CONCEPTS FOR

24  DOLLS AND TOYS; RIGHT?

25       A.   YES.                                                01:29:08

98

EXHIBIT _____17_____

PAGE _____308_____

1     Q.    YOU CAME UP AND CREATED DRAWINGS FOR

2    DOLLS AND TOYS?

3     A.    YES.

4     Q.    WAS IT YOUR UNDERSTANDING BACK WHEN YOU

5    WERE EMPLOYED BY MATTEL THAT DRAWINGS OF DOLLS AND    01:29:16

6    TOYS THAT YOU MADE WERE OWNED BY MATTEL OR BELONGED

7    TO MATTEL?

8     MR. MCFARLAND:  OBJECTION; CALLS FOR A LEGAL

9    CONCLUSION.

10     THE DEPONENT:  EVERYTHING I DID FOR MATTEL    01:29:28

11    BELONGED TO MATTEL.  ACTUALLY, EVERYTHING I DID

12    WHILE I WAS WORKING FOR MATTEL BELONGED TO MATTEL.

13    BY MR. ZELLER:

14     Q.    YOU UNDERSTOOD THAT DRAWINGS THAT YOU

15    MADE OF DOLLS --    01:29:38

16     A.    YES.

17     Q.    -- BELONGED TO MATTEL?

18     MR. MCFARLAND:  OBJECTION; CALLS FOR A LEGAL

19    CONCLUSION.

20     THE DEPONENT:  YES.    01:29:43

21    BY MR. ZELLER:

22     Q.    YOU UNDERSTOOD THAT DOLL OR TOY CONCEPTS

23    THAT YOU CAME UP WITH, WHEN YOU WERE A MATTEL

24    EMPLOYEE, BELONGED TO MATTEL; CORRECT?

25     MR. MCFARLAND:  OBJECTION; CALLS FOR A LEGAL    01:29:52

99

EXHIBIT 17

PAGE 309

```
 1    CONCLUSION.

 2         THE DEPONENT:   YES.

 3    BY MR. ZELLER:

 4         Q.    AND YOU UNDERSTOOD THAT THE WHOLE TIME

 5    THAT YOU WERE EMPLOYED BY MATTEL --                   01:29:56

 6         MR. MCFARLAND:   OBJECTION --

 7    BY MR. ZELLER:

 8         Q.    -- IS THAT TRUE?

 9         MR. MCFARLAND:   SAME OBJECTION.

10         THE DEPONENT:   YES.                             01:30:00

11    BY MR. ZELLER:

12         Q.    ARE YOU AWARE OF ANYONE WHO WAS AT THE

13    TIME A MATTEL EMPLOYEE WHO WAS ALSO DOING WORK FOR

14    A MATTEL COMPETITOR?

15         A.    NO.                                        01:30:15

16         Q.    IS THAT SOMETHING YOU'D EVER HEARD WAS

17    GOING ON?

18         A.    NOT FOR COMPETITORS.

19         Q.    YOU HEARD SOMETHING WAS GOING ON FOR

20    PEOPLE OR COMPANIES THAT WERE NOT COMPETITORS?       01:30:28

21         A.    PEOPLE THAT WORKED AT MATTEL VERY OFTEN

22    WOULD JUST TAKE EXTRA WORK ON THE SIDE.  WHAT THEY

23    DID, I DID NOT WANT TO KNOW -- HAVE ANYTHING TO DO

24    WITH.  BUT IT WAS -- IT WAS FAIRLY COMMON KNOWLEDGE

25    THAT PEOPLE WOULD -- THE GUYS OVER IN HOT WHEELS     01:30:44
```

100

EXHIBIT 

PAGE  310

1    CALLED THEM G JOBS.

2        Q.    AND WHEN YOU SAY JOBS ON THE SIDE, ARE

3    YOU TALKING ABOUT JOBS THAT WERE FOR COMPANIES

4    OTHER THAN MATTEL?

5        A.    I GUESS SO.  I -- I DON'T KNOW WHAT            01:31:03

6    PEOPLE DID SPECIFICALLY.  I MEAN, I KNOW PEOPLE DID

7    WORK FOR -- YEAH, FOR COMPANIES OTHER THAN MATTEL.

8    WHAT THEY DID, WHO THEY DID IT FOR, I NEVER WANTED

9    TO KNOW.

10       Q.    WHERE DID YOU HEAR THIS?                       01:31:19

11       A.    IT WAS COMMON KNOWLEDGE IN THE DESIGN

12   CENTER.

13       Q.    WELL, PLEASE TELL ME EVERY SOURCE OF

14   INFORMATION THAT YOU HAVE, WHERE YOU --

15       A.    EVERY DESIGNER I EVER TALKED TO.               01:31:31

16       Q.    EVERYONE?

17       A.    YEAH.  I MEAN, EVERYBODY KNEW, YEAH.

18       Q.    SO --

19       A.    ALMOST.  I MEAN, I SHOULDN'T SAY

20   EVERYONE.  I'M SURE THERE WERE A FEW PEOPLE THAT        01:31:39

21   WERE IGNORANT OF THE FACT, BUT --

22       Q.    BUT YOU DIDN'T DO THAT?

23       A.    NO.  MY MOTHER WORKED THERE FOR 20 YEARS

24   AND MADE ME PARANOID ABOUT IT.  SHE TOLD ME THAT I

25   WOULD END UP IN A ROOM LIKE THIS, DOING SOMETHING       01:31:51

101

EXHIBIT ___H___

PAGE ___31/___

```
 1   DO.

 2       Q.    ARE THERE ANY OTHERS YOU RECALL?

 3       A.    NO.

 4       Q.    AND THESE ARE ALL PEOPLE YOU HAD

 5   CONVERSATIONS WITH CONCERNING THE -- WHAT YOU'RE        01:40:56

 6   CALLING THE SIDE JOBS?

 7       A.    UH-HUH.

 8       Q.    THAT'S A "YES"?

 9       A.    YES.

10       Q.    ARE ALL THESE PEOPLE WHO, IN FACT, WERE       01:41:00

11   ENGAGING IN SIDE JOBS WHEN THEY WERE AT MATTEL?

12       A.    I DON'T KNOW.  POSSIBLY.  I DON'T KNOW.

13       Q.    WHICH ONES?

14       A.    I DON'T KNOW.

15       Q.    DO YOU HAVE ANY KNOWLEDGE OR INFORMATION       01:41:08

16   OR FACTS ABOUT ANYONE YOU CAN TELL US BY NAME AT

17   MATTEL WORKING ON WHAT YOU CALL THESE SIDE JOBS?

18       A.    NO, BECAUSE I'VE ASKED PEOPLE NOT TO TELL

19   ME.

20       Q.    SO YOU THINK THAT IT'S TRUE, BUT YOU           01:41:21

21   DON'T HAVE ANY FACTS TO ESTABLISH THAT IT HAS, IN

22   FACT, OCCURRED; IS THAT TRUE?

23       MR. MCFARLAND:  OBJECTION; MISSTATES HER

24   TESTIMONY.  SHE'S ALREADY TESTIFIED ON THAT

25   QUESTION.                                                01:41:35
```

```
1    BY MR. ZELLER:

2         Q.    YOU CAN GO AHEAD AND ANSWER.

3         A.    I DON'T KNOW.

4         Q.    I'M SORRY.  YOU DON'T KNOW WHAT?

5         A.    WHETHER THESE PEOPLE ENGAGED IN WORK          01:41:42

6    OUTSIDE OF MATTEL OR NOT.

7         Q.    TELL ME EVERY PERSON YOU KNOW FOR A

8    FACT --

9         A.    I DON'T KNOW.

10        Q.    -- IS ENGAGED -- I'M SORRY.  I'M NOT          01:41:50

11   FINISHED WITH MY QUESTION.

12              WHAT I'M ASKING YOU IS THE CONVERSE OF

13   IT.  OKAY.  CAN YOU TELL ME, BY NAME, ANYONE THAT

14   YOU KNOW FOR A FACT WAS DOING WORK OUTSIDE OF

15   MATTEL, WHILE THEY WERE A MATTEL EMPLOYEE?             01:42:02

16        A.    I DON'T KNOW FOR A FACT.

17        Q.    YOU MENTIONED THAT CARTER BRYANT WAS

18   AMONG THE PEOPLE THAT YOU'D LISTED HERE.

19        A.    RIGHT.

20        Q.    WHAT IS IT THAT YOU AND MR. BRYANT HAVE       01:42:21

21   DISCUSSED ABOUT DOING WORK ON THE SIDE WHILE MATTEL

22   EMPLOYEES?

23        A.    WE JUST KNEW THAT PEOPLE DID WORK ON THE

24   SIDE AS MATTEL EMPLOYEES TO MAKE EXTRA MONEY.  IN

25   FACT, I KNOW OF AN INSTANCE WHERE IVY ROSS CAUGHT       01:42:35
```

105

EXHIBIT 17

PAGE 313



1    SOMEBODY WORKING OUTSIDE OF MATTEL.  AMY MEYER.

2         Q.    IF I UNDERSTAND THE LAST PART OF YOUR

3    TESTIMONY CORRECTLY --

4         A.    I KNOW -- I'M SORRY.  I KNOW THAT AMY

5    MEYER FOR A FACT WAS WORKING OUTSIDE OF MATTEL.          01:42:50

6         Q.    AND THEN IVY ROSS CAUGHT HER?

7         A.    RIGHT.

8         Q.    AND HOW IS IT YOU KNOW ABOUT THAT?

9         A.    JUST THROUGH THE RUMOR MILL AT MATTEL.  I

10   DON'T REMEMBER WHO SPECIFICALLY TOLD ME.                01:43:04

11        Q.    SO IT WAS ONLY SOMETHING YOU HEARD ABOUT

12   IT?

13        A.    RIGHT.

14        Q.    YOU DON'T --

15        A.    IT WAS A RUMOR.                               01:43:08

16        Q.    WITH RESPECT TO THE RUMOR THAT YOU HEARD,

17   DID YOU HAVE AN UNDERSTANDING AS TO WHO OUTSIDE OF

18   MATTEL THIS WAS?

19        A.    WHAT DO YOU MEAN?  I'M SORRY.

20        Q.    WHO AMY MEYER WAS DOING WORK FOR OUTSIDE      01:43:21

21   MATTEL.

22        A.    SHE WAS WORKING IN A DEPARTMENT STORE.

23        Q.    DO YOU KNOW FOR A FACT AS TO WHETHER OR

24   NOT ANY MATTEL DESIGNER, WHO WAS AT THE TIME

25   EMPLOYED BY MATTEL, WAS DOING DESIGN WORK OF ANY         01:43:45

106

```
 1      KIND FOR A MATTEL COMPETITOR?

 2          A.    NOT FOR A FACT.

 3          Q.    IS THIS A SUBJECT THAT YOU'VE DISCUSSED

 4      WITH YOUR HUSBAND RICHARD SANDHAM?

 5          THE DEPONENT:  ISN'T THAT PRIVILEGED                01:44:09

 6      INFORMATION?

 7          MR. MCFARLAND:  YOU DON'T NEED TO TESTIFY ABOUT

 8      THE DISCUSSIONS WITH YOUR HUSBAND.

 9          MR. ZELLER:  ARE YOU INSTRUCTING HER?

10          MR. MCFARLAND:  I'M INSTRUCTING HER NOT TO          01:44:16

11      TESTIFY ABOUT HER DISCUSSIONS WITH HER HUSBAND,

12      YES.

13          MR. ZELLER:  IN RESPONSE TO THAT PARTICULAR

14      QUESTION?

15          MR. MCFARLAND:  YOU CAN ANSWER THE QUESTION         01:44:21

16      WHETHER A DISCUSSION EVER OCCURRED.

17          THE DEPONENT:  NO.

18              THE INFORMATION BETWEEN MY HUSBAND AND I

19      IS PRIVILEGED; RIGHT?

20          MR. MCFARLAND:  OKAY.  IT'S PRIVILEGED.  BUT        01:44:29

21      DID -- DID A DISCUSSION EVER OCCUR, NOT THE

22      CONTENT?  DO YOU EVER RECALL TALKING TO YOUR

23      HUSBAND ABOUT THE SUBJECT?

24          THE DEPONENT:  MAYBE.

25      ///                                                     01:44:37
```

107

EXHIBIT ___17___

PAGE ___315___

1    BY MR. ZELLER:

2        Q.    WHAT DID YOU AND HE DISCUSS ON THAT

3    SUBJECT?

4        MR. MCFARLAND:  OBJECTION; THAT'S --

5        THE DEPONENT:  I DON'T RECALL.                    01:44:40

6        MR. MCFARLAND:  OKAY.

7        MR. ZELLER:  ARE YOU INSTRUCTING HER?

8        MR. MCFARLAND:  I'M INSTRUCTING HER NOT TO

9    ANSWER DISCUSSIONS WITH HER HUSBAND, YES.

10   BY MR. ZELLER:                                        01:44:50

11       Q.    HAVE YOU DISCUSSED THIS LAWSUIT WITH YOUR

12   HUSBAND?

13       A.    I'M NOT GOING TO ANSWER THAT.

14       Q.    YOU CAN'T TELL ME ONE WAY OR ANOTHER?

15       A.    DO I HAVE TO?  IF I HAVE TO, I WILL.        01:45:00

16       MR. MCFARLAND:  WELL, FIRST OF ALL, IT'S ASKED

17   AND ANSWERED.  SHE'S ALREADY TOLD YOU SHE MENTIONED

18   TO HER HUSBAND AND OTHER PEOPLE.

19       THE DEPONENT:  MICHAEL MOORE KNOWS FOR A FACT.

20   YOU CALLED HIM -- YOU CALLED -- I KNOW YOU CALLED     01:45:16

21   RICHARD IN THE OFFICE TO FIND ME FOR THIS TO TRACK

22   ME DOWN.  SO YES.

23       MR. MCFARLAND:  SO WE'RE NOT GOING TO REVEAL

24   THE CONTENT OF CONVERSATIONS.

25   ///                                                   01:45:29

                                                      108

EXHIBIT ___12___

PAGE ___314___

```
 1    BY MR. ZELLER:

 2        Q.    ONE WAY OR THE OTHER?

 3        A.    I DON'T KNOW.

 4        Q.    YOU CAN'T ANSWER MY QUESTION?

 5        A.    I DID ANSWER YOUR QUESTION.  I DON'T         01:51:02

 6    KNOW.

 7        Q.    HE MIGHT HAVE, MIGHT NOT HAVE; YOU DON'T

 8    KNOW?

 9        MR. MCFARLAND:  OBJECTION TO THE FORM OF THE

10    QUESTION.  SHE'S ANSWERED YOUR QUESTION.  SHE          01:51:08

11    DOESN'T KNOW.  YOU WANT TO KEEP REPHRASING TO GET

12    SOMETHING ON THE RECORD THAT MISSTATES HER

13    TESTIMONY.  SHE DOESN'T KNOW.

14        THE DEPONENT:  I DON'T KNOW.

15    BY MR. ZELLER:                                         01:51:16

16        Q.    ONE WAY OR THE OTHER?

17        A.    I DON'T KNOW.

18        Q.    IS THAT A SUBJECT YOU'VE EVER DISCUSSED

19    WITH HIM?

20        A.    NO.                                          01:51:31

21        Q.    IS THERE SOMETHING ELSE YOU DON'T CARE

22    ABOUT AS TO WHETHER OR NOT HE'S DOING THAT?

23        MR. MCFARLAND:  OBJECTION TO THE TONE OF THE

24    QUESTION AND THE PHRASING OF THE QUESTION.

25        THE DEPONENT:  IT'S NONE OF MY BUSINESS.           01:51:40
```

EXHIBIT *17*

PAGE _3/7_

115

```
 1    BY MR. ZELLER:

 2        Q.    ARE YOU AWARE OF ANYONE WHO AT THE TIME

 3    HE OR SHE WAS WORKING AT MATTEL ALSO WAS WORKING

 4    FOR MGA?

 5        A.    AT THE SAME TIME?                          01:51:57

 6        Q.    RIGHT.

 7        A.    NO.

 8        Q.    DO YOU KNOW ANYONE -- WELL, STRIKE THAT.

 9              IT'S TRUE THAT IN 2000 YOU BECAME AWARE

10    THAT CARTER BRYANT WAS WORKING WITH MGA WHILE HE    01:52:12

11    WAS STILL EMPLOYED BY MATTEL; RIGHT?

12        A.    I --

13        MR. WERDEGAR:   OBJECTION; ASSUMES FACTS NOT IN

14    EVIDENCE, LACKS FOUNDATION, CALLS FOR SPECULATION.

15        THE DEPONENT:   I DIDN'T KNOW FOR A FACT.        01:52:22

16    BY MR. ZELLER:

17        Q.    YOU -- IT WAS YOUR UNDERSTANDING --

18        A.    IN 2000 -- I DIDN'T KNOW -- IT WAS RUMOR.

19    ALL I WAS HEARING WAS RUMOR AT THE TIME.

20        MR. MCFARLAND:   IN 2000?                        01:52:32

21        THE DEPONENT:   IN 2000.

22        MR. MCFARLAND:   2000.

23    BY MR. ZELLER:

24        Q.    WHEN YOU SAY YOU'RE -- WELL, LET'S STEP

25    BACK.                                                01:52:40
```

EXHIBIT _____ 17
PAGE _____ 318

116

1          HAVE YOU EVER DISCUSSED WITH CARTER

2    BRYANT WHETHER HE WAS WORKING WITH MGA WHILE HE WAS

3    STILL EMPLOYED BY MATTEL?

4          A.    NO.

5          Q.    DO YOU KNOW ONE WAY OR ANOTHER WHETHER          01:52:49

6    MR. BRYANT WAS WORKING FOR MGA WHEN HE WAS EMPLOYED

7    BY MATTEL?

8          A.    I DON'T KNOW.

9          Q.    WHEN IS IT YOU FIRST HEARD ABOUT MGA?

10         A.    SOMETIME IN 2001.  SOMETIME IN 2001.          01:53:03

11         Q.    AND HOW DID YOU HEAR OF MGA FOR THE FIRST

12   TIME?

13         A.    SOMEBODY TOLD ME TO LOOK UP THESE

14   COMPETITOR DOLLS ON THE INTERNET.  I DON'T REMEMBER

15   WHO IT WAS.  AND THAT WAS THE FIRST TIME I SAW THE          01:53:31

16   BRATZ.

17         Q.    AND UNTIL YOU SAW BRATZ ON THAT WEBSITE,

18   THAT WAS THE FIRST TIME THAT YOU -- WELL, STRIKE

19   THAT.

20         YOU'D NEVER HEARD OF MGA PRIOR TO THE          01:53:46

21   TIME IN 2001 WHEN YOU LOOKED UP THESE COMPETITOR

22   DOLLS CALLED BRATZ ON THE WEBSITE?

23         A.    NOT THAT I PAID -- IF I HAD HEARD, I

24   WOULDN'T HAVE PAID ATTENTION TO IT.  I WOULD HAVE

25   GLOSSED RIGHT OVER IT.  EXHIBIT _____ 17          01:54:03

PAGE _____ 319

117

1          Q.    HAVE YOU EVER HAD A DISCUSSION WITH

2     CARTER BRYANT AT ANY TIME ABOUT HIS WORK WITH MGA

3     OR HIS RELATIONSHIP WITH MGA?

4          MR. WERDEGAR:   OBJECTION; VAGUE, OVERBROAD,

5     AMBIGUOUS AS TO TIME.                                    01:54:28

6          THE DEPONENT:   NO.

7     BY MR. ZELLER:

8          Q.    DID THERE COME A TIME WHEN YOU BEGAN

9     WORKING WITH CARTER BRYANT ON A DOLL PROJECT THAT

10    BECAME KNOWN AS BRATZ AT SOME POINT?                     01:54:49

11         A.    I'VE NEVER WORKED WITH CARTER ON

12    ANYTHING, EXCEPT HIS CD, HIS MUSIC CD.

13         MR. PLEVAN:   I'M SORRY.   COULD I HAVE THAT READ

14    BACK, JUST THE LAST PART OF THE ANSWER.

15              (THE RECORD WAS READ AS FOLLOWS:               01:55:02

16              A    EXCEPT HIS CD, HIS MUSIC CD.)

17         MR. PLEVAN:   OH, THANK YOU.

18    BY MR. ZELLER:

19         Q.    AT ANY TIME PRIOR TO THE TIME THAT CARTER

20    BRYANT LEFT MATTEL THE SECOND TIME, THE LAST TIME,       01:55:18

21    DID YOU WORK ON ANY GRAPHICS AT MR. BRYANT'S

22    REQUEST OR DIRECTION?

23         A.    I MAY HAVE.

24         Q.    DO YOU RECALL ONE WAY OR ANOTHER WHETHER

25    YOU DID?            EXHIBIT _____ 12            01:55:32

                          PAGE _____ 320

                                                              118

1     A.    WELL, I'M NOT SURE I ANSWERED IT

2   CORRECTLY.  WE WENT OVER IT SO FAST.  CAN WE GO

3   BACK AND --

4     Q.    WELL, LET ME TRY A COUPLE MORE QUESTIONS

5   THEN, AND LET'S JUST SEE IF THIS IS THE BALLPARK OF          02:11:01

6   WHAT -- WHAT YOU WERE TALKING ABOUT.

7     A.    OKAY.

8     MR. MCFARLAND:  DO YOU HAVE SOMETHING YOU WANT

9   TO SAY TO THIS?

10    MR. ZELLER:  YEAH, IF YOU WANT TO --                       02:11:10

11    THE DEPONENT:  IT WAS SOMETHING ABOUT CARTER,

12  IF I HAD HEARD ABOUT SOMETHING ABOUT CARTER AND THE

13  BRATZ IN 2000.

14    MR. MCFARLAND:  CARTER AND MGA IN 2000.

15    THE DEPONENT:  I DIDN'T.  YOU KNOW WHAT, YOU            02:11:18

16  ARE GOING TO ASK ME, I THINK, THE QUESTION RIGHT

17  NOW.

18  BY MR. ZELLER:

19    Q.    RIGHT.  WELL, LET -- LET ME TRY THIS

20  THEN.                                                        02:11:23

21    A.    OKAY.

22    Q.    AT ANY TIME PRIOR TO THE TIME THAT CARTER

23  BRYANT LEFT MATTEL THE SECOND AND THE LAST TIME --

24    A.    OKAY.

25    Q.    -- DID YOU HEAR FROM ANY SOURCE OR LEARN            02:11:32

1    FROM ANY SOURCE THAT CARTER BRYANT WAS DOING WORK

2    WITH MGA?

3        A.    PRIOR TO --

4        MR. WERDEGAR:  OBJECTION; ASKED AND ANSWERED.

5        THE DEPONENT:  WHAT'S THAT?                    02:11:45

6        MR. MCFARLAND:  IT'S BEEN ASKED AND ANSWERED.

7            BUT PRIOR TO THE TIME THAT --

8        MR. ZELLER:  I MEAN, IF SHE DOESN'T WANT -- IF

9    SHE DOESN'T CARE TO AMPLIFY HER TESTIMONY OR CHANGE

10   IT, THEN WE'RE DONE.  I WAS DOING THIS BECAUSE I    02:11:55

11   THOUGHT SHE WANTED TO CLARIFY SOMETHING, BUT

12   APPARENTLY NOT.  BECAUSE IF I'M GOING TO GET ASKED

13   AND ANSWERED OBJECTIONS APPARENTLY BECAUSE THE

14   WITNESS WANTS TO GO OVER THIS TERRITORY AGAIN,

15   THEN, YOU KNOW --                                  02:12:05

16   BY MR. ZELLER:

17       Q.    PLEASE TELL US IF THERE'S SOMETHING THAT

18   YOU NEED TO CHANGE ABOUT YOUR PRIOR TESTIMONY.

19   PLEASE TELL ME WHAT IT IS.

20       A.    PRIOR TO CARTER LEAVING, I DID NOT KNOW   02:12:10

21   ANYTHING ABOUT THE BRATZ OR SOME OTHER CONCEPT THAT

22   HE WAS WORKING ON.

23       Q.    AND WHEN YOU SAY CARTER BRYANT LEAVING,

24   YOU'RE REFERRING TO CARTER BRYANT LEAVING MATTEL

25   THE SECOND AND LAST TIME?                          02:12:24

EXHIBIT _____ 17

PAGE _____ 322

124

```
 1        A.    YES.

 2        Q.    AND THAT WASN'T SOMETHING THAT YOU

 3   DISCUSSED WITH CARTER BRYANT OR HEARD FROM ANY

 4   SOURCE OR LEARNED FROM ANY SOURCE; IS THAT TRUE?

 5        A.    RIGHT.  CORRECT.                          02:12:40

 6        Q.    WHEN WAS THE FIRST TIME THAT YOU HEARD OF

 7   BRATZ, B-R-A-T-Z, AS A NAME?

 8        A.    WHEN I PULLED THEM UP ON THE WEBSITE

 9   IN --

10        Q.    THAT WAS IN 2001?                         02:13:01

11        A.    YES.

12        Q.    HAD CARTER BRYANT EVER USED THE WORD

13   "BRATZ," B-R-A-T-Z, TO YOU PRIOR TO THAT TIME?

14        A.    NOT TO MY RECOLLECTION.

15        Q.    REGARDLESS OF WHETHER YOU KNEW IT WAS --  02:13:14

16   WHAT ITS NAME WAS --

17        A.    UH-HUH.

18        Q.    -- AND EVEN IF IT WAS CALLED BY A

19   DIFFERENT NAME, DID CARTER BRYANT EVER SUGGEST TO

20   YOU OR SAY TO YOU, IN WORDS OR SUBSTANCE, THAT HE   02:13:37

21   HAD A DOLL CONCEPT THAT HE HIMSELF HAD COME UP WITH

22   THAT HE WAS WORKING ON PRIOR TO THE TIME HE LEFT

23   MATTEL THAT SECOND TIME AND THE LAST TIME?

24        A.    NO.  IF HE DID, I DON'T REMEMBER.

25        Q.    PRIOR TO THE TIME THAT CARTER BRYANT LEFT 02:13:55
```

EXHIBIT _____ 12

PAGE _____ 323

125

1    MATTEL THAT SECOND-TO-LAST TIME, DID CARTER BRYANT

2    EVER SAY TO YOU THAT HE HAD COME UP WITH A DOLL

3    CONCEPT WHEN HE WAS LIVING BACK IN MISSOURI IN

4    1998?

5         A.   I DON'T REMEMBER HIM DOING THAT.                02:14:11

6         Q.   HAS CARTER BRYANT EVER SAID TO YOU THAT

7    HE CAME UP WITH BRATZ DOLLS OR THE BRATZ CONCEPT

8    WHEN HE WAS LIVING IN MISSOURI IN 1998?

9         A.   NO.

10        Q.   DO YOU HAVE ANY KNOWLEDGE OR INFORMATION       02:14:27

11   FROM ANY SOURCE AS TO WHEN IT WAS THAT CARTER

12   BRYANT CAME UP WITH THE BRATZ CONCEPT?

13        A.   NO.

14        Q.   DO YOU HAVE ANY KNOWLEDGE OR INFORMATION

15   AS TO WHEN CARTER BRYANT DID ANY OF HIS BRATZ        02:14:38

16   DRAWINGS?

17        MR. MCFARLAND:   I ASSUME YOU'RE EXCLUDING

18   CONVERSATIONS WITH ME FROM THIS.   IS THAT CORRECT,

19   MR. ZELLER?

20        MR. ZELLER:   I'M JUST ASKING YES OR NO AT THIS    02:14:48

21   POINT.

22        MR. MCFARLAND:   GO AHEAD, ANSWER THE QUESTION.

23             READ THE QUESTION BACK.

24             (THE RECORD WAS READ AS FOLLOWS:

25             Q    DO YOU HAVE ANY KNOWLEDGE OR            02:14:36

EXHIBIT _____ N

PAGE _____ 324

126

1   MR. MCFARLAND, IS THAT THE SAME G3 THAT YOU HAD

2   BACK WHEN YOU WERE LIVING THERE IN GARDENA?

3       A.   YES.

4       Q.   WHEN DID YOU GET THAT G3?

5       A.   SOMETIME WHEN I WAS LIVING IN THE HOUSE        02:17:30

6   ON 160TH STREET.

7       Q.   I'M SORRY.  YOU'RE GOING TO HAVE TO

8   REMIND ME, WAS THAT THE -- WAS THAT THE SECOND

9   HOUSE IN GARDENA THAT YOU LIVED IN WITH CARTER

10  BRYANT?                                               02:17:47

11      A.   YES.

12      Q.   DID MR. BRYANT USE THAT COMPUTER?

13      A.   YES.

14      Q.   DIRECTING YOUR ATTENTION BACK TO

15  EXHIBIT 302 FOR A MOMENT.  YOU SEE WHERE THERE'S     02:18:07

16  THIS BRATZ DESIGN HERE --

17      A.   YES.

18      Q.   -- THE WORD "BRATZ"?

19           DID YOU CREATE THAT?

20      A.   I COULD HAVE.  IT'S A SIMPLE, LIKE A --      02:18:16

21  LIKE A PRESET -- LIKE A PRESET FROM PHOTOSHOP --

22  TYPE FROM PHOTOSHOP OR ILLUSTRATOR.  SO I COULD

23  HAVE.

24      Q.   WELL, I'M TRYING TO FIND OUT WHAT YOUR

25  INFORMATION AND KNOWLEDGE IS.  SO --                 02:18:38

129

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT 17

PAGE 324.001

```
1         A.    I DON'T REMEMBER.  I MEAN, I COULD -- I
2    MAY HAVE, I MAY NOT HAVE.  I HELPED -- IT WAS
3    LIKE -- IT WAS ALMOST A PUBLIC COMPUTER.  EVERYBODY
4    THAT -- EVERYBODY AND THEIR MOTHER THAT CAME
5    THROUGH THAT HOUSE GOT ON THAT COMPUTER.  AND I WAS      02:18:52
6    CONSTANTLY SHOWING PEOPLE HOW TO USE PHOTOSHOP AND
7    ILLUSTRATOR.  SO I COULD HAVE.
8         Q.    WELL, LET'S MAYBE BREAK THIS DOWN A
9    LITTLE BIT.  DID YOU SHOW MR. BRYANT HOW TO USE
10   PHOTOSHOP AND ILLUSTRATOR ON THAT COMPUTER?            02:19:14
11        A.   YES.
12        Q.    AND YOU DON'T HAVE A MEMORY ONE WAY OR
13   ANOTHER WHETHER YOU'RE THE ONE WHO CREATED THIS --
14   THIS GRAPHIC THAT SAYS "BRATZ"; IS THAT TRUE?
15        A.    RIGHT.                                       02:19:26
16        Q.    AT ANY TIME PRIOR TO THE TIME THAT CARTER
17   BRYANT LEFT MATTEL THE SECOND-AND-LAST TIME, DID
18   YOU WORK WITH MR. BRYANT ON ANY KIND OF
19   THREE-DIMENSIONAL PROTOTYPE?
20        A.    NO.                                          02:19:41
21        Q.    OR MODEL, OR DOLL?
22        A.    NO.
23        Q.    HAVE YOU EVER HAD A CONVERSATION WITH
24   CARTER BRYANT THAT RELATED TO BRATZ EVER?
25        A.    YES.          EXHIBIT _____ 17            02:20:00
                              PAGE _____ 325
```

130

```
 1          Q.     AND WHEN WAS THE FIRST TIME?

 2          A.     WHEN I WENT BACK IN -- THAT TRIP IN

 3     NOVEMBER OF 2002.  WE DID THE CROSS-COUNTRY TRIP,

 4     WE STOPPED IN MISSOURI.

 5          Q.     THAT WAS THE ONE YOU WENT CROSS-COUNTRY          02:20:20

 6     WITH RICHARD IRMEN?

 7          A.     YES, YES.

 8          Q.     AND WHEN YOU WERE IN MISSOURI IS WHEN YOU

 9     HAD THE CONVERSATION WITH MR. BRYANT --

10          A.     YES.                                            02:20:30

11          Q.     -- IN NOVEMBER OF 2002?

12          A.     YES.

13          Q.     AND WHAT DID YOU AND HE DISCUSS ABOUT

14     BRATZ?

15          A.     I WANTED TO KNOW WHY HE HADN'T TOLD ME          02:20:36

16     ANYTHING IN ALL THAT TIME.

17          Q.     AND WHAT DID HE SAY?

18          A.     HE SAID HE WAS PROTECTING ME.  HE KNEW I

19     WAS PARANOID ABOUT WORK OUTSIDE OF MATTEL, AND HE

20     DIDN'T WANT TO GET ME INVOLVED IN ANYTHING.                02:20:51

21          Q.     AND THOSE ARE -- THAT'S WHAT CARTER

22     BRYANT SAID TO YOU?

23          A.     IT WAS THE GIST OF THE CONVERSATION.

24          Q.     AND IS THERE ANYTHING ELSE YOU CAN

25     REMEMBER THAT HE SAID TO YOU DURING THAT                   02:21:12
```

131

EXHIBIT 17

PAGE 326

1    CONVERSATION ABOUT BRATZ OR THAT YOU SAID?

2         A.    THAT WAS -- THAT WAS WHAT I REMEMBER.   I

3    MEAN, WE MAY HAVE TALKED ABOUT MORE OR LESS, BUT

4    THAT -- I MEAN BECAUSE THAT WAS THE MAIN QUESTION I

5    WANTED ANSWERED FROM HIM.                              02:21:25

6         Q.    I TAKE IT AT SOME POINT YOU -- YOU FOUND

7    OUT THAT CARTER BRYANT HAD INVOLVEMENT WITH BRATZ

8    AND YOU WERE SURPRISED?

9         A.    YES.   SHOCKED.

10        Q.    AND HOW IS IT THAT YOU -- YOU LEARNED      02:21:44

11   ABOUT CARTER BRYANT BEING INVOLVED?

12        A.    THROUGH THE RUMOR MILL AT WORK, AT

13   MATTEL.

14        Q.    CAN YOU TELL ME ANY PARTICULAR

15   CIRCUMSTANCES WHERE IT WAS BROUGHT TO YOUR          02:22:01

16   ATTENTION OR YOU LEARNED THAT CARTER BRYANT WAS

17   INVOLVED WITH BRATZ IN SOME WAY?

18        A.    YOU KNOW, I -- I SUSPECTED IT, BECAUSE

19   EVERY -- I WAS HEARING IT FROM EVERYONE, THE DESIGN

20   STAFF, EVERYBODY WAS ABUZZ ABOUT IT AND -- IT WAS    02:22:15

21   AFTER THE WEBSITE.   SO IT WAS SOMETIME IN 2001,

22   BEFORE 2002.

23             YOU KNOW, WHEN YOU HEAR THINGS FROM ONE

24   OR TWO PEOPLE, YOU QUESTION IT.   WHEN YOU HEAR

25   THINGS FROM 10 AND 20 PEOPLE, YOU FIGURE IT'S        02:22:36

132    17

PAGE  327

1    PROBABLY TRUE.  BUT WITHOUT ACTUALLY CONFRONTING

2    CARTER AND TALKING TO HIM ABOUT IT, I WASN'T

3    ABSOLUTELY SURE.

4         Q.    AS TO WHETHER OR NOT HE HAD BEEN INVOLVED

5    WITH BRATZ?                                          02:22:49

6         A.    RIGHT.

7         Q.    AND WAS THERE SOME PARTICULAR REASON YOU

8    DIDN'T CONFRONT HIM OR CALL HIM UP OR ASK HIM?

9         A.    WE JUST DIDN'T HAVE THAT KIND OF -- I

10   MEAN WE NEVER REALLY WERE CONFRONTATIONAL WITH EACH   02:23:00

11   OTHER, YOU KNOW.  HE KIND OF -- CARTER WAS LIKE IN

12   HIS OWN LITTLE WORLD, AND I SURE HAD A HELL OF A

13   LOT ON MY MIND THAT YEAR.

14        Q.    SO YOU -- HAVE YOU TOLD ME EVERYTHING

15   THAT YOU CAN REMEMBER ABOUT THE CONVERSATION THAT     02:23:33

16   YOU HAD WITH CARTER IN THAT NOVEMBER 2002 TIME

17   PERIOD AS IT PERTAINED TO BRATZ?

18        A.    AS IT PERTAINED TO BRATZ, YES.

19        Q.    BUT WERE THERE OTHER THINGS THAT YOU AND

20   HE DISCUSSED AT THAT TIME?                            02:23:45

21        A.    YEAH.

22        Q.    WERE ANY OF THEM ABOUT MATTEL OR MGA?

23        A.    NO.  THEY WERE MOSTLY ABOUT THE PETS.

24        Q.    CARTER'S PETS?

25        A.    I HAVE A LOT OF CATS, HE HAS A LOT OF      02:23:53

133

EXHIBIT _____

PAGE ___328___

1    DOGS.

2        Q.    HAVE YOU EVER HAD ANY CONVERSATIONS WITH

3    CARTER BRYANT ABOUT BRATZ, OTHER THAN THAT ONE?

4        A.    NOT THAT I RECALL.  I MEAN, THAT ONE

5    REALLY STANDS OUT IN MY HEAD AS -- AS BEING A MAJOR          02:24:20

6    TALK BETWEEN US.  SO I REALLY DON'T RECALL ANY

7    OTHER TIME TALKING ABOUT IT.

8        Q.    DIRECTING YOUR ATTENTION BACK TO

9    EXHIBIT 302.  YOU LOOKED AT THE DRAWINGS IN HERE.

10   ARE THERE ANY DRAWINGS IN HERE THAT YOU SAW AT ANY           02:24:48

11   TIME PRIOR TO 2004?

12       A.    PRIOR TO 2004.

13       MR. MCFARLAND:  YOU HAVE TO VERBALIZE IT.

14       THE DEPONENT:  NO.  I'M SORRY.  NO.

15            I'M SORRY.  SMACK ME ACROSS THE HEAD.                02:25:06

16       MR. MCFARLAND:  YOU ANSWERED THE QUESTION.

17   BY MR. ZELLER:

18       Q.    OTHER THAN WHAT YOU'VE TOLD ME ABOUT SO

19   FAR, ARE THERE ANY OTHER INSTANCES IN WHICH YOU HAD

20   ANY COMMUNICATION OF ANY KIND WITH CARTER BRYANT             02:25:28

21   ABOUT BRATZ?

22       A.    NO.

23       Q.    OTHER THAN WHAT YOU TOLD ME ABOUT, HAVE

24   YOU EVER HAD ANY OTHER COMMUNICATION WITH CARTER

25   BRYANT -- AND I MEAN COMMUNICATION OF ANY KIND,              02:25:41

134

EXHIBIT 17

PAGE 329

```
 1    WHETHER WRITTEN OR OVER THE PHONE OR FACE TO

 2    FACE -- ABOUT MGA?

 3         A.    ABOUT MGA?

 4         Q.    RIGHT.

 5         A.    MAYBE.  I -- I DON'T RECALL SPECIFIC          02:25:51

 6    INSTANCES OR ANYTHING, BUT PROBABLY.

 7         Q.    WERE THOSE COMMUNICATIONS AFTER NOVEMBER

 8    OF 2002?

 9         MR. MCFARLAND:  JUST WARN YOU NOT TO GUESS.

10         THE DEPONENT:  I DON'T KNOW.                        02:26:16

11    BY MR. ZELLER:

12         Q.    DO YOU KNOW A MARGARET LEAHY?

13         A.    IS SHE THE SCULPTOR MARGARET?

14         Q.    YES.

15         A.    I KNOW OF HER.  I DON'T KNOW HER.             02:26:42

16         Q.    AND HOW DO YOU KNOW OF HER?

17         A.    SHE DID SOME WORK FOR ROXANNA POWELL, A

18    DESIGNER I WORKED WITH AT MATTEL.  AND I KNOW THEY

19    WERE FRIENDS.

20         Q.    DID YOU EVER WORK WITH HER WHEN YOU WERE      02:26:51

21    AT MATTEL?

22         A.    NO, NOT DIRECTLY.

23         Q.    WELL, WHEN YOU SAY "NOT DIRECTLY" --

24         A.    ROXANNA WAS A PRELIMINARY DESIGNER.  I

25    WAS A DEVELOPMENT DESIGNER.  SO STUFF THAT ROXANNA       02:27:11
```

135

EXHIBIT 17

PAGE 330

```
 1    WORKED ON TRICKLED DOWN TO ME TO DEVELOP.  MARGARET
 2    MAY HAVE WORKED ON STUFF WITH ROXANNA IN PRELIM
 3    THAT I ENDED UP WORKING ON IN DEVELOPMENT, BUT I
 4    WOULDN'T HAVE WORKED WITH HER DIRECTLY.
 5        Q.    SO IT'S -- IT'S YOUR BELIEF OR                02:27:29
 6    UNDERSTANDING THAT THERE WERE PROJECTS THAT BOTH
 7    YOU AND MARGARET WORKED ON, BUT YOU DIDN'T WORK
 8    TOGETHER ON?
 9        MR. MCFARLAND:   OBJECTION; MISSTATES HER
10    TESTIMONY.                                             02:27:41
11        THE DEPONENT:   SHE WORKED ON PROJECTS WITH
12    ROXANNA.  I DON'T -- I DON'T -- I DON'T KNOW FOR A
13    FACT WHETHER SOME OF THE PROJECTS THAT I GOT THAT I
14    WORKED ON WITH ROXANNA WERE WORKED ON BY MARGARET.
15    SO I CAN'T ANSWER YES OR NO ON THAT.                   02:27:57
16    BY MR. ZELLER:
17        Q.    BUT DO YOU KNOW A SARAH HALPERN?
18        A.    I'VE HEARD THE NAME.  MARKETING?  I
19    DON'T -- THE NAME IS JUST FAMILIAR, BUT I DON'T
20    KNOW HER.                                              02:28:12
21        Q.    HOW DID YOU HEAR ABOUT THE NAME?
22        A.    IT JUST SOUNDS -- I DON'T KNOW.  I GUESS
23    I HEARD IT AT MATTEL.  I DON'T KNOW..
24        MR. MCFARLAND:   AGAIN, I WOULD CAUTION YOU NOT
25    TO GUESS.                                              02:28:21
```

136

EXHIBIT 17

PAGE 331

```
 1        THE DEPONENT:  SORRY.  I DON'T KNOW.

 2   BY MR. ZELLER:

 3        Q.    HAVE YOU EVER HEARD OF A MATTEL PRODUCT

 4   OR A MATTEL DOLL CALLED DIVA STARZ?

 5        A.    YES.                                          02:28:40

 6        Q.    AND HOW IS IT YOU FIRST BECAME AWARE OF

 7   DIVA STARZ?

 8        A.    THEY WERE IN ACCESSORIES IN MY MOTHER'S

 9   GROUP.

10        Q.    AND WHEN IS IT YOU FIRST BECAME AWARE OF     02:28:47

11   THE DIVA STARZ PROJECT, REGARDLESS OF WHAT THE NAME

12   WAS AT THE TIME?

13        A.    SEE, MY MOTHER WAS STILL ALIVE.  SO IT

14   WAS BEFORE -- WHEN SHE WAS STILL AT MATTEL.  IT

15   WOULD HAVE TO BE BEFORE SUMMER OF '99.  EXACT DATE,     02:29:14

16   I HAVE NO IDEA.

17        Q.    SO YOU GENERALLY BECAME AWARE THAT THERE

18   WAS A PROJECT THAT WAS GOING ON THAT LATER BE

19   CALLED -- BECAME KNOWN AS DIVA STARZ, BY THE SUMMER

20   OF 1999?                                                02:29:33

21        A.    YES.

22        Q.    DO YOU KNOW A MAUREEN MULLEN?

23        A.    NO.

24        Q.    MAUREEN CHIANESE?

25        A.    NO.                                          02:29:46
```

137

EXHIBIT  17

PAGE  332

```
 1        Q.    YOU MENTIONED THAT YOUR MOTHER'S GROUP,

 2   IN ACCESSORIES THERE, WAS WORKING ON DIVA STARZ FOR

 3   A PERIOD OF TIME.

 4        A.    YES.

 5        Q.    DID YOUR MOTHER WORK ON IT?              02:29:58

 6        A.    I DON'T KNOW.

 7        Q.    DID YOU KNOW ANYONE BACK IN THAT TIME

 8   PERIOD WHO WAS WORKING ON DIVA STARZ WITHIN MATTEL?

 9        A.    KISLAP.

10        Q.    ONGCHANGCO?                              02:30:14

11        A.    YES.

12        Q.    ANYONE ELSE?

13        A.    HE'S THE ONLY ONE I REMEMBER.

14        Q.    DO YOU KNOW A RENEE PASKO?

15        A.    NO.                                      02:30:45

16        Q.    DO YOU KNOW A PAULA GARCIA?

17        A.    NO.  NO.

18        Q.    PAULA TREANTAFELLES?

19        A.    I'VE HEARD THE NAME, BUT I DON'T KNOW

20   HER.                                               02:30:54

21        Q.    AND HOW DID YOU HEAR THE NAME?

22        A.    I KNOW SHE'S SOMEBODY AT MGA.

23        Q.    AND HOW DO YOU KNOW THAT?

24        A.    I HEARD IT SOMEWHERE.  I DON'T KNOW WHO

25   FROM.                                              02:31:02
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077   EXHIBIT 17

PAGE 332. 001

```
 1        Q.    YOU MENTIONED THAT YOU DO KNOW PEOPLE WHO

 2   ARE -- WHO WORK OVER THERE AT MGA.

 3        A.    YES.

 4        Q.    PLEASE TELL ME WHO YOU KNOW OVER THERE.

 5        A.    JOE FELDMAN.  CHANG, I DON'T KNOW HER              02:31:23

 6   FIRST NAME OR LAST NAME.  I JUST KNOW HER AS CHANG,

 7   BUT SHE'S NOT THERE ANYMORE.  MELODY HANSEN.  AND

 8   JANET BLASER, BUT SHE'S NOT THERE ANYMORE EITHER.

 9        Q.    I'M SORRY.  BLASER?

10        A.    JANET BLAZER, YEAH, B-L-A-Z-E-R.  DENNIS          02:31:56

11   SOAI.  OH, CHRISTINE NIGOGHOSSIAN.

12        Q.    CAN YOU SPELL THAT LAST NAME?

13        A.    NO.  WOULDN'T EVEN TRY.

14        Q.    ANYONE ELSE?

15        A.    THAT'S ALL I CAN THINK OF RIGHT NOW.             02:32:22

16        Q.    IS THERE ANYONE ELSE WHO YOU KNOW WORKED

17   AT MGA, EVEN IF THEY'RE NOT THERE NOW, BEYOND THE

18   PEOPLE YOU TOLD ME ABOUT?

19        A.    NO.  THOSE ARE THE ONLY PEOPLE'S NAMES

20   THAT ARE COMING UP IN MY HEAD RIGHT NOW.                    02:32:41

21        Q.    WHAT I'M GOING TO DO IS GIVE YOU A STACK

22   OF DRAWINGS HERE.  I'M GOING TO SHOW YOU A SERIES

23   OF DRAWINGS THAT WERE PREVIOUSLY MARKED AS

24   EXHIBITS 701 THROUGH 796.

25             AND PROBABLY THE EASIEST THING TO DO IS           02:33:38
```

139

EXHIBIT __17__

PAGE __332.002__

1    GO THROUGH THEM PAGE BY PAGE.

2        MR. MCFARLAND:  I HAVE A QUESTION.  THESE ARE

3    MARKED "BRYANT ATTORNEYS' EYES ONLY."

4        MR. WERDEGAR:  I HAVEN'T SEEN THE EXHIBIT YET.

5        MR. MCFARLAND:  WELL, I'M SORRY.  LET ME GIVE          02:33:59

6    YOU A COPY.  THAT'S THE ORIGINAL.  THAT MIGHT BE AN

7    ISSUE FOR BRYANT'S COUNSEL.

8        MR. ZELLER:  ACTUALLY, SHE NEEDS THOSE BACK.

9    SHE HAS TO PULL A COUPLE THINGS OUT.

10        MR. PLEVAN:  DO YOU WANT THIS ONE BACK, TOO?          02:34:21

11        MR. WERDEGAR:  I DO NOTE FOR THE RECORD THAT

12   THIS EXHIBIT THAT'S NOW BEING PRODUCED IS MARKED

13   "BRYANT ATTORNEYS' EYES ONLY," AS WERE, BY THE WAY,

14   A COUPLE OTHER EXHIBITS THAT WERE USED EARLIER.

15        SO I THINK THAT -- YOU KNOW, I DON'T KNOW            02:34:36

16   HOW BEST TO HANDLE THAT, BUT THERE ARE MATTEL

17   REPRESENTATIVES HERE WHO ARE OUTSIDE OF THE SCOPE

18   OF THE DESIGNATION OF THE PROTECTIVE ORDER.

19        YOU KNOW, I'M WILLING TO LET THEM -- YOU

20   KNOW, I GUESS WE CAN SEE WHERE THE QUESTIONING          02:34:48

21   GOES, WITH RESPECT TO THESE DOCUMENTS, BUT THEY

22   CERTAINLY SHOULDN'T BE LOOKING AT THE EXHIBITS.

23        MR. PLEVAN:  I'LL JUST SIMPLY STATE, SINCE THE

24   WITNESS SAID SHE -- THERE WAS NO TESTIMONY OF

25   SUBSTANCE, I HAVE NO OBJECTION AT THIS POINT.          02:34:59

                                                                140

EXHIBIT  14

PAGE  332.003

1   SO -- FROM AN MGA POINT OF VIEW.

2       MR. WERDEGAR:  WE'LL SEE WHERE THE QUESTIONING

3   GOES.  BUT, AGAIN, I JUST WANT TO MAKE SURE THAT

4   THEY -- MATTEL REPRESENTATIVES HERE AREN'T LOOKING

5   AT EXHIBITS.  AND IF WE START GOING INTO AN AREA                02:35:10

6   THAT -- THAT APPEARS TO -- SHOULD BE SUBJECT TO

7   A.E.O., I'LL -- YOU KNOW, I'LL RAISE THAT.

8       MR. MCFARLAND:  YOU WANT THE WITNESS TO REVIEW

9   THIS DOCUMENT?

10      MR. ZELLER:  YEAH.  I MEAN IT -- I THINK WHERE             02:35:25

11  WE HEAD IS -- IS GOING TO DEPEND ON -- ON HER

12  ANSWER.

13  BY MR. ZELLER:

14      Q.   SO HERE'S WHAT I'D LIKE TO DO:  YOU HAVE

15  IN FRONT OF YOU, FOR THE RECORD, EXHIBITS 701              02:35:32

16  THROUGH 796.  AND WHAT I'D LIKE YOU TO DO IS GO

17  THROUGH THESE ONE BY ONE AND PLEASE TELL ME WHETHER

18  OR NOT THESE ARE DRAWINGS THAT YOU'VE EVER SEEN

19  BEFORE.

20      A.   OKAY.                                             02:35:57

21          NO.

22      Q.   NO TO 701.

23      A.   NO TO 702.  NO TO 703.  NO TO 704.  NO TO

24  705.  I DON'T KNOW TO 706.  NO TO 707.  NO TO 708.

25  NO TO 709.  NO TO 710.  NO TO 711.  NO TO 712.  NO        02:36:57

141

EXHIBIT  17

PAGE  332.004

```
 1   TO 713.  NO TO 714.  NO TO 715.  NO TO 716.  NO

 2   TO -- 749?

 3       MR. MCFARLAND:  IS THAT RIGHT, IT SKIPS TO 749?

 4   AND THEN WE GO TO 7 --

 5       MR. ZELLER:  YEAH.  ACTUALLY, IT LOOKS LIKE        02:37:43

 6   THEY'RE NOT ENTIRELY IN ORDER.  IF YOU -- WE'LL

 7   REORDER THOSE SLIGHTLY, BUT IF YOU CAN SKIP AHEAD

 8   TO -- WHAT WAS THAT?

 9       MR. MCFARLAND:  TO 718?

10       MR. ZELLER:  THERE SHOULD BE A 717.             02:37:53

11       MR. MCFARLAND:  I KNOW.  I DON'T SEE 717.

12       MR. ZELLER:  YEAH, THERE IS.  IT'S RIGHT HERE.

13   IT'S THIS ONE.

14       MS. HAULER:  FOR SOME REASON THERE'S TWO.

15       MR. MCFARLAND:  TOWARDS THE END.                02:38:08

16       MR. PLEVAN:  IS THERE A 717?  I SEE A 718.

17       MR. ZELLER:  THERE IS.  YOU HAVE TO SKIP AHEAD

18   A COUPLE.

19       MS. HAULER:  THERE IS.  IT'S ON THE TOP

20   RIGHT-HAND CORNER.  IT SAYS IT'S --                 02:38:21

21       MR. PLEVAN:  MARKED IN A DIFFERENT LOCATION?

22       MS. HAULER:  YEAH.  BECAUSE IF YOU USE THE ONE

23   THAT'S MARKED, YOU CAN'T SEE IT AS WELL.

24       THE DEPONENT:  OKAY.  SO --

25   ///                                                 02:38:35
```

142

EXHIBIT _14_

PAGE _332.005_

BY MR. ZELLER:

Q.    JUST SO THAT THERE'S A PENDING QUESTION:
STARTING WITH EXHIBIT 717, PLEASE TELL ME WHETHER
YOU'VE SEEN ANY OF THESE MATERIALS BEFORE.

A.    OKAY.                                                    02:38:46

      NO TO 717.  NO TO 718.  NO TO 719.  NO TO
720.  NO TO 721.  NO TO 722.  NO TO 723.  NO TO
724.  NO TO 725.  NO.  I SAW THIS ON ANOTHER PAGE
UP HERE, 726.

Q.    TODAY?                                                   02:39:28

A.    TODAY.

      MR. MCFARLAND:  THAT'S NOT WHAT YOU'RE ASKING;
RIGHT, MR. ZELLER?

      MR. ZELLER:  THAT'S CORRECT.

      THE DEPONENT:  IT'S BEFORE TODAY -- RIGHT? --          02:39:33
IS WHAT YOU'RE ASKING.

BY MR. ZELLER:

Q.    RIGHT.

A.    SO NO TO 726.  NO TO 727.  NO TO 728.  NO
TO 729.  NO TO 730.  NO TO 731.  NO TO 732.  NO TO          02:39:41
733.  NO TO 734.  NO TO 735.  NO TO 736.  NO TO
737.  NO TO 738.  NO TO 739.  NO TO 740.  NO TO
741.  NO TO 742.  NO TO 743.  NO TO 744.  NO TO
745.  NO TO 746.  NO TO 747.  NO TO 748.

      MR. MCFARLAND:  DO YOU WANT US TO REINSERT             02:40:49

143

EXHIBIT ___17

PAGE _ 332.006

1    49 --

2        MR. ZELLER:  YES.

3        MR. MCFARLAND:  -- AND 50 HERE?

4        MR. ZELLER:  YES, IF WE COULD.

5        THE DEPONENT:  NO TO 749.  NO TO 750.  NO TO          02:40:54

6    751.  NO TO 752.  NO TO 753.  NO TO 754.  NO TO

7    755.  NO TO 756.  NO TO 757.  NO TO 758.  NO TO

8    759.  NO TO 760.  NO TO 761.  NO TO 762.  I DON'T

9    KNOW TO 763.  THAT'S -- THESE ARE -- 764, THESE ARE

10   CROAKIES.  NO TO 765.  766 -- THE CROAKIES, I HAVE      02:41:44

11   NO -- I DON'T KNOW ONE WAY OR THE OTHER.  THEY'RE

12   CROAKIES.

13       Q.    I'M SORRY.  THEY'RE WHAT?

14       A.    THEY'RE CROAKIES.

15       Q.    WHAT ARE CROAKIES?                             02:41:54

16       A.    A CROAKY IS AN IMAGE FASHION DESIGNERS

17   USE TO DRAW OVER THE TOP OF A FIGURE.  YOU TRACE A

18   FIGURE OUT OF SOMETHING YOU DREW OR OUT OF A BOOK

19   OR OUT OF SOMETHING, YOU OVERLAY IT WITH TRACING

20   PAPER, AND YOU USE IT AS A FIGURE TO DRAW A CONCEPT     02:42:08

21   ON TOP OF FOR A FASHION.

22       Q.    AND YOU'RE REFERRING TO EXHIBIT 766?

23       A.    YEAH.  LET ME -- ALL THE CROAKIES, THEY

24   START AT 758.  FROM 758 TO 767, 768, 769, 770,

25   THOSE ARE ALL CROAKIES.  I HAVE NO IDEA IF I SAW        02:42:42

EXHIBIT  17

PAGE_ 332 .007

1   THOSE BEFORE OR NOT.  THEY'RE JUST FIGURES.

2            NO TO 771.  NO TO 772.  NO TO 773.  NO TO

3   774.  NO TO 775.  NO TO 776.  NO TO 777.  NO TO

4   778.  NO TO 779.  NO TO 780.  I DON'T KNOW ABOUT

5   THE LOGO ON 780.  NO TO 781.  NO TO 782.  783 IS          02:43:38

6   ANOTHER CROAKY; I DON'T KNOW.  784, NO.  NO TO 785.

7   NO TO 786.  NO TO 787.  NO TO 788.  NO TO 789.  NO

8   TO 790.  NO TO 791.  NO TO 792.  NO TO 793.  NO TO

9   794.  NO TO 795.  NO TO 796.

10       Q.   FOCUSING ON THIS GROUP OF EXHIBITS, 701          02:44:42

11   THROUGH 796, DO YOU HAVE ANY KNOWLEDGE OR

12   INFORMATION AS TO WHEN ANY OF THESE DRAWINGS WERE

13   CREATED?

14       A.   NO.

15       Q.   WITH RESPECT TO EXHIBIT 706 --                   02:45:12

16       A.   ARE THOSE THE SHOES?

17       Q.   YES.

18       A.   YEAH, THE SHOES ARE LIKE THE CROAKIES.  I

19   MAY HAVE SEEN THEM, I MAY NOT, THE SHOES.

20       Q.   YOU'RE NOT JUST SURE ABOUT THOSE?               02:45:22

21       A.   NO.

22       Q.   AND IS IT FAIR TO SAY AS TO THE ONES THAT

23   YOU HAD CALLED CROAKIES, WHICH ARE 706 AND THEN 758

24   THROUGH 767 --

25       A.   OKAY.                                           02:45:33

145

EXHIBIT 14

PAGE 332.008

1      Q.    -- THAT YOU'RE -- YOU'RE NOT SURE ONE WAY

2   OR ANOTHER WHETHER YOU'VE EVER SEEN THOSE?

3      A.    YEAH.   THEY'RE JUST -- THEY'RE FIGURES.

4   IT'S LIKE ASKING ME IF I'VE EVER SEEN A MANNEQUIN

5   BEFORE.   YEAH.                                        02:45:44

6      Q.    YOU JUST -- YOU THINK THEY'RE SO GENERIC

7   YOU CAN'T TELL?

8      MR. MCFARLAND:   OBJECTION; MISSTATES HER

9   TESTIMONY, AND USE OF THE WORD "GENERIC."

10     THE DEPONENT:   THERE'S NOT ENOUGH DETAIL ON      02:45:52

11  THEM TO DECIPHER ONE WAY OR THE OTHER WHAT THEY

12  ARE.

13  BY MR. ZELLER:

14     Q.    JUST WHEN YOU THOUGHT WE WERE DONE, I

15  HAVE THREE MORE THAT I'D LIKE TO SHOW YOU,          02:46:16

16  EXHIBITS 1107 THROUGH 1109.

17         IF YOU COULD PLEASE TELL ME IF YOU'VE

18  EVER SEEN BEFORE TODAY ANY OF THE -- THESE THREE

19  DRAWINGS, EXHIBITS 1007 THROUGH 1109.

20     A.    NO.                                          02:46:43

21     Q.    IT'S FAIR TO SAY YOU DON'T HAVE ANY

22  KNOWLEDGE OR INFORMATION AS TO WHEN THEY WERE

23  CREATED; IS THAT TRUE?

24     A.    YES.

25     MR. MCFARLAND:   DID SHE MARK IT?   OH, YOU'RE    02:46:59

146

EXHIBIT 17

PAGE 332.009

1    NOT MARKING IT.  I'M SORRY.

2        MR. ZELLER:  YEAH.  THOSE WERE PREVIOUSLY

3    MARKED.

4        MR. MCFARLAND:  PREVIOUSLY MARKED.

5    BY MR. ZELLER:                              02:47:09

6        Q.   WAS THAT TIME WHEN YOU STOPPED IN

7    MISSOURI, IN NOVEMBER OF 2002 ON YOUR CROSS-COUNTRY

8    TRIP AND THEN YOU SAW CARTER THERE AND YOU TALKED

9    ABOUT THE CONVERSATION YOU HAD WITH HIM ABOUT

10   BRATZ, DID HE SHOW YOU ANY DRAWINGS AT THAT TIME?    02:47:22

11       A.   NO.

12       Q.   HAS MR. BRYANT EVER SHOWN YOU BRATZ

13   DRAWINGS?

14       A.   NO.

15       Q.   AND I'M TALKING ABOUT ANY TIME IN YOUR    02:47:30

16   LIFE.

17       A.   I DON'T REMEMBER EVER SEEING THEM.

18       Q.   HAS MR. BRYANT EVER SAID TO YOU, IN WORDS

19   OR SUBSTANCE, WHAT PROMPTED HIM TO CREATE BRATZ OR

20   WHAT THE INSPIRATION WAS BEHIND THEM?              02:47:50

21       A.   I DIDN'T ASK.

22       Q.   WELL, WHETHER OR NOT YOU ASKED --

23       A.   AND HE DIDN'T VOLUNTEER.

24       Q.   YOU'RE STARTING TO SEE HOW THIS GOES.

25            HAVE YOU EVER DISCUSSED THAT WITH RICHARD   02:48:02

147

EXHIBIT 17

332. 010

```
 1    IRMEN?

 2         A.    I DON'T KNOW.

 3         Q.    IS THERE ANYONE YOU'VE EVER DISCUSSED

 4    THE -- CARTER BRYANT'S INSPIRATION OR THE ORIGINS

 5    OF BRATZ WITH?                                          02:48:14

 6         A.    NO.

 7         Q.    PRIOR TO THE TIME THAT -- WELL, LET ME

 8    REPRESENT THIS TO YOU.  THE LAWSUIT WAS FILED, THIS

 9    PARTICULAR CASE, IN APRIL OF 2004.

10         A.    OKAY.                                        02:48:41

11         Q.    SO IF YOU CAN MAYBE HAVE THE TIME PERIOD

12    BEFORE APRIL 2004 IN MIND.

13         A.    OKAY.  2003 IS WHAT I'M TRYING TO PIECE

14    TOGETHER.

15         MR. MCFARLAND:  LET HIM ASK HIS QUESTION.          02:48:54

16         THE DEPONENT:  OKAY.

17    BY MR. ZELLER:

18         Q.    AT ANY TIME PRIOR TO THE TIME THAT YOU

19    HEARD ABOUT THE LAWSUIT FOR THE FIRST TIME, HAD

20    ANYONE EVER SAID TO YOU, IN WORDS OR SUBSTANCE,         02:49:03

21    THAT CARTER BRYANT HAD CREATED BRATZ WHEN HE WAS

22    EMPLOYED BY MATTEL?

23         MR. MCFARLAND:  LISTEN TO THE QUESTION.

24         THE DEPONENT:  I -- I DON'T RECALL ANYBODY

25    SAYING THAT.                                            02:49:15
```

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077 EXHIBIT ___17___

PAGE 332.011

1        MR. PLEVAN:  COULD I HAVE THAT QUESTION AND

2   ANSWER READ BACK.  I'M SORRY.

3        I DON'T NEED THE OBJECTION, JUST THE

4   QUESTION AND ANSWER.

5        (THE RECORD WAS READ AS FOLLOWS:                02:49:18

6        Q    AT ANY TIME PRIOR TO THE TIME

7             THAT YOU HEARD ABOUT THIS LAWSUIT

8             FOR THE FIRST TIME, HAD ANYONE

9             EVER SAID TO YOU, IN WORDS OR

10            SUBSTANCE, THAT CARTER BRYANT HAD       02:49:07

11            CREATED BRATZ WHEN HE WAS EMPLOYED

12            BY MATTEL?

13       A    I DON'T RECALL ANYBODY SAYING

14            THAT.)

15   BY MR. ZELLER:                                     02:49:34

16       Q.   PRIOR TO THE TIME THAT YOU HEARD ABOUT

17   THE LAWSUIT FOR THE FIRST TIME, HAD ANYONE

18   SUGGESTED TO YOU IN ANY WAY, WHETHER IN WRITING OR

19   ANY OTHER WAY, THAT CARTER BRYANT HAD CREATED BRATZ

20   WHEN HE WAS EMPLOYED BY MATTEL?                     02:49:46

21       A.   NOT THAT I REMEMBER.

22       Q.   PRIOR TO THE TIME THAT YOU FIRST HEARD

23   ABOUT THIS LAWSUIT, DID ANYONE EVER SAY TO YOU,

24   WORDS OR SUBSTANCE, THAT CARTER BRYANT WAS ALREADY

25   WORKING FOR OR WITH MGA PRIOR TO THE TIME THAT HE   02:49:58

149

EXHIBIT 14

332.012

1    LEFT MATTEL THE SECOND TIME?

2        MR. MCFARLAND:   OBJECTION; ASSUMES FACTS NOT IN

3    EVIDENCE.

4        THE DEPONENT:   I DON'T KNOW.

5    BY MR. ZELLER:                                          02:50:07

6        Q.   HAD ANYONE EVER SUGGESTED THAT TO YOU

7    IN -- IN WRITING OR ANY OTHER WAY?

8        A.   I DON'T REMEMBER.

9        Q.   PRIOR TO THE TIME THAT THIS LAWSUIT WAS

10   FILED, DID YOU EVER SAY TO ANYONE THAT CARTER        02:50:17

11   BRYANT HAD BEEN WORKING ON BRATZ WHEN HE WAS

12   EMPLOYED BY MATTEL?

13       A.   NO.

14       Q.   PRIOR TO THE TIME THAT THIS LAWSUIT WAS

15   FILED, DID YOU EVER SAY TO ANYONE, OR COMMUNICATE    02:50:28

16   IN ANY WAY TO ANYONE, THAT CARTER BRYANT HAD BEEN

17   WORKING WITH MGA PRIOR TO THE TIME THAT HE LEFT

18   MATTEL?

19       A.   NO.

20       Q.   AT SOME POINT WHEN THE BRATZ DOLLS WERE      02:50:55

21   RELEASED AND YOU FIRST BECAME AWARE OF THEM, THAT

22   WAS IN 2001?

23       A.   YEAH.   WHEN I SAW THEM ON THE -- ON MY --

24   ON THE WEBSITE WAS THE FIRST TIME I SAW THEM.

25       Q.   AND AT -- AT SOME POINT YOU HEARD THAT --    02:51:11

150

EXHIBIT _14_

332.013

```
 1    RUMORS, OR PEOPLE WERE WONDERING, WHETHER OR NOT

 2    CARTER BRYANT HAD COPIED TOON TEENS IN CREATING

 3    BRATZ; IS THAT TRUE?

 4        MR. WERDEGAR:  OBJECTION; ASSUMES FACTS NOT IN

 5    EVIDENCE.                                          02:51:29

 6        THE DEPONENT:  I DON'T KNOW ABOUT THAT ONE.  I

 7    DON'T REMEMBER THAT CONVERSATION COMING UP WITH

 8    ANYONE.  I DON'T REMEMBER THAT.

 9    BY MR. ZELLER:

10        Q.   WELL, MAYBE IF WE STEP BACK THEN FOR A     02:51:41

11    MOMENT.

12             YOU HAD MENTIONED THAT THERE WERE RUMORS

13    THAT YOU HEARD BACK IN THE 2001 TIME PERIOD.

14    YOU'VE ALREADY MENTIONED PREVIOUSLY THAT SOME OF

15    THOSE RUMORS WERE THAT CARTER BRYANT WAS SOMEHOW   02:51:51

16    INVOLVED WITH BRATZ; RIGHT?

17        A.   I'M SORRY.  CAN YOU SAY AGAIN?

18        Q.   SURE.  I'M TRYING TO -- I'M TRYING TO

19    KIND OF PIECE THROUGH SOMETHING HERE TO MAKE SURE I

20    FULLY UNDERSTAND.                                  02:52:08

21             YOU HAD MENTIONED THAT AT SOME POINT,

22    AFTER THE BRATZ DOLLS WERE RELEASED AND YOU BECAME

23    AWARE OF THEM -- AT SOME POINT IN 2001 -- THAT

24    THERE WERE RUMORS THAT YOU HEARD; RIGHT?

25        A.   YES.  THAT CARTER -- YES.                 02:52:21
```

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

14

332.014

```
 1        Q.    THE RUMORS THAT YOU HEARD WERE THAT

 2   CARTER BRYANT HAD SOME INVOLVEMENT WITH THE BRATZ

 3   DOLLS; RIGHT?

 4        A.    YES.

 5        Q.    DID YOU HEAR ANY OTHER RUMORS WITH          02:52:30

 6   RESPECT TO BRATZ OR CARTER BRYANT?

 7        A.    NO, NO.  NOT THAT I REMEMBER.

 8        Q.    SO THE -- THE RUMORS THAT YOU TESTIFIED

 9   ABOUT BEFORE WERE WHETHER OR NOT CARTER BRYANT WAS

10   THE DESIGNER OR THE CREATOR OR SOMEHOW INVOLVED       02:52:44

11   WITH BRATZ?

12        A.    CORRECT.

13        Q.    AND THEN AT ANY TIME SINCE THEN, OTHER

14   THAN THOSE RUMORS, DID YOU HEAR ANY OTHER RUMORS

15   ABOUT BRATZ OR CARTER BRYANT?                         02:52:59

16        A.    NOT THAT I REMEMBER.

17        Q.    AND YOU MENTIONED THAT DURING THAT TIME

18   PERIOD YOU WEREN'T SURE WHETHER CARTER BRYANT WAS

19   THE DESIGNER OR CREATOR OF BRATZ; IS THAT TRUE?

20        A.    CORRECT.                                    02:53:21

21        Q.    AT SOME POINT DID YOU LEARN THAT HE WAS?

22        A.    WHEN HE TOLD ME.

23        Q.    AND THAT WAS IN NOVEMBER OF 2002 --

24        A.    2002.

25        Q.    -- IN MISSOURI?                             02:53:28
```

152

```
 1        A.    YES.
 2        Q.    AND WHEN YOU LEARNED THAT INFORMATION
 3   THAT HE TOLD YOU, DID YOU GO AND TELL ANYONE?
 4        A.    I MAY HAVE.  I DON'T KNOW.
 5        Q.    DID YOU TELL ANYONE ELSE AT MATTEL?        02:53:48
 6        A.    MAYBE MY FATHER.
 7        Q.    I'M SORRY.  WHO?
 8        A.    MY FATHER.
 9        Q.    OH, YOUR FATHER IS AT MATTEL?
10        A.    NO.  YOU SAID OUTSIDE OF MATTEL.            02:54:01
11        Q.    NO, NO.  I SAID -- OH, I'M SORRY.  I -- I
12   WAS -- I WAS ASKING ABOUT AT MATTEL.
13        A.    OKAY.  AT MATTEL?
14        Q.    YES.
15        A.    AT MATTEL -- I DON'T THINK I WAS REALLY     02:54:09
16   IN CONTACT WITH ANYBODY AT MATTEL AFTER 2002.
17              NO, NOT AFTER 2002.
18        Q.    SO THAT WE'RE ON THE SAME PAGE -- I
19   THOUGHT I'D ASKED THE QUESTION, BUT MAYBE I -- IT
20   WAS MY MISTAKE, BUT JUST SO THAT WE HAVE A CLEAR     02:54:28
21   RECORD ON THIS.
22              YOU LEARNED FROM CARTER THAT HE WAS THE
23   CREATOR OR DESIGNER OF BRATZ IN NOVEMBER OF 2002
24   FOR THE FIRST TIME?
25        A.    YES.                                        02:54:42
```

153

EXHIBIT 14

PAGE 332.016

1      Q.    IT'S -- IT'S YOUR BEST RECOLLECTION YOU

2   DIDN'T TELL ANYONE AT MATTEL ABOUT THAT?

3      A.    YES.

4      Q.    YOU THINK THAT YOU TOLD YOUR FATHER;

5   RIGHT?                                                02:54:52

6      A.    YES.

7      Q.    HE -- HE DOESN'T WORK AT MATTEL?

8      A.    RIGHT.

9      Q.    OKAY.

10     A.    YOU SAID -- I THOUGHT YOU SAID OUTSIDE        02:54:57

11  MATTEL.  AND I WENT, OH, OKAY.

12     Q.    OTHER -- OTHER THAN YOUR FATHER, DID YOU

13  TELL ANYONE ELSE?

14     A.    OUTSIDE OR INSIDE OF MATTEL?

15     Q.    ANYWHERE IN THE WORLD.                        02:55:05

16     A.    ANYWHERE IN -- I MAY HAVE MENTIONED TO MY

17  FAMILY, WHO KNEW CARTER, PEOPLE IN MY FAMILY THAT

18  KNEW CARTER.

19     Q.    DO YOU HAVE A RECOLLECTION OF DOING THAT

20  OR IS THAT JUST YOUR SURMISE?                         02:55:25

21     A.    THAT'S JUST MY SURMISE.

22     Q.    SO IT'S FAIR TO SAY THAT THE ONE PERSON

23  YOU DO REMEMBER SAYING IT TO WAS YOUR FATHER?

24     A.    YES.

25     Q.    AND YOU REMEMBER FOR SURE THAT THERE WAS      02:55:32

154

```
 1    ANYONE ELSE; IS THAT TRUE?

 2        A.    YES.

 3        Q.    DO YOU KNOW A VERONICA MARLOW?

 4        A.    YES.

 5        Q.    AND HOW DO YOU KNOW HER?              02:56:08

 6        A.    SHE WORKED FOR MY MOTHER.

 7        Q.    WHEN THEY WERE BOTH AT MATTEL?

 8        A.    YES.

 9        Q.    DID YOU EVER DO ANY ACTUAL WORK WITH HER?

10        A.    NO.                                   02:56:21

11        Q.    SO YOU KNEW HER THROUGH YOUR MOTHER?

12        A.    YES.

13        Q.    AND, FOR THE RECORD, YOUR -- YOUR MOM'S

14    NAME WAS PAT?

15        A.    PAT TIRIO-CLOONAN.                    02:56:27

16        Q.    DO YOU HAVE A SENSE OF HOW LONG YOUR

17    MOTHER AND VERONICA MARLOW WORKED TOGETHER?

18        A.    IT WASN'T VERY LONG.  I COULDN'T TELL YOU

19    FOR SURE EXACT DATES, BUT I KNOW IT WAS UNDER

20    JOE -- WHEN SHE REPORTED TO JOE FRANKE, DURING THAT   02:56:54

21    TENURE.

22        Q.    HAVE YOU HAD ANY CONTACT WITH VERONICA

23    MARLOW SINCE SHE LEFT MATTEL?

24        MR. MCFARLAND:  OBJECTION; ASSUMES FACTS NOT IN

25    EVIDENCE.  AND THE QUESTION IS VAGUE AND AMBIGUOUS,   02:57:13
```

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT _14_

PAGE _332.018_

1    WITH RESPECT TO WHEN MS. MARLOW LEFT MATTEL.

2        THE DEPONENT:  I DON'T KNOW WHEN SHE LEFT

3    MATTEL.

4    BY MR. ZELLER:

5        Q.    LET ME TRY IT THIS WAY:  YOU KNOW SHE          02:57:25

6    LEFT MATTEL AT SOME POINT?

7        A.    OKAY.

8        MR. MCFARLAND:  ARE YOU ASKING THE WITNESS OR

9    TELLING THE WITNESS?

10   BY MR. ZELLER:                                           02:57:32

11       Q.    THAT'S WHAT I -- I AM ASKING.

12             DO YOU KNOW -- DO YOU KNOW ONE WAY OR

13   ANOTHER WHETHER SHE'S STILL AT MATTEL?

14       A.    NO, REALLY, I DON'T.

15       Q.    WHEN WAS THE LAST TIME YOU HAD ANY             02:57:37

16   CONTACT WITH VERONICA MARLOW?

17       A.    I HAD A LITTLE GOING AWAY PARTY FOR

18   CARTER AND HE INVITED HER.

19       Q.    AND WHEN YOU SAY "GOING AWAY PARTY," WAS

20   THIS WHEN HE MOVED PERMANENTLY FROM CALIFORNIA TO        02:58:03

21   MISSOURI?

22       A.    YES.

23       Q.    AND SO THAT WAS AFTER HE HAD LEFT MATTEL?

24       A.    YES.  YEAH.  YES.  YES.

25       Q.    WHEN IS IT THAT HE -- HE LEFT CALIFORNIA       02:58:14

156

EXHIBIT  17

PAGE  332.019

```
 1    TO LIVE IN MISSOURI THAT LAST TIME?

 2         A.    IT WAS -- OH, SOMETIME IN EARLY 2002, I

 3    THINK.  YOU KNOW, I'M NOT SURE.

 4         Q.    IS THAT YOUR BEST --

 5         A.    YEAH, THAT'S MY BEST GUESS.   THAT'S A        02:58:38

 6    GUESS.

 7         Q.    I DON'T WANT A PURE GUESS, BUT IF IT'S

 8    YOUR BEST TESTIMONY, THAT'S -- THAT'S --

 9         A.    IT'S MY BEST GUESS.

10         Q.    OKAY.  YOU MENTIONED THAT YOU -- YOU HAD     02:58:45

11    THAT GOING AWAY PARTY FOR CARTER.  WAS THAT AT YOUR

12    HOUSE OR HIS HOUSE?

13         A.    MY HOUSE.

14         Q.    AND WAS THAT THE LAST TIME THAT YOU HAD

15    ANY CONTACT WITH VERONICA MARLOW?                       02:59:05

16         A.    YES.

17         Q.    YOU SAW HER AT THE PARTY?

18         A.    YES.

19         Q.    DID CARTER BRYANT EVER TELL YOU WHY HE

20    LEFT MATTEL THE SECOND TIME, THE LAST TIME?            02:59:20

21         A.    NO.

22         Q.    DID YOU HAVE ANY UNDERSTANDING AS TO WHY?

23         A.    JUST AN ASSUMPTION.

24         Q.    AND WHAT WAS THAT?

25         A.    HE WAS WORKING ON THE BRATZ.                 02:59:29
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0070 EXHIBIT _17_

PAGE ___332,020___

```
1        Q.    WELL, LET ME -- LET ME TRY IT THIS WAY --

2   BECAUSE YOU -- YOU EVENTUALLY AT SOME POINT BECAME

3   AWARE OF IT -- RIGHT? -- THAT -- THAT HE IS WORKING

4   ON BRATZ?

5        A.    YES.                                          02:59:42

6        Q.    AND AS WE TALKED ABOUT EARLIER.  SO I

7   GUESS WHAT I'M TRYING TO DO IS FOCUS IN MORE ON

8   ANOTHER -- ON THE TIME PERIOD WHEN HE LEFT.

9        A.    WHEN HE LEFT MATTEL.

10       Q.    RIGHT.                                        02:59:51

11       A.    OKAY.

12       Q.    SO I TAKE IT THAT WHEN CARTER BRYANT LEFT

13  MATTEL THAT SECOND AND LAST TIME --

14       A.    OKAY.

15       Q.    -- YOU BECAME AWARE OF IT IN SOME WAY?        02:59:58

16       A.    NOT TILL -- IT WAS A GOOD DEAL AFTER HE

17  LEFT.  I DON'T REMEMBER WHEN HE LEFT.

18       MR. MCFARLAND:  I THINK YOU NEED TO LISTEN TO

19  THE QUESTION.

20       MR. ZELLER:  YEAH.                                  03:00:10

21  BY MR. ZELLER:

22       Q.    OKAY.  LET'S -- LET'S TRY IT THIS WAY,

23  BECAUSE I -- I DON'T WANT YOU TO CONFUSE TWO

24  THINGS.

25       A.    OKAY.                                         03:00:16
```

158

EXHIBIT 17

PAGE 332.021

1      Q.    WHAT -- WHAT I'M REALLY -- I'M JUST

2    FOCUSED ON IS NOT SO MUCH BRATZ.

3      A.    OKAY.

4      Q.    I'M -- I'M FOCUSED ON THE FACT OF WHEN

5    CARTER BRYANT LEFT MATTEL THAT SECOND TIME.          03:00:23

6      A.    OKAY.

7      Q.    RIGHT.  YOU RECALL LEARNING AT SOME POINT

8    THAT CARTER BRYANT LEFT MATTEL THAT SECOND-AND-LAST

9    TIME?

10     A.    YES.                                          03:00:34

11     Q.    AND HOW IS IT YOU LEARNED ABOUT THAT?

12     A.    SOMEBODY -- HE ANNOUNCED, I THINK TO HIS

13   GROUP, THAT HE WAS LEAVING.  SOMEBODY FROM HIS

14   GROUP -- I THINK, I'M NOT SURE WHO IT WAS -- THEY

15   WERE OVER IN -- THEY WERE TALKING TO SOMEBODY         03:00:57

16   OUTSIDE OF MY OFFICE, AND I HEARD THEM MENTION THAT

17   "CARTER IS LEAVING," AND I -- I WAS REALLY

18   SURPRISED, BECAUSE HE HADN'T TOLD ME THAT HE WAS

19   LEAVING.  AND I -- I THINK IT WAS ROBERT BEST.

20     Q.    AND THEN, IN TERMS OF YOUR LEARNING ABOUT     03:01:28

21   CARTER LEAVING MATTEL THAT SECOND-AND-LAST TIME,

22   WHAT HAPPENED THEN, AFTER YOU HEARD -- OVERHEARD

23   THAT CONVERSATION?

24     A.    I WENT OVER TO HIS OFFICE AND SAID, "ARE

25   YOU -- ARE YOU -- YOU KNOW, ARE YOU REALLY           03:01:41

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077  EXHIBIT 17

PAGE 332.022

```
 1    LEAVING?"

 2           AND HE SAID, "YEAH.  SORRY I DIDN'T TELL

 3    YOU."

 4           AND I SAID, "YOU'RE GOING BACK TO

 5    MISSOURI AGAIN?"  AND I ASSUMED HE WAS GOING TO GO       03:01:49

 6    BACK AND WORK WITH HIS SISTER ON ANOTHER MUSIC CD

 7    OR SOMETHING.  THAT WAS REALLY ABOUT IT.  I MEAN --

 8       Q.   AND WHEN YOU SAY "HIS OFFICE" AND HE SAID

 9    HE WAS LEAVING, THAT WAS CARTER'S CUBICLE, AND

10    THESE ARE THINGS THAT CARTER BRYANT SAID?              03:02:08

11       A.   YES.

12       Q.   YOU SAID THAT YOU ASSUMED HE WAS -- HE

13    WAS GOING BACK TO MISSOURI TO WORK ON A CD.  WHY

14    DID YOU HAVE THAT ASSUMPTION?

15       A.   BECAUSE THAT'S WHAT HE DID LAST TIME.         03:02:23

16       Q.   AND WHEN YOU SAY THE "LAST TIME," THE

17    TIME HE HAD GONE BACK TO MISSOURI IN 1998?

18       A.   YES.

19       Q.   DID CARTER SAY TO YOU, IN WORDS OR

20    SUBSTANCE, WHY HE WAS LEAVING?                         03:02:35

21       A.   NO.

22       Q.   DID HE EVER AT ANY TIME?

23       A.   NOT -- NO.

24       Q.   DID HE HAVE ANY EXPLANATION AS TO WHY HE

25    HADN'T TOLD YOU?                                       03:02:50
```

160

EXHIBIT 14

PAGE 332.023

```
 1        MR. MCFARLAND:  OBJECTION; ASKED AND ANSWERED.
 2        THE DEPONENT:  I DIDN'T -- IT DIDN'T EVEN OCCUR
 3   TO ME TO ASK.
 4   BY MR. ZELLER:
 5        Q.   AND HE DIDN'T VOLUNTEER?                    03:02:58
 6        A.   RIGHT.
 7        Q.   WAS IT YOUR UNDERSTANDING, WHEN YOU HAD
 8   THAT CONVERSATION WITH HIM THERE IN THE CUBICLE,
 9   THAT HE WAS GOING TO BE LEAVING THE STATE?
10        A.   YES.                                        03:03:18
11        Q.   DID YOU AT SOME POINT LEARN THAT HE, IN
12   FACT, HADN'T LEFT CALIFORNIA?
13        A.   YES.
14        Q.   AND HOW DID YOU FIND OUT ABOUT THAT?
15        A.   WELL, I KNEW WHERE HE LIVED.                03:03:28
16        Q.   WELL --
17             (SPEAKING SIMULTANEOUSLY.)
18        THE DEPONENT:  HIS CAR -- IF HIS CAR IS IN THE
19   DRIVEWAY, HE'S STILL THERE.
20   BY MR. ZELLER:                                        03:03:37
21        Q.   YOU WERE STILL LIVING IN THAT AREA?
22        A.   YES.  YEAH.
23        Q.   OKAY.  SO -- SO YOU SAW THAT HE WAS
24   ACTUALLY STILL AT HOME?
25        A.   YES.                                        03:03:43
```

161

EXHIBIT _____

PAGE _____ 337

1        Q.    IN -- IN GARDENA?

2        A.    YES.

3        Q.    PRIOR TO THE TIME WHEN YOU HAD THAT

4    CONVERSATION WITH CARTER BRYANT ABOUT HIS LEAVING

5    MATTEL THAT SECOND-AND-LAST TIME, WAS THERE A          03:04:02

6    PERIOD OF TIME WHERE YOU HADN'T SPOKEN WITH CARTER?

7        A.    WE WOULD GO WEEKS WITHOUT SPEAKING TO

8    EACH OTHER SOMETIMES.

9        Q.    WELL, LET ME TRY IT THIS WAY:  WAS

10   THERE -- WAS THERE ANY FRICTION BETWEEN THE TWO OF      03:04:21

11   YOU PRIOR TO THAT TIME?

12       A.    NO.

13       Q.    HAS THERE EVER BEEN A TIME PERIOD WHERE

14   YOU TWO HAD A FALLING OUT OR YOU DIDN'T CONSIDER

15   HIM YOUR FRIEND?                                        03:04:35

16       A.    NO.

17       Q.    OR THERE WAS ANY FRICTION?

18       A.    NO.

19       Q.    I TAKE IT BETWEEN THE TIME WHEN CARTER

20   LEFT MATTEL THAT SECOND-AND-LAST TIME, AND THEN THE     03:04:53

21   TIME THAT HE HAD THE GOING AWAY PARTY THAT YOU

22   THREW FOR HIM, WHEN HE WENT BACK TO MISSOURI

23   PERMANENTLY, YOU SAW CARTER FROM TIME TO TIME?

24       A.    YES.

25       Q.    DID YOU SEE HIM OVER AT HIS HOUSE AND         03:05:04

PAGE _____ 334

```
 1    YOUR HOUSE?

 2         A.    YOU KNOW, I WAS OVER AT HIS HOUSE A FEW

 3    TIMES.  AFTER MARCH OF 2000, I REALLY DIDN'T GO

 4    OVER TO HIS HOUSE VERY MUCH.  I MEAN, WE WOULD SEE

 5    EACH OTHER, BUT IT WAS -- IT WAS RARELY, AFTER          03:05:39

 6    2002.

 7         DEPOSITION OFFICER:  DID YOU SAY 2002?

 8         THE DEPONENT:  YES.

 9    BY MR. ZELLER:

10         Q.    I'M SORRY.  2002?                             03:05:59

11         A.    YES.

12              I'M SORRY, I'M SORRY.  NO.  IT WAS 2000,

13    YEAH, YEAH.  AND IT WAS BECAUSE I MOVED TO THE

14    TOWNHOUSE IN TORRANCE AND HE WAS LIVING IN GARDENA

15    AND WE WERE JUST IN DIFFERENT CITIES.                   03:06:16

16         Q.    SO THE RECORD IS CLEAR, WHEN YOU WERE

17    SAYING THAT IT WAS MORE RARE, OR YOU RARELY WENT

18    OVER TO HIS HOUSE, THAT WAS AFTER MARCH OF 2000?

19         A.    YES.

20         Q.    AFTER MARCH OF 2000, UP UNTIL THE TIME        03:06:26

21    WHEN YOU SAW CARTER IN MISSOURI IN NOVEMBER OF

22    2002 --

23         A.    YES.

24         Q.    -- DID YOU HAVE ANY CONTACT WITH CARTER

25    WHERE HE -- OR ANY COMMUNICATION WITH CARTER, ANY       03:06:50
```

163

17

PAGE 335

1    CONVERSATION WITH CARTER, IN WHICH HE TOLD YOU

2    ABOUT WHAT HE WAS DOING FOR A JOB AFTER HE'D LEFT

3    MATTEL?

4        A.    I DON'T REMEMBER AN EXACT CONVERSATION,          03:07:08

5    BUT FOR SOME REASON I WAS UNDER THE ASSUMPTION THAT

6    HE WAS DOING GREETING CARDS AND POSTERS.

7            BUT, ONCE AGAIN, I WOULDN'T HAVE ASKED.

8    CARTER AND I HAVE A "DON'T ASK, DON'T TELL"

9    RELATIONSHIP, IN CASE YOU HAVEN'T FIGURED THAT OUT.

10       Q.    SO IF I UNDERSTAND YOU CORRECTLY, DURING        03:07:33

11   THAT TIME PERIOD, FROM WHEN CARTER BRYANT LEFT

12   MATTEL THAT LAST AND SECOND TIME --

13       A.    OKAY.

14       Q.    -- UP UNTIL THE TIME THAT HE TOLD YOU

15   THAT HE HAD BEEN INVOLVED WITH BRATZ IN NOVEMBER OF     03:07:43

16   2002, IT WAS YOUR UNDERSTANDING THAT HE WAS A

17   FREELANCER WHO WORKED ON GREETING CARDS AND

18   POSTERS?

19       MR. MCFARLAND:   OBJECTION; MISSTATES HER

20   TESTIMONY.   THAT WAS HER ASSUMPTION; SHE SAID SHE      03:07:56

21   DIDN'T ASK.

22       MR. ZELLER:   WELL, I'M ASKING WHAT HER BELIEF

23   WAS.  I'M JUST TRYING TO MAKE SURE IT WAS CLEAR.

24       THE DEPONENT:   THAT WAS MY ASSUMPTION, YEAH, MY

25   BELIEF, MY ASSUMPTION.                                  03:08:06

164

EXHIBIT 17

PAGE 336

```
 1          DEPOSITION OFFICER:  CAN WE TAKE A QUICK BREAK?

 2          MR. ZELLER:  YEAH, ABSOLUTELY.  SURE.

 3          DEPOSITION OFFICER:  THANK YOU.

 4          THE VIDEOGRAPHER:  THIS IS THE END OF TAPE

 5     NO. 2.  GOING OFF THE RECORD AT 3:08 P.M.            03:08:43

 6              (A RECESS WAS HELD.)

 7          THE VIDEOGRAPHER:  THIS IS THE START OF TAPE

 8     NO. 3.  GOING BACK ON THE RECORD AT 3:22 P.M.

 9     BY MR. ZELLER:

10          Q.    YOU'VE SEEN BRATZ DOLLS ON THE SHELVES OF    03:22:49

11     RETAIL STORES?

12          A.    IT'S BEEN A WHILE.

13          Q.    BUT YOU HAVE SEEN THEM?

14          A.    YES.

15          Q.    OTHER THAN SEEING BRATZ DOLLS ON RETAIL      03:22:58

16     SHELVES OR ON THE WEBSITE THAT YOU TALKED ABOUT

17     EARLIER, SETTING ASIDE, YOU KNOW, THE -- THE

18     MANUFACTURED BRATZ DOLLS, HAVE YOU EVER SEEN ANY

19     BRATZ SCULPTURE OR PROTOTYPE AT ANY TIME?

20          A.    NO.                                          03:23:16

21          Q.    DO YOU HAVE ANY KNOWLEDGE OR INFORMATION

22     AS TO WHO SCULPTED THE BRATZ DOLLS?

23          A.    NO.

24          Q.    IS THAT ANYTHING YOU'VE EVER DISCUSSED

25     WITH ANYBODY?              EXHIBIT _____ 17         03:23:29

                                  PAGE _____ 337
```

                                                              165

```
1    CAME ON FULL-TIME, THERE WERE A LOT OF

2    NONDISCLOSURE AGREEMENTS I SIGNED WITH MATTEL.

3    BY MR. PLEVAN:

4         Q.    WAS THIS PART OF H.R. IN-PROCESSING?

5         A.    YES.  AS FAR -- I MEAN --              07:04:24

6         Q.    DO YOU RECALL?

7         A.    -- WITH ME IT WAS.

8               YEAH.

9         Q.    AND WERE THERE OTHER PEOPLE BEING

10   IN-PROCESS AT THE SAME TIME?                      07:04:30

11        A.    YES.

12        Q.    APPROXIMATELY HOW MANY?

13        A.    I DON'T KNOW.

14        Q.    MORE THAN TEN?

15        A.    THERE WERE AT LEAST TEN PEOPLE IN THE  07:04:37

16   DESIGN CENTER.

17        Q.    WHO WERE BEING IN-PROCESS AT THE SAME

18   TIME?

19        A.    WHO WERE COMING ON FULL -- YOU KNOW,

20   COMING ON FULL-TIME, YES.                         07:04:45

21        Q.    DID SOMEONE EXPLAIN TO YOU WHAT THESE

22   AGREEMENTS MEANT?

23        A.    NO.

24        Q.    DID YOU READ IT BEFORE YOU SIGNED IT?

25        A.    I TRIED TO.                            07:04:55
```

EXHIBIT __17__

PAGE __338__

307

```
 1        Q.    AND WHAT DO YOU MEAN BY "TRIED TO"?

 2        A.    IT'S TOO MUCH LEGALESE.  I -- I CAN'T

 3   DECIPHER SOME OF.  IT'S TOO CRYPTIC FOR ME.

 4        Q.    WHAT, IF ANYTHING, DO YOU RECALL WAS THE

 5   REACTION AMONG YOUR COLLEAGUES IN THE DESIGN CENTER      07:05:09

 6   TO BRATZ WHEN THEY FIRST HEARD ABOUT IT?

 7        MR. ZELLER:  THE QUESTION IS VAGUE.

 8        THE DEPONENT:  THERE WAS A LOT OF BUZZ ABOUT

 9   IT, BECAUSE CARTER WAS RELATED -- BECAUSE IT WAS

10   RELATED TO CARTER.  SO PEOPLE WERE TALKING.             07:05:24

11            THE SAME -- THE SAME THING HAPPENED WITH

12   ELON DANCER WHEN SHE DID BETTY SPAGHETTY.

13            ANYTIME SOMEONE THAT WORKED AT MATTEL

14   WENT OUT AND, YOU KNOW, PRODUCED A TOY OR

15   SOMETHING, THERE WAS A BIG BUZZ GOING ON.               07:05:38

16   BY MR. PLEVAN:

17        Q.    DO YOU RECALL SPECIFIC INDIVIDUALS THAT

18   YOU RECALL REFER TO THE FACT THAT THEY THOUGHT

19   CARTER HAD BEEN THE DESIGNER?  AND I'M FOCUSING NOW

20   ON THE TIME IN 2001, AT OR ABOUT THE TIME YOU FIRST     07:05:50

21   LEARNED ABOUT BRATZ.

22        A.    2001, WHICH WOULD HAVE BEEN BEFORE I LEFT

23   MATTEL.  IT WAS COMMON KNOWLEDGE AMONG THE

24   DESIGNERS THAT HE DID IT, HE PROBABLY DID IT.

25        Q.    DO YOU REMEMBER ANY SPECIFIC INDIVIDUALS     07:06:03
```

EXHIBIT _____

PAGE  339

308

```
 1    YOU HAD THAT KIND OF A DISCUSSION WITH?

 2         A.    I KNOW ROXANNA POWELL AND I TALKED ABOUT

 3    IT, BILL GREENING AND I TALKED ABOUT IT, JANET

 4    BLASER AND I TALKED ABOUT IT.

 5              CASSIDY ASKED ME.  CASSIDY PARK CAME OUT       07:06:29

 6    AND ASKED ME IF I -- IF I KNEW IF CARTER HAD DONE

 7    IT OR NOT, DONE THE BRATZ OR NOT.

 8         Q.    WHAT WAS CASSIDY PARK'S POSITION AT THAT

 9    TIME?

10         A.    I BELIEVE SHE WAS A V.P.                     07:06:40

11         Q.    I'M SORRY?

12         A.    VICE PRESIDENT.

13         Q.    VICE PRESIDENT IN WHAT AREA?

14         A.    BARBIE MAIN LINE.

15         Q.    NOW, WHEN YOU WERE IN MISSOURI -- AND I      07:06:48

16    THINK YOU SAID ON THAT TRIP ACROSS COUNTRY --

17         A.    YES.

18         Q.    -- AND YOU GOT SNOWED IN?

19         A.    YES.

20         Q.    AND YOU HAD -- I THINK YOU TESTIFIED YOU     07:07:02

21    HAD A DISCUSSION WITH MR. BRYANT AT THAT TIME ABOUT

22    HIS ROLE IN BRATZ?

23         A.    YES.

24         Q.    DID HE TELL YOU NOT TO TELL ANYBODY?

25         A.    NO.                                          07:07:13
```

EXHIBIT _____

PAGE _____

309

1          Q.     DURING THE PERIOD OF TIME YOU WERE AT

2     MATTEL, WAS THERE, FROM TIME TO TIME, LAYOFFS OF A

3     NUMBER OF INDIVIDUAL EMPLOYEES?

4          A.     CONSTANTLY.

5          Q.     "CONSTANTLY" MEANING ONCE EVERY YEAR?        07:07:27

6     ONCE EVERY TWO YEARS?

7          A.     ABOUT ONCE EVERY -- YEAH, ONCE EVERY TWO

8     YEARS.

9          Q.     AND DID THAT ENGENDER A -- SORT OF A

10    FEELING THAT YOU NEVER KNEW WHEN YOU WOULD BE GONE?     07:07:37

11         MR. ZELLER:   THE QUESTION IS OVERBROAD, LACKS

12    FOUNDATION, AND VAGUE.

13         THE DEPONENT:   THE FASTER THEY HAPPENED, THE

14    MORE MORALE PLUNGED.   IF THEY WERE SPREAD OUT LIKE

15    OVER TWO, THREE YEARS, IT KIND OF -- IT WENT AWAY.      07:07:53

16    BUT WHEN THEY WERE LIKE EVERY -- WHEN THEY WERE

17    HAPPENING EVERY YEAR AND WE WERE CONSTANTLY GETTING

18    OVER -- OUR LEADERSHIP OVERHEAD WAS CHANGING,

19    ABSOLUTELY.

20    BY MR. PLEVAN:                                          07:08:06

21         Q.     WHAT PERIOD OF TIME WAS THAT THAT WE'RE

22    TALKING ABOUT WHEN IT HAPPENED MORE FREQUENTLY --

23         A.    IT SEEMED --

24         Q.     IF I COULD FINISH.

25              -- MORE FREQUENTLY AND THERE WAS A MORALE     07:08:10

EXHIBIT _____ 17

PAGE _____ 341        310

BY MR. PLEVAN:

    Q.    DID HE DO ANY FACE PAINTING?

    A.    I DON'T KNOW.

    Q.    JUST GIVE ME ONE SECOND.

    A.    OKAY.                   07:11:37

    MR. PLEVAN:  I HAVE NO FURTHER QUESTIONS.


                  EXAMINATION

BY MR. WERDEGAR:

                            07:12:06

    Q.    HELLO, MS. CLOONAN.

    A.    HELLO.

    Q.    I'M MATT WERDEGAR.  WE MET EARLIER TODAY.

AND I'M ONE OF CARTER BRYANT'S ATTORNEYS IN THIS

LITIGATION.

        I JUST HAVE A COUPLE MORE QUESTIONS FOR    07:12:13

YOU, AND THEN WE'LL -- WE'LL LET YOU GO.

        JUST A MOMENT AGO MR. PLEVAN WAS ASKING

YOU ABOUT PEOPLE THAT YOU WERE AWARE OF AT MATTEL

BACK IN THE 2001 TIME FRAME, WHEN YOU FIRST LEARNED

ABOUT BRATZ, AND YOU -- YOU TESTIFIED THAT IT WAS    07:12:27

COMMON KNOWLEDGE IN THE DESIGN CENTER.

        DO YOU RECALL THAT LINE OF QUESTIONING?

    A.    YES.

    Q.    AND YOU MENTIONED A COUPLE NAMES, AND

THEN THERE WAS SOME FOLLOW-UP QUESTIONING ABOUT A    07:12:35

EXHIBIT _____ 17

```
 1   CASSIDY PARK.

 2            I JUST WANTED TO MAKE SURE YOU HAD NAMED

 3   ALL THE NAMES THAT YOU -- YOU REMEMBER NOW OF

 4   PEOPLE THAT YOU RECALL SPEAKING TO ABOUT THE FACT

 5   THAT CARTER BRYANT MAY HAVE BEEN INVOLVED IN THE          07:12:49

 6   CREATION OF BRATZ BACK IN THAT TIME FRAME.

 7        MR. ZELLER:  THE QUESTION IS VAGUE AS TO "BACK

 8   IN THAT TIME FRAME."

 9   BY MR. WERDEGAR:

10        Q.    AND, AGAIN, JUST TO BE CLEAR, THE TIME        07:12:55

11   FRAME I'M TALKING ABOUT IS BACK IN THE 2001 TIME

12   FRAME WHEN YOU TESTIFIED YOU FIRST -- FIRST BECAME

13   AWARE OF BRATZ.

14        A.    TOWARDS THE END OF 2001, I THINK IT WAS

15   COMMON KNOWLEDGE, THROUGHOUT THE DESIGN CENTER, OF       07:13:06

16   PEOPLE THAT KNEW CARTER.  I --

17            (PUBLIC ADDRESS SYSTEM INTERRUPTION.)

18        THE DEPONENT:  THAT'S OBNOXIOUS.

19            I MEAN, I REMEMBER HAVING CONVERSATIONS

20   ABOUT IT WITH ROXANNA POWELL, BILL GREENING, AND         07:13:30

21   JANET BLASER, BECAUSE I REMEMBER THEM CONSTANTLY

22   GOING "COME ON, COME ON, YOU KNOW, YOU KNEW HIM,

23   YOU HAD TO HAVE KNOWN SOMETHING."

24            BUT, YOU KNOW, LILY AND I -- LILY AND I

25   KNEW ABOUT -- LILY KNEW ABOUT -- I TALKED ABOUT          07:13:45
```

| | |
|---|---|
| 1 | LILY WITH IT.  BILL MARTINEZ, WHO ALSO KNEW CARTER. |
| 2 | WHO ELSE?  MICHAEL HASTEY.  ROBERT BEST.  THAT'S |
| 3 | PRIMARILY THE PEOPLE THAT I KNEW AND CARTER KNEW. |
| 4 | CASSIDY, ANN DRISCOLL.  I REMEMBER |
| 5 | TALKING ABOUT JOE FRANKE WITH IT, TOO, BECAUSE HE |
| 6 | WAS MY MOTHER'S -- MY MOTHER HAD REPORTED TO HIM. |
| 7 | SO WE WOULD TALK EVERY SO OFTEN. |
| 8 | THAT'S ALL I CAN REALLY RECALL THE TOP OF |
| 9 | MY HEAD HAVING -- YOU KNOW, IN PASSING, THEM ASKING |
| 10 | ME JUST -- I GUESS JUST TRYING TO CONFIRM WITH ME |
| 11 | IF CARTER HAD REALLY DONE IT, DONE THE BRATZ. |
| 12 | BY MR. WERDEGAR: |
| 13 | Q.    SO GENERALLY THESE CONVERSATIONS PEOPLE |
| 14 | WERE APPROACHING YOU AND ASKING YOU -- |
| 15 | A.    IS IT -- |
| 16 | Q.    -- HEY, I'VE HEARD CARTER WAS INVOLVED IN |
| 17 | THIS, IS IT -- IS IT TRUE? |
| 18 | A.    YES. |
| 19 | Q.    WHAT DID YOU -- BEYOND THAT, DID YOU AND |
| 20 | LILY TALK AT ALL ABOUT BRATZ BACK IN THAT TIME |
| 21 | FRAME AGAIN, WHEN YOU -- WHEN YOU FIRST LEARNED |
| 22 | ABOUT BRATZ FROM THE WEBSITE IN 2001? |
| 23 | A.    WELL, WE KNEW SOMETHING -- SOMETHING WAS |
| 24 | UP, LIKE WE WEREN'T SURE EXACTLY WHAT WAS UP. |
| 25 | BECAUSE SOMEONE HAD TAKEN HER DRAWING DOWN IN HER |

Timestamps:
07:14:55
07:15:20
07:15:30
07:15:39
07:15:57

316

EXHIBIT    17

PAGE _____ 344

1   OFFICE.  BUT WE HADN'T RELATED THAT TO THE BRATZ.

2          BUT LATER WHEN THEY ASKED HER TO PULL OUT

3   THE TOON TEENS, WE WERE WONDERING IF SOMETHING

4   WAS -- SOMETHING WAS UP.

5          AND THEN ON MY LEAVING, WITH CASSIDY

6   SAYING THAT TO ME, IT KIND OF JUST CLINKED IT IN MY

7   HEAD THAT SOMETHING WAS GOING ON.

8      Q.    AND, AGAIN, THIS IS ALL IN -- CAN YOU PUT

9   A TIME WINDOW ON THE EVENTS YOU'RE JUST DESCRIBING

10  WITH RESPECT TO TOON TEENS?

11     A.    IT -- IT HAPPENED TOWARDS THE END OF

12  2001, IT WAS -- BECAUSE BY THE TIME 2002 ROLLED

13  AROUND, I WAS KIND OF ON MY WAY OUT OF MATTEL,

14  MENTALLY, PHYSICALLY, AND EVERY WAY POSSIBLE.

15         SO THIS -- THIS STUFF -- I REALLY

16  REMEMBER THIS STUFF HAPPENED TOWARDS THE END --

17  TOWARDS THE END OF 2001.  AND JUST BEING SICK AND

18  TIRED OF HEARING IT, ALL OF IT.

19     Q.    THEN YOU MENTIONED THAT AT ONE POINT IN

20  TIME YOU HEARD FROM LILY THAT THEY HAD COME AND

21  ASKED -- ASKED -- ASKED HER TO PULL -- EXCUSE ME --

22  COME AND ASKED HER TO PULL TOON TEENS BACK.

23         WHO IS THE "THEY" YOU'RE REFERRING TO?

24     MR. ZELLER:  I OBJECT TO THE PREDICATE,

25  MISCHARACTERIZES THE WITNESS 'S TESTIMONY.

07:16:15

07:16:32

07:16:53

07:17:06

07:17:21

317

EXHIBIT 17

PAGE 345

1       THE DEPONENT:  SHE WAS REFERRING TO CASSIDY.

2   CASSIDY IS THE ONE THAT ASKED HER TO COME AND

3   GET -- BRING IT OVER TO LEGAL.

4   BY MR. WERDEGAR:

5       Q.    TO MATTEL LEGAL?                          07:17:30

6       A.    YES.

7       Q.    AND DO YOU -- DID LILY KNOW -- AS FAR AS

8   YOU KNOW, DID LILY CONVEY TO YOU OF ANY

9   UNDERSTANDING AS TO WHY THEY WANTED HER TO DO THAT?

10      A.    NO.  WE -- WELL, WE THOUGHT IT WAS IN      07:17:39

11  RELATION TO THE BRATZ.  BECAUSE THERE WERE SO MUCH

12  GOING ON.  THINGS WERE -- THERE WERE JUST LITTLE

13  TICKERS GOING ON AT THE TIME.

14      LIKE I SAID, WITH CASSIDY ASKED -- IF

15  CASSIDY ASKED -- IF CASSIDY HADN'T ASKED ME, I      07:17:54

16  WOULDN'T HAVE THOUGHT ABOUT IT, REALLY.  BUT IT

17  WAS -- IT WAS LIKE -- THE PICTURE CAME DOWN ON HER

18  WALL, CASSIDY ASKED ME ABOUT CARTER, THEN SHE HAD

19  TO PULL TOON TEENS OUT.  IT WAS JUST LIKE ALL THOSE

20  LITTLE THINGS KIND OF -- I DON'T KNOW --            07:18:12

21  SOMETHING -- WE KNEW SOMETHING WAS UP, WE JUST

22  WEREN'T SURE WHAT.

23      MR. WERDEGAR:  WHERE ARE WE IN TIME?

24      THE VIDEOGRAPHER:  13 MINUTES LEFT.

25      MR. WERDEGAR:  13 MINUTES LEFT?                 07:18:24

318

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0070
EXHIBIT _D_

PAGE ___○4__