**EXHIBIT 24**



Deposition
Exhibit 717

EXHIBIT 24

PAGE 521

**EXHIBIT 25**

Deposition
Exhibit
719

EXHIBIT 25

PAGE 522

BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdoffice.com

**EXHIBIT 26**

Deposition
Exhibit
722

EXHIBIT 20

PAGE 523

**EXHIBIT 27**



Deposition
Exhibit
725

EXHIBIT 77

PAGE 524

**EXHIBIT 28**



TOP OF HEAD

ROOTING LINE / SEPERATION LINE

ACTUAL PROPORTION

ACTUAL SIZE
10"

0,7
3, 1/0
2.52
1.47

310) 530 -3615

**ATTORNEY'S EYES ONLY**

BRYANT 00278

EXHIBIT ___28___

PAGE ___525___

**EXHIBIT 29**

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   MATTHEW M. WERDEGAR - #200470
5  mwerdegar@kvn.com
   JOHN E. TRINIDAD - #250468
6  jtrinidad@kvn.com
   AUDREY WALTON-HADLOCK- #250574
7  awaltonhadlock@kvn.com
   710 Sansome Street
8  San Francisco, CA  94111-1704
   Telephone: (415) 391-5400
9  Facsimile:  (415) 397-7188

10 Attorneys for Plaintiff
   CARTER BRYANT

11

12                    UNITED STATES DISTRICT COURT

13                   CENTRAL DISTRICT OF CALIFORNIA

14                         EASTERN DIVISION

15

16 CARTER BRYANT, an individual,         Case No. CV 04-09049 SGL (RNBx)
                                         (consolidated with CV 04-9059 & 05-
17                     Plaintiff,        2727

18      v.                               CARTER BRYANT'S SECOND
                                         SUPPLEMENTAL RESPONSES TO
19 MATTEL, INC. a Delaware               MATTEL, INC'S REVISED
   Corporation,                          FOURTH SET OF
20                                       INTERROGATORIES

21                     Defendant.        Judge:    Hon. Stephen G. Larson

22 CONSOLIDATED WITH MATTEL,             HIGHLY CONFIDENTIAL –
   INC., v. BRYANT and MGA               ATTORNEYS' EYES ONLY
23 ENTERTAINMENT, INC. v.
   MATTEL, INC.

24

25

26 PROPOUNDING PARTY:      MATTEL, INC.
                                              EXHIBIT ___29___
27 RESPONDING PARTY:       CARTER BRYANT

28 SET NO.:                FOUR (REVISED) PAGE ___S26___

                                         1-28

409873.01

1 performed by Bryant while he was working for Mattel or that Bryant adopts or

2 agrees with any fact or legal conclusion assumed, presumed or contained in any of

3 Mattel's interrogatories.

4     21.    Bryant objects to each of Mattel's interrogatories because Mattel has

5 propounded more than 50 interrogatories, including discrete subparts. Under

6 Judge Larson's order of February 22, 2007, "Interrogatories are limited to 50 for

7 each side for both [Case Nos. CV 04-04049-SGL and CV 05-02727]."

8     **22.**    The above stated objections are incorporated by reference as though

9 fully set forth in each response below. Subject to the existing Protective Order and

10 without waiving any of the foregoing objections, Bryant responds as follows:

11

12             **SPECIFIC RESPONSES AND OBJECTIONS**

13 **INTERROGATORY NO. 42:**

14     State all facts that support YOUR contention, if YOU so contend, that any

15 BRATZ DOLLS are not BASED ON BRATZ DESIGNS created by BRYANT on

16 or before October 19, 2000, and IDENTIFY all PERSONS with knowledge of such

17 facts and all DOCUMENTS that REFER OR RELATE TO such facts.

18 **RESPONSE TO INTERROGATORY NO. 42:**

19     Bryant incorporates by reference his general objections. Bryant objects that

20 this interrogatory is an overbroad and unduly burdensome contention interrogatory

21 to the extent it asks for "every fact" which supports the denial of a statement or

22 allegation. *See, e.g., Safeco of Am. v. Rawstron,* 181 F.R.D. 441, 447-48 (C.D.

23 Cal. 1998) (rejecting discovery requests seeking "all facts, documents, and

24 witnesses that support the denial of a statement or allegation of fact" because the

25 "universe of potentially responsive information is almost endless.").

26     Bryant also objects to this interrogatory on the ground that it is overbroad,

27 unduly burdensome, vague and ambiguous both generally and specifically with

28 respect to the terms IDENTIFY and REFER OR RELATE TO. Bryant also

CARTER BRYANT'S SECOND SUPPLEMENTAL RESPONSES TO
MATTEL, INC'S REVISED FOURTH SET OF INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT   29

PAGE   527

1   objects to this interrogatory as overbroad, unduly burdensome, vague and

2   ambiguous generally and specifically with respects to the terms BASED ON,

3   BRATZ DOLLS, and BRATZ DESIGNS.  In addition, Bryant objects to this

4   interrogatory to the extent it calls for the disclosure of attorney-client privileged

5   information, information protected from disclosure by the work-product doctrine,

6   the joint defense privilege or the common interest privilege.  Bryant also objects to

7   this interrogatory generally and specifically with respect to the term BASED ON to

8   the extent it calls for a legal conclusion.  Bryant also objects to this interrogatory to

9   the extent it calls for the premature disclosure of expert opinions or analysis.

10   Bryant further objects to the extent that this interrogatory seeks information that is

11   outside Bryant's personal knowledge and is not in Bryant's possession, custody, or

12   control.  In particular, Bryant objects to this interrogatory to the extent that it

13   requests that Bryant "[s]tate *all* facts ... and IDENTIFY *all* PERSONS...and *all*

14   DOCUMENTS."  (emphasis added).

15       Bryant objects to this interrogatory because Mattel has propounded more

16   than 50 interrogatories.  Under Judge Larson's order of February 22, 2007,

17   "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-04049

18   SGL and CV 05-02727]."

19   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 42:**

20       Bryant incorporates by reference his general objections.  Bryant objects that

21   this interrogatory is an overbroad and unduly burdensome contention interrogatory

22   to the extent it asks for "every fact" which supports the denial of a statement or

23   allegation.  *See, e.g., Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D.

24   Cal. 1998) (rejecting discovery requests seeking "all facts, documents, and

25   witnesses that support the denial of a statement or allegation of fact" because the

26   "universe of potentially responsive information is almost endless.").

27       Bryant also objects to this interrogatory on the ground that it is overbroad,

28   unduly burdensome, vague and ambiguous both generally and specifically with

7

CARTER BRYANT'S SECOND SUPPLEMENTAL RESPONSES TO
MATTEL, INC'S REVISED FOURTH SET OF INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _____29_____

PAGE _____528_____

1 respect to the terms IDENTIFY and REFER OR RELATE TO.  Bryant also

2 objects to this interrogatory as overbroad, unduly burdensome, vague and

3 ambiguous generally and specifically with respects to the terms BASED ON,

4 BRATZ DOLLS, and BRATZ DESIGNS.  In addition, Bryant objects to this

5 interrogatory to the extent it calls for the disclosure of attorney-client privileged

6 information, information protected from disclosure by the work-product doctrine,

7 the joint defense privilege or the common interest privilege.  Bryant also objects to

8 this interrogatory generally and specifically with respect to the term BASED ON to

9 the extent it calls for a legal conclusion.  Bryant also objects to this interrogatory to

10 the extent it calls for the premature disclosure of expert opinions or analysis.

11 Bryant further objects to the extent that this interrogatory seeks information that is

12 outside Bryant's personal knowledge and is not in Bryant's possession, custody, or

13 control.  In particular, Bryant objects to this interrogatory to the extent that it

14 requests that Bryant "[s]tate *all* facts … and IDENTIFY *all* PERSONS…and *all*

15 DOCUMENTS." (emphasis added).

16      Bryant objects to this interrogatory because Mattel has propounded more

17 than 50 interrogatories.  Under Judge Larson's order of February 22, 2007,

18 "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-04049

19 SGL and CV 05-02727]."

20      Subject to, and without waiver of, the foregoing objections, Bryant responds

21 as follows:

22      The first generation of Bratz dolls, first "reduced to practice" and first

23 expressed in a tangible medium after October 20, 2000, and all subsequent Bratz

24 dolls, differ markedly and significantly from the drawings or designs completed by

25 Bryant prior to October 20, 2000.  First, with respect to the three-dimensional

26 "dummy" to which Bryant referred at his deposition, it had no material

27 resemblance to the first generation of Bratz dolls.  Second, with respect to Bryant's

28 drawings, Bryant notes that two-dimensional drawings do not translate into three-

8

CARTER BRYANT'S SECOND SUPPLEMENTAL RESP[...]
MATTEL, INC'S REVISED FOURTH SET OF INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

PAGE _____ 530

1    dimensional dolls without original, creative effort. Third, there are recognizable

2    and material differences in the total overall look and feel of the first generation of

3    Bratz dolls compared to Bryant's drawings completed prior to October 20, 2000.

4    Fourth there are recognizable and material differences in the individual elements of

5    the first generation of Bratz dolls compared to Bryant's drawings completed prior

6    to October 20, 2000, including, but not limited to, with respect to the following:

7    hair styles; hair colors; facial expressions; depiction of noses; eye art; extent of

8    detail of eye art; lip art; eyebrow art; proportions of the bodies; posture; spatial

9    arrangement of hands, wrists and arms; and proportions and spatial arrangements

10   of the eyes, noses, and mouths. Additional details regarding such differences will

11   be the subject of expert disclosures and will be provided at a later time consistent

12   with the Court's orders regarding the disclosure of expert opinions.

13          The following persons have knowledge of the facts and circumstances

14   regarding the foregoing: Isaac Larian, Carter Bryant; Margaret Leahy; Veronica

15   Marlow; Anna Rhee; Mercedeh Ward; Sarah Halpern; Paula Treantafellas

16   (Garcia); Steve Tarmichael; Rebecca Harris; Cecilia Kwok; David Dees; Jesse

17   Ramirez; Sam Wong; Edmond Lee; Steven Lee; Aileen Storer; Eric Yip; Leon

18   Djiguerian; Rachel Harris; Maggie Siu; Ben Ton; Samuel Wong; Ray Wong;

19   Steffan Smith; and Samir Khare.

20          The following documents may be relevant to these facts: all

21   "DOCUMENTS" that refer to or evidence the work performed by MGA

22   employees, contractors, and freelancers, including Bryant, toward the reduction to

23   practice of the first generation of Bratz dolls during the period after October 19,

24   2000 through June 1, 2001, including but not limited to: (i) documents showing

25   the development of the first generation of Bratz dolls; (ii) documents showing

26   exchanges with the Hong Kong factory regarding the development of the first

27   generation of Bratz dolls; (iii) documents showing the timing of the development

28   of packaging, fashion, and accessories for the first generation of Bratz dolls; (iv)

9

409873.01

CARTER BRYANT'S SECOND SUPPLEMENTAL RESPONSES TO
MATTEL, INC'S REVISED FOURTH SET OF INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

29

PAGE _____ 531

1   documents related to the January 2001 Hong Kong toy fair; (v) documents related

2   to the February 2001 New York toy fair; (vi) polyurethane samples of prototypes;

3   (vii) rotocasts and sculpts in Hong Kong; and (viii) invoices submitted from Carter

4   Bryant, Veronica Marlow, Anna Rhee, and Victoria O'Connor, and other invoices

5   submitted for freelance work performed on the Bratz project.  The documents

6   evidencing this work, including the categories of documents (i) – (viii)

7   summarized above, number in the tens of thousands and are too numerous to

8   identify individually.

9        As stated above, this interrogatory calls for the disclosure of expert opinions

10  and analysis, although expert discovery has not yet been completed and disclosure

11  of expert opinions and analysis would be premature.  Accordingly, Bryant reserves

12  the right to supplement his response to this interrogatory at a later time consistent

13  with the Court's orders regarding the disclosure of expert opinions.

14  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 42:**

15       Bryant incorporates by reference his general objections.  Bryant objects that

16  this interrogatory is an overbroad and unduly burdensome contention interrogatory

17  to the extent it asks for "every fact" which supports the denial of a statement or

18  allegation.  *See, e.g., Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D.

19  Cal. 1998) (rejecting discovery requests seeking "all facts, documents, and

20  witnesses that support the denial of a statement or allegation of fact" because the

21  "universe of potentially responsive information is almost endless.").

22       Bryant also objects to this interrogatory on the ground that it is overbroad,

23  unduly burdensome, vague and ambiguous both generally and specifically with

24  respect to the terms IDENTIFY and REFER OR RELATE TO.  Bryant also

25  objects to this interrogatory as overbroad, unduly burdensome, vague and

26  ambiguous generally and specifically with respects to the terms BASED ON,

27  BRATZ DOLLS, and BRATZ DESIGNS.  In addition, Bryant objects to this

28  interrogatory to the extent it calls for the disclosure of attorney-client privileged

10

409873.01

EXHIBIT   29

PAGE   533

1   information, information protected from disclosure by the work-product doctrine,

2   the joint defense privilege or the common interest privilege.  Bryant also objects to

3   this interrogatory generally and specifically with respect to the term BASED ON to

4   the extent it calls for a legal conclusion.  Bryant also objects to this interrogatory to

5   the extent it calls for the premature disclosure of expert opinions or analysis.

6   Bryant further objects to the extent that this interrogatory seeks information that is

7   outside Bryant's personal knowledge and is not in Bryant's possession, custody, or

8   control.  In particular, Bryant objects to this interrogatory to the extent that it

9   requests that Bryant "[s]tate *all* facts … and IDENTIFY *all* PERSONS…and *all*

10  DOCUMENTS."  (emphasis added).

11         Bryant objects to this interrogatory because Mattel has propounded more

12  than 50 interrogatories.  Under Judge Larson's order of February 22, 2007,

13  "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-04049

14  SGL and CV 05-02727]."

15         Subject to and without waiving the foregoing objections, Bryant provides his

16  Second Supplemental Response as follows:

17         The first generation of Bratz dolls, first "reduced to practice" and first

18  expressed in a tangible medium after October 20, 2000, and all subsequent Bratz

19  dolls, differ markedly and significantly from the drawings or designs completed by

20  Bryant prior to October 20, 2000.  First, with respect to the three-dimensional

21  "dummy" to which Bryant referred at his deposition, it had no material

22  resemblance to the first generation of Bratz dolls.  Second, with respect to Bryant's

23  drawings, Bryant notes that two-dimensional drawings do not translate into three-

24  dimensional dolls without original, creative effort.  Third, there are recognizable

25  and material differences in the total overall look and feel of the first generation of

26  Bratz dolls compared to Bryant's drawings completed prior to October 20, 2000.

27  Fourth there are recognizable and material differences in the individual elements of

28  the first generation of Bratz dolls compared to Bryant's drawings completed prior

11

409873.01

CARTER BRYANT'S SECOND SUPPLEMENTAL RESPONSES TO
MATTEL, INC'S REVISED FOURTH SET OF INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

29

PAGE _____ 533

1   to October 20, 2000, including, but not limited to, with respect to the following:

2   hair styles; hair colors; facial expressions; depiction of noses; eye art; extent of

3   detail of eye art; lip art; eyebrow art; proportions of the bodies; posture; spatial

4   arrangement of hands, wrists and arms; and proportions and spatial arrangements

5   of the eyes, noses, and mouths.  Additional details regarding such differences will

6   be the subject of expert disclosures and will be provided at a later time consistent

7   with the Court's orders regarding the disclosure of expert opinions.

8         The following persons have knowledge of the facts and circumstances

9   regarding the foregoing:  Isaac Larian, Carter Bryant; Margaret Leahy; Veronica

10  Marlow; Anna Rhee; Mercedeh Ward; Sarah Halpern; Paula Treantafellas

11  (Garcia); Steve Tarmichael; Rebecca Harris; Cecilia Kwok; David Dees; Jesse

12  Ramirez; Sam Wong; Edmond Lee; Steven Lee; Aileen Storer; Eric Yip; Leon

13  Djiguerian; Rachel Harris; Maggie Siu; Ben Ton; Samuel Wong; Ray Wong;

14  Steffan Smith; and Samir Khare.

15        The following documents may be relevant to these facts:  all

16  "DOCUMENTS" that refer to or evidence the work performed by MGA

17  employees, contractors, and freelancers, including Bryant, toward the reduction to

18  practice of the first generation of Bratz dolls during the period after October 19,

19  2000 through June 1, 2001, including but not limited to:  (i) documents showing

20  the development of the first generation of Bratz dolls; (ii) documents showing

21  exchanges with the Hong Kong factory regarding the development of the first

22  generation of Bratz dolls; (iii) documents showing the timing of the development

23  of packaging, fashion, and accessories for the first generation of Bratz dolls; (iv)

24  documents related to the January 2001 Hong Kong toy fair; (v) documents related

25  to the February 2001 New York toy fair; (vi) polyurethane samples of prototypes;

26  (vii) rotocasts and sculpts in Hong Kong; and (viii) invoices submitted from Carter

27  Bryant, Veronica Marlow, Anna Rhee, and Victoria O'Connor, and other invoices

28  submitted for freelance work performed on the Bratz project.

CARTER BRYANT'S SECOND SUPPLEMENTAL RESPONSES TO
MATTEL, INC'S REVISED FOURTH SET OF INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

29

PAGE _____ 534

1    Bryant also further identifies all persons and documents identified by MGA

2    in its responses to this interrogatory and interrogatories on related subject matter,

3    including any future supplemental responses.  Although Bryant lacks personal

4    knowledge of many factual statements in MGA's interrogatory responses, and is

5    still completing his analysis of the matters stated in MGA's responses (particularly

6    in light of Mattel's production of roughly half a million documents at the end of

7    the discovery period), Bryant also reserves the right to rely on all factual

8    statements in MGA's responses to this interrogatory and interrogatories on related

9    subject matter, including any future supplemental responses by MGA.

10    As stated above, this interrogatory calls for the disclosure of expert opinions

11    and analysis, although expert discovery has not yet been completed and disclosure

12    of expert opinions and analysis would be premature.  Accordingly, Bryant reserves

13    the right to supplement his response to this interrogatory at a later time consistent

14    with the Court's orders regarding the disclosure of expert opinions.

15    **INTERROGATORY NO. 43:**

16    For each concept, design, product, product packaging or other matter that

17    YOU contend MATTEL copied or infringed, including but not limited to those

18    identified in MGA's Responses To Mattel, Inc.'s First Set Of Interrogatories Re

19    Claims Of Unfair Competition, Response To Interrogatory No. 2 (and any

20    Supplemental Responses to such Interrogatory), state the date that each such

21    concept, design, product, product packaging or other matter was conceived, and

22    IDENTIFY all PERSONS with knowledge of, and all DOCUMENTS that REFER

23    OR RELATE TO, the foregoing.

24    **RESPONSE TO INTERROGATORY NO. 43:**

25    Bryant incorporates by reference his general objections.  Bryant objects to

26    this interrogatory on the grounds that it is overbroad, unduly burdensome, vague

27    and ambiguous, and compound both generally and specifically with respect to the

28    terms YOU, IDENTIFY, MATTEL, and REFER OR RELATE TO.  In addition,

409873.01

EXHIBIT _29_

PAGE _535_

1  possession, custody, or control.  In particular, Bryant objects to this interrogatory

2  to the extent that it that it requests that Bryant "IDENTIFY *all* PERSONS...and *all*

3  DOCUMENTS" (emphasis added).

4     Bryant objects to this interrogatory because Mattel has propounded more

5  than 50 interrogatories.  Under Judge Larson's order of February 22, 2007,

6  "Interrogatories are limited to 0 for each side for both [Case Nos. CV 04-04049-

7  SGL and CV 05-02727]."

8     Subject to, and without waiver of, the foregoing objections, Bryant responds

9  as follows.  Bryant incorporates by reference MGA Entertainment, Inc's Response

10  to Interrogatory No. 44, and any and all supplemental responses thereto.  Although

11  Bryant lacks personal knowledge of many factual statements in MGA's

12  interrogatory responses, and is still completing his analysis of the matters stated in

13  MGA's responses (particularly in light of Mattel's production of roughly half a

14  million documents at the end of the discovery period), Bryant reserves the right to

15  rely on all factual statements in MGA's responses to this interrogatory and

16  interrogatories on related subject matter, including any future supplemental

17  responses by MGA.  Bryant also identifies all persons and documents identified by

18  MGA in its responses to this interrogatory and interrogatories on related subject

19  matter, including any future supplemental responses.

20  Dated:  January 28, 2008                    KEKER & VAN NEST, LLP

21

22

23  By:  _____
                                   CHRISTA M. ANDERSON
24                                 Attorneys for Plaintiff
                                   CARTER BRYANT
25

26

27

28

409873.01

EXHIBIT  29

PAGE  536

PROOF OF SERVICE

1

2      I am employed in the City and County of San Francisco, State of California

3   in the office of a member of the bar of this court at whose direction the following
    service was made.  I am over the age of eighteen years and not a party to the within

4   action.  My business address is Keker & Van Nest, LLP, 710 Sansome Street, San

5   Francisco, California  94111.

6   On January 28, 2008, I served the following document(s):

7      **CARTER BRYANT'S SECOND SUPPLEMENTAL RESPONSES TO**

8      **MATTEL, INC'S REVISED FOURTH SET OF INTERROGATORIES**

9

10  by **FEDERAL EXPRESS**, by placing a true and correct copy in a sealed envelope
    addressed as shown below.  I am readily familiar with the practice of Keker & Van

11  Nest, LLP for correspondence for delivery by FedEx Corporation.  According to
    that practice, items are retrieved daily by a FedEx Corporation employee for

12  overnight delivery.

13
    by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and
14  correct copy scanned into an electronic file in Adobe "pdf" format.  The
    transmission was reported as complete and without error.
15

16  John B. Quinn                          Thomas J. Nolan
17  Michael T. Zeller                      Skadden Arps Slate Meagher & Flom
    Quinn Emanuel Urquhart Oliver &        300 South Grand Avenue, Suite 3400
18  Hedges, LLP                            Los Angeles, CA 90071-3144
19  865 South Figueroa Street, 10th Floor  Tel:   213/687-5000
    Los Angeles, CA  90017-2543            Fax:   213/687-5600
20  Tel:   213/443-3000                    Email:  tnolan@skadden.com
21  Fax:   213/443-3100
    Email:  johnquinn@quinnemanuel.com
22  Email:  michaelzeller@quinnemanuel.com

23
    Alexander H. Cote
24  Overland Borenstein Scheper & Kim LLP
25  300 S. Grand Avenue, Suite 2750
    Los Angeles, California 90071
26  Tel:   213/613-4660
27  Fax:  213/613-4656
    Email :     acote@obsklaw.com
28

396359.01

EXHIBIT _____ 2 9

PAGE _____ 5 3 7

1    Executed on January 28, 2008, at San Francisco, California.

2    I declare under penalty of perjury under the laws of the State of California

3    that the above is true and correct.

4    _____
     JULIE A. SELBY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT                    29

PAGE                    538

**EXHIBIT 30**

*Final*

**MGA ENTERTAINMENT**
16730 Schoenborn Street
North Hills, California 91343

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

**1.     Retention as Consultant/Services:** MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

**2.     Term/Exclusivity:** The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

**3.     Ownership:**

(a)     All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire", and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

[00006662.DOC/2 / 10/04/2000  03:05 PM]

1

ATTORNEY'S EYES ONLY

BRYANT 00794


DEPOSITION EXHIBIT

15

11·5·04          SH

**EXHIBIT D**
**PAGE 24**

patents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute. Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, all such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents. If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)     Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine. Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.     Compensation/Costs:

(a)     For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of five thousand five hundred dollars ($5,500.00) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of five thousand dollars ($5,000.00) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)     MGA shall pay to Bryant a royalty of three percent (3%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services. As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances). MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00008562.DOC/2710/04/2009  03:05 PM}

2

ATTORNEY'S EYES ONLY

BRYANT 00795

and binding on Bryant, shall constitute an account stated, and shall not be subject to any question for any reason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to MGA within two (2) years after the date rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA  in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)     All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent.  In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)     Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis.  Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable).  MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)     MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales.  MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell.  Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant.  Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.     **Warranties and Indemnity**:  Bryant represents, warrants and agrees that:

(a)     he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)     neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)     the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

{00006682.DOC/2 / 10/04/2000  03:05 PM}

3

ATTORNEY'S EYES
ONLY                    BRYANT 00796

patents, copyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property rights;

(d)     he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

(e)     he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.     **Default/Termination:**

(a)     In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

(b)     Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.     **Confidentiality:**

(a)     Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

(b)     Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

(c)     Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

[00006662.DOC/2 / 10/04/2000 03:05 PM]

4

ATTORNEY'S EYES ONLY

BRYANT 00797

EXHIBIT 0
PAGE 27

entitled to equitable relief in the nature of injunction and to all other available relief, at law and/or in equity.

8.    **Notices:**  All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time. All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid. Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 160th Street, Gardena, California 90247.

9.    **Independent Contractor/No Partnership/Third Party Beneficiary:** Bryant's relationship with MGA is that of an independent contractor. Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name. Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties. In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship. Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise. This Agreement shall not be construed to be for the benefit of any third party.

10.    **Services Rendered Deemed Special, etc.:** Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.    **General Provisions:**

(a)    This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law. Any such assignment shall not relieve such Party of its obligations hereunder.

(b)    The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

(c)    A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof. All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

(d)    Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

{00006662.DOC/2 / 10/04/2000  03:05 PM}

5

ATTORNEY'S EYES ONLY

BRYANT 00798

EXHIBIT  D
PAGE 28

Use

**EXHIBIT 31**

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain polices, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

### 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

### 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees at my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research of development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

### 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

### 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement may be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

_Carter H. Bryant_  
Employee Signature

MATTEL, INC.  
by _Teresa Newcomb_  
Signature

CARTER H. BRYANT  
Employee Name (print)

TERESA NEWCOMB  
Name of Witness (print)

01/04/99  
Date

M 0001596



DEPOSITION EXHIBIT

EXHIBIT 31

PAGE 545

**EXHIBIT 32**

## CONFLICT OF INTEREST QUESTIONNAIRE

*BRYANT, CARTER H.*      *PROJECT DESIGNER*
Name (Last, First, M.I.)          Job Title          Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflict of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel Competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES ● NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES ● NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES ● NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES ○ NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES ○ NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES ● NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES ● NO   7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES ● NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES ● NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

*4, 5, freelance design + artwork in 1998, from appx. 5/98 - 11/98. for the Ashton Drake galleries.*

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

*Carter H. Bryant*                              *01/04/98*
Signature                                        Date

M 0001621



EXHIBIT _____ 32

PAGE _____ 546

**EXHIBIT 33**

## Employee Confidential Information and Inventions Agreement

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment by the Company and other good and valuable consideration, I agree that:

1. *Provisions Related to Trade Secrets.*

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including any formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information of the Company, its customers, suppliers, joint venturers, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time, either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

2. *Ownership of Inventions.*

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time and in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provisions of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

M 0001638

DEPOSITION EXHIBIT 23

EXHIBIT 33
PAGE 541

3.   Conflicts with Other Activities.

(a)   My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or the future business plans of the Company.

(b)   My employment with the Company and my compliance with this Agreement do not and will not breach any agreement to keep in confidence information acquired by me prior to or outside of my employment with the Company. I have not brought and will not bring with me to the Company for use in the performance of my duties at the Company any materials, documents or information of a former employer or any third party that are not generally available to the public unless I have obtained express written authorization from the owner for their possession and use by or for the Company. I have not entered into, and will not enter into, any agreement, either oral or written, in conflict with this Agreement.

4.   Miscellaneous.

(a)   My obligations under this Agreement may not be modified or terminated, in whole or in part, except in a writing signed by a Vice-President of the Company. Any waiver by the Company of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b)   Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c)   My obligations under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d)   I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e)   Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f)   This Agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g)   This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.

_____
Employee Signature

MATTEL, INC.

By _____

CARTER H. BRYANT
_____
Employee Name   (print)

I. NEWCOMB
_____
Name of Witness   (print)

11/6/95
_____
Date

M 0001639

EXHIBIT _____ 33

PAGE _____ 548

**EXHIBIT 34**

# EMPLOYMENT APPLICATION

Mattel is an equal opportunity and affirmative action employer. It is our policy to develop and promote solely on the basis of ability.

**GENERAL DATA**

*BRYANT, CARTER H.*                     Redacted                    *01/01/99*

Name (Last, First, M.I.)                 Social Security Number        Date of Application

|                    |                    |
Address                                  Telephone Number         Pager Number

City, State, Zip Code

Are you legally authorized to work in the U.S.? Legal documentation proving identity and work authorization must be presented after any employment offer and before beginning work. Persons without proper documentation may not begin work.  ● YES  ○ NO

*PROJECT DESIGNER*          ● YES  ○ NO                          *11/95 — 04/98*

Position desired                   Have you ever been employed by Mattel?                    If yes, when?

Are there any reasons that would prevent you from:   Working Overtime  ○ YES  ● NO      Overnight Travel  ○ YES  ● NO

Will you accept part time work?  ○ YES  ● NO    Are you available for all shifts?  ● YES  ○ NO

Desired Salary *60K*    How did you learn of job openings at Mattel?  ○ Newspaper  ○ Mattel Employee  ○ Agency  ○ Other___
                                                          *N/A*

**MILITARY** (if applicable)

Branch of U.S. Military Service          Date of Discharge                          Nature of Discharge

If dishonorable, then explain

**MEDICAL**

Are you able to perform the essential functions of the position for which you are applying?  ● YES  ○ NO

If applicable, what reasonable accommodations do you request?

**CIVIL STATUS**

Have you ever been convicted of any offense other than a traffic violation (exclude those for which the record has been judicially expunged, sealed or eradicated)?  ○ YES  ● NO
(Marijuana offenses over 2 years old may be omitted)

If yes, please explain

Conviction of a crime is not an automatic bar from employment. All circumstances such as age at time of offense and nature of violation will be considered.

**EDUCATION**

*APPLE VALLEY HIGH, APPLE VALLEY, CA      1983–1987*

High School                     Address

*OTIS COLLEGE OF ART/DESIGN      LOS ANGELES, CA*          *FASHION DESIGN*

College                         Address                              Degree earned and major

College                         Address                              Degree earned and major

Graduate School                 Address                              Degree earned and major

Other (include special or technical training and military courses completed)

Special Training, Skills, Activities, Foreign Language Capabilities
For administrative positions:

Typing speed (wpm)      Shorthand (wpm)      Software Applications

CONFIDENTIAL-
ATTORNEYS' EYES ONLY

M 0001611

**EMPLOYMENT HISTORY** Starting with the present, list all jobs during the past ten years. Account for all periods of unemployment and military service.

| Company Name | Address (Street, City, State, Zip Code) | | Telephone Number |
|---|---|---|---|
| MATTEL | 333 CONTINENTAL BLVD EL SEGUNDO CA 90245 | | (310) 252-2000 |
| Date Started to Date Ended | Job Title | Final Salary | ● YES ○ NO Eligible for Rehire? |
| 11/95 – 04/98 | DESIGNER | 45K | |
| Reason for leaving | Supervisor Name | | Title |
| FREELANCING | CASSIDY PARK | | SENIOR STAFF DESIGNER |
| Description of Job Duties | | | |
| BARBIE PRELIM DESIGNER | | | |

| Company Name | Address (Street, City, State, Zip Code) | | Telephone Number |
|---|---|---|---|
| CHESBRO MUSIC CO. | 327 BROADWAY IDAHO FALLS, ID 83404 | | |
| Date Started to Date Ended | Job Title | Final Salary | ● YES ○ NO Eligible for Rehire? |
| 01/93 – 11/93 | SALES | $5.75 HRLY | |
| Reason for leaving | Supervisor Name | | Title |
| ATTENDED COLLEGE | DALE | | |
| Description of Job Duties | | | |
| SET-UP OF GUITARS FOR RESALE, ALSO MUSIC FLOOR SALES | | | |

| Company Name | Address (Street, City, State, Zip Code) | | Telephone Number |
|---|---|---|---|
| CINEMARK | 2210 E. PALMDALE BLVD PALMDALE CA 93550 | | |
| Date Started to Date Ended | Job Title | Final Salary | ● YES ○ NO Eligible for Rehire? |
| 10/90 – 07/92 | BOX ATTENDANT | $5.25 HR | |
| Reason for leaving | Supervisor Name | | Title |
| MOVED WITH FAMILY TO IDAHO | TERRI | | MANAGER |
| Description of Job Duties | | | |
| SALES OF THEATRE TICKETS | | | |

| Company Name | Address (Street, City, State, Zip Code) | | Telephone Number |
|---|---|---|---|
| FEDERAL EXPRESS | WOODLEY AVE, VAN NUYS, | | |
| Date Started to Date Ended | Job Title | Final Salary | ● YES ○ NO Eligible for Rehire? |
| 03-90 – 09/90 | COURIER | $6.80 HR | |
| Reason for leaving | Supervisor Name | | Title |
| COULD NO LONGER COMMUTE | ? DON'T RECALL | | |
| Description of Job Duties | | | |
| ORGANIZE & DELIVER DAILY PACKAGE DELIVERY ROUTE | | | |

**BUSINESS REFERENCE** List three individuals for whom you have worked that we may contact as business references.

May we contact your current employer? ○ YES ○ NO N/A

| Name | Company | Address | Telephone Number |
|---|---|---|---|
| CASSIDY PARK | MATTEL INC | 333 CONTINENTAL BLVD EL SEGUNDO CA 90245 | (310) 252-3451 |
| PATRICIA JANSON | MATTEL INC | 333 CONTINENTAL BLVD EL SEGUNDO CA 90245 | (310) 252-4832 |
| DIANA PENA | | 1920 PINE AVE MANHATTAN BEACH, CA 90266 | |

**IMPORTANT INFORMATION: DO NOT SIGN THIS FORM UNLESS YOU ARE WILLING TO AGREE TO THE FOLLOWING TERMS AND LIMITATIONS:**

1. I authorize investigation of all statements contained in this application and I certify that this information is true and correct. I release Mattel, and my former employers, and all others, from any liability for damage which may result from such investigation. Any falsification or omission of material information from this application or in any other employment documents, may result in a denial of an offer or, if the individual is hired, termination of employment.

2. I acknowledge that my answer with respect to citizenship is given under penalty of perjury pursuant to section 16209 .3 of the Regulations under the California Labor Code.

3. Following receipt of a job offer, and upon request at any time during the course of my employment, I will submit to medical evaluation(s) by a Company-designated physician or medical clinic. I shall further consent to the release of any medical evaluation results to the Company for purposes of ascertaining my fitness for duty.

4. I agree, if employed, to conform to the guidelines and regulations of Mattel, as revised from time to time, and agree that those guidelines and regulations do not constitute an employment contract.

5. Apart from the above mentioned guidelines and regulations, I understand and agree that either Mattel or I may terminate my employment at any time and that I can be demoted, reassigned or transferred by the Company, with or without notice, for any reason and with or without cause. Mattel and I hereby acknowledge there are no oral or written sole agreements concerning this term of my employment. Mattel and I further agree that neither of us has made any representations contrary to this term of my employment. Mattel and I agree, and intend that, this paragraph be the final and complete expression of the agreement between of us regarding the circumstances under which my employment may be terminated. Mattel and I agree that the provisions of this paragraph may not be modified by either party acting alone, nor may they be modified orally, by implied agreement or by course of conduct, but rather only through an express written agreement signed by me and the Chief Executive Officer of Mattel.

Signature: _(signature)_                Date: 01/04/99

CONFIDENTIAL-
ATTORNEYS' EYES ONLY

M 0001612

EXHIBIT F
PAGE 43

**EXHIBIT 35**



# Teen Skipper™

by Scott Arend

It's Skipper doll's 33rd birthday, and in the usual limited life span of toys, that makes her something of a legend. During that time she's had five face lifts, a new body, two boyfriends, several cars, a boat and a horse. She's perfected her athletic skills on roller skates, teeter boards, sleds and in the ice skating rink, while still finding time to babysit, act as a flower girl or bridesmaid in dozens of weddings and be elected Homecoming Queen. In spite of these triumphs—she's never really gotten to grow up—until now. 1997 is the year that Barbie doll's little sister, Skipper, finally becomes a real teen-ager. Teen Skipper has grown an additional two inches, has a new body style, face mold, hairstyle, clothes, a hip new attitude and is officially 16 years old. Available since May, Teen Skipper and her friends, Nikki and Courtney, are cute, cool and catching the interest of vintage and new doll collectors—an unusual surprise for a doll designed as part of the children's play line.

An adult-figured doll with breasts was still a radical idea to many parents in the early 1960s, and their children were not allowed to play with the Barbie doll. Mattel appealed to this group of parents and kids with the introduction of Skipper, Barbie doll's little sister. Only 9" tall and lacking the full-figured body of Barbie doll, Skipper was approximately 7-10 years of age. The sis-ter connection between the two dolls was firmly

BRYANT 00943          CONFIDENTIAL

EXHIBIT 35

PAGE 551



established by Mattel through the use of companion outfits. All 10 of Skipper doll's original 1964 ensembles and 8 of the 12 ensembles from 1965, coordinated with Barbie doll's wardrobe.

Skipper doll's success can be measured by the profusion of ensembles she received and by the world of friends that was soon added for her. Although she continued to be involved in many activities younger children enjoyed, such as giving tea parties and jumping rope, her wardrobe reflected the eye-popping influences of mod fashion. Wild colors, prints, patterns and accessories definitely made her the coolest pre-teen in toydom.

The first head mold for Skipper doll was used exclusively through

*Teen Skipper, left, as she appears on store shelves  if you like Skipper, chances are you will love friends Nikki and Courtney. Below  Talented fashion illustrator Carter Bryant prepared these preliminary sketches of this new teen doll*

1978, and occasionally between 1978 and 1984. This original doll was superseded by "Super Teen Skipper" who was introduced in 1979 and, by following the lead of the Superstar Barbie, had a smiling face. Although a teen-ager, she still had the shapeless body of her predecessor, and was meant to be about 13 years old. Not too popular with kids, she underwent cosmetic surgery again for another smiling debut in 1985 as Hot Stuff Skipper. Looking rather demonic, the doll was as unpopular as the one she replaced, and a new look was again developed.

Radically different from the earlier versions, the fourth incarnation of Skipper doll, introduced in 1988, had a large head and a flatter, cartoon-like face. She resembled the humans prevalent in Japanese animation, and was somewhat similar to the Takara Jenny doll with her big eyes and small, closed mouth. Although her make over included a new body with small breasts, the doll looked very childlike. She had a wide age range with younger activities reflected in Pet Pals Skipper and Babysitter Skipper, as well as older teen-aged activities such as Homecoming Queen and Teen Sweetheart. Whatever age she portrayed, she was extremely appealing to children, and over two dozen versions of this doll were created, including the first introduction of an African American Skipper.

A revamped, smiling Skipper doll, who appeared to be 12 or 13 years of age, was introduced in 1995. Her head size was smaller and she didn't have the large painted eyes used over the past seven years, but she still seemed to be at an awkward



38 *Barbie Bazaar*

"Cool Streaks Nikki"

BRYANT 00944

EXHIBIT 35

PAGE 552

CONFIDENTIAL