07:15:07  1    ARE ENTITLED TO SOME TIME WITH THIS WITNESS, BUT THE

07:15:10  2    ORDER IS THAT SHE BE PRODUCED FOR AN ADDITIONAL

07:15:13  3    14 HOURS, AND I CAN'T MAKE HER STAY LATER.  I'D

07:15:15  4    AGAIN ASK YOU TO YIELD TO ME NOW, AND IF NOT,

07:15:21  5    RESERVE MY RIGHTS TO OBJECT TO THE USE OF THE

07:15:23  6    TRANSCRIPT.

07:15:24  7    BY MR. ZELLER:

07:15:25  8         Q.   I'M GOING TO SHOW YOU WHAT'S BEEN MARKED

07:15:26  9    AS EXHIBIT 606 PREVIOUSLY.

07:15:28  10        MS. TORRES:  I TAKE IT THAT MEANS HE'S NOT

07:15:30  11   GOING TO YIELD THE TIME.

07:15:33  12        MR. PAGE:  I'M GETTING THAT, YES.

07:16:05  13   BY MR. ZELLER:

07:16:06  14        Q.   DO YOU HAVE EXHIBIT 606 IN FRONT OF YOU?

07:16:07  15        A.   YES.

07:16:09  16        Q.   DIRECTING YOUR ATTENTION TO THE SECOND

07:16:10  17   PAGE OF EXHIBIT 606, DO YOU RECOGNIZE THIS AS AN

07:16:12  18   INVOICE THAT VERONICA MARLOW SENT YOU IN CONNECTION

07:16:15  19   WITH THE BRATZ PROJECT ON OR ABOUT NOVEMBER 14TH,

07:16:18  20   2000?

07:16:21  21        A.   YES.

07:16:22  22        Q.   YOU'LL SEE IN THE "DESCRIPTION" FIELD IT

07:16:24  23   SAYS:

07:16:25  24             "'BRATZ' DOLLS RESEARCH,

07:16:25  25   DEVELOPMENT AND SUPPORT SERVICES FROM

EXHIBIT    45

PAGE       696

1276

07:16:29  1       SEPTEMBER 29TH, 2000, TO OCTOBER 20TH,

07:16:32  2       2000."

07:16:33  3       A.   YES.

07:16:34  4       Q.   DO YOU HAVE ANY REASON TO DISPUTE OR DOUBT

07:16:38  5   THAT VERONICA MARLOW PERFORMED THE WORK THAT'S

07:16:41  6   LISTED HERE DURING THE TIME PERIOD SEPTEMBER 29TH,

07:16:46  7   2000, THROUGH OCTOBER 20TH, 2000?

07:17:14  8             THE DEPONENT:   CAN YOU PLEASE REPEAT THE

07:17:15  9   QUESTION?

         10             (THE DEPOSITION OFFICER READ THE

         11             RECORD AS FOLLOWS:

         12              "QUESTION:   DO YOU HAVE ANY REASON

         13             TO DISPUTE OR DOUBT THAT VERONICA

         14             MARLOW PERFORMED THE WORK THAT'S

         15             LISTED HERE DURING THE TIME PERIOD

         16             SEPTEMBER 29TH, 2000, THROUGH

         17             OCTOBER 20TH, 2000?")

07:17:37 18             THE DEPONENT:   NO.

07:17:39 19   BY MR. ZELLER:

07:17:42 20       Q.   DIRECTING YOUR ATTENTION TO THE NEXT LINE

07:17:43 21   ITEM OF THIS INVOICE -- OR THE FIRST LINE ITEM,

07:17:46 22   ACTUALLY, WHERE IT SAYS SHE SPENT 18 HOURS,

07:17:48 23   "BRAINSTORM AND DEVELOPMENT MEETINGS."  DO YOU SEE

07:17:52 24   THAT?

07:17:52 25       A.   YES.

EXHIBIT ___45___

PAGE ___697___

1277

1            <u>DEPOSITION OFFICER'S CERTIFICATE</u>

2

3   STATE OF CALIFORNIA       )

                             )    SS.

4   COUNTY OF ORANGE        )

5

6      I, J'ANA SIEGERS, HEREBY CERTIFY:

7      I AM A DULY QUALIFIED CERTIFIED SHORTHAND

8 REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

9 CERTIFICATE NUMBER CSR 10845 ISSUED BY THE COURT

10 REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL

11 FORCE AND EFFECT. [FED. R. DIV. P. 28(A)].

12      I AM AUTHORIZED TO ADMINISTER OATHS OR

13 AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

14 PROCEDURE, SECTION 2093(B) AND PRIOR TO BEING

15 EXAMINED, THE DEPONENT WAS FIRST DULY SWORN BY ME.

16 [FED. R. CIV. P. 28(A), 30(F)(1)].

17      I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY OR

18 COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE

19 OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, NOR AM I

20 FINANCIALLY INTERESTED IN THIS ACTION.

21 [FED. R. CIV. P. 28].

22      I AM THE DEPOSITION OFFICER THAT

23 STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

24 FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS

25 A TRUE RECORD OF THE TESTIMONY GIVEN BY THE

EXHIBIT _____ 45

PAGE _____ 698

1328

1  DEPONENT.  [FED. R. CIV. P. 30(F)(1)].

2      BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

3  THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF

4  REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

5  PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

6  ARE APPENDED HERETO.  [FED. R. CIV. P. 30(E)].

7

8

9  DATED:  OCTOBER 23, 2007.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT __45__

PAGE __699__                    1329

**EXHIBIT 46**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., A DELAWARE CORPORATION,

         PLAINTIFF,

       V.

CARTER BRYANT, AN INDIVIDUAL, AND DOES 1 THROUGH 10, INCLUSIVE,

         DEFENDANTS.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO.  CV 04-9059 DDP (AJWX)

# C O N F I D E N T I A L

## ATTORNEYS' EYES ONLY

### (PAGES 1 - 83, 125 - 159, 166 - 168, 173 - 180, 203 - 216)

# DEPOSITION OF VICTORIA O'CONNOR

# DECEMBER 6, 2004

REPORTED BY:
PAULA A. PYBURN
CSR. NO. 7304
JOB NO. 04AE373-PP

EXHIBIT _____ 44

PAGE _____ 700



COURT REPORTERS
700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4
    MATTEL, INC., A DELAWARE    )
 5  CORPORATION,                )
                                )
 6          PLAINTIFF,          )
                                )
 7      VS.                     )    NO. CV 04-9059 DDP
                                )        (AJWX)
 8  CARTER BRYANT, AN           )
    INDIVIDUAL, AND DOES 1      )
 9  THROUGH 10, INCLUSIVE,      )
                                )
10          DEFENDANTS.         )
   _____)
11                              )
    AND RELATED                 )
12  CROSS-ACTION.               )
   _____)
13
14              C O N F I D E N T I A L
15       (PURSUANT TO STIPULATED PROTECTIVE ORDER,
     THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL)
16
17    (PAGES 1-83, PAGES 125-159, PAGES 166-168, PAGES
               173-180 AND PAGES 203-216)
18
19  DEPOSITION OF VICTORIA O'CONNOR, TAKEN ON BEHALF OF
20  THE PLAINTIFF AND CROSS-DEFENDANT AT 865 SOUTH
21  FIGUEROA STREET, 10TH FLOOR, LOS ANGELES,
22  CALIFORNIA, COMMENCING AT 9:46 A.M., MONDAY,
23  DECEMBER 6, 2004, BEFORE PAULA A. PYBURN, CSR 7304,
24  RPR.
25
```

2

EXHIBIT ___46___

PAGE ___701___

```
 1    APPEARANCES OF COUNSEL:
 2
 3    FOR THE PLAINTIFF AND CROSS-DEFENDANT:
 4        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
          BY:   JOHN B. QUINN, ESQ.
 5                   AND
                MICHAEL T. ZELLER, ESQ.
 6                   AND
                TANIA KREBS, ESQ.
 7        865 SOUTH FIGUEROA STREET, 10TH FLOOR
          LOS ANGELES, CALIFORNIA 90017-2543
 8        (213) 443-3000
 9
10    FOR THE DEFENDANTS AND CROSS-COMPLAINANT:
11        LITTLER MENDELSON
          BY:   KEITH A. JACOBY, ESQ.
12        2049 CENTURY PARK EAST, 5TH FLOOR
          LOS ANGELES, CALIFORNIA 90067-3107
13        (310) 553-0308
14
15    FOR DEFENDANT IN INTERVENTION, MGA ENTERTAINMENT:
16        O'MELVENY & MEYERS LLP
          BY:   DIANA M. TORRES, ESQ.
17        400 SOUTH HOPE STREET
          LOS ANGELES, CALIFORNIA 90071-2899
18        (213) 430-6000
19
20    ALSO PRESENT:
21        RICHARD DANIELS, MGA SENIOR COUNSEL
          MICHAEL MOORE, MATTEL SENIOR COUNSEL
22        SHERRI MULFORD, VIDEOGRAPHER
          JILL E. THOMAS, MATTEL ASSISTANT GENERAL COUNSEL
23
24
25
```

3

EXHIBIT 46

PAGE 702

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4
    MATTEL, INC., A DELAWARE    )
 5  CORPORATION,                )
                                )
 6          PLAINTIFF,          )
                                )
 7      VS.                     )   NO. CV 04-9059 DDP
                                )          (AJWX)
 8  CARTER BRYANT, AN           )
    INDIVIDUAL, AND DOES 1      )
 9  THROUGH 10, INCLUSIVE,      )
                                )
10          DEFENDANTS.         )
    _____)
11                              )
    AND RELATED                 )
12  CROSS-ACTION.               )
    _____)
13
14            C O N F I D E N T I A L
15      (PURSUANT TO STIPULATED PROTECTIVE ORDER,
     THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL)
16
17    (PAGES 1-83, PAGES 125-159, PAGES 166-168, PAGES
              173-180 AND PAGES 203-216)
18
19  DEPOSITION OF VICTORIA O'CONNOR, TAKEN ON BEHALF OF
20  THE PLAINTIFF AND CROSS-DEFENDANT AT 865 SOUTH
21  FIGUEROA STREET, 10TH FLOOR, LOS ANGELES,
22  CALIFORNIA, COMMENCING AT 9:46 A.M., MONDAY,
23  DECEMBER 6, 2004, BEFORE PAULA A. PYBURN, CSR 7304,
24  RPR.
25
```

2

EXHIBIT ___46___

PAGE ___701___

```
 1    GUESS, INC.   THEN IN FEBRUARY OF 1996 I BEGAN

 2    WORKING FOR MOSSIMO, INC., AND THEN IN 1998 I BEGAN

 3    WORKING FOR GIBSON OVERSEAS, INC., AND THEN STARTED

 4    WITH MGA IN 1999.

 5         Q.   AND SINCE MGA HAVE YOU BEEN EMPLOYED?          10:16AM

 6         A.   YES.

 7         Q.   AND WHAT HAS YOUR EMPLOYMENT BEEN SINCE

 8    THEN?

 9         A.   WARNER BROTHERS.

10         Q.   IS THAT WHERE YOU'RE EMPLOYED NOW?            10:16AM

11         A.   YES.

12         Q.   AND WHEN DID YOU JOIN WARNER BROTHERS?

13         A.   FEBRUARY 2003.

14         Q.   WHAT'S YOUR EDUCATIONAL BACKGROUND?

15         A.   I HAVE A BACHELOR OF ARTS DEGREE IN          10:16AM

16    PSYCHOLOGY.

17         Q.   FROM WHAT INSTITUTION?

18         A.   CALIFORNIA STATE LOS ANGELES.

19         Q.   AND WHAT YEAR DID YOU GET THAT?

20         A.   1994.                                        10:16AM

21         Q.   ANY DEGREES BEYOND THAT?

22         A.   NO.

23         Q.   SO YOU -- YOU -- WAS THERE A PERIOD OF TIME

24    WHERE YOU WERE BOTH GOING TO SCHOOL AND WORKING AT

25    GUESS?                                                 10:17AM
```

                                                                    32

EXHIBIT ___46___

PAGE___702.001

```
 1        A.    YES.

 2        Q.    WHAT POSITION DID YOU HAVE AT GUESS?

 3        A.    LICENSING MANAGER.

 4        Q.    AND AT MOSSIMO?

 5        A.    LICENSING MANAGER.                          10:17AM

 6        Q.    GIBSON -- IS IT OWNERS?

 7        A.    OVERSEAS.

 8        Q.    -- OVERSEAS?

 9        A.    SAME TITLE, LICENSING MANAGER.

10        Q.    BY THE WAY, WERE THESE POSITIONS ALL IN THE   10:17AM

11   LOS ANGELES AREA?

12        A.    MOSSIMO WAS IN IRVINE, CALIFORNIA.

13        Q.    THE OTHERS ALL IN THE IMMEDIATE LOS ANGELES

14   AREA?

15        A.    YES.                                         10:17AM

16        Q.    WHAT IS THE BUSINESS OF GIBSON OVERSEAS,

17   I'M NOT FAMILIAR WITH THAT FIRM?

18        A.    THEY ARE A HOUSEWARES MANUFACTURER.

19        Q.    AND WHAT DO YOU DO NOW AT WARNER BROTHERS?

20        A.    LICENSING.                                   10:17AM

21        Q.    ALL RIGHT.  SO IF WE CAN GO BACK TO THE

22   FIRST POSITION YOU HELD AT MGA AS LICENSING MANAGER,

23   COULD YOU TELL US WHAT YOUR DUTIES WERE IN THAT

24   POSITION.

25        A.    MY DUTIES WERE TO SEEK OUT PROPERTIES        10:18AM
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT _____ 46 _____

PAGE _____ 702.002 _____

```
 1        A.   YES.

 2        Q.   WHEN YOU FIRST STARTED AT MGA, WERE YOU THE

 3   ONLY LICENSING MANAGER?

 4        A.   YES.

 5        Q.   AND WHILE YOU WERE THERE, WERE THERE OTHER      10:19AM

 6   FOLKS WHO JOINED THE FIRM AS LICENSING MANAGERS OR

 7   IN A LICENSING CAPACITY?

 8        A.   YES.

 9        Q.   HOW MANY OTHER PEOPLE ARE WE TALKING ABOUT?

10        A.   BY THE TIME I LEFT, THERE WERE FIVE OTHERS      10:19AM

11   BESIDES MYSELF.

12        Q.   AND DID THEY -- THEY ALL JOIN AT DIFFERENT

13   TIMES DURING THE FOUR-YEAR PERIOD YOU WERE THERE?

14        A.   YES.

15        Q.   DO YOU RECALL THE NAMES OF -- OF THOSE FIVE     10:20AM

16   OTHER PEOPLE?

17        A.   YES.

18        Q.   COULD YOU SHARE THEM WITH US.

19        A.   YES.  LISA TAWIL, T-A-W-I-L, DANA

20   GOLDSTEIN, SHELLY SHIBATA, S-H-I-B-A-T-A, DIANA LUNA      10:20AM

21   AND SANDRINE DERASPIDE, D-E-R-A-S-P-I-D-E.

22        Q.   NOW, WITH RESPECT TO CARTER BRYANT AND THE

23   BRATZ PROPERTY, WERE YOU THE LICENSING MANAGER THAT

24   HAD PRINCIPAL RESPONSIBILITY FOR DEALING WITH THAT?

25        A.   YES.                                            10:21AM
```

35

EXHIBIT _____ 416

PAGE _____ 702.004

```
 1        Q.   DID ANY OF THE OTHER INDIVIDUALS WHO YOU'VE

 2   JUST IDENTIFIED WHO WORKED IN A LICENSING FUNCTION

 3   EVER HAVE ANY INVOLVEMENT IN -- IN DEALINGS WITH

 4   CARTER BRYANT OR BRATZ?

 5        A.   NO.                                        10:21AM

 6        Q.   WHILE YOU WERE AT MGA DID MGA EVER HAVE ANY

 7   DOLLS THAT WERE MGA PRODUCTS OTHER THAN THE --

 8   WHAT'S KNOWN AS THE BRATZ LINE?

 9        A.   WHAT KIND OF DOLLS ARE YOU REFERRING TO?

10        Q.   DOLLS LIKE KIDS PLAY WITH.                 10:21AM

11        A.   THERE'S LARGE DOLLS, FASHION DOLLS, SMALL

12   DOLLS.

13        Q.   OKAY.  ANY KIND OF DOLLS.  I'M TRYING TO

14   FIND OUT IF BRATZ WAS THE ONLY DOLL LINE THAT MGA

15   HAD, OR WHETHER THEY HAD SOME OTHER DOLLS THAT MIGHT  10:21AM

16   BE LARGE FASHION OR ANY KIND OF DOLL.

17        A.   YES.

18        Q.   WHAT OTHER KINDS OF DOLLS DID MGA HAVE AS

19   PRODUCTS WHILE YOU WERE THERE, BESIDES BRATZ?

20        A.   SPECIAL FEATURE DOLLS AND LARGE DOLLS.     10:22AM

21        Q.   SO ARE THESE SORT OF RECOGNIZED CATEGORIES

22   OF DIFFERENT KINDS OF DOLLS IN THE MARKETPLACE?

23        A.   YES.

24        Q.   HOW WOULD YOU DESCRIBE THE BRATZ DOLLS,

25   WHAT -- WHAT CATEGORY IN THE MARKETPLACE WOULD THEY   10:22AM
```

36

EXHIBIT _____ 46

PAGE _____ 702.005

1      A.   CORRECT.

2      Q.   DURING THE TIME -- DURING THE -- THE TIME

3   THAT YOU WERE A LICENSING DIRECTOR AND IN DOING THE

4   LICENSING ACTIVITIES THAT YOU DID, DID YOU BECOME

5   AWARE OF WHETHER OTHER COMPANIES HAD AGREEMENTS WITH      10:31AM

6   THEIR EMPLOYEES THAT PROVIDED THAT OTHER COMPANIES

7   WOULD OWN THE RIGHTS TO IDEAS OR PROPERTIES THAT

8   WERE DEVELOPED DURING THE COURSE OF THEIR EMPLOYEES'

9   EMPLOYMENT?

10     A.   I DON'T RECALL.                                  10:31AM

11     Q.   ONE WAY OR ANOTHER?

12     A.   RIGHT.

13     Q.   DID -- WERE THERE ANY FOLKS WHO WORKED AT

14   MGA WHO HAD FORMERLY BEEN EMPLOYED BY MATTEL?

15     A.   YES.                                             10:31AM

16     Q.   CAN YOU RECALL ANY OF THEIR NAMES?

17     A.   YES.

18     Q.   WHAT WOULD THOSE BE?

19     A.   PAULA TREANTAFELLES.  THAT'S ALL THAT I

20   RECALL.                                                 10:32AM

21     Q.   ALL RIGHT.  DID YOU EVER HEAR FROM ANY

22   SOURCE THAT PAULA HAD HAD SOME TYPE OF AGREEMENT

23   WITH -- WRITTEN AGREEMENT WITH MATTEL WHILE SHE

24   WORKED AT MATTEL?

25     A.   NO.                                              10:32AM

EXHIBIT  46

PAGE _____ 703

```
1        Q.   DID YOU EVER DISCUSS WITH PAULA WHETHER OR
2   NOT SHE HAD SUCH AN AGREEMENT?
3        A.   NO.
4        Q.   DID YOU EVER DISCUSS WITH PAULA WHETHER
5   MATTEL EMPLOYEES GENERALLY HAD THOSE TYPES OF          10:32AM
6   AGREEMENTS WITH MATTEL?
7        A.   I DON'T RECALL.
8        Q.   DO YOU RECALL EVER DISCUSSING THAT SUBJECT
9   WITH ANYBODY?  BY "THAT SUBJECT" I MEAN WHETHER OR
10  NOT MATTEL EMPLOYEES HAD AGREEMENTS WITH MATTEL.       10:32AM
11       A.   I DON'T RECALL.
12       Q.   YOU DON'T RECALL ONE WAY OR THE OTHER?
13       A.   CORRECT.
14       Q.   YOU MIGHT HAVE DONE IT -- YOU MIGHT HAVE
15  DISCUSSED THAT, YOU MIGHT NOT HAVE DISCUSSED IT; YOU   10:32AM
16  JUST DON'T RECALL?
17       A.   CORRECT.
18       Q.   WHEN DID YOU FIRST MEET CARTER BRYANT?
19       A.   I DON'T RECALL THE EXACT DAY.
20       Q.   WHAT WOULD BE THE BEST APPROXIMATION YOU     10:33AM
21  CAN GIVE US OF WHEN THAT WAS?
22       A.   EITHER -- MAYBE EITHER AUGUST OR EARLY
23  SEPTEMBER OF 2000 -- NO, 2- -- 2000.
24       Q.   IS THERE ANY WAY THAT YOU'RE AWARE OF THAT
25  YOU COULD NAIL DOWN THAT DATE ANY -- MORE              10:33AM
```

46

EXHIBIT  46

PAGE  704

1    SPECIFICALLY?

2        A.    IS THERE A WAY THAT I COULD?

3        Q.    YEAH.

4        A.    I MAY HAVE WRITTEN IT IN MY FRANKLIN

5    PLANNER AT THE TIME.                                    10:33AM

6        Q.    DO YOU STILL HAVE THE -- THE PAGES FROM

7    THAT PLANNER?

8        A.    IT'S AT MGA ENTERTAINMENT.

9        Q.    WAS THAT A PLANNER PROVIDED TO YOU BY MGA?

10       A.    YES.                                          10:34AM

11       Q.    AND YOU LEFT IT THERE WHEN YOU LEFT?

12       A.    YES.

13       Q.    IS THERE ANY OTHER PLACE WHERE YOU MIGHT

14   HAVE NOTED THE DATE OF THAT MEETING?

15       A.    NO.                                           10:34AM

16       Q.    WHAT WERE THE CIRCUMSTANCES OF THAT MEETING

17   WHEN YOU FIRST MET MR. BRYANT?

18       A.    I WAS TOLD THAT HE HAD A FASHION DOLL

19   CONCEPT THAT HE WANTED TO -- WAS INTERESTED IN

20   LICENSING.                                              10:34AM

21       Q.    AND THAT THERE WOULD BE A MEETING AND --

22   AND COULD YOU ATTEND?

23       A.    CORRECT.

24       Q.    BASICALLY THAT WOULD BE YOUR JOB, TO PURSUE

25   SOMETHING LIKE THAT?                                    10:34AM

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT 46

PAGE 705

1        A.    CORRECT.

2        Q.    AND WHO WAS IT WHO TOLD YOU THAT HE HAD A

3    FASHION DOLL CONCEPT THAT HE WAS INTERESTED IN

4    LICENSING?

5        A.    PAULA TREANTAFELLES.                          10:34AM

6        Q.    AND CAN YOU TELL US APPROXIMATELY HOW LONG

7    BEFORE THE MEETING ACTUALLY TOOK PLACE THAT SHE GAVE

8    YOU THIS INFORMATION?

9        A.    I DON'T RECALL.

10       Q.    IS -- DO YOU RECALL WHETHER OR NOT THE DATE    10:35AM

11   OF THE MEETING HAD ALREADY BEEN SET UP AT THE TIME

12   THAT YOU WERE FIRST TOLD ABOUT THIS?

13       A.    YES.

14       Q.    AND HAD IT BEEN?

15       A.    YES.                                           10:35AM

16       Q.    YOU -- YOU RESPONDED SO PRECISELY, I JUST

17   WANT TO MAKE SURE I UNDERSTAND WHAT YOU'RE SAYING.

18            SO PAULA HAD MADE AN APPOINTMENT TO MEET

19   WITH CARTER BRYANT, AND BASICALLY TOLD YOU THIS

20   MEETING IS SET UP FOR THIS PURPOSE AND THIS IS         10:35AM

21   WITHIN YOUR JOB AREA AND -- AND CAN YOU ATTEND?

22       A.    YES.

23            MS. TORRES:  OBJECTION.  MISSTATES THE

24   WITNESS'S TESTIMONY.

25   ///                                                     10:35AM

48

EXHIBIT 46

PAGE 706

1    BY MR. QUINN:

2        Q.   DID I MISSTATE IT?  BECAUSE I DON'T WANT

3    MISSTATED IT.  IS WHAT I SAID TRUE?  IF IT ISN'T --

4        A.    THERE -- THERE WAS -- A MEETING DATE SET;

5    SHE REQUESTED THAT I ATTEND.                         10:35AM

6        Q.    ALL RIGHT.  WHEN SHE TOLD YOU THIS, DID SHE

7    TELL YOU ANYTHING ELSE ABOUT MR. BRYANT OR THE

8    FASHION DOLL CONCEPT OR WHAT HE -- WHAT HE WAS

9    LOOKING FOR?

10       A.    I DON'T RECALL THE SPECIFIC CONVERSATION.    10:36AM

11       Q.    DO -- DID SHE TELL YOU WHETHER OR NOT SHE

12   HAD MET MR. BRYANT ALREADY?

13       A.    I DON'T RECALL.

14       Q.    DID YOU HAVE AN UNDERSTANDING THAT SHE HAD

15   ALREADY MET MR. BRYANT?                              10:36AM

16       A.    I DON'T THINK SO.  I KNOW SHE HAD NOT SEEN

17   THE CONCEPT BEFORE.

18       Q.    DID SHE DESCRIBE THE CONCEPT TO YOU AT ALL?

19       A.    NO, SHE HADN'T SEEN IT.

20       Q.    HOW WAS IT THAT YOU KNOW SHE HAD NOT SEEN    10:36AM

21   THE CONCEPT BEFORE?

22       A.    BECAUSE I TOLD HER BEFORE WE WENT IN, I

23   TOLD HER TO ACT A CERTAIN WAY WHEN HE SHOWED US THE

24   CONCEPT.

25       Q.    WHAT DID YOU TELL HER?                      10:36AM

49

EXHIBIT    46

PAGE    707

```
 1        A.    I TOLD HER --
 2        Q.    FALL OUT OF HER CHAIR?
 3        A.    NO, I TOLD HER NOT TO DO THAT.
 4        Q.    OKAY.  SO YAWN, YAWN WHEN HE SHOWS YOU?
 5        A.    PRETTY MUCH.                              10:36AM
 6        Q.    DID SHE EXPRESS IN ANY WAY ANY ENTHUSIASM
 7   OR EXCITEMENT ABOUT THE PROJECT?
 8        A.    YES.
 9        Q.    AND DO YOU RECALL HOW THAT ENTHUSIASM OR
10   EXCITEMENT DEMONSTRATED ITSELF?                       10:37AM
11        A.    I THINK SHE SHRIEKED AND DID SOMETHING LIKE
12   THIS (INDICATING), AND MAYBE SAID, "OH, MY GOD,"
13   WHEN SHE SAW THE CONCEPT.
14        Q.    WHEN SHE SAW THE CONCEPT IN THE MEETING?
15        A.    CORRECT.                                  10:37AM
16        Q.    WHEN YOU WERE PRESENT?
17        A.    CORRECT.
18        Q.    SHE DIDN'T FOLLOW YOUR ADVICE?
19        A.    NO, AND WE JOKED ABOUT THAT FOR QUITE SOME
20   TIME THEREAFTER.                                     10:37AM
21        Q.    SO IS IT FAIR TO SAY SHE LOVED IT?
22        A.    YES.
23        Q.    PRIOR TO THE MEETING, GOING BACK TO YOUR
24   DISCUSSION WITH HER PRIOR TO THE MEETING, DID SHE
25   EXPRESS TO YOU ANY INTEREST IN THE PROJECT?  I MEAN,  10:37AM
```

50

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT ___46___

PAGE ___708___

```
 1    I KNOW YOU HAD TOLD ME SHE HADN'T SEEN IT YET, BUT

 2    IN SOME WAY DID SHE EXPRESS TO YOU THAT THIS IS

 3    SOMETHING WE'RE INTERESTED IN OR ANYTHING LIKE THAT?

 4        A.    SHE WAS INTERESTED IN ENTERING INTO THE

 5    CATEGORY.                                           10:37AM

 6        Q.    OKAY.  FASHION DOLLS?

 7        A.    CORRECT.

 8        Q.    IS THAT SOMETHING THAT MGA HAD BEEN TRYING

 9    TO GET INTO?

10        A.    YES.                                      10:37AM

11        Q.    FOR HOW LONG?

12        A.    I DON'T KNOW.

13        Q.    AT THAT POINT YOU WERE AWARE THAT MGA HAD

14    BEEN TRYING TO GET INTO THE FASHION DOLL CATEGORY?

15        A.    CORRECT.                                  10:38AM

16        Q.    HOW LONG HAD YOU BEEN AWARE THAT THEY WERE

17    TRYING TO GET INTO THAT CATEGORY?

18        A.    I DON'T REMEMBER.

19        Q.    MORE THAN A YEAR?

20              MR. JACOBY:  OBJECTION.  LACKS FOUNDATION. 10:38AM

21    BY MR. QUINN:

22        Q.    I'M JUST ASKING ABOUT YOUR OWN AWARENESS.

23        A.    I WOULD SAY --

24        Q.    YOU'RE THE ONLY ONE WHO'D KNOW.

25        A.    -- LESS THAN A YEAR.                       10:38AM
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT 4

PAGE 709

1        Q.    OKAY.  SO HAD YOU LOOKED AT ANY OTHER

2    FASHION DOLL CONCEPTS BEFORE YOU LOOKED AT BRATZ?

3        A.    I DON'T RECALL.

4        Q.    WHAT WAS PAULA'S POSITION AT MGA?

5        A.    AT WHICH TIME?                              10:38AM

6        Q.    AT THE TIME YOU HAD THIS -- THIS FIRST

7    MEETING WITH MR. BRYANT.

8        A.    SHE -- SHE WAS A PRODUCT MANAGER.

9        Q.    AND WHAT IS IT THAT A PRODUCT MANAGER DOES

10   OR DID AT MGA?                                        10:38AM

11       A.    PRODUCT MANAGER DEVELOPS THE PRODUCTS,

12   HELPS TO MARKET THE PRODUCT.

13       Q.    BEFORE THIS -- BEFORE PAULA TALKED TO YOU

14   ABOUT MEETING WITH MR. BRYANT, HAD YOU EVER EVEN

15   HEARD OF CARTER BRYANT?                               10:39AM

16       A.    NO.

17       Q.    AND DID YOU HAVE AN UNDERSTANDING AS TO

18   WHETHER OR NOT PAULA HAD PREVIOUSLY MET MR. BRYANT,

19   OR WAS THIS WAS HER FIRST MEETING WITH HIM TOO?

20       A.    I -- I DON'T RECALL.                        10:39AM

21       Q.    DO YOU HAVE AN UNDERSTANDING WHETHER OR NOT

22   ANYBODY AT MGA HAD PREVIOUSLY MET WITH MR. BRYANT?

23       A.    I DON'T RECALL.

24       Q.    SO AS FAR AS YOUR MEMORY GOES RIGHT NOW,

25   THE FIRST MEMORY -- THE FIRST MEETING YOU'RE AWARE    10:39AM

52

EXHIBIT __46__

PAGE ___710___

1    OF THAT TOOK PLACE BETWEEN ANY REPRESENTATIVE OF MGA

2    AND MR. BRYANT WAS THIS MEETING THAT YOU ATTENDED?

3         A.   CORRECT.

4         Q.   WHO ATTENDED THIS MEETING BESIDES YOU AND

5    PAULA?                                              10:40AM

6         A.   NO ONE.

7         Q.   SO THREE PEOPLE?

8         A.   YES.

9         Q.   COULD YOU PLEASE TELL US APPROXIMATELY HOW

10   LONG THE MEETING LASTED.                            10:40AM

11        A.   MAYBE 30 MINUTES.

12        Q.   AND WHERE DID THE MEETING TAKE PLACE?

13        A.   IN ISAAC LARIAN'S OFFICE.

14        Q.   I ASSUME THAT'S MGA'S CHIEF PLACE OF

15   BUSINESS?                                           10:40AM

16        A.   CORRECT.

17        Q.   AND WHERE WAS THAT AT THE TIME?

18        A.   THE PHYSICAL ADDRESS?

19        Q.   YES, PLEASE.

20        A.   16730 SCHOENBORN STREET,                  10:40AM

21   S-C-H-O-E-N-B-O-R-N, STREET, IN NORTH HILLS.

22        Q.   DID YOU KNOW AN INDIVIDUAL AT MGA BY THE

23   NAME OF VERONICA MARLOW?

24        A.   YES.

25        Q.   WHO WAS VERONICA MARLOW?                  10:40AM

53

EXHIBIT _____ 46

PAGE _____ 711

```
1        A.   SHE WAS A FREELANCE DESIGNER.

2        Q.   SO SHE -- IS IT TRUE THAT SHE WAS NOT AN

3   MGA EMPLOYEE?

4        A.   NO -- YES, IT'S TRUE SHE WAS NOT.

5        Q.   OKAY.  AND SHE -- SHE -- DID SHE DO           10:41AM

6   FREELANCE WORK, FREELANCE DESIGN WORK FOR MGA?

7        A.   I BELIEVE SO, BUT I DIDN'T DEAL DIRECTLY

8   WITH HER SO I CAN'T CONFIRM THAT.

9        Q.   ALL RIGHT.  AS YOU THINK ABOUT IT, WAS

10  VERONICA MARLOW PRESENT IN THIS MEETING WITH -- THIS    10:41AM

11  FIRST MEETING THAT YOU HAD WITH MR. BRYANT?

12       A.   I DON'T THINK SO.

13       Q.   DO YOU HAVE ANY UNDERSTANDING AS TO HOW

14  MR. BRYANT FIRST CAME TO BE PUT IN CONTACT WITH MGA?

15       A.   YES.                                          10:41AM

16       Q.   AND WHAT IS THAT?

17       A.   THROUGH VERONICA.

18       Q.   AND HOW IS IT THAT YOU KNOW THAT?

19       A.   BECAUSE THAT -- THAT'S WHAT WAS TOLD TO ME

20  BY PAULA.                                               10:41AM

21       Q.   DID PAULA TELL YOU THAT IN THAT FIRST

22  CONVERSATION WHERE SHE SAID THIS MEETING WAS COMING

23  UP?

24       A.   I DON'T REMEMBER WHEN SHE SAID IT.

25       Q.   DID YOU HAVE ANY UNDERSTANDING -- DID         10:42AM
```

54

EXHIBIT       46

PAGE          712

```
 1    ANYBODY GIVE YOU ANY INFORMATION AS TO HOW VERONICA

 2    HAPPENED TO KNOW MR. BRYANT?

 3         A.   I DON'T RECALL SPECIFICS.

 4         Q.   GENERALITIES?

 5         A.   I BELIEVE THEY WORKED TOGETHER.          10:42AM

 6         Q.   AT MATTEL?

 7         A.   YES.

 8         Q.   AND IS THAT SOMETHING THAT YOU LEARNED --

 9    THAT YOU KNEW AS OF THE TIME YOU HAD THIS FIRST

10    MEETING WITH MR. BRYANT?                           10:42AM

11         A.   YES.

12         Q.   CAN YOU TELL ME AS BEST YOU CAN RECALL WHAT

13    HAPPENED IN THIS APPROXIMATELY 30-MINUTE MEETING

14    THAT YOU HAD WITH MR. BRYANT.

15         A.   YES.                                     10:42AM

16              MR. JACOBY:   OBJECTION.  VAGUE, CALLS FOR A

17    NARRATIVE.

18    BY MR. QUINN:

19         Q.   PLEASE GIVE US A NARRATIVE --

20         A.   A NARRATIVE.                             10:43AM

21         Q.   -- OF WHAT HAPPENED IN THIS MEETING.

22         A.   HE UNVEILED A DOLL, A PROTOTYPE, AND ALSO

23    HE HAD A DRAWING OF FOUR GIRLS, AN ILLUSTRATION, AND

24    HE SAID THE DOLLS WERE CALLED BRATZ, AND WE SAID WE

25    LIKE THE CONCEPT BUT THAT WE NEEDED TO DISCUSS IT   10:43AM
```

55

EXHIBIT _____ 46

PAGE _____ 713

1      A.   NO.

2      Q.   WHAT WAS YOUR OWN UNEXPRESSED PRIVATE

3   REACTION TO THE CONCEPT THAT HE PRESENTED?

4      A.   I THOUGHT IT WAS BEAUTIFUL, IT WAS

5   FANTASTIC.                                        11:19AM

6      Q.   OKAY.   THE -- I'D LIKE TO GO ON TO -- I

7   MEAN, DO YOU RECALL BEING IN A MEETING WITH

8   MR. BRYANT WHERE MR. LARIAN WAS PRESENT?

9      A.   YES.

10     Q.   AND I THINK WE'VE ALREADY ESTABLISHED       11:19AM

11  YOU'RE JUST NOT SURE WHETHER THAT -- THIS FIRST

12  MEETING MORPHED INTO THAT, OR WHETHER THAT'S A

13  SECOND MEETING.

14     A.   CORRECT.

15     Q.   SO I'M GOING TO -- WITH THAT UNDERSTANDING   11:19AM

16  THAT WE'RE NOT SURE WHETHER IT'S A FIRST MEETING OR

17  A SECOND MEETING, JUST FOR EASE OF REFERENCE I'M

18  GOING TO CALL IT A SECOND MEETING, RECOGNIZING THAT

19  SO FAR AS YOUR RECOLLECTION IS CONCERNED, THIS MAY

20  JUST HAVE BEEN A -- PART OF THE FIRST MEETING.       11:19AM

21  OKAY?

22     A.   OKAY.

23     Q.   I'M -- I'M GOING TO USE "SECOND MEETING" TO

24  REFER TO WHAT YOU RECALL WITH MR. LARIAN BEING

25  PRESENT WITH MR. BRYANT, I'M JUST GOING TO CALL THAT  11:19AM

EXHIBIT _____ 46

PAGE _____ 714

```
 1    SHORTHAND AS THE SECOND MEETING.   OKAY?

 2        A.   OKAY.

 3        Q.   WHAT DO YOU RECALL WAS SAID IN THE SECOND

 4    MEETING IN THE PRESENCE OF MR. LARIAN?

 5        A.   WITH CARTER BRYANT?                        11:20AM

 6        Q.   YES.

 7        A.   HE SAID THAT HE LIKED THE DOLL CONCEPT AND

 8    THAT WE NEEDED TO THINK ABOUT WHETHER OR NOT IT WAS

 9    SOMETHING WE WANTED TO LICENSE BECAUSE WE WERE

10    LOOKING AT OTHER DOLL CONCEPTS, FASHION DOLL         11:20AM

11    CONCEPTS FROM OTHER INVENTORS.

12        Q.   WAS THAT TRUE SO FAR AS YOU'RE AWARE AT THE

13    TIME, THAT MGA WAS LOOKING AT OTHER FASHION DOLL

14    CONCEPTS FROM OTHER INVENTORS?

15        A.   NO.                                         11:20AM

16        Q.   I MEAN, IF MGA HAD BEEN LOOKING AT OTHER

17    FASHION DOLL CONCEPTS SUBMITTED BY OTHER INVENTORS

18    AT THAT TIME, WOULD THAT HAVE BEEN SOMETHING YOU

19    WOULD HAVE HAD KNOWLEDGE OF?

20        A.   YES.                                        11:20AM

21        Q.   BECAUSE THAT WAS YOUR JOB?

22        A.   YES.

23        Q.   DO YOU RECALL ANYTHING ELSE THAT WAS SAID

24    IN THIS MEETING WITH MR. LARIAN?

25        A.   NO.                                         11:20AM
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT _____ 46

PAGE _____ 715

```
 1       Q.    DO YOU RECALL -- IN THE SECOND MEETING DO
 2   YOU RECALL MR. BRYANT BEING ASKED IF HE HAD ANY KIND
 3   OF A CONTRACT WITH MATTEL?
 4       A.    I DON'T RECALL.
 5       Q.    ONE WAY OR THE OTHER?                        11:21AM
 6       A.    CORRECT.
 7       Q.    DO YOU RECALL AT ANY TIME MR. BRYANT BEING
 8   ASKED IF HE HAD ANY FORM OF CONTRACT WITH MATTEL?
 9       A.    NO.
10       Q.    LET ME JUST SEE IF I CAN JOG YOUR MEMORY A  11:21AM
11   LITTLE BIT.  DO YOU RECALL THAT YOU, YOURSELF, EVER
12   SPOKE JUST ONE-ON-ONE WITH MR. BRYANT AND ASKED HIM
13   WHETHER HE HAD A CONTRACT WITH MATTEL?
14       A.    NO.
15       Q.    DID HE EVER TELL YOU THAT HE HAD A          11:21AM
16   CONFIDENTIALITY AGREEMENT BUT HE DIDN'T HAVE A COPY
17   OF IT, DOES THAT RING A BELL?
18       A.    I DON'T RECALL.
19       Q.    I WILL REPRESENT TO YOU THAT MR. BRYANT
20   TESTIFIED, I TOOK HIS DEPOSITION, THAT AT SOME POINT  11:22AM
21   IN THIS PROCESS YOU SPOKE TO HIM AND ASKED TO HAVE A
22   COPY OF HIS -- ASKED HIM, DO YOU HAVE AN AGREEMENT
23   WITH MATTEL; HE SAID, I HAVE JUST A CONFIDENTIALITY
24   AGREEMENT; YOU SAID, DO YOU HAVE A COPY; AND HE
25   SAID, I DON'T HAVE A COPY OF IT.                      11:22AM
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT 46

PAGE 716

```
1              MR. QUINN:  CAN YOU HOLD FOR JUST A SECOND.

2              MR. JACOBY:  SURE.

3              MR. QUINN:  I'M SORRY.

4              ALL RIGHT.

5   BY MR. JACOBY:                                    03:44PM

6      Q.   DO YOU HAVE KNOWLEDGE OF -- IN THE

7   LICENSING AGREEMENTS THAT YOU'VE WORKED ON OTHER

8   THAN THE BRYANT CONTRACT, IS THERE TYPICALLY A REP

9   AND WARRANTY ABOUT OWNERSHIP?

10             MR. QUINN:  VAGUE AND AMBIGUOUS.         03:44PM

11             THE WITNESS:  I WOULD HAVE TO SEE THE OTHER

12  LICENSE AGREEMENTS THAT I WORKED ON PREVIOUSLY TO

13  ANSWER THAT QUESTION.

14  BY MR. JACOBY:

15     Q.   HAVE YOU EVER SEEN ONE BEFORE?            03:45PM

16             MR. QUINN:  SEEN ONE WHAT?

17  BY MR. JACOBY:

18     Q.   HAVE YOU EVER SEEN A LICENSING CONTRACT

19  WITH A REP AND WARRANTY ABOUT OWNERSHIP?

20             MR. QUINN:  OTHER THAN THIS ONE?         03:45PM

21             MR. JACOBY:  OTHER THAN THIS ONE.

22             THE WITNESS:  WITH AN INVENTOR?

23  BY MR. JACOBY:

24     Q.   I'M SORRY?

25     A.   WITH AN INVENTOR.                          03:45PM
```

221

EXHIBIT _____46_

PAGE _____717

```
 1        Q.   WITH AN INVENTOR.  IS MR. -- WHEN YOU SAY
 2   "INVENTOR," WOULD MR. BRYANT BE CONSIDERED AN
 3   INVENTOR?
 4        A.   YES.
 5        Q.   WHAT DO YOU MEAN BY "INVENTOR," JUST SO THE      03:45PM
 6   RECORD'S CLEAR?
 7        A.   HE INVENTED A CONCEPT.
 8        Q.   OKAY.  AND DO YOU UNDERSTAND BASED AS
 9   THE -- LET ME BACK UP.
10             IN 2000, WHAT WAS YOUR TITLE?                    03:45PM
11        A.   2000, IT WAS LICENSING MANAGER.
12        Q.   OKAY.  AS A LICENSING MANAGER FOR MGA AND
13   BASED ON YOUR EXPERIENCE WITH MGA AND BEFORE, DO YOU
14   UNDERSTAND THE PARAGRAPH THAT I JUST READ?
15        A.   YES.                                             03:45PM
16        Q.   OKAY.  WHAT DOES IT MEAN TO YOU?
17        A.   IT MEANS THAT HE'S SAYING THAT HIS CONCEPT
18   DOESN'T INFRINGE ON ANYTHING ELSE THAT'S EXISTING IN
19   THE MARKET.
20        Q.   OKAY.  DOES IT SAY ANYTHING ELSE TO YOU?        03:45PM
21        A.   SAYS THAT THERE ARE NO CLAIMS THAT CAN BE
22   MADE AS A RESULT OF THAT WITH ANY THIRD PARTY, AND
23   THAT IT'S FREE FROM ANY COPYRIGHTS, TRADE SECRETS,
24   IP RIGHTS.
25        Q.   OKAY, AND AS YOU READ THIS YOU                  03:46PM
```

A&E COURT REPORTERS (213) 955-0070  FAX (213) 955-0077

EXHIBIT 46

PAGE 718

```
 1    UNDERSTOOD -- THAT'S THE PROMISE YOU UNDERSTOOD

 2    MR. BRYANT WAS GIVING MGA; CORRECT?

 3        A.   YES.

 4        Q.   OKAY.  DO YOU KNOW AS YOU SIT HERE TODAY

 5    WHETHER OR NOT CARTER BRYANT -- STRIKE THAT.          03:46PM

 6             DO YOU KNOW AS YOU SIT HERE TODAY WHETHER

 7    MGA SOUGHT ANY OTHER ASSURANCE THAT CARTER BRYANT

 8    CREATED THESE DRAWINGS BEFORE HE ARRIVED AT MATTEL?

 9             MR. QUINN:  VAGUE AND AMBIGUOUS, LACKS

10    FOUNDATION.                                           03:47PM

11             THE WITNESS:  DO I HAVE ANY ASSURANCE THAT

12    HE DID?

13    BY MR. JACOBY:

14        Q.   DO YOU KNOW IF MGA SOUGHT SUCH AN

15    ASSURANCE?                                            03:47PM

16             MR. QUINN:  SAME OBJECTION.

17             THE WITNESS:  I DON'T KNOW.

18    BY MR. JACOBY:

19        Q.   IF YOU LOOK AT PARAGRAPH 5(E), IT READS

20    THAT (READING):                                       03:47PM

21             "HE" -- "HE" IS BRYANT -- "SHALL

22             INDEMNIFY AND HOLD MGA HARMLESS FROM

23             AND AGAINST ANY AND ALL CLAIMS,

24             LOSSES, COSTS, JUDGMENTS,

25             SETTLEMENTS DAMAGES AND EXPENSES             03:47PM
```

223

EXHIBIT 6

PAGE 719

1    Q.   MY UNDERSTANDING OF YOUR TESTIMONY IS YOU

2    RECALL A CONVERSATION IN JUNE OF 2001 WITH A BANDAI

3    REPRESENTATIVE; IS THAT RIGHT?

4    A.   YES.

5    Q.   BUT THERE -- TO YOUR RECOLLECTION THERE        04:04PM

6    WERE NO CONVERSATIONS WITH A BANDAI REPRESENTATIVE

7    BEFORE THAT?

8    A.   THERE COULD HAVE BEEN; I DON'T REMEMBER.

9    Q.   ANY OTHER COMMUNICATIONS OF ANY FORM WITH A

10   BANDAI REPRESENTATIVE PRIOR TO JUNE?                04:04PM

11   A.   NOT THAT I REMEMBER.

12   Q.   IF MR. LARIAN SAID THAT I TOLD VICTORIA

13   O'CONNOR TO MAKE SURE THAT CARTER BRYANT CREATED

14   BRATZ OUTSIDE HIS MATTEL EMPLOYMENT, I GAVE HER THAT

15   JOB, WOULD THAT BE A TRUE STATEMENT?                04:05PM

16        MS. TORRES:  OBJECTION.

17        THE WITNESS:  NO.

18   BY MR. QUINN:

19   Q.   DID HE EVER GIVE YOU THAT INSTRUCTION?

20   A.   NOT THAT I REMEMBER.                           04:05PM

21   Q.   IS THAT SOMETHING YOU THINK YOU'D REMEMBER

22   IF HE TOLD YOU, MAKE SURE THAT HE CREATED THAT

23   OUTSIDE HIS MATTEL EMPLOYMENT?

24   A.   YES.

25        MR. JACOBY:  OBJECTION. ARGUMENTATIVE.         04:05PM

EXHIBIT  46

PAGE  719.001

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

## DEPOSITION CORRECTION SHEET

CASE NAME: MATTEL   v. CARTER BRYANT

DEPOSITION OF: VICTORIA O'Connor

DEPOSITION DATE: 12/6/04

I declare under **penalty of perjury** that I have read the foregoing _143_ pages of my deposition testimony, taken on _12/6/04_ at _865 S. FIGUEROA St. 10th FL., LOS ANGELES_, California, and that the same is a **true record and testimony** given by me at the time and place hereinabove set forth, with the following exceptions:

**PAGE # : LINE #   CORRECTION/CHANGES TO BE MADE**

| PAGE # | LINE # | | | |
|---|---|---|---|---|
| 73 175 | 5 | FROM | YOU | |
| | | TO | I | |
| | 11 | FROM | CAMI | |
| | | TO | KAMI | |
| | : | FROM | | |
| | | TO | | |
| | : | FROM | | |
| | | TO | | |
| | : | FROM | | |
| | | TO | | |
| | : | FROM | | |
| | | TO | | |
| | : | FROM | | |
| | | TO | | |
| | : | FROM | | |
| | | TO | | |

_Victoria O'Connor_
**SIGNATURE OF DEPONENT**

_1/7/05_
**DATE**

EXHIBIT _46_

PAGE _720_

# DEPOSITION CORRECTION SHEET

CASE NAME: _MATTEL_ v. _CARTER BRYANT_

DEPOSITION OF: _VICTORIA O'CONNOR_

DEPOSITION DATE: _12/6/04_

I declare under penalty of perjury that I have read the foregoing _109_ pages of my deposition testimony, taken on _12/6/04_ at _865 S. FIGUEROA ST. 10th FL. LOS ANGELES_, California, and that the same is a **true record and testimony** given by me at the time and place hereinabove set forth, with the following exceptions:

PAGE # : LINE #    CORRECTION/CHANGES TO BE MADE

| | | | |
|---|---|---|---|
| 162 | : 4 | FROM | FRANKIE |
| | | TO | FRANKI |
| 172 | : 13 | FROM | CAMI |
| | | TO | KAMI |
| F13 | : 13 | FROM | CAMI |
| | | TO | KAMI |
| 193 | : 14 | FROM | CAMI |
| | | TO | KAMI |
| 220 | : 25 | FROM | IR |
| | | TO | — |
| 243 | : 17 | FROM | GEM |
| | 21 | TO | JEM |
| | : | FROM | |
| | | TO | |
| | : | FROM | |
| | | TO | |

_Victoria O'Connor_          _1/7/05_
SIGNATURE OF DEPONENT          DATE

EXHIBIT _46_

PAGE _721_

1    STATE OF CALIFORNIA    )
                            )    SS.
2    COUNTY OF LOS ANGELES  )

3        I, PAULA A. PYBURN, CERTIFIED SHORTHAND

4    REPORTER, CERTIFICATE NUMBER 7304, RPR, FOR THE

5    STATE OF CALIFORNIA, HEREBY CERTIFY:

6            THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE

7    ME AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH

8    TIME THE DEPONENT WAS PLACED UNDER OATH BY ME;

9            THE TESTIMONY OF THE DEPONENT AND ALL

10   OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

11   RECORDED STENOGRAPHICALLY BY ME AND WERE THEREAFTER

12   TRANSCRIBED;

13           THE FOREGOING TRANSCRIPT IS A TRUE AND

14   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

15           I FURTHER CERTIFY THAT I AM NEITHER COUNSEL

16   FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN

17   ANY WAY INTERESTED IN THE OUTCOME THEREOF.

18           IN WITNESS WHEREOF, I HAVE HEREUNTO

19   SUBSCRIBED MY NAME THIS ____ DAY OF_____,

20   2006.

21

22   _Paula A. Pyburn_

23

24

25

EXHIBIT __46__

PAGE __722__

**EXHIBIT 47**

September 18, 2000

Dear Kinuyo,

I enjoyed speaking with you on the phone today about possibly ordering a supply of your Hollow Saran hair fiber.

I would like to request a sample card of the different colors available and also, if possible, a sample card of the different curl sizes available.

The company I am working with is called MGA ENTERTAINMENT, and we are located in Los Angeles, CA. You can email me with any questions at: sophiesays@hotmail.com.

Please send the sample cards, along with price information to the following address:

MGA Entertainment
Attn: Carter Bryant
1319 W. 160th St.
Gardena, CA 90247
USA

My phone number, once again, is 310-538-3615

Thank you very much,

Sincerely,

Carter H. Bryant



DEPOSITION EXHIBIT
30
11.8.04        SH

BRYANT 01200
CONFIDENTIAL

EXHIBIT   47
PAGE   723

```
⋊⋊⋊  T R A N S M I S S I O N   R E P O R T  ⋊⋊⋊

SEP-17-00 17:55  ID:3102976935          KINKOS HAWTHORNE

  J O B   N U M B E R                      7 5 7

  I N F O R M A T I O N   C O D E           OK

  TELEPHONE NUMBER         01181334861064
  NAME(ID NUMBER)          0334861064
  START TIME               SEP-17-00 17:54
  PAGES TRANSMITTED        001    TRANSMISSION MODE      EHMR
  RESOLUTION               STD    REDIALING TIMES        00
  SECURITY                 OFF    MAILBOX                OFF.
  MACHINE ENGAGED          00'23

  THIS TRANSMISSION IS COMPLETED.

  LAST SUCCESSFUL PAGE     001
```

September 18, 2000

Dear Kinuyo,

I enjoyed speaking with you on the phone today about possibly ordering a supply of your Hollow Saran hair fiber.

I would like to request a sample card of the different colors available and also, if possible, a sample card of the different curl sizes available. We will likely be placing a large order for this hair very soon, as we will probably be using it on a new doll line.

The company I am working with is called MGA ENTERTAINMENT, and we are located in Los Angeles, CA. You can email me with any questions at: sophiesays@hotmail.com.

Please send the sample cards, along with price information to the following address:

MGA Entertainment
Attn: Carter Bryant
1319 W. 160th St.
Gardena, CA 90247
USA

My phone number, once again, is 310-538-3615

Thank you very much,

Sincerely,

Carter H. Bryant

BRYANT 01201
CONFIDENTIAL

EXHIBIT  47

PAGE  724

Inbox                                                                                       Page 1 of 2



**MSN Home** **Hotmail** **Web Search** **Shopping** **Money** **People & Chat**    Passport sign out

**Hotmail**°  *sophiesays@hotmail.com*

Inbox    Compose    Addresses    Folders    Options                    Calendar    Help

Inbox

**From:**    "K. Shichijyo" <uccjapan@ma.rosenet.ne.jp>  Save Address - Block Sender
**To:**      "Bryant Carter" <sophiesays@hotmail.com>  Save Address
**Subject:** Hollow saran hair
**Date:**    Mon, 18 Sep 2000 17:24:37 +0900

Reply       Reply All       Forward       Delete       Previous       Next       Close

Dear Mr. Bryant:

Thank you very much for your new inquiry of our hollow saran hair.
As per letter attached, I am sending yu color card of our hollow
saran hair.   If you have any other questions or requests, please
feel free to contact me at any time.

Meantime, as per your fax, you will likely be placing a large
order of the hair for your new doll line.
We would like to know how much order quantiy is expected
roughly when our hollow saran hair is used on your new doll lilne.

Thank you very much again of your new inquiry and we are
looking forward to start new business with you in the near future.

Best Regards,
K. Shichijyo
* * * * * * *
UNIVERSAL COMMERCE CORP., LTD.
E-MAIL : @uccjapan@ma.rosenet.ne.jp
TEL : +81-3-3407-8110    FAX : +81-3-3486-1084


☎ Attachment: MGAEntertainment.doc (157k) -- View Attachment

*Notice*: Attachments are automatically scanned for viruses using   McAfee Click Here

Reply       Reply All       Forward       Delete       Previous       Next       Close

Move⁉️ (Move to Selected Folder) ⁉️

.../getmsg?curmbox=F000000001&a=96929453094001231711&msg=MSG969269/18/00

BRYANT 01202
CONFIDENTIAL

EXHIBIT   47

PAGE   725

# Universal        Commerce        Corp.,        Ltd.

### Fax Transmission

Fax 81-3-3486-1084    Tel 81-3-3407-8110

Fax To MGA Entertainment

Attn. Mr. Carter Bryant

From K. Shichijyo

Ref No. F-16269/00

Date Sept. 21, 2000

Page 1/1

Dear Mr. Bryant:

Re Hollow Saran Yarn

Thank you very much for your call this morning.
As per Tel. conversation, I learned that you are going to make dolls in Hongkong. We have an representative in HK and they have curing facility in China.
If your vendor in Hongkong does not have curling facility, we will supply curl hair to your HK vendor thru our representative.
We do business with many HK doll makers and please let us know doll manufacturer name who will make dolls for you for our reference.

I am sending you one bag each of curl hair samples in 3mm 6mm 10mm 13mm
and 17mm by Airborne Express today. You will receive them early next week accordingly. As informed you, we will be glad to supply you any samples for your new development and please inform us color numbers and curl sizes required. We will send our samples to you or to your HK vendor according to your requirements.

As per your information, you are going to exhibit new dolls to Toy Fair in N.Y.
next year. We really hope that your new doll line will be successful and we will be more than happy to work with you on this project.

Thank you very much again and we are looking forward to your reply.

Best Regards,
K. Shichijyo

BRYANT 01203
CONFIDENTIAL

EXHIBIT    47

PAGE     726

**EXHIBIT 48**

Wed, Oct 18, 2000  10:18 PM

**From:** Liz Hogan <lizhogan@earthlink.net>
**To:** paula treanntafelles <ptreantafelles@mgae.com>
**Cc:** steve linker <link67@earthlink.net>
**Date:** Thursday, October 12, 2000 7:47 PM
**Subject:** questions: BRATS

FMA — 2/1

paula and carter,
(please forward to carter, i dont have his email)

steve and i would like to meet with you and carter on monday
to maybe get some of the art...so we can get going....
let us know what time and where is good for you.

here are some questions and comments on the Brats project:

✓ 1. we need some spec sheets calling out sizes and dimensions
on the dolls and the accessories   copies ___ TODAY

✓ 2. we need the existing art boards that we saw in the mtg.
or good color copies.   copies

3. is the name "BRATS" confirmed or can we work on it/change it? → need new name by end of month.
                                                                        FOR GIRLS TOO.

← 4. do you have photos/jpegs of the sculpts? — casts by nextweek FOR Ref.

5. are the renderings of the outfits (that we saw)
the confirmed outfits that you will be manufacturing?

6. is there any packaging brief?

thanks,
liz

DEADLINES

12/15 — WAL·MART MTg.
         TRADE DRESS

"DOUBLE TROUBLE"

BRATS

11/20(?) — TARGET — White Box — FOR PLAN·A·gRAMS.
Box whites FOR planogRams.

11/

Page 1 of 1

DEP. EX. NO. 320
FOR I.D. AS OF   9-13-06 p

EXHIBIT   48   SL00001
PAGE   727

**EXHIBIT 49**

Sat, Oct 22, 2005   12:23 AM

**From:** Liz Hogan <lizhogan@earthlink.net>
**To:** paula treanntafelles <ptreantafelles@mgae.com>
**Cc:** steve linker <link67@earthlink.net>
**Date:** Saturday, October 14, 2000 6:06 PM
**Subject:** Packaging Estimate: Brats

---

Paula-

The following is the estimate for the Brats Trade Dress and packaging design project.
It looks like a lot but it covers every possible area we could think of that might come
up during the next couple of months, including a couple rounds of revisions, hiring
illustrators, and/or photography, and it also includes our full dedication that you
requested. Our costs will be balanced out according to what we provide you on this
project. Meaning, we will only charge you for the time we spend working on the
project and not the full quote amount unless we reach that mark at any time (highly
unlikely-but worse case scenario). If that is the case we will notify you on where we
are at during each phase.

we look forward to getting started, thanks.

Steven Linker
Penny Arcade. Inc.
310-395-1205

**Packaging Estimate: Brats** (small doll line)
4 Sku's - 12.99 Retail (9" dolls)
2 Sku's - 4.99 Retail (Dress Packs)
1 Sku  -  9.99 Retail (Hair Pack)

EXHIBIT    49

PAGE    728

DEP. EX. NO. 321
FOR I.D. AS OF  9-13-06 PK

Page 1 of 3

SL00005

Sat, Oct 22, 2005  12:23 AM

**Dieline:**
box development (pencil sketches) - 600.00
dieline/ 3 structures (engineered, w/mock-up) - 1050.00
(1 round of revisions included)
Total: 1650.00

**Phase 1**
trade dress exploration, research and concepting /3 unique directions
includes:
product shots FPO (digital) - 1,500.00
logo development - 5,000.00 -7,,500 (ave. 6,000.00)
tag line/burst copy and fonts - 1,500.00 - 2,500.00
color palette exploration-pms chips - 600.00
background patterns/design/research - 5,000.00 -7,500.00
support art/icons - 4,000.00 - 4,500.00
Total: 17,600.00 - 24,000.00

-meet to review 11/01/00
comments and changes (board art for sales mtg) 11/06
need additional 2 weeks in this concepting stage -if possible

**Phase 2**
(MGA to make comments -style/direction is chosen)

logo finals - 4,000.00 - 6,000.00
stylized illustrations (girl poses) production ready - 8,000.00 - 10,000.00
art, icons/element - 1,000.00 - 3,000.00
copy approved - 2,000.00
product and kid photoshoot - 9,000.00-13,000.00
(includes model fees, supplies, hi-res scan, art direction)
MGA legal copy, safety copy, logos, UPC provided - 2,000.00
build 3 dielines (illustrator) - 1,100.00
print outs, mock ups - 3,000.00 - 3,500.00
Total: 30,100.00 - 40,600.00

-status review 12/011
-date approved samples will be ready for photoshoot???

**Phase 3**
set all 7 boxes/ backercards for print production
clean-up, spell check, final approvals MGA

Page 2 of 3

EXHIBIT   49
PAGE   729

SL00006

Sat, Oct 22, 2005  12:23 AM

FMA  includes hi res scans from photoshoot,
layered files provided on disk to MGA and
print outs, final mock ups
press proof -optional LA - 350.00
Total: 7,350.00 -10,000.00


-FMA due TBA
 Total: 57,600.00 - 7,6250.00

*all mock-ups will be created to scale
no rush fee's are included

EXHIBIT ___49___

PAGE ___730___
EXHIBIT

**Page 3 of 3**

SL00007

BLUEBIRD OFFICE SUPPLIES
(888) 477-0700
www.bluebirdoffice.com

**EXHIBIT 50**

1

1          IN THE UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4    CARTER BRYANT, an individual, )

5                    Plaintiff, )

6         vs.                        )    Case No.

7    MATTEL, INC., a Delaware        )  CV 04-09049 SGL

8    corporation,                    )      (RNBx)

9                    Defendant. )

10

11        CONFIDENTIAL - ATTORNEYS' EYES ONLY

12

13          The videotaped deposition of

14   STEVEN LINKER, called as a witness for examination,

15   taken pursuant to the Federal Rules of Civil

16   Procedure of the United States District Courts

17   pertaining to the taking of depositions, taken

18   before PAULINE M. VARGO, a Notary Public within and

19   for the County of DuPage, State of Illinois, and a

20   Certified Shorthand Reporter of said state, C.S.R.

21   No. 84-1573, at Suite 4000, One IBM Plaza, Chicago,

22   Illinois, on the 13th day of September, A.D. 2006,

23   at 9:50 a.m.

24                              EXHIBIT ___50___

                                PAGE ___731___

1     PRESENT:

2         LITTLER MENDELSON,

3         (2049 Century Park East, 5th Floor,

4         Los Angeles, California  90067.3107,

5         310.712.7314), by:

6         MR. DOUGLAS A. WICKHAM,

7            appeared on behalf of the Plaintiff

8            Carter Bryant;

9

10        MATTEL, INC.,

11        (333 Continental Boulevard,

12        El Segundo, California  90245.5012,

13        310.252.6733), by:

14        MR. MICHAEL MOORE,

15        Senior Counsel,

16            -and-

17        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP,

18        (865 South Figueroa Street, 10th Floor,

19        Los Angeles, California  90017.2543,

20        213.443.3000), by:

21        MR. MICHAEL T. ZELLER,

22        MS. TANIA KREBS,

23            appeared on behalf of Defendant

24            Mattel, Inc.;

EXHIBIT _____ 50

PAGE _____ 732

3

```
 1          PRESENT (Continued):

 2               O'MELVENY & MYERS, LLP,

 3               (Times Square Tower,

 4               7 Times Square,

 5               New York, New York  10036,

 6               212.326.2000), by:

 7          MS. DALE M. CENDALI,

 8               appeared on behalf of Intervenor

 9               MGA Entertainment;


11          BERMAN, MAUSNER & RESSER,

12               (11601 Wilshire Boulevard, Suite 600,

13               Los Angeles, California  90025,

14               310.473.3333), by:

15          MR. LAURENCE M. BERMAN,

16               appeared on behalf of the Deponent.

17

18

19

20

21

22

23                               EXHIBIT ___50___

24                               PAGE ___733___
```

4

```
 1            ALSO PRESENT:
 2                 MR. MICHAEL A. HALL,
 3                     Paralegal, Littler Mendelson;
 4                 MR. CARTER BRYANT.
 5
 6            VIDEOGRAPHER:
 7                 MR. JOSEPH BURKE,
 8                 Esquire Deposition Services.
 9
10            REPORTED BY:
11                 PAULINE M. VARGO,
12   09:46:12      C.S.R. No. 84-1573.
13
14
15
16
17
18
19
20
21
22
23
24
```

EXHIBIT ___50___

PAGE ___734___

62

| | | |
|---|---|---|
| 1 | 11:24:47 | presented the concept. We needed to see the |
| 2 | 11:24:50 | concept first before we could talk about packaging. |
| 3 | 11:24:53 | Q.    Please tell me what you mean when you |
| 4 | 11:24:56 | say that she presented it to you. |
| 5 | 11:24:57 | A.    At this meeting we were shown the |
| 6 | 11:25:02 | concept of Bratz, the dolls. |
| 7 | 11:25:07 | Q.    What were you shown? |
| 8 | 11:25:09 | A.    We were shown artboards, illustrations |
| 9 | 11:25:12 | of dolls and their features as far as what the |
| 10 | 11:25:19 | dolls do and what they represent. |
| 11 | 11:25:27 | Q.    At this meeting on or about October 10th |
| 12 | 11:25:31 | or 11th, 2000, did anyone refer to this project as |
| 13 | 11:25:37 | being Bratz by name? |
| 14 | 11:25:39 | A.    Yes. |
| 15 | 11:25:44 | Q.    Was that the first time that you heard |
| 16 | 11:25:48 | anyone at MGA use the word "Bratz," B-r-a-t-z, to |
| 17 | 11:25:54 | describe the project, that is, the MGA project? |
| 18 | 11:25:58 | A.    The term "Bratz" was used by MGA or |
| 19 | 11:26:02 | Paula at the meeting, yes. |
| 20 | 11:26:04 | Q.    Well, I am driving at something a little |
| 21 | 11:26:06 | bit different. |
| 22 | 11:26:07 | A.    Okay. |
| 23 | 11:26:07 | Q.    Was that the first time that you heard |
| 4 | 11:26:09 | the term "Bratz" in connection with the MGA |

EXHIBIT _____ 50

PAGE _____ 735

63

| | | |
|---|---|---|
| 1 | 11:26:12 | project? |
| 2 | 11:26:12 | A.    Yes, yes. |
| 3 | 11:26:14 | Q.    So prior to that time, you didn't hear |
| 4 | 11:26:17 | the name from MGA? |
| 5 | 11:26:19 | A.    No. |
| 6 | 11:26:24 | Q.    Did Mr. Bryant say or do anything at |
| 7 | 11:26:27 | this meeting? |
| 8 | 11:26:29 | A.    Not much. |
| 9 | 11:26:32 | Q.    Well -- |
| 10 | 11:26:33 | A.    He presented -- it was his -- he brought |
| 11 | 11:26:36 | the portfolio with the images. |
| 12 | 11:26:39 | Q.    When you say "the images," you are |
| 13 | 11:26:42 | referring to the artboards and the illustrations |
| 14 | 11:26:44 | and the things you mentioned earlier? |
| 15 | 11:26:46 | A.    Yes. |
| 16 | 11:26:51 | Q.    Did you know Mr. Bryant before this |
| 17 | 11:26:53 | meeting? |
| 18 | 11:26:53 | A.    Yes. |
| 19 | 11:26:53 | Q.    How did you know him? |
| 20 | 11:26:55 | A.    We worked at Mattel at the same time in |
| 21 | 11:27:00 | 1996 before I left, so I knew him from there. |
| 22 | 11:27:06 | Q.    Did you and Mr. Bryant talk about Mattel |
| 23 | 11:27:08 | at all during the meeting? |
| 24 | 11:27:12 | A.    Briefly.  I think I asked him when he |

EXHIBIT 56

PAGE 736

64

1    11:27:15   left or, you know, because I was no longer there,

2    11:27:18   so I assumed he was no longer there, and he said he

3    11:27:21   had just quit, so that was about it.

4    11:27:25        Q.    Mr. Bryant said he had quit?

5    11:27:27        A.    Yes.

6    11:27:29        Q.    Quit Mattel?

7    11:27:29        A.    Or he left.  He was no longer there.

8    11:27:32   That's all I know from that meeting, that he was no

9    11:27:34   longer with Mattel.

10   11:27:59        Q.    Was there anything that happened in

11   11:28:03   between the meeting that you had that you described

12   11:28:07   at Starbucks on or about October 10th or 11th,

13   11:28:13   2000, and then the time that the October 12th, 2000

14   11:28:17   e-mail was sent, which we marked as Exhibit 320, as

15   11:28:20   it pertains to Bratz, or was the next thing that

16   11:28:23   happened that you sent the e-mail or Liz sent the

17   11:28:26   e-mail with your participation?

18   11:28:29        A.    When we left, I know that we prepared

19   11:28:31   this e-mail, because we had a lot of questions, and

20   11:28:34   also, we were starting to work on quotes for the

21   11:28:38   job because that's typically what we do and we knew

22   11:28:41   this was a big job, so we started bouncing back

23   11:28:46   ideas, but primarily we left there with these

24   11:28:50   questions and wanted to set up a secondary meeting

56

EXHIBIT _____

PAGE _____ 737

1    11:28:53  to go over these and to get more information.

2    11:29:00        Q.     Returning for a moment to Exhibit 320,

3    11:29:07  you will see it starts off about the third

4    11:29:09  paragraph down, "Here are some questions and

5    11:29:13  comments on the Brats project"?

6    11:29:16        A.     Yes.

7    11:29:17        Q.     And then it says in Point 2 in the

8    11:29:21  typewritten portion, it says, "We need the existing

9    11:29:24  artboards that we saw in the meeting or good color

10   11:29:27  copies."

11   11:29:28        A.     Yes.

12   11:29:28        Q.     Do you see that portion?

13   11:29:29        A.     Yes.

14   11:29:31        Q.     What's that meeting that's being

15   11:29:32  referred to here?

16   11:29:34        A.     The meeting at Starbucks.

17   11:29:36        Q.     This is referring to the artboards that

18   11:29:40  you had seen at the Starbucks meeting a day or two

19   11:29:44  before?

20   11:29:44        A.     Yes.

21   11:29:52        Q.     Then in Point 5 in the typewritten

22   11:29:55  portion of Exhibit 320 it says, quote, "Are the

23   11:29:59  renderings of the outfits (that we saw) the

24   11:30:05  confirmed outfits that you will be manufacturing?"

EXHIBIT __50__

PAGE __738__

254

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4    CARTER BRYANT, an individual, )

 5                    Plaintiff, )

 6         vs.                     )    Case No.

 7    MATTEL, INC., a Delaware     )  CV 04-09049 SGL

 8    corporation,                 )      (RNBx)

 9                    Defendant. )

10              I hereby certify that I have read the

11    foregoing transcript of my deposition given at the

12    time and place aforesaid, consisting of Pages 1 to

13    253, inclusive, and I do again subscribe and make

14    oath that the same is a true, correct and complete

15    transcript of my deposition so given as aforesaid,

16    and includes changes, if any, so made by me.

17

18                            STEVEN LINKER

19    SUBSCRIBED AND SWORN TO

20    before me this        day

21    of            , A.D. 2006.

22

23         Notary Public

24
```

EXHIBIT  50

PAGE  739

255

```
 1          STATE OF ILLINOIS )
 2                            )  SS:
 3          COUNTY OF DuPAGE  )
 4                    I, PAULINE M. VARGO, a Notary Public
 5          within and for the County of DuPage, State of
 6          Illinois, and a Certified Shorthand Reporter of
 7          said state, C.S.R. No. 84-1573, do hereby certify:
 8                    That previous to the commencement of the
 9          examination of the witness, the witness was duly
10          sworn to testify the whole truth concerning the
11          matters herein;
12                    That the foregoing deposition transcript
13          was reported stenographically by me, was thereafter
14          reduced to typewriting under my personal direction
15          and constitutes a true record of the testimony
16          given and the proceedings had;
17                    That the said deposition was taken
18          before me at the time and place specified;
19                    That I am not a relative or employee or
20          attorney or counsel, nor a relative or employee of
21          such attorney or counsel for any of the parties
22          hereto, nor interested directly or indirectly in
23          the outcome of this action.
 4
```

EXHIBIT 50

PAGE 740

256

```
 1              IN WITNESS WHEREOF, I do hereunto set my

 2      hand and affix my seal of office at Chicago,

 3      Illinois, this 22nd day of September, 2006.

 4

 5

 6              Notary Public, DuPage County, Illinois.

 7              My commission expires July 27, 2007.

 8

 9      C.S.R. Certificate No. 84-1573

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

EXHIBIT __50__

PAGE __741__

**EXHIBIT 51**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION                Certified Copy

 4      ---------------------------------

 5      MATTEL, INC., a Delaware            )

 6      Corporation,                        )

 7                Plaintiff,                 )

 8                vs.                        ) No. CV 04-9059

 9      CARTER BRYANT, an individual;       )     NM  (RNBx)

10      and DOES 1 through 10,              ) VOLUME I

11      Inclusive,                          )

12                Defendants.               )

13      ---------------------------------)

14      (COMPLETE CAPTION ON NEXT PAGE.)

15

16        CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18        Videotaped 30(b)(6) Deposition of

19        JILL NORDQUIST, taken at 400 South

20        Hope Street, Los Angeles, California,

21        commencing at 9:44 A.M., Tuesday,

22        July 31, 2007, before Wendy S. Schreiber,

23        CSR No. 3558, RPR, CLR.

24

25      PAGES 1 - 303
```

EXHIBIT   51

PAGE   742

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT
2              CENTRAL DISTRICT OF CALIFORNIA
3                    EASTERN DIVISION
4
5       -------------------------------
6    MATTEL, INC., a Delaware          )
7    Corporation,                      )
8               Plaintiff,             )
9               vs.                    ) No. CV 04-9059
10   CARTER BRYANT, an individual;     )    NM (RNBx)
11   and DOES 1 through 10,            )
12   Inclusive,                        )
13               Defendants.           )
14      -------------------------------)
15   CARTER BRYANT, on behalf of       )
16   himself, all present and          )
17   former employees of Mattel,       )
18   Inc., and the general public,     )
19               Counter-Claimants,    )
20               vs.                   )
21   MATTEL, INC., a Delaware          )
22   Corporation,                      )
23               Counter-Defendant.    )
24      -------------------------------
25                              EXHIBIT  5l
                                PAGE   743       2
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    APPEARANCES OF COUNSEL:

2

3        FOR THE PLAINTIFF:

4

5        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

6        BY:  JON E. COREY, ESQ.

7        865 South Figueroa Street, Tenth Floor

8        Los Angeles, California 90017

9        (213) 443-3000

10        Jcorey@quinnemanuel.com

11

12                    -AND-

13

14        MATTEL, INC.

15        BY:  JILL E. THOMAS, ESQ. (A.M. Session)

16             MICHAEL MOORE, ESQ.  (P.M. Session)

17        333 Continental Boulevard

18        El Segundo, California 90245-5012

19        (310) 252-2000

20        jill.thomas@mattel.com

21

22

23

24                              EXHIBIT  51

25                              PAGE  744
```

3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR THE DEFENDANT AND COUNTERCLAIMANT

 4        CARTER BRYANT:

 5

 6            KEKER & VAN NEST LLP

 7            BY:  CHRISTA MARTINE ANDERSON, ESQ.

 8            710 Sansome Street

 9            San Francisco, California 94111-1704

10            (415) 391-5400

11            cma@kvn.com

12

13

14        FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16            O'MELVENY & MYERS LLP

17            BY:  DIANA TORRES, ESQ.

18            400 South Hope Street

19            Los Angeles, California 90071-2899

20            (213) 430-6000

21            dtorres@omm.com

22

23    ALSO PRESENT:

24

25            RYAN GULINO, VIDEO OPERATOR
```

4

EXHIBIT __51__

PAGE __745__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    you had any communications with Carter Bryant on the

2    subject of his considering or deciding to leave

3    Mattel?

4        A.   Yes.

5        Q.   When was the first time you had any such          02:05PM

6    conversation?

7        A.   The day he resigned.

8        Q.   What day was that?

9        A.   I don't remember the date or the day of the

10   week.                                                      02:05PM

11       Q.   Where did this conversation take place?

12       A.   In his cubicle.

13       Q.   Was anybody else present?

14       A.   Yes.

15       Q.   Who else?                                         02:05PM

16       A.   Kitty Hammons.

17       Q.   Anybody else?

18       A.   No.

19       Q.   Were you all in or around this cubicle?

20       A.   Inside his cubicle.                               02:05PM

21       Q.   You can all fit in there?

22       A.   Yeah.

23       Q.   Can you give me -- strike that.

24            I understand you don't remember the specific

25   day that this conversation took place but could you        02:06PM
```
                                                                123

EXHIBIT 51

PAGE 746

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    give me your best estimation of when the

2    conversation took place?

3         A.   All I remember it was approximately two

4    weeks prior to him actually physically leaving

5    Mattel.                                        02:06PM

6         Q.   How long was this conversation?

7         A.   Ten minutes.

8         Q.   I'd like you to give me your best

9    recollection of what any -- everybody said during

10   this particular conversation.                  02:06PM

11        A.   Okay.

12        Q.   So we can proceed in any way you'd like but

13   probably the best way to do it is proceed

14   chronologically from the first thing that is said

15   through the conversation so you can tell me       02:07PM

16   everything you remember.   Okay?

17        A.   Okay.

18        Q.   So what is it that you recall being said

19   during this conversation with Mr. Bryant?

20        A.   Kitty and I went over to Carter's cube    02:07PM

21   because we had just heard that he had resigned and I

22   asked him point-blank if he was going to a

23   competitive doll company to which he responded with

24   no and I said, "Where are you going?"  And he said

25   he wasn't going to say.  And then I told him that if  02:07PM

                                                          124

EXHIBIT 51

PAGE 747

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   he worked for me and resigned without saying where

2   he was going that I personally would have him leave

3   immediately, and he didn't comment.  And we asked

4   him what he would be doing and he said he was going

5   to go somewhere that would allow him to have more        02:07PM

6   creative control and input and that he would be

7   spending a fair amount of time in Asia and that's --

8   that was I believe the conversation.

9        Q.   Did Kitty Hammons say anything during this

10   conversation?                                           02:08PM

11       A.   I think she probably may have interjected a

12   word or two.

13       Q.   But you don't remember anything as you sit

14   here now?

15       A.   Not specifically.                              02:08PM

16       Q.   You say that you went to his cube because

17   you just had heard he resigned.

18       A.   Correct.

19       Q.   Who informed you of that?

20       A.   I had been at my desk in my cube at the        02:08PM

21   Tower and had been on the phone with I believe it

22   was Mina Mirkazemi discussing other business issues

23   and at the end of the conversation she said, "Oh,

24   did you guys hear?  Carter just resigned."

25       Q.   What did you say in response?                  02:09PM

                                                             125

EXHIBIT 51

PAGE 748

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   No, I hadn't heard that.

2      Q.   What, if anything, did she say in return

3   after you made that comment?

4      A.   She said, "Yes, he's -- it's true."

5           And I believe I asked her where he was going   02:09PM

6   and she said that he wouldn't say.

7      Q.   What else, if anything, did Mina Mirkazemi

8   say during this conversation in relation to Carter

9   Bryant?

10     A.   That was the extent that related to Carter.   02:09PM

11     Q.   What else, if anything, did you say during

12   this conversation in relation to Carter Bryant?

13     A.   That I was going to ask him myself.

14     Q.   Okay.  Anything else?

15     A.   No.                                           02:10PM

16     Q.   How is it that Kitty Hammons came to be with

17   you as you went to the cubicle to talk to

18   Mr. Bryant?

19     A.   Kitty and I were on our way to one of those

20   working meetings that we had regularly in the Design   02:10PM

21   Center so we stopped at Carter's cube before we went

22   to the meeting.

23     Q.   Did Kitty Hammons -- strike that.

24          Did you inform Kitty Hammons of what you had

25   just learned about Mr. Bryant's resignation before   02:10PM

                                                              126

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   you arrived at Mr. Bryant's cubicle?

2      A.   Yes.

3      Q.   What did you tell her?

4      A.   I don't remember verbatim.  I believe it was

5   something to the extent of I hung up the phone.        02:11PM

6   Kitty sat across from me and I said, "I just -- Mina

7   just told me that Carter resigned."

8      Q.   And did she say anything in response?

9      A.   I think she asked the same question

10  everybody asks which is "Where is he going?"           02:11PM

11     Q.   And you said --

12     A.   I said, "Mina said they didn't know.  He

13  wouldn't say."

14     Q.   Between the time that you had this

15  conversation with Mina Mirkazemi on the phone and      02:11PM

16  the time that you arrived at Carter Bryant's

17  cubicle, did you have any conversations with anyone

18  else about Carter Bryant besides Kitty Hammons?

19     A.   No.

20     Q.   Was the first question that you asked --      02:11PM

21  strike that.

22          Was the first thing that was said when you

23  met Carter Bryant in his cubicle a question to the

24  effect of "Are you going to a competitive doll

25  company"?                                              02:12PM

127

EXHIBIT ____51

PAGE ____750

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   That was if not the first question probably

2    the second question.

3        Q.   Do you remember saying anything else before

4    that?

5        A.   I think I probably said, "Where are you      02:12PM

6    going?"

7        Q.   And his response to that first question of

8    where are you going was what?

9        A.   "I'm not saying."

10       Q.   Did you tell him during this conversation    02:12PM

11   that if he worked for you you would have him leave

12   immediately?

13       A.   No, my exact words were if he had worked for

14   me and resigned and hadn't said where he was going

15   that I would then have him leave immediately.        02:12PM

16       Q.   And it's your testimony that he didn't say

17   anything in response to that comment?

18       A.   Correct.

19       Q.   Aside from what you've already told me about

20   your recollection of what Mr. Bryant said during     02:12PM

21   that conversation, do you recall him saying anything

22   else?

23       A.   No.

24       Q.   I know you said that this conversation

25   lasted about ten minutes but what you've told me so   02:13PM

                                                          128

EXHIBIT ___51___

PAGE ___751___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    far doesn't sound like it would take ten minutes to

2    have that conversation.  Do you have any further

3    recollection of anything else that was said during

4    this conversation?

5        A.   I don't have any further recollection.        02:13PM

6        Q.   Do you still believe that ten minutes is an

7    accurate estimate of how long the conversation

8    lasted?

9        A.   It's hard to say because I don't remember if

10   Kitty interjected or not.                              02:13PM

11       Q.   Do you -- strike that.

12            Would you characterize this conversation as

13   having been a pleasant conversation?

14       A.   I think it was commensurate with other

15   conversations we had had.                              02:13PM

16       Q.   I'm going to reiterate the question.

17            Would you characterize this particular

18   conversation as having been a pleasant conversation?

19       A.   Yes.

20       Q.   How would you describe Mr. Bryant's demeanor  02:14PM

21   during the conversation?

22       A.   Similar to his general demeanor.

23       Q.   And how would you describe that?

24       A.   Private, timid, not saying a lot.

25       Q.   And that was how he normally was with you?    02:14PM

                                                            129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    subject?

2         A.   Kitty because she had been with me and I

3    mentioned it to Ron when I saw him shortly

4    thereafter.

5         Q.   Anyone else?                            02:18PM

6         A.   Not that I remember right now.

7         Q.   When was the conversation with Kitty that

8    concerned the subject matters that were discussed

9    during the Carter Bryant meeting where he confirmed

10   his resignation?                                 02:18PM

11        A.   When we left his cube and we walked on to

12   our meeting that we were going to in the Design

13   Center in the first place, we discussed right after

14   we left his cube what we had just discussed.

15        Q.   Did you just repeat to each other what you  02:18PM

16   had just heard?

17        A.   That's -- I'd say yes.

18        Q.   Do you remember discussing anything else

19   besides repeating to each other what you had just

20   heard in the conversation with Mr. Bryant?        02:19PM

21        A.   I remember not believing his -- not

22   believing he was telling me everything.

23        Q.   That's what you told Kitty?

24        A.   Uh-huh, yes.

25        Q.   What else, if anything, did you discuss with  02:19PM

133

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Kitty about the conversation you had just had with

2    Carter Bryant?

3        A.    That was the extent, I believe.

4        Q.    At that point in time were you concerned

5    that he was potentially going to a competitor?        02:19PM

6        A.    Absolutely.

7        Q.    And is that a concern that you had expressed

8    to Kitty during the conversation?

9        A.    Yes.

10       Q.    What, if anything, did Kitty say in          02:19PM

11   response?

12       A.    I again don't remember verbatim but I think

13   she, too, thought it was odd that he wouldn't tell

14   us where he was going.

15       Q.    Did she communicate to you that she was      02:20PM

16   suspicious that he might be going to a competitor?

17       A.    Yes.

18       Q.    Do you recall anything else about the

19   conversation with Kitty other than what you've

20   already told me?                                       02:20PM

21       A.    My own feeling as to why I didn't believe --

22   or why I assumed or thought he would be going to a

23   competitor is because I didn't think that he had any

24   other -- I thought that he was first and foremost a

25   doll designer so I couldn't imagine that he was        02:20PM

                                                            134

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   going to do something other than design dolls.

2       Q.   Is that a thought that you communicated to

3   Kitty as well?

4       A.   Yes.

5       Q.   Do you remember anything else that was        02:21PM

6   discussed with Kitty in that conversation?

7       A.   That was the gist of it.

8       Q.   You also said that you spoke with Ron

9   Longsdorf about the meeting you had had with Carter

10  Bryant in his cubicle; is that right?              02:21PM

11      A.   Yes.

12      Q.   When was this particular discussion with Ron

13  Longsdorf?

14      A.   After attending a meeting in the Design

15  Center I walked past Ron's office and he waved me   02:21PM

16  into his office just to say hello and when I was in

17  there I had repeated to him that Carter wouldn't say

18  where he was going and that if I were his boss and

19  he wouldn't tell me where he was going that I would

20  ask him to leave and Ron didn't really respond.  He  02:22PM

21  just kind of, you know -- what's the word? -- he

22  just kind of shrugged his shoulders.

23      Q.   Do you remember saying anything else to Ron

24  during this conversation?

25      A.   In general or about Carter?              02:22PM

135

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   About Carter.

2    A.   No.

3    Q.   Do you remember Ron saying anything to you

4    in relation to Carter Bryant's departure?

5    A.   No.                                        02:22PM

6    Q.   Do you -- strike that.

7         Did Ron Longsdorf ever comment to you at any

8    point in time about Carter Bryant leaving Mattel?

9    A.   Yes.

10   Q.   When did you discuss that subject with      02:23PM

11   Mr. Longsdorf?

12   A.   I think after Ron -- after Carter was

13   already gone.

14   Q.   How long after Carter was gone?

15   A.   Probably pretty immediately thereafter      02:23PM

16   because we were going to be releasing a doll with

17   his name on it.

18   Q.   So at the time that Carter had left you were

19   just about to release this Grand Entrance doll; is

20   that right?                                      02:23PM

21   A.   I think it was going to hit the market in

22   December or January and I think he left in -- I

23   don't remember the exact month -- September,

24   October.  I think it was a pretty -- the doll

25   development cycle is pretty long, it's 12 to 18    02:23PM

136

EXHIBIT 51
PAGE 756

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Besides the communications you had with

2   Mr. Bryant just generally relating to the ongoing

3   work that he had been doing at the time that he gave

4   his resignation, did you have any other discussions

5   with Carter Bryant that related in any way to his          02:34PM

6   departure from Mattel?

7           MR. COREY:  Objection:  asked and answered.

8           THE WITNESS:  Can you -- I guess I'm not

9   clear on the question.

10  BY MS. ANDERSON:                                            02:34PM

11     Q.   I just want to make sure -- I want to give

12  you another background so it makes it clear what

13  I've asking.

14          I know that you had just general day-to-day

15  work that was ongoing in relation to the projects          02:34PM

16  that Mr. Bryant was working on at the time, right?

17  And I know you had meetings that continued until he

18  left in that regard.  I'm trying to find out whether

19  you have given me your best recollection as to

20  whether you had any discussions with Carter Bryant        02:35PM

21  that related in any way to his leaving Mattel during

22  that two-week period from when you had the

23  discussion in the cubicle until he actually left

24  Mattel's physical employment.

25          MR. COREY:  Objection:  asked and answered.        02:35PM

                                                              144

EXHIBIT 51

PAGE 757

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      THE WITNESS:  My recollection of the two
2   weeks or whatever the exact time was that transpired
3   from the time he resigned until the time he left
4   consisted of me confronting him directly on the day
5   that I heard he was leaving and asking him if he was   02:35PM
6   going to a competitor -- competitive doll company,
7   to which he responded no, and after that I did not
8   press any further but continued to communicate with
9   him on business-related matters.
10  BY MS. ANDERSON:                                        02:35PM
11      Q.  Do you know who sat near Mr. Bryant when he
12  was working at the Design Center during the time
13  period that you knew him at Mattel?
14      A.  Yes.
15      Q.  Who sat near him?                               02:36PM
16      A.  There was the working table that I mentioned
17  that was in the middle.  Carter was right outside of
18  the working table in a cube.  There may have been a
19  sample maker whose name I thought started with a B
20  but I don't remember because he wasn't somebody that  02:36PM
21  I worked with directly.  I know that Robert was in a
22  corner.  I know that Nini who was Robert's sample
23  maker sat on the other end.  I believe that
24  Heather's cube was somewhere over here.  And then on
25  the -- directly across from Carter with the working  02:36PM
                                                          145

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   table being in the middle was I believe Sharon

2   Zuckerman and Katiana on that side.

3       Q.   I'm just going to give you a piece of paper

4   so you can draw this for me just so we have sort of

5   a general layout of where these folks are sitting.      02:37PM

6           MR. COREY:  Don't you have one -- just a

7   second.

8           THE WITNESS:  I don't remember --

9           MR. COREY:  Hold on just a second.

10          MS. ANDERSON:  Should we put that exhibit      02:37PM

11  sticker on it now -- so that we have it?

12          (Deposition Exhibit 543 was marked

13      for identification and is annexed hereto.)

14  BY MS. ANDERSON:

15      Q.   So I'm showing you a blank page, Exhibit      02:37PM

16  543.  If you could just generally draw the layout

17  that you were describing with your hand motions

18  earlier as to where Mr. Bryant's cubicle was located

19  and where other people were located during the time

20  you were working with him.                             02:37PM

21          MR. COREY:  And just to be clear, you

22  want -- you just want the area around Mr. Bryant's

23  cubicle at what period of time of time?

24          MS. ANDERSON:  This time frame that the

25  witness worked with Mr. Bryant which doesn't appear   02:38PM

146

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          When did you first learn that Carter Bryant

2   was involved in any way with Bratz?

3       A.   Around the time that Bratz launched in I

4   think it was the summer of 2001 when I -- I think

5   when we first learned about the launch of Bratz I     03:57PM

6   heard from people in the Design Center that Carter

7   was working there.

8       Q.   More than one person?

9       A.   Yes.

10      Q.   Do you remember who?                          03:57PM

11      A.   I don't.

12      Q.   Do you remember what anybody said?

13      A.   I just remember people saying that he was

14   working at MGA on Bratz.

15      Q.   Do you recall -- was it a -- scratch that.   03:57PM

16          Do you remember what people's sentiments

17   were?  Were they happy for him?  Were they not happy

18   for him?  Anything about what they were -- what

19   their sentiments were with respect to his working at

20   MGA on Bratz?                                         03:58PM

21      A.   I don't remember exact sentiments of other

22   people.  I just remember my own unhappiness that he

23   had lied to me less than a year prior.

24      Q.   Do you remember people expressing surprise?

25      A.   I think people were surprised based on the    03:58PM

186

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    fact that he had said he was going to be spending a

2    lot of time in Asia and that he wasn't going to a

3    competitor and yet he was working just up the 405.

4        Q.    Aren't most toys -- don't most toy companies

5    in America manufacture their products in Asia?          03:58PM

6        MR. COREY:  Objection:  speculation.

7        THE WITNESS:  I know where Mattel

8    manufactures its toys.

9    BY MS. TORRES:

10       Q.    And that's in Asia?                            03:58PM

11       A.    Yes.

12       Q.    Do you think it was -- in your view was it

13   fairly well known in the summer of 2001 after --

14   when Bratz first launched that Carter was involved

15   with Bratz?                                              03:59PM

16       MR. COREY:  Objection:  speculation, vague

17   and ambiguous.

18       THE WITNESS:  I don't think it was widely

19   known.

20   BY MS. TORRES:                                           03:59PM

21       Q.    Why do you say that?

22       A.    I think the only reason I had learned was

23   because someone had mentioned it to me because they

24   knew him because I had worked with him the year

25   prior.                                                   03:59PM

187

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Did you then tell anybody else that you had

2    learned that Carter was involved with Bratz around

3    the time of its launch?

4           MR. COREY:  Objection: mischaracterizes her

5    testimony.                                      03:59PM

6           THE WITNESS:  At the immediate launch of --

7    of Bratz I'm not sure in relation to when it hit the

8    market to when I learned that he was working at MGA

9    on Bratz.  I know that at some point within the time

10   frame of it being out on the market I had mentioned   04:00PM

11   to the -- to Ann Parducci when I saw her carrying a

12   Bratz doll one day that I said, "Oh, you realize

13   that's what Carter is working on now?"

14   BY MS. TORRES:

15     Q.   Did Ms. Parducci respond to you in any way?   04:00PM

16     A.   Yes, she was surprised.

17     Q.   What did she say?

18     A.   She looked surprised and she said something

19   to the effect of "Really?"

20     Q.   Was she carrying a Bratz doll at work?      04:00PM

21     A.   Yes.

22     Q.   Do you know why she was carrying a Bratz

23   doll at work?

24     A.   It's my understanding that she went out to

25   retail and purchased one.                        04:01PM

188

EXHIBIT 51

PAGE 762

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        I declare under penalty of perjury
2    under the laws of the State of California
3    that the foregoing is true and correct.
4        Executed on  August 23          ,
5    2007, at  El Segundo                ,
6    California.
7
8
9                    _____
10                   JILL NORDQUIST
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

299

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA   ) ss:

 2   COUNTY OF LOS ANGELES )

 3

 4        I, WENDY S. SCHREIBER, CSR No. 3558, do

 5   hereby certify:

 6

 7        That the foregoing deposition of JILL

 8   NORDQUIST was taken before me at the time and place

 9   therein set forth, at which time the witness was

10   placed under oath and was sworn by me to tell the

11   truth, the whole truth, and nothing but the truth;

12        That the testimony of the witness and all

13   objections made by counsel at the time of the

14   examination were recorded stenographically by me,

15   and were thereafter transcribed under my direction

16   and supervision, and that the foregoing pages

17   contain a full, true and accurate record of all

18   proceedings and testimony to the best of my skill

19   and ability.

20        I further certify that I am neither

21   counsel for any party in said action, nor am I

22   related to any party to said action, nor am I in any

23   way interested in the outcome thereof.

24

25
```

300

EXHIBIT 51

PAGE 764

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            IN WITNESS WHEREOF, I have subscribed my
 2   name this 8th day of August, 2007.
 3
 4
 5
 6   _____
 7        WENDY S. SCHREIBER, CSR No. 3558, RPR
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

301

EXHIBIT 51

PAGE 745

**EXHIBIT 52**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
)
PLAINTIFF, )
)                    CASE NO.
V. )                    CV 04-9040 SGL (RNBX)
)
MATTEL, INC., A DELAWARE )
CORPORATION, ET AL., )
)
DEFENDANTS. )
————————————————— )
)
AND CONSOLIDATED ACTION (S). )
————————————————— )

# C O N F I D E N T I A L

**(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)**

# DEPOSITION OF RACHEL HARRIS

# FEBRUARY 26, 2008

REPORTED BY:
BETH FELIX
CSR NO. 12766
JOB NO. 08AE157-BF

EXHIBIT ___52___

PAGE ___766___



COURT REPORTERS

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

1               UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

3

4    CARTER BRYANT, AN INDIVIDUAL, )
                                   )
5              PLAINTIFF,          )
                                   )
6        V.                        ) NO. CV049049SGLRNBX
                                   )
7    MATTEL, INC., A DELAWARE      )
     CORPORATION, ET AL.,          )
8                                  )
                                   )
9    DEFENDANTS.          )
     _____)

10

11              C O N F I D E N T I A L

12        (PURSUANT TO PROTECTIVE ORDER, THIS

13        TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL,

14              ATTORNEYS' EYES ONLY.)

15              PAGES 1 THROUGH 334

16

17              DEPOSITION OF RACHEL HARRIS,

18        TAKEN ON BEHALF OF THE DEFENDANTS, AT

19        865 SOUTH FIGUEROA, 10TH FLOOR, LOS ANGELES,

20        CALIFORNIA, COMMENCING AT 10:03 A.M., TUESDAY,

21        FEBRUARY 26, 2008, BEFORE BETH FELIX, CSR NO.

22        12766.

23

24                          EXHIBIT 52

25                          PAGE 767

```
 1     APPEARANCES OF COUNSEL:
 2
 3     FOR THE DEFENDANT MATTEL, INC.:
 4         QUINN EMANUEL URQUHART OLIVER & HEDGES
           BY:  MICHAEL ZELLER
 5         ATTORNEY AT LAW
           865 SOUTH FIGUEROA, 10TH FLOOR
 6         LOS ANGELES, CALIFORNIA  90017
           (213) 624-7707
 7
       FOR THE DEFENDANT M.G.A.:
 8
           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
 9         BY:  LANCE A. ETCHEVERRY
           BY:  CLAUDE KESSELER
10         ATTORNEYS AT LAW
           300 SOUTH GRAND AVENUE
11         LOS ANGELES, CALIFORNIA  90071
           (213) 687-5000
12
13
14
15
16
17
18
19
20
21
22
23
24                              EXHIBIT 52
25                              PAGE 768
```

```
 1    SHE WAS AT MATTEL.
 2          MR. ETCHEVERRY:  OBJECTION.  ASKED AND
 3    ANSWERED.
 4          THE WITNESS:  YES.
 5    BY MR. ZELLER:
 6       Q   DID -- DID MS. WARD EVER SAY TO YOU, IN WORDS
 7    OR SUBSTANCE, THAT, IF MATTEL KNEW THAT CARTER BRYANT
 8    HAD SHOWN BRATZ TO M.G.A., THAT MATTEL WOULD BE UPSET?
 9          MR. ETCHEVERRY: OBJECTION.  VAGUE.  CALLS FOR
10    SPECULATION.  LACKS FOUNDATION.
11          THE WITNESS:  YES.  MERCEDAH DID MENTION THAT,
12    AND PAULA MENTIONED THAT AS WELL.
13    BY MR. ZELLER:
14       Q   AND WAS THIS DURING A TIME PERIOD WHEN YOU
15    WERE THERE AT M.G.A. STILL?
16       A   YES.
17       Q   DID YOU HEAR THIS SEPARATELY FROM THEM, OR
18    WERE THEY TOGETHER WHEN YOU HEARD THIS?
19       A   SEPARATELY.
20       Q   AND WHAT IS IT YOU CAN REMEMBER PAULA
21    TREANTAFELLES SAYING TO YOU ON THAT SUBJECT WHEN YOU
22    WERE THERE AT M.G.A.?
23       A   THE DAY THAT CARTER WAS COMING IN TO MEET WITH
24    US SHE JUST MENTIONED NOT TO MENTION ANYTHING ABOUT
25    THIS MEETING BECAUSE CARTER WAS COMING IN ON HIS LUNCH
```

                                                          167

EXHIBIT 52

PAGE 768.001