1    BREAK, AND IF HE -- IF MATTEL, YOU KNOW, FOUND OUT,

2    THAT, YOU KNOW, HE COULD GET INTO TROUBLE BUT THAT HE

3    HAD ALREADY GIVEN NOTICE AT MATTEL.  SO HE WASN'T GOING

4    TO BE WORKING THERE FOR LONG ANYWAY.

5         Q    AND THIS FIRST MEETING WAS THE FIRST MEETING

6    THAT WE TALKED ABOUT EARLIER THAT WAS IN OCTOBER OF

7    2000?

8         A    YES.

9         Q    AND THEN WHAT IS IT YOU CAN REMEMBER MS. WARD

10   SAYING ON THAT SUBJECT?

11        A    SIMILAR, JUST THAT -- YOU KNOW, THAT CARTER

12   HAD PRESENTED IT TO MATTEL.  THEY TURNED IT DOWN, BUT,

13   YOU KNOW, IF HE SHOWED IT TO ANYONE ELSE OR IF ANYONE

14   ELSE TOOK IT, THAT IT WOULDN'T BE VERY GOOD FOR HIM.

15        Q    AND DID YOU HAVE AN UNDERSTANDING AS TO WHAT

16   SHE MEANT BY "IT WOULDN'T BE VERY GOOD FOR HIM"?

17             MR. ETCHEVERRY:  OBJECTION.  CALLS FOR

18   SPECULATION.  LACKS FOUNDATION.

19             THE WITNESS:  I MEAN, OUR CONVERSATION, YOU

20   KNOW, MOST DEFINITELY WENT ON BUT JUST BEING IN THE

21   INDUSTRY YOU KNOW, YOU KNOW, IF YOU -- BECAUSE HE HAD

22   ALREADY PRESENTED IT TO THEM, YOU KNOW, THE THOUGHT WAS

23   THAT IT BELONGED TO THEM WHETHER THEY USE IT OR NOT.

24   BUT SO -- BUT THEY TURNED IT DOWN.  I DON'T KNOW HOW

25   MANY YEARS WENT IN BETWEEN FROM THE TIME HE PRESENTED

EXHIBIT    52

168

1    IT TO THE TIME HE PRESENTED IT TO M.G.A., BUT IT WAS

2    JUST -- YOU JUST KNEW.

3    BY MR. ZELLER:

4        Q    AND "THEM" IN YOUR ANSWER IS MATTEL?

5        A    YES.

6        Q    WHEN YOU SAY YOU JUST KNOW, THAT'S BASED ON

7    BEING IN THE INDUSTRY?

8        A    YES.

9        Q    AS WELL AS ALL THE INFORMATION THAT WAS

10   AVAILABLE TO YOU AT THE TIME YOU WERE THERE AT M.G.A.?

11       A    YES.

12       Q    WAS IT, ALSO, YOUR IMPRESSION THAT -- FROM

13   THESE CONVERSATIONS THAT YOU HAD, THAT CARTER NOT ONLY

14   PRESENTED BRATZ DOLLS TO MATTEL AND WAS TURNED DOWN BUT

15   THAT HE HAD COME UP WITH THE BRATZ DOLLS WHEN HE WAS AT

16   MATTEL?

17            MR. ETCHEVERRY:  OBJECTION.  LACKS FOUNDATION.

18   VAGUE.

19            THE WITNESS:  THERE WAS NO INDICATION THAT HE

20   HAD COME UP WITH THEM WHILE HE WAS AT MATTEL.  HE MAY

21   VERY WELL HAVE COME UP WITH THEM BEFORE HE WAS AT

22   MATTEL.  I DON'T KNOW THAT EITHER WAY.

23   BY MR. ZELLER:

24       Q    IS THAT ANYTHING ANYONE EVER SAID TO YOU

25   ANYTHING ON?

EXHIBIT _52_

PAGE _769_

169

```
 1        A    NO.

 2        Q    YOU DON'T HAVE ANY INFORMATION ON WHETHER HE

 3   HAD COME UP WITH THE BRATZ DOLLS WHEN HE WAS THERE AT

 4   MATTEL OR BEFORE; IS THAT CORRECT?

 5        A    CORRECT.

 6        Q    DURING THAT FIRST MEETING WHEN YOU WERE THERE

 7   WITH CARTER BRYANT, DID HE SAY ANYTHING ABOUT WHETHER

 8   OR NOT PEOPLE WERE SUPPOSED TO KNOW THAT HE WAS WORKING

 9   WITH M.G.A. AT THAT TIME?

10        A    I DON'T RECALL HIM MENTIONING ANYTHING

11   SPECIFIC HIMSELF.

12        Q    DID HE OR ANYONE ELSE THERE AT M.G.A. DURING

13   THAT TIME PERIOD SUGGEST THAT IT WASN'T SUPPOSED TO BE

14   STATED OUTSIDE OF M.G.A. THAT CARTER WAS WORKING WITH

15   M.G.A.?

16             MR. ETCHEVERRY:  OBJECTION.  VAGUE.

17             THE WITNESS:  YES.  THAT WAS DEFINITELY

18   COMMUNICATED.

19   BY MR. ZELLER:

20        Q    IT WAS COMMUNICATED THAT IT WAS SUPPOSED TO BE

21   KEPT SECRET?

22             MR. ETCHEVERRY:  OBJECTION.  MISSTATES THE

23   WITNESS'S TESTIMONY.

24             THE WITNESS:  YES, THAT IT SHOULDN'T BE

25   DISCUSSED.
```

EXHIBIT 52

PAGE 770

170

1    BY MR. ZELLER:

2        Q    WITH ANYONE OUTSIDE THE COMPANY?

3            MR. ETCHEVERRY:  SAME OBJECTION.

4            THE WITNESS:  CORRECT.

5    BY MR. ZELLER:

6        Q    WHERE DID YOU RECEIVE THIS DIRECTION OR

7    INSTRUCTION FROM?

8            MR. ETCHEVERRY:  OBJECTION.  VAGUE AS TO

9    "DIRECTION OR INSTRUCTION."

10           THE WITNESS:  FROM PAULA, FROM -- I CAN'T

11   RECALL IF IT CAME DIRECTLY FROM ISAAC OR NOT, BUT I DO

12   REMEMBER AN OCCASION FROM PAULA.

13   BY MR. ZELLER:

14       Q    YOU RECALL AN OCCASION WHERE PAULA SAID THAT?

15       A    YES.

16       Q    AND WAS THAT THE SAME OCCASION YOU WERE

17   TALKING ABOUT EARLIER IN ADVANCE OF THAT VERY FIRST

18   MEETING HAD YOU WITH CARTER BRYANT?

19       A    THAT WAS ONE OCCASION.  YES.

20       Q    THERE WERE OTHER OCCASIONS IN WHICH SHE SAID

21   THAT?

22       A    THERE WAS ONE OTHER JUST IN MY OFFICE.

23       Q    WAS THIS -- THIS WAS AFTER THE FIRST MEETING

24   YOU HAD WITH CARTER BRYANT?

25       A    YES.

EXHIBIT 52

PAGE 771

171

1        Q    CAN YOU PUT A TIME PERIOD ON IT WHEN SHE HAD

2   REITERATED THAT IT WASN'T SUPPOSED TO BE DISCUSSED

3   OUTSIDE THE COMPANY?

4             MR. ETCHEVERRY:   OBJECTION.   MISCHARACTERIZES

5   THE WITNESS'S TESTIMONY.

6             THE WITNESS:   NO, NO WAY TO PINPOINT.

7   BY MR. ZELLER:

8        Q    I TAKE IT IT WAS DURING A TIME WHEN YOU WERE

9   STILL THERE AT M.G.A.?

10       A    YES.

11       Q    IS IT YOUR RECOLLECTION THAT, WHEN YOU STARTED

12  THERE AT M.G.A., THAT THERE WAS ALREADY A BRATZ DOLL

13  SCULPTURE THAT HAD BEEN DONE?

14            MR. ETCHEVERRY:   OBJECTION. . LACKS FOUNDATION.

15            THE WITNESS:   I KNOW WE COVERED THIS EARLIER

16  BUT --

17  BY MR. ZELLER:

18       Q    WE TALKED ABOUT -- WELL, JUST MAYBE TO BACK UP

19  FOR A SECOND.   MAYBE YOU CAN TAKE A LOOK AT THE IMAGES

20  OF THE SCULPTS THAT I HAD SHOWN YOU PREVIOUSLY.   FOR

21  THE RECORD, THE FIRST ONE WAS EXHIBIT 1105.   THAT'S THE

22  ONE THAT'S DATED OCTOBER 16TH, 2000.   YOU'LL SEE THERE

23  ON THE SECOND PAGE THERE'S AN IMAGE OF A CASTING.

24       A    YES.

25       Q    AS I MENTIONING, YOU'LL SEE THAT THIS IS DATED

EXHIBIT __52__

__772__

PAGE

172

1    OCTOBER 16TH, 2000, WHICH IS ABOUT A WEEK AFTER YOU

2    STARTED.

3         A    YES.

4         Q    SO DOES SEEING THIS HELP YOUR RECOLLECTION AS

5    TO WHETHER OR NOT YOU HAD SEEN OR WERE JUST AWARE

6    WHETHER YOU HAD SEEN IT OR NOT OF THERE BEING A BRATZ

7    SCULPTURE BY THIS OCTOBER 16TH, 2000, TIME PERIOD?

8              MR. ETCHEVERRY:   OBJECTION.   VAGUE.   ASKED AND

9    ANSWERED.

10             THE WITNESS:   I'M SORRY.   COULD YOU REPEAT THE

11   QUESTION?

12   BY MR. ZELLER:

13        Q    SURE.   ABSOLUTELY.   OBVIOUSLY, WE'VE BEEN

14   TALKING ABOUT EXHIBIT 1105, WHICH IS THIS E-MAIL.   THE

15   BOTTOM ONE, IN FACT, IS DATED OCTOBER 15TH, 2000.

16   THAT'S A FEW DAYS AFTER YOU HAD STARTED.

17        A    RIGHT.

18        Q    DO YOU REMEMBER IF THERE WAS A PERIOD OF TIME

19   THAT HAD ELAPSED BEFORE YOU FIRST EVER EVEN HEARD THAT

20   THERE WAS A SCULPTURE FOR THE BRATZ DOLLS, OR WAS THAT

21   SOMETHING THAT YOU KNEW PRETTY QUICKLY AFTER YOU

22   STARTED?

23             MR. ETCHEVERRY:   OBJECTION.   ASKED AND

24   ANSWERED.   COMPOUND.

25             THE WITNESS:   IT WOULD HAVE BEEN CLOSER TO THE

EXHIBIT  52

PAGE  773

173

1    WORKED WITH HER, THOUGH, BUT I DO REMEMBER THAT NAME.

2        Q    DO YOU KNOW AN ALYSE CLUNEN (PHONETIC)?

3        A    NO.

4        Q    DO YOU KNOW A SARA HELPRIN?

5        A    NO.

6        Q    DO YOU KNOW MEL WOODS?

7        A    NO.

8            MR. ZELLER:  PLEASE, MARK AS EXHIBIT 4507 A

9    MULTIPAGE DOCUMENT BEARING BATES NUMBERS MGA3801819

10   THROUGH 822.

11           (DEFENDANTS' EXHIBIT 4507 WAS MARKED FOR

12           IDENTIFICATION BY THE COURT REPORTER.)

13           MR. ETCHEVERRY:  COUNSEL, IS THERE A QUESTION

14   PENDING?

15           MR. ZELLER:  SHE'S LOOKING AT THIS EXHIBIT

16   4507.

17       Q    IF YOU CAN, LET US KNOW WHEN YOU'VE HAD A

18   CHANCE TO LOOK AT IT.

19       A    YEAH.  GO AHEAD.

20       Q    DO YOU RECOGNIZE ANY PORTION OF EXHIBIT 4507?

21       A    YEAH.  THIS IS THE E-MAIL THAT -- THE BOTTOM

22   PART OF IT IS THE E-MAIL THAT DAVID FORWARDED ME THAT

23   HE SENT OUT.

24       Q    THIS IS THE PART OF THE E-MAIL WHERE IT BEGINS

25   ON THE FIRST PAGE SAYING, "FROM DAVID DEES, SENT MARCH

EXHIBIT 52

PAGE 774

261

1    9TH, 2002," AND THEN FOLLOWS?

2         A    YES.

3         Q    IF I UNDERSTOOD YOU CORRECTLY, THIS IS TEXT

4    THAT DAVID DEES HAD FORWARDED TO YOU IN OR ABOUT MARCH

5    OF 2002?

6         A    PROBABLY, AFTER THAT, BUT YES.

7         Q    DO YOU RECALL IF IT WAS CLOSE IN TIME TO WHEN

8    HE HAD, ACTUALLY, SENT OUT THE E-MAIL ORIGINALLY TO

9    THIS FAN SITE?

10        A    IT WAS PRETTY CLOSE AFTER.

11        Q    DID YOU HAVE AN UNDERSTANDING AS TO WHY ISAAC

12   LARIAN WAS UNHAPPY WITH DAVID DEES FOR SENDING THIS

13   E-MAIL?

14             MR. ETCHEVERRY:  OBJECTION.  LACKS FOUNDATION.

15   CALLS FOR SPECULATION.

16             THE WITNESS:  ISAAC -- I MEAN, IT JUST GAVE

17   HIM MORE INFORMATION THAT ISN'T SUPPOSED TO BE GIVEN.

18   BY MR. ZELLER:

19        Q    THAT INCLUDES INFORMATION ABOUT CARTER BRYANT?

20        A    UH-HUH.  YES.

21        Q    AND WHAT IS YOUR UNDERSTANDING ABOUT THE

22   INFORMATION THAT WAS GIVEN ABOUT CARTER BRYANT THAT WAS

23   NOT SUPPOSED TO BE GIVEN OUT?

24             MR. ETCHEVERRY:  OBJECTION.  VAGUE.

25             THE WITNESS:  BECAUSE AT CERTAIN TIMES -- OR

EXHIBIT   52

775

PAGE

262

1   AT A CERTAIN POINT, ISAAC HAD MENTIONED THAT HE DIDN'T

2   WANT CARTER BRYANT RELATED TO BRATZ.  HE WANTED TO KEEP

3   THOSE VERY SEPARATE AND NOT PUBLISHED AND NOT ANYTHING

4   THAT'S OUT THERE.

5   BY MR. ZELLER:

6        Q   IT WAS YOUR UNDERSTANDING THAT HE DIDN'T WANT

7   CARTER BRYANT'S NAME PUBLICLY ASSOCIATED WITH BRATZ?

8        A   CORRECT.

9        Q   AND WHAT IS THAT UNDERSTANDING BASED ON?

10        A   CONVERSATIONS DIRECTLY FROM ISAAC.

11        Q   AND WERE THOSE CONVERSATIONS THAT HAD YOU WITH

12   HIM?

13        A   THAT HE HAD WITH SEVERAL OF US, NOT JUST ONE

14   PERSON.

15        Q   AND THESE WERE STATEMENTS THAT HE MADE DURING

16   THE TIME YOU WERE THERE AT M.G.A.?

17        A   YES.

18        Q   AND WHAT IS IT YOU CAN RECALL BEST HIM SAYING

19   ALONG THOSE LINES IN WORDS OR SUBSTANCE?

20        MR. ETCHEVERRY:  ASKED AND ANSWERED.

21        THE WITNESS:  TOO LONG AGO TO REMEMBER.  I

22   DON'T KNOW EXACT, YOU KNOW, WHAT HE, ACTUALLY, SAID.

23   BY MR. ZELLER:

24        Q   I UNDERSTAND.  I'M NOT ASKING YOU, YOU KNOW,

25   THE EXACT.  I'M ASKING, MORE OR LESS, FOR THE GIST OF

EXHIBIT  5L

PAGE  776

263

1    WHAT YOU CAN REMEMBER HE SAID.

2            MR. ETCHEVERRY:  SAME OBJECTION.

3            THE WITNESS:  JUST THAT, YOU KNOW, ANYTHING

4    WITH RELATION TO BRATZ SHOULD JUST BE -- WE SHOULD JUST

5    NOT INCLUDE CARTER, WHICH IS ONE OF THE REASONS WHY HE

6    NEVER REALLY SHOWED UP AT THE OFFICE MUCH -- JUST THAT

7    BRATZ JUST NEEDS TO STAY SEPARATE FROM CARTER'S NAME

8    BEING INVOLVED WITH IT.  IF ANYBODY ASKS WHO CREATED

9    IT, IT WAS ISAAC.  AT ONE POINT, HE SAID IT WAS HIS

10   DAUGHTER AND INSPIRATION FROM HIS DAUGHTER THAT HE WAS

11   GOING TO KIND OF SAY WAS WHERE THE IDEA CAME FROM.

12   BY MR. ZELLER:

13      Q   AND ARE THESE STATEMENTS YOU JUST DESCRIBED

14   STATEMENTS THAT ISAAC LARIAN MADE IN YOUR PRESENCE?

15      A   YES.

16      Q   DID ISAAC IN THOSE CIRCUMSTANCES OR AT ANY

17   TIME SAY TO YOU OR ANYONE ELSE IN YOUR PRESENCE AS TO

18   WHY HE WANTED IT KEPT NOT PUBLIC THAT CARTER BRYANT WAS

19   INVOLVED WITH BRATZ?

20           MR. ETCHEVERRY:  OBJECTION.  MISCHARACTERIZES

21   THE WITNESS'S TESTIMONY.  VAGUE.

22           THE WITNESS:  I DON'T THINK HE GAVE ANY

23   SPECIFIC -- EVERYONE JUST KNEW IT WAS RELATED TO MATTEL

24   ISSUES, NOT SAYING THAT IT WAS BECAUSE IT WAS MATTEL'S

25   BUT MORE THAT THERE COULD BE ISSUES BECAUSE HE USED TO

EXHIBIT 52

PAGE 777

264

1    WORK THERE.  PAULA USED TO WORK THERE, SO JUST KEEP HIS

2    NAME OUT OF IT, AND KEEP IT CLEAN.

3    BY MR. ZELLER:

4         Q   WAS IT YOUR IMPRESSION THAT ONE REASON WHY

5    ISAAC MADE THESE STATEMENTS IS BECAUSE HE DIDN'T MATTEL

6    TO KNOW?

7              MR. ETCHEVERRY:  OBJECTION.  CALLS FOR

8    SPECULATION.  LACKS FOUNDATION.

9              THE WITNESS:  I DON'T KNOW.

10   BY MR. ZELLER:

11        Q   YOU'RE NOT SURE ONE WAY OR ANOTHER?

12             MR. ETCHEVERRY:  SAME OBJECTIONS.

13             THE WITNESS:  I'M NOT SURE.

14   BY MR. ZELLER:

15        Q   I APOLOGIZE IF I ASKED YOU THIS BEFORE.  THE

16   STATEMENTS THAT YOU WERE TALKING ABOUT THAT ISAAC MADE

17   -- THAT WAS WHEN YOU WERE THERE AT M.G.A.?

18        A   YES.

19        Q   GOING BACK TO 4507, APPARENTLY, DAVID DEES

20   DIDN'T GET THE MEMO?

21        A   NO.

22        Q   NO?

23        A   DAVID -- HE'S OUT THERE.  HE'S NOT THE NORM.

24        Q   DO YOU KNOW IF THIS E-MAIL THAT WE'VE BEEN

25   TALKING ABOUT FROM DAVID DEES THAT HE SENT OUT TO THIS

EXHIBIT 5 L

PAGE 778

265

1    FAN CLUB -- IS THAT SOMETHING THAT RESULTED IN A BREAK

2    DOWN OF HIS RELATIONSHIP WITH M.G.A.?

3            MR. ETCHEVERRY:  OBJECTION.  CALLS FOR

4    SPECULATION.  LACKS FOUNDATION.

5            THE WITNESS:  YES.  DAVID DIDN'T RECEIVE ANY

6    OTHER PROJECTS AFTER THIS.  AILEEN HAD, ALSO, SENT SOME

7    KIND OF E-MAIL TO DAVID TELLING HIM THAT HE WASN'T

8    GOING TO GET -- THAT HE SCREWED UP.  PRETTY MUCH,

9    THAT'S WHAT IT WAS.  THAT'S WHEN HE CALLED ME.

10   BY MR. ZELLER:

11      Q   I SEE.  SO DAVID DEES CALLED YOU AFTER HE HAD

12   GOTTEN THE E-MAIL FROM AILEEN STORER SAYING HE WASN'T

13   GOING TO GET ANY MORE WORK AS A RESULT OF HAVING SENT

14   THIS E-MAIL THAT WE HAVE THAT'S PART OF EXHIBIT 4507?

15           MR. ETCHEVERRY:  OBJECTION.  LACKS FOUNDATION.

16           THE WITNESS:  YES, AND HE WAS KIND OF DEER IN

17   THE HEADLIGHTS.  HE HAD NO CLUE WHY.

18   BY MR. ZELLER:

19      Q   DID DAVID FORWARD YOU THE E-MAIL THAT HE

20   RECEIVED FROM AILEEN, OR DID HE DESCRIBE IT TO YOU OVER

21   THE PHONE?

22      A   I DON'T REMEMBER.  I KNOW HE DID SEND THIS

23   PART OF THE E-MAIL TO ME.  I DON'T REMEMBER IF THE

24   AILEEN PART OF IT WAS IN THERE OR NOT, BUT I HAD, ALSO,

25   SPOKE TO HER AT ONE POINT REGARDING THAT, ALSO.

EXHIBIT 52

779

PAGE

266

1      Q    AND WHAT DID SHE SAY?

2      A    SHE JUST SAID, "HERE'S WHAT HE DID."  THERE'S

3   NOT MUCH SHE COULD SAY.  SHE JUST MENTIONED THE LETTER

4   AND SAID HE JUST -- YOU KNOW, ISAAC DOESN'T WANT TO

5   SEND ANYTHING ELSE TO HIM, SO WE'RE DONE.

6           MR. ETCHEVERRY:  COUNSEL, JUST SO YOU KNOW, BY

7   OUR CLOCK, WE'VE GOT 15 MINUTES LEFT UNDER THE

8   SEVEN-HOUR LIMIT.

9   BY MR. ZELLER:

10     Q    DO YOU KNOW A WOMAN NAMED ANNA RHEE, R-H-E-E?

11     A    YES.

12     Q    AN HOW DO YOU KNOW HER?

13     A    I KNOW SHE DOES SOMETHING FOR DOLLS BECAUSE

14  I'VE USED HER ON ANOTHER DOLL LINE, BUT I CANNOT

15  REMEMBER.  I THINK SHE DOES FACE PAINTING FOR THE DOLLS

16  OR HAIR ROOTING, ONE OF THOSE, BUT I'VE USED HER IN THE

17  PAST.

18     Q    DID YOU WORK WITH HER ON BRATZ?

19     A    NO.

20     Q    WAS THE OTHER DOLL LINE THAT YOU'RE REFERRING

21  TO ONE THAT YOU WORKED ON WHEN YOU WERE AT M.G.A. OR

22  SOME OTHER COMPANY?

23     A    SOMEWHERE ELSE.

24     Q    SOME OTHER COMPANY?

25     A    YES.

EXHIBIT 52

PAGE 780

267

1      Q    YOU DON'T REMEMBER WORKING WITH ANNA AT ALL

2   WHEN YOU WERE THERE AT M.G.A.?

3      A    NO.

4      Q    YOU TWO DIDN'T CROSS PATHS THERE?

5      A    NO.

6      Q    WAS FACE PAINTING FOR BRATZ PART OF YOUR

7   RESPONSIBILITY WHEN YOU WERE THERE?

8      A    NO.

9      Q    YOU DIDN'T HAVE ANY DEALINGS WITH THE FACE

10  PAINTERS ON BRATZ?

11     A    NO.

12     Q    DID YOU RUN ACROSS ANNA RHEE FOR THE FIRST

13  TIME AFTER YOU WERE AT M.G.A., OR WAS IT BEFORE?

14     A    AFTER.

15     Q    DO YOU RECALL WHAT THE OTHER DOLL LINE WAS?

16     A    MYSTIKATS.

17     Q    WITH RESPECT TO THE MYSTIKATS PRODUCTS, HOW IS

18  IT THAT ANNA RHEE CAME TO WORK ON THOSE?  WAS IT

19  SOMEONE YOU PICKED, OR WAS SHE SOMEONE WHO CAME TO YOU?

20          MR. ETCHEVERRY:  OBJECTION.  LACKS FOUNDATION.

21          THE WITNESS:  I HAD CALLED ON MERCEDAH TO HELP

22  ME DEVELOP THIS DOLL LINE WHEN I WAS AT PLAYHUT.

23  BY MR. ZELLER:

24     Q    DID SHE DO THAT?  DID MERCEDAH HELP YOU ON

25  THAT?

EXHIBIT 52

PAGE 781

268

1              DEPONENT'S DECLARATION

2

3    STATE OF CALIFORNIA        )

4                               ) SS.

5    COUNTY OF LOS ANGELES      )

6

7         I,_____, DO

8    HEREBY CERTIFY UNDER PENALTY OF PERJURY THAT THE

9    FOREGOING DEPOSITION IS TRUE AND CORRECT.

10

11

12

13

14   EXECUTED AT_____.

15                          (PLACE)

16

17

18   ON_____.

19                          (DATE)

20

21

22

23              _____

24              EXHIBIT 52

25              PAGE 782

333

```
 1    STATE OF CALIFORNIA     )
 2                            ) SS.
 3    COUNTY OF LOS ANGELES   )
 4
 5        I, BETH FELIX, CERTIFIED SHORTHAND REPORTER,
 6    CERTIFICATE NO. 12766, FOR THE STATE OF CALIFORNIA,
 7    HEREBY CERTIFY:
 8        THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT
 9    THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME THE
10    DEPONENT WAS PLACED UNDER OATH BY ME;
11        THE TESTIMONY OF THE DEPONENT AND ALL OBJECTIONS
12    MADE AT THE TIME OF THE EXAMINATION WERE RECORDED
13    STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED.
14    THE FOREGOING TRANSCRIPT IS A TRUE AND CORRECT
15    TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;
16        I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR
17    NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN ANY WAY
18    INTERESTED IN THE OUTCOME THEREOF;
19        IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED MY
20    NAME THIS 26TH OF FEBRUARY, 2008.
21
22                    Beth Felix
                      _____
                           BETH FELIX
23
24
25                    EXHIBIT  52
                      PAGE     783
```

334

**EXHIBIT 53**



# ANNUAL RETIREMENT GUIDE

The McGraw-Hill Companies

# BusinessWeek

JULY 28, 2003                                   www.businessweek.com

# CITI'S NEXT ACT

**STOCK VS. OPTIONS**
THE NEW EXEC COMP GAME

**STRATEGIES**
▸YAHOO!
▸GENERAL MILLS
▸MATTEL

**GE**
MEET CHARLENE BEGLEY, A RISING STAR

**INVESTING**
HOW OUR WALL STREET COLUMN PERFORMED

**CHUCK PRINCE:**
Sandy Weill's top troubleshooter is the unlikely choice to become CEO. Does he have the right stuff to lead the world's most important bank? PAGE 30

#BXBBG0D ***CR LOT 0016A*C033
#JLI2121G091 0H300116    BX003676
GARY JOLICOPUR          MAR 22 04   071994 0975
2121 GATES AVE B                    T099
REDONDO BEACH  CA  90278-2007

EXHIBIT  53
PAGE  784



Exhibit no. 631
Date: 8/30/07
Mabride Pyburn

M 0074054

631.1

stead, regular uniform fabric may sport nano-size umbrellas that open to seal the cloth's pores, making it impervious to airborn chemicals and pathogens.

In both cases, a key objective is to take a load off soldiers' backs. Today, they lug 60 pounds or more into battle, depending upon which weapon they carry, and the so-called marching load is almost twice as heavy. In five years, the Army wants to trim the combat load to 40 pounds, and then to 15 pounds with the Future Warrior outfit. MIT's Vest predicts that armored vests, which weigh 28 pounds now, will end up "at around eight pounds, maybe even five."

Artificial muscles that could enable soldiers to leap tall walls, if not buildings, are in the works, too. One candidate is made from polypyrrole. It flexes when jolted by electricity, then relaxes when the juice is turned off. So far, though, its reactions are much too slow.

Even with the best armor, wounds are inevitable. So when a soldier is hit in an arm or leg, special fibers in the uniform would constrict into a tourniquet. This will be a real life-saver, because half of all battlefeild deaths are due to massive blood loss before wounded soldiers can be treated. In addition, sensors would provide the soldier's vital signs and location to medics via radio. Until the Future Warrior garment is ready, soldiers will wear an adhesive chest patch fitted with sensors and a tiny radio. It's being developed by MIT partner CIMIT (Center for Integration of Medicine & Innovative Technology) in Cambridge, Mass.

To satisfy its industrial partners and avoid chewing up money needlessly, the new institute will be "run on a business model, with regular milestone reviews," says Edwin L. "Ned" Thomas, the MIT materials-science professor tapped as its head. It will have a staff of 40 MIT scientists from eight departments, plus 100-odd graduate students and visiting researchers from the Army and industry.

Thomas admits that some wish-list items may never materialize. But that's okay—the idea is to infuse army research with new thinking. So the Pentagon plans to announce, starting in August, more research centers at other universities, focused on such areas as biotechnology and detecting landmines. In the same spirit, to supplement its $1.2 billion research effort, the Army will funnel $25 million to small, innovative companies that probably never dreamed of getting a Pentagon contract. The fund's top priority? Finding better ways to generate and store power for the Army's high-tech gadgets. It's easy to see why: A brigade of 1,500 troops goes through 120 tons of batteries a year. And that's before they hit their invisibility buttons.

*By Otis Port in Cambridge, Mass.*

## The Corporation

### COMMENTARY
### By Christopher Palmeri

# TO REALLY BE A PLAYER, MATTEL NEEDS HOTTER TOYS

The Bratz pack has invaded the Gabriela house. The line of trendy dolls burst on the scene two years ago, offering girls a hipper alternative to the old standby, Barbie. Thinks Jennifer Lopez to Barbie's Reese Witherspoon, Joan Gabriela, a Hollywood (Fla.) mother of two, now has eight Bratz dolls in her home. Her daughters, ages 6 and 9, rarely touch their Barbies. "Barbie is pretty much a thing of the past," she says. "They like Bratz better."

That's bad news for Barbie's maker, Mattel Inc.—and for the three-year-old turnaround efforts of CEO Robert A. Eckert, the ex-president of Kraft Foods Inc. who replaced the embattled Jill E. Barad. The El Segundo (Calif.) toy giant counts on Barbie for about one-third of its revenues and more of its profits. But Mattel says U.S. Barbie sales declined 2% last year and 14% in this year's first quarter. The overall doll category, says market researcher NPD Group Inc., dropped only 3% in the quarter.

Give Eckert, 48, his due: He pulled Mattel out of its tailspin after its disastrous $3.8 billion acquisition of Learning Co. He got rid of the money-losing computer-game maker and slashed costs. His goal: to bring the stability of a consumer-products company to the hit-driven toymaker. And using such practices as computer-aided design to speed up product development and just-in-time inventory management, he succeeded.

But now it looks like Eckert is learning a valuable lesson: Mattel is selling toys, not soap or cornflakes. Good brand management goes only so far in a business that caters to children's whims. Like it or not, the key to success is launching innovative products and promoting the heck out of them. If you don't do it, your competitors will.

Eckert's strategy has been great for Mattel's bottom line. Profits last year, before special charges, were a healthy $455 million, and the stock has nearly doubled, to $20, since Eckert arrived in May, 2000. But top-line growth has sputtered. U.S. revenues, $3.4 billion in 2002, have declined marginally in the past few years. Total 2002 sales of $4.9 bil-

lion crept up from $4.5 billion in 2000—thanks to overseas expansion.

While Eckert continues to build on the massive Barbie franchise that Barad constructed, he now knows that he needs hot new toys. Recycling old characters like *Sesame Street's* Elmo just won't be enough. "We need to do a better job on the top line," he says. "The good news is it's only spring training, and we have a long season ahead of us."

To that end, Eckert has begun an ambitious push. Between now and Christmas, he hopes to launch 250 new toys, including dozens of Hot Wheels models and Flavas, a Bratz-like hip-hop posse with baggy jeans and serious bling-bling. Originally, half of these toys weren't scheduled until 2004.

## FIRST CAME BRATZ...

| | |
|---|---|
| MAKER | MGA Entertainment |
| DEBUT | 2001 |
| NAMES | Yasmin, Sasha, Cloe, Jade, and Meygan |
| MOTTO | The girls with a passion for fashion |
| HER RIDE | Late-night stretch limo |

M 0074055

EXHIBIT 53

PAGE 785

631.2

That should help boost sales. But it's even more important that Mattel prove it can respond to nimble upstarts as well as traditional big rivals like Hasbro Inc. After all, it took the company more than a year to launch a competitor to MGA Entertainment's Bratz. My Scene Barbie didn't hit stores until last October and has yet to make a dent in Bratz's success. At its Santa Monica (Calif.) store recently, Toy "R" Us Inc. devoted just a sliver of the shelf space to My Scene that it did to Bratz. And My Scene dolls were being offered as 2 for 1. "It's not really catching ground," says Sean P. McGowan, toy industry analyst at Harris Nesbitt Gerard Inc.

Mattel will start tossing in a cell phone with 900 free minutes if you buy four of the $13.99 dolls. It also plans to add accessories and boy versions—Hudson, River, and Bryant.

Barbie isn't the only Mattel



**...THEN, MY SCENE BARBIE**

| | |
|---|---|
| **MAKER** | Mattel |
| **DEBUT** | 2002 |
| **NAMES** | Barbie, Madison, Chelsea, and Nolee |
| **MOTTO** | My city. My style. My scene. |
| **HER RIDE** | Vespa motorscooter |

Data: MGA Entertainment, Mattel

stalwart under attack. Its Fisher-Price unit, long the king of preschool, is losing sales to newcomer LeapFrog Enterprises Inc., whose electronic interactive books have captured 19% of the $2.9 billion preschool toy and electronic-learning aid markets. Eckert is counting on a successful launch in August for Power-Touch, Mattel's version of LeapFrog's popular interactive book. PowerTouch is operated by pointing a finger at an image or a word, instead of the stylus used in LeapFrog's original products. That's key for younger kids. "It's much easier for her to use," says Christopher Coye, a Los Angeles-area parent whose 4-year-old tested a PowerTouch. Still, LeapFrog releases a finger-operated system in August, too.

Over the long term, Eckert puts at risk one of the strongest toy companies around if he can't instill innovation and rapid reaction in his much-tightened organization. To his credit, he is making it crystal clear that he doesn't want ideas to linger in the pipeline. When Matchbox brand managers mentioned this year that they had designed a toy firehouse that could be shipped with no assembly required, Eckert told them to get it out by fall. "Why wait?" he says. "If you've got it, sell it." And not a moment too soon: Sales of Mattel's Hot Wheels and Matchbox cars fell 6% in the first quarter, thanks to competition for boys' attention from action figures like Hasbro's resurgent G.I. Joe and Transformers.

The question is how much Eckert needs to tweak his model. He probably cut back too much, for instance, on marketing. In 1998, Mattel's advertising and promotional spending totaled $681 million, or 13.8% of sales. By last year, it had fallen to $552 million, or 11.2% of sales. Aggressive television marketing boosted sales of Hot Wheels cars in Spain last year, and a strong new campaign could help Mattel toys here.

Mattel won't live or die on every new toy it develops. But it can't just rely on Barbies, either. "Like they say in business school—no risk, no reward," says Isaac Larian, CEO of privately held MGA. He should know: He got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers. As Eckert is finding out, sometimes the best ideas are right in front of you.

*By Christopher Palmeri in Los Angeles*

# BusinessWeek

# Manage your account online

Now you can manage your subscription through the Internet. You may change your delivery address, check your account status, renew your subscription, pay your invoice, report a missing or damaged copy, or suspend delivery of your magazine through our Customer Service site. You may go directly to www.businessweek.com/service.htm or follow these simple steps:

1. Go to www.businessweek.com.
2. Scroll down the left side listings until you reach the "Customer Service" link.
3. Click on the "Customer Service" link.
4. Scroll down below and click on US/Canadian subscribers link.

NOTE: You will ██████████ number, which appears on the label of your magazine.

For individual subscriptions, changes, or inquiries:
Phone: (800) 635-1200
Email: bwcustomerservice@neodata.com

Education Department
Phone: (800) 843-7352
Fax: (800) 876-9416
Email: bw_group@businessweek.com
Web Site:
www.resourcecenter.businessweek.com

M 0074056

EXHIBIT 53

PAGE 786

631.3

**EXHIBIT 54**

**Immigrant's Creative Company Shakes Up Toy Industry**

By JEFF WEISS; Contributing Reporter
1,098 words
29 March 2004
San Fernando Valley Business Journal
English
2004 San Fernando Valley Business Journal.  All rights reserved.

Large Business Award - MGA Entertainment, North Hills

Only 16 years old, with a mere $750 in his pocket, and with parents across the globe in Iran, **Isaac Larian** never expected to eventually be the founder of one of the fastest growing toy companies in the world.

Initially undecided whether to emigrate to the United States or to Israel, Larian opted to pursue the American dream. The Business Journal's recipient of the family business Best Large Company award, MGA Entertainment, is the end product of Larian's hard work, determination, and foresight in capitalizing upon opportunity.

Yet before becoming a toy mogul, Larian set out to forge a career in the civil engineering industry before realizing his true talents lay elsewhere.

"I came here to get a civil engineering degree because I thought I'd be a civil engineer and go back to Iran and build infrastructure," Larian said. "I graduated in 1978 from Cal State Los Angeles but I never worked as an engineer. Shortly after graduating, the (Iranian) revolution broke out and I discovered that engineering wasn't for me. I was more of an entrepreneur."

The following year Larian and his brother Farhad founded MGA as a consumer electronics company. Their first foray into the toy industry didn't come until 1987 when Isaac saw the opportunity to manufacture Nintendo's hand-held electronic games.

"I'm an entrepreneur and in 1987 I saw an opportunity to become the distributor for Nintendo's hand-held games. I just saw opportunity. Most entrepreneurs do that," Larian said.

After two years in the hand-held video game industry, MGA left the toy game and returned to consumer

Page 229       © 2005  Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT 54

PAGE 787

M 0101133

electronics. Returning in 1993 to produce Mighty Morphin Power Rangers accessories, MGA never left the toy industry, having its first breakthrough item with 1997's wildly successful Singing Bouncing Baby Doll.

"Singing Bouncing Baby was our first doll and it was a huge hit," Larian said. "We ended up winning Family Fun Toy of the Year which is the Oscars of the toy industry. We ended up doing in excess of a million pieces," said Larian.

Introducing Bratz

But MGA's greatest success came later, with the introduction of 2001's Bratz dolls. Against all odds, Larian pioneered a line of dolls able to undercut the success of Barbie, the only company to do so since Barbie's 1959 debut.

However, the modest Larian is quick to acknowledge others for contributing to the company's success. A close knit family, Larian's sister, Shirin Makabi, is the company's director of travel and expenses. Shirin's husband, Eli Makabi, is MGA's vice-president in charge of traffic in sales. In addition, the Makabis co-own the business with Larian. But Larian family involvement does not stop there; Larian's children have played a crucial role in MGA's development.

"My oldest son, 17-year-old Jason, is very creative and a music writer. He has come up with some of our popular toys," Larian said. "He came up with Commandobot—a robot that was the first ever robot toy to work on voice recognition. It was a fantastic seller that was featured in Wired magazine. It was Jason's idea for Bratz."

Larian's other children have also been key to product development.

"Yasmin, my 15-year-old daughter, is involved in the business as well. She's particularly interested in fashion and focus groups. One of the Bratz is named after her," Larian said. "My 10-year-old son, Cameron, is also the namesake for one of the boy Bratz. Cameron comes up with different product ideas. One of our best ideas was a winter wonderland Bratz line. We were on a family ski vacation and he said 'Dad, you should do a Bratz winter break.' So we did it and it sold wonderfully."

Thanking the employees

Larian also credits the company's 430 employees for much of MGA's success.

"Our success is due to the passion of the people we have working for us. Each one has contributed to our success because they are passionate about the company and winning."

Page 230      © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT   54

PAGE   788

M 0101134

With business booming, a Bratz licensing deal with 20th Century Fox has been inked. A Bratz DVD and a Bratz feature film are soon on the way.

"The Bratz are a true phenomenon that has taken the toy/doll industry by storm," Jim Gianopulos, chairman of Fox Filmed Entertainment, said. "They are more than just toys; they reflect the cultural diversity and contemporary style that kids relate to. That kind of success and impact on young people make the company a natural in a major motion picture, and we look forward to turning the Bratz figures into major motion picture stars."

MGA's projected revenue for 2004 is $1 billion and the company has openings for 110 employees in a variety of positions. Although MGA's success is now assured, there were obstacles along the way.

"I noticed some discrimination when I first got into the business world. I think that after living here for 33 years, there is unfortunately discrimination whether you're Jewish, Persian, black or whatever," Larian said. "But it made me stronger to go out and fight. People become resilient and they get angry and they need to turn that anger into positive energy."

Larian has certainly come a great distance from being a teenager with inclinations towards civil engineering and less than a thousand dollars in his pocket. Thanks to MGA, Barbie's pedestal seems a little less secure.

"I'm having a lot of fun and enjoying what I'm doing here right now and I think as long as you have fun at your job, it's a great thing," Larian said. "I believe that in life you have to have passion for what you do and if you lose that passion you shouldn't do it. My vision is for MGA to become a multibillion-dollar entertainment company and specialize in other things besides just toys."

Looking back on the whirlwind rise of MGA, Larian still seems a bit surprised by the amount of success he's encountered.

"My life is proof that dreams come true. You can't give up. They were definitely moments of self-doubt. I just didn't want to fail, I always had that desire to win," Larian said. "We've made history by unseating Barbie and for a small San Fernando Valley company to do that is a miracle."

Document SFVBJ00020041020e03t0003p

Page 231    © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT ___54___

PAGE ___789___

M 0101135

**EXHIBIT 55**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware Corporation,

Plaintiff,

vs.                    CASE NO. CV 04-9059 NM
                                (RJBx)

CARTER BRYANT, an individual, and
DOES 1 through 10, Inclusive.

Defendants.

_____

CARTER BRYANT, on behalf of himself,
all present and former employees of
Mattel, Inc., and the general public.

Cross-Complaint.

vs.

MATTEL, INC.,
a Delaware corporation.

Cross-Defendant.

_____

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF JACQUELINE RAMONA PRINCE

Tuesday, December 21, 2004

Atlanta, Georgia

Reported by:
Kendra R. Bridges
B-2194 Court Reporter
Court Reporter/Notary Public
JOB NO. 29654

EXHIBIT _____ JJ

PAGE _____ 790



**www.sarnoffcourtreporters.com**

46 Corporate Park, Suite 100      445 South Figueroa St., Suite 2950
Irvine, CA  92606                Los Angeles, CA  90071

phone  877.955.3855
fax    949.955.3854

**SARNOFF**
*Court Reporters and*
*Legal Technologies*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

4   MATTEL, INC., a Delaware Corporation,

5                 Plaintiff,

6        vs.              CASE NO. CV 04-9059 NM
                              (RJBx)

7   CARTER BRYANT, an individual, and
    DOES 1 through 10, Inclusive.

8                 Defendants.

9   _____

    CARTER BRYANT, on behalf of himself,
10  all present and former employees of
    Mattel, Inc., and the general public.

11
                  Cross-Complaint.
12
         vs.
13
    MATTEL, INC.,
14  a Delaware corporation.

15                Cross-Defendant.

16  _____

17

18        Deposition of JACQUELINE PRINCE, taken by the

19  Defendant, at 999 Peachtree Street, Suite 2300, Atlanta,

20  Georgia, on the 21st day of December, 2004, at 9:40 a.m.,

21  before Kendra R. Bridges, Registered Professional

22  Reporter and Notary Public.

23                              EXHIBIT ____55____

24

25                              PAGE ____791____

2

**SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES**
**877.955.3855**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    APPEARANCES OF COUNSEL:

2

3    For the Plaintiff and Cross-Defendant:

4    MR. MICHAEL T. ZELLER, Esq.

5    Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP

6    865 South Figueroa Street

7    Tenth Floor

8    Los Angeles, California   90017

9    213-624-7707

10   213-624-0643

11   mtz@quinnemanuel.com

12

13   MICHAEL MOORE, Esq.

14   Mattel, Inc.

15   333 Continental Boulevard

16   El Segundo, California   90245

17   310-252-2000

18   310-252-3861

19   michael.moore@mattel.com

20

21

22

23

24                           EXHIBIT ___55___

25                           PAGE ___792___

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:  (CONTINUED)

 2

 3    For the Defendants:

 4    LARRY W. MCFARLAND, Esq.

 5    KEATS MCFARLAND & WILSON

 6    9720 Wilshire Boulevard

 7    Penthouse Suite

 8    Beverly Hills, California   90212

 9    310-777-3750

10    310-860-0363

11    lmcfarland@kmwlaw.com

12

13    DONALD W. BENSON, Esq.

14    LITTLER MEDELSON

15    3348 Peachtree Road, NE

16    Suite 1100

17    Atlanta, Georgia   30326

18    404-233-0330

19    404-233-2361

20    dbenson@littler.com

21

22

23

24                          EXHIBIT ___SS___

25                          PAGE ___793___
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    APPEARANCES OF COUNSEL:  (CONTINUED)

2

3    For Ms. Prince:

4    DANIEL J. WARREN, Esq.

5    Sutherland Asbill & Brennan, LLP

6    999 Peachtree Street

7    Suite 2300

8    Atlanta, Georgia   30309

9    404-853-8028

10   404-853-8806

11   djwarren@sablaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT ___55___

PAGE ___794___

5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.   After.

2          Q.   So you wrote the entries in first and then

3    Mr. Bryant signed it?

4          A.   Yes.

5          Q.   And did you write these entries into your

6    journal before or after you actually stamped any

7    drawings?

8          A.   After I stamped the drawings.

9          Q.   And then so if I understand it correctly, the

10   first thing you did was -- with respect to the

11   notarization itself, we'll talk about the other

12   circumstances in a bit of course.  But with respect to

13   the notarization itself, the first thing you did was

14   notarize all of the drawings?

15         A.   Right.

16         Q.   And so with that notarization on the drawings,

17   you signed them and Mr. Carter Bryant signed them as

18   well?

19         A.   Yes.

20         Q.   And that was -- and then the next thing that

21   happened was, is that you wrote the entries into your

22   journal?

23         A.   Right.

24         Q.   And then Mr. Carter Bryant signed the journal?

25         A.   Right.  That's how I remember it.

EXHIBIT _5_

PAGE __795__

111

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  Directing your attention to the box where it

2   says document kind or type?

3      A.  Yes.

4      Q.  And for the record, we're referring to Exhibit

5   60, and specifically the entries that pertain to the

6   notarization of Carter Bryant's drawings.  And you'll see

7   the words here:  Original sketches of doll idea hyphen

8   characters, six total, equal sign, names are colon, Zoe,

9   Lupe, L-u-p-e, Hallidae, H-a-l-l-i-d-a-e, Jay, two males,

10   and then there's an additional notation:  From 1998,

11   Missouri.

12           Do you see that?

13      A.  Yes.

14      Q.  And you wrote all those words in there?

15      A.  Yes.

16      Q.  Did you choose to put this particular

17   information down?

18      A.  This is information he gave me that he thought

19   would be helpful, so I wrote it -- tried to squeeze it

20   in.

21      Q.  My question is a little bit different.  In terms

22   of the information that's -- I understand that

23   Mr. Bryant's the source of the information --

24      A.  Yes.

25      Q.  -- but were you the one who chose to put that

EXHIBIT _____ 55

PAGE _____ 796

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  information down?  The particular information that's

2  reflected here?

3       A.  Yes.

4       Q.  Now, the names that are listed here, did you get

5  those names from the drawings?

6       A.  He told me the names and I believe the names

7  were on the drawings as well, but I remember he told me

8  the names.

9       Q.  Did you look at the drawings --

10       A.  Yes.

11       Q.  -- in order to get the names?

12       A.  I must have.

13       Q.  It's your best recollection that you got the

14  names from the drawings; right?

15       A.  Yes.

16       Q.  And let me try it this way.  How is it that you

17  knew how to spell the particular character's name?  Like

18  for example Zoe, you have Z-o-e.  How do you know it

19  wasn't Z-o-e-y?

20       A.  Right.  It --

21       Q.  Did you get that from the drawings?

22       A.  Yes, from the drawings.

23       Q.  Did Carter Bryant actually tell you the names

24  of any of these characters?

25       A.  I remember him talking about them.

EXHIBIT 55
PAGE 797

113

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    at least your viewpoint that there wasn't a way of

2    documenting through the notary process --

3        A.  No.

4        Q.  -- the creation date or the idea date?

5            MR. MCFARLAND:  Objection; calls for

6        speculation.

7            THE WITNESS:  He didn't seem disappointed.

8        Q.  (By Mr. Zeller)  Didn't seem surprised either,

9    to your mind?

10           MR. MCFARLAND:  Objection; calls for

11       speculation.

12           THE WITNESS:  No.

13       Q.  (By Mr. Zeller)  And who was it -- well, I'll

14   ask it this way:  It's your recollection that then you

15   were the one who suggested that one way of doing -- of

16   documenting the -- that at least the date as of the time

17   you were doing the notarization was you?

18       A.  Yes.

19       Q.  That wasn't something that Mr. Bryant came up

20   with that you recall?

21       A.  No.

22       Q.  Or that Mr. Bryant brought up I should say?

23       A.  No.

24       Q.  And did Mr. Bryant comment on that idea at all?

25       A.  No.

EXHIBIT ___55___

PAGE ___798___

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   He just said --

2      A.   He just said, Well, let's do that.

3      Q.   Had Mr. Bryant pulled out the drawings prior to

4  the time that you had that discussion or any part of that

5  discussion?

6      A.   Yes.

7      Q.   Okay.  Maybe you could tell me the first that

8  you can recall happening during the conversation you had

9  with Mr. Bryant?

10     A.   I just remember that the -- I just remember

11  looking at the drawings.

12     Q.   He came in and he sat down in your living room;

13  right?  Is that correct?

14     A.   Would you repeat that?

15     Q.   Yeah.  Mr. Bryant came into your house --

16     A.   Uh-huh.

17     Q.   -- or excuse me, your apartment, and sat down in

18  your living room; right?

19     A.   Right.

20     Q.   And did he pull out the drawings at that time or

21  did you -- did you chat first?

22     A.   We chatted first.

23     Q.   Was it about the drawings or about the dolls?

24     A.   He was explaining what he wanted, which was

25  to -- that he had worked on some drawings while he was in

EXHIBIT ___55___

PAGE ___799___

138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  Minnesota I think it was, and that he was trying to

2  figure out a way to document that they had been done

3  before he came from Minnesota.

4        And I said, Well, I don't know what to do except

5  we -- I mean, the only thing I can do as far as being a

6  notary is just acknowledge your signature, this date and

7  time.  If you want to do that, put those on there.  He

8  said, Okay, let's do that, and that was that.

9     Q.  Was it actually Missouri instead of Minnesota?

10    A.  I don't know if it was Missouri or Minnesota.  I

11 always forget which one.

12    Q.  If you take a look back at Exhibit 60 in your

13 journal entry, you'll see it has the word Missouri?

14    A.  Oh, okay.  I'm sure it's Missouri.

15    Q.  Does that help your recollection?

16    A.  Yeah.  Oh, yeah.  I'll be -- I still don't

17 remember.

18    Q.  But based on your journal entry, you think

19 it's more likely it was Missouri?

20    A.  Well, yes, that's obviously what he told me at

21 the time.

22    Q.  Well -- but my question is a little bit

23 different in this sense:  Did Mr. Bryant pull out the

24 drawings before he started explaining what they were and

25 what he wanted or did he start explaining first and then

EXHIBIT __55__

PAGE __800__

139

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    show you the drawings?

2         A.   I don't remember exactly.

3              THE VIDEOGRAPHER:   12:48.  We're off the

4    record.

5              (Whereupon, a recess was taken.)

6              THE VIDEOGRAPHER:   1:17.  We're back on the

7    record.

8         MR. ZELLER:   Let's please mark as Exhibit 61 a

9    one-page document which consists of a letter from

10   Charlotte McCluskey to Jacqueline Ramona Prince,

11   dated July 21st, 2004.

12             (Whereupon, Exhibit 61 was marked for

13             identification.)

14        Q.   (By Mr. Zeller)   For the record this is a letter

15   that was just produced today?

16        A.   Yeah.

17        Q.   And you recognize that as the letter that you

18   were referring to earlier in your testimony --

19        A.   Yes.

20        Q.   -- relating to the original of your notary

21   journal?

22        A.   Yes.

23        Q.   And the stamp as well?

24        A.   Yes.

25        Q.   Now, unfortunately there's only -- why don't you

EXHIBIT  55

PAGE  801                                    140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    hang on to that.

2        A.   Okay.

3        Q.   There's only one copy so I apologize for

4    standing a bit.   I would just take a -- ask you a few

5    questions about it.

6             You'll see that this letter is July 21st, 2004?

7        A.   Yes.

8        Q.   And the letter references that the attorney,

9    Charlotte McCluskey, took possession of the original

10   notary book and the stamp on that day?

11       A.   Right.

12       Q.   Was that the same day that she met with you?

13       A.   Yes.

14       Q.   And seeing this letter, does that refresh your

15   recollection that it was Charlotte McCluskey who visited

16   you at your home?

17       A.   Yes.   It was Charlotte McCluskey.

18       Q.   Now, are your initials somewhere on this

19   document?

20       A.   Yes.   The top set of initials and date are mine.

21       Q.   And the date there is 7/21/04?

22       A.   Right.

23       Q.   And who are the initials of the person below?

24       A.   Charlotte McCluskey, 7/21/04.

25       Q.   Now, you'll see it says by hand-delivery.   Did

EXHIBIT ___55___

PAGE ___802___                                    141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  she actually bring the letter with her to the meeting or

2  did she send it by messenger later on?

3      A.  I believe she brought this with her.  And I

4  handed it to her, yes.

5      Q.  And so you both initialed the letter at the same

6  time while you were there in the house?

7      A.  Yes.

8      Q.  And then there's some handwritten notation

9  there.  It says to the effect, and stamp enclosed in

10  case?

11      A.  Yes, that's my handwriting because she had just

12  put regarding notary book and I said, Well, the stamp is

13  in there, too, so I wrote that on there.

14      Q.  Now, other than the notary book and the stamp as

15  reflected in this letter, did you give anything else to

16  Ms. McCluskey on that day?

17      A.  No.

18      Q.  No documents or any other tangible things?

19      A.  No.  Just -- I handed her this entire packet,

20  whatever's in that little case.

21      Q.  And then did you make a copy of the letter at

22  the time or was one sent to you later?

23      A.  One was sent to me later.

24      Q.  It was a photocopy?           EXHIBIT __55__

25      A.  Yes.                          PAGE __803__

142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  And how was that sent to you?

2    A.  In the mail.

3    Q.  And then have you had any communications with

4  Ms. McCluskey in any way since the letter was signed?

5    A.  Not exactly.  I called and left her a voice mail

6  when I got a request to come to a deposition.

7    Q.  And so you learned about the possibility of

8  there -- a deposition would be taken in the case from

9  that voice mail?

10   A.  No.  I got -- received something in the mail.

11   Q.  Oh, I see.  You left it for her?

12   A.  Yes.  So, I called her and said, Hey, what do I

13  need to do?

14   Q.  And did you hear back from her?

15   A.  No, I heard back from Dan Warren.

16   Q.  And did you have any other communications with

17  attorneys in between the time that you signed this letter

18  that's dated -- or initialed I should say, this letter

19  dated July 24th, 2004 and the time you spoke with

20  Mr. Warren?

21   A.  No.  July 21st, no.  21st.

22   Q.  Oh, I'm sorry I misspoke --    EXHIBIT ____55____

23   A.  That's okay.

24   Q.  -- 21st.    PAGE ____804____

25        Returning to the time when Mr. Bryant came to

143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    your apartment when you notarized the drawings, we were

2    talking about when Mr. Bryant showed you the drawings.

3           Do you recall how many drawings there were?

4      A.  No.  Several, but I don't recall exactly how

5    many sheets of paper.  I wrote it in my notary book at

6    the time.

7      Q.  Were all the drawings on the same kind of paper

8    or were they on different kinds of paper?

9      A.  I don't remember.

10     Q.  Do you remember some of the drawings being on

11   tracing paper?

12     A.  I don't remember.

13     Q.  Do you recall the drawings being on kind of

14   over-sized translucent paper that had to be unfolded?

15     A.  I remember big paper, but I don't remember what

16   kind of paper.

17     Q.  Were all the drawings that you saw on the same

18   kind of paper?

19     A.  I don't remember that.

20     Q.  Did you eventually notarize all of the drawings

21   that Mr. Bryant brought with him?

22     A.  Yes.  I notarized every sheet of paper he had.

23     Q.  So there were no other additional drawings that

24   Mr. Bryant brought with him that you did not notarize?

25     A.  No.

EXHIBIT ___55___

PAGE ___805___

144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   My statement is correct?

2    A.   Your statement's correct.

3    Q.   Do you recall drawings having to be unfolded

4  when you were in the process of notarizing them?

5    A.   Unfolded, no.

6    Q.   Do you remember any of the drawings being folded

7  up?

8    A.   No.  I don't remember anything being folded.

9    Q.   Were all the drawings that you were shown in

10  black and white?

11    A.   Yes.

12    Q.   You weren't shown any big color drawings --

13    A.   No.

14    Q.   -- is that correct?

15    A.   No.  I don't remember seeing color.

16    Q.   My statement's correct?

17    A.   Your statement's correct.

18    Q.   Just to follow up on that point, you put in your

19  notary journal that you notarized 13 drawings in total?

20    A.   Yes.  Yes.

21    Q.   Those were the total number of drawings, these

22  13 drawings, that Mr. Bryant brought with him and that

23  you notarized; is that correct?   EXHIBIT _55_

24    A.   Yes.                        PAGE _806_

25    Q.   And did you count them yourself?  The number of

145

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  them?

2       A.  I don't remember counting them.

3       Q.  Do you have any recollection as to where you got

4  the number 13 from in particular?

5       A.  I just don't remember counting them.  I'm sure I

6  did, but I don't remember actually going one, two, three,

7  four.

8       Q.  It is your expectation that you were the one who

9  identified that there were 13 of these drawings?

10          MR. MCFARLAND:  Objection --

11          THE WITNESS:  Yes.

12          MR. MCFARLAND:  -- calls for speculation.

13       Q.  (By MR. Zeller)  That would be in accordance

14  with your normal practice as a notary --

15       A.  Right.

16       Q.  -- is that correct?

17       A.  Well, yes.

18       Q.  By the way, was that the first time you had ever

19  notarized any kind of drawings?

20       A.  Yes.

21       Q.  Did you ever subsequently notarize any kind of

22  drawings?

23       A.  No.

24       Q.  That was the first and only occasion?

25       A.  Right.

EXHIBIT _55_

PAGE _807_

146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Had anyone ever asked to -- you to notarize

2   drawings other than this instance with Mr. Bryant?

3      A.   No.

4      Q.   I'm talking about before or after?

5      A.   Right, no.

6      Q.   Now, other than the content of the conversation

7   that you had with Mr. Bryant that you've told me so far

8   about in this deposition, is there anything else that you

9   said or that he said in the course of the conversation?

10      A.   No.

11      Q.   You've told me your complete testimony as to the

12   contents of those conversations or that conversation?

13      A.   Yes.

14      Q.   Prior to the time that Mr. Bryant came to your

15   apartment and had the drawings notarized, did you have

16   any understanding or belief that Mr. Bryant was working

17   on this project?

18      A.   No.

19      Q.   So this was the first time that you had learned

20   about it?

21      A.   Yes.

22      Q.   Did Mr. Bryant say at any point during that

23   conversation or at any other time as to whether or not he

24   was working with anyone else on this project?

EXHIBIT 55

25      A.   No.

PAGE 808

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  Did you ever obtain an understanding from any

2    source as to whether or not Mr. Bryant was working on

3    this project with anyone?

4    A.  No.

5    Q.  If you could return to your journal entry for a

6    moment where it says document kind or type, the Carter

7    Bryant entry?

8    A.  Yes.

9    Q.  It says original sketches of doll idea.

10   Do you see that part of it?

11   A.  Yes.

12   Q.  And then later on it says from 1998, Missouri?

13   A.  Right.

14   Q.  Was it your understanding that Mr. Bryant was

15   telling you that the doll ideas were from 1998, Missouri,

16   or that the sketches were?

17   A.  The sketches.  That was my understanding.

18   Q.  Do you have an understanding as to why you wrote

19   down doll idea?

20   A.  No.  I don't remember why I wrote doll idea.

21   Q.  Are those words that Mr. Bryant used?

22   A.  I don't remember.

23   Q.  Other than in conversations that you had with

24   Mr. Warren, have you ever discussed with anyone the fact

25   that Mr. Bryant had these drawings notarized?

EXHIBIT _____ 55

PAGE _____ 809

148

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.  No.

2    Q.  So it's fair to say that in between the time

3  that Mr. Bryant came to your apartment and had the

4  drawings notarized all the way up until your first

5  conversation with Mr. Warren, you never discussed the

6  subject with anyone?

7    A.  No.

8    Q.  And no one had ever asked about it?

9       THE WITNESS:  No.

10      MR. MCFARLAND:  Objection.  Misstates her

11  testimony.  She already testified about the Cendali

12  conversation.

13      MR. ZELLER:  I'm sorry.

14      MR. MCFARLAND:  She already testified about the

15  conversation with Ms. Cendali which predated the

16  conversation with Mr. Warren.  You just said, Isn't

17  it fair to say that there were no conversations

18  about these notarizations from the time of Carter

19  Bryant to Mr. Warren and Ms. Cendali was before

20  Mr. Warren.

21      MR. ZELLER:  I'll clarify that then.

22    Q.  (By Mr. Zeller)  Let me restate it just so the

23  record is clear on that point.

24      Other than your first contact with Ms. Cendali,

25  did you discuss with anyone the fact that Mr. Bryant had

EXHIBIT 55
PAGE 810

149

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    these drawings notarized after you had notarized them?

2        A.   No.

3        Q.   So it's fair to say that you didn't discuss with

4    anyone the fact that these drawings were notarized from

5    the time that you notarized them up until the time that

6    you had the discussion with Ms. Cendali?

7        A.   Right.  Correct.

8        Q.   And so the record is clear, the first time that

9    you discussed with anyone ever, the fact that

10   Mr. Bryant -- the fact of this notarization of

11   Mr. Bryant's drawings, was when you received the call

12   from Ms. Cendali?

13       A.   Correct.

14       Q.   And that's the call that you had testified about

15   before?

16       A.   Right.

17       Q.   Did you have any reaction when Mr. Bryant showed

18   you the drawings?

19       A.   Yes.

20       Q.   What was your reaction?

21       A.   I thought they were great.

22       Q.   Did you tell him that?

23       A.   Yeah.

24       Q.   Did you say anything else to Mr. Bryant about

25   the drawings?

EXHIBIT ___5___

PAGE ___811___

150

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   The only thing I really said is I thought they

2  were really hip looking and I thought it was a great idea

3  but other than that, no.   Just that he's really talented.

4  I always told him he was really talented when he

5  sketches.

6    Q.   Did you tell Mr. Bryant that you thought that

7  they were original or very original?

8    A.   Yeah, I told him what a great idea.

9    Q.   Well, let me break this down a little bit.   Do

10 you ever recall using the word original?

11   A.   I don't recall.

12   Q.   At that time, would you consider yourself to be

13 somebody who could detIrmen whether or not drawings were

14 original or not?

15       MR. MCFARLAND:   Object again to the use of the

16     word original, which is, of course, a copyright term

17     and therefore calls for a legal conclusion.

18       MR. WARREN:   Join the objection.

19       THE WITNESS:   They looked original to me.

20   Q.   (By Mr. Zeller)   That's not quite what I'm

21 driving at, but, first of all just so the record is

22 clear --

23   A.   I guess I don't understand.

24   Q.   Just so the record is clear, you don't recall

25 using the word original to Mr. Bryant; correct?

EXHIBIT _____ 55

PAGE _____ 813

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.  I don't recall.

2    Q.  And so my next question is:  Did you consider

3  yourself at that time someone who had sufficient

4  experience in the area to detIrmen whether or not

5  something was original such that you said that to

6  Mr. Bryant?

7         MR. MCFARLAND:  Objection to the use of the

8      word original.  It calls for a legal conclusion.

9         MR. WARREN:  Join the objection.

10        THE WITNESS:  What do you mean when you say

11     consider myself -- did you say an expert?

12    Q.  (By Mr. Zeller)  Or someone who was in a

13  position to comment on whether or not Mr. Bryant's

14  drawings were quote original unquote?

15        MR. MCFARLAND:  Same objection.

16        THE WITNESS:  Well, it looked like there were

17     pencil marks on it, if that's what you mean.  They

18     didn't look like copies.

19    Q.  (By Mr. Zeller)  Other than the drawings, did

20  Mr. Bryant bring anything with him?

21    A.  No.

22    Q.  Did you ever see any 3-dimensional

23  representations or prototypes or models or anything like

24  that of Mr. Bryant's dolls?

EXHIBIT _5_

25    A.  No.

PAGE _813_

152

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  And I'm asking in any context?

2    A.  No.

3    Q.  At the time that the notarization of

4  Mr. Bryant's signature was done on the drawings, did you

5  notarize anything else for Mr. Bryant such as an

6  affidavit of any kind?

7    A.  I don't think so.  I think I just notarized

8  drawings for him.

9    Q.  Did Mr. Bryant tell you anything about the

10  circumstances under which he claimed to have come up with

11  the doll idea?

12    A.  All he told me is that while he was home, back

13  home, he came up with this concept for some dolls and

14  that's it.

15    Q.  You'll see in the notary journal which we marked

16  as Exhibit 60 --

17    A.  Uh-huh.

18    Q.  -- that there's a reference to 1998?

19    A.  Yes.

20    Q.  Did Mr. Bryant use the word 1998 to describe

21  when he came up with it?

22    A.  Yes.                    EXHIBIT ___55___

23    Q.  So he --                PAGE ___814___

24    A.  Pertaining to last year.

25    Q.  -- he specifically referred to the year?

153

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.  Yes.

2    Q.  Did he say what month in the year?

3    A.  I don't remember.

4    Q.  You don't have a recollection of him saying

5    that?

6    A.  I don't have a recollection, no.

7    Q.  Is it your expectation that if Mr. Bryant told

8    you the month in 1998, that he said that he came up with

9    this, that you would have written it down in the notary

10   journal?

11        MR. MCFARLAND:  Objection.

12        THE WITNESS:  I don't remember.

13        MR. MCFARLAND:  Objection.  Calls again as

14        before, you ask these questions, Is it your

15        expectation; it calls for speculation.

16        MR. ZELLER:  It's completely proper.

17        MR. MCFARLAND:  Calls for speculation.

18        MR. ZELLER:  You can go ahead and answer.

19        THE WITNESS:  I don't remember.

20   Q.  (By Mr. Zeller)  I'm not asking about

21   your memory at this point.  What I -- what I'm trying to

22   find out is, is based upon your experience as a notary,

23   and what it is that you did in connection with notarizing

24   Mr. Bryant's signature on these drawings, is it your

25   expectation or belief that if Mr. Bryant said to you that

EXHIBIT  5

PAGE  815

154

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   he came up with this idea in a particular month in 1998,

2   that you would have reported that in the journal?

3          MR. MCFARLAND:  Object to the -- object to the

4      question as phrased.  Calls for speculation.

5          MR. WARREN:  Join the objection.

6          THE WITNESS:  I don't know what to say.

7      Q.  (By Mr. Zeller)  It's fair to say that it's

8   your best testimony based on your understanding and based

9   upon your recollection, that you didn't receive any

10  information about what month in 1998 that Mr. Bryant

11  claimed to have come up with the idea; right?

12         MR. MCFARLAND:  Objection; mischaracterizing

13     her testimony.  She says she doesn't recall whether

14     he told her or not.  That is her testimony.

15         MR. ZELLER:  You can go ahead and answer.

16         THE WITNESS:  I don't recall.

17     Q.  (By Mr. Zeller)  I'm not asking about

18  recollection only.

19             (Whereupon, the record was read by the

20             reporter.)

21         MR. WARREN:  I'll join the objection; that is

22     it your best testimony seems to be is it your best

23     guess, which calls for speculation.

24         THE WITNESS:  Since we're -- okay, I would

25     assume that if he told me the month while I was

EXHIBIT 55

PAGE 816

155

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    writing this down that I would have written it down,

2    but it's an assumption.

3    Q.   (By Mr. Zeller)   It is your expectation,

4    correct?

5         MR. MCFARLAND:   Objection to the use of

6    expectation; it calls for speculation.   She's

7    already said she doesn't remember.   Now you're

8    asking her to guess.

9    Q.   (By Mr. Zeller)   My question is when you use the

10   word assume, you're saying that's your expectation;

11   correct?

12        MR. WARREN:   Objection.

13        MR. MCFARLAND:   Object to the use of the word

14   expect.   Expect is a guess.

15        THE WITNESS:   That's my guess.

16        MR. ZELLER:   Your expectation?

17        MR. MCFARLAND:   She's already answered the

18   question.

19        MR. WARREN:   Objection.

20        THE WITNESS:   It's my guess.   Really that's --

21   I mean, I don't know what else to say.

22   Q.   (By Mr. Zeller)   Well, let me try it this way.

23   If Mr. Bryant told you a particular month in 1998 that he

24   claims to have come up with the doll idea -- I'm sorry,

25   I've actually -- can you read back what I said?

EXHIBIT  5

PAGE  817                        156

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          (Whereupon, the record was read by the

2          reporter.)

3     Q.   (By Mr. Zeller)  We'll come back to this in

4  another way.  Let me -- let me ask something else though

5  first to try to lead into some of this.

6          I take it you don't have any personal knowledge

7  as to the date when Carter Bryant came up with what he

8  says was his doll idea; correct?

9     A.   No, no.

10    Q.   I -- my statement's correct?

11    A.   Correct.

12    Q.   The only information that you received was based

13  upon information from Mr. Bryant; is that correct?

14    A.   Correct.

15    Q.   So you don't know for a fact that Mr. Bryant

16  came up with the doll idea or did the sketches in

17  Missouri in 1998; correct?

18          MR. MCFARLAND:  Objection; asked and answered.

19      She's already answered the question.

20          THE WITNESS:  Well, I've seen his sketches

21      before.  And it looks like his work.

22    Q.   (By Mr. Zeller)  My question is a little bit

23  different.  I'm talking about these particular drawings

24  and this particular doll idea.  EXHIBIT ___55___

25    A.   Uh-huh.                PAGE ___818___

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   My question is:  You don't have any direct

2  personal knowledge --

3      A.   No.

4      Q.   -- that Mr. Bryant came up with the doll idea or

5  did the sketches when he was in Missouri in 1998; is that

6  correct?

7      A.   Correct.

8      Q.   Did you talk with Mr. Bryant after he had come

9  by your apartment and had the drawings notarized?  I'm

10  talking about any subject.

11      A.   What do you mean had I talked to him?  Have I --

12  did I talk to him after that?

13      Q.   Yes.

14      A.   In any way, shape, or form?

15      Q.   That's right.

16      A.   I worked with him; I would say, yes.

17      Q.   Do you have a recollection of actually talking

18  to him after he had come by your apartment?

19      A.   No.  No specific conversation.

20      Q.   But it's your best recollection that you did

21  talk with him at the design center?

22      A.   I don't remember specifically talking to him

23  about anything, but I do remember being around him.

24      Q.   And I take it from your prior testimony, just so

25  the record's clear on this, you never discussed again

EXHIBIT ___5J___

PAGE ____819____

158

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   with Mr. Bryant the notarization of his drawings?  It

2   never came up again?

3        A.   No.

4        Q.   Do you remember if Mr. Bryant left Mattel before

5   you did?

6        A.   I don't remember that.  I don't remember when he

7   left.

8        Q.   Do you -- do you recall going to a going-away

9   party or anything like that for Mr. Bryant?

10       A.   No.

11       Q.   Did you have one when you left Mattel?

12       A.   Did I have one when I left Mattel?

13       Q.   Yeah.

14       A.   I had a going-away party when I left Barbie

15   Collectibles and went into sculpting.  But, no, I didn't

16   have a party when I left sculpting.

17       Q.   Did you have any kind of lunch or any gathering

18   like that?

19       A.   I don't think so, no.

20       Q.   You don't recall ever discussing with Mr. Bryant

21   the fact that you were leaving Mattel or that he was

22   leaving Mattel?

23       A.   I don't recall.

24       Q.   You don't have a recollection of having a

25   conversation like that?

EXHIBIT  55

PAGE  820

159

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   No, I don't.

2      Q.   You had talked a bit about the falling out that

3 you had with Ron.  If you could please tell us, were

4 there any other circumstances surrounding your fallout

5 with Ron other than what you had described previously?

6      A.   No.

7      Q.   Was he someone you had a good work -- working

8 relationship with prior to that time?

9      A.   Yes.

10      Q.   And then I take it that when, from your

11 perspective, Mr. Longsdorf didn't follow up on his

12 promises, you were -- you were disappointed?

13      A.   Correct.

14      Q.   And did you go and express that to him?

15      A.   Yes.

16      Q.   And that's what ultimately led you to stop

17 working for Ron and then in going to sculpting?

18      A.   Yes.

19      Q.   And did that happen all at once?

20      A.   Within a few days.

21      Q.   So things went downhill very rapidly from the

22 conversation you had with Ron?

23      A.   Yes.

24      Q.   And from your perspective, was it -- was it

25 mutual at that point that Ron also thought it was best if

EXHIBIT _55_

PAGE ____821____          160

www.huseby.com           Mattel, Inc., et al. v. Carter Bryant, et al.           CV 04-9059 NM (RJBX)
                         Jacqueline Ramona Prince                                 12/21/2004

Page 199

```
 1
 2    STATE OF GEORGIA:
 3    COUNTY OF FULTON:
 4    I hereby certify that the foregoing
 5    deposition was stenographically recorded by me, as
 6    stated in the caption.  The deponent was duly sworn
 7    to tell the truth, the whole truth, and nothing but
 8    the truth.  The colloquies, statements, questions,
 9    and answers thereto were reduced to typewriting
10    under my direction and supervision; that the
11    deposition is a true and correct record of the
12    testimony/evidence given by the deponent.
13    I further certify that I am not a relative,
14    an employee of attorney or counsel of the parties,
15    nor am I financially interested in the action.
16                    This, the 21st day of December, 2004
17
18              Kendra R. Bridges
19              KENDRA R. BRIDGES
20              Certified Court Reporter
21              (B-2194) and Notary Public
22              My commission expires on the
23              5th day of August 2008.
24
25                          EXHIBIT  55
                            PAGE  822
```

Reported By: Kendra R. Bridges, Court Reporter
Huseby, Inc. Charlotte, 1230 West Morehead Street, Suite 408, Charlotte, NC, 28208, 704-333-9889

KENDRA~1.TIF

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: **Mattel, Inc. v. Carter Bryant**          Pg 1 of 1 Pg
Dep. Date: **December 21, 2004**
Deponent: **Jacqueline Ramona Prince**

### CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason Therefore |
|-----|-----|-----------|-------------|------------------|
| 112 | 9 | Jay | Jade | typographical error |
| 151 | 13 | detirmen | determine | misspelled |
| 152 | 4 | detirmen | determine | misspelled |
| 174 | 15 | Jay | Jade | typographical error |

Jacqueline Ramona Prince
**Jacqueline Ramona Prince**

3-17-05
Date

AO 1286140.1

EXHIBIT ___55___

PAGE ___823___

**EXHIBIT 56**

# CONFIDENTIAL

## AND FOR

# ATTORNEYS' EYES ONLY

Alpha Reporting Service
3230-G South National
Springfield, MO 65807
(417) 887-4110
(417) 889-4246
www.alphareportingservice.com

EXHIBIT _S6_____

PAGE _824_____

# Transcript of the Testimony of
# **Thomas Bryant**

**Date:** September 26, 2007

**Case:** Bryant v. Mattel
CV-04-9049-SGL (RNBx); USDC

ALPHA REPORTING SERVICE
Phone: 417-887-4110
Fax: 417-889-4246
Email: schedule@alphareportingservice.com
www.alphareportingservice.com

EXHIBIT 56

PAGE 825

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

1

```
 1            UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION

 4

 5   CARTER BRYANT, an individual,

 6              Plaintiff,

 7        vs.        Case No. CV-04-9049-SGL (RNBx)

 8   MATTEL, INC., a Delaware corporation.

 9              Defendant.

10

11          VIDEOTAPED DEPOSITION OF

12      MR. THOMAS ALVIN BRYANT,

13   produced, sworn, and examined on Wednesday,

14   September 26, 2007, at 11:17 a.m. of that

15   day, at the University Plaza Hotel,

16   333 S. John Q. Hammons Parkway, in the City of

17   Springfield, County of Greene, and State of

18   Missouri, before me, Dawn A. Chapman, RPR, CCR

19   (MO), CCR (KS), in the above-captioned cause;

20   taken on behalf of the Defendant.

21

22

23          ALPHA REPORTING SERVICE
              3230-G South National
24       Springfield, Missouri 65807
              (417) 887-4110
25
```

EXHIBIT _56_

PAGE _886_

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

2

1              A P P E A R A N C E S

2    For Plaintiff:     MR. MICHAEL H. PAGE
                        KEKER & VAN NEST, LLP
3                       710 Sansome Street
                        San Francisco, CA 94111-1704
4                       (415) 391-5400

5    For Defendant:     MR. MICHAEL T. ZELLER
                        MS. TAMAR BUCHAKJIAN
6                       QUINN EMANUEL URQUHART
                        OLIVER & HEDGES, LLP
7                       865 S. Figueroa Street
                        10th Floor
8                       Los Angeles, CA 90017-2543
                        (213) 443-3000
9
     VIDEOGRAPHER:      MR. BEN COPELAND
10                      SOUTHWEST AUDIO-VIDEO
                        241 S. Union
11                      Springfield, MO 65802
                        (417) 887-4900

12

13

14               I N D E X

15

16   Testimony of

17   MR. THOMAS ALVIN BRYANT:           Examination

18     By Mr. Zeller:                        4

19   REPORTER'S CERTIFICATE:               160

20

21   Phonetic spellings are signified by:  (Ph.).

22   Exactly as stated:  (Sic).

23

24                          EXHIBIT ___ 5 6

25                          PAGE ___ 827

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

56

```
 1        trenches.
 2   Q    And as of the time that you had this conversation
 3        with Carter and what you talked about the -- his
 4        employment contract with Mattel --
 5   A    Uh-huh.
 6   Q    -- were you aware, was it your understanding that
 7        he was doing work with MGA?
 8   A    I was not aware of him doing any work with MGA.
 9   Q    Were you aware of him doing work for anybody?
10   A    Other than Mattel, no.
11   Q    When Carter told you that he was leaving Mattel,
12        and I'm talking about that particular time
13        period --
14   A    Uh-huh.
15   Q    -- did you have an understanding as to what he
16        was going to do after he left?
17   A    I did not know definitely what he was going to do
18        when he left.  I knew he had worked on some
19        design things and when he was living with us in
20        Kimberling City and he had worked on some
21        greeting cards, but I did not know exactly what
22        he was going to do.
23   Q    When is it that you first learned that Carter
24        was -- was doing work with MGA?
25   A    Oh, I don't remember how long it was after that,
```

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

57

1     seems like it was some weeks after that, but I

2     don't remember for sure.

3   Q   So it's -- it's your best recollection that

4     Carter told you that he was leaving Mattel, and

5     then it was a number of weeks after that time

6     period when you first came to -- to learn that

7     Carter was doing work with MGA?

8   A   Well, it was after that -- some time frame after

9     that that I learned that he was presenting some

10    things to MGA with the possibility of going to

11    work with them on a contract basis.

12  Q   So is it fair to say that the first time that you

13    heard about MGA specifically, namely, the -- the

14    name MGA Entertainment, that Carter had -- had

15    already left Mattel?

16  A   The best of my recollection, yes.

17  Q   And it was your understanding based on your

18    conversations with Carter that it was some weeks

19    after he had left Mattel when he was presenting

20    some designs to -- to MGA for consideration?

21  A   Would you rephrase it, again?

22  Q   Yeah.

23        MR. ZELLER:  If we could have it repeated,

24    please, just read it back.

25             (The requested portion of the record

EXHIBIT _____ 56

PAGE _____ 829

58

1          was read by the reporter.)

2    A     I believe that's correct.

3    Q     (By Mr. Zeller) And -- and prior to the time that

4          you had the conversation with Carter in which you

5          and he had discussed the Mattel employment

6          contract, is it your recollection that -- that

7          you learned either from Carter or from your wife

8          that -- that Carter was going to be leaving

9          Mattel?

10   A     I didn't -- I don't remember knowing about it

11         prior to -- to that conversation that he was --

12         definitely had decided he was going to leave.

13   Q     So it's your best recollection that that

14         conversation that you had with Carter about the

15         employment contract, that was the first time you

16         learned about his leaving Mattel the second time

17         around?

18   A     The best of my recollection is he told me he was

19         going to be leaving Mattel, and I told him to

20         check with his attorney or get himself an

21         attorney to go over the contract, the employment

22         contract with Mattel.

23   Q     Other than that conversation that you had with

24         him, had you ever spoken -- and I'm talking about

25         any other time over the years -- with Carter

EXHIBIT 56

PAGE 830

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

59

1    about his -- his contract or agreements with

2    Mattel?

3    A    He -- the only thing he ever said was he had an

4        employment contract that he signed when he first

5        went to work with them.  I never saw the

6        contract.

7    Q    And -- and the conversation you're mentioning

8        which he said he had such an agreement, was that

9        at the time when he was first starting with

10       Mattel during the first stint?

11   A    I believe it was, I don't remember whether it was

12       the first time or the second time that he

13       started -- that he -- we talked a little bit

14       about an employment contract -- contract.

15   Q    But he mentioned to you that he had such an

16       agreement with Mattel?

17   A    Yes.

18   Q    And this was a separate conversation and a

19       conversation that was prior to the one about the

20       employment contract and the fatherly advice that

21       you gave him?

22   A    It was prior.

23   Q    And the only thing you're not sure about is, is

24       whether it was he was first starting with Mattel

25       the first stint or the second stint?

EXHIBIT 56

PAGE 831

60

1   A    True.

2   Q    But it was -- it was one of those two?

3   A    Yes.

4   Q    Is there anything else that you can recall about

5        the conversation that you had with Carter where

6        he -- he mentioned that he had this employment

7        agreement?

8   A    No.

9   Q    Then other than those two instances you told me

10       about, the one where he had mentioned that he had

11       an employment contract with Mattel --

12  A    Uh-huh.

13  Q    -- which was near or at the time he was starting

14       with Mattel on one of his two stints, and then

15       the subsequent conversation that you mentioned

16       that you had with him right before he was leaving

17       where you and he had talked about the Mattel

18       employment contract, were there any other

19       occasions in which you and Carter talked about

20       his Mattel employment contract?

21  A    Not that I recall.

22  Q    Have you ever talked with Carter about his deal

23       or agreements with MGA?

24  A    No.

25  Q    Do you have any information about the terms of

EXHIBIT 56

PAGE 832

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

61

```
 1            his agreements with -- with MGA or his deal?
 2    A       Well, I have heard some comments but I don't
 3            know -- I -- I try not to get into my children's
 4            business too much.  I heard, you know, that he
 5            has a contract with them and he gets a certain
 6            percentage of the sales of the dolls that he
 7            creates.
 8    Q       And where did you get that understanding from?
 9    A       I believe just small talk between he and I,
10            it's...
11    Q       And when you say he, you mean Carter?
12    A       Yes.
13    Q       Is there anything else that -- that you -- you
14            know about or have any information about
15            regarding Carter's deal with MGA?
16    A       The only thing I know about it is what he's told
17            me that he works for them under a contract basis
18            and -- but I do not know any of the details of
19            the contract.
20    Q       After Carter left Mattel the second time, Carter
21            continued to live in California for a period of
22            time?
23    A       Yes.
24    Q       And then at some point he moved here to Missouri?
25    A       Yes.
```

EXHIBIT _____
PAGE _____ 833

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

149

1          with you and your wife in Kimberling City,

2          Missouri.

3     A    Okay.

4     Q    First one I wanted to ask you about is Yasmin?

5     A    No.

6     Q    Fiona?

7     A    No.

8     Q    That's F-I-O-N-A.  Kadeisha?

9     A    No.

10    Q    Sasha?

11    A    No.

12    Q    Do you have any knowledge or information about

13         the source or the inspiration behind the BRATZ

14         dolls?

15    A    No.

16    Q    Did Carter ever tell you how he came up with

17         BRATZ?

18    A    The idea of the doll?

19    Q    Right.

20    A    No.

21    Q    Do you have any knowledge or information as to

22         the source or inspiration behind the -- the name

23         BRATZ?

24    A    No.

25    Q    Is it fair to say you don't know who came up with

EXHIBIT 56

PAGE 834

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

150

1    it or where it came from?

2  A    I do not know who came up with it.

3  Q    Do you have any knowledge or information as to

4       how Carter came to be involved with or was

5       introduced to MGA?

6  A    I have no idea.

7  Q    That's not anything you've ever discussed with

8       Carter?

9  A    No.

10  Q    Does the name Mersedah Ward sound familiar to

11      you?

12  A    No.

13  Q    Does the name Sarah Halpren sound familiar to

14      you?

15  A    No.

16  Q    Are you aware of Carter applying to work for or

17      interviewing with Hasbro at any time?

18  A    No, I'm not aware of that.

19  Q    Are you aware of him applying or interviewing

20      with any toy company, other than Mattel and --

21      and MGA?

22  A    I'm not aware of any others.

23  Q    You had mentioned the occasion in which you spoke

24      with Carter about, and you called it fatherly

25      advice of getting an attorney to -- in connection

151

1        with his -- his Mattel employment contract; were

2        there any other occasions in which you advised

3        him to -- to get an attorney?

4  A   I believe I talked to him one time about getting

5        an attorney to get any kind of patent rights or

6        protection for his ideas, thoughts, inspirations

7        and drawings.

8  Q   When did you do that?

9  A   Oh, when he was -- I believe he was still going

10       to school at Otis at that time.  And it may have

11       been even before that, because he was writing

12       songs, and I said, you know, you need to protect

13       yourself when you write these songs, so it was

14       probably during that period of time.

15  Q   And did you suggest to him that it might be good

16       for him to talk to an attorney for those reasons?

17  A   Yes.

18  Q   Did Carter say that he would do that?

19  A   I believe what he told me was that he could do a,

20       what he called a poor man's patent -- or not

21       patent -- but copyright by putting it in an

22       envelope, sealing it, mailing it to himself, when

23       he got it back never opening it unless he needed

24       it.  And that was what he called the poor man's

25       copyright.  And he assured me, he said, Dad, that

EXHIBIT 56

PAGE 836

Bryant v. Mattel                9/26/2007                Thomas Bryant

152

1        will work.

2    Q   Do you know one way or another whether Carter did

3        contact an attorney to talk about the patent

4        rights and the other protections that you talked

5        about?

6    A   I really doubt it, he didn't have two dimes to

7        rub together at that time.

8    Q   You had mentioned that you know that Carter wrote

9        songs --

10   A   Uh-huh.

11   Q   -- days gone by, presumably still might, but were

12       you aware of him obtaining copyright

13       registrations for any of those songs?

14   A   Not copyright.  He did the put them in the

15       envelope, mailed them off so they would come back

16       to himself unopened, I am aware of that.

17   Q   But -- but you're not aware one way or another

18       whether he went and obtained registrations from

19       the U.S. Copyright Office for any of those songs?

20   A   I'm not aware of it.

21   Q   You'll have to help me out on exactly the

22       relationship here.  But I believe that a relative

23       of yours is named Brooke Gilbert?

24   A   Yes.

25   Q   And how is she related to you?

EXHIBIT 56

PAGE 837

Bryant v. Mattel                    9/26/2007                    Thomas Bryant

153

1   A   My granddaughter.

2   Q   I see.  And she's -- she's the daughter of which

3       of your daughters now?

4   A   My oldest daughter, Amber.  A-M-B-E-R.

5   Q   And -- and is Am- -- well, let me ask it this

6       way.  Does Amber live in Missouri now?

7   A   No, she does not.

8   Q   Where does she live now?

9   A   She lives in Idaho Falls, Idaho.

10  Q   Brooke Gilbert now lives in Missouri?

11  A   Yes.

12  Q   And how long has she been back?

13  A   How long has she been back?

14  Q   Well, maybe she never left.

15  A   Well, she moved here, and I'm not aware of her

16      ever leaving once she moved here, but she moved

17      here from Idaho Falls four or five years ago.

18  Q   Hopefully I won't be too confused here, but let

19      me -- so if I understand it, did -- did Amber

20      live in Missouri previously before moving to

21      Idaho Falls?

22  A   No.

23  Q   Prior to the time that Brooke moved to Missouri

24      four or five years ago, did Brooke live here?

25  A   No.

EXHIBIT 56
PAGE 838

159

1                    DEPONENT'S SIGNATURE PAGE

2

3

4        In Re:  Bryant v. Mattel

5                CV 04-9049 SGL (RNBx)
                 U.S. District Court
6                Central District of California

7

8        Taken:  September 26, 2007

9

10                        - - - - -

11

12

13                        _____

14                        THOMAS ALVIN BRYANT

15

16       Subscribed and sworn to before me this ____

17       day of _____, 20___.

18

19

20                        _____
                          Notary Public
21

22       My Commission expires:

23       _____

24

25

EXHIBIT 5L
PAGE 839

160

1                    REPORTER'S CERTIFICATE

2        STATE OF MISSOURI)
                          ) ss
3        COUNTY OF GREENE )

4           I, DAWN A. CHAPMAN, Registered Professional
         Reporter, Certified Shorthand Reporter and
5        Certified Court Reporter, do hereby certify that
         the witness was duly sworn by me; that the facts
6        stated by me in the caption hereof are true; that
         the said witness did make the above and foregoing
7        answers in response to questions propounded as
         shown; that I did, in stenotype, report said
8        proceedings; and that the above and foregoing
         typewritten pages contain a full, true, and
9        correct transcription of my shorthand notes taken
         on such occasion.  That presentment by me to the
10       witness for signature was waived; that the
         deposition will be thereafter by the witness read
11       over, signed, and sworn to on or before the date
         of trial; that said deposition is now herewith
12       returned.

13

14          I further certify that I am neither attorney
         for, nor counsel for, nor related to, nor
15       employed by any of the parties to the action in
         which this deposition was taken; and, further,
16       that I am not a relative or employee of any
         attorney or counsel employed by the parties
17       hereto, or financially interested in the action.

18

19       _____
         DAWN A. CHAPMAN, RPR, CSR, CCR
20                 CCR No. 645

21

22

23            ALPHA REPORTING SERVICE
              3230-G South National
24         Springfield, Missouri 65807
                (417) 887-4110
25

EXHIBIT 5V

PAGE 840

**EXHIBIT 57**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION                Certified Copy

 4

 5       ------------------------------

 6       MATTEL, INC., a Delaware          )

 7       Corporation,                      )

 8                    Plaintiff,           )

 9                    vs.                  )  No. CV 04-9059

10       CARTER BRYANT, an individual;     )  NM (RNBx)

11       and DOES 1 through 10,            )

12       Inclusive,                        )

13                    Defendants.          )

14       ------------------------------    )

15       (COMPLETE CAPTION ON NEXT PAGE.)

16

17           CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19           Videotaped 30(b)(6) Deposition of LISSA S.

20       FREED, taken at 400 South Hope Street,

21       Los Angeles, California, commencing at

22       9:35 A.M., Thursday, May 3, 2007, before

23       Wendy S. Schreiber, CSR No. 3558, RPR, CLR.

24

25       PAGES 1 - 137
```

EXHIBIT ___57___

PAGE ___841___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION

 4

 5    ------------------------------

 6    MATTEL, INC., a Delaware          )

 7    Corporation,                      )

 8                Plaintiff,            )

 9                vs.                   ) No. CV 04-9059

10    CARTER BRYANT, an individual;    )   NM (RNBx)

11    And DOES 1 through 10,            )

12    Inclusive,                        )

13                Defendants.          )

14    ------------------------------ )

15    CARTER BRYANT, on behalf of      )

16    himself, all present and         )

17    former employees of Mattel,      )

18    Inc., and the general public,    )

19                Counter-Claimants, )

20                vs.                   )

21    MATTEL, INC., a Delaware          )

22    Corporation,                      )

23                Counter-Defendant. )

24    ------------------------------

25
                                                    2
```

EXHIBIT 57

PAGE 842

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:
 2

 3       FOR THE PLAINTIFF:
 4           QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
             BY:  B. DYLAN PROCTOR, ESQ.
 5           865 South Figueroa Street, Tenth Floor
             Los Angeles, California 90017
 6           (213) 443-3000
             dylanproctor@quinnemanuel.com
 7

 8       FOR THE DEFENDANT AND COUNTERCLAIMANT
 9       CARTER BRYANT:
10           KEKER & VAN NEST LLP
             BY:  MICHAEL H. PAGE, ESQ.
11           710 Sansome Street
             San Francisco, Califonria 94111-1704
12           (415) 391-5400
             Mhp@kvn.com
13

14       FOR DEFENDANT MGA ENTERTAINMENT, INC.:
15           O'MELVENY & MYERS LLP
16           BY:  JAMES JENAL, ESQ.
17           400 South Hope Street
18           Los Angeles, California 90071-2899
19           (213) 430-6000
20           jjenal@omm.com
21

22       ALSO PRESENT:
23           JILL THOMAS
24           DAVID WEST, VIDEO OPERATOR
25
```

3

EXHIBIT _____ 57

PAGE _____ 843