CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   I see.  Is that the same person who conducts

2   some portion of the orientation?

3      A.   Yes.

4      Q.   Describe for me the process back then --

5   strike that.                                          10:14AM

6           Could you describe for me the process back

7   in 1999 by which people were given the forms to sign

8   and then they were collected?  Describe the

9   orientation process around that.

10          MR. PROCTOR:  Object as overbroad but you     10:15AM

11   can answer.

12          THE WITNESS:  Which forms?

13   BY MR. PAGE:

14      Q.   The invention agreement, Conflict of

15   Interest Questionnaire.                              10:15AM

16      A.   Those forms to the best of my knowledge in

17   1999 were typically sent in a packet to the employee

18   once they signed their offer letter so they had time

19   to review them and complete them and they brought

20   them with them on their first day of employment.     10:15AM

21      Q.   I see.  So they were told "Here's a bunch of

22   stuff.  Sign them and bring them with you to the

23   orientation."

24          MR. PROCTOR:  Objection:  misstates the

25   testimony, assumes facts not in evidence.            10:15AM

                                                          36

EXHIBIT ___57___

PAGE ___844___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. PAGE:

 2      Q.   Did you understand the question?

 3      A.   Do you want to know how they were told about

 4   the forms?  Is that what you're asking?

 5      Q.   I'm trying to walk through the process.    10:15AM

 6      A.   Okay.

 7      Q.   So you would typically mail a packet to new

 8   hires before they arrived for orientation; is that

 9   correct?

10      A.   Yes.                                       10:15AM

11      Q.   What would be in that packet?

12      A.   In that packet there would be a cover sheet

13   and it explains each of the forms that they need to

14   complete, those that are required, those that are

15   optional, and a brief description of the purpose of  10:16AM

16   each form and in there would be each of those forms.

17   Things like the Conflict of Interest Questionnaire

18   and the inventions agreement are in that packet.

19      Q.   What other things are in that packet?

20      A.   Government forms like W-4 for tax purposes,  10:16AM

21   employee handbook, things like that.

22      Q.   Are there insurance election forms, things

23   like that?

24      A.   In 1999 I would say there probably was

25   benefits information included in that packet.        10:16AM
                                                          37
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Does HR have -- still have copies of the

2   form cover letters that would go out with these

3   packets?

4      A.    We had the updated version, I know that.

5   I'm not sure that we still have the one from '99 but    10:16AM

6   it would be substantially similar.

7      Q.    Do you recall in 1999 what the explanation

8   of the inventions agreement was that was contained

9   in that cover letter?

10     A.    You're asking if I recall how the purpose     10:17AM

11  was spelled out on the cover letter --

12     Q.    Yes.

13     A.    -- as to the inventions agreement?   I

14  wouldn't remember verbatim nor do I know that I've

15  seen that exact form.   Like I said, I think it's the    10:17AM

16  same.   But I could -- I could tell you based on the

17  form that I have -- that I'm familiar with today.

18     Q.    I think we have a current one.

19     A.    Okay.

20     Q.    Which we'll get to.   I'm just sort of being   10:17AM

21  really mechanical and going in order.

22     A.    Sure.

23     Q.    So the new hire would receive the forms,

24  presumably would come to orientation with them

25  signed and ready to turn in, right?   Is that          10:17AM

                                                              38

EXHIBIT ___57___

PAGE ___846___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    I declare under penalty of perjury

2    under the laws of the State of California

3    that the foregoing is true and correct.

4        Executed on _June 22_____,

5    2007, at _El Segundo_____,

6    California.

7

8

9        _Lissa Freed_

10       LISSA S. FREED

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

133

EXHIBIT _57_

PAGE _847_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   STATE OF CALIFORNIA    ) ss:

2   COUNTY OF LOS ANGELES )

3

4           I, WENDY S. SCHREIBER, CSR No. 3558, do

5   hereby certify:

6

7           That the foregoing deposition of LISSA S.

8   FREED was taken before me at the time and place

9   therein set forth, at which time the witness was

10  placed under oath and was sworn by me to tell the

11  truth, the whole truth, and nothing but the truth;

12          That the testimony of the witness and all

13  objections made by counsel at the time of the

14  examination were recorded stenographically by me,

15  and were thereafter transcribed under my direction

16  and supervision, and that the foregoing pages

17  contain a full, true and accurate record of all

18  proceedings and testimony to the best of my skill

19  and ability.

20          I further certify that I am neither

21  counsel for any party in said action, nor am I

22  related to any party to said action, nor am I in any

23  way interested in the outcome thereof.

24

25

                                                    134

EXHIBIT ___57___

PAGE ___848___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          IN WITNESS WHEREOF, I have subscribed my

2     name this 14th day of May, 2007.

3

4

5

6     _____

7          WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

135

EXHIBIT _____ 52

PAGE _____ 849

**EXHIBIT 58**

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,    )
                                 )
            PLAINTIFF,           )
                                 )    CASE NO.
    V.                           )    CV 04-9040 SGL (RNBX)
                                 )
MATTEL, INC., A DELAWARE         )
CORPORATION,                     )
                                 )
            DEFENDANT.           )
_____)
                                 )
AND CONSOLIDATED ACTIONS .       )
                                 )

# C O N F I D E N T I A L

(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN
DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)

# DEPOSITION OF ANDREAS KOCH

# VOLUME I

# FEBRUARY 15, 2008



EXHIBIT ___58___

PAGE ___850___

REPORTED BY:
PAULA A. PYBURN
CSR NO. 7304
JOB NO. 08AE118-PP

COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, AN                    )
INDIVIDUAL,                          )
                                     ) CASE NO.
        PLAINTIFF,                   ) CV 04-9049 SGL(RNBX)
                                     )
V.                                   ) CONSOLIDATED WITH
                                     ) CASE NO. 04-9059
MATTEL, INC., A DELAWARE             )            AND
CORPORATION,                         ) CASE NO. 05-2727
                                     )
        DEFENDANT.                   )
_____    )
                                     )
AND CONSOLIDATED ACTION(S)           )
_____    )


CONFIDENTIAL ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF ANDREAS
KOCH, VOLUME I, TAKEN ON BEHALF OF
MATTEL, INC., AT 200 NORTH SEPULVEDA
BOULEVARD, SUITE 1550, LOS ANGELES,
CALIFORNIA, COMMENCING AT 8:31 A.M.,
FRIDAY, FEBRUARY 15, 2008, BEFORE
PAULA A. PYBURN, C.S.R. 7304,
R.P.R., C.L.R.

EXHIBIT __58__

PAGE __851__

2

```
 1   APPEARANCES OF COUNSEL:
 2   FOR M.G.A. ENTERTAINMENT, INC.:
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      BY:  MARCUS R. MUMFORD, ESQ.
 4    300 SOUTH GRAND AVENUE
      LOS ANGELES, CALIFORNIA 90071-3144
 5    (213) 687-5000
      MMUMFORD@SKADDEN.COM
 6
 7   FOR DEFENDANT MATTEL, INC.:
 8    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      BY:  MICHAEL T. ZELLER, ESQ.
 9    865 SOUTH FIGUEROA STREET
      10TH FLOOR
10    LOS ANGELES, CALIFORNIA 90017
      (213) 443-3000
11    MICHAELZELLER@QUINNEMMANUEL.COM
12
     FOR CARTER BRYANT:
13
      KEKER & VAN NEST LLP
14    BY:  CHRISTA MARTINE ANDERSON, ESQ.
           (NOT PRESENT)
15    710 SANSOME STREET
      SAN FRANCISCO, CALIFORNIA 94111
16    (415) 391-5400
      CANDERSON@KVN.COM
17
18   ALSO PRESENT:
19    PHILIP CRUZ, J.T.V. LITIGATION SERVICES
20
21
22
23           EXHIBIT  58
24
25           PAGE  852
```

| | |
|---|---|
| 1 | AND TO THE FORM OF IT AS WELL. |
| 2 | BY MR. ZELLER: |
| 3 | Q.   WHEN DID YOU -- WELL, I'M SORRY, LET ME ASK |
| 4 | THIS FIRST: |
| 5 | DID YOU MEET CARTER BRYANT FOR THE FIRST | 08:56:25 |
| 6 | TIME ACTUALLY AT M.G.A.'S OFFICES? |
| 7 | A.   YES. |
| 8 | Q.   AND -- |
| 9 | A.   CAN I -- CAN I CLARIFY THAT?  THERE ALWAYS |
| 10 | IS THAT CHANCE THAT I MET HIM -- COULD HAVE MET HIM | 08:56:35 |
| 11 | AT MATTEL, I DON'T KNOW.  THERE ARE 3,000 PEOPLE |
| 12 | OVER THERE.  THERE IS A CHANCE I COULD HAVE MET HIM |
| 13 | IN THE CAFETERIA AMONGST THOUSANDS OF OTHER PEOPLE |
| 14 | COMING IN AND OUT.  LIKELY NOT.  CERTAINLY SOMEONE I |
| 15 | DIDN'T KNOW THAT I RECALL, SO I JUST WANTED TO | 08:56:52 |
| 16 | CLARIFY THAT.  OKAY. |
| 17 | MR. MUMFORD:  AND I JUST OBJECT AND MOVE TO |
| 18 | STRIKE TO THE EXTENT THAT THAT WAS A NONRESPONSIVE |
| 19 | ANSWER TO A QUESTION. |
| 20 | AGAIN, JUST LET'S DO IT QUESTION AND ANSWER | 08:57:03 |
| 21 | HERE. |
| 22 | THE WITNESS:  OKAY.  I JUST THOUGHT FOR THE |
| 23 | SAKE OF MY GUT FEELING RIGHT HERE IS THAT HE ASKED |
| 24 | IF IT WAS THE FIRST TIME I MET HIM THERE AT M.G.A., |
| 25 | AND I -- I COULDN'T SAY WITH A HUNDRED PERCENT -- | 08:57:15 |

EXHIBIT __58__

PAGE __853__

29

```
 1            MR. MUMFORD:  I UNDERSTAND.  I UNDERSTAND.

 2            THE WITNESS:  OKAY.  AS LONG AS HE --

 3            MR. MUMFORD:  I UNDERSTAND THAT WAS THE --

 4            THE WITNESS:  OKAY.  OKAY.  THERE -- OKAY.

 5   BY MR. ZELLER:                                          08:57:23

 6       Q.   IS -- IS IT FAIR TO SAY THAT THE FIRST TIME

 7   YOU RECALL MEETING CARTER BRYANT WAS AT M.G.A.?

 8       A.   YES.

 9       Q.   AND WHEN YOU FIRST MET CARTER BRYANT,

10   WAS -- THAT YOU REMEMBER, WAS ANYONE ELSE PRESENT?     08:57:33

11       A.   YES.

12       Q.   WHO ELSE WAS THERE?

13       A.   I DON'T KNOW HOW TO SPELL THE LAST NAME, SO

14   IT'S PAULA, IT'S A GREEK LAST NAME, AND YOU PROBABLY

15   HAVE HER ON RECORD, BOTH, BOTH COUNSEL.  AND --        08:57:46

16   YEAH.

17       Q.   PAULA TREANTAFELLES?

18       A.   THAT'S -- THAT'S IT, I BELIEVE, YEAH.

19       Q.   AND BACK WHEN YOU WERE THERE AT M.G.A. SHE

20   WAS A PRODUCT MANAGER?                                 08:58:01

21       A.   THAT'S RIGHT.

22       Q.   AND -- AND SO PAULA TREANTAFELLES WAS

23   THERE, CARTER BRYANT WAS THERE AND YOU WERE THERE?

24       A.   YES.

25       Q.   WAS ANYONE ELSE PRESENT FOR THE FIRST TIME    08:58:09
```

EXHIBIT 58
854

PAGE ____
                                                          30

```
 1    WHEN YOU -- YOU MET CARTER BRYANT?

 2         A.   I CAN'T BE A HUNDRED PERCENT CERTAIN

 3    BECAUSE OF THE -- BECAUSE OF THE -- THE LAYOUT OF

 4    OUR OFFICE ENVIRONMENT.  IT WASN'T A -- A --

 5    EVERYONE IN ONE ROOM TYPE OF ENVIRONMENT.  IT WAS      08:58:27

 6    MUCH MORE OF AN OPEN FORUM TYPE OF ATMOSPHERE.  SO I

 7    WILL JUST SAY I DON'T KNOW.

 8         Q.   WELL, WHEN YOU SAY THAT THERE WAS AN OPEN

 9    FORUM OR THE LAYOUT OF THE OFFICE ENVIRONMENT, ARE

10    YOU TALKING ABOUT THE FACT THAT THERE WERE CUBICLES?   08:58:43

11         A.   YES.

12         Q.   AND I TAKE IT YOU HAD A CUBICLE THERE?

13         A.   THAT'S RIGHT, YES.

14         Q.   AND PAULA TREANTAFELLES HAD A CUBICLE?

15         A.   YES.                                         08:58:52

16         Q.   DID YOU SIT NEXT TO ONE ANOTHER?

17         A.   YES.

18         Q.   DIRECTLY NEXT TO ONE ANOTHER?

19         A.   YES.

20         Q.   AND WAS IT IN THIS -- THIS CUBICLE AREA      08:58:59

21    WHERE YOU FIRST MET CARTER BRYANT?

22         A.   NO.  NO.

23         Q.   AND WHERE WAS IT YOU FIRST MET HIM, THEN?

24         A.   IT'S -- THE CUBICLES ARE SET IN A WAY THAT

25    THEY'RE IN ROWS, AND THE END OF THE ROW IS SORT OF     08:59:21
```

EXHIBIT ___58___

1    A -- KIND OF AN OPEN SPACE, ALMOST LIKE A CONFERENCE

2    DESK LIKE THIS (INDICATING) THAT WOULD JUST BE SORT

3    OF A -- JUST AN END PIECE THAT WE JUST SORT OF BEGAN

4    OUR FIRST, YOU KNOW, OBSERVATIONS OF THIS.  BUT IT

5    DIDN'T END THERE.  THAT'S JUST WHAT STARTED.                08:59:44

6        Q.   SO IF I UNDERSTAND, THERE WAS A -- THERE

7    WAS A TABLE THAT WAS AT THE END OF THE CUBICLE ROW?

8        A.   YES.

9        Q.   AND -- AND THAT'S WHERE YOU AND CARTER AND

10   PAULA TREANTAFELLES WERE?                                  08:59:58

11       A.   YES.

12       Q.   AND WHAT IS IT THAT HAPPENED AT THAT FIRST

13   MEETING?

14       A.   WHERE DO YOU WANT ME TO START?  I MEAN, DO

15   YOU WANT ME TO START ON WHO -- LIKE HOW THIS PERSON        09:00:09

16   CAME INTO THE BUILDING AND -- AND WHAT HE DID OR --

17   OR DO YOU WANT TO JUST START AT THE VERY FIRST

18   HANDSHAKE?  I MEAN --

19       Q.   WELL, WHAT I WOULD LIKE TO DO IS START

20   WHERE -- WHAT -- WHAT YOU FIRST HAVE KNOWLEDGE OF.         09:00:22

21   I MEAN, LET ME TRY IT THIS WAY:  WERE YOU YOURSELF

22   INVOLVED IN BRINGING CARTER INTO THE BUILDING?

23       A.   NO, I WASN'T THE PERSON WHO INVITED HIM.

24   WHEN A -- WHEN AN OUTSIDE GUEST, A FREELANCER,

25   ENTERS OUR SMALL BUILDING OUT IN -- YOU KNOW, IN          09:00:40

EXHIBIT __58__

PAGE __856__                    32

```
 1    NORTH HILLS, YOU KNOW, WE JUST -- WE SEE NEW PEOPLE
 2    COMING IN, SO IN THE LOBBY WAITING, YOU JUST SEE IT.
 3    SO WE'RE AWARE THAT SOMEONE'S COMING IN.
 4          AND WE'RE ALWAYS KEEN TO SEE WHAT THIS
 5    PERSON HAS TO BRING.  IT'S EXCITING WHEN YOU'RE IN          09:00:57
 6    THE TOY INDUSTRY TO SEE -- SEE THINGS AND SEE THINGS
 7    THAT ARE NEW FROM OUTSIDERS, MEET A NEW FACE.
 8          SO THEN IT PROCEEDED INTO THE -- THE
 9    INTRODUCTIONS.  INITIALLY WITH PAULA.  AND THEN I --
10    BECAUSE OF PROXIMITY I BECAME INVOLVED, OR -- YEAH,        09:01:17
11    INVOLVED.
12       Q.   SO IF I UNDERSTAND, YOU CORRECTLY, CARTER
13    AND PAULA WERE TOGETHER FIRST AND THEN -- AND THEN
14    YOU JOINED THEM?
15       A.   THAT'S RIGHT.  BECAUSE OF THE NATURE OF HER        09:01:35
16    SIDE OF THE BUSINESS, DOLLS, GIRLS TOYS, I'M NOT
17    SURE WHO INVITED CARTER, BUT SHE WAS THE HOSTESS
18    TO -- TO -- ONCE HE ARRIVED.  IT WAS HER -- IT WAS
19    HER -- HER PROJECT.
20       Q.   AND SO YOU THEN AT SOME POINT JOINED THEM          09:02:00
21    DURING THIS -- DURING THIS MEETING?
22       A.   YES.  AT A VERY EARLY STAGE.
23       Q.   AND WHAT IS IT YOU CAN -- YOU CAN REMEMBER
24    FROM THE TIME WHEN YOU -- YOU STARTED THIS MEETING,
25    JUST GENERALLY SPEAKING?                                   09:02:13
```

EXHIBIT ___58___

PAGE ___857___

33

```
 1        A.   WELL, INTRODUCTIONS, AND I DO REMEMBER

 2    PAULA ASKING ME TO COME IN ON THE CONVERSA- -- ON

 3    THE -- THE MEETING BECAUSE (A) WE WERE FRIENDS, (B)

 4    WITH THE PROXIMITY, (C) WE -- WE SHARED IDENTICAL

 5    RESPONSIBILITIES, ALMOST THIS -- THIS TIGHT            09:02:30

 6    (INDICATING), YOU KNOW -- THIS UNDERSTANDING THAT

 7    WE'RE BOTH ON THE SAME PAGE BECAUSE OF THE NATURE OF

 8    WHAT WE DO.

 9             AND -- AND BASICALLY A LITTLE BIT OF HELP.

10    WHAT DO YOU THINK, WHAT'S YOUR OPINION, IS THIS       09:02:46

11    SOMETHING -- WHAT'S YOUR TAKE ON IT, YOU KNOW,

12    PUTTING ASIDE THE FACT THAT YOU DON'T REALLY WORK ON

13    DOLLS, ANDREAS, WHAT -- WHAT DO YOU THINK ON THIS

14    WHOLE THING FROM A TOY EXPERT PERSPECTIVE.

15        Q.   DURING THE COURSE OF THIS MEETING I TAKE IT   09:03:01

16    THAT -- WELL, STRIKE THAT.

17             DURING THE COURSE OF THIS MEETING, THIS

18    VERY FIRST MEETING, DID CARTER BRYANT SHOW ANY

19    DRAWINGS OR WRITTEN MATERIALS?

20        A.   YES.                                          09:03:15

21        Q.   WAS IT -- WAS IT DRAWINGS?

22        A.   YES.

23        Q.   CAN YOU -- CAN YOU TELL ME WHAT THE -- WHAT

24    THE DRAWINGS WERE, GENERALLY SPEAKING?

25        A.    THEY WERE -- IT WAS IN A -- YOUR TYPICAL     09:03:24
```

EXHIBIT ____58

PAGE ____858

34

1    FREELANCE PORTFOLIO LEATHER CASING, A LARGE -- YOU

2    KNOW, YOU SEE THE ARTIST WALKING, CARRYING THESE

3    WITH A HANDLE.

4            IT'S OPENED UP, HE'S MAKING A PRESENTATION,

5    HE'S -- HE'S NARRATING AND SETTING A MOOD, A TONE ON      09:03:41

6    THE -- THE TYPE OF DOLLS THESE WILL BE, WHAT'S

7    DIFFERENT ABOUT THEM, UNIQUE SELLING POINTS, AND --

8    AND THEN VARIOUS THEMES, BRAND EXTENSIONS, AND

9    ACCESSORY POSSIBILITIES TO -- AND THEN THOSE ARE

10   SORT OF THE VERBAL THINGS THAT TOOK PLACE.                09:04:10

11           THEN OF COURSE VISUALLY THE PAGES ARE

12   FLIPPING, AND THERE ARE A FAIR AMOUNT OF THEM, AND

13   SHOWING VARIOUS CONCEPTS, AND IT LOOKED TO ME LIKE

14   FREEHAND SKETCHING, BUT I'M -- I'M NOT AN EXPERT

15   ON -- ON, YOU KNOW, DESIGNERS, IF IT'S ACTUALLY DONE      09:04:32

16   THROUGH COMPUTERS OR WHAT IT IS, BUT IT WAS AT A

17   CONCEPT STAGE.

18       Q.   AND IF YOU COULD PLEASE TELL US WHAT YOU

19   MEAN BY "AT A CONCEPT STAGE."

20       A.   MEANING IT WAS -- SO LET'S JUST SAY WE           09:04:45

21   DON'T KNOW ANYTHING ABOUT THE COMPUTER CAPABILITY --

22   THESE ARE DRAWINGS AND -- AND SORT OF SPECS, LIKE

23   ALMOST LIKE A BLUEPRINT OF MEASUREMENT -- SORT OF

24   SCALES TO -- TO DESIGNS OF THE ACTUAL FIGURES, BOTH

25   FROM AN ANATOMICAL SORT OF LOOK, TO ACCESSORIES,          09:05:08

EXHIBIT _____ 58

PAGE _____ 859

35

1  CLOTHING, ADDITIONS, TOPICAL THINGS THAT YOU WOULD

2  ADD WITH IT.

3          IT WAS VERY CLEAR THAT IT WASN'T JUST, HERE

4  IT IS, HERE'S A DRE- -- AND IT WAS JUST LIKE THIS.

5  I MEAN, IT WAS VERY CLEAR THAT HE WAS A          09:05:26

6  PROFESSIONAL.  HE HAD A LOT OF DIFFERENT MIX AND

7  MATCHES TYPE OF THINGS THAT YOU COULD -- YOU COULD

8  LINE EXTEND.

9      Q.   SO I TAKE IT THAT AMONG THESE DRAWINGS THAT

10  YOU SAW WERE DOLL DESIGN DRAWINGS?          09:05:40

11      A.   YES.

12      Q.   THERE WERE ALSO DRAWINGS FOR -- FOR

13  ACCESSORIES FOR THE DOLLS?

14      A.   YES.

15      Q.   WERE THERE -- YOU HAD MENTIONED THAT THERE          09:05:50

16  WERE -- THERE WERE DRAWINGS OR -- WELL, ACTUALLY,

17  STRIKE THAT.

18          I THINK YOU HAD MENTIONED THAT THERE WAS AT

19  LEAST SOME DISCUSSION DURING THE COURSE OF THIS

20  MEETING WITH CARTER AND PAULA ABOUT BRAND          09:06:01

21  EXTENSIONS?

22      A.   YES.

23      Q.   WAS THAT SOMETHING THAT CARTER RAISED?

24      A.   I CAN'T RECALL HUNDRED PERCENT ON WHO

25  RAISED IT FIRST.          EXHIBIT _____ 58          09:06:08

PAGE _____ 860

36

1      Q.   BUT -- BUT IT WAS DISCUSSED DURING THIS

2   MEETING?

3      A.   YES.

4      Q.   WHAT IS IT YOU RECALL BEING DISCUSSED ABOUT

5   BRAND EXTENSIONS AT THAT MEETING?                    09:06:14

6      A.   IT WAS -- THIS IS VERY EARLY STAGE.   THIS

7   IS ONE OF -- MY RECOLLECTION, ONE OF AT LEAST TWO --

8   ONE OF TWO MEETINGS THAT I WAS INVOLVED IN.   SO THIS

9   IS -- THIS IS STAGE 1, WHICH IS MORE PITCHING, WHAT

10  DO YOU THINK, LET'S JUST GET A FEEL FOR EACH OTHER    09:06:33

11  BEFORE WE TAKE IT TO THE NEXT LEVEL.   IT HAS

12  POTENTIAL, THAT'S THE KIND OF DISCUSSION.

13        IT WOULD BE TOO PRELIMINARY FOR US TO GO

14  INTO THE TYPE OF BRAND EXTENSIONS; THAT'S NOT A

15  CONVERSATION FOR THAT MEETING -- THAT FIRST MEETING,  09:06:47

16  I SHOULD SAY.   THAT WAS JUST WHAT DO YOU THINK, DO

17  YOU LIKE IT.   AM I HERE FOR THE RIGHT REASON.   AM I

18  WASTING YOUR TIME.

19        AND -- SO WE SEE THROUGH THAT.   I MEAN, AS

20  BRAND MANAGERS WE -- WE KNOW WHAT -- WE'RE THINKING   09:07:06

21  A FEW STEP- -- HE'S -- HE'S A DESIGNER.   WE KNOW

22  EXACTLY WHAT TO DO, FROM TAKING THIS AND BRINGING IT

23  TO MARKET.

24        SO PAULA AND I ARE ON A DIFFERENT LEVEL AND

25  THINKING ABOUT PRODUCT DEVELOPMENT, WHILE HE'S MORE   09:07:17

EXHIBIT ____58____

____861____

PAGE ____

37

1    FROM A CREATIVE DESIGNER STANDPOINT, SAYING, YOU

2    KNOW, I CAN CHANGE THIS, YOU KNOW, AND THIS CAN

3    HAPPEN AND I HAVE THE OPPORTUNITY TO DO THESE TYPE

4    OF THINGS.  THAT'S ALL IT WAS AT THE FIRST STAGE.

5        Q.   I TAKE IT THAT THE DRAWINGS THAT YOU -- YOU      09:07:30

6    SAW AT THIS FIRST MEETING --

7        A.   UH-HUH.

8        Q.   -- ALSO INCLUDED DRAWINGS OF -- OF FASHIONS

9    FOR THE DOLLS?

10       A.   YES.                                             09:07:40

11            MR. MUMFORD:  OBJECTION; LEADING.

12   BY MR. ZELLER:

13       Q.   CAN YOU TELL ME APPROXIMATELY THE NUMBER

14   OF -- OF DRAWINGS OF FASHIONS THAT YOU REMEMBER

15   SEEING?                                                   09:07:48

16       A.   THE NUMBER?

17       Q.   YEAH.

18       A.   NOT TO AN EXACT NUMBER, NO.

19       Q.   CAN YOU TELL ME, GENERALLY SPEAKING, WAS IT

20   MORE THAN TEN, MORE THAN 20?                              09:07:54

21       A.   YES.  I CAN'T -- IT'S -- I CAN'T BREAK IT

22   DOWN LIKE THAT.  I MEAN, IT'S -- BECAUSE THERE'S SO

23   MANY NUANCES, THERE WERE SO MANY -- IT'S -- IT'S

24   ALMOST LIKE THIS PAGE 1, HERE ARE THE FIGURES.  HERE

25   IS ANOTHER FIGURE.  HERE IS A -- HERE'S ANOTHER           09:08:16

EXHIBIT ___58___

PAGE ___862___

38

1   COUPLE FIGURES THAT COULD BE ADDED TO THE LINE.

2          NOW LET'S GO THROUGH THE ACCESSORIES.

3          I MEAN, IT'S SORT OF -- YOU'RE READING A

4   BOOK.  YOU'RE AT CHAPTER 1 AND YOU ARE FLIPPING

5   THROUGH.  AND HERE ARE THINGS YOU CAN ADD TO IT.  SO          09:08:28

6   HE'S -- HE'S LAYING OUT A STORY LINE.

7          SO NO, I DON'T KNOW -- REMEMBER HOW MANY --

8   WHEN YOU SAY FASHION ITEMS, THERE'S -- THERE WAS

9   MULTIPLE COMBINATIONS, AND THEY'RE INTERCHANGEABLE.

10  IT'S LIKE BARBIE.  YOU CAN CHANGE -- YEAH.  SO AT          09:08:47

11  THAT POINT IT WAS -- IT WASN'T A CONVERSATION TO THE

12  EXACT NUMBER.

13     Q.   I TAKE IT IT'S FAIR TO SAY THAT THERE

14  WERE -- THERE WERE A LOT OF THESE DRAWINGS?

15     A.   WHAT DO YOU CONSIDER A LOT?          09:09:03

16     Q.   I MEAN, I GUESS WE CAN TRY AND DEFINE THAT

17  IN A SECOND, BUT LET ME TRY IT THIS WAY.

18          I TAKE IT THAT THERE WAS -- THERE WAS MORE

19  THAN ONE DRAWING?

20     A.   YES.          09:09:13

21     Q.   CAN YOU GIVE APPROXIMATELY A TIME PERIOD AS

22  TO HOW LONG IT TOOK TO -- TO GO -- FOR CARTER TO GO

23  THROUGH ALL THOSE DRAWINGS?

24          MR. MUMFORD:  OBJECTION TO THE EXTENT THIS

25  HAS ALREADY -- HAS ALREADY BEEN -- I'M SORRY, MIKE.          09:09:22

EXHIBIT __58__

__863__

PAGE _____          39

BY MR. ZELLER:

1   Q.   YOU KNOW, WAS IT -- WAS IT SOMETHING THAT
2   WAS A FEW MINUTES, SOMETHING THAT TOOK LONGER THAN A
3   FEW MINUTES?
4       MR. MUMFORD:  OBJECTION TO THE EXTENT THAT          09:09:30
5   THIS HAS ALREADY BEEN ASKED AND ANSWERED.
6       I'M JUST SAYING MR. ZELLER'S ENTITLED TO
7   ASK -- ASK THE QUESTIONS; HE'S NOT ENTITLED TO KEEP
8   ASKING THE SAME QUESTION IN HOPES --
9       THE WITNESS:  UH-HUH.                               09:09:47
10      MR. MUMFORD:  -- THAT YOU WILL CHANGE YOUR
11  ANSWER.
12      THAT'S -- THAT'S -- THAT'S JUST A BRIEF
13  EXPLANATION OF WHY I MAKE THAT OBJECTION.
14  BY MR. ZELLER:                                          09:09:58
15  Q.   I'M NOT ASKING THE SAME QUESTION.
16  A.   OKAY.
17  Q.   LET ME REPHRASE THE QUESTION --
18  A.   OKAY.
19  Q.   -- JUST SO THERE'S A CLEAR QUESTION FOR            09:10:01
20  YOU.
21  A.   OKAY.
22  Q.   WHAT I GUESS I'M TRYING TO DO IS IS SEE IF
23  THERE'S ANY GUIDEPOST THAT YOU HAVE IN YOUR MIND AS
24  TO THE NUMBER OF DRAWINGS OR THE AMOUNT OF -- THE       09:10:11

EXHIBIT  58

PAGE  864

40

```
 1   QUANTITY OF MATERIAL --

 2       A.   YES.

 3       Q.   -- THAT CARTER BRYANT WAS SHOWING AT THAT

 4   FIRST MEETING.

 5       A.   RIGHT.                                          09:10:17

 6       Q.   AND I THINK -- YOU KNOW, YOU SAID THAT IT'S

 7   OBVIOUSLY HARD TO BREAK IT DOWN AS TO WHETHER OR NOT

 8   IT WAS FASHIONS VERSUS ACCESSORIES AND THE LIKE

 9   BECAUSE THIS WAS, AS YOU SAID, A STORY LINE.

10       A.   UH-HUH.                                         09:10:28

11       Q.   RIGHT?

12            MR. MUMFORD:  OBJECTION TO THE COLLOQUY

13   HERE.

14            MR. ZELLER:  WE'RE GOING TO BE HERE FOR A

15   VERY LONG TIME IF YOU INTERRUPT MY QUESTIONS           09:10:33

16   REPEATEDLY.

17       Q.   WE'LL START OVER AGAIN.  I'M TRYING TO FIND

18   OUT IF IN YOUR OWN -- YOUR OWN RECOLLECTION, IF

19   THERE'S SOME WAY THAT YOU'RE ABLE TO QUANTIFY THE

20   AMOUNT OF MATERIAL THAT CARTER BRYANT BROUGHT AND      09:10:45

21   SHOWED AT THAT FIRST MEETING --

22       A.   OKAY.

23       Q.   -- WHETHER IT'S BY WAY OF NUMBER OF

24   DRAWINGS, JUST IN TERMS OF APPROXIMATE NUMBER, OR

25   WHETHER YOU COULD SAY IT TOOK US A CERTAIN AMOUNT OF   09:10:56
```

EXHIBIT 58

PAGE 865                    41

1    TIME TO GO THROUGH THEM?

2         MR. MUMFORD:  OBJECTION TO THE EXTENT THIS

3    HAS ALREADY BEEN ASKED AND ANSWERED.

4         THE WITNESS:  SO THE REASON WHY IT'S

5    DIFFICULT TO ANSWER THIS IS, (1) BECAUSE OF THE TIME          09:11:13

6    DURATION THAT'S ELAPSED; (2) IS BECAUSE I CAN'T

7    RECALL EXACTLY HOW MANY ITEMS PER PAGE THAT WERE

8    FEATURED.  THE PAGES ARE AS WIDE AS WHERE YOU'RE

9    SITTING TO WHERE I AM ALMOST.

10        DID HE -- DID HE LAY OUT -- AS A GENERAL              09:11:28

11   NUMBER, APPROXIMATELY SOMEWHERE BETWEEN 5 TO -- TO

12   15 PAGES, MAYBE, WOULD BE PRETTY -- PRETTY SAFE.

13        I CAN'T -- HOW LONG DID THE CONVERSATION

14   GO?  WELL, THERE'S -- THERE'S FLUFF TIME IN BETWEEN,

15   TALKING ABOUT, OH, THIS IS EXCITING TO DO THIS,            09:11:49

16   AND -- AND OH, HOW DID YOU LEARN TO -- YOU KNOW,

17   JUST SIDE CONVERSATIONS THAT LEAD INTO HIM MAKING

18   THIS.

19        SO DOES THAT GIVE YOU KIND OF AN IDEA?  AND

20   HOW LONG WAS IT?  APPROXIMATELY -- IT WASN'T A          09:12:03

21   TWO-HOUR MEETING AND IT WASN'T TEN MINUTES.  IT

22   WAS -- WE -- WE STARTED AT THE DESK, SO JUST

23   LOGICALLY WE'RE STANDING LOOKING AT IT, BECAUSE WE

24   DON'T -- WE'RE NOT GIVING THIS GUY MUCH CREDENCE AS

25   ANOTHER FREELANCE DESIGNER COMING IN; MANY CAME          09:12:20

EXHIBIT ___5-8___

PAGE ___866___

42

1   THROUGH.

2          SO ONCE HE SORT OF PASSED THAT -- THAT

3   INITIAL SCREENING OF YEAH, THIS GUY IS LEGITIMATE,

4   OKAY, THEN IT -- THEN IT EVOLVED INTO ALMOST A

5   LITTLE BIT MORE OF A -- A SERIOUS CONVERSATION.  AND          09:12:31

6   I CAN'T REMEMBER IF WE SAT AT PAULA'S DESK OR IT

7   WAS -- WE WENT INTO ONE OF THE BREAKOUT ROOMS THERE,

8   I DON'T REMEMBER THAT.

9          SO MY -- THEN I -- AND THEN I EXCUSED

10  MYSELF BECAUSE MY JOB WAS DONE AS JUST SOMEONE JUST          09:12:45

11  HELPING PAULA IN HER CATEGORY; I NEED TO DO MY

12  THING.  SO MY INVOLVEMENT MAY HAVE LASTED 10, 15

13  MINUTES DURING THE EARLY STAGES OF, YES, THIS IS --

14  WOW STAGE, INTO, YOU KNOW, HELPING CREATE THE

15  DIALOGUE, ASKING SOME QUESTIONS THAT MAYBE PAULA             09:13:07

16  DIDN'T ASK THAT SHE -- THAT SHE EVENTUALLY WOULD

17  HAVE BUT, YOU KNOW, JUST SORT OF WORKING AS A TEAM.

18         AND THEN -- THEN I -- THAT WAS IT.  AND

19  THEN I WENT INTO MY --

20         MR. MUMFORD:  JUST MOVE TO STRIKE TO THE              09:13:20

21  EXTENT THAT WAS A NONRESPONSIVE ANSWER.

22  BY MR. ZELLER:

23      Q.   I THINK YOU HAD MENTIONED THAT THE -- THE

24  DRAWINGS THAT CARTER SHOWED AT THAT MEETING WERE

25  PRETTY SIZABLE.  I THINK YOU SAID THEY WERE AS WIDE          09:13:33

EXHIBIT __58__

__867__

PAGE _____

43

1   AS THIS TABLE?

2       A.   YEAH.   I MEAN, THEY WERE PORTFOLIO PIECES.

3   SO FROM WHERE YOU ARE TO -- I DON'T KNOW, HOW BIG IS

4   THAT?   RIGHT ABOUT HERE OR SO (INDICATING), JUST,

5   YOU KNOW, THE BIG -- THE BIG LEATHER CASES THEY          09:13:44

6   CARRY THEM IN, FROM AARON BROTHERS, THESE THINGS.

7       Q.   AND IT'S YOUR RECOLLECTION THAT THERE WERE

8   MULTIPLE DRAWINGS ON -- ON EACH OF THESE LARGE

9   PAGES?

10      A.   ON EACH PAGE OR IN TOTAL?                        09:13:53

11      Q.   ON EACH PAGE.   OR DID A NUMBER OF THE PAGES

12  THAT YOU REMEMBER SEEING, THESE LARGE-SIZE PAGES,

13  DID THEY HAVE MULTIPLE DRAWINGS ON AT LEAST SOME OF

14  THEM?

15      A.   I CAN'T BE A HUNDRED PERCENT SURE BECAUSE        09:14:05

16  IT'S COMMON TO SEE IT BOTH WAYS, SO IT WOULDN'T HAVE

17  BEEN SOMETHING I WOULD HAVE RECALLED AS BEING

18  UNUSUAL OR DIFFERENT.   IT JUST DEPENDS ON THE STYLE

19  OF THIS FREELANCER.   I DON'T REMEMBER HOW MANY PER

20  PAGE.   I REALLY DON'T.                                  09:14:19

21      Q.   AND DID -- DID YOU SEE THE REACTION THAT

22  PAULA TREANTAFELLES HAD WHEN SHE WAS SHOWING THE

23  DRAWING --

24      A.   YES.

25      Q.   -- OR SHE WAS SHOWN THE DRAWINGS?               09:14:29

EXHIBIT  58

PAGE  868                    44

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

```
 1       A.    YES.

 2       Q.    AND WHAT WAS HER REACTION?

 3       A.    EXCITEMENT.

 4       Q.    DID SHE -- I'M SORRY, I DIDN'T MEAN TO CUT

 5  YOU OFF.                                            09:14:39

 6       A.    NO, PLEASE --

 7       Q.    WHAT DID SHE -- DID SHE VERBALIZE THAT IN

 8  SOME WAY?

 9       A.    YES.

10             MR. MUMFORD:  OBJECTION; LEADING.         09:14:46

11             THE WITNESS:  SO CONTINUE OR?

12             MR. MUMFORD:  YEAH, YOU CAN --

13             THE WITNESS:  OKAY.

14             MR. MUMFORD:  YOU CAN GO AHEAD AND ANSWER.

15             THE WITNESS:  YES, OH, YES.               09:14:54

16  BY MR. ZELLER:

17       Q.    WHAT DO YOU REMEMBER HER SAYING ABOUT

18  THE -- ABOUT CARTER'S DRAWINGS?

19       A.    I CAN'T RESTATE EXACT WORD- -- WORDING, BUT

20  GOING EIGHT YEARS BACK, IT'S -- IT WAS CRYSTAL        09:15:03

21  CLEAR.  I MEAN, THIS WAS HANDS DOWN.  EVEN FROM MY

22  STANDPOINT IN A -- NOT IN A DOLL DIVISION, THIS WAS

23  SOMETHING REFRESHINGLY GOOD AND UNUSUALLY POWERFUL

24  THAT -- THAT IS DOLLAR SIGNS, THIS IS SOMETHING THAT

25  IS -- THE MARKET NEEDS, THE INDUSTRY DOES NOT HAVE.   09:15:26
```

EXHIBIT ___58___

PAGE ___869___

45

```
 1        AND IT WAS -- PAULA IS -- IS VERY KEEN ON

 2   FASHION, SO SHE TOOK A -- A REAL LIKING TO HER,

 3   BEING THE TYPE OF PERSON SHE IS.  YOU KNOW, I THINK

 4   JUST BECAUSE OF HER PASSION.  SHE JUST -- MORE SO

 5   THAN I AM BECAUSE OF -- I'M A GUY.                      09:15:51

 6        MR. MUMFORD:  I WOULD JUST OBJECT, AND I

 7   OBJECT AND AGAIN MOVE TO STRIKE TO THE EXTENT THAT

 8   THAT ANSWER WAS -- DID NOT RESPOND TO THE QUESTION.

 9   BY MR. ZELLER:

10        Q.   LET ME -- LET ME TRY AND BREAK IT DOWN A     09:16:03

11   LITTLE BIT MORE.  EVEN IF YOU CAN'T REMEMBER PAULA'S

12   EXACT WORDS, YOU DO RECALL THAT SHE WAS EXCITED WHEN

13   SHE SAW CARTER BRYANT'S DRAWINGS?

14        A.   YES.

15        MR. MUMFORD:  OBJECTION; LEADING.                 09:16:13

16   BY MR. ZELLER:

17        Q.   AND WHAT IN SUBSTANCE DO YOU REMEMBER HER

18   SAYING IN REACTION TO THE DRAWINGS?

19        MR. MUMFORD:  OBJECTION; ASKED AND

20   ANSWERED.                                              09:16:29

21        THE WITNESS:  CONTINUE?

22   BY MR. ZELLER:

23        Q.   YES, PLEASE.

24        A.   IMMEDIATE EXCITEMENT.  I MEAN, THIS IS --

25   EVERY PASSING PAGE WAS -- YOU KNOW, WAS JUST -- IT     09:16:36
```

EXHIBIT _5δ_

PAGE _870_

46

1    WAS -- THE CONTINUAL HYPE, THE EXCITEMENT, THE CLEAR

2    INTEREST, I MEAN, IS THE BEST WAY I CAN PUT IT.

3    JUST ELATED.  AND RIGHTFULLY SO.  SO, YOU KNOW, THAT

4    WAS -- THAT WAS IT, YEAH.

5         Q.   I TAKE IT YOUR -- YOUR OWN PERSONAL                09:17:00

6    REACTION WAS ONE OF EXCITEMENT?

7         A.   SURE, YEAH.

8         Q.   AND WHAT WAS IT ABOUT THE -- THE DRAWINGS

9    THAT -- THAT FROM YOUR PERSPECTIVE MADE THEM SEEM,

10   YOU KNOW, "REFRESHINGLY GOOD," I THINK WAS YOUR --         09:17:15

11   YOUR PHRASE, AND UNUSUALLY POWERFUL?

12        A.   ITS UNIQUE CHARACTERISTICS.  IT'S NEVER

13   BEEN SEEN BEFORE.  ITS -- ITS FULL STORY, ITS

14   COMPLETENESS, THAT THIS WASN'T SOMEONE JUST THROWING

15   SOMETHING AGAINST THE WALL TO SEE IF IT STICKS AND         09:17:40

16   HE CLOSES HIS BRIEFCASE AND GOES TO THE NEXT PLACE.

17        IT WAS -- IT WAS VERY THOROUGHLY -- I THINK

18   THE WHOLE ENTIRE CONCEPT WAS -- WAS WELL DONE,

19   AND -- AND I THINK THERE WAS JUST A LOT OF TIME AND

20   EFFORT PUT INTO IT, AND IT SHOWED.                         09:17:56

21        Q.   AND THIS WAS YOUR -- YOUR REACTION TO THE

22   DRAWINGS THAT YOU SAW THAT CARTER BRYANT HAD

23   BROUGHT?

24        A.   BOTH OF OUR REACTIONS.

25        Q.   BOTH -- BOTH YOU AND PAULA'S?                    09:18:07

EXHIBIT ___58___

PAGE ___871___

47

1      A.    PAULA, YEAH.

2      Q.    AND WHEN YOU WERE TALKING ABOUT THAT THERE

3   WERE UNIQUE CHARACTERISTICS THAT HADN'T BEEN SEEN

4   BEFORE, YOU WERE INCLUDING THE -- THE DRAWINGS THAT

5   CARTER SHOWED ON THAT OCCASION?                         09:18:22

6      A.    YES.

7            MR. MUMFORD:  OBJECTION; LEADING.

8            JUST -- JUST AN EXPLANATION ON THAT.  THE

9   OBJECTION LEADING REFERS TO THE FACT THAT AS

10  QUESTIONERS WE CAN'T PUT WORDS IN YOUR MOUTH; THAT'S    09:18:43

11  WHAT THAT IS.

12           THE WITNESS:  OH, I SEE.  I SEE.

13           MR. MUMFORD:  THIS IS SUPPOSED TO BE AN

14  EXAMINATION.

15           THE WITNESS:  I SEE.                            09:18:51

16  BY MR. ZELLER:

17     Q.    EARLIER TODAY YOU SPOKE WITH MR. MUMFORD;

18  IS THAT RIGHT?

19           MR. MUMFORD:  AGAIN, I WOULD INSTRUCT THE

20  WITNESS TO ANSWER "YES" OR "NO" TO THE EXTENT THAT      09:19:03

21  IT --

22           THE WITNESS:  YES.

23  BY MR. ZELLER:

24     Q.    IN FACT, EARLIER IN THE DEPOSITION TODAY

25  BEFORE WE STARTED MR. MUMFORD ASKED TO SPEAK WITH       09:19:12

EXHIBIT   58

PAGE _____ 872                    48

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

```
 1    YOU ALONE?

 2        A.   YES.

 3        Q.   WHAT DID YOU AND HE TALK ABOUT?

 4             MR. MUMFORD:  OBJECTION.  MIKE, YOU KNOW

 5    YOU CAN'T ASK -- ASK THAT QUESTION.  INSTRUCT YOU        09:19:20

 6    NOT -- NOT -- NOT TO ANSWER.

 7    BY MR. ZELLER:

 8        Q.   IS MR. MUMFORD YOUR LAWYER?

 9        A.   NO.

10        Q.   HAS HE EVER BEEN YOUR LAWYER?             09:19:30

11        A.   NO.

12        Q.   IS SKADDEN, ARPS YOUR LAWYERS?

13        A.   NO.

14        Q.   PLEASE GO AHEAD AND TELL US WHAT IT IS

15    THAT -- THAT YOU AND HE DISCUSSED.                  09:19:36

16             MR. MUMFORD:  LET ME CLEAN THIS UP, MIKE.

17             DID I TELL YOU THAT I WAS YOUR LAWYER?

18             THE WITNESS:  NO.

19             MR. MUMFORD:  IN FACT, I TOLD YOU THAT I

20    REPRESENTED M.G.A.; CORRECT?                        09:19:45

21             THE WITNESS:  RIGHT.

22             MR. MUMFORD:  AND -- AND THE CONTENT OF OUR

23    CONVERSATION REFLECTED THE SCOPE OF YOUR EMPLOYMENT

24    AT M.G.A.; CORRECT?

25             THE WITNESS:  THAT'S RIGHT.              09:19:58
```

EXHIBIT _58_

PAGE _873_

49



1          DECLARATION OF WITNESS

2

3     I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS

4  OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS

5  TRUE AND CORRECT.

6

7

8  EXECUTED AT              , ON                    ,
                (PLACE)              (DATE)

9

10

11          (SIGNATURE OF WITNESS)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT _58_

PAGE _874_

124

```
 1   STATE OF CALIFORNIA )

 2   COUNTY OF RIVERSIDE )  SS.

 3

 4        I, PAULA A. PYBURN, CSR NO. 7304, R.P.R.,

 5   C.L.R., IN AND FOR THE STATE OF CALIFORNIA, DO

 6   HEREBY CERTIFY:

 7        I AM THE DEPOSITION OFFICER THAT

 8   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

 9   FOREGOING DEPOSITION;

10        PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST

11   DULY SWORN BY ME;

12        THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF

13   THE TESTIMONY GIVEN.

14        BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

15   THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF

16   REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

17   PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

18   ARE APPENDED HERETO.

19

20   DATED  February 19, 2008

21

22

23        _____
              PAULA A. PYBURN

24            C.S.R. NO. 7304, R.P.R.

              CERTIFIED LIVENOTE REPORTER

25            EXHIBIT  58
              PAGE  875
```

                                                        125

**EXHIBIT 59**

CERTIFIED COPY

ARBITRATION BEFORE ADR SERVICES, INC.

In Re Arbitration Between          )
FARHAD LARIAN,                     )
                                   )
              Claimant,            )
                                   )
      vs.                          )No. 05-2096-ABH
                                   )
ISAAC LARIAN,                      )
                                   )
              Respondent.          )
_____    )

VOLUME II

ARBITRATION PROCEEDING

November 17, 2005

EXHIBIT ___59___

PAGE ___876___

211299

⊛

BARKLEY
Court Reporters

(212) 808-8500 New York     (310) 207-8000 Los Angeles     (949) 955-0400 Irvine     (415) 433-5777 San Francisco
(702) 366-0500 Las Vegas     (915) 922-5777 Sacramento     (408) 885-0550 San Jose     (760) 322-2240 Palm Springs
                             (858) 455-5444 San Diego      (951) 686-0606 Riverside   (818) 702-0202 Woodland Hills

1        ARBITRATION BEFORE ADR SERVICES, INC.

2

3

4   In Re Arbitration Between              )
    FARHAD LARIAN,                         )
5                                          )
                    Claimant,              )
6                                          )
              vs.                          )   No. 05-2096-ABH
7                                          )
    ISAAC LARIAN,                          )
8                                          )
                    Respondent.            )
9   _____)

10

11

12

13

14        Arbitration Proceeding, Volume II, taken at

15   ADR Services, Inc., 1900 Avenue of the Stars,

16   Suite 250, Los Angeles, California, beginning

17   at 10:00 a.m., Thursday, November 17, 2005,.

18   before ANNA B. SACRIPANTI, Certified Shorthand

19   Reporter No. 9533.

20

21

22

23

24

25
                    EXHIBIT ___59___

                    PAGE ___877___

                    174

BARKLEY
Court Reporters

```
 1    APPEARANCES:

 2


 3    Before:

 4          HONORABLE ALAN B. HABER
            ADR Services, Inc.
 5          1900 Avenue of the Stars, Suite 250
            Los Angeles, CA 90067
 6          (310) 201-0010

 7


 8    For Claimant:

 9          KABATECK BROWN KELLNER LLP
            BY:  RICHARD L. KELLNER
10          Attorney at Law
            350 South Grand Avenue, 39th Floor
11          Los Angeles, California 90071
            (213) 217-5000
12


13
            COTKINS, COLLINS & GINSBURG
14          BY:  ROBERT G. WILSON
            Attorney at Law
15          300 South Grand Avenue, 24th Floor
            Los Angeles, California 90071
16          (213) 688-9350

17


18    For the Respondent:

19          KAYE SCHOLER LLP
            BY:  LARRY R. FELDMAN
20           ROBERT M. TURNER
            Attorneys at Law
21          1999 Avenue of the Stars, Suite 1700
            Los Angeles, California 90067
22          (310) 788-1000

23

24                      EXHIBIT _____59_____

25                      PAGE _____878_____
```

                                175

ARBITRATION PROCEEDINGS - VOLUME II                    BARKLEY
                                                   Court Reporters

1    APPEARANCES (Continued):

2

3    Also Present:

4         FARHAD LARIAN
          ISAAC LARIAN
5         DAPHNE GRONICH, General Counsel, MGA Entertainment
          LISA MAMMONE, Paralegal, Kaye Scholer LLP
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        EXHIBIT _____59_____

          PAGE _____879_____

176

ARBITRATION PROCEEDINGS - VOLUME II

**BARKLEY**
Court Reporters

```
1                          INDEX

2  WITNESS                           EXAMINATION

3  ISAAC LARIAN

4         Cross (By Mr. Kellner)          179

5

6

7

8  JENNIFER LYNN MAURUS

9         Direct (By Mr. Kellner)         221

10        Cross (By Mr. Feldman)          244

11        Redirect (By Mr. Kellner)       312

12

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /                 EXHIBIT _____ 59 _____

25  / / /                 PAGE _____ 880 _____
```

177

ARBITRATION PROCEEDINGS – VOLUME II

**BARKLEY**
Court Reporters

1            And we would provide feedback to whether we

2    thought there was a place for it in the market or what

3    our specific accounts might feel about the product.  We

4    would give sometimes packaging feedback.  We would talk

5    about what size and dimensions the packages would have

6    to be, for example, to fit in our specific account

7    shelving constraints.  We would also provide historical

8    information, sales information that would help determine

9    whether a product was truly viable.

10        Q    Now, do you recall the first time you came in

11   contact with the concept that eventually became Bratz?

12        A    Yes.

13        Q    Why don't you describe for us the circumstances

14   surrounding that first occasion?

15        A    I had a conversation with Paula Treantefelles

16   in her work space.  I don't recall if I was in the

17   general area, and we started talking, or if I went over

18   to her to talk about something else.  But she had a

19   guest at her desk.  She introduced me to him, his name

20   was Carter, and they had some sketches, some artist

21   sketches of fashion dolls.  They showed them to me.  She

22   was telling me about the concept, and she expressed her

23   excitement about it and asked me what I thought of the

24   drawings.

25        Q    Let me stop you right there.  When exactly did

EXHIBIT _____59_____

PAGE _____881_____

227

ARBITRATION PROCEEDINGS - VOLUME II

**BARKLEY**
Court Reporters

```
 1   this first conversation take place?

 2        A    I don't know exactly when, but it would have

 3   been in the summer of 2000.

 4        Q    Would it be in the early summer or late summer?

 5        A    I believe it was early summer.

 6        Q    And you mentioned the name Paula.  What was

 7   Paula's position in the company at the time?

 8             (Knock on the door.  Off the record.)

 9   BY MR. KELLNER:

10        Q    When was the first time that you received any

11   information that Isaac Larian had knowledge about Bratz?

12        A    When Paula showed me the drawings, she had

13   indicated that she had met with Isaac about the concept.

14        Q    And when she said that -- I'm sorry.

15             When she said that to you about the concept, at

16   that point had the name Bratz been as ascribed to this

17   concept?

18        A    No.

19        Q    Now, you mentioned Carter.  Was Carter Bryant

20   the person you are referring to as Carter?

21        A    Yes.

22        Q    At the time did you know that -- withdrawn.

23             Can you describe what the sketches looked like?

24        A    Yeah.  They were colored pencil sketches on

25   white paper, they looked like fashion designer sketches
```

EXHIBIT _____ 55

PAGE _____ 880

228

BARKLEY
Court Reporters

```
 1    of clothing.  A few of them, they were elongated image

 2    of a woman or a girl, with fashionable clothing on.

 3    Their heads were a little bit more exaggerated in size.

 4        Q    Can you recall what Paula said to you during

 5    that initial conversation about Bratz and anything to do

 6    with MGA at all?

 7             MR. FELDMAN:  It's really hearsay.  I mean

 8    somebody says something to her.  I understand the time,

 9    and I didn't object, and I know.

10             THE ARBITRATOR:  I can't tell you if it's for

11    the truth of the matter or some other purpose.

12             MR. KELLNER:  It's more a background

13    information.

14             MR. FELDMAN:  I object.  He's established a

15    date, what conversation regarding Bratz.

16             THE ARBITRATOR:  What are you trying to --

17    what's your offer of proof?

18             MR. KELLNER:  At this point, your honor, as I

19    said this is just background.  I can just keep going.

20             THE ARBITRATOR:  Okay.

21    BY MR. KELLNER:

22        Q    After you had that initial discussion with

23    Paula about Bratz, what was the next contact that you

24    had in connection with this Bratz concept?

25        A    There was a formal product review in September
```

EXHIBIT _____ 59 _____

PAGE _____ 883 _____

229

ARBITRATION PROCEEDINGS - VOLUME II

**BARKLEY**
Court Reporters

1    of 2000 in which it was shown to the sales department,

2    and in between the time I first saw the sketches and

3    that formal product review, she and I may have talked

4    about it in passing.

5        Q    Okay.  Why don't you describe what a product

6    review is.

7        A    We were getting ready -- we were getting

8    prepared for the upcoming toy show.  So our product

9    department, the marketing department put together a line

10   review for sale.  So each product manager had all of

11   their products, and they came to -- we were in a

12   conference room, and all the sales managers would be on

13   one side of the table, and they would essentially pitch

14   us the product.  They would give us the product

15   features.  They would give us some background

16   information on, maybe the category the product was in

17   using analysis.  They would show us, if they had

18   samples, they would show us the samples.  If they had

19   markups, they would show us the markups.  If it was just

20   drawings on boards, they would show us those, they would

21   show us the packaging comps, as well.  So, basically, it

22   was just a complete line review of all the products that

23   we were going to be offering to the market.

24       Q    Was Bratz included in that?

25       A    Yes.

EXHIBIT ___59___

PAGE ___384___

230

BARKLEY
Court Reporters

1      Q    And are you sure that this product review took

2  place prior to, let's say, September 30, 2000?

3      A    Yes.

4      Q    And why is that?

5      A    I recall it was in the early to middle of

6  September.  We had to have time to get prepared for the

7  pre-toy shows, and that usually started in October.

8      Q    Maybe we should go through the whole sequence.

9           You talked about the line review.  Is there a

10 sequence of events that toy goes from concept to actual

11 sale at MGA?

12     A    Yes.

13     Q    Why don't you explain that whole sequence of

14 events?

15     A    Okay.  We -- MGA dealt primarily with the mass

16 markets.  We worked on long lead times.  Generally we

17 worked a year ahead of time from when we represent the

18 product to when the product would actually be on the

19 shelves for sale.

20          So the development of a product would be dealt

21 with through marketing and product development side of

22 the business.  And at a certain point, it would be shown

23 to sales, and that would be our line, product line

24 review.  Sales -- excuse me.

25          The product managers would essentially pitch

EXHIBIT ___59___

PAGE ___885___

231

BARKLEY
Court Reporters

1    Q    From the sales marketing perspective, what

2    importance did MGA attribute to the comments that were

3    made by the large chains at this pre-toy show or

4    presentation?

5    A    The major buyers' comments were critical to

6    deciding whether we would move forward with the product.

7         If the big four buyers weren't interested in

8    it, it didn't really make much sense to put resources

9    forward because we needed their volume to justify the

10   tooling cost and production cost and development cost of

11   the product.

12   Q    When was the first time that Isaac Larian

13   expressed any excitement about the Bratz concept?

14        MR. FELDMAN:  You are talking to her?

15        MR. KELLNER:  Yes.

16        THE WITNESS:  At the line review in September,

17   he was present, and he expressed excitement about it

18   then.

19   BY MR. KELLNER:

20   Q    Do you recall anything that he said?

21   A    Not specifically.

22   Q    How about in general?

23   A    Yeah.  In general, he thought that it was going

24   to be a really great item.  He was excited about it.  We

25   were putting a lot of resources toward the product.  He

EXHIBIT _____ 59

PAGE _____ 886

233

BARKLEY
Court Reporters

1    wanted us, the sales, to do our absolute best to get the

2    product positioned and sold into all the major accounts.

3        Q    Okay.  And you actually participated in one of

4    these pre-toy fair presentations involving Bratz.

5    Correct?

6        A    Yes, I did.

7        Q    And do you recall to which chain that was?

8        A    Kmart.

9        Q    And when did that occur?

10       A    November 2000.

11       Q    Do you recall the specific date?

12       A    I believe it was November 9.

13       Q    And was there a particular buyer that you were

14   presenting towards to?

15       A    We presented to all of the Kmart buyers for

16   which we had products.

17       Q    And who did you present Bratz to?

18       A    Paulette Brimm.

19       Q    What was Paulette's position at Kmart?

20       A    She was the buyer responsible for the girls

21   category.

22       Q    And how many products did you present to

23   Paulette at this pre-toy fair presentation?

24       A    Probably about a dozen.

25       Q    And how much, what percentage of time did you

EXHIBIT ___54___

PAGE ___887___

234

ARBITRATION PROCEEDINGS - VOLUME II

BARKLEY
Court Reporters

1    devote to the presentation of Bratz to Paulette?

2         A    At least half of our meeting with her.

3         Q    Why don't you describe exactly what the

4    presentation was to Paulette at this presentation?

5         A    Sure.  We brought all of the samples of all of

6    the doll products and girl products that would have been

7    appropriate for her to buy.  We set them up in our hotel

8    room.  I was there with Paul Warner, who was my boss,

9    and Paula Treantefelles, the product manager, was there

10   as well, plus our outside sales group outside, sales rep

11   Mark Pregel was present as well.

12        We went through each item, basically showing

13   Paulette the items.  A lot of them were existing

14   products for K-mart.  So she was already familiar with

15   them, and we would show her what the refreshes were on

16   the dolls, for example, maybe we have changed the

17   clothing.  And there were a few new dolls which used

18   similar technology as the existing assortment of dolls

19   we had, and we told her the new features of those.

20        And then as we got to Bratz, Paula

21   Treantefelles did the presentation.  We had story

22   boards, big story boards for each of the four

23   characters.  We had shown to the buyers four ethnicities

24   we were going with originally.  Each one had a specific

25   style attributed to her; so we talked about that and

EXHIBIT _____ 51 _____

PAGE _____ 886 _____

235

BARKLEY
Court Reporters

1   what their clothes might look like.  Each had a special

2   icon that was going to distinguish them and be carried

3   throughout all the packaging, and as the products line

4   expanded, it included accessories and all kinds of

5   things.

6        The story boards also had -- they had artist

7   renderings on them, and we had some sample clothing.  We

8   talked a lot about -- Paula had talked a lot about the

9   market segment we were trying to break into which was a

10  tween market.  We talked about Barbie and how Barbie was

11  perceived as baby-ish by girls, and older girls, the 8

12  to 12 girls, aren't really into Barbies anymore, but

13  they had a real desire to still have doll-playing in

14  fashion.

15       We talked about how fashionable -- really the

16  primary focus of this product is wanting to appeal to

17  older girls, even college level girls.  We talked about

18  how the packaging was going to be a showcase type

19  packaging so the older girl could keep it on her shelf

20  as a collectible in the package, where the younger girl

21  could take it out and play with it.

22       We talked about the features of the dolls, the

23  luxurious hair, how the features, the face were going to

24  be played up and more prominent, we talked about how we

25  were going to deal with the feet and the shoes.  One of



EXHIBIT ____54____

PAGE ____889____

236

ARBITRATION PROCEEDINGS - VOLUME II

BARKLEY
Court Reporters

1  the problems with Barbie is it can't stand, and Bratz

2  were designed so that it could stand up, be

3  freestanding.

4          Paula talked about the focus group and results

5  from the girls in the focus groups, how they felt about

6  it.  We discussed the product name.  We discussed the

7  product tag line.  We discussed the accessories that we

8  were going to have initially to complement the dolls.

9          We talked about -- essentially we did a very

10  long presentation of MGA's commitment to the item and to

11  the potential line that was going to become.  It was a

12  brand new category for MGA we were moving into, and the

13  category was dominated by one other product, which was

14  Barbie.

15          So we needed to, in order to get the buyer to

16  believe in us and to believe in the product, we had to

17  really make a strong pitch that this was going to be a

18  big item for MGA, and it was very viable for them to buy

19  and do it.

20     Q    Let me do a couple of things and try move it

21  along.  You mentioned focus groups.

22     A    Yes.

23     Q    Can you tell me what the focus groups were

24  about with respect to Bratz?

25     A    As I was told --

EXHIBIT ___59___

PAGE ___890___

237

BARKLEY
Court Reporters

 1          MR. FELDMAN:  Wait, wait, wait.  If she has

 2     information that she was there, that's one thing.  If

 3     somebody tells her something, that's hearsay.

 4          THE ARBITRATOR:  Right.

 5     BY MR. KELLNER:

 6       Q    What information was related to the buyer with

 7     respect to the focus groups.

 8          MR. FELDMAN:  This is at the initial meeting?

 9          MR. KELLNER:  Correct.

10          THE WITNESS:  We talked -- it was told to the

11     buyer that the girls felt that fashions were very

12     important, that the hair had to be long and luxurious so

13     there could be hair play, the girls really like the name

14     Bratz.  There was a little bit of a concern about the

15     negative connotation of the word Bratz, and it was

16     expressed that the focus group girls preferred that name

17     over the others.

18     BY MR. KELLNER:

19       Q    You mentioned product search.  What product

20     research was done, to your knowledge, with respect to

21     Bratz?

22       A    There's a reporting service for the toy

23     industry, at the time it was called TRSTS, Toy Retail

24     Sales Trend Service.  I think now it's NPD Fun World.

25          MR. WILSON:  Fun World?

                    EXHIBIT ____59____

                    PAGE ____891____

                         238

BARKLEY
Court Reporters

```
 1              MR. FELDMAN:   In 2000.

 2              MR. KELLNER:   In 2000.

 3              MR. FELDMAN:   Well, let's get some foundation

 4    that she's done anything.

 5    BY MR. KELLNER:

 6        Q    Was there any discussion --

 7              MR. FELDMAN:   As a salesperson.  Go ahead.

 8              MR. KELLNER:   Counsel.

 9              MR. FELDMAN:   Go ahead.

10    BY MR. KELLNER:

11        Q    Was there any discussion about animated series

12    when you made that presentation on November 9?

13        A    I believe there was.

14        Q    What was discussed with the buyers?

15        A    Paula expressed to Paulette, the buyer, that

16    Isaac was talking with production companies about

17    creating an animated series featuring the Bratz

18    characters.

19        Q    Did Isaac ever communicate to you any

20    excitement that he had with respect to Bratz, let's say

21    prior to December 4, 2000, in the context of the

22    company?

23        A    Yes.  That sales presentations, he presented to

24    the whole sales department that he was excited about the

25    product.
```

EXHIBIT __59__

PAGE __892__

241

ARBITRATION PROCEEDINGS - VOLUME II

**BARKLEY**
Court Reporters

1              COURT REPORTERS CERTIFICATE

2

3    STATE OF CALIFORNIA      )
                              )  ss.
4    COUNTY OF  LOS ANGELES   )

5

6          I,  ___Anna Sacripanti___ , hereby certify:

7          I am a duly qualified Certified Shorthand

8    Reporter, in the State of California, holder of

9    Certificate Number CSR  9533   issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.

12          I am not financially interested in this action

13   and am not a relative or employee of any attorney of the

14   parties, or of any of the parties.

15          I am the reporter that stenographically

16   recorded the testimony in the foregoing

17   proceeding and the foregoing transcript is a true

18   record of the testimony given.

19

20   Dated:    03/21/08

21

22

23

24   EXHIBIT   59

25   PAGE   893

                        324

BARKLEY
Court Reporters

1  STATE OF CALIFORNIA        }
                              }  ss.
2  COUNTY OF LOS ANGELES      }

3

4          I, OLIVER GARCIA, hereby certify:

5          I am an employee of Barkley Court Reporters,

6  duly authorized agent for the deposition officer that

7  stenographically recorded the testimony in the foregoing

8  proceeding and authorized to execute this copy

9  certificate.

10         The foregoing is a true and correct copy of

11  the original transcript of the stated proceeding.

12

13  Dated  03.21.08.

14

15

16

17

18

19

20

21

22

23

24  EXHIBIT  59

25  PAGE  894

**BARKLEY**

**EXHIBIT 60**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1　　　　　UNITED STATES DISTRICT COURT

2　　　　　CENTRAL DISTRICT OF CALIFORNIA

3　　　　　　　EASTERN DIVISION

4　　-------------------------------

**Certified Copy**

5　　MATTEL, INC., a Delaware　　　　)

6　　Corporation,　　　　　　　　　)

7　　　　　　　Plaintiff,　　　　　)

8　　　　　　　vs.　　　　　　　　　) No. CV 04-9059

9　　CARTER BRYANT, an individual; )　　NM (RNBx)

10　　and DOES 1 through 10,　　　　) VOLUME I

11　　Inclusive,

12　　　　　　　Defendants.

13　　-------------------------------)

14　　(COMPLETE CAPTION ON NEXT PAGE.)

15

16　　CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18　　Videotaped Deposition of IVY ROSS,

19　　taken at 300 South Grand Street,

20　　Los Angeles, California, commencing

21　　at 9:17 A.M., Thursday, January 17,

22　　2008, before Ricki Q. Melton,

23　　CSR No. 9400, RPR No. 45429.

24

25　　PAGES 1 - 258

EXHIBIT ___60___

PAGE ___895___

1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4

 5       -------------------------------

 6    MATTEL, INC., a Delaware          )

 7    Corporation,                      )

 8                  Plaintiff,          )

 9                  vs.                 ) No. CV 04-9059

10    CARTER BRYANT, an individual;     )    NM (RNBx)

11    and DOES 1 through 10,            )

12    Inclusive,                        )

13                  Defendants.         )

14       ----------------------------- )

15    CARTER BRYANT, on behalf of       )

16    himself, all present and          )

17    former employees of Mattel,       )

18    Inc., and the general public,     )

19                  Counter-Claimants,  )

20                  vs.                 )

21    MATTEL, INC., a Delaware          )

22    Corporation,                      )

23                  Counter-Defendant. )

24       -------------------------------

25
```

EXHIBIT _66_

PAGE _896_

2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        APPEARANCES OF COUNSEL:

 2

 3            For the Plaintiff:

 4

 5            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6            BY:  DYLAN PROCTOR, ESQ.

 7            865 South Figueroa Street, Tenth Floor

 8            Los Angeles, California 90017

 9            (213) 443-3000

10            dylanproctor@quinnemanuel.com

11

12                      -and-

13

14            MATTEL, INC.

15            BY:  MICHAEL MOORE, ESQ.

16            333 Continental Boulevard

17            El Segundo, California 90245-5012

18            (310) 252-2000

19            michael.moore@mattel.com

20

21

22

23

24

25
```

EXHIBIT ___60___

PAGE ___897___

3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        APPEARANCES (Continued):

 2

 3           For the Defendant and Counterclaimant

 4           Carter Bryant:

 5

 6           KEKER & VAN NEST LLP

 7           BY:  CHRISTA ANDERSON, ESQ.

 8           710 Sansome Street

 9           San Francisco, California 94111-1704

10           (415) 391-5400

11           canderson@kvn.com

12

13       For Defendant MGA Entertainment, Inc.:

14

15           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

16           BY:  KENNETH PLEVAN, ESQ.

17               MICHELLE M. CAMPANA, ESQ.

18           Four Times Square

19           New York, New York 10036-6522

20           (212) 735-3000

21           kplevan@skadden.com

22           micampan@skadden.com

23

24     ALSO PRESENT:

25           David West, Video Operator
```

EXHIBIT 66

PAGE 898

4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. PLEVAN: | 10:35:10 |
| 2 | Q.   Did you know about Bratz before the work | 10:35:10 |
| 3 | on My Scene began? | 10:35:12 |
| 4 | MR. PROCTOR:   Same objections.   Calls for | 10:35:14 |
| 5 | speculation -- | 10:35:15 |
| 6 | THE WITNESS:   I don't recall because I | 10:35:16 |
| 7 | don't recall when Bratz came out and exactly when | 10:35:18 |
| 8 | the work on My Scene began. | 10:35:21 |
| 9 | BY MR. PLEVAN: | 10:35:24 |
| 10 | Q.   Are you familiar with the phrase "fighter | 10:35:24 |
| 11 | brand"? | 10:35:26 |
| 12 | A.   No, I am not. | 10:35:27 |
| 13 | Q.   Was My Scene introduced specifically to | 10:35:31 |
| 14 | compete directly with Bratz? | 10:35:36 |
| 15 | MR. PROCTOR:   Objection.   Assumes facts | 10:35:38 |
| 16 | not in evidence. | 10:35:40 |
| 17 | THE WITNESS:   No, not to the best of my | 10:35:41 |
| 18 | recollection. | 10:35:43 |
| 19 | BY MR. PLEVAN: | 10:35:43 |
| 20 | Q.   Did Mattel ever introduce a line of dolls | 10:35:43 |
| 21 | to specifically target a competitive product in the | 10:35:46 |
| 22 | marketplace? | 10:35:50 |
| 23 | MR. PROCTOR:   Assumes facts not in | 10:35:50 |
| 24 | evidence. | 10:35:51 |
| 25 | THE WITNESS:   Not to the best of my | 10:35:52 |
| | | 59 |

EXHIBIT _____ 60

PAGE _____ 899

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | recollection. | 10:35:53 |
| 2 | BY MR. PLEVAN: | 10:36:02 |
| 3 | Q.   Although you don't recall when you first | 10:36:02 |
| 4 | saw or learned of Bratz, do you remember what your | 10:36:04 |
| 5 | observations were -- | 10:36:11 |
| 6 | Let me ask you first:  How did you learn | 10:36:12 |
| 7 | about Bratz? | 10:36:14 |
| 8 | A.   I don't remember whether I saw it in a | 10:36:19 |
| 9 | store or whether a daughter's friend brought it to | 10:36:21 |
| 10 | me.  I don't remember the very first moment of | 10:36:27 |
| 11 | observation, but it could have been any of those | 10:36:29 |
| 12 | methods. | 10:36:32 |
| 13 | Q.   And what do you recall your first | 10:36:32 |
| 14 | reactions were when you saw Bratz? | 10:36:35 |
| 15 | A.   Wow.  They look a little bit like Tune | 10:36:42 |
| 16 | Teens, which is something we had done internally, | 10:36:48 |
| 17 | and they had a big head and big eyes like Diva | 10:36:49 |
| 18 | Starz. | 10:37:00 |
| 19 | I remember making an observation to myself | 10:37:00 |
| 20 | or saying that.  I mean that is what I thought. | 10:37:10 |
| 21 | Q.   Were you at that time concerned that | 10:37:15 |
| 22 | rights of Mattel had been violated? | 10:37:17 |
| 23 | MR. PROCTOR:  Assumes facts not in | 10:37:19 |
| 24 | evidence. | 10:37:20 |
| 25 | THE WITNESS:  No. | 10:37:21 |

EXHIBIT _____ 60
PAGE _____ 900

60

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    BY MR. PLEVAN:                                      10:37:26

2       Q.   Did there come a time that you were        10:37:26

3    concerned that rights of Mattel had been violated  10:37:28

4    in connection with the Bratz dolls?                10:37:30

5           MR. PROCTOR:  Overbroad.                     10:37:32

6           THE WITNESS:  No.                            10:37:33

7    BY MR. PLEVAN:                                      10:37:36

8       Q.   Did you ever institute any investigation   10:37:36

9    into the individuals who were involved in          10:37:39

10   developing Bratz?                                   10:37:43

11          MR. PROCTOR:  Objection.  Vague and          10:37:44

12   ambiguous as to "institute an investigation" and   10:37:45

13   "individuals."                                      10:37:50

14          THE WITNESS:  Yeah.  I would not use the     10:37:50

15   word "investigation" or...                          10:37:52

16   BY MR. PLEVAN:                                      10:37:53

17      Q.   Did you complain to anybody?               10:37:53

18      A.   About?                                      10:37:55

19          MR. PROCTOR:  Objection.  Vague and          10:37:56

20   ambiguous.                                          10:38:00

21          "Did you complain to anybody" about what?   10:38:00

22   BY MR. PLEVAN:                                      10:38:11

23      Q.   Did you complain to anyone at Mattel about 10:38:11

24   Bratz or any aspect of Bratz?                       10:38:15

25          MR. PROCTOR:  Objection.  Vague and          10:38:18
                                                            61
```

EXHIBIT _____ 60

PAGE _____ 901

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ambiguous. | 10:38:19 |
| 2 | At any point in time? | 10:38:20 |
| 3 | MR. PLEVAN:  Yes. | 10:38:21 |
| 4 | MR. PROCTOR:  Overbroad. | 10:38:26 |
| 5 | Go ahead. | 10:38:27 |
| 6 | THE WITNESS:  No, I did not complain to | 10:38:28 |
| 7 | anyone at Mattel about Bratz. | 10:38:31 |
| 8 | BY MR. PLEVAN: | 10:38:33 |
| 9 | Q.   Did you bring to the attention of the | 10:38:33 |
| 10 | Mattel legal department Bratz in any connection? | 10:38:35 |
| 11 | MR. PROCTOR:  Overbroad, vague and | 10:38:40 |
| 12 | ambiguous. | 10:38:44 |
| 13 | Go ahead. | 10:38:44 |
| 14 | THE WITNESS:  About -- directly about | 10:38:48 |
| 15 | Bratz, no. | 10:38:51 |
| 16 | BY MR. PLEVAN: | 10:38:51 |
| 17 | Q.   Indirectly about Bratz? | 10:38:51 |
| 18 | MR. PROCTOR:  Same objections. | 10:38:53 |
| 19 | Go ahead. | 10:38:54 |
| 20 | THE WITNESS:  No. | 10:38:55 |
| 21 | BY MR. PLEVAN: | 10:39:03 |
| 22 | Q.   To your understanding, who was involved in | 10:39:04 |
| 23 | the development of Bratz? | 10:39:06 |
| 24 | MR. PROCTOR:  Objection.  Overbroad. | 10:39:10 |
| 25 | THE WITNESS:  What do you mean by | 10:39:13 |

62

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | "involved"?  I stated earlier the -- from the | 10:39:14 |
| 2 | design perspective the people that -- | 10:39:18 |
| 3 |         Oh, in Bratz? | 10:39:21 |
| 4 | BY MR. PLEVAN: | 10:39:21 |
| 5 |     Q.   Bratz. | 10:39:23 |
| 6 |     A.   Who was -- what I understand, my concern | 10:39:23 |
| 7 | was I thought that someone named Carter Bryant had | 10:39:41 |
| 8 | been heavily influenced and taken Lillie Martinez's | 10:39:53 |
| 9 | idea for Tune Teens -- is what I had thought. | 10:39:58 |
| 10 |     Q.   And was this a thought you had when you | 10:40:09 |
| 11 | first saw Bratz? | 10:40:11 |
| 12 |         MR. PROCTOR:  Objection.  Vague and | 10:40:16 |
| 13 | ambiguous. | 10:40:17 |
| 14 |         THE WITNESS:  No. | 10:40:17 |
| 15 | BY MR. PLEVAN: | 10:40:19 |
| 16 |     Q.   Well, when you first saw Bratz, you, of | 10:40:20 |
| 17 | course, were aware of Tune Teens? | 10:40:22 |
| 18 |     A.   Yes, but I didn't know Carter Bryant -- | 10:40:27 |
| 19 | what he had said to Lillie.  That was my first | 10:40:33 |
| 20 | concern -- it wasn't until I heard that, that I | 10:40:39 |
| 21 | thought he may have been influenced by Lillie's | 10:40:43 |
| 22 | Tune Teens, taken her idea. | 10:40:50 |
| 23 |     Q.   What was Ms. Martinez's idea for Tune | 10:40:55 |
| 24 | Teens? | 10:41:01 |
| 25 |         MR. PROCTOR:  Vague and ambiguous, | 10:41:01 |
| | | 63 |

EXHIBIT 66

PAGE 903

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | overbroad. | 10:41:02 |
| 2 | Go ahead. | 10:41:02 |
| 3 | THE WITNESS:  Lillie had a certain drawing | 10:41:08 |
| 4 | style that, in fact, looks a little bit like | 10:41:10 |
| 5 | herself, but it was a style of drawing that she had | 10:41:15 |
| 6 | that she had also implemented in a line called Tune | 10:41:18 |
| 7 | Teens that she had created during an internal | 10:41:22 |
| 8 | design competition, if you want to call it that. | 10:41:33 |
| 9 | BY MR. PLEVAN: | 10:41:47 |
| 10 | Q.   How would you describe that design style, | 10:41:48 |
| 11 | that drawing style? | 10:41:54 |
| 12 | A.   It's Lillie's style.  It tends to look | 10:41:58 |
| 13 | like her.  It has kind of big articulated lips and | 10:42:01 |
| 14 | big eyes. | 10:42:08 |
| 15 | I mean I would have to see something to | 10:42:09 |
| 16 | actually show you what I believe her style to be. | 10:42:11 |
| 17 | It's hard to explain it, but I think some of the | 10:42:15 |
| 18 | characteristics are articulated large lips, large | 10:42:18 |
| 19 | eyes, a part ethnic feel, ethnic attitude. | 10:42:23 |
| 20 | Q.   Anything else? | 10:42:40 |
| 21 | A.   As I stated, it's hard to describe it.  I | 10:42:45 |
| 22 | think that's about -- without seeing something, | 10:42:47 |
| 23 | that's how I would describe it. | 10:42:48 |
| 24 | Q.   Now, you indicated you had a -- well, did | 10:42:53 |
| 25 | you have a discussion with Ms. Martinez related to | 10:42:56 |

64

EXHIBIT  60

PAGE 904

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | anyone about where Mr. Bryant was working? | 11:10:05 |
| 2 | MR. PROCTOR:  Objection.  Vague and | 11:10:10 |
| 3 | ambiguous as to time. | 11:10:11 |
| 4 | At any point in time? | 11:10:12 |
| 5 | MR. PLEVAN:  Yes. | 11:10:13 |
| 6 | THE WITNESS:  I don't recall any specific | 11:10:19 |
| 7 | conversations.  I know that there must have been | 11:10:20 |
| 8 | some.  I don't remember specific ones. | 11:10:23 |
| 9 | BY MR. PLEVAN: | 11:10:26 |
| 10 | Q.  And do you recall who they were with? | 11:10:28 |
| 11 | MR. PROCTOR:  I'm going to object as vague | 11:10:32 |
| 12 | and ambiguous. | 11:10:34 |
| 13 | Just for clarification, are you asking | 11:10:35 |
| 14 | conversations with anyone about Mr. Bryant working | 11:10:37 |
| 15 | at MGA? | 11:10:40 |
| 16 | MR. PLEVAN:  Yes. | 11:10:42 |
| 17 | MR. PROCTOR:  Okay.  So -- okay. | 11:10:42 |
| 18 | THE WITNESS:  I do not recall a specific | 11:10:45 |
| 19 | conversation, no. | 11:10:48 |
| 20 | BY MR. PLEVAN: | 11:10:50 |
| 21 | Q.  What do you recall about your conversation | 11:10:50 |
| 22 | with Mr. Bryant when he left? | 11:10:52 |
| 23 | A.  I recall that I asked him if there was | 11:10:57 |
| 24 | anything I could do to make him stay because he was | 11:11:07 |
| 25 | a talented designer. | 11:11:11 |

86

EXHIBIT    60

PAGE    905

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | He told me that he -- that it was not | 11:11:13 |
| 2 | about his work at Mattel, that he had enjoyed | 11:11:16 |
| 3 | working here -- in fact, it was his second time | 11:11:21 |
| 4 | working at Mattel -- but that it was -- the | 11:11:23 |
| 5 | situation he was going to was too good to pass up | 11:11:26 |
| 6 | because he was going to be able to be much freer. | 11:11:30 |
| 7 | He told me he was going to have more time | 11:11:33 |
| 8 | on his hands, be able to sit at home and with his | 11:11:36 |
| 9 | dog on his side and do drawings and spend more | 11:11:41 |
| 10 | quality time at home, and it's just something he | 11:11:51 |
| 11 | felt he really needed to do at this point in his | 11:11:51 |
| 12 | life, and I asked if he was going to a -- could he | 11:11:54 |
| 13 | tell me, you know, was he going to a competitor, | 11:11:58 |
| 14 | and he said no, it was not a competitor, and I | 11:12:00 |
| 15 | said, "Okay.  I'm sorry to lose you.  Good luck." | 11:12:08 |
| 16 | Let him stay two weeks, which was our | 11:12:11 |
| 17 | policy.  If you were not going to a competitor, we | 11:12:14 |
| 18 | allowed you to give two weeks' notice.  If he was | 11:12:17 |
| 19 | going to a competitor, he would have been walked | 11:12:21 |
| 20 | out by security.  That was our policy. | 11:12:23 |
| 21 | So I remember he told me he was not, and I | 11:12:25 |
| 22 | let him stay, and I -- and that was my | 11:12:27 |
| 23 | conversation. | 11:12:31 |
| 24 | Q.   Was this a face-to-face conversation? | 11:12:32 |
| 25 | A.   Yes, it was. | 11:12:34 |
| | | 87 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q. And was this in your office? | 11:12:35 |
| 2 | A. No. I remember it being in his work area. | 11:12:39 |
| 3 | Q. So you had heard he was leaving and gone | 11:12:45 |
| 4 | to talk to him? | 11:12:48 |
| 5 | A. Yes. His boss's boss had come to me, my | 11:12:50 |
| 6 | direct report, Ron Longsdorf, and told me Carter | 11:12:54 |
| 7 | had just resigned, and he and I were both very | 11:12:58 |
| 8 | upset because he was a talented designer, and I | 11:13:02 |
| 9 | said, "Let me try and talk to him," and I asked Ron | 11:13:05 |
| 10 | actually, "Do you know where he's going or why?" | 11:13:08 |
| 11 | And he said, "No, I think it's a life -- | 11:13:11 |
| 12 | it sounds like it's a life" -- you know, without | 11:13:14 |
| 13 | getting too personal, "It felt like it was a life | 11:13:17 |
| 14 | change he needed to make," because he painted a | 11:13:20 |
| 15 | picture to both of us separately of one where he | 11:13:22 |
| 16 | was going to have this great lifestyle of not | 11:13:25 |
| 17 | having to come in to work every day. So it felt | 11:13:27 |
| 18 | like it was some free-lance-type situation or | 11:13:31 |
| 19 | part-time job. That was not my concern. That's | 11:13:36 |
| 20 | what it felt like to me. | 11:13:39 |
| 21 | Q. Do you recall approximately when this was | 11:13:44 |
| 22 | that Mr. Bryant left? | 11:13:46 |
| 23 | A. No, I do not. | 11:13:48 |
| 24 | Q. And what was Mr. Longsdorf's position at | 11:13:50 |
| 25 | this time? | 11:13:55 |

88

EXHIBIT    6<sup>6</sup>

PAGE_____  907

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I think his title was vice president of | 11:13:55 |
| 2 | collector. | 11:13:59 |
| 3 | Q.   And do you recall the projects that -- or | 11:14:05 |
| 4 | the work that Mr. Bryant was doing when he was -- | 11:14:10 |
| 5 | within the period of time he was working prior to | 11:14:13 |
| 6 | leaving when you had this conversation with him? | 11:14:17 |
| 7 | MR. PROCTOR:  Overbroad, vague and | 11:14:20 |
| 8 | ambiguous. | 11:14:22 |
| 9 | Any of them?  All of them? | 11:14:22 |
| 10 | BY MR. PLEVAN: | 11:14:25 |
| 11 | Q.   Well, what was his work assignment? | 11:14:26 |
| 12 | A.   I don't remember. | 11:14:27 |
| 13 | Q.   In general, what -- well, what -- if he | 11:14:29 |
| 14 | was working with Mr. Longsdorf, does that mean he | 11:14:36 |
| 15 | was in collectibles? | 11:14:40 |
| 16 | A.   That might have been his prime | 11:14:41 |
| 17 | responsibility, but often designers in these design | 11:14:43 |
| 18 | competitions, collector -- people that were | 11:14:46 |
| 19 | assigned under collector manager would also | 11:14:49 |
| 20 | participate in the main line dolls and vice versa, | 11:14:51 |
| 21 | and often we would pull designers on projects in | 11:14:55 |
| 22 | the opposite areas. | 11:15:03 |
| 23 | So it was not an exclusive arrangement. | 11:15:04 |
| 24 | It tended to be a focus but not exclusive. | 11:15:08 |
| 25 | Q.   Do you have any specific recollection of | 11:15:12 |

89

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     trying to think how to describe it -- that would     12:09:13

 2     talk Furbish, I think.                                12:09:15

 3        Q.   Do you remember when Furby was on the         12:09:19

 4     market?                                               12:09:21

 5        A.   No, I don't remember the exact date.          12:09:22

 6        Q.   Are you familiar with a cartoon series        12:09:33

 7     called Sailor Moon?                                   12:09:35

 8        A.   No.                                           12:09:41

 9        Q.   Were you involved at all in the               12:09:45

10     procurement of hair for dolls?                        12:09:47

11        A.   In the purchasing of it?  No, I did not       12:09:52

12     purchase.                                             12:09:56

13        Q.   Do you know where Mattel got its hair for     12:09:58

14     dolls?                                                12:10:02

15        A.   I know it was a number of sources.            12:10:02

16        Q.   Do you remember the identities of any of      12:10:05

17     them?                                                 12:10:09

18        A.   I'm sorry.  The what?                         12:10:09

19        Q.   The identities of any of them.                12:10:10

20        A.   No.                                           12:10:12

21        Q.   Was a company called Universal one of         12:10:16

22     them?                                                 12:10:19

23        A.   I don't remember.                             12:10:19

24        Q.   Do you recall any discussion at Mattel of     12:10:30

25     what steps, if any, should be taken to respond to     12:10:35
```

                                                             119

EXHIBIT 60

PAGE 909

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Bratz being a competitor on the market? | 12:10:40 |
| 2 | A.  No. | 12:10:43 |
| 3 | MR. PROCTOR:  Objection.  Overbroad, | 12:10:43 |
| 4 | assumes facts not in evidence. | 12:10:45 |
| 5 | BY MR. PLEVAN: | 12:11:02 |
| 6 | Q.  Did anyone at Mattel ever express the view | 12:11:02 |
| 7 | that My Scene was a copy of Bratz? | 12:11:06 |
| 8 | MR. PROCTOR:  Objection.  Calls for | 12:11:09 |
| 9 | speculation. | 12:11:11 |
| 10 | THE WITNESS:  Not to the best of my -- not | 12:11:11 |
| 11 | that I recall. | 12:11:14 |
| 12 | BY MR. PLEVAN: | 12:11:16 |
| 13 | Q.  Do you recall anyone at Mattel comparing | 12:11:17 |
| 14 | My Scene to Bratz? | 12:11:20 |
| 15 | MR. PROCTOR:  Objection.  Overbroad. | 12:11:22 |
| 16 | THE WITNESS:  No, I do not remember. | 12:11:24 |
| 17 | BY MR. PLEVAN: | 12:11:43 |
| 18 | Q.  Do you know Roxanna Powell? | 12:11:43 |
| 19 | A.  Yes. | 12:11:46 |
| 20 | Q.  Who was or -- was or is Roxanna Powell? | 12:11:47 |
| 21 | A.  She worked at Mattel as a doll designer. | 12:11:52 |
| 22 | When I was left, she was in Catherine Demas's | 12:11:58 |
| 23 | group. | 12:12:03 |
| 24 | Q.  Do you recall whether you had any | 12:12:04 |
| 25 | discussions with Roxanna Powell about Carter | 12:12:06 |

120

EXHIBIT 60
PAGE 910

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      Bryant's role in Bratz?                      12:12:10

2          A.   I do not recall.                    12:12:11

3          Q.   Are you familiar with a project called   12:12:19

4      NHB?                                          12:12:24

5          A.   N --                                 12:12:26

6          Q.   Capital N, capital H, capital B.     12:12:27

7          A.   No.                                  12:12:30

8          Q.   As a code name for an investigation of   12:12:31

9      MGA?                                          12:12:35

10         A.   No.                                  12:12:35

11         Q.   Do you know Margaret Lahey?          12:12:42

12         A.   Yes.                                 12:12:44

13         Q.   And how do you know Margaret Lahey?  12:12:45

14         A.   She was a sculptress at Mattel.      12:12:48

15         Q.   During what period of time --        12:12:54

16         A.   I don't --                           12:12:54

17         Q.   -- if you recall?                    12:12:56

18         A.   I don't remember.  I remember she left   12:12:56

19     before I left.                                12:13:00

20         Q.   Was she a skilled sculptress?        12:13:00

21         A.    To the best of my memory.  I remember it   12:13:04

22     was a loss that she left.  So she must have been.   12:13:07

23         Q.   When new design projects were started at   12:13:22

24     Mattel, did they always start with drawings?  12:13:25

25              MR. PROCTOR:  Objection.  Overbroad.  12:13:32
```
121

EXHIBIT 60

PAGE 911

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  No. | 12:13:33 |
| 2 | BY MR. PLEVAN: | 12:13:34 |
| 3 | Q.   What alternatives are there to starting | 12:13:35 |
| 4 | with drawings? | 12:13:40 |
| 5 | A.   Sometimes we would start with part of a | 12:13:41 |
| 6 | sculpture that we had from another project and then | 12:13:43 |
| 7 | draw pieces we wanted to add on to it. | 12:13:47 |
| 8 | Q.   Any other means of starting a project? | 12:13:52 |
| 9 | MR. PROCTOR:  Vague and ambiguous, | 12:13:57 |
| 10 | overbroad. | 12:13:58 |
| 11 | Go ahead. | 12:13:58 |
| 12 | THE WITNESS:  My understanding of what you | 12:14:01 |
| 13 | are asking, it either would come from a drawing or | 12:14:03 |
| 14 | already having a part or having it in your mind's | 12:14:06 |
| 15 | eye, which would then result in a drawing. | 12:14:14 |
| 16 | BY MR. PLEVAN: | 12:14:16 |
| 17 | Q.   Could it start with a -- photographs or | 12:14:16 |
| 18 | tear sheets and a description? | 12:14:19 |
| 19 | MR. PROCTOR:  Objection.  Vague and | 12:14:24 |
| 20 | ambiguous. | 12:14:24 |
| 21 | THE WITNESS:  No, I would not consider | 12:14:27 |
| 22 | that the start of the project. | 12:14:28 |
| 23 | BY MR. PLEVAN: | 12:14:32 |
| 24 | Q.   That would be something back before the | 12:14:32 |
| 25 | start of a project? | 12:14:35 |

122

EXHIBIT    60

PAGE _____ 912

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. PROCTOR:  Vague and ambiguous -- | 03:33:24 |
| 2 | THE WITNESS:  Okay.  I will repeat the -- | 03:33:24 |
| 3 | MR. PROCTOR:  -- misstates the testimony. | 03:33:25 |
| 4 | THE WITNESS:  Yeah, totally misstates it. | 03:33:26 |
| 5 | BY MS. ANDERSON: | 03:33:30 |
| 6 | Q.  I'm not trying to misstate your testimony, | 03:33:30 |
| 7 | Ms. Ross, but I want to get the testimony clearly, | 03:33:32 |
| 8 | and obviously I'm confused.  So there's a chance | 03:33:34 |
| 9 | that others may be as well. | 03:33:37 |
| 10 | A.  There's no doubt that Ron -- | 03:33:38 |
| 11 | MR. PROCTOR:  Let her -- | 03:33:41 |
| 12 | BY MS. ANDERSON: | 03:33:43 |
| 13 | Q.  Let me ask a question or the record will | 03:33:43 |
| 14 | look crazy. | 03:33:45 |
| 15 | A.  All right. | 03:33:45 |
| 16 | Q.  Okay.  So strike my colloquy, and my | 03:33:46 |
| 17 | question to you is:  You did testify earlier that | 03:33:48 |
| 18 | Mr. Longsdorf did come to you, requesting that you | 03:33:51 |
| 19 | speak with Mr. Bryant about his leaving; is that | 03:33:54 |
| 20 | true? | 03:33:54 |
| 21 | A.  Mr. Longsdorf came to me, telling me that | 03:33:58 |
| 22 | Carter Bryant had resigned. | 03:34:01 |
| 23 | Q.  Okay. | 03:34:04 |
| 24 | A.  That was the reason he came to me. | 03:34:04 |
| 25 | Q.  In this conversation -- | 03:34:07 |

219

EXHIBIT __6 0__

PAGE __913__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    Uh-huh.                                   03:34:09

 2      Q.    -- did Mr. Longsdorf make any statements  03:34:10

 3   to you about what he said Mr. Bryant told          03:34:14

 4   Mr. Longsdorf?                                     03:34:18

 5      A.    Yes.  I asked Ron why was -- first of all,03:34:18

 6   why was Carter leaving, and he told me, and again, 03:34:23

 7   not in these words, but the gist of it was that he 03:34:27

 8   had gotten a great opportunity where he was going  03:34:31

 9   to be doing something that gave him a lot of       03:34:34

10   freedom and a different lifestyle and it appeared  03:34:36

11   that he couldn't be convinced otherwise, that it   03:34:42

12   was something --                                   03:34:45

13          Because I remember saying to him, you       03:34:47

14   know, "Is there anything we can do?  Are there any 03:34:49

15   issues with us," and he said it appears that it's  03:34:59

16   not about any complaints about us, meaning --      03:34:59

17   sometimes when someone resigns, you know, someone  03:34:59

18   wants more money, someone wants a different        03:35:00

19   position.                                          03:35:02

20          So I had asked him, "Is there any -- you    03:35:03

21   know, is there anything that you could get out of  03:35:05

22   him that we could do differently to keep him."  I  03:35:07

23   remember that the nature of it was that wasn't the 03:35:10

24   issue.  The issue was that he had a great          03:35:12

25   opportunity that allowed him a very different      03:35:16
                                                              220
```

EXHIBIT 60

PAGE 914

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    lifestyle.                                          03:35:19

2        Q.   Okay.  And that's your best recollection   03:35:21

3    of what Mr. Longsdorf conveyed to you, although you 03:35:22

4    can't remember verbatim his choice of words?        03:35:25

5        A.   I can't remember verbatim, but that was    03:35:28

6    the gist of it.                                      03:35:31

7        Q.   Okay.  And the conversation that you are    03:35:34

8    not totally sure happened, which was a potential     03:35:35

9    follow-up with either Ron Longsdorf or Ann           03:35:37

10   Driskill, can you give any information about that    03:35:41

11   conversation that may or may not have happened in    03:35:44

12   your mind?                                           03:35:47

13       A.   No, I'm very clear that I went back to one  03:35:47

14   of them -- either one of them or both of them --     03:35:50

15       Q.   Okay.                                       03:35:53

16       A.   -- and quote, unquote, "closed the loop"    03:35:53

17   and reported back that I had had the conversation    03:35:56

18   with Carter and, in fact, I could not convince him   03:35:59

19   to stay.  Because I was the boss and I was the one   03:36:02

20   who had to make the determination in this case       03:36:05

21   whether we should ask him to leave, because he was   03:36:08

22   going to competition, or whether he could, you       03:36:12

23   know, stay his two weeks.                            03:36:14

24            So I owed to them, and I don't remember     03:36:15

25   whether I couldn't -- sometimes, if I can't find     03:36:17

                                                          221

EXHIBIT 60

PAGE 915

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        I declare under penalty of perjury

2    under the laws of the State of California

3    that the foregoing is true and correct.

4

5        Executed on _Feb 4_____ , 2008,

6    at _____, _____.

7

8

9

10    _____

11        SIGNATURE OF THE WITNESS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        251

EXHIBIT 60
PAGE 916

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      STATE OF CALIFORNIA    ) ss:

 2      COUNTY OF LOS ANGELES  )

 3

 4         I, RICKI Q. MELTON, CSR No. 9400, RPR No. 45429,

 5      do hereby certify:

 6

 7         That the foregoing deposition testimony of

 8      IVY ROSS was taken before me at the

 9      time and place therein set forth, at which time the

10      witness was placed under oath and was sworn by me to

11      tell the truth, the whole truth, and nothing but the

12      truth;

13

14        That the testimony of the witness and all objections

15      made by counsel at the time of the examination were

16      recorded stenographically by me and were thereafter

17      transcribed under my direction and supervision, and

18      that the foregoing pages contain a full, true, and

19      accurate record of all proceedings and testimony to

20      the best of my skill and ability.

21

22         I further certify that I am neither counsel for

23      any party to said action nor am I related to any

24      party to said action, nor am I in any way interested

25      in the outcome thereof.
```

                                                        252

EXHIBIT  60

PAGE  917

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           IN WITNESS WHEREOF, I have subscribed my name

2      this 21st day of January, 2008.

3

4

5

6                    _____

7              RICKI Q. MELTON, CSR No. 9400

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      EXHIBIT 60

25      PAGE 918

253

**EXHIBIT 61**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA   Certified Copy

3            EASTERN DIVISION

4

5    ------------------------------

6    MATTEL, INC., a Delaware      )

7    Corporation,                  )

8              Plaintiff,          )

9         vs.                      ) No. CV 04-9059 NM

10   CARTER BRYANT, an individual; )     (RNBx)

11   and DOES 1 through 10,        ) VOLUME I

12   Inclusive,                    )

13             Defendants.         )

14   ------------------------------)

15   (COMPLETE CAPTION ON NEXT PAGE.)

16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19     Videotaped deposition of RICHARD N. DE ANDA,

20     taken at 300 South Grand Street, Los Angeles,

21     California, commencing at 9:17 A.M.,

22     Wednesday, December 19, 2007, before

23     Wendy S. Schreiber, CSR No. 3558, RPR, CLR.

24

25   PAGES 1 - 332

1

EXHIBIT ____6l____

PAGE:____9l9____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA

 3                 EASTERN DIVISION

 4

 5    -------------------------------

 6    MATTEL, INC., a Delaware          )

 7    Corporation,                      )

 8              Plaintiff,              )

 9              vs.                     ) No. CV 04-9059 NM

10    CARTER BRYANT, an individual;     )    (RNBx)

11    and DOES 1 through 10,            )

12    Inclusive,                        )

13              Defendants.            )

14    ------------------------------ )

15    CARTER BRYANT, on behalf of       )

16    himself, all present and          )

17    former employees of Mattel,       )

18    Inc., and the general public,     )

19              Counter-Claimants, )

20              vs.                     )

21    MATTEL, INC., a Delaware          )

22    Corporation,                      )

23              Counter-Defendant. )

24    -------------------------------

25
                                                    2
```

EXHIBIT ___61___

PAGE ____920____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF:

 4

 5            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6            BY:  JON COREY, ESQ.

 7            865 South Figueroa Street, Tenth Floor

 8            Los Angeles, California 90017

 9            (213) 443-3000

10            joncorey@quinnemanuel.com

11

12                    -AND-

13

14        MATTEL, INC.

15        BY:  JILL THOMAS, ESQ.

16        333 Continental Boulevard

17        El Segundo, California 90245-5012

18        (310) 252-2000

19        jill.thomas@mattel.com

20

21

22

23

24

25
                                                    3
```

EXHIBIT ____61____

PAGE ___921___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR THE DEFENDANT AND COUNTERCLAIMANT

 4        CARTER BRYANT:

 5              KEKER & VAN NEST LLP

 6              BY:  MATTHEW M. WERDEGAR, ESQ.

 7              710 Sansome Street

 8              San Francisco, California 94111-1704

 9              (415) 391-5400

10              mwerdegar@kvn.com

11

12        FOR DEFENDANT MGA ENTERTAINMENT, INC.:

13              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

14              BY:  THOMAS J. NOLAN, ESQ.

15                   MARCUS R. MUMFORD, ESQ.

16              300 South Grand Avenue

17              Suite 3400

18              Los Angeles, California 90017

19              (213) 687-5000

20              thomas.nolan@skadden.com

21              mmumford@skadden.com

22

23        ALSO PRESENT:

24              DAVID WEST, VIDEO OPERATOR

25
```

4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    those investigations; is that correct?

 2        A.    Yes.

 3        Q.    That would be the purpose for talking to

 4    them?

 5        A.    Yes.                                        02:45PM

 6        Q.    Okay.  But nothing to refresh your

 7    recollection or provide you with information that

 8    would make you available to testify more fulsomely

 9    on any of these issues, correct?

10              MR. COREY:  Objection.  Nothing with respect 02:45PM

11    to talking to other people.

12              MR. NOLAN:  I didn't understand that one

13    either.  What do you mean?

14              MR. COREY:  You said "nothing" and I just

15    want to make sure I understand what "nothing" refers  02:45PM

16    to.

17              THE WITNESS:  Now I'm thoroughly confused.

18    Could you repeat the question?

19              MR. NOLAN:  Of course, I'm sorry.  This

20    happens after awhile.  Let me be more artful in the   02:46PM

21    question.

22        Q.    Did you meet with anyone within Mattel and

23    ask them questions with respect to the background of

24    any of the investigations relevant to this lawsuit

25    in an effort to prepare yourself to answer questions  02:46PM
                                                           165
```

EXHIBIT 61

PAGE 923

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    propounded to you in this deposition?

2        A.   No, other than the attorneys that I dealt

3    with which we have previously discussed and I've

4    indicated.

5        Q.   When was the first time that you heard of a    02:46PM

6    company by the name of MGA?

7        A.   I think that it was in 2002 and that is my

8    best -- I'm only saying that because I can relate

9    that to an event.  I don't know if I heard of the

10   company prior but that in my mind would be pretty    02:47PM

11   accurate to say that probably in early 2002.

12       Q.   Early 2002.  A particular month in 2002?

13       A.   Probably -- you know, thinking back to the

14   issue I would say probably March of 2002.

15       Q.   And let's continue to set the table here.    02:47PM

16   Bratz, B-r-a-t-z, when was the first time you became

17   aware of a line of fashion dolls with the name or

18   referred to as Bratz?

19       A.   I would say at the same time I became aware

20   of MGA.                                              02:48PM

21       Q.   And what about the first time you became

22   aware of an individual by the name of Isaac Larian?

23       A.   I am not certain but it was sometime after I

24   became aware of MGA and I don't know if it's months

25   or a year but it could be -- and, I'm sorry, several    02:49PM

                                                            166



EXHIBIT ____

PAGE ____924

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    months after or a year, I'm not certain, but I know

 2    if we said -- if we said from three to 12 months

 3    from March forward of '02 -- of 2002, maybe thinking

 4    back five years may be a good estimate but, once

 5    again, five years ago, I'm sorry.              02:49PM

 6        Q.   What about an employee by the name of Carter

 7    Bryant?

 8        A.   I think the first time I became aware of him

 9    was in this March 2002 discussion.

10        Q.   Was there a particular event that caused you 02:49PM

11    to learn of MGA, Bratz and Carter Bryant?

12        A.   Yes.

13        Q.   Can you describe that event for me.

14        A.   As best as I can recall -- once again five

15    years ago -- it -- it stems from a meeting that I    02:50PM

16    attended at the Design Center in El Segundo,

17    Mattel's Design Center, and just prior to the

18    meeting -- and I don't know if it was days or a week

19    or two -- information was --

20        Q.   Go ahead.                                  02:50PM

21        A.   I'm sorry.  Okay.  I'm trying to think of --

22    I have an understanding of why the meeting was

23    called and I'm just trying to think of when I first

24    received information for this meeting to be called

25    but I think it was either days or maybe a week or    02:51PM
                                                              167
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    maybe longer information was provided or given to me

 2    by a phone call from -- and I don't remember who but

 3    it could be one of two people concerning Carter

 4    Bryant designing the Bratz doll for MGA.

 5         Q.   You said that you heard that Carter Bryant    02:51PM

 6    had designed the Bratz doll for MGA in a phone call

 7    with one or two people.

 8         A.   No.  No.

 9         Q.   One or the other?

10         A.   One or the other.                             02:51PM

11         Q.   Thank you.  Who are those -- who are the two

12    candidates for that information -- as the source of

13    that information?

14         A.   Ivy Ross and Cassidy Parks.  I think it's

15    Cassidy Beale Parks.  I think she has a -- a double    02:52PM

16    last name.

17         Q.   Whether or not it was Ivy or Cassidy, what

18    is your best recollection as to what was told to you

19    in this phone call?

20         A.   I can't tell you what was told to me.  I can 02:52PM

21    only tell you at this point in time kind of the

22    general -- my general take-away from that

23    conversation because there's no way I could tell you

24    verbatim what the call was, but it had to do with

25    information that Carter Bryant after he left Mattel    02:52PM
                                                            168
```

EXHIBIT __61__

PAGE __926__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   and working with MGA created Bratz and that Bratz --

2   that he utilized Lilly Martinez's Tune Teens

3   renderings to create Bratz or copied them to create

4   Bratz.  That was the -- that was my take-away from

5   the conversation.                                    02:53PM

6       Q.   Why have you narrowed down the source of

7   that information to a phone call either from Ivy

8   Ross or Cassidy Beale-Park?

9       A.   Because that's all I can recall at this

10  time.                                                02:53PM

11      Q.   Did you take notes of that phone call?

12      A.   I don't -- I don't have any recollection of

13  taking notes of that phone call.  I think that was

14  the genesis for the meeting.

15      Q.   What -- have you -- have you provided to us  02:54PM

16  the full extent of what you recall about that first

17  phone call?

18      A.   In conversation now?

19      Q.   Yes.

20      A.   Oh, yes.  I don't have -- if I may, I don't  02:54PM

21  have -- I don't have a recollection of the words

22  exchanged.  I have a recollection of my

23  understanding of what my -- at this time and place

24  five years later -- of what my take-away was from

25  that conversation.                                   02:54PM
                                                         169

EXHIBIT ___61___

PAGE ___927___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   What was the significance, if any, to that
 2   information when you received it?
 3           MR. COREY:  Objection:  vague.
 4           THE WITNESS:  That a Mattel design had been
 5   infringed upon.                                   02:55PM
 6   BY MR. NOLAN:
 7      Q.   And that was the Lilly Martinez doll,
 8   correct?
 9      A.   Yes.
10      Q.   How often do you receive -- up until that  02:55PM
11   point in time of your employment how often had you
12   received that type of a phone call?
13      A.   Can you identify "type" for me?  Maybe I can
14   help you.
15      Q.   I'm sorry, where somebody within Mattel is  02:55PM
16   advising you that a Mattel employee has used
17   Mattel's copyrighted information to work on a
18   product in competition to Mattel.
19           MR. COREY:  Objection:  mischaracterizes the
20   testimony.                                         02:55PM
21   BY MR. NOLAN:
22      Q.   Did I -- did I summarize that correctly
23   because I don't want to mischaracterize.  That's
24   what I took from your recitation of the phone call.
25   Was that accurate?                                 02:55PM
                                                        170
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    to a time and place.
 2         Q.   But you're clear that that phone call that
 3    you had in -- sometime in March of 2002 was an
 4    important phone call to you, correct?  It was
 5    reporting a serious issue where you suspected that a   02:57PM
 6    Mattel employee had done harm to Mattel, correct?
 7              MR. COREY:  Objection: mischaracterizes the
 8    testimony.
 9              THE WITNESS:  It was a phone call that --
10              MR. COREY:  And assumes facts.              02:57PM
11              THE WITNESS:  It was a phone call that
12    required further information.
13    BY MR. NOLAN:
14         Q.   How long did the call take?
15         A.   I have no idea.                             02:57PM
16         Q.   So you're -- you know, you're a retired LAPD
17    detective, you've got your own security agency.  Did
18    you ask whether or not it was Cassidy or Ivy what
19    the basis for their belief was for this accusation?
20              MR. COREY:  I'm going to object to the      02:58PM
21    preamble.
22              THE WITNESS:  When would this have occurred?
23    BY MR. NOLAN:
24         Q.   When you were on the phone with them.
25         A.   I don't remember.  It's been five years.  As  02:58PM
                                                         172
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    I had mentioned, I do not recall the exchange of

 2    words in that I only recall what I took away from

 3    the conversation; that -- that caused a meeting to

 4    occur then after.

 5    BY MR. NOLAN:                                    02:58PM

 6      Q.   And just so the record is clear tell me your

 7    take-away from the phone call that led you to set up

 8    a meeting.  What was the information that was being

 9    conveyed to you again?

10         MR. COREY:  Objection:  asked and answered,  02:58PM

11    mischaracterizes his testimony, assumes facts.

12         THE WITNESS:  As I indicated before, my

13    take-away from it was that Carter Bryant while at

14    MGA created Bratz and in doing so infringed on the

15    copyright of Lilly Martinez's Tune Teens to create  02:59PM

16    Bratz.  That was basically what I walked away with

17    in my mind as I sit here today and as --

18    BY MR. NOLAN:

19      Q.   Did you take away from that phone call that

20    this was just a mere suspicion or did Ivy Ross or   02:59PM

21    Cassidy tell you that, in fact, that they had

22    confirmed this fact?

23      A.   I can't remember.  I mean, I can't remember

24    the words exchanged.  I'm just -- all I'm conveying

25    to you is my understanding of the conversation.  I  03:00PM
                                                          173
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   do not have a recorded memory of that conversation.

 2        Q.   But you, nevertheless, thought it was an

 3   important phone call, correct?

 4        A.   I thought it was a phone call that required

 5   further follow-up to, yes.                          03:00PM

 6        Q.   Because you suspected that a former employee

 7   of Mattel had done harm to Mattel, correct?

 8             MR. COREY:  Objection:  vague and ambiguous

 9   and assumes facts.

10             THE WITNESS:  Yes.  I had -- it required    03:00PM

11   further follow-up to determine the facts of the

12   matter.

13   BY MR. NOLAN:

14        Q.   And the -- and presumably the extent of the

15   harm to Mattel if, in fact, the facts were true,    03:00PM

16   correct?

17             MR. COREY:  Objection:  mischaracterizes the

18   testimony and vague and ambiguous.

19             THE WITNESS:  I'm sorry, once more.

20   BY MR. NOLAN:                                        03:01PM

21        Q.   Do you want me to repeat it?

22        A.   Please.

23        Q.   That based on the phone call from either

24   Cassidy or Ivy and the information conveyed to you

25   you felt that there was sufficient concern that a    03:01PM
                                                             174
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that I remember of the meeting and I have the -- I

2    have an understanding what I walked away with from

3    the meeting.

4        Q.   So you would agree with me -- as I disclosed

5    to you off the record we're almost the same age --    03:47PM

6    with the passage of time your memory dims, correct?

7            MR. COREY:  It was actually on the record,

8    Tom.

9            MR. NOLAN:  Okay.  I think it probably

10   applies to most people here.                          03:47PM

11       Q.   Your memory -- okay.

12           Tell me to the best of your recollection

13   what was said during this meeting, who said it, what

14   other people reacted to.  And give me -- give me a

15   sense of the meeting --                               03:47PM

16           MR. COREY:  Objection:  narrative.

17   BY MR. NOLAN:

18       Q.   -- to the best of your recollection.  And

19   I'm just thinking that -- is it easier for you to

20   describe this in a narrative way without me           03:48PM

21   interrupting you all the time?

22       A.   Yes.

23       Q.   Good.  Just give me -- give me -- give me

24   your best recollection.

25           MR. COREY:  Objection:  narrative.  It        03:48PM

                                                                205

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    doesn't cure the problem.

2         Go ahead.

3         THE WITNESS:  As I recall this meeting, it

4    was held within the Design Center in a meeting room

5    somewhere in the center of the Design Center and it    03:48PM

6    was -- the meeting room -- outside the meeting room

7    were cubicles that designers and employees worked at

8    and that, like I said before, I believe to my

9    recollection Cassidy Parks, Ivy Ross, Michele

10   McShane, Bob Simoneau, myself and possibly one or    03:48PM

11   two other people but those one or two other people

12   could have may have walked in and walked out during

13   the meeting and that's why I'm having difficulty

14   recalling these individuals.

15        The subject matter of the meeting was to try 03:48PM

16   to understand -- have a better idea of -- of what

17   they were communicating to us with regards to Carter

18   Bryant utilizing or copying Luis Martinez's Tune

19   Teens while at MGA to create Bratz.  And I

20   remember -- and I remember walking out of -- I    03:49PM

21   believe I walked out of -- along with everyone

22   else -- of the conference room to a cubicle that was

23   fairly close -- I'd say one or two cubicles away --

24   maybe a little more -- and seen a rendering of Tune

25   Teens.  And as I recall the rendering, it was    03:49PM
                                                          206

EXHIBIT _____ 6\

PAGE _____ 933

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    probably maybe 20 inches by 20 inches, maybe a

2    little larger, maybe a little smaller, and within

3    the rendering there were smaller squares and had

4    drawings of either doll faces or close ups of the

5    lips or eyes -- a variety of different -- but there      03:50PM

6    were a series of them just on one piece.  And -- and

7    the room itself was filled with -- with just

8    walls -- all four walls or three walls of dolls of

9    Barbies and dolls and what have you.

10          And the take-away from that meeting was that 03:50PM

11   Michele McShane would -- would take the next step

12   which was the responsibility to determine if,

13   in fact, the Tune Teens -- Louie Martinez's Tune

14   Teens were, in fact, a copyright infringement

15   violation that was utilized to create the Bratz      03:50PM

16   doll.  That was the take-away from there.  So the

17   ball was transferred at that time into her court.

18   BY MR. NOLAN:

19      Q.    During this meeting did Ivy Ross and/or

20   Carter -- I mean, Cassidy Parks give you any details  03:51PM

21   as to what the basis of their suspicion was that

22   Carter working at MGA had misappropriated Mattel

23   intellectual property for use on the Bratz project?

24          MR. COREY:  Objection:  ambiguous.

25   /   /   /                                            03:51PM
                                                            207

EXHIBIT _____ 61

PAGE _____ 934

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. NOLAN:

2        Q.   In other words, did they tell you -- did

3    they just, you know, come up with it?  I mean, did

4    you do anything to find out, well, what makes you

5    think that?                                    03:51PM

6        A.   My belief is that they had heard this from

7    others but it sounded -- as I sit here today, my

8    recollection of it sounded more of speculation at

9    the time.

10       Q.   Speculation or suspicion?             03:52PM

11       A.   I can't answer either/or actually to tell

12   you the truth.  But as I sit here today --

13       Q.   Speculation would be more of a guess, right,

14   and suspicion would be more something based on

15   some --                                        03:52PM

16       A.   More substance.  I'm sorry, I didn't mean to

17   interrupt you.  I apologize.

18           MR. COREY:  Did you finish your question,

19   Counsel?

20           MR. NOLAN:  Yes.                        03:52PM

21           MR. COREY:  Objection:  vague and ambiguous,

22   calls for a legal conclusion and may call for

23   speculation.

24           THE WITNESS:  And, I apologize, you're going

25   to have repeat it.                             03:52PM
                                                       208

EXHIBIT     41

PAGE ___935___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    sculpture?

2        A.    I believe that that is accurate but not

3    certain for -- I believe that I've heard that

4    information and I believe it to be accurate but I'm

5    not certain.                                              03:54PM

6        Q.    But I'm not asking you to attest to that

7    fact.  That's just that you had heard that, correct?

8        A.    Yes.

9        Q.    In fact, Ivy Ross told you at the meeting

10   that she had had a conversation with Margaret Lehy     03:54PM

11   in the summer of '01 where she specifically asked

12   Margaret Lehy what was Carter's involvement in the

13   Bratz, correct?

14           MR. COREY:  Objection:  calls for

15   speculation.                                             03:55PM

16           THE WITNESS:  I do not have any

17   recollection -- once again, I have no recollection

18   of the words of that meeting and I do not recall

19   anything of that sort.

20   BY MR. NOLAN:                                            03:55PM

21       Q.    Well, don't you recall -- I'm sorry, don't

22   you recall that Ivy Ross told you that Margaret Lehy

23   had told her that Carter was one of the designers of

24   the Bratz doll in the summer of '01?

25       A.    No, I do not recall that.                      03:55PM
                                                                  210

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. COREY:  Objection:  vague and ambiguous.

2          THE WITNESS:  I'm sorry.

3   BY MR. NOLAN:

4      Q.   Do you recall that Ivy Ross or anybody

5   mentioned during this meeting the name of Roxanna      03:55PM

6   Powell?

7      A.   I don't recall the name Roxanna Powell.

8      Q.   Sitting here today you don't know who

9   Roxanna Powell is?

10     A.   Sitting here today I don't.               03:56PM

11         MR. COREY:  Can we take an afternoon break

12  when you get to a stopping point, Counsel?

13         MR. NOLAN:  Sure, just give me a few more

14  minutes if you don't mind.  Can you hold on just for

15  a little bit?                                    03:56PM

16         MR. COREY:  No, not at all.

17         THE WITNESS:  Unless you have something to

18  refresh my memory, I'm sorry, I don't.  It doesn't

19  ring a bell.

20  BY MR. NOLAN:                                    03:56PM

21     Q.   Did you have an impression as to whether or

22  not that was the first time Ms. McShane had met with

23  either Ivy Ross or Cassidy Park in connection with

24  this matter?

25         MR. COREY:  Objection:  vague and ambiguous  03:56PM

                                                          211

EXHIBIT ___61___

PAGE ___937___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and speculative.

 2           THE WITNESS:  I would -- I would say that

 3    that would be my opinion, yes.

 4    BY MR. NOLAN:

 5      Q.   But you're not certain?                    03:57PM

 6      A.   No, I'm not certain.  I'm not certain at

 7    all.

 8      Q.   Did either Cassidy Park or Ivy Ross have any

 9    materials with them -- any papers, any drawings,

10    anything -- with them at that meeting?            03:57PM

11      A.   I do not recall.

12      Q.   And what about McShane?  Did she have

13    anything there, any papers?  Was she taking notes?

14      A.   I do not recall.  I don't recall.

15      Q.   When you walked out of the meeting and you   03:57PM

16    saw the renderings of Teen Tunes, did someone have

17    to point that out to you, sir, or did you know about

18    Teen Tunes beforehand?

19      A.   No, I do --

20           MR. COREY:  Tune Teens?                    03:57PM

21           MR. NOLAN:  What did I say, Teen Tunes?  I'm

22    sorry, Tune Teens.

23           THE WITNESS:  I am so sorry.  Try it again.

24      Q.   When you walked out of the meeting and you

25    saw the renderings on the wall --                  03:58PM
                                                             212
```

EXHIBIT ___61___

PAGE __938__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    previously from either Ivy Ross or Cassidy Park?

 2            MR. COREY:  Objection:  vague and ambiguous.

 3            THE WITNESS:  In what respect?

 4    BY MR. NOLAN:

 5        Q.   Well, let's go through it.  It just says --  04:59PM

 6            MR. COREY:  And actually, Tom, before you

 7    start can we mark the bigger copy as 1194?

 8            MR. MUMFORD:  Well, how about if we just add

 9    it as the last page of Exhibit 1193?

10            MR. NOLAN:  No, no, no, this is how we'll    04:59PM

11    do.  We'll mark this as 1193-A.

12            MR. COREY:  That's fine.

13            THE WITNESS:  Do you want to do that now or

14    later?

15            MR. NOLAN:  No, we can do it later.         05:00PM

16            THE WITNESS:  Okay.

17            (Deposition Exhibit 1193-A was marked

18       for identification and is bound separately.)

19    BY MR. NOLAN:

20        Q.   So read for me this letter, please.        05:00PM

21        A.   Okay.  It's going to be difficult, too,

22    because even if it's blown up it's still -- it's

23    distorted somewhat.

24        Q.   Well, before you start reading it, did you

25    have difficulty reading this when you received it    05:00PM
                                                            242
```