CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    from Alan Kaye?

 2         A.   No, it was a lot clearer than this.  It was

 3    not -- it was not a copy of a copy of a copy and it

 4    was not at this font.  I believe the font was

 5    similar to this, if not larger, and much clearer.      05:00PM

 6    It looked like the first rendition of the letter.

 7              So it starts out by -- let's see, even on

 8    this letter it looks like CBO if you look at it, not

 9    CEO and it doesn't look like Mattel but I think it's

10    Mattel Inc.  It doesn't look like 333 Continental      05:00PM

11    Boulevard but I believe it to be El Segundo,

12    California 90254.

13              And "Dear CEO:  I have information that I

14    think Mattel should investigate.  In 2000..." -- and

15    I don't believe -- right above 2000 there is a         05:01PM

16    hyphen.  I think that's part of the scribblings of

17    the written note before there.  "In 2000 a Mattel

18    employee by the name of Carter Bryant was working

19    with Mattel to design dolls.  One of the dolls that

20    he was working on creating..." -- this is where it     05:01PM

21    gets difficult -- "...was the Bratz dolls."

22         Q.   Let me stop for a moment.

23         A.   Okay.

24         Q.   Is it your testimony that Ivy Ross and/or

25    Cassidy Park in March of 2002 had made the             05:01PM
                                                                243
```

EXHIBIT ___61___

PAGE ___940___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    accusation that Carter Bryant while a Mattel

 2    employee was working on creating the Bratz doll?

 3         A.    I'm sorry, you have to repeat that again.

 4              MR. NOLAN:  Can I have the question reread.

 5              (The pending question was read as follows:   05:02PM

 6                   "Q.    Is it your testimony that

 7              Ivy Ross and/or Cassidy Park in March

 8              of 2002 had made the accusation that

 9              Carter Bryant while a Mattel employee

10              was working on creating the Bratz doll?")   05:02PM

11    BY MR. NOLAN:

12         Q.    Is that what Cassidy Park and/or Ivy Ross

13    had told you in March of '02?

14         A.    No, not at all, Counselor.  No.

15         Q.    Continue to read then.                    05:02PM

16         A.    Okay.  "MGA Entertainment..." and that looks

17    like "...found out about his creation and approached

18    him to plan a way that he could sell..." -- at least

19    it looks like "sell" -- "...the dolls to MGA and

20    never tell Mattel.  While he was working with Mattel  05:02PM

21    and working to create these dolls he worked out a

22    deal with MGA that let him..." -- is that what it

23    is?  "...let him collect a large sum of money each

24    year from MGA in exchange for his..." -- and then

25    there's a line through it --                          05:03PM
                                                                 244
```

EXHIBIT 61

PAGE 941

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   "...for his secrecy about the dolls"?

 2      A.   Is that what it says?  Okay.  About -- I

 3   couldn't just make out "secrecy" there's a line

 4   through it here.  "...secrecy about the dolls and

 5   the fact that they are rightly Mattel dolls."      05:03PM

 6      Q.   Stop for a moment.  Is that what Cassidy

 7   Park and/or Ivy Ross had told you in March of '02?

 8      A.   No.

 9      Q.   Okay.  Continue reading.

10      A.   "Carter left Mattel to live off of the money 05:03PM

11   that MGA has been playing him since..." -- that

12   doesn't make sense.

13      Q.   Does it say "Carter left Mattel to live off

14   of the money that MGA has been paying him since

15   then"?  Do you see that?                            05:04PM

16      A.   Okay, that does make sense then.

17      Q.   By the way, did you review this letter with

18   your counsel?

19      A.   Yes, I did but it was not in this format.

20   This is terrible.                                   05:04PM

21      Q.   Okay, but in reading -- in reading the

22   letter you don't remember what it said?  I mean, you

23   just reviewed this yesterday, right?

24      A.   Probably.

25      Q.   Okay.                                       05:04PM
                                                             245
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. COREY:  But, Counsel, you asked him to
 2   read the letter.  That's what he's doing.
 3            THE WITNESS:  I'm trying to be as accurate
 4   as I can.  If you would provide me a letter that's
 5   worthwhile, this is very difficult to read.          05:04PM
 6            "MGA tells everyone in the business that
 7   Bratz was created by MGA which is..." -- and I
 8   cannot read this next word because there's a line
 9   through it -- "...which is not true.  MGA know that
10   Carter was..." -- is it "and" or "all"?  -- it would  05:05PM
11   be "...an employee with Mattel and that it was wrong
12   to pay him to steal this product from Mattel."  And
13   it says -- let me finish, please.  "Cc:  Toy Book
14   Playthings."
15            MR. NOLAN:  Jon, I'll just point out that    05:05PM
16   this is the copy that we received from you in the
17   production.  If you have a cleaner copy, which
18   apparently you did because you showed it to
19   Mr. De Anda in preparation, we would like to have a
20   cleaner copy of it so we don't have this problem at   05:05PM
21   trial.  Okay?
22            MR. COREY:  I'll tell you what I have.  We
23   have a bigger copy.
24            MR. NOLAN:  Can you produce that to us?
25            MR. COREY:  Sure.                            05:05PM
                                                           246
```

EXHIBIT ___6١___

PAGE ___943___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. NOLAN:  Whatever form you showed it to
 2    him.  And then we'll use that, too.
 3       Q.   Okay.  So there's no mention of Teen
 4    Tunes --
 5            MR. COREY:  Tune Teens.              05:05PM
 6    BY MR. NOLAN:
 7       Q.   -- Tune Teens, I'm sorry, in this letter,
 8    correct?
 9       A.   In the words I've just read to you, no.
10       Q.   Did you provide to Ms. McShane a copy of   05:06PM
11    this anonymous letter?
12       A.   I don't believe I did.
13       Q.   Do you know whether or not she had a copy of
14    the letter sent to her?
15       A.   I do not know that.                  05:06PM
16       Q.   Did you walk away from or take away from
17    that conversation that she was aware that Bob Eckert
18    had received an anonymous letter making these type
19    of allegations against Carter Bryant and MGA?
20            MR. COREY:  And just to be clear, this is   05:06PM
21    the conversation that he had after he received the
22    anonymous letter?
23            MR. NOLAN:  Yes.
24            THE WITNESS:  I don't recall.
25    /  /  /                                      05:06PM
                                                        247
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. NOLAN:

2        Q.   Now, what did you do after you spoke to

3    Ms. McShane?

4        A.   With regards to?

5        Q.   This letter that Alan Kaye had sent on to    05:07PM

6    you.

7        A.   I think I had prepared an E-mail to Alan

8    Kaye in response to the letter.

9        Q.   What -- do you remember what your reaction

10   was to this letter after you reviewed it?           05:07PM

11       A.   I'm not certain that I remember my reaction

12   other than I was mildly interested that there was --

13   it was an anonymous letter, did not know the source

14   or the basis of it.  That was pretty much my

15   reaction to it.                                      05:08PM

16       Q.   So your reaction would be described using

17   your terms mild interest in the fact that it was an

18   anonymous letter?

19       A.   I was mildly interested in it being that it

20   was an anonymous letter that didn't give me the --   05:08PM

21   the author's information and so I could -- so I

22   could investigate or communicate with the source of

23   the letter to understand the basis of it.

24            (Deposition Exhibit 1194 was marked

25        for identification and is bound separately.)    05:08PM
                                                          248

EXHIBIT    61
PAGE    945

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. NOLAN:
 2        Q.   So I'll mark now as Exhibit No. 1194 an
 3    E-mail exchange to Alan Kaye, subject MGA 'Bratz'
 4    from Rich.  Do you see the document marked 1194?
 5        A.   Yes, I do.                              05:09PM
 6        Q.   And is this an E-mail from you to Alan Kaye?
 7        A.   Yes, I believe it to be an E-mail from me to
 8    Alan Kaye.
 9        Q.   Was this sent from your E-mail service at
10    Mattel?                                          05:09PM
11        A.   Yes.
12        Q.   And Alan Kaye's position at that time was
13    what at Mattel?
14        A.   He was the Senior Vice President of Human
15    Resources and my -- who I directly reported to.  05:10PM
16        Q.   How soon after having the telephone call
17    with Ms. McShane did you send this E-mail to Alan
18    Kaye?
19             MR. COREY:  I'm sorry, can I get that read
20    back?                                            05:10PM
21             (The pending question was read as follows:
22                  "Q.   How soon after having
23             the telephone call with Ms. McShane
24             did you send this E-mail to Alan Kaye?")
25             THE WITNESS:  I would say probably within a  05:10PM
                                                              249
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   day.
 2   BY MR. NOLAN:
 3       Q.   In the phone call that you had with
 4   Ms. McShane did you read to her the anonymous
 5   letter?                                          05:11PM
 6       A.   I have no recollection of reading to her the
 7   anonymous letter in my phone call.
 8       Q.   Did you summarize the contents of the letter
 9   or the accusations in that phone call?
10       A.   I don't recall.  I may -- I don't recall.   05:11PM
11       Q.   It's possible that you provided to
12   Ms. McShane the details of the accusations now
13   contained in this anonymous letter?
14           MR. COREY:  Objection:  speculation.
15           THE WITNESS:  To be as accurate as I        05:11PM
16   possibly can, I don't recall communicating the facts
17   of this letter to McShane.  I don't recall.  That's
18   all I can say at this point in time.  It's five
19   years -- or four years ago.  I don't recall.
20   BY MR. NOLAN:                                      05:12PM
21       Q.   But it is possible that you summarized these
22   accusations to Ms. McShane?
23           MR. COREY:  Objection:  speculation.
24           THE WITNESS:  But, once again, I don't
25   recall.                                            05:12PM
                                                          250
```

EXHIBIT 61

PAGE 947

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       Q.   But as you're sitting here today, you cannot

 2    tell us what the basis of their belief was with

 3    respect to Carter using Mattel's property to develop

 4    Bratz?

 5             MR. COREY:  Objection:  vague and ambiguous   05:17PM

 6    and assumes facts, mischaracterizes the testimony.

 7    BY MR. NOLAN:

 8       Q.   You just described them, sir, as a credible

 9    source.

10             MR. COREY:  Counsel, can I finish my          05:17PM

11    objections -- Counsel, can I finish my objections

12    before you talk over me?

13             Objection:  vague and ambiguous, calls for

14    speculation, mischaracterizes the witness'

15    testimony.                                             05:17PM

16             MR. NOLAN:  How did I -- okay.

17       Q.   You believed that Ivy Ross and Cassidy Park

18    were credible.  Is that your testimony?

19       A.   I had no reason to believe they weren't.

20    Yes, I believed them to be credible.                  05:18PM

21       Q.   But -- so when you were talking to them in

22    March, what was the basis for the accusation?  What

23    did they tell you that led you to believe that it

24    was credible?

25       A.   As we sit here today, I can't tell you        05:18PM
                                                              255
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    because I told you before that I do not recall the

2    exact words used in the conversation.  I know what I

3    left the meeting with and I believed their

4    statements to be credible.  They have no reason to

5    lie to me or give me misinformation.                    05:18PM

6        Q.    How do you know that neither Cassidy -- or

7    that Cassidy Park or Ivy Ross wrote this letter to

8    the CEO?

9             MR. COREY:  Objection:  vague and ambiguous.

10            THE WITNESS:  I don't know that.              05:18PM

11   BY MR. NOLAN:

12       Q.    So after you received the letter and you had

13   a mild interest, without regard to the E-mail for

14   just a moment, tell me what steps you took after --

15   after writing the E-mail that we'll talk about in a    05:19PM

16   minute to follow up on this letter as requested by

17   the head of HR for Mattel at the direction of the

18   CEO of Mattel.

19       A.    As I recall, I did nothing more than file it

20   away at that time.                                      05:19PM

21       Q.    Let's turn to the E-mail that we've marked

22   now as Exhibit No. 1194.  And is it your -- so if

23   the letter is received by Bob Eckert on August 5th,

24   2002 -- that's the anonymous letter, yes?

25       A.    Yes.                                          05:19PM

                                                                 256

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       Q.   And then you write an E-mail saying to Alan

 2   Kaye "I've received your anonymous letter."  This

 3   E-mail is not dated.  Can you give me your best

 4   estimate as to the date that this E-mail was sent?

 5   How many days after the anonymous letter was          05:19PM

 6   received by Bob Eckert?

 7            MR. COREY:  Objection:  asked and answered.

 8            THE WITNESS:  I would -- I know that this

 9   letter came after my conversation -- let me back up.

10            I know that upon receiving the letter I had  05:20PM

11   a brief conversation with Michele McShane and I

12   don't recall the conversation other than that I knew

13   at that time again that the analyzation of the

14   copyright was not completed.  Following the

15   conversation with Michele McShane is when I created   05:20PM

16   this E-mail to Alan Kaye and I believe it to be

17   within a day, if not hours, of the conversation I

18   had with McShane.  I'm saying a day, it's at the

19   outer edge and many times sooner than probably.

20       Q.   So it could have been within hours?          05:21PM

21       A.   It could have been within hours.

22       Q.   But certainly within at least a couple of

23   days of August 5th, 2002 you wrote this E-mail to

24   Alan Kaye, yes?

25       A.   If I received the E-mail on August 5th, I    05:21PM
                                                              257
```

EXHIBIT 61

PAGE 050

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    would say that that's a pretty accurate statement.

2        Q.    Of 2002?

3        A.    Yes, of 2002.

4        Q.    Do you know why the E-mail that was produced

5    in this case does not contain a date on the E-mail?    05:21PM

6        A.    Yeah, I was struggling with that and I think

7    I know the reason why.  If I create an E-mail and

8    push "Print" for the file before I send the E-mail

9    and then have to go back and retrieve the E-mail

10    from the sent file, I don't think as I recall it    05:21PM

11    stamps the date on it in time.  I think that's what

12    happened here.

13        Q.    But you don't have any doubt in your mind

14    that you sent this E-mail to Alan Kaye on or about

15    August 5th, 2002 or a day or two around that date,    05:22PM

16    correct?

17        A.    I know this as accurate as I can be is that

18    upon receiving the August 5th, 2002 anonymous letter

19    from Bob Eckert, whatever day it was -- and I don't

20    know if it was that day or a day after or a couple    05:22PM

21    days after -- that I contacted Michelle McShane soon

22    thereafter and then soon thereafter sent the E-mail.

23        Q.    Okay.  So let's -- let's just step back for

24    a moment and see where we're at in this story.

25             So between March of 2002 when you had your    05:22PM

                                                              258



CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    meeting with Ms. McShane and Ivy Ross and Cassidy

 2    Park through the receipt of this anonymous letter

 3    from Alan Kaye, okay, that had been sent to Bob

 4    Eckert the only contact that you had with

 5    Ms. McShane was approximately twice a month in the    05:23PM

 6    form of telephone communications where you were

 7    asking her the status of her analysis of the

 8    copyright issue?

 9           MR. COREY:  Objection:  mischaracterizes the

10    testimony.                                            05:23PM

11    BY MR. NOLAN:

12       Q.   Is that right?

13       A.   Regards to this matter?

14       Q.   With regards to this matter.

15       A.   Yes.                                          05:23PM

16       Q.   Did you do anything else other than have

17    phone calls with Ms. McShane?

18           MR. COREY:  Again, with respect to this

19    matter?

20           MR. NOLAN:  Regarding any matter involving     05:23PM

21    MGA.

22           THE WITNESS:  As I recall, at that time this

23    was the only matter regarding MGA at that time.

24       Q.   So from the period --

25       A.   I'm sorry, Counsel, I'm not finished.         05:23PM
                                                                 259
```

EXHIBIT 61
PAGE 952

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   I apologize.

 2      A.   All right.  And to answer your primary

 3  question did I do anything other than contact

 4  Michele McShane with regards to MGA, to the best of

 5  my recollection that is what I recall.            05:24PM

 6      Q.   So you didn't write any memos to the file or

 7  to anybody else at Mattel, correct, regarding this

 8  subject that you had been discussing with McShane?

 9      A.   Not that I recall, no.

10      Q.   Do you remember writing any memo or note or  05:24PM

11  sending an E-mail to anybody within the legal

12  department complaining about McShane's handling of

13  this issue?

14           MR. COREY:  Objection:  vague.

15           THE WITNESS:  No, I don't.              05:25PM

16  BY MR. NOLAN:

17      Q.   So although you described it as being mildly

18  frustrating that it was taking so long, you took no

19  actions during the period of March of '02 through

20  August of '02 to register your frustration that it  05:25PM

21  was taking so long to determine if there was,

22  in fact, an issue.  Is that a fair statement?

23      A.   I don't know if I used the words "mildly

24  frustrating" in my description of my waiting for the

25  information but there was frustration.           05:25PM
                                                        260
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   So would it be fair to assume that if
 2   someone else was conducting an investigation of
 3   either Carter Bryant, MGA or Isaac Larian there
 4   would have been a cross-reference to the file that
 5   had been opened in March of 2002?            05:32PM
 6           MR. COREY:  Objection:  vague and ambiguous.
 7           THE WITNESS:  A cross-reference to the file
 8   in -- I'm sorry, I apologize.  Could you repeat this
 9   question again?
10   BY MR. NOLAN:                                05:33PM
11      Q.   Sure.  I mean, once you opened up a file,
12   you opened up a file based on the information that
13   was received from Ivy Ross and Cassidy Park in March
14   of 2002 or somebody did in your department, yes?
15      A.   Yes.                                 05:33PM
16      Q.   If -- once that case was opened if somebody
17   else in your department was conducting an
18   investigation of Carter Bryant, MGA, Isaac Larian,
19   they would have come across the open file that you
20   had asked Bob Simoneau to establish, correct?  05:33PM
21           MR. COREY:  Objection:  vague and ambiguous
22   and calls for speculation.
23           THE WITNESS:  That -- that would be a very
24   high probability, yes.
25   /  /  /                                      05:33PM
                                                      266
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. NOLAN:

 2        Q.   So let's turn to your E-mail now of --

 3        A.   Excuse me a second.

 4             MS. THOMAS:  Do you want some Kleenex?

 5             THE WITNESS:  I do.  I just need some      05:34PM

 6    Kleenex.  I get bloody noses.

 7    BY MR. NOLAN:

 8        Q.   Can we continue?

 9        A.   Oh, yes, please.  I'm sorry.

10        Q.   I didn't want to inconvenience you.  1194 is 05:34PM

11    the E-mail.

12        A.   Yes.

13        Q.   So there's no doubt in mind that you sent

14    this E-mail, correct?

15        A.   No, I truly believe I sent this E-mail.  I  05:34PM

16    just don't know the precise time and date.

17        Q.   "Alan, I've received your anonymous letter

18    originally sent to Bob Eckert regarding Carter

19    Bryant and 'Bratz'."  And that's the letter that we

20    marked as Exhibit 1193, correct?                    05:34PM

21        A.   Yes.

22        Q.   "I'm aware of this situation and have been

23    working on it for several months."  Do you see that?

24        A.   Yes.

25        Q.   Had you, in fact, been working on it for   05:35PM
                                                            267
```

EXHIBIT 61

PAGE 955

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    several months or were you waiting for Legal to

 2    render an analysis?

 3         A.   That's what I meant by that.

 4         Q.   So when you said "I've been working on it

 5    for several months," that's not what you meant to     05:35PM

 6    say to your boss, correct?

 7              MR. COREY:  Objection:  mischaracterizes --

 8    let me finish.  Objection:  mischaracterizes the

 9    testimony.

10              THE WITNESS:  No, that's exactly what I      05:36PM

11    meant to say.

12    BY MR. NOLAN:

13         Q.   So what you really meant to say is I've been

14    working on it for several months but haven't been

15    doing anything because I'm waiting for the legal       05:36PM

16    analysis from McShane?

17              MR. COREY:  Objection:  mischaracterizes the

18    testimony.

19              THE WITNESS:  No, that's what you're saying.

20         Q.   No, but I'm just saying isn't that what you  05:36PM

21    were intending to say to him if you had completed

22    your -- your -- you made an accurate recitation of

23    what was going on?

24              MR. COREY:  Objection:  argumentative and

25    mischaracterizes the testimony.                        05:36PM
```

                                                              268

EXHIBIT ___61___

PAGE ___956___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           THE WITNESS:  This is just semantics what
 2   you believe working on it and my belief of working
 3   on it is but is exactly what I meant to say is what
 4   I said.
 5   BY MR. NOLAN:                                    05:36PM
 6      Q.   Yes.  And just to make sure I understand so
 7   your working on it included just sitting back and
 8   having phone calls waiting for McShane to do the
 9   analysis, correct?
10           MR. COREY:  Objection:  argumentative and  05:36PM
11   mischaracterizes the testimony.
12           VIDEO OPERATOR:  Off the record 5:36.
13                  (Brief recess.)
14           VIDEO OPERATOR:  We're back on the record at
15   5:37.                                            05:37PM
16   BY MR. NOLAN:
17      Q.   Then your E-mail goes on.  "My frustration
18   in this matter was the genesis of" -- and then
19   there's appearing a blank.  Did you type something
20   in where there's a blank?                        05:38PM
21      A.   Yes, however, I did not have an opportunity
22   to answer your last question.
23      Q.   What was the answer?
24      A.   Something about my posture.  I'm not quite
25   certain if you read it back to me.               05:38PM
                                                         269
```

EXHIBIT _____ 61

PAGE _____ 957

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    you had twice a month, maybe sometimes more than

 2    twice a month, that we talked about this afternoon

 3    in your deposition, correct?

 4       A.   Or sometimes less than twice a month and,

 5    once again, I don't recall if she had sent E-mails      05:50PM

 6    or not.  I'm not saying that she did not, I'm saying

 7    that I don't recall if I received any E-mails or

 8    other means of communications passed in the hall or

 9    I don't know.

10       Q.   Prior to -- I'm sorry, at the time of this      05:51PM

11    August E-mail to Alan Kaye do I understand that

12    there had been no conclusion reached by the outside

13    firm with respect to the issue that it had been

14    asked to address?

15            MR. COREY:  Objection:  vague.                  05:51PM

16            THE WITNESS:  The issue of?

17    BY MR. NOLAN:

18       Q.   Whether or not the information from Cassidy

19    Park and Ivy Ross should be further investigated as

20    a copyright violation.                                  05:51PM

21            MR. COREY:  Objection:  vague.

22            THE WITNESS:  Yes.

23            MR. NOLAN:  There may have been a double

24    negative.

25            MR. COREY:  I think there was.                  05:51PM
                                                                  279
```

EXHIBIT ___61

PAGE ___958



CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. NOLAN:

 2       Q.   So there had not been any conclusion yet by

 3    the receipt of this letter in this E-mail, correct?

 4       A.   By the outside counsel?

 5       Q.   By the outside counsel.                    05:51PM

 6       A.   I'm sorry?

 7            MR. COREY:  If you're seeking clarification

 8    of the question, go ahead.  Once the question gets

 9    finished then I'll decide whether an objection is

10    appropriate.                                       05:52PM

11    BY MR. NOLAN:

12       Q.   Had there been a conclusion reached by

13    outside counsel with respect to the issue of whether

14    or not there was a copyright violation in connection

15    with the allegations or accusations made by Cassidy  05:52PM

16    Park and Ivy Ross?

17            MR. COREY:  Objection:  vague.

18            THE WITNESS:  There was no -- no, there was

19    no conclusion at the time of August 2002.

20    BY MR. NOLAN:                                      05:52PM

21       Q.   At the time that you wrote this E-mail there

22    had been no conclusion by the outside counsel,

23    correct?

24            MR. COREY:  Objection:  vague.

25            THE WITNESS:  That is correct.             05:52PM
                                                             280
```

EXHIBIT ___61___

PAGE ___959___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. NOLAN:

2        Q.    And Ms. McShane told you that, correct?

3        A.    That would be correct.

4        Q.    Then we go on and it says "The truth of the

5    matter is that Carter Bryant did work for Mattel,      05:52PM

6    however" and then there's a further redaction.  And

7    I assume that when you read this E-mail a month ago

8    outside of the presence of your attorney that that

9    portion of the E-mail was not redacted, correct?

10            MR. COREY:  Objection: assumes facts.        05:53PM

11            THE WITNESS:  That is correct.

12    BY MR. NOLAN:

13        Q.    And you read that portion at that time that

14    had not been redacted?

15            MR. COREY:  Same objection.                  05:53PM

16            THE WITNESS:  I'm sorry, I got distracted.

17    BY MR. NOLAN:

18        Q.    You read the entire E-mail in its unredacted

19    format a month ago?

20        A.    A month or so, yes.                         05:53PM

21        Q.    And you told that to your lawyers while they

22    were preparing you recently for this deposition,

23    correct?

24            MR. COREY:  Objection: mischaracterizes the

25    testimony and assumes facts.                          05:53PM
                                                                281

EXHIBIT  61

PAGE  960

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  I don't recall if I did or

 2    didn't as I think I've restated.

 3    BY MR. NOLAN:

 4        Q.   Did the unredacted E-mail help you put into

 5    perspective what was going on during the period of     05:53PM

 6    March 2002 through August of 2002?

 7            MR. COREY:  Objection:  assumes facts, vague

 8    and ambiguous.

 9            THE WITNESS:  I'm sorry, did it help me --

10    I'm sorry?                                             05:54PM

11    BY MR. NOLAN:

12        Q.   To remember the events, you know, that were

13    occurring between March -- March 2002 and August

14    2002.

15        A.   When I read this the -- the complete copy     05:54PM

16    back a month or so ago, it may have but I don't

17    recall now.

18        Q.   Then it says "The truth of the Carter Bryant

19    did work for Mattel, however."  When you wrote this

20    E-mail, was it your intention to convey to -- well,    05:54PM

21    let me approach it a different way.

22            The information that is redacted in this

23    section of the E-mail, is the source of that

24    information Ms. McShane?

25        A.   Yes, I believe it to be so, yes.             05:54PM
                                                                 282
```

EXHIBIT ___61___

PAGE ___961___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   And that's the same information that you

 2   were receiving in these various phone calls that you

 3   were having with Ms. McShane during the period of

 4   March 2002 through August 2002?

 5           MR. COREY:  Objection:  mischaracterizes    05:55PM

 6   testimony.

 7           THE WITNESS:  Yes.

 8   BY MR. NOLAN:

 9      Q.   Those same conversations that we've been

10   talking about that could have occurred?           05:55PM

11      A.   Yes.

12      Q.   Where she was reporting to you on the statis

13   of this analysis that was being done by outside

14   counsel on the copyright issue, correct?

15           MR. COREY:  Same objection.               05:55PM

16           THE WITNESS:  I don't know how to

17   characterize the reporting as me asking questions as

18   to the status.

19   BY MR. NOLAN:

20      Q.   And she was answering those questions,     05:55PM

21   correct?

22      A.   Yes.

23      Q.   And that was what caused you to more or less

24   sit back and continue to not do anything because you

25   were waiting for the conclusion, correct?          05:55PM
                                                         283
```

EXHIBIT 6

PAGE 962

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. COREY:  Objection:  mischaracterizes the

 2     testimony and vague.

 3            THE WITNESS:  I don't know my posture as far

 4     as sending it back but I was waiting for additional

 5     information, yes.                              05:56PM

 6     BY MR. NOLAN:

 7        Q.   Just to be clear about this, was Ms. McShane

 8     communicating to you -- strike that.

 9            Do you know whether or not the Legal

10     department -- other than the analysis that was being 05:56PM

11     done by legal counsel was the Legal department

12     conducting their own internal investigation of the

13     accusations?

14            MR. COREY:  Objection:  speculation.

15            THE WITNESS:  I don't know that.         05:56PM

16     BY MR. NOLAN:

17        Q.   She never told you that, did she?

18        A.   I don't know she did or did not.  I don't

19     know that at this point in time.

20        Q.   But none of the redactions in this E-mail   05:56PM

21     refer to investigative steps taken by Mattel's

22     internal legal team, correct?

23            MR. COREY:  Objection:  speculation.

24            You can answer "yes" or "no."

25            THE WITNESS:  I don't believe --           05:57PM
                                                           284
```

EXHIBIT _____ *M*

PAGE ____ 963

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            VIDEO OPERATOR:  Off the record 5:58.

2                    (Brief recess.)

3            VIDEO OPERATOR:  We're back on the record

4    at 5:59.

5    BY MR. NOLAN:                                      05:59PM

6       Q.   You were in the middle of an answer, I

7    believe.  Wendy?  Let me go through this again.

8    I'll ask the question.  If this is repetitive, I

9    apologize.  Let me ask you.

10           Is there something in this E-mail right    05:59PM

11   after "in this matter was the general" blank, blank,

12   blank that is not attributed to information provided

13   to you by Ms. McShane?

14           MR. COREY:  Can you say that again?  I

15   apologize.                                         05:59PM

16   BY MR. NOLAN:

17      Q.   This E-mail where there's redactions, is it

18   fair -- is it accurate to say that the information

19   that has been redacted from this E-mail is

20   information that came to you from your             06:00PM

21   communications with Ms. McShane?

22      A.   That is correct.

23      Q.   Concerning the status of the analysis done

24   by outside counsel, correct?

25           MR. COREY:  Objection:  assumes facts, calls 06:00PM
                                                          285

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          I declare under penalty of perjury
 2     under the laws of the State of California
 3     that the foregoing is true and correct.
 4          Executed on _____,
 5     2007, at _____,
 6     California.
 7
 8
 9          _____
10               RICHARD N. DE ANDA
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

328

EXHIBIT 61
PAGE 965

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA   ) ss:
 2   COUNTY OF LOS ANGELES )
 3
 4          I, WENDY S. SCHREIBER, CSR No. 3558, do
 5   hereby certify:
 6
 7          That the foregoing deposition of RICHARD
 8   N. DE ANDA was taken before me at the time and place
 9   therein set forth, at which time the witness was
10   placed under oath and was sworn by me to tell the
11   truth, the whole truth, and nothing but the truth;
12          That the testimony of the witness and all
13   objections made by counsel at the time of the
14   examination were recorded stenographically by me,
15   and were thereafter transcribed under my direction
16   and supervision, and that the foregoing pages
17   contain a full, true and accurate record of all
18   proceedings and testimony to the best of my skill
19   and ability.
20          I further certify that I am neither
21   counsel for any party in said action, nor am I
22   related to any party to said action, nor am I in any
23   way interested in the outcome thereof.
24
25
```

329

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      IN WITNESS WHEREOF, I have subscribed my

2  name this 26th day of December, 2007.

3

4

5

6      _____

7      WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

330

EXHIBIT 61
PAGE 907

**EXHIBIT 62**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION        Certified Copy

 4

 5      -------------------------------

 6      MATTEL, INC., a Delaware       )

 7      Corporation,                   )

 8                    Plaintiff,       )

 9                    vs.              ) No. CV 04-9059

10      CARTER BRYANT, an individual;  )     NM (RNBx)

11      and DOES 1 through 10,         ) VOLUME I

12      Inclusive,                     )

13                    Defendants.      )

14      ------------------------------ )

15      (COMPLETE CAPTION ON NEXT PAGE.)

16

17         CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19         Videotaped Deposition of KATHLEEN

20         SIMPSON-TAYLOR, taken at 300 South

21         Grand Street, Los Angeles, California,

22         commencing at 9:13 A.M., Saturday,

23         February 23, 2008, before Wendy S.

24         Schreiber, CSR No. 3558, RPR, CLR.

25      PAGES 1 - 317
```

EXHIBIT 6V

PAGE 968

1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION

 4

 5      -------------------------------

 6   MATTEL, INC., a Delaware          )

 7   Corporation,                      )

 8              Plaintiff,             )

 9              vs.                    ) No. CV 04-9059

10   CARTER BRYANT, an individual;    )    NM (RNBx)

11   and DOES 1 through 10,           )

12   Inclusive,                       )

13              Defendants.           )

14      -------------------------------)

15   CARTER BRYANT, on behalf of      )

16   himself, all present and         )

17   former employees of Mattel,      )

18   Inc., and the general public,    )

19              Counter-Claimants,    )

20              vs.                    )

21   MATTEL, INC., a Delaware         )

22   Corporation,                     )

23              Counter-Defendant.    )

24      -------------------------------
```

EXHIBIT ___ 62

PAGE ___ 969

2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3       For the Plaintiff:

 4

 5          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6          BY:  MICHAEL ZELLER, ESQ.

 7          865 South Figueroa Street, Tenth Floor

 8          Los Angeles, California 90017

 9          (213) 443-3000

10          michaelzeller@quinnemanuel.com

11

12                    -and-

13

14          MATTEL, INC.

15          BY:  JILL THOMAS, ESQ.

16          333 Continental Boulevard

17          El Segundo, California 90245-5012

18          (310) 252-2000

19          jill.thomas@mattel.com

20

21

22

23

24

25
```

EXHIBIT ___6 2___

PAGE ___9 7 0___                    3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3        For the Defendant and Counterclaimant

 4        Carter Bryant:

 5

 6           KEKER & VAN NEST LLP

 7           BY:  AUDREY WALTON-HADLOCK, ESQ.

 8           710 Sansome Street

 9           San Francisco, California 94111-1704

10           (415) 391-5400

11           awaltonhadlock@kvn.com

12

13      For Defendant MGA Entertainment, Inc.:

14           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

15           BY:  THOMAS J. NOLAN, ESQ.

16               JONATHAN D. USLANER, ESQ.

17               MARCUS R. MUMFORD, ESQ.

18           300 South Grand Avenue

19           Los Angeles, California 90071-3144

20           (213) 687-5000

21           tnolan@skadden.com

22

23      Also Present:

24           Video Operator - David West

25
```

EXHIBIT  62

PAGE  971

4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   The -- the information I saw has a header on

2    it and my words of that are review.  It might not be

3    exactly what the header on that form is.

4      Q.   Were you told not to refer to it as an

5    investigation?                                     11:00AM

6      A.   Was I told not to refer to it?  No.

7      Q.   So if -- if we're showing you documents and

8    it refers to it as an investigation file -- well,

9    we'll get to that in just a minute.  Let me ask you

10   this question.                                     11:00AM

11          Did you see any evidence that there were

12   rumors or innuendoes at Mattel prior to March of

13   2002 with respect to Carter Bryant's involvement

14   with Bratz?

15          MR. ZELLER:  Objection as to form.          11:00AM

16          THE WITNESS:  Can you repeat your question?

17   BY MR. NOLAN:

18     Q.   Sure.  As part of your preparation for

19   today's deposition --

20     A.   Uh-huh --                                    11:00AM

21     Q.   -- did you review any interrogatories filed

22   by Mattel in this case?

23     A.   I did.

24     Q.   And you're aware that in interrogatories

25   filed in this case Mattel refers to rumors and       11:01AM

                                                              74

EXHIBIT 62
PAGE 912

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    innuendoes, their term.  Do you know -- did you see

2    that term -- those terms?

3            MR. ZELLER:  Are you asking about the

4    particular words from a document?

5            MR. NOLAN:  Yes.                          11:01AM

6            THE WITNESS:  I'm not recalling those

7    particular words.

8        Q.   Do you -- as part of your preparation today,

9    did you do any investigation as to whether or not

10   prior to March of 2002 there had been any rumors      11:01AM

11   concerning Carter Bryant's involvement with Bratz?

12       A.   The -- the earliest recollection I have

13   relates to this review/investigation/information

14   gathering that the Bratz products potentially

15   plagiarized the Toon Teens Mattel design.             11:02AM

16       Q.   What do you mean by "plagiarized"?

17       A.   It was -- in my words, not any definition,

18   is that it was potentially infringing on that,

19   copyright infringement, taking someone else's idea

20   or taking someone else's design in this case.         11:02AM

21       Q.   And at the time that the review was

22   initiated by Mattel it was known that Carter Bryant

23   was the creator of Bratz, yes?

24       A.   That's not my recollection.

25       Q.   When -- in your preparation for your         11:03AM

                                                           75

EXHIBIT  62

PAGE  913

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    deposition today, when did you -- did you see any

 2    documents which suggested when Mattel was first

 3    advised that Carter Bryant was the creator of Bratz?

 4         MR. ZELLER:  This is asked and answered.

 5         THE WITNESS:  The earliest documentation      11:03AM

 6    that I've seen is a newspaper article that stated

 7    that Carter Bryant was the designer of Bratz and

 8    that was in July 2003.  I don't remember the

 9    specific date.

10         MR. ZELLER:  Tom, I don't want to interrupt   11:03AM

11    your line but we've been going for an hour and 45

12    minutes so --

13         MR. NOLAN:  Do you need a break?

14         MR. ZELLER:  Yeah, whenever we get to a

15    convenient place.                                  11:04AM

16         MR. NOLAN:  Give me -- let me -- give me

17    five minutes.  Let me see if I can do one thing and

18    then we'll take a break if you don't mind.

19         THE WITNESS:  Oh, I'm fine.  Thank you.

20    Q.   Are you sure?  Okay.                          11:04AM

21         (Deposition Exhibit 4427 was marked

22         for identification and is annexed hereto.)

23    BY MR. NOLAN:

24    Q.   I'd like to mark -- this may already have an

25    exhibit number but for purposes of today we'll mark 11:04AM
                                                          76
```

EXHIBIT ___ 62

PAGE ___ 914

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   we get to the people in the Design Center, it was

 2   based on what conversation you had with Lily

 3   Martinez?

 4          MR. ZELLER:  Let the record reflect you

 5   interrupted the witness' answer.                12:26PM

 6          MR. NOLAN:  And I admitted that and I

 7   apologize but I just -- what were you referring to

 8   back -- the conversation you had with Lily Martinez?

 9          THE WITNESS:  Lily Martinez had spoken with

10   Cassidy Park who I believe was her supervisor      12:26PM

11   stating that -- what I've previously testified about

12   Carter Bryant's comments made when he saw her

13   project, and Lily communicated that to her

14   supervisor who communicated that to Ivy Ross who was

15   I believe Cassidy Parks' supervisor and as a result  12:26PM

16   of that there was this review of potential

17   infringement of the Toon Teens idea, concept,

18   project.

19   BY MR. NOLAN:

20       Q.   So let me just break this down and make    12:27PM

21   certain I understand this.

22          MR. ZELLER:  Also, I'm not sure she was done

23   with her answer but go ahead.

24   BY MR. NOLAN:

25       Q.   Were you?                                  12:27PM
                                                         120
```

EXHIBIT 62

PAGE 974.001

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   which pages are redacted in the exhibit you've

 2   provided were in that form when I reviewed

 3   documentation over the past several days in

 4   preparing for my testimony today.

 5        Q.   Okay.  In your capacity as a 30(b)(6)        03:29PM

 6   witness today what relationship, if any, is there

 7   between this investigative file and the review that

 8   was conducted at Mattel comparing Bratz to Toon

 9   Teens?

10        MR. ZELLER:  The question is vague.              03:30PM

11        THE WITNESS:  Can you please repeat that

12   very long question?

13   BY MR. NOLAN:

14        Q.   Sure.  Is this investigative file related in

15   any way to the investigation or the review that was  03:30PM

16   initiated by Michele McShane?

17        MR. ZELLER:  Objection as to "initiated by

18   Michelle McShane."

19        THE WITNESS:  It's not my understanding that

20   Michele McShane initiated a review.  My             03:30PM

21   understanding is, as I've testified earlier today,

22   that Lily Martinez spoke with I believe to be her

23   boss, certainly a senior person in the Design

24   Center, named Cassidy Park who spoke with Ivy Ross

25   and they contacted the Security department.         03:30PM
                                                          185
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. ZELLER:  By the way, I do -- I do

2     actually have the materials that she looked at.  So

3     I assume it's an agreement it's not a waiver.

4          MR. NOLAN:  No, but at a break I just want

5     to confirm it.                                    03:31PM

6          MR. ZELLER:  I can give it to you now if

7     you'd like.  I just only have one copy.

8          MR. NOLAN:  May I just show it to one of my

9     fellow colleagues here and let them -- see if the

10    blank pages are lined up.  We'll come back to that.  03:31PM

11    I don't mean to distract you.

12         THE WITNESS:  Thank you.

13    Q.    If I understand the chronology is that Lily

14    Martinez reports or has a conversation with her

15    supervisor, Cassidy Park, concerning potential     03:31PM

16    plagiarism of Toon Teens by Bratz, correct?

17    A.    That Bratz is a potential plagiarism of Toon

18    Teens, correct.

19    Q.    That Cassidy Park reports that to Ivy Ross,

20    correct?                                           03:32PM

21    A.    Correct.

22    Q.    And that Cassidy Park and Ivy Ross then

23    contact Richard De Anda in Security, correct?

24    A.    I don't know if they both contacted him.  I

25    believe Ivy Ross -- my recollection is it was Ivy  03:32PM

                                                         186

EXHIBIT _____ 62

PAGE _____ 976

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Ross.  I don't know if they both contacted him.

2      Q.  And that Ivy Ross then had a meeting with

3    somebody in the Security department, yes?

4      A.  Yes.

5      Q.  And that that meeting took place on or about   03:32PM

6    March 15th or March 20th of 2002?

7      A.  Yes.

8      Q.  Now, when was Michele McShane made aware of

9    the rumors and innuendoes at Mattel concerning the

10   Bratz doll, do you know?                   03:33PM

11       MR. ZELLER:  Objection.  The question is

12   vague as to "the Bratz doll."

13       THE WITNESS:  I didn't speak with Michele

14   McShane.  As I've previously testified, I know she

15   was present at a meeting because Richard De Anda    03:33PM

16   shared that information -- information with me and

17   I've also testified to that; that she was present at

18   a meeting with Cassidy Park and Ivy Ross and Richard

19   and herself and Bob Simoneau -- I don't know if he

20   was there or not -- and at which time she received   03:33PM

21   information about this possible plagiarism.

22   BY MR. NOLAN:

23      Q.  Do you know what information she was told at

24   that meeting?

25      A.  I don't know all of the information that she 03:34PM

                                     187

EXHIBIT 62

PAGE 977

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   was told.  Richard De Anda told me that he was

 2   present at that meeting and that they discussed this

 3   issue; that this project of Toon Teens -- that Bratz

 4   potentially had plagiarized this project of Toon

 5   Teens of Lily Martinez.                            03:34PM

 6        Q.   If you look at the incident narrative that's

 7   contained on page 0074310 --

 8        A.   Yes.

 9        Q.   -- you would agree with me that there's no

10   reference to Toon Teens, correct?                  03:34PM

11        MR. ZELLER:  You mean on that particular

12   page?

13        MR. NOLAN:  Yes.

14        THE WITNESS:  There is no reference to Toon

15   Teens, but what I know from Richard De Anda is that 03:35PM

16   was the subject of the meeting that they had.

17   BY MR. NOLAN:

18        Q.   And my question to you is:  The information

19   set forth here that information had been received

20   from the Design Center staff that MGA Entertainment 03:35PM

21   headed by a person known as Isaac Larian had

22   recently hired a number of former Mattel employees

23   and is manufacturing products that appear to be

24   Mattel designs, did Richard De Anda tell you that he

25   told that to Michele McShane?                       03:35PM
                                                              188
```

EXHIBIT 62

PAGE 978

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    again to yourself and assume that the facts are true

2    and then ask you whether or not you believe that

3    those facts would violate any agreement that Carter

4    Bryant had signed at Mattel.  Okay?

5         MR. ZELLER:  Same objections.  Calls for a       05:04PM

6    legal conclusion, outside the scope and assumes

7    facts not in evidence.

8         THE WITNESS:  So is your question assuming

9    this is -- everything written here is factual?

10        MR. NOLAN:  Yes.                                 05:05PM

11        THE WITNESS:  I don't contend or -- I'm not

12   here to represent as a witness of Mattel that this

13   is a factual letter so I find difficulty answering

14   that question.

15   Q.   I know, but I'm just asking you to assume        05:05PM

16   that the facts are correct.  I'm not asking you

17   whether or not you conducted the investigation.  I'm

18   assuming -- I'm asking you that based on your

19   investigation -- I'm sorry, your preparation as a

20   30(b)(6) witness in the case and reviewing his       05:05PM

21   inventions agreement, the conflict questionnaire,

22   et cetera, et cetera, and the other agreements that

23   we'll get to in a little while, if those facts were

24   true, did anything in that letter constitute a

25   violation of any agreement that Carter Bryant had    05:05PM

                                                          240

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   signed?

 2          MR. ZELLER:  Calls for a legal conclusion,

 3   outside the scope, assumes facts, mischaracterizes

 4   the record.

 5          THE WITNESS:  So once again, assuming this    05:06PM

 6   is a factual letter would this -- would the

 7   information -- could you repeat your question?

 8   BY MR. NOLAN:

 9      Q.   Sure.  Well, first of all, this is a factual

10   letter, it's just not signed, correct?  There are    05:07PM

11   facts set forth in the letter, yes?

12          MR. ZELLER:  Objection.

13          THE WITNESS:  It's an anonymous letter

14   that's very ambiguous.  I wouldn't call it a factual

15   letter.                                              05:07PM

16   BY MR. NOLAN:

17      Q.   Okay.  So you wouldn't consider any of that

18   to be specific information of wrongdoing by Carter

19   Bryant?

20          MR. ZELLER:  Can I have that read back,        05:07PM

21   please?

22          (The pending question was read as follows:

23             "Q.   So you wouldn't consider

24          any of that to be specific information

25          of wrongdoing by Carter Bryant?")          05:07PM
                                                            241
```

EXHIBIT  62

PAGE  980

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           MR. ZELLER:  The document speaks for itself,

2    mischaracterizes the record.

3    BY MR. NOLAN:

4        Q.   You can answer.

5           MR. ZELLER:  And outside the scope.           05:07PM

6           THE WITNESS:  I -- I read this letter to be

7    very ambiguous.  It -- it is someone who wouldn't

8    identify themselves words and that's how I reviewed

9    the letter.  I don't review it as being factual or

10   based on facts.                                      05:08PM

11   BY MR. NOLAN:

12       Q.   I guess what I'm saying though is if those

13   facts turned out to be true, based on your review of

14   the inventions agreement, the conflict of interest

15   policy, the Conflict of Interest Questionnaire,      05:08PM

16   would it be your understanding that that contact

17   would violate any of Carter Bryant's agreements with

18   Mattel?

19          MR. ZELLER:  Mischaracterizes the record as

20   to this letter, calls for a legal conclusion,        05:08PM

21   outside the scope, assumes facts.

22          THE WITNESS:  If it were true that Carter

23   Bryant was working with MGA, a competitor, during

24   his employment with Mattel, that would be a

25   violation of his inventions agreement and his        05:09PM
                                                              242

EXHIBIT  62

PAGE  981

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Conflict of Interest agreement.

2    BY MR. NOLAN:

3        Q.   Okay.  Now, what I'd like you to do is set

4    that aside for just a moment and in the

5    investigative file that you have there that's marked    05:10PM

6    as an exhibit -- I apologize I forget what number.

7        A.   This one?

8        Q.   Yes, ma'am.  And if you turn to the

9    chronological log that I pointed to you earlier

10   where there was the allegation of plagiarism -- do     05:10PM

11   you have that?  It's 743272 B.

12       A.   I'm sorry, what was the page number?

13           Can I please have my testimony reread --

14   read back, my last response.

15               (Record read.)                             05:11PM

16           THE WITNESS:  Thank you.

17   BY MR. NOLAN:

18       Q.   Okay.  So now looking at this and I'm asking

19   you now to look at the entry for 3/28/02, do you see

20   that?                                                  05:12PM

21       A.   Yes.

22       Q.   If the information reported by Cassidy Park

23   to Michele McShane and Richard De Anda was true

24   concerning Carter Bryant, would that conduct

25   constitute a violation of his inventions agreement    05:12PM

243

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    or any agreement signed by Carter at Mattel?

 2            MR. ZELLER:  At this point I'm going to

 3    start instructing, Counsel.  You cannot be asking

 4    this witness legal contention questions.  This is

 5    just really beyond the pale.                        05:12PM

 6            MR. NOLAN:  But it's not really a legal

 7    contention.

 8            MR. ZELLER:  You're asking about -- you're

 9    asking her to render a legal opinion as to what is a

10    violation and what is not.  It is not what she is    05:12PM

11    here for.

12            MR. NOLAN:  Michael, she's designated as a

13    30(b)(6) witness on such agreements as the invention

14    agreement and other things, okay, and all I'm

15    asking --                                            05:13PM

16            MR. ZELLER:  Also, as you know, when we

17    raised this issue in front of Judge Larson, you

18    agreed that those topics were not calling for legal

19    contentions, legal conclusions.

20            MR. NOLAN:  And that's why I'm representing   05:13PM

21    this.  What I'm saying is what I'm -- based on her

22    knowledge of the inventions agreement and the work

23    that she prepared herself to testify today -- I'm

24    not asking her as a lawyer or anything else like

25    that -- does she believe if this conduct were true   05:13PM
                                                            244
```

EXHIBIT 62

PAGE 983

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           I declare under penalty of perjury
 2      under the laws of the State of California
 3      that the foregoing is true and correct.
 4           Executed on _____,
 5      2008, at _____,
 6      California.
 7
 8
 9                   _____
10                   KATHLEEN SIMPSON-TAYLOR
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

311

EXHIBIT _____ 62

PAGE _____ 984

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA    ) ss:

 2    COUNTY OF LOS ANGELES )

 3

 4          I, WENDY S. SCHREIBER, C.S.R. No. 3558, do

 5    hereby certify:

 6

 7          That the foregoing deposition of KATHLEEN

 8    SIMPSON-TAYLOR was taken before me at the time and

 9    place therein set forth, at which time the witness

10    was placed under oath and was sworn by me to tell

11    the truth, the whole truth, and nothing but the

12    truth;

13          That the testimony of the witness and all

14    objections made by counsel at the time of the

15    examination were recorded stenographically by me,

16    and were thereafter transcribed under my direction

17    and supervision, and that the foregoing pages

18    contain a full, true and accurate record of all

19    proceedings and testimony to the best of my skill

20    and ability.

21          I further certify that I am neither

22    counsel for any party in said action, nor am I

23    related to any party to said action, nor am I in any

24    way interested in the outcome thereof.

25
```

312

EXHIBIT 62

PAGE 985

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          IN WITNESS WHEREOF, I have subscribed my

2    name this 26th day of February, 2008.

3

4

5

6    _____

7          WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT __62__ 313

**EXHIBIT 63**

*Alan K —*
*worth having*
*Richard explore ?*
*RA?*

RECEIVED
AUG 05 2002
ROBERT A. ECKERT

CEO
Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245

Dear CEO:

　　I have information that I think Mattel should investigate. In 2000 a Mattel employee by the name of Carter Bryant was working with Mattel to design dolls. One of the dolls that he was working on creating was the Bratz dolls. MGA Entertainment found out about his creation and approached him to plan a way that he could sell the dolls to MGA and never tell Mattel. While he was working with Mattel and working to create these dolls he worked out a deal with MGA that let him collect a large sum of money each year from MGA in exchange for his secrecy about the dolls and the fact that they are rightly Mattel dolls. Carter left Mattel to live off of the money that MGA has been paying him since then. MGA tells everyone in the business that Bratz was created by MGA which is not true. MGA know that Carter was an employee with Mattel and that it was wrong to pay him to steal this product from Mattel.

Cc: Toy Book
　　Playthings

RICHARD —
I SUGGE START
W/ IU'V TO SEE
IF THIS MAKES
ANY SENSE.

DE Anda
EXHIBIT NO. 1193
12/19/07
Wendy S. Schreiber

CONFIDENTIAL - ATTORNEYS EYES ONLY

M 0074401

EXHIBIT ___63___
PAGE ___987___

CEO
Mattel, Inc.
333 Continental Blvd.
El Segundo, California 90245

CONFIDENTIAL - ATTORNEYS EYES ONLY

M 0074402

EXHIBIT ___63___

PAGE ___988___

**EXHIBIT 64**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION          Certified Copy

4     ----------------------------

5     MATTEL, INC., a Delaware        )

6     corporation,                    )

7               Plaintiff,            )

8          vs.                        ) No. CV04-9059

9     CARTER BRYANT, an individual; ) NM (RNBx)

10    and DOES 1 through 10,

11    Inclusive,                      )

12               Defendants.          )

13    ---------------------------)

14    AND RELATED COUNTER-CLAIM       )

15    ----------------------------

16

17          CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19    Videotaped Deposition of ROBERT A. ECKERT,

20    taken at 1985 East Grand Avenue, El Segundo,

21    California, commencing at 8:04 A.M., Monday,

22    January 28, 2008, before Kathleen E.

23    Barney, CSR No. 5698.

24                                EXHIBIT ___64___

25    PAGES 1 - 196              PAGE ___989___

1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4

 5         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6         BY:  JOHN B. QUINN

 7              BRIDGET A. HAULER

 8         865 South Figueroa Street

 9         10th Floor

10         Los Angeles, California  90017

11         (213) 624-7707

12         johnquinn@quinnemanuel.com

13         bridgethauler@quinnemanuel.com

14

15         MATTEL, INC.

16         BY:  BOB NORMILE

17         Senior Vice President

18         General Counsel & Secretary

19         333 Continental Boulevard

20         El Segundo, California  90245

21

22

23

24

25
```

EXHIBIT ___ C 4

PAGE ___ 990

2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3    FOR DEFENDANT MGA ENTERTAINMENT, INC.:

 4

 5         SKADDEN, ARPS, SLATE, MEAGHER & FLOM

 6         BY:   THOMAS J. NOLAN

 7               ROBERT J. HERRINGTON

 8         300 South Grand Avenue

 9         Los Angeles, California  90071-3144

10         (213) 687-5000

11         tnolan@skadden.com

12         rherring@skadden.com

13

14

15    ALSO PRESENT:

16

17         RYAN GULINO, VIDEOGRAPHER

18

19

20

21

22

23

24

25
```

EXHIBIT   64

PAGE   991

3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    recall seeing some presentations or some information

 2    where it broke out market share by age group within

 3    what NPD, an outside service, defined as some

 4    category of dolls or fashion dolls.

 5         Q.  When was the -- can you give us a particular    09:30

 6    year when you first learned that Bratz was gaining

 7    market share against Barbie in any age group?

 8         A.  I believe it was 2001.

 9         Q.  And who would have reported that to you?

10         A.  I probably read it in a report.               09:30

11         Q.  Do you recall a specific report?

12         A.  It likely would have come from NPD market

13    share data in Spain.

14         Q.  Why Spain?

15         A.  I believe Bratz was launched in Spain in       09:30

16    2001.

17         Q.  At or about that time when you learned that

18    Bratz had been launched in Spain in 2001, did you

19    have discussions with people at Mattel with respect

20    to the impact Bratz might have on the Barbie line?     09:31

21         A.  I may have, but I don't remember specific

22    discussions.

23         Q.  Do you recall having a specific discussion

24    following your reading of a report showing that Bratz

25    was taking market share away from Barbie in Spain?     09:31
                                                              75
```

EXHIBIT ___64___

PAGE ___191.001___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.  No.

2       Q.  Do you recall whether or not in 2001 you

3   believed that Bratz was presenting any domestic

4   threat to the Barbie line?

5       A.  Do I recall when I read the Spanish -- I'm      09:31

6   sorry.

7       Q.  Well, when you read the Spanish report, did

8   you have a concern that Bratz could present a

9   domestic challenge to the Barbie line?

10      A.  I don't believe I did.                           09:31

11      Q.  When was the first time that you learned

12  that Bratz was taking market share away from Barbie

13  domestically, in the United States?

14      A.  That would have likely been either late in

15  2001 or early of -- in 2002.                             09:32

16      Q.  And whether or not it was in late 2001 or

17  early 2002, how did you come to learn that Bratz was

18  projecting a challenge to the Barbie line

19  domestically?

20          MR. QUINN:  Projecting?  I think that            09:32

21  misstates his testimony.

22  BY MR. NOLAN:

23      Q.  Was a competitive threat to Barbie.

24      A.  I don't know when I first learned of that or

25  how I first learned of Bratz in the United States.       09:32

76

EXHIBIT _____ 64

PAGE _____ 991-002

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    with outside lawyers.  And I believe the meeting was

2    in either the -- either very late in 2003 or very

3    early in 2004.  It was sometime prior to a winter

4    meeting I had.

5         Q.  And who attended that meeting?                10:40

6         A.  Mr. Quinn, Bob Normile, representatives of

7    the law firm Wachtell Lipton, and others in New York.

8    John Vogelstein, a director of Mattel.  And I'm sure

9    there were several others.

10        Q.  Were other board members present other than   10:41

11   John Vogelstein and yourself?

12        A.  I don't believe so.

13        Q.  Where did the meeting take place?  In New

14   York?

15        A.  In New York City.                             10:41

16        Q.  At Wachtell Lipton's offices?

17        A.  That's correct.

18        Q.  At that meeting did you -- strike that.

19            Prior to that meeting, had you ever received

20   any communications suggesting that there may be a      10:41

21   basis to file a claim against Carter Bryant or MGA

22   concerning the design of Bratz?

23            MR. QUINN:  Other than attorney-client

24   communications?

25

EXHIBIT _____ 64

PAGE _____ 992                128

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. NOLAN:

2        Q.  Other than attorney-client communications.

3        A.  Can I ask a clarifying question here?

4        Q.  Of course.

5        A.  I did become aware of a document on -- I          10:42

6    believe it was Sunday.  It was either Saturday or

7    Sunday -- that would be relevant to that subject.

8        Q.  So why don't we just anticipate what

9    document that may have been.

10       A.  All right.                                          10:42

11       Q.  Out of the millions of documents produced.

12           This has been marked as Exhibit No. 1193 at

13   the DeAnda deposition.  I'm sorry.

14           Let me show you this document, if I might.

15       A.  Yes.                                                10:42

16           (The document referred to was

17           previously marked as Exhibit 1193 for

18           identification and is attached hereto.)

19   BY MR NOLAN:

20       Q.  Just as a preliminary matter, from the             10:42

21   period -- from day one of taking over as CEO at

22   Mattel through today, on how many occasions have you

23   received an anonymous letter from someone?

24       A.  I don't have a specific number in mind.

25       Q.  Is it more than one?    EXHIBIT  64                 10:43
                                              993                129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.  Yes.

 2      Q.  Does it happen frequently?

 3      A.  How would you define "frequently"?

 4      Q.  More than ten times?

 5      A.  Yes.  I believe so.                          10:43

 6      Q.  More than 50 times?

 7          MR. QUINN:  I'm sorry.  Was that 50?

 8  BY MR. NOLAN:

 9      Q.  50.

10      A.  Yes, I believe so.                           10:43

11      Q.  And do they all generally track the same

12  type of information or are they all different, all

13  unique?

14      A.  That's a pretty broad -- when you say "all,"

15  I don't know whether they're all similar or all      10:43

16  different.  You know --

17      Q.  It was an inartful question.

18          Let's turn to 1193 here for a moment.

19      A.  You'd like me to --

20      Q.  Let's just dissect it for a moment.  And     10:44

21  read it if you need to.

22      A.  I apologize, but I'm -- some of the words

23  are quite fuzzy, and I'm trying -- you know, I'm

24  familiar with it, but there are specific words I

25  can't read.                                          10:44
                                                         130
```

EXHIBIT ___64___

PAGE ___994___

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  Okay.  If any of my questions are directed

2   to specific words, we'll get to that.  And I

3   apologize.  This is the quality that occurs after it

4   has been copied multiple times.  And it was produced

5   to us.                                                    10:45

6           First of all, in the upper right-hand corner

7   it says:

8               "Received August 5th, 2002,

9           Robert A. Eckert."  Right?

10      A.  No.                                               10:45

11      Q.  What does it say?

12      A.  It says on my copy:

13          "Received August 05, 2002, Robert A.

14   E-C-K-E."

15      Q.  Is that you?                                      10:45

16      A.  I would assume so.

17      Q.  So it's your stamp?

18      A.  It may be.

19      Q.  Do you have a stamp where you or your

20   assistant date stamps correspondence that you           10:45

21   receive?

22      A.  Yes.

23      Q.  And is it generally the case that a stamp is

24   placed on correspondence you receive on or about the

25   date you actually receive it?   EXHIBIT ____ 64          10:45
                                                             131

                                     PAGE     995

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.  I don't know.

2        Q.  You mean it's possible that someone either

3   back dates documents that you receive or puts the

4   wrong address -- wrong date on it?

5            MR. QUINN:  Calls for speculation.          10:46

6            THE WITNESS:  I don't know.

7   BY MR. NOLAN:

8        Q.  So do you have any reason, as you're sitting

9   here, to believe that this stamp date does not

10  accurately reflect the date that it came in to your   10:46

11  office?

12       A.  No.

13       Q.  Do you recall receiving this document?

14       A.  Are you asking -- can I ask a clarifying

15  question?                                             10:46

16       Q.  Sure.

17       A.  Is that related to meetings I had with my

18  outside attorneys or --

19       Q.  No.  Independent.

20       A.  Independent of meetings with my outside      10:46

21  attorneys?  No, I do not.

22       Q.  In any event, do you recognize any of the

23  handwriting in this document?    EXHIBIT ___64___

24       A.  Yes, I do.                 PAGE ___996___

25       Q.  Which handwriting do you recognize?          10:46
                                                          132
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   I recognize my handwriting.

 2        Q.   And where is that?

 3        A.   At the top of the page.

 4        Q.   And what does that read?

 5        A.   It has an arrow pointing to a name, "Alan       10:47

 6   Kaye," hyphen, "worth having Richard explore,"

 7   question mark, and my initials.

 8        Q.   What was your intent in writing this note to

 9   Alan Kaye?

10        A.   I don't know.                                   10:47

11        Q.   You -- do you often send letters to Alan

12   Kaye and ask him to follow up on it for you?

13             MR. QUINN:  Follow up on what?

14   BY MR. NOLAN:

15        Q.   On the letter.                                  10:47

16        A.   When you say "often," could you give me --

17        Q.   Ever.

18        A.   Yes, I have.

19        Q.   And what is your expectation when you put a

20   notation on a document like this to Alan Kaye?  That      10:47

21   he will, in fact, report back to you?

22             MR. QUINN:  It's vague and ambiguous.

23   Overbroad.  Are we asking about this specific

24   document?                         EXHIBIT ____ 64

25             MR. NOLAN: Yes.         PAGE ____ 997           10:47
                                                              133
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                    PENALTY OF PERJURY

2

3          I hereby declare I am the deponent in

4    the within matter; that I have read the foregoing

5    deposition and know the contents thereof and I

6    declare that the same is true of my knowledge except

7    as to the matters which are therein stated upon my

8    information or belief, and as to those matters I

9    believe it to be true.

10

11         I declare under penalty of perjury that the

12   foregoing is true and correct.

13         Executed this _____ day of _____,

14   2008, at _____,

15   California.

16

17

18

19   _____

20                  (W I T N E S S)

21

22

23

24                        EXHIBIT ___64___

25                        PAGE ___998___          193

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    STATE OF CALIFORNIA      )
                              )  ss
2    COUNTY OF LOS ANGELES    )

3

4         I, Kathleen E. Barney, a Certified Shorthand

5    Reporter, do hereby certify:

6         That prior to being examined, the witness in

7    the foregoing proceedings was by me duly sworn to

8    testify to the truth, the whole truth, and nothing

9    but the truth;

10        That said proceedings were taken before me

11   at the time and place therein set forth and were

12   taken down by me in shorthand and thereafter

13   transcribed into typewriting under my direction and

14   supervision;

15        I further certify that I am neither counsel

16   for, nor related to, any party to said proceedings,

17   nor in anywise interested in the outcome thereof.

18        In witness whereof, I have hereunto

19   subscribed my name.

20                                    EXHIBIT _____ 64

21   Dated: February 13, 2008
                                     PAGE _____ 999
22

23

24             *Kathleen E. Barney* (signature)

25        Kathleen E. Barney, CSR No. 5698

                                                    194

**EXHIBIT 65**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., )
A DELAWARE CORPORATION, )
)
PLAINTIFF, )
)
VS. ) NO. CV-04 9059 (NM)
)
CARTER BRYANT, AN INDIVIDUAL; )
AND DOES 1 THROUGH 10, INCLUSIVE, )
)
DEFENDANTS. )
_____ )
)
CARTER BRYANT, ON BEHALF OF )
HIMSELF, ALL PRESENT AND FORMER )
EMPLOYEES OF MATTEL, INC., AND )
THE GENERAL PUBLIC, )
)
COUNTER-COMPLAINANT, )
)
VS. )
)
MATTEL, INC., )
A DELAWARE CORPORATION, )
)
COUNTER-DEFENDANT )
_____ )

CONFIDENTIAL TRANSCRIPT PURSUANT TO COURT ORDER

ATTORNEYS' EYES ONLY

DEPOSITION OF ALAN KAYE

MARINA DEL REY, CALIFORNIA

FRIDAY, DECEMBER 10, 2004

REPORTED BY:
STEVEN W. CORNWELL
CSR NO. 7193, RPR
JOB NO.
39767LMF

EXHIBIT 65

PAGE 1000

**LUDWIG KLEIN**
REPORTERS & VIDEO, INC.
10868 KLING STREET
TOLUCA LAKE, CALIFORNIA 91602
800.540.0681      Fax 818.508.6326
e-mail: lois@ludwigklein.com

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    MATTEL, INC.,                    )
     A DELAWARE CORPORATION,          )
5                                     )
                          PLAINTIFF,  )
6                                     )
               VS.                    ) NO. CV-04 9059 (NM)
7                                     )
     CARTER BRYANT, AN INDIVIDUAL;    )
8    AND COES 1 THROUGH 10, INCLUSIVE,)
                                      )
9                         DEFENDANTS. )
     _____)
10                                    )
     CARTER BRYANT, ON BEHALF OF      )
11   HIMSELF, ALL PRESENT AND FORMER  )
     EMPLOYEES OF MATTEL, INC., AND   )
12   THE GENERAL PUBLIC,              )
                                      )
13             COUNTER-COMPLAINANT,   )
                                      )
14             VS.                    )
                                      )
15   MATTEL, INC.,                    )
     A DELAWARE CORPORATION,          )
16                                    )
               COUNTER-DEFENDANT      )
17   _____)

18        DEPOSITION OF ALAN KAYE, TAKEN ON BEHALF OF

19   THE DEFENDANTS, AT 4100 ADMIRALTY WAY, MARINA DEL

20   REY, CALIFORNIA, COMMENCING AT 9:30 A.M., ON FRIDAY,

21   DECEMBER 10, 2004, BEFORE STEVEN W. CORNWELL, CSR NO.

22   7193, A CERTIFIED SHORTHAND REPORTER IN AND FOR THE

23   STATE OF CALIFORNIA.

24                                    EXHIBIT ___CS___

25                                    PAGE ___1001___

CONFIDENTIAL - ATTORNEYS' EYES ONLY
LUDWIG KLEIN REPORTERS & VIDEO, INC. 800.540.0681

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

```
 1    APPEARANCES:

 2

          FOR PLAINTIFF AND COUNTER-DEFENDANT
 3        MATTEL, INC.:

 4            QUINN EMANUEL URQUHART
              OLIVER & HEDGES, L.L.P.
 5            BY:  MICHAEL T. ZELLER, ATTORNEY AT LAW
              865 SOUTH FIGUEROA STREET
 6            TENTH FLOOR
              LOS ANGELES, CALIFORNIA  90017
 7            (213) 443-3180  FAX:  (213) 624-0643
                         -AND-
 8            MICHAEL MOORE, SENIOR COUNSEL
              333 CONTINENTAL BOULEVARD
 9            EL SEGUNDO, CALIFORNIA  90245-5012
              (310) 252-6733  FAX:  (310) 252-3861

10

11        FOR DEFENDANT CARTER BRYANT:

12            LITTLER MENDELSON
              BY:  KEITH A. JACOBY, ATTORNEY AT LAW
13            2049 CENTURY PARK EAST
              FIFTH FLOOR
14            LOS ANGELES, CALIFORNIA  90067-3107
              (310) 553-0308  FAX:  (310) 553-5583

15

16        FOR INTERVENOR M.G.A. ENTERTAINMENT, INC.:

17            O'MELVENY & MYERS L.L.P.
              BY:  DIANA M. TORRES, ATTORNEY AT LAW
18            400 SOUTH HOPE STREET
              LOS ANGELES, CALIFORNIA  90071-2899
19            (213) 430-6000  FAX:  (213) 430-6407

20

          ALSO PRESENT:
21
              STU CHARNO, VIDEOGRAPHER
22

23

24                              EXHIBIT ____65____

25                              PAGE ____1002____
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

1                    I N D E X

2     EXAMINATION:                                    PAGE

3              BY MR. JACOBY                          6

4              BY MS. TORRES                          297

5              BY MR. JACOBY                          372

6                  E X H I B I T S

7     DEFENDANTS'                                     PAGE

8
      40   ANONYMOUS LETTER.  (1 PAGE)                13
9
      41   ORGANIZATION CHART OF MATTEL.  (2 PAGES)   71
10
      42   MEDIA STATEMENT OF MATTEL, INC.,           93
11         APRIL 27, 2004.  (1 PAGE)

12    43   DOCUMENT ENTITLED "PROPRIETARY             129
           INFORMATION CHECKOUT."  (1 PAGE)
13
      44   LETTER TO CARTER BRYANT FROM LYNNE         188
14         ROBINSON, DATED DECEMBER 11, 1998.
           (2 PAGES)
15
      45   DOCUMENT ENTITLED "CONFLICT OF INTEREST    193
16         QUESTIONNAIRE."  (1 PAGE)

17    46   DOCUMENT ENTITLED "EMPLOYEE CONFIDENTIAL   193
           INFORMATION AND INVENTIONS AGREEMENT.
18         (1 PAGE)

19    47   CERTIFICATE OF REGISTRATION WITH THE       238
           UNITED STATES COPYRIGHT OFFICE.
20         (2 PAGES)

21    48   COLLECTION OF DRAWINGS AND PHOTOGRAPHS,    248
           BATES STAMP M0012566 THROUGH MOO12586.
22         (21 PAGES)

23    49   PHONE LOG FROM MATTEL, INC.  (17 PAGES)    277

24    50   EXIT INTERVIEW OF CARTER BRYANT.           282
           (2 PAGES)            EXHIBIT ___65___
25
                                PAGE ___1003___

CONFIDENTIAL - ATTORNEYS' EYES ONLY
LUDWIG KLEIN REPORTERS & VIDEO, INC. 800.540.0681

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

| | | |
|---|---|---|
| 1 | GO THROUGH YOU AT SOME LEVEL FOR APPROVAL? | 09:36:3 |
| 2 | A. NO. | 09:36:3 |
| 3 | Q. DO YOU HAVE ANY RECOLLECTION OF DISCUSSING | 09:36:3 |
| 4 | WITH ANYONE MR. BRYANT'S REHIRE IN JANUARY OF 1999? | 09:36:3 |
| 5 | A. NO. | 09:36:4 |
| 6 | Q. AND SO IS IT CORRECT, THEN, THAT DURING THE | 09:36:4 |
| 7 | ENTIRETY OF MR. BRYANT'S EMPLOYMENT YOU HAVE NO | 09:36:5 |
| 8 | RECOLLECTION OF ANY DIRECT CONVERSATIONS WITH | 09:36:5 |
| 9 | MR. BRYANT? | 09:36:5 |
| 10 | A. CORRECT. | 09:36:58 |
| 11 | Q. DO YOU HAVE ANY RECOLLECTION OF EVER | 09:37:0 |
| 12 | RECEIVING AN EMAIL FROM MR. BRYANT? | 09:37:0 |
| 13 | A. NO. | 09:37:04 |
| 14 | Q. WOULD IT BE CORRECT, THOUGH, THAT YOU SENT | 09:37:0 |
| 15 | OUT EMAILS FROM TIME TO TIME THAT WOULD GO TO ALL | 09:37:0 |
| 16 | EMPLOYEES? | 09:37:1 |
| 17 | A. CORRECT. | 09:37:1 |
| 18 | Q. IN THE MATTEL EMAIL SYSTEM IS THERE A | 09:37:1 |
| 19 | FEATURE THAT ALLOWS YOU TO SEND AN EMAIL TO ALL | 09:37:17 |
| 20 | MATTEL EMPLOYEES? | 09:37:21 |
| 21 | A. YES. | 09:37:22 |
| 22 | MR. ZELLER: THE QUESTION IS VAGUE. | 09:37:22 |
| 23 | Q. BY MR. JACOBY: IS THERE A FEATURE THAT | 09:37:23 |
| 24 | ALLOWS YOU TO SEND AN EMAIL TO ALL MATTEL DESIGN | 09:37:26 |
| 25 | DEPARTMENT MEMBERS, IN OTHER WORDS, ARE THERE | 09:37:30 |

EXHIBIT _____ CS

PAGE _____ 1004

12

CONFIDENTIAL - ATTORNEYS' EYES ONLY
LUDWIG KLEIN REPORTERS & VIDEO, INC. 800.540.0681

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

1    SUBGROUPINGS?                                              09:37:3

2         A.  I DO NOT KNOW.                                    09:37:3

3         Q.  IS THERE A FEATURE THAT ALLOWS YOU TO SEND        09:37:3

4    AN EMAIL TO ALL MATTEL EMPLOYEES WORLDWIDE?                09:37:3

5         A.  YES.                                              09:37:4

6         Q.  HAVE YOU EVER DONE THAT?                          09:37:4

7         A.  YES.                                              09:37:4

8         Q.  IS THAT COMMON?                                   09:37:4

9         A.  YES.                                              09:37:4

10        MR. JACOBY:  WE WILL GET BACK TO EMAILS IN A          09:37:5

11   LITTLE BIT.  I'D LIKE TO SHOW YOU A DOCUMENT WHICH WE      09:37:5

12   WILL MARK AS EXHIBIT 40.                                   09:38:0:

13            (DEFENDANTS' EXHIBIT 40 WAS MARKED                09:38:0

14            FOR IDENTIFICATION BY THE CERTIFIED               09:38:0

15            SHORTHAND REPORTER.)                              09:38:0

16        MR. JACOBY:  IT'S BATES STAMPED M 0013841.  AND       09:38:0

17   IT'S MARKED CONFIDENTIAL.  AND THIS DEPOSITION WILL        09:38:1:

18   BE -- THE ENTIRETY OF IT WILL BE DESIGNATED AS            09:38:1

19   CONFIDENTIAL.  AND THERE MAY BE AT SOME POINT WHERE        09:38:18

20   WE GO ON AN ATTORNEYS' EYES ONLY TRANSCRIPT.  BUT         09:38:2:

21   THIS IS NOT AN ATTORNEYS' EYES ONLY DOCUMENT.             09:38:2!

22        Q.  IF YOU CAN PLEASE REVIEW THE DOCUMENT AND         09:38:4

23   LOOK UP AT ME WHEN YOU ARE READY TO RECEIVE    65         09:38:4

24   QUESTIONS.                                                 09:38:49

25            HAVE YOU EVER SEEN THIS DOCUMENT BEFORE           09:38:5

EXHIBIT
PAGE    1005

1:

CONFIDENTIAL - ATTORNEYS' EYES ONLY
LUDWIG KLEIN REPORTERS & VIDEO, INC. 800.540.0681

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

| 1 | TODAY? | 09:38:5 |
| 2 | A.  YES. | 09:38:5 |
| 3 | MR. ZELLER:  AND I ASSUME YOU ARE EXCLUDING THE | 09:38:5 |
| 4 | FAX HEADER INFORMATION. | 09:39:0 |
| 5 | Q.  BY MR. JACOBY:  YEAH, I BELIEVE THE FAX | 09:39:0 |
| 6 | HEADER -- I'LL REPRESENT TO YOU THE FAX HEADER | 09:39:0 |
| 7 | REPRESENTS WHEN THIS DOCUMENT WAS TRANSMITTED DURING | 09:39:0 |
| 8 | THE COURSE OF THIS LITIGATION. | 09:39:0 |
| 9 | DO YOU RECALL RECEIVING THIS DOCUMENT ON OR | 09:39:1 |
| 10 | ABOUT AUGUST 5TH, 2002? | 09:39:1 |
| 11 | A.  NO. | 09:39:1 |
| 12 | Q.  DO YOU RECALL RECEIVING THIS DOCUMENT AT ANY | 09:39:1 |
| 13 | TIME IN 2002? | 09:39:2 |
| 14 | A.  NO. | 09:39:2 |
| 15 | Q.  CAN YOU TELL ME WHAT THIS DOCUMENT IS. | 09:39:2 |
| 16 | A.  THIS IS A -- AN ANONYMOUS LETTER -- AN | 09:39:2 |
| 17 | ANONYMOUS EMAIL TO THE C.E.O. OF MATTEL CONCERNING AN | 09:39:3 |
| 18 | EMPLOYEE OF MATTEL. | 09:39:3 |
| 19 | Q.  HOW DO YOU KNOW IT'S AN EMAIL? | 09:39:4 |
| 20 | MR. ZELLER:  THE QUESTION LACKS FOUNDATION. | 09:39:4 |
| 21 | MR. JACOBY:  WELL, LET ME WITHDRAW IT. | 09:39:4 |
| 22 | Q.  WHAT IS THE BASIS FOR THE TESTIMONY YOU JUST | 09:39:4 |
| 23 | GAVE THAT THIS IS AN EMAIL? | 09:39:5 |
| 24 | MR. ZELLER:  IT MISCHARACTERIZES THE WITNESS'S | 09:39:5 |
| 25 | TESTIMONY. | 09:39:5 |

EXHIBIT ............ G S

PAGE ............ 1006

1

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

1      MR. JACOBY:  YOU CAN ANSWER.                       09:39:5

2      THE WITNESS:  COUNSEL TOLD ME IT WAS AN EMAIL.     09:40:0

3   MY COUNSEL TOLD ME IT WAS AN EMAIL.                   09:40:0

4      MR. ZELLER:  WELL, FIRST OF ALL, YOU SHOULDN'T     09:40:0

5   BE DISCLOSING WHAT IT IS THAT YOU DISCUSSED WITH      09:40:0

6   COUNSEL.                                              09:40:1

7         SECOND, I'M GOING TO OBJECT FOR THE RECORD      09:40:1

8   TO EXHIBIT 40 BECAUSE YOU HAVEN'T PROVIDED THE        09:40:1

9   WITNESS WITH THE ACCOMPANYING ENVELOPE THAT WENT WITH 09:40:1

10  THIS LETTER.                                          09:40:2

11     Q.  BY MR. JACOBY:  THAT'S CORRECT.  I'LL          09:40:2

12  REPRESENT TO YOU THERE WAS AN ENVELOPE THAT WENT WITH 09:40:2

13  THIS LETTER.  DO YOU HAVE ANY FIRSTHAND KNOWLEDGE     09:40:2

14  THAT THIS IS EITHER A LETTER OR AN EMAIL?             09:40:3

15     MR. ZELLER:  IN OTHER WORDS, --                    09:40:3

16     THE WITNESS:  NOW I DO.                            09:40:3

17     MR. ZELLER:  WHAT HE'S ASKING YOU IS WHETHER OR    09:40:4

18  NOT YOU HAVE ANY DIRECT PERSONAL KNOWLEDGE AS TO HOW  09:40:4

19  THIS WAS TRANSMITTED TO MATTEL.                       09:40:4

20     THE WITNESS:  NO.                                  09:40:5

21     MR. JACOBY:  OKAY.                                 09:40:5

22     Q.  THIS DOESN'T NAME -- THE LETTER -- WE'LL       09:40:5

23  CALL IT THE ANONYMOUS LETTER.  IS THAT OKAY?  WE CAN  09:41:0

24  AGREE ON THAT, IRRESPECTIVE OF WHETHER IT'S AN EMAIL  09:41:0

25  OR A LETTER, I'M GOING TO REFER TO IT LIKE YOU DID AS 09:41:0

EXHIBIT                CS

1007

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

1    THE ANONYMOUS LETTER.                                09:41:1

2           THIS IS STAMPED IN THE RIGHT-HAND CORNER      09:41:1

3    "RECEIVED AUGUST 5TH, 2002, ROBERT A. ECKERT." IS IT 09:41:1

4    THE PRACTICE OF MR. ECKERT'S OFFICE IF YOU KNOW TO   09:41:1

5    STAMP DOCUMENTS THAT ARE RECEIVED BY HIS OFFICE IN   09:41:2

6    THIS FASHION?                                        09:41:2

7           A.  I DO NOT KNOW.                            09:41:2

8           Q.  OKAY.                                     09:41:2

9           HAVE YOU SEEN OTHER DOCUMENTS BESIDES THIS    09:41:2

10   ONE THAT HAVE MR. ECKERT'S STAMP ON IT?              09:41:2

11          A.  YES.                                      09:41:3

12          Q.  IS THE UNDERSTANDING THAT YOU DERIVE FROM 09:41:3

13   THAT THAT THIS LETTER WAS RECEIVED AT SOME POINT BY  09:41:3

14   MR. ECKERT'S OFFICE?                                 09:41:3

15          A.  YES.                                      09:41:3

16          Q.  IF YOU LOOK AT THE TOP OF THE DOCUMENT,   09:41:3

17   THERE'S AN ARROW AND SOME HANDWRITING.  AND I BELIEVE 09:41:4

18   IT SAYS "ALAN K.," HYPHEN, "WORTH HAVING RICHARD     09:41:4

19   EXPLORE," QUESTION MARK.  AND THEN THERE IS AN       09:41:4

20   INITIAL THAT LOOKS LIKE R-A-E.  DO YOU -- ARE YOU    09:41:5

21   FAMILIAR WITH MR. ECKERT'S HANDWRITING?              09:41:5

22          A.  YES.                                      09:41:5

23          Q.  ARE YOU FAMILIAR WITH HIS INITIALS?       09:41:5

24          A.  YES.                                      09:42:0

25          Q.  ARE THOSE MR. ECKERT'S INITIALS?          09:42:0

                                        65
                                      EXHIBIT

PAGE _____ 1008

16

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

| 1 | A. YES. | 09:42:0 |
| 2 | Q. OKAY. AND ARE YOU ALAN K.? | 09:42:0 |
| 3 | A. YES. | 09:42:0 |
| 4 | Q. AND DO YOU RECALL MR. ECKERT'S OFFICE | 09:42:0 |
| 5 | TRANSMITTING THIS DOCUMENT TO YOU AT SOME POINT IN | 09:42:1 |
| 6 | 2002? | 09:42:1 |
| 7 | A. NO. | 09:42:1 |
| 8 | Q. DO YOU HAVE ANY RECOLLECTION AT ALL OF THIS | 09:42:1 |
| 9 | DOCUMENT OTHER THAN FROM CONVERSATIONS WITH COUNSEL? | 09:42:1 |
| 10 | A. I'M NOT SURE HOW TO ANSWER THE QUESTION. | 09:42:3 |
| 11 | I'M NOT SURE -- I DON'T UNDERSTAND THE QUESTION. | 09:42:3 |
| 12 | Q. OKAY. LET ME WITHDRAW IT. | 09:42:3 |
| 13 | WAS IT MR. ECKERT'S PRACTICE TO SEND YOU | 09:42:4 |
| 14 | NOTES? | 09:42:4 |
| 15 | A. YES. | 09:42:4 |
| 16 | Q. DID YOU HAVE A PRACTICE OF HOW YOU HANDLED | 09:42:4 |
| 17 | NOTES THAT MR. ECKERT SENT? | 09:42:5 |
| 18 | MR. ZELLER: THE QUESTION IS OVERBROAD. | 09:42:5 |
| 19 | Q. BY MR. JACOBY: IN OTHER WORDS, DO YOU KEEP | 09:42:5 |
| 20 | AN ECKERT NOTES FILE, OR IS THERE SOME WAY THAT YOU | 09:42:5 |
| 21 | MAINTAIN DOCUMENTS THAT MR. ECKERT SENT YOU? | 09:42:5 |
| 22 | A. NO. | 09:43:0 |
| 23 | Q. OKAY. | 09:43:0 |
| 24 | WAS IT YOUR PRACTICE TO THROW AWAY NOTES | 09:43:0 |
| 25 | THAT MR. ECKERT SENT YOU AFTER YOU WERE DONE WITH | 09:43:0 |

EXHIBIT _____ 65

PAGE _____ 1009

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

1    THEM?                                                    09:43:1

2         MR. ZELLER:  THE QUESTION IS OVERBROAD.             09:43:1

3         THE WITNESS:  AT TIMES.                             09:43:1

4         MR. JACOBY:  OKAY.                                  09:43:1

5         Q.  SO IT WOULDN'T BE YOUR PRACTICE TO KEEP         09:43:1

6    EVERY SCRAP OF PAPER THAT --                             09:43:2

7         A.  NO.                                             09:43:2

8         Q.  -- MR. ECKERT SENT YOU?  OKAY.                  09:43:2

9         IT'S REALLY IMPORTANT THAT YOU LET ME               09:43:2

10   FINISH MY QUESTION.  BECAUSE SOMETIMES --                09:43:2

11        A.  UNDERSTOOD.                                     09:43:2

12        Q.  -- THE LAST FEW WORDS OF A QUESTION CHANGE      09:43:2

13   ITS MEANING.                                             09:43:3

14        DO YOU HAVE ANY RECOLLECTION OF RESPONDING          09:43:3

15   TO THIS INQUIRY BY MR. ECKERT?                           09:43:3

16        A.  I'M NOT SURE HOW TO ANSWER THE QUESTION.  I     09:43:4

17   HAVE A RECOLLECTION NOW SINCE YOU ARE GIVING ME THIS.    09:43:5

18   PRIOR TO SEEING THIS I WOULDN'T HAVE HAD ANY             09:43:5

19   RECOLLECTION.                                            09:43:5

20        Q.  OKAY.  WELL, THAT'S FINE.  ONE OF THE           09:43:5

21   PURPOSES OF SHOWING YOU DOCUMENTS IN A DEPOSITION IS     09:44:0

22   TO REFRESH YOUR RECOLLECTION.  LET ME ASK YOU THIS.      09:44:0

23        DO YOU KNOW WHO THE RICHARD IS THAT                 09:44:0

24   MR. ECKERT REFERS TO IN THIS HANDWRITTEN NOTE?           09:44:1

25        A.  YES.                                            09:44:1

EXHIBIT     65

PAGE     1010

18

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

```
 1    AGREEMENT?                                            14:23:2

 2         MR. ZELLER:  THIS HAS BEEN ASKED AND ANSWERED.   14:23:2

 3         MR. JACOBY:  I DON'T THINK IT HAS.               14:23:3

 4         MR. ZELLER:  HE ALREADY TESTIFIED AS TO --       14:23:3

 5         Q.  BY MR. JACOBY:  YOU'VE TESTIFIED THAT        14:23:3

 6    DOMESTIC EMPLOYEES ARE GIVEN IT.  BUT I'M ASKING A    14:23:3

 7    SLIGHTLY DIFFERENT QUESTION, WHICH IS IS SIGNING THIS 14:23:3

 8    AN ABSOLUTE PRECONDITION FOR WORKING AT MATTEL?       14:23:3

 9    DOMESTICALLY.                                         14:23:4

10         MR. ZELLER:  WELL, BUT I THINK THE WORD IS A     14:23:4

11    QUALIFICATION EVEN BEYOND DOMESTICALLY.  GO AHEAD AND 14:23:4

12    ASK THE QUESTION.  I DON'T THINK IT'S PROPERLY        14:23:4

13    FRAMED.                                               14:23:5

14         MR. JACOBY:  WOULD YOU READ THE QUESTION BACK TO 14:23:5

15    THE WITNESS.                                          14:23:5

16         THE WITNESS:  REQUIRED, AGAIN, IS A DIFFICULT    14:23:5

17    WORD.                                                 14:23:5

18         MR. JACOBY:  LET ME ASK IT THIS WAY.             14:23:5

19         Q.  IF A PROSPECTIVE EMPLOYEE REFUSES TO SIGN    14:23:5

20    THIS, WILL MATTEL NOT EMPLOY THEM?                    14:24:0

21         MR. ZELLER:  IN ANY POSITION?                    14:24:0

22         MR. JACOBY:  DOMESTICALLY.                       14:24:0

23         MR. ZELLER:  BUT EVEN WITH DOMESTICALLY, ARE YOU 14:24:0

24    ASKING ABOUT ANY TYPE OF EMPLOYEE NO MATTER WHAT      14:24:1

25    POSITION?                                             14:24:1
```

EXHIBIT ____65____

PAGE ____1011____

214

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

| 1 | MR. JACOBY:  YOU CAN ANSWER. | 14:24:1? |
| 2 | THE WITNESS:  I DON'T KNOW. | 14:24:1? |
| 3 | Q.  BY MR. JACOBY:  ARE YOU AWARE OF ANYONE EVER | 14:24:1? |
| 4 | REFUSING TO SIGN THIS? | 14:24:2? |
| 5 | MR. ZELLER:  THIS AGREEMENT HERE, 46? | 14:24:2? |
| 6 | MR. JACOBY:  THE FORM OF AGREEMENT. | 14:24:2? |
| 7 | THE WITNESS:  AS IS, YES. | 14:24:28 |
| 8 | Q.  BY MR. JACOBY:  WHAT DO YOU MEAN BY "AS | 14:24:4? |
| 9 | IS"? | 14:24:43 |
| 10 | A.  THERE ARE PEOPLE WHO HAVE ADDENDUMS TO THIS | 14:24:44 |
| 11 | AGREEMENT. | 14:24:47 |
| 12 | Q.  WHAT WOULD THOSE ADDENDUMS TYPICALLY | 14:24:4? |
| 13 | INCLUDE? | 14:24:52 |
| 14 | MR. ZELLER:  THE QUESTION IS OVERBROAD. | 14:24:53 |
| 15 | THE WITNESS:  THOSE ADDENDUMS WOULD INCLUDE | 14:24:57 |
| 16 | INVENTIONS THAT HAVE OCCURRED PRIOR TO THEIR | 14:25:01 |
| 17 | EMPLOYMENT AT MATTEL. | 14:25:04 |
| 18 | MR. JACOBY:  I SEE. | 14:25:05 |
| 19 | Q.  PEOPLE DISCLOSE THEM, AND THEN THAT | 14:25:06 |
| 20 | DISCLOSURE IS ATTACHED TO THIS FORM OF AGREEMENT? | 14:25:08 |
| 21 | A.  CORRECT. | 14:25:11 |
| 22 | Q.  HOW OFTEN DOES THAT OCCUR? | 14:25:11 |
| 23 | A.  ENOUGH.  ESPECIALLY IN THE TOY INDUSTRY, | 14:25:14 |
| 24 | ESPECIALLY WITH DESIGNERS AND TOY PEOPLE. | 14:25:17 |
| 25 | Q.  AND ARE THE THINGS THAT ARE DISCLOSED THINGS | 14:25:19 |

EXHIBIT _____ 65

215

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

| | | |
|---|---|---|
| 1 | THAT HAVE BEEN REDUCED TO PRACTICE AS YOU INTERPRET | 14:25:22 |
| 2 | THAT TERM TO MEAN? | 14:25:26 |
| 3 | A.  YES. | 14:25:27 |
| 4 | Q.  OKAY.  WHAT ABOUT IDEAS THAT ARE JUST | 14:25:27 |
| 5 | CONCEIVED, ARE THEY DISCLOSED? | 14:25:29 |
| 6 | MR. ZELLER:  OBJECTION AS TO THE FORM OF THE | 14:25:32 |
| 7 | QUESTION.  CALLS FOR A LEGAL CONCLUSION. | 14:25:33 |
| 8 | THE WITNESS:  DON'T KNOW SPECIFICALLY. | 14:25:36 |
| 9 | MR. JACOBY:  OKAY. | 14:25:37 |
| 10 | Q.  JUST LET ME MAKE SURE YOU UNDERSTAND MY | 14:25:38 |
| 11 | QUESTION.  I'M ASKING ARE YOU AWARE OF ANYONE WHO HAS | 14:25:41 |
| 12 | EVER DISCLOSED IN AN ADDENDUM TO THIS AGREEMENT | 14:25:44 |
| 13 | SOMETHING THAT HAS BEEN CONCEIVED BUT NOT YET REDUCED | 14:25:46 |
| 14 | TO PRACTICE? | 14:25:49 |
| 15 | A.  I DON'T KNOW THAT. | 14:25:50 |
| 16 | Q.  DO YOU KNOW IF THAT'S EVER OCCURRED FROM ANY | 14:25:50 |
| 17 | SOURCE? | 14:25:53 |
| 18 | A.  I DON'T KNOW THAT. | 14:25:53 |
| 19 | Q.  OKAY. | 14:25:55 |
| 20 | IT'S POSSIBLE, YOU ARE JUST -- YOU DON'T | 14:25:55 |
| 21 | HAVE KNOWLEDGE OF EVERY AGREEMENT THAT'S EVER BEEN | 14:25:57 |
| 22 | SIGNED? | 14:25:59 |
| 23 | A.  CORRECT.  IT MAY HAVE OCCURRED. | 14:26:00 |
| 24 | Q.  OKAY. | 14:26:01 |
| 25 | SO THEN LET ME GET BACK TO WHERE I STARTED. | 14:26:06 |

EXHIBIT ___65___

216

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

| | | |
|---|---|---|
| 1 | PUTTING ASIDE ADDENDUMS, ARE YOU AWARE OF ANYONE WHO | 14:26:1 |
| 2 | HAS SOUGHT TO VARY -- I'M GOING TO GIVE YOU A LEGAL | 14:26:1 |
| 3 | TERM.  LAWYERS USE THE TERM "BOILERPLATE" TO MEAN | 14:26:1 |
| 4 | TERMS THAT ARE IN FORMS LIKE THIS.  SO I'M GOING TO | 14:26:1 |
| 5 | CALL EVERYTHING FROM THE "E" IN EMPLOYEE TO THE "T," | 14:26:2 |
| 6 | PERIOD, AT THE BOTTOM OF EMPLOYMENT AS THE | 14:26:2 |
| 7 | BOILERPLATE OF THIS AGREEMENT. | 14:26:2 |
| 8 | MR. ZELLER:  I'M GOING TO OBJECT TO THE FORM OF | 14:26:3 |
| 9 | THE QUESTION.  IF YOU WANT TO TALK ABOUT THE LANGUAGE | 14:26:3 |
| 10 | ON THIS, BUT YOU CHARACTERIZING IT THAT WAY IS | 14:26:3 |
| 11 | TOTALLY IMPROPER. | 14:26:3 |
| 12 | MR. JACOBY:  I WILL CHARACTERIZE IT ANOTHER WAY | 14:26:3 |
| 13 | THEN, JUST SO WE'RE CLEAR. | 14:26:40 |
| 14 | Q.  HAS ANYONE EVER VARIED THE TYPE -- THE TYPED | 14:26:4 |
| 15 | WORDS IN THIS AGREEMENT IN ANY OTHER WAY BY OTHER | 14:26:4 |
| 16 | THAN ADDING AN ADDENDUM? | 14:26:4 |
| 17 | A.  I DON'T KNOW. | 14:26:4 |
| 18 | Q.  IT COULD HAVE HAPPENED, YOU JUST DON'T -- | 14:26:5 |
| 19 | A.  CORRECT. | 14:26:53 |
| 20 | Q.  YOU ARE NOT AWARE OF ANYONE WHO HAS DONE | 14:26:5 |
| 21 | THAT? | 14:26:5 |
| 22 | A.  CORRECT. | 14:26:5 |
| 23 | Q.  YOU ARE NOT AWARE OF ANYONE -- ARE YOU AWARE | 14:26:58 |
| 24 | OF ANYONE WHO HAS NEGOTIATED THE TERMS OF THIS | 14:26:59 |
| 25 | AGREEMENT, OTHER THAN ADDING AN ADDENDUM? | 14:27:02 |

EXHIBIT _____ 5

21

CONFIDENTIAL - ATTORNEYS' EYES ONLY
LUDWIG KLEIN REPORTERS & VIDEO, INC. 800.540.0681

ALAN KAYE - 12/10/2004 - MATTEL VS. BRYANT

1

2

3                          WITNESS'S CERTIFICATE

4

5

6

7          I AM THE WITNESS IN THE FOREGOING

8     DEPOSITION. I HAVE READ THE FOREGOING DEPOSITION

9     AND HAVING MADE SUCH CHANGES AND CORRECTIONS AS

10    I DESIRE, I CERTIFY THAT THE SAME IS TRUE OF MY

11    OWN KNOWLEDGE, EXCEPT AS TO THOSE MATTERS WHICH

12    ARE THEREIN STATED UPON MY INFORMATION OR

13    BELIEF, AND AS TO THOSE MATTERS, I BELIEVE IT TO

14    BE TRUE.

15          I DECLARE UNDER PENALTY OF PERJURY UNDER

16    THE LAWS OF THE STATE OF CALIFORNIA THAT THE

17    FOREGOING IS TRUE AND CORRECT.

18          EXECUTED ON _____,

19    AT _____.

20

21

22

23    _____

24    ALAN KAYE

25          EXHIBIT _____ 65

          PAGE _____ 1015

377

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4

 5          I, STEVEN W. CORNWELL, CSR NO. 7193, A

 6   CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF

 7   CALIFORNIA, DO HEREBY CERTIFY:

 8          THAT PRIOR TO BEING EXAMINED THE WITNESS NAMED

 9   IN THE FOREGOING PROCEEDINGS WAS BY ME DULY SWORN TO

10   TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

11   THE TRUTH;

12          THAT SAID PROCEEDINGS WERE TAKEN BY ME IN

13   SHORTHAND AT THE TIME AND PLACE HEREIN NAMED AND WAS

14   THEREAFTER TRANSCRIBED INTO TYPEWRITING UNDER MY

15   DIRECTION, SAID TRANSCRIPT BEING A TRUE AND CORRECT

16   TRANSCRIPTION OF MY SHORTHAND NOTES.

17          I FURTHER CERTIFY THAT I HAVE NO INTEREST IN

18   THE OUTCOME OF THIS ACTION.

19                    MARCH 23, 2007

20

21

22

23                         _____
                           STEVEN W. CORNWELL
24                         CSR NO. 7193

25
```

EXHIBIT 65

PAGE 1016

37

**EXHIBIT 66**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., A DELAWARE )
CORPORATION,                )
                            )
        PLAINTIFF,          )
                            )
    VS.                     )  NO. CV 04-9059 NM(RNBX)
                            )
CARTER BRYANT, AN           )
INDIVIDUAL; AND DOES 1      )
THROUGH 10, INCLUSIVE,      )
                            )
        DEFENDANTS.         )
_____    )
                            )
AND RELATED COUNTER-CLAIM.  )
_____    )

CONFIDENTIAL TRANSCRIPT

VOLUME I

DEPOSITION OF ANNA RHEE

LOS ANGELES, CALIFORNIA

THURSDAY, FEBRUARY 3, 2005

REPORTED BY:

KAREN E. KAY
C.S.R. NO. 3862, R.M.R., C.R.R.

JOB NO.
C40593LMF

**LUDWIG KLEIN**

10868 KLING STREET
TOLUCA LAKE, CALIFORNIA 91602
800.540.0681      FAX 818.508.6326
e-mail: lois@ludwigklein.com

EXHIBIT ____66____

PAGE ____1017____

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1                    I N D E X

2   EXAMINATION BY                                    PAGE

3   MR. WICKHAM                                        16

4

5

6

7          CONFIDENTIAL PORTIONS OF TRANSCRIPT

8                     PAGES

9                      16
                     105-229
10

11

12

13

14              E X H I B I T S

15   DEFENDANT'S                                        PAGE

16     202      HAND-DRAWN IMAGES OF DOLL               155
                HEADS, BRYANT00173 (1 PG.)
17
       203      COLOR PHOTOCOPY OF A PRAYER             191
18              ANGELS DOLL IN ITS PACKAGING (1
                PG.)
19
       204      COLOR PHOTOCOPY OF A PRAYER             192
20              ANGELS DOLL FACE (1 PG.)

21

22

23

24

25

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ___66___

PAGE ___1018___

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| 1 | CUSTODY, OR CONTROL? | 10:42:54 |
| 2 | A    YES. | 10:42:57 |
| 3 | Q    AND DID YOU PRODUCE OR PROVIDE ALL OF THE | 10:42:58 |
| 4 | DOCUMENTS YOU HAD FOUND TO YOUR ATTORNEYS? | 10:43:02 |
| 5 | A    YES. | 10:43:06 |
| 6 | MR. WICKHAM:  OKAY. | 10:43:07 |
| 7 | MR. BERMAN:  AND I'LL REPRESENT THAT EVERY | 10:43:10 |
| 8 | DOCUMENT THAT SHE PRODUCED TO US WE PROVIDED TO YOU | 10:43:14 |
| 9 | IN ACCORDANCE WITH OUR STIPULATION AND ORDER. | 10:43:18 |
| 10 | NOTHING WAS WITHHELD THAT SHE HAD PROVIDED TO US. | 10:43:21 |
| 11 | MR. WICKHAM:  I'LL GO AHEAD -- I'M NOT | 10:43:26 |
| 12 | GOING TO BE EXAMINING ON THIS YET, BUT SINCE WE'RE | 10:43:28 |
| 13 | ON THIS SUBJECT, LET'S MARK THIS AS 201, AND THIS | 10:43:30 |
| 14 | DOCUMENT HAS BEEN DESIGNATED AS ATTORNEYS' EYES ONLY | 10:43:44 |
| 15 | AND SHOULD BE TREATED AS SUCH.  WE WILL NOT BE GOING | 10:43:47 |
| 16 | INTO AN ATTORNEYS' EYES ONLY SECTION OF THE | 10:43:50 |
| 17 | DEPOSITION RIGHT NOW. | 10:43:53 |
| 18 | (DEFENDANT'S EXHIBIT 201 WAS MARKED FOR | 10:43:55 |
| 19 | IDENTIFICATION BY THE CERTIFIED SHORTHAND REPORTER.) | 10:43:57 |
| 20 | BY MR. WICKHAM: | 10:44:02 |
| 21 | Q    OKAY.  I DON'T EXPECT YOU TO STUDY EVERY | 10:44:04 |
| 22 | SINGLE PAGE, BUT WOULD YOU SCAN THROUGH WHAT HAS | 10:44:07 |
| 23 | BEEN MARKED AS EXHIBIT 201. | 10:44:10 |
| 24 | A    THAT WOULD BE THE FIRST PAGE? | 10:44:14 |
| 25 | Q    JUST SCAN THROUGH THE ENTIRE STACK OF | 10:44:17 |

NONCONFIDENTIAL TRANSCRIPT - VOLUME II          23

EXHIBIT 66

PAGE 1018.001

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | | |
|---|---|---|---|
| 1 | DOCUMENTS THERE. | | 10:44:18 |
| 2 | A   OKAY. | | 10:44:19 |
| 3 | Q   I THINK YOU MIGHT RECOGNIZE THEM.   DO YOU | | 10:44:19 |
| 4 | RECOGNIZE THE DOCUMENTS THAT ARE MARKED AS | | 10:44:37 |
| 5 | EXHIBIT 201? | | 10:44:39 |
| 6 | A   2,001? | | 10:44:41 |
| 7 | Q   201. | | 10:44:44 |
| 8 | A   YES. | | 10:44:45 |
| 9 | Q   AND ARE THESE THE DOCUMENTS THAT YOU HAD | | 10:44:45 |
| 10 | LOCATED AND PRODUCED IN RESPONSE TO THE SUBPOENA? | | 10:44:46 |
| 11 | MR. BERMAN:   I'M GOING TO OBJECT.   ASSUMES | | 10:44:49 |
| 12 | FACTS NOT IN EVIDENCE, AND IT'S COMPOUND. | | 10:44:51 |
| 13 | THE WITNESS:   YES. | | 10:44:53 |
| 14 | MR. WICKHAM:   OKAY. | | 10:45:00 |
| 15 | MR. BERMAN:   AND I'LL TAKE IT THAT YOU'RE | | 10:45:01 |
| 16 | REPRESENTING THAT THIS IS THE FULL SUM OF THE | | 10:45:02 |
| 17 | DOCUMENTS THAT WE PRODUCED? | | 10:45:04 |
| 18 | MR. WICKHAM:   IT IS. | | 10:45:04 |
| 19 | MR. BERMAN:   BECAUSE NEITHER ONE OF US | | 10:45:05 |
| 20 | WOULD REMEMBER THAT. | | 10:45:08 |
| 21 | MR. WICKHAM:   YEAH.   NO.   IT IS.   AND | | 10:45:08 |
| 22 | ACTUALLY IT BEARS YOUR BATE NUMBERS ON THE BOTTOM. | | 10:45:09 |
| 23 | MR. BERMAN:   RIGHT.   I JUST DON'T KNOW IF | | 10:45:11 |
| 24 | IT'S ALL OF THEM.   I DON'T REMEMBER OFF THE TOP OF | | 10:45:12 |
| 25 | MY HEAD IF THERE ARE ONLY 58 OR MORE. | | 10:45:14 |

EXHIBIT 66

PAGE 1018.002

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| 1 | | SEE THAT THERE? | 01:40:46 |
| 2 | A | YEP. | 01:40:48 |
| 3 | Q | IS THAT IN YOUR HANDWRITING? | 01:40:49 |
| 4 | A | YES. | 01:40:54 |
| 5 | Q | OKAY.  GREAT.  ALL RIGHT.  SO YOU CREATED | 01:40:55 |

6  ALL THE INFORMATION THAT'S ON THIS DOCUMENT?   01:40:56

7  MR. BERMAN:  OBJECTION.  SHE CREATED THE   01:40:58

8  HANDWRITING.  SHE DID NOT CREATE -- THE INFORMATION   01:41:00

9  IS DIFFERENT.  SHE WROTE IT.   01:41:03

10  MR. WICKHAM:  THANK YOU FOR THE   01:41:05

11  CLARIFICATION, COUNSEL.   01:41:06

12  THE WITNESS:  YES.   01:41:09

13  BY MR. WICKHAM:

14  Q  COULD YOU TELL ME HOW YOU WERE FIRST   01:41:11

15  REFERRED TO M.G.A. TO DO FREELANCE WORK?   01:41:15

16  A  CARTER BRYANT ASKED ME.   01:41:22

17  Q  THIS ANGEL FACE THING?   01:41:30

18  A  YES.   01:41:33

19  Q  DO YOU KNOW A WOMAN BY THE NAME OF VERONICA   01:41:36

20  MARLOW?   01:41:39

21  A  I KNOW HER A LITTLE BIT.   01:41:45

22  Q  OKAY.  DID A WOMAN BY THE NAME OF VERONICA   01:41:47

23  MARLOW CONTACT YOU ABOUT DOING SOME WORK ON THIS   01:41:51

24  ANGEL FACE PROJECT?   01:41:58

25  MR. BERMAN:  OBJECT.  ASSUMES FACTS NOT IN   01:41:59

106

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT _66_

PAGE _1019_

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | EVIDENCE. | 01:42:01 |
| 2 | THE WITNESS:  NO. | 01:42:03 |
| 3 | BY MR. WICKHAM: | |
| 4 | Q    OKAY.  SO YOUR BEST RECOLLECTION IS THAT | 01:42:04 |
| 5 | CARTER BRYANT HAD REFERRED YOU TO M.G.A.? | 01:42:06 |
| 6 | A    DEFINITELY. | 01:42:09 |
| 7 | Q    OKAY.  AND SPECIFICALLY THAT HE HAD | 01:42:11 |
| 8 | REFERRED YOU TO M.G.A., WHICH ULTIMATELY LED TO YOU | 01:42:13 |
| 9 | DOING THIS WORK ON THE ANGEL FACE PROJECT? | 01:42:16 |
| 10 | MR. BERMAN:  I'M GOING TO OBJECT.  IT | 01:42:21 |
| 11 | ASSUMES FACTS NOT IN EVIDENCE ON THE ANGEL FACE | 01:42:22 |
| 12 | PROJECT.  IT SAYS "[READING:]  ANGEL BABY DOLL | 01:42:24 |
| 13 | HEADS."  YOU'RE SAYING IT'S ANGEL FACE. | 01:42:28 |
| 14 | THE WITNESS:  YEP. | 01:42:33 |
| 15 | BY MR. WICKHAM: | |
| 16 | Q    OKAY.  WELL, TELL ME ABOUT THE FIRST | 01:42:33 |
| 17 | CONVERSATION THAT YOU HAD WITH CARTER BRYANT | 01:42:36 |
| 18 | ABOUT -- THAT ULTIMATELY LED TO THE INVOICE THAT'S | 01:42:39 |
| 19 | THE FIRST PAGE OF EXHIBIT 201. | 01:42:43 |
| 20 | A    THE FIRST CONVERSATION THAT WE HAD? | 01:42:49 |
| 21 | Q    YES.  THAT LED TO THIS FORM. | 01:42:50 |
| 22 | A    I THINK IT WAS -- LET ME THINK WHAT IT WAS. | 01:43:03 |
| 23 | GIVE ME A SECOND.  I THINK I WAS AT HIS HOUSE, AND | 01:43:09 |
| 24 | HE MENTIONED THAT HE HAD LIKE A SECRET PROJECT, WAS | 01:43:19 |
| 25 | A BIG, BIG, BIG SECRET, AND -- AND HE TOLD ME IT | 01:43:28 |

107

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ___(4___

PAGE ___1020___

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| 1 | WOULD BE COMING UP AND WOULD I WANT TO DO IT.  AND I | 01:43:32 |
| 2 | SAID, "SURE.  NO PROBLEM."  THEN LATER ON HE BROUGHT | 01:43:35 |
| 3 | IT TO MY HOUSE. | 01:43:38 |
| 4 | Q    AND THAT'S THIS ANGEL DOLL HEADS? | 01:43:41 |
| 5 | MR. ZELLER:  OBJECTION. | 01:43:47 |
| 6 | THE WITNESS:  YEAH. | 01:43:49 |
| 7 | BY MR. WICKHAM: | |
| 8 | Q    OKAY.  AND WHAT WERE THESE ANGEL DOLL | 01:43:52 |
| 9 | HEADS? | 01:43:56 |
| 10 | A    BRATZ. | 01:43:57 |
| 11 | Q    "BRATZ"? | 01:43:58 |
| 12 | A    YEAH. | 01:43:59 |
| 13 | MR. BERMAN:  I'M GOING TO OBJECT THAT THAT | 01:43:59 |
| 14 | WAS ARGUMENTATIVE. | 01:44:00 |
| 15 | BY MR. WICKHAM: | |
| 16 | Q    CAN YOU TELL ME WHERE ON THE FIRST PAGE OF | 01:44:04 |
| 17 | EXHIBIT 201 THAT YOU SEE SOMETHING IN HERE THAT | 01:44:07 |
| 18 | MAKES YOU BELIEVE THAT THIS PARTICULAR INVOICE | 01:44:11 |
| 19 | RELATES TO BRATZ? | 01:44:13 |
| 20 | A    IT DOESN'T.  IT DOESN'T. | 01:44:19 |
| 21 | Q    OKAY.  DO YOU KNOW WHAT AN ANGEL BABY DOLL | 01:44:23 |
| 22 | HEAD IS? | 01:44:25 |
| 23 | MR. ZELLER:  OBJECT.  THE QUESTION IS | 01:44:31 |
| 24 | VAGUE. | 01:44:32 |
| 25 | THE REPORTER:  EXCUSE ME? | 01:44:32 |

108

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 64
PAGE 1021

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | MR. ZELLER:  I SAID, "THE QUESTION IS | 01:44:32 |
| 2 | VAGUE." | 01:44:32 |
| 3 | THE WITNESS:  I DON'T REMEMBER THIS. | 01:44:42 |
| 4 | BY MR. WICKHAM: | 01:44:43 |
| 5 | Q    DO YOU EVER REMEMBER WORKING ON AN ANGEL | 01:44:45 |
| 6 | BABY DOLL HEAD FOR M.G.A.? | 01:44:48 |
| 7 | A    POSSIBLY. | 01:44:58 |
| 8 | Q    OKAY.  DO YOU REMEMBER HAVING A REQUEST BY | 01:44:59 |
| 9 | SOMEONE BY THE NAME OF KERRI LEGG WHO REQUESTED YOU | 01:45:02 |
| 10 | TO CREATE TWO ANGEL BABY DOLL HEADS? | 01:45:07 |
| 11 | MR. ZELLER:  ASSUMES FACTS NOT IN EVIDENCE. | 01:45:12 |
| 12 | THE WITNESS:  I DON'T KNOW WHO THAT IS | 01:45:14 |
| 13 | ACTUALLY. | 01:45:15 |
| 14 | BY MR. WICKHAM: | |
| 15 | Q    OKAY.  WELL, HAVING LOOKED AT THIS AND | 01:45:16 |
| 16 | SEEING THAT IT'S IN YOUR WRITING, WHY DID YOU PUT | 01:45:19 |
| 17 | THAT THERE? | 01:45:23 |
| 18 | MR. BERMAN:  WHY DID YOU PUT THE | 01:45:23 |
| 19 | "[READING:]  REQUEST BY KERRI LEGG"? | 01:45:24 |
| 20 | THE WITNESS:  WELL, I THINK I ASKED | 01:45:30 |
| 21 | CARTER -- I DIDN'T KNOW IT WAS CALLED BRATZ OR | 01:45:32 |
| 22 | ANYTHING.  I GO, "WELL, WHAT DO YOU WANT ME TO PUT | 01:45:36 |
| 23 | ON THE INVOICE?" | 01:45:39 |
| 24 | AND HE TOLD ME TO PUT "ANGEL BABY DOLL | 01:45:40 |
| 25 | HEADS," | 01:45:43 |

109

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT _____ 66

PAGE _____ 1022

LUDWIG KLEIN REPORTERS & VIDEO, INC.    800.540.0681

| | | |
|---|---|---|
| 1 | AND I GO, "WELL, WHO DO I SAY 'REQUEST | 01:45:44 |
| 2 | BY'?"  BECAUSE I ALWAYS PUT "REQUEST BY."  IT'S LIKE | 01:45:46 |
| 3 | A STANDARD THING THAT I ALWAYS DO.  IT'S LIKE A | 01:45:48 |
| 4 | CHECKUP ON LIKE WHO PAID ME AND WHO DIDN'T. | 01:45:50 |
| 5 | AND HE SAID, "PUT KERRI LEGG."  I DON'T | 01:45:53 |
| 6 | HAVE TO KNOW THE PERSON. | 01:45:57 |
| 7 | Q    THE DATE YOU PUT ON THIS, 6/12/2000, DO YOU | 01:45:58 |
| 8 | KNOW WHETHER THAT'S AN ACCURATE DATE? | 01:46:01 |
| 9 | A    HAS TO BE. | 01:46:06 |
| 10 | Q    WHY DOES IT HAVE TO BE? | 01:46:07 |
| 11 | A    BECAUSE THAT'S THE DATE THAT I TURNED IT | 01:46:09 |
| 12 | IN.  WHY WOULD I PUT SOME OTHER DATE? | 01:46:11 |
| 13 | Q    WELL, YOU PUT IN THIS "[READING:]  REQUEST | 01:46:17 |
| 14 | BY KERRI LEGG," BUT YOU SAY THAT THAT DOESN'T -- | 01:46:18 |
| 15 | THAT WASN'T SOMETHING THAT WAS REQUESTED BY KERRI | 01:46:21 |
| 16 | LEGG.  SO HOW DO YOU KNOW THAT THE "6/12/2000" DATE | 01:46:24 |
| 17 | IS ACCURATE? | 01:46:31 |
| 18 | MR. ZELLER:  OBJECTION. | 01:46:32 |
| 19 | MR. BERMAN:  IT'S ARGUMENTATIVE. | 01:46:34 |
| 20 | MR. ZELLER:  SAME OBJECTION. | 01:46:35 |
| 21 | THE WITNESS:  IT JUST HAS TO BE. | 01:46:35 |
| 22 | BY MR. WICKHAM: | |
| 23 | Q    LET ME ASK YOU A DIFFERENT QUESTION. | 01:46:37 |
| 24 | A    OKAY. | 01:46:43 |
| 25 | Q    WHY DON'T WE TURN TO PAGE AR0016. | 01:46:43 |

110

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 66

PAGE 1023

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| 1 | MR. BERMAN:  YEAH.  AND IT'S ON OR ABOUT. | 01:48:10 |
| 2 | JOIN IN THOSE OBJECTIONS. | 01:48:11 |
| 3 | THE WITNESS:  CORRECT. | 01:48:14 |
| 4 | BY MR. WICKHAM: | |
| 5 | Q    OKAY.  LET ME ASK YOU ABOUT A COUPLE PAGES | 01:48:14 |
| 6 | BACK, AR0013. | 01:48:22 |
| 7 | A    OKAY. | 01:48:33 |
| 8 | Q    OKAY.  NOW, DO YOU RECOGNIZE THE PRINTING | 01:48:33 |
| 9 | AND HANDWRITING ON THIS INVOICE? | 01:48:35 |
| 10 | A    YES, I DO. | 01:48:42 |
| 11 | Q    OKAY.  AND IS THAT ALL YOUR PRINTING AND | 01:48:44 |
| 12 | HANDWRITING? | 01:48:46 |
| 13 | A    YES. | 01:48:48 |
| 14 | Q    OKAY.  DO YOU KNOW WHAT THIS INVOICE | 01:48:49 |
| 15 | RELATES TO? | 01:48:51 |
| 16 | A    YES. | 01:48:54 |
| 17 | Q    WHAT DOES IT RELATE TO? | 01:48:56 |
| 18 | A    BRATZ. | 01:49:07 |
| 19 | Q    "BRATZ"? | 01:49:08 |
| 20 | A    YES. | 01:49:08 |
| 21 | Q    AND WHAT IS IT ON THIS INVOICE THAT MAKES | 01:49:09 |
| 22 | YOU BELIEVE THAT THIS INVOICE RELATES TO SOMETHING | 01:49:11 |
| 23 | ON BRATZ? | 01:49:14 |
| 24 | A    WELL, BECAUSE AT THAT TIME, THOSE EARLY | 01:49:18 |
| 25 | TIMES, I THINK THAT'S THE ONLY THING THAT I'VE DONE. | 01:49:24 |

112

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 64

PAGE 1024

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | | |
|---|---|---|---|
| 1 | | I MEAN EVERYTHING IS BRATZ.  WITH CARTER, EVERYTHING | 01:49:28 |
| 2 | | HAS BEEN BRATZ. | 01:49:32 |
| 3 | Q | WELL, THERE'S ANOTHER NAME ON THIS.  DO YOU | 01:49:35 |
| 4 | | RECOGNIZE THAT NAME? | 01:49:35 |
| 5 | A | YES. | 01:49:40 |
| 6 | Q | WHO IS THIS PAULA TRANTAFALES? | 01:49:41 |
| 7 | A | SHE WORKS FOR M.G.A. | 01:49:48 |
| 8 | Q | OKAY. | 01:49:51 |
| 9 | A | CARTER'S FRIEND. | 01:49:53 |
| 10 | Q | OKAY.  AND YOU BELIEVE THAT THIS RELATES TO | 01:49:54 |
| 11 | | WHAT SORT OF WORK? | 01:49:56 |
| 12 | A | BRATZ. | 01:50:01 |
| 13 | | MR. BERMAN:  LET ME OBJECT.  I'M SORRY. | 01:50:01 |
| 14 | | BY MR. WICKHAM: | |
| 15 | Q | WHAT ABOUT BRATZ?  WHAT WORK WERE YOU | 01:50:03 |
| 16 | | PERFORMING WHEN YOU WERE CARRYING OUT THE WORK? | 01:50:06 |
| 17 | | MR. BERMAN:  THE INVOICE 0013? | 01:50:13 |
| 18 | | MR. WICKHAM:  YES. | 01:50:15 |
| 19 | | MR. BERMAN:  OKAY. | 01:50:15 |
| 20 | | THE WITNESS:  BRATZ. | 01:50:16 |
| 21 | | BY MR. WICKHAM: | |
| 22 | Q | WHAT ASPECT OF BRATZ? | 01:50:18 |
| 23 | A | WHAT DO YOU MEAN "WHAT ASPECT OF BRATZ"? | 01:50:21 |
| 24 | Q | BRATZ FEET, BRATZ HAIR, BRATZ NOSE?  WHAT | 01:50:24 |
| 25 | | ABOUT BRATZ WERE YOU DOING THAT YOU WERE BILLING | 01:50:28 |

113

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT _____ 46

PAGE _____ 1025

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | | |
|---|---|---|---|
| 1 | M.G.A. FOR?  WHAT WERE YOU DOING? | | 01:50:31 |
| 2 | A | THEIR FACES. | 01:50:35 |
| 3 | Q | OKAY.  ALL RIGHT.  SO THIS DEALT WITH DOLL | 01:50:36 |
| 4 | FACES; CORRECT? | | 01:50:40 |
| 5 | A | CORRECT. | 01:50:42 |
| 6 | Q | PAINTING DOLL FACES? | 01:50:42 |
| 7 | | MR. BERMAN:  OBJECTION.  LEADING. | 01:50:45 |
| 8 | BY MR. WICKHAM: | | 01:50:45 |
| 9 | Q | CORRECT? | 01:50:46 |
| 10 | | MR. BERMAN:  LEADING. | 01:50:46 |
| 11 | | THE WITNESS:  CORRECT. | 01:50:47 |
| 12 | BY MR. WICKHAM: | | |
| 13 | Q | AND THIS WAS FOR PAINTING FOUR DOLL FACES; | 01:50:49 |
| 14 | YES? | | 01:50:55 |
| 15 | A | YES. | 01:50:57 |
| 16 | Q | OKAY.  NOW, YOU SEE THE DATE THERE, | 01:50:58 |
| 17 | "[READING:] DECEMBER 7, 2000"? | | 01:50:59 |
| 18 | A | YES. | 01:51:02 |
| 19 | Q | DO YOU BELIEVE THAT'S AN ACCURATE DATE? | 01:51:02 |
| 20 | A | YES. | 01:51:08 |
| 21 | Q | OKAY.  ALL RIGHT.  LET'S TAKE A LOOK AT THE | 01:51:08 |
| 22 | NEXT PRIOR INVOICE, 0012.  WHAT IS THIS -- FIRST OF | | 01:51:16 |
| 23 | ALL, DOES ALL THE PRINTING AND HANDWRITING ON THIS | | 01:51:26 |
| 24 | PAGE APPEAR TO BE YOURS? | | 01:51:29 |
| 25 | A | YES. | 01:51:35 |

114

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT _____ 66

PAGE _____ 1026

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1   Q    OKAY.  WHAT DOES THIS INVOICE RELATE TO?        01:51:37

2        MR. BERMAN:  I'M GOING TO OBJECT.  THAT'S       01:51:42

3   VAGUE AND AMBIGUOUS.  DO YOU MEAN WHAT PROJECT OR    01:51:42

4   WHAT -- LIKE IS THAT WHAT YOU'RE ASKING?             01:51:44

5        MR. WICKHAM:  ALL THE ABOVE, YES.               01:51:47

6   Q    WHAT DOES IT RELATE TO?                         01:51:50

7        MR. BERMAN:  OBJECTION.  ASKED AND              01:51:51

8   ANSWERED.  SHE'S ALREADY SAID ALL THE WORK WAS WHAT  01:51:52

9   SHE SAID.                                            01:51:53

10       THE WITNESS:  BRATZ.                            01:51:56

11  BY MR. WICKHAM:                                      01:51:58

12  Q    THIS RELATED TO BRATZ AS WELL?                  01:51:58

13  A    LET ME MAKE SURE.  YES, IT IS FOR SURE.         01:52:00

14  Q    NOW, WHAT'S THE REFERENCE THERE TO              01:52:14

15  "[READING:]  SET OF COLOR SWATCHES AND               01:52:15

16  SPECIFICATIONS"?  WHAT DOES THAT MEAN?               01:52:17

17  A    THAT MEANS THAT I GAVE HIM A SET OF             01:52:24

18  SWATCHES TO MATCH THE COLORS OF WHAT'S USED ON A     01:52:28

19  BRATZ FACE.                                          01:52:33

20  Q    OKAY.  AND WHAT IS THE -- WHAT IS BELOW         01:52:35

21  THAT?                                                01:52:39

22  A    "[READING:]  LIP COLOR 'REDUE.'"                01:52:39

23  Q    OKAY.  AND WHAT DOES THAT REFER TO?             01:52:42

24  A    WELL, THAT MEANS HE ASKED FOR A SLIGHT          01:52:45

25  CHANGE IN LIP TONE.                                  01:52:50

115

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT _____ 66

PAGE _____ 1027

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1         MR. BERMAN:   OKAY.   THEN ASK HER THAT, WHAT        02:05:41
2   IS THE REFERENCE TO "BOOK #2" AT THE TOP.                 02:05:42
3         MR. WICKHAM:   I'VE ALREADY ASKED THAT              02:05:42
4   QUESTION.                                                 02:05:44
5         MR. BERMAN:   NO, NO, NO.   THE ONE AT THE          02:05:44
6   TOP.   THERE'S ONE AT THE VERY TOP.   DO YOU SEE?         02:05:44
7   THAT'S WHY THEY PUT IT THERE.   IT WAS CUT OFF.           02:05:46
8   BY MR. WICKHAM:                                           12:59:57
9     Q    WHAT IS THE REFERENCE TO "[READING:]   BOOK        02:05:50
10  #2"?                                                      02:05:51
11    A.   IT'S THE SECOND BOOK OF THE YEAR.                  02:05:51
12    Q    I'M SORRY?                                         02:05:53
13    A    SECOND BOOK THAT WAS FILLED UP.   LIKE I           02:05:54
14  START OUT WITH BOOK #1, AND THEN I GO TO BOOK #2 AND      02:05:56
15  THEN BOOK #3.                                             02:06:01
16        MR. BERMAN:   THAT'S WHY IT STARTS AT 51.           02:06:01
17  BY MR. WICKHAM:
18    Q    OKAY.   LET'S GO TO 0005.                          02:06:04
19        MR. BERMAN:   ONE SECOND.                           02:06:09
20        (MR. BERMAN CONFERS WITH THE WITNESS.)              01:57:38
21  BY MR. WICKHAM:
22    Q    IS ALL THE PRINTING AND HANDWRITING ON THIS        02:06:28
23  PAGE YOURS?                                               02:06:30
24    A    YES.                                               02:06:35
25    Q    CAN YOU TELL ME WHAT THIS RELATES TO?              02:06:36

126

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT _____ 66
PAGE _____ 1028

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1        MR. BERMAN:  OBJECT AS VAGUE AND AMBIGUOUS.    02:06:45

2        THE WITNESS:  I THINK BRATZ.                   02:07:02

3   BY MR. WICKHAM:

4    Q    WELL, WHAT ON THIS PAGE MAKES YOU THINK       02:07:03

5   THAT THIS RELATES TO BRATZ?                         02:07:05

6    A    BECAUSE THAT'S WHAT THEY'RE CALLING IT FROM   02:07:16

7   THE BEGINNING.                                      02:07:19

8    Q    THEY WERE CALLING BRATZ "ANGEL BLACK          02:07:19

9   FACES"?                                             02:07:24

10       MR. BERMAN:  I WOULD OBJECT.  ASSUMES FACTS     02:07:24

11  NOT IN EVIDENCE.  THERE'S THE WORD "ANGEL" ON ALL OF 02:07:27

12  THEM.                                               02:07:31

13       THE WITNESS:  IN THE BEGINNING, THAT'S WHAT    02:07:31

14  HE TOLD ME TO PUT DOWN.                             02:07:32

15  BY MR. WICKHAM:

16   Q    WHO?                                          02:07:34

17   A    CARTER.                                       02:07:36

18   Q    WELL, DOES THIS DOCUMENT IN FACT REFER TO     02:07:38

19  AN ANGEL FACE PROJECT WHERE YOU WERE DOING FACE     02:07:42

20  PAINTING FOR WHAT APPEAR TO BE AFRICAN-AMERICAN     02:07:46

21  DOLLS?                                              02:07:51

22       MR. BERMAN:  OBJECT AS VAGUE AND AMBIGUOUS.    02:07:51

23       THE WITNESS:  THERE'S BLACK BRATZ.             02:08:02

24  BY MR. WICKHAM:                                     02:08:04

25   Q    I'M JUST ASKING YOU ABOUT THIS INVOICE.       02:08:05

127

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ____66____

PAGE ____1029____