LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| 1 | A | OH, TELL ME THE QUESTION AGAIN. | 02:08:07 |
| 2 | | MR. WICKHAM:   REPORTER, PLEASE READ IT | 02:08:08 |
| 3 | BACK. | | 02:08:09 |
| 4 | | MR. BERMAN:   SHE ANSWERED THE QUESTION. | 02:08:10 |
| 5 | SORRY. | | 02:08:12 |
| 6 | | (PENDING QUESTION READ.) | 02:08:28 |
| 7 | | MR. BERMAN:   I'M GOING TO OBJECT.   IT'S -- | 02:08:28 |
| 8 | DID I OBJECT TO THAT IN THE BEGINNING? | | 02:08:29 |
| 9 | | (RECORD READ.) | 02:08:37 |
| 10 | | MR. BERMAN:   AND BEST EVIDENCE RULE AND | 02:08:38 |
| 11 | MISQUOTES THE DOCUMENT. | | 02:08:44 |
| 12 | | THE WITNESS:   YES. | 02:08:47 |
| 13 | BY MR. WICKHAM: | | 02:08:47 |
| 14 | Q | OKAY.   NOW, BENEATH THE REFERENCE TO | 02:08:50 |
| 15 | "[READING:]   ANGEL BLACK FACES," THERE'S A REFERENCE | | 02:08:55 |
| 16 | TO "LIPS ON ANOTHER B-L-K DOLL."   DO YOU SEE THAT | | 02:08:55 |
| 17 | THERE? | | 02:09:00 |
| 18 | A | UH-HUH. | 02:09:01 |
| 19 | Q | YOU HAVE TO ANSWER AUDIBLY. | 02:09:02 |
| 20 | A | WHAT? | 02:09:04 |
| 21 | Q | YOU HAVE TO ANSWER AUDIBLY. | 02:09:04 |
| 22 | A | OH, SORRY.   YES. | 02:09:05 |
| 23 | Q | DO YOU SEE THAT THERE? | 02:09:07 |
| 24 | A | YES. | 02:09:08 |
| 25 | Q | WHAT DOES THAT REFER TO? | 02:09:08 |

128

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 66
PAGE 1030

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | MS. TORRES:  I WILL GO MAKE SURE. | 02:11:03 |
| 2 | MR. BERMAN:  YEAH, JUST MAKE SURE THAT HE | 02:11:03 |
| 3 | DOESN'T. | 02:11:03 |
| 4 | MS. TORRES:  I KNOW WHY HE LEFT.  IT WASN'T | 02:11:06 |
| 5 | TO -- | 02:11:07 |
| 6 | MR. BERMAN:  OKAY.  ALL RIGHT. | 02:11:07 |
| 7 | MR. WICKHAM:  HE HAD ANOTHER MEETING IN MY | 02:11:07 |
| 8 | OFFICE. | 02:11:07 |
| 9 | MS. TORRES:  BUT THAT'S BESIDES THE POINT. | 02:11:07 |
| 10 | THIS IS HER WORK FOR HIS CLIENT. | 02:11:10 |
| 11 | MR. BERMAN:  I UNDERSTAND.  I UNDERSTAND. | 02:11:13 |
| 12 | BUT HER TESTIMONY ABOUT IT IS NOT HER WORK.  THE | 02:11:13 |
| 13 | DOCUMENT ITSELF HE CAN SHARE WITH HER BECAUSE WE | 02:11:17 |
| 14 | SUBMITTED IT TO YOU PREVIOUSLY.  HER TESTIMONY | 02:11:20 |
| 15 | RELATED TO IT CANNOT BE SHARED WITH ANYONE; OKAY? | 02:11:22 |
| 16 | MS. TORRES:  WHAT SHE WORKED ON AT M.G.A. | 02:11:27 |
| 17 | CAN'T BE SHARED WITH M.G.A.? | 02:11:29 |
| 18 | MR. BERMAN:  HER TESTIMONY ABOUT THAT IS | 02:11:31 |
| 19 | ATTORNEYS' EYES ONLY; OKAY? | 02:11:33 |
| 20 | MS. TORRES:  OKAY.  WE'LL DEAL WITH THAT. | 02:11:35 |
| 21 | MR. BERMAN:  LET'S JUST MAKE SURE -- | 02:11:36 |
| 22 | MS. TORRES:  I WILL GO MAKE SURE, BUT | 02:11:38 |
| 23 | THAT'S NOT WHY. | 02:11:39 |
| 24 | MR. BERMAN:  OKAY.  AND I'M GLAD TO HEAR | 02:11:40 |
| 25 | THAT, BUT, YOU KNOW, HE BOLTED OUT OF HERE.  I DON'T | 02:11:42 |

131

EXHIBIT ___66___

PAGE ___1031___

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | | |
|---|---|---|---|
| 1 | KNOW WHAT HE'S GOING TO DO. | | 02:11:45 |
| 2 | MS. TORRES:  NO, NO.  THAT'S FINE. | | 02:11:47 |
| 3 | BY MR. WICKHAM: | | |
| 4 | Q   DOES THIS INVOICE, 0004, REFER TO WORK THAT | | 02:11:48 |
| 5 | YOU DID IN SEPTEMBER OF 2000? | | 02:11:52 |
| 6 | A   YES. | | 02:11:57 |
| 7 | Q   OKAY.  AND THE REFERENCE THERE TO | | 02:11:59 |
| 8 | "[READING:]  REQUEST BY PAULA TRANTAFALES," DO YOU | | 02:12:00 |
| 9 | SEE THAT THERE? | | 02:12:03 |
| 10 | A   YES. | | 02:12:05 |
| 11 | Q   WHY DID YOU PUT THAT ON THIS INVOICE? | | 02:12:05 |
| 12 | A   PROBABLY BECAUSE SHE REQUESTED IT. | | 02:12:10 |
| 13 | Q   OKAY.  AND WHAT DOES THIS REFER TO?  WHAT | | 02:12:13 |
| 14 | WORK DID YOU DO IN CONNECTION WITH THIS INVOICE? | | 02:12:17 |
| 15 | A   WHAT DO YOU MEAN? | | 02:12:23 |
| 16 | Q   WHAT WORK WERE YOU SEEKING PAYMENT FOR IN | | 02:12:25 |
| 17 | CONNECTION WITH THIS INVOICE? | | 02:12:28 |
| 18 | MR. BERMAN:  OBJECTION.  IT'S VAGUE AND | | 02:12:30 |
| 19 | AMBIGUOUS. | | 02:12:30 |
| 20 | THE WITNESS:  BRATZ AGAIN. | | 02:12:39 |
| 21 | BY MR. WICKHAM: | | 06:59:57 |
| 22 | Q   AND WHAT ON THIS PAGE GIVES YOU ANY | | 02:12:40 |
| 23 | INDICATION THAT THIS REFERRED TO WORK ON BRATZ? | | 02:12:42 |
| 24 | MR. ZELLER:  OBJECTION AS TO FORM. | | 02:12:47 |
| 25 | THE WITNESS:  BECAUSE IN THOSE DAYS, THAT | | 02:12:50 |

132

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ___ 66

PAGE ___ 1032

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | EARLY ON, IT'S ALWAYS BRATZ, AND IT WAS CALLED ANGEL | 02:12:55 |
| 2 | FACES. | 02:13:00 |
| 3 | BY MR. WICKHAM: | 02:13:03 |
| 4 | Q    OKAY.  SO THE REFERENCE TO ANGEL FACES ON | 02:13:04 |
| 5 | THIS IS WHAT MAKES YOU BELIEVE THAT THIS REFERS TO | 02:13:06 |
| 6 | BRATZ? | 02:13:09 |
| 7 | MR. BERMAN:  I'M GOING TO OBJECT.  THAT | 02:13:10 |
| 8 | MISSTATES HER TESTIMONY.  SHE SAID HER WORK EARLY | 02:13:11 |
| 9 | ON. | 02:13:12 |
| 10 | MR. WICKHAM:  COUNSEL, LET THE WITNESS | 02:13:17 |
| 11 | TESTIFY. | 02:13:17 |
| 12 | THE WITNESS:  YES. | 02:13:17 |
| 13 | BY MR. WICKHAM: | |
| 14 | Q    WHAT ABOUT THE REFERENCE TO "ANGEL FACES" | 02:13:18 |
| 15 | ON THIS INVOICE MAKES YOU BELIEVE THAT THIS REFERS | 02:13:19 |
| 16 | TO BRATZ? | 02:13:22 |
| 17 | MR. BERMAN:  OBJECTION.  MISSTATES HER | 02:13:23 |
| 18 | TESTIMONY.  IT'S BEEN ASKED AND ANSWERED ALREADY. | 02:13:23 |
| 19 | THE WITNESS:  YES. | 02:13:27 |
| 20 | BY MR. WICKHAM: | |
| 21 | Q    OKAY.  LET'S GO TO 0003. | 02:13:34 |
| 22 | MR. BERMAN:  ONE SECOND. | 02:13:40 |
| 23 | (MR. BERMAN CONFERS WITH THE WITNESS.) | 01:57:38 |
| 24 | BY MR. WICKHAM: | 02:13:43 |
| 25 | Q    WHAT DOES THIS REFER TO?  STRIKE THAT.  LET | 02:13:58 |

133

EXHIBIT 66

PAGE 1033

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | ME ASK THE FOUNDATIONAL. | 02:14:01 |
| 2 | THE PRINTING AND HANDWRITING ON THIS PAGE, | 02:14:02 |
| 3 | IS THAT ALL YOUR PRINTING AND HANDWRITING? | 02:14:04 |
| 4 | A    YES. | 02:14:09 |
| 5 | Q    OKAY.  AND THE DATE ON IT, "[READING:] | 02:14:09 |
| 6 | SEPTEMBER 8, 2000," DO YOU SEE THAT THERE? | 02:14:14 |
| 7 | A    YES. | 02:14:19 |
| 8 | Q    DOES THIS REFER TO WORK THAT YOU PERFORMED | 02:14:19 |
| 9 | IN OR ABOUT SEPTEMBER 2000? | 02:14:22 |
| 10 | A    YES. | 02:14:27 |
| 11 | Q    OKAY.  AND THE REFERENCE HERE TO | 02:14:27 |
| 12 | "[READING:]  5 ANGEL FACES," DO YOU SEE THAT THERE? | 02:14:32 |
| 13 | A    YES. | 02:14:37 |
| 14 | Q    OKAY.  WHAT WORK DID YOU PERFORM THAT THIS | 02:14:38 |
| 15 | IS AN INVOICE THAT YOU WERE SEEKING PAYMENT FOR? | 02:14:42 |
| 16 | MR. BERMAN:  OBJECT.  IT'S VAGUE AND | 02:14:46 |
| 17 | AMBIGUOUS. | 02:14:46 |
| 18 | THE WITNESS:  BRATZ AGAIN. | 02:14:50 |
| 19 | BY MR. WICKHAM: | 02:14:50 |
| 20 | Q    OKAY.  BUT WHAT SPECIFIC WORK? | 02:14:51 |
| 21 | A    FACES. | 02:14:57 |
| 22 | Q    OKAY.  FACES ON WHAT WITH REGARD TO THIS | 02:14:57 |
| 23 | SPECIFIC ONE? | 02:15:00 |
| 24 | MR. BERMAN:  I'M GOING TO OBJECT.  IT'S | 02:15:01 |
| 25 | VAGUE. | 02:15:03 |

134

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT  66

PAGE  1054

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | YOU TO SEEK PAYMENT ON THIS INVOICE? | 02:16:29 |
| 2 | MR. BERMAN:  OBJECT.  IT'S VAGUE AND | 02:16:34 |
| 3 | AMBIGUOUS. | 02:16:35 |
| 4 | THE WITNESS:  A VINYL DOLL FACE. | 02:16:35 |
| 5 | BY MR. WICKHAM: | |
| 6 | Q    OKAY.  DO YOU HAVE A RECOLLECTION OF THIS? | 02:16:38 |
| 7 | A    I HAVE DONE SO MANY.  NO. | 02:16:42 |
| 8 | Q    OKAY.  WELL, DO YOU HAVE A RECOLLECTION | 02:16:45 |
| 9 | THAT ON OR ABOUT SEPTEMBER 8, 2000, THAT YOU HAD A | 02:16:48 |
| 10 | THREE-DIMENSIONAL DOLL HEAD AND THAT YOU PAINTED | 02:16:57 |
| 11 | BRATZ FACES ON THAT DOLL HEAD? | 02:17:01 |
| 12 | MR. BERMAN:  I'M GOING TO OBJECT TO THE | 02:17:06 |
| 13 | QUESTION AS VAGUE AND AMBIGUOUS. | 02:17:07 |
| 14 | THE WITNESS:  ARE YOU ASKING ME IF I | 02:17:11 |
| 15 | REMEMBER PAINTING THAT DAY, LIKE THAT DAY? | 02:17:13 |
| 16 | MR. BERMAN:  YEAH.  THAT'S, I THINK, WHAT | 02:17:19 |
| 17 | THE SENSE OF THE QUESTION IS.  THAT'S WHY I THOUGHT | 02:17:19 |
| 18 | IT WAS VAGUE AND AMBIGUOUS. | 02:17:21 |
| 19 | BY MR. WICKHAM: | |
| 20 | Q    YOU'VE GOT AN INVOICE, SEPTEMBER 8, 2000; | 02:17:23 |
| 21 | RIGHT? | 02:17:24 |
| 22 | A    RIGHT. | 02:17:25 |
| 23 | Q    DO YOU INVOICE -- DO YOU SEND INVOICES | 02:17:25 |
| 24 | BEFORE YOU DO THE WORK OR AFTER YOU DO THE WORK? | 02:17:29 |
| 25 | A    THE DAY I TURN IT IN.  THE DAY IT'S DUE. | 02:17:33 |

137

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT __66__

PAGE __1035__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | Q    OKAY.  SO AFTER YOU'VE COMPLETED THE WORK | 02:17:38 |
| 2 | AND YOU TURN IN THE WORK, YOU TURN IN THE WORK -- | 02:17:43 |
| 3 | A    UH-HUH. | 02:17:47 |
| 4 | MR. BERMAN:  IS THAT YES? | 02:17:48 |
| 5 | THE WITNESS:  YES. | 02:17:49 |
| 6 | BY MR. WICKHAM: | 03:59:57 |
| 7 | Q    -- ALONG WITH AN INVOICE; YES? | 02:17:49 |
| 8 | A    YES. | 02:17:54 |
| 9 | Q    OKAY.  SO BY SEPTEMBER 8, 2000, YOU HAD | 02:17:54 |
| 10 | COMPLETED THE WORK THAT RELATES TO THIS INVOICE; | 02:17:59 |
| 11 | CORRECT? | 02:18:01 |
| 12 | A    CORRECT. | 02:18:05 |
| 13 | Q    OKAY.  BY SEPTEMBER 8, 2000, YOU HAD | 02:18:06 |
| 14 | CREATED FIVE FACE PAINTINGS ON THREE-DIMENSIONAL | 02:18:09 |
| 15 | DOLL HEADS? | 02:18:18 |
| 16 | A    YES. | 02:18:20 |
| 17 | Q    AND YOU BELIEVE THAT THIS REFERENCE TO | 02:18:22 |
| 18 | "[READING:]  5 ANGEL FACES" REFERS TO FIVE BRATZ | 02:18:23 |
| 19 | FACES THAT YOU PAINTED ON THREE-DIMENSIONAL DOLL | 02:18:29 |
| 20 | HEADS SOMETIME ON OR BEFORE SEPTEMBER 8, 2000; IS | 02:18:31 |
| 21 | THAT CORRECT? | 02:18:36 |
| 22 | A    CORRECT. | 02:18:37 |
| 23 | Q    COULD YOU BE MISTAKEN ABOUT THAT? | 02:18:39 |
| 24 | MR. ZELLER:  OBJECT TO THE FORM. | 02:18:43 |
| 25 | MR. BERMAN:  ME, TOO. | 02:18:44 |

138

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT _66_

PAGE _1036_

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | THE WITNESS:  NO.  IT CAN'T BE. | 02:18:44 |
| 2 | BY MR. WICKHAM: | |
| 3 | Q    WHAT WERE THE SIZE OF THESE DOLL HEADS? | 02:18:48 |
| 4 | A    (INDICATING.) | 02:18:56 |
| 5 | Q    THE COURT REPORTER CAN'T MEASURE THAT. | 02:18:57 |
| 6 | MR. BERMAN:  WELL, SHE PROBABLY CAN | 02:19:01 |
| 7 | DESCRIBE THAT, BUT -- | 02:19:04 |
| 8 | BY MR. WICKHAM: | |
| 9 | Q    WERE THEY THE SIZE OF A GRAPEFRUIT OR THE | 02:19:06 |
| 10 | SIZE OF AN ORANGE OR THE SIZE OF A LIME? | 02:19:08 |
| 11 | MR. BERMAN:  I'M GOING TO OBJECT.  THAT'S | 02:19:16 |
| 12 | VAGUE AND AMBIGUOUS. | 02:19:17 |
| 13 | THE WITNESS:  IT'S NOT ANY SMALLER THAN A | 02:19:17 |
| 14 | LIME, DEPENDING ON THE SIZE OF THE LIME.  A SMALL | 02:19:18 |
| 15 | LIME. | 02:19:21 |
| 16 | BY MR. WICKHAM: | |
| 17 | Q    WHAT WAS THE MATERIAL THAT THE DOLL HEADS | 02:19:24 |
| 18 | WERE MADE OUT OF, IF YOU RECALL? | 02:19:26 |
| 19 | MR. ZELLER:  ARE YOU TALKING ABOUT THIS | 02:19:29 |
| 20 | PARTICULAR OCCASION? | 02:19:30 |
| 21 | MR. WICKHAM:  YES. | 02:19:32 |
| 22 | MR. BERMAN:  OBJECT AS ASKED AND ANSWERED. | 02:19:35 |
| 23 | THE WITNESS:  VINYL. | 02:19:47 |
| 24 | BY MR. WICKHAM: | |
| 25 | Q    OKAY.  SOME SORT OF A PLASTIC MATERIAL? | 02:19:50 |

139

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT 66

PAGE 1037

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1          MR. BERMAN:  SORRY.                           04:11:25

2    BY MR. WICKHAM:

3      Q    SO THIS REFERS TO, ONCE AGAIN, THAT JUMP     04:11:28

4    ROPE DOLL, BUT THIS REFERS TO A BLACK JUMP ROPE     04:11:30

5    DOLL; YES?                                          04:11:34

6      A    YES, YES.                                    04:11:35

7      Q    OKAY.  SO THIS IS AT LEAST ONE OF THE        04:11:38

8    DOLLS, NON-BRATZ DOLLS, THAT YOU WERE WORKING ON    04:11:42

9    THAT WAS A BLACK DOLL; RIGHT?                       04:11:45

10     A    RIGHT.                                       04:11:48

11     Q    WERE THERE OTHER BRANDS OF DOLLS OR, YOU     04:11:49

12   KNOW, TYPES OF DOLLS BESIDES BRATZ AND BESIDES JUMP 04:11:53

13   ROPE DOLL THAT HAD AMONG THE DOLLS A BLACK DOLL THAT 04:12:00

14   YOU WORKED ON?                                      04:12:06

15         MR. BERMAN:  I'M GOING TO OBJECT AS IT'S      04:12:07

16   UNINTELLIGIBLE.                                     04:12:10

17         THE WITNESS:  ARE YOU SAYING WERE THERE       04:12:11

18   OTHER BRANDS OF --                                  04:12:12

19         MR. BERMAN:  NO, NO, NO.  IF YOU DON'T        04:12:15

20   UNDERSTAND THE QUESTION, JUST ASK FOR HIM TO        04:12:15

21   REPHRASE IT.                                        04:12:16

22   BY MR. WICKHAM:

23     Q    DO YOU UNDERSTAND THE QUESTION?              04:12:16

24     A    NO.                                          04:12:18

25     Q    OKAY.  YOU WORKED ON BRATZ DOLLS THAT AMONG  04:12:18

                                                         201

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ____ 66

PAGE ____ 1038

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | THE CAST OF DOLLS THERE WAS A BLACK DOLL; YES? | 04:12:23 |
| 2 | A    YES. | 04:12:27 |
| 3 | Q    OKAY.  AND THEN YOU HAVE A REFERENCE IN | 04:12:27 |
| 4 | YOUR INVOICE HERE TO A JUMP ROPE DOLL THAT'S BLACK; | 04:12:29 |
| 5 | RIGHT? | 04:12:32 |
| 6 | A    RIGHT. | 04:12:34 |
| 7 | Q    OKAY.  BESIDES BRATZ AND BESIDES JUMP ROPE | 04:12:35 |
| 8 | DOLLS, WERE THERE ANY OTHER DOLLS YOU WORKED ON IN | 04:12:38 |
| 9 | SERVICES FOR M.G.A. THAT WERE BLACK? | 04:12:40 |
| 10 | A    YES. | 04:12:46 |
| 11 | Q    OKAY.  HOW MANY OTHER TYPES OF DOLLS WERE | 04:12:46 |
| 12 | BLACK? | 04:12:50 |
| 13 | A    I DON'T REMEMBER THE EXACT AMOUNT. | 04:12:55 |
| 14 | Q    DO YOU REMEMBER WHETHER ANY OF THE PRAYER | 04:12:57 |
| 15 | ANGEL DOLLS HAD COME OUT AS BEING BLACK OR | 04:13:00 |
| 16 | AFRICAN-AMERICAN? | 04:13:06 |
| 17 | MR. ZELLER:  OBJECTION.  LACKS FOUNDATION | 04:13:08 |
| 18 | WHEN YOU SAY "COME OUT." | 04:13:08 |
| 19 | BY MR. WICKHAM: | 04:13:10 |
| 20 | Q    CAME TO MARKET. | 04:13:11 |
| 21 | A    YES, THERE WAS. | 04:13:13 |
| 22 | Q    WHEN WAS THE VERY FIRST TIME THAT | 04:13:21 |
| 23 | MR. BRYANT HAD EVER APPROACHED YOU ABOUT WORKING ON | 04:13:22 |
| 24 | ANY SORT OF A DOLL PROJECT? | 04:13:28 |
| 25 | MR. BERMAN:  I'M GOING TO OBJECT BECAUSE | 04:13:31 |

202

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ___ 46

PAGE ___ 1039

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| | | |
|---|---|---|
| 1 | THAT'S VAGUE AND AMBIGUOUS. | 04:13:33 |
| 2 | MR. ZELLER:  ARE YOU TALKING ABOUT WITH | 04:13:41 |
| 3 | RESPECT TO NON-MATTEL WORK? | 04:13:43 |
| 4 | THE WITNESS:  HE CAME TO ME? | 04:13:48 |
| 5 | BY MR. WICKHAM: | |
| 6 | Q    YEAH.  LET ME CLARIFY.  AT ANY POINT IN | 04:13:49 |
| 7 | TIME, DID MR. BRYANT EVER ASK YOU TO DO ANY FACE | 04:13:51 |
| 8 | PAINTING FOR A MATTEL DOLL? | 04:13:56 |
| 9 | A    YES. | 04:14:07 |
| 10 | Q    OKAY.  HOW MANY MATTEL DOLLS DID MR. BRYANT | 04:14:07 |
| 11 | ASK YOU TO DO FACE PAINTING FOR? | 04:14:10 |
| 12 | A    I DON'T REMEMBER. | 04:14:16 |
| 13 | Q    WHICH MATTEL DOLLS DID MR. BRYANT ASK YOU | 04:14:18 |
| 14 | TO DO FACE PAINTING FOR? | 04:14:20 |
| 15 | A    ONLY ONE I SPECIFICALLY REMEMBER WAS THE | 04:14:26 |
| 16 | ONE WHERE THEY WERE WEARING SKI CLOTHES WITH SKI | 04:14:30 |
| 17 | HATS AND STUFF. | 04:14:34 |
| 18 | Q    OKAY.  THAT'S THE -- | 04:14:36 |
| 19 | A    -- THE BARBIE AND SKIPPER THINGY.  OKAY. | 04:14:36 |
| 20 | MR. BERMAN:  SKI BARBIE. | 04:14:40 |
| 21 | BY MR. WICKHAM: | |
| 22 | Q    THAT'S THE ONLY ONE YOU REMEMBER? | 04:14:42 |
| 23 | A    THAT'S THE ONLY ONE I REMEMBER. | 04:14:43 |
| 24 | Q    OKAY.  BESIDES -- STRIKE THAT. | 04:14:47 |
| 25 | AS TO NON-MATTEL DOLLS, WHEN WAS THE VERY | 04:14:51 |

203

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ___66___

PAGE ___1040___

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1   FIRST TIME THAT MR. BRYANT CAME TO YOU AND ASKED YOU      04:14:55

2   TO DO WORK ON A NON-MATTEL DOLL?                          04:14:57

3       A    I WAS OVER AT HIS HOUSE, AND HE TOLD ME          04:15:00

4   THAT HE WAS INVENTING --                                 04:15:05

5            MR. BERMAN:  OKAY.  I'M SORRY.  I DON'T          04:15:08

6   MEAN TO CUT YOU OFF, BUT HE ASKED YOU WHEN, NOT WHAT      04:15:10

7   DID HE DO.                                               04:15:12

8            THE WITNESS:  OH, I DON'T REMEMBER THE           04:15:14

9   DATE.  I DON'T REMEMBER.                                 04:15:14

10  BY MR. WICKHAM:

11      Q    WHICH HOUSE WERE YOU AT?                        04:15:19

12      A    HIS HOUSE.                                      04:15:22

13      Q    WHICH HOUSE?                                    04:15:23

14      A    SORRY.  THE SMALL COTTAGE ONE.                  04:15:24

15      Q    AND AT THAT TIME WHO WAS HIS ROOMMATE?          04:15:34

16      A    RICHARD ERMINE.                                 04:15:37

17      Q    DID HE HAVE ANY OTHER ROOMMATES AT THAT         04:15:40

18  TIME?                                                    04:15:42

19      A    NO.                                             04:15:47

20           MR. BERMAN:  SHE SAID "NO."                     04:15:50

21  BY MR. WICKHAM:                                          04:15:50

22      Q    WAS ELISE LIVING IN THAT HOUSE AT THAT          04:15:52

23  TIME?                                                    04:15:54

24      A    NO.                                             04:15:57

25      Q    OKAY.  AND YOU WERE AT MR. BRYANT'S SMALL       04:16:01

                                                              204

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ___ 66

PAGE ___ 1041

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

| 1 | COTTAGE HOUSE, AND YOU HAD A DISCUSSION ABOUT | 04:16:04 |
| 2 | WORKING ON A NON-MATTEL DOLL; IS THAT CORRECT? | 04:16:10 |
| 3 | A    YES. | 04:16:17 |
| 4 | Q    OKAY.  WHO WAS THERE BESIDES YOURSELF AND | 04:16:18 |
| 5 | MR. BRYANT? | 04:16:20 |
| 6 | A    I DON'T REMEMBER IF RICHARD WAS THERE OR | 04:16:27 |
| 7 | NOT. | 04:16:28 |
| 8 | Q    OKAY.  WAS THERE ANYONE ELSE BESIDES | 04:16:32 |
| 9 | YOURSELF, CARTER, AND POSSIBLY MR. ERMINE? | 04:16:33 |
| 10 | MR. BERMAN:  I'M MR. BERMAN.  I WAS NOT | 04:16:37 |
| 11 | THERE. | 04:16:39 |
| 12 | MR. WICKHAM:  ERMINE. | 04:16:40 |
| 13 | MR. BERMAN:  I'M SORRY. | 04:16:43 |
| 14 | MR. ZELLER:  YOU CATEGORICALLY DENY THAT? | 04:16:43 |
| 15 | THE WITNESS:  NO. | 04:16:43 |
| 16 | MR. BERMAN:  AND IF IT WAS ME, I SHOULDN'T | 04:16:43 |
| 17 | HAVE BEEN THERE. | 04:16:43 |
| 18 | BY MR. WICKHAM: | 04:16:43 |
| 19 | Q    WAS ANYONE ELSE PRESENT? | 04:16:46 |
| 20 | A    NO ONE ELSE. | 04:16:47 |
| 21 | Q    WHERE IN THE HOUSE WERE YOU AND MR. BRYANT? | 04:16:48 |
| 22 | A    LIVING ROOM. | 04:16:56 |
| 23 | Q    AND HOW DID THE SUBJECT COME UP? | 04:16:57 |
| 24 | A    HE BROUGHT IT UP. | 04:17:03 |
| 25 | Q    AND WHAT DID HE SAY? | 04:17:06 |

205

CONFIDENTIAL TRANSCRIPT - VOLUME I

EXHIBIT ___66___

PAGE __1042__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1

2

3                    WITNESS'S CERTIFICATE

4

5

6

7          I AM THE WITNESS IN THE FOREGOING

8    DEPOSITION.  I HAVE READ THE FOREGOING DEPOSITION

9    AND HAVING MADE SUCH CHANGES AND CORRECTIONS AS I

10   DESIRE, I CERTIFY THAT THE SAME IS TRUE OF MY OWN

11   KNOWLEDGE, EXCEPT AS TO THOSE MATTERS WHICH ARE

12   THEREIN STATED UPON MY INFORMATION OR BELIEF, AND AS

13   TO THOSE MATTERS, I BELIEVE IT TO BE TRUE.

14          I DECLARE UNDER PENALTY OF PERJURY UNDER

15   THE LAWS OF THE STATE OF CALIFORNIA THAT THE

16   FOREGOING IS TRUE AND CORRECT.

17          EXECUTED ON _____,

18   AT _____.

19

20

21

22          _____
                           ANNA RHEE
23

24

25

                                                      233
EXHIBIT 66
PAGE 1043

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4          I, KAREN E. KAY, C.S.R. NO. 3862, A CERTIFIED

 5   SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA,

 6   DO HEREBY CERTIFY:

 7          THAT PRIOR TO BEING EXAMINED THE WITNESS NAMED

 8   IN THE FOREGOING PROCEEDINGS WAS BY ME DULY SWORN TO

 9   TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

10   THE TRUTH;

11          THAT SAID PROCEEDINGS WERE TAKEN BY ME IN

12   SHORTHAND AT THE TIME AND PLACE HEREIN NAMED AND WAS

13   THEREAFTER TRANSCRIBED INTO TYPEWRITING UNDER MY

14   DIRECTION, SAID TRANSCRIPT BEING A TRUE AND CORRECT

15   TRANSCRIPTION OF MY SHORTHAND NOTES.

16          I FURTHER CERTIFY THAT I HAVE NO INTEREST IN

17   THE OUTCOME OF THIS ACTION.

18

19

20                    FEBRUARY 7, 2005

21

22

23                    KAREN E. KAY
                      C.S.R. NO. 3862
24

25
```

234

EXHIBIT ____64____

PAGE ____1044____

**EXHIBIT 67**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware Corporation,

        Plaintiff,

      vs.          NO. CV 04-9059 NM (RJBx)

CARTER BRYANT, an individual, and
DOES 1 through 10, Inclusive.

        Defendants.

_____

CARTER BRYANT, on behalf of himself,
all present and former employees of
Mattel, Inc., and the general public.

        Cross-Complaint.

      vs.

MATTEL, INC.,
a Delaware corporation.

        Cross-Defendant.

_____

**CERTIFIED COPY**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPOSITION OF PAULA GARCIA

Thursday, May 24, 2007

Los Angeles, California

VOLUME 1

Reported by:
DAVID OCANAS
CSR No. 12567

JOB NO. 66418

EXHIBIT 67

PAGE 1045

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MATTEL, INC., a Delaware Corporation,

 5                  Plaintiff,

 6            vs.            NO. CV 04-9059 NM (RJBx)

 7   CARTER BRYANT, an individual, and
     DOES 1 through 10, Inclusive.
 8
                  Defendants.
 9
     _____
     CARTER BRYANT, on behalf of himself,
10   all present and former employees of
     Mattel, Inc., and the general public.
11
                  Cross-Complaint.
12
            vs.
13
     MATTEL, INC.,
14   a Delaware corporation.

15                Cross-Defendant.

16   _____

17

18        Videotaped Deposition of PAULA GARCIA,

19   Volume 1, taken on behalf of Plaintiff and

20   Cross-Defendant, at 865 South Figueroa Street,

21   Tenth Floor, Los Angeles, California, beginning at

22   10:18 a.m. and ending at 7:08 p.m. on Thursday, May

23   24, 2007 before David Ocanas, Certified Shorthand

24   Reporter No. 12567.
                              EXHIBIT _____ 67
25
                              PAGE _____ 1046
```

```
 1    APPEARANCES:
 2
 3    For Mattel:
 4           QUINN, EMANUEL, URQUHART, OLIVER &
              HEDGES, LLP
 5           BY:  BRIDGET MORRIS
              Attorney at Law
 6           865 South Figueroa Street
              Tenth Floor
 7           Los Angeles, California 90017
              213-624-7707
 8           E-mail:  Michaelzeller@quinnemanuel.com
                      bridgetmorris@quinnemanuel.com
 9
      For MGA Entertainment:
10
              O'MELVENY & MYERS LLP
11           BY:  DIANA M. TORRES
              Attorney at Law
12           400 South Hope Street
              Los Angeles, California 90071-2899
13           (213) 430-6000
              E-mail:  Dtorres@omm.com
14
      For Carter Bryant:
15
              KEKER & VAN NEST
16           BY:  MICHAEL H. PAGE
              Attorney at Law
17           710 Sansome Street
              San Francisco, California 94111-1704
18           (415) 397-7188
              E-mail:  Mhp@kvn.com
19
      Also Present:
20
              MICHAEL MOORE, Mattel
21           JILL THOMAS, Mattel
               DAPHNE GRONICH, MGA Entertainment
22           CRAIG HOLDEN, MGA Entertainment
23
24                           EXHIBIT ___67___
25
                             PAGE ___1047___
```

```
 1    APPEARANCES:  (CONT'D)

 2

 3    Videographer:

 4            CHARLIE GUILLEN
              SARNOFF COURT REPORTERS
 5            AND LEGAL TECHNOLOGIES
              20 Corporate Park
 6            Irvine, California 92606
              (877) 955-3855
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                              EXHIBIT __67__

25                              PAGE __1048__
```

```
 1    MGA on this subject, how it is that Carter Bryant

 2    came to work for or with MGA?

 3              MS. TORRES:  Objection, vague, calls for a

 4    narrative and compound.

17:32 5              Go ahead.

 6              THE WITNESS:  Can you please rephrase your

 7    question?

 8    BY MR. ZELLER:

 9         Q    Sure.

17:32 10              How did Carter Bryant come to work with

11    MGA?

12              MS. TORRES:  Same objections.

13              THE WITNESS:  He came to work with MGA on

14    MGA's fashion doll.

17:32 15    BY MR. ZELLER:

16         Q    Who is the person at MGA who had the very

17    first contact with Carter Bryant regarding Bratz?

18         A    I cannot name one single person.

19         Q    Please tell me all the people who had all

17:33 20    the initial first contact with Carter Bryant

21    regarding Bratz there at MGA?

22         A    It was myself, Victoria O'Connor, Isaac

23    Larian.

24         Q    And that contact that you're referring to

17:33 25    is this meeting notice that we have marked as
```

EXHIBIT ___67___

PAGE ___1049___                          242

PAULA GARCIA, V. 1                                05/24/07
CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    Exhibit 301 or was the meeting that's reflected in

 2    this notice?

 3         A    Yes.

 4         Q    And Mr. Larian was there?

17:33 5    A    Yes.

 6         Q    And Victoria O'Connor was there?

 7         A    Yes.

 8         Q    You were there and Carter Bryant was

 9    there, right?

17:33 10   A    Yes.

11         Q    Was anyone else present?

12         A    Yes.

13         Q    Who else?

14         A    Veronica Marlow was present and Isaac's

17:34 15   daughter, Jasmine Larian.

16         Q    Anyone else?

17         A    No.

18         Q    And is that the first time that you ever

19    laid eyes on Carter Bryant, was at that meeting on

17:34 20   September 1st, 2000?

21         A    Yes.

22         Q    Had you had any kind of contact with

23    Mr. Bryant prior to this meeting, whether it was by

24    e-mail by phone or in any other way?

17:34 25   A    Yes.
```

EXHIBIT _____ 67

PAGE _____ 1050

243

1      Q      What contact did you have with Mr. Bryant

2    prior to this meeting?

3      A      I received an e-mail from Carter Bryant.

4      Q      When did you receive the e-mail?

17:34 5      A      I don't remember the exact date.

6      Q      What was the approximate date?

7      A      Approximately end of August, 2000.

8      Q      What did the e-mail say?

9      A      I don't remember what the e-mail said, but

17:35 10   I remember that it included attachments.

11      Q      And did those attachments include things

12    that related to Bratz in some way?

13      A      No.

14      Q      What did the attachments include?

17:35 15      A      The attachments were drawings.

16      Q      And they were drawings of what?

17      A      They were I-Explorations, I-Sketches that

18    Carter was submitting as concept that could be

19    implemented on MGA's Prayer Angel dolls.

17:36 20      Q      So these were sketches or drawings for

21    potential use on the Prayer Angel dolls?

22      A      Yes.

23      Q      And how is it that you knew that?

24             MS. TORRES:  Objection, vague.

17:36 25             THE WITNESS:  I don't understand.

EXHIBIT ___67___

BY MR. ZELLER:

1

2    Q    Did the e-mail say it was for Prayer

3    Angels?

4    A    I don't remember.

17:36 5    Q    Did you recognize the drawings as being

6    drawings for Prayer Angels?

7    A    Yes.

8    Q    Did you have an understanding as -- let me

9    ask it this way.

17:36 10        Was that e-mail that you received from

11   Carter Bryant the very first contact that you had

12   with him of any kind?

13   A    Yes.

14   Q    And so you received this e-mail from

17:37 15   Mr. Bryant.

16        Had you been expecting it?

17   A    Yes.

18   Q    And how is it that you had come to expect

19   this e-mail from Mr. Bryant?

17:37 20   A    Veronica Marlow recommended that Carter

21   Bryant take a shot at drawing some I-Concepts for

22   the Prayer Angel dolls.

23   Q    Veronica Marlow had recommended that to

24   you?

17:37 25   A    Yes.

EXHIBIT _____ 67

PAGE _____ 1052

245

1       Q    When did Veronica Marlow recommend that to

2   you?

3       A    I don't remember.

4       Q    Was it sometime after that conversation

17:38  5   you had with her on the way to the photo shoot that

6   you described earlier?

7       A    Yes, I believe so, yes.

8       Q    How is it, by your understanding, Veronica

9   Marlow came to recommend to you that Carter Bryant

17:38 10   take a shot at drawing Prayer Angel concepts?

11       A    Given that Veronica was very involved in

12   Prayer Angel doll, she was aware that I had not

13   identified I-Designs I had -- I found appropriate

14   for the concept.

17:38 15       Q    As of the time that you received this

16   e-mail that you mentioned from Carter Bryant at the

17   end of August 2000, had anyone else worked up

18   I-Designs for Prayer Angels, or were those the

19   first ones?

17:39 20       A    Yes.

21       Q    Someone worked on them before?

22            MS. TORRES:  Objection, compound.

23            THE WITNESS:  I believe that others had

24   attempted I-Designs prior.   EXHIBIT _____ 67

17:39 25   BY MR. ZELLER:

                              PAGE _____ 1053

246

```
 1   2000, right?

 2        A    Yes.

 3        Q    Mr. Bryant was present at this meeting,

 4   correct?

18:31 5        A    Yes.

 6        Q    He showed you what you understood to be a

 7   concept, at a minimum, for a doll, correct?

 8        A    Yes.

 9        Q    In fact, it was your understanding that

18:31 10   the purpose of this meeting was for Mr. Bryant to

11   present to you a doll concept, correct?

12        A    Yes.

13        Q    And in the course of that, he showed you

14   large colored drawings of what you understood to be

18:32 15   representations of dolls; isn't that true?

16             MS. TORRES:  Objection, vague, misstates

17   the witness' testimony.

18             THE WITNESS:  I remember them to be 2-D

19   references for a style or an attitude that could

18:32 20   potentially be dolls.

21   BY MR. ZELLER:

22        Q    Didn't Mr. Bryant and Veronica Marlow

23   express to you and the others in that meeting an

24   interest that these drawings be a reference for

18:32 25   dolls?
```

EXHIBIT ____ 67 ____

PAGE ____ 1054 ____

270

```
 1          A    Yes.

 2          Q    At some point during the meeting, you

 3     became aware that Mr. Bryant was at that time

 4     employed by Mattel; isn't that correct?

18:33 5              MS. TORRES:  Objection.

 6              THE WITNESS:  No, that's not correct.

 7     BY MR. ZELLER:

 8          Q    You knew before the meeting that

 9     Mr. Bryant was employed by Mattel; is that true?

18:33 10              MS. TORRES:  Objection, vague.

11              At the time of the meeting?

12              MR. ZELLER:  Yes, before the meeting.

13              THE WITNESS:  Was currently at Mattel?

14     BY MR. ZELLER:

18:33 15          Q    Was at the time that you learned about it

16     at Mattel?

17          A    I don't remember knowing that information.

18          Q    Is it the case -- let me try it this way.

19              At some point, did you become aware that

18:33 20     Carter Bryant was, as of September 1, 2000 when you

21     had this meeting, at that point, employed by

22     Mattel?

23          A    Yes.

24          Q    When did you first become aware of that?

18:34 25          A    My memory is three years ago.
```

EXHIBIT 67

PAGE 1055

271

```
    1          Q    So sometime in 2004?

    2          A    Approximately, yes.

    3          Q    This was -- is this after Mattel brought

    4    this lawsuit?

18:34 5        A    I'm not sure when Mattel brought the

    6    lawsuit.

    7          Q    I will represent to you that the lawsuit,

    8    in its initial stage, was filed in April of 2004.

    9               Are you able to tell me whether you knew

18:34 10   about Mr. Bryant being employed by Mattel as of

    11   September 19, 2000, before or after the lawsuit?

    12         A    I can't be sure.

    13         Q    I assume, at some point, you learned that

    14   Mattel had filed the lawsuit; is that correct?

18:35 15       A    Yes.

    16         Q    It's your expectation that you knew about

    17   it soon after it was filed; is that true?

    18         A    I don't know if I was advised soon after.

    19              I don't know.

18:35 20       Q    You would expect that you knew at sometime

    21   in 2004, which was the year that it was filed; is

    22   that true?                EXHIBIT ____ 67

    23         A    I believe so.   PAGE ____ 1056

    24         Q    Did you, at some point, learn that Carter

18:35 25   Bryant was being deposed in this case?
```

                                                              272

1        A    Sorry, could you repeat the question?

2        Q    At some point, did you learn that Carter

3    Bryant was going to have his deposition taken in

4    this case?

18:35  5        A    No.

6        Q    How is it that you learned that Carter

7    Bryant was employed by Mattel as of the time that

8    he had had this meeting with you and others that

9    you reference as occurring on September 19, 2000?

18:36 10            MS. TORRES:  I object and instruct the

11   witness not to answer if her answer involves

12   communications with counsel.

13            THE WITNESS:  Then I can't answer the

14   question.

18:36 15            (Instruction not to answer.)

16   BY MR. ZELLER:

17       Q    You don't have any information other than

18   what the lawyers conveyed to you?

19       A    No.

18:36 20       Q    What facts did the lawyers tell you about

21   Mr. Bryant's employment status as of September 1,

22   2000?

23            MS. TORRES:  I object and instruct the

24   witness not to answer on the grounds of

18:36 25   attorney-client privilege.

EXHIBIT _____ 67

PAGE _____ 1057

273

```
 1            (Instruction not to answer.)
 2            THE WITNESS:  I can't answer the question.
 3     BY MR. ZELLER:
 4        Q    Did the lawyers tell you whether or not
18:36 5   Mr. Bryant was employed by Mattel as of September
 6     1st, 2000?
 7            MS. TORRES:  Same objections, same
 8     instruction.
 9            (Instruction not to answer.)
18:36 10          THE WITNESS:  I can't answer the question.
11     BY MR. ZELLER:
12        Q    Because of the instruction?
13        A    Yes.
14        Q    What facts are you aware of from any
18:36 15   source as to whether or not Mr. Bryant was still
16     working for Mattel as of September 1st, 2000?
17            MS. TORRES:  I am going to caution the
18     witness not to disclose attorney-client
19     communications.
18:37 20          If you can answer that otherwise, go
21     ahead.
22            THE WITNESS:  Then I can't
23            (Instruction not to answer.)
24            MR. PAGE:  I pose an objection as to form.
18:37 25          THE WITNESS:  I can't answer the question.
```

EXHIBIT ____ 67
PAGE ____ 1058

274

```
 1            MR. ZELLER:  Because of the instruction?
 2            THE WITNESS:  Yes.
 3    BY MR. ZELLER:
 4       Q   Is that particular fact regarding whether
18:37 5  or not Mr. Bryant was employed by Mattel something
 6    you have discussed with lawyers?
 7            MS. TORRES:  Objection.  I'm instructing
 8    the witness not to answer, because it will require
 9    attorney-client communications.
18:37 10           (Instruction not to answer.)
11            THE WITNESS:  Then I cannot answer the
12    question.
13            MR. ZELLER:  Because of the instruction?
14            THE WITNESS:  Yes.
18:37 15  BY MR. ZELLER:
16       Q   Is it your best recollection that prior to
17    October -- I'll rephrase that.
18            Is it your best recollection that prior to
19    April of 2004, you were unaware that Mr. Bryant had
18:38 20  been employed by Mattel as of September 19, 2000?
21            MR. PAGE:  Objection, compound.
22            THE WITNESS:  Yes.   EXHIBIT ____ 67
23    BY MR. ZELLER:
                                    PAGE ____ 1059
24       Q   Did you at any time prior to June of 2001
18:38 25  ever learn or hear from any source that Mr. Bryant
```

275

PAULA GARCIA, V. 1                          05/24/07
CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    had ever been employed by Mattel?
 2              MS. TORRES:  Objection, asked and
 3    answered.
 4              MR. ZELLER:  This is a different question
18:38 5    just to be clear.
 6              I'm not asking as of -- whether you knew
 7    it as of that time or whether he was employed by
 8    Mattel during a particular time period.
 9              I'm trying to find out now more generally.
18:39 10             At any time prior to June 2001, had you
11    known that Carter Bryant had worked for Mattel at
12    some point in his career?
13              MS. TORRES:  Same objection.  Asked and
14    answered.
18:39 15             THE WITNESS:  Yes.
16    BY MR. ZELLER:
17        Q   How did you come to learn that Mr. Bryant,
18    at some point, had some affiliation or worked for
19    Mattel?
18:39 20       A   I don't remember the exact date.
21        Q   My question isn't necessarily the date.
22              I'm trying to find out how you learned
23    that.
24              MS. TORRES:  Objection, asked and
18:39 25    answered.
```

EXHIBIT _____ 6 Y

PAGE _____ 1060

276

PAULA GARCIA, V. 1                                      05/24/07
CONFIDENTIAL ATTORNEYS' EYES ONLY

1
2
3
4
5
6
7
8               I, PAULA GARCIA, do hereby
9    declare under penalty of perjury that I have read
10   the foregoing transcript; that I have made any
11   corrections as noted herein, in ink, initialed by
12   me, or attached hereto; that my testimony as
13   contained herein, as corrected, is true and
14   correct.
15               Executed this _____ day of _____,
16   2007, at _____, _____.
17                    (City)                (State)
18
19
20               _____
21               PAULA GARCIA
22               Volume 1
23
24                         EXHIBIT ____ 6 7
25
                           PAGE ____ 1061

                                                            298

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
 1
 2
 3
 4              I, the undersigned, a Certified
 5   Shorthand Reporter, do hereby certify:
 6              That the foregoing proceedings were
 7   taken before me at the time and place herein set
 8   forth; that any witness in the foregoing
 9   proceedings, prior to testifying, were placed under
10   oath; that a verbatim record of the proceedings was
11   made by me using machine shorthand which was
12   thereafter transcribed under my direction; further,
13   that the foregoing is an accurate transcription
14   thereof.
15              I further certify that I am neither
16   financially interested in the action nor a relative
17   or employee of any attorney of any of the parties.
18              IN WITNESS WHEREOF, I have this
19   date subscribed by name.
20
21   Dated:
                 MAY 3 0 2007
22
23
24           DAVID OCANAS         EXHIBIT ____ 67
25           CSR No. 12567        PAGE ____ 1062
```

**EXHIBIT 68**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware Corporation,

            Plaintiff,

        vs.           NO. CV 04-9059 NM (RJBx)

CARTER BRYANT, an individual, and
DOES 1 through 10, Inclusive.

            Defendants.

_____

CARTER BRYANT, on behalf of himself,
all present and former employees of
Mattel, Inc., and the general public.

            Cross-Complaint.

        vs.

MATTEL, INC.,
a Delaware corporation.

            Cross-Defendant.

**CERTIFIED COPY**

_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPOSITION OF PAULA GARCIA

Friday, May 25, 2007

Los Angeles, California

VOLUME 2

Reported by:
DAVID OCANAS
CSR No. 12567

JOB NO. 66420

EXHIBIT ___68___

PAGE ___1063___

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MATTEL, INC., a Delaware Corporation,

 5                  Plaintiff,

 6          vs.              NO. CV 04-9059 NM (RJBx)

 7   CARTER BRYANT, an individual, and
     DOES 1 through 10, Inclusive.
 8
                    Defendants.
 9
     _____
     CARTER BRYANT, on behalf of himself,
10   all present and former employees of
     Mattel, Inc., and the general public.
11
                    Cross-Complaint.
12
            vs.
13
     MATTEL, INC.,
14   a Delaware corporation.

15                  Cross-Defendant.

16   _____

17

18        Videotaped Deposition of PAULA GARCIA,

19   Volume 2, taken on behalf of Plaintiff and

20   Cross-Defendant, at 865 South Figueroa Street,

21   Tenth Floor, Los Angeles, California, beginning at

22   9:56 a.m. and ending at 8:21 p.m. on Friday, May

23   25, 2007 before David Ocanas, Certified Shorthand

24   Reporter No. 12567.        EXHIBIT ___68___

25                              PAGE ___1064___
```

301

PAULA GARCIA, V. 2                                    05/25/07
CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    APPEARANCES:
 2
 3    For Mattel:
 4            QUINN, EMANUEL, URQUHART, OLIVER &
              HEDGES, LLP
 5            BY:  BRIDGET MORRIS
              Attorney at Law
 6            865 South Figueroa Street
              Tenth Floor
 7            Los Angeles, California 90017
              213-624-7707
 8            E-mail:  Michaelzeller@quinnemanuel.com
                       bridgetmorris@quinnemanuel.com
 9
      For MGA Entertainment:
10
              O'MELVENY & MYERS LLP
11            BY:  DIANA M. TORRES
              Attorney at Law
12            400 South Hope Street
              Los Angeles, California 90071-2899
13            (213) 430-6000
              E-mail:  Dtorres@omm.com
14
      For Carter Bryant:
15
              KEKER & VAN NEST
16            BY:  MICHAEL H. PAGE
              Attorney at Law
17            710 Sansome Street
              San Francisco, California 94111-1704
18            (415) 397-7188
              E-mail:  Mhp@kvn.com
19
      Also Present:
20
              MICHAEL MOORE, Mattel
21            DAPHNE GRONICH, MGA Entertainment
              CRAIG HOLDEN, MGA Entertainment
22
23
24                       EXHIBIT ____68____
25
                         PAGE ____1005____
```

```
 1   APPEARANCES:  (CONT'D)

 2

 3   Videographer:

 4          CHARLIE GUILLEN
            SARNOFF COURT REPORTERS
 5          AND LEGAL TECHNOLOGIES
            20 Corporate Park
 6          Irvine, California 92606
            (877) 955-3855
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                          EXHIBIT    68

25                          PAGE    10606
```

303

```
 1          Los Angeles, California, Friday, May 25, 2007

 2                 9:56 a.m. - 8:21 p.m.

 3

 4               PAULA GARCIA,

 5     having been administered an oath, was examined and

 6     testified as follows:

 7

 8               MS. TORRES:  Before we proceed, I want to

 9     put on the record, I got your e-mail last night and

09:56 10     while I disagree with it entirely, I'll address

11     that in writing.

12               I am prepared to make the offer -- if you

13     don't feel prepared to go forward today based on

14     our document production, we can come back on

09:56 15     Tuesday.

16               MR. ZELLER:  We never said we weren't

17     prepared to go forward.

18               My point is, it's already set forth in the

19     e-mail -- because of delays on your part, we

09:56 20     started now on both days late.  I don't want to

21     waste more time.

22               MS. TORRES:  Go ahead, we can go forward.

23

24                              EXHIBIT _____68_____

25                              PAGE ___1067_____
```

307

```
  1                    EXAMINATION
  2   BY MR. ZELLER:
  3        Q    On that note, good morning.
  4        A    Good morning.
09:56 5        Q    Directing your attention to Exhibit 301
  6   which is the meeting notice we talked about
  7   earlier?
  8             Who actually sent this meeting notice out?
  9        A    I don't know for sure.
09:57 10       Q    Did you send it out?
 11        A    No.
 12        Q    When you say you don't know for sure, do
 13   you have an understanding or belief as to who it
 14   was?
09:57 15       A    I believe it may have been Dede Brown.
 16        Q    Dede Brown was Isaac Larian's assistant?
 17        A    Yes.
 18        Q    Do you have an understanding or belief
 19   whether or not Victoria O'Connor sent it out?
09:57 20       A    I'm not sure.
 21        Q    Before the meeting with Carter Bryant that
 22   you testified earlier occurred on September 1st,
 23   2000, did anyone at MGA see Bryant's Bratz drawings
 24   beforehand?
09:57 25            MS. TORRES:  Objection, calls for
```

EXHIBIT _68_

PAGE _1068_

1    speculation.

2            THE WITNESS:  No, not that I'm aware of.

3    BY MR. ZELLER:

4        Q    So as far as you're aware of or as far as

09:57 5    you know, the first time that anyone at MGA saw

6    Carter Bryant's Bratz drawings was at that

7    September 1st, 2000 meeting that you testified

8    about earlier?

9            MR. PAGE:  I object, vague and ambiguous.

09:57 10            THE WITNESS:  Yes.

11    BY MR. ZELLER:

12        Q    You understood that the purpose of the

13    September 1st, 2000 meeting with Carter Bryant was

14    for Mr. Bryant to make a pitch to MGA to make Bratz

09:58 15    dolls; is that correct?

16            MS. TORRES:  Objection, vague, asked and

17    answered.

EXHIBIT ____ 68

18            THE WITNESS:  Yes.

PAGE ____ 1069

19    BY MR. ZELLER:

09:58 20        Q    Was it the normal procedure in that time

21    period for Isaac Larian to attend the first meeting

22    where someone was pitching a toy to MGA and where

23    no one else at MGA had first seen it?

24            MS. TORRES:  Objection, lack of

09:58 25    foundation, calls for speculation, assumes facts

309

```
  1    not in evidence.

  2            THE WITNESS:  I don't know.

  3    BY MR. ZELLER:

  4        Q    Had it happened prior to September 1st,

09:58 5    2000?

  6            MS. TORRES:  Objection, lack of

  7    foundation, calls for speculation.

  8            THE WITNESS:  To be clear, a meeting like

  9    this?  Not to my knowledge.

09:59 10   BY MR. ZELLER:

  11       Q    When you say "a meeting like this," you

  12   mean where someone comes in to pitch a toy to the

  13   company; is that correct?

  14       A    Yes.

09:59 15      Q    Has it happened since the September 1st,

  16   2000 meeting?

  17           MS. TORRES:  Objection, lack of

  18   foundation, calls for speculation.

  19           THE WITNESS:  Not to my knowledge, no.

09:59 20   BY MR. ZELLER:

  21       Q    So the only instance in which you're aware

  22   of in which someone came in to pitch a toy idea or

  23   a toy and Isaac Larian was in attendance at it, no

  24   one else at MGA had seen it beforehand was the

09:59 25   Carter Bryant meeting on September 1st, 2000?
```

EXHIBIT 68

PAGE 1070

```
 1          Q    Focusing on that conversation you had with

 2    Veronica Marlow, there in the lobby of MGA, in

 3    which you expressed interest about a trendy fashion

 4    doll, that was the first time in which you had

10:06 5    expressed any interest in developing a fashion doll

 6    on MGA's behalf to Veronica Marlow; is that

 7    correct?

 8          A    Yes.

 9          Q    Is it true that Veronica Marlow had never

10:06 10   raised with you, prior to that time, the prospect

11    of MGA getting into fashion dolls?

12               MS. TORRES:  Objection, vague.

13               THE WITNESS:  No.

14    BY MR. ZELLER:

10:06 15         Q    My statement is true or not true?

16          A    It is not true.

17          Q    So Veronica Marlow had raised the prospect

18    of MGA getting into fashion dolls prior to that

19    conversation with you?

10:07 20         A    To be clear, prior to that conversation,

21    Veronica Marlow had not raised any conversation

22    about MGA's relationship to fashion dolls.

23          Q    So the first discussion you ever had with

24    Veronica Marlow about MGA getting into fashion

10:07 25   dolls, whether it was raised by you or raised by
```

EXHIBIT _____ 60

PAGE _____ 1071

316

```
 1    Veronica Marlow, was the conversation you described

 2    previously that you had with her in the lobby of

 3    MGA?

 4          A    Yes.

10:07 5          Q    Is it true that prior to that conversation

 6    in the lobby there at MGA that Veronica Marlow had

 7    never raised with you the prospect of MGA looking

 8    at or considering Bryant's Bratz concepts or

 9    artwork?

10:07 10              MS. TORRES:  Objection, vague, compound.

 11              THE WITNESS:  Yes.

 12    BY MR. ZELLER:

 13          Q    And she had never mentioned Carter Bryant

 14    to you before then; is that true?

10:08 15          A    True.

 16          Q    Yesterday you had mentioned that you

 17    received an e-mail from Carter Bryant with the

 18    Prayer Angels attachment.

 19              Do you recall that?

10:08 20          A    Yes.

 21          Q    You mentioned that was prior to the

 22    September 1st, 2000 meeting.

 23              Do you remember that?

 24          A    Yes.

10:08 25          Q    Did you have any contact with Carter
```

EXHIBIT ____ 68

PAGE ____ 1072

317

1    Bryant in any way between the time of that first

2    e-mail that you received from him with the Prayer

3    Angels attachments and the September 1st, 2000

4    meeting?

10:08 5        A    No.

6        Q    So the next thing that happened in terms

7    of your contact with Carter Bryant after you

8    received the e-mail with the Prayer Angels

9    attachments was the September 1st, 2000 meeting

10:08 10   itself?

11       A    Correct.

12       Q    What was your understanding as to why

13   Carter Bryant was sending you the Prayer Angels

14   attachments, the attachments to that e-mail?

10:09 15       MS. TORRES:   Objection, asked and

16   answered.

17            THE WITNESS:   Carter Bryant -- let me

18   start over.

19            Veronica Marlow who was much involved in

10:09 20   the Prayer Angels concept and design with me,

21   realized that I had not arrived at I-designs for

22   Prayer Angels that I was content with.  And she had

23   recommended Carter be given a shot.

EXHIBIT _____ 68

24   BY MR. ZELLER:

PAGE _____ 1073

10:09 25       Q    It was your understanding it was work for

318

```
 1    that particular project; is that true?

 2        A    Yes.

 3        Q    It was to help move the ball forward on

 4    the project and maybe come up with something that

10:10 5   would make the product better?

 6             MS. TORRES:  Objection, vague.

 7             THE WITNESS:  Make the product as I

 8    expected it.

 9    BY MR. ZELLER:

10:10 10       Q    More in line with your expectations?

11        A    Yes.

12        Q    Do you have, beyond what you have told me,

13    any other understanding as to why Carter Bryant was

14    sending you those Prayer Angels attachments?

10:10 15            MS. TORRES:  Objection, vague.

16             THE WITNESS:  No.

17    BY MR. ZELLER:

18        Q    What's your understanding as to how Carter

19    Bryant knew to send those -- that attachment to you

10:10 20   in particular?

21        A    I don't know for sure.

22             But I expect that Veronica Marlow told

23    him.

24        Q    Because I presume that prior to that time

10:10 25   you had never sent Carter Bryant an e-mail; is that
```

EXHIBIT ___ 68

PAGE ___ 1074

319

```
 1    correct?

 2         A    That's correct.

 3         Q    What was the -- did he send that e-mail

 4    from a Mattel e-mail address?

 5         A    I'd like to state to be clear that I'm not

 6    sure now as I sit here in thinking whether that I

 7    received those drawings in an e-mail, or if it was

 8    actually possibly a fax.

 9              I'm not sure.

10         Q    You do remember at some point receiving

11    these I-Drawings you had mentioned from Carter

12    Bryant that related to Prayer Angels?

13         A    Yes.

14         Q    You're just not sure if it was a fax to

15    you or an e-mail to you?

16         A    That's correct.

17         Q    So do you have an understanding, then, as

18    to how -- regardless of how he transmitted it,

19    Mr. Bryant understood or knew that he should send

20    it to you in particular?

21              MS. TORRES:  Objection, asked and

22    answered.

23              THE WITNESS:  Yes.   EXHIBIT _____ C 8 ____

24    BY MR. ZELLER:                    PAGE _____ 1075 _____

25         Q    If you could please tell me what that
```

                                                          320

1    understanding is?

2        A    Again, I expect that a conversation took

3    place between Veronica and Carter where -- I don't

4    know for sure.

10:12 5        I can only expect that Veronica suggested

6    that he send them directly to me.

7        Q    Just to make sure this part of it is

8    clear, regardless of whether those Prayer Angels

9    materials that Mr. Bryant sent you were sent by

10:12 10   e-mail or by fax, that was the very first contact

11   you ever had with Carter Bryant directly of any

12   kind; is that correct?

13        MS. TORRES:  Objection, vague, asked and

14   answered.

10:12 15        THE WITNESS:  Yes.

16        MR. ZELLER:  Let's please mark as Exhibit

17   393 a two-page document bearing Bates numbers

18   Bryant 173, 174 consisting of some drawings.

19             (Deposition Exhibit 393,

10:13 20             Drawings, was marked.)

21   BY MR. ZELLER:

22        Q    Directing your attention to what we have

23   marked Exhibit 393, have you ever seen these

24   before?                    EXHIBIT _____ 68

10:14 25        A    Yes.        PAGE _____ 1076

321

```
 1        Q    What do you recognize them as?

 2        A    I recognize them to be the drawings

 3   submissions that Carter completed for the mentioned

 4   project.

10:14 5        Q    In connection with Prayer Angels?

 6        A    Yes.

 7        Q    Were these materials in whole or in part

 8   the drawings that were attached to that e-mail or

 9   were part of that fax that you were talking about

10:14 10  Carter Bryant sending to you?

11        A    Yes, to the best of my memory.

12        Q    Is your memory that it was both of these

13   pages and all of the material that's depicted on

14   Exhibit 393, or was it something less?

10:14 15       MS. TORRES:  Objection, vague.

16        THE WITNESS:  I'm not sure if the hair

17   sketch drawing was included.  I don't remember it.

18        But it's possible that it was also

19   included.

10:15 20  BY MR. ZELLER:

21        Q    You are confident that the first page of

22   Exhibit 393 are the Prayer Angels drawings that

23   Carter Bryant sent to you; is that correct?

24        A    Yes.

10:15 25       MS. TORRES:  Objection, misstates the
```

EXHIBIT _68_

PAGE _1071_

322

```
 1    witness' testimony.

 2    BY MR. ZELLER:

 3        Q    And this was the first -- this was part

 4    and parcel of the first contact you ever had with

10:15 5   Mr. Bryant; is that correct?

 6              MS. TORRES:  Objection, vague.

 7              THE WITNESS:  Yes.

 8    BY MR. ZELLER:

 9        Q    What did you do with these -- with these

10:1510   drawings when you received them?

11              MS. TORRES:  Objection, vague.

12              THE WITNESS:  I remember reviewing them.

13              And not much more passed that.

14    BY MR. ZELLER:

10:1615   Q    What was your reaction to them?

16        A    I remember my reaction that I found them

17    not what I was looking for.

18        Q    Were these ever used for Prayer Angels?

19        A    No.

10:1620         MS. TORRES:  Objection, vague.

21              THE WITNESS:  No.

22    BY MR. ZELLER:

23        Q    So they weren't used for the final product

24    in any way?

10:1625   A    No.
```

EXHIBIT _____ 68

PAGE _____ 1078

323

1          Q    Were they used for any prototypes or

2     models or works in progress for any version or

3     reiteration of Prayer Angels?

4               MS. TORRES:  Objection, vague, compound.

10:16  5          THE WITNESS:  No.

6     BY MR. ZELLER:

7          Q    It's fair to say you saw these drawings,

8     they didn't fit your vision for the product and

9     they were not used, they didn't go any further than

10:16 10    that; is that correct?

11              MS. TORRES:  Same objections.

12              THE WITNESS:  Yes.

13    BY MR. ZELLER:

14         Q    Did you ever talk to Carter Bryant about

10:17 15    these drawings we marked as Exhibit 393?

16         A    No.

17         Q    Did he ever ask about them?

18         A    Not to my memory.

19         Q    Prior to the time that Carter Bryant and

10:17 20    Veronica Marlow came into the September 1, 2000

21    meeting, did you know what the meeting was about?

22              MS. TORRES:  Objection, asked and

23    answered.

24              THE WITNESS:  I had an expectation.

10:17 25    BY MR. ZELLER:                    EXHIBIT ____ 6 9

                                         PAGE ____ 1079

324

```
        1        Q    What was that expectation?
        2        A    I expected that it was going to be a
        3     presentation that Carter would deliver in response
        4     to my comment to Veronica in mid-August about my
10:18   5     search or interest in a trendy fashion doll.
        6        Q    Where did you get that expectation from?
        7             MS. TORRES:  Objection, asked and
        8     answered.
        9             THE WITNESS:  From Veronica's response in
10:18  10     return to you should meet Carter Bryant.
       11     BY MR. ZELLER:
       12        Q    During the conversation that you had in
       13     the lobby at MGA on the way to the photo shoot that
       14     you talked about earlier?
10:18  15        A    Yes.
       16        Q    I guess what I'm maybe asking is a little
       17     bit more specific.
       18             You, of course, at some point, received
       19     the meeting notice we talked about as Exhibit 301?
10:18  20             Beyond that conversation you had with
       21     Veronica Marlow in the lobby there at MGA and then
       22     other than receiving this meeting notice that we
       23     have marked as Exhibit 301, did you have any other
       24     information about what the meeting itself was going
10:18  25     to be about?
```

EXHIBIT ___68___

PAGE ___1080___

PAULA GARCIA, V. 2                                              05/25/07
CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1          A    No.
 2          Q    That's not something you discussed with
 3     anyone prior to the meeting other than what you
 4     already told me about; is that correct?
10:19  5               MS. TORRES:  Objection, vague.
 6               THE WITNESS:  Yes.
 7     BY MR. ZELLER:
 8          Q    Did you talk or communicate with Veronica
 9     Marlow on any subject between the time that she had
10:19 10   first mentioned Carter Bryant's name and the time
11     of that September 1st, 2000 meeting?
12               MS. TORRES:  Objection, vague.
13               THE WITNESS:  I can't remember exactly,
14     but it's possible.
10:19 15   BY MR. ZELLER:
16          Q    Is it your expectation that you did?
17          A    My expectation that if we spoke before, it
18     would be related to Prayer Angels.
19          Q    During that time period in August of 2000,
10:20 20   was it fairly typical for you to communicate with
21     Veronica Marlow about Prayer Angels?
22          A    Yes.
23          Q    Were there other subjects in that time
24     period that were typical for you to communicate
10:20 25   with Veronica Marlow about, other than Prayer
```

EXHIBIT  68

PAGE  1081

326

             1    Angels as we've already discussed and other than

             2    Hoppity Baby?

             3              MS. TORRES:  Objection, vague, compound.

             4              THE WITNESS:  Yes.

    10:20    5    BY MR. ZELLER:

             6         Q    What else?

             7         A    I can't remember exactly, but I think she

             8    might have helped us, me, on My Dream Baby or like

             9    concept.

    10:20   10         Q    Other than Prayer Angels, My Dream Baby

            11    and the Hoppity Baby product, was there anything

            12    else that Veronica Marlow was working on for MGA

            13    during that August 2000 time period?

            14              MS. TORRES:  Objection.

    10:21   15              Lack of foundation, calls for speculation,

            16    and vague.

            17              THE WITNESS:  No.

            18    BY MR. ZELLER:

            19         Q    Was Kami Gillmour fired from MGA?

    10:21   20              MS. TORRES:  Objection, calls for

            21    speculation.

            22              THE WITNESS:  I don't know for sure.

            23    BY MR. ZELLER:

            24         Q    Do you have an understanding or have you

    10:21   25    heard anything about the terms or the circumstances

EXHIBIT 68
PAGE 1082

327

```
 1    of her departure from MGA?

 2        A    I understood that she left on her own

 3    accord.

 4        Q    Was it your understanding that she left

 5    MGA on good terms?

 6            MS. TORRES:  Objection, vague, calls for

 7    speculation.

 8            THE WITNESS:  It was only my perception

 9    that she left on good terms.

10    BY MR. ZELLER:

11        Q    Did Victoria O'Connor ever say while you

12    were present or ever say to you in words or

13    substance that she was concerned about acquiring or

14    potentially acquiring Bratz, because Bryant was

15    employed by Mattel?

16            MS. TORRES:  Objection, vague.

17            THE WITNESS:  No, not to my memory.

18    BY MR. ZELLER:

19        Q    Did Isaac Larian ever say to you in words

20    or substance that he was concerned about acquiring

21    or potentially acquiring Bratz from Bryant, because

22    he was employed by Mattel?

23            MS. TORRES:  Objection, vague.

24            THE WITNESS:  No, not to my memory.

25    BY MR. ZELLER:
```

EXHIBIT _68_

PAGE _1083_

328

1        Q    Did anyone at MGA ever express that?

2             MS. TORRES:  Same objection.

3             THE WITNESS:  No.

4    BY MR. ZELLER:

10:22 5        Q    Did Victoria O'Connor ever tell you or

6    ever communicate to you in any way that Isaac

7    Larian asked her to white out fax information in

8    order to conceal the fact that Carter Bryant was

9    employed by Mattel at the time he signed his

10:22 10   contract with MGA?

11            MS. TORRES:  Objection, vague and to the

12   extent it purports to convey what Ms. O'Connor

13   testified to misstates the witness' testimony.

14            Go ahead.

10:23 15  BY MR. ZELLER:

16       Q    Have you ever heard about that prior to

17   the time that I mentioned it now?

18            MS. TORRES:  Objection, vague.

19            THE WITNESS:  Yes.

10:23 20  BY MR. ZELLER:

21       Q    In what context did you hear about it?

22       A    I learned of it in a review of her

23   testimony, in the testimony of Victoria O'Connor.

24       Q    In connection with your deposition here?

10:23 25       A    Yes.

EXHIBIT _____ 6 f

PAGE _____ 1084

329

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
  1        Q    So did you read her entire deposition

  2   transcript?

  3        A    No.

  4        Q    What portions of it do you recall reading?

10:23 5             MS. TORRES:  Objection, vague, asked and

  6   answered.

  7             MR. ZELLER:  Just in terms of the

  8   subjects.

  9             Were there particular subjects that you

10:2310   read about in connection with the transcript?

 11             THE WITNESS:  Yes.

 12             MS. TORRES:  Objection, vague.

 13   BY MR. ZELLER:

 14        Q    What was the subject or subjects?

10:2415   A    The subject, I believe, was her testimony

 16   on the first meeting with Carter Bryant.

 17        Q    Did you -- was your -- when you read that

 18   testimony, did you believe it was accurate or

 19   inaccurate with respect to her description of that

10:2420   first meeting with Carter Bryant?

 21             MS. TORRES:  Objection, vague and

 22   compound.

 23             THE WITNESS:  I don't -- I can't say

 24   whether it was accurate or inaccurate.

10:2425             I just did not remember the same facts
```

EXHIBIT _____

PAGE _____ 1085

330

```
 1    that she represented.

 2    BY MR. ZELLER:

 3         Q    What is it that you thought was

 4    inconsistent between your memory of what occurred

10:24 5   and what it is that Victoria O'Connor said about

 6    that first meeting?

 7              MS. TORRES:   Objection, vague.

 8              THE WITNESS:   It's my memory that, in

 9    review of her testimony, she had thought or she had

10:25 10  suggested that there were possibly two meetings in

11    conjunction with the review of Carter's concept.

12    BY MR. ZELLER:

13         Q    Your memory was it didn't happen that way,

14    there was just the one meeting on September 1st,

10:25 15  2000; is that correct?

16         A    Yes.

17         Q    Other than the portion of Victoria

18    O'Connor's deposition that you read about the

19    whiting out of the fax header of the MGA-Bryant

10:25 20  contract, do you have any information or have you

21    heard anything else about the episode that Victoria

22    O'Connor talked about where she was -- where she

23    says, asked by Isaac Larian to white the fax header

24    out?

10:25 25        MS. TORRES:   Objection
```

EXHIBIT _____ 68

PAGE _____ 1086

331

```
 1              Vague, calls for speculation, and

 2    misstates Ms. O'Connor's testimony.

 3              THE WITNESS:  No.

 4    BY MR. ZELLER:

 5        Q    What Victoria O'Connor said in her

 6    transcript is the only information you have about

 7    that subject; is that true?

 8        A    Yes.

 9        Q    You don't know what Victoria O'Connor said

10    in her testimony about whiting out that fax header

11    was true or not true?

12        A    I have no way of knowing what of Victoria

13    testified is true or not true.

14        Q    You don't have any knowledge about that

15    episode that she testified about; is that true?

16              MS. TORRES:  Objection to the form, calls

17    for speculation.

18              MR. PAGE:  Misstates her testimony.

19              THE WITNESS:  That's correct.

20    BY MR. ZELLER:

21        Q    Do you know who asked Victoria O'Connor to

22    attend the September 1st, 2000 meeting?

23        A    I don't know.

24        Q    Were you the one who asked for her to be

25    present there?
```

EXHIBIT __68__

PAGE __1087__

```
        1            MS. TORRES:  Objection, asked and
        2    answered.
        3            THE WITNESS:  I don't know, I don't
        4    remember.
10:27   5    BY MR. ZELLER:
        6       Q    And you understand here, I'm not asking
        7    about the mechanics of who sent it out.
        8            Who ultimately made the request that
        9    Victoria O'Connor attend the meeting?
10:27  10       A    I don't remember suggesting Victoria
       11    O'Connor attend the meeting.
       12       Q    Did you tell Victoria O'Connor prior to
       13    that initial meeting with Carter Bryant that Carter
       14    Bryant wanted a meeting, because he had a fashion
10:27  15    doll to license?
       16            MS. TORRES:  Objection, vague.
       17            THE WITNESS:  I don't remember.
       18    BY MR. ZELLER:
       19       Q    Is your memory that it did not happen or
10:27  20    you're just not sure?
       21       A    I'm not sure.
       22       Q    Did you ever have a meeting with Carter
       23    Bryant and Victoria O'Connor where Isaac Larian was
       24    not present and where you or Victoria O'Connor told
10:28  25    Mr. Bryant that you would have to check with Isaac
```

EXHIBIT ___68___

PAGE ___1088___

333

```
 1    Larian before going further or forward with Bratz?

 2            MS. TORRES:  Objection, vague, compound,

 3    vague as to time.

 4            THE WITNESS:  No.

10:28  5    BY MR. ZELLER:

 6        Q   Didn't Bryant say during a meeting that

 7    you and Victoria O'Connor had with Carter Bryant

 8    that he was then employed by Mattel in Barbie

 9    Collectibles?

10:28 10            MS. TORRES:  Objection, vague, compound,

11    calls for speculation.

12            THE WITNESS:  I don't remember that

13    conversation.

14    BY MR. ZELLER:

10:28 15        Q   Is it your memory that did not happen, or

16    are you saying you're not sure?

17            MS. TORRES:  Objection, vague.

18            THE WITNESS:  I don't remember that

19    conversation, I don't remember that happened.

10:29 20    BY MR. ZELLER:

21        Q   Is it your testimony that, to your best

22    knowledge, that did not happen or you're just not

23    sure?

24            MS. TORRES:  Objection, asked and

10:29 25    answered.
```

EXHIBIT _____ 68

PAGE _____ 1089

334

```
 1              THE WITNESS:  It's possible that

 2      conversation may have happened.

 3              I don't remember it.

 4      BY MR. ZELLER:

10:29 5     Q  Did David Dees send around an e-mail at

 6      some point saying that MGA's Bratz story was bunk?

 7              MS. TORRES:  Objection.

 8              Vague, calls for speculation.

 9              Vague as to time.

10:30 10    BY MR. ZELLER:

11          Q  At any time.

12          A  I don't remember -- I don't remember that

13      David Dees sent an e-mail regarding Bratz.

14              I don't remember if I necessarily remember

10:30 15    the word "bunked."

16          Q  Do you remember there being an episode in

17      which David Dees sent to a fan club an e-mail about

18      Bratz?

19              MS. TORRES:  Objection, vague.  Calls for

10:31 20    speculation.

21              THE WITNESS:  I remember -- I remember

22      David Dees sending an e-mail about Bratz, that's

23      all I remember.

24      BY MR. ZELLER:

10:31 25        Q  Didn't David Dees send an e-mail to a fan
```

EXHIBIT ___68___

PAGE ___1090___

335

```
 1    worked on Bratz packaging; is that correct, in the

 2    year 2000?

 3              MS. TORRES:  Objection, vague.

 4              MR. ZELLER:  I thought it was going to

15:06  5    come out better than that.

 6              Let me try one more time.

 7              I was hoping to have a clearer question

 8    the second time.  It didn't quite happen.

 9    BY MR. ZELLER:

15:06 10        Q   You mentioned the people who you either

11    know or you believe may have worked on Bratz

12    packaging in the year 2000 were Ilene Storer,

13    Rachel Harris and Vivian Matt.

14              Is there anyone else who you know or who

15:06 15    you believe worked on Bratz packaging in the year

16    2000?

17              MS. TORRES:  Objection, vague.

18              THE WITNESS:  I'm having a hard time

19    answering the question.

15:06 20    BY MR. ZELLER:

21        Q   As you sit here, can you think of anyone

22    else?

23        A   I can't be sure of anyone else.

24        Q   Do you have a general memory that there

15:07 25    were other people, but you just can't remember who
```

EXHIBIT _____ 68

PAGE _____ 1091

```
 1   they were?

 2        A    No.

 3        Q    Who is it that rooted the Bratz samples

 4   that were used at the Hong Kong Toy Fair in January

 5   of 2001?

 6             MS. TORRES:  Objection, assumes facts not

 7   in evidence.

 8             THE WITNESS:  There was, to my memory, no

 9   one who rooted the heads for Hong Kong Toy Fair.

10   BY MR. ZELLER:

11        Q    As of the time of the Hong Kong Toy Fair,

12   I take it there were Bratz dolls, sample dolls that

13   were shown there; is that true?

14             MS. TORRES:  Objection, vague.

15             THE WITNESS:  It was a representation of

16   Bratz dolls, yes.

17   BY MR. ZELLER:

18        Q    When you say representation, what do you

19   mean?

20        A    They may not have been the -- they may not

21   have physically took on -- how do I articulate,

22   they may not have been exactly the way that we

23   manufactured them ultimately as manufactured dolls.

24        Q    They looked like Bratz dolls, didn't they?

25             MS. TORRES:  Objection, vague.
```

EXHIBIT 68

PAGE 1092

```
 1              THE WITNESS:  Yes.

 2   BY MR. ZELLER:

 3        Q    So my question is:  Where did those --

 4   what you call representations of Bratz dolls that

15:08 5   were shown there at the Hong Kong Toy Fair in 2001

 6   come from?

 7              MS. TORRES:  Objection, vague and

 8   compound.

 9              THE WITNESS:  The dolls themselves?

15:09 10  BY MR. ZELLER:

11        Q    Yes.

12              MS. TORRES:  Same objections.

13              THE WITNESS:  Can you be more specific?

14   BY MR. ZELLER:

15:09 15       Q    Who made them?

16              MS. TORRES:  Objection, vague, compound.

17              THE WITNESS:  A few people were involved

18   in making the sample.

19   BY MR. ZELLER:

15:09 20       Q    Please tell me who was involved in making

21   the samples that were the Bratz dolls that were

22   shown at the Hong Kong Toy Fair in January of 2001?

23              MS. TORRES:  Objection, vague, compound,

24   calls for a narrative.

15:09 25             THE WITNESS:  Veronica Marlow, Margaret
```

EXHIBIT ___68___

PAGE ___1093___

481

1

2

3

4

5

6

7

8              I, PAULA GARCIA, do hereby

9   declare under penalty of perjury that I have read

10  the foregoing transcript; that I have made any

11  corrections as noted herein, in ink, initialed by

12  me, or attached hereto; that my testimony as

13  contained herein, as corrected, is true and

14  correct.

15          Executed this _____ day of _____,

16  2007, at _____, _____.

17                  (City)                 (State)

18

19

20          _____

21              PAULA GARCIA

22              Volume 2

23

24                          EXHIBIT _____68_____

25                          PAGE _____1094_____

649

1

2

3

4          I, the undersigned, a Certified

5   Shorthand Reporter, do hereby certify:

6          That the foregoing proceedings were

7   taken before me at the time and place herein set

8   forth; that any witness in the foregoing

9   proceedings, prior to testifying, were placed under

10  oath; that a verbatim record of the proceedings was

11  made by me using machine shorthand which was

12  thereafter transcribed under my direction; further,

13  that the foregoing is an accurate transcription

14  thereof.

15          I further certify that I am neither

16  financially interested in the action nor a relative

17  or employee of any attorney of any of the parties.

18          IN WITNESS WHEREOF, I have this

19  date subscribed by name.

20

21  Dated:   MAY 3 0 2007

22

23          _____

24          DAVID OCANAS

25          CSR No. 12567 EXHIBIT ___ 68

                              PAGE 1095

**EXHIBIT 69**

1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Suite 3400
3  Los Angeles, CA  90071
   Tel.: (213) 687-5000/Fax: (213) 687-5600
4
   KENNETH PLEVAN (admitted *pro hac vice*)
5  (kplevan@skadden.com)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  Four Times Square
   New York, NY  10046
7  Tel.: (212) 735-3000 / Fax: (212) 735-2000
8  Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. DE C.V., and Isaac Larian
9
10                    UNITED STATED DISTRICT COURT
11                    CENTRAL DISTRICT OF CALIFORNIA
12
13  CARTER BRYANT, an individual,          )   CASE NO. CV 04-9049 SGL (RNBx)
14                                         )
                  Plaintiff,               )   MGA'S NOTICE OF
15                                         )   WITHDRAWAL OF UNCLEAN
          v.                               )   HANDS AFFIRMATIVE DEFENSE
16                                         )   AS IT PERTAINS TO PHASE 1
    MATTEL, INC., a Delaware               )
17  corporation,                           )
                                           )
18                Defendant.               )
                                           )
19  _____    )
                                           )
20  AND CONSOLIDATED ACTIONS               )
                                           )
21
22
23
24
25
26
27
28                          2·15·08
    _____
    MGA'S NOTICE OF WITHDRAWAL OF UNCLEAN HANDS AFFIRMATIVE DEFENSE AS IT PERTAINS TO PHASE I

                    EXHIBIT ____69____

                    PAGE ____1096____

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that the MGA Parties hereby withdraw their affirmative defense based on unclean hands as it pertains to Phase 1 of this action.  The MGA Parties will assert unclean hands as an affirmative defense only in connection with Phase 2 of this action.

DATED:  February 15, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____
Thomas J. Nolan
Attorney for MGA Entertainment, Inc.

MGA'S NOTICE OF WITHDRAWAL OF UNCLEAN HANDS AFFIRMATIVE DEFENSE AS IT PERTAINS TO PHASE I

1

EXHIBIT __69__

PAGE __1097__



1  THOMAS J. NOLAN (Bar No. 066992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, CA  90071-3144
3  Telephone:  (213) 687-5000
   Facsimile:  (213) 687-5600
4  E-mail:      tnolan@skadden.com

5  KENNETH PLEVAN (admitted *pro hac vice*)
   (kplevan@skadden.com)
6  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Times Square
7  New York, NY  10036
   Tel.: (212) 735-3000 / Fax: (212) 735-2000
8
   Attorneys for Counter-Defendants,
9  MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT
   (HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.V.
10

11               UNITED STATES DISTRICT COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13                     EASTERN DIVISION

14  CARTER BRYANT, an individual      )  CASE NO. CV 04-9049 SGL (RNBx)
                                      )
15                   Plaintiff,       )  Consolidated with Case No. 04-9059
                                      )  and Case No. 05-2727
16         v.                         )
                                      )  **PROOF OF SERVICE**
17  MATTEL, INC., a Delaware          )
    corporation                       )
18                                    )
                     Defendant.       )
19                                    )
                                      )
20                                    )
                                      )
21                                    )
                                      )
22  Consolidated with MATTEL, INC. v. )  Discovery Cut-Off:  January 28, 2008
    BRYANT and MGA                    )
23  ENTERTAINMENT, INC. v.            )
    MATTEL, INC.                      )
24                                    )
25
26
27
28

                          2-15-08
   _____
   PROOF OF SERVICE                        NO. CV 04-9049 SGL (RNBx)

                    EXHIBIT ____69____

                    PAGE ____1098____

1

<u>PROOF OF SERVICE</u>

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3  I am employed in the county of Los Angeles, State of California.  I am over the age
4  of 18 and not a party to the within action.  My business address is 300 South Grand Avenue, 34th Floor, Los Angeles, CA 90071.

5  On February 15, 2008, I served the foregoing documents described as:

6

**SEE ATTACHED DOCUMENT LIST**

7  on the interested parties in this action addressed as follows:

8

9

**SEE ATTACHED SERVICE LIST**

10  ☒  (BY PERSONAL SERVICE)  ☐  By personally delivering copies to the
11  person served. (FEDERAL)

12  ☒  I caused such document to be hand delivered to the above addressees. (FEDERAL)
13

14

15  ☒  (BY FEDERAL EXPRESS) I am readily familiar with the firm's practice for
16  the collection and processing of correspondence for mailing with Federal Express and the fact that the correspondence would be deposited with Federal Express that same day in the ordinary course of business; on this date, the
17  above-referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing following ordinary business
18  practices.

19  I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

20

Executed on February 15, 2008 at Los Angeles, California.

21

22  _____Matthew Bowman_____          _____
PRINT NAME                                    SIGNATURE

23

24

25

26

27

28

PROOF OF SERVICE                                              NO. CV 04-9049 SGL (RNBx)

EXHIBIT ___69___

PAGE ___1099___

1

## DOCUMENT LIST

2

3   1) MGA'S NOTICE OF WITHDRAWAL OF UNCLEAN HANDS AFFIRMATIVE DEFENSE AS IT PERTAINS TO PHASE 1

4   2) PROOF OF SERVICE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

EXHIBIT ___69___

PAGE ___1100___

SERVICE LIST

John B. Quinn, Esq.
Michael T. Zeller, Esq.
Jon D. Corey, Esq.
Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000
(213) 443-3100 (Fax)

Attorneys for Mattel, Inc.
[Personal Service]

John W. Keker, Esq.
Michael H. Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400
(415) 397-7188 (Fax)

Attorneys for Carter Bryant
[Federal Express]

Mark E. Overland, Esq.
Alexander H. Cote, Esq.
David C. Scheper, Esq.
Overland Borenstein Scheper & Kim
300 South Grand Avenue, Suite 2750
Los Angeles, CA 90071
(213) 613-4655
(213) 613-4656 (Fax)

[Federal Express]

- 4 -

PROOF OF SERVICE

NO. CV 04-9049 SGL (RNBx)

EXHIBIT ____69____

PAGE ____1101____

**EXHIBIT 70**

RightFAX          2/22/2007 3:18     PAGE 002/017    Fax Server

SEND

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

10

11   MGA ENTERTAINMENT, INC.,        )   Case No. CV 05-02727 SGL(RNBx)
                                      )
12              Plaintiff,            )   SCHEDULING ORDER [FRCP 16(b)]
                                      )
13        v.                          )   1.   Establishing a Discovery Cut-off Date of
                                      )        March 3, 2008
14   MATTEL, INC.,                    )
                                      )   2.   Non-Discovery Motion Hearing Cutoff
15              Defendants.           )        date of April 7, 2008, at 10:00 a.m.
                                      )
16                                        3.   Setting Final Pretrial Conference for
17                                             June 2, 2008, at 11:00 a.m.

18                                        4.   Setting Jury Trial Date of July 1, 2008, at
                                               9:30 a.m.
19

20
       READ THIS ORDER CAREFULLY. IT CONTROLS THE CASE
21                                                              FEB 2 2 2007
       AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES.
22

23     The above matter is set for trial before the Honorable Stephen G. Larson, United

24   States District Judge, Courtroom 1, United States District Court, Eastern Division, 2nd

25   Floor, Riverside, California.

26

27     1.     Discovery Cut-Off: This is the last date to complete discovery, including

28                                                        FEB 2 2 2007

2-21

EXHIBIT ___70___

PAGE ___1102___

1  expert discovery, and the resolution of any discovery motions before this court.  If expert

2  witnesses are to be called at trial, the parties shall designate experts to be called at trial and

3  provide reports required by Fed. R. Civ. P. 26(a)(B), not later than eight weeks prior to the

4  discovery cutoff date.  Rebuttal expert witnesses shall be designated and reports provided as

5  required by Fed.R.Civ.P. 26(a)(2)(B), not later than five weeks prior to the discovery cutoff

6  date.  Failure to timely comply with this deadline may result in the expert being excluded at

7  trial as a witness.  The Court requires compliance with Local Rule 37-1 and 37-2 in the

8  preparation and filing of discovery motions.  Discovery motions may not be heard on an ex

9  parte basis.

10      2.    **Joinder of Parties and Amendment of Pleadings:**  Any motions to join other

11  parties or for leave to amend the pleadings shall be filed within sixty (60) days of the date of

12  this Order so that they can be heard and decided prior to the deadline.  This deadline does

13  not apply if the deadline for joining parties or amending pleadings has already been

14  calendared or occurred by virtue of an order issued by another Judge.

15      In addition to the requirements of Local Rules 15-1, 15-2, and 15-3, all motions to

16  amend the pleadings shall (a) state the effect of the amendment; (b) be serially numbered to

17  differentiate the amendment from previous amendments and (c) state the page, line

18  number(s), and wording of any proposed change or addition of material.

19      3.    **Motion Filing Cut-Off:**  The Court hears motions on Mondays at 10:00 a.m.

20  The motion filing cut-off date is the last day motions may be heard (not filed).  The Court will

21  not decide late motions.  Issues left undetermined by the passage of the motion cut-off date

22  should be listed as issues for trial in the Final Pretrial Conference Order.  As an exception to

23  the above, motions in limine dealing with evidentiary matters may be heard at or before trial;

24  however, summary judgment motions disguised as motions in limine will not be heard.

25  Parties need not wait until the discovery cut-off to bring motions for summary judgment or

26  partial summary judgment.  However, in the usual case, the court expects that more than the

27  minimum notice will be provided to counsel opposing motions for summary judgment.  In the

28

EXHIBIT ___70___

PAGE ___1103___

1  usual case, the parties should confer and agree on the date for setting such motions.

2       Ex parte applications are entertained solely for extraordinary relief. See Mission Power

3  Eng. Co. v. Continential Casualty Co., 883 F.Supp. 488 (C.D. Cal. 1995). Strict adherence to

4  proper ex parte procedures is required for any ex parte application filed with the Court.

5       4.   **Stipulations to Extend Time:** Stipulations to extend the time to file any required

6  document or to continue any pretrial or trial date must set forth (a) the existing due date or

7  hearing date; (b) the current pretrial conference date and trial date; (c) the specific reasons

8  supporting good cause for granting the extension or continuance; and (d) whether there have

9  been any prior requests for extensions or continuances, and whether these were granted or

10  denied by the Court.

11       5.   **Summary Judgment Motions:** The Separate Statement of Undisputed Facts is to

12  be prepared in a two-column format. The left-hand column should set forth the allegedly

13  undisputed fact. The right-hand column should set forth the evidence that supports the

14  factual statement. The fact statements should be set forth in sequentially numbered

15  paragraphs. Each paragraph should contain a narrowly focused statement of fact. Each

16  numbered paragraph should address a single subject in as concise a manner as possible.

17       The opposing party's statement of genuine issues must be in two columns and

18  track the movant's separate statement exactly as prepared. The document must be in two

19  columns; the left-hand column must restate the allegedly undisputed fact, and the right-hand

20  column must indicate either undisputed, or disputed. The opposing party may dispute all or

21  only a portion of the statement, but if disputing only a portion, must clearly indicate what part

22  is being disputed. Where the opposing party is disputing the fact in whole or part, the

23  opposing party must, in the right-hand column, label and restate the moving party's evidence

24  in support of the fact, followed by the opposing party's evidence controverting the fact.

25  Where the opposing party is disputing the fact on the basis of an evidentiary objection, the

26  party must cite to the evidence alleged to be objectionable and state the ground of the

27

28

3

EXHIBIT ___70___

PAGE ___1104___

1 objection and nothing more.  **No argument should be set forth in this document.**

2     The opposing party may submit additional material facts that bear on or relate to the

3 issues raised by the movant, which shall follow the format described above for the moving

4 party's separate statement.  These additional facts shall follow the movant's facts, shall

5 continue in sequentially numbered paragraphs (i.e., if movant's last statement of fact was set

6 forth in paragraph 30, then the first new fact will be set forth in paragraph 31), and shall set

7 forth in the right hand column the evidence that supports that statement.

8     The moving party, in its reply, shall respond to the additional facts in the same

9 manner and format that the opposition party is required to adhere to in responding to the

10 statement of undisputed facts, as described above.

11     (a) <u>**Supporting Evidence:**</u> No party should submit any evidence other than the

12 specific items of evidence or testimony necessary to support or controvert a proposed

13 statement of undisputed fact.  Thus, for example, the entire transcript of a deposition, entire

14 sets of interrogatory responses, and documents that do not specifically support or controvert

15 material in the separate statements, should not be submitted in support or opposition to a

16 motion for summary judgment.  Any such material will not be considered.

17     Evidence submitted in support of or in opposition to a motion should be submitted

18 either by way of stipulation or as exhibits to declarations sufficient to authenticate the

19 proffered evidence, and should not be attached to the Memorandum of Points and

20 Authorities.  The Court will accept counsel's authentication of deposition transcript, of written

21 discovery responses, and of the <u>receipt</u> of documents in discovery <u>if the fact that the</u>

22 <u>document was in the opponent's possession is of independent significance</u>.  Documentary

23 evidence as to which there is no stipulation regarding foundation must be accompanied by

24 the testimony, either by declaration or properly authenticated deposition transcript, of a

25 witness who can establish its authenticity.

26     If evidence in support of or in opposition to a motion exceeds twenty pages, the

27

28

4

EXHIBIT ___70___

PAGE ___1105___

1    evidence must be in a separate bound volume and include a Table of Contents.

2        **(b) Objections to Evidence:** If a party disputes a fact based in whole or in part

3    on an evidentiary objection, the ground of the objection, as indicated above, should be

4    stated in the separate statement but not argued in that document.  Evidentiary objections

5    are to be addressed in a separate memorandum to be filed with the opposition or reply brief

6    of the party.  This memorandum should be organized <u>to track the paragraph numbers of</u>

7    <u>the separate statement in sequence</u>.  It should identify the specific item of evidence to

8    which objection is made, the ground of the objection, and a very brief argument with citation

9    to authority as to why the objection is well taken.  The following is an example of the format

10   contemplated by the Court:

11       Separate Statement Paragraph 1:  Objection to the supporting deposition transcript

12       of Jane Smith at 60:1-10 on the grounds that the statement constitutes inadmissible

13       hearsay and no exception is applicable.  To the extent it is offered to prove her

14       state of mind, it is irrelevant since her state of mind is not in issue.

15       Fed. R. Evid. 801, 802.

16   Do not submit blanket or boilerplate objections to the opponent's statements of

17   undisputed fact: these will be disregarded and overruled.

18       **(c) The Memorandum of Points and Authorities:** The movant's memorandum of

19   points and authorities should be in the usual form required under Local Rule 7-5 and should

20   contain a narrative statement of facts as to those aspects of the case that are before the

21   Court. All facts should be supported with citations to the paragraph number in the  Separate

22   Statement that supports the factual assertion and not to the underlying evidence.

23       Unless the case involves some unusual twist on Rule 56, the motion need only

24   contain a brief statement of the Rule 56 standard;  the Court is familiar with the Rule and

25   with its interpretation under Celotex and its progeny.  If at all possible, the argument should

26   be organized to focus on the pertinent elements of the cause(s) of action or defense(s) in

27

28

5

EXHIBIT ___70___

PAGE ___1106___

1   issue, with the purpose of showing the existence or non-existence of a genuine issue of

2   material fact for trial on that element of the claim or defense.

3          Likewise, the opposition memorandum of points and authorities should be in the

4   usual form required by Local Rule 7-5, and where the opposition memorandum sets forth

5   facts, the memorandum should cite to paragraphs in the separate statement if they are not in

6   dispute, to the evidence that contravenes the fact where the fact is in dispute or, if the fact is

7   contravened by an additional fact in the statement of genuine issues, the citation should be

8   to such fact by paragraph number.

9          **(d) Timing:** In virtually every case, the Court expects that the moving party will

10  provide more than the minimum twenty-one (21) day notice for such motions. The moving

11  party should deliver to chambers a copy of a diskette, in WordPerfect format (11.0 or earlier

12  versions), containing the Statement of Uncontroverted Facts and Conclusions of Law.

13         6.   **Motions in Limine:** The parties must file motions in limine addressing the

14  admissibility of evidence in accordance with Local Rule 7-3. The parties shall file their

15  opposing and reply papers in accordance with Local Rules 7-9 and 7-10 respectively.

16         7.   **Pretrial Conference and Trial Setting:** Compliance with the requirements of

17  Local Rule 16 is mandatory. Counsel shall submit carefully prepared Memoranda of

18  Contentions of Fact and Law (which may also serve as the trial briefs) and Proposed Pre-

19  Trial Conference Order ("PTCO") in accordance with the provisions of Local Rules 16-1

20  through 16-7. The Proposed Pre-Trial Conference Order shall conform to the example set

21  forth in Appendix A to the Local Rules, modified as necessary to comply with this order.

22         The Memoranda of Contentions of Fact and Law, Exhibit Lists, and Witness Lists

23  shall be served and filed no later than fourteen (14) calendar days before the Pre-Trial

24  Conference. The Proposed Pre-Trial Conference Order shall be lodged fourteen (14)

25  calendar days before the Pre-Trial Conference.

26         The Proposed Pre-Trial Conference Order must contain a Table of Contents. Place

27

28

6

EXHIBIT ___70___

PAGE ___1107___

In all capital letters and in bold the separately numbered headings for each category in the PTCO. Under paragraph 1, list each claim, counterclaim, or defense that has been dismissed or abandoned. In multiple-party cases where not all claims or counterclaims will be prosecuted against all remaining parties on the other side, please specify to which party each claim or counterclaim is directed. The factual issues in dispute should track the elements of a claim or defense upon which the jury would be required to make findings. Counsel should state issues in ultimate fact form, not as evidentiary fact issues (i.e., "was the defendant negligent," "was defendant's negligence the proximate cause of plaintiff's injury;" not "was the plaintiff standing on the corner of 12th Street and Lemon Avenue at 10:00 a.m. on March 1"). Issues of law should state legal issues upon which the Court will be required to rule after the Pre-Trial Conference, including during the trial, and should not list ultimate fact issues to be submitted to the trier of fact.

In drafting the PTCO, the court expects that counsel will attempt to agree on and set forth as many non-contested facts as possible. The court will normally read the uncontested facts to the jury at the start of the trial. Carefully drafted and comprehensively stated stipulation of facts will reduce the length of trial and increase jury understanding of the case.

If expert witnesses are to be called at trial, each party must list and identify its respective expert witnesses, both retained and non-retained. <u>Failure of a party to list and identify an expert witness in the Proposed Pre-Trial Conference Order shall preclude a party from calling that expert witness at trial.</u>

This case has been placed on calendar for a Final Pretrial Conference ("PTC") pursuant to Fed. R. Civ. P. 16 and Local Rule 16-1, <u>et seq.</u>, unless the PTC was expressly waived at the Scheduling Conference by the court. Unless excused for good cause, each party appearing in this action shall be represented at the PTC and all pretrial meetings of counsel, by lead trial counsel. The failure to attend the PTC or to submit the required pretrial

7

EXHIBIT ___70___

PAGE ___1108___

1  documents may result in the dismissal of the action, striking the answer and entering a

2  default, and/or the imposition of sanctions.

3         A continuance of the Final Pretrial Conference at counsel's request or stipulation

4  will only be approved upon a showing of good cause.  Counsel should plan to do the

5  necessary pretrial work on a schedule which will insure its completion with time to spare

6  before the Final Pretrial Conference.  Specifically, failure to complete discovery work,

7  including expert discovery, is not a ground for a continuance.

8         Compliance with the requirements of Local Rules 16-1 to 16-13 is required by the

9  court.  Carefully prepared Memoranda of Contentions of Fact (which may also serve as the

10  trial brief) and a proposed Final Pretrial Conference Order shall be submitted in accordance

11  with the provisions of Local Rule 16-7 and the form of the proposed Final Pretrial Conference

12  Order shall be in conformity with the format set forth in Appendix A to the Local Rules.

13         At the PTC, counsel should be prepared to discuss means of streamlining the trial,

14  including, but not limited to: bifurcation, presentation of non-critical testimony by  deposition

15  excerpts, stipulations as to the content of testimony, presentation of testimony on direct

16  examination by declaration subject to cross-examination, and qualification of experts by

17  admitted resumes.  In certain cases where the PTC is waived by the court, counsel must

18  follow Local Rule 16-11.

19     8.   **Witness List and Times Estimates:**  Counsel shall prepare a list of their witnesses,

20  an estimate of the length of time needed for direct examination for each witness, and whether

21  the witness will testify by deposition or in person.  Counsel shall exchange these lists with

22  opposing counsel.[1]  **Counsel shall jointly file a single witness list, including estimates for**

23  **direct examination of their own witnesses and estimates for cross-examination of**

24  **opposing witnesses.**  This list shall be filed at the time counsel lodge the Proposed Pre-Trial

25

26  _____

27     [1]  See "Joint Trial Witness Estimate Form" appended to this order.

28

8

EXHIBIT ___70___

PAGE ___1109___

●                    ●

1    Conference Order, i.e., fourteen (14) days before the Pre-Trial Conference.

2      9.   **Jury Instructions and Verdict Forms:**   Fourteen (14) calendar days prior to

3    counsel's Rule 16 pre-trial meeting, counsel shall exchange proposed jury instructions

4    (general and special) and special verdict forms (if applicable). Seven (7) calendar days prior

5    to the Rule 16-2 meeting, counsel shall exchange any objections to the instructions and

6    special verdict forms. Prior to, or at the time of the Rule 16 meeting, counsel shall meet and

7    confer with the goal of reaching agreement on one set of joint jury instructions and one special

8    verdict form.

9      The parties should make every attempt to agree upon the jury instructions before

10   submitting them to the Court. The Court expects counsel to agree on the substantial majority

11   of jury instructions, particularly when pattern instructions provide a statement of applicable law.

12   When the Manual of Model Civil Jury Instructions for the Ninth Circuit provides a version of an

13   applicable requested instruction, the parties should submit the most recent version of the

14   Model instruction. Where language appears in brackets in the model instruction, counsel shall

15   select the appropriate text and eliminate the inapplicable bracketed text. Where California law

16   applies, counsel should use <u>Judicial Council of California Civil Jury Instructions</u> (June 2006)

17   ("CACI"). If neither of the above sources is applicable, counsel are directed to use the

18   instructions from O'Malley, Grenig & Lee (formerly Devitt, <u>et al.</u>), <u>Federal Jury Practice and</u>

19   <u>Instructions</u> (latest edition). Each requested jury instruction shall cover only one subject or

20   principle of law and shall be numbered and set forth in full on a separate page, citing the

21   authority or source of the requested instruction (except for the "clean" jury copy discussed

22   below).

23      When the parties disagree on an instruction, the party opposing the instruction must

24   attach a short statement (one to two paragraphs) supporting the objection, and the party

25   submitting the instruction must attach a short statement supporting the instruction. Each

26   statement should be on a separate page and should follow directly after the disputed

27

28

9

EXHIBIT __70__

PAGE __1110__

1  instruction.

2      The parties ultimately must submit one document or, if the parties disagree over any

3  proposed jury instructions, two documents.  If the parties submit two documents, those

4  documents shall consist of: (a) a set of Joint Proposed Jury Instructions and (b) a set of

5  Disputed Jury Instructions, along with reasons supporting and opposing each disputed

6  instruction in the format set forth in the previous paragraph.

7      The parties must file proposed jury instructions fourteen (14) calendar days before

8  the Pre-Trial Conference.  If the court is closed that day, counsel shall file the proposed

9  instructions the preceding Friday.  No later than 4:00 p.m. on the date such instructions are

10  due, the parties must submit conformed courtesy copies to the Court's courtesy box located

11  outside the entrance to Courtroom 1, United States District Court, 3470 Twelfth Street, 2nd

12  Floor, Riverside, California.  Counsel shall also provide the Court with a 3½ inch diskette

13  compatible with WordPerfect version 11.0 or lower containing the proposed jury instructions, in

14  accordance with this paragraph and the previous paragraph.

15      The Court will send a copy of the instructions into the jury room for the jury's use

16  during deliberations.  Accordingly, in addition to the file copies described above, the diskette

17  submitted with the jury instructions shall contain a "clean set" of Joint Proposed and/or

18  Disputed Jury Instructions, containing only the text of each instruction set forth in full on each

19  page, with the caption "Court's Instruction No. ___" (eliminating titles, supporting authority,

20  indication of party proposing, etc.).

21      An index page shall accompany all jury instructions submitted to the Court.  The

22  index page shall indicate the following:

23      (a)  The number of the instruction;

24      (b)  A brief title of the instruction;

25      (c)  The source of the instruction and any relevant case citations; and

26      (d)  The page number of the instruction.

27

28

EXHIBIT ___70___

PAGE ___1111___

EXAMPLE:

| Number | Title | Source | Page |
|--------|-------|--------|------|
| 1 | Trademark-Defined (15 U.S.C. § 1127) | 9th Cir. 15.3.2 | 7 |

Along with the jury instructions, counsel shall submit any necessary special verdict form fourteen (14) calendar days before the Pre-Trial Conference.

10. **Voir Dire Questions:** Counsel may, but need not, submit brief proposed voir dire questions for the jury at the Pre-Trial Conference. The Court will conduct its own voir dire after consulting any proposed voir dire submitted by counsel. After the Court conducts its own voir dire, counsel will be provided an opportunity to ask supplemental questions subject to Court approval.

11. **Joint Statement of the Case:** Counsel shall submit a joint statement of the case at the Pretrial Conference. The joint statement of the case will be read to the prospective panel of jurors prior to the commencement of voir dire. The statement should not exceed one page. The statement shall be filed with the Court no later than 4:00 p.m., on the Wednesday prior to the Pre-Trial Conference.

12. **Exhibits:** The parties shall file their witness lists and exhibits lists in accordance with Local Rule 16. Counsel are to assemble their exhibits by placing them in three-ring binders labeled on the spine portion of the binder showing both the volume number and the exhibit numbers. Each exhibit shall be separated by a tabbed divider on the right side. Counsel shall provide original exhibits for the courtroom deputy clerk and a duplicate set for the judge. The original exhibits shall be tagged with the appropriate exhibit tags in the upper or lower right corner of the first page of each exhibit and include the case number, case name, and exhibit number. Each binder shall contain a Table of Contents. Counsel must comply with Local Rule 26-3 when numbering the exhibits. The Clerk's Office, located at the United States District Court, 3470 Twelfth Street, Riverside, California can supply counsel with appropriate exhibit tags.

11

EXHIBIT _____70_____

PAGE _____1112_____

1     The Court requires the following to be submitted to the courtroom deputy clerk on the

2  first day of trial: (a) The original exhibits with the Court's exhibit tags; (b) one bench book with

3  a copy of each exhibit for the Court's use, tabbed as described above; (c) three (3) copies of

4  exhibit lists and a floppy disk containing the exhibit list; (d) three (3) copies of witness lists in

5  the order in which the witnesses will be called to testify; and (e) file a Notice of Lodging of

6  Deposition Transcripts  (original and 2 copies) and Lodge all anticipated trial deposition

7  transcripts directly with the deputy clerk in the courtroom.

8     All counsel are to meet no later than ten (10) calendar days before trial to discuss

9  and agree to the extent possible on issues including foundation and admissibility.

10     **13. Pre-Trial Exhibit Stipulation:**  The parties shall prepare a Pre-Trial Exhibit

11  Stipulation which shall contain each party's numbered list of trial exhibits, with objections, if

12  any, to each exhibit including the basis of the objection and the offering party's response.  All

13  exhibits to which there is no objection shall be deemed admitted.  All parties shall stipulate to

14  the authenticity of exhibits whenever possible, and the Pre-Trial Exhibit Stipulation shall

15  identify any exhibits whose authenticity has not been stipulated to and the specific reasons for

16  the party's failure to stipulate.

17     The Stipulation shall be substantially in the following form:

18                       Pre-Trial Exhibit Stipulation

19  Plaintiff's Exhibits

20  Number      Description        Objection        Response to Question

21

22  Defendant's Exhibits

23  Number      Description        Objection        Response to Question

24

25     The Pre-Trial Exhibit Stipulation shall be filed at the same time as counsel lodges the

26  Proposed Pre-Trial Conference Order.  Failure to comply with this paragraph may constitute a

27

28

12

EXHIBIT ___70___

PAGE ___1113___

1   waiver of all objections.

2      **14. Findings of Fact and Conclusions of Law:** For a non-jury trial, counsel for each

3   party shall lodge proposed findings of fact and conclusions of law fourteen (14) days before

4   trial. The parties should deliver to chambers a copy of these findings and conclusions of law

5   on disk in WordPerfect format.

6        (a)   Underline in red the portions which it disputes;

7        (b)   Underline in blue the portions which it admits; and

8        (c)   Underline in black the portions which it deems not disputed, but deems

9           irrelevant.

10      Counsel may agree with a part of a finding or conclusion, disagree with a part of it

11   and/or consider a part of irrelevant.

12      Two marked copies of opposing counsel's proposed findings of fact and conclusions of

13   law shall be lodged with the court seven (7) days before trial and one marked copy shall be

14   served on opposing counsel. Courtesy copies of the marked copies shall be deposited in the

15   drop box located outside the entrance of Courtroom 1 of the above-entitled court on the date

16   due.

17      **15. Settlement:** Local Rule 16-15.2 provides that the Settlement Conference shall be

18   conducted not later than 45 days before the Pretrial Conference. The Court believes that in

19   most cases completion of all discovery and dispositive motions will help the parties assess

20   their positions before they embark on the costly pre-trial process. However, in many cases,

21   the parties find it more difficult to settle after they have incurred the cost of all discovery and

22   motion practice. Accordingly, the Court strongly encourages counsel and the parties to pursue

23   settlement earlier.

24      The Court has a keen interest in helping the parties achieve settlement. If the parties

25   believe that it would be more likely that a settlement would be reached if they conduct

26   settlement conference at an earlier time than that specified by the Court, they should conduct

27

28

13

EXHIBIT 70

PAGE 1114

1  it at that time.  In any event, the parties must file a Status Report re Settlement at the time

2  they lodge the Proposed Pretrial Order.

3  The Court will not conduct settlement conferences in non-jury cases which the Court will

4  try.  In jury cases, the Court will conduct a settlement conference at the parties' request if

5  *three conditions exist: (a) The parties are satisfied that the fact issues in the case will be tried*

6  *to a jury; (b) all significant pre-trial rulings which Court must make have been made; and (c)*

7  *the parties desire the Court to conduct the conference, understanding that if settlement fails,*

8  *the Court will preside over the trial of the case.*

9  **If a settlement is reached, it shall be reported immediately to this Court as**

10  **required by Local Rule 16-15.7.**

11  16.  The failure to attend the pretrial conference or to submit timely in conformity

12  with the format set forth in this order, the jury instructions, pre-trial exhibit stipulation, joint

13  statement of the case, voir dire questions, summary of witness testimony and times estimates,

14  proposed Pretrial Conference Order or the memorandum of contentions of fact and law may

15  result in the dismissal of the action, striking the answer and entering default and/or the

16  imposition of sanctions.

17  **17. Telephonic Status Conference:**

18  Telephonic status conferences are sometimes set by the court to discuss settlement

19  status and other pending issues.  If a telephonic status conference has been set, all counsel

20  are ordered to discuss the matter with their clients and opposing counsel before the telephonic

21  status conference.  Plaintiff's counsel must make the arrangements and place the conference

22  call.  Plaintiff's counsel shall include all counsel of record and the Court on the date and time

23  scheduled.  The conference operator is to place the final call to the Court at (951) 328-4410.

24  *To assist the Court and staff, participants shall identify themselves each time they speak.  No*

25  *cellular telephones or speaker telephones will be allowed.*

26  **Internet Site**

27

28

14

EXHIBIT ___70___

PAGE ___1115___

1       Counsel are encouraged to review the Central District's website for additional information.

2    The address is "http: //www.cacd.uscourts.gov".

3

4       The courtroom deputy clerk is ordered to serve a copy of this Order by mail, facsimile or

5    e-mail on counsel for all parties to this action.

6

7       IT IS SO ORDERED.

        FEB 2 1 2007

8    Dated: _____

9

10

11

12   STEPHEN G. LARSON
     UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                15

EXHIBIT ___70___

PAGE ___1116___

Joint Trial Witness Estimate Form

Case: _____                                    Trial Date: _____

| | WITNESS NAME | PARTY CALLING WITNESS AND ESTIMATE | X-EXAMINER'S ESTIMATE | DESCRIPTION OF TESTIMONY | COMMENTS |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| | Total Estimates This Page: | | | | |

Instructions:
(1) List witnesses (last name first); (2) For description, be extremely brief, e.g., "eyewitness to accident." Or "expert on standard of care"(3) Use estimates within fractions of an hour, rounded off to the closest quarter of an hour, e.g. if you estimate 20 minutes, make it .25. An estimate of one and one-half hours would be 1.5. An estimate of three-quarters of an hour would be .75; (4) Note special factors in "Comments" column. e.g., "Needs Interpreter." (5) Entries may be in handwriting if very neat and legible.

-16-

EXHIBIT ___70___

PAGE ___1117___

Confirmation Report — Memory Send

Page        : 001
Date & Time : 02-22-2007   03:22pm
Line 1      : 2136240543
Line 2      :
Machine ID  : QUINN EMANUEL

| | | |
|---|---|---|
| Job number | : | 446 |
| Date | : | 02-22  03:18pm |
| To | : | ☎76039#20257#13104771699 |
| Number of pages | : | 016 |
| Start time | : | 02-22  03:18pm |
| End time | : | 02-22  03:22pm |
| Pages sent | : | 016 |
| Status | : | OK |
| Job number | : 446 | *** SEND SUCCESSFUL *** |

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

NEW YORK
51 Madison Avenue, 22nd Floor
New York, NY, 10010
(212) 849-7000
Facsimile: (212) 849-7100

LOS ANGELES
855 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

SAN FRANCISCO
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

SILICON VALLEY
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

LOS ANGELES OFFICE
FACSIMILE TRANSMISSION

DATE:        February 22, 2007               NUMBER OF PAGES, INCLUDING COVER:  16

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Rahul Ravipudi, Esq. | (310) 477-1700 | (310) 477-1699 |

FROM:        Allison Burkholder, Esq.

RE:          Oulati v. IBM

MESSAGE:     PLEASE SEE ATTACHED

| | | | | |
|---|---|---|---|---|
| 20257/2008443 | | | | |
| CLIENT # | 20257 | ROUTE/ RETURN TO: | Monica Asarrurs | ☐ CONFIRM FAX ☐ INCLUDE CONF. REPORT |
| OPERATOR: | Rafael | | CONFIRMED?   ☐ NO   ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

EXHIBIT  70

PAGE  1118

RightFAX        2/22/2007 3:18   PAGE 001/017   Fax Server

From:   Name:        United States District Court
                     312 North Spring Street
                     Los Angeles, CA 90012
        Voice Phone:  (213) 894-5474

To:     Name:        Michael Zeller
        Company:

                     865 S Figueroa St, 10th Floor,
        City/State:  Los Angeles,CA 90017-2543
        Fax Number:  213-443-3100



### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## Automated Document Delivery Service
*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

Fax Notes:

Case 2:05-CV-02727 : MGA ENTERTAINMENT INC V. MATTEL INC ET AL

Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:

        Western Division:   CrimintakeCourtDocs-LA@cacd.uscourts.gov
        Southern Division:  CrimintakeCourtDocs-SA@cacd.uscourts.gov
        Eastern Division:   CrimintakeCourtDocs-RS@cacd.uscourts.gov

For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.

Switch to e-mail delivery and get these documents sooner!
To switch, complete and submit
Optical Scanning Enrollment / Update form G-76.
Call 213-894-5474 for help and free technical support.

If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.

Date and time of transmission:        Thursday, February 22, 2007 3:14:36 PM
Number of pages including this cover sheet:  17

EXHIBIT   70

PAGE   1119

.

**EXHIBIT 71**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION


CARTER BRYANT, an individual,

           Plaintiff,

    - against -     CASE NO.: CV 04-5049 SGL

MATTEL, INC., a Delaware corporation,

           Defendant.

**CERTIFIED COPY**

_____
AND CONSOLIDATED ACTIONS.
_____

CONFIDENTIAL ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF NANA ASHONG,

taken by Respective Parties, pursuant to Subpoena,
at the offices of Quinn Emanuel, 51 Madison Avenue,
22nd Floor, New York, New York, on Monday, January
28, 2008, commencing at 9:39 a.m., before Chandra D.
Brown, a Registered Professional Reporter and Notary
Public within and for the State of New York.


JOB No. 81553


EXHIBIT _____71_____

PAGE _____1120_____

```
 1      A P P E A R A N C E S:

 2

 3                  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
                    Attorneys for the Plaintiff
 4                  Four Times Square
                    New York, NY 10036
 5                  By: PAUL M. ECKLES, ESQ.

 6

 7

                    QUINN EMANUEL URQUHART OLIVER &
 8                  HEDGES, LLP
                    Attorneys for the Defendant
 9                  865 South Figueroa Street, 10th Floor
                    Los Angeles, CA 90017-2543
10                  By: MICHAEL T. ZELLER, ESQ.

11

12

13      ALSO PRESENT:

14              Chad Ackerman

15

16

17

18

19

20

21

22

23

24                                  EXHIBIT ___71___

25                                  PAGE ___1121___
```

1           FEDERAL STIPULATIONS

2                IT IS HEREBY STIPULATED AND AGREED by and

3       between the attorneys for the respective parties

4       hereto, that all rights, including the right to

5       object to any questions, except as to form, or to

6       move to strike any testimony is reserved;

7                IT IS FURTHER STIPULATED AND AGREED that

8       the attorneys for the respective parties hereto,

9       that the failure to object to any questions, or to

10      move to strike testimony at this examination shall

11      not be a bar or waiver to make such motion at, and

12      is reserved for trial of this action;

13               IT IS FURTHER STIPULATED AND AGREED that

14      the within examination may be sworn to by the

15      witness being examined before a Notary Public other

16      than the Notary Public before whom this examination

17      was begun with the same force and effect as though

18      signed and sworn to in Court;

19               IT IS FURTHER STIPULATED AND AGREED that

20      the filing and certification of the original of this

21      examination shall be and the same are hereby waived.

22

23                              EXHIBIT ___71___

24

25                              PAGE ___1122___

3

NANA ASHONG                                    01/28/08
CONFIDENTIAL ATTORNEYS' EYES ONLY

16:09:33    1         Q     In this, are the elements for protection

            2    that you're referencing here in connection with

            3    Bratz?

            4         A     Yes.

16:09:40    5         Q     The listing of Bratz elements for

            6    protection are those that are listed starting at the

            7    bottom of the first page of this Exhibit 4916 and

            8    continuing on to the second page; is that right?

            9         A     Yes.

16:09:53   10         Q     It begins under this heading where it says

           11    in Class 28, dolls and dolls accessories, in

           12    Class 35, licensing services; is that correct?

           13         A     Yes.

           14         Q     Turning your attention to the list itself,

16:10:07   15    you will see that the first element that you list

           16    there for Bratz is Angel, A-N-G-E-L, right?

           17         A     Yes.

           18         Q     Further down you will see that there is a

           19    reference to miscellaneous design and then in

16:10:20   20    parenthesis, angel wings and halo icon, closed

           21    parenthesis.

           22               Do you see that?

           23         A     Yes.

           24         Q     Now, the most miscellaneous design that

16:10:29   25    you're referring to here, that's the angel wings and

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855  EXHIBIT _____ 71

PAGE _____ 1123

| | | |
|---|---|---|
| 16:10:32 | 1 | the halo you were talking about earlier, right? |
| | 2 | A    Yes. |
| | 3 | Q    You'll agree with me that by this time, |
| | 4 | April 30 of 2001, one element that people were |
| 16:10:47 | 5 | considering at least internally within MGA in terms |
| | 6 | of protecting the Bratz property was the term |
| | 7 | "Angel," right? |
| | 8 | A    Yes. |
| | 9 | Q    That's a term that by the time you were |
| 16:11:08 | 10 | working there at MGA you associated as a possible |
| | 11 | name in connection with the Bratz line; is that |
| | 12 | true? |
| | 13 | MR. ECKLES:  Objection.  Leading.  Vague |
| | 14 | and ambiguous. |
| 16:11:20 | 15 | A    It was a nickname for an existing |
| | 16 | character |
| | 17 | Q    Which character was it a nickname for? |
| | 18 | A    Cloe. |
| | 19 | Q    Directing your attention further down the |
| 16:11:37 | 20 | second page of Exhibit 4916, you see that heading |
| | 21 | where it says "for copyright"? |
| | 22 | A    Yes. |
| | 23 | Q    Then the first bullet point is actual |
| | 24 | dolls, right? |
| 16:11:47 | 25 | A    Yes. |

214

| | | |
|---|---|---|
| 16:11:48 | 1 | Q    Then it lists the four names of the |
| | 2 | individual dolls as of that time:  Yasmin, Sesha, or |
| | 3 | Sasha rather, Jade and Cloe? |
| | 4 | A    Yes. |
| 16:11:58 | 5 | Q    By this you were indicating that the |
| | 6 | copyright registration or application for |
| | 7 | registration that was an element for protection was |
| | 8 | for the Bratz dolls themselves; is that true? |
| | 9 | MR. ECKLES:  Objection.  Vague.  Calls for |
| 16:12:16 | 10 | speculation.  Objection to the extent you're |
| | 11 | looking for a legal conclusion. |
| | 12 | A    In -- in terms of my research, yes. |
| | 13 | Q    In terms of what you understood was -- was |
| | 14 | the protection that was appropriate for the company |
| 16:12:42 | 15 | to have in connection with the launch of Bratz, |
| | 16 | right? |
| | 17 | MR. ECKLES:  Same objections.  Calls for |
| | 18 | legal conclusion and leading.  Calls for |
| | 19 | speculation. |
| 16:12:51 | 20 | A    In my understanding, yes. |
| | 21 | MR. ZELLER:  Let's mark as -- |
| | 22 | BY MR. ZELLER: |
| | 23 | Q    I'm going to show you what's previously |
| | 24 | marked as Exhibit 551.  For the record, this is a |
| 16:13:46 | 25 | two-page document bearing Bates Numbers MGA069426 |

215

EXHIBIT _____ 71

PAGE _____ 1125