Martinez, Liliana 5/20/2005

1   STATE OF CALIFORNIA          )

                                 ) ss:

2   COUNTY OF LOS ANGELES        )

3

4           I, JUDITH SCHLUSSEL, do hereby certify:

5           That I am a duly qualified Certified Shorthand

6   Reporter, in and for the State of California, holder of

7   certificate number 4307, which is in full force and

8   effect and that I am authorized to administer oaths and

9   affirmations;

10          That the foregoing deposition testimony of the

11  herein named witness was taken before me at the time and

12  place herein set forth;

13          That prior to being examined, the witness named

14  in the foregoing deposition, was duly sworn or affirmed

15  by me, to testify the truth, the whole truth, and

16  nothing but the truth;

17          That the testimony of the witness and all

18  objections made at the time of the examination were

19  recorded stenographically by me, and were thereafter

20  transcribed under my direction and supervision;

21          That the foregoing pages contain a full, true

22  and accurate record of the proceedings and testimony to

23  the best of my skill and ability;

24          That prior to the completion of the foregoing

25  deposition, review of the transcript was not requested.

EXHIBIT ____91____

PAGE ____1489____

**Page 362**

1          I further certify that I am not a relative or

2    employee or attorney or counsel of any of the parties,

3    nor am I a relative or employee of such attorney or

4    counsel, nor am I financially interested in the outcome

5    of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8    this 5th_ day of June_____, 2005_.

9

10

11    ___Judith Schlussel___

12    JUDITH SCHLUSSEL, CSR No. 4307

13

14

15

16

17

18

19

20

21

22

23

24          EXHIBIT ___91___

25          PAGE ___1490___

**EXHIBIT 92**

Claimant
Isaac Larian
First
Exhibits IL 1 and ILA-D
*14*.05.04

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

INTELLECTUAL PROPERTY

B E T W E E N:

MGA ENTERTAINMENT, INC.

Claimant

- and -

THOMAS CHRISTOPHER JOSEPH METSON

Defendant

---

### AFFIDAVIT OF ISAAC LARIAN

---

I, **ISAAC LARIAN,** of 16730 Schoenborn Street, North Hills, California, CA 91343, USA MAKE OATH and say as follows:

**Introduction**

1.  I am the Chief Executive Officer of the Claimant. I make this statement in support of the Claimant's applications for a disclosure order under CPR Part 25.1(1)(h), CPR Part 31 and the Court's equitable jurisdiction, and an interim injunction to restrain the Defendant from dealing in unlawful BRATZ trading cards under CPR 25.1(a) (set out in the Application Notice issued in these proceedings.

2.  Save where otherwise stated, I make this statement from facts within my own knowledge. Where I state facts which are not within my own knowledge, the source of my information is identified. I am duly authorised to make this Affidavit on behalf of the Claimant.

M17447.115/LT:327391.2/eaal

EXHIBIT 92
PAGE 1491
295

Confidential - Attorney's Eyes Only

MGA 0868039

3.    I have been the Chief Executive Officer of the Claimant since the Claimant was founded in 1979.

4.    There is now produced and shown to me marked **Exhibit "IL 1"** a bundle of copy documents to which I shall refer in this affidavit by reference to the relevant page numbers.

**The Claimant**

5.    The Claimant was founded as a consumer electronics business in 1979.  It entered the toy business in 1987 when it obtained an exclusive licence to sell Nintendo hand-held games in the US.  The Claimant subsequently obtained licences for other toy products including HELLO KITTY and POWER RANGERS and then developed its own branded toys such as BRATZ dolls.

6.    The Claimant has offices in Los Angeles, Hong Kong, Mexico and Canada and has over 450 employees. The Claimant sells its products around the world including in the US and Europe.

7.    Today, the Claimant has achieved earnings in excess of US$600 million in 2003 and its earnings are projected to be US$1 billion in 2004.  About 65-70% of the Claimant's business relates to BRATZ dolls and related merchandise (see below).

8.    I established the Claimant and was the inspiration behind the BRATZ dolls.  I have been the main driving force behind the success of the Claimant.

**The BRATZ Dolls**

9.    The Claimant started promoting and selling the BRATZ dolls in the US in June 2001.  The first four characters were "Cloe", "Sasha", "Jade" and "Yasmin".

10.   The BRATZ dolls have distinctive oversized heads decorated with exaggerated eyes and

296

M17447.115/LT:327391.2/labd                    2

Confidential - Attorney's Eyes Only

EXHIBIT _____92_____

PAGE _____1492_____

MGA 0868040

eyelashes, multi-coloured eye make-up, two-tone lipstick and rugged cheeks. These dolls were at that time, completely unique and were aimed at girls between the ages of 7 –12 years olds. At **Exhibit "IL A"** are samples of the latest BRATZ dolls on the UK market.

11.     The Claimant launched the BRATZ dolls in the UK in September 2001.

12.     Today, there are currently 8 full sized female dolls in the BRATZ collection called "Cloe", "Sasha", "Jade", "Yasmin", "Meygan", "Dana", "Nevra" and "Fianna" and 4 mini female dolls called "Ailani", "Nazalia", "Talia" and "Zada". There are also 5 full sized male dolls in the BRATZ collection called "Cameron", "Dylan", "Eitan", "Koby" and "Cade" and 4 mini male dolls called Mikko", "Colin", "Deavon" and "Lakin".

13.     As a result of the BRATZ dolls' uniqueness and designs, they have become a world-wide success. More than 50 million BRATZ dolls have been sold around the world to date, of which around 2.25 million have been sold in the United Kingdom as of 30 April 2004.

14.     At pages 1 to 4 of **Exhibit IL 1** is a copy of a schedule that appears on the website of the Office of National Statistics. I can see from this schedule that there were approximately 2,231,000 girls between the ages of 7-12 (inclusive) in the middle of 2002, Therefore, with cumulative sales of over 2 million, I estimate that a significant proportion of girls in this age group have one or more BRATZ dolls.

15.     For two consecutive years in 2001 and 2002, the BRATZ dolls have won the toy industry's most prestigious awards, The People's Choice Toy of the Year Award. In 2003, BRATZ dolls won the Toy Industry Association, Inc.'s Property Toy of the Year Award, the TIA Girl Toy of the Year Award, the Family Fun Toy of the Year, Toy Wishes Magazine Hot Dozen, MSN BC Hottest Toy of the Year 2003, MSN.com Top Holiday Toy 2003, NBC Today Show Toy Test Winner 2003, Toys R Us/Amazon.com, E-bay and KB Toys Hot List for 2003, and CNN Money Top Ten Holiday Toys for Girls 2003. At pages 5 to 6 of **Exhibit IL 1** are copies of articles confirming that the Claimant has won these awards.

297

EXHIBIT _____92_____

PAGE _____1493_____

Confidential - Attorney's Eyes Only                                        MGA 0868041

## Merchandising of the BRATZ brand

16.    A significant proportion of the Claimant's business since 2001 has been devoted to the creation and commercial exploitation of the BRATZ brand.  The Claimant licenses the right to use the BRATZ characters throughout the world on a wide range of products such as back-to-school products, home décor, beauty products and trading cards.  To date, there are over 200 licensees world-wide.

17.    In order to maintain its reputation as well as the value of its licences, the Claimant carefully selects each licensee to ensure that its licensed products are manufactured and controlled in accordance with the reputation of the brand.  The Claimant subjects each licence to a strict quality review and approval program.  For instance, in the Claimant's current standard terms and conditions for a BRATZ licence (a copy of which is at pages 7 to 22 of **Exhibit IL 1**) there is a clause requiring all licensed articles and any related packaging and advertising to be approved by the Claimant in writing at all stages of development and production of that product by the licensee (Clause 7(b)).

18.    The Claimant has a stringent approval process, which involves the licensee sending the Claimant's Approval Department a "Product Approval Form" for every stage of development from initial concept to final production and distribution for each product under licence. At page 23 of **Exhibit IL 1** is a copy of a sample "Product Approval Form". Only after the Approval Department has given its approval to that particular stage of the development, can the licensee proceed to the next stage.

19.    The Claimant also manufactures a wide range of merchandising products which it sells directly to its distributors in Europe and the US, including stationery, slippers, torches, clothing, schoolbags, tissues, posters, greeting cards, toiletries, jewellery, magazines and scarves.

20.    In the UK, the Claimant has appointed Vivid Imaginations Limited ("Vivid") as its primary licensee for a number of BRATZ products including dolls and doll accessories. Mr Nick

298

Confidential - Attorney's Eyes Only                                                    MGA 0868042

Austin, Chief Executive Officer of Vivid, informs me that he projects that Vivid's sales for BRATZ licensed products will be around £38 million (which, according to Mr Austin, equates to an approximate retail sales of £61 million). Mr Austin informs me that between January and April 2004, Vivid has made sales of £8.5 million. Mr Austin estimates that about 70–75% of the £38 million projected this year will relate to sales of the BRATZ dolls.

21.   Since April 2003, the Claimant's licensing agent for the UK is The Licensing Company ("TLC"). TLC is responsible for finding further opportunities to licence the BRATZ brand to potential licensees. Mr Rupert Waters, Senior Licensing Manager, informs me that over the last year TLC have collected around £875,000 in royalties for a range of goods including confectionery, stationery, greeting cards, clothing, and watches which he says equates to approximately £6,250,000 in wholesale sales (working on the basis of a 14% royalty rate on the wholesale price) and approximately £12,500,000 at retail sales (being approximately a 50% mark up on the wholesale price). Further, Mr Waters informs me that TLC has also secured total licence guarantees for this year of approximately £1,330,000 (which are simply up-front and non-recoupable payments by licensees to the Claimant). Mr Waters estimates that these licences should achieve retail sales of approximately £20 million.

**Promotion of the BRATZ brand**

22.   The Claimant has spent literally millions of dollars (and therefore pounds sterling) developing, building and promoting the BRATZ brand around the world including the placement of advertisements in all media, including printing advertisements, television spots and radio spots since 2001. In keeping with the importance of the BRATZ brand, the Claimant's licensees have also spent millions of dollars in advertising BRATZ products and promoting the use of the BRATZ characters on original licenced products in the USA, the UK and elsewhere.

23.   The Claimant also operates two websites to promote the BRATZ dolls and BRATZ

299

M17447.115/LT:327391.2/labd                    5

EXHIBIT _____ 92

PAGE _____ 1495

Confidential - Attorney's Eyes Only                    MGA 0868043

products at www.bratzpack.com and www.mgae.com.   Bratzpack.com provides games, e-greetings and the mix and match of BRATZ fashion and hair designs.   The website also offers visitors the opportunity to join the BRATZ fan club.   Over 250,000 BRATZ fans have signed up and have asked to be notified of new fashion trends that the BRATZ dolls will wear, and of the launch and marketing of those new fashions and new dolls.

24.   As a result of the BRATZ popularity, the BRATZ dolls have received enormous amounts of unsolicited publicity.   At pages 24 to 38 of **Exhibit IL 1** are copies of independent third party articles on the BRATZ range of dolls and the BRATZ phenomenon.   Today, BRATZ dolls are recognised to be challenging the role and position of BARBIE in the girls' toy doll sector of the children's doll market.

**Intellectual Property Rights in the BRATZ Range of Products**

25.   The Claimant owns all the rights in and to the BRATZ range of dolls and licensed merchandise.

26.   The Claimant has 22 Community Trade Mark applications, 3 registered Community Trade Marks and 1 registered UK Trade Mark featuring the word "BRATZ", details of which are at pages 39 to 61 of **Exhibit IL 1**.   For the purposes of these proceedings the Claimant relies on the following: registered UK Trade Mark no. 2,276,354 "BRATZ" in Class 28 for dolls and doll accessories; registered Community Trade Mark nos 2,582,658 "BRATZ" in Classes 3, 14, 16, 21, 24 and 26, covering inter alia stationery in class 16; and 2,347,524 "BRATZ" in Class 18 and in Class 28 for inter alia dolls and doll accessories.

**Merchandising of BRATZ lenticular cards**

27.   I am informed by Ms Sandrine de Raspide, Vice President, International Sales and Licensing, of the Claimant that she was contacted, around the second quarter of 2002, by the Claimant's Italian licensing agent Ms Emanuela Silvestri, Licensing Director of Licensing Consultants Srl (she is also known as "Dela"), with a new licensing proposal

300

M17447.115/LT:327391.2/labd                                              6

EXHIBIT ___92___

PAGE ___1496___

Confidential - Attorney's Eyes Only

MGA 0868044

relating to BRATZ lenticular cards (i.e. cards that are holographic in nature depicting several images on each card that are individually visible when the card is held in a different position against the light). Ms Silvestri has been the Claimant's licensing agent in Italy since 6 December 2001, and in that time has negotiated inter alia, the Claimant's licence with Panini Spa for stickers, collectable publishing products and albums. Ms Silvestri was therefore aware of the Claimant's interest in licensing BRATZ for stickers and cards.

28.    Ms Silvestri told Ms de Raspide that there was a new company in Italy called Prominter Srl ("Prominter") that produced original lenticular cards. Ms Silvestri enquired whether the Claimant would be prepared to licence Prominter to produce BRATZ lenticular cards in Italy.    Ms Silvestri explained that Prominter was very successful and had made a lot of money by manufacturing and selling lenticular cards for other brands. Ms Silvestri also explained that the main person behind Prominter was Mr Franco Galantini, who had created the lenticular cards. Mr Galantini is also a director of Prominter.

29.    Around the second quarter of 2002, Ms Silvestri sent Ms de Raspide samples of lenticular cards that Prominter had made under other licences. Ms de Raspide discussed the proposal with me and showed me the samples, and I concluded that it was a good business opportunity for the BRATZ brand. Ms de Raspide then asked Ms Silvestri to put together a Deal Memorandum, which Ms Silvestri subsequently sent to me.

30.    After further discussions, the Claimant decided to proceed with two licences for lenticular cards.

31.    The first licence was entered into on 30 July 2002.    Under this licence Prominter were authorised to produce BRATZ lenticular cards to be given away free as promotional gifts with every purchase of Yoga fruit juice (the "Yoga Licence"). Each box of three fruit juice cartons was to contain a BRATZ lenticular card. The Yoga Licence covered the following territories: Italy, San Marino, Citta del Vaticano, Italian speaking Switzerland and its term was from 1 December 2002 to 31 March 2003. A copy of the relevant Deal Memorandum

301

EXHIBIT ___92___

PAGE ___1497___

Confidential - Attorney's Eyes Only                              MGA 0868045

is at pages 62 and 63 of **Exhibit IL 1** and a copy of the Yoga Licence is at pages 64 to 79 of **Exhibit IL 1.**

32. The Claimant and Prominter subsequently agreed to extend the term of the Yoga Licence to 31 May 2003. A copy of the two agreements amending the Yoga Licence is at pages 80 to 83 of **Exhibit IL 1.**

33. The second licence was entered into on 24 January 2003. Under this licence, the Claimant authorised Prominter to manufacture and distribute BRATZ hologram (or lenticular) cards, a pamphlet and collector for hologram cards (i.e. album) until 28 February 2004. At pages 83 to 84 of **Exhibit IL 1** is a copy of the relevant Deal Memorandum and at pages 85 to 102 of **Exhibit IL 1** is a copy of the second licence (the "Prominter Licence").

34. Both the Yoga Licence and the Prominter Licence incorporate the Claimant's standard terms and conditions. I therefore draw the Court's attention to the following provisions which are the same in each licence agreement:

34.1 Clause 4 of the Prominter Licence (and Clause 5 of the Yoga Licence) provides that Prominter can distribute and sell within Italy, San Marino, Citta Del Vatizano (ie the Vatican City), and Italian speaking Switzerland ("the Territory");

34.2 Clause 11 of the Prominter Licence (and the Yoga Licence) states that the approved manufacturer of the Licensed Articles is Special Print;

34.3 Clause 12 of the Prominter Licence (and the Yoga Licence) states that all Licensed Articles and any related packaging and advertising must be approved by the Claimant in writing before promotion, distribution or sale by Prominter;

34.4 Clause 8(c) of Schedule A of the Prominter Licence (and the Yoga Licence) provides that all copyrights, patents and trade marks in the Licensed Articles and Packaging and Promotional Material shall be owned by the Claimant;

302

M17447.115/LT:327391.2/eaal                    8

EXHIBIT _____92_____

PAGE _____1498_____

Confidential - Attorney's Eyes Only                    MGA 0868046

34.5    Clause 11(a) of Schedule A of the Prominter Licence (and the Yoga Licence) provides, amongst other things, that if Prominter does not comply with the approval process, the Claimant can terminate the relevant agreement provided Prominter has not remedied such failure to the Claimant's satisfaction within 10 days of notificaton. In addition, clause 11(a) of Schedule A of the Prominter Licence also provides that in the event of any soliciting of sales outside the Territory, the Claimant can terminate the Prominter Licence immediately;

34.6    Clause 11(b) of Schedule A of the Prominter Licence (and the Yoga Licence) provides, amongst other things, that if the relevant agreement is terminated for a non-material breach, Prominter has 60 days to sell any remaining Licensed Articles, provided that those articles have not been manufactured for sale within the period and the Claimant has been given the opportunity to buy them first;

34.7    Clause 12(c) of Schedule A of the Prominter Licence (and the Yoga Licence) provides that Prominter may not enter into any agreement with any third party for the manufacturing, distribution or shipping of any other Licensed Articles without the Claimant's prior written consent. Any attempt by the licensee to assign, sublicense, mortgage or otherwise encumber the relevant agreement or any other licensee's rights, interests, or duties under the relevant agreement shall be void and be in material breach of the relevant agreement; and

34.8    Clause 12(f) of Schedule A of the Prominter Licence (and the Yoga Licence) provides that the relevant agreement is governed by and construed in accordance with federal laws of the US and laws of the State of California, and the parties submit to the jurisdiction of the Courts of California.

35.    There are also other specific provisions in each licence which are relevant, and I set these out below.

303

EXHIBIT ___92___

PAGE ___1499___

Confidential - Attorney's Eyes Only                    MGA 0868047

**Yoga Licence**

36.   Clause 14 of the Yoga Licence provides that Prominter shall not sell Licensed Products in any manner whatsoever, including for advertising or promotional purposes, for tied sales, bundled sales or as articles to be used as premiums, gifts, or for similar purposes. It also states that Prominter shall not sell the Licensed Products to wholesalers, retailers, canvassers, salesmen, or any others who will use, or whom Prominter has valid reason to presume that their intention is to use the Licensed Products for these purposes.

**Prominter Licence**

37.   Clause 4 of the Prominter Licence states that if Prominter markets, promotes, sells or offers for sale directly or indirectly any of the Licensed Articles outside the Territory, the Claimant may in its sole and absolute discretion, terminate the Prominter Licence. However, it should be noted that clause 4(d) of Schedule A of the Prominter Licence provides that Prominter may make sales outside the Territory, if those requests or orders are unsolicited by Prominter: ie passive sales outside the Territory are permissible but active sales are not.

38.   The Prominter Licence and the Yoga Licence (which I shall call together the "Agreements") were the first instances of the Claimant granting rights for the manufacture and sale of BRATZ lenticular cards anywhere in the world.   The Agreements only covered the Territory. I shall refer to the BRATZ cards manufactured by Prominter in the Agreements as "Italian Cards".

39.   I have seen a sample of the Italian Cards that were purchased by Mr Rupert Waters of The Licensing Company (the Claimant's licensing agent in the UK) from Berry's 4-5 Victoria Grove, London, W8 on 26 February 2004. I can see from this sample that it bears the Yoga mark and the name Prominter (this is available for inspection and marked **Exhibit "IL B"**). I therefore conclude that this sample must have been produced with the intention of being sold under the Yoga Licence, even though this was not permitted under

304

EXHIBIT ___92___

PAGE ___1500___

Confidential - Attorney's Eyes Only                                        MGA 0868048

the Yoga Licence and no final approval for such sale was ever given by the Claimant.

40.     I am very surprised that the sample I have referred to above appears to have been made under the Yoga Licence because Prominter were not allowed to sell the Italian Cards under the Yoga Licence and the Yoga promotion never went ahead.

41.     I have also seen a sample of the Italian Cards, which do not bear the Yoga mark (this sample is available for inspection and marked **Exhibit "IL C"**). I am not absolutely sure where this sample came from, but I am informed by Mr David Oakes, Senior Counsel, that it is likely to have been provided by Mr Galantini either during the approval process or during the negotiations set out in paragraphs 43-61 below.

42.     Around July 2003, (i.e. some 6 months after entering into the Prominter Licence, and after various breaches by Prominter set out below, the Claimant decided to manufacture its own BRATZ lenticular cards in China, which it planned to distribute in the US, Canada and Europe (excluding Italy).  These cards were first shipped to the US on 23 July 2003. The first time these BRATZ lenticular cards were shipped to the Claimant's licensees in the UK and France was in November 2003, but they were not put on those markets until January 2004.  At paragraphs 151-3 below, I set out details of the UK licensee of the BRATZ lenticular cards, Vivid and its experience of marketing such licensed product in the UK.

**Further Discussions between the Claimant and Prominter for an extension to Prominter's licence and to source the Italian Cards to the US and Canada**

43.     During the course of 2003 Prominter had on-going discussions with the Claimant about a number of matters including the extension of its licence to cover parts of Europe, and whether Prominter were able to source the Italian Cards for the US and Canadian markets. In the end, these discussions came to nothing and the Claimant did not enter into a licence extension with Prominter for Europe, or any agreement for Prominter to source the Italian Cards for the US and Canadian markets.  These discussions are

505

EXHIBIT ___92___

___1501___

Confidential - Attorney's Eyes Only                                MGA 0868049

summarised below.

44. On 21 April 2003, I wrote to Mr Galantini to explain that the Claimant planned to launch BRATZ lenticular cards in the US and Canada and asked Mr Galantini to advise on his best price and delivery of 10 million plus packs of 4 cards, so that I could compare this price to another price from a manufacturer in China. I also requested that 100 packs of 4 cards be sent to me in California, so I could inspect them (as I had not received any samples from Prominter since the Agreements were entered into, and, as I explain in paragraphs **62-132** below these cards had not been approved for sale). At page 103 of **Exhibit IL 1** is a copy of this email. The reason that I requested such information was to compare Prominter's prices to those of a Hong Kong supplier that I had identified as a possible source of similar products.

45. Mr Galantini replied on 22 April 2003 and informed me that the costs of production of 10 million Italian Cards were €0.17 each. A copy of the email is at page 104 of **Exhibit IL 1.**

46. On 22 April 2003, I replied to Mr Galantini's email and asked when the delivery date for the Italian Cards would be, as Mr Galantini had not provided this information in his last email. A copy of this email is at page 105 of **Exhibit IL 1.**

47. Shortly after 22 April 2003, I asked Mr Shawn Brower, Product Manager at the Claimant, to liase with Mr Galantini and obtain the information the Claimant required to compare Prominter's product to that of the Hong Kong supplier.

48. On 24 April 2003, Mr Brower wrote to Mr Galantini informing him that I was still awaiting samples of the Italian Cards. Mr Brower explained that this was very urgent and that he would need Mr Galantini's help in order to expedite the process. A copy of this email is at page 106 of **Exhibit IL 1.**

49. Shortly after 24 April 2003, Mr Brower received the samples of the Italian Cards and showed them to me. I was very impressed and instructed Mr Brower to inform Mr

306

M17447.115/LT:327391.2/eaal                              12

EXHIBIT 92

PAGE 1502

Confidential - Attorney's Eyes Only

MGA 0868050

Galantini that we wanted to proceed but required the Italian writing to be removed and replaced with English on the cards intended for English speaking countries.

50.    On 26 April 2003, Mr Brower sent an email to Mr Galantini informing him that I wanted to proceed with the Italian Cards from Prominter and sell them in the US market. However, as the samples the Claimant had received were in Italian, Mr Brower indicated that the Italian writing would need to be removed from the production process. Mr Brower asked Mr Galantini to send all the original artwork files to the Claimant on a CD. A copy of this email is at page 107 of **Exhibit IL 1.**

51.    On 28 April 2003, Mr Galantini sent an email to Mr Brower informing him that he had sent all the original artwork files on 6 CDs. He also informed him that he had translated the Italian writing in the artwork into English. A copy of this email is at page 108 of **Exhibit IL 1.**

52.    On 28 April 2003, Ms de Raspide received an email from Ms Silvestri enquiring whether the Claimant would grant Prominter a European licence to distribute the Italian cards. On the same day, Ms de Raspide replied and said that the Claimant did not want to extend the licence at this point. A copy of these emails is at page 109 of **Exhibit IL 1.**

53.    I am informed by Ms de Raspide, that the reason that she told Ms Silvestri that the Claimant did not want to proceed with a licence extension was because she knew that the Claimant was still in the process of deciding whether to use Prominter to source the Italian Cards or ask a Hong Kong company to manufacture then on the Claimant's behalf.

54.    On 29 April 2003, Mr Galantini replied to Mr Brower's email of 26 April (paragraph 50 above) and informed him of the shipping details. A copy of this email is at pages 110 and 111 of **Exhibit IL 1.** On 30 April 2003, I told Mr Galantini that the Claimant would do its own importation, customs clearance and insurance. A copy of this email is at page 112 of **Exhibit IL 1.**

307

EXHIBIT ___92___

PAGE ___1303___

Confidential - Attorney's Eyes Only                                    MGA 0868051

55. On 8 May 2003, Ms Silvestri, the Claimant's Italian licensing agent, sent an email to Ms Sandrine De Raspide informing her that Mr Galantini had asked her about the possibility of extending the licence to Spain, France, UK, Benelux and Scandinavia. Ms Silvestri indicated that she would propose an advance of more than €350,000 and a royalty of 16%. Ms Silvestri asked if the Claimant would reconsider its decision. A copy of this email is at page 113 of **Exhibit IL 1**.

56. After this email of 8 May 2003, Ms de Raspide discussed the proposal with me, and I indicated that the Claimant would consider an extension for an advance of US$500,000 and 20% royalty rate.

57. On 9 May 2003, Ms De Raspide replied to Ms Silvestri and said that for the territories mentioned, the Claimant could review a deal for an advance of US$500,000 and a 20% royalty rate. I am informed by Ms de Raspide that she deliberately used the term "review" as she did not want to commit the Claimant to any deal, as the Claimant was still, at that time, considering distributing the BRATZ lenticular cards in Europe itself via other licensees. On 9 May 2003, Ms Silvestri informed Mr Galantini of the Claimant's terms. Copies of these emails are at pages 114 and 115 of **Exhibit IL 1**.

58. On 21 May 2003, Prominter sent a draft Deal Memorandum to the Claimant. This Deal Memorandum was just a formal request by Prominter for an extension to the Agreement. At pages 116 to 118 of **Exhibit IL 1** is a copy of this Deal Memorandum. I can see from this Deal Memorandum that Prominter was requesting an extension to its licence so that it could sell Italian Cards in France, Spain, Portugal, UK, Germany, Austria, Scandinavia and Benelux (which of course covers further territories than those indicated in Ms Silvestri's email of 8 May 2003). Prominter requested that the term run from June 2003 to June 2004. Pursuant to this agreement, Prominter said that it would pay the Claimant €200,000 on signing the agreement (as opposed to the US$500,000 requested by Ms de Raspide), €150,000 on 1 October 2003 and a further €150,000 on 1 January 2004. Prominter also agreed to pay a 20% royalty.

308

EXHIBIT 92

PAGE 1504

Confidential - Attorney's Eyes Only                                   MGA 0868052

59.   This draft Deal Memorandum was never accepted by the Claimant. Further, the form of
the draft was unacceptable, as it was not properly drafted. For instance, there is an
inconsistency between the term of the contract (ie from June 2003 through June 2004)
and the marketing dates (i.e. June 03 and October 04). In essence, Prominter were
agreeing to market the Italian Cards after the term of the contract (ie until October 04).
Further, the guarantee or advance on signing was only Euros 200,000 rather than the
US$500,000 requested by Ms de Raspide.

60.   On 29 May 2003, Prominter sent a letter to the Claimant, following Mr Brower's request in
paragraph 50 above for Mr Galantini to send the original artwork files to the Claimant,
enclosing the electronic version of the artwork.  A copy of this letter is at pages 119 to 124
of **Exhibit IL 1.**

61.   Around June 2003, I became aware that Prominter were breaching the Agreement by
selling unapproved Italian Cards and soliciting sales of such cards outside the Territory in
Mexico, France and the UK. I therefore decided to put the discussions with Prominter
about the licence extension and the sourcing of Italian Cards to the US and Canada on
hold, until I had decided what to do about the breaches of the Prominter Licence and
determined whether it should be terminated. I set out below the events leading up to the
termination of the Prominter Licence on 25 June 2003 and my decision not to continue
the business relationship with Prominter.

**Breakdown of Relationship between Prominter and the Claimant**

62.   Following the grant of the Prominter Licence, Ms Silvestri liased with Prominter and the
Claimant's Approval Department to ensure that the Italian Cards were approved by the
Claimant pursuant to the Prominter Licence.

63.   Ms de Raspide and I had a meeting with Ms Silvestri during the New York Toy Fair at the
Toy Building in February 2003 where she brought mock-ups of the Italian Cards with her
for us to see.  The Claimant's Approval Department, however, had not approved these

EXHIBIT ___ 309
___ 92

PAGE ___ 1505

Confidential - Attorney's Eyes Only                                   MGA 0868053

cards, and so understandably I did not think that the Italian Cards were being marketed by Prominter at this time.

64. As indicated in paragraph 18 above, in order for a licensee to obtain approval for its product it needs to go through a stringent process, which culminates in the granting of a "Product Approval Form" by the Approval Department, which allows the licensee to do whatever is indicated on the form (e.g. pre-production or distribution of the products). Such a form had never been issued to Prominter, and so Prominter did not have the authority to market any Italian Cards or even circulate samples of the Italian Cards to the retail trade.

65. On 27 March 2003, Ms Dana Goldstein, Licensing Co-ordinator at the Claimant, sent an email to me informing me that she had discovered that the Italian Cards were being offered for sale on eBay.  I was surprised by this as the Italian Cards had not been approved for the pre-production stage (i.e. moving from the concept stage to 3D samples) yet alone for sale.  A copy of this email is at page 125 of **Exhibit IL 1.**

66. On 27 March 2003, I asked Ms Silvestri to explain why the Italian Cards were being offered on eBay and in Italian stores (although I did not know at that time that the Italian Cards were in fact being offered in stores, but I thought it was a fair assumption to make since they were being offered on eBay).  A copy of the email is at page 126 of **Exhibit IL 1.**

67. On or around 3 April 2003, Ms Silvestri had a meeting with Mr Galantini and unknown people at the Association of the Kiosk Distributors.  Following that meeting she sent an email to me setting out what had been disclosed by both parties.  A copy of this email is at page 127 of **Exhibit IL 1.** Ms Silvestri said that:

67.1 Prominter had sent all nine distributors in the Association of the Kiosk Distributors (including Megatoys) two prototype boxes of 24 packs of Italian Cards for them to show their customers;

310

EXHIBIT 92

PAGE 13016

Confidential - Attorney's Eyes Only

MGA 0868054

67.2    Mr Muscara of Megatoys put the advertisement on eBay to determine the potential demand for the Italian Cards;

67.3    Mr Galantini admitted that Prominter had manufactured and sold 100 boxes of Italian Cards (24 packs in each box) and sent them to 50 Kiosks throughout Italy. Mr Galantini said that Prominter did this to determine whether its projection for sales was accurate; and

67.4    She recommended that the Claimant ask Prominter to pay a fine to compensate the Claimant for the breaches of the Prominter Licence, and that the approval process should continue.

68.    After further discussions, I indicated to Ms Silvestri on 4 April 2003, that the Claimant had terminated the Prominter Licence and would only re-instate the Prominter Licence if Prominter paid $100,000, which was non-recoupable from royalties, by 10 April 2002. A copy of the email is at page 128 of **Exhibit IL 1**.

69.    Following a further exchange of emails between Ms Silvestri and me (at pages 129 to 132 of **Exhibit IL 1**), I also demanded that Prominter must promise not to breach the Prominter Licence again.

70.    Mr Kamarck, who was then General Counsel of the Claimant, then drafted an Amendment to the Prominter Licence and this was forwarded to Prominter through Ms Silvestri.

71.    On 4 April 2003, the Claimant and Prominter entered into the First Amendment to the Prominter Licence, whereby the Claimant waived its right to terminate the Prominter Licence, in consideration of Prominter paying it US$100,000. At page 133 of **Exhibit IL 1** is a copy of this First Amendment to the Prominter Licence.

72.    Pursuant to the First Amendment the Claimant and Prominter agreed to continue with the approval process, which had not been completed.

311

EXHIBIT 92

PAGE 1507

Confidential - Attorney's Eyes Only                    MGA 0868055

73.    On 20 May 2004, the Claimant received a Royalty Statement for sales of about 100 boxes
of Italian Cards made under the Prominter Licence. A copy of this statement is at page
134 of **Exhibit IL 1**.

74.    In June - July 2003, the Claimant held its annual Spring Review, where licensees are
invited to Los Angeles to meet with the Claimant's representatives and to review the new
line of BRATZ products. On 7 June 2003, Ms de Raspide and I were informed by Mr
Carlos Callego of Hasbro Mexico that he had been recently approached by Prominter and
told that Prominter had the right to distribute the Italian Cards in Mexico.

75.    On hearing this information, I was extremely annoyed to learn that Prominter were
continuing to breach the Prominter Licence, despite Mr Galantini's promises not to
infringe again. I decided to terminate the Prominter Licence and instructed Ms de Raspide
to ask Mr Kamarck to send Prominter a termination letter. A copy of Ms de Raspide's
email to Mr Kamarck dated 7 June 2003 is at page 135 of **Exhibit IL 1**. I can see from
this email, that Ms de Raspide also told Ms Goldstein to put the artwork approval for the
Italian Cards on hold. At this stage, none of the Italian Cards had been approved for sale.

76.    Ms de Raspide informed Ms Silvestri on 8 June 2003 that the Claimant was terminating
the Prominter Licence. A copy of this email is at page 136 of **Exhibit IL 1**.

77.    On 9 June 2003, Mr Kamarck wrote to Mr Galantini, and informed him that the Claimant
was terminating the Prominter Licence effective from 25 June 2003, as the Claimant had
discovered that Prominter were soliciting sales outside the Territory. At page 137 of
**Exhibit IL 1** is a copy of this letter.

78.    On 10 June 2003, Mr Galantini replied to Mr Kamarck's letter of 9 June 2003 and stated
that Prominter had not sold any Italian Cards outside the Territory. Mr Galantini said that
all Prominter had done was discuss the possibility of marketing the Italian Cards over
Europe with certain European distributors and business partners pursuant to their draft
Deal Memorandum of 21 May 2003 (see paragraph 58 above). At pages 138 to 141 of

312

EXHIBIT    92

PAGE    1308                MGA 0868056

Confidential - Attorney's Eyes Only

**Exhibit IL 1** is a copy of this letter.

79. On receiving Mr Galantini's letter of 10 June 2003, I was surprised to discover that Prominter had been discussing the possibility of marketing Italian Cards in Europe and instructed Mr Kamarck to disclose that the Claimant had learned that Prominter was making sales to Mexico.

80. On 11 June 2003, Mr Kamarck replied to Mr Galantini's letter of 10 June 2003 and stated that the Claimant had discovered that Prominter had approached Hasbro in Mexico regarding the distribution of Italian Cards in that country. Mr Kamarck stated that this was in breach of the Prominter Licence and requested that Prominter cure this breach, although it was not in fact curable, and others. A copy of the letter is at page 142 of **Exhibit IL 1**.

81. On 12 June 2003, Ms De Raspide and I invited Mr Galantini to a meeting at the New York Toy Fair.   During the meeting, I discussed with Mr Galantini the breaches of the Prominter Licence by Prominter, and Mr Galantini showed me a new product line, musical lenticular cards.   Mr Galantini said that he wanted the relationship to work, and stressed that the sales of the Italian Cards were going very well.

82. I was very surprised and annoyed by Mr Galantini's admission that he had sold the Italian Cards, as they still had not been approved for sale. I told Mr Galantini that we could put these troubles behind us if he would come clean and disclose all Prominter's breaches and could assure us that nothing similar would ever happen again.  I made it clear that the continuation of our commercial relationship depended upon him telling us exactly what he had done; otherwise we would be unable to trust him in the future.  I also made it absolutely clear to Mr Galantini that, if Prominter breached the contract one more time, the Claimant would terminate the Prominter Licence, and pursue Prominter for damages.

83. Mr Galantini then admitted that Prominter had breached the Prominter Licence by selling unapproved Italian Cards, but insisted that he only "tested" the market in Europe and

M17447.115/LT:327391.2/labd                    19

Confidential - Attorney's Eyes Only

313
EXHIBIT 92

PAGE 1509     MGA 0868057

Mexico. Mr Galantini said that Prominter had manufactured 3.2 million packs of unapproved Italian Cards and had sold about 1.8 million. I had not expected Mr Galantini to disclose sales of this magnitude and was rather taken back by his confession. However, even though the quantity of Italian Cards sold by Prominter was astonishing, I decided to give Mr Galantini one last opportunity to reform his ways. Mr Galantini and I agreed to sign a Second Amendment to the Prominter Licence, on the condition that Prominter pay the royalties on the unapproved Italian Cards immediately.

84.     I did not discuss with Mr Galantini any of the licence extension issues, as my main concern was to deal with the breaches.

85.     On 12 June 2003, Ms de Raspide sent Mr Kamarck an email setting out what had been agreed at the meeting and a copy of this email is at page 143 of **Exhibit IL 1**. Ms de Raspide asked Mr Kamarck to send a letter to Mr Galantini reflecting what had been agreed.

86.     The Draft Second Amendment was drafted and sent to Ms Silvestri by Mr Kamarck on 20 June 2003.  A copy of the Draft Second Amendment to the Prominter Licence is at page 144 to 145 of **Exhibit IL 1**.

87.     Ms Silvestri replied to Mr Kamarck on 22 June 2003 (a copy of the email is at page 146 of **Exhibit IL 1**). Ms Silvestri indicated that the numbers in the Draft Second Amendment needed to be changed, and that she would be having a meeting with Prominter to obtain these new figures.

88.     On 24 June 2003, Ms Silvestri sent an email to Mr Kamarck and Ms de Raspide explaining the outcome of her meeting with Prominter.  This email informed them amongst other things that:

88.1     Prominter had in fact manufactured 4,870,000 Italian Cards and sold 2,950,000;

88.2     she would invoice Prominter for these sales;

EXHIBIT 314 92

PAGE 1510

Confidential - Attorney's Eyes Only                                        MGA 0868058

88.3    production of the Italian Cards had stopped; and

88.4    she recognised that the cards had not been approved.

A copy of the email is at pages 147 to 148 of **Exhibit IL 1**.

89.    Mr Kamarck forwarded this email to me on 24 June 2003.

90.    Following this new information, I concluded that I simply could not trust Mr Galantini any further.  He could have been in no doubt at our meeting in New York that I required him to make a frank and complete disclosure of Prominter's activities in distributing unapproved BRATZ cards.  Despite this, it appeared that the figures he had given me were a huge understatement.  I could not imagine why he had done this and formed the view that we were now in the position where I could simply no longer believe anything he told me.  Given this I did not see how we could continue to do business.

91.    On 24 June 2003, I had an email exchange with Ms Silvestri where I informed her that "we can't work like this and will terminate the Prominter Licence with Prominter". A copy of these emails is at pages 149 to 151 of **Exhibit IL 1**.

92.    On 26 June 2003, Ms de Raspide asked Ms Silvestri to invoice Prominter for the Italian Cards it had manufactured and distributed and to request payment by 7 July 2003. A copy of this email is at page 152 of **Exhibit IL 1**.

93.    Ms Silvestri replied by saying that the invoice had been sent two days earlier and that she had requested payment by 3 July 2003. A copy of this email is at page 153 of **Exhibit IL 1**.

94.    Ms Silvestri also informed Ms de Raspide that the technical part of the Italian Cards was owned by Prominter and that they might take action against the Claimant. A copy of this email is at pages 154 to 155 of **Exhibit IL 1**.

M17447.115/LT:327391.2/eaal            21

315

EXHIBIT 92

PAGE 1511

Confidential - Attorney's Eyes Only            MGA 0868059

95.    On 1 July 2003, Mr Galantini sent me an email requesting a meeting to discuss the European licence. Despite my misgivings about Mr Galantini's trustworthiness, it was clear that he was capable of generating large sales of BRATZ cards. If I could find a way to control his exploitation of the BRATZ brand, I was still prepared to discuss working with him again. I therefore replied to his email without closing the door completely while making it clear that he had to persuade me that it was sensible to continue our relationship. I said that "before we discuss and do ANYTHING else, you must come CLEAN and pay all royalties now". I also said that, "you must also prove to us how can we trust you in the future", and that if the Claimant decided to go forward, it would need major guarantees that this type of infringement would not re-occur.

96.    On 2 July 2003 during the Spring Review, Ms de Raspide and I met Mr Yves Cognard from Hasbro France and Mr Nick Austin and Mr Neil Bandtock from Vivid Imaginations Limited ("Vivid") in Los Angeles to show them our new products and to discuss with Vivid the possibility of them taking the UK licence for BRATZ products. During those meetings, both Hasbro France and Vivid informed me that they had been approached by Prominter representatives and told that Prominter had the right to distribute the BRATZ lenticular cards in their respective territories. Vivid informed me that they were on the verge of placing an order for BRATZ cards with Prominter.

I was astonished and horrified to discover yet a further area of Mr Galantini's activities outside the Prominter Licence which had been hidden from us. This was a step beyond distributing unapproved Italian Cards because it involved deliberately attempting to make sales outside the licensed territory. I concluded that this was the final straw, and sent an email to Ms Donna Cunningham, General Counsel of the Claimant, informing her that we needed to collect outstanding royalties and then "shut this guy down", by which I meant end the Claimant's relationship with Prominter. A copy of this email is at page 156 of **Exhibit IL 1**.

98.    On 3 July 2003, Mr Galantini sent me an email and confirmed that he had asked his bank to transfer the full invoice amount (meant for royalties of an unauthorised product) to the

516

EXHIBIT 92

PAGE 1512

Confidential - Attorney's Eyes Only                              MGA 0868060

Licensing Consultants Srl. He also said that. "... this is a small demonstration that I can be trusted". A copy of this email is at page 157 of **Exhibit IL 1**.

99.    On receiving this email, I asked Ms Diana Luna of the Licensing Department and Ms de Raspide to look out for the money and let me know when it arrived. A copy of this email is at page 158 of **Exhibit IL 1**.

100.    On the same day, Ms Luna confirmed that she would inform me when the money arrived and that the total that she expected was €163,436. Copies of these emails are at pages 159 to 160 of **Exhibit IL 1**.

101.    · On 3 July 2003, I replied to Ms Luna's email and informed her and others (including Ms de Raspide) that "once we get this royalty and in order for this licensee to continue being a licensee for BRATZ, we will require a $1million deposit and an agreement that this deposit will be used as a partial damages if he breaches the contract again. Otherwise, we will terminate". A copy of this email is at page 161 of **Exhibit IL 1**.

102.    The reason that I offered this solution was because I was very keen that the licence should continue. I thought that this amount would be a sufficient deterrent to Prominter and would stop it breaching the Prominter Licence.

103.    On 8 July 2003, Ms de Raspide informed me that Ms Silvestri had received €163,436 from Prominter, and that Ms Silvestri was making the necessary arrangements to transfer the money to the Claimant.

104.    Following notification of payment of the royalties, Ms de Raspide enquired in an email dated 8 July 2003, whether I wanted to insist on a $1million deposit. A copy of this email is at page 162 of **Exhibit IL 1**.

105.    I subsequently informed Ms de Raspide that I wanted her to put this proposal to Prominter and so on 10 July 2003 Ms de Raspide called Ms Silvestri and communicated this proposal to her. A copy of an email from Ms de Raspide to the Claimant's Legal

317

EXHIBIT    92

PAGE    1513

Confidential - Attorney's Eyes Only                                    MGA 0868061

Department confirms this (see page 163 of **Exhibit IL 1**). In this email, Ms de Raspide also instructed Mr Kamarck not to send the letter of termination to Prominter yet. After speaking to Ms Silvestri, Ms de Raspide told me that she thought that it was a good idea and would put it to Prominter. Ms de Raspide said that she expected a response from Prominter in the next few days.

106.    On 9 July 2003, I sent an email to Mr Galantini reminding him that at the New York Licensing Show I had said that if Prominter breached the Prominter Licence one more time, the Claimant would terminate the Prominter Licence. I then explained to Mr Galantini that I had just been told by Hasbro France and Vivid in the UK that Prominter had been telling them that Prominter had the right to distribute Italian Cards in those markets. I wanted to remind Mr Galantini how seriously I regarded what I had been told and finished my email to him by saying "We cannot work like this without trust". A copy of this email is at page 164 of **Exhibit IL 1**. Mr Galantini's response by email the following day said that the contacts with "Hasbro France and Vivid have been effected in order to explore distribution in Europe ...". This admission makes it clear that Mr Galantini had instructed the Defendant to approach Vivid in June 2003 (details of this approach are set out in the Affidavit of Neil John Bandtock). A copy of this email is at page 165 of **Exhibit IL 1**. I responded almost immediately telling Mr Galantini that there had been too many breaches and too many excuses when they were discovered, that he had broken our trust and that we were not interested in doing business like this. A copy of this email is at page 166 of **Exhibit IL 1**.

107.    On 10 July 2003, Mr Kamarck sent a letter to Mr Galantini (see pages 167 and 168 of **Exhibit IL 1**) informing him that the Prominter Licence had been properly terminated as of 25 June 2003 because Prominter:

107.1    had failed at the meeting on 12 June 2003 to give accurate figures of the number of unapproved Italian Cards sold; and

107.2    continued to solicit sales outside the Territory (i.e. in France and the UK). 318

M17447.115/LT:327391.2/labd                    24                    EXHIBIT ___92___

PAGE ___1514___

Confidential - Attorney's Eyes Only                    MGA 0868062

108.    Ms Silvestri sent an email dated 11 July 2003 to Ms de Raspide informing her that Mr Galantini admitted to selling unapproved Italian Cards, but denied making sales or soliciting orders outside the Territory. She said that all Mr Galantini claimed to have done is make presentations whilst the Claimant was considering the licence request for Europe. Prominter could not expose itself to $1 million as the Italian market alone cannot generate this amount. She also said that Mr Galantini had got in touch with his lawyers, as he felt that the Claimant had copied Prominter's animated cards.   A copy of this email is at pages 169 and 170 of **Exhibit IL 1**.

109.    On 11 July 2003, Mr Galantini said in an email to me that Prominter had not sold any Italian Cards in Mexico or the UK and had not directly or indirectly sold Italian Cards in any foreign countries. Mr Galantini said that the only company that was directly contacted by Prominter was Hasbro France. A copy of this email is at page 171 of **Exhibit IL 1**.

110.    On 22 July 2003, I received an email from Ms Silvestri informing me that she had spoken to an insurance company about insuring against Prominter's infringements and that she did not think it would be viable. She suggested, instead, that Mr Galantini could obtain a bank guarantee of $500,000 against the right to manufacture and distribute one collection of Italian Cards in Europe in accordance with the Deal Memorandum issued by Prominter. She said that if Prominter breached the Prominter Licence again, this money would belong to the Claimant. She also explained that Prominter wanted to renew the YOGA promotion (which I have already said expired on 31 May 2003) and make BRATZ musical cards. A copy of this email is at page 172 of **Exhibit IL 1**.

111.    I replied to Ms Silvestri's email immediately, and informed her that the Prominter Licence was terminated. I said that Prominter could open a letter of credit in favour of the Claimant and that it should state:

*"Prominter will sell Bratz lenticular cards under permission and approval of MGA only in Italy per contract dated ???/. If MGA finds PROMINTER is in breach, MGA can make a statement to the bank and collect the LC in full as partial damages caused to MGA by*

EXHIBIT ___92___

PAGE ___1515___

319

Confidential - Attorney's Eyes Only                                    MGA 0868063

*Prominter for the breaches".*

I told Ms Silvestri that the Claimant would not enter into any other agreements with Prominter for at least 90 days to enable it to monitor Prominter and ensure that it was complying with the Prominter Licence. I also informed her that the Claimant would not tolerate any further breaches. A copy of this email is at pages 173 and 174 of **Exhibit IL 1**.

112. On 23 July 2003, I received an email from Ms Silvestri informing me that Mr Galantini agreed with my proposal set out in my email of 22 July 2003 and stated that it would take 15 days to open a letter of credit. Ms Silvestri enquired as to what amount I wanted secured by the letter of credit. Ms Silvestri also said that Mr Galantini would like to issue the collection of lenticular cards by October 2003 in Italy only and would like to get a license for Audio Cards.

113. Despite the current negotiations, it seems that Mr Galantini decided to protect Prominter's position in correspondence. He sent a letter to me on 25 July 2003.setting out a formal position rather different from his previous admissions of breaches of the Prominter Licence. In retrospect, he was probably already trying to set up in correspondence a position to which he could subsequently refer in court. In this letter, Mr Galantini insisted that Prominter had not committed any infringement and indicated that he would not accept that the contract was null and void. Mr Galantini said that Prominter had never attempted to sell the Italian Cards outside the Italian territory and that all Prominter had done was test the market in anticipation of the Claimant granting them a licence for the whole of Europe. Mr Galantini expressly denied that Prominter had made any attempt to sell the Italian Cards into Mexico. A copy of this letter is at page 175 of **Exhibit IL 1**.

114. Following the letter from Mr Galantini, it was clear to me that there was a dispute between Mr Galantini and me as to whether the Prominter Licence had been terminated. I therefore instructed Mr David Oakes to send a further letter to Mr Galantini informing him that the Prominter Licence had been terminated.

M17447.115/LT:327391.2/labd                    26

EXHIBIT 92 320

PAGE 1516

Confidential - Attorney's Eyes Only

MGA 0868064

15.    On 30 July 2003 Mr Oakes wrote to Mr Galantini and reiterated that the Prominter
Licence had been terminated on 25 June 2003 (as per Mr Kamarck's letter of 9 June
2003).   Mr Oakes demanded that Prominter immediately cease and desist from any
further manufacture, sale or distribution of Italian Cards and Albums.  A copy of this letter
is at pages 176 and 177 of **Exhibit IL 1**.

116.    Unsurprisingly, given the apparent dispute between the parties, the Claimant did not
receive any assurance or undertaking from Prominter in accordance with the
requirements set out by Mr Oakes in his letter of 30 July 2003.

7.    As far as the Claimant is concerned the Prominter Licence was terminated on 25 June
2003.  The Yoga Licence had previously expired  and therefore Prominter should not
have been manufacturing or selling any Italian Cards after that date. It is clear that
Prominter does not accept this.  However, I would suggest to the Court that, in light of the
evidence from Vivid about its dealings with Prominter in June 2003, it is clear that
Prominter had in fact been in breach of the terms of the Prominter Licence and that MGA
was entirely justified in terminating the contract.

118.    On about 22 August 2003, I discovered that Prominter were still selling cards despite the
termination of the Prominter Licence. I cannot now recall how I discovered this
information, but it is clear from what happened afterwards that Mr Galantini has not
challenged this. I reported this to Ms Silvestri on 22 August 2003, and asked her to speak
to Prominter and find out what was happening. A copy of this email is at page 178 of
**Exhibit IL 1**.

119.    Ms Silvestri replied on 22 August 2003 and informed me that Mr Galantini had asked her
to try to persuade me to start a new relationship with Prominter. Mr Galantini told Ms
Silvestri that it would take about three months to have all 35,000 Italian kiosks cleared of
the Italian Cards. Ms Silvestri also confirmed in this email that she had found out that Mr
Galantini had recalled the cards.  Ms Silvestri also informed me that Mr Galantini had
received more than 15 million orders for packs of Italian Cards from different distributors

EXHIBIT  92

321

PAGE  1517

Confidential - Attorney's Eyes Only

MGA 0868065

in Europe, although Mr Galantini had not accepted them. A copy of this email is at pages 179 and 180 of **Exhibit IL 1**.

120.   On 22 August 2003, I repeated my earlier offer to Ms Silvestri that if Prominter wanted to continue in its relationship with the Claimant then it would need to provide a letter of credit or deposit which the Claimant would use to set off any damages it suffered as a result of any future violations of the licence. A copy of this email is at pages 181 and 182 of **Exhibit IL 1**.

121.   On 1 September 2003, I received an email from Ms Silvestri informing me that "Franco is interested in making a deal – for Italy only – for the Bratz and Lil Bratz – for one collection of lenticular (animated cards) and for the music cards ...". She indicated that Mr Galantini was trying to open a letter of credit or obtain a bank guarantee. She also said that Prominter wanted a one year licence. A copy of this email is at page 183 of **Exhibit IL 1**.

122.   I replied on the same day and informed Ms Silvestri that we would offer $250,000 advance and 20% royalty. A copy of this email is at page 184 of **Exhibit IL 1**.

123.   On 4 September 2003, Ms Silvestri informed me that Prominter was willing to enter into a new licence, but needed to discuss the financial aspects with its bank.  Ms Silvestri therefore requested more time. A copy of this email is at pages 185 and 186 of **Exhibit IL 1**. I immediately replied informing Ms Silvestri that the Claimant was willing to wait until 8 September 2003, as long as Mr Galantini confirmed in writing that day that he had ceased all sales, productions and marketing of all BRATZ products pending settlement.

124.   Ms Silvestri replied on the same date, requesting more time as the bank needed to understand how the procedure for recovering damages from the $1million would work. She also enquired about the products that Prominter would be allowed to sell if a deal was done. Finally she said that Mr Galantini would send a letter confirming that he had stopped selling the Italian Cards.

EXHIBIT 92

322

PAGE 1518

Confidential - Attorney's Eyes Only

MGA 0868066

125. On 5 September 2003, the Claimant received a fax from Prominter's Italian lawyers attaching a copy of a claim that Prominter had brought against the Claimant in Italy (see paragraphs 133-140 below). These negotiations therefore went no further.

126. On 12 September 2003, I was informed by Ms Luna that a director of a prospective licensee, Mr Peter Ruf of Living Pictures, informed her that he had acquired a album from Prominter. Ms Luna informed me that this album had not been licensed. On 18 September 2003, Ms Luna confirmed that the last comments on the file were on 22 June 2003, which stated that the sample album had been "disapproved". A copy of these two emails is at pages 187 to 189 of **Exhibit IL 1**.

127. On 23 September 2003, Ms Andrea Henz-Trojer of K Kiosk AG, Hotackerstrasse 40, CH-4132, Muttenz, sent an email to the Claimant informing the Claimant that K Kiosk AG had received two offers of "Bratz animated cards" in Switzerland and enclosed a photograph of the product. She asked which company has the licence for Switzerland for this product. A copy of this email is at pages 190 to 192 of **Exhibit IL 1**.

128. Ms Diana Luna forwarded this email to me on 23 September 2003, I immediately reviewed the photograph and saw that it was a Prominter product (because of the Italian language on it). I forwarded the email to Mr Kamarck, and asked him to inform Mr MacFarland, who is the Claimant's external US lawyer from Keats, MacFarland and Wilson. A copy of this email is at pages 193 to 194 of **Exhibit IL 1**.

129. I discussed the sale of the album with Ms Silvestri on 18 September 2003 and she informed me that the album "was almost approved" and Prominter had sold 40,000 albums in Italy. She also said that the royalties had been paid on them. At pages 195 to 196 of **Exhibit IL 1** is a copy of this email.

130. I asked Ms Luna to look into this and she informed me on 8 October 2003 that no royalties were paid on the albums. A copy of this email is at pages 197 to 198 of **Exhibit IL 1**.

EXHIBIT __92__  323

PAGE ___1519___

Confidential - Attorney's Eyes Only                      MGA 0868067

131.    On 22 September 2003, Ms Silvestri informed me that Prominter had advertised the
Italian Cards on TV and sent me a copy of it. At pages 199 to 200 of **Exhibit IL 1** is a
copy of this email.

132.    Overall, I tried my best to make the relationship work with Mr Galantini and Prominter, but
was repeatedly undermined by Prominter who continually misled us about its dealing in
the Italian Cards. In particular, Prominter made sales of the Italian Cards, even though the
Italian Cards were never approved for sale within Italy. I have reviewed all the relevant
approval forms issued pursuant to the Agreements, and I confirm that the Claimant has
not approved any Italian Cards for production under the Agreements.   At pages 201 to
218 of **Exhibit IL 1** are copies of the latest Product Approval Forms that the Claimant
received from Prominter in relation to the Italian Cards manufactured under the Yoga
Licence and Prominter Licence.   It is clear from these Product Approval Forms that the
Italian Cards were not authorised for sale.   Furthermore, Prominter misrepresented to
other distributors in Mexico, UK and France that it had the rights to distribute the Italian
Cards in those countries and even solicited sales in the UK.

**Action brought by Prominter against the Claimant in Italy**

133.    On 4 September 2003, Prominter filed proceedings against the Claimant in Italy.   At
pages 219 to 336 of **Exhibit IL 1** is an English translation of the Italian summons, which
sets out Prominter's allegations and the remedies it seeks, which include, amongst other
things:

133.1    a declaration that it has not sold Italian Cards outside the Territory defined in the
Prominter Licence and that the Prominter Licence is still valid and enforceable;

133.2    a declaration that a licence had been concluded between Prominter and the
Claimant enabling Prominter to sell the BRATZ lenticular cards in the US,
Canada and Europe;

EXHIBIT _92_

324

PAGE _1520_

Confidential - Attorney's Eyes Only

MGA 0868068

133.3    damages for breach of contract; and

133.4    an order that the Claimant returns the electronic CDs carrying the artistic works of the Italian Cards .

134.    I understand from the Italian lawyer that the Claimant has retained on this matter, Mr Gabriele Cuonzo of Trevisan & Cuonzo Avvocati, that Prominter obtained an Italian Court Order enabling them to serve the Claim Form by fax on the Claimant, which they subsequently did.

135.    The Claimant has been advised by Mr MacFarland that service by fax on the Claimant does not conform with the Hague Convention and therefore the Italian summons has not, as a matter of Californian law, been served correctly on the Claimant.

136.    The Italian Court asked both parties to attend a hearing on 23 April 2004.

137.    On 22 April 2004 an associate of Trevisan & Cuonzo Avvocati attended an informal meeting with the Judge and informed him that service by fax was defective under the Hague Convention and should not therefore be recognised by the Italian Court.

138.    A representative of Trevisan & Cuonzo Avvocati attended the hearing on 23 April 2004 as part of the public gallery, but did not participate in the proceedings since the Claimant did not wish to submit to the Italian jurisdiction.

139.    The Judge informed Prominter's Italian lawyers at the hearing on 23 April 2004 of his concerns regarding the validity of Prominter's service. After the hearing had come to an end, Prominter's lawyers made an informal approach to the same Judge in the same afternoon. Although neither Mr Cuonzo nor any of his associates were present at this informal hearing, Mr Cuonzo was subsequently informed that Prominter's lawyers successfully persuaded the Judge that the claim had been correctly served on the Claimant. The Judge has therefore declared Prominter's service by fax valid.

325

EXHIBIT   92

PAGE   1521

Confidential - Attorney's Eyes Only                                        MGA 0868069

140.    Mr Cuonzo has subsequently discovered a recent Italian Supreme Court decision, as yet unreported, which states that service by fax on a foreign entity in Italian proceedings is void. The Claimant has instructed Mr Cuonzo to inform the Italian Court of the Supreme Court's decision, and to seek to persuade the Judge to overturn his decision that the claim was properly served on the Claimant.

## Proceedings in the US

141.    On 5 September 2003 (without knowledge of the Italian proceedings commenced by Prominter only the day before), the Claimant filed a claim against Prominter in the Californian Courts. On 22 September 2003 the Claimant filed an amended claim in the Californian Courts against Prominter seeking a declaration that the Prominter Licence between the parties was terminated no later than 22 September 2003 and a permanent injunction to restrain Prominter from manufacturing and selling the Italian Cards and albums. At pages 337 to 347 of **Exhibit IL 1** is a copy of the claim filed in the US proceedings.

142.    I am informed by Mr MacFarland that the Claimant translated the amended claim and served it on Prominter on 20 November 2003 in accordance with the Hague Convention and in compliance with the service procedures of the Italian Code of Civil Procedure. This is confirmed by the Declaration of James L Seal, which is at pages 348 to 367 of **Exhibit IL 1**.

143.    On 19 December 2003, Prominter's Italian lawyers, Studio Dell'Avvocato Giovanni Cavani, wrote to the Federal District Court of the US disputing the jurisdiction of the US Court in view of the pending Italian proceedings. A copy of this letter is at pages 368 to 372 of **Exhibit IL 1**.

144.    Prominter did not file any evidence in the US proceedings and so on 6 January 2004 the Claimant filed a request to enter Default Judgment against Prominter. Default was entered against Prominter on 13 February 2004 and the Claimant filed a motion for

M17447.115/LT:327391.2/labd                              32

EXHIBIT __92__  326

PAGE __1522__

Confidential - Attorney's Eyes Only                                          MGA 0868070

default judgment on 23 February 2004. The Claimant was given a hearing date of 15 March 2004.

145.   On 2 March 2004, the Court clerk indicated that the default judgment would be determined without a hearing and under submission.

146.   On 11 March 2004, Prominter filed an Ex-parte Application requesting further time to file its Defence and that the Default Judgment be set aside.

147.   Part of the papers filed by Prominter in these proceedings was a statutory declaration of Mr Galantini, a copy of which is at pages 373 and 374 of **Exhibit IL 1.** I can be seen from this declaration that Mr Galantini says that Prominter has not sold any Licensed Articles or used the BRATZ trade marks after 28 February 2004.

148.   On 18 March 2004, the Court ordered that the disposition of the Claimant's motion to enter into Default Judgment against Prominter should be delayed until after the court ruled on Prominter's motion to set aside and vacate Default Judgment, which is presently before the Court.

149.   On 28 April 2004, Judge Klausner granted an order in these proceedings setting aside the Default Judgment application and requiring Prominter to file a reply to the Claimant's Amended Claim no later than 3 May 2004. A copy of this Order is at pages 375 to 377 of **Exhibit IL 1.**

150.   On 30 April 2004, Prominter served its answer to the Claimant's Amended Claim. A copy of this is at pages 378 to 389 of **Exhibit IL 1.** In short, Prominter denies all allegations and claims not to have sold any Italian Cards outside the Territory.

**The Claimant's UK Licence**

151.   On 1 January 2004, Vivid became the Claimant's new UK licensee for certain BRATZ products including BRATZ dolls and lenticular cards. Vivid replaced the Claimant's

327

EXHIBIT _a2_

Confidential - Attorney's Eyes Only

PAGE ___1523___                    MGA 0868071

existing licensee, Bandai UK Limited.

152.    Around the beginning of January 2004, Vivid received delivery of its first order of BRATZ lenticular cards from the Claimant and sold 25,000 packs of BRATZ lenticular cards to two of its retail customers, Tesco and Argos.

153.    At **Exhibit "IL D"** is a sample of the official UK BRATZ lenticular cards. I shall refer to these cards as the "English Cards".

## Discovery of the Italian Cards on the UK market

154.    On 24 February 2004, Ms Daphne Gronich informed me that she was told by Mr Rupert Walters that he had been informed by a potential licensee, Panini UK Limited ("Panini"), that Comag Distribution and Publications Limited (were distributing a substantial quantity of Italian Cards in the UK.

155.    As Ms Gronich was surprised by this discovery, she has informed me that she asked Mr Ray Black and Mr Paul Cox of SJ Berwin on 27 February 2004 to instruct an investigator to make enquiries into Comag's activities and other identified suppliers to determine, amongst other things, when Prominter had sold these Italian Cards onto either the Italian or UK market.

156.    I have been informed by Mr Paul Cox of SJ Berwin that he asked Mr Graham Robinson and Mr Steve White of Farncombe International Limited to make the necessary enquiries.

157.    I have read the investigator's report exhibited to Mr Robinson's Affidavit and I would draw the Court's attention to the following information and evidence collated on the various parties involved in the distribution of the Italian Cards to the UK.

## Investigation of Comag

158.    Between 27 February 2004 – 3 March 2004, Mr White had a number of telephone

328

EXHIBIT 92

PAGE 1524

Confidential - Attorney's Eyes Only                    MGA 0868072

conversations with several employees at Comag including: (a) Ms Jackie Moody, Accounts Development Manager on 27 February (paragraphs 3.7 – 3.9 at pages 6 and 7 of **Exhibit GR1** to the Affidavit of Graham Robinson) and 1 March 2004 (paragraphs 3.12 – 3.13 at page 7 of **Exhibit GR1** to the Affidavit of Graham Robinson); (b) Ms Hazel Isaacs New Business Director (who informed Mr White that she was involved with the manufacturer when Comag did the deal to bring the Italian Cards into the UK) on 3 March 2004 (paragraphs 3.23 – 3.29 at page 9 of **Exhibit GR1** to the Affidavit of Graham Robinson); and (c) Ms Helen Britten, Operations Executive on 3 March 2004 (paragraph 3.16 at pages 7 and 8 of **Exhibit GR1** to the Affidavit of Graham Robinson) . During those conversations Mr White was told that:

158.1   the UK agent for the supplier was the Defendant, Mr Tom Metson, (Ms Moody and Ms Isaacs; paragraph 3.8 at page 6 and paragraph 3.28 at page 9 of **Exhibit GR1** to the Affidavit of Graham Robinson).

158.2   Mr Metson was the UK representative of Prominter. In particular, Ms Isaacs confirmed that Mr Metson handled everything for Prominter in the UK and that if you contacted Prominter they would just say "talk to Tom" (paragraph 3.28 at page 9 of **Exhibit GR1** to the Affidavit of Graham Robinson);

158.3   Comag started selling the Italian BRATZ cards on 12 February 2004. The BRATZ cards had been sent to 90 wholesalers throughout the UK (Ms Britten; paragraph 3.16 at pages 6 and 7 of **Exhibit GR1** to the Affidavit of Graham Robinson);

158.4   Comag expected to get more Italian Cards at a later date. In particular, Ms Isaacs replied to Mr White's enquiry on whether they will be getting more Italian Cards by saying, *"not of this series, because they produced their quantity for us and that's it, but if this one does well, then they are talking about, there is a second series which would come out later in the year"* (paragraph 3.25 at page 9 of **Exhibit GR1** to the Affidavit of Graham Robinson);

329

EXHIBIT 92

PAGE 1525

Confidential - Attorney's Eyes Only          MGA 0868073

*Investigation of Mr Metson*

159.    Between 4 March – 6 April 2004, Mr White and Mr Robinson had about 10 telephone conversations with Mr Metson (paragraphs 3.37 – 3.105 at pages 11 – 20 of **Exhibit GR1** and paragraphs 3.14 – 3.20 at pages 13 – 15 of **Exhibit GR2** to the Affidavit of Graham Robinson).

160.    During those conversations they obtained the following information and evidence that:

    160.1    the Italian Cards were not licensed in the UK, but they were official licensed product from Prominter made in Italy for the Italian market and other Italian speaking territories (paragraph 3.40 at page 11 of **Exhibit GR1** to the Affidavit of Graham Robinson);

    160.2    Mr Metson has stated that Prominter has an ongoing licence with MGA to produce and sell BRATZ lenticular cards. For instance, Mr Metson told the investigators on 26 March 2004 that there is a licence in place between MGA and Prominter that runs *"till the end of next year"* (a copy of the transcript of the conversation between Graham Robinson and Mr Metson on 26 March 2004 is at Exhibit FIL/13654/17 referred to in paragraph 3.99 at page 19 of **Exhibit GR1** to the Affidavit of Graham Robinson, and a copy of the transcript is also at pages 390 to 397 of **Exhibit IL 1**). I understand this to mean that the licence agreement between MGA and Prominter would last until the end of 2005;

    160.3    Prominter was not able to export the Italian BRATZ cards to the UK. If they did, then the product would be illegal (paragraph 3.43 at page 11 of **Exhibit GR1** to the Affidavit of Graham Robinson);

    160.4    Mr Metson is the UK agent for T Group Srl (paragraph 3.62 at page 14 of **Exhibit GR1** to the Affidavit of Graham Robinson) (which I shall refer to as "T Group") whose business addresses are at: Via Cernuschi, 6, 20052 Monza (MI),

M17447.115/LT:327391.2/labd                    36                    EXHIBIT 92          330

PAGE 1526

Confidential - Attorney's Eyes Only                                        MGA 0868074

Sede Legale; Via Sondrio, 15, 20053 Muggio (MI), Magazzino (paragraph 3.96 at page 19 of **Exhibit GR1** to the Affidavit of Graham Robinson); and Via Pavia 38-40, 20053 Muggio, Milan (paragraph 3.91 at page 18 of **Exhibit GR1** to the Affidavit of Graham Robinson);

160.5    Mr Metson is paid a retainer plus a commission by T Group to sell the Italian BRATZ cards in the UK (paragraph 3.93 at page 19 of **Exhibit GR1** to the Affidavit of Graham Robinson).  Mr Metson also explained that on occasions he buys small quantities of Italian Cards through his own business Planet Zorb and sells them on to third parties in the UK (paragraphs 3.92 and 3.93 at page 19 of **Exhibit GR1** to the Affidavit of Graham Robinson);

160.6    in the words of Mr Metson, *"Prominter work hand in glove with T Group"* (paragraph 3.85 at page 18 of **Exhibit GR1** to the Affidavit of Graham Robinson).  He explained that T Group is the official assigned distributor of all Prominter products outside of Italy (paragraph 3.104 at page 20 of **Exhibit GR1** to the Affidavit of Graham Robinson).  He stated that T Group is an Italian company who also act as a sub-contract printer for Prominter (paragraph 3.89 at page 18 of **Exhibit GR1** to the Affidavit of Graham Robinson). He also confirmed that T Group manufacture the Italian Cards for Prominter (paragraph 3.85 at page 18 of **Exhibit GR1** to the Affidavit of Graham Robinson) and purchase the Italian  Cards back from them for sale to Comag (paragraph 3.92 at page 19 of **Exhibit GR1** to the Affidavit of Graham Robinson);

160.7    T Group purchase Italian Cards from Prominter and then distribute those cards throughout Europe (paragraph 3.84 at page 17 of **Exhibit GR1** to the Affidavit of Graham Robinson). Mr Metson repeatedly claimed that the Italian Cards were brought into the UK under the Treaty of Rome (paragraphs 3.84 and 3.92 at pages 17 and 19 and paragraph 3.40 at page 11 of **Exhibit GR1** to the Affidavit of Graham Robinson).   He said that as Prominter sell the Italian Cards to T Group in Italy, T Group are then free, under the Treaty of Rome, to sell those

EXHIBIT  92    331

PAGE  1527

Confidential - Attorney's Eyes Only

MGA 0868075

Italian Cards anywhere in Europe (paragraph 3.84 at page 17 of **Exhibit GR1** to the Affidavit of Graham Robinson).   Mr Metson provided a copy of a declaration, which was sworn by T Group on 10 October 2003 (at page 2 of Exhibit FIL/13654/16 referred to in paragraph 3.96 at page 19 of **Exhibit GR1** to the Affidavit of Graham Robinson, which is also exhibited at page 398 of **Exhibit IL 1**);

160.8   the Italian Cards were still being printed on an on-going basis (paragraph 3.64 at page 14 of **Exhibit GR1** to the Affidavit of Graham Robinson).   In particular, on 4 March 2004, Mr Metson indicated that he thought that the Italian Cards would be available for the next two or three years (paragraph 3.47 at page 12 of **Exhibit GR1** to the Affidavit of Graham Robinson).   He confirmed that there would be a continuing supply, and that series 2 was already out in Italy and that there was a third one with *"two lenticular cards as you see them but then it's got a make-up piece where the girls can put glitter in their hair and dress their nails, and that's also in a 99p pack so there's plenty of stuff to come yet"* (paragraph 3.47 at page 12 of **Exhibit GR1** to the Affidavit of Graham Robinson).   On 5 March 2004, Mr Metson stated that *"16 million Series 1 cards had been printed and 6 million Series 2 cards had been sold in Italy.   Series 3 was lined up for launch in the summer"* (paragraph 3.64 at page 14 of **Exhibit GR1** to the Affidavit of Graham Robinson);

160.9   Comag was the first launch of the Italian Cards in the UK (paragraph 3.74 at page 15 of **Exhibit GR1** to the Affidavit of Graham Robinson).   Mr Metson said that Comag bought 600,000 packets of Italian Cards and 5,000 Italian albums from T Group (paragraph 3.45 and 3.77 at pages 12 and 16 of **Exhibit GR1** to the Affidavit of Graham Robinson) and provided a copy of the delivery note from T Group confirming that the delivery date to Comag was 2 February 2004 (a copy of this delivery note is at page 411 of **Exhibit IL 1**);

160.10   the Italian Cards had been sold to other UK businesses such as JA Magsons,

EXHIBIT 92
332
PAGE 1528

**Confidential - Attorney's Eyes Only**          MGA 0868076

and Mark and Paul Cullinson (referred to in the telephone transcript at pages 390 to 397 of **Exhibit IL 1**). Mr Metson claimed that the Italian Cards were delivered to JA Magsons in January 2004 (paragraph 3.75 at page 16 of **Exhibit GR1** to the Affidavit of Graham Robinson). Mr Metson also indicated that he had just concluded an agreement, on or around 26 March 2004, with Mark and Paul Cullinson who have direct trading accounts with Argos, Toys 'R' Us and Woolworths in the UK (referred to in the telephone transcript at pages 390 to 397 of **Exhibit IL 1**). He stated that the Italian Cards would soon be appearing on an Argos flier (referred to in the telephone transcript at pages 390 to 397 of **Exhibit IL 1**). Argos, Toys 'R' Us and Woolworths are large high street retailers in the UK. However, separate approaches by our investigator to Argos, Toys R Us and Woolworths on 4 May 2004 have revealed that those companies are not, at least on that date, selling the Italian Cards (see **Exhibit GR3** to the Affidavit of Graham Robinson);

160.11   Mr Metson made an offer to supply our investigator with 24,000 Italian Cards for 38.2p each and 1000 Italian BRATZ albums for £1.85 each on 17 March 2004 (paragraph 3.83 at page 17 of **Exhibit GR1** to the Affidavit of Graham Robinson). At Exhibit FIL/13654/13 referred to at paragraph 3.83 at page 17 of **Exhibit GR1** to the Affidavit of Graham Robinson is a copy of this offer from Mr Metson. Mr Metson informed us that these products were being sourced from the remaining stock in Comag's possession (paragraphs 3.72 and 3.73 at page 15 of **Exhibit GR1** to the Affidavit of Graham Robinson). He explained that he had bought these products from Comag and that they were being stored at Comag's premises (paragraphs 3.72 and 3.73 at page 15 of **Exhibit GR1** to the Affidavit of Graham Robinson); and

160.12   Prominter used to be a promotions company and that they brought in a "marketing whiz kid" called Sandro Guerzoni, who had been in the business for 28 years of which 18 years were spent as Panini's International Sales and

EXHIBIT ___92___

PAGE ___1529___

333

Confidential - Attorney's Eyes Only

MGA 0868077

Marketing Director (referred to in the telephone transcript at pages 390 to 397 of **Exhibit IL 1**).  Mr Metson explained that Mr Guerzoni had been brought into Prominter, and had a great deal of experience in licences (referred to in the telephone transcript at pages 390 to 397 of **Exhibit IL 1**).

161.    Finally, during our investigator's conversations with Mr Metson, it was noticeable that Mr Metson referred to T Group and Prominter collectively as "we" and "us", which suggests that the companies are sufficiently closely related to be treated as a single organisation and that he regards himself as part of that organisation.   For instance, on 18 March 2004, Mr White explained to Mr Metson that he understood that Prominter did not have a licence to market the Italian Cards in the UK and it was T Group who were selling them. Mr Metson replied by saying that, "we had a licence for Italy and we were promised one for the UK....". Mr Metson went on to explain that "[i]n order for us to correctly bring these products in 100% legally into the UK, Prominter has sold these products to another Italian company called the T Group....." (paragraph 3.84 at page 17 of **Exhibit GR1** to the Affidavit of Graham Robinson).

*Investigation into Special Print*

162.    On or around 11 March 2004, Mr Cox instructed Farncombe to make an approach to an Italian company named Special Print S.r.l. ("Special Print") who originally manufactured the BRATZ cards for Prominter under the Agreement (which has been terminated). At pages 399 to 401 of **Exhibit IL 1** is a copy of the Claimant's Approval of Manufacturer Agreement.   Mr Cox asked Farncombe to determine, amongst other things, whether Special Print was continuing to manufacture the Italian Cards for Prominter.

163.    On 12 March 2004, Mr Oliver Maude-Roxby of Farncombe telephoned Special Print and spoke to Mr Carlo Boroli, the Sales Director of Special Print. Under a suitable pretext, Mr Maude-Roxby arranged to meet Mr Boroli on 15 March 2004 at Special Print's offices in Milan.

334

EXHIBIT __92__

PAGE __1530__

Confidential - Attorney's Eyes Only

MGA 0868078

164.    On 15 March 2004, Mr Maude-Roxby attended the meeting at Special Print and was introduced to Mr Gianmatteo Maggioni at Customer Services. During the course of the meeting, Mr Maude-Roxby was told that Special Print:

164.1    was the only company in Europe that processed lenticular sheets and also printed lenticular products such as cards, advertising and promotional materials. Mr Maggioni stated that, although Special Print did not work on designs for cards themselves, they would provide input on a client's designs as and when required;

164.2    had started printing a second series of Italian Cards "at the end of last year";

164.3    had ceased making the Italian Cards in November; and

164.4    were "working on a third series", but that it was "not yet in production". Mr Maggioni said he was unsure as to the timing of production for the third series.

*Investigation into JA Magsons*

165.    On 4 March 2004, Mr White called JA Magsons and spoke to Mr Paul Clark (who said he was a buyer for JA Magsons). Mr White informed Mr Clark that he was interested in buying some Italian Cards, and then Mr White proceeded to ask some questions about the cards. During that conversation, Mr Clark said *"we've got stock in at the moment, I've just got another order going in on them, we're buying them all the time at the moment"*. Mr Clark also said that *"...they are printing them all the time"*.

*Investigation into Playcom, SAS*

166.    On 9 December 2003, Ms de Raspide and I were informed by Mr Doron Peled of Ilanit Toys, the Claimant's Israeli licensee, that the Italian Cards were being sold on the Israeli market by Toys 'R' Us. Mr Peled subsequently said in an email dated 17 December 2003 that the Italian cards say they are not produced by Prominter. Further, Mr Peled

EXHIBIT ___92___

335

PAGE ___153___

Confidential - Attorney's Eyes Only                    MGA 0868079

said that the Italian Cards were imported by HG Distribution, who bought them from Playcom SAS in Italy (who I shall refer to as "Playcom") who claimed it can sell the Italian Cards around the world. Copies of these emails are at pages 402 to 405 of **Exhibit IL 1**.

167.    On or around 18 December 2003, Mr David Oakes received from Mr Peled a copy of a declaration that Toys R Us had received from Playcom. A copy of this declaration is at page 406 of **Exhibit IL 1**.

168.    I can be seen from this Exhibit that the declaration is identical to the declaration sworn by T Group (at page 398 of **Exhibit IL 1**), save for the name and contact details of the declarant and the date the declaration was sworn.

169.    Mr Roncaglia (another of the Claimant's lawyers in Italy) also provided us with an Italian company search for Playcom. A copy of this company search is at pages 407 to 410 of **Exhibit IL 1**. I can see from this company search that the same Mr Sandro Guerzoni, mentioned by Mr Metson as working for Prominter, is also a director of Playcom.

170.    I can see from the delivery note provided by Mr Metson (see page 411 of **Exhibit IL 1**) that one of the fax lines at the top of the fax reads "DA: Playco N.FAX 059663363 01 APR 2004 16.40 P1". I have compared the fax number on the delivery note (ie 059663363) to the fax number appearing on the fax line on the Playcom declaration (ie 059663363) and can see they are identical. Further, I also note that the fax number given by Playcom as part of its contact details at the bottom of the Playcom declaration is 059663363. I conclude from this that Mr Metson obtained the T Group delivery note (page 411 of **Exhibit IL 1**) dated 2 February 2004 from Playcom. It is also clear that the same declaration has been used by both of them for the same purpose. They are therefore working in close collaboration in distributing Italian Cards.

**The Claimant's Request for a Disclosure Order**

171.    The evidence and information obtained by the investigator from Mr Metson, Special Print

M17447.115/LT:327391.2/labd          42          EXHIBIT 92   336

PAGE 1532

Confidential - Attorney's Eyes Only                          MGA 0868080

and JA Magsons contradicts the statements made by Mr Galantini in the Declaration at pages 373 to 374 **Exhibit IL 1** that Prominter have not traded in Italian Cards or used the BRATZ trade marks since 28 February 2004. In particular, Mr Metson informed the investigator that the licence between Prominter and the Claimant continues until the end of 2005, and that he expects to have further supplies of the Italian Cards for the next two to three years. The investigation of Special Print revealed that whilst Special Print was not currently manufacturing the Italian Cards (or admitting to it), it was currently working on Series 3 of the Italian Cards, which is presumably in conjunction with Prominter. *Because of the discrepancy between what Prominter claims it is doing in the US litigation and what Mr Metson and others say is happening commercially, I believe that if Mr Metson is given notice of the requirement to disclose documents evidencing the dealings in Italian Cards which have and continue to occur, it is likely that he will hide or destroy records which undermine Mr Galantini's claims in the US litigation. (emphasis added)*

172.    Further, if the relationship between T Group and Prominter is as close as Mr Metson suggests, then it would appear that it is not an arm's length relationship. If the relationship is not arms length, then the explanation given by Mr Metson of what is happening (i.e. that cards made under licence for Prominter are supplied in Italy to T Group and then independently sold and supplied by T Group outside the Italian territory of the Prominter Licence). Rather, it appears that Prominter has created a structure or an arrangement with T Group and Playcom under which T Group and Playcom, acting in practical terms on Prominter's behalf, actively distribute the Italian Cards that are purchased by them from Prominter through agents such as Mr Metson, with Prominter's knowledge and co-operation. Alternatively, T Group is making the Italian Cards for Prominter outside the terms of the arrangement between the Claimant and Prominter.

173.    In these circumstances, I am advised by Mr Black that the following acts would constitute infringement of the Claimant's trade marks set out in paragraph 26 above: (a) sales of the Italian Cards by T Group in the UK before termination of the Prominter Licence; (b)

EXHIBIT  92  337

PAGE  1533

Confidential - Attorney's Eyes Only                MGA 0868081

sales of the Italian Cards by T Group or Prominter after termination of the Prominter Licence; (c) sales of the Italian Cards by T Group or Prominter after the expiry of the Prominter Licence on 28 February 2004; (d) sale of any Italian Cards manufactured by T Group; and (e) sale of any Italian Cards under the Yoga Licence, or after the expiry of that licence.

174.   Based on the present evidence, T Group, Mr Metson and Prominter appear to have infringed and continue to infringe the Claimant's trade mark rights.

175.   Over the last two months, Mr Robinson and Mr White have undertaken an extensive investigation into the activities of Mr Metson, Comag, T Group and Prominter (at significant cost) in order to obtain sufficient evidence to bring an action against Mr Metson in the UK and T Group and Prominter in Italy.  Unfortunately, in that time, Farncombe have not been able to obtain any documentary evidence to explain the precise nature of the relationship between T Group, Prominter and Playcom (other than the declaration from T Group which raises more questions than it answers).

176.   Given the secretive nature of Prominter and T Group's activities, Prominter's frequent breaches of the Agreement, and the contradictory statements made by Mr Galantini in the US proceedings, I am very concerned that an inter partes application will lead to a significant risk that Prominter, T Group and Mr Metson will take steps to conceal, remove or destroy any evidence and information in their possession which explains the nature of their relationship.

177.   In the circumstances, the Claimant respectfully requests the Court to grant an ex parte disclosure order in the terms of the Application Notice and draft Search Order to enable the Claimant's representatives to obtain forthwith from Mr Metson any relevant evidence pertaining to his dealings with T Group, Prominter and Playcom in trading cards into the UK.

178.   It is the Claimant's intention to request an equivalent ex parte order and injunction from

338

M17447.115/LT:327391.2/labd                    44                   EXHIBIT ___92___

PAGE ___1534___

Confidential - Attorney's Eyes Only                                        MGA 0868082

the Italian Courts in relation to Prominter, Playcom and T Group.

179.    The Claimant's intention is to serve both ex parte orders (in the UK and Italy) at the same time on the respective parties, so as not to alert these defendants to the action being brought in another jurisdiction. The Claimant would therefore request the Court to allow it a 7 day period within which to serve the ex parte order on Mr Metson, as Mr Roncaglia cannot say for certain when the Italian Court will make the Order and it may take up to 7 days from the date of application for the Claimant to receive its Order.    Further, the Claimant would ask the Court to permit the Claimant to use the documents obtained from Mr Metson can be used in the Italian proceedings against Prominter, Playcom and T Group.

180.    The Claimant has instructed Mr Matthew Talbot of Harvey Ingram Owston to act as the Supervising Solicitor in accordance with the Practice Direction to Part 25 CPR and to serve the Search Order on Mr Metson, should this Honourable Court grant the Order requested.

181.    The Claimant requests that the Court allows it through SJ Berwin, to search for and seize the categories of documents identified in the draft Order from Mr Metson's residential address at 158 Swithland Lane, Rothley, Leicester, Leicestershire, LE7 7SF or any other addresses identified by Mr Metson during the course of the search as being places where such documents are located.

**The Claimant's Request for Injunctive relief**

182.    I will now explain why it has been necessary to issue proceedings and seek an interim injunction against Mr Metson in this action.

*Unquantifiable harm to the Claimant*

183.    Mr Metson and T Group have already sold significant quantities of Italian Cards and albums in the UK, and will continue to do so unless restrained by this Honourable Court.

M17447.115/LT:327391.2/labd    45

339

EXHIBIT ___92___

PAGE ___1535___

Confidential - Attorney's Eyes Only    MGA 0868083

Mr Metson has already indicated that he expects to continue to sell these products into the UK market for the next two to three years. Further, Mr Metson informed Mr Graham Robinson on 26 March 2004 that he had just recently agreed a deal with Mark and Paul Cullinson who have direct accounts with three large retailers (ie Argos, Toys R Us and Woolworths). As indicated above, however, the Claimant's investigator has confirmed that on 4 May 2004 the Italian Cards were not being offered for sale by Argos, Woolworths, or Toys R Us.

184.   On 7 May 2004, Mr Paul Cox at SJ Berwin asked our Italian lawyer, Mr Roncaglia, to arrange for an investigator to make a test purchase of Italian Cards in Italy. On 10 May 2004, Mr Roncaglia reported that his investigators had visited three newspaper stands in Florence and four in Milan and that there were no Italian Cards on those stands. I am informed by Mr Roncaglia that one person working on a stand in Florence said that the Italian Cards had been withdrawn approximately three weeks earlier. Whereas, the persons working at the four stands in Milan said that the Italian Cards were finished.

185.   The direct sale of substantial quantities of Italian Cards in the UK is causing significant damage to the reputation of the Claimant and is damaging its relationship with its licensees.

186.   BRATZ is a very special and valuable brand and has grown enormously since it was first launched in the UK in 2002. The BRATZ brand represents a certain lifestyle, which is cool and funky, and this is what children are buying into when they purchase BRATZ products. It is therefore critical to the success of the Claimant's business that the Claimant has control over what goods are marketed under or by reference to the BRATZ brand and how those products are being or will be marketed.

187.   The Claimant has not approved any version of the Italian Cards or albums. Consequently, the Claimant has had no control over the nature or quality of the product that Mr Metson is marketing or intending to import and sell in the UK such as the representations appearing on the cards and the Italian lifestyle statements that are on the

340

M17447.115/LT:327391.2/labd

46EXHIBIT ___92___

PAGE ___1536___

Confidential - Attorney's Eyes Only                                 MGA 0868084

cards (e.g. in English such a statement would be "Movin' Groovin' Cool-lectible Cards!").

188.   I have compared the Italian Cards and English Cards, and note that there are several differences between them. For instance, as I have already mentioned the Italian Cards are in Italian and do not bear any lifestyle statements. Further, the Italian cards are thinner and more flexible than the English Cards. In my view, the presence of the Italian Cards on the UK market (bearing the same numbers as the equivalent English cards) is likely to confuse children, particularly because there will be two different versions of the same numbered card on the UK market.

189.   As indicated above, Vivid is the Claimant's UK licensee for BRATZ dolls and lenticular cards. Vivid purchases the English Cards from the Claimant for around US$2.15 FOB and then sells them on to UK retailers. Vivid usually sells the English Cards to retailers at £2.50, and those retailers sell on to their customers at a recommended retail price of £3.99, I can see from page 412 of **Exhibit IL 1** that Argos are currently selling two packs of English Cards to the public for £6.99.   The investigations by Farncombe reveal that Mr Metson is significantly undercutting Vivid's price by selling the Italian Cards for around 38p per pack, and Comag is consequently significantly undercutting Vivid's customers by selling the cards to the retailers at such a price that those retailers can sell the cards to the public at 99p per pack.

190.   As retail customers are highly price sensitive and generally knowledgeable about market pricing, the ability of Mr Metson seriously to undercut Vivid's price has had and will continue to have a massive impact upon Vivid's ability to sell the English Cards to its distributors, who are unable to compete against the prices of other distributors who are selling the Italian Cards.

191.   Mr Neil Bandtock, Commercial Director of Vivid, informs me that out of the first order of 250,000 English Cards, Vivid still has 175,000 packs left in stock. Mr Bandtock expected by April 2004 to have sold the first order, but has been unable to sell them because of the availability of the Italian Cards.

341

Confidential - Attorney's Eyes Only                                    MGA 0868085

192.    In order to compete with these Italian Cards (which retail to the general public at 99p each), Mr Bandtock says Vivid would have to sell the English Cards at a massive loss which it simply cannot afford to do. As a consequence, Vivid has already lost an order for 100,000 packs of English Cards from Club Group, who refused to buy the cards because of the availability of the Italian Cards at 99p. Tesco and Argos have also been unable to sell their first order of 25,000 packs and have requested a reduction in Vivid's price in order to sell the cards.  Vivid have agreed to mark down the cards sold to Tesco and Argos to £2.99, but expect them to request a further mark down shortly. Neil Bandtock informs me that 75% of Vivid's customers are refusing to take the English Cards.

193.    Mr Bandtock and Vivid are extremely annoyed and disappointed that the market for English Cards is being destroyed in the UK.

194.    Further, Vivid's inability to sell through its first order of English Cards means that it is still selling Series 1, whereas in the US Series 4 is being sold.

195.    Neil Bandtock also informs me that Vivid are very concerned that its customers will refuse to buy other BRATZ products, because of what has happened to their profits in relation to the English Cards.

196.    Mr Metson's activities are accordingly reducing Vivid's (and its distributors) profits and this will likely damage the relationship between the Claimant and Vivid, and its willingness to support the sale of English Cards and other BRATZ products in the UK.  Because Vivid pays a high price for the right to distribute BRATZ products in the UK including a substantial front end advance against royalties plus a fixed amount for each BRATZ product that it buys from the Claimant, it expects the Claimant to do all that it can to prevent infringing BRATZ products from penetrating the UK market, and depriving it of the ability to make the sale of legitimate products in the UK.

197.    The flood of over 0.5 million Italian Cards on to the UK market is having a disastrous effect on the Claimant's ability to set a price for the English Cards in the UK.  In this

M17447.115/LT:327391.2/labd                    48   EXHIBIT __92__                    342

Confidential - Attorney's Eyes Only                    PAGE __153B__                    MGA 0868086

regard, as children are coming to expect that they can buy Italian Cards for 99p they have rejected any English Cards which are being sold for more than this price.  Such price depression has a serious effect on the businesses of the Claimant and of Vivid, who are unable to sell the cards at the price they originally expected.

198.    If other licensees or other potential licensees find out that the Claimant is not taking any immediate action to protect a licensee from the unlawful manufacture and importation of equivalent BRATZ products which are having a very damaging effect upon that licensee's business, they may lose faith and may be put off entering into licenses with the Claimant in the future, or extending their current licences.

199.    More generally, the Claimant has a reputation in the UK for not tolerating any infringement of its rights and if the Claimant is not seen to take effective action against infringers of its rights, it will lead to others exploiting the BRATZ brand by importing BRATZ knock-off products into the UK.

200.    Finally, the activities of Mr Metson and others are seriously damaging the development of the UK market for trading cards, and there is a significant risk that they will destroy the UK market for BRATZ cards.  The main idea behind the BRATZ cards is to encourage children to make repeat purchases of the BRATZ cards.  However, as the Italian Cards do not conform to the BRATZ brand (ie they do not carry the lifestyle statements, which are an important part of the BRATZ brand and are critical to helping children understand the attitude and character of the dolls), I believe that children are likely to reject the Italian Cards and not repeat the experience.

201.    By way of example, I am informed by Mr Waters that they have been in negotiations with Panini UK Limited ("Panini"), a leading European manufacturer of stickers and trading cards, over the possibility of the Claimant granting Panini the right to produce BRATZ trading cards (not lenticular).  Panini has been monitoring the sales made by a UK retailer to the public, which had been supplied with Italian Cards by Comag.  Unfortunately, Panini has decided not to enter into a licence with the Claimant, as it has said that the

343

EXHIBIT ___92___

PAGE ___1539___

Confidential - Attorney's Eyes Only                    MGA 0868087

sales of Italian Cards were disappointing in the UK.

*Damage suffered by Mr Metson*

202.  As the licence with Prominter has now ended, Mr Metson should not be continuing to trade in the Italian Cards, and therefore any losses he suffers are the result of his own actions.

203.  Mr Metson has no rights in and to the BRATZ brand or any right to manufacture or distribute the Italian or English Cards on behalf of the Claimant. Mr Metson is simply a sales person, who I understand from Farncombe's reports sells a variety of products (other than BRATZ products) to third parties, as and when such products become available, or when they are requested. Mr Metson's business is unlikely to be financially dependent upon his commission or profit earned on the sales of the Italian Cards in the UK alone.

204.  Therefore, Mr Metson's losses are financially quantifiable because it is simply a case of assessing the commission that Mr Metson would have received from T Group, and/or the profit he would made from his own sales if he was allowed to continue to sell the Italian Cards in the normal course of trade. I suggest that his damage in any event is likely to be small, and it should be a relatively simple accounting exercise to calculate it.

*Mr Metson's financial position*

205.  I would ask the Court to consider that even if The Claimant's losses are quantifiable, Mr Metson appears unable to pay them. In this regard, I note from the investigator's reports exhibited to the Affidavit of Graham Robinson that Mr Metson does not own his house at 158 Swithland Lane, Rothley, Leicester, Leicestershire, LE7 7SF (paragraph 3.35 of GR1). Further, Mr Metson also said to the investigator that he could not finance a large trade himself which is why he only acts as a representative for T Group in larger deals (in the last paragraph on page 4 of the transcript of the conversation between our

M17447.115/LT:327391.2/labd

50

Confidential - Attorney's Eyes Only

EXHIBIT 92

PAGE 1540

344

MGA 0868088

investigator and Mr Metson on 26 March 2004 - at Exhibit GR 1 of Graham Robinson's Affidavit).

*Cross undertakings in damages*

206.    The Claimant is willing to undertake to pay damages to the Defendant, in the event that an interim injunction is awarded and a permanent injunction is not granted at trial.

207.    If Mr Metson wins at trial having been injuncted in the meantime, the Claimant is in a position to satisfy its cross undertaking in damages.

208.    Mr Black informs me that this Honourable Court would expect to see the Claimant's latest accounts for 2002 (which are audited) and its accounts for 2003 (which are unaudited) to satisfy itself that the Claimant is able to satisfy the cross undertaking in damages, should it be called upon.

209.    The Claimant is a private company established under the laws of the United States and as a consequence is not required to file its accounts at any public registry.  The Claimant regards its accounts as highly confidential and therefore restricts access to them.

210.    The Claimant is therefore reluctant to disclose its accounts in these proceedings, and requests that this Honourable Court makes the Order annexed to the Application Notice which sets out who can see these accounts and prevents further use of the accounts outside the proceedings.  On the assumption that this Order will be granted, I have instructed Mr Black to hand a copy of the Claimant's audited accounts for 2002 and its unaudited accounts for 2003 to the Court at the Hearing.

345

EXHIBIT __92__

PAGE __1541__

Confidential - Attorney's Eyes Only                                    MGA 0868089

211.   In the circumstances, I respectfully request that this Honourable Court should grant the injunction and disclosure order sought by the Claimant in this action.

Sworn at   14730 Schoenborn St.
North Hills, CA. 91343

May 14, 2004

Before me   Joseph David Newcomb

JOSEPH DAVID NEWCOMB
Commission # 1466241
Notary Public - California
Los Angeles County
My Comm. Expires Jan 27, 2008

346

M17447.115/LT:327391.2/labd   52   EXHIBIT ___92___

PAGE ___1542___

Confidential - Attorney's Eyes Only   MGA 0868090

Claimant
Isaac Larian
First
Exhibits IL 1 and ILA-D
*14* .05.04

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

INTELLECTUAL PROPERTY

B E T W E E N:

MGA ENTERTAINMENT, INC.
Claimant

- and -

THOMAS CHRISTOPHER JOSEPH METSON
Defendant

_____

**AFFIDAVIT OF ISAAC LARIAN**

_____

SJ Berwin
222 Gray's Inn Road
London   WC1X 8XF

Tel:  020 7533 2222

Ref:  M17447.115/LT:327391.2/eaai

347
EXHIBIT 92
1542.1

Confidential - Attorney's Eyes Only

MGA 0868091

**EXHIBIT 93**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
)
PLAINTIFF, )
)
V. )       NO.  CV 04-9040  SGL (RNBX)
)
MATTEL, INC., A DELAWARE )
CORPORATION, )
)
DEFENDANTS. )
———————————————— )
)
AND CONSOLIDATED ACTION (S). )
———————————————— )

# 30 (B) (6) DEPOSITION OF SPENCER WOODMAN

## VOLUME I

## OCTOBER 9, 2007

EXHIBIT ___93___

PAGE ___1543___



REPORTED BY:
PAULA PYBURN
CSR NO. 7304
JOB NO. 07AE623-PP

COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| CARTER BRYANT, AN INDIVIDUAL, | ) ) ) | |
| PLAINTIFF, | ) ) | CASE NO. CV 04-9049 SGL(RNBX) |
| V. | ) ) ) | CONSOLIDATED WITH CASE NO. 04-9059 AND |
| MATTEL, INC., A DELAWARE CORPORATION, | ) ) ) | CASE NO. 05-2727 |
| DEFENDANT. | ) | |
| _____ | ) ) | |
| AND CONSOLIDATED ACTION(S) | ) | |
| _____ | ) | |

VIDEOTAPED 30(B)(6) DEPOSITION OF
SPENCER WOODMAN, VOLUME I, TAKEN ON
BEHALF OF MATTEL, INC., AT 865 SOUTH
FIGUEROA STREET, 2ND FLOOR, LOS
ANGELES, CALIFORNIA, COMMENCING AT
9:31 A.M., TUESDAY, OCTOBER 9, 2007,
BEFORE PAULA A. PYBURN, C.S.R. 7304,
R.P.R., C.L.R.

EXHIBIT ___93___

PAGE ___1544___

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR M.G.A. ENTERTAINMENT, INC.:

 4     CHRISTENSEN, GLASER, FINK, JACOBS,
       WEIL & SHAPIRO, LLP

 5     BY:  JOEL KLEVENS, ESQ.
       10250 CONSTELLATION BOULEVARD

 6     LOS ANGELES, CALIFORNIA 90067
       (310) 553-3000

 7     JKLEVENS@CHRISGLASE.COM

 8

 9    FOR MATTEL, INC.:

10     QUINN EMANUEL URQUHART OLIVER & HEDGES, L.L.P.
       BY:  DIANE CAFFERATA HUTNYAN, ESQ.

11     BY:  LILY Y. LU, ESQ.
       865 SOUTH FIGUEROA STREET

12     10TH FLOOR
       LOS ANGELES, CALIFORNIA 90017-2543

13     (213) 443-3000
       DIANEHUTNYAN@QUINNEMANUEL.COM

14     LILYLU@QUINNEMANUEL.COM

15

      ALSO PRESENT:

16

       RICH DANIELS,

17          IN-HOUSE COUNSEL, M.G.A. ENTERTAINMENT, INC.
       STEVEN TOGAMI,

18          J.T.V. LITIGATION SERVICES, INC.

19

20

21

22

23                          EXHIBIT ____13____

24

25                          PAGE ___1545____
```

3

```
 1   ABOUT -- ANYTHING ABOUT THE PREPARATION OF ANY SWORN

 2   STATEMENT IN THIS CASE THAT YOU'VE SEEN; CORRECT?

 3        A.   ABOUT THE --

 4             MR. KLEVENS:  SAME OBJECTIONS.

 5             THE WITNESS:  -- PREPARATION OF THE          03:12:28

 6   DOCUMENT?  NO.

 7   BY MS. HUTNYAN:

 8        Q.   OR THE STATEMENTS THEREIN?

 9             MR. KLEVENS:  OBJECTION; COMPOUND.

10             THE WITNESS:  CORRECT.                       03:12:36

11   BY MS. HUTNYAN:

12        Q.   DO YOU KNOW WHO AT M.G.A. PROVIDES

13   AUTHORIZATION TO FILE A LAWSUIT?

14             MR. KLEVENS:  OBJECTION; VAGUE, AMBIGUOUS,

15   VAGUE AS TO TIME, OUTSIDE THE SCOPE OF TOPIC 34.       03:12:59

16             THE WITNESS:  NO, I DON'T.

17             MS. HUTNYAN:  OKAY.  LET'S -- THIS IS A NEW

18   DOCUMENT.  OKAY.  SO THIS WILL BE --

19             MS. LU:  947.

20             MS. HUTNYAN:  947.  OKAY.  AND THIS IS A     03:13:38

21   FRESH COPY.  DOESN'T HAVE ANY NOTES ON IT.

22             (EXHIBIT NUMBER 947 WAS MARKED FOR

23             IDENTIFICATION AND IS BOUND

24             SEPARATELY.)

25             MS. HUTNYAN:  THANK YOU.  EXHIBIT  97        03:14:00

                                    PAGE  1046
```

217

```
 1          Q.    OKAY.   I'VE HANDED YOU DOCUMENT WITH BATES

 2   NOS. MGA 0868039 THROUGH 868091.   THAT'S EXHIBIT

 3   947.

 4          IS THAT WHAT YOU HAVE?

 5          A.    YES.                                            03:14:28

 6          Q.    OKAY.   AND THE CAPTION IS "M.G.A.

 7   ENTERTAINMENT, INC., AND THOMAS CHRISTOPHER JOSEPH

 8   METSON."

 9          DO YOU SEE THAT?

10          A.    YES, I DO.                                     03:14:38

11          Q.    OKAY.   AND BELOW THAT IT SAYS "AFFIDAVIT OF

12   ISAAC LARIAN."

13          A.    YES.

14          Q.    HAVE YOU SEEN THIS DOCUMENT BEFORE?

15          A.    YES.                                           03:14:49

16          Q.    DID YOU SEE IT IN CONNECTION WITH YOUR

17   PREP- -- PREPARATION FOR YOUR DEPOSITION?

18          A.    YES.

19          Q.    OKAY.   AND IS IT YOUR UNDERSTANDING THAT

20   THIS IS A SWORN STATEMENT OF ISAAC LARIAN?               03:14:58

21          A.    I BELIEVE IT IS, YES.

22          Q.    OKAY.   DO YOU BELIEVE THAT THE STATEMENTS

23   IN EXHIBIT 947 THAT MR. LARIAN IS ATTESTING TO ARE

24   TRUE AND CORRECT?

25          MR. KLEVENS:   YOU MEAN ALL OF THEM?               03:15:18
```

EXHIBIT _____ 93

PAGE _____ 1547

218

```
 1    OBJECTION; VAGUE, AMBIGUOUS, OVERBROAD, COMPOUND.
 2          THE WITNESS:  YEAH, CAN YOU ASK THE
 3    QUESTION AGAIN?
 4    BY MS. HUTNYAN:
 5       Q.   WELL, LET ME ASK YOU, DO YOU KNOW OF          03:15:33
 6    ANYTHING IN THIS AFFIDAVIT THAT YOU KNOW IS NOT
 7    TRUE?
 8          MR. KLEVENS:  SAME OBJECTION, IT'S
 9    OVERBROAD.  YOU'RE TALKING ABOUT A DOCUMENT THAT'S
10    52 PAGES.                                           03:15:44
11          MS. HUTNYAN:  COULD BE A LOT IN IT THAT
12    MR. LARIAN WOULD BE NOT TELLING THE TRUTH ABOUT, I
13    GUESS.
14          MR. KLEVENS:  MY OBJECTION STANDS.  YOU CAN
15    ASK HIM ANY QUESTIONS YOU WANT.                     03:15:55
16          MS. HUTNYAN:  I THOUGHT IT WAS PRETTY
17    NARROW.
18          MR. KLEVENS:  THIS QUESTION AS PHRASED IS
19    VAGUE, AMBIGUOUS AND OVERBROAD AND COMPOUND.
20          THE WITNESS:  WELL, BASED ON THE -- ON THE     03:16:03
21    QUESTION, I'M NOT SURE I CAN ANSWER THAT WITHOUT
22    GOING THROUGH THE DOCUMENT.
23    BY MS. HUTNYAN:
24       Q.   OKAY.  I THOUGHT MAYBE BECAUSE YOU HAD
25    REVIEWED IT --                                      03:16:12
```

EXHIBIT _____ 93

PAGE _____ 1548

219

1                    DECLARATION OF WITNESS

2

3      I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS

4    OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS

5    TRUE AND CORRECT.

6

7

8    EXECUTED AT                    , ON                      ,
                          (PLACE)                    (DATE)

9

10

11            (SIGNATURE OF WITNESS)

12

13

14

15

16

17

18

19

20

21

22

23

24    EXHIBIT _____ 93

25    PAGE ____ 1549

328

```
 1    STATE OF CALIFORNIA        )

 2    COUNTY OF LOS ANGELES      )  SS.

 3

 4     I, PAULA A. PYBURN, CSR NO. 7304, RPR, IN AND FOR

 5    THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

 6     I AM THE DEPOSITION OFFICER THAT STENOGRAPHICALLY

 7    RECORDED THE TESTIMONY IN THE FOREGOING DEPOSITION;

 8     PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST DULY

 9    SWORN BY ME;

10     THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE

11    TESTIMONY GIVEN.

12     BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF THE

13    TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.   IF

14    REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

15    PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

16    ARE APPENDED HERETO.

17

18    DATED  October 16, 2007  .

19

20

21          _____

22

23

24          EXHIBIT _____ 93

25          PAGE _____ 1550
```

329

**EXHIBIT 94**

| ☒ Yahoo! Finance | | Search - Finance Home - Yahoo! - Help | ☑ Reuters |

☒ Click here for more information

[ Latest Headlines | Market Overview | News Alerts ]

**Thursday February 14, 3:18 pm** Eastern Time

# With Bratz, a toy maker's dreams come true

By Jan Paschal

NEW YORK, Feb 14 (Reuters) - For Isaac Larian, a toy maker who first set foot on U.S. soil in 1971 as a teenager from Tehran with $570 in his pocket, this year's Toy Fair represented his ``wildest dreams come true.''

ADVERTISEMENT

☒ Click Here!

The reason? The ``People's Choice Toy of the Year Award'' went to his company, privately held MGA Entertainment Inc., of North Hills, California, for the Bratz -- a quartet of 11-inch dolls with attitude.

The Bratz, marketed as ``the dolls with a passion for fashion,'' favor clothes that take their style cues from pop music superstars Britney Spears and J. Lo, as well as from American teen girls who make the club scenes on both coasts.

``The People's Choice'' awards -- where consumers pick their favorites -- are sponsored by the Toy Industry Association, which owns and manages Toy Fair. Other ``Toy of the Year'' awards, called ``T.O.T.Y.'s'' in the business, are given in other categories, including best boy's, best girl's and best educational toys.

The Bratz, known as Yasmin, Cloe, Jade and Sasha, love thick-soled sneakers, boots and shoes (think Skechers and Steve Madden). Though sold separately, they run in a pack like 'tweens and teens often do. (Check them out at http://www.bratzpack.com/.)

``When they announced the girl's toy winner and we didn't get it, I threw my acceptance speech away,'' Larian told Reuters. ``Then, when it came time for 'People's Choice' and they called out MGA, I ran up to the podium and gave my speech from memory. Now I know what the Oscars feel like.''

Larian, the chief executive of MGA Entertainment, who has a master's degree in business, founded the

EXHIBIT ____94____

PAGE ____1551____

Los Angeles area company as a maker of electronic handheld games in the late 1970s. The company made its name as the licensee for the handheld Pac-Man and Ms. Pac-Man games.

Last year, MGA entered the competitive fashion doll category by creating the Bratz, designed to appeal to fashion-conscious girls ages 7 to 12, and intended, as MGA's public relations director Dave Malacrida put it, "to take market share away from Barbie," Mattel Inc.'s best-selling doll for the last 43 years.

"Bratz are the anti-Barbie," Malacrida said.

The Bratz favor low-rise glitter jeans, micro skirts and midriff-baring tops. Their bodies resemble those of teen girls, instead of Barbie's shape, which is rarely seen on a real woman. Their hair, eyes and skin reflect various ethnicities. Before Christmas, Sasha, Jade and Yasmin disappeared quickly from the shelves of the huge new Toys 'R Us (NYSE:TOY - news) store in New York City's Times Square, leaving blue-eyed blonde Cloe to fend for herself. The same thing happened at Wal-Mart (NYSE:WMT - news) and other toy retailers.

"If you look at Barbie, the scale is a girl about 5 feet, 11 inches tall," Larian said. "Not every girl looks like that. You see all kinds of girls, all kinds of beauty, in every shape and color. We wanted to make dolls who look like real girls."

Larian, a doting father of two boys and a girl, named one of the dolls Yasmin after his own daughter.

BEATING BARBIE

In December 2001, the Bratz did the unthinkable. In the crowded fashion doll category, they outsold Barbie, the perennial best seller for Mattel Inc. (NYSE:MAT - news), the largest publicly traded U.S.-based toymaker. The Bratz ranked No. 1, with about $8.5 million in sales, or 588,282 units sold at an average price of $14.41 each, for December alone, at retailers representing 65 percent of the U.S. market, according to NPD TRSTS, a report by The NPD Group, of Port Washington, New York.

"My reaction was, 'Oh my God, we beat Barbie,'" said Larian, whose company's sales were estimated at $100 million in 2001.

Tina Sederberg, a buyer for Target stores, recalled her first impression of the Bratz dolls at a Toy Fair 2001 preview.

"They were very different, very beautiful, fashion forward and a little bit edgy, which is what attracted girls to the line," she said, in an interview from Target Corp. (NYSE:TGT - news) headquarters in Minneapolis. "We are very happy with current sales results."

IS "RAPUNZEL BARBIE" READY TO RUMBLE?

Mattel, with fourth-quarter 2001 sales of $1.61 billion, dominated the fashion doll category's sales for all of 2001 "with strong sales of Holiday Barbie and the Barbie VW Beetle," The NPD Group said in a report this week. "Not far behind was MGA Entertainment's new introduction, the Bratz doll assortment, capturing third position in the overall dolls supercategory."

At Toy Fair this year, Mattel showed "Rapunzel Barbie" in Caucasian and African-American versions with hair flowing past her feet, much like Rapunzel of the classic fairy-tale fame. The line's "sold separately" items include Ken, in a fairy-tale prince costume; an animated video, and a carriage drawn

EXHIBIT ___94___

PAGE ___1582___

by a horse with an exceptionally long, flowing (yes, brushable!) mane.

``Hair play is the No. 1 play category for girls,'' said Julia Jensen, Mattel's spokeswoman for Barbie.

CLUB CLOTHES AND A CAR

At Toy Fair 2002, MGA Entertainment showed a new version of the Bratz with Funk N' Glow clothes embedded with fiber-optics -- a fashion trend already seen on teen club dance floors. When you close the front of the jacket, the icon on the back lights up.

The Funk N' Glow line of dolls will be priced about $10 higher -- suggested retail is $24.99 -- than the original Bratz.

A Bratzmobile, which looks like a squared-off blue 1957 Cadillac with a built-in FM radio and a trunk that pops open, is part of this year's extended toy line. It will sell for about $34.99. A Stylin' Salon and Spa, with salon chairs upholstered in leopard print and a mauve tub on one side, and an aqua health-club juice bar on the other side, will sell for $49.99.

``We're building a brand,'' MGA spokesman Malacrida said.

Email this story - Most-emailed articles - Most-viewed articles

**Related News Categories:** US Market News

Search News | Help

Copyright © 2002 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service
Copyright © 2002 Reuters Limited. All rights reserved. Republication or redistribution of Reuters content is expressly prohibited without the prior written consent of Reuters. Reuters shall not be liable for any errors or delays in the content, or for any actions taken in reliance thereon.
Questions or Comments?

EXHIBIT ___94___

PAGE ___1553___

Confidential - For Attorney's Eyes Only

MGA 0142777

**EXHIBIT 95**

| From: | Isaac Larian |
|---|---|
| To: | Victoria O'Connor; Dave Malacrida; Aileen Storer; Paula Treantafelles; Margo Chazen; Dianna Eisenberg |
| CC: | Abe Mirza; Julie Mote; Beth Cahill |
| BCC: | |
| Sent Date: | 2002-03-12 12:17:42:953 |
| Received Date: | 2002-03-12 12:17:42:953 |
| Subject: | FW: Hi |
| Attachments: | |

Victoria, Dave: Who gave David Dees info and what he does for us to this Yahoo lady and why?

This Yahoo lady is giving us too much legal grief even though she does not mean it.

Please DO NOT send any information or reply to her e mails unless you have cleared it with me.

Julie/Beth/ Abe:      **REDACTED**      There must be no mention about Mattel or any of their properties, Carter , any MGA Bratz arts ,etc.

**REDACTED**

——Original Message——
From: Paula Treantafelles
Sent: Monday, March 11, 2002 5:55 PM
To: Isaac Larian; Abe Mirza; Beth Cahill
Subject: FW: Hi

——Original Message——
From: David Dees [mailto:davodees@hotmail.com]
Sent: Saturday, March 09, 2002 12:37 PM
To: bryant598@cs.com
Subject: Hi

Hi Carter,.

I thought you would enjoy this letter i wrote to the Bratzworld club on Yahoo. It starts off with the club leader introducing it. Dees,

Hello!

I'm posting a wonderful letter from David Dees- the guy who does the awesome art we love to look at on the Bratz website and on posters and wherever Bratz girls are. I just want to post it to its own message so i can save that as a text file in the David Dees folder in files so you can read it anytime you like. We've

CONFIDENTIAL – ATTORNEYS' EYES ONLY

MGA 3801819

always liked it that MGA communicates with the Bratz fans and
this takes it even further into VERY COOL land.

Make sure you also check out his portfolio for all the other stuff
he does- you've probably seen lots of it- he's extremely talented!

Okay enough from me- I'll post his letter right after this
:)
snowflakebebe

>Hello my name is Christian (I'm a girl!) and I do a fan list for the Bratz
>dolls and I was wondering if you could post and maybe share some of your
>other Bratz art that we may not have seen (we have lots of it in the files
>section) - or talk about your experience working on the illustrations of
>the
>Bratz. I am in contact with MGA and they have endorsed this "fan club" so
>if
>I need to get permission from them for anything I can ask- but I hope
>you'll
>share some art if you can. We have the link to your portfolio up in our
>files and bookmark section. Come visit sometime :) We love your art. Its
>a
>big part of the fun of the Bratz :)

Hi Christian,

Thanks so much for your letter and interest in the world of Bratz. I talked
to the art director at MGA , and she said that of course i am not the one to
be releasing any Bratz art ahead of time, so i will check and see if i can
post some of that older airbrush art for you. She also said MGA is in the
process of building a new website that is going to be packed to the hilt
with cool art of all the new fashions, and believe me, they are wild and
colorful as i just finished about thirty new pieces of art that will amaze
you.

I work freelance as an illustrator and have my own studio at home where i
paint at my leisure, but if a job comes in you can be sure that it is
usually being rushed. My immediate live-in family consists of two furry
felines. A crosseyed siamese mix named Buddy, and a female red striped tabby
named Goose.

I am swamped right now with colorizing lots of the new wacky funk styles,
and there are new hats and boas and tops that I got a kick out of. However I
can't take credit for creating the Bratz Dolls, or even the first Bratz
illustrations, for that honor would go to a fellow named Carter Bryant*, who
is truly a genius of fashion and the soul and only person who first drew
those great pouty lips and that extreme look that only our heros share. I
have never met him personally, but on the phone and emails he is certainly
the nicest sincere fellow ever, and very optimistic and complementary about
my art in his approach. It felt good early on when he would tell me i was
doing a good job bringing them to life. Can you tell I am a fan of his as

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA 3801820

well?

Let me tell you about MGA. It is located in North Hills, California, at the west end of the beautiful San Fernando Valley, where I lived for many years, but now I live in Salt Lake, where the Olympics just were. Anyway, when you walk into the big, high ceiling lobby there is a real pretty receptionist with reddish brown hair (and that sometimes wears leopard prints), and if you look to the left you will see the stairs wind up to the second floor where all the cool stuff happens. And as you start up them there is, to the right, a little rock garden with plants, and it always has some of the new toys, like robot dogs, insectobots, or baby dolls sitting in there as if they are playing. As you get to the top of the stairs, that is if you can get permission to come up to this top secret place, the first thing you notice to your right is two big doors opening into a spacious office with a fancy glass desk, usually covered with toys, and sitting there working busily away is a great fellow named Isaac, who is the owner, president, and creator of most of the MGA toys. He always seems to leave his doors open and when I stop by to pick up a job I glance in and wave if he happens to look up.

The first big area past there has lots of low partitioned cubicles with all the business people who keep the finances working, but then the next rows are the package and advertising designers, which is sort of the front line of the creativity, and as you continue up the steps there is a silly sign hanging that says Design Farm, and that is the beginning of the art studios. It always freaks me out to go in there because it is a busy beehive of toy ideas and designers flying around like a tornado. It is a big open room with black walls and bright lights shining down spotlighting the work areas, and colorful toys and wacky new ideas and drawings lining the walls. The middle area has a long table work table covered with new toy packages being assembled for the first time, with most of the mocked up packages being created by cutting and pasting by hand, and only after the idea is shown through many approval lines is it mass produced. Sometimes a whole new line of Bratz accessories will be displayed, and i am amazed at the details of the clothes at such a small scale. When i pop in i am usually asked for my opinion about the new toys, such as if i think they will be popular or how to promote them, and i am always happy to put in my two cents. There are about a dozen or so design areas with computers that surround the work table, and at each station is someone with more talent than you can imagine all corraled into one group. That is why they come up with such great stuff. There is also a window on one wall and whenever i look out of it, it is stunning to look down into the warehouse which quite a large expanse of big boxes and lifts carrying them around. I guess that is the tour.

About working on the illustrations, well they are all colored on the computer. The best thing i can say is that i finally figured out a great way to paint their hair that flows great, and looks sort of real. But that is in the last group of art i just finished and it will available to you soon i suppose. If you have any suggestions about any of the art I always welcome your viewpoint.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

MGA 3801821

Anyway that is about it. I will send in anything that i am allowed to
release to you guys, or check my website for new art that i am putting up
all the time. Feel free to download any art that you like off my site. See
ya. david.

(* You can do a google.com search under Carter Bryant and you
can see some things he has done.

-snowflakebebe)

WOW what a cool letter... i have to say again that everyone so far involved
with the Bratz company is so cool, and responds personally and actually
takes some time.... as for Carter Bryant i searched and searched and came up
with nothing. so if any one find his website, can you post the URL.. ;) many
thanks...

Pink Glitter
>>Vayne<<
xxx

Get your FREE download of MSN Explorer at http://explorer.msn.com/intl.asp.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          MGA 3801822

**EXHIBIT 96**

| From: | Isaac Larian |
|---|---|
| To: | Dee Dee Valencia |
| CC: | |
| BCC: | |
| Sent Date: | 2003-02-06 20:05:14:687 |
| Received Date: | 2003-02-06 20:05:14:687 |
| Subject: | RE: Bratz |
| Attachments: | |

Good ideas.

Lets share with the team after NY and execute.

-----Original Message-----
**From:** Dee Dee Valencia
**Sent:** Thursday, February 06, 2003 11:59 AM
**To:** Isaac Larian
**Subject:** RE: Bratz

Okay ... I am jotting down my first thought .... I'll think more. Had experience in past lives in collectible market....

Limited Edition Collectible # of pcs low low low - build for the future

SELLING - DISTRIBUTION
-Go for 2 partners; 1 TV (QVC) and other Hallmark sold in Collectibles Section (next would be ornaments with Hallmark)
-Offer the first 1,000 to our fan club members - 1st come first serve - build frenzy then you can advertise that the remaining # is going to be on QVC and in Hallmark only for a limited time.
-This strategy would also help, 'literally presell' the program to QVC & Hallmark. Built in demand, advertised, slam dunk!
-After market sales - will boom - ebay.... keep track of it .. powerful ...

FEATURES:
-Signed by....???? - I know we want to keep Carter under wraps ...

-Custom / Original art of girls as the certificate of authenticity - framed for room and showing off to friends

-The box is JUST AS IMPORTANT as THE PRODUCT in the collectible market. So packaging needs to be authentic and out of this world.

Product Ideas:
-Porcelain real hair, real fabrics as accents - high high detail
-Tie to well known hip fashion designer that designed clothing for extra equity
-Set of 4 dolls 6"-8"high (size smaller than mass market dolls - these are display only pcs)
-They need to be sold in a showcase cool environment - funky - this is part of the display in their room
-Something exclusive for the girl herself ... exclusive fashion bag is my first thought.


I'll think more.... we should absolutely utilize the Bratz Fan Club more. They 'expect' to be the first ones to know what is up and coming for Bratz. This is a built in base for exclusive or allocated or presold sell of goods.

DD

EXHIBIT 16
PAGE 1558

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    MGA 3801558

-----Original Message-----
**From:** Isaac Larian
**Sent:** Wednesday, February 05, 2003 8:13 PM
**To:** Summer Wells; Paula Treantafelles; Dee Dee Valencia; Shawn Brower; Randi Kagan
**Subject:** Bratz

What do you think about the idea of developing a high end ,really cute, older, collectable plush to sell only in Specialty and gift? For dolls, may be we do a plastic head?

Let me know what do you think?

Isaac Larian
CEO
MGA ENTERTAINMENT
*A Consumer Entertainment Product Company*
16730 Schoenborn Street
North Hills, California, 91343-6122
Tel: 818-894-3150
Fax:818-894-1267
Ilarian@mgae.com
www.MGAE.COM
Meet the girls with Passion for Fashion
www.Bratzpack.com

EXHIBIT 96
PAGE 1559

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA 3801559

**EXHIBIT 97**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3112**

WRITER'S INTERNET ADDRESS
**dylanproctor@quinnemanuel.com**

July 19, 2007

**VIA FACSIMILE AND U.S. MAIL**

Diana M. Torres, Esq.
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, California  90071

Re:    <u>Mattel, Inc. v. Bryant</u>

Dear Diana:

At the <u>Art Attacks v. MGA</u> trial, Isaac Larian testified that Carter Bryant's lawyer wrote a letter to MGA confirming that Bryant created Bratz drawings in 1998.  No such letter has ever been produced by MGA or Bryant in this case.  We request that you please produce the document immediately, if it exists - - it would obviously be discoverable.  In the alternative, please consider this a request to meet and confer within the next five days pursuant to Paragraph 5 of the Order for the Appointment of a Discovery Master.  If MGA refuses to produce the document, Mattel contemplates moving to enforce the Court's May 15, 2007 Order, to compel its production, and for sanctions.

I look forward to hearing from you.

Very truly yours,

B. Dylan Proctor

BDP:lak
cc:    Michael Page, Esq.

EXHIBIT _____ 97

PAGE _____ 1560

**quinn emanuel urquhart oliver & hedges, llp**

07209/2172300.1          NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

**DATE:**   July 19, 2007                    **NUMBER OF PAGES, INCLUDING COVER: 2**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Diana Torres, Esq.<br>**O'Melveny & Myers, LLP** | (213) 430-6000 | (213) 430-6407 |
| Michael H. Page, Esq.<br>**Keker & Van Nest, LLP** | (415) 391-5400 | (415) 397-7188 |

**FROM:**   B. Dylan Proctor, Esq.

**RE:**   *Bryant v. Mattel*

**MESSAGE:**



07209/2172399.1

| CLIENT # | 7209 | ROUTE/<br>RETURN TO: | Mia Albert/3rd Floor | ☒ CONFIRM FAX<br>☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | | | CONFIRMED?   ☐ NO  ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

EXHIBIT _____ G7

PAGE _____ 1561

07/19/2007 17:00 FAX  121344331^9        QEUOH-LAO-2                                    ☑001

```
                         *****************************
                         ***   MULTI TX/RX REPORT   ***
                         *****************************

TX/RX NO          2883
PGS.                 2
TX/RX INCOMPLETE     -----

TRANSACTION OK
                    (1)   9414#07209#12134306407
                    (2)   9414#007209#14153977188

ERROR INFORMATION        -----
```

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

<table>
<tr>
<td>NEW YORK<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>(212) 849-7000<br>Facsimile: (212) 849-7100</td>
<td>LOS ANGELES<br>865 South Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>(213) 443-3000<br>Facsimile: (213) 443-3100</td>
<td>SAN FRANCISCO<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br>(415) 875-6600<br>Facsimile: (415) 875-6700<br><br>SILICON VALLEY<br>555 Twin Dolphin Drive, Suite 560<br>Redwood Shores, CA 94065<br>(650) 801-5000<br>Facsimile: (650) 801-5100</td>
</tr>
</table>

### LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

**DATE:**    July 19, 2007            **NUMBER OF PAGES, INCLUDING COVER: 2**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Diana Torres, Esq.<br>**O'Melveny & Myers, LLP** | (213) 430-6000 | (213) 430-6407 |
| Michael H. Page, Esq.<br>**Keker & Van Nest, LLP** | (415) 391-5400 | (415) 397-7188 |

**FROM:**       B. Dylan Proctor, Esq.

**RE:**         *Bryant v. Mattel*

**MESSAGE:**

EXHIBIT _____ 97

PAGE _____ 562