# EXHIBIT 112

Righ tFAX          5    7/2006 2:28    PAGE 002/002    Fax Server

# PRIORITY SEND

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 05-02727 SGL(RNBx)                    Date: May 16, 2006

Title:    MGA ENTERTAINMENT, INC. -v- MATTEL, INC.

=================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

|  |  |
|---|---|
| Jim Holmes | None Present |
| Courtroom Deputy | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None present                          None present

PROCEEDINGS:    MINUTE ORDER (IN CHAMBERS)

        This matter is before the Court on its own motion.  The Court orders the parties to show cause why this action should not be consolidated for all purposes with the two related actions: <u>Bryant v. Mattel, Inc.,</u> CV 04-09049 SGL (RNBx); <u>Mattel, Inc. v. Bryant,</u> CV 04-09059 SGL (RNBx). The parties' briefs re consolidation must be filed no later than June 5, 2006.  The Court will address the matter at the hearing on the motions set in the related cases on June 26, 2006.

        The Court's stay order, entered May 20, 2005, is vacated.

        IT IS SO ORDERED.

MINUTES FORM 90
CIVIL -- GEN                              1

Initials of Deputy Clerk __jh__

EXHIBIT 12
PAGE 782

# EXHIBIT 113

1   DALE M. CENDALI (admitted *pro hac vice*)
   O'MELVENY & MYERS LLP
2   400 South Hope Street
   Los Angeles, CA 90071-2899
3   Telephone:  (213) 430-6000
   Facsimile:  (213) 430-6407
4   Email:      jjenal@omm.com

5   PATRICIA GLASER (S.B. # 55668)
   CHRISTENSEN, GLASER, FINK,
6   JACOBS, WEIL & SHAPIRO, LLP
   10250 Constellation Boulevard, 19th Floor
7   Los Angeles, CA 90067
   Telephone:  (310) 553-3000
8   Facsimile:  (310) 557-9815

9   Attorneys for MGA Entertainment, Inc.

10   JOHN KECKER
   KECKER & VAN NEST, LLP
11   710 Sansome Street
   San Francisco, CA 94111
12   Telephone:  (415) 391-5400
   Facsimile:  (415) 397-7188

13

   Attorneys for Carter Bryant

14

15       UNITED STATES DISTRICT COURT

      CENTRAL DISTRICT OF CALIFORNIA

16

17

| | |
|---|---|
| 18   CARTER BRYANT, an individual, | Case No.  CV 04-09049 SGL (RNBx) (consolidated with CV 04-9059 & 05-2727) |
| 19       Plaintiff, | |
| 20       v. | **MGA ENTERTAINMENT, INC.'S NOTICE OF MOTION FOR TERMINATING SANCTIONS AGAINST MATTEL, INC. DUE TO SPOLIATION OF EVIDENCE; AND** |
| 21   MATTEL, INC., a Delaware Corporation, | |
| 22 | |
| 23       Defendant. | **[PROPOSED] ORDER** |
| 24 | Hearing Date:  August 13, 2007<br>Time:  10:00 a.m.<br>Place:  Courtroom 1 |
| 25 | |
| 26 | Discovery Cutoff: January 14, 2008<br>Pre-trial Conference: April 7, 2008<br>Trial Date: April 29, 2008 |
| 27   AND CONSOLIDATED ACTIONS | |
| 28 | |

EXHIBIT _____ 113

PAGE _____ 1783

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that, on August 13, 2007, at 10:00 a.m.

3    before Hon. Stephen G. Larson, MGA Entertainment, Inc. ("MGA") and Carter

4    Bryant ("Bryant") jointly will, and hereby do, move the Court to issue an order for

5    terminating sanctions against Mattel, Inc. ("Mattel") due to Mattel's spoliation of

6    evidence.

7          This Motion is made on the grounds that Mattel has engaged in a

8    conscious and systematic effort to destroy evidence relevant to its claims against

9    MGA and Mr. Bryant, and then deliberately sought to conceal its efforts. Mattel's

10   conduct is in plain violation of its legal obligations, is highly prejudicial, and

11   warrants terminating sanctions.

12         This Motion is based on this Notice of Motion, the accompanying

13   Memorandum of Points and Authorities, the Declaration of Michael Keats filed

14   concurrently herewith and attached exhibits, the Declaration of Kendall J. Burr filed

15   concurrently herewith and attached exhibits, the Declaration of James P. Jenal filed

16   concurrently herewith and attached exhibits, the Declaration of Yvonne L. Garcia

17   filed concurrently herewith and attached exhibits, the record and files of this Court,

18   and all other matters of which the Court may take judicial notice.

19

20

21   Dated:    July 23 , 2007        MICHAEL KEATS
                                     O'MELVENY & MYERS LLP
22

23                                   By: _Michael Keats_ (JB)
                                        Michael Keats
24                                   Attorneys for MGA Entertainment, Inc.

25

26

27

28

                                     MGA'S NOTICE OF MTN FOR
                        - 2 -        TERMINATING SANCTIONS DUE TO
                                     SPOLIATION CV 04-09049 SGL (RNBX)

EXHIBIT ___113___

PAGE ___1784___

**[PROPOSED] ORDER**

Based on the above Application, and good cause appearing for the entry thereof, IT IS HEREBY ORDERED that each of the following actions:

1. Case No. CV 04-9059 SGL (RNBx); and

2. Mattel's Counterclaims in Case No. CV 05-2727 SGL (RNBx)

are hereby dismissed with prejudice.

DATED: _____        _____

                                        Hon. Stephen G. Larson

MGA'S NOTICE OF MTN FOR
TERMINATING SANCTIONS DUE TO
SPOLIATION CV 04-09049 SGL (RNBX)

EXHIBIT ___113___

PAGE ___1785___

1   DALE M. CENDALI (admitted *pro hac vice*)
    O'MELVENY & MYERS LLP
2   400 South Hope Street
    Los Angeles, CA 90071-2899
3   Telephone:  (213) 430-6000
    Facsimile:  (213) 430-6407
4   Email:    jjenal@omm.com

5   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
6   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
7   Los Angeles, CA 90067
    Telephone:  (310) 553-3000
8   Facsimile:  (310) 557-9815

9   Attorneys for MGA Entertainment, Inc.

10  JOHN W. KEKER (S.B. #49092)
    KEKER & VAN NEST, LLP
11  710 Sansome Street
    San Francisco, CA 94111
12  Telephone: (415) 391-5400
    Fax: (415) 397-7188
13
14  Attorneys for Carter Bryant

15              UNITED STATES DISTRICT COURT
16              CENTRAL DISTRICT OF CALIFORNIA
                      EASTERN DIVISION

17  CARTER BRYANT, an individual,      Case No.  CV 04-09049 SGL (RNBx)
                                       (consolidated with CV 04-9059 & 05-2727)
18              Plaintiff,
                                       CONFIDENTIAL- FILED UNDER
19       v.                            SEAL

20  MATTEL, INC., a Delaware           MGA ENTERTAINMENT, INC.'S
    Corporation,                       MOTION FOR TERMINATING
21                                     SANCTIONS AGAINST MATTEL, INC.
                Defendant.             DUE TO SPOLIATION OF EVIDENCE
22
23  AND CONSOLIDATED ACTIONS          Hon. Stephen G. Larson

24                                     Discovery Cut-off:  January 14, 2008
                                       Pre-trial Conference:  April 7, 2008
25                                     Trial Date:  April 29, 2008

26                                     Hearing Date: August 13, 2007
                                       Hearing Time: 10:00 am
27                                     Courtroom:   1

28

EXHIBIT 113
1785-001

RECEIVED
JUL 2 3 2007
BNL 4:45

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ......................................................................................... 1

II.   BACKGROUND ............................................................................................ 3

      A.    Mattel Never Suspended Its Auto Delete Policy ................................ 3

      B.    Mattel Was on Notice of Its Claims by 2002 ..................................... 4

      C.    The 2003 Investigation and the Wall Street Journal Article ............... 5

      D.    Mattel Sues Bryant and "Does" in 2004 ............................................ 6

      E.    MGA's Document Retention Demands ............................................... 7

      F.    Mattel Stonewalls MGA's Efforts to Obtain Discovery about
            Email Preservation ............................................................................. 8

      G.    Mattel Perpetrates a Fraud on the Court .......................................... 10

      H.    Discovery Has Revealed Mattel's Spoliation .................................. 11

            (a)   Mattel Overwrote Its Backup Tapes from 2002-2005 ............ 12

            (b)   There Are No Zeus Server Backup Tapes from 1998-2001 ..... 13

            (c)   Mattel "Lost" Carter Bryant's October 2000 Phone
                  Records ................................................................................ 14

III.  ARGUMENT ................................................................................................ 14

      A.    Mattel's Conduct Warrants Terminating Sanctions ........................... 15

            1.    The Court Has Inherent Power To Dismiss Mattel's
                  Claims for Spoliation of Evidence .......................................... 15

            2.    Mattel Had a Duty To Preserve Evidence At Least As
                  Early As March 2002 .............................................................. 16

            3.    Mattel's Duty to Preserve Required It to Suspend its
                  Routine Document Destruction Policies .................................. 17

            4.    Mattel's Failure to Suspend Auto Delete and Maintain
                  Backup Tapes Constitutes "Willfulness, Fault or Bad
                  Faith" Warranting Terminating Sanctions ................................ 18

      B.    Mattel's Spoliation Meets The Test Set Forth In Anheuser
            Busch ................................................................................................ 20

            1.    The Public's Interest In Expeditious Resolution of
                  Litigation and The Court's Ability To Manage Its Docket
                  Have Both Been Compromised By Mattel's Conduct .............. 20

            2.    Mattel's Spoliation Has Prejudiced MGA and Bryant ............. 21

            3.    Mattel's Spoliation Warrants Dismissal And Less Drastic
                  Sanctions Are Not Appropriate ................................................ 24

      C.    CONCLUSION ................................................................................... 25

EXHIBIT ____11?____
PAGE ____1?85.00?____

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

- i -

1

## TABLE OF AUTHORITIES

2

Page

3

## CASES

4   *Akiona v. United States,*
       938 F.2d 158 (9th Cir. 1991) .................................................................. 16

5   *Alexander v. Nat'l Farmers Org.,*
       687 F.2d 1173 (8th Cir. 1982) ........................................................... 19, 22

6

7   *Anheuser-Busch, Inc. v. Natural Beverage Distribs.,*
       69 F.3d 337 (9th Cir. 1995) ........................................................ 15, 16, 20

8   *Broccoli v. Echostar Communications Corp.,*
       229 F.R.D. 506 (D. Md. 2005) ............................................................... 19

9   *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,*
       2007 WL 684001 (D. Colo. Mar. 2, 2007) ............................................. 18

10
    *Carlucci v. Piper Aircraft Corp.,*
11     102 F.R.D. 472 (S.D. Fla. 1984) ........................................................... 15

12  *Cecconi v. Cecconi,*
       2007 Bankr. LEXIS 1323 (Bankr. N.D. Cal. April 17, 2007) ............... 16

13  *Computer Associates Int'l. v. American Fundware, Inc.,*
       133 F.R.D. 166 (D. Colo. 1990) ............................................................ 15

14
    *Convolve, Inc. v. Compaq Computer Corp.,*
15     223 F.R.D. 162 (S.D.N.Y. 2004) ........................................................... 20

16  *DaimlerChrysler Motors v. Bill Davis Racing, Inc.,*
       2005 U.S. Dist. LEXIS 38162 (D. Mich. 2005) ................................... 18

17  *Frame v. S-H, Inc.,*
       967 F.2d 194 (5th Cir. 1992) ................................................................ 15

18  *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.,*
       2007 U.S. Dist. LEXIS 48309 (N.D. Cal. June 27, 2007) ..................... 21

19
    *Halaco Eng'g Co. v. Costle,*
20     843 F.2d 376 (9th Cir. 1988) ................................................................ 21

21  *Henry v. Gill Industries, Inc.,*
       983 F.2d 943 (9th Cir. 1993) ................................................................ 16

22  *Housing Rights Ctr. v. Sterling,*
       2004 U.S. Dist. LEXIS 28877 (C.D. Cal. Dec. 6, 2004) ...................... 17

23  *In re Fitzsimmons,*
       920 F.2d 1468 (9th Cir. 1990) .............................................................. 20

24  *In re Wechsler,*
       121 F. Supp. 2d 404 (D. Del. 2000) ...................................................... 15

25

26  *Leon v. IDX Sys. Corp.,*
       464 F.3d 951 (9th Cir. 2006) ........................................................ passim

27  *Metropolitan Opera Ass'n, Inc. v. Local 100 Hotel Employees and*
       *Restaurant Employees Int'l Union,*
       212 F.R.D. 178 (S.D.N.Y. 2003) ........................................................... 15

28

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT ___13___
PAGE ___ 1985 203

1

**TABLE OF AUTHORITIES**
(Continued)

2
Page

3  *Mosaid Technologies Inc. v. Samsung Elecs. Co., Ltd.,*
4      348 F. Supp. 2d 332 (D.N.J. 2004)................................................20

   *National Ass'n of Radiation Survivors v. Turnage,*
5      115 F.R.D. 543 (N.D. Cal. 1987) ...............................................16

6  *Padgett v. City of Monte Sereno,*
       No. C 04-03946 JW, 2007 U.S. Dist. LEXIS 24301 (N.D. Cal.
7      March 20, 2007).........................................................................19

8  *Residential Funding Corp. v. DeGeorge Fin. Corp.,*
       306 F.3d 99 (2d Cir. 2002) ........................................................21
9
   *Synanon Church v. United States,*
10      820 F.2d 421 (D.C. Cir. 1987),
        aff'd 579 F. Supp. 967 (D.D.C. 1984)........................................15
11
   *Telectron, Inc. v. Overhead Door Corp.,*
12      116 F.R.D. 107 (S.D. Fla. 1987).................................................21

   *UMG Recordings, Inc. v. Hummer Winbald Venture Partners,*
13      462 F. Supp. 2d 1060 (N.D. Cal. 2006)..................................19, 21

14 *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,*
       982 F.2d 363 (9th Cir. 1992) ...............................................15, 16
15
   *United States v. Kitsap Physicians Serv.,*
16      314 F.3d 995 (9th Cir. 2002).....................................................19

   *United States v. Nat'l Medical Enters., Inc.,*
17      792 F.2d 906 (9th Cir. 1986)......................................................21

18 *Wm. T. Thompson Co. v. General Nutrition Corp.,*
       593 F. Supp. 1443 (C.D. Cal. 1984)......................................15, 17
19
   *Zubulake v. UBS Warburg LLC,*
20      220 F.R.D. 212 (S.D.N.Y. 2003)............................................17, 21

**OTHER AUTHORITIES**
21
   Quinn Emanuel, Business Litigation Report, *New e-Discovery Rules
22      Go Into Effect* (Jan. 2007)........................................................17

   Quinn Emanuel, Business Litigation Report, *Preservation of
23      Electronic Information for Discovery: Emerging Standards* (Nov.
        2004) ................................................................................17, 18
24
   Quinn Emanuel, Business Litigation Report, *Spoliation of Electronic
25      Evidence Gives Rise to Adverse Jury Instructions* (April 2005)...........2

**RULES**
26
   Fed. R. Civ. P. 30(b)(6) ..................................................8, 10, 14

   Fed. R. Civ. P. 37.....................................................................21

- iii -

EXHIBIT 113
MGA'S MOTION FOR TERMINATING SANCTIONS
PAGE

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Mattel, Inc. ("Mattel") cleaned house before it went to war with MGA Entertainment, Inc. ("MGA") by making sure that evidence helpful to Carter Bryant and MGA would not be preserved for trial. As the Court is aware, Mattel has brought claims against MGA and Mr. Bryant purportedly based on events that allegedly occurred nearly a decade ago. In fact, Mattel obtained leave to amend its complaint to assert claims against MGA, in part, by representing to the Court that it had preserved the evidence that would be relevant to those claims. Discovery, however, has revealed Mattel's representations to be a sham: in fact, Mattel has engaged in a deliberate and systematic attempt to destroy relevant evidence, in violation of its legal obligations and in a calculated effort to force defendants to litigate this case on an evidentiary record riddled with gaps Mattel itself created.

Mattel's spoliation of evidence is astonishing both in its scope and in its thoroughness. While Mattel admits that its 25,000 employees exchange more than 80,000 emails daily (or over 20,000,000 per year), Mattel has, to date, produced just *1,200 emails*. Mattel's production of emails is so sparse because, despite conducting a number of substantial investigations since at least early 2002 of the very claims at issue here, *Mattel did not suspend its auto-deletion of email for anyone, even its most obvious potential witnesses, or preserve any email backup tapes*. In fact, Mattel continued to auto-delete email and to recycle backup tapes for an *entire year after Mattel sued Mr. Bryant.* And although one Mattel witness claims that Mattel "probably" preserved a 2002 backup tape for the server used by its design center employees such as Carter Bryant, Mattel disposed of the hardware necessary to review it, and it now admits -- contrary to its counsel's express representations to this Court under oath -- that it has no backup tapes at all (1) for the 1999-2001 period, (2) for 2003 (when the *Wall Street Journal* article was published, in which Mattel first made its allegations public), or (3) for 2004 (when

1  Mattel filed suit).

2     Mattel likewise did nothing to preserve physical documents.  Mattel has thus

3  "lost" critical physical documents in this case: the phone records for Mr. Bryant's

4  telephone extension at Mattel for October 2000.  These records are significant

5  because Mattel seeks to claim "Bratz" on the theory that he used Mattel resources

6  that very month to help MGA meet key milestones in the development of "Bratz."

7     As Mattel's counsel has written, "[b]y now, all lawyers know — or should

8  know — that bad things can happen if electronic evidence is not preserved."[1]  Thus,

9  aware of the consequences of its misdeeds, Mattel attempted a cover-up:

10   • Mattel concealed its internal investigation and other documents that
11     reveal that it first was on notice of its claims against Bryant and MGA
      no later than March 2002, at which time its duty to preserve relevant
12     evidence attached.

13   • Mattel repeatedly and aggressively evaded discovery by refusing for
      two years to produce witnesses familiar with its electronic document
14     preservation efforts.

15   • When it finally produced those witnesses, Mattel's counsel directed
      them not to answer questions about post-2000 preservation practices.

16   • Mattel represented to the Court, MGA, and Bryant that there had been
      no spoliation -- representations on which the Court expressly relied[2] --
17     but Mattel's witnesses have since admitted under oath that Mattel has
      no backup tapes for its e-mail servers for 1998 through April 2005.
18

19     The prejudice resulting directly from Mattel's actions cannot be overstated.

20  Mattel is asserting claims based on events that allegedly transpired long ago, in

21  1998-2000.  It investigated these very claims when evidence existed and memories

22  were fresh, selectively saving certain evidence and destroying the rest.  It then

23  waited years -- until memories had faded -- before bringing its claims.

24

25  [1] Quinn Emanuel, Business Litigation Report, *Spoliation of Electronic Evidence Gives
    Rise to Adverse Jury Instructions* (April 2005), Ex. 22 to the Declaration of Kendall Burr,
26  dated July 20, 2007 ("Burr Decl.").
    [2] *Bryant v. Mattel, Inc.*, No. CV-04-9049-SGL, slip op., at 13 (C.D. Cal. Jan. 12, 2006)
27  (allowing amendment because no "evidence that the e-mails so deleted from a Mattel
    employee's inbox are forever lost or, as is far more likely, whether such information
28  remains or is otherwise archived on some backup file on Mattel's computer system").

EXHIBIT'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)
PAGE  1785.006

1    Mattel is a large, sophisticated company, with seemingly unlimited resources
2  to conduct scorched-earth litigation. It has retained prominent outside counsel, and
3  more than 30 lawyers have appeared in this case on its behalf. Given the attention
4  that Mattel and its lawyers have lavished on this case, Mattel's failure to preserve
5  and produce evidence, and its efforts to conceal its spoliation from the Court,
6  MGA, and Bryant, can lead only to the conclusion that its spoliation was intentional
7  and in bad faith. Mattel and its counsel sought to obstruct these proceedings,
8  deprive MGA and Bryant of relevant evidence that would support their defenses,
9  and gain an unfair advantage by convincing the Court that it should be allowed to
10  bring its claims long after the underlying facts at issue took place. Mattel's years of
11  misconduct and brazen misrepresentations warrant the imposition of the most
12  serious sanctions available: dismissal of Mattel's claims against Bryant and MGA.

13  **II.   BACKGROUND**

14    The following facts are based on testimony from Mattel's own witnesses and
15  documents that Mattel was ordered to produce:

16    **A.   Mattel Never Suspended Its Auto Delete Policy**

17    Mattel has an automatic e-mail destruction policy that has been in force since
18  1999, pursuant to which, Mattel's computer systems automatically delete emails
19  from an employee's in-box after 90 days. *See* Declaration of James P. Jenal, dated
20  July 20, 2007 ("Jenal Decl.") ¶9 Ex. 8 at 355-356. *Mattel has never suspended*
21  *that policy at any time during this litigation -- not even for key witnesses* of whom
22  it has known for years, like those listed in Mattel's initial disclosures. *See* Jenal
23  Decl., ¶9, Ex. 8 at 380-381; Declaration of Michael Keats, dated July 20, 2007
24  ("Keats Decl."), ¶5. The only reason Mattel has proffered for its failure to do so is
25  that it was supposedly too expensive for Mattel, a multi-billion dollar publicly held
26  company, to do so.[3] *Id.*

27  ───────────────
[3] Notably, Mattel seeks hundreds of millions of dollars of damages from Bryant and MGA
28  and has insisted that they incur enormous sums themselves to review and produce
electronic evidence. *See* Burr Decl., Ex. 2.

EXHIBIT MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

3

PAGE 1785.007

1       Similarly, Mattel did not retain backup tapes of its email systems from 1998-

2    April 2005. Jenal Decl., ¶3, Ex. 2 at 230-235. Mattel's email systems are backed-

3    up on tapes that are ordinarily kept for 30 days and then recycled. *Id.* ¶7, Ex. 6 at

4    157-158:5. Mattel did not suspend this practice until April 2005, *Id.* ¶9, Ex. 8 at

5    366-369, which again resulted in the destruction of potentially relevant emails.

6    Mattel offers no excuse for this destruction.

7       **B.**   **Mattel Was on Notice of Its Claims by 2002**

8       Mattel's failure to preserve evidence, in accordance with its legal obligations,

9    is particularly egregious given that Mattel was on notice of its claims against

10   Bryant and MGA since at least March 2002, when it conducted an extensive

11   internal investigation into the allegations that form the basis for this lawsuit. *See*

12   Burr Decl., ¶2. MGA and Bryant were unaware of this investigation until Mattel

13   produced documents concerning the investigation after being compelled to do so by

14   the Discovery Master.[4] *Id.*, ¶2, Ex. 1.

15      Those documents reveal that, in March 2002, Mattel opened a formal

16   investigation in response to information provided by two Mattel employees, Evelyn

17   Viohl and Ivy Ross. *Id.*, ¶4, Ex. 3. According to Mattel's documents, Ms. Viohl

18   and Ms. Ross told Mattel that MGA had hired a number of former Mattel

19   employees and was manufacturing products they believed were based on Mattel

20   designs. *Id.* Mattel's investigators then set about to obtain information about MGA,

21   Isaac Larian, and Carter Bryant to support those allegations. On March 28, 2002,

22   Mattel employee Cassidy Park suggested to a Mattel investigator that Mr. Bryant, a

23   former employee and Mattel illustrator, had plagiarized the designs of Lily

24   Martinez in creating MGA's "Bratz" dolls. *Id.* ¶5, Ex. 4. That same day, a Mattel

25   investigator contacted Mattel's human resources department to obtain Mr. Bryant's

26

27   _____

[4] Mattel refused to disclose any material documents regarding Mattel's investigation of
MGA, MGA employees, and Mattel employees. On January 30, 2007, Judge Infante

28   ordered Mattel to produce its investigation files.

MEMORANDUM IN SUPPORT OF MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT *1785-008*
PAGE _____

1   file for his investigation. Mattel also conducted an extensive investigation of MGA
2   and its employees.[5] Id.

3       Five months later, in August 2002, Mattel's CEO Bob Eckert received an
4   anonymous letter reciting the allegations that ultimately formed the basis for
5   Mattel's lawsuit against Mr. Bryant and MGA. Id. ¶6, Ex. 6. Richard De Anda, the
6   Head of Mattel's Worldwide Security Department, wrote an email to Alan Kaye,
7   Head of Human Resources, in response to Mattel's receipt of the August 2002
8   "anonymous letter," confirming that the allegations raised in the letter had been
9   under investigation for months. Id. ¶6, Ex. 7. In the email, Mr. De Anda states, "I
10   am aware of this situation and have been working on it for several months. My
11   frustration in this matter was the genesis of [redacted] *and that is now in the hands*
12   *of [Mattel's General Counsel,] Robert Normile."* Id. (emphasis added).

13       Thus, Mattel and its General Counsel were on notice of Mattel's claims
14   against Bryant and MGA just months after MGA's "Bratz" dolls first went to
15   market in June 2001.[6] *See* Burr Decl., Ex. 23. Yet in spite of Mattel's internal
16   investigation, which began in early 2002 and involved Mattel's General Counsel,
17   Mattel did nothing between 2002-2005 to collect relevant email, to suspend its
18   auto-delete policy, or to preserve back-up tapes of electronic files.

19       **C.**   **The 2003 Investigation and the *Wall Street Journal* Article**
20       Mattel's focus on MGA and Bryant did not let up after 2002. In mid-2003,
21   Mattel initiated yet another investigation of MGA. This investigation, too, involved
22   allegations of misappropriating Mattel's intellectual property and copying of Mattel

---

23   [5] In addition to information about Mr. Bryant and MGA, the March 2002 investigation file
24   contains personal information about Mr. Larian, such as his social security number, age,
     home address, and business address, and similar information for his parents, wife, and
25   children. Burr Decl. ¶ 5, Ex. 5. Mattel investigators even probed into details about
     Larian's personal endeavors, including information about Larian's involvement with the
26   Parent-Teacher Association at El Rodeo School and his attendance at the Stephen S. Wise
     Temple, as well as his hobbies. *Id.*
27   [6] Notwithstanding the facts revealed by its own evidence, Mattel falsely alleges in its
     Amended Answer and Counterclaims and elsewhere, that it only learned of Bryant's
28   association with MGA on November 24, 2003. Burr Decl. ¶3, Ex. 2.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT

PAGE 1785.009

1   products by MGA employees.  Again, Mattel conducted an FBI-type investigation

2   of MGA and its employees.  Burr Decl. ¶30, Ex. 30.

3       In April 2004, Mattel turned its suspicious eye toward a new employee,

4   Ronald Brawer.  Mattel learned that Brawer had been communicating with MGA

5   and immediately opened a new investigation.  Mattel searched public records using

6   Brawer's social security number, reviewed his e-mails, searched his phone records,

7   and searched his corporate apartment in New York City.  *Id.* ¶31, Ex. 31.  Thus, by

8   that time, Mattel was on notice of potential trade secret claims that it did not

9   ultimately bring until January 2007.  *Id.*, Ex. 2.

10      Mattel also admits that, in mid-2003, it placed a story with the *Wall Street*

11  *Journal* as part of its effort to promote a new product line intended to compete with

12  "Bratz."  Keats Decl. ¶2, Ex. 1.  In doing so, Mattel employees took the opportunity

13  to publish Mattel's theory.  The *Wall Street Journal* reported:

14          Inside Mattel, some are convinced the "Bratz" borrow liberally from a
            Mattel project that was scrapped at the testing stage in 1998…[The
15          "Bratz'"] oversized heads - with their pursed lips and cartoonist eyes -
            are "virtually identical" to the heads of the dolls her team created, says
16          the designer, who left Mattel in 2001…"The big heads, the big eyes,
            the big feet - they were all the same" as 'Bratz.'"
17

18  *Id.* ¶3, Ex. 2.  Julia Jensen, the Mattel employee who placed the article, specifically

19  testified that she exchanged emails with the *Wall Street Journal* reporter who wrote

20  this article yet, to this day, Mattel has not produced any emails reflecting her

21  communications or internal discussions about those communications or about the

22  article itself.  *Id.* ¶4, Ex. 1 at 103-104, 170-171; Ex. 3; Burr Decl. ¶7.  Why?

23  Because Mattel knowingly allowed those emails to be destroyed, even though it

24  was actively investigating MGA and Bryant for the same conduct.

25      **D.    Mattel Sues Bryant and "Does" in 2004**

26      Mattel filed its original complaint against Bryant in April 2004.  *See* Burr

27  Decl., Ex. 8.  That complaint contained, almost verbatim, the allegations that Mattel

28  investigated in 2002.  Yet at no time *before or for an entire year after* filing its

6

EXHIBIT OTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

PAGE ___ 785. 010

1    lawsuit did Mattel do anything to suspend its auto-delete policy for possible

2    witnesses or take backup tapes out of circulation.  Jenal Decl., ¶9, Ex. 8 at 366-369.

3        It was only *after* MGA sued Mattel in 2005 (hereinafter "*MGA v. Mattel*")

4    that Mattel started taking email backup tapes out of circulation.  *Id.*  In fact, Mattel

5    concealed the existence of these tapes from MGA until only recently, and admits

6    that it has not searched them and has no intention of doing so. Keats Decl., ¶¶5-6,

7    Exs. 4-7. Even if the tapes were searched, the earliest emails on those tapes would

8    date back only to early 2005 -- leaving a gaping evidentiary hole prior to that time.

9    Jenal Decl., ¶9, Ex. 8 at 366-369.

10       **E.    MGA's Document Retention Demands**

11       In mid-April, 2005, MGA filed its own suit against Mattel.  In a letter dated

12   April 16, 2005, MGA demanded that Mattel "immediately suspend any document

13   retention or destruction policy, including, but not limited to, the deletion of emails

14   or other electronic records, and take any and all measures necessary, including

15   retaining archival documents in storage and backing-up and/or mirroring electronic

16   records and metadata . . ." Burr Decl., Ex. 12.  Mattel promptly assured MGA that

17   *it would* preserve documents "relating to the accused Mattel products and the third-

18   party organizations referenced in the complaint." *Id.*, Ex. 13.   Mattel went on to

19   explain that it would not suspend its auto-delete policy for *all* of its 25,000

20   employees (a request that MGA never made), because of the purported massive

21   volume of email and other electronic data created by its employees worldwide;

22   according to Mattel's counsel, Mattel processes over 80,000 email messages per

23   day over its servers.[7]  *Id.*  Mattel nonetheless indicated in its response that it was

24   aware of its obligations to preserve evidence, and would comply with them -- which

25   obligations clearly encompass a duty to preserve emails and electronic documents

---

26
27   [7]  Mattel invited MGA to agree to Mattel's approach to document preservation and
     threatened to seek intervention from the Court if MGA did not, including requiring MGA
     to bear the cost of document retention.  Burr Decl., Ex. 13.  Mattel's preservation
28   obligations arise by law, and MGA saw no reason to enter into any such agreement.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT ____12____
PAGE ____17-85.011____

1   of reasonably likely witnesses. *Id.* MGA sent Mattel another preservation demand

2   on September 5, 2005. *Id.*, Ex. 14. MGA sent these letters to make sure Mattel

3   would retain documents relevant to MGA's claims against Mattel, not knowing that

4   Mattel had chosen not to retain documents concerning the claims Mattel had

5   brought the previous year.

6   **F.    Mattel Stonewalls MGA's Efforts to Obtain Discovery about**

7   **Email Preservation**

8        The record is similarly replete with evidence that Mattel actively sought to

9   frustrate MGA's efforts to obtain discovery concerning Mattel's preservation

10   efforts. On December 21, 2004, just days after MGA intervened, Mr. Bryant served

11   a 30(b)(6) deposition notice requesting that Mattel provide designees on the issues

12   of email and document retention. Jenal Decl. ¶4. Mattel refused to do so. At Mr.

13   Bryant's request, he and Mattel met and conferred on March 14 and 15, 2005,

14   regarding Mattel's failure to designate witnesses in response to Bryant's 30(b)(6)

15   notice. *Id.* ¶4. Mattel delayed another two months -- until May 16, 2005 -- before

16   designating its witnesses. *Id.* ¶4. On May 23, 2005, this Court stayed discovery

17   pending Mattel's appeal to the Ninth Circuit of the Court's denial of Mattel's

18   motion to remand, thus saving Mattel from having to produce its Information

19   Technology witnesses for deposition. Burr Decl., Ex. 15.

20        On August 10, 2006, after the stay was lifted, MGA requested deposition

21   dates for Mattel's 30(b)(6) witnesses on, among other topics, Mattel's "Zeus"

22   server (which is used by Mattel doll designers and others in its design center) and

23   its email servers. Jenal Decl. ¶4. On September 12 and November 8, 2006, MGA

24   deposed Julia Marine, the administrator of Mattel's Zeus file server, who testified

25   that, although a backup tape set "probably" from 2002 had been provided to

26   Mattel's legal department, Mattel no longer had the ability to restore and search

27   those tapes for responsive documents because it had disposed of the hardware

28   needed to read the backup tapes. *Id.* ¶2, Ex. 1 at 111-112, 117-119. Ms. Marine

8

EXHIBIT 13

PAGE 1785.013

1  further testified that she had no idea what was on the 2002 backup tapes. *Id.*

2      Over the next several months, MGA and Bryant sought to depose Mattel's

3  designated witness on its email system. *Id.* ¶ 4.  Although Mattel had identified

4  witnesses for *other* electronic information categories on or about August 18, 2006,

5  notably, Mattel had refused to identify a witness or provide a date for a deposition

6  on topics *concerning Mattel's electronic mail.* *Id.*  On three separate occasions

7  throughout the Fall, MGA reiterated, in writing, its previously ignored requests that

8  Mattel schedule the deposition of its "email" designee. *Id.* ¶4, Ex. 3.  Mattel finally

9  responded by letter on October 20, 2006, offering David Kayano as its designee and

10  setting the week of December 6 – nearly seven weeks later and nearly four months

11  after being first asked in August 2006 – for a deposition on its electronic mail

12  system and practices. *Id.*  Mattel ignored MGA's requests for an earlier date, and

13  when MGA consented to go forward on December 6, Mattel unilaterally cancelled

14  the deposition pending agreement on the appointment of a discovery master. *Id.*

15  Once the parties had reached agreement on a discovery master, Mattel again refused

16  to produce Mr. Kayano on December 6, claiming by letter on December 1 that Mr.

17  Kayano would be unavailable until after January 16, 2007. *Id.* ¶5, Ex. 4.  This time,

18  Mattel's excuse for Mr. Kayano's unavailability was that Mattel had recently

19  acquired another company and that Mr. Kayano would be busy working on that

20  acquisition; a press release on Mattel's website stating that the acquisition had been

21  completed on October 3, 2006, *before* Mattel had even designated Mr. Kayano as

22  its witness belied Mattel's assertion, however. *Id.* ¶6, Ex. 5.

23      When Mattel finally produced Mr. Kawashima as a substitute for deposition

24  after the hearing on Mattel's motion for leave to amend, Mr. Kawashima admitted

25  that Mattel had no email backups at all from 1998 through 2000. *Id.* ¶7, Ex.6 at

26  195-198.  When MGA tried to question Kawashima about email backups after

27  2000, Mattel's counsel instructed him not to answer, purportedly because, in 2004,

28  well before MGA sued Mattel or Mattel amended its Answer and Counterclaims,

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBx)

1    the parties had supposedly agreed to limit the 30(b)(6) testimony concerning emails

2    to the period during which Bryant was employed at Mattel. *Id.* at 195-198. MGA

3    disagreed and was forced to file a motion to compel to obtain information about

4    Mattel's post-2000 email preservation efforts. Burr Decl., Ex. 24. Even in the face

5    of a court order, Mattel delayed further, refusing to make Mr. Kawashima available

6    for deposition until June 2007. Jenal Decl., ¶8.

### G.   Mattel Perpetrates a Fraud on the Court

8        Mattel's pattern of improper conduct extended to its submissions to the

9    Court. In November 2006, Mattel moved to amend its complaint so that it could

10   bring "aiding and abetting" and copyright infringement claims against MGA, and to

11   assert other claims for misappropriation of trade secrets and RICO violations in the

12   *Bryant* case. MGA opposed Mattel's motion to amend on several grounds,

13   including because the proposed claims related to events of long ago, and also

14   because it appeared that Mattel had not preserved key electronic documents, in two

15   forms – (1) although Mattel had led MGA to believe that it has preserved backup

16   tapes of its Zeus server, it had not preserved hardware capable of reading it;[8] and

17   (2) it appeared that emails were not being preserved. Burr Decl., Ex. 17 at 9:15-

18   10:16, 15:6-15:11. Mattel has more than 25,000 employees and claims that its

19   email server handles 80,000 emails on a *daily* basis, yet had produced virtually no

20   emails. Indeed, to date, Mattel's production has included only a mere 1,200 emails.

21   MGA strongly suspected, and hence argued, that Mattel had purposely delayed the

22   deposition of Mattel's witness on electronic document retention in an effort to

23   deprive MGA and Bryant of evidence to back up their spoliation concerns. *Id.*

24       For its part, Mattel denied that spoliation had occurred. *Id.*, Ex. 18 at 5:1-6:6.

25   To support that denial, Mattel's counsel submitted a sworn declaration claiming

26   that Mattel had backups of the "file server known as Zeus that were created in

27   ─────────────

28   [8] The Zeus server houses concept data and design drawings. Electronic mail also can be
     stored on Zeus, but that is not its main function. Jenal Decl ¶ 2, Ex. 1 at 94:5-95:4.

                                          MGA'S MOTION FOR TERMINATING
                        10                ────SANCTIONS────
                                          CV 04-09049 SGL (RNBX)

1    1998, 1999, 2000, and 2001 and at various other times." *Id.*, Ex. 19 at ¶14.

2    Regarding email preservation, Mattel also argued that "equally erroneous is MGA's

3    unexplained assertion that 'email records' have 'disappeared.'" Id., Ex. 18 at 5:25.

4    In conclusion, Mattel argued that MGA could not "identify any relevant evidence

5    that was lost" and that "[t]here had been no spoliation." *Id.* at 6:5-6.

6         Relying in part on Mattel's representation that evidence had been preserved

7    and was readily available, the Court granted Mattel's motion for leave to amend.

8    *Id.* ¶20, Ex. 20. The Court did not interpret Ms. Marine as saying that information

9    on the Zeus server backup tapes that Mattel may possess had been "'eliminated' or

10   forever lost." *Id.* at 11:19-25. Turning to MGA's claim that email records were

11   also missing, the Court then noted:

12            MGA next surmises that Mattel's e-mail records have disappeared, not
              because it has any proof on that point, but simply because Mattel has
13            postponed the deposition of the individual most knowledgeable of
              Mattel's email records until after the hearing on Mattel's motion for
14            leave to amend. ... MGA then makes much of a deposition from a
              Mattel executive, Alan Kaye, who testified that e-mails in his inbox
15            would be automatically deleted if they had remained there for more
              than a certain time period. ... *Noticeably absent from MGA's*
16            *argument is any evidence that the e-mails so deleted from a Mattel*
              *employee's inbox are forever lost or, as is far more likely, whether*
17            *such information remains or is otherwise archived on some backup file*
              *on Mattel's computer system.*[9]
18

19        The Court determined that "absent concrete proof that spoliation has

20   occurred, nothing in MGA's argument forms a basis for denying Mattel its

21   requested leave to amend." *Id.* at 13:5-13:7. Mattel's representations to the Court

22   on these issues, however, were demonstrably false.

23       **H.    Discovery Has Revealed Mattel's Spoliation**

24        In spite of Mattel's efforts at concealment, defendants have now uncovered

25   the "concrete proof" of spoliation to which the Court's decision alluded.

26

27

28   [9] *Id.* at 12:16-13:5. (citations omitted) (emphasis supplied).

11

MGA['S] [MOTION] FOR TERMINATING
SANCTIONS
CV-04-09049 SGL (RNBX)

EXHIBIT ___
PAGE _____

1          (a)   **Mattel Overwrote Its Backup Tapes from 2002-2005**

2          On June 13, 2007, during a meeting about Mattel's deficient document

3    production, Mattel revealed for the first time that it had not suspended its auto

4    delete policy for anyone, and that it either had no back-up tapes or would not search

5    them. Keats Decl. ¶5.  When MGA advised Mattel of MGA's serious concerns

6    about these revelations, Mattel scrambled to take back its admission, assuring MGA

7    that a satisfactory explanation would be provided the following week at the long-

8    delayed continuation of the Kawashima deposition. *Id.* at ¶6, Exs. 5-7.  Mattel also

9    took the insupportable position that its May 2005 response to MGA's preservation

10   letter relieved it of any obligation to suspend its auto delete policy. *Id.*, Ex. 7.

11         On June 19, 2007, Mr. Kawashima confirmed what Mattel's counsel had told

12   MGA during the June 13, 2007 meet and confer, namely, that Mattel had *not*

13   suspended its auto delete policy for anyone. Mr. Kawashima also revealed that

14   Mattel had only started preserving its back-up tapes on **April 19, 2005** -- a full

15   *three years* after Mattel began its investigation into Bryant, MGA, and the origin of

16   "Bratz," and more than *one year after* Mattel had brought suit against Carter

17   Bryant. Jenal Decl. ¶9, Ex. 8 at 300.  Mr. Kawashima further testified that Mattel

18   had not preserved the emails from the year 2000 of Carter Bryant, and key

19   witnesses Mercedeh Ward, Cassidy Park, Lily Martinez, Ann Driskill, Paula

20   Treantafelles or the Diva Starz designers, or emails of Robert Eckert, Alan Kaye,

21   and Richard De Anda from 2002 - 2005, while these very people were investigating

22   the allegations brought here.[10]  *Id.* ¶9, Ex. 8 at 493-503.

23         As Mattel watched its spoliation story spill out through Mr. Kawashima's

24   testimony, Mattel once again attempted to stem the tide by instructing him not to

25   answer questions about document retention, purportedly on the ground that a level

26   of confidentiality *beyond attorneys' eyes only* should apply. *Id.* ¶8, Ex. 7.

27   _____

[10] Mattel has not searched its post-April 2005 backup tapes either. Jenal Decl. ¶9, Ex. 8 at
28   311:25-312:24.

                                                     12

MGA'S MEMO FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT ___
PAGE ___

1  Notwithstanding Mattel's last-minute request, and the lack of merit in its position,

2  MGA agreed to treat Mr. Kawashima's answers as Mattel requested, subject to

3  MGA's right to challenge Mattel's newly-invented designation at a later date before

4  the Discovery Master. *Id.* Mattel rejected MGA's proposed accommodation and

5  instructed Mr. Kawashima not to answer on the grounds that his answers might

6  reveal Mattel's "security measures." *Id.*[11]

7       (b)   **There Are No Zeus Server Backup Tapes from 1998-2001**

8       Not only did Mattel fail to suspend its auto delete policy, at the very least, for

9  key witnesses, as it was required by law to do, but Mattel also permitted

10  destruction of relevant backup tapes that would have allowed it to recover the files

11  it had destroyed.  At the continuation of the deposition of Julia Marine on June 26,

12  2007, Ms. Marine testified, on behalf of Mattel, that while Mattel may have

13  retained a backup of the Zeus server in 2002,[12] it had not retained *any other* backup

14  tapes *prior to 2002.* Jenal Decl. ¶3, Ex. 2 at 230-235.  Ms. Marine's testimony

15  squarely contradicts the sworn declaration Mattel submitted in support of its

16  motion for leave to amend its Answer and Counterclaims, in which Mattel's

17  counsel told this Court that Mattel had backup tapes of the Zeus server "created in

18  1998, 1999, 2000, and 2001 and at various other times." Burr Decl., Ex. 19 at ¶14.

19

20  [11] Indeed, recent deposition testimony from just one week ago demonstrates that Mattel
    continues to improperly restrict questioning of witnesses regarding the preservation of
21  emails, and is apparently coaching its witnesses during breaks in order to prepare them to
    "clean up the record" when the depositions continue. Burr Decl. ¶26, Exs. 25-26.
22  [12] Marine's testimony that the oldest preserved backup for Zeus is from "probably 2002"
    is suspect.  She testified that regular off-site backups were rotated on a two to three month
23  cycle until she received an email from Mattel's legal department to preserve documents.
    Jenal Decl. ¶ 2, Ex. 1 at 101:3-16.  Although Marine testified that she had "no idea" when
24  she received that email, Kawashima was absolutely certain it was April 18, 2005. *Id.* ¶ 9,
    Ex. 8 at 366:1-14.  Thus, it is highly unlikely that Mattel still had a 2002 backup tape in
25  2005 -- unless Mattel had previously set it aside for other reasons as yet unrevealed.  In
    her resumed deposition in June of this year, Marine revealed for the first time that from
26  time-to-time -- literally whenever it seemed to her like a good idea and she had enough
    tapes lying around to do it (*Id.* ¶3, Ex. 2 at 230:17-235:21) -- she would create a backup
27  that would be kept for two years.  She testified that the oldest such backup that she would
    have "might" date back to 2005.  Thus, by to her own calculations, her oldest backup tape
28  would date to 2003, not 2002.

13

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

1   Ms. Marine specifically stated that she -- as the Zeus server administrator and the
2   person responsible for performing the backups of that server -- was unaware of the
3   existence of *any* backups going back to 2001, let alone for 1998-2000.[13]  Jenal
4   Decl. ¶3, Ex.2 at 230-235.  To this day, Mattel's counsel has not filed anything
5   with the Court to correct the clearly false statements of its counsel.
6            (c)    Mattel "Lost" Carter Bryant's October 2000 Phone Records
7            MGA long ago requested, but has yet to receive, logs for Carter Bryant's
8   telephone extension at Mattel for the month of October 2000, the month in which
9   he signed his contract with MGA and left Mattel.  Burr Decl. ¶22, Ex. 21.  At the
10  deposition of Rodney Palmer, Jr., Mattel's designated 30(b)(6) witness on Mattel's
11  phone logs, Mr. Palmer testified that Mattel retains data going back to 2000
12  regarding calls placed from Bryant's extension, but that he had no knowledge of
13  what became of the data for October 2000. Jenal Decl. ¶11, Ex. 9 at 55-57, 103-
14  110. Mr. Palmer believes that these logs must have gotten "lost," even though they
15  were supposedly turned over to Mattel's Legal Department sometime *in the 2003-*
16  *2004* period. *Id.* The month of October 2000 is a critical time period relevant to
17  Mattel's claims against Mr. Bryant that he, while still employed at Mattel in
18  October 2000, assisted MGA in meeting important milestones in the development
19  of "Bratz." Mattel has yet to explain their disappearance.[14]
20  **III.   ARGUMENT**
21            Mattel has engaged in a conscious and systematic effort to destroy evidence
22  relevant to its claims against MGA and Mr. Bryant thereto, and then deliberately
23  sought to conceal its efforts.  Mattel's conduct is in plain violation of its legal

---

[13] Mattel still has not searched whatever Zeus backup tapes it claims to have and Ms. Marine testified that she had "no idea" what is on them. Jenal Decl. ¶2, Ex.1 at 111-112.
[14] This may not be the only instance of crucial evidence from October 2000 disappearing. Mattel claims that it cannot locate any of Bryant's time records after September 8, 2000. Although its 30(b)(6) witness speculated that those records never existed, he conceded that they could have been deleted without leaving any record that they had been deleted. Burr Decl., Ex. 27 at 115-16.

obligations, is highly prejudicial, and warrants terminating sanctions.

### A.   Mattel's Conduct Warrants Terminating Sanctions

#### 1.   The Court Has Inherent Power To Dismiss Mattel's Claims for Spoliation of Evidence

The Court may impose terminating sanctions when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (affirming dismissal sanction with prejudice where plaintiff had deleted files from laptop during pendency of litigation); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (affirming dismissal of counterclaim).[15] The power to terminate is part of the inherent power "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (citation omitted).  This power allows the Court "to levy sanctions in response to abusive litigation practices" like those at issue here, namely, spoliation of evidence. *Id.*; *Leon*, 464 F.3d at 958.  Imposition of dismissal

---

[15] Numerous other courts have issued terminating sanctions for the failure to preserve evidence. *See Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984) (entering default judgment where defendant failed to preserve documents that it reasonably should have known were relevant to litigation and responsive to discovery requests); *Metropolitan Opera Ass'n, Inc. v. Local 100 Hotel Employees and Restaurant Employees Int'l Union*, 212 F.R.D. 178 (S.D.N.Y. 2003) (granting terminating sanctions where defendants destroyed "a year's worth" of electronic documents from the most relevant time period in the action); *In re Wechsler*, 121 F. Supp. 2d 404, 415 (D. Del. 2000) ("When [document] destruction is willful or in bad faith and intended to prevent the other side from examining the evidence, the court may impose the most severe sanction of all – the outright dismissal of a claim or the entry of a default judgment."); *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 485-86 (S.D. Fla. 1984) (entry of default is an appropriate remedy for litigants who destroy evidence and for remedying the wrong caused to the other side); *Computer Associates Int'l. v. American Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990) (entering default judgment where defendant failed to suspend general practice of destroying previous versions of software code after it should have been aware that litigation over code was imminent); *Synanon Church v. United States*, 820 F.2d 421, 427-28 (D.C. Cir. 1987), *aff'd* 579 F. Supp. 967 (D.D.C. 1984) (affirming dismissal based on finding in separate litigation that plaintiff deliberately destroyed documents relevant to claims and potential defenses); *Frame v. S-H, Inc.*, 967 F.2d 194, 203 (5th Cir. 1992) (striking defendant's pleadings where incomplete production indicated that relevant documents and electronic records were destroyed).

1  sanctions is appropriate if there is evidence of "willfulness, fault, or bad faith" by

2  the sanctioned party. *See id.* (affirming dismissal of counterclaim where plaintiff

3  was prejudiced by counter-claimant's willful concealment of relevant documents);

4  *Unigard*, 982 F.2d at 368 n.2; *Anheuser-Busch*, 69 F.3d at 348.

5      A party need not demonstrate that spoliation was deliberate or in bad faith to

6  support sanctions, however.  In this Circuit, the moving party need show only that

7  the spoliating party had notice that the destroyed evidence was potentially relevant

8  to the litigation. *Leon*, 464 F.3d at 959; *Akiona v. United States*, 938 F.2d 158, 161

9  (9th Cir. 1991).  Indeed, a district court need only find "disobedient conduct not

10 shown to be outside the control of the litigant" before ordering dismissal sanctions.

11 *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 948-949 (9th Cir. 1993) (plaintiff

12 offered various explanations for his conduct delaying discovery, but "none

13 persuades that circumstances outside his control caused his transgressions").

14 Dismissal sanctions are available where the conduct to be sanctioned is due to

15 "willfulness, fault, *or* bad faith." *Id.* at 946 (citation omitted); *Anheuser Busch*, 69

16 F.3d at 348 (emphasis added).  Mattel's conduct warrants terminating sanctions

17 under any of these standards.

18          2.    **Mattel Had a Duty To Preserve Evidence At Least As Early
19                As March 2002**

20      A party has a duty to preserve evidence as soon as it is on notice of its

21 potential claims. *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543,

22 556-57 (N.D. Cal. 1987); *Cecconi v. Cecconi*, 2007 Bankr. LEXIS 1323 *56 (Bankr.

23 N.D. Cal. April 17, 2007) (plaintiff had duty to preserve evidence "as soon as a

24 potential claim is identified") (citation omitted).  Mattel was on notice of the very

25 claims it brings here at least as early as March, 2002 when it began investigating

26 allegations that Mr. Bryant had stolen Mattel designs and given them to MGA to

27 manufacture and produce "Bratz" dolls.  Accordingly, Mattel has had a duty to

28 preserve evidence -- whether helpful to it or not -- since at least March, 2002.

16

**3.   Mattel's Duty to Preserve Required It to Suspend its
Routine Document Destruction Policies**

Once a plaintiff reasonably anticipates litigation, it must "suspend its routine document retention and destruction policies and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Housing Rights Ctr. v. Sterling*, 2004 U.S. Dist. LEXIS 28877, at *21 (C.D. Cal. Dec. 6, 2004) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("*Zubulake IV*"). Mattel and its counsel were well aware of this obligation. Quinn Emanuel, Business Litigation Report, *New e-Discovery Rules Go Into Effect* (Jan. 2007) ("good faith may require…that a party intervene to suspend certain features of the routine operation of an information system to prevent loss of information"); Quinn Emanuel, Business Litigation Report, *Preservation of Electronic Information for Discovery: Emerging Standards* (Nov. 2004) ("at the outset of litigation or "when litigation is reasonably anticipated," party should suspend routine document retention or destruction policy and implement litigation hold). Burr Decl. Exs. 28-29. "While a litigant is under no duty to keep or retain every document in its possession… it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984).[16]  Mattel did not do so.

---

[16] *Zubulake IV* set forth a party's basic obligations when the duty to preserve arises: (a) a party must "preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request;" (b) this duty extends to the key individuals in a case – those who are likely to have relevant information – and encompasses documents created by and prepared for them; (c) although a litigation hold need not apply to backup tapes maintained solely for disaster recovery, such a hold should apply to backup tapes used on a regular basis for information retrieval; and (d) to the extent a party can identify backup tapes containing documents of "key players," these tapes, for disaster recovery and information retrieval, should be preserved if the information is not otherwise available. 220 F.R.D. at 217-18.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

17

EXHIBIT ___13___

PAGE ___1785.021___

1      Beginning in March 2002, Mattel was required to maintain the relevant

2  electronic evidence for individual witnesses, including emails and other electronic

3  documents, and to preserve backup tapes of those witnesses' files related to the

4  litigation if the information was not otherwise available. *See Cache La Poudre*

5  *Feeds, LLC v. Land O'Lakes, Inc.*, 2007 WL 684001 (D. Colo. Mar. 2, 2007)

6  ("Once a 'litigation hold' has been established, a party cannot continue a routine

7  procedure that effectively ensures that potentially relevant and readily available

8  information is no longer 'reasonably accessible'"); *DaimlerChrysler Motors v. Bill*

9  *Davis Racing, Inc.*, 2005 U.S. Dist. LEXIS 38162 (D. Mich. 2005) (normal

10  procedures for destruction of documents must be suspended when a party is on

11  notice that documents may be relevant to litigation); Quinn Emanuel, Business

12  Litigation Report, *Preservation of Electronic Information for Discovery: Emerging*

13  *Standards* (recommending that companies preserve electronically stored

14  information of key employees even if "inaccessible") (Burr Decl., Ex. 29).

15      Mattel's spoliation of evidence cannot seriously be disputed.  Mattel admits

16  that it did not suspend the automatic deletion of email for potential witnesses at any

17  time, Jenal Decl., ¶9, Ex. 8 at 380:14-381:3, and admits that it maintained no

18  backup tapes for email before April 2005. *Id.* at 300:12-301:7.  Similarly, while

19  Mattel claims it "probably" has a 2002 back up tape of the "Zeus" server used by its

20  design center employees, *Id.*, ¶2, Ex. 1 at 99:4-15; ¶3, Ex. 2 at 209:1-24, it admits it

21  retained no other back up tape until April 2005 and did not issue a litigation hold

22  memo until April 2005. *Id.*, ¶9, Ex. 8 at 367:25-369, 404:4-405:16.  Therefore

23  email and data from before April 2005, save for what might be on a 2002 Zeus back

24  up tape Mattel "probably" kept, are permanently lost. *Id.*

25      **4.**    **Mattel's Failure to Suspend Auto Delete and Maintain**

26             **Backup Tapes Constitutes "Willfulness, Fault or Bad Faith"**
                **Warranting Terminating Sanctions**

27      A party's destruction of evidence qualifies as willful spoliation if the party

28  has "some notice that the documents were potentially relevant to the litigation be-

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT ___/13___

PAGE ___1785 022___

1   fore they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995,

2   1001 (9th Cir. 2002) (emphasis added) (internal quotation marks and citation

3   omitted).  Moreover, because "the relevance of . . . [destroyed] documents cannot

4   be clearly ascertained because the documents no longer exist," a spoliating party

5   "can hardly assert any presumption of irrelevance as to the destroyed documents."

6   *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982).  As set forth

7   above, Mattel was well on notice of its claims -- and indeed investigated those

8   claims -- in 2002, yet chose to allow obvious evidence concerning the factual

9   underpinnings of its claims to be destroyed.  Then, in addition to failing to suspend

10  its routine document destruction policies, Mattel actively concealed its failure from

11  both MGA and this Court.  Such conduct is "willful" spoliation.

12        Even if its conduct had not been willful (which it was), Mattel's failure to

13  implement a litigation hold or take adequate measures to preserve evidence

14  constitutes the requisite "fault" warranting terminating sanctions.  *UMG*

15  *Recordings, Inc. v. Hummer Winbald Venture Partners*, 462 F. Supp. 2d 1060,

16  1068 (N.D. Cal. 2006) (deletion of emails in violation of a duty to preserve, even if

17  not willful, can still meet the "fault" standard because such conduct demonstrates

18  gross negligence); *see also Padgett v. City of Monte Sereno*, No. C 04-03946 JW,

19  2007 U.S. Dist. LEXIS 24301 *9 (N.D. Cal. March 20, 2007) ("Whether

20  characterized as willful or negligent, [defendant's] conduct constitutes the kind of

21  "fault" sufficient to warrant sanctions, including dismissal").  Indeed, such a

22  failure, especially for a party clearly on notice of potential litigation, goes beyond

23  mere "fault," and constitutes bad faith, "gross spoliation" warranting severe

24  sanctions.  *Broccoli v. Echostar Communications Corp.*, 229 F.R.D. 506, 510-512

25  (D. Md. 2005) (large corporation with ample financial resources had "clearly acted

26  in bad faith in its failure to suspend its email and data destruction policy" after its

27  duty to preserve electronic documents had been triggered).  *See also Mosaid*

28  *Technologies Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 339 (D.N.J.

EXHIBIT _113_   MGA'S MOTION FOR TERMINATING
                SANCTIONS
                CV 04-09049 SGL (RNBX)
PAGE _1785.023_

1  2004) ("When the duty [to preserve potentially relevant evidence] is triggered, it

2  cannot be a defense to a spoliation claim that the party inadvertently failed to place

3  a 'litigation hold' or 'off switch' on its document retention policy to stop the

4  destruction of that evidence"); *Convolve, Inc. v. Compaq Computer Corp.*, 223

5  F.R.D. 162 (S.D.N.Y. 2004) ("in the world of electronic data, the preservation

6  obligation is not limited simply to avoiding affirmative acts of destruction").

7     Mattel's spoliation was in bad faith and -- at a minimum -- satisfies the

8  "fault" requirement to impose severe sanctions. *See In re Fitzsimmons*, 920 F.2d

9  1468, 1472 (9th Cir. 1990) (misrepresentation of facts to court is bad faith).[17]

10    **B.    Mattel's Spoliation Meets The Test Set Forth In *Anheuser Busch***

11     Before issuing terminating sanctions, district courts in this Circuit should

12  consider the following factors: "(1) the public's interest in expeditious resolution of

13  litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the

14  party seeking sanctions; (4) the public policy favoring disposition of cases on their

15  merits; and (5) the availability of less drastic sanctions." *Anheuser-Busch*, 69

16  F.3d at 348; *see also Leon*, 464 F.3d at 958 (applying five-part standard in the

17  context of dismissal sanctions for spoliation of evidence pursuant to the district

18  court's inherent authority to sanction). The district court need not make explicit

19  findings regarding each of these factors. *Id.* Moreover, "the public policy favoring

20  disposition of cases on their merits" is not sufficient to outweigh the other four

21  factors, *Leon*, 464 F.3d at 960-61, all of which weigh in favor of dismissal here.

22          1.    **The Public's Interest In Expeditious Resolution of Litigation and The Court's Ability To Manage Its Docket Have Both Been Compromised By Mattel's Conduct**

24     The first two factors weigh strongly in favor of dismissal. Mattel waited

25  more than two years to bring its initial claims against Mr. Bryant and almost five

26  years to bring its claims against MGA and add additional claims against Bryant.

27  ───────────

28  [17] A timeline in the Appendix to this brief illustrates Mattel's bad faith conduct in failing to preserve electronic evidence.

1   Throughout this time, Mattel knowingly allowed evidence to be destroyed. Then,

2   Mattel made demonstrably false representations to this Court denying its spoliation,

3   and did so for the express purpose of convincing this Court to allow its five-year-

4   old claims to proceed. Mattel's tactic worked -- the Court relied on Mattel's

5   misrepresentations in determining that there would be no prejudice in allowing

6   Mattel to amend its Answer to assert counterclaims against MGA and Bryant. It is

7   difficult to conceive of conduct that more severely interfered with expeditious

8   resolution of litigation or the Court's ability to manage its docket.

9               **2.   Mattel's Spoliation Has Prejudiced MGA and Bryant**

10  Although prejudice is not required for an award of terminating sanctions,[18]

11  this factor, too, favors terminating sanctions. Courts have held that, when a party

12  destroys documents through its own gross negligence, a presumption arises that the

13  documents were relevant and would have supported its adversary's case. *See, e.g.*,

14  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir.

15  2002) ("[A] showing of gross negligence in the destruction or untimely production

16  of evidence may, standing alone, support a finding that the evidence was

17  unfavorable to the grossly negligent party."); *Google Inc. v. Am. Blind & Wallpaper*

18  *Factory, Inc.*, 2007 U.S. Dist. LEXIS 48309 (N.D. Cal. June 27, 2007)

19  ("[S]poliation of evidence raises a presumption that the destroyed evidence goes to

20  the merits of the case, and further, that such evidence was adverse to the party that

21  destroyed it.").[19] Indeed, were the rule otherwise, the guilty party would profit

22

23  [18] *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 379 (9th Cir. 1988) (finding prejudice optional in awarding sanctions); *United States v. Nat'l Medical Enters., Inc.*, 792 F.2d

24  906, 912-913 (9th Cir. 1986) (prejudice is not required for a dismissal); *UMG Recordings*, 462 F. Supp. 2d at 1075 n.4 (although prejudice might be required for terminating

25  sanctions under Rule 37, prejudice is only an optional consideration for courts granting terminating sanctions pursuant to its inherent power).

26  [19] *See also Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133 (S.D. Fla. 1987) ("[W]hile it is now impossible to determine precisely what or how many documents were

27  destroyed, the bad-faith destruction of a relevant document, by itself, gives rise to a strong inference that the production of the document would have been unfavorable to the party

28  responsible for its destruction."); *Zubulake IV*, 220 F.R.D. at 220 ("When evidence is destroyed in bad faith (*i.e.*, intentionally or willfully), that fact alone is sufficient to

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT 21    113
PAGE    1785025

1      from its spoliation of evidence by being able to point to the other party's lack of

2      specific evidence -- evidence that the spoliating party made unavailable in the first

3      place. The Ninth Circuit has not endorsed such a rule. *See Leon*, 464 F.3d at 959

4      ("because the relevance of . . . [destroyed] documents cannot be clearly ascertained

5      because the documents no longer exist, a party can hardly assert any presumption of

6      irrelevance as to the destroyed documents").[20]  Prejudice must be presumed here.

7          Moreover, the Court need not just presume prejudice here because actual

8      prejudice exists. Despite Mattel's wholesale destruction of evidence, there are

9      guideposts to what Mattel destroyed. The 2002-2005 period is particularly crucial

10     because one of the central themes of Bryant's and MGA's defense is that Mattel

11     deliberately delayed bringing this lawsuit for years because it knew its claims were

12     speculative and it had to win in the marketplace by offering competing products.

13     When Mattel could not compete fairly in the marketplace, it then turned to the

14     courts as a last resort. The deleted email would have told this story, and at a

15     minimum, would have explained Mattel's long delay between its discovery of its

16     claims, and the filing of this lawsuit.

17          The deleted email would also have provided other relevant information. As

18     Mattel was conducting its investigation of MGA and Bryant in 2002 and 2003, its

19     investigators talked to a number of people who are now witnesses in this case. Burr

20     Decl., ¶33, Ex. 32. Mattel's employees and its investigators communicated about

21     and in connection with those investigations by email. Id. ¶34. Ex. 33. Mattel also

22     sponsored an article published in the *Wall Street Journal* in July 2003, in which it

23     was reported that "some" "inside Mattel" were making the allegations Mattel makes

24     in this lawsuit. Mattel employees communicated extensively with the *Wall Street*

25     *Journal* in 2003 to provide information for that article and indeed communicated

26     about that article internally. Keats Decl. ¶4, Ex. 1 at 25:21-24; 26:11-36:7; 78:9-

27     demonstrate relevance").

28     [20] *See also Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205-06 (8th Cir. 1982).

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

1   79:15; 92:13-93:18; 114:8-115:6.  Further, Mattel executives made public

2   announcements to Mattel employees on the day Mattel filed its suit against Mr.

3   Bryant.  As Mattel witnesses have conceded, Mattel employees discussed that

4   event, and expressed sympathy for Mr. Bryant and the view that Mattel was wrong.

5   Burr Decl. ¶31, Ex. 31 at 192:15-19; 201:23-202:25; 280:13-24.  In a case such as

6   this, against a behemoth corporation that has listed no fewer than 153 people on its

7   initial disclosures, the content of communications about the subject matter of the

8   litigation and their identification of witnesses with relevant information and

9   sympathetic views towards Mr. Bryant would be enormously helpful.  The

10  destruction of that evidence, in turn, is enormously prejudicial.

11      In sum, the lost email correspondence was relevant to, or likely to lead to the

12  discovery of admissible evidence regarding, among other things: (a) Carter

13  Bryant's employment and work at Mattel, including emails and data that would

14  refute Mattel's claims that he did not meet his employment obligations; (b) Mattel's

15  awareness of "Bratz" and the bases, if any, of its suspicions concerning Bryant's

16  alleged misconduct in developing "Bratz;" (c) the reasons Mattel delayed bringing

17  suit for so many years; (d) Mattel's investigation of its claims against Bryant, MGA

18  and Isaac Larian in 2002; (e) Mattel's 2003 communications with the *Wall Street*

19  *Journal,* in which Mattel employees accused Bryant and MGA of stealing Mattel's

20  designs; (f) the early development of MY SCENE; (g) Mattel's communications

21  with suppliers, retailers, and others to impair MGA's ability to compete.

22      The failure to preserve backup tapes of the Zeus server is also prejudicial.

23  The latest incarnation of Mattel's claims is based on Mattel's theory that Bryant and

24  possibly[21] another MGA employee, Paula Garcia, who left Mattel even before

25  Bryant, were exposed to a Mattel product called "Diva Starz" and used designs

26  from that project to create "Bratz." Jenal Decl. ¶12.  Mattel bases its allegations

27  _____

[21] The word "possibly" is used because Mattel refuses to make its claims clear, lest it
28  decide to change its theory yet again.

25 EXHIBIT _____ 113 _____   MGA'S MOTION FOR TERMINATING
                                              SANCTIONS
                                    CV 04-09049 SGL (RNBX)

PAGE ___ 1785.027

1    regarding Ms. Garcia on three documents (Garcia Dep. Exs. 305, 306, 307) that it
2    miraculously saved from a 10 day period in the summer of 1998 that suggest that
3    Ms. Garcia was assigned (for 10 days, at any rate) to a project that bears no
4    physical resemblance to "Diva Starz" and that Mattel admits was cancelled shortly
5    thereafter but somehow morphed into "Diva Starz." Declaration of Yvonne Garcia,
6    ("Garcia Decl."), ¶2, Ex. 1 at 106:19-109:5, 152:11-156:5, Ex. 2. Mattel bases its
7    claims regarding Mr. Bryant on the fact that he worked in the design center at
8    Mattel and may have had access to designs through Mattel's Zeus server. Jenal
9    Decl., ¶10. Documents on that server detailing the day-to-day development of
10   Mattel's "Diva Starz" project, and the metadata associated with such documents,
11   would demonstrate whether Mr. Bryant or Ms. Garcia even had access to them and
12   could have copied any "Diva Starz" design. Those design center documents, all of
13   which were available in 2002, *are the very documents Mattel destroyed*.

14          Finally, the prejudice resulting from Mattel's "loss" of Mr. Bryant's October
15   2000 time records is significant. It is in that very month that Mattel claims Mr.
16   Bryant worked with MGA to complete the sculpt of MGA's "Bratz" dolls. Those
17   records -- if they were still available -- would help to exonerate Mr. Bryant.

18          3.    **Mattel's Spoliation Warrants Dismissal And Less Drastic**
19                **Sanctions Are Not Appropriate**

20          Mattel cannot save its claims by pointing to the fifth factor, the supposed
21   availability of less drastic remedies. First, the District court need only determine
22   the feasibility and appropriateness of less drastic sanctions; even where less drastic
23   remedies are available, the Court need not forego terminating sanctions. *Leon*, 464
24   F.3d at 960 ("lesser" sanctions of excluding evidence and jury instruction creating
25   presumption inappropriate because they left defendants "equally helpless to rebut
26   any material that plaintiffs might use to overcome the presumption"). Moreover,
27   less drastic sanctions would do nothing to remedy Mattel's misconduct here
28   because MGA and Mr. Bryant have been deprived of evidence necessary to prove

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT _____ 113 _____

PAGE _____ 1785.028 _____

1  their defenses.  This is particularly true because Mattel waited so long to bring its

2  claims and witnesses' memories have faded.  *See* Garcia Decl., ¶2, Ex. 1 at 42:13-

3  20; 47:2-7; 166:21-24; Burr Decl., ¶32, Ex. 31 at 262:18-263:1; 270:19-25.

4  ### C.  CONCLUSION

5    Long aware that its claims had no merit, Mattel engaged in the deliberate and

6  systematic destruction of relevant evidence in a calculated effort to litigate its

7  claims after memories had faded, on a cherry-picked record that Mattel itself

8  designed.  Mattel's actions -- and its flagrant misrepresentations to this Court -- are

9  precisely the type of conduct that warrants the serious sanction of termination.  For

10  the foregoing reasons, this motion should be granted.

11

12  Dated: July 23, 2007          O'MELVENY & MYERS LLP

13

14                                By: Dale M. Cendali

15                                Attorneys for MGA Entertainment, Inc.

16

17  Dated: July 23 2007           CHRISTENSEN, GLASER, FINK,
                                  JACOBS, WEIL & SHAPIRO, LLP
18

19                                By:  Patricia Glaser

20                                Attorneys for MGA Entertainment, Inc.

21

22  Dated: July 23 2007           KEKER & VAN NEST, LLP

23

24                                By:  John W. Keker

25                                Attorneys for Carter Bryant

26

27

28

EXHIBIT 113
25

1785.029

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

# EXHIBIT 114

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            UNITED STATES DISTRICT COURT
 2         CENTRAL DISTRICT OF CALIFORNIA
 3                 EASTERN DIVISION          Certified Copy
 4
 5     --------------------------------
 6    MATTEL, INC., a Delaware          )
 7    Corporation,                      )
 8              Plaintiff,              )
 9              vs.                      ) No. CV 04-9059
10    CARTER BRYANT, an individual;     )    NM  (RNBx)
11    and DOES 1 through 10,            )  VOLUME I
12    Inclusive,                        )
13              Defendants.            )
14    ----------------------------- )
15    (COMPLETE CAPTION ON NEXT PAGE.)
16
17         CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19      Videotaped Deposition of ADRIENNE FONTANELLA,
20      taken at 300 South Grand Street, Los Angeles,
21      California, commencing at 9:10 A.M.,
22      Wednesday, January 16, 2008, before
23      Wendy S. Schreiber, CSR No. 3558, RPR, CLR.
24
25    PAGES 1 - 260
                                                      1
```

Confidential - Attorneys Eyes Only



EXHIBIT C
PAGE 16

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    APPEARANCES OF COUNSEL:

2

3        FOR THE PLAINTIFF:

4            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5            BY:  MICHAEL ZELLER, ESQ.

6            865 South Figueroa Street, Tenth Floor
             Los Angeles, California 90017

7            (213) 443-3000
             mzeller@quinnemanuel.com

8

9        FOR THE DEFENDANT AND COUNTERCLAIMANT

10       CARTER BRYANT:

11           KEKER & VAN NEST LLP

12           BY:  AUDREY WALTON-HADLOCK, ESQ.

13           710 Sansome Street
             San Francisco, California 94111-1704

14           (415) 391-5400

15           awaltonhadlock@kvn.com

16

17       FOR DEFENDANT MGA ENTERTAINMENT, INC.:

18           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

19           BY:   KENNETH PLEVAN, ESQ.

20                 MICHELLE M. CAMPANA, ESQ.
             Four Times Square

21           New York, New York 10036-6522
             (212) 735-3000

22           kplevan@skadden.com
             micampan@skadden.com

23

24       ALSO PRESENT:
             Video Operator - David West

25

                                                      3
```



EXHIBIT C
PAGE 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the licensing side of the business?

2         MR. PLEVAN:  Yes.  That was what the intent

3    of the question was.

4         THE WITNESS:  Yeah.

5    Q.   When you became President of Girls, what was 09:37AM

6    happening in terms of the sales of Barbie dolls?

7    A.   I came in in February of '99 so the plan had

8    already been done and I vaguely remember Barbie was

9    doing about $1.8 billion in sales.

10   Q.   And over the next several years?        09:38AM

11   A.   When I left in 2003, I think worldwide sales

12   were $2.1 billion or $2.2 billion.

13   Q.   Now, did the $2.1 billion, $2.2 billion did

14   that include a line called My Scene?

15   A.   Yes.                                    09:38AM

16   Q.   And do you recall what portion of the $2.1

17   billion to $2.2 billion worldwide --

18        MR. ZELLER:  I'm sorry, this is as of the

19   time she left?

20        MR. PLEVAN:  Yes.                       09:39AM

21   Q.   -- was accounted for by My Scene?

22   A.   It was not very big.

23   Q.   You referred to the Design Center.  I think

24   you indicated Ms. Ivy Ross was in charge of the

25   Design Center.                               09:39AM
                                                      25

EXHIBIT C
PAGE 18

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.    Yes.

2      Q.    What is the -- what is the Design Center?

3      A.    The Design Center for Mattel at the time was

4   a separate building and there was -- there were both

5   Girls and Boys division designers, sculptors,          09:39AM

6   Packaging, Planning, I think Electronics, Modeling.

7   There were a number of departments.

8      Q.    Approximately how many employees were there

9   in the Design Center when you were at Girls?

10     A.    In excess of 200.                              09:40AM

11     Q.    When you went to Mattel in 19 -- what did we

12  agree, '96 --

13     A.    Yes.

14     Q.    -- did you sign an employment agreement?

15     A.    Yes.                                           09:40AM

16     Q.    And what -- what did that consist of?

17     A.    I remember maybe three things. I had a

18  contract. I signed a form employee inventors kind

19  of confidentiality agreement and then maybe another

20  form document.                                         09:41AM

21     Q.    The contract was a specific employment

22  contract related to you personally and your salary?

23     A.    I'm trying to think did I have a contract.

24  I think -- I believe, yes.

25     Q.    Did you -- well, let me withdraw that.        09:41AM
                                                                26
```

EXHIBIT C
PAGE 19

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              You referred to a form employee inventors
 2  kind of confidentiality agreement.
 3      A.   Uh-huh.
 4      Q.   What did that look like?  Do you recall?
 5      A.   I just remember that I disclosed -- it asked  09:42AM
 6  and talked about whatever happened at Mattel Mattel
 7  owned and you weren't able to do anything else while
 8  you were working at Mattel.  And I disclosed that I
 9  had a company January Productions, Inc. and
10  basically wanted to keep it -- did not want to close  09:42AM
11  it and wanted to make sure that there was no problem
12  with the agreement and the fact that I had this
13  company.  So it was disclosed.  It was up to Mattel
14  to determine if it was competitive or contradicted
15  the document at all.                                  09:43AM
16      Q.   And did someone eventually get back to you
17  on that point?
18      A.   Oh, absolutely.  Absolutely.
19      Q.   Who was that?
20      A.   It was reviewed by many people.  Jean        09:43AM
21  McKenzie, it was reviewed by Human Resource, it was
22  reviewed by -- I mean, it was -- yes.  It was
23  reviewed by a number of people.
24      Q.   Who got back to you and said it was okay?
25      A.   Generally things came through the Human      09:43AM
                                                           27
```

EXHIBIT C
PAGE 20

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Resource department but I believe it was both Jean

2    McKenzie and whoever I was dealing with in the Human

3    Resource department.

4        Q.    Do you remember the actual time you received

5    what you referred to as the form agreements for        09:44AM

6    signature?

7        A.    No.

8        Q.    Was this something you received for your

9    review prior to actually moving to California?   I

10   take it you moved to California when you started at    09:44AM

11   Mattel?

12       A.    I didn't.

13       Q.    Did not?

14       A.    I did not.

15       Q.    Let me ask you, where do you live today?     09:44AM

16       A.    Today I live in California.

17       Q.    What's your home address?

18       A.         Redacted

19       Q.    I'm sorry, maybe someone else knows that

20   but --                                                  09:44AM

21       A.         Redacted

22

23       Q.    And how long have you lived there?

24       A.    Since June of 2002.

25       Q.    And where did you live prior to that?        09:44AM
                                                                  28



EXHIBIT C
PAGE 21

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   I lived in Marina Del Rey.  I don't

 2   remember -- on Privateer Street.

 3      Q.   And before that?

 4      A.   I lived on 200 East 90th Street.

 5      Q.   At what point did you move to California?    09:45AM

 6      A.   In November of 1999.  November of 1999.

 7      Q.   Do you recall whether or not you received

 8   those form agreements prior to your becoming an

 9   employee of Mattel?

10      A.   I don't recall but I would assume that I    09:45AM

11   did.

12      Q.   This was part of the negotiations relating

13   to accepting the position?

14      A.   Yes.

15      Q.   Did you review those form agreements with    09:45AM

16   your -- with an attorney?

17      A.   They were pretty clear to me.  I don't think

18   so.  I mean, my attorney was really more involved in

19   my contract.  I think that -- I don't recall exactly

20   but I believe that it was pretty explicit to me and    09:46AM

21   I just disclosed January Productions and that was

22   the end of it.

23      Q.   Who were you represented by at the time?

24      A.   I really wasn't represented.  Again, it was

25   just a very simple, simple, simple, simple employee    09:46AM
```

                                                              29

EXHIBIT C
PAGE 22

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1            I declare under penalty of perjury
2       under the laws of the State of California
3       that the foregoing is true and correct.
4            Executed on _____,
5       2008, at _____,
6       California.
7
8
9
10      ADRIENNE FONTANELLA
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25                                              253
```

EXHIBIT C
PAGE 23

# EXHIBIT 115



(Folio 1)

**HCA 3856/2003**

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
CIVIL ACTION NO. 3856 OF 2003     HIGH COURT ACC. OFFICE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Saved by   FEESPAID

FC2                              1045
CHEQUE                        1045.(
OCT16'03#001A0101 16:01R    FEESPA

BETWEEN:-

MGA ENTERTAINMENT INC.                          **Plaintiff**

and

UNI-FORTUNE TOYS INDUSTRIAL LIMITED       1st  **Defendant**
FU WEI TOYS COMPANY LIMITED                2nd  **Defendant**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To the 1st Defendant UNI-FORTUNE TOYS INDUSTRIAL LIMITED whose registered office is situate at Flat A-B, 21st Floor, Cheung Hing Shing Centre, 23 Sha Tsui Road, Tsuen Wan, New Territories, Hong Kong

And to the 2nd Defendant FU WEI TOYS COMPANY LIMITED whose registered office situate at Flat A-B, 21st Floor, Cheung Hing Shing Centre, 23 Sha Tsui Road, Tsuen Wan, New Territories, Hong Kong

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the back.

Within 14 days after the service of this Writ on you, counting the day of service, you must either satisfy the claim or return to the Registry of High court the accompanying ACKNOWLEDGEMENT OF SERVICE stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgement within the time stated, or if you return the Acknowledgement without stating therein an intention to contest the proceedings, the Plaintiff(s) may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued from the Registry of the High Court this 16th day of October 2003

Registrar

Note:-   This Writ may not be served later than 12 calendar months beginning with that date unless renewed by order of the Court.

IMPORTANT
Directions for Acknowledgement of Service are given with the accompanying form.
S.C.549 (s)

C:\MAGGIE\IP\Copyright\WT...1874-MGA\WH6.doc

M0012593

DEPOSITION EXHIBIT

EXHIBIT _____ 115 _____

PAGE _____ 1796 _____    (32)

### STATEMENT OF CLAIM
### (Please see attached)

*(Where the Plaintiff's claim is for a debt or liquidated demand only: If, within the time for returning the Acknowledgment of Service, the Defendant pays the amount claimed and $1,550.00 for costs and, if the Plaintiff obtains an order for substituted service, the additional sum of $565.00, further proceedings will stayed. The money must be paid to the Plaintiff or his Solicitors.)

THIS WRIT   was issued by Messrs. William W. L. Fan & Co. of Room 507, 5th Floor, Hang Seng Building, 77 Des Voeux Road Central, Hong Kong, Solicitors for the Plaintiff MGA Entertainment Inc. whose principal place of business is situate at 16730 Schoenborn Street, North Hills, Ca 91343-6122, USA and c/o Room 1001, 10th Floor, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong.

C:\MAGGIE\WP\copyright\WF - 1375-MGA\WF/R.DOC

M0012594

EXHIBIT ___115___

PAGE ___1796___

## STATEMENT OF CLAIM

1. The Plaintiff is and at all material times a corporation existing under the laws of the U.S.A. carrying on business in the design, manufacture, marketing and selling of toys, in particular, fashion dolls.

2. The 1st and 2nd Defendants were and at all material times companies incorporated and existing under the laws of Hong Kong carrying on the business in the manufacture and marketing of toys. The shareholders, directors and registered office of 1st and 2nd Defendant are identical.

3. The Plaintiff is and at all material times, has been the owner of the copyright subsisting in original artistic works in respect of the Plaintiff's Bratz fashion dolls ("the said Artistic Works").

### Particulars of Original Artistic Works

(a) 18 design drawings of various Bratz fashion dolls made between the years 1998 and 2000.

(b) Wax models of the head, body and shoes of the Bratz fashion dolls made between the year 2000 and 2001.

C:\MACO\E\IP\copyright\WF - 1878 AAQ A.WHS.DOC

M0012595

EXHIBIT 115
PAGE 1797

(c) Silicon rubber moulds and polyurethane samples made therefrom of the Bratz fashion dolls made between the years 2000 and 2001.

(d) 4 drawings of the facial decoration of the Bratz fashion dolls made between the years 2000 and 2001.

(e) 8 drawings 4 of which are pantone colour guides of the facial decorations of the Bratz fashion dolls made between the years of 2000 and 2001.

(f) 4 hand painted deco-masters on 4 rubber head sculpts made between the years 2000 and 2001.

### Particulars of Ownership and Subsistence

(g) Carter Bryant (hereinafter referred to as "Mr. Bryant") was commissioned by the Plaintiff to make the design drawings referred to in sub-paragraphs (a) and (e) hereof. At all material times, it was the understanding and agreement between the Plaintiff and Mr. Bryant that copyright subsisting in the artistic works should vest in the Plaintiff. Pursuant thereto, a confirmatory assignment was made between the Plaintiff and Mr. Bryant in September 2000.

C:\MAGGIE\P\copyright\WF-1876-MOA\WF.doc

M0012596

EXHIBIT 115

PAGE 1798

(h) At all material times, Mr. Bryant is a resident of and domiciled in the U.S.A.

(i) Margaret Leahy (hereinunder referred to as "Ms. Leahy") was
commissioned by the Plaintiff to make the artistic works referred to in
subparagraph (b) hereof. At all material times, it was the understanding
and agreement between the Plaintiff and Ms. Leahy that copyright
subsisting in the artistic works should vest in the Plaintiff. Pursuant thereto,
a confirmatory assignment was made between the Plaintiff and Ms. Leahy
in June 2003.

(j) At all material times, Ms. Leahy is a resident of and domiciled in the USA.

(k) Jessie Ramirez (hereinunder referred to as "Ms. Ramirez") was
commissioned by the Plaintiff to make the silicon rubber moulds and
polyurethane samples referred in subparagraph (c) hereof. At all material
times, it was the understanding and agreement between the Plaintiff and
Ms. Ramirez that copyright subsisting in the artistic works should vest in the
Plaintiff. Pursuant thereto, a confirmatory assignment was made between
the Plaintiff and Ms. Ramirez on 16th June 2003.

(l) At all material times, Ms. Ramirez is a resident of and domiciled in the USA.

(m)Anna Rhee (hereinunder referred to as "Ms. Rhee") was commissioned by
the Plaintiff to make the artistic works referred to in sub-paragraphs (d) and
(f) hereof. At all material times, it was the understanding and agreement

C:\MAGGIE\P\copyright\MT\1878-MCANN6.doc

M0012597

EXHIBIT 115

PAGE 1799

between the Plaintiff and Ms. Rhee that copyright subsisting in the artistic works should vest in the Plaintiff. Pursuant thereto, a confirmatory assignment was made between the Plaintiff and Ms. Rhee on 12th June 2003.

(n) At all material times, Ms. Rhee is a resident of and domiciled in the USA.

(o) The said Artistic Works as described in sub-paragraphs (a) to (f) above were first published in the USA in or about June 2001 when the Bratz fashion dolls were exhibited and offered for sale. Alternatively, the said Artistic Works are unpublished. The artistic works referred to in sub-paragraph (b) hereof and the silicon rubber moulds referred to in sub-paragraph (c) hereof were destroyed in the course of the Plaintiff's business.

4. Prior to the issue of the Writ herein, the 1st and 2nd Defendants have infringed the said Artistic Works by authorising the manufacture, the manufacture of and/or importing into and exporting from Hong Kong in its course of business, possessing for the purpose of trade or business, selling or offering or exposing for sale, for the purpose of trade or business exhibiting in public or distributing fashion dolls known as Glitter Girls which are reproductions of or a reproduction of a substantial part of the said Artistic Works without the license of the Plaintiff (hereinafter collectively

C:\MAGGIE\VP\copyright\WF...1878-MGA\WPS.doc

M0012598

EXHIBIT  115

PAGE  1800

referred as "the Infringing Dolls")

## Particulars

The Plaintiff will in particular rely on the following facts and matters:-

a) The exposure for sale of the Infringing Dolls to an investigator employed by the Plaintiff by the distribution of leaflets depicting the Infringing Dolls on 8th February 2003 and 14th February 2003.

b) The possession for the purpose of trade or business and exposure for sale of the Infringing Dolls by the 1st and/or the 2nd Defendants in a showroom at Room 802A, Empire Centre, Tsimshatsui East, Kowloon on the 14th February 2003 to an investigator employed by the Plaintiff.

c) The sale and/or distribution of 2 Infringing Dolls by the 1st Defendant at the 1st and 2nd Defendant's registered offices on the 11th March 2003 to an investigator employed by the Plaintiff.

d) The exposure for sale by the 2nd Defendant of the Infringing Dolls by the provision of a quotation dated 11th March 2003.

e) The exposure for sale of the Infringing Dolls by the 1st and 2nd Defendants

M0012599

EXHIBIT 115

PAGE 1801

by way of an advertisement in p.140 of Vol. 2 of 2003 issue of the Hong Kong Toys Magazine.

f) The exhibition in public of the Infringing Dolls by the 1st and/or 2nd Defendants at the Hong Kong Houseware Fair and Hong Kong Gifts & Premium Fair 2003 ("the Hong Kong Fair") in July 2003.

g) The manufacture, authorization of manufacture, sale and export on divers dates an unknown quantity of the Infringing Dolls to Europe and the United States by the 1st and 2nd Defendants.

h) The admission by the 1st and 2nd Defendants that the 2nd Defendant was the supplier of the Infringing Dolls to the 1st Defendant in a letter dated 21st August 2003 sent by the 1st and 2nd Defendants' solicitor to the Plaintiff's solicitors.

The Plaintiff is, prior to proper discovery and/or interrogatories, unable to give full particulars of all the wrongful acts of copyright infringement of the 1st and 2nd Defendants but will seek to recover damages in respect of each and every such wrongful act.

5. The Plaintiff will in so far as is necessary rely on the fact that at all material times

C:\MAGGIE\VP\COPYRIGHT\WF-1278-MGA-WW\H.doc

M0012600

EXHIBIT __115__

PAGE __1802__

by way of an advertisement in p.140 of Vol. 2 of 2003 issue of the Hong Kong Toys Magazine.

f) The exhibition in public of the Infringing Dolls by the 1st and/or 2nd Defendants at the Hong Kong Houseware Fair and Hong Kong Gifts & Premium Fair 2003 ("the Hong Kong Fair") in July 2003.

g) The manufacture, authorization of manufacture, sale and export on divers dates an unknown quantity of the Infringing Dolls to Europe and the United States by the 1st and 2nd Defendants.

h) The admission by the 1st and 2nd Defendants that the 2nd Defendant was the supplier of the Infringing Dolls to the 1st Defendant in a letter dated 21st August 2003 sent by the 1st and 2nd Defendants' solicitor to the Plaintiff's solicitors.

The Plaintiff is, prior to proper discovery and/or interrogatories, unable to give full particulars of all the wrongful acts of copyright infringement of the 1st and 2nd Defendants but will seek to recover damages in respect of each and every such wrongful act.

5. The Plaintiff will in so far as is necessary rely on the fact that at all material times

M0012601

EXHIBIT 115

PAGE 1803

the 1st and 2nd Defendants knew or had reason to believe that the Infringing Dolls are infringing copies of the said Artistic Works within the meaning of the Copyright Ord., Cap. 528.

### Particulars of Knowledge

The Plaintiff will in particular rely upon the following facts and matters:-

(a)  The Plaintiff relies on the fact that the 1st and 2nd Defendants are in the same business as the Plaintiff, the Bratz fashion dolls being first exhibited and sold in the USA in June 2001.

(b)  The Bratz fashion dolls have won numerous awards including Toy of the Year Award, People's Choice of the Year Award, Doctor Toy Award and Family Fun Best Toy Award and numerous articles have been about the Bratz fashion dolls and their success.  The Bratz fashion dolls have achieved worldwide fame and publicity.

(c)  The Plaintiff relies on the objective similarity between the said Artistic Works and the Infringing Dolls.

(d)  On 14th February 2003, a Mr. Allen Ho on behalf of the 1st and 2nd Defendants informed an investigator employed by the Plaintiff that some modifications were made to the Infringing Dolls so that the Infringing Dolls would not resemble the Bratz fashion dolls too much.

(e)  In correspondence dated 7th August 2003 between the solicitors for the

C:\MAGGIE\Pdoc\my\EWF-1874-MGA\Wrk.doc

M0012602

EXHIBIT 115

PAGE 1804

the 1st and 2nd Defendants knew or had reason to believe that the Infringing Dolls are infringing copies of the said Artistic Works within the meaning of the Copyright Ord., Cap. 528.

## Particulars of Knowledge

The Plaintiff will in particular rely upon the following facts and matters:-

(a)     The Plaintiff relies on the fact that the 1st and 2nd Defendants are in the same business as the Plaintiff, the Bratz fashion dolls being first exhibited and sold in the USA in June 2001.

(b)     The Bratz fashion dolls have won numerous awards including Toy of the Year Award, People's Choice of the Year Award, Doctor Toy Award and Family Fun Best Toy Award and numerous articles have been about the Bratz fashion dolls and their success.   The Bratz fashion dolls have achieved worldwide fame and publicity.

(c)     The Plaintiff relies on the objective similarity between the said Artistic Works and the Infringing Dolls.

(d)     On 14th February 2003, a Mr. Allen Ho on behalf of the 1st and 2nd Defendants informed an investigator employed by the Plaintiff that some modifications were made to the Infringing Dolls so that the Infringing Dolls would not resemble the Bratz fashion dolls too much.

(e)     In correspondence dated 7th August 2003 between the solicitors for the

C:\MAGGIE\VP\copyright\WP -1676-MGA\Writ.doc

M0012603

EXHIBIT 115

PAGE 1805

1st and 2nd Defendants and the Plaintiff's solicitors, the 1st Defendant asserted that it ceased dealing with the Infringing Dolls upon learning the infringement of copyright, however on 21 August 2003, the 1st Defendant asserted that prior to the receipt of the cease and desist letter dated 30th July 2003, it had not promoted, offered and/or exposed for sale and/or sold the Infringing Dolls. On 10th September 2003, the 1st Defendant further asserted that it has not promoted, offered and/or exposed for sale and/or sold the Infringing Dolls. The Plaintiff refers to sub-paragraphs (a) to (e) of paragraph 4 herein. In light of the foregoing, the Plaintiff relies on the deliberate attempt by the 1st Defendant to conceal its infringing activities to show that the 1st Defendant had knowledge or had reason to believe that the Infringing Dolls were infringing copies of the said Artistic Works.  The Plaintiff also relies on the fact that the 1st and 2nd Defendants have identical directors and thus any knowledge of the 1st Defendant is imputed to the 2nd Defendant as well.

The Plaintiff is, prior to proper discovery and/or interrogatories, unable to give full particulars of all the particulars of knowledge of the 1st and 2nd Defendants.

6. By reason of the foregoing, the Plaintiff has suffered loss and unless the 1st and 2nd Defendants are restrained by this Honourable Court, will continue to suffer loss and damage.

7. By reason of all the circumstances of this case, including the flagrancy of the infringement, the benefit accruing to the 1st and 2nd Defendants by reason of the

C:\MAGGIE\IP\copyright\WT - 1076-94\CA\WYR.DOC

M0012604

EXHIBIT   115

PAGE   1806

infringement and the completeness, accuracy and reliability of the 1st and 2nd Defendants' business accounts and records, the Plaintiff claims additional damages under Section 108 of the Copyright Ord., Cap. 528.

<u>Particulars</u>

The Plaintiff will in particular rely upon the following facts and matters:-

(a) The Plaintiff repeats the particulars supplied under paragraphs 5 hereof.

(b) The 1st and 2nd Defendants in infringing the said Artistic Works have reaped substantial benefits in that the 1st and 2nd Defendants do not have to incur development costs, marketing costs and the risks that the Infringing Dolls might not be popular with its customers. The 1st and 2nd Defendants knew that in copying the said Artistic Works they will be able to produce, market and sell a product that has proven to be successful and is in demand by members of the trade and public.

8.  By reason of the 1st and 2nd Defendants' wrongful acts and/or by reason of the 1st and 2nd Defendants' dealing in the Infringing Dolls, the 1st and 2nd Defendants owe a duty to the Plaintiff to assist the Plaintiff by supplying the Plaintiff with full information relating to the products complained of, all dealings therein or therewith

C:\MAGIC\EVP\copying\EW7 - 1576 MGA\WA.doc

M0012605

EXHIBIT   115

1807

and the identities of all other wrong doers.

9.  Further by virtue of sections 48 and 49 of the High Court Ordinance (Cap. 4) the Plaintiff is entitled to and claims to recover interest on any amount found to be due to the Plaintiff at such rate(s) and for such period(s) as this Honourable Court considers just and proper.

AND the Plaintiff claims:-

1.  An injunction to restrain the 1st and 2nd Defendants whether acting by themselves, their directors, officers, servants or agents or any of them or otherwise howsoever from infringing the Plaintiff's copyright in original artistic works relating to the Plaintiff's fashion dolls under the name "Bratz" and/or from directing, procuring, instigating, causing, enabling or assisting others to do so.

2.  An order for delivery up or destruction upon oath of all articles and materials in the 1st and 2nd Defendants' possession, power, custody or control including dies, plates, templates, labels, moulds, leaflets, catalogues and packaging the use or sale or dealing therewith by the 1st and 2nd Defendants would offend against the foregoing injunction.

C:\MAGGIE\IP\copyright\WT - 1978-MGA.wyn.doc

M0012606

EXHIBIT ___115___

PAGE ___1808___

3. An inquiry as to damages, alternatively damages or, at the Plaintiff's option, account of profits, in respect of the 1st and 2nd Defendants' wrongful acts of infringement of copyright.

4. Additional damages pursuant to section 108(2) of the Copyright Ordinance.

5. An order for the payment by the 1st and 2nd Defendants' of all sums found due to the Plaintiff upon making such inquiries and/or accounts together with such interest thereon as this Honourable Court shall deem just pursuant to Section 48 of the High Court Ordinance.

6. An order for discovery or verification upon oath of all matters relating to the foregoing.

7. Costs

8. Such further or other relief as this Honourable Court shall deem just.

Dated this 16th day of October 2003.

William W.L. Fan & Co.

Solicitors for the Plaintiff

C:\MAGGIE\P\copyright\WF - 1578-MS.A\WFA.DOC

M0012607

EXHIBIT ___115___

PAGE ___1809___

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
ACTION NO.    OF 2003

HCA    /2003

BETWEEN:-

MGA ENTERTAINMENT INC.                                                    Plaintiff

and

UNI-FORTUNE TOYS INDUSTRIAL LIMITED                          1st Defendant

FU WEI TOYS COMPANY LIMITED                                      2nd Defendant

## ACKNOWLEDGMENT OF SERVICE OF WRIT OF SUMMONS

**If you intend to instruct a Solicitor to act for you, give him this form IMMEDIATELY.**

Important.   Read the accompanying directions and notes for guidance carefully before completing this form.  If any information required is omitted or given wrongly, **THIS FORM MAY HAVE TO BE RETURNED.**

Delay may result in judgment being entered against a Defendant whereby he or his Solicitor may have to pay the costs of applying to set it aside.

| | | |
|---|---|---|
| See Notes 1, 3, 4, and 5 | 1. | State the full name of the Defendant by whom or on whose behalf the service of the Writ of Summons is being acknowledged. |
| | 2. | State whether the Defendant intends to contest the proceedings (tick appropriate box)       Yes [    ]       No [    ] |
| See Direction 3. | 3. | If the claim against the Defendant is for a debt or liquidated demand, AND he does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff(s) (tick box) |

where words appear between square brackets delete if inapplicable

Service of the Writ of Summons is acknowledged accordingly.

(Signed) [Defendant in person] [Solicitor] (                              )
Address for service :-

Notice as to Address for Service

Solicitor.   Where the Defendant is represented by a Solicitor, state the Solicitor's place of business in Hong Kong.

Defendant in person.  Where the Defendant is acting in person, he must give his residence OR, if he does not reside in Hong Kong, he must give an address in Hong Kong where communications for him should be sent.  In the case of a limited company, "residence" mean its registered or principal office.

S.C 551(s)

William W. L. Fan & Co., Solicitors for the Plaintiff,
Room 507, 5th Floor, Hang Seng Building,
77 Des Voeux Road Central, Hong Kong.
[Ref: WF-1878-RC]

C:\MAGG-IEYP\copy\hp\wf - 1878-MGA\WR.doc

M0012608

EXHIBIT  115

PAGE  1810

HCA   /2003

### IN THE HIGH COURT OF THE
### HONG KONG SPECIAL ADMINISTRATIVE REGION
### COURT OF FIRST INSTANCE
### ACTION NO.   OF 2003

BETWEEN:-

    MGA ENTERTAINMENT INC.                                        Plaintiff

and

    UNI-FORTUNE TOYS INDUSTRIAL LIMITED                    1st Defendant

    FU WEI TOYS COMPANY LIMITED                            2nd Defendant

## ACKNOWLEDGMENT OF SERVICE OF WRIT OF SUMMONS

**If you intend to instruct a Solicitor to act for you, give him this form IMMEDIATELY.**

    **Important.**   Read the accompanying directions and notes for guidance carefully before completing this form.  If any information required is omitted or given wrongly; THIS FORM MAY HAVE TO BE RETURNED.

    Delay may result in judgment being entered against a Defendant whereby he or his Solicitor may have to pay the costs of applying to set it aside.

See Notes 1, 3,4, and 5

1.  State the full name of the Defendant by whom or on whose behalf the service of the Writ of Summons is being acknowledged.

2.  State whether the Defendant intends to contest the proceedings (tick appropriate box)     Yes [        ]          No [        ]

See Direction 3.

3.  If the claim against the Defendant is for a debt or liquidated demand, AND he does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff(s) (tick box)

where words appear between square brackets delete if inapplicable

Service of the Writ of Summons is acknowledged accordingly.

    (Signed) [Defendant in person] [Solicitor] (            )
    Address for service :-

Notice as to Address for Service

    Solicitor.   Where the Defendant is represented by a Solicitor, state the Solicitor's place of business in Hong Kong.

    Defendant in person. Where the Defendant is acting in person, he must give his residence OR, if he does not reside in Hong Kong, he must give an address in Hong Kong where communications for him should be sent.  In the case of a limited company, "residence" mean its registered or principal office.
S.C 551(s)

William W. L. Fan & Co., Solicitors for the Plaintiff,
Room 507, 5th Floor, Hang Seng Building,
77 Des Voeux Road Central, Hong Kong.
[Ref: WF-1878-RC]

C:\MAGGIE\HappyWrit\WF-1878-MGAWrit.doc

M0012609

EXHIBIT   115
PAGE   1811

HCA      /2003

**IN THE HIGH COURT OF THE**
**HONG KONG SPECIAL ADMINISTRATIVE REGION**
**COURT OF FIRST INSTANCE**
**ACTION NO.       OF 2003**

BETWEEN:-

MGA ENTERTAINMENT INC.                                    Plaintiff

and

UNI-FORTUNE TOYS INDUSTRIAL LIMITED              1st Defendant

FU WEI TOYS COMPANY LIMITED                         2nd Defendant

## ACKNOWLEDGMENT OF SERVICE OF WRIT OF SUMMONS

**If you intend to instruct a Solicitor to act for you, give him this form IMMEDIATELY.**

**Important.** Read the accompanying directions and notes for guidance carefully before completing this form. If any information required is omitted or given wrongly, **THIS FORM MAY HAVE TO BE RETURNED.**

Delay may result in judgment being entered against a Defendant whereby he or his Solicitor may have to pay the costs of applying to set it aside.

See Notes1, 3,4, and 5

1.   State the full name of the Defendant by whom or on whose behalf the service of the Writ of Summons is being acknowledged.

2.   State whether the Defendant intends to contest the proceedings (tick appropriate box)       Yes [        ]       No [        ]

See Direction 3.

3.   If the claim against the Defendant is for a debt or liquidated demand, AND he does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff(s) (tick box)

where words appear between square brackets delete if inapplicable

Service of the Writ of Summons is acknowledged accordingly.

(Signed) [Defendant in person] [Solicitor] (                    )
Address for service :-

Notice as to Address for Service
Solicitor.   Where the Defendant is represented by a Solicitor, state the Solicitor's place of business in Hong Kong.
Defendant in person.   Where the Defendant is acting in person, he must give his residence OR, if he does not reside in Hong Kong, he must give an address in Hong Kong where communications for him should be sent.   In the case of a limited company, "residence" mean its registered or principal office.
S.C 551(s)

C:\MAGGIE\P\copyright\WF-1878-MGA\Writ.doc

William W. L. Fan & Co., Solicitors for the Plaintiff,
Room 507, 5th Floor, Hang Seng Building,
77 Des Voeux Road Central, Hong Kong.
[Ref: WF-1878-RC]

M0012610

EXHIBIT   115

1812

Acknowledgment of Service of Writ of Summons

(O.12  r.3)

Directions for Acknowledgment of Service

1.  The accompanying from of ACKNOWLEDGMENT OF SERVICE should be detached and completed by Solicitor acting on behalf of the Defendant or by the Defendant if acting in person. After completion it must delivered or sent by post to the Registry of the High Court at the following address:-

LG1, High Court Building, 38 Queensway, Hong Kong.

2.  A Defendant who states in this Acknowledgment of Service that he intends to contest the proceedings MUS ALSO file a DEFENCE which must be written in the English language with the registry and serve a cop thereof on the Solicitor for the Plaintiff (or on the Plaintiff if acting in person).

If a statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear at the top of the back the Defence must be filed and served within 14 days after the time for acknowledging service of the Writ, unless in th meantime a summons for judgment is served on the Defendant.

If a Statement of Claim is not indorsed on the Writ, the Defence need not be filed and served until 14 days after Statement of Claim has been served on the Defendant.

If the Defendant fails to the file and serve his defence within the appropriate time, the Plaintiff may enter judgmen against him without further notice.

3.  A STAY OF EXECUTION against the Defendant's goods may be applied for where the Defendant is unable t pay the money for which any judgment is entered. If a Defendant to an action for a debt or liquidated deman (i.e. a fixed sum) who does not intend to contest the proceedings states, in answer to Question 3 in th Acknowledgment of Service, that he intends to apply for a stay, execution will be stayed for 14 days after hi Acknowledgment, but he must within that time, ISSUE A SUMMONS for a stay of execution, supported b and affidavit of his means. The affidavit should state any offer which the Defendant desires to make fo payment of the money by instalments or otherwise.

See attached Notes for Guidance

Notes for Guidance

1.  Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Registry of the High Court.

2.  For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to him and a writ served by post or by insertion through the Defendant's letter box is treated as having been served on the seventh day after the date of posting or insertion.[Not applicable if the defendant is a company served at its registered office.]

3.  Where the Defendant is sued in a name different from his own, the form must be completed by him with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4.  Where the Defendant is a FIRM and a Solicitor is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "partner in the firm of (..........)" after his name.

5.  Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN HIS OWN, the form must be completed by him with the addition in paragraph 1 of the description" trading as (..........)" after his name.

6.  Where the Defendant is a LIMITED COMPANY the form must be completed by a Solicitor or by someone authorized to act on behalf of the Company, but the Company can take no further step in the proceedings without a Solicitor acting on its behalf.

7.  Where the Defendant is a MINOR or a MENTAL Patient, the form must be completed by a Solicitor acting for guardian ad litem.

8.  A Defendant acting in person may obtain help in completing the form at the Registry of the High Court.

9.  These notes deal only with the more usual cases. In case of difficulty a Defendant in person should refer t paragraph 8 above.

M0012611

115

1813

因這是法律文件，忽視它可帶來嚴重的後果，如有疑問，請儘向發出文件的法庭登記處，香港金鐘道38號高等法院大樓LG1查詢你亦應考慮聽取律師的意見或是申請法律援助。

(This is legal document. The consequences of ignoring it may serious. If in doubt you should enquire as soon as possible at the Regist of the Court issuing the document, namely, LG1 High Court Buildir No.38 Queensway, Hong Kong. You should also consider taking t advice of a Solicitor or applying for legal Aid.).

M0012612

EXHIBIT ___115___

PAGE ___1814___

HCA                    /2003

香港特別行政區

高等法院

原訟法庭

高院民事訴訟二零零三年第            號

                                                            原告人

                                            對

                                                            被告人

致被告人...........................................................................

地址...............................................................................

　　本傳訊令狀由上述原告人就背頁所列出的索償聲請而向你發出。

　　在本令狀送達給你（14）天內，由送達之日起計，你必須清償有關的索償要求，或於夾附的令狀送達認收書內述明是否擬對本訴訟進行抗辯，然後把該認收書交回高等法院登記處。

　　若你在上述指定期限內不清償有關的索償要求，或不交回送達認收書，或不在交回的送達認收書內述明是否擬提出抗辯，則你不會接獲進一步通知，原告人即可繼續進行訴訟，而屆時法庭亦可逕行判你敗訴。

　　本令狀由高等法院登記處在二零零三年        月        日發出。

　　註：本令狀必須在發出日期起計 12 個曆月內送達被告人；但經法庭下令准予延期則不在此限。

重要事項

有關填寫送達認收書的須知事項已載列在夾附表格內。

M0012613

EXHIBIT  115

PAGE  1815

　　若原告人的索償請只是爲了追討一筆債務或算定索償款額時：　在交回送達認收書的規定期限內，如果被告人清付所索償款額和訟費＄　　　又倘原告人獲准以間接方式送達令狀時，另加數額＄　　　則本訴訟即于擱置。該筆款項必須付給原告人或其代表律師。

　　本令狀由范偉廉律師行，地址爲香港中環德輔道中七十七號恒生大廈五字樓五零七室代表上述原告人申請發出，原告人的地址爲：

　　　　　　　　　　　　　　　　原告人代表律師
　　　　　　　　　　　　　　　　范偉廉律師事務所

M0012614

EXHIBIT 115
PAGE 1816

香港高等法院

原訴法庭

2003 年某案第　　　宗

原告人

被告人

傳訊令狀送達認收書

如你欲委託律師代辦理，須用把這表交給他處理。

重要事項：填寫這表格前，必須小心閱讀附件內載的填寫須知事項和指南。如所提供的資料有錯漏時，則這份表格可能被退回。

如不遵填這，可導致被告人被判敗訴，而被告人或其代表律師可隨受認原訴時，或須付出訟費。

| 參照填寫指南 1、3、4 及 5 項。 | 1. | 請填寫認收傳訊令狀的被告人全名；或倘由他人代表收已送達的令狀時，亦請填寫該名被告人的全名。 |

| | 2. | 請註明被告人是否要就這宗訴訟提出抗辯（請在適用的方格內加「✓」符號） |

　　　　　　　　　□ 是　　　　　　　　□ 否

| 請參照填寫須知事項 3。 | 3. | 如果訴訟是關於要被告人清付一筆債款或一筆算定款項，而被告人不擬對訴訟加以抗辯時，則須註明是否有意申請延緩執行由原告人呈請法庭裁定的事項。（請在方格內加上「✓」符號） □ |

| 方格內不適用的字句請刪去。 | | 本人現承認已收到傳訊令狀。 |

　　　　　　　　　　　　　　　　　（簽署）[律師]（　　　　　　　）
　　　　　　　　　　　　　　　　　[無律師代表的被告人]
　　　　　　　　　　　　　　　　　認收傳訊令狀地址

填寫有關認收傳訊令狀地址須知：

律師：如被告人由律師代表他，則須寫律師在香港的辦事處。

沒有律師代表的被告人——如被告人沒有律師代表他，則他須填寫他本人的住址；或如果他並非屬於香港，則須填寫他在本港的通訊地址。如果被告是一間有限公司時，則須填寫公司的註冊地址或被辦事處地址。

原告人代表律師：范偉棠律師事務所
地址　　　：香港中環德輔道中七十七號恒生大廈五字樓五號七室。
電話號碼　：2110 2128
傳真號碼　：2111 9336
檔案號碼　：WF-1

M0012615

EXHIBIT ___115___

PAGE ___1817___

傳訊令狀送達認收書

填寫送達認收書須知

（一）　關於令狀上的送達認收書，應由被告人的代表律師填寫，或如無律師代表他，則由被告本人把附件拆出填妥，並把送交或用郵遞方式交回等法院登記處；該登記處地址是：

香港金鐘道三十八號高等法院地下一層

（二）　被告人如在令狀送達認收書內表示擬對訴訟提出抗辯時，必須同時以英文填寫一份擬抗辯書呈交高等法院登記處，並把副本一份送達原告人的代表律師（或如原告人並無律師代表他，則送達原告人）。

令狀背面如果載有案情聲請書（即在背頁上端註有「案情聲請書」等字眼）時，被告人須要在認收傳訊令狀期限屆滿後 14 天內，把擬抗辯書呈交高等法院登記處或送達原告人，但如在該段期限內，被告人已按照原告人是題法院之判決清還一份，則不在此限。

傳訊令狀背面如果並未載有案情聲請書時，則被告人僅須要在收到案情聲請書後 14 天後，把擬抗辯書呈交法院和送達原告人。

如被告人於指定期限內不把擬抗辯書交法院和送達原告人，則原告人毋須再行通知，即可逕向法院請求對被告人敗訴。

（三）　如法庭宣判被告人敗訴，而被告人未能清付所判決欠款時，被告人可向法庭申請憑藉執行令狀對被告人財物令。如果被告人是由於一筆固定之一筆判定欠款（即一固定欠款）而被告訴，而又不接到該欠款須書加以抗辯，但亦在傳訊令狀送達認收書第三段兩項內選明該令須執行令狀扣押物令時，則應當對令終予以處理，在未獲收傳訊令狀 14 天後子予執行；但在該段期限內，他必須發出要求延緩執行令狀的傳票，並且要求附一份列明其資產收支狀況的簡單，以作佐證。被告人並須在審庭內送明分期付款數額及期限或其他情償辦法。

（請參閱附頁內的填寫指南）

填寫指南

（一）　每一被告人（如超過一名）必須填交送達認收書一份，並把認收書交回高等法院登記處。

（二）　就如何計算傳訊令狀送達 14 天期而言，如果傳票送達被告人本身，則以傳訊令狀交到被告人手上當天作為送達日期；如以郵遞方式或把傳訊令狀放入被告人的信箱方式時，則以傳訊令狀寄出之日或放入被告人信箱日起計的第七天作為送達日期（如被告人是一間公司，而傳票是送達該公司的註冊辦事處，則此條並不適用）。

（三）　如被告人以另一名稱為被告時，則該表格必須由本人填寫，並須在每一段內加上「以某某名義被告」字樣（即載於傳訊令狀上的名詞）。

（四）　如被告是一商號，而並沒有委託律師作為代表時，則該表格必須由一名合夥人填寫，並須在每一段內填註此姓名之後加寫「某某商號合夥人」字樣。

（五）　被告人是以個人身份用其他姓名經營商號而被告訴時，則該表格必須由他填寫，並須在每一段內緊隨他本身姓名之後加寫「經營某某商號」字樣。

（六）　如被告是一間有限公司，該表格必須由律師代填填寫，或由該公司所授權人士填寫，但如無律師代填，該公司不得採取進一步訴訟程序。

（七）　如被告未成年或是一名精神病患者，則該表格必須由訴訟監護人的代表律師代填寫。

（八）　如被告人沒有律師代表他，可到高等法院登記處請求協助填寫表格。

（九）　此「填寫指南」只適用於一般案件，沒有律師代表的被告人送到困難時，可參閱上文第 8 段。

M0012616

EXHIBIT　115

1818

HCA    /2003

## IN THE HIGH COURT OF THE

## HONG KONG SPECIAL ADMINISTRATIVE REGION

## COURT OF FIRST INSTANCE

ACTION NO. 3856 OF 2003

_____

MGA ENTERTAINMENT INC.                                    Plaintiff

and

UNI-FORTUNE TOYS INDUSTRIAL LIMITED     1st Defendant
FU WEI TOYS COMPANY LIMITED                 2nd Defendant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## WRIT OF SUMMONS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Issued this 16th day of October 2003.   at 4:25 pm.

**WILLIAM W. L. FAN & CO.**
**SOLICITORS**
Room 507, 5th Floor,
Hang Seng Building,
77 Des Voeux Road Central,
Hong Kong.
Tel.: 2110 2128  Fax: 2111 9336
Ref: WF-1878-RC

C:\MAGGIE\VF\copyright\WF-1878-MGA\WRIT.DOC

M0012617

EXHIBIT ___115___

PAGE ___1819___

# EXHIBIT 116

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

Case No. CV 05-02727

Expert Report of Robert Tonner

February 11, 2008

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT ___116___

PAGE ___1820___

## Expert Witness Report
## By Robert Tonner

The Lawyers for MGA contacted me in late summer of 2007 about a lawsuit between Mattel and MGA. I have never testified as an expert witness in any other case and I am being paid for my time spent on this case in the amount of $250.00 per hour.

Naturally, being a doll manufacturer, I've known about MGA and Mattel and their products for many years and I've had the opportunity to meet a few of the Mattel designers over the years. Ann Driskill (who, I believe, is a project manager at Mattel) and I worked together for a short time on Seventh Avenue. I've never done any business with Mattel, although they put in an offer to buy my company in 1999. (I turned them down.) Although in my travels over the years in the doll/toy worlds I might have met people who worked at MGA, I don't recall ever meeting either Mr. Bryant or Mr. Larian.

### Published Articles

1) *DOLLS* article about personal inspiration, 2003
2) *Haute Doll* article about the history Fashion Toni dolls, Oct 2005
3) *Haute Doll* article about early fashion dolls, 2004
4) Wrote "Robert Tonner Inspirations" 2006 (book)

### Biography

I was born and raised in Bluffton, Indiana, and even as a small child I had an interest in fashion dolls.

After three years of college I left for New York City in 1973. I received a full scholarship to attend Parsons School of Design to study fashion design. I graduated from Parsons in 1975 with a Bachelor of Fine Arts degree.

After graduating from Parsons, I worked in the garment center in New York City as a fashion designer. I had a great career in the market that spanned eighteen years. Of those eighteen, I was a designer for Blassport, the sportswear division of Bill Blass, for eight years. During my time in the garment center I also did a line of clothing under my own label. In addition to designing, I taught a fashion design class at Parsons, part time, for three years in the early 1980's.

I started sculpting as a hobby around 1981 or 1982 and soon started sculpting dolls. At that time, I sought out and found doll making and collecting organizations. I joined the Manhattan Toy and Doll Collectors Club in the late seventies and became President in the mid-eighties. During the eighties, I continued my sculpting and made one-of-a-kind dolls at nights and on weekends. I was elected into the National Institute of American Doll Artists in 1988 and I spent four years (1991-1995) as standards chairman and two years as President (1995 to 1997).

After tiring of the garment center in the late eighties, I left to start my own doll company, Robert Tonner Doll Design, in 1991 and showed my first line at New York City's Toy Fair in February, 1992.

EXHIBIT 116

PAGE 1821

CONFIDENTIAL –
ATTORNEYS EYES ONLY

As I built my company in the 1990's, I also did freelance design work for other manufacturers. I sculpted a doll for Madame Alexander in 1992 and designed and sculpted The Magic Attic dolls for the Georgetown Collection in 1995.

Robert Tonner Design eventually became Tonner Doll Company Inc. and my company is considered a leader the field of collectible dolls. During the past sixteen years, I have won many awards and received acknowledgement from the doll and collectible industries.

- "Little Girl in a Duffle Coat" and porcelain Superman chosen for the permanent collection of the Museum of Decorative Arts at the Louvre in Paris.
- Peoples Choice Award, Disney Doll and Teddy Convention, 1999
- *The Robert Tonner Story, Dolls and Dreams*, published by Portfolio Press, 2000
- Modern Doll Convention, Lifetime Achievement Award, 2002
- United Federation of Doll Clubs Philanthropic Award, 2003
- Tonner department opens in FAO Schwarz in New York, Las Vagas, 2004
- Collectors United Industry Leadership Award, 2006
- Jones Publishing Crystal Award for Industry Leadership, 2007
- Cover stories and/or articles about my work in *DOLLS* Magazine, *Doll Reader*, *Contemporary Doll Collector*, *Doll Castel News*, *Disneyana*, *Toy Fair*, *Doll UK*, *UFDC Doll News*, *Mune Cas* (Spain), *Action Figure Digest*, *Fashion Doll Quarterly*, *Haute doll*, *Playthings*, *Toy Fare*, and *Toy Book*.
- Coverage in mainstream press: *People, Newsweek* and *The New York Times*
- Since 1993 I have received over fifty awards from the industry's top collector magazines, *DOLLS* and *Doll Reader* (DOTY Award and DOLLS Award of Excellence)
- Opened Tonner Company Store, our first retail store, December 2007.

In addition to industry acknowledgement for my design work, I am also well known for my charity work with dolls. In 1996, I conceptualized Dolls Have Heart, a gala event benefiting AmFar. Demi Moore hosted and the event raised over $350,000.00. Tonner Fashion dolls were dressed by every famous designer working at the time and auctioned at the event. I used the template for the AmFar event in London benefiting Action on Addiction. As a result of our donations, I have appeared on the Today show during their annual Toy Drive for the past seven years.

I was asked to be the keynote speaker at IDEX, an industry trade show, in 2004. I gave my speech, "Observations of a Reluctant Businessman".

**Why I Am Considered an Expert Witness**

Over the years, I have become an historian of the modern fashion doll, in part because I lived though it. As a small child, I was very aware of the fashion dolls on the shelves of the toy stores (also in that day, the dime store and hardware stores). Growing up, I paid attention to the dolls being produced and the companies producing them. During high school, I was less interested but my interest in dolls returned shortly after I graduated from college. As my desire to make dolls developed, I started collecting fashion dolls (with a focus on Barbie) and studied their history and eventually began researching dolls that represent a fashion figure in the modern period. Over the past few years I have been asked to speak on the history of the modern fashion doll numerous times by various doll clubs and organizations.

EXHIBIT 116

PAGE 1022 CONFIDENTIAL –
ATTORNEYS EYES ONLY

I define the modern fashion doll as "made of plastic with a sculpted bust and a sculpted high heeled foot, dressed in teenage or adult fashion."

**Unique Qualifications**

*I know how a doll is made.* Although there are other doll artists who have developed companies in the past, Tonner Doll Company Inc. is probably the most well known artist-run company currently.  I am a doll sculptor and I have designed dolls from start to finish.  I have finished waxes to ready the sculpt for the mold making process.  I have engineered joints.  I have first hand experience in mold making, casting and firing of porcelain dolls.  My company sells or has sold dolls made of porcelain and rotational and injection molded plastics.  I've overseen production in the US and in the Far East (China).  I know the intricacies of clothing design and fabrics (18 years of fashion design in New York City) and can and have made clothing patterns and first samples for dolls.  I have knowledge of the wig and hair fibers that are currently used on dolls and I have styled and designed rooting patterns for doll production.  I've made doll shoes.  I have created packaging design for our dolls.

*I have designed dolls for both the collectible and mass markets.* Although the main focus of my doll career has been in the collectible market, I have designed dolls for children.  In 1986, I did freelance doll clothing design for Coleco, makers of the Cabbage Patch dolls.  For the Georgetown Collection in the mid 90's, I designed and sculpted the Magic Attic dolls created as a competitor of the American Girl doll.  For Tonner Doll Company, I designed and sculpted a princess doll for the mass market to coincide with the movie "Ella Enchanted".

*I have worked with and know many doll designers.* In addition to my extensive knowledge of commercial doll making, I have worked with many doll artists.  For the Tonner Doll Company, I work with outside doll designers and sculptors.  I was standards chairman for the National Institute of American Doll Artists ("NIADA"), a forty year old doll artist organization, considered one of the most prestigious in the world.  My responsibility was to screen applicants for admission by judging their work in portfolio form.  Admission standards to NIADA are very high; out of the dozens of applicants each year only a very few made it in.  I was also President of NIADA for two years, and I am still a member.

*I know the doll business.* The Tonner Doll Company Inc. is almost seventeen years old and is arguably one of most successful in the field.

*I am considered an expert on modern fashion doll history.* Although there are many artists who have started their own companies, few, if any have grown their company to the size of the Tonner Doll Company Inc.  Fewer still, if any, know fashion doll history as I do.  In addition, while there may be doll historians who have as much or more knowledge of the modern fashion doll, I know of no other who also manufactures dolls.  I am often asked to speak to industry and collector groups on the subject.

*I am considered an expert because of my unique mix of knowledge and experience.*

EXHIBIT 116

PAGE 1823

CONFIDENTIAL –
ATTORNEYS EYES ONLY

3

## Company History

After three years and three different colleges as a pre-med student, I moved to New York City in 1973 to finish my college education at Parsons School of Design under full scholarship. I graduated in 1975 at the top of my class and immediately went to work on Seventh Avenue in New York—the hub of American fashion design. After three years as an assistant to an up-and-coming designer, I was hired by Bill Blass to head up his sportswear division, Blassport. I was thrilled to be there and did very well. About six years later, I was hired away to start a line under my own name. The line was well received, but under-capitalized. I then worked for the Leslie Fay Company designing sportswear, and eventually went back to Blass. After eighteen years in fashion, I felt it was time for a change.

I started sculpting as a hobby in the early eighties always with the goal in mind of designing a doll. I finished my first doll in 1983 and although I was working in an intense business (fashion design) at the time, I spent much of my free time at night and on weekends developing my skills.

By the late eighties I was in my mid-thirties and was tired of working for other people—I felt I was no longer doing work that I was really proud of. Designing to please a boss or store buyers was starting become less and less tolerable. So, in 1991, I left the garment center and moved to upstate New York to start my new business. Although it had crossed my mind to start a clothing business, my real passion was dolls.

I taught myself how to make molds and cast porcelain, and once I was accomplished enough, I felt I had the knowledge to start the doll business.

I started my Company in the spring of 1991 with the thought of showing my dolls at the International Toy Fair in New York City in February, 1992. I did accomplish that goal—I brought a line of 12 porcelain dolls that I had made myself. I booked just a little over $100,000 in sales during the five day show. I considered Toy Fair a great success and began to build my business. I hired part-time help in the beginning and added full time help by 1994.

Although at the time my porcelain dolls were popular, the expense of the dolls ($250 to $1500) limited the market I could reach. By 1993, I was experimenting with vinyl and produced my first vinyl doll. Using vinyl, I was able to lower the price of the doll as well as make it more "playable".

In 1993 I added "Alice in Wonderland" to my line. The character is in the public domain and I quickly realized how much a famous name could help my sales. This realization prompted me to look at licensing other well known characters. We were too small for the big studios to take seriously, so I looked for characters that had been overlooked or put aside. I found two: Betsy McCall, a beloved character from McCall's magazine during the 50's and 60's, and Little Orphan Annie. Annie dolls had been produced in the past, but had never done well for larger toy companies. However, both dolls did well for us and I have included licensed products on the line since.

With the Betsy McCall doll, I reluctantly took production over to China. Although we had grown at a great pace, we were still a small company and dealing with the Far East

4

EXHIBIT ___116___   CONFIDENTIAL – ATTORNEYS EYES ONLY

PAGE ___1824___

was intimidating. As it turned out, it was to be one of the best moves I've made. My dolls could be produced at competitive prices.

Nineteen ninety nine was a tremendous year for Tonner Doll Company. I introduced the doll that I had wanted to make since I started making dolls. The doll was named Tyler Wentworth and she was a 16 inch vinyl and hard plastic fashion doll with a story line inspired by my years as a fashion designer. The sale of those dolls changed the company overnight. Sales tripled and Tonner Doll became one of the leading collectible doll companies in the United States.

As my company became more successful, I added to my licensed products with Star Wars from Lucas Films and Titanic dolls from Universal. However, the next big breakthrough for my company was when we were granted the license for Harry Potter from Warner Brothers. Although Harry Potter dolls had been produced by Mattel and tested by Madame Alexander, my understanding was that the dolls did not perform for those companies. After the first two or three films, Warner Brothers was willing to try my lesser known company. Our Harry Potter dolls were a hit for us and that success led to licensing deals with Warner Brothers for the Wizard of Oz, Gone With the Wind and DC Comic heroes such as Wonder Woman and Superman. We were offered Disney lines such as Pirates of the Caribbean and Narnia, along with the classic properties such as Mary Poppins and Sleeping Beauty. Marvel licensed Spiderman to us and we are currently working on New Line Cinema's Golden Compass.

In 2002 I purchased the Effanbee Doll Company out of bankruptcy. Effanbee had existed since 1910 and remains a venerable contributor to the doll industry.

In 2006, I formed Wilde Imagination, a direct marketing company that currently sells a unique line of collectible dolls directly to consumers via e-commerce and mail order. **(Exhibit #1, Tonner Company Products)**


## A Condensed History of the Modern Fashion Doll

The American doll industry is relatively young. During the late nineteenth century, a majority of doll manufacturing was done in Europe, with Germany and France as industry leaders. Most doll heads were made of porcelain or papier-mâché with composition or wooden bodies. The dolls that originated in France were known for their exquisitely sculpted faces; the dolls were highly stylized and could be very expensive. The German doll manufacturers became competitive with France when they later introduced real looking (rather than stylized) dolls into the market.

At the time, American doll manufacturing was almost nonexistent. The majority of dolls were imported from Europe. A few companies did produce dolls at the time, but even fewer did their own sculpting. Doll heads and bodies would often be brought in from Europe to be dressed and sold in America.

However, all this changed during WWI. Importing from Europe became more and more difficult, so toy and novelty companies began to look to produce their own designs. The early American dolls looked similar to their European counterparts, but soon, the American-made dolls took on a look and direction of their own that dominated doll making for decades.

EXHIBIT 116  CONFIDENTIAL – ATTORNEYS EYES ONLY

PAGE 1825

Because of the shortage of dolls during WWI, new doll companies were born. Effanbee and Ideal were probably the best known and Effanbee is still in existence today.

Around 1912, the use of composition became the most popular material for doll making. Made of wood pulp, glues and fillers, it was considered more durable for doll making than the previous porcelain.

During the second decade of the twentieth century highly stylized character dolls were popular. Dolls such as Raggedy Ann, The Campbell Kids and Kewpies did well for their manufacturers. Effanbee produced some of the first "Mama" dolls starting in 1918. The dolls were so named because of a simple voice box that said "mama" when the doll was hugged or rocked.

In the twenties, doll manufacturing in America became a thriving business. The Bye-Lo Baby was extremely popular. Made to look like a real newborn baby, the doll was revolutionary for its time. During the latter part of the decade, the Effanbee doll Company introduced Patsy, a fourteen inch composition doll, who is generally considered to be the first with an extensive wardrobe and accessories.

During this period, the only doll that could be considered a fashion doll representing an adult was the boudoir doll. Made by various companies, they were very long and very thin and were used and sold more as decorations for the bedroom or parlor rather than as toys.

The 1930's was a decade of celebrity dolls. The Shirley Temple doll by Ideal dominated toy shelves, and the licensed characters such as dolls from Gone With the Wind, Snow White and The Wizard of OZ were the best sellers. Baby dolls remained very popular. Effanbee followed up on the success of their Patsy with the Dy-Dee Baby, a doll that could wet her diaper. The forties bought huge changes to the doll world. The technical advances and especially the use of plastics during WWII changed the way dolls were made from then on. Near the end of the decade, nearly all dolls brought to market were made of plastics. In the early fifties, economically, America was doing very well and the parents of the baby boomers had more disposable income than ever before. The toy industry boomed.

Fashion dolls were almost nonexistent during the first half of the last century. The dolls produced before 1950, with a very few exceptions, were dolls representing babies or girls. Doll play seemed to be geared toward "nurturing" or "playmate" type of play patterns. After 1950 a new type of play pattern emerged and girls began to look to the future and aspirational play became popular—hence the advent of fashion dolls.

Sensing a market for a doll body that represented an adult female, Madame Alexander developed her Cissy doll in 1955. Cissy was unique in the doll world because of two things; her adult-like sculpted bust line and her permanently arched feet that were meant to accommodate high heeled shoes. The doll was revolutionary and the "inspired by" dolls entered the market in 1956. Almost every company had their versions of the adult fashion doll, with the Ideal Toy Company the most successful with their Revlon Doll. At the time, if a doll was successful, the company would produce the doll in numerous sizes. The most popular sizes of these dolls were the 10" and the 18" sizes. Hundreds of different fashion doll styles were introduced into the marketplace in the next few years and while baby dolls and child dolls were still around, the fashion doll rained supreme.

In 1959, Mattel introduced their truly groundbreaking doll, Barbie. Ruth Handler and her husband Elliot started making toys around 1945. In the mid-fifties Ruth Handler,

EXHIBIT ___116___
CONFIDENTIAL –
ATTORNEYS EYES ONLY

PAGE ___1826___

inspired by watching her daughter, Barbie, play with grown up paper dolls, convinced her husband to develop a very grown up fashion doll. The Barbie sculpt was inspired by Lilli, a character in a German newspaper. As the story goes, Lilli was sculpted to be a sort of "naughty" toy for grown men and was sold in tobacco shops and bars. Although Lilli's look was slightly softened for Barbie, Mattel's market research confirmed that mothers hated the doll but little girls loved her. Ruth Handler decided to bet on the girls. Unique television advertising (on the Mickey Mouse Club) made Barbie the hottest doll around. It would be three years before Mattel's production of the doll would catch up with the demand.

For the competing companies at that time, mainly Ideal and American Character, it was business as usual. Barbie was certainly popular, so they decided to react as they always had—they would develop their own fashion dolls. At the time, Ideal was the biggest doll company; it had many popular dolls, such as Shirley Temple and Patty Playpal. The Revlon doll was no longer selling, so Ideal first tried a Barbie knockoff, Mitzi. Mitzi had a look similar to Barbie, but she was not nearly as well made. Girls could tell the difference and stayed away from the doll. Ideal then tried a 16" doll called Jackie; it had Barbie proportions, but again, it could not compete. In 1962, Ideal tried again to go after Barbie with Tammy. The Tammy doll had a much less developed body (more like a young teen than an adult woman) and was allegedly in answer to parents concerns about Barbie's more mature shape. Tammy did rather well for the first couple of years but by 1966 she was all but off the shelves. During this period, due to superior design, marketing and manufacturing, not a single company could compete with Mattel in the fashion doll world.

During the seventies and eighties, many companies tried to compete with Barbie with various strategies. In 1985, Hasbro introduced Jem. Jem was aimed at the Barbie audience and was introduced with a fully formed world. She had a somewhat unique look (although she still had a Barbie "feel") and an unusual story line about a rock band; she even had Saturday morning cartoons to enhance and promote the product. However, within that same year, Mattel introduced its Barbie and the Rockers line with a similar rock music focus. Barbie again won the battle. Hasbro countered a year or so later with its very tame Maxi doll. Maxi had the feel of a bland Barbie and didn't last.

In the 1980's there was a boom in doll collecting. Baby boomers started to take another look at the dolls they grew up with, and were interested in having those dolls again. Mattel and Madame Alexander benefited from this new view of their products; more and more adults started collecting dolls. Collectors were open to all kinds of new products and small doll companies sprang up seemingly overnight.

The fashion doll industry changed drastically in the 1990's. Collectors looked for alternatives to Barbie and found it in Aston Drake's Gene doll. Although Gene owed a lot to the original Barbie marketing, it was not a Barbie look-a-like—Gene was 16" tall and had her own stylized face. Collectors loved the doll and many gave up Barbie collecting for Gene. Gene's character was a glamorous movie star—Mattel countered with their Barbie Hollywood Movie Star collection. In 1999 Tonner Doll entered the fashion doll market with Tyler Wentworth, a doll with a story line (she's a fashion designer) and an extensive wardrobe. Again, collectors responded well and this time Mattel's response was its Silkstone Fashion Designer Barbie. She was a vintage looking doll with high fashion clothing.

7

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 116

PAGE 1827

The marketplace was changing.  Collectors were looking for something more than Barbie and the toy market gave them multiple new choices.
**(Exhibit #2, Samples of Dolls from Fashion Doll History)**

## Bratz versus Barbie

I've always enjoyed checking out the new dolls in the toy aisles, and of course, I've known about the Bratz dolls since 2001.  I remember seeing the product in the stores and what caught my eye was its great packaging and design.  I was also intrigued by the proportions of the doll.

I began to hear of a "feud" between Barbie and Bratz (or Mattel and MGA) some time later.  And, I can't say I was surprised when I first heard that Mattel was "not happy" about the Bratz doll.  Barbie was and had been the number one fashion doll for decades, and she did not take kindly to new dolls in her fashion doll aisle.

When I was contacted by lawyers for MGA in the summer of 2007, I learned that there were legal issues pertaining to Carter Bryant and his creation of the Bratz line.  I have no in-house lawyer; actually, I try to stay away from lawyers.  However, because of my interest in the fashion doll industry, I was intrigued.  Once I came to understand what the case was about I agreed to testify as an expert on behalf of MGA.  I have great respect for Mattel—it's a great company; however, after hearing Mr. Bryant's story about the creation of the Bratz line, his story rang true to me.  I have had the opportunity to read Mr. Bryant's deposition and I have been asked to comment on Mr. Bryant's story about how he came up with the idea for Bratz, as well as the role that MGA played.

## "Inspired by" or "copying"

In toy design, as in fashion design, new, commercial ideas are highly coveted and valuable things.  True, breakout, market-changing ideas are rare.

There is a long history in the toy industry of dolls that were "inspired by" or, in some cases, downright copied.  With every hit doll, imitations were on the store shelves in a short amount of time.  An early example of a doll that inspired many imitations was the Shirley Temple doll from Ideal.  When the doll came out in the 30's, there were imitations on the shelves within a few months.  At times, these imitators were sculpted by the same artist who did the original.  **(Exhibit #3, Shirley Temple)**  Rarely did a copy hurt the original.  In the case of the Shirley Temple doll, Ideal had the right to the name— no other company did, so they definitely had the advantage.

The American doll industry was born in and around New York City.  Practically all the manufacturers worked with the same vendors.  The vinyl and plastic factories worked with a number of competing doll companies. At times, the plastic molding company would have a body sculpt created and sell it to a number of different doll makers.  Heads were usually proprietary, but not always.  With overlapping resources and vendors, it was difficult, at best, to keep secrets.  At that time, manufacturers accepted this fact and unless a doll was a line-for-line copy, they looked the other way.  A company was able to differentiate itself from others by hair and clothing design and/or unique gimmicks.

EXHIBIT 116

CONFIDENTIAL – ATTORNEYS EYES ONLY

PAGE 1828

This accepted way of doing business changed in 1959 with Mattel. Mattel took its production overseas and, because it was in California, was able to better protect its ideas. The competing companies at the time, such as Ideal, did respond as they always had and made dolls to compete with the new star doll, Barbie. Many tries later, Ideal succumbed to Mattel's superior design and marketing. Ideal was not the only one. Competitor after competitor closed its door when they could no longer compete with the Barbie machine.

Dolls that change the direction of the category are rare. Mattel, with Barbie changed the way fashion dolls looked and with that change, took over the market. In one of the rarest moves in modern doll history, Mattel followed Barbie with another groundbreaking doll—Chatty Cathy. Chatty Cathy was an 18" doll who could "speak". The gimmick was great but the real change was the look of the doll. She looked like a real little girl; she had slightly protruding teeth, freckles and a natural lip color. This was revolutionary in mass market dolls. Over the next few decades there were few, if any, dolls that were true breakouts. The one that does come to mind is the Cabbage Patch line of dolls. And then Bratz. **(Exhibit #4, Milestone Dolls)**

## Design Inspiration

During my days in the fashion business I was asked many times by people who weren't in the business, just how designers all come up with the same ideas at the same time. For example, if all the designers raised or lowered hemlines simultaneously, it would look to an outsider as if all the designers got together to make these decisions. Of course, that never happened. Fashion designers, just like toy designers, are exposed to the same set of cultural influences. They all watch television, listen to music, see movies, see or listen to the news, pay attention to all popular culture, and they usually watch what the competition is doing.

The same is true for doll design. A good doll designer needs to know what's going on in the world. A doll designer, especially one working in the mass market, must also be able to anticipate what children and collectors are going to want. This ability to anticipate potential desire for a product is what good design is all about.

Just as fashion designers create similar products at the same time, doll designers do also. A recent example of "great minds thinking alike" happened just this past year. The Madame Alexander Doll Company used their 21 inch fashion doll, Cissy, as a pirate. A few months later, Barbie did The Pirate Barbie Doll, and at the Tonner Doll Company, we will show our pirate doll at Toy Fair this year. All three companies are showing pirate fashion dolls at about the same time because that is what we all hear about. The Pirates of the Caribbean movie was a huge hit. Did Mattel copy Madame Alexander? Did we copy either one? I wouldn't presume to answer the first question, but we didn't need to copy anyone. We knew that a pirate doll was the right thing to do at this time in fashion and I assume the Mattel designers knew it too. The pirate dolls are just one example of many. **(Exhibit #5, Pirates)**

In 1998, when Mr. Bryant said that he came up with the idea for the Bratz dolls, there were a lot of changes happening in the fashion world as well as in the doll world. Fashion for teenagers and young adults was originating on the street. Kids would put together what they thought was "cool" and many times it had nothing to do with the fashion design originating in the fashion capitals. Seventh Avenue was starting to bring

9

EXHIBIT 116

PAGE 1829

CONFIDENTIAL –
ATTORNEYS EYES ONLY

the pant silhouette closer to the body, but on the street, kids bought and wore bigger and bigger jeans and pants. The rejection of dictated fashion gave the kids on the street a unique look.

Shoes and boots at that time were big and clunky, and models were photographed in such a way as to exaggerate the look. Hair styles were all over the place, from short cuts to long straight or curly hair. The young women in the magazines and on the runways were becoming thinner and thinner. Because of the "shrinking" body of the models, their heads and feet tended to seem bigger. The fashion proportion was changing.

The new fashion proportion was picked up not just in the fashion magazines, but also in the ads in those magazines. Most notably were the Steve Madden ads in which, at first, illustrations would be drawn with oversized feet and heads, and later real models would be digitally altered to have extremely oversized heads and feet and a tiny, shrunken body. The Steve Madden ads weren't the only ads to use this new proportion. In the *Seventeen* magazine issue that Mr. Bryant references as an inspiration for Bratz, there were many ads that had the proportion of Mr. Bryant's original sketches for the dolls. In that same *Seventeen* magazine, the Paris Blues jeans ad could have been mistaken for an early Bratz drawing. Coke also used an illustration in its advertising that had this same new look. **(Exhibit #6, 1998 *Seventeen Magazine*)**

Whereas I know for a fact that fashion designers don't get together to plan what's going to be the new look of the season, I'm also reasonably sure that the ad agencies don't get together either so they can make similar ads. They all sense what's in the air and respond in their art work, using the pop cultural references that they've been exposed to.

The exaggerated proportion of a large head, big feet and tiny body was very much in the public awareness in 1998. Mr. Bryant did not invent this proportion; he just acknowledged or pointed it out in his drawings.

As a doll designer, you couldn't help but notice this proportion—I did. I recognized it and thought it would make a great doll shape—I just didn't have the resources at the time to do anything about it. I would have been greatly surprised if all of the talented doll designers out there weren't aware of this new proportion and thinking the same thing.

In conjunction with this new fashion proportion there was an emerging new, young attitude. Hip-Hop bands and girl group rock bands, such as The Spice Girls, were extremely popular. The young women in these groups were edgier and more "in your face", and they were being covered in the teen magazines. **(Exhibit #7, Spice Girls and Dixie Chicks)**

Edgy, in your face pop culture celebrities were very much in the public awareness. Mr. Bryant did not invent this attitude; again, he just acknowledged and brought attention to it in his drawings.

**Components of Doll Design**

The Idea

Direction changing doll ideas are almost always the inspiration of single person. Ruth Handler, the creator of Barbie, is a perfect example. She did not invent the fashion doll, she did not invent high fashion paper dolls—she didn't even invent the "look" of Barbie.

10

EXHIBIT 116

PAGE 1830

CONFIDENTIAL – ATTORNEYS EYES ONLY

What Ms. Handler did was to take the cultural elements around her and put them together in a unique way. It was the idea that was unique—not the doll.

The same example can be made of another Mattel product, American Girl. The American Girl doll was the concept of Pleasant Roland, founder of the Pleasant Company. Ms. Roland created an extremely successful company by putting together elements that were in the public awareness in a relatively new way. Ms. Roland took a German designed doll that had been around for a few years, coupled it with books and extra clothing and accessories and sold it through catalogues. None of the products that were designed for American Girl were unique. Dolls with books had been around for decades (Raggedy Ann) as were dolls with extra outfits and accessories (Patsy, Ginny and Barbie). Catalogue marketing was certainly nothing new in the late eighties. However, all these elements were put together in an uncommon and extremely tasteful way. So again, it was the idea (in this case, marketing) that was unique, not the doll.

Mr. Bryant tells much the same kind of story as did Ruth Handler. He knew about the current styles. He knew of the "modern" attitude of the current teenage girl. Just as Ruth Handler described her dawning awareness of the play patterns of her daughter, Mr. Bryant described his moment of "ah hah!" when, after seeing the teens in the school yard with all their attitude, he came up with the name for his idea, Bratz.

This is the way a new idea happens. It is a "perfect storm" of cultural influences and inspiration.

<u>Presenting the Idea</u>

A new idea has to be conveyed to the persons who can fund the development and get a doll out into the public. I understand that Mattel designers occasionally present tear sheets (pictures from magazines) to their project managers or design directors to communicate the idea of a new look (whether it's for a doll face or an outfit). I'm sure some Mattel designers sketch, and I can imagine those designers showing another manufacturer's doll as an example to get an idea across—all these methods are used. Mr. Bryant happens to be a gifted artist. The way he was able to present his idea was through an illustration. The illustration was not a schematic—it was not a technical drawing. Mr. Bryant's drawing of the Bratz characters was his way of communicating an idea; in essence, he drew a "tear sheet".

Mr. Bryant communicated the attitude for his characters with his illustrations. Many years before, Mattel did the same thing with Barbie. Barbies, in the early sixties, came packed with what is called a "cross-sell" booklet. The booklet showed various outfits that could be purchased for a child's Barbie doll. The illustrations of Barbie and her friends were not accurate depictions of the dolls—there was no way they could bend or move as they were sometimes drawn. The purpose of those illustrations was to suggest a fun, high fashion "mood". The purpose of Mr. Bryant's original sketches was the same—to evoke a mood. **(Exhibit # 7a, Barbie Illustration)**

One other thing can be said about Mr. Bryant's sketches—as he drew them, the four characters changed. Their proportions changed—they became longer, with smaller hips. This is again to my point—he presented an idea, and not an exact doll design.

I understand that there is some question as to how relevant it was that Mr. Bryant added color to his sketches sometime after he originally drew them. In my opinion, adding color to sketches means very little. His was not a color concept, it was a doll idea.

11  EXHIBIT ___116___

CONFIDENTIAL –
ATTORNEYS EYES ONLY

The only value color could add was to make his presentation look more interesting. As far as I know, Mr. Bryant may have used any color marker or pencil that he happened to have at his desk at the time and I have not heard or read anywhere that color was important to his idea. **(Exhibit #8, Carter Bryant Pitch Book)**

The Sculpt

The Bratz doll is beautifully stylized and sculpted. It is a very professional sculpt—well balanced, highly stylized, and very appealing and like nothing in the market at that time. The fact is that Carter Bryant did not sculpt the doll—he merely presented the concept.

The importance of the sculptor and what he/she brings to a doll cannot be over emphasized. Just as the idea or concept of a new doll is crucial, so is the ability and sensibility of the sculptor.

Many companies produce dolls made to represent the same characters. One of the most notable popular characters is Scarlett O'Hara from the movie Gone With the Wind. World Doll in the 1980's, Mattel, The Franklin Mint and Tonner Doll have all done portraits of the actress, Vivian Leigh, who portrayed Scarlett in the movie. Each of the dolls look markedly different although they are all supposed to portray the same person. The point being, that each sculptor brings his/her personal style to a project—even one as specific as Scarlet O'Hara. **(Exhibit #9, Scarlett Doll Sculpts)**

Superman is another character that has many defining features, but with each sculptor, he can look vastly different. I have had the opportunity to do a sculpt of the Superman character on two different occasions. Although I sculpted both, they do not look alike. I attribute this difference to the fact that I brought a different set of cultural references to the project (they were done a decade apart) and that I worked with two different sets of people who each saw Superman in their own unique way. The art directors for each doll had a lot to say. **(Exhibit #10, Superman Doll Sculpts)**

Scarlett O'Hara and Superman are not the only two examples. There are countless examples of the same character being sculpted by different persons at different companies with entirely different results. Other examples are Dorothy from the Wizard of Oz, Lucile Ball, Little Orphan Annie, Harry Potter and any of the Disney characters to name just a few.

If Mr. Bryant had given this project to any other sculptor (even one from Mattel) there is no way that it would have looked the same and, therefore, may or may not have been successful.

In addition, the tone of the doll was changed during sculpting. In comparing Mr. Bryant's original sketches with the final sculpt, I see important differences. The shape of the head is the most drastic change. Although the sculptor achieved a stylized sculpt that superficially resembles the illustration, the sculpt has a more childlike quality. Mr. Bryant's sketch shows a character with a more adult head whereas the sculpt has a bigger, slightly protruding forehead which is much more childlike. The tone was changed from more of an adult look to that of a younger look. The contrast of the young face shape and the dramatic makeup resulted in a startling, new image in fashion dolls. **(Exhibit #11, Blank Bratz Doll vs Carter Bryant Sketch)**

12

EXHIBIT 116

PAGE 1832

CONFIDENTIAL –
ATTORNEYS EYES ONLY

## Fashion Design

During the period that Carter Bryant worked at Mattel in 1999 and 2000, Mattel
focused on glamorous type fashion for Barbie. Glamorous fashion dolls were popular in
the collector market—Mattel knew this and that knowledge was reflected in the high
style and luxurious looks that dominated its Barbie designs. These glamorous designs
were certainly not what real teen-agers wore. "Celebration Barbie", "Flamingo Barbie"
and even Mr. Bryant's own "Grand Entrance Barbie" are all glamour dolls in ball gowns.
Mattel also focused on fantasy with its "Barbie Angel" doll. Other than a doll like its
"Nsync Barbie" the teenager was all but ignored. **(Exhibit #12, Glamour Barbies)**

Of course the Mattel designers knew what was going on in teen fashion—all good
designers would—but that knowledge was just loosely applied to Barbie. In contrast
MGA's focus was on teen age style—and it got it just right.

In looking at Mr. Bryant's "pitch book", the clothing reflected what was going on in
teen fashion—the sketches got the idea across, but the final, manufactured fashions
changed dramatically as the line developed. Although the look of the doll was somewhat
revolutionary in 2001 compared to other dolls on the market, in retrospect, it was just the
start of the look of the Bratz line. In other words, it was a jumping off place for the MGA
designers. The focus—that of teen age fashion—was important in developing the Bratz
message, not the styles in the original illustration.

I had the opportunity to look over a vast amount of the Bratz dolls that MGA has
produced since 2001 and I noticed two things; first, the fashion design is truly amazing
and spot on and second, it's changed dramatically over the years. Whoever was
responsible for the clothing design is highly talented and/or had great direction. Doll
clothing design is the result of dozens of decisions—the weight of the fabric, how a fabric
will lay, how the fabric will respond in such a small size, how will the colors work
together, how are the fabrics going to be finished, to name just a few. It takes a
knowledgeable design director to be able to work with and put together all the elements
for even a relatively successful design. MGA had an extremely talented project manager
for the Bratz project. **(Exhibit #13, Bratz Product)**

I understand that MGA appears to have worked quickly to get Bratz out to the
market and did clothing for the dolls that reflected Mr. Bryant's concept, but the real
development of the dolls came the next year. This is a typical line development
timetable—a line often gets better the second year.   From what I have seen, Mr. Bryant
seems to be a very talented designer, and I understand that he's done design work for
MGA during the past five years. The work consistently gets better (and it started off at a
very high level).

Not to down play Mr. Bryant's clothing design on the first year dolls, but it was more
about how Bratz was positioned in the marketplace (the fact that they were teenagers with
a "bratty" attitude) than what the dolls were wearing.

## The Face Design

A talented face designer or painter is essential for a winning doll product. He/she
must know the anatomy; they must know eye and mouth shape and how to balance color
and the features for the desired look. I believe a good face painter can enhance a doll, but
a great face painter can turn an ordinary doll into a spectacular doll. The combination of

EXHIBIT _____ 116

CONFIDENTIAL –
ATTORNEYS EYES ONLY

PAGE _____ 1833

a great face painter with a great sculpt can create doll magic. The artist who designed the Bratz way used his/her own artistry to create a very new look for Bratz.

Hair Design

I have compared Mr. Bryant's hair design for the Bratz dolls with the doll product that eventually was sold in the market place. Mr. Bryant's idea for removable skull caps, designed to change hair style and color, was not used. Also, the styles that he illustrated in his original sketches were a little edgier than the styles that made it to market. The final hair styles were age and character appropriate styles that reflected the softened version of dolls that, from my information of the process, was as a result of the project manager's input.

The Project Manager

I understand that the project manager for Bratz was Paula Treantafelles. I believe that this project headed by anyone else could have, and in my opinion probably would have, been a disaster. Ms. Treantafelles, from what I understand, was responsible for pulling together a team to do this project. Every decision she made turned Bratz into the winning product it is. I believe it takes a singular vision and a very high taste level to develop a product like Bratz.

The Packaging Design

The packaging design for the Bratz line was new, innovative and unique. It set the standard for toy packaging that is still being imitated today. There were two revolutionary features of the Bratz packaging that set the product apart from its competition. One was the trapezoidal shape of the box and the second, and probably the most important, was the clear plastic at the top of the box that allowed light onto the dolls face. I have no idea who was responsible for the initial packaging concept, but it showed creative, out of the doll box, thinking.

At the time, MGA's designer out-designed Mattel. **(Exhibit #14, Bratz Packaging)**

The Marketing

Mattel has almost always been on top of the competition. I believe through rather unique circumstances, MGA was able to get Bratz into the market rather quietly, test it, and then ramp up before Mattel realized what was happening. Mattel seemed to have been distracted by the disastrous purchase of the Learning Company in 1999 and fallout from that purchase in 2000. As a result, MGA was able to debut and promote Bratz (the product got off to a great start in Spain) while Mattel was otherwise occupied.

**Prior Art**

When I was a small child in the 1950's, the dolls on the shelves were generally all sculpted by or inspired by the same sculptor, Bernard Lipfert. In 1959, when Barbie was introduced, she was shockingly original for the American market. She was beautifully done and the baby boomer children loved the way she looked. Mr. Bryant, however, grew up with different set of references. He grew up with Barbie and that look of a doll was nothing unusual. He also grew up with things in the popular culture such as Japanese Anime (such as Speed Racer), the artwork of Margaret Keane, the Kenner doll

14   EXHIBIT   116

PAGE   1834

CONFIDENTIAL –
ATTORNEYS EYES ONLY

Blyth, just to name a few. All of these works portrayed people with larger heads and big eyes, and in many cases, smaller bodies—very similar to the Bratz dolls. Did he see all this? There is no way I can really know, but these things were out there, the feeling was in the air, and on some level Mr. Bryant, as are all good designers, was influenced by the prior art (television, artwork, toys, ads, etc.) in the market place.
**(Exhibit #15, Prior Art)**

## Why Bratz?

When Bratz was introduced in 2001, it was a breath of fresh air in the commercial doll world. Bratz was the first truly new look in the fashion doll world in almost forty years. The quirky proportions did not try to emulate Barbie—they were unique. Bratz dolls are multi-cultural without over emphasizing ethnic differences. The name and the attitude are extremely important to the target market. And, last but certainly not least, Bratz was extremely well designed by the team Ms. Treantafelles pulled together.

## Diva Starz and Toon Teens

In 1999, Mattel was working on a doll line called Toon Teens (a product in work while Mr. Bryant was working at Mattel) and in 2000 Mattel introduced doll products called Diva Starz. I understand that Mattel alleges that Mr. Bryant was inspired by or copied these dolls. Mr. Bryant could have easily developed Bratz without seeing either of those products, or any product that Mattel had on the market or was developing. The change of the fashion proportion was in the air. Just as the designers for Diva Starz and Toon Teens felt it, so did Mr. Bryant. Further, when comparing Toon Teens and Diva Starz with the Bratz sketch, I believe that it is more likely that the Mattel products were not Mr. Bryant's inspiration. The focus on teen fashion and especially the new attitude were just not as evident in the Mattel products as they were in the *Seventeen* magazine that Mr. Bryant states to be his inspiration.

Interestingly, although the Mattel designers recognized the new proportion in their Diva Starz dolls, they were not able to make the line a long term success. I assume that in order to accommodate the mechanism that allowed Diva Starz to "talk" and move her eyes, the designers traded a pleasing design form for function. MGA did not include anything in the Bratz design that interfered with the sculpt. In addition, I believe the element that Mr. Bryant added to the new proportion (the "bratty" attitude) as well as Ms. Treantafelles taste level made Bratz a hit. Every choice in the design and marketing of Diva Starz and Bratz would determine how each would ultimately do in the marketplace.

And again, even more important than the look of the doll, was the change of attitude. It is my opinion that Mattel would not have produced a doll with a "bratty" attitude and therefore could never have come out with a line like Bratz.
**(Exhibit #16, Diva Starz and Toon Teens)**

## The Time It Takes to Make a Doll Prototype

EXHIBIT 116

PAGE 1835

CONFIDENTIAL –
ATTORNEYS EYES ONLY

I understand that in this case there is some question about MGA being able to develop a new doll in the short amount of time from early October, 2000 and have it ready to show at Hong Kong Toy Fair in January of 2001. Was it possible? The answer is absolutely, yes. Realistically, the individual steps in making a doll for mass production do not take all that long. The reason it can take a year plus to get a doll to market is because of the bureaucracy that each company has in place to create and test a new doll product. How fast or how slowly a design comes to fruition, usually depends on the powers that be to make decisions. If a product is desired to make a certain date, then it's up to those decision makers to push it along. With talented, professional people (which MGA certainly had), a new product prototype can come together pretty quickly, and certainly within three to four months. It would be a tight schedule, but absolutely doable.

A unique sculpt can be done in as little as a few hours—and of course, it all depends on the sculptor. I have sculpted a rough doll (head and body) in as little as two days. In the product development process, the next step would be approval by the project manager. When I design a doll, that takes no time—either I like it or not; if I like it, I proceed with the wax work/ engineering. If a project manager is focused on the project, comments and/or changes could be made in very little time.

The next step would be to mold the original sculpt to put into wax for refinement. Depending on how complicated the wax clean up is, a doll could be finished in a matter of a few days to a couple of weeks.

Once the wax is done, a rotational master mold can be made in as little as seven to ten days. In my experience, injected molded parts take sixty to ninety days for production, but there are numerous ways to produce a prototype body in a very short amount of time without using the production molds. (Also, this is not to say that injection molds couldn't be used—personally, I've never wanted to throw the money at it to get it done faster).

Of course, the product is not finished until face paint, hair rooting, clothing design and package design are done. All these steps can and are usually done while the doll body is being readied for mold making. These finishing steps are usually done simultaneously and can take as little as a few minutes for something like hair rooting.

**Two Very Important People**

Undeniably Mr. Bryant was important in the development of the Bratz line. However, there were two other people who were even more important: Mr. Larian and Ms. Treantafelles. Mr. Larian had the money, the manufacturing capabilities, and the good sense to let those who he hired do the job they were hired to do. Ms. Treantafelles was perhaps the most important person in the development of the project. She took an idea from an untested, unknown clothing designer (who was not a doll designer) and worked with an extremely talented staff to develop a market changing doll.

Over the years, I have witnessed what seemed to be a good ideas flop and mundane ideas do well—and it's all because of the creative people (sculptors, designers, etc.) involved. Couple the right creative people with funds to do a project properly, and there's a chance that it might work. Again, Mr. Larian and Ms. Treantafelles were those right people.

Further, it is my opinion that MGA, at the time, was probably the only company that could have turned Bratz into a hit.

16   EXHIBIT 116

CONFIDENTIAL – ATTORNEYS EYES ONLY

1834

**Mattel and the Doll World**

Mattel, over the years, has rightfully protected its Barbie property. There are numerous examples of a competing toy company trying to knock Barbie off her shelf. Time and time again, Barbie was able to stop the challenge with great design and marketing efforts. However, Bratz did not enter the Barbie world. The Bratz dolls are not about blonde hair and blue eyes, they are not about sweetness and light, and they were not sculpted to look like or be confused with Barbie. Mattel used the approach to counter Bratz that always worked for them in the past. To knock a competitor's doll off the shelf, they used fine design and imaginative ideas. For the first time, however, this approach did not work. They tried to capture the "coolness" and "attitude" of the Bratz line with Flavas, an extremely ill advised and badly carried out line of "Hip Hop" dolls that were heavily criticized. Shortly before Flavas, Mattel countered Bratz doing something that competing companies had always done to them; they came out with something very similar to Bratz—the My Scene dolls.

My Scene dolls are a beautifully designed and sculpted answer to the Bratz line. Relying heavily on the Bratz look, Mattel was able to design and market their new dolls in a relativity short amount of time. On close examination, the My Scene dolls make use of the standard Barbie body with one change—the head. To get the new doll proportion to compete with the Bratz dolls, Mattel made the head oversized and brilliantly made "shoes" with the oversized feet sculpted in the shoes to create the look. Mattel could use the same Barbie foot, but just slip on this new "shoe" to change the proportion of the doll. **(Exhibit # 17, My Scene Foot)**

I thought the initial look of the line of dolls was great. The line had a similar look to Bratz, but at the same time, they made it their own. However, although the look and packaging of the dolls was interesting it still wasn't as new looking as the Bratz dolls. As a result of trying to compete, in my opinion, My Scene later started to look more and more like Bratz.

Throughout Barbie's history, Mattel has aggressively gone after just about every company that dares to try to compete with Barbie. Major players in toys, such as Hasbro and Kenner, could not stand up to Mattel's tactics. I believe that they had every right to do so—Barbie belongs to Mattel and they have every right to protect their product. The difference with the Bratz line is the MGA did not try to go after Barbie. MGA developed its own brand. Barbie for all intents and purposes "owns" blonde hair and blue eyes— MGA doesn't care. MGA developed a line that's more relevant to today's older girls and they didn't do it by "going into Barbie's backyard". Therefore, the Mattel tactic has not, and in my opinion, can not work.

Although Mattel probably has some of the most talented people working in dolls today, MGA has been able to out design and out market them.

**General Comments**

The following is a list of documents and resources I used in preparing this report.

17

EXHIBIT 116

PAGE 1837

CONFIDENTIAL – ATTORNEYS EYES ONLY

Note: It would be impossible to list everything that has contributed to my general knowledge of fashion design, doll design and doll manufacturer over the past thirty plus years. However, in addition to my general knowledge, I have reviewed dozens of Bratz, My Scene, and Diva Starz dolls as well as pictures of Mattel's prototype dolls for Toon Teens.

**Books**
1) <u>Toy Wars</u> by G Wayne Miller; Times Books, NY, NY; cpy. 1998
2) <u>I Had That Doll!</u> By the editors of Doll Reader; Park Lane Press, Avenel, NJ; cpy. 1996
3) <u>More Twentieth Dolls from Bisque to Vinyl</u> by Johana Gast Anderton; Athena Publishing Co., North Kansas City, MO; cpy. 1974
4) <u>This is Blythe</u> by Gina Garan; Chronicle Books LLC, San Francisco, CA; cpy. 2000

**Web Sites**
1) http://www.lapassiondesbratz.simulatus.info/
2) http://www.about.com Doll Collecting, The Barbie Start Page

**Court Documents**
1) Affidavit of Daphne Gronich
2) Mattel v. Bryant MGA Complaints Notebook
3) Transcript of portion of trial, Art Attacks Ink, LLC, vs. MGA
4) Excerpts From Interrogatory Responses In Which a Party Has Provided a Statement on Its Position
5) Exhibits from Carter Bryant Deposition, November 2004
6) Carter Bryant's Deposition 11/4/2004
7) Expert Report of John Steven Baulch
8) 2005 Barbie Spring Line Review, April 15, 2004
9) Margaret Leahy's Deposition 12/12/2007
10) Carter Bryant's Deposition, rough draft, 1/23/2008
11) Carter Bryant's Deposition, rough draft, 1/25/2008
12) Color version, pitch book
13) Color version, Exhibit 1107, 1108,1109, 1110
14) Exhibit 1330
15) August 1998 issue of Seventeen Magazine

**Other**
1) Portions of Seventeen and other fashion magazines from 1998
2) Met with Margaret Leahy's lawyer to view original Bratz sculpts and prototypes.
3) Heard from expert witness Peter S. Menell
4) Heard from expert witness Tina Tomiyama

EXHIBIT 116

PAGE 1838

CONFIDENTIAL – ATTORNEYS EYES ONLY

**Conclusion**

1) I believe that Mr. Bryant's accounting of his inspiration is true, for the reasons discussed above. I believe that his inspiration for Bratz happened when and how he said it did.

2) Whereas the importance of a new idea cannot be denied, the same idea, without the help of a very talented staff, could have been a flop. I believe that the original idea for Bratz was only one part of what made a very successful doll program.

3) There was absolutely enough time for MGA to create the Bratz doll prototypes for the Hong Kong Toy Fair in 2001.

4) It is my opinion that although the illustrations that Mr. Bryant did for his pitch book certainly inspired the line, the Bratz dolls are not copies of that work.

Date: February 8, 2008

By: _____

19

EXHIBIT    116

PAGE    1839

CONFIDENTIAL –
ATTORNEYS EYES ONLY