CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   '01? Because I remember we were looking for -- we
2   were looking for something to appeal to older girls,
3   a brand that appealed to older girls, and we were
4   looking at -- I think at the time we were launching
5   What's Her Face and we were looking for what the         11:37AM
6   next either flanker was or what also an older girl
7   alternative was.
8       Q.  And what happened in the fall of -- in
9   September of '01 that you believe was the beginning
10  of the development of My Scene?                          11:38AM
11          MR. ZELLER: Just asked and answered.
12          THE WITNESS: I mean, I did answer that
13  question. We were always looking. So, I mean, why
14  it started then versus -- I mean, it could have
15  started -- we were always -- every month we were        11:38AM
16  looking for new concepts that appealed to all ages.
17  BY MR. PLEVAN:
18      Q.  So what happened in the fall of '01 that you
19  sort of recall was the beginning of the development
20  of My Scene? Was there a meeting that you attended       11:38AM
21  or someone made a presentation or someone later told
22  you two months later that this work had been done
23  earlier?
24      A.  No, you asked me -- I mean, just to be
25  clear, you asked me about the lead time prior to the    11:38AM

EXHIBIT 1
PAGE 19
Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 launch.
2   Q.  Yes.
3   A.  And how we got back to let's say September
4 is what I'm addressing is that the series of things
5 that happened that lead to the manufacturing are we    11:39AM
6 see drawings, we identify -- there's a whole
7 process. Marketing says we have this for three,
8 four and five year olds, we have this for five, six
9 and seven year olds, we have this for eight and
10 there's millions of slots that happen -- millions --   11:39AM
11 when I say "millions," there are a lot of -- let me
12 be clear. There are a lot of slots that happen in
13 each age group across many categories of products.
14 So what I'm referring to is we probably -- I
15 would -- I mean, I don't recall exactly but we         11:39AM
16 probably said in the older girl category we need to
17 start -- there's nothing that's filling this slot.
18 So we probably began looking and in August -- I
19 believe every August we would meet with our
20 international affiliates and we would have a           11:40AM
21 worldwide meeting where we would get input to what
22 was -- to their feelings on what girls were looking
23 for and what was relevant in their different
24 markets. And we would begin looking at -- and we
25 also had our Blue Sky meetings I think in August so    11:40AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  we were also looking at a lot of concepts. And so
2  what I'm saying is most likely the beginning of what
3  became My Scene began at some level, some concept,
4  you know, in September and eventually I remember
5  seeing Glamour Maids heads which -- which was            11:40AM
6  probably maybe in January --
7    Q.  January of?
8    A.  Of '01 -- no, January of '02. And as we're
9  working on a concept things come together. So we
10 finally say, well, we have this concept that we're     11:41AM
11 thinking about and this is beginning to look like
12 it's going to fit. I mean, that's my recollection.
13   Q.  But -- I may have misstated the question but
14 I wasn't looking for what probably happened. I was
15 asking if you had a recollection of the lead time     11:41AM
16 for the development of the My Scene brand.
17         MR. ZELLER: This was asked and answered.
18         THE WITNESS: Yeah, it really is asked and
19 answered. If you're asking me was the lead time
20 longer than a normal lead time? No. If you're        11:41AM
21 asking me was it shorter than a normal lead time?
22 It was basically how we do things. We were lucky in
23 the case of My Scene that we had a head that
24 existed. I mean, that -- that -- you know, to
25 sculpt a head took a long time to have a model and   11:42AM

91

EXHIBIT 1
PAGE 21

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   I declare under penalty of perjury
2   under the laws of the State of California
3   that the foregoing is true and correct.
4   Executed on _March 5, 2008_,
5   2008, at _____,
6   California.
7
8
9   _[signature]_
10  ADRIENNE FONTANELLA
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

253

EXHIBIT __1__

PAGE __2__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA   ) ss:
 2   COUNTY OF LOS ANGELES )
 3
 4         I, WENDY S. SCHREIBER, C.S.R. No. 3558, do
 5   hereby certify:
 6
 7         That the foregoing deposition of ADRIENNE
 8   FONTANELLA was taken before me at the time and place
 9   therein set forth, at which time the witness was
10   placed under oath and was sworn by me to tell the
11   truth, the whole truth, and nothing but the truth;
12         That the testimony of the witness and all
13   objections made by counsel at the time of the
14   examination were recorded stenographically by me,
15   and were thereafter transcribed under my direction
16   and supervision, and that the foregoing pages
17   contain a full, true and accurate record of all
18   proceedings and testimony to the best of my skill
19   and ability.
20         I further certify that I am neither
21   counsel for any party in said action, nor am I
22   related to any party to said action, nor am I in any
23   way interested in the outcome thereof.
24
25
                                                    254
```

Veritext National Deposition & Litigation Services
866 299-5127

EXHIBIT 1
PAGE 23

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      IN WITNESS WHEREOF, I have subscribed my
2  name this 28th day of January, 2008.
3
4
5
6      _____
7          WENDY S. SCHREIBER, CSR No. 3558, RPR
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

255

EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

    Plaintiff,

vs.

MATTEL INC., a
Delaware Corporation,

    Defendant.

No. C04-09049 SGL (RNBx)
Consolidated with
No. CV 04-09059
CV 05-2727

**CERTIFIED COPY**

AND CONSOLIDATED ACTIONS.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF CARTER BRYANT

San Francisco, California

Wednesday, January 23, 2008

Volume 4

Reported by:
JODI L. BOSETTI
CSR No. 11316, RPR

JOB No. 81227

EXHIBIT 2
PAGE 25

| | |
|---|---|
| 13:11 1 | side for another toy company; is that true? |
| 13:11 2 | MR. WERDEGAR: Objection. Vague as to time, |
| 13:11 3 | asked and answered, lacks foundation, calls for |
| 13:11 4 | speculation, incomplete hypothetical, and it calls for |
| 13:12 5 | a legal conclusion. |
| 13:12 6 | THE WITNESS: I'm sorry. Can you give me the |
| 13:12 7 | question one more time. |
| 13:12 8 | BY MR. QUINN: |
| 13:12 9 | Q  You just don't know whether or not Mattel, |
| 13:12 10 | what their attitude would be? |
| 13:12 11 | During the time that you were employed by |
| 13:12 12 | Mattel, is it true that you just had no idea whether |
| 13:12 13 | or not Mattel would have any objection for your doing |
| 13:12 14 | work on the side for another toy company; is that a |
| 13:12 15 | true statement? |
| 13:12 16 | MR. WERDEGAR: Objection. Lacks foundation, |
| 13:12 17 | calls for speculation, calls for a legal conclusion. |
| 13:12 18 | If I didn't say vague as to time, it is. It's also an |
| 13:12 19 | incomplete hypothetical and it's vague as to work for |
| 13:12 20 | another toy company. |
| 13:12 21 | BY MR. QUINN: |
| 13:12 22 | Q  Your turn. |
| 13:12 23 | A  I don't know. |
| 13:12 24 | Q  Is there some reason in your own mind where |
| 13:12 25 | you -- can you explain to me why it is that you have |

787

EXHIBIT ___2___

PAGE ___26___

13:12 1   an understanding why MGA, while you were working for
13:12 2   MGA, would not want you working for another toy
13:12 3   company, but you just have no idea whether or not
13:12 4   Mattel would have an objection to that?  Can you
13:12 5   explain the distinction for me?
13:12 6          MR. WERDEGAR:  Objection.  Lacks foundation,
13:13 7   calls for speculation, calls for a legal conclusion,
13:13 8   vague as to time, incomplete hypothetical.
13:13 9          MS. CAMPANA:  I join in his objection.
13:13 10         THE WITNESS:  No.
13:13 11  BY MR. QUINN:
13:13 12      Q   You can't explain it?
13:13 13      A   No.
13:13 14      Q   Did somebody at Mattel tell you that during
13:13 15  your Mattel employment it's perfectly fine if you do
13:13 16  some work on the side for another toy company?
13:13 17      A   I don't recall anybody ever saying that.
13:13 18      Q   Do you have any basis to believe that it was
13:13 19  perfectly fine for you to do work for another toy
13:13 20  company while you were employed by Mattel?
13:13 21         MR. WERDEGAR:  Objection.  Misstates prior
13:13 22  testimony, vague and ambiguous.
13:13 23         THE WITNESS:  No.
13:13 24  BY MR. QUINN:
13:13 25      Q   Was it your understanding, sir, that entering

CARTER BRYANT, V. 4　　　　　　　　　　01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
13:13  1   into this agreement with MGA, which is marked as
13:13  2   Exhibit 15, that you were assigning or transferring
13:13  3   over to MGA any rights to something that you had
13:14  4   created?
13:14  5        MR. WERDEGAR:  Objection.  Calls for a legal
13:14  6   conclusion, lacks foundation, vague.  And, again, if
13:14  7   you have an understanding that derives from
13:14  8   conversations or communications you've had with your
13:14  9   counsel, you should not divulge that.
13:14 10        MS. CAMPANA:  I join in Counsel's objections.
13:14 11        THE WITNESS:  I think I had a basic understanding
13:14 12   that that is what was happening.
13:14 13   BY MR. QUINN:
13:14 14        Q    And what was it that, in your understanding,
13:14 15   you were transferring or assigning to MGA?
13:14 16        MR. WERDEGAR:  Again, calls for a legal
13:14 17   conclusion, vague and ambiguous, the document speaks
13:14 18   for itself.
13:14 19        MS. CAMPANA:  I join in Counsel's objections.
13:14 20        THE WITNESS:  Basically the idea for these
13:14 21   characters.
13:14 22   BY MR. QUINN:
13:14 23        Q    "These characters" meaning?
13:14 24        A    The Bratz characters.
13:14 25        Q    You showed that -- you know, we've marked and
```

789

CARTER BRYANT, V. 4  01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

| | |
|---|---|
| 14:50 1 | point as a toy inventor? |
| 14:50 2 | MR. WERDEGAR: Objection. Vague as to time, |
| 14:50 3 | vague as to "toy inventor." |
| 14:50 4 | THE WITNESS: Well, I don't really remember. |
| 14:50 5 | BY MR. QUINN: |
| 14:50 6 | Q   You might have and you might not, you're just |
| 14:50 7 | not sure; is that true? |
| 14:50 8 | MR. WERDEGAR: Objection. Asked and answered. |
| 14:50 9 | THE WITNESS: I don't remember. |
| 14:50 10 | BY MR. QUINN: |
| 14:50 11 | Q   Have you ever patented anything? |
| 14:50 12 | A   No. |
| 14:50 13 | Q   Have you ever made something, created |
| 14:50 14 | something which, in your understanding, was |
| 14:50 15 | patentable? |
| 14:50 16 | MR. WERDEGAR: Objection. Calls for a legal |
| 14:50 17 | conclusion, vague and ambiguous. |
| 14:50 18 | THE WITNESS: I don't know. |
| 14:50 19 | BY MR. QUINN: |
| 14:50 20 | Q   Was it your intention, when you gave up your |
| 14:51 21 | rights on Bratz, to get your foot in the door of |
| 14:51 22 | creating products, only products that were patentable? |
| 14:51 23 | MR. WERDEGAR: Objection. Lacks foundation, |
| 14:51 24 | calls for speculation, calls for a legal conclusion. |
| 14:51 25 | MS. CAMPANA: I add also objection, vague. |

865

| | |
|---|---|
| 14:51 1 | THE WITNESS: I don't think that thought ever |
| 14:51 2 | would have entered my mind. |
| 14:51 3 | BY MR. QUINN: |
| 14:51 4 | Q  Why not? |
| 14:51 5 | MR. WERDEGAR: Objection. Vague. |
| 14:51 6 | THE WITNESS: I just wouldn't have ever thought |
| 14:51 7 | about patent one way or another. |
| 14:51 8 | MR. QUINN: Why don't we take a minute. |
| 14:51 9 | MR. WERDEGAR: Okay. |
| 14:51 10 | THE VIDEOGRAPHER: The time is 2:51. We're going |
| 14:52 11 | off the record. |
| 14:52 12 | (Recess.) |
| 15:07 13 | THE VIDEOGRAPHER: The time is 3:07. We are back |
| 15:07 14 | on record. |
| 15:07 15 | MR. WERDEGAR: Either now or at some point |
| 15:07 16 | Mr. Bryant wants to clarify one of his earlier |
| 15:07 17 | answers. |
| 15:07 18 | MR. QUINN: Okay. |
| 15:07 19 | MR. WERDEGAR: Why don't you do it now, make your |
| 15:07 20 | clarification. |
| 15:07 21 | THE WITNESS: Yeah. I just wanted to say that |
| 15:07 22 | earlier you had asked me something about moonlighting, |
| 15:07 23 | and moonlighting was actually something that was -- |
| 15:07 24 | you know, I knew was happening within the company, |
| 15:07 25 | just I had that knowledge, you know, through the |

EXHIBIT  2
PAGE  30

```
15:08  1   grapevine.  I didn't know any, you know, specific
15:08  2   person who was moonlighting, but --
15:08  3   BY MR. QUINN:
15:08  4       Q    Okay.  And we just took a break?
15:08  5       A    Yes.
15:08  6       Q    And during that break you spoke to your
15:08  7   counsel?
15:08  8       MR. WERDEGAR:  You can answer that yes or no.
15:08  9       THE WITNESS:  Yes.
15:08 10   BY MR. QUINN:
15:08 11       Q    And we come back and the first thing you do
15:08 12   is put on the record a reference to moonlighting,
15:08 13   right?
15:08 14       A    Yes.
15:08 15       Q    Are you saying that I used the term
15:08 16   "moonlighting"?
15:08 17       A    I don't know.  I don't remember if you did or
15:08 18   not, but I thought we had talked about that.
15:08 19       Q    But you don't know anybody who actually did
15:08 20   it by name?
15:08 21       A    I don't know of specific people, no.
15:08 22       Q    You just heard rumors?
15:08 23       A    Yeah, it was rumors, yes.
15:08 24       Q    Will you take a look at Exhibit 15 -- are you
15:08 25   saying that the rumors were that people -- by
```

CARTER BRYANT, V. 4                           01/23/08
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
15:08  1   moonlighting do you mean working for other toy
15:08  2   companies?
15:08  3       A    Not just toy companies, but other things in
15:08  4   general.
15:08  5       Q    Like, you know, a doll designer might work at
15:09  6   McDonald's or be a security guard or have another job;
15:09  7   is that what you're referring to?
15:09  8       MR. WERDEGAR:  Objection.  Misstates testimony.
15:09  9       THE WITNESS:  I'm just -- yeah, I'm just
15:09 10   referring to any work other than their work at Mattel.
15:09 11   BY MR. QUINN:
15:09 12       Q    All right.  But in terms of -- are you
15:09 13   telling me that you heard rumors about Mattel
15:09 14   employees who were working on toy products for other
15:09 15   companies or for the benefit of other companies?  Is
15:09 16   that what you're telling me?
15:09 17       A    I believe so, yes.
15:09 18       Q    You heard rumors about that?
15:09 19       A    Yes.
15:09 20       Q    But you can't recall any names?
15:09 21       A    No.
15:09 22       Q    Can you recall what any of the products were?
15:09 23       A    No.
15:09 24       Q    Or the other companies that these employees
15:09 25   were supposedly by rumor working for, can you recall
```

868

EXHIBIT ____2____

PAGE ____32____