STATE OF CALIFORNIA )

COUNTY OF RIVERSIDE )


I, the undersigned, a Certified Shorthand

Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before

me at the time and place herein set forth; that any

witnesses in the foregoing proceedings, prior to

testifying, were placed under oath; that a verbatim

record of the proceedings was made by me using machine

shorthand which was thereafter transcribed under my

direction; further, that the foregoing is an accurate

transcription thereof.

I further testify that I am neither financially

interested in the action nor a relative or employee of

any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed

my name.


Dated: MARCH 3, 2008


Michelle Hutton, CSR
Certificate No. 7322

EXHIBIT 12

PAGE 232

**EXHIBIT 13**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

        Plaintiff,

vs.

MATTEL, INC., a Delaware
corporation,

        Defendant.

Case No.
CV 04-9040 SGL(RNBx)
Consolidated with
Case No. CV 04-09059
Case No. CV 05-02727

**CERTIFIED**

**COPY**

_____

AND CONSOLIDATED ACTIONS.

_____

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF PETER MENELL, Ph.D.

San Francisco, California

Tuesday, April 1, 2008

Reported by:
DARCY J. BROKAW
RPR, CRR, CLR, CSR No. 12584

Job No. 84831

EXHIBIT _____ 13 _____

PAGE _____ 233 _____

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

01:26 1      Microsoft?

2            A      I didn't ultimately testify.

3            Q      Did you issue a report?

4            A      I wrote a report, but it was -- I think it

01:26 5      was more in the nature of a consulting document and

6            not as an evidentiary document.

7            Q      Are we done with your expert witness work,

8            or is there one that pops up here later?

9            A      I think that's -- that probably covers it.

01:27 10     Q      So this is the first litigation matter in

11           which you've ever been retained to opine on the

12           copyright in a two-dimensional visual work, correct?

13           A      That's correct.

14           Q      Have you ever served as a judge?

01:27 15            MR. HANSEN:  Object to the form.

16                  THE WITNESS:  How would you define

17           "judge"?

18           BY MR. VAN DALSEM:

19           Q      Has anyone ever appointed you -- I don't

01:27 20     think you've ever been a real judge.

21                  Have you ever served as a judge?  Have you

22           ever served as a judge pro tem?

23           A      No.

24           Q      I take it you've presided over some moot

01:27 25     court?

58

EXHIBIT 13

PAGE 234

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

01:27  1        A     I've done my share of that.

       2        Q     And you've never appeared in court as a

       3   lawyer?

       4              MR. HANSEN:  Object to the form.

01:28  5              THE WITNESS:  That's correct.

       6   BY MR. VAN DALSEM:

       7        Q     You've never tried a case?

       8        A     Correct.

       9        Q     Have you ever actually testified before a

01:28 10   jury?

      11        A     No.

      12        Q     Have you ever testified as a witness in a

      13   bench trial?

      14        A     Yes.

01:28 15        Q     And in what matter did your work progress

      16   to the stage of testifying in front of the court in

      17   a bench trial?

      18        A     In the tax litigation involving

      19   Microsoft -- it's on page 23 -- I did testify in tax

01:29 20   court on behalf of the Internal Revenue Service.

      21        Q     And is that your only experience

      22   testifying as an expert witness in any tribunal?

      23        A     No.

      24        Q     What else?

01:29 25        A     In the ACE Insurance and Casualty matter,

                                                               59

EXHIBIT _____ 13

PAGE _____ 335

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

01:29 1    I testified on two different occasions before a

2    special master, who was designated by a Federal

3    District Court judge.

4         Q     So no jury there?

01:29 5        A     No jury there.

6              And then in the Green Hills Software

7    matter, I testified before a three-judge arbitration

8    panel.

9         Q     Is that it?

01:29 10       A     That's correct.

11        Q     So you've never testified in a bench trial

12   before a district judge?

13        A     That's correct.

14        Q     To your knowledge, have the lawyers that

01:30 15  hired you proposed that you be a witness in a jury

16   trial where your testimony was excluded by the

17   court?

18        A     Have I ever had that situation?

19        Q     Correct.

01:30 20       A     No.

21        Q     Do you know what a Daubert motion is?

22        A     Yes, I do.

23        Q     To your knowledge, has anyone ever filed a

24   Daubert motion against you?

01:30 25       A     No.

60

EXHIBIT /3

PAGE 236

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

01:30 1        Q    So the fact that you haven't testified
2    before a jury is not the result of any court order
3    preventing you from doing so?
4        A    That's correct.
01:30 5        Q    It's just the circumstances?
6        A    That's correct.
7        Q    Do you have any special training in art
8    history?
9        A    No.
01:31 10        Q    Do you have any degree in art history?
11        A    No.
12        Q    Have you ever taught art history?
13        A    No.
14        Q    Have you ever authored any publications
01:31 15    regarding art history?
16        A    No.
17        Q    Have you ever taught courses concerning
18    art history?
19        A    No.
01:31 20        Q    Do you have any special training in
21    design?
22        A    I'm not sure what you mean by "design."
23        Q    Any type of design, in the broadest sense.
24        A    Well, I mean, I do design work in my job.
01:31 25        Q    What kind of design work do you do in your

61

EXHIBIT  13

PAGE  237

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

01:31  1    job?
       2         A    I develop two-dimensional and audio-visual
       3    presentation materials.
       4         Q    Power points?
01:32  5         A    You can call them that.
       6         Q    Well, you have a couple power points --
       7    those look like power points attached to your
       8    report.  Are those power points?
       9         A    Yes.
01:32 10         Q    Other than designing power points, what
      11    other special training do you have in design of any
      12    type?
      13         A    I would say I don't have special training.
      14         Q    Do you have any degrees in design?
01:32 15         A    No.
      16         Q    Have you ever taught about design?
      17         A    No.
      18         Q    Have you ever authored any publications
      19    concerning design?
01:32 20         A    No.
      21         Q    Have you ever taken any courses in design?
      22         A    Well, I haven't taken courses in a long
      23    time, but I don't recall taking courses in design.
      24         Q    Do you have any special training in pop
01:32 25    culture?

                                                              62

EXHIBIT _____ 13 _____

PAGE _____ 238 _____

PETER MENELL, PH.D.                     04/01/08
CONFIDENTIAL

01:32  1      A     I have two teenage sons.

      2      Q     What ages?

      3      A     14 and 17.

      4      Q     Other than your experience as a

01:33  5   contemporary father, do you have any special

      6   training in pop culture?

      7      A     Well, you know, I teach in the

      8   entertainment law field, and so I'm regularly

      9   dealing with pop culture and in that area.  I spend

01:33 10   a lot of time teaching cases relating to the latest

    11   musical and artistic and motion picture fads,

    12   television issues.  I write about the history of the

    13   music industry and so I read a lot in the area, but

    14   I wouldn't say that I focus on the art as such.

01:34 15   It's really in relationship to works of authorship.

    16      Q     So comparing your expertise in pop culture

    17   to that of the man on the street, you may have some

    18   increased knowledge in the subject simply because

    19   you're a copyright law professor and some aspects of

01:34 20   pop culture collide with copyright law from time to

    21   time?

    22          MR. HANSEN:  Object to the form.

    23          THE WITNESS:  Correct.

    24   BY MR. VAN DALSEM:

01:34 25      Q     I don't know if there's such a thing.  But

                                          63

EXHIBIT _____ 13 _____

PAGE _____ 239 _____

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

```
01:34  1    do you have any degrees relating to pop cultures?
       2        A    No.
       3        Q    Have you ever taught about pop culture,
       4    other than in connection with how a court may have
01:34  5    ruled upon a decision -- a fact pattern that could
       6    include the subject?
       7        A    Well, as you may know, in at least the
       8    academic world of research universities,
       9    interdisciplinary work is very much at the
01:35 10    forefront; and so I think everyone working and
      11    writing in the copyright field is trying to
      12    understand where creative forces come from.
      13             And for example, you know, in today's
      14    world just as one illustration, there is greater
01:35 15    interest in what's referred to as appropriation art,
      16    so the idea that one could do art by augmenting or
      17    collaging different types of art.  So I'm aware of
      18    sort of art patterns and, you know, and I actively
      19    discuss these issues in academic contexts and in
01:35 20    teaching.
      21        Q    You don't teach a course in pop culture?
      22        A    Well, some people might characterize a
      23    course on entertainment law as having a big pop
      24    culture element.  But it's true, it's not taught
01:36 25    from the perspective of the pop culture but really
```

64

EXHIBIT 13

PAGE 240

01:36  1    how businesses form around commercializing pop

2    culture.

3         Q    Now, in your expert report in this case,

4    you actually compare various elements of the Bryant

01:36  5    drawings to the Bratz dolls, lips to lips, other

6    features to other features, right?

7         A    Yes.

8         Q    What qualifies you, as opposed to the

9    subject matter experts in this case, Tonner, the

01:36 10    other people, to actually make the factual

11    comparison of whether a set of lips -- one set of

12    lips is or isn't similar to another set of lips?

13              MR. HANSEN:  Object to the form.

14              You can answer.

01:37 15              THE WITNESS:  As I explain in my report,

16    one of the challenges that we have in a copyright

17    field is that there are typically two somewhat

18    discrete types of knowledgeable people.  There are

19    subject matter experts who typically don't have

01:37 20    training in the features of copyright law, and there

21    are copyright law experts who are not principally

22    trained in the art fields.  And the copyright law is

23    looking to have some hybridization of those two

24    communities.  There's a need for the people who are

01:38 25    doing the analysis to understand how the law

EXHIBIT _____ 13

PAGE _____ 241

01:38  1    functions, and so that's a role that I've come to

      2    play in a variety of matters.

      3            And my basis is that I read most of the

      4    copyright cases that are decided, particularly in

01:38  5    the art areas.  As someone who does a lot of

      6    teaching in the area, I've made it one of my sort of

      7    distinctive characteristics, that I go out and get

      8    copies of the works that are being litigated.  And

      9    so I've built up a large library of the art, film

01:38 10    clips, et cetera, in the litigated cases.  And so

     11    what I can do in my teaching is to basically provide

     12    an understanding of the contours of the law by

     13    showing many of the cases juxtaposed to each other.

     14    And it's something that I really took an active

01:39 15    interest in when I was invited to do the training

     16    programs at the Federal Judicial Center.

     17            And so I've built up a library of

     18    materials, and I can provide some sense of where

     19    these contours are; and I've played a variety of

01:39 20    roles in working with subject matter experts.

     21    BY MR. VAN DALSEM:

     22      Q     Your expertise as a copyright scholar

     23    includes having a broad view on how courts have

     24    rendered decisions based on various factual

01:40 25    scenarios being presented to them?

66

13

PAGE _____ 242

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

01:40  1        A        That's correct.

       2        Q        In this particular case, would you agree

       3    that Lee Loetz has greater expertise in comparing

       4    the actual artistic elements of the works than you

01:40  5    do?

       6              MR. HANSEN:   Object to the form.

       7              THE WITNESS:   Well, I -- I think that it's

       8    critical for anyone who's engaged in that process to

       9    be aware of how prior influences affect the work;

01:40 10    and in that sense, I have critical information to

      11    bring to the table.   I would not compare my art

      12    skills to his skills.   I'm sure that he's a very

      13    good artist, and I don't have any -- any claim to

      14    that.

01:41 15              But what I've seen time and time again is

      16    that there's a tendency in copyright cases to do

      17    what I sometimes call plagiarism analysis, where you

      18    have someone who, without proper instruction, will

      19    render what you might call artistic judgments about

01:41 20    whether two things are similar, but without any

      21    recognition that that copyright law is not a

      22    plagiarism analysis, it's an analysis of what is

      23    original and protected.

      24    BY MR. VAN DALSEM:

01:41 25        Q        But the expertise you bring to this case

                                                              67

EXHIBIT _____ 13 _____

PAGE _____ 243 _____

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

01:41 1   is how courts of the United States have interpreted

2   the U.S. Copyright Act, not your expertise in

3   fashion dolls, for example?

4        A    Well, let's be a little more concrete.

01:42 5   Think about the Feist case.  This was a case

6   involving telephone directories.  Now, it's true,

7   I'm not an expert in compiling telephone

8   directories; but I can read that case and I can, I

9   think, do a filtration of unprotected, unoriginal

01:42 10   content, alphabetical ordering of names.

11        Now, when you move into the art area,

12   there are some things that I think are pretty

13   self-evident that I'm going to be able to evaluate

14   based on knowing the contours of the law and things

01:42 15   that don't require artistic training to a great

16   degree.  There are other issues about which, you

17   know, I would certainly defer to -- to trained

18   subject matter experts who understand at least the

19   fundamental principles of the law.

01:43 20        And so, you know, my engagement here was

21   not to come in as an art expert.  I -- I spent some

22   time with some art experts, and I have knowledge

23   about prior art.  I read materials from Carter

24   Bryant in which he said that he was aware of these

01:43 25   works when he did his work.

68

13

PAGE 244

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

03:46  1    subsistence question begins with where the

       2    creativity lies.  And it's possible that copyright

       3    wouldn't subsist in, you know, a very modest, you

       4    know, I mean something that didn't go over the

03:46  5    modicum of originality -- modicum of creativity.

       6    That's the phrase as used.  Or something that

       7    derives from another work, a derivative work, where

       8    there was no permission to use the derivative work.

       9    No copyright would subsist under the 1976 act in the

03:47 10    additional creativity, if it is a derivative work.

      11    And that's under Section 103.

      12            So I'm just saying, you know, in sort of

      13    the abstract, you have to identify where the --

      14    where the work gets over the

03:47 15    originality/protectability hurdle.

      16    BY MR. VAN DALSEM:

      17        Q    Well let's talk about the Bryant drawings

      18    in particular.

      19            You concluded in your report that

03:47 20    copyright does subsist in the drawings, albeit thin?

      21        A    Well, based on what I know, I mean, you

      22    know, it's certainly possible.  Although it's not

      23    anything that I've been told and I have no basis to

      24    assert this; but, you know, if Carter Bryant found

03:47 25    this picture of Jade in an old magazine and, you

                                                          135

EXHIBIT _____13_____

PAGE _____245_____

03:48 1    know, he was just trying to practice his

2    line-drawing skills and he traced it and managed it

3    perfectly, it might be that there was absolutely no

4    protection at all in his rendition of Jade.

03:48 5        Q    But there's no evidence that that

6    occurred?

7        A    There's no evidence of that.  I'm not

8    saying it.  But I'm just saying that that's

9    relevant.  I mean, when I looked at the Steve Madden

03:48 10    art and other things, I don't think there's a sort

11    of spot-on copy here.  And so, yeah, I think there's

12    enough there that copyright subsists in the drawing.

13        Q    Drawings?

14        A    Drawings.

03:48 15        Based only on 102 analysis.  There may be

16    other reasons that there's no copyright, but that's

17    the only ones that I focused on.

18        Q    Have you read MGA's opposition to the

19    summary judgment motion that Mattel filed?

03:48 20        A    I've seen it.  I can't say I've studied

21    it.

22        Q    Do you see that it really concedes

23    originality, without getting into thinness or

24    thickness?

03:49 25        A    Yeah.  If they have, I -- I could

136

EXHIBIT _13_

PAGE _246_

03:49  1    understand that.  But if you're asking me did they,

       2    you know, I'll take your word for it.  I don't -- I

       3    don't remember that specifically.

       4        Q    Based upon what you now know and based

03:49  5    upon the evidence that you've reviewed, it's your

       6    opinion that copyright subsists in the Carter Bryant

       7    drawings?

       8        A    Let's just say we're assuming it subsists.

       9    I don't know that I -- you know, I mean, you know,

03:49 10    based on what I know, you know, Carter Bryant says

      11    he drew these; and, you know, that would be enough.

      12        Q    You're aware that MGA filed a copyright

      13    registrations for certain of the Bryant drawings?

      14        A    Yes.

03:49 15        Q    And by doing so, they created a

      16    presumption of copyrightability?

      17        A    They would not have to prove -- the burden

      18    would not be on them to prove copyright subsists.

      19        Q    The law is that the registration of the

03:50 20    work creates a presumption, a rebuttable presumption

      21    of copyrightability?

      22        A    I think it says it constitutes prima facie

      23    evidence, but they're the same thing in this

      24    context.

03:50 25        Q    And you're not sitting here today offering

137

EXHIBIT _____ 13

PAGE _____ 247

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

04:27  1    the sketch.

       2                MR. VAN DALSEM:  Let's change tapes.

       3                THE VIDEOGRAPHER:  The time is 4:27.

       4    We're going off the record, and this is the

04:27  5    completion of Media No. 2.

       6                      (A brief recess was taken.)

       7                THE VIDEOGRAPHER:  The time is 4:36.  We

       8    are back on the record, and this will be the

       9    beginning of Media No. 3 in the deposition of

04:36 10    Professor Peter Menell.

      11    BY MR. VAN DALSEM:

      12        Q    Professor Menell, if you could turn back

      13    to slide C34 in your report, the one we were going

      14    over before the break.

04:36 15        A    Yes.

      16        Q    What special training do you have that

      17    gives you knowledge superior to others in terms of

      18    how to compare graphic works of art in the manner in

      19    which you've done?

04:37 20        A    Well, I wouldn't characterize what I'm

      21    doing as based on art.  I'm doing it based on just

      22    whether one thing is the same as another.  You know,

      23    this is really just saying, you know, is there

      24    virtual identity between the middle and the top

04:37 25    image.  And so, you know, I came up with a few

162

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

04:37 1   illustrative telltale gotchas that, you know; if

2   it's virtually identical, why isn't the eyebrow

3   lining up with the gland; why is there an extra, you

4   know, eyelash in the middle.

04:38 5        So I'm just really using my abilities as

6   an observer and pointing out that under a standard

7   which is fairly strict, virtual identity, these are

8   not virtually identical.

9        Q    So in terms of the actual factual

04:38 10   comparison of these two eyes, which you've depicted

11   in C34, what you're doing here is pointing out what,

12   in your opinion, should be obvious to anyone who

13   looks at these two images?

14        A    Well, I'm trying to do it in a way that is

04:38 15   systematic; and so given that the standard requires

16   a degree of care, I'm trying to show these specific

17   differences, among others.  But these specific ones

18   led me to the conclusion that I reached.  And that's

19   the sense in which I say "illustrative."  I'm not

04:39 20   doing everything; I'm just trying to give a flavor

21   for it at the time I wrote it.

22        I don't know it was that clear to me, you

23   know, who was going to be using it; and so, you

24   know, I wanted to just kind of give, you know, a

04:39 25   fairly intuitive analysis, knowing that there would

163

PETER MENELL, PH.D.                           04/01/08
CONFIDENTIAL

04:39 1    probably be other people opining and analyzing.
      2         Q    What is your understanding of what a
      3    fashion doll is?
      4         A    A fashion doll is -- it can be a toy
04:40 5    product or a collectable art product.  There's a
      6    spectrum.  And it's used for play and for display,
      7    and it is designed in such a way that it can
      8    accommodate different clothing and hair
      9    accouterments and, you know, features that
04:40 10   predominantly girls -- but I'm sure there are boys
      11   that play with these things, but I think
      12   predominantly girls play with -- not all girls, but
      13   a fairly large marketplace of girls.  And people who
      14   like art that captures fashion and celebrities and,
04:40 15   you know, different measures, different types of
      16   beauty.
      17        So I see it as trying to capture, you
      18   know, in some ways an idealized human form and
      19   allows people to mix and match clothing, et cetera.
04:41 20        Q    You don't hold yourself out as an expert
      21   on fashion dolls, do you?
      22        A    No.  But I did sleep at Holiday Inn last
      23   night -- no.
      24        I've heard about them.  I attended a
04:41 25   lecture by Robert Tonner and, you know, I'm familiar

                                                          164

EXHIBIT ___13___

PAGE ___250___

PETER MENELL, PH.D.                                      04/01/08
CONFIDENTIAL

04:41  1    with it.  I think I was aware of the doll market.

       2    I've certainly -- one can't be a copyright professor

       3    without coming across doll cases.

       4         Q    While we have Exhibit C to your report

04:41  5    out, let's run through it, because I have some

       6    questions.  Let's just start at slide 1.

       7         A    Sure.

       8         Q    On slide C2, that's a -- is that a quote

       9    from Nichols?

04:42 10         A    It is.

      11         Q    And Nichols did not deal with a

      12    two-dimensional visual work, did it?

      13         A    No, it did not.

      14         Q    It dealt with a play and a movie?

04:42 15         A    Yes.

      16         Q    On slide C3, what's a sketch?

      17         A    I referenced, I think it's Mary

      18    Bergstein's report, and I used some of her

      19    terminology; and she provides this sort of waterfall

04:42 20    model of the process of designing dolls or fine art.

      21         Q    Before your work on this case, did you

      22    draw any meaningful distinction between a sketch and

      23    a drawing?

      24         A    You know, as I understand these terms, as

04:43 25    Mary used them, I did; but I don't know that I

                                                                165