PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

05:43  1    that someone of his experience and background would

       2    have written a paragraph like that.

       3         Q    Well, you agree that the Bryant drawings

       4    are sufficiently original to have copyright subsist

05:44  5    in them, correct?

       6         A    I think that's an assumption that we're

       7    working from.  I think the parties agree, from what

       8    you've said, so I'm not going to dispute that.  I

       9    think that's -- that's a reasonable starting point.

05:44 10              But the point I make here is a much more

      11    black letter, copyright 101 point, which is that

      12    there's an implication in Mr. Oman's paragraph that

      13    MGA was in violation of rules and has been

      14    inconsistent and that I think he misunderstands the

05:45 15    distinction -- I think he understands it, frankly.

      16    I think he misstates the distinction between a

      17    derivative work and a work -- or a work that would

      18    require someone to register the work as a derivative

      19    work, an underlying work that would cause that

05:45 20    requirement to be triggered, and a work that was

      21    merely affecting the degree of protection, how

      22    original it is, not whether it is a derivative work.

      23         Q    You say in your report on the final

      24    page -- they're not numbered -- Paragraph 7, about

05:45 25    midway down, quotes:  "Few, if any, works of art or

                                                           206

EXHIBIT ___13___

PAGE ___252___

05:45 1    literature are wholly original, but that does not

2    make them derivative works."

3            Do you see that?

4        A    I do.

05:45 5        Q    And you agree that that's an accurate

6    statement?

7        A    Well, just to put it in context, so this

8    concept of wholly original, I think is a -- it's not

9    a concept that is understood within copyright law.

05:46 10   I'm not familiar of any doctrines that use the

11   terminology.  And it's used in Mr. Oman's paragraph.

12           And so I'm just saying that -- that if I

13   understand him, he's saying "wholly original" means

14   somewhat like your comment about, you know, Carter

05:46 15   Bryant having -- having been God and created arms,

16   legs, torso, et cetera.  So I just think it's kind

17   of a make-weight argument.  I don't think anything

18   is wholly original.  And that's really all I'm

19   saying here.

05:47 20       Q    When is someone required to disclose on a

21   copyright application that the work submitted for

22   registration is a derivative work based on a prior

23   work?

24       A    You're saying when do they have to do

05:47 25   that?

EXHIBIT _____13_____

PAGE _____253_____

05:47  1        Q    Correct.  Under what circumstances?

2        A    Oh.  Well, I think under the circumstance

3   in which at least the form provides a definition,

4   and if you fit into that definition, what I say in

05:47  5   Paragraph 4 is that definition is really itself

6   drawn from the Copyright Act.  And so I would say if

7   what you're submitting for registration would be

8   deemed a derivative work, then you need to disclose

9   that, and then you also have to indicate what you've

05:48 10   done beyond the derivative work that gets you

11   copyright protection.

12        Q    The contribution of new and independently

13   copyrightable expression?

14        A    Correct.

05:48 15        Q    And when -- how does the law define when a

16   second work is a derivative of a first work?  How

17   much of it does it have to use?

18        A    Well, I think that David Nimmer or Nimmer

19   on "Copyright" provides a test.  And I think this is

05:48 20   the proper test, if I can quote:

21             "A work will be considered a

22             derivative work only if it would be

23             considered an infringing work if the

24             material that it had derived from a

05:49 25             preexisting work had been taken without

208

EXHIBIT _____13_____

PAGE _____254_____

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

05:49  1              the consent of a copyright proprietor of

       2              such preexisting work."

       3        Q    So under the definition you just read,

       4   that's the definition you quote in your report,

05:49  5   right?

       6        A    That is.

       7        Q    And you believe that's the correct

       8   definition?

       9        A    Yes.

05:49 10        Q    Under that definition, if the Bratz dolls

      11   infringed upon the Bryant drawings, they would be

      12   derivative works?

      13              MR. HANSEN:  Object to the form.

      14              THE WITNESS:  I think that that would be a

05:50 15   way of characterizing it.

      16   BY MR. VAN DALSEM:

      17        Q    And by the same token, if the Bratz dolls

      18   are derivative works under that definition of the

      19   Bryant drawings, and Mattel owns those drawings, MGA

05:50 20   would be liable for copyright infringement, correct?

      21              MR. HANSEN:  Object to the form.

      22              THE WITNESS:  Well, my understanding of

      23   the case is that there are a lot of issues that

      24   potentially stand in the way there.  So if you're

05:50 25   saying none of that applies, then without, you know,

209

EXHIBIT _____ 13
PAGE _____ 255

05:50  1     a lot of other bases for this not to be infringement

       2     or not to be actionable or the statute of

       3     limitations or, you know, a whole bunch of other

       4     things, you know, I'm saying that's the definition

05:51  5     of a derivative work.

       6          Q     So putting aside those other defenses you

       7     mentioned, the answer to my question is "yes,"

       8     right?

       9               MR. HANSEN:  Object to the form.

05:51 10               THE WITNESS:  I'm -- you know, I don't

      11     want to speak to -- if there's nothing else that

      12     could affect the determination, then yes.

      13     BY MR. VAN DALSEM:

      14          Q     Have you reviewed the registration and

05:51 15     continuation forms filed by MGA with respect to the

      16     Bratz dolls and the Bryant drawings?

      17          A     No.

      18          Q     You haven't?

      19          A     They were among the materials that I had

05:51 20     in the packages, but, you know, I didn't -- I wasn't

      21     asked to make any assessment of those issues.  I was

      22     asked to look at the infringement question, and I

      23     looked at the infringement question.

      24          Q     Do you know for a fact that you were

05:52 25     provided with the continuation forms for the Bratz

                                                              210

EXHIBIT ___13___

PAGE ___256___

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

06:03 1  wasn't asked to deal with a question of this nature.
      2  I just tried to make my best analysis of what I saw.
      3  BY MR. VAN DALSEM:
      4      Q     In 4966, it is not the copyright office
06:03 5  that is making a determination that the dolls are a
      6  derivative work of the drawing; that is a
      7  representation made to the copyright office by MGA,
      8  is it not?
      9           MR. HANSEN:  Object to the form.
06:04 10          THE WITNESS:  That's -- that's -- you
     11  know, that's what they say here.
     12  BY MR. VAN DALSEM:
     13      Q     So assuming it is found that Mattel owns
     14  the Jade drawing and assuming it is found that MGA's
06:04 15  representation under oath to the copyright office
     16  that the dolls are derivative works of the drawings
     17  is found to be an accurate statement, MGA will be
     18  found liable for copyright infringement unless some
     19  other defense prevails; would you agree?
06:04 20          MR. HANSEN:  Object to the form.
     21          THE WITNESS:  Can you just repeat that.
     22          MR. VAN DALSEM:  Would you reread it
     23  please.
     24      (The record was read back by the reporter as follows:
06:04 25              "Q    So assuming it is found

219

EXHIBIT _____ 13
PAGE _____ 257

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

06:04 1            that Mattel owns the Jade

2            drawing and assuming it is found

3            that MGA's representation under

4            oath to the copyright office

06:04 5            that the dolls are derivative

6            works of the drawings is found

7            to be an accurate statement, MGA

8            will be found liable for

9            copyright infringement unless

06:04 10          some other defense prevails;

11           would you agree?")

12     MR. HANSEN:  Same objection.

13     Go ahead.

14     THE WITNESS:  That sounds correct.

06:05 15 BY MR. VAN DALSEM:

16     Q   You were unaware of this evidence as I've

17 just presented it to you, at least in its totality,

18 before I've just walked you through it?

19     MR. HANSEN:  Object to the form.

06:05 20 BY MR. VAN DALSEM:

21     Q   Go ahead.

22     A   I was aware that there had been some

23 controversy relating to registration, and I think

24 Mr. Oman referred to it in his report.  So I was

06:05 25 aware that there had been some characterization

220

EXHIBIT  13

PAGE  258

PETER MENELL, PH.D.                           04/01/08
CONFIDENTIAL

06:05 1    issues, but I wasn't asked to address that issue.

2    And as I said, I completed a report based on a

3    charge, and this was not part of it.  I wanted to

4    look at the issue of copyright infringement de novo,

06:05 5    and, you know, the relevance of this is not

6    something that I considered.

7        Q    It's not relevant to your opinion that the

8    party whose lawyers hired you has filed documents

9    with the copyright office under oath that are

06:06 10   directly contrary to your opinion?

11           MR. HANSEN:  Object to the form.

12           THE WITNESS:  I was asked to do a task.  I

13   didn't question, you know, this historical issue.

14   It's quite possible that they made a mistake; that

06:06 15   it was not a willful mistake.  I really can't speak

16   to those issues.  I think, you know, what

17   constitutes a derivative work is somewhat a

18   complicated issue.  Did they do a full infringement

19   analysis in making this determination?  I'm not

06:06 20   sure.

21   BY MR. VAN DALSEM:

22       Q    If you could look at Exhibit 4966, look at

23   the second page, do you see this was filed by a law

24   firm on MGA's behalf?

06:07 25       A    I do.

221

EXHIBIT  13

PAGE  259

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

06:07 1          Q      And do you recognize the name of that law

2     firm?

3          A      Certainly.

4          Q      And what is the name of that law firm?

06:07 5          A      White & Case.

6          Q      Are they one of the oldest and most

7     reputable law firms in the United States?

8                MR. HANSEN:  Object to the form.

9                MR. VAN DALSEM:  You have to do that

06:07 10    because you're a Skadden lawyer.

11                MR. HANSEN:  I'm just objecting to the

12    form.

13                THE WITNESS:  You know, I --

14                MR. HANSEN:  I've never heard of them.

06:07 15    Sorry.  I'm kidding.

16                MR. VAN DALSEM:  Let's have a clean

17    record.

18                MR. HANSEN:  Ask the question again, and

19    I'll just object.  I apologize.

06:07 20    BY MR. VAN DALSEM:

21          Q      Would you agree that White & Case is one

22    of the most prominent law firms in the United

23    States?

24                MR. HANSEN:  Object to the form.

06:07 25                THE WITNESS:  They're a well-known law

222

EXHIBIT _____ 13

PAGE _____ 260

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

06:33 1    declarations that she's filed in connection with

2    MGA's copyright infringement litigation?

3        A    You know, a lot of names and a lot of

4    documents.  So, you know, I just can't -- it's not

06:33 5    someone's name who I focused on, but there were a

6    lot of, you know, former employees who were -- or

7    people in the industry, you know, area of

8    intellectual property tests, and there were a lot of

9    materials that I saw relating to custom.  So it's

06:33 10    possible that she was one of them.  I don't

11    remember.

12        Q    Does it refresh your recollection that she

13    was MGA's in-house general counsel for a period of

14    time?

06:33 15        A    No.

16        Q    Let's go back to your report.

17        A    Okay.

18        Q    If you could turn to page 15, please.

19             Are you on page 15?

06:34 20        A    Yes.

21        Q    And does this start your infringement

22    analysis?

23        A    Yes, it does.

24        Q    If you could turn to page 23.

06:35 25    Paragraph 66, it says:  "Summary of AFC analysis."

231

EXHIBIT _____ 13 _____

PAGE _____ 261 _____

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

06:35 1            Does that mean summary of

2    abstraction-filtration and comparison analysis?

3       A    That's an abbreviation I used, yes.

4       Q    And that is the method you used to attempt

06:35 5    to filter what you contend to be unprotected

6    elements from the Carter Bryant Bratz drawings?

7       A    As I indicated earlier I used the

8    formulation that I associate with Judge Learned

9    Hand, as it has been elaborated and articulated.

06:35 10       Q    The AFC test was either announced, or the

11    case which is most often cited for the proposition

12    is Altai case?

13       A    Yes.

14       Q    And that was decided by the Second

06:36 15    Circuit?

16       A    That's correct.

17       Q    The Ninth Circuit does not employ the AFC

18    test, correct?

19       A    In the Apple case, I think the court says

06:36 20    that it's functionally equivalent to what the Ninth

21    Circuit does.

22       Q    What's the name of the Ninth Circuit's

23    test?

24       A    There are a variety of names, but I think

06:36 25    "extrinsic/intrinsic" is the term you're looking

232

EXHIBIT _____ 13

PAGE _____ 262

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

06:36 1    for.

2          Q     Correct.  And you are familiar with the

3    Krofft decision?

4          A     Yes, I am.

06:36 5          Q     And with the body of Ninth Circuit law,

6    after the Krofft decision, which refines the

7    extrinsic/intrinsic test adopted by the Ninth

8    Circuit?

9          A     Are you asking am I familiar with that?

06:36 10         Q     Yes.

11         A     Yes.

12         Q     The Ninth Circuit to this day employs the

13   extrinsic/intrinsic test in deciding copyright

14   cases, right?

06:37 15         A     Well, they use that terminology.

16         Q     And the Ninth Circuit's

17   extrinsic/intrinsic test differs in some respects

18   from the Second Circuit's AFC test, correct?

19         A     Well, I think they're functionally very

06:37 20   similar.

21         Q     But they're not exactly the same, are

22   they?

23         A     No.  You know, it's a question of

24   interpretation.  My analysis here was intended to

06:37 25   apply fundamental copyright principles that I think

233

EXHIBIT ___13___

PAGE ___263___

06:37 1    apply everywhere.

2         Q    But it's not the analysis that would be

3    performed by the Ninth Circuit in reviewing this

4    case, is it?  They would employ the

06:37 5    extrinsic/intrinsic test?

6              MR. HANSEN:  Object to the form.

7              THE WITNESS:  Well, I'm saying that in --

8    done properly, I think it maps pretty closely.  I

9    think it has the same basic steps and, you know,

06:38 10   I -- I'm not -- you know, different circuits have

11   different factors, different tests under various

12   bodies of law; but the essence is what are the

13   fundamental principles, and that's -- that's where I

14   was directing my analysis.  So I didn't structure

06:38 15   it -- I didn't write it as an opinion under Ninth

16   Circuit terminology, but I think everything that I

17   wrote here would be -- would be applied in this way.

18             I talk about the virtual identity standard

19   which is the Ninth Circuit standard, and as between

06:39 20   extrinsic and intrinsic, I think the extrinsic test

21   has many of the characteristics of abstraction and

22   filtration; and the intrinsic test is an added step,

23   but I think it has many of the characteristics of

24   the comparison.  But the courts do them in somewhat

06:39 25   different orders, but I think it's -- it's largely

234

EXHIBIT ____13____

PAGE ____264____

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

06:57 1    BY MR. VAN DALSEM:

2          Q    The concept of total look and feel or

3    total concept and feel has not been adopted by the

4    Second Circuit, has it?

06:57 5              MR. HANSEN:  Object to the form.

6              THE WITNESS:  You know, I haven't done a

7    search for that term.  I know that it has been used

8    outside of the Ninth Circuit, but part of the

9    problem with it is that if you're uncritical, you go

06:57 10   too far in terms of what copyright will protect.  So

11   if you say "total," well if total includes the

12   protected elements -- I'm sorry, the unprotected

13   elements, then you're going to have a direct

14   conflict with Supreme Court precedent, with

06:58 15   Section 102B of the Copyright Act, Section 102A of

16   the Copyright Act.  I think these are term of art.

17   You'll find language, especially in the more recent

18   cases, that are making clear that those essential

19   limiting doctrines apply in the Ninth Circuit.

06:58 20   BY MR. VAN DALSEM:

21         Q    The Ninth Circuit applies the inverse

22   ratio rule, correct?

23         A    Well, I think that's a controversial

24   issue.  The inverse ratio rule is, I think, well

06:58 25   established throughout the country with regards to

247

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

06:58 1    the factual copying determination. So I definitely

2    would say that the Ninth Circuit would use it in

3    that context. When you get to the other parts of

4    the analysis, it's -- you know, there are some

06:59 5    decisions that say that you have to filter things

6    out. The fact that something is widely available

7    doesn't require -- doesn't change the fact that you

8    need substantial similarity of protected expression.

9        Q    The Second Circuit has expressly rejected

06:59 10   the inverse ratio rule, hasn't it?

11       A    Second Circuit uses the inverse ratio rule

12   in Arnstein versus Porter. And it's used on the

13   factual copying stage of the analysis.

14       Q    But it's not used in the infringement

06:59 15   analysis by the Second Circuit, correct?

16       A    Well, factual copying is part of

17   infringement analysis. It's not used in the part of

18   the test that deals with substantial similarity of

19   protected expression.

07:00 20       Q    And it is in the Ninth Circuit?

21       A    Well, I think it's at least been discussed

22   in that context, but the cases that talk about it

23   are somewhat ambiguous; and given the fact that

24   copyright protection cannot extend to unprotected

07:00 25   elements, you know, that's a limitation on how that

248

EXHIBIT _____ 13

PAGE _____ 266

PETER MENELL, PH.D.          04/01/08
CONFIDENTIAL

07:00  1    would apply.

       2            So I'm just saying that there are a lot of

       3    cases out there, and you'll see it discussed.  I

       4    think some cases have been more -- more scrupulous.

07:00  5    The BensBargains case says it doesn't apply.

       6        Q    The inverse ratio rule states that if

       7    there's a high degree of access, a lower standard of

       8    proof of substantial similarity is required; is that

       9    an accurate statement?

07:01 10            MR. HANSEN:  Object to the form.

      11            THE WITNESS:  That's how it's been

      12    characterized, but I'll say there are some cases

      13    that say that you apply it on the factual copying

      14    and not on the legal copying question.

07:01 15    BY MR. VAN DALSEM:

      16        Q    Well the inverse ratio rule applies to the

      17    extrinsic part of the Ninth Circuit's test, right?

      18        A    Well, I'm just stating that I think that

      19    there's at least some ambiguity, and that doesn't

07:01 20    seem to be the unanimous understanding of courts

      21    within the Ninth Circuit.

      22        Q    Would you agree here that MGA had a high

      23    degree of access to the Carter Bryant drawings?

      24            MR. HANSEN:  Object to the form.

07:01 25            THE WITNESS:  Well, MGA is not a person.

                                                          249

EXHIBIT _____ 13 _____

PAGE _____ 267

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

07:01 1    There are employees working at MGA who did see the

2     drawings.

3     BY MR. VAN DALSEM:

4          Q    MGA in fact submitted copies of those

07:01 5    drawings to the U.S. Copyright Office as we've gone

6     over earlier, right?

7          A    They did.

8          Q    That would suggest a very high degree of

9     access, wouldn't it?

07:02 10              MR. HANSEN:  Object to the form.

11              THE WITNESS:  Yes.  But just to be clear,

12    you might have employees working on the project who

13    don't see the work.  For example, in the computer

14    software area, there's what's called a Cleanroom

07:02 15    process.

16    BY MR. VAN DALSEM:

17         Q    The Bratz dolls were not Cleanroomed to

18    exclude any influence of the Carter Bryant drawings,

19    were they?

07:02 20              MR. HANSEN:  Object to the form.

21              THE WITNESS:  I'm just being illustrative

22    here.  It may be that the face painter didn't see

23    the drawings.  I know Margaret Leahy did see some

24    drawings or at least talked to Carter, but I think

07:02 25    the project took on a life of its own and the design

250

EXHIBIT _____13_____

PAGE _____268_____

PETER MENELL, PH.D.                                04/01/08
CONFIDENTIAL

07:03  1    evolved away from the drawings.  That's my

       2    understanding of the facts.

       3    BY MR. VAN DALSEM:

       4        Q    In your infringement analysis, how did you

07:03  5    factor in a lower standard of proof, if at all, in

       6    examining substantial similarity?

       7        A    Well, I applied the principles that are

       8    described in the report.  And I didn't vary the

       9    standard of substantial similarity with regards to

07:03 10    unprotected elements.  And you can see the report

      11    that I have, I filtered out unprotected elements;

      12    and with regards to compilations, I used the Ninth

      13    Circuit tests of virtual identity.  I think I'm

      14    following the law there.

07:04 15        Q    The phrase "inverse ratio" does not appear

      16    in your report, does it?

      17             MR. HANSEN:  Object to the form.

      18             THE WITNESS:  If you go to slide B3,

      19    what's represented by that curved line in this

07:05 20    two-dimensional grid is what I would characterize as

      21    the inverse ratio rule.

      22    BY MR. VAN DALSEM:

      23        Q    Okay.  Did you alter the standard of proof

      24    that you used in performing your analysis based upon

07:05 25    MGA's high level of access?

                                                            251

EXHIBIT _____ 13

PAGE _____ 269

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

07:05   1                MR. HANSEN:  Object to the form.

2                THE WITNESS:  Given that I found the

3   elements were only thinly protected, I applied the

4   stricter standard relating to compilations of

07:06   5   significantly unprotectable works, which I think is

6   the proper way to approach this matter.

7   BY MR. VAN DALSEM:

8       Q    Professor Nimmer -- is David a professor?

9   He's a professor, isn't he?

07:06 10      A    He is a professor.

11      Q    Professor Nimmer, in his treatise, opines

12   that the inverse ratio rule is simply wrong; is that

13   your understanding?

14                MR. HANSEN:  Object to the form.

07:06 15            THE WITNESS:  I think that's correct.

16   BY MR. VAN DALSEM:

17      Q    And you agree with Professor Nimmer's

18   treatise on that subject?

19      A    Well, he says that it's wrong in the

07:06 20   context of the substantial similarities

21   determination.  He agrees with it in the context of

22   factual copying.

23      Q    To the extent he has opined that the

24   inverse ratio rule is wrong with respect to the

07:06 25   substantial similarity analysis, you agree with his

252

EXHIBIT ____13____

PAGE ____270____

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

07:07 1   opinion?

2        A      Well, I think it's important that

3   unprotectable features not be protected.  And so if

4   a high degree of access were to lower the thresholds

07:07 5   in a way that enabled unprotected things to be

6   protected, I would think the criticism is fair.  I'm

7   not aware that that's how it is done in the Ninth

8   Circuit.  I'd be surprised if the Ninth Circuit were

9   to say that we are overriding Section 102B of the

07:07 10   Copyright Act.

11        Q      If you were on the Ninth Circuit, it would

12   be your view that the inverse ratio rule should

13   simply be abolished; is that correct?

14             MR. HANSEN:  Object to the form.

07:07 15             Objection to form.

16             THE WITNESS:  I think the inverse ratio

17   rule makes sense on the issue of factual copying.  I

18   think it's confusing in the area of substantial

19   similarity.  But, you know, there are cases like

07:08 20   this BensBargains case which I think are indicative

21   of what is an appropriate use of the test.

22   BY MR. VAN DALSEM:

23        Q      In deciding to employ the AFC similarity

24   test that you used, did you give any consideration

07:08 25   to the fact that the work that Mattel alleges was

253

EXHIBIT _____13_____

PAGE _____271_____

PETER MENELL, PH.D.                          04/01/08
CONFIDENTIAL

07:23  1   instruction?

2              MR. HANSEN:  Been there.  I already told

3   you.

4              MR. VAN DALSEM:  Is there a privilege

07:23  5   you're asserting?

6              MR. HANSEN:  No.

7              MR. VAN DALSEM:  So you're instructing the

8   witness not to answer a question not on the basis of

9   privilege?

07:24 10              MR. HANSEN:  That's correct.

11              MR. VAN DALSEM:  Here it is.

12              Let's mark as 4977 a photograph of the My

13   Scene doll.

14                      (Defendant's Exhibit 4977 marked

07:24 15                       for identification)

16   BY MR. VAN DALSEM:

17       Q    If you could take a look at that and

18   simply confirm for me that that appears to be a

19   photograph of the doll that we can attach to the

07:24 20   deposition so we know what you were looking at.

21       A    I think it's the same.  The head position

22   is a little different so it might not be exact, but

23   maybe it's the same one.

24       Q    Have you reviewed the survey done by

07:24 25   Mr. Hollander in this case?

264

EXHIBIT _____ 13

PAGE _____ 272