PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

| | | |
|---|---|---|
| 07:24 | 1 | A What's the name? |
| | 2 | Q Hollander. |
| | 3 | A I don't know of any survey done by |
| | 4 | Mr. Hollander. |
| 07:24 | 5 | Q MGA's counsel hasn't told you that Mattel |
| | 6 | commissioned a survey of young girls to take a look |
| | 7 | at the Bryant drawings and to give their thoughts as |
| | 8 | to whether they thought they were Bratz? |
| | 9 | MR. HANSEN: Object to the form. |
| 07:25 | 10 | THE WITNESS: I'm not aware of any survey. |
| | 11 | BY MR. VAN DALSEM: |
| | 12 | Q The law provides that with respect to an |
| | 13 | infringement analysis, the relevant inquiry is the |
| | 14 | intended audience of the allegedly infringing |
| 07:25 | 15 | article; is that correct? |
| | 16 | MR. HANSEN: Object to the form. |
| | 17 | What law? |
| | 18 | THE WITNESS: In the trademark area, |
| | 19 | that's -- I mean, I think a lay audience is what |
| 07:25 | 20 | some cases refer to. I don't know it's necessarily |
| | 21 | "the intended audience." So maybe you can tell me |
| | 22 | what -- I know "lay audience" is used in some cases. |
| | 23 | I know of one case where the Ninth Circuit uses a |
| | 24 | "target audience" reference, the Data East case. |
| 07:26 | 25 | But I don't -- I think that it's just a lay audience |

265.

EXHIBIT ___13___

PAGE ___273___

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

07:26 1    is usually the way it's phrased.

2    BY MR. VAN DALSEM:

3        Q    And you're not aware of any authority

4    anywhere in the country that says in performing an

07:26 5    infringement analysis it makes a difference if the

6    intended audience of the article consists of

7    children?

8            MR. HANSEN:  Object to the form.

9            THE WITNESS:  Oh, I think there are some

07:26 10    cases that talk about -- in the fashion doll area,

11    that talk about that.  But I don't know that the way

12    the doll is viewed is you impanel a jury of

13    children.  And I don't know of any case in which

14    that's happened.

07:26 15    BY MR. VAN DALSEM:

16        Q    And I'm not suggesting that's the case.

17        A    Okay.

18        Q    Your analysis -- to the extent your

19    analysis was subjective, you brought to your

07:26 20    analysis a Harvard degree, a Stanford degree, an MIT

21    degree and being, you know, a man in his 40s; you

22    brought all of that to your analysis, correct?

23            MR. HANSEN:  Object to the form.

24            THE WITNESS:  Those are -- those are

07:27 25    aspects of my background, so yeah, I was -- you

266

EXHIBIT _____13_____

PAGE _____274_____

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

07:27  1   know, but my goal was not to decide whether this was

2   substantially similar or virtually identical in

3   protected expression, from my standpoint.  I was

4   trying to provide an illustrative analysis and, you

07:27  5   know, as I indicated in my declaration, you know, I

6   think those are factual questions.  I mean, I wasn't

7   saying, you know, this is -- this is the answer.

8   I'm saying this is, I think, a sensible, careful,

9   cautious analysis of the issues.

07:28 10   BY MR. VAN DALSEM:

11        Q     But you nevertheless reached a conclusion

12   of noninfringement?

13        A     I felt that that was -- that was

14   appropriate.

07:28 15        Q     And is that conclusion under the intrinsic

16   test or the extrinsic test?

17        A     It was illustrative of copyright

18   principles that I think are relevant to both the

19   extrinsic and intrinsic tests.  And as I indicated

07:28 20   in my declaration, you know, I think the intrinsic

21   test goes to the jury, so I'm not claiming that this

22   resolves the case.  I don't think -- although I'm

23   not fully aware, I don't think MGA brought a summary

24   judgment motion, saying that they prevail on

07:28 25   copyright infringement analysis.

267

EXHIBIT ___13___

PAGE ___275___

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

07:28  1            So, you know, I think it was to provide,
       2   you know, some big-picture thinking, some
       3   illustration of what are the elements, knowing that
       4   there would be many other people contributing to
07:29  5   that process and there would be people along the way
       6   who would need to kind of evaluate this case.  I
       7   didn't intend this to be the basis for summary
       8   adjudication.  I didn't understand that to be the
       9   goal.
07:29 10       Q    I'm going to talk about the inventions
      11   agreement for a bit.  Part of your report interprets
      12   the inventions agreement; is that correct?
      13       A    Yes, it does.
      14       Q    You've never advised California employers
07:29 15   regarding workplace procedures; is that correct?
      16            MR. HANSEN:  Object to the form.
      17            THE WITNESS:  What do you mean by
      18   "workplace procedures"?
      19   BY MR. VAN DALSEM:
07:29 20       Q    Employment procedures.
      21       A    Are you asking whether I've given advice
      22   about invention agreements or agreements relating to
      23   people who work in creative enterprises?
      24       Q    No.  I'm asking whether or not you've
07:30 25   advised California employers with respect to issues

                                                         268

EXHIBIT ___13___

PAGE ___276___

07:33 1    to those issues?

2         A    Oh, yes.

3         Q    Which ones?

4         A    The introduction -- the Intellectual

07:33 5    Property in the New Technological Age case book has

6    treatment of those issues in many of the chapters.

7    In the trade secret chapter, there's a whole section

8    on employee agreements, employment agreements.  And

9    then in the patent chapter, I think we deal with --

07:33 10    with what's called the shop right.  We have a

11    section dealing with Section 2870 of the California

12    employment code.  In the copyright chapter, we've

13    got a variety of materials relating to work made for

14    hire, relating to idea submissions.  Those are the

07:34 15    principal ones I can think of off the top of my

16    head.

17         Oh, in my materials for this book on

18    intellectual property in the entertainment industry,

19    we have several case files that deal with those

07:34 20    issues.  There's a movie set of case files that I

21    talked about, the Enron case files; and then I've

22    got information on -- information on termination of

23    transfers.

24         In fact, I've written some articles with

07:35 25    David Nimmer on termination of transfers, and we

271

EXHIBIT    13

PAGE    277

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

07:35  1    have a large article in the pipeline in which I go

       2    through the history of the music industry and how

       3    employment agreements have been used.

       4         The industry used to use an employment

07:35  5    agreement model and then it shifted more to an

       6    independent contractor model. It's a very salient

       7    issue, as you're probably aware, in the recording

       8    industry today.

       9         Q    In terms of your report, interpreting the

07:35 10    inventions agreement, you're familiar with the

      11    proposition that interpreting legal contracts is the

      12    province of the court?

      13         A    Yes.

      14         Q    And so why would it be proper for you as

07:36 15    an expert to presume to tell the judge in this case

      16    how to interpret a written contract?

      17         MR. HANSEN:  Object to the form.

      18         THE WITNESS:  I was asked to do an

      19    analysis; and, frankly, it wasn't obvious to me, it

07:36 20    wasn't disclosed to me, how this would be used.

      21    That was, you know, something that is really, you

      22    know, up to the lawyers. But I conducted the

      23    analysis and wrote it up.

      24    BY MR. VAN DALSEM:

07:36 25         Q    You did it very much in a manner that a

                                                             272

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

07:36 1    judge might do if he was writing up an opinion

2    interpreting a contractual clause?

3              MR. HANSEN:  Object to the form.

4              THE WITNESS:  There are aspects of it

07:36 5    there.  But, you know, I tried to, where I could,

6    you know, where I thought it was helpful, to draw

7    upon some terms of art that I'm familiar with.  I

8    pulled together some information about Mattel's

9    patent portfolio.

07:37 10             You know, I tried to encapsulate a wide

11   range of issues, and I deal -- a lot of my career, a

12   lot of my work in this area, as you've brought out

13   earlier, is in technology-oriented enterprises; and

14   there's a lot of work that I do in the context of

07:37 15   content and entertainment-oriented enterprises.  And

16   so, you know, I have a somewhat diverse range of

17   experiences.  And looking at these agreements seem

18   to be a good opportunity to see what was really

19   going on for a company like Mattel, which, frankly,

07:38 20   is in both of those areas.  They have a big toy

21   company and they have a fashion doll division, and

22   those things are under one roof.

23   BY MR. VAN DALSEM:

24        Q    You don't teach contracts law at Boalt, do

07:38 25   you?

273

EXHIBIT          13

PAGE          279

07:38 1        A     I don't teach the basic contract law

2     class.

3        Q     You're familiar with the proposition of

4     California law that unless a contractual provision

07:38 5     is deemed or determined to be ambiguous, that the

6     court is to interpret that contractual provision

7     based on the four corners of the document?

8        A     California law -- and I'm very familiar

9     with California contract law and I deal with it in

07:38 10     many aspects of my work and I do teach about

11     contracts in my classes.  It's just that I don't

12     teach the first-year contract class.

13        But California law has, I think, one of

14     the more flexible parol evidence rules.  And so, you

07:39 15     know, my reading of the law is that, you know,

16     California is at the more liberal end of looking

17     outside of the four corners.

18        Q     To contrast it to, say, New York law,

19     California law will consider extrinsic evidence in

07:39 20     determining whether an ambiguity exists; is that

21     your understanding?

22        A     Well, I did my best to capture what I

23     thought to be the best statement of California law.

24     And so I'm going to -- I'm going to just say it's in

07:39 25     here how I interpreted that.  But I think you can

274

EXHIBIT _____13_____

PAGE _____280_____

PETER MENELL, PH.D.                         04/01/08
CONFIDENTIAL

07:59 1    BY MR. VAN DALSEM:

2          Q     And do you believe it's outside of clause

3    1A because Carter Bryant, as you understand it, was

4    not in a flanker brand division, designing dolls?

07:59 5              MR. HANSEN:  Object to the form.

6              THE WITNESS:  I said it as four different

7    things, and you picked one of them.  So I'm going to

8    stick with what I have in Paragraph 76.

9    BY MR. VAN DALSEM:

08:00 10         Q     Well, let me see if I can wrap up the

11   trade secret section of this.

12             MR. HANSEN:  I don't want to cut you off;

13   but, you know, we're over seven hours.  Are you

14   almost done?

08:00 15            MR. VAN DALSEM:  For the record, we

16   started at noon.  We've taken very short breaks.

17   We've managed to get seven clock hours in in eight

18   hours, which might be a record of minimal breaks in

19   a deposition.  So I need a few more minutes to try

08:00 20   to finish up my exam.  Either that or we come back

21   tomorrow morning.  I know everybody's tired.  I'm

22   tired.  I need a few more minutes to finish up the

23   exam.

24             MR. HANSEN:  I'll give you a little

08:00 25   leeway.  I didn't walk out the door.  I'm just

288

EXHIBIT _____ 13

PAGE _____ 281

PETER MENELL, PH.D.  04/01/08
CONFIDENTIAL

08:00 1    saying the argument has been over the seven hours in
2    the Federal Rules, and we're over that. So --
3           MR. VAN DALSEM: I understand.
4           MR. HANSEN: -- if you can wrap up, I'd
08:00 5    appreciate it.
6           MR. VAN DALSEM: I appreciate your
7    indulgence.
8           MR. HANSEN: We have gone without breaks
9    too.
08:00 10          MR. VAN DALSEM: I'm sure you have.
11          MR. HANSEN: Go ahead. I'm not stopping
12    you.
13    BY MR. VAN DALSEM:
14          Q    You agree with me that it is ultimately
08:01 15    for the court to decide what the trade secret
16    provision of the invention agreement means?
17          A    I think that's fair.
18          Q    Okay. Let's talk about the Paragraph 2 of
19    the inventions agreement.
08:01 20          And does your opinion -- does it start on
21    Paragraph 78 of your report?
22          A    Yes, it does.
23          Q    And would you agree with me, as well, that
24    interpreting Section 2 of the inventions agreement
08:01 25    is ultimately a task for the court?

289

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT _____ 13
PAGE _____ 282

PETER MENELL, PH.D.
CONFIDENTIAL

04/01/08

08:01 1    A    Yes.

2    Q    How many times is the word "copyright"

3   used in Section 2 of the inventions agreement?

4    A    I think three times.  I'm looking at

08:02 5   Sections 2A and B.

6    Q    It's in D, as well.

7    A    Okay.  Sorry, I was focusing on the

8   language in my somewhat larger typeface text.

9         So yes.  So that's -- so is that four

08:02 10  times?

11    Q    Yes.

12         Do you have an opinion as to whether

13  Carter Bryant's Bratz drawings, assuming they were

14  created when Mattel contends they were created, fall

08:03 15  within the assignment provision of Section 2 of the

16  inventions agreement?

17         MR. HANSEN:  Object to the form.

18         THE WITNESS:  I think I concluded that it

19  didn't.

08:03 20  BY MR. VAN DALSEM:

21    Q    And tell me the basis of that opinion.

22    A    Well, it's a rather detailed analysis, but

23  it begins with the interpretation of the specific

24  assignment clause.  It says:  "I hereby assign to

08:03 25  the company" --

290

EXHIBIT  13

PAGE  283

PETER MENELL, PH.D.                    04/01/08
CONFIDENTIAL

08:03  1      Q    I'm sorry, where are you reading from,

2   just so I can follow along?

3      A    2A. And then skipping over some phrases

4   that are not pertinent, "all my right, title and

08:04  5   interest in such inventions." And "inventions" are

6   previously referenced in the first sentence. And it

7   says that he "will communicate to the company as

8   promptly and fully as practicable all inventions, as

9   defined below, conceived or reduced to practice by

08:04 10   me at any time during my employment by the company."

11       And then Paragraph 2B says: "The term

12   'inventions' includes but is not limited to all

13   discoveries, improvements, processes, developments,

14   designs, know-how, data, computer programs and

08:05 15   formula, whether patentable or unpatentable."

16      Q    Let's spend a minute and talk about 2B,

17   which is the definition of "inventions."

18       Do you see the clause there: "Includes,

19   but is not limited to"?

08:05 20      A    I do.

21      Q    Okay. And as a reader of English, do you

22   understand that, therefore, the list of things that

23   follows is a nonexclusive and nonexhaustive list?

24       MR. HANSEN: Object to the form.

08:05 25       THE WITNESS: I would agree with that.

291

EXHIBIT ___13___

PAGE ___284___

1          I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11         Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [ X ] was [ ] was not requested.

15         I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: _____APR 0 3 2008_____

22

23  _____

24  DARCY J. BROKAW
    CSR No. 12584

25

EXHIBIT _____13_____

PAGE _____285_____

**EXHIBIT 14**

CERTIFIED COPY

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,  )
                               )
            PLAINTIFF,         )
                               )
    V.                         )        NO.  CV 04-9040 SGL (RNBX)
                               )
MATTEL, INC., A DELAWARE       )
CORPORATION,                   )
                               )
            DEFENDANTS.        )
———————————————————————————————)
                               )
AND CONSOLIDATED ACTION (S).   )
———————————————————————————————)

# C O N F I D E N T I A L

**(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)**

## DEPOSITION OF REBECCA HARRIS

## VOLUME II

## JANUARY 22, 2008



REPORTED BY:
RENEE PACHECO
CSR NO.  11564
JOB NO. 08AE070-RP

COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT _____14_____

PAGE _____286_____

1   KONG. THERE WAS PRESENTATIONS MADE TO WAL-MART,

2   WHICH ACTUALLY JULIE CHOMO DID NOT ATTEND.

3   WAL-MART, TOYS "R" US, KMART, I BELIEVE WALGREENS.

4   DID I SAY TARGET? OH, I'M SORRY, TARGET DID NOT

5   ATTEND HONG KONG.                                        02:12:05

6       Q.   OTHER THAN HONG KONG TOY FAIR, DID PAULA

7   GARCIA ATTEND ANY OTHER BRATZ PRESENTATIONS PRIOR

8   TO JUNE 30TH OF 2001?

9       A.   SHE ATTENDED NEW YORK TOY FAIR.

10      Q.   ANY OTHERS?                                     02:12:35

11      A.   AND I DO KNOW SHE -- THAT SHE DID GO TO

12  SOME -- SOME OF THE INDIVIDUAL MEETINGS. AND WHICH

13  ONES, THOUGH -- I DON'T RECALL WHICH ONES, BUT I --

14  I DO KNOW SHE SAID SHE ATTENDED SOME OF THE

15  MEETINGS WHERE THEY LITERALLY JUST GO TO THEIR        02:12:55

16  OFFICE AND PRESENT.

17      Q.   DID PAULA GARCIA ATTEND ANY OF THE

18  RETAILER PRESENTATIONS THAT MGA MADE IN NOVEMBER OF

19  2000, IN CONNECTION WITH BRATZ?

20      A.   IN NOVEMBER 2000. I DON'T KNOW.              02:13:11

21      Q.   DID ISAAC LARIAN ANY ATTEND ANY OF THE

22  RETAILER PRESENTATIONS, IN CONNECTION WITH BRATZ IN

23  NOVEMBER OF 2000?

24      A.   AGAIN, IN NOVEMBER, I DO NOT KNOW.

25      Q.   WHO ATTENDED THE PRESENTATIONS THAT WERE     02:13:36

365

EXHIBIT ___14___

PAGE ___287___

```
 1   MADE TO RETAILERS, IN CONNECTION WITH BRATZ IN
 2   NOVEMBER OF 2000?
 3        A.    I KNOW THAT PAUL WARNER ATTENDED,
 4   JENNIFER MORRIS, MIKE LINGG.
 5        Q.    ANYONE ELSE?                              02:14:15
 6        A.    NOT OFF THE TOP OF MY HEAD.
 7        Q.    DID JULIE CHOMO ATTEND ANY OF THOSE, IN
 8   NOVEMBER OF 2000?
 9        A.    I DON'T KNOW.  JULIE WAS -- SHE WORKED
10   FOR THE COMPANY, SHE LEFT THE COMPANY, AND THEN SHE  02:14:31
11   CAME BACK.  AND I -- I BELIEVE SHE CAME BACK,
12   THOUGH, IN -- NOT IN NOVEMBER.  I BELIEVE SHE CAME
13   BACK IN DECEMBER OF 2000.
14        Q.    WHAT WERE THE -- WELL, STRIKE THAT.
15             WHICH RETAILERS DID MGA MAKE             02:14:55
16   PRESENTATIONS TO, IN CONNECTION WITH BRATZ IN
17   NOVEMBER OF 2000?
18        A.    TO WAL-MART, TO KMART, WALGREENS, AND I
19   BELIEVE TOYS "R" US.
20        Q.    ANY OTHERS?                              02:15:33
21        A.    TARGET?  DID I HAVE TARGET ON THERE?
22        Q.    NOT SO FAR.  YOU'VE LISTED WAL-MART,
23   KMART, WALGREENS AND -- AND POSSIBLY TOYS "R" US.
24        A.    AND TARGET.  TOYS "R" US, I'M NOT SURE IF
25   THAT WAS DONE IN ACTUALLY NOVEMBER OR IF THAT WAS    02:15:54
```

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0070

EXHIBIT _____ 14

PAGE _____ 288

```
 1    IN DECEMBER.

 2        Q.    SO LET ME TRY IT THIS WAY, THEN:  YOU ARE

 3    SURE THAT MGA MADE PRESENTATIONS TO RETAILERS, IN

 4    CONNECTION WITH BRATZ, SPECIFICALLY TO WAL-MART,

 5    KMART, WALGREENS, AND TARGET, IN NOVEMBER OF 2000?     02:16:15

 6        A.    YES.

 7        Q.    AND YOU MENTIONED THAT, TO THE BEST OF --

 8    OF YOUR INFORMATION SO FAR, TOYS "R" US WAS A

 9    PRESENTATION THAT WAS MADE IN DECEMBER?

10        A.    IT WAS EITHER -- I -- I BELIEVE IT WAS     02:16:27

11    EITHER NOVEMBER OR DECEMBER.  I -- I WANT TO SAY,

12    THOUGH, IT WAS IN DECEMBER.

13        Q.    WAS THAT THE ONE THAT WAS RESCHEDULED?

14        A.    I -- I DON'T KNOW IF IT WAS RESCHEDULED.

15        Q.    WELL, SETTING ASIDE, THEN, THE     02:16:47

16    POSSIBILITY OF -- OF TOYS "R" US IN DECEMBER, WHICH

17    RETAILERS DID MGA MAKE PRESENTATIONS TO, IN

18    CONNECTION WITH BRATZ IN DECEMBER OF 2000?

19        A.    ACTUALLY, I -- THE ONLY ONE I THINK I

20    KNOW, IF -- IF IT WAS DECEMBER, WAS TOYS "R" US.     02:17:05

21    YOU KNOW, BECAUSE IN DECEMBER THEY'RE GETTING READY

22    TO GO TO HONG KONG TOY FAIR, WHICH IS -- YOU KNOW,

23    THEY ALL FLY ON JANUARY 1ST.

24        Q.    FOCUSING THEN ON THE NOVEMBER OF 2000

25    TIME PERIOD -- WELL, LET ME TRY IT THIS WAY:  WAS     02:17:26
```

367

EXHIBIT _____ 14

PAGE _____ 289

1    NOVEMBER 2000 THE FIRST MONTH THAT MGA MADE ANY

2    PRESENTATIONS TO RETAILERS INSOFAR AS IT CONCERNED

3    BRATZ?

4         A.    TO MY KNOWLEDGE, YES.

5         Q.    AND WHICH WAS THE FIRST RETAILER THAT MGA        02:17:40

6    DID THAT WITH?

7         A.    I DON'T KNOW WHICH ONE OF THEM WAS FIRST.

8         Q.    YOU PROBABLY SAW IN THE DOCUMENTATION AND

9    PEOPLE'S PLANNERS AND THE LIKE THAT THERE WERE

10   REFERENCES TO A RETAILER PRESENTATION -- AND MAYBE       02:18:02

11   IT'S MORE THAN ONE, BUT AT LEAST ONE, AS OF

12   NOVEMBER 7TH, 2000.

13        DO YOU RECALL SEEING REFERENCES TO THAT

14   IN THE DOCUMENTS?

15        A.    I KNOW IT WAS EARLY NOVEMBER.  SO DO I --     02:18:12

16   YOU KNOW, AM I GOING TO SAY YES, I REMEMBER

17   NOVEMBER 7TH?  NO, I DON'T.  I -- I DO RECALL IT

18   WAS EARLY NOVEMBER.

19        Q.    WHAT I CAN DO IS I -- I CAN SHOW YOU

20   SOME -- SOME DOCUMENTS.                                  02:18:28

21        A.    THAT WOULD BE HELPFUL.

22        Q.    SHARPEN IT UP A LITTLE BIT.

23        A.    BECAUSE THEN I CAN ANSWER YOU.

24        Q.    BELIEVE IT OR NOT, I'M NOT TRYING TO

25   TRICK YOU.  I JUST WANT TO TRY TO MOVE IT ALONG --       02:18:42

                                                    368

EXHIBIT _____ 14

PAGE _____ 290

1     A.    I KNOW.

2     Q.    -- BECAUSE I --

3     MR. PLEVAN:  YOU DON'T NEED TO COMMENT.

4     THE DEPONENT:  I'M SORRY.

5  BY MR. ZELLER:                                    02:18:47

6     Q.    OKAY.  LET ME SHOW YOU --

7     MR. PLEVAN:  ANSWER QUESTIONS.

8  BY MR. ZELLER:

9     Q.    -- WHAT WAS PREVIOUSLY MARKED AS

10 EXHIBIT 536.                                      02:18:51

11        YOUR ATTORNEY IS JUST NO FUN.

12    A.    I KNOW.

13    Q.    AND THERE ARE A COUPLE PORTIONS OF THIS

14 I'D LIKE TO DIRECT YOUR ATTENTION TO SPECIFICALLY.

15 WE'LL -- WE'LL COME BACK TO THE NOVEMBER 7TH       02:19:25

16 QUESTIONS HERE IN A SECOND.

17        BUT FIRST LET ME ASK YOU SOME QUESTIONS.

18 LAST TIME AROUND YOU DIDN'T HAVE CERTAIN

19 INFORMATION ABOUT SOME OF THESE ENTRIES, BUT LET

20 ME -- LET ME CHECK AGAIN.                          02:19:39

21        DIRECTING YOUR ATTENTION TO THE FIRST

22 PAGE OF EXHIBIT 536, DO YOU KNOW WHOSE CALENDAR

23 PAGE THIS IS FROM?

24    A.    I DO NOT.

25    Q.    YOU DON'T RECOGNIZE ANY OF THE            02:19:48

369

EXHIBIT ____14____

PAGE ____291____

1    HANDWRITING?

2         A.    I DON'T.

3         Q.    IT'S NOT YOURS?

4         A.    IT IS NOT MINE.

5         Q.    YOU WILL SEE ON THE FIRST PAGE OF                02:19:52

6    EXHIBIT 536 THERE'S A REFERENCE, NOVEMBER 7TH, IT

7    SAYS:

8               "SELL SHT PROOF TO PAUL."

9               DO YOU SEE THAT?

10        A.    I DO.                                             02:20:03

11        Q.    DO YOU HAVE AN UNDERSTANDING AS TO WHAT

12   THAT REFERS TO?

13        A.    I DO.

14        Q.    AND WHAT IS THAT?

15        A.    THAT IS -- OUR SELL SHEETS ARE LIKE              02:20:08

16   PRODUCT INFORMATION.  AND IT'S A -- USUALLY A PHOTO

17   OF THE PRODUCT, AND THEN IT GIVES ALL THE SELLING

18   FEATURES.

19        Q.    IS THERE SOMEONE NAMED PAUL WHO YOU'RE

20   FAMILIAR WITH?                                              02:20:31

21        A.    YES.

22        Q.    AND WHO'S THAT?

23        A.    THAT WOULD BE PAUL WARNER.

24        Q.    BY NOVEMBER 7TH, HAD THERE BEEN SELL

25   SHEET PROOFS FOR BRATZ?                                     02:20:46

EXHIBIT _____ 14

PAGE _____ 292