AUG-13-2004 15:12 FROM:LITTLER  NELSON      310 553 5583          TO  3 624 0643       P.60/61

**DRAFT**

1   <u>RESPONSE TO REQUEST NO. 45:</u>

2        In addition to the general objections stated above, Mattel objects to this Request

3   on the grounds that it calls for the disclosure of information subject to the attorney-

4   client privilege, the attorney work-product doctrine and other applicable privileges.

5   Mattel further objects to this Request on the grounds that it is overbroad, unduly

6   burdensome and vague and ambiguous in that it seeks all documents and all undefined

7   "forms" that any of its many employees signed, or has even been requested by Mattel

8   to sign, including for time periods during which defendant was not employed by

9   Mattel and including with respect to matters that are not at issue in this case. Mattel

10  further objects to this Request on the grounds that it seeks information that is not

11  relevant to this action, nor likely to lead to admissible evidence.

12  <u>DEFENDANT'S POSITION</u>

13       Bryant has offered to accept form exemplars actually distributed to prospective

14  or actual employees of Mattel during the relevant time period. This obviates any

15  objection that each personnel file would have to be searched to comply with the

16  request. No exemplars were produced.

17       The request seeks documents that are relevant to Mattel's pattern and practice of

18  pre and post-employment forms and/or agreements with its prospective or current

19  employees which is at issue in this suit and goes to the heart of Mattel's claims and

20  Bryant's defenses. Accordingly, Mattel is not excused from responding based on its

21  asserted objections.

22       Plaintiff has also objected on the grounds that the request is unreasonably

23  burdensome, yet utterly fails to provide any factual basis or show why the request

24  amounts to an unreasonable burden such that it would be excused from responding

25  under Federal Rule 26(b)(2)(iii). The burden or expense associated with producing

26  this narrowly-defined scope of documents does not outweigh its likely benefit taking

27  into account the needs of the case, the amount in controversy, the parties' resources,

28  the importance of the issues at stake in the litigation, and the importance of the

LITTLER MENDELSON

EXHIBIT 25 PAGE 189

AUG-13-2004 15:12 FROM:LITTLER   NDELSON   310 553 5583   T  10 524 2643   P.61/61

1   proposed discovery in resolving the issues.  To the contrary, any burden or expense

2   associated with the production of these documents is minimal, particularly given

3   Mattel's financial resources and the key importance of these documents to issues in

4   the litigation.

5

6   Dated: August      , 2004                          **DRAFT**

7                                          _____
                                           KEITH A. JACOBY
8                                          LITTLER MENDELSON
                                           A Professional Corporation
9                                          Attorneys for Defendant
                                           CARTER BRYANT
10  Dated: August     , 2004                          **DRAFT**

11                                         _____
                                           MICHAEL T. ZELLER
12                                         QUINN EMANUEL URQUHART
                                           OLIVER & HEDGES, LLP
13                                         Attorneys for Plaintiff
                                           MATTEL, INC.
14

15

16      Los_Angeles:369580.15 028307.1010

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
2048 Century Park East
5th floor
Los Angeles, CA 90067-3107
310 553 0308

EXHIBIT 25 PAGE 190

**EXHIBIT 26**

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

<table>
<tr><td>

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**PALM SPRINGS**
45-025 Manitou Drive, Suite 8
Indian Wells, CA 92210
(760) 345-4757
Facsimile: (760) 345-2414

</td><td>

**LOS ANGELES**
865 So. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**NEW YORK**
335 Madison Avenue, 17th Floor
New York, NY 10017-4611
(212) 702-8100
Facsimile: (212) 702-8200

</td><td>

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

</td></tr>
</table>

## LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:**  August 15, 2004

**NUMBER OF PAGES, INCLUDING COVER:**

**TO/COMPANY:**

| NAME | PHONE NO. | FAX NO. |
|------|-----------|---------|
| Robert Millman | 310-553-0308 | 310-553-5583 |

**FROM:**  Michael T. Zeller

**RE:**  Mattel v. Bryant

**MESSAGE:**

Correct version of previously sent letter.



FAXED
AUG 15 2004

| CLIENT #:  **7209** | ROUTE/RETURN TO:  **Maria Albert** | ☐ CONFIRM FAX<br>☐ INCLUDE CONF. REPORT |
|---|---|---|
| OPERATOR: | | CONFIRMED?  ☐ No  ☐ YES: |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3178 AS SOON AS POSSIBLE.**

EXHIBIT 26 PAGE 191

Confirmation Report — Memory Send

```
                              Page        : 001
                              Date & Time : Aug-15-04  05:34pm
                              Line 1      : 2136240643
                              Line 2      :
                              Machine ID  : QUINN EMANUEL
```

| | | |
|---|---|---|
| Job number | : | 428 |
| Date | : | Aug-15 05:32pm |
| To | : | ☎9414#07209#13105535583 |
| Number of pages | : | 007 |
| Start time | : | Aug-15 05:32pm |
| End time | : | Aug-15 05:34pm |
| Pages sent | : | 007 |
| Status | : | OK |

Job number    : 428        *** SEND SUCCESSFUL ***

## QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA  92121
(858) 812-3107
Facsimile: (858) 812-3336

**PALM SPRINGS**
45-025 Manitou Drive, Suite 5
Indian Wells, CA  92210
(760) 345-4757
Facsimile: (760) 345-2414

**LOS ANGELES**
865 So. Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000
Facsimile: (213) 443-3100

**NEW YORK**
335 Madison Avenue, 17th Floor
New York, NY  10017-4611
(212) 702-8100
Facsimile: (212) 702-8200

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA  94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA  94065
(650) 801-5000
Facsimile: (650) 801-5100

### LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:**  August 15, 2004

**NUMBER OF PAGES, INCLUDING COVER:**

**TO/COMPANY:**

| NAME | PHONE NO. | FAX NO. |
|---|---|---|
| Robert Millman | 310-553-0308 | 310-553-5583 |

**FROM:**  Michael T. Zeller

**RE:**  Mattel v. Bryant

**MESSAGE:**

Correct version of previously sent letter.

| | | | |
|---|---|---|---|
| **CLIENT #:**  7209 | **ROUTE/**<br>**RETURN TO:**  Maria Albert | | ☐ **CONFIRM FAX**<br>☐ **INCLUDE CONF. REPORT** |
| **OPERATOR:**  _astie_ | **CONFIRMED?**  ☐ **No**  ☐ **YES:** | | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service.  Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3175 AS SOON AS POSSIBLE.

EXHIBIT 26  PAGE 192

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

August 15, 2004

**BY FACSIMILE**

Robert Millman, Esq.
Littler Mendelson
2049 Century Park East, 5th Floor
Los Angeles, California 90067

Mattel v. Bryant

Dear Mr. Millman:

I am writing in response to your letter of Friday afternoon to John Quinn announcing defendant's last-minute refusal to appear for deposition and further to my discussion late Friday afternoon with Keith Jacoby on that subject.

Both Keith Jacoby and Douglas Wickham of your firm personally gave their word as attorneys and as officers of the Court that Mr. Bryant would appear for deposition in St. Louis on August 17, 2004. They made these representations, orally and in writing, so as to avoid Mattel's filing of an earlier motion to compel Mr. Bryant's deposition. When we asked that defendant agree to a Stipulation confirming that he would appear, defendant's counsel claimed that the request was "insulting" because their "word as attorneys" was "good enough" to ensure his appearance at deposition. Indeed, those promises where made in the aftermath of Judge Manella's rejection of defendant's request for a discovery stay, including of defendant's deposition.

Regrettably, we now know what defendant's counsel's representations as attorneys are worth. It is also regrettable that, in deciding to go back on their word that Mr. Bryant would appear for deposition, defendants' counsel made no effort to work out the alleged issues regarding Mr. Bryant's deposition raised in your letter. Instead, defendant's counsel simply faxed--without warning and on the Friday afternoon before the deposition--an announcement that purported to unconditionally cancel that deposition. Defendant is even taking the extreme position, as stated

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

EXHIBIT 22 PAGE 193

Mr. Jacoby stated over the phone, that Mr. Bryant will not comply with any deposition notice unless ordered by the Court to do so. This is further confirmed by the fact that your letter gives no indication that defendant will appear for deposition at any time, let alone by a date certain.

As I discussed in detail with Mr. Jacoby on Friday, your letter's latest set of excuses for defendant's refusal to appear for deposition almost four months into this case are erroneous. At the outset, much of defendant's argument is premised upon mischaracterizations of Mattel's suit. As the Complaint alleges, Mattel has sued defendant for breach of contract, breach of the duty of loyalty and related state claims because he secretly worked for and assisted a Mattel competitor (MGA Entertainment) while he was employed by Mattel and was being paid by Mattel for his exclusive design services.

Nowhere do you cite any aspect of the Complaint or Mattel's other pleadings which allege, as you claim, that "the 'Bratz' concept was stolen." As defendant's counsel has been repeatedly informed, Mattel does not have information sufficient to make a determination as to whether that is what defendant did. To the contrary, that information concerning the origins of Bratz and what defendant used in designing it is uniquely in the possession of defendant and MGA, but neither has produced it, as discussed further below. All you cite for your argument about Mattel's supposed position is a *Wall Street Journal* article from last year. A newspaper article written by an independent journalist is neither a Mattel pleading nor a document by Mattel. Indeed, no Mattel representative is quoted in the article on the subject of defendant. As your letter concedes, the quote you rely upon is from some anonymous individual.

Likewise, your letter's reliance on the supposed deficiencies in Mattel's production is legally and factually untenable and does not excuse defendant's refusal to live up to his counsel's promises that he would appear for deposition at the agreed upon time and place. It is without legal merit because the <u>Federal Rules</u> expressly reject it. As <u>Rule</u> 26(d) states on its face, "the fact that a party is conducting discovery, whether by deposition or otherwise, does not operate to delay any other party's discovery." <u>Accord</u> Schwarzer, Tashima, and Wagstaffe, <u>California Practice Guide: Federal Civil Procedure Before Trial</u>, ¶ 11:1390 ("The fact one party is conducting discovery (by deposition or otherwise) does not operate to delay another party's right to discovery."). Your letter cites no legal authority supporting defendant's position otherwise.

Your letter's assertions about Mattel's production are also without factual merit. While the letter elsewhere sweepingly claims that phone records are "useless," you complain that phone records from October 2000 are missing. Mattel has extensively and repeatedly searched for its October 2000 phone record tapes reflecting calls from defendant's Mattel extension and has not located those records. Had Mr. Bryant's counsel asked us about this before breaching their promises and arrogating to themselves the right to refuse to comply with a valid deposition notice, defendant would have learned this.

2

Similarly, your letter asserts that Mattel supposedly has "indicated that electronic searches have not even been attempted to date." That claim, which you base on statements that I allegedly made at a meeting that you did not attend, is incorrect. Both before and after bringing this suit, Mattel undertook extensive, repeated searches of its computer systems and of numerous hard drives and tapes. In fact, Mattel's production includes printouts of computer data, which you must have seen if you personally reviewed the documents as you claim. Mr. Jacoby and I did not discuss, and he never asked, at the meeting on August 9 about the extent of Mattel's search for such information. Had Mr. Jacoby raised the subject on Monday, or had defendant's counsel inquired about it before unilaterally refusing to produce defendant for deposition, defendant would have learned this too.

Similarly, I did not say at the August 9 meeting that the search for defendant's time records relating to projects he worked on at Mattel "ha[s] just begun." I only stated at the meeting-- which was held *before* the parties had exchanged their documents--that such a search was not yet completed. The locations where such time records are kept have been searched, and records pertaining to defendant were not found. Defendants' counsel also could have learned this by simply asking, but instead jumped to unfounded conclusions so as to justify cancelling the deposition. Defendant's decision to do so is particularly suspect because it may well be that defendant did not submit time records when he worked for Mattel. Whether defendant did so is a fact that defendant himself knows. When I asked Mr. Jacoby on August 9 whether defendant even submitted time records when he was at Mattel, Mr. Jacoby stated that he did not know, that he would check with defendant and that he would let us know. I have heard nothing from defendant on this score.

Moreover, there is no basis for defendant's unsupported assumption that these types of time records for defendant--if defendant ever created them--could support his flat refusal to be deposed. While we have produced as requested by defendant non-privileged documents relating to the many projects that Mr. Bryant worked on during his Mattel employment, these matters are not directly at issue in this case as far as we know. Even more to the point, defendant was the one who worked on these projects, so he obviously is already in possession of the facts concerning them, and the suggestion that he cannot be deposed on this ground is unfounded.

Nor did Mr. Jacoby and I discuss, and he never asked, at the meeting on August 9 about Mattel's extensive email searches. What we did discuss at the meeting was the gross overbreadth of the one request for emails that defendant raised at the conference. That was Request No. 17, which seeks "[a]ll electronic mail messages to or from any MATTEL employee that relate or refer to Bryant, from 1998 to the present."

I explained to Mr. Jacoby the numerous problems with this request. At one point, Mr. Jacoby stated that what he wanted were emails to or from defendant relating to Bratz when he was employed by Mattel and suggested that Mattel could locate those emails by just searching its

3

EXHIBIT _26_ PAGE _195_

email servers. I informed Mr. Jacoby that Mattel's email servers do not have emails going back to the 1995 through 2000 time period when defendant was employed by Mattel. Rather, Mattel's email servers retain emails for 90 days and, if the individual user deletes an email, even less. Backups are kept for 28 days. I also stated that, to be sure, there are current emails about defendant on Mattel's servers, but they are privileged communications relating to this suit. Mr. Jacoby specifically conceded that he was not asking for those. As things were left at Monday's meeting, Mr. Jacoby stated that he would send me a letter proposing a way to narrow this one email request that defendant was still relying on (as well as to narrow the other overbroad requests that were discussed on Monday), but he never did so.

Mattel has in fact extensively searched for non-privileged emails of the type requested by Mr. Jacoby, but has not located any. In Friday's conversation, when I informed Mr. Jacoby of this, Mr. Jacoby insisted that Mattel "must" have emails between defendant and others about Bratz because defendant told him that he has exchanged such emails. This is news to us, since Mattel has not located any such emails in its searches. Defendant, however, has never produced these emails that Mr. Jacoby stated exist--or, for that matter, any other email. Accordingly, it is defendant who is deliberately withholding documents, not Mattel.

Your letter also complains that the "Toon Teens" drawings were not produced. Although you claim that they were responsive to defendant's document requests, your letter does not cite any request where defendant sought "Toon Teens" documents. Nor could you, because defendant's requests do not ask for them. Indeed, even though they were not (and are not) responsive to any of defendant's requests, I repeatedly offered to produce "Toon Teens" materials to Keith Jacoby at our meeting on August 9 when he asked questions about the *Wall Street Journal* article. He did not accept my offer, so they were not produced. It was only on Friday evening, when I reminded Mr. Jacoby that I had previously offered these documents and that he had not accepted my offer, that defendant stated for the first time that defendant would like these documents. We will send these over by messenger on Monday morning, which eliminates this excuse by defendant for refusing to be deposed (and indeed is a matter that defendant could have eliminated last Monday).

Your letter also asserts that Mattel has supposedly "abused" the Protective Order and ostensibly impaired defendant's ability to prepare for deposition. That also could have been cleared up with a discussion if defendant's counsel was interested in keeping their word that defendant would appear for deposition. As I informed Mr. Jacoby, under the Protective Order a designated document may be shown to a person who created, received or had previously seen that document, so long as the person otherwise abides by the Protective Order. This includes defendant because, as your letter concedes, he created many of the documents produced. I also told Mr. Jacoby that, in any event, Mattel has no objection to defendant's counsel sharing Mattel's production with defendant, provided that he does not share the designated information with others. Moreover, to

4

EXHIBIT 26   PAGE 196

the extent that you purport to disagree with designations in the production,[1] the Protective Order provides a mechanism for addressing such issues. It does not include the unilateral refusal to appear for deposition as an option. Although Mr. Jacoby stated on Friday that he would get back to me as to whether these points resolved the issue as to defendant's deposition, I have not heard from him.

Finally, your letter contains irrelevant, and incorrect, proclamations about the supposed completeness and good faith of defendant's and MGA's productions. Of course, defendant's and MGA's productions have nothing to do with defendant's refusal to appear for deposition as promised. Additionally, to see the complete inadequacy of defendant's production, one need look no further than the fact that *Mattel* produced *defendant's contract with MGA*, but *defendant himself failed* to produce it. Indeed, there is not one page of documents concerning defendant's contracts with MGA in defendant's production, such as those pertaining to their negotiation or the prior drafts and comments exchanged between defendant and MGA. To cite another example of documents that are clearly being withheld, MGA has not produced a single drawing.

Nor, as pointed out above, has defendant produced any emails, even though defendant's counsel stated on Friday that such emails to and from defendant exist and that they therefore must be in defendant's possession. While your letter touts the emails that MGA produced, the earliest email that MGA produced is dated September 27, 2000. No earlier communications have been produced. This is despite the fact that the September 27, 2000 email shows, on its face, that Bratz was already underway at MGA and that defendant therefore was already working for MGA by that time. This also despite MGA's statement to the *Wall Street Journal*, reflected in the very article that you centrally rely upon, that Bratz first came to its attention in 1999. Yet, no emails from 1999 or any other time prior to late September 2000 have been produced. Also absent from defendant's and MGA's production are any documents relating to when defendant began his relationship with MGA or started working for MGA.

These and other glaring deficiencies in defendant's and MGA's productions will be the subject of a separate letter, but suffice it to say for now that your letter's reliance on the alleged completeness and good faith of defendant's and MGA's production as a basis for defendant's refusal to appear for deposition is misplaced.

---

[1] The very Mattel designations that your letter complains about are also true of defendant's production, and MGA has taken the position all along that internal product design drawings are highly sensitive information. Moreover, while you cite the designation of materials from magazines, it was entirety of internal Mattel *product design files* that they were contained in that were designated, as allowed by the Protective Order that defendant agreed to. If defendant is now taking the position that internal product design and development files cannot be designated under the Protective Order, defendant is contradicting himself. Defendant specifically requested that language covering such materials be included in the Protective Order.

5

EXHIBIT 26 PAGE 197

Mr. Bryant's counsel still have the opportunity to honor their repeated promises--made as officers of the Court--that he will be produced for deposition in St. Louis on August 17. To that end, please have someone from your office contact me to discuss resolving any remaining issues defendant believes need to be addressed in advance of the scheduled deposition.

Otherwise, as I informed Mr. Jacoby on Friday, defendant is forcing Mattel to bring to an <u>ex parte</u> application to compel Mr. Bryant's deposition, and I am confirming Mattel's notice that it will be filing such an application if defendant continues to fail to cooperate in this matter. Because Mr. Jacoby declined to agree during my conversation that defendant would reimburse Mattel for the expenses it already had incurred in connection with the deposition as of the time that defendant unilaterally cancelled it, and based upon the lack of substantial justification for defendant's actions, Mattel will be seeking sanctions as well if it is forced to seek Court intervention.

I look forward to hearing from you.


Very truly yours,

Michael T. Zeller

6

EXHIBIT 26 PAGE 198

BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdoffice.com

**EXHIBIT 27**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

August 15, 2004

**BY FACSIMILE**
Keith A. Jacoby, Esq.
Littler Mendelson
2049 Century Park East, 5th Floor
Los Angeles, California 90067

Mattel v. Bryant

Dear Keith:

I am writing in connection with the 58-page Joint Stipulation that your office faxed to us on late Friday afternoon, August 13, 2004.

Local Rule 37-2.1 states: "When a party states its contentions with respect to a particular issue, such party shall also state how it proposed to resolve the dispute over that issue at the conference of counsel." Defendant's portions of the Joint Stipulation do not state how defendant proposed to resolve the issues at our meeting and thus do not comply with this requirement.

This is not an immaterial omission in the situation presented here, because such a statement would reflect that many of the requests asserted in the draft Joint Stipulation are not the proper subject of a motion to compel at this juncture. As you know, at the meet and confer on August 9, 2004, defendant proposed resolving issues relating to several of defendant's document requests by offering to narrow them and by agreeing to send me a letter with defendant's exact language to do so. I never received the promised letter.

The Joint Stipulation also fails to include the required statement by defendant because much of the Joint Stipulation covers matters that were not discussed at the meet and confer. While the defendant's portions of the Joint Stipulation make a variety of assertions about what Mattel supposedly has and has not done with respect to production, we did not discuss at the August 9 meeting Mattel's extensive efforts to locate responsive documents or what documents it has been unable to locate. Likewise, most of the requests that are the subject of the draft Joint Stipulation

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3107

EXHIBIT 27  PAGE 199

were requests that defendant did not raise at the meet and confer and that the parties did not address. These include, to cite a few examples, Request Nos. 4, 6, 7, 9, 10, 11, 13, 14, 15, 16, 21, 22, 23, 25, 30 and 32.

If you would like to discuss these requests, or Mattel's extensive document searches, I will be available in the coming week to do so. Not only is that required by the Local Rules, but fairness to the Court dictates that defendant present only those issues that have been discussed and that the parties have explored ways of trying to resolve. It also goes without saying that I believe you should provide me with the letter proposal narrowing the requests that you promised to provide.[1]

Defendant's draft Joint Stipulation fails to comply with the Local Rules in other respects as well. Although Rule 37-2.1 requires the "specification of the issues in dispute," the defendant's Joint Stipulation contains one "issue" that encompasses disparate requests and issues and indeed that runs for some 50 pages. That is neither consistent with the Rules nor does it make for a comprehensible document. In further violation of Rule 37-2.1, defendant's introductory statement exceeds 3 pages.

Finally, your cover letter for the Joint Stipulation asserts that defendant "reserves the right to make revisions to the stipulation" and claims that you "will forward" such revisions to me at some unspecified time. While minor, non-substantive revisions are customary and acceptable, we do not agree that you are entitled to create a moving target document.

Please confirm that defendant's portions of the Joint Stipulation are what defendant actually intends to submit to the Court. Please also let me know how you would like to proceed on the other matters addressed above.

I look forward to hearing from you.

Very truly yours,

Michael T. Zeller

---

[1] Contrary to what you told me on the phone on Friday, the Joint Stipulation includes requests that defendant agreed to provide proposals on and that therefore were, at the end of the meeting, to be the subject of further discussion between the parties. Request No. 17 is an example of one such request and, in fact, was the request that the parties spent the most time discussing at the meet and confer. You stated that you were considering narrowing it such that it would seek emails to or from defendant that refer or relate to Bratz, but would have to think about it and would send me your written proposal. As you know, however, defendant has not done so.

2

EXHIBIT 27  PAGE 200

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**LOS ANGELES**
865 So. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**PALM SPRINGS**
45-025 Manitou Drive, Suite 8
Indian Wells, CA 92210
(760) 345-4757
Facsimile: (760) 345-2414

**NEW YORK**
335 Madison Avenue, 17th Floor
New York, NY 10017-4611
(212) 702-8100
Facsimile: (212) 702-8200

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:**   August 15, 2004

**NUMBER OF PAGES, INCLUDING COVER:**

**TO/COMPANY:**

| NAME | PHONE NO. | FAX NO. |
|---|---|---|
| Keith Jacoby | 310-553-0308 | 310-553-5583 |

**FROM:**   Michael T. Zeller

**RE:**   Mattel v. Bryant

**MESSAGE:**



FAXED AUG 15 2004

| CLIENT #:  **7209** | ROUTE/ RETURN TO:  **Maria Albert** | ☐ CONFIRM FAX ☐ INCLUDE CONF. REPORT |
|---|---|---|
| OPERATOR: | CONFIRMED?  ☐ No  ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3178 AS SOON AS POSSIBLE.

EXHIBIT 21 PAGE 201

## Send Confirmation Report

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | ID: 12136240643 | | | 15 Aug '04   6:40PM Page   1 | |

Line 1: quinn,emanuel   ID: 12136240643
Line 2: JetFax M920e   ID: 13102014746

| Job | Start time | Usage | Phone Number/Email | Type | Pages | Mode | Status |
|---|---|---|---|---|---|---|---|
| 885 | 8/15  6:39PM | 0'57" | 9776#7209#13105535583# | Send............. | 3/ 3 | EC144 | Completed.................... |

Total:   0'57"      Pages sent: 3      Pages printed: 0

### QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

SAN DIEGO                 LOS ANGELES               SAN FRANCISCO
                          800 So. Figueroa Street, 10th Floor
                          Los Angeles, CA 90017
                          (213) 443-3000
                          Facsimile: (213) 443-3100

PALM SPRINGS              NEW YORK                  SILICON VALLEY
                          335 Madison Avenue, 17th Floor
                          New York, NY 10017-4611
                          (212) 702-8100
                          Facsimile: (212) 702-8200

**LOS ANGELES OFFICE**

### FACSIMILE TRANSMISSION

DATE: August 15, 2004

NUMBER OF PAGES, INCLUDING COVER:

| TO/COMPANY: | NAME | PHONE NO. | FAX NO. |
|---|---|---|---|
| Keith Jacoby | | 310-553-0308 | 310-553-5583 |

FROM: Michael T. Zeller

RE: Mattel v. Bryant

MESSAGE:

ROUTE
CLIENT #: 7209    RETURN TO: Maria Albert   ☐ CONFIRM FAX
                                             ☐ INCLUDE CONF. REPORT
OPERATOR:
CONFIRMED? ☐ No ☐ YES:

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3170 AS SOON AS POSSIBLE.

EXHIBIT 21   PAGE 202

**EXHIBIT 28**

1   ROBERT F. MILLMAN, Bar No. CA 062152
    DOUGLAS A. WICKHAM, Bar No. CA 127268
2   LITTLER MENDELSON
    A Professional Corporation
3   2049 Century Park East, 5th Floor
    Los Angeles, CA  90067.3107
4   Telephone:  310.553.0308
    Facsimile:  310.553.5583
5
    Attorneys for Defendant
6   CARTER BRYANT

7

8               UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10  MATTEL, INC., a Delaware          Case No.  CV04-3431 NM (RNBx)
    Corporation,
11                                    ASSIGNED FOR ALL PURPOSES TO
                  Plaintiff,          JUDGE HON. NORA M. MANELLA
12
                                      **SECOND DECLARATION OF
13     v.                             CARTER BRYANT IN SUPPORT OF
                                      OPPOSITION TO PLAINTIFF'S
14  CARTER BRYANT, an individual; and MOTION TO REMAND AND FOR
    DOES 1 through 10, inclusive,     COSTS**
15
                  Defendant.          Date:  August 23, 2004
16                                    Time:  10:00 A.M.
                                      Dept:  11
17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067.3107
310.553.0308

BRYANT DECLARATION II

EXHIBIT 21   PAGE 103

I, Carter Bryant, declare as follows:

1. I am the defendant in the above-entitled action. All of the information contained herein is based upon my personal and first hand knowledge and if called and sworn as a witness. I could and would competently testify thereto.

2. At the time of the removal, I was a citizen of the county of Springfield-Greene, Missouri. My citizenship has not changed.

3. I am a party to an agreement with MGA Entertainment, Inc.("MGA"), referenced in Plaintiff Mattel, Inc.'s motion for remand. In the first twenty months of the Agreement alone -- i.e., by the end of May 2002, I had received over one million dollars. My revenues to date are in the millions of dollars and I continue to provide services under the Agreement and earn money pursuant to its terms. In this lawsuit, Mattel seeks to obtain all the money I have earned or will ever earn as a result of my work on Bratz™. Mattel is seeking to deprive me of my livelihood.

4. October 20, 2000, was my final day of employment with Mattel. I gave notice of my resignation prior to that time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of July in New York, New York.

CARTER BRYANT

Los_Angeles:365704.4 028307.1010

BRYANT DECLARATION II                              2.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

EXHIBIT 2\_ PAGE 204

## PROOF OF SERVICE BY MAIL

I am employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 2049 Century Park East, 5th Floor, Los Angeles, California 90067.3107. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. On July 2, 2004, I placed with this firm at the above address for deposit with the United States Postal Service a true and correct copy of the within document(s):

**SECOND DECLARATION OF CARTER BRYANT IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION TO REMAND AND FOR COSTS**

in a sealed envelope, postage fully paid, addressed as follows:

Michael T. Zeller
Quinn Emauel Urquhart Oliver
& Hedges LLP
865 S. Figueroa Street
10th Floor
Los Angeles, CA 90017

Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 2, 2004, at Los Angeles, California.

Julie Contreras

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

EXHIBIT _21_ PAGE. _305_

**EXHIBIT 29**

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _____

Employee Name (print)  CARTER H. BRYANT

Date  01/04/99

MATTEL, INC.
By _____
Signature

Name of Witness (print)  TERESA NEWCOMB

EXHIBIT 24 PAGE 206

www.onlinelegalsupply.com
(800) 860-2787  △ Recycled Paper

**EXHIBIT 30**

**MGA ENTERTAINMENT**
**16730 Schoenborn Street**
**North Hills, California 91343**

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

1.    **Retention as Consultant/Services:** MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

2.    **Term/Exclusivity:** The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3.    **Ownership:**

(a)    All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

EXHIBIT 30 PAGE 201

patents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute.  Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents.  If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)      Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine.  Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.      <u>Compensation/Costs</u>:                          REDACTED

(a)      For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of ,                    dollars ($            per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of '            dollars ($        ; per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.



(b)      MGA shall pay to Bryant a royalty of .            percent ( %) of the Net Sales Receipts from
the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services.  As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances).  MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

2

EXHIBIT 30 PAGE 268


and binding on Bryant, shall constitute an account stated, and shall not be subject to any question for any reason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to MGA within two (2) years after the date rendered.  No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA  in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection.  Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)    All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent.  In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations.  Reimbursement shall be at the actual cost of such item without any mark-up.

(d)    Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis.  Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable).  MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)    MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales.  MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell.  Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant.  Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.    <u>Warranties and Indemnity</u>:  Bryant represents, warrants and agrees that:

(a)    he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)    neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)    the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

3

EXHIBIT _30_ PAGE _209_

patents, copyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property
rights;

(d)    he shall comply with all applicable laws and regulations in force during the Term of this
Agreement with respect to the services to be rendered hereunder; and

(e)    he shall indemnify and hold MGA harmless from and against any and all claims, losses,
costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising
from any breach by him of any of the warranties, representations and agreements made by him
hereunder.

6.    **Default/Termination:**

(a)    In the event either Party fails to perform any of its material obligations hereunder, or
breaches any representation, warranty or agreement contained herein, the other Party may terminate
this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have
remedied such failure within such thirty (30) day period.

(b)    Upon the termination of this Agreement Bryant shall turn over to MGA all materials
relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of
their destruction.

7.    **Confidentiality:**

(a)    Bryant shall keep in confidence and not disclose to any third party, without the written
permission of MGA, the Confidential Information made known to him under this Agreement.  As used
herein, the term "Confidential Information" means information relating to MGA's products (whether
current or projected), product titles, customers, employees, tools and techniques, designs, drawings,
schematics and other documentation relating thereto and other confidential and proprietary business
information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or
which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are
treated by MGA as confidential.  This requirement of confidentiality shall not apply to any information
that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant
from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's
possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by
order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure,
MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or
requirement of disclosure or seek appropriate protective order).

(b)    Bryant agrees and acknowledges that all Confidential Information disclosed to him shall
be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as
granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential
Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant
further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant
any right to develop, manufacture, produce and/or distribute any product(s) derived from or which
otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist
others to do so.  Bryant may not make, sell, license or distribute copies of the Confidential Information
disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this
Agreement or any of Bryant's rights or obligations under this Agreement.

(c)    Bryant acknowledges that his failure to perform any of the terms or conditions of this
Agreement shall result in immediate and irreparable damage to MGA.  Bryant also acknowledges that
there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{00006662.DOC/2 / 10/04/2000  03:05 PM}

4

EXHIBIT _30__ PAGE _210_

entitled to equitable relief in the nature of injunction and to all other available relief, at law and/or in
equity.

8.      **Notices:**  All notices, statements and/or payments to be given to the parties hereunder shall be
addressed to the parties at the addresses set forth on the first page hereof or at such other address as
the parties shall designate in writing from time to time.  All notices shall be in writing and shall either be
served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard
copy), all charges prepaid.  Except as otherwise provided herein, such notices shall be deemed given
when personally delivered, all charges prepaid, or on the date five (5) days following the date of
mailing, except that notices of change of address shall be effective only after the actual receipt thereof.
Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park
East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all
notices to Bryant shall be sent to Carter Bryant 1319 West 160th Street, Gardena, California 90247.

9.      **Independent Contractor/No Partnership/Third Party Beneficiary:** Bryant's relationship with
MGA is that of an independent contractor.  Bryant does not have, and will not represent that he has,
any power, right or authority to bind MGA, or to assume or create any obligation or responsibility,
express or implied, on behalf of MGA in MGA's name.  Nothing stated in the Agreement shall be
construed as constituting a partnership or as creating the relationships of employer/employee or
principal/agent between the parties.  In all matters relating to the Agreement, Bryant shall not act as
MGA's employee within the meaning or application of any federal or state unemployment insurance
laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason
of an employment relationship.  Bryant will be solely responsible for all taxes, including without
limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties
hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise.  This
Agreement shall not be construed to be for the benefit of any third party.

10.     **Services Rendered Deemed Special, etc.:**   Bryant acknowledges that the services to be
rendered by him hereunder are of a special, unique, extraordinary and intellectual character which
gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law
and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to
MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.     **General Provisions:**

        (a)     This Agreement may not be assigned by either Party hereto either voluntarily or by
operation of law.  Any such assignment shall not relieve such Party of its obligations hereunder.

        (b)     The titles of the paragraphs of this Agreement are for convenience only and shall not in
any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

        (c)     A waiver by either Party of the terms or conditions of this Agreement in any instance
shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any
subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained
herein shall be cumulative and none of them shall be in limitation of any other remedy, right,
undertaking, obligation or agreement of either Party.

        (d)     Neither Party hereto shall be liable to the other for any incidental, consequential, special
or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of
this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or
strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or
damage.

{00006662.DOC/2 / 10/04/2000  03:05 PM)

EXHIBIT 30 PAGE 211

(e)   This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction of the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)   This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained. No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)   Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____
CARTER BRYANT

REDACTED

_____
Social Security Number

{00006662.DOC/2 / 10/04/2000  03:05 PM}

6

EXHIBIT 30   PAGE 212

**EXHIBIT  31**

7/18/03 WSJ A1
7/18/03 Wall St. J: A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 2

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Friday, July 18, 2003

Dolled Up: To Lure Older Girls, Mattel Brings In
Hip-Hop Crowd
----
It Sees Stalwart Barbie Lose Market Share, So
'Flavas' Will Take on the 'Bratz'
----
Battle of the Big Heads
By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8-

to 12- year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT 3/   PAGE 213

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 3

that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories, she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet -- they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and

former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name for himself by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT _31_ PAGE _214_

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 4

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips, as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights -- meaning separate molds -- and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self-expression," she says.

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT 31 PAGE 215

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
**(Publication page references are not available for this document.)**

Page 5

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11 body piercings and her mud wrestling-themed MTV video called "Dirrty."It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."

---- INDEX REFERENCES ----

COMPANY:          KB Holdings LLC (KBTY); Mattel Inc (MATL)

NEWS SUBJECT:       (Marketing (C31); Market Share (C313); Corporate/Industrial News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice - Consumer Products (REQRCP); Editor's Choice - Industry Trends/Analysis (REQR))

INDUSTRY:         (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

REGION:          (North American Countries (NAMZ); United States (USA); United States - California (USCA); Northeast U.S. (USE); United States - Massachusetts (USMA); Western U.S. (USW))

OTHER INDEXING:     Marketing; Market Share; Page-One Story; Content Types; Corporate/Industrial News; United States - California; United States - Massachusetts; United States; Northeast U.S.; Western U.S.; North American Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores; Consumer Products;

Media; Consumer Cyclical; Newswire More Code; Newswire End Code; All Entertainment & Leisure; Limited Product Specialty Retailers; Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index; S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

Word Count: 2217

7/18/03 WSJ A1

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT 3/    PAGE 2/ 10

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the aforesaid County, State of California; I am over the age of eighteen years and not a party to the within entitled action; my business address is: **865 S. Figueroa Street, 10th Floor, Los Angeles, California  90017.**

On **August/7**, 2004, I served the foregoing document(s) described as:
**DECLARATION OF MICHAEL T. ZELLER IN SUPPORT OF MATTEL, INC.'S EX PARTE APPLICATION TO COMPEL DEPOSITION OF DEFENDANT CARTER BRYANT** on interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

Robert Millman
Douglas A. Wickham
Keith A. Jacoby
**LITTLER MENDELSON**
2049 Century Park East
5th Floor
Los Angeles, CA 90067
(310) 553-0308
Fax (310) 553-5583

_____ **BY MAIL**

_____ I placed such envelope in the mail at Los Angeles, California.  The envelope was mailed with postage thereon full prepaid

_____ As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. Postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

**_X_ BY FACSIMILE**
I transmitted from a facsimile transmission machine whose telephone number is (213) 624-0643 the following documents described above to whose facsimile transmission machine telephone number is **(310)553-5583**. The above-described transmission was reported as complete without error by a transmission report issued by the facsimile transmission machine upon which the said transmission was made immediately following the transmission.

**_X_ BY FEDERAL EXPRESS**
I placed such envelope for deposit with Federal Express to be delivered via priority overnight.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **August** _17_ 2004, at Los Angeles, California.

_____
Johanna C. Lopez