1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue
3  Los Angeles, CA 90071-3144
   Tel.: (213) 687-5000/Fax: (213) 687-5600
4
   RAOUL D. KENNEDY (Bar No. 40892)
5  (rkennedy@skadden.com)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  4 Embarcadero Center, 38th Floor
   San Francisco, CA 94111-5974
7  Tel.: (415) 984-6400 / Fax: (415) 984-2698

8  Attorneys for MGA Entertainment, Inc.

9

10                  UNITED STATED DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

12  CARTER BRYANT, an individual,        ) CASE NO. CV 04-9049 SGL (RNBx)
                                         ) Consolidated with Case No. 04-9059
13                    Plaintiff,         ) and Case No. 05-2727
                                         )
14         v.                            ) **DISCOVERY MATTER**
                                         ) [PUBLIC REDACTED]
15  MATTEL, INC., a Delaware             ) DECLARATION OF ROBERT J.
    corporation,                         ) HERRINGTON IN SUPPORT OF
16                                       ) MGA'S MOTION TO COMPEL
                      Defendant.         ) MATTEL TO PRODUCE EMAIL
17                                       ) AND OTHER ELECTRONIC
                                         ) DOCUMENTS
18                                       )
                                         ) [To be heard by Discovery Master
19                                       ) Hon. Edward Infante (Ret.) Pursuant
                                         ) to Court Order of December 6, 2006]
20  AND CONSOLIDATED ACTIONS            )
                                         ) Hearing Date: TBD
21                                       ) Time: TBD

22

23

24

25

26

27

28

I, Robert J. Herrington, declare and state as follows:

I am an attorney with Skadden, Arps, Slate, Meagher & Flom, LLP, counsel of record for MGA Entertainment, Inc. ("MGA").

1.      Attached as **Exhibit 1** hereto is a true and correct copy of the Affidavit of Michael Moore, dated September 10, 2007.

2.      Attached as **Exhibit 2** hereto is a true and correct copy of Mattel's Supplemental Responses to MGA's First Set of Interrogatories, dated December 7, 2007.

3.      Attached as **Exhibit 3** hereto is a true and correct copy of Mattel's Consolidated (1) Initial Disclosures Relating to MGA's Unfair Competition Claims and (2) Second Supplemental Initial Disclosures Relating to Mattel's Claims Against Bryant and MGA, dated January 5, 2007.

4.      Attached as **Exhibit 4** hereto is a true and correct copy of the Court's Order Granting in Part Carter Bryant and MGA's Motion to Compel the Production of Documents and 30(b)(6) Depositions, dated January 30, 2007.

5.      Attached as **Exhibit 5** hereto is a true and correct copy of the Court's Order Granting in Part and Denying in Part MGA's Motion to Compel Documents Responsive to First Set of Requests for Production of Documents, dated May 22, 2007.

6.      Attached as **Exhibit 6** hereto is a true and correct copy of the Declarations of Erin Bric and Sergio Hernandez in Support of Opposition of Mattel to MGA's Motion to Compel, dated April 25, 2007.

7.      Attached as **Exhibit 7** hereto is a true and correct copy of the Court's Order Granting in Part and Denying in Part MGA's Motion to Compel Mattel to Supplement Responses and Produce Documents Responsive to First Set of Requests

for Production of Documents and Things; Denying Request for Sanctions, dated September 12, 2007.

8.      Attached as **Exhibit 8** hereto is a true and correct copy of the Court's Order Denying Mattel's Motion for Reconsideration of a Portion of the May 22, 2007 Order Granting in Part and Denying in Part MGA's Motion to Compel Production of Documents; Granting in Part Mattel's Request for an Extension of Time, dated July 19, 2007.

9.      During a meet-and-confer session on December 14, 2007, counsel for Mattel, Timothy Alger, stated that few of Mattel's email backup tapes have been searched for responsive documents because of cost concerns.

10.     Attached as **Exhibit 9** hereto is a true and correct copy of a Letter from Robert J. Herrington to Jon D. Corey, Esq., dated December 17, 2007.

11.     Attached as **Exhibit 10** hereto is a true and correct copy of meet-and-confer email correspondence between Robert Herrington and Christopher Tayback, Esq., dated December 26-27, 2007.

12.     During a meet-and-confer conference on December 26, 2007, when MGA's counsel pointed out that the Court already had overruled Mattel's objection to the production of email based on cost concerns, Mattel's position changed and counsel began asserting that Mattel had conducted a "reasonable search of electronic files where Mattel believed it would find responsive documents."

13.     I am informed that MGA has incurred costs of more than $4.3 million, not including the cost of attorney time, in harvesting and creating a searchable database of multiple terabytes of electronically stored information.

14.     Attached as **Exhibit 11** hereto is a true and correct copy of Mattel's Motion to Compel Production of Metadata, dated November 21, 2007.

Declaration of Robert J. Herrington in Support of MGA's Motion To Compel Production of Email and other Electronic Documents

-3-

15.     Attached as **Exhibit 12** hereto is a true and correct copy of Mattel's Subpoena to Farhad Larian, dated September 4, 2007.

16.     Many of the emails produced by Mattel show hand-written annotations or print headers, indicating they were produced from hard copies.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 16, 2008, at Los Angeles, California.

By: _____
Robert J. Herrington

Declaration of Robert J. Herrington in Support of MGA's Motion To Compel
Production of Email and other Electronic Documents
-4-

487794-Los Angeles Server 1A - MSW

# Exhibit 1

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Exhibit 2

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9

10               UNITED STATES DISTRICT COURT

11               CENTRAL DISTRICT OF CALIFORNIA

12                      EASTERN DIVISION

13  CARTER BRYANT, an individual,      | CASE NO. CV 04-09049 SGL (RNBx)

14          Plaintiff,                 | Consolidated with Case Nos. CV 04-9059 and CV 05-2727

15      vs.                            | Hon. Stephen G. Larson

16  MATTEL, INC., a Delaware           | SUPPLEMENTAL RESPONSES TO
    corporation,                       | MGA'S FIRST SET OF
17                                     | INTERROGATORIES TO MATTEL,
          Defendant.                   | INC.
18

19  AND CONSOLIDATED ACTIONS.

20

21

22  PROPOUNDING PARTY:    MGA ENTERTAINMENT, INC.

23  RESPONDING PARTY:     MATTEL, INC.

24  SET NO.:              ONE (1)

25

26          **ATTORNEY'S EYES ONLY --**

27       **SUBJECT TO PROTECTIVE ORDER**

28            Exhibit _2_, P. _40_

07209/2267105.11

─────────────────────────────────────────────
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

## Preliminary Statement

Mattel has not yet completed its investigation of the facts relating to this action, has not yet reviewed all documents relating to this action, has not yet interviewed all witnesses in this action, and has yet to receive requested discovery from defendants Carter Bryant and from defendant MGA Entertainment, Inc. ("MGA") with regard to this action.  Consequently, Mattel reserves the right to amend and/or supplement its responses if and when additional facts or documents are discovered.  Additionally, because Mattel's responses are based on facts and documents that Mattel has identified to date, they do not preclude Mattel from later relying on facts or documents discovered or generated pursuant to subsequent investigation or discovery.  Mattel's partial response to any of MGA's First Set of Interrogatories (the "Interrogatories") is not to be construed as a waiver of any of its objections or its right to object to any other Interrogatory or discovery request.

## General Objections

Mattel generally objects to each of the Interrogatories on each and every one of the following grounds, which are incorporated into and made a part of Mattel's response to each and every individual Interrogatory:

1.     Mattel objects to the Interrogatories on the grounds that they seek to impose obligations upon Mattel beyond those imposed by the Federal Rules of Civil Procedure.

2.     Mattel objects to the Interrogatories on the grounds that they call for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege, including the privilege against disclosure of the identities and work product of consulting experts.  Such information and documents will not be produced.

3.     Mattel objects to the Interrogatories on the grounds that they seek the disclosure of information or documents that are in the possession, custody and control of independent parties over whom Mattel has no control, including

Exhibit __2__, P. __41__

1   without limitation to defendants Carter Bryant and MGA Entertainment Inc.

2   ("MGA"), and seek the disclosure of information or documents that are in the

3   possession, custody and control of defendants or are publicly available and hence

4   equally available to all parties to this litigation.

5          4.    Mattel objects to the Interrogatories on the grounds that they

6   seek information that is neither relevant to the claims or defenses of any party to the

7   pending action nor reasonably calculated to lead to the discovery of admissible

8   evidence.

9          5.    Mattel objects to the Interrogatories on the grounds that they are

10   unduly burdensome and oppressive.

11          6.    Mattel objects to the Interrogatories on the grounds that they

12   seek the disclosure of information or documents in violation of the terms of

13   agreements or protective orders entered into with third parties, or in violation of the

14   privacy, contractual, or other rights of third parties.

15          7.    Mattel objects to the Interrogatories on the grounds that the

16   definition of "Mattel" is overbroad, vague and ambiguous and unduly burdensome.

17   **Specific and General Objections and Supplemental Responses**

18         Each of the following objections and responses to the Interrogatories is

19   expressly made subject to the above Preliminary Statement and General Objections,

20   all of which are incorporated in each of the following objections and responses to

21   specific Interrogatories.

22

23   **INTERROGATORY NO. 1:**

24         State all facts, with particularity, and IDENTIFY all DOCUMENTS

25   that support YOUR contention, if YOU so contend, that YOU have suffered harm as

26   a result of any act or omission of MGA.

27

28                   Exhibit _2_, P. _42_

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

In addition to the general objections stated above, Mattel specifically objects to this Interrogatory on the grounds that it is overbroad, oppressive and harassing, including without limitation that the Interrogatory is not restricted to claims in this suit and thus purports to require disclosure of matters that have no bearing on and are not at issue in this suit. Such matters will not be revealed or addressed. Mattel further objects to this Interrogatory as unreasonably burdensome and overbroad in that it purports to require Mattel to summarize all facts and identify all documents on this subject, including without limitation facts that are known to or in the possession, custody and control of defendants and non-parties, including non-parties associated with defendants. Mattel further objects to this Interrogatory on the grounds that it is vague and ambiguous with regard to the phrase "suffered harm as a result of any act or omission." Mattel further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine and other applicable privileges. Mattel further objects to this Request on the grounds that it is premature and seeks to circumvent the expert disclosure provisions of the <u>Federal</u> and <u>Local Rules</u>. Mattel continues its factual investigation and currently awaits MGA's compliance with multiple Court Orders compelling MGA to produce documents, to answer Interrogatories and to produce witnesses for deposition which MGA still has not complied with and indeed that the Court has found MGA violated. Mattel also has pending motions to compel against defendants MGA, Bryant, Machado and others associated with defendants, including to compel them to produce documents, to appear for deposition and to answer requests for admissions. In addition, the depositions of certain witnesses, including without limitation Carter Bryant and various MGA representatives, have yet to be completed, and other witnesses, including various MGA representatives such as Gustavo Machado, Ron Brawer, Mariana Trueba, Pablo Vargas, Janine Brisbois,

1   Shirin Salemnia, as well as Veronica Marlow, Margaret Hatch-Leahy and Elise
2   Cloonan, have yet to be produced for deposition. Furthermore, although MGA's
3   original production in this case regarding the alleged origins and development of
4   Bratz consisted of only a few thousand pages, and only after multiple Court Orders
5   compelling MGA and Bryant to produce their documents, MGA and other
6   Defendants have begun to produced voluminous documents only in recent weeks,
7   including documents that Mattel has been unable to access or review because of
8   technical deficiencies in MGA's production that MGA only recently corrected.
9   Furthermore, despite prior Court Order directing MGA to provide documents in
10  unredacted form, MGA has failed to comply and thus continues to deny Mattel
11  information that the Court has ruled Mattel is entitled to. The review of MGA's,
12  Bryant's and other Defendants' belated, and still incomplete, productions continues.
13  Mattel reserves the right to supplement this response consistent with <u>Federal Rule of</u>
14  <u>Civil Procedure</u> 26(e).

15          Without waiving the foregoing General and Specific objections, and
16  subject thereto, Mattel responds to this Interrogatory as follows: Mattel has and
17  continues to suffer harm as a result of the acts and omissions of MGA and other
18  defendants in this action in numerous ways, including those enumerated below.

19          **Defendants' Theft of Bratz from Mattel.** Carter Bryant is a former
20  Mattel employee who worked as a Mattel product designer during two time periods,
21  first from September 1995 to April 1998, and then from January 4, 1999 to October
22  20, 2000. Bryant conceived, created, developed, improved and reduced to practice
23  Bratz designs while employed by Mattel as a designer. Bryant wrongfully
24  concealed his Bratz work from Mattel. Then, Bryant wrongfully sold Bratz to
25  MGA, and MGA wrongfully purported to acquire Bratz, while Bryant was a Mattel
26  employee. Moreover, while still working for Mattel, Bryant (1) accepted money
27  from MGA; (2) did work for MGA; (3) used Mattel personnel and resources to
28  benefit himself and help MGA in connection with the design and development of

1   Bratz. Through all of this, MGA and Larian knew that Bryant was a Mattel

2   employee. Nonetheless, they encouraged, aided and financed Bryant to develop

3   Bratz, knowing that by performing such work, including design-related work, for his

4   own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his

5   contractual, statutory and common law duties to Mattel.

6           As the rightful owner of Bratz concepts, designs and properties that

7   Bryant created, conceived, reduced to practice, improved or otherwise worked on

8   pursuant to Bryant's contracts with Mattel, namely the Inventions Agreement and

9   Conflict of Interest Questionnaire, Mattel has and continues to suffer harm and is

10  entitled to damages arising from Bryant's, MGA's and other Defendants' use and

11  theft of those concepts, designs and properties, their infringement of copyrights in

12  connection therewith and their other unlawful conduct. Bryant, MGA, and other

13  Defendants have infringed Mattel's copyrights in Bratz drawings and works created

14  by Bryant while employed by Mattel by copying and preparing derivative works

15  based on those Bratz works. The works that infringe Mattel's copyrights and other

16  rights in such works include numerous Bratz dolls and other Bratz products that

17  MGA has released to market. In fact, MGA's own original copyright registrations

18  for Bratz doll products admit that they are derivatives of Bryant's drawings owned

19  by Mattel.

20          When Bryant started his second term of employment with Mattel,

21  Bryant executed an Employee Confidential Information and Inventions Agreement

22  ("Inventions Agreement"). In the Inventions Agreement, Bryant assigned to Mattel

23  all rights in "inventions," including "designs," that he created during his Mattel

24  employment to the fullest extent of the law. As Bryant's counsel has acknowledged,

25  "[t]he nature of the assignment here is that it is a broad based assignment of all

26  inventions during their employment; all things that were conceived and practiced."

27  Accordingly, under the Inventions Agreement, Mattel owns, among other things, all

28  doll and toy ideas, concepts, designs, works and other matters that were conceived,

1  created or reduced to pratice by Bryant during the term of his Mattel employment.

2  In addition, Bryant promised in the Inventions Agreement that, during his Mattel

3  employment, he would not "engage in any employment or business other than for

4  [Mattel], or invest in or assist (in any manner) any business competitive with the

5  business or future business plans of [Mattel]" without Mattel's express written

6  consent.  Similarly, in a Conflict of Interest Questionnaire Bryant signed at the same

7  time as the Inventions Agreement, Bryant certified that, other than as disclosed, he

8  had not worked for any competitor of Mattel and had not engaged in any business

9  transaction involving a Mattel competitor that could be construed as a conflict of

10  interest in the prior year.  Bryant promised to immediately notify his supervisor of

11  any change in his situation that would cause him to change that certification, yet

12  never disclosed his work with MGA.  To the contrary, as established by deposition

13  testimony and other evidence, Bryant misled others at Mattel upon his departure.

14  Bryant understood what the Conflict Questionnaire required because, among other

15  things, he disclosed on it the freelance work he had performed while in Missouri for

16  Ashton-Drake, but never disclosed his claimed work on Bratz in 1998.  Finally,

17  Bryant promised in the Inventions Agreement not to disclose or misuse Mattel's

18  proprietary or confidential information.  That obligation continues to this day, and

19  continues to be violated.

20         During his Mattel employment, Bryant knowingly entered into a

21  contract with MGA to assign the rights to Bratz.  In late November 2003, Mattel

22  first obtained a copy of a contract between Bryant and MGA, a Mattel competitor,

23  dated as of September 18, 2000 — a time when Bryant was still employed by

24  Mattel.  That contract required Bryant to provide design services on Bratz, a line of

25  dolls created by Bryant and marketed by MGA, to MGA on a "top priority" basis.

26  Obviously, this agreement squarely conflicted with Bryant's preexisting obligations

27  to Mattel.  It also purported to grant MGA ownership of works produced by Bryant

28  both before and after the agreement's effective date, in further contravention of

-7-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit 2 , P. 46

1  Bryant's obligations to Mattel under the Inventions Agreement.  Bryant knew that
2  these actions were in direct violation of his obligations to Mattel, as did MGA.
3        Moreover, Bryant misrepresented that he was leaving his employment
4  with Mattel to pursue non-competitive interests.  At the time that Bryant made those
5  misrepresentations, he knew the statements were false.  He also knew at the time
6  that he made those misrepresentations that he had engaged in business activities that
7  were competitive with Mattel and planned to continue to do so, which he failed to
8  dislose.
9        Bryant's last day of employment with Mattel was October 20, 2000.  At
10  that time, he signed a further agreement, called the "Proprietary Information
11  Checkout."  In it, Bryant acknowledged that "he has agreed to transfer all inventions
12  made or conceived during the period of his employment to Mattel," and that:

13        My interest in (a) any and all inventions . . . which I have made
14        or conceived . . . and in (b) any . . . designs, trademarks,
15        copyright subject matter [or] . . . artistic works which I have
16        made or conceived . . . during the period of my employment
17        which relate or are applicable directly or indirectly to any phase
18        of [Mattel's] business shall be the exclusive property of [Mattel].
19  Bryant executed the Proprietary Information Checkout notwithstanding his
20  execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works
21  to MGA one month earlier.  Nor did Bryant otherwise disclose to Mattel his MGA
22  agreement or work.  To the contrary, Bryant concealed from Mattel that he was
23  going to a competitor and explicitly told others at Mattel that he was going to do
24  "non-competitive" pursuits.  Bryant knew at the time that those representations were
25  false and made those false statements to conceal from Mattel the facts that he was
26  already working with MGA and that he had contracted with MGA to purportedly
27  assign Bratz works to MGA and to provide design and development services to
28  MGA, a Mattel competitor.      Exhibit  2 , P. 47

1        As a result of the efforts of Bryant and other Mattel employees working

2  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at

3  deposition in 2004), the Bratz dolls had been designed and were far along in

4  development during the time that Bryant was employed by Mattel and prior to the

5  time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and

6  develop designs for the dolls as well as other aspects of the products such as their

7  fashion accessories during the time he was employed by Mattel, but MGA showed

8  Bratz prototypes and/or visual representations of Bratz to numerous third parties,

9  including without limitation retailers, no later than November 2000, less than three

10  weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these

11  presentations while Bryant was still employed by Mattel.  Bryant and MGA

12  employees also repeatedly and continuously communicated with employees of

13  MGA Entertainment (HK) Limited regarding the design and manufacturing of

14  Bratz.  Bratz also were shown to retailers at the Hong Kong Toy Fair in January

15  2001 and very soon thereafter at the New York Toy Fair.  The Bratz dolls which had

16  been created during the time of Bryant's employment by Mattel, and based on

17  Bryant's concepts, designs, three-dimensional items and other works, were very

18  similar to the dolls as released, which was possible only because of Bryant's work

19  on Bratz with MGA during his Mattel employment, using Mattel resources.

20        Evidence Mattel has been able to obtain thus far has established that

21  Bryant worked for his own and MGA's benefit during his Mattel employment, and

22  did so using Mattel resources.  First, Bryant admitted at deposition, and documents

23  confirm, that he worked and aided MGA during the term of his Mattel employment

24  without Mattel's consent or knowledge, although further showing his guilty

25  knowledge he sought to minimize and conceal the time period and extent of his aid

26  to and work with MGA.  At deposition, Bryant further admitted, and documents

27  confirm, among other things, that:  (1) he worked on his Bratz drawings while

28  employed by Mattel and showed them to MGA while employed by Mattel; (2) he

1    used Mattel employees and materials to prepare a three-dimensional doll prototype

2    for his pitch to MGA — a pitch he made while employed by Mattel; (3) he

3    performed development-related work on Bratz while employed by Mattel; (4) he

4    worked on an ostensibly separate doll called "Angel" for MGA while employed by

5    Mattel; (5) he targeted Mattel vendors and engaged them to start their work on Bratz

6    before he left Mattel, using Mattel resources; (5) he used Mattel personnel and other

7    Mattel resources to work on the Bratz project during his Mattel employment,

8    including without limitation by identifying Mattel vendors who Bryant knew as a

9    consequence of his Mattel employment to work on the project and enlisting them to

10   work on the Bratz project during the term of his Mattel employment; and (6) he

11   received monetary payments and other benefits from MGA during the term of his

12   Mattel employment, at least some of which Bryant and MGA sought to conceal in

13   this litigation.  MGA and Isaac Larian, MGA's CEO, were aware when Bryant first

14   met with them that Bryant was still employed at Mattel and furthermore were aware

15   of Bryant's obligations to Mattel.  Both Bryant and MGA benefitted as a

16   consequence of his aid and assistance to and work with MGA during the term of his

17   Mattel employment.

18            Other evidence adduced to date also shows, among other things, that:

19   (1) Contrary to Bryant's testimony, Bryant created a key design drawing that was the

20   basis for three-dimensional Bratz dolls while employed by Mattel.  Bryant testified

21   at deposition that he created this drawing in November 2000, after he had left

22   Mattel.  However, Steve Linker, a third-party vendor working with MGA, testified

23   that he received that design drawing (as well as other Bratz development

24   documents) from MGA at a meeting held *before* Bryant left Mattel.  (2) Bryant

25   created Bratz designs that bear an April 2000 fax header date, six months before he

26   left Mattel;  (3) Contrary to Bryant's testimony, Bryant had faces of three-

27   dimensional Bratz dolls painted as of June 2000 (*i.e.*, some five months before he

28   left Mattel).  Anna Rhee, a third party vendor also working for MGA, has testified

1  that she was asked by Bryant and paid by MGA to paint Bratz doll heads in June
2  2000.  (4) Bratz design drawings produced by defendants with alleged "8/1998"
3  creation dates (*i.e.*, purportedly when Bryant was not employed by Mattel) did not
4  bear those dates as of October 2000, and thus the dates were added to the drawings
5  produced by defendants *post hoc*.  These include drawings registered by MGA with
6  the Copyright Office which bear false '8/1998' creation dates.  (5) According to
7  MGA's own emails, Bryant worked on Bratz with MGA for at least 4 hours per day
8  starting weeks before he left Mattel.  (6) One vendor alone, Veronica Marlow, billed
9  for 169 hours of development services on Bratz before Bryant left Mattel.  (7)
10 While he was working for Mattel, Bryant contacted vendors for his own and MGA's
11 benefit, including but not limited to, vendors in Hong Kong for doll hair for Bratz
12 and admitted to them that he was working with MGA.
13          Other witnesses who have testified in the case have provided testimony
14 revealing that Bryant aided and worked with MGA during his Mattel employment.
15 Bryant introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee
16 agree that she had no involvement with MGA prior to Bryant's introduction).  As
17 stated above, Anna Rhee was asked by Bryant and paid by MGA to paint Bratz doll
18 heads in June 2000.  Ms. Rhee produced approximately twenty invoices for work
19 that she performed on Bryant-related MGA projects in the year 2000.  These
20 invoices also reveal that Ms. Rhee performed work with Bryant and MGA on at
21 least seven separate occasions before Bryant's departure from Mattel--including one
22 invoice that dates to June 12, 2000, well before Bryant claimed at deposition to have
23 even heard of MGA.
24          After Ms. Rhee produced these documents, MGA then made a
25 supplemental production of certain internal documents relating to work performed
26 by Ms. Rhee during the June-October 2000 time period.  These belatedly produced
27 MGA records purport to show that Ms. Rhee's work during that time period related
28 to a project known as "Angel" and/or "Prayer Angels."  At her deposition, however,

1   Ms. Rhee testified that her work during that time period was for Bratz and that
2   "Angel" was MGA's and Bryant's code name for Bratz.  Thus, Ms. Rhee testified
3   that her June 12, 2000 work was for face painting on two Bratz doll heads; her late
4   August 2000 work was for face painting on four Bratz doll heads; and her work as
5   of September 8, 2000 was for face painting on additional Bratz doll heads.  All of
6   these are times when Bryant was employed by Mattel.
7           At the deposition, defendants' counsel repeatedly tried--and failed--to
8   persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"
9   was a different doll project than Bratz and that she worked on that project in the
10  June 2000, not Bratz.  For example, defendants' counsel asked whether the June 12,
11  2000 invoice--which Ms. Rhee had testified was for work on Bratz--"could" instead
12  relate to the doll "that ultimately came to market as Prayer Angels."  Ms. Rhee
13  responded:  "There's no way."  Ms. Rhee further testified that during a time when
14  Bryant was necessarily employed by Mattel, he had contacted her about the "big"
15  and "secret" project that he was working on.  Bryant instructed Anna Rhee not to tell
16  anyone about the "secret" project, including Mattel employees.  He discussed this
17  project with Ms. Rhee while she was visiting the Mattel Design Center where
18  Bryant was working and informed her that he had engaged a "corporate attorney" to
19  help him with the "secret" project.  Although MGA has claimed, under oath and
20  falsely, that Ms. Rhee was supposedly working on a separate project other than
21  Bratz in June 2000, its claims are contradicted by MGA's own documents and the
22  testimony of its witnesses, including Paula Garcia.
23          Further, Paula Garcia, MGA's Bratz project manager, worked for
24  Mattel until April 2000.  Ms. Garcia was heavily involved with the Bratz project,
25  including when Bryant while employed by Mattel.  Ms. Garcia, among others
26  working at MGA in 2000, had had access and knowledge of the DIVA STARZ
27  project while she was still a Mattel employee.  In addition, Maureen Mullen, also a
28  former Mattel employee, worked for MGA in 2000.  Ms. Mullen, one of the primary

-12-
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO M~~~'S FIRST SET OF INTERROGATORIES
Exhibit 2, P. 51

1  designers on DIVA STARZ, worked with Ms. Garcia at Mattel and was friends with
2  her.  Concurrently with her consulting work on DIVA STARZ in 2000, Mullen was
3  paid $17,000 by MGA for work on a doll design.  Ms. Garcia and Larian emailed
4  Ms. Mullen in October 2000 asking if she could recommend any former Mattel
5  seamstresses to work on the clothing for Bratz.

6       Bryant has paid and continues to pay Veronica Marlow -- who Bryant
7  claims introduced him to MGA -- at least 10% of his 3% royalty from Bratz.  As a
8  result, Ms. Marlow has since been paid millions of dollars by both Bryant and
9  MGA.  Ms. Marlow was originally employed at Mattel, where she got to know
10 Bryant, and then began to work for MGA in or around April 2000.  She worked as a
11 third party vendor on dolls for MGA prior to July 2000.  She made sample clothing
12 for the original Bratz dolls.

13      Even according to defendants, Bryant made his Bratz pitch to MGA
14 during the time when he was still employed with Mattel, and after Bryant's initial
15 meeting with Ms. Garcia and Ms. Marlow.  Also present at that meeting were Isaac
16 Larian, his daughter Jasmine, Paula Garcia, Veronica Marlow and Victoria
17 O'Connor.   Also, while still employed by Mattel, Bryant solicited Margaret Hatch-
18 Leahy, a Mattel employee until September 5, 2000, to sculpt the Bratz dolls and
19 introduced her to MGA.  Bryant attended a meeting with Ms. Garcia and Margaret
20 Leahy, to discuss Bratz doll sculptures during a time that Bryant was still employed
21 at Mattel.  As a result of Bryant's and MGA's solicitation, Ms. Hatch-Leahy created
22 the first Bratz sculpt and, according to Ms. Garcia, was the sole person to work on
23 the Bratz sculptures in the time period of 2000.  The initial Bratz head sculpt was
24 completed prior to Bryant's departure from Mattel.  Ms. Hatch Leahy also worked
25 on Bratz samples exhibited at the Hong Kong Toy Fair in January 2001 and the
26 New York Toy Fair in February 2001.

27      Further, MGA and those associated with MGA have made statements,
28 including under oath, that confirm Bryant assisted and worked with MGA during his

-13-
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit 2, P. 52

1   Mattel employment.  In statements to the press, for example, MGA's CEO, Isaac

2   Larian, told the Wall Street Journal that "he chose Mr. Bryant's idea for the Bratz

3   over several others after holding a sort of fashion-doll design contest in late 1999"--

4   a time when Bryant was employed by Mattel and well before the time that MGA

5   and Bryant claim in this case to have even been introduced.  In a sworn affidavit

6   filed in a Hong Kong lawsuit brought by MGA, Isaac Larian stated that "[t]he Bratz

7   dolls were first exhibited in the USA in November 2000," which further confirms

8   that Bryant was working with and aiding MGA on the project prior to his departure

9   from Mattel on or about October 20, 2000.

10          Moreover, in an MGA email dated September 9, 2001, authored by

11  Nana Ashong, an associate product manager at MGA who worked on the Bratz

12  project, Ms. Ashong gives the "key legally relevant dates for Bratz" as reflected by

13  MGA's copyright registration applications, including a "date of creation" of

14  September 18, 2000.  Sam Khare, an MGA Rule 30(b)(6) designee on the subject of

15  MGA's copyright, trademark and patent applications and registrations and

16  associated communications, confirmed that the meaning of Ms. Ashong's email was

17  "that the Bratz dolls were created on September 18, 2000."

18          Additionally, Isaac Larian was sued for fraud and other claims by his

19  brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

20  Complaint asserts, among other things, that "in or about late 1999 and early 2000,

21  Isaac became aware of a potential new product line that had tremendous potential

22  for [MGA].  The new product line involved the 'Bratz' dolls and related products."

23  The verified Complaint further states:  "In or about early 2000, Isaac called a

24  meeting to discuss the new Bratz product line with selected individuals" at MGA,

25  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

26  Bratz line" in February, March and May 2000.  Bryant was working for Mattel

27  during each of these time periods.

28

1        Since 2001, MGA has distributed, sold and licensed Bratz and Bratz-

2   related products throughout the world.  MGA and Bryant claim current ownership of

3   Bratz, and all copyrights and copyright registrations related thereto.  MGA

4   continues to market, sell and license Bratz and has expressed an intention to

5   continue to do so.  MGA's and other Defendants' continued use, sale, distribution

6   and licensing of Bratz infringes upon Mattel's rights, and has injured and continues

7   to injure Mattel.

8        Bryant's, Garcia's And Others Exposure To Mattel Projects.  Other

9   evidence adduced to date also confirms, among other things, that Bryant designed

10  Bratz while employed by Mattel and not in 1998 as he has attempted to claim.

11  Mattel designer Lily Martinez was working on a project in 1999 called Toon Teens.

12  Ms. Martinez had her sketches up in her cubicle for a period of time in 1999.

13  Bryant saw Ms. Martinez's Toon Teens sketches on at least one occasion and

14  commented that he liked them and "had never seen anything like them."  The

15  sketches Ms. Martinez had done in 1999 of Toon Teens bear strong resemblances to

16  the initial Bratz design drawings that Bryant did.  According to Bryant,

17  Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while

18  both Bryant and Ms. Cloonan were employed by Mattel.  Ms. Cloonan was Bryant's

19  roommate in 1999-2000.  She also worked on the Mattel "Toon Teens" project.

20  Bryant's exposure to Toon Teens designs and the similarities between the Toon

21  Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created

22  Bratz works while he was a Mattel employee and not in 1998 as he claims.

23       Second, documents and designs for Mattel's DIVA STARZ project in

24  late 1999 and in 2000 that were never publicly released, and that pre-date the release

25  of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz

26  dolls.  For example, names internally considered at Mattel in late 1999 and through

27  2000 for the DIVA STARZ project tend to show that Bryant designed Bratz while at

28  Mattel.  Names that were internally considered at Mattel during that time period

-15-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit  2 , P.  54

1  included "Brats" and variations thereon, "Brat Pack," "Boyz" and "Petz."  Ms.
2  Garcia acknowledged that "Brats" spelled with an "s" was subsequently considered
3  as a name for the "Bratz" dolls.  Furthermore, design work that Steve Linker did for
4  "Mini Diva Starz" at Mattel's behest in early 2000 bear similarities to the Bratz dolls
5  and, indeed, Ms. Garcia later contacted him in the summer of 2000 to solicit his
6  involvement with Bryant and Bratz.

7            Bryant's, Paula Garcia's and other individual's exposure to aspects of
8  the DIVA STARZ projects, including designs and names, while they were Mattel
9  employees, tends to establish that Bryant created Bratz works and conceived of the
10 name "Bratz" while he was a Mattel employee.  For example, as a Mattel design
11 employee, Bryant had access to DIVA STARZ designs and drawings in the Mattel
12 design center.  As a further example, Paula Garcia had also had access and
13 knowledge of the DIVA STARZ project while while she and Bryant were Mattel
14 employees as she testified at deposition and for reasons stated above.  And other
15 persons working with or at MGA during 2000 either themselves worked on the
16 DIVA STARZ project or were associated with those who did.

17            Bryant and MGA's Concealment of Their Misconduct.  Showing their
18 guilty knowledge and further harming Mattel, Bryant and MGA attempted to
19 conceal their unlawful conduct from Mattel for as long as possible, hiding that
20 Bryant developed Bratz while working for Mattel, among other things.  In fact, both
21 Bryant and MGA have spoiliated evidence relating to the timing and extent of
22 Bryant's aid to and work with MGA during his Mattel employment.  Thus, not only
23 did Bryant mislead others at Mattel as noted above, but evidence revealed in
24 discovery to date also shows the following:

25            First, MGA's CEO, Isaac Larian, ordered former MGA executive,
26 Victoria O'Connor, to redact "Barbie Collectibles" from the faxed version of
27 Bryant's Bratz agreement with MGA to conceal that Bryant had sent the contract
28 from Mattel's Design Center.  According to Ms. O'Connor, Bryant faxed a signed

1   copy of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of
2   the contract included a fax header that read "Barbie Collectibles" and bore the
3   number of the Mattel fax machine that it came from, revealing that it came from
4   Mattel's Designer Center where Bryant worked.  When Ms. O'Connor brought this
5   to the attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax
6   header information on all pages of the contract and send the contract, as altered, to
7   an outside MGA attorney and MGA's former counsel in this action, Patricia Glaser.
8   At Mr. Larian's direction, Ms. O'Connor proceeded to alter each page of the
9   contract in order to conceal, as Ms. O'Connor testified, the fact that Bryant "was
10  still employed at Mattel at the time the contract [between MGA and Bryant] was
11  executed."

12          Second, while he was still a Mattel employee, Bryant also sent a fax to
13  an MGA attorney, David Rosenbaum, to provide information about his Mattel
14  employment and Mattel agreements to MGA.  In the fax, Bryant advised MGA, "I
15  am unable to look into this too much further with our [i.e., Mattel's] Human
16  Resources director without risking suspicion."  However, Bryant did send his offer
17  letter from Mattel to MGA with this fax.  That letter made it clear to MGA that, as
18  standard in the industry and standard within MGA as well, Bryant had signed an
19  Inventions Agreement with Mattel.

20          Third, MGA, Larian and Bryant altered numerous original Bratz
21  drawings created by Bryant by adding false and misleading date notations of
22  "8/1998" and "© 8/1998" to the drawings, even though the drawings were not
23  created in August 1998.  These notations were not made in 1998, and defendants do
24  not deny the drawings were not completed in 1998.  Nevertheless, they falsely told
25  the Copyright Office they were.

26          Jacqueline Ramona Prince, a third-party witness, has raised other
27  questions about the integrity of Bryant's documents.  According to both Ms. Prince
28  and Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

1    was employed by Mattel, and asked her to notarize them "as of" 1998. Ms. Prince,

2    however, testified that markings which now appear on the copy of a Bratz drawing

3    produced by defendants did not appear on the original drawing that Bryant showed

4    her in 1999. This conflicts with Bryant's testimony about the drawing. He claims

5    that he created the drawing in August 1998, before he showed it to Ms. Prince.

6             Fourth, as further examples, Bryant and MGA have produced other

7    documents that appear to have been altered to conceal information. These include,

8    most notably, faxes of Bratz drawings that have fax header dates in April 10, 2000

9    and thereabouts--six months before Bryant left Mattel's employ. One page produced

10   by Bryant states that it was the third page of a fax transmission, neither preceding

11   nor subsequent pages, nor any cover sheet, has been produced. Further, even though

12   the fax headers on the produced pages have fields for both the sender's name and

13   the sender's telephone number, neither the name of the sender nor the sender's

14   telephone number appears in the fax headers -- in violation of federal law, as the

15   Court has ruled.

16             Fifth, Bryant and MGA caused destructive testing to be performed on

17   Bryant's original drawings without either advance notice to or approval by the Court

18   or Mattel. Some of these drawings--including the originals of documents BRYANT

19   192 and BRYANT 210--had holes in them. Bryant testified that his drawings did

20   not have holes in them when he turned them over to defendants' counsel and that he

21   was unaware of the origin of the holes. Despite Court Orders to do so, MGA refuses

22   to provide testimony explaining or accounting for MGA's handling of these key

23   drawings. As the Court has stated: "That there are serious questions concerning the

24   handling of these critical documents [by MGA] certainly causes the Court much

25   concern about whether the truth seeking functions of the adversarial system have

26   been fundamentally compromised in this case." Order Re Motion for Appointment

27   of Expert Witnesses, at 11:10-13.

28

07209/2267105.11

-18-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit _2_, P. _57_

1        Sixth, to further conceal their unlawful conduct, MGA and Isaac Larian

2 knowingly and intentionally made conflicting and false claims regarding the origins

3 and creation of Bratz, including under oath.  For example, MGA made public

4 statements about the origins of Bratz in the press that claimed persons other than

5 Bryant created Bratz — sometimes Larian took credit for inventing Bratz (either his

6 kid's clothes inspired him or boredom with BARBIE did), sometimes he gave credit

7 to his son for the idea.  At points, MGA claimed that Larian chose Bratz during a

8 "competition" hosted by MGA.  In 2004, MGA submitted an Affidavit of Isaac

9 Larian to the High Court of Justice in the United Kingdom.  In that Affidavit, Mr.

10 Larian swore:  "I established the Claimant and *was the inspiration behind the*

11 *BRATZ dolls*."  Exh. 4 at ¶ 8 (Emphasis added.).

12        Similarly, in 2003, Larian represented to the U.S. Patent and

13 Trademark Office that Bratz originated from him.  The patent application crediting

14 Mr. Larian as the *sole* "Inventor" seeks a patent for "changeable footwear," and for a

15 "Doll with Aesthetic Changeable Footgear."  The application claims as part of the

16 patent, among other things:  "[a] doll with changeable footgear comprising: a torso

17 having a body and legs, said legs having predetermined skin color and texture; a pair

18 of foot/shoe assemblies . . . each said assembly being removable . . . each said

19 assembly and lower legs having a snap-together joint with a protuberance on one

20 part and a mating recess on the other part, and a simulated strap forming part of said

21 shoe extending around said assembly at said separation point."  Bryan Armstrong,

22 MGA's Rule 30(b)(6) witness on the subject of patent applications (among other

23 subjects), testified that the subject of this application was, in fact, the Bratz dolls.

24 The pre-prepared Bratz pitch materials that Carter Bryant testified he first presented

25 to MGA in September 2000 — and, significantly, at the meeting where Mr. Larian

26 and Mr. Bryant claim they first had any contact with one another — also show Bratz

27 dolls with the removable feet that are the subject of the claims of the patent

28 application.  According to Bryant's deposition testimony, Bryant was the one who

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES
Exhibit 2, P. 58

1  came up with the removable feet for Bratz.  Nevertheless, Bryant also made false,

2  sworn statements to the U.S. Patent and Trademark Office in connection with the

3  application.  These are just but a few examples of the well-documented false

4  statements that MGA, Larian and Bryant have made over the years (including in this

5  case) with respect to Bratz, including its origins, creation, design and development.

6          Last, in addition to Bryant's use of "Evidence Eliminator" as discussed

7  below, MGA has spoliated electronic evidence.  For example, MGA engaged in the

8  practice of "wiping" the hard drives on Mr. Larian's two computers every six months

9  to a year.  MGA's designee on documentary and electronic evidence preservation

10  and collection testified that the only effort made by MGA to collect e-mail messages

11  was a search conducted in 2005 of the e-mail messages of Isaac Larian.   In a similar

12  vein, Defendants have obstructed the truth finding process at every turn during this

13  litigation.  As a tactical measure to conceal the truth, defendants refused to produce

14  virtually any evidence or witnesses until ordered and often not even then.  For

15  example, Bryant and Larian both refused to answer questions under oath until *twice*

16  ordered by the Court to do so.  Defendants also redacted relevant information from

17  their documents and concealed 99.9% of their documents until ordered to produce

18  them.

19          Bryant's Evidence Eliminator Software.  Bryant used and installed a

20  program called "Evidence Eliminator" on his computer, including the desktop

21  computer he purchased in October 2000.  The "Evidence Eliminator" program has

22  only one purpose, which is to permanently destroy data from computer hard drives.

23  Although the desktop likely had documents from a key time period regarding Bratz,

24  it appears that no Bratz documents from 2000 are on the desktop.  There are also

25  only a few pages of Bratz documents from 2001 on the desktop.

26  **MGA's and Other Defendants Theft of Trade Secrets.**

27          Bryant's theft of Bratz and other properties (and purported assignment

28  of those properties to MGA) is just one of a series of thefts and unlawful conduct

1   orchestrated by MGA.  MGA has engaged in a course of conduct designed to

2   systematically steal Mattel's property, including its trade secrets.  By encouraging

3   Mattel employees to join MGA and steal Mattel's confidential information, MGA

4   has unlawfully obtained valuable trade secrets relating to Mattel's business in the

5   United States and worldwide.  MGA has used the misappropriated confidential and

6   proprietary information taken from Mattel for its own benefit and commercial gain

7   and the detriment of Mattel.  Moreover, many of the MGA product attributes of

8   which MGA alleges Mattel imitated were in fact first conceived by Mattel, and

9   implemented by MGA only after the trade secret ideas were stolen from Mattel by

10  MGA.  These and other facts demonstrate that Mattel suffered and continues to

11  suffer harm because of MGA's access to Mattel's business plans and strategies.  The

12  facts also demonstrate that MGA was the one copying Mattel, not the other way

13  around.

14          MGA's and other defendants' systematic theft of Mattel's trade secrets,

15  has helped MGA unfairly compete against Mattel.  In the past few years, MGA has

16  hired directly from Mattel numerous employees, ranging from the Senior Vice-

17  President level to lower level employees.  Many of these employees were

18  specifically targeted and recruited by MGA based on the Mattel confidential and

19  proprietary information these Mattel employees could access.

20  **MGA Steals Mattel Trade Secrets in Mexico**

21          Key events demonstrating that Mattel has suffered and continues to

22  suffer harm as a result of MGA's and other defendant's acts or omissions include the

23  following.  In or about late 2003 or early 2004, MGA decided to expand its business

24  operations in Mexico.  To do so, operating from its headquarters in Southern

25  California, MGA approached three key Mattel employees in Mexico, enticed them

26  to steal Mattel's sensitive business planning materials, and then hired them to assist

27  in establishing and running MGA's new subsidiary, MGA de Mexico.  These three

28  former Mattel employees included defendant Carlos Gustavo Machado Gomez

1  ("Machado"), Mariana Trueba Almada ("Trueba"), and Pablo Vargas San Jose
2  ("Vargas").  By virtue of their positions at Mattel, they had access to Mattel's highly
3  confidential and sensitive marketing and product development information.
4         Machado was the Senior Marketing Manager, Boys Division for Mattel
5  Mexico, a position of trust and confidence.  He was employed at Mattel Mexico
6  from April 1, 1997 until April 19, 2004.  His duties included short, medium and
7  long-term marketing planning, generating product sales projections, and assisting in
8  creation of the media plan.  Trueba was the Senior Marketing Manager, Girls
9  Division for Mattel Mexico, a position of trust and confidence.  She was employed
10 at Mattel Mexico from November 3, 1997 until April 19, 2004.  Like Machado, her
11 duties included short, medium and long-term marketing planning, generating
12 product sales projections, and assisting in creation of the media plan.  Vargas was a
13 Senior Trade Marketing Manager with Mattel Mexico, a position of trust and
14 confidence.  He was employed at Mattel Mexico from March 29, 2001 until April
15 19, 2004.  Vargas was responsible for ensuring that point-of-sale promotions were
16 carried out, analyzing the results of such promotions, negotiating promotion
17 budgets, and generally managing promotional activities.
18        Machado, Trueba and Vargas were obligated, including pursuant to
19 their employment agreements, to maintain the confidentiality of Mattel's
20 information, and to protect Mattel's proprietary information and not to disclose them
21 to competitors.  Their respective employment agreements each read, in relevant part:
22        TENTH.  The EMPLOYEE acknowledges that all of the
23        documents and information provided to him by virtue of
24        his employment are the EMPLOYER's exclusive property,
25        including any documents and information that the
26        EMPLOYEE may draw up or prepare in relation to or in
27        connection with his services hereunder, and therefore he
28        undertakes to preserve such documents and information in

1   proper condition and to surrender them to the

2   EMPLOYER whenever the EMPLOYER may so require

3   or upon termination of this agreement, for whatever

4   reasons.

5   ELEVENTH.  The EMPLOYEE shall not disclose any

6   aspect of the EMPLOYER's business and will not provide

7   to third parties, whether orally or in writing, directly or

8   indirectly, any information on the systems or activities of

9   any kind that he knows while performing his work for the

10  EMPLOYER, or in the EMPLOYER's relationship with

11  any companies with which it deals or with its customers.

12  Should the EMPLOYEE fail to comply with any of the

13  obligations to which reference is made in this and the

14  preceding clause, and besides any liability of a labor and

15  civil nature due to damages caused to the EMPLOYER,

16  the EMPLOYER reserves the right to denounce the

17  offense or offenses which might be committed.

18  The "Conflict of Interest Manual," which Machado, Trueba and Vargas

19  received on March 6, 2002, also provides:

20  [N]o employee must get involved in any type of outside

21  business activity, transaction or action which, due to its

22  nature (notwithstanding the personal gain received by the

23  employee), may... have a negative impact on Mattel's

24  capacity to compete through the disclosure of proprietary,

25  commercial, pricing, technical information and any other

26  private or confidential information...  Information

27  Technology Security and Use Policies... Definition of

28  technological resources...  'Technological Resources'

1   include all of the electronic devices, software and

2   electronic means of communication such as but not limited

3   to, personal computers and work stations, notebook

4   computers, portable digital assistants (PDA), central

5   computers and minicomputers, hardware such as hard disk

6   units and tape units, peripherals such as printers, modems,

7   fax machines and copiers, software applications and

8   related files, sources and data, including software to access

9   outside services such as Internet, e-mail, telephones,

10   cellular telephones, beepers and voice-mail systems...

11   Authorization... Mattel provides certain Technological

12   Resources to its employees in order to help them carry out

13   their job.  Each employee is under the obligation to use

14   Mattel's Technological Resources in such way that they

15   increase productivity, enhance Mattel's public image and

16   are respectful of other employees.  The misuse of such

17   resources gives rise to a penalty of up to and including the

18   employment termination... The Technological Resources

19   are and remain Mattel's property, even if an employee

20   puts them to personal use...  The violation of intellectual

21   property rights laws is forbidden...  Employees must not

22   use Mattel's Technological Resources to copy, retrieve,

23   resend or send materials which are registered as

24   intellectual property unless the employee has the author's

25   authorization or makes a single copy thereof for his own

26   use...  Other forbidden uses...  The employees are not

27   authorized to use any of Mattel's Technological Resources

28   for illegal purposes, in violation of any Mattel policy and

1      contrary to Mattel's best interests, in any such way that

2      they disclose Mattel's confidential information or property

3      to third parties, or it to their own personal or secondary

4      benefit... Privacy... On certain occasions, Mattel may

5      have sufficient reasons to access its Technological

6      Resources, including computer files, e-mail messages and

7      voice-mail messages. Therefore, the employees must

8      understand that they have no privacy right regarding any

9      messages or information created or kept in Mattel's

10      Technological Resources, including such information or

11      messages regarded to be personal by an employee... Data

12      compilation... Mattel reserves the right at any time to

13      increase the amount and type of information that it

14      retains... 3. Use of documents and files: Each document

15      or file stored in a Mattel computer has a record, which

16      shows what users have had access to a certain document or

17      file. All documents and files are subject to probing and/or

18      monitoring... Confidential Information... Any

19      confidential or proprietary information transferred through

20      the Technological Resources must bear the following

21      confidentiality legend: 'Commercial Confidential

22      Communication...

23      On January 9, 2003, and February 12, 2004, Machado, Vargas and

24 Trueba received by electronic mail, with other employees, "Mattel Code of Ethical

25 Business Conduct." The pertinent parts read as follows:

26      "...INTELLECTUAL PROPERTY... Mattel's Intellectual

27      Property, including registered trademarks, registered

28      garments, tradenames, intellectual property rights, patents

-25-

Exhibit 2 , P. 64

1    and similar rights or interests are among the most
2    important assets... PROPRIETARY INFORMATION...
3    The employees and directors are under the obligation to
4    protect the confidentiality of Mattel's proprietary
5    information.  The proprietary information is any
6    information not generally known by the public, which is
7    highly useful to Mattel, which might be useful to its
8    competitors or third parties or which might be harmful to
9    Mattel or its customers if disclosed.  The proprietary
10   information includes trade secrets, revenues and profits
11   information and salientes [sic], as well as information on
12   new products, marketing plans, design and development
13   efforts, manufacturing processes and any information
14   related to likely acquisitions, divestitures or investments.
15   We can protect the security of Mattel's proprietary
16   information by restricting access to it.  The confidential
17   information must not be discussed with those who are not
18   under the obligation to keep such information secret, and
19   in public places where it is most unlikely that the
20   information will remain secret, such as airplanes,
21   restaurants and elevators.  The obligation to preserve the
22   confidential information continues even after employment
23   has been rescinded...  Confidential information and
24   security trading...  Employees and directors who have
25   access to confidential information are not allowed to use
26   or share the information for Mattel's security trading
27   purposes or any other company, or for purpose other than
28   the conduct of our business...  Any non-public information

1    regarding Mattel and the private information regarding

2    Mattel's business partners obtained while in the employ of

3    the company, must be regarded confidential

4    information..."

5    Machado, Trueba and Vargas also read and understood Mattel's "E-

6    mail Use Policy," whose pertinent parts read as follows:

7    It is forbidden so send or resend confidential information

8    or illegally copy messages without permit or consent of

9    the author...Mattel de Mexico allows the reasonable use of

10    the e-mail for personal use, provided it adheres to said

11    guidelines...the personal use of electronic mail must not

12    interfere with the job...all messages sent through the

13    company's e-mail electronic system, including personal

14    messages, are the property of Mattel de Mexico...Do not

15    send confidential information through the e-mail. If you

16    do, make sure that the information is encrypted, by using

17    the codes...All e-mail accounts existing in the e-mail

18    system are the propriety of Mattel de Mexico."

19    At 9:00 a.m. on April 19, 2004, concurrently and without providing a

20    prior notice, Machado and Trueba tendered their resignations to Ricardo Ibarra

21    García, and Vargas tendered his resignation to Roberto Jacobo Isaías Zanatta. Each

22    resignation was effective immediately. Ricardo Ibarra García inquired of Machado

23    and Trueba why they had resigned. Both Machado and Trueba responded that they

24    had been hired by a competitor, but refused to identify the competitor. Vargas also

25    refused to identify the company that had hired him, saying that he could not reveal

26    the name because that information was "competitive" and "confidential."

27    Each was asked to wait for while the appropriate personnel computed

28    their separation payment, but they insisted that they were in a hurry and said that

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit 2, P. 66

1  they would pick up the payment owed to them on April 23, 2004 and immediately
2  left the premises.

3          Later on April 19, 2004, Nelly Vanessa Tejada Rojas, Machado's
4  administrative assistant, reported to Ricardo Kiyoshi Honda Hatadi, who managed
5  the computer systems, that Machado's computer was inoperative and that the
6  computer screen showed an error message after it was turned on. Mr. Honda
7  confirmed that the error message indicated that the computer was not reading the
8  internal hard drive. Mr. Honda removed the hard drive from Machado's computer
9  for additional testing and concluded that the hard drive was damaged.

10         The immediate resignation of three employees to go to an unnamed
11  competitor and the suspicious errors on Machado's computer caused Mattel to begin
12  investigating their activities. Mattel discovered that Machado, Trueba and Vargas
13  stole a vast array of Mattel trade secrets, including by surreptitiously downloading
14  enormous quantities of Mattel confidential and trade secret data from Mattel
15  computers onto USB (or "thumb") drives. This information involved virtually every
16  category of Mattel's sensitive and trade secret business plans and information for the
17  Mexican market, and a significant quantity of sensitive and trade secret information
18  relating to Mattel's business in the United States and worldwide. Machado, Trueba
19  and Vargas attempted to conceal their widespread theft of Mattel's proprietary
20  information. Machado ran a software program called System & Internet Washer Pro
21  on his Mattel personal computer in an attempt to not only erase information,
22  including information that would reveal the addresses to which he had sent, or from
23  which he had received, e-mails, but to destroy any evidence of the activities that he
24  had done on the computer. Machado also damaged the hard drive of his Mattel
25  personal computer for the same purpose. Their emails showed they had planned in
26  advance with MGA to maximize the damage to Mattel.

27         Machado, Trueba and Vargas has been in frequent telephonic and e-
28  mail contact with MGA personnel, including Larian, for over three months prior to

-28-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit __2__, P. __67__

1  their resignation.  The primary vehicle for these communications in furtherance of

2  their "plot" was an America Online e-mail account with the address

3  <plot04@aol.com>.  Machado admits, that in the months prior to their resignations,

4  Machado, Trueba and Vargas, "discussed with MGA personnel, including Larian,

5  employment at MGAE de Mexico" and used the America Online e-mail account,

6  <plot04@aol.com>.  Larian also admits these communications took place.

7          Isaac Larian, Thomas Park, MGA's then COO, and Susanna

8  Kuemmerle, head of MGA's Mexican operations, were each heavily involved in

9  recruiting Machado, Trueba and Vargas.  While MGA was recruiting them,

10  Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and

11  proprietary information in order to prove their value to MGA and improve their

12  negotiating position vis-à-vis their respective employment contracts with MGA.  For

13  example, Trueba and Vargas prepared an "analysis" to justify their worth to MGA.

14  As a result of this analysis and other information, MGA offered to pay each of them,

15  to do the same jobs for a smaller company, far more than they were earning at

16  Mattel -- with potentially hefty bonuses based on MGA's revenue growth -- and,

17  offered to give them all cars.

18          Prior to their resignations, Machado, Trueba and Vargas made plans to

19  meet with MGA personnel in person, and discussed with MGA personnel, including

20  Larian, specific details regarding setting up MGA offices in Mexico City.  Also,

21  prior to their resignations Larian and others at MGA directed Machado, Trueba and

22  Vargas to steal virtually all Mattel confidential and proprietary information that they

23  could access and bring it with them to MGA.  For example, in a March 22, 2006

24  email message from the <plot04@aol.com> addressed to Larian, MGA's General

25  Manager Susan Kuemmerle and another MGA officer Thomas Park, Machado,

26  Trueba and Vargas sought to prove their value in this endeavor to MGA by writing:

27  "Attached you will find our analysis for future discussion.  We will be available

28  during the nights of the week after 16:30 Los Angeles time . . . ."  In another email,

1  confirming that the participants intentionally sought to maximize the damage to

2  Mattel from their misconduct, Kuemmerle wrote to Larian and Park: "Gustavo,

3  Mariana and Pablo want to resign (all at the same time, and you can believe my

4  smile!) next Wednesday."

5          Beginning on April 12, 2004, a week before his resignation and after

6  numerous communications and meetings with Larian and other MGA personnel,

7  Machado began transferring additional Mattel confidential and proprietary

8  information to a portable USB storage device (also know as a "thumb drive") that he

9  connected to his Mattel computer.  On Friday, April 16, 2004, the last business day

10  before he gave notice, Machado copied at least 70 sensitive documents to the

11  portable USB storage device.  Similarly, starting on April 12, 2004, Vargas copied

12  a host of confidential and proprietary materials to a portable USB storage device,

13  including sales plans, sales projections and customer profiles.  On April 16, 2004,

14  Trueba also copied Mattel confidential and proprietary information to a portable

15  USB storage device connected to her Mattel computer.  Trueba also took steps to

16  increase further her access to Mattel's confidential information.  For example, just

17  four days before leaving, Trueba went out of her way to seek to attend a meeting at

18  which Mattel personnel analyzed BARBIE programs for the United States, Canada

19  and South America.  Two days before her resignation, she contacted a Mattel

20  employee located in El Segundo, California and Mattel's advertising agency to

21  request updated confidential information about advertising plans for BARBIE.

22  Trueba acted at the direction of MGA and Larian and did so in order to obtain

23  further information that would allow MGA to obtain unfair competitive advantage

24  over Mattel.

25          Machado, Trueba and Vargas stole virtually every type of document a

26  competitor would need to enter the Mexican market and to unlawfully compete with

27  Mattel in Mexico, in the United States, and elsewhere.  They stole global internal

28  future line lists that detailed anticipated future products, production and shipping

-30-
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit __2__, P. _69_

1  costs for Mattel products; daily sales data for Mattel products; customer data; sales

2  estimates and projections; marketing projections; documents analyzing changes in

3  sales performance from 2003 to 2004; budgets for advertising and promotional

4  expenses; strategic research reflecting consumer responses to products in

5  development; media plans; consumer comments regarding existing Mattel products

6  customer discounts and terms of sale; customer inventory level data; assessments of

7  promotional campaign success; market size historical data and projections;

8  marketing plans and strategies; merchandising plans; retail pricing and marketing

9  strategies; and other similar materials. A search of MGA's Mexico City facilities on

10  October 27, 2005 by Mexican criminal authorities pursuant to a Court-issued search

11  warrant found and seized from MGA's offices both electronic and paper copies of a

12  large number of documents containing Mattel trade secrets. Specific documents

13  taken include but are not limited to printouts from the ISIS system, printouts from

14  the Sales Cube system; reports from the Point of Sale Analysis System; a document

15  entitled "draft" containing information from the ISIS system; sales plan 2004

16  compared to 2003; pos review; tyco r/c season 2002 promotionals; a&p 2004; sales

17  by brand forecast 2; hot wheels int'l 2002 key drivers;  mattel mexico sales by

18  brand;  quantitative screen test for spring 2004, "max steel" line in mexico report;

19  2002 demand planning status; suggested seasonal purchase order for wal-mart and

20  bodega aurrera (children); mattel 2002 customer profile; 2004 mattel alternative

21  media plan; total march 2004 barbie line report; 800-barbie line march 2004

22  summary;  discounted products; rsp report; yearly a&p budget; 2003 summary

23  media; 2003-2005 market size; monthly si vs. st; spring 04 preference test mexico

24  report; revision pos 09 dic 02; draft 04_ext plan mar9; archivo 2004gz_04final

25  nuevo margen 29ene04; a&p04-media; a&p2004-media1; restatement ap 2003; frp

26  bid 2003 proyeccion diaria al 11 ene; frp bid 2003 proyeccion diaria al 05mzo; frp

27  bid al 19 de marzo 2004 y frp bid al 26 marzo 2004; frp bodega aurrera al 11 abril

28  2004, frp carrefour al 26 marzo 2004, frp gpo comex al 26 marzo 2004, frp liverpool

-31-

SUPPLEMENTAL RESPONSE ~~~~~~~~~~~~~~~~~~~~~~ A'S FIRST SET OF INTERROGATORIES

Exhibit  2 , P. 70

1  al 28 marzo 2004, frp palacio de hierro al 26 marzo 2004, frp soriana al 09 abril

2  2004, frp walmart al 11 abril 2004, frp walmex al 11 abril 2004; 2005 all worlds.xls;

3  plan 2004 - ver 03 31 de marzo; promociones, demostradores y eventos 2004.xls;

4  restatement ap 2003.xls; frp bid 2003 proyeccion diaria al 11 ene.xls; frp bid al 19

5  marzo 2004.xls; frp bodega aurrera al abril 2004.xls; 11.50 29 marzo 2004.xls;

6  historico promotores 1999-2002.xls; sell through por cliente 2002.xls; sivsst02.xls;

7  sivsst02.xls; matrix.xls; regional bid 27 a 02 apr.xls; external plan 2nd sem 2004 -

8  walmart mod red 12 abr.xls; my scene 03 vs. 04.xls; my scene 03 vs. 04.xls; int mkt

9  plan cons final.xls; integrated mkt plan.xls; net sales 2002-2004tavo.xls; strategic

10  session mattel march 2004 - results.xls; top 10 by country2003finalb.xls; pres mkt

11  plans 03.ppt; brittany action plan 2003 150304.ppt; venta insolita v2.ppt; mattel

12  final.ppt; boys-brazil.ppt; wheels y tendencias.ppt; overallstrat.ppt; sales terms

13  approved! nov 25 2003 (al 24 mzo 04) wm nov-dec 60 days11.ppt; mkt. president's

14  review april 03.ppt; mattel cierre 2003 top 5.doc; essence.doc; an_iisis competencia

15  octubre 31.xls; f041504.pdf; mediabudget.xls; mediabudget.xls; comparativo bratz-

16  my scene 2003.xls; annual 200 industry insights.doc; april2004_zandl.pdf; zandl

17  invoice_2004.pdf; zandl_message.doc; barbie customized fall guidelinesonly.ppt;

18  status al 25 nov.doc; status al cierre de oct.doc; yearly a&p budget; 2003 summary

19  media; 2003-2005 market size; monthly si vs. st spreadsheet; 2004 girls full year

20  mexico viability testing report; total march 2004 barbie line report and 800-barbie

21  line march 2004 summary; directorio mattel brands1.doc; march 2004 closing.xls;

22  facturación porsucursal 2003 total año.xls; 3 yr sales vision.pdf; jugueteria pres

23  final con imagenes.ppt; encuesta linea 1h 2006.pdf; sales overview mattel mexico

24  sept 10th 2003.ppt; bid semanal_aug 22 2003_units_week 27-29.pdf.

25          The stolen information was not limited to the Mexican market. The

26  information stolen would, and did, give MGA an unfair competitive advantage in

27  the United States and around the world. Further, the stolen information was not

28  located exclusively in Mexico, but included confidential and proprietary information

SUPPLEMENTAL RESPONSE ~~~ ~~ ~~~~~~~~ ~~ ~~A'S FIRST SET OF INTERROGATORIES

Exhibit __2__, P. __71__

1  that resided on Mattel computers in Phoenix, Arizona and El Segundo, California,
2  and/or documents which were originally created by personnel in El Segundo,
3  California. Included among these stolen documents was one of Mattel's earliest
4  internal global line lists for the upcoming year, which included information for
5  BARBIE products for the upcoming year and included, for each product, the
6  expected profit margin, advertising expenditures, expected volume and marketing
7  strategy. Machado, Trueba or Vargas delivered that internal line list to Larian or
8  another MGA officer during their negotiations with MGA.

9      Armed with Mattel's confidential business plans and methods, MGA
10  was able to increased its market share in Mexico by 90 percent in a single year.
11  This increase came at the expense of Mattel, which lost market share during 2004 in
12  Mexico and was forced to increase its advertising and promotional spending to
13  offset further losses.

14     Upon becoming aware of the theft of confidential information, Mattel
15  notified Mexican authorities, who obtained a judicial warrant to search MGA's
16  facilities in Mexico City. That raid occurred on October 27, 2005. In that raid,
17  Mexican authorities seized from MGA's offices both electronic and paper copies of
18  a large number of Mattel trade secrets, including not only those that Mattel
19  discovered through its forensic investigations but also many other trade secrets that
20  Mattel did not know had been stolen.

21  **Ron Brawer Steals Mattel Trade Secrets**
22     In 2004, MGA targeted Ron Brawer, Mattel's former Senior Vice
23  President and General Manager, to facilitate MGA's theft and use of Mattel's
24  valuable business methods and practices. Mr. Brawer held a position of trust and
25  confidence at Mattel and an obligation to protect Mattel's confidential and
26  proprietary information, under his agreements with Mattel and the "Code of
27  Conduct" circulated to all Mattel employees, including Mr. Brawer. In his executive
28  position, Mr. Brawer was provided access to Mattel information that was both

07209/2267105.11

-33-

Exhibit _Z_, P. _72_

1 sensitive and confidential; including, but not limited to, detailed information related
2 to development, manufacture, marketing, pricing, shipping, and performance of
3 Mattel's then-current and anticipated future product lines, and other confidential
4 business plans between Mattel and its most significant retail customers. In or about
5 late May 2004, Brawer began requesting and analyzing detailed information related
6 to Mattel and its four key retail accounts.

7       Throughout 2004, Mattel reminded and stressed to its employees,
8 including Brawer, the importance of protecting Mattel's confidential and proprietary
9 materials and information. On March 18, 2004, in response to a survey from the
10 President of Mattel Brands, Matt Bousquette, confirming compliance with Mattel's
11 Code of Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous
12 protection of it's [sic] intellectual property," reflecting Brawer's clear understanding
13 that Mattel required its proprietary information to be kept confidential.

14       Just prior to Brawer's resignation from Mattel on September 17, 2004,
15 Brawer went out of his way to obtain confidential Mattel information. On
16 September 15, 2004, when Brawer left work at noon for observance of Rosh
17 Hashanah, he carried a large cardboard box with binders and other materials.
18 Several hours after his departure, Brawer instructed his assistant to print Mattel's
19 2004 Sales Plan for one of Mattel's significant customers and to provide it to him,
20 falsely claiming he needed it for a meeting.

21       On September 17, 2004, Brawer returned to Mattel and immediately
22 informed his supervisor that he was leaving Mattel, effective October 1, 2004, to
23 work for competitor MGA. Brawer did this despite his prior to denials to Mattel that
24 he had been in contact with MGA about potential employment and despite
25 representing that he would not talk to MGA. After Brawer's resignation, Mattel
26 reminded Mr. Brawer, by a hand-delivered letter, of his continuing confidentiality
27 obligations, which continue beyond the termination of his employment. Mattel also
28 did so at Mr. Brawer's exit interview, at which time Mr. Brawer was given a copy of

07209/2267105.11

-34-

Exhibit 2, P. 73

1  his Original Confidentiality Agreement, and another copy of the Code of Conduct.
2  On his last day of employment at Mattel, Mattel hand-delivered to Brawer another
3  letter that, among other things, reminded him of his confidentiality obligations to
4  Mattel under the Code of Conduct.
5          Upon joining MGA, Mr. Brawer became its Executive Vice-President
6  of Sales and Marketing.  In that role, Mr. Brawer had and continues to have
7  responsibility for MGA's accounts with the same retailers that he worked with while
8  at Mattel.  Mr. Brawer falsely represented during his Mattel exit interview that he
9  had returned all proprietary information to Mattel.  On the contrary, Mr. Brawer
10  removed proprietary and trade secret information from Mattel that he did not return.
11  Mr. Brawer did not return to Mattel, for example, the information contained in his
12  contacts file.  The contacts file included contact information for Mattel customers,
13  most notably TRU, and extensive contact information for Mattel employees,
14  including titles, e-mail addresses and telephone numbers.  MGA has conceded that
15  Mr. Brawer has been using that contact information on a regular basis.  Since
16  leaving Mattel, Mr. Brawer has contacted Mattel employees, both by telephone and
17  by electronic mail.  Based on his knowledge of Mattel's operations and the roles of
18  certain Mattel employees, he has targeted certain Mattel employees who have broad
19  access to Mattel proprietary information in an effort to induce and encourage them
20  to join MGA and to steal or otherwise wrongfully misappropriate Mattel
21  confidential information and trade secrets.  Mr. Brawer has done so by promising
22  these Mattel employees salaries 25 percent or more higher than they earn at Mattel
23  and stating to them that they should not be concerned by legal action taken by
24  Mattel to protect its trade secrets and its rights because such claims are hard to prove
25  and easy to defeat.
26  **Janine Brisbois Steals Mattel Trade Secrets**
27          Additionally, in an effort to increase its market share and sales in
28  Canada and elsewhere around the world, MGA stole Mattel trade secrets regarding

07209/2267105.11

-35-

1  its customers, sales, projects, advertising and strategy, for Canada. In 2005, MGA

2  recruited ex-Mattel employee Janine Brisbois. Relying on their misappropriated

3  knowledge of Mattel's operations and roles of certain Mattel employees, MGA

4  targeted Ms. Brisbois who had broad access to Mattel proprietary information in an

5  effort to induce and encourage her to join MGA and to steal additional Mattel

6  confidential information and trade secrets. Ms. Brisbois was at the time a Director

7  of Sales for Mattel's Girls Division in Canada and responsible for Mattel's account

8  with Toys 'R Us and Wal-Mart, a position of trust and confidence. When Brisbois

9  joined MGA, MGA gave her responsibility for those same accounts. In her

10 capacity, Ms. Brisbois had access to Mattel's confidential and proprietary

11 information regarding Mattel's future product lines, advertising and promotional

12 campaigns and product profitability. Ms. Brisbois was obligated, including pursuant

13 to her employment agreements, to maintain the confidentiality of Mattel's

14 information, and to protect Mattel's proprietary information and not to disclose them

15 to competitors.

16          Nonetheless, Ms. Brisbois spoke with Larian prior to her departure

17 from Mattel, and four days before she resigned, copied approximately 45 Mattel

18 documents containing Mattel proprietary advertising, project, sales, customer and

19 strategy information (for both Canada and the United States) onto a USB drive with

20 the volume label "BACKPACK." Ms. Brisbois removed the thumb drive from

21 Mattel Canada's office by concealing it in her backpack or gym bag the last time that

22 she left that office. These documents contained Mattel trade secret and proprietary

23 information, and included: (1) a document containing the price, cost, sales plan and

24 quantity of every Mattel product ordered by every Mattel customer in 2005 and

25 2006; (2) the BARBIE television advertising strategy and information concerning

26 sales increases generated by television advertisements; (3) competitive analysis of

27 Mattel vis-à-vis its competitors in Canada; (4) an analysis of Mattel's girls business

28 sales beginning in 2003 and forecasts through 2006; (5) profit and loss reviews for

1   Mattel's products being sold in Wal-Mart, including margins and profit in not only
2   Canada, but in the United States and Mexico; and (6) a document containing the
3   product launch dates and related advertising for all Mattel new products between
4   Fall 2005 and Spring 2006.  To Mattel's knowledge, Brisbois took the following
5   documents:   Barbie Spring 2005 POS Analysis May 5.ppt; Competitive
6   Review1.ppt; Girls quota pre 1.xls; Wal-Mart G1 Global Development - Mattel
7   FYE 04 P&L; Month over Month Co-op Planning .xls; Planning Matrix.xls;
8   Walmart Canada 2006 Strategic Plan; 2003 1st Half Review & 2nd Half Plan.xls;
9   2003 Sales Plan Targets by Month.xls; 2004 Bahamas Prep.xls
10  2005 WM Scorecard LW_YTD week 22.xls; 52 Weeks Budget Report 2004.xls
11  back of postcard.doc; Barbie Pricing Initiative Letter.doc; Barbie Spring 2005 POS
12  analysis May 5.ppt; BOOTEX.LOG; BWSA-PN Page 1.jpg; BWSA-PN Page 2.jpg;
13  Charity Partnership.ppt; Competitive Review1.ppt; Competitor Review -
14  exhibits.xls; contacts 092305.pst; Don - August Plan.xls; ECB01000; Fall BLRs.xls;
15  girls quota prep 1.xls; GLP-mar28.ppt; JB TRAC 2004.doc; July Market Run to
16  US.xls; March 04 Plan to Hit 6.0.xls; Mattel WMT FYE04.xls; Month over Month
17  Co-op Planning.xls; NAM Scorecard Jun 21 2005.xls; New Item Process Grid.xls;
18  Phone List for Labour.doc; Planning Matrix.xls; Price Compression Analysis.xls;
19  Program Briefing Document.doc; Project Status Report-011504.xls; Qualcomm
20  2003 Review.xls; Q2 Review - Aug 15.xls; RIM Credit Request - Sept 05.xls; Sales
21  QOR-QFR Functional Competencies.doc; SAP - Customer Insight - Training
22  Material (Tab 2).ppt; Script May 14.xls; Vendor Scorecard Comparison Week 18 vs
23  Week 22.xls; Wal-Mart Canada '06 june 24.ppt; WalMart DI Process Calander (Fall
24  2005).xls; Warefall Charts Update-March 16.xls; WEEKLY FALL 2005.xls;
25  WM LR Presentation.ppt; WM Volume Driver Fact Sheet.xls; Barbie Models for
26  Nov 1&2.xls; CMN Handbill Details.xls; CMN Store Listing.xls; Give Along
27  POP.ppt; Give Along Program Package.doc; Nov 2003 WalMart Licensing Cart
28  Details.xls; Please Give Along French.ppt; Please Give Along with.ppt;

-37-

Exhibit   2  , P.  76

1 WM CNN Charity Driver.xls; WM Monday CMN Presentation.ppt; 2003 TRAC -
2 Nilo.doc; 2003 TRAC David Watts.doc; 2003 TRAC-Danielle.doc; 2003 TRAC-
3 Mark.doc; 2003 TRAC-Sharon.doc; 2003TRAC Janine.doc; 2003TRAC
4 WendyWard.doc; CSI Spider Chart.ppt; Evergreen Reco.doc; MAT-
5 1425Presentation2.ppt; WM Volume Driver Fact Sheet.xls;

6      During Ms. Brisbois' exit interview she was specifically asked whether
7 she was "taking anything." Ms. Brisbois responded, "No." Both during and after
8 her exit interview, Ms. Brisbois was advised by Mattel of her obligations to preserve
9 Mattel's confidential and proprietary information. Nevertheless, Ms. Brisbois not
10 only stole Mattel trade secrets, but while Ms. Brisbois was working as a Vice
11 President of Sales at MGA Entertainment Canada, she accessed and used a number
12 of these Mattel documents. Ms. Brisbois and MGA subsequently used these stolen
13 trade secrets to the benefit of MGA Entertainment, Inc. U.S., including its
14 management of MGA's Toys 'R Us and Wal-Mart accounts. Ms. Brisbois'
15 participation in this alleged scheme with MGA has harmed Mattel.

16 **Jorge Castilla Steals Mattel Trade Secrets**

17      Jorge Castilla was also recruited by MGA from Mattel, and when he
18 left Mattel he took with him confidential and proprietary trade secrets that belonged
19 to Mattel. Some of the stolen trade secrets related to his job responsibilities; others,
20 Mr. Castilla was not authorized to access.

21      Mr. Castilla joined Mattel in November 1999, after having previously
22 worked at Mattel for approximately two months in 1995. Mr. Castilla worked in
23 Mattel's offices in Europe, primarily on a pilot program to improve sales forecasting
24 in the United Kingdom. Mr. Castilla played a particularly significant role in
25 preparing, launching and evaluating that pilot program. Mr. Castilla, in particular,
26 performed an analysis of what Mattel would need to do with its world-wide sales
27 forecasting programs to obtain the benefit of the pilot program, in which Mattel had
28 invested heavily.

Exhibit __2__, P. __77__

1    Mr. Castilla returned to the United States in late 2004, and joined the

2    International Planning group at Mattel's headquarters in El Segundo, California. In

3    that group, Mr. Castilla was responsible for setting up Mattel's Electronic Data

4    Warehouse system, a proprietary database containing highly confidential business

5    information, such as sales, future/pending orders, product availability, sales

6    forecasts at the stock keeping unit level. In addition, he was responsible for

7    preparing information for senior financial officers regarding inventory levels, sales

8    demands and related topics. Also, because of the "gap" analysis that Mr. Castilla

9    had performed while in the United Kingdom, he was responsible for implementing

10   Mattel's customized sales forecasting system.

11   On Monday, March 13, 2006, Mr. Castilla informed Brenda Ray-

12   Martin, to whom he reported, that he was resigning to take a position with MGA

13   Entertainment, Inc. When he resigned, Mr. Castilla held the title of Planning

14   Specialist in Mattel's Operations Planning and Finance department. MGA hired him

15   to be a Manager, Sales Planning, with responsibilities that substantially paralleled

16   those that he had at Mattel. MGA hired Mr. Castilla at a salary of $90,000 annually,

17   plus benefits and bonuses.

18   In Mr. Castilla's Employee Confidential Information and Inventions

19   Agreement, which he signed on October 29, 1999, he acknowledged that he would

20   develop and have access to Mattel proprietary information. He further agreed not to

21   "disclose or use at any time either during or after my employment with [Mattel], any

22   Proprietary Information," and to "cooperate with the Company and use [his] best

23   efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary

24   Information." He also agreed that when he left Mattel's employ, he would deliver to

25   Mattel "all tangible, written, graphical, machine readable and other materials

26   (including all copies in [his] possession or under [his] control containing or

27   disclosing Proprietary Information."

28

-39-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit __2__, P. __78__

1    Mr. Castilla had further agreed to the terms in Mattel's Code of
2    Conduct to preserve Mattel's confidential and proprietary information and was
3    specifically warned that "the unauthorized use or disclosure of [Mattel's]
4    confidential, proprietary or trade secret information" may result in the termination of
5    his employment. He further agreed:

6         Employees have an obligation to protect the Company's
7         confidential and proprietary information. Confidential and
8         proprietary information is any infromation which is not
9         generally known to the public that is useful to the
10        Company and that would either be useful to the
11        Company's competitors or third parties or harmful to the
12        Company or its customers, if disclosed. Confidential and
13        proprietary information includes, but is not limited to,
14        trade secrets, revenue and profit information and
15        projections, new product information, sales and marketing
16        plans, design and development plans, manufacturing
17        processes, confidential personnel information and
18        information regarding potential acquisitions, divestitures
19        and/or investments.

20   During Mr. Castilla's exit interview on March 13, 2006, he was
21   provided with a document reminding him of his obligations to preserve Mattel's
22   confidential and proprietary information, including his obligations under Mattel's
23   Employee Confidential Information and Inventions Agreement, including but not
24   limited to "inventions, marketing plans, product plans, business strategies, forecasts
25   and personnel information."

26   Mr. Castilla filled out an exit interview checkout form, in which he
27   acknowledge receiving not only the reminder, but the Mattel Code of Conduct. He
28   disclosed that he had accepted a position at MGA Entertainment, as the Manager of

-40-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit __2__, P. __79__

1 Global Sales Planning, with an undetermined start date. Most significantly, he
2 acknowledged that, during the course of his employment at Mattel, he had received
3 financial plans, financial forecasts, process planning documents, sales forecasts,
4 documents regarding enhancements to ISIS, documents regarding gap analysis
5 between systems, process overviews, inventory reports, sales plans, documents re
6 inventory management, shipping reports, confidential personnel information, market
7 share reports, process maps, order presentation reports, demand planning
8 documents, enterprise and data warehouse information, reports generated from or
9 regarding GRS. As of March 13, 2006, Mr. Castilla affirmed that he did not copy
10 any of the listed documents, did not disclose any of the documents or the
11 information that they contained to anyone outside of Mattel, and denied having
12 possession of any of the listed documents. He also affirmed that he returned to
13 Mattel all of its confidential and proprietary documents, by representing that he
14 "brought them in on March 12, 2006, filed them and put together a summary of
15 ongoing projects for supervisor, Brenda [Ray-Martin]." He further affirmed that he
16 had attended meetings at which Mattel confidential and proprietary information was
17 discussed, denied that he had a copy or disclosed any confidential or proprietary
18 information received at those meetings, and represented that all had been returned to
19 Ms. Ray-Martin. He then reaffirmed that he had not disclosed Mattel confidential or
20 proprietary information to persons outside of Mattel in the last twelve months.
21         As of Friday, March 10, 2006, Castilla had created a folder on his
22 network share drive that he labeled "To Take." The folder contained approximately
23 56 megabytes of information. The bulk of that information was made up of
24 documents containing Mattel confidential and proprietary information. Mr. Castilla,
25 who rarely worked weekends, entered Mattel's headquarters building at
26 approximately 9:30 a.m. on Sunday, March 12, 2006 and departed at approximately
27 2:00 p.m. On Monday, March 13, 2006, Castilla had deleted the "To Take" folder
28 and its contents from his network share drive. Castilla had transferred the

-41-
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES
Exhibit  2 , P.  80

1   information in the "To Take" folder and potentially the folder itself to an e-mail

2   account <hoclau04@gmail.com>, <hoclau04@yahoo.com> and/or to a personal

3   digital assistant device.

4           Castilla took the following documents from Mattel which were

5   primarily related to his work in inventory management and forecasting for Mattel:

6   SP2005 business update.ppt; sales planning IT meeting 2005-10-19.ppt; sales

7   planning updates IGB - Aug05.ppt; sales planning updated July 1205.ppt; testing

8   schedule.xls; testing log 3-01-06.xls; sales intelligence.xls; promotions.doc;

9   marketing process data flow v.1.0.doc; marketing intelligence definitions and

10   calculation; ISIS sales planning enhancements final.xls; GPS enhancement business

11   requirements.doc; forecasting process framework 2005 v.4.0.xls; ISIS enhancements

12   and training w updates.xls; initial concept sales planning v2.doc; sprint

13   strawman.xls; sprint 9 sales planning 2006.xls; SP2005 project plan masterv2.xls;

14   SP2005 project plan master.xls; progress diagram.xls; forecasting -product

15   backlog.xls; notes.docs; international planning organization.xls; 2006

16   TRAC_jorgecastilla_2005_endreview.doc; overview presentation final_Sep_27;

17   TRAC_jorgecastilla_2005 midreview.doc; lottery.xls; inventory

18   template_consolidated0510.xls; 2006 int'l planning calendar and milestones.xls;

19   inventory template_consolidated0509.xls; CAP_jorgecastilla_2005.doc;

20   CAP_blank.doc; inventory template consolidated0507.xls; inventory template

21   consolidated0505.xls; inventory template consolidated0503.xls; QOR_QFR profile

22   and management assessment; TRAC_jorgecastilla_2005.doc; TRAC blank.doc; intl

23   planning calendar.xls; inventory planning consolidated.xls; inventory template

24   consolidated0502.xls; 2004 TRAC jorge castilla.doc; planning calendar mock

25   up.xls; seasonal process mapping.ppt; inventory template-consolidated.xls;

26   inventory report consolidated_110204.xls; oneidw functionality_final.xls;

27   demand_management_utopia_apics.ppt; smape business case.ppt; mapavsmape.xls;

28   idwmod2_handsontraining_HQ.ppt; revised vision fit gap analysis.xls;

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit __2__ , P. __81__

1  spuserguide_accountallocations.ppt; spuserguide_accountinginquries.ppt;

2  spuserguide_companyinquiries.ppt; idwmod1_introdcutionandoverview.ppt;

3  idwmod2_handsontraining.ppt; priorities_jorgecastilla.xls;

4  idwmod3_powerplaywindowsworkshop.ppt; idemod2_oneidwexercises.doc;

5  idwmod3_powerusercheatsheet.ppt; idw_trainingworkshopguide.ppt;

6  spuserguide_introduction.ppt; TRAC_jorgecastilla_2003.doc; OMNI to ISIS - FP

7  gap summary.ppt; OMNI ISIS process flow mapping.ppt; OMNI ISIS process flow

8  mapping.xls; ISIS for the U.S. feasibility results.ppt; ISIS presentation.ppt;

9  backcasting.ppt; CAP_jorgecastilla_2003.doc; backcasting_v2.xls; backcasting.xls;

10  demandplanningcycle.ppt; navigation_draft.doc; demanddraft.doc; definitions.doc;

11  TRAC_jorgecastilla_2002.doc; planning roles.ppt; process review kickoff.ppt;

12  mattel international dictionary.xls; neur demand planner.doc.  In addition to

13  documents related to Mattel's inventory planning and sales forecasting system,

14  Castilla also took with him a highly confidential document that lays out the future

15  international business strategies and marketing priorities for the coming years for

16  Mattel's entire international business team that was prepared by senior Mattel

17  executives.

18      The Mattel confidential and proprietary information that Castilla took

19  from Mattel, both in his head and in documentary form, relates primarily to the

20  successful and efficient management of inventory and the use of sophisticated

21  forecasting techniques that Mattel, through significant investment, developed to

22  obtain a competitive advantage in the toy industry with its unique order,

23  manufacture, and delivery cycles.  The former Mattel employees working at Mattel

24  recognized the value of Castilla's knowledge, and was in dire need of improved

25  inventory management in light of the excess and unsold inventory that it had on

26  hand after to 2006 sales season.  To remedy their problem, MGA targeted Castilla--

27  and the Mattel-specific knowledge that he possessed--and lured him to MGA.  With

28  the benefit of the information that he brought with him, on information and belief,

1 Castilla has used that proprietary and confidential information to improve MGA's

2 sales forecasting and inventory planning, thus saving MGA millions and millions of

3 dollars.

4          This is just a subset of the vast misconduct committed by MGA and the

5 other defendants to injure Mattel.  Other misconduct and relevant evidence has been

6 revealed in discovery in this action, including in depositions, in documents, and in

7 discovery responses.  Such matters are the subject of on-going investigation and

8 discovery and will be the subject of future discovery, including discovery that MGA

9 and MGA have refused to disclose and thus are or will be the subject of motions to

10 compel.  They include without limitation Larian's false statements about Mattel,

11 MGA, and Bratz, including without limitation his false statements to Wal-Mart and

12 others that (a) MGA did not use the Hua Tai 4K factory that was found to have

13 engaged in gross labor abuses to manufacture Bratz dolls, even though such denials

14 were false and knowingly so; (b) Mattel used the same factories as MGA; and (c)

15 Mattel was the one falsely accusing MGA of using the Hua Tai 4K factory.  Larian

16 also made false representations about Mattel products.  For example, as a result of

17 Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units

18 of the MY SCENE MY BLING BLING product with real gems.  Further, MGA and

19 Larian, in an effort to gain an unfair competitive advantage, repeatedly issued false

20 and misleading press releases about Bratz's sales, Bratz's market share, Bratz's

21 position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products,

22 and the market share of Mattel's BARBIE products.  At the time that MGA and

23 Larian made those misrepresentations to retailers and the press, they knew that their

24 statements were false.  In addition, MGA stole Mattel properties in connection with

25 MGA's Scooter Samatha product and recruited other Mattel employees, including

26 former Mattel employees whose identities are currently unknown by Mattel and are

27 the subject of on-going or future discovery, to steal additional Mattel properties and

28

-44-
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit  2 , P.  83

1  trade secrets.  Mattel reserves its right to rely on and introduce evidence of all such

2  misconduct, acts and omissions, and all other relevant evidence.

3         By way of further answer, pursuant to <u>Federal Rule of Civil Procedure</u>

4  <u>33(d)</u>, Mattel has produced responsive, non-privileged documents and tangible items

5  in its possession, custody or control from which the answer to this Interrogatory may

6  be derived.  The documents supporting Mattel's contentions in response to this

7  Interrogatory No. 1 and containing additional information responsive to this

8  Interrogatory include, but are not limited to, the following: Deposition Transcript of

9  Carter Bryant, dated November 4, 5 and 8, 2004; Deposition Transcript of Steven

10  Linker, dated September 13, 2006; Deposition Transcript of Anna Rhee, dated

11  February 3, 2005; Deposition Transcript of Paula Garcia, dated May 24, 2007, May

12  25, 2007, October 9, 2007 and October 10, 2007; Deposition Transcript of Rene

13  Pasko, dated June 13, 2007; Deposition Transcript of Isaac Larian, dated July 18,

14  2006; Deposition Transcript of Brian Armstrong, dated July 18, 2007 and August 1,

15  2007; Deposition Transcript of Sandy Yonemoto, dated May 30, 2007; Deposition

16  Transcript of Victoria O'Connor, dated December 6, 2004; Deposition Transcript of

17  Sam Khare, dated August 20, 2007; Deposition Transcript of Jill Nordquist, dated

18  July 31, 2007; Deposition Transcript of Jacqueline Prince, dated December 21,

19  2004; Deposition Transcript of Liliana Martinez, May 20, 2005; Deposition

20  Transcript of Kislap Ongchango, dated April 24, 2007; Deposition Transcript of

21  Joni Pratte, dated June 1, 2007; Deposition Transcript of Robert Hudnut, July 13,

22  2007 and August 20, 2007; Deposition Transcript of Rebecca Harris, dated July 20,

23  2007; Deposition Transcript of Kerri Brode, dated August 15, 2007 and January 19,

24  2007; Deposition Transcript of Charnayne Brooks, dated March 2, 2007; Deposition

25  Transcript of Janet Bryant, dated September 25, 2007; Deposition Transcript of Tom

26  Bryant, dated September 26, 2007; Deposition Transcript of Kenneth Lockhart,

27  dated June 14, 2007 and June 15, 2007; Deposition Transcript of Dave Malacrida,

28  dated August 30, 2007; Deposition Transcript of Rodney Palmer, dated June 26,

-45-
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit  2 , P.  84

1   2007; Deposition Transcript of Mei Wah (Sarah) Chui, dated September 28, 2007;

2   Deposition Transcript of Edmond Lee, dated October 4, 2007 and October 5, 2007;

3   Deposition Transcript of Richard Irmen, dated September 28, 2007; Deposition of

4   Brooke Gilbert, dated July 24, 2007; Deposition Transcript of Arnoldo Artavia,

5   dated September 21, 2006; Deposition Transcript of Carter Bryant, dated September

6   9, 2003 in Gunther Wahl Productions, Inc. v. Mattel, Inc., Case No. BC 269746;

7   Deposition Transcript of Cassidy Park, dated March 2, 2005; Deposition Transcript

8   of Julia Marine, dated September 21, 2006, November 8, 2006, and June 26, 2007;

9   Deposition Transcript of Fred Kawashima, dated January 17, 2007, June 19, 2007

10  and September 13, 2007; Deposition Transcript of Lissa Freed, dated May 3, 2007;

11  Deposition Transcript of Julia Jensen, dated June 8, 2007; Deposition Transcript of

12  Alan Kaye, dated December 10, 2004 and June 21, 2007; Deposition Transcript of

13  Ann Driskill, dated December 15, 2004, and July 12, 2007; Deposition Transcript of

14  Lisa Tonnu, dated July 19, 2007, September 24, 2007 and September 25, 2007;

15  Deposition Transcript of Schuyler Bacon, dated September 27, 2007; Deposition

16  Transcript of Spencer Woodman, dated October 9, 2007; Deposition Transcript of

17  Maureen Tkacik, dated September 28, 2007; Deposition of Schuyler Bacon, dated

18  September 27, 2007; BRYANT 02440-1, 2456-9, 02462-7, 10431-3, 10451-67;

19  MGA HK 0001515-43; SABW-M 00247-58; SABW-M 00597-8, 589-90; SABW-

20  M 00037-8; MGA 0068915; SABW-M 00179-88; MGA 0184197-8; MGA

21  0053574-7; MGA 0053569-73; SABW-M 00601-2, 00599-600; BRYANT 07015-9;

22  MGA 0183938-9; MGA 0183934-7; SABW-M 00595-6, 593-4; MGA 0186063-7;

23  MGA HK 0001935; SABW-M 00587-8; MGA 0008859-64; MGA 0009145; MGA

24  0068962-75; KMW-M 01646-52; MGA 0050711; MGA 0009146B-9B; MGA

25  0008858; MGA 0050554-5; MGA 0007363-72; MGA HK 0002476-8; MGA HK

26  0008253-70; SABW-M 00283-96; SABW-M 00271-82; SABW-M00437, 00431,

27  436, 429; MGA 003704-13; MGA 0069001; MGA 0007430; MGA 0051546; MGA

28  0008035A-8A; MGA 0072176-9; MGA 0050710-2; MGA000705; MGA 0008851-

-46-
Exhibit __2__, P. __85__

1  5; TARM0031-47; UB0001; MGA HK0008205-70; MGA HK 0008553-4;
2  MGA0050707-9; MGA 0008039-42; MGA 0053422; MGA0007479-81;
3  MGA0007487-9; MGA0007490-2; MGA 0005369-71; MGA0002338A-9A; MGA
4  0070857-8; MGA HK 0008468-9; MGA 0007482-3; UB0006; UB0004; UB0003;
5  UB 0005; MGA 005372-5; MGA 0007498-501; MGA 0007495-7; MGA 0053154-
6  6; MGA 0007502; MGA 0007511-2; MGA0007503; MGA HK 0008036-7; MGA
7  HK 0008475-82; MGA HK 0008483-6; MGA0008616A; MGA 0049234-6; MGA
8  00050702-9; MGA 0008043-6; MGA 0007513; MGA 0007514; MGA 0007515-9;
9  MGA HK 0008470-4; MGA 0053442-6; MGA 0008856 A; MGA 0007538-41; UB
10 0007; UB 0199; MGA 0842107-9; MGA 0007542-5; SABW-M 00319-46; MGA
11 0008043A-6A; MGA 0007547-9; MGA 0053081-3; MGA 0049230-3; MGA
12 0001461-6; MGA 0007553-4; MGA 0007555-6; MGA HK 0008508-9; MGA HK
13 0008518-9; MGA 0007567-8; MGA 0007574-5; MGA 0007562-3; MGA 0007578;
14 MGA 0007581-2; MGA 0053079-80; MGA 0051890; MGA HK 0008594-5; MGA
15 0051453-5; MGA HK 0008592-3; MGA 0007609; MGA 0007608; UB 0200;
16 SABW-M 00427; MGA 0007612-3; MGA 0001628-9; MGA 0007621; MGA
17 0007622; MGA 0007633-5; MGA 0140783-6; MGA 0053050-2; MGA 0001630-2;
18 MGA 0008865; UB 0008; MGA 0008615A-8A; MGA 0072019-27; MGA
19 0001298; SABW - L 00001-12; MGA 0836832-3; MGA 0868092-3; MGA
20 0051574-6; MGA 0007845-6; MGA 0007843-4; MGA 000726; MGA 0007847;
21 MGA 0007848-52; MGA 001342; MGA 0064572; MGA 001341; MGA 001340;
22 MGA 0868100A-3A; MGA 001318-37; MGA 0842078-81; MGA 0064575;
23 BRYANT 01211; MGA 0064577; UB 0013; MGA 000713; MGA 001299-302;
24 MGA 0046778; MGA 0067816-23; MGA 0199003; MGA 0004717; MGA
25 0008595A; MGA 0007891; MGA HK 0009036-49; SL 00001; MGA HK 0002342-
26 4; UB 0014; MGA 0190944-7; MGA 0046776-7; SL 00004; SL 00008-9; MGA
27 0046774; MGA 0051568; MGA 0004718B; MGA 0051566-7; MGA HK 0002331;
28 UB 0015; UB 0016; MGA 001297-8; MGA HK 0000158; MGA HK 0002359;

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES
Exhibit  2 , P.  86

1  MGA HK 0002336; MGA HK 0002332-4; SL 00005-7; MGA 0051562-3; MGA
2  HK 0008993-9017; MGA HK 0002345-8; MGA 0003866B-8B; MGA HK
3  0002375-8; MGA HK 0002379-82; MGA 0008570B; MGA 0053317-21; MGA
4  0066403-7; MGA 0004611-6B; MGA 0005320B-4B; MGA HK 0002341; MGA
5  HK 0002328; MGA 0009136; MGA 0005484B; MGA HK 0002353-4; MGA
6  0049268-71; MGA HK 0002360; MGA HK 0002361-2; MGA HK 0000159-260;
7  MGA HK 0007118-487; MGA 0009134; MGA HK 0008989-90; MGA 0046704-5;
8  MGA 002639-64; MGA HK 0002367-8; MGA HK 0002369-88; MGA 0046750-72;
9  AR 0008; MGA HK 0002396-7; MGA HK 0008974-88; MGA HK 0002403-4;
10  MGA HK 0002401-2; MGA HK 0002391-2; MGA 0009128A-32A; MGA 005496-
11  7; MGA 0837088-9; MGA 001477; MGA 0066270-6; MGA 0005592A; MGA HK
12  0002398-400; MGA HK 0002401-2; MGA 0427516; MGA 001467-9; MGA
13  001470-2; MGA 000425-6; MGA HK 0001837-9; MGA 0046743; MGA HK
14  0002406-8; MGA HK 0002409-11; MGA 0065327-31; MGA 0009062-5; MGA HK
15  0002439-41; MGA HK 0002442-5; MGA HK 0002446-50; MGA HK 0002451-4;
16  MGA 0005529B-30B; Bryant 19372-4; SABW-M 00065-78; Bryant 01276-8;
17  MGA 0005543B-4B; MGA 0008030-1; MGA HK 0001840-2; MGA 0007943;
18  MGA HK 0002435-8; MGA 0046868-70; MGA 0067834-5; MGA HK 0008956-72;
19  MGA HK 0002490-601; MGA HK 0002602-3; MGA HK 0001856; SABW-M
20  00383; MGA 0008070; MGA 0008625; MGA 0008619-40; Bryant 01286-92; MGA
21  HK 0002604-20; MGA HK 0008939-55; MGA HK 0001848-51; MGA HK
22  0002487-9; MGA HK 0001852-5; Bryant 04428; Bryant 02089-92; Bryant 02941;
23  Bryant 00787-9; MGA HK 0002621-37; MGA HK 0008925-38; MGA HK
24  0002645-61; MGA HK 0002665-6; MGA HK 0002689-765; MGA HK 0008919-
25  24; MGA HK 0002783-880; MGA 0836721-2; SL 00010; MGA 0004721B-2B;
26  MGA HK 0002884-7; MGA 0052031-6; MGA 0005316B; MGA 0053331-4; MGA
27  HK 0002904-7; MGA HK 0002908-9; MGA 0005491B-3B; MGA 0005438B;
28  MGA HK 0002910-2; MGA HK 0007748-9; MGA 0050752-4; MGA HK 0002913-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit _2_, P. _87_

| | |
|---|---|
| 1 | 5; MGA HK 0002916-7; MGA HK 0008864; MGA 000427-8; MGA HK 0002938- |
| 2 | 40; MGA HK 0001858-60; MGA 0008557; MGA HK 0002921-3; MGA |
| 3 | 0004562B-3B; MGA 0836578-89; MGA 0046691-3; MGA HK 0008846-57; MGA |
| 4 | HK 0002941-2; Bryant 01293; MGA HK 0002948-9; MGA HK 0002950-1; MGA |
| 5 | HK 0002954-6; MGA 0009125-6; Bryant 00219; MGA 000010-1; MGA 006396-7; |
| 6 | MGA HK 0007747; MGA 0836593; MGA 0004578B; MGA HK 0002982-4; MGA |
| 7 | 0046681-2; MGA 0829273-89; MGA 0009122A-4A; MGA 000014; MGA HK |
| 8 | 0002997; MGA HK 0003000-2; MGA HK 0001933; MGA HK 0003003-5; MGA |
| 9 | 0046680; MGA 5018; MGA 0046672; MGA HK 0003020-119; MGA HK |
| 10 | 0008814-6; MGA 000018; MGA 0008551; Bryant 04427; MGA 0008886A-97A; |
| 11 | MGA 0008549; MGA 0008587; MGA 9354B-7B; MGA 9407B-12B; MGA HK |
| 12 | 0008708-25; MGA HK 0008679-706; MGA 0837468-70; MGA 0066304; MGA |
| 13 | HK 0003138-40; MGA HK 0004434-7; UB 0000127B-31B; MGA HK 0001870-3; |
| 14 | MGA HK 0003150-4; MGA HK 0000261; MGA HK 0003168-72; MGA HK 1874- |
| 15 | 8; MGA 0836601; MGA 0046668; Bryant 02761; MGA 0072003-9; MGA |
| 16 | 0046498-501; SABW-M 00145-8; MGA 006631-3; MGA 006599B-6611B; MGA |
| 17 | HK 0009901-46; MGA 0008653B; MGA0008578B-9B; MGA 0005555B-8B; |
| 18 | MGA 0861632; MGA 0004558; MGA 0006945-75; MGA 0068078-95; MGA |
| 19 | 0009198; MGA 0005559B; MGA 0834205-6; MGA 0046493-4; MGA 0009185-9; |
| 20 | MGA HK 0001176; MGA 0009190-1; MGA HK 0010186-98; MGA HK 0010152- |
| 21 | 85; MGA HK 0002066; SH 0129; MGA 0006579-86; MGA 0006849-917; MGA |
| 22 | 0009083B; MGA 0050727-29; MGA 0837363-72; SBM 0009-10; SBM 0005-6; |
| 23 | SBM 0007-8; MGA HK 0010121-42; MGA 001430; AR 0013; MGA 000678; |
| 24 | MGA HK 0001588; MGA HK 0010109-18; MGA HK 0008068-90; MGA |
| 25 | 0050698-9; MGA 0140757-60; MGA0008578B; MGA 0836315; MGA 0009403-4; |
| 26 | MGA 000077-81; MGA HK 0009974-97; MGA 0004628; MGA HK 0004104-5; |
| 27 | MGA HK 0004381-2; MGA 0046486-90; MGA 0005633B; MGA 0006278; MGA |
| 28 | 0066608; MGA 0835737; MGA HK 0001187; MGA 000083; MGA HK 0009850- |

-49-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit __2__, P. __88__

1   2; MGA 0009093-9; MGA 0000734; MGA HK 0000647-756; MGA HK 0000079-

2   155; MGA 0065464-6, 65575-7; MGA 0002625, 2618; MGA HK 0009805-25;

3   MGA 0065444; MGA 0836640; MGA HK 0002131-5; MGA 0004635B; MGA HK

4   0002136-7, 2270-1; MGA 000682; MGA 0001423, 1426; MGA 0002632-3; SBM

5   0011; MGA 0002630; MGA HK 0002146-56, 2263-5; MGA HK 0002157-9; MGA

6   HK 0002260; MGA HK 0002266; MGA 0004637B-38B; MGA 0051649-52; MGA

7   HK 0002292-5, 2296-7; MGA HK 0009776; SH 0109; MGA HK 0004048-55,

8   2310-2, 4069-72; MGA 000089-92; MGA HK 0002093-4; MGA 0004639-40;

9   MGA 0009041-2; MGA HK 0009771; MGA HK 0000267-8; MGA 0068289-96,

10  68434-42; MGA HK 0004087-9; MGA 000093-6; MGA HK 0004092-103; MGA

11  HK 0009669-79; MGA 006978; MGA 007109; MGA HK 0001200; MGA 0002635,

12  2621, 2631, 2634, 2624; MGA HK 0009767; MGA 0046457; MGA HK 0004115-7;

13  MGA HK 0004123-229; MGA HK 0004230; MGA 000097-104; MGA HK

14  0009756-8; MGA HK 0004231-2; MGA HK 0004244; MGA 0066423-5; MGA

15  0836650; MGA 0001422, 1425; MGA 000533-6; MGA HK 0009712-55; MGA HK

16  0004245-6; MGA HK 0004250-1; MGA HK 0002099-100; MGA 0004282; MGA

17  HK 0001209; MGA 0000532; MGA 000113-22; MGA HK 0004293, 4294; MGA

18  0004295-301; MGA 000123-5; MGA 0009117; MGA 000127-8; MGA 0046418-

19  27; MGA 0837512-3; MGA 0068493-561; MGA HK 0000078-155; MGA

20  0050696-7; MGA 003914-50; MGA 000150-60; MGA 0000161B-5B; MGA

21  0066432-4; MGA 0066435-9; MGA HK0001593-621; MGA 0836862-5; MGA

22  0149307-26; MGA 000166-7; MGK HK 0004413-27; MGA 006272; MGA 006504;

23  MGA 0006480-503; MGA HK 0001242-4; MGA HK 0002462-75; MGA HK

24  0001553-4; MGA 0003598-602; MGA 0003569B-71B; MGA 0047267-334;

25  MGA0006447-67; M 0001638-9; M 0001596; MGA004717; MGA000730; M

26  0001621; M 0001636; BRYANT 00794-9; M 0001597; MGA 0069426-7;

27  MGA006453-67; M 0074054-6; M 0070398-9; M 0101133-5; M 0001808-10;

28  BRYANT 01294-6; BRYANT 01297-9; BRYANT 01300-3; MGA 0064571;

-50-
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit __2__, P. __89__