COPY

1  DALE M. CENDALI (admitted *pro hac vice*)
   DIANA M. TORRES (S.B. #162284)
2  JAMES P. JENAL (S.B. #180190)
   O'MELVENY & MYERS LLP
3  400 South Hope Street
   Los Angeles, CA 90071-2899
4  Telephone: (213) 430-6000
   Facsimile: (213) 430-6407
5  jjenal@omm.com

6  PATRICIA GLASER (S.B. #55668)
   CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP
7  10250 Constellation Boulevard, 19th Floor
   Los Angeles, CA 90067
8  Telephone: (310) 553-3000
   Facsimile: (310) 557-9815

9
   Attorneys for MGA Entertainment, Inc.
10
   MICHAEL H. PAGE (S.B. #154913)
11 KEKER & VAN NEST LLP
   710 Sansome Street
12 San Francisco, CA 94111
   Telephone: (415) 391-5400
13 Facsimile: (415) 397-7188

14 Attorneys for Carter Bryant

15        UNITED STATES DISTRICT COURT

16        CENTRAL DISTRICT OF CALIFORNIA

17              EASTERN DIVISION

18

19 CARTER BRYANT, an individual,          Case No. CV 04-9059 SGL (RNBx)
                                           (consolidated with CV 04-9059 & 05-
20              Plaintiff,                 2727)

21       v.                               [DISCOVERY MATTER]
                                          [PUBLIC REDACTED]
22 MATTEL, INC., a Delaware               DECLARATION OF YVONNE L.
   corporation,                           GARCIA IN SUPPORT OF MGA
23                                        ENTERTAINMENT, INC.'S AND
                Defendant.                CARTER BRYANT'S JOINT
24                                        MOTION TO COMPEL RE:
                                          MATTEL'S BANDYING OF 30(B)(6)
25                                        WITNESSES

26                                        Hearing Date: T.B.D.
                                          Time: T.B.D.
27 AND CONSOLIDATED ACTIONS

28
                                          DECL. OF YVONNE L. GARCIA ISO JOINT
                                          MTN TO COMPEL RE MATTEL'S 30(B)(6)
                                          WITNESSES CV 04-9059 SGL (RNBX)

I, Yvonne L. Garcia, declare and state as follows:

I am an attorney in the law firm of O'Melveny & Myers LLP, counsel for MGA Entertainment, Inc. ("MGA"). All of the facts set forth herein are known to me personally, and if called as a witness, I could and would testify competently thereto.

1.   On April 4, 2007, the Discovery Master conducted a hearing on MGA and Bryant's second motion to compel. During the hearing Mattel's counsel was advised that they were present to finally provide designations and dates sufficient to satisfy Bryant's notice. Attached as **Exhibit 1** is a true and correct copy of excerpts from the Transcript of Proceedings Before Hon. Edward A. Infante, dated April 4, 2007.

2.   On July 31, 2007, Mattel produced Jill Nordquist for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from that deposition.

3.   On July 13, 2007, Mattel produced Robert Hudnut for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from that deposition.

4.   On May 30, 2007, Mattel produced Sandy Yonemoto for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from that deposition.

5.   On June 1, 2007, Mattel produced Joni Pratte for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from that deposition.

6.   On April 24, 2007, Mattel produced Kislap Ongchanco for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from that deposition.

7.   On June 13, 2007, Mattel produced Rene Pasko for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). Attached hereto as **Exhibit 7**

DECL. OF YVONNE L. GARCIA ISO JOINT
MTN TO COMPEL RE MATTEL'S 30(B)(6)
WITNESSES CV 04-9059 SGL (RNBX)

1   is a true and correct copy of excerpts from that deposition.

2           8.    On July 18, 2003, the Wall Street Journal published an article

3   by Maureen Tkacik titled, "Dolled Up: To Lure Older Girls, Mattel Brings In Hip-

4   Hop Crowd—It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on

5   the 'Bratz'—Battle of the Big Heads." Attached hereto as **Exhibit 8** is a true and

6   correct copy of that article.

7           9.    On May 16, 2007, MGA's counsel, Jim Jenal, wrote to Mattel's

8   counsel, Timothy Alger, regarding Mattel's decision to change its original witness

9   designation for topic 41 of Bryant's 30(b)(6) notice. Originally, Mattel designated

10  Jules Andres to testify as to topic 41. On May 16, however, Mattel substituted Julia

11  Jensen for Ms. Andres. Attached hereto as **Exhibit 9** is a true and correct copy of

12  Mr. Jenal's e-mail to Mr. Alger, dated May 16, 2007, and of Mr. Alger's response

13  to Mr. Jenal, dated May 17, 2007.

14        10.    On June 8, 2007, Mattel produced Julia Jensen for deposition

15  pursuant to Federal Rule of Civil Procedure 30(b)(6). Attached hereto as **Exhibit**

16  **10** is a true and correct copy of excerpts from that deposition.

17        11.    Attached hereto as **Exhibit 11** is a true and correct copy of a

18  letter from Jim Jenal to Dylan Proctor, dated July 2, 2007.

19        12.    The parties met and conferred on July 10, 2007, but when MGA

20  broached the subject of Mattel's bandying practices, Mattel's counsel was

21  unprepared to discuss the issue. MGA's counsel identified some of the witnesses

22  and topics that were the source of the problem, as well as the relief MGA and

23  Bryant were seeking, in hopes that the information would facilitate the discussion.

24  Mattel's counsel, however, demanded that MGA and Bryant send a separate meet

25  and confer letter identifying the witnesses and topics which they wished to discuss.

26        13.    Attached hereto as **Exhibit 12** is a true and correct copy of a

27  letter from William Charron to Dylan Proctor, dated July 11, 2007.

28        14.    Attached hereto as **Exhibit 13** is a true and correct copy of a

DECL. OF YVONNE L. GARCIA ISO JOINT
MTN TO COMPEL RE MATTEL'S 30(B)(6)
WITNESSES CV 04-9059 SGL (RNBX)

letter from Dylan Proctor to William Charron and Jennifer Glad, dated July 15, 2007.

15.    On August 20, 2007, Mattel produced Robert Hudnut for a second day of deposition testimony pursuant to Federal Rule of Civil Procedure 30(b)(6).  Attached hereto as **Exhibit 14** is a true and correct copy of excerpts from that deposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 24, 2007, at Los Angeles, California.

Yvonne L. Garcia

- 4 -

**Exhibit 1**

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION

4

5     ------------------------------

6     CARTER BRYANT, an individual,    )

7            Plaintiff,        )

8            vs.            ) No. CV 04-09049 SGL

9     MATTEL, INC., a Delaware      ) (RNBx)  (c/w CV

10    Corporation,            ) 04-9059 & 05-2727)

11           Defendant.        )

12    ------------------------------)

13    CONSOLIDATED WITH MATTEL, INC.,  )

14    v. BRYANT and MGA ENTERTAINMENT,  )

15    INC., v. MATTEL, INC.          )

16    ------------------------------

17

18       Transcript of Proceedings before

19       the Honorable Edward A. Infante,

20       via conference call, commencing at

21       9:29 A.M., Wednesday, April 4, 2007

22       before Cathryn L. Baker, CSR No. 7695.

23

24

25    PAGES 1 - 33

MGA-Mattell_Hearing              Unsigned                Page 1

```
 1      APPEARANCES OF COUNSEL:

 2

 3      FOR MATTEL, INC.:

 4

 5         QUINN EMANUEL URQUHART OLIVER & HEDGES

 6         BY:  JON COREY, ESQ.

 7             BRIDGET MORRIS, ESQ.

 8         865 South Figueroa Street

 9         10th Floor

10         Los Angeles, California 90017

11         (213) 443-3000

12

13

14      FOR MGA ENTERTAINMENT, INC.:

15

16         O'MELVENY & MYERS LLP

17         BY:  JAMES JENAL, ESQ.

18         400 South Hope Street

19         Los Angeles, California 90071

20         (213) 430-6000

21

22

23

24

25
```

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3

4    FOR CARTER BRYANT:

5

6       LITTLER MENDELSON

7       BY:  KEITH JACOBY, ESQ.

8         ALYA MEYERS, ESQ.

9       2049 Century Park East

10      5th Floor

11      Los Angeles, California 90067

12      (310) 553-0308

13

14

15

16

17

18

19

20

21

22

23

24

25

1      May 9th through the 11th, May 18th, May 29th through the

2      31st.

3          MR. JACOBY:  What topics, Jon, is this person

4      for?

5          MR. COREY:  She is designated on topic No. 41.

6          MR. JACOBY:  Could you spell her name?

7          MR. COREY:  Yeah, It's J-u-l-e-s.  Andres is

8      A-n-d-r-e-s.

9          MR. JACOBY:  Okay.  Do you want to pick dates

10     as we go or do you want to lay everyone out?

11         JUDGE INFANTE:  We can pick dates as we go.

12     I'll leave it up to you.

13         MR. JACOBY:  Okay.  For the first person,

14     Lissa Freed, I am available -- Bryant's counsel is

15     available on May 3rd.  Is that a date that works for

16     MGA?

17         MR. JENAL:  Yes, it is.

18         MR. JACOBY:  How about May 3rd?

19         MR. JENAL:  All right.

20         MR. JACOBY:  For Jules Andres, Bryant's

21     counsel is available -- could we skip her because I

22     don't see a day that mixes with your blackout dates.

23     Could we just go to the next person?

24         MR. COREY:  Sure.  Sandy Yonemoto is

25     available --

1          MR. JACOBY:  What topic is she?

2          MR. COREY:  Within the scope of the order

3     she's going to address topics -- topics 2 through 7 are

4     relatively broad and they overlap significantly, so

5     there will be a number of designees that will testify

6     with respect to those topics.  She's also designated, as

7     we've indicated previously, with respect to some topics

8     that are not within the scope -- that are not covered by

9     the order.

10          MR. JACOBY:  And what topics are those?

11          MR. JENAL:  54 to 56, that's what you had

12    designated her on before.

13          MR. COREY:  That's right.  And I believe also

14    22.

15          MR. JACOBY:  Okay.  So these are topics that

16    were the subject of the subsequent meet and confer that

17    you're now agreeing to produce her on?

18          MR. COREY:  Those topics were not within the

19    scope of the subsequent meet and confer.  Those were all

20    things that she had been offered on that we had

21    discussed before.

22          MR. JACOBY:  So you are offering her on those

23    topics now?

24          MR. COREY:  Yes.

25          MR. JACOBY:  Okay.  All right.  What days can

1   dividing this by a time frame, this person is

2   knowledgeable on a certain time frame, or this person is

3   knowledgeable on a certain topic?

4        MR. COREY:  I'll tell you what the problem --

5   not the problem.  The way that I read 2 through 7, Diva

6   Starz falls within the scope of a significant part of

7   those.  And there are three or four people who all have

8   different pieces of the puzzle with respect to Diva

9   Starz, Joni Pratt, Renee Pasko and Congchangco Kislap

10   are all people who have -- and Rob Hudnut are all people

11   who have part of that puzzle.

12        MR. JACOBY:  Does she speak English?

13        MR. COREY:  Joni Pratt?

14        MR. JACOBY:  Yes.

15        MR. COREY:  Yes.

16        MR. JACOBY:  Well, the afternoon of May 2nd

17   would work, and we would be willing to continue it until

18   we're done.  With the start time of 1:00, we'd be

19   willing to continue till we're done.  I guess you need

20   to give us feedback on whether it's going to be here or

21   in Hong Kong, and whether 1:00 o'clock California time

22   works Hong Kong time, whatever that is.

23        MR. COREY:  For the purpose of this call,

24   let's assume that she will be here.  Can you have

25   someone continue her to May 3rd and have someone else

**Exhibit 2**

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

-----------------------------

MATTEL, INC., a Delaware         )

Corporation,                  )

      Plaintiff,  ·    )

      vs.            ) No. CV 04-9059

CARTER BRYANT, an individual; )    NM (RNBx)

and DOES 1 through 10,         ) VOLUME I

Inclusive,               )

      Defendants.       )

----------------------------- )

(COMPLETE CAPTION ON NEXT PAGE.)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


Videotaped 30(b)(6) Deposition of

JILL NORDQUIST, taken at 400 South

Hope Street, Los Angeles, California,

commencing at 9:44 A.M., Tuesday,

July 31, 2007, before Wendy S. Schreiber,

CSR No. 3558, RPR, CLR.


PAGES 1 - 303

MGA v. MATTEL                        None                         Page 1

11

Nordquist, Jill (AEO) 7/31/2007 11:01:00 AM

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

-------------------------------

MATTEL, INC., a Delaware        )

Corporation,                   )

      Plaintiff,        )

      vs.                ) No. CV 04-9059

CARTER BRYANT, an individual; )    NM (RNBx)

and DOES 1 through 10,        )

Inclusive,                     )

      Defendants.        )

------------------------ )

CARTER BRYANT, on behalf of  )

himself, all present and      )

former employees of Mattel,   )

Inc., and the general public,  )

      Counter-Claimants, )

      vs.                )

MATTEL, INC., a Delaware       )

Corporation,                  )

      Counter-Defendant. )

--------------------------

MGA v. MATTEL                    None                         Page 2

12

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:


QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

BY:  JON E. COREY, ESQ.

865 South Figueroa Street, Tenth Floor

Los Angeles, California 90017

(213) 443-3000

Jcorey@quinnemanuel.com


    -AND-


MATTEL, INC.

BY:  JILL E. THOMAS, ESQ. (A.M. Session)

    MICHAEL MOORE, ESQ.  (P.M. Session)

333 Continental Boulevard

El Segundo, California 90245-5012

(310) 252-2000

jill.thomas@mattel.com

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

APPEARANCES OF COUNSEL (CONTINUED):

FOR THE DEFENDANT AND COUNTERCLAIMANT

CARTER BRYANT:

    KEKER & VAN NEST LLP

    BY:  CHRISTA MARTINE ANDERSON, ESQ.

    710 Sansome Street

    San Francisco, California 94111-1704

    (415) 391-5400

    cma@kvn.com

FOR DEFENDANT MGA ENTERTAINMENT, INC.:

    O'MELVENY & MYERS LLP

    BY:  DIANA TORRES, ESQ.

    400 South Hope Street

    Los Angeles, California 90071-2899

    (213) 430-6000

    dtorres@omm.com

ALSO PRESENT:

    RYAN GULINO, VIDEO OPERATOR

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1    Mattel has offered on these topics.  Mattel has also

2    offered other designees to testify in regard to that

3    topic so I just want to make sure that it's clear

4    that she's not the only designee for these topics.

5        MS. ANDERSON:  We understand.  I see that

6    you all have designated other witnesses as well.  We

7    understand that.

8        MR. COREY:  I just want to make sure that's

9    perfectly clear.

10        MS. ANDERSON:  We understand.

11        Q.  Now, in regard to these topics and preparing

12    for your deposition as a Rule 30(b)(6)

13    representative, did you try to educate yourself with

14    knowledge that Mattel may hold but that you didn't

15    have within your own personal knowledge?

16        A.  Can you rephrase that?

17        Q.  Sure.  I'm assuming you've been designated

18    as a Rule 30(b)(6) witness because you know some

19    information that may be relevant to these topics; is

20    that correct?

21        A.  That's correct.

22        Q.  Besides the things that you already know of

23    your own personal knowledge, did you go out and try

24    to educate yourself with other information that you

25    might not have known already to sit here and testify

MGA v. MATTEL                     None                     Page 15

1    today on those topics?

2        A.  I just want to make sure I understand the

3    question correctly.  So you're asking if there

4    was -- if I didn't have firsthand knowledge of

5    something if I asked somebody else who may have had

6    firsthand knowledge?

7        Q.  Correct.

8        A.  No.

9        Q.  And similarly for things of which you didn't

10   have firsthand knowledge, did you go out and try to

11   review any documents to educate yourself on things

12   you didn't have personal knowledge of already?

13       A.  No.

14       Q.  Now, have we covered the documents that you

15   reviewed in preparation for your deposition at this

16   point?

17       A.  Let me just verify since I'm sworn in.

18       Q.  Sure.

19       A.  So there's this one, there was the one I

20   don't know the name of that was the complaint I

21   think we're calling it and then the document

22   regarding Mattel Mexico.

23       Q.  Okay.

24       A.  Yes.

25       Q.  Can you briefly describe to me your

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1      MS. ANDERSON:  Let me rephrase it in a way

2    to avoid that problem completely.

3      Q.  Are you ready?

4      A.  Okay.

5      Q.  Okay.  Did you ever have any discussions

6    with Carter Bryant about whether he ever engaged in

7    any kind of creative work during a time period when

8    he was not employed by Mattel?

9      A.  No.

10     Q.  Did you ever have any discussions with

11   Mr. Bryant about the subject of where he was living

12   immediately prior to him coming to work for Mattel

13   in early 1999?

14     A.  Yes.

15     Q.  What discussions did you have in that

16   regard?

17     A.  When he joined the Collector Team and we

18   were getting acquainted, he mentioned that he had

19   been at Mattel before and I believe he said he

20   worked on the Customized Main Line business and he

21   had mentioned having lived I believe in the Midwest

22   and then obviously was then living in L.A. because

23   he was working at Mattel.

24     Q.  Was this one conversation you had with

25   Mr. Bryant or is this information you learned over a

MGA v. MATTEL                    None                    Page  106

17

Nordquist, Jill (AEO) 7/31/2007 11:01:00 AM

1       MR. COREY: Objection: speculation.

2       THE WITNESS: We decided to develop a series

3   showcasing designers because we had one designer,

4   Robert Best, who had a huge fan base and a big

5   following and we thought it would be fun for the

6   collector community to be able to engage with other

7   designers and to have interest in designers other

8   than just Robert.

9   BY MS. ANDERSON:

10      Q. Who was responsible for selecting Carter

11  Bryant to have his name associated with the first of

12  these Grand Entrance dolls?

13      MR. COREY: Same objection.

14      THE WITNESS: I don't remember who

15  ultimately made that decision.

16  BY MS. ANDERSON:

17      Q. Were you involved in the decision to develop

18  this series of dolls?

19      A. Yes.

20      Q. And who else was involved besides yourself?

21      A. I believe that the Marketing team ranging

22  from myself and the people who reported to me and

23  the person I reported to as well as Ann Driskill and

24  Ron Longsdorf all agreed that it would be a neat

25  concept for collectors.

MGA v. MATTEL                    None                    Page 112

18

Nordquist, Jill (AEO)  7/31/2007 11:01:00 AM

1    was common practice that they would then ask to

2    be -- would then be asked to leave.

3    BY MS. ANDERSON:

4        Q.   Where was that company?

5        A.   Dep Corporation.

6        Q.   At the time that you had this conversation

7    with Mr. Bryant, were you aware of any practice at

8    Mattel with respect to how to handle a situation

9    where an employee was leaving but refused to say

10   whether they were going to a competitor?

11       MR. COREY:  Objection:  calls for

12   speculation.

13       THE WITNESS:  Carter was not my employee so

14   it wasn't my decision to make.

15       MS. ANDERSON:  Move to strike as

16   nonresponsive.

17       Q.   My question to you is not about Mr. Bryant

18   in particular.

19       A.   Okay.

20       Q.   It's just background.  Now I'll ask the

21   question.

22       In the same time frame that you were having

23   this conversation with Mr. Bryant were you aware of

24   there being any general practice at Mattel with

25   respect to how to handle a situation where an

MGA v. MATTEL                 None                      Page  131

                              19

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1    employee was resigning but was refusing to tell you

2    whether they were going to go to a competitor?

3        MR. COREY:  Objection:  calls for

4    speculation.

5        THE WITNESS:  I don't know of any such

6    policy at Mattel about how to handle that sort of

7    situation.

8    BY MS. ANDERSON:

9        Q.  Is that something -- strike that.

10       If you were going to try to find out what

11   Mattel's practices are, if any, with regard to that

12   kind of situation, would you check with Human

13   Resources?

14       MR. COREY:  Objection:  speculation.

15       THE WITNESS:  If -- if I had an employee

16   reporting to me directly and I had a question as to

17   how to handle their resignation, I would contact my

18   boss or HR or Legal, if necessary.

19   BY MS. ANDERSON:

20       Q.  Following the conversation that you had with

21   Mr. Bryant, did you discuss with anyone else the

22   subject matter of the conversation you had with

23   Carter Bryant?

24       A.  Yes.

25       Q.  With how many people did you discuss that

MGA v. MATTEL                    None                    Page 132

20

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1    sure if he reported in to Heather at that point or

2    in to Ann Driskill.

3        Q.   Did you ever discuss with Ann Driskill the

4    subject of whether Carter Bryant should continue

5    working at Mattel after he gave his notice?

6        A.   No.

7        Q.   Do you recall having considered telling her

8    but decided not to?

9            MR. COREY:  Objection:  speculation.

10           THE WITNESS:  All I remember was making a

11   comment to Ron.

12   BY MS. ANDERSON:

13       Q.   When you say that you weren't sure whether

14   Carter was reporting to Heather at the time or

15   whether he was reporting to Ann Driskill, are you

16   referring to Heather Fonseca?

17       A.   Yes.

18       Q.   As a person who supervises employees at

19   Mattel, do you receive any training about what to do

20   when an employee gives notice?

21       A.   I don't know that I've been trained

22   specifically on that.  I don't think so.

23       Q.   Generally speaking, have you ever been

24   educated on any particular practices that you as a

25   supervisor are supposed to follow if and when an

MGA v. MATTEL                    None                   Page  139

21

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1    employee gives notice?

2      A.  I don't believe so.

3      Q.  Are there any written guidelines that you're

4    aware of that dictate what supervisors at Mattel are

5    supposed to do when an employee gives notice?

6      MR. COREY:  Objection:  speculation.

7      THE WITNESS:  I don't know if such

8    information exists.

9    BY MS. ANDERSON:

10     Q.  On the occasions where employees have given

11   you notice that they intend to leave Mattel do you

12   ever make it a practice to contact anyone in Human

13   Resources after you receive that notice?

14     A.  Absolutely.

15     Q.  Is that sort of a regular thing that you do?

16     A.  Generally what I've done in the past of the

17   people who have resigned directly to me I've -- if

18   they had a resignation letter that they handed at

19   the time of telling me I would take that letter and

20   I would go find my supervisor and tell him or her

21   that So-and-So resigned and here's their letter and

22   then I would call HR after and tell them that the

23   person had resigned and I would hand deliver the

24   person's letter if they had it prepared already.

25     Q.  Anything else that is part of your normal

MGA v. MATTEL                      None                      Page  140

22

Nordquist, Jill (AEO) 7/31/2007 11:01:00 AM

1    that so we're all looking at the same thing?

2        MS. ANDERSON:  Sure.  I'll ask another

3    question while we're waiting.

4        Q.  Did you ever have any communications with

5    Carter Bryant on the subject of whether or not he

6    did any kind of creative work on his own time even

7    during his period of employment at Mattel?

8        A.  No.

9        Q.  Did you have any communications with anyone

10   else on the subject of whether or not Carter Bryant

11   did creative work on his own time even during the

12   period of time that he was employed by Mattel?

13       A.  No.

14       Q.  Setting aside conversations you had with

15   Mattel's lawyers, did you ever have any

16   communications with anyone about the subject of

17   whether or not Carter Bryant did any work for any

18   Mattel competitor during the period of time that he

19   was an employee of Mattel?

20       A.  No.

21       Q.  Did any of the other designers that you ever

22   worked with while you were at Mattel ever report to

23   you that they.had done creative work on their own

24   time?

25       MR. COREY:  Objection:  vague and ambiguous.

MGA v. MATTEL                    None                         Page  149

23

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1       question and I'll wrap that up and then we can

2       break.

3           Q.  Are you aware of any written document that

4       you've ever seen that lays out what you believe to

5       be Mattel's policy about what one can and cannot do

6       in one's free time as a Mattel employee?

7           MR. COREY:  Objection:  calls for

8       speculation and lacks foundation.

9           THE WITNESS:  My understanding of Mattel

10      policy is that if you are unclear as to what you

11      should or shouldn't be doing that you should check

12      with somebody.

13      BY MS. ANDERSON:

14          Q.  But are you aware of any written documents

15      that advise employees about what they are and are

16      not permitted to engage in on their free time?

17          MR. COREY:  Same objection.

18          THE WITNESS:  My understanding is that

19      Mattel's guidelines are specific to what you're

20      doing while you're at Mattel.  I'm not sure about

21      like free time.  I'm not -- you know, I really don't

22      know about that.

23      BY MS. ANDERSON:

24          Q.  And did you ever have to sign any kind of

25      written employment agreements in connection with

MGA v. MATTEL                        None                        Page  158

Nordquist, Jill (AEO) 7/31/2007 11:01:00 AM

1          MS. ANDERSON:  It's not a matter of

2     fairness.  You're wasting my time in this

3     deposition.

4          MR. COREY:  I didn't say fairness.

5          MS. ANDERSON:  All right, let's start all

6     over again.

7          Q.  You now have in mind the sentence that

8     starts on line 27 of page 40, correct?

9          A.  Correct.

10          Q.  My question to you is:  Aside from what

11     you've already testified to in this deposition, are

12     you aware of any information that relates in any way

13     to the allegation that Mr. Bryant did not disclose

14     to Mattel that he was working with MGA, a known

15     competitor, while employed by Mattel which you see

16     is an allegation in this document you have before

17     you?

18          A.  No.

19          Q.  Drawing your attention to the next page,

20     page 41, on line 4, the document states "In late

21     November 2003, Mattel obtained a copy of a contract

22     evidencing that Bryant had aided and assisted, and

23     worked as a designer with, MGA, a Mattel competitor,

24     while he was employed by Mattel and was being paid

25     by Mattel for his exclusive services as a designer."

MGA v. MATTEL                    None                    Page 171

25

Nordquist, Jill (AEO) 7/31/2007 11:01:00 AM

1        Do you see that?

2        A.  I do.

3        Q.  My question to you is:  Do you have any

4    knowledge about Mattel obtaining a copy of any

5    contract related to Carter Bryant and MGA?

6        A.  No.

7        MR. COREY:  You need to keep your voice up.

8        THE WITNESS:  Sorry.  No.

9    BY MS. ANDERSON:

10       Q.  Now, you can set the document aside for one

11   second.  I'll go back to it.

12       Do you have any knowledge of any facts

13   related to allegations that Mr. Bryant used any kind

14   of Mattel resources to assist him in doing work for

15   MGA while he was employed by Mattel?

16       A.  No.

17       Q.  Do you have any information related to the

18   allegation that Mr. Bryant used the services of any

19   Mattel personnel to assist him in doing work for MGA

20   during his employment at Mattel?

21       A.  No.

22       Q.  Do you have any information about the

23   allegation that Mr. Bryant communicated information

24   about a Mattel hair vendor to MGA during the period

25   of time that Mr. Bryant was employed by Mattel?

MGA v. MATTEL                          None              26              Page  172

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1    A.   No.

2    Q.   Do you have any information whatsoever about

3    Mr. Bryant doing any kind of work for MGA during the

4    time he was employed by Mattel?

5    A.   No.

6    Q.   Do you know anybody named Ana Ree?

7    A.   I don't think so.

8        MR. COREY:  I believe it's pronounced Ree.

9    BY MS. ANDERSON:

10   Q.   Do you know anybody named Ana Ree?

11   A.   It doesn't ring a bell right now.

12   Q.   Did you ever have any discussions with Ivy

13   Ross or Sandy Yonemoto about the subject of Carter

14   Bryant's leaving Mattel's employment?

15   A.   No.

16   Q.   I've done that one so you can set that big

17   fat exhibit to the side.

18   A.   Okay.

19   Q.   If you could go back to the first document I

20   showed you which is the deposition notice 413 --

21   A.   Uh-huh.

22   Q.   -- let's start first at the end on topic 55

23   which is the second-to-last page of this exhibit.

24   A.   Uh-huh.

25   Q.   That topic is "All acts, omissions,

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1    all the information you're aware of that is

2    responsive and related to those topics.

3         MR. COREY:  I'm going to object on the

4    ground that that's compound.  I mean, she's sat here

5    and answered the questions that you've asked her.

6    It's your obligation to ask her questions to elicit

7    the information she's --

8         MS. ANDERSON:  I have asked her and now I'm

9    asking her if there's anything else she has to tell

10   me.

11        MR. COREY:  I'm going to object as compound

12   and calls for a narrative.

13        MS. ANDERSON:  Okay, we'll take it one by

14   one.

15   Q.   Topic No. 2, "All contractual and

16   non-contractual duties and obligations Bryant owed

17   or performed for Mattel during his employment with

18   Mattel, and thereafter."

19        Do you see that?

20   A.   Yes.

21   Q.   You're one of the 30(b)(6) representatives

22   on this topic, correct?

23   A.   Yes.

24   Q.   Have you given testimony related to

25   information you have that relates to this topic?

MGA v. MATTEL                    None              28              Page 175

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1        MR. COREY:  I'm going to reiterate my same

2    objections.  She sat here and she's answered the

3    question.

4        MS. TORRES:  Counsel, there's not supposed

5    to be speaking objections.

6        MS. ANDERSON:  We've heard it.

7        MR. COREY:  I'm giving you an opportunity to

8    correct the record while we're here.

9        MS. ANDERSON:  I didn't ask for it.  State

10   your legal objection and then we'll get the answer.

11       You can answer.

12       THE WITNESS:  Sorry, what was the question?

13   Q.  Well, the whole point of this deposition is

14   to find out what information you have that's

15   relevant to the topics on which you have been

16   designated and I've asked you about your dealings

17   with Mr. Bryant, correct?

18   A.  Correct.

19   Q.  And I've asked you whether you saw any

20   contracts that Mr. Bryant might have signed during

21   his employment with Mattel, correct?

22   A.  Correct.

23   Q.  And you are not aware of any, right?

24   A.  I have not seen any of the documents that he

25   signed.

MGA v. MATTEL                    None            29              Page  176

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1      Q.   Right.  And so I don't want to have to

2    re ask you all the questions I've asked you today

3    and you have given a lot of information about your

4    experiences with Mr. Bryant.  Okay?

5          My question to you is:  Setting aside all

6    the things you've already told us today, are you

7    aware of any other information that relates to topic

8    No. 2 that I just read to you besides what you've

9    already told me?

10         MR. COREY:  Objection:  compound, calls for

11   a narrative.  It's an improper type of question for

12   a Rule 30(b)(6) witness.

13         THE WITNESS:  As it relates to No: 2, I know

14   what Carter's job responsibilities and duties were

15   as a Collector designer during the time that I was

16   his marketing counterpart and I think I've tried to

17   represent those during the day.  I don't think I

18   have any additional information.

19   BY MS. ANDERSON:

20     Q.   Have you given me today your best

21   description of Mr. Bryant's job responsibilities

22   during the time that you worked with him?

23         MR. COREY:  Same objections.

24         THE WITNESS:  I think I've identified to

25   the -- his responsibilities to the extent that I

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1    knew what they were.

2    BY MS. ANDERSON:

3        Q.  And you don't have any personal knowledge of

4    contractual obligations that he signed onto as a

5    Mattel employee, correct?

6        A.  I do not.

7        Q.  Are you aware of any non-contractual duties

8    or obligations that Mr. Bryant had during his

9    employment at Mattel?

10       MR. COREY:  Calls for a legal conclusion.

11       THE WITNESS:  I don't know anything about

12   his employment circumstances or contracts.

13   BY MS. ANDERSON:

14       Q.  Are you aware of anything that Mr. Bryant

15   did or didn't do in the course of his work at Mattel

16   that you thought was improper?

17       MR. COREY:  Hold on just a second.

18       THE WITNESS:  I thought it was improper that

19   he lied to me when he left when he denied going to a

20   competitor when he, in fact, was going to a

21   competitor.

22   BY MS. ANDERSON:

23       Q.  Is there anything else besides that that you

24   believe was something that Mr. Bryant did that was

25   improper during the course of his employment at

Nordquist, Jill (AEO) 7/31/2007 11:01:00 AM

1   Mattel?

2      A.  Not that I was made aware of.

3      Q.  What kind of -- strike that.

4          Did Mr. Bryant have access to any kind of

5   confidential or proprietary information while he was

6   at Mattel?

7      A.  Yes.

8      Q.  What kind of confidential or proprietary

9   information do you have knowledge that Mr. Bryant

10  was given access to while he was employed at Mattel?

11     A.  Everything that we worked on was

12  confidential.  Our entire doll line, I mean, it was

13  our livelihood, how we made our revenue so our doll

14  line was confidential.

15         He also sat in the Design Center which is a

16  highly-confidential area and had access to the

17  entire lay of the land of the Design Center.

18     Q.  Do you have any knowledge as you sit here

19  today of Mr. Bryant having done anything improper

20  with respect to any confidential information that

21  Mr. Bryant had access to while he was at Mattel?

22     MR. COREY:  Objection:  calls for a legal

23  conclusion and vague and ambiguous.

24     THE WITNESS:  The only improper confidential

25  information that I was aware of was when he lied to

MGA v. MATTEL                    None                    Page 179

32

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1    BY MS. ANDERSON:

2        Q.  Did you ever meet someone named Richard

3    Irmen, I-r-m-e-n?

4        A.  Offhand I don't know.

5        Q.  Did you ever come to be introduced to Carter

6    Bryant's significant other at any point in time?

7        A.  No.

8        Q.  And as you sit here today, do you recall

9    what specific work Carter Bryant worked on in the

10   last two weeks he was at Mattel?

11       A.  No.

12           MS. ANDERSON:  Subject to any possible

13   follow-up I'm done.  Shall we go off the record so

14   we can switch positions?

15           VIDEO OPERATOR:  Off the record at 3:47.

16           (Brief recess.)

17           VIDEO OPERATOR:  The time is 3:56 p.m.  We

18   are back on the record.

19

20           FURTHER EXAMINATION

21   BY MS. TORRES:

22       Q.  Good afternoon, Ms. Nordquist.  I represent

23   MGA and I have some questions that I'd like to ask

24   you that pertain particularly to MGA but I have a

25   couple quick follow-ups on Carter Bryant.

MGA v. MATTEL              None           33        Page  185

Nordquist, Jill (AEO)  7/31/2007 11:01:00 AM

1   Q.  You told me that you believe Ms. Trueba I

2   think you said got her hands on the document.

3   A.  Correct.

4   Q.  Is your belief that Ms. Trueba received this

5   document based on anything other than what Mattel's

6   counsel told you?

7   A.  No.

8   Q.  Do you have any information as to where

9   Ms. Trueba might have received this document given

10  the fact that you did not give it to her?

11  A.  I do not.

12  Q.  Other than information you have made -- you

13  may have learned from Mattel's counsel, do you have

14  any knowledge of any theft or misappropriation of

15  Mattel trade secrets by Carter Bryant?

16  A.  The only knowledge I have is based on press

17  releases or articles that I've read.

18  Q.  And other than what you might have been told

19  by Mattel's counsel, do you have any knowledge of

20  the theft or misappropriation of Mattel trade

21  secrets by any MGA employee?

22  A.  No.

23  Q.  Other than what you may have been told by

24  Mattel's counsel, do you have any knowledge of any

25  theft of Mattel trade secrets by any employee of any

MGA v. MATTEL                  None                          Page 215

34

Nordquist, Jill (AEO)  7/31/2007  11:01:00 AM

1
2
3
4
5          REDACTED
6
7
8
9          REDACTED
10
11
12
13
14
15         REDACTED
16
17
18
19
20         REDACTED
21
22
23
24
25

MGA v. MATTEL                    None                      Page  216

35

**Exhibit  3**

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4

5     ------------------------------

6     MATTEL, INC., a Delaware      )

7        Corporation,              )

8           Plaintiff,        )

9           vs.              ) No. CV 04-9059

10    CARTER BRYANT, an individual;  )    NM (RNBx)

11    and DOES 1 through 10,        ) VOLUME I

12    Inclusive,                  )

13          Defendants.        )

14    ------------------------------ )

15    (COMPLETE CAPTION ON NEXT PAGE.)

16

17    CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19    Videotaped 30(b)(6) Deposition of

20    ROBERT K. HUDNUT, JR., taken at

21    400 South Hope Street, Los Angeles,

22    California, commencing at 9:35 A.M.,

23    Friday, July 13, 2007, before Wendy S.

24    Schreiber, CSR No. 3558, RPR, CLR.

25    PAGES 1 - 238

1       UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA

3       EASTERN DIVISION

4

5       -----------------------------

6       MATTEL, INC., a Delaware   )

7       Corporation,         )

8            Plaintiff,    )

9           vs.        ) No. CV 04-9059

10      CARTER BRYANT, an individual; )   NM (RNBx)

11      and DOES 1 through 10,    )

12      Inclusive,         )

13           Defendants.    )

14      --------------------------- )

15      CARTER BRYANT, on behalf of  )

16      himself, all present and    )

17      former employees of Mattel,  )

18      Inc., and the general public, )

19           Counter-Claimants, )

20           vs.       )

21      MATTEL, INC., a Delaware    )

22      Corporation,         )

23           Counter-Defendant. )

24      -----------------------------

25

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1      APPEARANCES OF COUNSEL:

2.

3.

4      FOR THE PLAINTIFF:

5

6      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

7      BY:  DIANE C. HUTNYAN, ATTORNEY AT LAW

8      865 South Figueroa Street, Tenth Floor

9      Los Angeles, California 90017

10     (213) 443-3000

11     dianehutnyan@quinnemanuel.com

12

13          -AND-

14

15     MATTEL, INC.

16     BY:  MICHAEL MOORE, ESQ.

17     333 Continental Boulevard

18     El Segundo, California 90245-5012

19     (310) 252-2000

20     michael.moore@mattel.com

21

22

23

24

25

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3    FOR THE DEFENDANT AND COUNTERCLAIMANT

4    CARTER BRYANT:

5

6        KEKER & VAN NEST LLP

7        BY:  MICHAEL H. PAGE, ESQ.

8        710 Sansome Street

9        San Francisco, California 94111-1704

10       (415) 391-5400

11       mhp@kvn.com

12

13

14   FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16       O'MELVENY & MYERS LLP

17       BY:  JAMES PAUL JENAL, ESQ.

18       400 South Hope Street

19       Los Angeles, California 90071-2899

20       (213) 430-6000

21       jjenal@omm.com

22

23   ALSO PRESENT:

24

25       DAVID WEST, VIDEO OPERATOR

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1      A.   If I may?

2      Q.   Sure.

3           MS. HUTNYAN:  Wait a minute.  I just want to

4      make sure that any information about what he did at

5      his depo prep doesn't result in some kind of a          11:44AM

6      waiver or privilege.  My understanding is that

7      during the case we've been allowing witnesses on

8      both sides to testify as to what they prepared for

9      in terms of the 30(b)(6) designations but that that

10     does not constitute a waiver.  Do you agree that        11:44AM

11     that's the case here?

12          MR. JENAL:  Well, I don't think I could ask

13     him what he's been designated on and his

14     understanding of it if that were a waiver of the

15     attorney-client privilege.  I think he has knowledge  11:45AM

16     as to why he's sitting here on behalf of Mattel

17     presumably and I'm entitled to find out about that.

18          MS. HUTNYAN:  Well, that's completely

19     non-responsive.  Did you hear my question?

20          MR. JENAL:  I'm not under oath here,             11:45AM

21     Counsel.  You want to make an objection at some

22     point, make an objection.  In the meantime I'm

23     trying to ask if he recognizes this document.

24     That's my question.  Are you instructing him not to

25     answer?                                 11:45AM

MGA v. MATTEL                     None                        Page 90

40

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1          MS. HUTNYAN:  I think I was extraordinarily

2     clear.  If you'd like to read back on your screen,

3     maybe review it, then you can answer my question.  I

4     just want to know if you are going to take the

5     position that responses as to what he did within his  11:45AM

6     preparation for his deposition won't constitute a

7     waiver of any kind.  I just want that reassurance

8     that it doesn't.  My understanding is that in

9     countless depositions before this you've agreed to

10    that so I'm not really sure why you're giving me a     11:45AM

11    hard time.  It seems like a no brainer.

12          MR. JENAL:  The question has never come up,

13    Counsel, so --

14          MS. HUTNYAN:  I've read it in deposition

15    transcripts.  Maybe you need to read up.          11:45AM

16          MR. JENAL:  I think I've read more

17    transcripts in this case than you have.  It hasn't

18    come up in my experience.  Let's just go and ask a

19    question.

20          MS. HUTNYAN:  Anything that relates to your  11:46AM

21    deposition preparation we need to find that out

22    before we answer questions related to it.

23          THE WITNESS:  Okay.

24    BY MR. JENAL:

25          Q.  So I was asking if you could turn to page 4  11:46AM

MGA v. MATTEL                    None                    **41**                Page  91

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1        of Exhibit 385.  Do you see that?

2            A.   Yes.

3            Q.   And is it your understanding that you've

4        been designated today to testify on behalf of Mattel

5        as to some of the topics in this deposition notice?   11:46AM

6            A.   That's correct.

7            Q.   And my understanding as to the topics that

8        you've been designated on is as follows:  It's

9        topics 2 through 8 that appear here on page 4, topic

10       11 which appears on the next page, topic 13 also on   11:46AM

11       that page and topic 24 which is on page 6 of Exhibit

12       385.  Is that your understanding as well, sir?

13            MS. HUTNYAN:  No, there's -- that's not what

14       he's been designated on.  He said 2 through 8, 11,

15       what and 24?                        11:47AM

16            MR. JENAL:  11, 13 and 24.

17            MS. HAULER:  No, my understanding is 2

18       through 7 and 11.

19            MS. HUTNYAN:  Portions of those.

20            MR. JENAL:  Your understanding is what,        11:47AM

21       Bridget?

22            MS. HAULER:  Two through 7 and 11.

23            MS. HUTNYAN:  And the portions of those that

24       specifically relate to the scripts that he's worked

25       on within those categories.                11:47AM

Hudnut, Rob (AEO)· 7/13/2007  9:19:00 AM

1          MR. JENAL:  And the basis for -- let's take

2      those in two steps, all right, because the notes

3      that I have from the meet and confer with Judge

4      Infante included 2 through 8, 11, 13 and 24.

5          MS. HAULER:  I can double-check but mine was 11:47AM

6      I had 2 through 7 from the same so I'll

7      double-check.  I'll have someone check it and E-mail

8      us back, but that was not mine.

9          MR. JENAL:  That's fine, Bridget.  Let's --

10         MR. PAGE:  Let's just look at it at a break. 11:48AM

11         MR. JENAL:  Yeah, we'll resolve that part of

12     the question on a break.

13     Q.  You understand then at least you agree as to

14     2 through 7 and 11; is that correct?

15         MS. HUTNYAN:  With the qualification that I  11:48AM

16     mentioned.

17         MR. JENAL:  Right, and we'll get to that in

18     just a second.

19     Q.  That's -- your understanding is that's the

20     designation?                        11:48AM

21     A.  That is my understanding.

22         MR. JENAL:  Okay.  And then the second part

23     of this was a limitation as to what, Counsel?

24         MS. HUTNYAN:  It's only the portions of

25     those topics that deal with his knowledge as to the   11:48AM

MGA v. MATTEL                 None                        Page  93

43

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1    scripts that might be pertinent to those topics. So

2    it's not those entire topics.

3         MR. JENAL: And is there some communication

4    that establishes that restriction?

5         MS. HAULER: Yes, the same as it's been the   11:48AM

6    same for every Diva Starz person that's been

7    deposed.

8         MR. JENAL: Sorry --

9         MS. HAULER: I couldn't tell you off the top

10   of my head exactly where that comes from but if you   11:48AM

11   look at the transcript for RenT Pasko, Kislap, Joni

12   Pratte, it's been the same practice for every single

13   one of those witnesses.

14        MR. JENAL: Okay. Just so I'm clear and the

15   record is clear that practice being what? I'm just   11:48AM

16   not sure what you meant by that.

17        MS. HAULER: That it's basically his

18   personal knowledge regarding his work on Diva Starz.

19   BY MR. JENAL:

20    Q.  Okay. Is that your understanding as well,   11:49AM

21   sir, that you're here today to testify as to your

22   personal knowledge with regards to these topics as

23   they pertain to Diva Starz?

24    A.  Yes.

25    Q.  Just so that the record is clear. So let me   11:49AM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1   ask you this.  If you would turn to page 4, topic 2,

2   which is all contractual and non-contractual duties

3   and obligations Bryant owned or performed for Mattel

4   during his employment with Mattel and thereafter, do

5   you see that?                        11:49AM

6       A.  Yes, I did.

7       Q.  What did you do to prepare today to testify

8   on behalf of Mattel as to that topic?

9       A.  Is that an okay question?

10          MR. PAGE:  If it isn't, she'll tell you.    11:49AM

11          MS. HUTNYAN:  Do you agree that questions as

12   to his preparation for his 30(b)(6) designation

13   testimony is not -- I'm sorry, that his responses do

14   not constitute a waiver of some kind?

15          MR. JENAL:  Well, insofar as that question    11:50AM

16   doesn't implicate any attorney-client privilege I

17   don't know how it could be a waiver of anything.

18   I'm asking what he did to prepare to testify on

19   behalf of the corporation for which he's been

20   designated.                        11:50AM

21          MS. HUTNYAN:  Okay, so you agree that it's

22   not a waiver.  That was easy.  Okay, it's not a

23   waiver.  Can you just repeat the question for me?

24          (The pending question was read as follows:

25          "Q.  What did you do to prepare      11:49AM

1           today to testify on behalf of Mattel

2           as to that topic?")

3    BY MR. JENAL:

4        Q.   And that was topic No. 2.

5        A.   Regarding 2 specifically as we prepared and  11:50AM

6    imagined the issues that would come up today we --

7        Q.   Let me back you up.  I don't want you to

8    disclose your conversations with counsel.  That's

9    not what I'm asking about.  Okay?  So conversations

10   with counsel are privileged.  I'm not interested in  11:51AM

11   those.  Okay?  So let's set those aside.

12           MR. PAGE:  Other than the existence of them.

13           MS. HUTNYAN:  Yes, right.

14   BY MR. JENAL:

15       Q.   I'm entitled to know when and where and that  11:51AM

16   sort of thing but the content of the communications

17   are off the table.  I'm not interested in that.

18   Okay?

19           So leaving aside the fact that you may have

20   discussed the topic with counsel, what else, if      11:51AM

21   anything, did you do to prepare to testify as to

22   topic No. 2?

23       A.   I don't know which things I did would be

24   directly related to No. 2.

25       Q.   Did you do any research to determine what    11:51AM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    contractual or non-contractual duties Carter Bryant

2    owed to Mattel?

3        A.   That Carter Bryant owed to Mattel?

4        Q.   Yes.

5        A.   Not direct.  Nothing direct.          11:51AM

6        Q.   Do you know who Carter Bryant was/is?  Is.

7        A.   I remember his name from his time here.  I'm

8    aware that he's part of this litigation.  I have a

9    feeling we had some meetings together way back when

10   but I did not know him.  I don't -- I don't know.  I  11:52AM

11   don't have specific recollections of any

12   interactions with Carter Bryant.

13       MS. HUTNYAN:  And I'm going to object to

14   this line of questions on the basis that it's

15   misleading.  I mean, I've told you what he's been  11:52AM

16   provided here to testify about with regard to those

17   topics and they're not about contractual duties.  I

18   think that's very clear.  It's about his information

19   that he has -- facts that are pertinent to those

20   topics relating to the scripts.  And so I'm just     11:52AM

21   going to object to that line of questioning.

22   BY MR. JENAL:

23       Q.   Let me ask you to look at topic No. 3.

24   Topic No. 3 for which you've been designated by

25   Mattel as its 30(b)(6) witness today is all of     11:53AM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1       A.   Not that I recall.

2       Q.   Leaving aside conversations with counsel,

3    whom else have you spoken to in preparation for your

4    deposition?

5       A.   In preparation?                    12:02PM

6       Q.   Correct.

7       A.   Nobody.

8       Q.   Aside from the Diva Starz materials that you

9    mentioned that you reviewed, what other written

10    materials did you review in preparation for your      12:02PM

11    deposition?

12       MS. HUTNYAN:  Objection:  calls for

13    speculation, lacks foundation.

14       THE WITNESS:  I also reviewed my

15    employment -- or my inventions agreement with      12:02PM

16    Mattel.

17    BY MR. JENAL:

18       Q.   Why did you do that?

19       MS. HUTNYAN:  Objection.  Instruct the

20    witness not to answer to the extent that it reflects  12:02PM

21    counsel's thoughts or work product.  Also calls for

22    speculation.  You're instructed.

23       THE WITNESS:  I'll not answer.  She

24    instructed me not to answer.

25    /  /  /                              12:03PM

Hudnut, Rob (AEO)  7/13/2007 9:19:00 AM

1    BY MR. JENAL:

2        Q.   Did you bring your inventions agreement with

3    you?

4        A.   I did not.

5        Q.   Did you turn it over to counsel?        12:03PM

6        A.   Yes, I did.

7            MR. JENAL:  Counsel, do you have it with you

8    today?

9            MS. HUTNYAN:  No, but you do.

10           MS. HAULER:  It's been produced.        12:03PM

11           MR. JENAL:  When was it produced?

12           MS. HAULER:  At least maybe -- maybe at

13    least two months ago.

14           MR. JENAL:  Can you be more precise?

15           MS. HAULER:  The exact day?  No.  But I know 12:03PM

16    it's been produced.

17           MR. JENAL:  Can you get us a Bates number?

18           MS. HAULER:  I can find out but it's

19    definitely been produced.

20    BY MR. JENAL:                    12:03PM

21        Q.   On the Diva Starz documents what's the

22    approximate volume/pages of documents that you've

23    reviewed?

24        A.   Pages?

25           MS. HUTNYAN:  Objection: vague, calls for  12:04PM

1    speculation.

2         THE WITNESS:  One hundred pages, 150 pages.

3    BY MR. JENAL:

4         Q.  Not boxes worth of material?

5         A.  No.                    12:04PM

6         Q.  Was that -- strike that.

7              Apart from the Diva Starz material that you

8    referenced and your inventions agreement, what other

9    written materials did you review in preparation for

10   your deposition?                12:04PM

11        A.  This was shown to me yesterday.

12        Q.  Exhibit 385, the deposition notice?

13        A.  That's right.

14        Q.  Did you review any other written materials

15   in preparation for your deposition?      12:04PM

16        A.  Not that I can think of.

17        Q.  Did you read the transcripts from any other

18   depositions that have been taken in this case?

19        A.  No.

20        Q.  Did you look at any of the complaints that  12:05PM

21   have been filed in this case?

22        A.  Is this -- I've only looked at 385.  In

23   terms of legal documents this is the only one I've

24   seen.

25        Q.  Fair enough.  Okay.          12:05PM

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1        Would you turn to page 5 of Exhibit 385 and

2     look at topic 11 there.

3        A.  Yes.

4        Q.  Which is all facts and circumstances showing

5     the conception, origination, creation, development    12:05PM

6     and/or reduction to practice of Diva Starz.  Do you

7     see that?

8        A.  I do.

9        Q.  Is that a topic that you believe you are

10    prepared to testify today on behalf of Mattel?        12:05PM

11        MS. HUTNYAN:  Objection:  asked and

12    answered.  I've already explained what the scope of

13    this is.  That's his designation.

14        THE WITNESS:  I can speak to some parts of

15    it and those that I know about I'm happy to speak     12:05PM

16    about.

17    BY MR. JENAL:

18        Q.  You don't have the kind of confusion as to

19    what knowledge you might have on topic 11 that you

20    had, for example, with topics 2 and 3?  Is that fair  12:06PM

21    to say?

22        MS. HUTNYAN:  Objection:  misstates the

23    witness' testimony.  Confusion?  It's very clear.

24    There's a limitation as to all the categories that

25    allows him to testify as to his personal knowledge    12:06PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    within those categories that he has.

2    BY MR. JENAL:

3        Q.  Your turn.

4        MS. HUTNYAN:  Objection:  vague and

5    ambiguous, misleading.                    12:06PM

6        THE WITNESS:  I understand that I'm here to

7    talk about Diva Starz and I'm prepared to do so.

8    BY MR. JENAL:

9        Q.  Okay.  Would you look at topic No. 4 which

10    you've also been designated on back on page 4 of    12:06PM

11    Exhibit 38.  Topic No. 4 is all of Bryant's acts or

12    omissions which breached any duties or obligations

13    imposed by the Conflict of Interest Questionnaire

14    and/or the Employee Confidential Information and

15    Inventions Agreement.  Do you see that?        12:06PM

16        A.  I do see it.

17        Q.  Do you have any information about Mattel's

18    knowledge of Bryant's acts or omissions which

19    breached any duties or obligations imposed by the

20    Conflict of Interest Questionnaire and/or The    12:07PM

21    Employee Confidential Information and Inventions

22    Agreement?

23        MS. HUTNYAN:  Objection:  calls for a legal

24    conclusion.  This witness knows facts pertaining to

25    the topic that he's been designated on.        12:07PM

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1      MR. JENAL: Make an objection. Stop

2    coaching the witness.

3      Q.  May I have an answer to my question, please,

4    Mr. Hudnut.

5      A.  We discussed Carter Bryant in deposition    12:07PM

6    preparation but my understanding is that would all

7    be privileged because it was part of our

8    preparation.

9         MS. HUTNYAN: It is privileged so don't get

10   into that. You're instructed not to get into      12:07PM

11   privileged material.

12   BY MR. JENAL:

13     Q.  I'm asking you as Mattel's representative do

14   you have any facts of which you are aware supporting

15   any understanding of Mattel as to Bryant's acts or   12:07PM

16   omissions which breached any duties or obligations

17   imposed by the Conflict of Interest Questionnaire

18   and/or the Employee Confidential Information and

19   Inventions Agreement?

20        MS. HUTNYAN: Calls for a legal conclusion,   12:08PM

21   misleading, calls for speculation.

22        THE WITNESS: What I know about it is how we

23   developed Diva Starz. That's what I know about.

24   BY MR. JENAL:

25     Q.  How about topic No. 5? Topic No. 5 is all   12:08PM

1    Mattel proprietary or confidential information

2    Bryant had access to during his employment with

3    Mattel.  Do you have any factual knowledge on behalf

4    of Mattel as to what Mattel proprietary or

5    confidential information Bryant had access to during   12:08PM

6    his employment with Mattel?

7        MS. HUTNYAN:  Calls for a legal conclusion.

8        You can answer.

9        THE WITNESS:  I don't know what information

10   Carter Bryant had or did not have access to when he   12:08PM

11   was at Mattel.

12   BY MR. JENAL:

13       Q.   Topic No. 6 is all of Bryant's acts or

14   omissions pursuant to which he aided, assisted and

15   worked for a competitor of Mattel while employed by   12:08PM

16   Mattel from 1995 to the present.  As Mattel's

17   30(b)(6) representative, do you have any knowledge

18   of facts regarding Bryant's acts or omissions

19   pursuant to which he aided, assisted and worked for

20   a competitor of Mattel while employed by Mattel from   12:09PM

21   1995 to the present?

22       MS. HUTNYAN:  Same objections.

23       THE WITNESS:  I don't have any personal

24   contact or knowledge of what he did or might not

25   have done.  I'm aware that that is at issue here so   12:09PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    there must be an issue.  Outside of my discussions

2    with counsel I don't have any other direct personal

3    knowledge of anything he did or didn't do.

4    BY MR. JENAL:

5        Q.  And leaving aside what counsel may have told 12:09PM

6    you, as Mattel's representative, does Mattel have

7    any knowledge of any facts regarding Bryant's acts

8    or omissions pursuant to which he aided, assisted

9    and worked for a competitor of Mattel while employed

10   by Mattel from 1995 to the present?            12:10PM

11       MS. HUTNYAN:  Objection:  calls for a legal

12   conclusion.  This witness does not have a roadmap to

13   what's pertinent to all.

14       MR. JENAL:  Make an objections.  Stop making

15   speeches.                               12:10PM

16       MS. HUTNYAN:  It's misleading.  If you want

17   facts from this witness, fine, but instead you want

18   to ask misleading questions.  I won't have it.  Okay

19   he's well prepared on the topic he was designated

20   on.  You don't --                        12:10PM

21       MR. JENAL:  He was designated on topics at

22   least 2 through 7 and 11.  I'm asking --

23       MS. HUTNYAN:  That portion of it that

24   pertains.  The fact in his personal knowledge.  Now

25   you're trying to get him to say that he doesn't have 12:10PM

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1    personal knowledge with regard to the topics.

2          MR. JENAL:  He already --

3          MS. HUTNYAN:  He does.  He already testified

4    that he did.  This is just horrendously misleading

5    and eight.  You know what the topics are.  Get on    12:10PM

6    the topics.  Okay?  Asking him to decide legal

7    conclusions as far as what's pertinent to what is

8    just not a proper area of questioning.  It's outside

9    the scope and I'll end the deposition if you

10   continue.  Okay?  I've given you leeway and I've    12:10PM

11   just about had it.  Okay?  He has facts that are

12   pertinent and we've already explained what they are.

13          MR. JENAL:  Can I have my question read

14   back, please.

15          (The pending question was read.)    12:11PM

16          MS. HUTNYAN:  Same objections.

17          THE WITNESS:  I'm not a lawyer so I don't

18   know what information Mattel has that would be

19   relevant or not relevant.  I haven't -- I'm -- I'm a

20   screenwriter and a song writer and a producer.    12:11PM

21   Those are the things that I'm prepared to talk

22   about.

23   BY MR. JENAL:

24      Q.  Looking at topic No. 7, topic No. 7 on which

25   you've been designated by Mattel is the services and    12:11PM

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1      property belonging to Mattel that Bryant provided to

2      any third party including MGA from 1995 to the

3      present. My question to you sir, as Mattel's

4      30(b)(6) designee on topic No. 7 are you aware of

5      any facts regarding services and property belonging   12:12PM

6      to Mattel that Bryant provided to any third party

7      including MGA from 1995 to the present?

8           MS. HUTNYAN:  Objection:  calls for a legal

9      conclusion, calls for speculation by a lay witness,

10     outside the scope of the designation.          12:12PM

11          THE WITNESS:  My understanding is I'm here

12     to talk about Diva Starz and what I know about that.

13     So how that applies or doesn't apply to No. 7 I

14     leave to the lawyers to figure out.

15          MR. JENAL:  Why don't we go off the record   12:12PM

16     and take our lunch break now.

17          VIDEO OPERATOR:  12:13 we're off the record.

18

19          (At the hour 12:13 p.m. the luncheon

20      recess was taken.)

21

22

23

24

25

MGA v. MATTEL                    None              57              Page 113

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    forward.  If so and it was something I might need at

2    a later date, I probably would have saved it.  If it

3    wasn't, then I probably wouldn't have saved it.

4    BY MR. JENAL:

5        Q.   Within the manner in which you have retained    01:29PM

6    your E-mails in these local folders is there a

7    specific folder that you would go looking in to find

8    E-mails related to Diva Starz?

9        A.   Well, as I sit here I can't recall if I have

10   a specific Diva Starz file or not in terms of a        01:29PM

11   local folder.  If I didn't, then I would go to that

12   LSPA folder which was sort of my catch-all for Girls

13   things.

14       Q.   Have you ever looked for E-mails related to

15   My Scene?                                              01:29PM

16       A.   Looked for them?

17       Q.   In relationship to requests from Legal.

18       A.   I don't recall personally doing so.

19       Q.   Do you have a local folder that relates to

20   the My Scene product?                                  01:30PM

21       A.   Yes, I do.

22       Q.   Would it again be your practice that E-mails

23   that you would copy from your in box into the My

24   Scene folder would be retained?

25       MS. HUTNYAN:  I'm just going to object as to        01:30PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    the designation just that this is outside the

2    designation, the topics that the witness has been

3    designated on, and I'd just like that to be a

4    running objection.

5        BY MR. JENAL:                              01:30PM

6        Q.   Do you understand my question?

7        A.   Could you repeat it, please?

8        Q.   Sure.  You've told us that as a general rule

9    once you copy E-mail into one of these local folders

10   it's generally your practice that you do not delete   01:30PM

11   those E-mails, correct?

12       A.   That's correct.

13       Q.   Do you have any reason to believe that your

14   practice would be different with regards to the My

15   Scene folder?                                01:31PM

16       A.   No.

17       MS. HUTNYAN:  Objection:  calls for

18   speculation.

19   BY MR. JENAL:

20       Q.   Do you know whether -- strike that.    01:31PM

21       Did you search on your C drive for documents

22   related to this litigation?

23       MS. HUTNYAN:  Objection:  calls for

24   speculation.

25       THE WITNESS:  To which litigation?        01:31PM

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1    doing in response to the communication you received

2    from Mr. Normile regarding preservation of documents

3    related to this litigation other than what you've

4    told us already?

5         A.   Not that I can think of right now.          01:32PM

6         Q.   Are you -- you mentioned to us earlier that

7    you were familiar with the name Carter Bryant,

8    correct?

9         A.   That's correct.

10        Q.   And that I think you said that you may have  01:33PM

11   been in some meetings with Carter Bryant at some

12   point in time; is that correct?

13        A.   That's correct.

14        Q.   Do you know whether you ever exchanged

15   E-mails with Carter Bryant while he was a Mattel      01:33PM

16   employee?

17        A.   I don't know.

18        Q.   Did you ever look for E-mails that might be

19   in your possession that were sent to or from Carter

20   Bryant?                                               01:33PM

21        A.   I don't recall doing that.

22        Q.   Do you know the name Paula Treantafelles?

23        A.   I'm aware --

24        MS. HUTNYAN:  Objection.  I'm sorry,

25   instruction not to answer with respect to any         01:33PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    C, none of the above.

2    BY MR. JENAL:

3        Q.   Could you tell me when did you first become

4    involved with the Diva Starz project?

5        A.   It would have been either late '99 or early   01:36PM

6    2000.  That's the answer.  Careful with the

7    microphone.

8        Q.   I'm holding it by the cord for just that

9    reason.

10        (Exhibit 477 was marked for identification   01:36PM

11    and attached to the deposition.)

12    BY MR. JENAL:

13        Q.   Mr. Hudnut, I'm showing you what the court

14    reporter has just marked as 477 in your deposition.

15    Could you take a look at this for a moment and tell   01:37PM

16    me if you recognize this?

17        A.   Yes, I do.

18        Q.   Exhibit 477 is a multi-page document bearing

19    Bates No. M 0110609 through 611.  What do you

20    recognize Exhibit 477 to be, sir?                01:37PM

21        A.   I recognize it to be the notes from a

22    brainstorming meeting that we had regarding the

23    creation of Diva Starz story content.

24        Q.   And there's a date on the E-mail that

25    appears to be transmitting the document -- the   01:38PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1     help us with that.  Prior to that there probably

2     would have been some phone calls saying, "Hey, we've

3     got a new brand and we'd like you to see if you

4     think it would make a good story."

5         Q.   Okay.  You mentioned Marketing and Design   01:39PM

6     partners.  Who were the Design people to whom you're

7     referring?

8         A.   On this -- on this project?

9         Q.   Well, correct.  You had said that you would

10    have had discussions prior to this March 13th, 2000   01:40PM

11    E-mail with your Marketing and Design partners and

12    so I'm just asking you who those Design partners

13    would have been, their names.

14        A.   My recollection is that Maureen Mullen I

15    believe is her last name would have been part of   01:40PM

16    that and I can't remember specifically who else

17    would have been part of that.

18        Q.   What about the Marketing partners?  Who

19    would those people have been?

20        A.   I'm trying to remember.  I know that Sara   01:41PM

21    Silverman was part of that.  She probably would have

22    been the main person as we got started.

23        Q.   Is it your understanding that by March 13th,

24    2000 the name for this project was Diva Starz as

25    opposed to something else, or was that just a   01:41PM

1   working title?

2        MS. HUTNYAN:  Objection:  calls for

3   speculation, vague.

4        You can answer.

5        THE WITNESS:  I don't know.  I know that it  01:41PM

6   was referred to as Diva Starz at the meeting so

7   sometimes at Mattel names change as we're -- as

8   we're developing the project so something that's

9   called something one day may be called something

10   different later.                    01:41PM

11   BY MR. JENAL:

12        Q.   Do you know whether the Diva Starz project

13   had that experience where the name started out as

14   one thing and then changed over time?

15        A.   I don't know.  I don't know.        01:42PM

16        Q.   Was it always called Diva Starz from the

17   time that you became involved with it?

18        A.   I believe it was but I don't know for sure.

19        Q.   That's your best recollection sitting here

20   today?                    01:42PM

21        A.   That's my best recollection.

22        Q.   This is from someone whose name appears to

23   be Mercedes -- is that Sichon?

24        A.   Sichon is the way she says it.

25        Q.   Who is Mercedes Sichon?        01:42PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1          MS. HUTNYAN:  Objection:  calls for

2     speculation.

3          THE WITNESS:  My sense of it is that the

4     pitch meetings probably occurred after the toys had

5     reached the shelf.                    02:08PM

6     BY MR. JENAL:

7          Q.  How about Kris Lynch?  Are you familiar with

8     that name?

9          A.  Kris Lynch?  It sounds somewhat familiar but

10    I can't place the face.               02:09PM

11         Q.  Bill Willett?  Are you familiar with that

12    name?

13         A.  Yes.

14         Q.  Who is Bill Willett?

15         A.  If he's the person I'm thinking of, he's a  02:09PM

16    designer at Mattel.

17         Q.  What was his involvement on the Diva Starz

18    project, if any?

19         MS. HUTNYAN:  Can I just ask for

20    clarification?  When you say "the Diva Starz       02:09PM

21    project," are you referring to the project he was

22    involved in for all these questions?

23         MR. JENAL:  Sorry.  And that's a fair

24    objection.  And maybe we should try to come up with

25    a nomenclature that makes this clear.          02:09PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1      Q.   There was a Diva Starz show project if you

2    will that you were directly engaged in, correct?

3      A.   That's correct.

4      Q.   And is the Diva Starz show project, would

5    that be a fair way to describe that or is there        02:09PM

6    another descriptor that you used commonly to

7    describe that?

8      A.   We would have called it Diva Starz

9    entertainment.

10     Q.   Fair enough.                     02:10PM

11     A.   Though, again, content isn't just

12   entertainment at Mattel.  It can come out a number

13   of ways.

14     Q.   I understand that.  But in terms of -- in

15   terms of your role --                    02:10PM

16     A.   Yes.

17     Q.   -- would the way you would phrase that would

18   be that you were involved with the Diva Starz

19   entertainment project?

20     A.   I think, yes.  For purposes of our       02:10PM

21   understanding each other we can use that.

22     Q.   Okay.  So I'll try to focus myself and say

23   "Diva Starz entertainment project" when I mean to

24   refer specifically to that which you worked on and

25   "Diva Starz project" as the broader sort of brand    02:10PM

MGA v. MATTEL            None         65        Page 154

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1     project within Mattel.  Do you understand that

2     distinction?

3         A.   I believe I do.

4             MS. HUTNYAN:  Can we get some clarification

5     as to the prior questions that used the one term and   02:11PM

6     what his understanding of that was?  Because I fear

7     that there was some ambiguity there perhaps.

8     BY MR. JENAL:

9         Q.   Okay.  In asking about these individuals I

10    was asking about the Diva Starz project.  The large   02:11PM

11    over the brand, okay, as opposed to the Diva Starz

12    entertainment project that was specifically within

13    your area.

14            And so you were -- when we talked about

15    Maureen Mullen, you were thinking about I believe in   02:11PM

16    terms of the broader brand project, correct?

17        A.   That's correct.

18        Q.   Did Ms. Mullen do any work on the Diva Starz

19    entertainment project other than the conversations

20    she may have had with you?                          02:11PM

21        A.   She would have been involved in -- I don't

22    remember the exact flow of designers through the

23    project but we would have kept Design and Marketing

24    partners involved in every step of this

25    entertainment project development.                   02:12PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1      speculation.

2             THE WITNESS:  Off the top of mine, no, I

3      don't recall who that would have been.

4      BY MR. JENAL:

5             Q.  How about the name Kislap Ongchango?        02:15PM

6             MS. HUTNYAN:  Same objection.

7      BY MR. JENAL:

8             Q.  Are you familiar with that name?

9             A.  That name does not ring a bell for me.

10            Q.  Not at all?                    02:15PM

11            A.  No.

12            Q.  What about Ken Hyman?

13            A.  No.

14            Q.  What about Eric Scifstrom?

15            MS. HUTNYAN:  It is just familiarity,        02:15PM

16     Counsel?

17            MR. JENAL:  Whether you recognize the name.

18     It he doesn't recognize the name, there's not much

19     more to ask.

20            MS. HUTNYAN:  Just to make sure I        02:15PM

21     understand.

22            THE WITNESS:  I don't recognize Eric's name.

23            MR. PAGE:  There's a cue for you.

24            THE WITNESS:  I don't.  I don't.

25            MS. HUTNYAN:  It's just "how about,"  I'm   02:16PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    not sure what you're asking so that's why I just

2    want to make sure we're on the same page.

3        MR. JENAL:  I think we're on the same page.

4    Why don't we take a short break.

5        VIDEO OPERATOR:  2:16 off the record.        02:16PM

6        (Brief recess.)

7        VIDEO OPERATOR:  The time is 2:33 p.m.

8    We're back on the record.  This is tape No. 3 of the

9    deposition of Rob Hudnut.  All parties may continue.

10   BY MR. JENAL:                              02:33PM

11       Q.  Mr. Hudnut, you realize you're still under

12   oath?

13       A.  Yes.

14       Q.  We had talked a little bit before the break

15   about Maureen Mullen and you told me that you had    02:33PM

16   spoken to her about sort of the personalities that

17   already existed because they had done a fair amount

18   of work with that and you wanted to make sure that

19   whatever work you did was harmonized, for lack of a

20   better term, with the work they had done, correct?  02:33PM

21       A.  My recollection of that is partially from

22   the documents I reviewed that showed me that she and

23   I had been in touch on that subject.  I don't

24   specifically remember the moments that we talked

25   about it but it appears that she was the one in      02:33PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1          A.   I think it was the Kislowitzes.

2          Q.   I'm sorry, who?

3          A.   Well, there was a company called -- I could

4     be -- maybe I'm wrong but I thought that the

5     Kislowitz brothers who are back east I thought that   02:35PM

6     they were somehow involved in the creation of Diva

7     Starz.

8          Q.   What's the basis for that understanding?

9          A.   I think I had that impression at the time.

10         Q.   Could you spell that name, please?          02:35PM

11         A.   I think --

12             MR. PAGE:  That was a yes-or-no question.

13             THE WITNESS:  I believe it's

14     K-i-s-l-o-w-i-t-z, but I could be wrong.

15     BY MR. JENAL:                                         02:35PM

16         Q.   Do you know what inspired the design of Diva

17     Starz?

18             MS. HUTNYAN:  Objection:  vague, calls for

19     speculation.

20             THE WITNESS:  I don't know that.             02:35PM

21             MS. HUTNYAN:  Outside the designation.

22             THE WITNESS:  No, I do not know what

23     inspired the design of Diva Starz.

24     BY MR. JENAL:

25         Q.   Did you ever speak with any of the folks who 02:36PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1      were the designers -- Ms. Mullen or anyone else in

2      the Design part of the Diva Starz project -- and ask

3      them about what their inspiration was?

4              MS. HUTNYAN:  Calls for speculation.

5              THE WITNESS:  I may have or I may not have   02:36PM

6      but I don't recall doing so.

7      BY MR. JENAL:

8          Q.   Did you create as part of the Diva Starz

9      entertainment project any additional characters that

10     weren't actual dolls that were being produced?      02:36PM

11         A.   Yes, we did.

12         Q.   How many characters if you recall were

13     produced as part of the Diva Starz entertainment

14     that weren't part of the dolls themselves?

15         A.   I had to refresh my memory by reading over  02:36PM

16     the brand artist and writer guide work that we did

17     in the scripts but we created boys to sort of

18     parallel the girls, we also had parents who were

19     never going to be around to make everybody more

20     independent, we had -- there was a mall that they    02:37PM

21     would spend a lot of time attending and we placed

22     security guards at that mall because to tell a story

23     you need conflict so we needed to find areas to

24     creat conflict.  I think there was also a principal

25     at their school.  Characters that would round out    02:37PM

1    BY MR. JENAL:

2        Q.  Your turn.

3        A.  Which types of inspiration?  I'm sorry, the

4    meaning of inspiration for stories or for?

5        Q.  Inspiration for the -- shall we say the      02:47PM

6    appearance or look of characters that you might use

7    in stories.

8            MS. HUTNYAN:  Same objections.  Lacks

9    foundation, calls for speculation.

10           THE WITNESS:  I look at magazines.  When I   02:47PM

11   review a magazine like a Kids Screen magazine, there

12   are ads for lots of different shows that are coming

13   up and so one sees different appearances of

14   different shows.  That is one thing that one can do.

15   BY MR. JENAL:                                         02:47PM

16       Q.  In the 2000 time frame do you have a sense

17   of whether there was a particular look for animated

18   characters that was particularly popular at that

19   time?

20           MS. HUTNYAN:  Objection: calls for           02:48PM

21   speculation, outside the designation, vague,

22   ambiguous.

23           THE WITNESS:  In 2000 there were a range.

24   There were lots of different styles of animation on

25   television so there were -- there are a number of    02:48PM



Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    things you can point to as -- as different styles

2    that were some more successful than others.  So

3    anime isn't new to the States.

4    BY MR. JENAL:

5        Q.   And my question was not limited to anime in  02:48PM

6    that context but just in animated characters

7    generally.  Is there anything that you can recall

8    from the 2000 or so time frame that stands out in

9    your mind as being kind of a popular look for

10   characters in animation?                    02:48PM

11       MS. HUTNYAN:  Same objection.  Even more

12   vague, more off the topic.

13       THE WITNESS:  I don't remember any one style

14   as being especially popular at that time, no.

15   BY MR. JENAL:                               02:49PM

16       Q.   Were there any characteristics about the

17   Diva Starz designs, the dolls themselves, that you

18   felt were important to be able to include in the

19   character appearances that you were going to create?

20   And by "you" I mean your team working on the Diva  02:49PM

21   Starz entertainment project.

22       MS. HUTNYAN:  Objection:  calls for

23   speculation.

24       THE WITNESS:  One of the things I really

25   liked about the Diva Starz characters is that they  02:49PM

1    the significance from an animation perspective of

2    the oversized heads?

3        A.   The oversized heads I thought were a very

4    distinctive look relative to what else was in the

5    market.  I thought that the eyes along with        02:51PM

6    oversized -- it would look ridiculous to have little

7    teeny eyes and a big head so the big eyes were part

8    and parcel of the -- they went along -- I thought

9    they had been designed beautifully and so the large

10   eyes and the large head I could see becoming really  02:51PM

11   wonderful animation.

12       Q.   And the large feet, was that also part of

13   what was important to you for animation?

14       MS. HUTNYAN:  Asked and answered.

15       THE WITNESS:  I thought that they helped --  02:52PM

16   helped the characters make sense.  If one imagined

17   them moving around in a world that is created around

18   them, the big feet would make them not look

19   ridiculous like they were going to fall over, you

20   know, at any moment.                    02:52PM

21   BY MR. JENAL:

22       Q.   Do you know -- from the perspective of the

23   actual design of the dolls, do you know whether the

24   choice to have big heads and big feet was an

25   artistic choice or was it a choice driven by the   02:52PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    engineering necessary for the doll?

2         MS. HUTNYAN:  Objection:  calls for

3    speculation, outside the designation.

4         THE WITNESS:  I don't know.  That's outside

5    of my -- what I do.  I don't know.              02:52PM

6    BY MR. JENAL:

7         Q.   No one ever told you, you know, we have to

8    have big feet because we have to put all of this

9    gear into this doll someplace and that's the only

10   place it will fit?                              02:53PM

11        MS. HUTNYAN:  Same objections.  Asked and

12   answered.

13        THE WITNESS:  I don't -- I don't recall ever

14   being told that.

15   BY MR. JENAL:                                   02:53PM

16        Q.   Are you familiar with the term "fashion

17   doll"?

18        A.   Yes, I am.

19        Q.   What's your understanding of the term

20   "fashion doll"?                                 02:53PM

21        MS. HUTNYAN:  Objection:  vague.

22        THE WITNESS:  A fashion doll is a doll that

23   generally has hair play and clothes play and would

24   appear fashionable.

25   / / /                                           02:53PM

MGA v. MATTEL                    None              74        Page  176

1    BY MR. JENAL:

2       Q.   Is it your understanding that the Diva Starz

3    when they were first being developed in 2000 or so,

4    were they intended to be a fashion doll?

5          MS. HUTNYAN:  Objection:  calls for          02:53PM

6    speculation, outside the designation.

7          THE WITNESS:  I don't know but I -- I don't

8    know what category people were trying to slot it

9    into but to my mind it certainly had lots of

10   fashionable elements to it and when I saw them      02:54PM

11   having plastic clothes that you can put on and off,

12   that's certainly a fashion doll play pattern, long

13   beautiful hair to comb and play with, so....

14   BY MR. JENAL:

15       Q.   Were there other play patterns associated  02:54PM

16   with Diva Starz that were separate and apart from

17   what you would associate with a fashion doll in the

18   2000 time period?

19          MS. HUTNYAN:  Objection:  calls for

20   speculation, lacks foundation, outside the scope of  02:54PM

21   the topics designated.

22          THE WITNESS:  Having dolls that talk was

23   certainly not unique to Diva Starz.  My recollection

24   of the product is that they had an ability to

25   interact and some extensive sound chips inside which  02:54PM

1    I thought was very exciting and very new.

2    BY MR. JENAL:

3        Q.   Were you familiar with the Barbie line of

4    products in the year 2000?

5        MS. HUTNYAN:  Objection:  vague.          02:55PM

6        THE WITNESS:  Parts of it.  Certainly not

7    all of it but parts of it.

8    BY MR. JENAL:

9        Q.   Would you consider Barbie a fashion doll

10   line?                              02:55PM

11       MS. HUTNYAN:  Objection:  outside the

12   designation.

13       THE WITNESS:  For me, yes, Barbie would be a

14   fashion doll line.

15   BY MR. JENAL:                          02:55PM

16       Q.   Do you know whether the types of play that

17   you referred to with the interactivity that was part

18   of the Diva Starz, do you know whether that was

19   incorporated into Barbie in the year 2000?

20       MS. HUTNYAN:  Objection:  calls for        02:55PM

21   speculation, lacks foundation, compound, vague, and

22   outside the designation.

23       THE WITNESS:  I don't recall whether it was

24   in 2000 or not.  It may have been, it may not have

25   been.  I don't recall.                    02:55PM

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1    BY MR. JENAL:

2        Q.  Have you ever heard of a term "category

3    team" at Mattel?

4            MS. HUTNYAN:  Objection:  vague.

5            THE WITNESS:  Category team?              02:55PM

6    BY MR. JENAL:

7        Q.  Yes.

8        A.  Probably along the way but it's not

9    something I use frequently.

10       Q.  Do you recall in any of the meetings that   02:56PM

11   you attended as part of the development process of

12   the Diva Starz entertainment project whether the

13   Diva Starz were described as a fashion doll concept?

14       A.  I don't -- they may have been.  I don't

15   recall one way or another.              02:56PM

16       Q.  Do you ever recall them being described as a

17   high-tech toy concept?

18           MS. HUTNYAN:  Objection:  calls for

19   speculation.

20           THE WITNESS:  Specifically that -- that   02:56PM

21   term?  I know that they were referred to as

22   high-tech toys.  Whether they were -- I don't think

23   that's a category, high-tech toy concept.  I

24   wouldn't think of that as its own category.

25       / / /              02:57PM

MGA v. MATTEL              None              77              Page 179

1    BY MR. JENAL:

2        Q.  Do you know whether within Mattel in 2000

3    when you were working in the -- within the confines

4    of the broader Diva Starz project, do you know

5    whether it was envisioned that Diva Starz would         02:57PM

6    compete with Barbie?

7        MS. HUTNYAN:  Objection: lacks foundation,

8    mischaracterizes the testimony of the witness, calls

9    for speculation, outside the designation.

10       THE WITNESS:  Could you repeat the question, 02:57PM

11   please?

12       MR. JENAL:  I think so.

13       Q.  In 2000 you were working on the Diva Starz

14   entertainment project, correct?

15       A.  Correct.                          02:57PM

16       Q.  And in the course of that work you

17   interacted with other people who were involved in

18   the broader Diva Starz project as we've described

19   those terms previously, correct?

20       A.  That's correct.                   02:57PM

21       Q.  In the course of that work that you did in

22   the 2000 time frame on the Diva Starz entertainment

23   project did you ever become aware as to whether or

24   not Diva Starz, the dolls, were expected to compete

25   with Barbie, the dolls, for sales?        02:58PM

Hudnut, Rob (AEO) 7/13/2007 9:19:00 AM

1          MS. HUTNYAN:  Objection:  calls for

2      speculation, lacks foundation, outside the

3      designation, calls for a legal conclusion.

4          THE WITNESS:  Again, I'm not sure if I

5      started in late '99 and whether it carried over into   02:58PM

6      2001 but I don't -- I don't know whether there was

7      any strategic goal of competing or not competing

8      with Barbie.

9      BY MR. JENAL:

10         Q.  Do you know whether there was a concern at   02:58PM

11     Mattel in the 2000 time frame that projects -- doll

12     projects not compete with Barbie?

13         MS. HUTNYAN:  Objection:  calls for

14     speculation, lacks foundation, outside the

15     designation, vague.                          02:58PM

16         THE WITNESS:  Could you rephrase that,

17     please, or help me with that again?

18     BY MR. JENAL:

19         Q.  In the 2000 time frame did you have any

20     understanding of the significance of the Barbie line  02:59PM

21     to Mattel as a product line?

22         MS. HUTNYAN:  Objection:  calls for

23     speculation, vague, outside the designation.

24     BY MR. JENAL:

25         Q.  Your turn.                          02:59PM

1        A.  Barbie is a significant brand for Mattel.

2    I'm aware of that.

3        Q.  So my question to you was:  Were you

4    aware -- in the time frame of 2000 or so were you

5    aware of any policy at Mattel, however that might be  02:59PM

6    expressed, of not creating products that would

7    compete with Barbie?

8        MS. HUTNYAN:  Objection:  outside the

9    designation, calls for speculation.

10       THE WITNESS:  Aware of a policy against    02:59PM

11   that?  No, I'm not aware of a policy at that time.

12   BY MR. JENAL:

13       Q.  Did you ever hear anyone say we can't go

14   forward with this project because to do so would

15   compete with sales for Barbie?                03:00PM

16       MS. HUTNYAN:  Same objection.

17       THE WITNESS:  I don't recall ever hearing

18   something like that.

19   BY MR. JENAL:

20       Q.  Are you aware of any projects that were    03:00PM

21   developed and then canceled because of a concern

22   that that product might compete with Barbie?

23       MS. HUTNYAN:  Asked and answered.  Same

24   objections.

25       THE WITNESS:  I'm not aware of any -- any    03:00PM

1   such project.

2   BY MR. JENAL:

3        Q.   Are you familiar with changes to the

4   appearance of the Diva Starz dolls in the time

5   period since 2000?                    03:00PM

6        MS. HUTNYAN:  Objection: vague, ambiguous,

7   calls for speculation.

8        THE WITNESS:  What -- what sorts of changes

9   and occurring in -- on the toy shelf or in the --

10   BY MR. JENAL:                         03:00PM

11        Q.   In the product that's released to the

12   public, correct.  Are you aware of any changes in

13   the appearance of those dolls in the time period say

14   between 2000 when they first were on the shelves and

15   say 2002?                             03:01PM

16        MS. HUTNYAN:  Same objection.  Calls for

17   speculation, vague, compound.

18        THE WITNESS:  When I was part of the

19   discussions of the Diva Starz business and its

20   development, the entertainment project and how it   03:01PM

21   relates to the brand, we recognized early on that

22   when one -- one of the main reasons a toy company

23   will create a television series is to drive a great

24   number of projects -- of products and oftentimes if

25   you look through the toy business a lot of those   03:01PM

1   products are $10 and under.  The products that

2   represent the kind of pocket change that a child

3   will have on their own or that a parent will be

4   willing to buy not for a special occasion.  So we

5   had talks from the beginning about creating dolls    03:02PM

6   that weren't as high-priced as the original Diva

7   Starz dolls but having other dolls that are simpler

8   in function and would expand the line.

9   BY MR. JENAL:

10      Q.  Do you know whether the dolls that you've    03:02PM

11   just described that were simpler in function, do you

12   know if those dolls were ever released to the

13   public?

14      MS. HUTNYAN:  Objection:  calls for

15   speculation, vague.                                 03:02PM

16      THE WITNESS:  I -- I don't specifically

17   recall how it wound up because my involvement with

18   Diva Starz stopped in the late 2000 or early 2001

19   time frame.

20   BY MR. JENAL:                                       03:02PM

21      Q.  Is it -- is it fair to say that once your

22   involvement with the Diva Starz entertainment

23   project ended in either late 2000 or early 2001 that

24   you no longer were close enough to the broader Diva

25   Starz project to know how it may have changed over   03:03PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1    time, the Diva Starz dolls may have changed over

2    time?

3        MS. HUTNYAN:  Objection:  vague, calls for

4    speculation.

5        THE WITNESS:  At some point we would have -- 03:03PM

6        MS. HUTNYAN:  And outside the designation.

7        THE WITNESS:  At some point we would have

8    stopped pursuing Diva Starz as an entertainment

9    project and at that point I would most likely not

10   have been involved in further design discussions.    03:03PM

11   BY MR. JENAL:

12       Q.  Did you ever own any Diva Starz dolls?

13       A.  Did I personally own any?

14       Q.  Yes.

15       A.  I don't recall personally owning any Diva    03:03PM

16   Starz dolls.

17       Q.  Did you ever hear the name Chat Girls at

18   Mattel?

19       A.  I do remember the name Chat Girls, yes.

20       Q.  What do you remember Chat Girls in         03:04PM

21   association with at Mattel?

22       MS. HUTNYAN:  Lacks foundation.

23       THE WITNESS:  I'm not -- I don't know if I'm

24   remembering this clearly or not.  I think that it

25   may have been discussed back when Diva Starz was    03:04PM

MGA v. MATTEL                    None            83            Page  185

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1     around and I -- and it may have been discussed since

2     in terms of a name that would make sense for

3     products that talk.  So that's the best I can

4     recollect.

5     BY MR. JENAL:                              03:05PM

6         Q.  So you say that it may have been discussed

7     back when Diva Starz was around.  As you sit here

8     today, do you have any specific recollection of Chat

9     Girls being used as a potential alternate name for

10    the project that became Diva Starz?              03:05PM

11        A.  I don't have a specific moment or

12    recollection of a meeting where that might have been

13    tied together, but I do have the sense that that

14    term is familiar to me and that it may have been

15    familiar from that time period.              03:05PM

16        Q.  Are there any other names that you can think

17    of that might have been associated with the project

18    that ultimately became known as Diva Starz?

19        MS. HUTNYAN:  Objection:  vague.

20        THE WITNESS:  Not that I -- sorry.          03:05PM

21        MS. HUTNYAN:  Sorry.  Objection:  vague.

22        THE WITNESS:  Not that I -- there may have

23    been some but I can't think of any off the top of my

24    head.

25    / / /                              03:06PM

MGA v. MATTEL                    None                    Page  186

84

1    BY MR. JENAL:

2        Q.  Did you ever see a list of potential names

3    for the project that became known as Diva Starz?

4        MS. HUTNYAN:  Objection:  vague.

5        THE WITNESS:  I don't recall seeing a list   03:06PM

6    of different names.

7    BY MR. JENAL:

8        Q.  Are you aware that such a list ever existed?

9        A.  It's completely logical to me that one would

10   exist because that's the normal way that we would   03:06PM

11   name a product.  We would generate either in a

12   brainstorm or somebody would own that and there

13   would be a long list and all the relevant parties

14   would be part of that process.

15       Q.  Who would own that list?              03:06PM

16       MS. HUTNYAN:  Objection:  calls for

17   speculation, lacks foundation, vague.

18       THE WITNESS:  It could be owned any number

19   of places.  It could be owned by Design, it could be

20   owned by Packaging.  Depending on how much          03:06PM

21   entertainment is involved it could be Entertainment.

22   BY MR. JENAL:

23       Q.  Is it fair to say that at least in the case

24   of Diva Starz this list if one ever was reduced to

25   writing, that didn't reside with Entertainment,     03:07PM

Hudnut, Rob (AEO)  7/13/2007  9:19:00 AM

1       A.   My recollection is that -- that Mattel had

2    updated this policy and was seeking our agreement to

3    it.

4       Q.   And to the best of your recollection that

5    was sometime in 2005?                          04:01PM

6       A.   Or 2006.  I don't -- I don't remember

7    precisely.

8       Q.   And did you sign that revised version of the

9    policy?

10      A.   I did not.                             04:02PM

11      Q.   Why not?

12      A.   There were some clauses that I was concerned

13   about.

14      Q.   Which clauses in particular were they?

15          MS. HUTNYAN:  Objection.  The document     04:02PM

16   speaks for itself.

17          MR. JENAL:  No, the document doesn't tell me

18   which clauses he objected to.  That was my question.

19          MS. HUTNYAN:  I don't think this is a memory

20   test either so which clauses is your question?      04:02PM

21          THE WITNESS:  I don't remember specifically

22   which clauses.

23   BY MR. JENAL:

24      Q.   What was the nature of those clauses that

25   caused you concern?                           04:02PM