**Exhibit 7**

Pasko, Rene  6/13/2007  12:13:00 PM

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      EASTERN DIVISION

4      ------------------------------

5      MATTEL, INC., a Delaware      )

6      Corporation,          )

7         Plaintiff,     )

8         vs.         ) No. CV 04-9059

9      CARTER BRYANT, an individual; )    NM (RNBx)

10    and DOES 1 through 10,      ) VOLUME I

11    Inclusive,        )

12        Defendants.      )

13    ------------------------------)

14    (COMPLETE CAPTION ON NEXT PAGE.)

15

16      CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18    Videotaped 30(b)(6) Deposition of

19    RENE PASKO, taken at 400 South Hope

20    Street, Los Angeles, California,

21    commencing at 10:05 A.M., Wednesday,

22    June 13, 2007, before Wendy S.

23    Schreiber, CSR No. 3558, RPR, CLR.

24

25    PAGES 1 - 222

MGA v. MATTEL             None             244            Page 1

Pasko, Rene  6/13/2007  12:13:00 PM

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4

5    ------------------------

6    MATTEL, INC., a Delaware      )

7    Corporation,               )

8            Plaintiff,      )

9            vs.          ) No. CV 04-9059

10   CARTER BRYANT, an individual; )    NM (RNBx)

11   and DOES 1 through 10,       )

12   Inclusive,             )

13           Defendants.      )

14   ----------------------- )

15   CARTER BRYANT, on behalf of   )

16   himself, all present and     )

17   former employees of Mattel,   )

18   Inc., and the general public, )

19           Counter-Claimants, )

20           vs.          )

21   MATTEL, INC., a Delaware      )

22   Corporation,             )

23           Counter-Defendant. )

24   ------------------------------

25

MGA v. MATTEL                  None          **245**          Page 2

Pasko, Rene 6/13/2007 12:13:00 PM

1    APPEARANCES OF COUNSEL:

2

3       FOR THE PLAINTIFF:

4

5       QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

6       BY:  MICHAEL ZELLER, ESQ.

7       865 South Figueroa Street, Tenth Floor

8       Los Angeles, California 90017

9       (213) 443-3000

10      mzeller@quinnemanuel.com

11

12         -AND-

13

14      MATTEL, INC.

15      BY:  MICHAEL MOORE, ESQ.

16      333 Continental Boulevard

17      El Segundo, California 90245-5012

18      (310) 252-2000

19      michael.moore@mattel.com

20

21

22

23

24

25

Pasko, Rene  6/13/2007  12:13:00 PM

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3    FOR THE DEFENDANT AND COUNTERCLAIMANT

4    CARTER BRYANT:

5

6        KEKER & VAN NEST LLP

7        BY:  JOHN TRINIDAD, ESQ.

8        710 Sansome Street

9        San Francisco, California 94111-1704

10       (415) 391-5400

11       jtrinidad@kvn.com

12

13   FOR DEFENDANT MGA ENTERTAINMENT, INC.:

14

15       O'MELVENY & MYERS LLP

16       BY:  DIANA TORRES, ESQ.

17           JENNIFER GLAD, ESQ.

18       400 South Hope Street

19       Los Angeles, California 90071-2899

20       (213) 430-6000

21       dtorres@omm.com

22       jglad@omm.com

23

24   ALSO PRESENT:

25       DAVID WEST, VIDEO OPERATOR

Pasko, Rene  6/13/2007  12:13:00 PM

1    to mark it as Exhibit 435.

2        Mike, if you have the number --

3        MR. ZELLER:  I have it -- it's been marked I

4    think more than once but I have it as 385.  This is

5    the Notice of Deposition of Plaintiff and        10:09AM

6    Counter-Defendant Mattel, Inc.

7        MS. TORRES:  January 11, 2005?

8        MR. ZELLER:  That's right.

9        MS. TORRES:  All right, so we can just use

10   385.                              10:09AM

11       (Exhibit 385 previously marked.)

12   BY MS. TORRES:

13       Q.  The court reporter has handed you what's

14   been previously marked as Exhibit 385 and I'd like

15   you to take a look at it and let me know if you've   10:10AM

16   ever seen that document before.

17       A.  Yes, I've seen the document before.

18       Q.  Can you tell me -- I understand that you're

19   here to testify on topics 2 through 7 and 10 through

20   11.                               10:11AM

21       MR. ZELLER:  I'm not sure that that's

22   correct but....

23       MS. TORRES:  Counsel, do you know which ones

24   she's here to testify on?

25       MR. ZELLER:  No one understands perhaps the  10:11AM

MGA v. MATTEL              None                              Page  10
                                     248

Pasko, Rene 6/13/2007 12:13:00 PM

1    appropriate distinction.  I believe that she's been

2    designated for topics 2 through 8, 11 through 13 and

3    24 with, of course, the same kinds of caveats and

4    explanations and the like that have all gone into

5    this.  She is here as she said to really testify       10:12AM

6    about Diva Starz as it relates to all these various

7    topics to the extent that they do relate to them.

8    BY MS. TORRES:

9        Q.  You've heard your counsel's representation.

10   Is that your understanding of what you're here to       10:12AM

11   testify on?

12       A.  Yes, it is.

13       Q.  Did you do anything to prepare for today's

14   deposition?

15       A.  What do you mean by "prepare"?       10:12AM

16       Q.  Did you meet with counsel?

17       A.  Yes.

18       Q.  Did you review documents?

19       A.  Yes.

20       Q.  Did you talk to anyone?       10:12AM

21       A.  Other than counsel?  No.

22       Q.  When did you meet with counsel?

23       A.  Roughly a month ago.

24       Q.  Have you met with counsel since then?

25       A.  Yes.       10:13AM

Pasko, Rene 6/13/2007 12:13:00 PM

1    in any way in preparation for this deposition?

2        A.  I did not.

3        Q.  In preparing for this deposition did you

4    look at any physical three-dimensional objects?

5            MR. ZELLER:  That weren't photographs?        10:36AM

6            MS. TORRES:  Correct.

7            THE WITNESS:  Not that I can remember.

8        Q.  You didn't look at any molds or any

9    prototypes?

10       A.  Three-dimensional you're speaking, right?        10:36AM

11       Q.  Yes.

12       A.  No.

13       Q.  Did you do anything that you haven't already

14   told me about to prepare for this deposition?

15       A.  Besides sleep really well I don't -- I don't 10:36AM

16   know what else I would have done.

17       Q.  That may be the best thing you can do.  So

18   that's a "no"?

19       A.  Yes.

20       Q.  Are you here to testify based solely on your 10:37AM

21   own personal knowledge?

22           MR. ZELLER:  The question is vague.

23           THE WITNESS:  By based on my personal

24   knowledge do you mean my experience or --

25                        10:37AM

MGA v. MATTEL                    None              Page 26
                                        250

Pasko, Rene  6/13/2007  12:13:00 PM

1     BY MS. TORRES:

2        Q.  Correct.  Your experience, what you know, as

3     opposed to knowledge you derived from somebody else.

4        A.  I'm here to testify about the facts.

5        Q.  The facts that you know personally?        10:37AM

6        MR. ZELLER:  The question is still vague.

7        THE WITNESS:  Are you asking me this just

8     based on Diva Starz or in general are you -- the

9     facts about Diva Starz or something different?

10    BY MS. TORRES:                          10:38AM

11       Q.  No, the facts about Diva Starz.

12       A.  Yes.

13       Q.  The letters -- the E-mails that you saw,

14    were you aware of those E-mails at the time you were

15    working on Diva Starz?                  10:39AM

16       A.  Yes, I was.

17       Q.  Did you review anything in preparing for

18    your deposition that you were not aware of at the

19    time of your work on Diva Starz?

20       A.  Not that I can remember at the moment.    10:39AM

21       Q.  Have you derived knowledge that you're

22    prepared to testify on today from any other source?

23       MR. ZELLER:  You mean other than things she

24    knew back then or documents that she was aware of

25    back then?                              10:39AM

MGA v. MATTEL                 None                          Page  27

                                251

Pasko, Rene  6/13/2007  12:13:00 PM

1        MS. TORRES:  Correct.

2        THE WITNESS:  Repeat the question.

3    BY MS. TORRES:

4        Q.  Have you derived knowledge that you're

5    prepared to testify on today from any other source?   10:39AM

6        A.  I'm just trying to make sure that I didn't

7    derive anything from elsewhere in my head before I

8    answer that.  As far as I know right now I haven't.

9        Q.  No?

10       A.  Right.  Yes.                        10:40AM

11       Q.  You mentioned earlier that you saw some --

12   saw an E-mail at least from late 1999 and you, I

13   believe, connected that to when you first started

14   working on Diva Starz.  Is that correct?

15       MR. ZELLER:  Misstates the witness'      10:41AM

16   testimony.

17       THE WITNESS:  Can you repeat the question,

18   please?

19   BY MS. TORRES:

20       Q.  Let me ask you a different one.        10:41AM

21       When did you first start working on Diva

22   Starz?

23       A.  Late '98, early 1999.

24       Q.  Had you previously worked on the precursor

25   to Diva Starz that you described earlier called Chat  10:41AM

MGA v. MATTEL                    None              252                Page  28

Pasko, Rene  6/13/2007  12:13:00 PM

1     A.  Yes.

2        Q.  Do you know when work first started on the

3     project that was called Chat Girls in mid to late

4     1998?

5        A.  I couldn't tell you.  I don't -- I don't     10:59AM

6     remember when the project started.

7        Q.  Is there anybody at Mattel that you know who

8     could tell me?

9        A.  That's a good question.  I -- I don't think

10    the people that worked on the project are even at     11:00AM

11    Mattel anymore.

12       Q.  Did you do anything in preparing for this

13    deposition to find out when work on the project that

14    was known as Chat Girls in mid to late 1998 first

15    started?                        11:00AM

16       A.  No, I did not.

17       Q.  Do you know anything about the conception of

18    that project?

19       MR. ZELLER:  Asked and answered to an

20    extent.                        11:00AM

21       THE WITNESS:  Can you repeat the question

22    again?

23    BY MS. TORRES:

24       Q.  Do you know anything about the conception of

25    the project that was called Chat Girls in mid to     11:01AM

MGA v. MATTEL                    None                    253                    Page  38

Pasko, Rene 6/13/2007 12:13:00 PM

1    late 1998?

2       MR. ZELLER: The question is vague, asked

3    and answered.

4       THE WITNESS: I don't really know.

5    BY MS. TORRES:          11:01AM

6      Q.  Did you do anything to find out that

7    information in preparing for your deposition?

8      A.  No, I did not.

9      Q.  Is there anybody at Mattel that you believe

10   would have that information?      11:01AM

11     A.  Like I told you before, a lot of those

12   people are gone.  I don't really know.

13     Q.  Did you do anything else on the project that

14   was called Chat Girls in mid to late 1998 other than

15   help Maureen Mullen with the animations for the    11:02AM

16   faces?

17      MR. ZELLER: The question is vague.

18      THE WITNESS: Do you mean like the design of

19   the character -- the dolls or --

20   BY MS. TORRES:        11:02AM

21     Q.  Anything.

22      MR. ZELLER: The question is vague,

23   overbroad.

24      THE WITNESS: As far as I can remember, I

25   only remember helping with the animations on the    11:02AM

MGA v. MATTEL          None         254        Page 39

Pasko, Rene  6/13/2007  12:13:00 PM

1    Q.  When did she leave Mattel, approximately?

2    A.  I couldn't even venture to guess.

3    Q.  More than a couple of years?

4    A.  Yeah, definitely more than a couple.

5    Q.  And I take it Mr. Mazzocco also left more    02:02PM

6    than a couple of years ago?

7    A.  Yes.

8    Q.  We talked -- let me ask you this.  Did you

9    work on any other project that was related in any

10    way to the Diva Starz project that Mattel ultimately  02:03PM

11    manufactured?

12    A.  I'm not sure I understand your question.

13    Q.  Well, you know Mattel manufactured a product

14    called Diva Starz, correct?

15    A.  Correct.                   02:04PM

16    Q.  And you told me earlier you distinguish to

17    some extent the Chat -- the project that was known

18    as Chat Girls in mid to late 1998 from the project

19    that was called Diva Starz in a later time period.

20    Do I have that right?            02:04PM

21    A.  Yes.

22    Q.  Did you work in any way on that latter

23    project, the project that was called Diva Starz?

24    A.  Yes.

25    Q.  When did you first start working on that    02:04PM

Pasko, Rene 6/13/2007 12:13:00 PM

1    you can recall with respect to the people who were

2    on the two teams?

3        MR. ZELLER:  The question has been asked and

4    answered.

5        THE WITNESS:  Do you mean the team that was  02:16PM

6    on what was Chat Girls and the team that was Cool

7    Talk'n Teens?

8    BY MS. TORRES:

9        Q.  Yes.

10       A.  I don't really remember if there were any  02:16PM

11   changes.

12       Q.  After Cool Talk'n Teens became referred to

13   as Chat Girls -- let me strike that.

14           Do you recall even approximately when Cool

15   Talk'n Teens became referred to as Chat Girls?    02:17PM

16       A.  I am not entirely sure but I want to say

17   early '99.

18       Q.  Do you know who made that decision?

19       A.  No, I don't.

20       Q.  Were you involved in that decision in any   02:17PM

21   way?

22       MR. ZELLER:  Assumes facts not in evidence.

23       THE WITNESS:  I don't really know who made

24   the decision to change the name.

25       / / /                        02:18PM

MGA v. MATTEL              None              256              Page 96

Pasko, Rene  6/13/2007  12:13:00 PM

1    BY MS. TORRES:

2        Q.   Is it fair to say that a decision was made

3    at some point in time to change the name from Cool

4    Talk'n Teens to Chat Girls?

5        A.   Yeah, you could say that but it isn't always  02:18PM

6    by group agreement.

7        Q.   What do you mean by that?

8        A.   When a product is in its early phase, it is

9    common for the designer to change what she's

10   referring to the product as, especially if the      02:18PM

11   inventor concept name is as bad as Cool Talk'n

12   Teens.

13       Q.   Okay.  Do you know whether Maureen Mullen

14   was involved in changing -- in changing the name

15   from Cool Talk'n Teens to Chat Girls?               02:19PM

16       A.   I -- I really don't know if she changed it

17   or not.

18       Q.   In your view that was a good change

19   regardless?

20       A.   For some reasons yes and some no.          02:19PM

21       Q.   For how long was the project referred to as

22   Chat Girls, the project that had been referred to

23   originally as Cool Talk'n Teens?

24       MR. ZELLER:  The question is vague.

25       THE WITNESS:  I couldn't put a time on it.  02:20PM

MGA v. MATTEL              None              257              Page 97

Pasko, Rene  6/13/2007  12:13:00 PM

1    BY MS. TORRES:

2        Q.  Was it a matter of months?  A matter of

3    weeks?  Do you have any estimate?

4        A.  I really -- I have no idea.  I was -- the

5    project wasn't with me at a certain point in mid-'99  02:20PM

6    so I don't know what happened to -- I don't really

7    know that they -- when they changed it from Chat

8    Girls to -- or if they referred to it as something

9    different when I wasn't working on it.

10       Q.  I take it then at some point after early '99 02:20PM

11   you stopped working on the project that had

12   originally been called Cool Talk'n Teens?

13           MR. ZELLER:  Misstates the witness'

14   testimony, assumes facts not in evidence.

15           THE WITNESS:  Can you ask the question       02:21PM

16   again?

17   BY MS. TORRES:

18       Q.  You said -- you just referred to a period of

19   time when you weren't working on it.  I'm assuming

20   you were referring to the project that had          02:21PM

21   originally been called Cool Talk'n Teens; is that

22   right?

23       A.  Yes.

24       Q.  For how long did you work on the project

25   called Cool Talk'n Teens continuously?             02:21PM

Pasko, Rene  6/13/2007  12:13:00 PM

1    BY MS. TORRES:

2       Q.  In your experience in the 1998 to 2000 time

3    period at Mattel was that everybody's practice?

4       MR. ZELLER:  Same objections.

5       THE WITNESS:  In my experience on the       02:25PM

6    projects and the groups that I've worked in we

7    like -- we like RCA models to represent what they're

8    going to be.

9    BY MS. TORRES:

10      Q.  Did people's practices vary?       02:26PM

11      MR. ZELLER:  The question lacks foundation,

12   it's overbroad, vague, calls for speculation.

13      THE WITNESS:  Can you repeat the question,

14   please?

15   BY MS. TORRES:       02:26PM

16      Q.  Did people's practices in that time period

17   vary with respect to the, you know, creation of

18   models for concept approval?

19      MR. ZELLER:  Same objections.

20      THE WITNESS:  Do you mean works-like versus  02:26PM

21   looks-like models?

22   BY MS. TORRES:

23      Q.  Sure.  In any way.

24      MR. ZELLER:  Same objections.

25      THE WITNESS:  I can only -- I only know       02:26PM

MGA v. MATTEL                        None            259            Page  101

Pasko, Rene  6/13/2007  12:13:00 PM

1    what, you know, I did in my group.  I don't -- I

2    don't really know what other people did in other

3    groups.

4    BY MS. TORRES:

5        Q.  You were never involved in the concept    02:26PM

6    approval meetings where other designers presented

7    models?

8        MR. ZELLER:  This is back in the time period

9    we're talking about?

10       MS. TORRES:  Yes.                    02:27PM

11       THE WITNESS:  I was at approval meetings for

12   my business unit so like I couldn't tell you what

13   the Boys' group did.

14   BY MS. TORRES:

15       Q.  Fair enough.  But you could tell me you did  02:27PM

16   see what other designers in your business unit did

17   with respect to the creation of models?

18       A.  Correct.

19       Q.  And my question is:  Did everybody in your

20   group in your business unit have exactly the same  02:27PM

21   practice with respect to the creation of models for

22   concept approval?

23       MR. ZELLER:  Same objections as before.

24       THE WITNESS:  I don't really remember what

25   everybody else did.  On the projects that I worked  02:27PM

Pasko, Rene  6/13/2007  12:13:00 PM

1   on and the projects that were created in the cube

2   across the way from me I know that it is a goal for,

3   you know, your -- it's a goal that CA represents the

4   final product or the CA model represents the final

5   product.                              02:28PM

6   BY MS. TORRES:

7       Q.  Have you ever seen a model -- a CA model

8   that ultimately did not represent the final product?

9       MR. ZELLER:  The question is vague,

10  overbroad, lacks foundation, and this is asked and    02:28PM

11  answered as well.

12      THE WITNESS:  Are you referring to like

13  looks-like models or works-like models?  It's kind

14  of a -- it's a broad question so it's hard to

15  pinpoint.                              02:29PM

16  BY MS. TORRES:

17      Q.  Did you ever see any works-like models that

18  didn't look like the ultimate product that was

19  manufactured in that time period?

20      A.  Well, because works-like models didn't    02:29PM

21  always have the shell around them they didn't always

22  look like the final product because sometimes you're

23  looking at a mechanism.

24      Q.  Did you -- do you recall ever seeing a

25  looks-like model that was presented for concept    02:29PM

MGA v. MATTEL                   None                    Page  103

261

Pasko, Rene  6/13/2007  12:13:00 PM

1    approval that ultimately didn't look like what was

2    manufactured?

3        MR. ZELLER:  The question is vague,

4    overbroad, lacks foundation, is asked and answered.

5        THE WITNESS:  I really don't remember      02:30PM

6    specific products being shown at a milestone, you

7    know, at the end.  I don't really -- I don't recall

8    anything.

9    BY MS. TORRES:

10       Q.  You don't remember one way or the other?    02:30PM

11       A.  No.

12       MR. ZELLER:  This is asked and answered.

13   BY MS. TORRES:

14       Q.  You used the phrase "represents the final

15   product."  What did you mean by that?         02:30PM

16       MR. ZELLER:  This is asked and answered as

17   well.

18       THE WITNESS:  What are you referring to?

19   What context?

20   BY MS. TORRES:                    02:30PM

21       Q.  Whether or not a model represents the final

22   product.  What do you mean by "represents"?

23       A.  I need to understand what question I was

24   answering when I said that.

25       Q.  You said that the goal was to create a CA    02:31PM

MGA v. MATTEL                          None                          Page  104

262

Pasko, Rene 6/13/2007 12:13:00 PM

1       A.   I am not sure who drew those characters.

2       Q.   Do you have any information about who drew

3    them?

4       A.   I really don't know where these -- who drew

5    these particular drawings.                    02:40PM

6       Q.   Do these drawings show characters with an

7    LCD face?

8           MR. ZELLER:  The question is vague.

9           THE WITNESS:  Are you talking about 435

10   still?                          02:40PM

11   BY MS. TORRES:

12      Q.   Correct.

13      A.   These drawings -- I don't see LCD faces on

14   these.

15      Q.   Do you recall a time in which the project   02:40PM

16   that was known as Chat Girls in the mid to late 1998

17   time period at Mattel did not have LCD faces?

18          MR. ZELLER:  Can I have the question read

19   back, please?

20          (The pending question was read as follows:   02:41PM

21           "Q.   Do you recall a time

22           in which the project that was known

23           as Chat Girls in the mid to late

24           1998 time period at Mattel did not

25           have LCD faces?")                02:41PM

Pasko, Rene 6/13/2007 12:13:00 PM

1          MR. ZELLER: The question is vague.

2          THE WITNESS: I wasn't a designer on Chat --

3    this Chat Girls project shown in 435 in the

4    beginning so I don't know the whole history of the

5    project.                              02:41PM

6          (Deposition Exhibit 437 was marked

7    for identification and is annexed hereto.)

8    BY MS. TORRES:

9       Q.  I'm going to ask the court reporter to mark

10   this as Exhibit 437. It's a document bearing the      02:42PM

11   Bates No. M 0038919. Have you ever seen this

12   document before?

13      A.  I've never seen this document.

14      Q.  Do you have any information or belief as to

15   who did the artwork that appears on the document?      02:43PM

16      A.  I can't be entirely sure who drew this.

17      Q.  Do you have a belief as to who drew it?

18      A.  It -- I -- I would think that Maureen Mullen

19   drew it but I'm not entirely sure since I wasn't on

20   the project the entire time.              02:44PM

21      Q.  What about it makes you think Maureen Mullen

22   drew it?

23      A.  She was the design -- she was the main

24   designer on the project.

25      Q.  Is there anything about the style of the art 02:44PM

MGA v. MATTEL                    None            264            Page  110

Pasko, Rene  6/13/2007  12:13:00 PM

1      MS. TORRES:  Certainly.

2      VIDEO OPERATOR:  Off the record at 2:51.

3          (Brief recess.)

4      VIDEO OPERATOR:  The time is 3:08 p.m.  We

5   are back on the record.  This is tape No. 3 in the      03:08PM

6   deposition of Rene Pasko.  All parties may continue.

7      (Deposition Exhibit 439 was marked

8      for identification and is annexed hereto.)

9   BY MS. TORRES:

10     Q.  I'm going to ask the court reporter to mark  03:08PM

11   as Exhibit -- I'm going to ask the court reporter to

12   mark as Exhibit 439, I believe, a -- three pages

13   that have the Bates No. M 0038914, 915 and 916.

14   Have you ever seen those drawings or any variations

15   of them?                          03:10PM

16     A.  I don't know if I've ever seen variations of

17   them but I don't remember seeing these drawings.

18     Q.  Do you have any information as to what

19   project, if any, these drawings pertain to?

20     MR. ZELLER:  The question is compound.     03:10PM

21     THE WITNESS:  Can you repeat the question?

22   BY MS. TORRES:

23     Q.  Do you have any information as to what

24   project, if any, these drawings pertain to?

25     MR. ZELLER:  Same objection.       03:10PM

Pasko, Rene  6/13/2007  12:13:00 PM

1        THE WITNESS:  I'm not really sure what

2    project these are for.

3    BY MS. TORRES:

4        Q.  Do you know if they're even for the same

5    project?                              03:11PM

6        A.  I couldn't tell you with any certainty.

7        Q.  Do you recognize any of the handwriting on

8    any of these three pages?

9        A.  It -- it looks -- some of it looks like

10   Maureen Mullen's handwriting.          03:11PM

11       Q.  What part -- what handwriting on these three

12   pages looks like hers?

13       A.  The one that ends in 16.

14       Q.  Does all of the handwriting on that page

15   look like hers?                        03:11PM

16       A.  Yes.

17       Q.  There's a reference in the upper right-hand

18   corner sort of in a diagonal slant to December 4

19              **REDACTED**

20       A.  Yes.                           03:12PM

21       Q.  Do you know what those refer to?

22       A.  Some of those things look like product names

23   or project names but I don't know what the date

24   means.

25       Q.  Do you recognize -- or do you have any      03:12PM

MGA v. MATTEL                    None            266            Page 115

Pasko, Rene  6/13/2007  12:13:00 PM

1    early 1999.

2         Q.   The drawing appears on a page that has a fax

3    header and a fax footer.  Do you see that?

4         A.   Yes.

5         Q.   Do you know whether or not the drawing is a  03:17PM

6    drawing that was faxed to Mattel from Kiscom or was

7    placed on paper that happened to have already been

8    faxed, like scrap paper or something?

9         A.   Oh, I have no idea.

10        Q.   Do you know whether this drawing was faxed   03:18PM

11   from Kiscom to Mattel?

12        A.   I don't know if it was faxed from them to

13   Mattel.

14        Q.   Do you recall seeing it -- do you recall

15   seeing it prior to March 1st, 1999?              03:18PM

16        A.   I -- I couldn't put a date on it.  It's

17   sometime early 1999.

18        Q.   Was -- was this drawing or a close version

19   of this drawing presented for rough concept approval

20   or concept approval at Mattel?              03:18PM

21        A.   I really don't know.

22        Q.   Were you working on the project that was

23   known as Cool Talk'n Teens in early 1999, on or

24   about March 1st of '99?

25        MR. ZELLER:  Asked and answered.        03:19PM

Pasko, Rene  6/13/2007  12:13:00 PM

1          THE WITNESS: Yes, I was on it in early '99.

2     BY MS. TORRES:

3          · Q.  Did you attend a rough concept approval

4     meeting for the project then known as Cool Talk'n

5     Teens?                                          . 03:19PM

6          A.  I can't be sure that I was there but I think

7     I was there.

8          Q.  Your best recollection is that you were

9     there?

10        A.  Exactly.                        03:20PM

11        Q.  Do you recall anything about that meeting?

12        A.  No.

13        Q.  Do you recall what was presented in terms of

14     either a two-dimensional drawing or a

15     three-dimensional model for the project then known   03:20PM

16     as Cool Talk'n Teens?

17        A.  I remember a model being presented, I don't

18     remember which milestone it was for, and it was a --

19     it was what the inventor submitted.

20        Q.  When you say that, do you mean a model that  03:21PM

21     the inventor actually made?

22        A.  Correct.

23        Q.  Did it look like this drawing?

24        A.  It -- I'm recalling this from memory.  You'd

25     have to show me pictures to confirm what model was   03:21PM

MGA v. MATTEL                    None                268              Page  119

Pasko, Rene  6/13/2007  12:13:00 PM

1    A.  I'm not sure which one this is referring to.

2    Q.  Was the project that was known as Cool

3    Talk'n Teens in late '98, early '99 in existence in

4    mid-September of 1998 to your knowledge?

5        MR. ZELLER:  The question is vague, lacks    03:49PM

6    foundation.

7        THE WITNESS:  I don't remember when the Cool

8    Talk'n Teens concept was submitted.

9    BY MS. TORRES:

10    Q.  To the best of your recollection was it    03:49PM

11    after mid-September of 1998?

12    A.  Possibly.

13    Q.  What's your best recollection?

14    A.  I really don't know.  I -- it seems like

15    there was some overlap but I don't remember.    03:50PM

16    Q.  As Mattel's representative, did you do

17    anything to investigate when the project that was

18    known as Cool Talk'n Teens was first submitted to

19    Mattel?

20        MR. ZELLER:  Mischaracterizes the    03:51PM

21    designation.

22        THE WITNESS:  Are you asking me when I

23    remember Cool Talk'n Teens being submitted?

24    BY MS. TORRES:

25    Q.  No, I'm asking if you did anything to --    03:51PM

Pasko, Rene  6/13/2007  12:13:00 PM

1    Talk'n Teens in the first part of '99.

2    BY MS. TORRES:

3        Q.   Do you recall seeing any documents

4    whatsoever that reflected all or even some of the

5    team members on the Cool Talk'n Teens project in the  03:57PM

6    first half of '99, whether it's an E-mail or some

7    other form of documentation?

8        MR. ZELLER:  The question is vague, asked

9    and answered.

10       THE WITNESS:  I remember seeing a phone list 03:58PM

11   but I don't remember which project it was for.

12   BY MS. TORRES:

13       Q.   Do you remember the names of the people on

14   the phone list?

15       A.   I don't -- you know what?  I'm not even sure 03:58PM

16   it was a phone list.  It might have been a product

17   description that had phone numbers on it, but I

18   don't know if it was for the Cool Talk'n Teens

19   project or not.

20       Q.   Anything else that you can recall seeing    03:59PM

21   that would reflect the names of all or some of the

22   members of the Cool Talk'n Teens project team?

23       MR. ZELLER:  During that time period?

24       MS. TORRES:  Yeah, in the first half of

25   1999.                        03:59PM

MGA v. MATTEL                None          270            Page  140

Pasko, Rene  6/13/2007  12:13:00 PM

1   they were on the shelves.

2   BY MS. TORRES:

3       Q.   Did they -- did they go to manufacture prior

4   to being shown at Toy Fair to the best of your

5   recollection?                          05:17PM

6       A.   I don't know.

7       Q.   Do you know when they were first shown to

8   licensees?

9       A.   You mean for a licensed product?

10      Q.   Yes.                          05:18PM

11      A.   I don't know.  I don't have that

12   information.

13      Q.   Are you aware of any records at Mattel that

14   would provide the information about when the product

15   that was ultimately manufactured by Mattel under the  05:18PM

16   name Diva Starz was first manufactured?

17      A.   It would be on -- well, from my experience I

18   don't remember -- I can't remember what was done at

19   the time but now currently it's usually in the

20   planning documents and the schedules and it's also   05:19PM

21   on -- there's usually a document that's submitted to

22   El Segundo from MAPS, which is Mattel Asia Pacific,

23   that is a final -- it's like a final commit to

24   actually starting production.

25      Q.   Did you see any of those types of documents  05:19PM

Pasko, Rene  6/13/2007  12:13:00 PM

1   in preparing for your deposition?

2       A.  Not that I remember right now.

3       Q.  When you said Toy Fair in January or

4   February, were you -- earlier, a few minutes ago,

5   were you referring to Toy Fair in 2000?          05:20PM

6       MR. ZELLER:  That's asked and answered.

7       THE WITNESS:  Yes.

8   BY MS. TORRES:

9       Q.  Do you recall whether it was shown at Hong

10  Kong Toy Fair?                    05:20PM

11      A.  I do not recall.

12      Q.  Do you recall whether it was shown at

13  New York Toy Fair?

14      A.  I can't remember.  At some point we switched

15  over to having our own toy fairs in California so I   05:20PM

16  don't remember when the switch happened.

17      Q.  Do you -- does Mattel no longer show

18  products at Hong Kong Toy Fair?

19      A.  At Hong Kong?  I don't know what we show at

20  Hong Kong Toy Fair to be honest.          05:20PM

21      Q.  Do you know whether Mattel still shows

22  products at New York Toy Fair?

23      A.  I know we've shown a few things in the past

24  but I don't know what we've shown recently.

25          Can I have a bathroom break, please?       05:21PM

MGA v. MATTEL                   None            272            Page  170

Pasko, Réne 6/13/2007 12:13:00 PM

1      Q.  And it was shown to retailers before that,

2    correct?

3      A.  Yes.

4      Q.  Do you know whether it was shown to

5    licensees before that?                          06:37PM

6      A.  This doll or both dolls?

7      Q.  Yes, the second doll.

8      A.  This one.  I do not know.

9      Q.  Do you know whether it was shown at Toy Fair

10   in 2001?                                        06:37PM

11     A.  Most likely.

12     Q.  Do you know whether -- well, do you know

13   whether it was shown at New York Toy Fair in 2001?

14     A.  That I am not sure.

15     Q.  Do you know whether it was shown at Hong    06:37PM

16   Kong Toy Fair in 2001?

17     A.  I do not know.

18     Q.  Do you know -- do you have any idea whether

19   it was shown at any non-Mattel Toy Fair in 2001?

20     A.  I am not for sure but it may have been shown 06:37PM

21   at Nuremberg.

22       (Deposition Exhibit 451 was marked for

23       identification and is annexed hereto.)

24   BY MS. TORRES:

25     Q.  Looking at Exhibit 451, what is that?       06:38PM

MGA v. MATTEL                     None            **273**              Page  203

Pasko, Rene  6/13/2007  12:13:00 PM

1     A.  This is one of the first four of what we

2     called the Fashion Divas.

3     Q.  Did you work on both 450 and 451?

4        MR. ZELLER:  The question is compound,

5     vague.                          06:38PM

6        THE WITNESS:  I was the designer for 450 and

7     my involvement on 451 was limited.

8     BY MS. TORRES:

9     Q.  What was your involvement on 451?

10    A.  I did some initial drawings.       06:38PM

11    Q.  When did you do those initial drawings?

12    A.  The summer of 2002.

13    Q.  When did that product come to market,

14    Exhibit -- the doll that's in Exhibit 451?

15    A.  I'm not really sure.           06:39PM

16    Q.  Do you have any -- do you have an educated

17    opinion or educated belief?

18       MR. ZELLER:  Asked and answered.

19       THE WITNESS:  It's dated 2002.

20    BY MS. TORRES:                      06:39PM

21    Q.  Do you know how long that product was in

22    development?

23    A.  I don't.  I was on maternity leave.

24    Q.  When were you on maternity leave?

25    A.  Mid-2002.                     06:40PM

Pasko, Rene  6/13/2007  12:13:00 PM

1      Q.  And did you do the initial drawings for the

2   doll that's in 451 before you went on maternity

3   leave?

4          MR. ZELLER:  Mischaracterizes the witness'

5   testimony.                              06:40PM

6          THE WITNESS:  I did a drawing in 2002.  I

7   don't remember when it was.

8   BY MS. TORRES:

9      Q.  Do you recall whether it was before or after

10   your maternity leave?                   06:40PM

11     A.  It was before.

12     Q.  Do you remember when you went out on

13   maternity leave more precisely than mid-2002?

14     A.  July.

15     Q.  Do you recall how much before you went out   06:40PM

16   on maternity leave that you did the drawing for 451?

17     A.  I don't.  I just remember I was pregnant.

18     Q.  At sometime in 2002.  You believe the summer

19   of 2002?

20     A.  Excuse me?  Repeat that again.       06:41PM

21     Q.  I thought you said earlier you believed it

22   was the summer of 2002.

23         MR. ZELLER:  This is asked and answered.

24         THE WITNESS:  That's what I want to say,

25   yeah.  To the best of my recollection, yes.   06:41PM

Pasko, Rene  6/13/2007  12:13:00 PM

1    BY MS. TORRES:

2        Q.   Did anybody work on this project prior to

3    the drawing that you did for 451?

4        MR. ZELLER:  The question is vague, lacks

5    foundation, outside the designation.          06:41PM

6        THE WITNESS:  I don't recall if anybody else

7    worked on it.

8    BY MS. TORRES:

9        Q.   Do you believe -- to the best of your

10   recollection were you the first designer to work on   06:41PM

11   the doll that is in 451?

12       MR. ZELLER:  Same objections.

13       THE WITNESS:  I'm not really sure. It could

14   have been worked on by somebody else but I'm not

15   really sure.                    06:42PM

16   BY MS. TORRES:

17       Q.   Were you -- do you recall any other designer

18   working on the doll that's in 451 other than

19   yourself?

20       MR. ZELLER:  This is asked and answered     06:42PM

21   repeatedly now.

22       THE WITNESS:  At what time?

23   BY MS. TORRES:

24       Q.   In the first half of 2002.

25       A.   Yes.                06:42PM

MGA v. MATTEL                    None              276              Page  206

Pasko, Rene  6/13/2007  12:13:00 PM

1      Q.  Who?

2      A.  There was a woman named Maya Terzian who was

3   also working on the project.

4      Q.  Did she report to you?

5      A.  No.                        06:43PM

6      Q.  Did you report to her?

7      A.  No.

8      Q.  Were you at or about the same level?

9      A.  No, she was a temp.

10     Q.  Do you know when she worked at Mattel?     06:43PM

11     A.  Maya worked at Mattel on and off for several

12  years.

13     Q.  Other than Maya, were there any other

14  designers that worked on the doll that's in 451

15  prior to the time you went on maternity leave?     06:43PM

16     A.  Not that I can remember right now.

17     Q.  To the best of your recollection was Maya

18  working on the doll that's in 451 before you were?

19       MR. ZELLER:  This is asked and answered.

20       THE WITNESS:  I don't remember.  I don't     06:43PM

21  know.

22  BY MS. TORRES:

23     Q.  Who took over for the doll -- designing the

24  doll that is in 451 after you went on maternity

25  leave?                          06:44PM

MGA v. MATTEL                 None          277          Page  207

Pasko, Rene 6/13/2007 12:13:00 PM

1      A.  Maya Terzian and Gregoria Hill who was the

2   manager and somewhat -- a designer named Liam -- I

3   can't remember his last name.  Yeah, I can't

4   remember his last name.

5      Q.  Is there anybody at Mattel to your knowledge 06:44PM

6   that has more information about when work on 451

7   started than you do?

8          MR. ZELLER:  Outside the designation.  It's

9   vague.

10         THE WITNESS:  A lot of the people that were  06:45PM

11   on this project are not at Mattel anymore so I don't

12   know.

13   BY MS. TORRES:

14      Q.  Is it fair to say that that doll is taller

15   and thinner than the original doll that's -- that    06:45PM

16   Mattel produced?

17      A.  You mean the original talking Diva Starz

18   doll?

19      Q.  Yes.

20      A.  Yes, she is taller and thinner.        06:45PM

21      Q.  And her head is not quite as large?

22      A.  Well, no, because they're different dolls.

23      Q.  But the head in 451 is substantially smaller

24   than the head of the original Diva Starz, correct?

25         MR. ZELLER:  It's argumentative.  This has  06:45PM

MGA v. MATTEL                    None            278            Page  208

Exhibit 8

Dolled Up: To Lure Older Girls, Mattel Brings In Hip-Hop Crowd — It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'Bratz' — Battle of the Big Heads

By Maureen Tkacik

2,217 words

18 July 2003

The Wall Street Journal

A1

English

(Copyright (c) 2003, Dow Jones & Company, Inc.)

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8- to 12-year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s,

Page 64      © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions: "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories, she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But

Page 65        © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet -- they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie.".

      © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

This year, closely held MGA expects revenue of about $800 million — with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips, as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights — meaning separate molds — and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two

282

designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self-expression," she says.

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire."

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11 body piercings and her mud wrestling-themed MTV video called "Dirrty." It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."

Document j000000020030718dz7i0000u

Page 68          © 2005  Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

**Exhibit 9**

**Jenal, Jim**

| | |
|---|---|
| **From:** | Timothy Alger [timalger@quinnemanuel.com] |
| **Sent:** | Thursday, May 17, 2007 12:06 PM |
| **To:** | Jenal, Jim |
| **Cc:** | Torres, Diana; Michael Page; Michael T Zeller; John Quinn; Jon Corey |
| **Subject:** | RE: Deposition agreement |

Jim:

Naturally, deposition arrangements or scheduling changes must be considered on a case-by-case basis, and we made no agreement yesterday about other depositions. Also, while you make reference to this as an "accommodation," Mattel's proposal to make Ms. Jensen available was driven by our desire to make available the best witness on the topic, and not for Mattel's benefit or convenience. The timing of our proposal (after I learned that Ms. Jensen had just returned to Mattel as an employee) was unfortunate; I apologized for the timing, and I appreciate your courtesies and those of Mr. Page. That being said, Mattel agrees as stated in the first two paragraphs, below.

Tim

---

**From:** Jenal, Jim [mailto:JJenal@OMM.com]
**Sent:** Wednesday, May 16, 2007 10:52 PM
**To:** Timothy Alger
**Cc:** Torres, Diana; Michael Page
**Subject:** Deposition agreement
**Importance:** High

Tim --

As we agreed during our telephone calls this evening, here is how we will handle the 30(b)(6) deposition of Mattel on topic 41. MGA and Bryant understand that in Mattel's view, Julia Jensen would be a more appropriate 30(b)(6) witness on this topic than the present designee, Jules Andres. Relying upon Mattel's representation, the deposition of Ms. Andres, previously scheduled for tomorrow morning, is off-calendar, subject to Bryant and MGA's reservation of rights as set forth below. In place of Ms. Andres, Mattel will make available Ms. Jensen on either June 7 or 8 at O'Melveny's offices in New York City. We will confirm with you tomorrow which of those two days we will use.

Should Ms. Jensen's knowledge on the designated topic prove to be deficient, Mattel agrees to make Ms. Andres available as a second witness on this topic pursuant to the same 30(b)(6) notice. Alternatively, if Ms. Jensen becomes unavailable for whatever reason, Mattel will make Ms. Andres available and will ensure that she is adequately educated on the designated topic.

In consideration for this accommodation, particularly given the late notice provided -- indeed, after Bryant's counsel had already traveled to Los Angeles for Ms. Andres' deposition (despite Mattel's attempt to contact him in time) -- MGA expects to receive reciprocal accommodations in handling the scheduling concerns of MGA's own 30(b)(6) designees.

If your understanding of our agreement differs in any material respect, please let me know immediately.

Best regards,

284

7/12/2007

Jim Jenal
for O'Melveny & Myers LLP

---

IMPORTANT NOTE: This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you for your assistance.

285

7/12/2007

Exhibit 10

Jensen, Julia 6/8/2007 12:00:00 AM

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3        EASTERN DIVISION

4     --------------------------------------

5     MATTEL, INC., a Delaware Corporation, )

6            Plaintiff,            )

7     vs.                   ) No. CV 04-9059

8     CARTER BRYANT, an individual; and    ) NM (RNBx)

9     DOES 1 through 10, Inclusive,        )

10            Defendants.            )

11    --------------------------------------)

12    CARTER BRYANT, on behalf of himself,  )

13    All present and former employees of   )

14    Mattel, Inc.; and the general public, )

15            Counter-Claimants,      )

16    vs.                  )

17    MATTEL, INC., a Delaware corporation, )

18            Counter-Defendant.     )

19    --------------------------------------

20        Deposition of JULIA JENSEN, taken at

21        7 Times Square, New York, New York,

22        commencing at 10:15 a.m., Friday,

23        June 8, 2007, before Morene

24        Korenman-Bangel, Notary Public.

25    PAGES 1 - 191

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4

5    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

6    BY: TIMOTHY L. ALGER, ESQ.

7    865 South Figueroa Street, 10th Floor

8    Los Angeles, California 90017

9    (213) 443-3000

10    timalger@quinnemanuel.com

11

12    FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:

13

14    O'MELVENY & MYERS LLP

15    BY: MICHAEL C. KEATS, ESQ.

16    KENDALL BURR, ESQ.

17    7 Times Square

18    New York, New York 10036

19    (212) 408-2400

20    mkeats@omm.com

21    kburr@omm.com

22

23    ALSO PRESENT:

24    MICHAEL MOORE, ESQ., MATTEL, INC.

25    ILYA TALEYSNIK, VIDEOGRAPHER

1          Jensen

2     knowledgeable about the topics discussed in paragraph

3     41?

4               MR. ALGER:  She's the person designated by

5     Mattel under Rule 30(b)(6).

6          I think that's the answer.

7     Q.    Can you answer that question?

8               MR. ALGER:  The reason I'm raising it, the

9     person most knowledgeable is more of a state law term,

10     and she's been designated under Rule 30(b)(6) as the

11     corporate designee as to the topic.

12          MR. KEATS:  I'll rephrase the question.

13          MR. ALGER:  I think that would be

14     sufficient.

15          MR. KEATS:  I will rephrase the question.

16     Q.    Do you have personal knowledge of the

17     subjects covered by paragraph 41?

18     A.    What specifically in paragraph 41?

19     Q.    Sure.

20          All statements of Mattel or ex-Mattel

21     employees in the July 2003 Wall Street Journal article.

22     And it goes on.  You can read it yourself if you wish.

23          MR. ALGER:  We don't have to spend a lot of

24     time, she's the corporate designee as to the topic 41

25     and she has personal knowledge as to some of this, and

Jensen, Julia  6/8/2007  12:00:00 AM

1               Jensen

2      also she may have knowledge on behalf of the

3      corporation as to some of this, to the extent that the

4      corporation has any knowledge of some of these matters.

5           But we don't want to be in a position here

6      where we're going to concede that we have knowledge of

7      certain things in here because there's actually been a

8      fair amount of meeting and conferring about this, and

9      we don't need to dwell on it, but she's the corporate

10     designee as to topic 41.

11          She came prepared to testify as to topic 41.

12          MR. KEATS:  Okay.

13     Q.   Did you, in preparation for this deposition

14     on this subject --

15     A.   Yes.

16     Q.   -- did you speak to anybody other than

17     counsel at Mattel?

18     A.   No.

19     Q.   Okay.  So you didn't interview, for example,

20     anybody from the design team about some of these

21     statements, right?

22     A.   In preparation for this meeting, I did not.

23     Q.   Okay.

24          Have you ever, at any time, interviewed

25     people from the design team at Mattel about some of the

1                    Jensen

2    subjects that are listed here?

3              (Witness referring to document.)

4    A.   I did not.

5    Q.   Okay.

6         So, to prepare for the deposition, I take it

7    you met with counsel, right?

8    A.   Yes.

9    Q.   Okay.

10        Did you do anything else besides meet with

11   counsel to prepare for the deposition?

12   A.   I reviewed the article from the Wall Street

13   Journal that's named in the deposition.

14   Q.   Okay.

15        Did you go back and look at any e-mails at

16   all on your own?

17   A.   I did not.

18   Q.   Okay.

19        All right.  That's all.

20   A.   Okay.

21   Q.   Now, this refers to the July 2003 Wall

22   Street Journal article.  I take it -- which article did

23   you review?

24   A.   The July 2003 Wall Street Journal article.

25   Q.   Is it a story that was written by

Jensen, Julia  6/8/2007  12:00:00 AM

1           Jensen

2     Q.    Okay.

3           Are you familiar with the concept of the

4     flanker brand, as referred to in that sentence?

5     A.    My understanding of flanker brand, in the

6     term I had ever heard it referred to, is slightly

7     different than what is outlined here.

8     Q.    And what is your understanding?

9     A.    My understanding, part of the portfolio of

10    fashion dolls that Mattel has at any given time.

11    Q.    Is the statement here that the Mattel

12    dolls -- sorry, let me focus on a narrower statement.

13          Is this correct that Mattel had strict

14    quotas that allowed only one flanker brand on the

15    market at a time with respect to Barbie?

16    A.    I'm not familiar with that.

17    Q.    Okay.  Do you think that statement's false?

18    A.    To the best of my knowledge, I am not

19    familiar with that ever.

20    Q.    Don't know?

21    A.    In my tenure.

22    Q.    Might be true, might not be true?

23    A.    Right.

24          In my tenure, that was never referred to.

25    Q.    All right.

1          Jensen

2     A.   Can you specifically point it out in that

3   article?  I apologize.

4     Q.   Oh, sure.  Right there (indicating).

5     A.   Sorry about that.

6     Q.   Right about that line.

7     A.   No, I did not understand how that related to

8   this article and Flavas, as I read it the first time.

9     Q.   Okay.

10         Do you have an understanding sitting here

11   today what it might mean?

12     A.   Within the context of the article, yes.

13     Q.   What's your understanding?

14     A.   That context of -- my personal understanding

15   is taking liberty with the concept of the fashion doll

16   trend of the exaggerated head/exaggerated foot style,

17   and pulling that into the Flavas launch.

18     Q.   All right.  Let's go to the third full

19   paragraph on that page.

20     A.   Yes.

21     Q.   It says "Mattel, Inc., hopes the dolls are

22   hip enough to take on 'the Bratz'."

23         Do you see that?

24     A.   Yes.

25     Q.   Had you told Maureen during your discussions

Jensen, Julia 6/8/2007 12:00:00 AM

1              Jensen

2    that that was indeed what Mattel's hope was for the

3    Flavas line?

4              MR. ALGER:  Objection, asked and answered.

5              MR. KEATS:  It's different with the

6    document.

7        Q.    You can answer the questions.  Your attorney

8    can direct you not to answer if there's an

9    attorney-client privilege or other things, but he's

10   making objections for the record so later on the judge

11   can decide whether or not it will be admitted for

12   trial, but you can answer the question.

13             Do you want to hear the question again?

14       A.    Please.

15       Q.    Sure.  No problem.

16             (Record read.)

17       A.    I had not.

18       Q.    Do you know if anybody else at Mattel had

19   made that statement to the Wall Street Journal?

20       A.    I am unaware of anyone making that

21   statement.

22       Q.    Did you ask people at Mattel whether or not

23   they had told the Wall Street Journal that at the time?

24       A.    I did not.

25       Q.    And since that time, have you asked whether

1          Jensen

2     or not someone at Mattel made that statement to the

3     Wall Street Journal?

4     A.    I have not.

5     Q.    Okay.

6          Did you disagree with that statement when

7     you read it back in 2003?

8     A.    In context to the article?

9     Q.    Yes.

10     A.    I personally believed, and continue to

11     believe, it was the reporter taking liberty with the

12     story and creating a lead-in.

13     Q.    Did you ever tell her that afterwards?

14     A.    I did not.

15     Q.    Did you demand a retraction or correction?

16     A.    I did not.

17     Q.    Did you have discussions about this subject

18     with anybody else at Mattel back in 2003?

19          MR. ALGER:  Objection, vague and ambiguous.

20     Q.    You can answer.

21     A.    To the best of my memory, I don't remember

22     specifically.

23     Q.    Go to the next sentence there.

24          It says "The Flavas (pronounced 'Flay-vuhs,'

25     like 'flavors'), a set of six styles brought from

Jensen, Julia  6/8/2007  12:00:00 AM

1              Jensen

2    design to production in just three months, represent a

3    striking gamble for the giant toy company."

4          Do you see that?

5    A.    Yes.

6    Q.    Do you know whether it's true that Flavas

7    went from design to production in just three months?

8    A.    I cannot confirm that.

9    Q.    Did you know that at the time?

10   A.    I did not.

11   Q.    Do you know where -- do you have any idea

12   where Maureen may have gotten that information from?

13   A.    I cannot confirm, but as I read the article

14   after it was printed, it appeared she sought a variety

15   of sources on the creation of Flavas, and culled from

16   that.

17   Q.    If an employee of Mattel spoke to the press

18   without your knowledge, would that be a violation of

19   company policy?

20          MR. ALGER:  Objection, vague and ambiguous.

21          Just for clarity, are you asking about her

22   knowledge, without her knowledge or without the

23   company's knowledge?  Just to clear it up, because as

24   phrased it's confusing.

25          MR. KEATS:  I would say without her

MGA v. MATTEL                    Unsigned                         Page 88

295

1                    Jensen

2    knowledge for now.

3         A.    Without my knowledge, would be against

4    company policy.  (Pause.)

5              I would have to review 2003 policy.  My

6    knowledge is, today, yes, that would be against company

7    policy.

8         Q.    Are there 2003 policies on that subject?

9         A.    I cannot confirm or deny.

10        Q.    Okay.

11        A.    I'm unaware.

12             MR. KEATS:  I'll just state for the record

13   if such policies exist, we call for them to be

14   produced.

15             MR. ALGER:  You can make a document

16   production request.

17             MR. KEATS:  I can make a request on the

18   record and I'll follow it up with a letter in the

19   ordinary course.

20             MR. ALGER:  You can make any request you

21   want, but just stating it on the record is not

22   sufficient.

23             MR. KEATS:  I disagree, but we'll follow up.

24   We'll be happy to follow up with a letter.  There

25   aren't enough letters in this case.

MGA v. MATTEL                    Unsigned                    Page 89

Jensen, Julia 6/8/2007 12:00:00 AM

1                    Jensen

2       Q.   Look at that same paragraph we were in.  I'm

3    just going to be complete for the record.

4            It says, "While Barbie which posted about

5    1.7 billion in sales for Mattel last year is still

6    queen, her share of the so-called fashion doll market

7    has fallen almost entirely due to Bratz."

8            Do you see that?

9       A.   Yes.

10      Q.   Did you ever tell Maureen that?

11      A.   I did not.

12      Q.   Do you know if anybody else at Mattel ever

13   told Maureen that?

14      A.   Not that I am aware of, nor were present for

15   conversation.

16      Q.   And prior to this deposition and preparation

17   for it, did you talk to any Mattel employees as to

18   whether or not they made that statement?

19      A.   I did not.

20      Q.   Let's go to the next paragraph.

21           It says "After trying and failing to defeat

22   the Bratz with a trendier Barbie last year, Mattel has

23   come up with a radical battle plan."

24           Do you know what the trendier Barbie is

25   that's referred to in this paragraph?

Jensen, Julia  6/8/2007  12:00:00 AM

1                    Jensen

2        A.    I do not.

3        Q.    Did you ever, after the article came out,

4    ever try to confirm the statements that are made in

5    that sentence?

6        A.    I did not.

7        Q.    Look on the second column, the top of the

8    page.

9              It says "With the Flavas, Mattel is trying

10   to get back into that market -- even if it risks

11   cannibalizing its biggest product."

12             Did you ever tell Maureen that?

13       A.    I did not.

14       Q.    Do you know if anybody else at Mattel did?

15       A.    Not that I am aware of.

16       Q.    Okay.

17             Did you try to confirm prior to this

18   deposition if anybody at Mattel might have made that

19   statement?

20       A.    I did not.

21       Q.    Go to the second full paragraph on the page

22   which starts "But Mattel now concedes."

23             It says "But Mattel now concedes Barbie has

24   gradually lost touch with some young girls' lives."

25   And there's a quote.

MGA v. MATTEL                    Unsigned            298              Page 97

Jensen, Julia  6/8/2007  12:00:00 AM

1                  Jensen

2     Q.   No, no, no.  We have to be very, very

3   specific.

4        All right.  Let's go to the next paragraph.

5   And I'm going to read it for the record.

6        "The history of the Bratz is intertwined

7   with Mattel.  MGA says the Bratz were designed by

8   Carter Bryant, a former member of the Barbie team.

9   Inside Mattel some are convinced Bratz borrow liberally

10   from a Mattel project that was scrapped at the testing

11   stage in 1998."

12        And then it says Mattel declined to comment.

13        Let's break this down.  First, where it says

14   inside Mattel some are convinced, do you know who the

15   "some" are, some people, or whatever, are referred to

16   in that sentence?

17     A.   I do not.

18     Q.   Did you ask anybody in preparation for this

19   deposition who those people were?

20     A.   I did not.

21     Q.   Did you do anything to find out, if it was

22   possible to figure out, who those people referred to

23   are?

24     A.   I did not.

25     Q.   Do you know what the project, the Mattel

1              Jensen

2    project, is that's referred to in that sentence, what

3    the specific project was?

4         A.   No.  To the best of my knowledge, I do not

5    know what specific project is being named here.

6         Q.   So, you never heard that the project

7    referred to here is Toon Teens?

8         A.   I did not specific to this, no.

9         Q.   Have you ever heard that the project at

10   issue was My Scene?

11        A.   No.

12        Q.   Have you ever heard that the Mattel project

13   at issue was some Barbie-related project?

14        A.   No, I did not.

15        Q.   After this article came out, did you do

16   anything to confirm what is said here in that sentence,

17   in the second sentence?

18        A.   I'm sorry, just to be clear, the second

19   sentence --

20        Q.   Where it says inside Mattel some are

21   convinced.

22             Did you do -- make any inquiry --

23             MR. ALGER:  Just for clarity, that's

24   actually the third sentence.

25             MR. KEATS:  You're right.  You're absolutely

Jensen, Julia  6/8/2007  12:00:00 AM

1                  Jensen

2        A.    Maureen presented to me the concept that

3    Mattel, someone at Mattel, had actually created the

4    designs that ultimately became Bratz, and could I

5    comment on that, and which I declined to comment.

6              And that is the context for the "no comment"

7    here.

8        Q.    And that phone call with her, is that the

9    first time you ever heard that?

10       A.    That was the first time I had ever heard

11   that.

12       Q.    And that was two days before the article

13   came out?

14       A.    Yes.  To the best of my recollection, either

15   two days or the day prior.

16       Q.    So, you'd had a bunch of these conversations

17   over about a month, I take it, with Maureen, about --

18       A.    About a three-week period.

19       Q.    About a three-week period.

20             And it never came up, the subject never came

21   up, until about a day or two before the article came

22   out, right?

23       A.    That is correct.

24       Q.    All right.  We'll go to the next paragraph.

25             It says Mr. Bryant didn't work on a line

1          Jensen

2     that Mattel scrapped according to former and current

3     Mattel designers.

4          And again, was this a subject of your

5     discussions with Ms. Ross as to who the people were who

6     were providing this information to the Wall Street

7     Journal?

8     A.    That is correct.

9     Q.    And you are unable to -- you never found

10    that out, even as of today, you don't know who that

11    was, correct?

12    A.    Correct.  Today I do not know who that

13    person or people were.

14    Q.    Then it says but most Barbie designers had

15    seen the prototypes, his former colleagues say.

16         Did you ask Ivy whether that statement was

17    true?

18    A.    I do not have recollection of asking that

19    specific question.

20         I don't believe I did.

21    Q.    Okay.

22         Have you heard of the Diva Starz line?

23    A.    Yes, I have.

24    Q.    Okay.

25         And is it your understanding that that was

1              Jensen

2      the project that people think Carter Bryant may have

3      copied at this time?

4      A.    I have no understanding of that, no.

5      Q.    Okay.

6            And then the next paragraph says the Mattel

7      doll line that was scrapped wasn't exactly like the

8      Bratz, says a long-time Mattel designer who worked on

9      the project.

10           And I take it sitting here today you do not

11     know who that employee was who made that comment,

12     right?

13     A.    Correct.

14     Q.    Okay.

15           And at the time you don't know whether

16     Ms. Ross undertook steps to figure that out, right?

17     A.    Not specifically, no.

18     Q.    Okay.

19           And to this day no one, to your knowledge,

20     at the company has tried to figure out who the source

21     of that statement was, right?  Other than counsel.

22     MR. ALGER:  Other than counsel, that's true,

23     but I -- I don't want to really help you out on the

24     deposition, but I don't want there to be some

25     confusion.

Jensen, Julia 6/8/2007 12:00:00 AM

1          Jensen

2          You haven't asked her whether she followed

3    up with the reporter at all.

4          MR. KEATS:  No.  I'll get there.

5          MR. ALGER:  Okay.

6          MR. KEATS:  I'll get there.

7          Yeah.

8          Q.    Did you talk to anybody at

9    Mattel -- actually, let's just read the question back.

10         (Question read.)

11         A.    I personally have not been involved in

12   identifying the source of that comment at Mattel and

13   have not been privy to conversations surrounding that.

14         Q.    Do you know if anybody's been trying to find

15   out who the sources of these statements were?

16         A.    I don't know.

17         Q.    Okay.

18         We'll now take your counsel's direction

19   because we might as well.

20         Did you ever ask the Wall Street Journal

21   reporter who she spoke to?

22         A.    Yes.

23         Q.    And when did you ask her that?

24         A.    Immediately following publication of the

25   article.

MGA v. MATTEL                    Unsigned                304                    Page  122

**Exhibit 11**

# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

July 2, 2007

OUR FILE NUMBER
527436-04

WRITER'S DIRECT DIAL
(213) 430-6584

WRITER'S E-MAIL ADDRESS
jjenal@omm.com

**VIA FACSIMILE AND ELECTRONIC MAIL**

Dylan Proctor, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street - 10th Floor
Los Angeles, California 90017-2543

Re:   *Mattel, Inc. v. Carter Bryant and Consolidated Actions*

Dear Dylan:

We are writing to request that Mattel withdraw its Third Set of Interrogatories and to meet and confer regarding Mattel's abusive discovery tactics pursuant to section 5 of the Discovery Master Stipulation.

First, in the District Court's scheduling order, dated February 12, 2007, the number of interrogatories was limited to 50 per side. With the service of this most recent set of interrogatories, however, Mattel has now propounded substantially more than the 50 interrogatories allowed. Specifically, many of the interrogatories served, both in the prior sets as well as those in Mattel's Third Set of Interrogatories, are compound, and constitute multiple interrogatories. Accordingly, please let us know promptly whether Mattel will withdraw its Third Set of Interrogatories and comply with the limits imposed by the District Court.

Second, Mattel has engaged in a multitude of discovery abuses, including improper use of the Rule 30(b)(6) deposition notice procedure to avoid noticing witnesses in their individual capacity; bandying, and exceeding the page limits on motions filed before the Discovery Master, among others. Absent resolution of these issues, as well as Mattel's failure to adhere to the limit on the number of interrogatories allowed, MGA and Bryant intend to file a motion for a protective order.

305

O'MELVENY & MYERS LLP
Dylan Proctor, Esq., July 2, 2007 – Page 2


Please let us know promptly whether Mattel will withdraw its Third Set of Interrogatories, as well as when Mattel is available to meet and confer on the remaining discovery issues.  I look forward to hearing from you.

Best regards,

James P. Jenal
for O'MELVENY & MYERS LLP

cc:    Diana M. Torres, Esq.
       Michael H. Page, Esq.
       John Trinidad, Esq.

LA2:835920.1

306

**Exhibit 12**

# O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

July 11, 2007

OUR FILE NUMBER
527436-4

**VIA FACSIMILE AND E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-8462

Dylan Proctor, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street - 10th Floor
Los Angeles, California 90017-2543

WRITER'S E-MAIL ADDRESS
wcharron@omm.com

Re:     *Mattel, Inc. v. Carter Bryant and Consolidated Actions*

Dear Dylan:

I am writing regarding the parties' agreement to continue the discussions begun at yesterday's meet and confer regarding Mattel's abusive bandying practices. As you know, MGA requested a meet and confer on the bandying issue in its July 2, 2007, letter. However, when MGA broached the subject of Mattel's bandying practices during yesterday's telephone conference, Mattel was unprepared to discuss the issue.

As previously discussed, Mattel has engaged in a number of discovery abuses, including bandying and producing unknowledgeable Rule 30(b)(6) witnesses. MGA is concerned about the testimony of Mattel's 30(b)(6) witnesses in general, including, but not limited to the testimony of Julia Jensen, Kislap Ongchanco, Rene Pasko, Joni Pratte, and Sandy Yonemoto with respect to topics 2-8 and 41 of Carter Bryant's Notice of Rule 30(b)(6) depositions. As I explained, MGA is seeking for Mattel to produce a properly educated 30(b)(6) witness who can testify competently as to Mattel's knowledge on these topics.

Tentatively, we discussed reconvening the meet and confer during the afternoon of Friday, July 13, 2007. However, my colleague James Jenal cannot participate in the meet and confer at that time because he is taking the deposition of Rob Hudnut. Thus, MGA and Carter Bryant request that the parties reconvene the meet and confer at 9:30 a.m. on Monday, July 16, 2007.

307

O'MELVENY & MYERS LLP
Dylan Proctor, Esq., July 11, 2007 - Page 2

We look forward to hearing from you.

Sincerely,

*William J. Charron* /ys

William J. Charron

**Exhibit 13**

**quinn emanuel trial lawyers | los angeles**

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
WRITER'S DIRECT DIAL NO.
(213) 443-3112

WRITER'S INTERNET ADDRESS
dylanproctor@quinnemanuel.com

July 15, 2007

VIA FACSIMILE AND U.S. MAIL

William J. Charron, Esq.                    Jennifer Glad, Esq.
O'Melveny & Myers LLP                       O'Melveny & Myers
1999 Avenue of the Stars, 7th Floor         400 S. Hope Street
Los Angeles, CA 90067                       Los Angeles, CA 90071

Re:    Mattel, Inc. v. Bryant

Dear William and Jennifer:

I write in response to your respective letters from Wednesday, July 11, 2007 and Thursday, July 12, 2007 regarding Mattel's alleged "abusive bandying practices."

In the July 11, 2007 letter, Mr. Charron provides at least more information than MGA had in the past by listing the Mattel Rule 30(b)(6) witnesses that MGA is putting at issue, but MGA still has not disclosed what the issues are or what the potential dispute is. Simply saying that MGA is "concerned about the testimony of Mattel's 30(b)(6) witnesses in general, including, but not limited to the testimony of Julia Jensen, Kislap Ongchanco, Rene Pasko, Joni Pratte and Sandy Yonemoto" with respect to a number of Topics does not provide notice of what aspects of these Topics MGA believes need to be further addressed or what further testimony should be offered by Mattel. MGA appears to recognize this because, in her subsequent July 12 letter, Ms. Glad states that, "as agreed, MGA and Bryant will send a second letter further detailing the discovery abuses for which MGA and Bryant intend to seek a protective order absent resolution of these issues." I look forward to receiving such a letter.

As I said before, I will be happy to meet and confer with you after MGA sends a letter that enables Mattel to identify what particular testimony and other matters are at issue, which is necessary to enable Mattel to prepare for the meet and confer. I look forward to hearing from you.

Very truly yours,

B. Dylan Proctor
07209/2166759.1

cc:  Michael Page, Esq.

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

309

**Exhibit 14**

1          THE VIDEOGRAPHER:  Good morning.  We're on

2     the record at 10:34 A.M. on August 20th, 2007 for

3     the 30 (B) 6 deposition of Robert K Hudnut junior.

4     We're taping this deposition at 400 south hope

5     street, suite 1800 in Los Angeles on behalf of the      10:34AM

6     defense in the action entitled Mattel, Inc. versus

7     Carter Bryant et al..

8          Case number is CV 04-9059 N M my name is

9     Ryan Gulino I'm the legal videographer from Veritext

10    station all deposition and litigation services 55077   10:35AM

11    an in Los Angeles tape number one of volume two

12    would counsel please identify yourselves for the

13    record.

14         MR. PAGE:  Michael Page from Keker & Van

15    Hest representing Carter Bryant.                  10:35AM

16         MR. JENAL:  Jim Jenal from O'Melveny &

17    Myers for MGA.

18         MS. HUTNYAN:  Diane Hutnyan from Quinn

19    Emanuel for Mattel.

20         MR. MOORE:  Michael Moore, in-house counsel   10:35AM

21    for Mattel.

22         MR. PAGE:

23     Q.  Good morning?

24     A.  Good morning.

25     Q.  Welcome back?                      10:35AM

1    Because I know he was in the collector business.

2         Q.   Relevant to this litigation if you know

3    what that means?

4         A.   Again I'm not a lawyer.

5         So could you rephrase the nugget of the          10:59AM

6    question please.

7         Q.   I think your previous answer was that you

8    don't have personal knowledge of anything that

9    Carter Bryant did at all basically other than he

10   worked in collectibles, correct?              10:59AM

11        A.   That's correct.

12        Q.   Now I'm trying to go one step further.

13   Have you heard from anyone else at Mattel anything

14   that Carter did that you think is relevant to this

15   lawsuit other than what you've heard from counsel?   10:59AM

16        A.   Other than what I've heard from counsel.

17        Q.   Yes?

18        A.   No.

19        Q.   So you don't, nobody else came to you one

20   day and said I saw Carter Xeroxing stacks of          10:59AM

21   documents or anything like that?

22        MS. HUTNYAN:  Objection vague the anything

23   like that part, but you can answer.

24        THE WITNESS:  No, no I have not heard

25   anything like that.  Page page.              10:59AM

MGA v. MATTEL                    Unsigned                    Page 16

311

1       Q.  Do you have any independent knowledge of

2   what Mattel proprietary or confidential information

3   Carter Bryant had access to at any time?

4           MS. HUTNYAN:  Objection calls for

5   speculation.                          10:59AM

6       Q.  That's sort of my point?

7       A.  Again do I have personal knowledge of what

8   he had access to?

9       Q.  Right?

10      A.  No.                           11:00AM

11      Q.  Do you in anything about, do you have any

12  knowledge that Carter Bryant did anything to jury

13  Mattel other than contained in your prior testimony?

14          MS. HUTNYAN:  Objection, vague.

15          THE WITNESS:  My own personal direct      11:00AM

16  experience is what you're asking.

17      Q.  Yes that's the first question?

18      A.  No.

19      Q.  Do you have any knowledge of anything that

20  Carter Bryant did to injury Mattel that you obtained   11:00AM

21  from anyone at Mattel other than a lawyer?

22          MS. HUTNYAN:  Asked and answered, vague.

23          THE WITNESS:  Beyond discussions with

24  counsel, no.

25          MR. PAGE:                      11:00AM

1    Q.   Okay.  Do you have any knowledge that

2    Carter Bryant ever provided any property that

3    belonged to Mattel to any third party?

4         MS. HUTNYAN:  Same objections.

5         THE WITNESS:  Again direct personal      11:00AM

6    knowledge, no.

7         MR. PAGE:

8         Q.   Do you have any indirect knowledge that

9    Carter Bryant ever provided any property that

10   belonged to Mattel to any third party other than     11:01AM

11   conversations with counsel?

12        MS. HUTNYAN:  Same objections.

13        THE WITNESS:  No.

14        MR. PAGE:

15        Q.   In your, in the previous session of your     11:01AM

16   deposition, you testified that at one point Mattel

17   had asked you to sign an updated employ dentures

18   agreement and you refused to do so do you remember

19   that testimony?

20        A.   Yes.                    11:01AM

21        MS. HUTNYAN:  Objection mischaracterizes

22   testimony.

23        Q.   What was inaccurate about the way I

24   characterized your testimony there if anything?

25        A.   Mattel had approached me regarding an     11:01AM