1   DALE M. CENDALI (admitted *pro hac vice*)
    DIANA M. TORRES (S.B. #162284)
2   JAMES P. JENAL (S.B. #180190)
    O'MELVENY & MYERS LLP
3   400 South Hope Street
    Los Angeles, CA 90071-2899
4   Telephone: (213) 430-6000
    Facsimile: (213) 430-6407
5   jjenal@omm.com

6   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP
7   10250 Constellation Boulevard, 19th Floor
    Los Angeles, CA 90067
·8  Telephone: (310) 553-3000
    Facsimile: (310) 557-9815
9
10  Attorneys for MGA Entertainment, Inc.

    MICHAEL H. PAGE (S.B. #154913)
11  KEKER & VAN NEST LLP
    710 Sansome Street
12  San Francisco, CA 94111
    Telephone: (415) 391-5400
13  Facsimile: (415) 397-7188

14  Attorneys for Carter Bryant

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17                    EASTERN DIVISION

18

19  CARTER BRYANT, an individual,        Case No. CV 04-9059 SGL (RNBx)
                                          (consolidated with CV 04-9059 & 05-
20              Plaintiff,                2727)

21       v.                              **DISCOVERY MATTER**
                                         [PUBLIC REDACTED]
22  MATTEL, INC., a Delaware             **DECLARATION OF YVONNE L.**
    corporation,                         **GARCIA IN SUPPORT OF MGA**
23                                       **ENTERTAINMENT, INC.'S AND**
                Defendant.               **CARTER BRYANT'S REPLY IN**
24·                                      **SUPPORT OF THEIR JOINT**
                                         **MOTION TO COMPEL RE:**
25                                       **MATTEL'S BANDYING OF 30(B)(6)**
                                         **WITNESSES**
26
                                         Hearing Date: T.B.D.
27  AND CONSOLIDATED ACTIONS            Time: T.B.D.

28
                                         DECL. OF YVONNE L. GARCIA ISO
                                         REPLY ISO JOINT MTC RE MATTEL'S
                                         BANDYING CV 04-9059 SGL (RNBX)

1        I, Yvonne L. Garcia, declare and state as follows:

2        I am an attorney in the law firm of O'Melveny & Myers LLP, counsel

3 for MGA Entertainment, Inc. ("MGA").  All of the facts set forth herein are known

4 to me personally, and if called as a witness, I could and would testify competently

5 thereto.

6        1.     On July 13, 2007, Mattel produced Robert Hudnut for

7 deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).  Attached hereto as

8 **Exhibit 1** is a true and correct copy of excerpts from that deposition.

9        2.     On August 20, 2007, Mattel produced Robert Hudnut for a

10 second day of deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).

11 Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from that

12 deposition.

13        3.     On June 8, 2007, Mattel produced Julia Jensen for deposition

14 pursuant to Federal Rule of Civil Procedure 30(b)(6).  Attached hereto as **Exhibit 3**

15 is a true and correct copy of excerpts from that deposition.

16        4.     On July 31, 2007, Mattel produced Jill Nordquist for deposition

17 pursuant to Federal Rule of Civil Procedure 30(b)(6).  Attached hereto as **Exhibit 4**

18 is a true and correct copy of excerpts from that deposition.

19        5.     On April 24, 2007, Mattel produced Kislap Ongchanco for

20 deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).  Attached hereto as

21 **Exhibit 5** is a true and correct copy of excerpts from that deposition.

22        6.     On June 13, 2007, Mattel produced Rene Pasko for deposition

23 pursuant to Federal Rule of Civil Procedure 30(b)(6).  Attached hereto as **Exhibit 6**

24 is a true and correct copy of excerpts from that deposition.

25        7.     On June 1, 2007, Mattel produced Joni Pratte for deposition

26 pursuant to Federal Rule of Civil Procedure 30(b)(6).  Attached hereto as **Exhibit 7**

27 is a true and correct copy of excerpts from that deposition.

28        8.     On May 30, 2007, Mattel produced Sandy Yonemoto for

DECL. OF YVONNE L. GARCIA ISO
REPLY ISO JOINT MTC RE MATTEL'S
BANDYING CV 04-9059 SGL (RNBX)

deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).  Attached hereto as **Exhibit 8** is a true and correct copy of excerpts from that deposition.

9.    Attached hereto as **Exhibit 9** is a true and correct copy of a letter from Jon Corey to Jim Jenal, Diana Torres, and Michael Page, dated July 23, 2007.

10.    Attached hereto as **Exhibit 10** is a true and correct copy of Judge Stephen G. Larson's Standing Order.

11.    Attached hereto as **Exhibit 11** is a true and correct copy of excerpts from the transcript of the August 27, 2007, hearing before Judge Stephen G. Larson on Defendants' Motion for Terminating Sanctions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 11, 2007, at Los Angeles, California.

Yvonne L. Garcia

DECL. OF YVONNE L. GARCIA ISO
REPLY ISO JOINT MTC RE MATTEL'S
BANDYING CV 04-9059 SGL (RNBX)

# Exhibit 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA

 3            EASTERN DIVISION                 Certified Copy

 4

 5    --------------------------------

 6    MATTEL, INC., a Delaware          )

 7    Corporation,                      )

 8              Plaintiff,              )

 9              vs.                     ) No. CV 04-9059

10    CARTER BRYANT, an individual;     )  NM (RNBx)

11    and DOES 1 through 10,            )  VOLUME I

12    Inclusive,                        )

13              Defendants.            )

14    --------------------------------)

15    (COMPLETE CAPTION ON NEXT PAGE.)

16

17    CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19        Videotaped 30(b)(6) Deposition of

20    ROBERT K. HUDNUT, JR., taken at

21    400 South Hope Street, Los Angeles,

22    California, commencing at 9:35 A.M.,

23    Friday, July 13, 2007, before Wendy S.

24    Schreiber, CSR No. 3558, RPR, CLR.

25    PAGES 1 - 238
```

1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                 EASTERN DIVISION

 4

 5     --------------------------------

 6     MATTEL, INC., a Delaware          )

 7     Corporation,                      )

 8                  Plaintiff,           )

 9                  vs.                  )  No. CV 04-9059

10     CARTER BRYANT, an individual;     )   NM (RNBx)

11     and DOES 1 through 10,            )

12     Inclusive,                        )

13                  Defendants.          )

14     ----------------------------     )

15     CARTER BRYANT, on behalf of       )

16     himself, all present and          )

17     former employees of Mattel,       )

18     Inc., and the general public,     )

19                  Counter-Claimants,   )

20                  vs.                  )

21     MATTEL, INC., a Delaware          )

22     Corporation,                      )

23                  Counter-Defendant.   )

24     --------------------------------

25
```

2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4         FOR THE PLAINTIFF:

 5

 6         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 7         BY:  DIANE C. HUTNYAN, ATTORNEY AT LAW

 8         865 South Figueroa Street, Tenth Floor

 9         Los Angeles, California 90017

10         (213) 443-3000

11         dianehutnyan@quinnemanuel.com

12

13                   -AND-

14

15         MATTEL, INC.

16         BY:  MICHAEL MOORE, ESQ.

17         333 Continental Boulevard

18         El Segundo, California 90245-5012

19         (310) 252-2000

20         michael.moore@mattel.com

21

22

23

24

25
```
3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      APPEARANCES OF COUNSEL (CONTINUED):

 2

 3          FOR THE DEFENDANT AND COUNTERCLAIMANT

 4      CARTER BRYANT:

 5

 6              KEKER & VAN NEST LLP

 7              BY:  MICHAEL H. PAGE, ESQ.

 8              710 Sansome Street

 9              San Francisco, California 94111-1704

10              (415) 391-5400

11              mhp@kvn.com

12

13

14          FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16              O'MELVENY & MYERS LLP

17              BY:  JAMES PAUL JENAL, ESQ.

18              400 South Hope Street

19              Los Angeles, California 90071-2899

20              (213) 430-6000

21              jjenal@omm.com

22

23          ALSO PRESENT:

24

25              DAVID WEST, VIDEO OPERATOR
```

4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    If I may?

2    Q.    Sure.

3         MS. HUTNYAN:  Wait a minute.  I just want to

4    make sure that any information about what he did at

5    his depo prep doesn't result in some kind of a        11:44AM

6    waiver or privilege.  My understanding is that

7    during the case we've been allowing witnesses on

8    both sides to testify as to what they prepared for

9    in terms of the 30(b)(6) designations but that that

10   does not constitute a waiver.  Do you agree that      11:44AM

11   that's the case here?

12        MR. JENAL:  Well, I don't think I could ask

13   him what he's been designated on and his

14   understanding of it if that were a waiver of the

15   attorney-client privilege.  I think he has knowledge  11:45AM

16   as to why he's sitting here on behalf of Mattel

17   presumably and I'm entitled to find out about that.

18        MS. HUTNYAN:  Well, that's completely

19   non-responsive.  Did you hear my question?

20        MR. JENAL:  I'm not under oath here,           11:45AM

21   Counsel.  You want to make an objection at some

22   point, make an objection.  In the meantime I'm

23   trying to ask if he recognizes this document.

24   That's my question.  Are you instructing him not to

25   answer?                                             11:45AM

                                                              90

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      MS. HUTNYAN:  I think I was extraordinarily

2    clear.  If you'd like to read back on your screen,

3    maybe review it, then you can answer my question.  I

4    just want to know if you are going to take the

5    position that responses as to what he did within his    11:45AM

6    preparation for his deposition won't constitute a

7    waiver of any kind.  I just want that reassurance

8    that it doesn't.  My understanding is that in

9    countless depositions before this you've agreed to

10   that so I'm not really sure why you're giving me a      11:45AM

11   hard time.  It seems like a no brainer.

12      MR. JENAL:  The question has never come up,

13   Counsel, so --

14      MS. HUTNYAN:  I've read it in deposition

15   transcripts.  Maybe you need to read up.                11:45AM

16      MR. JENAL:  I think I've read more

17   transcripts in this case than you have.  It hasn't

18   come up in my experience.  Let's just go and ask a

19   question.

20      MS. HUTNYAN:  Anything that relates to your    11:46AM

21   deposition preparation we need to find that out

22   before we answer questions related to it.

23      THE WITNESS:  Okay.

24   BY MR. JENAL:

25      Q.  So I was asking if you could turn to page 4  11:46AM

91

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   of Exhibit 385.   Do you see that?

2        A.    Yes.

3        Q.    And is it your understanding that you've

4   been designated today to testify on behalf of Mattel

5   as to some of the topics in this deposition notice?   11:46AM

6        A.    That's correct.

7        Q.    And my understanding as to the topics that

8   you've been designated on is as follows:   It's

9   topics 2 through 8 that appear here on page 4, topic

10  11 which appears on the next page, topic 13 also on   11:46AM

11  that page and topic 24 which is on page 6 of Exhibit

12  385.   Is that your understanding as well, sir?

13           MS. HUTNYAN:   No, there's -- that's not what

14  he's been designated on.   He said 2 through 8, 11,

15  what and 24?                                          11:47AM

16           MR. JENAL:   11, 13 and 24.

17           MS. HAULER:   No, my understanding is 2

18  through 7 and 11.

19           MS. HUTNYAN:   Portions of those.

20           MR. JENAL:   Your understanding is what,      11:47AM

21  Bridget?

22           MS. HAULER:   Two through 7 and 11.

23           MS. HUTNYAN:   And the portions of those that

24  specifically relate to the scripts that he's worked

25  on within those categories.                           11:47AM

                                                            92

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. JENAL:  And the basis for -- let's take

2    those in two steps, all right, because the notes

3    that I have from the meet and confer with Judge

4    Infante included 2 through 8, 11, 13 and 24.

5          MS. HAULER:  I can double-check but mine was  11:47AM

6    I had 2 through 7 from the same so I'll

7    double-check.  I'll have someone check it and E-mail

8    us back, but that was not mine.

9          MR. JENAL:  That's fine, Bridget.  Let's --

10          MR. PAGE:  Let's just look at it at a break.  11:48AM

11          MR. JENAL:  Yeah, we'll resolve that part of

12    the question on a break.

13     Q.    You understand then at least you agree as to

14    2 through 7 and 11; is that correct?

15          MS. HUTNYAN:  With the qualification that I  11:48AM

16    mentioned.

17          MR. JENAL:  Right, and we'll get to that in

18    just a second.

19     Q.    That's -- your understanding is that's the

20    designation?                                         11:48AM

21     A.    That is my understanding.

22          MR. JENAL:  Okay.  And then the second part

23    of this was a limitation as to what, Counsel?

24          MS. HUTNYAN:  It's only the portions of

25    those topics that deal with his knowledge as to the  11:48AM

93

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    scripts that might be pertinent to those topics.  So

2    it's not those entire topics.

3         MR. JENAL:  And is there some communication

4    that establishes that restriction?

5         MS. HAULER:  Yes, the same as it's been the    11:48AM

6    same for every Diva Starz person that's been

7    deposed.

8         MR. JENAL:  Sorry --

9         MS. HAULER:  I couldn't tell you off the top

10   of my head exactly where that comes from but if you    11:48AM

11   look at the transcript for RenT Pasko, Kislap, Joni

12   Pratte, it's been the same practice for every single

13   one of those witnesses.

14        MR. JENAL:  Okay.  Just so I'm clear and the

15   record is clear that practice being what?  I'm just    11:48AM

16   not sure what you meant by that.

17        MS. HAULER:  That it's basically his

18   personal knowledge regarding his work on Diva Starz.

19   BY MR. JENAL:

20      Q.   Okay.  Is that your understanding as well,    11:49AM

21   sir, that you're here today to testify as to your

22   personal knowledge with regards to these topics as

23   they pertain to Diva Starz?

24      A.   Yes.

25      Q.   Just so that the record is clear.  So let me   11:49AM

94

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ask you this.  If you would turn to page 4, topic 2,

2   which is all contractual and non-contractual duties

3   and obligations Bryant owned or performed for Mattel

4   during his employment with Mattel and thereafter, do

5   you see that?                                      11:49AM

6       A.   Yes, I did.

7       Q.   What did you do to prepare today to testify

8   on behalf of Mattel as to that topic?

9       A.   Is that an okay question?

10          MR. PAGE:  If it isn't, she'll tell you.    11:49AM

11          MS. HUTNYAN:  Do you agree that questions as

12   to his preparation for his 30(b)(6) designation

13   testimony is not -- I'm sorry, that his responses do

14   not constitute a waiver of some kind?

15          MR. JENAL:  Well, insofar as that question   11:50AM

16   doesn't implicate any attorney-client privilege I

17   don't know how it could be a waiver of anything.

18   I'm asking what he did to prepare to testify on

19   behalf of the corporation for which he's been

20   designated.                                       11:50AM

21          MS. HUTNYAN:  Okay, so you agree that it's

22   not a waiver.  That was easy.  Okay, it's not a

23   waiver.  Can you just repeat the question for me?

24          (The pending question was read as follows:

25          "Q.   What did you do to prepare            11:49AM

95

13

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        today to testify on behalf of Mattel

2        as to that topic?")

3    BY MR. JENAL:

4        Q.   And that was topic No. 2.

5        A.   Regarding 2 specifically as we prepared and   11:50AM

6    imagined the issues that would come up today we --

7        Q.   Let me back you up.  I don't want you to

8    disclose your conversations with counsel.  That's

9    not what I'm asking about.  Okay?  So conversations

10   with counsel are privileged.  I'm not interested in   11:51AM

11   those.  Okay?  So let's set those aside.

12            MR. PAGE:  Other than the existence of them.

13            MS. HUTNYAN:  Yes, right.

14   BY MR. JENAL:

15       Q.   I'm entitled to know when and where and that  11:51AM

16   sort of thing but the content of the communications

17   are off the table.  I'm not interested in that.

18   Okay?

19            So leaving aside the fact that you may have

20   discussed the topic with counsel, what else, if      11:51AM

21   anything, did you do to prepare to testify as to

22   topic No. 2?

23       A.   I don't know which things I did would be

24   directly related to No. 2.

25       Q.   Did you do any research to determine what    11:51AM

                                                          96

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    contractual or non-contractual duties Carter Bryant

 2    owed to Mattel?

 3        A.    That Carter Bryant owed to Mattel?

 4        Q.    Yes.

 5        A.    Not direct.  Nothing direct.            11:51AM

 6        Q.    Do you know who Carter Bryant was/is?  Is.

 7        A.    I remember his name from his time here.  I'm

 8    aware that he's part of this litigation.  I have a

 9    feeling we had some meetings together way back when

10    but I did not know him.  I don't -- I don't know.  I   11:52AM

11    don't have specific recollections of any

12    interactions with Carter Bryant.

13            MS. HUTNYAN:  And I'm going to object to

14    this line of questions on the basis that it's

15    misleading.  I mean, I've told you what he's been     11:52AM

16    provided here to testify about with regard to those

17    topics and they're not about contractual duties.  I

18    think that's very clear.  It's about his information

19    that he has -- facts that are pertinent to those

20    topics relating to the scripts.  And so I'm just      11:52AM

21    going to object to that line of questioning.

22    BY MR. JENAL:

23        Q.    Let me ask you to look at topic No. 3.

24    Topic No. 3 for which you've been designated by

25    Mattel as its 30(b)(6) witness today is all of        11:53AM
                                                               97
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Not that I recall.

2      Q.   Leaving aside conversations with counsel,

3   whom else have you spoken to in preparation for your

4   deposition?

5      A.   In preparation?                          12:02PM

6      Q.   Correct.

7      A.   Nobody.

8      Q.   Aside from the Diva Starz materials that you

9   mentioned that you reviewed, what other written

10  materials did you review in preparation for your     12:02PM

11  deposition?

12         MS. HUTNYAN:  Objection:  calls for

13  speculation, lacks foundation.

14         THE WITNESS:  I also reviewed my

15  employment -- or my inventions agreement with        12:02PM

16  Mattel.

17  BY MR. JENAL:

18     Q.   Why did you do that?

19         MS. HUTNYAN:  Objection.  Instruct the

20  witness not to answer to the extent that it reflects  12:02PM

21  counsel's thoughts or work product.  Also calls for

22  speculation.  You're instructed.

23         THE WITNESS:  I'll not answer.  She

24  instructed me not to answer.

25  /  /  /                                              12:03PM

                                                            104

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    BY MR. JENAL:

2        Q.    Did you bring your inventions agreement with

3    you?

4        A.    I did not.

5        Q.    Did you turn it over to counsel?              12:03PM

6        A.    Yes, I did.

7              MR. JENAL:   Counsel, do you have it with you

8    today?

9              MS. HUTNYAN:  No, but you do.

10             MS. HAULER:  It's been produced.               12:03PM

11             MR. JENAL:   When was it produced?

12             MS. HAULER:  At least maybe -- maybe at

13   least two months ago.

14             MR. JENAL:   Can you be more precise?

15             MS. HAULER:  The exact day?  No.  But I know  12:03PM

16   it's been produced.

17             MR. JENAL:   Can you get us a Bates number?

18             MS. HAULER:  I can find out but it's

19   definitely been produced.

20   BY MR. JENAL:                                            12:03PM

21       Q.    On the Diva Starz documents what's the

22   approximate volume/pages of documents that you've

23   reviewed?

24       A.    Pages?

25             MS. HUTNYAN:  Objection:  vague, calls for    12:04PM
```

105

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     speculation.

2          THE WITNESS:  One hundred pages, 150 pages.

3   BY MR. JENAL:

4     Q.   Not boxes worth of material?

5     A.   No.                                          12:04PM

6     Q.   Was that -- strike that.

7          Apart from the Diva Starz material that you

8   referenced and your inventions agreement, what other

9   written materials did you review in preparation for

10  your deposition?                                    12:04PM

11    A.   This was shown to me yesterday.

12    Q.   Exhibit 385, the deposition notice?

13    A.   That's right.

14    Q.   Did you review any other written materials

15  in preparation for your deposition?                 12:04PM

16    A.   Not that I can think of.

17    Q.   Did you read the transcripts from any other

18  depositions that have been taken in this case?

19    A.   No.

20    Q.   Did you look at any of the complaints that   12:05PM

21  have been filed in this case?

22    A.   Is this -- I've only looked at 385.  In

23  terms of legal documents this is the only one I've

24  seen.

25    Q.   Fair enough.  Okay.                          12:05PM

                                                        106

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1         Would you turn to page 5 of Exhibit 385 and

2   look at topic 11 there.

3       A.   Yes.

4       Q.   Which is all facts and circumstances showing

5   the conception, origination, creation, development   12:05PM

6   and/or reduction to practice of Diva Starz.  Do you

7   see that?

8       A.   I do.

9       Q.   Is that a topic that you believe you are

10   prepared to testify today on behalf of Mattel?      12:05PM

11         MS. HUTNYAN:  Objection:  asked and

12   answered.  I've already explained what the scope of

13   this is.  That's his designation.

14         THE WITNESS:  I can speak to some parts of

15   it and those that I know about I'm happy to speak    12:05PM

16   about.

17   BY MR. JENAL:

18       Q.   You don't have the kind of confusion as to

19   what knowledge you might have on topic 11 that you

20   had, for example, with topics 2 and 3?  Is that fair 12:06PM

21   to say?

22         MS. HUTNYAN:  Objection:  misstates the

23   witness' testimony.  Confusion?  It's very clear.

24   There's a limitation as to all the categories that

25   allows him to testify as to his personal knowledge   12:06PM

107

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    within those categories that he has.

2    BY MR. JENAL:

3        Q.    Your turn.

4            MS. HUTNYAN:  Objection:  vague and

5    ambiguous, misleading.                                    12:06PM

6            THE WITNESS:  I understand that I'm here to

7    talk about Diva Starz and I'm prepared to do so.

8    BY MR. JENAL:

9        Q.    Okay.  Would you look at topic No. 4 which

10   you've also been designated on back on page 4 of          12:06PM

11   Exhibit 38.  Topic No. 4 is all of Bryant's acts or

12   omissions which breached any duties or obligations

13   imposed by the Conflict of Interest Questionnaire

14   and/or the Employee Confidential Information and

15   Inventions Agreement.  Do you see that?                   12:06PM

16       A.    I do see it.

17       Q.    Do you have any information about Mattel's

18   knowledge of Bryant's acts or omissions which

19   breached any duties or obligations imposed by the

20   Conflict of Interest Questionnaire and/or The            12:07PM

21   Employee Confidential Information and Inventions

22   Agreement?

23           MS. HUTNYAN:  Objection:  calls for a legal

24   conclusion.  This witness knows facts pertaining to

25   the topic that he's been designated on.                   12:07PM

                                                                   108

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    MR. JENAL:  Make an objection.  Stop

2    coaching the witness.

3         Q.   May I have an answer to my question, please,

4    Mr. Hudnut.

5         A.   We discussed Carter Bryant in deposition        12:07PM

6    preparation but my understanding is that would all

7    be privileged because it was part of our

8    preparation.

9         MS. HUTNYAN:  It is privileged so don't get

10   into that.  You're instructed not to get into        12:07PM

11   privileged material.

12   BY MR. JENAL:

13        Q.   I'm asking you as Mattel's representative do

14   you have any facts of which you are aware supporting

15   any understanding of Mattel as to Bryant's acts or    12:07PM

16   omissions which breached any duties or obligations

17   imposed by the Conflict of Interest Questionnaire

18   and/or the Employee Confidential Information and

19   Inventions Agreement?

20        MS. HUTNYAN:  Calls for a legal conclusion,    12:08PM

21   misleading, calls for speculation.

22        THE WITNESS:  What I know about it is how we

23   developed Diva Starz.  That's what I know about.

24   BY MR. JENAL:

25        Q.   How about topic No. 5?  Topic No. 5 is all    12:08PM

                                                              109

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Mattel proprietary or confidential information

2   Bryant had access to during his employment with

3   Mattel. Do you have any factual knowledge on behalf

4   of Mattel as to what Mattel proprietary or

5   confidential information Bryant had access to during   12:08PM

6   his employment with Mattel?

7           MS. HUTNYAN:  Calls for a legal conclusion.

8           You can answer.

9           THE WITNESS:  I don't know what information

10  Carter Bryant had or did not have access to when he   12:08PM

11  was at Mattel.

12  BY MR. JENAL:

13      Q.   Topic No. 6 is all of Bryant's acts or

14  omissions pursuant to which he aided, assisted and

15  worked for a competitor of Mattel while employed by   12:08PM

16  Mattel from 1995 to the present.  As Mattel's

17  30(b)(6) representative, do you have any knowledge

18  of facts regarding Bryant's acts or omissions

19  pursuant to which he aided, assisted and worked for

20  a competitor of Mattel while employed by Mattel from  12:09PM

21  1995 to the present?

22          MS. HUTNYAN:  Same objections.

23          THE WITNESS:  I don't have any personal

24  contact or knowledge of what he did or might not

25  have done. I'm aware that that is at issue here so   12:09PM

110

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  there must be an issue.  Outside of my discussions

2  with counsel I don't have any other direct personal

3  knowledge of anything he did or didn't do.

4  BY MR. JENAL:

5    Q.   And leaving aside what counsel may have told 12:09PM

6  you, as Mattel's representative, does Mattel have

7  any knowledge of any facts regarding Bryant's acts

8  or omissions pursuant to which he aided, assisted

9  and worked for a competitor of Mattel while employed

10  by Mattel from 1995 to the present?          12:10PM

11    MS. HUTNYAN:  Objection:  calls for a legal

12  conclusion.  This witness does not have a roadmap to

13  what's pertinent to all.

14    MR. JENAL:  Make an objections.  Stop making

15  speeches.                                    12:10PM

16    MS. HUTNYAN:  It's misleading.  If you want

17  facts from this witness, fine, but instead you want

18  to ask misleading questions.  I won't have it.  Okay

19  he's well prepared on the topic he was designated

20  on.  You don't --                            12:10PM

21    MR. JENAL:  He was designated on topics at

22  least 2 through 7 and 11.  I'm asking --

23    MS. HUTNYAN:  That portion of it that

24  pertains.  The fact in his personal knowledge.  Now

25  you're trying to get him to say that he doesn't have 12:10PM

111

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   personal knowledge with regard to the topics.

2        MR. JENAL:  He already --

3        MS. HUTNYAN:  He does.  He already testified

4   that he did.  This is just horrendously misleading

5   and eight.  You know what the topics are.  Get on       12:10PM

6   the topics.  Okay?  Asking him to decide legal

7   conclusions as far as what's pertinent to what is

8   just not a proper area of questioning.  It's outside

9   the scope and I'll end the deposition if you

10  continue.  Okay?  I've given you leeway and I've       12:10PM

11  just about had it.  Okay?  He has facts that are

12  pertinent and we've already explained what they are.

13       MR. JENAL:  Can I have my question read

14  back, please.

15            (The pending question was read.)           12:11PM

16       MS. HUTNYAN:  Same objections.

17       THE WITNESS:  I'm not a lawyer so I don't

18  know what information Mattel has that would be

19  relevant or not relevant.  I haven't -- I'm -- I'm a

20  screenwriter and a song writer and a producer.        12:11PM

21  Those are the things that I'm prepared to talk

22  about.

23  BY MR. JENAL:

24       Q.   Looking at topic No. 7, topic No. 7 on which

25  you've been designated by Mattel is the services and   12:11PM

112

CONFIDENTIAL - ATTORNEYS' EYES ON__

1    property belonging to Mattel that Bryant provided to

2    any third party including MGA from 1995 to the

3    present. My question to you sir, as Mattel's

4    30(b)(6) designee on topic No. 7 are you aware of

5    any facts regarding services and property belonging      12:12PM

6    to Mattel that Bryant provided to any third party

7    including MGA from 1995 to the present?

8           MS. HUTNYAN:  Objection: calls for a legal

9    conclusion, calls for speculation by a lay witness,

10   outside the scope of the designation.                     12:12PM

11          THE WITNESS:  My understanding is I'm here

12   to talk about Diva Starz and what I know about that.

13   So how that applies or doesn't apply to No. 7 I

14   leave to the lawyers to figure out.

15          MR. JENAL:  Why don't we go off the record     12:12PM

16   and take our lunch break now.

17          VIDEO OPERATOR:  12:13 we're off the record.

18

19          (At the hour 12:13 p.m. the luncheon

20       recess was taken.)

21

22

23

24

25

                                                             113

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    forward.  If so and it was something I might need at

2    a later date, I probably would have saved it.  If it

3    wasn't, then I probably wouldn't have saved it.

4    BY MR. JENAL:

5        Q.   Within the manner in which you have retained  01:29PM

6    your E-mails in these local folders is there a

7    specific folder that you would go looking in to find

8    E-mails related to Diva Starz?

9        A.   Well, as I sit here I can't recall if I have

10   a specific Diva Starz file or not in terms of a       01:29PM

11   local folder.  If I didn't, then I would go to that

12   LSPA folder which was sort of my catch-all for Girls

13   things.

14       Q.   Have you ever looked for E-mails related to

15   My Scene?                                             01:29PM

16       A.   Looked for them?

17       Q.   In relationship to requests from Legal.

18       A.   I don't recall personally doing so.

19       Q.   Do you have a local folder that relates to

20   the My Scene product?                                 01:30PM

21       A.   Yes, I do.

22       Q.   Would it again be your practice that E-mails

23   that you would copy from your in box into the My

24   Scene folder would be retained?

25            MS. HUTNYAN:  I'm just going to object as to  01:30PM

                                                            123

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the designation just that this is outside the

2    designation, the topics that the witness has been

3    designated on, and I'd just like that to be a

4    running objection.

5    BY MR. JENAL:                                      01:30PM

6        Q.   Do you understand my question?

7        A.   Could you repeat it, please?

8        Q.   Sure.  You've told us that as a general rule

9    once you copy E-mail into one of these local folders

10   it's generally your practice that you do not delete   01:30PM

11   those E-mails, correct?

12       A.   That's correct.

13       Q.   Do you have any reason to believe that your

14   practice would be different with regards to the My

15   Scene folder?                                      01:31PM

16       A.   No.

17           MS. HUTNYAN:  Objection:  calls for

18   speculation.

19   BY MR. JENAL:

20       Q.   Do you know whether -- strike that.      01:31PM

21           Did you search on your C drive for documents

22   related to this litigation?

23           MS. HUTNYAN:  Objection:  calls for

24   speculation.

25           THE WITNESS:  To which litigation?        01:31PM

                                                          124

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   doing in response to the communication you received
 2   from Mr. Normile regarding preservation of documents
 3   related to this litigation other than what you've
 4   told us already?
 5       A.   Not that I can think of right now.          01:32PM
 6       Q.   Are you -- you mentioned to us earlier that
 7   you were familiar with the name Carter Bryant,
 8   correct?
 9       A.   That's correct.
10       Q.   And that I think you said that you may have  01:33PM
11   been in some meetings with Carter Bryant at some
12   point in time; is that correct?
13       A.   That's correct.
14       Q.   Do you know whether you ever exchanged
15   E-mails with Carter Bryant while he was a Mattel     01:33PM
16   employee?
17       A.   I don't know.
18       Q.   Did you ever look for E-mails that might be
19   in your possession that were sent to or from Carter
20   Bryant?                                              01:33PM
21       A.   I don't recall doing that.
22       Q.   Do you know the name Paula Treantafelles?
23       A.   I'm aware --
24           MS. HUTNYAN:  Objection.  I'm sorry,
25   instruction not to answer with respect to any        01:33PM
```

126

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    C, none of the above.

2    BY MR. JENAL:

3        Q.    Could you tell me when did you first become

4    involved with the Diva Starz project?

5        A.    It would have been either late '99 or early    01:36PM

6    2000.  That's the answer.  Careful with the

7    microphone.

8        Q.    I'm holding it by the cord for just that

9    reason.

10           (Exhibit 477 was marked for identification    01:36PM

11       and attached to the deposition.)

12   BY MR. JENAL:

13       Q.    Mr. Hudnut, I'm showing you what the court

14   reporter has just marked as 477 in your deposition.

15   Could you take a look at this for a moment and tell    01:37PM

16   me if you recognize this?

17       A.    Yes, I do.

18       Q.    Exhibit 477 is a multi-page document bearing

19   Bates No. M 0110609 through 611.  What do you

20   recognize Exhibit 477 to be, sir?    01:37PM

21       A.    I recognize it to be the notes from a

22   brainstorming meeting that we had regarding the

23   creation of Diva Starz story content.

24       Q.    And there's a date on the E-mail that

25   appears to be transmitting the document -- the    01:38PM

129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    help us with that.  Prior to that there probably

2    would have been some phone calls saying, "Hey, we've

3    got a new brand and we'd like you to see if you

4    think it would make a good story."

5        Q.   Okay.  You mentioned Marketing and Design    01:39PM

6    partners.  Who were the Design people to whom you're

7    referring?

8        A.   On this -- on this project?

9        Q.   Well, correct.  You had said that you would

10   have had discussions prior to this March 13th, 2000    01:40PM

11   E-mail with your Marketing and Design partners and

12   so I'm just asking you who those Design partners

13   would have been, their names.

14       A.   My recollection is that Maureen Mullen I

15   believe is her last name would have been part of    01:40PM

16   that and I can't remember specifically who else

17   would have been part of that.

18       Q.   What about the Marketing partners?  Who

19   would those people have been?

20       A.   I'm trying to remember.  I know that Sara    01:41PM

21   Silverman was part of that.  She probably would have

22   been the main person as we got started.

23       Q.   Is it your understanding that by March 13th,

24   2000 the name for this project was Diva Starz as

25   opposed to something else, or was that just a    01:41PM

131

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    working title?

2              MS. HUTNYAN:  Objection:  calls for

3    speculation, vague.

4              You can answer.

5              THE WITNESS:  I don't know.  I know that it    01:41PM

6    was referred to as Diva Starz at the meeting so

7    sometimes at Mattel names change as we're -- as

8    we're developing the project so something that's

9    called something one day may be called something

10   different later.                                          01:41PM

11   BY MR. JENAL:

12        Q.   Do you know whether the Diva Starz project

13   had that experience where the name started out as

14   one thing and then changed over time?

15        A.   I don't know.  I don't know.                    01:42PM

16        Q.   Was it always called Diva Starz from the

17   time that you became involved with it?

18        A.   I believe it was but I don't know for sure.

19        Q.   That's your best recollection sitting here

20   today?                                                    01:42PM

21        A.   That's my best recollection.

22        Q.   This is from someone whose name appears to

23   be Mercedes -- is that Sichon?

24        A.   Sichon is the way she says it.

25        Q.   Who is Mercedes Sichon?                         01:42PM

                                                              132

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MS. HUTNYAN:  Objection:  calls for
 2    speculation.
 3          THE WITNESS:  My sense of it is that the
 4    pitch meetings probably occurred after the toys had
 5    reached the shelf.                          02:08PM
 6    BY MR. JENAL:
 7       Q.   How about Kris Lynch?  Are you familiar with
 8    that name?
 9       A.   Kris Lynch?  It sounds somewhat familiar but
10    I can't place the face.                     02:09PM
11       Q.   Bill Willett?  Are you familiar with that
12    name?
13       A.   Yes.
14       Q.   Who is Bill Willett?
15       A.   If he's the person I'm thinking of, he's a   02:09PM
16    designer at Mattel.
17       Q.   What was his involvement on the Diva Starz
18    project, if any?
19          MS. HUTNYAN:  Can I just ask for
20    clarification?  When you say "the Diva Starz        02:09PM
21    project," are you referring to the project he was
22    involved in for all these questions?
23          MR. JENAL:  Sorry.  And that's a fair
24    objection.  And maybe we should try to come up with
25    a nomenclature that makes this clear.              02:09PM
```

153

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   There was a Diva Starz show project if you

2   will that you were directly engaged in, correct?

3      A.   That's correct.

4      Q.   And is the Diva Starz show project, would

5   that be a fair way to describe that or is there          02:09PM

6   another descriptor that you used commonly to

7   describe that?

8      A.   We would have called it Diva Starz

9   entertainment.

10      Q.   Fair enough.                                      02:10PM

11      A.   Though, again, content isn't just

12   entertainment at Mattel.  It can come out a number

13   of ways.

14      Q.   I understand that.  But in terms of -- in

15   terms of your role --                                    02:10PM

16      A.   Yes.

17      Q.   -- would the way you would phrase that would

18   be that you were involved with the Diva Starz

19   entertainment project?

20      A.   I think, yes.  For purposes of our               02:10PM

21   understanding each other we can use that.

22      Q.   Okay.  So I'll try to focus myself and say

23   "Diva Starz entertainment project" when I mean to

24   refer specifically to that which you worked on and

25   "Diva Starz project" as the broader sort of brand        02:10PM

154

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    project within Mattel.  Do you understand that

2    distinction?

3        A.   I believe I do.

4            MS. HUTNYAN:  Can we get some clarification

5    as to the prior questions that used the one term and   02:11PM

6    what his understanding of that was?  Because I fear

7    that there was some ambiguity there perhaps.

8    BY MR. JENAL:

9        Q.   Okay.  In asking about these individuals I

10   was asking about the Diva Starz project.  The large    02:11PM

11   over the brand, okay, as opposed to the Diva Starz

12   entertainment project that was specifically within

13   your area.

14           And so you were -- when we talked about

15   Maureen Mullen, you were thinking about I believe in   02:11PM

16   terms of the broader brand project, correct?

17       A.   That's correct.

18       Q.   Did Ms. Mullen do any work on the Diva Starz

19   entertainment project other than the conversations

20   she may have had with you?                             02:11PM

21       A.   She would have been involved in -- I don't

22   remember the exact flow of designers through the

23   project but we would have kept Design and Marketing

24   partners involved in every step of this

25   entertainment project development.                     02:12PM

                                                            155

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    speculation.

2              THE WITNESS:  Off the top of mine, no, I

3    don't recall who that would have been.

4    BY MR. JENAL:

5         Q.   How about the name Kislap Ongchango?          02:15PM

6              MS. HUTNYAN:  Same objection.

7    BY MR. JENAL:

8         Q.   Are you familiar with that name?

9         A.   That name does not ring a bell for me.

10        Q.   Not at all?                                    02:15PM

11        A.   No.

12        Q.   What about Ken Hyman?

13        A.   No.

14        Q.   What about Eric Scifstrom?

15             MS. HUTNYAN:  It is just familiarity,          02:15PM

16   Counsel?

17             MR. JENAL:  Whether you recognize the name.

18   It he doesn't recognize the name, there's not much

19   more to ask.

20             MS. HUTNYAN:  Just to make sure I              02:15PM

21   understand.

22             THE WITNESS:  I don't recognize Eric's name.

23             MR. PAGE:  There's a cue for you.

24             THE WITNESS:  I don't.  I don't.

25             MS. HUTNYAN:  It's just "how about," I'm       02:16PM

159

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   not sure what you're asking so that's why I just

 2   want to make sure we're on the same page.

 3           MR. JENAL:  I think we're on the same page.

 4   Why don't we take a short break.

 5           VIDEO OPERATOR:  2:16 off the record.        02:16PM

 6                   (Brief recess.)

 7           VIDEO OPERATOR:  The time is 2:33 p.m.

 8   We're back on the record.  This is tape No. 3 of the

 9   deposition of Rob Hudnut.  All parties may continue.

10   BY MR. JENAL:                                         02:33PM

11       Q.   Mr. Hudnut, you realize you're still under

12   oath?

13       A.   Yes.

14       Q.   We had talked a little bit before the break

15   about Maureen Mullen and you told me that you had     02:33PM

16   spoken to her about sort of the personalities that

17   already existed because they had done a fair amount

18   of work with that and you wanted to make sure that

19   whatever work you did was harmonized, for lack of a

20   better term, with the work they had done, correct?    02:33PM

21       A.   My recollection of that is partially from

22   the documents I reviewed that showed me that she and

23   I had been in touch on that subject.  I don't

24   specifically remember the moments that we talked

25   about it but it appears that she was the one in       02:33PM
                                                             160
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   I think it was the Kislowitzes.

2      Q.   I'm sorry, who?

3      A.   Well, there was a company called -- I could

4   be -- maybe I'm wrong but I thought that the

5   Kislowitz brothers who are back east I thought that    02:35PM

6   they were somehow involved in the creation of Diva

7   Starz.

8      Q.   What's the basis for that understanding?

9      A.   I think I had that impression at the time.

10     Q.   Could you spell that name, please?          02:35PM

11     A.   I think --

12          MR. PAGE:  That was a yes-or-no question.

13          THE WITNESS:  I believe it's

14   K-i-s-l-o-w-i-t-z, but I could be wrong.

15   BY MR. JENAL:                                      02:35PM

16     Q.   Do you know what inspired the design of Diva

17   Starz?

18          MS. HUTNYAN:  Objection:  vague, calls for

19   speculation.

20          THE WITNESS:  I don't know that.            02:35PM

21          MS. HUTNYAN:  Outside the designation.

22          THE WITNESS:  No, I do not know what

23   inspired the design of Diva Starz.

24   BY MR. JENAL:

25     Q.   Did you ever speak with any of the folks who 02:36PM

162

37

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    were the designers -- Ms. Mullen or anyone else in

2    the Design part of the Diva Starz project -- and ask

3    them about what their inspiration was?

4          MS. HUTNYAN:  Calls for speculation.

5          THE WITNESS:  I may have or I may not have    02:36PM

6    but I don't recall doing so.

7    BY MR. JENAL:

8      Q.   Did you create as part of the Diva Starz

9    entertainment project any additional characters that

10   weren't actual dolls that were being produced?       02:36PM

11     A.   Yes, we did.

12     Q.   How many characters if you recall were

13   produced as part of the Diva Starz entertainment

14   that weren't part of the dolls themselves?

15     A.   I had to refresh my memory by reading over    02:36PM

16   the brand artist and writer guide work that we did

17   in the scripts but we created boys to sort of

18   parallel the girls, we also had parents who were

19   never going to be around to make everybody more

20   independent, we had -- there was a mall that they     02:37PM

21   would spend a lot of time attending and we placed

22   security guards at that mall because to tell a story

23   you need conflict so we needed to find areas to

24   creat conflict.  I think there was also a principal

25   at their school.  Characters that would round out    02:37PM
```

163

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MR. JENAL:

2      Q.   Your turn.

3      A.   Which types of inspiration?  I'm sorry, the

4   meaning of inspiration for stories or for?

5      Q.   Inspiration for the -- shall we say the          02:47PM

6   appearance or look of characters that you might use

7   in stories.

8         MS. HUTNYAN:  Same objections.  Lacks

9   foundation, calls for speculation.

10        THE WITNESS:  I look at magazines.  When I       02:47PM

11  review a magazine like a Kids Screen magazine, there

12  are ads for lots of different shows that are coming

13  up and so one sees different appearances of

14  different shows.  That is one thing that one can do.

15  BY MR. JENAL:                                           02:47PM

16     Q.   In the 2000 time frame do you have a sense

17  of whether there was a particular look for animated

18  characters that was particularly popular at that

19  time?

20        MS. HUTNYAN:  Objection:  calls for             02:48PM

21  speculation, outside the designation, vague,

22  ambiguous.

23        THE WITNESS:  In 2000 there were a range.

24  There were lots of different styles of animation on

25  television so there were -- there are a number of     02:48PM

                                                            172

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   things you can point to as -- as different styles
 2   that were some more successful than others.  So
 3   anime isn't new to the States.
 4   BY MR. JENAL:
 5       Q.   And my question was not limited to anime in   02:48PM
 6   that context but just in animated characters
 7   generally.  Is there anything that you can recall
 8   from the 2000 or so time frame that stands out in
 9   your mind as being kind of a popular look for
10   characters in animation?                              02:48PM
11           MS. HUTNYAN:  Same objection.  Even more
12   vague, more off the topic.
13           THE WITNESS:  I don't remember any one style
14   as being especially popular at that time, no.
15   BY MR. JENAL:                                         02:49PM
16       Q.   Were there any characteristics about the
17   Diva Starz designs, the dolls themselves, that you
18   felt were important to be able to include in the
19   character appearances that you were going to create?
20   And by "you" I mean your team working on the Diva     02:49PM
21   Starz entertainment project.
22           MS. HUTNYAN:  Objection; calls for
23   speculation.
24           THE WITNESS:  One of the things I really
25   liked about the Diva Starz characters is that they    02:49PM
```
                                                                    173

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    the significance from an animation perspective of

2    the oversized heads?

3        A.   The oversized heads I thought were a very

4    distinctive look relative to what else was in the

5    market.   I thought that the eyes along with          02:51PM

6    oversized -- it would look ridiculous to have little

7    teeny eyes and a big head so the big eyes were part

8    and parcel of the -- they went along -- I thought

9    they had been designed beautifully and so the large

10   eyes and the large head I could see becoming really   02:51PM

11   wonderful animation.

12       Q.   And the large feet, was that also part of

13   what was important to you for animation?

14            MS. HUTNYAN:   Asked and answered.

15            THE WITNESS:   I thought that they helped --  02:52PM

16   helped the characters make sense.   If one imagined

17   them moving around in a world that is created around

18   them, the big feet would make them not look

19   ridiculous like they were going to fall over, you

20   know, at any moment.                                  02:52PM

21   BY MR. JENAL:

22       Q.   Do you know -- from the perspective of the

23   actual design of the dolls, do you know whether the

24   choice to have big heads and big feet was an

25   artistic choice or was it a choice driven by the      02:52PM
                                                              175
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  engineering necessary for the doll?

2          MS. HUTNYAN:  Objection:  calls for

3  speculation, outside the designation.

4          THE WITNESS:  I don't know.  That's outside

5  of my -- what I do.  I don't know.                02:52PM

6  BY MR. JENAL:

7      Q.  No one ever told you, you know, we have to

8  have big feet because we have to put all of this

9  gear into this doll someplace and that's the only

10  place it will fit?                               02:53PM

11         MS. HUTNYAN:  Same objections.  Asked and

12  answered.

13         THE WITNESS:  I don't -- I don't recall ever

14  being told that.

15  BY MR. JENAL:                                    02:53PM

16      Q.  Are you familiar with the term "fashion

17  doll"?

18      A.  Yes, I am.

19      Q.  What's your understanding of the term

20  "fashion doll"?                                  02:53PM

21         MS. HUTNYAN:  Objection:  vague.

22         THE WITNESS:  A fashion doll is a doll that

23  generally has hair play and clothes play and would

24  appear fashionable.

25  /  /  /                                          02:53PM

                                                      176

42

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JENAL:

2        Q.   Is it your understanding that the Diva Starz

3    when they were first being developed in 2000 or so,

4    were they intended to be a fashion doll?

5        MS. HUTNYAN:  Objection:  calls for          02:53PM

6    speculation, outside the designation.

7        THE WITNESS:  I don't know but I -- I don't

8    know what category people were trying to slot it

9    into but to my mind it certainly had lots of

10   fashionable elements to it and when I saw them       02:54PM

11   having plastic clothes that you can put on and off,

12   that's certainly a fashion doll play pattern, long

13   beautiful hair to comb and play with, so....

14   BY MR. JENAL:

15       Q.   Were there other play patterns associated    02:54PM

16   with Diva Starz that were separate and apart from

17   what you would associate with a fashion doll in the

18   2000 time period?

19       MS. HUTNYAN:  Objection:  calls for

20   speculation, lacks foundation, outside the scope of   02:54PM

21   the topics designated.

22       THE WITNESS:  Having dolls that talk was

23   certainly not unique to Diva Starz.  My recollection

24   of the product is that they had an ability to

25   interact and some extensive sound chips inside which   02:54PM

177

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   I thought was very exciting and very new.

2   BY MR. JENAL:

3       Q.   Were you familiar with the Barbie line of

4   products in the year 2000?

5              MS. HUTNYAN:  Objection:  vague.                  02:55PM

6              THE WITNESS:  Parts of it.  Certainly not

7   all of it but parts of it.

8   BY MR. JENAL:

9       Q.   Would you consider Barbie a fashion doll

10  line?                                                       02:55PM

11             MS. HUTNYAN:  Objection:  outside the

12  designation.

13             THE WITNESS:  For me, yes, Barbie would be a

14  fashion doll line.

15  BY MR. JENAL:                                               02:55PM

16      Q.   Do you know whether the types of play that

17  you referred to with the interactivity that was part

18  of the Diva Starz, do you know whether that was

19  incorporated into Barbie in the year 2000?

20             MS. HUTNYAN:  Objection:  calls for            02:55PM

21  speculation, lacks foundation, compound, vague, and

22  outside the designation.

23             THE WITNESS:  I don't recall whether it was

24  in 2000 or not.  It may have been, it may not have

25  been.  I don't recall.                                      02:55PM

178

1   BY MR. JENAL:

2       Q.   Have you ever heard of a term "category

3   team" at Mattel?

4           MS. HUTNYAN:  Objection:  vague.

5           THE WITNESS:  Category team?                    02:55PM

6   BY MR. JENAL:

7       Q.   Yes.

8       A.   Probably along the way but it's not

9   something I use frequently.

10      Q.   Do you recall in any of the meetings that     02:56PM

11  you attended as part of the development process of

12  the Diva Starz entertainment project whether the

13  Diva Starz were described as a fashion doll concept?

14      A.   I don't -- they may have been.  I don't

15  recall one way or another.                              02:56PM

16      Q.   Do you ever recall them being described as a

17  high-tech toy concept?

18          MS. HUTNYAN:  Objection:  calls for

19  speculation.

20          THE WITNESS:  Specifically that -- that       02:56PM

21  term?  I know that they were referred to as

22  high-tech toys.  Whether they were -- I don't think

23  that's a category, high-tech toy concept.  I

24  wouldn't think of that as its own category.

25  /  /  /                                                02:57PM

179

45

CONFIDENTIAL - ATTORNEYS' EYES ON

```
 1   BY MR. JENAL:

 2       Q.   Do you know whether within Mattel in 2000

 3   when you were working in the -- within the confines

 4   of the broader Diva Starz project, do you know

 5   whether it was envisioned that Diva Starz would        02:57PM

 6   compete with Barbie?

 7           MS. HUTNYAN:  Objection:  lacks foundation,

 8   mischaracterizes the testimony of the witness, calls

 9   for speculation, outside the designation.

10           THE WITNESS:  Could you repeat the question, 02:57PM

11   please?

12           MR. JENAL:  I think so.

13       Q.   In 2000 you were working on the Diva Starz

14   entertainment project, correct?

15       A.   Correct.                                      02:57PM

16       Q.   And in the course of that work you

17   interacted with other people who were involved in

18   the broader Diva Starz project as we've described

19   those terms previously, correct?

20       A.   That's correct.                               02:57PM

21       Q.   In the course of that work that you did in

22   the 2000 time frame on the Diva Starz entertainment

23   project did you ever become aware as to whether or

24   not Diva Starz, the dolls, were expected to compete

25   with Barbie, the dolls, for sales?                     02:58PM
                                                                180
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       MS. HUTNYAN:  Objection:  calls for

2    speculation, lacks foundation, outside the

3    designation, calls for a legal conclusion.

4       THE WITNESS:  Again, I'm not sure if I

5    started in late '99 and whether it carried over into   02:58PM

6    2001 but I don't -- I don't know whether there was

7    any strategic goal of competing or not competing

8    with Barbie.

9    BY MR. JENAL:

10      Q.   Do you know whether there was a concern at   02:58PM

11   Mattel in the 2000 time frame that projects -- doll

12   projects not compete with Barbie?

13      MS. HUTNYAN:  Objection:  calls for

14   speculation, lacks foundation, outside the

15   designation, vague.                                  02:58PM

16      THE WITNESS:  Could you rephrase that,

17   please, or help me with that again?

18   BY MR. JENAL:

19      Q.   In the 2000 time frame did you have any

20   understanding of the significance of the Barbie line   02:59PM

21   to Mattel as a product line?

22      MS. HUTNYAN:  Objection:  calls for

23   speculation, vague, outside the designation.

24   BY MR. JENAL:

25      Q.   Your turn.                                   02:59PM

                                                           181

CONFIDENTIAL - ATTORNEYS' EYES O.

1      A.    Barbie is a significant brand for Mattel.

2   I'm aware of that.

3      Q.   So my question to you was:  Were you

4   aware -- in the time frame of 2000 or so were you

5   aware of any policy at Mattel, however that might be      02:59PM

6   expressed, of not creating products that would

7   compete with Barbie?

8          MS. HUTNYAN:  Objection:  outside the

9   designation, calls for speculation.

10         THE WITNESS:  Aware of a policy against       02:59PM

11   that?  No, I'm not aware of a policy at that time.

12   BY MR. JENAL:

13     Q.   Did you ever hear anyone say we can't go

14   forward with this project because to do so would

15   compete with sales for Barbie?            03:00PM

16         MS. HUTNYAN:  Same objection.

17         THE WITNESS:  I don't recall ever hearing

18   something like that.

19   BY MR. JENAL:

20     Q.   Are you aware of any projects that were      03:00PM

21   developed and then canceled because of a concern

22   that that product might compete with Barbie?

23         MS. HUTNYAN:  Asked and answered.  Same

24   objections.

25         THE WITNESS:  I'm not aware of any -- any    03:00PM

182

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   such project.

2   BY MR. JENAL:

3       Q.   Are you familiar with changes to the

4   appearance of the Diva Starz dolls in the time

5   period since 2000?                                    03:00PM

6           MS. HUTNYAN:  Objection:  vague, ambiguous,

7   calls for speculation.

8           THE WITNESS:  What -- what sorts of changes

9   and occurring in -- on the toy shelf or in the --

10  BY MR. JENAL:                                         03:00PM

11      Q.   In the product that's released to the

12  public, correct.  Are you aware of any changes in

13  the appearance of those dolls in the time period say

14  between 2000 when they first were on the shelves and

15  say 2002?                                             03:01PM

16          MS. HUTNYAN:  Same objection.  Calls for

17  speculation, vague, compound.

18          THE WITNESS:  When I was part of the

19  discussions of the Diva Starz business and its

20  development, the entertainment project and how it    03:01PM

21  relates to the brand, we recognized early on that

22  when one -- one of the main reasons a toy company

23  will create a television series is to drive a great

24  number of projects -- of products and oftentimes if

25  you look through the toy business a lot of those      03:01PM

183

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    products are $10 and under.  The products that

2    represent the kind of pocket change that a child

3    will have on their own or that a parent will be

4    willing to buy not for a special occasion.  So we

5    had talks from the beginning about creating dolls          03:02PM

6    that weren't as high-priced as the original Diva

7    Starz dolls but having other dolls that are simpler

8    in function and would expand the line.

9    BY MR. JENAL:

10       Q.   Do you know whether the dolls that you've           03:02PM

11   just described that were simpler in function, do you

12   know if those dolls were ever released to the

13   public?

14            MS. HUTNYAN:  Objection:  calls for

15   speculation, vague.                                          03:02PM

16            THE WITNESS:  I -- I don't specifically

17   recall how it wound up because my involvement with

18   Diva Starz stopped in the late 2000 or early 2001

19   time frame.

20   BY MR. JENAL:                                                03:02PM

21       Q.   Is it -- is it fair to say that once your

22   involvement with the Diva Starz entertainment

23   project ended in either late 2000 or early 2001 that

24   you no longer were close enough to the broader Diva

25   Starz project to know how it may have changed over           03:03PM

                                                                      184

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   time, the Diva Starz dolls may have changed over

2   time?

3          MS. HUTNYAN:  Objection:  vague, calls for

4   speculation.

5          THE WITNESS:  At some point we would have -- 03:03PM

6          MS. HUTNYAN:  And outside the designation.

7          THE WITNESS:  At some point we would have

8   stopped pursuing Diva Starz as an entertainment

9   project and at that point I would most likely not

10  have been involved in further design discussions.       03:03PM

11  BY MR. JENAL:

12      Q.   Did you ever own any Diva Starz dolls?

13      A.   Did I personally own any?

14      Q.   Yes.

15      A.   I don't recall personally owning any Diva   03:03PM

16  Starz dolls.

17      Q.   Did you ever hear the name Chat Girls at

18  Mattel?

19      A.   I do remember the name Chat Girls, yes.

20      Q.   What do you remember Chat Girls in          03:04PM

21  association with at Mattel?

22          MS. HUTNYAN:  Lacks foundation.

23          THE WITNESS:  I'm not -- I don't know if I'm

24  remembering this clearly or not.  I think that it

25  may have been discussed back when Diva Starz was    03:04PM

                                                        185

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   around and I -- and it may have been discussed since

2   in terms of a name that would make sense for

3   products that talk.  So that's the best I can

4   recollect.

5   BY MR. JENAL:                                          03:05PM

6         Q.   So you say that it may have been discussed

7   back when Diva Starz was around.  As you sit here

8   today, do you have any specific recollection of Chat

9   Girls being used as a potential alternate name for

10  the project that became Diva Starz?                    03:05PM

11        A.   I don't have a specific moment or

12  recollection of a meeting where that might have been

13  tied together, but I do have the sense that that

14  term is familiar to me and that it may have been

15  familiar from that time period.                        03:05PM

16        Q.   Are there any other names that you can think

17  of that might have been associated with the project

18  that ultimately became known as Diva Starz?

19            MS. HUTNYAN:  Objection:  vague.

20            THE WITNESS:  Not that I -- sorry.           03:05PM

21            MS. HUTNYAN:  Sorry.  Objection:  vague.

22            THE WITNESS:  Not that I -- there may have

23  been some but I can't think of any off the top of my

24  head.

25        /    /    /                                      03:06PM

                                                           186

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JENAL:

2        Q.    Did you ever see a list of potential names

3    for the project that became known as Diva Starz?

4            MS. HUTNYAN:  Objection:  vague.

5            THE WITNESS:  I don't recall seeing a list   03:06PM

6    of different names.

7    BY MR. JENAL:

8        Q.    Are you aware that such a list ever existed?

9        A.    It's completely logical to me that one would

10   exist because that's the normal way that we would     03:06PM

11   name a product.  We would generate either in a

12   brainstorm or somebody would own that and there

13   would be a long list and all the relevant parties

14   would be part of that process.

15       Q.    Who would own that list?                     03:06PM

16           MS. HUTNYAN:  Objection:  calls for

17   speculation, lacks foundation, vague.

18           THE WITNESS:  It could be owned any number

19   of places.  It could be owned by Design, it could be

20   owned by Packaging.  Depending on how much            03:06PM

21   entertainment is involved it could be Entertainment.

22   BY MR. JENAL:

23       Q.    Is it fair to say that at least in the case

24   of Diva Starz this list if one ever was reduced to

25   writing, that didn't reside with Entertainment,       03:07PM

                                                              187

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.   My recollection is that -- that Mattel had

2   updated this policy and was seeking our agreement to

3   it.

4       Q.   And to the best of your recollection that

5   was sometime in 2005?                              04:01PM

6       A.   Or 2006.  I don't -- I don't remember

7   precisely.

8       Q.   And did you sign that revised version of the

9   policy?

10      A.   I did not.                                04:02PM

11      Q.   Why not?

12      A.   There were some clauses that I was concerned

13  about.

14      Q.   Which clauses in particular were they?

15           MS. HUTNYAN:  Objection.  The document     04:02PM

16  speaks for itself.

17           MR. JENAL:  No, the document doesn't tell me

18  which clauses he objected to.  That was my question.

19           MS. HUTNYAN:  I don't think this is a memory

20  test either so which clauses is your question?       04:02PM

21           THE WITNESS:  I don't remember specifically

22  which clauses.

23  BY MR. JENAL:

24      Q.   What was the nature of those clauses that

25  caused you concern?                                 04:02PM

                                                          221

**Exhibit 2**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

Certified Copy

4

5    --------------------------------

6    MATTEL, INC., a Delaware              )

7    Corporation,                         )

8                 Plaintiff,              ) No. CV 04-9059

9          vs.                           )     NM (RNBx)

10   CARTER BRYANT, an individual;       ) VOLUME II

11   and DOES 1 through 10,              )

12   inclusive,                          )

13                 Defendants.            )

14   --------------------------------)

15   (COMPLETE CAPTION ON NEXT PAGE. )

16

17      CONFIDENTIAL ATTORNEYS' EYES ONLY

18

19   Continued Videotaped 30(b)(6) Deposition

20   of ROBERT K. HUDNUT, JR., at 400 South

21   Hope Street, Los Angeles, California,

22   commencing at 10:34 a.m., Monday,

23   August 20, 2007, before Janice Schutzman,

24   CSR No. 9509.

25   PAGES 239 - 275

239

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Well, you mean relative to this litigation?

2   Because I know he was in the collector business.

3      Q.   Relevant to this litigation, if you know

4   what that means.

5      A.   Again, I'm not a lawyer.                    10:58AM

6          So could you rephrase the nugget of the

7   question, please.

8      Q.   I think your previous answer was that you

9   don't have personal knowledge of anything that

10  Carter Bryant did at all, basically, other than that  10:59AM

11  he worked in collectibles, correct?

12     A.   That's correct.

13     Q.   Now I'm trying to go one step further.

14  Have you heard from anyone else at Mattel anything

15  that Carter did that you think is relevant to this    10:59AM

16  lawsuit, other than what you've heard from counsel?

17     A.   Other than what I've heard from counsel --

18     Q.   Yes.

19     A.   -- no.

20     Q.   So you don't, nobody else came to you one    10:59AM

21  day and said I saw Carter, you know, Xeroxing stacks

22  of documents or anything like that?

23          MS. HUTNYAN:   Objection, vague, the

24  "anything like that" part.

25          But you can answer.                          10:59AM

                                                    260

```
 1              THE WITNESS:  No.  No, I have not heard
 2    anything like that.
 3    BY MR. PAGE:
 4        Q.    Do you have any independent knowledge of
 5    what Mattel proprietary or confidential information    10:59AM
 6    Carter Bryant had access to at any time?
 7              MS. HUTNYAN:  Objection, calls for
 8    speculation.
 9    BY MR. PAGE:
10        Q.    That's sort of my point.                     10:59AM
11        A.    Again, do I have personal knowledge of what
12    he had access to?
13        Q.    Right.
14        A.    No.
15        Q.    Do you know anything about, do you have any   11:00AM
16    knowledge that Carter Bryant did anything to injure
17    Mattel other than contained in your prior testimony?
18              MS. HUTNYAN:  Objection, vague.
19              THE WITNESS:  My own personal direct
20    experience is what you're asking?                      11:00AM
21    BY MR. PAGE:
22        Q.    Yes, that's the first question.
23        A.    No.
24        Q.    Do you have any knowledge of anything that
25    Carter Bryant did to injure Mattel that you obtained   11:00AM
```

261

57

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    from anyone at Mattel other than a lawyer?

 2              MS. HUTNYAN:  Asked and answered, vague.

 3              THE WITNESS:  Beyond discussions with

 4    counsel, no.

 5    BY MR. PAGE:

 6       Q.   Okay.  Do you have any knowledge that

 7    Carter Bryant ever provided any property that

 8    belonged to Mattel to any third party?

 9              MS. HUTNYAN:  Same objections.

10              THE WITNESS:  Again, direct personal         11:00AM

11    knowledge, no.

12    BY MR. PAGE:

13       Q.   Do you have any indirect knowledge that

14    Carter Bryant ever provided any property that

15    belonged to Mattel to any third party other than     11:01AM

16    conversations with counsel?

17              MS. HUTNYAN:  Same objections.

18              THE WITNESS:  No.

19    BY MR. PAGE:

20       Q.   In your, in the previous session of your     11:01AM

21    deposition, you testified that at one point Mattel

22    had asked you to sign an updated employee inventions

23    agreement and that you had refused to do so.

24              Do you remember that testimony?

25       A.   Yes.                                           11:01AM

                                                                  262
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    MS. HUTNYAN:  Objection, mischaracterizes

2    testimony.

3    BY MR. PAGE:

4        Q.   What was inaccurate about the way I

5    characterized your testimony there, if anything?    11:01AM

6        A.   Mattel had approached me regarding an

7    updated inventions agreement.  And you're correct, I

8    did not sign it.

9        MS. HUTNYAN:  A little different than

10    "refused."  Just objecting to your spin.            11:02AM

11    BY MR. PAGE:

12        Q.   Okay.  When you did not sign it, did you

13    have a conversation with anyone at Mattel about your

14    choice not to sign it?

15        MS. HUTNYAN:  Objection, asked and            11:02AM

16    answered.

17        THE WITNESS:  I believe I spoke with HR

18    about it and I believe I mentioned to my boss at the

19    time that I was not planning to sign it and, as I

20    think I mentioned last time, he directed me to       11:02AM

21    legal.

22    BY MR. PAGE:

23        Q.   And your boss at the time was whom?

24        A.   Steve Ross.

25        Q.   And Mr. Ross had you then talk to the legal   11:02AM

263

**Exhibit 3**

```
1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA          Certified Copy

3                 EASTERN DIVISION

4    -------------------------------------

5    MATTEL, INC., a Delaware Corporation,  )

6                 Plaintiff,                 )

7          vs.                               ) No. CV 04-9059

8    CARTER BRYANT, an individual; and       ) NM (RNBx)

9    DOES 1 through 10, Inclusive,           )

10               Defendants.                 )

11   ------------------------------------)

12   CARTER BRYANT, on behalf of himself,    )

13   All present and former employees of     )

14   Mattel, Inc., and the general public,   )

15               Counter-Claimants,          )

16         vs.                               )

17   MATTEL, INC., a Delaware corporation,   )

18               Counter-Defendant.          )

19   -------------------------------------

20        Deposition of JULIA JENSEN, taken at

21        7 Times Square, New York, New York,

22        commencing at 10:15 a.m., Friday,

23        June 8, 2007, before Morene

24        Korenman-Bangel, Notary Public.

25   PAGES 1 - 191
```

1

```
 1     APPEARANCES OF COUNSEL:

 2

 3     FOR THE PLAINTIFF:

 4

 5         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6         BY: TIMOTHY L. ALGER, ESQ.

 7         865 South Figueroa Street, 10th Floor

 8         Los Angeles, California 90017

 9         (213) 443-3000

10         timalger@quinnemanuel.com

11

12     FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:

13

14         O'MELVENY & MYERS LLP

15         BY: MICHAEL C. KEATS, ESQ.

16             KENDALL BURR, ESQ.

17         7 Times Square

18         New York, New York 10036

19         (212) 408-2400

20         mkeats@omm.com

21         kburr@omm.com

22

23     ALSO PRESENT:

24         MICHAEL MOORE, ESQ., MATTEL, INC.

25         ILYA TALEYSNIK, VIDEOGRAPHER
```

2

Jensen

1

2   knowledgeable about the topics discussed in paragraph

3   41?

4          MR. ALGER:   She's the person designated by

5   Mattel under Rule 30(b)(6).

6          I think that's the answer.

7   Q.     Can you answer that question?

8          MR. ALGER:   The reason I'm raising it, the

9   person most knowledgeable is more of a state law term,

10  and she's been designated under Rule 30(b)(6) as the

11  corporate designee as to the topic.

12         MR. KEATS:   I'll rephrase the question.

13         MR. ALGER:   I think that would be

14  sufficient.

15         MR. KEATS:   I will rephrase the question.

16  Q.     Do you have personal knowledge of the

17  subjects covered by paragraph 41?

18  A.     What specifically in paragraph 41?

19  Q.     Sure.

20         All statements of Mattel or ex-Mattel

21  employees in the July 2003 Wall Street Journal article.

22  And it goes on.  You can read it yourself if you wish.

23         MR. ALGER:  We don't have to spend a lot of

24  time, she's the corporate designee as to the topic 41

25  and she has personal knowledge as to some of this, and

22

Jensen

1

2      also she may have knowledge on behalf of the

3      corporation as to some of this, to the extent that the

4      corporation has any knowledge of some of these matters.

5              But we don't want to be in a position here

6      where we're going to concede that we have knowledge of

7      certain things in here because there's actually been a

8      fair amount of meeting and conferring about this, and

9      we don't need to dwell on it, but she's the corporate

10     designee as to topic 41.

11             She came prepared to testify as to topic 41.

12             MR. KEATS:  Okay.

13     Q.      Did you, in preparation for this deposition

14     on this subject --

15     A.      Yes.

16     Q.      -- did you speak to anybody other than

17     counsel at Mattel?

18     A.      No.

19     Q.      Okay.  So you didn't interview, for example,

20     anybody from the design team about some of these

21     statements, right?

22     A.      In preparation for this meeting, I did not.

23     Q.      Okay.

24             Have you ever, at any time, interviewed

25     people from the design team at Mattel about some of the

                                                          23

```
 1                           Jensen
 2    subjects that are listed here?
 3                 (Witness referring to document.)
 4       A.      I did not.
 5       Q.      Okay.
 6               So, to prepare for the deposition, I take it
 7    you met with counsel, right?
 8       A.      Yes.
 9       Q.      Okay.
10               Did you do anything else besides meet with
11    counsel to prepare for the deposition?
12       A.      I reviewed the article from the Wall Street
13    Journal that's named in the deposition.
14       Q.      Okay.
15               Did you go back and look at any e-mails at
16    all on your own?
17       A.      I did not.
18       Q.      Okay.
19               All right.  That's all.
20       A.      Okay.
21       Q.      Now, this refers to the July 2003 Wall
22    Street Journal article.  I take it -- which article did
23    you review?
24       A.      The July 2003 Wall Street Journal article.
25       Q.      Is it a story that was written by
```

24

```
 1                              Jensen

 2       Q.      Okay.

 3               Are you familiar with the concept of the

 4  flanker brand, as referred to in that sentence?

 5       A.      My understanding of flanker brand, in the

 6  term I had ever heard it referred to, is slightly

 7  different than what is outlined here.

 8       Q.      And what is your understanding?

 9       A.      My understanding, part of the portfolio of

10  fashion dolls that Mattel has at any given time.

11       Q.      Is the statement here that the Mattel

12  dolls -- sorry, let me focus on a narrower statement.

13               Is this correct that Mattel had strict

14  quotas that allowed only one flanker brand on the

15  market at a time with respect to Barbie?

16       A.      I'm not familiar with that.

17       Q.      Okay.  Do you think that statement's false?

18       A.      To the best of my knowledge, I am not

19  familiar with that ever.

20       Q.      Don't know?

21       A.      In my tenure.

22       Q.      Might be true, might not be true?

23       A.      Right.

24               In my tenure, that was never referred to.

25       Q.      All right.
```

65

```
1                              Jensen
2        A.     Can you specifically point it out in that
3    article?  I apologize.
4        Q.     Oh, sure.  Right there (indicating).
5        A.     Sorry about that.
6        Q.     Right about that line.
7        A.     No, I did not understand how that related to
8    this article and Flavas, as I read it the first time.
9        Q.     Okay.
10             Do you have an understanding sitting here
11   today what it might mean?
12       A.     Within the context of the article, yes.
13       Q.     What's your understanding?
14       A.     That context of -- my personal understanding
15   is taking liberty with the concept of the fashion doll
16   trend of the exaggerated head/exaggerated foot style,
17   and pulling that into the Flavas launch.
18       Q.     All right.  Let's go to the third full
19   paragraph on that page.
20       A.     Yes.
21       Q.     It says "Mattel, Inc., hopes the dolls are
22   hip enough to take on 'the Bratz'."
23             Do you see that?
24       A.     Yes.
25       Q.     Had you told Maureen during your discussions
```

85

1                          Jensen

2      that that was indeed what Mattel's hope was for the

3      Flavas line?

4                  MR. ALGER:  Objection, asked and answered.

5                  MR. KEATS:  It's different with the

6      document.

7           Q.     You can answer the questions.  Your attorney

8      can direct you not to answer if there's an

9      attorney-client privilege or other things, but he's

10     making objections for the record so later on the judge

11     can decide whether or not it will be admitted for

12     trial, but you can answer the question.

13                 Do you want to hear the question again?

14          A.     Please.

15          Q.     Sure.  No problem.

16                 (Record read.)

17          A.     I had not.

18          Q.     Do you know if anybody else at Mattel had

19     made that statement to the Wall Street Journal?

20          A.     I am unaware of anyone making that

21     statement.

22          Q.     Did you ask people at Mattel whether or not

23     they had told the Wall Street Journal that at the time?

24          A.     I did not.

25          Q.     And since that time, have you asked whether

                                                           86

```
 1                          Jensen
 2    or not someone at Mattel made that statement to the
 3    Wall Street Journal?
 4         A.      I have not.
 5         Q.      Okay.
 6                 Did you disagree with that statement when
 7    you read it back in 2003?
 8         A.      In context to the article?
 9         Q.      Yes.
10         A.      I personally believed, and continue to
11    believe, it was the reporter taking liberty with the
12    story and creating a lead-in.
13         Q.      Did you ever tell her that afterwards?
14         A.      I did not.
15         Q.      Did you demand a retraction or correction?
16         A.      I did not.
17         Q.      Did you have discussions about this subject
18    with anybody else at Mattel back in 2003?
19                 MR. ALGER:  Objection, vague and ambiguous.
20         Q.      You can answer.
21         A.      To the best of my memory, I don't remember
22    specifically.
23         Q.      Go to the next sentence there.
24                 It says "The Flavas (pronounced 'Flay-vuhs,'
25    like 'flavors'), a set of six styles brought from
```

87

1                          Jensen

2    design to production in just three months, represent a

3    striking gamble for the giant toy company."

4              Do you see that?

5    A.     Yes.

6    Q.     Do you know whether it's true that Flavas

7    went from design to production in just three months?

8    A.     I cannot confirm that.

9    Q.     Did you know that at the time?

10   A.     I did not.

11   Q.     Do you know where -- do you have any idea

12   where Maureen may have gotten that information from?

13   A.     I cannot confirm, but as I read the article

14   after it was printed, it appeared she sought a variety

15   of sources on the creation of Flavas, and culled from

16   that.

17   Q.     If an employee of Mattel spoke to the press

18   without your knowledge, would that be a violation of

19   company policy?

20             MR. ALGER:   Objection, vague and ambiguous.

21             Just for clarity, are you asking about her

22   knowledge, without her knowledge or without the

23   company's knowledge?  Just to clear it up, because as

24   phrased it's confusing.

25             MR. KEATS:   I would say without her

88

<pre>
 1                          Jensen

 2   knowledge for now.

 3      A.     Without my knowledge, would be against

 4   company policy.   (Pause.)

 5             I would have to review 2003 policy.   My

 6   knowledge is, today, yes, that would be against company

 7   policy.

 8      Q.     Are there 2003 policies on that subject?

 9      A.     I cannot confirm or deny.

10      Q.     Okay.

11      A.     I'm unaware.

12             MR. KEATS:   I'll just state for the record

13   if such policies exist, we call for them to be

14   produced.

15             MR. ALGER:   You can make a document

16   production request.

17             MR. KEATS:   I can make a request on the

18   record and I'll follow it up with a letter in the

19   ordinary course.

20             MR. ALGER:   You can make any request you

21   want, but just stating it on the record is not

22   sufficient.

23             MR. KEATS:   I disagree, but we'll follow up.

24   We'll be happy to follow up with a letter.   There

25   aren't enough letters in this case.

                                                     89
</pre>

1                                    Jensen

2        Q.     Look at that same paragraph we were in.  I'm

3    just going to be complete for the record.

4               It says, "While Barbie which posted about

5    1.7 billion in sales for Mattel last year is still

6    queen, her share of the so-called fashion doll market

7    has fallen almost entirely due to Bratz."

8               Do you see that?

9        A.     Yes.

10       Q.     Did you ever tell Maureen that?

11       A.     I did not.

12       Q.     Do you know if anybody else at Mattel ever

13   told Maureen that?

14       A.     Not that I am aware of, nor were present for

15   conversation.

16       Q.     And prior to this deposition and preparation

17   for it, did you talk to any Mattel employees as to

18   whether or not they made that statement?

19       A.     I did not.

20       Q.     Let's go to the next paragraph.

21              It says "After trying and failing to defeat

22   the Bratz with a trendier Barbie last year, Mattel has

23   come up with a radical battle plan."

24              Do you know what the trendier Barbie is

25   that's referred to in this paragraph?

                                                              96

```
 1                              Jensen

 2      A.      I do not.

 3      Q.      Did you ever, after the article came out,

 4  ever try to confirm the statements that are made in

 5  that sentence?

 6      A.      I did not.

 7      Q.      Look on the second column, the top of the

 8  page.

 9              It says "With the Flavas, Mattel is trying

10  to get back into that market -- even if it risks

11  cannibalizing its biggest product."

12              Did you ever tell Maureen that?

13      A.      I did not.

14      Q.      Do you know if anybody else at Mattel did?

15      A.      Not that I am aware of.

16      Q.      Okay.

17              Did you try to confirm prior to this

18  deposition if anybody at Mattel might have made that

19  statement?

20      A.      I did not.

21      Q.      Go to the second full paragraph on the page

22  which starts "But Mattel now concedes."

23              It says "But Mattel now concedes Barbie has

24  gradually lost touch with some young girls' lives."

25  And there's a quote.
```

97

72

1                              Jensen

2        Q.      No, no, no.  We have to be very, very

3   specific.

4                 All right.  Let's go to the next paragraph.

5   And I'm going to read it for the record.

6                 "The history of the Bratz is intertwined

7   with Mattel.  MGA says the Bratz were designed by

8   Carter Bryant, a former member of the Barbie team.

9   Inside Mattel some are convinced Bratz borrow liberally

10  from a Mattel project that was scrapped at the testing

11  stage in 1998."

12                And then it says Mattel declined to comment.

13                Let's break this down.  First, where it says

14  inside Mattel some are convinced, do you know who the

15  "some" are, some people, or whatever, are referred to

16  in that sentence?

17       A.      I do not.

18       Q.      Did you ask anybody in preparation for this

19  deposition who those people were?

20       A.      I did not.

21       Q.      Did you do anything to find out, if it was

22  possible to figure out, who those people referred to

23  are?

24       A.      I did not.

25       Q.      Do you know what the project, the Mattel

                                                          112

```
 1                          Jensen
 2   project, is that's referred to in that sentence, what
 3   the specific project was?
 4        A.     No.  To the best of my knowledge, I do not
 5   know what specific project is being named here.
 6        Q.     So, you never heard that the project
 7   referred to here is Toon Teens?
 8        A.     I did not specific to this, no.
 9        Q.     Have you ever heard that the project at
10   issue was My Scene?
11        A.     No.
12        Q.     Have you ever heard that the Mattel project
13   at issue was some Barbie-related project?
14        A.     No, I did not.
15        Q.     After this article came out, did you do
16   anything to confirm what is said here in that sentence,
17   in the second sentence?
18        A.     I'm sorry, just to be clear, the second
19   sentence --
20        Q.     Where it says inside Mattel some are
21   convinced.
22               Did you do -- make any inquiry --
23               MR. ALGER:  Just for clarity, that's
24   actually the third sentence.
25               MR. KEATS:  You're right.  You're absolutely
```

113

1                               Jensen

2        A.      Maureen presented to me the concept that

3    Mattel, someone at Mattel, had actually created the

4    designs that ultimately became Bratz, and could I

5    comment on that, and which I declined to comment.

6                And that is the context for the "no comment"

7    here.

8        Q.      And that phone call with her, is that the

9    first time you ever heard that?

10       A.      That was the first time I had ever heard

11   that.

12       Q.      And that was two days before the article

13   came out?

14       A.      Yes.  To the best of my recollection, either

15   two days or the day prior.

16       Q.      So, you'd had a bunch of these conversations

17   over about a month, I take it, with Maureen, about --

18       A.      About a three-week period.

19       Q.      About a three-week period.

20               And it never came up, the subject never came

21   up, until about a day or two before the article came

22   out, right?

23       A.      That is correct.

24       Q.      All right.  We'll go to the next paragraph.

25               It says Mr. Bryant didn't work on a line

                                                        119

1                                    Jensen

2    that Mattel scrapped according to former and current

3    Mattel designers.

4           And again, was this a subject of your

5    discussions with Ms. Ross as to who the people were who

6    were providing this information to the Wall Street

7    Journal?

8       A.      That is correct.

9       Q.      And you are unable to -- you never found

10   that out, even as of today, you don't know who that

11   was, correct?

12      A.      Correct.  Today I do not know who that

13   person or people were.

14      Q.      Then it says but most Barbie designers had

15   seen the prototypes, his former colleagues say.

16          Did you ask Ivy whether that statement was

17   true?

18      A.      I do not have recollection of asking that

19   specific question.

20          I don't believe I did.

21      Q.      Okay.

22          Have you heard of the Diva Starz line?

23      A.      Yes, I have.

24      Q.      Okay.

25          And is it your understanding that that was

                                                            120

1                          Jensen

2      the project that people think Carter Bryant may have

3      copied at this time?

4           A.      I have no understanding of that, no.

5           Q.      Okay.

6                   And then the next paragraph says the Mattel

7      doll line that was scrapped wasn't exactly like the

8      Bratz, says a long-time Mattel designer who worked on

9      the project.

10                  And I take it sitting here today you do not

11     know who that employee was who made that comment,

12     right?

13          A.      Correct.

14          Q.      Okay.

15                  And at the time you don't know whether

16     Ms. Ross undertook steps to figure that out, right?

17          A.      Not specifically, no.

18          Q.      Okay.

19                  And to this day no one, to your knowledge,

20     at the company has tried to figure out who the source

21     of that statement was, right?  Other than counsel.

22                  MR. ALGER:  Other than counsel, that's true,

23     but I -- I don't want to really help you out on the

24     deposition, but I don't want there to be some

25     confusion.

                                                              121