```
 1                           Jensen
 2              You haven't asked her whether she followed
 3      up with the reporter at all.
 4              MR. KEATS:  No.  I'll get there.
 5              MR. ALGER:  Okay.
 6              MR. KEATS:  I'll get there.
 7              Yeah.
 8       Q.     Did you talk to anybody at
 9      Mattel -- actually, let's just read the question back.
10              (Question read.)
11       A.     I personally have not been involved in
12      identifying the source of that comment at Mattel and
13      have not been privy to conversations surrounding that.
14       Q.     Do you know if anybody's been trying to find
15      out who the sources of these statements were?
16       A.     I don't know.
17       Q.     Okay.
18              We'll now take your counsel's direction
19      because we might as well.
20              Did you ever ask the Wall Street Journal
21      reporter who she spoke to?
22       A.     Yes.
23       Q.     And when did you ask her that?
24       A.     Immediately following publication of the
25      article.
```

                                                                     122

# Exhibit 4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4     ------------------------------------

5     MATTEL, INC., a Delaware            )

6     Corporation,                        )

7               Plaintiff,                )

8               vs.                       )  No. CV 04-9059

9     CARTER BRYANT, an individual;       )     NM (RNBx)

10    and DOES 1 through 10,              )  VOLUME I

11    Inclusive,                          )

12              Defendants.               )

13    ------------------------------------)

14    (COMPLETE CAPTION ON NEXT PAGE.)

15

16        CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18        Videotaped 30(b)(6) Deposition of

19        JILL NORDQUIST, taken at 400 South

20        Hope Street, Los Angeles, California,

21        commencing at 9:44 A.M., Tuesday,

22        July 31, 2007, before Wendy S. Schreiber,

23        CSR No. 3558, RPR, CLR.

24

25    PAGES 1 - 303

*Certified Copy*

*Confidential - Attorneys' Eyes Only*

1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4

5    ------------------------------

6    MATTEL, INC., a Delaware           )

7    Corporation,                       )

8              Plaintiff,               )

9          vs.                          )  No. CV 04-9059

10   CARTER BRYANT, an individual;      )    NM (RNBx)

11   and DOES 1 through 10,             )

12   Inclusive,                         )

13             Defendants.              )

14   ------------------------------     )

15   CARTER BRYANT, on behalf of        )

16   himself, all present and           )

17   former employees of Mattel,        )

18   Inc., and the general public,      )

19             Counter-Claimants,       )

20          vs.                         )

21   MATTEL, INC., a Delaware           )

22   Corporation,                       )

23             Counter-Defendant.       )

24   ------------------------------

25
```

                                                    2

80

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF:

 4

 5            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6            BY:   JON E. COREY, ESQ.

 7            865 South Figueroa Street, Tenth Floor

 8            Los Angeles, California 90017

 9            (213) 443-3000

10            Jcorey@quinnemanuel.com

11

12                        -AND-

13

14        MATTEL, INC.

15            BY:   JILL E. THOMAS, ESQ. (A.M. Session)

16                  MICHAEL MOORE, ESQ.  (P.M. Session)

17            333 Continental Boulevard

18            El Segundo, California 90245-5012

19            (310) 252-2000

20            jill.thomas@mattel.com

21

22

23

24

25
```

3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   APPEARANCES OF COUNSEL (CONTINUED):

 2

 3      FOR THE DEFENDANT AND COUNTERCLAIMANT

 4      CARTER BRYANT:

 5

 6          KEKER & VAN NEST LLP

 7          BY:  CHRISTA MARTINE ANDERSON, ESQ.

 8          710 Sansome Street

 9          San Francisco, California 94111-1704

10          (415) 391-5400

11          cma@kvn.com

12

13

14      FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16          O'MELVENY & MYERS LLP

17          BY:  DIANA TORRES, ESQ.

18          400 South Hope Street

19          Los Angeles, California 90071-2899

20          (213) 430-6000

21          dtorres@omm.com

22

23   ALSO PRESENT:

24

25          RYAN GULINO, VIDEO OPERATOR
```

4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Mattel has offered on these topics.  Mattel has also

2   offered other designees to testify in regard to that

3   topic so I just want to make sure that it's clear

4   that she's not the only designee for these topics.

5          MS. ANDERSON:  We understand.  I see that          09:55AM

6   you all have designated other witnesses as well.  We

7   understand that.

8          MR. COREY:  I just want to make sure that's

9   perfectly clear.

10         MS. ANDERSON:  We understand.                       09:55AM

11      Q.   Now, in regard to these topics and preparing

12   for your deposition as a Rule 30(b)(6)

13   representative, did you try to educate yourself with

14   knowledge that Mattel may hold but that you didn't

15   have within your own personal knowledge?            09:55AM

16      A.   Can you rephrase that?

17      Q.   Sure.  I'm assuming you've been designated

18   as a Rule 30(b)(6) witness because you know some

19   information that may be relevant to these topics; is

20   that correct?                                       09:55AM

21      A.   That's correct.

22      Q.   Besides the things that you already know of

23   your own personal knowledge, did you go out and try

24   to educate yourself with other information that you

25   might not have known already to sit here and testify  09:56AM

                                                        15

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   today on those topics?

2        A.   I just want to make sure I understand the

3   question correctly.  So you're asking if there

4   was -- if I didn't have firsthand knowledge of

5   something if I asked somebody else who may have had   09:56AM

6   firsthand knowledge?

7        Q.   Correct.

8        A.   No.

9        Q.   And similarly for things of which you didn't

10  have firsthand knowledge, did you go out and try to   09:56AM

11  review any documents to educate yourself on things

12  you didn't have personal knowledge of already?

13       A.   No.

14       Q.   Now, have we covered the documents that you

15  reviewed in preparation for your deposition at this   09:56AM

16  point?

17       A.   Let me just verify since I'm sworn in.

18       Q.   Sure.

19       A.   So there's this one, there was the one I

20  don't know the name of that was the complaint I   09:56AM

21  think we're calling it and then the document

22  regarding Mattel Mexico.

23       Q.   Okay.

24       A.   Yes.

25       Q.   Can you briefly describe to me your   09:57AM

16

CONFIDENTIAL - ATTORNEYS' EYES O

```
 1          MS. ANDERSON:  Let me rephrase it in a way
 2   to avoid that problem completely.
 3          Q.   Are you ready?
 4          A.   Okay.
 5          Q.   Okay.  Did you ever have any discussions    12:25PM
 6   with Carter Bryant about whether he ever engaged in
 7   any kind of creative work during a time period when
 8   he was not employed by Mattel?
 9          A.   No.
10          Q.   Did you ever have any discussions with      12:25PM
11   Mr. Bryant about the subject of where he was living
12   immediately prior to him coming to work for Mattel
13   in early 1999?
14          A.   Yes.
15          Q.   What discussions did you have in that       12:25PM
16   regard?
17          A.   When he joined the Collector Team and we
18   were getting acquainted, he mentioned that he had
19   been at Mattel before and I believe he said he
20   worked on the Customized Main Line business and he    12:25PM
21   had mentioned having lived I believe in the Midwest
22   and then obviously was then living in L.A. because
23   he was working at Mattel.
24          Q.   Was this one conversation you had with
25   Mr. Bryant or is this information you learned over a   12:26PM
```

106

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. COREY:  Objection:  speculation.

2          THE WITNESS:  We decided to develop a series

3    showcasing designers because we had one designer,

4    Robert Best, who had a huge fan base and a big

5    following and we thought it would be fun for the          01:46PM

6    collector community to be able to engage with other

7    designers and to have interest in designers other

8    than just Robert.

9    BY MS. ANDERSON:

10         Q.  Who was responsible for selecting Carter          01:46PM

11   Bryant to have his name associated with the first of

12   these Grand Entrance dolls?

13         MR. COREY:  Same objection.

14         THE WITNESS:  I don't remember who

15   ultimately made that decision.                              01:46PM

16   BY MS. ANDERSON:

17         Q.  Were you involved in the decision to develop

18   this series of dolls?

19         A.  Yes.

20         Q.  And who else was involved besides yourself?  01:46PM

21         A.   I believe that the Marketing team ranging

22   from myself and the people who reported to me and

23   the person I reported to as well as Ann Driskill and

24   Ron Longsdorf all agreed that it would be a neat

25   concept for collectors.                                     01:47PM

                                                                 112

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   was common practice that they would then ask to

2   be -- would then be asked to leave.

3   BY MS. ANDERSON:

4       Q.   Where was that company?

5       A.   Dep Corporation.                        02:16PM

6       Q.   At the time that you had this conversation

7   with Mr. Bryant, were you aware of any practice at

8   Mattel with respect to how to handle a situation

9   where an employee was leaving but refused to say

10  whether they were going to a competitor?          02:16PM

11          MR. COREY:   Objection:   calls for

12  speculation.

13          THE WITNESS:   Carter was not my employee so

14  it wasn't my decision to make.

15          MS. ANDERSON:   Move to strike as           02:16PM

16  nonresponsive.

17      Q.   My question to you is not about Mr. Bryant

18  in particular.

19      A.   Okay.

20      Q.   It's just background.   Now I'll ask the    02:16PM

21  question.

22          In the same time frame that you were having

23  this conversation with Mr. Bryant were you aware of

24  there being any general practice at Mattel with

25  respect to how to handle a situation where an         02:16PM

131

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    employee was resigning but was refusing to tell you

2    whether they were going to go to a competitor?

3            MR. COREY:  Objection: calls for

4    speculation.

5            THE WITNESS:  I don't know of any such          02:17PM

6    policy at Mattel about how to handle that sort of

7    situation.

8    BY MS. ANDERSON:

9       Q.   Is that something -- strike that.

10           If you were going to try to find out what        02:17PM

11   Mattel's practices are, if any, with regard to that

12   kind of situation, would you check with Human

13   Resources?

14           MR. COREY:  Objection:  speculation.

15           THE WITNESS:  If -- if I had an employee         02:17PM

16   reporting to me directly and I had a question as to

17   how to handle their resignation, I would contact my

18   boss or HR or Legal, if necessary.

19   BY MS. ANDERSON:

20      Q.   Following the conversation that you had with 02:17PM

21   Mr. Bryant, did you discuss with anyone else the

22   subject matter of the conversation you had with

23   Carter Bryant?

24      A.   Yes.

25      Q.   With how many people did you discuss that       02:17PM

                                                                   132

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    sure if he reported in to Heather at that point or

2    in to Ann Driskill.

3        Q.   Did you ever discuss with Ann Driskill the

4    subject of whether Carter Bryant should continue

5    working at Mattel after he gave his notice?          02:27PM

6        A.   No.

7        Q.   Do you recall having considered telling her

8    but decided not to?

9            MR. COREY:  Objection: speculation.

10           THE WITNESS:  All I remember was making a     02:27PM

11   comment to Ron.

12   BY MS. ANDERSON:

13       Q.   When you say that you weren't sure whether

14   Carter was reporting to Heather at the time or

15   whether he was reporting to Ann Driskill, are you    02:27PM

16   referring to Heather Fonseca?

17       A.   Yes.

18       Q.   As a person who supervises employees at

19   Mattel, do you receive any training about what to do

20   when an employee gives notice?                       02:28PM

21       A.   I don't know that I've been trained

22   specifically on that.  I don't think so.

23       Q.   Generally speaking, have you ever been

24   educated on any particular practices that you as a

25   supervisor are supposed to follow if and when an     02:28PM

                                                              139

CONFIDENTIAL - ATTORNEYS' EYES O...

1    employee gives notice?

2        A.    I don't believe so.

3        Q.    Are there any written guidelines that you're

4    aware of that dictate what supervisors at Mattel are

5    supposed to do when an employee gives notice?          02:28PM

6            MR. COREY:  Objection:  speculation.

7            THE WITNESS:  I don't know if such

8    information exists.

9    BY MS. ANDERSON:

10       Q.    On the occasions where employees have given   02:29PM

11   you notice that they intend to leave Mattel do you

12   ever make it a practice to contact anyone in Human

13   Resources after you receive that notice?

14       A.    Absolutely.

15       Q.    Is that sort of a regular thing that you do?  02:29PM

16       A.    Generally what I've done in the past of the

17   people who have resigned directly to me I've -- if

18   they had a resignation letter that they handed at

19   the time of telling me I would take that letter and

20   I would go find my supervisor and tell him or her    02:29PM

21   that So-and-So resigned and here's their letter and

22   then I would call HR after and tell them that the

23   person had resigned and I would hand deliver the

24   person's letter if they had it prepared already.

25       Q.    Anything else that is part of your normal     02:30PM

                                                             140

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that so we're all looking at the same thing?

2          MS. ANDERSON:  Sure.  I'll ask another

3    question while we're waiting.

4          Q.   Did you ever have any communications with

5    Carter Bryant on the subject of whether or not he      02:43PM

6    did any kind of creative work on his own time even

7    during his period of employment at Mattel?

8          A.   No.

9          Q.   Did you have any communications with anyone

10   else on the subject of whether or not Carter Bryant    02:43PM

11   did creative work on his own time even during the

12   period of time that he was employed by Mattel?

13         A.   No.

14         Q.   Setting aside conversations you had with

15   Mattel's lawyers, did you ever have any                02:43PM

16   communications with anyone about the subject of

17   whether or not Carter Bryant did any work for any

18   Mattel competitor during the period of time that he

19   was an employee of Mattel?

20         A.   No.                                         02:43PM

21         Q.   Did any of the other designers that you ever

22   worked with while you were at Mattel ever report to

23   you that they had done creative work on their own

24   time?

25         MR. COREY:  Objection:  vague and ambiguous. 02:44PM

149

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    question and I'll wrap that up and then we can

2    break.

3       Q.   Are you aware of any written document that

4    you've ever seen that lays out what you believe to

5    be Mattel's policy about what one can and cannot do          02:55PM

6    in one's free time as a Mattel employee?

7            MR. COREY:  Objection:  calls for

8    speculation and lacks foundation.

9            THE WITNESS:  My understanding of Mattel

10   policy is that if you are unclear as to what you            02:55PM

11   should or shouldn't be doing that you should check

12   with somebody.

13   BY MS. ANDERSON:

14      Q.   But are you aware of any written documents

15   that advise employees about what they are and are           02:56PM

16   not permitted to engage in on their free time?

17           MR. COREY:  Same objection.

18           THE WITNESS:  My understanding is that

19   Mattel's guidelines are specific to what you're

20   doing while you're at Mattel.  I'm not sure about           02:56PM

21   like free time.  I'm not -- you know, I really don't

22   know about that.

23   BY MS. ANDERSON:

24      Q.   And did you ever have to sign any kind of

25   written employment agreements in connection with            02:56PM

                                                                 158

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MS. ANDERSON:  It's not a matter of

2     fairness.  You're wasting my time in this

3     deposition.

4          MR. COREY:  I didn't say fairness.

5          MS. ANDERSON:  All right, let's start all          03:26PM

6     over again.

7     Q.    You now have in mind the sentence that

8     starts on line 27 of page 40, correct?

9     A.    Correct.

10    Q.    My question to you is:  Aside from what          03:27PM

11    you've already testified to in this deposition, are

12    you aware of any information that relates in any way

13    to the allegation that Mr. Bryant did not disclose

14    to Mattel that he was working with MGA, a known

15    competitor, while employed by Mattel which you see          03:27PM

16    is an allegation in this document you have before

17    you?

18    A.    No.

19    Q.    Drawing your attention to the next page,

20    page 41, on line 4, the document states "In late          03:27PM

21    November 2003, Mattel obtained a copy of a contract

22    evidencing that Bryant had aided and assisted, and

23    worked as a designer with, MGA, a Mattel competitor,

24    while he was employed by Mattel and was being paid

25    by Mattel for his exclusive services as a designer."          03:27PM

171

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Do you see that?

2     A.   I do.

3     Q.   My question to you is:  Do you have any

4  knowledge about Mattel obtaining a copy of any

5  contract related to Carter Bryant and MGA?          03:28PM

6     A.   No.

7          MR. COREY:  You need to keep your voice up.

8          THE WITNESS:  Sorry.  No.

9  BY MS. ANDERSON:

10    Q.   Now, you can set the document aside for one    03:28PM

11  second.  I'll go back to it.

12          Do you have any knowledge of any facts

13  related to allegations that Mr. Bryant used any kind

14  of Mattel resources to assist him in doing work for

15  MGA while he was employed by Mattel?                 03:28PM

16    A.   No.

17    Q.   Do you have any information related to the

18  allegation that Mr. Bryant used the services of any

19  Mattel personnel to assist him in doing work for MGA

20  during his employment at Mattel?                     03:29PM

21    A.   No.

22    Q.   Do you have any information about the

23  allegation that Mr. Bryant communicated information

24  about a Mattel hair vendor to MGA during the period

25  of time that Mr. Bryant was employed by Mattel?      03:29PM

                                                          172

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   No.

 2      Q.   Do you have any information whatsoever about

 3  Mr. Bryant doing any kind of work for MGA during the

 4  time he was employed by Mattel?

 5      A.   No.                                       03:29PM

 6      Q.   Do you know anybody named Ana Ree?

 7      A.   I don't think so.

 8           MR. COREY:   I believe it's pronounced Ree.

 9  BY MS. ANDERSON:

10      Q.   Do you know anybody named Ana Ree?        03:29PM

11      A.   It doesn't ring a bell right now.

12      Q.   Did you ever have any discussions with Ivy

13  Ross or Sandy Yonemoto about the subject of Carter

14  Bryant's leaving Mattel's employment?

15      A.   No.                                       03:30PM

16      Q.   I've done that one so you can set that big

17  fat exhibit to the side.

18      A.   Okay.

19      Q.   If you could go back to the first document I

20  showed you which is the deposition notice 413 --    03:30PM

21      A.   Uh-huh.

22      Q.   -- let's start first at the end on topic 55

23  which is the second-to-last page of this exhibit.

24      A.   Uh-huh.

25      Q.   That topic is "All acts, omissions,         03:30PM
```
173

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   all the information you're aware of that is

2   responsive and related to those topics.

3        MR. COREY:  I'm going to object on the

4   ground that that's compound.  I mean, she's sat here

5   and answered the questions that you've asked her.     03:32PM

6   It's your obligation to ask her questions to elicit

7   the information she's --

8        MS. ANDERSON:  I have asked her and now I'm

9   asking her if there's anything else she has to tell

10  me.                                                   03:32PM

11       MR. COREY:  I'm going to object as compound

12  and calls for a narrative.

13       MS. ANDERSON:  Okay, we'll take it one by

14  one.

15       Q.   Topic No. 2, "All contractual and          03:32PM

16  non-contractual duties and obligations Bryant owed

17  or performed for Mattel during his employment with

18  Mattel, and thereafter."

19       Do you see that?

20       A.   Yes.                                        03:32PM

21       Q.   You're one of the 30(b)(6) representatives

22  on this topic, correct?

23       A.   Yes.

24       Q.   Have you given testimony related to

25  information you have that relates to this topic?      03:32PM
                                                          175

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       MR. COREY:  I'm going to reiterate my same

2   objections.  She sat here and she's answered the

3   question.

4       MS. TORRES:  Counsel, there's not supposed

5   to be speaking objections.                          03:33PM

6       MS. ANDERSON:  We've heard it.

7       MR. COREY:  I'm giving you an opportunity to

8   correct the record while we're here.

9       MS. ANDERSON:  I didn't ask for it.  State

10  your legal objection and then we'll get the answer.  03:33PM

11       You can answer.

12       THE WITNESS:  Sorry, what was the question?

13   Q.   Well, the whole point of this deposition is

14  to find out what information you have that's

15  relevant to the topics on which you have been       03:33PM

16  designated and I've asked you about your dealings

17  with Mr. Bryant, correct?

18   A.   Correct.

19   Q.   And I've asked you whether you saw any

20  contracts that Mr. Bryant might have signed during  03:33PM

21  his employment with Mattel, correct?

22   A.   Correct.

23   Q.   And you are not aware of any, right?

24   A.   I have not seen any of the documents that he

25  signed.                                             03:33PM

                                                        176

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.   Right.  And so I don't want to have to

2   re ask you all the questions I've asked you today

3   and you have given a lot of information about your

4   experiences with Mr. Bryant.  Okay?

5           My question to you is:  Setting aside all      03:33PM

6   the things you've already told us today, are you

7   aware of any other information that relates to topic

8   No. 2 that I just read to you besides what you've

9   already told me?

10          MR. COREY:  Objection:  compound, calls for   03:34PM

11   a narrative.  It's an improper type of question for

12   a Rule 30(b)(6) witness.

13          THE WITNESS:  As it relates to No. 2, I know

14   what Carter's job responsibilities and duties were

15   as a Collector designer during the time that I was     03:34PM

16   his marketing counterpart and I think I've tried to

17   represent those during the day.  I don't think I

18   have any additional information.

19   BY MS. ANDERSON:

20      Q.   Have you given me today your best             03:34PM

21   description of Mr. Bryant's job responsibilities

22   during the time that you worked with him?

23          MR. COREY:  Same objections.

24          THE WITNESS:  I think I've identified to

25   the -- his responsibilities to the extent that I       03:34PM

177

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   knew what they were.

2   BY MS. ANDERSON:

3       Q.   And you don't have any personal knowledge of

4   contractual obligations that he signed onto as a

5   Mattel employee, correct?                          03:35PM

6       A.   I do not.

7       Q.   Are you aware of any non-contractual duties

8   or obligations that Mr. Bryant had during his

9   employment at Mattel?

10          MR. COREY:  Calls for a legal conclusion.   03:35PM

11          THE WITNESS:  I don't know anything about

12   his employment circumstances or contracts.

13   BY MS. ANDERSON:

14       Q.   Are you aware of anything that Mr. Bryant

15   did or didn't do in the course of his work at Mattel   03:35PM

16   that you thought was improper?

17          MR. COREY:  Hold on just a second.

18          THE WITNESS:  I thought it was improper that

19   he lied to me when he left when he denied going to a

20   competitor when he, in fact, was going to a        03:36PM

21   competitor.

22   BY MS. ANDERSON:

23       Q.   Is there anything else besides that that you

24   believe was something that Mr. Bryant did that was

25   improper during the course of his employment at    03:36PM

                                                        178

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Mattel?
 2      A.    Not that I was made aware of.
 3      Q.    What kind of -- strike that.
 4            Did Mr. Bryant have access to any kind of
 5   confidential or proprietary information while he was   03:36PM
 6   at Mattel?
 7      A.    Yes.
 8      Q.    What kind of confidential or proprietary
 9   information do you have knowledge that Mr. Bryant
10   was given access to while he was employed at Mattel?  03:36PM
11      A.    Everything that we worked on was
12   confidential.  Our entire doll line, I mean, it was
13   our livelihood, how we made our revenue so our doll
14   line was confidential.
15            He also sat in the Design Center which is a  03:37PM
16   highly-confidential area and had access to the
17   entire lay of the land of the Design Center.
18      Q.    Do you have any knowledge as you sit here
19   today of Mr. Bryant having done anything improper
20   with respect to any confidential information that     03:37PM
21   Mr. Bryant had access to while he was at Mattel?
22            MR. COREY:  Objection:  calls for a legal
23   conclusion and vague and ambiguous.
24            THE WITNESS:  The only improper confidential
25   information that I was aware of was when he lied to   03:37PM
```

179

100

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. ANDERSON:

2       Q.    Did you ever meet someone named Richard

3   Irmen, I-r-m-e-n?

4       A.    Offhand I don't know.

5       Q.    Did you ever come to be introduced to Carter   03:46PM

6   Bryant's significant other at any point in time?

7       A.    No.

8       Q.    And as you sit here today, do you recall

9   what specific work Carter Bryant worked on in the

10  last two weeks he was at Mattel?                          03:47PM

11      A.    No.

12            MS. ANDERSON:  Subject to any possible

13  follow-up I'm done.  Shall we go off the record so

14  we can switch positions?

15            VIDEO OPERATOR:  Off the record at 3:47.        03:47PM

16                (Brief recess.)

17            VIDEO OPERATOR:  The time is 3:56 p.m.  We

18  are back on the record.

19

20                FURTHER EXAMINATION                         03:56PM

21  BY MS. TORRES:

22      Q.    Good afternoon, Ms. Nordquist.  I represent

23  MGA and I have some questions that I'd like to ask

24  you that pertain particularly to MGA but I have a

25  couple quick follow-ups on Carter Bryant.               03:56PM

                                                              185

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   You told me that you believe Ms. Trueba I

2  think you said got her hands on the document.

3      A.   Correct.

4      Q.   Is your belief that Ms. Trueba received this

5  document based on anything other than what Mattel's    04:38PM

6  counsel told you?

7      A.   No.

8      Q.   Do you have any information as to where

9  Ms. Trueba might have received this document given

10  the fact that you did not give it to her?            04:38PM

11      A.   I do not.

12      Q.   Other than information you have made -- you

13  may have learned from Mattel's counsel, do you have

14  any knowledge of any theft or misappropriation of

15  Mattel trade secrets by Carter Bryant?              04:39PM

16      A.   The only knowledge I have is based on press

17  releases or articles that I've read.

18      Q.   And other than what you might have been told

19  by Mattel's counsel, do you have any knowledge of

20  the theft or misappropriation of Mattel trade        04:39PM

21  secrets by any MGA employee?

22      A.   No.

23      Q.   Other than what you may have been told by

24  Mattel's counsel, do you have any knowledge of any

25  theft of Mattel trade secrets by any employee of any  04:39PM

                                                      215

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   MGA subsidiary?

2       A.   I don't think so.

3       Q.   If I asked you those same questions again

4   but used confidential information instead of trade

5   secrets, would your answers be the same?          04:40PM

6       A.   You'd have to ask me again because I don't

7   remember the exact wording.

8       Q.   Other than what you may have been told by

9   Mattel's counsel, do you have any knowledge of the

10  theft or misappropriation of Mattel confidential      04:40PM

11  information by either Carter Bryant or any MGA

12  employee?

13      A.   No, I do not.

14      Q.   The same would be true for MGA subsidiary

15  employees, correct?                                    04:40PM

16      A.   I don't know.

17      Q.   Other than what you may have been told by

18  Mattel's counsel, do you have any knowledge of theft

19  or misappropriation of Mattel confidential

20  information by any employee of any MGA subsidiary?     04:40PM

21      A.   Not to my knowledge.

22      Q.   Why didn't you give the 2004 viability

23  report to Ms. Trueba?

24      A.   The viability reports were only distributed

25  to directors in El Segundo in the Tower, in our       04:41PM

216

**Exhibit 5**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION          Certified Copy

4

5     --------------------------------

6     MATTEL, INC., a Delaware          )

7     Corporation,                      )

8              Plaintiff,               )

9              vs.                      ) No. CV 04-9059

10    CARTER BRYANT, an individual;     )    NM (RNBx)

11    and DOES 1 through 10,

12    Inclusive,

13             Defendants.              )

14    -------------------------------   )

15    (COMPLETE CAPTION ON NEXT PAGE.)

16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19    Videotaped 30(b)(6) Deposition of KISLAP

20    ONGCHANCO, taken at 400 South Hope Street,

21    Los Angeles, California, commencing at

22    9:45 A.M., Tuesday, April 24, 2007, before

23    Wendy S. Schreiber, CSR No. 3558, RPR, CLR.

24

25    PAGES 1 - 282

1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4

 5     ------------------------------

 6     MATTEL, INC., a Delaware       )

 7     Corporation,                   )

 8               Plaintiff,           )

 9               vs.                  ) No. CV 04-9059

10     CARTER BRYANT, an individual;  )    NM (RNBx)

11     And DOES 1 through 10,         )

12     Inclusive,                     )

13               Defendants.          )

14     ------------------------------ )

15     CARTER BRYANT, on behalf of    )

16     himself, all present and       )

17     former employees of Mattel,    )

18     Inc., and the general public,  )

19               Counter-Claimant,    )

20               vs.                  )

21     MATTEL, INC., a Delaware       )

22     Corporation,                   )

23               Counter-Defendant. )

24     ------------------------------
 
25
```
                                                      2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2

 3       FOR THE PLAINTIFF:

 4

 5          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6          BY:  MICHAEL T. ZELLER, ESQ.

 7          865 South Figueroa Street, Tenth Floor

 8          Los Angeles, California 90017

 9          (213) 443-3000

10          michaelzeller@quinnemanuel.com

11

12

13       FOR THE DEFENDANT AND COUNTER-CLAIMANT

14       CARTER BRYANT:

15

16          LITTLER MENDELSON

17          BY:  KEITH JACOBY, ESQ.

18          2049 Century Park East

19          Fifth Floor

20          Los Angeles, California 90067-3107

21          (310) 553-0308

22

23                - AND -

24

25
```

3

106

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3

 4         KEKER & VAN NEST LLP

 5         BY:  MICHAEL H. PAGE, ESQ.

 6         710 Sansome Street

 7         San Francisco, California 94111-1704

 8         (415) 391-5400

 9         Mhp@kvn.com

10

11

12    FOR DEFENDANT MGA ENTERTAINMENT, INC.:

13

14         O'MELVENY & MYERS LLP

15         BY:  DIANA M. TORRES, ESQ.

16         400 South Hope Street

17         Los Angeles, California 90071-2899

18         (213) 430-6000

19         dtorres@omm.com

20         jjenal@omm.com

21

22    ALSO PRESENT:

23

24         DAVID WEST, VIDEO OPERATOR

25
```

4

107

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    time?

2              MR. ZELLER:  The question is overbroad,

3    lacks foundation.

4              THE WITNESS:  Can you be more specific,

5    please?                                              10:01AM

6    BY MS. TORRES:

7        Q.   What did you understand was Ms. Mullen's job

8    responsibilities at Mattel as a preliminary

9    designer?

10       A.   She would think of designs and try to       10:01AM

11   execute it for approval.

12       Q.   Did Ms. Mullen to your knowledge come up

13   with the original design for Diva Starz?

14             MR. ZELLER:  I'm going to object.  The

15   question is overbroad and also lacks foundation as   10:02AM

16   to Diva Starz.

17             THE WITNESS:  Can you be more specific?

18   BY MS. TORRES:

19       Q.   I don't think so.  Can you answer that

20   question?                                            10:02AM

21       A.   No, I can't.

22       Q.   Do you know who came up with the original --

23   whose idea was Diva Starz, do you know?

24       A.   I do not know.

25       Q.   Did Ms. Mullen create the original Diva      10:02AM

                                                              19

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Starz drawings to your knowledge?

 2            MR. ZELLER:  I'm going to object as to lack

 3   of foundation.  When you say "Diva Starz," are you

 4   talking about the project?  Dolls?  I mean,

 5   there's -- the question is hopelessly vague.        10:02AM

 6            THE WITNESS:  I do not know.

 7   BY MS. TORRES:

 8      Q.   You don't know.  Do you have an

 9   understanding as to what Ms. Mullen's -- what

10   Ms. Mullen did as a preliminary designer for Diva    10:03AM

11   Starz?

12      A.   I don't know.

13      Q.   You don't know?

14      A.   I don't know.

15      Q.   You said after the point -- at some point    10:03AM

16   before you became a staff designer you stopped

17   working on Diva Starz, correct?

18      A.   Correct.

19      Q.   Do you recall when that was?

20      A.   No, I don't.                                 10:03AM

21      Q.   Obviously it was more than two years ago?

22      A.   Yes.

23      Q.   Was it more than three years ago?

24      A.   Yes.

25      Q.   Was it more than four years ago?            10:03AM
                                                          20
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Diva Starz.
 2        Q.    Is Barbara Miller still with Mattel to your
 3    knowledge?
 4        A.    To my knowledge, no.
 5        Q.    Do you know where she is?              10:17AM
 6        A.    I do not.
 7        Q.    Do you recall when she left Mattel?
 8        A.    I don't recall.
 9        Q.    Do you recall the circumstances under which
10    she left?                                       10:17AM
11        A.    No, I don't recall.
12        Q.    Did you ever hear that she's still in
13    Southern California?
14        A.    I saw her briefly I would say about a
15    year -- well, maybe about eight months ago, but I   10:18AM
16    didn't get to talk to her.
17        Q.    Where did you see her?
18        A.    In downtown El Segundo in a car.
19        Q.    While you were driving?  While she was
20    driving?                                         10:18AM
21        A.    We were both driving.  I believe she was
22    driving.  I saw her in the car.  I believe she was
23    driving.
24        Q.    If you look at category No. 11, the category
25    above No. 12 --                                  10:18AM
                                                            27
```

1      A.    Uh-huh.

2      Q.    -- that refers to facts and circumstances

3   showing the conception, origination, creation,

4   development and/or reduction to practice of Diva

5   Starz as opposed to Mini Diva Starz.                10:19AM

6      A.    Okay.

7      Q.    I am correct, aren't I, that you are not

8   designated on category 11?

9      A.    I worked on Diva Starz so I would imagine I

10   would be.                                          10:19AM

11      Q.    But you don't know one way or the other?

12      A.    Yes, I would be designated.

13          MS. TORRES:  Mr. Zeller?

14          MR. ZELLER:  Well, it's whatever is

15   reflected in the stipulation.  I mean, he is       10:19AM

16   someone, you know, with knowledge of Diva Starz.

17   Part of -- I mean, obviously our production of

18   witnesses has been subject to all matter of

19   negotiation and objections and everything else that

20   obviously there's no point in recounting here.      10:19AM

21          MS. TORRES:  No.

22          MR. ZELLER:  So I think that -- I mean, to

23   the extent that you want to ask him about things

24   that he worked on in connection with Diva Starz -- I

25   mean, because principally the problem from our       10:19AM

                                                          28

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    perspective on this topic about Diva Starz is

2    there's a lot of Diva Starz.  There are multiple

3    products and everything else so if -- I certainly do

4    not have an issue in him speaking to the aspects of

5    Diva Starz that he worked on.  Most of those I          10:20AM

6    think, you know, you'll find to be irrelevant but

7    you're certainly free to ask him on those and I

8    would not object that they're outside the

9    designation.  But I think you'll also find just

10   based on what his role is as someone who is more on    10:20AM

11   the development side that he -- he is not someone

12   involved in things -- the first parts of these

13   things -- conception, origination and so on --

14   because he gets the project after some stage of

15   development by the prelim designers.                    10:20AM

16         So he is knowledgeable about a piece of this

17   but I think the Mini Diva Starz are the ones that

18   you'll see that really overlap with the other topics

19   and, you know, why he's here today.

20   BY MS. TORRES:                                          10:20AM

21      Q.   Mr. Ongchangco, Mr. Zeller just represented

22   that you -- as a development designer you were not

23   involved in the conception or origination of Diva

24   Starz.  Is that correct?

25      A.   That's correct.                                 10:21AM

                                                                 29

CONFIDENTIAL - ATTORNEYS' EYES O...

```
 1              MR. ZELLER:  I'm just going to object to the

 2    overbreadth of the question in terms of "Diva Starz"

 3    because there's multiple components but I think it's

 4    fine.

 5    BY MS. TORRES:                                    10:21AM

 6         Q.   Were you involved in any aspect of the

 7    conception or origination of Diva Starz?

 8         A.   I was not.

 9         Q.   Were you involved in any aspect of the

10    conception or origination of Mini Diva Starz?       10:21AM

11         A.   I was not.

12         Q.   Do you know who was involved in the

13    conception of Mini Diva Starz?

14         A.   I don't know.

15         Q.   Do you know how Mini Diva Starz was        10:21AM

16    conceived?

17         A.   I don't know.

18         Q.   If you would look at category 8 in the

19    deposition notice.  There are other individuals who

20    have also been designated on those topics and I'd    10:22AM

21    like to know if you know them.  Rob Hudnut?

22         A.   No.

23         Q.   You don't know him?

24         A.   I don't know him.

25         Q.   Rene Pasko you mentioned earlier.          10:22AM
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Yeah.

2    A.    Design process wise I was just working with

3    Maureen on those and possibly Barbara Miller on the

4    Mini Divas.

5    Q.    Were you and Maureen and Barbara Miller the    10:44AM

6    only three people to the best of your recollection

7    involved in the design process of either Diva Starz

8    or Mini Diva Starz?

9         MR. ZELLER:  First of all, this is asked and

10   answered.  Second, the question lacks foundation.    10:44AM

11   It's outside the scope of the designation.

12        THE WITNESS:  I don't know.

13   BY MS. TORRES:

14   Q.    Do you recall working with anyone else?

15   A.    I don't recall at this time.               10:44AM

16        MR. JACOBY:  I just want to object to that

17   objection.  I mean, category 12 talks about the

18   development of Mini Diva Starz.  Asking who else

19   developed it is dead on within the scope of the

20   designation.                                      10:44AM

21        MR. ZELLER:  But not for this witness.

22   There are a number of people who will be testifying

23   about Diva Starz including Rene Pasko.  He's here to

24   talk about things that he worked on and so I'm

25   objecting to the things that are outside the scope   10:45AM

                                                          49

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of what he worked on.

2            MR. JACOBY:   I thought the question referred

3    to Mini Diva Starz.   Am I incorrect?

4            MR. ZELLER:   Well, I understand but not any

5    question about Mini Divas would be within the scope      10:45AM

6    of this particular witness' designation.   I'm not

7    saying she can't ask questions but that's not why

8    he's here.

9            MS. TORRES:   Mr. Zeller, can you clarify

10   for us then what aspects of these topics this           10:45AM

11   witness is designated on and what aspects he's not?

12           MR. ZELLER:   That's what I was telling you

13   earlier.   It's exactly what I was saying earlier.

14   He is part -- he's a development designer.   He picks

15   up the project at a particular point.   He can talk     10:45AM

16   about what he did from there as well as -- but

17   you're asking him about the whole design process and

18   that's why I'm objecting to it outside the scope of

19   the designation.   But, again, I'm not trying to

20   suggest you can't ask him anything you want but I       10:45AM

21   just don't see that as within the scope of the

22   designation is all.

23   BY MS. TORRES:

24       Q.   Let me ask you this.   From the time you

25   first started working on the project until the time     10:46AM

                                                                    50

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   you stopped working on the project --

2        A.   Okay.

3        Q.   -- were there any other people involved in

4   the design of Mini Diva Starz?

5        A.   Not to the best of my knowledge.          10:46AM

6        Q.   From the time you started working on Diva

7   Starz until the time you stopped working on Diva

8   Starz were there any other people involved in the

9   development of Diva Starz?

10            MR. ZELLER:  Objection.  The question is    10:46AM

11   vague as to "development."

12            THE WITNESS:  I don't know.

13   BY MS. TORRES:

14        Q.   Do you recall working at all with a man by

15   the name of Mr. Steve Linker?                         10:46AM

16        A.   Yes.

17        Q.   Who is Mr. Linker?

18        A.   He was an outside designer that I believe

19   Maureen was working with.

20        Q.   Did you work with him at all?              10:46AM

21        A.   I worked with him on graphics only.

22        Q.   What do you mean by that?

23        A.   Meaning labels, stuff like that.  Not the

24   doll at all.

25        Q.   Do you know whether Mr. Linker had any     10:47AM

                                                          51

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    responsibility for designing the doll itself, the

2    Mini Diva Starz doll?

3            MR. ZELLER:  Objection.  The question is

4    vague.

5            THE WITNESS:  I don't know.                10:47AM

6    BY MS. TORRES:

7       Q.   Do you know whether Mr. Linker had any

8    involvement in designing the Diva Starz doll at all?

9       A.   I don't know.

10      Q.   Were there any other outside vendors to your 10:47AM

11   knowledge who worked on any aspect of the

12   development of Diva Starz?

13           MR. ZELLER:  The question is overbroad and

14   vague, outside the scope of the designation.

15           THE WITNESS:  I don't know.                10:47AM

16   BY MS. TORRES:

17      Q.   Were there any other outside vendors to your

18   knowledge who worked on any aspect of the

19   development of Mini Diva Starz?

20           MR. ZELLER:  Same objections.              10:47AM

21           THE WITNESS:  I don't know.

22   BY MS. TORRES:

23      Q.   So the only one that you can think of is

24   Steve Linker?

25      A.   As far as I remember, that's who he -- that 10:48AM

                                                        52

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MS. TORRES:  In the second half of 1999.

2          THE WITNESS:  I don't think so because I

3   think that name was finalized later on so I believe

4   at that time it was still called Chat Girls.

5     Q.   Was the Chat Girls project at that time        10:52AM

6   considered to be a -- a more confidential project

7   than any other project to your knowledge?

8          MR. ZELLER:  Objection:  lacks foundation.

9   The question is vague as to "considered" and also

10  outside the scope of the designation.                  10:52AM

11         THE WITNESS:  I don't know.

12  BY MS. TORRES:

13    Q.   Did you have any understanding as to whether

14  or not the Chat Girls project was considered

15  confidential?                                          10:52AM

16    A.   All of our projects is confidential -- are

17  confidential.

18    Q.   Did you have any understanding as to whether

19  or not Chat Girls was considered more confidential

20  than other projects generally at Mattel?              10:52AM

21         MR. ZELLER:  The question is outside the

22  scope of the designation.  Also lacks foundation, is

23  vague.

24         THE WITNESS:  I don't know.

25  /   /   /                                              10:53AM

                                                               56

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. TORRES:

2        Q.   To your knowledge were there any -- were

3    there any additional security measures in place for

4    maintaining the confidentiality of the Chat Girls or

5    Diva Starz project at that time?                    10:53AM

6        A.   I don't know.

7             MR. ZELLER:  Same objections.

8             THE WITNESS:  I don't remember.

9    BY MS. TORRES:

10       Q.   Did you have any sense at the time you first 10:53AM

11   started working on the Diva Starz project, whether

12   it was called Chat Girls or Diva Starz, that it was

13   an important project at Mattel relative to other

14   projects?

15            MR. ZELLER:  You're talking about the big    10:54AM

16   ones?

17            MS. TORRES:  Yeah, the big ones.

18            THE WITNESS:  They were all very important.

19   That's how I treat my projects to be all very

20   important.                                           10:54AM

21       Q.   You didn't consider it to be any more

22   important than any other project?

23       A.   They're all equally to me are important.

24       Q.   Did you consider the Diva Starz project at

25   that time to be any more confidential than any other 10:54AM

57

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    question is vague, lacks foundation.

2            THE WITNESS:  Can you rephrase that, please?

3    BY MS. TORRES:

4        Q.   Is it fair to say that "prototype" can refer

5    to a three-dimensional version of a product at a        11:42AM

6    number of different stages?

7            MR. ZELLER:  Same objections.

8            THE WITNESS:  It's possible.

9    BY MS. TORRES:

10       Q.   Do you work at all with sculptors as a          11:42AM

11   development designer?

12       A.   On occasion but only to make comments on

13   what they didn't do properly or how we intended the

14   product, but mostly that's with Preliminary Design.

15       Q.   Is it your -- do you have any knowledge as      11:42AM

16   to anything about the sculpting process?

17       A.   I'm sorry?

18       Q.   Do you have any knowledge about the

19   sculpting process at all?

20           MR. ZELLER:  I'm sorry, are we talking about 11:43AM

21   now or then?

22           MS. TORRES:  I'm talking about now actually.

23       Q.   Do you have any knowledge about the

24   sculpting process?

25       A.   I'm not into sculpting design so I would not 11:43AM

81

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   know the process.

2       Q.   So you weren't familiar with it at the time

3   either?

4       A.   Correct.

5            (Exhibit 309 previously marked.)          11:43AM

6   BY MS. TORRES:

7       Q.   I'm going to hand you what was previously

8   marked as Exhibit 309.

9       A.   Thank you.

10      Q.   Have you ever seen any -- have you ever seen   11:44AM

11   the images depicted in Exhibit 309?

12      A.   The second page looks familiar but I don't

13   remember if I saw it or not.   The first page I don't

14   remember seeing during that time especially.

15      Q.   Is it fair to say that the images depicted   11:44AM

16   in Exhibit 309 are of different characters than the

17   images depicted in Exhibit 308?

18           MR. ZELLER:  Lacks foundation, outside the

19   scope of the designation.

20           THE WITNESS:  Yeah, I didn't work on these   11:44AM

21   so I don't know.

22   BY MS. TORRES:

23      Q.   Looking at them, do you think that they

24   depict the same characters?

25           MR. ZELLER:  The images speak for            11:45AM

                                                              82

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  when they were introduced.

2      Q.   Other than the large Diva Starz dolls, the

3  Mini Diva Starz dolls and the Fashion Diva Starz

4  dolls, can you recall any other dolls that you would

5  consider within the Diva Starz product line?          12:02PM

6          MR. ZELLER:  Lacks foundation, outside the

7  scope of the designation, vague.

8          THE WITNESS:  I can only tell you what I've

9  worked on and those were the ones you named.

10  BY MS. TORRES:                                         12:02PM

11      Q.   To the best of your recollection did Mattel

12  continue to manufacture the Mini Diva Starz after it

13  introduced the Fashion Diva Starz dolls?

14      A.   I don't remember.

15      Q.   To the best of your recollection did Mattel   12:03PM

16  stop manufacturing the Mini Diva Starz dolls before

17  it stopped manufacturing the Fashion Diva Starz?

18      A.   Can you repeat that, please?

19      Q.   To the best of your stop manufacturing the

20  Mini Diva Starz dolls before it stopped              12:03PM

21  manufacturing the Fashion Diva Starz dolls?

22          MR. ZELLER:  Lacks foundation, outside the

23  designation.

24          THE WITNESS:  Yeah, I'm not sure.

25  /  /  /                                               12:03PM

                                                          95

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. TORRES:

2       Q.   To the best of your knowledge does Mattel

3   still manufacture any Diva Starz dolls?

4           MR. ZELLER:   Same objections.

5           THE WITNESS:   I'm not working on them so I        12:03PM

6   don't know.

7   BY MS. TORRES:

8       Q.   Are you familiar with Mattel's products at

9   all other than the ones that you work on?

10          MR. ZELLER:   Objection.                           12:03PM

11          THE WITNESS:   Yeah, there's just so many.

12  The ones that I worked on I'm not working on the

13  Diva Starz right now so I wouldn't know.

14  BY MS. TORRES:

15      Q.   Do you have any knowledge whatsoever as to       12:03PM

16  whether or not Diva Starz are still on the market?

17      A.   I do not know.

18          MS. TORRES:   Do you want to take a break for

19  lunch?

20          MR. ZELLER:   Sure.                                12:04PM

21          MS. TORRES:   It's a little after 12:00.

22  I'll get the color copies.

23          VIDEO OPERATOR:   Let's go off the record at

24  12:04.

25          (At 12:04 p.m. the luncheon recess was taken.)     12:04PM

96

123

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1          (At the hour of 1:18 p.m. the following

2        proceedings were had at the same place with

3         the same persons present.)

4

5          VIDEO OPERATOR:   The time is 1:18 p.m.   We      01:34PM

6   are back on the record.

7

8                EXAMINATION (CONTINUING)

9   BY MS. TORRES:

10     Q.    Mr. Ongchangco, did you do anything to        01:18PM

11  prepare for this deposition today?

12     A.    Yeah, we went over some notes, paperwork.

13     Q.    Who did you go over notes and paperwork

14  with?

15     A.    With my counsel.                              01:18PM

16     Q.    Who is that?

17     A.    Mike Zeller.

18     Q.    Was there anyone else -- was there anyone

19  else present when you met with Mr. Zeller?

20     A.    I believe Mike Moore was there.               01:18PM

21     Q.    When was this?

22     A.    Yesterday.

23     Q.    Did you prepare for this deposition in any

24  way prior to yesterday?

25     A.    We also went over some notes on Friday, I     01:18PM
```
97

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    believe.

2         Q.    Prior to Friday did you do anything to

3    prepare for this deposition?

4         A.    I don't think so.

5         Q.    How long did you meet with Mr. Zeller on    01:18PM

6    Friday?

7         A.    I think maybe about maybe three or four

8    hours maybe.

9         Q.    Was Mr. Moore present at that time?

10        A.    I think so.  I think he was.              01:19PM

11        Q.    Where were you?

12        A.    At El Segundo.

13        Q.    At Mattel's offices in El Segundo?

14        A.    That's correct.

15        Q.    On Friday did you go over -- did you review  01:19PM

16   any documents?

17        A.    Yes.

18        Q.    What documents did you review?

19        A.    They're like sketches and some other

20   documents that we had there present.                01:19PM

21        Q.    Were any of the sketches that you reviewed

22   on Friday the sketches that we've looked at today?

23        A.    Some, yes.

24        Q.    What sketches were those?

25               MR. ZELLER:  Just so the record is clear   01:19PM

                                                          98

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   about this part, I assume you're asking him for

2   purposes of his preparation for 30(b)(6) and that's

3   not a waiver of privilege?

4           MS. TORRES:  Correct.

5           MR. ZELLER:  Go ahead.                    01:19PM

6           THE WITNESS:  There were some -- probably

7   most of this, I believe.  I think most of these.

8   BY MS. TORRES:

9       Q.   Most of these?

10      A.   These sketches but I did not see this one.  01:20PM

11      Q.   When you say most of these sketches, are you

12  talking about the documents I showed you that had

13  been previously marked as exhibits to a prior

14  deposition?

15          MR. ZELLER:  The question lacks foundation.  01:20PM

16          THE WITNESS:  It would be these documents.

17  I don't know if they were prior or not.  I did not

18  see -- well, this is not a sketch.  So I only saw

19  the sketches or drawings.

20  BY MS. TORRES:                                      01:20PM

21      Q.   Are there any numbers at the bottom of the

22  sketches and drawings that you're referring to?

23      A.   I believe, let's see, TP 0012, TP --

24      Q.   Before you continue, is there any writing to

25  the left of TP 0012?                                01:20PM

                                                         99

126

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     A.    Yes, No. 312.

 2     Q.    Yes.

 3     A.    311, 310, 309, 308 and 307.

 4     Q.    What was the purpose in reviewing those

 5   sketches on Friday?                              01:21PM

 6         MR. ZELLER:  Objection:  calls for a legal

 7   conclusion, lacks foundation.

 8         THE WITNESS:  Just so that I'm familiar with

 9   them or remember what I -- you know, what I've seen

10   before or what I did not see before.  Basically  01:21PM

11   that.

12   BY MS. TORRES:

13     Q.    Did you review any other sketches on Friday?

14     A.    I don't remember reviewing any other

15   sketches.                                        01:21PM

16     Q.    Those are the only ones you recall

17   reviewing?

18     A.    I think so.  I wouldn't know unless I see

19   them.

20     Q.    Did you review any different -- did you   01:21PM

21   review any documents yesterday when you met with Mr.

22   Zeller?

23     A.    Yes, parts of I believe Steve Linker's

24   deposition, parts of it.

25     Q.    Did you do anything else in your meeting  01:22PM
                                                          100
```

127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    with Mr. Zeller yesterday?

2        A.    No.

3        Q.    How long did you meet with Mr. Zeller

4    yesterday?

5        A.    I believe -- let's see, maybe about five        01:22PM

6    hours, four and a half hours maybe.

7        Q.    Did you spend the entire time reviewing

8    Mr. Linker's deposition testimony?

9        A.    Oh, no, no, no.  That was just part of all

10   the other stuff that I had.                                 01:22PM

11       Q.    What else did you do -- let's go back to

12   Friday.

13             Did you do anything other than review

14   sketches last Friday with Mr. Zeller?

15       A.    I don't remember.  I think it's just           01:22PM

16   sketches on Friday.

17       Q.    Did you talk to anyone by telephone or

18   communicate with anyone by E-mail other than

19   Mr. Zeller and perhaps Mr. Moore in your deposition

20   preparation on Friday?                                      01:22PM

21       A.    No, I did not.

22       Q.    In your deposition preparation yesterday did

23   you talk to anyone by phone?

24       A.    No, I did not.

25       Q.    Did you meet with anyone?                         01:23PM

101

128

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   No, in regards to -- no.  To this, no.

 2           MR. ZELLER:  I'm sorry, you mean anyone in

 3    addition?

 4           MS. TORRES:  Correct.

 5           THE WITNESS:  Oh, right.              01:23PM

 6      Q.   Other than Mr. Zeller or Mr. Moore.

 7      A.   Right.

 8      Q.   Did you communicate with anyone by E-mail?

 9      A.   No.

10      Q.   Other than in -- other than your meetings  01:23PM

11    with Mr. Zeller and Mr. Moore on Friday and

12    yesterday, did you do anything to prepare for your

13    deposition?

14      A.   No.

15      Q.   Did you talk to anybody to prepare for your  01:23PM

16    deposition other than Mr. Zeller or Mr. Moore at any

17    time?

18      A.   No.

19      Q.   Did you communicate with anybody by E-mail

20    or telephone in any way to prepare for your     01:23PM

21    deposition?

22      A.   No.

23      Q.   Did you review any other deposition

24    transcripts or parts of deposition transcripts other

25    than Mr. Linker's to prepare for your deposition?  01:24PM
```

102

129

CONFIDENTIAL - ATTORNEYS' EYES ON___

```
1       A.    I had an old deposition that I went through
2  but that was it.
3       Q.    What old deposition was that?
4       A.    It was a prior deposition that I had.
5       Q.    Was it the deposition that you had          01:24PM
6  approximately eight months ago that you identified
7  earlier today?
8       A.    Yes.
9       Q.    You also testified that you reviewed notes,
10 correct?                                               01:24PM
11      A.    Yes.
12      Q.    What notes did you review?
13      A.    Well, it would be some of the notes that
14 were on these sketches basically.
15      Q.    Did you review any documents other than the  01:25PM
16 aspects of Mr. Linker's deposition that you looked
17 at, your own prior deposition testimony and sketches
18 to prepare for your deposition?
19           MR. ZELLER:  This is asked and answered.
20           THE WITNESS:  No.  No.                        01:25PM
21 BY MS. TORRES:
22      Q.    Did you review any E-mails?
23      A.    No.
24      Q.    In the 1999, 2000, 2001 time frame did you
25 have an E-mail account at Mattel?                       01:25PM
```

103

130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    you can read it like in about ten minutes during a
 2    break, I promise.  It's very short.  We have
 3    produced it, absolutely.
 4    BY MS. TORRES:
 5         Q.    Prior to being deposed in the other case    01:30PM
 6    eight or nine months ago, did you talk to people to
 7    prepare for that deposition?
 8         A.    Only my counsel.
 9         Q.    Only your counsel?
10         A.    Only my counsel.                            01:30PM
11         Q.    You didn't ask anybody else any questions to
12    prepare yourself for that deposition?
13         A.    No.
14         Q.    In reviewing the transcript for that -- of
15    that deposition testimony did you see anything that   01:30PM
16    you thought was incorrect?
17         A.    No.
18         Q.    Is it fair to say that in testifying here
19    today as a 30(b)(6) witness for Mattel you are
20    testifying only based on your own personal           01:31PM
21    knowledge?
22              MR. ZELLER:  Objection.
23              That also calls for a legal conclusion as
24    phrased.
25              THE WITNESS:  I cannot answer that question. 01:31PM
                                                             108
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MS. TORRES:

 2       Q.   Why not?

 3       A.   Well, my knowledge, yes, I guess that would

 4   be correct.

 5       Q.   Is there anyone else's knowledge that you      01:31PM

 6   have that you're prepared to give today?

 7       A.   No, only my own knowledge.

 8       Q.   Only your own personal knowledge?

 9       A.   Yes.

10            (Deposition Exhibit 388 was marked          01:31PM

11       for identification and is annexed hereto.)

12   BY MS. TORRES:

13       Q.   I'm going to ask the court reporter to mark

14   as Exhibit 388 a collection of documents they're

15   bearing Bates Nos. M 0032796 through 32811.            01:32PM

16            MR. ZELLER:  I'm going to object to this

17   exhibit as provided in this form.

18   BY MS. TORRES:

19       Q.   Do you recognize these documents?

20       A.   Yes, I do.                                    01:32PM

21       Q.   What are they?

22       A.   These are the color specifications and parts

23   for each doll.

24       Q.   Are these documents that you create or that

25   you created in the course of your work at Mattel?      01:33PM
                                                               109
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   more than create this type of document?

2       A.   Yes.

3       Q.   And convey the information in this type of

4   document to Hong Kong?

5       A.   Yes.                                          01:55PM

6       Q.   What did you do?

7       A.   I made sure that when they come back to me

8   with the colors and everything I have to make sure

9   that they're the correct colors.  I worked with, you

10  know, the engineers to make sure they're functioning  01:56PM

11  properly.  Stuff like that.

12      Q.   Did you do anything other than work on

13  colors and make sure the engineering worked

14  properly?

15      A.   Well, I worked with Engineering to make sure 01:56PM

16  that, you know, the parts like fit inside, too.  So

17  there was an instance where the shoe was a little

18  bit too small because we need to add one more

19  battery and so we had to make sure that it still has

20  that similar look to what it originally was, but      01:56PM

21  that was about it.

22      Q.   Were the shoes designed to hold the battery?

23           MR. ZELLER:  Objection:  lacks foundation,

24  calls for speculation.

25           THE WITNESS:  Can you be more specific?      01:56PM

                                                          127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MS. TORRES:

 2         Q.   Were the shoes designed to hold the

 3    batteries?

 4              MR. ZELLER:  Same objections.  Calls for

 5    speculation.  Outside the designation as well.      01:56PM

 6              THE WITNESS:  The engineer would have that

 7    information.

 8    BY MS. TORRES:

 9         Q.   Did the shoes hold the batteries?

10         A.   Yes.                                        01:57PM

11         Q.   Were the shoes -- were -- were the shoes

12    sized to hold the battery?

13              MR. ZELLER:  Outside the designation, calls

14    for speculation, lacks foundation.

15              THE WITNESS:  I think you would have to talk 01:57PM

16    to the engineer on that specifically.

17    BY MS. TORRES:

18         Q.   Did the engineer report to you on that?

19         A.   Yes.

20         Q.   Were the shoes sized to hold the batteries? 01:57PM

21              MR. ZELLER:  Same objection.  Outside the

22    scope of the designation, lacks foundation, calls

23    for speculation.

24              THE WITNESS:  You'd have to talk to the

25    engineer for that.                                    01:57PM
                                                               128
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. JACOBY:  Move to strike as

2    nonresponsive.  That is a nonresponsive answer.

3          MR. ZELLER:  Well, Counsel, since this is

4    allegedly your deposition, perhaps you should have

5    been actually the one asking questions first but I          01:57PM

6    don't see how you're interjecting yourself on her

7    questioning.  Do you have a basis for it?

8          MR. JACOBY:  Yeah, I can move to strike a

9    nonresponsive answer and I will be asking questions

10   on other topics that Ms. Torres isn't covering right     01:58PM

11   now.

12         MR. ZELLER:  Well, on topics that he's not

13   designated on.

14         MR. JACOBY:  No, I want to talk 2 through 7

15   which he is designated on and we just haven't gotten     01:58PM

16   to yet.

17         MR. ZELLER:  Counsel, we'll see.

18         MR. JACOBY:  You know, Michael, it is not an

19   answer for a witness -- a 30(b)(6) witness to say go

20   talk to somebody else.                                    01:58PM

21         MR. ZELLER:  Of course it is.

22         MR. JACOBY:  No.  Even if somebody else

23   knows, we're entitled to know what he knows.  So if

24   he says "I don't know," that's fine, we'll move on

25   to the next question.                                     01:58PM

                                                                129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. ZELLER:  You can argue all you want

2     otherwise.  He's a development designer.  You

3     obviously didn't understand that the first time

4     around and you still don't.  He is here to talk --

5          MR. JACOBY:  He is here to respond to          01:58PM

6     questions.

7          MR. ZELLER:  He is responding.

8          MR. JACOBY:  No, he's not.

9     BY MS. TORRES:

10      Q.  Do you know whether the shoes were sized to   01:58PM

11   hold the batteries?

12          MR. ZELLER:  Outside the designation.

13   BY MS. TORRES:

14      Q.  It's a "yes" or "no."

15          MR. ZELLER:  Outside the designation.  Lacks  01:59PM

16   foundation.

17          THE WITNESS:  It's possible but I'm not too

18   sure.

19   BY MS. TORRES:

20      Q.  You're not too sure?                          01:59PM

21      A.  Not too sure.

22      Q.  Do you know what was inside the head of the

23   doll, the original Diva Starz?

24          MR. ZELLER:  Outside the designation.

25          THE WITNESS:  I've never actually opened one  01:59PM

                                                         130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    so I couldn't tell you.

2    BY MS. TORRES:

3        Q.    So you weren't responsible for making

4    whatever was in the head of the Diva Starz work?

5        A.    That's correct, I'm not.                    01:59PM

6        Q.    Who was?

7              MR. ZELLER:  Calls for speculation.

8              THE WITNESS:  The engineer.  The engineer

9    was responsible to make sure it works, yes.

10   BY MS. TORRES:                                        01:59PM

11       Q.    Did that engineer report to you?

12       A.    No.

13       Q.    Who did that engineer report to?

14       A.    His supervisor, but I don't remember who his

15   supervisor was at the time.                           01:59PM

16       Q.    Did that supervisor report to you?

17       A.    No.

18       Q.    Do you know who that supervisor reported to?

19       A.    No.

20       Q.    Did Engineering for the original Diva Starz  01:59PM

21   line report to Preliminary Design?

22       A.    Yes.

23       Q.    Was the engineering primarily finished by

24   the time it got to you, the project got to you?

25             MR. ZELLER:  Objection: lacks foundation,   02:00PM

131

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   calls for speculation.

2           THE WITNESS:  Not necessarily.

3   BY MS. TORRES:

4       Q.   You don't know one way or the other?

5       A.   I don't know.                        02:00PM

6       Q.   Do you have any idea as to what stage of

7   development the Diva Starz -- the original large

8   Diva Starz dolls were in at the time the project

9   came to you?

10          MR. ZELLER:  Can I have the question read   02:00PM

11  back, please?

12              (The pending question was read.)

13          MR. ZELLER:  The question is overbroad,

14  lacks foundation, calls for speculation.

15          THE WITNESS:  Engineering wise I totally do   02:00PM

16  not know.  All I knew is the product came to me and

17  I started working on it but I don't know any

18  specifics about electronics and the engineering

19  aspects of it.

20  BY MS. TORRES:                                02:00PM

21      Q.   Because those aspects -- responsibility for

22  those aspects was -- fell within the responsibility

23  of Preliminary Design, correct?

24      A.   Yes, and Engineering, of course.

25      Q.   What aspects of the original Diva Starz doll   02:01PM

132

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    I'm not sure exactly.  I wasn't counting the days or

2    anything.

3        Q.   You don't recall whether or not you created

4    a sheet that is similar to the ones in Exhibit 388

5    for the original Mini Diva Starz dolls?            02:07PM

6             MR. ZELLER:  This is asked and answered.

7             THE WITNESS:  Something similar but not the

8    same.

9    BY MS. TORRES:

10       Q.   Was that one of the first things that you   02:07PM

11   did in connection with the Mini Diva Starz dolls?

12       A.   Well, I reviewed it first, the parts, and

13   eventually probably made a document similar to this.

14       Q.   Did you then also convey the information

15   about the colors to a counterpart in Hong Kong?     02:07PM

16       A.   Yes.

17       Q.   Was it the same counterpart that you worked

18   with on the large dolls?

19       A.   I'm not sure.  It's possible but I'm not

20   sure.                                               02:07PM

21       Q.   Did you do anything to refresh your

22   recollection or to find out that information in

23   connection with your preparation for your deposition

24   today?

25       A.   No.                                        02:08PM

                                                         139

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MR. ZELLER:  It's outside the scope of the

2    designation if you haven't been hearing that

3    objection enough.

4    BY MS. TORRES:

5        Q.   Did you have any involvement in choosing the   02:08PM

6    colors for the Diva Starz dolls at any point in

7    time?

8        A.   No.

9        Q.   Were those chosen by Preliminary Design?

10       A.   That's correct.                                02:08PM

11       Q.   Do you have any knowledge of how those

12   colors were chosen?

13       A.   No.

14             MR. ZELLER:  I'm sorry, did you say clothes

15   or colors?                                              02:08PM

16             MS. TORRES:  Colors.

17             MR. ZELLER:  Thank you.

18   BY MS. TORRES:

19       Q.   Did you have any involvement in deciding

20   what clothes would be manufactured for the Diva         02:08PM

21   Starz dolls at any point in time?

22       A.   No.

23       Q.   What about for the Mini Diva Starz dolls?

24       A.   No.

25       Q.   Was that all done by Preliminary Design?       02:09PM
                                                             140
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    That's correct.

 2        Q.    Do you have any knowledge as to how the

 3   fashions for the clothes were created or decided

 4   upon?

 5        A.    No, I don't know.                         02:09PM

 6        Q.    In looking at Exhibit 388 there are

 7   different dates for these types of documents -- the

 8   same type of document.  Do you see that?

 9        A.    Uh-huh.

10        Q.    Is this essentially different iterations of 02:09PM

11   the -- is this designed to reflect different

12   iterations of the project?

13        A.    There might have been minor changes.  I'd

14   have to compare each one to tell you what the

15   differences are, but the quality of this printout is  02:09PM

16   really bad.  I can't tell you, but there might be

17   some minor changes therefore the dates have changed.

18        Q.    When you printed out one of these documents,

19   did it automatically print with the date in the

20   bottom right-hand corner?                            02:10PM

21        A.    No.

22        Q.    Did you manually input that?

23        A.    That's correct.

24        Q.    Did you -- was it your practice to manually

25   input the date that you were printing the document   02:10PM
```

141

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Yes, and I -- yes.

2      Q.   I'm going to ask you to look again at

3   Exhibit 385.

4      A.   Okay.

5      Q.   If you look at page 4, category No. 8 --        02:14PM

6      A.   Okay.

7      Q.   -- the topic is "All acts, omissions,

8   circumstances and/or evidence showing, or tending to

9   show, that any and all products of MGA, including

10   but not limited to, any and all products sold under        02:14PM

11   the trade name 'Bratz,' originated from, were

12   derived from, are based upon, are copied or

13   incorporated from, or are substantially or

14   confusingly similar to, any design, research and

15   development work, work in progress, or product owned   02:14PM

16   at any time by Mattel or created by any Mattel

17   employee, including but not limited to Bryant, or

18   any independent contractor during the time that such

19   Person was working for Mattel."

20          I believe you testified earlier that you do   02:15PM

21   have information on that subject.

22          MR. ZELLER:  To the extent he's been

23   designated.

24          THE WITNESS:  Yeah.  Did you have any

25   specific questions on that?                            02:15PM

                                                              145

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. TORRES:

2        Q.    No.  Let me ask you this.  Do you have

3    information on that subject?

4            MR. ZELLER:  Asked and answered.

5            THE WITNESS:  I do not aside from what we        02:15PM

6    have here.

7    BY MS. TORRES:

8        Q.    What do you mean "aside from what we have

9    here"?

10       A.    Well, the documents that we went over.  I        02:15PM

11   mean, personally I do not have any.

12       Q.    Are any of the documents that we have here

13   acts, omissions, circumstances or evidence showing

14   that any products of MGA originated from or were

15   derived from or are based in any way upon products        02:15PM

16   of Mattel?

17           MR. ZELLER:  If you're going to phrase these

18   things like they're contention interrogatories, it's

19   completely improper.  If you want to ask him

20   questions about facts, you can do that.        02:16PM

21   BY MS. TORRES:

22       Q.    Do you have any --

23           MR. ZELLER:  Asking him to interpret a legal

24   document is not appropriate.

25   /   /   /        02:16PM

                                                              146

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. TORRES:

2        Q.   Do you have any knowledge of any acts by MGA

3    that you think show that any product of MGA is based

4    in any way on any product of Mattel?

5            MR. ZELLER:  First of all, Counsel, as you      02:16PM

6    know, he is here to talk about the aspects of that

7    from Diva Starz, not any and all products.

8            MS. TORRES:  No, that's what I'm asking.

9    Does he have any --

10           MR. ZELLER:  If you're asking about Diva        02:16PM

11   Starz, that's --

12           MS. TORRES:  It's a yes-or-no question.

13           MR. ZELLER:  Well, you're phrasing it again

14   in this overbroad, legal contention way and I have a

15   problem with that.                                      02:16PM

16   BY MS. TORRES:

17       Q.   Do you have any knowledge that's relevant in

18   any way to this topic other than on Diva Starz or

19   Mini Diva Starz?

20       A.   I don't think so.  I didn't work with Bryant  02:17PM

21   so I don't know.

22       Q.   Did you know Carter Bryant at all?

23       A.   I might have met him before but I don't know

24   him at all -- I don't know him well at all.

25       Q.   Do you recall ever having a conversation       02:17PM

                                                                    147

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   with him?

2       A.   No.

3       Q.   In your capacity as a representative of

4   Mattel, do you have any belief that any product from

5   MGA originated from Diva Starz?              02:17PM

6            MR. ZELLER:  First of all, he's not here to

7   give his beliefs as a representative.  As we've

8   already said, in terms of the designations the

9   people aren't here to connect the dots.  If you want

10  to ask him about the use of Brats in Diva Starz,     02:17PM

11  that's why he's here as you've been now told

12  repeatedly.  So you're trying to phrase it in this

13  legal contention way that's completely improper and

14  you're wasting everybody's time.  You know why he's

15  here and, you know, you should ask some questions     02:18PM

16  about it.

17           MR. PAGE:  Can I make a suggestion that

18  might help?

19           MR. ZELLER:  Yes.

20           MR. PAGE:  Will you make a representation     02:18PM

21  that he has testimony only of his own knowledge;

22  that he hasn't collected testimony from other people

23  at Mattel?  That would shorten it a whole lot.

24           MR. ZELLER:  What he said is that he's read

25  Steve Linker's testimony, he's looked at documents,   02:18PM
```

148

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   he's here to testify including based on what it is

2   that he knows based on his work as a development

3   designer on the use of the name Brats internally.

4   That's why he's here.  That's what I told you the

5   other day over the phone and that's what I've been          02:18PM

6   trying to tell, you know, Diana.

7           But I don't think it's appropriate to argue

8   with the witness about these sort of designations.

9   I don't intend to do that to your witnesses and I

10  don't think that's appropriate.  I mean, he's not --       02:18PM

11  he doesn't know how these things fit into the case.

12  If you want to ask him, you know, facts that he

13  knows on that subject, that's what you can do.

14          MR. PAGE:  Counsel, but my suggestion was

15  does she have to exhaust the universe of everything        02:19PM

16  Mattel might know that you might have told him that

17  he's going to testify to?

18          MR. ZELLER:  No, absolutely not.

19          MR. PAGE:  Of if she exhausts his personal

20  knowledge, is he done as a designee?                       02:19PM

21          MR. ZELLER:  Right.  Once -- right, exactly.

22  Because he -- and also maybe the other piece to be

23  clear about this is that we have designated a number

24  of other people -- Rene Pasko, Joanie Pratt -- and

25  those other people perhaps as well to talk about the       02:19PM

149