CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Did the packaging on the Mini Diva Starz

2    relate back to the pop stars that are identified

3    here:  Gwen Stefani, Brittany Spears, et cetera?

4           MR. ZELLER:  Can I have the question read

5    back, please?                                    04:26PM

6           (The pending question was read as follows:

7           "Q.   Did the packaging on

8           the Mini Diva Starz relate back

9           to the pop stars that are identified

10          here:  Gwen Stefani, Brittany Spears,    04:26PM

11          et cetera?")

12          MR. ZELLER:  The question is vague, outside

13    the designation.

14          THE WITNESS:  The packaging related to the

15    Diva Starz brand.                               04:26PM

16    BY MR. JENAL:

17      Q.   Did it reference, for example -- did it

18    reference Alexa as Brittany?

19      A.   No, it did not I don't believe.

20      Q.   Were you familiar with the marketing on the  04:27PM

21    Mini Diva Starz?

22          MR. ZELLER:  The question is vague.  Outside

23    the designation.

24          THE WITNESS:  Packaging is my specialty, not

25    marketing.                                      04:27PM

                                                        206

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. JENAL:
 2      Q.   Fair enough.  Were you familiar with the
 3   marketing for Mini Diva Starz?
 4      A.   No, I was not.
 5           MR. ZELLER:  Same objections.              04:27PM
 6   BY MR. JENAL:
 7      Q.   Not at all?
 8           MR. ZELLER:  The question is argumentative,
 9   asked and answered.
10           THE WITNESS:  No.                          04:27PM
11   BY MR. JENAL:
12      Q.   Ms. Pratte, you've referred a couple of
13   times to wanting to be able to look at the actual
14   packaging associated with the Diva Starz products.
15   I have marked as Exhibit 431 a somewhat less than     04:28PM
16   expert photograph of the packaging, at least the
17   front packaging in part of that, but what I'd really
18   like you to look at -- this is simply so we have
19   something to put in the record -- is the product
20   itself.  Will you take a look at that.                04:28PM
21           MR. ZELLER:  I object to the failure to
22   produce Exhibit 431 by MGA.
23           MR. JENAL:  Exhibit 431 is a
24   commercially-sold product.  It's not MGA's property
25   other than purchasing it at Target.                   04:29PM
                                                          207
```

Veritext National Deposition & Litigation Services
213 623-5005                    252

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JENAL:

2        Q.   Generally speaking, do you know whether that

3    would cause a problem to change the height of the

4    packaging?

5            MR. ZELLER:  Same objections.  Also, that        05:06PM

6    question assumes facts not in evidence.

7            THE WITNESS:  Every retailer is different.

8    It would depend on the retailer.

9    BY MR. JENAL:

10       Q.   When the decision -- do you recall the         05:06PM

11   decision being made to change the height of the

12   packaging in going to the Fashion Nikki which is

13   reflected in Exhibit 434?

14       A.   I don't recall why the height was changed.

15       Q.   Do you recall any discussion at the time       05:06PM

16   that changing the height could cause problems for

17   retailers?

18           MR. ZELLER:  Same objections as before.

19           THE WITNESS:  I don't recall why the height

20   was changed.                                            05:07PM

21   BY MR. JENAL:

22       Q.   That wasn't my question.  My question was:

23   Do you recall any discussion that changing the

24   height could cause problems for retailers?

25           MR. ZELLER:  Same objections.                   05:07PM

                                                             222

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           THE WITNESS:  No, I don't recall any

2    discussion.

3    BY MR. JENAL:

4        Q.   Do you recall any discussion that changing

5    the height of the packaging could cause problems for   05:07PM

6    shipping the product from where it was manufactured?

7           MR. ZELLER:  Same objections.

8           THE WITNESS:  I don't recall any discussion

9    that changing the height of the package would cause

10   problems.                                               05:07PM

11          MR. JENAL:  Very well.  I think I'm done.

12   Thank you for your time and your patience.  Unless

13   Mr. Page has something further....

14          MR. PAGE:  Just -- no, I have nothing

15   further.                                                05:07PM

16          MR. JENAL:  We're off the record.

17          VIDEO OPERATOR:  This is the end of tape 3

18   and concludes Volume 1 of the deposition of Joni

19   Pratte.  We're off the record at 5:07 p.m.

20          (TIME NOTED:  5:07 P.M.)

21

22

23

24

25

                                                           223

# Exhibit 8

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                                    Certified Copy

5    ------------------------------

6    MATTEL, INC., a Delaware        )

7    Corporation,                    )

8              Plaintiff,            )

               vs.                   ) No. CV 04-9059

9    CARTER BRYANT, an individual;   ) NM (RNBx)

10   and DOES 1 through 10,          )

11   Inclusive,                      )

12             Defendants.           )

13   ------------------------------)

14   (COMPLETE CAPTION ON NEXT PAGE.)

15

16       CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18       Videotaped 30(b)(6) deposition of SANDY

19   YONEMOTO, taken at 400 South Hope Street,

20   Los Angeles, California, commencing at

21   10:19 A.M., Wednesday, May 30, 2007,

22   before Wendy S. Schreiber, CSR No. 3558,

23   RPR, CLR.

24

25   PAGES 1 - 188

                                                    1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4    --------------------------------

 5    MATTEL, INC., a Delaware          )

 6    Corporation,                      )

 7              Plaintiff,              )

 8              vs.                     ) No. CV 04-9059

 9    CARTER BRYANT, an individual;     )    NM (RNBx)

10    and DOES 1 through 10,            )

11    Inclusive,                        )

12              Defendants.            )

13    ------------------------------    )

14    CARTER BRYANT, on behalf of       )

15    himself, all present and          )

16    former employees of Mattel,       )

17    Inc., and the general public,     )

18              Counter-Claimants,     )

19              vs.                     )

20    MATTEL, INC., a Delaware          )

21    Corporation,                      )

22              Counter-Defendant. )

23    --------------------------------

24

25
```

2

CONFIDENTIAL - ATTORNEYS' EYES O...

```
1    APPEARANCES OF COUNSEL:

2

3

4        FOR THE PLAINTIFF:

5

6        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

7        BY:  MICHAEL ZELLER, ESQ.

8        865 South Figueroa Street, Tenth Floor

9        Los Angeles, California 90017

10       (213) 443-3000

11       mzeller@quinnemanuel.com

12

13                    -AND-

14

15       MATTEL, INC.

16       BY:  MICHAEL MOORE, ESQ.

17       333 Continental Boulevard

18       El Segundo, California 90245-5012

19       (310) 252-2000

20       michael.moore@mattel.com

21

22

23

24

25
```

3

257

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR THE DEFENDANT AND COUNTERCLAIMANT

 4        CARTER BRYANT:

 5

 6            KEKER & VAN NEST LLP

 7            BY:  CHRISTA MARTINE ANDERSON, ESQ.

 8            710 Sansome Street

 9            San Francisco, Califonria 94111-1704

10            (415) 391-5400

11            Canderson@kvn.com

12

13

14        FOR DEFENDANT MGA ENTERTAINMENT, INC.:

15

16            O'MELVENY & MYERS LLP

17            BY:  JAMES JENAL, ESQ.

18            400 South Hope Street

19            Los Angeles, California 90071-2899

20            (213) 430-6000

21            jjenal@omm.com

22

23        ALSO PRESENT:

24

25            RYAN GULINO, VIDEO OPERATOR
```

4

CONFIDENTIAL - ATTORNEYS' EYES O...

```
1      Q.   Who was present during the first session?

2      A.   Mr. Zeller.

3      Q.   Anybody else?

4      A.   It was mainly Mr. Zeller and myself.

5      Q.   Did anyone join during part of the meeting?   10:25AM

6      A.   Mr. Moore.

7      Q.   I'd just like a "yes" or "no" to the

8  following question.  Did you review any documents in

9  preparing for your deposition during that first

10  session?                                              10:25AM

11     A.   Yes.

12     Q.   Did any of those documents refresh your

13  recollection?

14     A.   Yes.

15     Q.   Which documents did you see during the first  10:26AM

16  session that refreshed your recollection?

17     A.   I looked at the Employee Confidential

18  Information and Inventions Agreement, the Conflict

19  of Interest agreement, Proprietary Information

20  Checkout form and the Exit Interview Report.          10:26AM

21     Q.   Any other documents you recall that

22  refreshed your recollection in that first session?

23     A.   That's all I can think of right now.

24     Q.   The Employee Confidentiality agreement that

25  you referenced earlier in your answer, was it signed  10:26AM
```

10

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Paula's depo was 405.  Do with that as you will.  I

2   just want to get us up to par.

3        MS. ANDERSON:  Given the abundance of

4   numbers and the shortage of paper in the world we'll

5   keep the sticker on there and move forward with 413.  10:30AM

6    Q.   Drawing your attention to Exhibit 413,

7   Ms. Yonemoto, have you seen this document before?

8    A.   Briefly, yes.

9    Q.   Do you understand that you've been

10  designated to testify as a 30(b)(6) representative      10:30AM

11  on certain topics in this deposition notice?

12   A.   Yes.

13   Q.   And in particular -- and take your time

14  looking at this exhibit -- but is it true that

15  you're here as a representative on topics 2 through    10:30AM

16  7, 22, 23, 54, 55 and 56?

17   A.   I do know that I'm here to represent the

18  facts in this matter so I can speak to that.

19   Q.   But in particular -- and, again, take your

20  time -- but is it your understanding that you're       10:31AM

21  here to testify as a 30(b)(6) representative on

22  topics 2 through 7, 22, 23, 54 to 56?

23        MR. ZELLER:  I'm not sure if 54 is -- when

24  it says "job summary report," I'm not sure what

25  document that is offhand.                              10:31AM

14

CONFIDENTIAL - ATTORNEYS' EYES O____

1        MS. ANDERSON:  I can show it to you.

2        MR. ZELLER:  We can perhaps do that during a

3   break but I'm not sure what this is referring to so

4   it may or may not be within the scope of what she's

5   being designated on.                              10:31AM

6        MS. ANDERSON:  We'll take it up at a break.

7   We can look at it.

8     Q.   Aside from 54 which we'll address

9   separately, do you understand that you're the

10  representative on the other topics I listed?        10:31AM

11    A.   Can you read those numbers a little bit

12  slower for me so I can take a look?

13    Q.   Two through 7 which is grouped together on

14  the page you're looking at.

15    A.   And what else, I'm sorry?                     10:32AM

16    Q.   Twenty-two, 23 and then 55 and 56 for now.

17    A.   I can speak to the facts as outlined.

18    Q.   Are you here to testify based on your

19  personal knowledge of events that might relate to

20  those subjects?                                     10:32AM

21    A.   I'm here based on what our business records

22  have shown related to this case.

23    Q.   Besides reviewing business records, did you

24  do anything else to educate yourself about the

25  topics that we just covered in the deposition        10:33AM

15

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   notice?
 2       A.   I'm not sure what you mean by "anything
 3   else."
 4       Q.   For example, did you go interview other
 5   Mattel employees to find out what they might know      10:33AM
 6   about those other topics?
 7       A.   No, I did not.
 8       Q.   Besides the documents that you identified in
 9   regard to your prep sessions, did you review any
10   other business records to prepare for your            10:33AM
11   deposition today?
12           MR. ZELLER:  This is asked and answered.
13           THE WITNESS:  I reviewed the documents we
14   discussed.
15   BY MS. ANDERSON:                                       10:33AM
16       Q.   And no other ones, right?
17       A.   No.
18       Q.   Did you do anything to assist lawyers in
19   preparing documents in this case?
20           MR. ZELLER:  The question is vague.           10:33AM
21           THE WITNESS:  I'm not sure, "assist."
22   BY MS. ANDERSON:
23       Q.   Did you do anything to help lawyers in the
24   process of collecting documents in regard to
25   producing things in this case?                         10:34AM
```

16

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   as Exhibit 23 in this case.  Have you ever seen this
 2   document before?
 3          MR. ZELLER:  Do you have an extra copy of
 4   that?
 5          MS. ANDERSON:  Yes.  Sorry about that.        10:36AM
 6          THE WITNESS:  I've not seen this particular
 7   document, no.
 8      Q.   Do you have any knowledge about the
 9   circumstances under which Mr. Bryant came to work
10   for Mattel in or around 1995?                        10:36AM
11      A.   No, I do not.
12      Q.   Do you have any knowledge about Mattel's
13   practices in regard to orientation of employees in
14   or around 1995?
15      A.   No, I did not at that time.                  10:36AM
16      Q.   When did you first begin to work for Mattel?
17      A.   1995.
18      Q.   What month did you start working at Mattel?
19      A.   It was June of 1995.
20      Q.   What was your first position with Mattel?    10:37AM
21      A.   It was in Human Resources.  I can't recall
22   my exact title.  I believe it was administrator, HR
23   administrator.
24      Q.   What office did you report to?  What
25   location of Mattel did you report to when you first  10:37AM
                                                            18
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   You can put it aside.

 2           (Exhibit 24 previously marked.)

 3   BY MS. ANDERSON:

 4      Q.   I'm showing you what has been marked as

 5   Exhibit 24 to your deposition -- actually, to          10:51AM

 6   another deposition in this case but you get the

 7   privilege of looking at it again.  Have you ever

 8   seen Exhibit 24 before?

 9      A.   No, I haven't.

10      Q.   In preparing for your deposition today did    10:51AM

11   you gather any information surrounding the

12   circumstances under which Exhibit 24 was signed?

13      A.   No, I did not.

14      Q.   Did you -- strike that.

15           Do you have any information about any          10:52AM

16   statements Mattel may have made to Mr. Bryant in

17   connection with the signing of Exhibit 24 before

18   you?

19      A.   No, I do not.

20      Q.   Do you have any information about any          10:52AM

21   statements that Mr. Bryant might have made in

22   connection with his coming to work for Mattel in

23   1995?

24      A.   No, I do not.

25           (Deposition Exhibit 414 was marked             10:52AM
                                                                 28
```

CONFIDENTIAL - ATTORNEYS' EYES ON

```
 1        for identification and is annexed hereto.)
 2   BY MS. ANDERSON:
 3        Q.   I'm going to show you what we're going to
 4   mark as Exhibit 414 to your deposition.  Have you
 5   ever seen Exhibit 414 before?                        10:53AM
 6        A.   Yes, the form looks familiar.
 7        Q.   Did this document refresh your recollection
 8   in any way in your preparation for your deposition
 9   today?
10        A.   No.                                         10:53AM
11        Q.   Is that your signature on the document?
12        A.   Yes, it is.
13        Q.   Did you sign this document on March 10th,
14   1997?
15        A.   That is the date there, yes.                10:53AM
16        Q.   What is Exhibit 414?
17        A.   If my memory serves me correct, we called
18   this a turn-around document during that time and it
19   was used for transactional changes to an employee's
20   record.                                               10:54AM
21        Q.   What transactional change does this Exhibit
22   414 reflect?
23        A.   It's on the topic of a personal leave of
24   absence.  The employee's first day worked would have
25   been January 5th, '98.  The actions were to cancel    10:54AM
                                                              29
```

CONFIDENTIAL - ATTORNEYS' EYES O...

1   the personal leave.  The employee is instead going

2   on a reduced-hour schedule.

3       Q.   I saw that you are reading from the document

4   which I thank you for but I want to know exactly

5   what you recall and what you're sort of just reading      10:54AM

6   from a document.  So I'm going to ask you a few

7   questions to find that out.

8           First of all, do you recall having filled

9   this form out in 1997?

10      A.   No.                                              10:55AM

11      Q.   Do you recall having any communications with

12  anyone at Mattel about making a transactional change

13  to Mr. Bryant's record back in 1997?

14      A.   No, I don't recall.

15      Q.   Is it your -- strike that.                       10:55AM

16          Is all of the handwriting on this document

17  your handwriting?

18      A.   No.

19      Q.   So just to make sure that I'm clear on what

20  you do or do not recall, do you have any              10:55AM

21  recollection of collecting any data for the purposes

22  of filling out Exhibit 414?

23      A.   I do not recall.

24      Q.   In 1997 when you filled out Exhibit 414 did

25  you have any regular business practice about what    10:55AM

                                                              30

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   No.   I would have taken direction from my

2    boss at the time.

3      Q.   But do you understand that Exhibit 414

4    relates to a transactional change concerning Carter

5    Bryant's employee record?                          10:57AM

6      A.   Yes, I see his name on the form.

7      Q.   As you sit here today, do you have any

8    knowledge about any cancellation of personal leave

9    by Carter Bryant in or around 1997?

10         MR. ZELLER:   When you say any information,   10:57AM

11   are you asking about her recollection at this point

12   or are you asking her her understanding of the

13   document?

14         MS. ANDERSON:   Let me be clear, yes.

15     Q.   I know you're here as a 30(b)(6)            10:57AM

16   representative so -- and I know you've said you

17   don't have any recollection of anything -- any sort

18   of discussions you might have had about filling out

19   this form or the like but what I'm trying to figure

20   out is perhaps in your work preparing to become a   10:58AM

21   30(b)(6) representative you might have gathered some

22   documents or otherwise information about Mattel's

23   knowledge about the subject of personal leave or

24   going on a reduced schedule.   You may not.   I'm just

25   trying to figure out what you know and what you      10:58AM

                                                            32

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    don't know.

2         With that in mind, aside from what one can

3    plainly read from the face of Exhibit 414, do you

4    have any information about the circumstances under

5    which Carter Bryant's personal leave was canceled in    10:58AM

6    or around 1997?

7    A.   No, I do not.

8    Q.   And aside from what one can simply read from

9    the face of Exhibit 414, do you have any information

10   about circumstances under which Mr. Bryant may have    10:58AM

11   gone on a reduced-hour schedule?

12        MR. ZELLER:   Other than what she talked

13   about in terms of the procedures?

14        MS. ANDERSON:   Yes, other than what you've

15   already testified to.                                   10:59AM

16        THE WITNESS:   No, I do not.

17        (Exhibit 25 previously marked.)

18   BY MS. ANDERSON:

19   Q.   I'm going to show you what has been marked

20   previously as Exhibit 25.   Have you ever seen         10:59AM

21   Exhibit 25 before?

22   A.   Yes, I have.

23   Q.   When was the first time you saw Exhibit 25?

24   A.   A couple of weeks ago.

25   Q.   Who is Teresa Newcomb?                             11:00AM

33

268

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    Ms. Newcomb works in our Corporate Staffing

2   department.

3      Q.    Do you understand that to be her signature

4   on Exhibit 25?

5      A.    Yes.                                      11:00AM

6      Q.    Do you know what her position was in January

7   of 1999?

8      A.    No, I couldn't tell you exactly.

9      Q.    Do you have any knowledge about -- strike

10  that.                                              11:00AM

11         Do you have any knowledge about the rehiring

12  of Carter Bryant in or around January of 1999?

13     A.    No, I do not.

14     Q.    Just to be clear, as a 30(b)(6)

15  representative did you do anything to gather any   11:00AM

16  information about the circumstances under which

17  Carter Bryant was rehired in January of 1999?

18     A.    No, I did not.

19     Q.    Did you -- strike that.

20         Do you have knowledge about Mattel's        11:01AM

21  practices with respect to having employees sign

22  agreements in the form that is reflected in Exhibit

23  25?

24     A.    Can you clarify what you mean by -- I'm not

25  sure I understand your question.                   11:01AM

                                                          34

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.    During what period of time did Mattel use
2   this form of agreement to onboard employees?
3           MR. ZELLER:  Just so I'm clear, I haven't
4   been objecting to this being outside the scope of
5   the designation since I assume you're looking to          11:03AM
6   find out what her areas of knowledge are but so it's
7   clear, the onboarding procedures as she talks about
8   is not within the scope of her designation, but you
9   can go ahead.
10          THE WITNESS:  Okay.  Beyond the fact that          11:03AM
11  this form has been dated by Mr. Bryant in '99 I can
12  speak to the fact that it was used in '99, but I
13  don't have full knowledge as to exactly when this
14  form was in use.
15          MS. ANDERSON:  You know, I don't want to          11:03AM
16  get into a long colloquy on the record but I do
17  think this relates to the subject matters we're
18  talking about and I'm trying to figure out what her
19  scope of knowledge is.  I know you have an objection
20  and you've stated it and I just want you to know          11:03AM
21  that I'm being silent to try to move it along, not
22  because I sort of acquiesce in your position.
23          MR. ZELLER:  Well, I don't want to get into
24  a colloquy but just two quick points.
25          No. 1, we had extensive discussions, and I          11:03AM
```

36

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    know this was before you were involved, with Carter

2    Bryant's counsel about the scope of these topics and

3    everything else because they're phrased in legal

4    conclusionary terms and so we had extensive

5    discussions and negotiations about what the meaning          11:04AM

6    of those topics were.

7           No. 2, we have said that Sandy is here to

8    talk about the exit interview.  I mean, that's what

9    she participated in with respect to Mr. Bryant.

10   You're, again, free to explore any areas you want          11:04AM

11   but just so it's clear, we have designated her

12   because she has information about issues that are

13   part and parcel of those topics as they were

14   negotiated and narrowed and understood through that

15   process.                                                   11:04AM

16          MS. ANDERSON:  Sure, and I understand there

17   may come a day when we have to fight about it but I

18   just want you to know I understand you're putting

19   your objections on the record.  I'm still going to

20   ask the questions.                                         11:04AM

21          MR. ZELLER:  Sure.

22          MS. ANDERSON:  I'm not going to argue back

23   to you for the rest of the deposition about scope.

24   It's something we can argue about later.

25          MR. ZELLER:  I understand.                          11:04AM

                                                                    37

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. ANDERSON:

2       Q.   So talking about Mattel and the use of the

3   form that's in Exhibit 25, do you have knowledge

4   based on your long experience in the HR department

5   about what period of time did Mattel use the form          11:05AM

6   that's reflected in Exhibit 25?

7           MR. ZELLER:  Asked and answered.

8           THE WITNESS:  As I stated previously, I can

9   speak to the fact that the form was used in 1999

10  because Mr. Bryant did date it, but I don't have the        11:05AM

11  knowledge of the time frame from beginning to end of

12  when it was used.

13  BY MS. ANDERSON:

14      Q.   Can you give me any reasonable estimation of

15  the time period during which the form that's                11:05AM

16  reflected in Exhibit 25 was used by Mattel?

17          MR. ZELLER:  Asked and answered.

18          THE WITNESS:  No, I cannot.

19  BY MS. ANDERSON:

20      Q.   Do you have any recollection as you sit here       11:05AM

21  today about when, if ever, Mattel stopped using

22  Exhibit 25's format and moved on to a different

23  format for Confidential Information and Inventions

24  Agreements?

25      A.   Can you restate that question?                     11:05AM

38

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Sure.  Do you have any recollection based on

2  your experience in the HR department as you sit here

3  today about when, if ever, Mattel stopped using the

4  form that we see in Exhibit 25 and moved on to using

5  a different form with new employees?          11:06AM

6    A.    I believe they're still using the form as

7  it's titled but I believe there has been at least

8  one update since this form, this version.

9    Q.    When was that update?

10   A.    I really don't know the exact date.      11:06AM

11   Q.    What is your best estimation of the date?

12   A.    I honestly could not tell you.

13   Q.    Do you believe it was within the last five

14  years?

15   A.    I'd have to do some research on my own      11:06AM

16  before I could answer that accurately for you.

17   Q.    Did you participate at all in the decision

18  to change the form?

19   A.    No, I did not.

20   Q.    Are there any instances that you are aware   11:06AM

21  of in which current employees were asked to sign a

22  new and different form of Confidential Information

23  and Inventions Agreement?

24   A.    No.

25         (Exhibit 26 previously marked.)            11:07AM

                                                        39

BY MS. ANDERSON:

Q. I'm showing you what has been marked -- actually, I have a better copy for you. Let me not strain your eyes with this squishy faxed version because, trust me, I think I did eye damage last night trying to look at it. 11:07AM

Now I am showing you a more legible version of Exhibit 26. Have you ever seen Exhibit 26 before?

A. Yes, I have. 11:08AM

Q. When was the first time that you saw Exhibit 26?

A. Approximately a couple of weeks ago.

Q. Do you have any knowledge about the circumstances under which Exhibit 26 was signed? 11:08AM

A. No, I do not.

Q. Do you have any knowledge about any statements made by Mattel to Mr. Bryant in connection with Exhibit 26?

A. No, I do not. 11:08AM

Q. Do you have any knowledge of any statements made by Mr. Bryant to Mattel in connection with Exhibit 26?

A. No, I do not.

Q. Drawing your attention to the language 11:08AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   No, I don't think so.

2      Q.   As you can see from the cover of Exhibit

3  417, this document is entitled "Plaintiff Mattel,

4  Inc.'s Objections and Supplemental Responses to

5  Defendant's First Set of Interrogatories."  Do you        12:02PM

6  see that?

7      A.   Yes.

8      Q.   I'm going to just ask you a few questions

9  about some of the information that Mattel included

10  in these responses to see if you have any knowledge       12:02PM

11  of what is stated therein and if you don't you can

12  tell me that.  Okay?

13      A.   Okay.

14      Q.   Drawing your attention to page 39 which for

15  some mysterious reason doesn't have 39 on it but you       12:02PM

16  can find it by locating page 40 --

17      A.   Yes, I've got it.

18      Q.   -- do you see where on this exhibit

19  following interrogatory No. 10 it says "State all

20  facts supporting YOUR contention that Bryant failed        12:02PM

21  to meet his obligations under the MATTEL "Employee

22  Confidential and Inventions Agreement" attached to

23  the Complaint as Exhibit 'A.'"

24          Do you see that?

25      A.   I see that.                                        12:02PM

                                                               73

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Mattel stated some things in response to

2    that question and I want to see if you know anything

3    about it.

4         Drawing your attention to page 42 and it

5    actually starts on the previous page, there's a          12:03PM

6    paragraph that starts "Although discovery and

7    Mattel's investigation are on-going..."  Do you see

8    that?

9    A.   What page are you on?

10   Q.   41, line 17.                                         12:03PM

11   A.   Yep, I see that.

12   Q.   Mattel lists a number of things and it says

13   on line 23 "...Bryant testified that," and you see a

14   No. 1?

15   A.   Yes.                                                 12:03PM

16   Q.   And a No. 2?

17   A.   Yes.

18   Q.   And a No. 3?

19   A.   Yes.

20   Q.   Go to the next page, 3(a).  Mattel's                 12:03PM

21   response states "Obtaining information about a

22   Mattel hair vendor, which Bryant then contacted for

23   his own and MGA's benefit..."  Do you see that?

24   A.   I do see that.

25   Q.   Do you have any knowledge about Mr. Bryant           12:03PM

74

```
 1    allegedly obtaining information about a Mattel hair

 2    vendor?

 3         A.   No, I do not.

 4         Q.   And then item (b) right below there --

 5         A.   Okay.                                   12:04PM

 6         Q.   -- it says "identifying others who Bryant

 7    knew as a consequence of his Mattel employment..."

 8    Do you see that?

 9         A.   Yes, I do.

10         Q.   Do you have any information about Mr. Bryant 12:04PM

11    contacting people that he knew as a consequence of

12    his Mattel employment?

13         A.   I'm sorry, go ahead.

14         Q.   Go ahead.

15         A.   I want to make sure I answer the question   12:04PM

16    correctly.

17         Q.   I'll restate it.

18              Do you have any information about Mr. Bryant

19    contacting people that he knew as a consequence of

20    his Mattel employment and using that information in   12:04PM

21    connection with development of the Bratz dolls?

22         A.   No, I do not.

23         Q.   And then item 4 right below there it says

24    "he worked on what Bryant characterized as a 'test

25    project' to aid and assist MGA."  Do you see that?   12:05PM
```

75

277

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    Yes.

2      Q.    Do you have any information about Mr. Bryant

3  allegedly working on a test project separate and

4  apart from the work that he was doing for Mattel

5  during the time of his employment from Mattel?          12:05PM

6          MR. ZELLER:  The question is vague.

7          THE WITNESS:  When you say "do you have any

8  information," can you clarify what you mean by that?

9  BY MS. ANDERSON:

10     Q.    Do you know of any facts that relate to       12:05PM

11  that?  Let me restate it so it's clear.

12          Do you have any knowledge about Mr. Bryant

13  allegedly working on a test project separate and

14  apart from the work that he did for Mattel during

15  the time of his employment with Mattel?               12:05PM

16          MR. ZELLER:  The question is still vague.

17          THE WITNESS:  Other than what -- the fact

18  that the complaint was brought up, that's all the

19  knowledge that I have.

20  BY MS. ANDERSON:                                       12:05PM

21     Q.    When you say "the complaint was brought up,"

22  are you talking about the complaint that was filed

23  in connection with this case?

24     A.    Yes.

25     Q.    So other than what it says on the face of     12:06PM

76

278

CONFIDENTIAL - ATTORNEYS' EYES O___

1    the complaint you don't know any other facts,

2    correct?

3         A.    That's correct.

4             MR. ZELLER:  As it relates to this?

5             MS. ANDERSON:  As it relates to this          12:06PM

6    subject, yes.

7         Q.    And then under item 5 it says "he entered

8    into his agreement with MGA during the term of his

9    Mattel employment and used Mattel resources in

10   connection with the negotiation and execution of       12:06PM

11   that agreement."  Do you see that?

12        A.    I see that, yes.

13        Q.    Do you have any knowledge of Mr. Bryant

14   using Mattel resources in connection with any

15   MGA-related project?                                    12:06PM

16        A.    Again, other than the complaint itself, no,

17   I do not.

18        Q.    Do you have any knowledge of any

19   communications Mr. Bryant may have had with Ivy Ross

20   about his departure from Mattel's employment?          12:07PM

21        A.    No, I do not.

22        Q.    And aside from what you've written expressly

23   on the Exit Interview form, do you know of any other

24   statements that Mr. Bryant made to you during the

25   exit interview?                                         12:07PM

                                                              77

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           MR. ZELLER:  Can I have the question read

 2    back, please.

 3           (The pending question was read as follows:

 4             "Q.   And aside from what

 5       you've written expressly on the Exit        12:07PM

 6       Interview form, do you know of any

 7       other statements that Mr. Bryant made

 8       to you during the exit interview?")

 9           MR. ZELLER:  The question is vague.  Also

10    asked and answered.                            12:07PM

11           THE WITNESS:  I don't have a personal

12    recollection of that meeting.  I would just defer to

13    the business records.

14    BY MS. ANDERSON:

15       Q.   In regard to that exit interview -- and feel 12:08PM

16    free to pull it out again if you would like to --

17    did you paraphrase what Mr. Bryant said to you or

18    were you writing verbatim what he said to you?

19       A.   I did paraphrase.

20       Q.   Do you know what you paraphrased and what    12:08PM

21    you didn't?   Strike that.  Let me ask it in a less

22    compound way.

23           Do you believe you paraphrased every

24    response that you indicated you received from

25    Mr. Bryant on the exit interview form?             12:08PM
                                                            78
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       A.   You know, I don't have a personal
 2  recollection of that meeting so I couldn't tell you
 3  for sure.
 4       Q.   Would you have any idea or would you just be
 5  guessing?                                        12:08PM
 6            MR. ZELLER:  Objection to "any idea."
 7            THE WITNESS:  I don't have a personal
 8  recollection of that meeting so I couldn't tell you.
 9            MS. ANDERSON:  Why don't we take a quick
10  break for lunch and then come back and we'll not be    12:09PM
11  much longer.
12            VIDEO OPERATOR:  This is the end of tape 1.
13  We are off the record at 12:09 p.m.
14
15       (At the hour 12:09 p.m. the luncheon
16    recess was taken.)
17
18
19
20
21
22
23
24
25
                                                        79
```

281

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    receives the information from Human Resources.

 2    BY MS. ANDERSON:

 3       Q.   Aside from what you've already testified to

 4    today, do you have any knowledge about any of the

 5    transaction changes that are reflected in Exhibit      01:16PM

 6    418?

 7       A.   Can you just restate -- so I answer it

 8    correctly can you please just restate your question?

 9       Q.   Just to be clear, there's a preface to it.

10    I'm not asking you to restate everything you've         01:16PM

11    already said today.

12       A.   Right.

13       Q.   With that in mind, aside from what you have

14    already testified to today, do you have any

15    knowledge about any of the transaction changes that    01:17PM

16    are reflected in Exhibit 418 concerning Carter

17    Bryant?

18       A.   I don't have any personal memory of that

19    other than the business records of which we've

20    discussed.                                              01:17PM

21       Q.   Does Mattel conduct code of conduct --

22    strike that.

23            During the period of time between 1995 and

24    the end of 2000, did Mattel conduct code of conduct

25    training with respect to its employees?                01:17PM
```

84

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. ZELLER:  The question is vague, outside

2  the designation.

3          THE WITNESS:  Yes, Mattel did have code of

4  conduct training.

5  BY MS. ANDERSON:                              01:17PM

6      Q.   Do you have any knowledge about what kind of

7  training was involved in the code of conduct

8  training provided by Mattel to its employees during

9  that period?

10     A.   There was a document to review.      01:18PM

11     Q.   What was that document called?

12     A.   I can't give you an exact title because I

13  would need to see it.  It's been -- it's been

14  awhile.  I can't recall the exact title of the

15  document other than code of conduct.          01:18PM

16     Q.   Besides providing a document to the

17  employees during this period, are you aware of any

18  other kind of code of conduct training that Mattel

19  conducted with respect to its employees during that

20  time period?                                  01:18PM

21         MR. ZELLER:  Outside the designation, vague.

22         THE WITNESS:  I don't recall.

23  BY MS. ANDERSON:

24     Q.   Do you have any knowledge whether Carter

25  Bryant received any code of conduct training in the  01:19PM

85

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    course of his employment at Mattel?

2              MR. ZELLER:  Outside the designation.

3         THE WITNESS:  Mr. Bryant along with all

4    employees would have received code of conduct -- the

5    code of conduct document while he was at Mattel.      01:19PM

6    BY MS. ANDERSON:

7         Q.   When you say that Mr. Bryant would have

8    received the code of conduct training -- strike

9    that.

10             When you say that Mr. Bryant would have      01:19PM

11   received the code of conduct document while he was

12   at Mattel, on what do you base that statement?

13        A.   That was our practice.  That would have been

14   a company practice to provide that to our employees.

15        Q.   Who do you understand to have been           01:19PM

16   responsible for providing that document to Mattel

17   employees during the time period 1995 through the

18   end of 2000?

19             MR. ZELLER:  The question is overbroad,

20   outside the designation.                               01:20PM

21             THE WITNESS:  I know the code of conduct was

22   a partnership between our Legal and HR department so

23   I can't recall the exact disseminator of the

24   information.

25   BY MS. ANDERSON:                                       01:20PM

86

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Do you have an understanding based on your

2   experience at Mattel as to when employees typically

3   received a copy of this code of conduct document

4   that you refer to?

5           MR. ZELLER:  Outside the designation.        01:20PM

6           THE WITNESS:  Are you referring to a certain

7   time frame?

8   BY MS. ANDERSON:

9      Q.   I'm talking about the time period 1995 to

10  the end of 2000, and I'm trying to assess whether     01:21PM

11  there is some particular juncture during an

12  employee's employment at which Mattel would

13  typically give this document to the employee.

14          MR. ZELLER:  Same objections.

15  BY MS. ANDERSON:                                       01:21PM

16     Q.   Do you understand my question?

17     A.   Yes.  I don't recall at what time -- well, I

18  do know that it was provided.  I don't recall

19  exactly at what point it was normally distributed.

20     Q.   So you're not sure if it was at the very       01:21PM

21  inception of the employment, correct?

22          MR. ZELLER:  Same objections.

23          THE WITNESS:  I'd have to go back and check.

24  I don't recall exactly the time frame of when it was

25  provided for employees.                                01:22PM

                                                           87

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Do you have any understanding about Mattel's

2  practices with respect to following up on

3  information provided in a Conflict of Interest

4  Questionnaire at the inception of employment during

5  the period 1998 through the end of 2000?        01:57PM

6        MR. ZELLER:  The question is vague, outside

7  the scope of the designation.

8        THE WITNESS:  That would not be part of my

9  responsibilities at that time.

10 BY MS. ANDERSON:                                01:58PM

11   Q.   Do you know who, if anyone, was responsible

12 for that?

13       MR. ZELLER:  Outside the designation, vague,

14 and this is asked and answered as well.

15       THE WITNESS:  This Conflict of Interest       01:58PM

16 Questionnaire is provided during the onboarding

17 process and is handled by our -- at the time was

18 handled by our Corporate Staffing department who

19 would have been the responsible party.

20 BY MS. ANDERSON:                                01:58PM

21   Q.   And when I asked you earlier whether you had

22 any understanding about Mattel's practices with

23 respect to following up on information in these

24 forms, you said that it was not part of your

25 responsibility at the time, correct?            01:58PM

109

CONFIDENTIAL - ATTORNEYS' EYES O   (

```
 1              MR. ZELLER:  She's asked and answered.

 2              THE WITNESS:  With regard to the Conflict of

 3    Interest Questionnaire?

 4    BY MS. ANDERSON:

 5       Q.   Right.                                    01:58PM

 6       A.   Yes, this is part of the onboarding forms

 7    that Corporate Staffing disseminated to the

 8    employee.

 9       Q.   Whether or not it was part of your

10    responsibility, do you have knowledge about the    01:59PM

11    practices that were followed in that regard?

12              MR. ZELLER:  This is asked and answered.

13              THE WITNESS:  I couldn't speak to that

14    accurately.  I was not part of that -- I wasn't part

15    of the Corporate Staffing group.                  01:59PM

16    BY MS. ANDERSON:

17       Q.   I'd just like to know if you have any

18    knowledge about Mattel's practices in that regard

19    during that time period.

20              MR. ZELLER:  The question is vague, asked  01:59PM

21    and answered.

22              MS. ANDERSON:  Strike that.  Let me rephrase

23    that.

24       Q.   Did you ever observe what Mattel did with

25    respect to following up on information in conflict  01:59PM
```
110

CONFIDENTIAL - ATTORNEYS' EYES O

1   of interest questionnaires in the period 1998

2   through 2000?

3           MR. ZELLER:  The question is vague.

4           THE WITNESS:  I personally did not have

5   involvement in that area.                          02:00PM

6   BY MS. ANDERSON:

7       Q.   I just don't want us speaking around each

8   other because when you say "I didn't have

9   involvement," I don't know exactly what you're

10  saying.                                            02:00PM

11      A.   Okay.

12      Q.   Do you -- strike that.

13           Is it correct to say that you do not know

14  what Mattel did with respect to following up on

15  information in conflict of interest questionnaires  02:00PM

16  during the period 1998 through 2000?

17          MR. ZELLER:  The question is vague.

18          THE WITNESS:  That's not exactly accurate.

19  I would say that this form was -- again, not to keep

20  repeating but is part of the ongoing process of the  02:00PM

21  employee.  It was the responsibility of the

22  Corporate Staffing department to note any of the

23  issues that you're talking about and to -- it would

24  have been under their umbrella of responsibility.

25  BY MS. ANDERSON:                                    02:00PM

                                                        111

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Besides what you have already told me, do
 2  you have any more specific information about what
 3  Mattel would do in following up on such information?
 4          MR. ZELLER:  The question is vague.
 5          THE WITNESS:  What do you mean what Mattel    02:01PM
 6  would do?
 7  BY MS. ANDERSON:
 8      Q.   For example, if Mattel saw something of
 9  concern on a filled-out questionnaire, would that
10  get handled in a different way than a questionnaire   02:01PM
11  that raised no concerns for Mattel, et cetera?  I'm
12  just trying to figure out what is the extent of your
13  knowledge about how these things were handled during
14  that time period.
15          MR. ZELLER:  Outside the designation, lacks   02:01PM
16  foundation.
17          MS. ANDERSON:  That wasn't a question.
18      Q.   My question is:  Besides what you've already
19  told me, do you have any more specific information
20  to provide about what Mattel's practices were in     02:01PM
21  following up on information reflected in conflict of
22  interest questionnaires during the period 1998
23  through 2000?
24          MR. ZELLER:  The question is vague, asked
25  and answered.                                         02:01PM
```
                                                            112

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  Again, I don't have any other
 2   information other than it would start with the
 3   Corporate Staffing department.
 4            MS. ANDERSON:  No further questions.
 5            MR. JENAL:  Let's go off the record, please. 02:02PM
 6            VIDEO OPERATOR:  We're off the record at
 7   2:02.
 8                      (Brief recess.)
 9            VIDEO OPERATOR:  We're back on the record
10   at 2:12 p.m.                                        02:12PM
11
12                  FURTHER EXAMINATION
13   BY MR. JENAL:
14       Q.   Ms. or Mrs.?
15       A.   Ms.                                        02:13PM
16       Q.   Very well.  Ms. Yonemoto, you realize you're
17   still under oath?
18       A.   Yes, I do.
19       Q.   My name is Jim Jenal.  I'm an attorney at
20   O'Melveny here and we represent MGA and I'd like to  02:13PM
21   ask you just a few questions.  I don't have a whole
22   lot and we'll get out of here fairly quickly, I
23   think, but let me see if I can come at a subject
24   that we've been dancing around a little bit with a
25   different approach.                                 02:13PM
```
                                                          113

290

CONFIDENTIAL - ATTORNEYS' EYES O.  l

1   Notice to capture information that could then be

2   entered into the PeopleSoft system?

3        MR. ZELLER:  Same objections.

4        THE WITNESS:  Yes.  The information on the

5   HR Action Notice was used to then input the data        02:54PM

6   into the PeopleSoft system.

7   BY MR. JENAL:

8    Q.   Now, I notice that at the bottom of this

9   page there's a Web address.  Do you see that?  It

10   starts "https" and then goes "peoplesoft" blah,        02:54PM

11   blah, blah.  I'm sorry, I'm on 418.  Do you see

12   that?

13    A.   Yes.

14    Q.   At the very end of that there's a date.  Do

15   you see that?  8/2/2004.        02:54PM

16    A.   Yes.

17    Q.   Is it your understanding from that that that

18   would be the date that this inquiry and producing

19   this screen shot would have been made?

20        MR. ZELLER:  Lacks foundation, outside the        02:55PM

21   designation.

22        THE WITNESS:  I don't know for sure.  I

23   don't think I can answer that accurately.  I don't

24   know for sure if that's the date that it was

25   printed.        02:55PM

144

CONFIDENTIAL - ATTORNEYS' EYES O___

1    BY MR. JENAL:

2        Q.    In the time when you were doing exit

3    interviews for Mattel, if you had wanted to find

4    this information for a particular employee, is that

5    something you could have asked people to run a query    02:55PM

6    if you will to PeopleSoft and get this information

7    returned to you?

8            MR. ZELLER:  Lacks foundation, vague.

9            THE WITNESS:  I could have asked someone in

10   Employee Services to do a print screen such as this    02:56PM

11   if I needed it, yes.

12   BY MR. JENAL:

13       Q.    So let me ask you this.  If you wanted --

14   let's say back in 2000 if you had wanted to get a

15   listing of every employee who is terminated for        02:56PM

16   other position, right, term OTP -- right -- could

17   you have asked somebody in Employee Services to have

18   run that kind of a query and give you that kind of

19   report?

20           MR. ZELLER:  Lacks foundation, vague,          02:56PM

21   outside the designation.

22           THE WITNESS:  I would have to go back and

23   find out if it had that capability.  I want to be

24   able to give you an accurate answer.  I think I'd

25   have to go back and look but, again, if that's a       02:56PM

145

CONFIDENTIAL - ATTORNEYS' EYES O... ⌐

```
 1    request I had, I would have requested it of our

 2    Employee Services group.

 3    BY MR. JENAL:

 4         Q.   I take it you never made such a request?

 5         A.   Not that I can recall.                    02:57PM

 6         Q.   I think you told us previously that prior to

 7    preparing for this deposition you had not spoken

 8    with anyone about Carter Bryant since 2000 when you

 9    had the exit interview session.  Is that correct?

10         MR. ZELLER:  Misstates the witness'            02:57PM

11    testimony.

12    BY MR. JENAL:

13         Q.   If I misstated it I don't mean to.  So if

14    that's not correct, please correct me.

15         A.   Can you reread your question so I make sure 02:57PM

16    I answer it correctly?

17         Q.   We know that you spoke with Carter Bryant

18    during his exit interview in October of 2000,

19    correct?

20         A.   Yes, during his exit interview I did speak  02:57PM

21    with him.

22         Q.   But you don't have a present recollection of

23    that actual event, you know it because you can see

24    the records that reflect that, correct?

25         A.   I don't have a personal recollection but I  02:57PM
                                                           146
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   do have the business records and his words on those

2   records that I could refer to.

3        Q.   Precisely.  Since that time did you speak to

4   anyone about Carter Bryant in 2001?

5        A.   Honestly besides -- besides talking with        02:58PM

6   Legal -- our legal counsel, I did not discuss

7   Mr. Bryant with -- with anyone else.

8        Q.   I'm not interested in the substance of your

9   conversations with legal counsel but when was the

10   first time that you spoke with Legal about Carter      02:58PM

11   Bryant?

12        A.   I don't have an exact date for you.  It's

13   probably been -- let me think.  It's probably been a

14   few years maybe but I don't have an exact date that

15   I can recall.                                          02:59PM

16        Q.   Do you recall someone in Legal -- let's

17   leave Legal aside for just a moment.

18             Aside from someone in the Legal department

19   at Mattel or outside lawyers, has anyone else ever

20   come to -- have you ever spoken with anyone else      02:59PM

21   about Carter Bryant since this exit interview?

22             MR. ZELLER:  Sorry, can I have the question

23   read back?

24             MR. JENAL:  Yeah.

25        Q.   Since the exit interview leaving aside       02:59PM

                                                            147

CONFIDENTIAL - ATTORNEYS' EYES O...L

1   Mattel's Legal department or outside counsel, have

2   you spoken with anyone else about Carter Bryant?

3       A.    No, no.

4       Q.    Do you know who Richard Deanda is?

5       A.    Yes, I know who Mr. Deanda is.                    03:00PM

6       Q.    Who is he as far as Mattel is concerned?

7       A.    He is Vice President -- I don't know the

8   exact title -- but of our security area, Security

9   department.

10      Q.    Do you know what the role of the Security      03:00PM

11  department is at Mattel?

12            MR. ZELLER:  The question lacks foundation,

13  outside the designation.

14            THE WITNESS:  Generally they're there to use

15  that term again provide security to the company.       03:00PM

16  They are the ones -- the greeters at the company to

17  insure that employees who are coming on premises are

18  there for a specific reason.  But beyond that, I

19  mean, I would have to refer to some kind of job

20  description to give you a more conclusive             03:00PM

21  explanation.  Go ahead.

22  BY MR. JENAL:

23      Q.    Are you aware of -- you referred to it as a

24  Security department so I'll refer to it in that

25  term, okay?  Is that fair?                             03:01PM

                                                              148

# Exhibit 9

07-23-2007   05:52pm   From-QUINN EmanUEL                    2134433100          T-924   P.001/006   F-280

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

| NEW YORK | LOS ANGELES | SAN FRANCISCO |
|---|---|---|
| 51 Madison Avenue, 22nd Floor | 865 South Figueroa Street, 10th Floor | 50 California Street, 22nd Floor |
| New York, NY 10010 | Los Angeles, CA 90017 | San Francisco, CA 94111 |
| (212) 849-7000 | (213) 443-3000 | (415) 875-6600 |
| Facsimile: (212) 849-7100 | Facsimile: (213) 443-3100 | Facsimile: (415) 875-6700 |

| SAN DIEGO | SILICON VALLEY |
|---|---|
| 4445 Eastgate Mall, Suite 200 | 555 Twin Dolphin Drive, Suite 560 |
| San Diego, CA 92121 | Redwood Shores, CA 94065 |
| (858) 812-3107 | (650) 801-5000 |
| Facsimile: (858) 812-3336 | Facsimile: (650) 801-5100 |

## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

DATE:   July 23, 2007                    NUMBER OF PAGES, INCLUDING COVER: 3

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| **Jim Jenal, Esq.** O'Melveny & Myers LLP | 213-430-6584 | 213-430-6407 |
| **Diana Torres, Esq.** O'Melveny & Myers LLP | 213-430-6584 | 213-430-6407 |
| **Michael Page, Esq.** Keker & Van Nest | 415-391-5400 | 415-397-7188 |

FROM:     Jon Corey

RE:       *Mattel, Inc. v. Bryant*

MESSAGE: .

07209/2170576.1

| CLIENT # | 7209 | ROUTE/ RETURN TO: | J. Lopez – 10 | ☒ CONFIRM FAX ☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | | | CONFIRMED?   ☐ NO  ☐ YES: _____ | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.   296

07-23-2007    05:52pm    From-QUINN EMANUEL                     2134433100          T-924   P.002/006   F-280

## quinn emanuel trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

July 23, 2007

VIA FACSIMILE AND U.S. MAIL

Jim Jenal, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071

Re:    Mattel, Inc. v. MGA Entertainment, Inc.

Dear Jim:

I write pursuant to paragraph 5 of the Discovery Master Stipulation to request that MGA meet and confer regarding MGA's defiance of Judge Infante's May 16, 2007 Order.  In that Order, Judge Infante compelled MGA to "make its designees for all Topics in the Second Notice, except Topic Nos. 25 and 26, available for deposition on or before June 30, 2007."  May 16, 2007 Order ¶ 3.  MGA's failure to provide a designee on many of the noticed topics before June 30, 2007 is an indefensible breach of the Court's Order.  Judge Infante also overruled all objections and limitations that MGA asserted to those topics.  *Id.* ¶ 5 ("All of MGA's objections and/or limitations regarding the Topics in Mattel's Rule 30(b)(6) deposition notices are overruled.").

In furtherance of its untimely efforts to comply with Judge Infante's May 16, 2007 Order, MGA designated Lisa Tonnu to testify regarding the following six topics in Mattel's Second Notice of Deposition of MGA Entertainment, Inc.:

>    **Topic No. 24:**  Any indemnification and fee arrangement that YOU and/or BRYANT has sought, proposed, requested or obtained in connection with this ACTION.

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 155 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212 702 8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760 345-2414

07209/2173163.1

297

**Topic No. 31:** The IDENTITY of each PERSON who, at any time since January 1, 1998, has performed any work or services for, by or on behalf of YOU while such PERSON was employed by MATTEL, the nature and timing of each such PERSON's work or services and the amount(s) paid by YOU to each such PERSON.

**Topic No. 37:** YOUR corporate structure since January 1, 1999, including without limitation the relationship between MGA Entertainment, Inc. and any of its predecessors, affiliates and subsidiaries.

**Topic No. 39 :** The preservation, collection, destruction, removal, transfer, loss or impairment of YOUR DOCUMENTS and DIGITAL INFORMATION in connection with the ACTION and/or any DOCUMENTS requested by MATTEL in the ACTION [paper documents only].

**Topic No. 40:** The preservation, collection, destruction, removal, transfer, loss or impairment of YOUR DOCUMENTS and DIGITAL INFORMATION since January 1, 1999 that REFER OR RELATE TO MATTEL (including without limitation to any MATTEL product, plan or information) that YOU received in any manner from any PERSON who was at the time an employee of MATTEL or who had previously been an employee of MATTEL.

**Topic No. 41:** The testing of or sampling from DOCUMENTS that REFER OR RELATE TO BRATZ or BRYANT, including without limitation such testing or sampling in connection with any ink, paper or chemical analysis performed or attempted to be performed to date, any DOCUMENTS that REFER OR RELATE thereto and all results and reports relating thereto.

I deposed (and you defended) Ms. Tonnu on July 19, 2007. I write to meet and confer prior to a motion to compel compliance with Judge Infante's Order, for sanctions, and for a recommendation to Judge Larson of a finding of contempt. I will address some of the specific deficiencies of Ms. Tonnu's deposition testimony below.

## Topic No. 24

Ms. Tonnu has no personal knowledge of Topic No. 24. Ms. Tonnu only was able to identify (a) the fee agreement between Mr. Bryant and Littler Mendelson, (b) the indemnification provision in the agreement between Mr. Bryant and MGA, and (c) a letter between Mr. Machado's counsel and MGA (which was not produced and which Mattel hereby requests that MGA produce forthwith).

Ms. Tonnu could not identify terms of the letter between Mr. Machado's counsel (who she could not identify) and MGA. With respect to the Bryant/Littler agreement, she was unable to provide any explanation beyond identification. She could not testify about MGA's intent or understanding of Bryant's "truthfulness," MGA's threats to terminate its agreement to pay Mr. Bryant's attorney's fees, the amount paid to Mr. Bryant (or any other person), or who, from MGA, negotiated or had input into that agreement, or even who agreed to pay Mr. Bryant's fees. Nor was she able to identify whether MGA had insurance policies that would indemnify it or

whether other persons had sought indemnification from MGA, but which MGA had declined. Further, Ms. Tonnu was unable to reconcile MGA's agreement to pay Bryant's fees with the indemnification provision in the September 18, 2000 agreement (or whether MGA had sought indemnification from Bryant under that provision). MGA has failed to comply with Judge Infante's May 16, 2007 Order.

**Topic No. 31**

Ms. Tonnu has no personal knowledge of Topic No. 31. Ms. Tonnu did nothing to be prepared to testify on this topic, but speak with Ms. Brooks, an accounts payable clerk, who apparently ran a report that identified Mr. Bryant as the only person that MGA paid while he was a Mattel employee. Ms. Tonnu's testimony was deficient in that she was unable to identify any criteria for the report, including names of individuals or the applicable date ranges used to determine whether they were accurate or what they reflected. Further, the scope of the topic is not limited to payment for services provide by Mattel employees, but includes work performed for MGA while employed by Mattel and the nature of such work or services. Ms. Tonnu made no effort to ascertain that information. Indeed, she did not speak with a single former Mattel employee in connection with this topic. MGA has failed to comply with Judge Infante's May 16, 2007 Order.

**Topic No. 39**

Ms. Tonnu neither participated in nor had personal knowledge of the steps MGA took to preserve documents or to collect documents requested by Mattel. Rather, Ms. Tonnu testified that her knowledge of these topics came primarily from a 10-minute conversation she had with MGA's counsel. You insisted that because the information came from counsel, it was privileged and would only allow Mattel to ask about the conversation with in-house counsel if Mattel stipulated that it was not a waiver of the attorney-client privilege. I informed you that Mattel would not argue that the disclosure of information about what MGA did not collect and preserve documents was a waiver of the privilege, because that type of information was not privileged itself, and can therefore not constitute a waiver. I further informed you that to avoid any suggestion of an inquiry into privileged information, I would not ask Ms. Tonnu about the conversation with Mr. Daniels, MGA in-house counsel, but would ask her what MGA did to collect and preserve documents Mattel requests. MGA, nevertheless, proceeded to instruct Ms. Tonnu not to answer all questions related to document collection and preservation (except you did allow her to testify about her personal document retention practices, even though she had no knowledge of MGA document retention or practices). You further instructed her not to answer any foundational questions regarding whether or not she had knowledge of MGA's collection and preservation practices.

Your assertion of privilege and the work product doctrine in this situation contradicts federal law and to the Discovery Master's May 4, 2007 Order Granting in Part Bryant's Motion to Overrule Instructions Not to Answer During the Deposition of Alan Kaye, to Compel Kaye to Answer Those Questions, and for Sanctions ("May 4 Order"). *Facts* learned by a party from his or her attorney are not protected on privilege or work product grounds. *See, e.g., Nutmeg Ins. Co. v. Atwell, Vogel & Sterling, et al.*, 120 F.R.D. 504, 509 (W.D. La. 1988) (stating that the work product doctrine does not protect facts a party learned from their attorney); *Garcia v. City of El Centro*, 214 F.R.D. 587, 591 (S.D. Cal. 2003) (stating that the work product doctrine does not

299

protect facts). The Discovery Master ruled accordingly in the May 4 Order on a motion brought by Carter Bryant. In that Order, the Discovery Master held that the attorney-client privilege did not shield Mattel witness Alan Kaye from questions regarding facts Mr. Kaye learned from counsel. As you are well aware, the questions I asked about document preservation and collection sought only facts, not advice or impressions.

Mattel complied with the May 4 Order when Mattel witness Robert Hudnut was deposed by MGA on July 13, 2007. Mr. Hudnut was questioned regarding the *facts* of the document search at Mattel, and he answered those questions. As you stated at that time:

> I'd just like to put on the record that the witness will be answering questions that relate to what he turned over or what he retained in response to requests from counsel but not questions as to the requests themselves, the communications from counsel.

Hudnut Transcript, 111:25-112:5. You then proceeded to ask Mr. Hudnut questions about the search he did *at the request of Mattel's counsel*, and what documents were provided *to counsel*:

> Q. Do you recall forwarding E-mails from any other folder?
> A. The reason the Ferrytopia example came to mind is because I remember doing that myself and so on other occasions I might have -- someone from Legal might have come and found the E-mails themselves and forwarded them on but the reason I brought up the Ferrytopia because I remember that because it was a recent example of where I did it myself.
> Q. Approximately how long ago did you do that?
> A. Six months ago give or take a little bit.
> Q. And you mentioned that it was possible that someone from legal might have come and looked for E-mails and forwarded them themselves. Do you know for a fact whether indeed that occurred where someone from Legal came to search E-mails on your computer?
> ...
> A. To the extent I know I can't think of a specific instance but if I get a request from Legal for documents, I do my best to provide them.

Hudnut Transcript, 115:24-116:24. Judge Infante has enforced the standard. MGA has flouted it, in violation of two court orders.

**Topic No. 40**

The only thing that Ms. Tonnu did to prepare to testify on this regard was to speak with three people—Ron Brawer, Suzanne Brisbois and Susan Kuemmerle. As MGA is well aware, more than 30 former Mattel employees work at MGA. Ms. Tonnu undertook no effort to determine whether any other former Mattel employees had provided Mattel documents to MGA, or do determine whether MGA possesses Mattel documents, regardless of the source. MGA has failed to comply with the May 16, 2007 Order.

## Topic No. 41

Ms. Tonnu had no personal knowledge of any ink, paper or chemistry testing performed.  Indeed, she was uniquely unqualified to answer any questions regarding ink, paper or chemistry testing of Bratz documents.  She made no effort to educate herself about the testing, procedures, handling or storage of the documents that MGA tested.  She did not speak with Mr. Speckin or anyone involved in the testing.  She had only read Mr. Speckin's declaration, and could not even say whether the representations in that declaration were accurate or not.  She was unable to identify what tests were performed on each documents, how those tests were done, why they were done, who was involved in the tests, how the documents were stored or shipped to ensure that information discoverable by subsequent examiners would not be contaminated or destroyed.  That is not compliance with the May 16, 2007 Order.

## Relief Sought

MGA's willful non-compliance with Judge Infante's May 16, 2007 Order with respect to Topic Nos. 24, 31, 39, 40 and 41 is inexcusable and indefensible.  Mattel will seek not only an order compelling a competent witnesses to testify regarding those topics and sanctions for the costs incurred in any motion and for being forced to depose an incompetent witness on these topics, but may also seek evidentiary sanctions, a finding that MGA is in willful violation of Judge Infante's Order and/or a recommendation from Judge Infante that Judge Larson initiate contempt proceedings against MGA.

If you would like to discuss these issues before Mattel proceeds with its motion, please let me know when you will be available.

Best regards,

*Jon Corey*

Jon Corey

07209/2173163 1

cc:     Diana Torres, Esq.
        Michael Page, Esq.

# Exhibit 10

SEND

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PLAINTIFF,                              )   Case No. CASE NUMBER
                     Plaintiff,         )   STANDING ORDER
                                        )
            v.                          )
DEFENDANT,                              )
                    Defendants.         )
_____)

## READ THIS ORDER CAREFULLY.  IT CONTROLS THE CASE AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES.

       This action has been assigned to the calendar of Judge Stephen G. Larson. Both the Court and the attorneys bear responsibility for the progress of litigation in the Federal Courts.  To secure the just, speedy, and inexpensive determination of every action, Fed. R. Civ. P. 1, all counsel of record and any parties proceeding pro se, are directed to familiarize themselves with the Federal Rules of Civil Procedure and the Local Rules of the Central District of California.

       IT IS HEREBY ORDERED:

       1.      **Service of the Complaint**:  Plaintiff shall promptly serve the Complaint in accordance with Fed. R. Civ. P. 4 and file the proofs of service pursuant to Local Rule

302

1   5-3.1 within three days following service.  Defendants also shall timely file their

2   responsive pleadings and file proofs of service within three days.

3        **2.    Presence of Lead Counsel:** Unless afforded leave of Court, lead trial

4   counsel shall attend all proceedings before this Court, including all status, scheduling,

5   and settlement conferences.

6        **3.    Discovery:** All discovery matters have been referred to a United States

7   Magistrate Judge (see initial designation following the case number).  The words

8   "DISCOVERY MATTER" shall appear in the caption of all documents relating to

9   discovery to insure proper routing.  Counsel are directed to contact the Magistrate

10  Judge Courtroom Deputy Clerk for the assigned Magistrate Judge to schedule matters

11  for hearing.

12       The decision of the Magistrate Judge shall be final, subject to modification by the

13  District Court only where it has been shown that the Magistrate Judge's order is clearly

14  erroneous or contrary to law.

15       Any party may file and serve a motion for review and reconsideration before this

16  Court.  The party seeking review must do so within ten days of service upon the party of

17  a written ruling, or within ten days of an oral ruling that the Magistrate Judge states will

18  not be followed by a written ruling.  The motion must specify which portions of the text

19  are clearly erroneous or contrary to law and the claim must be supported by points and

20  authorities.  A copy of the moving papers and responses shall be delivered to the

21  Magistrate Judge's clerk for review upon the filing of the required documents.

22       Unless there is a likelihood that, upon motion by a party, the Court would order

23  that any or all discovery is premature, counsel shall begin before the Scheduling

24  Conference.  At the very least, the parties shall comply fully with the letter and spirit of

25  Fed. R. Civ. P. 26(a) relating to initial disclosures and thereby produce and obtain most

26  of what would be produced in the early stages of discovery.

27       If expert witnesses are to be called at trial, the parties shall designate experts to

28  be called at trial and provide reports required by Fed. R. Civ. P. 26(a)(2)(B) not later

2

303

1   than eight weeks prior to the discovery cutoff date.  Rebuttal expert witnesses shall be

2   designated and reports provided as required by Fed. R. Civ. P. 26(a)(2)(B) not later

3   than five weeks prior to the discovery cutoff date.  Failure to timely comply with this

4   deadline may result in the expert being excluded at trial as a witness.

5          4.    **Motions:**

6                 (a)    **Time for Filing and Hearing Motions**:  Motions shall be filed in

7   accordance with Local Rules 6-1 and 7-2, et seq.[1]  This Court hears motions on

8   Mondays, commencing at 10:00 a.m.  No supplemental brief shall be filed without prior

9   leave of Court.  Many motions to dismiss or to strike could be avoided if the parties

10  confer in good faith (as they are required to do under L.R. 7-3), especially for perceived

11  defects in a complaint, answer, or counterclaim which could be corrected by

12  amendment. See Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996) (where a motion

13  to dismiss is granted, a district court should provide leave to amend unless it is clear

14  that the complaint could not be saved by any amendment).  Moreover, a party has the

15  right to amend its complaint "once as a matter of course at any time before a responsive

16  pleading is served."  Fed. R. Civ. P. 15(a).  A 12(b)(6) motion is not a responsive

17  pleading for purposes of Rule 15(a) and therefore plaintiff might have a right to amend.

18  See Nolen v. Fitzharris, 450 F.2d 958, 958-59 (9th Cir. 1971); St. Michael's

19  Convalescent Hospital v. California, 643 F.2d 1369, 1374 (9th Cir. 1981).  Even where a

20  party has amended its Complaint once, or where a responsive pleading has been

21  served, the Federal Rules provide that leave to amend "shall be freely given when

22  justice so requires."  Fed. R. Civ. P. 15(a).  The Ninth Circuit requires that this policy

23  favoring amendment be applied with "extreme liberality."  Morongo Band of Mission

24

25          [1]  Among other things, Local Rule 7-3 requires counsel to engage in a pre-filing

26  conference "to discuss thoroughly . . . the substance of the contemplated motion and any
    potential resolution."  Counsel should discuss the issues sufficiently so that if a motion is

27  still necessary, the briefing may be directed to those substantive issues requiring
    resolution by the Court.  Counsel should resolve minor procedural or other nonsubstantive

28  matters during the conference.

                                3

                                364

1  Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990)(citing DCB Programs, Ltd. v.
2  Leighton, 833 F.2d 183, 186 (9th Cir. 1987)).  These principles require that counsel for
3  the plaintiff should carefully evaluate the defendant's contentions as to the deficiencies
4  in the complaint and, in many instances, the moving party should agree to any
5  amendment that would cure a curable defect.

6         In the unlikely event that motions under Fed. R. Civ. P. 12 challenging pleadings
7  are filed after the Rule 16 Scheduling Conference, the moving party shall attach a copy
8  of the challenged pleading to the Memorandum of Points and Authorities in support of
9  the motion.

10        The foregoing provisions apply as well to motions to dismiss a counterclaim,
11  answer, or  affirmative defense that a plaintiff might file.

12        **(b)     Length and Format of Motion Papers:  Memoranda of Points**
13  **and Authorities in support of or in opposition to motions shall not exceed 25**
14  **pages.  Replies shall not exceed 12 pages.**  Only in rare instances and for good
15  cause shown will the Court grant an application to extend these page limitations.

16        Typeface shall comply with Local Rule 11-3.1.1.  If Times Roman or another
17  proportionally spaced font is used, the size must be no less than 14-point; if Courier or
18  another monospaced font is used, the size must be no less than 12-point, and there
19  must be no fewer than 10.5 characters per inch.  Footnotes shall be in typeface no less
20  than one size smaller than text size and shall be used sparingly.

21        Filings that do not conform to the Local Rules and this Order will not be
22  considered.

23        **(c)     Citations to Case Law:**  Citations to case law **must** identify not
24  only the case being cited, but the specific page being referenced.  Certain kinds of
25  authority are considered more useful — or authoritative — than others.  If more than
26  one authority is cited in support of a proposition, these supporting authorities shall be
27  listed such that the more authoritative ones appear first.

28        **(d)     Citations to Statutory Sources:**  Counsel are reminded that the

4

305

1  basic purpose of a legal citation is to allow the reader to locate a cited source accurately

2  and efficiently.  Accordingly, statutory references should identify, with specificity, which

3  sections and subsections are being referenced.  Statutory references which do not

4  indicate specifically which section and subsection are being referred to are to be

5  **avoided**.  Citations to treatises, manuals, and other materials should similarly include

6  the volume and the section being referenced.

7          (e)    **Citations to Other Sources:**  Parties offering evidence in support

8  of, or in opposition to, a motion (notably a Rule 56 motion) must cite to specific page

9  and line numbers in depositions and paragraph numbers in affidavits.  Furthermore,

10  such evidence must be authenticated properly.  The Court directs the parties to become

11  familiar with <u>Orr v. Bank of America, NT & SA</u>, 285 F.3d 764 (9th Cir. 2002).

12          (f)    **Courtesy Copies:**  Counsel shall deliver a conformed courtesy

13  copy of all opposition and reply papers in motion matters to the courtesy box on the wall

14  outside the entrance to Courtroom One, located on the second floor of the United States

15  Courthouse, 3470 Twelfth Street, Riverside, California, **by 4:00 p.m. on the date due.**

16          (g)    **Limits on Motions**

17              (1) **Motions for Summary Judgment:**  No party may file more

18  than one motion pursuant to Fed. R. Civ. P. 56, regardless of whether such motion is

19  denominated as a motion for summary judgment or summary adjudication.

20              (2) **Motions in Limine:**  No party may file more than five

21  motions in limine.

22          (h)    **Exhibits:**  Exhibits filed in support of any pleading shall be tabbed.

23      5.    **Proposed Orders:**  Each party filing or opposing a motion, or seeking the

24  determination of any matter, shall serve and lodge a Proposed Order setting forth the

25  relief or action sought and a brief statement of the rationale for the decision with

26  appropriate citations.

27      6.    **Ex Parte Applications:**  Counsel are reminded that <u>ex parte</u> applications

28  are solely for extraordinary relief.  <u>See Mission Power Engineering Co. v. Continental</u>

5

306

1  Casualty Co., 883 F. Supp. 488 (C.D. Cal. 1995).  Applications which fail to conform

2  with Local Rules 7-19 and 7-19.1, **including a statement of opposing counsel's**

3  **position**, will not be considered.  Any opposition must be filed not later than 24 hours

4  after service.  If counsel do not intend to oppose the ex parte application, counsel must

5  inform the court clerk by telephone.  The Court considers ex parte applications on the

6  papers and usually does not set these matters for hearing.

7      Counsel shall deliver a conformed courtesy copy of moving, opposition, or notice

8  of non-opposition papers to the courtesy box outside the entrance to Courtroom One.

9  The courtroom deputy clerk will notify counsel of the Court's ruling or a hearing date and

10  time, if the Court determines a hearing is necessary.

11      **7.    Applications or Stipulations to Extend the Time to File any Required**

12  **Document or to Continue any Pretrial or Trial Date:**  No stipulations extending

13  scheduling requirements or modifying applicable rules are effective until and unless the

14  Court approves them.  Both applications and stipulations must be filed in advance of the

15  date due and set forth:

16      (a)    the existing due date or hearing date as well as the discovery cutoff

17  date, the last date for hearing motions, the pre-trial conference date and the trial date;

18      (b)    specific, concrete reasons supporting good cause for granting the

19  extension; and

20      (c)    whether there have been prior requests for extensions, and

21  whether these were granted or denied by the Court.

22      **8.    TROs and Injunctions:**  Parties seeking emergency or provisional relief

23  shall comply with Fed. R. Civ. P. 65 and Local Rule 65-1.  The Court will not rule on any

24  application for such relief for at least 24 hours after the party subject to the requested

25  order has been served; such party may file opposing or responding papers in the

26  interim.[2]  The parties shall lodge a courtesy copy, conformed to reflect that it has been

27

28      [2] Local Rule 7-19.2 - Waiver of Notice.  If the Judge to whom the application is made finds that the interest of justice requires that the ex parte application be heard

307

1 filed, of all papers relating to TROs and injunctions.  The courtesy copy shall be placed

2 in the courtesy box outside the entrance to Courtroom One.  All such papers shall be

3 filed "loose," i.e., not inside envelopes.

4     **9.**    **Cases Removed From State Court:**  All documents filed in state court,

5 including documents appended to the complaint, answers, and motions, must be refiled

6 in this Court as a supplement to the Notice of Removal, if not already included.  See 28

7 U.S.C. § 1447(a)-(b).  If defendant has not yet responded, the answer or responsive

8 pleading filed in this Court must comply with the Federal Rules of Civil Procedure and

9 the Local Rules of the Central District.  If a motion was pending in state court before the

10 case was removed, it must be re-noticed in accordance with Local Rule 6-1.

11     **10.**   **ERISA Cases:**

12     The following procedure will apply in cases in which a plaintiff seeks benefits

13 under an ERISA plan:

14     (a)    Because discovery is disfavored in such cases, the parties may

15 request discovery only where it is necessary to determine the appropriate standard of

16 review and the proper scope of the administrative record.  See Kearney v. Standard Ins.

17 Co., 175 F.3d 1084, 1090-91 (9th Cir. 1999).  The Court will set a discovery cut-off date.

18 Any disputes concerning discovery that the parties are unable to resolve through the

19 meet and confer process shall be submitted to the assigned Magistrate Judge.  The

20 parties are advised to carefully follow all of the requirements of L.R. 37-1, et. seq.

21     (b)    Absent an agreed-upon statement of facts, the Court will not hear

22 motions for summary judgment; instead, the Court will consider a joint motion to

23 determine the proper standard of review.  In accordance with the schedule established

24 by the Court, the parties shall file simultaneous briefs in support of their respective

25 positions on the appropriate standard of review.  The parties shall also file simultaneous

27 without notice (which in the instance of a TRO means that the requisite showing under

28 Fed. R. Civ. P. 65(b) has been made) the Judge may waive the notice requirement of L.R. 7-19.1.

7

308

1 | opposing briefs.

2 |        (c)    Prior to filing a motion to determine the proper standard of review,

3 | the parties shall participate in a settlement conference pursuant to L.R. 16-14.

4 |        (d)    Within thirty days after the entry of the Court's order (or the parties'

5 | stipulation) re standard of review, the parties shall participate in a <u>second</u> settlement

6 | conference pursuant to L.R. 16-14.

7 |        (e)    Absent a settlement, the Court will conduct an administrative review

8 | on the parties' trial briefs.  The Court will not conduct a trial or hear oral argument

9 | unless the Court, after receiving and reviewing the parties' trial briefs, decides that such

10 | argument would be helpful to the Court.  The parties shall file simultaneous opening

11 | briefs and opposing briefs per the schedule established by the Court.  The matter will be

12 | taken under submission and the Court will issue an Order Re Administrative Review.

13 |      With the opening briefs, the parties shall jointly lodge with the Court two copies of

14 | the administrative record.  The original copy must be formatted in compliance with the

15 | Court's Local Rules; the chambers copy must include a table of contents, must be

16 | tabbed, and must be placed in a three-ring binder.

17 |        (f)    In addition to any applicable items set forth in the Court's Order

18 | setting the Rule 26(f) conference, the parties' Rule 26(f) Report shall set forth a

19 | statement of whether the parties anticipate that the Court will be required to determine

20 | the appropriate standard of review.

21 |        (g)    The Court will set a briefing schedule for and a cut-off date for

22 | hearing of motions regarding standard of review and the scope of the administrative

23 | record.

24 |     **11.**   <u>**Status of Fictitiously Named Defendants:**</u>  This Court intends to adhere

25 | to the following procedures where a matter is removed to this Court on diversity grounds

26 | with fictitiously named defendants referred to in the complaint (<u>see</u> 28 U.S.C. §§

27 | 1441(a) and 1447):

28 |        (a)    Plaintiff is normally expected to ascertain the identity of and serve

309

1    any fictitiously named defendants within 120 days of the removal of the action to this

2    Court.

3            (b)     If plaintiff believes (by reason of the necessity for discovery or

4    otherwise) that fictitiously named defendants cannot be fully identified within the 120-

5    day period, an ex parte application requesting permission to extend that period to

6    effectuate service may be filed with this Court.  Such application shall state the reasons

7    therefor, and may be granted upon a showing of good cause.  The ex parte application

8    shall be served upon all appearing parties, and shall state that appearing parties may

9    comment within seven (7) days of the filing of the ex parte application.

10            (c)     If plaintiff desires to substitute a named defendant for one of the

11    fictitiously named parties, plaintiff first shall seek to obtain consent from counsel for the

12    previously-identified defendants (and counsel for the fictitiously named party, if that

13    party has separate counsel).  If consent is withheld or denied, plaintiff may apply ex

14    parte requesting such amendment, with notice to all appearing parties.  Each party shall

15    have seven calendar days to respond.  The ex parte application and any response

16    should comment not only on the substitution of the named party for a fictitiously named

17    defendant, but on the question of whether the matter should thereafter be remanded to

18    the Superior Court if diversity of citizenship is destroyed by the addition of the new

19    substituted party. See 28 U.S.C. § 1447(e).

20        **12.**   **Communications with Chambers**:  Counsel shall not attempt to contact

21    the Court or its chambers staff by telephone or by any other ex parte means, although

22    counsel may contact the Court's courtroom deputy clerk, James Holmes, at (951) 328-

23    4464, with appropriate inquiries.  To facilitate communication with the courtroom deputy,

24    counsel should list their facsimile transmission numbers along with their telephone

25    numbers on all papers.

26        **13.**   **Notice of this Order**:  Counsel for plaintiff shall immediately serve this

27    Order on all parties, including any new parties to the action.  If this case came to the

28    Court by noticed removal, defendant shall serve this Order on all other parties.

310

14. **Internet Site:** Counsel are encouraged to review the Central District's Website for additional information.[3] The address is "http://www.cacd.uscourts.gov."

IT IS SO ORDERED.

Dated:

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

---

[3] Copies of the Local Rules are available on our website at "http: //www.cacd.uscourts.gov" or they may be purchased from one of the following:

Los Angeles Daily Journal
915 East 1st Street
Los Angeles, California 90012

West Publishing Company
610 Opperman Drive
Post Office Box 64526
St. Paul, Minnesota 55164-0526

Metropolitan News
210 South Spring Street
Los Angeles, California 90012

10          311

**Exhibit 11**

ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7     CARTER BRYANT,              )

                                  )

8              PLAINTIFF,  )

                                  )

9          VS.             ) NO. ED CV 04-09049

                           ) (LEAD LOW NUMBER)

10    MATTEL, INC.,              )

                                  )

11         DEFENDANT.   )

_____) BRYANT'S MOTION FOR

12    AND RELATED ACTIONS,        ) TERMINATING SANCTIONS

                                  )

13

14

          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

          RIVERSIDE, CALIFORNIA

16

          MONDAY, AUGUST 27, 2007

17

             11:06 A.M.

18

19

20

21

22

23          THERESA A. LANZA, RPR, CSR

          FEDERAL OFFICIAL COURT REPORTER

24          3470 12TH STREET, RM. 134

          RIVERSIDE, CALIFORNIA  92501

25            (951) 274-0844

          CSR11457@SBCGLOBAL.NET

ATTORNEYS' EYES ONLY

1    APPEARANCES:

2

3    ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

4

    QUINN EMANUEL

5        BY:  JOHN B. QUINN

    BY:  MICHAEL T. ZELLER

6        BY:  JON C. COREY

    865 S. FIGUEROA STREET,

7        10TH FLOOR

    LOS ANGELES, CALIFORNIA  90017

8        (213) 624-7707

9

10   ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
    CARTER BRYANT:

11

    KEKER & VAN NEST

12       BY:  MICHAEL H. PAGE

    710 SANSOME STREET

13       SAN FRANCISCO, CALIFORNIA  94111-1704

    (415) 391-5400

14

15

16   ON BEHALF OF MGA ENTERTAINMENT:

17       O'MELVENY & MYERS LLP

    BY:  DIANA M. TORRES

18       400 SOUTH HOPE STREET

    LOS ANGELES, CALIFORNIA  90071-2899

19       (213) 430-6000

20       CHRISTENSEN, GLASER, FINK,

    JACOBS, WEIL & SHAPIRO, LLP

21       BY:  PATRICIA GLASER

    10250 CONSTELLATION BOULEVARD

22       LOS ANGELES, CALIFORNIA  90067

    (310) 553-3000

23

24

25

ATTORNEYS' EYES ONLY

1                    I N D E X

2                              PAGE

3    ARGUMENT.....................................    4

4    TESTIMONY....................................    83

5

6

7

     WITNESS        DIRECT     CROSS    REDIRECT    RECROSS

8    MICHAEL MOORE

9    BY THE COURT        83

     BY MS. GLASER       86

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ATTORNEYS' EYES ONLY

1        MR. QUINN:  NON PRIVILEGED INFORMATION, YOUR HONOR,

2    JUST FOR CLARIFICATION.

3        THE COURT:  YES, NON PRIVILEGED INFORMATION.

4        IT'S A TOUGH QUESTION TO ASK, COUNSEL.  I UNDERSTAND

5    WHAT YOU'RE TRYING TO GET AT.

6        MS. GLASER:  EXCUSE ME, YOUR HONOR.  THIS IS THE

7    GENTLEMAN WHO SAID HE GOT THE TAPES FROM SOMEPLACE IN ARIZONA.

8        THE COURT:  YOU SEE, THIS GOES BACK TO THE ISSUE OF

9    WHETHER OR NOT THIS WAS NOT THE RIGHT 30(B) WITNESS, AND I TEND

10   TO THINK THAT THIS IS PERHAPS A DISCOVERY DISPUTE WHICH SHOULD

11   HAVE BEEN PROPERLY FULLY LITIGATED, BUT THIS IS NOT THE

12   GRAVAMEN OF YOUR ALLEGATION AT THIS POINT.

13       MS. GLASER:  THE ONLY PROBLEM, YOUR HONOR, IS --

14       THE COURT:  IT'S FORGING INTO SOMETHING ELSE, AND

15   THAT SOMETHING ELSE IS NOT REALLY WHAT I WANT TO ENTERTAIN AT

16   THIS MOMENT.

17       MS. GLASER:  I UNDERSTAND THAT.  AND MY ONLY POINT

18   IS, YOUR HONOR, WE WERE MISLED.  I THINK THE RECORD IS CLEAR

19   THAT WE WERE MISLED.  AND I DON'T THINK WE HAVE AN OBLIGATION,

20   AFTER SOMEBODY IS DESIGNATED AS A 30(B)(6) WITNESS, TO SAY,

21   'OH, SHE'S NOT SURE.'  WHICH ISN'T WHAT SHE SAID.  SHE SAID

22   THAT SHE DOESN'T THINK 'WE GO BACK THAT FAR.'

23       SO THEY HAVE OFFERED HER.  I DIDN'T OFFER HER; I

24   DIDN'T DESIGNATE HER.  THEY DESIGNATED HER.  AND THIS GENTLEMAN

25   HAS MORE INFORMATION ON THE DATE SHE'S TESTIFYING THAN SHE

ATTORNEYS' EYES ONLY

1   DOES.  THAT'S A HEAD FAKE.  THAT IS HIDING EVIDENCE.  THAT IS

2   NOT FAIR.

3        THE COURT:  YOU WERE CERTAINLY ENTITLED, AT THE TIME

4   THAT IT WAS ASKED, TO A YES OR NO ANSWER TO WHETHER OR NOT

5   THESE BACKUP TAPES EXISTED, AND IT APPEARS THAT YOU DID NOT GET

6   THAT FROM MS. MARINE.

7        MS. GLASER:  I'LL MOVE ON, YOUR HONOR.

8        THE COURT:  OKAY.  THANK YOU.

9   BY MS. GLASER:

10  Q   BY THE WAY, HAVE ANY OF THE DOCUMENTS ON THE BACKUP TAPES

11  FOR THE ZEUS SERVER BEEN RETRIEVED FROM THE BACKUP TAPES AND

12  PROVIDED TO MGA OR ITS COUNSEL OR TO CARTER BRYANT OR HIS

13  COUNSEL?

14       THE COURT:  YOU'RE ASKING IF DOCUMENTS, PARTICULAR

15  DOCUMENTS, WHETHER DOCUMENTS CAME FROM THE BACKUP TAPES?

16       MS. GLASER:  YES, SIR.

17       THE WITNESS:  IF ANY DOCUMENTS FROM THE ZEUS BACKUP

18  TAPES WERE RETRIEVED FOR MGA'S COUNSEL?

19       I UNDERSTAND THAT THAT'S WHAT HAPPENED.

20  BY MS. GLASER:

21  Q   WHEN DID THAT HAPPEN?

22  A   I'M NOT SURE WHEN IT HAPPENED.  THERE'S ONGOING

23  PRODUCTION.  BUT I DID ASK COUNSEL IF THIS HAD HAPPENED.  I DID

24  INQUIRE AS TO WHETHER DOCUMENTS WERE PRODUCED FROM THOSE ZEU

25  TAPES, AND I UNDERSTAND THAT THEY WERE.