# Exhibit 3

1    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
     865 South Figueroa Street, 10th Floor
6    Los Angeles, California 90017-2543
     Telephone: (213) 443-3000
7    Facsimile: (213) 443-3100

8    Attorneys for Mattel, Inc.

9

10               UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                  EASTERN DIVISION

| | |
|---|---|
| 13   CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx) |
| 14         Plaintiff, | Consolidated with Case Nos. CV 04-9059 and CV 05-2727 |
| 15      vs. | Hon. Stephen G. Larson |
| 16   MATTEL, INC., a Delaware corporation, | SUPPLEMENTAL RESPONSES TO MGA'S FIRST SET OF INTERROGATORIES TO MATTEL, INC. |
| 17        Defendant. | |
| 18   AND CONSOLIDATED ACTIONS. | |
| 19 | |

20

21   PROPOUNDING PARTY:     MGA ENTERTAINMENT, INC.

22

23   RESPONDING PARTY:      MATTEL, INC.

24   SET NO.:               ONE (1)

25                <u>**ATTORNEY'S EYES ONLY –**</u>

26             <u>**SUBJECT TO PROTECTIVE ORDER**</u>

27

28

        SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit 3, P. 88

1    As a result of the efforts of Bryant and other Mattel employees working

2  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at

3  deposition in 2004), the Bratz dolls had been designed and were far along in

4  development during the time that Bryant was employed by Mattel and prior to the

5  time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and

6  develop designs for the dolls as well as other aspects of the products such as their

7  fashion accessories during the time he was employed by Mattel, but MGA showed

8  Bratz prototypes and/or visual representations of Bratz to numerous third parties,

9  including without limitation retailers, no later than November 2000, less than three

10 weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these

11 presentations while Bryant was still employed by Mattel.  Bryant and MGA

12 employees also repeatedly and continuously communicated with employees of

13 MGA Entertainment (HK) Limited regarding the design and manufacturing of

14 Bratz.  Bratz also were shown to retailers at the Hong Kong Toy Fair in January

15 2001 and very soon thereafter at the New York Toy Fair.  The Bratz dolls which had

16 been created during the time of Bryant's employment by Mattel, and based on

17 Bryant's concepts, designs, three-dimensional items and other works, were very

18 similar to the dolls as released, which was possible only because of Bryant's work

19 on Bratz with MGA during his Mattel employment, using Mattel resources.

20    Evidence Mattel has been able to obtain thus far has established that

21 Bryant worked for his own and MGA's benefit during his Mattel employment, and

22 did so using Mattel resources.  First, Bryant admitted at deposition, and documents

23 confirm, that he worked and aided MGA during the term of his Mattel employment

24 without Mattel's consent or knowledge, although further showing his guilty

25 knowledge he sought to minimize and conceal the time period and extent of his aid

26 to and work with MGA.  At deposition, Bryant further admitted, and documents

27 confirm, among other things, that:  (1) he worked on his Bratz drawings while

28 employed by Mattel and showed them to MGA while employed by Mattel; (2) he

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

07209/2267105.11

Exhibit 3 , P. 89

1   they would pick up the payment owed to them on April 23, 2004 and immediately

2   left the premises.

3        Later on April 19, 2004, Nelly Vanessa Tejada Rojas, Machado's

4   administrative assistant, reported to Ricardo Kiyoshi Honda Hatadi, who managed

5   the computer systems, that Machado's computer was inoperative and that the

6   computer screen showed an error message after it was turned on.  Mr. Honda

7   confirmed that the error message indicated that the computer was not reading the

8   internal hard drive.  Mr. Honda removed the hard drive from Machado's computer

9   for additional testing and concluded that the hard drive was damaged.

10       The immediate resignation of three employees to go to an unnamed

11   competitor and the suspicious errors on Machado's computer caused Mattel to begin

12   investigating their activities.  Mattel discovered that Machado, Trueba and Vargas

13   stole a vast array of Mattel trade secrets, including by surreptitiously downloading

14   enormous quantities of Mattel confidential and trade secret data from Mattel

15   computers onto USB (or "thumb") drives.  This information involved virtually every

16   category of Mattel's sensitive and trade secret business plans and information for the

17   Mexican market, and a significant quantity of sensitive and trade secret information

18   relating to Mattel's business in the United States and worldwide.  Machado, Trueba

19   and Vargas attempted to conceal their widespread theft of Mattel's proprietary

20   information.  Machado ran a software program called System & Internet Washer Pro

21   on his Mattel personal computer in an attempt to not only erase information,

22   including information that would reveal the addresses to which he had sent, or from

23   which he had received, e-mails, but to destroy any evidence of the activities that he

24   had done on the computer.  Machado also damaged the hard drive of his Mattel

25   personal computer for the same purpose.  Their emails showed they had planned in

26   advance with MGA to maximize the damage to Mattel.

27       Machado, Trueba and Vargas has been in frequent telephonic and e-

28   mail contact with MGA personnel, including Larian, for over three months prior to

-28-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit 3 , P. 90

1    By way of further answer, pursuant to Federal Rule of Civil Procedure

2  33(d), Mattel has produced responsive, non-privileged documents and tangible items

3  in its possession, custody or control from which the answer to this Interrogatory may

4  be derived.

5    Mattel continues its factual investigation and currently has outstanding

6  discovery requests to Bryant and to MGA, as well as motions to compel Bryant and

7  MGA to disclose information relevant to this subject.  Mattel reserves the right to

8  supplement this response and, consistent with its obligations under Federal Rule of

9  Civil Procedure 26(e), Mattel will supplement this response if Mattel receives

10  additional responsive information.

11

12  **INTERROGATORY NO. 10:**

13    State, with particularity, when and how MATTEL first learned that

14  BRYANT performed work for MGA.

15

16  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

17    In addition to the general objections stated above, Mattel specifically

18  objects to this Interrogatory as unreasonably burdensome, overbroad and

19  incomprehensible in that it defines "Mattel" to include "past . . . employees,"

20  including but not limited to defendant Carter Bryant and a number of other former

21  Mattel employees who worked with Carter Bryant to design and develop Bratz after

22  each had been a Mattel employee and who, at that time, had no relationship with

23  Mattel that would have required those persons to disclose to Mattel the development

24  of the Bratz dolls.  Mattel further objects to this interrogatory on the grounds that it

25  is vague and ambiguous with regard to the phrase "first learned that BRYANT

26  performed work for MGA."  Mattel further objects to this Interrogatory on the

27  grounds that it calls for information that is neither relevant to the claims or defenses

28  of any party to the pending action nor reasonably calculated to lead to the discovery

1  of admissible evidence.  Mattel further objects to this Interrogatory on the grounds

2  that it calls for the disclosure of information subject to the attorney-client privilege,

3  the attorney work-product doctrine and other applicable privileges.  Mattel

4  continues its factual investigation and currently awaits MGA's compliance with

5  multiple Court Orders compelling MGA to produce documents, to answer

6  Interrogatories and to produce witnesses for deposition which MGA still has not

7  complied with and indeed that the Court has found MGA violated.  Mattel also has

8  pending motions to compel against defendants MGA, Bryant, Machado and others

9  associated with defendants, including to compel them to produce documents, to

10  appear for deposition and to answer requests for admissions.  In addition, the

11  depositions of certain witnesses, including without limitation Carter Bryant and

12  various MGA representatives, have yet to be completed, and other witnesses,

13  including various MGA representatives such as Gustavo Machado, Ron Brawer,

14  Mariana Trueba, Pablo Vargas, Janine Brisbois, Shirin Salemnia, as well as

15  Veronica Marlow, Margaret Hatch-Leahy and Elise Cloonan, have yet to be

16  produced for deposition.  Furthermore, although MGA's original production in this

17  case regarding the alleged origins and development of Bratz consisted of only a few

18  thousand pages, and only after multiple Court Orders compelling MGA and Bryant

19  to produce their documents, MGA and other Defendants have begun to produced

20  voluminous documents only in recent weeks, including documents that Mattel has

21  been unable to access or review because of technical deficiencies in MGA's

22  production that MGA only recently corrected.  Furthermore, despite prior Court

23  Order directing MGA to provide documents in unredacted form, MGA has failed to

24  comply and thus continues to deny Mattel information that the Court has ruled

25  Mattel is entitled to.  The review of MGA's, Bryant's and other Defendants' belated,

26  and still incomplete, productions continues.  Mattel reserves the right to supplement

27  this response consistent with Federal Rule of Civil Procedure 26(e).

28

1    Subject to and without waiving the foregoing general and specific

2  objections, Mattel responds as follows:

3    Excluding from this response defendant Carter Bryant and those former

4  Mattel employees who worked with defendant Carter Bryant to design and develop

5  Bratz, Mattel states as follows:  Bryant and MGA acted to conceal, including by

6  Bryant's affirmative misrepresentations to Mattel during his Mattel employment,

7  Bryant's involvement with Bratz.  To Mattel's knowledge, Bryant was first publicly

8  and definitively confirmed as the Bratz designer in the July 18, 2003 Wall Street

9  Journal article, in which Isaac Larian also indicated that Bryant had been involved in

10  some manner with MGA in or about "late 1999."

11    After Bryant left Mattel, but prior to the July 18, 2003 article, there was

12  rumor and innuendo that Bryant may be working with MGA on Bratz.  Mattel

13  conducted an investigation in Spring 2002 based on allegations that Bryant may

14  have plagiarized "Toon Teens" and created Bratz dolls for MGA, and later in

15  August 2002 based on an anonymous letter sent to Mattel.  The letter's author

16  (whoever it was) offered no evidence for his or her allegations.  The potential claims

17  investigated in 2002 have not been asserted in this case.  In March 2002, Mattel

18  investigated allegations of possible copyright infringement of "Toon Teens" designs,

19  not whether Mr. Bryant created Bratz or worked with MGA during his Mattel

20  employment.  The potential claims investigated in 2002 did not give Mattel any

21  knowledge, or even reason to believe, that Bryant worked for MGA and/or

22  conceived of Bratz while a Mattel employee.

23    Subsequently, on November 24, 2003, Mattel obtained a copy of a

24  contract between defendant Carter Bryant and defendant MGA.  That contract--

25  which Bryant and MGA had entered into while Bryant was employed by Mattel--

26  required Bryant to provide design services to MGA on a "top priority" basis, in

27  conflict with his then-existing obligations to Mattel.  It also purported to grant MGA

28  ownership of works produced by Bryant both before and after the agreement's

1   effective date, in further contravention of his obligations to Mattel.  Through this

2   agreement, Mattel first determined that it was likely that Bryant worked as a

3   designer for a Mattel competitor, MGA, while being employed and paid by Mattel

4   for his exclusive services as a designer.

5          Also, and as the Court determined in its Order denying defendant's

6   Motion for Termination Sanctions dated August 29, 2007 — one of defendants'

7   unsuccessful attempts to avoid a trial on the merits of Mattel's claims — that

8   "November 24, 2003, marks the date when litigation between Mattel and Bryant

9   became more than merely speculative and in fact became probable. . . . Although

10  prior to this date an internal investigation may have raised suspicion on Mattel's part

11  that litigation might arise, there was no evidence presented to the Court that Mattel

12  should have known it had a viable claim against Bryant before November 2003."

13         Answering further, the fact that Bryant worked with MGA while

14  employed by Mattel was confirmed for the first time by Bryant at his deposition in

15  November 2004, which took place only after Bryant had refused to be deposed for

16  months and only after the Court entered two Orders compelling him to testify.  At

17  that time, he acknowledged that he worked on the "Bratz" project and an ostensibly

18  separate project that defendants purport to call "Angel" during the time of his Mattel

19  employment.

20         By way of a further answer, the deposition of Jill Nordquist was taken

21  in this action from which the answer to this Interrogatory may be further derived.

22         By way of further answer, pursuant to <u>Federal Rule of Civil Procedure</u>

23  33(d), Mattel has produced responsive, non-privileged documents and tangible items

24  in its possession, custody or control from which the answer to this Interrogatory may

25  be derived, including the documents identified in response to Interrogatory No. 1.

26         By way of further answer, this topic may be the subject of expert

27  testimony, which will be disclosed in the manner, and at the time, required for

28  expert disclosures pursuant to the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

1   Mattel continues its factual investigation and currently has outstanding
2   discovery requests to Bryant and to MGA, as well as motions to compel Bryant and
3   MGA to disclose information relevant to this subject.  Mattel reserves the right to
4   supplement this response and, consistent with its obligations under <u>Federal Rule of</u>
5   <u>Civil Procedure</u> 26(e), Mattel will supplement this response if Mattel receives
6   additional responsive information.

7

8   **INTERROGATORY NO. 11:**
9   State, with particularity, when and how MATTEL first learned that
10  BRYANT conceived of the BRATZ CONCEPT.

11

12  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**
13  In addition to the general objections stated above, Mattel specifically
14  objects to this Interrogatory on the grounds that it calls for the disclosure of
15  information subject to the attorney-client privilege, the attorney work-product
16  doctrine and other applicable privileges.  Mattel further objects to this Interrogatory
17  as unreasonably burdensome and overbroad in that it purports to require Mattel to
18  summarize all facts on this subject, including without limitation facts that are known
19  to or in the possession, custody and control of defendants and non-parties, including
20  non-parties associated with defendants.  Mattel further objects to this interrogatory
21  on the grounds that it is vague and ambiguous with regard to the phrase "first
22  learned that BRYANT conceived of the BRATZ CONCEPT."  Mattel further
23  objects to this interrogatory on the grounds that it is unreasonably burdensome and
24  overbroad in that it defines "Mattel" to include "past . . . employees," including but
25  not limited to defendant Carter Bryant and a number of other former Mattel
26  employees who worked with Carter Bryant to design and develop Bratz after each
27  had been a Mattel employee and who, at that time, had no relationship with Mattel
28  that would have required those persons to disclose to Mattel the development of the

-115-
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

Exhibit 3 , P. 95

# Exhibit 4

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2     johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5   Los Angeles, California 90017-2543
    Telephone:  (213) 443-3000
6   Facsimile:  (213) 443-3100

7   Attorneys for Mattel, Inc.

8

9                   UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11                        EASTERN DIVISION

12   CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

13          Plaintiff,                     Consolidated with
                                           Case No. CV 04-09059
14       vs.                               Case No. CV 05-02727

15   MATTEL, INC., a Delaware             Hon. Stephen G. Larson
     corporation,
16                                        MATTEL, INC.'S OBJECTIONS AND
            Defendant.                    SECOND SUPPLEMENTAL
17                                        RESPONSES TO DEFENDANT'S
                                          FIRST SET OF INTERROGATORIES,
18   AND CONSOLIDATED ACTIONS             NUMBERS 1-14

19

20

21   PROPOUNDING PARTY:      CARTER BRYANT

22   RESPONDING PARTY:       MATTEL, INC.

23   SET NO.:                ONE (1)

24

25              **ATTORNEY'S EYES ONLY --**

26           **SUBJECT TO PROTECTIVE ORDER**

27

28

07209/2523329.2

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

1   in its possession, custody or control from which the answer to this Interrogatory may

2   be derived.

3           By way of further answer, Mattel currently has not yet received

4   discovery from defendant or MGA, has not yet obtained any deposition testimony

5   and has not yet had the opportunity to obtain information from other third parties

6   who may possess relevant information.  Mattel therefore reserves the right to

7   supplement this response after Mattel receives more information about defendant's

8   activities.  By way of further answer, this topic may be the subject of expert

9   testimony, which will be disclosed in the manner, and at the time, required for

10  expert disclosures pursuant to the Federal and Local Rules.

11

12  FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

13          In addition to the general objections stated above, Mattel specifically

14  objects to this Interrogatory on the grounds that it is overbroad, oppressive and

15  harassing, including without limitation that the Interrogatory is not restricted to

16  claims in this suit and thus purports to require disclosure of matters that have no

17  bearing on and are not at issue in this suit.  Such matters will not be revealed or

18  addressed.  Mattel further objects to this Interrogatory as unreasonably burdensome

19  and overbroad in that it purports to require Mattel to summarize all facts and

20  identify all documents on this subject, including without limitation facts that are

21  known to or in the possession, custody and control of defendants and non-parties,

22  including non-parties associated with defendants.  Mattel further objects to this

23  Interrogatory on the grounds that it is vague and ambiguous.  Mattel further objects

24  to this Interrogatory on the grounds that it calls for the disclosure of information

25  subject to the attorney-client privilege, the attorney work-product doctrine and other

26  applicable privileges.  Mattel further objects to this Request on the grounds that it is

27  premature and seeks to circumvent the expert disclosure provisions of the Federal

28  and Local Rules.  Mattel continues its factual investigation and currently awaits the

07209/2323339.2

-15-

Exhibit 4, P. 97

1  assign Bratz works to MGA and to provide design and development services to
2  MGA, a Mattel competitor.

3       As a result of the efforts of Bryant and other Mattel employees working
4  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at
5  deposition in 2004), the Bratz dolls had been designed and were far along in
6  development during the time that Bryant was employed by Mattel and prior to the
7  time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and
8  develop designs for the dolls as well as other aspects of the products such as their
9  fashion accessories during the time he was employed by Mattel, but MGA showed
10  Bratz prototypes and/or visual representations of Bratz to numerous third parties,
11  including without limitation retailers, no later than November 2000, less than three
12  weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these
13  presentations while Bryant was still employed by Mattel.  Bryant and MGA
14  employees also repeatedly and continuously communicated with employees of
15  MGA Entertainment (HK) Limited regarding the design and manufacturing of
16  Bratz.  Bratz also were shown to retailers at the Hong Kong Toy Fair in January
17  2001 and very soon thereafter at the New York Toy Fair.  The Bratz dolls which had
18  been created during the time of Bryant's employment by Mattel, and based on
19  Bryant's concepts, designs, three-dimensional items and other works, were very
20  similar to the dolls as released, which was possible only because of Bryant's work
21  on Bratz with MGA during his Mattel employment, using Mattel resources.

22       Evidence Mattel has been able to obtain thus far has established that
23  Bryant worked for his own and MGA's benefit during his Mattel employment, and
24  did so using Mattel resources.  First, Bryant admitted at deposition, and documents
25  confirm, that he worked and aided MGA during the term of his Mattel employment
26  without Mattel's consent or knowledge, although further showing his guilty
27  knowledge he sought to minimize and conceal the time period and extent of his aid
28  to and work with MGA.  At deposition, Bryant further admitted, and documents

-20-

07209/2373329.2

Exhibit 4 , P. 98

1  confirm, among other things, that:  (1) he worked on his Bratz drawings while
2  employed by Mattel and showed them to MGA while employed by Mattel; (2) he
3  used Mattel employees and materials to prepare a three-dimensional doll prototype
4  for his pitch to MGA — a pitch he made while employed by Mattel; (3) he
5  performed development-related work on Bratz while employed by Mattel; (4) he
6  worked on an ostensibly separate doll called "Angel" for MGA while employed by
7  Mattel; (5) he targeted Mattel vendors and engaged them to start their work on Bratz
8  before he left Mattel, using Mattel resources; (6) he used Mattel personnel and other
9  Mattel resources to work on the Bratz project during his Mattel employment,
10 including without limitation by identifying Mattel vendors who Bryant knew as a
11 consequence of his Mattel employment to work on the project and enlisting them to
12 work on the Bratz project during the term of his Mattel employment; and (7) he
13 received monetary payments and other benefits from MGA during the term of his
14 Mattel employment, at least some of which Bryant and MGA sought to conceal in
15 this litigation.  MGA and Isaac Larian, MGA's CEO, were aware when Bryant first
16 met with them that Bryant was still employed at Mattel and furthermore were aware
17 of Bryant's obligations to Mattel.  Both Bryant and MGA benefited as a
18 consequence of his aid and assistance to and work with MGA during the term of his
19 Mattel employment.
20          After Bryant left Mattel, but prior to the July 18, 2003 article, there was
21 rumor and innuendo that Bryant may be working with MGA on Bratz.  Mattel
22 conducted an investigation in Spring 2002 based on allegations that Bryant may
23 have plagiarized "Toon Teens" and created Bratz dolls for MGA, and later in
24 August 2002 based on an anonymous letter sent to Mattel.  The letter's author
25 (whoever it was) offered no evidence for his or her allegations.  The potential claims
26 investigated in 2002 have not been asserted in this case.  In March 2002, Mattel
27 investigated allegations of possible copyright infringement of "Toon Teens" designs,
28 not whether Mr. Bryant created Bratz or worked with MGA during his Mattel

Exhibit 4, P. 99

1  continue to do so.  MGA's and other Defendants' continued use, sale, distribution

2  and licensing of Bratz infringes upon Mattel's rights; and has injured and continues

3  to injure Mattel.

4      <u>Bryant's, Garcia's And Others Exposure To Mattel Projects.</u>  Other

5  evidence adduced to date also confirms, among other things, that Bryant designed

6  Bratz while employed by Mattel and not in 1998 as he has attempted to claim.

7  Mattel designer Lily Martinez was working on a project in 1999 called Toon Teens.

8  Ms. Martinez had her sketches up in her cubicle for a period of time in 1999.

9  Bryant saw Ms. Martinez's Toon Teens sketches on at least one occasion and

10  commented that he liked them and "had never seen anything like them."  The

11  sketches Ms. Martinez had done in 1999 of Toon Teens bear strong resemblances to

12  the initial Bratz design drawings that Bryant did.  According to Bryant,

13  Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while

14  both Bryant and Ms. Cloonan were employed by Mattel.  Ms. Cloonan was Bryant's

15  roommate in 1999-2000.  She also worked on the Mattel "Toon Teens" project.

16  Bryant's exposure to Toon Teens designs and the similarities between the Toon

17  Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created

18  Bratz works while he was a Mattel employee and not in 1998 as he claims.

19      Second, documents and designs for Mattel's DIVA STARZ project in

20  late 1999 and in 2000 that were never publicly released, and that pre-date the release

21  of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz

22  dolls.  For example, names internally considered at Mattel in late 1999 and through

23  2000 for the DIVA STARZ project tend to show that Bryant designed Bratz while at

24  Mattel.  Names that were internally considered at Mattel during that time period

25  included "Brats" and variations thereon, "Brat Pack," "Boyz" and "Petz."  Ms.

26  Garcia acknowledged that "Brats" spelled with an "s" was subsequently considered

27  as a name for the "Bratz" dolls.  Furthermore, design work that Steve Linker did for

28  "Mini Diva Starz" at Mattel's behest in early 2000 bear similarities to the Bratz dolls

-27-

1    that he made those misrepresentations that he had engaged in business activities that

2    were competitive with Mattel and planned to continue to do so, which he failed to

3    disclose.

4            Bryant's last day of employment with Mattel was October 20, 2000.  At

5    that time, he signed a further agreement, called the "Proprietary Information

6    Checkout."  In it, Bryant acknowledged that "he has agreed to transfer all inventions

7    made or conceived during the period of his employment to Mattel," and that:

8            My interest in (a) any and all inventions . . . which I have made

9            or conceived . . . and in (b) any . . . designs, trademarks,

10           copyright subject matter [or] . . . artistic works which I have

11           made or conceived . . . during the period of my employment

12           which relate or are applicable directly or indirectly to any phase

13           of [Mattel's] business shall be the exclusive property of [Mattel].

14   Bryant executed the Proprietary Information Checkout notwithstanding his

15   execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works

16   to MGA one month earlier.  Nor did Bryant otherwise disclose to Mattel his MGA

17   agreement or work.  To the contrary, Bryant concealed from Mattel that he was

18   going to a competitor and explicitly told others at Mattel that he was going to do

19   "non-competitive" pursuits.  Bryant knew at the time that those representations were

20   false and made those false statements to conceal from Mattel the facts that he was

21   already working with MGA and that he had contracted with MGA to purportedly

22   assign Bratz works to MGA and to provide design and development services to

23   MGA, a Mattel competitor.

24           As a result of the efforts of Bryant and other Mattel employees working

25   on Bratz (done without Mattel's knowledge until the time Bryant admitted it at

26   deposition in 2004), the Bratz dolls had been designed and were far along in

27   development during the time that Bryant was employed by Mattel and prior to the

28   time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and

1   develop designs for the dolls as well as other aspects of the products such as their

2   fashion accessories during the time he was employed by Mattel, but MGA showed

3   Bratz prototypes and/or visual representations of Bratz to numerous third parties,

4   including without limitation retailers, no later than November 2000, less than three

5   weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these

6   presentations while Bryant was still employed by Mattel.  Bryant and MGA

7   employees also repeatedly and continuously communicated with employees of

8   MGA Entertainment (HK) Limited regarding the design and manufacturing of

9   Bratz.  Bratz also were shown to retailers at the Hong Kong Toy Fair in January

10   2001 and very soon thereafter at the New York Toy Fair.  The Bratz dolls which had

11   been created during the time of Bryant's employment by Mattel, and based on

12   Bryant's concepts, designs, three-dimensional items and other works, were very

13   similar to the dolls as released, which was possible only because of Bryant's work

14   on Bratz with MGA during his Mattel employment, using Mattel resources.

15         Evidence Mattel has been able to obtain thus far has established that

16   Bryant worked for his own and MGA's benefit during his Mattel employment, and

17   did so using Mattel resources.  First, Bryant admitted at deposition, and documents

18   confirm, that he worked and aided MGA during the term of his Mattel employment

19   without Mattel's consent or knowledge, although further showing his guilty

20   knowledge he sought to minimize and conceal the time period and extent of his aid

21   to and work with MGA.  At deposition, Bryant further admitted, and documents

22   confirm, among other things, that:  (1) he worked on his Bratz drawings while

23   employed by Mattel and showed them to MGA while employed by Mattel; (2) he

24   used Mattel employees and materials to prepare a three-dimensional doll prototype

25   for his pitch to MGA — a pitch he made while employed by Mattel; (3) he

26   performed development-related work on Bratz while employed by Mattel; (4) he

27   worked on an ostensibly separate doll called "Angel" for MGA while employed by

28   Mattel; (5) he targeted Mattel vendors and engaged them to start their work on Bratz

Exhibit 4 , P. 102

1   Bryant executed the Proprietary Information Checkout notwithstanding his

2   execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works

3   to MGA one month earlier.  Nor did Bryant otherwise disclose to Mattel his MGA

4   agreement or work.  To the contrary, Bryant concealed from Mattel that he was

5   going to a competitor and explicitly told others at Mattel that he was going to do

6   "non-competitive" pursuits.  Bryant knew at the time that those representations were

7   false and made those false statements to conceal from Mattel the facts that he was

8   already working with MGA and that he had contracted with MGA to purportedly

9   assign Bratz works to MGA and to provide design and development services to

10  MGA, a Mattel competitor.

11         As a result of the efforts of Bryant and other Mattel employees working

12  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at

13  deposition in 2004), the Bratz dolls had been designed and were far along in

14  development during the time that Bryant was employed by Mattel and prior to the

15  time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and

16  develop designs for the dolls as well as other aspects of the products such as their

17  fashion accessories during the time he was employed by Mattel, but MGA showed

18  Bratz prototypes and/or visual representations of Bratz to numerous third parties,

19  including without limitation retailers, no later than November 2000, less than three

20  weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these

21  presentations while Bryant was still employed by Mattel.  Bryant and MGA

22  employees also repeatedly and continuously communicated with employees of

23  MGA Entertainment (HK) Limited regarding the design and manufacturing of

24  Bratz.  Bratz also were shown to retailers at the Hong Kong Toy Fair in January

25  2001 and very soon thereafter at the New York Toy Fair.  The Bratz dolls which had

26  been created during the time of Bryant's employment by Mattel, and based on

27  Bryant's concepts, designs, three-dimensional items and other works, were very

28

-102-

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Exhibit 4 , P. 103

1 already working with MGA and that he had contracted with MGA to purportedly
2 assign Bratz works to MGA and to provide design and development services to
3 MGA, a Mattel competitor.

4     As a result of the efforts of Bryant and other Mattel employees working
5 on Bratz (done without Mattel's knowledge until the time Bryant admitted it at
6 deposition in 2004), the Bratz dolls had been designed and were far along in
7 development during the time that Bryant was employed by Mattel and prior to the
8 time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and
9 develop designs for the dolls as well as other aspects of the products such as their
10 fashion accessories during the time he was employed by Mattel, but MGA showed
11 Bratz prototypes and/or visual representations of Bratz to numerous third parties,
12 including without limitation retailers, no later than November 2000, less than three
13 weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these
14 presentations while Bryant was still employed by Mattel. Bryant and MGA
15 employees also repeatedly and continuously communicated with employees of
16 MGA Entertainment (HK) Limited regarding the design and manufacturing of
17 Bratz. Bratz also were shown to retailers at the Hong Kong Toy Fair in January
18 2001 and very soon thereafter at the New York Toy Fair. The Bratz dolls which had
19 been created during the time of Bryant's employment by Mattel, and based on
20 Bryant's concepts, designs, three-dimensional items and other works, were very
21 similar to the dolls as released, which was possible only because of Bryant's work
22 on Bratz with MGA during his Mattel employment, using Mattel resources.

23     Evidence Mattel has been able to obtain thus far has established that
24 Bryant worked for his own and MGA's benefit during his Mattel employment, and
25 did so using Mattel resources. First, Bryant admitted at deposition, and documents
26 confirm, that he worked and aided MGA during the term of his Mattel employment
27 without Mattel's consent or knowledge, although further showing his guilty
28 knowledge he sought to minimize and conceal the time period and extent of his aid

07209/2123122.2

Exhibit 4 , P. 104

1  relating to this subject at the outset of discovery in this action and also seeks to

2  circumvent the expert disclosure provisions of the Federal and Local Rules.

3          Subject to and without waiving the foregoing general and specific

4  objections, Mattel responds as follows:

5          The facts necessary to answer this Interrogatory are known to

6  defendant as well as MGA and other third parties, but not to Mattel at this juncture.

7  Mattel currently has outstanding discovery requests to defendant and to MGA, and

8  reserves the right to supplement this response after Mattel receives more

9  information about defendant's activities.

10

11  <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:</u>

12          In addition to the general objections stated above, Mattel specifically

13  objects to this Interrogatory on the grounds that it is overbroad, oppressive and

14  harassing, including without limitation that the Interrogatory is not restricted to

15  claims in this suit and thus purports to require disclosure of matters that have no

16  bearing on and are not at issue in this suit.  Such matters will not be revealed or

17  addressed.  Mattel further objects to this Interrogatory as unreasonably burdensome

18  and overbroad in that it purports to require Mattel to summarize all facts and

19  identify all documents on this subject, including without limitation facts that are

20  known to or in the possession, custody and control of defendants and non-parties,

21  including non-parties associated with defendants.  Mattel further objects to this

22  Interrogatory on the grounds that it is vague and ambiguous.  Mattel further objects

23  to this Interrogatory on the grounds that it calls for the disclosure of information

24  subject to the attorney-client privilege, the attorney work-product doctrine and other

25  applicable privileges.  Mattel further objects to this Request on the grounds that it is

26  premature and seeks to circumvent the expert disclosure provisions of the Federal

27  and Local Rules.  Mattel continues its factual investigation and currently awaits the

28  opposing parties compliance with multiple Court Orders compelling the production

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

07209/2323329.1

Exhibit 4 , P. 105

1  assign Bratz works to MGA and to provide design and development services to
2  MGA, a Mattel competitor.

3          As a result of the efforts of Bryant and other Mattel employees working
4  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at
5  deposition in 2004), the Bratz dolls had been designed and were far along in
6  development during the time that Bryant was employed by Mattel and prior to the
7  time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and
8  develop designs for the dolls as well as other aspects of the products such as their
9  fashion accessories during the time he was employed by Mattel, but MGA showed
10  Bratz prototypes and/or visual representations of Bratz to numerous third parties,
11  including without limitation retailers, no later than November 2000, less than three
12  weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these
13  presentations while Bryant was still employed by Mattel.  Bryant and MGA
14  employees also repeatedly and continuously communicated with employees of
15  MGA Entertainment (HK) Limited regarding the design and manufacturing of
16  Bratz.  Bratz also were shown to retailers at the Hong Kong Toy Fair in January
17  2001 and very soon thereafter at the New York Toy Fair.  The Bratz dolls which had
18  been created during the time of Bryant's employment by Mattel, and based on
19  Bryant's concepts, designs, three-dimensional items and other works, were very
20  similar to the dolls as released, which was possible only because of Bryant's work
21  on Bratz with MGA during his Mattel employment, using Mattel resources.

22          Evidence Mattel has been able to obtain thus far has established that
23  Bryant worked for his own and MGA's benefit during his Mattel employment, and
24  did so using Mattel resources.  First, Bryant admitted at deposition, and documents
25  confirm, that he worked and aided MGA during the term of his Mattel employment
26  without Mattel's consent or knowledge, although further showing his guilty
27  knowledge he sought to minimize and conceal the time period and extent of his aid
28  to and work with MGA.  At deposition, Bryant further admitted, and documents

Exhibit _____, P. 106

1   Bratz line" in February, March and May 2000.  Bryant was working for Mattel

2   during each of these time periods.

3           Since 2001, MGA has distributed, sold and licensed Bratz and Bratz-

4   related products throughout the world.  MGA and Bryant claim current ownership of

5   Bratz, and all copyrights and copyright registrations related thereto.  MGA

6   continues to market, sell and license Bratz and has expressed an intention to

7   continue to do so.  MGA's and other Defendants' continued use, sale, distribution

8   and licensing of Bratz infringes upon Mattel's rights, and has injured and continues

9   to injure Mattel.

10          <u>Bryant's, Garcia's And Others Exposure To Mattel Projects.</u>  Other

11  evidence adduced to date also confirms, among other things, that Bryant designed

12  Bratz while employed by Mattel and not in 1998 as he has attempted to claim.

13  Mattel designer Lily Martinez was working on a project in 1999 called Toon Teens.

14  Ms. Martinez had her sketches up in her cubicle for a period of time in 1999.

15  Bryant saw Ms. Martinez's Toon Teens sketches on at least one occasion and

16  commented that he liked them and "had never seen anything like them."  The

17  sketches Ms. Martinez had done in 1999 of Toon Teens bear strong resemblances to

18  the initial Bratz design drawings that Bryant did.  According to Bryant,

19  Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while

20  both Bryant and Ms. Cloonan were employed by Mattel.  Ms. Cloonan was Bryant's

21  roommate in 1999-2000.  She also worked on the Mattel "Toon Teens" project.

22  Bryant's exposure to Toon Teens designs and the similarities between the Toon

23  Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created

24  Bratz works while he was a Mattel employee and not in 1998 as he claims.

25          Second, documents and designs for Mattel's DIVA STARZ project in

26  late 1999 and in 2000 that were never publicly released, and that pre-date the release

27  of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz

28  dolls.  For example, names internally considered at Mattel in late 1999 and through

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

07209/2329320.2

Exhibit __4__, P. _107_

1  Mattel; compensation paid by Mattel to defendant during defendant's period of

2  disloyalty; and all other damages and relief sought in Mattel's Complaint.

3        By way of further answer, pursuant to <u>Federal Rule of Civil Procedure</u>

4  33(d), Mattel will produce responsive, non-privileged documents and tangible items

5  in its possession, custody or control from which the answer to this Interrogatory may

6  be derived.

7        By way of further answer, Mattel currently has not yet received

8  discovery from defendant or MGA, has not yet obtained any deposition testimony

9  and has not yet had the opportunity to obtain information from other third parties

10  who may possess relevant information.  Mattel therefore reserves the right to

11  supplement this response after Mattel receives more information about defendant's

12  activities.  By way of further answer, this topic may be the subject of expert

13  testimony, which will be disclosed in the manner, and at the time, required for

14  expert disclosures pursuant to the <u>Federal</u> and <u>Local Rules</u>.

15

16  <u>FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6</u>:

17        In addition to the general objections stated above, Mattel specifically

18  objects to this Interrogatory on the grounds that it is overbroad, oppressive and

19  harassing, including without limitation that the Interrogatory is not restricted to

20  claims in this suit and thus purports to require disclosure of matters that have no

21  bearing on and are not at issue in this suit.  Such matters will not be revealed or

22  addressed.  Mattel further objects to this Interrogatory as unreasonably burdensome

23  and overbroad in that it purports to require Mattel to summarize all facts and

24  identify all documents on this subject, including without limitation facts that are

25  known to or in the possession, custody and control of defendants and non-parties,

26  including non-parties associated with defendants.  Mattel further objects to this

27  Interrogatory on the grounds that it is vague and ambiguous.  Mattel further objects

28  to this Interrogatory on the grounds that it calls for the disclosure of information

Exhibit _4_ , P. _108_

1    subject to the attorney-client privilege, the attorney work-product doctrine and other
2    applicable privileges.  Mattel further objects to this Request on the grounds that it is
3    premature and seeks to circumvent the expert disclosure provisions of the Federal
4    and Local Rules.  Mattel continues its factual investigation and currently awaits the
5    opposing parties compliance with multiple Court Orders compelling the production
6    of documents, to answer Interrogatories and to produce witnesses for deposition
7    which have not been complied with and indeed that the Court has found MGA
8    violated.  Mattel also has pending motions to compel against defendants MGA,
9    Bryant, Machado and others associated with defendants, including to compel them
10   to produce documents, to appear for deposition and to answer requests for
11   admissions.  In addition, the depositions of certain witnesses, including without
12   limitation Carter Bryant and various MGA representatives, have yet to be
13   completed, and other witnesses, such as Veronica Marlow and Elise Cloonan, have
14   yet to be produced for deposition.  Furthermore, although Bryant's original
15   production in this case regarding the alleged origins and development of Bratz
16   consisted of only a few thousand pages, and only after multiple Court Orders
17   compelling MGA and Bryant to produce their documents, MGA and other
18   Defendants have begun to produce voluminous documents only in recent weeks,
19   including documents that Mattel has been unable to access or review because of
20   technical deficiencies in MGA's production that MGA only recently corrected.
21   Furthermore, despite prior Court Order directing MGA to provide documents in
22   unredacted form, MGA has failed to comply and thus continues to deny Mattel
23   information that the Court has ruled Mattel is entitled to.  The review of MGA's,
24   Bryant's and other Defendants' belated, and still incomplete, productions continues.
25   Mattel reserves the right to supplement this response consistent with Federal Rule of
26   Civil Procedure 26(e).
27
28

-203-
MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Exhibit 4, P. 105

1   which relate or are applicable directly or indirectly to any phase
2   of [Mattel's] business shall be the exclusive property of [Mattel].
3   Bryant executed the Proprietary Information Checkout notwithstanding his
4   execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works
5   to MGA one month earlier.  Nor did Bryant otherwise disclose to Mattel his MGA
6   agreement or work.  To the contrary, Bryant concealed from Mattel that he was
7   going to a competitor and explicitly told others at Mattel that he was going to do
8   "non-competitive" pursuits.  Bryant knew at the time that those representations were
9   false and made those false statements to conceal from Mattel the facts that he was
10  already working with MGA and that he had contracted with MGA to purportedly
11  assign Bratz works to MGA and to provide design and development services to
12  MGA, a Mattel competitor.
13          As a result of the efforts of Bryant and other Mattel employees working
14  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at
15  deposition in 2004), the Bratz dolls had been designed and were far along in
16  development during the time that Bryant was employed by Mattel and prior to the
17  time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and
18  develop designs for the dolls as well as other aspects of the products such as their
19  fashion accessories during the time he was employed by Mattel, but MGA showed
20  Bratz prototypes and/or visual representations of Bratz to numerous third parties,
21  including without limitation retailers, no later than November 2000, less than three
22  weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these
23  presentations while Bryant was still employed by Mattel.  Bryant and MGA
24  employees also repeatedly and continuously communicated with employees of
25  MGA Entertainment (HK) Limited regarding the design and manufacturing of
26  Bratz.  Bratz also were shown to retailers at the Hong Kong Toy Fair in January
27  2001 and very soon thereafter at the New York Toy Fair.  The Bratz dolls which had
28  been created during the time of Bryant's employment by Mattel, and based on

07209/2323329.2

Exhibit  4 , P.  110

1  Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while
2  both Bryant and Ms. Cloonan were employed by Mattel. Ms. Cloonan was Bryant's
3  roommate in 1999-2000. She also worked on the Mattel "Toon Teens" project.
4  Bryant's exposure to Toon Teens designs and the similarities between the Toon
5  Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created
6  Bratz works while he was a Mattel employee and not in 1998 as he claims.
7         Second, documents and designs for Mattel's DIVA STARZ project in
8  late 1999 and in 2000 that were never publicly released, and that pre-date the release
9  of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz
10 dolls. For example, names internally considered at Mattel in late 1999 and through
11 2000 for the DIVA STARZ project tend to show that Bryant designed Bratz while at
12 Mattel. Names that were internally considered at Mattel during that time period
13 included "Brats" and variations thereon, "Brat Pack," "Boyz" and "Petz." Ms.
14 Garcia acknowledged that "Brats" spelled with an "s" was subsequently considered
15 as a name for the "Bratz" dolls. Furthermore, design work that Steve Linker did for
16 "Mini Diva Starz" at Mattel's behest in early 2000 bear similarities to the Bratz dolls
17 and, indeed, Ms. Garcia later contacted him in the summer of 2000 to solicit his
18 involvement with Bryant and Bratz.
19         Bryant's, Paula Garcia's and other individual's exposure to aspects of
20 the DIVA STARZ projects, including designs and names, while they were Mattel
21 employees, tends to establish that Bryant created Bratz works and conceived of the
22 name "Bratz" while he was a Mattel employee. For example, as a Mattel design
23 employee, Bryant had access to DIVA STARZ designs and drawings in the Mattel
24 design center. As a further example, Paula Garcia also had access and knowledge of
25 the DIVA STARZ project while she and Bryant were Mattel employees as she
26 testified at deposition and for reasons stated above. And other persons working with
27 or at MGA during 2000 either themselves worked on the DIVA STARZ project or
28 were associated with those who did.

07209/2523329.2

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Exhibit 4 , P. 111

1  Mattel employees who worked with Carter Bryant to design and develop Bratz after
2  each had been a Mattel employee and who, at that time, had no relationship with
3  Mattel that would have required those persons to disclose to Mattel the development
4  of the Bratz dolls.  Mattel further objects to this interrogatory on the grounds that it
5  is vague and ambiguous with regard to the phrase "first became aware of the alleged
6  wrongful conduct of Bryant in November 2003."  Mattel further objects to this
7  Interrogatory on the grounds that it calls for information that is neither relevant to
8  the claims or defenses of any party to the pending action nor reasonably calculated
9  to lead to the discovery of admissible evidence.  Mattel further objects to this
10 Interrogatory on the grounds that it calls for the disclosure of information subject to
11 the attorney-client privilege, the attorney work-product doctrine and other applicable
12 privileges.  Mattel continues its factual investigation and currently awaits opposing
13 parties compliance with multiple Court Orders compelling the production of
14 documents, to answer Interrogatories and to produce witnesses for deposition which
15 have not been complied with and indeed that the Court has found MGA violated.
16 Mattel also has pending motions to compel against defendants MGA, Bryant,
17 Machado and others associated with defendants, including to compel them to
18 produce documents, to appear for deposition and to answer requests for admissions.
19 In addition, the depositions of certain witnesses, including without limitation Carter
20 Bryant and various MGA representatives, have yet to be completed, and other
21 witnesses, such as Veronica Marlow and Elise Cloonan, have yet to be produced for
22 deposition.  Furthermore, although Bryant's original production in this case
23 regarding the alleged origins and development of Bratz, consisted of only a few
24 thousand pages, and only after multiple Court Orders compelling MGA and Bryant
25 to produce their documents, MGA and other Defendants have begun to produce
26 voluminous documents only in recent weeks, including documents that Mattel has
27 been unable to access or review because of technical deficiencies in MGA's
28 production that MGA only recently corrected.  Furthermore, despite prior Court

1   Order directing MGA to provide documents in unredacted form, MGA has failed to

2   comply and thus continues to deny Mattel information that the Court has ruled

3   Mattel is entitled to. The review of MGA's, Bryant's and other Defendants' belated,

4   and still incomplete, productions continues. Mattel reserves the right to supplement

5   this response consistent with Federal Rule of Civil Procedure 26(e).

6         Without waiving the foregoing General and Specific objections, and

7   subject thereto, Mattel responds to this interrogatory as follows:

8         Excluding from this response defendant Carter Bryant and those former

9   Mattel employees who worked with defendant Carter Bryant to design and develop

10   Bratz, Mattel states as follows: Bryant and MGA acted to conceal, including by

11   Bryant's affirmative misrepresentations to Mattel during his Mattel employment,

12   Bryant's involvement with Bratz. To Mattel's knowledge, Bryant was first publicly

13   and definitively confirmed as the Bratz designer in the July 18, 2003 *Wall Street*

14   *Journal* article, in which Isaac Larian also indicated that Bryant had been involved

15   in some manner with MGA in or about "late 1999."

16         After Bryant left Mattel, but prior to the July 18, 2003 article, there was

17   rumor and innuendo that Bryant may be working with MGA on Bratz. Mattel

18   conducted an investigation in Spring 2002 based on allegations that Bryant may

19   have plagiarized "Toon Teens" and created Bratz dolls for MGA, and later in

20   August 2002 based on an anonymous letter sent to Mattel. The letter's author

21   (whoever it was) offered no evidence for his or her allegations. The potential claims

22   investigated in 2002 have not been asserted in this case. In March 2002, Mattel

23   investigated allegations of possible copyright infringement of "Toon Teens" designs,

24   not whether Mr. Bryant created Bratz or worked with MGA during his Mattel

25   employment. The potential claims investigated in 2002 did not give Mattel any

26   knowledge, or even reason to believe, that Bryant worked for MGA and/or

27   conceived of Bratz while a Mattel employee.

28

-300-
MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

1       By way of further answer, this topic may be the subject of expert

2  testimony, which will be disclosed in the manner, and at the time, required for

3  expert disclosures pursuant to the Federal and Local Rules.

4       By way of further answer, Mattel currently has outstanding discovery

5  requests to defendant and to MGA, and reserves the right to supplement this

6  response after Mattel receives more information about defendant's activities.

7

8  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

9       In addition to the general objections stated above, Mattel specifically

10 objects to this Interrogatory on the grounds that it calls for the disclosure of

11 information subject to the attorney-client privilege, the attorney work-product

12 doctrine and other applicable privileges.  Mattel further objects to this Interrogatory

13 on the ground that it calls for the disclosure of confidential and/or proprietary

14 information, which Mattel will disclose only subject to and in reliance upon a

15 suitable protective order.  Mattel further objects to this Interrogatory as

16 unreasonably burdensome and overbroad in that it purports to require Mattel to

17 summarize all facts on this subject, including without limitation, facts that are

18 known to or in the possession, custody and control of defendant Bryant, defendant-

19 in-intervention MGA Entertainment, Inc. and nonparties, including nonparties

20 associated with Bryant and/or MGA.  Mattel only undertakes to make a good-faith,

21 reasonable effort to summarize facts currently known to it in responding to this

22 Interrogatory.  Mattel further objects to this Interrogatory on the grounds that it is

23 premature in that it purports to seek to all facts relating to this subject at the outset

24 of discovery in this action and also seeks to circumvent the expert disclosure

25 provisions of the Federal Rules of Civil Procedure and the Local Rules.

26      Subject to and without waiving the foregoing general and specific

27 objections, Mattel responds as follows:

28

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

07209/2323329.2

Exhibit 4 , P. 114

assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

As a result of the efforts of Bryant and other Mattel employees working on Bratz (done without Mattel's knowledge until the time Bryant admitted it at deposition in 2004), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or visual representations of Bratz to numerous third parties, including without limitation retailers, no later than November 2000, less than three weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these presentations while Bryant was still employed by Mattel. Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited regarding the design and manufacturing of Bratz. Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001 and very soon thereafter at the New York Toy Fair. The Bratz dolls which had been created during the time of Bryant's employment by Mattel, and based on Bryant's concepts, designs, three-dimensional items and other works, were very similar to the dolls as released, which was possible only because of Bryant's work on Bratz with MGA during his Mattel employment, using Mattel resources.

Evidence Mattel has been able to obtain thus far has established that Bryant worked for his own and MGA's benefit during his Mattel employment, and did so using Mattel resources. First, Bryant admitted at deposition, and documents confirm, that he worked and aided MGA during the term of his Mattel employment without Mattel's consent or knowledge, although further showing his guilty knowledge he sought to minimize and conceal the time period and extent of his aid to and work with MGA. At deposition, Bryant further admitted, and documents

07209/2323329.2

Exhibit 4 , P. 115

1  Bratz line" in February, March and May 2000. Bryant was working for Mattel

2  during each of these time periods.

3        Since 2001, MGA has distributed, sold and licensed Bratz and Bratz-

4  related products throughout the world. MGA and Bryant claim current ownership of

5  Bratz, and all copyrights and copyright registrations related thereto. MGA

6  continues to market, sell and license Bratz and has expressed an intention to

7  continue to do so. MGA's and other Defendants' continued use, sale, distribution

8  and licensing of Bratz infringes upon Mattel's rights, and has injured and continues

9  to injure Mattel.

10        <u>Bryant's, Garcia's And Others Exposure To Mattel Projects.</u> Other

11  evidence adduced to date also confirms, among other things, that Bryant designed

12  Bratz while employed by Mattel and not in 1998 as he has attempted to claim.

13  Mattel designer Lily Martinez was working on a project in 1999 called Toon Teens.

14  Ms. Martinez had her sketches up in her cubicle for a period of time in 1999.

15  Bryant saw Ms. Martinez's Toon Teens sketches on at least one occasion and

16  commented that he liked them and "had never seen anything like them." The

17  sketches Ms. Martinez had done in 1999 of Toon Teens bear strong resemblances to

18  the initial Bratz design drawings that Bryant did. According to Bryant,

19  Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while

20  both Bryant and Ms. Cloonan were employed by Mattel. Ms. Cloonan was Bryant's

21  roommate in 1999-2000. She also worked on the Mattel "Toon Teens" project.

22  Bryant's exposure to Toon Teens designs and the similarities between the Toon

23  Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created

24  Bratz works while he was a Mattel employee and not in 1998 as he claims.

25        Second, documents and designs for Mattel's DIVA STARZ project in

26  late 1999 and in 2000 that were never publicly released, and that pre-date the release

27  of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz

28  dolls. For example, names internally considered at Mattel in late 1999 and through

-336-

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

07209/2323329.2

Exhibit _4_, P. _116_

1  By way of further answer, Mattel currently has not yet received

2  discovery from defendant or MGA, has not yet obtained any deposition testimony

3  and has not yet had the opportunity to obtain information from other third parties

4  who may possess relevant information.  Mattel therefore reserves the right to

5  supplement this response after Mattel receives more information about defendant's

6  activities.  By way of further answer, this topic may be the subject of expert

7  testimony, which will be disclosed in the manner, and at the time, required for

8  expert disclosures pursuant to the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

9

10  <u>FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11</u>:

11  In addition to the general objections stated above, Mattel specifically

12  objects to this Interrogatory on the grounds that it is overbroad, oppressive and

13  harassing, including without limitation that the Interrogatory is not restricted to

14  claims in this suit and thus purports to require disclosure of matters that have no

15  bearing on and are not at issue in this suit.  Such matters will not be revealed or

16  addressed.  Mattel further objects to this Interrogatory as unreasonably burdensome

17  and overbroad in that it purports to require Mattel to summarize all facts and

18  identify all documents on this subject, including without limitation facts that are

19  known to or in the possession, custody and control of defendants and non-parties,

20  including non-parties associated with defendants.  Mattel further objects to this

21  Interrogatory on the grounds that it is vague and ambiguous.  Mattel further objects

22  to this Interrogatory on the grounds that it calls for the disclosure of information

23  subject to the attorney-client privilege, the attorney work-product doctrine and other

24  applicable privileges.  Mattel further objects to this Request on the grounds that it is

25  premature and seeks to circumvent the expert disclosure provisions of the <u>Federal</u>

26  and <u>Local</u> <u>Rules</u>.  Mattel continues its factual investigation and currently awaits  the

27  opposing parties compliance with multiple Court Orders compelling the production

28  of documents, to answer Interrogatories and to produce witnesses for deposition

1    As a result of the efforts of Bryant and other Mattel employees working
2  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at
3  deposition in 2004), the Bratz dolls had been designed and were far along in
4  development during the time that Bryant was employed by Mattel and prior to the
5  time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and
6  develop designs for the dolls as well as other aspects of the products such as their
7  fashion accessories during the time he was employed by Mattel, but MGA showed
8  Bratz prototypes and/or visual representations of Bratz to numerous third parties,
9  including without limitation retailers, no later than November 2000, less than three
10 weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these
11 presentations while Bryant was still employed by Mattel. Bryant and MGA
12 employees also repeatedly and continuously communicated with employees of
13 MGA Entertainment (HK) Limited regarding the design and manufacturing of
14 Bratz. Bratz also were shown to retailers at the Hong Kong Toy Fair in January
15 2001 and very soon thereafter at the New York Toy Fair. The Bratz dolls which had
16 been created during the time of Bryant's employment by Mattel, and based on
17 Bryant's concepts, designs, three-dimensional items and other works, were very
18 similar to the dolls as released, which was possible only because of Bryant's work
19 on Bratz with MGA during his Mattel employment, using Mattel resources.
20    Evidence Mattel has been able to obtain thus far has established that
21 Bryant worked for his own and MGA's benefit during his Mattel employment, and
22 did so using Mattel resources. First, Bryant admitted at deposition, and documents
23 confirm, that he worked and aided MGA during the term of his Mattel employment
24 without Mattel's consent or knowledge, although further showing his guilty
25 knowledge he sought to minimize and conceal the time period and extent of his aid
26 to and work with MGA. At deposition, Bryant further admitted, and documents
27 confirm, among other things, that: (1) he worked on his Bratz drawings while
28 employed by Mattel and showed them to MGA while employed by Mattel; (2) he

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

0720/2323929.2

Exhibit 4 , P. 118

1    Since 2001, MGA has distributed, sold and licensed Bratz and Bratz-
2  related products throughout the world.  MGA and Bryant claim current ownership of
3  Bratz, and all copyrights and copyright registrations related thereto.  MGA
4  continues to market, sell and license Bratz and has expressed an intention to
5  continue to do so.  MGA's and other Defendants' continued use, sale, distribution
6  and licensing of Bratz infringes upon Mattel's rights, and has injured and continues
7  to injure Mattel.

8         Bryant's, Garcia's And Others Exposure To Mattel Projects.  Other
9  evidence adduced to date also confirms, among other things, that Bryant designed
10 Bratz while employed by Mattel and not in 1998 as he has attempted to claim.
11 Mattel designer Lily Martinez was working on a project in 1999 called Toon Teens.
12 Ms. Martinez had her sketches up in her cubicle for a period of time in 1999.
13 Bryant saw Ms. Martinez's Toon Teens sketches on at least one occasion and
14 commented that he liked them and "had never seen anything like them."  The
15 sketches Ms. Martinez had done in 1999 of Toon Teens bear strong resemblances to
16 the initial Bratz design drawings that Bryant did.  According to Bryant,
17 Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while
18 both Bryant and Ms. Cloonan were employed by Mattel.  Ms. Cloonan was Bryant's
19 roommate in 1999-2000.  She also worked on the Mattel "Toon Teens" project.
20 Bryant's exposure to Toon Teens designs and the similarities between the Toon
21 Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created
22 Bratz works while he was a Mattel employee and not in 1998 as he claims.

23         Second, documents and designs for Mattel's DIVA STARZ project in
24 late 1999 and in 2000 that were never publicly released, and that pre-date the release
25 of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz
26 dolls.  For example, names internally considered at Mattel in late 1999 and through
27 2000 for the DIVA STARZ project tend to show that Bryant designed Bratz while at
28 Mattel.  Names that were internally considered at Mattel during that time period

-376-

07/09/2323329.2

## FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:

1         In addition to the general objections stated above, Mattel specifically
2    objects to this Interrogatory on the grounds that it is overbroad, oppressive and
3    harassing, including without limitation that the Interrogatory is not restricted to
4    claims in this suit and thus purports to require disclosure of matters that have no
5    bearing on and are not at issue in this suit. Such matters will not be revealed or
6    addressed. Mattel further objects to this Interrogatory as unreasonably burdensome
7    and overbroad in that it purports to require Mattel to summarize all facts and
8    identify all documents on this subject, including without limitation facts that are
9    known to or in the possession, custody and control of defendants and non-parties,
10   including non-parties associated with defendants. Mattel further objects to this
11   Interrogatory on the grounds that it is vague and ambiguous. Mattel further objects
12   to this Interrogatory on the grounds that it calls for the disclosure of information
13   subject to the attorney-client privilege, the attorney work-product doctrine and other
14   applicable privileges. Mattel further objects to this Request on the grounds that it is
15   premature and seeks to circumvent the expert disclosure provisions of the Federal
16   and Local Rules. Mattel continues its factual investigation and currently awaits the
17   opposing parties compliance with multiple Court Orders compelling the production
18   of documents, to answer Interrogatories and to produce witnesses for deposition
19   which have not been complied with and indeed that the Court has found MGA
20   violated. Mattel also has pending motions to compel against defendants MGA,
21   Bryant, Machado and others associated with defendants, including to compel them
22   to produce documents, to appear for deposition and to answer requests for
23   admissions. In addition, the depositions of certain witnesses, including without
24   limitation Carter Bryant and various MGA representatives, have yet to be
25   completed, and other witnesses, such as Veronica Marlow and Elise Cloonan, have
26   yet to be produced for deposition. Furthermore, although Bryant's original
27   production in this case regarding the alleged origins and development of Bratz

Exhibit 4, P. 120

1    Bryant's last day of employment with Mattel was October 20, 2000. At
2  that time, he signed a further agreement, called the "Proprietary Information
3  Checkout." In it, Bryant acknowledged that "he has agreed to transfer all inventions
4  made or conceived during the period of his employment to Mattel," and that:

5    My interest in (a) any and all inventions . . . which I have made
6    or conceived . . . and in (b) any . . . designs, trademarks,
7    copyright subject matter [or] . . . artistic works which I have
8    made or conceived . . . during the period of my employment
9    which relate or are applicable directly or indirectly to any phase
10    of [Mattel's] business shall be the exclusive property of [Mattel].

11  Bryant executed the Proprietary Information Checkout notwithstanding his
12  execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works
13  to MGA one month earlier. Nor did Bryant otherwise disclose to Mattel his MGA
14  agreement or work. To the contrary, Bryant concealed from Mattel that he was
15  going to a competitor and explicitly told others at Mattel that he was going to do
16  "non-competitive" pursuits. Bryant knew at the time that those representations were
17  false and made those false statements to conceal from Mattel the facts that he was
18  already working with MGA and that he had contracted with MGA to purportedly
19  assign Bratz works to MGA and to provide design and development services to
20  MGA, a Mattel competitor.

21    As a result of the efforts of Bryant and other Mattel employees working
22  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at
23  deposition in 2004), the Bratz dolls had been designed and were far along in
24  development during the time that Bryant was employed by Mattel and prior to the
25  time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and
26  develop designs for the dolls as well as other aspects of the products such as their
27  fashion accessories during the time he was employed by Mattel, but MGA showed
28  Bratz prototypes and/or visual representations of Bratz to numerous third parties,

07209/2323929.2

Exhibit 4 , P. 121

**Bryant's, Garcia's And Others Exposure To Mattel Projects.** Other evidence adduced to date also confirms, among other things, that Bryant designed Bratz while employed by Mattel and not in 1998 as he has attempted to claim. Mattel designer Lily Martinez was working on a project in 1999 called Toon Teens. Ms. Martinez had her sketches up in her cubicle for a period of time in 1999. Bryant saw Ms. Martinez's Toon Teens sketches on at least one occasion and commented that he liked them and "had never seen anything like them." The sketches Ms. Martinez had done in 1999 of Toon Teens bear strong resemblances to the initial Bratz design drawings that Bryant did. According to Bryant, Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while both Bryant and Ms. Cloonan were employed by Mattel. Ms. Cloonan was Bryant's roommate in 1999-2000. She also worked on the Mattel "Toon Teens" project. Bryant's exposure to Toon Teens designs and the similarities between the Toon Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created Bratz works while he was a Mattel employee and not in 1998 as he claims.

Second, documents and designs for Mattel's DIVA STARZ project in late 1999 and in 2000 that were never publicly released, and that pre-date the release of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz dolls. For example, names internally considered at Mattel in late 1999 and through 2000 for the DIVA STARZ project tend to show that Bryant designed Bratz while at Mattel. Names that were internally considered at Mattel during that time period included "Brats" and variations thereon, "Brat Pack," "Boyz" and "Petz." Ms. Garcia acknowledged that "Brats" spelled with an "s" was subsequently considered as a name for the "Bratz" dolls. Furthermore, design work that Steve Linker did for "Mini Diva Starz" at Mattel's behest in early 2000 bear similarities to the Bratz dolls and, indeed, Ms. Garcia later contacted him in the summer of 2000 to solicit his involvement with Bryant and Bratz.

Exhibit 4, P. 122

1   and has not yet had the opportunity to obtain information from other third parties

2   who may possess relevant information.  Mattel therefore reserves the right to

3   supplement this response after Mattel receives more information about defendant's

4   activities.  By way of further answer, this topic may be the subject of expert

5   testimony, which will be disclosed in the manner, and at the time, required for

6   expert disclosures pursuant to the Federal and Local Rules.

7

8   FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:

9               In addition to the general objections stated above, Mattel specifically

10  objects to this Interrogatory on the grounds that it is overbroad, oppressive and

11  harassing, including without limitation that the Interrogatory is not restricted to

12  claims in this suit and thus purports to require disclosure of matters that have no

13  bearing on and are not at issue in this suit.  Such matters will not be revealed or

14  addressed.  Mattel further objects to this Interrogatory as unreasonably burdensome

15  and overbroad in that it purports to require Mattel to summarize all facts and

16  identify all documents on this subject, including without limitation facts that are

17  known to or in the possession, custody and control of defendants and non-parties,

18  including non-parties associated with defendants.  Mattel further objects to this

19  Interrogatory on the grounds that it is vague and ambiguous.  Mattel further objects

20  to this Interrogatory on the grounds that it calls for the disclosure of information

21  subject to the attorney-client privilege, the attorney work-product doctrine and other

22  applicable privileges.  Mattel further objects to this Request on the grounds that it is

23  premature and seeks to circumvent the expert disclosure provisions of the Federal

24  and Local Rules.  Mattel continues its factual investigation and currently awaits the

25  opposing parties compliance with multiple Court Orders compelling the production

26  of documents, to answer Interrogatories and to produce witnesses for deposition

27  which have not been complied with and indeed that the Court has found MGA

28  violated.  Mattel also has pending motions to compel against defendants MGA,

-445-

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Exhibit 4 , P. 123

1    Moreover, Bryant misrepresented that he was leaving his employment

2  with Mattel to pursue non-competitive interests.  At the time that Bryant made those

3  misrepresentations, he knew the statements were false.  He also knew at the time

4  that he made those misrepresentations that he had engaged in business activities that

5  were competitive with Mattel and planned to continue to do so, which he failed to

6  disclose.

7    Bryant's last day of employment with Mattel was October 20, 2000.  At

8  that time, he signed a further agreement, called the "Proprietary Information

9  Checkout."  In it, Bryant acknowledged that "he has agreed to transfer all inventions

10  made or conceived during the period of his employment to Mattel," and that:

11    My interest in (a) any and all inventions . . . which I have made

12    or conceived . . . and in (b) any . . . designs, trademarks,

13    copyright subject matter [or] . . . artistic works which I have

14    made or conceived . . . during the period of my employment

15    which relate or are applicable directly or indirectly to any phase

16    of [Mattel's] business shall be the exclusive property of [Mattel].

17  Bryant executed the Proprietary Information Checkout notwithstanding his

18  execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works

19  to MGA one month earlier.  Nor did Bryant otherwise disclose to Mattel his MGA

20  agreement or work.  To the contrary, Bryant concealed from Mattel that he was

21  going to a competitor and explicitly told others at Mattel that he was going to do

22  "non-competitive" pursuits.  Bryant knew at the time that those representations were

23  false and made those false statements to conceal from Mattel the facts that he was

24  already working with MGA and that he had contracted with MGA to purportedly

25  assign Bratz works to MGA and to provide design and development services to

26  MGA, a Mattel competitor.

27    As a result of the efforts of Bryant and other Mattel employees working

28  on Bratz (done without Mattel's knowledge until the time Bryant admitted it at

-449-

Exhibit 4 , P. 124

1  deposition in 2004), the Bratz dolls had been designed and were far along in

2  development during the time that Bryant was employed by Mattel and prior to the

3  time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and

4  develop designs for the dolls as well as other aspects of the products such as their

5  fashion accessories during the time he was employed by Mattel, but MGA showed

6  Bratz prototypes and/or visual representations of Bratz to numerous third parties,

7  including without limitation retailers, no later than November 2000, less than three

8  weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these

9  presentations while Bryant was still employed by Mattel.  Bryant and MGA

10  employees also repeatedly and continuously communicated with employees of

11  MGA Entertainment (HK) Limited regarding the design and manufacturing of

12  Bratz.  Bratz also were shown to retailers at the Hong Kong Toy Fair in January

13  2001 and very soon thereafter at the New York Toy Fair.  The Bratz dolls which had

14  been created during the time of Bryant's employment by Mattel, and based on

15  Bryant's concepts, designs, three-dimensional items and other works, were very

16  similar to the dolls as released, which was possible only because of Bryant's work

17  on Bratz with MGA during his Mattel employment, using Mattel resources.

18          Evidence Mattel has been able to obtain thus far has established that

19  Bryant worked for his own and MGA's benefit during his Mattel employment, and

20  did so using Mattel resources.  First, Bryant admitted at deposition, and documents

21  confirm, that he worked and aided MGA during the term of his Mattel employment

22  without Mattel's consent or knowledge, although further showing his guilty

23  knowledge he sought to minimize and conceal the time period and extent of his aid

24  to and work with MGA.  At deposition, Bryant further admitted, and documents

25  confirm, among other things, that:  (1) he worked on his Bratz drawings while

26  employed by Mattel and showed them to MGA while employed by Mattel; (2) he

27  used Mattel employees and materials to prepare a three-dimensional doll prototype

28  for his pitch to MGA — a pitch he made while employed by Mattel; (3) he

MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

07209/2323329.2

Exhibit  4 , P. 125

1  continues to market, sell and license Bratz and has expressed an intention to

2  continue to do so. MGA's and other Defendants' continued use, sale, distribution

3  and licensing of Bratz infringes upon Mattel's rights, and has injured and continues

4  to injure Mattel.

5      Bryant's, Garcia's And Others Exposure To Mattel Projects.  Other

6  evidence adduced to date also confirms, among other things, that Bryant designed

7  Bratz while employed by Mattel and not in 1998 as he has attempted to claim.

8  Mattel designer Lily Martinez was working on a project in 1999 called Toon Teens.

9  Ms. Martinez had her sketches up in her cubicle for a period of time in 1999.

10  Bryant saw Ms. Martinez's Toon Teens sketches on at least one occasion and

11  commented that he liked them and "had never seen anything like them." The

12  sketches Ms. Martinez had done in 1999 of Toon Teens bear strong resemblances to

13  the initial Bratz design drawings that Bryant did. According to Bryant,

14  Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while

15  both Bryant and Ms. Cloonan were employed by Mattel. Ms. Cloonan was Bryant's

16  roommate in 1999-2000. She also worked on the Mattel "Toon Teens" project.

17  Bryant's exposure to Toon Teens designs and the similarities between the Toon

18  Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created

19  Bratz works while he was a Mattel employee and not in 1998 as he claims.

20      Second, documents and designs for Mattel's DIVA STARZ project in

21  late 1999 and in 2000 that were never publicly released, and that pre-date the release

22  of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz

23  dolls. For example, names internally considered at Mattel in late 1999 and through

24  2000 for the DIVA STARZ project tend to show that Bryant designed Bratz while at

25  Mattel. Names that were internally considered at Mattel during that time period

26  included "Brats" and variations thereon, "Brat Pack," "Boyz" and "Petz." Ms.

27  Garcia acknowledged that "Brats" spelled with an "s" was subsequently considered

28  as a name for the "Bratz" dolls. Furthermore, design work that Steve Linker did for

-456-
MATTEL, INC.'S SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

07209/2323329.2

Exhibit 4 , P. 126

1    addressed. Mattel further objects to this Interrogatory as unreasonably burdensome
2    and overbroad in that it purports to require Mattel to summarize all facts and
3    identify all documents on this subject, including without limitation facts that are
4    known to or in the possession, custody and control of defendants and non-parties,
5    including non-parties associated with defendants. Mattel further objects to this
6    Interrogatory on the grounds that it is vague and ambiguous. Mattel further objects
7    to this Interrogatory on the grounds that it calls for the disclosure of information
8    subject to the attorney-client privilege, the attorney work-product doctrine and other
9    applicable privileges. Mattel further objects to this Request on the grounds that it is
10   premature and seeks to circumvent the expert disclosure provisions of the Federal
11   and Local Rules. Mattel continues its factual investigation and currently awaits the
12   opposing parties compliance with multiple Court Orders compelling the production
13   of documents, to answer Interrogatories and to produce witnesses for deposition
14   which have not been complied with and indeed that the Court has found MGA
15   violated. Mattel also has pending motions to compel against defendants MGA,
16   Bryant, Machado and others associated with defendants, including to compel them
17   to produce documents, to appear for deposition and to answer requests for
18   admissions. In addition, the depositions of certain witnesses, including without
19   limitation Carter Bryant and various MGA representatives, have yet to be
20   completed, and other witnesses, such as Veronica Marlow and Elise Cloonan, have
21   yet to be produced for deposition. Furthermore, although Bryant's original
22   production in this case regarding the alleged origins and development of Bratz
23   consisted of only a few thousand pages, and only after multiple Court Orders
24   compelling MGA and Bryant to produce their documents, MGA and other
25   Defendants have begun to produce voluminous documents only in recent weeks,
26   including documents that Mattel has been unable to access or review because of
27   technical deficiencies in MGA's production that MGA only recently corrected.
28   Furthermore, despite prior Court Order directing MGA to provide documents in

-477-

Exhibit  4 , P. 127

made or conceived . . . during the period of my employment which relate or are applicable directly or indirectly to any phase of [Mattel's] business shall be the exclusive property of [Mattel].

Bryant executed the Proprietary Information Checkout notwithstanding his execution of the MGA/Bratz agreement purporting to convey Bryant's Bratz works to MGA one month earlier. Nor did Bryant otherwise disclose to Mattel his MGA agreement or work. To the contrary, Bryant concealed from Mattel that he was going to a competitor and explicitly told others at Mattel that he was going to do "non-competitive" pursuits. Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the facts that he was already working with MGA and that he had contracted with MGA to purportedly assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

As a result of the efforts of Bryant and other Mattel employees working on Bratz (done without Mattel's knowledge until the time Bryant admitted it at deposition in 2004), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or visual representations of Bratz to numerous third parties, including without limitation retailers, no later than November 2000, less than three weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these presentations while Bryant was still employed by Mattel. Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited regarding the design and manufacturing of Bratz. Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001 and very soon thereafter at the New York Toy Fair. The Bratz dolls which had

1  Elise Cloonan prepared portions of Bryant's Bratz pitch materials to MGA while
2  both Bryant and Ms. Cloonan were employed by Mattel. Ms. Cloonan was Bryant's
3  roommate in 1999-2000. She also worked on the Mattel "Toon Teens" project.
4  Bryant's exposure to Toon Teens designs and the similarities between the Toon
5  Teens drawings and Bryant's Bratz drawings tends to establish that Bryant created
6  Bratz works while he was a Mattel employee and not in 1998 as he claims.
7      Second, documents and designs for Mattel's DIVA STARZ project in
8  late 1999 and in 2000 that were never publicly released, and that pre-date the release
9  of Bratz, show that DIVA STARZ dolls share certain common elements with Bratz
10  dolls. For example, names internally considered at Mattel in late 1999 and through
11  2000 for the DIVA STARZ project tend to show that Bryant designed Bratz while at
12  Mattel. Names that were internally considered at Mattel during that time period
13  included "Brats" and variations thereon, "Brat Pack," "Boyz" and "Petz." Ms.
14  Garcia acknowledged that "Brats" spelled with an "s" was subsequently considered
15  as a name for the "Bratz" dolls. Furthermore, design work that Steve Linker did for
16  "Mini Diva Starz" at Mattel's behest in early 2000 bear similarities to the Bratz dolls
17  and, indeed, Ms. Garcia later contacted him in the summer of 2000 to solicit his
18  involvement with Bryant and Bratz.
19      Bryant's, Paula Garcia's and other individual's exposure to aspects of
20  the DIVA STARZ projects, including designs and names, while they were Mattel
21  employees, tends to establish that Bryant created Bratz works and conceived of the
22  name "Bratz" while he was a Mattel employee. For example, as a Mattel design
23  employee, Bryant had access to DIVA STARZ designs and drawings in the Mattel
24  design center. As a further example, Paula Garcia also had access and knowledge of
25  the DIVA STARZ project while she and Bryant were Mattel employees as she
26  testified at deposition and for reasons stated above. And other persons working with
27  or at MGA during 2000 either themselves worked on the DIVA STARZ project or
28  were associated with those who did.

-488-



Exhibit 4 , P. 129

# Exhibit 5

*Alan K —*
*worth having*
*Richard explore ?*

(RA)

RECEIVED
AUG 05 2002
ROBERT A. ECKERT

CEO
Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245

Dear CEO:

   I have information that I think Mattel should investigate.  In 2000 a Mattel employee by the name of Carter Bryant was working with Mattel to design dolls.  One of the dolls that he was working on creating was the Bratz dolls.  MGA Entertainment found out about his creation and approached him to plan a way that he could sell the dolls to MGA and never tell Mattel.  While he was working with Mattel and working to create these dolls he worked out a deal with MGA that let him collect a large sum of money each year from MGA in exchange for his secrecy about the dolls and the fact that they are rightly Mattel dolls.  Carter left Mattel to live off of the money that MGA has been paying him since then.  MGA tells everyone in the business that Bratz was created by MGA which is not true. MGA know that Carter was an employee with Mattel and that it was wrong to pay him to steal this product from Mattel.

Cc:  Toy Book
     Playthings

*RICHARD —*
*I agree start*
*w/ you to see*
*if this makes*
*any sense.*

CONFIDENTIAL - ATTORNEYS EYES ONLY

M 0074401

Exhibit 5 , P. 130

# Exhibit 6

De Anda, Richard

To:                        Kaya, Alan
Subject:                   MGA "Bratz"

Alan,

I've received your anonymous letter originally sent to Bob Eckert regarding Carter Bryant and "Bratz". I'm aware of this situation and have been working on it for several months. My frustration in this matter was the genesis of and that is now in the hands of Robert Normile. The truth of the

matter is that Carter Bryant did work for Mattel, however.                        according to outside

attorneys.

REDACTED

McShane has been
            We only found out during our last trip to Mexico that Mattel has a relationship with MGA. We have MGA's product
in our Mexico warehouse.  Evidently, Mattel Latin America has an agreement with MGA to sell there product.  This is a
good example that the right hand doesn't know what the left is doing.

Let me know if and how you would like me to respond to Mr. Bob.

Rich

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

M 0074400

Exhibit 6 , P. 131

# Exhibit 7

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
)
PLAINTIFF, )
)
V. )          NO.  CV 04-9040 SGL (RNBX)
)
MATTEL, INC., A DELAWARE )
CORPORATION, )
)
DEFENDANTS. )
_____ )
)
AND CONSOLIDATED ACTION (S). )
)

# C O N F I D E N T I A L

(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN
DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)

## DEPOSITION OF ELISE CLOONAN

## DECEMBER 14, 2007



COURT REPORTERS

REPORTED BY:
RENEE PACHECO
CSR NO.  11564
JOB NO. 07AE756-RP

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

Exhibit  7 , P. 132

1       THE DEPONENT:  OH, MAY OF 2002.

2  BY MR. PLEVAN:

3       Q.    AND WHAT WERE THE CIRCUMSTANCES

4  CONCERNING YOUR LEAVING?

5       A.    I WAS -- I WAS PUSHED INTO A POSITION I          07:09:24

6  WASN'T COMFORTABLE IN.  THERE WERE A LOT OF

7  CIRCUMSTANCES AT THE TIME.  I WAS PRETTY BURNED

8  OUT, TOO.  I WAS JUST BURNED OUT IN LIFE AFTER

9  TAKING CARE OF MY MOTHER, MY GRANDMOTHER, MOVING

10  SEVERAL THOUSAND TIMES.  I WAS DONE WORKING THERE.     07:09:42

11       AND CASSIDY CALLED ME INTO HER OFFICE

12  AND, YOU KNOW, BASICALLY SAID, "ARE YOU GOING TO DO

13  THE JOB THAT I'VE ASSIGNED -- THAT, YOU KNOW, I'VE

14  ASSIGNED YOU TO DO OR NOT?"

15       AND I TOLD HER I WASN'T, YOU KNOW.              07:10:00

16       AND SHE SAID, "WELL, YOU KNOW, YOU

17  UNDERSTAND I HAVE TO FILL THAT POSITION WITH

18  SOMEONE WHO NEEDS TO DO THAT JOB."

19       I UNDERSTOOD THAT, THAT WAS FINE.

20       I -- I WAS -- I WAS REALLY BURNED OUT.  I       07:10:10

21  WAS TIRED.  I FELT LIKE EVERYBODY WAS NAGGING ME

22  ABOUT CARTER ALSO.  I DIDN'T KNOW ANYTHING ABOUT

23  WHAT HE HAD DONE.  AND, I GUESS, IF YOU'RE THE

24  ROOMMATE, NOBODY BELIEVES YOU.  AND I THOUGHT I WAS

25  A LITTLE PARANOID ABOUT THAT UNTIL I LEFT.          07:10:27

312

1              AND, YOU KNOW, CASSIDY WAS -- CASSIDY WAS

2      ACTUALLY VERY GOOD TO ME ABOUT LEAVING.  SHE GAVE

3      ME TIME TO FINISH PROJECTS UP, GET MY PERSONAL LIFE

4      IN ORDER, AND MOVE ON.

5              BUT THE LAST THING SHE SAID TO ME ON THE          07:10:44

6      WAY OUT, SHE SAID, "IF YOU'RE GOING TO THAT COMPANY

7      IN NORTHRIDGE, YOU'RE OUT OF THE DOOR RIGHT NOW."

8         Q.    THIS IS DURING THE CONVERSATION YOU HAD

9      WITH HER ABOUT YOUR LEAVING?

10        A.    YES.                                            07:10:53

11        Q.    AND WHAT COMPANY IS IN NORTHRIDGE THAT

12     YOU UNDERSTOOD?

13        A.    OH, MGA IS IN NORTHRIDGE.

14        Q.    I THINK YOU MENTIONED ON DIRECT TESTIMONY

15     THAT MR. CARTER -- I'M SORRY -- MR. BRYANT, CARTER       07:11:11

16     BRYANT, WAS A DRESS DESIGNER?

17        A.    FASHION DESIGNER.

18        Q.    A FASHION DESIGNER.

19        A.    YES.

20        Q.    THANK YOU.                                      07:11:19

21              DID HE DO ANY SCULPTING WORK WHEN HE WAS

22     AT MATTEL, TO YOUR KNOWLEDGE?

23        MR. ZELLER:  THE QUESTION LACKS FOUNDATION.

24        THE DEPONENT:  I DON'T RECALL.

25     ///                                                      07:11:24

                                                           313

1   BY MR. PLEVAN:

2        Q.    DID HE DO ANY FACE PAINTING?

3        A.    I DON'T KNOW.

4        Q.    JUST GIVE ME ONE SECOND.

5        A.    OKAY.                                          07:11:37

6        MR. PLEVAN:   I HAVE NO FURTHER QUESTIONS.

7

8                      EXAMINATION

9   BY MR. WERDEGAR:                                          07:12:06

10       Q.    HELLO, MS. CLOONAN.

11       A.    HELLO.

12       Q.    I'M MATT WERDEGAR.   WE MET EARLIER TODAY.

13  AND I'M ONE OF CARTER BRYANT'S ATTORNEYS IN THIS

14  LITIGATION.                                               07:12:13

15       I JUST HAVE A COUPLE MORE QUESTIONS FOR

16  YOU, AND THEN WE'LL -- WE'LL LET YOU GO.

17       JUST A MOMENT AGO MR. PLEVAN WAS ASKING

18  YOU ABOUT PEOPLE THAT YOU WERE AWARE OF AT MATTEL

19  BACK IN THE 2001 TIME FRAME, WHEN YOU FIRST LEARNED

20  ABOUT BRATZ, AND YOU -- YOU TESTIFIED THAT IT WAS     07:12:27

21  COMMON KNOWLEDGE IN THE DESIGN CENTER.

22       DO YOU RECALL THAT LINE OF QUESTIONING?

23       A.    YES.

24       Q.    AND YOU MENTIONED A COUPLE NAMES, AND

25  THEN THERE WAS SOME FOLLOW-UP QUESTIONING ABOUT A     07:12:35

                                                            314

1    CASSIDY PARK.

2            I JUST WANTED TO MAKE SURE YOU HAD NAMED

3    ALL THE NAMES THAT YOU -- YOU REMEMBER NOW OF

4    PEOPLE THAT YOU RECALL SPEAKING TO ABOUT THE FACT

5    THAT CARTER BRYANT MAY HAVE BEEN INVOLVED IN THE          07:12:49

6    CREATION OF BRATZ BACK IN THAT TIME FRAME.

7        MR. ZELLER:  THE QUESTION IS VAGUE AS TO "BACK

8    IN THAT TIME FRAME."

9    BY MR. WERDEGAR:

10       Q.    AND, AGAIN, JUST TO BE CLEAR, THE TIME          07:12:55

11   FRAME I'M TALKING ABOUT IS BACK IN THE 2001 TIME

12   FRAME WHEN YOU TESTIFIED YOU FIRST -- FIRST BECAME

13   AWARE OF BRATZ.

14       A.    TOWARDS THE END OF 2001, I THINK IT WAS

15   COMMON KNOWLEDGE, THROUGHOUT THE DESIGN CENTER, OF        07:13:06

16   PEOPLE THAT KNEW CARTER.  I --

17            (PUBLIC ADDRESS SYSTEM INTERRUPTION.)

18       THE DEPONENT:  THAT'S OBNOXIOUS.

19            I MEAN, I REMEMBER HAVING CONVERSATIONS

20   ABOUT IT WITH ROXANNA POWELL, BILL GREENING, AND          07:13:30

21   JANET BLASER, BECAUSE I REMEMBER THEM CONSTANTLY

22   GOING "COME ON, COME ON, YOU KNOW, YOU KNEW HIM,

23   YOU HAD TO HAVE KNOWN SOMETHING."

24            BUT, YOU KNOW, LILY AND I -- LILY AND I

25   KNEW ABOUT -- LILY KNEW ABOUT -- I TALKED ABOUT          07:13:45

315

1   LILY WITH IT.  BILL MARTINEZ, WHO ALSO KNEW CARTER.

2   WHO ELSE?  MICHAEL HASTEY.  ROBERT BEST.  THAT'S

3   PRIMARILY THE PEOPLE THAT I KNEW AND CARTER KNEW.

4           CASSIDY, ANN DRISCOLL.  I REMEMBER

5   TALKING ABOUT JOE FRANKE WITH IT, TOO, BECAUSE HE          07:14:55

6   WAS MY MOTHER'S -- MY MOTHER HAD REPORTED TO HIM.

7   SO WE WOULD TALK EVERY SO OFTEN.

8           THAT'S ALL I CAN REALLY RECALL THE TOP OF

9   MY HEAD HAVING -- YOU KNOW, IN PASSING, THEM ASKING

10  ME JUST -- I GUESS JUST TRYING TO CONFIRM WITH ME          07:15:20

11  IF CARTER HAD REALLY DONE IT, DONE THE BRATZ.

12  BY MR. WERDEGAR:

13      Q.   SO GENERALLY THESE CONVERSATIONS PEOPLE

14  WERE APPROACHING YOU AND ASKING YOU --

15      A.   IS IT --                                          07:15:30

16      Q.   -- HEY, I'VE HEARD CARTER WAS INVOLVED IN

17  THIS, IS IT -- IS IT TRUE?

18      A.   YES.

19      Q.   WHAT DID YOU -- BEYOND THAT, DID YOU AND

20  LILY TALK AT ALL ABOUT BRATZ BACK IN THAT TIME             07:15:39

21  FRAME AGAIN, WHEN YOU -- WHEN YOU FIRST LEARNED

22  ABOUT BRATZ FROM THE WEBSITE IN 2001?

23      A.    WELL, WE KNEW SOMETHING -- SOMETHING WAS

24  UP, LIKE WE WEREN'T SURE EXACTLY WHAT WAS UP.

25  BECAUSE SOMEONE HAD TAKEN HER DRAWING DOWN IN HER          07:15:57

316

Exhibit ___7___, P.__137__

1    OFFICE.  BUT WE HADN'T RELATED THAT TO THE BRATZ.

2         BUT LATER WHEN THEY ASKED HER TO PULL OUT

3    THE TOON TEENS, WE WERE WONDERING IF SOMETHING

4    WAS -- SOMETHING WAS UP.

5         AND THEN ON MY LEAVING, WITH CASSIDY                    07:16:15

6    SAYING THAT TO ME, IT KIND OF JUST CLINKED IT IN MY

7    HEAD THAT SOMETHING WAS GOING ON.

8         Q.   AND, AGAIN, THIS IS ALL IN -- CAN YOU PUT

9    A TIME WINDOW ON THE EVENTS YOU'RE JUST DESCRIBING

10   WITH RESPECT TO TOON TEENS?                                  07:16:32

11        A.   IT -- IT HAPPENED TOWARDS THE END OF

12   2001.  IT WAS -- BECAUSE BY THE TIME 2002 ROLLED

13   AROUND, I WAS KIND OF ON MY WAY OUT OF MATTEL,

14   MENTALLY, PHYSICALLY, AND EVERY WAY POSSIBLE.

15        SO THIS -- THIS STUFF -- I REALLY                       07:16:53

16   REMEMBER THIS STUFF HAPPENED TOWARDS THE END --

17   TOWARDS THE END OF 2001.  AND JUST BEING SICK AND

18   TIRED OF HEARING IT, ALL OF IT.

19        Q.   THEN YOU MENTIONED THAT AT ONE POINT IN

20   TIME YOU HEARD FROM LILY THAT THEY HAD COME AND            07:17:06

21   ASKED -- ASKED -- ASKED HER TO PULL -- EXCUSE ME --

22   COME AND ASKED HER TO PULL TOON TEENS BACK.

23        WHO IS THE "THEY" YOU'RE REFERRING TO?

24        MR. ZELLER:  I OBJECT TO THE PREDICATE,

25   MISCHARACTERIZES THE WITNESS'S TESTIMONY.                    07:17:21

317

1   THE DEPONENT:  SHE WAS REFERRING TO CASSIDY.

2   CASSIDY IS THE ONE THAT ASKED HER TO COME AND

3   GET -- BRING IT OVER TO LEGAL.

4   BY MR. WERDEGAR:

5       Q.    TO MATTEL LEGAL?                          07:17:30

6       A.    YES.

7       Q.    AND DO YOU -- DID LILY KNOW -- AS FAR AS

8   YOU KNOW, DID LILY CONVEY TO YOU OF ANY

9   UNDERSTANDING AS TO WHY THEY WANTED HER TO DO THAT?   07:17:39

10      A.    NO.  WE -- WELL, WE THOUGHT IT WAS IN

11  RELATION TO THE BRATZ.  BECAUSE THERE WERE SO MUCH

12  GOING ON.  THINGS WERE -- THERE WERE JUST LITTLE

13  TICKERS GOING ON AT THE TIME.

14          LIKE I SAID, WITH CASSIDY ASKED -- IF

15  CASSIDY ASKED -- IF CASSIDY HADN'T ASKED ME, I       07:17:54

16  WOULDN'T HAVE THOUGHT ABOUT IT, REALLY.  BUT IT

17  WAS -- IT WAS LIKE -- THE PICTURE CAME DOWN ON HER

18  WALL, CASSIDY ASKED ME ABOUT CARTER, THEN SHE HAD

19  TO PULL TOON TEENS OUT.  IT WAS JUST LIKE ALL THOSE

20  LITTLE THINGS KIND OF -- I DON'T KNOW --            07:18:12

21  SOMETHING -- WE KNEW SOMETHING WAS UP, WE JUST

22  WEREN'T SURE WHAT.

23      MR. WERDEGAR:  WHERE ARE WE IN TIME?

24      THE VIDEOGRAPHER:  13 MINUTES LEFT.

25      MR. WERDEGAR:  13 MINUTES LEFT?                  07:18:24

318

1        THE VIDEOGRAPHER:  13, YEAH.

2        MR. WERDEGAR:  OKAY.  I DON'T THINK I HAVE ANY

3    OTHER QUESTIONS FOR YOU AT THIS TIME.

4            MS. CLOONAN, THANK YOU SO MUCH.

5        THE DEPONENT:  OKAY.                           07:18:37

6        MR. ZELLER:  I HAVE MORE QUESTIONS.

7

8            FURTHER EXAMINATION

9    BY MR. ZELLER:

10       Q.   DO YOU HAVE ANY PERSONAL KNOWLEDGE AS      07:18:44

11   TO -- WELL, LET ME ASK THIS:  DID YOU COME UP WITH

12   THE NAME TOON TEENS?

13       A.   NO.

14       Q.   DID YOU -- WERE YOU THERE WHEN PEOPLE

15   CAME UP WITH THE NAME TOON TEENS?                  07:18:54

16       A.   DEBBIE CAME UP WITH THE NAME TOON TEENS.

17       Q.   DEBBIE HASTEY?

18       A.   YES.  TOON TEENS.

19       Q.   AND WERE YOU THERE AT THAT TIME?

20       A.   YES.                                      07:19:03

21       Q.   WAS THAT PART OF A BRAINSTORMING SESSION?

22       A.   I DON'T THINK SO.  BECAUSE WE WERE

23   CALLING IT LILY PADS FOR THE LONGEST TIME.

24       Q.   ARE THERE OTHER NAMES THAT YOU REMEMBER

25   BEING USED IN CONNECTION WITH TOON TEENS OR LILY   07:19:18

319

1   PADS?

2       A.    THOSE ARE THE ONLY TWO I KNOW OF.

3       Q.    DID YOU EVER HAVE A SPECIFIC CONVERSATION

4   WITH DEBBIE HASTEY REGARDING HOW SHE CAME UP WITH

5   TOON TEENS AS A NAME?          07:19:31

6       A.    NO.  I DON'T REMEMBER.

7             YOU KNOW, I'M -- I'M SORRY.  I THINK -- I

8   THINK MARKETING GAVE IT THAT NAME.  I DON'T THINK

9   IT WAS DEBBIE.  DEBBIE WAS THE ONE CALLING --

10  I'M -- LILY -- DEBBIE WAS THE ONE CALLING IT LILY          07:19:53

11  PADS.  AND I BELIEVE MARKETING WERE THE ONES THAT

12  ASSIGNED THE NAME TOON TEENS TO IT.

13      Q.    DO YOU KNOW WHO IN MARKETING CAME UP WITH

14  IT?          07:20:02

15      A.    NO.

16      Q.    YOU DON'T KNOW THE CIRCUMSTANCES UNDER

17  WHICH IT WAS --

18      A.    NO.

19      Q.    -- IT WAS CONCEIVED OF?

20      A.    RIGHT.          07:20:07

21            (PUBLIC ADDRESS SYSTEM INTERRUPTION.)

22  BY MR. ZELLER:

23      Q.    DO YOU THINK ANNA RHEE IS A DISHONEST

24  PERSON?

25      A.    NOT --          07:20:49

                                                          320

1    MR. MCFARLAND:   OBJECTION; VAGUE AND AMBIGUOUS.

2  BY MR. ZELLER:

3      Q.   I'M SORRY?

4      A.   NOT INTENTIONALLY.

5      Q.   WELL, DO YOU KNOW OF SPECIFIC INSTANCES                    07:20:55

6  OF DISHONESTY BY MS. RHEE?

7      A.   SHE FORGETS THINGS A LOT.  SHE -- SHE

8  TWISTS THINGS -- SHE GETS THINGS CONFUSED IN HER

9  HEAD A LOT.                                                         07:21:09

10     Q.   YOU WOULD KNOW WHAT I MEAN, YOU'VE HEARD

11 THE WORD "DISHONEST" BEFORE; RIGHT?

12     A.   RIGHT.

13     Q.   DO YOU THINK SHE'S A DISHONEST PERSON?

14     MR. MCFARLAND:   OBJECTION; ASKED AND ANSWERED.

15     THE DEPONENT:   IT'S NOT AN INTENTIONAL -- IT'S              07:21:17

16 NOT PREMEDITATED ON HER PART, HER DISHONESTY.  IF

17 SHE HEARS A RUMOR, SHE TAKES IS AS -- SHE TAKES IT

18 VERBATIM, INSTEAD OF UNDERSTANDING THAT IT'S A

19 RUMOR.  SHE'LL, YOU KNOW, ABSOLUTELY -- SHE -- SHE               07:21:42

20 TAKES THINGS LITERALLY.

21 BY MR. ZELLER:

22     Q.   IS SHE A GOOD FACE PAINTER?

23     A.   SHE'S AN EXCELLENT FACE PAINTER.

24     Q.   HAVE YOU EVER -- IN FACT, YOU THINK THAT                07:21:49

25 SHE'S EXCELLENT AT HER JOB; RIGHT?

321

# Exhibit 8

# EXIT INTERVIEW REPORT

MAT-3728

**NAME** CARTER BRYAN T

**BADGE NUMBER** 90202

**EMPLOYMENT DATE**

**SEPARATION DATE** 10/19/00

**DEPARTMENT**

**SUPERVISOR NAME** Heather Fonsera / Ann Driskill

**POSITION TITLE**

☐ EXEMPT   ☐ NON-EXEMPT

**DOES EMPLOYEE HAVE NEW JOB?**
☑ YES   ☐ NO

**IF YES, GIVE JOB TITLE AND NEW EMPLOYER** Business owner - illustration / product design   ☐ NO INFORMATION

**WHO INITIATED THE CONTACT LEADING TO THE NEW JOB?**
☐ EMPLOYEE   ☐ NEW COMPANY OR ITS AGENTS   ☐ NO INFORMATION

**WHAT KIND OF A MOVE IS IT IN RESPONSIBILITY?**
☐ UP   ☐ LATERAL   ☐ DOWN   ☐ NO INFORMATION

**WHAT KIND OF A MOVE IS IT IN SALARY?**
☐ LESS   ☐ SAME   ☐ MORE BY $   PER WEEK   ☐ NO INFORMATION

**BACKGROUND INFORMATION**

**EMPLOYEE'S NEW JOB**

---

**COMMENTS AND ATTITUDES**
(Questions to be used as guidelines only and do not reflect any particular order of asking. From the Exit Interview, briefly report the terminating employee's comments, attitudes and suggestions regarding each of the areas listed.)

**WORK ITSELF**
PRINCIPAL DUTIES IN MATTEL. UTILIZED YOUR TRAINING, SKILLS, EXPERIENCE. CHALLENGING? DID YOU FEEL YOU WERE A CONTRIBUTING MEMBER OF THE TEAM? STIMULATING WORK CLIMATE? FIT WITH CAREER PLANS?

Felt challenged; exciting.
loved job

**SALARY**
FAIR FOR WORK DONE? INCREASES KEYED TO PERFORMANCE?

Yes.

**ADVANCEMENT**
HOW DID YOU FEEL ABOUT YOUR PERSONAL CHANCES FOR PROMOTION AT MATTEL? HOW DID YOU FEEL ABOUT ADVANCEMENT AT MATTEL IN GENERAL? DID YOU EVER FEEL OVERLOOKED?

Really good.

**SUPERVISION**
HOW DID YOU FEEL ABOUT YOUR SUPERVISOR'S PERSONAL RELATIONSHIP TO YOU? ABOUT SUPERVISOR'S TECHNICAL KNOWLEDGE? LEADERSHIP ABILITY? DID SUPERVISOR REVIEW YOUR PERFORMANCE? HELP AND ENCOURAGE YOU? OVER OR UNDERSUPERVISE YOU? DELEGATE ENOUGH?

Ann capable in her position. Not greatest of skills.
design direction very good.

---

DISTRIBUTION/RETENTION: ORIGINAL-Human Resources Management (Official Copy-3 Years)

CONFIDENTIAL
ATTORNEYS' EYES ONLY

M 0001654

Exhibit 8 , P. 143

## COMMENTS AND ATTITUDES (Cont'd)

### TRAINING AND DEVELOPMENT

DID YOU HAVE ANY OPPORTUNITY TO ATTEND TRAINING COURSES OR SEMINARS? COMPANY, OUTSIDE, OR BOTH? JOB COACHING OR SPECIAL ASSIGNMENTS TO ENHANCE SKILLS? WERE DEVELOPMENT EFFORTS SUFFICIENT?

No

### GENERAL

MATTEL IN GENERAL AS A PLACE TO WORK? MATTEL'S MAJOR STRENGTHS AND WEAKNESSES? HOW DID YOU FEEL ABOUT YOUR MATTEL ASSOCIATES? WHAT CHANGES OR IMPROVEMENTS WOULD YOU RECOMMEND TO MAKE MATTEL A MORE SATISFYING AND REWARDING PLACE IN WHICH TO WORK? OTHER COMMENTS?

Really good. Has its problems like everywhere. One of the best experiences he's had.

## SUMMARY

WAS SEPARATION [✓] EMPLOYEE INITIATED OR [ ] COMPANY INITIATED? (SUMMARIZE THE MAJOR REASONS FOR THE SEPARATION)

WHAT ACTIONS OF THE COMPANY MIGHT HAVE PREVENTED THE SEPARATION?

Not real sure at this point. Opportunity arose — had to take it

INTERVIEW COMMENTS AND SUGGESTIONS FOR FOLLOW-UP:

| INTERVIEWER'S NAME | INTERVIEW DATE | DATE FORM COMPLETED |
|---|---|---|
| | 10/19/00 | |

CONFIDENTIAL-
ATTORNEYS' EYES ONLY

M 0001655

Exhibit 8 , P. 144

# Exhibit 9

1  DALE M. CENDALI (admitted pro hac vice)
   DIANA M. TORRES (S.B. #162284)
2  MARC F. FEINSTEIN (S.B. #158901)
   O'MELVENY & MYERS LLP
3  400 South Hope Street
   Los Angeles, California 90071-2899
4  Telephone: (213) 430-6000
   Facsimile: (213) 430-6407
5  Email: dtorres@omm.com

6  PATRICIA GLASER (S.B. # 55668)
   CHRISTENSEN, GLASER, FINK,
7  JACOBS, WEIL & SHAPIRO LLP
   10250 Constellation Boulevard, 19th Floor
8  Los Angeles, California 90067
   Telephone:  (310) 553-3000
9  Facsimile:  (310) 556-2920
   Email: pglaser@chrisglase.com

10
   Attorneys for Counter-defendants MGA
11 Entertainment, Inc., Isaac Larian, MGA
   Entertainment (HK) Limited, and MGAE de
12 Mexico S.R.L. de C.V.

13

14

15               UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17                    EASTERN DIVISION

18 CARTER BRYANT, an individual,         Case No. CV 05-2727 SGL (RNBx)
                                         (Consolidated with CV 04-09049 and
19              Plaintiff,               CV 04-9059)

20        v.                            AMENDED ANSWER AND
                                        AFFIRMATIVE DEFENSES OF
21 MATTEL, INC., a Delaware Corporation, MGA ENTERTAINMENT INC.,
                                        MGA ENTERTAINMENT (HK)
22              Defendant               LIMITED, AND MGAE DE
                                        MEXICO S.R.L. DE C.V. TO
23                                      MATTEL, INC.'S SECOND
                                        AMENDED ANSWER AND
24                                      COUNTERCLAIMS

25 CONSOLIDATED WITH                    Judge:    Hon. Stephen G. Larson
                                        Courtroom: 1
26 MATTEL, INC. v. BRYANT and
27 MGA ENTERTAINMENT, INC. v.
   MATTEL, INC.
28

Exhibit 9 , P. 145

1   pretense in order to interrogate them about Bratz and this litigation; Mattel's

2   coercing its employees to accept restrictive covenants (right before a massive

3   layoff) and non-compete clauses and other efforts to prevent prospective MGA

4   employees from accepting offers of employment; Mattel's delay in suing Carter

5   Bryant because, *inter alia*, Mattel wanted Bryant to testify in an unrelated Mattel

6   case; Mattel's falsely inflating its Barbie sales figures in an effort to mislead the

7   public and retailers; and Mattel's taking all measures to conceal its bad acts,

8   including the willful non-retention and destruction of documents.  Additionally,

9   Mattel believed from the time that Carter Bryant left Mattel's employ that he was

10  going to perform work for a Mattel competitor.  Mattel began investigating Bryant

11  and MGA Defendants, including Bryant's role in the creation and development of

12  Bratz, at least as early as March 2002.  Nonetheless, Mattel waited years to bring

13  suit, all the while allowing MGA Defendants to spend years developing their

14  business and invest tens of millions of dollars developing the Bratz products and

15  building the Bratz brand.  These averments are made on information and belief

16  except where MGA Defendants have knowledge thereof.

17                          **THIRD AFFIRMATIVE DEFENSE**

18                                      (Laches)

19         Mattel's counterclaims are barred by the equitable doctrine of laches

20  because, among other things, Mattel believed from the time that Carter Bryant left

21  Mattel's employ that he was going to perform work for a Mattel competitor.  Mattel

22  began investigating Bryant and MGA Defendants, including Bryant's role in the

23  creation and development of Bratz, at least as early as March 2002 and thereafter

24  continued its investigation into Bryant's role in the creation and development of

25  Bratz, as well as his work with MGA, in August 2002 after Mattel's CEO, Robert

26  Eckert, received an "anonymous letter" that claimed that Bryant stole the idea for

27  Bratz from Mattel and sold it to MGA Defendants.  Nonetheless, Mattel waited

28  years to bring suit, all the while allowing MGA Defendants to spend years

LA2:841935.2

Exhibit 9 , P. 146

developing their business and invest tens of millions of dollars developing the Bratz products and building the Bratz brand.

## FOURTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Mattel's counterclaims are barred by the applicable statutes of limitations, including but not limited to, 18 U.S.C. § 1961 *et seq.*, 17 U.S.C. § 507(b), and Code of Civil Procedure §§ 337, 339, 343 and 338(c).

## FIFTH AFFIRMATIVE DEFENSE

### (*Bona Fide* Purchaser for Value)

Mattel cannot maintain its counterclaims against MGA Defendants because MGA Defendants paid valuable consideration for Bryant's assignment of his rights in the original Bratz drawings to MGA Defendants, and MGA Defendants acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA Defendants was valid and permissible.

## SIXTH AFFIRMATIVE DEFENSE

### (17 U.S.C. § 205(d))

Mattel cannot maintain its counterclaims against MGA Defendants because, among other things, MGA Defendants acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA Defendants was valid and permissible.

## SEVENTH AFFIRMATIVE DEFENSE

### (Information Readily Ascertainable)

MGA Defendants cannot be liable, either on their own account or by association with other defendants, for misappropriation of information that was readily ascertainable by proper means at the time of the alleged acquisition or use. Such information includes, but is not limited to, the identity of suppliers,

- 22 -

Exhibit 9 , P. 147