**EXHIBIT  1**

COPY

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2     Michael T. Zeller (Bar No. 196417)
    865 South Figueroa Street, 10th Floor
3   Los Angeles, California 90017
    Telephone:   (213) 443-3000
4   Facsimile:   (213) 443-3100

5   Attorneys for Plaintiff
    Mattel, Inc.

6

7

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2004

John A. Clarke, Executive Officer/Clerk

By ~~~~~~~~~~~, Deputy
        SUE CARR

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware corporation,      )   CASE NO.   BC314398
                                               )
12                    Plaintiff,               )
                                               )   COMPLAINT FOR:
13                                             )
                                               )   (1)  BREACH OF CONTRACT;
14         v.                                  )   (2)  BREACH OF FIDUCIARY
                                               )        DUTY;
15                                             )   (3)  BREACH OF DUTY OF
    CARTER BRYANT, an individual; and          )        LOYALTY;
16  DOES 1 through 10, inclusive,              )   (4)  UNJUST ENRICHMENT; AND
                                               )   (5)  CONVERSION
17                    Defendants.              )
                                               )
18                                             )
                                               )
19

20

21

22

23

24

25

26

27

28

1      Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter

2   Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as

3   "defendants") and alleges as follows:

4

5                                    Parties

6

7           1.      Mattel is a corporation organized and existing under the laws of the

8   State of Delaware and has its principal place of business in El Segundo, California.

9           2.      Mattel is informed and believes, and on that basis alleges, that defendant

10   Bryant is an individual currently residing in Springfield, Missouri.

11           3.      The true names and capacities of defendants sued herein as Does 1

12   through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such

13   fictitious names. Mattel will amend this Complaint to allege their true names and capacities

14   when the same are ascertained.

15           4.      Mattel is informed and believes, and on that basis alleges, that at all

16   times relevant herein, defendants, and each of them, were acting in concert and active

17   participation with each other in committing the wrongful acts alleged herein, and were the

18   agents of each other, and in doing the things alleged herein, each defendant was acting

19   within the course and scope of his, her or its agency and was subject to and under the

20   supervision of, and was acting with the knowledge of, his, her or its co-defendants.

21

22                           Jurisdiction and Venue

23

24           5.      During the time of the acts complained of herein, Bryant was employed

25   by Mattel in, and was a resident of, Los Angeles County. Bryant's contracts with Mattel that

26   are at issue in this action were executed, performed and breached by Bryant in Los Angeles

27   County. In addition, defendants committed the tortious conduct alleged herein while

28   physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

07209/579342.1

-2-

COMPLAINT

EXHIBIT 1

1  defendants' other wrongful acts in Los Angeles County.   Accordingly, this Court has

2  personal jurisdiction over defendants.

3          6.       Venue is proper pursuant to <u>Code of Civil Procedure</u> §§ 393 and 395(a),

4  as the causes of action arose in Los Angeles County, the contractual obligations at issue were

5  incurred, were to be performed and were breached by Bryant in Los Angeles County, and

6  Bryant does not currently reside in California.

7

8                                    <u>Factual Background</u>

9

10         7.       Mattel is a long standing and successful independent manufacturer and

11 marketer of toys, dolls, games and stuffed toys and animals.   Mattel was founded in 1945 by

12 Elliot and Ruth Handler and Harold "Matt" Mattson.   The name of the company was created

13 by incorporating the names of two of its founders, "MATT-son" and "EL-liot."   Originating

14 from the Handlers' garage in Southern California, the company greatly expanded its

15 operations following World War II and soon began to thrive as its reputation for producing

16 high-quality toys spread.   During the next several decades, Mattel became world famous for

17 producing high-quality products at reasonable prices.   Today, some of Mattel's most famous

18 brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19         8.       Critical to Mattel's success, and to the livelihood of its employees, is

20 Mattel's ability to design and develop new products.   Mattel invests many millions of dollars

21 in product design and development annually, and it introduces hundreds of new products

22 each year.   In El Segundo, California alone, Mattel maintains a 180,000 square-foot design

23 center that houses more than 850 designers, sculptors, painters and other artists, whom

24 Mattel pays to work exclusively and full-time to create the products that Mattel sells and on

25 which Mattel's business depends.

26         9.       Defendant Bryant was employed by Mattel from September 1995

27 through April 1998, and then again from January 1999 through October 2000, as a product

28 designer at Mattel's design center in El Segundo, California.

07209/579342.1

-3-

COMPLAINT

EXHIBIT 1

10.     On January 4, 1999, upon starting his second term of employment by Mattel, and as a condition of and in consideration for his employment, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employee Agreement"). Among other things, Bryant agreed that he would not, without Mattel's express written consent, "engage in any employment or business other than for [Mattel], or invest in or assist (in any manner) any business competitive with the business or future business plans of [Mattel]." Bryant further acknowledged that he held a position of trust with Mattel. In addition, Bryant assigned to Mattel all rights, title and interest in "inventions," including without limitation "designs," that he conceived or reduced to practice during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement with Mattel is attached as Exhibit A.

11.     Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant specifically agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. The only conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time subsequently) concerned freelance work that is unrelated to the conduct alleged herein. A true and correct copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B.

12.     In late November 2003, Mattel learned that Bryant had secretly aided, assisted and worked for a Mattel competitor, including without limitation by entering into an agreement with the competitor, during the time Bryant was employed by Mattel pursuant to the above-referenced agreements and was being paid by Mattel as a product designer. Bryant's agreement with the competitor obligated Bryant to provide product design services to the competitor on a "top priority" basis. Bryant's agreement also provided, among other

07209/579342.1

-4-

COMPLAINT

EXHIBIT 1

1   things, that Bryant would receive royalties and other consideration for sales of products on

2   which Bryant provided aid or assistance; that all work and services furnished by Bryant to

3   the competitor under the agreement purportedly would be considered "works for hire"; and

4   that all intellectual property rights to preexisting work by Bryant purportedly would be

5   assigned to the competitor.  In addition, while Bryant was employed by Mattel, Bryant and

6   the other defendants converted, misappropriated and misused Mattel property and resources

7   for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8          13.     During the time that he was employed by Mattel and thereafter, Bryant

9   concealed these actions from Mattel, including without limitation by failing to notify his

10   supervisor of his conflict of interest regarding the competitor and by making affirmative

11   misrepresentations to Mattel management upon his departure from Mattel.  Because of

12   Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to

13   suspect that Bryant had worked for the competitor while still employed by Mattel until late

14   November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's

15   agreement with the competitor and saw that the date of the agreement predated Bryant's

16   departure from Mattel.

17          14.     As a consequence, Bryant breached his contracts with Mattel and

18   violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have

19   unlawfully aided and abetted his violation of such duties; and each of the defendants has

20   been unjustly enriched and engaged in acts of conversion.

21

22                        FIRST CLAIM FOR RELIEF

23                        (Breach of Contract)

24

25          15.     Mattel repeats and realleges each and every allegation set forth in

26   paragraphs 1 through 14, above, as though fully set forth at length.

27          16.     Pursuant to his Mattel Employment Agreement, and for good and

28   valuable consideration, Bryant agreed that he would not, without Mattel's express written

-5-

COMPLAINT

**EXHIBIT 1**

1  consent, engage in any employment or business other than for Mattel or assist in any manner

2  any business competitive with the business or future business plans of Mattel during his

3  employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further

4  assigned to Mattel all right, title and interest in "inventions," including without limitation

5  "designs," that he conceived or reduced to practice during his employment by Mattel.  In

6  addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as

7  disclosed, he had not worked for any competitor of Mattel and had not engaged in any

8  business venture or transaction involving a Mattel competitor that could be construed as a

9  conflict of interest.  Bryant further promised that he would notify his superior immediately

10  of any change in his situation that would cause him to change any of the foregoing

11  certifications or representations.

12          17.   The Employment Agreement and the Conflict Questionnaire are valid,

13  enforceable contracts, and Mattel has performed each and every term and condition of the

14  Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

15          18.   Bryant materially breached the foregoing contracts with Mattel, in that,

16  among other things, he secretly aided, assisted and worked for a Mattel competitor during

17  his employment with Mattel, without the express written consent of Mattel.

18          19.   As a consequence of Bryant's breach, Mattel has suffered and will in

19  the future continue to suffer damages in an amount to be proven at trial.  Such damages

20  include, without limitation, the amounts paid by the competitor to Bryant during his Mattel

21  employment; the amounts paid by the competitor to Bryant as a result of the work he

22  performed for the competitor during his Mattel employment; the amount that Mattel paid

23  Bryant during the time he wrongfully worked for the competitor; the value of information

24  and intellectual property owned by Mattel which Bryant provided to the competitor; the

25  value of the benefits the competitor obtained from Bryant during the time he was employed

26  by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of

27  the work he performed for the competitor during his Mattel employment.

28

**EXHIBIT 1**

20.     Furthermore, Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

<u>SECOND CLAIM FOR RELIEF</u>

(Breach of Fiduciary Duty)

21.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 20, above, as though fully set forth at length.

22.     Bryant held a position of trust and confidence with Mattel.  In his position, Bryant had access to and was entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of his job assignments and duties.  In his position, Bryant also represented Mattel in its dealings with third parties and, in his actions in the course and scope of his employment with Mattel, was an agent of Mattel.  Bryant confirmed his relationship of trust with Mattel in the Employee Agreement.  Bryant thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant might bring to Mattel.

23.     Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor.  As alleged

-7-

COMPLAINT

EXHIBIT 1

1    above, Bryant also breached the aforementioned duty by using Mattel property and resources

2    for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3         24.    The other defendants, acting with full knowledge of Bryant's obligations

4    to Mattel, aided and abetted Bryant in such conduct.

5         25.    As a direct and proximate result of defendants' wrongful conduct,

6    Mattel has incurred damages in an amount to be determined at trial.

7         26.    Defendants acted with malice, fraud and oppression, and in conscious

8    disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9    against defendants in an amount to be determined at trial.

10         27.    Furthermore, defendants' conduct has caused, and unless enjoined will

11    continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12    money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13    is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or

14    restraining defendants from continuing to benefit from such breach.

15

16                       **THIRD CLAIM FOR RELIEF**

17                       (Breach of Duty of Loyalty)

18

19         28.    Mattel repeats and realleges each and every allegation set forth in

20    paragraphs 1 through 27, above, as though fully set forth at length.

21         29.    As an employee of Mattel, Bryant owed a duty of undivided loyalty to

22    Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist

23    a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant

24    was required to always give preference to Mattel's business over his own, similar interests

25    during the course of his employment with Mattel.

26         30.    Bryant breached his duty of loyalty to Mattel in that, while employed

27    by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including

28    without limitation by entering into an agreement with a Mattel competitor. As alleged

07209/579342.1

-8-

CON    ﹀T

**EXHIBIT 1**

1 | above, Bryant also breached the aforementioned duty by using Mattel property and resources
2 | for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3 | 31. The other defendants, acting with full knowledge of Bryant's obligations
4 | to Mattel, aided and abetted Bryant in such wrongful conduct.

5 | 32. As a direct and proximate result of defendants' wrongful conduct,
6 | Mattel has incurred damages in an amount to be determined at trial.

7 | 33. Defendants acted with malice, fraud and oppression, and in conscious
8 | disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages
9 | against defendants in an amount to be determined at trial.

10 | 34. Furthermore, defendants' conduct has caused, and unless enjoined will
11 | continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
12 | money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel
13 | is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or
14 | restraining defendants from continuing to benefit from such breach.

15 |

16 | **FOURTH CLAIM FOR RELIEF**

17 | (Unjust Enrichment)

18 |

19 | 35. Mattel repeats and realleges each and every allegation set forth in
20 | paragraphs 1 through 34, above, as though fully set forth at length.

21 | 36. Defendants, by the aforementioned conduct, unfairly used and diverted
22 | Mattel property, resources and opportunities for the benefit of, and to aid and assist,
23 | themselves, all without authorization by or payment to Mattel for the same. Defendants have
24 | been unjustly enriched as a result.

25 | 37. Mattel is entitled to an award of all such amounts by which defendants
26 | have been unjustly enriched in an amount to be determined at trial.

27 |

28 |

07209/579342.1

-9-

COMPLAINT

**EXHIBIT 1**

38.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

39.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from any further unjust enrichment.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

40.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 39, above, as though fully set forth at length.

41.     Mattel was entitled to, inter alia, Bryant's exclusive services and the exclusive ownership of his inventions as a Mattel product designer.  However, Bryant provided such services, and purported to grant rights to such inventions, to a competitor during the time of his exclusive Mattel employment.  All such services and the inventions and work product resulting from such services, including without limitation ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property created by Bryant during the term of the aforesaid agreements, were the property of Mattel.  Such services and property were provided by Bryant to others, including defendants, and used by them.

42.     Defendants wrongfully converted Mattel property and resources by asserting ownership thereto and by appropriating and using Mattel's property and resources for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

07209/579342.1

-10-

COMPI

**EXHIBIT 1**

43.   As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages.  Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44.   Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45.   Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## PRAYER FOR RELIEF

WHEREFORE, Mattel hereby respectfully requests that this Court:

A.   Award Mattel its damages;

B.   Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C.   Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D.   Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E.   Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F.   Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and



G.    Award such other and further relief as this Court deems just and proper.

DATED:  April 27, 2004

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _____
Michael T. Zeller
Attorneys for Plaintiff
Mattel, Inc.

07209/579342.1

-12-

COMPLAINT

EXHIBIT 1

**Exhibit A**

**EXHIBIT 1**

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities away from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my experience with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable or other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as is practicable all Inventions (as defined below) conceived or reduced to practice by me alone or jointly by others) at any time during my employment by the Company. Thereby assign to the Company and/or its nominees all of my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research or development of the employer or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement. In addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS
THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _____

Employee Name (print)   CARTER H. BRYANT

Date   01/04/99

MATTEL, INC.
By: _____
Signature

Name of Witness (print)   TERESA NEWCOMB

**EXHIBIT 1**

**Exhibit B**

**EXHIBIT 1**

## CONFLICT OF INTEREST QUESTIONNAIRE

*BRYANT, CARTER H.*    *PROJECT DESIGNER*

Name (Last, First, M.I.)        Job Title        Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.**, means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

- ○ YES  ● NO  1. Have you owned, directly or indirectly, any interest in a Mattel supplier?
- ○ YES  ● NO  2. Have you owned, directly or indirectly, and interest in a Mattel competitor?
- ○ YES  ● NO  3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?
- ● YES  ○ NO  4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?
- ● YES  ○ NO  5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?
- ○ YES  ● NO  6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?
- ○ YES  ● NO  7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?
- ○ YES  ● NO  8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?
- ○ YES  ● NO  9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

*4, 5, freelance design & artwork in 1998.*
*from appx. 5/98 - 11/98 for the Ashton-Drake*
*galleries.*

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

*Carter H. Bryant*    01/04/98

Signature        Date

**EXHIBIT 1**

**EXHIBIT  2**

*Final*

**MGA ENTERTAINMENT**
**16730 Schoenborn Street**
**North Hills, California 91343**

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

1. **Retention as Consultant/Services:** MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached as Exhibit "A" to this Agreement, and is incorporated herein by reference.

2. **Term/Exclusivity:** The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3. **Ownership:**

(a)    All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

{00006662.DOC/2 / 10/04/2000  03:05 PM}

1

ATTORNEY'S EYES ONLY

**EXHIBIT 2**

MGA000001

patents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute. Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents.  If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)     Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine.  Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.     **Compensation/Costs:**

(a)     For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of five thousand five hundred dollars ($5,500.00) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of five thousand dollars ($5,000.00) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)     MGA shall pay to Bryant a royalty of three percent (3%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services.  As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances).  MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

2

EXHIBIT 2

ATTORNEY'S EYES ONLY

MGA000002

and binding on Bryant, shall constitute an account stated, and shall not be subject to any question for any reason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to MGA within two (2) years after the date rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)     All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent. In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)     Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis. Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable). MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)     MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales. MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell. Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant. Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.     <u>Warranties and Indemnity</u>: Bryant represents, warrants and agrees that:

(a)     he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)     neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)     the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

3                    31                    **EXHIBIT 2**

ATTORNEY'S EYES
ONLY

MGA000003

patents, copyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property rights;

(d)    he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

(e)    he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.    **Default/Termination:**

(a)    In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

(b)    Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.    **Confidentiality:**

(a)    Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

(b)    Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

(c)    Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{00006662.DOC/2 / 10/04/2000  03:05 PM}

4

32

EXHIBIT 2

**ATTORNEY'S EYES ONLY**

MGA000000

entitled to equitable relief in the nature of injunction and to all other available relief, at law and/or in equity.

8.    **Notices:** All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time. All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid. Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 160th Street, Gardena, California 90247.

9.    **Independent Contractor/No Partnership/Third Party Beneficiary:** Bryant's relationship with MGA is that of an independent contractor. Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name. Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties. In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship. Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise. This Agreement shall not be construed to be for the benefit of any third party.

10.    **Services Rendered Deemed Special, etc.:** Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.    **General Provisions:**

(a)    This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law. Any such assignment shall not relieve such Party of its obligations hereunder.

(b)    The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

(c)    A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof. All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

(d)    Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

{00006662.DOC/2 / 10/04/2000  03:05 PM}

5

33

**EXHIBIT 2**

ATTORNEY'S EYES ONLY

MGA000005

(e)     This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction of the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)     This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained.  No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)     Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____
CARTER BRYANT

_____
Social Security Number

REDACTED

[00006662.DOC/2 / 10/04/2000  03:05 PM]

6

44

Exhibit 4

**EXHIBIT  3**

1  ROBERT F. MILLMAN, Bar No. CA 062152
   DOUGLAS A. WICKHAM, Bar No. CA 127268
2  KEITH A. JACOBY, Bar No. CA 150233
   LITTLER MENDELSON
3  A Professional Corporation
   2049 Century Park East, 5th Floor
4  Los Angeles, CA 90067.3107
   Telephone:   310.553.0308
5  Facsimile:   310.553.5583

6  Attorneys for Defendant/Cross-Complainant
   CARTER BRYANT

7

**ORIGINAL FILED**

SEP 0 8 2004

LOS ANGELES
SUPERIOR COURT

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware Corporation,          Case No. BC314398

12              Plaintiff,                          ASSIGNED FOR ALL PURPOSES TO THE
                                                    HONORABLE GREGORY W. ALARCON –
13       v.                                         DEPARTMENT 36

14  CARTER BRYANT, an individual; and              DATE ACTION FILED: April 27, 2004
    DOES 1 through 10, inclusive,
15                                                  DEFENDANT/CROSS-COMPLAINANT
                Defendant.                          CARTER BRYANT'S CROSS-
16                                                  COMPLAINT FOR:

17                                                  (1) UNFAIR COMPETITION (Business &
                                                    Professions Code §§ 16600, et seq. and 17200
18                                                  et seq.);
                                                    (2) RESCISSION;
19                                                  (3) DECLARATORY RELIEF; AND
                                                    (4) FRAUD.
20
                                                    DEMAND FOR JURY TRIAL
21
                                                    [Code Of Civil Procedure § 428.10]
22

23  CARTER BRYANT, on behalf of himself,
    all present and former employees of Mattel,
24  Inc., and the general public,

25              Cross-Complainant,

26       v.

27  MATTEL, INC., a Delaware Corporation,

28              Cross-Defendant.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 3

1         1.    Defendant and Cross-Complainant Carter Bryant ("Bryant"), for his Cross-

2  Complaint alleges, upon personal knowledge with respect to himself and his own acts, and upon

3  information and belief as to all other matters, as follows:

4                       **OVERVIEW**

5         2.    In this Action, Bryant's former employer, Mattel, Inc. ("Mattel"), has sued

6  Bryant for, among other things, breach of a purported Employee Confidential Information and

7  Inventions Agreement ("Agreement"). The Agreement is a classic contract of adhesion, drafted

8  solely by Mattel, forced upon Bryant on a take-it-or-leave-it basis with no negotiations invited or

9  allowed. Although signing the Agreement was a condition of Bryant's employment, Mattel never

10  explained the terms and conditions of the Agreement to Bryant and Bryant never was given a

11  meaningful opportunity to secure legal advice concerning its meaning or terms. Bryant, who is a

12  high school graduate, did not and could not understand the terms of the Agreement; indeed, no

13  reasonable layperson could understand the legal significance, meaning and terms of the Agreement,

14  which appeared to be written for lawyers with several years of experience as corporate attorneys.

15         3.    Furthermore, the Agreement contains terms and conditions that violate

16  established California law on their face and/or in connection with Mattel's interpretation and threats

17  to enforce this Agreement. For example, the confidentiality provision in the first section of the

18  Agreement (as interpreted by Mattel) purports to require Bryant (and similarly situated present and

19  former Mattel employees) to maintain a cone of silence – on pains of a breach of contract lawsuit by

20  Mattel's lawyers – over such innocuous *and public* information as the identities of Mattel employees

21  and the general skills and knowledge of such employees. Such a provision clearly is unlawful and

22  violates public policy because it *de facto* inhibits the free flow of information regarding employee

23  talents and thereby restricts employee mobility in this State, thus undermining one of California's

24  fundamental public policies.

25         4.    The Agreement also purports to prevent current employees from accepting

26  any other employment or engagement of any nature whatsoever, regardless of whether such work or

27  services could lead to the disclosure of Mattel's proprietary information or trade secrets or otherwise

28  constitute a breach of the employee's duty of loyalty. Thus, if a Mattel employee went to work at a

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310 553 0308

1  gas station or a grocery store to earn extra money for his or her family, the Agreement flatly – and

2  unlawfully – prohibits such employment and renders such an employee liable to Mattel for breach of

3  contract.   Such a broad restriction concerning an employee's lawful off-duty conduct violates

4  California Business and Professions Code sections 16600 and 17200 and California Labor Code

5  sections 96(k) and 98.6 and California's broad public policies prohibiting unlawful covenants not to

6  compete.

7       5.       Finally, the Agreement also purports to require each and every Mattel

8  employee, including Bryant, to assign all inventions or creations conceived or reduced to practice

9  during the time period of his or her Mattel employment in direct violation of California Labor Code

10  section 2870.  While the Agreement purports to limit this broad assignment to the extent required

11  under Section 2870, this limitation is shrouded in so much legalese that no employee in Bryant's

12  shoes would know or understand either the inventions assignment or the limit on that assignment.

13  On information and belief, Bryant alleges that Mattel intentionally and purposefully implemented

14  this overly broad and unconscionable Agreement to lure employees to adhere to its unlawful terms

15  and to assign to Mattel inventions and creations that, by law, do not belong to Mattel.

16       6.       With this Cross-Compliant, Bryant alone and on behalf of all present and

17  former Mattel employees within the applicable limitations period and the general public, seeks to put

18  an end to Mattel's unlawful and unconscionable practices, with an injunction barring Mattel from

19  requiring employees to sign such agreements and threatening to enforce them, with a declaration that

20  all such agreements (including the Agreement signed by Bryant and any later, similar agreements)

21  are void and unenforceable because they are unconscionable, and with an order disgorging Mattel of

22  all profits unlawfully obtained by its misconduct.

23                **THE PARTIES**

24       7.       Bryant is an individual residing in the State of Missouri who was employed by

25  Mattel from 1995 through April 1998 and again from January 1999 to approximately October 20,

26  2000.

27       8.       On information and belief, Bryant alleges that Mattel is a multi-billion dollar,

28  international toy company that, at its El Segundo facility alone, maintains a 180,000 square-foot

2

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

DEFENDANT/CROSS-COMPLAINANT

**EXHIBIT 3**

1   design center with more than eight hundred fifty (850) employees.  On information and belief,
2   Bryant alleges that Mattel also maintains facilities in New York state, Wisconsin, New Jersey and
3   Illinois.

4         9.    Mattel markets numerous lines of toys, but one of its most well-known
5   products is the "Barbie" doll line, which, according to Mattel's website, accounts for more than $3.6
6   billion in annual retail sales.  On information and belief, Bryant alleges that Mattel, either directly or
7   indirectly through subsidiaries or affiliates, markets and sells Hot Wheels toy cars, "ViewMasters"
8   (three-dimensional viewer toys), the Fisher-Price line of toys and a line of dolls named "American
9   Girl."

10         10.    Bryant brings this Cross-Complaint on his own behalf, on behalf of all
11   current and former Mattel employees (identified below) and on behalf of the general public
12   pursuant to California Business and Professions Code sections 16600, 17200, 17203 and 17204 and
13   the California Labor Code sections 98(k), 98.6, and 2699 (the California Labor Code Private
14   Attorneys' General Act of 2004).

15                        **NATURE OF THE ACTION**

16         11.    Cross-Complainant Bryant brings this Cross-Complaint to remedy the unfair
17   business practices of his former employer, Mattel.

18         12.    During Bryant's initial employment by Mattel, he was assigned to the "Main
19   Line" Barbie Department, where he designed fashions and hairstyles for Barbie and her toy
20   companions, including "Teen Skipper."

21         13.    Between approximately late April 1998 and January 4, 1999, Bryant was not
22   employed by Mattel.  However, commencing on or about January 4, 1999, Bryant returned to work
23   at Mattel and was employed in Mattel's Barbie "Collector" Department, designing clothing fashions
24   and accessories for high-end Barbie dolls for the adult "collector" market.

25         14.    Upon beginning this second term of employment with Mattel, Bryant was
26   required to execute a boilerplate document entitled "Employee Confidential Information And
27   Inventions Agreement" (defined above as the "Agreement").

28         15.    The Agreement was a preprinted, non-negotiable form contract prepared by

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

3

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 3

1    Mattel, printed on Mattel stationery.   The Agreement purports to completely prohibit or, at a

2    minimum, creates a substantial chilling effect on, Bryant's or any other employee's preparations to

3    compete and purports to prevent Bryant and other employees from taking meaningful steps to obtain

4    any other competitive employment while still in the employ of Mattel.   Such an agreement

5    unlawfully restrains Bryant (and similarly situated employees) in his/their business, trade and

6    professions and thus violates well-established rights of employee mobility under California law.

7            16.     The Agreement also purports to effect an assignment of all inventions created

8    or even simply touched by Bryant during the time period of his employment with Mattel, regardless

9    of whether or not they relate to any aspect of Mattel's business and regardless of when or where this

10   occurred.  On its face, Mattel's Agreement theoretically purports to assign to Mattel any "invention"

11   of any kind conceived or reduced to practice by Bryant during the time period of his employment

12   with Mattel.  As Mattel has construed the Agreement, any time Bryant placed pen and pencil to

13   paper during the time period of his Mattel employment, such "works" are owned by Mattel even if

14   such works or inventions were created on his own time with his own materials.

15           17.     As applied here, the Agreement unlawfully infringes on Bryant's right to

16   prepare to compete and to seek other employment and it unlawfully appropriates to Mattel

17   inventions that were created or reduced to practice on Bryant's own time and using his own

18   equipment that are unrelated to his work for Mattel.  Such an invention assignment is overbroad,

19   unconscionable, violates Labor Code section 2870, constitutes an unfair business practice and is

20   therefore unlawful.

21           18.     The Agreement primarily contains a sweeping provision that purports to

22   assign to Mattel each and every invention by Bryant that he created or reduced to practice during the

23   time period of his employment with Mattel.  The Agreement's only attempt to limit the scope of the

24   assignment is a perfunctory reference to California Labor Code section 2870.   That quotation is

25   found in a separate part of the Agreement from the overbroad, illegal clause defining what is

26   covered, appears in fine print, and is stated in language so confusing that no lay person could

27   reasonably understand it.

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

4

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

**EXHIBIT 3**

19.     Even considering the language of Mattel's reference to Labor Code section 2870 in the Agreement, the Agreement remains impermissibly overbroad and unenforceable. According to that provision of the Agreement, any invention conceived or reduced to practice by Bryant during his employment with Mattel would belong to Mattel by virtue of the unlawful Agreement, regardless of whether the invention related to the work performed by Bryant for Mattel.

20.     In addition to the unlawful inventions assignment, the Agreement contains several other provisions that are equally unlawful, either on the face of the Agreement or as applied by Mattel, as it seeks to enforce the Agreement.  As discussed above, the confidentiality provision in the Agreement is grossly overbroad and purports to prohibit employees from disclosing and using publicly available information and it purports to prohibit employees from engaging in lawful off duty conduct in violation of Business and Professions Code 16600 and 17200, the California Labor Code and this State's public policy.

21.     Furthermore, Mattel's overly broad agreement cannot be saved from illegality by narrow construction.  Otherwise, if these sorts of agreements could simply be reformed during litigation, employers would have no disincentive to draft and attempt to enforce such overbroad, illegal agreements that chill employees from exercising their rights.

22.     Due to Mattel's fraudulent and/or negligent misrepresentation of the terms contained within the Agreement (and Mattel's failure to affirmatively disclose its material terms to Bryant when Bryant was instructed to sign the Agreement by Mattel), Bryant did not discover, and would not reasonably be expected to discover, that the Agreement was misleading, unconscionable and unlawful until Mattel instituted the underlying lawsuit on April 27, 2004, attempting to enforce the Agreement.  At the time it required Bryant to execute the adhesive Agreement as a condition of his employment, Mattel did not explain the terms of the Agreement to Bryant, give him sufficient time to review it, or permit or encourage him to seek independent counsel regarding its legal effect. Had Bryant been made aware of the full meaning and intent of the Agreement, he would not have signed it.

23.     Furthermore, Bryant is informed and believes that Plaintiff Mattel has been aware that Bryant was involved in designing the "Bratz" line of toys since at least sometime in 2001.

5

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067-3107
310.553.0308

EXHIBIT 3

1     Rather than bringing suit at that time, Mattel elected instead to wait until three years later to attempt

2     to enforce the unlawful Agreement in the underlying lawsuit.

3          24.     Even though Bryant conceived the "Bratz" idea when he was not employed by

4     Mattel in 1998 and he, with others, did not reduce that idea to practice until after Bryant left Mattel,

5     Mattel nevertheless is using the Agreement to frivolously sue Bryant, in an attempt to hijack

6     "Bratz."

7          25.     Bryant is informed and believes that all employees of Mattel who were hired

8     between 1999 (and before) and the present were required to execute the same or substantially

9     similar agreements, as a pre-condition of their employment with Mattel. Bryant is informed and

10    believes that his case is representative of a larger pattern and practice of wrongful conduct engaged

11    in by Mattel. Mattel, as a standard business practice, has forced its employees to enter into and has

12    wrongfully enforced similar quasi-non-competition and assignment of inventions contracts with its

13    present and former employees. Bryant is informed and believes that Mattel uses these agreements

14    to prevent or stifle competition in the toy industry and/or to unlawfully inhibit employee mobility.

15    Indeed, Bryant is informed and believes, and based thereon alleges, that Mattel continues to force

16    new and current employees to enter into the same or similarly overbroad and unlawful agreements.

17         26.     Bryant was presented with the form Agreement by Mattel on or about January

18    4, 1999, at the outset of his second term of employment. At that time, he was told that his execution

19    of the Agreement was a condition of his employment with Mattel. The terms of the Agreement were

20    not explained to him, nor was he told that the Agreement would preclude him from maintaining any

21    employment other than with Mattel, despite statutory guarantees to the contrary. Bryant was not

22    informed that by executing the Agreement, he was assigning to Mattel all the inventions and

23    creations he created or simply even touched during the time period of his employment with Mattel

24    regardless of how unrelated they might be to his work at Mattel. Bryant was not advised that Mattel

25    would attempt to claim ownership of any invention he may have conceived prior to employment by

26    Mattel and perfected after he left Mattel. Bryant neither was given a meaningful opportunity to

27    review the Agreement at the time he executed it, nor was he given the opportunity to consult with an

28    attorney before executing it. Mattel did not give Bryant the opportunity to negotiate the

6

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT 3

1  Agreement's terms, allow him to review it overnight, or suggest that he consult an attorney before

2  executing it.  In essence, the Agreement was a pre-printed form and was presented to Bryant's on a

3  "take it or leave it" basis and Bryant and all present and former Mattel employees in effect were

4  bludgeoned into accepting its terms or not being allowed to work there.

5      27.    At the time Bryant executed the Agreement, he did not understand the scope,

6  breadth or meaning of its terms.  Bryant is informed and believes, and on that basis alleges that at the

7  time all other current and former employees of Mattel executed identical or similar agreements with

8  Mattel, they, too, did not understand the scope, breadth or meaning of their terms.  As discussed

9  below, the Agreement is both procedurally and substantively unconscionable and thus wholly

10  unenforceable.

11      28.    In this action, Bryant seeks on behalf of himself and the general public the

12  intervention of the Court to obtain remedies to preclude Mattel's unlawful acts.  Among other

13  things, Bryant seeks a declaration from this Court that Mattel's Agreements are not enforceable

14  against Bryant and all other present and former similarly situated Mattel employees.  Bryant also

15  seeks permanent injunctive relief barring Mattel from forcing present and future employees to sign

16  such agreements, stopping Mattel from threatening to enforce and attempting to enforce illegal non-

17  compete/invention assignment contracts against Bryant and any other current or former Mattel

18  employees, and requiring Mattel to disgorge and/or make restitution for all unlawful profits

19  received and/or costs incurred by virtue of its unlawful and unfair business practices and other legal

20  and/or equitable relief to which Bryant and/or the general public may be justly entitled.

21      29.    Bryant also seeks, through this Cross-Complaint, rescission of the

22  unconscionable and unlawful Agreement signed by Bryant.

23              **FIRST CAUSE OF ACTION**

24      **(UNFAIR COMPETITION AGAINST DEFENDANT MATTEL)**

25          **(Business & Professions Code § 17200 et seq.)**

26      30.    Bryant realleges and incorporates by reference each of the allegations in

27  Paragraphs 1 through 29 of this Cross-Complaint as if fully set forth herein.

28      31.    Bryant brings his claim for unfair competition and unfair business practices

7

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310 553.0308

DEFENDANT/CROSS-COMPLAINANT'S CROSS

EXHIBIT 3

42

1   on behalf of himself, the current and former employees of Mattel and the general public, pursuant

2   to California Business and Professions Code sections 16600, 17200, 17203 and 17204.

3       32.   The non-competition and invention assignment provisions contained in the

4   Agreement, which Mattel forced Bryant to execute as a condition of employment, and which it is

5   now trying to enforce in the underlying action, are illegal pursuant to California Business and

6.  Professions Code sections 16600 and 17200.  Said provisions constitute an unfair restraint of trade

7   for the following, non-exclusive reasons:  they illegally restrict the job mobility of current and even

8   former Mattel employees, they illegally restrict current Mattel employees from seeking other

9   gainful employment, they illegally restrict the use of public information, such as the identity or job

10  functions of current Mattel employees, they specifically prevent or deter Mattel's present and

11  former employees, such as Bryant, from accepting or holding any lawful employment within the

12  State of California or elsewhere other than with Mattel, and they purport to assign for Mattel's

13  unlawful benefit all the inventions of Mattel's current and former employees, with a narrow

14  exception which is the employee's burden to prove.

15      33.   The Agreement is also unlawful in that it violates the provisions of California

16  Labor Code section 96(k), which guarantees the rights of employees to be free in the lawful

17  activities they pursue outside working hours, section 98.6 to the extent Mattel has taken adverse

18  employment actions against employees who have refused to sign the Agreement, and Labor Code

19  section 2699.

20      34.   The Agreement also violates the provisions of California Labor Code section

21  2870 inasmuch as it provides for a far broader assignment of employee inventions than is permitted

22  by applicable law.

23      35.   The Agreement was a contract of adhesion and was procedurally

24  unconscionable because, among other things, Bryant was required to sign it as a condition of his

25  employment with no negotiations allowed, it was presented to him on a preprinted form and on a

26  take-it-or-leave-it basis, he was not allowed to thoroughly review or consider its terms, he was not

27  permitted to review it overnight, he was not provided with the opportunity to consult counsel prior

28  to executing it, and it was never thoroughly and completely explained to him.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

8

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COM:

EXHIBIT 3