RECEIVE

MAR 0 8 2005

_____ Priority
__/__ Send
_____ Clsd
_____ Enter
_____ JS-5/JS-6
_____ JS-2/JS-3

FILED
CLERK, U.S. DISTRICT COURT

MAR – 4 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, | CASE NO. CV 04-9059 NM (RNBx) |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFF MATTEL, INC.'S MOTION TO REMAND AND CERTIFYING QUESTION FOR INTERLOCUTORY REVIEW |
| CARTER BRYANT, an individual; and DOES 1 through 10, inclusive, | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

DOCKETED ON CM

MAR 4 2005

BY _____ 006

## I. INTRODUCTION

On April 27, 2004, Mattel, Inc. ("Mattel"), the world's largest manufacturer and marketer of toys, dolls, games, and stuffed toys and animals, filed the instant Complaint against its former employee, Carter Bryant ("Bryant"), in the Superior Court for the County of Los Angeles. The Complaint fails to state the amount in controversy and asserts generically-phrased causes of action for: (1) breach of contract; (2) breach of fiduciary duty; (3) breach of duty of loyalty; (4) unjust enrichment; and (5) conversion. On May 14, 2004, Bryant filed a Notice of Removal. On August 20, 2004, the court granted Mattel's motion to remand,

EXHIBIT 4 PAGE 46   3·4

finding that Bryant had failed to demonstrate the presence of either federal question jurisdiction or diversity jurisdiction. On November 2, 2004, Bryant filed a second Notice of Removal. On December 7, 2004, MGA Entertainment ("MGA"), pursuant to stipulation and order, intervened as a defendant. Pending before the court is Mattel's Motion to Remand.

## II. FACTUAL & PROCEDURAL BACKGROUND

### A. Allegations in Mattel's Complaint

Mattel employed Bryant as a product designer from September 1995 through April 1998, and from January 1999 through October 2000. Compl. ¶ 9. Upon starting his second term, Bryant signed an Employee Confidential Information and Inventions Agreement, in which he agreed not to "engage in any employment or business other than for [Mattel], or invest or assist (in any manner) any business competitive with the business or future business plans of [Mattel]." Id. ¶ 10. Bryant assigned to Mattel all rights, title, and interest in the "inventions" he conceived of, or reduced to practice, during his employment. Id.

Bryant also completed Mattel's Conflict of Interest Questionnaire. Id. ¶ 11. Bryant certified that he had not worked for any of Mattel's competitors in the prior twelve months and had not engaged in any business dealings creating a conflict of interest. Id. Bryant agreed to notify Mattel of any future events raising a conflict of interest. Id.

The Complaint asserts that, "[i]n late November 2003, Mattel learned that Bryant had secretly aided, assisted and worked for a Mattel competitor . . . by entering into an agreement with the competitor, during the time [he] was employed by Mattel . . . ." Id. ¶ 12. "Bryant's agreement with the competitor obligated Bryant to provide product design services to the competitor on a 'top priority' basis." Id. Furthermore, it "provided . . . that Bryant would receive royalties and

2

EXHIBIT _4_ PAGE _47_

1   other consideration for sales of products on which [he] provided aid or assistance;

2   that all work and services furnished by Bryant to the competitor under the

3   agreement would be considered 'works for hire'; and that all intellectual property

4   rights to preexisting work by Bryant purportedly would be assigned to the

5   competitor." Id. The Complaint also alleges that "Bryant converted,

6   misappropriated and misused Mattel property and resources for the benefit of, and

7   to aid and assist, Bryant personally and Mattel's competitor." Id.

8         In support of its first motion to remand, Mattel provided a copy of this

9   agreement between Bryant and MGA. See Zeller Decl., Ex. 9 (MGA Agreement).

10  Pursuant to the agreement, signed September 18, 2000, Bryant agreed to provide

11  product design services for MGA's line of "Bratz" dolls (the "Bratz"). Id.[1] In

12  return, MGA agreed to pay Bryant $5,500 per month for the first six months and

13  $5,000 per month for the next three months. Id. MGA also agreed to pay Bryant a

14  3% royalty on the Bratz he worked on. Id.

15                    *B. The First Notice of Removal*

16        On May 14, 2004, pursuant to 28 U.S.C. § 1441, Bryant filed his first notice

17  of removal.[2] Bryant argued that this court had subject matter jurisdiction under

18  both 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1332

19

20  _____

21        [1] Bryant's last day of employment at Mattel was October 20, 2000.

22        [2] 28 U.S.C. § 1441 provides in part:

23
        (a) Except as otherwise expressly provided by Act of Congress, any civil
24      action brought in a State court of which the district courts of the United
25      States have original jurisdiction, may be removed by the defendant or the
        defendants, to the district court of the United States for the district and
26      division embracing the place where such action is pending. For purposes of
27      removal under this chapter, the citizenship of defendants sued under
        fictitious names shall be disregarded.
28

EXHIBIT *4* PAGE *48*

1    (diversity jurisdiction).³ First, Bryant asserted that the court had jurisdiction under

2    § 1331 because Mattel's claims likely implicated the rights to the Bratz and,

3    therefore, would "require construction of federal intellectual property laws . . . ."

4    Opp. to First Mot. to Remand at 11.  Second, Bryant contended that the court had

5    jurisdiction under § 1332 because he was of diverse citizenship from Mattel and

6    the rights to the Bratz, worth "millions," were in controversy. Id. at 1-2, 5-6.

7         On June 14, 2004, Mattel filed a motion to remand, arguing it did not know

8    whether the Bratz were in controversy because it did not know whether Bryant

9    developed the Bratz while still employed by Mattel.  See, e.g., July 12, 2004 Rep.

10   at 4 (disclaiming knowledge of "whether rights to Bratz are indeed at stake here").

11                          *C. August 20, 2004 Order*

12        On August 20, 2004, the court granted Mattel's motion to remand, finding

13   that Bryant had failed to demonstrate the presence of subject matter jurisdiction.

14   First, the court found that Bryant had failed to demonstrate federal question

15   jurisdiction because the face of the Complaint asserted only state law claims. See

16   Aug. 20, 2004 Order at 8.  Second, the court found that Bryant had failed to

17   demonstrate diversity jurisdiction because he had not shown that the rights to the

18   Bratz were in controversy. See id. at 6.

19

20   _____

21   ³ 28 U.S.C. § 1331 provides:

22   The district courts shall have original jurisdiction of all civil actions arising
23   under the Constitution, laws, or treaties of the United States.

24   28 U.S.C. § 1332 provides:

25
26   (a) The district courts shall have original jurisdiction of all civil actions
     where the matter in controversy exceeds the sum or value of $75,000,
27   exclusive of interest and costs, and is between . . . citizens of different
     States . . . .
28

EXHIBIT _4_ PAGE _49_

### D. *Events Occurring Between the First and Second Notices of Removal*

On August 12, 2004, Mattel produced to Bryant a July 18, 2003 Wall Street Journal article that suggested Bryant had copied a scrapped Mattel project, known as "Toon Teens," in creating the Bratz.  Not. of.Removal ¶ 21.[4]

---

[4] This article provided:

The history of the Bratz is intertwined with Mattel.  MGA says the Bratz were designed by Carter Bryant, a former member of [Mattel's] Barbie team.  Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998.  Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers.  But most Barbie designers had seen the prototypes, his former colleagues say.  Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project.  But the Bratz's oversized heads – with their pursed lips and cartoonish eyes – are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say.  Mattel declined to comment.  She even posted her sketch on her cubicle, colleagues say.  "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001.  "The big heads, the big eyes, the big feet – they were all the same" as the Bratz.  Ms. Martinez declined to comment . . . .

This year, closely held MGA expects revenue of about $800 million – with 65% of that coming from the Bratz . . . .

Zeller Decl., Ex. 35 (Maureen Tkacik, *Dolled Up: To Lure Older Girls, Mattel Brings in*
(continued . . .)

EXHIBIT 4 PAGE 50

1       On August 16, 2004, upon Bryant's specific request, Mattel produced to

2   Bryant drawings of the Toon Teens.  Jacoby Decl. ¶ 5.  Mattel also produced the

3   copyright registration for the Toon Teens drawings filed November 28, 2003, four

4   years after the drawings were allegedly created.  Not. of Removal ¶ 21; Zeller

5   Decl. ¶ 27.[5]  Mattel had failed to produce these documents in response to Bryant's

6   June 14, 2004 comprehensive Request for Production.  Jacoby Decl. ¶ 5; Zeller

7   Decl., Ex. 36; Second Zeller Decl., Ex. 6.[6]  When Mattel eventually produced the

8   Toon Teens documents in August, it maintained: "Mattel does not believe the

9   Toon Teens drawings and documents . . . are responsive to defendant's

10  propounded document requests."  Zeller Decl., Ex. 36.

11

12  ———————————————

13  Hip-Hop Crowd: It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on

14  the 'Bratz', Wall St. J., July 18, 2003, at A1.

15     [5] Copyright registration is a prerequisite for bringing a copyright infringement

16  action.  17 U.S.C. § 411(a).

17     [6] Bryant requested all documents: (1) "that support [the] contention . . . that Bryant
    . . . converted, used, sold, assigned or transferred any Mattel work product . . . created by

18  any Mattel employee other than Bryant"; (2) "that support [the] contention . . . that any

19  product sold at any time by [MGA] under the trade name 'Bratz' originated from, is
    derived from, is based on, copies, incorporates, or is substantially or confusingly similar

20  to any design or work product owned at any time by Mattel . . . or created by any Mattel

21  employee"; (3) "that [Mattel] contend[s] . . . [were] created by any employee of Mattel . .
    . and improperly used by Bryant for his own gain, or the gain of any third party"; (4) that

22  evidence, relate, or refer to the contention that "Bryant misappropriated any property"; (5)

23  that "evidence, relate or refer to any damages [Mattel] contend[s] to have suffered as the
    result of any act or omission of Bryant"; (6) that "evidence, relate or refer to the items or

24  rights that [Mattel] contend[s] Bryant converted, improperly used, sold, assigned or

25  otherwise transferred"; (7) that "evidence, relate or refer to the creation of 'Bratz' dolls";
    and (8) that "evidence, relate or refer to any art work or other work product done at

26  Mattel that [Mattel] contend[s] Bryant utilized in connection with his creation of anything

27  for MGA, including but not limited to . . . 'Bratz.'" Second Zeller Decl., Ex. 6 (Request

28  for Production of Documents).

6

EXHIBIT 4 PAGE 51

On September 8, 2004, Bryant filed a cross-complaint against Mattel asserting claims for unfair competition, rescission, declaratory relief, and fraud. See Cross-Compl. On September 9 and 10, 2004, Bryant filed papers in state court arguing that Mattel's action was implicitly premised upon the allegation that Bryant copied the Toon Teens in developing the Bratz. Zeller Decl., Exs. 8 (Bryant's Mot. for Protective Order) & 45 (Bryant's Case Management Statement).

On October 8, 2004, Mattel again produced to Bryant the above-mentioned Toon Teens documents, this time in response to Bryant's discovery request seeking "[a]ll documents . . . that evidence, relate or refer to Toon Teen's [sic] similarity to any toy sold under the trademark or trade name 'Bratz.'" Jacoby Decl. ¶ 8; Second Zeller Decl., Ex. 7.

On October 11, 2004, Mattel produced to Bryant evidence of a document-exchange agreement it has with a company being sued by MGA for infringing the copyrights to the Bratz. Jacoby Decl. ¶ 9 & Ex. 7. The company had requested that Mattel send it documents relating to the Toon Teens "so that [it] [could] challenge the originality of MGA's design [in the Bratz] and [MGA's] corresponding claim to copyright." Jacoby Decl., Ex. 7.

On October 13, 2004, Mattel produced to Bryant an anonymous letter received by Mattel's CEO in August 2002, alleging that Bryant had stolen the idea for the Bratz from Mattel. Jacoby Decl. ¶ 10 & Ex. 8. Mattel also produced documents indicating that this letter triggered an investigation in 2002 into Bryant's conduct. Id.

Mattel has aggressively pursued discovery relating to the Bratz. See Not. of Removal ¶ 21. In late October 2004, "Mattel[] . . . informed . . . Bryant it would no longer honor a previously agreed upon discovery limitation[] that Mattel would

7

EXHIBIT 4 PAGE 52

1   seek only documents related to the 'first generation of Bratz designs.'" Not. of

2   Removal ¶ 21; Jacoby Decl. ¶ 13 & Exs. 9, 13, 14.

3                        *E.  Second Notice of Removal*

4        On November 2, 2004, Bryant filed a second Notice of Removal based upon

5   both § 1331 (federal question) and § 1332 (diversity) jurisdiction.[7]  Bryant asserts

6   that the Complaint presents a federal question because events occurring since the

7   first removal and remand demonstrate that Mattel's conversion claim involves the

8   rights to the Bratz and is completely preempted by the Copyright Act.  Not. of

9   Removal ¶¶ 10, 29, 34.  Bryant also contends that there is diversity jurisdiction

10  because he and Mattel are of diverse citizenship and the same facts demonstrate

11  that the amount in controversy exceeds $75,000. See id. ¶¶ 9-24.

12      *F.  Events Occurring After Bryant Filed the Second Notice of Removal*

13       On November 2, 2004, Bryant filed a Complaint in federal court seeking a

14  declaratory judgment that the Bratz do not violate Mattel's copyrights.

15       From November 4 through November 8, 2004, Mattel's lead counsel took

16  Bryant's deposition and questioned Bryant regarding not only the "substantial

17  similarity" between the Toon Teens and the Bratz, but also the amount of royalties

18  Bryant had received from the Bratz.  Jacoby Decl., Ex. 1 (Bryant Depo.) at 254-58,

19  564-67, 703.  When pressed for the relevance of the latter line of questioning,

20

21

22        [7] An hour before filing his second Notice of Removal, Bryant faxed Mattel an

23  offer to settle the case for an amount hundreds of thousands of dollars over the

24  jurisdictional minimum. Not. of Removal ¶ 25; Zeller Decl. ¶ 35 & Ex. 51. The timing of Bryant's offer, although suspicious, does not detract from the fact that Mattel has not

25  pursued the offer, which, by its own terms, remained open for seven days.  Not. of

26  Removal ¶ 25; Zeller Decl. ¶ 35 & Ex. 51. Furthermore, despite Mattel's arguments to the contrary, the scope of the offer's releases do not render it meaningless, especially in

27  light of the fact that Mattel does not argue that the offer would have been acceptable if

28  more narrowly tailored.

EXHIBIT *4* PAGE *53*

1  Mattel's counsel stated: "Damages." Id. at 703.  Bryant testified that he had

2  received approximately $10 million in Bratz-related royalties.  Id. at 705.

3        On December 1, 2004, Mattel filed the instant Motion to Remand.  On

4  December 7, 2004, by stipulation and order, MGA intervened as a defendant.[8]  In

5  the stipulation, MGA asserted that "it has a significantly protectable interest

6  relating to the subject matter of the action, . . . the disposition of the action may

7  impair or impede [its] ability to protect its interest absent intervention, and [its]

8  interest is not adequately represented by the existing parties."  Stip. & Order

9  Permitting Intervention at 1.[9]

10       Also on December 7, 2004, Mattel filed a Motion to Dismiss Bryant's

11 Complaint for Declaratory Relief arguing, in part, that Bryant's case regarding the

12 copyrights to the Bratz "attempts to get a federal court to preemptively decide

13 issues presented in [Mattel's action against Bryant]."  Mot. to Dismiss Comp. for

14 Decl. Rel. at 1.

15       After both Bryant and MGA filed Oppositions to the instant Motion to

16 Remand, Mattel filed two reply briefs.  Mattel argued, in part, that MGA's post-

17 removal intervention destroyed the possibility of diversity jurisdiction.  The court

18 ordered supplemental briefing on the issue.  See Jan. 12, 2005 Order.  On January

19 25, 2005, the court ordered further briefing on two issues: (1) whether MGA had

20 _____

21       [8] MGA, like Mattel, has its principal place of business in California.  Compl. ¶ 1;
Second Zeller Decl. ¶ 8 & Exs. 14-15.  MGA is also incorporated in California.  Second
22 Zeller Decl. ¶ 8 & Ex. 16.  28 U.S.C. § 1332(c)(1) provides that "a corporation shall be
23 deemed to be a citizen of any State by which it has been incorporated and of the State
where it has its principal place of business."
24
25       [9] MGA acquired the first Bratz drawings from Bryant in late 2000.  Woods Decl. ¶
2.  In the first two years of sales of the Bratz, MGA earned "tens of millions of dollars."
26 Id. ¶ 10.  MGA employs over 200 people in Southern California.  Id.  "Of those, the
27 majority are directly or indirectly involved in production, marketing and sales of the
'Bratz' product line."  Id.
28

EXHIBIT _4_ PAGE _54_

1  properly intervened under Rule 24 of the Federal Rules of Civil Procedure; and

2  (2) whether MGA was an "indispensable party" under Rule 19(b).  See Jan. 25,

3  2005 Order.  For the reasons set forth below, the court denies Mattel's Motion to

4  Remand.

5

6  ### III. ANALYSIS

7  Generally, a state civil action is removable only if it could have been filed

8  originally in federal court. 28 U.S.C. § 1441. This "original jurisdiction" may be

9  based upon either the presence of a federal question or the diversity of the parties.

10  See Chesler/Perlmutter Prods., Inc. v. Fireworks Entm't Inc., 177 F. Supp. 2d

11  1050, 1054-55 (C.D. Cal. 2001) (Collins, J.).  On removal, the removing defendant

12  bears the burden of proving the existence of the jurisdictional facts.  See Gaus v.

13  Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992).  There is a "strong presumption"

14  against removal.  Id.  When a plaintiff moves to remand, the removing party has

15  the burden of establishing by a preponderance of the evidence that removal was

16  proper.  See Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, 403-04 (9th Cir.

17  1996).

18  In its Motion to Remand, Mattel argues: (1) that Bryant was precluded from

19  removing this action without any "new evidence"; (2) that removal was untimely;

20  (3) that Bryant waived his right to remove; and (4) that Bryant's removal fails on

21  the merits.

22  ### A. Preclusion

23  Mattel argues that Bryant was precluded from removing a second time

24  without any "new" evidence.  Mot. at 1, 15.  Successive removals are not

25  necessarily barred.  16 James Wm. Moore et al., Moore's Federal Practice

26  § 107.30[4] (3d ed. 2004); Green v. R.J. Reynolds Tobacco Co., 274 F.3d 263,

27  266-68 (5th Cir. 2001); Benson v. SI Handling Sys., Inc., 188 F.3d 780, 782-83

28

10

EXHIBIT 4 PAGE 55

(7th Cir. 1999); Doe v. American Red Cross, 14 F.3d 196, 198 (3d Cir. 1993). "For example, if a district court remands a case to state court because the defendant failed to prove the jurisdictional amount, but the plaintiff after remand discloses that the amount in controversy is greater than the statutory amount in controversy, the defendant may file a second notice of removal." 16 Moore et al., supra § 107.30[4] (citing Brierly v. Alusuisse Flexible Packaging, Inc., 184 F.3d 527 (6th Cir. 1999)). For the reasons discussed in detail below, the court finds new evidence permitted Bryant to filed a second notice of removal. See infra Part III.D.2.

### B. Timeliness

Mattel argues that Bryant's second Notice of Removal was untimely. Mot. at 2, 5-8. The timeliness of removal is governed by 28 U.S.C. § 1446(b), which provides:

> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable . . . .

28 U.S.C. § 1446(b). This time limit "is triggered only when the information supporting removal is unequivocally clear and certain." Moore et al., supra § 107.30[3][a][i][C] (citing Bosky v. Kroger Texas, LP., 288 F.3d 208, 211 (5th Cir. 2002); Huffman v. Saul Holdings Ltd. P'ship, 194 F.3d 1072, 1078 (10th Cir. 1999)). See also Schwarzer et al., Cal. Prac. Guide: Fed. Civ. Pro. Before Trial § 2:914.5 (2004) ("The information supporting removal (i.e., federal question or diversity of citizenship) must be 'unequivocally clear and certain' to start the 30-day removal period running.") (emphasis omitted) (quoting Bosky, 288 F.3d at 211)).

11

EXHIBIT 4 PAGE 56

1    Without conceding the existence of any basis for removal, Mattel argues

2  that Bryant had "unequivocally clear and certain" information supporting removal

3  more than 30 days before he filed the notice of removal on November 2, 2004.

4  First, Mattel argues that the action became removable on federal question grounds

5  when Bryant received the Complaint.  Second, Mattel asserts that the action

6  became removable on diversity grounds more than 30 days before Bryant filed the

7  notice because prior to October 2004, Bryant: (1) had received the Wall Street

8  Journal article and the Toon Teens documents; and (2) had filed papers in state

9  court arguing that Mattel's case was premised upon the allegation that Bryant

10  "stole the 'Bratz' concept from Mattel."

11    As to federal question jurisdiction, Mattel's position contradicts its own

12  assertion – and this court's conclusion – that the Complaint failed to state a federal

13  question on its face.  See Aug. 20, 2004 Order at 8; see also infra Part III.D.1.  It

14  also contradicts Mattel's assertion – and this court's conclusion – that there is

15  insufficient pre-removal evidence to permit the court to find complete copyright

16  preemption and thus federal question jurisdiction.  See infra Part III.D.1.

17  Accordingly, the 30-day removal period could not have been triggered by

18  "unequivocally clear and certain" evidence of federal question jurisdiction prior to

19  removal.

20    As to diversity jurisdiction, it was not "unequivocally clear and certain"

21  more than 30 days prior to Bryant's  November 2, 2004 removal that the rights to

22  the Bratz – and thus more than $75,000 – were in controversy.  Bryant's receipt of

23  the Wall Street Journal article provided no clear notice that Mattel would assert in

24  this litigation that Bryant stole the Bratz idea from Mattel.  Indeed, the article

25  twice noted that Mattel had declined to comment.  Similarly, the importance of

26  Mattel's August 16, 2004 document production was diminished by Mattel's own

27  disclaimer of the documents' relevancy.  Finally, as Mattel concedes, how Bryant

28

12

EXHIBIT _4_ PAGE _57_

1   has characterized Mattel's case is not dispositive of this court's jurisdiction.  See

2   Mattel's Obj. to Torres Decl. at 4.  Because the removal period did not start

3   running more than 30 days before November 2, 2004, Bryant's removal was not

4   untimely.

*C. Waiver*

6       Mattel argues that Bryant waived his right to remove by filing permissive

7   counter-claims in state court after the case had become removable. Mot. at 2-3,

8   8-13.[10]  "[I]t is well established that a defendant 'may waive the right to remove to

9   federal court where, after it is apparent that the case is removable, the defendant

10  takes actions in state court that manifest his or her intent to have the matter

11  adjudicated there, and to abandon his or her right to a federal forum.'" Acosta v.

12  Direct Merchs. Bank, 207 F. Supp. 2d 1129, 1131-32 (S.D. Cal. 2002) (Whelan,

13  J.) (quoting Resolution Trust Corp. v. Bayside Developers, 43 F.3d 1230, 1240

14  (9th Cir. 1994)).  A defendant so manifests his intent to remain in state court if he

15  files permissive counter-claims in state court after the case has become removable.

16  See Moore v. Permanente Med. Group, Inc., 981 F.2d 443 (9th Cir. 1992); Schmitt

17  v. Insurance Co. of N. Am., 845 F.2d 1546, 1548 (9th Cir. 1988); Acosta, 207 F.

18  Supp. 1131-33; California Republican Party v. Mercier, 652 F. Supp. 928, 931

19

20      [10] Mattel also argues that Bryant waived his right to remove by moving for a

21  protective order and engaging in discovery in state court. Mot. at 2-3, 12-13. A
    defendant does not waive his right to remove by engaging in this sort of litigation activity.

22  See 16 Moore et al., supra § 107.18[3][b] (defendant does not waive right to remove by

23  "moving for confidentiality order"). See also Acosta v. Direct Merchs. Bank, 207 F.
    Supp. 2d 1129, 1131 (S.D. Cal. 2002) (Whelan, J.) ("In general, the right of removal is

24  not lost by action in state court short of proceeding to an adjudication on the merits.")

25  (quotation marks omitted). Mattel cites only one case, Chavez v. Kincaid, 15 F. Supp. 2d
    1118 (D.N.M. 1998), for the proposition that a defendant waives his right to remove by

26  engaging in discovery. The Chavez court, however, focused on the fact that the

27  defendant had filed a motion to dismiss, not that the defendant had engaged in discovery.
    Id. at 1125.

28

13

EXHIBIT 4 PAGE 58

1  (C.D. Cal. 1986) (Pfaelzer, J.). See also Moore et al., supra § 107.18[3][a] (a

2  defendant waives right to remove by "[p]articipating in state court proceedings,

3  such as seeking some form of affirmative relief, when the defendant is not

4  compelled to take the action"). "However, [for there to be a waiver,] it must

5  [have] be[en] unequivocally apparent that the case [was] removable [before the

6  defendant engaged in the litigation conduct], [] the intent to waive the right to

7  remove to federal court and to submit to state court jurisdiction must [have been]

8  clear and unequivocal, and the defendant's actions must be inconsistent with the

9  right to remove." Moore et al., supra § 107.18[3][a] (citing numerous cases). See

10  also Acosta, 207 F. Supp. 2d at 1131 ("A waiver of the removal right must be clear

11  and unequivocal.").

12      The instant action was not removable on September 8, 2004, when Bryant

13  filed his counter-claims. As noted above, it was not "unequivocally apparent" that

14  the case was removable any time before October 2004. See supra Part III.B.

15  Thus, Bryant did not waive his right to remove.

*D. The Merits of the Removal*

17      Bryant asserts that removal was proper because this court has jurisdiction

18  under both § 1331 (federal question) and § 1332 (diversity).

1. Section 1331: Federal Question Jurisdiction

20      Bryant and MGA contend that the court has federal question jurisdiction

21  under § 1331 because Mattel's conversion claim is completely preempted by the

22  Copyright Act.[11]

23

24      [11] MGA also argues in its Opposition that Mattel's breach of fiduciary duty,

25  breach of loyalty, and unjust enrichment claims are completely preempted. MGA Opp. at

26  6-12. Because these arguments did not appear in the Notice of Removal, the court need

27  not consider them. 14C Charles Alan Wright & Arthur Miller, Federal Practice and

28  Procedure § 3732 (3d ed. 1988) ("the district court may decline to assert jurisdiction over

(continued . . .)

14

EXHIBIT 4 PAGE 59

1       Federal question jurisdiction is governed by the "well-pleaded complaint

2   rule." This rule provides that jurisdiction under § 1331 is proper only when a

3   federal question appears on the face of a well-pled complaint. See, e.g.,

4   Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). As a result, a plaintiff – as

5   master of the complaint – "may avoid federal jurisdiction by exclusive reliance on

6   state law." Id. Further, a defendant cannot remove solely "on the basis of a

7   federal defense, including the defense of preemption, even if the defense is

8   anticipated in the plaintiff's complaint, and even if both parties concede that the

9   federal defense is the only question truly at issue." Id. at 393. Thus, the federal

10  question must appear on the face of the complaint, as alleged and controlled by the

11  plaintiff. Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d at 1055.

12      "There does exist, however, a corollary to the well-pleaded complaint rule,

13  known as the 'complete preemption' doctrine. The Supreme Court has concluded

14  that the preemptive force of some statutes is so strong that they 'completely

15  preempt' an area of state law. In such cases, any claim purportedly based on that

16  preempted state law is considered, from its inception, a federal claim, and

17  therefore arises under federal law." Balcorta v. Twentieth Century-Fox Film

18  Corp., 208 F.3d 1102, 1107 (9th Cir. 2000) (quoting Metropolitan Life Ins. Co. v.

19  Taylor, 481 U.S. 58, 65 (1987)). In these cases, even a well-pled state law

20  complaint may be removed to federal court.[12]

21

22  the case for reasons not averred in the removal notice"). Furthermore, consideration of

23  the arguments would not change the court's conclusion that there was no basis for federal

24  question jurisdiction at the time of removal.

25      [12] Moreover, "under the artful pleading rule a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." ARCO Envtl.

26  Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of the State of Montana, 213

27  F.3d 1108, 1114 (9th Cir. 2000) (quotation marks omitted). "Though 'artful pleading'

28      (continued . . .)

15

EXHIBIT 4 PAGE 60

1    In determining whether a particular state law claim is completely preempted

2  by federal law for purposes of removal jurisdiction, the court may look to the

3  factual allegations in the complaint and the information included in the notice of

4  removal. Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d at 1058 ("[D]istrict

5  courts may consider the petition of removal 'to clarify the action plaintiff presents

6  and to determine if it encompasses an action within federal jurisdiction.") (quoting

7  Schroeder v. Trans World Airlines, Inc., 702 F.2d 189, 191 (9th Cir. 1983)). The

8  court cannot consider post-removal evidence. See id. (court cannot consider

9  evidence in motion to dismiss or opposition to motion to remand). This contrasts

10  with diversity jurisdiction, where the court can "consider post-removal evidence in

11  determining whether [the] requisite amount is in controversy." 16 Moore et al.,

12  supra § 107.14[2][g] n. 102.1.

13    The Copyright Act has complete preemptive force. See Rosciszewski v.

14  Arete Assocs., Inc., 1 F.3d 225 (4th Cir. 1993); Chesler/Perlmutter Prods., Inc.,

15  177 F. Supp. 2d 1050; Worth v. Universal Pictures, Inc., 5 F. Supp. 2d 816 (C.D.

16  Cal. 1997) (Baird, J.); Dielsi v. Falk, 916 F. Supp. 985 (C.D. Cal. 1996) (Collins,

17  J.). Furthermore, state law conversion claims are capable of being completely

18  preempted by the Copyright Act. See, e.g., Dielsi, 916 F. Supp. at 992; Worth, 5

19  F. Supp. 2d at 822-23. In order for there to be such preemption, the state law

20  claim must meet two requirements. First, the "work at issue" must come within

21  the subject matter of copyright. Del Madera Props. v. Rhodes & Gardner, Inc.,

22

23

_____

24  and 'complete preemption' ostensibly remain separate doctrines, they are so intertwined
in the available case law that they appear to raise [the] same question: are Plaintiff's
25  claims so 'completely preempted' that it is only by 'artful pleading' that [it] manages to
avoid a 'federal question' in the Complaint[?]" Braco v. MCI Worldcom
26  Communications, Inc., 138 F. Supp. 2d 1260, 1268 (C.D. Cal. 2001) (Collins, J.). "In
other words, it seems that 'complete preemption' is a prerequisite of sorts to any finding
27  that a plaintiff has 'pled around' what would otherwise be a federal claim." Id.

28

16

EXHIBIT 4 PAGE 67

1   820 F.2d 973, 976 (9th Cir. 1987); Selby v. New Line Cinema Corp., 96 F. Supp.

2   2d 1053, 1057 (C.D. Cal. 2000) (Matz, J.).  Second, the rights granted under the

3   state law must be "equivalent to [one] of the exclusive rights within the general

4   scope of copyright." Del Madera, 820 F.2d at 976; see also Selby, 96 F. Supp. 2d

5   at 1057.

6          The court cannot find that Mattel's conversion claim was completely

7   preempted at the time of removal because the Complaint and the Notice of

8   Removal fail to reveal what work is even "at issue," much less whether that work

9   falls within "the subject matter of copyright."  First, the Complaint is vague and

10  generalized; Mattel never mentions what items or works Bryant allegedly

11  converted.  As Bryant acknowledges, the Complaint's allegations are so generic

12  that "Mattel could conceivably be trying to recover the value of anything from a

13  pen or pad of paper to [a] truckload of collectible 'Barbie' dolls or more."  Not. of

14  Removal ¶ 18.  Second, although the information in the Notice of Removal sheds

15  some light on the nature of Mattel's claims, it does not necessarily demonstrate

16  what works are "at issue."  It was not until *after* removal – when Mattel admitted

17  that the Bratz are relevant to its damages and asserted that this action involves the

18  same issues as Bryant's declaratory relief action – that it became clear that

19  Mattel's conversion claim is rooted in the allegation that Bryant "stole" the Bratz

20  idea from Mattel.  The court, however, may not consider this post-removal

21  evidence for purposes of determining if there was complete preemption at

22  removal.  See Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d at 1058.  Thus

23  constrained by the evidence it may consider, the court cannot find that Mattel's

24  conversion claim was preempted by the Copyright Act at the time of removal.

25  Consequently, Bryant has failed to show that the court has federal question

26  jurisdiction under § 1331.

27

28

17

EXHIBIT 4 PAGE 62

1    **2. Section 1332: Diversity Jurisdiction**

2    Bryant and MGA argue that there is diversity jurisdiction under § 1332.

3    This presents two issues: first, whether diversity jurisdiction was present at the

4    time of removal; second, whether MGA's post-removal intervention as a non-

5    diverse defendant destroyed the possibility of diversity jurisdiction.

6    *a. Diversity Jurisdiction at Removal*

7    To demonstrate the existence of diversity jurisdiction at the time of removal,

8    Bryant must show that he and Mattel were of diverse citizenship and that it is more

9    likely than not that "the matter in controversy exceed[ed] the sum or value of

10   $75,000, exclusive of interest and costs." 28 U.S.C. § 1331; Singer v. State Farm

11   Mut. Auto. Ins. Co., 116 F.3d 373, 376 (9th Cir. 1997); Sanchez v. Monumental

12   Life Ins. Co., 102 F.3d 398, 403-4 (9th Cir. 1996).  Mattel was and is a citizen of

13   Delaware and California, and Bryant was and is a citizen of Missouri.  Not. of

14   Removal ¶¶ 12-13.  Therefore, Mattel and Bryant were of diverse citizenship at the

15   time of removal.

16   Further, Bryant has demonstrated that it is more likely than not that more

17   than $75,000 was in controversy at the time of removal.  Unlike federal question

18   jurisdiction, the court may "consider post-removal evidence in determining

19   whether [the] requisite amount is in controversy." 16 James Wm. Moore et al.,

20   Moore's Federal Practice § 107.14[2][g] n. 102.1 (3d ed. 2004) (citing Singer v.

21   State Farm Mut. Auto Ins., 116 F.3d 373, 377 (9th Cir. 1997) (court may consider

22   plaintiff counsel's post-removal oral admission to court); Williams v. Best Buy

23   Co., Inc., 269 F.3d 1316, 1319-20 (11th Cir. 2001); Allen v. R & H Oil & Gas Co.,

24   63 F.3d 1326, 1335-36 (5th Cir. 1995)).  See also Sierminski v. Transouth Fin.

25   Corp., 216 F.3d 945, 947-49 (11th Cir. 2000) (court may consider, among other

26   post-removal evidence, plaintiff's post-removal admissions); Harmon v. OKI Sys.,

27

28

18

EXHIBIT 4 PAGE 63

1  115 F.3d 477 (7th Cir. 1997).  Cumulatively, the pre-removal and post-removal

2  evidence demonstrates that the rights to the Bratz were and are in controversy.

3  　　　　Specifically, Mattel's counsel has admitted that Bryant's royalties on the

4  Bratz are relevant to Mattel's claim for damages; Mattel has acknowledged the

5  similarity of the Toon Teens and the Bratz in its responses to discovery requests;

6  Mattel has sought discovery regarding the "substantial similarity" between the

7  Toon Teens and the Bratz; Mattel has agreed to provide a third party with

8  documentation regarding the Toon Teens to demonstrate the Bratz are knock-offs

9  of the Toon Teens; Mattel has admitted launching an investigation into the

10  allegation the Bryant stole the idea for the Bratz from Mattel; Mattel has

11  vigorously pursued discovery relating to the Bratz; and Mattel has admitted that its

12  case involves that same issues as Bryant's declaratory relief action regarding the

13  Bratz.  Because the value of the rights to the Bratz easily exceeds $75,000, Bryant

14  has demonstrated that it is more likely than not that the amount in controversy

15  exceeded the jurisdictional minimum at the time of removal.  See Jacoby Decl.,

16  Ex. 1 (Bryant Depo.) at 705 (testimony that Bryant has received approximately

17  $10 million in royalties from the Bratz).  Accordingly, Bryant has met his burden

18  in demonstrating that diversity jurisdiction existed at the time of removal.

19  　　　　　　　b. The Effect of MGA's Intervention

20  　　　　Mattel argues that MGA's post-removal intervention as a non-diverse

21  defendant destroyed diversity.  In contrast, Bryant and MGA contend that MGA's

22  intervention had no such effect, due to the long-standing rule that "[i]f a non-

23  diverse party enters a case by intervention as of right, his presence will not destroy

24  jurisdiction unless [he] was an indispensable party when the plaintiff filed the

25  complaint." Deutsche Fin. Serv. Corp. v. Schwartz Homes, Inc., 187 F.R.D. 542,

26  545 (N.D. Ohio 1999) (citing Dean v. Holiday Inns, Inc., 860 F.2d 670, 672 (6th

27  Cir. 1988)).  See also Wichita R.R. & Light Co. v. Pub. Utils. Comm'n, 260 U.S.

28

EXHIBIT _4_ PAGE _64_

48, 54 (1922); Am. Nat'l Bank & Trust Co. of Chicago v. Bailey, 750 F.2d 577, 582 (7th Cir. 1984); Gaines v. Dixie Carriers, Inc., 434 F.2d 52, 54 (5th Cir. 1970); Hardy-Latham v. Wellons, 415 F.2d 674, 676 (4th Cir. 1968); Black v. Texas Employers' Ins. Ass'n, 326 F.2d 603 (10th Cir. 1964); Formulabs, Inc. v. Hartley Pen Co., 318 F.2d 485, 492 (9th Cir. 1963); Mut. Fire, Marine & Inland Co. v. Adler, 726 F. Supp. 478, 481-82 (S.D.N.Y. 1989).  Mattel responds: (1) that MGA's intervention did not meet the requirements of this rule; and (2) that this rule is no longer good law in light of the passage of 28 U.S.C. § 1447(e) in 1988 and 28 U.S.C. § 1367(b) in 1990.

  i.  Application of the Rule Regarding Non-Diverse Intervenors

To intervene as "of right," one must meet the requirements of Rule 24(a)(2), which provides:

> Intervention of Right.  Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a)(2).  The court applies a four-part test under Rule 24(a)(2): (1) the application for intervention must be timely; (2) the applicant must have a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit.  Northwest Forest Res. Council v. Glickman, 82 F.3d 825, 836 (9th Cir. 1996).  "In general, [courts] construe Rule 24(a) liberally in favor of potential intervenors."  Southwest Ctr. for Biological

20

EXHIBIT 4 PAGE 65

1   Diversity v. Berg, 268 F.3d 810, 818 (9th Cir. 2001). "In addition to mandating
2   broad construction, [the court's] review is 'guided primarily by practical
3   considerations,' not technical distinctions." Id.
4        MGA's intervention met the requirements of Rule 24(a)(2). First, MGA's
5   intervention was indisputably timely as the parties stipulated to allow MGA to
6   intervene. See Southwest Ctr. for Biological Diversity, 268 F. 3d at 818 ("As the
7   parties agree that Applicants' motion to intervene was timely, we need not address
8   this factor."). Second, MGA has a "significantly protectable" interest in Bryant's
9   services relating to the Bratz and in the drawings of and rights to the Bratz. See
10  generally Moore et al., supra § 19.06[1] (assignees are usually "necessary parties"
11  under Rule 19(a), which employs same analysis as Rule 24(a)(2)). Third, MGA is
12  so situated that the disposition of the action may, as a practical matter, impair or
13  impede its ability to protect these interests. For example, MGA's interests could
14  be impacted by an injunction precluding Bryant from continuing to assist MGA in
15  developing the Bratz. Similarly, as MGA notes: "[I]f Bryant somehow were held
16  to have copied Mattel's 'Toon Teens' work, MGA's acquisition of Bryant's
17  original 'Bratz' drawings could be challenged." Bryant & MGA's Brief in
18  Response to Court's Questions at 5. Finally, because MGA has broader rights to
19  the Bratz than Bryant, Bryant may not adequately protect MGA's interests. See
20  generally Moore et al., supra § 24.03[4][a][i] ("the applicant's burden on this
21  matter should be viewed as minimal"). Thus, MGA intervened as "of right" under
22  Rule 24(a)(2).
23
24
25  ///
26
27
28

21

EXHIBIT 4 PAGE 66

1    Consequently, unless it was "indispensable" under Rule 19(b) at the time

2 Mattel filed the Complaint, MGA did not destroy diversity by intervening.[13]   In

3

4    _____

5        [13] Rule 19 provides:

6        (a) Persons to be Joined if Feasible.  A person who is subject to service of
         process and whose joinder will not deprive the court of jurisdiction over the
7        subject matter of the action shall be joined as a party in the action if . . .
8        (2) the person claims an interest relating to the subject of the action and is
         so situated that the disposition of the action in the person's absence may
9        (i) as a practical matter impair or impede the person's ability to protect that
10       interest . . . .  If the person has not been so joined, the court shall order that
         the person be made a party . . . .
11

12       (b) Determination by Court Whenever Joinder not Feasible.  If a [party
         meeting the requirements of 19(a)] cannot be made a party, the court shall
13       determine whether in equity and good conscience the action should proceed
14       among the parties before it, or should be dismissed, the absent person being
         thus regarded as indispensable.  The factors to be considered by the court
15       include: first, to what extent a judgment rendered in the person's absence
16       might be prejudicial to the person or those already parties; second, the
         extent to which, by protective provisions in the judgment, by the shaping of
17       relief, or other measures, the prejudice can be lessened or avoided; third,
18       whether a judgment rendered in the person's absence will be adequate;
         fourth, whether the plaintiff will have an adequate remedy if the action is
19       dismissed for nonjoinder.

20

21   Fed. R. Civ. P. 19.
         An absent party is "necessary" if he meets the requirements of Rule 19(a).  He is
22   "indispensable" if he meets the requirements of Rule 19(b) and the court determines, in
23   equity and good conscience, that the case should be dismissed rather than proceed without
     him.
24       Although the factors in Rule 19(b) "overlap" with those in Rule 19(a), "[o]verlap .
25   . . should not be equated with redundancy."  Moore et al., supra § 19.05[1][a].  "While the
26   necessary party analysis under Rule 19(a) and the indispensability analysis under Rule
     19(b) look at similar issues, each has a different thrust which reflects its different
27   purpose."  Id.  "Under the former, the court is more or less concerned with whether

28                                                                    (continued . . .)

                                          22

EXHIBIT 4 PAGE 67

1  this context, the court examines whether the intervenor was "indispensable" at the
2  time the original action was filed. See Mut. Fire, Marine & Inland Ins. Co., 726 F.
3  Supp. at 481 (an intervenor has to show an independent basis for jurisdiction only
4  if it "was indispensable to the action at the time it was brought"). See also Am.
5  Nat'l Bank & Trust Co. of Chicago, 750 F.2d at 582 (Posner, J.) ("[I]f the
6  nondiverse party comes into the case by intervening in it, his presence will not
7  deprive the court of jurisdiction unless the intervenor was an indispensable party
8  when the complaint was filed. Federal jurisdiction is determined by the facts as
9  they exist when the case is filed, and not by what happens later . . . . So the fact
10 that a resident of the plaintiff's state intervenes will not require the plaintiff to
11 abandon his suit unless the resident was an indispensable party at the time the suit
12 was filed – in which event the plaintiff should have joined him at the outset, and if
13 he had done so the court would have known that complete diversity was
14 lacking."). Examining whether the intervenor was "indispensable" when the
15 action was filed "prevent[s] collusion between parties to avoid jurisdictional
16 requirements." Mut. Fire, Marine & Inland Ins. Co., 726 F. Supp. at 481. "If the
17 rule were otherwise, the requirement of complete diversity could be avoided by
18 having one party bring an action while the indispensable party waits and then
19 intervenes as of right under the court's ancillary jurisdiction." Id.

20     Here, MGA was not "indispensable" to the lawsuit as Mattel chose to
21 characterize it in its Complaint. Mattel elected to sue Bryant in state court on what
22 Mattel – as master of its Complaint – asserted were purely state law claims.
23 Conspicuously absent from the Complaint was any mention of MGA or the Bratz.
24 Indeed, as late as July 2004, months after filing its Complaint against Bryant,

25
26 nonjoinder *could* have one of the adverse effects addressed by that Rule." Id. (emphasis
27 in original). "Under the indispensability analysis, the court . . . must determine whether
28 nonjoinder *actually will* result in . . . prejudice . . . ." Id. (emphasis in original).

EXHIBIT 4 PAGE 68

1    Mattel claimed to be unable to determine "whether rights to Bratz are indeed at

2    stake here." See, e.g., July 12, 2004 Rep. at 4. Thus, it cannot be said that MGA

3    was "necessary," much less "indispensable" to the action at the time Mattel filed

4    its Complaint against Bryant.

5         Furthermore, there is no indication that the parties colluded to avoid the

6    requirement of complete diversity. First, the parties have submitted over 126

7    pages in briefing, 118 exhibits, and two *ex parte* applications in connection with

8    the instant motion to remand. Second, because this case was removed by Bryant

9    from state court, there is a "*prima facie* absence of effort by the plaintiff to

10   circumvent the complete diversity requirement." Joan Steinman, Supplemental

11   Jurisdiction in § 1441 Removed Cases: An Unsurveyed Frontier of Congress'

12   Handiwork, 35 Ariz. L. Rev. 305, 347 (1993).

13        Because MGA intervened as of right and was not "indispensable" at the

14   time Mattel filed its Complaint against Bryant, its intervention did not destroy

15   diversity jurisdiction under the rule as it existed prior to the enactment of

16   § 1447(e) and § 1367(b).

17              ii.  The Effect of § 1447(e) and § 1367(b)

18        Mattel argues that § 1447(e) and § 1367(b) modified the application of the

19   rule that the intervention of a non-diverse, non-indispensable party does not

20   destroy diversity jurisdiction.

21        Section 1447(e) provides:

22        If after removal the plaintiff seeks to join additional defendants
         whose joinder would destroy subject matter jurisdiction, the court
23        may deny joinder, or permit joinder and remand the action to the State
24        court.

25

26   28 U.S.C. § 1447(e). This section does not apply to the present case. While

27   § 1447(e) discusses the court's options when a *plaintiff* attempts to *join* a non-

28

EXHIBIT 4 PAGE 69

1    diverse defendant, the present case involves the *intervention* of a non-diverse

2    *defendant*.  Therefore, § 1447(e) did not change the above-mentioned rule as it

3    applies here.

4        Section 1367 provides in pertinent part:

5        (a) Except as provided in subsection[] (b) . . . , in any civil action of

6        which the district courts have original jurisdiction, the district courts

7        shall have supplemental jurisdiction over all other claims that are so

8        related to claims in the action within such original jurisdiction that

9        they form part of the same case or controversy under Article III of the

10       United States Constitution.  Such supplemental jurisdiction shall

11       include claims that involve the joinder or intervention of additional

    parties.

12       (b) In any civil action of which the district courts have original

13       jurisdiction founded solely on section 1332 of this title, the district

14       courts shall not have supplemental jurisdiction under subsection (a)

15       over claims by plaintiffs against persons made parties under Rule 14,

16       19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims

    by persons proposed to be joined as plaintiffs under Rule 19 of such

17       rules, or seeking to intervene as plaintiffs under Rule 24 of such rules,

18       when exercising supplemental jurisdiction over such claims would be

    inconsistent with the jurisdictional requirements of section 1332.

19   28 U.S.C. § 1367.  Mattel argues that because the court's jurisdiction is premised

20   upon § 1332 and MGA and Mattel are not diverse, the court is prohibited by

21   § 1367(b) from exercising supplemental jurisdiction over MGA.  This argument

22   fails to recognize the distinction between "parties" and "claims."  Section 1367(b)

23   is concerned with the assertion of new "claims," not the intervention alone of new

24   "parties."  As succinctly stated by one of the preeminent scholars in the field:

25       [W]hether the context is removal or not, there can be persons who

26       intervene on the side of the defendants . . . against whom the plaintiff

    has no claim to assert.  Indeed, the intervention of persons under Rule

27       24 typically will be at the instigation of the intervenors, and not at the

28

EXHIBIT 4 PAGE 70

urging of the plaintiff, and will be precipitated by the persons' concern that disposition of the action in their absence will as a practical matter impair or impede their ability to protect their interests .... In these situations where the plaintiff does not seek to assert a claim against the defendant intervenor, the plaintiff has not sought to circumvent the complete diversity requirement of § 1332, and § 1367(b) does not purport to limit the exercise of supplemental jurisdiction over the involvement or interests of such intervening parties. Its limitations apply only to the *claims*, if any, that the plaintiff would assert against such intervening defendants.

Joan Steinman, Supplemental Jurisdiction in § 1441 Removed Cases: An Unsurveyed Frontier of Congress' Handiwork, 35 Ariz. L. Rev. 305, 344-45 (1993) (emphasis in original).[14]

---

[14]  See also Wichita R.R. & Light Co., 260 U.S. 48 (1922) (allowing intervention of non-diverse defendant); Home Ins. Co. v. Hughes, CIV. A. No. 95-1833, 1996 WL 109292, *2 (E.D. La. Mar. 11, 1996) (intervention of non-diverse defendant does not destroy diversity); Maryland Cas. Co. v. W.R. Grace & Co., No. 88 Civ. 4337 (JSM), 1996 WL 34154 (S.D.N.Y. Jan. 30, 1996) (intervention of non-diverse "cross-claim defendant" does not destroy diversity); MCI Telecomms. Corp. v. Logan Group, Inc., 848 F. Supp. 86, 89 & n. 2 (N.D. Tex. 1994) (suggesting that intervening defendant does not trigger § 1367(b) concerns); Schwarzer et al., Cal. Prac. Guide: Fed. Civ. Pro. Before Trial § 7:179 (2004) ("An independent basis for subject matter jurisdiction may not be required where one intervenes as a defendant as a matter of right."); 36 Suzanne J. Bailey et al., Corpus Juris Secundum § 142 (2004) ("[J]urisdiction of an action between citizens of different states ordinarily is not lost by the intervention of new parties who are citizens of the same state as the original parties to whom their interests are opposed."); Marilyn J. Ireland, Supplemental Jurisdiction Over Claims in Intervention, 23 N.M. L. Rev. 57, 68-69 (1993) ("Jurisdiction once acquired on [the] ground [of diversity] is not . . . defeated by the intervention . . . of a party whose presence is not essential to a decision of the controversy between the original parties. Section 1367 does not change this conclusion . . . . [I]n the case of subject matter jurisdiction, it is jurisdiction over claims, not over parties, that is in issue . . . . [D]efensive intervenors have never been considered to violate the complete diversity rule in the past. It does not now necessarily follow that they will be held to be 'inconsistent with the requirements of section 1332.'") (quotation (continued . . .)

EXHIBIT _4_ PAGE _71_

1    Here, MGA has intervened as a defendant and Mattel has not attempted to

2   amend its Complaint to assert any claims against MGA.[15]  Therefore, MGA's

3   _____

4   marks and citations omitted); Abram Chayes, The Role of the Judge in Public Law

5   Litigation, 89 Harv. L. Rev. 1281, 1290 (1976) (the right to participate in a case has
    ceased to depend on having a right to relief or liability to satisfy a claim).  Mattel cites

6   Lumber Ins. Cos., Inc. v. Allen, 892 F. Supp. 31 (D.N.H. 1993), for the proposition that

7   the mere intervention of a non-diverse defendant destroys diversity.  Insofar as Lumber
    Ins. stands for this proposition, the court disagrees, as such a holding ignores the

8   distinction between claims and parties.

9       [15]  Mattel cites Uni Storebrand Ins. Co., UK Ltd. v. Star Terminal Corp., No. 96

10  CIV. 9556 (DLC), 1997 WL 391125 (S.D.N.Y. July 11, 1997), for the proposition that an
    intervening defendant "steps into the shoes" of a full-party defendant and, therefore,

11  "takes on" the plaintiff's original "claims" as if they were asserted against the intervening

12  party.  Uni Storebrand is distinguishable.  There, the original defendant had completely
    failed to appear in the action and Societe Generale Energie Corp., S.A. ("SGE") sought to

13  intervene as a defendant to protect its interests that were otherwise subject to default.  In

14  those specific circumstances, the court found that SGE, by intervening, "stepped into the
    shoes" of the original defendant and "took on" the claims asserted by the original

15  plaintiff.  See id. at *4 ("As a practical matter, the only live claim in this action is a non-

16  diverse claim between [the plaintiff] and SGE."); id. at *6 ("The unique posture of this
    case stems from the fact that . . . the nominal defendant[] is a dissolved corporation which

17  does not intend to appear.").  In contrast, Bryant, the original defendant, has appeared in

18  this action and has litigated his rights vigorously.

19      Furthermore, even if the court assumed that MGA "took on" Mattel's claims
    against Bryant, the court would not be barred by § 1367(b) from retaining jurisdiction.

20  After all, "[w]hen one turns to removed cases, . . . supplemental jurisdiction should be

21  liberally exercised – because of the prima facie absence of effort by the plaintiff to
    circumvent the complete diversity requirement."  Steinman, supra at 347 (emphasis

22  added).  Because this is a removed case, the court may liberally exercise supplemental

23  jurisdiction over the "claims" MGA might have "taken on" by intervening after removal.
    This "[does] not expand federal jurisdiction beyond the bounds that the [Supreme] Court

24  [has] recognized."  Id. at 347-48; see Phelps v. Oaks, 117 U.S. 236 (1886).  Additionally,

25  by exercising supplemental jurisdiction over these claims, the court can "simultaneously
    adjudicate the original civil action, safeguard the defendant's removal, and allow all of

26  plaintiff's related claims to be heard in one suit."  Steinman, supra at 348.  "All this serves

27  fairness and efficiency, without sacrificing enforcement of the jurisdictional requirements
                                                              (continued . . .)

28

                                          27

EXHIBIT 4 PAGE 72

1   intervention did not implicate § 1367(b).  In short, because neither § 1447(e) nor

2   § 1367(b) precludes the court from exercising diversity jurisdiction over an action

3   involving the post-removal intervention of a non-diverse, non-indispensable

4   defendant, the court finds that MGA's intervention did not destroy diversity.[16]

5

6                **IV. CERTIFICATION UNDER 28 U.S.C. § 1292(b)**

7        "In circumstances where a district judge upholds subject matter jurisdiction

8   and denies a motion to remand, but has doubts about these rulings, the judge may

9   sometimes secure interlocutory review by certifying the rulings under 28 U.S.C.

10  § 1292(b)."  Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d

11

12  _____

13  of § 1332 . . . ."  Id.
        Finally, to the extent Mattel argues its "claims" are asserted against MGA, it lends
14  credence to the inference that its claims are actually related to the rights to the Bratz and
15  are likely preempted by the Copyright Act, thereby raising a federal question.

16       [16]  The cases cited by Mattel fail to address the situation before the court.  See
17  Stevens v. Brink's Home Sec., Inc., 378 F.3d 944, 949 (9th Cir. 2004) (plaintiff's
     amending complaint to join non-diverse defendants); TIG Ins. Co. v. Reliable Research
18  Co., 334 F.3d 630, 634 (7th Cir. 2003) (intervening plaintiff); Doleac v. Michalson, 264
19  F.3d 470, 473-77 (5th Cir. 2001) (plaintiff's amending complaint to add claims against
     non-diverse defendant); Cobb v. Delta Exports, Inc., 186 F.3d 675, 677 (5th Cir. 1999)
20  (same); Casas Office Mach., Inc. v. Mita Copystar Am, Inc., 42 F.3d 668, 672-78 (1st Cir.
21  1995) (same); Yniques v. Cabral, 985 F.2d 1031 (9th Cir. 1993) (plaintiff's amending
     complaint to join non-diverse defendant; holding based on 1447(e), which applies only to
22  efforts by plaintiffs to join non-diverse defendants); Miller v. Grgurich, 763 F.2d 372,
23  373 (9th Cir. 1985) (paraphrasing Desert Empire Bank v. Ins. Co. of N. Am., 623 F.2d
     1371, 1374 (9th Cir. 1980), involving plaintiff's amending complaint to add claims
24  against non-diverse defendant); Carolina Asphalt Paving, Inc. v. Balfour Beatty Constr.,
25  Inc., No. 9:04-1578-28, 2004 WL 3015177, at *3 (D.S.C. Nov. 19, 2004) (plaintiff's
     addition of claims against third-party defendant); Diaz v. Allstate Ins. Group, 185 F.R.D.
26  581, 595-96 (C.D. Cal. 1998) (plaintiff's joining non-diverse defendant); Farm Bureau
27  Mut. Ins. Co., Inc. v. Eighmy, 849 F. Supp. 40 (D. Kan. 1994) (pre-removal intervention
     of non-diverse defendant).
28

                                   28

EXHIBIT _4_ PAGE _73_

1  116, 132 (2d Cir. 2003) (Newman, J., concurring) (citing Breuer v. Jim's Concrete

2  of Brevard, Inc., 538 U.S. 691 (2003)).  28 U.S.C. § 1292(b) provides:

3       When a district judge, in making in a civil action an order not
        otherwise appealable under this section, shall be of the opinion that
4       such order involves a controlling question of law as to which there is
5       substantial ground for difference of opinion and that an immediate
        appeal from the order may materially advance the ultimate
6       termination of the litigation, he shall so state in writing in such order.
7       The Court of Appeals which would have jurisdiction of an appeal of
8       such action may thereupon, in its discretion, permit an appeal to be
        taken from such order, if application is made to it within ten days
9       after the entry of the order: *Provided, however*, That application for
10      an appeal hereunder shall not stay proceedings in the district court
11      unless the district judge or the Court of Appeals or a judge thereof
12      shall so order.

13  28 U.S.C. § 1292(b).

14       No court of appeals has addressed whether § 1447(e) or § 1367(b) causes

15  the post-removal, Rule 24(a)(2) intervention of a non-diverse, non-indispensable

16  defendant to destroy diversity jurisdiction.  This court's finding that neither

17  section does so is a controlling question of law critical to the court's exercise of

18  jurisdiction and as to which there is no precedent.  Resolution of the issue will

19  both materially advance the litigation and avoid the needless expenditure of

20  judicial resources if the Court of Appeals concludes this court lacks jurisdiction.

21  See, e.g., Valdez v. Allstate Ins. Co., 372 F.3d 1115 (9th Cir. 2004) (raising issue

22  of jurisdiction *sua sponte* after case had proceeded to summary judgment in

23  district court).  Accordingly, the court certifies the issue for interlocutory appeal

24  under § 1292(b).  No later than 10 days from the date of this order, Mattel shall

25  file its application to appeal this court's order or notify this court, in writing, that

26  no such application will be made.

27

28

EXHIBIT 4 PAGE 74

## V. CONCLUSION

Finding the presence of diversity jurisdiction under § 1332, the court **DENIES** Mattel's Motion to Remand. [17]

IT IS SO ORDERED.

DATED: March 4, 2005

Nora M. Manella
United States District Judge

---

[17] Mattel's request for attorneys' fees is denied.

30

EXHIBIT _4_ PAGE _75_

EXHIBIT 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES-GENERAL

CV04-09059-NM(RNBx)
CASE NO.  CV05-02727-NM(RNBx)        DATE:  5/20/05

TITLE:  Mattel Inc. -v- Carter Bryant, et al
        MGA Entertainment Inc. -v- Mattel, Inc.

PRESENT:        HON. NORA M. MANELLA, JUDGE

Judith Hurley              N/A
Deputy Clerk               Court Reporter

ATTORNEY FOR PLAINTIFF      ATTORNEY FOR DEFENDANT

       N/A                      N/A

PROCEEDINGS:  IN CHAMBERS

    Now that the Ninth Circuit has granted Mattel's petition for permission to file
an interlocutory appeal, all discovery in these actions is stayed pending the
determination of the appeal.  The stay of discovery also applies to pending &
prospective discovery motions.

cc: Counsel
CIVIL MINUTES 11

Initials of Deputy Clerk ___

EXHIBIT _5_ PAGE _76_

**EXHIBIT 6**

RightFAX          5/.  2006 2:28   PAGE 002/002       .x Server

**PRIORITY SEND**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES – GENERAL</u>

Case No.    CV 05-02727 SGL(RNBx)                    Date:  May 16, 2006

Title:    MGA ENTERTAINMENT, INC. -v- MATTEL, INC.
========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes                              None Present
        Courtroom Deputy                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None present                           None present

PROCEEDINGS:    MINUTE ORDER (IN CHAMBERS)

        This matter is before the Court on its own motion.  The Court orders the parties to show cause why this action should not be consolidated for all purposes with the two related actions: <u>Bryant v. Mattel, Inc.</u>, CV 04-09049 SGL (RNBx); <u>Mattel, Inc. v. Bryant,</u> CV 04-09059 SGL (RNBx). The parties' briefs re consolidation must be filed no later than June 5, 2006.  The Court will address the matter at the hearing on the motions set in the related cases on June 26, 2006.

        The Court's stay order, entered May 20, 2005, is vacated.

        IT IS SO ORDERED.

MINUTES FORM 90                    1           Initials of Deputy Clerk __jh
CIVIL – GEN

EXHIBIT 6 PAGE 77

ORIGINAL

**EXHIBIT  7**

<u>CONFIDENTIAL</u>                                    1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


MATTEL, INC., a Delaware corporation, )     CASE NO.
                                      )     CV 04-9059 DDP (AJWx)
                 Plaintiff,           )
                                      )
         vs.                          )
                                      )
CARTER BRYANT, an individual, and     )
DOES 1 through 10, inclusive,         )
                                      )
                 Defendants.          )
_____)
CARTER BRYANT, on behalf of himself,  )
all present and former employees of   )
Mattel, Inc., and the general public, )
                                      )
                 Cross-Complainant,   )
                                      )
         vs.                          )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
                 Cross-Defendant.     )


VOLUME I
THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Thursday, November 4, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

COPY      EXHIBIT _7_ PAGE _78_

CONFIDENTIAL                                                4

1    Reporter, would you please swear in the witness.

2                    CARTER BRYANT,

3    being first duly sworn to testify the truth, the whole

4    truth, and nothing but the truth, testified as follows:

5                    VIDEOGRAPHER:  We're now on the record.  The          09:12

6    time is 9:14 a.m.

7                    MR. QUINN:  Thank you.

8                    DIRECT EXAMINATION

9    BY MR. QUINN:

10   Q    Good morning, Mr. Bryant.                                        09:13

11   A    Good morning.

12                   MR. WICKHAM:  John, just by way of

13   clarification so that we have an understanding that Mr.

14   Bryant is appearing today pursuant to Judge Alarcon's

15   order that ordered that his deposition proceed today on          09:13

16   November 4 and tomorrow on November 5; however, the action

17   has recently been removed to the U.S. District Court for

18   the Central District of California, and as a consequence,

19   the deposition is proceeding pursuant to the Federal Rules

20   of Civil Procedure, including its limitations on                 09:13

21   discovery.

22        That said, even though the Federal rules do have a

23   seven-hour limitation on depositions, we have agreed that

24   Mr. Bryant will be here today and tomorrow and that we do

25   intend that he will be here until the deposition is              09:13

EXHIBIT _7_ PAGE _79_

1    completed.  It was noticed to continue from day to day                  09:13

2    until completed, and so if we're not completed by -- on

3    Friday, then we're prepared to proceed on Saturday,

4    Sunday, what have you, to ensure that the deposition does

5    get completed during this session.                                      09:14

6              MR. QUINN:  I'm not sure whether we agree

7    with any of that, but let's proceed with the deposition.

8    Q   (By Mr. Quinn)  Good morning, Mr. Bryant.

9    A   Good morning.

10   Q   When did you first hear of MGA?                                     09:14

11   A   I first heard of MGA through a friend of mine, Veronica

12       Marlow, and I think that was back in 2000.

13   Q   Can you recall approximately what time in 2000?

14   A   I think -- I think it was perhaps around July.

15   Q   Is there some reason why the month of July sticks out in           09:14

16       your mind?

17   A   I just remember it was sometime in the mid to late summer.

18   Q   And how did you know Veronica Marlow?

19   A   She was a good friend of mine who I had known from Mattel.

20   Q   And what was her affiliation with MGA at the time?                 09:15

21   A   She was doing freelance work for MGA.

22   Q   Do you know what kind of work she was doing?

23   A   She was designing dolls, and other than that, I'm not

24       sure.

25   Q   Do I understand correctly that she was not an MGA employee         09:15

EXHIBIT  7  PAGE 80

CONFIDENTIAL                                    6

1     at the time?                                          09:15

2   A   That's right.

3   Q   And do you know what kind of doll she was designing for

4       MGA at the time?

5   A   I don't.                                            09:15

6           MR. WICKHAM:  One other thing, John, because

7       I don't want to interrupt with -- unnecessarily, I'd like

8       to have a continuing direction that the entire deposition

9       will proceed pursuant to the protective order that at a

10      minimum the deposition proceed with designations of       09:15

11      confidentiality, and as matters that go to attorney's eyes

12      only arise, then we will designate those things and we'll

13      have to properly deal with those things in terms of the

14      attendance of the company's representative, but I do want

15      to have the entire deposition just designated as          09:16

16      confidential so that I don't have to keep on objecting and

17      interposing to say that it's -- you know, this is

18      confidential and that's not.

19          MR. QUINN:  Does this mean -- I'm just not

20      familiar with the protective order in place.  Does that   09:16

21      mean that anything would have to be filed under seal if

22      any part of the deposition is filed with the Court?

23          MR. ZELLER:  (Nods head).

24          MR. QUINN:  I'm being told, yes, it does.

25      And -- I mean, ordinarily I just -- I think that's        09:16

EXHIBIT _7_ PAGE _81_

CONFIDENTIAL                                                  8

1    Q    You don't recall one way or the other?                      09:17

2    A    No.

3    Q    Do you have any understanding as to how long she had been

4         working on those two projects for MGA?

5    A    No, I don't.                                                 09:17

6    Q    Do you know whether or not the projects she was ever --

7         that those projects she was working on for MGA ever

8         actually became MGA products?

9    A    I believe they did, yes.

10   Q    Both the baby doll and the angel doll?                       09:18

11   A    Yes.

12   Q    Do you know when MGA began to offer those two dolls to the

13        public?

14   A    I don't.

15   Q    Can you tell us the context in which Ms. Marlow first        09:18

16        spoke to you about MGA in July of 2000?

17   A    I spoke with her.  I told her that I had a project that I

18        was interested in possibly doing something with, and I

19        spoke to her and asked her if she could possibly -- or if

20        she had any leads or if she could possibly help me pitch    09:18

21        this idea.

22   Q    So you contacted her?

23   A    Yes.

24   Q    And in response to that query what did she say?

25   A    She told me that she had been working for a company called  09:19

EXHIBIT 7 PAGE 82

CONFIDENTIAL                                    9

1    MGA and that they, in fact, were looking for new doll                09:19

2    projects.

3  Q   And is it true that you had never heard of MGA before?

4  A   I had not.

5  Q   What was the project that you were referring to?                   09:19

6  A   The Bratz.

7  Q   And how did you describe it to her when you described this

8      project that you were working on that you were interested

9      in doing something with?

10 A   I don't remember exactly how the conversation went but it          09:19

11     was something to the effect that they were a group of teen

12     dolls with funky clothes and disproportionate features.

13 Q   Do you recall anything else that you told her when you

14     were describing this project to her?

15 A   I don't recall right at this time.                                 09:20

16 Q   And what response did she make when you told her about

17     this project that you were interested in pursuing?

18 A   I don't recall exactly what she said.

19 Q   Well, in general can you recall what her response was?

20 A   In general I think she expressed interest, and she told me         09:20

21     that she had been working with MGA and that they might

22     possibly be interested.

23 Q   Do you recall anything else that she said?

24 A   No, not at this time I don't.

25 Q   Did she -- what was the next step in your presenting this          09:20

EXHIBIT 7 PAGE 83

CONFIDENTIAL                                          10

1        to MGA?  And by "this," I'm referring to the Bratz                09:21

2        project.

3    A   The next step was that Veronica put me in touch with one

4        of the product managers at MGA, Paula Treantafelles, and

5        helped set up a meeting time for me to meet with Paula and        09:21

6        to show her the project.

7    Q   Did you know Paula?

8    A   No, I did not.

9    Q   And do you recall -- did you actually meet with Paula?

10   A   Yes.                                                              09:21

11   Q   And can you recall approximately when that was?

12   A   Excuse me.  It was toward the end of August of 2000.

13   Q   And do you recall where that meeting took place?

14   A   Yes.  It took place at the MGA offices.

15   Q   Besides yourself and Paula, did anybody else participate          09:21

16       in that meeting?

17   A   Veronica was present and also a woman named Victoria

18       O'Connor.

19   Q   Was Victoria O'Connor an MGA employee at the time?

20   A   Yes.                                                              09:22

21   Q   And what was your understanding about what her position

22       was at MGA?

23   A   I understood that she was the director of licensing, that

24       she -- she was the one responsible for bringing in outside

25       projects.                                                         09:22

EXHIBIT 7 PAGE 84

| | | |
|---|---|---|
| 1 | Q | So was that -- in that meeting was it just you, Victoria, |
| 2 | | Paula?  Just the three of you? |
| 3 | A | And Veronica. |
| 4 | Q | And Veronica? |
| 5 | A | Yes. |
| 6 | Q | How long did that meeting last? |
| 7 | A | Oh, approximately 45 minutes. |
| 8 | Q | And did you bring with you any sketches or illustrations |
| 9 | | or prototypes to show them what this idea was that you |
| 10 | | had? |
| 11 | A | I brought drawings, yes. |
| 12 | Q | Anything else? |
| 13 | A | No. |
| 14 | Q | Were those drawings in a three-ring binder or folder or -- |
| 15 | A | They were in a portfolio. |
| 16 | Q | Just sort of loose? |
| 17 | A | No.  They were in plastic sleeves. |
| 18 | Q | Between the time that Veronica first told you about MGA |
| 19 | | and the time that you had this meeting -- |
| 20 | A | Yes. |
| 21 | Q | -- did you learn anything else about MGA? |
| 22 | A | What do you mean specifically? |
| 23 | Q | Well, for example, did you look them up on the web or did |
| 24 | | you try to get any information about what this MGA company |
| 25 | | was? |

09:22
09:22
09:23
09:2?
09:2?
09:2?

CONFIDENTIAL                                                                40

1    he -- if he knew of anybody.  I was just -- I didn't                    10:0

2    really know where to start with an attorney, so I was just

3    looking for references.

4  Q  Why was it that you thought that you had a need to consult

5    with an attorney at that time?                                          10:0

6  A  Because I was -- I think this was at the time that I was

7    either getting ready to -- yeah.  I think I was getting

8    ready to pitch the Bratz idea to a toy company, to MGA,

9    and I wanted to find out what my -- what I might need to

10   do to protect myself.                                                   10:07

11 Q  Had it been your experience that before designers

12   disclosed ideas to companies that might take the ideas and

13   market them that they got some legal advice about

14   nondisclosure agreements?  Had that been your experience?

15           MR. WICKHAM:  Objection, lacks foundation.                      10:08

16 A  I don't know that that had been my personal experience.

17 Q  (By Mr. Quinn)  But had you heard that that was typical?

18           MR. WICKHAM:  Objection, lacks foundation,

19   calls for speculation.

20 A  I didn't know one way or another if that was typical.                  10:08

21 Q  (By Mr. Quinn)  Well, what caused you to think, then, that

22   you might need a lawyer in this situation?

23 A  I guess I just figured that there might be contracts that

24   would need to be reviewed.  I wanted to know if I needed

25   to get this copyrighted or patented before I brought it to                10:08

EXHIBIT  7  PAGE 86

CONFIDENTIAL                                          41

1     a toy company.                                              10:0?

2   Q   Is it true that you consulted a lawyer before you first

3       showed your Bratz idea to the folks at MGA?

4   A   Yes.                                                       10:0?

5   Q   So would that have been in July of 2000 that you first

6       consulted a lawyer?

7   A   I don't recall the time exactly.

8   Q   Well, I think you told me that you first met with MGA -- I

9       don't want to get it wrong -- end of August.

10  A   Yes, end of August.                                       10:0?

11  Q   All right.  So you would have consulted a lawyer before

12      then?

13  A   Yes.

14  Q   And did the lawyer help you come up with some type of an

15      agreement?                                                10:0?

16            MR. WICKHAM:  Objection.  Currently I'll

17      interpose an attorney-client privilege and instruct the

18      witness not to respond.  We previously had made an offer

19      of -- pertaining to information concerning his

20      consultations with Ms. Wang as it relates to the agreement   10:09

21      that he ultimately signed with MGA.  We had offered to

22      have a limited waiver of the attorney-client privilege

23      which was limited to that transaction and heretofore that

24      agreement has not been accepted by your side, so although

25      I'm going to be instructing concerning his consultations   10:10

EXHIBIT 7 PAGE 87

CONFIDENTIAL                                          42

1   with Ms. Wang at the present, I'll continue to extend that
2   offer of having a transactional waiver of the privilege
3   pertaining to his advice and counsel with Ms. Wang as it
4   relates to the negotiation of and ultimately the
5   consummation of the agreement that Mr. Bryant entered into
6   with MGA Entertainment, Inc.
7   Q   (By Mr. Quinn)  I'm not asking for the substance of any
8       communications with the counsel.  I'm just asking whether
9       the counsel helped you come up with an agreement.  Yes or
10      no?
11              MR. WICKHAM:  I think that that potentially
12      infringes on the attorney-client privilege.  If you want
13      to accept my offer, then we can make this streamlined.  If
14      you don't, I'll instruct the witness not to respond.
15              MR. QUINN:  So you're instructing the
16      witness?
17              MR. WICKHAM:  That is correct, and you're
18      not accepting the offer.
19  Q   (By Mr. Quinn)  When you first met with MGA at the end of
20      August did you have with you a form of agreement?
21  A   No.
22  Q   At the time that you first showed the folks at MGA your
23      Bratz idea at the end of August, did you enter into any
24      type of nondisclosure or other agreement with MGA?
25  A   Not to my recollection.

EXHIBIT 7 PAGE 88

CONFIDENTIAL                                                    44

1    you showed it to anyone else on earth?

2   A    Yes.  I had shown it to my mother.  I had shown it to my

3        partner, Richard.  My mother informs me that she had shown

4        the drawings to my father, and I showed it to Veronica,

5        Veronica Marlow.

6   Q    What is Richard's last name?

7   A    Irmen, I-R-M-E-N.

8   Q    And where does he reside?

9   A    He resides here in Springfield.

10  Q    Could you give us his address, please.

11  A    1303 South Farm Road 115.

12  Q    Is that your residence as well?

13  A    Yes.

14  Q    And when was it that you showed this to Mr. Irmen?

15  A    It was when I was returning to California from Missouri.

16       I believe it was New Year's Eve when I was unpacking my

17       things.

18  Q    New Year's Eve in what year?

19  A    1998.

20  Q    So you were unpacking in California?

21  A    Yes.

22  Q    And you showed it to him on December 31st, 1998?

23  A    Yes.  He was living in California at the time.

24  Q    So, as I understand it, in 1998 for some period of time

25       you had come back here to live; is that true?

10:1?
10:13
10:14
10:14
10:14
10:14
10:15

EXHIBIT 7 PAGE 89

CONFIDENTIAL                                                45

| 1 | A | Yes. | 10:15 |
| 2 | Q | "Here" meaning Springfield, Missouri? | |
| 3 | A | Yes.  Springfield area, yes. | |
| 4 | Q | And Mr. Irmen had remained in California during that | |
| 5 | | period? | 10:15 |
| 6 | A | Yes. | |
| 7 | Q | When was it that you showed the Bratz concept to your | |
| 8 | | mother? | |
| 9 | A | It was sometime in August, late August 1998. | |
| 10 | Q | And how is it that you remember that particular month? | 10:15 |
| 11 | A | That's when I created them. | |
| 12 | Q | And it's your recollection that you showed them to her at | |
| 13 | | the time that you created them? | |
| 14 | A | Yes. | |
| 15 | Q | And were you living with your mother at the time? | 10:15 |
| 16 | A | Yes. | |
| 17 | Q | And does your father reside there as well? | |
| 18 | A | Yes. | |
| 19 | Q | And what address was that? | |
| 20 | A | That was 1-A Sycamore Drive, Kimberling City. | 10:16 |
| 21 | Q | Missouri? | |
| 22 | A | Missouri. | |
| 23 | Q | Does your mother still reside at that address? | |
| 24 | A | No. | |
| 25 | Q | Where does your mother reside now? | 10:16 |

EXHIBIT 7 PAGE 90

CONFIDENTIAL                                                        46

```
 1   A     They reside at --                                          10:16
 2               MR. WICKHAM:  For the time being I'm going
 3         to instruct the witness not to respond.  At a break I may
 4         revisit that instruction but for the time being I'll
 5         object on privacy grounds and instruct the witness not to  10:16
 6         respond.
 7               MR. QUINN:  As to what his mother's address
 8         is?
 9               MR. WICKHAM:  Yes.
10   Q     (By Mr. Quinn)  What's your mother's name?  Can I know     10:16
11         that?
12   A     Janet Bryant.
13   Q     And your father?
14   A     Tom Bryant.
15               MR. QUINN:  Okay.  Change the tape.  We'll           10:17
16         have to change tape.
17               VIDEOGRAPHER:  We're off the record.  Time's
18         10:17.
19               (Break in proceedings.)
20               VIDEOGRAPHER:  Back on the record.  The              10:28
21         time's 10:28.
22   Q     (By Mr. Quinn)  Mr. Bryant, is it true that as of the time
23         that you first presented the Bratz materials to MGA in
24         late August of 2000, the only people you had shown those
25         materials to were your mother, Mr. Irwin, and Veronica     10:28
```

EXHIBIT 7 PAGE 91

1   Q   -- referring to?  You told them you were still employed by

2       Mattel prior to the time you signed the October 4

3       agreement, correct?

4   A   Yes.

5   Q   And did you ask them whether that raised any problems as

6       far as they were concerned at MGA?

7              MS. CENDALI:  Objection to the form.

8   A   Not that I recall.

9   Q   (By Mr. Quinn)  Did -- what -- who did you tell that you

10      were still employed by Mattel?

11   A   I told Isaac Larian and Paula Treantafelles.

12   Q   Did either one of them tell you that you should keep this

13      work that you were doing with MGA confidential?

14              MR. WICKHAM:  Objection, lacks foundation,

15      mischaracterizes the witness's testimony.

16   A   I don't recall the conversation.

17   Q   (By Mr. Quinn)  They might have said that, they might not

18      have said that, you just don't recall at all; is that

19      true?

20              MS. CENDALI:  Objection, mischaracterizes

21      his testimony.

22   Q   (By Mr. Quinn)  Is that true?

23   A   I don't recall.

24   Q   One way or the other?

25   A   One way or the other.

11:19
11:19
11:19
11:20
11:20
11:20

EXHIBIT 7 PAGE 92

CONFIDENTIAL                                                    88

1   Q   They might have said that, they might not, you just don't

2       recall?

3   A   Right.

4   Q   Do you recall -- what did you tell them when you said you

5       were still employed by Mattel?  Do you recall?

6   A   I don't remember how the conversation went.

7   Q   Let's -- let's take them one at a time.  When was it that

8       you first told Paula that you were still employed by

9       Mattel?

10             MS. CENDALI:  Objection, mischaracterizes

11      his testimony, use of the word "still."

12  A   I believe that I told Paula that I was employed by Mattel

13      at my first meeting with her.

14  Q   (By Mr. Quinn)  And did that subject ever come up again

15      between you and Paula, the fact that you were still

16      employed by Mattel?

17  A   I don't remember.

18  Q   It might have, it might not have, you just don't recall

19      one way or the other?

20  A   That's right.

21  Q   When was it that you told Isaac Larian that you were still

22      employed by Mattel?

23             MS. CENDALI:  Objection.

24  A   The first time I met Isaac.

25  Q   (By Mr. Quinn)  And when was that?

EXHIBIT 7 PAGE 93

89

1    A    I believe it was on September 1st.                        11:2

2    Q    And where did that meeting take place?

3    A    That was at MGA.

4    Q    In Mr. Larian's office?

5              MR. WICKHAM:   Objection, foundation.                11:2;

6    A    I believe it was Mr. Larian's office.

7    Q    (By Mr. Quinn)   Was anybody else present during that

8         meeting?

9    A    Yes.  Paula was present, Victoria O'Connor, Veronica

10        Marlow.                                                   11:2)

11   Q    So there was a total of five people present?

12   A    Yeah.

13   Q    Including yourself?

14   A    And Isaac's daughter, Jasmine.

15   Q    So a total of six people including yourself?             11:22

16   A    Yes.

17   Q    And how did the subject -- this meeting took place on

18        September 1, 2000?

19   A    Yes.

20   Q    How was it that you remember this date?                  11:22

21   A    Just through the discussions that we've had with the legal

22        team.

23   Q    Do you have any documents --

24              THE WITNESS:  Sorry.

25   Q    (By Mr. Quinn)   Do you have any documents or records that  11:22

EXHIBIT 7 PAGE 94

CONFIDENTIAL                                    90

1      reflect that date?

2   A  Not that I can -- not that I can remember.

3   Q  How did the subject of your Mattel employment come up in

4      this meeting on September 1?

5   A  I believe that I just told Mr. Larian that I was employed

6      by Mattel.

7   Q  Why did you bring that up?

8   A  Well, I felt it was important for him to know.

9   Q  Why is that?

10  A  I just felt it was important for him to know that.

11  Q  At that point did you have any concern at all about

12     whether you should be engaging in this activity with MGA

13     given that you were still a Mattel employee?

14  A  No.  I really didn't.  I considered this nothing more than

15     a -- basically a job interview.

16  Q  Did it occur to you -- and did you have copies of those

17     agreements that you had signed with Mattel at that time?

18              MR. WICKHAM:  Objection, vague as to time,

19     foundation.

20  A  I don't remember, but I don't think I did.

21  Q  (By Mr. Quinn)  And I'm not -- I didn't mean with you, you

22     know, physically --

23  A  Right.

24  Q  -- in this meeting in Mr. Larian's office.  Did you -- did

25     you have copies of those agreements somewhere in your

11:2:
11:2:
11:2:
11:2:
11:23
11:23
11:23

CONFIDENTIAL                                        110

```
 1    Q    (By Mr. Quinn)  So you don't recall anything at all that    12:0
 2         you said; is that true?
 3    A    I don't recall my comments, no.
 4    Q    Any of them?
 5    A    No.                                                          12:0:
 6    Q    My statement is correct?  You don't recall any of them?  I
 7         don't want to get caught in a double negative, which can
 8         happen.
 9                   MR. WICKHAM:  Asked and answered about two
10         or three times.                                             12:0:
11    A    Statements -- yes, your statement is true.
12    Q    (By Mr. Quinn)  Thank you.  Did Victoria, when she asked
13         you about your agreement with Mattel, did she tell you why
14         she wanted to see it?
15    A    I believe that she told me that she wanted to have MGA's    12:04
16         attorneys take a look at it to see if there would be any
17         potential problems.
18    Q    Do you recall anything else that she said on that subject?
19    A    Not right offhand, no.
20    Q    Do you recall -- I mean, you've told me that -- you said    12:04
21         you didn't have a copy of it.  That's what you told her?
22    A    Right.
23    Q    Did you have any discussion with her about what the terms
24         were of your agreement with Mattel?
25                   MR. WICKHAM:  Objection, asked and answered.      12:04
```

EXHIBIT 7 PAGE 96

CONFIDENTIAL                                                111

1                  MS. CENDALI:   Objection, vague.   Which                 12:06

2      agreement?

3   A  I'm sorry.   Which agreement are you referring to?

4   Q  (By Mr. Quinn)   Any agreement.   Was there any discussion

5      that you had with her about the terms of any of your                 12:04

6      agreements with Mattel?

7   A  I don't remember.

8   Q  One way or the other?

9   A  No.

10  Q  Did you give her any reassurance that this would -- the              12:05

11     activities that you were doing would not be a problem

12     under any agreement that you had with Mattel?   Did you say

13     that to her?

14  A  I don't remember if I said that to her but that was my

15     thought.   I thought that, you know, this was a project               12:05

16     that I had created while I was not employed with Mattel,

17     so I didn't think there would be a problem.

18  Q  And is that -- did you tell that to Victoria?

19  A  I may have.   I don't remember exactly.

20                  (Pause in proceedings.)                                  12:05

21  Q  (By Mr. Quinn)   Did you know a -- do you know a woman by

22     the name of Anna Rhee?

23  A  Yes.

24  Q  Who is she?

25  A  She was a face painter.   She was a friend of mine.                   12:06

EXHIBIT 7 PAGE 97

CONFIDENTIAL                                                                      112

```
 1    Q    Where did you meet her?                                  12:0(

 2    A    I met her at Mattel.

 3    Q    Did you meet her in connection with your Mattel

 4         employment?

 5    A    Yes.                                                      12:0(

 6    Q    And when you met her was she employed by Mattel?

 7    A    Yes.

 8    Q    And when you left Mattel's employment was she still

 9         employed by Mattel?

10              MR. WICKHAM:   Objection, lacks foundation,          12:06

11         calls for speculation.

12    A    To the best of my knowledge, no.  She was a freelancer.

13    Q    (By Mr. Quinn)  So at some point had her situation

14         converted from an -- from an employee to an independent

15         contractor?                                              12:06

16              MR. WICKHAM:   Objection, lacks foundation,

17         calls for speculation.

18    A    To the best of my knowledge that's what happened.

19    Q    (By Mr. Quinn)  And how did you learn that?

20    A    I think that at some point in time she told me that she  12:06

21         was going to be leaving.

22    Q    Do you recall when that was?

23    A    No, I don't.

24    Q    Do you recall the year?

25    A    No, I don't.                                             12:07
```

EXHIBIT 7 PAGE 98