1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  JASON D. RUSSELL (Bar No. 169219)
   (jrussell@skadden.com)
3  MARINA V. BOGORAD (Bar No. 217524)
   (mbogorad@skadden.com)
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue
5  Los Angeles, California 90071-3144
   Telephone:  (213) 687-5000
6  Facsimile:  (213) 687-5600

7  RAOUL D. KENNEDY (Bar No. 40892)
   (rkennedy@skadden.com)
8  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   4 Embarcadero Center, Suite 3800
9  San Francisco, CA  94111-5974
   Tel.: (415) 984-2698 / Fax: (415) 984-2626
10

11 Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                   EASTERN DIVISION

16 CARTER BRYANT, an individual,        )  CASE NO. CV 04-9049 SGL (RNBx)
                                        )
17                    Plaintiff,        )  Consolidated with Case No. 04-9059
                                        )  and Case No. 05-2727
18            v.                        )
                                        )  Honorable Stephen G. Larson
19 MATTEL, INC., a Delaware             )  [PUBLIC REDACTED]
   corporation,                         )  DECLARATION OF JASON D.
20                                      )  RUSSELL IN SUPPORT OF MGA
                      Defendant.        )  PARTIES' MOTIONS IN LIMINE NOS.
21                                      )  1-12
                                        )
22                                      )        VOLUME 1 OF 5
                                        )
23                                      )  Hearing Date: May 21, 2008
                                        )  Time: 1:00 p.m.
24                                      )
   _____ )
25 AND CONSOLIDATED ACTIONS.           )
                                        )
26

27

28

I, Jason D. Russell, hereby declare as follows:

1.     I am an attorney licensed to practice law in the State of California and am a partner at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, counsel of record for MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively, the "MGA Parties") in the above-captioned matter. I submit this Declaration in Support of MGA Parties' Motions *in limine* Nos. 1-12. Unless otherwise stated, I have personal knowledge of the facts set forth below and, if called as a witness, I could and would testify competently thereto.

2.     More than three months ago, on January 15, 2008, MGA produced to Mattel excerpts of a rough transcript of the proceedings in the arbitration styled Larian v. Larian, Case No. 05-2096-ABH, arbitrated November 16 and 17, 2005 before ADR Services in Los Angeles (the "Larian Arbitration"). Only two witnesses testified in that arbitration: Isaac Larian and Jennifer Maurus. Maurus was disclosed as a former sales manager at MGA in MGA Entertainment Inc.'s Responses to Mattel Inc.'s First Set of Interrogatories re Claims of Unfair Competition at Response No. 1 dated January 19, 2008. Mattel began relying on Maurus's testimony in the Larian Arbitration last month in its Joint Opposition to the Motion for Summary Judgment, and its corresponding responses to MGA's Separate Statement of Uncontroverted Fact filed March 24, 2008. Maurus has not been deposed in this case, and, to my knowledge, Mattel has issued no deposition subpoena or scheduled any deposition for her. However, Maurus is listed as number 17 on Mattel's Phase 1 Witness List dated April 1, 2008 as a witness it intends at this time to call at trial as part of its case-in-chief. (A true and correct copy of Mattel's Phase 1 Witness List dated April 1, 2008 is attached hereto as Exhibit 1.) While Mattel "reserves the right to use these witnesses' testimony through prior deposition or other testimony to the extent the witness is unavailable to provide live testimony at trial," Mattel does not represent in its Witness List that it has made any effort to establish that Maurus will be unavailable to testify at trial.

3.       A true and correct copy of the Verified Complaint in <u>Larian v. Larian</u> dated August 25, 3003 and bearing Bates numbers FL 6465-6489 is attached hereto as **Exhibit 2**.

4.       A true and correct copy of a letter from Kaye Scholer to Cotkin Collins and Ginsburg dated November 15, 2005 and bearing Bates numbers CC 00567-00568 is attached hereto as **Exhibit 3**.

5.       A true and correct copy of the Complaint in <u>Larian v. Larian and Zorabi</u> dated February 28, 2005 and bearing Bates numbers FL 6526-6553 is attached hereto as **Exhibit 4**.

6.       A true and correct copy of the Opening Arbitration Brief in <u>Larian v. Larian</u> dated November 14, 2005 and bearing Bates numbers MGA 3809056-3809120 is attached hereto as **Exhibit 5**.

7.       A true and correct copy of excerpts of Volumes I and II of the Confidential-AEO transcripts of the arbitration proceeding in <u>Larian v. Larian</u> dated November 16 and 17, 2005 is attached hereto as **Exhibit 6**.

8.       A true and correct copy of the Final Arbitration Award in <u>Larian v. Larian</u> dated November 28, 2005 is attached hereto as **Exhibit 7**.

9.       A true and correct copy of the Final Arbitration Award in <u>Larian v. Larian</u> dated February 3, 2006 and bearing Bates numbers CC 00517-00522 is attached hereto as **Exhibit 8**.

10.      A true and correct copy of Third Party MGA Entertainment Inc's Motion for a Protective Order dated November 14, 2005 and bearing Bates numbers CC 00342-00360 is attached hereto as **Exhibit 9**.

11.      A true and correct copy of a communication from Farhad Larian bearing Bates numbers KS05926-05948 is attached hereto as **Exhibit 10**.

12.      A true and correct copy of an e-mail chain dated August 14, 2000 bearing Bates numbers KBK 01300-01301 is attached hereto as **Exhibit 11**.

Declaration of Jason D. Russell in Support of MGA Parties' Motions *in limine* Nos. 1-12
Case No. CV 04-9049 SGL (RNBx)

13.　　A true and correct copy of excerpts of the transcript of the deposition of Farhad Larian taken February 4, 2008 is attached hereto as **Exhibit 12**.

14.　　A true and correct copy of an email chain between Isaac Larian and Haim Saban beginning on January 30, 2003 bearing Bates numbers MGA 1008775-1008778 is attached hereto as **Exhibit 13**.

15.　　A true and correct copy of an email from Mel Woods to Isaac Larian dated June 26, 2003 bearing Bates numbers MGA 4008769-4008771 is attached hereto as **Exhibit 14**.

16.　　A true and correct copy of the Affirmation of Peter Leung in MGA Entm't, Inc. v. Double Grand Corp. Ltd., HCA 1883/2003 dated June 26, 2003 and bearing Bates numbers MGA 0885074-0885088 is attached hereto as **Exhibit 15**.

17.　　A true and correct copy of the Affidavit of Isaac Larian, MGA Entm't, Inc. v. Toys & Trends, HCA 2152/2002, bearing Bates numbers MGA 0883395-0883408 is attached hereto as **Exhibit 16**.

18.　　A true and correct copy of the Affirmation of Lam Yuen Chak, MGA Entm't, Inc. v. Hunglam Toys Co., HCA 2687/2003, dated August 11, 2003 and bearing Bates numbers MGA 0884533-0884542 is attached hereto as **Exhibit 17**.

19.　　A true and correct copy of an Order Denying a Motion for Summary Judgment, Art Attacks Ink v. MGA Entm't, Inc., Civ. No. 04 CV 1035-B (BLM) (S.D. Cal. Nov. 1, 2006), bearing Bates numbers MGA 1499772-1499791 is attached hereto as **Exhibit 18**.

20.　　A true and correct copy of the Summons and Complaint in Integrity Toys, Inc. v. MGA Entm't, Inc., Case No. 05 CV 2142, dated August 17, 2005 and bearing Bates numbers MGA 0806552-0806573 is attached hereto as **Exhibit 19**.

21.　　A true and correct copy of a notice of opposition and opposition to an MGA trademark application (No. 78/382,405) in Quicksilver, Inc. v. MGA Entm't, Inc.,

Opposition No. 91160679, dated May 26, 2004 and bearing Bates numbers MGA 0806427-0806445 is attached hereto as **Exhibit 20**.

22.     A true and correct copy of Declaration of Daphne Gronich in Support of Ex Parte Application for Temporary Restraining Order in <u>MGA Entm't, Inc. v. Multitoy, Inc.</u>, 04-CV-02524 (C.D. Cal. Apr. 12, 2004), bearing Bates numbers MGA 0871500-0871508 is attached hereto as **Exhibit 21**.

23.     A true and correct copy of the Witness Statement of Paula Treantafelles Garcia in <u>MGA Entm't, Inc. v. UBI Soft Entm't</u>, Arb. No. AAA Claim No. 50 T 133 00467, dated March 13, 2006 and bearing Bates numbers MGA 0873672-0873685 is attached hereto as **Exhibit 22**.

24.     A true and correct copy of the Declaration of David Oakes in <u>Dudnikov v. MGA Entm't, Inc.</u>, Civ. Action No. 03-D-2512 (PAC) (D. Col. Apr. 6, 2004), bearing Bates numbers MGA 0871307-0871313 is attached hereto as **Exhibit 23**.

25.     A true and correct copy of an excerpt of the Transcript of Arbitration in <u>Fun 4 All Corp. v. MGA Entm't, Inc.</u>, dated May 29, 2002 and bearing Bates numbers MGA 0871766-871775 is attached hereto as **Exhibit 24**.

26.     A true and correct copy of a settlement agreement between MGA Entertainment, Inc. and Bandai America Incorporated bearing Bates number MGA 1480173 is attached hereto as **Exhibit 25**.

27.     A true and correct copy of an order resolving proceedings in Mexico (in the original Spanish) dated September 12, 2006 and bearing Bates numbers MGA 0876944-0876959 is attached hereto as **Exhibit 26**.

28.     A true and correct copy a chart identifying the Bates numbers of examples of the types of Agreements to be excluded pursuant to the MGA Parties' Motion *in limine* No. 4 is attached hereto as **Exhibit 27**.

29.     True and correct copies of examples of MGA Employment Agreements Bates numbered MGA 0875741-50, MGA 0875719-28, MGA 3814785-89, MGA 0875570-79,

MGA 0875548-54, MGA 0875683-5703, MGA 0875451-78, and MGA 0875555-69 are attached hereto as **Exhibit 28**.

30.    A true and correct copy of Mattel Inventions Agreement with Bryant dated January 4, 1999, introduced as C. Bryant Depo. Ex. 25, is attached hereto **Exhibit 29.**

31.    A true and correct copy of an email from Craig Holden to Michael Page, Isaac Larian and John Keker dated June 20, 2007 and bearing Bates numbers MGA 3765585-3765589 is attached hereto as **Exhibit 30**.

32.    A true and correct copy of MGA Entertainment's billing policy bearing Bates numbers MGA 3709766-3709771 is attached hereto as **Exhibit 31**.

33.    A true and correct copy of an email from Dale Cendali to Craig Holden and Isaac Larian dated June 23, 2007 and bearing Bates numbers MGA 3709794-3709798 is attached hereto as **Exhibit 32**.

34.    A true and correct copy of an excerpt from Mattel's Fifth Set of Interrogatories dated October 19, 2007 is attached hereto as **Exhibit 33**.

35.    A true and correct copy of Mattel's Opposition to MGA Parties' Motion for Clarification Regarding Portions of February 15, 2008 Order Granting In Part and Denying In Part Mattel's Motion to Compel Responses to Interrogatory Nos. 27-44 and 46-50 by the MGA Parties is attached hereto as **Exhibit 34**.

36.    A chart identifying the Bates numbers of samples of Phase Two documents to be excluded pursuant to the MGA Parties' Motion *in limine* No. 6 is attached hereto as **Exhibit 35**.

37.    A true and correct copy of an email exchange between Isaac Larian and Carter Bryant dated February 15, 2002 and bearing Bates numbers MGA 0069280-0069282 is attached hereto as **Exhibit 36**.

38.    A true and correct copy of excerpts of Mattel's Proposed Jury Instructions and Special Verdict Forms dated April 1, 2008 is attached hereto as **Exhibit 37**.

39.    A true and correct copy of an email chain from Isaac Larian to Nancy Koppang dated April 11, 2004 and bearing Bates numbers MGA 3473852-3473854 is attached hereto as **Exhibit 38**.

40.    A true and correct copy of an email form Ron Brawer to Linda Whaley dated February 28, 2006 and bearing Bates numbers MGA 0869679-0869683 is attached hereto as **Exhibit 39**.

41.    A true and correct copy of an email from Nancy Koppang to Isaac Larian bearing Bates numbers MGA 0861322-0861325 is attached hereto as **Exhibit 40**.

42.    A true and correct copy of an email from Isaac Larian to Ron Brawer dated October 26, 2004 and bearing Bates numbers MGA 0200954-0200958 is attached hereto as **Exhibit 41**.

43.    A true and correct copy of the Expert Report of Michael J. Wagner dated February 11, 2008 and Exhibits thereto is attached hereto as **Exhibit 42**.

44.    A true and correct copy of the Expert Rebuttal Report of Michael J. Wagner dated March 17, 2008 is attached hereto as **Exhibit 43**.

45.    A true and correct copy of excerpts of the transcript of the deposition of Michael J. Wagner taken March 21, 2008 is attached hereto as **Exhibit 44**.

46.    A true and correct copy of excerpts of the transcript of the deposition of Lisa Tonmu taken January 17, 2008 is attached hereto as **Exhibit 45**.

47.    A true and correct copy of excerpts of Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc. dated December 7, 2007 is attached hereto as **Exhibit 46**.

48.    A true and correct copy of the Mattel, Inc.'s Form 10-K filed February 27, 2006 is attached hereto as **Exhibit 47**.

49.    A true and correct copy of IBISWorld Industry Report, "Doll, Toy, and Game Manufacturing in the U.S." dated February 18, 2008 is attached hereto as **Exhibit 48**.

50.     A true and correct copy of the Expert Rebuttal Report of Kenneth Hollander dated March 17, 2008 is attached hereto as **Exhibit 49**.

51.     A true and correct copy of the Expert Rebuttal Report of Heather McComb dated March 17, 2008 is attached hereto as **Exhibit 50**.

52.     A true and correct copy of the Expert Rebuttal Report of Denise Van Patten dated March 17, 2008 is attached hereto as **Exhibit 51**.

53.     A true and correct copy of the Expert Rebuttal Report and Supplement of Nicholas Mirzoeff dated March 17-18, 2008 is attached hereto as **Exhibit 52**.

54.     A true and correct copy of the webpage available at http://www.kharesearch.com/legal.htm (last visited April 11, 2008) is attached hereto as **Exhibit 53**.

55.     A true and correct copy of an excerpt of the transcript of the deposition of Ralph Oman dated March 31, 2008 is attached hereto as **Exhibit 54**.

56.     A true and correct copy of the Expert Report of Ralph Oman dated February 11, 2008 is attached hereto as **Exhibit 55**.

57.     A true and correct copy of an excerpt of the transcript of the deposition of Sam Khare dated September 20, 2007 is attached hereto as **Exhibit 56**.

58.     A true and correct copy of the Expert Report of John L. Alex dated February 11, 2008 is attached hereto as **Exhibit 57**.

59.     A true and correct copy of excerpts of the transcript of the deposition of John L. Alex dated April 9, 2008 is attached hereto as **Exhibit 58**.

60.     A true and correct copy of the Expert Report of Carol A. Scott dated February 11, 2008, as well as curriculum vitae and Exhibit 4C attached thereto, is attached hereto as **Exhibit 59**.

61.     A true and correct copy of the Rebuttal Expert Report of Carol A. Scott dated March 17, 2008 is attached hereto as **Exhibit 60**.

62.    A true and correct copy of excerpts of the transcript of the deposition of Carol A. Scott taken April 3, 2008 is attached hereto as **Exhibit 61**.

63.    A true and correct copy of a spread sheet introduced as Lisa Tonnu deposition exhibit 660 bearing Bates numbers MGA 00868723-00868865 is attached hereto as **Exhibit 62**.

64.    A true and correct copy of excerpts of the Rough Transcript of the transcript of the deposition of Tina Patel (Varu) taken April 8, 2008 is attached hereto as **Exhibit 63**.

65.    A true and correct copy of excerpts of the Expert Rebuttal Report of Erich Joachimsthaler dated March 17, 2008 is attached hereto as **Exhibit 64**.

66.    A true and correct copy of the Expert Rebuttal Report of Robert C. Lind dated March 17, 2008 is attached hereto as **Exhibit 65**.

67.    A true and correct copy of the Expert Report of Lee Loetz dated February 11, 2008 and excerpts of exhibits attached thereto is attached hereto as **Exhibit 66**.

68.    A true and correct copy of the Expert Rebuttal Report of Lee Loetz dated March 17, 2008 is attached hereto as **Exhibit 67**.

69.    A true and correct copy of excerpts of the transcript of the deposition of Lee Loetz taken March 26, 2008 and Loetz deposition exhibit 4615 are attached hereto as **Exhibit 68**.

70.    A true and correct copy of a Copyright Office Letter dated April 8, 2005 bearing Bates numbers MGA 0868141-0868144 is attached hereto as **Exhibit 69**.

71.    A true and correct copy of excerpts of the transcript of the deposition of Margaret Leahy taken December 12, 2007 is attached hereto as **Exhibit 70**.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on April 14, 2008, at Los Angeles, California.

Jason D. Russell

viii

# Exhibit 1

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
(michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
(joncorey@quinnemanuel.com)
Timothy L. Alger (Bar No. 160303)
(timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>Hon. Stephen G. Larson<br><br>MATTEL, INC.'S CORRECTED PHASE ONE WITNESS LIST<br><br>**Phase 1:**<br>Discovery Cut-Off:     January 28, 2008<br>Pre-Trial Conference:  May 5, 2008<br>Trial Date:                May 27, 2008 |

-1-

MATTEL, INC.'S PHASE ONE WITNESS LIST

Exhibit __1__ ,
P. __1__

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Mattel, Inc. ("Mattel") hereby identifies the following witnesses that it intends at this time to call at trial, other than those witnesses contemplated for impeachment or rebuttal. Mattel reserves the right to present these witnesses' testimony through prior deposition or other testimony to the extent a witness is unavailable to provide live testimony at trial or such testimony is otherwise admissible. Mattel reserves the right to call any witnesses included in the witness lists of other parties to this action and any amendments thereto, including any expert witnesses. Mattel reserves the right to supplement or amend its designation of witnesses and their testimony.

## Witnesses Mattel Intends to Call In Its Case In Chief

1. Nana Ashong
2. Kerri Brode
3. Carter Bryant
4. Ana Isabel Cabrera
5. Beatriz Morales
6. Elise Cloonan
7. Mel Woods
8. Robert Eckert
9. Lissa Freed
10. Rachel Harris
11. Andreas Koch
12. Farhad Larian
13. Isaac Larian
14. Steven Linker
15. Maria Veronica de Souza Marlow
16. Liliana Martinez

| | | |
|---|---|---|
| 1 | 17. | Jennifer Maurus |
| 2 | 18. | Carl Meyer |
| 3 | 19. | Victoria O'Connor |
| 4 | 20. | Sarah Odom |
| 5 | 21. | Denise O'Neal |
| 6 | 22. | Jeff Weiss |
| 7 | 23. | Jacqueline Ramona Prince |
| 8 | 24. | Anna Rhee |
| 9 | 25. | David Rosenbaum |
| 10 | 26. | Maria Elena Salazar |
| 11 | 27. | Maureen Tkacik |
| 12 | 28. | Lisa Tonnu |
| 13 | 29. | Paula Dianthe Treantafelles (Garcia) |
| 14 | 30. | Anne Wang |
| 15 | 31. | Sandy Yonemoto |
| 16 | 32. | Kitty Hammons |
| 17 | 33. | Ivy Ross |
| 18 | 34. | Cassidy Park |
| 19 | 35. | Bryan Armstrong |
| 20 | 36. | Margaret Hatch-Leahy |
| 21 | 37. | Samir Khare |
| 22 | 38. | Sheila Kyaw |
| 23 | 39. | Edmond Lee |
| 24 | 40. | Mark Menz |
| 25 | 41. | Valery Aginsky |
| 26 | 42. | Lloyd Cunningham |
| 27 | 43. | William Flynn |
| 28 | 44. | Frank Keiser |

Exhibit _1_ ,
P. _3_

MATTEL, INC.'S PHASE ONE WITNESS LIST

| | | |
|---|---|---|
| 1 | 45. | Lee Loetz |
| 2 | 46. | Ralph Oman |
| 3 | 47. | Walter Rantanen |
| 4 | 48. | Carol Scott |
| 5 | 49. | Michael Wagner |
| 6 | 50. | John Alex |
| 7 | 51. | Bruce Stein |
| 8 | 52. | Kenneth Hollander |
| 9 | 53. | Angel Gomez |
| 10 | 54. | Robert C. Lind |
| 11 | 55. | Heather McComb |
| 12 | 56. | Nicholas Mirzoeff |
| 13 | 57. | Denise Van Patten |
| 14 | 58. | Ginger McRae |
| 15 | 59. | Christopher Palmeri |
| 16 | 60. | Jill Nordquist |
| 17 | 61. | Arnold Artavia |

18 **Witnesses Mattel May Call In Its Case In Chief**

| | | |
|---|---|---|
| 19 | 62. | Joan Gaynor |
| 20 | 63. | Rene Pasko |
| 21 | 64. | Pedro Salazar |
| 22 | 65. | Rodney Palmer |
| 23 | 66. | Richard De Anda |
| 24 | 67. | Kami Gillmore-Bryant |
| 25 | 68. | Robert Hudnut |
| 26 | 69. | Cynthia Pierce |
| 27 | 70. | David Dees |
| 28 | 71. | Wendy Feinburg |

07209/2441845.7

-4-

Exhibit __1__,
P. __4__

MATTEL, INC.'S PHASE ONE WITNESS LIST

| | | |
|---|---|---|
| 1 | 72. | Schuyler Bacon |
| 2 | 73. | Robert Best |
| 3 | 74. | Sandra Bilotto |
| 4 | 75. | Ann Driskill |
| 5 | 76. | Brooke Gilbert |
| 6 | 77. | Daphne Gronich |
| 7 | 78. | Sarah Halpern |
| 8 | 79. | Rebecca Harris |
| 9 | 80. | Martin Hitch |
| 10 | 81. | Hoi Hoffman-Briggs |
| 11 | 82. | Don Howarth |
| 12 | 83. | Julia Jensen |
| 13 | 84. | Fred Kawashima |
| 14 | 85. | Cecelia Kwok |
| 15 | 86. | Steven Lee |
| 16 | 87. | Victor Lee |
| 17 | 88. | David Malacrida |
| 18 | 89. | Dennis Medici |
| 19 | 90. | Amy Myers |
| 20 | 91. | Joyce Ng |
| 21 | 92. | Charles O'Connor |
| 22 | 93. | Kislap Ongchango |
| 23 | 94. | Joni Pratte |
| 24 | 95. | William Ragsdale |
| 25 | 96. | Wendy Ragsdale |
| 26 | 97. | Lon P. Ross |
| 27 | 98. | Ellis Stern |
| 28 | 99. | Maureen Tafoya |

07209/2441845.7

Exhibit _1_,
P. _5_

MATTEL, INC.'S PHASE ONE WITNESS LIST

| | |
|---|---|
| 1 | 100. Frankie Tsang |
| 2 | 101. Morad Zarabi |
| 3 | 102. Chris Sesto |
| 4 | 103. Patrica Glaser |
| 5 | 104. Scott Gizer |
| 6 | 105. Alisa Morganthaler-Lever |
| 7 | 106. Douglas Wickham |
| 8 | 107. Keith Jacoby |
| 9 | 108. Kenneth Lockhart |
| 10 | 109. Carmen Monteagudo |
| 11 | 110. Jessie Ramirez |
| 12 | 111. Neil Friedman |
| 13 | 112. Lucy Arant |
| 14 | 113. Michael Moore |
| 15 | 114. Debora Middleton |
| 16 | 115. Ernest Dutcher |
| 17 | 116. Robert G. Wilson |
| 18 | 117. Alan N. Goldgberg |
| 19 | 118. William Conkle |
| 20 | 119. Mark Kremer |
| 21 | 120. Bryant Delgadillo |
| 22 | 121. Larry Feldman |
| 23 | 122. Robert Turner |
| 24 | 123. Richard Kellner |
| 25 | 124. Ronald Brawer |
| 26 | 125. Carlos Gustavo Machado |
| 27 | 126. Nick Armando Contreras |
| 28 | 127. Mariana Trueba Almada |

07209/2441845.7

Exhibit __1__,
P. __6__

MATTEL, INC.'S PHASE ONE WITNESS LIST

| | |
|---|---|
| 1 | 128.  Janine Brisbois |
| 2 | 129.  Daniel Cooney |
| 3 | 130.  Susana Kuemmerle |
| 4 | 131.  Jean Gomez |
| 5 | 132.  Janet Bryant |
| 6 | 133.  Thomas Bryant |
| 7 | 134.  Jeanne Galvano |
| 8 | 135.  Richard Irmen |
| 9 | 136.  Charnayne Brooks |
| 10 | 137.  Sarah Choi |
| 11 | 138.  Mei Wah (Sarah) Chui |
| 12 | 139.  Larry Clayton |
| 13 | 140.  Adrienne Fontenella |
| 14 | 141.  Mitchell Kamarck |
| 15 | 142.  Yim Chong Lo |
| 16 | 143.  Ron Longsdorf |
| 17 | 144.  Eli Makabi |
| 18 | 145.  Susan G. McBride |
| 19 | 146.  Colleen O'Higgins |
| 20 | 147.  Kumi Croom |
| 21 | 148.  Julia Marine |
| 22 | 149.  Shirin Salemnia |
| 23 | 150.  Richard Sandham |
| 24 | 151.  Aileen Storer |
| 25 | 152.  Stephen Tarmichael |
| 26 | 153.  Ben Ton |
| 27 | 154.  Evelyn Viohl |
| 28 | 155.  Spencer Woodman |

07209/2441845.7

-7-

Exhibit __1__,
P. __7__

MATTEL, INC.'S PHASE ONE WITNESS LIST

1    156.  Milton Zablow

2    157.  Joe Franke

3    158.  Larry McFarland

4    159.  Maureen Mullen Chianese

5    160.  Tina Patel

6    161.  Matt Bousquette

7    162.  Joe Tiongco

8    163.  Mercedeh Ward

9    164.  Alan Kaye

10    165.  Theresa Newcomb

11    166.  Paul Warner

12    167.  Helene Bartels

13    168.  Traci Feldman

14    169.  Michael Hebden

15

16  DATED:  April 1, 2008        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

17

18                  By: Jon D. Corey

19                  Jon D. Corey
                     Attorneys for Plaintiff Mattel, Inc.

20

21

22

23

24

25

26

27

28

-8-

Exhibit __1__,
P. __8__

MATTEL, INC.'S PHASE ONE WITNESS LIST

1

**PROOF OF SERVICE**

2       I am employed in the County of Los Angeles, State of California.  I am over

3  the age of eighteen years and not a party to the within action; my business address is

4  865 South Figueroa Street, 10th Floor, Los Angeles, California 90017.

5       On April 1, 2008, I served true copies of the following documents described

6  as: **MATTEL, INC.'S CORRECTED PHASE ONE WITNESS LIST** on the

7  parties in this action as follows:

8
   Thomas J. Nolan, Esq.                       Mark E. Overland, Esq.
9  **Skadden, Arps, Slate, Meagher &**          David C. Scheper, Esq.
   **Flom LLP**                                 Alexander H. Cote, Esq.
10 300 South Grand Avenue, Suite 3400          **Overland Borenstein Scheper &**
   Los Angeles, CA  90071                       **Kim, LLP**
11 'tnolan@skadden.com'                         300 South Grand Avenue, Suite 2750
                                                Los Angeles, CA 90071
12
   John W. Keker, Esq.                          'moverland@obsklaw.com'
13 Michael H. Page, Esq.
   Christa M. Anderson, Esq.
14 **Keker & Van Nest, LLP**
   710 Sansome Street
15 San Francisco, CA 94111

16 'MWerdegar@kvn.com'

17

18     **[X]  BY ELECTRONIC MAIL TRANSMISSION:** By electronic mail
   transmission from monicaascarrunz@quinnemanuel.com on April 1, 2008, by
19 transmitting a PDF format copy of such document(s) to each such person at the
   e-mail address listed below their address(es).  The document(s) was/were
20 transmitted by electronic transmission and such transmission was reported as
   complete and without error.

21

22

23     Executed on April 1, 2008, at Los Angeles, California.

24

25                    Tamar Buchakjian

26

27

28

07209/2456597.176189/2
47320.2
                                          -3-                    Case No. CV 04-9049 SGL (RNBx)
                                                                      PROOF OF SERVICE
                                   Exhibit   1   ,
                                   P.   9

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is NOW Messenger Service, 1301 West Second Street, Suite 206, Los Angeles, California 90026.

On April 1, 2008, I served true copies of the following documents described as: **MATTEL, INC.'S CORRECTED PHASE ONE WITNESS LIST** on the parties in this action as follows:

Thomas J. Nolan, Esq.
**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071

[X]   **PERSONAL:** By personally delivering the document listed above to the person(s) at the address(es) set forth above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made

Executed on April 1, 2008, at Los Angeles, California.

BRIAN SHORE

Case No. CV 04-9049 SGL (RNBx)

07209/2456597.176189/24
47320.2

PROOF OF SERVICE

Exhibit _1_,
P. _10_

**Exhibit 2**

HOWARTH & SMITH
DON HOWARTH (State Bar No 53783)
SUZELLE M SMITH (State Bar No 113992)
BRIAN D BUBB (State Bar No 137408)
ROBERT D BRAIN (State Bar No 98815)
800 Wilshire Blvd , Suite 750
Los Angeles, California 90017

(213) 955-9400

Attorneys for Plaintiff
FARHAD LARIAN

COPY

ORIGINAL FILED

AUG 2 5 2003

LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| FARHAD LARIAN,<br><br>      Plaintiff,<br><br>   vs<br><br>ISAAC LARIAN and DOES 1 through 50, inclusive,<br><br>      Defendants | CASE NO    BC301371<br><br>VERIFIED COMPLAINT FOR<br><br>1)  FRAUD & DECEIT IN THE INDUCEMENT OF ARBITRATION AGREEMENT,<br><br>2)  BREACH OF FIDUCIARY DUTIES,<br><br>3)  FRAUD & DECEIT IN THE CONDUCT OF ARBITRATION PROCESS,<br><br>4)  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING,<br><br>5)  VIOLATION OF CALIFORNIA CORPORATIONS CODE §§ 25401 AND 25501,<br><br>6)  VIOLATION OF CALIFORNIA CORPORATIONS CODE §§ 25402 AND 25502,<br><br>7)  FRAUD & DECEIT RE DECEMBER 2000 AGREEMENT; |

03 P391001 618

FL 6465

VERIFIED COMPLAINT

Exhibit   2   ,
P.   11

8)   NEGLIGENT MISREPRESENTATION,

9)   UNFAIR COMPETITION, IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, and

10)  RESCISSION BASED ON MISTAKE

DEMAND FOR JURY TRIAL

Plaintiff, FARHAD LARIAN ("Plaintiff" or "Fred") alleges as follows

## COMMON ALLEGATIONS

Parties and Venue

1    Plaintiff Farhad Larian, also known as "Fred" Larian, is now, and at all times herein mentioned was, a resident of the State of California   He is currently residing in Los Angeles County, California

2    Defendant Isaac Larian ("Isaac") is now, and at all time herein mentioned was, a resident of Los Angeles County, California

3    Plaintiff is unaware of the true names and capacities of Defendant DOES 1 through 50, inclusive, and therefore sues such Defendants by fictitious names   Plaintiff will amend this complaint to show the true names and capacities of, and to make specific allegations against, these Defendants if and when additional information against them is ascertained   Plaintiff is informed and believes and thereon alleges that each of the Defendants, including each fictitiously named Defendant, is liable in some manner for the events referred to in this complaint

4.   At all times mentioned herein, each Defendant was the agent of each of the other Defendants, and was acting within the course and scope of said agency in performing the acts described herein

5    Venue is proper in Los Angeles County under California Code of Civil Procedure § 395 because Defendant Isaac Larian resides in Los Angeles County.

FL 6466

VERIFIED COMPLAINT

Exhibit  2  ,
P. 12

## General Background

6       In or about 1979, two brothers, Plaintiff Fred Larian and Defendant Isaac Larian formed an equal partnership to import and distribute name brand consumer products, splitting the profits and losses 50/50

7       In or about 1982 the partnership was incorporated as ABC International Traders, Inc ("ABC"), a closely-held, not publicly traded company, with each brother owning an equal 50 percent of the corporation   Upon incorporation, the brothers continued as before to divide the work and to split equally the profits in running the business   In or about 2002, the name of ABC was changed to MGA Entertainment, Inc ("MGA)

8       In or about 1985 or 1986, Fred's and Isaac's shares were diluted when ABC sold stock to their brother-in-law, Jahangir "Eli" Makabi   Such sale left Fred and Isaac each with an equal 45 percent share of the ownership of ABC   After the sale of the stock to Mr Makabi, the brothers continued as partners and joint venturers in operating the Company, both continued to divide the work at ABC, and each sharing equally 45 percent of its profits

9       In or about 1994, Fred and Isaac also became equal 45 percent shareholders (with 10 percent going to Mr Makabi) in MGA Hong Kong, Limited (together with MGA and ABC, "the Company"), and operated part of their business through such entity. At all times referenced herein, Isaac has served as the President of the Company.  More recently, Isaac also acquired the additional title of CEO.

10      Starting as far back as 1993, disputes arose between the brothers over the operation of the Company   In part, this was because, as Isaac put it, they were "equal partners in the Company" yet had different ideas on how best to make the Company prosper.  Over the years, Fred and Isaac discussed various ways to resolve these disputes

///
///
///

3

FL 6467

Exhibit **2** ,
P. **13**

11    One method the brothers' discussed was having one brother buy out the other's equity interest  Over the years, various such purchases were discussed and on one occasion an outside appraisal of the Company, performed at the specific request of Isaac, valued the Company at $35 million to $40 million

12    By 1999, Isaac, as President, had assumed control of sales, product development and financial matters  At Isaac's direction, Fred assumed responsibility for major projects such as customs regulations, facilities management and warehouse distribution control, and was not as involved in the day-to-day sales or financial control of the Company  For his role, Isaac took a significantly greater salary

## Defendant's Concealment of the Bratz Doll Line

13    Plaintiff is informed and believes that beginning in or about late 1999 and early 2000, Isaac became aware of a potential new product line that had tremendous potential for the Company  The new product line involved the "Bratz" dolls and related products  Bratz dolls are "hipper" and more "edgy" than Barbie and Barbie-type dolls, and are aimed at the post-adolescent, pre-teen and early teen market, i e , a market where the allure of playing with Barbie-type dolls wanes

14    Plaintiff is informed and believes that during this same time period, Isaac devised a plan to keep this business opportunity secret from Fred and to gain control of the Company by buying Fred's shares at a value which did not include this new business opportunity  Isaac concealed from Plaintiff, his brother and partner and stockholder, knowledge he had, as well as his intentions and actions undertaken, regarding the Bratz product line

15.    In or about early 2000, Isaac called a meeting to discuss the new Bratz product line with selected individuals in the Company.  Plaintiff is informed and believes that those present at the meeting spoke enthusiastically of the tremendous opportunity the Bratz line presented for the Company as, *inter alia*, it captured a vacant market niche

///

4

FL 6468

VERIFIED COMPLAINT

Exhibit  2  ,
P.  14

1  Fred was not present for this meeting  Upon information and belief, Isaac took steps to

2  conceal the results of the meeting from Fred

3      16    Also in or about February 2000, Isaac tried to dissuade Fred from attending

4  the New York Toy Fair, even though Fred had routinely and regularly attended such toy

5  fairs in the past  The New York Toy Fair is an important venue for discussing and

6  researching the market potential of new product lines  Isaac was furious when he

7  discovered that Plaintiff was traveling to New York for the fair  Plaintiff was expelled by

8  Isaac from meetings he tried to attend and was excluded from any discussions Isaac may

9  have had relating to the Bratz line of products at the fair

10      17    In early March 2000, while continuing to conceal from Fred the Company's

11  plans for the Bratz line, Isaac offered to purchase all of Plaintiff's 45 percent interest in

12  the Company for $9 million  The offer was based on a total value of the Company of $20

13  million  Upon information and belief, Isaac knew at the time he made the offer of the

14  Company's plans already in place, and actions already undertaken, regarding the Bratz

15  line, and that such plans made the Company worth well in excess of $20 million

16      18    As set forth herein, the two brothers divided responsibilities with Isaac,

17  assuming control of sales, product development and financial matters, and Fred assuming

18  responsibility for major projects  Financial information was handled by Isaac and the

19  Controller, Dennis Medici  Throughout 2000 Isaac repeatedly and routinely shared with

20  Fred any financial information that showed the Company was performing poorly, while

21  withholding any positive financial information about the Company, including the plans

22  for the Bratz line.  Indeed, in May 2000 Isaac told the Company's the Controller, Dennis

23  Medici, that he was to no longer give Fred any information regarding the financial

24  operation of the Company. During this period, Isaac gave Fred only bleak financial news

25  about the Company and continued to conceal the Company's plans and actions

26  undertaken regarding Bratz

27      19.    On or about September 18, 2000, Isaac caused the Company to enter into a

28  worldwide licensing agreement for the Bratz dolls and related items  The existence of

03 P391001 618

FL 6469

Exhibit  2  ,
P.  15

VERIFIED COMPLAINT

1   this license was concealed from Fred   Upon information and belief, these important and

2   valuable rights are already generating revenues of in excess of $500 million a year and

3   are expected to exceed $3 billion in the next few years

4

5   <u>Fraud Regarding the Arbitration Agreement</u>

6         20     In or about September 2000, Isaac resumed his efforts to buy Fred's interest

7   in the Company   Isaac kept the Bratz opportunity and other information about the true

8   financial condition of the Company hidden from Fred in an effort to secure Fred's

9   agreement to a proposed arbitration process with their Uncle Morad Zarabi   Isaac agreed,

10  and induced Fred to agree, to the arbitration process without disclosing that during the

11  arbitration he would conceal the Company's plans and actions undertaken regarding the

12  Bratz line, and other financial information about the Company so that such information

13  would not be included in Mr Zarabi's valuation of the Company   In or about September

14  2000, Isaac and Fred executed the "Agreement to Arbitrate and Selection of Arbitrator"

15  ("Arbitration Agreement") attached hereto as Exhibit A

16        21     At all times before and up through his execution of the Arbitration

17  Agreement and for some considerable time thereafter, Fred was unaware of the true facts

18  regarding the new business opportunities and Bratz line of products, was unaware of the

19  true financial condition of the Company, and was unaware of the intention of Isaac to

20  conceal such material facts from the arbitrator and from him during the arbitration

21  process   Had Fred been aware of the new business opportunities, the Bratz line of

22  products, the true financial condition of the Company, and/or the plans of Isaac to

23  conceal such material information from him and from the arbitrator, he would not have

24  agreed to enter into the arbitration process for the sale of his interest in the Company;

25  would not have agreed to the Arbitration Agreement, would not have agreed to have Mr.

26  Zarabi serve as arbitrator, and, would have placed greater restrictions and obligations on

27  the powers of any arbitrator, including without limitation a written requirement that the

28  Company be valued by an independent appraiser outside the family and that such

03 P391001 618                              FL 6470                        VERIFIED COMPLAINT


Exhibit 2,
P. 16

1   appraisal be distributed to the parties for comment before any decision in the arbitration

2   was reached

3       22    In or about, December 2000, as a result of the Arbitration Agreement, Fred

4   and Isaac entered into a settlement and resolution of their differences with Fred agreeing

5   to sell his shares to Isaac  Fred and Isaac executed a written "Agreement for Sale of

6   Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached hereto as

7   Exhibit B.  One of the factors in causing Fred to enter into the Agreement for Sale of

8   Stock was the fact that he had been fraudulently induced into entering into the Arbitration

9   Agreement

10      23    At the time Isaac agreed to have Mr  Zarabi arbitrate the value of the

11  Company and other issues, and at all relevant times thereafter, Isaac knew that he would

12  continue to conceal the existence of his and the Company's plans for the Bratz line from

13  Mr  Zarabi and Fred during the arbitration, and other financial information about the

14  Company, the result of which, Isaac knew and intended, would be a fraudulently

15  diminished value of Fred's shares from what they would be worth if all pertinent

16  financial information about the Company and its plans for the Bratz product line were

17  disclosed   Isaac entered into the arbitration with the intent to induce Fred to rely on his

18  presenting Mr  Zarabi with all material information about the Company and its finances

19  so as to allow Mr  Zarabi to determine a fair value for the Company.  Fred did, in fact,

20  actually and reasonably rely on Isaac disclosing such material information in agreeing to

21  have Mr. Zarabi decide the value of the shares and other matters, and in executing the

22  "Arbitration Agreement"

23

24  **Fraud in the Conduct of the Ongoing Arbitration**

25      24    Mr. Zarabi held various hearings and received financial and other

26  information about the Company in his role as arbitrator beginning in the Fall of 2000.

27  Isaac did not disclose to Fred the license the Company had obtained in September 2000

28  for the Bratz line, the plans the Company had to develop and distribute, or any other

7

03 P391001 618          FL 6471          VERIFIED COMPLAINT

Exhibit 2 ,
P. 17

1   actions the Company had already undertaken regarding, the Bratz product line and other

2   business opportunities, the true financial condition of the Company, or the other matters

3   alleged heretofore   Upon information and belief, during this period, Isaac did not

4   disclose to Mr Zarabi the license the Company had obtained in September 2000 for the

5   Bratz line, the plans the Company had to develop and distribute, or any other actions the

6   Company had already undertaken regarding, the Bratz product line and other business

7   opportunities, the true financial condition of the Company, or the other matters alleged

8   heretofore

9         25      At the time Isaac agreed to have Mr Zarabi arbitrate the value of the

10  Company and other issues, and at all relevant times thereafter, Isaac knew that he would

11  continue to conceal the existence of his and the Company's plans for the Bratz line from

12  Mr Zarabi and Fred during the arbitration, and other financial information about the

13  Company, the result of which, Isaac knew and intended, would be a fraudulently

14  diminished value of Fred's shares from what they would be worth if all pertinent

15  financial information about the Company and its plans for the Bratz product line were

16  disclosed   Isaac entered into the arbitration with the intent to induce Fred to rely on his

17  presenting Mr Zarabi with all material information about the Company and its finances

18  so as to allow Mr Zarabi to determine a fair value for the Company   Fred did, in fact,

19  actually and reasonably rely on Isaac disclosing such material information in agreeing to

20  have Mr Zarabi decide the value of the shares and other matters, and in agreeing to the

21  arbitration process

22        26      In or about, December 2000, as a result of the arbitration process,

23  Fred and Isaac entered into a settlement and resolution of their differences with Fred

24  agreeing to sell his shares to Isaac   Fred and Isaac executed a written "Agreement for

25  Sale of Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached

26  hereto as Exhibit B   One of the factors in causing Fred to enter into the Agreement for

27  Sale of Stock was the fraud and facts set forth heretofore

28  ///

03.P391001 618

FL 6472

VERIFIED COMPLAINT

Exhibit 2
P. 18

**Fraud In the Agreement for Sale of Stock**

27     At all relevant times herein and during the negotiation of the December 2000 Agreement, Isaac continued his fraudulent concealment and nondisclosure as set forth herein of the Company's plans, assets and steps undertaken, regarding the Bratz product line as well as other financial information regarding the Company  But for the fraud, and had Plaintiff known of the true facts regarding the Company's plans, assets and steps undertaken regarding the Bratz product line, the true financial information about the Company and the other matters alleged heretofore, he would not have agreed to sell his shares to Isaac under the terms of the December 2000 Agreement

**Discovery of Fraud**

28     In or about late spring and summer 2002, Plaintiff first became aware of the true scope of the Company's extraordinary plans, efforts and history regarding the Bratz product line and other financial information about the Company that had been concealed from him by Isaac, as the license had been concealed from him  In or about the spring and summer 2002, Isaac asked Fred to audit payments that were due to the Company.  In that audit, Fred discovered information, for the first time, that the Company had been receiving or was expecting significant revenues based on the Bratz product line

29.     Fred then asked Mr. Zarabi whether Isaac had disclosed that information to Mr Zarabi and/or any appraiser involved with the arbitration  Plaintiff was told by Mr Zarabi that Isaac had not provided him with such information  Plaintiff made a demand that Mr Zarabi rectify the situation, but to date nothing has been done  Thereafter, Plaintiff made a demand that Isaac pay the fair market value of Plaintiff's share of the company, but Isaac has failed and refused to do so

///

///

///

///

9

03 P391001 618     FL 6473     VERIFIED COMPLAINT

Exhibit  2 ,
P.  19

# FIRST CAUSE OF ACTION

### (Fraud & Deceit in the Inducement of Arbitration Agreement)

30     Plaintiff hereby reasserts and realleges Paragraphs 1 through 29 inclusive, as though set forth in full herein

31     In entering into the Arbitration Agreement, agreeing to participate in the arbitration process contemplated thereby, and offering to purchase Plaintiff's shares in the Company, Defendant knowingly made false representations of material fact to Plaintiff and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to Plaintiff  Such facts specifically include, without limitation, his intentions regarding the information he was planning to conceal from the arbitrator, otherwise fail to disclose during the course of the arbitration process, and/or had already concealed from Plaintiff, concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line

32     Plaintiff actually, reasonably, and justifiably relied upon the false statements, concealments, and omissions of Defendant described above in agreeing to execute the Arbitration Agreement, participate in the arbitration process contemplated thereby, and sell his shares in the Company  Had Plaintiff known of the true facts, specifically including the true facts concerning Defendant's intentions regarding, without limitation, the information he was planning to conceal from arbitrator, otherwise fail to disclose during the arbitration process and/or already had concealed from Plaintiff concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the Arbitration Agreement, would not have agreed to participate in the arbitration process contemplated thereby, and would not have agreed to sell his shares of the Company.

33.     Defendant made the false representations, concealments and omissions alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

10

1   for purposes of inducing Plaintiff to execute the Arbitration Agreement, agree to

2   participate in the arbitration process contemplated thereby, and sell his shares in the

3   Company at a below fair market price

4          34     At all material times, Plaintiff was unaware of the falsity of the

5   representations and disclosures of Defendant as alleged above and believed them to be

6   true   At all material times, Plaintiff was unaware of the material omissions, concealments

7   and misstatements of material facts by Defendant, and could not, in the exercise of

8   reasonable care, made himself aware of the falsity of such misrepresentations and

9   nondisclosures, or the existence of such omissions or concealments

10          35     As a direct and proximate result of the fraudulent conduct alleged above,

11   Plaintiff has been damaged, without limitation, in that he was fraudulently induced to

12   enter the Arbitration Agreement, participate in the arbitration process contemplated

13   thereby, sell his shares of the Company to Defendant at a below fair market price of less

14   than $9 million, and enter into the December 2000 sale agreement   Plaintiff is entitled to

15   rescission of the September agreement to arbitrate, rescission of the December 2000 stock

16   sale agreement and restitution of his shares in the Company   In the alternative, Plaintiff

17   is entitled to damages, the amount of such damage is not presently ascertainable, but will

18   be proven at trial

19          36     The conduct of Defendant as alleged above, was fraudulent, malicious,

20   oppressive, and despicable, has subjected Plaintiff to unjust hardship in conscious

21   disregard of his rights, and was done to vex, annoy, and harass Plaintiff so as to justify an

22   award of punitive damages against Defendant

23

24                        **SECOND CAUSE OF ACTION**

25                         **(Breach of Fiduciary Duties)**

26          37     Plaintiff hereby reasserts and realleges Paragraphs 1 through 36 inclusive,

27   as though set forth in full herein

28   ///

FL 6475     VERIFIED COMPLAINT
Exhibit 2 ,
P. 21

38    As alleged herein, as an officer, manager and major shareholder of the Company in which Plaintiff was a shareholder, and as Plaintiff's partner and joint venturer in the management and operation of the Company, and otherwise due to their family relationship, Defendant owed Plaintiff fiduciary duties of loyalty, honesty, care and fair dealing in all matters concerning the Company

39    At all times alleged herein, Plaintiff actually and reasonably reposed the highest trust and confidence in Defendant's loyalty, honesty, care, and fair dealing in all matters concerning the Company

40    Defendant repeatedly breached and violated such fiduciary duties owed Plaintiff by, among other things, failing to inform Plaintiff, without limitation, of the true and accurate financial condition of the Company, its financial prospects, its business opportunities, the Company's plans and actions already undertaken concerning the Bratz product line, and/or his intentions regarding the information he was planning to conceal from the arbitrator and others in the course of the arbitration process stemming from the Arbitration Agreement

41    Said breaches of fiduciary duties by Defendant have caused Plaintiff damage, including but not limited to damages resulting from the sale of his shares of the Company to Defendant at a below fair market price, in an amount not presently ascertainable, but which will be proven at the time of trial.

42    The conduct of Defendant, as alleged above, was fraudulent, malicious, oppressive, and despicable, has subjected Plaintiff to unjust hardship in conscious disregard of his rights, and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant

## THIRD CAUSE OF ACTION

### (Fraud & Deceit in the Conduct of the Arbitration Process)

43.    Plaintiff hereby reasserts and realleges paragraphs 1 through 42, inclusive, as though set forth in full herein

12

44      In participating in the arbitration process contemplated by the Arbitration Agreement, Defendant knowingly made false representations of material fact and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to the arbitrator and otherwise during the arbitration   Such facts specifically included, without limitation, information as to the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line

45      Plaintiff actually, reasonably, and justifiably relied upon the false statements, concealments, and omissions of Defendant described above in participating in the arbitration process contemplated by the Arbitration Agreement   Had Plaintiff known of the true facts, specifically including, without limitation, the scope of the information Defendant concealed from the arbitrator and otherwise not disclosed in the course of the arbitration process regarding the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have participated in the arbitration process or agreed to sell his shares of the Company

46.      Defendant made the false representations, concealments and omissions alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth for purposes of inducing Plaintiff to participate in the arbitration process contemplated by the Arbitration Agreement and to sell his shares of the Company to Defendant at a below market price

47      At all material times, Plaintiff was unaware of the falsity of the representations and disclosures of Defendant as alleged above and believed them to be true   At all material times, Plaintiff was also unaware of the material omissions, concealments and misstatements of material facts by Defendant, and could not, in the exercise of reasonable care, made himself aware of the falsity of such misrepresentations and nondisclosures, or the existence of such omissions or concealments

///

13

Exhibit  2  ,
P.  23

48      As a direct and proximate result of the fraudulent conduct alleged above, Plaintiff has been damaged in that he was fraudulently induced to participate in the arbitration contemplated by the Arbitration Agreement and sell his shares of the Company to Defendant at a below fair market price   Plaintiff is entitled to rescission of the December 2000 stock sale agreement and restitution of his shares in the Company   In the alternative, Plaintiff is entitled to damages, the amount of such damage is not presently ascertainable, but will be proven at trial

49      The conduct of Defendant, as alleged above was fraudulent, malicious, oppressive, and despicable, has subjected Plaintiff to unjust hardship in conscious disregard of his rights, and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant

## FOURTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing in the Arbitration Agreement)

50      Plaintiff hereby reasserts and realleges paragraphs 1 through 49, inclusive, as though set forth in full herein

51      The Arbitration Agreement contract executed by Plaintiff and Defendant contained an implied covenant of good faith and fair dealing which imposed the following, among others duties on Defendant  (a) a duty to act with honesty in fact in his performance under the agreement, (b) a duty of fair, open and honest disclosure to Plaintiff; (c) a duty to refrain from realizing secret gains at the expense of Plaintiff by connivance, deceit, suppression of facts, or other improper means, and (d) a duty to refrain from taking any action which would unfairly injure the rights of the Plaintiff or interfere in his ability to recognize his reasonable expectations under, and benefits of, the Agreement.

52      By engaging in the conduct described above, specifically including, without limitation, concealing from the arbitrator and otherwise failing to disclose material facts

14

03 P391001 618

Exhibit  2
P.  24

FL 6478

VERIFIED COMPLAINT

1   in the course of the arbitration process information regarding the true and accurate

2   financial condition of the Company, its financial prospects, its business opportunities,

3   and/or the Company's plans and actions already undertaken concerning the Bratz product

4   line, Defendant has breached his duties of good faith and fair dealing set forth above

5       53    At all times herein relevant, Plaintiff has performed and discharged all

6   covenants, conditions, and duties required of him under the Arbitration Agreement,

7   including all duties imposed by the covenant of good faith and fair dealing, except those

8   obligations, if any, which have been prevented by Defendant, those obligations Defendant

9   has waived by his words and/or conduct, or those obligations which Defendant is

10  estopped from asserting that Plaintiff has not performed as a result of Defendant's

11  conduct alleged herein

12      54    As a direct and proximate result of Defendant's actions and breaches as

13  alleged herein, Plaintiff has suffered, and continues to suffer damages in an amount as yet

14  unascertained but which will be established at trial

15      55.   The conduct of Defendant, as alleged above, was fraudulent, malicious,

16  oppressive, and despicable, has subjected Plaintiff to unjust hardship in conscious

17  disregard of his rights, and was done to vex, annoy, and harass Plaintiff so as to justify an

18  award of punitive damages against Defendant

19

20                          **FIFTH CAUSE OF ACTION**

21      (Violation of California Corporations Code §§ 25401 and 25501)

22      56    Plaintiff hereby reasserts and realleges paragraphs 1 through 55, inclusive,

23  as though set forth in full herein

24      57.   In committing the acts, omissions, and concealments alleged herein,

25  Defendant has violated California Corporations Code, Section 25401 by, among other

26  things, offering to purchase a security in this State: (a) by means of written and/or oral

27  communications containing untrue statements of material facts, specifically including

28  untrue facts regarding the true and accurate financial condition of the Company, its

15

Exhibit  2 ,
P. 25

FL 6479          VERIFIED COMPLAINT

1  financial prospects, its business opportunities, and/or the Company's plans and actions

2  already undertaken concerning the Bratz product line, and/or (b) omitting to state material

3  facts necessary in order to make statements made, in light of the circumstances when they

4  were first made, not misleading, specifically regarding the true and accurate financial

5  condition of the Company, its financial prospects, its business opportunities, and/or the

6  Company's plans and actions already undertaken concerning the Bratz product line

7        58    As a direct and proximate result of the acts and conduct of Defendant,

8  Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

9  or damages under California Corporations Code § 25501, in an amount as yet

10  unascertained but which will be established at trial, plus such other relief as pled herein

11

12                        **SIXTH CAUSE OF ACTION**

13        (Violation of California Corporations Code §§ 25402 and 25502)

14        59    Plaintiff hereby reasserts and realleges paragraphs 1 through 58 inclusive,

15  as though set forth in full herein

16        60.    At all times alleged herein, Defendant was an officer of the Company, a

17  director of the Company, a controlling person of the Company, and/or a person whose

18  relationship with the Company provided him access, directly and indirectly, to material

19  information about the Company, within the meaning of California Corporations Code §

20  25402.

21        61.    At all times alleged, Defendant had access to, and had information about,

22  the Company not generally available to the public or to Plaintiff, which would

23  significantly affect the value, and fair market price of the shares, of the Company,

24  specifically including, without limitation, information regarding the true and accurate

25  financial condition of the Company, its financial prospects, its business opportunities,

26  and/or the Company's plans and actions already undertaken concerning the Bratz product

27  line.

28  ///

03.P391001 618                                                    FL 6480

Exhibit 2,
P. 26                                           VERIFIED COMPLAINT

1    62    At all times herein alleged, Defendant knew such information regarding,

2   without limitation, the true and accurate financial condition of the Company, its financial

3   prospects, its business opportunities, and/or the Company's plans and actions already

4   undertaken concerning the Bratz product line, was not generally available to the public or

5   to Plaintiff, and was not intended to be available to the public or to Plaintiff

6    63    In committing the acts, omissions, and concealments alleged herein,

7   Defendant has violated California Corporations Code, Section 25402 by, among other

8   things, purchasing and offering to purchase from Plaintiff his shares of the Company at a

9   time when he knew of material, non-public, undisclosed information about the Company

10   gained from his status as an officer, director, controlling person, and individual with

11   access to such information regarding, without limitation, the true and accurate financial

12   condition of the Company, its financial prospects, its business opportunities, and/or the

13   Company's plans and actions already undertaken concerning the Bratz product line

14    64    As a direct and proximate result of the acts and conduct of Defendant,

15   Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

16   or damages pursuant to California Corporations Code § 25502 in an amount as yet

17   unascertained but which will be established at trial, plus such other relief as pled herein

18

19    **SEVENTH CAUSE OF ACTION**

20    **(Fraud & Deceit Regarding the December 2000 Agreement)**

21    65    Plaintiff hereby reasserts and realleges paragraphs 1 through 64 inclusive,

22   as though set forth in full herein.

23    66    Prior to Plaintiff's entering into the December 2000 Agreement to sell

24   Plaintiff's stock in the Company to Defendant, Defendant knowingly made false

25   representations of material fact and/or concealed and/or failed to disclose material facts

26   known to Defendant which he was under a duty to disclose to Plaintiff.  Such facts

27   specifically included, without limitation, the true and accurate financial condition of the

28   ///

1  Company, its financial prospects, its business opportunities, and/or the Company's plans
2  and actions already undertaken concerning the Bratz product line

3      67    Plaintiff actually, reasonably, and justifiably relied upon the false
4  statements, concealments, and omissions of Defendant described above in executing the
5  December 2000 Agreement and agreeing to sell his shares to Defendant  Had Plaintiff
6  known of the true facts, specifically including, without limitation, the facts concerning
7  true and accurate financial condition of the Company, its financial prospects, its business
8  opportunities, and/or the Company's plans and actions already undertaken concerning the
9  Bratz product line, Plaintiff would not have entered into the December 2000 Agreement,
10  or otherwise agreed to sell his shares in the Company at that time

11      68    Defendant made the false representations, concealments and omissions
12  alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth
13  for purposes of inducing Plaintiff to execute the December 2000 Agreement and to sell
14  his shares in the Company to the Defendant at a below fair market price

15      69    At all material times, Plaintiff was unaware of the falsity of the
16  representations and disclosures of Defendant as alleged above and believed them to be
17  true  At all material times, Plaintiff was also unaware of the material omissions,
18  concealments and misstatements of material facts by Defendant, and could not, in the
19  exercise of reasonable care, made himself aware of the falsity of such misrepresentations
20  and nondisclosures, or the existence of such omissions or concealments

21      70    As a direct and proximate result of the fraudulent conduct alleged above,
22  Plaintiff has been damaged in that he was fraudulently induced to enter the December
23  2000 Agreement calling for the sale of his shares of the Company at a below fair market
24  price  The amount of such damage is not presently ascertainable, but will be proven at
25  trial
26  ///
27  ///
28  ///

18

03 P391001 618                    FL 6482              VERIFIED COMPLAINT

71   The conduct of Defendant, as alleged above, was fraudulent, malicious, oppressive, and despicable, has subjected Plaintiff to unjust hardship in conscious disregard of his rights, and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

72   Plaintiff hereby reasserts and realleges paragraphs 1 through 70 inclusive, as though set forth in full herein

73   Prior to Plaintiff's entering into the December 2000 Agreement to sell Plaintiff's stock in the Company, Defendant owed Plaintiff a duty of reasonable care regarding, without limitation, the accuracy and honesty of the statements made regarding the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line

74   Defendant breached his duty to Plaintiff by making misrepresentations of material facts, and by omitting and failing to disclose material facts, which he knew, or in the exercise of reasonable care, should have known were inaccurate and which he was under a duty to disclose to Plaintiff, specifically including, without limitation, information concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line

75   Defendant made such misrepresentations and omissions concerning, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line with the intent to induce Plaintiff into executing the December 2000 Agreement and selling his shares to Defendant at below fair market value price.

03 P391001 618                                    FL 6483                    VERIFIED COMPLAINT

Exhibit 2

P. 29

1   76   Plaintiff actually, reasonably, and justifiably relied upon the false

2   statements and omissions of Defendant described above in deciding to execute the

3   December 2000 Agreement and sell his shares in the Company to Defendant   Had

4   Plaintiff known of the true facts, specifically including, without limitation, the true and

5   accurate financial condition of the Company, its financial prospects, its business

6   opportunities, and/or the Company's plans and actions already undertaken concerning the

7   Bratz product line, Plaintiff would not have entered into the December 2000 Agreement,

8   or otherwise agreed to sell his shares in the Company at that time

9   77   As a direct and proximate result of the negligent conduct alleged above,

10   Plaintiff has been damaged in that he was improperly induced to enter the December

11   2000 Agreement and sold his shares of the Company at a below fair market price   The

12   amount of such damage is not presently ascertainable, but will be proven at trial

13

14   ### NINTH CAUSE OF ACTION

15   **(Unfair Competition in Violation of California**
16   **Business & Professions Code §§ 17200 et seq.)**

17   78   Plaintiff hereby reasserts and realleges paragraphs 1 through 77 inclusive,

18   as though set forth in full herein

19   79.   California Business and Professions Code §§ 17200 et seq  proscribes, in

20   part, "any unlawful, unfair, or fraudulent business practice."

21   80   By virtue of the conduct alleged above, Defendant has committed unlawful,

22   unfair, and/or fraudulent business practices with regard to his dealings with Plaintiff

23   81.   As a direct and proximate result of Defendant's violations Business and

24   Professions Code §17200 et seq  alleged above, Plaintiff has been harmed and is entitled

25   to restitution of the amounts to which he has been unjustly harmed, and Defendant

26   unjustly enriched, and other relief as pled herein

27   ///

28   ///

03.P391001 618                     Exhibit 2,        FL 6484        VERIFIED COMPLAINT
                                   P. 30

# TENTH CAUSE OF ACTION

## (Rescission Based on Mistake)

82     Plaintiff hereby reasserts and realleges paragraphs 1 through 81, inclusive, as though set forth in full herein

83     In entering into both the Arbitration Agreement and the December 2000 Agreement, Plaintiff was mistaken in his belief that Defendant planned to inform the arbitrator, and otherwise to disclose during the course of the arbitration proceeding, and/or had already had disclosed to Plaintiff, without limitation true and accurate information concerning the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line

84     The disclosure of true and accurate information to Plaintiff and to the arbitrator concerning, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line was a basic assumption on which the Arbitration Agreement and/or the December 2000 Agreement rested

85     Defendant's failure to accurately disclose true and accurate information to Plaintiff and to the arbitrator regarding, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line had a such material effect on the Arbitration Agreement and/or the December 2000 Agreement that enforcement of either agreement against Plaintiff would be unfair and unconscionable

86     Defendant both knew about, and was the cause of, Plaintiff's mistake in believing Defendant would accurately disclose to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line at the time Plaintiff executed those agreements.

03.P391001 618                                    FL 6485                    VERIFIED COMPLAINT

Exhibit  2 ,
P. 31

87      Plaintiff did not bear the risk of Defendant's entering into the Arbitration Agreement and/or the December 2000 Agreement without disclosing to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows

### ON THE FIRST AND SECOND CAUSES OF ACTION

1     For rescission of the Arbitration Agreement,

2     For rescission of Plaintiff's sale of his shares in the Company,

3     For restitution of Plaintiff's shares in the Company,

4     In the alternative of rescission of the sale of shares and restitution, for damages according to proof,

5     For punitive damages in an amount necessary to punish the Defendant, to the extent permitted by law

6     For attorneys fees and cost of suit

7     For interest at the maximum rate allowed by law.

8.     For such other and further relief the Court may deem just, equitable, and/or proper

### ON THE THIRD AND SEVENTH CAUSES OF ACTION

1     For rescission of Plaintiff's sale of his shares in the Company,

2.     For restitution of Plaintiff's shares in the Company,

3.     In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

4.     For punitive damages in an amount necessary to punish the Defendant, to the extent permitted by law.

22

03 P391001 618                          FL 6486                          VERIFIED COMPLAINT

Exhibit 2

P. 32

1      5     For attorneys fees and cost of suit

2      6     For interest at the maximum rate allowed by law

3      7     For such other and further relief the Court may deem just, equitable, and/or

4  proper

5

6             **ON THE FOURTH AND EIGHTH CAUSES OF ACTION**

7      1     For damages according to proof,

8      2     For attorneys fees and cost of suit

9      3     For interest at the maximum rate allowed by law

10     4     For such other and further relief the Court may deem just, equitable, and/or

11  proper

12

13            **ON THE FIFTH AND SIXTH CAUSES OF ACTION**

14     1     For rescission of Plaintiff's sale of his shares in the Company,

15     2     For restitution of Plaintiff's shares in the Company,

16     3     In the alternative of rescission of the sale of shares and restitution, for

17  damages according to proof,

18     4     For attorneys fees and cost of suit

19     5.    For interest at the maximum rate allowed by law.

20     6     For such other and further relief the Court may deem just, equitable, and/or

21  proper

22

23              **ON THE NINTH CAUSE OF ACTION**

24     1.    For restitution in an amount necessary to restore to Plaintiff the amount by

25  which Defendant has been unjustly enriched by means of the unlawful, unfair, and

26  fraudulent acts alleged above.

27     2.    For attorneys fees and cost of suit

28     3.    For interest at the maximum rate allowed by law.

1    4    For such other and further relief the Court may deem just, equitable, and/or
2  proper

3

4              ## ON THE TENTH CAUSE OF ACTION

5    1    For rescission of Plaintiff's sale of his shares in the Company,

6    2    For restitution of Plaintiff's shares in the Company,

7    3    For attorneys fees and cost of suit

8    4    For interest at the maximum rate allowed by law

9    5    For such other and further relief the Court may deem just, equitable, and/or
10  proper

11

12              ## DEMAND FOR JURY TRIAL

13    Plaintiff hereby demands a trial by jury herein on all causes of action so triable

14

15  DATED  August 25, 2003        HOWARTH & SMITH
16                                DON HOWARTH
                                  SUZELLE M. SMITH
17                                BRIAN D. BUBB
                                  ROBERT D BRAIN
18

19                                By. _Don Howarth_
20                                    Don Howarth

21                                Attorneys for Plaintiff
                                  Farhad Larian
22

23

24

25

26

27

28

                            24

03.P391001 618            Exhibit 2,        FL 6488      VERIFIED COMPLAINT
                          P. 34

1

**VERIFICATION**

2     I, Farhad Larian, declare

3     I am a party to this action, and I certify and declare that I have read the foregoing

4 **VERIFIED COMPLAINT** and know its contents thereof   The same is true of my own

5 knowledge, except as to those matters which are therein alleged on information and

6 belief, and as to those matters, I believe them to be true

7     I declare under penalty of perjury under the laws of the State of California that this

8 Verification was executed on August 22, 2003, at Los Angeles, California and that the

9 foregoing is true and correct

10

11                       _____

12                             Farhad Larian

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

03 P390001 618

FL 6489

VERIFICATION

Exhibit 2 ,
P. 35

**Exhibit 3**

KAYE SCHOLER LLP

1999 Avenue of the Stars
Suite 1700
Los Angeles, California  90067-6048
310 788-1000
Fax 310 788-1200
www.kayescholer.com

Larry R. Feldman
310 788-1090
Fax 310 788-1200
larryfeldman@kayescholer.com

November 15, 2005

**Via Facsimile & U.S. Mail**

Robert G. Wilson
Cotkin, Collins & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

Re:    Larian v. Larian; ADRS Case No. 05-2096

Dear Bob:

For the last few weeks, we have struggled with how to comply with your subpoenas served on Isaac Larian and MGA Entertainment.  The subpoenas are nothing more than a discovery request.  There is no possible way to comply with the requests because the requests, among other things are overly broad, ambiguous, ask for privileged documents, and do not seek evidence.

I know you have received our motion to quash, however, I wanted you to understand that we will not be producing any document at the hearing until Judge Haber has ruled on our motion.  Thereafter, depending on his ruling, we will not be in a position to comply with producing any documents for a considerable period of time thereafter.  If there is a specific, relevant, non-privileged document that you wish us to produce, please advise.  Otherwise, so the proceedings are not delayed, you might consider calling a witness other than Isaac Larian during your initial presentation.

I will be in the office all day today if you want to discuss this issue with me by telephone.

Very truly yours,

Larry R. Feldman

NEW YORK   CHICAGO   LOS ANGELES   WASHINGTON, D.C.   WEST PALM BEACH   FRANKFURT   LONDON   SHANGHAI

23183625.WPD

Exhibit **3**,
P. **36**

CC 00567

MEMORY TRANSMISSION REPORT

```
                              PAGE      : 001
                              TIME      : NOV-15-05  09:09AM
                              TEL NUMBER1: 310 788 1200
                              TEL NUMBER2:
                              NAME      : kaye scholer llp
```

FILE NUMBER            :   992

DATE                  :   NOV-15 09:08AM

TO                    : ☎912136889351

DOCUMENT PAGES        :   002

START TIME            :   NOV-15 09:08AM

END TIME              :   NOV-15 09:09AM

SENT PAGES            :   002

STATUS                :   OK

FILE NUMBER    : 992          *** SUCCESSFUL TX NOTICE ***

# KAYE SCHOLER LLP

FAX COVER SHEET

1999 Avenue of the Stars, Suite 1700
Los Angeles, California 90067-6048
310 788-1000
Fax 310 788-1200

| | | | |
|---|---|---|---|
| Date: | November 15, 2005 | Client No.: | 36037-0002 |
| To: | Robert G. Wilson | Phone No.: | (213) 688-9350 |
| | | Fax No.: | (213) 688-9351 |
| To: | | Phone No.: | |
| | | Fax No.: | |
| From: | Larry R. Feldman | Direct Dial No.: | 310 788-1090 |
| | larryfeldman@kayescholer.com | Direct Fax No.: | 310 229-1990 |
| Re: | Larian v. Larian; ADRS Case No. 05-2096-ABH | | |

Number of Pages:   2   (Including Cover Sheet)

Message:

IF ALL PAGES ARE NOT RECEIVED, CALL (310) 788-1230
(or Call Direct Dial Number Listed Above)

NOTE:  This facsimile transmission contains confidential and/or legally privileged information from the law firm Kaye Scholer LLP intended only for the use of the individual(s) named on the transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this facsimile transmission is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for the return of the documents to us at no cost to you.

NEW YORK     CHICAGO     LOS ANGELES     WASHINGTON, D.C.     WEST PALM BEACH     FRANKFURT     LONDON     SHANGHAI
23180271.WPD

Exhibit **3** ,
P. **37**

CC 00568

**Exhibit 4**

1   William C Conkle (SB# 076103)
    Mark D. Kremer (SB# 100978)
2   Eric S Engel (SB# 105656), members of
    CONKLE & OLESTEN
3   Professional Law Corporation
    3130 Wilshire Boulevard, Suite 500
4   Santa Monica, California 90403-2403

5   Telephone· (310) 998-9100

6   Attorneys for Plaintiff Farhad Larian

7

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 2 8 2005

John A Clarke, Executive Officer/Clerk
By_____, Deputy
        J. SUNGA

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF LOS ANGELES

10

11   FARHAD LARIAN,                    ) CASE NO.  BC 329501
                                       )
12              Plaintiff,             ) VERIFIED COMPLAINT FOR
                                       )
13   v.                                ) 1)   FRAUD
                                       )
14   MORAD ZARABI, ISAAC LARIAN        ) 2)   NEGLIGENT
     AND KAMBIZ ZARABI AND DOES 1      )      MISREPRESENTATION
15   through 5, INCLUSIVE              )
                                       ) 3)   CONSPIRACY
16              Defendants             )
                                       ) 4)   DECLARATORY RELIEF
17   _____      )
                                         5)   CONSTRUCTIVE TRUST
18
                                         6)   INJUNCTIVE RELIEF
19

20        Plaintiff alleges as follows:

21

22        1.    Plaintiff, Farhad Larian also known as Fred Larian ("FRED") is now and
23
     at all times relevant to this Complaint was a resident of Los Angeles County California
24

25        2.    Defendant, Morad Zarabi ("MORAD") is now and at all times relevant to
26
     this Complaint was a resident of Los Angeles County California.
27

28

2221 002\9929

Complaint

Exhibit 4
P. 38

FL 6526

3.      Defendant, Isaac Larian ("ISAAC") is now and at all times relevant to this Complaint was a resident of Los Angeles County California

4.      Defendant Kambiz Robert Zarabi ("KAMBIZ") is now and at all times relevant to this Complaint was a resident of Los Angeles County California

5.      Plaintiff is unaware of the true names and capacities of Does 1 through 5 and therefore sues such defendants by such fictitious names   Plaintiff will amend this Complaint to identify the true names and capacities of these defendants if and when additional information against them is ascertained   Plaintiff is informed and believes that each of the doe defendants is liable in some manner for the acts and omissions and the injuries and damages alleged in this Complaint

6      At all times relevant to this Complaint, each defendant was the agent or employee of each of the other defendants as the case may have been, and was acting within the course of the scope of such agency or employment in performing the acts alleged in this Complaint.

7.      FRED and ISAAC are brothers who for over 20 years engaged in business as partners through equal ownership of several businesses and ventures they co-founded.  They shared profits and losses on an equal basis.

8.      The businesses they co-founded included the companies known as ABC International Traders, Inc. ("ABC") and MGA Entertainment Hong Kong Ltd ("MGAEHK").  ABC and MGAEHK collectively are referred to as "MGA".  At all times relevant to this Complaint FRED and ISAAC each owned 45% of the outstanding stock, while their brother in law Jangahir Makabi ("MAKABI") owned 10% of MGA   FRED's 45% interest amounted to 10,000,000 shares of common stock in ABC and

FL 6527

1   450 shares of common stock in MGAEHK (collectively "FRED's Stock")  Over time

2   FRED and ISAAC divided responsibilities in MGA's business  ISAAC, as CEO

3   assumed responsibility for finance, sales, marketing and product development while

4   FRED, as Executive Vice President was responsible for operations, including customs,

5   warehousing, distribution and facilities

6

7       9.    MORAD is the uncle of ISAAC and FRED.

8

9       10    In the spring of 2000 ISAAC offered to buy FRED's 45% interest in MGA

10   for $9,000,000 valuing MGA at $20,000,000.  FRED responded that he wanted an

11   appraisal of MGA to consider selling his interest.  Consequently, ISAAC and FRED

12   continued to negotiate a buy-sell agreement for ISAAC to buy FRED's Stock. ISAAC

13   told FRED that he only wanted to appraise MGA as of December 31, 1999.  FRED

14   demanded a current appraisal  To avoid an appraisal ISAAC suggested using a process

15   by which he or FRED would make an offer to buy the other's interest if not

16   accepted would require the refusing party to purchase the offeror's interest for the same

17   price. FRED rejected the method telling ISAAC that FRED did not want to be a buyer.

18   Ultimately ISAAC refused to go through with a buy-sell agreement that required three

19   appraisals of MGA.

20

21       11.    From the inception of their partnership, FRED and ISAAC had agreed that

22   their salaries and other compensation from MGA would always be equal  They had

23   followed this agreement for more than twenty years, taking equal raises and pay-cuts

24   at the same time.  In early 2000, however, while he was attempting to buy FRED out

25   of MGA,  ISAAC secretly gave himself a $100,000 raise to about $325,000. ISAAC

26   later demanded that the MGA Board of Directors raise his salary to $500,000, ratify

27   $750,000 as a bonus for 1999, authorize a $1,500,000 bonus for 2000, and give him a

28   4% royalty on items he "personally develops for MGA's 2001 line or products".

Complaint
Exhibit 4 ,
P. 40

FL 6528

1  Subsequently, Isaac's two brothers-in-law purporting to act as MGA directors increased
2  ISAAC's salary to always be three times that of FRED's salary and authorized an
3  additional bonus of up to 50% of ISAAC's tripled salary.  FRED is informed and
4  believes that ISAAC engineered the compensation increase to put additional pressure
5  on FRED to sell out his interests in MGA   FRED is further informed and believes that
6  in exchange for MAKABI's vote, ISAAC promised MAKABI some portion of FRED's
7  Stock if FRED agreed to sell it to ISAAC

8

9       12    In or around the summer of 2000, following ISAAC's refusal to proceed
10 with the buy-sell agreement, MORAD contacted FRED and urged him to let MORAD
11 arbitrate the impasse between ISAAC and FRED over the stock sale.  MORAD told
12 FRED that FRED should not wait any longer to resolve his disputes with ISAAC as
13 ISAAC was attempting to "take over the company" by the enormous raise in
14 compensation which MORAD said was "just a part of ISAAC's plans to oust FRED"
15 MORAD suggested that he determine which brother should sell his interest in MGA
16 and at what price   FRED responded that he did not want to be a buyer and required for
17 any arbitration, that the price of his stock be determined by an appraisal of the current
18 value of MGA, as ISAAC had control of the financial and business information FRED
19 also told MORAD he required a resolution of certain other partnership accounts   In
20 response MORAD promised FRED that the price of FRED's interest in MGA would
21 be determined by a current and accurate appraisal of MGA that MORAD would obtain
22 MORAD called the appraisal "the central piece of the arbitration".  MORAD also
23 promised to resolve the accounting of the other partnership accounts.

24

25      13.   In several communications with FRED, MORAD stressed his unique
26 position to serve as an arbitrator.  MORAD held out his familial relationship to the
27 brothers as assuring his impartiality and trustworthiness.  MORAD promised to treat
28 each brother "as one of his eyes", an expression meaning that MORAD would allow

2221 002\9929                        -4-

FL 6529

1   no harm to come to either of them.  MORAD claimed that his business experience
2   would assure the accuracy of the appraisal and the accounting and that he would hire
3   a CPA, Mike Shenassafar, to assist him   MORAD said that he would serve as an
4   arbitrator free of charge, requiring reimbursement only for expenses, such as fees for
5   the appraisal and the CPA. MORAD told FRED that he could trust MORAD to resolve
6   the brothers' dispute, ending the unhappiness it was causing their family

7

8       14   MORAD presented FRED with an Agreement for Arbitration and
9   Selection of Arbitrator ("Arbitration Agreement"), a copy of which is attached as
10  Exhibit 1 to this Complaint.  FRED is informed and believes that MORAD's attorney
11  Ellis Stern drafted it. MORAD told FRED that he should not hire an attorney to advise
12  him about the Arbitration Agreement because "attorneys are in it for themselves and
13  would never allow this to end until they got all of the money for themselves"
14  MORAD reiterated to FRED that he could trust MORAD

15

16      15   In reliance on the representations of MORAD, on or about September 28,
17  2000 FRED signed the Arbitration Agreement without the advice of counsel and did
18  not hire counsel to represent him in the arbitration.

19

20      16.   Plaintiff is informed and believes that the representations of MORAD
21  were false when made in and around the summer of 2000 prior to FRED's execution
22  of the Arbitration Agreement.   MORAD engaged in misrepresentations and
23  concealments to induce FRED's agreement to allow MORAD to arbitrate the
24  controversy with ISAAC so that MORAD could fix the sale price without an appraisal
25  MORAD never intended to engage in any neutral arbitration using an accurate and
26  current appraisal of MGA and never intended to use a CPA to assist him with the
27  appraisal. MORAD intended to trick FRED to sell his interest in MGA to ISAAC and
28  settle the other partnership accounts by making FRED believe the price for FRED's

1  Stock had been established by an accurate appraisal and accounting, but in fact was

2  pre-determined by MORAD   In furtherance of his plan, MORAD concealed from

3  FRED MORAD's inability to competently read and write English

4

5  17   Plaintiff is informed and believes that MORAD made his false

6  representations pursuant to an agreement and plan formed between MORAD and

7  ISAAC to induce FRED to give MORAD authority to determine a value for MGA and

8  trick FRED into selling his interests in MGA at a price pre-determined by ISAAC

9  without an appraisal   Under the plan and agreement with ISAAC, MORAD agreed to

10  induce FRED's consent to the Arbitration Agreement, by promising FRED an accurate

11  and complete appraisal, but would fix the price for which FRED would sell his Stock

12  to ISAAC and settle the partnership accounts, at or below the $9,000,000 ISAAC had

13  previously offered to pay for FRED's Stock, irrespective of the true appraised value

14  of MGA

15

16  18.   Following execution of the Arbitration Agreement, MORAD took steps

17  in accordance with his intent and the plan to defraud FRED into accepting a price for

18  his interests not determined by an appraisal including the following·

19      18.1   Consistent with ISAAC's earlier proposal to avoid an appraisal,

20  prior to commissioning the appraisal MORAD induced FRED to give him a written

21  offer to purchase ISAAC's 45% interest in MGA based upon a value of $17,500,000.

22  FRED withdrew the offer the same day.

23      18 2   MORAD hired National Business Appraisers ("NBA") to perform

24  an appraisal of ABC, and in order to lower the appraised value of ABC, allowed NBA

25  to restrict the valuation period to the end of December 1999 thereby eliminating year

26  2000 financial and business information from the appraisal, including information

27  relating to the "Bratz" product line.

28

18 3   MORAD allowed NBA to value only ABC and omit valuation of MGAEHK.

18.4   Upon receiving the initial draft of NBA's appraisal of ABC with a value of $26,942,000 as of December 31, 1999, MORAD instructed NBA to reduce the valuation to get close to $20,000,000 which would yield a price of $9,000,000 for FRED's interest

18 5   MORAD subsequently concealed from FRED that the final reduced appraisal of ABC was at $21,600,000 and represented that the appraisal found the value of MGA to be $17,500,000

18.6   On information and belief MORAD never involved the CPA in the appraisal process, never showed the appraisal to the CPA, nor allowed him to review it for accuracy.

19   In or around late November or early December 2000, MORAD came to FRED with a proposed price of $8,775,000 for sale of FRED's Stock to ISAAC calculated on 45% of a combined valuation of $19,500,000 for MGA and the other partnership accounts  MORAD represented to FRED that the appraisal placed the value of MGA at $17,500,000.  MORAD said  the  $2,000,000 difference between  the appraisal of $17,500,000 and the $19,500,000 was to satisfy the amount due from ISAAC to FRED for the other partnership accounts  Believing in his uncle's integrity, FRED trusted MORAD's representation of the value found by the appraisal   In reliance on MORAD's representations, FRED agreed to settle his disputes with ISAAC by selling his interest at the price MORAD represented was determined by the appraisal of MGA and the partnership accounts.

20.   MORAD's personal attorney Ellis Stern drew up agreements for the sale and settlement of FRED's interest in MGA to ISAAC and the partnership accounts including an Agreement for Sale of Stock, Pledge Agreement, Promissory Note, Mutual

Complaint
Exhibit 4
P. 44

FL 6532

1   Release and Consulting Agreement (collectively "December 2000 Agreement"). FRED

2   asked MORAD if FRED should have an attorney to advise him about the transaction

3   MORAD said no   MORAD said that he would make sure the agreements accurately

4   reflected the transaction and protected both FRED and ISAAC   Based on MORAD's

5   representation, FRED did not have counsel advise him with respect to the transaction

6   and signed the December 2000 Agreement.

7

8       21.   In inducing FRED's agreement to sell FRED's Stock to ISAAC, MORAD

9   continued to conceal his fraud and deceit from FRED. MORAD assured FRED that the

10  sale price based on a combined valuation of $19,500,000 for MGA and the partnership

11  accounts was determined by the appraisal and accounting   MORAD convinced FRED

12  to agree to resolve any disputes with ISAAC over the December 2000 Agreement by

13  arbitrating them before MORAD or if MORAD was unavailable before his son

14  KAMBIZ   MORAD repeated to FRED that he should keep resolution of such matters

15  in the family and FRED could trust both MORAD and KAMBIZ   MORAD also

16  claimed that as a director of MGA and as the arbitrator, he would be in a position to

17  protect FRED's interest   In reliance on MORAD's representations including that the

18  appraised value of MGA had been $17,500,000 upon which the sale price for his

19  interest in MGA was based, FRED agreed to the provisions for resolving any disputes

20  over the December 2000 Agreement by arbitrating before MORAD (and if MORAD

21  was unavailable to serve, MORAD's son KAMBIZ) ("December Arbitration

22  Provisions")

23

24      22.   MORAD's representations to FRED that FRED should trust him to

25  continue to act as an impartial and honest arbitrator of disputes that might arise under

26  the December 2000 Agreement were false and were made to conceal MORAD's fraud

27  and deceit in the appraisal and valuation of MGA and to induce FRED's agreement to

28  the December Arbitration Provisions so to allow MORAD to hide his wrongful acts and

1  omissions and/or conspiracy with ISAAC  MORAD had not honestly and impartially
2  acted as an arbitrator in the past and had no intent to arbitrate or otherwise act
3  impartially and honestly to resolve any disputes that might arise under the December
4  2000 Agreement  MORAD intended only to use his position as arbitrator to continue
5  to conceal his fraud and deceit and other wrongful acts and omissions toward FRED

6

7      23.   Under the December 2000 Agreement, MORAD became a director of
8  MGA and took possession of the share certificates for FRED's Stock as Trustee to be
9  held as collateral for ISAAC's payment of the full purchase price to FRED

10

11     24.   Following the execution of the December 2000 Agreement, MORAD
12  requested FRED to "return the favor" for what MORAD called his "pro-bono
13  arbitration work" in 2000. MORAD requested $10,000 00 from FRED for MORAD's
14  relative  MORAD told FRED that ISAAC had already paid an identical amount
15  FRED paid the money MORAD requested  In June 2004 FRED's attorneys asked
16  MORAD to disclose and produce evidence of these payments  MORAD, through his
17  attorney Ellis Stern, refused. In or around June 2004, in relation to FRED's inquiry
18  about these payments, MORAD publicly threatened that he "will destroy FRED and
19  make him equal to dirt".  On information and belief MORAD sought and obtained a
20  larger payment from ISAAC for MORAD's "pro-bono arbitration work" and for that
21  reason refused to disclose such payments.

22

23     25.   In 2001, ISAAC was unable to make the payment under the promissory
24  note given FRED as part of the December 2000 Agreement.  MORAD induced FRED
25  to extend the due date of the note and advanced money on behalf of ISAAC to FRED
26  for payments on the promissory note.

27

28

26.   In or around the summer of 2002, FRED became aware of facts that suggested the valuation of MGA in 2000 represented by MORAD may have been inaccurate and that the actual valuation of MGA was significantly higher because of a license and plans for a product line called "Bratz" which were undisclosed to FRED FRED requested a copy of the appraisal of MGA performed in 2000  MORAD refused, maintaining that he was legally not allowed to disclose it   FRED did not suspect MORAD of any wrong doing at this time, believing instead that ISAAC had withheld the Bratz information from both FRED and MORAD without MORAD's knowledge or consent

27   Subsequently FRED submitted to MORAD his claim that FRED had been defrauded by ISAAC

28   A few months after FRED's submission of his claim to MORAD for the fraud in the sale of FRED's Stock, MORAD called a meeting at his offices on January 26, 2003.  He advised FRED that no lawyers would be allowed and that no evidence would be presented as this  was an informal meeting.  MORAD tape recorded the meeting which lasted less than two hours  After ISAAC left the meeting, he called MORAD and MORAD reported to FRED that ISAAC said "figure out a way to pay FRED something and get rid of him".  On or about September 14, 2004 MORAD declared under oath that the meeting occurred on a different day and was an "arbitration hearing" upon which he "took the matter under submission"!

29.   After the January meeting in several communications, MORAD and KAMBIZ  advised FRED ways to settle the claim against ISAAC including buying back a portion of FRED's Stock, which MORAD said he had convinced ISAAC to allow.

1    30    In 2003, FRED learned that sometime after the January 26, 2003 meeting

2  MORAD had commissioned another appraisal of MGA ("2003 Appraisal")  MORAD

3  told FRED he had commissioned the 2003 Appraisal but did not show it to him   In

4  December 2004 FRED learned that the valuation date of the 2003 Appraisal was as of

5  December 31, 2000 (the effective date under the December 2000 Agreement) and that

6  it found the value of ABC to be $33,805,000   In December 2004 FRED also learned

7  that in or about April 2004, MORAD had commissioned yet another appraisal of MGA

8  based on a valuation date ending December 31, 2001 ("2004 Appraisal")

9

10    31    Throughout 2003, FRED again asked MORAD and also KAMBIZ to

11  provide FRED a copy of the appraisals  They initially refused to disclose any of the

12  documentation for the appraisals   FRED filed suit in August 2003 against ISAAC for

13  fraud arising from the non-disclosure of the Bratz line (The "Bratz Action")   In

14  September 2003, MORAD promised to give FRED all documents and records relating

15  to the 2000 and 2003 appraisals in exchange for payment of $15,000   MORAD's

16  attorney, Ellis Stern corroborated MORAD's promise to give FRED all of the

17  documents and records related to the appraisal. FRED paid MORAD the $15,000 but

18  then MORAD refused to provide all of the records to FRED. MORAD said instead he

19  had turned over his records and files to his attorney Stern who refused to produce

20  copies to FRED.

21

22    32.    When FRED continued to press for production of MORAD's entire file

23  concerning the 2000 and 2003 appraisals, ISAAC opposed production and demanded

24  that no records from the appraisal be produced   Finally after the Court in the Bratz

25  Action ordered discovery, MORAD's attorneys produced certain of the documents

26  related to the 2000 appraisal but refused to produce documents related to the 2003

27  Appraisal.  MORAD's attorney Stern represented to have produced all of the 2000

28  appraisal documentation and provided a privilege log which he later filed in Court. No

1  draft appraisals were produced to FRED by MORAD personally or by his attorneys
2  The draft of the 2000 appraisal, the 2004 Appraisal, and some correspondence from
3  NBA relating to the 2000 appraisals were neither produced nor listed on the privilege
4  log Stern had submitted to FRED and the Court  FRED pursued discovery of NBA and
5  the appraiser but both ISAAC and MORAD opposed it   Ultimately it was not until
6  FRED went to NBA directly in December 2004 that he discovered the extent and nature
7  of MORAD's wrongful acts  The documents and information provided by NBA also
8  revealed that MORAD's attorney, Stern  had submitted a false privilege log to FRED
9  and to the Court

10

11      33.    In or around April to July 2004 FRED learned of translations that
12  MORAD had ordered including translations related to a January 30, 2003 letter
13  MORAD had received from FRED's attorney, and of MORAD's need to use translators
14  in the contemplated arbitration of FRED's claims against ISAAC   These facts and
15  documents were suppressed from FRED by MORAD and his attorney

16

17      34.    In or around January 2004, FRED demanded of MORAD that FRED's
18  Stock held by MORAD as trustee pursuant to the December 2000 Agreement be
19  maintained pending resolution of FRED's claims against ISAAC  Through his attorney
20  Stern, MORAD agreed. In or around December 2004, FRED demanded that MORAD
21  show FRED the stock certificates   MORAD refused.

22

23      35.    In or around December 2004, FRED obtained documentation and
24  information directly from NBA disclosing that:

25          35.1   NBA had never provided MORAD with an appraisal valuing ABC
26  or MGA at $17,500,000 as MORAD had represented to FRED;

27          35.2   In or around October 2000 NBA transmitted to MORAD an initia
28  draft appraisal valuing ABC at $26,942,000. MORAD then instructed NBA to decreas

FL 6537

1  the value to get close to $20,000,000 and allowed the valuation date to be as of
2  December 31, 1999,

3       35.3  NBA's final reduced appraisal in November 2000 was
4  $21,600,000.00 for the period ending December 31, 1999 and excluded MGAEHK
5  from the valuation;

6       35.4  Commencing in February 2003, NBA met with MORAD and
7  KAMBIZ concerning the November 2000 appraisal because of FRED's claim against
8  ISAAC for fraud;

9       35 5  In February 2003, MORAD commissioned the appraisal of MGA
10  as of December 31, 2000 (2003 Appraisal) without consideration of the Bratz License
11  and product line. This appraisal found the value to be $33,805,000 00,

12       35.6  MORAD subsequently requested NBA to reduce the 2003 Appraisal
13  by applying a minority shareholder discount

14       35.7  In 2000, NBA had given the draft 2000 appraisal to MORAD and
15  his attorneys.

16       35.8  In 2004, MORAD's attorneys advised NBA to destroy any drafts
17  of the 2000 appraisal.

18       35.9  In 2004 MORAD commissioned the appraisal of ABC as of
19  December 31, 2001 (2004 Appraisal) to obtain a valuation lower than the 2003
20  Appraisal. The 2004 Appraisal, the draft 2000 appraisal, and some correspondence
21  from NBA relating to the 2000 appraisals had been suppressed from FRED and omitted
22  from the privilege log Stern submitted to both FRED and the Court.

23

24      36.  FRED is informed and believes that MORAD's suppression of the
25  appraisals, his attempts to destroy and prevent discovery of evidence, and his lies to
26  FRED were calculated to conceal his fraud in the inducement of the Arbitration
27  Agreement and December Arbitration Provisions, his corruption of the appraisal in
28

1   2000, and/or in furtherance of the conspiracy with ISAAC to trick FRED into selling
2   Fred's Stock at a price pre-determined by ISAAC and/or MORAD

4   FIRST CAUSE OF ACTION FOR PROMISSORY FRAUD INDUCING
5   CONSENT TO THE ARBITRATION AGREEMENT
6   AGAINST MORAD ZARABI

7   37.   Plaintiff realleges paragraphs 1 through 36 of this Complaint

9   38.   MORAD's representations to Plaintiff concerning MORAD's intention
10   to neutrally, honestly, completely and accurately appraise the current value of MGA,
11   and account for the other partnership matters, to resolve Plaintiff's disputes with
12   ISAAC were false and known by MORAD to be false when he made them.  The
13   misrepresentations and omissions were material and made to induce Plaintiff to consent
14   to the Arbitration Agreement and selection of MORAD as arbitrator   The true facts
15   were that MORAD never intended to engage in an accurate, complete and current
16   appraisal of MGA or accounting of the other partnership matters, but rather to set a
17   pre-determined price for the sale of FRED's Stock to ISAAC.  In furtherance of this
18   intent, MORAD concealed his disability in reading and writing English.

20   39.   Reasonably relying on MORAD's representation of what MORAD
21   intended to do as an arbitrator and that Plaintiff could trust him, Plaintiff was induced
22   to sign the Arbitration Agreement and selection of MORAD as the arbitrator   Had
23   Plaintiff known MORAD's true intentions, Plaintiff would not have signed the
24   Arbitration Agreement, and would not have agreed to the December Arbitration
25   Provisions.

27   40.   As a result of the fraud and deceit alleged herein, Plaintiff is entitled to
28   rescission of the Arbitration Agreement and the December Arbitration Provisions

2221.002\9929                          -14-
Complaint                              FL 6539

Exhibit  4  ,
P.  51

1  proximately caused by it as well as restitution of all sums obtained by MORAD from
2  Plaintiff because of them

3

4  ## SECOND CAUSE OF ACTION FOR NEGLIGENT
5  ## MISREPRESENTATIONS INDUCING CONSENT
6  ## TO THE ARBITRATION AGREEMENT
7  ## AGAINST MORAD ZARABI

8      41.   Plaintiff realleges paragraphs 1 through 36 of this Complaint

9

10      42   MORAD owed a duty of reasonable care in making representations and
11  statements to Plaintiff regarding MORAD's ability and intentions with respect to the
12  appraisal of MGA and the accounting of the other partnership matters

13

14      43.   MORAD breached his duty to Plaintiff by making misrepresentations of
15  material facts and by omitting and failing to disclose material facts which he knew or
16  in the exercise of reasonable care should have known were untrue or inaccurate and
17  which he was under a duty to disclose to Plaintiff, including without limitation, his
18  inability to competently read and write English, his intent to set a pre-determined price
19  for Fred's Stock and the value of the other partnership accounts

20

21      44.   MORAD made the misrepresentations and omissions with the intent to
22  induce Plaintiff to agree to the Arbitration Agreement consenting to arbitrate before
23  MORAD as the arbitrator of the disputes between Plaintiff and ISAAC over MGA and
24  the other partnership matters.

25

26      45.   Plaintiff actually, reasonably and justifiably relied upon the false
27  statements and omissions of MORAD and consented to the Arbitration Agreement.
28  Had Plaintiff known the true facts, Plaintiff would not have entered into the Arbitration

2221 002\9929               -15-                            FL 6540
Complaint

Exhibit 4,
P. 52

1  Agreement and selection of MORAD as the arbitrator, and would not have given

2  MORAD authority as arbitrator to determine the price at which Plaintiff would sell his

3  interest in MGA and the other partnership accounts.

4

5      46    As a result of the misrepresentation alleged herein, FRED is entitled to

6  rescission of the Arbitration Agreement and the December Arbitration Provisions

7  proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff

8  because of them

9

10      **THIRD CAUSE OF ACTION FOR CONSPIRACY TO COMMIT**

11      **PROMISSORY FRAUD INDUCING CONSENT TO THE**

12      **ARBITRATION AGREEMENT**

13      **AGAINST MORAD ZARABI AND ISAAC LARIAN**

14      47    Plaintiff realleges paragraphs 1 through 36 of this Complaint

15

16      48.    Plaintiff is informed and believes that commencing in or around the

17  summer and fall of 2000, ISAAC and MORAD conspired and agreed together to induce

18  FRED to give MORAD power and authority as an arbitrator to set a price

19  pre-determined by ISAAC and/or MORAD, at which ISAAC would purchase FRED's

20  shares in MGA.

21

22      49.    In furtherance of the conspiracy, MORAD made the misrepresentations

23  and omissions of material facts alleged in this Complaint to induce FRED to consent

24  to arbitration before MORAD and to execute the Arbitration Agreement.  MORAD's

25  representations were false and known by MORAD and ISAAC to be false when made.

26

27      50.    In reasonable reliance on the representations of MORAD, Plaintiff

28  executed the  Arbitration Agreement.

2221 002\9929                          -16-

FL 6541

51.    Plaintiff is entitled to rescission of the Arbitration Agreement and the December Arbitration Provisions proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff because of them.

### FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF
### OVER VALIDITY OF THE ARBITRATION AGREEMENT
### AND THE DECEMBER ARBITRATION PROVISIONS
### AGAINST MORAD ZARABI AND ISAAC LARIAN

52.    Plaintiff realleges paragraphs 1 though 36 of this Complaint

53.    An actual justiciable controversy exists between Plaintiff on the one hand, and Defendants MORAD and ISAAC on the other hand in that Plaintiff contends that the Arbitration Agreement was void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to it, and that the December Arbitration Provisions are likewise void because they were proximately caused by Plaintiff's consent to the Arbitration Agreement.  Plaintiff is informed and believes that Defendants MORAD and ISAAC contend that the Arbitration Agreement is valid and enforceable and that there is no basis for invalidating or voiding the Arbitration Agreement or the December Arbitration Provisions

54.    Plaintiff has no accurate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the Arbitration Agreement and the December Arbitration Provisions.

Complaint
Exhibit  4  ,
P. 54

FL 6542

# FIFTH CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT
## OF THE DECEMBER ARBITRATION PROVISIONS
### AGAINST MORAD ZARABI

55    Plaintiff realleges paragraphs 1 through 36 of this Complaint

56    MORAD's representations to FRED in or around the end of November or the beginning of December 2000 concerning the accuracy of the appraisal of MGA, the appraised value being $17,500,000, and MORAD's honesty and trustworthiness were false when made and known by MORAD to be false when made.  The true facts were that MORAD concealed the appraisal showing the value of MGA to be significantly greater than the representation to Plaintiff, and concealed the fact that he had corrupted and acted to distort the appraisal of MGA by ordering the appraiser to reduce the value to close to $20,000,000   In making the misrepresentations and omissions, MORAD intended to induce Plaintiff to agree to resolve any disputes arising from the December 2000 Agreement by arbitration before MORAD and/or KAMBIZ, so that MORAD could continue to conceal his fraud and deceit and his wrongful acts and omissions

57.    The misrepresentations and omissions to Plaintiff were material and Plaintiff reasonably relied on them to his detriment and by them was induced to enter into the December Arbitration Provisions.

58.    As the result of MORAD's fraud and deceit, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

## SIXTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION INDUCING CONSENT TO THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI

59.    Plaintiff realleges paragraphs 1 through 36 of this Complaint

60    MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding the appraised value of MGA and the accounting of the other partnership matters

61.    MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were inaccurate and which he was under a duty to disclose to Plaintiff, including without limitation, the true and correct valuation of MGA found by NBA's appraisal.

62    MORAD made the misrepresentations and omissions with the intent to induce Plaintiff to consent to the December Arbitration Provisions selecting MORAD and his son KAMBIZ as the arbitrators with sole authority to determine disputes between Plaintiff and ISAAC arising from the December 2000 Agreement

63.    Plaintiff actually, reasonably and justifiably relied upon the false statements and omissions of MORAD.  Had Plaintiff known the true facts, Plaintiff would not have entered into the December Arbitration Provisions which selected MORAD and his son KAMBIZ as the arbitrators.

64.   As a result of MORAD's misrepresentations Plaintiff is entitled to rescission of the December Arbitration Provision and restitution of all sums obtained by MORAD from Plaintiff because of them

## SEVENTH CAUSE OF ACTION FOR CONSPIRACY TO FRAUDULENTLY INDUCE EXECUTION OF THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI AND ISAAC LARIAN

65   Plaintiff realleges paragraphs 1 through 36 of this Complaint

66.   Plaintiff is informed and believes that the misrepresentations and omissions by MORAD in late November to December 2000 were carried out pursuant to a conspiracy and agreement between MORAD and ISAAC to induce FRED to agree to arbitrate all disputes before MORAD and KAMBIZ so they could continue to conceal MORAD's and ISAAC's fraud and conspiracy.

67.   In furtherance of the conspiracy, MORAD committed the acts alleged in this Complaint, including without limitation manipulating and corrupting the appraisal, lying to FRED about the appraised value of MGA and inducing FRED to resolve all disputes arising out of the agreement by arbitration before MORAD or KAMBIZ in order to conceal the conspiracy.

68.   As the result of the misrepresentations by MORAD pursuant to the conspiracy of ISAAC and MORAD which induced FRED's consent to the December Arbitration Provisions, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

**EIGHTH CAUSE OF ACTION FOR DECLARATORY RELIEF**
**OVER VALIDITY OF THE DECEMBER ARBITRATION PROVISIONS**
**AGAINST ISAAC LARIAN**

69.    Plaintiff realleges paragraphs 1 though 36 of this Complaint

70    An actual justiciable controversy exists between Plaintiff on the one hand and ISAAC on the other hand in that Plaintiff contends that the December Arbitration Provisions were void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to them while Plaintiff is informed and believes that ISAAC contends that the December Arbitration Provisions are valid and enforceable and that there is no basis for invalidating or voiding them, in whole or part

71    Plaintiff has no adequate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the December Arbitration Provisions

**NINTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT**
**OVER  THE DISQUALIFICATION OF MORAD ZARABI**
**AND KAMBIZ ROBERT ZARABI FROM SERVING AS ARBITRATORS**
**AGAINST ISAAC LARIAN, MORAD ZARABI**
**AND KAMBIZ ROBERT ZARABI**

72.    Plaintiff realleges paragraphs 1 through 36 of this Complaint

73.    An actual justiciable controversy exists between Plaintiff on the one hand and Defendants on the other hand in that Plaintiff contends that as a result of the position, facts and circumstances concerning MORAD and KAMBIZ alleged in this Complaint, they are disqualified under California law from exercising any power or authority as an arbitrator of any disputes between Plaintiff and Defendant ISAAC

2221.002\9929                                    -21-
                                        Complaint

1   LARIAN; while Plaintiff is informed and believes that Defendants and each of them
2   contend that MORAD and KAMBIZ are not so disqualified

4       74   Plaintiff has no adequate remedy at law and the parties require a judicial
5   declaration of their legal rights and obligations with respect to the ability of MORAD
6   and KAMBIZ to exercise power and authority as arbitrators under the December 2000
7   Agreement

9       **TENTH CAUSE OF ACTION  FOR DECLARATORY JUDGMENT**
10      **OVER ENFORCEABILITY OF ARBITRATION AGREEMENTS**
11                **AGAINST ISAAC LARIAN**
12      75.   Plaintiff realleges paragraphs 1 through 36 of this Complaint

14      76   An actual justiciable controversy exists between Plaintiff on the one hand
15  and Defendant ISAAC LARIAN on the other hand in that Plaintiff contends that the
16  Arbitration Agreement and the December Arbitration Provisions are unenforceable in
17  that they are agreements to arbitrate solely before MORAD ZARABI and in the case
18  of the December Arbitration Provisions, KAMBIZ ZARABI if MORAD is unavailable
19  or such arbitrators as either of them might appoint if MORAD and KAMBIZ are both
20  unavailable.  Because MORAD and KAMBIZ are disqualified under California law,
21  neither may serve as arbitrator or appoint arbitrators  Plaintiff is informed and believes
22  that Defendant ISAAC LARIAN disputes the disqualification of MORAD and
23  KAMBIZ ZARABI and that notwithstanding any disqualification of MORAD and
24  KAMBIZ, contends the arbitration agreements are legally enforceable.

26      77.   Plaintiff has no adequate remedy at law and the parties require judicial
27  declaration of their rights and obligations with respect to the Arbitration Agreement
28  and the December Arbitration Provisions and their enforceability.

2221 002\9929                    -22-
                              Complaint                    FL 6547

Exhibit  4  ,
P. 59

1    ELEVENTH CAUSE OF ACTION FOR RESCISSION

2    OF THE DECEMBER 2000 AGREEMENT BASED ON PROMISSORY

3    FRAUD INDUCING CONSENT TO ARBITRATION AGREEMENT

4    AGAINST MORAD ZARABI AND ISAAC LARIAN

5        78.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

6

7        79.    The fraud and deceit of MORAD and/or conspiracy of MORAD and

8    ISAAC to deceive and defraud, inducing Plaintiff to consent to the Arbitration

9    Agreement proximately caused Plaintiff's consent to the December 2000 Agreement

10   As a consequence of Plaintiff's entitlement to rescission of the Arbitration Agreement,

11   Plaintiff is also entitled to rescission of the December 2000 Agreement, including the

12   Pledge Agreement and restitution of his stock in MGA subject to any accounting

13   required by law

14

15       80    As a proximate result of Defendants wrongful conduct, Plaintiff has been

16   damaged in an amount and of a nature according to proof at trial

17

18       81.    MORAD's wrongful acts were conducted maliciously, oppressively and

19   fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award

20   of punitive damages sufficient to punish MORAD and deter such conduct in the future

21

22   TWELFTH CAUSE OF ACTION FOR RESCISSION

23   OF THE DECEMBER 2000 AGREEMENT

24   AGAINST MORAD ZARABI AND ISAAC LARIAN

25       82.    Plaintiff realleges paragraphs 1 through 36 of this Complaint

26

27       83.    MORAD's fraud and deceit and/or the conspiracy of MORAD and ISAAC

28   to defraud and deceive, inducing Plaintiff into believing that MORAD had carried out

2221 002\9929                        -23-                        FL 6548

Complaint

Exhibit  4  ,

P. 160

1  an accurate, complete, and current appraisal of MGA which purportedly had
2  determined the value of MGA to be $17,500,000 proximately caused Plaintiff to
3  consent to the December 2000 Agreement and consequently Plaintiff is entitled to
4  rescission of it, including the Pledge Agreement and restitution of his stock in MGA
5  subject to any accounting required by law

7      84  As a proximate result of Defendants wrongful conduct, Plaintiff has been
8  damaged in an amount and of a nature according to proof at trial

10      85  MORAD's wrongful acts were conducted maliciously, oppressively and
11  fraudulently with the intent to injure Plaintiff  Plaintiff is therefore entitled to an award
12  of punitive damages sufficient to punish MORAD and deter such conduct in the future.

14       **THIRTEENTH CAUSE OF ACTION FOR RESCISSION BASED ON**
15        **NEGLIGENT MISREPRESENTATIONS INDUCING**
16        **THE DECEMBER 2000 AGREEMENT**
17        **AGAINST MORAD ZARABI**
18      86.  Plaintiff realleges paragraphs 1 through 36 of this Complaint.

20      87.  MORAD owed a duty of reasonable care in making representations and
21  statements to Plaintiff regarding a) his purported intention to impartially arbitrate the
22  sale of Plaintiff's interest in MGA by an accurate, complete, and current appraisal and
23  b) the true and correct appraised value of MGA and the accounting of the other
24  partnership matters.

26      88.  MORAD breached his duty to Plaintiff by making misrepresentations of
27  material facts and by omitting and failing to disclose material facts which he knew or
28  in the exercise of reasonable care should have known were inaccurate and which he

2221 002\9929
-24-
Complaint

FL 6549

Exhibit __4__ ,
P. __61__

1   was under a duty to disclose to Plaintiff, including without limitation, MORAD's true
2   intentions regarding setting the price for Plaintiff's stock and the true and correct
3   valuation of MGA found by NBA's appraisal.

4

5   89.   MORAD's misrepresentations induced Plaintiff's execution of the
6   December 2000 Agreement and Plaintiff is entitled to rescission of it, including the
7   Pledge Agreement and to restitution of his stock in MGA subject to an accounting
8   required by law.

9

10   90.   As a proximate result of Defendants wrongful conduct, Plaintiff has been
11   damaged in an amount and of a nature according to proof at trial.

12

13   **FOURTEENTH CAUSE OF ACTION FOR DECLARATORY**
14   **RELIEF OVER VALIDITY OF THE DECEMBER 2000 AGREEMENT**
15   **AGAINST ISAAC LARIAN**

16   91.   Plaintiff realleges paragraphs 1 through 36 of this Complaint

17

18   92.   An actual justiciable controversy exists between Plaintiff on the one hand
19   and Defendant ISAAC on the other hand  in that Plaintiff contends that the December
20   2000 Agreement was void ab initio due to the fraud and deceit of MORAD and/or
21   ISAAC inducing Plaintiff's consent to it while Plaintiff is informed and believes that
22   ISAAC contends the December 2000 Agreement is valid, enforceable and that there is
23   no basis for invalidating or voiding it

24

25   93.   Plaintiff has no accurate remedy at law and the parties require a judicial
26   declaration of their legal rights and obligations with respect to the December 2000
27   Agreement.

28

2221 002\9929                    -25-
                            Complaint                    FL 6550
                        Exhibit  4  ,
                        P.  62

### FIFTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE
### TRUST, PRELIMINARY INJUNCTION AND ACCOUNTING
### AGAINST MORAD ZARABI AND ISAAC LARIAN

94    Plaintiff realleges paragraphs 1 through 36 of this Complaint

95    The share certificates for FRED's Stock were held in trust by MORAD pursuant to  a pledge agreement made by ISAAC in connection with the December 2000 Agreement   Plaintiff has made demand on MORAD to show him the share certificates, but MORAD has failed and refused to do so   Plaintiff is informed and believes that MORAD has turned over the stock certificates or other instruments affecting the stock certificates to  ISAAC

96.    By virtue of their fraudulent acts, Plaintiff is entitled to rescission of the December 2000 Agreement and to restitution of his stock in MGA subject to an accounting by the Court of any amount of the consideration Plaintiff received for his stock that must be returned to Isaac, which Plaintiff hereby offers to restore Defendants and each of them hold FRED's Stock as a constructive trustee for Plaintiff's benefit.  Plaintiff is informed and believes that the stock certificates may be voided, lost or destroyed and Plaintiff's stock interest diluted or altered to Plaintiff's detriment unless Defendants and each of them are enjoined and restrained from taking any acts of any nature with respect to Plaintiff's stock certificates and stock interest.

97.    Plaintiff does not know what amounts, if any have accrued or been distributed on account of Plaintiff's MGA stock and an accounting is therefore necessary to determine what amounts, if any are due Plaintiff on account of his MGA stock.

WHEREFORE, Plaintiff prays for judgment as follows·

1. That the September 28, 2000 Agreement to Arbitrate and Selection of Arbitrator is declared void ab initio or is rescinded,

2 That the December Arbitration Provisions are declared void ab initio or are rescinded,

3. That MORAD ZARABI is judicially declared as disqualified from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

4. That KAMBIZ ROBERT ZARABI is judicially declared as disqualified from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

5. That Defendants and each of them and their agents and employees hold Plaintiff's MGA Stock as constructive trustees for Plaintiff's benefit,

6 That Defendants and each of them, their agents, employees and all those in active concert and participation with them are preliminarily and permanently enjoining from transferring, disposing of, or altering FRED's Stock certificates or interest in MGA;

7. That the December 2000 Agreement (including all related agreements) is declared void ab initio or is rescinded;

8. That Plaintiff's stock in MGA be restored to him;

9. For an accounting of all monies accruing to or distributed on account of Plaintiff's stock in MGA;

10. For damages as allowed by law and according to proof at trial;

11. For reasonable attorneys fees;

12. For costs as allowed by law;

13. For punitive damages as allowed by law and according to proof at trial; and

2221 002\9929

-27-
Complaint

FL 6552

Exhibit 4 ,
P. 64

1      14.    For such other relief as the Court deems just and proper.

2

3   Dated: February 24, 2005                William C. Conkle
                                            Mark D. Kremer
4                                           Eric S Engel, members of
                                            CONKLE & OLESTEN
5                                           Professional Law Corporation

6

7                          By:

8                                           Mark D. Kremer
                                            Attorneys for Plaintiff
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2221 002\9929                    -28-
                              Complaint                    FL 6553

Exhibit  4  ,
P.  65