**Exhibit 5**

*Larian*
*P1.*
*11-14-05*

KABATECK BROWN KELLNER LLP
Richard L. Kellner, SBN 171416
Michael R. Brown, SBN 65324
Alfredo Torrijos, SBN 222458
350 South Grand Avenue, 39th Floor
Los Angeles, California  90071
Telephone:  (213) 217-5000
Facsimile:  (213) 217-5010

COTKIN, COLLINS & GINSBURG
A PROFESSIONAL CORPORATION
Robert G. Wilson, SBN 58653
300 South Grand Avenue, 24th Floor
Los Angeles, California  90071
Telephone:  (213) 688-9350
Facsimile:  (213) 688-9351

Attorneys for Claimant
Farhad Larian

## ARBITRATION BEFORE ADR SERVICES, INC.

| | |
|---|---|
| In re Arbitration Between<br>FAHRAD LARIAN,<br><br>        Claimant,<br><br>    v.<br><br>ISAAC LARIAN,<br><br>        Respondent. | ADRS Case. No. 05-2096-ABH<br><br>The Honorable Alan Haber<br><br>**CLAIMANT'S OPENING<br>ARBITRATION BRIEF**<br><br>Date:      November 16, 2005<br>Time:      9:00 A.M. |

Exhibit *5*
P. *lele*

onfidential

MGA 3809056

## TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT.................................................................1

II.  CLAIMANT'S CLAIM FOR RESCISSION BASED UPON MUTUAL MISTAKE..........................................................................5

    A.   RESCISSION BASED UPON MUTUAL MISTAKE..................................6

    B.   RESCISSION BASED UPON UNILATERAL MISTAKE, WITH THE KNOWLEDGE AND/OR COMPLICITY OF ISAAC.................8

        1.   Isaac's Possible Defenses................................................9

III. CLAIMANT'S CLAIM FOR MONEY DAMAGES AND/OR RESCISSION BASED UPON BREACHES OF FIDUCIARY DUTY AND FRAUDULENT CONCEALMENT..........................................................12

    A.   ISAAC BREACHED HIS FIDUCIARY DUTY TO INFORM HIS BROTHER ABOUT THE EXISTENCE OF THE EXCLUSIVE BRATZ LICENSE, THE RELATED PRODUCT LINE, THE INTEREST EXPRESSED BY K-MART TO THE PRODUCT AND THE RESULTS OF FOCUS GROUPS.......................................................................13

    B.   ISAAC FRAUDULENTLY CONCEALED THE BRATZ LICENSE BUSINESS OPPORTUNITY....................................................15

        1.   General Law Relating To Fraudulent Concealment.........................15

        2.   Persson v. Smart Inventions, Inc......................................16

        3.   Isaac Had An Absolute Duty To Disclose The Bratz Concept To His Brother....................................................19

        4.   Isaac Actively Concealed The Bratz Business Opportunity.................20

V.   NEITHER WAIVER NOR LACHES APPLY IN THIS CASE...........................21

    A.   Laches Is Functionally Irrelevant To The Damages Causes of Action.............21

    B.   Laches Does Not Apply To The Rescission Causes of Action....................21

IV.  CONCLUSION.............................................................................23

i

Exhibit _5_,
P. _67_

onfidential

MGA 3809057

## I.   SUMMARY OF ARGUMENT

This arbitration is about an older brother (respondent Isaac Larian ["Isaac"]) who believed that it was unfair that his younger brother (claimant Fahrad Larian ["Fred"]) was receiving an equal share in their company (MGA), when the older brother believed he was solely responsible for its growth. This arbitration is also about how Fred was misled into selling his shares to Isaac at a price far below fair market value.[1]

Claimant Fahrad Larian will proffer compelling *evidence* of fraud and breaches of fiduciary duty that cut at the heart of the December 4, 2000 Agreement for the Sale of Stock. Fred's case will not be built upon a credibility fight between him and his brother, but will be supported by ample documentary evidence and the testimony *from third party witnesses*.

Fred's first claim seeks rescission based upon mutual mistake in connection with the sale of his stock in MGA to Isaac. The evidence will show that on December 4, 2000, Fred entered into a written contract to sell his 45% interest in MGA to Isaac for $8.775 million. This sale was facilitated by Fred and Isaac's uncle Morad Zarabi, who engaged the services of an appraiser (Ernest Dutcher) to determine the fair market price for the brothers and who retained an attorney to draft the contract of sale. The sale was predicated upon the brothers' understanding that the price was based upon a fair and independent appraisal that reflected the fair market value of MGA.

The purchase agreement prepared by Morad was a pure contract, that provided Fred and Isaac with the right to rescind the contract within three days of its execution. In addition, Isaac has admitted that Fred was given the option to sell only one-half of his shares because Isaac knew that his limited financial resources might not be sufficient to fund the $8.775 million purchase. Thus, if Isaac had to pay fair market value for the stock (which will be revealed at the

---

[1]   Claimant will dispense with a recitation of the procedural history of this matter before June 2005 because, as the Arbitrator has observed, this arbitration proceeding began in June 2005. This arbitration brief will present a summary of the evidence to be presented and the applicable law.

1

onfidential

MGA  3809058

arbitration to be more than two times the amount paid), *he could only afford to buy a fraction of Fred's 45% interest in the company.*

However, the brothers did not know that the entire "appraisal" process was a fraud. The appraiser (Dutcher) will testify that Morad actually instructed him to reduce his determination of MGA's fair market value. In addition, the parties were unaware that the appraisal was based upon MGA's value in 1999 rather than the 2000 purchase date. Years later, when Morad asked the appraiser (Dutcher) to determine the value of MGA in 2000, he determined that its fair market value was $34 million, rather than $20 million.[2]

Needless to say, if Isaac knew that the process was biased or if he was complicit in the fraud, Fred would have an absolute right to rescission or monetary damages. (Civil Code Section 1689[b][2]) If Isaac was mistaken (like Fred) about the process and the true fair market value of the corporation, then under California law the transaction could be rescinded under the doctrine of "mutual mistake." (*Levy v. Wolff* (1956) 46 Cal.2d 367, 368; *Guthrie v. Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 884.) Either way, Fred will be entitled to rescission.

Because Isaac did not have the financial wherewithal to pay Fred the fair market value for his MGA stock, reformation of the contract is not a viable remedy. In other words, if the parties had known that the fair market price for the stock was at least twice than what was paid, the most that Isaac could have purchased was one half the stock (in the event Fred was willing to sell at that price).

* * *

Separate and apart from the mutual mistake that provides a basis for rescission, Fred is entitled to money damages and/or rescission because Isaac failed to disclose to him a major business opportunity that MGA had developed in the months preceding the sale of his 45%

---

[2]    At the hearing, the appraiser (Dutcher) and Claimant's expert will testify that the true fair market value of the company was far in excess of $40 million. Claimant's expert is Mike Wierwille, former Managing Director of Standard & Poor's and Price Waterhouse's valuation group.

2

Exhibit __5__,
P. __69__

onfidential

MGA 3809059

interest in the company.  As a result, Isaac breached his fiduciary duties to Fred and engaged in fraudulent concealment.

The facts underlying this portion of Claimant's case will be supported by *sworn testimony from independent former MGA employees.*  These witnesses will testify that *in the Summer of 2000*, the marketing and production departments of MGA began to evaluate a possible new doll line that would compete with Mattel's Barbie dolls.  At marketing meetings, sketches of the dolls that were prepared by Carter Bryant (a Mattel employee who had developed this concept) were presented for discussion.  The marketing department then began a plan to determine the viability of the product line on the open market – *before the date that MGA formally purchased the license for the Bratz products* and *months before the subject December 4, 2000 sale of Fred's MGA stock.*

Through September 2000, Isaac negotiated with Carter Bryant (then still an employee at Mattel) for the exclusive license to sell the Bratz line of products.  Isaac's execution of the Bratz license agreement with Carter Bryant (dated as of September 18, 2000) represented a milestone event for MGA.

In its 21 year history, Bratz was the only toy line for which MGA held an exclusive license for all products.  Previously, MGA was the licensee that paid for the right to use a third-party's license on isolated toys.  Bratz did not represent an isolated toy, but an entire line of dolls and related products.  Bratz was more than just a pipe dream because, as Isaac Larian proudly reported to the media when Bratz became a mega-hit, a Wal-Mart buyer had specifically told him *in 1999* that Wal-Mart was eager to purchase a viable competitor to the Barbie line of doll products.

By November 2000, Isaac had specific knowledge that Bratz had been test marketed with very positive results.  Moreover, buyers for such chains as K-Mart expressed great interest in Bratz when they were provided private showings of the doll line in November 2000. Nonetheless, Fred was never told about any of the foregoing.  Instead, Isaac fed Fred information that portrayed financial gloom for the toy company.

3

Exhibit 5 ,
P. 70

onfidential

Based upon Isaac's Answer and discussions between counsel, the following defenses will probably be raised to the breach of fiduciary duty and fraudulent concealment claims.

First, Isaac asserts that no one could have known that Bratz would be a mega-billion dollar product line. However, such a defense would radically misstate Fred's burden of proof. Under California law, Fred does not have to prove that Isaac knew Bratz would be a multi-billion dollar product. To the contrary, all Fred has to prove is that "a reasonable investor would have considered the existence of [the Bratz concept and the exclusive license] important in deciding whether and at what price to sell his shares in the corporation." (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1163.)[3] Based upon expert testimony, percipient testimony and common sense, this defense will fail.

Second, Isaac claims that Fred had knowledge about Bratz before he executed the December 4, 2000 contract. To date, the only documents Isaac's attorneys have produced in their attempt to prove this defense are two emails to Fred in 2000 that mentioned the word "Bratz" in the context of possible shipping and customs issues. If this is all the evidence that Isaac has on this issue (and no additional evidence has been provided by Isaac), his defense will fail because former employees of MGA will *testify* that there was prolific email traffic regarding Bratz, none of which found its way to Fred Larian. Indeed, having been given only two emails that mentioned the word "Bratz" and nothing more, Fred could not have gleaned the business significance of the Bratz product, that it represented an exclusive license or the results of focus groups and presentations to the buyers for major department store chains.

Third, Isaac claims that Fred is barred from raising these claims under the doctrine of laches. This argument will fail for two reasons: (a) because Fred was under the mistaken belief that the appraisal encompassed all aspects of the business, he had no reason to claim rescission

---

[3]   The Arbitrator is urged to compare the facts in *Persson* with those in this case. As will be demonstrated below and at the hearing, the facts in both cases are substantively identical and the Arbitrator will be asked to make a comparable finding that Isaac Larian engaged in fraudulent concealment.

4

Exhibit 5 ,
P. 71

onfidential

MGA 3809061

in 2001 when he discovered that Bratz was an active product line for which MGA had an exclusive license; and (b) even if a laches defense can be somehow formulated for the relief of rescission based upon these facts, it will fail for the breach of fiduciary duty and fraudulent concealment claims because the case was commenced within the applicable statute of limitations.  As our Supreme Court has explicitly ruled, the determination of a reasonable delay (laches) in filing a legal claim is pegged to the applicable statute of limitations. (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 900.)

Accordingly, under any factual scenario, Fred Larian will ultimately have a claim for monetary damages in connection with the breach of fiduciary duty and fraudulent concealment claims that will be measured by the present fair market value for a 45% interest in MGA (minus the $8.775 million paid) plus the dividends and other profits that he should have received since December 2000 through the present date.

## II.   CLAIMANT'S CLAIM FOR RESCISSION BASED UPON MUTUAL MISTAKE

Fred Larian signed the December 4, 2000 Stock Sale Agreement believing that the sale price was based on a neutral, fair and current appraisal of his shares.  These basic assumption underlying the Stock Sale Agreement were clearly incorrect.  Rescission is therefore warranted due to this mistake of fact. (Civ. Code, § 1689(b)(1).)

In entering the contract for the sale of Fred Larian's stock in MGA to Isaac Larian, the brothers were mutually mistaken regarding two material facts: (a) that the price in their agreement reflected a fair and independent appraisal; and (b) that the price in their agreement reflected the fair market value of the stock.[4]  However, the evidence will show that the sale price contained in the Stock Sale Agreement was not based on a neutral, fair and current appraisal of MGA.

---

[4]   Of course, if Isaac was not mistaken in this regard, he was necessarily complicit in the fraud against his brother.

Exhibit _5_
P. _72_

onfidential

MGA 3809062

## A.   RESCISSION BASED UPON MUTUAL MISTAKE

Section 1689(b) of the Civil Code provides that: "A party to a contract may rescind the contract [i]f the consent of the party rescinding . . . was given by mistake. . . ."  Rescission is available for both mutual mistake and unilateral mistake. (*Merced County Mut. Fire Ins. Co. v. State of California* (1991) 233 Cal.App.3d 765, 771-772.)

Mutual mistake occurs when both parties to a contract are under a mistake regarding a fact assumed by them as a basis upon which they entered into the contract. (*Raddue v. Le Sage* (1956) 138 Cal.App.2d 852, 855.)  "In California a mutual mistake, whether of fact or law, which affects an essential element of the contract and is harmful to one of the parties is subject to rescission by the party harmed." (*Guthrie v. Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 884 (citations omitted).)

Of course, rescission is unavailable when the mutual mistake relates to a collateral matter or something that is merely incidental to the contract. (*Hannah v. Steinman* (1911) 159 Cal. 142, 147 ["mistake here was not as to a purely collateral matter, but rather went to the essence of the contract"]; *Reid v. Landon* (1958) 166 Cal.App.2d 476, 483 ["mistake must be such that it animated and controlled the conduct of the party; go to the essence of the object in view and not be merely incidental"].)  Instead, the mistake must be material such that it goes to the essence of the contract. (See Civ. Code, § 1577 [mistake of fact defined as a mistake which is "material to the contract"]; *Estate of Barton* (1950) 96 Cal.App.2d 234, 239 ["The general rule is that where an agreement is founded upon a mutual mistake of fact which is material and goes to the essence of the contract, relief will be granted to the one against whom it is sought to be enforced"].)

A mutual mistake is material, such as to warrant rescission, when it animates and controls the conduct of the party.  Thus, in *Roller v. California Pacific Title Ins. Co.* (1949) 92 Cal.App.2d 149, the court stated the rule as follows:

> "A mistake as to a matter of fact, to warrant relief in equity, must be material, and the fact must be such that it animated and controlled the conduct of the party.  It must go to the essence of the object in view, and not be merely incidental. *The*

6

onfidential

MGA 3809063

*court must be satisfied, that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved."*

(92 Cal.App. at 157, *quoting Grymes v. Sanders* (1876) 93 U.S. 55, 60 (emphasis added); see also Civ. Code, § 1568 ["Consent is deemed to have been obtained through [mistake] only when it would not have been given had such [mistake] not existed."].)

As the evidence will show, Morad and Isaac were both aware that Isaac's financial resources placed a financial ceiling on his ability to buy Fred's shares. Isaac could pay approximately $9 million over time to Fred, based upon a market value of MGA of $20 million. The independent appraiser (Ernest Dutcher) has already declared (*under oath*) that Morad directed him to slash his independently determined appraised value of Fred's MGA stock to arrive at a $20 million value for MGA. His determination of value excluded MGA Entertainment Hong Kong, Ltd., an entity not included in MGA's financials that were given to the appraiser.

A copy of Ernest Dutcher's declaration is attached hereto as Exhibit A.[5] It is anticipated that his testimony will be consistent with his sworn declaration.

Remarkably, the appraiser was instructed to determine the value of the company as of 1999, not the December 2000 purchase date. Years later, Morad commissioned Dutcher to appraise the value of MGA as of December 2000. According to Dutcher, if he had been provided with all the pertinent information regarding MGA, he would have determined that the fair market value of the MGA in 2000 was *$34 million*. Significantly, the *$34 million* figure still <u>does not</u> include the value attributable to MGA Entertainment Hong Kong, Ltd., and it does not include any value attributable to the Bratz exclusive license.

Claimant's expert will testify that the fair market value of MGA exceeded $40 million as of the date of the sale of the stock.

---

[5]    The Dutcher declaration is not being proffered as a document that will be entered into evidence. Instead, it provides a concise statement of the core testimony that Dutcher will provide at the hearing. Mr. Dutcher will testify at the hearing.

7

Exhibit __5__,
P. __74__

onfidential

MGA 3809064

Finally, the appraiser (like Fred) was never advised about the Bratz license, despite the fact that the appraiser asked Isaac if there was anything unusual going on in the business. Even though K-Mart buyers told MGA that K-Mart was excited about the Bratz concept and that focus groups loved the product, Isaac never informed the appraiser about this information.

Fred reasonably assumed that the sale price of his MGA shares was based on a neutral, fair and current appraisal of his shares. The evidence will show that Fred repeatedly stated to Isaac that he was not willing to sell his shares in the company absent an acceptable appraisal determining the fair market value of his shares. In short, Isaac and Fred decided to go to Morad in order to have him facilitate the neutral, fair and current determination of the fair market value of the MGA stock.

More importantly, the assumption that the sales price was based on a neutral, fair and current appraisal was unquestionably central to the agreement.

### B.    RESCISSION BASED UPON UNILATERAL MISTAKE, WITH THE KNOWLEDGE AND/OR COMPLICITY OF ISAAC

In the subject transaction involving a corporation valued in excess of $20 million, no reasonable person would be willing to sell their 45% interest in the company if it was not based upon a legitimate determination of the fair market value. Indeed, the only reason someone would not be willing to have the sales price based upon something other than a legitimate determination of the fair market value would be if they knew that the manipulation of the process would benefit them. Under such circumstances, rescission would be available based upon unilateral mistake.

If Isaac knew that the appraisal was flawed, rescission would be warranted based on fraud. Civil Code section 1689(2) provides that a party may rescind a contract, "[i]f the consent of the party rescinding ... was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or *with the connivance* of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party." (Emphasis added.) Thus, section 1689 provides that the misrepresentations of a third party can serve as the basis for

8

Exhibit 5 ,<br>P. 75

onfidential

MGA  3809065

rescission when that party connived with the contracting party against whom rescission is sought.

It is fundamental that duress or fraud of a third party "'renders a transaction voidable by a party induced thereby to enter into it if the other party . . . has reason to know of the fraud . . . [or duress] before he has given or promised in good faith something of value in the transaction or changed his position materially by reason of the transaction ....'" (*Leeper v. Beltrami* (1959) 53 Cal.2d 195, 206, quoting with approval Rest.1st, Contracts, § 477, citing *Harper v. Murray* (1920) 184 Cal. 290 and *Carroll v. Carroll* (1941) 16 Cal.2d 761; *see also Hall v. Department of Adoptions* (1975) 47 Cal.App.3d 898, 903, citing *Leeper*.)

Thus, no matter how Isaac testifies, Fred will be entitled to rescission.

### 1. Isaac's Possible Defenses

In his answer, Isaac has raised the defense of waiver to the rescission cause of action. However, as the evidence will prove, it was not until late 2003 that Fred Larian discovered Morad's fraud and, months later, he discovered the fact that the fair market value of his stock vastly exceeded the amount that Isaac would have been able to pay for his stock. For this reason, the waiver argument will fail. (*Union Pac. R. Co. v. Zimmer* (1948) 87 Cal.App.2d 524, 532 [there can be no waiver where the injured party had no knowledge of the facts giving rise to the right to rescind]; *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 304 [right is not waived when the acts constituting the alleged waiver were induced by fraud].)

In the past, Isaac has intimated that the purchase agreement was somehow an arbitration award that is not subject to review. Such an argument, if made, would be patently frivolous since the contract does not have any of the vestiges of an arbitration award. (*Code of Civil Procedure* Sections 1283.4 and 1283.6.) Indeed, since Fred was given the unilateral right to back out of the sales contract within three days (Exhibit B hereto), and Isaac gave him the option of selling only one-half his shares, there would be no good faith basis for proffering such an argument.

Finally, Isaac has proffered a defense in his answer that the parties entered a mutual, general release and Fred is thus precluded from bringing any claims relating to the sales

9

Exhibit _5_,
P. _76_

onfidential

MGA 3809066

agreement.  However, a rescinded contract is an extinguished contract (Civ. Code, § 1688), meaning that it has ceased to exist and none of its provisions can be enforced by any party. (See, *Larsen v. Johannes* (1970) 7 Cal.App.3d 491, 501; *Bowman v. Victor* (1948) 83 Cal.App.2d 693, 699; *Dyer Bros. G.W.I. Wks. v. Central I. Wks.* (1925) 72 Cal.App. 202, 209.)  "When a contract is rescinded, it ceases to exist. If the action to rescind or an action based on an alleged rescission or abandonment is successful, the contract is forever ended, and its covenants cannot thereafter be enforced by any action." (*Lemle v. Barry* (1919) 181 Cal. 1, 5 (concurring opinion).)  Obviously, therefore, if the Stock Sale Agreement is rescinded, the mutual release (which is simply part of the contract) is rescinded as well and has no effect.

Furthermore, to the extent that the Arbitrator does not order the rescission of the *entire* Stock Sale Agreement, the mutual release would still not be a bar to Fred's recovery of damages based on Isaac's breach of fiduciary duty or fraudulent concealment.  This point was addressed by the court in *Persson v. Smart Inventions, Inc.*

The stock redemption agreement in *Persson* contained a mutual release by the parties "under which Persson [the seller] released Nokes [the buyer] and Smart Inventions from all liability of any kind, known or unknown, 'relating to this Agreement and [Persson]'s relationships in any capacity with [Smart Inventions] and Nokes.'" (*Persson v. Smart Inventions, Inc., supra*, 125 Cal.App.4th at 1152-53.)  The defendant in *Persson* argued that since the plaintiff sought to affirm the contract and seek damages for fraud (rather than seeking to rescind the contract), the plaintiff was precluded from obtaining damages in light of the mutual release. (*Id.* at *1153.*)  In other words, the defendant contended that the plaintiff could not seek to rescind only part of the contract (i.e., the mutual release), while affirming the rest of the contract.  The court rejected this argument, stating that, "there is no support for, and we reject out of hand, the notion that a court has no equitable power to set aside a provision of a contract procured by fraud.  Courts have long had the authority to set aside unconscionable or illegal contractual provisions, for example, while enforcing the remainder of a contract." (*Id.* at 1153-53 (citations omitted).)

10

Exhibit 5
P. 77

onfidential

MGA 3809067

The *Person* court acknowledged partial rescission of a contract is typically not allowed because "'retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate.'" (*Id.* at 1154, *citing Simmons v. Cal. Institute of Technology* (1949) 34 Cal.2d 264, 275.)   The court, however, noted that: "Setting aside the release provisions of the Stock Redemption Agreement does not result in unjust enrichment, and does not bind the parties to a contract they did not contemplate. Quite the opposite is true.   The ruling merely sets aside mutual releases which were not in any event among the essential objects of the contract, which has a severability provision." (*Id.* (footnote omitted).)   The court concluded by stating:

> "In short, a party who was fraudulently induced to contract to sell shares cannot be deprived of the well-recognized option to affirm the contract and sue for damages for fraud simply because the contract contained a mutual release of unknown claims."

(*Id.*)

Therefore, to the extent that Arbitrator does not award the complete rescission of the Stock Sale Agreement, the rescission of the mutual release would still be warranted.   (*M.G. Chamberlain and Co. v. Simpson* (1959) 173 Cal.App.2d 263, 277 [a release that is not knowing and/or is procured by fraud is unenforceable; *see also Elmer v. Jordan* (1943) 23 Cal.2d 469, 474-475 [where deception is practiced upon a party, release signed by him must be construed as settlement of only those matters as to which the minds of parties met, and may not be considered to be in satisfaction of anything not consented to by him].)

Accordingly, Claimant Fred Larian is entitled to the rescission of the December 4, 2000 contract, the return of his shares in MGA, plus all dividends and other payments that had been made to Isaac from his shares since 2000 through the present date, minus the $8.775 million he originally received for his stock.

11

Exhibit 5,
P. 78

onfidential

MGA 3809068

### III. CLAIMANT'S CLAIM FOR MONEY DAMAGES AND/OR RESCISSION BASED UPON BREACHES OF FIDUCIARY DUTY AND FRAUDULENT CONCEALMENT

Under California law, a party who has entered a contract as the result of fraudulent concealment or breach of fiduciary duty has the right to seek the remedy of rescission and has the independent right to bring an action for monetary damages within the applicable statute of limitations.

Thus, in addition to the separate claim for rescission based upon mutual mistake (*see* Section II, *supra*), Fred Larian can seek rescission based upon breach of fiduciary duty or fraud. (*Interactive Multimedia Artists, Inc. v. Superior Court* (1998) 62 Cal.App.4th 1546, 1553 [breach of fiduciary duty justifies rescission]; *Stokes v. Henson* (1990) 217 Cal.App.3d 187, 192 [same]; Civ. Code, § 1692 [rescission based on fraud].)

Fred Larian also has the alternative right to seek monetary damages based upon Isaac's breach of fiduciary duty and fraudulent concealment. (*Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 316-317 [party who contracts in reliance on the fraud of a another may either elect rescission or damages].) [6]

Civil Code section 1692 provides that even if a court finds that rescission is not an available remedy, the party still has the right to pursue monetary damages in the same action. Although an "action for damages" is based on an affirmance of the contract, while an "action for rescission" is based on a disaffirmance thereof and such remedies are mutually inconsistent, damages may be prayed for in event rescission cannot be had. (*Hutchason v. Marks* (1942) 54 Cal.App.2d 113.)

In this arbitration, Claimant can seek <u>both</u> monetary damages and rescission. If the Arbitrator deems that rescission is not available, Claimant has the right to still pursue monetary damages.

---

[6]    A plaintiff who contracts in reliance on the fraud of a defendant may either elect through contract remedy restitution based upon rescission and damages (2 Witkin, Calif.Procedure (2d ed.) Actions, pp. 984) or both restitution and consequential damages. (*Runyan v. Pacific Air Industries, Inc., supra*, 2 Cal.3d at 316-317; Civ.Code, § 1692.)

12

Exhibit 5
P. 79

onfidential                                                          MGA 3809069

**A.    ISAAC BREACHED HIS FIDUCIARY DUTY TO INFORM HIS BROTHER ABOUT THE EXISTENCE OF THE EXCLUSIVE BRATZ LICENSE, THE RELATED PRODUCT LINE, THE INTEREST EXPRESSED BY K-MART TO THE PRODUCT AND THE RESULTS OF FOCUS GROUPS**

Isaac Larian had a fiduciary duty to disclose all material information about MGA's valuation and business to Fred Larian.  California law imposes explicit fiduciary duties on controlling shareholders in closely-held corporations to minority shareholders, especially when they possess superior access to information.  (*Stephenson v. Driver* (1997) 16 Cal.4th 1167.)

Under California law, the elements of a cause of action for breach of fiduciary duty are existence of fiduciary duty, breach of fiduciary duty, and damage proximately caused by breach. (*Stanley v. Richmond* (1995) 41 Cal.Rptr.2d 768.)  "Constructive fraud" allows conduct insufficient to constitute actual fraud to be treated as such where parties stand in a fiduciary relationship.  The difference between actual fraud and constructive fraud is primarily in the type of conduct which may be treated as fraudulent, such as failure to disclose material facts within knowledge of fiduciary. (*Id.*; *Matter of Estate of Gump* (1991) 2 Cal.Rptr.2d 269.)

In dealings between parties in a confidential or fiduciary relationship, the party in whom confidence is placed must disclose all material facts within his or her knowledge, and the failure to do so may constitute constructive fraud. (1 Witkin, Summary of Cal. Law, Contracts § 401 (9th ed. 1990) ("Witkin Summary"); Restatement (Second) of Contracts, § 161(d) and com. f.) The only exception to this rule in the case of a closely-held corporation is when the closely-held shareholders have equal power and access to information.[7]

Although Isaac and Fred owned the same number of shares in each corporation, the evidence will clearly show that it was Isaac who controlled the business.  In fact, he specifically instructed employees to keep Fred in the dark about the development of new products.

The evidence will show that Isaac was the CEO and laid down all the rules for MGA.

---

[7]    For example, *Persson v. Smart Inventions, Inc.*, *supra*, the Court of Appeal ruled that Nokes and Persson had equal power over the corporation, where there was "no evidence of a 'weaker' or a 'stronger' party."  When the shareholders possess such equal powers, the court will not impose independent fiduciary duties. (*Id.* at 1161-1162.)

13

Exhibit _5_,
P. _80_

onfidential

MGA 3809070

Indeed, the evidence will show that Isaac obtained the unfettered cooperation of the other shareholder who possessed a ten percent interest in MGA (Eli Makabi). Thus, Isaac had complete control over the corporation.

Moreover, from the Summer of 2000 through the end of the year, Fred was assigned by Isaac to work on a different floor (the warehouse) and had no meaningful direct contact with the creative personnel of the company.

California courts have consistently ruled that "where an officer or a director of a corporation has knowledge of special facts affecting the value of its stock, he cannot deal with a stockholder at arm's length but is under a duty to disclose such facts before making a purchase or sale of the stock." (*Hobart v. Hobart Estate Company* (1945) 26 Cal.2d 412, 432-433; *Jaynes v. Jaynes* (1950) 98 Cal. App. 2d 447, 451.) In *Hobart*, the Supreme Court stated the rule that "where an officer or a director of a corporation has knowledge of special facts affecting the value of its stock, he cannot deal with a stockholder at arm's length but is under a duty to disclose such facts before making a purchase or sale of the stock." (*Hobart v. Hobart Estate Company*, *supra*, 26 Cal.2d at 432-433.)

"Under the 'special facts' doctrine a corporate officer owes a limited fiduciary duty in transactions with a shareholder involving the transfer of stock. The confidential relationship arises as a result of the officer's possession of special knowledge gained in his capacity as a corporate fiduciary. An officer, in buying or selling to a shareholder, must inform him of those matters relating to the corporate business of which the officer has knowledge and which the shareholder has a right to know about, so that the latter may have the benefit of such information in judging the advantages of the deal." (*Id.* at 433.) The special facts doctrine has been expanded in California to apply to officers, directors and controlling shareholders who seek to gain an advantage in the sale or transfer of stock. (*Fisher v. Pennsylvania Life Co.* (1977) 69 Cal.App.3d 506, 512.)

The *Hobart* court's application of the special facts doctrine to a corporate officer was based largely on the circumstances that the officer, like Isaac in the present case, held "the

14

onfidential

MGA 3809071

voting control of the stock, giving him the right to select most if not all of the directors and indirectly the right to determine all company policy and practice. . . . Moreover, and of particular importance, the company was a closely held family corporation . . . . The stock was not dealt in on the market and the judgment of its value had to be made not from published stock transactions but from the information of one familiar with the facts . . . ." (*Hobart v. Hobart Estate Company, supra,* 26 Cal.2d at 432.) Thus, the fiduciary duty is especially prevalent where the corporation is closely held. (*Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 111.)

Thus, Isaac had a fiduciary duty to disclose information regarding Bratz to his brother.

**B.    ISAAC FRAUDULENTLY CONCEALED THE BRATZ LICENSE BUSINESS OPPORTUNITY.**

**1.    General Law Relating to Fraudulent Concealment**

Under California law, even in the absence of a fiduciary or confidential relationship, a duty to disclose exists where a party has knowledge of material facts that are not known or reasonably accessible to the other party. (See *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 347; *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294; *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735.)   Such undisclosed facts are material if they would have a significant and measurable effect on market value. (*Reed v. King* (1983) 145 Cal.App.3d 261, 267.)   A breach of this duty of disclosure will give rise to a cause of action for both rescission and damages. (*Karoutas v. HomeFed Bank* (1991) 232 Cal.App.3d 767, 771.)

In *Lingsch v. Savage,* the court specified the elements making up the cause of action as follows: "The elements of a cause of action for damages for fraud based on mere nondisclosure and involving no confidential relationship would therefore appear to be the following: (1) Nondisclosure by the defendant of facts materially affecting the value or desirability of the property; (2) Defendant's knowledge of such facts and of their being unknown to or beyond the reach of the plaintiff; (3) Defendant's intention to induce action by the plaintiff; (4) Inducement of the plaintiff to act by reason of the nondisclosure and (5) Resulting damages. (Citations.)" (213 Cal.App.2d at 738.)

In the recent case of *Persson v. Smart Inventions, Inc., supra,* the Court of Appeal

15

Exhibit _5_ ,
P. _82_

onfidential

MGA 3809072

addressed the application of this law in a functionally identical case.

### 2.   *Persson v. Smart Inventions, Inc.*

It is rare to have an appellate decision issued within months of the commencement of an arbitration, where the facts are so apposite as to be dispositive. Such a situation has occurred in this matter when the Court of Appeal for the Second Appellate District issued its opinion in *Persson v. Smart Inventions, Inc., supra,* on January 19, 2005. A copy of this decision is attached hereto as Exhibit C for the Arbitrator's convenience.

Just like in this arbitration, *Persson* involved the sale of stock between the two founders of a closely-held corporation – each of whom owned fifty percent of the outstanding shares. The company, Smart Inventions, Inc., was a corporation that marketed consumer products. The dispute between the two shareholders was strikingly similar to that involved in this case:

> "Nokes was President of Smart Inventions and ran the day-to-day activities
> of the corporation. He perceived a disparity in the amount of time he and Persson,
> whose primary responsibility was product development, devoted to the business."

(*Id.* at 1147.)

For approximately one year, the parties engaged in negotiations for a buy-out that were completely unsuccessful. In June 1999, Nokes renewed his efforts to buy Persson out. He portrayed the business as doing poorly, and that the company had "no new hit products." (*Id.* at 1148.) On July 19, 2000, Nokes prepared a term sheet that provided for Nokes' payment of $1.4 million for Persson's shares. The parties executed the stock redemption agreement on August 6, 1999. (*Id.* at 1149.)

Unbeknownst to Persson, Nokes had failed to disclose that Smart Inventions had been working on a new portable light fixture product called "Tap Light." Nokes had begun to look into the product in April 1999, but did not tell Persson. In mid-May 1999, Nokes showed Tap Light (along with a number of other products) to the Home Shopping Network (HSN), which expressed interest in the product. Later that month, Nokes began production on television advertisements for the product. By July 1999, HSN began to place some nominal orders for the

Exhibit __5__,
P. __83__

onfidential

MGA 3809073

product. An advertising campaign for the product was set for Aùgust 6, 1999. Persson was not informed of any of the foregoing. (*Id.*) The term sheet was executed on July 19, 2000 and the stock redemption agreement was redeemed on August 6, 1999. (*Id.*)

The Court ruled that Nokes fraudulently concealed from Persson the "Tap Light" product that was under development. In language that will be applicable to this case, the Court of Appeal first set forth the case law to determine materiality:

"Under California law, a fact is material if " 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' . . ." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 (*Engalla*), quoting Rest. 2d Torts, Section 538, subd. (2)(a).) In this context, a fact is material, and the jury was so instructed, "if there is a substantial likelihood that, under all of the circumstances, a reasonable investor would consider it important in reaching an investment decision." Materiality is a question of fact for the jury, "unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." (*Engalla, supra,* 15 Cal.4th at p. 977, quoting Rest.2d Torts, Section 538, comm.. e, p. 82.)

Ample evidence permitted the jury to find that a reasonable investor would have considered the existence of the Tap Light important in deciding whether and at what price to sell his shares in the corporation. The evidence showed, for example, that the Tap Light was one of a relatively small number of products for which television commercial spots were produced and aired during the corporation's history. The Tap Light was under development by Nokes as a potential new product as early as April 1999, and a commercial spot was readied to launch in a national media campaign in July 1999. Persson testified that no one in his position would have signed away his interest in the corporation on the same day a commercial for a new product was scheduled to air, because results from

onfidential

Exhibit _5_ ,
P. _84_

MGA 3809074

spot commercials in test markets are available within just a few days, and when the results are good, 'that paper you can basically take to the bank.' Persson's attorney in the transaction testified that 'products in the pipeline' are an important element in the valuation of a corporation. Valerie Castle, a consultant in the direct response television marketing business, testified that in her opinion the Tap Light was 'substantially material' to the value of Smart Inventions, and that it would not have been reasonable to sign away a half interest in Smart Inventions without waiting the short time necessary to see whether or not the Tap Light commercial was a success."

(*Id.* at 1162-63.)

Then, the Court of Appeal disposed of Nokes' argument that it was speculative to claim that the Tap Light product was material because its future sales could not be determined:

"Nokes insists several federal cases support the proposition that the inability to predict the profitability of a potential new product means, as a matter of law, the product is not material to a shareholder's decision to sell his shares. The cases do not support that proposition. None of them pertain to the materiality of information on a new product to a shareholder's decision to sell shares. These cases merely support the general and undisputed points that hindsight may not be used to determine whether a fact is material, and that forecasts of a corporation's future prospects – as opposed to the facts from which such forecasts may be derived – are not material. THE CASES DO NOT ASSIST Nokes, where the relevant question is whether a reasonable investor would want to know about the existence of a product in the corporate pipeline – a product in which the Home Shopping Network had expressed interest and for which there were imminent plans for test markets – before deciding to sell his shares in the company. . ."

(*Id.* at 1163-1164)(emphasis in opinion.)

Here, Isaac Larian was under a substantially stronger obligation to disclose information

18

Exhibit 5 ,
P. 85

onfidential

MGA 3809075

regarding the Bratz license and product line to his brother.

### 3.   Isaac Had An Absolute Duty To Disclose The Bratz Concept To His Brother

The evidence will show that the Bratz product was extremely material to the valuation of MGA, imposing a disclosure obligation on Isaac independent and in addition to those arising from his fiduciary duties (Section III [A], *supra*.)

In its 21 year history, MGA had never purchased an exclusive license for all products in a toy line or life-style brand.  The evidence will show that for all of its other toy products, MGA was the licensee that paid for the right to use a third-party's license on isolated toys.  <u>This significant departure from its prior business model creates a stronger obligation for Isaac to disclose, when compared with the defendant in</u> *Persson*.  Indeed, unlike *Persson*, MGA's ownership of the Bratz license constituted a tangible asset.

Just like the defendant in *Persson*, the Bratz product was in development before the purchase agreement was signed.  In the case of *Persson*, the origination of the product was a few months before the contract, while in this case it was almost one half a year before the date the purchase agreement was signed.

Just like the defendant in *Persson*, Isaac had specific knowledge of at least one national store chain's interest in the product.  A Wal-Mart buyer told Isaac in 1999 that it would buy a doll that would compete with Barbie, and a K-Mart buyer who saw Bratz in November 2000 was excited about the product.  This is comparable to the presentation of the Tap Light product to HSN who expressed an interest in the product.

However, unlike *Persson*, Isaac was aware of focus groups of children and their mothers who loved the Bratz product, while the appraisal process was taking place and before Fred sold his shares in the company.

Significantly, unlike *Persson*, MGA hired new personnel specifically for the Bratz product line development – many directly from Mattel's Barbie development departments.

Finally, similar to *Persson*, Isaac was asked by the appraiser to provide him with all

19

Exhibit <u>5</u> ,<br>P. <u>86</u>

onfidential

MGA 3809076

material changes to the business – yet, he never mentioned Bratz.  The use of an appraiser is critical in this regard, since Isaac had to know that such positive information could only have a positive effect on the determination of the fair market value of the MGA stock.

### 4.    Isaac Actively Concealed The Bratz Business Opportunity

The Supreme Court has ruled that "[i]n transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise [when] . . . the defendant actively conceals discovery from the plaintiff." (*Warner Construction. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294; see, also *La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1151 ["active concealment of facts ... may under certain circumstances be actionable without [a fiduciary or confidential] relationship"]; *Stevens v. Superior Court* (1986) 180 Cal.App.3d 605, 608- 609 ["It is, however, established by statute that intentional concealment of a material fact is an alternative form of fraud and deceit equivalent to direct affirmative misrepresentation"]; *Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 37 ["An active concealment has the same force and effect as a representation which is positive in form"]; *Sime v. Malouf* (1949) 95 Cal.App.2d 82, 99 [without regard to a fiduciary relationship, defendants' intentional concealment of material facts constituted actionable fraud].)

Thus, in *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, the court observed: "The law imposes the obligation that every person is bound ... to abstain from injuring the person or property of another, or infringing upon any of his [or her] rights," (*id.* at 511), and "[a]lthough mere nondisclosure is not ordinarily actionable unless the defendant is a fiduciary with a duty to disclose, active concealment or suppression of facts by a nonfiduciary is the equivalent of a false representation, i.e., actual fraud." (*Id.* at 512.)

Here, the evidence will demonstrate that Isaac affirmatively concealed the Bratz business opportunity by telling his employees to keep Fred out of the loop on the development of products.  Despite the fact that there were many emails regarding Bratz between MGA employees, Isaac managed to prevent such emails from going to Fred.  Indeed, Isaac even told a

Exhibit 5,
P. 87

onfidential

MGA 3809077

key new employee in October 2000 that he "owned the business."

As a result of Isaac's machinations, MGA's employees largely believed that Fred was out of the corporate picture from at least the Summer of 2000 through the end of the year.

## V.   NEITHER WAIVER NOR LACHES APPLY IN THIS CASE

It is expected that Isaac Larian will argue that the doctrine of waiver and laches preclude rescission of the Stock Sale Agreement. The evidence, however, will show that neither of these defenses applies in this case.

### A.   Laches Is Functionally Irrelevant to the Damages Causes of Action

In determining the reasonableness of a delay in filing an action, the courts are guided by the applicable statute of limitations. (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 909.) Where a cause of action is based on a party's breach of its fiduciary duties, the four-year catchall statute set forth in Code of Civil Procedure section 343 governs. (*Manok v. Fishman* (1973) 31 Cal.App.3d 208, 213.) Accordingly, laches will *not* constitute *any* defense to the actions at law since they were all filed within the applicable limitations period.

### B.   Laches Does Not Apply to the Rescission Causes of Action

Without question, a party who seeks rescission is required to give notice to the other party of his election to rescind and offer to restore the consideration he has received. (Civ. Code, § 1691(a); *Stegeman v. Vandeventer* (1943) 57 Cal.App.2d 753, 761 ["[a]s a general rule it is firmly established in California that a party attempting to rescind a contract must give notice of rescission to his adversary with an offer to restore the consideration he has received as a condition precedent his bringing an action to rescind"].) Failure in satisfying these requirements, however, does not preclude the remedy of rescission. Section 1693 states that rescission can only be denied due to delay in notice or delay in tendering restoration if the "delay has been substantially prejudicial to the other party." (*See Wilke v. Coinway, Inc.* (1967) 257 Cal.App.2d 126 [noting that "reasonable diligence or promptness on the part of the party seeking rescission is no longer a prerequisite for the remedy. The new requirement is essentially

21

Exhibit 5
P. 88

onfidential

MGA 3809078

one of freedom from laches.  Its application depends on whether, under the particular facts, the delay has in any way prejudiced the defendant"].)

Here, the question is whether Fred "unreasonably delayed" in "commencing an action which has prejudiced the party asserting the defense." (*Utica Mutual Ins. Co. v. Monarch Ins. Co.* (1967) 250 Cal.App.2d 538, 543.)  Laches is an affirmative defense and the burden of proving it rests upon the party asserting it.  (*Id.*)  Among the factors that may influence the determination whether delay was reasonable are the difficulties encountered by the plaintiff in commencing the suit, or the litigant's ignorance of facts prior to commencing the action.  (*Hahn v. Board of Education* (1988) 205 Cal.App.3d 744, 753 ["unreasonableness of delay cannot be considered in a vacuum, but must be measured against the applicable statute of limitations and the practicalities included in deciding whether to proceed with a lawsuit"]; *McNulty v. Lloyd* (1932) 149 Cal.App.2d 7, 10-11 ["In order to impute laches to one who seeks relief in equity, it should clearly appear that he either had actual knowledge of the facts or failed to acquire such knowledge after having notice thereof."]; *Garrison v. Blanchard* (1942) 127 Cal.App. 616, 620 ["Full knowledge of the facts or of sufficient facts to put him on inquiry is an essential element to the imputation of laches"].)

The evidence will show that Fred did not unreasonably delay in commencing proceedings relating to the fraud and breaches of fiduciary duty that attended the sale of his stock in MGA. Within months of the execution of the Stock Sale Agreement, Fred presented complaints to Morad, who was designated as the individual who would arbitrate disputes under the Stock Sale Agreement.  Morad assured Fred that the matter would be resolved.  However, during the next four years, the "arbitration" process was bogged down by collateral litigation.

Ultimately, Morad was unable to complete the consideration of these claims, and the matter was referred to the present Arbitrator to resolve all disputes between the parties.  Thus, when the applicable facts are fully considered, it will be clear that Fred did not waive his rights. The laches defense should be rejected in its entirety.

22

Exhibit 5
P. 89

onfidential

MGA 3809079

## IV.    CONCLUSION

Based upon the foregoing, and the evidence that will be presented at the arbitration hearing of this matter, Claimant Fahrad Larian will respectfully request that the Arbitrator rule that: (a) the December 4, 2000 Agreement for Sale of Stock be rescinded, that Claimant receive back his shares in MGA plus an accounting to determine all dividends and other consideration he should have received since the date of the execution of the Agreement for Sale of Stock (minus the $8.775 million consideration received); or (b) in the alternative, rule that Respondent Isaac Larian breached his fiduciary duties and/or engaged in fraudulent concealment and award Claimant the present value of a forty-five percent interest in MGA, plus an accounting to determine all dividends and other consideration he should have received since the date of the execution of the Agreement for Sale of Stock (minus the $8.775 million consideration received). Claimant also seeks interest, costs, attorneys' fees and such other and further relief as the Arbitrator deems just and proper.

DATED: November 14, 2005          Respectfully submitted,

KABATECK BROWN KELLNER LLP

By: _____
        Richard L. Kellner

COTKIN, COLLINS & GINSBURG

By: _____
        Robert G. Wilson

23

Exhibit 5 ,
P. 90

onfidential

MGA  3809080

# Exhibit 6

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Exhibit 7

NOV 28 2005 12:36PM  HP LASERJET 3200                                    P.1



# FACSIMILE TRANSMITTAL

## ADR SERVICES, INC.
1900 Avenue of the Stars, Suite 250
Los Angeles, California 90067
www.adrservices.org

**DATE:**          **November 28, 2005**

| RECIPIENT | 🖷 FAX NUMBER | ☎ PHONE NUMBER |
|---|---|---|
| RICHARD L. KELLNER, ESQ. MICHAEL R. BROWN, ESQ. | (213) 217-5010 | (213) 217-5000 |
| ROBERT G. WILSON, ESQ. | (213) 688-9351 | (213) 688-9350 |
| LARRY R. FELDMAN, ESQ. | (310) 788-1200 | (310) 788-1000 |

| SENDER | | |
|---|---|---|
| TERRY SHEA | (310) 201-0016 | (310) 201-0010 (EXT 25) |

**NUMBER OF PAGES INCLUDING COVER:**          5

*RE:*   *LARIAN v. LARIAN*
       *ADRS Case No. 05-2096-ABH*

*MESSAGE:*

*Please find the attached Final Arbitration Award for the above-referenced matter.  The previous version was not dated. Please refer to this version, which is dated.*

## PLEASE CALL (310) 201-0010 IF YOU DO NOT RECEIVE ALL PAGES.

(ss)

Received  Nov-28-2005  12:38pm  From-          To-COTKIN COLLINS AND G    Page  001

Exhibit 7 ,
P. 113

CC 00545

1   Honorable Alan B. Haber
    ADR SERVICES, INC
2   1900 Avenue of the Stars, Suite 250
    Los Angeles, California 90067-4303
3   (310) 201-0010 PH
    (310) 201-0016 FAX
4

5

6               IN THE MATTER OF THE ARBITRATION BETWEEN

7

8

9

10  FARHAD LARIAN                      )
                                       )
11             Claimant               )    ADR Case No. 05-2096-ABH
                                       )
12  vs.                               )    LASC Case No. BC 301371
13  ISAAC LARIAN                      )
                                       )    FINAL ARBITRATION AWARD
14             Respondent             )
                                       )    DISMISSAL OF ALL CLAIMS WITH
15                                     )         PREJUDICE
                                       )
16

17

18

19

20

21

22

23

24

25  CHRONOLOGY OF EVENTS:

26      This Binding Arbitration between the above-named claimant and respondent commenced

27  on November 16, 2005, at the ADR offices, Suite 250, 1900 Avenue of the Stars, Los Angeles,

28  90067. , This Arbitration was scheduled for hearings on November 16, 17, 18, 21, 22, 23 and

29  December 5, 2005.   Claimant Farhad was represented by Mr. Robert G. Wilson of the law firm

                                        1

Exhibit 7  ,
P. 114

CC 00546

1   of Cotkin, Collins and Ginsburg and Mr. Richard Kellner of the law firm of Kabateck, Brown

2   and Kellner.   Respondent Isaac Larian was represented by Mr. Larry Feldman and Mr. Robert

3   Turner, both of the Kaye Scholer LLP law firm.  Also in attendance was Ms. Daphne Gronich,

4   counsel for third-party intervenor, MGA Entertainment, Inc.

5       On November 17, 2005, the second day of the Arbitration proceedings, towards the end

6   of the full-day session, following the testimony of a witness called by claimant, claimant's

7   counsel called claimant Farhad Larian to testify as a witness.   Upon taking his place at the

8   witness chair, claimant Farhad Larian requested that he be permitted to address me, and the

9   assemblage of counsel, and announced that he wishes to "go off the record". I then requested that

10  claimant Larian consult privately with both of his counsel.  Claimant Farhad Larian declined my

11  request that he consult with his attorneys.  Both of his attorneys appeared ready to leave the

12  hearing room and consult with claimant Farhad Larian.      However, claimant Farhad Larian

13  continued to insist that he be permitted to address me and the assemblage of attorneys. I again

14  suggested that claimant Farhad Larian meet with his attorneys.   For a second time he insisted

15  that he be allowed to address me and the assemblage, and refused my second suggestion that it

16  would be advisable for him to speak to his attorneys.    I informed him that any remarks or

17  statements that he made would have to be "on the record"(at all times during the Arbitration

18  proceding, a Certified Court Reporter was recording the proceedings).   Claimant Farhad Larian

19  then addressed the assemblage and explained that certain evidence presented thus far in the

20  proceedings caused him to conclude that his claims against respondent Isaac Larian were

21  unfounded and that it was his request that the proceedings be brought to a conclusion.

22  Thereupon, one of claimant's attorneys, Mr. Robert G. Wilson announced that he was resigning

23  as claimant's counsel.   In essence, and unquestionably, claimant Farhad Larian conceded that

24  his claims against Isaac Larian for breach of fiduciary duty, fraud, and unilateral mistake and

25  requests for monetary damages and recission should be "dropped", and the arbitration should be

26  terminated.  I suggested that a recess would be appropriate.  Claimant and his counsel, Mr.

27  Richard Kellner then retired to a different room: I then left the hearing room and briefly spoke

28  with Mr. Kellner and claimant Farhad Larian and with Mr. Kellner's permission explained that if

29  his true intentions were to terminate the proceedings, that he and Mr. Kellner would have to

2

Exhibit  7
P. 115

CC 00547

1  return to the hearing room and agree "on the record" to dismiss all of the Arbitration claims.

2  and acknowledge that a dismissal with prejudice would mean that he would not be able to renew

3  or refile his claims in the future.  Claimant Farhad then acknowledge on the record that he

4  understood the consequences of a dismissal of his Arbitrtion claims, and that he wished for a

5  dismissal with prejudice of the claims.

6

7  THE ARBITRATION AWARD:

8      Based on my satisfaction that claimant Farhad Larian knowingly and voluntarily wished

9  for all of his Arbitration claims in this proceeding against respondent Isaac Larian be dismissed

10  with prejudice, and his acknowledgment that there was no merit to any of his claims in this

11  proceeding, I am ordering that all of the claims made by claimant Farhad Larian in this

12  proceeding be forthwith dismissed with prejudice, and issue an award in favor of respondent

13  Isaac Larian.

14

15  DATED: November 28, 2005

16                                      Hon. Alan B. Haber(ret.), Arbitrator

3

CC 00548

Exhibit 7
P. 116

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is ADR Services, Inc., 1900 Avenue of the Stars, Suite 250 Los Angeles, California 90067.

On November 28, 2005, I served the foregoing document described as the **FINAL ARBITRATION AWARD** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Richard Kellner, Esq.
Michael R. Brown, Esq.
KABATECK BROWN & KELLNER LLP
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071

Robert G. Wilson, Esq.                   Larry R. Feldman, Esq.
COTKIN COLLINS & GINSBURG                 KAYE SCHOLER
300 South Grand Avenue, 24th Floor        1999 Avenue of the Stars, Suite 1600
Los Angeles, California 90071             Los Angeles, California 90067

_____X_____  **BY U.S. MAIL,** I caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

_____X_____  **BY FACSIMILE,** I caused such to be faxed to the attorneys on November 28, 2005.

_____  **BY PERSONAL SERVICE** I caused such envelope to be delivered by hand to:

_____X_____  **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____  **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 28, 2005 at Los Angeles, California.

Terry Shea

H:\Award\PROOF OF SERVICE.doc

**CC 00549**

Exhibit  7
P. 117

# Exhibit 8

FEB 03 2006 5:12PM   HP LASERJET 3200                                    P.1



# FACSIMILE TRANSMITTAL

## ADR SERVICES, INC.
1900 Avenue of the Stars, Suite 250
Los Angeles, California 90067
www.adrservices.org

**DATE:**          <u>February 3, 2006</u>

| RECIPIENT | 📠 FAX NUMBER | ☎ PHONE NUMBER |
|---|---|---|
| RICHARD L. KELLNER, ESQ.<br>MICHAEL R. BROWN, ESQ. | **(213) 217-5010** | **(213) 217-5000** |
| ROBERT G. WILSON, ESQ. | **(213) 688-9351** | **(213) 688-9350** |
| LARRY R. FELDMAN, ESQ.<br>ROBERT TURNER, ESQ. | **(310) 788-1200** | **(310) 788-1000** |

| SENDER | | |
|---|---|---|
| HON. ALAN B. HABER | **(310) 201-0016** | **(310) 201-0010** (EXT 25) |

**NUMBER OF PAGES INCLUDING COVER:**     6

**RE:**   <u>*LARIAN v. LARIAN*</u>
     *ADRS Case No. 05-2096-ABH*

**MESSAGE:**

*Please find the attached Final Arbitration Award for the above-referenced matter.*

**PLEASE CALL (310) 201-0010 IF YOU DO NOT RECEIVE ALL PAGES.**

                                                                **(ss)**

Received  Feb-03-2006  05:14pm    From-              To-COTKIN COLLINS AND G    Page 001

CC 00517

Exhibit  8
P. 118

1  Honorable Alan B. Haber(Ret.)
   ADR SERVICES, INC.
2  1900 Avenue of the Stars, Suite 250
   Los Angeles, California 90067-4303
3  (310) 201-0010 PH
   (310) 201-0016 FAX
4

5

6

7

8                    IN THE MATTER OF THE ARBITRATION BETWEEN

9

10  FARHAD LARIAN,                    )       LASC CASE No. BC301371
                                      )
11              Claimant,             )       ADR CASE No. 05-2096-ABH
                                      )
12        Vs.                         )
                                      )       FINAL ARBITRATION AMENDMENT
13  ISAAC LARIAN,                     )       FOR RESPONDENT'S MOTION FOR
                                      )       PREVAILING PARTY ATTORNEY'S
14              Respondent,           )       FEES
                                      )
15                                    )

16

17

18        On November 28, 2005, my Arbitration Award was filed and served on counsel for the

19  claimant and respondent. The Award entered a dismissal with prejudice of all claims in this

20  arbitration proceeding.    This dismissal was requested by claimant on the second day of the

21  Arbitration proceedings.   Respondent filed a Motion for Attorneys Fees, requesting fees and

22  costs incurred by respondent during the course of this litigation.    I have considered the

23  respondent's moving papers, and declaration, and have considered the respondent's opposition

24  papers and the two declarations attached to the opposition papers.    The parties agreed to a

25  telephonic conference call for oral argument in connection with this motion.   On February 1, this

26  matter was argued by the parties by way of a telephonic conference call.   Present during the call

27  for Claimant was Mr. Richard Kellner of the law firm of Kabateck Brown Kellner LLP, and

28  present during the conference call for Respondent was Mr. Larry Feldman of the law firm of

29  Kaye Scholer LLP.

                                              1

Exhibit  B
P. 119

CC 00518

FINDINGS RE: THE JURISDICTION ISSUE

Claimant's counsel alleged (1) that as the Arbitrator I had no jurisdiction to issue an Arbitration Award and therefore there was no prevailing party; (2) that I should use my discretion and not award attorney's fees to the respondent Isaac Larian, and (3) attorneys fees and costs should not be awarded because the respondent's application for fees and costs is not adequate.  I find that the claimant's claim of lack of jurisdiction is not well-taken.  Judge Nelson appointed me as the arbitrator in this matter on May 4, 2005, following his having made a finding that the parties were unable to agree on an arbitrator.  Judge Nelson's ruling followed a remittitur from the Second District Court of Appeal, ordering that a prior ruling denying the respondent's request to arbitrate this matter be vacated, and that an arbitration go forward pursuant to Section 1281.6 of the California Code of Civil Procedure. The chronology of events leading up to my appointment as arbitrator establishes the hypocrisy of the claimant's claim that that my selection as arbitrator was improper.

On March 2, 2005(following the Court of Appeal's mandate to grant an order compelling arbitration) Judge Nelson ordered each party to submit a list of at least five(5) nominees to serve as the arbitrator.  Judge Nelson informed counsel that he would then select five(5) names for the two submitted lists, indicating that in the event the parties could not agree from his list, that he would select the arbitrator, in accordance with Section 1281.6 of the Code of Civil Procedure. Respondent provided five(5) names; my name was not on the list.  Claimant provided five names and my name was on the list.(Interestingly, claimant in their submission of five names, objected to Judge Nelson's procedure, and asserted that a principal term of the arbitration agreement provided that the arbitrator serve without charging a fee).  Finding a retired Judge to serve as a neutral arbitrator without monetary compensation in a case where a claimant(as in this case) is seeking six million dollars in monetary damages($600,000,000.) is probably more difficult than trying to locate Judge Crater.

On March 24, 2005, Judge Nelson selected retired Judge Robert Altman to serve as the arbitrator in this matter.  On April 4, 2005, Judge Nelson, having learned that Judge Altman withdrew as arbitrator, informed counsel that he would be sending a new list of five(5) arbitrator nominees. My name was on that list of five(5).  On April 15, claimant's counsel wrote to Judge

2

Exhibit   8 ,
P. 120

CC 00519

1  Nelson listing claimant's nominees; once again my name was on claimant's list, and made
2  reference to the names of four of respondent's nominees. My name was not on the respondent's
3  list. Once again, the parties could not agree on Judge Nelson's list of five. On May 4, 2005,
4  Judge Nelson appointed me as the arbitrator pursuant to Section 1281.6 of the Code of Civil
5  Procedure.

6      The legal principles of estoppel and waiver have application to the claimant's claim of my
7  lacking jurisdiction to serve as the arbitrator. At no time from the receipt of Judge Nelson's
8  minute order transmitted to me on May 4, 2005 and through and including my involvement in
9  pre-Arbitration proceedings, and the Arbitration, had claimant ever asserted to me that I lacked
10 jurisdiction to serve as the arbitrator in this matter. The first time that I learned of the lack of
11 jurisdiction claim was upon receiving claimant's counsel's opposition brief to the respondent's
12 Motion for attorneys fees and costs. I find that Judge Nelson's appointment of me as arbitrator is
13 the law of the case.

14

15 FINDINGS RE: ATTORNEYS FEES AND COSTS REQUESTS
16     As previously discussed, I find that the respondent is the prevailing party in this litigation.
17 The Stock Purchase Agreement provided that the prevailing party can recover attorneys fees and
18 costs. I have considered and read respondent's moving papers and have reviewed all 97 exhibits
19 attached to respondent's declaration. This case involved a claim for $600,000,000. in monetary
20 damages and was intensely litigated over an approximately two-year period. The nature of this
21 case demanded skilled and experienced attorneys. Claimant retained serially, three different law
22 firms to represent him over the period of this case, as did respondent in hiring two attorneys who
23 have more than 60 combined years of heavy litigation experience and are highly skilled in their
24 profession. Considering the nature of this case, I am satisfied that the records of hours kept by
25 claimant's counsel, and their hourly rates for counsel and paralegals was justified; that the hours
26 for which the claimant was billed were spent. A review of the 97 exhibits provided by
27 respondent demonstrates the nature of the litigation pre-Arbitration; the extensive motions that
28 were litigated, the appellate matters and the time spent for preparation of the arbitration
29 proceedings. I find that the fees charged by counsel for the respondents was reasonable.

3

Exhibit  8 ,
P. 121

CC 00520

THE ATTORNEYS FEES AWARD:

The attorneys fees award is the sum of $1,180,481.05: Judgment for respondent Isaac Larian in the sum of $1,180,481.05 against respondent Farhad Larian.

DATED: February 3, 2006

_____

Arbitrator, Judge Alan B. Haber(ret.)

4

Exhibit  8
P. 122

CC 00521

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is ADR Services, Inc., 1900 Avenue of the Stars, Suite 250 Los Angeles, California 90067.

On February 3, 2006, I served the foregoing document described as the **FINAL ARBITRATION AMENDMENT FOR RESPONDENT'S MOTION FOR PREVAILING PARTY ATTORNEY'S FEES** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Richard Kellner, Esq.
Michael R. Brown, Esq.
KABATECK BROWN & KELLNER
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071

Robert G. Wilson, Esq.                     Larry R. Feldman, Esq.
COTKIN COLLINS & GINSBURG                  Robert Turner, Esq.
300 South Grand Avenue, 24th Floor         KAYE SCHOLER
Los Angeles, California 90071              1999 Avenue of the Stars, Suite 1600
                                          Los Angeles, California 90067

___X___   **BY U.S. MAIL,** I caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

___X___   **BY FACSIMILE,** I caused such to be faxed to the attorneys on February 3, 2006.

_____   **BY PERSONAL SERVICE** I caused such envelope to be delivered by hand to:

___X___   **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____   **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 3, 2006 at Los Angeles, California.

_Terry Shea_

Received   Feb-03-2006   05:14pm   From-          To-COTKIN COLLINS AND G   Page  006

**CC 00522**

Exhibit _8_ ,
P. _173_

**Exhibit 9**

11-17-05

1   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
2   O'MELVENY & MYERS, LLP
    400 South Hope Street
3   Los Angeles, California 90071-2899
    Telephone: (213) 430-6000
4   Facsimile: (213) 430-6407
    email:   dtorres@omm.com
5
    DALE M. CENDALI (of counsel, not admitted in
6   California)
    O'MELVENY & MYERS, LLP
7   7 Times Square
    New York, New York 10036
8   Telephone: (212) 326-2000
    Facsimile: (212) 326-2061
9
    Attorneys for Third Party,
10  MGA Entertainment, Inc.

11

12                    **ARBITRATION BEFORE**

13                    **ADR SERVICES, INC.**

14

15   FARHAD LARIAN,                    **ADRS Case No.:  05-2096-ABH**

16          Plaintiff,                 **THIRD PARTY MGA
                                        ENTERTAINMENT INC.'S MOTION**
17          v.                         **FOR PROTECTIVE ORDER**

18   ISAAC LARIAN,

19          Defendant.

20

21

22

23

24

25

26

27                                     **CC 00342**

28

                                       MGA'S MOTION FOR PROTECTIVE
                                       ORDER

Exhibit  9  ,
P.  124

## I.   INTRODUCTION

Third party, MGA Entertainment Inc., ("MGA") has received a subpoena from Plaintiff, Farhad Larian ("Farhad Larian"), requesting that MGA produce documents that contain an extensive amount of highly confidential, commercially sensitive material. Farhad Larian has already demonstrated a disregard for the confidentiality of MGA's proprietary and trade secret information *and* his willingness to cooperate with MGA's competitors and adversaries in other litigation.  MGA has also received word that Farhad Larian has issued subpoenas to and intends to call as witnesses many of its key employees and former employees and contractors to testify about MGA's product development. MGA seeks a protective order, accordingly, to ensure that its documents, their contents, and testimony elicited in this arbitration concerning MGA's business operations cannot be disseminated to others outside of the arbitration and will not be used for any purpose other than the arbitration.

## II.   BACKGROUND FACTS

MGA is the maker of the highly successful "Bratz" line of dolls and related products.  After its initial launch in Spain in June 2001, MGA introduced those dolls in the United States later that year.  The "Bratz" dolls, with their hip, edgy fashions were a sudden – and surprising – hit among the "tween"-age girls who had years ago lost interest in the long-reigning but stale "Barbie" doll.  (*See* Declaration of Daphne Gronich ("Gronich Decl.") filed concurrently ¶ 2.)

In April 2004, Mattel, Inc. filed suit against Carter Bryant, a consultant for MGA who had created the initial "Bratz" drawings.  Bryant, a former Mattel employee, had twice left his employment at Mattel, the second time to work for MGA in October 2000. Although it had been three and a half years since Bryant had left Mattel, Mattel filed suit apparently after reading a 2003 *Wall Street Journal* article that inaccurately reported that MGA had begun working on the "Bratz" dolls in 1999 after conducting a fashion doll "contest."  (*Id.* ¶ 3.)  At that time, Mattel was suffering substantial losses in a variety of

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00343

1   product lines including "Barbie," which reportedly was being dethroned even more

2   rapidly with the increase in the "Bratz" dolls' popularity.  According to published reports,

3   the "Barbie" line accounted for the great majority of Mattel's revenues.  (*Id.*)

4        Since that time, MGA has learned that Mattel has been in contact with a wide

5   variety of people involved in litigation against MGA.  First, Mattel entered into an

6   information sharing agreement with a company in Hong Kong that was producing and

7   distributing counterfeit "Bratz" products.  Second, Mattel has been in contact with Art

8   Attacks, LLC, a company suing MGA for purported trademark infringement of its

9   "Spoiled Brats" airbrush art.  Finally, and importantly, Mattel appears to have been

10  providing Mr. Larian with assistance in this arbitration.  All of Mattel's efforts have been

11  designed to undermine MGA's rights to the "Bratz" line of products in a last-ditch effort

12  to save its ailing "Barbie" line.  (*Id.* ¶ 4.)

13        Mattel has been unable to conduct discovery of MGA in its case against Bryant

14  since May 2005 because of an interlocutory appeal Mattel filed at that time.  (*Id.* ¶ 5.)  In

15  Farhad Larian, however, Mattel has found an ally eager and willing to help Mattel bypass

16  the discovery stay.  Using home address lists he improperly took from MGA, Farhad

17  Larian has spent the past few months repeatedly calling MGA's current and former

18  employees and contractors in an effort to obtain confidential information about MGA's

19  product development.  He persisted in these efforts even though MGA – and those he

20  called – complained about his harassing conduct.  MGA also learned that Mattel was

21  calling many of these very same witnesses at or about the same time that Farhad Larian

22  was calling them.  (*Id.* ¶¶ 6-7.)  And, MGA has learned that Farhad Larian apparently has

23  obtained information from Mattel and provided that information to Art Attacks.  (*See*

24  Declaration of Paula E. Ambrosini ("Ambrosini Decl.") filed concurrently ¶¶ 3-4.)

25        MGA is not a party to the instant dispute between its CEO Isaac Larian and his

26  brother Farhad Larian, and has not participated in this matter.  MGA is nonetheless

27  legitimately concerned that Farhad Larian seeks to use this arbitration as a means of

28  obtaining information that he can then disclose, to MGA's detriment, to MGA's

1  competitors and adversaries.  (Gronich Decl. ¶ 8.)  Neither MGA's corporate interest nor

2  the interests of its many employees who have worked tirelessly on the "Bratz" line of

3  products should be compromised in this way because of what is essentially a *dispute*

4  *among family members.* (*Id.* ¶ 14.)

5  **III.    MGA IS ENTITLED TO PROTECT FROM DISCLOSURE THE
       CONFIDENTIAL, PROPRIETARY, TRADE SECRET AND
6       COMMERCIALLY SENSITIVE INFORMATION SOUGHT BY FARHAD
       LARIAN.**

7        The ADR rules specifically give the arbitrator power and authority to "issue orders

8  to protect the confidentiality of proprietary information, trade secrets or other sensitive

9  information."[1]  (*See* ADR Rule 27.)  A third party – such as MGA is here – is

10  presumptively entitled to a protective order limiting the disclosure of its confidential,

11  proprietary information.  *See. e.g., Harris v. Sup. Ct.,* 3 Cal. App. 4th 661, 668 (1992)(trial

12  court required to limit the scope of inquiry to the extent necessary to a fair resolution of

13  the case).  Such an order is appropriate and should issue here.[2]

14        **A.    Farhad Larian Seeks To Obtain and Use Confidential and Trade
             Secret Documents Belonging to MGA.**

15

16        At the hearing, Farhad Larian seeks to obtain and use confidential and proprietary,

17  trade secret documents.  Farhad Larian has issued a subpoena for, among other things,

18  internal and private financial information relating to MGA's product pricing, costs, sales

19  and projections.  He also seeks documents that contain trade secret and proprietary details

20  relating to MGA's development, marketing, licensing and sale of a wide array of products,

21  including MGA's "Bratz" line of fashion dolls and related toys and accessories.  Indeed,

22  some of the documents depict trade secret ideas, designs and concepts that have not yet

23

24  [1] Even if the ADR rules do not specifically apply to this arbitration, Rule 27 is representative of
   the powers the arbitrator has.  California and Federal Rules of Civil Procedure confer similar
25  power and authority on California and Federal Courts Judges to issue protective orders limiting
   the use and dissemination of confidential information.  *See* Cal. Code Civ. Proc. 2031.060 (b)(5)
26  (authorizing court to order that "a trade secret or other confidential research, development, or
   commercial information not be disclosed, or be disclosed only to specified person or only in a
27  specified way"); Fed. R. Civ. Proc. 26 (c)(7) (authorizing court to order "that a trade secret or
   other confidential research, development, or commercial information not be revealed or be
28  revealed only in a designated way").
   [2] A Proposed Order is attached hereto as Exhibit A.

- 4 -

MGA'S MOTION FOR PROTECTIVE
ORDER

Exhibit 9,
P. 127

**CC 00345**

1  been commercially marketed by MGA.  Others include detailed specifications for "Bratz'"

2  eye designs and facial features, including paint colors for the eyelids, eye shadow, iris

3  color, lip and cheek color and color placement, and detailed specifications for "Bratz" hair

4  characteristics, including color, weight and curl size.  Still others disclose confidential

5  product production and development information including production and development

6  schedules lead times, capacity information and ramp-up times.  Certain documents

7  additionally disclose confidential concept drawings and proposed names of "Bratz"

8  characters that have never been publicly revealed.  (Gronich Decl. ¶ 9.)  Apart from the

9  fact that such information cannot reasonably be deemed relevant to a dispute relating to

10  events taking place in 2000 well before the "Bratz" dolls were fully developed, finalized

11  or commercially introduced, this type of information too is unquestionably proprietary,

12  trade secret or competitively sensitive information and, thus, entitled to protection.  ADR

13  Rule 27; *see Sprinturf, Inc. v. Southwest Recreational Industries, Inc.,* 216 F.R.D. 320,

14  324 (E.D.Pa. 2003)(finding proprietary information regarding the development of product

15  line to be confidential, sensitive and appropriate for protective order); *see also, e.g., Vacco*

16  *Inds., Inc. v. Van Den Berg,* 5 Cal. App. 4th 34 (1992)(drawings, plans, designs and

17  similar documents relating to a company's products may constitute trade secrets);

18  *Components for Research, Inc. v. Isolation Prods., Inc.,* 241 Cal. App. 2d 726, 728-29

19  (1966)(production techniques and manufacturing "know-how" may be trade secret); *MAI*

20  *Sys. Corp. v. Peak Computer, Inc,* 991 F.2d 511, 522 (9th Cir. 1993)(technical data, not

21  generally known to the public, is trade secret); *Formulabs, Inc. v. Hartley Pen Co.,* 318

22  F.2d 485 (9th Cir. 1963)(formulas and dyes used in product manufacturing, and product

23  testing procedures, are trade secret).

24       Indeed, the detailed information that Farhad Larian has asked MGA to produce

25  would provide a virtual road-map for the production of a "Bratz" doll and could obviously

26  be used to MGA's competitive injury and disadvantage.  Collectively, the documents

27  disclose exactly how MGA took "Bratz" from idea, to concept, to design, to production,

28  how long it took, what steps MGA followed, what its internal approval processes were,

- 5 -

Exhibit __9__,
P. __128__

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00346

1   what designs it considered and rejected and similar information.  Such information would

2   be of great value to MGA's competitors and, in the wrong hands, could wreak havoc on

3   MGA's business, jeopardize its competitive position in the toy industry, and cause MGA

4   severe and extensive damage.

5   **B.**   **Farhad Larian Seeks Testimony From MGA Personnel and Contractors Concerning MGA Proprietary and Trade Secret Information.**

6

7   The disclosure of its documents is not MGA's only concern.  Many of the people

8   that Farhad Larian intends to call as witnesses at the arbitration, apparently to testify at the

9   arbitration about the conception and development of the "Bratz" dolls, will also be

10  prominent witnesses in MGA's litigation with Mattel on the same subjects.  Thus, the

11  testimony generated during the arbitration is also likely to disclose MGA trade secrets and

12  proprietary and confidential financial and product development information.  MGA, as a

13  third party, however, will not be able to object or otherwise attempt to curtail such

14  disclosures.  Nor will MGA be able to cross-examine the witnesses or present rebuttal

15  testimony and evidence.  MGA is, thus, also concerned about the potential disclosure of

16  information obtained through the testimony over its witnesses during the arbitration hearing.

17  **C.**   **MGA Has Legitimate Concerns That Farhad Larian May Share Its Confidential, Proprietary Trade Secret Information With MGA's Competitors And Adversaries.**

18

19  MGA is – and has reason to be – concerned that documents produced and

20  testimony generated during the course of this arbitration will be disclosed to its

21  competitors or to other parties adverse to MGA.  MGA is currently involved in a high-

22  stakes litigation with its fiercest competitor, Mattel, over the ownership rights to the

23  "Bratz" line of dolls (*Mattel v. Bryant,* case number CV 04-9059 NM (RnBx) in the

24  United States District Court for the Central District of California.)[3].  In the course of that

25  litigation, MGA has learned that Mattel has entered into at least one document sharing

26  ―――――――――――――――

[3] In a nutshell, Mattel contends that it owns the rights to the "Bratz" line of dolls by virtue of the

27  fact that the creator of the original "Bratz" artwork is a former Mattel employee.  Mattel sued the creator in April 2004, and MGA has intervened to protect its rights.  That case is pending in the

28  United States District Court in Los Angeles but all discovery in the case is currently stayed pending the outcome of an interlocutory appeal over federal jurisdiction.

- 6 -

Exhibit 9 ,
P. 129

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00347

1   agreement with a party adverse to MGA in another litigation, through which Mattel has

2   received information and documents produced in that case. (Gronich Decl. ¶ 4;

3   Ambrosini Decl. ¶ 2.)  Because Mattel currently manufactures and sells fashion dolls that

4   directly compete with "Bratz" dolls in the same market for the same customers, it

5   obviously has a keen interest in obtaining any competitively sensitive information it can

6   regarding "Bratz," from any source.  The Protective Order in place in the *Mattel v. Bryant*

7   case, however, prevents Mattel from using the information that it obtains there for

8   purposes other than that litigation.  If Mattel could get the same information from another

9   source, however, such as Farhad Larian, it would potentially be free to use the information

10  in any way it chose. (Ambrosini Decl. ¶ 2.)

11          Farhad Larian appears to be in close, cooperative contact with Mattel and other

12  MGA adversaries.  He has already obtained a partial transcript of a deposition taken in the

13  Mattel litigation (which could have been obtained only from Mattel) and given it to

14  another party adverse to MGA, Art Attacks Ink, LLC, who is suing MGA for trademark

15  infringement in the Southern District of California. (Ambrosini Decl. ¶¶ 3-4.)  In addition

16  to this, Farhad Larian has moved to intervene in the Art Attacks' case for the sole purpose

17  of obtaining confidential MGA documents. (Ambrosini Decl. ¶ 5.)[4]  Indeed, Farhad

18  Larian has used this arbitration as an excuse for trying to obtain access to confidential

19  documents in the Art Attacks case – claiming he needs them for the arbitration when, in

20  fact, the arbitration will be over before his motion will be heard.[5]  (*Id.*)

21          **D.      MGA Is Entitled To Stringent Protective Measures To Prevent**

22          **The Disclosure Of Its Confidential, Proprietary and Trade Secret**
            **Information.**

23          There is no reason that MGA should have to run the risk that its confidential,

24  proprietary and trade-secret information may become freely available to all, just because it

25  and its employees have been served with third-party subpoenas.  On the contrary, the

26  Larian arbitration is a private proceeding, arranged by contract; it is not a public trial.  *See*

27  ───────────────
    [4] A true and correct copy of the Motion is attached to the Ambrosini Declaration as Exhibit 1.

28  [5] Farhad Larian's Motion for Intervention to allow him access to confidential information in the
    Art Attacks case is currently scheduled to be heard on December 12. (Ambrosini Decl. ¶ 5.)

MGA'S MOTION FOR PROTECTIVE
ORDER

Exhibit  9  ,
P.  130

CC 00348

1   *O'Flaherty v. Belgum,* 115 Cal. App. 4th 1044, 9 Cal. Rptr. 3d 286 (2004)("Arbitration is

2   a private proceeding, arranged by contract.")(citing *Rifkind & Sterling, Inc., v. Rifkind,* 28

3   Cal. App. 4th 1282, 1290, 33 Cal. Rptr. 2d 282 (1994)).  In fact, ADR Rule 13 requires

4   that "[t]he arbitrator and ADR Services shall maintain the privacy of the hearings unless

5   the law provides to the contrary."  Thus, whereas a public Court may balance the public's

6   right to access against a litigant's need to protect confidential information, such

7   considerations have no application here.  Indeed, as ADR notes on its website, the private,

8   confidential nature of arbitration is one of its attractive benefits.  (*See*

9   adrservices.org/processes.htm (mentioning a number of advantages that arbitration

10   provides over a court trial, including that "the arbitration process is private and

11   confidential" and stating that "[c]ontractual arbitration and arbitration by stipulation are

12   private. . .").

13          An appropriate Protective Order restricting access to and use and dissemination of

14   MGA's documents and transcripts of the arbitration will fairly balance the interests of all

15   concerned, allowing Farhad Larian to arbitrate his claims, while guarding against

16   potentially harmful side effects that could compromise MGA's proprietary interests and

17   cause competitive injury and disadvantage to MGA.  *See e.g., Moskowitz v. Sup. Ct.,* 137

18   Cal. App. 3d 313, 318-19 (1982)(limiting use of information to purposes related to lawsuit

19   and limiting access to persons with a legitimate interest in the lawsuit); *Brown Bag*

20   *Software v. Symantec Corp.,* 960 F.2d 1465, 1470 (9th Cir. 1992)(limiting access to trade

21   secret material to counsel of record); *see also, e.g., Liberty Felder v. Curtiss Anthony*

22   *Corp.,* 90 F.R.D. 80, 83 (S.D. Ohio 1981) (employing protective order to limit access and

23   use confidential information); *Chesa Intern., Ltd. v. Fashion Associates, Inc.,* 425 F.

24   Supp. 234, 237 (S.D.N.Y. 1977) (restricting access to competitive information to

25   "plaintiff's attorneys *only*")(emphasis in original); *Safe Flight Instr. Corp. v. Sundstrand*

26   *Data Control Inc.,* 682 F. Supp. 20, 22 (D. Del. 1988) (limiting access to attorneys only

27   of, among other things, confidential research and development information in patent

28   case); *Borden Co. v. Sylk,* 289 F. Supp. 847, 848-49 (E.D.Pa. 1968) (ordering discovery

- 8 -

MGA'S MOTION FOR PROTECTIVE ORDER

1    on condition that it not be revealed or used for any purpose other than preparation for

2    trial); *Miles v. Boeing Co.,* 154 F.R.D. 112, 116 (E.D.Pa. 1994) (placing restrictions on

3    access and use of confidential information).

4           Specifically, MGA requests an order – such as that appended hereto as Exhibit A –

5    providing (1) that the documents that MGA produces pursuant to the subpoena, the

6    information contained therein, and the testimony elicited during the arbitration shall not

7    be used for any purpose other than arbitrating Farhad Larian's claims against Isaac Larian;

8    (2) that, in keeping with the protective orders entered by the United States District Courts

9    for the Central and Southern Districts of California (as well as other tribunals), the

10   documents produced by MGA or concerning MGA's business and the testimony about

11   same shall be deemed "Attorneys Eyes Only" and Farhad Larian shall not be permitted to

12   view, obtain, access or copy those documents or the transcripts of the arbitration and that

13   such documents, transcripts and any copies thereof, shall be destroyed at the completion

14   of the arbitration and the expiration of any appeal (or time to appeal) thereof; and (3) that

15   neither Farhad Larian nor his counsel shall be permitted to share or disseminate the

16   documents or transcripts to others, remove them from the arbitration, make copies of

17   them, or inform third parties of their existence or content or otherwise disclose the same to

18   anyone, unless compelled by law.  In other words, whatever may be disclosed about

19   MGA's business, in privacy and confidence during the course of the arbitration, should

20   remain private and confidential both during – and after – the arbitration.  In addition,

21   MGA respectfully requests that the arbitrator exercise discretion and not allow Farhad

22   Larian to explore areas of confidential information that have no bearing on the instant

23   arbitration.

24          ADR Rule 27 gives the arbitrator power and authority to issue such an order and to

25   exercise such discretion.  For the reasons discussed, there is ample reason to do so.

26   MGA's Motion should be granted.

27   **IV.   CONCLUSION**

28          MGA's should be granted a Protective Order to restrict access to confidential,

- 9 -

MGA'S MOTION FOR PROTECTIVE ORDER

Exhibit  9  ,

P. 132

CC 00350

1   proprietary, trade secret and commercially and competitively sensitive information that

2   may be disclosed, in documents or testimony, during the course of this arbitration, limit

3   the use of such information to the purposes of this proceeding, and prohibit the

4   dissemination of such information to others not party to the proceeding.

5

6         Dated: November 14, 2005

7                                        DIANA M. TORRES
                                         PAULA E. AMBROSINI
8                                        O'MELVENY & MYERS LLP

9                                        By: _____
10
                                            Paula E. Ambrosini
11                                       Attorneys for Third-Party,
                                         MGA Entertainment, Inc.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                       CC 00351

28

                              - 10 -
                                              MGA'S MOTION FOR PROTECTIVE
                                                              ORDER

Exhibit 9 ,
P. 133

# EXHIBIT A

Exhibit 9,
P. 134

CC 00352

1   DIANA M. TORRES  (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
2   CARLOS M. LAZATIN  (S.B. #229650)
    O'MELVENY & MYERS, LLP
3   400 South Hope Street
    Los Angeles, California 90071-2899
4   Telephone:  (213) 430-6000
    Facsimile:  (213) 430-6407
5   email:  dtorres@omm.com

6   DALE M. CENDALI (of counsel, not admitted in
    California)
7   O'MELVENY & MYERS, LLP
    7 Times Square
8   New York, New York 10036
    Telephone: (212) 326-2000
9   Facsimile:  (212) 326-2061

10  Attorneys for Third Party,
    MGA Entertainment, Inc.

11

12              **ARBITRATION BEFORE**

13              **ADR SERVICES, INC.**

14

15  FARHAD LARIAN,                    **ADRS Case No.:  05-2096-ABH**

16              Plaintiff,            **[PROPOSED] PROTECTIVE ORDER**

17              v.

18  ISAAC LARIAN,

19              Defendant.

20

21

22

23

24

25

26

27

28

LA2:782144.1                                              **CC 00353**

Exhibit 9
P. 135

1. **PURPOSES AND LIMITATIONS**

This arbitration will involve the disclosure of documents and information that should be used only for the purpose of prosecuting, defending, or attempting to settle this arbitration and for no other purpose, including any other dispute involving any Party hereto or any non-party hereto.  Accordingly, the following Protective Order is hereby imposed upon the parties to this arbitration, Isaac Larian and Farhad Larian, and their employees, consultants, retained experts, counsel and support staff (the "Parties").

2. **SCOPE**

Protection is conferred by this Protective Order on all documents produced by third party MGA Entertainment, Inc. ("MGA") to Farhad Larian in response to a subpoena, all information copied or extracted therefrom, all copies, excerpts, summaries, or compilations thereof, and all testimony presented to the arbitrator, and transcripts of such testimony from any current or former MGA employee or contractor pertaining to MGA's business.  ("Protected Material").

3. **DURATION**

The obligations imposed by this Protective Order shall remain in effect during and after this arbitration and until the parties, Isaac Larian *and* Farhad Larian, and MGA agree otherwise, in writing, or an arbitrator or court order otherwise directs.

4. **ACCESS TO AND USE OF PROTECTED MATERIAL**

4.1    **Basic Principles:**  The Parties may use Protected Material in connection with this case only for prosecuting, defending or attempting to settle this arbitration and may not use such material for any other purposes, including in connection with any other matters, including between the same parties.  Protected Material may be disclosed only to the categories of persons and under the conditions described in this Protective Order. When the arbitration has been terminated, the Parties must comply with the provision of section 5 below (FINAL DISPOSITION).  Protected Material must be stored and maintained by the Parties at a location and in a secure manner that ensure that access is

- 2 -

CC 00354

Exhibit 9 ,
P. 136

1    limited to the persons authorized and for the purposes permitted under this Protective

2    Order.

3        **4.2    Disclosure of Protected Material:**  Unless otherwise ordered by a court or

4    jointly permitted in writing by Isaac Larian *and* MGA, Protected Material may be

5    disclosed only to:

6            (a)      counsel of record in this arbitration and employees of said counsel to

7    whom it is reasonably necessary to disclose the information for this arbitration, and who

8    have specifically agreed to be bound by the terms of this Protective Order by executing

9    the undertaking attached hereto as Exhibit A;

10           (b)      experts to whom disclosure is reasonably necessary for this

11   arbitration, and who have specifically agreed to be bound by the terms of this Protective

12   Order by executing the undertaking attached hereto as Exhibit A;

13           (c)      the arbitrator and his personnel;

14           (d)      court reporters, their staffs, and professional vendors to whom

15   disclosure is reasonably necessary for this arbitration, and who have specifically agreed to

16   be bound by the terms of this Protective Order by executing the undertaking attached

17   hereto as Exhibit A;

18           (e)      witnesses in the arbitration to whom disclosure is reasonably

19   necessary, and who have specifically agreed to be bound by the terms of this Protective

20   Order by executing the undertaking attached hereto as Exhibit A; and

21           (f)      the author of the document or the original source of the information.

22       **4.3    Identifying Legend:**  Protected Material shall be appropriately identified

23   and marked with the legend "Confidential" or "Confidential – Attorneys Only."

24   Transcripts shall further include a statement substantially in the following form:

25           This transcript contains material subject to Protective Order.  The transcript may not

26           be used for any purpose other than this arbitration and its contents may not be

27           disclosed to anyone other than those persons permitted to access Protected Material

28           under the terms of the Protective Order.

LA2:782144.1                           - 3 -

Exhibit 9
P. 137

CC 00355

1    **4.4**    <u>Other Restrictions on Access to and Use of Protected Material:</u>  No

2    party or person shall be permitted to share or disseminate the documents produced by

3    MGA or the transcripts of these proceedings to others, remove them from the arbitration,

4    make copies of them, or inform third parties of their existence or content or otherwise

5    disclose the same to anyone, unless compelled by law.

6           In short, this is a private proceeding; whatever may be disclosed about MGA's

7    business, in privacy and confidence during the course of the arbitration, should remain

8    private and confidential both during – and after – the arbitration.

9    **5.    FINAL DISPOSITION**

10          Unless otherwise ordered or jointly agreed in writing by Isaac Larian *and*

11   Farhad Larian, within 10 days after the final termination of this arbitration and any appeal

12   (or, if no notice of appeal is filed, the deadline for filing a notice of appeal), all Protected

13   Material must be returned to its original source or destroyed, including all copies,

14   abstracts, compilations, summaries or any other form of reproducing or capturing any of

15   the Protected Material.  Whether the Protected Material is returned or destroyed, each

16   Party must submit a written certification to the other Party, *and* the person or entity from

17   whom the Protected Material was secured or subpoenaed, by the 10 day deadline that

18   identifies (by category, where appropriate) all of the Protected Material that was returned

19   or destroyed and that affirms that the Party has not retained any copies, abstracts,

20   compilations, summaries or other forms or reproducing or capturing any of the Protected

21   Material.  Notwithstanding this provision, counsel of record for each Party is entitled to

22   retain an archival copy of all pleadings, motion papers, legal memoranda, correspondence

23   or attorney work product.  Any such archival copies that contain or constitute Protected

24   Material, however, shall otherwise remain subject to this Protective Order.

25   **6.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION**

26

27          If a Party is served with a subpoena or an order issued in other litigation that

28   would compel disclosure of any Protected Material, the Party receiving the subpoena must

Exhibit  9
P. 138

notify the other Party *and* the person or entity from whom the Protected Material was secured or subpoenaed, in writing, immediately and in no event more than two business days after receiving the subpoena or order.  Such notification must include a copy of the subpoena or court order.

The Party receiving the subpoena also must immediately inform, in writing, the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Protective Order.  In addition, the Party receiving the subpoena must deliver a copy of this Protective Order promptly to the Party in the other action that caused the subpoena or order to issue.

The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and afford the Parties in this case *and* the person or entity from whom the Protected Material was secured or subpoenaed, an opportunity to try to protect whatever confidentiality interest such Party may have in the court from which the subpoena or order issued.

SO ORDERED:

DATED:_____                    _____

1  UNDERTAKING RE
   PROTECTIVE ORDER
2

3              UNDERTAKING OF _____
4

5

6  I, _____, declare:
7

8      My address is _____

9  My present occupation is _____

10

11     1.    I have received a copy of the Protective Order operative in this action,

12  ADRS Case No. 05-2096-ABH.  I have carefully read and understand the provisions of

13  the Protective Order.

14     2.    I will comply with all of the provision of the Protective Order.  I will hold in

15  confidence, and will not disclose to anyone other than those persons specifically

16  authorized by the Protective Order, and will not copy or use except for the proceedings

17  concerning the matters in issue between the parties, any and all Protected Material that I

18  receive.

19     Executed this ____ day of _____, at _____. I declare under

20  penalty of perjury under the laws of California that the foregoing is true and correct.

21

22              _____

23

24

25

26

27

28

## PROOF OF SERVICE

I, Linda M. Rich, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California  90071-2899.  On November 14, 2005, I served the within documents:

1.   **THIRD PARTY MGA ENTERTAINMENT INC.'S MOTION FOR PROTECTIVE ORDER**

| | |
|---|---|
| ☒ | by transmitting via facsimile machine the document(s) listed above to the fax number(s) set forth below on this date.  The outgoing facsimile machine telephone number in this office is (213) 430-6407.  The facsimile machines used in this office create a transmission report for each outgoing facsimile transmitted.  A copy of the transmission report(s) for the service of this document, properly issued by the facsimile machine(s) that transmitted this document and showing that such transmission was (transmissions were) completed without error, is attached hereto. |
| ☒ | by transmitting via e-mail the document(s) listed above to the e-mail address(s) set forth below on this date. |
| ☒ | by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope designated by the carrier, with delivery fees paid or provided for, for delivery the next business day to the person(s) listed above, and placing the envelope for collection today by the overnight courier in accordance with the firm's ordinary business practices.  I am readily familiar with this firm's practice for collection and processing of overnight courier correspondence.  In the ordinary course of business, such correspondence collected from me would be processed on the same day, with fees thereon fully prepaid, and deposited that day in a box or other facility regularly maintained by Federal Express, which is an express carrier. |

### PLEASE SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on November 14, 2005, at Los Angeles, California.

LINDA M. RICH

LA2:782602.1

CC 00359

Exhibit 9
P. 141

1

## SERVICE LIST

2

| Kabateck Brown Kellner LLP | Cotkin, Collins & Ginsburg |
|---|---|
| Michael R. Brown | Robert G. Wilson |
| Richard L. Kellner | 300 South Grand Avenue |
| 350 S. Grand Avenue | 24th Floor |
| 39th Floor | Los Angeles, CA 90071-3134 |
| Los Angeles, CA 90071 | (213) 688-9350 Telephone |
| (213) 217-5000 Telephone | (213) 688-9351 Fax |
| (213) 217-5010 Fax | rgw@ccglaw.cc |
| mrb@kbklawyers.com | |
| rlk@kbklawyers.com | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA2:782602.1

Exhibit 9 ,
P. 142

CC 00360

# Exhibit 10

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Exhibit 11

**Fred Larian**

| | |
|---|---|
| **From:** | Isaac Larian |
| **Sent:** | Friday, April 14, 2000 5:10 PM |
| **To:** | Russ, August & Kabot - Larry Russ; Fred Larian; Isaac Larian |
| **Cc:** | Eli Makabi; Leon Neman |
| **Subject:** | RE: CALL OF SPECIAL MEETING OF THE BOARD OF DIRECTORS OF |

I have no preference one way or another.

I did not ask for you to be there. Fred did.

THE ONLY ISSUES THAT WILL BE DISCUSSED AT THE MEETING ARE THOSE ON THE AGENDA AND NOTHING ELSE WILL BE ALLOWED.

Isaac

-----Original Message-----

| | |
|---|---|
| **From:** | Larry Russ [mailto:lruss@raklaw.com] |
| **Sent:** | Friday, April 14, 2000 4:14 PM |
| **To:** | Fred Larian; Isaac Larian |
| **Cc:** | Eli Makabi; Leon Neman |
| **Subject:** | RE: CALL OF SPECIAL MEETING OF THE BOARD OF DIRECTORS OF |

Reply to:  RE: CALL OF SPECIAL MEETING OF THE BOARD OF DIRECTORS OF I am not sure why anyone would want me to attend your director's meeting.  I have no vote and as Fred and Isaac know, I cannot take sides.  The only conceivable purpose of my attendance is to try to maintain calm, encourage compromise and take minutes of the meeting.  I will not render any legal opinions about the propriety of any party's position.  If the directors still want me to attend, please advise.

Isaac Larian wrote:

Larry Russ is welcome to attend the meeting in the capacity of corporate attorney and to tae unbiased notes of the meeting.

Mr. Kessler ( Fred's attorney) or my personal attorney are not allowed in the meeting. Please inform them. If they show up, security will be called for their removal of the premises.

Isaac

| | |
|---|---|
| -----Original Message----- | |
| **From:** | Fred Larian |
| **Sent:** | Friday, April 14, 2000 4:48 PM |
| **To:** | Russ, August & Kabot - Larry Russ |
| **Cc:** | Isaac Larian; Eli Makabi |
| **Subject:** | FW: CALL OF SPECIAL MEETING OF THE BOARD OF DIRECTORS OF |
| **Importance:** | High |

Dear Larry:

This confirms my request and your agreement to attend this very important meeting as ABC International's corporate attorney.  The meeting will be at 5:00PM on Monday, April 17 at our offices on Schoenborn.

Sincerely,

Fred Larian

CC by fax to Mr. Leon Neman

KBK 01300

Exhibit  11 ,
P.  166

-----Original Message-----
From:      Isaac Larian
Sent:      Tuesday, April 11, 2000 7:23 PM
To:        Eli Makabi; Fred Larian; Leon Neman
Cc:        Isaac Larian
Subject:   CALL OF SPECIAL MEETING OF THE BOARD OF DIRECTORS OF
Importance:    High

## CALL OF SPECIAL MEETING OF THE BOARD OF DIRECTORS OF
## ABC INTERNATIONAL TRADERS, INC.
### (A California corporation)

The undersigned, President of ABC INTERNATIONAL TRADERS, INC., pursuant to Section 8 of the Bylaws of ABC INTERNATIONAL TRADERS, INC., hereby calls a special meeting of the Board of Directors of this corporation on April 17th, 2000 at 5 p.m., at 16730 Schoenborn street, NH, ca 91343 for the following purpose and such business as may properly come before the Board:

1. Ratifying Isaac Larian's salary increase from $221,540.80 to $500,000 per annum, as of January 1, 2000, as compensation for his services as CEO and President of this Corporation.
2. Ratify a special bonus of $750,000 for Isaac Larian, based on the performance of the company in 1999.
3. To set up a special bonus of $1,500,000 should the EBIT of the company exceed $8,000,000 in 2000.
4. To Ratify to pay Isaac Larian a royalty of 4% on any new toy ideas he personally develops for MGA'S 2001 line.


Dated: _April 11, 2000


Isaac Larian

_____
Signed by: Isaac Larian
President of ABC International Traders, Inc.


F:\Docs\Larian\documents\call of special meeting.doc

Exhibit 11 ,
P. 167

**KBK 01301**

# Exhibit 12

CE... IFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,       )
                                    )
                PLAINTIFF,          )
                                    )       CASE NO.
        V.                          )       CV 04-9040 SGL (RNBX)
                                    )
MATTEL, INC., A DELAWARE            )       CONSOLIDATED WITH
CORPORATION,                        )       CASE NO. 04-9059
                                    )
                DEFENDANTS.         )       CASE NO.   05-2727
                                    )
                                    )
AND CONSOLIDATED ACTION (S).        )
                                    )

# C O N F I D E N T I A L

### (ATTORNEYS' EYES ONLY)

## DEPOSITION OF FARHAD LARIAN

## VOLUME I

## FEBRUARY 4, 2008



REPORTED BY:
PAULA PYBURN
CSR NO. 7304
JOB NO. 08AE084-PP

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

Exhibit 12,
P. 168

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN ) | |
| INDIVIDUAL, ) | |
| ) | CASE NO. |
| PLAINTIFF, ) | CV 04-9049 SGL(RNBX) |
| ) | |
| V. ) | CONSOLIDATED WITH |
| ) | CASE NO. 04-9059 |
| MATTEL, INC., A DELAWARE ) | AND |
| CORPORATION, ) | CASE NO. 05-2727 |
| ) | |
| DEFENDANT. ) | |
| ——————————————) | |
| ) | |
| AND CONSOLIDATED ACTION(S) ) | |
| ——————————————) | |

CONFIDENTIAL ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF FARHAD
LARIAN, VOLUME I, TAKEN ON BEHALF OF
MATTEL, INC., AT 10250 CONSTELLATION
BOULEVARD, 20TH FLOOR, LOS ANGELES,
CALIFORNIA, COMMENCING AT 9:39 A.M.,
MONDAY, FEBRUARY 4, 2008, BEFORE
PAULA A. PYBURN, C.S.R. 7304,
R.P.R., C.L.R.

1

Exhibit 12 ,
P. 169

```
1   APPEARANCES OF COUNSEL:
2   FOR M.G.A. ENTERTAINMENT, INC.:
3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     BY:  JOSE R. ALLEN, ESQ.
4    FOUR EMBARCADERO CENTER
     SAN FRANCISCO, CALIFORNIA 94111
5    (415) 984-6400
     JRALLEN@SKADDEN.COM
6
7   FOR DEFENDANT MATTEL, INC.:
8    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     BY:  MICHAEL T. ZELLER, ESQ.
9             AND
     BY:  BRIDGET A. HAULER, ESQ.
10   865 SOUTH FIGUEROA STREET
     10TH FLOOR
11   LOS ANGELES, CALIFORNIA 90017
     (213) 443-3000
12   MICHAELZELLER@QUINNEMMANUEL.COM
     BRIDGETHAULER@QUINNEMMANUEL.COM
13
14  FOR CARTER BRYANT:
15   KEKER & VAN NEST LLP
     BY:  CHRISTA MARTINE ANDERSON, ESQ.
16         (WHERE INDICATED)
     710 SANSOME STREET
17   SAN FRANCISCO, CALIFORNIA 94111
     (415) 391-5400
18   CANDERSON@KVN.COM
19
20
21
22
23
24
25
```

2

Exhibit 12 ,
P. 170

```
 1   APPEARANCES OF COUNSEL:   (CONTINUED)
 2   FOR THE WITNESS:
 3   CHRISTENSEN, GLASER, FINK, JACOBS,
     WEIL & SHAPIRO, LLP
 4   BY:  PATRICIA GLASER, ESQ.
          (WHERE INDICATED)
 5              AND
     BY:  ALISA MORGENTHALER LEVER, ESQ.
 6              AND
     BY:  JIM SCHREIR, ESQ.
 7          (WHERE INDICATED)
     10250 CONSTELLATION BOULEVARD
 8   NINETEENTH FLOOR
     LOS ANGELES, CALIFORNIA 90067
 9   (310) 553-3000
10
     ALSO PRESENT:
11
     RICHARD DANIELS,
12         IN-HOUSE COUNSEL, M.G.A. ENTERTAINMENT, INC.
     JOSH SHAPIRO
13         M.G.A. ENTERTAINMENT, INC. (WHERE INDICATED)
     STEVEN TOGAMI,
14         J.T.V. LITIGATIONS SERVICES, INC.
15
16
17
18
19
20
21
22
23
24
25
```

3

Exhibit 12,
P. 17

| | |
|---|---|
| 1 | WHAT YOU'RE REFERRING TO HERE PERTAINED TO ACTIONS | |
| 2 | BY ISAAC? | |
| 3 | MR. ALLEN:  OBJECTION. | |
| 4 | MS. GLASER:  NO FOUNDATION, ASSUMES FACTS | |
| 5 | NOT IN EVIDENCE. | 02:44:49 |
| 6 | THE WITNESS:  IF IT'S SOMETHING THAT MAY | |
| 7 | HAVE HAPPENED 30-SOME YEARS AGO, PEOPLE CHANGE, SO I | |
| 8 | DON'T KNOW. | |
| 9 | BY MR. ZELLER: | |
| 10 | Q.   YOU WERE BOTH ADULTS AT THE TIME? | 02:44:56 |
| 11 | A.   I DON'T CONSIDER MYSELF AN ADULT SOMETIMES, | |
| 12 | SO -- STILL, SO -- | |
| 13 | MS. GLASER:  AND THIS ISN'T -- THIS -- | |
| 14 | THERE'S NO FOUNDATION AS TO WHEN THIS PURPORT- -- | |
| 15 | WHO DID IT AND WHEN IT WAS PURPORTEDLY DONE. | 02:45:10 |
| 16 | MR. ZELLER:  WELL, WE'LL GET TO THAT. | |
| 17 | Q.   DIRECTING YOUR ATTENTION TO PAGE 17 OF THIS | |
| 18 | EXHIBIT, WHICH IS KS 05942.  THERE'S A SECOND BULLET | |
| 19 | POINT WHERE IT SAYS (READING): | |
| 20 | THE TRUTH THAT FARHAD DID NOT | 02:45:36 |
| 21 | HESITATE TO ALLOW YOU TO TAKE MONEY | |
| 22 | FROM THE COMPANY FOR CAROLWOOD EVEN | |
| 23 | A FEW DAYS AFTER YOU HAD ABUSED HIM, | |
| 24 | YOU PROMISED TO BRING THE MONEY BACK | |
| 25 | WITHIN SIX MONTHS AND YOU DID NOT | 02:45:47 |

207

Exhibit  12,
P.  172

1    STATE OF CALIFORNIA        )

2    COUNTY OF RIVERSIDE        )  SS.

3

4        I, PAULA A. PYBURN, CSR NO. 7304, R.P.R., C.L.R., IN

5    AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

6        I AM THE DEPOSITION OFFICER THAT STENOGRAPHICALLY

7    RECORDED THE TESTIMONY IN THE FOREGOING DEPOSITION;

8        PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST DULY

9    SWORN BY ME;

10       THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE

11   TESTIMONY GIVEN.

12       BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF THE

13   TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF REQUESTED,

14   ANY CHANGES MADE BY THE DEPONENT (AND PROVIDED TO THE

15   REPORTER) DURING THE PERIOD ALLOWED ARE APPENDED HERETO.

16

17   DATED _February 8, 2008_ .

18

19

20   _____

21   PAULA A. PYBURN
     C.S.R. NO. 7304, R.P.R.
     CERTIFIED LIVENOTE REPORTER

22

23

24

25

Exhibit 12 ,
P. 173

**Exhibit 13**

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Exhibit 14

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER