# Exhibit 15

42

HCA 1883 /2003

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
CIVIL ACTION NO. 1883 OF 2003

BETWEEN

MGA ENTERTAINMENT INC.                     1st Plaintiff

MGA ENTERTAINMENT (H.K.) LIMITED          2nd Plaintiff

and

DOUBLE GRAND CORPORATION LIMITED          Defendant


<u>AFFIRMATION OF PETER LEUNG</u>


I, Peter Leung, of Room 501A, Energy Plaza, 92 Granville Road, Tsimshatsui East, Kowloon, Hong Kong do solemnly, sincerely and truly affirm and say as follows: -


1.    I am a director and shareholder of the Defendant. I am duly authorised by the Defendant to make this affirmation on behalf of the Defendant. Unless otherwise stated, the facts deposed to herein are true and within my personal knowledge, information and belief or gleaned from the records of the Defendant.


2.    I have read copies of Writ of Summons filed on 26 May 2003, the Amended Writ of Summons filed on 20 June 2003, the Plaintiffs' Summons, the Affirmation of Lam Yuen Chak and the exhibits referred to therein, the Affirmation of Lee Shiu Cheung and the exhibits referred to therein and the Affidavit of Raymond David Black and the exhibits

1

Exhibit 15 ,
P. 181

Confidential - Attorney's Eyes Only

MGA 0885074

43

referred to therein, all filed on 18 June 2003 but only served on my solicitors in later afternoon on the 20 June 2003, which was a Friday.

3.   I make this Affirmation to oppose the application of the Plaintiffs by their Summons filed on 18 June 2003.

4.   Unless otherwise stated, I shall adopt the abbreviation contained in the Plaintiffs' affirmations.

**The Plaintiffs' claim and the Defendant's case**

5.   The Plaintiffs filed their Writ of Summons with an Indorsement of Claim on 26 May 2006 and an Amended Writ of Summons on 20 June 2003. The Defendant filed their Acknowledgement of Service of the Writ on 6 June 2003. To date, the Plaintiffs still have not filed their Statement of Claim.

6.   Despite repeated requests from the Defendant, in particular the Defendant's solicitors' letter to the Plaintiff's solicitors dated 16 May 2003 referred to in paragraph 32 and the exhibit marked "LSC-22" of the Affirmation of Lee Shiu Cheung, the Plaintiffs have still failed and/or refused to state in clear and specific terms what part or parts of the designs and drawings of the 1st Plaintiff's fashion dolls were alleged to have been copied by the Defendant. I also confirm that the contents of the said letter dated the 16 May 2003, in so far as it contains statements of facts, are true.

7.   I have been advised that the complaints of the Plaintiffs are by no means clear but doing the best one can from reading the Affirmation of Lee Shiu Cheung, they appears as follows:

2

Exhibit 15,
P. 182

Confidential - Attorney's Eyes Only

MGA 0885075

44

(i)     *The facial decoration and features of the Bratz dolls are unique and much time, effort and monetary resources have been expended in perfecting them* (para. 15 of Lee's affirmation).

(ii)    *The Bratz dolls are unique in a variety of ways including their oversized heads and individual facial decoration.... The elements of the face that can be made-up, the eyes and mouth, are exaggerated while the elements of the face that cannot be made-up, the nose, is reduced. In addition, Bratz make-up is mutli-coloured and the eyelashes are exaggerated in size but limited in number of eyelashes. The lipstick is also two-toned....* (para. 18 of Lee's affirmation).

(iii)   *In so far as this action is concerned, the Defendant has copied the facial decoration of the full and mini version of Cloe and the head, body parts and shoes of the mini version of Cloe.* (para. 20 of Lee's affirmation).

(iv)    *The Trendy Teenz is a slavish copy of the mini version of Cloe down to the shoes and its snap on function.* (para. 35 of Lee's affirmation).

(v)     *The facial decoration of the doll head design on the Bobble pen and Rocker Headz Bobbing Fashion doll is also a reproduction of the facial decoration of Cloe.* (para. 35 of Lee's affirmation).

(vi)    *Bratz is popular because of its unique funky and sassy image. I also refer to paragraph 18 hereinbefore explaining the unique facial features of the dolls. The Trendy Teenz, Rockerheadz Bobblehead Fashion Dolls and Rockerheadz*

3

Exhibit 15 ,

P. 183

Confidential - Attorney's Eyes Only

MGA 0885076

45

*Fashion Doll Bobble Pen have copied BRATZ's image in particular the eyes and lip and will dilute the exclusivity and affect the image of the BRATZ dolls.* (para. 37(ii) of Lee's affirmation).

(vii) *The BRATZ dolls and their accessories (which are not the subject matter of the action) are marketed….. (para. 22 of Lee's affirmation).*

8.  The Defendant has never copied any drawings or any artistic works of the 1st Plaintiff's fashion dolls. The Trendy Teenz, The Mini Trendy Teenz, the RockerHeadz Bobblehead Fashion Dolls and the RockerHeadz Fashion Doll Bobble Pen ("the Defendant's Dolls") are the independent creation of the Defendant and stemmed from the design of one of the lines of the Defendant's toys known as Little Big Eyes Dolls.

9.  The features of the head shape, the body parts and the shoes snap function of the Bratz Dolls are common features in dolls as illustrated hereinbelow.

**The Defendant**

10. The Defendant is a company that manufactures and sells toys to overseas buyers. I and my business partner Madam Zheng YuLing, who is an investor in the mainland China, incorporated the Defendant in 1995.

11. I am responsible for manufacturing and products development. My brother Leung Wai Hung Ken ("Ken Leung"), a director of the Defendant, is responsible for marketing and sales. He also joins in to provide ideas for developing new dolls or toys from time to time.

4

Exhibit 15 ,
P. 184

Confidential - Attorney's Eyes Only

MGA 0885077

46

12. The Defendant runs a factory in China. The Defendant's factory has a special team of skilled workers consisting of 4 members, all of them are either graduates of arts schools in China and / or experienced workers in making prototype for toys ("the Prototype Team").

**My qualification and experience**

13. I have been in the toys manufacturing business for 18 years. I graduated from the University of Hong Kong and obtained a Bachelor of Arts Degree in 1983. I completed a Toy Designs and Production Management Course at the Hong Kong Polytechnics (now known as Polytechnics University of Hong Kong) in 1985 and have worked as marketing and sales representative in various toys companies since 1985. During my employment in the toys companies, I gained extensive experience in toys designs.

14. Ken Leung is my brother. He completed his tertiary education in the United States and has obtained a Business Administration Degree in 1991. He has been in the toys business since 1993.

**Little Big Eyes Doll**

15. Since late 2000, the Defendant has been manufacturing and selling a 12 inches version of the Little Big Eyes Dolls ("Little Big Eyes Dolls"). The average sale was about 100,000 pieces each year. There are now produced and shown to me marked "PL-1" a sample of the Little Big Eyes Dolls in its packaging and a colour print out thereof.

16. The copyright in the artistic works relating to the Little Big Eyes Dolls and their packaging belongs to the Defendant.

**Mini Little Big Eyes Dolls**

5

Exhibit  15 ,
P.  185

Confidential - Attorney's Eyes Only

MGA 0885078

47

17. In April 2002, I came up with an idea to produce a mini version of the Little Big Eyes Dolls because they would be less expensive than the full version, which were usually ordered for the festive season, and therefore would have a better demand throughout the whole year.

18. I therefore instructed the Prototype Team to produce a 4 inches mini version prototype of the Little Big Eyes for display in the showing room of the Defendant's office.

19. In order to make the mini version looks more interesting, I changed the accessories to a comb and two pairs of hairgrips. The comb was a product of the Defendant and the hairgrips were purchased from the wholesalers in Guangzhou, China.

20. In July 2002, the Defendant started to manufacture and sell the mini version of the Little Big Eyes Dolls ("the Mini Little Big Eyes Dolls"). There are now produced and shown to me marked "PL-2" a sample of the Mini Little Big Eyes Dolls in its packaging and a colour print out thereof.

**Chinese Opera Singer Doll**

21. In late 2000, I planned to design a Chinese Opera Singer Doll as a combination of the existing body of the Little Big Eyes Dolls and a head of a Chinese Opera Singer with hair decorative parts and clothing.

22. I discussed with Ken Leung about my idea and asked him to prepare the drawings for the Chinese Opera Singer Doll for my consideration. There is now produced and shown to me marked "PL-3a" a copy of the drawing of the head part prepared by Ken Leung.

6

Exhibit 15 ,
P. 186

Confidential - Attorney's Eyes Only

MGA 0885079

23. I then asked the Prototype Team to make the plaster mould for the head of the Chinese Opera Singer Doll and build the prototype of the doll. There are now produced and shown to me marked "**PL-3b**" print outs of the plaster head of the Chinese Opera Singer Doll.

24. The steel mould was finished in early 2001. After a preliminary run of production it was discovered that the costs of manufacturing the decorative parts, e.g. the hair decorative pins, of the doll were too high and the idea of production of the Chinese Opera Singer Dolls had to be abandoned.

25. However, the steel mould and the design of the outline of the eyes of the Chinese Opera Singer Dolls was kept and used later in the Trendy Teenz Dolls.

**Trendy Teenz Dolls**

26. In or about February 2002, a Mr. James Connolly of Toy Depot Ltd. ("Toy Depot UK") visited my office. During the visit, he was shown samples of the Little Big Eyes Dolls. He was interested in the Little Big Eyes Dolls. He further indicated that he wished to purchase a doll, similar to the size and packaging of the Little Big Eyes Dolls but with a funky and trendy look.

27. I told him that I can modify the head and clothing of the Little Big Eyes Doll to meet his requirements and a prototype of the new doll would be prepared for his consideration.

28. Being inspired by Mr. Connolly's suggestion, I went through various websites, including one Funky Girl Model Website, on the Internet and a number of magazines and materials, e.g. The Cosmopolitan, some teenage Japanese fashion magazines for the ideas of a trendy teenage girl and some drawings of a trendy teenage girl which the Defendant had in

7

Exhibit 15 ,
P. 187

Confidential - Attorney's Eyes Only

MGA 0885080

possession. There are now produced and shown to me marked 'PL- 4a" copies of samples of the materials that I have gone through.

29. At that time I also recalled I and Ken Leung had bought from the Kiddyland in Japan a postcard of a caricature entitled "Hiphop Girl" which depicted a teenage girl holding a cigarette in a very lazy manner and I noted that the outline of her eyes were very similar to the outline of the eyes of the Chinese Opera Singer Doll. The said postcard has been lost and no copy thereof can be produced.

30. I therefore decided that my trendy teenage girl doll should also bear the similar outline of the eyes of the Chinese Opera Singer Doll (which in line with traditional Chinese opera characters possesses very prominent eye features) and asked Ken Leung to prepare the drawings of the facial features of the trendy teenage girl doll in accordance with my ideas.

31. Ken Leung handed me some drawings of the facial features of the trendy teenage girl in early May 2002. There are now produced and shown to me marked 'PL- 4b" copies of the drawing of the facial feature prepared by Ken Leung.

32. I then asked the Prototype Team to make a prototype doll head according to the drawing and using the head shape of the Chinese Opera Doll.

33. I then made further modifications on the facial features, having regard to the costs of production, of the trendy teenage girl doll and then asked the Prototype Team of the Defendant's factory to make the final prototype of the dolls which were subsequently known as Trendy Teenz Dolls.

8

Exhibit 15 ,
P. 188

Confidential - Attorney's Eyes Only

MGA 0885081

34. The sample of Trendy Teenz Dolls was accepted by Mr. Connolly in mid June 2002 and by a purchase order dated 28 July 2002. Toy Depot UK purchased 5.124 pieces of the Trendy Teenz Dolls through a distributor agent. There are now produced and shown to me marked "PL-4c" a sample of the Trendy Teenz Dolls in its packaging and a colour print out thereof.

**Mini Trendy Teenz Dolls**

35. I recall Mr. Connolly told me in or about June 2002 that he had read an article in the United Kingdom which predicted that trendy and funky dolls of five or six inches would be very popular in the coming year.

36. I therefore suggested to him that I could make a mini version of the Trendy Teenz Doll and use the packaging and accessories of the Mini Little Big Eyes Dolls.

37. Since we have experience in making mini versions of dolls, a prototype of a mini version of the Trendy Teenz Doll was prepared within a week for Mr. Connolly's consideration. There are now produced and shown to me marked "PL-5" a sample of the Mini Trendy Teenz Dolls in its packaging and a colour print out thereof.

38. Mr. Connolly was satisfied with the prototype and he placed an order, in the same purchase order for the Trendy Teenz Dolls, for 5,424 pieces of the Mini Trendy Teenz Dolls.

**Rocker Headz Bobblehead Fashion Dolls**

39. The Rocker Headz Bobblehead Fashion Dolls, other than the head part, and the packaging were designed by a designer David Larks in the United States in August 2002 through his own independent skill and labour. The heads of the Rocker Headz Bobblehead Fashion Dolls are the heads of the Trendy Teenz Dolls. There are now produced and shown to me

9

Exhibit 15 ,
P. 189

Confidential - Attorney's Eyes Only

MGA 0885082

marked "PL- 6a" copies of some drawings. an e-mail between I and David Larks and the packaging designed prepared by David Larks and "PL- 6b" a sample of the Rocker Headz Bobblehead Fashion Dolls and a colour print out thereof.

### RockerHeadz Fashion Doll Bobble Pen

40. The RockerHeadz Fashion Doll Bobble Pen was designed by me. The heads of the The RockerHeadz Fashion Doll Bobble Pens are the head of the Mini Trendy Teenz Dolls. There are now produced and shown to me marked "PL- 7" a sample of the RockerHeadz Fashion Doll Bobble Pens in its packaging and a colour print out thereof.

### The parts under complaint

### The exaggerated eyes and mouth and reduced nose

41. As mentioned at paragraph 32 hereinabove, the exaggerated eyes and mouth and reduced nose of the Trendy Teenz Dolls and Mini Trendy Teenz Dolls were made by the Prototype Team of the Defendant without any reference to any drawings of Cloe nor to any of its finished products.

42. The features exaggerated eyes and mouth and reduced nose are common in dolls and there is absolute nothing original about it. As it is well known, that is the sort of features which would give a feeling of cuteness in a doll.  There are now produced and shown to me marked certain well known brands of dolls that I are available in the market.

"PL-8"   A "Lauren Doll" which was a sample supplied by my customer. Note the eye lashes. (Dolldak)

"PL-9"   A Disney Princess "Belle". Note the eye lashes.

"PL-10"   A Barbie doll called "My Scene". Note the 2 tone lip color and interchangable clothing.

10

Exhibit 15 ,
P. 190

Confidential - Attorney's Eyes Only

MGA 0885083

52

"PL-11"    A Barbie doll called "Shoes galore".

"PL-12"    A Barbie doll called "Exotic Beauty". Note the eye lashes.

"PL-13"    A doll called "Jessica". (1999)

43. I am currently in the course of procuring more samples of other famous makers of toy dolls to demonstrate the "unique features" alleged by the Plaintiffs on their products which allegedly the Defendant has infringed the copyright are indeed common place and not original. However given the shortage of time I am yet unable to do so.

**The facial decoration**

44. As mentioned above, the facial decoration of the Defendant's Dolls were independent creation by me, Ken Leung, the Prototype Team and David Larks.

45. As I have not seen any of the exhibits of BRATZ purported produced, I would produce herewith 2 different versions of Cole which I was able to obtain from the market. They are respectively produced as "PL-14" and "PL-15". It can be seen that the eyes of the 2 version of "Cole" are quite different.

46. Furthermore, facial decoration of the Defendant's Dolls are clearly different from that of Cloe. (The following comparisons are not intended to be exhaustive but demonstrative).

<u>The mouth</u>

The corners of the Defendant's Dolls are pointed upward and depict a smiling face. The corners of the mouth of Cloe (of either version) are however pointed horizontally giving a cooler appearance. As to 2 tone colour, compare also "PL-10". This is simply common place and has nothing original about it.

11

Exhibit 15,
P. 191

Confidential - Attorney's Eyes Only

MGA 0885084

<u>The eyes</u>

(i)      The eyes are of different shape, size and colours.

(ii)     The iris have two completely different space ratios in the amount of colour fill. Cloe's eyes also fill up more of the white space in the eye balls.

(iii)    Both Trendy Teenz and the Cole" in "PL-14" have 5 eye lashes on each eye. The BARTZ second lash of the 3 lashes on the top lid of Cloe is almost of the same height as the third lash, whereas the middle lash of the Trendy Teenz is shorter, with great prominence being given to the 3rd lash. The Cole doll in "PL-15" has, on the other hand, very different eyes to "PL-14". Compare also dolls produced by other toy makers and one can see that eye lashes of this type is common place.

(iv)     The lines drawing the eyeliners are much thicker in the Defendant's Dolls. The whole of the eyes also tilt at a more acute angle that that of Cole.

**The body parts**

47. The body parts of the Defendant's dolls are the body parts of the Little Big Eyes Dolls or the Mini Little Big Eyes Dolls, the copyright of which belongs to the Defendant. I do not know in what respect the 1st Plaintiff alleges the Defendant has infringed its copyright in the body parts.

**The shoe snap on function**

48. The Plaintiffs have neither any drawings of the shoe snap on function nor any copyright thereon.

49. Furthermore, the snap on function of shoes is a common idea in dolls, and I understand what the Plaintiffs now allege infringement of copyright not design work. I am advised and verily believe that no copyright exists in an idea. It may be noticed that in any event the

12

Exhibit 15 ,
P. 192

Confidential - Attorney's Eyes Only

MGA 0885085

artistic work of the snap on shoes in the mini-Trendy Teenz are very different from that in the BRATZ range of dolls.

50. I have never seen any of the Plaintiffs' BRATZ dolls until I read a magazine entitled Plaything in late September 2002.

51. In the premises, the Plaintiffs have not demonstrated that the Defendant has infringed their copyright in the drawing of Cloe and that there is a serious question to be tried.

**Loss of business if interim injunction is ordered.**

52. The sales amount of the Trendy Teenz Dolls and the Mini Trendy Teenz Dolls in the period from July 2002 to 31 March 2003 was about HK$430,000, representing about 5 % of the total turnover of the Defendant's business.

53. I estimate that the Defendant would receive further purchase orders for the Defendant's Dolls for a total contract sum of HK$4 million up to the month of March 2004.

54. As pointed out by the Plaintiffs, compared with the 1st Plaintiff, the Defendant is a company operating in a much smaller scale and relies very heavily on the goodwill of relatively small number of customers to keep its business going. Should the Court grant the present injunction against the Defendant, it would mean that the Defendant will immediately be unable to fulfill a substantial proportion of it existing orders to customers, thus entailing loss of profit and faces possible law suits. Worse of all, the goodwill of those customers which the Defendant can ill afford would be lost. This would almost certainly have a dramatic effect on its future development of the Defendant's business, not merely on the existing line of products, but on other lines of products which are not the subject-matter

13

Exhibit 15 ,
P. 193

Confidential - Attorney's Eyes Only

MGA 0885086

this action. The loss of goodwill is something which is difficult to quantify as there are all sorts of possibilities and large number of variations. And I humbly submit that it will be unjust that an interim injunction should be granted at this stage, based as it is on some tenuous and uncertain allegations of similarities between the products of the parties, and which may have a stifling effect on the Defendant.


AFFIRMED at Messrs. Peter        )
K.H. Wong & Co., solicitors of   )
Room 707, Nan Fung Tower,        )
173 Des Voeux Road Central,      )
Hong Kong                        )
this 26th   day of June   2003   )


Before me,


Ho Tak Ming
Solicitor, Hong Kong SAR
Peter K. H. Wong & Co.


This Affirmation is filed on behalf of the Defendant.


14

Exhibit 15 ,
P. 194

Confidential - Attorney's Eyes Only

MGA 0885087

HCA 1883 /2003

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
CIVIL ACTION NO. 1883 OF 2003

Between

MGA ENTERTAINMENT INC.                    1st Plaintiff

MGA ENTERTAINMENT (H.K.) LIMITED          2nd Plaintiff

and

DOUBLE GRAND CORPORATION LIMITED          Defendant

---

AFFIRMATION OF PETER LEUNG

---

Filed on the 26th day of June 2003

PHILIP S. W. CHAN & CO.
SOLICITORS
Room 705, Nan Fung Tower
173 Des Voeux Road Central
Hong Kong
Tel. No.: 2581 2581
Fax No.: 2581 2121
Ref.: BL-2875-CIV

15

Exhibit 15 ,
P. 195

Confidential - Attorney's Eyes Only

MGA 0885088

# Exhibit 16

HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

BETWEEN

ABC INTERNATIONAL TRADERS, INC.

doing business as MGA ENTERTAINMENT                    Plaintiff

and



(1) TOYS & TRENDS (HONG KONG) LIMITED
(2) CITYWORLD LIMITED
(3) JURG WILLI KESSELRING                          Defendants

This is the marked exhibit referred to in the Third Affirmation of Lee Shiu Cheung dated the 4th day of July 2002.

| Exhibit Ref | Date | Description | Page No. |
|---|---|---|---|
| LSC-28 | 2nd July 2002 | Copy Affidavit of Isaac Larian together with exhibits | 27 |



Before me,

Chan Yiu Chee
Solicitor, Hong Kong SAR
C.L. Chow & Macksion Chan, Solicitors

Solicitor, Hong Kong SAR

C:\C-M; Documents\Sydney\03- 1135-MGA\Sec Aff of Stephen Lee-final.doc

Exhibit 16 ,
P. 196

Confidential - Attorney's Eyes Only

MGA 0883395

HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

BETWEEN

ABC INTERNATIONAL TRADERS, INC.
doing business as MGA ENTERTAINMENT                              Plaintiff

and

(1) TOYS & TRENDS (HONG KONG) LIMITED

(2) CITYWORLD LIMITED

(3) JURG WILLI KESSELRING                                       Defendants

---

### AFFIDAVIT OF ISAAC LARIAN

---

I, Isaac Larian of 16730 Schoenborn Street, North Hills, California, United States of American do make oath and say as follows: -

1.      I am the CEO of MGA and duly authorised by MGA to make this affidavit on its behalf. Unless otherwise stated, the facts and matters contained herein are either within my own personal knowledge or gleaned from books and records of MGA to which I have free access. Insofar as facts and matters that do not fall within the aforesaid category, they are related to me by the respective sources stated hereinafter and are true to the best of my information and belief. For the purpose of this affidavit, I shall adopt the abbreviations used in the First Affirmation of Lee Shiu Cheung filed on behalf of MGA on the 18th June 2002 (hereinafter referred to as "the 1st Lee Affirmation").

Exhibit 16,
P. 197

1

Confidential - Attorney's Eyes Only

MGA 0883396

2.   I have read the Affidavit of Jurg Willi Kesselring (hereinafter referred to as "the Kesselring Affidavit") and the Affirmation of Wilson Hoi Sing Lam (hereinafter referred to as "the Wilson Lam Affirmation") both filed herein on the 28th June 2002 on behalf of the Defendants.  I make this affidavit in reply thereto.   Although many matters are raised in the aforesaid affidavit and affirmation, I shall not for the purpose of this application deal with each and every point unless they pertain to this application.  However, in not dealing with each and every point, it should not be taken that I have agreed to such allegations.  For the avoidance of doubt, no admissions are made to any of the allegations contained in the Kesselring Affidavit and the Wilson Lam Affirmation unless expressly admitted by me herein and the same are denied.  I shall first deal with the Kesselring Affidavit by way of its paragraph numbers as they appear hereunder.

Paragraphs 3 to 12

3.   In these paragraphs, Mr. Kesselring attempts to paint a picture that MGA was aware of the Defendants' infringing activities as early as 31 January to 5 February 2002 during the Numberg Toy Fair by making the groundless accusation that Bandai being "the Plaintiff's agent" saw the Funky Tweenz dolls then and MGA took no action.  This bare assertion is without any evidence and cannot be any further away from the truth.

4.   I have no idea why Mr. Kesselring alleges that Bandai is MGA's agent.  In fact they are not.  Bandai is a major player in the toy industry and has hundreds of companies worldwide with thousands of employees.  Some Bandai companies in different parts of the world have become distributors of Bratz dolls.

5.   Furthermore, MGA neither attended the Nurnberg Toy Fair nor sent any representative to the said Fair.  Having seen these allegations for the first time after reading the draft of Kesselring Affidavit, I caused enquiries to be made with Bandai France.  Now produced and shown to me marked "IL-1" is a true

Exhibit 16,
P. 196

2

Confidential - Attorney's Eyes Only

MGA 0883397

copy of the email I caused to be sent to Bandai France making enquires regarding this incident and their reply. We received a reply from Masayuki Matsuo of Bandai France saying after enquiries, the Japanese gentlemen mentioned in the Kesselring Affidavit was an accounting and financial manager and not in the sales and marketing department. It was his first visit to the Nurmberg Toy Fair and apparently it seems that he took photographs as mementos.

6.   I must stress again that MGA had no knowledge of the Defendants infringing activities until the incident referred to in paragraph 17 of the 1st Lee Affirmation and if MGA had known of their infringing activities back in late January or early February 2002, MGA would have taken action immediately. MGA is a corporation that takes its intellectual property rights very seriously. Toys R Us Canada is MGA's largest customer in Canada.  Upon finding that they were dealing in the Funky Tweenz dolls MGA served them a cease and desist letter. The Defendants' allegations are purely baseless conjecture without the support of any evidence.

7.   MGA has never made an allegation that the Defendants were secretly conducting their infringing activities and there is no point for Mr. Kesselring to make these assertions.  If the Defendants had conducted their activities secretly, my legal advisors would no doubt advise MGA to obtain an *Anton Piller* against them.

8.   MGA does not have offices or associated companies in Canada.  MGA does not have any authorised distributor of Bratz dolls in Canada but instead sells directly to retailers in Canada such as Walmart, and Toys R Us using a salesman.  MGA would not have known of the availability of Funky Tweenz dolls in Canada unless MGA was notified.  And MGA was only notified of the availability of Funky Tweenz dolls in Canada on 24 May 2002.  I crave leave to refer to paragraph 24 of the 1st Lee Affirmation.

Exhibit 16 ,
P. 199

3

Confidential - Attorney's Eyes Only                                           MGA 0883398

9.   I also find it quite improbable according to the Defendants' own evidence that Funky Tweenz dolls were widely available in Canada since March 2002. I crave leave to refer to the Certificate of Canadian Safety Compliance dated 15 February 2002 exhibited as "JWK-13" to the Kesselring Affidavit. The said certificate states that shipping dates were between 6th and 19th March 2002. Taking into account of these shipment dates, even by air, it would be quite impossible logistically to store, distribute and make available these infringements at the retail level all within the month of March.

10.  The legal department of MGA has recently contacted Toys R Us Canada and we have been informed that they have about 3,000 pieces of Funky Tweenz dolls on hand and are willing to take them off the shelves once an injunction has been obtained against the Defendants.

11.  I must apologise on behalf of Lee Shiu Cheung for making the mistake that he did in paragraph 19 of the 1st Lee Affirmation. I crave leave to refer to Mr. Drevet's email exhibited as "LSC-15" to the 1st Lee Affirmation. The said email was dated 14th May 2002 and Lee Shiu Cheung mistakenly thought that was the date when Mr. Drevet visited the Tokyo Toy Fair. In the said email, Mr. Drevet expressly states, "I'm sending you a leaflet I've found on the Toys & Trends booth during the Tokyo Toy Fair". There can thus be no doubt that he visited the 1st Defendants booth during the Tokyo Toy Fair in May 2002,

Paragraphs 13 to 19

12.  I fail to understand the point made by the Defendants in these paragraphs and consequently the relevance of these matters. Insofar as the concept of the Bratz dolls are concerned, the 1st Lee Affirmation dealt with these matters to provide the Court with the background and history of the Bratz dolls and mainly the marketing strategy or concept. Furthermore, I am advised by my legal advisors that copyright law does not protect concepts or ideas *per se* but the expression of an idea in a material form. And in this case, it is the 17 design drawings exhibited as "LSC-3". The complaint made by MGA is that

Exhibit 16,
P. 200

4

Confidential - Attorney's Eyes Only

the 3 dimensional Funky Tweenz dolls have infringed the 2 dimensional drawings which are artistic works in which copyright subsists. The aforesaid, I think, would be sufficient to deal with these paragraphs but for the sake of completeness I shall deal with the dolls mentioned therein.

13.  The Bratz dolls were first exhibited in the USA in November 2000. They were further exhibited in Hong Kong in January 2001. The Bratz dolls were first publicly made available for sale at the retail level in August 2001 in the USA.

14.  I have never heard of Simba Toys GmbH & Co. and have never come across these Girlz dolls until reading the Kesselring Affidavit. Just by looking at the photographs and not having seen the samples I cannot see how these dolls can infringe MGA's copyright in the artistic works for they do not look the same. Furthermore, I do not accept that these dolls were marketed all over Europe before the Nurnberg Toy Fair without any evidence but a bare allegation coming from Mr. Kesselring.

15.  The photographs of the We Teen dolls exhibited as "JWK-6" do not resemble the Bratz dolls by just looking at the pictures.

16.  To say the Fad dolls have similar dimensions and proportions to the Bratz dolls is just sheer nonsense. One can see very clearly from the photographs that they do not. These dolls have plastic hair and square faces  Mr. Kesselring has not asserted that these dolls are published prior to the Bratz dolls.

17.  Looking at the photographs of the Sassy Secrets dolls one can see very clearly that they do not resemble the Bratz dolls at all. These are 6 inch electronic dolls which can talk. Further, they do not have change of fabric fashion and shoes that Bratz are popular for and Funky Tweenz have copied. Again Mr. Kesselring has not asserted that these dolls are published prior to the Bratz dolls.

Exhibit 16 ,
P. 201                                                    5

Confidential - Attorney's Eyes Only                                    MGA 0883400

18. In light of the foregoing, the existence of these dolls in the market can in no way impeach the originality of MGA's artistic works. Mr. Kesselring is again speculating without any evidence. Furthermore, I find it quite odd for Mr. Kesselring to say that both Funky Tweenz dolls and the Bratz dolls originate from a common source when he attempts to explain how the Defendants came up with the Funky Tweenz dolls.

19. The possibility of mere chance or coincidence is again ruled out by reason of the foregoing and Mr. Kesselring has not explained why it is so. However, what is more important is that Mr. Kesselring has not denied on oath that the Funky Tweenz dolls are similar to the Bratz dolls.

20. What Mr. Kesselring has conveniently not dealt with or he is unable to deal with is the fact that there are numerous instances of queries from MGA's customers concerning the similarity between the Funky Tweenz dolls and the Bratz dolls which points to loss of reputation and licensing income. The alleged competition in the market from the other dolls mentioned by Mr. Kesselring is again fanciful conjecture. Mr. Kesselring has also omitted to deal with other parts of the Bratz dolls that the Defendants have copied such as large changeable shoes, the body and neck.

21. I must apologise on behalf of Lee Siu Cheung again for misquoting the Defendants slogan in paragraph 32 of the 1st Lee Affirmation. This was a clerical error and MGA's solicitors have already written to the Defendants' solicitors. Now produced and shown to me marked "JL-2" a true copy of the said letter. However, this does not detract from the fact that the Funky Tweenz dolls used the tag line "kids never looked this cool" which is similar to the Bratz tag line "best friends never looked this good" which was referred to in the comparison made by Miss Treantafelles and was exhibited as "LSC-23" to the 1st Lee Affirmation. Mr. Kesselring has very conveniently omitted to deal with this point.

Exhibit 16,
P. 202

6

Confidential - Attorney's Eyes Only

MGA 0883401

22.  I fail to see any point in paragraph 19 of the Kesselring Affirmation. I am advised by my legal advisors that copyright law is territorial and each jurisdiction has its own set laws regulating copyright. MGA's cause of action is based on the Copyright Ordinance of Hong Kong and not the Federal Copyright Act of the USA. The USA registration certificates were exhibited to show that the Bratz dolls enjoy copyright protection in the USA.

Paragraphs 19-20

23.  I cannot accept the allegation that Mr. Kesselring purchased a Bratz doll in New York on 10th February 2002. His credit card statement exhibited as "JWK-10" shows he purchased something at the New York Toys R Us on 12 February 2002 for US$86.61. A Bratz doll retails in New York Toys R Us for US$14.99 and not US$86.61. Furthermore, Mr. Kesserling has not produced a receipt evidencing the purchase, which he no doubt would have kept to seek reimbursement from the 1st or 2nd Defendant as company expenses since he has said he purchases toys from competitors all the time. Further, Mr. Kesselring fails to explain why he was only showing the Bratz doll in their showroom next to the Funk Tweenz and not any of the other dolls such as Barbie, Mary Kate and Ashley which he alleges "inspired" the Defendants to make the Funky Tweenz.

24.  Although Mr. Kesselring did not misrepresent to the investigator retained by MGA that the Funky Tweenz dolls had anything to do with the Bratz dolls, this had no bearing whatsoever to MGA's copyright claim. Any misrepresentation if made, would have a bearing on a passing off claim.

Paragraphs 22-29

25.  In some of these paragraphs Mr. Kesserling has given a lot of his personal opinion on the state of the toy doll market, which I can hardly agree. Winning an award for a toy design does not mean that one follows the market closely. Furthermore, the award exhibited as "JWK-10a" was awarded to Uranium

Exhibit 16,
P. 203

7

Confidential - Attorney's Eyes Only                                                    MGA 0883402

Toys (Far East) Limited in 1992 for a fax machine and not a doll and not to Mr. Kesselring as alleged.

26.    Dressing dolls had always been a huge market for the toy industry. The Barbie doll has been around for over 43 years and has a retail turnover of US$1.5 billion a year. According to the leading USA toy market research company, TRSTS, Barbie dolls command 88.5% of the doll market last year. But the latest research results show this share has shrunken to 84.6% so far this year due to the appearance of the Bratz dolls which now command 10.1% of the market share which is the 2nd largest market share after Mattel and Barbie. Prior to the appearance of Bratz dolls, no doll could take away the market share enjoyed by Barbie. The Barbie doll has been so successful because it has been able to reinvent itself time and time again like 3 or 4 years ago, the Barbie doll range introduced a new range of dolls called the Generation Girls which is a dressing doll with a trendy look.

27.    The Lisa Frank Girl is not a well known cartoon character. It is a line of girls stationery and accessories sold in the USA. To my knowledge there has not been a Lisa Frank doll yet though we understand that a company has applied for a licence after seeing the craze in Fashion dolls inspired by Bratz.

28.    The reason why most dolls are 11 inches in height or more accurately 11 ½ inches is that it is the height of the Barbie introduced over 43 years ago and that has become the unofficial industry norm. The Bratz dolls are 10 ½ inches tall.

29.    Mary Kate and Ashley Olsen are movie stars in the USA and they are identical twin sisters hence dolls that are character merchandised under their names are called "twins" and not according to the explanation given by Mr. Kesselring. Betty Spaghetti dolls are not fashion dolls. They are pre-school plastic dolls that are completely different from Bratz.

Exhibit 16,
P. 204

8

Confidential - Attorney's Eyes Only

MGA 0883403

30.  Mr. Kesselring said he took inspiration from a lot of other dolls on the market but oddly, he never referred to the Bratz dolls.  The Bratz dolls won the People's Choice Awards of the Toy Industry which is similar to the Oscars in the film industry, as well as Doctor Toy best top 10 Toy Award and Family Fun Best Toy Award. Bratz were further cited to be the first doll ever to beat Barbie in the fashion doll category.  I find it quite inconceivable that he never referred to the Bratz dolls despite its huge success and wide media coverage evidenced by some of the sample media cuttings exhibited as "LSC-10" to the 1st Lee Affirmation.  Even the article taken from The Toy Book which he exhibited as "JWK-10c" has a whole column devoted to Bratz dolls.  The said article says and I quote, "Trying to capture some of MGA's success, a host of manufacturers are debuting personality/fashion dolls."

31.  The reason why design drawings of the dolls head had to be made was because they had to get the colour scheme of features of the head so that after moulding they can be dyed properly according to the scheme which serves as a benchmark.   This is very apparent from paragraph 21 of the Affirmation of Wilson Lam.

32.  Having taken a look at the pictures of the Barbie dolls exhibited as "JWK-12" they bear no resemblance to the Funky Tweenz but Funky Tweenz bear a striking resemblance to the Bratz dolls.

Paragraphs 30-33

33.  The safety certificates exhibited as "JWK-13" only pertain to Europe and Canada and not the USA which has more stricter requirements.  MGA's fears stated in paragraph 36 of the 1st Lee Affirmation are valid.

34.  I fail to see how that the life span of fashion dolls will only last 2 years as alleged.  The Barbie doll has been around for over 43 years.  The Defendants have not shown by way of evidence how an injunction would affect their reputation.

Exhibit 16 ,
P. 205

9

Confidential - Attorney's Eyes Only

MGA 0883404

35.    MGA is not using this action to stifle competition as alleged. MGA welcomes lawful competition but not copying. The other examples of dolls mentioned in the Kesselring Affidavit do not resemble the Brätz dolls at all. If MGA was to stifle lawful competition it would have taken legal action against those manufacturers. One must bear in mind that no one has stated that other dolls on the market resemble Bratz dolls save and except Funky Tweenz dolls. There is abundant evidence in this regard from independent third parties.

36.    Mr. Antunes of Antunes Enterprises Inc. deals in Funky Fashion dolls manufactured by the 2nd Defendant. This is quite apparent from its website. Now produced and shown to me marked "IL-3" are true copies of downloaded pages from the website of Antunes Enterprises Inc. There is no suggestion at all that these Funky Fashion dolls are anything other than Funky Tweenz dolls.

The Wilson Lam Affirmation

Paragraphs 5-11

37.    The matters raised in these paragraphs have been dealt with by me in paragraphs 3 to 11 herein.

Paragraphs 12-30

38.    In paragraph 15, Mr. Wilson Lam stated that the body for the Funky Tweenz dolls were manufactured using existing moulds of dolls of 11 ½ inches in height previously manufactured by the 1st and 2nd Defendants. These dolls have not been exhibited and moulds made for the manufacture of 11 ½ inch

Exhibit 16,
P. 206

10

Confidential - Attorney's Eyes Only

MGA 0883405

dolls cannot be used to manufacture dolls of 14-15 inches in height for the simple reason that the size of the cavity cannot be increased due to the size of the mould itself.

39. The Defendants have not adduced any evidence regarding the design process of the body and shoes of the Funky Tweenz dolls which resemble the Bratz dolls. The absence of such evidence must be taken to mean they have copied.

40. The rudimentary drawings of the facial features of the dolls exhibited as "WL-3" and "WL-4" do not resemble the Funky Tweenz dolls.

41. No design drawings for the feet or shoes of the dolls were ever exhibited and there is no evidence concerning this aspect.

42. In light of the foregoing, I cannot accept the evidence of Mr. Kesserling and Mr. Wilson Lam and the Defendants must have copied the Bratz dolls. I humbly pray that injunctions would be granted to restrain their unlawful activities.

Sworn at State of California )
County of Los Angeles )
 )
 )
Subscribed and sworn to before )
me on )
this 2 day of July 2002 )

Before me, Eve Marie Johnson

Notary Public

This affidavit is filed on behalf of the Plaintiff.

EVE MARIE JOHNSON
COMM. # 1312814
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. JULY 12, 2005

Exhibit 16,
P. 267

Confidential - Attorney's Eyes Only

MGA 0883406

HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

BETWEEN

ABC INTERNATIONAL TRADERS, INC.
doing business as MGA ENTERTAINMENT                    Plaintiff

and

(1) TOYS & TRENDS (HONG KONG) LIMITED

(2) CITYWORLD LIMITED

(3) JURG WILLI KESSELRING              Defendants

---

AFFIDAVIT OF ISAAC LARIAN

Filed this       day of       ,2002.

---

William WL Fan & Co.
507 Hang Seng Building
77 Des Voeux Road
Central
Hong Kong
Tel: 2110 2128

Exhibit 16,
P. 200

12

Confidential - Attorney's Eyes Only                                MGA 0883407

Fax: 2111 9336
Ref: WF-1595-TC/CL

HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

BETWEEN

ABC INTERNATIONAL TRADERS, INC.
doing business as MGA ENTERTAINMENT          Plaintiff

and

(1) TOYS & TRENDS (HONG KONG) LIMITED

(2) CITYWORLD LIMITED

(3) JURG WILLI KESSELRING                              Defendants

This is the marked exhibit referred to in the Affidavit of Isaac Larian sworn
on        July 2002.

| Exhibit No. | Date | Description | Page No. |
|---|---|---|---|
| IL-1 | 21 June 2002 | Copy e-mail caused to be sent by Isaac Larian to Masayuki Matsuo of Bandai France | 1-2 |
| | 24 June 2002 | Copy e-mail in reply by Masayuki Matsuo of Bandai France | |

Before me, Eve Marie Johnson

Sworn at state of California
County of Los Angeles
Subscribed and sworn to before
me on this 2nd day of July 2002

EVE MARIE JOHNSON
COMM. # 1312614
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. JULY 12, 2005

Notary Public

Exhibit 16
P. 209

Confidential - Attorney's Eyes Only                                      MGA 0883408

# Exhibit 17

HCA 2687/2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 2687 OF 2003

———————————

BETWEEN

MGA ENTERTAINMENT INC.                                    Plaintiff

and

HUNGLAM TOYS COMPANY LIMITED                    Defendant

———————————

AFFIRMATION OF LAM YUEN CHAK

I, Lam Yuen Chak of Suite 1701-1702, Central Plaza, 18 Harbour Road, Wanchai, Hong Kong, do solemnly, sincerely and truly affirm and say as follows:-

1.    I am a Director of Kroll Fact Finders Limited ("my Company"), a company incorporated under the laws of Hong Kong carrying on business in conducting investigation and enquiries relating to infringement of intellectual and industry property rights.   I am duly authorised by my Company and the Plaintiff to

1

Exhibit 17,
P. 210

Confidential - Attorney's Eyes Only                                    MGA 0884533

make this affirmation in support of the Plaintiff's application herein. Save where otherwise indicated below, the matters deposed to herein are gleaned from public documents and records or related to me by the investigators employed by my Company and are true to the best of my information and belief. Since investigators employed by my Company frequently conduct investigations, I humbly crave leave from this Honourable Court that the names of the investigators be kept confidential. The name of the investigator, hereinunder referred to as "the Investigator" who carried out the investigation herein and who reported the results to me is written on a piece of paper and sealed in the envelope now produced and shown to me marked "LYC-1".

2.     On or about 20th June 2003, my Company received instructions from Messrs. William W. L. Fan & Co., the Plaintiff's solicitors herein to investigate the Defendant to see if it had infringed the Plaintiff's copyright in its "BRATZ" dolls by selling or otherwise dealing with dolls called "SCAMPZ" or other dolls.

3.     A search was made with the Hong Kong database of the Trade Development Council ("TDC") and copy of the Defendant's company profile is now produced and shown to me marked "LYC-2". Based on the above information, a further search was conducted on "Hung Hing Industrial Co.", the Defendant's associated firm, and a copy of the search is now produced and shown to me

2

Exhibit  17  ,
P.  211

Confidential - Attorney's Eyes Only

MGA 0884534

marked "LYC-3".

4.    On or about 24th June 2003, the Investigator sent an email enquiry to the Defendant at its email address "candy@hunglamtoys.com.hk" posted in the TDC database, giving reference to their advertisement in the Hong Kong Toys magazine, Vol. 1/ 2003 issue 2, informing the Defendant that he was interested in some of the Defendant's items and requesting for some quotation on FOB HK basis.    The Investigator also told the Defendant that his company's representatives would soon come to Hong Kong.

5.    On or about 25th June 2003, an email was received from Ms. Candy Choy ("Choy") of the Defendant from the email address "candy@scampz.com" requesting for more information on the Investigator's front company. There is now produced and shown to me marked "LYC-4" copy emails from the Investigator and Candy Choy respectively.

6.    On or about 26th June 2003, the Investigator telephoned Choy to confirm the information that was required.    Later, the Investigator sent an email to Choy giving full address details of the front company.

7.    On or about 27th June 2003, an email was received from the Defendant asking for the specification of the items as required by the Investigator.    There is now

3

Exhibit 17 ,
P. 212

Confidential - Attorney's Eyes Only

MGA 0884535

produced and shown to me marked "LYC-5" copy of the said email. Later, the Investigator telephoned Choy and told her that he would be coming to Hong Kong soon and would like to visit the Defendant's company and would confirm the specification then.

8.    On 30th June 2003, the Investigator sent an email to Choy to inform her of his expected arrival time in Hong Kong and requested for a meeting with her on 3rd July 2003 at 3:00p.m.

9.    On 2nd July 2003, the Investigator telephoned Choy saying he was already in Hong Kong and a meeting was then arranged to be on 3rd July 2003 at 2:30p.m.

10.   On 3rd July 2003, the Investigator visited the Defendant's premises at the appointed time at Flat B, 14/F, Glee Industrial Building, 77-81 Chai Wan Kok Street, Tsuen Wan, New Territories, the registered office of the Defendant.

11.   On arrival, the Investigator checked the lobby directory and found the Defendant's name was listed to be situate at 14/B.

12.   The Investigator proceeded to the Defendant's office and found a signage showing two company names outside its entrance ie. Hunglam Toys Co., Ltd. and Hung Hing Industrial Co..

4

Exhibit 17 ,
P. 213

Confidential - Attorney's Eyes Only                                        MGA 0884536

13.   The Investigator entered the 900-s.q. ft. premises and was greeted by Choy and then led into the showroom. The showroom had two parts/divisions, separated by a glass partition.  One part of the showroom was totally dedicated to the display of the SCAMPZ dolls and over a hundred different styles were seen on display.

14.   Name cards were then exchanged. There is now produced and shown to me marked "LYC-6" copy Choy's name card. It can be seen that Choy's position is the Managing Director. The name card shows that a company "Hunglam International Co." is operated by the Defendant.

15.    Choy gave the Investigator a catalogue which showed the SCAMPZ dolls and over 100 different styles of them were said to be available.  There are now produced and shown to me marked "LYC-7" copies of the relevant pages of the catalogue.

16.   According to Choy, the Defendant is a family business which has been started 18 years ago and they are a manufacturer with own factory in Huizhou, Guangdong.  The factory is 16 years old, with over 600 workers.  The Defendant also occupies a flat on the 9th floor of the Glee Industrial Building. The 9th Floor is their Hong Kong office and the 14th floor is their showroom.

5

Exhibit  17 ,
P. 214

Confidential - Attorney's Eyes Only

MGA 0884537

Their main items are dolls and their main markets are US and Europe (France, Italy, Germany and UK).

17.   The Investigator took a look around both showrooms, selected a few SCAMPZ dolls and other samples, and then asked Choy for the prices.  More information was also asked of the SCAMPZ dolls.  Choy replied that SCAMPZ is a 17 inches tall fashion doll and there were over 100 different styles to choose from. The SCAMPZ dolls have been around since the end of last year.  They were made in their factory in China.  They were sold mainly to Europe but she did not specify which cities.  Three different packaging styles were available: poly bag packing, window box packing w/o accessories, and window box packing with accessories.

18.   Choy said that the pricing of the SCAMPZ could be broken down according to the different styles in four reasons as follows:

|        | Window box<br>w/o accessories | Window box<br>with accessories |
|--------|-------------------------------|--------------------------------|
| Summer | US$3.25/pc FOB HK             | US$6.40/pc FOB HK             |
| Autumn | US$3.45/pc FOB HK             | US$6.60/pc FOB HK             |
| Spring | US$3.65/pc FOB HK             | US$6.80/pc FOB HK             |
| Winter | US$4.50/pc FOB HK             | US$8.05/pc FOB HK             |

6

Exhibit 17 ,
P. 215

Confidential - Attorney's Eyes Only

MGA 0884538

19. When asked about the volume of SCAMPZ dolls sold, Choy just said "a lot" and did not comment further. The Investigator discreetly made reference to other fashion dolls such as the Plaintiffs' BRATZ dolls, but Choy made no comment.

20. The Investigator requested Choy for some samples of the SCAMPZ dolls and other items. Choy said that she did not have any extra samples at the moment and that she would prepare some for the investigator to collect in a few days' time. The Investigator offered payment and Choy prepared a handwritten list of samples and charged the Investigator HK$258 for payment of the samples in advance. There is now produced and shown to marked "LYC-8" copy list of samples.

21. After paying, the Investigator asked Choy about the different company names, Hunglam International Co. and Hung Hing Industrial Co.. Choy explained that they are group companies and they are part of Hunglam Toys Co. Ltd. (It was noted that the Company profile of Hung Hing in the TDC database listed Choy as a partner.)

22. Before leaving, the Investigator told Choy that he would call her in a few days for collection of the samples. On the way out, the Investigator noticed about 10

7

Exhibit __\7__ ,
P. __216__

Confidential - Attorney's Eyes Only

MGA 0884539

carton boxes stacked and marked "Toi-Toys" and "Veldhoven".

23.    On 8th July 2003, the Investigator called Choy and asked her if the samples were ready. Choy said that they would be ready later that afternoon and asked the Investigator to come and collect them.  So later that afternoon, the Investigator went to the Defendant's premises again and proceeded to the 9th floor instead.  No name boards or plate were seen outside the Defendant's door. The Investigator went into the 1,000-sq.ft. office and 4 or 5 people were seen working there. No samples or products were seen.  The Investigator was told to go to the 14th floor as Choy was there.

24.    The Investigator went up to the 14th floor and met Choy in the showroom. Choy told the Investigator to wait for a while as they were still packing the samples, the Investigator asked Choy if he could take some pictures of the samples as not all the styles and designs were displayed in the catalogue. Choy replied in the negative, saying it was against their company policy.  She said she would email some pictures to the Investigator instead.

25.    The Investigator selected one more SCAMPZ doll sample and asked Choy to include it in the sample invoice.  Choy charged the Investigator an additional HK$63 and added the same to the sample invoice.  Soon all the 10 samples (six object SCAMPZ dolls and four other dolls) were packed and Choy gave them

8

Exhibit 17,
P. 217

Confidential - Attorney's Eyes Only

MGA 0884540

to the Investigator along with the printed quotation and sample invoice.

25. There are now produced and shown to me marked "LYC-9 a, b, c, d, e and f" 6 SCAMPZ dolls obtained by the Investigator from the Defendant.   Further produced and shown to me marked "LYC-10" are the printed quotation and sample invoice.

Affirmed at CL Chow & Macksion
Chan, Solicitors, Rms 501-502,        )
Hang Seng Building, TT Des
Voeux Road Central, HK.               )

this ( 4th day of August 2003)

Before me,

Chan Yiu Chee

Solicitor

9

Exhibit 17 ,
P. 218

Confidential - Attorney's Eyes Only

MGA 0884541

HCA NO. 2687/2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 2687 OF 2003

———————

BETWEEN

MGA ENTERTAINMENT INC.                    Plaintiff

and

HUNGLAM TOYS COMPANY LIMITED        Defendant

———————

—————————————————————————

AFFIRMATION OF LAM YUEN CHAK

—————————————————————————

Filed on the      day of        2003

**WILLIAM W.L. FAN & CO.**
**SOLICITORS**
Room 507, 5th Floor,
Hang Seng Building,
77 Des Voeux Road Central,
Hong Kong.
Tel.:2110 2128  Fax: 2111 9336
Ref: WF-2015-RC

10
Exhibit 17,
P. 219

Confidential – Attorney's Eyes Only                    MGA 0884542

# Exhibit 18

THIS EXHIBIT IS FILED
UNDER SEAL
PURSUANT TO
PROTECTIVE ORDER

# Exhibit 19

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

ORIGINAL

NORTHERN ———————————— DISTRICT OF ———————————— GEORGIA

INTEGRITY TOYS, INC.

V.

ABC INTERNATIONAL TRADERS, INC., d/b/a
MGA ENTERTAINMENT CORPORATION

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

1 05 CV 21 42

TO: (Name and address of defendant)
ABC INTERNATIONAL TRADERS, INC. d/b/a
MGA ENTERTAINMENT CORPORATION
c/o Isaac E. Larian
Registered Agent:
16730 Schoenborn Street
North Hills, California 91343

YOU ARE HEREBY SUMMONED and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

John M. Bowler, Esq.
Michael D. Hobbs, Esq.
Segeda T. Ranjeet, Esq.
Trenton A. Ward, Esq.
Troutman Sanders LLP
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia  30308

an answer to the complaint which is herewith served upon you, within ___twenty (20)___ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must file your answer with the Clerk of this Court within a reasonable period of time after service.

~~LUTHER~~ D. THOMAS

—————————————————————————
CLERK

_signature_

—————————————————————————
(BY) DEPUTY CLERK

_8·17·05_

—————————————————————————
DATE

MGA 0806552

AO 440 (Rev. 10/83) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: ;_____

_____

☐ Returned unexecuted: _____

_____

_____

☐ Other *(specify)*: _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
              *Date*                          *Signature of Server*

_____
*Address of Server*

_____

(1)    As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

Exhibit 19 ,
P. 241

MGA 0806553

COPY

FILED IN CLERKS OFFICE
U.S.D.C.-Atlanta

AUG 1 7 2005

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

INTEGRITY TOYS, INC.,
    a New Jersey corporation,

    Plaintiff,

    v.

ABC International Traders,
Inc., d/b/a MGA Entertainment
Corporation,
    a California corporation,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. **1 05 CV 2142**

**TRIAL BY JURY DEMANDED**

## COMPLAINT

Plaintiff Integrity Toys, Inc., for its Complaint against Defendant ABC

International Traders, Inc, d/b/a MGA Entertainment Corporation, states as

follows:

## INTRODUCTION

1.

This is an action for federal and common law unfair competition for

unauthorized use of Plaintiff's "JADE" trademark in violation of Section 43(a) of

the Lanham Act, 15 U.S.C. § 1125(a) and the Uniform Deceptive Trade Practices

Exhibit 19 ,
P. 242

MGA 0806554

Act, O.C.G.A. § 10-1-370 et seq.; for violation of the Georgia Passing Off Statute.

O.C.G.A. § 23-2-55; and for Georgia trademark dilution, O.C.G.A. § 10-1-451(b).

Plaintiff seeks equitable relief, including injunctive relief to prevent further

unauthorized and deceptive usage of Plaintiff's "JADE" trademark, as well as

damages, punitive damages, costs and attorney's fees.

## PARTIES, JURISDICTION AND VENUE

### 2.

Plaintiff Integrity Toys, Inc. ("Integrity Toys") is a New Jersey corporation

with its principal place of business in Chesapeake City, Maryland.

### 3.

Upon information and belief, Defendant ABC International Traders, Inc. is a

California corporation, doing business as MGA Entertainment Corporation

("MGA Entertainment") with its principal place of business in North Hills,

California.  MGA Entertainment can be served with process through its registered

agent, Isaac E. Larian, located at 16730 Schoenborn Street, North Hills, California

91343.

Exhibit 19 ,
P. 243

MGA 0806555

4.

This Court has personal jurisdiction over the Defendant MGA Entertainment in that it is doing business in the State of Georgia and has committed acts within this State giving rise to this Complaint.

5.

This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338(a) & (b), and has supplemental jurisdiction over the state common law claims under 28 U.S.C. § 1367(a).

6.

Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) & (c).

## FACTS COMMON TO ALL COUNTS

## PLAINTIFF AND ITS WELL-KNOWN "JADE" TRADEMARK

7.

Since at least as early as 1997, Integrity Toys has been using the mark "JADE" (the "Mark") in connection with a series of dolls, which are offered for sale across the nation and available for purchase in national retail chains such Wal-Mart, K-Mart, Toys 'R' Us, Kaybee Toys, CVS, Ames, Kroger's and Walgreen's stores.

195743e_1.DOC

3

Exhibit 19
P. 244

MGA 0806556

8.

For example, Integrity Toys offers a JADE "Cool Streaks" doll, a JADE "Tropical Splash" doll, a JADE "Future World" doll, a JADE "Capri Casual" doll, and a JADE "In Style" doll, among others. Copies of various pages from Integrity Toys' catalogs evidencing and illustrating Integrity Toys' use of the Mark are attached to the Complaint as Exhibit "A."

9.

Integrity Toys is the largest manufacturer of ethnic dolls in the United States and since its first use of the Mark, Integrity Toys has sold approximately hundreds of thousands of dollars in JADE brand dolls.

10.

Since its first use of the Mark, Integrity Toys has spent thousands of dollars in advertising and promotion of its dolls under the Mark. Beginning in 1997 and continuing through 1998, 1999, 2000, 2001, 2002, 2003, and 2004, Integrity Toys circulated thousands of advertising brochures listing its JADE dolls to distributors and consumers nationwide and has thousands of dollars worth of JADE dolls. In addition, Integrity Toys advertises and promotes it line of JADE dolls through its website at www.integritytoys.com.

MGA 0806557

11.

Integrity Toys has invested significant resources, time, and money in the developing its dolls under the Mark. As a result, Integrity Toys has developed substantial goodwill in the Mark, which serves to distinguish Integrity Toy's dolls from those of others and to indicate the source, origin, sponsorship and affiliation of Integrity Toys goods.

12.

Integrity Toys owns United States Trademark Application Serial No. 78/369,884 for the Mark in respect of dolls, which it filed with the United States Patent and Trademark Office ("PTO") on February 18, 2004. A copy of the particulars for the Application is attached to the Complaint as Exhibit "B."

## DEFENDANT'S INFRINGING ACTIVITIES

13.

Upon information and belief, MGA Entertainment distributes and sells toys, including dolls. In addition, MGA Entertainment's dolls are available in some of the same national retail chains in which Integrity Toys dolls are sold, including, Wal-Mart and Toy 'R' Us.

MGA 0806558

14.

MGA Entertainment is the owner of U.S. Trademark Registration No. 2,602,536 for the mark "JADE" in respect of dolls, which issued on July 30, 2002 (the "Registration"). A copy of the particulars for the Registration is attached as Exhibit "C."

15.

In the Registration, MGA Entertainment claims first use of "JADE" in connection with dolls as of May 21, 2001. Such use is junior to Integrity Toys' use of its JADE mark in 1997.

16.

On or around October 21, 2003, Integrity Toys received a letter from counsel for MGA Entertainment in which MGA Entertainment asserted claims of trademark infringement, unfair competition, and dilution based on Integrity Toys' use of the Mark for dolls and demanding that Integrity Toys cease use of the Mark (the "Cease & Desist Letter"). A true and correct copy of said Cease and Desist Letter is attached to the Complaint as Exhibit "D." MGA Entertainment has thus agreed and asserted that a likelihood of confusion exists between MGA's JADE mark for dolls and Integrity Toys' JADE mark for dolls.

1397474_1.DOC

6

Exhibit 19,
P. 247

MGA 0806559

17.

On or around November 10, 2003, counsel for Integrity Toys responded to MGA Entertainment's Cease & Desist Letter informing MGA Entertainment of Integrity Toys' prior and superior rights to the Mark in respect of dolls and demanding that MGA Entertainment immediately cease its infringing use of the Mark. A true and correct copy of that letter is attached to the Complaint as Exhibit "E."

18.

On January 1, 2004, Integrity Toys filed a Petition for Cancellation of MGA Entertainment's Registration for "JADE" with the USPTO's Trademark Trial and Appeal Board, which Petition is still pending.

19.

MGA Entertainment has refused to accede to Integrity Toys demands and has continued its infringing use of the Mark on several competing dolls. True and correct copies of pictures of some of MGA Entertainment's dolls identified by "JADE" which are currently available for purchase at Toys 'R' Us stores in Atlanta, Georgia are attached to the Complaint as Exhibit "F."

MGA 0806560

20.

In addition, MGA Entertainment has continued to promote and advertise its dolls using the Mark through several media, including MGA Entertainment's website at: www.mgae.com.

## THE EXTENSIVE INJURY CAUSED TO INTEGRITY TOYS

21.

The damaging effect of Defendant's infringement is extensive.  Integrity Toy's business interests are directly harmed, because its intellectual property is being infringed.  Furthermore, Defendant is cheating Integrity Toys – the legitimate trademark holder – out of substantial sales and goodwill.

22.

MGA Entertainment's continued use and promotion of dolls identified by a mark that is identical to Integrity Toys' JADE Mark on directly competitive dolls, all of which MGA Entertainment has asserted results in a likelihood of confusion, unless enjoined, is likely to cause consumer confusion or mistake, or to deceive, as to the source, origin, sponsorship or approval of the respective dolls produced or distributed by MGA Entertainment and Integrity Toys.  In particular, Defendant's actions are likely to cause confusion and mistake among consumers that: (a) Defendant's "JADE" toys originate with Integrity Toys, (b) Integrity Toys is

8

Exhibit 19,
P. 249

MGA 0806561

affiliated, connected or associated with the Defendant; and (c) that Defendant's infringing "JADE" toys are being offered to consumers with the sponsorship and approval of Integrity Toys.

23.

In addition, MGA Entertainment's continued use of "JADE" to identify dolls has caused injury, loss and damage to Integrity Toys and threatens to cause Integrity Toys further immediate and irreparable injury, loss and damage for which it will have no adequate remedy at law.  Further, Integrity Toys' loss of control over the "JADE" Mark and to its reputation and goodwill constitutes an irreparable injury.

24.

MGA Entertainment's continued use of "JADE" to identify dolls, without authorization and over the protest of Integrity Toys evidences willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of such conduct.

MGA 0806562

## COUNT ONE

### FEDERAL UNFAIR COMPETITION

25.

Integrity Toys incorporates herein and realleges, as if fully set forth in this paragraph, the allegations in Paragraphs 1-23 above, inclusive.

26.

The aforesaid actions of Defendant MGA Entertainment in adopting and using the mark "JADE" to identify dolls is likely to cause confusion or to cause mistake, or to deceive as to the source, origin, sponsorship or approval of the dolls produced or distributed by Integrity Toys and MGA Entertainment, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

27.

MGA Entertainment's continuing use of "JADE" to identify dolls falsely suggests an affiliation or connection with or sponsorship or approval of MGA Entertainment and its dolls by Integrity Toys, and/or of Integrity Toys and its dolls by MGA Entertainment, in violation of 15 U.S.C. § 1125(a).

28.

The actions complained of herein have caused damage to Integrity Toys and to its business, reputation and goodwill.

1397474_1.DOC

10

Exhibit 19 ,
P. 251

MGA 0806563

29.

Unless preliminarily and permanently enjoined, MGA Entertainment's conduct will cause Integrity Toys irreparable harm for which there exists no adequate remedy at law.

30.

Integrity Toys is entitled to recover from MGA Entertainment all damages it has sustained due to MGA Entertainment's improper conduct, and MGA Entertainment's profits obtained from their infringing conduct, in an amount to be proved at trial and to be trebled, pursuant to 15 U.S.C. § 1117.

31.

Upon information and belief, the actions of MGA Entertainment have been willful and deliberate and amount to exceptional circumstances, justifying an award of attorneys' fees to Integrity Toys pursuant to 15 U.S.C. § 1117.

## COUNT TWO

## COMMON LAW TRADEMARK MARK INFRINGEMENT

32.

Integrity Toys incorporates herein and realleges, as if fully set forth in this paragraph, the allegations in paragraphs 1-30 above, inclusive.

MGA 0806564

33.

Integrity Toys has prior and exclusive rights to use the JADE Mark to identify, market, promote and sell its dolls.

34.

MGA Entertainment's use of an identical mark for its dolls has caused a likelihood of confusion, mistake or deception, and therefore infringes Integrity Toys rights in and to its JADE Mark in violation of the common law of Georgia.

35.

MGA Entertainment's actions complained of herein have caused damage to Integrity Toys and to its business, reputation and goodwill.

36.

Integrity Toys is entitled to recover its damages sustained due to MGA Entertainment's improper conduct, in an amount to be proved at trial.

37.

Unless preliminarily and permanently enjoined, MGA Entertainment's conduct will cause Integrity Toys irreparable harm for which there exists no adequate remedy at law.

38.

Upon information and belief, the actions of MGA Entertainment have been willful and deliberate and amount to exceptional circumstances, justifying an award of attorneys' fees to Integrity Toys.

COUNT THREE

VIOLATION OF THE GEORGIA DECEPTIVE TRADE PRACTICES ACT

39.

Integrity Toys incorporates herein and realleges, as if fully set forth in this paragraph, the allegations in paragraphs 1-37 above, inclusive.

40.

By reason of the foregoing, MGA Entertainment has engaged in acts which have caused a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval or certification of goods.

41.

By reason of the foregoing, MGA Entertainment has engaged in acts which have caused a likelihood of confusion or misunderstanding as to the affiliation, connection or association with or certification by another.

Exhibit 19,
P. 254

MGA 0806566

42.

MGA Entertainment's conduct constitutes unfair and deceptive trade practices in violation of Georgia law, including the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, et seq.

43.

MGA Entertainment's actions complained of herein have caused damage to Integrity Toys and to its business, reputation and goodwill.

44.

Unless preliminarily and permanently enjoined, MGA Entertainment's conduct will cause Integrity Toys irreparable harm for which there exists no adequate remedy at law.

45.

Integrity Toys is entitled to recover its attorneys fees and costs incurred in connection with this action.

46.

Upon information and belief, the actions of MGA Entertainment have been willful and deliberate and amount to exceptional circumstances, justifying an award of attorneys' fees to Integrity Toys.

197474_1 DOC

14

MGA 0806567

## COUNT FOUR

## COMMON LAW UNFAIR COMPETITION

### 47.

Integrity Toys incorporates herein and realleges, as if fully set forth in this paragraph, the allegations in paragraphs 1-45 above, inclusive.

### 48.

The aforesaid actions of MGA Entertainment in adopting and using an identical mark to Integrity Toy's JADE mark to identify directly competitive toys, namely, dolls, constitutes unfair competition in violation of the common law of the State of Georgia.

### 49.

MGA Entertainment's actions complained of herein have caused damage to Integrity Toys and to its business, reputation and goodwill.

### 50.

Integrity Toys is entitled to recover from MGA Entertainment all damages sustained due to MGA Entertainment's improper conduct, in an amount to be proved at trial.

15

Exhibit 19
P. 256

MGA 0806568

51.

Unless preliminarily and permanently enjoined, MGA Entertainment's conduct will cause Integrity Toys irreparable harm for which there exists no adequate remedy at law.

52.

Upon information and belief, the actions of MGA Entertainment have been willful and deliberate and amount to exceptional circumstances, justifying an award of attorneys' fees to Integrity Toys.

## COUNT FIVE

## VIOLATION OF GEORGIA PASSING OFF STATUTE

53.

Integrity Toys incorporates herein and realleges, as if fully set forth in this paragraph, the allegations in paragraphs 1-51 above, inclusive.

54.

By reason of the foregoing, MGA Entertainment has willfully engaged in acts which have caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of its dolls bearing Integrity Toys' JADE Mark.

MGA 0806569

55.

By reason of the foregoing, MGA Entertainment has willfully engaged in acts which have caused a likelihood of confusion or misunderstanding as to the affiliation, connection or association with or certification by another in violation of O.C.G.A. § 23-2-55.

56.

MGA Entertainment's actions have caused damage to Integrity Toys and to its business, reputation and goodwill.

57.

Unless preliminarily and permanently enjoined, MGA Entertainment's conduct will cause Integrity Toys irreparable harm for which there exists no adequate remedy at law.

## COUNT SIX

## GEORGIA TRADEMARK DILUTION

58.

Integrity Toys incorporates herein and realleges, as if fully set forth in this paragraph, the allegations in paragraphs 1-56 above, inclusive.

1397474_1.DOC

17

Exhibit 19 ,
P. 258

MGA 0806570

59.

MGA Entertainment's conduct mentioned herein has caused injury to the business reputation of Integrity Toys and/or of a dilution of the distinctive quality of Integrity Toys' JADE Mark, thereby diluting the distinctiveness and value of the Mark in violation of O.C.G.A. § 10-1-451(b) and Georgia common law.

60.

MGA Entertainment's actions complained of herein have caused damage to Integrity Toys and to its business, reputation and goodwill.

61.

Integrity Toys is entitled to recover its damages sustained due to MGA Entertainment's improper conduct, in an amount to be proved at trial.

62.

Unless preliminarily and permanently enjoined, MGA Entertainment's conduct will cause Integrity Toys irreparable harm for which there exists no adequate remedy at law.

WHEREFORE, by virtue of the infringing and unlawful conduct of MGA Entertainment as alleged in this Complaint, Integrity Toys respectfully prays that the Court:

MGA 0806571

1.      Award judgment to Integrity Toys and against MGA Entertainment, on all counts of the Complaint;

2.      Award Integrity Toys compensatory damages sustained due to MGA Entertainment's unlawful and infringing conduct, and all profits derived by MGA Entertainment from its unlawful and infringing conduct, in an amount to be proved at trial and to be trebled;

3.      Award Integrity Toys preliminary and permanent injunctive relief against MGA Entertainment its officers, directors, employees, agents, servants, representatives, partners, subsidiaries, attorneys and any persons under its control or acting in concert or privity with it, or persons purporting to act on its behalf from using, reproducing, or misappropriating Integrity Toys' JADE Mark;

4.      Enter an order that Defendant be enjoined to deliver upon oath, to be impounded during the pendency of this action and destroyed pursuant to judgment herewith, all marks, products, and merchandise in its possession, custody or control which are shown by the evidence to unlawfully bear and infringe Integrity Toys' JADE Mark, and any reproductions, copies or colorable imitations thereof;

5.      Award Integrity Toys recovery of its reasonable attorneys' fees and costs of prosecuting this action;

MGA 0806572

6.     Award Integrity Toys punitive damages in an amount deemed appropriate;

7.     Grant such other, further, and different relief as the Court deems just and equitable; and

8.     Order a trial by jury on all appropriate issues.

Respectfully submitted this *17 ηι* day of August, 2005.

TROUTMAN SANDERS LLP

John M. Bowler
Georgia Bar No. 071770
Michael D. Hobbs, Jr.
Georgia Bar No. 358160
Segeda T. Ranjeet
Georgia Bar No. 594505
Trenton A. Ward
Georgia Bar No. 737779
ATTORNEYS FOR PLAINTIFF
INTEGRITY TOYS, INC.

## FONT CERTIFICATION

I hereby certify that this document is presented in Times New Roman 14.

Trenton A. Ward
Georgia Bar. No: 737779

MGA 0806573

**Exhibit 20**

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
**Trademark Trial and Appeal Board**
2900 Crystal Drive
Arlington, Virginia 22202-3513

Mailed:  **May 27, 2004**

Opposition No 91160679
Serial No. 78302485

 **ORIGINAL**

Mitchell Kamarck
MGA Entertainment, Inc.
16370 Schoenborn Street
North Hills, CA 91343

Qukisilver, Inc.

v.

MGA Entertainment, Inc.

Jeffrey L. Van Hoosear
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614

**Michelle Greenfield, Legal Assistant:**

A notice of opposition to the registration sought in the above-identified application has been filed.  A copy of the notice is attached.

**ANSWER IS DUE FORTY DAYS** after the mailing date hereof. (See Trademark Rule 2.196 for expiration date falling on Saturday, Sunday or a holiday).

Proceedings will be conducted in accordance with the Trademark Rules of Practice, set forth in Title 37, part 2, of the Code of Federal Regulations.  The parties are reminded of the recent amendments to the Trademark Rules that affect the rules of practice before the TTAB.  See Rules of Practice for Trademark-Related Filings Under the Madrid Protocol Implementation Act, 68 Fed. R. 55,748 (September 26, 2003) (effective November 2, 2003); Reorganization of Correspondence and Other Provisions, 68 Fed. Reg. 48,286 (August 13, 2003) (effective September 2, 2003).  Notices concerning the rules changes, as well as the

Exhibit _20_,
P. _262_

MGA 0806427





Exhibit 20,
P. 263

MGA 0806428

*Trademark Trial and Appeal Board Manual of Procedure* (TBMP), are available at www.uspto.gov.

**The parties are particularly referred to Trademark Rule 2.126 pertaining to the form of submissions. Paper submissions, including but not limited to exhibits and depositions, not filed in accordance with Trademark Rule 2.126 may not be given consideration or entered into the case file.**

**Discovery and testimony periods are set as follows:**

| | |
|---|---|
| Discovery period to open: | **June 16, 2004** |
| Discovery period to close: | **December 13, 2004** |
| 30-day testimony period for party in position of plaintiff to close: | **March 13, 2005** |
| 30-day testimony period for party in position of defendant to close: | **May 12, 2005** |
| 15-day rebuttal testimony period for plaintiff to close: | **June 26, 2005** |

A party must serve on the adverse party a copy of the transcript of any testimony taken during the party's testimony period, together with copies of documentary exhibits, within 30 days after completion of the taking of such testimony. See Trademark Rule 2.125.

Briefs shall be filed in accordance with Trademark Rule 2.128(a) and (b). An oral hearing will be set only upon request filed as provided by Trademark Rule 2.129.

**NOTE:** The Board allows parties to utilize telephone conferences to discuss or resolve many interlocutory matters that arise in inter partes cases. See the *Official Gazette* notice titled "*Permanent Expansion of Telephone Conferencing on Interlocutory Matters in Inter Partes Cases Before the Trademark Trial and Appeal Board,*" 1235 TMOG 68 (June 20, 2000). The notice is available at http://www.uspto.gov. Interlocutory matters which the Board agrees to discuss or decide by phone conference may

Exhibit 20,
P. 264

MGA 0806429

be decided adversely to any party which fails to participate.

If the parties to this proceeding are also parties to other Board proceedings involving related marks or, during the pendency of this proceeding, they become parties to such proceedings, they should notify the Board immediately, so that the Board can consider consolidation of proceedings.

### New Developments at the Trademark Trial and Appeal Board

TTAB forms for electronic filing of extensions of time to oppose, notices of opposition, and inter partes filings are now available at http://estta.uspto.gov.  Images of TTAB proceeding files can be viewed using TTABVue at http://ttabvue.uspto.gov.

Exhibit 20 ,
P. 265

MGA 0806430

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number: **ESTTA9308**

Filing date: **05/26/2004**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

## Notice of Opposition

Notice is hereby given that the following party opposes registration of the indicated application.

**Opposer Information**

| Name | Quiksilver, Inc. | | |
|---|---|---|---|
| Entity | Corporation | Citizenship | Delaware |
| Address | 15202 Graham Street<br>Huntington Beach, CA 92649<br>UNITED STATES | | |

| Attorney information | Jeffrey L. Van Hoosear<br>Knobbe, Martens, Olson & Bear, LLP<br>2040 Main Street, Fourteenth Floor<br>Irvine, CA 92614<br>UNITED STATES<br>efiling@kmob.com Phone:949-760-0404 |
|---|---|

**Applicant Information**

| Application No | 78302485 | Publication date | 04/27/2004 |
|---|---|---|---|
| Opposition Filing Date | 05/26/2004 | Opposition Period Ends | 05/27/2004 |
| Applicant | MGA Entertainment, Inc. | | |

**Goods/Services Affected by Opposition**

| Class 028. First Use: First Use In Commerce: |
|---|

Exhibit 20,
P. 266

MGA 0806431

All goods and sevices in the class are opposed, namely: Toys games and playthings namely plush dolls, dolls, and, plush doll and doll clothing, accessories and playsets

| Attachments | 3870_001.pdf ( 7 pages ) |
|---|---|

| Signature | /Jeffrey L. Van Hoosear/ |
|---|---|
| Name | Jeffrey L. Van Hoosear |
| Date | 05/26/2004 |

Exhibit 20
P. 267

MGA 0806432

QUIKS2.280TIS

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Quiksilver, Inc.,

      Opposer,

v.

MGA Entertainment, Inc.,

      Applicant.

Application No. 78/302,485

I hereby certify that this correspondence and all marked attachments are being deposited with the United States Postal Service as first-class mail in an envelope addressed to: Commissioner for Trademarks, 2900 Crystal Drive, Arlington, VA 22202-3514, on

May 26, 2004
(Date)

_Jeffrey L. Van Hoosear_

## NOTICE OF OPPOSITION

Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA 22202-3514

ATT: BOX TTAB FEE

Dear Sir:

Opposer, Quiksilver, Inc., a Delaware corporation, ("Opposer"), located and doing business at 15202 Graham Street, Huntington Beach, CA 92649, believes that it is or will be damaged by the registration of the mark ROXXI shown in Application No. 78/302,485, filed September 18, 2003 by MGA Entertainment, Inc. for goods classified in Class 28, and hereby opposes the same. A description of the Applicant's Trademark Application No. 78/302,485 is as follows:

MARK:                ROXXI

APPLICATION NO:       78/302,485

FILED:             September 18, 2003

-1-

Exhibit _20_
P. _268_

MGA 0806433

PUBLISHED:                    April 27, 2004

CLASS:                        28

GOODS:                        Toys games and playthings, namely plush dolls, dolls, and plush doll and doll clothing, accessories and playsets

## I. BACKGROUND

1.  For many years and long prior to the filing of the mark shown in Application No. 78/302,485, Opposer has been engaged in the manufacture of clothing, headwear, footwear and personal items, including but not limited to, watches, sunglasses, sporting goods, cosmetics, furniture, bedding and towels, backpacks, luggage and bags, and various types of promotional merchandise under its ROXY mark and other ROXY containing marks (hereinafter collectively referred to as "ROXY Marks").

2.  Opposer's ROXY brand accounts for up to forty percent (40%) of Opposer's estimated $700 million annual sales and continues to be one of Opposer's most important brands.

3.  Opposer extensively promotes its ROXY brand through the sponsorship of sporting contests and events, entertainment events, and through the endorsement of numerous high-profile athletes and celebrities.  The ROXY brand is also extensively promoted through Opposer's retail stores located throughout the United States.  Opposer has also licensed the use of its ROXY mark on various goods such as automobiles and cellular telephones.

4.  Opposer also owns and uses the Internet domain name <www.roxy.com>.  Since at least as early as July 29, 1992, Opposer has operated the <www.roxy.com> website, which prominently displays the ROXY mark, and through which Opposer offers for sale, markets, and distributes a wide variety of products.

Exhibit 20 ,
P. 219

MGA 0806434

5. Applicant, to the knowledge and belief of Opposer, manufactures, distributes, sells and/or markets its products to the same type of customers that Opposer sells and/or markets to.

6. As such, Opposer submits that the customers of Applicant and Opposer may overlap, and therefore, Applicant and Opposer could be competitors.

## II. GROUNDS FOR OPPOSITION

As grounds for opposition, it is alleged that:

7. Opposer is the owner of the mark ROXY and other marks which incorporate the mark ROXY (as mentioned above, collectively referred to herein as the "ROXY Marks").

8. Since at least as early as 1990, Opposer has been marketing, producing and selling clothing and other goods in connection with the mark ROXY.

9. Since at least as early as November 15, 1996, Opposer has been offering retail store services featuring clothing and other goods under the mark ROXY.

10. Since at least as early as January 1, 1996, Opposer has been marketing, producing and selling watches and jewelry under the mark ROXY.

11. Since at least as early as July 31, 1997, Opposer has been marketing, producing and selling paper goods and printed materials under the mark ROXY.

12. Since at least as early as January 31, 1994, Opposer has been marketing, producing and selling bags and wallets under the mark ROXY.

13. Since at least as early as June 30, 1999, Opposer has been marketing, producing and selling bedding and towels under the mark ROXY.

14. Since at least as early as March 1, 2000, Opposer has been marketing, producing and selling furniture under the mark ROXY.

15. Opposer has used its ROXY Marks throughout the United States and such use has been continuous since at least as early as 1990, and said marks have not been abandoned. By

-3-

Exhibit _20_,
P. _270_

MGA 0806435

reason of Opposer's widespread and continuous use and license of the ROXY Marks, Opposer has common law rights in its ROXY Marks throughout the United States.

16. In addition, Opposer through extensive sales, advertising and promotion of the goods and services provided under its ROXY Marks, has developed, at great expense and effort, valuable goodwill in its ROXY Marks.

17. By virtue of its substantial use, Opposer's distinctive ROXY Marks have become famous in the minds of consumers, and the purchasing public has come to associate the ROXY Marks with Opposer as indicating that goods and services so marked originate with or are associated with Opposer.

18. Opposer is the owner of U.S. Trademark Registration No. 2,427,898 for the mark ROXY for "clothing, footwear and headgear, namely, shirts, t-shirts, dresses, skirts, pajamas, swim suits, sweatshirts, sweat pants, tank tops, shorts, pants, jackets, sweaters, socks, belts, wetsuits, ski wear, snowboard clothing, namely, snow pants, powder pants, jackets, snow bibs, gloves, thermal wear, shoes, athletic shoes, sandals, slippers, boots, beach footwear, hats, caps, and visors in Class 25." Opposer's Registration No. 2,427,898 is based on an application filed in the U.S. Patent and Trademark Office on December 28, 1998. Said registration issued on February 13, 2001.

19. Opposer is the owner of U.S. Trademark Registration No. 2,474,406 for the mark ROXY for "furniture, namely chairs, chair cushions, beach chairs, mirrors, tables, chests, beds, jewelry boxes not of metal, letter boxes not of metal, sleeping bags, pillows, picture frames, fitted furniture covers, and decorative bead curtains in Class 20." Opposer's Registration No. 2,474,406 is based on an application filed in the U.S. Patent and Trademark Office on November 1, 1999. Said registration issued on July 31, 2001.

Exhibit *20*
P. *271*

MGA 0806436

20. Opposer is the owner of U.S. Trademark Registration No. 2,083,400 for the mark QUIKSILVER ROXY for "clothing, namely, T-shirts, sweatshirts, shorts, jackets, gloves, pajamas, swim suits, skirts, dresses, shirts, tank tops, pants, coats, sweaters, socks and belts; footwear and headwear in Class 25." Opposer's Registration No. 2,083,400 is based on an application filed in the U.S. Patent and Trademark Office on April 4, 1996. Said registration issued on July 29, 1997.

21. Opposer is the owner of U.S. Trademark Registration No. 2,228,883 for the mark ROXY for "retail store services featuring clothing and accessories in Class 35." Opposer's Registration No. 2,228,883 is based on an application filed in the U.S. Patent and Trademark Office on April 23, 1998. Said registration issued on March 2, 1999.

22. Opposer is the owner of U.S. Trademark Registration No. 2,225,688 for the mark ROXY for "watches and jewelry in Class 14." Opposer's Registration No. 2,225,688 is based on an application filed in the U.S. Patent and Trademark Office on December 18, 1997. Said registration issued on February 23, 1999.

23. Opposer is the owner of U.S. Trademark Registration No. 2,297,591 for the mark ROXY for "paper goods and printed matter, namely, books related to the subject of surfing, book covers, calendars, stickers, decals, bumper stickers, pencils, pens, posters, notebooks and binders in Class 16." Opposer's Registration No. 2,297,591 is based on an application filed in the U.S. Patent and Trademark Office on April 13, 1998. Said registration issued on December 7, 1999.

24. Opposer is the owner of U.S. Trademark Registration No. 2,255,435 for the mark ROXY for "athletic bags, backpacks, beach bags, general purpose bags, tote bags, traveling bags, fanny packs, purses, leather key fobs, wallets, and umbrellas in Class 18." Opposer's Registration

-5-

Exhibit 20 ,
P. 272

MGA 0806437

No. 2,255,435 is based on an application filed in the U.S. Patent and Trademark Office on April 13, 1998. Said registration issued on June 22, 1999.

25. Opposer is the owner of U.S. Trademark Registration No. 2,375,481 for the mark ROXY for "bed sheets, bed linens, bed spreads, duvet covers, pillow shams, pillow cases, comforters and towels in Class 24." Opposer's Registration No. 2,375,481 is based on an application filed in the U.S. Patent and Trademark Office on October 22, 1999. Said registration issued on August 8, 2000.

26. The dates of first use of Opposer's Registrations recited herein predate Applicant's filing date of the mark shown in Applicant's Application No. 78/302,485. Therefore, Opposer's rights in the marks covered under the registrations recited herein predate and are superior to Applicant's rights in the mark shown in Application No. 78/302,485.

27. Opposer relies on its Registration Nos. 2,427,898; 2,474,406; 2,083,400; 2,228,883; 2,225,688; 2,297,591; 2,255,435; 2,375,481, and on its common law rights in each of the ROXY Marks, as set forth above. In view of the similarity of Applicant's ROXXI mark and Opposer's ROXY Marks and the related nature of the respective goods and/or services, consumers, and marketing channels, Opposer alleges that Applicant's use of its mark on its applied for goods so resembles Opposer's ROXY Marks as to be likely to cause confusion, to cause mistake or to deceive, or to dilute Opposer's ROXY Marks.

WHEREFORE, Opposer will be damaged by the registration of Application No. 78/302,485 and prays that Application No. 78/302,485 be rejected and stricken, that no registration be issued to Applicant, and that this Opposition be sustained in favor of Opposer.

Exhibit _20_ ,
P. _273_

MGA 0806438

Please charge any additional fees, including any fees for additional extension of time, or credit overpayment to Deposit Account No. 11-1410.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: May 26, 2004

By: _____
Jeffrey L. Van Hoosear
2040 Main Street
Fourteenth Floor
Irvine, CA  92614
(949) 760-0404
Attorneys for Quiksilver, Inc.

OPPCAN
H:\DOCS\CAB\CAB-4907.DOC
052604

-7-

MGA 0806439

# THE TRADEMARK TRIAL AND APPEAL BOARD WOULD LIKE YOU TO KNOW:

The TTAB Customer Service Center is available to

*answer telephone inquiries
*explain pertinent legal provisions and related administrative
   practices as they apply to specific cases
*provide status information on pending cases
*provide access to the files of pending cases
*resolve problems

The telephone number for the TTAB Customer Service Center is (703) 308-9300, extension 0 [zero].

The Patent and Trademark Office has two special boxes for expedited processing and distribution of documents filed with the TTAB.  Envelopes and transmittal letters for TTAB should be addressed to:  Commissioner for Trademarks, 2900 Crystal Drive, Arlington, VA 22202, followed by one of the following designations

"Box TTAB Fee": for papers filed with the TTAB that include
filing fees, such as notices of opposition, petitions to cancel,
and notices of ex parte appeal
                              and
"Box TTAB": for all non-fee papers filed with the TTAB, such as
requests for extensions of time to file notices of opposition and
motions.

The TTAB Customer Service Center makes every effort to provide public access to application files, opposition files, cancellation files and concurrent use files immediately upon request for access. Files located will be made available in a central storage area accessible to the public.  You can also access information about TTAB proceeding files online.  Go to http://www.uspto.gov/web/offices/dcom/ttab/ and click the "BISX LINK".

Any questions, comments, or suggestions concerning TTAB service should be directed to Jean Brown, TTAB Technical Program Manager, at (703) 308-9300, extension 123 or Afendi Ziad, Supervisory Legal Assistant at (703) 308-9300, extension 205 or Angela Pope, Supervisory Legal Assistant at (703) 308-9300, extension 144.

## NOTICE CONCERNING ALTERNATIVE DISPUTE RESOLUTION (ADR)

Exhibit 20 ,
P. 275

MGA 0806440

**TTAB NOTICE CONCERNING CORRESPONDENCE ADDRESS**
**(TRADEMARK RULE 2.18)**

The Trademark Trial and Appeal Board will mail correspondence to only one address for each party.

If a party is located in the U.S., correspondence will be sent to the party's own address, unless (1) papers filed with the Board are filed by a party's attorney, (2) a written power of attorney is filed, (3) a written authorization of some other person entitled to be recognized is filed, or (4) the party requests in writing that correspondence be sent to another address. In these situations, correspondence will be sent, respectively, to (1) the attorney filing papers, (2) the attorney named in the power of attorney, (3) the other person designated in the written authorization, or (4) the other address specified by the party.

When one attorney or other authorized representative makes an appearance on behalf of a party, his address is noted on the proceeding file as the correspondence address. If a second attorney or other authorized representative makes an appearance on behalf of the party, and requests that correspondence be directed to him, the correspondence address on the proceeding file will be changed, and future correspondence will be sent to the second attorney or other authorized representative, rather than to the first one. If the second attorney or other authorized representative does not request that correspondence be sent to him, the Board will continue to send correspondence to the first attorney or authorized representative.

If a power of attorney from a party to one attorney has been filed, and thereafter another attorney or authorized representative makes an appearance on behalf of the party and asks that correspondence be sent to him, the second attorney or authorized representative will be required to submit authorization, from the party or from the first attorney, for the requested change in correspondence address.

If a power of attorney from a party to one attorney has been filed, and thereafter a power of attorney from the party to another attorney is filed, the second power of attorney will be construed as a written request to change the correspondence address from the first attorney to the second one, even if there is no revocation of the first power, unless the party or the first attorney directs otherwise. Likewise, if an attorney makes an appearance on behalf of a party, and thereafter the party files a written power of attorney to another attorney, the Board will send subsequent correspondence to the appointed attorney.

If a power of attorney from a party to one attorney has been filed, and thereafter that attorney files an "associated power of attorney" to another attorney, the correspondence address will remain unchanged, and the Board will continue to send correspondence to the first attorney, unless the first attorney or the party directs otherwise.

In the case of a party whose application is the subject of a Board proceeding, any appearance or power of attorney (or designation of other authorized representative) of record in the application file at the time of the commencement of the Board proceeding is considered to be effective for purposes of the proceeding, and correspondence will be sent initially to that address. Thereafter, the correspondence address may be changed as described in Trademark Rule 2.18.

In the case of a party whose registration is the subject of a Board proceeding, any representative which may be of record in the registration file at the time of the commencement of the Board proceeding is not considered to be effective for purposes of the Board proceeding. Rather, correspondence is sent to the registrant itself unless and until another correspondence address is established in the manner described in Trademark Rule 2.18.

Exhibit _20_,
P. _276_

MGA 0806441

The Trademark Trial and Appeal Board encourages you to consider alternative dispute resolution as a means of settling the issues raised in this opposition or cancellation proceeding. Although more than 95% of Board proceedings are decided prior to trial (by settlement or by entry of pre-trial judgment), alternative dispute resolution techniques might produce an earlier, mutually agreeable resolution of your dispute or might, at least, narrow the scope of discovery or the issues for trial. In either case, alternative dispute resolution might save you time and money.

Many non-profit organizations, both inside and outside the intellectual property field, offer alternative dispute resolution services. Listed below are the names and addresses of organizations that have indicated that they can make arrangements for alternative dispute resolution. The listings are given for your convenience; the Board does not sponsor nor endorse any particular organization's alternative dispute resolution services.

| | |
|---|---|
| **International Trademark Association**<br>Telephone: (212) 642-1726<br>Fax: (212) 768-7796<br>www.inta.org/adr/index.shtml<br>e-mail: lstigliano@inta.org | **CPR Institute for Dispute Resolution**<br>Telephone: (212) 949-6490<br>Fax: (212) 949-8859<br>www.cpradr.org<br>e-mail: info@cpradr.org |
| **American Intellectual Property Law Association (AIPLA)**<br>2001 Jefferson Davis Highway<br>Suite 203<br>Arlington, Virginia 22202<br>Telephone: (703) 415-0780<br>Fax: (703) 415-0786 | |
| **American Arbitration Association (AAA)**<br>Headquarters<br>140 West 51st Street<br>New York, New York 10020-1203<br>Telephone: (212) 484-3266<br>Fax: (212) 307-4387 | |

Finally, if the parties consider using alternative dispute resolution in this proceeding, the Board would like to know; and if the parties actually engage in alternative dispute resolution, the Board would be interested to learn what mechanism (e.g., arbitration, mediation, etc.) was used and with what general result. Such a statement from the parties is not required but would be helpful to the Board in assessing the value of alternative dispute resolution in Trademark Trial and Appeal Board proceedings.

MGA 0806442

**FILING OPPOSITION/CANCELLATION**

- Any person (Opposer) may file a Notice of Opposition within 30 days against any mark published under 15 USC 1062(a) in Official Gazette; may oppose in whole or part.[1]

- Time for filing Notice may be extended by written request to TTAB. A first extension for not more than 30 days will be granted upon request. Further extensions may be granted for good cause. Extensions aggregating more than 120 days from pub. date not granted unless consented to by applicant or extraordinary circumstances. 37 CFR 2.102(c). Request should be in triplicate. 37 CFR 2.102(d).

- Any person (Petitioner) may file a Petition to cancel a registration in whole or in part, but only under conditions set forth in 15 USC 1064.[2] Geographic limitation will be considered by TTAB only in concurrent use proceeding. 37 CFR 2.99(h), 2.133(c).

- Opposer/Petitioner is in position of Plaintiff and Applicant/Respondent is Defendant. 37 CFR 2.116(b).

- Notice/Petition corresponds to complaint in civil action. 37 CFR 2.116(c).

- Amendment to pleadings in accord with Rule 15, Fed. Rules of Civil Procedure (FRCP). 37 CFR 2.107, 2.115.

**MAILING PROCEDURES**

- Certificate of Mailing or Transmission and Express Mail procedures effective for all papers. 37 CFR 1.8, 1.10.

**INSTITUTION OF PROCEEDING; WITHDRAWAL**

- TTAB examines Notice/Petition for formal requirements and sends notification to Defendant, generally within few weeks of filing date. Duplicate copy of Notice/Petition and Exhibits sent to Defendant. 37 CFR 2.105, 2.113.

- Notice/Petition may be withdrawn without prejudice before Defendant files Answer. 37 CFR 2.106(c), 2.114(c). With written consent of Defendant, later withdrawal may be without prejudice.

- Defendant may not abandon application or surrender registration without prejudice except with written consent of Plaintiff. 37 CFR 2.135, 2.134.

**ANSWER; MOTIONS**

- Time for Answer set by TTAB for 40 days from Notification mailing date.[3] Counterclaim should be filed with answer or promptly upon discovery of information supporting Counterclaim. 37 CFR 2.106(b), 2.114(b).

- Time for reply to Counterclaim set by TTAB for not less than 30 days from TTAB action mailing date. 37 CFR 2.106(b), 2.114(b).

- Motions may be brought before TTAB in writing and with Brief in support. Brief in opposition thereto, 15 days (30 days for summary judgment motion). Briefs limited to 25 pages. Reply Brief, if filed, 15 days, limited to 10 pages. Reconsideration 30 days after decision; Opposition Brief, 15 days. 37 CFR 2.127. Most motions used in Federal practice are applicable.

- Motions for Summary Judgment, to Compel, and to Test Sufficiency of Responses to Requests for Admissions, if filed, due before Plaintiff testimony period opens. 37 CFR 2.127(e), 2.120(e), 2.120(h).

**TRIAL DATES**

- TTAB issues Order setting opening and close of Discovery and Trial dates. Discovery set for period of 180 days; 30-day Pl. Testimony period closes 90 days after close of Discovery period; 30-day Def. Test. period closes 60 days after Pl. Test. period; 15-day Pl. Rebuttal Test. period closes 45 days after Def. Test. period. 37 CFR 2.120(a), 2.121.

- In cases where Counterclaim filed, TTAB sets additional time periods for testimony and briefing.

**DISCOVERY PERIOD**

- Interrogatories, Reqs. for Prod. Of Docs. & Things, and Reqs. for Adm., if served, must be served by last day of Discovery period. Written Responses within 30 days from date of service of Disc. Reqs. FRCP apply except as otherwise provided. 37 CFR 2.116, 2.120(a). Extension of Time to respond to discovery granted upon cause or by stipulation.[4]

- Interrogatories limited to proceeding total of 75, counting subparts; additional interrogatories allowed upon motion for good cause or by stipulation. 37 CFR 2.120(d)(1).

- Discovery Depositions (noticed and taken within Disc. Period) in District where deponent resides or is employed. 37 CFR 2.120(a), 2.120(b). Either party may request designation of witnesses under FRCP 30(b)(6), 31(a).

**PLAINTIFF'S TRIAL PERIOD**

- Plaintiff's Testimony-In-Chief. Opens 60 days after Discovery Period closes, and runs for 30 days (refer to Order).

- Testimony taken by deposition upon oral examination or upon written questions. 37 CFR 2.123, 2.124.

- Plaintiff serves Transcript of testimony and copies of documentary exhibits on adverse party within 30 days after completion of taking testimony. Certified transcript and exhibits filed with TTAB. 37 CFR 2.125.

- Notice of Reliance as appropriate on Discovery Deps., Adms. and Int. Answers, with copies of same, due before close of Test. 37 CFR 2.120.[5]

- Involved app. or reg. files are in evidence for relevant and competent purposes. Publications in gen. Circ. or in libraries, and official records, may be received if appropriate Notice of Reliance is filed and copies submitted within Test. period. 37 CFR 2.122.

- Motion under 37 CFR 2.132, if filed, due after close of Pl.'s Test. period & before opening of Def.'s.

**DEFENDANT'S TRIAL PERIOD**

- Opens 30 days after close of Pl.'s Test. period. Runs for 30 days.

- Test. taken by deposition upon oral examination or upon written questions. 37 CFR 2.123, 2.124.

- Notice of Reliance on Discovery responses also due within Test. period, if filed. 37 CFR 2.120.

- Notice of Reliance on gen. circ. publ. and official records due within Test. period, if filed. 37 CFR 2.122.

- Def. serves Test. transcript on Pl. within 30 days and files certified transcript and exhibits with TTAB. 37 CFR 2.125.

**PLAINTIFF'S REBUTTAL PERIOD**

- Rebuttal Test. period for Pl. opens 30 days after close of Def.'s Test. period and runs for 15 days.

- Pl. may file Notice of Reliance under 37 CFR 2.120, 2.122, with matter relied on, and take Test. to rebut Def. Test. and other evidence.

- Pl. serves and files Transcript of Rebuttal Test. and exhibits in accordance with 37 CFR 2.125.

**BRIEFS; ORAL HEARING**

- Pl. Brief due 60 days after Rebuttal period closing.[6]

- Def. Brief, if filed, due 30 days after Pl. Brief due.

- Pl. Reply Brief, if filed, due 15 days after Def. Brief due. 37 CFR 2.128.

Exhibit 20,
P. 278

MGA 0806443

❖ Separate Request for Oral Hearing, if filed, due not later than 10 days after Reply Brief due. 37 CFR 2.129.

❖ TTAB Notice of Oral Hearing sent to all parties.

Oral Hearing before panel of at least three TTAB judges. 30 minutes for each party. 37 CFR 2.129.

**DECISION; RECONSIDERATION; APPEAL**

❖ TTAB Deliberation. Writing of Opinion and Decision in due course.

❖ Request for rehearing, reconsideration or modification, if

...ed, due within one month. Brief opposition due within 15 days. 37 CFR 2.129(c).

❖ Any Appeal from TTAB Decision due within two months of Decision or two months after denial of req. for recon. See especially 37 CFR 2.129(d).

Exhibit _20_ ,
P. _279_

MGA 0806444

NOTE: *Footnotes and TTAB addresses and telephone number appear on the back of this sheet.*

## FOOTNOTES

(1) Opposer may be any legal entity including a corporation. Opposer must believe that opposer would be damaged by registration of the mark and state the reasons. 15 USC 1063 and 37 CFR 2.101. Notice of Opposition need not be verified. $300 required fee for each class for each person opposing. 37 CFR 2.6, 2.101(b). May be signed by attorney. 37 CFR 2.101(b). Duplicate copy including exhibits required. Order status and title copies of pleaded registrations in advance and attach to Notice/Petition or introduce as evidence during Testimony-In-Chief period. 37 CFR 2.122.

(2) Action, grounds and requirements (Footnote 1) for initiation of Cancellation proceeding are similar to those for an Opposition proceeding and are covered in 15 USC 1064, 1092 and 37 CFR 2.111, 2.112. $300 required fee per class, per person. Duplicate copy required.

(3) Except Notice/Petition, each paper must be served on opponent. Statement of service (date and manner) is required. Period to respond to Motions and Discovery Requests is extended 5 days when service is by first-class mail, "Express Mail," or overnight courier. 37 CFR 2.119. Action due on weekend or D.C. holiday can be taken on next business day. 37 CFR 1.7.

(4) Resetting of time to respond to Discovery Request does not result in extension of Discovery period and subsequent testimony periods unless requested. 37 CFR 2.120(a). All consented extensions of time should be filed in triplicate and list specific dates for all subsequent periods affected.

(5) Except for 37 CFR 2.122(e) documents, documents produced in response to Requests for Production cannot be made of record by Notice of Reliance alone. 37 CFR 2.120(j)(ii).

(6) Briefs should be typewritten or printed, double-spaced, in at least pica or eleven-point type, on letter paper (8½ x 11). Three copies of briefs required. Alphabetical index of cases required. Length limit of 55 pages, including table of contents, index of cases, description of record, statement of issues, recitation of facts, argument, and summary. Reply brief 25 pages total. 37 CFR 2.128(b).


## ADDRESSES AND TELEPHONE

### All papers not requiring a fee should be mailed to:

**Box TTAB No Fee**
Commissioner for Trademarks
**2900 Crystal Drive**
Arlington, Virginia 22202-3513

**NOTE: For papers with fee, use "Box TTAB Fee"**

## TTAB Office Location and Telephone Number

**2900 Crystal Drive**
**South Tower, Suite 9B40**
**Arlington, Virginia 22202-3513**

**Telephone: (703) 308-9300**

Exhibit _20_ ,
P. _280_

MGA 0806445

# Exhibit 21

1  LARRY W. MCFARLAND (State Bar No. 129668)
2  DAVID K. CAPLAN (State Bar No. 181174)
   ELLIE SCHWIMMER (State Bar No. 221522)
   KEATS MCFARLAND & WILSON LLP
3  9720 Wilshire Boulevard
   Penthouse Suite
4  Beverly Hills, California 90212
   Tel: (310) 248-3830
5  Fax: (310) 860-0363

6  Attorneys for Plaintiff
7  MGA ENTERTAINMENT, INC.

8

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

13

14  MGA ENTERTAINMENT, INC.,              **UNDER SEAL**

15           Plaintiff,                    Civil Action No.:

16           v.

17  MULTITOY, INC., YUAN-LAN LIU,         **DECLARATION OF DAPHNE
    an individual, JEFF WU, an individual  GRONICH IN SUPPORT OF
18  and dba IMC TOYS, ALL TOYS            PLAINTIFF'S EX PARTE
    IMPORTS, INC., SUSAN LIU, an          APPLICATION FOR TEMPORARY
19  individual, TOYSDIVISION, INC.,       RESTRAINING ORDER, SEIZURE
    TOM LIU, an individual, and DOES 1-   AND IMPOUNDMENT ORDER,
20  20,                                    EXPEDITED DISCOVERY ORDER
                                           AND ORDER TO SHOW CAUSE RE
21           Defendants.                   PRELIMINARY INJUNCTION**

22

23

24

25

26

27

28

I:\IP\10306\00009\pleadings\TRO - Gronich Decl.doc

Exhibit  21 ,
P. 281

Confidential - Attorney's Eyes Only                          MGA 0871500

FILED
CLERK, U.S. DISTRICT COURT

APR 1 2 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

1      I, Daphne Gronich, hereby declare and state:

2      1.    I am General Counsel for Plaintiff MGA Entertainment, Inc. ("Plaintiff").

3 I am submitting this declaration in support of Plaintiff's *Ex Parte* Application for

4 Temporary Restraining Order, Seizure and Impoundment Order, Order to Show Cause

5 re Preliminary Injunction and Expedited Discovery Order.  Unless otherwise stated

6 herein, I have personal knowledge of the facts stated in this declaration and, if called

7 upon by a court of law to do so, I could and would testify competently to them.

8      2.    Plaintiff is the exclusive owner of all rights in and to the internationally

9 famous BRATZ characters, which include, but are not limited to, "Cloe," "Jade,"

10 "Sasha," "Yasmin," "Meygan," "Dana," "Fianna," "Nevra," "Cameron," "Dylan,"

11 "Eitan," "Koby," "Cade," "Ailani," "Nazalia," "Talia," "Zada," "Mikko," "Colin,"

12 "Deavon" and "Lakin" (including all of the different authorized versions of these

13 characters). These characters are hereinafter referred to as the "BRATZ Characters."

14 True and correct copies of exemplars of depictions of the BRATZ Characters, in the

15 form of selected pages from Plaintiff's copyrighted BRATZ Purse Style Guide, are

16 attached hereto as **Exhibit 1**.

17      3.    The BRATZ Characters, the associated images, accessories and designs,

18 and all other forms of intellectual property associated with the BRATZ Characters,

19 including the distinctive trapezoidal packaging therefor, are extremely valuable to

20 Plaintiff.

21      4.    In 2001, Plaintiff introduced a new line of fashion dolls known as the

22 "BRATZ" or, alternatively, the "BRATZPACK" which are three-dimensional

23 depictions of the BRATZ Characters (hereinafter the "BRATZ Dolls").  When first

24 introduced, the BRATZ Dolls only included "Cloe," "Jade," "Sasha" and "Yasmin."

25 Dolls based on the additional characters listed in paragraph 2, have been introduced

26 since that time.  True and correct copies of photographs of BRATZ Dolls are attached

27 hereto as **Exhibit 2**.

28

Exhibit 21 ,
P. 282

Confidential - Attorney's Eyes Only

MGA 0871501

5. Plaintiff's rights in and to the internationally famous BRATZ Characters and the BRATZ Dolls include all intellectual and industrial property rights associated therewith, including, without limitation, all copyrights, patents, trademarks, industrial designs, trade secrets, contract and licensing rights, design rights, moral rights and trade dress rights in and to the BRATZ Characters, the BRATZ Dolls and the distinctive packaging in which such dolls and related products are sold (collectively referred to as the "BRATZ Property").

6. Plaintiff has obtained numerous federal copyright registrations for the BRATZ Characters and the BRATZ Dolls (the "BRATZ Copyrights"). Plaintiff has complied with all applicable copyright laws. The BRATZ Copyrights are valid, subsisting and in full force and effect. True and correct photocopies of representative copyright registrations, including copyright registrations for Plaintiff's BRATZ Dolls, are attached hereto as **Exhibit 3**.

7. More than 50 million BRATZ Dolls have been sold to date on a worldwide basis, of which over 35 million have been sold in the United States. In addition, over 25 million packages of accessories for such BRATZ Dolls have been sold worldwide, including over 15 million sold in the United States.

8. For two consecutive years in 2001 and 2002, Plaintiff won the toy industry's most prestigious award, the People's Choice Toy of the Year Award, for its BRATZ Dolls. In 2003, Plaintiff won the Toy Industry Association, Inc. ("TIA") Property Toy of the Year Award, the TIA Girl Toy of the Year Award, the Family Fun Toy of the Year, Toy Wishes Magazine Hot Dozen, MSNBC Hottest Toy of the Year 2003, MSN.com Top Holiday Toy 2003, NBC Today Show Toy Test Winner 2003, Toys R. Us/Amazon.com, eBay, and KB Toys Host Lists for 2003, and CNN Money Top 10 Holiday Toys for Girls 2003.

9. Plaintiff operates a web site to promote the BRATZ Dolls and BRATZ Products (as defined below in paragraph 11) at www.bratzpack.com. This web site

I:\IP\10306\00009\pleadings\TRO - Gronich Decl.doc                    -3-

Exhibit 21 ,
P. 283

Confidential - Attorney's Eyes Only

MGA 0871502

1    provides games, e-greetings and the Mix 'N Match Mall of BRATZ fashion and hair

2    designs. The web site also offers visitors the opportunity to join the "Bratz" fan club.

3    Over 250,000 BRATZ fans have signed up and have asked to be notified of new

4    fashion trends that the BRATZ Dolls will wear, as well as the launch and marketing of

5    those new fashions and new dolls.

6        10.    Plaintiff has spent millions of dollars to develop, build and promote the

7    BRATZ Property including, without limitation, the placement of advertisements in all

8    media, including print ads, television spots and radio spots.

9        11.    A significant portion of Plaintiff's business since 2001 has been devoted

10   to the creation and commercial exploitation of the BRATZ Property.  Plaintiff licenses

11   the right to use the BRATZ Characters in a wide range of products such as apparel,

12   back-to-school products, home decor, jewelry and beauty products.  Plaintiff

13   manufactures a wide range of merchandise, including the BRATZ Dolls, and has also

14   produced an upcoming direct-to-video production entitled "BRATZ: The Video,

15   Starrin' 'N' Stylin'!" which will be released in the third quarter of 2004 (these

16   products are hereinafter referred to as the "BRATZ Products").  Plaintiff has

17   numerous active merchandise and promotional licenses, and the number of licenses is

18   continuing to grow. In order to maintain its reputation as well as the value of its

19   licenses, Plaintiff carefully selects each licensee to ensure the quality of its licensed

20   products and has subjected each licensee to a strict quality review and approval

21   program.  Plaintiff currently has over 200 licensees worldwide for BRATZ Products.

22       12.    In keeping with the importance of the BRATZ Property, Plaintiff and/or

23   its licensees have expended tens of millions of dollars in advertising the BRATZ

24   Products and promoting the use of the BRATZ Characters on original licensed

25   products, which include apparel and other items. Items bearing the BRATZ Characters

26   and/or the BRATZ name and mark have proven to be in great demand.

27

28

I:\IP\10306\00009\pleadings\TRO - Gronich Decl.doc          -4-

Exhibit 21,
P. 284

Confidential - Attorney's Eyes Only                                      MGA 0871503

13.    The BRATZ Characters are extremely valuable and successful. The licensing of rights to the BRATZ Characters and sale of BRATZ Products has generated tens of millions of dollars in revenue. In 2003, such sales and licenses generated in excess of $500 million in revenue.

14.    The BRATZ Characters are extremely popular with the public, and the BRATZ Dolls and BRATZ Characters have received enormous amounts of unsolicited publicity, through various magazine and newspaper articles discussing the BRATZ Dolls and Characters.  Attached hereto as **Exhibit 4** are true and correct copies of some such articles.

15.    Through Plaintiff's extensive sales and promotional efforts, as well as its strict adherence to the highest standards of quality for its licensed and manufactured products, Plaintiff and its BRATZ Property are associated in the public mind with high-quality dolls, playsets and accessories, and the BRATZ Property has considerable value to Plaintiff.

16.    As a result of the foregoing, Plaintiff has developed strong trademark rights in various elements associated with the sale and marketing of the BRATZ Property (hereinafter the "BRATZ Trademarks"). The BRATZ Trademarks are renowned nationwide as identifiers of quality dolls and related products.  These trademarks include, but are not limited to, the following:  BRATZ, the names and designs of the individual BRATZ Characters as well as of the BRATZPACK, the design of the packaging for the BRATZ Dolls, and various taglines and other word marks associated with the sale and marketing of the BRATZ Products including, but not limited to, the mark "THE GIRLS WITH A PASSION FOR FASHION." Plaintiff has also obtained numerous federal trademark registrations for the BRATZ Trademarks.  Among these registrations are registrations for the BRATZ and BRATZ PACK marks, the names of several of the BRATZ Characters, and for the mark THE GIRLS WITH A PASSION FOR FASHION in Class 28 for dolls and dolls'

Confidential - Attorney's Eyes Only                                              MGA 0871504

1   accessories (hereinafter the "PASSION FOR FASHION Trademark"). True and

2   correct photocopies of representative trademark registrations are attached hereto as

3   **Exhibit 5.**

4       17.    Plaintiff has used the BRATZ Trademarks continuously on and in

5   connection with the BRATZ Products since the inception of each of the various

6   BRATZ Products, and these BRATZ Trademarks have never been abandoned. The

7   BRATZ Trademarks are valid, subsisting and in full force and effect.

8       18.    Based on the extensive sales and promotion of the BRATZ Products and

9   the wide popularity of such products, including Plaintiff's promotion of its BRATZ

10   Products in media outlets and on its website www.bratzpack.com, the BRATZ

11   Trademarks have developed secondary meaning and significance in the minds of the

12   public, and the services and products utilizing and/or bearing such marks are

13   immediately identified by the purchasing public with Plaintiff.

14       19.    On or about March 26, 2004, I received information that defendant All

15   Toys Imports, Inc. ("All Toys"), located at 330 South Wall Street, Los Angeles,

16   California 90013, was selling and offering for sale a "Musical Trendy Teenies Doll"

17   bearing images of Plaintiff's BRATZ Copyrights and the PASSION FOR FASHION

18   Trademark.  I have examined a "Musical Trendy Teenies Doll" purchased from

19   defendant All Toys by IC.  This "Musical Trendy Teenies Doll" is not a licensed

20   BRATZ Product and bears infringements of the BRATZ Copyrights and a counterfeit

21   of Plaintiff's PASSION FOR FASHION Trademark. True and correct photocopies of

22   photographs of the "Musical Trendy Teenies Doll" purchased from defendant All

23   Toys are attached hereto as **Exhibit 6.** A true and correct photocopy of an image of

24   All Toy's use of the BRATZ Copyrights compared with an image from Plaintiff's

25   copyrighted Cloe Doll Configuration, Accessories and Packaging, and a true and

26   correct photocopy of an image of All Toys' use of the PASSION FOR FASHION

27

28

Confidential - Attorney's Eyes Only    MGA 0871505

1    Trademark compared with an image from Plaintiff's copyrighted Jade Doll

2    Configuration, Accessories and Packaging are attached hereto as **Exhibit 7**.

3        20.    On or about March 26, 2004, I received information that defendant Toys

4    Division, Inc. ("Toys Division"), located at 1440 Boyd Street, Los Angeles, California

5    90033, was selling and offering for sale an "Angel Doll" bearing images of Plaintiff's

6    BRATZ Copyrights.  I have examined an "Angel Doll" purchased from defendant

7    Toys Division by IC.  This "Angel Doll" is not a licensed BRATZ Product and bears

8    infringements of the BRATZ Copyrights.  True and correct photocopies of

9    photographs of the "Angel Doll" purchased from defendant Toys Division are

10   attached hereto as **Exhibit 8**. A true and correct photocopy of an image of Toys

11   Division's use of the BRATZ Copyrights compared with an image from Plaintiff's

12   copyrighted BRATZ Purse Style Guide is attached hereto as **Exhibit 9**.

13       21.    On or about March 26, 2004, I received information that defendant

14   Multitoy, Inc. ("Multitoy"), located at 309 East 4th Street, Los Angeles, California

15   90013, was selling and offering for sale a "Fashion Doll" bearing images of Plaintiff's

16   BRATZ Copyrights.  I have examined a "Fashion Doll" purchased from defendant

17   Multitoy by Investigative Consultants ("IC").  This "Fashion Doll" is not a licensed

18   BRATZ Product and bears infringements of the BRATZ Copyrights.  True and correct

19   photocopies of photographs of the "Fashion Doll" purchased from defendant Multitoy

20   are attached hereto as **Exhibit 10**.  A true and correct photocopy of an image of

21   Multitoy's use of the BRATZ Copyrights compared with an image from Plaintiff's

22   copyrighted BRATZ Purse Style Guide is attached hereto as **Exhibit 11**.

23       22.    On or about March 26, 2004, I received information that defendant JEFF

24   WU dba IMC Toys ("IMC Toys"), located at 406 East 4th Street, Los Angeles,

25   California 90013, was selling and offering for sale a "Fashion Doll" bearing images of

26   Plaintiff's BRATZ Copyrights.  I have examined a "Fashion Doll" purchased from

27   IMC Toys by IC.  This "Fashion Doll" is not a licensed BRATZ Product and bears

28

Exhibit _21_,
P. _287_

Confidential - Attorney's Eyes Only

MGA 0871506

1   infringements of the BRATZ Copyrights.  True and correct photocopies of

2   photographs of the "Fashion Doll" purchased from IMC Toys are attached hereto as

3   **Exhibit 12**. A true and correct photocopy of an image of IMC Toys' use of the

4   BRATZ Copyrights compared with an image from Plaintiff's copyrighted BRATZ

5   Purse Style Guide is attached hereto as **Exhibit 13**.

6       23.   Defendants' products, as set forth in paragraphs 19-22 herein, are not

7   licensed by Plaintiff and, at all relevant times, Defendants were not authorized by

8   Plaintiff, or any authorized agent of Plaintiff, to import, advertise, manufacture (or

9   cause to be manufactured), distribute, sell, offer for sale and/or otherwise exploit their

10  counterfeit and/or infringing products.  In addition, Defendants' products included no

11  indicia of ownership, such as the name of Plaintiff or its licensees or manufacturers.

12      24.   Unfortunately, due to the popularity of the BRATZ Characters and the

13  BRATZ Products, products bearing infringements and counterfeits of the BRATZ

14  Property are being sold throughout the United States. Plaintiff has undertaken and is

15  continuing to exert substantial efforts to prohibit such counterfeiting activity through

16  investigations, recordation of Plaintiff's rights with U.S. Customs and international

17  enforcement actions. Unless relief is granted by the Court, Plaintiff and/or its

18  authorized licensees, retailer customers and retail store customers will continue to

19  suffer extensive damage and irreparable harm from the infringing and illegal activities

20  of Defendants.

21      25.   Products licensed by Plaintiff and/or its licensees bearing the BRATZ

22  Property are of the highest quality. The quality of Plaintiff's and/or its licensees'

23  authentic products featuring the BRATZ Property far exceeds that found in

24  Defendants' infringing goods. However, the appearance of the infringing products in

25  this case is such that a reasonable purchaser could very easily be misled by these

26  products into thinking that he or she is buying a genuine BRATZ Product, particularly

27  since the target consumer audience for Plaintiff's BRATZ Products are children, who

28

Confidential - Attorney's Eyes Only                                    MGA 0871507

are less sophisticated or able to distinguish between authentic and counterfeit merchandise.

26.    The BRATZ Products are hugely popular with consumers, and especially young children, so that child safety is also an important issue in the design and manufacture of licensed products. The safety issue raises special concerns regarding the counterfeit and/or infringing products imported, advertised, manufactured (or caused to be manufactured), distributed, sold, offered for sale and/or otherwise exploited by Defendants. These counterfeit and/or infringing products may be harmful or defective and may not have been adequately designed, labeled, tested or marked with respect to flammability. Not only does this create a substantial peril for the consuming public, but it also creates an unavoidable risk of damage to the reputation and good will of Plaintiff and/or its licensees, as well as the popularity and success of the authorized licensed products, because the consuming public will be deceived as to the origin of such products.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that all of the foregoing is true and correct.

Executed this 9ᵗʰ day of April, 2004, at Beverly Hills, California.

Daphne Gronich

I:\IP\10306\00009\pleadings\TRO - Gronich Decl.doc        -9-

Exhibit 21,
P. 289

Confidential - Attorney's Eyes Only                                    MGA 0871508

# Exhibit 22

DOUGLAS A. WINTHROP (No. 183532)
SIMON J. FRANKEL (171552)
DERRICK H. ROBINSON (No. 226291)
JEFFREY M. ROSENFELD (No. 222187)
HOWARD RICE NEMEROVSKI CANADY
    FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone:   415/434-1600
Facsimile:   415/217-5910

Attorneys for Claimant and Counter-Respondent
MGA ENTERTAINMENT, INC.

## ARBITRATION TRIBUNALS OF THE

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| MGA ENTERTAINMENT, INC., | No. AAA Claim No. 50 T 133 00467 |
| Claimant, | |
| v. | WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA IN SUPPORT OF MGA ENTERTAINMENT, INC. |
| UBI SOFT ENTERTAINMENT, S.A., | |
| Respondent. | |
| UBI SOFT ENTERTAINMENT, S.A., | |
| Counter-Claimant, | |
| v. | |
| MGA ENTERTAINMENT, INC., | |
| Counter-Respondent. | |

WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA

Exhibit 22,
P. 290

Confidential - Attorney's Eyes Only

MGA 0873672

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        Claimant and Counter-Respondent MGA Entertainment, Inc. ("Claimant" or

3   "MGA") hereby submits the witness statement of Paula Treantafelles Garcia.   MGA

4   reserves the right to call Ms. Garcia as a rebuttal or defense witness.

5

6   DATED: March 3, 2006.

7                                          Respectfully,

8                                          DOUGLAS A. WINTHROP
                                           HOWARD RICE NEMEROVSKI CANADY
9                                              FALK & RABKIN
                                           A Professional Corporation
10

11                                         By: _____
12                                              DOUGLAS A. WINTHROP

13                                         Attorneys for Claimant and Counter-
                                           Respondent MGA ENTERTAINMENT, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-1-
WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA

Exhibit 22,
P. 291

Confidential - Attorney's Eyes Only                                          MGA 0873673

## WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA
## IN SUPPORT OF MGA ENTERTAINMENT, INC.

I, Paula Treantafelles Garcia, declare:

### EMPLOYMENT HISTORY

1.      I am the Vice President of Product Design and Development at MGA Entertainment, Inc. ("MGA").

2.      Prior to joining MGA, I was employed by Mattel Inc. ("Mattel"). I started at Mattel in 1997, as a Junior Sales Analyst. In this position, I analyzed sales trends to predict successful toy product segments and marketing strategies.

3.      About a year after I joined Mattel, I had the opportunity to move into a Project Planning group at Mattel. My role in this group was to oversee and facilitate the development and manufacturing of toy products by tracking development milestones and ensuring timely completion of the product by the creative team. In this position, I gained experience in compiling feedback from creative teams at Mattel regarding a number of Mattel toy products, namely large dolls, feature large dolls, and small dolls. In the Project Planning group, I also gained experience in tracking and implementing feedback from licensors, such as Disney.

4.      In early 2000, I left Mattel and joined MGA as an Associate Product Manager. As an Associate Product Manager I developed product concepts and product packaging, and collaborated on the creation of marketing plans for these products. I was later promoted to a Product Manager at MGA. While the nature of my responsibilities as a Product Manager remained the same, I was given greater decision-making authority as to the various products, product-packaging, and marketing campaigns in which I was involved. Given the success with my MGA product lines, and, specifically, with the "Bratz" product lines, I became the Director Product Development—Bratz and Dolls. My present title is Vice President of Product Design and Development.

-2-

Exhibit _22_ ,
P. _292_

Confidential - Attorney's Eyes Only

MGA 0873674

### THE "BRATZ" PROPERTY

5.    In late 2000 and early 2001, I became involved in the development and marketing of the "Bratz" line of dolls at MGA.  We designed the "Bratz" dolls to offer girls with a more up-to-date, multi-ethnic, and hip doll choice, as compared with Mattel's Barbie dolls.  The "Bratz" doll line initially focused on four, approximately ten-inch sized dolls of different ethnicities:  Sasha (African American), Jade (Asian), Yasmin (Hispanic) and Cloe (Caucasian).

6.    Since the launch of the "Bratz" dolls in the summer of 2001, MGA has enjoyed tremendous success with the "Bratz" product line.   "Bratz" quickly became one of the world's premiere doll lines and girls' lifestyle brands, and it has won popular and critical acclaim.  For example, the "Bratz" line has won Family Fun Magazine's Toy of the Year Award four years in a row.

7.    While each of the "Bratz" characters possesses unique personalities, there is a core set of "Bratz" characteristics, which all the "Bratz" characters possess, and which has not changed since the introduction of the "Bratz" dolls in the summer of 2001.  The "Bratz" characters are all ultra-cool, hip, sassy, and composed, and they are all attentive to the latest fashion and cultural trends.  The "Bratz" characters display these characteristics in the clothes they wear, the accessories they use, and the way they act:  the "Bratz" characters are always loath to do anything that would make them look foolish or unstylish.

8.    The "Bratz" characters are also distinguished by their unique look.  Compared with a doll such as Barbie, the "Bratz" dolls have over-sized heads and shoes; they all have thick hair in big and funky styles; they are curvaceous; they have large almond-shaped eyes and pouty lips; and they have thin, angular faces.  And, as noted above, while the individual "Bratz" characters have their own, unique personalities, they all wear the latest in fashion trends.

9.    These are the characteristics that make the "Bratz" characters, the "Bratz."  It is these social and physical characteristics that have led the "Bratz" dolls to their worldwide success.  Without these characteristics, the "Bratz" would simply be another doll line, and

-3-

Confidential - Attorney's Eyes Only

MGA 0873675

1  the "Bratz" line would not be the unique property that it has become.  As such, it is

2  imperative for MGA to preserve these essential physical and social characteristics of the

3  "Bratz" characters, both in the "Bratz" products that MGA develops internally, as well as

4  in the "Bratz" products that MGA licenses others to develop.

5      10.  I have been fortunate to have worked on the "Bratz" line since its introduction

6  in the summer of 2001.  I helped design the look of the "Bratz" dolls, and I helped create

7  the personalities of the "Bratz" characters.  I am intimately familiar with the way the

8  "Bratz" characters look, the clothes they wear, the accessories they use, and the way they

9  act.  And, as stated above, these are the essential characteristics of the "Bratz" line.  As

10  such, I make every reasonable effort to ensure that representations of the "Bratz"

11  characters preserve these essential traits and the overall brand.

12

13  ## DEVELOPMENT OF THE "BRATZ" VIDEO GAME

14      11.  In the summer of 2002, after the "Bratz" line had gained immense popularity, I

15  learned that MGA had entered into an agreement with Ubisoft Entertainment, S.A.

16  ("Ubisoft") to develop a video game based on the "Bratz" characters.  I was excited by the

17  prospect of working with Ubisoft to expand the scope and depth of the "Bratz" brand

18  through the video game world.

19      12.  Around this time, I also learned that Susan McBride, a recent arrival at MGA,

20  who had extensive experience in the video game industry, would be assisting Victoria

21  O'Connor, MGA's Director of Licensing, in providing feedback to Ubisoft regarding

22  Ubisoft's development efforts.

23      13.  I soon had the opportunity to work with Susan McBride, and I was

24  immediately impressed with her video game development knowledge.  Susan had a solid

25  understanding of what was possible in video game development in terms of graphics,

26  animations, and music.  Susan also displayed a passion for video game development and a

27  willingness to devote a significant amount of time to helping Ubisoft develop the "Bratz"

28  video game.

-4-

WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA
Exhibit _22_ ,
P. _294_

Confidential - Attorney's Eyes Only

MGA 0873676

1    14.    Susan and I worked with Charles O'Connor, Victoria O'Connor, and Aileen

2    Storer, as the MGA team members primarily responsible for reviewing Ubisoft's video

3    game submissions.  In practice, Susan and Victoria handled the majority of this work; I

4    only became involved when specific questions relating to the "Bratz" look or

5    characteristics came into question.

6        15.    While I do not recall much of the specifics of the development of the games, I

7    do remember the models, animations, and songs as described below, because of their

8    inconsistency with the "Bratz" characters, and our concern about their potential to tarnish

9    the "Bratz" brand.

10

11    **THE CHARACTER MODELS FOR THE "BRATZ" VIDEO GAME**

12

13        16.    At some point in the summer of 2002, Ubisoft submitted to MGA various

14    three-dimensional ("3D") models of the "Bratz" characters to be used in the video games.

15    I was alarmed by the low quality of these models.   They were so coarse that even

16    somebody familiar with the "Bratz" brand would have trouble recognizing these models

17    as the "Bratz" characters.   Their hair looked as if it was made up of one large plastic

18    piece, instead of strands of hair.  The "Bratz" characters' faces, eyes, eyebrows, and lips

19    were all out of proportion and off-specification with the character art.   The "Bratz"

20    characters' clothes did not look like they were made out of fabric but, rather, as if they

21    were painted on the "Bratz" models' bodies.   Most significantly, these models looked

22    rough; they lacked the detail, finesse, and flair that make the "Bratz" property unique.

23    Instead, they looked like simple block characters.   True and correct electronic copies of

24    the initial 3D models submitted by Ubisoft to MGA are attached hereto on a CD as

25    Exhibit 126 (Electronic).

26        17.    I was concerned that using these models would not only result in a video game

27    that would not appeal to the target audience, but would also jeopardize the "Bratz" brand

28    generally, by lowering the quality of the look of the "Bratz" characters.  As I stated above,

-5-

WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA

Exhibit 22,
P. 295

Confidential - Attorney's Eyes Only

MGA 0873677

1   MGA has made tremendous efforts to preserve the integrity of the "Bratz" brand in all of

2   the "Bratz" products that it releases. I wanted Ubisoft to portray the "Bratz" characters as

3   closely to specification as possible.

4       18.   I expressed my concerns about the quality of these "Bratz" models to Victoria

5   O'Connor and Susan McBride. I asked Susan McBride if, based on her video game

6   experience, she believed that these 3D models were the best quality models that could be

7   developed. Susan McBride informed me that this was not the case. She said that the

8   character models could be improved significantly if they were turned into two-

9   dimensional ("2D") sprites rather than 3D models. Susan McBride showed me examples

10  of what the 2D sprite-based models could look like, and the difference was like night and

11  day.

12      19.   The 2D sprite-based models that Susan showed me had the style and detail that

13  3D "Bratz" models had been missing. The proportions were truer to the "Bratz" brand.

14  The hair was appropriately styled and hung more naturally, showing individual strands of

15  hair. Most significantly, the 2D sprite-based models contained much more detail than the

16  3D models.

17      20.   Susan and I agreed that we would ask Ubisoft to use these 2D sprite-based

18  models in all of the versions of the "Bratz" video game Ubisoft was then developing. A

19  true and correct copy of meeting notes in which we requested that Ubisoft use 2D sprite-

20  based models instead of 3D models is attached hereto as Exhibit 127.

21      21.   Despite our request, Ubisoft continued to submit 3D models to MGA. These

22  new 3D models were also inconsistent with the "Bratz" look and were also coarse and

23  lacking in detail. Again, the hair on these models looked as if it was composed of one

24  plastic piece, rather than individual hair strands; the clothes did not appear natural or

25  made of fabric; and the facial features were off-specification and crudely-drawn. These

26  models were not true to the "Bratz" brand and below an acceptable quality for a "Bratz"

27  product. True and correct electronic examples of these later 3D model submissions are

28  attached hereto on a CD as Exhibit 128 (Electronic).

-6-

Confidential - Attorney's Eyes Only

MGA 0873678

22.    Throughout Ubisoft's ongoing 3D model submissions, Susan McBride and I continued to agree that we wanted to use the 2D sprite-based models instead of these 3D models.  Eventually, Ubisoft switched to the 2D sprite-based models.  The transformation in the models was well worth the switch from 3D to 2D.  Someone looking at the 2D sprite-based models can easily notice the difference in quality from the 3D models.  True and correct copies of the final 2D sprite-based models are attached hereto as Exhibit 129.

## THE CHARACTER ANIMATIONS FOR THE "BRATZ" VIDEO GAME

23.    I was similarly disappointed with Ubisoft's initial submissions of character animations, *i.e.*, the dance moves that the "Bratz" characters would perform in the video game.  Ubisoft had the "Bratz" characters jumping, flipping, and performing acrobatic feats.  Not only was this completely out-of-line with the "Bratz" characters' personalities, but it was not even consistent with other popular girls' products.  True and correct electronic examples of these initial animations are attached hereto on a CD as Exhibit 130 (Electronic).

24.    As I noted above, the "Bratz" characters' cool, calm, and collected personalities are the hallmark of the "Bratz" characters.  The "Bratz" characters would never do anything to make themselves look foolish or out-of-style.  The "Bratz" characters would certainly never jump around, flip, or perform acrobatic feats.  It is simply not their style.  Anybody familiar with the "Bratz" brand should have recognized that these initial character animations submitted by Ubisoft were inappropriate for the "Bratz."

25.    As with the models, I feared that these off-brand and cartoon-like dance moves would not only result in a video game that was not true to the "Bratz" characters, but would also jeopardize the "Bratz" brand generally.  As such, I wanted Ubisoft to make these dance move animations more realistic, and thus more in line with the "Bratz" characters' personalities and the target audience.

-7-

Confidential - Attorney's Eyes Only

MGA 0873679

26.   I expressed my disappointment to Susan McBride and Victoria O'Connor. Susan and Victoria agreed with my feedback, and I understand that Susan sent our concerns on to Ubisoft, stating that overall, the animations needed to be more "graceful, feminine and sexy" and "need[ed] to move like real girls move, not like extreme cartoon animations might move." I also understand that Susan McBride asked Ubisoft to look at the comparable Mary Kate & Ashley dance video game as an example of realistic dancing animation. A true and correct copy of this email from Susan McBride is attached hereto as Exhibit 131.

27.   Ubisoft seemed surprised by our rejection of its character animations. Its producers and developers did not seem to understand what was wrong with the initial dance moves or how girls would realistically dance. I would have expected that a company that was interested enough in the "Bratz" brand to secure a license from MGA would have taken the time to understand the nature of the "Bratz" characters and appropriate looks and moves for these characters.

28.   In an effort to help Ubisoft implement more appropriate dance moves into the "Bratz" video game, Susan McBride actually made video tapes of me and other MGA employees demonstrating specific dance moves. True and correct excerpts from these video tapes of me and others demonstrating dance moves are attached hereto on a CD as Exhibit 132 (Electronic).

29.   This video tape clearly helped Ubisoft develop more appropriate, on-brand dance moves; moves that were more consistent with the "Bratz" characters' personality. True and correct electronic examples of the final character animations are attached hereto on a CD as Exhibit 133 (Electronic).[1]

## THE SONGS FOR THE "BRATZ" VIDEO GAME

30.   Ubisoft's initial songs for the "Bratz" video game also were inconsistent with

---

[1] Click on HTML files to view multiple animations simultaneously.

-8-

WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA

Exhibit 22,
P. 298

Confidential - Attorney's Eyes Only

MGA 0873680

the "Bratz" brand. I was disappointed by both the out-of-date melodies of the submitted songs, as well as the electronic, atonal sounds of the instrumentation. I also thought that much of the music was "techno" in nature, which was not consistent with the "Bratz" brand. True and correct electronic examples of Ubisoft's initial song submissions are attached hereto on a CD as Exhibit 134 (Electronic).

31. I understand that on July 10, 2002, Victoria O'Connor had sent to Ubisoft a list of the appropriate types of music for the "Bratz" characters. While the "Bratz" character Jade, might have favored techno elements in her music because of her extreme style, techno music as a whole was inappropriate for *all* of the "Bratz" characters and inappropriate as popular dance music for a video game targeted at girls. Rather, we had asked Ubisoft to incorporate music modeled after J. Lo., No Doubt, Nelly Furtado, and Avril Lavigne. As such, we had expected Ubisoft's songs to include a variety of music incorporating pop, hip hop, soul, along with some techno music. A true and correct copy of the email that Victoria O'Connor had previously sent to Ubisoft requesting specific types of music is attached hereto as Exhibit 135.

32. I understand that Susan McBride told Ubisoft that the initial song submissions were too techno and off specification for the "Bratz" characters, and asked Ubisoft to submit new songs for MGA's review. A true and correct copy of this email from Susan McBride to Ashley Bushore is attached hereto as Exhibit 136.

33. Again, Ubisoft was resistant to changing the music. In an email he sent to MGA, Tony Van of Ubisoft pressured MGA to compromise on the songs, stating that the music did not affect the quality of the characters, and therefore, MGA should let the music slide by. A true and correct copy of an email from Tony Van to Victoria O'Connor and Susan McBride asking MGA to compromise on the music is attached hereto as Exhibit 137.

34. What Tony Van failed to understand was that the "Bratz" characters are not defined solely by their physical appearances, but are also substantially defined by their cool styles. Having techno music throughout the "Bratz" video game would not only have

-9-

Confidential - Attorney's Eyes Only

MGA 0873681

1  resulted in a video game that was inconsistent with the "Bratz" characters, but it could

2  have tarnished the "Bratz" brand generally.  As such, we urged Ubisoft to revise the songs

3  to give them a more popular, soulful, and hip hop flair.

4      35.    As part of our review of Ubisoft's game submissions, on occasion I gave

5  feedback that a particular song needed, for example, to have more hip hop or base in it or

6  to have less of a salsa feel.  Other times, MGA would give Ubisoft a specific reference

7  song to serve as a model song, or would give Ubisoft descriptive feedback, such as to

8  make the song less masculine and aggressive.  Examples of such MGA feedback to

9  Ubisoft regarding the songs are attached hereto as Exhibit 138 and Exhibit 139.

10     36.    I am aware that Ubisoft claims that MGA's comments regarding the songs and

11  certain graphical submissions were vague, and that the composer or graphic artist could

12  not implement them.  I do not believe this is a fair assessment of such feedback.  I have

13  worked with many composers and graphic artists in my employment at MGA and Mattel.

14  This is the type of language that creative people use with each other when they need to

15  critique and refine graphics and music.

16     37.    For example, I believe that a talented, popular music composer or music editor

17  should have been able to understand such feedback and incorporate it into a song.  A

18  talented composer would have understood that to make a song less masculine and

19  aggressive, one might raise the pitches of the song or change the instrumentation to

20  include less coarse sounds.  While Ubisoft complained about this feedback, such feedback

21  is commonly used to critique music.

22     38.    Similarly, asking Ubisoft to make shoes more funky and hip is the type of

23  feedback typically used in the industry.  A talented graphic artist should be able to make

24  shoes more funky and hip, by using brighter colors and textures, such as glitter, by adding

25  disproportions and sole thickness, by adding some wedge to them, or by modeling the

26  shoes from styles that are regarded as funky and hip by the industry and the public, such

27  as Steve Madden's line of shoes.

28     39.    Ultimately, Ubisoft developed several new songs that were truer to the

-10-

WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA

Exhibit 22,
P. 300

Confidential - Attorney's Eyes Only

MGA 0873682

1  personalities of the "Bratz" characters and the reference music that we had provided to
2  Ubisoft.   True and correct electronic examples of some of these approved songs are
3  attached hereto on a CD as Exhibit 140 (Electronic).

4

5  ### THE JEAN-PIERRE NON-PLAYER CHARACTER

6      40.   Another Ubisoft video game element that raised concerns about quality and
7  faithfulness to the "Bratz" brand was the addition of a new character, named Jean-Pierre.
8  Some time in early 2003, Ubisoft proposed adding a new character to the "Bratz" video
9  game, which would assist the "Bratz" characters in their gameplay.   This new character, to
10 be named Jean-Pierre, would be an adult male character who would operate a clothing
11 boutique that the "Bratz" characters would visit in the game.   A copy of an email from
12 Iskander Elhaimer explaining the role of Jean-Pierre is attached hereto as Exhibit 141.

13     41.   Soon thereafter, Ubisoft sent us several proposed looks for the Jean-Pierre
14 character.   These proposed looks were horrible; they did not fit into the "Bratz" world
15 and, frankly, they looked creepy.   I remember that one proposed Jean-Pierre character
16 looked like a pirate, with an anchor-shaped earring, and another had in indescribable
17 hairstyle.   True and correct copies of these proposed Jean-Pierre character sketches are
18 attached hereto as Exhibit 142.

19     42.   I was extremely disappointed with Ubisoft's submission, and I thought that all
20 of Ubisoft's proposed Jean-Pierre characters were inappropriate for the "Bratz" video
21 game, primarily because they did not look like characters that would exist in the "Bratz"
22 world, or that looked like the type of character we would want to portray as interacting
23 with young girls.   A true and correct copy of an internal MGA email I sent expressing my
24 discomfort with Ubisoft's Jean-Pierre submissions is attached hereto as Exhibit 143.

25     43.   While I had expected Ubisoft to develop ancillary characters for the "Bratz"
26 video game, as with all submissions, such characters needed to be consistent with the
27 "Bratz" brand and of sufficient quality.   Unfortunately, each of Ubisoft's attempts had
28 been very far-off the mark, and I felt uncomfortable approving their use in the "Bratz"

-11-

Confidential - Attorney's Eyes Only

MGA 0873683

1    video game.  I was surprised by Ubisoft's difficulties in following the "Bratz" brand

2    specifications.  Ubisoft had the same amount of reference material that other "Bratz"

3    licensees possessed (such as what the "Bratz" "direct-to-video" developer had received

4    from MGA), yet had far more difficulty producing artwork that was true to the "Bratz"

5    brand.

6         44.   In the end, I did not think that any of Ubisoft's Jean-Pierre characters could be

7    salvaged.  Out of desperation, I called a contact at Klasky Csupo, a third party design

8    studio that MGA has used to create "Bratz" artwork.  While Klasky Csupo had no more

9    reference material than Ubisoft had, it was consistently able to create on-specification

10    "Bratz" artwork quickly and with minimal feedback from MGA.  Though I had hoped that

11    Ubisoft would have been able to create an appropriate Jean-Pierre character, I turned to

12    Klasky Csupo as a last resort; otherwise, MGA risked sacrificing the "Bratz" brand.

13         45.   Soon thereafter, we agreed to give Ubisoft another opportunity to develop the

14    Jean-Pierre character, which we had decided would now be modeled as an adult female

15    character named Kassandra.  In order to assist Ubisoft in developing an appropriate

16    Kassandra character, I provided Ubisoft with an additional reference image for a

17    Kassandra model.  A true and correct example of the email in which I sent the additional

18    reference image to Ashley Bushore is attached hereto as Exhibit 144.  Ultimately,

-12-

WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA

Exhibit 22,

P. 362

Confidential - Attorney's Eyes Only

MGA 0873684

Ubisoft's Kassndra models improved considerably in comparison to its initial Jean-Pierre submissions and became much truer to the "Bratz" look.  A true and correct example of a later Kassandra submission from Ubisoft is attached hereto as Exhibit 145.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.  Executed this 13 day of March, 2006, at Van Nuys, California.

DATED: March 13 2006.

PAULA TREANTAFELLES GARCIA

-13-

WITNESS STATEMENT OF PAULA TREANTAFELLES GARCIA

Exhibit 22,
P. 303

Confidential - Attorney's Eyes Only

MGA 0873685