EXHIBIT  8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

| | |
|---|---|
| CARTER BRYANT, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | )   NO. ED CV 04-09049 |
| | )   (LEAD LOW NUMBER) |
| MATTEL, INC., | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |
| AND RELATED ACTIONS, | ) |
| _____ | ) |

**CERTIFIED COPY**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, JUNE 26, 2006

10:56 A.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
(951) 274-0844
CSR11457@SBCGLOBAL.NET

EXHIBIT ___8___

PAGE ___196___

2

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

 4

 5                        QUINN EMANUEL
                          BY:   JON D. COREY
 6                        BY:   JOHN B. QUINN
                          865 S. FIGUEROA STREET,
 7                        10TH FLOOR
                          LOS ANGELES, CALIFORNIA  90017
 8                        (213) 624-7707

 9

10    ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
      CARTER BRYANT:

11
                          LITTLER MENDELSON
12                        BY:   KEITH A. JACOBY
                          BY:   DOUGLAS A. WICKHAM
13                        2049 CENTURY PARK EAST,
                          FIFTH FLOOR
14                        LOS ANGELES, CALIFORNIA  90067
                          (310) 553-0308
15

16    ON BEHALF OF MGA ENTERTAINMENT:

17
                          O'MELVENY & MYERS LLP
18                        BY:   DIANA M. TORRES
                          BY:   DALE CENDALI
19                        400 SOUTH HOPE STREET
                          LOS ANGELES, CALIFORNIA  90071
20                        (213) 430-6000

21

22

23

24

25
```

EXHIBIT _____ 8

PAGE _____ 197

JUNE 26, 2006        ED CV 04-9049-SGL

11

1   BROUGHT.  WHAT'S NOT CLEAR TO THE COURT AT THIS POINT IS

2   EXACTLY WHAT ALLEGATIONS ARE SUPPORTING THESE CLAIMS.

3           FOR EXAMPLE, YOU ARGUE THAT IT'S UNCONSCIONABLE.

4   WHAT ABOUT IT IS UNCONSCIONABLE?  YOU CAN CERTAINLY

5   CHARACTERIZE THIS VERY EASILY AS SOMETHING WHICH IS SIMPLY AN         11:09

6   EFFORT -- EVEN IF I ASSUME THAT PROCEDURALLY IT'S AN ADHESION

7   CONTRACT -- IS AN EFFORT BY MATTEL TO REQUIRE EMPLOYEE LOYALTY

8   BY ITSELF UNCONSCIONABLE?

9           MR. WICKHAM:  THE NINTH CIRCUIT IN THE LAST SEVERAL

10  YEARS -- I'D SAY ACTUALLY ABOUT THE LAST SEVEN OR EIGHT YEARS        11:09

11  -- HAS DEVELOPED A DOCTRINE AND A BODY OF LAW GOVERNING

12  UNCONSCIONABILITY.  ACTUALLY, IT'S SOME OFFSHOOT FROM

13  CALIFORNIA COURT DECISIONS -- TING VERSUS AT&T AND INGALL

14  VERSUS CIRCUIT CITY -- AND THOSE CASES HAVE ANALYZED THE

15  UNCONSCIONABILITY ISSUE IN THE CONTEXT OF PRE-DISPUTE               11:09

16  ARBITRATION AGREEMENTS IN THE EMPLOYMENT CONTEXT.  THOSE CASES

17  THEMSELVES APPLIED AND ANALYZED THE CALIFORNIA SUPREME COURT'S

18  DECISION IN ALMENDAREZ.

19          THERE'S TWO ELEMENTS TO ESTABLISH A CLAIM OF

20  UNCONSCIONABILITY:  ONE IS PROCEDURAL UNCONSCIONABILITY; THE        11:10

21  OTHER IS SUBSTANTIVE UNCONSCIONABILITY.  THE PROCEDURAL

22  UNCONSCIONABILITY GOES TO THE MANNER OF FORMATION.  IS THE

23  AGREEMENT ON A PRE-PRINTED FORM CONTRACT, A CONTRACT OF

24  ADHESION?  IS THERE ANY MEANINGFUL OPPORTUNITY FOR

25  NEGOTIATIONS?  IS IT PRESENTED TO THE EMPLOYEE ON A TAKE IT OR      11:10

EXHIBIT _____ 8

PAGE 198

12

1   LEAVE IT BASIS?

2          WE WOULD SUBMIT THAT, FIRST OF ALL, THOSE ARE PLED IN

3   THE COUNTERCLAIM AND THAT THOSE ESTABLISH THE EXISTENCE OF

4   PROCEDURAL UNCONSCIONABILITY.

5          THE COURT:  I'M ASSUMING THAT FROM MY QUESTION, IS          11:1(

6   THE SUBSTANTIVE UNCONSCIONABILITY --

7          MR. WICKHAM:  WITH REGARD TO SUBSTANTIVE

8   UNCONSCIONABILITY, THIS GOES TO SOME OF THE CLAIMS THAT ARE

9   PART AND PARCEL OF THE 17200 CLAIM:  ARE THERE PROVISIONS IN

10  THE AGREEMENT THAT ARE UNFAIR OR UNLAWFUL?          11:1(

11         AND WE WOULD SUBMIT THAT, FIRST OF ALL, WITH REGARD

12  TO THE INVENTIONS ASSIGNMENT, AS DRAFTED HERE, IT VIOLATES

13  CALIFORNIA LABOR CODE SECTION 2870 AND 2871.

14         THE COURT:  WHICH IS SPECIFICALLY REFERENCED IN THE

15  AGREEMENT, IS IT NOT?          11:11

16         MR. WICKHAM:  YOUR HONOR, IT'S REFERENCED IN THE

17  AGREEMENT, BUT IT IS NOT REFERENCED IN THE MANNER THAT THE

18  STATUTE ACTUALLY CONTEMPLATES.  THE STATUTE SPECIFICALLY

19  CONTEMPLATES THAT THE NATURE OF ANY ASSIGNMENT, AS A

20  SUBSTANTIVE MATTER OF THE CONTRACT, WOULD NOT EXTEND TO THOSE          11:11

21  MATTERS.  2871 SAYS THAT ANY ASSIGNMENT THAT GOES BEYOND WHAT

22  2870 PERMITS IS, TO THAT EXTENT, VOID.

23         THE NATURE OF THE ASSIGNMENT HERE IS THAT IT IS A

24  BROAD BASED ASSIGNMENT OF ALL INVENTIONS DURING THEIR

25  EMPLOYMENT; ALL THINGS THAT WERE CONCEIVED AND PRACTICED.          11:11

JUNE 26, 2006          ED CV 04-9049-SGL

EXHIBIT ____ 8

PAGE 199

13

1          NOW, TWO PARAGRAPHS DOWN, IT SAYS, 'OF COURSE,

2    NOTHING IN HERE WILL APPLY IF 2870 APPLIES.'

3          WELL, THERE'S TWO RESPONSES WITH REGARD TO THAT.

4          FIRST OF ALL, THAT IS A SEPARATE NOTICE THAT THEY ARE

5    REQUIRED TO PROVIDE IN THE CONTRACT UNDER 2872.  AND SECONDLY,          11:12

6    THAT IF YOU PUT YOURSELF IN THE POSITION OF AN EMPLOYEE WHO

7    DOES NOT HAVE A COLLEGE DEGREE; WHO IS GETTING A $30,000 A YEAR

8    JOB; WHO DOESN'T HAVE THE WHEREWITHAL TO RETAIN COUNSEL TO BE

9    ABLE TO INFORM THEM WHAT 2870 MEANS...  MY EYES ARE GLAZING

10   OVER; I HAVE NO IDEA; I'M NOT A LAWYER ON THIS.          11:12

11         YOUR HONOR, WHAT IS PARTICULARLY TELLING ABOUT THIS

12   IS THAT SUBSEQUENT TO THE MOTION, WE DEPOSED MR. BRYANT'S

13   SUPERVISOR, ANN DRISCAL.  THE AGREEMENT IS PREDICATED ON AN

14   ASSIGNMENT OF THINGS THAT WERE CONCEIVED OR THAT WERE REDUCED

15   TO PRACTICE.          11:13

16         I WILL CONFESS, YOUR HONOR, THAT PRIOR TO THIS CASE,

17   I DID NOT KNOW WHAT 'REDUCED TO PRACTICE' WAS; AND, IN FACT, IT

18   IS A TERM OF ART WHICH IS IN THE PATENT FIELD; AND AS AN

19   EMPLOYMENT LAWYER, I'M NOT FAMILIAR WITH THAT.  AND HERE WE'RE

20   EXPECTING 30-YEAR OLD PEOPLE WITHOUT COLLEGE DEGREES TO KNOW          11:13

21   WHAT 'REDUCED TO PRACTICE' MEANS?

22         WELL, WE ASKED MR. BRYANT'S SUPERVISOR, THE ONE WHO

23   WAS CHARGED AT LEAST WITH SOME RESPONSIBILITY FOR THIS

24   AGREEMENT; WE ASKED HER WHETHER OR NOT SHE KNEW WHAT LABOR CODE

25   SECTION 2870 WAS.          11:13

EXHIBIT _____ 8

JUNE 26, 2006          ED CV 04-9049-SGL

PAGE _____ 20D

66

1        THE CLERK:   COURT STANDS IN RECESS.

2

3

4

5

6

7

8

9

10

11

12

13

14

15                              CERTIFICATE

16

17    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
      STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
18    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
      ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
19    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
      THE UNITED STATES.

20

21    _____          7-3-06
      THERESA A. LANZA, RPR, CSR            DATE
22    OFFICIAL COURT REPORTER

23

24

25                                      EXHIBIT _____ 8

                                        PAGE _____ 201

          JUNE 26, 2006          ED CV 04-9049-SGL

EXHIBIT 9

## EXPERT REPORT OF D. JAN DUFFY

### RE: IN THE MATTER OF CARTER BRYANT v. MGA ENTERTAINMENT, INC. AND CONSOLIDATED CASES

**Case No. CV 04-9059**

United States District Court
Central District of California
Eastern Division

### PROFESSIONAL QUALIFICATIONS:

As detailed in the attached resume, I am a management practices consultant, workplace investigator, and educator with offices in San Francisco, California, and London, UK. I advise employers and employees, human resources professionals, managers, and attorneys, in both public and in-house settings, concerning such management issues as effective discrimination, harassment and retaliation prevention and correction; conducting workplace investigations; critical thinking in managerial decision-making; workplace information practices; culture assessment; diversity change management; and managing in the global workplace. I advise employers in designing and implementing equity and diversity change management and monitoring programs, and drafting and implementing appropriate workplace policies, procedures, and programs. I also maintain a nationwide practice as an employment practices litigation consultant and testifying expert, serving both plaintiffs and defendants, concerning usual and appropriate workplace-related management practices.

From September 1980 until September 1996, I was employed full-time as a Professor of Business at California Polytechnic State University at San Luis Obispo, California. In that capacity, I taught undergraduate and graduate business classes in public policy and government regulation of business, legal and regulatory aspects of international business transactions, employment, and business law. All of those classes included a component of civil rights and employment law and policy, as well as critical thinking in managerial decision-making. My students were chiefly MBA, management, human resources, finance, marketing, accounting, and international business majors. I taught and evaluated the performance of several hundred such students each year. As a business school professor, I also served the university in the following capacities, among others: Chair of the 1993 Business Dean Search Committee; faculty liaison to the Business School Advisory Council; faculty liaison to the University President's Cabinet; Chair of the University Grievance and Disciplinary Action Committee; sexual harassment advisor and investigator; and as a member or Chair of various committees including the Affirmative Action Grant Review Committee and the Ad Hoc Committee on the Status of Women. As a senior faculty member, I had occasion to observe, evaluate and/or recommend job-related decisions respecting university business students, faculty, and administrators. I participated, as either a member or Chair, on several dozen selections or appointment committees for administrators, interim administrators, foundation administrators, faculty, and student employment positions.

I am also a former management-side employment attorney. Having practiced full time for

1

CONFIDENTIAL –
ATTORNEYS EYES ONLY
EXHIBIT _____ 9

PAGE _____ 202

**Opinion 2**

**During the period relevant to this litigation, Mattel's intellectual property protection program and the policies, procedures, and practices Mattel utilized to establish and maintain them, were seriously deficient and failed to conform to the above key principles in a number of critical respects. As such, they fell substantially short of the usual and reasonable management practice concerning intellectual property protection of California employers at the time. Accordingly, it is my opinion that it is not reasonable to expect employees such as Carter Bryant who are subject to such ambiguous practices and procedures to navigate them alone, but nevertheless be expected to have a clear understanding of the parameters governing their behavior.**

**<u>BASES OR GROUNDS FOR OPINIONS:</u>**

**Opinion 1**

California law and public policy famously provide substantial and extensive protections for employee rights. This high level of protection, which is somewhat unique in the United States, extends, for example, to special employee privacy rights, rights to post-employment competition, rights to their own ideas and inventions, and rights to be free from unintended waiver of fundamental rights, among others. Moreover, although this is not to say that California employees are free from traditional responsibilities such as respect for employer property, even those responsibilities are defined and affected by the employee rights orientation of California law and policy.

This high degree of employee rights protection necessarily imposes significant constraints on employers in managing their employees. Because, by definition, reasonable management practice must comply with the law and policy of the jurisdiction in which an employer operates, California legal and policy employee rights protection necessarily and dramatically influences what constitutes "usual and reasonable management practice" in California. Thus, while the specific law and policy that applies to the adjudication of a particular case, such as the instant lawsuit between Mattel, MGA, and Carter Bryant, is always the province of the court, and while the determination of the facts and application of the law to the facts is the province of the jury, California employers and their advisors must remain mindful of general constraints imposed by such California law and policy in designing, implementing, and maintaining employee-related management practices.

For employers, human resources professionals, and other laypersons who design and manage an organization's employee related programs, policies, and procedures, this mindfulness generally takes the form of adherence to certain basic principles. Indeed, in this regard, the principles which pertain to intellectual property protection are no different than those which apply to programs and policies relating to discrimination, sexual harassment, and retaliation programs, among others. Among the principles relevant to this case, which particularly implicates management practices related to employer intellectual property protection programs, are the following:

6

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT _____9___

PAGE ___203___

1)   Intellectual property protection initiatives and programs must exhibit careful attention to conformity with a number of fundamental employee rights protected by California law and policy;

2)   Employers must demonstrate commitment to, and support for, any such programs that they establish and expect to maintain through the devotion of appropriate resources to establish, implement, and maintain them;

3)   The programs, policies and procedures must be clear, consistent, and comprehensible;

4)   The programs and policies must be communicated to or imposed upon employees by effective and reasonable procedures.

**1)   Intellectual property protection initiatives and programs must exhibit careful and meaningful attention to conformity with a number of fundamental employee rights protected by California law and policy**

Because they implicate so many fundamental employee rights, management practices related to employer protection of intellectual property, which incorporates such matters as trade secrets and proprietary information protection; employer/employee rights to ideas and inventions; conflicts of interest; and codes of conduct, among others, must be especially attentive to conforming practices to California's law and policy-driven employee rights orientation.

These rights include, for example, the right to privacy, which is guaranteed to employees by Article 1 of the California Constitution. California employers are restrained by such employee privacy rights from, among other things, unwarranted intrusions into the private lives of employees. Of particular relevance respecting such privacy rights and management practices involved in intellectual property protection are programs, policies, procedures and practices involving employer/employee rights to ideas and inventions. The restrictions on employers imposed by privacy considerations, generally include employers inability to claim ownership of inventions, and materials created by employees entirely on their own time, that do not use their employers' equipment, supplies, facilities, or trade secrets and that do not relate to the employers' business or actual or demonstrably anticipated research or development; or result from work performed for the employer. (This particular privacy right is also codified in California Labor Code Section 2870). Accordingly, when drafting and imposing inventions agreements and related policies and procedures, California employers must not only refrain from claiming any such protected inventions but must also essentially alert employees that to the extent a provision in any employment agreement purports to do so, it is unenforceable. Employers must also include in any such agreements the explicit language of Labor Code Section 2870 so as to explain to employees the nature and extent of the restriction on the employer's rights.

Another privacy-related source of California law and policy and the principles necessarily observed by California employers in establishing reasonable management

7

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _____ 9

PAGE _____ 204

practices in connection with intellectual property protection is the "right to pursue any lawful employment or enterprise" or, as it is sometimes described, the "right to earn a living." This right particularly impacts management practice related to designing and implementing provisions related to an employee's right to compete post employment with the former employer. As opposed to most states, where reasonable covenants not to compete are legal and usual management practice, in California, any such covenant in connection with an employment agreement, no matter how limited in time or scope, is void as being contrary to public policy. In fact, the public policy that California employers must observe is so strong that it even overrides any contractual provision designating the law of another state as controlling, at least with respect to the validity of the covenant not to compete. (This right is also codified in California's Business and Professions Code, Section 16600.) This means, for example, that California employers cannot impose management practices that prevent or attempt to prevent employees, post-employment, from working for a competitor or establishing a business that competes with the former employer. Although California employers can prohibit employees from competing while they are employed, the public policy against prohibiting employees from competing after employment is so strong that California employees who, even while employed are merely "preparing to compete" or engaging in reasonable actions to obtain other employment, are protected from employer interference. As a result, reasonable California employers may design and impose unambiguous restrictions on competition by employees that prohibit them only from competing while they are employed.

Another important policy restriction imposed by the California Labor Code on California employers is that employees cannot be required to sign agreements that are illegal under California law. For example, a recognized exception to the doctrine of employment at will is that even at-will employees cannot legally be terminated for refusing to sign an unduly broad and illegal post-employment covenant not to compete. As a result, reasonable California employers take particular care to ensure that agreements that they require employees to sign are free from inappropriate, overreaching, inaccurate and potentially illegal provisions.

2)    **Employers must demonstrate commitment to, and support for, any such programs that they establish and expect to maintain through the devotion of appropriate resources to establish, implement, and maintain them**

In the modern workplace, employees are inundated with countless memos, programs, policies, initiatives and other directives from management at all levels. Those policies that organizations most value and that they actually expect to impose and enforce must accordingly be prioritized and differentiated from the mass of less critical directives. In the workplace, as elsewhere, actions speak louder than words. Thus, organizations have learned to differentiate crucial programs and policies by taking the actions that demonstrate their unambiguous commitment to the particular program or policy. That is, "walking the walk" rather than merely "talking the talk."

The actions that organizations take to demonstrate such commitment particularly include investing in the necessary resources of attention and active engagement from top leadership. The importance of such engagement has been particularly recognized by government regulators. In the Sarbanes-Oxley Act following upon the business improprieties at the beginning of this century, for example, Congress directed the U.S.

8

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _____ a

PAGE _____ 205

With respect to Mattel's exit interview process, Alan Kaye also testified that employees were typically asked to sign the Proprietary Information Checkout forms that were presented to them at their exit interviews, on the spot.   He confirmed that Mattel's HR department does not have a policy requiring HR to explain the Proprietary Information Checkout form to separating employees and he has never instructed his staff in HR to explain the document to departing employees.   In his view, it is not common practice to explain this document to departing employees in garden-variety circumstances.   In short, Mattel appears to have made little if any effort to assist employees in understanding its policies and procedures or the import of the documents it was expecting them to sign.

In sum, Mattel failed to make reasonable efforts to communicate its critical intellectual property protection policies and procedures to its employees, thus leaving them with no meaningful opportunity to understand Mattel's expectations in this regard.

## CONCLUSIONS

The deficiencies identified above are seriously out of keeping with usual and reasonable management practice among California employers.   The effects of such failures are substantial and deleterious to an effective intellectual property protection program. Clearly, each of them may permit or foster inaccurate, unfair and even illegal constraints on employee rights and obligations. Each of them can lead to employees agreeing to obligations or the relinquishment of rights under conditions which are far from "knowing and voluntary." Further, each of them can leave employees with an inaccurate or, at minimum, ambiguous understanding of the constraints or other obligations the employer imposed, or sought to impose, through its policies and procedures.

In short, these multiple failures render the intellectual property protection programs, policies and procedures of Mattel at the time relevant to this litigation gravely deficient, and deprive employees such as Carter Bryant of reasonable or effective guidance as to Mattel's expectations regarding workplace conduct.

Respectfully submitted,

_2/11/08_
Date

_D. Jan Duffy_
D. Jan Duffy

22

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT ____9____

PAGE ____206____

EXHIBIT 10

SCULPTURAL BODY DRAWING; 9/19/99
TO BE USED FOR ALL DOLLS



JOINTED HERE, @ SHOULDERS

JOINTED HIPS

SCULPTED FINGERNAILS

TOTAL DOLL HEIGHT W/ HEAD: 11½"-12"

9"

ACTUAL SIZE

BASIC SHOE SCULPT

2" appx.

2¼" appx.

**CONFIDENTIAL**      **Attorney's Eyes Only**          BRYANT 01975

EXHIBIT ___10___

PAGE ___207___

EXHIBIT 11



2½" APPX

ACTUAL SIZE

LUPE

-LUPE-

SCULPTURAL
DRAWINGS ;
HEADS

9/19/99



2½" APPX

ACTUAL SIZE

ZÖE

-ZÖE-

**CONFIDENTIAL**     **Attorney's Eyes Only**     BRYANT 01976

EXHIBIT _____ ll _____

PAGE _____ 208 _____

EXHIBIT 12



ATTORNEY'S EYES
ONLY

BRYANT 00273



DEPOSITION
EXHIBIT
716
Bryant J.    9-25-07

EXHIBIT _____ 12

PAGE _____ 209



EXHIBIT 12

PAGE 210

DEPO
EXH.
717



ATTORNEY'S EYES
ONLY

BRYANT 00228

DEPOSITION
EXHIBIT
118
Bryant J.   7-25-07
PENGAD 800-631-6989

EXHIBIT _____ 12
PAGE _____ 211



EXHIBIT ____ /2

PAGE ____ 2/2

DEPO
EX
#19



ATTORNEY'S EYES
ONLY

BRYANT 00221

EXHIBIT ___12___

PAGE ___213___



DEPOSITION
EXHIBIT
721
Bryant J   9-25-07



EXHIBIT _____

PAGE _214_

DEPO
EXH.
722



THIS IS
MORE THE
LIP LOOK I
WANT FOR
HER.

JADE'S
"GLAMOUR"
DRESS

ATTORNEY'S EYES
ONLY

BRYANT 00297



DEPOSITION
EXHIBIT
724
Bryant J   9-25-07

EXHIBIT _____ 12

PAGE _____ 215



EXHIBIT

PAGE

12

216

DEPO
EXH.
725

EXHIBIT 13



HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO.  2152 OF 2002

BETWEEN

ABC INTERNATIONAL TRADERS, INC.                                    Plaintiff
doing business as MGA ENTERTAINMENT

and

(1) TOYS & TRENDS (HONG KONG) LIMITED

(2) CITYWORLD LIMITED

(3) JURG WILLI KESSELRING                                               Defendants

AFFIRMATION OF LEE SHIU CHEUNG

I, Lee Shiu Cheung of Room 1001, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong do solemnly, sincerely and truly affirm and say as follows: -

1.      I am the Managing Director of MGA (HK) Entertainment Ltd. (hereinafter referred to as "MGAHK"), an affiliate of ABC International Traders Inc, doing business as MGA Entertainment, the Plaintiff herein (hereinafter referred to as "MGA") and duly authorised by MGA to make this affirmation on its behalf. Unless otherwise stated, the facts and matters contained herein are true and they are either within my own personal knowledge or gleaned from books and records of MGAHK to which I have free access or supplied or related to me by Isaac Larain, the CEO of MGA.  Insofar as facts and matters that do not fall within the aforesaid category, they are related to me by the respective sources stated hereinafter and are true to the best of my information and belief.

Exhibit   941
E. Lee
10, 5 / 07   12 pgs
Angela Dupre, CSR 7804

M 0001570

EXHIBIT _____ 13 _____

PAGE _____ 217 _____

2.   MGA was originally founded in 1979 as a consumer electronics business. However, in 1987 MGA obtained exclusive rights to sell Nintendo hand held LCD games (Game Boy) in the USA and naturally, Game Boy was an instant success which paved the way for MGA to enter the toy business.  MGA obtained licenses to deal with a series of action figures known as Power Rangers back in the 1990s which was again another mega success worldwide. This year MGA added Spider-Man: The Movie to its already existing collection of licences.  Thus one can see that MGA is a reputable company in the toy business with substantial goodwill by successfully acquiring the aforesaid licences of these "mega hits".  MGA holds a total of 17 licences and others include Hello Kitty and Coca Cola.  Now produced and shown to me marked "LSC-1" is a copy of the corporate profile of MGA downloaded from its website.

3.   Since 1987 MGA has primarily concentrated and focused its efforts in the toy industry and as at the date hereof, MGA has 8 product categories and they are smart toys, interactive dolls, handheld games, fashion dolls, youth electronics, music, licensed products and small dolls.  In the years 2000 and 2001, MGA's revenue exceeded US$93 million and US$98 million respectively.  The projected revenue for the year 2002 is US$250 million due to the success of a range of dolls known as BRATZ which is the subject matter of this action and will be dealt with in detail hereinafter.  For the year 2001, the sale of BRATZ dolls, accessories and income from licence fees accounted for 22% of the total revenue of US$160 million.   MGA forecasts that the sale of BRATZ dolls, accessories and income from licence fees for the year 2002 will account for 50% of the revenue for that year.

4.   Toys designed and marketed by MGA have been the subject of numerous awards and prizes.  However, the most successful toy designed and marketed by MGA must be the BRATZ dolls.  In the year 2001, BRATZ dolls won the

2

M 0001571

EXHIBIT _____ 13

PAGE _____ 218

941-2

following awards in the USA, namely, Toy of the Year Award (Winner) and People's Choice Toy of the Year (Winner).

**BRATZ DOLLS**

5.   On 18 September 2000, MGA entered into an agreement to commission Mr. Carter Bryant (hereinafter referred to as "Mr. Bryant") to design and develop a line of dolls known as BRATZ (hereinafter referred to as "the Agreement"). Mr. Bryant was a graduate of Ottis College in fashion and toy design. Although BRATZ is a misspelling of the word "brats", the former was coined by MGA not to denote naughty or spoilt children but to denote hip and cool young adolescent or teenage girls. This idea of hip and cool is born out in the design of the BRATZ dolls.

6.   Now produced and shown to me marked "LSC-2" is a copy of the Agreement. I crave leave to draw this Court's attention to clause 3 of the Agreement whereby all intellectual property right including copyright subsisting in the works generated by Mr. Bryant shall be owned by MGA.  Pursuant and prior to the Agreement and commission, Mr. Bryant did design a range of 4 dolls known as BRATZ and did make original design drawings of the BRATZ dolls. At all material times, Mr. Bryant is a resident of and domiciled in the USA.

7.   Now produced and shown to me marked "LSC-3" are copies of 17 initial concept and design drawings of the BRATZ dolls made by Mr. Bryant in the year 2000 pursuant to the Agreement.  Now produced and shown to me marked "LSC-4" is a copy of a sheet of paper setting out the initial concept and idea of the BRATZ dolls by Mr. Bryant.  The 4 dolls represent 4 best friends in high school who love to trade clothes, shoes and hairdos.  Since these accessories are interchangeable, the 4 dolls can look different every day. And furthermore, there would be a lucrative business of supplying accessories to the owners of BRATZ dolls thus ensuring a steady stream of revenue.

3

M 0001572

EXHIBIT ___13___ 942-3

PAGE ___217___

8. Each of the 4 BRATZ dolls was given a name and a different ethnic origin so they could appeal to everyone in the targeted age group of girls between 5 to 14 years old. Chloe is Caucasian, Sasha is black, Yasmin is Hispanic and Jade is Oriental.

9. The BRATZ dolls are the subject matter of copyright protection in the United States and copies of their registration certificates are now produced and shown to me marked "LSC-5". Samples of each of the 4 dolls in their original packaging are now produced and shown to me marked "LSC-6a to d".

10. The BRATZ dolls and accessories are marketed and sold in the following packs: -

a)   BRATZ dolls, Beach Party doll and micro BRATZ doll- BRATZ dolls are those exhibited as "IL-6a to d", Beach Party dolls are BRATZ dolls wearing beach apparel and micro BRATZ dolls are smaller versions of BRATZ dolls. The total sales of the Bratz dolls and Micro Bratz dolls for 2001 was over US$22 million. The 1st quarter sales (FOB) for dolls this year has so far been over US$17 Million. Now produced and shown to me marked "LSC-7" is a sample of 1 micro BRATZ doll.

b)   BRATZ fashion pack- These are separately sold apparel so that the dolls could have a wider selection of new clothing. The total sales value (FOB) of the fashion packs for the year 2001 was over US$940,000. The first quarter sales(FOB) for the said fashion packs this year has so far been over US$1.5 million. Now produced and shown to me marked "LSC-8" is a sample of a BRATZ fashion pack.

c)   BRATZ shoe pack- These are additional shoes of different styles sold in separate packs. The total sales value (FOB) of the shoe packs for the year 2001 was over US$140,000.

4

M 0001573

EXHIBIT _____13_____   941-4

PAGE _____220_____

11.    The BRATZ dolls and accessories are marketed and sold in the European Union, the Americas, Australia, New Zealand, Philippines, Indonesia, Israel, Japan and Switzerland.

12.    The BRATZ dolls have their own website at www.bratzpack.com. The site also maintains a fan club known as BRATZ pack which maintains a list of its members. The aim of this fan club is to notify its members of new fashion trends that the BRATZ dolls will wear themselves and the launch and marketing thereof. Now produced and shown to me marked "LSC-9" are downloaded copies from the said website.

13.    So far MGA has spent a total of US$7.5 million in advertising and promotion expenses in USA alone. A further sum of US$5 million has been spent in MGA's other markets worldwide as listed hereinabove.

14.    As mentioned hereinbefore, the BRATZ dolls have become an instant success and they have become collectibles. Considerable media coverage have been given to these dolls and now produced and shown to me marked "LSC-10" is a selection of press cuttings and celebrity photos of the BRATZ pack.

15.    Another major source of revenue generated by the BRATZ dolls is income derived from merchandising rights by granting non-exclusive licences to other companies worldwide. So far, 27 merchandise licence agreements have been granted in respect of a wide range of products including paper napkins, girls clothing, jewelry, bedding, home furnishing, stationery, toiletries, video games and footwear etc. Now produced and shown to me marked "LSC-11" is a sample of a merchandise licence agreement.

16.    Furthermore, MGA has granted exclusive distribution rights of the BRATZ dolls and accessories to Bandai Inc. for a term of 3 years starting from 1 April 2001 in France, Belgium, Germany, Austria, Switzerland, Spain, UK, Portugal, Ireland, Luxembourg and Netherlands.

5

M 0001574

EXHIBIT _____13_____    941-5

PAGE _____221_____

17.

18.

19.

20.

6

M 0001575

EXHIBIT ___13___    941-6

PAGE    222

21.

22.

23.

24.

7

M 0001576

EXHIBIT _____ 13 _____        941-7

PAGE _____ 223

25.

26.

27.

28.

29.

8

M 0001577

EXHIBIT _____ 13 _____ 9418

PAGE _____ 224

30.

31.

32.

9

M 0001578

EXHIBIT _____ 13 _____   941-9

PAGE _____ 225 _____

33.

34.

35.

10

M 0001579

EXHIBIT 13

PAGE 226

941-10



36.

37.

38.

11

M 0001580

EXHIBIT ____ 13

PAGE ____ 227

941-11

39.    Finally, I state that this affidavit is made on behalf of MGA, the owner of the copyright subsisting in the artistic works exhibited as "LSC-3" herein and: -

a)    The said artistic works were made on divers dates between 1998 and 2000 in the USA;

b)    The author of the said artistic works is one Carter Bryant and at all material times he was a resident of and domiciled in the USA;

c)    Copies of the said artistic works exhibited as "IL-3" are true copies of the said artistic works.

Affirmed at the office of Messrs.    )
C.L. Chow & Macksion Chan,    )
Rooms 501-507, 5th, Hang    )
Seng Bldg, 77 Des Voeux    )
Road Central, H.K.    )
this 18th day of June    2002    )

Before me,

Chau Yiu Chee
Solicitor, Hong Kong SAR
C.L. Chow & Macksion Chan, Solicitors

Solicitor
This affirmation is filed on behalf of the Plaintiff.

12

M 0001581

EXHIBIT _____ 13 _____    941-12

PAGE _____ 228 _____

**EXHIBIT 14**



HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

_____

BETWEEN

    ABC INTERNATIONAL TRADERS, INC.        Plaintiff
    doing business as MGA ENTERTAINMENT

    and

    (1)  TOYS & TRENDS (HONG KONG) LIMITED

    (2)  CITYWORLD LIMITED

    (3)  JURG WILLI KESSELRING        Defendants

This is the exhibit marked "LSC-3" referred to in the Affirmation of Lee Shiu Cheung dated the 18th day of June 2002.

| Description of document | Date | No. of pages |
|---|---|---|
| Copies of 17 initial concept and Design drawings of the BRATZ Dolls made by Mr. Bryant in the year 2000 | divers | 17 |

Before me,

*Chung Lee*

Solicitor, HKSAR

Chan Yiu Chee
Solicitor, Hong Kong SAR
C.L. Chow & Macksion Chan, Solicitors

M 0001489A

DEPOSITION EXHIBIT

EXHIBIT _____ 14

PAGE _____ 229



EXHIBIT 14

PAGE 230

All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

JUNE 2000
Contract date : 9/18/2000

M 0001489



8/1998

All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/6/00

EXHIBIT___14___

PAGE___231___

M 0001490



EXHIBIT ___14___

PAGE ___232___

All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/18/00

M 0001491



© /1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/18/00

EXHIBIT _____ 14

PAGE _____ 234

M 0001493



All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date : 9/18/00

M 0001494

EXHIBIT ___14___

PAGE ___235___



© 8/1998

All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/18/00

M 0001495

EXHIBIT ___14___

PAGE ___230___



8/1998

All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date   9/18/00

EXHIBIT     14

PAGE     237

M 0001496



8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date 9/18/00

EXHIBIT ___14___

PAGE ___238___ .

M 0001497



ⓒ

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/15/00

EXHIBIT _____ 14

PAGE _____ 239

M 0001498