**Exhibit 1**

COPY

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  Michael T. Zeller (Bar No. 196417)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Plaintiff
Mattel, Inc.

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2004

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
        SUE CARR

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, | CASE NO. **BC314398** |
| Plaintiff, | COMPLAINT FOR: |
| v. | (1) BREACH OF CONTRACT;<br>(2) BREACH OF FIDUCIARY DUTY;<br>(3) BREACH OF DUTY OF LOYALTY;<br>(4) UNJUST ENRICHMENT; AND<br>(5) CONVERSION |
| CARTER BRYANT, an individual; and DOES 1 through 10, inclusive, | |
| Defendants. | |

07209/579342.1

COMPLAINT

EXHIBIT 1          5

EXHIBIT _1_ PAGE _4_

1          Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter

2   Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as

3   "defendants") and alleges as follows:

4

5                                          Parties

6

7          1.     Mattel is a corporation organized and existing under the laws of the

8   State of Delaware and has its principal place of business in El Segundo, California.

9          2.     Mattel is informed and believes, and on that basis alleges, that defendant

10   Bryant is an individual currently residing in Springfield, Missouri.

11         3.     The true names and capacities of defendants sued herein as Does 1

12   through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such

13   fictitious names. Mattel will amend this Complaint to allege their true names and capacities

14   when the same are ascertained.

15         4.     Mattel is informed and believes, and on that basis alleges, that at all

16   times relevant herein, defendants, and each of them, were acting in concert and active

17   participation with each other in committing the wrongful acts alleged herein, and were the

18   agents of each other, and in doing the things alleged herein, each defendant was acting

19   within the course and scope of his, her or its agency and was subject to and under the

20   supervision of, and was acting with the knowledge of, his, her or its co-defendants.

21

22                                Jurisdiction and Venue

23

24         5.     During the time of the acts complained of herein, Bryant was employed

25   by Mattel in, and was a resident of, Los Angeles County. Bryant's contracts with Mattel that

26   are at issue in this action were executed, performed and breached by Bryant in Los Angeles

27   County.  In addition, defendants committed the tortious conduct alleged herein while

28   physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

07209/579342.1

-2-

COMPLAINT

EXHIBIT 1

EXHIBIT 1 PAGE 5

1   defendants' other wrongful acts in Los Angeles County.   Accordingly, this Court has

2   personal jurisdiction over defendants.

3         6.     Venue is proper pursuant to <u>Code of Civil Procedure</u> §§ 393 and 395(a),

4   as the causes of action arose in Los Angeles County, the contractual obligations at issue were

5   incurred, were to be performed and were breached by Bryant in Los Angeles County, and

6   Bryant does not currently reside in California.

7

8   <u>Factual Background</u>

9

10         7.     Mattel is a long standing and successful independent manufacturer and

11   marketer of toys, dolls, games and stuffed toys and animals.  Mattel was founded in 1945 by

12   Elliot and Ruth Handler and Harold "Matt" Mattson.  The name of the company was created

13   by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating

14   from the Handlers' garage in Southern California, the company greatly expanded its

15   operations following World War II and soon began to thrive as its reputation for producing

16   high-quality toys spread.  During the next several decades, Mattel became world famous for

17   producing high-quality products at reasonable prices.  Today, some of Mattel's most famous

18   brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19         8.     Critical to Mattel's success, and to the livelihood of its employees, is

20   Mattel's ability to design and develop new products.  Mattel invests many millions of dollars

21   in product design and development annually, and it introduces hundreds of new products

22   each year.  In El Segundo, California alone, Mattel maintains a 180,000 square-foot design

23   center that houses more than 850 designers, sculptors, painters and other artists, whom

24   Mattel pays to work exclusively and full-time to create the products that Mattel sells and on

25   which Mattel's business depends.

26         9.     Defendant Bryant was employed by Mattel from September 1995

27   through April 1998, and then again from January 1999 through October 2000, as a product

28   designer at Mattel's design center in El Segundo, California.

07209/579342.1

-3-

COMPLAINT

7

EXHIBIT 1

EXHIBIT _____ / ____ PAGE ____

10.     On January 4, 1999, upon starting his second term of employment by Mattel, and as a condition of and in consideration for his employment, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employee Agreement").   Among other things, Bryant agreed that he would not, without Mattel's express written consent, "engage in any employment or business other than for [Mattel], or invest in or assist (in any manner) any business competitive with the business or future business plans of [Mattel]." Bryant further acknowledged that he held a position of trust with Mattel.   In addition, Bryant assigned to Mattel all rights, title and interest in "inventions," including without limitation "designs," that he conceived or reduced to practice during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement with Mattel is attached as Exhibit A.

11.     Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire").   Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant specifically agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. The only conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time subsequently) concerned freelance work that is unrelated to the conduct alleged herein.   A true and correct copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B.

12.     In late November 2003, Mattel learned that Bryant had secretly aided, assisted and worked for a Mattel competitor, including without limitation by entering into an agreement with the competitor, during the time Bryant was employed by Mattel pursuant to the above-referenced agreements and was being paid by Mattel as a product designer. Bryant's agreement with the competitor obligated Bryant to provide product design services to the competitor on a "top priority" basis. Bryant's agreement also provided, among other

-4-

COMPLAINT

8

EXHIBIT 1

EXHIBIT  1  PAGE  7

1    things, that Bryant would receive royalties and other consideration for sales of products on

2    which Bryant provided aid or assistance; that all work and services furnished by Bryant to

3    the competitor under the agreement purportedly would be considered "works for hire"; and

4    that all intellectual property rights to preexisting work by Bryant purportedly would be

5    assigned to the competitor. In addition, while Bryant was employed by Mattel, Bryant and

6    the other defendants converted, misappropriated and misused Mattel property and resources

7    for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8         13.   During the time that he was employed by Mattel and thereafter, Bryant

9    concealed these actions from Mattel, including without limitation by failing to notify his

10   supervisor of his conflict of interest regarding the competitor and by making affirmative

11   misrepresentations to Mattel management upon his departure from Mattel. Because of

12   Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to

13   suspect that Bryant had worked for the competitor while still employed by Mattel until late

14   November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's

15   agreement with the competitor and saw that the date of the agreement predated Bryant's

16   departure from Mattel.

17        14.   As a consequence, Bryant breached his contracts with Mattel and

18   violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have

19   unlawfully aided and abetted his violation of such duties; and each of the defendants has

20   been unjustly enriched and engaged in acts of conversion.

21

22                    FIRST CLAIM FOR RELIEF

23                       (Breach of Contract)

24

25        15.   Mattel repeats and realleges each and every allegation set forth in

26   paragraphs 1 through 14, above, as though fully set forth at length.

27        16.   Pursuant to his Mattel Employment Agreement, and for good and

28   valuable consideration, Bryant agreed that he would not, without Mattel's express written

07209/579342.1

-5-

9

EXHIBIT 1

1  consent, engage in any employment or business other than for Mattel or assist in any manner

2  any business competitive with the business or future business plans of Mattel during his

3  employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further

4  assigned to Mattel all right, title and interest in "inventions," including without limitation

5  "designs," that he conceived or reduced to practice during his employment by Mattel. In

6  addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as

7  disclosed, he had not worked for any competitor of Mattel and had not engaged in any

8  business venture or transaction involving a Mattel competitor that could be construed as a

9  conflict of interest. Bryant further promised that he would notify his superior immediately

10  of any change in his situation that would cause him to change any of the foregoing

11  certifications or representations.

12         17.    The Employment Agreement and the Conflict Questionnaire are valid,

13  enforceable contracts, and Mattel has performed each and every term and condition of the

14  Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

15         18.    Bryant materially breached the foregoing contracts with Mattel, in that,

16  among other things, he secretly aided, assisted and worked for a Mattel competitor during

17  his employment with Mattel, without the express written consent of Mattel.

18         19.    As a consequence of Bryant's breach, Mattel has suffered and will in

19  the future continue to suffer damages in an amount to be proven at trial. Such damages

20  include, without limitation, the amounts paid by the competitor to Bryant during his Mattel

21  employment; the amounts paid by the competitor to Bryant as a result of the work he

22  performed for the competitor during his Mattel employment; the amount that Mattel paid

23  Bryant during the time he wrongfully worked for the competitor; the value of information

24  and intellectual property owned by Mattel which Bryant provided to the competitor; the

25  value of the benefits the competitor obtained from Bryant during the time he was employed

26  by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of

27  the work he performed for the competitor during his Mattel employment.

28

10

**EXHIBIT 1**

EXHIBIT  1  PAGE  9

20. Furthermore, Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

21. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 20, above, as though fully set forth at length.

22. Bryant held a position of trust and confidence with Mattel. In his position, Bryant had access to and was entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of his job assignments and duties. In his position, Bryant also represented Mattel in its dealings with third parties and, in his actions in the course and scope of his employment with Mattel, was an agent of Mattel. Bryant confirmed his relationship of trust with Mattel in the Employee Agreement. Bryant thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant might bring to Mattel.

23. Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor. As alleged

COMPLAINT

1 1

EXHIBIT 1

EXHIBIT __/__ PAGE _10_

1 | above, Bryant also breached the aforementioned duty by using Mattel property and resources
2 | for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3 | 24.   The other defendants, acting with full knowledge of Bryant's obligations
4 | to Mattel, aided and abetted Bryant in such conduct.

5 | 25.   As a direct and proximate result of defendants' wrongful conduct,
6 | Mattel has incurred damages in an amount to be determined at trial.

7 | 26.   Defendants acted with malice, fraud and oppression, and in conscious
8 | disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages
9 | against defendants in an amount to be determined at trial.

10 | 27.   Furthermore, defendants' conduct has caused, and unless enjoined will
11 | continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
12 | money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel
13 | is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or
14 | restraining defendants from continuing to benefit from such breach.

15 |

16 | **THIRD CLAIM FOR RELIEF**

17 | (Breach of Duty of Loyalty)

18 |

19 | 28.   Mattel repeats and realleges each and every allegation set forth in
20 | paragraphs 1 through 27, above, as though fully set forth at length.

21 | 29.   As an employee of Mattel, Bryant owed a duty of undivided loyalty to
22 | Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist
23 | a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant
24 | was required to always give preference to Mattel's business over his own, similar interests
25 | during the course of his employment with Mattel.

26 | 30.   Bryant breached his duty of loyalty to Mattel in that, while employed
27 | by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including
28 | without limitation by entering into an agreement with a Mattel competitor. As alleged

07209/579342.1

-8-

CON   JT

1 2

EXHIBIT 1

EXHIBIT __/__ PAGE __//__

1   above, Bryant also breached the aforementioned duty by using Mattel property and resources

2   for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3         31.   The other defendants, acting with full knowledge of Bryant's obligations

4   to Mattel, aided and abetted Bryant in such wrongful conduct.

5         32.   As a direct and proximate result of defendants' wrongful conduct,

6   Mattel has incurred damages in an amount to be determined at trial.

7         33.   Defendants acted with malice, fraud and oppression, and in conscious

8   disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9   against defendants in an amount to be determined at trial.

10        34.   Furthermore, defendants' conduct has caused, and unless enjoined will

11   continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12   money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13   is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or

14   restraining defendants from continuing to benefit from such breach.

15

16                  **FOURTH CLAIM FOR RELIEF**

17                   (Unjust Enrichment)

18

19         35.   Mattel repeats and realleges each and every allegation set forth in

20   paragraphs 1 through 34, above, as though fully set forth at length.

21         36.   Defendants, by the aforementioned conduct, unfairly used and diverted

22   Mattel property, resources and opportunities for the benefit of, and to aid and assist,

23   themselves, all without authorization by or payment to Mattel for the same. Defendants have

24   been unjustly enriched as a result.

25         37.   Mattel is entitled to an award of all such amounts by which defendants

26   have been unjustly enriched in an amount to be determined at trial.

27

28

-9-

COMPLAINT

13

EXHIBIT 1

38.    Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

39.    Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining defendants from any further unjust enrichment.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

40.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 39, above, as though fully set forth at length.

41.    Mattel was entitled to, inter alia, Bryant's exclusive services and the exclusive ownership of his inventions as a Mattel product designer. However, Bryant provided such services, and purported to grant rights to such inventions, to a competitor during the time of his exclusive Mattel employment. All such services and the inventions and work product resulting from such services, including without limitation ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property created by Bryant during the term of the aforesaid agreements, were the property of Mattel. Such services and property were provided by Bryant to others, including defendants, and used by them.

42.    Defendants wrongfully converted Mattel property and resources by asserting ownership thereto and by appropriating and using Mattel's property and resources for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

07209/579342.1

-10-

COMPL

14

EXHIBIT 1

EXHIBIT __1__ PAGE __13__

43.     As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages. Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## PRAYER FOR RELIEF

WHEREFORE, Mattel hereby respectfully requests that this Court:

A.     Award Mattel its damages;

B.     Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C.     Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D.     Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E.     Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F.     Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and

07209/579342.1

-11-

COMPLAINT

EXHIBIT 1

15

1    G.    Award such other and further relief as this Court deems just and proper.

2

3   DATED: April 27, 2004              QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
4

5                                      By _____
6                                         Michael T. Zeller
                                          Attorneys for Plaintiff
7                                         Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/579342.1                              -12-
                                                                    COMPLAINT

16

EXHIBIT 1

EXHIBIT 1   PAGE 15

**Exhibit A**

EXHIBIT 1

17

EXHIBIT __1__ PAGE __16__

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those embodied in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will not draw trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and ongoing activities away from the Company will not conflict with the Company's development of its proprietary rights; and (v) which and if my employment with the Company continues I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including Information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any Information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensees, licensors, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company promptly and fully in writing all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. Thereby I assign to the Company and/or its appointment all my right, title and interest in such inventions, and all my right, title and interest in any patent, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its assignees (without charge but at my expense as and at any time in any proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights to any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer, or (2) result from any work performed by the employee for the employer. I acknowledge that this paragraph (c) under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patent, copyrights and other proprietary rights all with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I will not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or make (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except by writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision, if any provision is held to be unreasonable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continued employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the date of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature

Employee Name (print)   CARTER H. BRYANT

Date   01/04/99

Signature

Name of Witness (print)   TERESA NEWCOMB

EXHIBIT 1

EXHIBIT _1_ PAGE _17_

**Exhibit B**

EXHIBIT 1

13

EXHIBIT ___/___ PAGE __/__

# CONFLICT OF INTEREST QUESTIONNAIRE

BRYANT, CARTER H.        PROJECT DESIGNER

Name (Last, First, M.I.)          Job Title          Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to provide compensation of any kind from any supplier or competitor. You may disregard mutual investment funds and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.** means receipt of anything of value, in cash or in kind, over $40 on any one occasion or over $300 total during the past twelve months.

| | |
|---|---|
| ○ YES  ● NO | 1. Have you owned, directly or indirectly, any interest in a Mattel supplier? |
| ○ YES  ● NO | 2. Have you owned, directly or indirectly, and interest in a Mattel competitor? |
| ○ YES  ● NO | 3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier? |
| ● YES  ○ NO | 4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor? |
| ● YES  ○ NO | 5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity? |
| ○ YES  ● NO | 6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity? |
| ○ YES  ● NO | 7. Have you engaged in any activity including the acquisition of ownership of any interest, for personal profit, not directly within the scope of your business, with respect to any supplier or competitor? |
| ○ YES  ● NO | 8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance? |
| ○ YES  ● NO | 9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel? |

If your answer to any of the above questions is "yes," please explain in the space below:

4, 5. freelance design + artwork in 1998.
from appx. 5/98 - 11/98. for the Ashton Drake
galleries.

I certify that I have read Mattel policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in any situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

_Carter H. Bryant_          01/04/98

Signature          Date

EXHIBIT 1

**Exhibit 2**

Kwai

**MGA ENTERTAINMENT**
**16730 Schoenborn Street**
**North Hills, California 91343**

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

1.    <u>Retention as Consultant/Services</u>: MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

2.    <u>Term/Exclusivity</u>: The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3.    <u>Ownership</u>:

(a)    All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

(00006662.DOC/2 / 10/04/2000 03:05 PM)

1

**ATTORNEY'S EYES ONLY**

MGA000001

EXHIBIT 2                                    21        EXHIBIT _2_ PAGE 20

patents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute. Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents. If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)     Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine. Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.     **Compensation/Costs:**

(a)     For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of five thousand five hundred dollars ($5,500.00) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of five thousand dollars ($5,000.00) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)     MGA shall pay to Bryant a royalty of three percent (3%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services. As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances). MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

2

ATTORNEY'S EYES
ONLY

MGA000002

EXHIBIT 2

EXHIBIT 2 PAGE 21

and binding on Bryant, shall constitute an account stated, and shall not be subject to any question for any reason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to MGA within two (2) years after the date rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)     All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent. In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)     Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis. Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable). MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)     MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales. MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell. Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant. Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.     Warranties and Indemnity:  Bryant represents, warrants and agrees that:

(a)     he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)     neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)     the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

3

ATTORNEY'S EYES ONLY

MGA000003

EXHIBIT 2

23
EXHIBIT _2_ PAGE _22_

patents, copyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property rights;

(d)     he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

(e)     he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

## 6.   Default/Termination:

(a)     In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

(b)     Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

## 7.   Confidentiality:

(a)     Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

(b)     Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

(c)     Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{00006662.DOC/2 / 10/04/2000  03:05 PM}

4

ATTORNEY'S EYES ONLY

MGA000004

24

EXHIBIT 2 PAGE 23

EXHIBIT 2

entitled to equitable relief in the nature of injunction and to all other available relief, at law and/or in equity.

8.   **Notices:** All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time. All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid. Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 160th Street, Gardena, California 90247.

9.   **Independent Contractor/No Partnership/Third Party Beneficiary:** Bryant's relationship with MGA is that of an independent contractor. Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name. Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties. In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship. Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise. This Agreement shall not be construed to be for the benefit of any third party.

10.   **Services Rendered Deemed Special, etc.:** Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.   **General Provisions:**

(a)   This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law. Any such assignment shall not relieve such Party of its obligations hereunder.

(b)   The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

(c)   A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof. All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

(d)   Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

{00006662.DOC/2 / 10/04/2000  03:05 PM}

5

ATTORNEY'S EYES ONLY

MGA000005

EXHIBIT 2

25
EXHIBIT 2 PAGE 24

(e)   This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction to the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)   This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained.  No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)   Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____
CARTER BRYANT
Redacted
_____
Social Security Number

{00008662.DOC/2 / 10/04/2000  03:05 PM}

6

ATTORNEY'S EYES
ONLY

MGA000006

EXHIBIT 2

26
EXHIBIT 2 PAGE 25

**Exhibit 3**

FILED
CLERK, U.S. DISTRICT COURT

MAR - 4 2005

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

Priority
Send
Clsd
Enter
JS-5/JS-6
JS-2/JS-3

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>CARTER BRYANT, an individual; and DOES 1 through 10, inclusive,<br><br>　　　Defendant.<br><br>———————————————<br>AND RELATED COUNTERCLAIMS | CASE NO. CV 04-9059 NM (RNBx)<br><br><br>ORDER DENYING PLAINTIFF MATTEL, INC.'S MOTION TO REMAND AND CERTIFYING QUESTION FOR INTERLOCUTORY REVIEW |

DOCKETED ON CM

MAR 4 2005

BY_____ 006

## I. INTRODUCTION

On April 27, 2004, Mattel, Inc. ("Mattel"), the world's largest manufacturer and marketer of toys, dolls, games, and stuffed toys and animals, filed the instant Complaint against its former employee, Carter Bryant ("Bryant"), in the Superior Court for the County of Los Angeles. The Complaint fails to state the amount in controversy and asserts generically-phrased causes of action for: (1) breach of contract; (2) breach of fiduciary duty; (3) breach of duty of loyalty; (4) unjust enrichment; and (5) conversion. On May 14, 2004, Bryant filed a Notice of Removal. On August 20, 2004, the court granted Mattel's motion to remand,

EXHIBIT 3 PAGE 26

1  finding that Bryant had failed to demonstrate the presence of either federal

2  question jurisdiction or diversity jurisdiction.  On November 2, 2004, Bryant filed

3  a second Notice of Removal.  On December 7, 2004, MGA Entertainment

4  ("MGA"), pursuant to stipulation and order, intervened as a defendant.  Pending

5  before the court is Mattel's Motion to Remand.

6

7  ## II. FACTUAL & PROCEDURAL BACKGROUND

8  ### A. Allegations in Mattel's Complaint

9        Mattel employed Bryant as a product designer from September 1995

10  through April 1998, and from January 1999 through October 2000.  Compl. ¶ 9.

11  Upon starting his second term, Bryant signed an Employee Confidential

12  Information and Inventions Agreement, in which he agreed not to "engage in any

13  employment or business other than for [Mattel], or invest or assist (in any manner)

14  any business competitive with the business or future business plans of [Mattel]."

15  Id. ¶ 10.  Bryant assigned to Mattel all rights, title, and interest in the "inventions"

16  he conceived of, or reduced to practice, during his employment.  Id.

17        Bryant also completed Mattel's Conflict of Interest Questionnaire.  Id. ¶ 11.

18  Bryant certified that he had not worked for any of Mattel's competitors in the prior

19  twelve months and had not engaged in any business dealings creating a conflict of

20  interest.  Id.  Bryant agreed to notify Mattel of any future events raising a conflict

21  of interest.  Id.

22        The Complaint asserts that, "[i]n late November 2003, Mattel learned that

23  Bryant had secretly aided, assisted and worked for a Mattel competitor . . . by

24  entering into an agreement with the competitor, during the time [he] was employed

25  by Mattel . . . ."  Id. ¶ 12.  "Bryant's agreement with the competitor obligated

26  Bryant to provide product design services to the competitor on a 'top priority'

27  basis."  Id.  Furthermore, it "provided . . . that Bryant would receive royalties and

28

2

EXHIBIT 3 PAGE 27

1  other consideration for sales of products on which [he] provided aid or assistance;

2  that all work and services furnished by Bryant to the competitor under the

3  agreement would be considered 'works for hire'; and that all intellectual property

4  rights to preexisting work by Bryant purportedly would be assigned to the

5  competitor." Id. The Complaint also alleges that "Bryant converted,

6  misappropriated and misused Mattel property and resources for the benefit of, and

7  to aid and assist, Bryant personally and Mattel's competitor." Id.

8  　　　In support of its first motion to remand, Mattel provided a copy of this

9  agreement between Bryant and MGA. See Zeller Decl., Ex. 9 (MGA Agreement).

10  Pursuant to the agreement, signed September 18, 2000, Bryant agreed to provide

11  product design services for MGA's line of "Bratz" dolls (the "Bratz"). Id.[1] In

12  return, MGA agreed to pay Bryant $5,500 per month for the first six months and

13  $5,000 per month for the next three months. Id. MGA also agreed to pay Bryant a

14  3% royalty on the Bratz he worked on. Id.

15  　　　　　　　　　*B. The First Notice of Removal*

16  　　　On May 14, 2004, pursuant to 28 U.S.C. § 1441, Bryant filed his first notice

17  of removal.[2] Bryant argued that this court had subject matter jurisdiction under

18  both 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1332

19

20  ─────────────────────

21  　　[1] Bryant's last day of employment at Mattel was October 20, 2000.

22  　　[2] 28 U.S.C. § 1441 provides in part:

23

24  (a) Except as otherwise expressly provided by Act of Congress, any civil
　　action brought in a State court of which the district courts of the United

25  States have original jurisdiction, may be removed by the defendant or the
　　defendants, to the district court of the United States for the district and

26  division embracing the place where such action is pending. For purposes of
　　removal under this chapter, the citizenship of defendants sued under

27  fictitious names shall be disregarded.

28

3

EXHIBIT 3 PAGE 28

1 (diversity jurisdiction).[3]  First, Bryant asserted that the court had jurisdiction under
2 § 1331 because Mattel's claims likely implicated the rights to the Bratz and,
3 therefore, would "require construction of federal intellectual property laws . . . ."
4 Opp. to First Mot. to Remand at 11.  Second, Bryant contended that the court had
5 jurisdiction under § 1332 because he was of diverse citizenship from Mattel and
6 the rights to the Bratz, worth "millions," were in controversy.  Id. at 1-2, 5-6.

7       On June 14, 2004, Mattel filed a motion to remand, arguing it did not know
8 whether the Bratz were in controversy because it did not know whether Bryant
9 developed the Bratz while still employed by Mattel.  See, e.g., July 12, 2004 Rep.
10 at 4 (disclaiming knowledge of "whether rights to Bratz are indeed at stake here").

11                       *C. August 20, 2004 Order*

12       On August 20, 2004, the court granted Mattel's motion to remand, finding
13 that Bryant had failed to demonstrate the presence of subject matter jurisdiction.
14 First, the court found that Bryant had failed to demonstrate federal question
15 jurisdiction because the face of the Complaint asserted only state law claims.  See
16 Aug. 20, 2004 Order at 8.  Second, the court found that Bryant had failed to
17 demonstrate diversity jurisdiction because he had not shown that the rights to the
18 Bratz were in controversy.  See id. at 6.

19
20

---

21    [3] 28 U.S.C. § 1331 provides:

22      The district courts shall have original jurisdiction of all civil actions arising
23      under the Constitution, laws, or treaties of the United States.

24      28 U.S.C. § 1332 provides:

25

26      (a) The district courts shall have original jurisdiction of all civil actions
     where the matter in controversy exceeds the sum or value of $75,000,
27      exclusive of interest and costs, and is between . . . citizens of different
28      States . . . .

4

EXHIBIT __3__ PAGE 29

*D. Events Occurring Between the First and Second Notices of Removal*

On August 12, 2004, Mattel produced to Bryant a July 18, 2003 Wall Street Journal article that suggested Bryant had copied a scrapped Mattel project, known as "Toon Teens," in creating the Bratz. Not. of Removal ¶ 21.[4]

---

[4] This article provided:

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of [Mattel's] Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized heads – with their pursed lips and cartoonish eyes – are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet – they were all the same" as the Bratz. Ms. Martinez declined to comment . . . .

This year, closely held MGA expects revenue of about $800 million – with 65% of that coming from the Bratz . . . .

Zeller Decl., Ex. 35 (Maureen Tkacik, <u>Dolled Up: To Lure Older Girls, Mattel Brings in</u>

(continued . . .)

5

EXHIBIT 3 PAGE 30

1    On August 16, 2004, upon Bryant's specific request, Mattel produced to

2  Bryant drawings of the Toon Teens.  Jacoby Decl. ¶ 5.  Mattel also produced the

3  copyright registration for the Toon Teens drawings filed November 28, 2003, four

4  years after the drawings were allegedly created.  Not. of Removal ¶ 21; Zeller

5  Decl. ¶ 27.[5]  Mattel had failed to produce these documents in response to Bryant's

6  June 14, 2004 comprehensive Request for Production.  Jacoby Decl. ¶ 5; Zeller

7  Decl., Ex. 36; Second Zeller Decl., Ex. 6.[6]  When Mattel eventually produced the

8  Toon Teens documents in August, it maintained: "Mattel does not believe the

9  Toon Teens drawings and documents . . . are responsive to defendant's

10  propounded document requests."  Zeller Decl., Ex. 36.

11

12  ─────────────────

13  Hip-Hop Crowd; It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on

14  the 'Bratz', Wall St. J., July 18, 2003, at A1).

15    [5] Copyright registration is a prerequisite for bringing a copyright infringement

16  action.  17 U.S.C. § 411(a).

17    [6] Bryant requested all documents: (1) "that support [the] contention . . . that Bryant
  . . . converted, used, sold, assigned or transferred any Mattel work product . . . created by

18  any Mattel employee other than Bryant"; (2) "that support [the] contention . . . that any

19  product sold at any time by [MGA] under the trade name 'Bratz' originated from, is
  derived from, is based on, copies, incorporates, or is substantially or confusingly similar

20  to any design or work product owned at any time by Mattel . . . or created by any Mattel

21  employee"; (3) "that [Mattel] contend[s] . . . [were] created by any employee of Mattel . .
  . and improperly used by Bryant for his own gain, or the gain of any third party"; (4) that

22  evidence, relate, or refer to the contention that "Bryant misappropriated any property"; (5)

23  that "evidence, relate or refer to any damages [Mattel] contend[s] to have suffered as the
  result of any act or omission of Bryant"; (6) that "evidence, relate or refer to the items or

24  rights that [Mattel] contend[s] Bryant converted, improperly used, sold, assigned or

25  otherwise transferred"; (7) that "evidence, relate or refer to the creation of 'Bratz' dolls";
  and (8) that "evidence, relate or refer to any art work or other work product done at

26  Mattel that [Mattel] contend[s] Bryant utilized in connection with his creation of anything

27  for MGA, including but not limited to . . . 'Bratz.'" Second Zeller Decl., Ex. 6 (Request

28  for Production of Documents).

6

EXHIBIT 3 PAGE 31

1    On September 8, 2004, Bryant filed a cross-complaint against Mattel
2  asserting claims for unfair competition, rescission, declaratory relief, and fraud.
3  See Cross-Compl. On September 9 and 10, 2004, Bryant filed papers in state
4  court arguing that Mattel's action was implicitly premised upon the allegation that
5  Bryant copied the Toon Teens in developing the Bratz. Zeller Decl., Exs. 8
6  (Bryant's Mot. for Protective Order) & 45 (Bryant's Case Management
7  Statement).

8    On October 8, 2004, Mattel again produced to Bryant the above-mentioned
9  Toon Teens documents, this time in response to Bryant's discovery request
10  seeking "[a]ll documents . . . that evidence, relate or refer to Toon Teen's [sic]
11  similarity to any toy sold under the trademark or trade name 'Bratz.'" Jacoby
12  Decl. ¶ 8; Second Zeller Decl., Ex. 7.

13    On October 11, 2004, Mattel produced to Bryant evidence of a document-
14  exchange agreement it has with a company being sued by MGA for infringing the
15  copyrights to the Bratz. Jacoby Decl. ¶ 9 & Ex. 7. The company had requested
16  that Mattel send it documents relating to the Toon Teens "so that [it] [could]
17  challenge the originality of MGA's design [in the Bratz] and [MGA's]
18  corresponding claim to copyright." Jacoby Decl., Ex. 7.

19    On October 13, 2004, Mattel produced to Bryant an anonymous letter
20  received by Mattel's CEO in August 2002, alleging that Bryant had stolen the idea
21  for the Bratz from Mattel. Jacoby Decl. ¶ 10 & Ex. 8. Mattel also produced
22  documents indicating that this letter triggered an investigation in 2002 into
23  Bryant's conduct. Id.

24    Mattel has aggressively pursued discovery relating to the Bratz. See Not. of
25  Removal ¶ 21. In late October 2004, "Mattel[] . . . informed . . . Bryant it would
26  no longer honor a previously agreed upon discovery limitation[] that Mattel would
27
28

EXHIBIT 3 PAGE 32

1   seek only documents related to the 'first generation of Bratz designs.'" Not. of

2   Removal ¶ 21; Jacoby Decl. ¶ 13 & Exs. 9, 13, 14.

### E. Second Notice of Removal

4   On November 2, 2004, Bryant filed a second Notice of Removal based upon

5   both § 1331 (federal question) and § 1332 (diversity) jurisdiction.[7]  Bryant asserts

6   that the Complaint presents a federal question because events occurring since the

7   first removal and remand demonstrate that Mattel's conversion claim involves the

8   rights to the Bratz and is completely preempted by the Copyright Act. Not. of

9   Removal ¶¶ 10, 29, 34. Bryant also contends that there is diversity jurisdiction

10  because he and Mattel are of diverse citizenship and the same facts demonstrate

11  that the amount in controversy exceeds $75,000. See id. ¶¶ 9-24.

### F. Events Occurring After Bryant Filed the Second Notice of Removal

13  On November 2, 2004, Bryant filed a Complaint in federal court seeking a

14  declaratory judgment that the Bratz do not violate Mattel's copyrights.

15  From November 4 through November 8, 2004, Mattel's lead counsel took

16  Bryant's deposition and questioned Bryant regarding not only the "substantial

17  similarity" between the Toon Teens and the Bratz, but also the amount of royalties

18  Bryant had received from the Bratz. Jacoby Decl., Ex. 1 (Bryant Depo.) at 254-58,

19  564-67, 703. When pressed for the relevance of the latter line of questioning,

20

21

---

22  [7] An hour before filing his second Notice of Removal, Bryant faxed Mattel an

23  offer to settle the case for an amount hundreds of thousands of dollars over the
jurisdictional minimum. Not. of Removal ¶ 25; Zeller Decl. ¶ 35 & Ex. 51. The timing

24  of Bryant's offer, although suspicious, does not detract from the fact that Mattel has not

25  pursued the offer, which, by its own terms, remained open for seven days. Not. of
Removal ¶ 25; Zeller Decl. ¶ 35 & Ex. 51. Furthermore, despite Mattel's arguments to

26  the contrary, the scope of the offer's releases do not render it meaningless, especially in

27  light of the fact that Mattel does not argue that the offer would have been acceptable if
more narrowly tailored.

28

8

EXHIBIT 3 PAGE 33

1  Mattel's counsel stated: "Damages." Id. at 703.  Bryant testified that he had

2  received approximately $10 million in Bratz-related royalties. Id. at 705.

3       On December 1, 2004, Mattel filed the instant Motion to Remand.  On

4  December 7, 2004, by stipulation and order, MGA intervened as a defendant.[8]  In

5  the stipulation, MGA asserted that "it has a significantly protectable interest

6  relating to the subject matter of the action, . . . the disposition of the action may

7  impair or impede [its] ability to protect its interest absent intervention, and [its]

8  interest is not adequately represented by the existing parties."  Stip. & Order

9  Permitting Intervention at 1.[9]

10       Also on December 7, 2004, Mattel filed a Motion to Dismiss Bryant's

11  Complaint for Declaratory Relief arguing, in part, that Bryant's case regarding the

12  copyrights to the Bratz "attempts to get a federal court to preemptively decide

13  issues presented in [Mattel's action against Bryant]."  Mot. to Dismiss Comp. for

14  Decl. Rel. at 1.

15       After both Bryant and MGA filed Oppositions to the instant Motion to

16  Remand, Mattel filed two reply briefs.  Mattel argued, in part, that MGA's post-

17  removal intervention destroyed the possibility of diversity jurisdiction.  The court

18  ordered supplemental briefing on the issue.  See Jan. 12, 2005 Order.  On January

19  25, 2005, the court ordered further briefing on two issues: (1) whether MGA had

20  ────────────────

21     [8] MGA, like Mattel, has its principal place of business in California.  Compl. ¶ 1;
22  Second Zeller Decl. ¶ 8 & Exs. 14-15.  MGA is also incorporated in California.  Second
Zeller Decl. ¶ 8 & Ex. 16.  28 U.S.C. § 1332(c)(1) provides that "a corporation shall be
23  deemed to be a citizen of any State by which it has been incorporated and of the State
where it has its principal place of business."
24

25     [9] MGA acquired the first Bratz drawings from Bryant in late 2000.  Woods Decl. ¶
26  2.  In the first two years of sales of the Bratz, MGA earned "tens of millions of dollars."
Id. ¶ 10.  MGA employs over 200 people in Southern California.  Id.  "Of those, the
27  majority are directly or indirectly involved in production, marketing and sales of the
'Bratz' product line."  Id.
28

9

EXHIBIT 3 PAGE 34

properly intervened under Rule 24 of the Federal Rules of Civil Procedure; and (2) whether MGA was an "indispensable party" under Rule 19(b). See Jan. 25, 2005 Order. For the reasons set forth below, the court denies Mattel's Motion to Remand.

## III. ANALYSIS

Generally, a state civil action is removable only if it could have been filed originally in federal court. 28 U.S.C. § 1441. This "original jurisdiction" may be based upon either the presence of a federal question or the diversity of the parties. See Chesler/Perlmutter Prods., Inc. v. Fireworks Entm't Inc., 177 F. Supp. 2d 1050, 1054-55 (C.D. Cal. 2001) (Collins, J.). On removal, the removing defendant bears the burden of proving the existence of the jurisdictional facts. See Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992). There is a "strong presumption" against removal. Id. When a plaintiff moves to remand, the removing party has the burden of establishing by a preponderance of the evidence that removal was proper. See Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, 403-04 (9th Cir. 1996).

In its Motion to Remand, Mattel argues: (1) that Bryant was precluded from removing this action without any "new evidence"; (2) that removal was untimely; (3) that Bryant waived his right to remove; and (4) that Bryant's removal fails on the merits.

### A. Preclusion

Mattel argues that Bryant was precluded from removing a second time without any "new" evidence. Mot. at 1, 15. Successive removals are not necessarily barred. 16 James Wm. Moore et al., Moore's Federal Practice § 107.30[4] (3d ed. 2004); Green v. R.J. Reynolds Tobacco Co., 274 F.3d 263, 266-68 (5th Cir. 2001); Benson v. SI Handling Sys., Inc., 188 F.3d 780, 782-83

10

EXHIBIT 3 PAGE 35

1    (7th Cir. 1999); Doe v. American Red Cross, 14 F.3d 196, 198 (3d Cir. 1993).

2    "For example, if a district court remands a case to state court because the

3    defendant failed to prove the jurisdictional amount, but the plaintiff after remand

4    discloses that the amount in controversy is greater than the statutory amount in

5    controversy, the defendant may file a second notice of removal." 16 Moore et al.,

6    supra § 107.30[4] (citing Brierly v. Alusuisse Flexible Packaging, Inc., 184 F.3d

7    527 (6th Cir. 1999)).  For the reasons discussed in detail below, the court finds

8    new evidence permitted Bryant to filed a second notice of removal. See infra Part

9    III.D.2.

10                              *B. Timeliness*

11        Mattel argues that Bryant's second Notice of Removal was untimely.  Mot.

12   at 2, 5-8.  The timeliness of removal is governed by 28 U.S.C. § 1446(b), which

13   provides:

14        If the case stated by the initial pleading is not removable, a notice of
15        removal may be filed within thirty days after receipt by the defendant,
         through service or otherwise, of a copy of an amended pleading,
16        motion, order or other paper from which it may first be ascertained
17        that the case is one which is or has become removable . . . .

18   28 U.S.C. § 1446(b).  This time limit "is triggered only when the information

19   supporting removal is unequivocally clear and certain."  Moore et al., supra

20   § 107.30[3][a][i][C] (citing Bosky v. Kroger Texas, LP., 288 F.3d 208, 211 (5th

21   Cir. 2002); Huffman v. Saul Holdings Ltd. P'ship, 194 F.3d 1072, 1078 (10th Cir.

22   1999).  See also Schwarzer et al., Cal. Prac. Guide: Fed. Civ. Pro. Before Trial

23   § 2:914.5 (2004) ("The information supporting removal (i.e., federal question or

24   diversity of citizenship) must be 'unequivocally clear and certain' to start the 30-

25   day removal period running.") (emphasis omitted) (quoting Bosky, 288 F.3d at

26   211)).

27

28

                                   11

EXHIBIT 3 PAGE 36

1    Without conceding the existence of any basis for removal, Mattel argues
2  that Bryant had "unequivocally clear and certain" information supporting removal
3  more than 30 days before he filed the notice of removal on November 2, 2004.
4  First, Mattel argues that the action became removable on federal question grounds
5  when Bryant received the Complaint.  Second, Mattel asserts that the action
6  became removable on diversity grounds more than 30 days before Bryant filed the
7  notice because prior to October 2004, Bryant: (1) had received the Wall Street
8  Journal article and the Toon Teens documents; and (2) had filed papers in state
9  court arguing that Mattel's case was premised upon the allegation that Bryant
10  "stole the 'Bratz' concept from Mattel."

11    As to federal question jurisdiction, Mattel's position contradicts its own
12  assertion – and this court's conclusion – that the Complaint failed to state a federal
13  question on its face.  See Aug. 20, 2004 Order at 8; see also infra Part III.D.1.  It
14  also contradicts Mattel's assertion  – and this court's conclusion – that there is
15  insufficient pre-removal evidence to permit the court to find complete copyright
16  preemption and thus federal question jurisdiction.  See infra Part III.D.1.
17  Accordingly, the 30-day removal period could not have been triggered by
18  "unequivocally clear and certain" evidence of federal question jurisdiction prior to
19  removal.

20    As to diversity jurisdiction, it was not "unequivocally clear and certain"
21  more than 30 days prior to Bryant's  November 2, 2004 removal that the rights to
22  the Bratz – and thus more than $75,000 – were in controversy.  Bryant's receipt of
23  the Wall Street Journal article provided no clear notice that Mattel would assert in
24  this litigation that Bryant stole the Bratz idea from Mattel.  Indeed, the article
25  twice noted that Mattel had declined to comment.  Similarly, the importance of
26  Mattel's August 16, 2004 document production was diminished by Mattel's own
27  disclaimer of the documents' relevancy.  Finally, as Mattel concedes, how Bryant
28

12

EXHIBIT  3  PAGE  37

1   has characterized Mattel's case is not dispositive of this court's jurisdiction. <u>See</u>

2   Mattel's Obj. to Torres Decl. at 4. Because the removal period did not start

3   running more than 30 days before November 2, 2004, Bryant's removal was not

4   untimely.

5                                   *C. Waiver*

6            Mattel argues that Bryant waived his right to remove by filing permissive

7   counter-claims in state court after the case had become removable. Mot. at 2-3,

8   8-13.[10] "[I]t is well established that a defendant 'may waive the right to remove to

9   federal court where, after it is apparent that the case is removable, the defendant

10  takes actions in state court that manifest his or her intent to have the matter

11  adjudicated there, and to abandon his or her right to a federal forum.'" <u>Acosta v.</u>

12  <u>Direct Merchs. Bank</u>, 207 F. Supp. 2d 1129, 1131-32 (S.D. Cal. 2002) (Whelan,

13  J.) (quoting <u>Resolution Trust Corp. v. Bayside Developers</u>, 43 F.3d 1230, 1240

14  (9th Cir. 1994)). A defendant so manifests his intent to remain in state court if he

15  files permissive counter-claims in state court after the case has become removable.

16  <u>See</u> <u>Moore v. Permanente Med. Group, Inc.</u>, 981 F.2d 443 (9th Cir. 1992); <u>Schmitt</u>

17  <u>v. Insurance Co. of N. Am.</u>, 845 F.2d 1546, 1548 (9th Cir. 1988); <u>Acosta</u>, 207 F.

18  Supp. 1131-33; <u>California Republican Party v. Mercier</u>, 652 F. Supp. 928, 931

19  _____

20            [10] Mattel also argues that Bryant waived his right to remove by moving for a

21  protective order and engaging in discovery in state court. Mot. at 2-3, 12-13. A
    defendant does not waive his right to remove by engaging in this sort of litigation activity.

22  <u>See</u> 16 Moore et al., <u>supra</u> § 107.18[3][b] (defendant does not waive right to remove by

23  "moving for confidentiality order"). <u>See also</u> <u>Acosta v. Direct Merchs. Bank</u>, 207 F.
    Supp. 2d 1129, 1131 (S.D. Cal. 2002) (Whelan, J.) ("In general, the right of removal is

24  not lost by action in state court short of proceeding to an adjudication on the merits.")

25  (quotation marks omitted). Mattel cites only one case, <u>Chavez v. Kincaid</u>, 15 F. Supp. 2d
    1118 (D.N.M. 1998), for the proposition that a defendant waives his right to remove by

26  engaging in discovery. The <u>Chavez</u> court, however, focused on the fact that the

27  defendant had filed a motion to dismiss, not that the defendant had engaged in discovery.

28  <u>Id.</u> at 1125.

                                        13

EXHIBIT 3 PAGE 38

1  (C.D. Cal. 1986) (Pfaelzer, J.). <u>See also</u> Moore et al., <u>supra</u> § 107.18[3][a] (a

2  defendant waives right to remove by "[p]articipating in state court proceedings,

3  such as seeking some form of affirmative relief, when the defendant is not

4  compelled to take the action"). "However, [for there to be a waiver,] it must

5  [have] be[en] unequivocally apparent that the case [was] removable [before the

6  defendant engaged in the litigation conduct], [] the intent to waive the right to

7  remove to federal court and to submit to state court jurisdiction must [have been]

8  clear and unequivocal, and the defendant's actions must be inconsistent with the

9  right to remove." Moore et al., <u>supra</u> § 107.18[3][a] (citing numerous cases). <u>See</u>

10 <u>also</u> <u>Acosta</u>, 207 F. Supp. 2d at 1131 ("A waiver of the removal right must be clear

11 and unequivocal.").

12      The instant action was not removable on September 8, 2004, when Bryant

13 filed his counter-claims. As noted above, it was not "unequivocally apparent" that

14 the case was removable any time before October 2004. <u>See</u> <u>supra</u> Part III.B.

15 Thus, Bryant did not waive his right to remove.

16                    *D. The Merits of the Removal*

17      Bryant asserts that removal was proper because this court has jurisdiction

18 under both § 1331 (federal question) and § 1332 (diversity).

19              1. <u>Section 1331: Federal Question Jurisdiction</u>

20      Bryant and MGA contend that the court has federal question jurisdiction

21 under § 1331 because Mattel's conversion claim is completely preempted by the

22 Copyright Act.[11]

23

24      [11] MGA also argues in its Opposition that Mattel's breach of fiduciary duty,

25 breach of loyalty, and unjust enrichment claims are completely preempted. MGA Opp. at

   6-12. Because these arguments did not appear in the Notice of Removal, the court need

26 not consider them. 14C Charles Alan Wright & Arthur Miller, <u>Federal Practice and</u>

27 <u>Procedure</u> § 3732 (3d ed. 1988) ("the district court may decline to assert jurisdiction over

28                                                              (continued . . .)

                                         14

EXHIBIT __3__ PAGE 39

1    Federal question jurisdiction is governed by the "well-pleaded complaint

2  rule." This rule provides that jurisdiction under § 1331 is proper only when a

3  federal question appears on the face of a well-pled complaint. See, e.g.,

4  Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). As a result, a plaintiff – as

5  master of the complaint  – "may avoid federal jurisdiction by exclusive reliance on

6  state law." Id. Further, a defendant cannot remove solely "on the basis of a

7  federal defense, including the defense of preemption, even if the defense is

8  anticipated in the plaintiff's complaint, and even if both parties concede that the

9  federal defense is the only question truly at issue." Id. at 393. Thus, the federal

10  question must appear on the face of the complaint, as alleged and controlled by the

11  plaintiff. Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d at 1055.

12    "There does exist, however, a corollary to the well-pleaded complaint rule,

13  known as the 'complete preemption' doctrine. The Supreme Court has concluded

14  that the preemptive force of some statutes is so strong that they 'completely

15  preempt' an area of state law. In such cases, any claim purportedly based on that

16  preempted state law is considered, from its inception, a federal claim, and

17  therefore arises under federal law." Balcorta v. Twentieth Century-Fox Film

18  Corp., 208 F.3d 1102, 1107 (9th Cir. 2000) (quoting Metropolitan Life Ins. Co. v.

19  Taylor, 481 U.S. 58, 65 (1987)). In these cases, even a well-pled state law

20  complaint may be removed to federal court.[12]

21

22  _____

the case for reasons not averred in the removal notice"). Furthermore, consideration of
23  the arguments would not change the court's conclusion that there was no basis for federal
24  question jurisdiction at the time of removal.

25    [12] Moreover, "under the artful pleading rule a plaintiff may not defeat removal by
omitting to plead necessary federal questions in a complaint." ARCO Envtl.
26  Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of the State of Montana, 213
27  F.3d 1108, 1114 (9th Cir. 2000) (quotation marks omitted). "Though 'artful pleading'
28                                                    (continued . . .)

EXHIBIT  3  PAGE  40

In determining whether a particular state law claim is completely preempted by federal law for purposes of removal jurisdiction, the court may look to the factual allegations in the complaint and the information included in the notice of removal. Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d at 1058 ("[D]istrict courts may consider the petition of removal 'to clarify the action plaintiff presents and to determine if it encompasses an action within federal jurisdiction.") (quoting Schroeder v. Trans World Airlines, Inc., 702 F.2d 189, 191 (9th Cir. 1983)). The court cannot consider post-removal evidence. See id. (court cannot consider evidence in motion to dismiss or opposition to motion to remand). This contrasts with diversity jurisdiction, where the court can "consider post-removal evidence in determining whether [the] requisite amount is in controversy." 16 Moore et al., supra § 107.14[2][g] n. 102.1.

The Copyright Act has complete preemptive force. See Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225 (4th Cir. 1993); Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d 1050; Worth v. Universal Pictures, Inc., 5 F. Supp. 2d 816 (C.D. Cal. 1997) (Baird, J.); Dielsi v. Falk, 916 F. Supp. 985 (C.D. Cal. 1996) (Collins, J.). Furthermore, state law conversion claims are capable of being completely preempted by the Copyright Act. See, e.g., Dielsi, 916 F. Supp. at 992; Worth, 5 F. Supp. 2d at 822-23. In order for there to be such preemption, the state law claim must meet two requirements. First, the "work at issue" must come within the subject matter of copyright. Del Madera Props. v. Rhodes & Gardner, Inc.,

---

and 'complete preemption' ostensibly remain separate doctrines, they are so intertwined in the available case law that they appear to raise [the] same question: are Plaintiff's claims so 'completely preempted' that it is only by 'artful pleading' that [it] manages to avoid a 'federal question' in the Complaint[?]" Braco v. MCI Worldcom Communications, Inc., 138 F. Supp. 2d 1260, 1268 (C.D. Cal. 2001) (Collins, J.). "In other words, it seems that 'complete preemption' is a prerequisite of sorts to any finding that a plaintiff has 'pled around' what would otherwise be a federal claim." Id.

16

EXHIBIT 3 PAGE 41

1   820 F.2d 973, 976 (9th Cir. 1987); Selby v. New Line Cinema Corp., 96 F. Supp.

2   2d 1053, 1057 (C.D. Cal. 2000) (Matz, J.).  Second, the rights granted under the

3   state law must be "equivalent to [one] of the exclusive rights within the general

4   scope of copyright."  Del Madera, 820 F.2d at 976; see also Selby, 96 F. Supp. 2d

5   at 1057.

6           The court cannot find that Mattel's conversion claim was completely

7   preempted at the time of removal because the Complaint and the Notice of

8   Removal fail to reveal what work is even "at issue," much less whether that work

9   falls within "the subject matter of copyright."  First, the Complaint is vague and

10  generalized; Mattel never mentions what items or works Bryant allegedly

11  converted.  As Bryant acknowledges, the Complaint's allegations are so generic

12  that "Mattel could conceivably be trying to recover the value of anything from a

13  pen or pad of paper to [a] truckload of collectible 'Barbie' dolls or more."  Not. of

14  Removal ¶ 18.  Second, although the information in the Notice of Removal sheds

15  some light on the nature of Mattel's claims, it does not necessarily demonstrate

16  what works are "at issue."  It was not until *after* removal – when Mattel admitted

17  that the Bratz are relevant to its damages and asserted that this action involves the

18  same issues as Bryant's declaratory relief action – that it became clear that

19  Mattel's conversion claim is rooted in the allegation that Bryant "stole" the Bratz

20  idea from Mattel.  The court, however, may not consider this post-removal

21  evidence for purposes of determining if there was complete preemption at

22  removal.  See Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d at 1058.  Thus

23  constrained by the evidence it may consider, the court cannot find that Mattel's

24  conversion claim was preempted by the Copyright Act at the time of removal.

25  Consequently, Bryant has failed to show that the court has federal question

26  jurisdiction under § 1331.

27

28

17

3  PAGE 42

### 2. Section 1332: Diversity Jurisdiction

Bryant and MGA argue that there is diversity jurisdiction under § 1332. This presents two issues: first, whether diversity jurisdiction was present at the time of removal; second, whether MGA's post-removal intervention as a non-diverse defendant destroyed the possibility of diversity jurisdiction.

#### a. Diversity Jurisdiction at Removal

To demonstrate the existence of diversity jurisdiction at the time of removal, Bryant must show that he and Mattel were of diverse citizenship and that it is more likely than not that "the matter in controversy exceed[ed] the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1331; Singer v. State Farm Mut. Auto. Ins. Co., 116 F.3d 373, 376 (9th Cir. 1997); Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, 403-4 (9th Cir. 1996). Mattel was and is a citizen of Delaware and California, and Bryant was and is a citizen of Missouri. Not. of Removal ¶¶ 12-13. Therefore, Mattel and Bryant were of diverse citizenship at the time of removal.

Further, Bryant has demonstrated that it is more likely than not that more than $75,000 was in controversy at the time of removal. Unlike federal question jurisdiction, the court may "consider post-removal evidence in determining whether [the] requisite amount is in controversy." 16 James Wm. Moore et al., Moore's Federal Practice § 107.14[2][g] n. 102.1 (3d ed. 2004) (citing Singer v. State Farm Mut. Auto Ins., 116 F.3d 373, 377 (9th Cir. 1997) (court may consider plaintiff counsel's post-removal oral admission to court); Williams v. Best Buy Co., Inc., 269 F.3d 1316, 1319-20 (11th Cir. 2001); Allen v. R & H Oil & Gas Co., 63 F.3d 1326, 1335-36 (5th Cir. 1995)). See also Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 947-49 (11th Cir. 2000) (court may consider, among other post-removal evidence, plaintiff's post-removal admissions); Harmon v. OKI Sys.,

18

EXHIBIT 3 PAGE 43

1  115 F.3d 477 (7th Cir. 1997). Cumulatively, the pre-removal and post-removal

2  evidence demonstrates that the rights to the Bratz were and are in controversy.

3        Specifically, Mattel's counsel has admitted that Bryant's royalties on the

4  Bratz are relevant to Mattel's claim for damages; Mattel has acknowledged the

5  similarity of the Toon Teens and the Bratz in its responses to discovery requests;

6  Mattel has sought discovery regarding the "substantial similarity" between the

7  Toon Teens and the Bratz; Mattel has agreed to provide a third party with

8  documentation regarding the Toon Teens to demonstrate the Bratz are knock-offs

9  of the Toon Teens; Mattel has admitted launching an investigation into the

10  allegation the Bryant stole the idea for the Bratz from Mattel; Mattel has

11  vigorously pursued discovery relating to the Bratz; and Mattel has admitted that its

12  case involves that same issues as Bryant's declaratory relief action regarding the

13  Bratz. Because the value of the rights to the Bratz easily exceeds $75,000, Bryant

14  has demonstrated that it is more likely than not that the amount in controversy

15  exceeded the jurisdictional minimum at the time of removal. See Jacoby Decl.,

16  Ex. 1 (Bryant Depo.) at 705 (testimony that Bryant has received approximately

17  $10 million in royalties from the Bratz). Accordingly, Bryant has met his burden

18  in demonstrating that diversity jurisdiction existed at the time of removal.

19                    *b. The Effect of MGA's Intervention*

20        Mattel argues that MGA's post-removal intervention as a non-diverse

21  defendant destroyed diversity. In contrast, Bryant and MGA contend that MGA's

22  intervention had no such effect, due to the long-standing rule that "[i]f a non-

23  diverse party enters a case by intervention as of right, his presence will not destroy

24  jurisdiction unless [he] was an indispensable party when the plaintiff filed the

25  complaint." Deutsche Fin. Serv. Corp. v. Schwartz Homes, Inc., 187 F.R.D. 542,

26  545 (N.D. Ohio 1999) (citing Dean v. Holiday Inns, Inc., 860 F.2d 670, 672 (6th

27  Cir. 1988)). See also Wichita R.R. & Light Co. v. Pub. Utils. Comm'n, 260 U.S.

28

19

EXHIBIT 3 PAGE 44

48, 54 (1922); <u>Am. Nat'l Bank & Trust Co. of Chicago v. Bailey</u>, 750 F.2d 577, 582 (7th Cir. 1984); <u>Gaines v. Dixie Carriers, Inc.</u>, 434 F.2d 52, 54 (5th Cir. 1970); <u>Hardy-Latham v. Wellons</u>, 415 F.2d 674, 676 (4th Cir. 1968); <u>Black v. Texas Employers' Ins. Ass'n</u>, 326 F.2d 603 (10th Cir. 1964); <u>Formulabs, Inc. v. Hartley Pen Co.</u>, 318 F.2d 485, 492 (9th Cir. 1963); <u>Mut. Fire, Marine & Inland Co. v. Adler</u>, 726 F. Supp. 478, 481-82 (S.D.N.Y. 1989).  Mattel responds: (1) that MGA's intervention did not meet the requirements of this rule; and (2) that this rule is no longer good law in light of the passage of 28 U.S.C. § 1447(e) in 1988 and 28 U.S.C. § 1367(b) in 1990.

> i. <u>Application of the Rule Regarding Non-Diverse Intervenors</u>

To intervene as "of right," one must meet the requirements of Rule 24(a)(2), which provides:

> Intervention of Right.  Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a)(2).  The court applies a four-part test under Rule 24(a)(2): (1) the application for intervention must be timely; (2) the applicant must have a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit.  <u>Northwest Forest Res. Council v. Glickman</u>, 82 F.3d 825, 836 (9th Cir. 1996).  "In general, [courts] construe Rule 24(a) liberally in favor of potential intervenors."  <u>Southwest Ctr. for Biological</u>

EXHIBIT 3 PAGE 45

1    <u>Diversity v. Berg</u>, 268 F.3d 810, 818 (9th Cir. 2001). "In addition to mandating

2    broad construction, [the court's] review is 'guided primarily by practical

3    considerations,' not technical distinctions." <u>Id.</u>

4         MGA's intervention met the requirements of Rule 24(a)(2).  First, MGA's

5    intervention was indisputably timely as the parties stipulated to allow MGA to

6    intervene. <u>See</u> <u>Southwest Ctr. for Biological Diversity</u>, 268 F. 3d at 818 ("As the

7    parties agree that Applicants' motion to intervene was timely, we need not address

8    this factor.").  Second, MGA has a "significantly protectable" interest in Bryant's

9    services relating to the Bratz and in the drawings of and rights to the Bratz. <u>See</u>

10    <u>generally</u> Moore et al., <u>supra</u> § 19.06[1] (assignees are usually "necessary parties"

11    under Rule 19(a), which employs same analysis as Rule 24(a)(2)).  Third, MGA is

12    so situated that the disposition of the action may, as a practical matter, impair or

13    impede its ability to protect these interests.  For example, MGA's interests could

14    be impacted by an injunction precluding Bryant from continuing to assist MGA in

15    developing the Bratz.  Similarly, as MGA notes: "[I]f Bryant somehow were held

16    to have copied Mattel's 'Toon Teens' work, MGA's acquisition of Bryant's

17    original 'Bratz' drawings could be challenged."  Bryant & MGA's Brief in

18    Response to Court's Questions at 5.  Finally, because MGA has broader rights to

19    the Bratz than Bryant, Bryant may not adequately protect MGA's interests. <u>See</u>

20    <u>generally</u> Moore et al., <u>supra</u> § 24.03[4][a][i] ("the applicant's burden on this

21    matter should be viewed as minimal").  Thus, MGA intervened as "of right" under

22    Rule 24(a)(2).

23

24

25    / / /

26

27

28

21

EXHIBIT 3 PAGE 46

Consequently, unless it was "indispensable" under Rule 19(b) at the time

Mattel filed the Complaint, MGA did not destroy diversity by intervening.[13] In

---

[13] Rule 19 provides:

(a) Persons to be Joined if Feasible. A person who is subject to service of
process and whose joinder will not deprive the court of jurisdiction over the
subject matter of the action shall be joined as a party in the action if . . .
(2) the person claims an interest relating to the subject of the action and is
so situated that the disposition of the action in the person's absence may
(i) as a practical matter impair or impede the person's ability to protect that
interest . . . . If the person has not been so joined, the court shall order that
the person be made a party . . . .

(b) Determination by Court Whenever Joinder not Feasible. If a [party
meeting the requirements of 19(a)] cannot be made a party, the court shall
determine whether in equity and good conscience the action should proceed
among the parties before it, or should be dismissed, the absent person being
thus regarded as indispensable. The factors to be considered by the court
include: first, to what extent a judgment rendered in the person's absence
might be prejudicial to the person or those already parties; second, the
extent to which, by protective provisions in the judgment, by the shaping of
relief, or other measures, the prejudice can be lessened or avoided; third,
whether a judgment rendered in the person's absence will be adequate;
fourth, whether the plaintiff will have an adequate remedy if the action is
dismissed for nonjoinder.

Fed. R. Civ. P. 19.

An absent party is "necessary" if he meets the requirements of Rule 19(a). He is
"indispensable" if he meets the requirements of Rule 19(b) and the court determines, in
equity and good conscience, that the case should be dismissed rather than proceed without
him.

Although the factors in Rule 19(b) "overlap" with those in Rule 19(a), "[o]verlap .
. . should not be equated with redundancy." Moore et al., supra § 19.05[1][a]. "While the
necessary party analysis under Rule 19(a) and the indispensability analysis under Rule
19(b) look at similar issues, each has a different thrust which reflects its different
purpose." Id. "Under the former, the court is more or less concerned with whether

(continued . . .)

22

EXHIBIT 3 PAGE 47

1  this context, the court examines whether the intervenor was "indispensable" at the
2  time the original action was filed.  See Mut. Fire, Marine & Inland Ins. Co., 726 F.
3  Supp. at 481 (an intervenor has to show an independent basis for jurisdiction only
4  if it "was indispensable to the action at the time it was brought").  See also Am.
5  Nat'l Bank & Trust Co. of Chicago, 750 F.2d at 582 (Posner, J.) ("[I]f the
6  nondiverse party comes into the case by intervening in it, his presence will not
7  deprive the court of jurisdiction unless the intervenor was an indispensable party
8  when the complaint was filed.  Federal jurisdiction is determined by the facts as
9  they exist when the case is filed, and not by what happens later . . . .  So the fact
10  that a resident of the plaintiff's state intervenes will not require the plaintiff to
11  abandon his suit unless the resident was an indispensable party at the time the suit
12  was filed – in which event the plaintiff should have joined him at the outset, and if
13  he had done so the court would have known that complete diversity was
14  lacking.").  Examining whether the intervenor was "indispensable" when the
15  action was filed "prevent[s] collusion between parties to avoid jurisdictional
16  requirements."  Mut. Fire, Marine & Inland Ins. Co., 726 F. Supp. at 481.  "If the
17  rule were otherwise, the requirement of complete diversity could be avoided by
18  having one party bring an action while the indispensable party waits and then
19  intervenes as of right under the court's ancillary jurisdiction."  Id.
20      Here, MGA was not "indispensable" to the lawsuit as Mattel chose to
21  characterize it in its Complaint.  Mattel elected to sue Bryant in state court on what
22  Mattel – as master of its Complaint – asserted were purely state law claims.
23  Conspicuously absent from the Complaint was any mention of MGA or the Bratz.
24  Indeed, as late as July 2004, months after filing its Complaint against Bryant,
25
26  nonjoinder *could* have one of the adverse effects addressed by that Rule."  Id. (emphasis
27  in original).  "Under the indispensability analysis, the court . . . must determine whether
28  nonjoinder *actually will* result in . . . prejudice . . . ."  Id. (emphasis in original).

23

EXHIBIT 3 PAGE 48

1   Mattel claimed to be unable to determine "whether rights to Bratz are indeed at

2   stake here." See, e.g., July 12, 2004 Rep. at 4.  Thus, it cannot be said that MGA

3   was "necessary," much less "indispensable" to the action at the time Mattel filed

4   its Complaint against Bryant.

5        Furthermore, there is no indication that the parties colluded to avoid the

6   requirement of complete diversity.  First, the parties have submitted over 126

7   pages in briefing, 118 exhibits, and two *ex parte* applications in connection with

8   the instant motion to remand.  Second, because this case was removed by Bryant

9   from state court, there is a "*prima facie* absence of effort by the plaintiff to

10  circumvent the complete diversity requirement."  Joan Steinman, Supplemental

11  Jurisdiction in § 1441 Removed Cases: An Unsurveyed Frontier of Congress'

12  Handiwork, 35 Ariz. L. Rev. 305, 347 (1993).

13       Because MGA intervened as of right and was not "indispensable" at the

14  time Mattel filed its Complaint against Bryant, its intervention did not destroy

15  diversity jurisdiction under the rule as it existed prior to the enactment of

16  § 1447(e) and § 1367(b).

17              ii.  The Effect of § 1447(e) and § 1367(b)

18       Mattel argues that § 1447(e) and § 1367(b) modified the application of the

19  rule that the intervention of a non-diverse, non-indispensable party does not

20  destroy diversity jurisdiction.

21       Section 1447(e) provides:

22       If after removal the plaintiff seeks to join additional defendants
         whose joinder would destroy subject matter jurisdiction, the court
23       may deny joinder, or permit joinder and remand the action to the State
24       court.

25

26  28 U.S.C. § 1447(e).  This section does not apply to the present case.  While

27  § 1447(e) discusses the court's options when a *plaintiff* attempts to *join* a non-

28

                                    24

EXHIBIT   3   PAGE 49

1   diverse defendant, the present case involves the *intervention* of a non-diverse

2   *defendant*. Therefore, § 1447(e) did not change the above-mentioned rule as it

3   applies here.

4       Section 1367 provides in pertinent part:

5       (a) Except as provided in subsection[] (b) . . . , in any civil action of
6       which the district courts have original jurisdiction, the district courts
        shall have supplemental jurisdiction over all other claims that are so
7       related to claims in the action within such original jurisdiction that
8       they form part of the same case or controversy under Article III of the
        United States Constitution. Such supplemental jurisdiction shall
9       include claims that involve the joinder or intervention of additional
10      parties.

11

12      (b) In any civil action of which the district courts have original
        jurisdiction founded solely on section 1332 of this title, the district
13      courts shall not have supplemental jurisdiction under subsection (a)
14      over claims by plaintiffs against persons made parties under Rule 14,
15      19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims
        by persons proposed to be joined as plaintiffs under Rule 19 of such
16      rules, or seeking to intervene as plaintiffs under Rule 24 of such rules,
17      when exercising supplemental jurisdiction over such claims would be
        inconsistent with the jurisdictional requirements of section 1332.
18

19   28 U.S.C. § 1367. Mattel argues that because the court's jurisdiction is premised

20   upon § 1332 and MGA and Mattel are not diverse, the court is prohibited by

21   § 1367(b) from exercising supplemental jurisdiction over MGA. This argument

22   fails to recognize the distinction between "parties" and "claims." Section 1367(b)

23   is concerned with the assertion of new "claims," not the intervention alone of new

24   "parties." As succinctly stated by one of the preeminent scholars in the field:

25       [W]hether the context is removal or not, there can be persons who
26       intervene on the side of the defendants . . . against whom the plaintiff
         has no claim to assert. Indeed, the intervention of persons under Rule
27       24 typically will be at the instigation of the intervenors, and not at the
28

25

EXHIBIT 3 PAGE 50

urging of the plaintiff, and will be precipitated by the persons' concern that disposition of the action in their absence will as a practical matter impair or impede their ability to protect their interests .... In these situations where the plaintiff does not seek to assert a claim against the defendant intervenor, the plaintiff has not sought to circumvent the complete diversity requirement of § 1332, and § 1367(b) does not purport to limit the exercise of supplemental jurisdiction over the involvement or interests of such intervening parties. Its limitations apply only to the *claims*, if any, that the plaintiff would assert against such intervening defendants.

Joan Steinman, Supplemental Jurisdiction in § 1441 Removed Cases: An Unsurveyed Frontier of Congress' Handiwork, 35 Ariz. L. Rev. 305, 344-45 (1993) (emphasis in original).[14]

---

[14]   See also Wichita R.R. & Light Co., 260 U.S. 48 (1922) (allowing intervention of non-diverse defendant); Home Ins. Co. v. Hughes, CIV. A. No. 95-1833, 1996 WL 109292, *2 (E.D. La. Mar. 11, 1996) (intervention of non-diverse defendant does not destroy diversity); Maryland Cas. Co. v. W.R. Grace & Co., No. 88 Civ. 4337 (JSM), 1996 WL 34154 (S.D.N.Y. Jan. 30, 1996) (intervention of non-diverse "cross-claim defendant" does not destroy diversity); MCI Telecomms. Corp. v. Logan Group, Inc., 848 F. Supp. 86, 89 & n. 2 (N.D. Tex. 1994) (suggesting that intervening defendant does not trigger § 1367(b) concerns); Schwarzer et al., Cal. Prac. Guide: Fed. Civ. Pro. Before Trial § 7:179 (2004) ("An independent basis for subject matter jurisdiction may not be required where one intervenes as a defendant as a matter of right."); 36 Suzanne J. Bailey et al., Corpus Juris Secundum § 142 (2004) ("[J]urisdiction of an action between citizens of different states ordinarily is not lost by the intervention of new parties who are citizens of the same state as the original parties to whom their interests are opposed."); Marilyn J. Ireland, Supplemental Jurisdiction Over Claims in Intervention, 23 N.M. L. Rev. 57, 68-69 (1993) ("Jurisdiction once acquired on [the] ground [of diversity] is not . . . defeated by the intervention . . . of a party whose presence is not essential to a decision of the controversy between the original parties. Section 1367 does not change this conclusion . . . . [I]n the case of subject matter jurisdiction, it is jurisdiction over claims, not over parties, that is in issue . . . . [D]efensive intervenors have never been considered to violate the complete diversity rule in the past. It does not now necessarily follow that they will be held to be 'inconsistent with the requirements of section 1332.'") (quotation

(continued . . .)

26

EXHIBIT 3 PAGE 51

1       Here, MGA has intervened as a defendant and Mattel has not attempted to

2   amend its Complaint to assert any claims against MGA.[15]    Therefore, MGA's

3

4   marks and citations omitted); Abram Chayes, The Role of the Judge in Public Law
    Litigation, 89 Harv. L. Rev. 1281, 1290 (1976) (the right to participate in a case has
5   ceased to depend on having a right to relief or liability to satisfy a claim).  Mattel cites
6   Lumber Ins. Cos., Inc. v. Allen, 892 F. Supp. 31 (D.N.H. 1993), for the proposition that
7   the mere intervention of a non-diverse defendant destroys diversity.  Insofar as Lumber
    Ins. stands for this proposition, the court disagrees, as such a holding ignores the
8   distinction between claims and parties.

9
    [15] Mattel cites Uni Storebrand Ins. Co., UK Ltd. v. Star Terminal Corp., No. 96
10  CIV. 9556 (DLC), 1997 WL 391125 (S.D.N.Y. July 11, 1997), for the proposition that an
    intervening defendant "steps into the shoes" of a full-party defendant and, therefore,
11  "takes on" the plaintiff's original "claims" as if they were asserted against the intervening
12  party.  Uni Storebrand is distinguishable.  There, the original defendant had completely
    failed to appear in the action and Societe Generale Energie Corp., S.A. ("SGE") sought to
13  intervene as a defendant to protect its interests that were otherwise subject to default.  In
14  those specific circumstances, the court found that SGE, by intervening, "stepped into the
    shoes" of the original defendant and "took on" the claims asserted by the original
15  plaintiff.  See id. at *4 ("As a practical matter, the only live claim in this action is a non-
16  diverse claim between [the plaintiff] and SGE."); id. at *6 ("The unique posture of this
    case stems from the fact that . . . the nominal defendant[] is a dissolved corporation which
17  does not intend to appear.").  In contrast, Bryant, the original defendant, has appeared in
18  this action and has litigated his rights vigorously.
        Furthermore, even if the court assumed that MGA "took on" Mattel's claims
19  against Bryant, the court would not be barred by § 1367(b) from retaining jurisdiction.
20  After all, "[w]hen one turns to removed cases, . . . supplemental jurisdiction should be
    liberally exercised – because of the prima facie absence of effort by the plaintiff to
21  circumvent the complete diversity requirement."  Steinman, supra at 347 (emphasis
22  added).  Because this is a removed case, the court may liberally exercise supplemental
23  jurisdiction over the "claims" MGA might have "taken on" by intervening after removal.
    This "[does] not expand federal jurisdiction beyond the bounds that the [Supreme] Court
24  [has] recognized."  Id. at 347-48; see Phelps v. Oaks, 117 U.S. 236 (1886).  Additionally,
25  by exercising supplemental jurisdiction over these claims, the court can "simultaneously
    adjudicate the original civil action, safeguard the defendant's removal, and allow all of
26  plaintiff's related claims to be heard in one suit."  Steinman, supra at 348.  "All this serves
27  fairness and efficiency, without sacrificing enforcement of the jurisdictional requirements
                                                                    (continued . . .)
28

                                          27

EXHIBIT ___3___ PAGE _52_

1  intervention did not implicate § 1367(b).  In short, because neither § 1447(e) nor

2  § 1367(b) precludes the court from exercising diversity jurisdiction over an action

3  involving the post-removal intervention of a non-diverse, non-indispensable

4  defendant, the court finds that MGA's intervention did not destroy diversity.[16]

5

6  ### IV. CERTIFICATION UNDER 28 U.S.C. § 1292(b)

7       "In circumstances where a district judge upholds subject matter jurisdiction

8  and denies a motion to remand, but has doubts about these rulings, the judge may

9  sometimes secure interlocutory review by certifying the rulings under 28 U.S.C.

10  § 1292(b)." Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d

11

12  _____

13  of § 1332 . . . ." Id.

       Finally, to the extent Mattel argues its "claims" are asserted against MGA, it lends
14  credence to the inference that its claims are actually related to the rights to the Bratz and
15  are likely preempted by the Copyright Act, thereby raising a federal question.

16       [16] The cases cited by Mattel fail to address the situation before the court. See
17  Stevens v. Brink's Home Sec., Inc., 378 F.3d 944, 949 (9th Cir. 2004) (plaintiff's
    amending complaint to join non-diverse defendants); TIG Ins. Co. v. Reliable Research
18  Co., 334 F.3d 630, 634 (7th Cir. 2003) (intervening plaintiff); Doleac v. Michalson, 264
19  F.3d 470, 473-77 (5th Cir. 2001) (plaintiff's amending complaint to add claims against
    non-diverse defendant); Cobb v. Delta Exports, Inc., 186 F.3d 675, 677 (5th Cir. 1999)
20  (same); Casas Office Mach., Inc. v. Mita Copystar Am. Inc., 42 F.3d 668, 672-78 (1st Cir.
21  1995) (same); Yniques v. Cabral, 985 F.2d 1031 (9th Cir. 1993) (plaintiff's amending
    complaint to join non-diverse defendant; holding based on 1447(e), which applies only to
22  efforts by plaintiffs to join non-diverse defendants); Miller v. Grgurich, 763 F.2d 372,
23  373 (9th Cir. 1985) (paraphrasing Desert Empire Bank v. Ins. Co. of N. Am., 623 F.2d
    1371, 1374 (9th Cir. 1980), involving plaintiff's amending complaint to add claims
24  against non-diverse defendant); Carolina Asphalt Paving, Inc. v. Balfour Beatty Constr.,
25  Inc., No. 9:04-1578-28, 2004 WL 3015177, at *3 (D.S.C. Nov. 19, 2004) (plaintiff's
    addition of claims against third-party defendant); Diaz v. Allstate Ins. Group, 185 F.R.D.
26  581, 595-96 (C.D. Cal. 1998) (plaintiff's joining non-diverse defendant); Farm Bureau
27  Mut. Ins. Co., Inc. v. Eighmy, 849 F. Supp. 40 (D. Kan. 1994) (pre-removal intervention
28  of non-diverse defendant).

EXHIBIT 3 PAGE 53

116, 132 (2d Cir. 2003) (Newman, J., concurring) (citing <u>Breuer v. Jim's Concrete of Brevard, Inc.</u>, 538 U.S. 691 (2003)).  28 U.S.C. § 1292(b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).

No court of appeals has addressed whether § 1447(e) or § 1367(b) causes the post-removal, Rule 24(a)(2) intervention of a non-diverse, non-indispensable defendant to destroy diversity jurisdiction.  This court's finding that neither section does so is a controlling question of law critical to the court's exercise of jurisdiction and as to which there is no precedent.  Resolution of the issue will both materially advance the litigation and avoid the needless expenditure of judicial resources if the Court of Appeals concludes this court lacks jurisdiction.  <u>See, e.g.</u>, <u>Valdez v. Allstate Ins. Co.</u>, 372 F.3d 1115 (9th Cir. 2004) (raising issue of jurisdiction *sua sponte* after case had proceeded to summary judgment in district court).  Accordingly, the court certifies the issue for interlocutory appeal under § 1292(b).  No later than 10 days from the date of this order, Mattel shall file its application to appeal this court's order or notify this court, in writing, that no such application will be made.

1

## V. CONCLUSION

2    Finding the presence of diversity jurisdiction under § 1332, the court

3    **DENIES** Mattel's Motion to Remand. [17]

4

5    IT IS SO ORDERED.

6    DATED: March 4, 2005

7

8

9                            Nora M. Manella

10                           United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

---

28    [17] Mattel's request for attorneys' fees is denied.

30

EXHIBIT 3 PAGE 55

**Exhibit 4**

1  M. RANDALL OPPENHEIMER (S.B. #77649)
   DIANA M. TORRES (S.B. #162284)
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, California 90071-2899
   Telephone:  (213) 430-6000
4  Facsimile:   (213) 430-6407

5

6  Attorneys for Applicant-Intervenor
   MGA ENTERTAINMENT, INC.

7

8

9

10

*SEND*

FILED
CLERK, U.S. DISTRICT COURT

DEC - 7 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

11  MATTEL, INC., a Delaware
    Corporation,
12
                     Plaintiff,
13
          v.
14
    CARTER BRYANT, an individual;
15  and DOES 1 through 10, inclusive,
16
                     Defendant.
17

Case No. CV 04-9059 NM (RNBx)

**STIPULATION PERMITTING MGA
TO INTERVENE AS A PARTY TO
THIS ACTION** *✓ ORDER*

Hon. Nora Manella

18

19

20

21

22

23

24

25

26

27

28

DOCKETED ON CM

DEC - 8 2004

006

BY

**STIPULATION PERMITTING MGA TO
INTERVENE AS A PARTY**

EXHIBIT _4_ PAGE _56_

1    WHEREAS, on April 27, 2004, Plaintiff Mattel, Inc. ("Mattel") filed suit

2    against Carter Bryant ("Bryant") and ten unnamed "Does" alleging breach of

3    contract, breach of the duty of loyalty, breach of fiduciary duty, conversion and

4    unjust enrichment.

5    WHEREAS, MGA, believes, at this time, that it has a significantly

6    protectable interest relating to the subject matter of the action, that the disposition

7    of the action may impair or impede MGA's ability to protect its interest absent

8    intervention, and that MGA's interest is not adequately represented by the existing

9    parties.

10    WHEREAS, Mattel is agreeable to the filing of the Answer in Intervention as

11    a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

12    its rights, defenses or positions in this or any other action or to the Answer in

13    Intervention, including without limitation to Mattel's jurisdictional objections;

14    WHEREAS, Bryant is agreeable to the filing of the Answer in Intervention as

15    a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

16    his rights, defenses or positions in this or any other action;

17    NOW THEREFORE, MGA, Mattel and Bryant hereby stipulate, subject to

18    this Court's approval, as follows:

19    1.    MGA may intervene as a party to this action; and

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

EXHIBIT _4_ PAGE _57_

2. MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated: December 3, 2004    O'MELVENY & MYERS LLP

By: _____
     Diana M. Torres
Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.

Dated: December___, 2004    QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP

By: _____
     Michael T. Zeller
Attorneys for Plaintiff
MATTEL, INC.

Dated: December___, 2004    LITTLER MENDELSON, P.C.

By: _____
     Keith A. Jacoby
Attorneys for Defendant
CARTER BRYANT

IT IS SO ORDERED.

Dated: December___, 2004

_____
Hon. Nora M. Manella
United States District Judge

- 2 -

EXHIBIT 4 PAGE 58

2.    MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:      December___, 2004     O'MELVENY & MYERS LLP

By:_____
      Diana M. Torres
      Attorneys for Applicant-Intervenor
      MGA ENTERTAINMENT, INC.

Dated:      December___, 2004     QUINN EMANUEL URQUHART
      OLIVER & HEDGES LLP

By:_____
      Michael T. Zeller
      Attorneys for Plaintiff
      MATTEL, INC.

Dated:      December___, 2004     LITTLER MENDELSON, P.C.

By:_____
      Keith A. Jacoby
      Attorneys for Defendant
      CARTER BRYANT

IT IS SO ORDERED.

Dated:      December____, 2004

_____
      Hon. Nora M. Manella
      United States District Judge

- 2 -

EXHIBIT 4 PAGE 59

1    2.    MGA shall be permitted to file its Answer in Intervention, lodged

2 concurrently with this Stipulation.

3

4    Dated:        December___, 2004        O'MELVENY & MYERS LLP

5

6                                          By:_____
                                              Diana M. Torres
7                                          Attorneys for Applicant-Intervenor
                                           MGA ENTERTAINMENT, INC.
8

9    Dated:        December___, 2004        QUINN EMANUEL URQUHART
                                           OLIVER & HEDGES LLP
10

11

12                                         By:_____
                                              Michael T. Zeller
13                                         Attorneys for Plaintiff
                                           MATTEL, INC.
14

15   Dated:        December 3, 2004         LITTLER MENDELSON, P.C.

16

17                                         By:_____
                                              Keith A. Jacoby
18                                         Attorneys for Defendant
                                           CARTER BRYANT
19

20   IT IS SO ORDERED.

21   Dated:        December 7th, 2004       _____

22                                             Hon. Nora M. Manella

23                                             United States District Judge

24

25

26

27

28

- 2 -

EXHIBIT 4 PAGE 60

1   M. RANDALL OPPENHEIMER (S.B. #77649)
    DIANA M. TORRES (S.B. #162284)
2   O'MELVENY & MYERS LLP
    400 South Hope Street
3   Los Angeles, California 90071-2899
    Telephone: (213) 430-6000
4   Facsimile: (213) 430-6407

5   Attorneys for Applicant-Intervenor
    MGA ENTERTAINMENT, INC.
6

7

8                UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10

11   MATTEL, INC., a Delaware              Case No. CV 04-9059 NM (RNBx)
     Corporation,
12                                         **MGA ENTERTAINMENT, INC.'S**
                      Plaintiff,           **ANSWER IN INTERVENTION TO**
13                                         **PLAINTIFF'S UNVERIFIED**
              v.                           **COMPLAINT**
14
     CARTER BRYANT, an individual;         Hon. Nora Manella
15   and DOES 1 through 10, inclusive,

16                    Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

LA2:730044

3

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT 4 PAGE 61

1       As it has now become abundantly clear that its rights are directly at stake in

2   this action, MGA Entertainment, Inc. ("MGA") intervenes in this case as a

3   defendant. Plaintiff Mattel, Inc. ("Mattel") filed suit against Carter Bryant

4   ("Bryant"), a design consultant for MGA, asserting, among other claims, that he

5   "wrongfully converted Mattel property" for his own benefit and "the benefit and

6   gain of others" and seeking both monetary and injunctive relief. It is now evident

7   that Mattel's claims are based on Mattel's misguided theory that Bryant allegedly

8   converted intellectual property from Mattel and used it as the underlying work for

9   his own and MGA's benefit. MGA reaches this conclusion in light of at least the

10  following:

11      (a)     Mattel's recent registration for an unreleased project created in

12              approximately 1999 that it now calls "Toon Teens," from which Mattel

13              has asserted in the press Bryant "borrowed liberally" for his work on

14              "Bratz," and which is also the subject of the declaratory relief action

15              that Bryant has filed;

16      (b)     the questioning of Bryant at his recent deposition focusing on the

17              creation and development of "Bratz;"

18      (c)     Mattel's recent efforts to subpoena third parties who worked on

19              MGA's "Bratz" products and have no information concerning Bryant's

20              employment relationship with Mattel; and

21      (d)     Mattel's recent attempts to assist those who have infringed MGA's

22              rights in other countries to prove (falsely) that MGA does not own the

23              copyrights to its "Bratz" products.

24  Indeed, Mattel's purported conversion claim is nothing more than a copyright claim

25  in disguise. It is preempted by federal copyright law, accordingly, and must be

26  recast as a copyright claim under federal law. This copyright action necessarily

27  implicates MGA's rights, as MGA owns all intellectual property rights in "Bratz."

28  While MGA denies that Mattel is entitled to rights in any of MGA's intellectual

property, including, without limitation, MGA's copyrights in the "Bratz" line of products, MGA must now intervene in this action to defend its intellectual property rights. Therefore Defendant in Intervention MGA, as answer to the Complaint herein, admits, denies, and alleges as follows:

1.    Upon information and belief, MGA admits that Mattel is a corporation organized and existing under the laws of the State of Delaware and has a place of business in El Segundo, California. Except as so admitted, MGA is without sufficient information to admit the allegations of ¶ 1, and on that basis denies the same.

2.    MGA admits that defendant Bryant is an individual currently residing in Springfield, Missouri.

3.    MGA is without sufficient information concerning either Mattel's knowledge or the identities of the Doe Defendants, if any, to enable it to admit the allegations of ¶ 3, and on that basis denies the same.

4.    MGA denies the allegations of ¶ 4.

5.    MGA denies the allegations of ¶ 5.

6.    MGA admits that Bryant does not currently reside in California and that Los Angeles County is a proper venue for this action. Except as so admitted, MGA denies the allegations of ¶ 6.

7.    MGA is without information to admit the specific allegations of ¶ 7 and on that basis denies the same, but admits that reports from Mattel and other public sources make assertions similar to those alleged in ¶ 7.

8.    MGA is without information to admit the specific allegations of ¶ 8 pertaining to Mattel's operations, and on that basis denies the same, but admits that Mattel has a large facility in El Segundo, California, in which Mattel employs a number of people.

9.    MGA is without information to admit the specific allegations of ¶ 9 pertaining to Mattel's operations, and on that basis denies the same, but admits that

1  Bryant was employed by Mattel during two time periods.

2      10.   MGA is informed and on that basis admits that Bryant signed

3  documents during his employment at Mattel. MGA alleges that Exhibit A speaks

4  for itself as to its contents. MGA lacks information sufficient to enable it to

5  identify or authenticate Exhibit A and on that basis denies each and every allegation

6  in ¶ 10 purporting to describe the content of Exhibit A. MGA further alleges that

7  the allegations in ¶ 10 purporting to describe the legal effect of Exhibit A consist of

8  legal argument and conclusions to which no response is required.

9      11.   MGA is informed and on that basis admits that Bryant signed

10 documents during his employment at Mattel. MGA alleges that Exhibit B speaks

11 for itself as to its contents. MGA lacks information sufficient to enable it to

12 identify or authenticate Exhibit B and on that basis denies each and every allegation

13 in ¶ 11 purporting to describe the content of Exhibit A. MGA further alleges that

14 the allegations in ¶ 11 purporting to describe the legal effect of Exhibit B consist of

15 legal argument and conclusions to which no response is required.

16     12.   MGA admits that Bryant signed a contract with MGA on or about

17 October 4, 2000 that provided that Bryant would receive royalties in connection

18 with certain work to be performed by him thereafter under that agreement, and that

19 MGA would own all intellectual property rights in property for which Bryant

20 provided services, as well as in the work assigned thereunder by Bryant to MGA.

21 Except as so admitted, MGA denies the allegations of ¶ 12.

22     13.   MGA is without information sufficient to admit the allegations in ¶ 13

23 and on that basis denies the same.

24     14.   MGA denies the allegations of ¶ 14.

25     15.   In answer to ¶ 15, MGA repeats its answers to the allegations in

26 paragraphs 1 through 14, above.

27     16.   MGA is informed and on that basis admits that Bryant signed

28 documents during his employment at Mattel. MGA alleges that any purported

EXHIBIT _4_ PAGE _64_

1  "Mattel Employment Agreement" and "Conflict Questionnaire" speak for

2  themselves as to their contents.  MGA lacks information sufficient to enable it to

3  identify or authenticate the purported "Mattel Employment Agreement" and

4  "Conflict Questionnaire" and on that basis denies each and every allegation in ¶ 16

5  purporting to describe the contents of such documents.  MGA further alleges that

6  the allegations in ¶ 16 purporting to describe the legal effect of any purported

7  "Mattel Employment Agreement" or "Conflict Questionnaire" consist of legal

8  argument and conclusions to which no response is required.

9       17.    MGA alleges that any purported "Mattel Employment Agreement" and

10  "Conflict Questionnaire" speak for themselves as to their contents.  MGA lacks

11  information sufficient to enable it to identify or authenticate the purported "Mattel

12  Employment Agreement" and "Conflict Questionnaire" and on that basis denies

13  each and every allegation in ¶ 16 purporting to describe the contents of such

14  documents.  MGA further alleges that the allegations in ¶ 16 purporting to describe

15  the legal effect of any purported "Mattel Employment Agreement" or "Conflict

16  Questionnaire" consist of legal argument and conclusions to which no response is

17  required.  MGA is without sufficient information concerning Mattel's performance,

18  if any, and on that basis denies all allegations regarding the same.

19       18.    MGA denies the allegations of ¶ 18.

20       19.    MGA denies the allegations of ¶ 19 and affirmatively asserts that the

21  relief sought by Mattel in this paragraph indicates that Mattel's first cause of action

22  implicates federal copyright laws.  To the extent that Mattel herein purports to set

23  forth the allegations in support of its first cause of action to substantiate a federal

24  copyright claim, these allegations are also expressly denied.

25       20.    MGA denies the allegations of ¶ 20 except that MGA alleges that any

26  purported "Employment Agreement" speaks for itself as to its contents.  MGA

27  lacks information sufficient to enable it to identify or authenticate the purported

28  "Employment Agreement" and on that basis denies each and every allegation in ¶

EXHIBIT 4 PAGE 65

1   20 purporting to describe the contents of such document.  MGA further alleges that

2   the allegations in ¶ 20 purporting to describe the legal effect of any purported

3   "Employment Agreement" consist of legal argument and conclusions to which no

4   response is required.

5        21.    In answer to ¶ 21, MGA repeats its answers to the allegations in

6   paragraphs 1 through 20, above.

7        22.    MGA is without information sufficient to admit the allegations of ¶ 22,

8   and on that basis denies same except that MGA alleges that any purported

9   "Employee Agreement" speaks for itself as to its contents.  MGA lacks information

10  sufficient to enable it to identify or authenticate the purported "Employee

11  Agreement" and on that basis denies each and every allegation in ¶ 22 purporting to

12  describe the contents of such document.  MGA further alleges that the allegations in

13  ¶ 22 purporting to describe the legal effect of any purported "Employee

14  Agreement" consist of legal argument and conclusions to which no response is

15  required.

16       23.    MGA denies the allegations of ¶ 23 and affirmatively asserts that the

17  relief sought by Mattel in this paragraph indicates that Mattel's first cause of action

18  implicates federal copyright laws.  To the extent that Mattel herein purports to set

19  forth the allegations in support of its first cause of action to substantiate a federal

20  copyright claim, these allegations are also expressly denied.

21       24.    MGA denies the allegations of ¶ 24.

22       25.    MGA denies the allegations of ¶ 25.

23       26.    MGA denies the allegations of ¶ 26.

24       27.    MGA denies the allegations of ¶ 27.

25       28.    In answer to ¶ 28, MGA repeats its answers to the allegations in

26  paragraphs 1 through 27, above.

27       29.    MGA denies the allegations of ¶ 29.

28       30.    MGA denies the allegations of ¶ 30 and affirmatively asserts that the

LA2:730044                          - 5 -    8         ANSWER IN INTERVENTION TO
                                                       PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT __4__ PAGE _66_

1  relief sought by Mattel in this paragraph indicates that Mattel's first cause of action

2  implicates federal copyright laws.  To the extent that Mattel herein purports to set

3  forth the allegations in support of its first cause of action to substantiate a federal

4  copyright claim, these allegations are also expressly denied.

5      31.    MGA denies the allegations of ¶ 31.

6      32.    MGA denies the allegations of ¶ 32.

7      33.    MGA denies the allegations of ¶ 33.

8      34.    MGA denies the allegations of ¶ 34.

9      35.    In answer to ¶ 35, MGA repeats its answers to the allegations in

10  paragraphs 1 through 34, above.

11      36.    MGA denies the allegations of ¶ 36 and affirmatively asserts that the

12  allegations in this paragraph indicate that Mattel's fourth cause of action implicates

13  federal copyright laws.  To the extent that Mattel herein purports to set forth the

14  allegations in support of its fourth cause of action to substantiate a federal copyright

15  claim, these allegations are also expressly denied..

16      37.    MGA denies the allegations of ¶ 37.

17      38.    MGA denies the allegations of ¶ 38.

18      39.    MGA denies the allegations of ¶ 39.

19      40.    In answer to ¶ 40, MGA repeats its answers to the allegations in

20  paragraphs 1 through 39, above.

21      41.    MGA denies the allegations of ¶ 41 and affirmatively asserts that the

22  allegations in this paragraph assert legal or equitable rights that are equivalent to

23  exclusive rights within the general scope of copyright protection and are, therefore,

24  expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be

25  recast as a federal question under copyright law.  To the extent that Mattel herein

26  purports to set forth the allegations in support of its fifth cause of action to support

27  a federal copyright claim, these allegations are also expressly denied.

28      42.    MGA denies the allegations of ¶ 42 and affirmatively asserts that the

LA2:730044                          - 6 -   *9*        ANSWER IN INTERVENTION TO
                                                       PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT _4_ PAGE _L7_

1    allegations in this paragraph assert legal or equitable rights that are equivalent to

2    exclusive rights within the general scope of copyright protection, which are

3    expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be

4    recast as a federal question under copyright law.  To the extent that Mattel herein

5    purports to set forth the allegations in support of its fifth cause of action to

6    substantiate a federal copyright claim, these allegations are also expressly denied.

7        43.    MGA denies the allegations of ¶ 43 and affirmatively asserts that the

8    allegations in this paragraph assert legal or equitable rights that are equivalent to

9    exclusive rights within the general scope of copyright protection, which are

10    expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be

11    recast as a federal question under copyright law.  To the extent that Mattel herein

12    purports to set forth the allegations in support of its fifth cause of action to

13    substantiate a federal copyright claim, these allegations are also expressly denied.

14        44.    MGA denies the allegations of ¶ 44.

15        45.    MGA denies the allegations of ¶ 45.

16

17                    **AFFIRMATIVE DEFENSES**

18    MGA asserts the following affirmative defenses:

19                **FIRST AFFIRMATIVE DEFENSE**

20        1.    Plaintiff's Complaint and each purported claim for relief therein is

21    preempted by the Federal Copyright Act.

22                **SECOND AFFIRMATIVE DEFENSE**

23        2.    Plaintiff's Complaint and each purported claim for relief therein fail to

24    state facts sufficient to constitute a claim for relief.

25                **THIRD AFFIRMATIVE DEFENSE**

26        3.    Plaintiff's Complaint and each purported claim for relief therein are

27    barred by the equitable doctrine of unclean hands.

28

ANSWER IN INTERVENTION TO
                                                              PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT __4__ PAGE 68

## FOURTH AFFIRMATIVE DEFENSE

4.  Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of waiver.

## FIFTH AFFIRMATIVE DEFENSE

5.  Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of estoppel.

## SIXTH AFFIRMATIVE DEFENSE

6.  Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

7.  Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of consent.

## EIGHTH AFFIRMATIVE DEFENSE

8.  Plaintiff's Complaint and each purported claim for relief therein, or some of them, are barred by the applicable statutes of limitations, including California Code of Civil Procedure sections 337, 339, 343 and 338(c) .

## NINTH AFFIRMATIVE DEFENSE

9.  Plaintiff's Complaint and each purported claim for relief therein, or some of them, are barred because no Defendant owed a legal duty to Plaintiff or, if any legal duty arose, it was not breached by any Defendant.

## TENTH AFFIRMATIVE DEFENSE

10.  Without admitting, and specifically denying, that any Defendant owed any duty to Plaintiff, any duty or obligation, contractual or otherwise, which Plaintiff claims was owed by any Defendant has been fully performed, satisfied and/or discharged.

## ELEVENTH AFFIRMATIVE DEFENSE

11.  Plaintiff's Complaint and each purported claim for relief therein are barred because each Defendant has complied fully with his and/or its obligations, if

LA2:730044

- 8 -   //

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT __4__ PAGE __14__

1  any, under all applicable laws.

2  ### TWELFTH AFFIRMATIVE DEFENSE

3  12.    Plaintiff's Complaint and each purported claim for relief therein are

4  barred because Plaintiff has failed to exercise reasonable diligence in properly

5  mitigating its damages, if any in fact were suffered.

6  ### THIRTEENTH AFFIRMATIVE DEFENSE

7  13.    Plaintiff's Complaint and each purported claim for relief therein are

8  barred because the alleged losses or harms sustained by Plaintiff, if any, resulted

9  from causes other than any act or omission by any Defendant.

10  ### FOURTEENTH AFFIRMATIVE DEFENSE

11  14.    Plaintiff's Complaint and each purported claim for relief therein, or

12  some of them, are barred because to the extent Plaintiff has suffered any harm, and

13  Defendant in Intervention denies that Plaintiff has suffered any harm, it is due to

14  Plaintiff's own acts and omissions.

15  ### FIFTEENTH AFFIRMATIVE DEFENSE

16  15.    Plaintiff's Complaint and each purported claim for relief therein, or

17  some of them, are barred because any alleged contract between Plaintiff and

18  Defendant Bryant fails for lack of consideration, is vague and uncertain, and

19  therefore is void, voidable and/or unenforceable.

20  ### SIXTEENTH AFFIRMATIVE DEFENSE

21  16.    Plaintiff's Complaint and each purported claim for relief therein, or

22  some of them, are barred because any breaches of an alleged contract or duty,

23  which Defendant in Intervention denies, are excused by Plaintiff's acts or

24  omissions.

25  ### SEVENTEENTH AFFIRMATIVE DEFENSE

26  17.    To the extent Plaintiff's Complaint and any purported claim for relief

27  therein, or some of them, seek the remedy of injunctive relief, that remedy is barred

28  because Plaintiff's remedies at law are adequate and any alleged harms, and

LA2:730044                                      - 9 -  12           ANSWER IN INTERVENTION TO
                                                                    PLAINTIFF'S UNVERIFIED COMPLAINT



EXHIBIT __4__ PAGE __70__

1  Defendant in Intervention denies that there are harms, are not irreparable.

2  ## EIGHTEENTH AFFIRMATIVE DEFENSE

3  18.  Plaintiff's Complaint and each purported claim for relief therein

4  cannot be maintained because any duties or obligations, contractual or otherwise,

5  which Plaintiff claims are owed by Defendant Bryant, are contrary to applicable

6  law.

7  ## NINETEENTH AFFIRMATIVE DEFENSE

8  19.  Plaintiff is barred from recovering punitive and/or exemplary damages

9  from Defendant or Defendant in Intervention ("Defendants") because an award of

10  such damages would violate the United States and/or California Constitutions, and

11  applicable case law.

12  ## TWENTIETH AFFIRMATIVE DEFENSE

13  20.  Defendant in Intervention does not presently know all facts concerning

14  the conduct of Plaintiff sufficient to state all affirmative defenses at this time.

15  Defendant in Intervention will seek leave of Court to amend this Answer in

16  Intervention should it later discover facts demonstrating the existence of additional

17  affirmative defenses.

18

19  **WHEREFORE**, Defendant in Intervention prays for judgment as follows:

20  1.  Plaintiff's Complaint shall be dismissed in its entirety with prejudice;

21  2.  Plaintiff shall take nothing by its action against Defendant;

22  3.  Defendant in Intervention shall be awarded its costs of suit and

23  attorneys' fees incurred in this matter (to the extent permitted by applicable law);

24  and

25  4.  Defendant in Intervention shall be awarded such other further relief as

26  may be deemed just and proper.

27

28

LA2:730044

- 10 - *13*

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT 4 PAGE 71

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:        December___, 2004

O'MELVENY & MYERS LLP

By:_____
        Diana M. Torres
Attorneys for Defendant-in-Intervention
MGA ENTERTAINMENT, INC.

LA2:730044

LA2:730044

- 11 - 14

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT 4 PAGE 72

**PROOF OF SERVICE**

I, Deresa Gade, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On December, 3, 2004, I served the within documents:

**MGA ENTERTAINMENT INC.'S STIPULATION TO INTERVENE AS A PARTY ANSWER IN INTERVETION, AND CERTIFICATE OF INTERESTED PARTIES**

☒    by transmitting via facsimile machine the document(s) listed above to the fax number(s) set forth below on this date. The outgoing facsimile machine telephone number in this office is (213) 430-6407.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Douglas A. Wickham
Keith Jacoby
Littler Mendelson
A Professional Corporation
2049 Century Park East, 5th Floor
Los Angeles, CA 90067-3107
Tel: (310) 553-0308
Fax: (310) 553-5583

John B. Quinn
Michael T. Zeller
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Tel: (213) 443-3000
Fax: (213) 443-3100

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on December 3, 2004, at Los Angeles, California.

_Deresa Gade_
Deresa Gade

EXHIBIT 4 PAGE 13

**Exhibit 5**

1 | ROBERT F. MILLMAN, Bar No. 062152
2 | DOUGLAS A. WICKHAM, Bar No. 127268
  | KEITH A. JACOBY, Bar No. 150233
3 | LITTLER MENDELSON
  | A Professional Corporation
4 | 2049 Century Park East, 5th Floor
  | Los Angeles, CA 90067.3107
5 | Telephone: 310.553.0308
  | Facsimile: 310.553.5583
6 | Attorneys for Plaintiff
  | CARTER BRYANT

7

8

9                      UNITED STATES DISTRICT COURT

10                    CENTRAL DISTRICT OF CALIFORNIA

11

12 | CARTER BRYANT, an individual        Case No.

13 |                      Plaintiff,      **COMPLAINT FOR:**

14 |       v.                            **DECLARATORY RELIEF OF COPYRIGHT NON-INFRINGEMENT**

15 | MATTEL, INC., a Delaware
   | corporation

16 |                      Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**    31

EXHIBIT 5 PAGE 74

1      Plaintiff Carter Bryant ("Bryant") for his complaint against Defendant

2  Mattel, Inc. ("Mattel") alleges as follows:

3                          **PARTIES**

4      1.      Bryant is an individual residing in Springfield-Greene County,

5  Missouri.

6      2.      Bryant is informed and believes, and based thereon alleges, that Mattel

7  is a Delaware corporation with a principal place of business at 333 Continental

8  Boulevard, El Segundo, California.

9                  **JURISDICTION AND VENUE**

10     3.      This is an action under 28 U.S.C. §§ 2201 and 2202 for declaratory

11 relief and further relief based upon a declaratory judgment or decree and the

12 Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* This Court has original subject

13 matter jurisdiction over Bryant's claim pursuant to 28 U.S.C. §§ 1331 and 1338(a)

14 & (b).

15     4.      This Court has personal jurisdiction over Mattel, as it conducts

16 continuous, systematic and routine business within the State of California and the

17 County of Los Angeles.

18     5.      Venue is proper in the United States District Court for the Central

19 District of California pursuant to 28 U.S.C. §§ 1391(b) & (c).

20                     **BACKGROUND FACTS**

21     6.      Bryant is the creative genius and inspiration behind an immensely

22 successful line of fashion dolls called "Bratz."

23     7.      Since its debut on the market in June, 2001, the "Bratz" line has

24 revitalized and invigorated the fashion-doll industry, long dominated by Mattel's

25 "Barbie" dolls.

26     8.      Mattel, however, does not like the competition.

27

28

2

EXHIBIT A          32          EXHIBIT _5_ PAGE _75_

9.    First, Mattel, the world's largest toy company, tried, and failed, to drive "Bratz" out of the market by, *inter alia,* introducing competing products that copy the fresh, new and trendy look of "Bratz."

10.    When this failed, Mattel resorted to other tactics – suing Bryant, three and one half years after the launch of "Bratz," in California state court accusing him, among other things, of the alleged "conversion" of Mattel's "ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property."

11.    Recent events discussed herein reveal what Mattel intends by this vague and overly-broad pleading.  Mattel intends to try to obtain control over the rights to "Bratz," apparently based, in whole or in part, on grounds that "Bratz" was allegedly copied from and infringes upon a scrapped Mattel project called "Toon Teens," or some other as yet undisclosed Mattel property, which Bryant was supposedly exposed to during a period of time when he was employed by Mattel.

12.    Bryant did not copy or infringe anything in coming up with "Bratz." Since these copyright issues cannot be resolved in state court, due to federal preemption, Bryant has a reasonable fear that Mattel will bring another lawsuit against him for copyright infringement.

13.    Bryant brings this action, accordingly, for a Declaratory Judgment that his past, present, and continuing contributions to and work on the conception and development of "Bratz" did not and do not violate or infringe any copyrights or intellectual or other property owned by Mattel.

## Carter Bryant's Background

14.    Bryant is a creative, innovative, artistic person who since an early age has had a special interest in dolls and fashion design.

15.    As a young boy, when his family could not afford to buy him toys, Bryant would draw them.  Dolls and puppets were particular favorites.  While still very young, Bryant began constructing marionettes from papier-mache.

3

**EXHIBIT B**

3 3

EXHIBIT 5 PAGE 76

16.    By age nine, Bryant had begun to draw fashions. Fashion soon became a passion. He bought books on Hollywood costume design and studied them intensely. He made designs for his puppets and drew characters and outfits for them. He even won a contest drawing "Archie" comic book characters and considered becoming a comic book artist.

17.    Bryant took art classes throughout junior high and high school. He also began reading, and studying, fashion magazines such as "Vogue" and "Harper's Bazaar," thinking he might one day have a career in fashion design. He began creating his own fashions based on what he saw in such magazines.

18.    After high school, Bryant considered going to design school, but gave up the dream when he realized that his family could not afford to send him.

19.    Instead, he tried songwriting for a while, and even formed a band in 1988. For several years, he took dead-end jobs to make ends meet, such as stocking shelves at Toys 'R' Us. But Bryant never let go of his dream, or gave up his interest in drawing and design.

20.    In 1993 he applied and was accepted to Parsons School of Design in Paris. Based on the information contained in Parsons' website, since its founding in 1896, Parsons has been a forerunner in the field of art and design and was the first art and design school in America to found a campus abroad in 1920.

21.    Unfortunately, despite loans and work programs, attendance was cost-prohibitive. Bryant went, instead, to Otis College of Art and Design in Los Angeles. According to its website, Otis began in 1918, when Los Angeles Times founder Harrison Gray Otis bequeathed his MacArthur Park property for a public art college. Otis is a four-year college offering bachelor's degrees in a variety of art and design-related areas including architecture, fine arts, fashion design and toy design.

22.    On an accelerated track, Bryant finished his entire first year in just 5 months, from January to June of 1994. He then applied and was accepted to

1 transfer to Parsons, however, again he could not raise enough money to go. He

2 stayed one more semester at Otis, but with only a small scholarship and mounting

3 debt, Bryant left the school in December, 1994. He went home to Missouri for

4 Christmas and ended up staying.

5     23.    Realizing that going to Paris and working as a fashion designer was

6 simply not economically feasible, Bryant got the idea that he might be able to

7 combine his love of dolls and fashion by becoming a fashion designer for dolls in

8 the toy industry. Naturally thinking of "Barbie," the fashion doll that had

9 dominated the market for decades, he put together a portfolio of ten or so drawings

10 to send to Mattel, but lacked the confidence to actually send it to such a huge,

11 intimidating company.

12     24.    By 1995, however, he decided he had nothing to lose. Broke and with

13 no real career opportunities in sight, Bryant sent the package to Mattel.

14                       **Bryant's Employment by Mattel**

15     25.    Much to his surprise, Mattel called him for an interview. After

16 completing a "trial project" for the company at its request prior to his being

17 considered for formal employment, he was hired as a temporary employee in

18 September, 1995. He was promoted to a full-time position in November, 1995.

19     26.    During his time at Mattel, Bryant worked exclusively on "Barbie"-

20 related projects for the "Barbie" family of dolls, as directed by Mattel's marketers.

21 Mattel told him what they wanted him to design, and he did what he was directed to

22 do.

23     27.    On occasion, Bryant would offer new, original and creative ideas to

24 Mattel, but Mattel discouraged anything non-traditional. No matter what the idea

25 was, Mattel would try to figure out a way to use it for "Barbie," or not at all.

26     28.    Bryant felt that his creativity and originality were being stifled and

27 suppressed at Mattel.

28

EXHIBIT  5  PAGE  78

35

29.    Within two years at Mattel, Bryant was feeling frustrated.  He simply did not fit Mattel's mold.  He also missed his family, and so decided to return home to Missouri.  With some significant design and work experience under his belt, he thought he might be able to build a career as a freelance design artist.

30.    He left California in approximately January 1998, but continued to work for Mattel from Missouri, on a part-time basis, until April, 1998.

### Bryant's Inspiration: "Bratz"

31.    Bryant continued to live with his parents in Missouri for the rest of the 1998, working exclusively on his own ideas and drawings, with the hopes of building a career as a freelance artist.

32.    Among other things, Bryant created greeting cards, and considered going into the greeting card business.  He even applied for a job at Hallmark. Bryant also did a bit of freelance design and artwork for Ashton Drake Galleries of Chicago.  On information and belief, Ashton Drake is the world's largest direct marketer of limited edition, collectible porcelain dolls, and its dolls have sold at auction for as much as $1200.  It is widely renowned among doll collectors for its top-quality, handcrafted collectible dolls.  Ashton Drake employs artists and freelancers to work on its doll programs and new doll concepts.  Bryant worked on "Angel" and "Wedding" theme projects for the company in 1998.  He supplemented his income by working at a clothing store, Old Navy.  But Bryant also worked on his own ideas for dolls – his lifelong obsession.  One day, while returning home from Old Navy, Bryant drove past a high school and had a "eureka" moment.  Inspired by the "bratty" attitude he had observed, as well as advertisements that he had seen relating to hip-hop fashions and other trends of the time, Bryant started sketching multi-ethnic, urban youth, dressed in trendy fashions. Bryant tried to capture in his sketches the "bratty" attitude he had observed.  Little did he know then that his concept, "Bratz," would become a national, indeed, international, sensation.

6

EXHIBIT  5  PAGE  79

36

EXHIBIT D