# Exhibit 52

## Expert Report of Nicholas Mirzoeff

MGA Entertainment, Inc. v. Mattel, Inc. et al., Case No. CV 05-02727

I was asked by Quinn Emanuel Urquhart Oliver & Hedges, LLP, counsel for Mattel, Inc. ("Mattel"), to serve as an expert witness in this matter.

Education and Experience

I attended St. Paul's School in London from 1975-79, one of the leading preparatory schools in Britain. From there I took a BA Honours degree in Modern History at Balliol College in the University of Oxford (1980-83). At that time, Art History was taught within History, and I specialized in Modern Art History in my third and final year. I then took a PhD degree jointly supervised in the departments of Art History and History at the University of Warwick. The degree was awarded in 1990. I came to the United States on a postdoctoral fellowship at UCLA, since which time I have taught in full-time tenure track positions at the University of Texas (Austin) (1992-93), the University of Wisconsin (Madison) (1993-98), and State University of New York (Stony Brook) (1998-2004).

Since 2004, I have been Professor of Art and Art Education at New York University, where I direct the MA/PhD program in Visual Culture. I have taught in departments granting the PhD for the past eighteen years, during which time I have published extensively in the fields of Art History and Visual Culture. I have published two books dealing with the representation of the body, Silent Poetry: Deafness, sign and visual culture in modern France (Princeton University Press, 1995) and Bodyscape: Art, Modernity and the Ideal Figure (Routledge, 1995). Since the publication of these texts in 1995, I have become known as one of the leading scholars in the new interdisciplinary field of Visual Culture. My edited collection, The Visual Culture Reader (Routledge, 1998; 2nd edition 2002; 3rd edition forthcoming), is the standard text in the field. Its companion text, An Introduction to Visual Culture (Routledge 1999; 2nd edition forthcoming 2009), has been translated into Chinese, Italian, Korean, and Spanish and is used worldwide. I have published essays and articles in Germany, Italy, Poland, Hungary, Norway, New Zealand, Great Britain, Spain, Argentina and Australia. I have served on the Board of Directors of the College Art Association (2002-6), a 14,000-member organization representing university teachers in art and history as well as museum professionals. I sit on the editorial boards of a variety of scholarly journals, such as The Journal of Visual Culture and Photography and Culture. I have written exhibition catalogs for a variety of contemporary artists, such as the premier Chinese artist Cai Guo-Chiang's exhibition "Head On" at the Deutsche Guggenheim Museum, Berlin. I have given invited and keynote lectures across the United States and around the world from Argentina to Turkey.

The Field of Visual Culture

Visual Culture is the interdisciplinary study of all forms of visual media in the modern and contemporary periods. The object of study in the field of Visual Culture is

Exhibit 52
P. 1163

anything that is designed or intended to be looked at.[1]  Most cultures prior to the eighteenth century learned and communicated their history and information audibly. With the development of the printing press, photocopier, computer, television, and now the Internet, society's focus has become intensely more visual, with visual media becoming the predominant form of documenting and communicating information, history, and values.

While many scholars in this field were originally trained in Art History, Visual Culture is now an independent field of study that concentrates on the "hypervisuality of the present" and the history of how contemporary society came to be so intently concerned with and dependent on all things visual.  For example, whereas once a cell phone, a device intended to relay sound, was merely a means to communicate verbally, cell phones now are more of a visual device than an audio device, having become a personal visual media interface, combining still and video cameras with video playback, music videos, films, and Internet access.  Whereas once people would be satisfied to sit through a strictly audio lecture, now the norm is to include a PowerPoint presentation, slides, or film component to such presentations to retain the interest of the audience and enhance the message being communicated.  The evolution of the use of visual media in art and society is the subject of studies in Visual Culture.

There are now fourteen graduate programs in Visual Culture in the United States and many more worldwide, especially in Europe.  In the 1990s, the Barbie doll was a widely discussed topic in visual culture studies, especially in undergraduate teaching practice, and I taught the topic.  I have also written an essay on the Teletubbies dolls (see Curriculum Vitae, attached).

Materials Reviewed

1.    Mattel, Inc.'s Second Amended Answer and Counterclaims.

2.    The depositions of Carter Bryant, Isaac Larian, Veronica Marlow, and Margaret Leahy, along with deposition exhibits 1-3, 5, 6, 8, 8B, 9, 302, 726, 735, 736B, 739, 741, 758, 766, 767, 779, 781, 787, 787B p. 2, 788, 789, 791, 792 and 793.

3.    Various drawings of Bratz dolls created by Carter Bryant.

4.    The expert reports of Lee Loetz (with exhibits 1-36), Debora Middleton, Mary Bergstein (with exhibits), Robert Tonner (with exhibits), Lloyd W. Cunningham (without exhibits), William J. Flynn (without exhibits) and Kenneth Hollander (with exhibits).

5.    Various advertisements from Seventeen magazine, dated August 1998.

---

[1]  In An Introduction to Visual Culture, I defined the object of study in the field of Visual Culture as "visual events in which information, meaning or pleasure is sought by the consumer in an interface with visual technology.  By visual technology, I mean any form of apparatus designed either to be looked at or to enhance natural vision, from oil painting to television and the Internet."  Id., at p. 3.

2

<u>Issues Addressed In Report</u>

I was asked to provide opinions regarding the following issues:

(1)    The opinions provided in the February 11, 2008 Expert Reports of Mary Bergstein and Debora Middleton.

(2)    Whether the drawings presented to MGA by Carter Bryant were fully realized representations of the Bratz dolls.

<u>The Drawings Carter Bryant Presented to MGA Were Fully Realized Representations of the Bratz Dolls</u>

According to Carter Bryant, as described at his deposition, Bryant produced dynamic drawings representing the Bratz in 1998 that he colored in 1999 and presented to MGA in 2000. (Bryant Depo., vol. I, 10-11; 45; 151.)[2]

Mary Bergstein suggests in her report that Bryant's drawings (such as the "Hero Pose," BRYANT00194, BRYANT00222 (Exs. B and D[3])) are "sketches." Bergstein defines sketches as a part of a multi-step design process, including sketches, studies, drawings, and models, using the Renaissance art practice of painters such as Leonardo da Vinci. (Bergstein, 4-5.) I disagree.

First, the Hero Pose drawing is a fully rendered representation of the dolls and is not an indefinite or rapid attempt by the designer to catch an idea as it happened, leaving details to be completed later. This drawing is visibly not a sketch in the sense of being "sketchy," meaning unfinished or incomplete. There is no indication of a hastily drawn, partially formed idea. The lines are consistent and the facial details and the texture of the hair and clothing are completely and carefully represented. The soles of the shoes are precisely indicated. Starbursts are drawn in to indicate excitement and give a sense of movement. The careful and consistent color scheme is indicative of a realized plan.[4]

Second, the commercial artwork created by Bryant may not properly be compared to the Renaissance art practices followed by painters such as Leonardo da Vinci. Sketches by da Vinci and other artists of the Renaissance sought to capture the "instant of inspiration." (Ex. H.) The sketch, however beautiful it might seem to modern eyes, was necessarily incomplete because it did not convey a story (*istoria*). Sketches were followed by models and drawings that fleshed out the idea and brought the inspiration with each step in the process closer to the final painting or sculpture in which the meaning intended by the artist was fully visible.

After the Renaissance period, artistic training centered on the working up of sketches drawn "after the life," meaning from a live model posed by the teacher, as seen

---

[2]   This report expresses no opinion about the accuracy of those dates.
[3]   All exhibits named alphabetically throughout the Report are attached.
[4]   The same can be said for the other drawings of the individual dolls that I understand Bryant presented to MGA in 2000 (Ex. K).

3

Exhibit 52
P. 1165

in the sketch by the British artist JMW Turner (1755-1851) of a "Life Class" (Ex. R). The students would produce sketches such as that made by the American artist Benjamin West (1738-1820) known as *Head of a Screaming Man* (Ex. S). By itself, this drawing cannot tell us a story, yet West would have intended it to be a part of one of his History paintings, such as *The Death of General Wolfe at Quebec* (1770) that illustrated important events from Classical or modern history. Turner himself was famous for demonstrating that the earlier versions of a painting did not amount to its finished state. At the annual Royal Academy exhibition in London in the early nineteenth century, Turner would hang an apparently completely unfinished canvas and then on *Varnishing Day* (Ex. T), when most artists would add a coat of varnish to their finished work to protect it, he would go into the gallery and complete the painting. This performance became a celebrity event, drawn in the act by the painter Millais.

Conversely, in the last two centuries, modern painters have seen the capturing of the moment as the final artwork. Indeed, in the nineteenth century, the Impressionists – who attempted to capture their "impression" of a scene as finished artwork – got their name from being ridiculed by academic critics who still followed da Vinci's belief that a sketch could not be a final finished artwork, but only a step in the creative process.[5]

Thus, Bergstein's application of the Renaissance meaning of the word "sketch" to Bryant's work is an anachronism that ignores two key facts: (1) the nature of sketching was radically transformed at least as early as the mid-nineteenth century (if not in the late eighteenth century) by modern artists, such as the Impressionists; and (2) although trained in art, there is no indication that Bryant followed any such traditional art practices in creating Bratz, as opposed to a commercial creation process.

Bryant was not creating fine art that might be exhibited in a gallery but commercial artwork for use in a creative industry. The art historical language of sketch and studies used by Bergstein implies work being produced by a single artist or at most a studio under the direction of that artist. What matters here, today, is the production of a drawing that can be developed into a product capable of being mechanically reproduced but nonetheless conveying specific expressive qualities. It always anticipates being

---

[5] As modern scholarship has demonstrated, it takes a good deal of time and attention to render this impression of a particular moment. An example from literature is the claim by Samuel Coleridge that the poem "Kubla Khan" came to him in a dream and he simply wrote it down. The surviving draft shows to the contrary reworking and corrections. (Ex. J.) By the same token, modern artists have to work very hard in the studio or on site to create their sense of dashed-off epiphanies. The photographer Robert Doisneau took a photograph of two lovers embracing called *The Kiss by the Hotel de Ville* (1950) that seemed to capture the essence of street photography and the pursuit of the decisive moment. Half a million reproductions of *The Kiss by the Hotel de Ville* were sold in the 1990s alone. (Ex. O.) It was revealed many years later that the photograph had been staged by Doisneau using actors – showing that the prized spontaneity of the image was a carefully created effect.

4

worked on by a team of specialized professionals who will translate the design into a commercial product.[6]

Bryant refers to having applied specialist techniques of copying using tracings on a lightbox (a rectangular metal box with a translucent top that can be illuminated from within) that he learned in art school. Rather than the individual "hand" of the artist being visible, as in the sketch, what matters here is consistency. In this context, no one individual has full and complete competence to execute every task required.

To take a parallel from fine art, the sculptor Auguste Rodin (1840-1917) is widely admired for his late nineteenth century pieces such as *The Thinker* (1885-1905) and *The Kiss* (1888-89). The first exhibited version of *The Thinker* (1888) was a small piece made in plaster by Rodin. In 1902, when Rodin began to have some of his most popular sculptures enlarged by a practicien, or fabricator, Henri LeBossé, a monumental version of *The Thinker* some five feet high was created from small clay models. (See Ex. P.) The enlargement was completed by the end of 1903 and shown in Paris during 1904. By the same token, details in *The Kiss*, such as the depression in the woman's thigh caused by the man's hand, cause great admiration for the skill of the artist. But the marble itself was carved by practicien Jean Turcan, not by Rodin, based on a clay model by Rodin. (See Ex. I.) However, no one suggests the sculpture is not "by" Rodin, in the sense of being artistically created by him. Similarly, the present-day American sculptor Richard Serra has his works fabricated at a steel mill in Seigen, Germany because only their rollers can create sufficiently large pieces of curved steel. (Ex. N (*Snake*, dated 1996).) Serra is widely acclaimed as the greatest sculptor alive today.

It is therefore erroneous to suggest that because Bryant's drawings do not meet the 300 dpi standard for doll packaging they do not fully express Bratz. (Middleton, 7). That Bryant did not bring an actual final doll to MGA that was immediately ready for manufacture did not make his drawings a mere spark or "inspiration" for a doll line that was "eventually designed," "first designed," or "developed by the creative design staff" at MGA. (Bergstein, 8-9, 15, 18, 23.)

I am also struck by Carter Bryant's statements showing the extent to which he had fully realized and developed Bratz when he says that he took it to MGA. He had derived a clear "overall feeling" (Bryant Depo., vol. III, 563) that allowed him to commission, direct and correct face painting and hair for the first model (Bryant Depo., vol. IV, 814-18). Similarly, according to Bryant, he had the drawings notarized and attempted to pitch them, which suggests that he realized that he had a complete, marketable idea. (Bryant Depo., vol. I, 54.) This strong sense of the project allowed him to correct the sculpt made by Margaret Leahy to more accurately correspond to his vision of "the entire thing" (Bryant Depo., vol. I, 84). Although Bryant claims not to be a model or doll maker (Bryant Depo., vol. II, 280), he felt he had a sufficiently strong understanding of Bratz

---

[6] No one seriously suggests that the Simpsons as portrayed on the television show or in countless toys are not the creation of Matt Groening, who drew the original characters but does not animate the moving representations of the characters or sculpt and manufacture the dolls. (Ex. M.)

Exhibit 52
P. 1167

that he could create a "front sculpt drawing." (BRYANT00278 (Ex. E) marked "ACTUAL PROPORTION ACTUAL SIZE 10.") Another Bryant drawing roughs out a shoulder design, including measurements (BRYANT00280 (Ex. F)). In his deposition, Bryant notes that he suggested that the dolls have "sculpted fingernails" (Bryant Depo., vol. II, 343; BRYANT00290 (Ex. G)) and the commercial Bratz dolls do in fact have such fingernails, as do Barbie dolls. Expert Lee Loetz found this "front sculpt drawing" corresponded to or "line[d] up" with the actually produced Bratz doll. (Loetz, 3-4.)

<u>Carter Bryant's Drawings Were Original And Not Generic, As Bergstein Suggests</u>

*The Bratz proportions are unusual for fashion dolls.*

Carter Bryant summarized the Bratz concept to be dolls that were "disproportionate," and to have "funky outfits" and "a bit of a bad attitude." (Bryant Depo., vol. I, 161.) It is not accurate to characterize these attributes as generic or public domain representations of teenagers in the late 1990s, as does Bergstein. Clearly, teenagers in the 1990's did not have disproportionately sized heads and feet.

Instead, as Bergstein states, the dolls were conceptualized and realized in opposition to Barbie dolls, to be the "anti-Barbie." (Bergstein, 5.) Their sense of being "real" was therefore understood not in relation to lived experience but to other fashion dolls in general, and Barbie in particular.

Bryant repeatedly describes the dolls as being "disproportionate," as if that marked a unique characteristic in the market for fashion dolls. As many scholars have demonstrated, previous fashion dolls were in no sense anatomically exact with reference to the human body. The physical proportions of dolls have frequently been distorted to match the concept of the doll. See e.g., Urla, Jacqueline and Alan Swendlund, "The Anthropometry of Barbie: Unsettling Ideals of the Feminine Body in Popular Culture," in Jennifer Terry and Jacqueline Urla (eds.), <u>Deviant Bodies: Critical Perspectives on Difference in Science and Popular Culture</u> (Indiana University Press, 1995), at p. 277-313.

Nevertheless, the Bratz drawings are unusual in the use of exaggerated heads and feet, in combination with a short torso. A distinctive feature of Bratz dolls is the size of their heads and feet in relation to the rest of the body. Middleton reports that Bratz bodies are 3 2/3 times the length of the head (Middleton, 6), making them notably disproportionate to the classical relation of 7:1, which is taught in art schools to be the ideal proportions for a body.

When Bryant attached a larger head to a Barbie body in creating his model (which he calls a "dummy"), he made his intent clear: he had designed an original doll that was "very disproportionate," meaning "it would have a small body, have large feet and a large head" (Bryant Depo., vol. I, 164, 167). Bryant also claimed that "from the very beginning" he envisaged the feet as being removable. (Bryant Depo., vol. II, 343). This was translated into the Bratz dolls.

6

Bergstein asserts that Bryant derived the doll's "immensely long legs" from seeing a Steve Madden advertisement from *Seventeen* magazine from August 1998 (Bergstein, 6). It is Madden's shoes that appear dominant in the ad, but that is precisely because this is an ad for shoes. The designer has situated the "presumed viewpoint," as art historians call it, in the drawing very low, placing the imagined spectator on the floor, next to the shoes (the presumed viewpoint makes the spectator feel they are looking up from the floor). From this viewpoint the shoes appear very large and the body towers above them.

Conversely, in Bryant's drawings, the viewpoint is at the conventional eye level—we are looking as if we are the same height as the Bratz – and not from the floor's eye view. Thus, the size of Bratz shoes in Bryant's work is considerably larger than even Madden's shoes. Moreover, the Madden black leather shoes shown in the *Seventeen* advertisement are stylistically completely distinct from the over-sized sneakers or platform boots worn by the Bratz.

In discussing the Madden ad, Veronica Marlow claims that Bryant "loved the way the doll look[ed] and how it had big heads and feet" (Marlow Depo., 149). Apart from the misstatement that the advertisement illustration was a doll, this again misrepresents the ad. Precisely because of the low angle of the presumed viewpoint, the head on the drawn figure in the Madden ad is in fact noticeably small.

*The Dixie Chicks advertisement.*

Bergstein asserts that the Dixie Chicks ad for their album <u>Wide Open Spaces</u> from the same edition of <u>Seventeen</u> influenced Bryant because of the caption "Chicks With Attitude." In 1998, the Dixie Chicks were predominantly known as a Country and Western band. Their photograph shows them as wholesome, clean-cut, smiling blonde Caucasian women in their twenties (lead singer Natalie Maines was 24 in 1998), walking confidently. Conversely, the attitude Bryant sought to convey with the Bratz was that of defiant teenagers with a high sense of fashion and moderately bad attitude. (Bryant Depo., vol. I, 160-161.)

The caption "Chicks With Attitude" is an apparent pun on the controversial hip-hop band N.W.A. whose album <u>Straight Outta Compton</u> was a hit in 1988. Apart from the reference to "attitude," there is no suggestion that the Dixie Chicks advertisement contributed anything to the Bratz drawings.

*The Bratz eyes do not resemble anime, Betty Boop, or Margaret Keane eyes.*

Bergstein appears to suggest that the Bratz' oversized eyes are generic because large eyes have been used in Japanese anime or manga drawings, in the Betty Boop cartoon, and in drawings by Margaret Keane. (Bergstein, 18-20.) Bergstein's report may also be construed to assert that the Bratz have eyes derived from Japanese anime or manga drawings, thereby giving them an "Asian" affect. (Bergstein, 19 and Bergstein Figure 27.) However, the eyes drawn by Bryant do not resemble any of these eyes – but they bear a direct relation to the eyes in the Bratz dolls sold by MGA.

7

Anime eyes tend to be much larger even than the Bratz eyes. Anime eyes for female characters are based on a series of ovals and never use the characteristic Bratz almond shape. Large light reflections typically dominate the area of the iris and pupil. Anime eyes have minimal or brushed eyelashes. (Ex. L.) Manga eyes are still larger and tend to be circular. Betty Boop's eyes are large circles with small dark ovals off to the side representing the iris, a small indentation in the oval representing the pupil, and sparse upper and lower lashes. The majority of the eye is white. The eyes in Lisa Frank's drawings, while large in proportion to the face, bear no resemblance to the Bratz eyes. Frank's eyes have a full, rounded oval shape with extremely large iris's (leaving only a sliver of white from the eyeball showing) and scarcely any definition of the eye's pupil. Although relatively large, the Bratz eyes bear no resemblance to any of these eyes. Rather, the eyes are a curved almond shape with a pointy interior and swooping exterior. The inside of the eyes contain a two layered circular representation of the iris and pupil. The eyelashes are long, full and noticeably curled upwards. In Bergstein's report, she cites the resemblance of the Bratz's eyes to those of three Lisa Frank characters, named Lisa, Carrie and Mara (Bergstein, 20). However, Lisa Frank's website indicates that all three of these characters are "new" (http://www.lisafrank.com/default.cfm?page=Gang; accessed 3/17/2008). The HTML source code for the page indicates that it was created in 1999, suggesting that the characters would not have been an influence on Bryant in 1998.[7]

*The Bratz dolls are not the result of the* Ally McBeal *and* Sex and the City *television series.*

Bergstein's apparent assertion that Bratz has been in the public domain for years because of shows like *Ally McBeal* and *Sex and the City* is misplaced. Bratz is about girls and marketed to girls "four and up" as stated on the box (and further demonstrated by the logo on the front of the box, which states "The girls with a passion for fashion!"). Bratz is not based on either the lives, values or fashion of the sexually active, career-oriented professional women in their 20s and 30s of *Ally McBeal* or *Sex and the City*. The Bratz girls are fun, confident, fashionable, and young enough to defy parental and societal expectations. In contrast, the protagonists of *Ally McBeal* and *Sex and the City* are adults who *define* parental and societal expectations. Bergstein describes the *Ally McBeal* character played by actress Calista Flockhart as anorexic (Bergstein, 22), an assertion that Flockhart has always denied. Indeed, the character was repeatedly shown eating in the series in order to dispel this rumor. Whatever the popularity of *Ally McBeal* with teens in the 1990's (not evidenced in Bergstein's report other than by assertion), this is irrelevant to any discussion of the origins of a doll for girls. Also, *Sex in the City* did not even air until June, 1998, was not widely successful in its first season, and contained adult content (including nudity, sex scenes and graphic language). While these television shows eventually became part of adult culture, this does not make them "historical precedents" (Bergstein, 23) for the Bratz dolls conceived by Bryant and manufactured and sold by MGA.

---

[7]  Bergstein's understanding of Lisa Frank as an influence on the Bratz appears to be derived from a Wikipedia article, a notoriously unreliable source, which I forbid my students to cite (Bergstein, 20).

8

*The Bratz design anticipated variations.*

Bergstein attempts to distinguish Bryant's drawings from the dolls manufactured and sold by MGA by pointing out superficial differences, such as hair length. However, superficial change is part of the essence of the Bratz. Bryant himself described Bratz as "Totally Transformable Teenage dolls," expressing the inherent ability for the dolls to change their looks. (BRYANT00183 (Ex. A).) The removable feet were consistent with this idea, as was Bryant's original proposal for the dolls to have changeable hair. Bryant designed ten different hair styles for the Bratz (BRYANT00218 (Ex. C)), making it possible for one doll to have very different looks, and drew some proposed hairstyles, several of which were used on the original dolls and others of which are being used on Bratz dolls currently being sold. (BRYANT00218 (Ex. C).)[8] Such variations, however important to keeping the dolls current, are superficial in design terms.

The first wave of Bratz dolls appear consistent with the Bryant drawings, as shown in detail in the Loetz report, and, since going to market, the dolls have remained consistent with the concept of a body that appears disproportionate, had "funky outfits" and a somewhat "bad attitude." (Bryant Depo., vol. I, 160-161.) The sense that Bryant's drawings represent the finished dolls was reinforced by the finding that 92.1% of a sample of girls aged 8-13 identified the drawings as representing the Bratz. (Hollander, 2, 15.)

<u>Conclusions</u>

As a scholar of the visual image, my first sense of the drawings presented by Bryant to MGA was that they represented the precise design that would come to be marketed as Bratz. Further investigation into the materials generated by the litigation have not only confirmed this impression but made it clear that Bryant had generated a doll design against which the first wave of dolls and all variations would be judged. These criteria included, in Bryant's own words, a "disproportionate" body, a sense of "attitude" and "funky outfits." (Bryant Depo., vol. I, 161.)

It is clear that Bryant took to MGA drawings that were fully rendered and conveyed a doll design that was concrete and specific. Bryant had a strong sense of what the design meant: a fashion doll that was disproportionate, more fashionable and with a wide variety of constantly changing accessories, including hair and skin tone. Even if not all of Bryant's ideas proved commercially viable, such as the ability to change the doll's

---

[8] The "night" hair for Zoe drawn by Bryant (BRYANT00223 (Ex. Q) is the same as the first generation Cloe, corresponding to style 4 in his drawing for ten hair styles (BRYANT00218 (Ex. C)). Likewise, the original Jade has hair similar to style 8, while Sasha is a version of style 5.

9

03/18/08  10:09 FAX 2129797462          VILLAGE POSTAL CENTER                    ☑002

hair, the fundamental silhouette of the Bratz in the drawings provided by Bryant to MGA contained the elements integral to and which appeared in the final product manufactured by MGA.

March 17, 2008

NICHOLAS DAVID MIRZOEFF

Exhibit 52,
P. 172

03/18/08  16:49 FAX 21297974(          VILLAGE POSTAL CENTER                          ☒002

Supplement to Expert Report of Nicholas Mirzoeff

## QUALIFICATIONS OF THE WITNESS, INCLUDING A LIST OF ALL PUBLICATIONS AUTHORED BY THE WITNESS WITHIN THE PRECEDING 10 YEARS

See Curriculum Vitae attached to the Expert Report of Nicholas Mirzoeff, dated March 17, 2008 (the "Mirzoeff Report").

## COMPENSATION

My hourly billing rate for time spent preparing my expert analysis and providing expert testimony is $350.

## CASES IN WHICH THE WITNESS HAS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION WITHIN THE PRECEDING FOUR YEARS

None.

March 18, 2008                          _____

                                        NICHOLAS DAVID MIRZOEFF

07209/2438018.2

Exhibit 52
P. 1173

## Curriculum Vitae

## <u>NICHOLAS DAVID MIRZOEFF</u>

**Education**

| | | |
|---|---|---|
| University of Warwick | 1983-86 | Ph.D. (Art History) 1990 |
| Balliol College, Oxford | 1980-83 | BA Hons. (History) 1983 |

**Ph.D. dissertation:** " Pictorial Form and Social Order in France 1638-1752: <u>L'Académie Royale de Peinture et Sculpture</u>" (University of Warwick, 1990)

**Teaching Positions**

| | | |
|---|---|---|
| New York University | 2004—present | Professor, Art and Art Professions, affiliate faculty in Performance Studies |
| SUNY Stony Brook | 2001—2004 | Professor, Art and Comparative Literature |
| SUNY Stony Brook | 1998—2001 | Associate Professor, Art and Comparative Literature |
| University of Wisconsin, Madison | 1997—1998 | Associate Professor, Art History |
| University of Wisconsin, Madison | 1992-97 | Assistant Professor, Art History |
| University of Texas, Austin | 1991-92 | Assistant Professor, Art History |
| University of California, Irvine | Spring 1991 | Lecturer, Art History |
| University of Warwick | Autumn 1984, 1987-8, 1989-90 | Lecturer, Art History |

**Administrative Experience (since 1998)**
Director, Visual Culture MA/PhD program, New York University, 2004—present
Hemispheric Institute Steering Group, 2007—present
College Art Association, Board of Directors, 2001-2005
Co-chair, CAA Visual Culture Caucus, 2000-2006
Chair, Center for Digital Arts and Culture proposal group 2000-2003
Acting Director, Humanities Institute, SUNY Stony Brook, January-September 2000,

11

Exhibit 52,
P. 1174

& January-May 2001.
Humanities Institute Advisory Board Member, 1998-2001, 2003-2005
Undergraduate Director, Art Department, SUNY Stony Brook, Fall 1999, Fall 2000—2002.
Graduate Studies Committee, Art Dept. SUNY Stony Brook, 1998-2000
Graduate Studies Committee, Comparative Literature, SUNY Stony Brook, Spring 2000.

**Awards and Grants**

| | |
|---|---|
| NYU-Steinhardt Challenge Grant | 2006 |
| University of Canterbury, New Zealand | Visiting Canterbury Fellow, Winter 2005 |
| Sterling and Francine Clark Art Institute, Williamstown, MA | Visiting Fellow, Fall 2002 |
| University of Nottingham, UK | Leverhulme Visiting Professor in Visual Culture, Spring 2002 |
| Humanities Research Center, Australian National University, Canberra | Visiting Fellow, Fall 2001 |
| William Andrews Clark Memorial Library, University of California, Los Angeles | Visiting Fellow, August-September 2001 |
| Humanities Institute, SUNY Stony Brook | Postdoctoral Research Fellow (Fall 1996) |
| John Carter Brown Library, Providence RI | Touro National Heritage Trust Fellowship, April 1996 |
| Graduate School, UW Madison | Research Leaves, Spring 1996, 1996-97. |
| Huntington Library, Pasadena CA | Visiting Fellow, June 1994 |
| Yale Center for British Art | Visiting Fellow, June 1993 |
| J. Paul Getty Center | Post-doctoral Fellow in the History of Art and the Humanities, 1992-93 |
| UCLA Center for 17th and 18th Century Studies | Post-doctoral Fellow, 1990-91 |

## PUBLICATIONS

**Books**

The Right to Look: A Global Counter-History of Visuality (Duke University Press, forthcoming)

12

Exhibit 52,
P. 1175

Seinfeld: A Critical Reading of the Series, 133pp, 55 color illus. (British Film Institute, 2007)

Watching Babylon: the War in Iraq and Global Visual Culture (Routledge, 2005), 203pp., 46 illus.
    Translated into Italian as Guardare la guerra (Rome: Meltemi, 2004)

An Introduction to Visual Culture, 272pp., 54 illustrations (Routledge, 1999). Italian translation (Rome: Meltemi, 2002); Spanish translation (Barcelona: Paidos, 2003); Chinese translation (Beijing: JSPPH, 2006); Korean and Hungarian translations forthcoming.
Chapter One reprinted and translated in Umelec (Czech Republic), July 2001.
    Second edition under contract: publication 2009.

Silent Poetry: Deafness, Sign and Visual Culture in Modern France, 340 pp., 77 illustrations (Princeton University Press, 1995)

Bodyscape: Art, Modernity and the Ideal Figure, 221pp., 35 illustrations (Routledge, 1995). Korean translation, 1998. Chapter Two translated into Hungarian

**Edited Collections**

The Visual Culture Reader, 554pp, 52 illustrations (Routledge, 1998)
    Includes essay "What Is Visual Culture?" and introductions.
    Introductory essay reprinted in Kunst og Kultur (Norway) 2 (2005): 76-84

    Second fully revised edition, includes essay "The Subject of Visual Culture," and introductions, 737pp, 60 illustrations (Routledge, 2002).

**Diaspora and Visual Culture: Representing Africans and Jews (Routledge, 2000)**

    Includes essays: "The Multiple Viewpoint: Diasporic Visual Cultures," pp.1-15 and "Pissarro's Passage: The Sensation of Caribbean Jewishness in Diaspora," pp. 55-74.

**Refereed and Journal Articles**
    "Response to War Questionnaire," October, issue 123 (Spring, 2008)

    "Invisible Empire: Abu Ghraib and Embodied Spectacle," Visual Arts Research, vol. 32, no. 2 (Issue 63), 2006: 38-42.

    "Disorientalism: Minority and Visuality in Imperial London," TDR 51 (Summer 2006), 52-69

13

Exhibit _52,_
P. __1176__

"On Visuality," The Journal of Visual Culture 2006, vol. 5 no 1, 53-79.

"Invisible Empire: Embodied Spectacle and Abu Ghraib," Radical History Review 95 (Spring 2006), 21-44

"Invisible Again: Representations of the Genocide in Rwanda," African Arts , vol. XXXVIII no. 5 (Autumn 2005), 36-39, 86-91, 96.

"Invisible Empire: The Spectacle at Abu Ghraib," Takahe (New Zealand) 56: 33-39.

"Newspapers," Art Journal (Summer 2003), 22-24.

"The Empire of Camps," Afterimage (Sep/Oct 2002), 13-14. Translated into Polish 2004.

"Ghostwriting: Working Out Visual Culture," The Journal of Visual Culture, vol. I no. 2, (2002): 239-54.

"Intervisuality," Exploding Aesthetics, Lier en Boog, Series of Philosophy of Art and Art Theory, vol. I6 (Amsterdam, 2002): 124-133.

"Revolution, Representation, Equality: Gender, Genre and Emulation in the Académie Royale de Peinture et Sculpture, 1785-1793," Eighteenth-Century Studies, Vol. 31 no. 2 (1997-98): 153-74.

"Photography at the Heart of Darkness: Herbert Lang's Photographs of the Congo (1909-1915)," in African Reflections, special number of the Elvehjem Museum Bulletin, ed. Henry J. Drewal (Spring 1996): 27-41.
  Reprinted in Tim Barringer and Tom Flynn, Colonialism and the Object: Empire, Material Culture and the Museum (Routledge, 1998), pp. 167-87.

"Seducing Our Eyes: Gender, Jurisprudence and Visuality in Watteau," Eighteenth Century Theory and Interpretation Vol. 35 no 2 (1994): 135-154.

"Body Talk: Deafness, Sign and Visual Language in the Ancien Régime," Eighteenth Century Studies Vol. 25 no 4 (Summer 1992): 561-586.

"The Silent Mind: Learning from Deafness," History Today, Vol. 42 (July 1992): 19-25.

## Chapters in Books of Essays

"Von Bildern und Helden: Sichtbarkeit im Krieg der Bilder," in Lydia Haustein, Bernd M. Scherer and Martin Hager (eds.), Feinbilder: Ideologien und visuelle Strategien der Kulturen (Berlin: Wallstein Verlag, 2007), 135-156.

14

"'That's All Folks': Contemporary Art and Popular Culture," in Amelia Jones (ed.), <u>A Companion to Contemporary Art Since 1945</u> (Oxford and Malden Ma.: Blackwell, 2006), 493-511.

"Network Subjects: or, The Ghost is the Message," in Wendy Hui Kyong Chun (ed.), <u>New Media, Old Media: A History and Theory Reader</u> (New York: Routledge, 2005), 355-346

"The visual culture machine: or, Deterritorializing Mickey Mouse," foreword to Amanda du Preez and Jeanne van Eeden (eds.), <u>South African Visual Culture</u> (Pretoria, South Africa: Van Schaik, 2005), v-vii.

"Libertad y Cultura Visual: Plantando cara a la globalización," in José Luis Brea (ed.), <u>Estudios Visuales: La espistemología de la visualidad en la era de la globalización</u> (Madrid: Ediciones Akal, 2005),  161-173.

 "Aboriginality: Gesture, Performance and Colonial Encounter," in <u>Migrating Images</u>, Peter Seel (ed.) [Berlin: Haus der Kulturen der Welt, 2004).

Contributor to Maurice Berger (ed.), <u>Postmodernism: A Virtual Discussion</u> (New York: Distributed Art Publishers, 2003).

"The Empire of Camps," in Feride Cicekoglu (ed.), <u>9-11 Istanbul-New York</u> (Istanbul: Homer Kitabevi, 2003), 68-83.

"Teletubbies: Infant Cyborg Desire and the Fear of Global Visual Culture," in Lisa Parks and Shanti Kumar (eds.), <u>Planet TV</u> (New York: New York University Press, 2002), 439-454.

"Ghostwriting: Working Out Visual Culture," in Michael Ann Holly and Keith Moxey (eds.),  <u>Art History, Aesthetics and Visual Studies</u> (New Haven: Yale University Press, 2002)

"Paper, Picture, Sign: Conversations between the Deaf, the Hard-of-Hearing and others," in Helen Deutsch and Felicity Nussbaum (eds.), <u>"Defect": Engendering the Modern Body</u> (Ann Arbor: University of Michigan Press, 2000), pp.75-92.

"Blindness and Art," in Lennard J. Davis (ed.), <u>The Disability Studies Reader</u> (Routledge, 1997), pp. 182-200.

"Framed: The Deaf in the Harem," in Jennifer Terry and Jacqueline Urla (eds.), <u>Deviant Bodies</u> (Indiana University Press, 1995), pp. 49-77

"Signs and Citizens: Sign Language and Visual Sign in the French Revolution," in John Brewer and Ann Bermingham (eds.), <u>The Consumption of Culture in Early Modern Europe</u> (Routledge, 1995), pp.272-93.

15

"Manet: The Respectable Rebel," in Bruce Bernard (ed.), The Impressionist
Revolution (New York: Orbis, 1986), p. 21-29.

**Catalogue Essays**
"Hitting the Wall," catalogue for Cai Guo-Qiang "Head On" at the Deutsche
Guggenheim, Berlin (Frankfurt: Deutsche Bank, 2006), 57-66 (also translated into
German as "Mauern und Wölfe").

"Atlantic Postcards" in catalogue for "Crossing the Atlantic: Uneasy Spaces," 80
Washington Square East Gallery, New York, 2006, 15-20.

"Agent Orange: Fashion, the Body and the Contemporary," in Peter Carelli and
Lena Wilhelmsson (eds.), In Fashion: New Swedish Clothing Design (Helsingborg,
Sweden: Redaktorer Editions, 2005), 280-84.

"Anarchy in the Ruins: Dreaming the Experimental University," in Nato Thompson
and Greg Sholette (eds.), The Interventionists (Massachussetts Museum of
Contemporary Art, 2004).

"The Shadow and the Substance: Photography and Indexicality in American
Photography," in Coco Fusco and Brian Wallis (eds.), Only Skin Deep: Changing
Visions of the American Self, International Center for Photography, (New York:
Abrams, 2003).

"The Haunted House: Visuality and Global Culture," in Arquitecturanimation
(Barcelona, 2002), 1-54 (with Spanish translation).

"Inside/Out: Jewishness Imagines Emancipation," in Susan Tumarkin Goodman
(ed.), The Emergence of Jewish Artists in Nineteenth Century Europe, (New York:
The Jewish Museum, New York City/Merell, 2001), 41-47.

"Eye Glasses," catalogue essay for Ken Aptekar, Memorial Art Gallery, Rochester,
NY, 2001

Catalogue essay for Elahe Massumi, Iranian Photography, Paris, 2001

"Intersections," essay for Joseph Grigely: Body Signs, exhibit at W.P.A.,
Washington DC, Sep-Dec 1993, pp.1-5.

**Commissions as editor of series: In-sight: Routledge Visual Culture**

Ray Guins (ed.), The Object and Visual Culture (2008)

16

Vanessa Schwartz and Jeannene Pryzblyski (eds.) The Nineteenth-Century Visual Culture Reader, 2004)

Amelia Jones (ed.), Feminism and Visual Culture (2003), 475pp

**Interviews**
With Octopus: a visual culture journal vol.3 (2007): 45-68.

With newspapers Il Manifesto, Avenire, and Liberazione (Italy, November 2004). RAI Radio 3 November 28, 2004

Interview in CAA News (July 2003), 1, 4.

Interview in Muerto (Hungary), October 2002, 13-14.

Interview in Radikal, Turkish newspaper, June 13, 2002.

"Wenn das Bild global wild," Ein E-mail-Interview mit Nicholas Mirzoeff von Tom Holert, in Imagineering: Visuelle Kultur und Politik der Sichtbarkeit, Oktogon Jahrbüch für moderne Kunst (Köln: Oktogon, 2000), pp.35-42.

**Curatorial and Museum Experience**

Scholar's Panel and adviser, "The New Jewish Identity Project," (commisioned photography show on non-Ashkenazi Jewishness), Jewish Museum, New York City, (2005).

Primary Adviser, "Only Skin Deep: Changing Visions of the American Self," curated by Brian Wallis and Coco Fusco, International Center for Photography, New York City, 2003.

Scholar's Panel and adviser, Emergence of Jewish Artists in Nineteenth Century Europe, curated by Susan Goodman, The Jewish Museum, New York City, November 2001.

Curator: "Intersecting Identities: Jewishness at the Crossroads," University Art Gallery, SUNY Stony Brook, Nov. 9-Dec.16, 2000.

Exhibitions Committee, University Art Gallery, SUNY Stony Brook, 1999—present

Scholar's Panel, Chaim Soutine, curated by Norman Kleeblatt and Kenneth Silver, The Jewish Museum, New York City.

Exhibitions Committee, Elvehjem Museum, Madison, Wisconsin, 1994-96.

**Lectures and Scholarly Papers (selected since 1995)**

17

*2007*

| | |
|---|---|
| Modern Language Association conference roundtable: "War", Chicago | "War is Culture: Counterinsurgency and Globalization" |
| *And* Cosmopolitanism and Globalization: 20th Anniversary Conference, Humanities Institute, Stony Brook University | |
| Performance Studies International 13, New York City | Chair for panel "The Event of the Image" |
| Art Beyond Sight: Multimodal Approaches to Learning, Creativity and Communication. Metropolitan Museum, New York | "Visual Culture and Dis/ability" |
| Narcissus and Eros: Image and Text, Deutsche Haus, NYU | "Water, Visuality, Slavery: From Saint-Domingue to Katrina" |
| "Corpolíticas: Body Politics en las Américas: Formations of Race, Class and Gender," Hemispheric Institute, Buenos Aires, Argentina | "I Noticed That..." Closing Plenary presentation |
| "Towards a New Visualization of Secrecy," conference, organized by the Jan van Eyck Academy and the Stedelijk Museum, Amsterdam concluding address | "Open Secrets: The Police and Visual Culture" |
| "Surrendering to the Image," FS-1 Photography Symposium, Bergen National Academy of the Arts, Norway, keynote address | "The death of 'the death of photography'" |

*2006*

| | |
|---|---|
| "Trans" Visual Culture conference, University of Wisconsin-Madison, keynote speaker | "Visual Rights: A politics for the global contemporary" |
| "Art History in An Age of Visual Culture" conference, New York University, opening address | "Borders Are U.S." |

18

| | |
|---|---|
| Deutsche Guggenheim, Berlin | "Striking: The Right to Strike/Striking the Right" |
| Performance Studies International #12, London | "The Right to Look" |
| University of Denver, invited speaker | "Before and After Jewishness: Frédéric Brenner and Jewish Diaspora" |
| House of World Cultures, Berlin. "Image Wars" conference | "On Visuality and Image Wars: The Graphic and the Hero |
| Teacher's College, Columbia University. Keynote Speaker, SICS Conference, "Threat [a]n[d] Youth" | "Visual Culture and the Crisis" |

*2005*

| | |
|---|---|
| Cooper Union, New York | "The Sideways Look: Minority and Visual Rights" |
| Massachussetts Museum of Contemporary Art | "The Event of Violence: Cai Quo Giang" |
| Visual Culture Seminar, Bryn Mawr College | "What is the Contemporary Now? The Place of the 'South'?" |
| Distinguished Visiting Scholar, University of Kentucky, Lexington | "What is the Contemporary Now? The Place of the 'South'?" |
| Keynote speaker, "What is the Contemporary Now?" conference, Christchurch, New Zealand | "What is the Contemporary Now?" |
| Pratt Institute, New York | "Visual Rights: Minority and Modernity" |

*2004*

| | |
|---|---|
| Visual Culture Gathering, Ohio State University, keynote speaker | "Invisible Empire: Globalization and the War in Iraq" |
| Visual Culture and Globalization conference, University of Southern California | "Invisible Empire: Globalization and the War in Iraq" |

Exhibit 52
P. 1182

"Object and Visual Culture" conference, Penn State University, keynote speaker

"Visual Culture Objects"

ARCO Madrid: Visual Studies Conference, keynote speaker

"Watching the War in Babylon"

University of Potsdam/Berlin Free University conference: "Visual Cultures and Globalization," keynote speaker

"Watching the War in Babylon, Long Island"

*2003*

Modern Language Association meeting, San Diego

"War in Babylon"

House of World Cultures, Berlin

"Aboriginality: Gesture, Encounter and Visual Culture"

Zacheta Gallery, University of Warsaw *and* Goethe Institute, Krakow, Poland

"The Empire of Camps"

College Art Association Meeting

"Visual Culture and Its Discontents"

*2002*

Columbia University Graduate Colloquium

"Enlightening Signs: The Performance of Gesture in the South Pacific"

Sterling and Francine Clark Art Institute, Williamstown, MA

Strange Attractors: Jewish-Queer Affinities in the Age of Oscar Wilde

Leverhulme Lecture Series: Institute for Research in Visual Culture University of Nottingham, Spring/Fall 2002

*And* lecture tour of Sweden, April 2002: Umeå, Linkoping, and Stockholm

1. The Ghost and the Gaze
2. Strange Attractors: Jewish-Queer Affinities in the Age of Oscar Wilde
3. Ghetto Moderns
4. The Empire of Camps

Keynote speaker, "9-11 as Visual Spectacle" conference, Istanbul Bilgi University, Turkey

"The Empire of Camps"

*2001*

University of Western Sydney, Sydney

"Visual Culture After 9/11"

Exhibit 52
P. 1143

| | |
|---|---|
| Humanities Research Center, Australian National University, Canberra | "Enlightening Signs: Gesture and Performance in Colonial Culture" |
| Keynote speaker, Visual Cultures conference, de Balie Arts Center, Amsterdam | "Intervisuality: Working Out Visual Culture |
| Keynote speaker, The Glasshouse Conference, La Sapienza University, Rome | "FLAGing Desire: Visualizing the Global Economy" |
| Invited Speaker, University of Rochester | "Intervisuality: Working Out Visual Culture." |

*2000*

| | |
|---|---|
| Archaeology of Multi-Media Conference (invited speaker), Brown University | "Desire in Camera: First Exposures from de Sade to the Webcam" |
| Global Humanities Conference (invited speaker), Dartmouth College | "Post-Post: The Visual Turn in the Humanities" |
| Vera List Center, New School University, New York (invited speaker) | "Strange Attractors, Strange Perspectives: African—Jewish—Queer diasporas 1900/2000" |
| Global and Multicultural Critiques of Whiteness Conference, Dartmouth College (Invited speaker) | "Strange Attractors: African-Jewish-Queer diasporas in the age of imperialism." |
| Crossroads International Cultural Studies Conference, Birmingham, England | "Remembering Rwanda: Photography and Performance After Genocide |
| College Art Association, New York | "Intervisuality: The Practice of Visual Culture in the era of global capital" |

*1999*

| | |
|---|---|
| Fashion and Identity, Chicago Cultural Center | "Parisiennes from Bukhara to Kongo: The body and resistance on modernity's borders" |

*1998*

| | |
|---|---|
| American Studies Association, New York City | "What Is Visual Culture?" |
| College Art Association, Toronto | "The Diasporic Mirror: Pissarro and the Caribbean" |

21

Exhibit 52,
P. 1184

*1997*

| | |
|---|---|
| Jewish Museum, New York City | The Saul and Gladys Gwirtzman Lecture: "Pissarro's Passage: The Jewishness of Camille Pissarro" |
| Gallaudet University, invited speaker | "A Deaf Variety of Modernism" |
| Wellesley College, "Recovering Benin," national conference. | "The Horror of Modernism: Sexuality and Cultural Geography in colonial Africa" |

*1996*

| | |
|---|---|
| Humanities Institute, SUNY Stony Brook | "On the passage of a Jewish artist through a rather dangerous moment in time" |
| Clark Library, UCLA, conference "Deformity, Monstrosity and Gender" | "Conversations With The Deaf" |
| Chair, "Diaspora and Modern Visual Culture," College Art Association, Boston | |
| Chair, "Gender, Hybridity and Identity in the Caribbean, 1660-1850, American Society for Eighteenth Century Studies (ASECS), National Meeting, Austin TX | "Colonial Subjection: Caribbean-Jewish Identity" |

*1995*

| | |
|---|---|
| "Prophets and Losses: Jewish Experience and Visual Culture," conference at Southern Methodist University: invited speaker | "Pissarro's Passage: Color, Identity and Jewishness at the fin-de-siècle" |
| Association of Art Historians, Great Britain | "Photography at the Heart of Darkness" |

**Editorial Boards**
Photography and Culture, 2006—present
The Journal of Visual Culture, 2001—present
Art Journal (USA), 2001-2003
Situation Analysis, 2002—present
"Interfaces," book series for University of New England Press, 2003—present
British Film Institute Television Classics series, 2004-2006

**Publications Referee**
    Cambridge University Press, 1999
    MIT Press, 1999, 2000, 2003

Exhibit 52,
P. 1185

Minnesota University Press, 1999, 2002, 2006
Oxford University Press, 1998, 2000
<u>Eighteenth-Century Studies</u>, 1996, 1997
Routledge, 1994—present
<u>The Art Bulletin</u>, 1994, 2000
University of Chicago Press, 1994, 2001, 2002, 2003, 2005
University of North Carolina Press, 2002
New York University Press, 2002, 2003
<u>Journal of Visual Culture</u>, 2001—present
<u>Art History</u>, 2003

**Grant proposal reviewer:**
J. Paul Getty Postdoctoral Grant Program, 1996—present
Guggenheim Foundation, 2003
ACLS, 2006

**Professional Organizations**
College Art Association
Association of Art Historians (Great Britain)
Arts Council of the African Studies Association
Society for Cinema and Media Studies
Modern Languages Association

Exhibit  52
P. 1186

# Exhibit 53

# KENNETH HOLLANDER ASSOCIATES

Home

Why Use Hollander?

Our Clients

Our Services

Legal / Intellectual
Property Research

How Our Clients
See Us

Our People

Our Commitment

E-Mail Us

## LEGAL/INTELLECTUAL PROPERTY RESEARCH

We have conducted intellectual property research for over 15 years on:

- Likelihood of Confusion
- Secondary Meaning
- Trademark/Trade Dress Infringement
- Claim Substantiation
- Genericism
- False Advertising

We are a member of INTA (International Trademark Association)

**Ken Hollander** is an expert witness in the Federal Court system on matters of intellectual property survey research, and experienced in the depositions, trial testimony, and presentations to the NAD (National Advertising Division of the Better Business Bureau).

### LEGAL SURVEY RESEARCH HISTORY OF KENNETH HOLLANDER ASSOCIATES

|   | Year | Client/Case#/Court/Year | Plaintiff/Def. | Subject | Research Conducted |
|---|------|-------------------------|----------------|---------|--------------------|
| 1 | 1986* | Needle & Rosenberg Atlanta, GA #C-86-483-A Northern District of GA, Atlanta Division, 1986 | Original Appalachian Artworks | Determine confusion between Garbage Pail Kids' and Cabbage Patch Kids' concepts | 1,200 mall intercept interviews |
| 2 | 1987 | Kilpatrick & Cody Atlanta, GA | Honey Baked Ham Co | Determine confusion between Logan Farm's signs and brochures and Honey Baked Ham signs and brochures | 300 mall intercept interviews |
| 3 | 1987 | Kilpatrick & Cody Atlanta, GA | Honey Baked Ham Co. | Determine confusion and secondary meaning between Logan Farms logo and Honey Baked Ham logo | 100 mall intercept interviews |
| 4 | 1988 | Troutman Sanders Atlanta, GA #1-88-CV-1208-WCO | Cable News Network (CNN) | Determine secondary meaning of a CNN program | 250 telephone interviews |
| 5 | 1989 | Kilpatrick & Cody Atlanta, GA | Western Stone and Metal Corp. | Determine possibility of slander by a large jewelry retailer | 179 telephone interviews |
| 6 | 1990* | Cleary Gottlieb New York, NY #CIV-2-88-73 E.D. Tenn., Northeastern Division, 1990 | Ferrari SPA Esercizio | Determine the secondary meaning of Testarossa automobiles | 200 telephone recruits to a central location test |

Exhibit 53,
P. 1187

| | | | | | |
|---|---|---|---|---|---|
| 7 | 1990* | Luedeka, Hodges & Neely, Knoxville, TN Opposition #79,317 Opposition #79,319 US Patent and Trademark Office; Trademark Trial and Appeal Board, 1990 | Morrison Inc. | Critique of opposing research which claimed to prove confusion | Review and counsel only |
| 8 | 1992* | Kilpatrick & Cody Atlanta, GA #2-92-1930-8 S.C., Charleston Division, 1992 | Fazoli's Restaurants | Determine confusion between Fazoli's restaurants and Zamboli's restaurants | 200 mall intercept interviews |
| 9 | 1993 | Kilpatrick & Cody Atlanta, GA | Honey Baked Ham | Determine confusion between a restaurant serving a product thought to be made by Honey Baked Ham | 200 mall intercept interviews |
| 10 | 1993 | Kilpatrick & Cody Atlanta, GA | Anheuser Busch, Inc. | Determine confusion of T-shirt advertising/logos for Wings | 229 mall intercept interviews |
| 11 | 1993* | Kilpatrick & Cody Atlanta, GA #4-89-2247-2 S.C., Judge C. Westen Houck, 1993 | Anheuser Busch, Inc. | Determine confusion of billboard advertising for Wings | 300 face-to-face interviews |
| 12 | 1994 | Leslie J. Lott & Assoc. Coral Gables, FL Opposition #83,585 Opposition #83.520 US Trademark Trial and Appeal Board, 1994 | Eurorent USA, Inc. | Critique research which claims to prove confusion | Review and counsel only |
| 13 | 1994 | Kilpatrick & Cody Atlanta, GA | Delta Air Llines | Determine confusion of employee advertising | 300 telephone interviews |
| 14 | 1994 | Kilpatrick & Cody Atlanta, GA | Riviana Foods | Determine confusion of Success Rice | 100 face-to-face interviews |
| 15 | 1994 | Kilpatrick & Cody Atlanta, GA | Anheuser Busch, Inc. | Determine confusion of billboard advertising for Wings | 300 face-to-face interviews |
| 16 | 1994 | Alston & Bird Atlanta, GA | Keng Firearms | Determine confusion of Ruger firearm | 20 face-to-face interviews |
| 17 | 1994* | Hopkins & Thomas Atlanta, GA #CIV.3-92-3619-19 S.C., Columbia Division, 1994 | AFLAC | Determine false advertising of Colonial Insurance | 200 telephone interviews |
| 18 | 1995 | Smith Gambrell Atlanta, GA | Micro Help | Determine confusion of "Uninstaller" mark | 201 telephone interviews |
| 19 | 1995 | Hopkins & Thomas Atlanta, GA | BioGard | Determine confusion of BioGard mark | 100 face-to-face interviews |

Exhibit  53
P. 1188

| 20 | 1995 | O'Melveny & Myers<br>Los Angeles, CA | Gallo Wine | False advertising | Review and counsel only |
| 21 | 1995 | Frost & Jacobs<br>Cincinnati, OH | Percell Industries | False advertising and confusion | Review and counsel only |
| 22 | 1995* | Reising, Ethington<br>Troy, MI<br>#91-CV-75211-DT<br>#93-CV-70461-DT<br>#94-CV-73616-DT<br>E.D. Michigan, 1996 | Men's Wearhouse | Critique opposing research which claims to prove confusion | Review and critique |
| 23 | 1996* | Paul, Hastings, Janofsky & Walker<br>Atlanta, GA<br>#C92-3874-WHO | State of California | Critique opposing research re teacher certification scores | Review and critique |
| 24 | 1996* | Kilpatrick & Cody<br>Atlanta, GA<br>#1-96-CV-0763-JOF<br>Northern District of GA,<br>Atlanta Division, Judge<br>Forrester, 1996 | Anheuser Busch, Inc. | Determine confusion of G.I. Apparel T-Shirts and Anheuser Busch | 588 face-to-face interviews |
| 25 | 1996* | Glass, McCullogh<br>Atlanta, GA<br>#1-95-CV-2445-JTC<br>US District Court, Northern District of GA, Atlanta Division, 1996 | LittleFuse, Inc. | Critique opposing research which claims to prove confusion | Review and critique |
| 26 | 1996 | Jones & Askew<br>Atlanta, GA | BellSouth | Determine confusion of The Classified Yellow Pages insert and BellSouth | 200 face-to-face interviews |
| 27 | 1996* | Jones & Askew<br>Atlanta, GA<br>#1-96-CV-769-CC<br>US District Court, Northern District of GA, Atlanta Division, 1996 | BellSouth | Determine confusion of the Real Pages and BellSouth | 300 face-to-face interviews |
| 28 | 1996 | Rader, Fishman & Grauer, Bloomfield, MI | Stroh Brewing | Critique opposing research which claims to prove confusion | Review and counsel only |
| 29 | 1997 | Kilpatrick Stockton<br>Atlanta, GA | Sara Lee | Determine confusion between Sheer Endurance and Sheer Energy | 500 face-to-face interviews |
| 30 | 1997* | Jones & Askew<br>Atlanta, GA | BellSouth | Determine confusion of Best Yellow Pages and BellSouth | 200 face-to-face interviews |
| 31 | 1997 | Kilpatrick Stockton<br>Atlanta, GA | IMAX | Determine secondary meaning of mark | Review and counsel only |
| 32 | 1997* | Kilpatrick Stockton<br>Atlanta, GA | BellSouth | Determine likelihood of confusion of cover | 400 face-to-face interviews |
| 33 | 1997* | Jones & Askew<br>Atlanta, GA | BellSouth | Determine confusion of the Talking Phone book and BellSouth | 200 face-to-face interviews |

Exhibit 53
P. 1189

| | | | | | |
|---|---|---|---|---|---|
| 34 | 1998* | Womble, Carlyle, Sandridge & Rice Atlanta, GA | R & A Bailey Co., Ltd. | Critique opposing research which claims to prove confusion | Review and critique |
| 35 | 1998 | Jones, Day, Reavis & Pogue Atlanta, GA | Simmons Company | Determine secondary meaning of a term | 209 face-to-face interviews |
| 36 | 1998 | Kilpatrick Stockton Atlanta, GA | General Mills | Determine confusion of Cheerios mark | Review and counsel only |
| 37 | 1998 | Hall, Booth, Smith & Slover Atlanta, GA | Rally Rags | Determine secondary meaning of a term | 300 telephone interviews |
| 38 | 1999 | Jones & Askew Atlanta, GA | BellSouth | Determine confusion of White Directory | 201 face-to-face interviews |
| 39 | 1999 | Needle & Rosenberg Atlanta, GA | Mansfield Oil | Determine confusion of a trademark | Review and counsel only |
| 40 | 1999 | Alston & Bird Atlanta, GA | Redman Products | Determine confusion of a trademark | Review and counsel only |
| 41 | 1999 | Alston & Bird Charlotte, NC | BBA Nonwovens | Determine secondary meaning of a trade dress item | 103 telephone interviews |
| 42 | 1999* | Nexsen Pruet Jacobs & Pollard Columbia, SC | American TV & Appliances | Critique opposing research which claims to prove confusion | Review and counsel only |
| 43 | 2000* | Alston & Bird Charlotte, NC | American Tool | Determine confusion of a trade dress item | 300 face-to-face interviews |
| 44 | 2000 | Alston & Bird Charlotte, NC | Lowe's, Inc. | Determine secondary meaning of storefront design | 200 face-to-face interviews |
| 45 | 2000 | Lott & Friedland Coral Gables, FL | Royal Caribbean Cruise Lines | Determine confusion of cruise ship names | 100 telephone interviews |
| 46 | 2000* | Miller & Martin Chattanooga, TN | Brach's | Determine confusion of competitive package | 200 face-to-face interviews |
| 47 | 2000 | Jenner & Block Chicago, IL | Brach's | Determine confusion of two competitive packages | 300 face-to-face interviews |
| 48 | 2000* | Lewis & Roca Phoenix, AZ | USPO | Determine confusion of opposing mark | 900 Internet interviews |
| 49 | 2000 | Gardner & Groff PC Atlanta, GA | TBC, Inc. | Determine confusion of competitive package | Review and counsel only |
| 50 | 2000 | Steel, Hector, & Davis, Miami, FL | Ponche Kuba | Determine confusion of competitive package | 200 face-to-face interviews |
| 51 | 2000 | Powell, Goldstein, Fraser & Murphy Atlanta, GA | NetBank.com | Determine confusion of competitive name | 400 Internet interviews |
| 52 | 2000 | Powell, Goldstein, Fraser & Murphy | AmSouth | Determine confusion of AmSouth name | Review and counsel only |

Exhibit 53,
P. 1190

| | | | | | |
|---|---|---|---|---|---|
| | | Atlanta, GA | | | |
| 53 | 2001* | Powell, Goldstein, Fraser & Murphy<br>Atlanta, GA | Integrity Inc. | Determine confusion of a trade name | 411 Internet interviews |
| 54 | 2001 | Alston & Bird<br>Charlotte, NC | Comfort Trac | Determine secondary meaning of a trade name | Review and counsel only |
| 55 | 2001 | Alston & Bird<br>Charlotte, NC | Lowe's, Inc. | Determine secondary meaning of a trade dress | 475 face-to-face interviews |
| 56 | 2001 | Hunton & Williams<br>Raleigh, NC | Chick-fil-A | Determine consumer understanding of possibly misleading advertising | 401 face-to-face interviews |
| 57 | 2001 | Alston & Bird<br>Charlotte, NC | Bank of America | Determine secondary meaning of the C&S name | 300 telephone interviews |
| 58 | 2001 | Kritzer & Levick<br>Atlanta, GA | Saiku-Japan Restaurants | Determine confusion of trade dress | 201 face-to-face interviews |
| 59 | 2001 | Powell, Goldstein, Fraser & Murphy<br>Atlanta, GA | Glock | Critique of opposing research which claimed to prove confusion | Review and counsel only |
| 60 | 2001 | Hunton & Williams<br>Richmond, VA | The Scotts Company | Determine confusion of a trade name | 300 face-to-face interviews |
| 61 | 2001 | Alston & Bird<br>Charlotte, NC | Bank of America | Determine confusion of a trade name | 100 telephone interviews |
| 62 | 2002 | Powell, Goldstein, Fraser & Murphy<br>Atlanta, GA | NetBank.com | Determine genericism of a trade name | 400 Internet interviews |
| 63 | 2002 | Brown & Kelly<br>Buffalo, NY | Island Pools | Critique opposing research which claims to prove confusion | Review and critique |
| 64 | 2002* | Brobeck, Phleger & Harrison,<br>San Diego, CA | Straumann | Determine confusion of trade dress | 70 face-to-face interviews |
| 65 | 2002 | Lott-Friedland<br>Coral Gables, FL | Kraft Foods | Determine likelihood of confusion | 304 face-to-face interviews |
| 66 | 2002 | Nexsen, Pruet, Jacobs & Pollard<br>Columbia, SC | Rugged Shark | Determine confusion of trade dress | 155 face-to-face interviews |
| 67 | 2002 | Goodwin Procter<br>Boston, MA | Banking Service | Critique research which claimed to cause confusion | Review and critique |
| 68 | 2002 | Luedeka, Neely & Graham<br>Knoxville, TN | Forward Air | Critique research which claimed to cause confusion | Review and critique |
| 69 | 2002* | Luedeka, Neely & Graham<br>Knoxville, TN | Forward Air | Determine likelihood of confusion | 80 telephone interviews |
| 70 | 2002* | Powell, Goldstein, Fraiser & Murphy<br>Atlanta, GA | Quantam National Bank | Determine confusion of trade name | 400 face-to-face interviews |
| | | Cooley, Goodward, & | | | |

Exhibit 53,
P. 1191

| | | | | | |
|---|---|---|---|---|---|
| 71 | 2002 | Broomfield CO | Internet Advertising | Critique research which claimed to cause confusion | Review and critique |
| 72 | 2002 | Rothwell, Figg, Ernst & Manbeck Washington, DC | Progressive Industries | Critique research which claimed to cause confusion | Review and critique |
| 73 | 2003* | Quirk & Tratos Las Vegas, NV | Hartl | Determine confusion of a trade name | 55 telephone interviews |
| 74 | 2003* | Carlton Fields Tampa, FL | Acushnet Company | Determine likelihood of confusion | 403 Internet interviews |
| 75 | 2003 | Armstrong Teasdale St. Louis, MO | Bonita Bay Properties | Determine likelihood of confusion | 300 telephone interviews |
| 76 | 2003* | Lott Friedland Coral Gables, FL | Intercontinental Doral Miami | Determine likelihood of confusion | 300 Internet interviews |
| 77 | 2003* | Hunton & Williams Dallas, TX | TXU | Determine likelihood of confusion | 303 Internet interviews |
| 78 | 2003* | Alston & Bird Charlotte, NC | Bank of America | Potential likelihood of confusion | Review & Counsel Only |
| 79 | 2003 | Winstead Dallas, TX | Team | Determine likelihood of confusion | 200 telephone Interviews |
| 80 | 2004 | Hennifer & Wood San Francisco, CA | Chia Pet | Determine likelihood of confusion | 300 Internet interviews |
| 81 | 2004 | Gardner Groff PC Atlanta, GA | Maytag | Determine likelihood of confusion | 300 Internet interviews |
| 82 | 2004* | Procter & Gamble | Procter & Gamble | Investigate competitor's false advertising claims | 743 face-to-face interviews |
| 83 | 2004 | Quinn Emanuel Urquhart Oliver & Hedges Los Angeles, CA | Archipelago | Determine likelihood of confusion | 402 face-to-face interviews |
| 84 | 2004* | Quinn Emanuel Urquhart Oliver & Hedges Los Angeles, CA | Archipelago | Determine likelihood of confusion | 303 face-to-face interviews |
| 85 | 2004 | Alston & Bird | Ale House Management | Critique of research | Review & critique |
| 86 | 2004 | Lewis & Roca Phoenix, AZ | Canyon Ranch Spa | Determine likelihood of confusion | 227 face-to-face interviews |
| 87 | 2005 | Alston & Bird | Lowe's Home Centers | Determine likelihood of confusion | 348 face-to-face interviews |
| 88 | 2005 | Jahn & Associates | Las Vegas Convention Bureau | Determine likelihood of confusion | 300 Internet interviews |
| * Served or will serve as an expert witness | | | | | |

TOP

45431 Greenling Circle, Mendocino, CA  95460 – 707.962.1648 (voice), 707.1635 (fax)

Exhibit 53
P. 1192

# KENNETH HOLLANDER ASSOCIATES



## HOW OUR CLIENTS SEE US

**Home**

**Why Use Hollander?**

**Our Clients**

**Our Services**

**Legal / Intellectual Property Research**

**How Our Clients See Us**

**Our People**

**Our Commitment**

**E-Mail Us**

The following are quotes taken from some of the letters sent by clients:

*"Kenneth Hollander Associates has consistently demonstrated that rarity of market research: the ability to leap beyond the raw data and give insight, perception, and focus to research information."*

> Peter S. Sealey
> President
> Columbia Pictures
> Burbank, California

*"We rely upon your expertise and insights for guidance, and appreciate your ability and willingness to partner with us in adding the value and objectivity to our research and marketing programs. The respect of the business community for your reputation and work is a key selling point with our customers."*

> Bill Damon
> Manager, Market Research
> Coca-Cola USA
> Atlanta, Georgia

*"It's doubly a pleasure to work with people who are not only professional but enthusiastic about what they do. . . I think of you first not only because I respect your work, but because I enjoy working with you."*

> Lillian Campbell
> Vice President, Public Relations
> Scottish Rite Children's Medical Center
> Atlanta, Georgia

*"My thanks to all of you for the excellent quantitative and qualitative research you have been conducting for Tupperware Home Parties. The professionals at Kenneth Hollander Associates have the unique combination of marketing research expertise and good marketing sense."*

> Harold Bloom
> Vice President, Market Research
> Tupperware Home Parties
> Orlando, Florida

*"To date we have been able to make four major marketing decisions based on four sophisticated and sensitive research studies conducted by Kenneth Hollander Associates. That's a pretty good track record."*

Exhibit __53__
P. __1193__

Janice Strickler
Director of Marketing Research
McNeil Consumer Products Company
Philadelphia, Pennsylvania


*"Your firm projects the same qualities which are your personal hallmark - insight not only of the specific assignment but of the larger marketing picture which generated that assignment. You and your people provide not only the analytical objectivity of a truly professional outside resource, but the trusted counsel that is usually only found internally."*

Richard Dixon,
Vice President Marketing Services
Budget Rent-A-Car
Chicago, Illinois


*"My confidence in your company's abilities is best illustrated by the fact that we now rarely use any other market research consultant."*

Hugh Wolff
Director of Advertising
Ingersoll-Rand Company
Woodcliff Lakes, New Jersey


*"At McCann-Erickson, we are fond of saying that Creative is the heart of advertising, but Research is the soul of creativity. You and your associates always produce research that is actionable and understandable to us and to our clients."*

G. Clisby Clarke
Executive Vice President and General Manager
McCann-Erickson
Atlanta, Georgia


*"You have a clear perception of the information we need, how to get it, and most importantly, how to use it in building product preference."*

Richard D. Mannis
Director, Marketing Research
CIBA-GEIGY
Corporation Summit, New Jersey


*". . . in fact, you've spoiled us. We've come to use your level of knowledge and service as the standard by which we measure the work of others."*

Jerri Perilman
Project Manager, Market Research
The Gillette Company
Boston, Massachusetts


TOP

Exhibit 53,
P. 1194

# KENNETH HOLLANDER ASSOCIATES



- Home
- Why Use Hollander?
- Our Clients
- Our Services
- Legal / Intellectual Property Research
- How Our Clients See Us
- Our People
- Our Commitment

**E-Mail Us**

## OUR PEOPLE

KEN HOLLANDER began his marketing research career with the Procter & Gamble Company, Cincinnati. At departure, he was Research Brand Manager in Experimental Research and Technique Development. This section handled all unique, non-recurring problems for all of P & G's brands.

Subsequently, he became Associate Research Director at Hallmark Cards, Kansas City, Missouri. He was responsible for the design of many of the research techniques that now provide the foundation for consumer research at Hallmark.

Ken then moved to the agency side of research, joining Young & Rubicam, Chicago. At departure, he was Director of Research and responsible for all of the research activities conducted for all clients.

Finally, he moved to Atlanta, joining The Interpublic Group as Vice President and Director. His principal responsibility was serving as research counsel to the marketing research departments of Coca-Cola USA and The Coca-Cola Export Corporation.

Wanting to actually do rather than just commission research, he took the plunge and established Kenneth Hollander Associates, Inc. in 1973. From that day to this, he has been a happy, hands-on "doer."

Ken was a contributing editor to Advertising, McGraw-Hill, New York, 5th edition -- the most widely-used advertising textbook in American universities. He is a frequent university lecturer and speaker at professional associations, the past chairman of the Advisory Board of the University of Georgia's Masters of Marketing Research Program, and the recipient of the University's Distinguished Practitioner award.

TOP

Next

---

45431 Greenling Circle, Mendocino, CA  95460 – 707.962.1648 (voice), 707.962.1635 (fax)

300 Beale Street, Suite 317, San Francisco, CA  94105 – 415.618.0268 (voice), 415.618.0063( fax)

Exhibit 53,
P. 1195

# KENNETH HOLLANDER ASSOCIATES



- Home
- Why Use Hollander?
- Our Clients
- Our Services
- Legal / Intellectual Property Research
- How Our Clients See Us
- Our People
- Our Commitment

**E-Mail Us**

## OUR COMMITMENT

We look forward to the opportunity of making your next marketing research project effortless, enjoyable, and--most of all--actionable.

45431 Greenling Circle, Mendocino, CA  95460 – 707.962.1648 (voice), 707.962.1635 (fax)

300 Beale Street, Suite 317, San Francisco, CA  94105 – 415.618.0268 (voice), 415.618.0063( fax)

Exhibit 53 ,
P. 1196

# Exhibit 54

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA

 3

 4      ------------------------------

 5   CARTER BRYANT, an individual, ) No. CV

 6                   Plaintiff,    ) 04-9049 SGL (RNBx)

 7          vs.                    )

 8   MATTEL, INC., a Delaware,     ) Consolidated with

 9   corporation,                  ) No. CV-04-09059

10                   Defendant.    ) No. CV 05-02727

11      ------------------------------

12

13

14       Videotaped Deposition of RALPH OMAN,

15       at 1440 New York Avenue, Northwest,

16       Washington, D.C., commencing at

17       10:00 a.m., Monday, March 31, 2008,

18       before KAREN YOUNG, Notary Public.

19

20

21

22

23

24

25   PAGES 1 - 83
```

Exhibit 54 ,
P. 1196

Page 2

```
 1    APPEARANCES OF COUNSEL:
 2        FOR THE PLAINTIFF:
 3            QUINN EMANUEL URQUHART OLIVER &
 4            HEDGES, LLP
 5            BY:  MICHAEL T. ZELLER, ESQ.
 6            865 South Figueroa Street, 10th Floor
 7            Los Angeles, California 90017
 8            michaelzeller@quinnemanuel.com
 9            (213) 624-3180
10
11        FOR THE DEFENDANT:
12            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13            BY:  KENNETH A. PLEVAN, ESQ.
14            Four Times Square
15            New York, New York 10036
16            kenneth.plevan@skadden.com
17            (212) 735-3410
18            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
19            BY:  PHILIP W. MARSH, ESQ.
20            1440 New York Avenue, Northwest
21            Washington, D.C. 20005-2111
22            pmarsh@skadden.com
23            (202) 371-7167
24
25        ALSO PRESENT: CONWAY BARKER, VIDEOGRAPHER
```

Exhibit 5 4 ,
P. 1197

Page 6

1    engagement, what was the source of your getting

2    those documents?

3       A.    Those documents were sent to me by the

4    Quinn Emanuel team of lawyers.

5       Q.    When were you first contacted by Quinn

6    Emanuel?

7       A.    I think it must have been in early

8    January.

9       Q.    And what was your understanding was the

10    scope of your retention?

11       A.    I would be commenting on the copyright

12    office registration procedures, the significance of

13    the registration certificate and the normal way an

14    examiner would look at a submission for

15    registration.

16       Q.    Anything else?

17       A.    That was all that was mentioned at the

18    outset.

19       Q.    Well, in addition to the outset, was that

20    a statement of what you in fact understood your role

21    to be in this case as an expert?

22       MR. ZELLER:  You're asking as of now what

23    he understands his role to be?

24       BY MR. PLEVAN:

25       Q.    Yeah.  What is your understanding now?  Is

Exhibit 54
P. 1198

Page 7

1   it any different than your initial understanding?

2       A.    Well, I felt that I had to respond to the

3   expert report of Professor Menell, and he raised an

4   issue that was really unrelated to the registration

5   procedures in the copyright office, and I have

6   researched that to a certain extent, but other than

7   that, I try to tailor my testimony to things that

8   I'm an expert in, and that is copyright office

9   procedures.

10      Q.    What is the issue that Professor Menell

11  raised that you did additional research on?

12      A.    The significance of the registration

13  certificate in a more general way and what the --

14  what the implications are that can be drawn from the

15  fact that the registration was made in a way that

16  suggests that the work is not a derivative work but

17  an original work of authorship.

18      Q.    You just used the phrase "original work of

19  authorship."  What does that refer to?

20      A.    Under the U.S. copyright laws, authors of

21  original works of authorship can register those

22  works in the copyright office.  It signifies that

23  the work was created by the author and is eligible

24  for copyright under the terms and conditions of the

25  federal copyright statute.

Exhibit 54 ,
P. 1199

Page 9

1    original.  I was using that term to describe the

2    type of authorship we're dealing with here rather

3    than what is technically known as a derivative work.

4        Q.    Mr. Oman, my question was is the phrase

5    "wholly original," is that a term of art in the

6    copyright law, and I believe your answer was it is

7    not?

8        A.    It is not.

9              MR. ZELLER:  Asked and answered.

10             BY MR. PLEVAN:

11       Q.    Is the phrase "largely nonoriginal" a term

12   of art in the copyright law as you understand it?

13       A.    In the law itself, no.

14       Q.    Is it a term of art at the copyright

15   office?

16       A.    It's the way I'm describing authorship in

17   the copyright office and the copyright bar and I've

18   heard it on many occasions.  I can't say that it's a

19   term of art.  It's just a way of describing

20   something.

21       Q.    For example, if -- let's mark as the next

22   exhibit, 4701, Circular 40.

23                        (Exhibit 4701

24                         was marked for

25                         identification.)

Exhibit 54,
P. 1200

Page 10

1          BY MR. PLEVAN:

2          Q.    Mr. Oman, could you identify Exhibit 4701

3     for us?

4          A.    Yes, it's a copyright office publication,

5     Circular 40, which describes the procedures for

6     registration of works of the visual arts.

7          Q.    And this is a circular that you were

8     directly or indirectly responsible for the issuance

9     of when you were registrar; is that correct?

10         A.    We made -- during my tenure as register of

11    copyrights, we made changes to it, updated it and

12    published it.  It I think has since been further

13    revised but -- yes, 2006, but I was part of the

14    creative process when I was register of copyrights

15    that provided the public with this further

16    clarification of how to comply with the copyright

17    office regulations.

18         Q.    And if we were to look within Circular 40,

19    would we find the phrases "largely nonoriginal" or

20    "wholly original"?

21         A.    No.

22         Q.    If you would turn to the second -- second

23    page of the circular, on the right-hand column, the

24    following language appears.  It says, quote,

25    "Copyright protection for an original work of

Exhibit 54 ,
P. 1201

Page 19

1    expert report or travel to South Africa.

2         Q.    In addition to that instance, were there

3    any other situations where you were retained as an

4    expert witness in connection with a lawsuit pending

5    outside of the United States?

6         A.    There were engagements that involved

7    foreign corporations but none that actually required

8    my attendance in a foreign jurisdiction.

9         Q.    Have you ever testified in a lawsuit

10   pending in Hong Kong?

11        A.    No, I haven't.

12        Q.    Have you ever been retained to be an

13   expert witness in connection with a lawsuit pending

14   in Hong Kong?

15        A.    No, I haven't.

16        Q.    Prior to the current engagement, have you

17   ever been retained by the law office of Quinn

18   Emanuel as an expert witness?

19        A.    Yes, I have.

20        Q.    On --

21             MR. ZELLER:  Just so it's clear, when

22   you're asking about these matters and retention, I

23   assume you're talking about nonconsulting roles,

24   because presumably in some instances there's going

25   to be a consulting expert privilege that would apply

Exhibit 54
P. 1202

Page 31

1   patent side of the spectrum.

2       Q.     Is the term "sophisticated company" a term

3   of art in copyright law?

4       A.     Not that I'm aware of.

5       Q.     Is it a term of art in patent law, to your

6   knowledge?

7       A.     Not that I'm aware of.

8       Q.     And that's the kind of phrase that we

9   would -- I take it you wouldn't find in a copyright

10  office circular; is that correct?

11          MR. ZELLER:   The question's overbroad.

12      A.     I can't think of an instance where we used

13  "sophisticated remitter" because it's laden with

14  values I suppose, but it is a way of describing

15  large corporations that have teams of legal experts

16  or legal technicians who know the system, know the

17  law and do these things routinely on a daily basis,

18  to distinguish the sophisticated remitter from the

19  poet or the artist who files maybe one registration

20  or two registrations for copyright in a lifetime and

21  is not sophisticated in terms of the process for

22  seeking a patent or seeking a copyright.

23      Q.     Do you consider Mattel to be a

24  sophisticated company?

25      A.     Yes, I would.

Exhibit 54 ,
P. 1203

Page 34

1    the clothing, the shoes, the accessories.  That's my

2    understanding of a fashion doll.

3        Q.    Turning to the copyright office's practice

4    with respect to an item such as a fashion doll, does

5    the copyright office consider the costumes to be

6    part of the copyright subject matter?

7        A.    Generally the copyright office doesn't get

8    into that type of analysis with -- they look at a

9    fashion doll that was submitted.  Actually, one in

10   the permanent display of the copyright office,

11   there's a Barbie doll.  It was I think removed last

12   year, but it was one of the examples of

13   copyrightable authorship that we had in the

14   permanent collection.  I do understand that there's

15   an ongoing dispute as to whether or not clothing of

16   dolls is eligible for copyright protection.

17              I would say that it, like many things in

18   copyright, it depends.  Sometimes it is and

19   sometimes it isn't.  If it's just the

20   miniaturization of a normal dress, it wouldn't be,

21   but if it's some fanciful original creation, if

22   there's a, for instance, a Wonderwoman doll -- I'm

23   not sure that there is such a thing, but if there

24   were a Wonderwoman doll which had imaginative

25   original creativity, it could be protected.  When I

Exhibit 54,
P. 1204

Page 38

1    or included in the package.  The whole work is
2    registrable -- is registered, and it's left for the
3    courts to decide what part of that -- of that
4    submission qualifies for copyright protection.
5         Q.    It is your understanding, I take it, that
6    in the fashion doll area, the fashions change?
7              MR. ZELLER:  Asked and answered.
8         A.    That's my understanding.  It's an evolving
9    process and the manufacturers of the fashion dolls
10   anticipate trends and that's the way the system
11   works.
12        Q.    Does the hair styles fall within the
13   subject matter of copyright with respect to a
14   fashion doll?
15             MR. ZELLER:  The question's vague, calls
16   for a legal conclusion.
17        A.    My recollection is that the hair style is
18   not, and if it's actually hair that can be
19   manipulated by the owner of the doll, if it's part
20   of a statue sculpt -- sculpture that's part of the
21   plastic mold, that could be one of the artistic
22   features that could qualify as one of the elements
23   of copyright protection.
24        Q.    But if it's hair that could be changed and
25   modified by the -- by the owner of the product, then

Exhibit 54
P. 1205

Page 39

1   this would not be within the subject for copyright;

2   is that correct?

3        A.     That's my understanding.

4        Q.     And what is your understanding with

5   respect to accessories?

6              MR. ZELLER:   The question's vague.

7        A.     Again, this is -- this is a --

8              MR. ZELLER:   And calls for a legal

9   conclusion.

10       A.     An area of the law that -- copyright

11  office practice that is handled on a case-by-case

12  basis.  The example that I'm thinking of would be,

13  for instance, a miniature comb for fashioning the

14  doll's hair.  That is useful in its own way.  Unless

15  there was some decorative element to it, a flower

16  border along the top, that comb standing alone would

17  not qualify for copyright protection.

18       Q.     You mentioned you have three daughters,

19  and I take it they had some familiarity with fashion

20  dolls when they were the appropriate age?

21       A.     They did.

22       Q.     And so you recall that fashion dolls often

23  come with accessories.

24              MR. ZELLER:   The question's overbroad,

25  vague.

Exhibit 54,
P. 1206

Page 41

1    ask you if you've seen this document before.

2         A.    Yes, I have.

3         Q.    And in what connection did you see it?

4         A.    It was part of the materials I examined in

5    preparation for this deposition.

6         Q.    Do you recall having read this document

7    over at the time?

8         A.    Yes, I have read through it.  I can't say

9    that I've analyzed it, but I've read through it and

10   got the general drift.

11        Q.    And you understand that this was a letter

12   written by a senior examiner at the copyright

13   office; is that correct?

14        A.    Yes, Wayne Crist.

15        Q.    Do you know Mr. Crist?

16        A.    I do.

17        Q.    And do you know how long he's been at the

18   copyright office?

19        A.    I don't know precisely how long he's been

20   in the copyright office but he's certainly been

21   there since my tenure.  He was -- which started in

22   1985, and he was experienced and reliable at that

23   point so I suspect he was probably there for years

24   before 1985.

25        Q.    So he'd be -- presumably at least 20

Exhibit 54 ,
P. 1207

Page 42

1    years.

2         A.    Yes.

3         Q.    If you turn to the page of this which is

4    page 2 but at the bottom it says MGA 0868143?

5         A.    I see that.

6         Q.    And if you'd look at the second full

7    paragraph, the one that begins, "The new space 6b,"

8    do you see that paragraph?

9         A.    I do see that.

10        Q.    Mr. Crist says in the third sentence,

11   quote, "Accessories," unquote, "apparently refers to

12   the doll clothing, brushes, et cetera, but these

13   elements are not protected by copyright."  Do you

14   see that sentence?

15        A.    I see that.

16        Q.    Do you believe that Mr. Crist has

17   correctly stated copyright office policy as of the

18   time this letter was written?

19             MR. ZELLER:  The question is vague,

20   overbroad, lacks context.

21        A.    Well, I think Mr. Crist is making a

22   general statement that is suitable for the context

23   in which he makes it, but I think that, as I said a

24   few minutes ago, you can't categorically exclude

25   brushes from copyright protection.  There could be

Exhibit 54,
P. 1208

Page 43

 1   some decorative features on it that would qualify

 2   for protection.

 3         The clothing, just like normal-size

 4   clothing for human beings, there are elements of

 5   clothing that can be protected by copyright as long

 6   as it's conceptually separable, fancy buttons or the

 7   fabric design or a whole variety of features of that

 8   clothing that qualify for copyright protection, and

 9   the same would be true for doll clothing.

10      Q.    Well, the next sentence, Mr. Crist in the

11   next sentence says, quote, "If the doll clothing is

12   regarded as a miniaturized model of real clothing,

13   there would appear to be no authorship in the simple

14   miniaturization to support a copyright claim,"

15   unquote.  Is that a view that you agree with?

16      A.    Yes, it is.

17      Q.    He then goes on to say, quote, "If the

18   doll clothing is regarded as intrinsically useful,

19   as are full-size clothing items for people, they

20   would not have any separable sculpturable authorship

21   which would support a claim, so they would not be

22   copyrightable for that reason because copyright does

23   not protect the designs of useful articles,"

24   unquote.  Is that a sentiment -- a view that you

25   agree with?

Exhibit 54
P. 1269

Page 44

1          MR. ZELLER:   The question's compound,

2     vague.

3     A.     Could you please break down the sentence

4     into its component parts so --

5     Q.     Well, if you could tell me which of the

6     parts that you agree with and which are the parts

7     you disagree with?

8     A.     Where are we starting again please?

9     Q.     "If the doll clothing is regarded as

10    intrinsically useful," that's the sentence.

11    A.     Yes.

12    Q.     "As are full-size clothing items for

13    people, they would not have any separable

14    sculpturable authorship which would support a

15    claim."  Let's stop there.

16    A.     Well, that begs the question that I raised

17    earlier in terms of features of clothing which do

18    qualify for copyright protection, so I would

19    disagree with the statement as a generalization, but

20    he is reflecting general copyright office policy.

21    Clothing -- clothing is not protected under the

22    copyright laws but there are features of it that

23    would be protected, and I suspect he -- this is

24    copyright office policy that he's reflecting in this

25    letter, but there would be specific examples where

Exhibit 54,
P. 1210

Page 45

1    you would find doll clothing copyrightable.

2            I have a conceptual problem in

3    understanding his contention that -- that clothing

4    for dolls is inherently useful.  Dolls to my

5    knowledge do not understand the notion of modesty so

6    the useful aspect of clothing and covering one's

7    modesty is not applicable to dolls.  It doesn't

8    serve the other useful purpose of keeping the doll

9    warm the way it does with human beings and clothing

10   for human beings, but they -- it must serve a useful

11   purpose in terms of making the doll look attractive?

12   Is that useful?  That's not the way we make the

13   analysis when it comes to human clothing, but it

14   makes -- as a general rule, I would recognize that

15   this probably is copyright office policy currently.

16      Q.    And the second part of the sentence is,

17   "They," referring to the doll clothing, "would not

18   be copyrightable for that reason because copyright

19   does not protect the designs of useful articles."

20   Does that in your view correctly state copyright

21   office policy as of the time that this letter was

22   written?

23      A.    As a general rule, again, the statement of

24   copyright understanding of the law, copyright does

25   not protect useful articles, and that applies to

Exhibit 5 4,
P. 1211

Page 46

1    clock designs, bottle designs, furniture designs.

2    If there can be some authorship, some features that

3    can be separated from the -- the design of the

4    useful article, that is eligible for copyright

5    protection.  The normal example would be decorative

6    carving on the back of a chair.  You can't get

7    protection for the shape of the chair, the shape of

8    the legs, but you can get protection for the shape

9    -- the applied designs that are applied to the legs

10   or to the back of the chair, and that would -- the

11   same would be true with clothing.

12        Q.    Now, Mr. Oman, going on to the next

13   sentence, Mr. Crist states, quote, "If you intend to

14   register the styling or general look of each doll

15   with its various outfits, these trademark or trade

16   dress elements are not protected under copyright law

17   but may be covered under the Lanham Act," unquote.

18   Do you see that?

19        A.    I see that.

20        Q.    And is that a correct statement in your

21   view of copyright office policy as of the time that

22   Mr. Crist made that statement?

23        A.    Trademark -- it would have to be

24   distinctive in some way that it would indicate the

25   origin of the goods, and just a regular ballroom

Exhibit 54 ,
P. 1212

Page 47

1    gown on a fashion doll, I don't see what the

2    trademark would be.  Generally trademark and trade

3    dress would apply in this context to something that

4    because of usage, because of advertising, because of

5    a variety of factors is recognized by the public as

6    coming from a particular source.  If that were the

7    case, then they certainly would be eligible for

8    trademark or trade dress protection and one would

9    seek that protection in the trademark office rather

10   than the copyright office.

11       Q.    Focusing on Mr. Crist's statement that the

12   styling or general look of each doll with its

13   various outfits is not protected under copyright

14   law, is that a statement that you think correctly

15   expresses copyright office policy as of the time

16   this letter was written?

17            MR. ZELLER:  This was asked and answered.

18       A.    The entire sentence says if you intend to

19   register the styling or general look of each doll

20   with its various outfits, these elements are not

21   protected under copyright law.  Again, as a

22   generalization, Mr. Crist is making an accurate

23   observation, but the same question recurs.  It

24   depends.

25            It -- many works of fine art have a look.

Exhibit 54
P. 1213

Page 64

1    look at it?

2        A.    No.   I was making a general statement

3    there.  I was not talking specifics.   I was just

4    only aware of the fact that the dates were being

5    changed in the CA forms, and at the time I wrote my

6    report, I would have been focused on those specific

7    dates but I didn't think they had any specific

8    relevance.   At least nothing that I was able to

9    fathom.

10       Q.    So at the time you were writing this

11   report, you would have had the dates in front of

12   you, the documents with the dates in front of you.

13       A.    Yes.

14       Q.    And you therefore could have at that time

15   included the specific dates in the report that you

16   wrote.

17       A.    I imagine I could have and I didn't.

18       Q.    And I'm asking you do you recall why you

19   did not.

20       A.    No, I didn't actually attach any -- not

21   having the big picture in the entire legal

22   proceeding, I did not attach any specific

23   significance to one date being changed from one to

24   another, but I suspect that there are reasons that

25   I'm not aware of.

Exhibit 54 ,
P. 1214

Page 65

1      Q.     Any other reason why as you sit here now

2   you have for not having included the specific dates

3   to which you had reference?

4      A.     No, I actually can't think of why I didn't

5   include a specific date or specific dates.

6              MR. PLEVAN:  Can we take a break?

7              THE VIDEOGRAPHER.  Off the record at

8   11:50.

9                   (Recessed at 11:50 a.m.)

10                  (Reconvened at 12:06 p.m.)

11             THE VIDEOGRAPHER:  This is the beginning

12  of Tape 2 in the deposition of Mr. Oman, on the

13  record at 12:06.

14             BY MR. PLEVAN:

15     Q.     Mr. Oman, what, if anything, did you do to

16  prepare for today's deposition?

17     A.     Can you repeat the question please?

18     Q.     Yes.  What, if anything, did you do to

19  prepare for today's deposition?

20     A.     I reviewed my expert report, I reviewed

21  the materials that I had, and I reviewed some

22  materials that I had not had previously, and I

23  discussed several points with Mr. Zeller.

24     Q.     Approximately how many hours did you spend

25  reviewing materials?

Page 69

1   will -- your question will come into focus, if I may

2   do that.

3       Q.     Yes, sir.

4       A.     "For these reasons, Samir Khare is

5   incorrect" -- it's spelled K-H-A-R-E -- "is

6   incorrect to say in his deposition on page 258 that

7   the two-dimensional drawings of the doll cannot have

8   been intended to register the dolls themselves."  So

9   your question is whether or not Mr. Khare is saying

10  that they could not have been used to create the

11  dolls or not have been used -- not have been

12  intended to register the dolls?  Is that the

13  question?  Is that the gist of your question?

14      Q.     The question is where on page 258 does

15  Mr. Khare talk about using the drawings -- the

16  intention of using the drawings to register the

17  dolls themselves.

18      A.     Well, the discussion on page 260 in line

19  4, 5, 6 and 7 suggests that we're talking about the

20  drawings in connection with the registration, and

21  the question is, "Mr. Khare, are you really saying

22  that the drawings were only used for the

23  registration of the packaging and not the dolls

24  themselves when in fact the implication" --

25      Q.     I'm sorry.  Could you tell me where you're

Exhibit 54
P. 1216

Page 70

1   reading from?

2       A.      Line 4, 5 and 6 and 7 on page 260.  The

3   questioner is asking, "Correct me if I'm wrong, but

4   it's your testimony that this drawing, which is here

5   on the last page of the Exhibit 507, that this was

6   used for the packaging used for packaging artwork in

7   connection with Bratz."

8       Q.      Yes.

9       A.      Rather than the dolls themselves, and the

10  deponent says, "My statement earlier was that the

11  drawing formed the loose basis for character art

12  which was developed subsequently, ended up on the

13  packaging and nothing else."  Then it goes on to

14  say, "I'll show you what was previously marked as

15  Exhibit 508.  This is a two-page document.  It is a

16  form CA," capital C capital A, "for the Sasha,"

17  S-A-S-H-A, "drawing registration."  That puts it in

18  the context in my view of using the dolls for

19  registration purposes, the drawings of the dolls.

20      Q.      So is it the language on page 260 that you

21  interpret as Mr. Khare saying that the drawings of

22  the dolls cannot have been intended to register the

23  dolls themselves?

24      A.      That was my interpretation, yes.

25      Q.      Now, on page 3 --

Exhibit 54 ,
P. 1217

Page 78

1    that we had about the consulting issue, just so that

2    there's no --

3              BY MR. PLEVAN:

4        Q.    Let me just -- let me withdraw the

5    question and go back to clarify that point

6    Mr. Zeller has raised.  I'd asked you earlier

7    whether or not you had ever served as a consultant,

8    expert consultant for a Quinn Emanuel client or for

9    Quinn Emanuel, and I think you were going to answer

10   on the record just so we have it clarified.

11             MR. ZELLER:  Right, and also just so it's

12   clear on the record too and we'll restate it, that

13   the parties agree that that's not a waiver of any

14   privilege in having him answer the question.

15             BY MR. PLEVAN:

16       Q.    Correct, and the answer is?

17       A.    I have not served as a consulting expert

18   witness for Quinn Emanuel or for anyone else, for

19   that matter.

20       Q.    So let's come back to this other question.

21   Do you have any personal familiarity with cases

22   where consumer surveys have been used on a copyright

23   issue?

24       A.    I can't think of any issues where a

25   consumer survey would have made a difference because

Exhibit 54 ,
P. 1218

```
 1    generally you don't take a vote on things like this.
 2    It's -- from the copyright office point of view,
 3    it's a matter of regulation, it's a matter of law
 4    and you do what has to be done, but this is the only
 5    case where I've seen a survey.
 6         Q.    In this particular case.
 7         A.    Yes.
 8              MR. PLEVAN:  No further questions.
 9              MR. ZELLER:  Usual stipulation?
10              MR. PLEVAN:  Well, I'm assuming that there
11    will be some -- I was asked to -- when I was
12    defending a deposition of your partner to expedite
13    the signature because of the timing of the trial
14    coming up et cetera.
15              MR. ZELLER:  Oh, okay.
16              MR. PLEVAN:  So I agreed with Mr. Corey
17    that we would do it in three weeks now.
18              MR. ZELLER:  Okay, that's fine.
19              MR. PLEVAN:  I would suggest that's plenty
20    enough time.
21              MR. ZELLER:  Yeah, I think it's -- you
22    don't have any -- in the next three weeks that would
23    make it difficult for you to review your transcript
24    and potentially make any corrections or sign it?
25              THE WITNESS:  I'll be in Mexico City next
```

Exhibit 54,
P. 1219

Page 82

```
 1   UNITED STATES OF AMERICA   )

 2                                ss:

 3   DISTRICT OF COLUMBIA        )

 4

 5          I, KAREN C. YOUNG, a Notary Public within

 6   and for the District of Columbia, do hereby certify

 7   that the witness whose deposition is hereinbefore

 8   set forth was duly sworn and that the within

 9   transcript is a true record of the testimony given

10   by such witness.

11          I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15          IN WITNESS WHEREOF, I have hereunto set my

16   hand this 2nd day of April, 2008.

17

18

19

20          _____

21              KAREN C. YOUNG

22

23

24   My Commission Expires:

25   July 31, 2009
```

# Exhibit 55

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) Consolidated with Case No. CV 04-09059 Case No. CV 05-02727 |
| Plaintiff, | |
| vs. | |
| MATTEL, INC., a Delaware corporation, | EXPERT REPORT OF RALPH OMAN |
| Defendant. | **Phase 1** Discovery Cut-Off:       January 28, 2008 Pre-Trial Conference:   May 5, 2008 Trial Date:                    May 27, 2008 |
| AND CONSOLIDATED ACTIONS | |

EXPERT REPORT RALPH OMAN

### EXPERT REPORT OF RALPH OMAN

I have been retained by attorneys for Mattel, Inc. ("Mattel"). This report is submitted pursuant to Fed. R. Civ. P. 26 (a)(2). I reserve the right to supplement or amend this report pursuant to Fed. R. Civ. P. 26 (e) if additional information affecting my opinion becomes available.

### QUALIFICATIONS

Currently I am Practitioner-in-Residence at the George Washington University Law School in Washington, D.C. I have 32 years experience in domestic and international copyright administration. My qualifications, which are set forth in my *curriculum vitae* attached as Exhibit A, include my education, training, and experience in the area of U.S. Copyright Office practice and procedure.

From 1985 through 1993, I served as the Register of Copyrights of the United States. As the Register of Copyrights, I was the chief government official responsible for administering the U.S. copyright system. Among other responsibilities, the Register of Copyrights supervises the work of the corps of examiners and rules on the copyrightability of works. I am familiar with the U.S. copyright law and U.S. Copyright Office rules, regulations, practices, and procedures, including those that relate to the registration of pictorial, graphic, and sculptural works. During my tenure, I supervised the revision of the *Compendium of Copyright Office Practices*, which is a manual of practices and procedures that is primarily intended for the use of the Copyright Office's staff. I supervised the 1990 revision of Circular 40, which is an official publication that summarizes the registration and deposit procedures for works of the visual arts, including drawings, prints, sculptural works, and dolls and other 3-dimensional works based on 2-dimensional designs. This publication is intended for use by the general public.

As the Register of Copyrights, I acted as principal advisor to the U.S. Congress on copyright legislation, and served as principal advisor to the U.S.

EXPERT REPORT RALPH OMAN

1

Department of State on international copyright matters, including drafting, negotiating and implementing international copyright treaties.  During my tenure as Register, I testified more than 40 times before Congress on proposed copyright legislation, and I helped move the United States into the Berne Convention for the Protection of Literary and Artistic Works.

Before becoming Register, I served in other government positions, including Chief Counsel of the U.S. Senate Subcommittee on Patents, Copyrights, and Trademarks, and Chief Counsel of the Senate Subcommittee on Criminal Law. I also served as Chief Minority Counsel on the Senate Subcommittee on Patents, Trademarks and Copyrights from 1975 to 1977.  In that capacity, I participated in the final drafting and negotiations that led to passage of the landmark U.S. Copyright Revision Act of 1976, the current statute.

I am a graduate of Hamilton College (A.B., 1962) and Georgetown University Law Center (J.D., 1973).  I am a member of the bar for the District of Columbia.  I am a Past President of the Giles S. Rich American Inn of Court (which is the intellectual property Inn for Washington, D.C.), a former Trustee of the Copyright Society of the United States of America, and the American Bar Association's Liaison to the Committee on Copyright at the World Intellectual Property Organization in Geneva.  In 2002, I received the Jefferson Medal from the New Jersey Intellectual Property Law Association, in recognition of my life-long commitment to the protection of intellectual property.

**EXPERT REPORT RALPH OMAN**

2

Exhibit 55 ,
P. 1223

1  At the George Washington University Law School I teach U.S.
2  copyright law, including Copyright Office registration procedures and the
3  registration of works of the Visual Arts. I have written numerous articles and
4  delivered many speeches addressing copyright and related rights, and I have testified
5  as an expert in the area of copyright law in a number of judicial proceedings. A list
6  of the articles and major policy speeches I have authored in the past ten years on
7  subjects relating to copyright law is attached as Exhibit B. My prior testimony is
8  listed in the attached Exhibit C. I am also the author of a book entitled <u>Copyright:</u>
9  <u>Engine of Development</u>, published by UNESCO. In 1993, I received the
10 International Book Award from the International Publishers Association.

### COMPENSATION

My work on this case is being billed at my standard rate of $350 per hour. My payment is not contingent upon the outcome of the case.

### MATERIALS REVIEWED

In the preparation of this report and for the expert testimony that I may be called upon to provide, I reviewed the Plaintiff's Complaint in case number CV05-02727 and the Defendant's Second Amended Answer and Counterclaims in case number 05-2727, along with the exhibits thereto. I reviewed the copyright registration certificates and the supplementary registrations for the works involved in this litigation, along with the deposit material, and I reviewed the affidavit of Isaac Larian in a 2002 Hong Kong case, <u>ABC International Traders, Inc. doing</u>

EXPERT REPORT RALPH OMAN

3

1    business as MGA Entertainment v. Toys & Trends (Hong Kong) Limited.  And I

2    also reviewed both volumes of the deposition of Bryan Armstrong in this case, the

3

4    deposition of Samir Kumar Khare, the six (6) Affidavits of Daphne

5    Gronich, Esquire, General Counsel of MGA, the three (3) affirmations of Lee Shiu

6
     Cheung, Managing Director of MGA Hong Kong, the Affirmation of Wai Lim Fan,
7

8    MGA's Hong Kong Solicitor, and a portion of MGA's Response to Mattel's

9    Amended Supplemental Interrogatory Regarding Defendant's Affirmative Defenses.

10   Finally, I have examined certain Bratz dolls.

11

12                          **EXPERT OPINION**

13       A.    <u>Summary</u>

14            Based on my experience as the Register of Copyrights, I would like to

15   explain the nature of the registration system in the U.S. Copyright Office and the

16
     significance of registration certificates.  In the context of that discussion, I will also
17

18   offer comments on the significance of supplementary registrations that seek to

19   correct or amplify the facts that were stated in the original applications.  And, last, I

20   will comment on the registration of a two-dimensional artwork and its relationship

21

22   to a three-dimensional work that derives from it, and the nature of the copyright

23   deposit that is required by Copyright Office regulations when filing the original

24
     registration application.
25

26            At the outset, it is important to keep in mind that the copyright system

27   is very different than the patent system.  For patents, the U.S. Patent and Trademark

28

                                                        EXPERT REPORT RALPH OMAN

                                    4

Exhibit 55
P. 1225

Office actually grants patents. Either the Office issues the patent, or it doesn't. If it doesn't grant the patent, you don't have one. For copyrights, the Copyright Office registers a "claim" to copyright. It doesn't grant the copyright. Only a court can deem a copyright enforceable.

**B.** **The Practices and Procedures of the U.S. Copyright Office Regarding the Registration of Pictorial, Graphic, and Sculptural Works**

The Copyright Act defines "pictorial, graphic and sculptural works" as "two-dimensional and three-dimensional works of fine, graphic, and applied art...." 17 U.S.C. § 101. In order to register a two- or three-dimensional work, the owner of that work must comply with the practices and procedures described in the Copyright Act, the Code of Federal Regulations, and Circulars 40 and 40A (*Copyright Registration for Works of the Visual Arts, Deposit Requirements in Visual Arts Material*). I will explain these practices and procedures from my vantage point as the former U.S. Register of Copyrights.

**1.** **Application Requirements.**

In order to register a claim to copyright in a work with the Copyright Office, the applicant must complete the relevant application form, which varies depending upon the nature of the work. In the case of a drawing or doll, the applicant typically uses uses "Form VA," which stands for "visual arts."

EXPERT REPORT RALPH OMAN

5

**(a)**   <u>Title of the Work.</u>

In order to complete Form VA, the applicant should identify the title of the work on line 1 of the application.

**(b)**   <u>Nature of the Work.</u>

The applicant should also identify the nature of the work on line 1 of the application. The nature of work space was added to form VA, because this form "cover[s] a number of different categories of works, and it was believed the additional information would clarify the general character or the type or category of the work being registered." Copyright Office, *Registration of Claims to Copyright,* 65 Fed. Reg. 41,508 (Jul 5, 2000). Although the "nature of authorship" statement on line 2 is the "primary source" for identifying the nature of the applicant's claim (as modified by the "derivative works" statements on lines 6(a) and 6(b) (if any)), the nature of work statement usually provides "a supplementary description augmenting the statement of authorship." *See id.* For instance, if the applicant submitted a photograph of an empty room, checked the "2 Dimensional Artwork" box on line 2, and wrote "wallpaper" in the nature of work space, the examiner would assume that the applicant intended to register the wallpaper design that is shown in the photograph, rather than the photograph itself. Together, these statements put the world on notice concerning the nature of the work that the applicant has created, and the nature of the authorship that appears in that work. However, they do not define the specific metes and bounds of the copyright in that

EXPERT REPORT RALPH OMAN

6

work.  The metes and bounds of the copyright are defined by the deposited work itself, and by judicial interpretation.

        **(c)**    <u>**Name of the Author.**</u>

        The applicant must provide the name of the person who created the work on line 2.

        **(d)**    <u>**Nature of Authorship.**</u>

        The applicant must describe the Nature of Authorship on line 2.  The applicant does not have to describe the nature of his or her authorship in any detail. The applicant is only required to check the boxes that are printed on line 2 that correspond to the type of authorship that the author has created (e.g., "2 Dimensional Artwork" for a fabric design, "3 Dimensional Sculpture" for a garden gnome, "Jewelry Design" for a bracelet, etc.).

        **(e)**    <u>**Date of Publication.**</u>

        Next, the applicant must identify the year in which the work was created (line 3(a)), and the specific date and nation where the work was first published (line 3(b)).  If the work has never been published, the applicant should leave line 3(b) blank.  "Publication" has a very specific meaning.  It is "...the distribution of copies...of a work to the public by sale or other transfer of ownership....  The offering to distribute copies...to a group of persons for purposes of further distribution...constitutes publication." 17 U.S.C. Section 101.

EXPERT REPORT RALPH OMAN

Exhibit _55_.
P. _1228_

   (f)    **Copyright Ownership.**

The applicant must provide the name and address of the copyright claimant on line 4. The copyright claimant is the person who owns the copyright in the work that the applicant has sought to register. In most cases, the author and the copyright claimant will be the same person. However, if they are different, the applicant must explain how the copyright claimant obtained his or her ownership of the copyright on line 4. The Copyright Office will normally accept a general "transfer of ownership" statement, such as "by assignment," "by will," "by contract," and the like.

   (g)    **Previous Registrations.**

If the work or a prior version of that work were previously registered with the Copyright Office, the applicant should disclose that information on line 5 of the application form. If so, the applicant must provide the previous registration number, and must explain why he or she seeks another registration.

   (h)    **Derivative Works.**

If the work is based upon or contains a substantial amount of, for example, previously registered or public domain material, the applicant should identify that preexisting work or material on line 6(a) of the application. This is known as a "derivative work statement." In addition, the applicant should identify the new and original material that the author has added to that preexisting material by describing that new material on line 6(b) of the application. This is known as the

EXPERT REPORT RALPH OMAN

8

Exhibit *55*,
P. |229

1   "material added" statement.  The material added statement "generally delineates the

2   extent of the claim" in the new material that the author has created above and

3

4   beyond the preexisting material that the applicant has identified on line 6(a).

5   *Compendium II* § 325.02.

6           The applicant does not have to describe each aspect of the preexisting

7

8   material that appears in the work, or each aspect of the new material that he or she

9   has created.  Instead, the applicant may provide a brief, general statement sufficient

10  to identify the preexisting material, such as "previous version," and, if necessary, a

11

12  brief, general statement sufficient to identify the new material that the author has

13  added to the work, such as "revised version," "artistic revisions," "additional

14

15  material," or the like.  In this respect, as mentioned above, the examination process

16  at the U.S. Copyright Office is more informal than the examinations that are

17  conducted at the U.S. Patent and Trademark Office.  When an applicant files a

18

19  patent application, the applicant must submit a list of "claims" describing each

20  aspect of the invention in great detail.  If, after review, the examiner determines that

21  the applicant's invention is truly new and non-obvious, the Patent and Trademark

22

23  Office will issue a patent for the invention.  By contrast, Copyright Office

24  examiners are not expected to make, and do not make, these types of evaluations.

25  The examiner will accept a general statement concerning the preexisting material

26

27  that may appear in the work, and a general statement concerning the new material

28  that has been added to that work.  As a general rule, the examiner will not compare

EXPERT REPORT RALPH OMAN

9

Exhibit 55 ,
P. 1230

1  the new work that has been submitted with works that have been registered in the

2  past to determine if these statements are correct, or to determine if the new material

3

4  qualifies quantitatively and qualitatively for copyright registration.[1]

5          Let me expand a bit on this point, because it is very important in the

6  context of this case. This difference between the patent examination system and the

7  copyright examination system has an important consequence. For a patent, the

8

9  inventor must fully disclose all of the technical particulars of the invention so that

10  others can understand the invention completely, reproduce it, refine it, build on it,

11  invent around it. That full disclosure is a vital part of the patent bargain. In

12

13  exchange of that disclosure the inventor gets 20 years of exclusivity to exploit the

14  invention.

15

16          For a copyright, on the other hand, the registration serves a vastly

17  different purpose. The creator is frequently permitted to deposit a photograph of a

18  3-dimensional work or a drawing of the work, because the purpose of the deposit is

19

20  not to enable the reconstruction of the work at a later date, but for three other

21  purposes: (1) to enrich the collections of the Library of Congress, (2) to let the

22

23          [1]  When I served as Register of Copyrights, the Turner Broadcasting Company

24  sought to register colorized versions of black and white films that were either in the

25  public domain or owned by TBS. I insisted that TBS submit a pristine copy of the

26  black and white version of each film so that the examiner could determine if the

     colorization process added any new material to those preexisting works. I note,

27  however, that this procedure was the exception to the general rule. In most cases,

28  the examiner makes this determination based solely on the statements that appear in

     lines 6(a) and (b).

EXPERT REPORT RALPH OMAN

Exhibit  55  ,
P.  1231

examiner confirm that the work contains at least a minimal level of creativity to satisfy the (admittedly low) standard for registration, and (3) for identification purposes in case of litigation.  For many works, including toys and dolls, the Library has no interest, so a deposit of the actual work itself is not required.  For example, the Library normally having no interest in unpublished databases, Copyright Office regulations permit the creator of an unpublished database to mask out large portions of the work if it contains trade secrets or other sensitive information.  Similarly, a computer programmer can block out large portions of the program's source code to protect proprietary information or valuable code.  In some cases, the programmer can refuse to supply any source code at all, and supply instead a sample of the object code, which is indecipherable.  Moreover, a remitter can request special relief from the deposit requirement entirely, based on undue burden, cost, or hardship.  None of these exemptions to full disclosure would be permitted in a patent application.

        For these reasons, Samir Khare is incorrect to say in his deposition on page 258 that the two-dimensional drawings of the dolls cannot have been intended to register the dolls themselves.  Confusing patents and copyright, he says that it is "...impossible [to] go from a 2-D flat drawing to a 3-D doll.  You simply can't.... [The 2-D drawing] doesn't give you any dimensions at all....  You simply don't capture enough detail."  Without dimensions, technical specification, and manufacturing techniques, he suggests, one cannot reconstruct the dolls.  His analysis misconstrues the basic rationale of the copyright registration system and the

EXPERT REPORT RALPH OMAN

11

1   purpose of the deposit requirement. The drawings of the dolls fulfill the deposit

2   requirements of the Copyright Office. They show the sufficiency of authorship for

3

4   registration purposes, and they permit the identification of the works for which

5   protection is claimed. The drawings therefore are the proper deposit for the dolls.

6
               **(i)**     **Certification.**
7

8           Finally, the applicant must provide the name of a person who the

9   Copyright Office should contact if the examiner has any questions concerning the

10   application (line 7), and the applicant must sign a certification on line 8 confirming
11

12   that the statements in the application are correct to the best of the applicant's

13   knowledge. Any person who knowingly makes a false representation of a material

14   fact in the application, or in a written statement filed in connection with that
15

16   application, may be fined up to $2,500. (*See* 17 U.S.C. § 506(e).) Normally, in a

17   case involving a willful false representation, the Copyright Office would also cancel

18   the registration.
19

20           Generally speaking, the Copyright Office insists on accuracy in

21   copyright applications. If the Copyright Office registers the claim, or refuses to
22

23   register the claim, the court can draw conclusions from that office action. But if the

24   applicant deliberately manipulates the process and thereby short-circuits an

25   informed assessment by the Copyright Office, then that purpose is thwarted. For
26

27   that reason, the consequences of misrepresentation could be serious. If an applicant

28   makes a material misrepresentation or a material omission in the application forms

EXPERT REPORT RALPH OMAN

12

1   or deposit materials, and if that misrepresentation or omission would have otherwise

2   prompted the examiner to reject the application, the registration could be invalidated

3

4   for committing fraud on the Copyright Office.

5       **2.   Deposit Requirements**

6           To register a pictorial, graphic, or sculptural work in the Copyright

7   Office, the applicant must provide the Office with a representation of that work.

8

9   Normally, as discussed above, the applicant will submit a photograph or a drawing

10  that is sufficient to identify the work that the applicant seeks to register. In many

11  cases, the Copyright Office prefers not to accept physical samples of these works

12

13  because of spatial constraints and because the Library of Congress has no interest in

14  adding dolls and other ephemera to the collection of the national library.

15      **3.   Filing Fee**

16          In order to register a pictorial, graphic, or sculptural work, the applicant

17  must pay the usual non-refundable fee of $45.00 for each application, which is

18

19  intended to recapture a portion of the cost of processing all of the paperwork.

20      **4.   The Examination Process**

21          When the Copyright Office receives an application, the Receiving and

22  Processing Division stamps the application form to indicate the date that the

23

24  application, the fee, and deposit were filed with the Copyright Office and sends the

25  $45.00 filing fee to the U.S. Treasury. If the Copyright Office subsequently issues a

26

27

28

EXPERT REPORT RALPH OMAN

13

1    registration certificate for the application, the filing date becomes the effective date

2    of the registration.

3

4         Next, the Copyright Office Receiving and Processing Division sends

5    the application and deposit to the Examining Division where the file is assigned to

6    an examiner.  The examiner will review the application and deposit material to

7

8    determine whether or not they are complete, and whether or not the work constitutes

9    copyrightable subject matter.  Over the past 20 years, this process has become

10   increasingly streamlined and automated – a modernization that began during my

11

12   tenure as Register-- due to the large number of applications that the Copyright

13   Office receives each year, and the great pressure to reduce costs and downsize the

14   staff of the Office.  In fact, in most cases the examiner will review each routine

15   application for roughly 1 to 5 minutes, and then will move on to the next application

16

17   in the stack.

18

19        As discussed above, the examination process at the U.S. Copyright

20   Office is very different than the examinations that are conducted at the U.S. Patent

21   and Trademark Office.  Some would say that it is less rigorous, but that would

22

23   confuse the purpose of the two examinations.  For instance, the Copyright Office

24   examiner will not conduct an independent investigation to determine if the work for

25   which registration is sought were created by the person who has been identified on

26   line 2 of the application.  Likewise, the examiner will not second-guess the date of

27

28   publication specified on line 3, or compare the applicant's work with an earlier

EXPERT REPORT RALPH OMAN

14

Exhibit 55
P. 1235

1  similar work to determine if the new work contains enough new material to merit a

2  new copyright registration – even if the applicant has provided a "derivative work"

3  statement on lines 6(a) and 6(b).  Instead, the examiner will normally rely solely on

4  the information that the applicant provided in the application form, along with the

5  certification on line 8 which states that this information is correct.  Of course, if an

6  author submits a work that is known to be in the public domain, such as "The Star-

7  Spangled Banner" or "The Lord's Prayer," the examiner would question the

8  application.

9          In examining an application, the examiner will determine if any portion

10  of the work can reasonably be construed to contain copyrightable authorship.  If the

11  nature of work statement or the material added statement mentions material that

12  both falls within, and does not fall within, the subject matter of copyright – such as

13  "artwork and layout" for a book – the examiner normally will annotate the

14  application to indicate that the presumptions that attach to the registration only cover

15  the author's material that is copyrightable – such as "artwork" (with "layout" not

16  eligible for protection).  If the nature of work or the material added statement

17  contains claims that are unacceptable as a matter of law – e.g., "ideas," "process," or

18  "concepts" – the examiner will contact the person identified on line 7 by telephone,

19  email, or letter to make certain that the claim to copyright actually comprises

20  copyrightable subject matter.

**EXPERT REPORT RALPH OMAN**

15

Exhibit 55
P. 1236

If the examiner finds that the work likely satisfies at least one of the statutory registration requirements, he or she will approve the work for registration, create an online record, and send the package to the unit that generates the registration certificate. If the work has been published, the Copyright Office will assign a registration number beginning with the letters "VA," which, as already mentioned, stand for "visual arts." If the work is unpublished, the Office will assign a registration number beginning with the letters "VAu." If the examiner determines that the work fails to satisfy the statutory registration requirements, he or she will issue a formal refusal, and will explain the basis for the refusal in writing. Rejections are infrequent.

5.      **Supplementary Registrations**

If a registration certificate contains an error or omission, the registrant can correct that mistake with a "supplementary registration." A supplementary registration does not replace the original – or "basic" – registration certificate, but it can be used to correct or to amplify some of the information that appears in that certificate. For example, if the applicant failed to identify his or her work as a work made for hire, he or she can ask the Copyright Office to issue a supplementary registration to correct that mistake. Likewise, if the basic registration mentions only one author and one copyright claimant, the Copyright Office will accept an application for a supplementary registration from other authors who would like the

EXPERT REPORT RALPH OMAN

16

record to reflect their claim to authorship and/or ownership in the work that was registered with the Copyright Office.

In order to obtain a supplementary registration, the registrant must complete Form CA, which stands for "Correction/Amplification," and must pay a filing fee of $115.00. If the Copyright Office decides to issue a supplementary registration, the basic registration still remains in effect. As the Copyright Office's information circular explains, "The basic registration will not be expunged or cancelled, and the two registrations will both stand in the Copyright Office records." *Circular 8, Supplementary Copyright Registrations* at p. 3. The supplementary registration simply directs the public's attention to a possible error or omission in the basic registration, and places what purports to be the correct information or the missing information in the official record.

C. **The Copyright Registrations**

1. **The Importance of the Registration Certificates**

It is well established that the Copyright Office will register claims to copyright in three-dimensional embodiments of two-dimensional drawings of a doll. As long as the underlying drawings of the dolls qualify for copyright protection, those registrations of the drawings protect not only the drawings but the dolls themselves. The protectable elements of the drawings, when incorporated into the form and appearance of the three-dimensional dolls, must of course be authorized by

1  the copyright owner of the drawings, or they will be infringing.  As Professor

2  Nimmer states in his treatise: "[C]ourts have correctly held three-dimensional dolls

3
4  copied from the copyrighted cartoon illustrations of 'Spark Plug, The Horse' and

5  'Betty Boop' to constitute infringement."  Nimmer on Copyright, 2.18 [H][1]

6  (footnotes omitted).  By way of illustration, the Disney company has the right to

7
8  create three-dimensional Mickey Mouse dolls based on the two-dimensional

9  drawings of the famous cartoon character.

10        Isaac Larian, when he sought to enforce MGA's claimed rights against

11
12  an accused infringer in the courts of Hong Kong, made the same point in his

13  affidavit to the court.  He correctly noted, after consultation with his lawyers, that

14
15  the creation of the original drawings of the dolls serve as the legal basis for claiming

16  copyright in the dolls themselves, and that he could sue the Hong Kong

17  manufacturer of the alleged knock-offs because they infringed the original drawings.

18
19  His actual words were as follow:  "[T]he 3 dimensional Funky Tweenz dolls have

20  infringed the 2 dimensional drawings which are artistic works in which copyright

21  subsists."  Larian Affidavit at para. 12.

22
23        By way of amplification, I also note that, in her affidavits for the Hong

24  Kong litigation in 2002, Ms. Gronich repeatedly identifies the 15 drawings as the

25  "artistic works" upon which the 3 dimensional dolls are modeled.  Gronich Affidavit

26
27  at para. 4 and para. 5.  Lee Shiu Cheung also makes clear that [t]he designs of the

28  Bratz dolls are all original drawings created by Mr. Bryant using his own

EXPERT REPORT RALPH OMAN

18

Exhibit 55
P. 1239

1    independent labour, skill and judgement [sic]," and the "17 initial concept drawings

2    of the first 4 Bratz dolls [were] designed by Mr. Bryant....." Lee Affirmation at

3    para. 8-9.

4

5         I also note that MGA's registration of Carter Bryant's drawings is itself

6    significant. In MGA's Response to Mattel's Supplemental Interrogatory, MGA

7    suggests that there were a number of prior works underlying Mr. Bryant's Bratz

8    drawings, and that the drawings are therefore largely non-original. However, MGA

9    itself registered those drawings and did not list any pre-existing works on which the

10   Bryant drawings were purportedly based. The Copyright office expects applicants

11   to identify previously registered or public domain materials on which the works are

12   based when they seek registration of those works. That MGA did not do so suggests

13   that it thought that Mr. Bryant's Bratz drawings were wholly original when it

14   registered them. Indeed, it is common sense that because the drawings were

15

16   registered as "original" works of art, MGA's registrations of the drawings reflect

17

18   that MGA believes that the drawings are original.

19

20

21        2.    **The Significance of the Supplementary Registrations**

22        The Copyright Office prides itself on the completeness and accuracy of

23   its public records. As the repository of vital copyright information, it helps authors

24   protect their rights, and it promotes trade and commerce in copyrighted materials.

25   For that reason, the Office encourages authors to correct that public record if they

26

27   discover errors or inaccuracies. That being said, the Copyright Office also

28

EXPERT REPORT RALPH OMAN

19

Exhibit 55 ,
P. 1240

1   discourages corrections of the record if the motivations are suspect.  It is one thing

2   to correct a mistake, but another thing to attempt to manipulate the record to gain

.3

4   some legal or competitive advantage.  In this case, plaintiff has submitted a series of

5   supplementary applications that purport to correct various dates of creation and

6   dates of publication, and the status of various works as a derivative works, among

7

8   other things.  I note that in my experience sophisticated companies such as MGA

9   generally do not make mistakes in their copyright applications.  When asked about

10  the discrepancy between an original publication date on an MGA copyright

11  registration form and the "corrected" date on the CA Form, Mr. Khare confesses

12

13  that in "[a]ll honesty, I don't know.  Because I can tell you, at the time that this

14  [original] Form VA was filled out, [MGA] had better information relating to when

15

16  this particular drawing may or may not have been—may have been published."

17  Khare Deposition at 253.  The forms are typically filled out by well-trained staff

18  professionals who appreciate the importance of an accurate filing.  It is a felony to

19

20  deliberately falsify a government document.  When the Copyright Office sees a

21  flurry of CAs in contemplation of litigation, or after litigation has already

22  commenced, the Office will normally view them as self-serving and irrelevant.  But

23

24  the Copyright Office doesn't challenge them because it knows that at that point the

25  matter is in the hands of the court.

26

27

28

EXPERT REPORT RALPH OMAN

20

Exhibit 55.
P. 1241

**D.**   <u>**Anomalies**</u>

   Mr. Armstrong, at pages 268-69 in Volume 1 of his deposition, claims that in registering the Bryant drawings MGA was simply intending to register the packaging for the Bratz dolls. I have long experience with the registration process, and I have never encountered a similar contention—where a sophisticated company first registers a display box with graphics rather than registering the underlying work itself. (The fact that MGA, or its agent, maintains a deposit account at the Copyright Office suggests to me a frequent use of the registration system, and a sophisticated understanding of the registration process.) Nor have I encountered a situation where a sophisticated company contends that it registered the original drawings of doll designs in the Copyright Office for the purpose of registering, not the unique physical characteristics of the dolls, but their packaging materials. And, finally, I have also never encountered a situation where a sophisticated company claims to be registering packaging materials and, as the deposit, submits drawings of the item that is supposed to go in the packaging. Occasionally, the Office will accept a substitute deposit in place of the actual item being registered, as long as the substitute contains a clear and complete representation of all of the graphic authorship claimed in the application. But the Office will do so only when the item for which registration is sought is no longer available. The Office has some discretion in this regard under its Special Relief authority 37 CFR 202.20(d). That being said, during my tenure as Register, the Office would not accept a drawing or

EXPERT REPORT RALPH OMAN

Exhibit 55,
P. 1242

photograph of, for example, a doll, for a claim to copyright in the packaging, with its various original graphics and artwork. Since the examiner would know that the packaging itself was readily available, he or she would insist that the remitter submit the actual packaging, or photographs of the packaging, as the only proper deposit.

Also anomalous is the series of supplementary registrations recently made by MGA. All of the corrections/amplifications seem to be an attempt to rewrite the timeline of the creation of the dolls. For the Hong Kong litigation MGA sought to establish that all of the creative acts that culminated with the sale of the Bratz dolls happened very early in the chronology. In the current litigation, we see an effort to create the impression that the various creative steps took place much later, that the whole process should ratchet forward to make it seem that events were much more recent than they actually were.


DATED:  February 11, 2008

Ralph Oman

EXPERT REPORT RALPH OMAN

22

Exhibit 55
P. 1243

# EXHIBIT A

# RALPH OMAN

**Current Position**            Practitioner-in-Residence, The George Washington University Law School, 20th and H Streets NW, Washington, D.C. 20006

**Professional Experience**     Counsel, Dechert LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401. 1995-2008

Of Counsel, Mudge Rose Guthrie Alexander and Ferdon, 1994-1995

Register of Copyrights of the United States, 1985-1993

> The Register of Copyrights is the chief government official charged with administering the national copyright law. The Register supervises the work of 550 Copyright Office employees, rules on the copyrightability of works, acts as a principal advisor to Congress on copyright legislation and, during my tenure, to the Department of State on international copyright matters, drafting, negotiating, and implementing international copyright agreements.

Pravel Professorial Lecturer in Intellectual Property and Patent Law, The George Washington University Law School, 1993 - present.

Chief Counsel, Subcommittee on Patents, Copyrights, and Trademarks, Committee on the Judiciary, U.S. Senate, 1983-1985

Staff Director, then Chief Counsel, Subcommittee on Criminal Law, Committee on the Judiciary, U.S. Senate, 1981-1983

Legislative Counsel to Senator Charles McC. Mathias (R-Maryland), 1977-1981

Counsel to Senator Hugh Scott (R-Pennsylvania), Subcommittee on Patents, Trademarks, and Copyrights, Committee on the Judiciary, U.S. Senate, 1975-1977

Attorney, Antitrust Division, U.S. Department of Justice, 1974-1975

Law Clerk, Judge C. Stanley Blair, U.S. District Court for the District of Maryland, 1973-1974

U.S. Naval Flight Officer, 1965-1970, (Retired from the U.S. Naval Reserve with the rank of Captain, 1992)

Foreign Service Officer, U.S. Department of State, Dhahran and Jidda, Saudi Arabia, 1962-1964

EXHIBIT _____ A

PAGE _____ 24

Exhibit 55
P. 1245

| | |
|---|---|
| **Education** | Georgetown University Law Center, J.D., 1973, Executive Editor, *Law and Policy in International Business* |
| | Hamilton College, A.B., 1962 |
| | Sorbonne, Paris, France, 1960-1961 |
| **Honors and Affiliations** | 1990 Exemplary Public Service Award of the New York State Bar Association Arts, Sports and Entertainment Law Section |
| | 1993 International Book Award from the International Publishers Association |
| | 1993 Lifetime Achievement Medal, Foundation for a Creative America |
| | Federal Bar Association, President, Capitol Hill Chapter 1993-1994 |
| | 2002, The Jefferson Medal, awarded by the New Jersey Intellectual Property Law Association, in recognition of long professional commitment to strong intellectual property protection |
| | Member, International Association for the Advancement of Teaching and Researching in Intellectual Property; ABA's Section on Intellectual Property Law, former chair of six of the eight copyright committees |
| | Former Trustee, Copyright Society of the United States of America |
| | Master of the Court, and Past President, Giles S. Rich Inn of Court, Washington, D.C. |
| | Admitted to practice in District of Columbia and before the U.S. Supreme Court and the Fourth Circuit Court of Appeals |
| | Who's Who in America |
| | Who's Who in American Law |
| **Personal** | Married, three children |
| **Miscellaneous** | Fluent French, conversational Arabic, private pilot's license, qualified sailing instructor |

EXHIBIT _____ A _____

PAGE _____ 25 _____

Exhibit 55

P. 1246

# EXHIBIT B

Exhibit 55 ,
P. 1247

**Exhibit B**

ARTICLES AND MAJOR POLICY SPEECHES BY RALPH OMAN (1997 - PRESENT)

(Authored or Co-Authored)

1.  "Copyright on the Global Internet: Trust Everybody - But Cut the Cards"  Delivered at Copyright on the Internet Seminar, Washington, D.C., November 8, 1996.

2.  "Copyright on the Global Internet: Two New Treaties" IP WorldWide, 1997.

3.  "Copyright on the Internet"  Delivered at National CLE Conference, Vail, Colorado, January 16, 1997.

4.  "Copyright and Software: A Tour d'Horizon"  Delivered at Association of Corporate Patent Counsel, Palm Beach, Florida, January 27, 1997.

5.  "Copyright Protection for Software and Databases"  Delivered at SmithKline Beechem, IP Workshop, Upper Marion, PA., January 30, 1997.

6.  "New Global Treaties Protect Copyright Online" article for ABA IPL Newsletter, Winter 1997.

7.  "The World Intellectual Property Organization: A United Nations Success Story"  Gerald Mossinghoff and Ralph Oman, *World Affairs,* Fall 1997.

8.  "The Shape of Things to Come"  Remarks prepared for the International Council of the National Academy of Television Arts and Sciences, New York, March 6, 1997.

9.  "Performing Rights in the Digital Age: The International Perspective" Fordham Law School's International Intellectual Property Law and Policy, Spring 1997

10. "Copyright Protection for Software"  Delivered at Franklin Pierce Law Center, Concord, NH, April 12,1997.

11. "Copyright Liability on the Internet"  Delivered at American University, May 2, 1997.

12. "From Scourge to Savior: How Digital Technology Will Save Authorship in the Age of the Internet"  Delivered at W.I.P.O. International Forum, Seville, Spain, May 14, 1997.

13. "Copyright in the Middle East: A Survey"  W.I.P.O. Arab Regional Symposium on the Agreement on Trade-Related Aspects of IP Rights, Amman, Jordan, June 17-19, 1997.

14. "Folkloric Treasures: The Next Copyright Frontier?"  Published in the ABA - IPL Section Newsletter, July 9, 1997.

EXHIBIT _____ B _____

PAGE _____ 26 _____

Exhibit 55,
P. 1248

15.     "Current Developments in Copyright: International Trends"  Delivered at George Washington Law School, Summer Intellectual Training Program, July 10, 1997.

16.     "Marketing Software, Databases, and Entertainment Media on the Internet: New Rules for the Digital Age"  Delivered at All Ohio Annual Institute on Intellectual Property, September 11-12, 1997.

17.     "The Need for Shared Liability on the Internet"  Published in the *Federal Bar Association Journal*, Winter 1997.

18.     "Copyright Basics"  Delivered at ASAE, Capitol Hilton, Washington, D.C., October 6, 1997.

19.     "Making the Internet Safe for the Songwriter: Copyright in the Digital Age"  Delivered at the Copyright Society of the South, Nashville, October 13, 1997

20.     "The Current State of International CopyrightLaw"  Delivered at International Law Institute, Washington, D.C., October 16, 1997.

21.     "The Current State of International Copyright Law"  Delivered at the World Bank, Washington, D.C., March 3,1997. (also presented at the Bulgarian Intellectual Property Rights Group, The International Law Institute, Nov. 12, 1997)

22.     "VideoWars - Copyright in the Digital Age"  Seattle, Washington, January 1998.

23.     "Strong Intellectual Property Protection: The Key to Sri Lanka's Economic Growth"  Delivered in Colombo, Sri Lanka, January 1998.

24.     "Copyright in the Digital Age"  Delivered at Video Wars Seminar in Seattle, Washington, February 12-13, 1998.

25.     "Making the Internet Safe for Authors and Composers: Copyright in the Digital Age"  John Marshall Law School, Chicago, February 27, 1998.

26.     "The Way to Net Infringers" *Legal Times*, March 23, 1998.

27.     "Congress Civilizes the Internet"  University of Akron School of Law, March 16, 1998.

28.     "The Internet and the Law of Intellectual Property,"  Washington, D.C. Bar, April 4, 1998.

29.     "Report on Copyright In China for the Standing Committee on Copyright Reform," Beijing/Shanghai/Tianjin, July 1-11, 1998.

30.     "The Growing International Consensus on Computer Software Protection"  ABA Annual Meeting, Toronto, August 1, 1998.

31.     "The Digital Millennium Copyright Act of 1998: Congress Civilizes the Internet"  Washington, D.C. Bar, August 31, 1998.

EXHIBIT ____ B ____

PAGE ____ 27 ____

2

Exhibit *55*,
P. 1249

32.   "Folkloric Treasures: The Next Copyright Frontier" ATRIP, Mexico City, August 24, 1998.

33.   "Congress Civilizes the Internet" NJIPLA, New Brunswick, New Jersey, October, 8, 1998.

34.   "Copyright in Cyberspace" Georgetown Law School, Washington, D.C., October 23, 1998.

35.   "Digital TV - Copyright in the Age of Digital Television" The Fourth Digital Television Forum, Los Angeles, December 1, 1998.

36.   "Creative Compromise" *Corporate Counsel Magazine,* December 1998.

37.   "The Digital Millennium Copyright Act: Congress Civilizes the Internet" D.C. Bar Association, Washington, D.C., December 11, 1998.

38.   "Congress Civilizes the Internet" *IP WorldWide,* January 1999.

39.   "The Cultural and Economic Importance of Copyright and Related Rights" U.S. Copyright Office, Library of Congress, March 18, 1999.

40.   "The Bazaar New World of E-commerce" *Corporate Counsel Magazine,* July 1999.

41.   "The Contours of International Copyright" Seminar sponsored by World Trade Organization and Organization of American States, Washington D.C., July 2, 1999.

42.   "The Contours of International Copyright" American Bar Association Young Lawyers Division, Atlanta, Georgia, August 9, 1999.

43.   "Database Protection in the Digital Age" National Institute of Health, Technology Transfer Office, Bethesda, Maryland, September 23, 1999.

44.   "The New Organum: Copyright in the Digital Age" International Judges Conference, Washington D.C., October 17, 1999, Published in the May 2000 issue of the Federal Circuit Bar Journal.

45.   "Copyright in the Digital Age" The Greater Richmond Intellectual Property Law Association, November 11, 1999

46.   "Collective Management in the Digital Age: A Report from the Republic of Technology" Spanish Society of Authors and Editors, Madrid, Spain, November 4, 1999.

47.   "Present at the Creation: Copyright in the Digital Age" Literary and Artistic Association for the Defense of the Rights of Authors, Alicante, Spain, November 8, 1999.

48.   "Copyright in the 20th Century: A Charter for a Living People" *Corporate Counsel Magazine,* December 1999.

49.   "Folkloric Treasures: The Next Copyright Frontier?" John Marshall Law School, January 4, 2000.

EXHIBIT ___B___

PAGE _____28_____

3

Exhibit _55_,
P. _1250_

50.   "Music in the Digital Age: An Overview" New York County Lawyers' Association, March 10, 2000

51.   "Database Protection in the Digital Age", Intellectual Property Seminar, Dechert Price & Rhoads, May 8, 2000.

52.   "Music in the Digital Age: An Overview", American Intellectual Property Law Association, h, PA, May 17, 2000.

53.   "Congress Acts To Make The World Safe For E-Commerce"  District of Columbia Bar Association, Washington, D.C., Continuing Legal Education  "Taming the Wild Wild Web," August 31, 2000

54.   "Present at the Creation: Copyright in the Digital Age"  University of Guadalajara, Organization of American States, December 5, 2000

55.   "The Digital Millenium Copyright Act:  An Assessment"  District of Columbia Bar Association, Washington, D.C., December 8, 2000

56.   "Folkloric Treasures:  The Next Copyright Frontier?", published in The John Marshall Law School, Winter 2000 edition, Vol. II, No. 1.

57.   "Speech to Experts from Lebanon ", Washington, D.C., October 2001

58.   "'Copyright and the 107[th] Congress", delivered at the New Jersey Intellectual Property Law Association, February 8, 2001, Metropark, N.J.

59.   "The Role of Service and Access Providers in Digital Transmissions and their Responsibility Regarding Copyright," UNESCO Forum, April 12, 2001.

60.   "Copyright and the 107[th] Congress," District of Columbia Bar Association, Washington, D.C.., April 30, 2001.

61.   "Liability and Copyright in the Age of the Internet," Stockholm, Sweden, July 6, 2001.

62.   Lebanon Speech (October 2001)

63.   "Congress Wrestles with State Liability for Intellectual Property Violations:  What Will Pass Constitutional Muster?", Intellectual Property & Technology Law Journal, Vol. 13, Number 12, December 2001.

64.   "New Developments in Copyright Litigation," National CLE Conference in Steamboat Springs, Colorado, January 7, 2002.

65.   "Copyright for Engineers", American Society of Mechanical Engineers, The Hilton, Alexandria, VA., May 6, 2002.

66.   "Jefferson Medal Speech", presented at the NJ Intellectual Property Law Association

EXHIBIT _____ B_____

PAGE _____ 29 _____

Exhibit 55 ,
P. 1251

67.  "Copyright for Architects", American Bar Association, Section of Intellectual Property Law, Philadelphia, PA, June 28, 2002.

68.  "Copymart: Harnessing the Power of Digital Technology," Copymart Symposium, Japanisch-Deutsches Zentrum, Berlin, Germany, September 6, 2002.

69.  "International Copyright: Engine of Progress," Georgetown University Law Center, November 18, 2002.

70.  "Copyright in the Digital Age," Delivered at the International Intellectual Property Week, Amman, Jordan, August 11, 2003.

71.  Public Administration of Copyrights, Amman, Jordan, August 13, 2003.

72.  "Copyright In Palestine," Delivered to the Ramallah, Palestine International Copyright Delegation, Ramallah Palestine, August 13-20, 2003.

73.  "Protection of Folklore: The Next Copyright Treaty," Delivered at the International Intellectual Property Week, Amman, Jordan, August 14, 2003.

74.  "Copyright and Developing Countries," "Enforcement of Copyright," and "Copyright Basics," Ramallah, Palestine, August 17-19, 2003.

75.  "The Protection of Actors Rights: The U.S. Perspective", Budapest, Hungary, September 17, 2003

76.  "Marketing Music Online," CIP Forum, Gütenborg, Sweden, October 6, 2003.

77.  "Annual Update of Copyright Law," AIPLA Annual Meeting, Washington, D.C., November 1, 2003.

78.  "The Role of the Private Sector in the International Harmonization of Copyright", Federalist Society's National Lawyers Convention, Washington, D.C., November 14, 2003

79.  "Going Back to First Principles", Santa Clara Computer & High Technology Law Journal Symposium, Santa Clara, CA, February 6, 2004

80.  "Panel on the Intellectual Property Legislative Process in European Union and United States", Fordham University School of Law, New York, NY, April 16, , 2004

81.  "Folklore, Broadcaster's Treaty, Audiovisual Performers Treaty," LAIPLA, Santa Barbara, CA, May 14-16, 2004

82.  "Curbing the Companies That Abet Online Piracy," The Boston Globe, August 9, 2004

83.  "Congress and the Courts Tackle the Digital Agenda . . . Again." The Annual Meeting of the American Intellectual Property Law Association, Washington, D.C., October 16, 2004

84.  "Liability on the Internet: A Comparative Study of Europe and the United States," VII SGAE International Seminar, Madrid, 1 and 2 December 2004

EXHIBIT ____ B ____

PAGE ____ 30 ____

5

Exhibit 55 ,
P. 1252

85.   "The Securities Industry and Intellectual Property," New York, January 12, 2005

86.   "GAME [ALMOST] OVER," University of Akron School of Law, Akron , Ohio, March 7, 2005

87.   "The China Report," U.S.-Asia Foundation Sponsors. March 20 - March 30, 2005.

88.   "Which File Swappers Are Vulnerable?" USA Today, June 28, 2005

89.   "The Continuing Search for Copyright Balance on the Internet:  The U.S. Supreme Court Bridles in Peer-to-Peer File-Sharing." WIPO Seminar on Collective Management of Copyright and Related Rights in the Digital era, New Delhi, India (September 13, 2005)

90.   "Emerging Digital Technologies:  Prospects and Opportunities for Creating New Business Models."  WIPO Seminar on Collective Management of Copyright and Related Rights in the Digital era, New Delhi, India (September 14, 2005)

91.   Introduction of Charlotte (January 24, 2006)

92.   Tribute to Marybeth Peters–Commemorating 40 years of service. Library of Congress, Washington, D.C. (February 14, 2006)

93.   Collective Management of Copyright in the Digital Age; delivered at The World Intellectual Property Organization - Geneva, Switzerland. (April 2006)

94.   The Evolution of U.S. Copyright from Developing Country to World Leaders, by Ralph Oman given at the Georgetown University Law School Seminar, Nancy Linck's Class, on April 12, 2006.

95.   Piracy in China and Russia, World Piracy Prevention Conference, Los Angles, CA. (Conf. was cancelled.) April 24-25, 2006.

96.   How Digital Rights Management Will Save Authorship in the Age of the Internet; (May 22-23, 2006) (Denver)

97.   "Copyright Piracy in China" delivered at The John Marshall School; Chicago, May 25-26, 2006.

98.   "Copyright and the Arab Renaissance" delivered at the Judicial Workshop on Intellectual Property Rights , European Patent Office, Munich, Germany, September 11-13, 2006.

99.   Tribute to Irwin Karp – Irwin Karp Memorial Service, Columbia Law School, New York, NY, October 20, 2006.

100.  The Role of the U.S. Copyright Office in the Administration of the U.S. Copyright System, given at Michigan State Law School, November 15, 2006 [Doc. No. 13191159/bus].

101.  Congress and Copyright:  Going Back to First Principles, The Denver Chapter of the Copyright Society of the U.S.A., Denver, Colorado, March 27, 2007.

EXHIBIT _____ B

PAGE _____ 31

6

Exhibit 55 ,
P. 1253

102.   Congress and Copyright:  New Directions with a New Majority, The Rocky Mountain Chapter of the Copyright Society of the U.S.A., Denver, Colorado, March 27, 2007.

103.   Speech presented at Breakfast given for His Excellency Ambassador Yang and distinguished guests on April 27, 2007.

104.   "Lebanon:  On the Threshold of a New Day," delivered at The Phoenicia Hotel in Beirut, Lebanon on July 30, 2007.

105.   Presentation by Ralph Oman given to the American Bar Association's IPL Section in San Francisco on August 9-13, 2007.

106.   Legislative Report on the 110th Congress, by Ralph Oman given at the IABM Conference in Atlanta, GA on October 5, 2007.

107.   Speech presented at Suffolk University Law School on November 7, 2007.

EXHIBIT __B__

PAGE __32__

7

Exhibit _55_,
P. _1254_

EXHIBIT C

Exhibit 55
P. 1255

EXPERT REPORTS, DECLARATIONS, DEPOSITION TESTIMONY,
AND TRIAL TESTIMONY (2003 - 2007)

| CASE CAPTION | PLEADING |
|---|---|
| *Karen Knauer, et al. v. Kaiser Permanente International, Inc., et al.,* Case No. C 02-05172 DLJ (N.D. Cal.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (October 3, 2003), DECLARATION OF RALPH OMAN, ESQUIRE (October 31, 2003), REBUTTAL EXPERT REPORT OF RALPH OMAN, ESQUIRE (November 14, 2003) (On behalf of defendant Kaiser Permanente)<br><br>On November 13, 2003 I was deposed by the plaintiff in my capacity as an expert on behalf of the defendants. |
| *Core Group PC v. Sprint PCS,* CASE NO. C 02-05172 DLJ (American Arbitration Association) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (November 17, 2003) (On behalf of petitioner, Core Group PC)<br><br>On February 13, 2004 I testified before a panel of the American Arbitration Association in my capacity as an expert on behalf of the plaintiff. |
| *S&R Design, Inc. v. BH Multi Com Corp.* CASE NO. 04 CV 00223 (LTS) (S.D.N.Y.) | DECLARATION OF RALPH OMAN (on behalf of BH Multi Com Corp.) (April 22, 2004) |
| Société du troit de reproduction des auteurs, compositeurs et editeurs au Canada (SODRAC) (Tariff Proceedings Before the Copyright Board of Canada) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (May 20, 2004) (On behalf of SODRAC)<br><br>My report was included as part of the record for this proceeding. |

EXHIBIT _____ C _____

PAGE _____ 33 _____

Exhibit 55 ,
P. 1256

| | |
|---|---|
| *New York Mercantile Exchange v. Intercontinental Exchange, Inc.* Case No. 02-CV 9277 (JGK) (DF) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (August 12, 2004) (On behalf of plaintiff NYMEX)<br><br>On October 12, 2004 I was deposed by the plaintiff in my capacity as an expert on behalf of NYMEX. |
| *eScholar LLC v. Otis Educational Systems, Inc.,* Case No. 04 CIV. 4051 (SCR) (SDNY) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (December 21, 2004) (On behalf of defendant Otis Educational Systems, Inc.)<br><br>On January 28, 2005 and February 9, 2005 I was deposed by the plaintiff in my capacity as an expert on behalf of Otis Educational Systems. |
| *Team Play Inc. et al. v. Boyer d/b/a Skyboy Productions,* Case No. 03 C 7240 (N.D. Ill.) | EXPERT REPORT OF RALPH OMAN (on behalf of plaintiff Team Play) (February 25, 2005) |
| *Express LLC v. Fetish Group Inc.,* Civil Action No. CV05-2931 (JTLx) (C.D. Cal.) | DECLARATION OF RALPH OMAN (September 9, 2005); SUPPLEMENTAL DECLARATION OF RALPH OMAN (September 16, 2005) (on behalf of plaintiff Fetish Group Inc.) |
| *Universal Furniture International, Inc. v. Collezione Europa USA, Inc.,* Case No. 1:04CV00977 (M.D.N.C.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (March 9, 2006) (on behalf of defendant Collezione Europa)<br><br>On June 2, 2006 I was deposed by the plaintiff in my capacity as an expert on behalf of Collezione Europa. |

13980821.1.BUSINESS

EXHIBIT _____ C

PAGE _____ 34

Exhibit 55
P. 1257

| | |
|---|---|
| *Richard K. Niemi et al. v. American Axle Manufacturing & Holding Inc., et al,* Case No. 05-74210 (E.D. Mich.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (July 28, 2006) (on behalf of defendants American Axle Manufacturing & Holding et al.) |
| *Jaime Feliciano Caceres d/b/a JF & Assoc. et al. v. LandFill Technologies Corp., et al.,* Case No. 02-2697 (PG) (D.P.R.) | EXPERT OF RALPH OMAN, ESQUIRE (December 8, 2006) and SUPPLEMENTAL EXPERT REPORT OF RALPH OMAN, ESQUIRE (October 11, 2007) (on behalf of plaintiffs Jaime Feliciano Caceres, et al.) |
| *Bird Brain v. CVS Corp.,* Case No. 06-12799 (E.D. Mich.) | EXPERT OF RALPH OMAN, ESQUIRE (March 6, 2007) (on behalf of plaintiff Bird Brain)<br><br>SUPPLEMENTAL EXPERT OF RALPH OMAN, ESQUIRE (March 22, 2007) (on behalf of plaintiff Bird Brain) |
| *Van Cleef & Arpels v. Frank Pollak and Sons,* | DECLARATION OF RALPH OMAN, ESQUIRE (May 2007) (on behalf of plaintiff Van Cleef & Arpels) |

13980821.1.BUSINESS

EXHIBIT _____ ᴄ _____

PAGE _____ 3 5 _____

Exhibit 55,
P. 1258

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

On **February 11, 2008,** I served true copies of the following document(s) described as:

**EXPERT REPORT OF RALPH OMAN**

on the parties in this action as follows:

John W. Keker, Esq.
Michael H. Page, Esq.
Christina M. Anderson, Esq.
**Keker & Van Nest, LLP**
710 Sansome Street
San Francisco, CA 94111
*jkeker@kvn.com*
*mhp@kvn.com*
*canderson@kvn.com*

Thomas J. Nolan
Timothy A. Miller
**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Ave.,
Suite 3400
Los Angeles, CA 90071
*thomas.nolan@skadden.com*
*timothy.miller@skadden.com*

Mark E. Overland
**Overland Borenstein Scheper & Kim LLP**
300 South Grand Ave.
Suite 2750
Los Angeles, CA 90071
*moverland@obsklaw.com*

**BY ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission from tamarbuchakjian@quinnemanuel.com on February 11, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 11, 2008, at Los Angeles, California.

Tamar Buchakjian

07975/2338347.1

-2-

Case No. CV 04-9049 SGL (RNBx)
PROOFS OF SERVICE

Exhibit 55,
P. 1259

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is NOW Messenger Service, 1301 West Second Street, Suite 206, Los Angeles, California 90026.

On February 12, 2008, I served true copies of the following documents described as:

**EXPERT REPORT OF RALPH OMAN**

on the parties in this action as follows:

John W. Keker, Esq.
Michael H. Page, Esq.
Christina M. Anderson, Esq.
**Keker & Van Nest, LLP**
710 Sansome Street
San Francisco, CA 94111

[√]     **[PERSONAL]** by personally delivering the document listed above to the person(s) at the address(es) set forth above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 12, 2008, at San Francisco, California.

_____
Erin Gilbride

1

## PROOF OF SERVICE

2

3     I am employed in the County of Los Angeles, State of California.  I am over the age of

4 eighteen years and not a party to the within action; my business address is NOW Messenger

5 Service, 1301 West Second Street, Suite 206, Los Angeles, California 90026.

6     On February 12, 2008, I served true copies of the following documents described as:

7    **EXPERT REPORT OF RALPH OMAN**

8    the parties in this action as follows:

9

10    Mark E. Overland                Thomas J. Nolan

11    **Overland Borenstein Scheper & Kim LLP**   Timothy A. Miller
       300 South Grand Ave.          **Skadden, Arps, Slate, Meageher & Flom**

12    Suite 2750                  **LLP**
       Los Angeles, CA 90071        300 South Grand Ave.,

13                                Suite 3400
                                Los Angeles, CA 90071

14

15    [√]    **[PERSONAL]** by personally delivering the document listed above to the person(s)

16    at the address(es) set forth above.

17    I declare that I am employed in the office of a member of the bar of this court at whose

18 direction the service was made.

19    Executed on February 12, 2008, at Los Angeles, California.

20

21

22                            Dave Quintana

23

24

25

26

27

28