THOMAS J. NOLAN (Bar No. 66992)
(tnolan@skadden.com)
JASON D. RUSSELL (Bar No. 169219)
(jrussell@skadden.com)
MARINA V. BOGORAD (Bar No. 217524)
(mbogorad@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

RAOUL D. KENNEDY (Bar No. 40892)
(rkennedy@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Embarcadero Center, Suite 3800
San Francisco, CA  94111-5974
Tel.: (415) 984-2698 / Fax: (415) 984-2626

Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. 04-9059 and Case No. 05-2727 |
| v. | Honorable Stephen G. Larson |
| MATTEL, INC., a Delaware corporation, | **[PUBLIC REDACTED]** DECLARATION OF JASON D. RUSSELL IN SUPPORT OF MGA PARTIES' MOTIONS *IN LIMINE* NOS. 1-12 |
| Defendant. | |
| | VOLUME 5 OF 5 |
| | Hearing Date: May 21, 2008 |
| AND CONSOLIDATED ACTIONS. | Time: 1:00 p.m. |

I, Jason D. Russell, hereby declare as follows:

1.     I am an attorney licensed to practice law in the State of California and am a partner at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, counsel of record for MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively, the "MGA Parties") in the above-captioned matter.  I submit this Declaration in Support of MGA Parties' Motions *in limine* Nos. 1-12.  Unless otherwise stated, I have personal knowledge of the facts set forth below and, if called as a witness, I could and would testify competently thereto.

2.     More than three months ago, on January 15, 2008, MGA produced to Mattel excerpts of a rough transcript of the proceedings in the arbitration styled Larian v. Larian, Case No. 05-2096-ABH, arbitrated November 16 and 17, 2005 before ADR Services in Los Angeles (the "Larian Arbitration").  Only two witnesses testified in that arbitration: Isaac Larian and Jennifer Maurus.  Maurus was disclosed as a former sales manager at MGA in MGA Entertainment Inc.'s Responses to Mattel Inc.'s First Set of Interrogatories re Claims of Unfair Competition at Response No. 1 dated January 19, 2008.  Mattel began relying on Maurus's testimony in the Larian Arbitration last month in its Joint Opposition to the Motion for Summary Judgment, and its corresponding responses to MGA's Separate Statement of Uncontroverted Fact filed March 24, 2008.  Maurus has not been deposed in this case, and, to my knowledge, Mattel has issued no deposition subpoena or scheduled any deposition for her.  However, Maurus is listed as number 17 on Mattel's Phase 1 Witness List dated April 1, 2008 as a witness it intends at this time to call at trial as part of its case-in-chief.  (A true and correct copy of Mattel's Phase 1 Witness List dated April 1, 2008 is attached hereto as Exhibit 1.) While Mattel "reserves the right to use these witnesses' testimony through prior deposition or other testimony to the extent the witness is unavailable to provide live testimony at trial," Mattel does not represent in its Witness List that it has made any effort to establish that Maurus will be unavailable to testify at trial.

3.      A true and correct copy of the Verified Complaint in <u>Larian v. Larian</u> dated August 25, 3003 and bearing Bates numbers FL 6465-6489 is attached hereto as **Exhibit 2**.

4.      A true and correct copy of a letter from Kaye Scholer to Cotkin Collins and Ginsburg dated November 15, 2005 and bearing Bates numbers CC 00567-00568 is attached hereto as **Exhibit 3**.

5.      A true and correct copy of the Complaint in <u>Larian v. Larian and Zorabi</u> dated February 28, 2005 and bearing Bates numbers FL 6526-6553 is attached hereto as **Exhibit 4**.

6.      A true and correct copy of the Opening Arbitration Brief in <u>Larian v. Larian</u> dated November 14, 2005 and bearing Bates numbers MGA 3809056-3809120 is attached hereto as **Exhibit 5**.

7.      A true and correct copy of excerpts of Volumes I and II of the Confidential-AEO transcripts of the arbitration proceeding in <u>Larian v. Larian</u> dated November 16 and 17, 2005 is attached hereto as **Exhibit 6**.

8.      A true and correct copy of the Final Arbitration Award in <u>Larian v. Larian</u> dated November 28, 2005 is attached hereto as **Exhibit 7**.

9.      A true and correct copy of the Final Arbitration Award in <u>Larian v. Larian</u> dated February 3, 2006 and bearing Bates numbers CC 00517-00522 is attached hereto as **Exhibit 8**.

10.     A true and correct copy of Third Party MGA Entertainment Inc's Motion for a Protective Order dated November 14, 2005 and bearing Bates numbers CC 00342-00360 is attached hereto as **Exhibit 9**.

11.     A true and correct copy of a communication from Farhad Larian bearing Bates numbers KS05926-05948 is attached hereto as **Exhibit 10**.

12.     A true and correct copy of an e-mail chain dated August 14, 2000 bearing Bates numbers KBK 01300-01301 is attached hereto as **Exhibit 11**.

Declaration of Jason D. Russell in Support of MGA Parties' Motions *in limine* Nos. 1-12
Case No. CV 04-9049 SGL (RNBx)

13.     A true and correct copy of excerpts of the transcript of the deposition of Farhad Larian taken February 4, 2008 is attached hereto as **Exhibit 12**.

14.     A true and correct copy of an email chain between Isaac Larian and Haim Saban beginning on January 30, 2003 bearing Bates numbers MGA 1008775-1008778 is attached hereto as **Exhibit 13**.

15.     A true and correct copy of an email from Mel Woods to Isaac Larian dated June 26, 2003 bearing Bates numbers MGA 4008769-4008771 is attached hereto as **Exhibit 14**.

16.     A true and correct copy of the Affirmation of Peter Leung in MGA Entm't, Inc. v. Double Grand Corp. Ltd., HCA 1883/2003 dated June 26, 2003 and bearing Bates numbers MGA 0885074-0885088 is attached hereto as **Exhibit 15**.

17.     A true and correct copy of the Affidavit of Isaac Larian, MGA Entm't, Inc. v. Toys & Trends, HCA 2152/2002, bearing Bates numbers MGA 0883395-0883408 is attached hereto as **Exhibit 16**.

18.     A true and correct copy of the Affirmation of Lam Yuen Chak, MGA Entm't, Inc. v. Hunglam Toys Co., HCA 2687/2003, dated August 11, 2003 and bearing Bates numbers MGA 0884533-0884542 is attached hereto as **Exhibit 17**.

19.     A true and correct copy of an Order Denying a Motion for Summary Judgment, Art Attacks Ink v. MGA Entm't, Inc., Civ. No. 04 CV 1035-B (BLM) (S.D. Cal. Nov. 1, 2006), bearing Bates numbers MGA 1499772-1499791 is attached hereto as **Exhibit 18**.

20.     A true and correct copy of the Summons and Complaint in Integrity Toys, Inc. v. MGA Entm't, Inc., Case No. 05 CV 2142, dated August 17, 2005 and bearing Bates numbers MGA 0806552-0806573 is attached hereto as **Exhibit 19**.

21.     A true and correct copy of a notice of opposition and opposition to an MGA trademark application (No. 78/382,405) in Quicksilver, Inc. v. MGA Entm't, Inc.,

Opposition No. 91160679, dated May 26, 2004 and bearing Bates numbers MGA 0806427-0806445 is attached hereto as **Exhibit 20**.

22.     A true and correct copy of Declaration of Daphne Gronich in Support of Ex Parte Application for Temporary Restraining Order in <u>MGA Entm't, Inc. v. Multitoy, Inc.,</u> 04-CV-02524 (C.D. Cal. Apr. 12, 2004), bearing Bates numbers MGA 0871500-0871508 is attached hereto as **Exhibit 21**.

23.     A true and correct copy of the Witness Statement of Paula Treantafelles Garcia in <u>MGA Entm't, Inc. v. UBI Soft Entm't</u>, Arb. No. AAA Claim No. 50 T 133 00467, dated March 13, 2006 and bearing Bates numbers MGA 0873672-0873685 is attached hereto as **Exhibit 22**.

24.     A true and correct copy of the Declaration of David Oakes in <u>Dudnikov v. MGA Entm't, Inc.</u>, Civ. Action No. 03-D-2512 (PAC) (D. Col. Apr. 6, 2004), bearing Bates numbers MGA 0871307-0871313 is attached hereto as **Exhibit 23**.

25.     A true and correct copy of an excerpt of the Transcript of Arbitration in <u>Fun 4 All Corp. v. MGA Entm't, Inc.</u>, dated May 29, 2002 and bearing Bates numbers MGA 0871766-871775 is attached hereto as **Exhibit 24**.

26.     A true and correct copy of a settlement agreement between MGA Entertainment, Inc. and Bandai America Incorporated bearing Bates number MGA 1480173 is attached hereto as **Exhibit 25**.

27.     A true and correct copy of an order resolving proceedings in Mexico (in the original Spanish) dated September 12, 2006 and bearing Bates numbers MGA 0876944-0876959 is attached hereto as **Exhibit 26**.

28.     A true and correct copy a chart identifying the Bates numbers of examples of the types of Agreements to be excluded pursuant to the MGA Parties' Motion *in limine* No. 4 is attached hereto as **Exhibit 27**.

29.     True and correct copies of examples of MGA Employment Agreements Bates numbered MGA 0875741-50, MGA 0875719-28, MGA 3814785-89, MGA 0875570-79,

iv

1   MGA 0875548-54, MGA 0875683-5703, MGA 0875451-78, and MGA 0875555-69 are

2   attached hereto as **Exhibit 28**.

3        30.    A true and correct copy of Mattel Inventions Agreement with Bryant dated

4   January 4, 1999, introduced as C. Bryant Depo. Ex. 25, is attached hereto **Exhibit 29.**

5        31.    A true and correct copy of an email from Craig Holden to Michael Page, Isaac

6   Larian and John Keker dated June 20, 2007 and bearing Bates numbers MGA 3765585-

7   3765589 is attached hereto as **Exhibit 30**.

8        32.    A true and correct copy of MGA Entertainment's billing policy bearing Bates

9   numbers MGA 3709766-3709771 is attached hereto as **Exhibit 31**.

10       33.    A true and correct copy of an email from Dale Cendali to Craig Holden and

11  Isaac Larian dated June 23, 2007 and bearing Bates numbers MGA 3709794-3709798 is

12  attached hereto as **Exhibit 32**.

13       34.    A true and correct copy of an excerpt from Mattel's Fifth Set of

14  Interrogatories dated October 19, 2007 is attached hereto as **Exhibit 33**.

15       35.    A true and correct copy of Mattel's Opposition to MGA Parties' Motion for

16  Clarification Regarding Portions of February 15, 2008 Order Granting In Part and Denying

17  In Part Mattel's Motion to Compel Responses to Interrogatory Nos. 27-44 and 46-50 by

18  the MGA Parties is attached hereto as **Exhibit 34**.

19       36.    A chart identifying the Bates numbers of samples of Phase Two documents to

20  be excluded pursuant to the MGA Parties' Motion *in limine* No. 6 is attached hereto as

21  **Exhibit 35**.

22       37.    A true and correct copy of an email exchange between Isaac Larian and

23  Carter Bryant dated February 15, 2002 and bearing Bates numbers MGA 0069280-

24  0069282 is attached hereto as **Exhibit 36**.

25       38.    A true and correct copy of excerpts of Mattel's Proposed Jury Instructions

26  and Special Verdict Forms dated April 1, 2008 is attached hereto as **Exhibit 37**.

27

28

39.   A true and correct copy of an email chain from Isaac Larian to Nancy Koppang dated April 11, 2004 and bearing Bates numbers MGA 3473852-3473854 is attached hereto as **Exhibit 38**.

40.   A true and correct copy of an email form Ron Brawer to Linda Whaley dated February 28, 2006 and bearing Bates numbers MGA 0869679-0869683 is attached hereto as **Exhibit 39**.

41.   A true and correct copy of an email from Nancy Koppang to Isaac Larian bearing Bates numbers MGA 0861322-0861325 is attached hereto as **Exhibit 40**.

42.   A true and correct copy of an email from Isaac Larian to Ron Brawer dated October 26, 2004 and bearing Bates numbers MGA 0200954-0200958 is attached hereto as **Exhibit 41**.

43.   A true and correct copy of the Expert Report of Michael J. Wagner dated February 11, 2008 and Exhibits thereto is attached hereto as **Exhibit 42**.

44.   A true and correct copy of the Expert Rebuttal Report of Michael J. Wagner dated March 17, 2008 is attached hereto as **Exhibit 43**.

45.   A true and correct copy of excerpts of the transcript of the deposition of Michael J. Wagner taken March 21, 2008 is attached hereto as **Exhibit 44**.

46.   A true and correct copy of excerpts of the transcript of the deposition of Lisa Tonnu taken January 17, 2008 is attached hereto as **Exhibit 45**.

47.   A true and correct copy of excerpts of Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc. dated December 7, 2007 is attached hereto as **Exhibit 46**.

48.   A true and correct copy of the Mattel, Inc.'s Form 10-K filed February 27, 2006 is attached hereto as **Exhibit 47**.

49.   A true and correct copy of IBISWorld Industry Report, "Doll, Toy, and Game Manufacturing in the U.S." dated February 18, 2008 is attached hereto as **Exhibit 48**.

50.     A true and correct copy of the Expert Rebuttal Report of Kenneth Hollander dated March 17, 2008 is attached hereto as **Exhibit 49**.

51.     A true and correct copy of the Expert Rebuttal Report of Heather McComb dated March 17, 2008 is attached hereto as **Exhibit 50**.

52.     A true and correct copy of the Expert Rebuttal Report of Denise Van Patten dated March 17, 2008 is attached hereto as **Exhibit 51**.

53.     A true and correct copy of the Expert Rebuttal Report and Supplement of Nicholas Mirzoeff dated March 17-18, 2008 is attached hereto as **Exhibit 52**.

54.     A     true     and     correct     copy     of     the     webpage     available     at http://www.kharesearch.com/legal.htm (last visited April 11, 2008) is attached hereto as **Exhibit 53**.

55.     A true and correct copy of an excerpt of the transcript of the deposition of Ralph Oman dated March 31, 2008 is attached hereto as **Exhibit 54**.

56.     A true and correct copy of the Expert Report of Ralph Oman dated February 11, 2008 is attached hereto as **Exhibit 55**.

57.     A true and correct copy of an excerpt of the transcript of the deposition of Sam Khare dated September 20, 2007 is attached hereto as **Exhibit 56**.

58.     A true and correct copy of the Expert Report of John L. Alex dated February 11, 2008 is attached hereto as **Exhibit 57**.

59.     A true and correct copy of excerpts of the transcript of the deposition of John L. Alex dated April 9, 2008 is attached hereto as **Exhibit 58**.

60.     A true and correct copy of the Expert Report of Carol A. Scott dated February 11, 2008, as well as curriculum vitae and Exhibit 4C attached thereto, is attached hereto as **Exhibit 59**.

61.     A true and correct copy of the Rebuttal Expert Report of Carol A. Scott dated March 17, 2008 is attached hereto as **Exhibit 60**.

Declaration of Jason D. Russell in Support of MGA Parties' Motions *in limine* Nos. 1-12
Case No. CV 04-9049 SGL (RNBx)

62.     A true and correct copy of excerpts of the transcript of the deposition of Carol A. Scott taken April 3, 2008 is attached hereto as **Exhibit 61**.

63.     A true and correct copy of a spread sheet introduced as Lisa Tonnu deposition exhibit 660 bearing Bates numbers MGA 00868723-00868865 is attached hereto as **Exhibit 62**.

64.     A true and correct copy of excerpts of the Rough Transcript of the transcript of the deposition of Tina Patel (Varu) taken April 8, 2008 is attached hereto as **Exhibit 63**.

65.     A true and correct copy of excerpts of the Expert Rebuttal Report of Erich Joachimsthaler dated March 17, 2008 is attached hereto as **Exhibit 64**.

66.     A true and correct copy of the Expert Rebuttal Report of Robert C. Lind dated March 17, 2008 is attached hereto as **Exhibit 65**.

67.     A true and correct copy of the Expert Report of Lee Loetz dated February 11, 2008 and excerpts of exhibits attached thereto is attached hereto as **Exhibit 66**.

68.     A true and correct copy of the Expert Rebuttal Report of Lee Loetz dated March 17, 2008 is attached hereto as **Exhibit 67**.

69.     A true and correct copy of excerpts of the transcript of the deposition of Lee Loetz taken March 26, 2008 and Loetz deposition exhibit 4615 are attached hereto as **Exhibit 68**.

70.     A true and correct copy of a Copyright Office Letter dated April 8, 2005 bearing Bates numbers MGA 0868141-0868144 is attached hereto as **Exhibit 69**.

71.     A true and correct copy of excerpts of the transcript of the deposition of Margaret Leahy taken December 12, 2007 is attached hereto as **Exhibit 70**.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on April 14, 2008, at Los Angeles, California.

Jason D. Russell

viii

Exhibit 56

DEPOSITION OF SAMIR K. KHARE

1            UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3

4   CARTER BRYANT, AN INDIVIDUAL, )
                                   )
5                PLAINTIFF,        )
                                   )
6        V.                        )  NO. CV 04-9049 SGL
                                   )              (RNBX)
7                                  )
    MATTEL, INC., A DELAWARE       )
8   CORPORATION,                   )     VOLUME I
                                   )
9                DEFENDANTS.       )
                                   )
10  AND CONSOLIDATED ACTIONS       )

11

12        C O N F I D E N T I A L

13        ATTORNEYS' EYES ONLY

14      (PURSUANT TO STIPULATION,
        THIS TRANSCRIPT HAS BEEN
15      DESIGNATED CONFIDENTIAL)

16  DEPOSITION OF SAMIR K. KHARE,

17  DESIGNATED AS A 30(B)(6) WITNESS

18  FOR MGA ENTERTAINMENT, INC.,

19  TAKEN ON BEHALF OF MATTEL, INC.,

20  AT 865 SOUTH FIGUEROA STREET,

21  TENTH FLOOR, LOS ANGELES,

22  CALIFORNIA, COMMENCING AT 9:37

23  A.M., ON MONDAY, AUGUST 20,

24  2007, REPORTED BY PAMELA S.

25  HARRIS, CSR #3909.

                                        2

A & E COURT REPORTERS    (213) 955-0070    FAX:   (213) 955-0077

Exhibit 56 ,
P. 1262

DEPOSITION OF SAMIR K. KHARE

```
1   APPEARANCES OF COUNSEL:

2   FOR DEFENDANT MATTEL, INC.:

3       QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
        BY:  MICHAEL T. ZELLER, ESQ.
4            BRIDGET A. HAULER, ESQ.
                  AND
5            DYLAN PROCTOR, ESQ.
             (A PORTION OF THE DEPOSITION)
6       865 SOUTH FIGUEROA STREET, TENTH FLOOR
        LOS ANGELES, CALIFORNIA  90017-2543
7       (213) 443-3000

8   FOR MGA ENTERTAINMENT, INC.:

9       O'MELVENY & MYERS
        BY:  DIANA M. TORRES, ESQ.
10      400 SOUTH HOPE STREET
        LOS ANGELES, CALIFORNIA 90071-2899
11      (213) 430-6000

12  ALSO PRESENT:

13      DAPHNE GRONICH, IN-HOUSE COUNSEL
        MGA ENTERTAINMENT, INC.
14
        STEVEN TOGAMI, THE VIDEOGRAPHER
15

16

17

18

19

20

21

22

23

24

25
                                               3
```

A & E COURT REPORTERS    (213) 955-0070    FAX:  (213) 955-0077

Exhibit 56 ,
P. 1263

DEPOSITION OF SAMIR K. KHARE

1          A.          CORRECT.

2          Q.          DIRECTING YOUR ATTENTION TO THE LAST

3    PAGE OF EXHIBIT 507, YOU STATED, IN SUBSTANCE, THAT

4    THIS DRAWING WAS USED ON ARTWORK AT SOME POINT; IS

5    THAT CORRECT?

6          A.          YES.

7          Q.          WAS IT USED FOR ANYTHING ELSE?

8          A.          NOT TO MY KNOWLEDGE, NO.

9          Q.          WAS THIS DRAWING THAT'S HERE ON THE

10   LAST PAGE OF EXHIBIT 507 USED IN CONNECTION WITH THE

11   CREATION OF BRATZ DOLLS IN ANY WAY?

12         MS. TORRES:  OBJECTION; BEYOND THE SCOPE, CALLS

13   FOR SPECULATION.

14         THE DEPONENT:  NO.  THAT -- THAT'S SIMPLY

15   IMPOSSIBLE.  YOU CAN'T GO FROM A 2-D FLAT DRAWING TO

16   A 3-D DOLL.  YOU SIMPLY CAN'T.

17   BY MR. ZELLER:

18         Q.          AND WHAT'S THE BASIS FOR THAT

19   STATEMENT?

20         A.          WELL, JUST WORKING WITH DOLLS AND

21   COMPARING A DOLL TO THIS, THIS DOESN'T GIVE YOU ANY

22   DIMENSIONS AT ALL.  IF YOU RECALL THE -- THE PATENTS

23   THAT WE WERE LOOKING AT EARLIER, THERE WERE MULTIPLE

24   VIEWS AND ANGLES OF THOSE ITEMS.

25                     SPECIFICALLY, THE DESIGN PATENTS, THEY

                                                      258

DEPOSITION OF SAMIR K. KHARE

1   SHOWED YOU DIFFERENT DIMENSIONS SO YOU CAN VISUALIZE

2   THE ITEM ON VARIOUS DIFFERENT AXES.  THIS IS A

3   VERY -- THIS IS A -- AS FLAT AS YOU CAN GET IN TERMS

4   OF THE DRAWING.  AND THERE'S NO WAY FOR YOU TO TAKE

5   THIS AND DETERMINE WHAT THE DIMENSIONS WOULD BE FOR

6   A THREE-DIMENSIONAL OBJECT.  YOU SIMPLY DON'T

7   CAPTURE ENOUGH DETAIL IN THIS.

8            THAT'S JUST ME OBSERVING.  I'M NOT AN

9   EXPERT HERE IN THE FIELD.  I'M NOT A DOLL EXPERT,

10  NOT EVEN AN ARTIST, BY ANY STRETCH OF THE

11  IMAGINATION.  BUT COMPARING INFORMATION WE'VE LOOKED

12  AT HERE TODAY, WHEN YOU'RE TRYING TO CAPTURE A

13  THREE-DIMENSIONAL OBJECT, YOU NEED MULTIPLE VIEWS OF

14  IT TO ACTUALLY UNDERSTAND THE -- THE DIFFERENT

15  DIMENSIONS.

16       Q.     IS IT THE CASE THAT YOU'RE TESTIFYING,

17  AS MGA'S REPRESENTATIVE WITH RESPECT TO THIS

18  COPYRIGHT REGISTRATION, THAT THE DOLLS WERE NOT

19  BASED, IN WHOLE OR IN PART, ON THIS DRAWING?

20       MS. TORRES:  I'M GOING TO OBJECT TO THE FORM OF

21  THE QUESTION IN THAT IT ASSUMES FACTS NOT IN

22  EVIDENCE AND MISCHARACTERIZES THE 30(B)(6)

23  DESIGNATION, BUT YOU CAN ANSWER.

24       THE DEPONENT:  THE DOLLS WERE NOT BASED ON THE

25  TWO-DIMENSIONAL ARTWORK.

259

DEPOSITION OF SAMIR K. KHARE

1   BY MR. ZELLER:

2        Q.        IN ANY WAY?

3        A.        IN ANY WAY.

4        Q.        AND CORRECT ME IF I'M WRONG, BUT IT'S

5   YOUR TESTIMONY THAT THIS DRAWING WHICH IS HERE ON

6   THE LAST PAGE OF EXHIBIT 507, THAT THIS WAS USED FOR

7   THE PACKAGING ARTWORK IN CONNECTION WITH BRATZ?

8        A.        MY STATEMENT EARLIER WAS THAT THIS

9   DRAWING FORMED THE LOOSE BASIS FOR CHARACTER ART

10  WHICH IS DEVELOPED, SUBSEQUENTLY ENDED UP ON THE

11  PACKAGING.

12       Q.        AND FOR NOTHING ELSE?

13       A.        CORRECT.

14       Q.        I'LL SHOW YOU WHAT WAS PREVIOUSLY

15  MARKED AS EXHIBIT 508.  THIS IS A TWO-PAGE DOCUMENT.

16  IT IS A FORM CA FOR THE SASHA DRAWING REGISTRATION.

17            DO YOU RECOGNIZE WHAT WE MARKED AS

18  EXHIBIT 508?

19            (WITNESS EXAMINED A DOCUMENT.)

20       THE DEPONENT:  I DO.

21  BY MR. ZELLER:

22       Q.        IS THIS A CORRECTION FORM THAT MGA

23  SUBMITTED TO THE COPYRIGHT OFFICE ON OR ABOUT MARCH

24  28, 2005 AS IT PERTAINED TO THE REGISTRATION WE'VE

25  MARKED AS EXHIBIT 507?

260

```
 1   STATE OF CALIFORNIA        )
                                )      SS.
 2   COUNTY OF LOS ANGELES      )

 3

 4        I, PAMELA S. HARRIS, CERTIFIED SHORTHAND

 5   REPORTER, CERTIFICATE NO. 3909, FOR THE STATE OF

 6   CALIFORNIA, HEREBY CERTIFY:

 7             THE FOREGOING PROCEEDINGS WERE TAKEN

 8   BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH,

 9   AT WHICH TIME THE DEPONENT WAS PLACED UNDER OATH BY

10   ME;

11             THE TESTIMONY OF THE DEPONENT AND ALL

12   OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

13   RECORDED STENOGRAPHICALLY BE ME AND WERE THEREAFTER

14   TRANSCRIBED;

15             THE FOREGOING TRANSCRIPT IS A TRUE AND

16   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

17             I FURTHER CERTIFY THAT I AM NEITHER

18   COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION

19   NOR IN ANY WAY INTERESTED IN THE OUTCOME

20   THEREOF.

21             IN WITNESS WHEREOF, I HAVE HEREUNTO

22   SUBSCRIBED MY NAME THIS ___17___ DAY OF

23   September, 2007.

24

25                    Pamela S. Harris
                      PAMELA S. HARRIS, CSR NO. 3909
```

Exhibit 56,
P. 1267

# Exhibit 57

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

CARTER BRYANT, an individual,

    Plaintiff,

    vs.

MATTEL, INC., a Delaware corporation

    Defendant.

AND CONSOLIDATED ACTIONS

CASE NO. CV 04-9049 SGL (RNBx)

Consolidated with

Case Nos. CV 04-09059 & CV 05-2727

Hon. Stephen G. Larson

## REPORT OF JOHN L. ALEX PURSUANT TO
## RULE 26 (a) (2) (B), FEDERAL RULES OF CIVIL PROCEDURE

I, John L. Alex, have been retained by Mattel, Inc. ("Mattel") as an expert consultant to Quinn Emanuel Urquart Oliver and Hedges, LLP ("QEOU&H") and to serve as a possible testifying expert witness in the above-identified case. This is my written report concerning issues relating to U.S. Serial No. 10/373,602 (the '602 application), entitled "Doll with Aesthetic Changeable Footwear," naming Isaac Larian as the sole inventor therein and to duty of candor and inventorship issues pertinent to the filing and prosecution of that patent application

This report is based on information made available to me to date. I understand, however, that preparation for trial continues and that I will have the right to supplement or amend this report or any further report in the event additional information pertinent to my opinions becomes known to me. I further understand that I may be asked at trial to express opinions in rebuttal of matters that are raised at trial.

Confidential – Attorney's Eyes Only

Exhibit 57
P. 1248

## I.   **QUALIFICATIONS**

I am a shareholder in and president of the firm of Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd. Located in Chicago, Illinois.  I graduated from the Northwestern University Technology Institute (now the McCormick School of Engineering and Applied Sciences) in 1959 with a Bachelor of Science degree in chemical engineering.  Following my graduation from engineering school, I attended the Northwestern University School of Law, from which I graduated in 1962 with a Juris Doctor degree.

Prior to commencing my career as an attorney, I worked for approximately two years performing various engineering duties at Sinclair Refining Company in East Chicago, Indiana as a co-op student during alternate quarters from 1955 through March 1959.  After graduating from engineering school, I worked during the summers of 1959 and 1960 as a chemical engineer with Allis-Chalmers Company in Milwaukee, Wisconsin.

My first legal employment was as a law clerk with the firm of Hill, Sherman, Meroni, Gross & Simpson during the summer of 1961.  After my graduation from law school in June of 1962, I was employed as an associate by that firm, and remained there until mid-1963.  Upon leaving the employ of the Hill, Sherman firm, I was associated for approximately one year with the firm of Dawson, Tilton, Fallon, Lungmus & Alexander.  Thereafter, I joined the firm of Greist, Lockwood, Greenawalt & Dewey as an associate.  I became a partner in that firm in 1968 and remained with that firm and its successors until 1999 when lawyers of my firm and of the firm of Cook, McFarron & Manzo formed my present firm.

Throughout my tenure with the firms noted above, I have spent the bulk of my time in the practice of law dealing with patent related matters at all levels.  During the early years of my practice, I personally prepared, filed and prosecuted a significant number of patent applications

2

Exhibit 57
P.1269

with the United States Patent and Trademark Office.  More recently, I have continued my patent prosecution practice by supervising and assisting other attorneys in my firm in patent application preparation and prosecution before the United States Patent and Trademark Office.

A substantial portion of my legal career has been devoted to providing opinions on patent infringement and validity issues, and representing clients (both patent owners and accused infringers) in patent litigation matters.  I have represented and continue to represent a number of clients in patent-related matters involving the mechanical and chemical arts.  During my career, I have studied, analyzed and given opinions on the prosecution of hundreds of patents.  Most recently, I have accepted engagements as a patent expert in a number of cases involving the mechanical and chemical arts.

Among the professional associations of which I am a member are the Intellectual Property Law Association of Chicago and the American Bar Association.

A more detailed synopsis of my career is contained in my curriculum vitae which is attached to this report as Attachment A.  My vitae also lists those cases in which I have testified as an expert witness during the last four years, by deposition and, where applicable, at trial.

## II.   COMPENSATION

I am being compensated for consulting and expert services provided in connection with this litigation at the rate of $460 per hour.

## III.   STATEMENT OF OPINIONS TO BE EXPRESSED

If called to testify at the trial of this case, I expect to generally testify about the nature and purpose of patents and patent applications.  I will describe the steps involved in the filing and

3

Exhibit 57
P. 1270

prosecution of the '602 application and explain the significance of its file history. I expect to also explain the parts of a patent application and the function each part must play, including the function of the claims. I expect to explain that a claim in a patent application is the definition identifying the scope of a claimed invention. I also expect to explain why it is important that the actual inventor(s) of the subject matter of each patent claim be properly identified and the importance of the duty of candor and good faith in dealing with the Patent Office imposed on each individual associated with the filing and prosecution of a patent application.

**IV.  INFORMATION REVIEWED**

In preparing to render my opinion as set forth in this report, I have to-date reviewed the following:

(1)  Exhibits 1, 3, 5, 499, 500, 501, 502, 503, 504, 546, 547, 548 and 549;

(2)  Declaration, Power of Attorney and Petition filed with the '602 patent application (MGA 3765285-6);

(3)  Collection of documents, 9 pages (Bryant 12577-85);

(4)  Transcript of deposition of Carter Bryant, 3 volumes, pp. 1-727;

(5)  Transcript of deposition of Bryan Armstrong, pp. 223-253, 305-309 and 333-343;

(6)  Transcript of deposition of Samir Khare, pp. 97-104, 109-175 and 245-249.

**V.  STATEMENT OF OPINIONS TO BE EXPRESSED AND REASONS THEREFOR**

**1.  General Testimony**

As background, it may be helpful to provide a brief description of certain aspects of the patent application process.

4

Exhibit 57
P. 1271

The Patent Application Process.  An inventor/applicant must go through a detailed procedure in the U.S. Patent and Trademark Office ("PTO") in order to seek a patent.  This procedure requires, among other things, that the person named in the application as the "inventor" provide a sworn statement that he is the original, first and a sole or a joint inventor of the subject matter claimed and for which a patent is sought.

Old or Obvious Inventions Are Not Patentable.  It should be understood that not every invention is patentable.  First of all, an invention has to be new.  That is, the PTO will not give the inventor a patent if the claimed invention turns out to have been previously known or in the public domain.  Therefore, the PTO patent examiner, in deciding whether to grant a patent, makes a search to see if there are any prior patents or publications, or instances of prior public knowledge or use (all of which we sometimes call the "prior art") that substantially show or describe the invention.  If there is such a reference in the prior art, the PTO examiner rejects the invention as "old" or "lacking novelty."

But just being "new" is not enough to qualify an invention for a patent.  If the invention, despite being technically novel, is so close to the prior art that it can be said to have been an obvious invention, the PTO will not grant a patent.  The test for obviousness is whether a person of ordinary skill in the art would have found the invention obvious at the time it was made.

Patent Claims and the Negotiation Process.  So in order to get a patent on an invention, the inventor/applicant has to tell how to make and use it, and also has to overcome any PTO objections that the invention was old or obvious.  Usually this requires some additional discussion between the inventor and the PTO.  This negotiation process is called "prosecution" of a patent application.  When the application is filed with the PTO, it contains one or more short numbered paragraphs at the end of the application which are called "claims."  The remainder of

5

Exhibit 57
P. 1272

the "specification" contains the detailed written description of the invention (sometimes drawings are also used to help explain the invention).

Patent claims are important because they are the only way the public has of knowing exactly what the result was of the prosecution process that took place between the inventor/applicant and the PTO. Claims give the PTO examiner something that he or she can work with the see whether the invention was new and nonobvious, and if the patent is issued, tell the public exactly what it is that constitutes an infringement of the patent. For these reasons, 35 U.S.C. § 112 also requires, as a condition for patentability, that the claims particularly point out and distinctly claim the subject matter that the applicant regards as his or her invention.

The Duty of Honesty to the PTO. Although most of the PTO's business is in writing, it is important to understand that the public does not have a lawyer to represent it in the bargaining process with the inventor—only the inventor is represented by counsel. For this reason, the courts and the PTO have been very strict in requiring that the inventor and the lawyer disclose every bit of information that a reasonable patent examiner might consider important. Applicants, their lawyers and those persons associated with the filing and prosecution of a patent application also must be completely honest in what they tell the PTO; they cannot submit an affidavit, or declaration or other statement that is false or misleading or only partially true. In this case, the named inventor attempted to mislead the PTO both as to inventorship and failed to inform the PTO of the public disclosure of the "BRATZ" dolls more than one year before the filing date of the '602 application. This concealment was later compounded when Mr. Carter Bryant later submitted a sworn declaration which was false and misleading.

6

Exhibit 57
P. 1273

2.      The "Changeable Footgear" Patent Application

On February 24, 2003 an application for patent entitled "Doll With Aesthetic Changeable Footgear" was filed in the U.S. Patent and Trademark Office naming Isaac Larian as the sole inventor. That application was accompanied by a sworn statement entitled "Declaration, Power of Attorney and Petition" wherein Mr. Larian affirmatively stated that he believed he was the original, first and sole inventor of the subject matter claimed in that patent application and further stated that he reviewed and understood the contents of the specification, including the claims and acknowledged his duty to disclose information material to the examination of that application in accordance with 37 C.F.R. § 1.56(a). That application, as filed, contained 17 claims, four of which were in independent form. Claim 1 which, for purposes of this report can be regarded as being representative of the independent claims, is reproduced below:

    1.      A doll with changeable footgear comprising:
        a torso having a body and legs, said legs having a predetermined skin color and texture;
        a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot; the foot having substantially the same predetermined skin color and texture;
        each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;
        each said assembly and lower legs having a snap-together joint with a protuberance on one part and a mating recess on the other part; and
        a simulated strap forming part of said shoe extending around said assembly at said separation point.

The application was acted on by Patent Examiner Ali Abdelwahed who issued an office action on May 12, 2003 wherein, among other things, he rejected all of the claims as being anticipated by the "BRATZ™ dolls reference" which he indicated "clearly discloses all of the structural limitations recited in claims 1-17."[1]  Shortly thereafter, Mr. Larian's attorney, Alan C. Rose, contacted Examiner Abdelwahed requesting the references supporting that rejection. That

---

[1] This rejection under 35 U.S.C. § 102 (b) was expressly recited to include on-sale activities in a subsequent office action finally rejecting these claims.

Exhibit 57
P. 1274

documentary support was provided and indicated that the so-called Bratz dolls had been launched in June 2001 by MGA Entertainment, the company headed by Mr. Larian.

In preparing to respond to Examiner Abdelwahed's rejection of claims 1-17 based on the Bratz prior art, Mr. Rose communicated with Mr. Carter Bryant and on August 11, 2003 sent him a Declaration for his signature noting in the body of his cover letter, that "[o]ur patent application was filed on February 24, 2003, so a release back in 2001 would be anticipatory, while a release in the fall of 2002 would be within the one year grace period." Accordingly, Mr. Rose fully apprized Mr. Bryant of the materiality of the Bratz prior art. The Declaration was signed by Mr. Bryant and stated that he was familiar with the Bratz dolls project of MGA Entertainment and that he had worked with Isaac Larian, president of MGA Entertainment on the Bratz doll project. It then made the following representation:

> 4.   "I was actively involved with the release of the Bratz dolls of the configuration as set for in paragraph 3, and this release did not occur until the fall of the year 2002."

Mr. Rose, in his Amendment filed on August 12, 2003 made a following statement:

> Regarding the 35 USC 102 rejection of all claims, attention is respectfully directed to the attached Declaration of Carter Bryant, a Freelance Designer who worked with the inventor on the Bratz doll project, and who confirms that the release date for the dolls as claimed in this patent application, did not occur until the fall of 2002. Of course, this is only a few months prior to the February 24, 2003 filing date of the present application. Accordingly, it is respectfully requested that the rejection based on the Bratz article be withdrawn.

I understand that the evidence will clearly show that the introduction of the Bratz dolls occurred well prior to the one-year critical date. Accordingly, the declaration of Carter Bryant, after having been advised of the materiality of the timing of the Bratz doll launch, in my opinion can be viewed as a knowing effort to mislead the PTO by a willful false statement made under oath in violation of 18 U.S.C. § 1001.

Exhibit 57
P. 1275

If called, I further expect to testify that the inventorship identified in the '602 application is incorrect and, in my opinion, constitutes a knowing effort to mislead the PTO. Inventorship in patent law is determined on claim-by-claim basis. Accordingly, if the claims as presented initially and as later amended in the patent application identify subject matter that can only be attributed to a person other than the named inventor (in this case, Mr. Bryant), the failure to identify him as a named inventor, in my opinion can be construed to be a knowing and willful misrepresentation as to inventorship.

Mr. Bryant, while still an employee of Mattel, Inc., presented representatives of MGA Entertainment with drawings of dolls that squarely fall within the scope of the claims of the '602 application in September 2000 more than two years prior to the filing of the '602 application. I further understand that the evidence will show that the Mr. Bryant has stated under oath he conceived the idea of detachable feet, as shown in a drawing contained in Exhibit 1, prior to his meeting with Mr. Larian. The claims in the '602 patent application specifically recite that the foot/shoe assemblies are removably secured to the lower leg or ankle of the doll by a "snap-together joint with a protuberance on one part and a mating recess on the other part. . . ." As such, these claims literally read on the Bryant drawings included in Exhibit 1 and the drawings from the '602 patent application which were attached to the Bryant Declaration. In fact, the specification of this application expressly stated both configurations were within the scope of the invention. The precise language in the specification reads as follows:

> "Thus, by way of example and not of limitation instead of having the protuberance 26 on the leg 16 and the recess 28 on the shoe/foot assemblies, this configuration may be reversed, with the protuberance on the shoe/foot assembly, and the recess on the doll legs."

9

Exhibit 57
P. 1276

I am not aware of anything in the record showing that Isaac Larian conceived the idea of a doll having detachable feet before he was provided Exhibit 1 in a September 2000 meeting with Mr. Bryant.

In view of the foregoing, it is my opinion that the '602 patent application naming Isaac Larian as the sole inventor, as recited in his Declaration, contains material false statements, which could be construed to be in violation of 18 U.S.C. § 1001. The materiality of such a misrepresentation is important to the PTO for a number of reasons, one of which being it can be significant in determining when an invention was actually made.

After submission of the Bryant Declaration and accompanying Amendment, Examiner Abdelwahed finally rejected the claims in the '602 application on October 28, 2003. A document which I understand came from the files of MGA Entertainment identified as Exhibit 499, shows that this application was abandoned on November 26, 2003. If this is in fact the case, it appears that there was an affirmative abandonment by those prosecuting the '602 application prior to its normal date for abandonment which would have occurred six months from the date of that final rejection.

## VI.   **EXHIBITS**

I have not yet determined what exhibits I might use at trial of this action if I am called to testify. Such exhibits will be promptly identified to all concerned parties if and when I am so called.

Date: February 11, 2008

John L. Alex

10

Exhibit 57
P. 1277

# CURRICULUM VITAE OF JOHN L. ALEX

## Business

Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd.
200 West Adams Street, Suite 2850
Chicago, Illinois 60606
(312) 236-8500

## Personal Data

Born:              July 25, 1936, Chicago, Illinois
Marital Status:    Married, three children
Residence:         Clarendon Hills, Illinois

## Education

Law School:        Northwestern University School of Law
1959-1962          Chicago, Illinois
                   Juris Doctor

Undergraduate:     Northwestern University
1954-1959          Evanston, Illinois
                   Bachelor of Science, Chemical Engineering

## Bar Admissions

State of Illinois
Supreme Court of the United States
U.S. Courts of Appeals for the Federal, First, Seventh and Eighth Circuit
U.S. District Court, Northern District of Illinois (Trial Bar)
U.S. Patent and Trademark Office

## Professional Experience

1999-Present       Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd.
                   Chicago, Illinois

1964-1999          Lockwood, Alex, FitzGibbon & Cummings
                   Chicago, Illinois

1963-1964          Dawson, Tilton, Fallon, Lungmus & Alexander
                   Chicago, Illinois

1962-1963          Hill, Sherman, Meroni, Gross and Simpson
                   Chicago, Illinois

<u>Professional Activities</u>

American Bar Association
American Intellectual Property Law Association
Intellectual Property Law Association of Chicago
The Lawyers Club of Chicago

<u>Practice</u>

Primary litigation responsibility (at trial and appellate level) in patent, trademark, copyright and related litigation;

Expert witness engagements in patent infringement litigation;

Patent, trademark and copyright licensing;

Validity and infringement evaluations and opinions;

Patent interferences;

Patent and trademark application preparation and prosecution;

Counseling in intellectual property matters.

<u>Cases Wherein I Have Testified As An Expert Witness at Trial or By Deposition Within the Preceding Four Years</u>

Ecolab v. Paraclipse, D. Nebraska (Deposition and Trial)

Lakewood Engineering and Manufacturing Co. v. Lasko Metal Products, Inc., N.D. IL (Deposition and Trial)

Caterpillar, Inc. v. Deere & Company, N.D. IL (Deposition)

Paymaster Technologies, Inc. v. The United States, U.S. Court of Claims (Deposition and Trial)

The Coca-Cola Company v. Pepsico, Inc. et al., N.D. GA (Atlanta Div.) (Deposition and Trial)

Novartis Corporation v. Teva Pharmaceuticals USA, Inc., D. NJ (Deposition)

Marine Polymer Technologies, Inc. v. HemCon, Inc., D. NH (Deposition)

# Exhibit 58

R040908.txt

11        A.    Doctrine of equivalence would certainly

12    be be one thin.

13        Q.    It's your opinion that the claims of the

14    '602 literally read on Bryant's drawings, is that

15    right?

16        A.    It's my opinion that they do, yes.

17        Q.    Is that still your opinion today?

18        A.    Yes.  I think that the claims as properly

19    construed read on that drawing.  For literal --

20    literally and they certainly cover the concept as

21    shown, but let's start with literal and stick with

22    literal.

23        Q.    Let's start with literal and do that.

24    You've heard of something called the all elements

25    rule?

                                                        88


1         A.    Yes.

2         Q.    So to literally infringe a claim, all

3     elements of the claim have to be present in the

4     device?

5         A.    Or their equivalent.

6         Q.    All elements or their equivalent?

7         A.    Yes.

8         Q.    So in terms of the Claim 1, we have a

9     doll with changeable foot gear, do you see that?

10        A.    Yes, sir.

11        Q.    So it's your opinion that's literally

12    present there, present in the sketch page 4 of

13    Exhibit?

14        A.    That is a doll, and it appears to have

Page 75

Exhibit 58,
P. 1280

R040908.txt

15    changeable foot gear.
16        Q.    Okay.  And in terms of the -- you see the
17    clause that begins each set assembly and lower
18    legs, it's the second from the last?
19        A.    Uh-huh.
20        Q.    Having an as as soon as possible together
21    joint with a protuberance on one part and a mating
22    recess on another part?
23        A.    Yes, I see that.
24        Q.    And is it your opinion that the drawing,
25    the Bryant drawing on page 4 of Exhibit 5207

                                            89

1    literally meets that claim element?
2        A.    That's my opinion, yes.
3        Q.    What is a protuberance?
4        A.    Protuberance is something that projects
5    from a flat surface typically.  It doesn't
6    necessarily have any specific shape.  It just
7    extends away from a flat surface.  It protrudes
8    from the surface.
9        Q.    A protuberance
10    protrudes?
11        A.    Protrudes.
12        Q.    Protrudes?
13        A.    I think so, that's correct.
14        Q.    Protuberance protrudes?
15        A.    Well, it's an extension.  It's something
16    that extends off that surface.
17        Q.    And where is that definition come from?
18        A.    That's just a normal, common, ordinary
19    language of the word -- and definition of the word
                    Page 76

Exhibit 58 ,
P. 1281

R040908.txt

20   that would be what would be readily understood and
21   I don't know that it's defined specifically
22   elsewhere.
23        Q.   The interpretation of patent claims,
24   would you agree with me that that's a matter of law
25   for the court?

                                                    90

1         MR. ZELLER:  Objection, question's
2    overbroad, vague.
3         THE WITNESS:  Courts construe claims,
4    judges construe claims.
5         Q.   And claim construction is a matter of
6    law?
7         A.
8         MR. ZELLER:  Same objections.
9         THE WITNESS:  Yes, I think that's
10   correct.
11        Q.   You've heard of the Markman decision?
12        A.   Yeah, I think I have, yes.
13        Q.   And the Markman decision among other
14   things holds that claim construction is a matter of
15   law for the court, right?
16        A.   That's correct.
17        Q.   So and in terms of construing claims, can
18   you tell me what the rules are for construing
19   patent claims?
20        MR. ZELLER:  The question's very
21   overbroad.
22        THE WITNESS:  That's vague.  I mean.
23        Q.   What do you look to first.  Let's take

                        Page 77
                   Exhibit 58 ,
                   P. 1282

R040908.txt

24     that break it's three minutes.  Let's take a break

25     right now we can get?

91

1          A.

2              VIDEOGRAPHER:  This ises end of tape

3     Number 2.  We've off the record at 11:39.

4              (Short recess.)

5              VIDEOGRAPHER:  Beginning of videotape

6     Number 3.  Back on the record at 11:47 p.m. R. a.m.

7              MR. HANSEN:  Much to our court reporter's

8     displeasure we were on the topics of protubance I'd

9     like to do.  So it's your opinion that the

10    configuration -- sorry.  Strike that.  I was

11    actually on claim construction.  Of protuberance.

12    And it's the in construing the claims the first

13    thing that you look at is the language of the

14    claims themselves, is that right.

15             THE WITNESS:  The language of the claims

16    is the first thing.

17        Q.    Other.  Let me state it differently.  In

18    construing the claims, the principal guidance is

19    what's called the quote intrinsic evidence, right?

20        A.    Yes.

21        Q.    That would be the claims the

22    specification and the prosecution history?

23        A.    Yes.

24        Q.    And then do you know what value expert

25    testimony has on that issue, if any?

92

1          A.    It's very little if the claims are

Page 78

Exhibit 58,

P. 1283

R040908.txt

2    unambiguous.

3        Q.   And is it your view that the word

4    protuberance is unambiguous in connection with the

5    '602 application?

6        A.   No, I don't think protuberance is -- I

7    don't think it's ambiguous.  It's unambiguous, yes.

8        Q.   Okay.  So let's look at the phrase as

9    soon as possible together joint.  Do you see that

10   in the same element that we were looking at, Claim

11   1?

12       A.   That's the -- 1, 2, 3, 4 -- is it the

13   fifth paragraph?

14       Q.   The second to last, yes, snap together

15   joint?

16       A.   Each is -- each set assembly and lower

17   leg having a snap together joint, I see that.

18       Q.   Is that -- the Bryant sketch page 4 of

19   Exhibit 5207 does that show a snap together joint?

20       A.   I believe so, yes.

21       Q.   And can you tell me in what way it's a

22   snap together joint?

23       A.   Well, it shows a protuberance which

24   extends upwardly from the foot gear element, right.

25       Q.   Yes?

                                                      93


1        A.   And it showed in spaced away form from

2    the leg so the clear impression that I would get

3    from looking at that is that it is intended that

4    the foot gear is to be attached to the leg by

5    insertion of the protuberance or projection into a

Exhibit _58_,

P. _1284_

R040908.txt

6   correspondingly sized recess in the leg.

7       Q.   And it's your opinion that the Bryant

8   drawing shows a snap together joint with a

9   protuberance?

10      A.   Yes, I think one skilled in the art would

11  certainly view it that way.

12      Q.   Are you skilled in the art?

13      A.   I am not skilled in the art, but I have

14  been drafting claims and interpreting claims for 40

15  years, and reading patent drawings.

16      Q.   Let's go to then the -- let's look at the

17  figure, Figure 2 first in the application which is

18  on page M G A 825494.

19      A.   Yes, sir, I have it.

20      Q.   And does that -- does Figure 2 show the

21  -- what's described as the snap together joint with

22  a protuberance in the application?

23      A.   Yes.

24      Q.   And do you see any differences between

25  the joint in the Bryant sketch and this figure?

                                              94


1       A.   Yes, I do.

2       Q.   Can you tell me what differences you see?

3       A.   I see a difference without a distinction.

4   I see a reversal of parts for one thing.

5       Q.   Just?

6       A.   I just want to add another point.  In

7   interpreting the drawing of whatever page 4, is it,

8   I'm reading it in the context of page 2 which talks

9   about exchanging shoes or foot gear.

10      Q.   That's fine.  Do you see -- so when you

Page 80

Exhibit _58_,

P. _1285_

R040908.txt

24    foot, the foot having substantially the same

25    predetermined skin color and texture.  I don't

105

1     think the Patent Office had any such prior art

2     other than the Bratz prior art that they cited

3     against the application.

4         Q.    Could you turn to the second page of the

5     application, the first text page?

6         A.    Yes, sir.

7         Q.    M G A 825486?

8         A.    Yes, sir.

9         Q.    And do you see all of the patents that

10    are listed on that page in paragraph 3?

11        A.    Yes, I do.

12        Q.    And that is -- paragraph 2 says quote, it

13    has previously been proposed to make dolls with

14    shoes, boots or foot gear which may be changed, and

15    patents which relate to such arrangements include

16    the following, right?

17        A.    Yes.

18        Q.    And then it's all the patents that are

19    listed there?

20        A.    Yes.

21        Q.    Did you review any of those patents?

22        A.    I did very briefly review them, but I

23    also looked at the two references that were cited,

24    one of which is cited as identified here in the

25    list.

106

1         Q.    Which one is that, the Rahmstorf?

Page 90

Exhibit 58 ,

P. 1285A

R040908.txt

2      A.   Yes.

3      Q.   And so changeable foot gear on dolls goes

4   all the way back to the 1800's, right?

5      A.   Well, I don't know if that was

6   changeable.  That was not the point.  I'd have to

7   look at the reference.  I'm not going to comment on

8   it, but I know this from looking at that reference.

9   It doesn't have what I just mentioned to you, a

10  pair of foot shoe assembly shrewding an open shoe

11  with straps with the strap being open to expose at

12  least a part, et cetera.  It doesn't have that I'm

13  certain of that.

14     Q.   So if Mr. Bryant said that he didn't

15  conceive of having the strap going around the

16  approximate separation point would that affect your

17  opinion at all?

18     A.

19          MR. ZELLER:  As to -- I'm sorry, as to

20  what inch haver tore.

21     Q.   As to whether or not he should be listed

22  as an inch inch VIN tore?

23     A.   I think I answered that question before.

24  I said he certainly invented everything up -- in

25  your hypothetical.

                                               107


1      Q.   Right?

2      A.   Everything up to the last sentence

3   unequivocally.  I believe giving a proper

4   interpretation of the last element he's the

5   inventor of that also because I think at doesn't

                    Page 91
                 Exhibit 58 ,
                 P. 1285B

R040908.txt

6   mean concealing.  If they wanted to have

7   concealing, they should have put that in the claim.

8   So that claim is broad enough to cover something

9   that's near but doesn't conceal.

10       Q.   And the specification doesn't change your

11   opinion on it?

12       A.   No, the specification says effectively

13   not maybe in those words, that if you put it at

14   this location, namely precisely at that, you end up

15   covering up the joint mark or whatever it is, the

16   joint.

17       Q.   So your testimony is that the word at as

18   used in this application as specifically as used in

19   the claims does not mean -- it means near the

20   separation point?

21       A.   I'm saying the failure to say what they

22   said in the spec in describing that joint would

23   suggest that the word at is less precise than the

24   location that they recited in the specification.

25   And but it's the claim that we start out with and

                                                    108


1   it's the claim that's to be construed.

2       Q.   And how far away can the strap be from

3   the separation point in your view and still

4   literally infringe Claim 1?

5       A.

6            MR. ZELLER:  The question's an incomplete

7   hypothetical.

8            THE WITNESS:  I would not -- I would say

9   certainly that looking at the drawing, I would say

10   that that drawing is near the separation point.

                    Page 92

Exhibit _58_,

P. _1285C_

**Exhibit 59**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>            Plaintiff,<br><br>    vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>            Defendant. | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>**EXPERT REPORT OF CAROL A. SCOTT** |
| AND CONSOLIDATED ACTIONS | |

**ATTORNEYS' EYES ONLY**

Exhibit 59
P. 1286

## I.   QUALIFICATIONS

1.      I am a Professor of Marketing at the Anderson Graduate School of Management of the University of California, Los Angeles ("UCLA"). I hold a Ph.D. in Marketing from Northwestern University, where my minor field of study was Social Psychology. I also received a Master of Science in Management degree from Northwestern University and a Bachelor of Science in Business and History Education degree from the University of Texas at Austin. I have served variously as the Chairman of the Faculty, Associate Dean, and Assistant Dean of the Anderson Graduate School of Management from 1985 through 1994. I am currently the faculty director of the Anderson School Executive Program.   A true and correct copy of my Curriculum Vitae, including a list of publications, is attached hereto as Exhibit 1.

2.      Over the past thirty years, I have taught courses on Marketing Strategy and Management, Consumer Behavior, Advertising, Distribution Strategy, and International Marketing to students in undergraduate and graduate education programs at UCLA, Harvard Business School, and Ohio State University. I also have published numerous journal articles, research reports, and book chapters on Consumer Behavior, Marketing Research and other marketing topics. I have served on the editorial boards of the *Journal of Marketing*, *Journal of Marketing Research*, and the *Journal of Consumer Research*. I have been a member of the board of directors for Sizzler International and A-Fem Medical Corporation, Inc. and currently am a member of the board of directors of United Online and Classmates Media Corporation. Over the past 25 years I have served as a consultant and testifying expert for a variety of marketing issues. During the past four years I have provided expert testimony in trial or by deposition in the matters listed in Exhibit 2. My current hourly rate is $550. Exhibit 3 lists the materials I have obtained from Counsel or other identified sources.

3.      I have been retained by Quinn Emanuel Urquhart Oliver & Hedges as an independent expert witness to testify on behalf of Mattel, Inc. ("Mattel").

## II.   THE ISSUES FOR WHICH I WILL GIVE AN OPINION

4.      If called by Mattel as an expert witness in this matter, I may be asked to opine about the relationship between the success of Bratz dolls and the sales of other accessories and

1

Exhibit 59
P. 1287

merchandise sold as part of the Bratz product line or as Bratz licensed goods manufactured by other companies.  I also may be asked to respond to the opinions offered by MGA Entertainment, Inc.'s ("MGA") or Carter Bryant's expert witnesses on these or additional issues.

## III.   SUMMARY OF OPINIONS

5.     Having reviewed and analyzed the evidence available to me at this time, I have determined the following:

6.     MGA's Bratz lines of accessories and other follow-on Bratz products are driven by the success and sale of the Bratz dolls themselves.

7.     The sale of accessories and other merchandise sold as part of the Bratz product line or as Bratz licensed goods are directly dependent on, and derive their value from, the success of the Bratz dolls.

## IV.   STATEMENT OF OPINIONS AND BASES FOR OPINIONS

### A.   Brand Value and Creation

8.     At a minimum, a brand is simply "a name, term, sign, symbol, or design, or a combination of them, intended to identify the goods or services of one seller or group of sellers and to differentiate them from those of competitors" (American Marketing Association definition).[1]  However, a strong brand is much more than simply a name.  In the mind of the consumer, the brand is closely tied to the product. The product itself is the primary influence on what consumers experience with a brand and what they know about it.  At the heart of a successful brand is invariably a successful product.[2]  The strength of the brand relates directly to the success of the core product or service that defines that brand.  In order for a brand to be considered strong and recognizable the core product that defines the brand must be a success. The name 'Levis', for example, is a strong and highly recognizable brand name that derived its strength and recognition from the sales of blue jeans, its core product.  A strong brand has high awareness among its target market and a set of strong, favorable, and unique associations

[1] As quoted in Kotler, Philip and Kevin Lane Keller, *Marketing Management*, 12th ed. (Upper Saddle River, New Jersey:  Pearson/Prentice-Hall, 2007), p. 275.
[2] *See*, generally, Keller, Kevin, Strategic Brand Management, pp.145, 195

Exhibit 59 ,
P. 1788

attached to it.   A strong, clear brand provides value to consumers in that it signals quality, provides functional, emotional, self-expressive, and/or experiential value, and sets consumers' expectations about product performance and use.[3]

9.     For a manufacturer, a strong brand is an important source of financial returns.  In brief, a strong brand is a significant business asset, and the strategic value of brand building to a company and the economic value of a brand are well established in both marketing theory and practice.[4]  A strong brand is associated with: 1) less vulnerability to competitive marketing actions and marketing crises; 2) larger margins; 3) more inelastic consumer response to price increases and elastic consumer responses to price decreases; 4) greater trade cooperation and support; 5) increased marketing communication effectiveness; 6) potential licensing opportunities and additional brand extension opportunities; and 7) greater loyalty.  The value of strong brands has been noted as an important element in the overall value of the firm.[5]

10.     One of the key benefits of building a strong brand is the opportunity to leverage its strengths and introduce other products that complement the original one or are otherwise associated with its success. Line extensions refer to the use of an established brand to introduce different sizes, models or other variants of the original brand, *e.g.,* iPod Nano, iPod Touch, etc. Brand extensions refer to the use of a brand from an established product class to enter another product class, *e.g.,* Starbucks ice cream.[6]  Licensing involves contractual arrangements that allow the use of images, names, logos, characters, etc. by other brands to market their own products for

---

[3] Tybout, Alice M., and Gregory S. Carpenter, "Creating and Managing Brands," in Dawn Iacobucci (ed.), *Kellogg on Marketing* (New York: John Wiley & Sons, 2001), pp., 74-102.
[4] *See,* for example, David A. Aaker, *Managing Brand Equity,*" (New York: The Free Press, 1991), David A. Aaker, *Building Strong Brands* (New York: The Free Press, 1996), David A. Aaker and Erich Joachimisthaler, *Brand Leadership* (New York: The Free Press, 2000), and Kevin Lane Keller, *Strategic Brand Management,* 2nd edition (Upper Saddle River, New Jersey: Pearson/Prentice-Hall, 2003).
[5] *See,* for example, the annual valuation of the top 100 brands conducted by Interbrand, a leading brand consultancy firm, in "Best Global Brands", *BusinessWeek,* and August, 6, 2007.
[6] *See* Keller, Kevin Lane, *Strategic Brand Management,* 2nd ed. (Upper Saddle River, NJ: Prentice Hall, 2003, Chapters 11, 12, and 13.

a fee. In effect, the licensee "rents" another brand to enhance the appeal of its own product.[7] The assumption by the licensor is that consumers will pay more for a product because of the recognition and image of the licensed entity.[8]

**B.    The Success of Bratz Dolls and Bratz Branded Products**

11.    The Bratz family of products has followed this account of brand strategy. Following their introduction in 2001, MGA achieved early and rapid sales success with Bratz dolls.[9] Sales of full-size Bratz dolls grew rapidly, from approximately $23.1 million in 2001, to $123.1 million in 2002, to $294.1 million in 2006. MGA's total sales of Bratz branded merchandise, including accessories and other related products, grew from approximately $189.7 million in 2002, to $621.3 million in 2006. *See* Exhibit 4A. In addition to earning the Toy Industry Association "People's Choice Toy of the Year" and Family Fun "Toy of the Year" awards in 2001, Bratz fashion dolls have won numerous additional industry awards since.[10]

12.    According to MGA, a key factor in the tremendous success of Bratz dolls was their design and attitude. MGA has stated that the Bratz dolls were designed and developed by Carter Bryant, and were so named to "denote hip and cool young adolescent or teenage girls," are "unique in a variety of ways including their oversized heads and individual facial decoration," and that "[t]his idea of hip and cool is born out in the design of the BRATZ dolls."[11] Also according to MGA, the original four Bratz full-size dolls have a distinctive look, including "disproportionately large heads, artfully made-up, heavy-lidded, sultry, almond-shaped large eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and oversized feet."[12]

13.    Participants in MGA-sponsored focus groups conducted nationally in early 2002

---

[7] Keller, 2003, p. 371. *See* also pp. 110-112, and 371-375.
[8] Keller, 2003, p. 110.
[9] MGA0883926-3927
[10] http://www.mgae.com/awards/awards.asp
[11] MGA0883922-3927
[12] MGA Entertainment, Inc.'s Responses to Mattel, Inc.'s First Set of Interrogatories re Claims of Unfair Competition, pp. 8-9.

4

Exhibit 59
P. 1290

indicated that Bratz were "liked for their cool-looking appearance, clothing, and fashion styles," and that "girls aspire to be like the dolls."[13]  Girls indicated that they also liked the smaller size of Bratz dolls versus Barbie and other popular fashion dolls, "perhaps ... due to the smaller 9 ½" size of [original] Bratz, which may help pre-adolescent 9-10 year old girls "identify" being like them."[14]  MGA has also stated that the success of Bratz and certain of its related dolls is also due to their large eyes and mouths, which are "capable of being decorated with makeup."[15]  According to MGA, "[t]he facial decorations and features of the [Bratz] dolls are unique and much time, effort and monetary resources have been expended in perfecting them," and that "Bratz is popular because of its unique funky and sassy image."[16]

14.      Subsequent to Bratz dolls' introduction, MGA has created a wide variety of sub-brands and accessory products designed to complement and expand play with the Bratz fashion dolls.  Sales of Bratz doll accessories began in mid-2001, around the time of the introduction of the original full-sized Bratz dolls.[17]  The first accessories sold were for use with the dolls themselves, including "Bratz Fashion Pack" assortments, and "Bratz Shoe Packs."[18]  Sales of the accessories were relatively light in 2001, when approximately $1.2 million of Bratz dolls accessories were sold.  Sales grew rapidly, however, to $52.4 million in 2002 and to $85.8 million in 2006.  See Exhibit 4A.

15.      Beginning in 2002, MGA extended the original Bratz brand by introducing several line extensions.[19]  These new series Bratz branded dolls and related accessories were different in scale than the original series.  Bratz dolls that are smaller in scale than the original full size dolls, including the Micro Bratz and Lil Bratz series, accounted for approximately $9.8

---

[13] MGA0149335
[14] MGA0149336
[15] MGA0883927
[16] MGA0883926, 3933
[17] MGA Entertainment, Inc.'s Responses to Mattel, Inc.'s First Set of Interrogatories re Claims of Unfair Competition, pp. 10-11.
[18] MGA068793
[19] In fact, according to MGA, for the year 2003 MGA projected revenues of over $650 million "due to the success of a range of dolls known as [Bratz]..."  MGA0883921

million in MGA sales in 2002, growing to $62.2 million in 2005. Accessories associated with these small dolls similarly grew quickly, from $1.3 million in 2002, to $34.9 million two years later. Larger scale dolls (Bratz Big Babyz, for example) and related accessories accounted for approximately $109.4 million in revenue from 2005 to 2006. Additionally, various plush Bratz toys accounted for approximately $22.3 million in revenue from 2003 to 2006. *See* Exhibit 4A.

16.     MGA has also introduced a number of extensions of the brand to new product categories, offering a wide variety of products designed for use by girls themselves which are associated with the Bratz brand image. Bratz branded fashion and other accessories for girls began selling in 2002, when MGA earned over $926,000 selling such products as Bratz (Temporary) Tattoos and Bratz Funky Fashion Denim Watch & Ring assortments. The category has grown to $9.7 million in revenue in 2006. Bratz home décor, including Bratz themed wall mirrors and bedding, accounted for $18.2 million of revenue for MGA in 2005. Similarly, MGA sales of Bratz stationary products, sporting goods (*e.g.*, Bratz Mountain Bikes and Scooters) and games and puzzles grew substantially from 2002 to 2006. Sales of stationary products alone accounted for approximately $1.5 million of MGA revenues in 2006. MGA consumer electronics and electronic toys and games, including the Bratz Crazy Cool Curling Iron and Bratz Electric Funk Microscope, totaled $45.6 million in revenue in 2006, up from $26.9 million in 2003. *See* Exhibit 4A.

17.     The sales of these line and brand extension products followed the initial sale and success of the original Bratz dolls. As noted above, while revenue and unit sales of original Bratz doll accessories were relatively light the year Bratz dolls were introduced, sales grew rapidly to $52.4 million and 5.5 million units in 2002, an annual increase of over 4090% and 1280%, respectively. Sales of Bratz Small and Mini doll accessories similarly grew following the introduction these additional lines. While revenue attributable to Bratz Small and Mini dolls grew 386% in 2003, to $47.7 million, sales of Small and Mini doll accessories grew by 2257% during the same one-year period, to $29.7 million. Sales of Bratz products designed for use by girls, as well as other related product lines, did not begin until as early as 2002, the year after Bratz dolls were introduced. Sporting goods and consumer electronics sales substantially began

in 2003, while Bratz Large Doll series products were launched in approximately 2005. *See* Exhibit 4A.

18.     These Bratz brand and line extensions into new series of dolls and doll accessories are consistent with typical branding strategy wherein a company seeks to leverage a successful brand based on a core product to promote additional products.  All of the line and brand extensions use the Bratz name and/or images of the Bratz dolls in some way, and promote their connection to the Bratz dolls.[20]  MGA's Bratz television commercials as well as images of product packaging produced in this matter and reviewed by me illustrate this close connection. Animated or illustrated depictions (or photographic images) of the Bratz dolls are featured prominently in these advertisements and on a large proportion of these Bratz product packaging images.   These depictions or images of the original Bratz dolls link these follow-on products directly with the Bratz dolls, and again serve to link the success of the Bratz dolls with these other products.

19.     In marketing and offering these follow-on products, MGA leveraged the successful Bratz brand.  Production of MGA marketing documents in this matter indicate that MGA attempted to expand the Bratz brand from one focused on the dolls and their accessories to more of a lifestyle brand whereby girls would buy products for themselves because of their association with the Bratz concept.  For example, in one series of MGA-commissioned focus groups in July 2003, MGA tested concepts for Bratz bath and body and consumer electronics products for girls.  The executive summary for this research notes that these tested products "present a cross-roads for Bratz to transition from a "doll" brand to a "lifestyle brand."  Girls 6 - 12 recognize this is a change from "Bratz" = "fashion dolls" to "Bratz" = "fashion dolls plus things for girls who like Bratz.""  Additionally, the document authors note that "Girls inexorably link these attributes with the brand and ... consequently expect them to be mirrored in any brand extensions."[21]  Some of the attributes of Bratz cited by the participant girls in this study included

---

[20] MGA0868723-8865
[21] MGA0162351

7

Exhibit 59,
P. 1293

"Coolest looking," "Fun to play with," "Beautiful," "Cutest," and "Size."

20.     These focus groups indicate efforts by MGA to determine the core meaning of the Bratz brand and then to embed those core meanings in follow on products.[22] This concept was apparent to MGA personnel. According to MGA: "The success of the BRATZ dolls ensured a lucrative business of supplying accessories to the owners of BRATZ dolls creating a steady stream of revenue."[23]

21.     In addition to line and brand extensions manufactured and sold directly by MGA, the Bratz brand was also licensed for use by other companies seeking to benefit from an association with the Bratz image. As noted above, licensees are willing to pay a licensing fee when they perceive that such use will provide a lift in the sale of their products over and above the cost of licensing. For example, a licensee must perceive that a t-shirt with a Bratz image on it will produce greater revenue than the same t-shirt without a Bratz image on it, even after deducting the cost of the license to use the image. In a business plan dated March 2001[24], MGA recognized the potential opportunity of licensing the Bratz brand and that the success of any licensing program would be based upon the success of the Bratz dolls; "The only risk involved is that the Bratz dolls do not sell-through at retail."[25]

22.     According to MGA, licensing is a major source of income for the company. "Another major source of revenue generated by the Bratz dolls is income derived from merchandising rights by granting non-exclusive licenses to other companies worldwide."[26] "So far, 120 merchandise [license] agreements have been granted in respect of a wide range of products, including paper napkins, girls clothing, jewelry, bedding, home furnishing, stationery, toiletries, video games, footwear and electrical appliances etc."[27] MGA projected $12 million in

---

[22] I note that in the above-referenced focus group study, younger girls liked a more explicit association with Bratz than older girls who favored a more subtle connection.
[23] MGA0883923
[24] MGA4033288-4033310
[25] MGA4033303
[26] MGA0883929
[27] MGA0883929

8

licensing revenue per year by the end of 2004. By the following year licensing activity and revenue grew substantially, as MGA noted that it had over 350 licensees and that the company's licensing revenue increased almost 40% during the first four months of 2005, versus the same period in 2004. MGA Chief Executive Officer Isaac Larian estimated in 2005 that licensing "[accounted] for about half of his company's revenue and possibly a greater share of its profits" at that time.[28]

23.     If the Bratz dolls were not a commercial success, MGA likely would not have extended the brand into these other areas. It is noteworthy that MGA's own internal sales data for each of these various categories of Bratz branded products are listed under the senior category of "Bratz Sales."[29] As noted above, sales of accessories and other extension products generally followed the sales of the Bratz dolls themselves. And, as marketing research cited above demonstrates, follow-on products were expected to be consistent with the overall Bratz image and to be attractive to girls because of that connection. It is also unlikely that Bratz doll accessories in particular would have a viable market absent the sales of Bratz dolls. It is my understanding that Bratz doll fashion accessories are scaled to fit with the Bratz dolls, as noted in one 2002 news article about Bratz dolls: "Bratz dolls are an inch shorter than Barbie, so the rivals can't share their wardrobes."[30] According to one industry expert, line and brand extension plans may be mapped out when dolls are introduced, but are not actually implemented if the doll itself is not successful. And, doll accessories are not typically offered by third parties who do not themselves manufacture the dolls.[31]

## V.   DATA AND OTHER INFORMATION CONSIDERED

24.     My testimony is based on my review of documents produced to date in this case, deposition transcripts, and the sources and information cited in this report. A list of documents

---

[28] *The Hollywood Reporter*, "What's Up With Bratz?", June 2005.
[29] MGA0868723-8865
[30] *The Wall Street Journal Asia*, "Is It a Fashion Coup? Sassy Bratz Dolls Grab Some of Barbie's Limelight --- Upstart Is Reaching Preteens With Street-Smart Look for Toys," December 2, 2002.
[31] Interview with Chuck Scothon, Mattel General Manager, Mattel's Girls' Brands, February 6, 2008.

Exhibit _59_
P. _1295_

considered is listed in Exhibit 3.

25.     I am continuing my analysis. I may review other documents and information that may become available during the course of this litigation. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions.

## VI.     EXHIBITS TO BE USED

26.     I may rely on one or more of the documents and deposition testimony identified in Section V above. I may also rely on demonstrative exhibits. I may also rely on the trial testimony and trial exhibits of the parties' witnesses.

## VII.    COMPENSATION

27.     I am being compensated for my work in this case at the rate of $550 per hour. My compensation is not dependent at all upon the outcome of this matter.

## VIII.   PRIOR TESTIMONY AND PUBLICATIONS

28.     I have testified as an expert at trial or by deposition within the preceding four years as set forth in Exhibit 2.

29.     A list of my publications for the preceding ten years can be found in my CV (*See* Exhibit 1).

My understanding is that some of this testimony is covered by protective orders.

February 11, 2008

*Carol A. Scott*

CAROL A. SCOTT

Exhibit 59
P. 1297

Exhibit 1

# CAROL A. SCOTT

Anderson Graduate School of Management
University of California
Los Angeles, California 90024
(310)  825-4458
(310)  206-2019 (fax)

1834 Park Blvd.
Palo Alto, CA  94306
(650) 473-9297
(650) 473-9298 (fax)

## EDUCATION

Ph. D.          Northwestern University, June 1975
                     Major Field:  Marketing
                     Minor Field:  Social Psychology

M.S.           Northwestern University, August 1972
                     Major:  Management

B.S.           University of Texas at Austin, December 1970
                     Major:  Business and history education
                     Graduated with highest honors

## TEACHING EXPERIENCE

1977 - present    **University of California, Los Angeles**
                        1989-          Professor of Marketing
                        1980-89      Associate Professor of Marketing
                        1979-80      Acting Associate Professor of Marketing
                        1978-79      Assistant Professor of Marketing
                        1977-78      Visiting Assistant Professor of Marketing
                                          (on leave from The Ohio State University)

1985 - 1986      **Harvard Business School**
                        Visiting Associate Professor, Business Administration

1974 - 1978      **The Ohio State University**
                        Assistant Professor of Marketing

Exhibit 59
P. 1298

## ACADEMIC ADMINISTRATIVE EXPERIENCE

1990 - 94      Chairman of the Faculty, Department (School) of Management
                  Responsible for all matters pertaining to the approximately
                  100 faculty FTE in the Anderson Graduate School of Management, a
                  single department school, including: recruiting, retention, promotions,
                  salary adjustments, scheduling and staffing of courses, and student and
                  peer evaluation of teaching.  Manage budget and process all
                  appointments for temporary faculty.

1987 - 91      Associate Dean, Academic Affairs
1993 - 94         Act for the dean in his absence.  Responsible for all academic degree
                  programs and support services including: full-time, Fully Employed
                  and Executive MBA Programs, Ph.D. and M.S. Programs,
                  Management Communications Program, Management Field Studies
                  Office, Computing Services Center, and all interdisciplinary study
                  centers (e.g., Entrepreneurial Studies Center, Finance and Real Estate,
                  International Business, etc.).

1986 - 87      Assistant Dean, MBA Curriculum & Policy
                  Responsible for all academic policies pertaining to the full- time MBA
                  Program.  Coordinated a review of this program which resulted in
                  revised core curriculum;  implemented computerized bidding system
                  for course enrollment.

## JOURNAL ARTICLES PUBLISHED

Robert A. Hansen and Carol A. Scott.  Comments on attribution theory and advertiser
   credibility. *Journal of Marketing Research, 13,* May 1976.

Carol A. Scott.  Effects of trial and incentives on repeat purchase behavior. *Journal of
   Marketing Research, 13,* August 1976.

Carol A. Scott.  Modifying socially-conscious behavior:  The foot-in-the-door technique.
   *Journal of Consumer Research, 4,* December 1977.

Carol A. Scott and Richard F. Yalch.  A test of the self-perception explanation of the
   effects of rewards on intrinsic interest. *Journal of Experimental Social
   Psychology, 14,* January, 1978.

Carol A. Scott and Richard F. Yalch.  Consumer response to initial product trial:  A
   Bayesian analysis. *Journal of Consumer Research, 7,* June 1980.

2

Exhibit *59*
P. *1299*

Alice M. Tybout and Carol A. Scott.  Availability of well-defined internal knowledge and the attitude formation process:  Information aggregation versus self-perception.  *Journal of Personality and Social Psychology, 44*, March 1983.

Deborah Roedder John, Carol A. Scott, and James R. Bettman.  Sampling data for covariation assessment:  The effect of prior beliefs on search patterns.  *Journal of Consumer Research, 13*, June 1986.

James R. Bettman, Deborah Roedder John, and Carol A. Scott.  Covariation assessment   by consumers.  *Journal of Consumer Research, 13*, December, 1986.

James R. Bettman, Elizabeth H. Creyer, Deborah Roedder John, and Carol A. Scott.  Covariation assessment in rank order data.  *Behavioral Decision Making, 1*, October-December, 1988, 239-254.

## REPORTS, PRESENTATIONS, CHAPTERS IN BOOKS

Carol A. Scott, Decade of the Executive Woman, New York: Korn/Ferry, International, 1993.

Vicky L. Crittenden, Carol A. Scott, and Rowland T. Moriarty.  The effects of prior product experience on organizational buying behavior.  In Paul Anderson and Melanie Wallendorf  eds.)  *Advances In Consumer Research*, vol. 14, 1986.

James R. Bettman, Deborah Roedder, and Carol A. Scott.  Consumers' assessment of covariation.  In T. Kinnear (ed.), *Advances In Consumer Research*, vol. 11, 1983.

Carol A. Scott and Alice M. Tybout.  Some indirect effects of case vs. base rate data on information processing strategies.  In R. Bagozzi and A. M. Tybout (eds.), *Advances in Consumer Research*, 10, Association for Consumer Research, 1982.  (Abstract).

Carol A. Scott.  On using attribution theory to understand advertising effects.  In A. Mitchell (ed), *Advances in Consumer Research*, 9, Association for Consumer Research, 1981.

Carol A. Scott.  Speculations on the role of marketing and corporate communications:  Some implications for practice and issues for research.  In S. A. Greyser (ed.), Proceedings of  the MSI Workshop on Corporate Communications, Marketing Science Institute, forthcoming.

Carol A. Scott and Alice M. Tybout.  Theoretical perspectives on the impact of negative information:  Does valence matter?  Abstract published in K. Monroe (ed.), *Advances in Consumer Research*, 8, Association for Consumer Research, 1980

3

Exhibit 59
P. 1300

Carol A. Scott.  Consumer satisfaction:  Perspectives from self-perception theory.  Paper presented at the American Psychological Association conference, Montreal, Canada, September, 1980.

Carol A. Scott.  Forming beliefs from experience:  Evidence from self-perception theory.  In H. H. Kassarjian and T. S. Robertson (eds.), *Perspectives In Consumer Behavior*, 3rd edition, Scott, Foresman, 1981.

Alice M. Tybout and Carol A. Scott.  Extending the self-perception explanation:  The effect of cue salience on behavior.  In W. L. Wilkie (ed.), *Advances in Consumer Research*, 6, Association for Consumer Research, 1979.

Carol A. Scott.  Attribution theory in consumer research:  Scope, issues, and contributions.  Proceedings, American Marketing Association Fall Educators' Conference, S. Jain (ed.), 1978.

Carol A. Scott.  The role of self-perception processes in consumer behavior:  Interpreting one's own experiences.  In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research.

Robert A. Hansen and Carol A Scott.  Alternative approaches to assessing the quality of self-report data.  In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research, 1978.

Robert A. Hansen and Carol A. Scott.  Improving the representativeness of survey research:  Some issues and unanswered questions.  Proceedings, American Marketing Association Fall Educators' Conference, 1977.

Richard F. Yalch and Carol A. Scott.  Effect of initial trial of a new product on attitude-behavior consistency.  In W. D. Perreault, Jr. (ed.), *Advances in Consumer Research*, 4,   Association for Consumer Research, 1977.

Carol A. Scott, Researching the broadened concept of consumer behavior.  In G. Zaltman and B. Sternthal (eds.), *Broadening the Concept of Consumer Behavior*.  Association for Consumer Research monograph, 1975.

Brian Sternthal, Carol A. Scott, and Ruby Roy.  Self-perception as a means of personal influence:  The foot-in-the-door technique.  In B. Anderson (ed.), *Advances in Consumer Research*, 3, Association for Consumer Research, 1975.

Carol A. Scott.  Hendley distributors.  Consumer behavior research case in Gerald Zaltman, Philip C. Burger, and Randall L. Schultz, *Cases in Marketing Research*, New York: Dryden Press, 1975.

4

Exhibit 59 ,
P. 1301

## AWARDS

1984       Outstanding Teacher of the Year, presented by MBA students at the Graduate School of Management, UCLA.

## GRANTS RECEIVED (non-university)

New Roles for Corporate Communications.  Grant received from the Marketing Science Institute (with James R. Bettman, Richard J. Lutz, and Barton A. Weitz), December 1980 - May 1981.

## SELECTED PROFESSIONAL ACTIVITIES

Academic Advisory Council, Marketing Science Institute, 1987 to 1990

Editorial Boards:
Journal of Marketing Research, December 1975 to July 1985
Journal of Marketing, July 1978 to July 1986; January 1991 - August 1993
Journal of Consumer Research, December 1980 -

Occasional reviewer, Journal of Personality and Social Psychology and Journal of Applied Psychology

Distinguished lecturer at University of Pennsylvania (1978), University of Washington (1979), University of Florida (1979), Berkeley/Stanford (1980), University of California, Santa Barbara (1982)

AMA Doctoral Dissertation Competition chairperson, 1985

Treasurer, Association for Consumer Research, 1980-81

Resident Faculty Member, American Marketing Association Doctoral Consortium, 1979, 1980, 1983.  Consortium speaker 1984, 1985, 1986

Program Committee, 1979 Annual Conference, Association for Consumer Research, Prof. Jerry Olson, chairman

**Consulting projects** for a number of profit, not-for-profit, and governmental organizations in Ohio and California.  Assignments have included strategic marketing audits, development of strategic marketing plans, advertising planning consultation, marketing research analysis and interpretation, and expert witness testimony preparation.  Member of the board of directors, Petco, Inc. (1989-1991), Sizzler International (1993-1999), A-Fem Medical (1995-2003), and United Online, Inc., 2003 to present.

5

Exhibit 59
P. 1302

## PROFESSIONAL MEMBERSHIPS
Association for Consumer Research

## COURSES TAUGHT
Undergraduate (primarily at The Ohio State University)
    Consumer Behavior; Advertising
Masters' (primarily at UCLA)
    Consumer Behavior; Introductory Marketing; Advanced Marketing Management;
    Management of Distribution Channels; Global Marketing Management; Market
    Assessment; Marketing Strategy and Policy (Executive MBA Program)
Ph.D. (UCLA, Harvard, and Ohio State)
    Consumer Behavior Theory and Research
    Attribution Theory Research in Marketing
    Doctoral research paper supervision

## THESIS ADVISING
Chair, Ph.D. Thesis Committee 6 students
Member, Ph.D. Thesis Committee - 9 students
Member, Masters Examining Committee (Ohio State) - 3 students

## RECENT COMMITTEE ASSIGNMENTS (UCLA only)
Task Force on Women at Anderson, 2001 –
University Committee on Research, 1999-2001
    Chair, Faculty Grants Program
Dean Search Committee, 1997-1999
Executive Education Advisory Committee 1997 – 1999
MBA Admissions Committee 1997-99
Academic Staffing Committee 1997-98
Faculty Executive Committee, 1993 - 1997
Professional Educational Task Force (University), 1993-94
UCLA Child Care Services Advisory Board, 1990 - present; Chair, 1991 - 1993

6

Exhibit 59,
P.1303

**Exhibit 4C**

Examples of Bratz Brand Products by Profit Center

Source: Tonnu Exhibit 660, Bates # MGA0868723, -731, -743, -751, -793, -813, -831, -841, -843-845, -852, -858, -864
Product examples are not provided for Code 1000; products are illegible

| Code | Description |
|------|-------------|
| **100** | **Accessories** |
| 254164 | Bratz Tattoos 24 pc Asst. |
| 255567 | Bratz Funky Fashion Denim Watch & Ring |
| 255574 | Bratz Funky Fashion Watch and Ring 6pc Asst |
| 258551 | Bratz Lookin' Cosmetics - Lip Gloss |
| 261087 | Bratz Stylin' Slippers |
| 261148 | Bratz Far-Out Fashion Totes Asst 6pk |
| 261339 | Bratz Keychain Assortment |
| 261551 | Bratz Flash n Dash Sasha Denim Purse |
| 267690 | Bratz Movin' Groovin' Single Foil Pack LenticCards |
| 267713 | Bratz Movin' Groovin' Cards |
| | |
| **200** | **Home Décor** |
| 100003 | Bratz Designer Inflatable Lounge with Foot Rest |
| 257905 | Dazzlin' Deco Lamp |
| 261094T | Bratz Slumber Pillowcase 6PK Target |
| 265597 | Bratz party Pillow Asst. |
| 267980 | Bratz Sun Kissed Beach Table |
| 269878 | Bratz Neon Hot Clock |
| 270423L | Bratz Lucious Lip Lounge |
| 273950 | Bratz Pillow 6pc Asst. WM PDQ |
| 276067 | Bratz Way Cool Wall Mirror |
| 286301 | Bratz Petz Sofa Sleeperzzzzz |
| | |
| **300** | **Stationery** |
| 255321 | Bratz Pens Asst |
| 255345 | Bratz Fashion Passion Pen - Yasmin |
| 261001 | Bratz Pens Cloe/Yasmin Asst |
| 261100 | Bratz Activity Slumber Party - Dazzlin' Diary |
| 261306 | Bratz on the Go Organizer |
| 263401 | Bratz Far'Out Fashion Calculator |
| 264033 | Bratz Sashay Attache |
| 264040 | Bratz Organize Tote |
| 264088 | Bratz Photo Journal |
| 265436 | Bratz Tote 'n Go Notes |
| | |
| **400** | **Fashion Dolls** |
| 100768 | Bratz Yasmin Collector Doll $39.99 SRP |
| 101277 | Bratz Ice Champions Dana |
| 101499 | Bratz Winter Fun Pack |
| 101574 | Bratz Kids on Ice Doll - Cloe |
| 102063 | Bratz Play Sportz Dolls |
| 248521GE | Bratz English Asst |
| 248521S | Bratz Doll Asst S'02 |
| 248545G | Bratz Doll Jade International |
| 251590 | Beach Party Bratz Intl Asst |
| 251637F | Bratz Beach Party - Jade (Bandai) |

Exhibit 59
P. 1304

Exhibit 4C

| 500 | **Fashion Dolls Accessories** |
|---|---|
| 100072B | Bratz Genie Magic Bottle |
| 100539 | Bratz Reduced Generic FFMO 4pc Asst |
| 102236 | Bratz Fashion Pixies Unicorn with Doll |
| 248583 | Bratz Fashion Pack - Study Hall Style |
| 249115I | Bratz Fasion packs Asst Italy · |
| 254072 | Bratz FM Cruiser |
| 254119 | Bratz Fashion Pack F02 Punk n Prep |
| 255215 | Bratz Salon n Spa |
| 255406TT | Bratz Funky Fashion Makeover - Cloe |
| 255420 | Bratz Funky Fashion Makeover - Jade |

| 600 | **Small/Mini Dolls** |
|---|---|
| 100362 | 1st Ever Bratz Babyz Twiins with Hair Fla |
| 101079 | Bratz Babyz on Ice Yasmin |
| 101932 | Bratz Babyz Pampered Pups Dana |
| 251644W | Micro Bratz Asst Wal-Mart |
| 251651 | Micro Bratz - Sasha |
| 257264 | Lil Bratz Pax Asst |
| 257271 | Lil Bratz Pax Cloe |
| 257288 | Lil Bratz Pax Yasmin |
| 257318F | Lil Bratz Spring Break Dolls Asst |
| 257325 | Lil Bratz Spring Break Cloe |

| 700 | **Small/Mini Dolls Accessories** |
|---|---|
| 257363 | Lil Bratz Beach Bike |
| 257615 | Lil Bratz Loungin' Loft |
| 258414 | Lil Bratz Funky Fashions Furnishings |
| 259022 | Lil Bratz Loungin' Loft Living Room |
| 261384E | Lil Bratz Room Cube 1 |
| 262527 | Lil Bratz Mini Coup |
| 264521I | Lil Bratz Beach Vespa |
| 264787 | Lil Bratz Mall Clothing Store |
| 269106 | Lil Bratz Moto-Bike Silver |
| 269199 | Lil Bratz Convertible Cool Pearl/White |

| 800 | **Large Dolls** |
|---|---|
| 100997I | Bratz Big Babyz on Ice- Vinessa |
| 304044 | Bratz Big Babyz Doll - Cloe |
| 305194 | Bratz Big Babyz Doll 3pc Asst |
| 305225 | Bratz Big Babyz Twiins Roxxi & Phoebe |
| 313045 | Bratz Big Babyz Doll - Flanna |
| 323372 | Bratz Big Babyz Bubble Trouble Doll Pack 3pc Asst |
| 323389 | Bratz Big Babyz Bubble Trouble Doll - Cloe |
| 325154 | Bratz Big Babyz Rock Angelz Asst. |
| 334576 | Bratz Big Babyz Doll Pack Katia |
| 334637 | Bratz Big Babyz The Movie Crazy Karaoke Cloe |

Exhibit _59_,
P. _1305_

**Exhibit 4C**

| 900 | **Large Dolls Accessories** |
|---|---|
| 100416 | Bratz Ponyz Stylin' FFMO 4pc Asst |
| 304883 | Bratz Big Babyz Fashion Pack Nighty-Nite |
| 304982 | Bratz Big Babyz Fashion Bag |
| 304999 | Bratz Big Babyz Bubble Blitz Bathtub |
| 305170 | Bratz Big Babyz Fashion Pack 8pc Asst |
| 305170XX1 | Bratz Big Babyz Fashion Packs 6pc Asst INTERNAL |
| 308232 | Bratz Big Babyz Motor-Bike |
| 323426 | Bratz Big Babyz Carrier |
| 330561 | Bratz Big Babyz Motorbike RC with Doll |
| 406044 | Bratz Ponyz Stylin' FFMO Maisie |

| 1100 | **Games/Puzzles** |
|---|---|
| 260875 | Bratz Electric Funk-Instant Messenger-Pk 6/12 |
| 261513 | Bratz Flash n Dash Flair your Hair |
| 261797 | Bratz Design N Style 3pc |
| 268130 | Bratz Sylin' Dance Mat |
| 280514 | Lil Bratz Puzzle Nazalia |
| 281597 | Lil Bratz Playing Cards Single Deck with Tin |
| 285229 | Bratz Board Game Make me Up! |
| 287070 | Bratz Board Game 6pc Asst |
| 287223 | Lil Bratz Pinball |
| 289647 | Bratz Virtual Buddiez Unkal |

| 1500 | **Sporting Goods** |
|---|---|
| 100225 | Bratz 20" Mountain Bike |
| 101567 | Bratz Fashion Flair 20" Hybrid Cruiser Bike |
| 264217 | Bratz Super Styline Skates Size 2 |
| 264248 | Bratz Lucious Lip Slumber Bag, 2 in 1 |
| 266563 | Bratz Stylin' Scooter |
| 266570 | Bratz Beauty Skateboard w/ strap, 28" |
| 272359 | Bratz Glammin' Guard Gear |
| 272366 | Bratz Rockin' Helmet |
| 280873 | Bratz Totally Hot Helmet |
| 284055 | Bratz Retro Funk Foldable Scooter |

| 1600 | **Consumer Electronics** |
|---|---|
| 257820 | Bratz Funkadelic Fashion Phone |
| 257844 | Bratz CD Player - White |
| 257875 | Bratz Beauty Boom Box |
| 263371 | Bratz Groove Tube TV |
| 265498 | Bratz Stylin' Portable TV Player- Pink |
| 267539 | Bratz Chill-Out Fridge |
| 271543 | Bratz Star Alarm Clock/Radio 6pc Asst |
| 271642 | Bratz Crazy Cool Curling Iron |
| 280309 | Bratz Rock N Go Radio |
| 302858 | Bratz Lips Shower Radio (WT) |

Exhibit 5 9
P. 1306

Exhibit 4C

| | |
|---|---|
| **1800** | **Consumer Electronics** |
| 256700 | Bratz Secret Safe |
| 263166 | Bratz Match Maker Journal Sasha |
| 272205 | Lil Bratz Laptop |
| 275107 | Bratz Electric Funk Microscope |
| 295266 | Bratz Stylin Safe |
| 295532 | Bratz Matchmaker OOH LA LA Matchmaker Journal |
| 302711 | Bratz Speak Spanish - Digital Language Tutor |
| 305729 | Bratz Plugged In FM Wireless Mic |
| 333241 | Bratz Cyber Style Laptop |
| 403210 | Rock Angelz Microphone |

Exhibit _59_,
P. _1307_

**Exhibit 60**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant. | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>**REBUTTAL EXPERT REPORT OF<br>CAROL A. SCOTT** |
| AND CONSOLIDATED ACTIONS | |

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Exhibit _60_,
P._1308_

## I.     QUALIFICATIONS

1.     I am a Professor of Marketing at the Anderson Graduate School of Management of the University of California, Los Angeles ("UCLA"). I hold a Ph.D. in Marketing from Northwestern University, where my minor field of study was Social Psychology. I also received a Master of Science in Management degree from Northwestern University and a Bachelor of Science in Business and History Education degree from the University of Texas at Austin. I have served variously as the Chairman of the Faculty, Associate Dean, and Assistant Dean of the Anderson Graduate School of Management from 1985 through 1994. I am currently the faculty director of the Anderson School Executive Program. A true and correct copy of my Curriculum Vitae, including a list of publications, is attached as Exhibit 1 to my previous report in this matter, the Report of Carol A. Scott, Ph.D., dated February 11, 2008.

2.     Over the past thirty years, I have taught courses on Marketing Strategy and Management, Consumer Behavior, Advertising, Distribution Strategy, and International Marketing to students in undergraduate and graduate education programs at UCLA, Harvard Business School, and Ohio State University. I also have published numerous journal articles, research reports, and book chapters on Consumer Behavior, Marketing Research and other marketing topics. I have served on the editorial boards of the *Journal of Marketing*, *Journal of Marketing Research*, and the *Journal of Consumer Research*. I have been a member of the board of directors for Sizzler International and A-Fem Medical Corporation, Inc. and currently am a member of the board of directors of United Online and Classmates Media Corporation. Over the past 25 years I have served as a consultant and testifying expert for a variety of marketing issues. During the past four years I have provided expert testimony in trial or by deposition in the matters listed as Exhibit 2 in my February 11, 2008 report. My current hourly rate is $550.

3.     I have been retained by Quinn Emanuel Urquhart Oliver & Hedges as an independent expert witness to testify on behalf of Mattel, Inc. ("Mattel").

## II.   THE ISSUES FOR WHICH I WILL GIVE AN OPINION

4.    Previously in this matter, I submitted the Report of Carol A. Scott, Ph.D., dated February 11, 2008, (the "Scott Report"). I have now been asked by counsel for Mattel to respond to the report of Dr. Erich Joachimsthaler (the "Joachimsthaler Report"), and to the report of Mr. Paul K. Meyer (the "Meyer Report"), both dated February 11, 2008, and prepared on behalf of MGA Entertainment, Inc. ("MGA").

## III.   SUMMARY OF OPINIONS

5.    Having reviewed and analyzed the Joachimsthaler Report and the Meyer Report, as well as data available to me, I have concluded the following:

6.    While I agree with Dr. Joachimsthaler that the Bratz brand has been and is an extremely valuable asset for MGA, one of the most basic and fundamental factors for Bratz' success was the design and appearance of the dolls. At the time the dolls were introduced, they were significantly different from other fashion dolls on the market and their appearance and design provided a platform from which to appeal to the "tween" market.

7.    The marketing and branding activities used by MGA were not particularly unique. As stated by Dr. Joachimsthaler and Mr. Meyer, MGA engaged in a number of marketing and branding activities designed to enhance the sales of Bratz. These include activities related to the traditional four elements of the marketing mix: product, price, promotion, and distribution of the dolls. As Dr. Joachimsthaler has stated, however, these initiatives followed classic marketing and branding strategy, and indeed would be expected of any company trying to sell its product in today's toy marketplace.

8.    The ability of MGA to extend and license the Bratz brand was, and is, dependent upon the success of the Bratz dolls. Dr. Joachimsthaler and Mr. Meyer both note that MGA successfully leveraged the Bratz brand by introducing many accessories and line and brand extensions and by licensing the brand to other companies for use in selling their own goods and services. As noted in the Scott Report, had the Bratz dolls been unsuccessful, it is unlikely that these other products would have been introduced or that outside parties would have been

interested in licensing the Bratz images to use in helping to sell their products.

9.     To the extent that Dr. Joachimsthaler's assertion that MGA was able to charge a premium over the price that would have been commanded by an unbranded alternative is true,[1] Dr. Joachimsthaler has not indicated what portion of that premium is due to the appearance and the design of the dolls.

10.     Mr. Meyer's listing of several "apportionment factors" he states were important in making the Bratz dolls and related lines of business successful is not based upon the degree to which each actually _was_ valued in the marketplace, and thus actually did contribute to the Bratz success.  Mr. Meyer has not performed consumer research or other analyses to quantify his "apportionment factors," and has instead simply relied upon opinions of MGA experts and executives.

## IV.   BASIS FOR OPINIONS

### A.   Role of the Appearance and Design of the Dolls in the Success of Bratz

11.     As I had noted in the Scott Report, in the mind of the consumer, the brand is closely tied to the product.  As stated by brand authority Dr. Kevin Keller, "The product is at the heart of brand equity."[2]  In the Joachimsthaler Report, Dr. Joachimsthaler depicts the central role of the product in the following diagram [*see* Joachimsthaler Report, page 10]:

---

[1] While the notion of an unbranded alternative is a useful conceptual device, it is not clear what this would be in practical terms, *i.e.,* a generic fashion doll that does not look like Bratz and does not carry its name, a doll that looks like Bratz but has no associated advertising or marketing, or some other configuration.  Any branded doll would be expected to allow a price premium over 'unbranded' alternatives, and Dr. Joachimsthaler does not indicate whether the margin on Bratz dolls (e.g., the revenues minus associated costs) is larger than other branded dolls on the market.

[2] Keller, Kevin Lane, *Strategic Brand Management*, 3rd edition, Pearson Education, Upper Saddle River, New Jersey, 2008, p. 199.

Exhibit _60_ ,
P. _1311_



In this diagram, Dr. Joachimsthaler shows the product to be a central node around which other associations are closely connected.

12.    Dr. Joachimsthaler further lists four components of a good and proactive system of brand management in his evaluation of the success of the Bratz line of products.  These include the brand identity and position, the brand architecture, organizational structures and processes, and brand building programs.[3]   A brand identity system is composed of concepts and elements that fit together in a coherent and logical way.  These include differentiating attributes around which brand meaning is built, brand personality, and the use of various brand symbols.[4] Brand architecture refers to the line of products as a "team that functions together as a unit to create synergy, clarity and leverage."  The Bratz brand architecture includes sub-brands (*e.g.*, the four individual Bratz dolls introduced under the umbrella Bratz name), themes, and various brand extensions and licensed products.[5]

13.    It is clear, however, that the appearance and design of the Bratz dolls was an integral part of this system.  Each of the elements of the Bratz identity system includes some aspect of the appearance and design of the dolls.  For example, the key differentiating attributes

[3] Expert report of Dr. Erich Joachimsthaler, pp. 18-19.  *See* also, generally, David Aaker and Erich Joachimsthaler, *Brand Leadership:  The Next Level of the Brand Revolution*, The Free Press, New York, 2000, p. 194-195
[4] *ibid.*, pp. 21-25.
[5] *ibid.*, pp. 27-31.

include "diversity including ethnic diversity." The four Bratz dolls were designed to "resemble a mix of Hispanic, Caucasian, Asian and African American" ethnicities.[6] As Isaac Larian is quoted, "Not everybody is blond and six foot two inches and has perfect proportions: We're going to make these dolls multiracial, mix and match."[7]

14.    In his discussion of brand personality, Dr. Joachimsthaler mentions the markedly different character expressions of Bratz as compared to Barbie as a contributing factor.[8] As MGA itself has stated, the Bratz dolls, as designed and developed by Carter Bryant, and so named to "denote hip and cool young adolescent or teenage girls," are "unique in a variety of ways including their oversized heads and individual facial decoration," and that "[t]his idea of hip and cool is born out in the design of the BRATZ dolls."[9]  Additionally, author Eric Clark noted what girls saw when presented with Bratz was:

"... a lavishly made-up doll with a bored expression, its eyes heavy-lidded and larded with color. The lips were bee-stung, the body curvaceous. Oversized heads were emphasized by the skinniness of the rest of the body. The clothes were skimpy, ultra-fashionable, perched over pert little bottoms. Next to his doll he [Larian] put Barbie and then asked what Barbie reminded them of. "Our mothers," they replied."[10]

Dr. Joachimsthaler states that the Bratz characters "broke stereotypical molds and ideas about body image."[11]

15.    Another element noted by Dr. Joachimsthaler as being important to building a consistent and coherent brand identity is "the symbol."[12] Visual elements in general include "symbols, trademarks, taglines, colors, brand characters, or design aspects of the physical features of products, labels on the product, packaging or promotional materials that provide a

---

[6] *ibid.*, p. 31.
[7] Eric Clark, *The Real Toy Story: Inside The Ruthless Battle for America's Youngest Consumers*, Free Press, New York, 2007, p. 93, and quoted in the Expert Report of Dr. Erich Joachimsthaler, p. 22.
[8] Expert Report of Dr. Erich Joachimsthaler, p. 23.
[9] MGA0883922-3927
[10] Eric Clark, *The Real Toy Story: Inside The Ruthless Battle for America's Youngest Consumers*, Free Press, New York, 2007, p. 93, and quoted in the Expert Report of Dr. Erich Joachimsthaler, pp. 89-90.
[11] *ibid.*, p. 22.
[12] Expert Report of Dr. Erich Joachimsthaler, p. 23.

sort of 'glue' or structure that helps hold the various elements of the brand together into a coherent brand identity system making it easier to gain recognition or recall."[13]  In his discussion of Bratz use of symbols, Dr. Joachimsthaler notes the role of product design, "which is important in the fashion doll category."[14]  In keeping with a design trend of distorting people and objects, the Bratz design "involved creating oversized heads and huge lips, but keeping them to a 'softened' proportion that would still speak to girls of the ages 7 to 12 . . . . The big head and somewhat distorted facial features allowed the doll 'to go beyond the box' and fashion herself as an expressive and stylistic creation."[15]

16.    Elements of the appearance and design of Bratz are also evident in Dr. Joachimsthaler's discussion of the second component of a proactive system to manage brands, brand architecture.  The brand architecture in this matter refers to the collection of Bratz products taken as a "team" or as a whole.  Dr. Joachimsthaler includes the four original Bratz dolls – Cloe, Sasha, Jade and Yasmin – as sub-brands under the umbrella "Bratz" brand.  Having four different sub-brands allows girls ". . . to have different relationships with these dolls."[16]

17.    In terms of brand building programs, Dr. Joachimsthaler describes in some detail various marketing and branding programs that MGA conducted in order to build the brand equity for the Bratz line.  For example, MGA engaged in an extensive advertising campaign using a variety of media to achieve a high level of awareness among the target market.  In addition to this, MGA used an "open packaging" system to increase the visual impact on store shelves.  The Bratz packaging does this, in part, through its clear structure which "allows for almost the entire product to be seen on all sides and lets the doll and accessories to shine through."[17]

18.    In addition, Dr. Joachimsthaler notes that MGA has engaged in activities designed

---

[13] David Aaker and Erich Joachimsthaler, *Brand Leadership:  The Next Level of the Brand Revolution*, The Free Press, New York, 2000, p. 54, as quoted in the Expert Report of Dr. Erich Joachimsthaler, p. 24.
[14] Expert Report of Dr. Erich Joachimsthaler, p. 24.
[15] *ibid.*, p. 25.
[16] *ibid.*, p. 27.
[17] Expert Report of Dr. Erich Joachimsthaler, pp. 33, and 36-37.

to create strong, favorable and unique brand associations for Bratz.[18] Many of these associations held by mothers of tweens, whether positive, negative, or neutral, relate to aspects of the appearance and design of the dolls: cute, pretty, beautiful, big features, ugly, and strange looking.[19]

19.     Thus, I conclude that appearance and design of the Bratz dolls was an integral part of the brand identity/position and brand architecture that contributed to the success of the Bratz brand. In addition, I conclude that Bratz dolls' appearance and design at issue in this case played an important role in a number of MGA marketing and branding activities.

**B.     Marketing and Branding Programs Conducted by MGA**

20.     In evaluating the marketing and branding programs conducted by MGA, Dr. Joachimsthaler reaches the conclusion that "MGA Entertainment engaged in the classic brand-building activities that I would expect from an entrepreneurial-minded company,"[20] and I agree that the manner in which MGA went about marketing the Bratz products and creating the Bratz brand followed well-known marketing and branding theory and practice.[21]  MGA created a "whole product" by offering a line of accessories, *e.g.*, doll fashions, designed to be used with the Bratz dolls, and used "themes" to provide the story line that would include the dolls, the dolls' fashions, and other accessories. Further, MGA leveraged the original Bratz products, using them to help sell brand extensions and to attract a variety of licensees that wished to use Bratz to help sell their own merchandise. MGA distributed the Bratz products through important retail outlets and engaged in a variety of programs to obtain significant shelf space. Promotion through a variety of advertising media, packaging, and other mechanisms was used to support the sale of the Bratz product line. These activities would be expected of any company selling its

---

[18] *ibid.*, p.39-45.
[19] *ibid.*, p. 40.
[20] Joachimsthaler Report, at 87.
[21] *See*, for example, the classic marketing management textbook: Kotler, Philip and Kevin Lane Keller, *Marketing Management*, 12th ed. (Upper Saddle River, New Jersey:  Pearson/Prentice-Hall, 2007); *see also* Keller, Kevin Lane, *Strategic Brand Management, 2nd ed.* (Upper Saddle River, NJ:  Prentice Hall, 2003

product in today's competitive marketplace.

21.     Indeed, none of these marketing and branding programs was particularly unique. For example, Dr. Joachimsthaler notes the sub-brands and other doll "friends" and characters which were introduced to flank the original dolls and provide a more complete world for them. As early as 1961, however, Mattel had used this same strategy to introduce Barbie's boyfriend, Ken. Mattel has developed a host of Barbie family and friends, and has a Barbie Family Tree that lists them all, complete with pets, horses, dogs, and kittens.[22]  Similarly, both Dr. Joachimsthaler and Mr. Meyer discuss the importance of creating "themes" to encompass the various dolls and accessories.[23]   Themes have been used by other dolls, however, and in particularly by Mattel for its Barbie doll.  Some of these are described by Dr. Joachimsthaler, while others are noted by Mr. Meyer.   In discussing Mattel's "Worlds of" theme strategy for the My Scene Barbie line, Mr. Meyer quotes Mattel CEO Robert Eckert:

> "We have a lot of confidence that this Worlds Of strategy is the right strategy.  It goes back to looking at what has done well even in Barbie's tough period, that is the entertainment properties like Swan Lake or Rapunzel or Nutcracker as well as My Scene … this content driven strategy we know appeals to girls."[24]

**C.     MGA Successfully Leveraged the Bratz Brand Through Brand Extensions and Licensing**

22.     Both Dr. Joachimsthaler and Mr. Meyer discuss the successful brand extensions introduced by MGA, as well as the multitude of licensing relationships which allow third parties to use the Bratz images and brand name on products.[25]  Both of MGA's experts note how these brand extensions and licensed products help to extend the meaning and scope of the Bratz brand. As noted in my earlier report, however, these brand extensions and licensing opportunities were made possible by, and are still to a large degree dependent upon, the success of the Bratz dolls.[26]

---

[22] Eric Clark, *The Real Toy Story*, p. 85.
[23] *See* Expert Report of Dr. Erich Joachimsthaler, pp. 27-29. and Expert Report of Dr. Paul K. Meyer, pp. 19-30.
[24] Earnings call, first quarter, 2004, as quoted in Expert Report of Dr. Paul K. Meyer, p. 22.
[25] Expert Report of Dr. Erich Joachimsthaler, pp. 29-30 and Expert Report of Paul K. Meyer, pp. 39-40.
[26] Expert Report of Dr. Carol A. Scott, pp. 4-9.

23.    The first accessories were sold for use with the dolls themselves.  Line extensions such as new series of Bratz branded dolls were introduced in 2002 as were Bratz branded fashion and other accessories for girls.  Although Bratz undoubtedly was launched with the idea of leveraging the Bratz dolls through line and brand extensions and licensing deals in mind,[27] the realization of these opportunities depended upon the dolls being successful in the marketplace.  As I have earlier noted, a March 2001 business plan warned that "The only risk involved is that the Bratz dolls do not sell-through at retail."[28]

### D.    The Role of Bratz Appearance and Design Vs. Other Factors in Producing  Any Price Premium for Bratz Products Has Not Been Demonstrated

24.    Dr. Joachimsthaler estimates that MGA has been able to achieve a price premium for the Bratz brand over an "unbranded equivalent of 50% to 70%.[29]  It is somewhat difficult to evaluate this claim since it is not clear exactly what is meant by the "Bratz brand" and an "unbranded equivalent."  One possibility is that Dr. Joachimsthaler means that any product could be priced 50% to 70% higher if it carries the Bratz name/brand than if it has no brand name attached to it at all.[30]  If this is the case, then two observations can be made.  First, many brands are able to achieve a price premium over an "unbranded" alternative.  Thus, a relevant question would be to what extent does the Bratz brand achieve a higher premium than other brands, *i.e.*, what is the benefit of using the Bratz as opposed to another brand name?  Second, assuming that the Bratz brand can command a higher price premium than an unbranded equivalent or other brand names, to what extent is this premium due to the appearance and design of Bratz, as opposed to other factors?  As I have shown above, the features and design of the Bratz dolls have been an important and integral part of building the Bratz brand identity and architecture, and thus one would expect that a substantial portion of any price premium achieved

---

[27] MGA 0883923
[28] MGA 4033303
[29] Expert Report of Dr. Erich Joachimsthaler, p. 66.
[30] It is important to note that Dr. Joachimsthaler appears to refer to a premium price, and not to larger gross margins or profits.  Gross margins or profits would require the additional consideration of costs.  Branded goods may sell for a higher price, but they may also incur greater costs due to promotional costs among others.

would be due to them.

**E.    Mr. Meyer's Apportionment of Bratz' Profits Is Not Based on the Evidence Regarding the Actual Importance of the Identified Factors to Consumers**

25.    In the Meyer Report, Mr. Meyer attempts to apportion MGA's profits on its Bratz products to a number of identified factors.[31]   He does this using a variety of approaches, including an attempt to link certain creative elements involved in the development of a fashion doll with "Key Fashion Doll Attributes" used by Mattel.[32]  Other approaches include an analysis of the royalties paid by MGA to Mr. Carter Bryant; the work tasks to develop the original doll; MGA's product development contributions; licensing agreements; MGA investments in the Bratz product line; and variations among different Bratz products.[33]  None of these approaches, however, is able to tell us how important the appearance and design was to consumers in their decision to purchase a Bratz doll.

26.    The approach that is closest to one based on the actual importance of factors to consumers is the one in which Mr. Meyer attempts to link creative elements involved in the development of a fashion doll, *i.e.*, "apportionment factors", to doll attributes that Mattel used in its consumer research to track consumer opinions about various brands of dolls, *i.e.*, "Key Fashion Doll Attributes." The apportionment factors were based primarily on input from MGA executives and expert witnesses with a background in doll design.  These included: (1) Doll Design – no hair; (2) Design/Hair; (3) Themes; (4) Fashions; (5) Accessories; (6) Characters; and (7) Marketing.  For reasons not given in his report, Mr. Meyer does not include an apportionment factor called "Packaging."[34]

27.    According to Mr. Meyer, the copyrighted works at issue in this matter relate to factors (1) and (2) above, *i.e.*, "doll design – no hair", and "design/hair."  Again, the basis for

---

[31] Expert Report of Mr. Paul K. Meyer, dated February 11, 2008.
[32]  These attributes were used by Mattel in various consumer research studies to track the performance of various doll brands.
[33] *ibid.*, p. 6.
[34] *ibid.*, p. 46.

this characterization is discussions with MGA executives and experts. This assignment of contribution to only these design factors, however, is not entirely consistent with Mr. Meyer's discussion of some of these apportionment factors. For example, his discussion of the development of the Bratz characters includes several references to the appearance and design of the dolls and the Bratz name:

> " . . . having a rebellious attitude. This is their leading thought that navigates their brand – starting with the name 'Bratz'."[35], and

> "Aesthetically, Bratz had a completely different animated look . . . In this case, the competitive threat was based on a unique brand positioning and product execution that was relevant and resonated with older girls."[36]

28.     Mr. Meyer's next step is to try to link these creative elements to attributes used in consumer research studies used by Mattel in tracking attitudes and opinions about various brands of dolls. These "Key Fashion Doll Attributes" include: (1) Fun, (2) Cooler, (3) Prettier, (4) Clothes, (5) Friends, (6) Stuff, (7) Be Like, and (8) Hair. Because these attributes were used in tracking studies over a period of 18 months, they are assumed to be important elements of consumers' attitudes toward the brands. It is noteworthy, however, that Mr. Meyer presents no data to indicate whether these eight attributes were equally important to consumers, or whether some were more important than others. It appears that Mr. Meyer treats each of these attributes as equally important.[37]

29.     Next, Mr. Meyer categorizes each apportionment factor in terms of whether or not it contributes to each of the Key Fashion Doll Attributes. Based on discussion with MGA expert Robert Tonner, Mr. Meyer determines that "Doll Design (No Hair)" contributes to four of the eight "Key Fashion Doll Attributes," and that "Design/Hair" contributes to two attributes, one of which overlaps with the "no hair" design factor. Thus, "Design" (both no hair and hair) is said to contribute to "fun", "cooler", "prettier", "friends", and "hair", for a total of five of the eight

---

[35] Email, "My Scene," November 17, 2005, Y&R000152-154, quoted in Expert Report of Paul K. Meyer, p. 31.
[36] "The Bratz Brief", November 14, 2003, M0079765-71 at 68, quoted in Expert Report of Paul K. Meyer, p. 32.
[37] Expert Report of Mr. Paul K. Meyer, pp. 42-47.

attributes.  All other apportionment factors are similarly categorized.

30.    Like Mr. Meyer's designation of which apportionment factors relate to the copyrighted works at issue in this case, this categorization is arbitrary and subjective at best, and totally based upon other experts' opinions -- not consumers.  For example, Mr. Meyer and MGA expert Robert Tonner determined that "themes" and "fashions" contributed to girls' ratings of wanting to "Be Like" the dolls, but that "doll design" (hair and no hair) and accessories did not.[38]

31.    As his last step, Mr. Meyer counts all of the instances of contributions of apportionment factors to key fashion doll attributes and calculates the proportion of the total accounted for by each apportionment factor.  Since there were 26 total instances of apportionment factors contributing to key attributes, Mr. Meyer divides the four instances attributed to Doll Design (he does not count "hair" as contributed by Design/Hair) by the total of 26 to arrive at his conclusion that Doll Design accounts for 15.4% of MGA's profits.[39]

32.    This method fails on several counts.  First, it is not clear that each of the eight key fashion doll attributes should be weighted equally in terms of their ability to generate sales of, or revenue for, the brand.[40]  That is "fun" or "cooler" are assumed to be on equal footing with "themes", "fashions", etc.  Second, any interaction between key fashion doll attributes has not been taken into account.  That is, to what degree do "prettier" and "clothes" and "friends" contribute to "fun"?  Third, relationships between apportionment factors have not been taken into account.  For example, would fashions and accessories contribute as much to "be like" if they had been connected to a different doll design?

33.    In sum, this approach does not provide us with reliable evidence as to the importance of Bratz' appearance and design in consumers' decisions to purchase the Bratz brand and thus its weight in producing sales or profits.

---

[38] Expert Report of Mr. Paul K. Meyer, p. 45.
[39] ibid., p. 46.
[40] I note that data that relates most plausibly to sales or revenues is being used to make inferences about profits.

## V.   DATA AND OTHER INFORMATION CONSIDERED

34.   My testimony is based on my review of documents produced to date in this case, deposition transcripts, and the sources and information cited in this report.  A list of documents considered is listed in Exhibit 1.

35.   I am continuing my analysis.  I may review other documents and information that may become available during the course of this litigation.  I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions.

## VI.   EXHIBITS TO BE USED

36.   I may rely on one or more of the documents and deposition testimony identified in Section V above.  I may also rely on demonstrative exhibits. I may also rely on the trial testimony and trial exhibits of the parties' witnesses.

## VII.   COMPENSATION

37.   I am being compensated for my work in this case at the rate of $550 per hour.  My compensation is not dependent at all upon the outcome of this matter.

## VIII.   PRIOR TESTIMONY AND PUBLICATIONS

38.   I have testified as an expert at trial or by deposition within the preceding four years as set forth in Exhibit 2 of the Scott Report.

39.   A list of my publications for the preceding ten years can be found in my CV (*See* Scott Report, Exhibit 1).

Exhibit 60,
P. 1321

My understanding is that some of this testimony is covered by protective orders.

March 17, 2008

*Carol A. Scott*

CAROL A. SCOTT

Exhibit 60,
P. 1322