Exhibit 61

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4

5      -----------------------------------

6      CARTER BRYANT, an individual,      )

7                      Plaintiff,         )

8        vs.                              ) Case No.

9      MATTEL, INC., a Delaware           ) CV 04-9049

10     Corporation,                       ) SGL (RNBx)

11                     Defendants.         )

12     CONSOLIDATED WITH MATTEL, INC.,    ) Case No.

13     V. BRYANT and MGA ENTERTAINMENT,   ) 04-9059

14     INC., v. MATTEL, INC.              ) NM (RNBx)

15     -----------------------------------

16

17          CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19     VIDEOTAPED DEPOSITION OF CAROL A. SCOTT, Ph.D.

20              THURSDAY, APRIL 3, 2008

21

22

23

24

25     PAGES 1 - 288.

Exhibit 61 ,
P. 1323

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1

 2

 3

 4

 5

 6

 7

 8

 9          Videotaped Deposition of CAROL A. SCOTT,

10          Ph.D., taken on behalf of MGA Entertainment

11          Inc., at 525 University Avenue, Palo Alto,

12          California, commencing at 10:00 a.m.,

13          Thursday, April 3, 2008, before Cynthia

14          Manning, CSR No. 7645.

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 101
P. 1324

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

 3       FOR PLAINTIFF MATTEL, INC.:

 4

 5           QUINN EMANUEL URQUHART OLIVER & HEDGES

 6           BY:  SCOTT B. KIDMAN, ESQ.

 7           865 South Figueroa Street, 10th Floor

 8           Los Angeles, California 90017

 9           213.624.7707

10           sbk@quinnemanuel.com

11

12       FOR DEFENDANT MGA ENTERTAINMENT, INC. and

13       ISAAC LARIAN:

14

15           SKADDEN ARPS SLATE MEAGHER & FLOM LLP

16           BY:  CARL A. ROTH, ESQ.

17               RYAN WEINSTEIN, ESQ.

18           300 South Grand Avenue

19           Los Angeles, California 90071

20           213.687.5000

21           croth@skadden.com

22           rweinstein@skadden.com

23

24

25
```

Exhibit _lol_ ,
P. _1325_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3       FOR DEFENDANT and COUNTERCLAIMANT CARTER BRYANT:

 4

 5          KEKER & VAN NEST LLP

 6          BY:  MATTHEW M. WERDEGAR, ESQ.

 7          710 Sansome Street

 8          San Francisco, California 94111

 9          415.397.7188

10          mwerdegar@kvn.com

11          (NOT PRESENT)

12

13

14       ALSO PRESENT:

15

16          DANIEL STROUD, VIDEOGRAPHER

17

18

19

20

21

22

23

24

25
```

Exhibit 6 (
P. 1326

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

1    usually consult for, it's bringing my expertise to        10:34:07

2    bear on what they know as a company, because they

3    obviously know their products better than I do.   But

4    I spent some time with, for example, the printer

5    division down in San Diego, spent a day talking with     10:34:20

6    them about, you know, just general ideas about how

7    they could get greater leverage out of their budget.

8         And so it wasn't me telling them that you

9    should position this printer as X, but more thinking

10   about what would look like -- what would be the          10:34:38

11   characteristics of the best position for this brand,

12   how would you want to relate the ink jet line to the

13   laser jet line to the other lines you have and how

14   would that work in a communications strategy.

15   Excuse me.                                                10:34:54

16        So I didn't design their message, but I

17   helped them think about how to formulate it.

18        Q.   Have you personally or your company -- have

19   you personally working within your company ever

20   developed a branding or marketing strategy for any       10:35:12

21   company that related to any specific product or

22   service?

23        A.   Have I actually designed one?

24        Q.   Yeah.

25        A.   No.                                             10:35:23

Exhibit _____
P. 1329

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 24

1          Q.   You indicated that you provided services      10:35:25

2     for computer companies is; is that right?

3          A.   Yes.

4          Q.   And what sort of consulting work did you do

5     for them?                                                10:35:34

6          A.   I have done market research studies.

7          Q.   When you say "market research," what do you

8     mean?

9          A.   A survey of consumers.

10         Q.   Okay.  Well, in the context of these          10:35:44

11    companies, did you provide -- did you design a

12    branding or marketing strategy for any particular

13    product or service?

14         A.   No, but I provided -- I provided them with

15    the information about consumers that they would then    10:35:57

16    use for that.

17         Q.   Okay.  And you have been teaching, it looks

18    like, for 30 years?

19         A.   A long time.

20         Q.   So you would consider yourself an academic;   10:36:13

21    is that right?

22         MR. KIDMAN:  Objection; vague and

23    ambiguous.

24         THE WITNESS:  Primarily.

25    //

Exhibit 61,
P. 1328

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 45

1    you relied on as support for the statements you have    11:02:44

2    in paragraph 6?

3            MR. KIDMAN:   In addition to the other

4    things that she's mentioned?  She didn't -- well, in

5    addition to the other things that she has already    11:02:55

6    talked about.

7    BY MR. ROTH:

8        Q.   Go ahead.

9        A.   Right.   Okay.   I think you'll see in the

10   report that we also took a look at just the basic    11:03:03

11   timeline of sales, when things were introduced, and

12   how sales are built over time.  So that's just again

13   another little -- doesn't prove it.   It confirms and

14   kind of supports the idea that the dolls come first,

15   and then obviously other things will come along to    11:03:21

16   fill out that line.

17           Just take a look.

18           (Witness reviewing document.)

19           Well, that's also where this interview with

20   Mr. Scothon comes into play.  So we -- I did talk to    11:03:53

21   him about, you know, what is the role between the

22   Bratz doll and these other products.  I had heard,

23   for example, that --

24       Q.   Wait a minute.  I asked you if you spoke to

25   Mr. Scothon about Bratz and you said no.    11:04:11

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

```
 1      A.  Well --                                    11:04:13

 2          MR. KIDMAN:  Objection; argumentative.

 3          THE WITNESS:  -- I guess I was wrong.  I

 4   forgot.  I must have forgot because it's right here

 5   in the report that we did talk about -- one thing I   11:04:18

 6   did ask him about, I asked him sort of a small

 7   question, but would Bratz clothes fit on a Barbie

 8   and he said not really, that they are not -- that

 9   the dolls are different kind of proportions and,

10   yeah, you could put them on there, but they don't    11:04:34

11   look very good.

12          You know, because the idea is if -- you

13   know, could Bratz clothes stand on their own.  If

14   there was no Bratz doll, would the Bratz clothes and

15   other accessories sell.  And, you know, one of the   11:04:49

16   factors would be, well, could you use those clothes

17   on some other doll.  You know, you'd say, "Wow, I

18   really like that outfit, I'm going to put it on

19   Barbie," or put it on something else.

20          And he says, well, you know, you can, but    11:05:04

21   it doesn't look the same, because the proportions

22   are different.

23          So that was just the only thing I was

24   asking about in that.

25          Let's see if there is anything else.  The    11:05:13
```

Exhibit 61,
P. 1330

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 65

1    Q.  You went to Target yesterday?                    11:50:08

2    A.  I did.

3    Q.  You said you'd made some other store

4  visits?

5    A.  My associate, Harriett Cellini, went to        11:50:16

6  Toys R Us.  Top three sellers are Toys R Us,

7  Wal-Mart and I believe Target may be the third, so

8  we got two of the three.

9    Q.  When the Harriett go to Toys R Us?

10   A.  Well, she has been on a couple of              11:50:33

11  occasions.  She went -- I believe she went before

12  the focus groups were done because we needed to buy

13  product and she went again this week to do an update

14  and take some photographs for me.

15   Q.  Okay.  Did she produce a report or notes       11:50:47

16  from her store visits?

17   A.  She sent me some photographs of displays.

18   Q.  When did she do that?

19   A.  Yesterday -- no.  Day before.  This week

20  sometime.                                            11:51:01

21   Q.  Have those been produced?

22   A.  I don't think they have because I just got

23  them.  You can have them.

24   Q.  Can you give them to us today?

25   A.  Probably.  I mean, if you want them            11:51:10

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

1      Q.   Does Lisa Tonnu work for Mattel?          12:00:32

2      A.   I don't know that.

3      Q.   Could you look at Exhibit 4C for me,

4   please.   Excuse me.

5      A.   Mm-hmm.                                    12:01:02

6      Q.   Look under -- there is a variety of

7   categories, it looks like:  Accessories, home decor,

8   stationery, fashion dolls, et cetera.

9           Do you see that?

10      A.   Yes.                                      12:01:14

11      Q.   And then there is a code on the left.

12           Do you see that?

13      A.   Right.

14      Q.   Do you know what that code refers to?

15      A.   Not exactly, but my -- going on assumption,  12:01:21

16   if you looked at 4A, you'll see that there is a

17   profit center.   So these categories are the profit

18   centers that come out of the MGA records and then

19   these numbers would be item numbers, some kind of

20   recordkeeping number that MGA uses to track the       12:01:42

21   products.

22      Q.   How do you know those numbers come out of

23   MGA records?

24      A.   Well, again, have to try to figure out who

25   else would have them.   And I don't -- I don't --     12:01:56

Exhibit 61
P. 1332

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 74

1      Q.  I'm not asking you for a logical summation.   12:02:00

2  I want to know what's the basis for that statement.

3      A.  All right.  My understanding is that Tim

4  Hoffman had access to data that was provided by MGA.

5      Q.  Okay.  You've never seen that underlying   12:02:15

6  data, have you?

7          MR. KIDMAN:  Objection; asked and answered.

8          THE WITNESS:  And I think I told you, I

9  have never gone into the electronic database myself.

10 I don't have the skills to do that.   12:02:24

11 BY MR. ROTH:

12     Q.  Looking under "Accessories," I'm on Exhibit

13 4C right now --

14     A.  Mm-hmm.

15     Q.  -- about five lines down it says, "Bratz   12:02:36

16 stylin' slippers."

17         Do you see that?

18     A.  Right.

19     Q.  What's that?

20     A.  I have no idea.   12:02:49

21     Q.  And two down from that, "Bratz keychain

22 assortment," do you know what that is?

23     A.  No, I don't.

24     Q.  Have you ever seen a Bratz keychain

25 assortment?   12:02:57

Exhibit 61,
P. 1333

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 75

1    A.  I don't know.  I saw a lot of things        12:02:58

2  yesterday, but I'm not sure keychains would be a

3  part of it.

4    Q.  Okay.  Next category is "Home Decor."

5        Do you see that?                            12:03:09

6    A.  Yes, I do.

7    Q.  Did you see any home decor on your trip to

8  the store yesterday?

9    A.  Depends what this home decor means.  I did

10  see -- what did I see yesterday?  I saw a chair.  So   12:03:26

11  there was a package that had a fold-up kind of

12  like -- looks like a look fabric scoop chair.

13    Q.  Had you seen any home decor -- any Bratz

14  home decor prior to yesterday?

15    A.  I don't believe I had.                      12:03:44

16        And I have to do this caveat because, as

17  part of the production in this case, there was some

18  advertising -- some advertising and there were print

19  and television advertising, various things that we

20  saw, and I frankly don't recall what was in those.    12:03:56

21  So I'm prepared to be corrected about that.

22    Q.  Okay.

23    A.  They don't stand out.

24    Q.  Okay.  The Bratz neon hot clocks, do you

25  see that?                                         12:04:07

Exhibit 61,
P. 1334

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 76

1    A.  Yes.                                               12:04:08

2    Q.  Do you know what that is?

3    A.  No, I don't.

4    Q.  Ever seen that?

5    A.  Nope.                                              12:04:13

6    Q.  Then the next category is stationery?

7    A.  Yes.

8    Q.  Have you ever seen any Bratz stationery?

9    A.  I don't believe I have.

10   Q.  Okay.  We're going to go to the next page          12:04:24

11   on 4C, "Fashion Dolls Accessories."

12   A.  Mm-hmm.

13   Q.  Okay.  Have you ever seen a Bratz genie

14   magic bottle?

15   A.  No.                                                12:04:38

16   Q.  Have you seen any of the things listed

17   under "Fashion Dolls Accessories"?

18   A.  I could not swear to that.  I may have seen

19   some of them, but I don't recall specifically.

20   Q.  Okay.  Go back to the first page, "Home            12:04:53

21   Decor."  You said you saw a chair?

22   A.  Right.

23   Q.  Did you see any of the products listed on

24   the home decor there listed on Exhibit 4C?

25   A.  I don't think so.                                  12:05:16

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 77

1      Q.   What about under "Accessories," have you      12:05:17

2   seen any of those products?

3      A.   Gosh, I don't know about lipgloss.   It's

4   possible.

5      Q.   You might have seen that yesterday?          12:05:33

6      A.   Maybe.

7      Q.   You would not have seen it before

8   yesterday?

9      A.   Probably not.

10      Q.   The second page of Exhibit 4C again --       12:05:46

11   excuse me -- there is a reference at the bottom of

12   the page to large dolls?

13      A.   Right.

14      Q.   Do you know what that refers to?

15      A.   Well, large dolls is apparently a category   12:05:59

16   that MGA uses as a profit center, so I assume they

17   mean the large doll as opposed to the Mini Bratz.

18      Q.   Have you ever seen a large doll?

19      A.   I believe those are the dolls that were on

20   the self.                                          12:06:16

21      Q.   Are the large dolls the regular-size dolls

22   or are they larger than the regular-size dolls?

23      A.   Well, there is various kinds of dolls.

24   There is the regular, old doll-doll and then there

25   is I guess some smaller dolls and bigger dolls.   And   12:06:29

Exhibit _lel_,
P. _1336_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 78

1   so there is all kinds of variations on that theme.        12:06:32

2           The examples under here -- and this is not

3   an exhaustive list, so I'm not sure how they would

4   put the regular dolls.  But the examples here are

5   big babies.  So those are a little different than       12:06:47

6   the ordinary Bratz dolls that you usually think

7   about.

8        Q.  You say this is not an exhaustive list.

9   What do you mean by that?

10       A.  Well, I don't believe it's an exhaustive       12:06:56

11  list.  I think what it says in the title is examples

12  and these change probably every single day; there is

13  a new one and something is eliminated and something

14  is added.  So they are examples.

15       Q.  Okay.  Well, other than seeing the word         12:07:09

16  "examples" at the first page of Exhibit 4C, do you

17  happen to know whether or not this is an exhaustive

18  list?

19       A.  I don't believe it is.

20       Q.  Based on what?                                  12:07:18

21       A.  Based on Tim's representation to me that

22  it's not an exhaustive list.  It was examples.  And

23  I know that they have got hundreds of products.  We

24  couldn't possibly have listed them all on those

25  pages.                                                   12:07:31

Exhibit 61,
P. 1337

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 79

1     Q.  All right.  Go on the next page of Exhibit     12:07:31

2   4C, which has "Large Doll Accessories" at the top.

3   There is a category games and puzzles.

4         Do you see that?

5     A.  Yes.                                            12:07:48

6     Q.  Have you ever seen any of these games or

7   puzzles?

8     A.  I don't think so.

9     Q.  Okay.  What about under any of the sporting

10  goods listed under the next category?                12:07:56

11    A.  Nope.

12    Q.  What about consumer electronics?

13    A.  Well, I did see -- I've seen a photo of the

14  CD player.  That was in one of Harriett's photos, I

15  believe.                                             12:08:15

16        I don't believe so.  But we did see --

17  since we were only looking at -- we saw -- that list

18  goes on to the next page.  I'm looking to see if

19  it's on there.

20        There was a sewing machine in Toys R Us.  I    12:08:40

21  don't see that listed.  So I don't know whether that

22  could go under consumer electronics or what, but

23  that's not on this list.  So I don't recall seeing

24  the ones on this list, no.

25    Q.  Okay.  All right.                              12:08:58

Exhibit 61
P. 1338

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 122

1    without knowing who created it, it's a chart that          13:58:25

2    kind of does a strengths and weaknesses analysis of

3    My Scene and Bratz within three kind of content

4    areas.  So it's the product itself, the content and

5    the market.                                                13:58:42

6    BY MR. ROTH:

7        Q.  Okay.  Now, when you received this

8    document, did you ask anyone who created it?

9        A.  No.

10       Q.  Did you wonder whether this reflected the        13:58:49

11   views of Mattel's senior management?

12       A.  Well, I mean I just assumed that it is,

13   because these are the kinds of things that would be

14   produced in an ordinary product management

15   situation.  So, you know, to a large extent, there       13:59:04

16   is nothing particularly new in here that I didn't

17   see in other documents as well.

18       Q.  Okay.  Under "Marketing," second page --

19   and you understand this to basically be a comparison

20   between My Scene and Bratz?                               13:59:20

21       A.  That's correct.

22       Q.  First page is My Scene; second page is

23   Bratz?

24       A.  Correct.

25       Q.  Under marketing for Bratz, second page, it       13:59:26

Exhibit ___,
P. 1339

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 123

1    says it has strong branding, correct?                13:59:29

2        A.   That's correct.

3        Q.   And you would agree with that?

4        A.   Yes.

5        Q.   And then it makes reference to Bratz        13:59:35

6    packaging.

7             You see that?

8        A.   Where are you?

9        Q.   Third bullet point.  Under "product,

10   packaging and communication fit with brand image."   13:59:45

11            See that?

12       A.   Yes, mm-hmm.

13       Q.   The fifth bullet point says "high brand

14   awareness."

15            Do you know what that refers to?            13:59:55

16       A.   Well, I'm assuming high brand awareness

17   means high brand awareness, meaning the girls in the

18   market segment are aware of the brand.

19       Q.   Now, the middle third of the page refers to

20   content.                                            14:00:11

21            You see that?

22       A.   Yes.

23       Q.   And we talked about content previously,

24   correct?

25       A.   Yes.                                        14:00:15

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

```
 1    ambiguous, lacks foundation.                    14:22:06

 2          THE WITNESS:  Well, I don't have any way of

 3    understanding religiously, but I have seen it in

 4    some of their documents.

 5    BY MR. ROTH:                                     14:22:12

 6       Q.  Doesn't Mattel conduct monthly focus

 7    groups?

 8       A.  Well, what I saw reference to -- and I

 9    didn't see all of them because I don't think all of

10    them were provided.  But I believe this was used by  14:22:20

11    Mr. Meyer and he used some of them.  He said he was

12    unable to get some others.  And they were for a

13    period of time, but I don't -- and they went from

14    like maybe 2003 to 2006 or something.  So I don't

15    have any way to know if they are still doing it, did  14:22:38

16    it before that, but they were doing it for some

17    period of time.

18       Q.  You do have a way of knowing that, right?

19       A.  Well, I could probably ask him if I needed

20    to, but I didn't really need to.               14:22:48

21       Q.  Are you planning on asking him?

22       A.  No.

23       Q.  Do you care?

24       A.  Whether they are still doing it?

25       Q.  Mm-hmm.                                  14:22:56
```

Exhibit 6 (
P. 1341

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 131

```
 1     A.   No.                                    14:22:57

 2     Q.   You don't care?

 3     A.   Huh-uh.

 4     Q.   Those studies are not interesting to you at

 5   all?                                          14:23:04

 6          MR. KIDMAN:  Objection; vague and

 7   ambiguous.

 8          THE WITNESS:  Well, I didn't say that

 9   they're not interesting, but, you know, in this

10   particular case, you have a lot of different     14:23:10

11   sources, and those are clearly some sources that

12   we've looked at and other people have looked at.

13   They're not the only things that are there and

14   whether they are still doing it today wouldn't take

15   away from what they did in 2003 and 2004 in any way.  14:23:25

16   BY MR. ROTH:

17     Q.   Okay.  It says "enable consumer to 'sample'

18   lifestyles."  What does that mean?

19     A.   Well, sort of -- you can sort of

20   vicariously participate in some things, like the   14:23:42

21   example here is a Versace scarf.  I probably -- I

22   can't afford to dress in, you know, Versace

23   fashions, I can't do it, but I might be able to kind

24   of sample that lifestyle by having certain

25   accessories or things like that that are more      14:23:59
```

Exhibit 161,
P. 1342

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 184

1  everything else completely, just cleanly to separate   15:50:41

2  it out.

3       And I just point out that the design of the

4  doll keeps coming up.  I don't think anywhere in

5  here -- let's -- at least I hope I didn't -- there   15:50:51

6  is nowhere in here have I quantified which thing was

7  more important than another.

8       But the original report was simply to say

9  that to the extent you have a successful doll, that

10  success is then going to provide you with a platform   15:51:09

11  of further products and accessories and licensing

12  opportunities.

13  BY MR. ROTH:

14     Q.  Okay.  Setting aside the distinction

15  between your opening and rebuttal report, do you   15:51:23

16  have an opinion that the design of the doll caused

17  MGA to earn profits on the Bratz lines of

18  accessories and other follow-on products?

19     A.  I'm not going to talk about profits

20  because, again, profits meaning I've looked at   15:51:38

21  expenses as well as revenues, and I haven't done

22  that.

23     Q.  Okay.

24     A.  People tell me that this is a very

25  profitable product line, but I haven't verified that   15:51:50

Exhibit 161,
P. 1343

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 185

1    myself.                                              15:51:53

2         What I can say is, I think it's fair to say

3    that an opinion that might come through the rebuttal

4    report is that the design of the doll was an

5    important factor in the success of the doll.  The    15:52:06

6    success of the doll then drives the other

7    opportunities; the leveraging opportunities, the

8    licensing opportunities.

9         So it provides that ability to do it, but I

10   don't have any analysis here that would look at      15:52:25

11   profitability, and I haven't done any apportionment

12   to say what part of any profits, if any, would be

13   due to the design of the doll.

14   Q.  What did you do between your initial report

15   and the issuance of your rebuttal report to          15:52:51

16   understand the role of the design of the doll in the

17   success of the Bratz fashion-doll line?

18   A.  Well, mostly, that rebuttal report is just

19   what it was; it was a rebuttal to

20   Mr. Joachimsthaler.  And, as I think I said in that  15:53:10

21   report, I don't disagree with him in large measure.

22   It's just that in his discussion there are elements

23   of the design of the doll that he chooses not to

24   focus on.

25        And all I do in my rebuttal report is just      15:53:27

Exhibit 101
P. 1544

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 189

```
 1   like that.  He gives a range of how much he would        15:57:35

 2   apportion the product -- the profits to the design

 3   of the doll.  It's not zero.

 4        Q.  Okay.  Now, in terms of your original

 5   report which you're attempting to explain the            15:57:47

 6   success of the other Bratz products; is that right?

 7        A.  Well, it's not to explain them.

 8            MR. KIDMAN:  Objection; asked and answered.

 9            THE WITNESS:  What were you going to say,

10   Scott?                                                   15:58:04

11            MR. KIDMAN:  Objection; asked and answered,

12   vague and ambiguous.

13            THE WITNESS:  It's not to explain them.

14   It's simply to talk about the connection between the

15   Bratz dolls and those others products.                  15:58:10

16   BY MR. ROTH:

17        Q.  Okay.  And if the Bratz dolls had succeeded

18   because there was terrific packaging, for example,

19   would that have affected your opinion in any way as

20   issued in your original report?                          15:58:30

21            MR. KIDMAN:  Objection; incomplete

22   hypothetical, vague and ambiguous.

23            THE WITNESS:  No, I don't think so.

24   BY MR. ROTH:

25        Q.  So for the purpose of your original report,     15:58:40
```

Exhibit 101
P. 1345

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 190

```
 1    it's your testimony that you're not trying to        15:58:45

 2    distinguish among the various reasons for the

 3    success of the Bratz doll line; you're simply

 4    opining that it's the success of the Bratz doll line

 5    that led to the successor sales of the other Bratz    15:58:56

 6    products; is that right?

 7         A.  That's correct.

 8         Q.  If you could look at Exhibit 4980, which is

 9    your initial report.  And we're going to look at 4C,

10    which is toward the back.                             15:59:42

11         A.  Exhibit 4C?

12         Q.  Yeah.

13         A.  Okay.

14         Q.  Okay.

15             MR. KIDMAN:  Give me one second.             15:59:51

16             MR. ROTH:  Sure.

17         Q.  Now I'm on the first page of that exhibit.

18    Do you know what role the -- strike that.

19             Do you know what role the design of the

20    Bratz doll had in the success, if there was, in the   16:00:16

21    sale of Bratz tattoos?

22         A.  Okay.  I think the way to answer this most

23    accurately for you is, again, nowhere in this report

24    do I parse out the importance or the degree of

25    importance of the design of the doll versus other     16:00:47
```

Exhibit 61,
P. 1346

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 191

1    elements.   Okay.  So in that regard, there is no      16:00:49

2    attempt here to say that Bratz -- the success of

3    Bratz tattoos -- I don't even know if Bratz tattoos

4    were successful.  For all I know, it failed

5    miserably; I have no idea.  But what I can say is,      16:01:07

6    to the extent that Bratz tattoos are sold as being

7    associated with Bratz, then the success of the Bratz

8    is being used to help sell those products.

9         Q.   How do you know?

10        A.   Well, if it weren't, why would we label      16:01:26

11   them "Bratz tattoos"?  Why wouldn't we just call

12   them "tattoos."  The whole point of putting a Bratz

13   name on them -- every product that I have seen that

14   is one of these accessory products, they all have

15   the doll, you know, a drawing or an animated drawing   16:01:43

16   of the doll on them.  The only reason I can see that

17   you would put them on there is that you're trying to

18   create the association of that product with the

19   Bratz.

20            And, you know, I guess somebody could argue    16:01:56

21   that we're trying to make, you know, the opposite

22   direction, but I think it's really that these

23   tattoos -- you should buy these tattoos as opposed

24   to other tattoos because these are Bratz and others

25   aren't.                                                 16:02:15

Exhibit 61
P. 1547

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 192

```
 1      Q.   Well, you have never seen the Bratz          16:02:15
 2   tattoos, correct?
 3      A.   You know, I have seen lots of photographs
 4   of things that we've had in the past, and I don't
 5   know if Bratz tattoos were them or not.   Everything   16:02:24
 6   I've seen a picture of has, you know, the Bratz name
 7   and it has a picture of the doll or the dolls or a
 8   doll or some doll.
 9      Q.   Is there a picture of the dolls on the
10   Bratz tattoo package?                                 16:02:42
11      A.   You know, I would be prepared to be
12   contradicted, but based on everything I've seen, you
13   know, to the extent that I don't remember seeing
14   this particular item, I can't swear to you that it's
15   on that particular item, but it's on everything      16:02:57
16   else.   So the probabilities are pretty darn high.
17      Q.   So that's a logical summation that you made
18   based upon your review of other Bratz-related
19   products, correct?
20      MR. KIDMAN:   Objection; mischaracterizes          16:03:12
21   her testimony.   She said she can't recall if she saw
22   the specific product.
23      THE WITNESS:   Well, again, you know, I have
24   not seen every single Bratz accessory out there.
25   That would take a long time.   They have a lot of     16:03:24
```

Exhibit 161,
P. 1348

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 194

1      Q.   How many photographs?                        16:04:31

2      A.   Well, there is quite a few that we got

3  that -- I think they're referenced here as part of

4  something that we've seen that Mattel asked Skadden

5  to provide a lot of photographs of some products.    16:04:45

6  And, you know, it's a long time ago.  I have seen a

7  lot of those.

8           And then I've also asked Tim and Brian,

9  because they keep physical possession of all the

10  materials that we get.  Because they don't trust me   16:05:00

11  not to lose things.  I've asked them about 16 times,

12  "Would you please go back and look at these again

13  and just be sure?"

14          And so nothing that we have seen -- let's

15  put it that way.  Nothing that we have seen          16:05:14

16  contradicts that rule.  It's not that they don't

17  somewhere, but the vast majority are like that.

18      Q.   Okay.  I'm asking not what the group of you

19  have seen.  I'm asking right now what you've seen.

20  You don't recall having seen a Bratz tattoo package?  16:05:30

21      A.   I don't recall them specifically.

22      Q.   Do you know whether the tattoos are

23  particularly high quality?

24      A.   I have no idea.

25      Q.   You don't know; okay.                        16:05:41

Exhibit 101
P. 1349

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 195

1        What about the Bratz funky fashion denim        16:05:46

2    watch and ring, have you ever seen that?

3        A.   I may have.

4        Q.   Do you know whether there is a picture of a

5    Bratz doll on that package?                          16:06:00

6        A.   You know, I can save you a lot of time

7    because most of these I'm not going to remember them

8    specifically.  I can't even remember specifically

9    all the products that I saw yesterday.  But I can

10   tell you that I have not yet been able to find a     16:06:14

11   Bratz accessory package that does not either say

12   Bratz or have the picture of the dolls or a doll.

13       Q.   What I am trying to then get at, and I'm

14   all for saving time, is with respect to each one of

15   these products, and there is a long list of products 16:06:39

16   here, which is examples and may not be an exhaustive

17   list, as you indicated earlier, have you looked at

18   the role of the product itself versus its

19   association with Bratz in terms of explaining its

20   commercial success or lack thereof?                  16:06:56

21       MR. KIDMAN:   Objection; vague and

22   ambiguous.

23       THE WITNESS:   I'm going to answer it this

24   way.  I have not analyzed each individual product to

25   determine which products were profitable and which   16:07:24

Exhibit 101,
P. 1350

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 196

1    were not.  That will be something the accountants   16:07:27

2    will obviously end up doing, not my job.

3          And I have not gone out to again apportion

4    different factors into success or lack thereof of a

5    product.  But what I can say is that every product   16:07:47

6    that I've seen is being sold at least in part on the

7    basis of its association with Bratz.

8          Now, someone else will decide how much and

9    quantify that relationship, but that's not what I

10   was asked to do.                                     16:08:13

11         I do know that people that license

12   products, they pay Bratz; Bratz doesn't pay them.

13   So to the extent that somebody is paying for

14   something of value, it's going in that direction.

15   BY MR. ROTH:                                         16:08:33

16      Q.  How do you know that?

17      A.  Well, I have never -- you can tell me

18   differently, but I have never seen a license

19   agreement where it's the licensor that pays the

20   licensee.  You know, it might be if you had a lousy  16:08:43

21   product and you were trying to -- you know, that

22   would be the case like -- if you said, for example,

23   gosh, Bratz aren't being perceived as very cool and

24   I wonder how I could get them to be perceived as

25   more cool.  Maybe I could go to -- and I had to have  16:09:03

Exhibit 61,
P. 1351

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 198

1    Q.   Back to the question I asked a few minutes      16:10:10

2    ago.  As I understand your testimony, you believe

3    that the association with Bratz played some role in

4    the commercial success, or lack thereof, in each of

5    these products but it's not your job to determine      16:10:30

6    how large that role was?

7    A.   That's correct.

8    Q.   And I take it with respect to each of these

9    individual products, you also didn't look at the

10   role of the qualities or attributes of the            16:10:43

11   underlying product as opposed to its association

12   with Bratz; is that right?

13   A.   That's correct.

14   Q.   So, for instance, just to pick out a few

15   here, under home decor, the second item is dazzling    16:10:57

16   deco lamp, right?

17   A.   Right.

18   Q.   You didn't analyze the dazzling deco lamp

19   to determine whether it was a particularly great

20   lamp as opposed to its association with Bratz?         16:11:10

21   A.   I didn't verify that.  There is somebody --

22   I can't remember who talks about the process of --

23   that happens within MGA of vetting licensees, you

24   know, reviewing it.  And so MGA has a process of

25   satisfying themselves that the product is up to       16:11:26

Exhibit 61
P. 1352

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 208

1   with the dolls and they were introduced around the        16:26:25

2   same time.

3          That paragraph also says those sales of

4   accessories were light in 2001, but they then began

5   to grow as the sales of the doll began to grow.        16:26:37

6   BY MR. ROTH:

7       Q.   Do you happen to know when these other

8   Bratz products were introduced?

9       A.   Well, which other Bratz products?

10      Q.   Any other.        16:26:49

11      A.   Well, I don't think we know that from the

12   data that's been provided.  I think all we can

13   kind -- well, you can tell when some categories were

14   because obviously in some time periods they aren't

15   there, but I don't think we have the data down to        16:27:04

16   individual products.  I think what we have are

17   sales, revenue and quantity numbers over time for

18   categories.  I don't think we have individual things

19   of that kind of.

20      Q.   When did MGA start selling Bratz home        16:27:18

21   decor?

22      A.   I'm sorry, Bratz home decor?

23      Q.   Yeah.

24      A.   I don't know that one.

25      Q.   What about Bratz stationery?        16:27:27

Exhibit ___,
P. 1353

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 209

1       A.   Bratz?                                      16:27:29

2       Q.   Stationery.

3       A.   I don't know.

4       Q.   What about mini dolls?

5       A.   Let's see if we talked about that.  To the   16:27:38

6   extent that I know any of those, we mentioned it in

7   here and I don't know for sure if I have that

8   information in here.

9       Q.   Okay.

10      A.   But I know they didn't come before the       16:27:54

11  Bratz doll.

12      Q.   How do you know that?

13      A.   Well, because the Bratz dolls were -- as

14  far as I know, they were the first dolls and the

15  other variations on the theme came later.  But, you   16:28:06

16  know, it's like I don't think they introduced

17  fashions and then the doll.  I think you introduce

18  the doll and then the fashions.

19      Q.   Do you know if that happened here?

20      A.   What?                                         16:28:18

21      Q.   That they introduced the dolls first and

22  then the fashion later?

23      A.   Well, I think what I understand is that the

24  dolls came with fashions.  So they are pretty much

25  simultaneous, although there may be some additional   16:28:29

Exhibit 61
P. 1354

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 220

1          THE WITNESS:  Could have been.                16:59:20

2    BY MR. ROTH:

3        Q.  Okay.  What about fashions, you indicated

4    that the use of fashions is not novel, correct?

5        A.  Right.  It's a fashion doll.              16:59:32

6        Q.  Okay.  But it's possible that the fashions

7    associated with the Bratz doll line are superior to

8    other fashions offered with other fashion-doll

9    lines, correct?

10          MR. KIDMAN:  Objection; vague and           16:59:45

11   ambiguous.

12          THE WITNESS:  Possible.

13   BY MR. ROTH:

14       Q.  What about MGA's other marketing branding

15   programs?  You indicate they're not unique, correct?  16:59:55

16       A.  That's correct.

17       Q.  But are they possibly superior to the

18   marketing branding programs of other doll lines?

19          MR. KIDMAN:  Objection; vague and

20   ambiguous.                                          17:00:06

21          THE WITNESS:  It's possible.

22   BY MR. ROTH:

23       Q.  Have you studied it one way or the other?

24       A.  No.

25       Q.  So it's possible that MGA's marketing       17:00:13

Exhibit 41
P. 1355

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 221

1  branding was superior to other fashion-doll lines;   17:00:15

2  you just don't know one way I or the other?

3          MR. KIDMAN:  Objection; vague and

4  ambiguous.

5  BY MR. ROTH:                                          17:00:24

6      Q.  Is that right?

7      A.  I'd say it's possible.

8      Q.  You just haven't studied?

9      A.  I have not studied that.

10     Q.  Okay.  So the things they did were the same   17:00:32

11 things that a lot of smart companies do; you just

12 don't know whether they did it better than others,

13 correct?

14     A.  Correct.

15         MR. ROTH:  I'd like to mark as next in        17:01:15

16 order a two-page document, Bates No. M 0079846 and

17 '47.  It's 4992.

18         (Deposition Exhibit 4992 was marked for

19         identification)

20 BY MR. ROTH:                                          17:01:34

21     Q.  Have you seen this document before?

22     A.  Yes, I think I have seen this.

23     Q.  Okay.

24     A.  I didn't recognize it because of the copy

25 things, but I do recognize this first paragraph.      17:01:52

Exhibit __
P. 1356

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 245

1    sales initiative for their dolls around packaging?    17:35:11

2         MR. KIDMAN:  Objection; vague and

3    ambiguous, lacks foundation.

4         THE WITNESS:  Well, what it says is that

5    they had -- they had more open packaging to let    17:35:22

6    people see the dolls better and they thought that

7    was a good thing.

8    BY MR. ROTH:

9       Q.  And do you agree?

10      A.  Could be.                                    17:35:34

11        MR. ROTH:  Why don't we -- we're getting

12   close to the end.  Why don't we take a break, see

13   where we are at, and see if I can organize myself

14   and hit the final stretch.

15        All right?                                     17:35:56

16        MR. KIDMAN:  All right.

17        THE WITNESS:  Sure.

18        THE VIDEOGRAPHER:  We're off the record.

19   The time is 5:36 p.m.

20        (Recess taken)                                 17:36:53

21        THE VIDEOGRAPHER:  We're back on the

22   record.  The time is 5:49 p.m.

23   BY MR. ROTH:

24      Q.  Okay.  Ms. Scott, would you in the normal

25   course of your work ever be asked either in the    17:49:27

Exhibit 161 ,
P. 1357

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 246

1    litigation context or the consulting context at          17:49:32

2    CrossField to measure the various attributes of a

3    product that enhance or detract from the brand of

4    the product?

5           MR. KIDMAN:  Objection; vague and                 17:49:49

6    ambiguous.

7           THE WITNESS:  Well, I hope they would

8    phrase the question a little bit more clearly for

9    me, because I'm not entirely sure what that means,

10   but would I ever be asked to examine attributes of a   17:50:02

11   brand, sure.

12   BY MR. ROTH:

13       Q.  No, what I mean is, in connection with the

14   work that you do for a client, would you be asked to

15   take a look at a client's brand and then to            17:50:13

16   understand what is enhancing that brand or maybe

17   detracting from that brand?

18       A.  You know, I might be asked to do some

19   consumer research to understand positives and

20   negatives, yes.                                        17:50:31

21       Q.  So the following things are helping you,

22   helping your brand, the following things are hurting

23   your brand?

24       A.  Right, yes.

25       Q.  And you might do research to try to            17:50:39

Exhibit 11,
P. 1358

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 247

| | | |
|---|---|---|
| 1 | determine that? | 17:50:42 |
| 2 | A.  Yes. | |
| 3 | Q.  Okay.  So -- and it's your professional | |
| 4 | opinion that the design of a product is an attribute | |
| 5 | of a product that might affect a brand; is that | 17:50:50 |
| 6 | right? | |
| 7 | A.  Yes. | |
| 8 | MR. KIDMAN:  Objection; vague. | |
| 9 | BY MR. ROTH: | |
| 10 | Q.  So the design of a product might enhance or | 17:50:57 |
| 11 | detract from the brand of that product; is that | |
| 12 | right? | |
| 13 | A.  Yes. | |
| 14 | Q.  And how would you go about determining | |
| 15 | whether or not the design of the product enhances or | 17:51:13 |
| 16 | detracts from the brand of the product? | |
| 17 | A.  Well, you know, there is a series of steps | |
| 18 | that you could go through, and, again, you know, | |
| 19 | designing studies on the fly is probably not the | |
| 20 | best way to design them, but I can give you a couple | 17:51:28 |
| 21 | of initial thoughts. | |
| 22 | You know, there is everything from the very | |
| 23 | simple questioning about asking people about certain | |
| 24 | attributes, but probably at some point you would | |
| 25 | want to do some experimentation where -- you know, | 17:51:47 |

Exhibit _lel_,
P. _1359_

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 248

```
1    after you do the kind of -- you know, I might start      17:51:51

2    with some focus groups, where people might tell me

3    about the product; whatever you want to say, tell me

4    about the product.

5         And then on the basis of that that I might          17:52:01

6    get from them, elicit some notions about attributes

7    that stand out to them that they comment upon.  And

8    then I might design some more, you know, pointed

9    questions in that direction to see what I get with

10   the self-explicated kind of a question about tell me     17:52:14

11   what you like or don't -- what does look good or

12   what doesn't, what's gotten in your way with this

13   product.  There might be a variety of ways to ask

14   that question.

15        And then at some point I would probably              17:52:29

16   want to do some experimentation, where based upon

17   what they're telling me I could create different

18   treatments, if you will.  So I could create a

19   product that has this design, a product that has

20   that design, and then do some experimentation to see      17:52:44

21   which one consumers respond to better.

22        Because sometimes they can't always tell

23   you, you know.  Some things are kind of not -- I

24   don't want to say subliminal, but sometimes we're

25   not -- our rational self takes over and we don't           17:53:02
```

Exhibit __61__,
P. __1360__

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 249

1   often just -- we can't sort of say exactly what we   17:53:05

2   respond to visually.  But I would try to do some

3   experimentation with it.

4       Q.  Did you do any of those -- any of that work

5   in this case?                                        17:53:15

6       A.  No.

7       Q.  Do you have any plans to do any of that

8   work in this case?

9       A.  Not sitting here today.

10      Q.  Okay.  I want to go back, if we could to --   17:53:22

11  see if I can find it.  It's your Transamerica

12  report, which -- that right there, exactly.

13      A.  Thanks.

14      Q.  And could you just -- if you need to read

15  it a little bit to familiarize yourself or remind    17:54:08

16  yourself of what you did.

17      A.  (Witness reviewing document.)

18          Yes.

19      Q.  Can you just explain for us in summary form

20  what you did in connection with this report, what    17:55:20

21  conclusions you reached.

22      A.  Okay.

23          MR. KIDMAN:  Objection --

24          THE WITNESS:  I think it's helpful to --

25          MR. KIDMAN:  -- overbroad.                    17:55:27

Exhibit 61
P. 1361

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 250

```
1            THE WITNESS:  -- start --              17:55:27
2        .   MR. KIDMAN:  I'm sorry.  Just making an
3   objection.  The question is overbroad.
4            THE WITNESS:  Well, it just means it will
5   take a little time to answer.                   17:55:34
6            I think I'll start kind of with the context
7   of what this report was about.
8   BY MR. ROTH:
9        Q.  Okay.
10       A.  This was a very unusual case, I don't think  17:55:43
11  I have ever seen another one quite like it, where
12  the company that bought the Transamerica company and
13  the Transamerica Building -- you know, at the time
14  property changes hands you get reassessed for tax
15  purposes.  And they were going to be -- I think the  17:56:01
16  rule is -- I can't remember exactly, but I believe
17  that you get taxed based upon your rental income.
18  There is some -- there is the value of the building
19  and then there is some calculation of returns that
20  you get and then the tax board decides how much --  17:56:16
21  what your tax rate is going to be.
22           And the company that purchased the
23  Transamerica Building wanted to be able to subtract
24  reasonable costs.  And among the reasonable costs
25  that they wanted to be able to subtract was the     17:56:32
```

Exhibit 161,
P. 1362

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 251

```
 1    advertising done by Transamerica Company, which        17:56:35

 2    featured the building.  So it wasn't advertising

 3    about rent in building, rent in my building, which

 4    is directly -- would be directly about the building,

 5    but it was advertising in which the Transamerica       17:56:46

 6    symbol, the building -- it was used as a symbol in

 7    other ads.  So it kind of -- you know, it

 8    contributed to making this building famous.

 9              And they felt that at least some portion of

10    that advertising expense should be subtracted in the   17:57:00

11    calculations in order to lower their taxation rate,

12    or their taxation amount, whatever it is.

13              In one of their claims was that unlike

14    Bratz, their claim was that their building was kind

15    of lousy in the sense that -- and we did a             17:57:20

16    walk-through of the building.  It's very

17    interesting.  I don't know if you have ever been to

18    the very top where you get to the very top of the

19    triangle, but the spaces get a little weird, a

20    little funky.  So that you can imagine if you are      17:57:33

21    trying to get a square office where the sides are

22    going like this on you (indicating), then all of a

23    sudden you get some very weird shapes.

24              And their point was that -- you know, with

25    other buildings, the higher up you go, the better      17:57:45
```

Exhibit 61,
P. 1363

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 252

1   your views are.  But with this building, the higher     17:57:48

2   up you go, well, maybe you get a better view, but

3   you get lousy floor space and there is not much of

4   it because the way the building was designed and the

5   columns get in the way and it's a big pain.     17:57:59

6         So they claim that while -- and it was old.

7   It was kind of old and dowdy.  I thought it looked

8   old and dowdy.  And they said:  Well, then, you

9   know -- their claim, at least, was that one of the

10  reasons people would be in that building was not     17:58:19

11  because it was such a wonderful, functional space,

12  but because when they gave their address as the

13  Transamerica Building it signified to their

14  clients -- you know, it had a symbolic value to it

15  and that that would in part hopefully overcome the     17:58:34

16  negative design features.

17        So they asked me to do some analysis of

18  that and to provide whatever I could to investigate

19  that claim.  One of the things that I did, I did --

20  I wanted to talk to clients themselves, people who     17:58:52

21  rented the space, but it wasn't really possible to

22  do that for a couple of reasons.  If I recall

23  correctly, one -- some of these -- it's hard to know

24  when a company rents the space who in the company

25  decided and how you would find them.  And it was     17:59:11

Exhibit 61,
P. 1364

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 253

```
1    also true that sometimes you don't get as much        17:59:15

2    turnover as you would like.  So we did the next best

3    thing, which was to interview as many -- I think it

4    was like property managers; people that lease out

5    spaces that -- you know, when clients came to them,    17:59:27

6    looked for office space, then they would show them

7    the various properties and try to help them decide

8    on a property.

9          And so I talked to them about, you know,

10   when their client -- when they're pitching their      17:59:43

11   clients, what do their clients value in

12   Transamerica, why do they think people want that

13   building, what's, you know, appealing to them.  And

14   that's what you'll see the findings relate to.  I

15   believe that that's -- the original research was      17:59:58

16   there.

17         And based on that finding about what the

18   real estate agents used as both the selling

19   proposition for the building, as well as what they

20   thought resonated with the clients, you know, it did  18:00:11

21   turn out in that sense that they thought most

22   people -- what attracted most people to that

23   building was not -- they didn't say:  God, this is

24   great floor space.  I've got to have it.  What they

25   said was:  This is such a prestigious symbol.  You    18:00:27
```

Exhibit 101,
P. 1365

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 254

```
 1    know, there is something unique about being in the        18:00:30

 2    Transamerica building that will be -- particularly

 3    for foreign clients who wanted to sort of make a

 4    statement to people around the word.  They just

 5    thought it was very recognizable.                          18:00:41

 6             And so the attorneys, which I believe was

 7    somebody from Morrison & Foerster -- you know, this

 8    was used as part of their case to suggest that the

 9    advertising that makes the building famous was

10    helpful to them in getting rental -- high rental         18:00:58

11    occupancy and, in fact, in being able to charge a

12    premium.  Because, you know, it had the same views

13    as other people.  Other buildings in the city had

14    views.  Other buildings had better space.  Other

15    buildings had better this, that and the other.  The      18:01:17

16    one thing that Transamerica could offer was the

17    symbolic value.

18         Q.   Okay.  Would you go to page 47 of the

19    report.  The bottom paragraph there says:

20             "Based on the data and my analysis of the       18:01:40

21             exclusive and prestigious nature of the

22             Transamerica Pyramid trademark, I conclude

23             that 9 to 10 percent of the Pyramid

24             building's gross revenues is the

25             appropriate estimate of the 'licensing'         18:01:52
```

Exhibit 61,
P. 1366

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 255

1           rate it should be charged."                    18:01:54

2       .   Do you recall what you meant by that?

3       A.  Oh, gee, it's hard to remember because the

4   formula is really kind of esoteric, but I do recall

5   that we did some look.  There is also some           18:02:05

6   quantitative analysis.

7           Oh, gee, they've blacked out stuff.

8           Interestingly enough, I was hired by Profit

9   to do this.  Morrison & Foerster contacted Profit.

10  Profit contacted me.  Profit, as you probably know,  18:02:27

11  is the firm that -- it's Dave Aaker's brand

12  consultancy firm.  Everybody knows everybody around

13  here.

14          And there was some piece of it, which I

15  don't recall.  There was some analysis of rents      18:02:41

16  and -- oh, here it goes.  Maybe there was some --

17  no, that's not it.

18          There was some other quantitative analysis

19  that we did to look at correlations of something.  I

20  can't remember what it was exactly.                  18:02:59

21          Oh, they have taken the whole thing out.

22  So that's why.  Figure 8.  There you go.  Blank

23  space.

24      Q.  This was redacted, as you can see from the

25  front page.                                          18:03:10

Exhibit 161 ,
P. 1367

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 256

1    A.   Yeah.                                              18:03:11

2    Q.   Were you attempting to somehow measure the

3  value of the advertising or the branding by virtue

4  of the use of a licensing or royalty fee?

5         MR. KIDMAN:   Vague and ambiguous.                18:03:38

6         THE WITNESS:   I don't think that's it.   I

7  think -- oh, I know what it was.   We had a bunch of

8  different things in here.   It was a very interesting

9  case.   It's just a long time ago.

10        I think there was some precedent in the          18:03:51

11  taxation board's things that if you were a hotel and

12  you had -- like you're the Marriott and you have to

13  pay a licensing fee to Marriott to put the Marriott

14  name on your building, that they would always allow

15  the hotel to deduct that expense.                       18:04:08

16   Q.   Mm-hmm.

17   A.   And so then there was the -- kind of an

18  equivalent argument was if you allow them to

19  subtract the cost of their licensing, then they

20  should be able to allow Transamerica to subtract a    18:04:22

21  like kind of number.   So they're both numbers that

22  provide you with some instant awareness or brand

23  appeal, if you will.

24   Q.   Okay.   Well, you say on page 46,

25  "Licensing, franchise -- I'm at the bottom, bottom     18:04:37

Exhibit __
P. 1368

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 257

1   paragraph there.                                          18:04:43

2          "Licensing, franchise or royalty fees for

3          brands similar to Transamerica and the

4          Transamerica Pyramid tend to fall in the

5          range of 9 to 10 percent of revenues, and    18:04:52

6          perhaps even up to 12 percent for

7          especially prestigious brand names."

8          So why are you measuring that?

9     A.   Well, you know, again, that was an attempt

10   to take something that the taxation board knows and   18:05:06

11   is familiar with and to translate it to the

12   Transamerica situation.

13    Q.   Okay.  So the licensing, franchise or

14   royalty fee was in your view in this report a proxy

15   for the value of the branding and advertising done    18:05:21

16   on the Transamerica Building?

17         MR. KIDMAN:  Objection; vague and

18   ambiguous.

19         THE WITNESS:  I'm just trying to remember.

20   This has been a long time.  And again, it was the    18:05:36

21   most unusual case I think I've ever been involved

22   in, and that's saying a lot.

23         I think we may have used that in part here

24   to give them, you know -- if -- if the taxation

25   board allows the deduction of licensing, then what   18:06:08

Exhibit 6l
P. 1369

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 258

```
 1    is the licensing rate for Transamerica.  So it        18:06:14

 2    wasn't to say you should use licensing, but it was

 3    to say, given that you use licensing, what would be

 4    the licensing fee that the company could charge the

 5    building for its, quote, brand.                         18:06:27

 6    BY MR. ROTH:

 7        Q.  Brand, okay.

 8        A.  Well, sort of brand, sort of advertising,

 9    sort of the expenses.  It's a little bit.

10    Squirrely.                                              18:06:39

11            And that's why licensing is in quotes,

12    because it's not exactly right.  But it was a way

13    that they could kind of talk about it in language

14    that the taxation board would understand.  I don't

15    think the taxation board bought this argument at       18:06:50

16    all, by the way.

17        Q.  Well, you did, you put it in your report;

18    right?

19        A.  I'm sorry, what?

20        Q.  You bought this argument?                       18:06:57

21        A.  Well, I did.  I don't know if they did.  I

22    don't know what happened.

23        Q.  I'm asking if you bought it.

24        A.  Yeah, I did.  I thought it was reasonable.

25            MR. KIDMAN:  Let me just object to the line     18:07:06
```

Exhibit 61
P. 1370

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 259

```
 1    of questioning on the grounds that you put this        18:07:07

 2    report in front of the witness and it's been

 3    redacted.  It's a report from 2002.  And obviously,

 4    as you say, it's been redacted, so...

 5           MR. ROTH:  What would you like to do to          18:07:20

 6    cure that problem?

 7           MR. KIDMAN:  I don't know.  It's your

 8    document.

 9           MR. ROTH:  Any suggestions?

10           MR. KIDMAN:  No.  I'm just stating an            18:07:27

11    objection for the record.  You're asking the witness

12    to testify about a document that's many years ago

13    and it's been redacted.

14    BY MR. ROTH:

15       Q.  Do you have a nonredacted version of this       18:07:37

16    document?

17       A.  I don't think so.

18       Q.  By the way, on pages 46 to 47, are there

19    any redactions?

20       A.  Not that I see.                                 18:07:58

21       Q.  Okay.  Page 43.  It says here, the second

22    sentence says:

23           "Brand building efforts on the part of

24           Transamerica Corporation have resulted in

25           rental rates for the Pyramid above those        18:08:32
```

Exhibit 6 ,
P. 1371

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA   )

 2                               :ss

 3    COUNTY OF SAN MATEO   )

 4         I, CYNTHIA MANNING, CSR No. 7645, a

 5    Certified Shorthand Reporter of the State of

 6    California, do hereby certify:

 7         That the foregoing proceedings were taken

 8    before me at the time and place herein set forth;

 9    that any witnesses in the foregoing proceedings,

10    prior to testifying, were placed under oath; that a

11    verbatim record of the proceedings was made by me

12    using machine shorthand which was thereafter

13    transcribed under my direction; further, that the

14    foregoing is an accurate transcription thereof.

15         I further certify that I am neither

16    financially interested in the action, nor a relative

17    or employee of any attorney of any of the parties.

18         IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    DATED: April 7, 2008

22

23

24

25         CYNTHIA MANNING, CSR No. 7645

                                              281
```