# Exhibit 63

ROUGH of Tina Varu (Patel).txt

```
 1          THE VIDEOGRAPHER:  Good morning we're now
 2     on the record, the date today is April 8th, 2008 and
 3     the time is 10:37 A.M..  my name is David west with
 4     Veritext of Los Angeles, California we are providing
 5     video services at Skadden Arps 300 south grand          10:37AM
 6     avenue, 32nd floor Los Angeles, Cal. this is the
 7     recorded testimony of Tina Varu in the matter of
 8     Carter Bryant versus Mattel, Inc. and consolidated.
 9     It is in United States District Court, central
10     district of California eastern division case number    10:37AM
11     CV 0409049 S G L.
12          Counsel will now introduce themselves for
13     the record.
14          MR. WEINSTEIN:  Ryan weinstein of Skadden
15     Arps on behalf of the MGA defendants.                   10:37AM
16          MR. ROTH:  Carl Roth on behalf of the MGA
17     defendants.
18          MR. COREY:  John Corey on behalf of Mattel
19     and the witness.
20          MR. MOORE:  Michael Moore on behalf of            10:37AM
21     Mattel.
22
23               TINA VARU,
24     the witness, having been administered an oath by the
25     Court Reporter, testified as follows:
```

1

```
 1
 2               EXAMINATION
```

Page 1

Exhibit 63
P. 1516

ROUGH of Tina Varu (Patel).txt

```
3     with Bates number MGA 0181451 through MGA 0181453.
4            (Deposition Exhibit ^  was marked for
5     identification.)                              12:07PM
6     BY MR. WEINSTEIN:
7        Q.   Ms. Varu you've been handed?
8            MR. MOORE:   I'm sorry can I see this or not
9     see this?
10            MR. ROTH:   In fact you probably have to    12:07PM
11     leave the room wine one sorry about that.
12            (At this time MICHAEL MOORE, ESQ. left the
13     deposition proceedings.)
14
15     BY MR. WEINSTEIN:
16        Q.   Ms. Varu I've handed you what's been marked
17     5111, let me try that again.
18            I've handed you was been marked as exhibit
19     5111, can you identify this exhibit for me?
20        A.   This was a report that Issac had me do my    12:08PM
21     first week.
22        Q.   So this is a report that you wrote?
23        A.   I paraphrased from the book that he made me
24     read.
25        Q.   Okay.  So if I can direct your attention to   12:08PM
                                                         65
```

f

```
1     the fourth paragraph, beginning with the words
2     brands that have high equity.  Do you see that?
3        A.   Yes.
4        Q.   It says brands that have high equity have
5     great efficiency and effectiveness of their         12:09PM
6     marketing programs at high brand loyalty if high
```

Page 57

Exhibit 63
P. 1517

ROUGH of Tina Varu (Patel).txt

7    premium prices and shall lie are more successful

8    with new products.

9              Those are, that's a sentence that you

10   wrote?                                              12:09PM

11       A.   Yes.

12       Q.   What did you mean by high premium prices in

13   that sentence?

14       A.   They charge higher premium.

15       Q.   What charges a higher premium?            12:09PM

16       A.   The company for that brand for brand

17   recognition.

18       Q.   So brands that have high equity charge high

19   premium prices, is that, is that what you're saying

20   in that sentence?                                   12:10PM

21       A.   Yes.

22       Q.   By the way, what is a brand that has high

23   equity, what does that mean?

24       A.   A brand that's been around for a very long

25   time can charge higher prices.  It's established in   12:10PM

66

f

1    the marketplace.

2        Q.   A brand that's established in the

3    marketplace might have high equity?

4        A.   Yes.

5        Q.   You also say that brands that have high    12:10PM

6    equity have greater efficiency and effectiveness of

7    their marketing programs.

8              What did you mean by that?

9        A.   The programs will go a long way, get more,

10   you'll get more for your money.                     12:10PM

Page 58

Exhibit 63 ,
P. 1518

ROUGH of Tina Varu (Patel).txt

11      Q.   Okay.  So brands that have high equity will

12   deliver more for their money in terms of marketing

13   spend, is that what you're saying here?

14           MR. COREY:  Objection mischaracterizes the

15   testimony and assumes facts.                          12:10PM

16           THE WITNESS:  Yes.

17      Q.   You said before the brands that have high

18   equity are brands that have been in the market for

19   awhile.

20           Is that correct?                              12:11PM

21      A.   They're more of established brands.

22      Q.   So it's the established brands that have

23   high equity, is that what you're saying?

24      A.   Correct.

25      Q.   And brands that are younger or less         12:11PM

                                                 67

f

1   established have less brand equity?

2      A.   Yes.

3      Q.   You also say that brands that have high

4   equity are usually more successful with new

5   products.                                             12:11PM

6           What did you mean about?

7      A.   Brands that are -- I'm sorry what did you

8   say in.

9      Q.   Brands that have high equity usually are

10   more successful with new products.                   12:11PM

11      A.   What did I mean by that?

12      Q.   Yeah, what does that mean?

13      A.   If a company comes out with a new product

14   that's, this company has been around for a long time

                        Page 59

Exhibit 63
P. 1519

ROUGH of Tina Varu (Patel).txt

15    comes out with a new product, it will be associated      12:11PM

16    with that company and people will be more likely to

17    try it.

18        Q.   Are you referring to a consent called a

19    brand extension there?

20        A.   Yes.                                            12:12PM

21        Q.   Can you define what a brand extension

22    means?

23        A.   A new product coming out of that brand.

24        Q.   Okay, so if I understand what you're saying

25    correctly, I believe what you're saying is the          12:12PM

                                                        68

f

1     brands that have high equity usually are more

2     successful with brand extensions, is that fair?

3         A.

4             MR. COREY:  What she's saying and what she

5     wrote summarizing the book in 5111 or what she's        12:12PM

6     saying now.

7             MR. ROTH:  Don't coach the witness that's

8     totally improper.

9             MR. COREY:  Objection, vague and ambiguous.

10            THE WITNESS:  Can you repeat that, I'm          12:12PM

11    sorry.

12    BY MR. WEINSTEIN:

13        Q.   Do brands with high equity have more

14    success with brand extensions?

15            MR. COREY:  Objection vague and ambiguous       12:12PM

16    to the extent it calls for expert opinion it's also

17    objectionable.

18            You can answer to the extent of your

                         Page 60

Exhibit 63
P. 1520

ROUGH of Tina Varu (Patel).txt

19    knowledge.

20          THE WITNESS:  It would be, I would assume        12:13PM

21    yes, but this was based from an expert book, so like

22    I said I paraphrased it.

23          Q.   Do you agree with what you wrote here?

24          A.   I agree, yes with that portion of it.

25          Q.   Okay I'd like you to turn, if you would, to    12:13PM

                                                      69

f

1     the last page of this exhibit Bates numbered MGA

2     0181453.

3           Do you see where it says conclusion:

4           A.   Yes.

5           Q.   And below that is a paragraph?          12:13PM

6           A.   Yes.

7           Q.   And you wrote this paragraph?

8           A.   Yes.

9           Q.   And here I take it you're no longer simply

10    paraphrasing the book, but you are offering some       12:14PM

11    conclusions or implications as they pertain to Bratz

12    and MGA?

13          A.   Yes.

14          Q.   Okay.  If I can direct you to the second to

15    last sentence, begins I as a brand manager.          12:14PM

16          Do you see that?

17          A.   Yes.

18          Q.   You write:  I as a brand manager need to

19    make it easy for consumers to purchase the Bratz.

20          What did you mean by that?          12:14PM

21          A.   Make it where the consumer has awareness

22    for the brand of dolls because it was relatively new

Page 61

Exhibit 63 ,
P. 1521

# Exhibit 64

# Rebuttal Expert Report of
# Dr. Erich Joachimsthaler

In the matter of

Carter Bryant v. Mattel and consolidated cases

March 17, 2008

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Exhibit 64,
P. 1522

8.   Her analyses and report has several additional flaws. Dr. Scott merely creates a timeline from 2000 until 2006 based on revenues and revenue growths. She describes MGA Entertainment's use of line extensions, brand extensions, and licensing during that time period. She does not establish a causal relationship, yet she concludes that there is a causal relationship that goes from dolls to accessories, merchandising and other products. Clearly this conclusion is inappropriate factually and logically. She also fails to mention that activities around licensing started before or around the launch of the Bratz dolls.  Licensee product roll-outs for Fall 2002 and 2003 as well as the creation of a show were already being discussed and planned in the first quarter of 2001, as can be seen in the internal email dated 2001-03-02.[7] It is well-known that Bratz introduced a fair number of brand-related products simultaneously with the launch of the dolls in 2001 that brought in $1.2 million of the $24 million revenue.  After just one year, the share of revenue from non-doll products shot up to 54% ($66 million out of $123 million), even though the brand was still in its nascent stage.[8]

9.   As an academic researcher, Dr. Scott well knows that merely establishing a time line of facts around the success of the dolls and the success of the accessories business does not establish causality. Hence, I do not agree with her conclusions. Most marketing experts and academics would agree that in the early stages of brand launch the objective is to create the brand in the minds of consumers, and the feedback benefits are actually and undeniably the critical dimension here in understanding the relationship between dolls, accessories, merchandise and other products.  Specifically, these brand leveraging strategies were not primarily intended to paving the way for new products, as Dr. Scott suggests, but were intended to helping to clarify

---

[7] See following:  Internal email from Victoria O'Connor to Paula Treantafelles and Lon Ross. March 2, 2001. MGA0049814.; ABC International Traders' Inc. March 2001 Business Plan.  MGA0047738-MGA0047761; Email from Victoria O'Connor to Isaac Larian. June 18, 2001.  MGA0048640-MGA0048645.
[8] Exhibit 4A of Carol Scott's expert report.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Exhibit 64
P. 1523

brand meaning, enhancing the Bratz brand image, and increasing market coverage.[9] Given the particularities of the toy industry, it is common knowledge that these brand leveraging strategies clearly do much more than generate more revenue from licensing. They are intended to create a sustainable brand and establish a business franchise given a volatile industry and highly fickle consumers.

**Dr. Scott does not analyze the role of line extensions, brand extensions and licensed products in creating play value for 7 to 12 year old girls**

10. In Dr. Scott's own work, for example her teaching of executives at the university, she clearly expresses the point of view that product orientation is yesterday's approach, and a consumer orientation is today's approach.[10] I do agree. It is then difficult to understand how Dr. Scott analyzes dolls, accessories, merchandise and other products while ignoring consumers, particularly a child or young girls' consumption and use behavior and the changes that place in the meaning of consumer behavior as girls grow older. Clearly, an understanding of the role of dolls, the designs, accessories and other follow-on Bratz products requires knowing how girls play and the meaning of play to them.

11. Tween girls today are "getting older younger" (Kids Getting Older Younger, or age compression).[11] In part because of this well-known and so-called age compression effect, the way girls used to play and the meaning of play to them has changed. This is particularly the case

---

[9] Kevin Lane Keller, *Strategic Brand Management*, 3rd ed., Prentice Hall: Upper Saddle River, NJ, 2008, p. 494
[10] Carol A. Scott. "Creating and Managing Strong Brands". EMBA Fall 2007 Presentation. M-CS 0052
[11] Julie Tinson and Clive Nancarrow, "GROw"ing up: tweens' involvement in family decision making, *Journal of Consumer Marketing*, (2007)160-170

7

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Exhibit 64
P. 1524

goods manufactured by other companies. I have offered six factors that account for that relationship and explain the success of Bratz products and the building of the Bratz brand.

Executed this 17th day of March, 2008:

Erich Joachimsthaler

22

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Exhibit 64,
P. 1525

.

# Exhibit 65

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>EXPERT REBUTTAL REPORT OF ROBERT C. LIND |

Exhibit 65 ,
P. 1526

## REBUTTAL TO EXPERT REPORT OF PETER S. MENELL
## BY ROBERT C. LIND

At the request of counsel for Mattel, Inc. ("Mattel"), I submit this rebuttal expert report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. This report sets forth the opinions, and the basis thereof, about which I may be called to testify at trial at the request of counsel for Mattel. Specifically, this report is directed to testimony that I may be asked to provide in view of the expected testimony of Peter S. Menell, as embodied in his expert report ("the Menell report") on behalf of MGA Entertainment, Inc. ("MGA"). The Menell report is directed toward the copyrightability of drawings created by Carter Bryant, the subsequent assignment of the copyrights in those drawings to Mattel and the alleged infringement of those copyrights by MGA and its employees.

Matters raised by the Plaintiff and/or the Defendant subsequent to this report, that are within the scope of my expert representation and that are subject to contradiction and/or rebuttal may be addressed in subsequent reports. It may become necessary to refine and supplement this and subsequent reports as additional information becomes available.

I also reserve the right to add to or to modify this report in the event that inaccuracies or omissions are discovered. My testimony at trial will take into account the evidence all parties produce, including the testimony of other expert witnesses.

## QUALIFICATIONS, COMPENSATION, PRIOR TESTIMONY

I am currently a Professor of Law at Southwestern Law School in Los Angeles, California, where I teach copyright law, entertainment law, entertainment and dignitary rights, and advanced entertainment law. I have been a member of the Southwestern faculty for more than 26 years. In addition, I have taught at Loyola Law School (Los Angeles), George Washington Law School and Marymount College of Virginia. My qualifications are set forth in my curriculum vitae that is attached as Appendix A to the Rebuttal Report.

I began my study of copyright law under the tutelage of Professor Waldo Moore in January of 1978, while earning my juris doctor degree from The National Law Center of the George Washington University. I stayed at George Washington as a graduate student, teaching and completing my course work in furtherance of a Master of Laws degree. In 1981, I was hired by Southwestern University School of Law to teach copyright law and to assist students interested in the field of entertainment law. Since that time, I have taught more than 50 sections of the copyright law course and six sections of the advanced copyright law seminar. I have taught copyright law to more than 2,500 students.

I am the author or co-author of six books:

- Entertainment Law: Legal Concepts and Business Practices (2d ed. 1992 & 2008 Supp.) (Co-Author), a five volume treatise published by Thomson West. I am currently writing a third edition of this work.
- Newsgathering and the Law (3d ed. 2005 & 2007 Supp.) (Co-Author), published by

1

Exhibit 65 ,
P. 1527

LexisNexis Publishing.
- Copyright Law (3d ed. 2006), a substantive outline published by Carolina Academic Press.
- Trademark Law (3d ed. 2006), a substantive outline published by Carolina Academic Press.
- Entertainment Law (3d ed. 2003 & 1999 Document Supp.) (Co-Author), a casebook published by LexisNexis Publishing.
- Art and Museum Law: Cases and Materials (Co-Author) (2002), a casebook published by Carolina Academic Press.

I have published more than thirty articles and chapters and have given more than 100 lectures and presentations, the majority of which have been on the topic of copyright law. I have made copyright presentations to law firms and legal departments of motion picture studios and music publishers. I am recognized and quoted as an expert in the subjects of intellectual property, entertainment, art, museum and media law by The New York Times, The Los Angeles Times, and The Los Angeles Daily Journal among other newspapers, magazines, television and radio stations.

I am outside copyright counsel for Warner/Chappell Music Publishing and outside intellectual property counsel for Lions Gate Entertainment for whom I provide analysis and advice concerning transactional, clearance, preventative and litigation matters. In addition, I consult with several attorneys, governmental entities, nonprofit organizations and companies regarding various intellectual property, media, First Amendment and entertainment issues.

I am paid $300 per hour for my study and testimony in this case. I have not testified as an expert at trial or by deposition in any case during the past four years.

## INFORMATION CONSIDERED

In addition to the case law and materials cited in this report, I have reviewed and relied on the following documents in preparing this report:

- Copyright registration certificates, supplementary registrations and deposit material, for the works involved in this litigation.
- Expert Report of Lee Loetz
- Expert Report of Kenneth Hollander
- Deposition of Rebecca Harris
- Employee Confidential Information and Inventions Agreement
- Expert Report of Peter S. Menell
- Bratz dolls

2

Exhibit 65
P. 1528

## EXPECTED TESTIMONY AND OPINIONS

### SUMMARY

This case involves the infringement of drawings made by Carter Bryant, the copyrights to which were assigned to Mattel. Employee Confidential Information and Inventions Agreement ("Inventions Agreement") ¶ 2(a). These drawings were made available to MGA and its employees when Bryant began working for MGA to develop a line of dolls. Both the Bryant drawings and the dolls were intended to be marketed to children. Access to the Bryant drawings has been admitted and there is evidence of direct copying by MGA. The Report by Professor Menell attempts to defend the actions of MGA by attacking the scope of copyright protection afforded the Bryant drawings, arguing that the individual elements contained in the drawings deserve little copyright protection and any claim of infringement of Mattel's compilation copyright must fail because MGA has not made an identical copy of those compilations.

These arguments are made without regard to Ninth Circuit legal precedent concerning intermediate copying, direct evidence of copying, the inverse ratio rule, the extrinsic test, the intrinsic test and the special rules of substantial similarity that are to accompany an analysis of works marketed to children. The legal framework and analysis provided by Professor Menell is heavily influenced by the law of the Second Circuit Court of Appeals. This is surprising, given that this action is pending in the United States District Court for the Central District of California, Eastern Division, which must apply the law of the Ninth Circuit Court of Appeals. The law of these two circuits often diverge, particularly regarding copyright infringement, the main focus of the Menell report.

There exist several significant differences between the Second Circuit law of copyright infringement and the law of the Ninth Circuit. One commentator has referred to these differences as a "chasm" between the two circuits. See William F. Patry, Patry on Copyright § 9:235 (2007). Several assertions made by Professor Menell in his report are at odds with the law enunciated by the Ninth Circuit. His inattention to Ninth Circuit precedent bypasses several Ninth Circuit rules regarding copyright infringement that are relevant to this litigation.

It is my opinion that the drawings created by Carter Bryant and assigned to Mattel meet the requirements for copyright protection, that it is likely that these drawings were directly copied by MGA during the development and marketing of the Bratz dolls and that many of the elements of the Bratz dolls are, at the very least, substantially similar to the Bryant drawings. Applying the current Ninth Circuit *Krofft* test, I have concluded that the ideas and expression found in the Bratz dolls are substantially similar to the ideas and expression of the Bryant drawings, satisfying the requirements of the extrinsic test for copyright infringement. A finder of fact would likely find that MGA's Bratz dolls took the total concept and feel of the Bryant drawings, satisfying the requirements of the intrinsic test for copyright infringement, particularly in light of their intended audience of young children. Finally, it is my view the facial, body and design elements of the Bryant drawings are protected as artistic works, and not just as compilations.

3

Exhibit 65
P. 1529

## INAPPLICABILITY OF THE ABSTRACTION, FILTRATION, COMPARISON TEST

Professor Menell spends much time describing and applying the abstraction, filtration, comparison test set forth by the Second Circuit in *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992). Menell report at 16-22. This test is not applicable to this case for several reasons. First, this case has not been filed in the Second Circuit, but in the Ninth Circuit which has its own tests for determining claims of copyright infringement. In the Ninth Circuit it is not only permissible to compare the ideas in the defendant's work to the ideas in the plaintiff's work, but it is reversible error for a trial court to fail to do so. See *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891, *6 (9th Cir. 2008) (district court's granting of summary judgment reversed because district court did not conduct an objective test of comparing both ideas and expression as required under the extrinsic test). Second, the *Computer Associates* test is not appropriate in cases, such as the case at bar, where the issue is primarily dealing with the alleged infringement of literal elements, rather than nonliteral elements. See *Lotus Development Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 814-15 (1st Cir. 1995) (while the *Altai* test may provide useful framework for assessing alleged nonliteral copying, it is of little help in assessing literal copying, where it may actually be misleading). Third, the dissection required by the test and the hypercritical analysis of the filtration step has been rightfully criticized when used in cases involving the visual arts because it improperly biases infringement decisions against copyright owners such as Mattel. This concern has been raised by Professor Paul Goldstein:

> Unlike literary or musical works, visual works can always be compared simultaneously, side-by-side, by judge or jury. Unlike literary and musical works, visual depictions are completely and graphically bounded by the artist's intentions. A picture is not only worth a thousand words; it also conveys its message in a single unambiguous image. As a consequence, the danger exists that, in dissecting the plaintiff's work to determine whether the defendant has appropriated any of its protected expression, courts will emphasize specific differences between works rather than their more substantial similarities.

II Paul Goldstein, Goldstein on Copyright § 10.2 (3d ed. 2007). With its copyright infringement tests, the Ninth Circuit has addressed this concern to a greater extent than has the Second Circuit.

Professor Menell spends several pages in his report itemizing the "wide range of influences" to which Carter Bryant is said to be exposed. See Menell report at 17-20. Apart from the August 1998 issue of Seventeen Magazine, Professor Menell does not indicate that Bryant ever saw the examples given and certainly provides no evidence that they were the source of his initial drawings of the Bratz dolls. The itemized list of alleged influences, including cultural trends, draft report of an art/popular culture historian, Betty Boop, *Speed Racer*, Sailor Moon, Margaret Keane, *Friends*, Ally McBeal, *Sex and the City*, the Spice Girls, Lara Croft, Angelina Jolie, additional prior art, popular culture material, Internet image searches, doll illustration art, fashion illustration and the August 1998 issue of Seventeen Magazine, would ordinarily form the basis of an attempt at an independent creation defense. However, such a defense was made impossible by Carter Bryant's involvement in the development of both the

4

drawings and the Bratz dolls.

## NINTH CIRCUIT INFRINGEMENT ANALYSIS

Rather than react to the attempted importation of the copyright infringement rules of the Second Circuit, my analysis is principally based on the law of copyright infringement applied in the Ninth Circuit. In order for a plaintiff to prevail in an action for copyright infringement in the Ninth Circuit, two elements must be established: Ownership of a valid copyright and the alleged infringer's violation of one or more of the exclusive rights granted to copyright holders under section 106 of the Copyright Act. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007). Where the alleged infringement is of the reproduction right, the plaintiff must prove that the infringer copied the plaintiff's work either through evidence of direct copying, or circumstantial evidence of copying, i.e. access and substantial similarity. *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 316 (9th Cir. 2004). The registration of the copyrights in the drawings with the Copyright Office, once by MGA and a second time by Mattel, creates a presumption that the drawings are protected by copyright. See *Smith v. Jackson*, 84 F.3d 1213, 1219 (9th Cir. 1996).

### Intermediate Copying

Professor Menell's report focuses largely on the MGA Bratz blank sculpt and the final version of the first generation Bratz dolls when analyzing the similarities between Bryant's drawings and MGA's allegedly infringing works. See Menell report at ¶¶ 53 & 54. In the Ninth Circuit, a broad view is taken of the rights protected by section 106(1) of the Copyright Act, the reproduction right. Ninth Circuit case law protects the copyright owner not only against the final product that is marketed commercially, but also against all prepatory items that may have led to the final revised copy. See *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 518 (9th Cir. 1993); *Walker v. University Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979) ("[T]he fact that an allegedly infringing work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement."); *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871, 875 (C.D. Cal. 1986).

Professor Menell assumes for purposes of his analysis that MGA's artists saw Carter Bryant's drawings, "worked from Carter Bryant's concepts" and that "[s]ome members of the creative team saw Carter Bryant's sketches and worked with his input." See Menell report at ¶¶ 39 & 66. Professor Menell does not specify how MGA employees "worked from" or "worked with" the drawings, but it appears that such activity encompassed reproduction of the drawings. There has been testimony that MGA prepared and used character art boards, also referred to as concept boards, created by Carter Bryant, that depicted drawings of the yet to be produced Bratz dolls, to buyers of several retailers such as Wal-Mart, Toys "R" Us, Kmart and Walgreens. Such material was also used at the Hong Kong Toy Fair. Deposition of Rebecca Harris, Volume 2 at 365-77 & 476-78 (Jan. 22, 2008). MGA's submission of deposit copies as

5

Exhibit 65 ,
P. 1531

part of its copyright registration applications of the Bryant drawings also constituted an unauthorized reproduction. Such a use of identical or substantially similar prepatory material in the product development stage or marketing stage is actionable infringement.

According to the Ninth Circuit, the Copyright Act proscribes unauthorized intermediate copying. *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1993) ("[T]he Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent."). This is so, regardless of whether the end product of the copying also infringes the exclusive rights of the copyright owner. See *Sega*, 977 F.2d at 1519.

The application of this rule that is analogous to the present case occurred in *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871 (C.D. Cal. 1986). In that case, the owner of the copyrights in classic feature-length animated motion pictures such as *Snow White and the Seven Dwarfs* and *Pinocchio* sued another animation studio, Filmation Associates, for copyright infringement. Disney claimed that Filmation was producing feature-length animated films based on the same public domain stories, such as *Pinocchio*, but had copied Disney's motion picture, series of designs and drawings of characters in the drawings, story boards, working model and advertising material Filmation had created for its *New Adventures of Pinocchio* motion picture that was being developed. *Disney*, 628 F. Supp. at 875.

Filmation defended its actions claiming that the materials it had created were only transitory steps en route to a fixed product, that it had yet to complete and distribute its motion picture and could not be said to have infringed Disney's copyrights until Filmation's motion picture was finished. *Disney*, 628 F. Supp. at 875-76. The United States District Court for the Central District of California rejected that argument, holding that any unauthorized reproduction of protected Disney material constituted copyright infringement, even though the preliminary works created in the production of Filmation's motion picture were merely part of the process by which Filmation planned to produce an ultimate product that would not be substantially similar to Disney's classic films. The court found that to constitute an actionable copy, Filmation's expression needed only to be a material object permanently cast in some intelligible form. The court deemed that Filmation's script, story board, story reel and promotional trailer constituted actionable copies, even though they may have been prepared only for the use of Filmation's animators. Copying of a work by a competitor is actionable, even though the copying is intended as part of a process to create a noninfringing work. "It is thus irrelevant that Filmation has not concluded or 'realized' what it considers to be a final motion picture: the Act prohibits the creation of copies, even if the creator considers those copies mere interim steps toward some final goal." *Disney*, 628 F. Supp. at 875.

The copying of the Bryant drawings by MGA, such as for use in sales pitches to retail stores, for use at a toy fair and to create deposit copies for the Copyright Office, all constitute actionable unauthorized reproductions.

6

Exhibit 65 ,
P. 1532

### Direct Evidence of Copying in the Ninth Circuit

In most copyright infringement actions, direct evidence of copying is not available.  See *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004); *Broderbund Software, Inc. v. Unison World, Inc.*, 648 F. Supp. 1127, 1135 (N.D. Cal. 1986).  Therefore, a plaintiff often attempts to establish the defendant's copying through circumstantial evidence by showing that the infringer had access to the work and that the two works are substantially similar.  *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970).  In his report, Professor Menell forthrightly admits to "skipping over the 'factual copying' element of the copyright infringement framework. . . ." Menell Report ¶ 39.  This is in light of apparently direct evidence that MGA employees copied the Bryant drawings.  MGA registered the same drawings of Jade (M 0110183), Sasha (M 0110187), Cloe (M 0110197), Yasmin (M 0110202) and Bratz Group (M 0110192), that have been registered with the Copyright Office by Mattel: Doll No. 2 (M 0059704), Group Drawing (M 0059708), Doll No. 3 (M 0059712), Doll No. 4 (M 0059716) and Doll No. 9 (M 0059736).

Professor Menell fails to address the implications of such evidence in the Ninth Circuit. Such unquestioned copying has significant ramifications under Ninth Circuit precedent.  Where there is evidence of direct copying, there is no need to analyze the similarities of the plaintiff's and defendant's works.  Compare *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (absent evidence of direct copying, proof of infringement involves demonstration of access and substantial similarity), with *Norse v. Henry Holt and Co.*, 991 F.2d 563, 566 (9th Cir. 1993) (substantial similarity analysis is inapposite to the copying issue where the defendant has admitted copying).  Even if similarity is analyzed, the traditional rigor of the substantial similarity standard is eased both by the inverse ratio rule of the Ninth Circuit and by the fact that the intended audience for the works is young children.

### Proof of Access in the Ninth Circuit

In copyright infringement cases where copying must be proven through circumstantial evidence, access is shown through evidence that the infringer had actually read or heard plaintiff's work, or had a reasonable opportunity to view or hear the plaintiff's work.  *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977); *Jason v. Fonda*, 698 F.2d 966, 967 (9th Cir. 1983) ("bare possibility" that the producers and broadcasters of the motion picture had access to the author's book was insufficient to prove access).  Professor Menell states in his report that he bases his copyright infringement analysis "on the express assumptions that copyright in the sketches are owned by someone other than MGA and that MGA's artists saw Carter Bryant's sketches before conducting their own work." Menell Report at ¶ 39.  When an employee of the copyright owner subsequently is employed by the defendant accused of copyright infringement, the connection provided by the employee is proof of defendant's access to the copyright owner's work.  See *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir. 1989).

There can be no more direct access than a situation where both the protected work and the

Exhibit 65
P. 1533

infringing work have been produced by the same person.  When the creator of a copyrighted work, without the authority to do so, reproduces the copyrighted work or creates a derivative work based upon that copyrighted work, copying and infringement are proven.

This case is reminiscent of the classic "Cherry Ripe" case, *Gross v. Seligman*, 212 F. 930 (2d Cir. 1914).  There, the creator of a photograph was found to have infringed its copyright by later creating a photograph of a substantially similar image  In that case an artist posed a model in the nude and fixed the image in a photograph titled *Grace of Youth*.  The artist subsequently assigned his copyright in the photograph to a third party.  Two years later the artist photographed the same model in an identical pose, now smiling with a cherry stem held in her teeth.  This photograph was titled *Cherry Ripe*.  The court found that the artist had copied his earlier work, either from memory or with the use of a copy of the earlier photograph.  "Whether the model in the second case was posed, and light and shade, etc., arranged with a copy of the first photograph physically present before the artist's eyes, or whether his mental reproduction of the exact combination he had already once effected was so clear and vivid that he did not need the physical reproduction of it, seems to us immaterial. The one thing, viz., the exercise of artistic talent, which made the first photographic picture a subject of copyright, has been used not to produce another picture, but to duplicate the original." *Gross*, 212 F. at 931.  In spite of changes made to the background, slight differences in the model's figure, and the addition of a smile and the holding of a cherry stem between the model's teeth, the Court of Appeals affirmed the district court's finding of an infringement of the copyright in the initial photograph. *Gross*, F. at 931.

Similarly to the facts in *Gross*, Carter Bryant created the copyrighted drawings, assigned away his copyrights in those works, and subsequently assisted in recreating the original works without the permission of their copyright owner.

The holding of the Second Circuit in *Gross* is instructive in considering the hypercritical nature of Professor Menell's analysis of whether Carter Bryant's drawings have been infringed by Carter Bryant's Bratz dolls.  The court in *Gross* concluded:

> The eye of an artist or a connoisseur will, no doubt, find differences between these two photographs. The backgrounds are not identical, the model in one case is sedate, in the other smiling; moreover the young woman was two years older when the later photograph was taken, and some slight changes in the contours of her figure are discoverable. But the identities are much greater than the differences, and it seems to us that the artist was careful to introduce only enough differences to argue about, while undertaking to make what would seem to be a copy to the ordinary purchaser who did not have both photographs before him at the same time. In this undertaking we think he succeeded.

212 F. 930, 931-32 (1914).

8

Exhibit 65 ,
P. 1534

*The Inverse Ratio Rule*

Having conceded access by MGA's employees, Professor Menell fails to address the impact this strong proof of access to Mattel's works by MGA's employees has on the amount of similarity that must be proven by Mattel pursuant to Ninth Circuit precedent. In the Ninth Circuit, when a high degree of access is shown, a lower standard of proof of substantial similarity is required. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000); *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003). Where a high degree of access has been conceded, as Professor Menell has done in his report, the copyright owner's burden of proof of substantial similarity is commensurately lowered. See *Swirsky v. Carey*, 376 F.3d 841, 844-45 (9th Cir. 2004); *Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir. 2002) ("If the trier of fact were to believe that [defendants] actually read [plaintiffs'] scripts . . . it could easily infer that the many similarities between plaintiffs' scripts and defendants' work were the result of copying, not mere coincidence.").

<u>Substantial Similarity</u>

As indicated above in the discussion regarding the Ninth Circuit's inverse ratio rule, substantial similarity is inextricably linked to the issue of access. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). The quantum of similarity required in this case is decreased as a result. The Ninth Circuit has traditionally employed a two-part test to determine whether two works are substantially similar. In *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977), the Ninth Circuit adopted a bifurcated test to determine whether a defendant was to be held liable for the unauthorized reproduction of the plaintiff's work. Under this approach, after access has been proven, a court in a copyright infringement action alleging the infringement of the reproduction right of 17 U.S.C. § 106(1) is to apply an extrinsic test and an intrinsic test. *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).

*The Extrinsic Test*

As originally adopted in *Krofft*, the extrinsic test focused on the similarity of ideas between the plaintiff's work and the defendant's work. *Krofft*, 562 F.2d at 1164. The similarity of ideas was determined by external criteria, with analytic dissection and expert testimony permitted. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994). The extrinsic test is an objective test that "depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." *Krofft*, 562 F.2d at 1164; *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) ("'extrinsic test' is an objective comparison of specific expressive elements"). If the plaintiff satisfies the extrinsic test, the case is to go to trial where the trier of fact will apply both the extrinsic and intrinsic tests to determine whether the defendant has infringed the plaintiff's copyright. See *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th

9

Cir. 1996).

The extrinsic test is to utilize specific criteria that can be listed and analyzed. *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900 (9th Cir. 1987). When analyzing these objective details, courts have found the evidence to fail the extrinsic test where there have been substantial differences between the plaintiff's and the defendant's works. See *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Subjective assessments of similarity in appearance between the plaintiff's work and the defendant's work are deemed best suited to the trier of fact as part of the intrinsic test. See *Shaw v. Lindheim*, 919 F.2d 1353, 1361 (9th Cir. 1990); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002).

The extrinsic test has evolved into an objective consideration of "whether there are substantial similarities in *both* ideas and expression". *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994) (emphasis in original). See *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990); *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir. 1989). This focus on both ideas and expression continues to be required by the Ninth Circuit. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 827 (9th Cir. 2002) ("Although the concept of a built-in night light is not protectible under copyright law, the choice of a smiling moon or star face with pinkish cheeks surrounded by stars in a specific configuration, and situated above an encircled star 'on' button, constitutes protectible expression.").

In the recent case of *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891 (9th Cir. 2008), the district court had granted summary judgment in a case where Mattel claimed that a competitor's flame logo infringed Mattel's logo used on its HOT WHEELS line of toy vehicles. "[T]he district court concluded that because the logos at issue were not similar, the extrinsic test was not met. It also found that since the logos were not similar, no reasonable person could believe that they conveyed a similar expression and, therefore, the intrinsic test had not been satisfied." *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891, *6 (9th Cir. 2008). The Ninth Circuit reversed the district court's granting of summary judgment because the district court did not conduct an objective test as to both ideas and expression as required under the extrinsic test. *Id.*

Professor Menell's admonition that the filtration step of the *Computer Associates* test must filter out all ideas by draining them through his colander, leaving only protected expression to compare to the defendant's work, is contrary to the analysis required by the Ninth Circuit in *Jada Toys*.

When analyzing artworks under the extrinsic test, a court looks to the similarity of the objective details in appearance. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002) ("the precise factors evaluated for literary works do not readily apply to art works."). These objective details include type of artwork involved, materials used, subject matter, setting for the subject, shapes, colors, and the arrangement of the representations. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). The cases that apply the *Krofft* test to artworks have identified several objective details that form the basis for analysis under the extrinsic test. These include the following:

10

Exhibit 65 ,
P. 1536

*Type of artwork involved*

Although the two-dimensional Carter Bryant drawings are a different type of artwork than the three-dimensional works of sculpture known as the Bratz dolls, they are integrally related to the origins and development of the Bratz product line. Drawings are traditionally the initial depictions of a new doll and constitute an important part of the process by which the doll is created. As confirmed by other expert reports on which I am relying, in this case the dolls appear to have been closely modeled on the drawings created by Carter Bryant. Furthermore, there is evidence that the three-dimensional sculpt for Bratz was based on Bryant's drawings and that Bryant himself made further contributions to the appearance of the sculpt.

*Materials used*

A difference in media does not excuse copying or the making of unauthorized derivatives. The Bryant drawings constituted a fundamental step in the development of the Bratz dolls. The Bryant drawings were created with sufficient specificity to effectively aid in the translation of the images from two-dimensional to three-dimensional. In *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871 (C.D. Cal. 1986), Filmation argued that its drawings which incorporated elements from Disney motion pictures, constituted a different media from the celluloid motion pictures produced by Disney. The court determined that the fact that the infringing copies were made in a medium different than that of the protected work was not a defense to copying. *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871, 876 (C.D. Cal. 1986). See *Walker v. University Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979).

*Subject matter*

Both the Bryant drawings and the Bratz dolls depict the same subject matter: dolls to be marketed to young girls that have sultry looking faces and a funky urban fashion style with large heads, wide eyes, full lips, very small noses, short curvy torsos and large oversized feet that can be detached and replaced with interchangeable feet in different style shoes. This similarity of both ideas and expressions is sufficient to satisfy the extrinsic test. In *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900-01 (9th Cir. 1987), the fact that the product lines of both plaintiffs and defendant depicted the same subject matter, stuffed dinosaur toys, was found to be sufficient to satisfy the extrinsic test.

Professor Menell argues that doll shapes and facial elements are entitled to only thin protection because their designs are based on the human anatomy and all artists are free to represent the human form. Menell report ¶ 47. This is not correct even under Second Circuit law. As the court in *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133 (2d Cir. 2004), points out, it would be the ubiquitous use of certain facial features in dolls that would raise doubt as to the originality of those features. 365 F.3d at 135 n.2. Courts protect specific features of dolls even though they are based on human physical attributes. See *Mattel, Inc. v. Azrak-*

11

Exhibit 65 ,
P. 1537

*Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983) (per curiam) (accentuation of certain muscle groups relative to others constituted protectible expression in Mattel's He-Man doll). The creative choices that are available when designing a doll are so numerous, the fact that they represent one or more of the many varieties of the human form will not preclude or limit the copyright protection offered to original works of art.  In upholding the copyright protection for the expressive features of a Barbie doll, the Second Circuit stated:

> There are innumerable ways of making upturned noses, bow lips, and widely spaced eyes.  Even if the record had shown that many dolls possess upturned noses, bow lips, and wide-spread eyes, it would not follow that each such doll – assuming it was independently created and not copied from others – would not enjoy protection  from copying.  We have often affirmed entitlement to copyright protection so long as the work was in fact created by its author, notwithstanding "lack of creativity," "lack of artistic merit" and absence of anything "strikingly unique or novel."

*Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133, 135 (2d Cir. 2004) (citations omitted).

It is the particularized expression in the Bryant drawings that are protected by copyright and which MGA is not permitted to copy.  *Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133, 136 (2d Cir. 2004) (citations omitted).  It must be emphasized that to merit protection from copying, a fixed work need only have been independently created by its author and possess "some minimal degree of creativity," the requisite level of which "is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist Publications, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 345 (1991).

### Setting for the subject

Both the Bryant drawings and the Bratz dolls focus on multi-ethnic young images with an interest in fashion that denotes a knowing, urban, hip attitude.

### Shapes

As set forth in the expert report of Lee Loetz, both the Bryant drawings and the Bratz dolls are constructed of large heads, wide eyes, full lips, very small noses, short torsos, long thin legs and large feet that can be detached and replaced with interchangeable feet in different style shoes.  The proportionately large head is placed on a smaller body.  The shape of the faces is similar and are of similar width and length.  The large inflated shape of the lips is similar.  Professor Menell opines that the Jade doll lips differ significantly from the Bryant drawing used for comparison.  However, the lips on the Jade doll are very similar to the drawings numbered M

12

Exhibit 65 ,
P. 1538

0110202 and M0110192, where the drawing depicts open lips of equal ratio with indented curvature at the top.

Professor Menell argues that there are significant differences between the drawings and the blank sculpt he uses to compare, rather than a completed Bratz doll. Menell report ¶ 54. However, the comparison at times is unfair, such as comparing the eyes even though there are no details in the eye sockets of the blank sculpt. At another point, Professor Menell points to the difference in the size of the feet depicted in the drawings and the bare feet depicted in the blank sculpt. Menell report ¶ 55. The fact that the drawing depicts the doll wearing large shoes accounts for the size differential. This comparison is particularly questionable in light of the fact that the Bratz dolls are popular for their shoes. Bates stamp MGA 0883400, ¶ 17.

As reflected in the Loetz Expert Report, each of the works of the parties, the almond shaped, upwardly angled, heavily lidded eye, as well as the placement of the pupil are similar. The eyeliner design and partially closed eyelids that cover half of the pupils in the drawings also appear in the dolls. Although Professor Menell provides several examples of eyes to compare with the style of eyes included in the drawings, none of the examples, except for the sculpt eye, share the half-closed eyelid, nor the upturned almond shape of the eye depicted in the Bryant drawing. See *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987) (eye style of stuffed dinosaurs was not dictated by the idea of stuffed dinosaur dolls and thus constituted protectable expression).

Professor Menell states that even if the Bryant drawings are protected by copyright, such protection is "thin" or "modest" due to the limiting doctrines of originality, merger, scenes a faire and functionality that are applied at the filtration stage of his analysis. The numerous creative choices available to a doll designer almost ensures sufficient originality for copyright protection where the doll has not been slavishly copied from another source. See *Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133, 135 (2d Cir. 2004). His report identifies several examples of dolls or images that depict a sassy, bratty attitude, an ensemble of four female friends, multi-racial or multi-ethnic elements, large head, large eyes, large feet, long legs. At no point does he indicate how these depictions have merged into an idea or how they are as a practical matter indispensable when designing a fashion doll.

As for functionality, Professor Menell parenthetically mentions "joint characteristics" without describing how those characteristics limit copyright protection. Menell report ¶ 54. He also makes a parenthetical reference to "aesthetic functionality" as a limiting factor due to social views of attractiveness. Menell report at ¶ 47. Although it may be conceded that dolls tend to incorporate attractive features (though images based on *Shrek* may belie that notion) Professor Menell makes no attempt to define the narrow confines of what he would consider socially acceptable attractiveness.

In essence, Professor Menell would have the reader of his report believe that although Carter Bryant was reportedly paid a large sum of money by MGA for the drawings, MGA found the drawings sufficiently original and developed to form the basis of its own copyright infringement action in Hong Kong and the Bratz doll line has been extremely successful, the drawings are merely commonplace and have only a "modest residue of copyright protection." Menell report ¶ 15.

13

Exhibit 65 ,
P. 1539

*Colors*

Professor Menell points out that one of the Bryant drawings uses black coloring for the eyebrow while one of the Bratz dolls uses brown. Menell report ¶ 62. However, this may be due to the different skin color used on the two compared works.

*Arrangement of the representations*

The body proportions of the Bryant drawings and dolls are largely identical. This is demonstrated by the alignments of the major anatomical landmarks of chins, shoulders, chests, waists, elbows, crotch, wrists, knees and ankles. The placements of the eyes, nose and lips on the dolls are also aligned in the same manner as they appear in the drawings. The eyes are equidistant in the dolls and the drawings, as are the eyebrows. A mole appears on the left eye in the dolls and the drawings. This strong similarity of body landmarks constitutes evidence that the drawings were a direct reference used to complete the dolls.

The similarities set forth above are sufficient to meet the requirements of the extrinsic test. Once that test is met, the trier of fact is to compare the total concept and feel of the competing works, without the assistance of expert witnesses and analytic dissection.

*The Intrinsic Test*

The intrinsic test focuses on the similarity of expression. It is a subjective test that examines an ordinary person's subjective impressions of the similarities between the two works and is exclusively the province of the trier of fact. *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). This subjective test does not permit expert testimony, nor does it allow analytic dissection. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994); *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1449 (9th Cir. 1988); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). The trier of fact is not to analyze the works or examine external criteria. *Krofft*, 652 F.2d at 1164. Under the intrinsic test, the finder of fact must decide as an ordinary observer "whether the 'total concept and feel of the two works is substantially similar." *Berkic v. Crichton*, 761 F.2d at 1292. At this point the works are to be compared as a whole. "The two works . . . should be considered and tested, not hypercritically or with meticulous scrutiny, but by the observations and impressions of the average reasonable reader and spectator." *Twentieth Century-Fox Film Corp. v. Stonesifer*, 140 F.2d 579, 582 (9th Cir. 1944).

The similarities between the Bratz dolls and the Bryant drawings are much closer than the works at issue in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977), which were found to be infringing.

14

## *The Intended Audience*

In determining whether the defendant has taken the total concept and feel of the plaintiff's work, the Ninth Circuit uses the standard of the "reasonable person in the intended audience." See *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 n.4 (9th Cir. 1989). Professor Menell has disregarded the special consideration given to the intended audience of the works at issue. Where works are to be used by children, their relative lack of sophistication is taken into account when a comparison of similarities is made. In *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th Cir. 1977), the Ninth Circuit noted: "The present case demands an even more intrinsic determination because both the plaintiffs' and defendants' works are directed to an audience of children. This raises the particular factual issue of the impact of the respective works upon the minds and imaginations of young people." *Krofft*, 562 F.2d at 1166. See also *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir. 1987) ("Because children are the intended market for the dolls, we must filter the intrinsic inquiry through the perception of children.").

This special consideration has also been adopted by the Second Circuit. See *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) ("Consideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is especially appropriate in an infringement action involving children's works, because children's works are often less complex than those aimed at an adult audience."); *Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp.*, 210 F. Supp. 2d 147, 161-62 (E.D.N.Y. 2002), aff'd, 354 F.3d 112, (2d Cir. 2003) ("some juvenilization of a judge's appreciation of what is important in dolls is tolerable").

And this is particularly so in the instant case where the basic consumer appeal is to youngsters. In applying the test of the average lay observer, they are not to be excluded-indeed they are the 'far-flung faithful . . . audience.' The television advertising campaign of plaintiff was directed toward acquainting these youngsters with Tammy and Pepper, its new teenage and pre-teen dolls. The impression of the faces and general appearance of the dolls was upon them. The plaintiff's and defendant's dolls are so substantially similar that the Randy doll, for example, would readily be mistaken for the Tammy doll. Both are slim, twelve-inch, not fully developed teenage female figures; both have full faces, large widely spaced eyes, pupils positioned to look to the left, long eyelashes, high eyebrows, pert upturned noses, bow lips, and puffed checks; both have movable heads, arms and legs, and both invite the child to acquire an accompanying wardrobe. In sum, the dolls create the same impression, both with respect to their appearances and the play-uses for which they are suited. It is the youngsters who, on the basis of this impression, go to the stores with their parents or at home make their wishes known for the dolls they desire after television has made its impact upon them. In their enthusiasm to acquire Tammy or Pepper they certainly are not bent upon 'detecting disparities' or even readily observing upon inspection such fine details as the point at which the necks are molded.

15

Exhibit 65 ,
P. 1541

*Ideal Toy Corp. v. Fab-Lu Ltd.*, 261 F. Supp. 238, 241-42 (S.D.N.Y. 1966), aff'd, 360 F.2d 1021 (2d Cir. 1966).

The intended audience for the Bratz dolls is young girls. These girls will not be familiar with the August 1998 issue of Seventeen Magazine or the litany of additional prior art provided by Professor Menell. Neither will these young consumers focus on the hypercritical comparative analysis of body elements and facial features presented in the Menell report.

## PROTECTION OF BRYANT DRAWINGS AS ALLEGED COMPILATIONS

The elements that make up the image of the drawings do not constitute a mere grouping of random similarities that led to a finding of noninfringement in *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Furthermore, under Ninth Circuit law, the standard of infringement for a compilation of creative elements is substantial similarity, not the identical or near identical standard argued for by Professor Menell. See *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446-47 (9th Cir. 1994); *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 321 (9th Cir. 1987).

Professor Menell relies on *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989), for the proposition that the protection of compilations should be limited to proof of virtual identity. The Bryant drawings are clearly artistic works and do not consist of the blank forms, useful articles and common property such as standard calendars, rulers and area code/time zone maps, the elements that comprised the organizer at issue in *Harper House*. As artistic works, the Bryant drawings deserve the broader, more traditional protection of the substantial similarity infringement standard because of the endless variation of expression that was available to Carter Bryant when he created the drawings. See *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 321 (9th Cir. 1987). Such works are to be considered as a whole, including any elements that may not be independently copyrightable apart from the work. See *McCulloch*, 823 F.2d at 321; *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109 (9th Cir. 1970).

## CONCLUSION

In my opinion, the analysis provided by Professor Menell in his report is not based on the law relevant to this case. In light of the law applied by the Ninth Circuit, the evidence of direct copying makes any the exercise of substantial similarity analysis unnecessary. Even assuming that direct copying cannot be proven in the case of the final version of the Bratz dolls, the strong showing of admitted access requires that the amount of similarity required to be proven by Mattel is reduced pursuant to the inverse ratio rule. The degree of similarity must also be lowered in light of the fact that the intended audience for these works are children. Comparing both the ideas and expression found in the Bryant drawings and the Bratz dolls, it is clear that there exists substantial similarity under the extrinsic test. As a result, the trier of fact, viewing the works through the eyes of their intended audience, will likely find that MGA's dolls took the total

16

Exhibit 65,
P. 1542

concept and feel of the Mattel drawings, satisfying the requirements of the intrinsic test. I reserve the right to supplement my testimony in light of any additional testimony by Professor Menell or assertions or evidence proffered by MGA's experts or fact witnesses at trial.

Date: 3-17-08

By: _Robert C._

Robert C. Lind

17

Exhibit 65,
P. 1543