# Exhibit 67

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>  Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>  Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>EXPERT REBUTTAL REPORT OF LEE LOETZ |

## CONFIDENTIAL -- ATTORNEY'S EYES ONLY

Exhibit 67
P. 1577

## EXPERT REBUTTAL REPORT OF LEE LOETZ

### I.     QUALIFICATIONS.

My qualifications are set forth in my expert report in this matter dated February 11, 2008. I am being compensated at the rate of $100 per hour for my time in this matter. I have not testified as an expert witness at trial or deposition in the proceeding four years and have not authored any publications in the preceding 10 years. In addition to the documents identified in Exhibit 1 to my expert report in this matter dated February 11, 2008, the materials I have reviewed or relied upon in connection with this rebuttal report are listed in Exhibit 1 hereto.

### II.    ISSUES ON WHICH I WILL GIVE AN OPINION.

I have been asked counsel for Mattel to address certain portions of the Expert Reports of Robert Tonner and Debora Middleton. In particular, I have been asked to respond to the statement by Mr. Tonner that he believes Carter Bryant's claim that his inspiration for Bratz happened in 1998 because of similarities between Bryant's Bratz drawings and certain images from 1998 issues of Seventeen magazine which Bryant claims to have been part of his inspiration. I have also been asked to respond to Ms. Middleton's claim that Bratz packaging artwork has evolved since the launch of Bratz and that, at least since July 2003, Bratz packaging artwork is materially different from Bryant's original Bratz drawings.

### III.   OPINIONS.

#### Bryant's Bratz Inspiration

I understand Carter Bryant claims that a source of his inspiration for Bratz was ads from a 1998 issue of Seventeen magazine showing girls with oversized heads and feet and "attitude." I also understand that Mr. Tonner claims that because Bryant's Bratz

-1-

Exhibit 67 ,
P. 1578

drawings share some of the proportions and "attitude" shown in these 1998 Seventeen magazine ads, he believes that Bryant's inspiration for Bratz happened "when and how" Bryant said it did.

It is important to note that these oversized proportions and even the specific ad campaigns that Bryant points to as his inspiration did not come and go in 1998. The Steven Madden ad campaign also appeared in 1999 issues of Seventeen magazine. So too did the Paris Blues and Coca-Cola ads that Bryant claims as inspiration. Based on my review of Carter Bryant's Bratz drawings against the Seventeen magazine ads from 1998 and 1999, I have come to the conclusion that, to the extent Bryant was inspired by ads in Seventeen magazine, it is equally, if not more, likely that Bryant's inspiration to create Bratz happened in 1999.

The 1999 Steve Madden ads are more similar to Bryant's Bratz drawings than the 1998 Steve Madden ads that Bryant claims as inspiration. While the girls in both the 1998 and 1999 Steve Madden ads have large feet and an urban style and attitude, it is the posing of the 1999 ads that stands out to me against the 1998 ads. In Exhibit 2 you can see a girl from a Steve Madden ad in a 1999 Seventeen magazine compared to an original Bryant Bratz drawing. Note the pose of both girls. The pigeon toes, knock knees, arm posture, and head tilt are all similar.

Exhibit 3 is another example of the noticeable similarity between a different girl from a 1999 Steven Madden ad and another of Carter Bryant's original drawings. Here we can see the angle of the shoulders, the knock-knees, and pigeon toes in both the ad and drawing.

Exhibit 67,
P. 1579

In addition, the oversized head and facial characteristics of the 1999 Steve Madden ads are more similar to the Bryant drawings than the 1998 Steve Madden ad.

In addition, I think the 1999 ads more plausibly than the 1998 ads could have been an "inspiration" to Carter Bryant for their fashions and facial expressions. The 1999 ads were of a photographic nature instead of a simplified stylized drawing style. Because of this, the fashions and facial expressions in the 1999 ads were more clearly defined than the 1998 ads.

Bryant also points to Paris Blues and Coca-Cola ads from the 1998 Seventeen magazine as inspiration. In my opinion, the same Paris Blues and Coca-Cola advertising campaigns appeared in 1999 issues of Seventeen magazine with no substantial change in graphic style. Based on my review of the 1998 and 1999 Seventeen Magazine ads, it is my belief that, to the extent Carter Bryant was inspired by Seventeen magazine ads, the 1999 ads were just as likely, if not more so, to be the inspiration for Bryant's original Bratz concept drawings.

In additional, I have reviewed drawings created in 1999 by a Mattel doll designer for a Mattel doll initiative called "Toon Teens." I understand that Bryant may have had access to these Toon Teens drawings in 1999 while he was employed by Mattel. In my opinion, the Toon Teen drawings share certain design features with Bryant's Bratz drawings, including a proportionally large head, large eyes and lips and large feet. See Exhibits 4 and 5. It is important to note that the Toon Teen drawings and Bryant's Bratz drawings were both concept drawings for an actual doll, not a flat graphic advertising campaign like the Seventeen magazine ads. Thus, similarities between them are shared

Exhibit 6? ,
P. 1580

play features in the doll concepts.  In my opinion, to the extent Bryant had access to these Toon Teen drawings, this further suggests that his inspiration for Bratz happened in 1999.

### Bratz Packaging Art

In my review of Bratz dolls packaging art over the multiple succeeding lines, it is clear to me that the all the subsequent packaging art was based on the original Bratz drawings submitted by Bryant, drawings that are very similar to the first generation packaging.  Indeed, packaging art is only a representation of the doll inside.  The Bratz sculpt did not change over time to any significant degree.  So it is not surprising that the packaging art which represents that doll did not change that significantly.

The least expensive way to freshen up a toy is through the packaging art.  By hiring new art directors, artists, changing rendering styles or using new design programs, the same characters could illustrated in may ways.  Over the life of the Bratz packaging, several varied art styles were used.  However the characters stayed true to their inherent aesthetic look.  The proportions, hair color, clothing styles, attitude, posing and makeup all stayed basically the same so all the characters were recognizable.  It is important to remember that artwork must successfully represent the toy inside the package.

The regular refreshing of packaging art is the industry standard.  MGA refreshed their Bratz packaging art while maintaining the same basic look of both the dolls and the packaging art.  All of the Bratz packaging art is based on the original artwork.

March 17, 2008

Lee Loetz

-4-

# Exhibit 68

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4

5    MATTEL, INC., a Delaware        )
     Corporation,                    )
6                                    )
                    Plaintiff,       )
7                                    )
                    vs.              )  No. CV 04-9059 NM
8                                    )  (RNBx)
     CARTER BRYANT, an individual;   )
9    and DOES 1 through 10,          )
     Inclusive,                      )
10                                   )
                    Defendants.      )
11   ------------------------------  )

     (COMPLETE CAPTION ON NEXT PAGE.)
12

13        CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15       Confidential Videotaped Deposition of

16       LEE LOETZ, taken on behalf of Defendants,

17       at 300 South Grand Street, Los Angeles,

18       California, beginning at 9:13 A.M.

19       and ending at 6:39 P.M., on Wednesday,

20       March 26, 2008, before Wendy S.

21       Schreiber, CSR No. 3558, RPR, CLR.

22

23

24

25   PAGES 1 - 374

Exhibit 68 ,
P. 1582

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                    EASTERN DIVISION
 4
 5    MATTEL, INC., a Delaware       )
      Corporation,                   )
 6                                   )
                     Plaintiff,      )
 7                                   )
                  vs.                ) No. CV 04-9059 NM
 8                                   ) (RNBx)
      CARTER BRYANT, an individual;  )
 9    and DOES 1 through 10,         )
      Inclusive,                     )
10                                   )
                     Defendants.     )
11    ------------------------------ )
      CARTER BRYANT, on behalf of    )
12    himself, all present and       )
      former employees of Mattel,    )
13    Inc., and the general public,  )
                                     )
14               Counter-Claimants,  )
                                     )
15                  vs.              )
                                     )
16    MATTEL, INC., a Delaware       )
      Corporation,                   )
17                                   )
                 Counter-Defendant.  )
18
19
20
21
22
23
24
25
```

Exhibit 68 ,
P. 1583

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1    APPEARANCES:
 2
 3        For the Plaintiff:
 4
 5            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
              BY:  SCOTT B. KIDMAN, ESQ.
 6            865 South Figueroa Street, Tenth Floor
              Los Angeles, California 90017
 7            (213) 443-3000
              sbk@quinnemanuel.com
 8
                          -and-
 9
              MATTEL, INC.
10            333 Continental Boulevard
              El Segundo, California 90245-5012
11            (310) 252-2000
              (NOT PRESENT)
12
13
          For the Defendant and Counterclaimant Carter
14        Bryant:
15
16            KEKER & VAN NEST LLP
              710 Sansome Street
17            San Francisco, California 94111-1704
              (415) 391-5400
18            (NOT PRESENT)
19
20
21
22
23
24
25
```

Exhibit 68 ,
P. 1584

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

```
 1    APPEARANCES (Continued):

 2

 3       For Defendant MGA Entertainment, Inc.:

 4

 5            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
              BY:  DAVID W. HANSEN, ESQ.
 6            525 University Avenue
              Palo Alto, California 94301
 7            (650) 470-4560
              david.hansen@skadden.com

 8

 9

10

11

              Video Operator - David West
12

13

14            Also present:   Donna Hill

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 68 ,
P. 1585

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 45

1        Q.    Madison Avenue?  How's that?

2        A.    I'm not that familiar with New York but

3    it's -- I think it's things you would maybe find in

4    the other boroughs of New York if you're looking for

5    geographic locations.                              10:09AM

6        Q.    Okay.  The problem with my example that's

7    more high fashion?

8        A.    I would say you'd probably find office or

9    more high fashions on a place like Fifth Avenue, I

10   suppose.  I'm not a New York expert but --          10:09AM

11       Q.    Where would you go to find a funky urban

12   style?  Is there anywhere?

13       A.    Hang out in front of the Staples Center.

14   Just go downtown, you know, someplace like that, you

15   know.  You could find it on 5th Avenue.  You could    10:09AM

16   find it -- are we talking New York still again?

17       Q.    Wherever you want.  I was thinking New York

18   for some reason.  I don't know why.

19       A.    Yeah.  It's -- now I believe you can find

20   these fashions almost anywhere because they're       10:09AM

21   popular.

22       Q.    So say in L.A. you said the Staples Center.

23       A.    Yeah, I'm just using that as a reference to

24   downtown.

25       Q.    So that would be more for the styles?       10:10AM

Exhibit 68,
P. 1586

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

```
 1        A.    The styles, the attitude, yeah.

 2        Q.    The hairstyles?

 3        A.    The hairstyles, sure.

 4        Q.    The first one of its style, the first time

 5   of fashions would be stuff you would see -- funky       10:10AM

 6   urban fashions would be the kind of fashions you

 7   could see a lot of in front of the Staples Center?

 8        A.    You could, sure.

 9        Q.    And hairdos, funky urban hairdos in front of

10   the Staples Center?                                     10:10AM

11        A.    I don't mean to be hanging out in the

12   Staples Center parking lot.  I just meant it as a

13   geographic -- I just meant that as a geographic

14   reference, you know, as the meaning downtown.  So I

15   think a better way to say this is any -- or most        10:10AM

16   downtown areas in major cities I believe you would

17   find, yes, funky urban styles of clothes.

18        Q.    How about the -- like the makeup, face

19   makeup type of thing?  Would you find that also in

20   the same areas?                                         10:10AM

21        A.    I believe so, yes.

22        Q.    All of these things would sort of come

23   generally together in the same sort of people?

24        A.    They could be.  I mean, I think you would

25   find elements in other people and -- and like I said   10:11AM
```

Exhibit 68 ,
P. 1587

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 47

1    now it's -- it's everywhere because it's the popular

2    style.

3        Q.    Do you know when that began, just your

4    opinion?

5        A.    Yeah, it's hard to put a specific date on    10:11AM

6    it.

7        Q.    You started with it wasn't that way in the

8    fifties --

9        A.    Yeah.

10       Q.    -- which I know because I grew up in the    10:11AM

11   fifties.

12       A.    Right, right, right.

13       Q.    And then in the seventies?

14       A.    I would say that the door was opened in the

15   seventies to let it in but I would say it probably    10:11AM

16   started when Rap music started to become popular if

17   I had to guess.

18       Q.    So --

19       A.    Yeah, that would be like the early eighties,

20   I believe, or late seventies even maybe, but    10:11AM

21   somewhere in that time line.

22       Q.    In terms of the -- you were talking before

23   about making the feet larger in connection with

24   funkiness.

25       A.    Uh-huh.    10:11AM

Exhibit 68,
P. 1588

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 301

1      Q.    In terms of what clothing to have on this

2    doll, was that your decision?

3      A.    Was that my decision?

4      Q.    Yes.

5      A.    I believe I thought that it would be -- that  05:02PM

6    this photograph would be a good idea -- the elements

7    that are present in this photograph would be a good

8    idea, yes.

9      Q.    Good idea for what?

10     A.    To demonstrate the similarity in fashions.    05:02PM

11     Q.    Does it matter whether or not the doll as

12   sold actually has other aspects of the pants,

13   for example?  Does it matter to you in terms of

14   faithful execution?

15     A.    No, not in this case.                        05:02PM

16     Q.    Would it matter in any case and, if so, how

17   would I determine that?

18     A.    Not in the case -- not in -- not in the

19   images that I reviewed.  I think generally in the

20   fashion doll industry you could have variations that  05:02PM

21   become so extreme or far afield that you lose the

22   essence of what was intended.

23     Q.    And which -- which actual dolls were you

24   given?

25     A.    I was given to my understanding what was the  05:03PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 302

```
 1   first generation of Bratz dolls.

 2       Q.   You got one of each?

 3       A.   I believe so, yes.

 4       Q.   Was that with the fashions that they were

 5   sold with?                                    05:03PM

 6       A.   It was still in the box unpacked.

 7       Q.   These pictures are not in the box, right?

 8       A.   No.

 9       Q.   So you took them out of the box?

10       A.   Yes.                                 05:03PM

11       Q.   Did you do that?

12       A.   I participated in that.  Yes, I did some of

13   that, yeah.

14       Q.   Is there anything that was done outside of

15   your presence?                               05:03PM

16       A.   Done outside of my presence?

17       Q.   Yeah.

18       A.   No, I don't believe so.

19       Q.   Do you know whether or not the picture on

20   the right, that doll is sold with a belt?    05:03PM

21       A.   Do I know if it was sold with a belt?  I

22   don't have a memory that it was sold with a belt,

23   no.

24       Q.   Do you know whether or not it was your

25   decision to remove the belt assuming it is sold with  05:03PM
```

Exhibit 68 ,
P. 1590

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 303

1    a belt?

2         A.    No, I don't remember that.

3         Q.    Do you know whose decision it would be?

4         A.    I'm not certain whose decision it was but if

5    it wasn't mine, it was Anna Lee's.                    05:03PM

6         Q.    Can you jump to 37 for me, Exhibit 37 of

7    your report.  Do you see the sketch on the left?

8         A.    Yes.

9         Q.    Do you know what that is?

10        A.    It's my understanding that it was one of   05:04PM

11   Carter Bryant's sketches for the Bratz dolls.

12        Q.    Do you know the circumstances under which

13   this sketch was created?

14        A.    The specific circumstances?

15        Q.    Yes.                                       05:04PM

16        A.    No, I don't.

17        Q.    Do you know whether or not this was a sketch

18   that Carter Bryant made of a doll sculpt?

19        A.    No, I don't know that either way.

20        Q.    Would that change your opinion?            05:04PM

21        A.    I'm sorry, can you rephrase the question?  A

22   drawing of a sculpt?  What do you mean by that?

23        Q.    Do you know whether or not the drawing on

24   the left was a drawing of a Bratz sculpt?

25        A.    You mean that -- sorry.                    05:04PM

Exhibit 68
P. 1591

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 304

1          MR. KIDMAN:  I'm sorry.

2          THE WITNESS:  Okay.  That there was an

3    existing sculpt and he drew from that sculpt for

4    this drawing?

5    BY MR. HANSEN:                                    05:05PM

6      Q.    Yes.

7      A.    I don't know that to be the case.

8      Q.    You don't know one way or another?

9      A.    I don't know, no.

10     Q.    So if this was assuming -- assume this is a  05:05PM

11   drawing of a Bratz sculpt.  Would that affect your

12   opinion at all?

13     A.    It may not and it may.  I would need to know

14   more.

15     Q.    So would you expect that a competent artist  05:05PM

16   that would draw the sculpt of the doll would

17   accurately recreate the doll landmarks in the

18   drawing?

19     A.    If they were -- I'm sorry, let me just get

20   this clear.  If a competent artist is looking at a  05:05PM

21   preexisting sculpt and then doing a drawing of that

22   existing sculpt?

23     Q.    Yes.

24     A.    And then your question is?

25     Q.    Would you expect that the body landmarks     05:05PM

Exhibit 68,
P. 1592

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 305

1    that you're showing here would be the same?

2        A.    I would expect that they would be similar,

3    yes.

4        Q.    So in terms of if -- if you made a drawing

5    of the doll on the right, an outline sketch like the    05:06PM

6    sketch on the left, you would -- it would be fairly

7    easy to get the -- get the chin, shoulders, chest,

8    waste, crotch, knees, ankles and bottom of the shoes

9    at the same location?

10       A.    I don't believe the drawing on the left is    05:06PM

11   what I would term an outline drawing.

12       Q.    What would you call it?

13       A.    Just a drawing.

14       Q.    But in terms of just making that drawing, if

15   you made a drawing of that sort from the -- based on    05:06PM

16   the doll, would you expect that the landmarks that

17   you set forth here would line up?

18       A.    I would expect that they would be similar,

19   yes.

20       Q.    Would you -- you could make them the same,    05:06PM

21   couldn't you?  You as a skilled artist.

22       A.    Yes.

23       Q.    So if you -- if you had a copy of the sculpt

24   and you drew the sculpt, your abilities would allow

25   you to have the -- all of these various landmarks in    05:06PM

Exhibit 68 ,
P. 1593

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 306

```
 1    Exhibit 37 line up?

 2         A.    I believe I could do that, yes.

 3         Q.    Now, if that's the case here, would that

 4    affect your opinion as to Exhibit 37?

 5         A.    I -- I think it's a different scenario.  It    05:07PM

 6    may and it may not affect my opinion here.  What I

 7    mean to say is that if I'm looking at a Bratz doll,

 8    I didn't create the idea of Bratz so the fact that

 9    these have some similarities it's different than if

10    I would do it than if Carter would do it because he    05:07PM

11    originated the Bratz concept.  So any differences I

12    would find, if there are differences, would be to

13    the mind of Carter probably more correct because

14    it's, I mean, in his drawing because he's, you know,

15    saying in his mind what Bratz is and since he's the    05:07PM

16    creator of Bratz then it would be different than any

17    differences I would have.  I'm sorry, this is a

18    difficult question to answer so do you want --

19         Q.    Let's take it another way.  What's being

20    shown in Exhibit 37?                                   05:08PM

21         A.    Right.

22         Q.    Just tell me what's being shown.

23         A.    What's being shown is a comparison of what I

24    understand to be a concept drawing for Bratz dolls

25    to the left and a photograph of a first wave of       05:08PM
```

Exhibit 68
P. 1594

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 317

1    Q.    That looks to be accurate?

2    A.    Yes.

3    Q.    In terms of just looking at the larger head

4    view on the top row of 4615, can you go through the

5    various photographs to the right of that and tell me      05:21PM

6    which of these are virtually identical in your

7    opinion to the sketch on the left?

8    A.    I would need to see these close up, I

9    believe, to make that level of distinction.

10   Q.    So this does not allow you to determine       05:21PM

11   whether or not the doll faces photographed here are

12   virtually identical to the sketch?

13   A.    I don't -- I don't think that your -- that

14   question -- I don't think I could answer that

15   particular question because I don't believe that     05:21PM

16   these dolls -- that all of these dolls here are

17   virtually identical to the drawing, but I would need

18   to see that close up to make -- to give you an

19   answer to that question.

20   Q.    Okay.  But you can't -- based on this you      05:22PM

21   can't say one way or another; is that right?

22   A.    It's difficult to tell from this image.

23   Q.    And why is that?

24   A.    Because I would want to see the doll as a

25   totality.  And that's what I -- what I mean to say    05:22PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 318

1   is the face as a whole if I was going to make that

2   level of distinction, which is what I did for my

3   report.  I had the first wave of Bratz dolls in

4   front of me.  I think I would need that here to make

5   that call.                                      05:22PM

6       Q.   So this doesn't show you enough information

7   to determine whether or not the dolls that are shown

8   here are virtually identical to the sketch?

9            MR. KIDMAN:  Objection:  asked and answered.

10  BY MR. HANSEN:                                  05:22PM

11      Q.   I just want to be clear on this.

12      A.   I don't believe so.  Not this image does,

13  no.

14      Q.   Okay.  Does this give you enough information

15  to determine whether or not the photos of the dolls  05:22PM

16  are a faithful execution of the sketch?

17      A.   No, I don't -- I don't think it does.

18      Q.   And what else would you need for that

19  opinion?

20      A.   I need to have the dolls here to make these  05:23PM

21  calls here.

22      Q.   So you can't just take parts of the face and

23  determine whether or not there's virtual identity or

24  faithful execution of the sketch?

25      A.   It's difficult to take a lineup of a piece   05:23PM

Exhibit 68 ,
P. 1596

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 319

```
 1    of a doll where there's actually several dolls in a

 2    row and make that level of distinction.  To make

 3    that -- to give that opinion I would want to see all

 4    of these dolls here physically and then -- and then

 5    look at the drawing at the same time.              05:23PM

 6        Q.   So in terms then of the -- there's certain

 7    of the exhibits to your report that have eyes and

 8    lips and things broken out.

 9        A.   Uh-huh.

10        Q.   Those exhibits standing alone are not     05:23PM

11    sufficient to make a determination whether or not

12    the sketch and the doll shown in any of those

13    exhibits is virtually identical or a faithful

14    execution?

15        A.   Not by themselves.  My attempt there was to   05:24PM

16    give an example of what I saw when I looked at the

17    dolls physically and I looked at the drawings.  And

18    my breakouts of the eyes and the nose were a attempt

19    to show specific details that I thought were

20    similar.  There were other things that I thought    05:24PM

21    were similar, too, that I didn't include in the

22    exhibit portion of it so I think you need to take

23    these things as a totality.  So you can look at the

24    eyes, you can look at the nose or the lips but to

25    make -- again, if we're talking about virtual      05:24PM
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 320

```
 1    identical -- are we still on that term?

 2        Q.   We're on either one, virtual iden --

 3    virtually identical or faithful execution.

 4        A.   I -- I -- I would need to look at these

 5    dolls to make that -- that call.              05:25PM

 6        Q.   So you can't opine as to virtual identity or

 7    faithful execution without seeing an actual doll; is

 8    that correct?

 9        A.   I can't --

10             MR. KIDMAN:   Objection:   asked and answered. 05:25PM

11    BY MR. HANSEN:

12        Q.   You can answer it.

13        A.   Yes, I believe I would need to see the dolls

14    to make that distinction.

15        Q.   To render that opinion?              05:25PM

16        A.   Yes.

17        Q.   So in terms of the -- let's take the eyes

18    that are in the second row of Exhibit 4615.

19        A.   Yes.

20        Q.   You can't say one way or another based on    05:25PM

21    what's shown here whether the eyes that are in the

22    photographs are a faithful execution of the eye in

23    the sketch?

24        A.   It's difficult from this angle here because

25    there's one eye broken out.                  05:25PM
```

Exhibit 68
P. 1598

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 321

1      Q.   Yes.  But you can't -- you can't tell me one

2   way or another whether the eyes in the photographs

3   are a faithful execution of the eye in the sketch;

4   is that right?

5      A.   I would want to see the doll as well to make   05:25PM

6   that call.

7      Q.   But can you make that call without seeing

8   the doll?

9          MR. KIDMAN:  Objection:  asked and answered.

10          THE WITNESS:  I would want to see that.  It   05:26PM

11   would -- to make these opinions that I gave, I took

12   this very seriously so I looked very closely at the

13   drawings, I looked very closely at photographs of

14   the dolls, I looked very closely at the dolls

15   themselves and the conclusions I came to were a       05:26PM

16   totality of examining all of that data.

17   BY MR. HANSEN:

18      Q.   But you'd need to examine the dolls?

19      A.   I believe so, yes.

20      Q.   How about the same with the lips?  Are the    05:26PM

21   lips shown here, the photographs, a faithful

22   execution of the lips in the sketch?

23      A.   I would want to see the rest of the face.  I

24   would want to see the doll here to make that

25   distinction.                                          05:26PM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 323

1    BY MR. HANSEN:

2        Q.   Okay.  And you can't give me any opinions on

3    virtual identical or faithful execution based on

4    what you see in 4615?

5            MR. KIDMAN:  Objection:  asked and answered.  05:27PM

6            THE WITNESS:  Not without the dolls, no.

7    BY MR. HANSEN:

8        Q.   Okay.  Did you -- do you have opinions with

9    respect to the package art relating to the Bratz?

10       A.   Do I have opinions?  Yes, I do.            05:28PM

11       Q.   You do.  And they're set forth I guess --

12   those are in your rebuttal report?

13       A.   I believe so, yes.

14       Q.   And in terms of package art, I assume you

15   don't need to look at the dolls?                    05:28PM

16       A.   No, if I'm making a judgment about the

17   packaging art in itself.

18       Q.   Let me show you some packaging art then.

19   Well, let me ask you.  Can you look at your rebuttal

20   report which is the thin one that's probably on your  05:28PM

21   left by now.  It's 4603.

22       A.   I think this might be it here.  Yes.

23       Q.   Is that it?

24       A.   Yes.

25       Q.   Do you have it?                            05:28PM

Exhibit 68
P. 1600

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 370

```
 1    STATE OF CALIFORNIA    ) ss:

 2    COUNTY OF LOS ANGELES )

 3

 4              I, WENDY S. SCHREIBER, C.S.R. No. 3558, do

 5    hereby certify:

 6

 7              That the foregoing deposition of LEE LOETZ

 8    was taken before me at the time and place therein

 9    set forth, at which time the witness was placed

10    under oath and was sworn by me to tell the truth,

11    the whole truth, and nothing but the truth;

12              That the testimony of the witness and all

13    objections made by counsel at the time of the

14    examination were recorded stenographically by me,

15    and were thereafter transcribed under my direction

16    and supervision, and that the foregoing pages

17    contain a full, true and accurate record of all

18    proceedings and testimony to the best of my skill

19    and ability.

20              I further certify that I am neither

21    counsel for any party in said action, nor am I

22    related to any party to said action, nor am I in any

23    way interested in the outcome thereof.

24

25
```

Exhibit 68
P. 1601

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 371

1          IN WITNESS WHEREOF, I have subscribed my

2     name this 31st day of March, 2008.

3

4

5

6          _____

7          WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 68,
P. 1602



Loetz
EXHIBIT NO. 4615
3/26/08
Wendy S. Schreiber

Exhibit 68,
P. 1603

**Exhibit 69**



# *Special Handling* Fax
### Examining Division
### U. S. Copyright Office

| | | |
|---|---|---|
| **To:** | **Carol A. Witschel**<br>White and Case LLP<br>Fax number: 212-354-8113 | Date: April 8, 2005 |
| **From:** | **Wayne Crist**<br>Senior Examiner, Visual Arts Section<br>Fax number: 202-707-3698<br>Phone number: 202-707-5879 | |
| **Re:** | **SASHA DOLL CONFIGURATION, ACCESSORIES AND PACKAGING (CA for VA 1-090-288) and 10 others**<br>**Control No.: 613231994  (Please include with your response.)** | |

### MESSAGE

Enclosed is a copy of the letter being sent to you via your local contact. Blank forms, circulars, and regulations are also available on our website: http://www.copyright.gov/ . Please call me if you have any questions.

---

When you reply, please return this sheet referring to our Control Number!
*If responding by mail*, use the following address *(U.S. Postal Service only)*:
Special Handling • Copyright Receiving & Processing • P.O. Box 71380 • Washington, DC 20024-1380

MGA 0868141

Exhibit 69,
P. 1604



COPYRIGHT
OFFICE          WEC/rc-d

April 8, 2005

WHITE AND CASE LLP
ATTN: CAROL A WITSCHEL
1155 AVENUE OF THE AMERICAS
NEW YORK   NY   10036

Control Number: 61-323-1994(W)
Re:   SASHA DOLL CONFIGURATION, ACCESSORIES AND PACKAGING
      (CA for VA 1-090-288) and 10 others

LIBRARY
OF
CONGRESS

Dear Ms. Witschel:

    This is a follow-up to our phone conversation of March 29. I had called because it was not clear to me with some of these claims exactly what corrections or amplifications of the earlier registrations that you were trying to make. You helped me to understand the situation better and I will discuss those issues below. In addition, I explained to you that I would need to get the deposit copies for the original claims in order to fully understand the entire situation and that, because of that need, it would take longer to process these claims. I now have all of the deposit material, but must address some issues which need to be resolved.

Washington
D.C.
20559-6000

    Please note that the CA claims for JADE DRAWING, YASMIN DRAWING, SASHA DRAWING, CLOE DRAWING, and BRATZ GROUP DRAWING are all acceptable as presented and I have cleared those claims. However, I am delaying final processing of those registrations so that this letter will not be delayed. For all claims which can be registered, we will have all of the final processing done at the same time.

    Re:   SASHA DOLL CONFIGURATION, ACCESSORIES AND PACKAGING
          (CA for VA 1-090-288); YASMIN DOLL CONFIGURATION,
          ACCESSORIES AND PACKAGING (CA for VA 1-090-290; JADE DOLL
          CONFIGURATION, ACCESSORIES AND PACKAGING (CA for
          VA 1-090-287; CLOB DOLL CONFIGURATION, ACCESSORIES AND
          PACKAGING (CA for VA 1-090-289)

    The original VA registrations to which these CA applications refer were apparently the first registrations of each respective doll. The original applications presented claims only in "3-dimensional sculpture" and did not refer to any preexisting authorship on which they were based. The CA applications seek to both correct and amplify the original claims. In our phone conversation, you explained that the same basic doll sculpture was used for all four works. Each doll has different coloring and artwork, different hair, and different clothing and accessories. Doll hair and hairstyles are not copyrightable. The doll clothing, etc. will be discussed below. It appears that each doll was accompanied by a sculpture of an alternate foot and shoe combination which, I assume, could replace each foot already on the doll. When examining these claims for

MGA 0868142

68-2

Exhibit 69
P. 1605

-2-

WHITE AND CASE LLP
NEW YORK   NY   10036

Control No. 61-323-1994(W)
April 8, 2005

registration, we interpreted each claim in sculpture to cover the entire basic doll sculpture and the extra combination foot and shoe sculptures as they were published, and we registered the claims.

There is no problem in correcting the creation and publication dates or in connecting these works to the preliminary drawings, which were apparently published at the same time as the dolls, according to the applications. Each CA application also adds the new authorship descriptions "2-dimensional artwork," "Photograph," and "Text." There is artwork on the dolls and the packaging which will support a copyright claim, so that claim is acceptable. The claim in "Photograph" apparently refers to the deposited snapshots used as identifying material for the work. As such, they are not a part of the unit of publication and cannot be claimed here. The only text in the deposit material consists of names and short phrases on the front of the packaging and this element is not copyrightable. Copyright does not protect names and titles or short phrases and slogans. Each CA should not refer to "photograph" or "text."

The new space 6b statement given in space C of each CA application also refers to "accessories" and "other elements." It is not clear what "other elements" means and that phrase should not be used on the application. "Accessories" apparently refers to the doll clothing, brushes, etc., but these elements are not protected by copyright. If the doll clothing is regarded as a miniaturized model of real clothing, there would appear to be no authorship in the simple miniaturization to support a copyright claim. If the doll clothing is regarded as intrinsically useful, as are full-sized clothing items for people, they would not have any separable sculptural authorship which would support a claim, so they would not be copyrightable for that reason because copyright does not protect the designs of useful articles. If you intend to register the styling or general "look" of each doll with its various outfits, these trademark or trade dress elements are not protected under copyright law, but may be covered under the Lanham Act. The applications should not refer to "accessories" or to any anything suggesting a claim in the clothing designs, styling, etc.

Please complete a new CA application for each work, or amend the originals, incorporating the changes discussed above.

Re:   BRATZ DOLL SCULPTURE (FEMALE) (CA for VA 1-148-305); BRATZ DOLL SCULPTURE (FEMALE) - VA 1-148-305

In our conversation, you stated that this work is the same basic doll sculpture, minus the hair, facial artwork, and clothing, as the four works registered previously and discussed above. You explained that the original VA claim here was filed because the original registration materials for those four works did not show the entire sculpture of the basic doll, even though this claim did not refer to the previously registered claims. The CA claim here was filed to make clear that this VA claim covered all of the sculptural authorship not shown in the deposits for the four earlier registrations. This presents a problem for both of these registrations. We interpret the four earlier registrations for the dolls in their packaging to cover the entire doll sculpture even though

MGA 0868143

6ᴢ5-3

Exhibit 69 ,
P. 1606

-3-

WHITE AND CASE LLP                                          Control No. 61-323-1994(W)
NEW YORK  NY  10036                                                    April 8, 2005

the deposit materials for those claims did not show the entire doll sculpture. Section
202.21(b) of the Copyright Office regulations specifies that, when identifying material
(such as photos) is required or allowed, "as many pieces of identifying material as are
necessary to show the entire copyrightable content in the ordinary case, but in no case less
than an adequate representation of such content, of the work for which deposit is being
made, or for which registration is being sought shall be submitted." The time for deposit
of pictures showing the entire doll sculpture without the clothing, etc. was when those
four original registrations were made. The deficiency of the deposit material at that time
cannot be corrected by making a new registration for the same work. Normally, only one
registration can be made for any particular work. (The four separate original VA
registrations for the packaged dolls could be justified because all of the claims were
received on the same date, all of the works were first published on the same date, and
each deposit revealed copyrightable sculptural authorship not contained in the others,
namely the different combination foot and shoe sculptures. The addition of a claim in
artwork now with each CA application adds that much more copyrightable authorship
which is different with each work.)

        All of this leads to the conclusion that this original VA registration should never
have been made. (We were not given full information at the time of registration to alert
us to the fact that the work was already registered.) Because the registration was made in
error, we now intend to cancel the original VA registration. If you believe that the
registration should not be cancelled, be sure to show cause in writing in your reply why
we should not cancel it. If we get no response from you concerning this issue within the
specified reply time, or if after considering your response we determine that the
registration is erroneous, we will cancel the registration.

        Assuming the original VA registration will be cancelled, we cannot register the
related CA claim. The filing fee is not refundable.

        Re:  BRATZ PETZ CATZ - SOFT TOYS, ACCESSORIES, PACKAGING &
             CONFIGURATION

        This application includes a claim in text in space 2 and mentions text and photos
in space 1. Again, the packaging contains some short phrases which will not support a
copyright claim in text and the photos are presumably not a part of the unit of publication.
Please omit these references on a new or amended application.

        If you have any questions, you may call me at 202-707-5879.

MGA 0868144

Exhibit 69
P. 1607

**Exhibit 70**

Page 2

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4

5     CARTER BRYANT, AN INDIVIDUAL, )
                                    )
6              PLAINTIFF,           )
                                    )
7         V.                        ) NO. CV04-9049SGL
                                    )
8     MATTEL, INC., A DELWARE       )
      CORPORATION, AND CONSOLIDATED )
9     ACCTIONS,                     )
                                    )
10             DEFENDANTS.          )
      _____)

11

12             C O N F I D E N T I A L

13        (PURSUANT TO PROTECTIVE ORDER, THIS

14      TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL,

15            ATTORNEYS' EYES ONLY.)

16            PAGES 1 THROUGH 314

17

18            DEPOSITION OF MARGARENT LEAHY,

19      TAKEN ON BEHALF OF THE DEFENDANTS, AT 865 SOUTH

20      FIGUEROA STREET, 10TH FLOOR, LOS ANGELES,

21      CALIFORNIA, COMMENCING AT 10:11 A.M., WEDNESDAY,

22      DECEMBER 12, 2007, BEFORE BETH FELIX, CSR NO.

23      12766.

24

25

Exhibit 70,
P. 1608

Page 3

```
 1    APPEARANCES OF COUNSEL:
 2
 3    FOR THE WITNESS:
 4         KEATS, MC FARLAND & WILSON
           BY:  LARRY W. MC FARLAND
 5         BY:  CHRISTIAN C. DOWELL
           ATTORNEYS AT LAW
 6         9720 WILSHIRE BOULEVARD, PENTHOUSE SUITE
           BEVERLY HILLS, CALIFORNIA  90212
 7         (310) 777-3750
 8    FOR THE PLAINTIFF:
 9         KEKER & VAN NEST
           BY:  CHRISTA MARTINE ANDERSON
10         ATTORNEY AT LAW
           710 SANSOME STREET
11         SAN FRANCISCO, CALIFORNIA  94111
           (415) 397-7188
12
      FOR DEFENDANT MATTEL:
13
           QUINN, EMANUEL, URQUHART, OLIVER & HODGES
14         BY:  MICHAEL T. ZELLER
           BY:  TAMAR BUCHAKJIAN
15         BY:  BRIDGET HAULER
           ATTORNEYS AT LAW
16         865 SOUTH FIGUEROA STREET, 10TH FLOOR
           LOS ANGELES, CALIFORNIA  90017
17         (213) 624-7707
18    FOR DEFENDANT M.G.A.:
19         SKADDEN, ARPS, SLATE, MEAGHER & FLOM
           BY:  MARCUS R. MUMFORD
20         BY:  KENNETH PLEVAN
           ATTORNEYS AT LAW
21         300 SOUTH GRAND AVENUE
           LOS ANGELES, CALIFORNIA 90071
22         (213) 687-5000
23
24
25
```

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

Exhibit 70
P. 1609

Page 4

1    APPEARANCES (CONTINUED)

2    ALSO PRESENT:

3        MICHAEL MOORE

         JILL THOMAS

4        STEVEN TOGAMI, VIDEOGRAPHER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 149

1        A    NO, NOT AT ALL.

2        Q    EITHER WAY?

3        A    EITHER WAY.

4        Q    DO YOU HAVE ANY KNOWLEDGE OR INFORMATION AS TO

5    WHEN EXHIBIT 1129 WAS CREATED?

6        A    I HAD ALREADY GONE THROUGH SEVERAL ITERATIONS

7    OF THE SCULPT, AND AT THIS POINT, CARTER HAD LOOKED AT

8    MY SCULPT AND COME UP WITH THIS DRAWING.

9        Q    AND HOW IS IT THAT YOU KNOW THAT CARTER HAD

10   COME UP WITH THIS DRAWING AS A RESULT OF THOSE

11   ITERATIONS OF THE SCULPT THAT YOU DID?

12       A    BECAUSE WHEN CARTER FIRST BROUGHT ME THE

13   DRAWINGS THEY WERE INSPIRATIONS AND NOT ACTUAL WORKING

14   DRAWINGS SO I HAD TO COME UP WITH THE SCULPT ON MY OWN

15   GIVEN THE INSPIRATION THAT HE GAVE ME.  IT'S KIND OF A

16   BIG LEAP, IF I'M EXPLAINING MYSELF OKAY, AND THEN AFTER

17   I GOT CLOSER TO A MORE PRODUCIBLE BODY, HE MADE THESE

18   DRAWINGS OFF OF ONE OF MY SCULPTS.

19       Q    YOU'RE TALKING ABOUT EXHIBIT 1129?

20       A    YES.

21       Q    AND WHAT IS YOUR TESTIMONY BASED ON?

22       A    WHAT DO YOU MEAN?

23       Q    WELL, YOU WERE TELLING US WHY CARTER BRYANT

24   CREATED THIS, SO MY QUESTION IS, HOW DO YOU KNOW THAT'S

25   WHY CARTER BRYANT CREATED EXHIBIT 1129?

Exhibit 70
P. 1611

Page 314

```
 1    STATE OF CALIFORNIA      )

 2                             ) SS.

 3    COUNTY OF LOS ANGELES    )

 4

 5        I, BETH FELIX, CERTIFIED SHORTHAND REPORTER,

 6    CERTIFICATE NO. 12766, FOR THE STATE OF CALIFORNIA,

 7    HEREBY CERTIFY:

 8        THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT

 9    THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME THE

10    DEPONENT WAS PLACED UNDER OATH BY ME;

11        THE TESTIMONY OF THE DEPONENT AND ALL OBJECTIONS

12    MADE AT THE TIME OF THE EXAMINATION WERE RECORDED

13    STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED.

14    THE FOREGOING TRANSCRIPT IS A TRUE AND CORRECT

15    TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

16        I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR

17    NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN ANY WAY

18    INTERESTED IN THE OUTCOME THEREOF;

19        IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED MY

20    NAME THIS 12TH OF DECEMBER, 2007.

21

22                          _____

                                    BETH FELIX

23

24

25
```

Exhibit 70,
P. 1612