**Exhibit 78**

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


MATTEL, INC., a Delaware corporation, )     CASE NO.
                                      )     CV 04-9059 DDP (AJWx)
                    Plaintiff,        )
                                      )
          vs.                         )
                                      )
CARTER BRYANT, an individual, and     )
DOES 1 through 10, inclusive,         )
                                      )
                    Defendants.       )
_____ )
CARTER BRYANT, on behalf of himself,  )
all present and former employees of   )
Mattel, Inc., and the general public, )
                                      )
                    Cross-Complainant,)
                                      )
          vs.                         )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
                    Cross-Defendant.  )


VOLUME I

THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Thursday, November 4, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079



ORIGINAL
Exhibit 78
P. 85

A P P E A R A N C E S

For Plaintiff and
Cross-Defendant:

MR. JOHN B. QUINN
MR. MICHAEL T. ZELLER
MS. TANIA KREBS
Quinn, Emanuel, Urquhart,
    Oliver & Hedges
865 South Figueroa Street
10th Floor
Los Angeles, California 90017

For Defendants and
Cross-Complainant:

MR. DOUGLAS A. WICKHAM
Littler Mendelson
2049 Century Park East
5th Floor
Los Angeles, California 90067

Also Present:

Ms. Dale M. Cendali
Mr. Michael Moore

Videotaped by:

Mr. Donald Gifford
Mr. Donald Gifford, II
1528 East Glenwood
Springfield, Missouri 65804

I N D E X

WITNESS:  CARTER BRYANT                              Page
Direct Examination by Mr. Quinn ..................    4
Notarial Certificate and Costs ...................  262

* * *

E X H I B I T S

| DEPOSITION EXHIBIT | DESCRIPTION | IDENTIFIED |
|---|---|---|
| | (NONE) | |

Phonetic spelling:   (Ph.)
Exactly as stated:   (Sic)

Exhibit 78 ,
P. 86

1     rights to Bratz?

2  A  Well, I'm not sure that I used those exact words.  I told

3     MGA that that -- that Bratz were my creation.

4  Q  And did you tell that to them in writing?

5  A  I don't -- I don't recall.

6  Q  Did you ever enter into an agreement with MGA which

7     provided in your understanding that you are promising to

8     MGA that you own the rights to Bratz?

9              MR. WICKHAM:  Object to the extent that it

10     calls for a legal conclusion.

11  A  Yes, I did.

12  Q  (By Mr. Quinn)  And when did you do that?

13  A  That was in October of 2000.

14  Q  And did you -- do you understand that if that turned out

15     not to be true, that you might have some liability to

16     MGA?

17              MR. WICKHAM:  Objection, attorney-client

18     privilege.  Instruct the witness not to respond.

19  Q  (By Mr. Quinn)  Do you have any understanding -- I'm

20     focusing my question now on your agreement with MGA.  Do

21     you understand?

22  A  Yes.

23  Q  Is it your understanding that under your agreement that if

24     it turned out that you did not, in fact, own the rights to

25     Bratz as you represented, that you would have some

Exhibit 78 ,
P. 87

1    potential liability to MGA?

2            MR. WICKHAM:  Calls for a legal conclusion.

3    A   I don't know.  I don't know if that's the case.

4    Q   (By Mr. Quinn)  Did that ever occur to you?

5    A   No, I don't think it ever did occur to me.

6    Q   And to this day it's never occurred to you that you might

7    have some liability to MGA under that agreement; is that

8    true?

9            MR. WICKHAM:  Objection, overbroad,

10   potentially invades the attorney-client privilege.  To the

11   extent that his question calls for any information that

12   you received from counsel, I instruct you not to respond.

13   To the extent that you have any understanding other than

14   obtained from your attorneys, you can respond.

15   A   Can you restate your question?

16   Q   (By Mr. Quinn)  Sure.  The question was about whether it

17   ever occurred to you that you might have some liability to

18   MGA if it turned out that you didn't own the rights to

19   Bratz.  Do you understand that much?

20   A   Yes.

21   Q   And I had asked you before whether that ever occurred to

22   you and you said no, and I -- then I said to this day is

23   it true that that never occurred to you, and your counsel

24   said, well, in answering just leave out anything your

25   lawyers have told you.

Exhibit 78
P. 88

1  A    Well -- I'm sorry.  No, it hadn't occurred to me

2       because --

3               MR. WICKHAM:  You've answered.

4               MR. QUINN:  Let him -- no.  Let him finish.

5       You really should not raise your hand like that and cut a

6       witness off when he's answering the question.

7               MR. WICKHAM:  Counsel, when the witness has

8       answered the question, he's answered the question.

9  Q    (By Mr. Quinn)  You may finish your answer, please.

10 A    I -- in my mind I own the rights -- I owned the rights to

11      the Bratz and felt perfectly comfortable assigning them to

12      MGA.

13 Q    And is it true that to this day it's never occurred to you

14      that you might have some liability to MGA if it turned out

15      that you didn't own the rights?  Is that true?

16              MR. WICKHAM:  Objection, asked and answered,

17      harassing, burdensome.  It's about the fourth or fifth

18      time that you've asked that question.  At this point in

19      time I'll instruct the witness not to respond.

20              MR. QUINN:  Well, he hasn't answered the

21      question, so it's going to be hard to complete this

22      deposition with all the instructions not to answer we're

23      racking up.  Do you have something to write me notes

24      with?

25              MR. ZELLER:  Yes.

Exhibit 78 ,
P. 89

43

1  Q  When was the -- at some point you did enter into an

2     agreement with MGA; is that true?

3  A  Yes.

4  Q  When did you first enter into an agreement with MGA?

5                 MR. WICKHAM:  Object on the ground -- to the

6     extent it calls for a legal conclusion and it's ambiguous

7     as phrased.

8  A  Sorry.

9  Q  (By Mr. Quinn)  That's okay.

10  A  The contract was signed on October 4th, 2000.

11  Q  And that contract that was signed on October 4, 2000, is

12     the first agreement you entered into with MGA; is that

13     true?

14  A  Yes.

15  Q  Now, did you show your Bratz concept, designs, et cetera,

16     to any toy company other than MGA?

17  A  No.

18  Q  Is there a reason that you didn't do that?

19  A  Yes, because MGA seemed very interested in the project

20     when I first showed it to them.

21  Q  Is there any reason other than that that you didn't show

22     it to any other toy company?

23  A  No.

24  Q  Before -- Mr. Bryant, before you showed your MGA -- or I'm

25     sorry.  Before you showed your Bratz concept to MGA, had

Exhibit 78 .
P. 90

1    Q     (By Mr. Quinn)   And this is just something -- in terms of    10:3

2          your purpose, this is just something you wanted to share

3          with her as a -- as your friend?

4    A     Yes.

5    Q     Who is Ramone Prince?    10:3'

6    A     Ramona Prince?

7    Q     Ramona Prince.

8    A     She was a friend, a coworker from Mattel.

9    Q     By the way, during the last break did you speak with Ms.

10         Cendali?    10:3'

11                MR. WICKHAM:   Objection, attorney-client

12         privilege, joint defense privilege.   Instruct the witness

13         not to respond.

14   Q     (By Mr. Quinn)   What was Ramona's position?

15   A     She was -- I believe she was an assistant to the secretary    10:37

16         of the VP in Barbie collectibles.

17   Q     She's an assistant to a secretary?

18   A     I think -- I think so, yes.

19   Q     Assistant to an assistant?

20   A     Yes.    10:37

21   Q     And what was your purpose in sharing the Bratz materials

22         to her?

23   A     I wanted to get them notarized.

24   Q     And why did you want to get them notarized?

25   A     Well, I had started thinking that I might want to send    10:38

Exhibit 78 .
P. 91

54

1    this out to somebody who might be able to help me do
2    something with it, to pitch it or something.  I felt like
3    I needed some kind of protection.  I didn't really know
4    anything about copyright or anything like that.  I figured
5    if I had them notarized, at least that they would show
6    that they were created, you know, as of that date.
7  Q   Had somebody suggested to you that you get them notarized?
8  A   No.
9  Q   This was your idea?
10 A   Yes.
11 Q   And did Ramona notarize them?
12 A   Yes.
13 Q   And did you show her the same 13 drawings that you had
14     shown Elise?
15 A   Yes.
16 Q   And did she notarize them all?
17 A   Yes.
18 Q   Do you recall -- did she just see them on the one
19     occasion?
20         MR. WICKHAM:  You're referring to Ms.
21 Prince?
22         MR. QUINN:  Yes.
23 A   Yes.
24 Q   (By Mr. Quinn)  And do you recall anything she said in
25     reaction to the drawings?

10:3
10:3
10:38
10:38
10:39
10:39

1    of trying to maybe pitch them or do something with them.

2    That's all I can really recall right now.

3    Q    Did you give her some explanation as to why you wanted to

4    have them notarized?

5    A    I think I just told her that I was getting ready to maybe

6    pitch this to somebody and felt that I needed some sort of

7    protection.

8    Q    Anything else that you can recall you said to her?

9    A    No.

10   Q    Were you, in fact, getting ready to pitch it to somebody

11   at that point?

12   A    Yes.  I was getting ready to send the project out to

13   Alaska Momma.

14   Q    All right.  The last name you gave me, and you said that

15   Alaska is an artist representative?

16   A    Yes.

17   Q    What's that?  Somebody who helps creators market their

18   creations?

19   A    Yes.

20   Q    And is Alaska -- is that a he or a she?

21   A    I believe the company was run by a woman.

22   Q    Alaska is a man or a woman?

23   A    That was just the name of the company.

24   Q    Okay.  Alaska Momma is the name of a company?

25   A    Right.

Exhibit 78 ,
P. 93

CONFIDENTIAL

```
 1    Q   And where were they located?                              10:42

 2    A   They're offices were in New York.

 3    Q   And did you meet with somebody there?

 4    A   No, I did not.

 5    Q   Well, you told me that you shared your Bratz concept with  10:42

 6        somebody at this firm, correct?

 7    A   Yes.

 8    Q   Can you tell us how that happened?

 9    A   I basically sent in color copies of my drawings.

10    Q   Just sent them in the mail?                                10:42

11    A   Yes.

12    Q   And did you hear back from them?

13    A   Yes.

14    Q   What did you hear?

15    A   Their response was that they were not interested because   10:42

16        they said that they normally did not work on toy projects.

17    Q   And when was it that you sent the drawings to this

18        company?

19    A   Sometime after August of '99.

20    Q   Can you narrow it down any more than that?                 10:43

21    A   I don't remember.

22    Q   Do you know whether or not it was in 1999 or 2000?

23    A   It was in 1999.

24    Q   Do you have any copies of any correspondence that you sent

25        to this firm or that they sent to you?                     10:43
```

Exhibit 78 ,
P. 94

1    MS. CENDALI:  Objection, vague.  Which                    12:04

2    agreement?

3  A   I'm sorry.  Which agreement are you referring to?

4  Q   (By Mr. Quinn)  Any agreement.  Was there any discussion    12:04

5    that you had with her about the terms of any of your

6    agreements with Mattel?

7  A   I don't remember.

8  Q   One way or the other?

9  A   No.

10  Q   Did you give her any reassurance that this would -- the    12:05

11    activities that you were doing would not be a problem

12    under any agreement that you had with Mattel?  Did you say

13    that to her?

14  A   I don't remember if I said that to her but that was my

15    thought.  I thought that, you know, this was a project    12:05

16    that I had created while I was not employed with Mattel,

17    so I didn't think there would be a problem.

18  Q   And is that -- did you tell that to Victoria?

19  A   I may have.  I don't remember exactly.

20    (Pause in proceedings.)                    12:05

21  Q   (By Mr. Quinn)  Did you know a -- do you know a woman by

22    the name of Anna Rhee?

23  A   Yes.

24  Q   Who is she?

25  A   She was a face painter.  She was a friend of mine.    12:06

Exhibit 78 ,
P. 95

1    A    No.                                                                    02:07

2    Q    Can you tell me when it was approximately in 1999 that you

3         created these color drawings?

4    A    I don't remember exactly when.  I think it was either in

5         the spring or the summer.                                             02:07

6    Q    And by then, as I understand it, you were back in Los

7         Angeles?

8    A    Yes.

9    Q    And physically where did you do this work with the light

10        box and adding the color?  Were you at work?  Were you at            02:08

11        home?  Where were you?

12   A    I was at home.

13   Q    So you had -- you had your own personal light box and

14        equipment so you could do this sort of thing at home?

15   A    Yes.                                                                   02:08

16   Q    And do you still have these -- the originals of these

17        color drawings that you created in 1999?

18   A    I believe they're in MGA's possession now.

19   Q    What was it that had happened in 1999 that had caused you

20        to take these drawings out and create the color versions?           02:08

21   A    I don't recall any certain event.  I think I just may have

22        been going through my things and found the drawings again

23        and just felt that they were still neat and different, but

24        I don't -- I don't recall any specific event.

25   Q    Did you have an idea at that time that you might now try              02:09

Exhibit 78
P. 96

CONFIDENTIAL

154

```
1        to see if this is a project that you could take forward    02:09
2        and get some company interested in pursuing?
3   A    I think that I sort of did think that.  I thought that
4        maybe this Alaska Momma might be able to help me pitch it.
5   Q    You told me the originals of these color provision -- or   02:09
6        these color versions that you created in 1999 are now in
7        the possession of MGA?
8   A    As far as I know.
9   Q    Did you give them to MGA?
10  A    Yes.                                                         02:09
11  Q    When was it that you gave them to MGA?
12  A    I think that I gave those to them in 2003.
13  Q    In what connection did you do that?
14  A    I think it was at the request of their in-house attorney.
15  Q    Did you have any understanding as to why they wanted them?  02:10
16            MS. CENDALI:  Objection, attorney-client
17       privilege.
18  A    I don't know.
19  Q    (By Mr. Quinn)  All right.  But I think you've told me
20       this morning that you did decide in 1999 to send some      02:10
21       drawings to Alaska Momma?
22  A    Uh-huh.
23  Q    And --
24            MR. WICKHAM:  You have to speak audibly.
25  A    I'm sorry.  Yes.                                            02:10
```

Exhibit 78
P. 97

1    Q    (By Mr. Quinn)   And you sent them the color versions?          02:10

2    A    Yes.

3    Q    And you told us about that this morning, that nothing came

4         of that?

5    A    That's right.                                                   02:11

6    Q    And did they return those to you?

7    A    I sent color copies and they returned them.

8    Q    The color originals you kept in your possession at that

9         time until you gave them to MGA sometime in 2003?

10   A    Yes.                                                            02:11

11   Q    All right.   Did you -- at any time during 1999 did you

12        take any other action to pursue the idea of seeing if this

13        is a -- you could move the Bratz project forward with some

14        company?

15   A    No.   After I got the rejection letter from Alaska Momma I     02:11

16        kind of -- I felt like I had had one too many rejection

17        letters and I just kind of shelved the whole thing.   I

18        just thought, you know, I don't want to keep trying to

19        send things out, so I just decided to shelve it.

20   Q    At this time when you were -- at the time you sent these       02:12

21        drawings to Alaska Momma, did you already have the name

22        "Bratz"?

23   A    Yes.

24   Q    And what was the inspiration that caused you to come up

25        with the idea of "Bratz"?                                      02:12

Exhibit 78
P. 98

```
 1    Q    (By Mr. Quinn)   You just didn't think they would be                     04:33

 2         interested?

 3    A    I didn't think they would be interested in it.

 4    Q    And in your answer you said something about Barbie?

 5    A    Yes.                                                                      04:33

 6    Q    What did Barbie have to do with you -- the fact that you

 7         didn't think they would be interested in Bratz?

 8    A    Because Mattel was very focused on Barbie as its core

 9         brand of fashion doll, and I did not think that they would

10         be interested in -- in a different kind of fashion doll.             04:34

11    Q    Did you think that people in Mattel would regard that as

12         something that would be competing with Barbie or would

13         take away from Barbie?

14              MR. WICKHAM:   Objection --

15              MS. CENDALI:   Objection.                                           04:34

16              MR. WICKHAM:   -- lacks foundation,

17         mischaracterizes the witness's testimony.

18    A    I'm not sure that I really thought that they thought it

19         would compete.  I just -- again, I just -- I just thought

20         that it would not be something that would -- that they           04:34

21         would be interested in doing.

22    Q    (By Mr. Quinn)  Did you think -- well, let's not use the

23         word "compete," then.  I mean, did you think that somehow

24         that -- at Mattel that a project like Bratz would be --

25         people would think that that would detract from Barbie in         04:35
```

Exhibit 78 ,
P. 99

NOTARIAL CERTIFICATE

STATE OF MISSOURI        )
                         )   ss.
COUNTY OF GREENE         )

     I, Sherrie L. Hunt, Certified Court Reporter, and Notary Public within and for the State of Missouri, do hereby certify that on November 4, 2004, pursuant to Notice, the above witness, CARTER BRYANT, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid; and that the deposition by him was reduced to writing by me in stenotype, and thereafter transcribed by me, and is fully and accurately set forth in the preceding pages; that presentment by me to the witness for signature was waived; and that the deposition will be thereafter by the witness read, signed, and sworn to on or before the date of trial.

     I do further certify that I am not related to, nor attorney for, nor employed by any of the said parties, nor otherwise interested in the event of said action.

> Sherrie L Hunt
> Notary Public
> Greene County
> State of Missouri
> My Commission Expires May 17, 2005

Sherrie L. Hunt
Certified Court Reporter
C.C.R. Number 1027
Notary Public

My commission expires:  May 17, 2005

Costs:   To Plaintiff and Cross-Defendant $1,399.25
         To Defendants and Cross-Complainant $422.65

COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

Exhibit 78
P. 100

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware corporation, )    CASE NO.
                                       )    CV 04-9059 DDP (AJWx)
            Plaintiff,                 )
                                       )
        vs.                            )
                                       )
CARTER BRYANT, an individual, and      )
DOES 1 through 10, inclusive,          )
                                       )
            Defendants.                )
_____    )
CARTER BRYANT, on behalf of himself,   )
all present and former employees of    )
Mattel, Inc., and the general public,  )
                                       )
            Cross-Complainant,         )
                                       )
        vs.                            )
                                       )
MATTEL, INC., a Delaware corporation,  )
                                       )
            Cross-Defendant.           )


VOLUME II
THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Friday, November 5, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079


Exhibit 78
P. 101

CONFIDENTIAL

# A P P E A R A N C E S

For Plaintiff and
Cross-Defendant:

MR. JOHN B. QUINN
MR. MICHAEL T. ZELLER
MS. TANIA KREBS
Quinn, Emanuel, Urquhart,
  Oliver & Hedges
865 South Figueroa Street
10th Floor
Los Angeles, California 90017

For Defendants and
Cross-Complainant:

MR. DOUGLAS A. WICKHAM
MS. DIBA RASTEGAR
Littler Mendelson
2049 Century Park East
5th Floor
Los Angeles, California 90067

Also Present:

Ms. Dale M. Cendali
Mr. Michael Moore

Videotaped by:

Mr. Donald Gifford
Mr. Donald Gifford, II
1528 East Glenwood
Springfield, Missouri 65804

# I N D E X

WITNESS:  CARTER BRYANT                                    Page

Direct Examination (Cont.) By Mr. Quinn .........    267

Notarial Certificate and Costs ...................    495

* * *

Phonetic spelling:   (Ph.)
Exactly as stated:   (Sic)

Exhibit 78
P. 102

| | |
|---|---|
| 1 | VIDEOGRAPHER:  And we're back on the record. | 09:10 |
| 2 | The date is November 5th, 2004.  The time is 9:10 a.m. |
| 3 | DIRECT EXAMINATION (CONTINUED) |
| 4 | BY MR. QUINN: |
| 5 | Q   Good morning, Mr. Bryant. | 09:10 |
| 6 | A   Good morning. |
| 7 | Q   At any time before your last day of employment at Mattel |
| 8 | did anybody from MGA ask you whether Mattel knew about |
| 9 | your Bratz project? |
| 10 | A   Not that I can recall. | 09:11 |
| 11 | Q   Did they ask -- did anybody from MGA ever ask you when you |
| 12 | had developed the Bratz idea? |
| 13 | A   I believe at the pitch meeting they asked when I had |
| 14 | developed the idea. |
| 15 | Q   Which meeting would that have been? | 09:11 |
| 16 | A   I think it was at the -- I think it was actually at both |
| 17 | meetings we talked about it. |
| 18 | Q   In the first meeting at the end of August did Paula ask |
| 19 | you that? |
| 20 | A   I can't recall exactly if it was Paula or might have been | 09:11 |
| 21 | Victoria. |
| 22 | Q   One of the two of them? |
| 23 | A   Yeah.  I think so. |
| 24 | Q   And you basically told them that you had created this back |
| 25 | in 1998? | 09:11 |

Exhibit 78
P. 103

```
 1    A    Yes.                                                        09:11

 2    Q    And then that subject came up again in the six-person

 3         meeting with Mr. Larian?

 4    A    I believe it did, yes.

 5    Q    Do you recall who asked you that?                           09:12

 6    A    I think Isaac may have asked.

 7    Q    And you gave the same answer, that you --

 8    A    Yeah.

 9    Q    -- did this back in 1998?

10    A    Yes.                                                        09:12

11    Q    Do I understand correctly that during the first six months

12         of 2000 you didn't do any Bratz -- Bratz sketches; is that

13         true?

14    A    That's true.

15    Q    And you didn't -- during the first six months of 2000, as  09:12

16         I understand it, you didn't do any work on the Bratz idea

17         or project; is that true?

18    A    That's true.

19    Q    I mean, you didn't send the sketches or show the sketches

20         to anybody during that six-month period?                   09:12

21    A    No, I did not.

22    Q    You indicated that you met with your counsel the day

23         before yesterday to prepare for your deposition.

24    A    Yes.

25    Q    And how much time did you meet with your counsel?          09:12
```

Exhibit 78 .
P. 104

CONFIDENTIAL

349

```
 1                    (Pause in proceedings.)
 2    Q    (By Mr. Quinn)  Well, did you retain all the original
 3         pages from that notebook on which you had done Bratz
 4         drawings or just some of them?
 5                    MR. WICKHAM:  Objection, calls for        11:35
 6         speculation.
 7    A    To the best of my recollection I only retained the pages
 8         that had the Bratz drawings.
 9    Q    (By Mr. Quinn)  But you retained all of those?
10    A    Yes.                                                 11:35
11    Q    Looking back at the exhibit that we were looking at, page
12         277 of exhibit --
13                    MR. QUINN:  What did we mark this?  5?
14                    MR. ZELLER:  Uh-huh.
15    Q    (By Mr. Quinn)  5.  Is -- did this -- was this the form of  11:35
16         the final sculpt?
17                    MS. CENDALI:  Objection.
18    A    No.
19    Q    (By Mr. Quinn)  And how was the final -- the form of the
20         final sculpt different than what's illustrated here?     11:36
21    A    I think if you'll turn to the next page we can see.
22    Q    It was closer to what we see on the next page?
23    A    Yes.
24    Q    These -- some of these pages, as we've commented on
25         before, were notarized by Ramona.  I've forgotten her last  11:36
```

Exhibit 78 ,
P. 105

CONFIDENTIAL

```
 1        name.   Prince.                                          11:36
 2   A    Yes.
 3   Q    Now, how is it that you happened to go to her to have her
 4        notarize those pages?
 5                  MR. WICKHAM:   Objection, asked and answered.   11:36
 6   A    We were friends at Mattel and through the course of normal
 7        conversation she just happened to tell me that she had a
 8        notary public license.
 9   Q    (By Mr. Quinn)  And did she notarize those -- she worked
10        in the design center?                                    11:37
11   A    Yes.
12   Q    Did she notarize those drawings at -- at the design
13        center?
14                  MR. WICKHAM:   Objection, asked and answered.
15   A    As I said yesterday, she notarized them at her home.     11:37
16   Q    (By Mr. Quinn)  Okay.  Let's turn to 278.  What are we
17        looking at here?
18   A    This is a drawing of the actual finished doll that I gave
19        to -- this drawing I gave to Margaret to have her restart
20        the sculpt.                                              11:37
21   Q    So this is not the first drawing that you gave her for the
22        sculpt?
23   A    No.
24   Q    And when did you do this drawing?
25   A    I believe I did this drawing in November of 2000.        11:37
```

Exhibit 7B,
P. 106

## NOTARIAL CERTIFICATE

STATE OF MISSOURI          )
                           )  ss.
COUNTY OF GREENE           )


I, Sherrie L. Hunt, Certified Court Reporter, and Notary Public within and for the State of Missouri, do hereby certify that on November 5, 2004, pursuant to Notice, the above witness, CARTER BRYANT, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid; and that the deposition by him was reduced to writing by me in stenotype, and thereafter transcribed by me, and is fully and accurately set forth in the preceding pages; that presentment by me to the witness for signature was waived; and that the deposition will be thereafter by the witness read, signed, and sworn to on or before the date of trial.

I do further certify that I am not related to, nor attorney for, nor employed by any of the said parties, nor otherwise interested in the event of said action.

Sherrie L Hunt
Notary Public
Greene County
State of Missouri
My Commission Expires May 17, 2005

Sherrie L. Hunt
Certified Court Reporter
C.C.R. Number 1027
Notary Public

My commission expires:  May 17, 2005


Costs:   To Plaintiff and Cross-Defendant $1,344.45
         To Defendants and Cross-Complainant $430.85


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079.


Exhibit 78,
P. 107

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware corporation, )
                                    )  CASE NO.
            Plaintiff,  )  CV 04-9059 DDP (AJWx)
                                    )
       vs.  )
                                      )
CARTER BRYANT, an individual, and  )
DOES 1 through 10, inclusive,  )
                                      )
           Defendants.  )
_____

CARTER BRYANT, on behalf of himself,  )
all present and former employees of  )
Mattel, Inc., and the general public,  )
                                      )
            Cross-Complainant,  )
                                      )
       vs.  )
                                      )
MATTEL, INC., a Delaware corporation,  )
                                      )
            Cross-Defendant.  )


VOLUME III
THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Monday, November 8, 2004,
at 10:27 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079



Exhibit 78 ,
P. 108

A P P E A R A N C E S

For Plaintiff and                MR. JOHN B. QUINN
Cross-Defendant:                 MR. MICHAEL T. ZELLER
                                 MS. TANIA KREBS
                                 Quinn, Emanuel, Urquhart,
                                   Oliver & Hedges
                                 865 South Figueroa Street
                                 10th Floor
                                 Los Angeles, California 90017

For Defendants and              MR. DOUGLAS A. WICKHAM
Cross-Complainant:              Littler Mendelson
                                2049 Century Park East
                                5th Floor
                                Los Angeles, California 90067

Also Present:                   ** Ms. Dale M. Cendali
                                ** Mr. Michael Moore

Videotaped by:                   Mr. Donald Gifford
                                 Mr. Donald Gifford, II
                                 1528 East Glenwood
                                 Springfield, Missouri 65804

** Not continuously present.


I N D E X

WITNESS:  CARTER BRYANT                              Page
Direct Examination (Cont.) By Mr. Quinn ..........    500
Notarial Certificate and Costs ..................     727

* * *


ANSWERS REQUESTED TO BE MARKED:     PAGE      LINE
                                    646        4
                                    646        15


Phonetic spelling:  (Ph.)
Exactly as stated:  (Sic)

Exhibit 78
P. 109

```
 1    head in the first period of your employment?          11:52
 2  A No, not to my recollection.
 3  Q Did you ever have any involvement in a design for a Barbie
 4    body?
 5  A I did have some involvement in updating Barbie's body. I   11:52
 6    came up with some ideas for what I thought might help make
 7    her more aesthetically pleasing, but they were never used.
 8  Q Okay.  And when was it that you came up with these ideas
 9    for updating Barbie's body?
10  A I think in '97.                                          11:53
11  Q And is there some way that you can describe for us what
12    those changes were to Barbie's body that you proposed?
13  A I think that I had proposed making her hips a little bit
14    smaller and making her arms a little bit longer.
15  Q Any other features that you can describe to us that you   11:53
16    proposed to change?
17  A I think that was about it.
18  Q Had somebody asked you to come up with these proposals or
19    is this something you did on your own?
20  A I don't recall.                                          11:54
21  Q One way or the other?
22  A One way or the other.
23  Q Did you actually create something to reflect these changes
24    to Barbie's body that you were proposing?
25         MS. CENDALI:  Objection to form.                    11:54
```

Exhibit 78
P. 110

CONFIDENTIAL

553

1   Q   What was that?  What was his experience in mechanical

2       things?

3   A   He was an HVAC mechanic.

4   Q   Did you -- did you supervise Richard in that assignment?

5           MR. WICKHAM:  Objection, vague.

6   A   No, I didn't supervise him.  I just worked with him.

7   Q   (By Mr. Quinn)  Did you give him any direction?

8   A   Yes.  I told him what I was looking for.

9   Q   So what would you call this that you came up with to

10      illustrate your ideas for the new Barbie form?  Was this a

11      dummy?

12          MS. CENDALI:  Objection.

13  Q   (By Mr. Quinn)  I'm just trying to find out what you would

14      call it.

15  A   I think that I would have probably called it a model.

16  Q   And who did you submit that to?

17  A   Well, I showed it to Cassidy and I -- I believe that we

18      dressed it and showed it in some meeting.

19  Q   Do you recall what kind of meeting it was you showed it

20      at?

21  A   I believe it was a -- like a concept approval type of a

22      meeting or something.

23  Q   Do you recall who was in attendance?

24  A   I don't really recall.

25  Q   Was -- were any decisions made at that meeting about this

11:57

11:57

11:58

11:58

11:59

11:59

Exhibit  78
P.  111

CONFIDENTIAL

1   change -- these changes to Bobby -- Barbie's body that you          11:59

2   were proposing?

3   A   I don't remember.

4   Q   You indicated that the changes that you were proposing

5   were never made.                                                   11:59

6   A   Right.

7   Q   Was Barbie's body changed in that time frame?

8   A   Not that I remember.

9   Q   Do you remember Barbie's body being changed since then?

10        MR. WICKHAM:   Objection, foundation.                        12:00

11  A   I think later on it was changed.

12  Q   (By Mr. Quinn)  Was it changed during your employment at

13  Mattel?

14  A   Not to my knowledge.

15  Q   So would it be your best estimate that Barbie's body was       12:00

16  changed after you last left Mattel --

17        MR. WICKHAM:   Objection.

18  Q   (By Mr. Quinn)  -- or during the two Mattel periods of

19  employment?

20        MR. WICKHAM:   Objection, compound,                          12:00

21  foundation.

22  A   My best estimate would be that it was changed after I left

23  the first time.

24  Q   (By Mr. Quinn)  All right.  So would it -- would it be

25  your best estimate that Barbie's body was changed between          12:00

Exhibit 78 ,
P. 112

955

1    the two periods of your employment at Mattel?                12:00

2    A    Yes.

3    Q    And do you know whether or not Barbie's hips were made

4    smaller?

5    A    I think they were actually made larger.                 12:01

6    Q    And do you know whether or not her arms were made larger

7    or smaller?

8    A    I don't know.

9    Q    If we could look again in Exhibit 5 to that page 278, the

10   drawing that you gave to Margaret --                         12:01

11   A    Yes.

12   Q    -- did you give that to her in person?

13   A    I don't recall.

14   Q    One way or the other?

15   A    No, one way or the other.                               12:01

16   Q    What would be your best recollection as to whether or not

17   you gave it to her in person?

18             MS. CENDALI:   Asked and answered.

19             MR. WICKHAM:   Objection, lacks foundation,

20   calls for speculation, asked and answered.                   12:01

21   A    I don't remember.

22   Q    (By Mr. Quinn)  Did you discuss it with her?

23   A    I think we had some discussion of it.

24   Q    What do you recall discussing when you gave this to her?

25             MS. CENDALI:   Asked and answered.                 12:02

Exhibit 78
P. 113

## NOTARIAL CERTIFICATE

STATE OF MISSOURI     )
                      )  ss.
COUNTY OF GREENE      )


      I, Sherrie L. Hunt, Certified Court Reporter, and Notary Public within and for the State of Missouri, do hereby certify that on November 8, 2004, pursuant to Notice, the above witness, CARTER BRYANT, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid; and that the deposition by him was reduced to writing by me in stenotype, and thereafter transcribed by me, and is fully and accurately set forth in the preceding pages; that presentment by me to the witness for signature was waived; and that the deposition will be thereafter by the witness read, signed, and sworn to on or before the date of trial.

      I do further certify that I am not related to, nor attorney for, nor employed by any of the said parties, nor otherwise interested in the event of said action.


```
Sherrie L. Hunt
Notary Public
Greene County
State of Missouri
My Commission Expires May 17, 2005
```

Sherrie L. Hunt
Certified Court Reporter
C.C.R. Number 1027
Notary Public


My commission expires:  May 17, 2005


Costs:   To Plaintiff and Cross-Defendant $1,243.65
         To Defendants and Cross-Complainant $420.00


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

Exhibit 78
P. 114

**Exhibit 79**

Page 2

1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA EASTERN DIVISION

3

4      CARTER BRYANT, AN INDIVIDUAL, )
                                     )
5           PLAINTIFF,               )
                                     )
6      VS.                           ) CASE NO. CV 04-9049
                                     )
7      MATTEL, INC., A DELAWARE      )
       CORPORATION,                  )
8                                    )
            DEFENDANT                )
9                                    )
                                     )
10     AND CONSOLIDATED ACTIONS.     )

11

12     TRANSCRIPT IS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES

13                            ONLY

14          DEPOSITION OF ANNE WANG, TAKEN AT 865 SOUTH FIGUEROA

15     STREET, TENTH FLOOR, LOS ANGELES, CALIFORNIA, COMMENCING AT

16     9:39 A.M., MONDAY, JANUARY 28, 2008, BEFORE APRIL CRUZ

17     CACULITAN, CERTIFIED SHORTHAND REPORTER NO. 12437.

18

19

20

21

22

23

24

25

Exhibit 79
P. 115

Page 3

```
 1    APPEARANCES OF COUNSEL:
 2    FOR THE PLAINTIFF CARTER BRYANT:
 3         KEKER & VAN NEST
           BY:  MATTHEW M. WERDEGAR, ESQ.
 4         710 SANSOME STREET
           TENTH FLOOR
 5         SAN FRANCISCO, CALIFORNIA 94111-1704
           (415) 391-5400
 6
 7    FOR THE DEFENDANT MATTEL, INC.:
 8         QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
           BY:  SHON MORGAN, ESQ.
 9              TAMAR BUCHAKJIAN
           865 SOUTH FIGUEROA STREET
10         TENTH FLOOR
           LOS ANGELES, CALIFORNIA 90017-2543
11         (213) 443-3000
12    FOR THE DEFENDANT MGA ENTERTAINMENT:
13         SKADDEN, ARPS, SLATE, MEACHER & FLOM, LLP
           BY:  JASON D. RUSSELL, ESQ.
14         300 SOUTH GRAND AVENUE
           LOS ANGELES, CALIFORNIA 90071-3144
15         (213) 687-5000
16    FOR THE WITNESS:
17         CALDWELL, LESLIE & PROCTOR, PC
           BY:  LINDA M. BURROW, ESQ.
18         1000 WILSHIRE BOULEVARD
           SUITE 600
19         LOS ANGLES, CALIFORNIA 90017-2463
           (213) 629-9040
20
21    ALSO PRESENT:
22         RICHARD DANIELS, MGA ENTERTAINMENT
23         PHILIP CRUZ, J.T.V. LITIGATION SERVICES
24
25
```

Exhibit 79 ,
P. 116

1      Q      WHAT LEADS YOU TO BELIEVE THAT?

2      A      BECAUSE I -- IT WAS AN ISSUE THAT I HAD NOT

3   BEEN AWARE OF BEFORE, AND IT WAS SOMETHING THAT I KNEW

4   I NEEDED TO EXPLORE.  AND, ALSO, I BELIEVE AT

5   MR. ROSENBAUM'S REQUEST.

6      Q      WHEN YOU SAY THIS IS AN ISSUE THAT YOU HADN'T

7   BEEN AWARE OF BEFORE, WHAT DO YOU MEAN BY THAT?

8              MR. WERDEGAR: OBJECTION.  VAGUE.

9              THE WITNESS:  IT HADN'T BEEN RAISED BEFORE.

10   BY MR. MORGAN:

11      Q      THE ISSUE OF WHETHER MR. BRYANT HAD OWNERSHIP

12   OF THE DOLLS?

13      A      CORRECT.

14      Q      NOBODY FROM MGA'S SIDE HAD RAISED THAT?

15              MR. WERDEGAR:  OBJECTION.  MISSTATES PRIOR

16   TESTIMONY.

17              MR. RUSSELL:  JOIN.

18   BY MR. MORGAN:

19      Q      BEFORE THIS CONVERSATION WITH MR. ROSENBAUM?

20              MS. BURROW:  ASKED AND ANSWERED.

21              THE WITNESS:  CORRECT.

22   BY MR. MORGAN:

23      Q      OKAY.  AND DID YOU, IN FACT, RESPOND TO

24   MR. ROSENBAUM ABOUT THAT ISSUE?

25      A      YES.

Exhibit __79__
P. __117__

Page 48

1       Q       WHEN DID YOU RESPOND?

2       A       IT MAY HAVE HAPPENED THE NEXT DAY OR THE DAY

3    AFTER.

4       Q       AND WHAT WAS THE FORM OF THAT RESPONSE?

5       A       I BELIEVE BY TELEPHONE.

6       Q       WAS THAT A PHONE CALL THAT YOU INITIATED?

7       A       I BELIEVE SO.

8       Q       AND WHAT DID YOU TELL MR. ROSENBAUM IN THAT

9    CONVERSATION?

10      A       THAT MR. CARTER WAS THE CREATOR AND THE

11   OWNER.

12      Q       DO YOU RECALL PROVIDING ANY MORE DETAIL TO

13   MR. ROSENBAUM THAN WHAT YOU JUST STATED?

14      A       YES.

15      Q       WHAT WAS THAT ADDITIONAL DETAIL?

16      A       THAT HE HAD CREATED THE DOLL AT A TIME PERIOD

17   SEPARATE FROM HIS EMPLOYMENT AND THAT IT WAS HIS OWN

18   SEPARATE CREATION.

19      Q       IN THAT CONVERSATION WITH MR. ROSENBAUM, DID

20   YOU ACTUALLY USE THE PHRASE "THE DOLL," OR WERE YOU

21   TALKING ABOUT SOME MORE SPECIFIC TANGIBLE EXPRESSION OF

22   THE DOLL CONCEPT?

23              MR. WERDEGAR:   OBJECTION.   VAGUE AND

24   AMBIGUOUS.

25              MR. RUSSELL:   JOIN.

Exhibit 79 ,
P. 118

1            MR. WERDEGAR:  JOIN.

2            MR. RUSSELL:  JOIN.

3            THE WITNESS:  I DON'T RECALL.

4    BY MR. MORGAN:

5       Q   I HAD THE CHANCE TO DEPOSE MR. ROSENBAUM ON

6    FRIDAY, AND HE TESTIFIED THAT HIS RECOLLECTION WAS YOU

7    HAD STATED THAT MR. BRYANT -- YOU BELIEVED HE HAD

8    CREATED THIS OUTSIDE OF HIS EMPLOYMENT WITH MATTEL AND

9    BEFORE THE TIME HE WAS EMPLOYED AT MATTEL, BUT NO

10   GREATER SPECIFICITY ABOUT WHEN.

11           IS THAT YOUR RECOLLECTION AS WELL?

12           MR. WERDEGAR:  I'M JUST GOING TO OBJECT TO

13   THE EXTENT THAT YOU'RE PURPORTING TO ACCURATELY

14   SUMMARIZE SOMEONE ELSE'S -- THAT WITNESS'S DEPOSITION

15   TESTIMONY.

16           MR. RUSSELL:  I'LL JOIN THAT.

17           MS. BURROW:  I'LL ALSO OBJECT AS ASKED AND

18   ANSWERED.

19           THE WITNESS:  PLEASE REPEAT THE QUESTION.

20   BY MR. MORGAN:

21      Q   SURE.  IN ESSENCE, MR. ROSENBAUM'S

22   RECOLLECTION WAS THAT NO SPECIFIC DATES OF CREATION

23   WERE DISCUSSED, BUT THAT IT WAS ALL DISCUSSED IN TERMS

24   OF RELATIVE TO HIS EMPLOYMENT AT MATTEL IN A SENSE THAT

25   YOU REPRESENTED YOU WERE SATISFIED THAT IT HAD BEEN

Exhibit __79__,
P. __119__

1   CREATED BEFORE THAT EMPLOYMENT.

2          AND MY QUESTION:  IS THAT YOUR RECOLLECTION

3   OF THAT CONVERSATION AS WELL?

4          MR. WERDEGAR:  I'M GOING TO OBJECT THAT IT'S

5   VAGUE AND AMBIGUOUS.  AND ALSO OBJECT AS PURPORTING TO

6   SUMMARIZE DEPOSITION TESTIMONY THAT COVERED, YOU KNOW,

7   QUITE A BIT OF TIME ON FRIDAY.

8          MR. RUSSELL:  JOIN.

9          THE WITNESS:  GENERALLY, YES.

10  BY MR. MORGAN:

11     Q    DO YOU RECALL MR. ROSENBAUM ASKING YOU IN

12  THAT CONVERSATION ABOUT THE SPECIFIC PLACE OR PLACES

13  WHERE MR. BRYANT HAD DEVELOPED THESE CONCEPTS?

14         MS. BURROW:  ASSUMES FACTS.

15         MR. WERDEGAR:  JOIN.

16         THE WITNESS:  PERHAPS.

17  BY MR. MORGAN:

18     Q    DO YOU RECALL GIVING HIM ANY RESPONSE TO

19  THAT?

20     A    I DON'T RECALL.

21     Q    MR. ROSENBAUM TESTIFIED THAT HE DID NOT ASK

22  YOU ANY SPECIFIC QUESTIONS ABOUT TANGIBLE FORMS THAT

23  THE CONCEPT MIGHT HAVE BEEN REDUCED TO.

24         IS THAT YOUR RECOLLECTION AS WELL?

25         MS. BURROW:  OBJECTION.  ASSUMES FACTS.

Exhibit 79 ,
P. 120

Page 125

1   STATE OF CALIFORNIA        )

                              )   SS.

2   COUNTY OF LOS ANGELES      )

3

4

5        I, APRIL CRUZ CACULITAN, CSR 12437, IN AND FOR THE

6   STATE OF CALIFORNIA, DO HEREBY CERTIFY:

7        THAT, PRIOR TO BEING EXAMINED, THE DEPONENT NAMED IN

8   THE FOREGOING DEPOSITION WAS BY ME DULY SWORN TO TESTIFY

9   THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH;

10       THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN SHORTHAND

11  AT THE TIME AND PLACE THEREIN NAMED, AND THEREAFTER REDUCED

12  TO TYPEWRITING UNDER MY DIRECTION, AND THE SAME IS A TRUE,

13  CORRECT AND COMPLETE TRANSCRIPT OF SAID PROCEEDINGS.

14       I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

15  EVENT OF THE ACTION.

16       WITNESS MY HAND THIS _____ DAY OF

17  _____, 2008.

18

19                         _____

20                         APRIL CRUZ CACULITAN

21                         CERTIFIED SHORTHAND

22                         REPORTER FOR THE

23                         STATE OF CALIFORNIA

24

25

Exhibit 79,
P. 121

**Exhibit 80**

Page 2

```
 1                UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA EASTERN DIVISION

 3

 4     CARTER BRYANT, AN INDIVIDUAL, )
                                     )
 5          PLAINTIFF,               )
                                     )
 6     VS.                           ) CASE NO. CV 04-9049
                                     )
 7     MATTEL, INC., A DELAWARE      )
       CORPORATION,                  )
 8                                   )
            DEFENDANT                )
 9                                   )
                                     )
10     AND CONSOLIDATED ACTIONS.     )

11

12     TRANSCRIPT IS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES

13                          ONLY

14        DEPOSITION OF DAVID ROSENBAUM, TAKEN AT 865 SOUTH

15     FIGUEROA STREET, 10TH FLOOR, LOS ANGELES, CALIFORNIA,

16     COMMENCING AT 9:26 A.M., FRIDAY, JANUARY 25, 2008, BEFORE

17     APRIL CRUZ CACULITAN, CERTIFIED SHORTHAND REPORTER NO.

18     12437.

19

20

21

22

23

24

25
```

Exhibit 80 ,
P. 122

Page 3

```
 1    APPEARANCES OF COUNSEL:
 2    FOR THE PLAINTIFF CARTER BRYANT:
 3         KEKER & VAN NEST
           BY:  MATTHEW M. WERDEGAR, ESQ.
 4         710 SANSOME STREET
           TENTH FLOOR
 5         SAN FRANCISCO, CALIFORNIA 94111-1704
           (415) 391-5400
 6
 7    FOR THE DEFENDANT MATTEL, INC.:
 8         QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
           BY:  SHON MORGAN, ESQ.
 9             TAMAR BUCHAKJIAN
           865 SOUTH FIGUEROA STREET
10         TENTH FLOOR
           LOS ANGELES, CALIFORNIA 90017-2543
11         (213) 443-3000
12    FOR THE DEFENDANT MGA ENTERTAINMENT AND THE WITNESS:
13         SKADDEN, ARPS, SLATE, MEACHER & FLOM, LLP
           BY:  JASON D. RUSSELL, ESQ.
14         300 SOUTH GRAND AVENUE
           LOS ANGELES, CALIFORNIA 90071-3144
15         (213) 687-5000
16    ALSO PRESENT:
17         RICHARD DANIELS, MGA ENTERTAINMENT
18         RANDY BALDWIN, J.T.V. LITIGATION SERVICES, INC.
19
20
21
22
23
24
25
```

Exhibit 80 ,
P. 123

1    BY MR. MORGAN:

2         Q    OKAY.  AND WHAT WAS HER RESPONSE?

3         A    SHE ADVISED ME THAT THE WORK THAT -- THAT

4    MR. BRYANT HAD DONE IN DEVELOPING THE -- WHAT I

5    REFERRED TO AS "THE CONCEPT" WAS DONE OUTSIDE THE SCOPE

6    OF HIS EMPLOYMENT WITH MATTEL AND HAD BEEN DONE PRIOR

7    TO HIS EMPLOYMENT WITH MATTEL.

8         Q    AND DID SHE EXPLAIN THAT WITH ANY GREATER

9    LEVEL OF SPECIFICITY THAN THAT?

10        A    I DON'T REMEMBER.  I REMEMBER HER TELLING ME

11   THAT IT WAS DONE PRIOR TO COMMENCING HIS EMPLOYMENT

12   WITH MATTEL.

13        Q    DID SHE TELL YOU IN THAT CONVERSATION WHEN HE

14   HAD STARTED HIS WORK AT MATTEL?

15        A    WELL, I HAD -- AS YOU'VE SEEN FROM THE

16   DOCUMENTS I PRODUCED, MR. BRYANT DID FAX ME SOME COPIES

17   OF RECORDS THAT RELATED TO HIS EMPLOYMENT WITH MATTEL.

18   AND IT INDICATED THAT HE'D STARTED EMPLOYMENT IN

19   DECEMBER OF -- I BELIEVE IT WAS 1998.

20        Q    SO THAT FAX YOU RECEIVED FROM MR. BRYANT,

21   THIS WAS BEFORE THE CALL WITH MS. WANG?

22        A    YES.

23        Q    SO IT WAS YOUR UNDERSTANDING AT THE TIME OF

24   THAT CALL THAT MR. BRYANT HAD STARTED AT MATTEL AT --

25   WHAT -- WHAT TIME DID YOU SAY?

Exhibit 80 ,
P. 124

Page 82

1    DURING THIS CONVERSATION?

2         A    NO.

3         Q    OR ANY SUBSEQUENT CONVERSATION WITH HER?

4         A    NO.

5         Q    AND YOU DIDN'T ASK DURING THAT CONVERSATION

6    IF HE HAD WORKED THERE BEFORE?

7         A    I DID NOT.

8         Q    OKAY.  RETURNING TO HER RESPONSE THAT

9    MR. BRYANT HAD DEVELOPED THIS BEFORE WORKING AT MATTEL,

10   DO YOU RECALL ANY MORE SPECIFICITY WHAT SHE SAID ABOUT

11   THAT?

12              MR. WERDEGAR:  OBJECTION.  ASKED AND

13   ANSWERED.

14              MR. RUSSELL:  JOIN.

15              THE WITNESS:  SHE TOLD ME THAT SHE HAD

16   REVIEWED THE CHRONOLOGY OF HIS DEVELOPMENT OF THE WORK

17   PRODUCT AND WAS SATISFIED THAT IT FELL OUTSIDE THE

18   SCOPE OF ANY EMPLOYMENT OBLIGATIONS TO MATTEL.

19   BY MR. MORGAN:

20        Q    WERE YOU UNDER THE IMPRESSION AT THAT TIME

21   THAT SHE HAD SOME SORT OF WRITTEN CHRONOLOGY RELATED TO

22   HIS DEVELOPMENT OF BRATZ?

23              MR. WERDEGAR:  OBJECTION.  LACKS FOUNDATION.

24   CALLS FOR SPECULATION.

25              MR. RUSSELL:  JOIN.

Exhibit 80 ,
P. 125

Page 84

1    IMPRESSION OR NOT.

2    BY MR. MORGAN:

3        Q    DID SHE OFFER YOU ANY MORE SPECIFIC

4    INFORMATION ABOUT THIS CHRONOLOGY, THE SPECIFIC DATES,

5    FOR INSTANCE?

6        A    NO.

7        Q    DID YOU ASK?

8        A    I INQUIRED AS TO THE TIMING OF HIS

9    THEN-EMPLOYMENT RELATIONSHIP WITH MATTEL AND HOW IT

10   RELATED TO WHAT I WAS -- WHAT MY UNDERSTANDING OF HIS

11   EMPLOYMENT RELATIONSHIP WITH MATTEL WAS.

12       Q    AND YOUR UNDERSTANDING OF THAT RELATIONSHIP

13   WAS BASED ON SEEING THE DOCUMENT THAT MR. BRYANT HAD

14   FAXED TO YOU?

15       A    CORRECT.

16       Q    SO IS IT FAIR TO SAY THAT SHE, MS. WANG, MADE

17   A REPRESENTATION THAT THE DEVELOPMENT WAS DONE BEFORE

18   WHAT YOU UNDERSTOOD THAT START DATE TO BE AND THAT YOU

19   DIDN'T ASK HER ANY FOLLOW-UP QUESTIONS ABOUT THE

20   SPECIFIC DATES OF DEVELOPMENT?

21           MR. WERDEGAR:  OBJECTION.  MISSTATES PRIOR

22   TESTIMONY.  LEADING.

23           MR. RUSSELL:  JOIN.

24           THE WITNESS:  I BELIEVE THAT I TESTIFIED THAT

25   BASED ON THAT CONVERSATION, I WAS ASSURED THAT HE HAD

Exhibit 80 ,
P. 126

Page 85

1   DONE THE WORK OUTSIDE THE SCOPE OF HIS EMPLOYMENT WITH

2   MATTEL.

3   BY MR. MORGAN:

4        Q     AND DO YOU RECALL WHETHER ANY SPECIFIC DATES

5   WERE MENTIONED CONCERNING THE DEVELOPMENT?

6        A     OTHER THAN PRIOR TO DECEMBER OF 1998?

7        Q     RIGHT.   IT WAS PHRASED IN TERMS RELATIVE TO

8   HIS MATTEL EMPLOYMENT?

9        A     CORRECT.

10       Q     OKAY.   NOT IN TERMS OF HIS SPECIFIC DATES?

11       A     CORRECT.

12       Q     I THINK YOU MENTIONED THAT SHE REFERRED TO --

13   SHE HAD LOOKED AT THE CHRONOLOGY AND WORK PRODUCT AND

14   WAS SATISFIED IT FELL OUTSIDE THE SCOPE OF ANY

15   OBLIGATIONS TO MATTEL.

16            DID SHE DESCRIBE IN ANY GREATER DETAIL WHAT

17   THE WORK PRODUCT SHE WAS REFERRING TO WAS?

18       A     I DON'T RECALL.

19       Q     DO YOU RECALL WHETHER SHE ACTUALLY USED THAT

20   PHRASE, "WORK PRODUCT"?

21       A     I DON'T.

22       Q     OKAY.   SO YOU DON'T RECALL HER REFERRING TO

23   ANY DESIGN DRAWINGS OR PROTOTYPES?

24       A     NO.

25       Q     SO AS A RESULT OF YOUR CONVERSATION WITH

Exhibit 80 ,
P. 127

1    AGREEMENT BETWEEN MGA AND MR. BRYANT.

2           AND DO YOU RECALL WHAT DAY HE ACTUALLY SIGNED

3    THE AGREEMENT?

4       A    NO.

5       Q    DID HE SEND BACK HIS SIGNATURE PAGE DIRECTLY

6    TO YOU OR TO SOMEBODY ELSE?

7       A    I BELIEVE HE RETURNED THE SIGNED COPIES

8    DIRECTLY TO MGA.

9       Q    OKAY.   DID YOU EVER RECEIVE A FULLY EXECUTED

10   COPY BY BOTH PARTIES?

11      A    FOR MY FILES?   NO.

12      Q    YES.

13      A    NO, I DID NOT.

14      Q    DID YOU EVER SEE THE FAXED SIGNATURE PAGE

15   THAT MR. BRYANT SENT TO MGA?

16      A    NO.

17      Q    DO YOU KNOW WHO HE SENT THAT TO AT MGA?

18      A    NOT SPECIFICALLY.

19      Q    DO YOU KNOW HOW LONG MR. BRYANT CONTINUED TO

20   WORK AT MATTEL AFTER HE SIGNED THAT AGREEMENT?

21      A    NO.

22      Q    NO IDEA WHATSOEVER?

23      A    NO IDEA.

24      Q    NEVER HEARD WHETHER IT WAS A WEEK OR THREE

25   WEEKS OR THREE MONTHS?

Exhibit 80 ,
P. 128

1    STATE OF CALIFORNIA      )

                              )   SS.

2    COUNTY OF LOS ANGELES    )

3

4

5        I, APRIL CRUZ CACULITAN, CSR 12437, IN AND FOR THE

6    STATE OF CALIFORNIA, DO HEREBY CERTIFY:

7        THAT, PRIOR TO BEING EXAMINED, THE DEPONENT NAMED IN

8    THE FOREGOING DEPOSITION WAS BY ME DULY SWORN TO TESTIFY

9    THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH;

10       THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN SHORTHAND

11   AT THE TIME AND PLACE THEREIN NAMED, AND THEREAFTER REDUCED

12   TO TYPEWRITING UNDER MY DIRECTION, AND THE SAME IS A TRUE,

13   CORRECT AND COMPLETE TRANSCRIPT OF SAID PROCEEDINGS.

14       I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

15   EVENT OF THE ACTION.

16   WITNESS MY HAND THIS ____*13th*____ DAY OF

17   *FEBRUARY*_____, 2008.

18

19

20                    APRIL CRUZ CACULITAN

21                    CERTIFIED SHORTHAND

22                    REPORTER FOR THE

23                    STATE OF CALIFORNIA

24

25

                                                      249

Exhibit *80*,
P. *129*

# Exhibit 81

*Final*

**MGA ENTERTAINMENT**
16730 Schoenborn Street
North Hills, California 91343

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement"). The parties' agreement is as follows:

1. **Retention as Consultant/Services:** MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products"). Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant. In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant. It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder. Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

2. **Term/Exclusivity:** The Term shall commence on the date of this Agreement. MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3. **Ownership:**

(a) All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised. MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

{00006662.DOC/2 / 10/04/2000 03:05 PM}

1

ATTORNEY'S EYES ONLY

BRYANT 00794



DEPOSITION EXHIBIT
15

11-5-04      SH

Exhibit 81 ,
P. 130

patents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute.  Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents.  If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)      Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine.  Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.      <u>Compensation/Costs</u>:

(a)      For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of five thousand five hundred dollars ($5,500.00) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of five thousand dollars ($5,000.00) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)      MGA shall pay to Bryant a royalty of three percent (3%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services. As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances).  MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00006662.DOC/2 / 10/04/2000 03.05 PM}

2

ATTORNEY'S EYES ONLY

BRYANT 00795

Exhibit **81** ,

P. **131**

and binding on Bryant, shall constitute an account stated, and shall not be subject to any question for any reason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to MGA within two (2) years after the date rendered.  No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA  in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)     All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent.  In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)     Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis.  Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable).  MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)     MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales.  MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell.  Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant.  Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.     <u>Warranties and Indemnity</u>:  Bryant represents, warrants and agrees that:

(a)     he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)     neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)     the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

[00006662.DOC/2 / 10/04/2000  03:05 PM]

3

ATTORNEY'S EYES ONLY

BRYANT 00796

Exhibit 81
P. 132

patents, copyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property rights;

     (d)    he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

     (e)    he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.    **Default/Termination:**

     (a)    In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

     (b)    Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.    **Confidentiality:**

     (a)    Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

     (b)    Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

     (c)    Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{00006662.DOC/2 / 10/04/2000  03:05 PM}

4

ATTORNEY'S EYES ONLY

BRYANT 00797

Exhibit 81
P. 133

entitled to equitable relief in the nature of injunction and to all other available relief, at law and/or in equity.

8.   Notices: All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time.  All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid.  Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 160th Street, Gardena, California 90247.

9.   Independent Contractor/No Partnership/Third Party Beneficiary: Bryant's relationship with MGA is that of an independent contractor.  Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name.  Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties.  In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship.  Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise.  This Agreement shall not be construed to be for the benefit of any third party.

10.   Services Rendered Deemed Special, etc.:  Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11.   General Provisions:

    (a)   This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law.  Any such assignment shall not relieve such Party of its obligations hereunder.

    (b)   The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

    (c)   A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

    (d)   Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

{00006662.DOC/2 / 10/04/2000 03:05 PM}

5

ATTORNEY'S EYES
ONLY

BRYANT 00798

Exhibit 81 ,
P. 134

(e)    This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction of the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)    This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained.  No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)    Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____
CARTER BRYANT

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
Social Security Number

{00004662.DOC/2 / 10/04/2000  03:05 PM}                    6

                                        ** TOTAL PAGE.04 **

BRYANT 00799

ATTORNEY'S EYES
ONLY

818984894            mga entertainment        Oct 04 00 04:38p

Exhibit 81,
P. 135

# Exhibit 82



**David Rosenbaum**

| | |
|---|---|
| Sent: | Wednesday, October 04, 2000 10:20 AM |
| To: | 'Anne Wang' |
| Cc: | Victoria O'Connor (E-mail) |
| Subject: | RE: Bryant/MGA Agreement |
| Importance: | High |

Anne - I reviewed your proposed revisions with my client and they are, by and large, unacceptable. I understand that my client has discussed these issues with Carter directly and he has agreed to withdraw most of the proposed changes. It is imperative that this agreement be concluded today. Please call me as soon as possible so that we may conclude this matter.

Regards,
David S. Rosenbaum
Fischbach, Perlstein & Lieberman, LLP
1875 Century Park East, Suite 850
Los Angeles, California 90067
Tel:310-556-1956
Fax:310-556-4617
e-mail: drosenbaum@fpllaw.com

This message is intended for the use of the individual or entity to
which it is addressed and may contain information that is privileged,
confidential and exempt from disclosure under applicable law. If the
reader of this message is not the intended recipient, or the employee or
agent responsible for delivering the message to the intended recipient,
you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately and return the
original message to us at the above address. Thank you.

-----Original Message-----
From: Anne Wang [mailto:awang@PS-IPLAW.com]
Sent: Wednesday, October 04, 2000 9:56 AM
To: Drosenbaum (E-mail)
Subject: Bryant/MGA Agreement

Hi David: I caught an inadvertent omission in the version I sent by email
yesterday. Therefore, please ignore that version and review the attached
version (which also is in Word instead of WordPerfect). It may be
difficult to reach me today as I will be in meetings throughout the day.
Look forward to your comments.   <<mga#2agt.doc>>
Anne Wang

1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MGA001340

Exhibit 82
P. 136

**David Rosenbaum**

From:             Anne Wang [awang@PS-IPLAW.com]
Sent:             Wednesday, October 04, 2000 9:56 AM
To:               Drosenbaum (E-mail)
Subject:          Bryant/MGA Agreement


mga#2agt.doc

        Hi David:  I caught an inadvertent omission in the version I sent by email
yesterday.  Therefore, please ignore that version and review the attached
the version (which also is in Word instead of WordPerfect).  It may be
difficult to reach me today as I will be in meetings throughout the day.
Look forward to your comments.  <<mga#2agt.doc>>
Anne Wang

1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MGA001341

Exhibit 82
P. 137