# Exhibit 92

1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  JASON D. RUSSELL (Bar No. 169219)
   (jrussell@skadden.com)
3  MARINA V. BOGORAD (Bar No. 217524)
   (mbogorad@skadden.com)
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Ste. 3400, Los Angeles, CA  90071-3144
5  Tel.: (213) 687-5000 / Fax: (213) 687-5600

6  RAOUL D. KENNEDY (Bar No. 40892)
   (rkennedy@skadden.com)
7  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   4 Embarcadero Center, Suite 3800
8  San Francisco, CA  94111-5974
   Tel.: (415) 984-2698 / Fax: (415) 984-2626

9  Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. de C.V.,
10 and Isaac Larian

11            UNITED STATES DISTRICT COURT

12           CENTRAL DISTRICT OF CALIFORNIA

13                  EASTERN DIVISION

14 CARTER BRYANT, an individual          ) CASE NO. CV 04-9049 SGL (RNBx)
                                          )
15                    Plaintiff,          ) Consolidated with Case No. 04-9059
                                          ) and Case No. 05-2727
16        v.                              )
                                          ) **MGA'S SUPPLEMENTAL**
17 MATTEL, INC., a Delaware               ) **RESPONSE TO MATTEL,**
   corporation                            ) **INC.'S AMENDED**
18                                        ) **SUPPLEMENTAL**
                      Defendant.          ) **INTERROGATORY**
19                                        ) **REGARDING DEFENDANTS'**
                                          ) **AFFIRMATIVE DEFENSES**
20                                        )
                                          ) Honorable Stephen G. Larson
21                                        ) Courtroom 1
                                          )
22                                        )
                                          )
23                                        )

24

25

26

27

28

MGA'S SUPPLEMENTAL RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES
NO. CV 04-9049 SGL (RNBx)

Exhibit 92 ,
P. 240

## PRELIMINARY STATEMENT

The General Response set forth herein applies to all responses that MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C. V. (the "MGA Parties") are providing in response to the amended supplemental interrogatory regarding affirmative defenses (the "Interrogatory") or may in the future provide in response to any discovery request in this action. The Response is made without waiving, or intending to waive but, on the contrary, expressly reserving: (a) the right to object, on the grounds of competency, privilege, relevancy or materiality, or any other proper grounds, to the use of the Response, for any purpose in whole or in part, in any subsequent step or proceeding in this action or any other action; (b) the right to object on any and all grounds, at any time, to other interrogatories or other discovery procedures; and (c) the right at any time to revise, correct, add to, or clarify any of the responses propounded herein.

The Response reflects only the present state of the MGA Parties' discovery regarding the information that Mattel seeks. Discovery and other investigation or research concerning this litigation are continuing, as Mattel only recently introduced documents it intends to use as trial exhibits. It is anticipated that further discovery, independent investigation, and legal research and analysis will supply additional facts and meaning to the known facts, as well as establish entirely new factual conclusions, all of which may lead the MGA Parties to discover other information responsive to this Interrogatory. The MGA Parties therefore reserve the right to amend or supplement this Response at any time in light of future investigation, research or analysis, and also expressly reserves the right to rely on, at any time, including trial, subsequently discovered information omitted from this Response as a result of mistake, error, oversight or inadvertence. The MGA Parties do not hereby admit, adopt or acquiesce in any factual or legal contention, assertion or characterization contained in the Interrogatory or any particular request therein, even where the MGA

1

1  Parties have not otherwise objected to a particular interrogatory, or has agreed to

2  provide information responsive to a particular interrogatory.

3      No incidental or implied admissions are intended by this Response. These

4  responses should not be taken as an admission that the MGA Parties accept or admit

5  the existence of any facts set forth or assumed by any instruction, definition or

6  interrogatory.

7  **SUPPLEMENTAL INTERROGATORY:**

8      State the facts upon which YOU intend to rely at trial to support YOUR

9  affirmative defenses, and IDENTIFY all PERSONS with knowledge of those facts

10  and all DOCUMENTS that REFER OR RELATE TO those facts.

11  **SUPPLEMENTAL RESPONSE TO SUPPLEMENTAL INTERROGATORY:**

12      <u>Statute of Limitations/Failure to State a Claim</u>

13      The MGA Parties hereby supplement their responses dated January 7, 2008

14  with the following responsive information:

15      In February 2001, Mr. Mateo Romano, a representative of Mattel de Mexico, a

16  wholly owned subsidiary of Mattel, Inc., attended the New York Toy Fair, where he

17  was offered the opportunity to license and distribute the BRATZ. Although Mr.

18  Romano initially indicated a desire to sell the BRATZ, in March of 2001 Mattel wrote

19  to Mr. Martin Hitch of MGA and stated that Mattel would not license and distribute

20  the BRATZ because "some products are very similar to our own concepts and this is a

21  very sensitive issue with the brand groups (Bratz and Samantha)." Mr. Romano told

22  MGA that "restrictions from El Segundo" – Mattel, Inc. headquarters – were the

23  reason why Mattel was not interested in MGA's products, as  Mattel, Inc. instructed

24  Romano not to carry products, like BRATZ, that Mattel believed were too similar to

25  Mattel's existing or planned products.

26      Despite declining to distribute the BRATZ, Mattel nonetheless (unbeknownst to

27  MGA) placed the BRATZ line into the Mattel product system, which came to light in

28

MGA'S SUPPLEMENTAL RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES
NO. CV 04-9049 SGL (RNBx)

Exhibit _92_,
P. _242_

April 2001, when Ms. Georgia Manolas, the international dolls product manager of Mattel, sent an email to Ms. Paula Garcia explaining that she was "surprise[d] when [she] looked in the system today and saw 'Bratz' and 'Scooter Samantha.'"

Mattel, Inc. controlled and restricted Mattel de Mexico's ability to purchase or distribute products (like the BRATZ) that Mattel, Inc. felt were "too similar." As Mr. Romano's emails at the time confirm, he was "having a lot of restrictions from El Segundo [Mattel, Inc.'s headquarters]" and that "your friends [referring to Mattel, Inc.] were reluctant to let us [Mattel de Mexico] carry the product [i.e., BRATZ]"). Moreover, Mr. Romano confirmed that the product catalogs given by MGA to Mattel de Mexico wound up on Mattel, Inc.'s internal computer system, which also shows the complete interaction between Mattel, Inc. and its subsidiary on this precise issue.

The MGA Parties reserve the right to supplement this response and, consistent with its obligations under Federal Rule of Civil Procedure 26(e), the MGA Parties will supplement this response if they receive additional responsive information.

The following persons have knowledge of facts and circumstances regarding the foregoing: Martin Hitch, Isaac Larian, Mateo Romano, Georgia Manolas, and Paula Garcia.

The following documents are relevant to the foregoing: a schedule from the New York Toy Fair bearing Bates number MGA 0304995 – 0305013; e-mail dated March 2, 2001 bearing Bates number MGA 045331; e-mail dated March 7, 2001 bearing Bates numbers MGA 0305882-3; e-mail dated March 14, 2001 bearing Bates numbers MGA 0305884-7; e-mail dated April, 20, 2001 bearing Bates number MGA 0049114; email dated April 20, 2001 bearing Bates number MGA 0050171; e-mail dated April 23, 2001 bearing Bates number MGA 0305909; e-mail dated April 25, 2001 bearing Bates numbers MGA 0435332-3; e-mail dated April 27, 2001 bearing Bates numbers MGA 0350915-917; Declaration of Mateo Romano, dated March 20, 2008, submitted in support of Mattel, Inc.'s Consolidated Opposition to Defendants'

3

Motions for Partial Summary Judgment; Declaration of Martin Hitch, dated April 1, 2008, submitted in support of the MGA Parties' Reply in Further Support of Their Motion for Partial Summary Judgment, and exhibits thereto.

DATED:  April 28, 2008

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

By: _____
            Thomas J. Nolan
Attorneys for MGA ENTERTAINMENT, INC.,
ISAAC LARIAN, MGA ENTERTAINMENT
(HK) Ltd., and MGAE de MEXICO S.R.L. de C.V.

MGA'S SUPPLEMENTAL RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES
NO. CV 04-9049 SGL (RNBx)

Exhibit 92 ,
P. 244

# Exhibit 93

Expert Witness Report
By Denise Van Patten
March 10, 2008
Confidential – For Attorney's Eyes Only

Quinn Emanuel Urquhart Oliver & Hedges, LLP contacted me regarding a
lawsuit between Mattel and MGA. I have been an expert witness in only one
other case for Mattel and I have been paid as an expert in this case at $300
per hour. I have known and met various people from Mattel and MGA over
the years in my capacity as the Guide to Doll Collecting at About.com, and
written about the dolls from both companies on my About.com site for the
past 9 years. I also am a dealer of collectible Barbie dolls.

## 1.    My Experience

I live and work in Chico, California, where I own a doll and toy shop called
Katherine's Cottage.  I have been the Guide to Doll Collecting at About.com
since early 1999, and I am the author of *"The Official Price Guide to Dolls,"*
published by House of Collectibles (Random House Books) in 2005. My
work is completely within the doll and toy industry, and has been for 9 years
full time, and part-time for several years before that. I have bought and sold
hundreds of thousands of dollars worth of dolls for my personal collection as
well. I have owned and operated my full-time doll and toy shop since
September 10, 2001 and an online and by-appointment doll business for 5
years prior to that.

As Guide to Doll Collecting at About.com I write and report exclusively and
extensively on dolls, doll collecting and the doll industry. In that capacity, I
write several articles about dolls each month, and have done so since 1999.
About.com is currently owned by The New York Times Company.   The
URL of my web site is www.collectdolls.about.com. Through this site, I stay
very up to date on dolls on the market, doll trends, and doll companies and
artists.  I have attended New York Toy Fair each year since 2000, and I have
also attended countless other doll shows, doll conventions, and doll events. I
have given seminars and lectures about dolls and doll history at many
events, including seminars about Barbie dolls and fashion doll history,
including at many national United Federation of Doll Clubs ("UFDC")

1

Exhibit 93
P. 245

facial makeup within the first year of production by making changes to the doll's make-up and releasing what collectors refer to today as Ponytail Barbie #3 (this took place within the first year of release of the doll) [Exhibit 8].

In fact, for some people, Barbie dolls remain controversial today. Commentators delight in pointing out how unnatural the dolls' dimensions would be in a real-life woman (according to the National Organization for Women, if Barbie were 5 ft 6 inches, her measurements would be 39-21-33, and the chances of a real woman having those measurements are 1 in 100,000), and that if her dimensions were real, she would topple over off her teeny tiny un-proportional feet.

## 8. The Wardrobe of Early Barbie

The first Barbie was sold in a bathing suit, albeit a modest one-piece, but 2-piece bathing suits followed by the mid 1960s with the "Twist and Turn" Barbie dolls. Some mothers found the bathing suits immodest, but the dolls were not sold in bathing suits to be racy—they were sold in bathing suits to keep the cost of the doll down, much the same way that French Fashion Dolls were sold in their underwear in the 1860s-1880s. Fashion dolls are sold to dress, and by selling a "basic" doll in underwear (or, in Barbie's case, a bathing suit), the doll was accessible to more people due to a lower price point. The cost of a couture French Fashion Doll dress could easily exceed the cost of a French Fashion Doll, just as the cost of an elaborate 1960s Barbie evening dress could easily equal or exceed the cost of a Barbie doll.

The original Barbie's wardrobe [Exhibit 9] consisted not of cutting-edge fashions, but the type of fashions you would see on teens and women of the era—beautiful business suits, dresses for shopping, nursing uniforms, evening and bridal gowns. Mothers who objected to the original Barbie doll were objecting to the doll's figure (especially the ample bosom) and generally not her classic wardrobe. It is this wardrobe and the way it was sold and played with that made Barbie a truly classic fashion doll. Just as the French Fashion Dolls of the 1800s helped girls imagine and practice life as an adult, the first Barbie dolls provided the same type of projection-play for little girls in the 1960s.

5

Exhibit 93 ,
P. 246

Scene Barbie dolls are just one of the many, many incarnations that Barbie doll have taken over its nearly 50 year history.

_____        3-17-08
Denise Van Patten                       Date

12

**Exhibit 94**

Page 2

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4

5    CARTER BRYANT, AN INDIVIDUAL,    )
                                      )
6              PLAINTIFF,             )
                                      )
7       VS.                          ) NO. CV 04-9049 SGL
                                      )
8    MATTEL, INC., A DELAWARE         )
     CORPORATION,                     )
9                                     )
               DEFENDANT.             )
10                                    )
                                      )
     _____      )
11                                    )
     AND CONSOLIDATED ACTION(S).      )
12   _____      )

13

14            C O N F I D E N T I A L

15       (PURSUANT TO PROTECTIVE ORDER, THIS
              TRANSCRIPT HAS BEEN DESIGNATED
16   CONFIDENTIAL FOR ATTORNEYS' EYES ONLY)

17

18   DEPOSITION OF ELISE CLOONAN, TAKEN

19   ON BEHALF OF THE DEFENDANTS, AT

20   865 SOUTH FIGUEROA STREET, 10TH

21   FLOOR, LOS ANGELES, CALIFORNIA,

22   COMMENCING AT 10:11 A.M., FRIDAY,

23   DECEMBER 14, 2007, BEFORE RENEE A.

24   PACHECO, RPR, CSR 11564.

25

Exhibit 94 ,
P. 248

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF CARTER BRYANT:

 4        KEKER & VAN NEST, LLP
          BY:  MATTHEW M. WERDEGAR, ESQ.
 5        710 SANSOME STREET
          SAN FRANCISCO, CALIFORNIA  94111-1704
 6        (415) 391-5400

 7

 8    FOR THE DEFENDANT MATTEL, INC.

 9        QUINN EMANUEL URQUHART OLIVER & HEDGES
          BY:  MICHAEL T. ZELLER, ESQ.
10             BRIDGET HAULER, ESQ.
          865 SOUTH FIGUEROA STREET
11        10TH FLOOR
          LOS ANGELES, CALIFORNIA  90017-2543
12        (213) 443-3000

13

14    FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:

15        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
          BY:  KENNETH A. PLEVAN, ESQ.
16        FOUR TIMES SQUARE
          NEW YORK, NEW YORK  10036
17        (212) 735-3000

18

19    FOR THE DEPONENT:

20        KEATS, MCFARLAND & WILSON, LLP
          BY:  LARRY W. MCFARLAND, ESQ.
21             CHRISTIAN C. DOWELL, ESQ.
          9720 WILSHIRE BOULEVARD
22        PENTHOUSE SUITE
          BEVERLY HILLS, CALIFORNIA 90212
23        (310) 777-3750
          LMCFARLAND@KMWLAW.COM
24        CDOWELL@KMWLAW.COM

25
```

Exhibit 94 ,
P. 249

Page 4

```
 1    APPEARANCES (CONTINUED):

 2    ALSO PRESENT:

 3        STEVEN TOGAMI - VIDEOGRAPHER

 4        MICHAEL MOORE

 5        JILL THOMAS

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 94 ,
P. 250

Page 308

1    Q.    AND WHAT DO YOU MEAN BY "TRIED TO"?

2    A.    IT'S TOO MUCH LEGALESE.  I -- I CAN'T

3  DECIPHER SOME OF.  IT'S TOO CRYPTIC FOR ME.

4    Q.    WHAT, IF ANYTHING, DO YOU RECALL WAS THE

5  REACTION AMONG YOUR COLLEAGUES IN THE DESIGN CENTER

6  TO BRATZ WHEN THEY FIRST HEARD ABOUT IT?

7    MR. ZELLER:  THE QUESTION IS VAGUE.

8    THE DEPONENT:  THERE WAS A LOT OF BUZZ ABOUT

9  IT, BECAUSE CARTER WAS RELATED -- BECAUSE IT WAS

10  RELATED TO CARTER.  SO PEOPLE WERE TALKING.

11       THE SAME -- THE SAME THING HAPPENED WITH

12  ELON DANCER WHEN SHE DID BETTY SPAGHETTY.

13       ANYTIME SOMEONE THAT WORKED AT MATTEL

14  WENT OUT AND, YOU KNOW, PRODUCED A TOY OR

15  SOMETHING, THERE WAS A BIG BUZZ GOING ON.

16  BY MR. PLEVAN:

17    Q.    DO YOU RECALL SPECIFIC INDIVIDUALS THAT

18  YOU RECALL REFER TO THE FACT THAT THEY THOUGHT

19  CARTER HAD BEEN THE DESIGNER?  AND I'M FOCUSING NOW

20  ON THE TIME IN 2001, AT OR ABOUT THE TIME YOU FIRST

21  LEARNED ABOUT BRATZ.

22    A.    2001, WHICH WOULD HAVE BEEN BEFORE I LEFT

23  MATTEL.  IT WAS COMMON KNOWLEDGE AMONG THE

24  DESIGNERS THAT HE DID IT, HE PROBABLY DID IT.

25    Q.    DO YOU REMEMBER ANY SPECIFIC INDIVIDUALS

Exhibit 94 ,
P. 251

Page 340

```
 1    STATE OF CALIFORNIA      )
                               )   SS.
 2    COUNTY OF LOS ANGELES    )

 3            I,    RENEE A. PACHECO    , CERTIFIED

 4    SHORTHAND REPORTER, CERTIFICATE NUMBER 11564, FOR

 5    THE STATE OF CALIFORNIA, HEREBY CERTIFY:

 6            THE FOREGOING PROCEEDINGS WERE TAKEN

 7    BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH,

 8    AT WHICH TIME THE DEPONENT WAS PLACED UNDER OATH BY

 9    ME;

10            THE TESTIMONY OF THE DEPONENT AND ALL

11    OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

12    RECORDED STENOGRAPHICALLY BY ME AND WERE THEREAFTER

13    TRANSCRIBED;

14            THE FOREGOING TRANSCRIPT IS A TRUE AND

15    CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

16            I FURTHER CERTIFY THAT I AM NEITHER

17    COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION

18    NOR IN ANY WAY INTERESTED IN THE OUTCOME THEREOF.

19            IN WITNESS WHEREOF, I HAVE HEREUNTO

20    SUBSCRIBED MY NAME THAT _____ DAY OF

21    _____, 2007.

22

23            _____

24

25
```

# Exhibit 95

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 1

```
 1              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
 2

 3     - - - - - - - - - - - - - - - -X
       IN THE MATTER OF                )
 4                                     )
       CARTER BRYANT                   )
 5                    Plaintiff,       )
                                       ) Case No:
 6     v.                              ) CV 04-9049 SGL(RNBX)
                                       )
 7     MATTEL, INC.                    )
                     Defendant.        )
 8     - - - - - - - - - - - - - - - -X
 9            C O N F I D E N T I A L
10      VIDEOTAPED DEPOSITION OF MR. RONALD BRAWER
11                    VOLUME I
12            Tuesday, February 5, 2008
13                AT: 9:54 a.m.
14                 Taken at:
15        Skadden, Arps, Slate, Meagher & Flom
                  40 Bank Street
16                Canary Wharf
                London, E14 5DS
17               United Kingdom
18
19
20
21
22
23    Court Reporter:
24    MRS. CHANELLE MALLIFF
      Accredited Real-time Reporter
25
```

Exhibit 95,
P. 253

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 2

```
 1                    A P P E A R A N C E S
 2    Appearing for the Plaintiff:
 3             JACK P. DICANIO
               SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 4             300 South Grand Avenue
               Los Angeles, CA 90071-3144
 5             Telephone:  (213) 687-5000
 6    Also Present:
               CRAIG HOLDEN - In-house Counsel, MGA
 7
 8
      Appearing for the Defendant:
 9
               DOMINIC SURPRENANT
10             QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
               865 S. Figueroa Street
11             10th Floor
               Los Angeles, CA 90017
12             Telephone:  (213) 443-3166
13
14    Videographer:
15             PHILLIP HILL
16
17
18
19
20
21
22
23
24
25
```

Exhibit 95 ,
P. 254

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 232

1    coming at MGA.

2        Q.   Other than the fact that Mattel sued you when you

3    left and the fact that they've pursued claims against MGA,

4    do you have any other basis for your testimony that Mattel

5    has pursued litigation as a business strategy?

6        A.   I believe that -- well, while I was at Mattel the

7    term -- the terminology or the phrase "litigation" as a

8    business strategy was often bantered about.

9        Q.   And who were the banterers?

10       A.   The one that used it the most was Matt Bousquette.

11   The person I know who echoed him quite often would be

12   Drew Vollero who was our chief -- he wasn't the chief

13   financial officer.  He was head of financing in our

14   division, but he obviously had a good grasp of what was

15   going on.

16       Q.   What was the second gentleman's name?

17       A.   D-r-e-w and his second name is Vollero,

18   V-o-l-l-e-r-o.

19       Q.   What specifically have you heard Mr. Bousquette say

20   on the topic of using litigation as a business strategy?

21       A.   Let me think about.  You're saying specifically.

22   When we would sit in staff meetings, which happened weekly

23   and for hours and hours at end with Matt, we would review

24   the business and the dynamics going on in the business.

25   This would be taking place 2002, 2003, 2004.  I can't

Exhibit 95 ,
P. 255

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 233

1    differentiate between the meetings because there were

2    probably in that time period alone over a hundred.  But in

3    some of the meetings we would review what our market share

4    and situation was with girls and with Barbie and we would

5    talk about different efforts the company was making to try

6    and fight the loss of share of Barbie and the declining

7    sales of Barbie.

8        There would always be two sides in the room.  There

9    would be the sales-oriented people: myself, Milt Zablow.  We

10   would get blamed for the fact that not every store had every

11   doll exactly on the shelf exactly at the time and that was

12   hurting our sales.  There was push-back from another side

13   that would say, "Hey, the issue goes well beyond just

14   distribution."  There was competitive issues such as Bratz

15   that were forcing the decline of Barbie.  Some of the

16   comments around what the company was doing over and above

17   our distribution problems were to face off with MGA with

18   litigation as a business strategy.  That would be -- it

19   wouldn't be discussed much beyond that, but one of the

20   strategies for trying to defeat Bratz was to litigate them

21   to death.  To litigate the owners or to litigate MGA to

22   death and that was one of the business strategies.

23       Q.  You have a specific recollection of Mr. Bousquette

24   stating what you've just stated in sum or substance at

25   meetings?

Exhibit 95 ,
P. 256

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 248

```
 1                 CERTIFICATE OF COURT REPORTER

 2

 3     I, MRS. CHANELLE MALLIFF, an Accredited Real-time Reporter,

 4     hereby certify that the testimony of the witness MR. RONALD

 5     BRAWER in the foregoing transcript, numbered pages 1 through

 6     246, taken on this 5th day of February, 2008 was recorded by

 7     me in machine shorthand and was thereafter transcribed by

 8     me; and that the foregoing transcript is a true and accurate

 9     verbatim record of the said testimony.

10

11

12     I further certify that I am not a relative, employee,

13     counsel or financially involved with any of the parties to

14     the within cause, nor am I an employee or relative of any

15     counsel for the parties, nor am I in any way interested in

16     the outcome of the within cause.

17

18

19     Signed:  ........................

20     Name:    MRS. CHANELLE MALLIFF

21     Date:    ........................

22

23

24

25
```

# Exhibit 96

042505Lind.txt

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4

5   MATTEL, INC., a Delaware        )
    Corporation,                    )
6                                   )
            Plaintiff,              )
7                                   )
            vs.                     ) No. CV 04-9059 NM
8                                   ) (RNBx)
    CARTER BRYANT, an individual;   )
9   and DOES 1 through 10,          )
    Inclusive,                      )
10                                  )
            Defendants.             )
11  ----------------------------- )
    (COMPLETE CAPTION ON NEXT PAGE.)

12

13

14

15

16      Videotaped Deposition of ROBERT C. LIND,

17      taken on behalf of Defendants, at 300 South

18      Grand Street, Los Angeles, California,

19      beginning at 9:57 A.M. and ending at 3:40 P.M.,

20      on Friday, April 25, 2008, before Wendy S.

21      Schreiber, CSR No. 3558, RPR, CLR.

22

23

24

25   PAGES 1 - 189

                                              1

M

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

              Page 1

Exhibit 96,
P. 258

042505Lind.txt
EASTERN DIVISION

3

4

5   MATTEL, INC., a Delaware               )
    Corporation,                           )
6                                          )
               Plaintiff,                  )
7                                          )
               vs.                         )   No. CV 04-9059 NM
8                                          )   (RNBx)
    CARTER BRYANT, an individual;          )
9   and DOES 1 through 10,                 )
    Inclusive,                             )
10                                         )
               Defendants.                 )
11  ------------------------------         )
    CARTER BRYANT, on behalf of            )
12  himself, all present and              )
    former employees of Mattel,            )
13  Inc., and the general public,          )
                                           )
14             Counter-Claimants,          )
                                           )
15             vs.                         )
                                           )
16  MATTEL, INC., a Delaware               )
    Corporation,                           )
17                                         )
               Counter-Defendant.          )

18

19

20

21

22

23

24

25

                                                        2

M

1   APPEARANCES:

2

3       For the Plaintiff:

4

5       QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
        BY:   DAVID W. QUINTO, ESQ.
6       865 South Figueroa Street, Tenth Floor
        Los Angeles, California 90017
                        Page 2

Exhibit 96
P. 259

042505Lind.txt

```
 7          (213) 443-3000
            davidquinto@quinnemanuel.com
 8
                        -and-
 9
10          MATTEL, INC.
            333 Continental Boulevard
            El Segundo, California 90245-5012
11          (310) 252-2000
            (NOT PRESENT)
12

13
            For the Defendant and Counterclaimant Carter
14          Bryant:

15

16          KEKER & VAN NEST LLP
            710 Sansome Street
17          San Francisco, California 94111-1704
            (415) 391-5400
18          (NOT PRESENT)

19

20

21

22

23

24

25
```

                                                    3

M


```
 1     APPEARANCES (Continued):

 2

 3        For Defendant MGA Entertainment, Inc.:

 4

 5          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
            BY:  DAVID W. HANSEN, ESQ.
 6               DONNA HILL, ATTORNEY AT LAW
            300 South Grand Avenue
 7          Los Angeles, California 90071-3144
            (213) 687-5000
 8          david.hansen@skadden.com

 9

10          Video Operator - David West
```

                        Page 3

Exhibit 96,
P. 260

042505Lind.txt

11    the dolls?

12        A.    Yes.

13        Q.    What training would you need for that?

14        A.    Dealing with the substantial similarity

15    analysis over a period of time and dealing with the

16    different types of works, understanding what -- what the

17    copyright law requires for there to be an infringement

18    and what kind of procedure you would go through.

19        Q.    Is that -- is that generally for experts in

20    this case or is it specifically relating to your

21    testimony?

22        A.    That would be dealing with -- with my

23    testimony.  I mean, you don't have to know the law to

24    opine if you're a doll expert, doll designer.

25        Q.    What do you -- do you envision having a role in

                                                            59

M


1    court in this case?

2        A.    I don't know.  I suspect in part that's what

3    we're doing today.

4        Q.    Determining whether you'll have a role?

5        A.    Yes.

6        Q.    Do you have any idea what role you might have

7    in this case in court?

8        A.    Well, Krofft talks about expert witnesses being

9    allowed to testify as to the extrinsic test, and I think

10    I would be helpful to a jury or even a court as finder

11    of fact as to the approach to take in looking at and

12    comparing two different works.

13        Q.    And that would be because of your experience in

14    applying the pertinent legal principles?

                            Page 52


Exhibit 96
P. 261

042505Lind.txt

15          A.    Legal principles and being engaged in that kind

16   of activity over a number of years.

17          Q.    What kind of activity?

18          A.    Comparing works, making decisions as to whether

19   or not there's substantial similarity between one or the

20   other, whether or not there are -- there's a copying of

21   ideas or scenes l'affaire or merger.

22          Q.    Any other role that you could see that you

23   could play in the Court here besides what you've already

24   said?

25          A.    I assume if the Court needed or asked for any

                                                              60


1    kind of information from me.  That has happened in the

2    past so...

3           Q.    In what circumstances has that happened in the

4    past?

5           A.    I had the pleasure of being in the courtroom as

6    an observer in Stephen Wright -- Judge Stephen Wright's

7    first copyright case, and the first day of trial he

8    decided to ask me questions as to what the law was and

9    whether the attorneys were accurate in their discussions

10   of what the law was, and then the second day of trial he

11   swore me in as the court's expert.

12          Q.    Do you remember the name of that case?

13          A.    It is Mouzon, M-o-u-z-o-n, versus, Optimism

14   Records.

15          Q.    And in connection with the first day where

16   you -- did you testify before the jury?

17          A.    There was no jury.  It was a judge trial.

18          Q.    A judge trial.  Okay.

                         Page 53

Exhibit 96 ,
P. 262

042505Lind.txt

12      Q.   If we're looking at the sketches as individual

13   works of original authorship -- is that a proper phrase?

14      A.   Okay.  I guess I don't know where you're going

15   with that.

16      Q.   Let's use your report.  Artistic works.  What

17   do you want to call the sketches just so we're on the

18   same page?

19      A.   Pictorial works that are artistic.

20      Q.   So pictorial works is the technical term, and

21   then the artistic is sort of just the gloss on them

22   here?

23      A.   Correct.

24      Q.   So in terms of the individual elements of a

25   pictorial work like the sketches -- okay?

                                                    75

M

1      A.   Just so I can clarify, by individual elements

2   you're talking about not just the entire work.  You're

3   talking about specific aspects of the nose, the ears,

4   the eyes, et cetera?

5      Q.   What I'm trying to get at -- I want to put

6   compilation to the side for a moment.

7      A.   Okay.

8      Q.   And I want to look at the -- at the works as

9   pictorial works that are artistic works that are

10   protected in the non-compilation way.

11      A.   Okay.  Understood.

12      Q.   So in that context is it appropriate to

13   consider protectable versus unprotectable elements of

14   the Bryant sketches at all?

15      A.   At all?

                   Page 66

               Exhibit 96 ,
               P. 263

042505Lind.txt

16      Q.   Period.

17      A.   Yes.

18      Q.   In what manner would that be appropriate?

19      A.   I think that if a jury found -- or finder of

20  fact found that only unprotectable elements were the

21  basis for the infringement in a non-compilation setting,

22  that that would be improper, but that's not to say that

23  the finder of fact could not take into account

24  unprotected elements in finding that there was a

25  copyright infringement where there was infringement of

                                                          76

1   protected elements.

2       Q.   Do you know whose burden it is to identify what

3   the protected elements are in the sketches?

4       A.   Generally it's going to be the plaintiff.

5       Q.   Do you know whether or not Mattel in this case

6   has identified any protected elements in the Bryant

7   sketches?

8            MR. QUINTO:  Again, I would ask you not to

9   speculate.

10           THE WITNESS:  I just -- I don't recall with the

11  summary judgment motion whether that was stated or

12  addressed.

13  BY MR. HANSEN:

14      Q.   Have you identified -- have you specifically

15  identified what protected elements there are --

16  "protectable elements" I guess is the right phrase -- in

17  the Bryant sketches?

18      A.   What I tried to do in my report was to do what

19  Krofft -- the Court Krofft stated should be done, and

                        Page 67

Exhibit 96 ,
P. 264

042505Lind.txt

20    that was to identify categories of elements that a

21    finder of fact would look to in making their -- its

22    comparison as to the total concept and feel test.

23          And so in my report I identified certain

24    categories that seemed rational to me and also had come

25    up in Ninth Circuit cases or decisions.

                                                            77

M


 1        Q.   In your report did you include all of the

 2    categories that you thought were appropriate for

 3    consideration in that regard?

 4        A.   Of -- so long as what I focused on were the

 5    ones that had also been identified by Ninth Circuit case

 6    law.   There may be others -- I haven't thought about it,

 7    but there may be others that if I had my way I would

 8    add, but these certainly seemed to be the most

 9    important.

10        Q.   Did you make any effort to determine what

11    protectable elements are -- what, if any, protectable

12    elements there are in the Bryant sketches?

13        A.   I made an analysis by looking at other expert

14    witnesses and looking at the photographs, et cetera;

15    that such things as the eyes, the nose, the face, they

16    seemed to me to be something that a jury could find to

17    be protected.

18        Q.   Do you believe that those elements are -- was

19    that your attempt, to identify protectable elements?

20        A.   It was to -- it was my intent to look at those

21    elements that generally come up in a case dealing with

22    dolls -- that invariably seems to be eyes, eyebrows,

23    nose, lips, ears, chin, those sorts of elements -- and

                        Page 68

Exhibit 96

P. 265

042505Lind.txt

4   established that a reasonable jury or finder of fact

5   could find that there's substantial similarity

6   between -- of expression and idea between plaintiff's

7   work and defendant's work, or that no reasonable jury

8   could find that there's substantial similarity of

9   expression and idea and then grant a summary judgment.

10       Q.   And in connection with that the Court is

11  considering what is and is not protectable expression in

12  the work?

13       A.   Considering it in the sense that -- after Jada

14  particularly, but even before Jada -- it's required that

15  they make that comparison, but the Court would not be

16  excluding unprotected elements at that point.

17       Q.   When you say "make that comparison," what

18  comparison would the Court be making?

19       A.   Between expression and idea.

20       Q.   But is the -- I want to focus on the

21  protectable versus unprotectable elements.

22       A.   Well, I'm using "idea" as another term

23  basically for "unprotected."

24       Q.   Okay.  But idea -- ideas are not protected by

25  copyright law?

                                                        81

M

1        A.   Correct.

2        Q.   Is there anything in terms of the protectable

3   versus unprotectable that would be unprotectable

4   potentially other than ideas?

5        A.   Yes.

6        Q.   Can you give me sort of general categories of

7   where that would -- what that might be?

                        Page 71

Exhibit 96
P. 266

042505Lind.txt

8      A.   A scenes l'affaire.

9      Q.   Anything else?

10     A.   And the scenes l'affaire is of three types.

11   You have the expression that is necessary to deal with a

12   particular topic or subject.  There is the scenes

13   l'affaire which is expression that necessarily flows

14   from a particular idea.  And then there is scenes

15   l'affaire that is equated with a genre.

16          Other limiting factors in addition to scenes

17   l'affaire would be merger, would be non-original

18   material, material that's in the public domain, and also

19   increasingly and somewhat questionably, depending on the

20   subject matter, the Court may look at functionality.

21     Q.   Can you just tell me what you mean by

22   functionality?

23     A.   It should be equated with the useful article

24   analysis for pictorial, graphic and sculptural works,

25   but with cases such as Computer Associates versus Alti

                                                    82

M

1   they're looking at non-useful article but expression

2   that is functional rather than something that is

3   intended to be read.

4     Q.   These unprotectable elements -- I'm sorry.  Is

5   that the -- is that the list?

6     A.   That's what I can come up with at the present

7   time.

8     Q.   Okay.  These unprotectable elements are

9   unprotectable under Ninth Circuit law; is that right?

10    A.   If they were solely the basis for the

11   infringement action, yes.

                    Page 72

Exhibit 96 ,
P. 267

042505Lind.txt

12      Q.   But I mean, these concepts -- these what is an
13   unprotectable idea -- the scenes l'affaire, merger and
14   the other three that you listed -- that is consistent
15   with Ninth Circuit law.  In other words, the Ninth
16   Circuit law recognizes that those categories that you
17   mention are unprotectable?
18      A.   Right, and there are certain types of works
19   such as with -- in the Apple versus Microsoft case where
20   you're dealing with the screen display where the Court
21   looked at -- both the District Court and the Ninth
22   Circuit agreed -- looked at the work of -- and looked at
23   the individual elements of the work and would use the
24   limiting factors to determine whether they could be
25   protected.

                                                           83

M

1           And so icons, there's a merger -- possible
2    merger problem there, with the notion or concept of
3    using overlapping windows.  That's an idea not
4    protected.  Or scenes l'affaire may come into play.
5           But when you're dealing with a work such as a
6    pictorial work, a drawing that's artistic, the -- I
7    think most courts in the Ninth Circuit and others are
8    saying you deal with them differently than you do with a
9    screen display or with a novel or a play and so you look
10   at their entirety, and I don't believe that the jury is
11   going to be prohibited from looking at the entirety,
12   including some of these aspects that in another context
13   would be taken out of the equation.
14      Q.   Well, that was addressed in Apple though,
15   wasn't it?

                        Page 73

                   Exhibit 96,
                   P. 267A

042505Lind.txt

16      A.   No.  Apple was not an artistic work.

17      Q.   So Apple -- the analysis in Apple you're saying

18  doesn't apply here?

19      A.   Correct.

20      Q.   And that's because of the other Ninth Circuit

21  decisions like Cavalier -- the ones that you mention in

22  your report?

23      A.   I'm sorry?

24      Q.   Sorry.  And what's the other one?  The Krofft

25  case?

                                                          84


1      A.   Right.  In addition to the fact that just as a

2  theoretical notion that there's a substantial difference

3  between how a artistic work, a graphic work, a pictorial

4  work is going to be viewed by a consumer or by the

5  average viewer and how a work that was mostly -- that

6  was mostly factual would be viewed.

7      Q.   How about the -- the Aliotto versus Dakin case?

8      A.   That's the dragon dolls?

9      Q.   Was it a dinosaur?

10      A.   Yeah.

11      Q.   The dinosaur case.  You cite that in your

12  report.

13      A.   Correct.

14      Q.   Did the -- did the Court in that case filter

15  out unprotected elements in determining -- in connection

16  with the infringement analysis?

17      A.   My recollection is that they said if someone is

18  going to just claim protection in a plush-stuffed

19  dinosaur, that that's just commonplace.  It's an idea

                        Page 74

Exhibit 96
P. 268

042505Lind.txt

20   and not going to be protected if that's the sole -- the

21   sole claim.  But where you have specific elements, my

22   recollection is that they protected those specific

23   elements.

24        Q.    Just going back to the -- the Bryant sketches,

25   is it your opinion that all of the elements of the

                                                            85

M

1   Bryant sketches are protectable elements?

2        A.    No.  There's going to be elements that would

3   not solely be protected as an element.  The fact that

4   there are two eyes, the fact that there's hair, if

5   that's the sole basis for the infringement action, that

6   would not lie in the Ninth Circuit.

7        Q.    Okay.  So you're not saying then that the

8   limiting doctrines are inapplicable to pictorial works,

9   if I understand it.

10         You're saying that they shouldn't be

11   filtered -- the unprotected elements shouldn't be

12   filtered out in making the infringement analysis?

13        A.    Correct.

14        Q.    But do you still need to figure out what's

15   protectable and what's not protectable?

16        A.    Well, you'd have to do it at the extrinsic

17   stage.  I mean -- because you have to -- after Jada you

18   have to make that analysis.  You have to make that

19   comparison.  Then the question is once you've made the

20   comparison what do you do with it?  What happens in the

21   Ninth Circuit?

22         Well, whatever happens to it doesn't happen at

23   the extrinsic level because now -- now you've got the

Page 75

Exhibit 96
P. 269

042505Lind.txt

24  Court saying either the plaintiff was able to show

25  substantial similarity of expression and ideas or they

86

M

1  were not able to do that, and if the defendant makes a

2  summary judgment motion then the case is gone.  And so

3  that then means okay, what happens at the intrinsic

4  stage?

5         Now, when it gets to trial you have the summary

6  judgment and plaintiff has been successful in showing

7  that there's at least a jury question as to substantial

8  similarity between expression and ideas.

9         You then go to trial where you present that

10  evidence all over again in front of the jury and so --

11  because the jury has to decide -- for there to be

12  infringement has to decide that both the extrinsic test

13  has been met and the intrinsic test has been met.

14         And so the jury is going to hear the same

15  expert witness testimony, the same analytical

16  dissection, and you can't expect the jury to forget the

17  alphabet.  They're not going to unring the bell.  So

18  they're going to keep that in mind, that there's

19  expression, that there's ideas, and then they're going

20  to be told, "You have to decide whether the defendant

21  took the total concept and feel the plaintiff's work by

22  looking at the entire work."

23         Now, if -- if the jury decides that there's

24  infringement because the drawing and the Bratz dolls

25  both have two ears and two eyes, that's not going to be

87

M

Page 76

Exhibit 96 ,
P. 269A

042505Lind.txt

1  possible because you're not protecting anything that's
2  protected by copyright.  But if they -- if the jurors
3  look at the context, the entire context of the two
4  works, and in that context they say, "Well, both have
5  two eyes but they both have eyes that are half shut,
6  they both have eyes that have a particular type of
7  pupil, they both have mouths but they both have mouths
8  that have the same type of lip structure," that's going
9  to be acceptable.
10      And so I think that under Ninth Circuit law
11  they are able to take into account unprotected elements
12  in context, but if they -- if the juror solely
13  determines infringement on those unprotected elements
14  alone, I don't think it will stand up.
15      Q.  How does the jury know which elements are
16  unprotected?
17      A.  Because they've heard the extrinsic argument.
18  Folks like us, like myself, Peter Menell, and I'm sure
19  you folks when you're addressing the jury and presenting
20  evidence are going to be able to show them what's
21  protected, what's not, because they have -- the jury is
22  going to have to make a determination of the extrinsic
23  test.  They're not bypassed just because a summary
24  judgment proceeding has taken place.
25      Q.  Do you -- are you aware that Mattel has filed a

88

M

1  pleading in which they say the analytical dissection of
2  protectable and unprotectable material presents an issue
3  of law to be addressed by the court?
4      A.  No.

Page 77

Exhibit 96
P. 270

042505Lind.txt

21   be copying, but I just don't have a good way of

22   enunciating that.

23        Q.   Any sense of how close it has to be?

24        A.   Well, the easy question is, well, yeah, it's

25   substantially similar, but that's a little circular.

                                                        101


1         Q.   Okay.  Is there a definition of "substantially

2    similar"?

3         A.   No.  Well, I mean, there is the definition of

4    the test that you use.

5         Q.   I mean the term itself is what I'm getting at.

6         A.   Yeah.  Not -- not one that is in the copyright

7    statute.

8         Q.   Yeah, okay.  I mean, it's the jury is typically

9    instructed on the words and they figure out what it

10   means?

11        A.   That's correct.

12        Q.   Okay.  In terms of the -- let's take -- do you

13   recall that the purpose or point of the Seventeen

14   Magazine stuff is that, you know, at least take the

15   Steve Madden ad that had like large feet.  Does that

16   strike a cord with you?

17        A.   I recall that argument, yes.

18        Q.   So in terms of the -- in terms of the large

19   feet being in the Steve Madden ad and then Bryant saying

20   he uses that as an inspiration, assuming that he's

21   testifying correctly does that have any bearing at all

22   in determining the protectability of his sketches?

23        A.   Yes, because if he relied on them, if he copied

24   them, I think inspiration may be not -- may not do it,

                          Page 89


                      Exhibit 96
                      P. 270A

042505Lind.txt

25    but if he copied them, then the drawings in that aspect

                                                                    102

M

1    would not be original to him.  There's no independent

2    creation there if he's merely copied something from a

3    magazine.  And assuming -- if I may?  Assuming we're

4    not -- still not talking about compilation.

5         Q.   Not yet.  So that's -- that's what I was

6    getting at.  What's the hook in terms of that would be

7    under -- in terms of the things that would be

8    unprotectable, that would fall into the non-original

9    category?

10        A.   Correct, and if that's the only -- if that was

11   the only element that is -- is found by the jury to be

12   infringed, then it would not be a proper finding of

13   infringement.

14        Q.   So if we talk about, you know, certain of the

15   other Seventeen Magazine ads that Mr. Bryant references

16   relate to like oversized heads and oversized lips and

17   things of that nature, assuming he's testifying

18   correctly that those served as an inspiration, would

19   those also -- are those pertinent at all?

20        A.   I'm not agreeing with your statements when

21   you're using the term "inspiration."

22        Q.   Okay.

23        A.   I'm using the term "copy."

24        Q.   Okay, when he copied those in some manner, he

25   used an oversized head.

                                                                    103

M

1         A.   Okay.

                          Page 90

                        Exhibit 96
                        P. 271

042505Lind.txt

2        Q.    How do we know whether he copied it in your

3   interpretation?

4        A.    You would have to compare the two.

5        Q.    And it sort of looks like they're kind of

6   similar or substantially similar?

7        A.    Yeah.

8        Q.    Do they have to be similar?  Do they have to be

9   substantially similar?

10       A.    In terms of defining what copying is?

11       Q.    I want to figure out at what level do they

12   become pertinent to determining the protectability of,

13   say, the feet in the sketches?

14       A.    Okay.  One of the things that -- that Professor

15   Menell does in his report is -- in my -- in my view he

16   creates questions or comparisons that are easily

17   resolved because he makes the comparisons at a high

18   level of abstraction.  Big shoes or big feet in the

19   magazine, big shoes, big feet in the drawings.  Big head

20   in the magazine, big head in the drawings.  Big eyes in

21   some of the 1970s, 1980s artwork, they're found there.

22   That's -- an argument can be made there at that level of

23   abstraction, but that's not where I would be focusing.

24   I'd be focusing on something more specific.  And so

25   what's the shape of the head?  How big is the head in

                                                    104

M

1   comparison to the other portions?  The eyes, et cetera.

2        Q.    And the mere fact -- I'm sorry, go ahead.  I

3   didn't mean to interrupt you.

4        A.    So the -- the -- the fact that a large head in

5   a -- an advertisement that's in the Seventeen Magazine

                        Page 91

Exhibit 96
P. 272

042505Lind.txt

6   was an inspiration to use your term or copy to use my

7   term is not really going to solve anything because

8   there's more specificity at issue.

9       Q.   And that's what I'm trying to get at.  From

10  your perspective how much specificity do we have to have

11  on that before it's potentially unprotectable?  Pick any

12  one of them.

13      A.   Well, not so much -- you mean, how much

14  specificity do we need before it's protectable?

15      Q.   Okay.  Is that the way to look at it?

16      A.   Right, because I would suggest that if it's

17  just the use of a big head --

18      Q.   Yeah.

19      A.   -- and that's the only thing that is the basis

20  for the infringement action, there's no infringement

21  action there, no successful infringement action there.

22      Q.   Okay.

23      A.   But -- because it's just too abstract.  He uses

24  Learned Hand's abstraction tests with the -- with the

25  pyramid which is exactly what I use in my class as well

                                                      105

M


1   and all of that is towards the top of the pyramid.  It's

2   an idea not protected.  But it certainly seems that a

3   jury could find that the specifics here in terms of the

4   shape of the head, the size in comparison to others,

5   what the face looks like, that is something that a jury

6   could find to be protectable.

7       Q.   All right.  So maybe I'm looking at it

8   backwards.  The burden is to show that the elements are

9   protectable?

                     Page 92


Exhibit 96 ,
P. 272A

042505Lind.txt

22    Q.    But in that -- and what I'm trying to be clear

23  on is in terms of as you say expression or ideas or

24  limiting factors, in terms of the expression in the

25  sketches, the drawings -- whatever we want to call

                                                      109

M

1   them -- is it -- the plaintiff is to identify what the

2   plaintiff believes to be the protected expression in the

3   drawings?

4     A.    Yes.

5     Q.    And then the plaintiff identifies the protected

6   ideas?

7     A.    That I'm not certain of because generally again

8   with the Second Circuit approach that is something that

9   the defendant has the burden of doing, particularly

10  under the filtration approach, but when you look in the

11  Ninth Circuit and again looking at Apple versus

12  Microsoft, there the District Court had said to Apple

13  you have to set up what you're claiming as protected

14  material because Apple had basically said here's our

15  program, Judge.  You decide what's protectable.

16    Q.    Right.

17    A.    And the judge said, no, that's your job.  You

18  have to basically prove up the bill of particulars.  And

19  then the defendant is -- is given the opportunity to try

20  and identify what is a -- a limiting factor.

21    Q.    So the plaintiff -- do you think that's an

22  appropriate framework here for the Bryant sketches?

23    A.    I think so.

24    Q.    And so if I understand it, the plaintiff sets

25  up the protectable elements specifically and the
                          Page 96

Exhibit 96
P. 273

042505Lind.txt

110

M

1    defendant tries to knock them down with the limiting
2    doctrines?
3        A.    Yeah, and -- and then -- but it's not for
4    purposes as it is with the Second Circuit of saying this
5    is going to get rid of the case or not.  What gets rid
6    of the case or not at the summary judgment level is --
7    is the substantial similarity of all of those.
8        Q.    In the Ninth Circuit?
9        A.    Correct, correct, in the Ninth Circuit.
10       Q.    Thank you.
11       A.    Thank you.
12            MR. HANSEN:  Off the record.
13            VIDEO OPERATOR:  We're off the record 12:41.
14
15            (At the hour 12:41 p.m. the luncheon
16        recess was taken.)
17
18
19
20
21
22
23
24
25

111

M

1            (At the hour of 1:35 p.m. the following

Page 97

Exhibit 96,
P. 274

042505Lind.txt

2      proceedings were had at the same place with

3      the same persons present.)

4

5           VIDEO OPERATOR:  The time is 1:35 p.m.  We are

6      back on the record.

7           MR. HANSEN:  Where do you want to go now?

8      Don't answer that.

9           MR. QUINTO:  Bar?

10

11               EXAMINATION (Resumed)

12     BY MR. HANSEN:

13          Q.   Getting closer.  So let me -- what I'd like to

14     do is if you could turn to -- I've given you an expert

15     report of Lee Loetz.  Have you seen this before?

16          A.   Yes.

17          Q.   You don't have to confirm that it's the whole

18     thing but it is.  You can look at any part you want.  I

19     wanted to focus on Exhibit 7 and just ask a few more

20     questions on some of the issues we've been discussing.

21          A.   Okay.

22          Q.   In terms of scenes l'affaire, okay, if you

23     could, just looking at the -- Exhibit 7 has one of the

24     sketches on the left and one of the dolls on the right.

25     Do you see that?

                                                         112

M

1          A.   Yes.

2          Q.   I just want to focus on the sketch.  It's just

3      a convenient way to get the sketches here.  Can you tell

4      me if any -- any part of the -- of the sketch in the

5      Loetz report, Exhibit 7, arguably constitute scenes

                          Page 98

                      Exhibit 96 ,
                      P. 275

042505Lind.txt

6    l'affaire?

7        A.   I couldn't because I'm not -- I don't know the

8    fashion world, the hip-hop world, to know what's --

9    what's commonly used, what has to be used to get an idea

10   across.

11       Q.   Okay.  And so in terms of then focusing on

12   human anatomy, for example, you mentioned I think eyes

13   before.  Is there any of this that -- like having arms

14   and legs and feet and heads and things, is that arguably

15   scenes l'affaire?

16       A.   I wouldn't call it scenes l'affaire because

17   scenes l'affaire is expression.  It's something that is

18   expression but because of it falling into one of those

19   three categories that I mentioned it's treated as an

20   idea but it's not an idea.  And so a doll or a drawing

21   such as this that has two arms, two eyes would be to me

22   an idea.

23       Q.   Okay.  How about like things like body

24   proportion?  If there are standard body proportions,

25   would that -- would that bare on the issue of scene

                                                      113

M

1    'affair?

2        A.   Again, I don't think it would be scene 'affair.

3    If anything, it would be an idea but -- but with body

4    proportions they vary so greatly that apart from saying

5    that you have two arms, two eyes, I don't know if you

6    can actually say that there is a certain measurement

7    that necessarily has to flow from, you know, torso to

8    leg length and that sort of thing.

9        Q.   Okay.  Is there anything in the drawing that

                     Page 99

                 Exhibit 96 ,
                 P. 276

042505Lind.txt

10      you would consider properly subject to filtration?

11          A.   Are we talking about the Ninth Circuit?

12          Q.   Yes, let's stick to the Ninth Circuit.  It's

13      hard enough dealing with that.

14          A.   Since there's not a step in the Ninth Circuit

15      that is filtration as it is in the Second Circuit so if

16      I --

17          Q.   Let me change the question then.  Sorry.

18          A.   Okay.

19          Q.   Is there anything in the -- in the sketch that

20      is arguably unprotectable from your perspective on any

21      of the grounds -- I'm sorry, individually on any of the

22      grounds that we talked about?

23          A.   Okay.  So that would be that if it was the sole

24      basis for an infringing action it would not be

25      successful?

                                                        114

M

1           Q.   Right.

2           A.   Okay.  The -- a reference to a rabbit or

3       whatever that animal is with the bag and there are

4       several aspects in the sense of someone wearing a hat is

5       not individual -- would not individually be protected.

6       Having an orange outer garment would not be individually

7       protected.  Someone wearing shoes not individually

8       protected.  Someone wearing baggy jeans not individually

9       protected.  Someone wearing a striped shirt, not

10      individually protected.  Someone with -- depicting long

11      hair not individually protected.

12          Q.   How about the words "hip-hop"?

13          A.   No.  I mean, a phrase not protected by

                          Page 100

                      Exhibit 96 ,
                      P. 277

042505Lind.txt

14   copyright individually except in the cases where -- the

15   few cases where that has been found to be protectable it

16   was with -- with pictorial work which is the ET case.

17      Q.   And when you say they're not individually

18   protectable, why is that, the elements that you just

19   went through?

20      A.   Because they are unprotected individually by

21   copyright they would be -- under the Ninth Circuit they

22   would likely be labeled as ideas or unprotected elements

23   in the extrinsic stage.

24         In the intrinsic stage the jury would be able

25   to look at them and take them into account when

                                                      115

M

1    determining whether the defendant took the total concept

2    and feel of the plaintiff's work because there are other

3    items here in addition to what I indicated that a jury

4    could find are protected by copyright and were

5    infringed.

6      Q.   Let's focus on the eyes for a second.

7      A.   Okay.

8      Q.   Would those be individually protectable?

9      A.   A jury could certainly find that they were

10   protected -- what the eyes used in -- expressed in the

11   drawing are sufficient for copyright protection in the

12   context of a doll.

13     Q.   And so that would be because of the

14   particularized expression of the eyes in the sketch?

15     A.   Yes.

16     Q.   And if you are -- if you were limited to

17   comparing the particularized eyes in the sketch with the

                    Page 101

                Exhibit 96,
                P. 278

042505Lind.txt

18   eyes in the doll, would that be done according to a

19   substantial similarity test or virtual identity test?

20   Some other test?

21        A.   The problem is that in my view of the Ninth

22   Circuit law they would not be done individually.   It

23   would be -- the jury is told -- the finder of fact is

24   told look at the complete work and so they're dissuaded

25   from going into that type of specificity.

                                                        116

M

1        Q.   And it's your view in that regard -- that's

2    your view with respect to both the intrinsic and

3    extrinsic part of the test?

4        A.   It is certainly the intrinsic part.   For the

5    extrinsic part because there's the requirement of

6    substantial similarity of expression and ideas, I think

7    you have to have some distillation, not quite

8    filtration, because you're not excluding them, but

9    identification would probably be the better term.   That

10   specific identification would come into play.

11       Q.   What does that mean?

12       A.   That they would -- that note would be taken.

13   That, for instance, with the intrin -- excuse me, with

14   the extrinsic test not only is an expert allowed but the

15   analytic dissection is allowed which is basically a

16   side-by-side comparison and so I would see it as a

17   proper use of an expert to place those eyes side by side

18   and discuss them as being substantially similar either

19   as expression or as an idea.

20       Q.   And that gets to my point.   In that regard is

21   it -- is the test substantially similar or virtual

                         Page 102

                    Exhibit _96_,
                    P. _279_

042505Lind.txt

22   identical eye-to-eye comparison?

23       A.   Substantial similarity.

24       Q.   Okay.

25       A.   In my view with these works that we're

117

1   discussing.

2       Q.   And is that the type of comparison that an

3   artist can make?

4       A.   In terms -- whether there's substantial

5   similarity of those attributes?

6       Q.   Yeah.

7       A.   I believe so.

8       Q.   Okay.  And it would be true then also as to

9   whether there's substantial dissimilarity?

10      A.   No, because that's -- as Learned Hands said

11  quite sometime ago you don't focus on the

12  dissimilarities of a work.  It's not a question of how

13  much the pirate did not take, it's how much they did

14  take and what -- where the similarities are.

15      Q.   Right.  The plagiarist can't excuse himself for

16  how much he didn't take?

17      A.   That's right.

18      Q.   But in terms of a specific eye, all right, are

19  we -- we're not talking about that the plagiarist didn't

20  take an eye, right?  The plagiarist here would be

21  arguably the doll -- whoever had the doll versus the

22  sketch?

23      A.   Correct.

24      Q.   So we're not talking -- we're talking about

25  that specific element.  It's completely inappropriate to

Page 103

042505Lind.txt

118

M

1    talk about similarities or dissimilarities of the
2    specific element?
3        A.   It's really a question of is it substantially
4    similar or is it not.
5        Q.   Yes.
6        A.   Which is different in my view than saying is --
7    is it substantially similar or is it dissimilar.
8        Q.   I see.  But I could say that it's not
9    substantially similar.
10       A.   Correct.
11       Q.   That's what -- so it's terminology, I guess.
12       A.   Well, but it's -- I think it's a bit more than
13   terminology because it's also -- it's a mind-set and a
14   focus and in almost all the cases, whether Second
15   Circuit, Ninth Circuit, agree that you're not supposed
16   to be -- particularly when -- when the work is such that
17   you're focusing on the entirety, you're told to focus on
18   the entirety, that you're not supposed to be itemizing
19   the dissimilarities, you're supposed to be checking it
20   out for similarities.
21       Q.   But in terms of -- you have -- it's appropriate
22   for an expert you're saying to take a look and compare
23   the eye in the sketch and the eye in the doll?
24       A.   Yes.
25       Q.   And they could make a determination based on

119

M

1    those two things as to the similarity of those eyes?
2        A.   Correct, as to both expression and idea.
                        Page 104

Exhibit 96
P. 281

042505Lind.txt

3      Q.    And then they presumably -- and I think this is

4   what you said, I just -- my terms may have been wrong --

5   the expert also could make an opinion as to them not

6   being similar?

7      A.    For the extrinsic test, yes.

8      Q.    Just the extrinsic part?  Okay.

9      A.    So that, of course, remains -- practically

10  remains with the finder of fact at the intrinsic level,

11  but you don't have the expert there pushing it for the

12  intrinsic purpose.

13     Q.    Okay.  Is there any circumstance that you can

14  think of with respect to pictorial works where the

15  comparison should be done using a virtual identity

16  standard?

17     A.    I wouldn't want to exclude it out of hand.  I'm

18  hard pressed to define something that would -- the --

19  well, one of the areas which I think I would agree with

20  the decisions deal with, as you mentioned before, items

21  found in nature.

22     Q.    Like the bunny?

23     A.    Well, this seems to be not quite a naturalistic

24  depiction, but you have the turkey decoy case --

25     Q.    Shataba?

                                                        120


1      A.    -- with the jellyfish and so the notion being

2   that where you have a work -- or an item found in nature

3   and you are depicting it as found in nature, there is a

4   limited number of means of expression and therefore the

5   standard is going to be identical -- nearly identical,

6   verbatim, nearly verbatim.
                    Page 105

                    Exhibit _96_
                    P. _282_

042505Lind.txt

15    A.   They can be if they meet the requirements of

16   copyrightability.  I think a jury could find that.

17    Q.   Are you aware of the Copyright Office's view of

18   that?

19    A.   I'm aware of a case where they had I think two

20   letters from an examiner in the Copyright Office.

21    Q.   Let me just show you -- do you know who Ralph

22   Ohman is?

23    A.   Yes.

24    Q.   Who is Ralph Ohman?

25    A.   A former registrar of the Copyright Office.

                                                      123

M

1    Q.   Do you know that he's an expert for Mattel in

2   this case?

3    A.   Yes.

4    Q.   Have you read his report?

5    A.   Yes.

6    Q.   Did you read his deposition?

7    A.   No.

8    Q.   Let me just show you -- we don't have to mark

9   this.  This is Mattel Exhibit 625, a letter from Wayne

10   Crist at the Copyright Office to Carol Witschel of White

11   & Case.  Just take a minute and look at that.

12    A.   Okay.

13    Q.   Let me clean up before I go there on the -- I

14   may have overlooked.  The hip-hop on Exhibit 7 in the

15   Loetz report, you mentioned the ET case.  I just want to

16   be clear.  Do you think hip-hop in this context is

17   copyrightable in the context of the Bryant sketch?

18    A.   Individually copyrightable?

                    Page 108

Exhibit 96,
P. 283

042505Lind.txt

19      Q.    Yes.

20      A.    No.

21      Q.    Copyrightable in some other respect?  As part

22 of a compilation, I guess?

23      A.    Yes, it could be part of a compilation.  Also

24 under the intrinsic test a finder of fact could keep

25 that in mind when looking at the totality of the work.

                                                        124

M

1       Q.    Okay.  In terms of the fashions on this -- on

2 the sketch, do you think that fashions on a fashion doll

3 are arguably scene 'affair?

4       A.    Again, well, you're asking a general question.

5       Q.    Yes, just generally.

6       A.    Yes, it could be.

7       Q.    It could be scene 'affair?

8       A.    Yes.

9       Q.    Under what circumstances would it be scene

10 'affair?

11      A.    When the idea that is intended to be depicted

12 is -- necessitates a certain kind of clothing.  So if

13 you want a doll that is on her way to the beach, she

14 would be wearing a swimsuit.  That would probably be

15 scene 'affair.

16      Q.    How about hair on a fashion doll?  Is that

17 scene 'affair?

18      A.    I think there's -- there's so many different

19 ways to present the hair that -- there may be some -- I

20 mean, you -- if you had a Jamaican doll and you had a

21 certain hairstyle that you would find in Jamaica, that

22 may be scene 'affair.

                         Page 109

                    Exhibit 96
                    P. 284

042505Lind.txt

24    A.   I do see that.

25    Q.   What is the Court referring to there in your

149

M

1    opinion?

2    A.   Well, this being the Second Circuit it is

3    saying that those elements that are not protected by

4    copyright are filtered out of the analysis for

5    substantial similarity.

6    Q.   Okay.  And then in your report you quote the

7    next part, right?  "The copyright does not protect

8    ideas; it protects only the author's particularized

9    expression..." --

10    A.   Where are you?

11    Q.   Sorry, right after that sentence in the same

12    paragraph.

13    A.   Okay, I'm sorry.  I believe so.

14    Q.   You agree that it doesn't -- you agree that the

15    copyright doesn't protect ideas, right?

16    A.   As -- as an individual element, yes.

17    Q.   Okay.  And in terms of protecting the

18    particularized expression of the idea, you agree with

19    that, too?

20    A.   That it does protect it if it's sufficiently

21    original, yes.

22    Q.   Okay.  And -- but do you agree with the first

23    sentence that the protection is quite limited?

24    A.   Limited in the sense under the Second Circuit

25    test that if it is an idea, it will be filtered out of

150

M

Page 131

Exhibit 96,
P. 285

042505Lind.txt

14   that can be detached and replaced with interchangeable

15   feet in different style shoes."

16         Do you see that?

17   A.   Yes, I do.

18   Q.   So are those -- all of the items that you list

19   there, are those ideas or concepts from a copyright

20   standpoint?  What I'm trying to get at is the way you

21   phrase it here it's not specific expression, you're just

22   talking about a big picture idea standpoint here?

23   A.   Yes.

24   Q.   Okay.  So the --

25   A.   I mean, in terms of subject matter such as is

                                                    170


1   it dinosaur and dinosaur or is it dinosaur and dog.

2   Q.   Right.  So it's not -- you're not saying that

3   every -- assuming that Mattel owns the drawings, that

4   every doll that had these characteristics would infringe

5   the copyright in the drawings?

6   A.   Not necessarily.  I'm agreeing with you not

7   necessarily.  The point here is that one of the

8   categories of -- of concerns that a finder of fact would

9   look at would be the subject matter.  That's just one of

10   several of these concerns.

11   Q.   Okay.  Then on the -- on the next page --

12   A.   That would be page 12.

13   Q.   Page 12, yes.  Thank you.  Under "Setting for

14   the subject" it says "Both the Bryant drawings and the

15   Bratz dolls focus on multi-ethnic young images with an

16   interest in fashion that denotes a knowing, urban, hip

17   attitude."

                        Page 149

Exhibit 96
P. 286

042505Lind.txt

18          Do you see that?

19      A.   I do.

20      Q.   Do you draw that from Loetz or did you come up

21   with that one on your own?

22      A.   It's mostly -- I don't know about mostly but I

23   did pick up on at least some of that, if not much of

24   that, from Loetz.  I also looked at -- on the Bratz side

25   looked at Wikipedia which made that.  I looked at the

                                                    171

M

1    dolls that I've brought here which emphasize the fashion

2    sense, et cetera.

3       Q.   In terms of those characteristics, the

4    multi-ethnic and young and interest in fashion and all

5    the rest of it, is that -- would you agree that's also

6    ideas or concepts versus particular expression?

7       A.   Yes.

8            MR. HANSEN:  Do you have the Jade doll exhibit,

9    Donna?  Let's just look at this.

10      Q.   The -- as to the shapes part -- sorry, on page

11   12 -- this one says "As set forth in the expert report

12   of Lee Loetz, both the Bryant drawings and the Bratz

13   dolls are constructed of large heads, wide eyes, full

14   lips, very small noses, short torsos, long thin legs and

15   large feet that can be detached and replaced with

16   interchangeable feet in different style shoes?"

17           Do you see that?

18      A.   Yes, I do.

19      Q.   Again, all of those characteristics, again,

20   these are ideas and concepts that are not in and of

21   themselves copyrightable?

                   Page 150

Exhibit 96
P. 287

042505Lind.txt

22      A.   Not in and of themselves, correct.

23      Q.   It would be the specific expression of any of

24  those concepts that would be copyrightable?

25      A.   That and possibly compilation protection.

172

M

1       Q.   Okay.  If we could jump then to the next page.

2   On the second full paragraph you say "As reflected in

3   the Loetz Expert Report, each of the works of the

4   parties, the almond shaped, upwardly angled, heavily

5   lidded eye, as well as the placement of the pupil are

6   similar."

7            Do you see that?

8       A.   I do see that.

9       Q.   Now, when you say "similar," are you -- are

10  they substantially similar?  Just similar?  Is that --

11  do you have an opinion one way or another on the degree

12  of similarity?

13           MR. QUINTO:  Legal opinion or personal opinion?

14           MR. HANSEN:  Well, opinion as the expert in the

15  case.

16           THE WITNESS:  My opinion would be that the

17  trier of fact would be able to find that they are

18  substantially similar.

19  BY MR. HANSEN:

20      Q.   If the standard was determined to be virtual

21  identity in this case, do you have any opinion as to

22  whether or not the sketches and the dolls are virtually

23  identical?

24      A.   No.

25      Q.   Do you have -- do you have any opinion as to --

Page 151

Exhibit 96,
P. 288

042505Lind.txt

14      Q.   -- the section -- I guess it's the second full

15  paragraph that starts after "Menell report 54."

16      A.   Page 13 you said?

17      Q.   The first full paragraph, the second sentence

18  that begins "However."

19      A.   Okay, just a minute.  The paragraph begins

20  "Professor Menell argues"?

21      Q.   Exactly.

22      A.   Okay.  And you're asking me to look at the

23  second sentence that begins "However, the comparison"?

24      Q.   Yes.

25      A.   Okay.

                                                        178

M

1       Q.   And it says "...at times is unfair."  Does that

2   mean at times it was fair?  Do you believe there was

3   anything fair about Professor Menell's comparison?

4       A.   Oh, he makes fair -- of course I don't agree

5   with his conclusions but I think you can -- you can take

6   certain aspects of the drawings, certain aspects of the

7   dolls, take a look at the entire drawing versus the

8   entire doll and I think -- I think it is -- it is fair

9   to compare them and to make your comparisons and to

10  argue about what standard of infringement should be used

11  and that sort of thing.  But I think he was -- and he

12  was mostly fair in that respect but I think one of

13  the -- one -- what was unfair was with the lips and the

14  other is -- is with the eyes where I think it's unfair

15  to compare similarity of eyes when you're -- when you're

16  dealing with a blank sculpt that doesn't even have an

17  eye.

                   Page 156

Exhibit 96
P. 289

042505Lind.txt

18      Q.   Okay.

19      A.   I thought that was going a little far.

20      Q.   Okay.  If we could go then to -- if you would

21  flip for me to page 14 of your report.

22      A.   Yes, sir.

23      Q.   Thank you.  This is the body.  I want to look

24  at the "Arrangement of the representation" section.

25      A.   Yes.

                                                    179

M

1       Q.   Talking about the -- it says "The body

2   proportions of the Bryant drawings and dolls are largely

3   identical."

4            Do you see that?

5       A.   Yes, I do.

6       Q.   And that is -- could you look again -- I think

7   you still have the Loetz report.  I think that's based

8   on Exhibit 37?

9       A.   Yes.

10      Q.   Is that what your -- is that what this portion

11  of your report is based on?

12      A.   Not just Exhibit 37.  My recollection is he

13  had --

14      Q.   It's also --

15      A.   He had several indications and comparisons.

16      Q.   But it's in part based on Exhibit 37?

17      A.   Yes.

18      Q.   Does -- let me ask you along this "major

19  anatomical landmarks of chin, shoulders, chests..." --

20  I'm sorry, I jumped back to your report.  I didn't

21  realize you closed it.

                        Page 157

                    Exhibit 96
                    P. 290

042505Lind.txt

22    A.   On what page?

23    Q.   Still on page 14.

24    A.   I'm there.

25    Q.   The -- thank you.  You're talking about the

180

1    body proportions of the Bryant drawings and the dolls

2    are largely identical in this section, right?

3    A.   Correct.

4    Q.   And that it's demonstrated by alignments of the

5    major anatomical landmarks of chins, shoulders, chests,

6    waists, elbows, crotch, wrists, knees and ankles, right?

7    A.   I see that.

8    Q.   Would -- does it matter at all to your opinion

9    in this regard as to whether any of these anatomical

10   landmarks are standard human anatomy?

11   A.   That would come into the analysis but since we

12   certainly don't have the same physical makeup, even

13   though we're in the same species going back to the

14   Second Circuit and Goldberg case and that sort of thing,

15   that as with dolls as with humans these landmarks may --

16   may vary between one individual and another.

17   Q.   Are you an expert in that area?

18   A.   No.  I would just say that that's kind of

19   common sense.

20   Q.   Do you know what a trochanter is?

21   A.   Absolutely not.

22   Q.   Do you know whether or not the knee is located

23   halfway between the trochanter and the bottom of the

24   foot on a normal human being?

25   A.   Absolutely not.

Page 158

Exhibit 96 ,
P. 291

042505Lind.txt

181

M

1       Q.   Okay, that's fine.  And you don't -- do you
2    know whether or not -- do you know what the standard
3    distance is between human eyes?
4       A.   No, I don't.
5       Q.   Do you know -- okay.  But there may be people
6    that may be more qualified to testify on that?
7       A.   Oh, undoubtedly.  But I guess my point is you
8    said the standard distance between eyes.  Not everyone
9    has the same distance between eyes.
10      Q.   Are you sure?
11      A.   Pretty much.  In my own mind.  You can
12   undoubtedly prove me wrong but it just seems that
13   different people have different eye sockets and --
14      Q.   Do you know whether or not like artists study
15   these type of things in connection with anatomy?
16      A.   I'm sure they do, I mean, in the sense that
17   that's what they're supposed to be representing and I --
18   well, leave it at that.
19      Q.   There may be people that have more specific
20   training in that area than you?
21      A.   Much more.
22      Q.   But I can't prove you wrong again, right?
23           MR. QUINTO:  When you go to Lens Crafters to be
24   fitted for eye glasses, they measure the distance
25   between your eyes.

182

M

1            MR. HANSEN:  There you have it.  Okay, that's
2    fine.
                         Page 159

Exhibit 96
P. 292

042505Lind.txt

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

185

M

1    STATE OF CALIFORNIA    ) ss:

2    COUNTY OF LOS ANGELES )

3

4         I, WENDY S. SCHREIBER, C.S.R. No. 3558, do

5    hereby certify:

6

7         That the foregoing deposition of ROBERT C.

8    LIND was taken before me at the time and place therein

9    set forth, at which time the witness was placed under

10   oath and was sworn by me to tell the truth, the whole

11   truth, and nothing but the truth;

12        That the testimony of the witness and all

13   objections made by counsel at the time of the

14   examination were recorded stenographically by me, and

Page 162

Exhibit 96 ,
P. 293

042505Lind.txt

15   were thereafter transcribed under my direction and

16   supervision, and that the foregoing pages contain a

17   full, true and accurate record of all proceedings and

18   testimony to the best of my skill and ability.

19          I further certify that I am neither counsel

20   for any party in said action, nor am I related to any

21   party to said action, nor am I in any way interested in

22   the outcome thereof.

23

24

25

186

M

1          IN WITNESS WHEREOF, I have subscribed my name

2    this 26th day of April, 2008.

3

4

5

6    _____

7          WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

Page 163

Exhibit 96 ,
P. 294

**Exhibit 97**

10306-17   :2027073696   # 1/ 4



# *Special Handling* Fax
## Examining Division
## U. S. Copyright Office

| | |
|---|---|
| **To:** | Carol A. Witschel<br>White and Case LLP<br>Fax number: 212-354-8113 |

Date: April 8, 2005

**From:** Wayne Crist
Senior Examiner, Visual Arts Section
Fax number: 202-707-3698
Phone number: 202-707-5879

**Re:** **SASHA DOLL CONFIGURATION, ACCESSORIES AND PACKAGING (CA for VA 1-090-288) and 10 others**
**Control No.: 613231994 (Please include with your response.)**

### MESSAGE

Enclosed is a copy of the letter being sent to you via your local contact. Blank forms, circulars, and regulations are also available on our website: http://www.copyright.gov/ . Please call me if you have any questions.

*Mattel 625*
EXHIBIT
FOR IDENTIFICATION
PAMELA S. HARRIS, CSR 3909
*Aug 26* 20___ *07*
(WITNESS)
*Samir Khare*

*When you reply*, please return this sheet referring to our Control Number!
*If responding by mail*, use the following address *(U.S. Postal Service only)*:
Special Handling • Copyright Receiving & Processing • P.O. Box 71380 • Washington, DC 20024-1380

Page 1 of 5

MGA 0868141

625-1

Exhibit 97 ,
P. 295

4-, 8-05; 9:49AM;                                                    :2027073698                # 2/  4

COPYRIGHT      WEC/rc-d
OFFICE

April 8, 2005



**WHITE AND CASE LLP**
ATTN: CAROL A WITSCHEL
1155 AVENUE OF THE AMERICAS
NEW YORK   NY   10036

**LIBRARY**
**OF**
**CONGRESS**

Control Number: 61-323-1994(W)
Re:    SASHA DOLL CONFIGURATION , ACCESSORIES AND PACKAGING
(CA for VA 1-090-288) and 10 others

Dear Ms. Witschel:

This is a follow-up to our phone conversation of March 29. I had called because it was not clear to me with some of these claims exactly what corrections or amplifications of the earlier registrations that you were trying to make. You helped me to understand the situation better and I will discuss those issues below. In addition, I explained to you I would need to get the deposit copies for the original claims in order to fully understand the entire situation and that, because of that need, it would take longer to process these claims. I now have all of the deposit material, but must address some issues which need to be resolved.

**Washington**
**D.C.**
**20559-6000**

Please note that the CA claims for JADE DRAWING, YASMIN DRAWING, SASHA DRAWING, CLOE DRAWING, and BRATZ GROUP DRAWING are all acceptable as presented and I have cleared those claims. However, I am delaying final processing of those registrations so that this letter will not be delayed. For all claims which can be registered, we will have all of the final processing done at the same time.

Re:    SASHA DOLL CONFIGURATION, ACCESSORIES AND PACKAGING
(CA for VA 1-090-288); YASMIN DOLL CONFIGURATION,
ACCESSORIES AND PACKAGING (CA for VA 1-090-290; JADE DOLL
CONFIGURATION, ACCESSORIES AND PACKAGING (CA for
VA 1-090-287; CLOE DOLL CONFIGURATION, ACCESSORIES AND
PACKAGING (CA for VA 1-090-289)

The original VA registrations to which these CA applications refer were apparently the first registrations of each respective doll. The original applications presented claims only in "3-dimensional sculpture" and did not refer to any preexisting authorship on which they were based. The CA applications seek to both correct and amplify the original claims. In our phone conversation, you explained that the same basic doll sculpture was used for all four works. Each doll has different coloring and artwork, different hair, and different clothing and accessories. Doll hair and hairstyles are not copyrightable. The doll clothing, etc. will be discussed below. It appears that each doll was accompanied by a sculpture of an alternate foot and shoe combination which, I assume, could replace each foot already on the doll. When examining these claims for

MGA  0868142

Exhibit 97 ,
P. 296

-2-

WHITE AND CASE LLP
NEW YORK   NY 10036

Control No. 61-323-1994(W)
April 8, 2005

registration, we interpreted each claim in sculpture to cover the entire basic doll sculpture and the extra combination foot and shoe sculptures as they were published, and we registered the claims.

There is no problem in correcting the creation and publication dates or in connecting these works to the preliminary drawings, which were apparently published at the same time as the dolls, according to the applications. Each CA application also adds the new authorship descriptions "2-dimensional artwork," "Photograph," and "Text." There is artwork on the dolls and the packaging which will support a copyright claim, so that claim is acceptable. The claim in "Photograph" apparently refers to the deposited snapshots used as identifying material for the work. As such, they are not a part of the unit of publication and cannot be claimed here. The only text in the deposit material consists of names and short phrases on the front of the packaging and this element is not copyrightable. Copyright does not protect names and titles or short phrases and slogans. Each CA should not refer to "photograph" or "text."

The new space 6b statement given in space C of each CA application also refers to "accessories" and "other elements." It is not clear what "other elements" means and that phrase should not be used on the application. "Accessories" apparently refers to the doll clothing, brushes, etc., but these elements are not protected by copyright. If the doll clothing is regarded as a miniaturized model of real clothing, there would appear to be no authorship in the simple miniaturization to support a copyright claim. If the doll clothing is regarded as intrinsically useful, as are full-sized clothing items for people, they would not have any separable sculptural authorship which would support a claim, so they would not be copyrightable for that reason because copyright does not protect the designs of useful articles. If you intend to register the styling or general "look" of each doll with its various outfits, these trademark or trade dress elements are not protected under copyright law, but may be covered under the Lanham Act. The applications should not refer to "accessories" or to any anything suggesting a claim in the clothing designs, styling, etc.

Please complete a new CA application for each work, or amend the originals, incorporating the changes discussed above.

Re:   BRATZ DOLL SCULPTURE (FEMALE) (CA for VA 1-148-305); BRATZ
        DOLL SCULPTURE (FEMALE) - VA 1-148-305

In our conversation, you stated that this work is the same basic doll sculpture, minus the hair, facial artwork, and clothing, as the four works registered previously and discussed above. You explained that the original VA claim here was filed because the original registration materials for those four works did not show the entire sculpture of the basic doll, even though this claim did not refer to the previously registered claims. The CA claim here was filed to make clear that this VA claim covered all of the sculptural authorship not shown in the deposits for the four earlier registrations. This presents a problem for both of these registrations. We interpret the four earlier registrations for the dolls in their packaging to cover the entire doll sculpture even though

MGA 0868143

Exhibit 97 ,
P. 297

625-3

-3-

WHITE AND CASE LLP
NEW YORK   NY   10036

Control No. 61-323-1994(W)
April 8, 2005

the deposit materials for those claims did not show the entire doll sculpture. Section 202.21(b) of the Copyright Office regulations specifies that, when identifying material (such as photos) is required or allowed, "as many pieces of identifying material as are necessary to show the entire copyrightable content in the ordinary case, but in no case less than an adequate representation of such content, of the work for which deposit is being made, or for which registration is being sought shall be submitted." The time for deposit of pictures showing the entire doll sculpture without the clothing, etc. was when those four original registrations were made. The deficiency of the deposit material at that time cannot be corrected by making a new registration for the same work. Normally, only one registration can be made for any particular work. (The four separate original VA registrations for the packaged dolls could be justified because all of the claims were received on the same date, all of the works were first published on the same date, and each deposit revealed copyrightable sculptural authorship not contained in the others, namely the different combination foot and shoe sculptures. The addition of a claim in artwork now with each CA application adds that much more copyrightable authorship which is different with each work.)

All of this leads to the conclusion that this original VA registration should never have been made. (We were not given full information at the time of registration to alert us to the fact that the work was already registered.) Because the registration was made in error, we now intend to cancel the original VA registration. If you believe that the registration should not be cancelled, be sure to show cause in writing in your reply why we should not cancel it. If we get no response from you concerning this issue within the specified reply time, or if after considering your response we determine that the registration is erroneous, we will cancel the registration.

Assuming the original VA registration will be cancelled, we cannot register the related CA claim. The filing fee is not refundable.

Re:   BRATZ PETZ CATZ - SOFT TOYS, ACCESSORIES, PACKAGING & CONFIGURATION

This application includes a claim in text in space 2 and mentions text and photos in space 1. Again, the packaging contains some short phrases which will not support a copyright claim in text and the photos are presumably not a part of the unit of publication. Please omit these references on a new or amended application.

If you have any questions, you may call me at 202-707-5879.

MGA 0868144

$605-4$

**Exhibit 98**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>    Plaintiff,<br><br>  vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>    Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>EXPERT REPORT OF BRUCE L. STEIN |

Exhibit 98 ,
P. 299

Toy companies at any given moment are typically working on three product years at one time; the product line that is already in the market, the product line that is being prepared for next calendar year, and product concepts for two years out. Design groups are primarily focused on the two latter product line years and as part of their regular work they frequently meet about, discuss, and are exposed to, new product ideas by other designers from within the company and from outside the company through presentations by freelance or independent design and invention groups.

Although some design group employees inside the toy companies envy the lifestyle and individual fortunes made by the small group of successful inventors, the risks and trade-offs of this career choice are well known. While designers have the option to go the independent route, most choose not to based on their individual risk tolerance and lifestyle preferences. As part of a company they receive many benefits not offered to a solo inventor, such as a regular salary, performance bonuses, stock options, health insurance, vacation pay, disability plans, 401k plans, life insurance, paid holidays, sick days, etc. In exchange for these pay and benefit packages, it is industry practice for a toy company to require these design group employees to execute contracts that assign their work product solely to the company. The universality of this type of invention assignment agreement is reflected in the Bryant/Mattel and Bryant/MGA agreements, as well as the other employment and consulting contracts used by both Mattel and MGA that were provided for my review. As with the confidentiality provisions, the invention assignment clauses in those contracts appear by their terms to extend beyond patentable inventions to other types of protectible intellectual property. Based on my experience, the scope of these provisions is consistent with predominant industry practice, although obviously the precise wording and scope of such provisions varies.

Being an independent is an option that is always open to toy designers. Many designers give the freelance, independent inventing route a try. Some succeed but it is a very challenging road that most inventors barely earn a living at. Most product ideas are rejected, and even if accepted it often takes years for an idea to make it to market and begin generating royalty income for the inventor. Also, for many independent inventors, the absence of a broad group of talented peers and the team process negatively impacts the quality of their ideas, their productivity and their enjoyment of their work.

Exhibit 98 ,
P. 300

**Exhibit 99**

YOUNG &
RUBICAM
BRANDS

18 May 2005

Mr. Tim Kilpin
SVP Girls' Brand Marketing
MATTEL TOYS
333 Continental Blvd.
El Segundo, CA 90245

Dear Tim:

## MY SCENE:  RECOMMENDED NEXT STEPS

This outlines our point of view about how to proceed toward development and production of a new campaign for My Scene.

### BACKGROUND

The Agency was asked to develop a new brand strategy and new campaign for the My Scene brand in the wake of a successful brand launch and the flagging performance at retail that has followed. Currently domestic awareness is stalled at about 60 percent.

Three weeks ago (4/29), Y&R presented five directions for a new advertising campaign using "Goes Hollywood" product as the vehicle for launching a brand re-positioning and new attitude designed both to renew interest in the dolls and invigorate sales.

Last week (5/10) we re-presented the work in conjunction with the O&M work to help you clarify brand differentiation among Mattel's doll brands and vis-à-vis Bratz. The outcome of the meeting was direction to develop two campaigns, "Walkin' the Talk" and "Livin' Large", for an immediate next milestone of testing prior to production.

Then, last Thursday, Y&R recommended moving forward with production of "Livin' Large".  We also jointly thought that pre-testing of the concepts be replaced with qualitative and quantitative post-testing instead.  We thought this because "Livin' Large" offers more extendable options, presents fewer legal clearance obstacles, and is unlike anything currently running in kid time. The tight schedule also does not allow time to adequately test the creative concepts and, since both Mattel and Y&R have research confirming the appeal of humor to girls, we felt confident in the recommendation and moving forward.

Monday the brand group told us that they were uncomfortable with the approach we'd agreed on and requested instead that both campaigns be fully developed to

Y&R 000145

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

Croom
EXHIBIT NO. 1209
12/20/07
Wendy S. Schreiber

Exhibit 99
P. 301

12-frame story boards with the understanding that decision would be made once these were presented.

Yesterday, (5/17) the advertising options for My Scene were evaluated once again. The issue of connecting advertising for the "Goes Hollywood" product with the direct-to-video My Scene DVD was raised and discussed in depth. The meeting concluded with a request that we summarize the Agency's thinking about how product advertising can successfully cross-promote the new My Scene DVD so that commercials for all the toys, and the DVD, can sell one another and collectively maximize awareness.

**HOW TO PROCEED**
**Milestone #1, The Briefs** -- To correct the lack of clarity that arose in our discussion of the brand brief with you, as well as in our conversation with Mattel Marketing staff in the UK, we propose the following changes to be incorporated into our existing briefs (Brand Brief, Goes Hollywood Limo and Swappin' Styles):

<u>What do we want her to think?</u>
"The My Scene girls let me in on all I have to look forward to when I get older".

<u>The one thought she should walk away with:</u>
My Scene is everything that's cool about being a teen: best friends, hot looks, and good times.

Additionally, we will change "executional considerations" to "executional mandatories" on the communications briefs and call out important things that need to be incorporated into the creative. The intent of this is to enumerate key findings from hot button testing so that evaluative criteria, strategy, and noteworthy executional issues will be summarized in one place.

**Milestone #2, Recommended Campaign Creative** – Since there is now a heightened concern about tying the Goes Hollywood DVD and the Goes Hollywood product more closely together, <u>we recommend proceeding with development of a single campaign built solely around the entertainment property that employs animation-plus-live-action.</u> We expect to apply this approach to three commercials: Goes Hollywood dolls, Goes Hollywood limo, and Swappin' Styles. And, though we know that Swappin' Styles is not themed to Hollywood, it will air in Fall with the Hollywood product so we'd shoot it with a similar Hollywood-esque flavor. Overall, this is a solid, conservative approach to the campaign though it may fall short in terms of generating school yard buzz.

We don't recommend moving forward with "Livin' Large" for the My Scene Goes Hollywood product launch. Instead, it should be carefully and deliberately tested so the concept can be kept pure and fresh for the "Bling-Bling" launch; in effect we're recommending a postponement of the distinctively new campaign until first quarter. Regrettably, we don't recommend moving forward with "Walkin the Talk" now.

Y&R 000146

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

Exhibit 99
P. 302

Please take a look at the "campaign flow chart" that accompanies this letter for a graphic representation of the recommended approach and how it can work successfully into next year.  Putting it on paper reinforced in our minds, at least, that this is a sensible plan of attack given market conditions, budget, marketing objectives, and time.

### *Why an animation-plus-live-action approach?*

- The combination of animation and live action is a solid, time-tested format that's worked for Mattel in the past.  It's based on the successful marketing of "Jammin' in Jamaica" and "Masquerade Madness", both of which had DVD properties with the same themes.  The noteworthy difference, however, is that in both instances, My Scene DVDs were free with doll purchases.

- The Goes Hollywood DVD and limo can be incorporated and cross-promoted in all three product commercials.  Since we're recommending an animation-plus-live-action approach, freshened with attitude and more trendy music, ALL the products featured in the movie can appear in ALL the Goes Hollywood work.

### *Why not proceed with "Livin' Large" now?*

- It's our point of view that "Livin' Large" will lose its unique, creative integrity if DVD animation has to be incorporated. The basis of this entire campaign is letting dolls be dolls in a real world environment.  Incorporating animation, we think, will dilute the essential premise for the creative.

- "Livin' Large" has the ability to re-define the My Scene brand.  To do so, we need to keep this creative execution pure and true to concept. Incorporating elements from the DVD will detract from the fresh approach to dolls that it affords you.

### *Why not explore "Walkin' the Talk" further?*

- Using technique as the primary basis for a campaign is proving problematic now that we've been asked to call out and explain product features and make a connection with the DVD release.  Preliminarily, we've made it work but technique-driven concepts for products other than dolls aren't as compelling as we think they can be.  That said we stand by the opinion that the technique is a distinctive way to appeal to girls in our target if we can keep it pure.

REDACTED

Y&R 000147

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 99 , P. 303

- In the event of significant changes, re-editing "Walkin' the Talk" may prove to be more time consuming than we currently anticipate because the spots are built, as you know, with a large series of single, digital images. Again, substantial re-edits may jeopardize critically important air dates.

- Looking forward into '06 products, "Walkin' the Talk" does not lend itself to being extendable with unique products e.g., Stylin' Head and Cooty Catcher.

**Milestone #3, Commercial Line-Up** – We can accomplish the goals of supporting all the Goes Hollywood products plus the promotion and Swappin' Styles with the three budgeted :30 commercials plus :15s from available footage and a few tags.

**Milestone #4, Pre-production Schedule and Testing** -- Based on your agreement with recommendation, here's the schedule:

- Proceed with development of "Livin' Large" rough-live material for testing during early summer domestically and in the UK. This means authorizing an expense of nearly $22,000 by month's end.
- Present 12-frame boards for recommended spots in My Scene Goes Hollywood DVD roll-out strategy, on May 26th.
- Revise creative if needed and review at next meeting with Matt on the 31st.
- Drop dead date for final campaign directional decision, Monday, June 6th.
- Pre-produce week of June 20 and shoot week of June 27
- Drop dead date to release rough cut material for UK ad testing, July 12th.

**SUMMARY OF RECOMMENDATIONS**
- Move forward with a new campaign for the Goes Hollywood DVD and fall products that combines animation-plus-live-action with new music from the exploration we just completed.
- Begin the steps now that will thoroughly test "Livin' Large" in time to launch it as the new campaign in Spring with the "Bling, Bling" product.
- Take no further action with "Walkin' the Talk" at this time.

Tim, I hope this has taken into account all the issues that were discussed in yesterday's wide-ranging conversations with you and the brand group and then with Matt. We will follow-up with Russell, Debbie, and Sujata to answer any of their questions as to why this change in direction. We spent a lot of time debating the best course of action for Mattel and My Scene. We think what's discussed here is solid and will communicate all that girls need to know about the Goes Hollywood product, the DVD, and Swappin' Styles too.

Best personal regards,
Susan Chittum
SVP, Brand Team Leader

CC: R. Arons, D. Haag, J. Gomez, S. Luther, A. Willensky
Attachments: brand brief, communications briefs (2), campaign flow chart

Y&R 000148

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

Exhibit **99** ,
P. **304**