# Exhibit 110

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                 ---o0o---

5   CARTER BRYANT, an individual,

6              Plaintiff,

7      vs.                          Case No.

8   MATTEL, INC., a Delaware        CV 04-9049

9   Corporation,                    SGL  (RNBx)

10

            Defendants.       /

11  CONSOLIDATED WITH MATTEL, INC.,    Case No.

12  V. BRYANT and MGA ENTERTAINMENT,   04-9059

13  INC., v. MATTEL, INC.      /      NM  (RNBx)

14

15

16       CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

18   VIDEOTAPED DEPOSITION OF MICHAEL J. WAGNER

19          FRIDAY, MARCH 21, 2008

20

21

22

23

24

25  PAGES 1 - 310

Exhibit 110 ,
P. 428

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1    APPEARANCES OF COUNSEL:

 2

 3       FOR PLAINTIFF MATTEL, INC.:

 4           QUINN EMANUEL URQUHART OLIVER & HEDGES

 5           BY:   ROBERT P. FELDMAN, ESQ.

 6           555 Twin Dolphin Drive, Suite 560

 7           Redwood Shores, California 94065

 8           650.801.5000

 9           bobfeldman@quinnemanuel.com

10

11       FOR DEFENDANT MGA ENTERTAINMENT, INC. and ISAAC

12       LARIAN:

13           SKADDEN ARPS SLATE MEAGHER & FLOM LLP

14           BY:   CARL A. ROTH, ESQ.

15               RYAN WEINSTEIN, ESQ.

16               PATRICK HAMMON, ESQ.

17           300 South Grand Avenue

18           Los Angeles, California 90071

19           213.687.5000

20           croth@skadden.com

21           rweinstein@skadden.com

22           phammon@skadden.com

23

24

25
```

Exhibit 110,
P. 429

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3       FOR DEFENDANT and COUNTERCLAIMANT CARTER BRYANT:

 4          KEKER & VAN NEST LLP

 5          BY:  MATTHEW M. WERDEGAR, ESQ.

 6          710 Sansome Street

 7          San Francisco, California 94111

 8          415.397.7188

 9          mwerdegar@kvn.com

10          (NOT PRESENT)

11

12

13       Also present:   Deepak Jain, Navigant Consulting

14                       Daniel Stroud, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 110 ,
P. 430

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 21

1      Q.   Did you ask Mr. Schoton if there was          10:16:23

2    market research or any other research that

3    supported his view?

4      A.   No.

5      Q.   Why not?                                       10:16:30

6      A.   It wasn't necessary for my assignment.

7    I'm not carrying that burden of proof.  I believe

8    others are.  But I just wanted some understanding

9    of that phenomenon.

10     Q.   When you say you're not carrying that          10:16:44

11   burden of proof, you believe others are, what do

12   you mean?

13     A.   My role here is actually fairly limited.

14   I have been asked to make certain calculations,

15   which I have done.  But I'm not here to draw any      10:16:55

16   causal linkage between the causes of action and any

17   actual computation of damages or demonstrating, you

18   know, what is the causal link between the sale of a

19   doll or sale of other accessories that go along

20   with the doll.                                        10:17:11

21     Q.   You understand someone else is carrying

22   that burden of proof?

23     A.   Yes.

24     Q.   Who?

25     A.   Well, my understanding is there will be        10:17:17

Exhibit 110 ,
P. 431

Page 27

1    Q.  Can you explain that distinction?                    10:24:20

2    A.  Well, for any of my calculations to be

3  relevant, they have to be something that's

4  recoverable based on proving a violation of

5  Mattel's rights.                                           10:24:34

6    Q.  Mm-hmm.

7    A.  And I'm not here and have not been

8  retained to draw that linkage.

9    Q.  Okay.  So you know that there are a wide

10 swath of products sometimes called -- referred to          10:24:48

11 as "SKUs"?  Are you familiar with that term,

12 "SKUs"?

13   A.  I am familiar with that term.  That's

14 Stock Keeping Unit.

15   Q.  There is a wide swath of SKUs that Mattel            10:25:00

16 claims infringe upon its intellectual property?

17        MR. FELDMAN:  I'm not sure what the phrase

18 "wide swath" means.  If you mean there is a number

19 of SKUs, then I agree with that.

20        THE WITNESS:  That's my understanding.              10:25:16

21 BY MR. ROTH:

22   Q.  And I take it from your previous testimony

23 that you're not offering an opinion as to which

24 SKUs may infringe upon that intellectual property

25 and which may not?                                          10:25:26

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 299

1    STATE OF CALIFORNIA   )

2         :ss

3    COUNTY OF SAN MATEO   )

4         I, CYNTHIA MANNING, CSR No. 7645, a

5    Certified Shorthand Reporter of the State of

6    California, do hereby certify:

7         That the foregoing proceedings were taken

8    before me at the time and place herein set forth;

9    that any witnesses in the foregoing proceedings,

10   prior to testifying, were placed under oath; that a

11   verbatim record of the proceedings was made by me

12   using machine shorthand which was thereafter

13   transcribed under my direction; further, that the

14   foregoing is an accurate transcription thereof.

15        I further certify that I am neither

16   financially interested in the action, nor a

17   relative or employee of any attorney of any of the

18   parties.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   DATED: March 25,2008

23

24

                    _____

25                  CYNTHIA MANNING, CSR No. 7645

# Exhibit 111

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4

5        - - - - - - - - - - - - - - - - - - - - - - - - -

6     CARTER BRYANT, an individual,       )

7                    Plaintiff,           )

8        vs.                              ) Case No.

9     MATTEL, INC., a Delaware            ) CV 04-9049

10    Corporation,                        ) SGL (RNBx)

11                    Defendants.         )

12    CONSOLIDATED WITH MATTEL, INC.,     ) Case No.

13    V. BRYANT and MGA ENTERTAINMENT,    ) 04-9059

14    INC., v. MATTEL, INC.               ) NM (RNBx)

15       - - - - - - - - - - - - - - - - - - - - - - - - -

16

17          CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19    VIDEOTAPED DEPOSITION OF CAROL A. SCOTT, Ph.D.

20              THURSDAY, APRIL 3, 2008

21

22

23

24

25    PAGES 1 - 288

Exhibit 111 ,
P. 434

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1

 2

 3

 4

 5

 6

 7

 8

 9        Videotaped Deposition of CAROL A. SCOTT,

10     Ph.D., taken on behalf of MGA Entertainment

11     Inc., at 525 University Avenue, Palo Alto,

12     California, commencing at 10:00 a.m.,

13     Thursday, April 3, 2008, before Cynthia

14     Manning, CSR No. 7645.

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 111 ,
P. 435

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

 3       FOR PLAINTIFF MATTEL, INC.:

 4

 5          QUINN EMANUEL URQUHART OLIVER & HEDGES

 6          BY:  SCOTT B. KIDMAN, ESQ.

 7          865 South Figueroa Street, 10th Floor

 8          Los Angeles, California 90017

 9          213.624.7707

10          sbk@quinnemanuel.com

11

12    FOR DEFENDANT MGA ENTERTAINMENT, INC. and

13    ISAAC LARIAN:

14

15       SKADDEN ARPS SLATE MEAGHER & FLOM LLP

16       BY:  CARL A. ROTH, ESQ.

17            RYAN WEINSTEIN, ESQ.

18       300 South Grand Avenue

19       Los Angeles, California 90071

20       213.687.5000

21       croth@skadden.com

22       rweinstein@skadden.com

23

24

25
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3      FOR DEFENDANT and COUNTERCLAIMANT CARTER BRYANT:

 4

 5          KEKER & VAN NEST LLP

 6          BY:  MATTHEW M. WERDEGAR, ESQ.

 7          710 Sansome Street

 8          San Francisco, California 94111

 9          415.397.7188

10          mwerdegar@kvn.com

11          (NOT PRESENT)

12

13

14    ALSO PRESENT:

15

16          DANIEL STROUD, VIDEOGRAPHER

17

18

19

20

21

22

23

24

25
```

Exhibit 111 ,
P. 437

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

1   resonant with consumers and their design and          14:49:09

2   attitude were important features.

3       Q.  Do you have an independent opinion about

4   what explains the success of the Bratz doll line?

5       A.  Well, I would say that I agree that -- and   14:49:21

6   my opinion would be that a key factor was this

7   design and attitude.

8       Q.  And that's what you meant to convey in this

9   paragraph?

10      A.  Well, what's conveyed in this paragraph is   14:49:34

11  what MGA said, but -- and, you know, the idea is

12  there to represent that opinion in this report.

13      Q.  As your opinion?

14      A.  Well, as something that they have said.  I

15  think later on in the rebuttal I might take this on  14:49:51

16  more, but in this particular report it was to report

17  MGA's view of the success.

18      Q.  Why is MGA's view relevant?

19      A.  Well, they're the ones that should know

20  their product really, and I think a lot of other     14:50:05

21  people say it as well.  But these are the people who

22  live and breathe that product.

23      Q.  What people are you talking about?

24      A.  Well, there would be people that work at

25  MGA obviously, but this particular paragraph was --  14:50:29

Exhibit 111 ,
P. 438

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 163

```
 1            THE VIDEOGRAPHER:  We're back on the         15:22:11
 2     record.  The time is 3:22 p.m.
 3     BY MR. ROTH:
 4         Q.  I take it you have never seen this report
 5     before?                                            15:22:19
 6         A.  I don't remember it, let's put it that way.
 7         Q.  Did you review other expert reports in this
 8     case?
 9         A.  Well, let's see what I remember seeing.  I
10     have seen expert reports from Dr. Joachimsthaler,  15:22:32
11     from Mr. Meyer, from Mr. Kidder, from Mr. Tonner,
12     although I don't remember a lot about his, just some
13     pieces of it because he is more the doll design
14     person.  More recently I have seen from Mr. Gruca --
15     Gruca or Gruca.  Hollander I have seen.  Hollander  15:22:55
16     or Hollinger.  I can't remember.  And then there is
17     a few others that have probably gotten skimmed at
18     one point in time.  So I have seen some of those,
19     but not -- I'm sure I haven't seen everything in
20     there.                                             15:23:13
21         Q.  You have seen the report of a Thomas Gruca?
22         A.  Yes.
23         Q.  What's your opinion of that report?
24         A.  Well --
25            MR. KIDMAN:  Objection; overbroad, assumes   15:23:20
```

Exhibit 111
P. 439

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 164

1   facts not in evidence.                                    15:23:23

2         ·   THE WITNESS:  He did a survey of consumers,

3   children -- well, moms and girls.  And he comes to

4   some conclusions.  I don't -- I would not find that

5   terribly reliable for varied reasons.                     15:23:46

6   BY MR. ROTH:

7         Q.  Which are the reasons?

8         A.  Well, simply start, if I can get most of

9   them for you just by recollection.

10        There are a couple of things about his           15:24:06

11  report that are not clear, so they cause some

12  questions.  Maybe just start from the beginning.

13        I don't know where or how he got people to

14  respond to his survey.  He doesn't provide any

15  information about that.  I know that this was done    15:24:22

16  on the internet and he got people to respond to a

17  survey on the internet, but I don't know how they

18  were recruited.  So I don't know if he went through

19  a company that has a panel, whether he put a -- you

20  know, he probably didn't, but just to make something  15:24:39

21  crazy up, I don't know whether he put a banner ad on

22  the Be-Bratz website and said answer a survey; I

23  just don't know.

24        And I didn't read it in all that detail, so

25  maybe there are things in there that I missed, but   15:24:53

Exhibit  111  ,
P.  440

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 165

1    one of the questions is are you a male or female.        15:24:55

2    So I guess he didn't know to start with who you

3    were, so it must have been a reasonably broad

4    invitation.   I don't know what the people were told

5    they were going to do or anything like that and        15:25:07

6    that's often an important thing to know about the

7    context of how the survey was done.

8          He then goes through some questions where

9    he asks -- presumably he asks the mom and then he

10   asks the girl, the daughter, to come to the computer   15:25:23

11   and answer some questions.

12         The question that he asked the daughters to

13   answer, I believe that was the question where he

14   asked them to divide a hundred points between a

15   certain number of attributes or features of dolls.     15:25:39

16   And the only problem with that is that he says that

17   his sample of girls is from ages 4 to -- maybe 4 to

18   12, and he gives me a mean age of somewhere I think

19   8, but I don't know what the distribution of ages

20   is.                                                     15:26:01

21         So I just don't know how many four-year

22   olds can really do this job by themselves.  If I ask

23   an average four-year-old to take a hundred points

24   and add and subtract -- may be some out there, but

25   my kid at four wouldn't have been a very reliable      15:26:16

Exhibit ___,
P. ____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 166

1    person to do that kind of task.  So it makes me --        15:26:20

2    it just makes me wonder a little bit about the

3    reliability of that information.

4         He does mention that -- in his opening

5    introduction about the study, he mentions that there   15:26:33

6    has been some research to suggest that these

7    self-explication methods, meaning methods where I

8    ask you directly how important something is, have

9    been shown to be effective -- equally or more

10   effective than conjoint analysis.                       15:26:50

11        And he cites a review paper which I looked

12   at this week, and the unfortunate part about that is

13   that the author of that paper reviewed maybe 23

14   studies in which sometimes conjoint was better,

15   sometimes self-explication was better, sometimes       15:27:07

16   they were the same.  But it's not all

17   self-explication methods that have been shown to be

18   better than conjoint or as reliable as conjoint.

19        And, in particular, the author points out

20   that simple methods of self-explication have, you      15:27:22

21   know, these obvious disadvantages where he doesn't

22   include those in his study.  He only looks at one.

23   There is only one method of self-explication that he

24   included in his review and that was not the one that

25   was used here.  So his premise that his method has     15:27:38

Exhibit 111 ,
P. 442

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 167

1   been shown to be as effective or more effective than   15:27:42

2   conjoint doesn't hold up, at least as far as I can

3   tell from the work he cited.

4          There is some people at UCLA that I talked

5   to about conjoint and, you know, it's clear that   15:27:53

6   most of this research that's going on, which is

7   ongoing to try to find an alternative to conjoint,

8   it's not simple self-explication methods that

9   they're looking at.

10          So, you know, that's just a question about   15:28:07

11   method.  It's a question about the appropriateness

12   of the method for four-year-olds or even

13   five-year-olds or six-year-olds, for all that I

14   know.

15          I also don't know where did he get his   15:28:18

16   factors.  I'm not sure -- he asked them -- and I

17   can't remember all the ones he asked them to divide

18   the hundred points between.  But I don't know where

19   those came from.  Were those things that girls

20   themselves kind of volunteered or were those things   15:28:35

21   that they got from other people.  I don't know where

22   they came from.  They don't all appear to be totally

23   independent of each other.  There could be some

24   interrelationships between them or have multiple

25   things about them.   15:28:50

Exhibit 111 ,
P. 443

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 168

1          So, you know, at best, what you could say          15:28:51

2    about that is it might have -- might give some

3    indication about the relative importance of things.

4    In that sense, I noted that the factor that got more

5    points than anything else was the design or          15:29:06

6    appearance of the doll.  That was I think like 18

7    and everything else was -- there were other factors

8    that got less than that.

9          So, relatively speaking, you could say that

10   that one came out as being more important than the          15:29:21

11   others; but, again, I'm not sure I would put much

12   faith in the absolute number that he gets, just

13   because it's -- there is too much I don't know about

14   it and it's a little squirrely in terms of asking

15   kids to do that kind of task.          15:29:38

16        Q.  Anything -- any other criticism?

17        A.  Other than -- no, there might be a few

18   others if I spent more time with it, but that's

19   really kind of my initial take on it.

20        Q.  How much time did you spend reviewing the          15:29:52

21   report?

22        A.  Not that much really, maybe two, three

23   hours.  You know, the way he presents the findings

24   is also a little strange.  It's more in terms of

25   like a -- it's done more like PowerPoint, oral          15:30:07

Exhibit 111
P. 444

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 169

```
 1   presentation than rather detailed numbers.  That's      15:30:10
 2   why you get these averages instead of the
 3   distribution of things.  And I haven't looked at
 4   every single slide in that in detail.  So, you know,
 5   I may find some other things or maybe I'll find some   15:30:23
 6   of those things have been -- questions have been
 7   answered; I don't know.
 8        Q.  Have you discussed with the report with
 9   anyone?
10        A.  With who?                                      15:30:32
11        Q.  Anyone.
12        A.  Anyone.  I did talk with Mr. Kidman
13   yesterday about that and, you know, just tell him
14   kind of what my reaction was to it.
15        Q.  Anybody else?                                  15:30:43
16        A.  Brian and Tim.  I always talk to them about
17   everything.
18        Q.  Why did you talk to Brian and Tim about it?
19        A.  Those are kind of my reality check people;
20   you know, that I'll look at something and I'll say:      15:30:55
21   Did you see that same thing?  Or What did you see?
22   Or Am I crazy about this?  Or What do you know about
23   something?  And they are just my soundingboards.
24        Q.  Okay.  Focusing now on Denise Van Patten,
25   would you look at page 7 of her report.  She has in      15:31:13
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 246

1    litigation context or the consulting context at          17:49:32

2    CrossField to measure the various attributes of a

3    product that enhance or detract from the brand of

4    the product?

5            MR. KIDMAN:   Objection; vague and              17:49:49

6    ambiguous.

7            THE WITNESS:   Well, I hope they would

8    phrase the question a little bit more clearly for

9    me, because I'm not entirely sure what that means,

10   but would I ever be asked to examine attributes of a  17:50:02

11   brand, sure.

12   BY MR. ROTH:

13       Q.   No, what I mean is, in connection with the

14   work that you do for a client, would you be asked to

15   take a look at a client's brand and then to           17:50:13

16   understand what is enhancing that brand or maybe

17   detracting from that brand?

18       A.   You know, I might be asked to do some

19   consumer research to understand positives and

20   negatives, yes.                                        17:50:31

21       Q.   So the following things are helping you,

22   helping your brand, the following things are hurting

23   your brand?

24       A.   Right, yes.

25       Q.   And you might do research to try to           17:50:39

Exhibit 111,
P. 446

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 247

1    determine that?                                          17:50:42

2        A.   Yes.

3        Q.   Okay.   So -- and it's your professional

4    opinion that the design of a product is an attribute

5    of a product that might affect a brand; is that         17:50:50

6    right?

7        A.   Yes.

8            MR. KIDMAN:   Objection; vague.

9    BY MR. ROTH:

10       Q.   So the design of a product might enhance or    17:50:57

11   detract from the brand of that product; is that

12   right?

13       A.   Yes.

14       Q.   And how would you go about determining

15   whether or not the design of the product enhances or    17:51:13

16   detracts from the brand of the product?

17       A.   Well, you know, there is a series of steps

18   that you could go through, and, again, you know,

19   designing studies on the fly is probably not the

20   best way to design them, but I can give you a couple     17:51:28

21   of initial thoughts.

22           You know, there is everything from the very

23   simple questioning about asking people about certain

24   attributes, but probably at some point you would

25   want to do some experimentation where -- you know,       17:51:47

Exhibit 111,
P. 447

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 248

1    after you do the kind of -- you know, I might start    17:51:51

2    with some focus groups, where people might tell me

3    about the product; whatever you want to say, tell me

4    about the product.

5            And then on the basis of that that I might    17:52:01

6    get from them, elicit some notions about attributes

7    that stand out to them that they comment upon.  And

8    then I might design some more, you know, pointed

9    questions in that direction to see what I get with

10   the self-explicated kind of a question about tell me    17:52:14

11   what you like or don't -- what does look good or

12   what doesn't, what's gotten in your way with this

13   product.  There might be a variety of ways to ask

14   that question.

15           And then at some point I would probably    17:52:29

16   want to do some experimentation, where based upon

17   what they're telling me I could create different

18   treatments, if you will.  So I could create a

19   product that has this design, a product that has

20   that design, and then do some experimentation to see    17:52:44

21   which one consumers respond to better.

22           Because sometimes they can't always tell

23   you, you know.  Some things are kind of not -- I

24   don't want to say subliminal, but sometimes we're

25   not -- our rational self takes over and we don't    17:53:02

Exhibit 111 ,
P. 448

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 249

```
1    often just -- we can't sort of say exactly what we    17:53:05
2    respond to visually.  But I would try to do some
3    experimentation with it.
4         Q.  Did you do any of those -- any of that work
5    in this case?                                          17:53:15
6         A.  No.
7         Q.  Do you have any plans to do any of that
8    work in this case?
9         A.  Not sitting here today.
10        Q.  Okay.  I want to go back, if we could to --  17:53:22
11   see if I can find it.  It's your Transamerica
12   report, which -- that right there, exactly.
13        A.  Thanks.
14        Q.  And could you just -- if you need to read
15   it a little bit to familiarize yourself or remind     17:54:08
16   yourself of what you did.
17        A.  (Witness reviewing document.)
18            Yes.
19        Q.  Can you just explain for us in summary form
20   what you did in connection with this report, what     17:55:20
21   conclusions you reached.
22        A.  Okay.
23            MR. KIDMAN:  Objection --
24            THE WITNESS:  I think it's helpful to --
25            MR. KIDMAN:  -- overbroad.                    17:55:27
```

Exhibit 111 ,
P. 449

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 281

1    STATE OF CALIFORNIA    )

2                                          :ss

3    COUNTY OF SAN MATEO    )

4         I, CYNTHIA MANNING, CSR No. 7645, a

5    Certified Shorthand Reporter of the State of

6    California, do hereby certify:

7         That the foregoing proceedings were taken

8    before me at the time and place herein set forth;

9    that any witnesses in the foregoing proceedings,

10   prior to testifying, were placed under oath; that a

11   verbatim record of the proceedings was made by me

12   using machine shorthand which was thereafter

13   transcribed under my direction; further, that the

14   foregoing is an accurate transcription thereof.

15        I further certify that I am neither

16   financially interested in the action, nor a relative

17   or employee of any attorney of any of the parties.

18        IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   DATED: April 7, 2008

22

23

24   _____

25        CYNTHIA MANNING, CSR No. 7645

Exhibit 111 ,
P. 450

# Exhibit 112

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

|  |  |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>———————————————————<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>**REBUTTAL EXPERT REPORT OF<br>CAROL A. SCOTT** |

## CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 112 ,
P. 451

## I.  QUALIFICATIONS

1.      I am a Professor of Marketing at the Anderson Graduate School of Management of the University of California, Los Angeles ("UCLA"). I hold a Ph.D. in Marketing from Northwestern University, where my minor field of study was Social Psychology. I also received a Master of Science in Management degree from Northwestern University and a Bachelor of Science in Business and History Education degree from the University of Texas at Austin. I have served variously as the Chairman of the Faculty, Associate Dean, and Assistant Dean of the Anderson Graduate School of Management from 1985 through 1994. I am currently the faculty director of the Anderson School Executive Program.  A true and correct copy of my Curriculum Vitae, including a list of publications, is attached as Exhibit 1 to my previous report in this matter, the Report of Carol A. Scott, Ph.D., dated February 11, 2008.

2.      Over the past thirty years, I have taught courses on Marketing Strategy and Management, Consumer Behavior, Advertising, Distribution Strategy, and International Marketing to students in undergraduate and graduate education programs at UCLA, Harvard Business School, and Ohio State University. I also have published numerous journal articles, research reports, and book chapters on Consumer Behavior, Marketing Research and other marketing topics. I have served on the editorial boards of the *Journal of Marketing*, *Journal of Marketing Research*, and the *Journal of Consumer Research*. I have been a member of the board of directors for Sizzler International and A-Fem Medical Corporation, Inc. and currently am a member of the board of directors of United Online and Classmates Media Corporation. Over the past 25 years I have served as a consultant and testifying expert for a variety of marketing issues. During the past four years I have provided expert testimony in trial or by deposition in the matters listed as Exhibit 2 in my February 11, 2008 report.  My current hourly rate is $550.

3.      I have been retained by Quinn Emanuel Urquhart Oliver & Hedges as an independent expert witness to testify on behalf of Mattel, Inc. ("Mattel").

## II.     THE ISSUES FOR WHICH I WILL GIVE AN OPINION

4.     Previously in this matter, I submitted the Report of Carol A. Scott, Ph.D., dated February 11, 2008, (the "Scott Report"). I have now been asked by counsel for Mattel to respond to the report of Dr. Erich Joachimsthaler (the "Joachimsthaler Report"), and to the report of Mr. Paul K. Meyer (the "Meyer Report"), both dated February 11, 2008, and prepared on behalf of MGA Entertainment, Inc. ("MGA").

## III.    SUMMARY OF OPINIONS

5.     Having reviewed and analyzed the Joachimsthaler Report and the Meyer Report, as well as data available to me, I have concluded the following:

6.     While I agree with Dr. Joachimsthaler that the Bratz brand has been and is an extremely valuable asset for MGA, one of the most basic and fundamental factors for Bratz' success was the design and appearance of the dolls. At the time the dolls were introduced, they were significantly different from other fashion dolls on the market and their appearance and design provided a platform from which to appeal to the "tween" market.

7.     The marketing and branding activities used by MGA were not particularly unique. As stated by Dr. Joachimsthaler and Mr. Meyer, MGA engaged in a number of marketing and branding activities designed to enhance the sales of Bratz. These include activities related to the traditional four elements of the marketing mix: product, price, promotion, and distribution of the dolls. As Dr. Joachimsthaler has stated, however, these initiatives followed classic marketing and branding strategy, and indeed would be expected of any company trying to sell its product in today's toy marketplace.

8.     The ability of MGA to extend and license the Bratz brand was, and is, dependent upon the success of the Bratz dolls. Dr. Joachimsthaler and Mr. Meyer both note that MGA successfully leveraged the Bratz brand by introducing many accessories and line and brand extensions and by licensing the brand to other companies for use in selling their own goods and services. As noted in the Scott Report, had the Bratz dolls been unsuccessful, it is unlikely that these other products would have been introduced or that outside parties would have been

2

Exhibit 112 ,
P. 453

interested in licensing the Bratz images to use in helping to sell their products.

9.     To the extent that Dr. Joachimsthaler's assertion that MGA was able to charge a premium over the price that would have been commanded by an unbranded alternative is true,[1] Dr. Joachimsthaler has not indicated what portion of that premium is due to the appearance and the design of the dolls.

10.     Mr. Meyer's listing of several "apportionment factors" he states were important in making the Bratz dolls and related lines of business successful is not based upon the degree to which each actually _was_ valued in the marketplace, and thus actually did contribute to the Bratz success.  Mr. Meyer has not performed consumer research or other analyses to quantify his "apportionment factors," and has instead simply relied upon opinions of MGA experts and executives.

## IV.     BASIS FOR OPINIONS

### A.     Role of the Appearance and Design of the Dolls in the Success of Bratz

11.     As I had noted in the Scott Report, in the mind of the consumer, the brand is closely tied to the product.  As stated by brand authority Dr. Kevin Keller, "The product is at the heart of brand equity."[2]  In the Joachimsthaler Report, Dr. Joachimsthaler depicts the central role of the product in the following diagram [_see_ Joachimsthaler Report, page 10]:

---

[1] While the notion of an unbranded alternative is a useful conceptual device, it is not clear what this would be in practical terms, _i.e._, a generic fashion doll that does not look like Bratz and does not carry its name, a doll that looks like Bratz but has no associated advertising or marketing, or some other configuration.   Any branded doll would be expected to allow a price premium over 'unbranded' alternatives, and Dr. Joachimsthaler does not indicate whether the margin on Bratz dolls (e.g., the revenues minus associated costs) is larger than other branded dolls on the market.

[2] Keller, Kevin Lane, _Strategic Brand Management_, 3rd edition, Pearson Education, Upper Saddle River, New Jersey, 2008, p. 199.

Exhibit 112
P. 454



In this diagram, Dr. Joachimsthaler shows the product to be a central node around which other associations are closely connected.

12.     Dr. Joachimsthaler further lists four components of a good and proactive system of brand management in his evaluation of the success of the Bratz line of products. These include the brand identity and position, the brand architecture, organizational structures and processes, and brand building programs.[3]  A brand identity system is composed of concepts and elements that fit together in a coherent and logical way. These include differentiating attributes around which brand meaning is built, brand personality, and the use of various brand symbols.[4] Brand architecture refers to the line of products as a "team that functions together as a unit to create synergy, clarity and leverage." The Bratz brand architecture includes sub-brands (e.g., the four individual Bratz dolls introduced under the umbrella Bratz name), themes, and various brand extensions and licensed products.[5]

13.     It is clear, however, that the appearance and design of the Bratz dolls was an integral part of this system.  Each of the elements of the Bratz identity system includes some aspect of the appearance and design of the dolls. For example, the key differentiating attributes

---

[3] Expert report of Dr. Erich Joachimsthaler, pp. 18-19.  *See* also, generally, David Aaker and Erich Joachimsthaler, *Brand Leadership:  The Next Level of the Brand Revolution*, The Free Press, New York, 2000, p. 194-195
[4] *ibid.,* pp. 21-25.
[5] *ibid.,* pp. 27-31.

include "diversity including ethnic diversity." The four Bratz dolls were designed to "resemble a mix of Hispanic, Caucasian, Asian and African American" ethnicities.[6] As Isaac Larian is quoted, "Not everybody is blond and six foot two inches and has perfect proportions: We're going to make these dolls multiracial, mix and match."[7]

14.    In his discussion of brand personality, Dr. Joachimsthaler mentions the markedly different character expressions of Bratz as compared to Barbie as a contributing factor.[8] As MGA itself has stated, the Bratz dolls, as designed and developed by Carter Bryant, and so named to "denote hip and cool young adolescent or teenage girls," are "unique in a variety of ways including their oversized heads and individual facial decoration," and that "[t]his idea of hip and cool is born out in the design of the BRATZ dolls."[9] Additionally, author Eric Clark noted what girls saw when presented with Bratz was:

> ". . . a lavishly made-up doll with a bored expression, its eyes heavy-lidded and larded with color. The lips were bee-stung, the body curvaceous. Oversized heads were emphasized by the skinniness of the rest of the body. The clothes were skimpy, ultra-fashionable, perched over pert little bottoms. Next to his doll he [Larian] put Barbie and then asked what Barbie reminded them of. "Our mothers," they replied."[10]

Dr. Joachimsthaler states that the Bratz characters "broke stereotypical molds and ideas about body image."[11]

15.    Another element noted by Dr. Joachimsthaler as being important to building a consistent and coherent brand identity is "the symbol."[12] Visual elements in general include "symbols, trademarks, taglines, colors, brand characters, or design aspects of the physical features of products, labels on the product, packaging or promotional materials that provide a

---

[6] *ibid.*, p. 31.
[7] Eric Clark, *The Real Toy Story: Inside The Ruthless Battle for America's Youngest Consumers*, Free Press, New York, 2007, p. 93, and quoted in the Expert Report of Dr. Erich Joachimsthaler, p. 22.
[8] Expert Report of Dr. Erich Joachimsthaler, p. 23.
[9] MGA0883922-3927
[10] Eric Clark, *The Real Toy Story: Inside The Ruthless Battle for America's Youngest Consumers*, Free Press, New York, 2007, p. 93, and quoted in the Expert Report of Dr. Erich Joachimsthaler, pp. 89-90.
[11] *ibid.*, p. 22.
[12] Expert Report of Dr. Erich Joachimsthaler, p. 23.

sort of 'glue' or structure that helps hold the various elements of the brand together into a coherent brand identity system making it easier to gain recognition or recall."[13]  In his discussion of Bratz use of symbols, Dr. Joachimsthaler notes the role of product design, "which is important in the fashion doll category."[14]  In keeping with a design trend of distorting people and objects, the Bratz design "involved creating oversized heads and huge lips, but keeping them to a 'softened' proportion that would still speak to girls of the ages 7 to 12 . . . . The big head and somewhat distorted facial features allowed the doll 'to go beyond the box' and fashion herself as an expressive and stylistic creation."[15]

  16. Elements of the appearance and design of Bratz are also evident in Dr. Joachimsthaler's discussion of the second component of a proactive system to manage brands, brand architecture.  The brand architecture in this matter refers to the collection of Bratz products taken as a "team" or as a whole.  Dr. Joachimsthaler includes the four original Bratz dolls – Cloe, Sasha, Jade and Yasmin – as sub-brands under the umbrella "Bratz" brand.  Having four different sub-brands allows girls ". . . to have different relationships with these dolls."[16]

  17. In terms of brand building programs, Dr. Joachimsthaler describes in some detail various marketing and branding programs that MGA conducted in order to build the brand equity for the Bratz line.  For example, MGA engaged in an extensive advertising campaign using a variety of media to achieve a high level of awareness among the target market.  In addition to this, MGA used an "open packaging" system to increase the visual impact on store shelves.  The Bratz packaging does this, in part, through its clear structure which "allows for almost the entire product to be seen on all sides and lets the doll and accessories to shine through."[17]

  18. In addition, Dr. Joachimsthaler notes that MGA has engaged in activities designed

---

[13] David Aaker and Erich Joachimsthaler, *Brand Leadership:  The Next Level of the Brand Revolution*, The Free Press, New York, 2000, p. 54, as quoted in the Expert Report of Dr. Erich Joachimsthaler, p. 24.
[14] Expert Report of Dr. Erich Joachimsthaler, p. 24.
[15] *ibid.*, p. 25.
[16] *ibid.*, p. 27.
[17] Expert Report of Dr. Erich Joachimsthaler, pp. 33, and 36-37.

Exhibit 112 ,
P. 457

to create strong, favorable and unique brand associations for Bratz.[18]  Many of these associations held by mothers of tweens, whether positive, negative, or neutral, relate to aspects of the appearance and design of the dolls:  cute, pretty, beautiful, big features, ugly, and strange looking.[19]

19.     Thus, I conclude that appearance and design of the Bratz dolls was an integral part of the brand identity/position and brand architecture that contributed to the success of the Bratz brand.  In addition, I conclude that Bratz dolls' appearance and design at issue in this case played an important role in a number of MGA marketing and branding activities.

**B.     Marketing and Branding Programs Conducted by MGA**

20.     In evaluating the marketing and branding programs conducted by MGA, Dr. Joachimsthaler reaches the conclusion that "MGA Entertainment engaged in the classic brand-building activities that I would expect from an entrepreneurial-minded company,"[20] and I agree that the manner in which MGA went about marketing the Bratz products and creating the Bratz brand followed well-known marketing and branding theory and practice.[21]  MGA created a "whole product" by offering a line of accessories, *e.g.*, doll fashions, designed to be used with the Bratz dolls, and used "themes" to provide the story line that would include the dolls, the dolls' fashions, and other accessories.  Further, MGA leveraged the original Bratz products, using them to help sell brand extensions and to attract a variety of licensees that wished to use Bratz to help sell their own merchandise.  MGA distributed the Bratz products through important retail outlets and engaged in a variety of programs to obtain significant shelf space.  Promotion through a variety of advertising media, packaging, and other mechanisms was used to support the sale of the Bratz product line.  These activities would be expected of any company selling its

---

[18] *ibid.*, p.39-45.
[19] *ibid.*, p. 40.
[20] Joachimsthaler Report, at 87.
[21] *See*, for example, the classic marketing management textbook: Kotler, Philip and Kevin Lane Keller, *Marketing Management*, 12th ed. (Upper Saddle River, New Jersey:  Pearson/Prentice-Hall, 2007); *see also* Keller, Kevin Lane, *Strategic Brand Management, 2nd ed.* (Upper Saddle River, NJ:  Prentice Hall, 2003

Exhibit 112 ,
P. 458

product in today's competitive marketplace.

21.     Indeed, none of these marketing and branding programs was particularly unique. For example, Dr. Joachimsthaler notes the sub-brands and other doll "friends" and characters which were introduced to flank the original dolls and provide a more complete world for them. As early as 1961, however, Mattel had used this same strategy to introduce Barbie's boyfriend, Ken.  Mattel has developed a host of Barbie family and friends, and has a Barbie Family Tree that lists them all, complete with pets, horses, dogs, and kittens.[22]  Similarly, both Dr. Joachimsthaler and Mr. Meyer discuss the importance of creating "themes" to encompass the various dolls and accessories.[23]  Themes have been used by other dolls, however, and in particularly by Mattel for its Barbie doll.  Some of these are described by Dr. Joachimsthaler, while others are noted by Mr. Meyer.   In discussing Mattel's "Worlds of" theme strategy for the My Scene Barbie line, Mr. Meyer quotes Mattel CEO Robert Eckert:

> "We have a lot of confidence that this Worlds Of strategy is the right strategy.  It goes back to looking at what has done well even in Barbie's tough period, that is the entertainment properties like Swan Lake or Rapunzel or Nutcracker as well as My Scene … this content driven strategy we know appeals to girls."[24]

**C.      MGA Successfully Leveraged the Bratz Brand Through Brand Extensions and Licensing**

22.     Both Dr. Joachimsthaler and Mr. Meyer discuss the successful brand extensions introduced by MGA, as well as the multitude of licensing relationships which allow third parties to use the Bratz images and brand name on products.[25]  Both of MGA's experts note how these brand extensions and licensed products help to extend the meaning and scope of the Bratz brand. As noted in my earlier report, however, these brand extensions and licensing opportunities were made possible by, and are still to a large degree dependent upon, the success of the Bratz dolls.[26]

---

[22] Eric Clark, *The Real Toy Story*, p. 85.
[23] *See* Expert Report of Dr. Erich Joachimsthaler, pp. 27-29. and Expert Report of Dr. Paul K. Meyer, pp. 19-30.
[24] Earnings call, first quarter, 2004, as quoted in Expert Report of Dr. Paul K. Meyer, p. 22.
[25] Expert Report of Dr. Erich Joachimsthaler, pp. 29-30 and Expert Report of Paul K. Meyer, pp. 39-40.
[26] Expert Report of Dr. Carol A. Scott, pp. 4-9.

Exhibit 112 ,
P. 459

23.    The first accessories were sold for use with the dolls themselves. Line extensions such as new series of Bratz branded dolls were introduced in 2002 as were Bratz branded fashion and other accessories for girls. Although Bratz undoubtedly was launched with the idea of leveraging the Bratz dolls through line and brand extensions and licensing deals in mind,[27] the realization of these opportunities depended upon the dolls being successful in the marketplace. As I have earlier noted, a March 2001 business plan warned that "The only risk involved is that the Bratz dolls do not sell-through at retail."[28]

**D.    The Role of Bratz Appearance and Design Vs. Other Factors in Producing Any Price Premium for Bratz Products Has Not Been Demonstrated**

24.    Dr. Joachimsthaler estimates that MGA has been able to achieve a price premium for the Bratz brand over an "unbranded equivalent of 50% to 70%.[29] It is somewhat difficult to evaluate this claim since it is not clear exactly what is meant by the "Bratz brand" and an "unbranded equivalent." One possibility is that Dr. Joachimsthaler means that any product could be priced 50% to 70% higher if it carries the Bratz name/brand than if it has no brand name attached to it at all.[30] If this is the case, then two observations can be made. First, many brands are able to achieve a price premium over an "unbranded" alternative. Thus, a relevant question would be to what extent does the Bratz brand achieve a higher premium than other brands, *i.e.*, what is the benefit of using the Bratz as opposed to another brand name? Second, assuming that the Bratz brand can command a higher price premium than an unbranded equivalent or other brand names, to what extent is this premium due to the appearance and design of Bratz, as opposed to other factors? As I have shown above, the features and design of the Bratz dolls have been an important and integral part of building the Bratz brand identity and architecture, and thus one would expect that a substantial portion of any price premium achieved

---

[27] MGA 0883923
[28] MGA 4033303
[29] Expert Report of Dr. Erich Joachimsthaler, p. 66.
[30] It is important to note that Dr. Joachimsthaler appears to refer to a premium price, and not to larger gross margins or profits. Gross margins or profits would require the additional consideration of costs. Branded goods may sell for a higher price, but they may also incur greater costs due to promotional costs among others.

would be due to them.

**E.      Mr. Meyer's Apportionment of Bratz' Profits Is Not Based on the Evidence Regarding the Actual Importance of the Identified Factors to Consumers**

25.      In the Meyer Report, Mr. Meyer attempts to apportion MGA's profits on its Bratz products to a number of identified factors.[31]  He does this using a variety of approaches, including an attempt to link certain creative elements involved in the development of a fashion doll with "Key Fashion Doll Attributes" used by Mattel.[32]  Other approaches include an analysis of the royalties paid by MGA to Mr. Carter Bryant; the work tasks to develop the original doll; MGA's product development contributions; licensing agreements; MGA investments in the Bratz product line; and variations among different Bratz products.[33]  None of these approaches, however, is able to tell us how important the appearance and design was to consumers in their decision to purchase a Bratz doll.

26.      The approach that is closest to one based on the actual importance of factors to consumers is the one in which Mr. Meyer attempts to link creative elements involved in the development of a fashion doll, *i.e.*, "apportionment factors", to doll attributes that Mattel used in its consumer research to track consumer opinions about various brands of dolls, *i.e.*, "Key Fashion Doll Attributes."  The apportionment factors were based primarily on input from MGA executives and expert witnesses with a background in doll design.  These included:  (1) Doll Design – no hair; (2) Design/Hair; (3) Themes; (4) Fashions; (5) Accessories; (6) Characters; and (7) Marketing.  For reasons not given in his report, Mr. Meyer does not include an apportionment factor called "Packaging."[34]

27.      According to Mr. Meyer, the copyrighted works at issue in this matter relate to factors (1) and (2) above, *i.e.*, "doll design – no hair", and "design/hair."  Again, the basis for

---

[31] Expert Report of Mr. Paul K. Meyer, dated February 11, 2008.
[32] These attributes were used by Mattel in various consumer research studies to track the performance of various doll brands.
[33] *ibid.*, p. 6.
[34] *ibid.*, p. 46.

this characterization is discussions with MGA executives and experts. This assignment of contribution to only these design factors, however, is not entirely consistent with Mr. Meyer's discussion of some of these apportionment factors. For example, his discussion of the development of the Bratz characters includes several references to the appearance and design of the dolls and the Bratz name:

> ". . . having a rebellious attitude. This is their leading thought that navigates their brand – starting with the name 'Bratz'."[35], and

> "Aesthetically, Bratz had a completely different animated look . . . In this case, the competitive threat was based on a unique brand positioning and product execution that was relevant and resonated with older girls."[36]

28.    Mr. Meyer's next step is to try to link these creative elements to attributes used in consumer research studies used by Mattel in tracking attitudes and opinions about various brands of dolls. These "Key Fashion Doll Attributes" include: (1) Fun, (2) Cooler, (3) Prettier, (4) Clothes, (5) Friends, (6) Stuff, (7) Be Like, and (8) Hair. Because these attributes were used in tracking studies over a period of 18 months, they are assumed to be important elements of consumers' attitudes toward the brands. It is noteworthy, however, that Mr. Meyer presents no data to indicate whether these eight attributes were equally important to consumers, or whether some were more important than others. It appears that Mr. Meyer treats each of these attributes as equally important.[37]

29.    Next, Mr. Meyer categorizes each apportionment factor in terms of whether or not it contributes to each of the Key Fashion Doll Attributes. Based on discussion with MGA expert Robert Tonner, Mr. Meyer determines that "Doll Design (No Hair)" contributes to four of the eight "Key Fashion Doll Attributes," and that "Design/Hair" contributes to two attributes, one of which overlaps with the "no hair" design factor. Thus, "Design" (both no hair and hair) is said to contribute to "fun", "cooler", "prettier", "friends", and "hair", for a total of five of the eight

---

[35] Email, "My Scene," November 17, 2005, Y&R000152-154, quoted in Expert Report of Paul K. Meyer, p. 31.
[36] "The Bratz Brief", November 14, 2003, M0079765-71 at 68, quoted in Expert Report of Paul K. Meyer, p. 32.
[37] Expert Report of Mr. Paul K. Meyer, pp. 42-47.

attributes. All other apportionment factors are similarly categorized.

30.    Like Mr. Meyer's designation of which apportionment factors relate to the copyrighted works at issue in this case, this categorization is arbitrary and subjective at best, and totally based upon other experts' opinions -- not consumers. For example, Mr. Meyer and MGA expert Robert Tonner determined that "themes" and "fashions" contributed to girls' ratings of wanting to "Be Like" the dolls, but that "doll design" (hair and no hair) and accessories did not.[38]

31.    As his last step, Mr. Meyer counts all of the instances of contributions of apportionment factors to key fashion doll attributes and calculates the proportion of the total accounted for by each apportionment factor. Since there were 26 total instances of apportionment factors contributing to key attributes, Mr. Meyer divides the four instances attributed to Doll Design (he does not count "hair" as contributed by Design/Hair) by the total of 26 to arrive at his conclusion that Doll Design accounts for 15.4% of MGA's profits.[39]

32.    This method fails on several counts. First, it is not clear that each of the eight key fashion doll attributes should be weighted equally in terms of their ability to generate sales of, or revenue for, the brand.[40] That is "fun" or "cooler" are assumed to be on equal footing with "themes", "fashions", etc. Second, any interaction between key fashion doll attributes has not been taken into account. That is, to what degree do "prettier" and "clothes" and "friends" contribute to "fun"? Third, relationships between apportionment factors have not been taken into account. For example, would fashions and accessories contribute as much to "be like" if they had been connected to a different doll design?

33.    In sum, this approach does not provide us with reliable evidence as to the importance of Bratz' appearance and design in consumers' decisions to purchase the Bratz brand and thus its weight in producing sales or profits.

---

[38] Expert Report of Mr. Paul K. Meyer, p. 45.
[39] *ibid.*, p. 46.
[40] I note that data that relates most plausibly to sales or revenues is being used to make inferences about profits.

12

Exhibit 112 ,
P. 463

## V.    DATA AND OTHER INFORMATION CONSIDERED

34.    My testimony is based on my review of documents produced to date in this case, deposition transcripts, and the sources and information cited in this report. A list of documents considered is listed in Exhibit 1.

35.    I am continuing my analysis. I may review other documents and information that may become available during the course of this litigation. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions.

## VI.    EXHIBITS TO BE USED

36.    I may rely on one or more of the documents and deposition testimony identified in Section V above. I may also rely on demonstrative exhibits. I may also rely on the trial testimony and trial exhibits of the parties' witnesses.

## VII.    COMPENSATION

37.    I am being compensated for my work in this case at the rate of $550 per hour. My compensation is not dependent at all upon the outcome of this matter.

## VIII.    PRIOR TESTIMONY AND PUBLICATIONS

38.    I have testified as an expert at trial or by deposition within the preceding four years as set forth in Exhibit 2 of the Scott Report.

39.    A list of my publications for the preceding ten years can be found in my CV (*See* Scott Report, Exhibit 1).

My understanding is that some of this testimony is covered by protective orders.

March 17, 2008

*Carol A. Scott*

CAROL A. SCOTT

Exhibit 112,
P. 465

**Exhibit 113**

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Exhibit 114

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4

5      --------------------------------

6    MATTEL, INC., a Delaware         )

7    Corporation,                     )

8                  Plaintiff,         )

9              vs.                    ) No. CV 04-9059

10   CARTER BRYANT, an individual;    )    NM (RNBx)

11   and DOES 1 through 10,           ) VOLUME I

12   inclusive,                       )

13                  Defendants.       )

14   --------------------------------)

15   (COMPLETE CAPTION ON NEXT PAGE. )

16

17         CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19      Videotaped Deposition of KENNETH HOLLANDER,

20      taken at 300 South Grand Avenue, Los Angeles,

21      California, commencing at 9:37 a.m., Wednesday,

22      April 16, 2008, before Janice Schutzman,

23      CSR No. 9509.

24

25   PAGES 1 - 164

Exhibit 114 ,
P. 472

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION

 4

 5      --------------------------------

 6   MATTEL, INC., a Delaware          )

 7   Corporation,                      )

 8                 Plaintiff,          )  No. CV 04-9059

 9            vs.                      )     NM (RNBx)

10   CARTER BRYANT, an individual;    )  VOLUME I

11   and DOES 1 through 10,            )

12   inclusive,                        )

13                 Defendants.         )

14   -------------------------------)

15   CARTER BRYANT, on behalf of       )

16   himself, all present and former )

17   employees of Mattel, Inc., and   )

18   the general public,               )

19            Counter-Calimants,       )

20       vs.                           )

21   MATTEL, INC., a Delaware          )

22   Corporation,                      )

23            Counter-Defendant.       )

24   --------------------------------

25
```

Exhibit 114 ,
P. 473

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
1    APPEARANCES OF COUNSEL:

2

3

4        FOR THE PLAINTIFF:

5

6            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
7            BY: SCOTT B. KIDMAN, ESQ.
8            865 South Figueroa Street
9            Tenth Floor
10           Los Angeles, California 90017
11           (213) 443-3000
12           sbk@quinnemanuel.com

13

14

15       FOR DEFENDANT MGA ENTERTAINMENT, INC.:

16

17           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
18           BY:  LAUREN E. AGUIAR, ESQ.
19               JORDAN FEIRMAN, ESQ.
20           Four Times Square
21           New York, New York  10036-6522
22           laguiar@skadden.com
23           jordan.feirman@skadden.com

24

25
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

1    APPEARANCES (Continued):

2

3

4       ALSO PRESENT:

5

6           DAVID WEST, Videographer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 114 ,
P. 475

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 39

1    in paragraph 11; correct?

2        A.   I do.

3            MR. KIDMAN:   Would this be a good time to

4    take just a short break?

5            MS. AGUIAR:   Of course.                    10:18AM

6            MR. KIDMAN:   Would that be okay?

7            MS. AGUIAR:   Absolutely.  Sure.

8            THE VIDEOGRAPHER:   We're off the record,

9    10:18.

10           (Recess taken.)                             10:28AM

11           THE VIDEOGRAPHER:   We're back on the record

12   at 10:29.

13   BY MS. AGUIAR:

14       Q.   Mr. Hollander, when I asked when you had

15   first been contacted about this case, you said that,   10:29AM

16   to the best of your recollection, it was the

17   beginning of 2008; correct?

18       A.   Yeah.  I believe I said January.

19       Q.   So when you were first contacted, am I

20   right that Mr. Tonner and Ms. Bergstein's report had   10:29AM

21   not been issued at that time; is that correct?

22       A.   I believe that's correct, but I don't know

23   that for a fact.

24       Q.   Well, their reports are both dated

25   February 11, 2008.                                  10:29AM

Exhibit 114,
P. 476

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 160

1    STATE OF CALIFORNIA    ) ss:

2    COUNTY OF LOS ANGELES )

3

4        I, JANICE SCHUTZMAN, C.S.R. No. 9509, do hereby

5    certify:

6

7        That the foregoing deposition testimony was

8    taken before me at the time and place therein set

9    forth and at which time the witness was administered

10   the oath;

11

12       That the testimony of the witness and all

13   objections made by counsel at the time of the

14   examination were recorded stenographically by me,

15   and were thereafter transcribed under my direction

16   and supervision, and that the foregoing pages

17   contain a full, true and accurate record of all

18   proceedings and testimony to the best of my skill

19   and ability.

20

21       I further certify that I am neither counsel for

22   any party to said action, nor am I related to any

23   party to said action, nor am I in any way interested

24   in the outcome thereof.

25

Exhibit 114 ,
P. 477

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 161

1        IN WITNESS WHEREOF, I have subscribed my name

2    this 21st day of April, 2008.

3

4

5

6                    _____

7                    JANICE SCHUTZMAN, C.S.R. No. 9509

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 114,
P. 478

# Exhibit 115

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
(213) 443-3112

WRITER'S INTERNET ADDRESS
dylanproctor@quinnemanuel.com

March 25, 2008

<u>VIA FACSIMILE AND U.S. MAIL</u>

Jason Russell, Esq.                          Matthew Werdegar, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP     Keker & Van Nest, LLP
300 South Grand Avenue, Suite 3400           710 Sansome Street
Los Angeles, CA 90071                        San Francisco, CA 94111

Re:    <u>Carter Bryant v. Mattel, Inc., et al.</u>

Dear Counsel:

I write to request a meet and confer pursuant to <u>Local Rule</u> 7-3 regarding Mattel, Inc.'s ("Mattel") contemplated Phase One motions *in limine*. As discussed below, we plan on moving on at least the following issues *in limine*:

- **Evidence That Carter Bryant's Employment Agreements With Mattel Are Unconscionable and Regarding Mattel's Human Resources Practices And Intellectual Property Policies.** Mattel will seek to preclude Defendants from asserting or introducing any evidence or argument regarding whether Bryant's 1999 Invention Assignment Agreement with Mattel, or any other agreement between Bryant and Mattel, is unfair, unconscionable or otherwise unenforceable. Mattel will also seek to exclude evidence of Mattel's general HR practices and intellectual property policies, including all testimony proffered by D. Jan Duffy on the grounds that such evidence is irrelevant to Phase 1 issues. Additionally, Mattel seeks to preclude any reference to evidence relating to any other version of Mattel's employment contracts on the grounds that such evidence is irrelevant and prejudicial.

- **Phase 1B Issues.** Mattel will seek to exclude all Phase 1B evidence, whether offered by a fact or expert witness, in Phase 1A of the trial. Among the Phase 1B evidence that Mattel

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

Exhibit 115 ,
P. 479

will seek to exclude from Phase 1A will be any fact or expert testimony regarding apportionment of damages, and any testimony regarding the value of the Bratz brand or the steps MGA has taken to build the brand, including but not limited to the expert testimonies of Paul Meyer, Douglas Kidder and Erich Joachimsthaler. Mattel will also seek to preclude the presentation of fact or expert evidence regarding Phase 2 claims in either portion of Phase 1 of the trial on the grounds that the discovery stay as to Phase 2 issues has unfairly prejudiced Mattel's ability to challenge testimony relating to Phase 2 issues.

- **Mattel's Purported Bad Acts.** Mattel will move to exclude evidence of alleged "bad acts" by Mattel and Mattel employees, including but not limited to, evidence of (a) irrelevant Mattel investigations regarding Larian, MGA, or Bratz; (b) alleged "grilling" of employees, (c) alleged misconduct by Mattel counsel and personnel and (d) allegations of witness tampering. This evidence is irrelevant, improper character evidence and highly prejudicial.

- **Actions Taken By Or Against Mattel Employees Other Than Bryant.** Mattel will seek to preclude Defendants from introducing evidence of actions taken by Mattel against employees other than Bryant, or vice versa, including other employees' alleged "moonlighting" and Mattel's alleged failures to take enforcement actions. Any such actions are irrelevant, prejudicial and confusing.

- **Evidence Regarding Advice Of Counsel.** Mattel will seek to preclude Defendants from asserting, relying on or introducing any evidence regarding communications and information related to advice they sought and/or received regarding the legal propriety of Defendants' misconduct, including MGA's contracting with Bryant regarding Bratz, MGA's subsequent copying, development, production and sales of Bratz, and MGA's or Bryant's obligations to Mattel. Defendants have prevented Mattel from eliciting evidence relating to any such advice, and it would be unfair to permit defendants to now reference or rely on such evidence affirmatively.

- **Mattel's Alleged "Motive" for Bringing the Lawsuit.** Mattel will seek to preclude Defendants from making any argument or introducing any evidence regarding Mattel's alleged "motive" for bringing the lawsuit. The MGA Parties' Motion for Partial Summary Judgment, among other things, indicates that Defendants intend to assert that Mattel is seeking to gain a competitive advantage by bringing suit. This is an improper attempt to confuse the jury and draw attention away from the merits of Mattel's claims. Mattel will also seek to exclude irrelevant and prejudicial evidence that Defendants claim reveals Mattel's motives for suing, including: (a) evidence of lower Barbie sales or financial problems at Mattel, which Defendants have claimed caused Mattel to file this action; (b) evidence relating to Mattel's alleged attempts to "kill Bratz"; (c) evidence relating to the phrase "House on Fire;" (d) evidence relating to Mattel layoffs. In addition, Mattel will seek to exclude evidence or argument about the "consequences" if Mattel prevails, such as whether MGA employees will lose jobs or whether Bratz will go off market.

- **Size Of Production.** The size of the parties' document productions are irrelevant to the claims and defenses in this case. Accordingly, Mattel will seek to preclude any reference to the sizes of the parties' respective productions.

2

Exhibit _115_,<br>P. _480_

- **Whether Mattel Would Have, Or Could Have, Marketed Bratz Successfully.** Defendants have asserted that Mattel would not have marketed Bratz had it been offered to it. Whether and/or how Mattel would have used its copyrights in Bratz is irrelevant. Accordingly, Mattel will seek to exclude any and all references to this matter.

- **Irrelevant Mattel Background Information That Has No Bearing On Phase 1.** Defendants' complaint and expert reports reference numerous background facts regarding Mattel that are wholly irrelevant to Phase 1 issues, such as Mattel's acquisition of the Learning Company. Mattel will seek to exclude all such irrelevant background information.

- **Equitable Defenses.** Mattel will seek to preclude Defendants from introducing to the jury evidence relating to any equitable defenses that are tried to the judge, not the jury. If at all, such evidence should be introduced only in a separate proceeding outside the presence of the jury.

- **Robert Tonner, Mary Bergstein, Debora Middleton, and Tina Tomiyama.** Mattel intends to preclude the testimony and expert reports of these witnesses on the grounds that they do not meet the standards of Fed. R. Evid. 702. They lack foundation for their opinions, do not apply reliable principles and methods to their analysis, and many of their opinions are outside their purported area of expertise.

- **Peter S. Menell.** Mattel intends to preclude Menell's expert report on the grounds that his opinions are not reliable or helpful to the trier of fact under Fed. R. Evid. 702. Menell lacks the specialized knowledge and expertise necessary to qualify as an expert with respect to many of the issues addressed in his report, including employment law, art history, doll design and jury deliberations. Menell's opinions should also be excluded as unreliable because he has applied the wrong law to the facts of this case. In addition, Menell should be stricken altogether because his opinions constitute improper legal opinion and attempt to dispose of the ultimate legal issues in this case, which is the sole province of the Court.

- **Dr. Lyter.** Mattel intends to bring a motion to exclude testimony by Dr. Lyter rebutting the reports of Lloyd Cunningam, Mr. William Flynn, and Mr. Walter Rantanen on the basis that he has no expertise in the field of questioned document examination and analysis or paper analysis.

- **Other Issues.** Mattel has not yet deposed many of defendants' experts and is continuing its analyses. Mattel reserves the right to move *in limine* on other issues not discussed above.

3

Exhibit 115 ,
P. 481

Please advise when the MGA Parties and Bryant are available to meet and confer regarding the above.

Best Regards,

B. Dylan Proctor

2433171_mc ltr re mil (2).DOC

4

Exhibit 115 ,
P. 482

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

<u>NEW YORK</u>
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

<u>LOS ANGELES</u>
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

<u>SAN FRANCISCO</u>
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

<u>TOKYO</u>
Akasaka Twin Tower Main Building, 6th Floor
17-22 Akasaka 2-Chome
Minato-ku, Tokyo 107-0052, Japan
+81 3 5561-1711
Facsimile: +81 3 5561-1712

<u>SILICON VALLEY</u>
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

*36·16*

## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

DATE:   March 25, 2008

NUMBER OF PAGES, INCLUDING COVER: 5

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Jason Russell, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP | (213) 687-5000 | (213) 687-5600 |
| Matthew Werdegar, Esq.<br>Keker & Van Nest, LLP | (415) 391-5400 | (415) 397-7188 |

FROM:   B. Dylan Proctor
        dylanproctor@quinnemanuel.com

RE:     <u>Carter Bryant v. Mattel, Inc., et al.</u>

MESSAGE:

Please deliver the attached to the named recipient above.  Thank you.

| CLIENT # | 07209 | ROUTE/<br>RETURN TO: | Dylan Proctor | ☒ CONFIRM FAX |
|---|---|---|---|---|
| | | | | ☒ INCLUDE CONF. REPORT |
| OPERATOR: | PRUDIEL LIBATIQUE | CONFIRMED? | ☐ NO   ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

Exhibit 115,
P. 483

# Exhibit 116

| From: | Martin Hitch |
|---|---|
| To: | Paula Treantafelles |
| CC: | |
| BCC: | |
| Sent Date: | 2001-04-26 04:16:25:003 |
| Received Date: | 2001-04-26 04:16:25:023 |
| Subject: | FW: Question |
| Attachments: | |

FYI – don't worry.

MH

-----Original Message-----
**From:** Romano, Mateo [mailto:romanoma@Mattel.com]
**Sent:** Wednesday, April 25, 2001 7:42 AM
**To:** Martin Hitch
**Subject:** RE: Question

Dear Martin,
You don't have to be dissapointed, ask your friend if he or she has seen the product?
Originally when you presented the line to me, I was very interested in those 2 items, for this reason the item number and description has to be loaded into the system so the subsidiaries can place their demands through the system.

At the end your "friends" were reluctant to let us carry the product.

I hope this clarifies the situation.

I have respected the confidentiality of your line with the people in El Segundo.

Regards,

-----Mensaje original-----
De:   **Martin Hitch [SMTP:MHitch@mgae.com]**
Enviado el:   Tuesday, April 24, 2001 11:14 AM
Para:   Romano, Mateo
Asunto: Question

Dear Mateo,

At NYTF I returned a Mattel Latin America price list to you after finding it in the reception of the toy building. I kept the information confidential despite MGA requesting copies and I did this in good faith to you and your business.

We have received an e-mail today from a friend at Mattel who was surprised to find our Bratz and Scooter Samantha products loaded in the Mattel system after information had been received by Mattel Latin America.

Exhibit 116
P. 484

Confidential - For Attorney's Eyes Only

MGA 0052195

I am disappointed at this news, please explain.


Martin Hitch
VP, International Sales
MGA Entertainment
Tel. +415.333.4233
www.mgae.com
 <<Martin Hitch (E-mail).vcf>>

  <<Archivo: Martin Hitch (E-mail).vcf>>

Exhibit  116
P. 485

Confidential - For Attorney's Eyes Only

MGA 0052196

**Exhibit 117**

1
2
3
4
5
6
7
8
9
10          UNITED STATES DISTRICT COURT
11          CENTRAL DISTRICT OF CALIFORNIA
12                 EASTERN DIVISION
13  CARTER BRYANT, an          CASE NO. CV 04-9049 SGL (RNBx)
    individual,
14                             Consolidated with Case Nos. CV 04-09059
                Plaintiff,     and CV 05-02727
15      vs.
                               **DISCOVERY MATTER**
16  MATTEL, INC., a Delaware
    corporation,               **[To Be Heard By Discovery Master Hon.**
17                             **Edward Infante (Ret.) Pursuant To The**
                Defendant.     **Court's Order of December 6, 2006]**
18
                               [PROPOSED] ORDER GRANTING IN
19  AND CONSOLIDATED           PART MATTEL'S RENEWED MOTION
    ACTIONS                    FOR RECONSIDERATION OF THE
20                             SEPTEMBER 12, 2007 ORDER
                               GRANTING IN PART AND DENYING IN
21                             PART MGA'S MOTION TO COMPEL
                               PRODUCTION OF DOCUMENTS
22
23
24
25
26
27
28

07209/2393380.1

Exhibit 117,
P. 486

[PROPOSED] ORDER

1            Having received Mattel's Renewed Motion For Reconsideration Of The
2    September 12, 2007 Order Granting In Part And Denying In Part MGA's Motion To
3    Compel Production Of Documents (the "Motion"), and having considered the
4    Motion and all papers in support and opposition thereto, as well as the argument of
5    counsel on February 11, 2008, the Court hereby rules as follows:
6            That portion of the September 12, 2007 Order ("Order") that granted
7    MGA's motion to compel as to Request Nos. 281-282 and 284-285, as narrowed by
8    MGA, is modified and limited to those documents that relate or would relate to
9    persons employed by Mattel in the El Segundo Design Center at any time between
10   January 1, 1995 and April 28, 2005 who were or would have been required to sign
11   Mattel's Employee Confidential Information and Inventions Agreement or Conflict
12   of Interest Questionnaire, or any version of the same, or otherwise came in contact
13   with Mattel's confidential information.
14           Mattel shall comply with the Order, as modified herein, by March 3,
15   2008.
16           Pursuant to Paragraph 6 of the Stipulation and Order for Appointment
17   of a Discovery Master, Mattel shall file this Order with the Clerk of the Court
18   forthwith.
19           IT IS SO ORDERED.
20
21
22
23   DATED: February 20, 2008       By _____
24                                Hon. Edward A. Infante (Ret.)
                                  Special Discovery Master
25
26
27
28

07209/2393380.1

-1-

[PROPOSED] ORDER

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on February 20, 2008, I served the attached ORDER GRANTING IN PART MATTEL'S RENEWED MOTION FOR RECONSIDERATION OF THE SEPTEMBER 12, 2007 ORDER GRANTING IN PART AND DENYING IN PART MGA'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| John Gordon | Quinn, Emanuel, Urquhart, Oliver & Hedges | johngordon@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Paul M. Eckles, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Paul.eckles@skadden.com |
| Lance A. Etcheverry, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Lance.etcheverry@skadden.com |
| Robert J. Herrington, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Robert.herrington@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on February 20, 2008, at San Francisco, California.

Sandra Chan

Exhibit 117 ,
P. 488

# Exhibit 118

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,  )
                               )
              PLAINTIFF,       )
                               )        CASE NO.
       V.                      )        CV 04-9040 SGL (RNBX)
                               )
MATTEL, INC., A DELAWARE       )        CONSOLIDATED WITH
CORPORATION,                   )        CASE NO. 04-9059
                               )
              DEFENDANTS.      )        CASE NO.   05-2727
_____)
                               )
AND CONSOLIDATED ACTION (S).   )
_____)


# TELEPHONIC TRANSCRIPT OF PROCEEDINGS

# FEBRUARY 11, 2008



**REPORTED BY:**
ANGELA DUPRE
CSR NO. 7804
JOB NO. 08AD008

COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

Exhibit 118 ,
P. 489

EXHIBIT     10

PAGE     550

1   AGREEMENTS THEY HAVE TO SIGN; COMMUNICATIONS WITH

2   EMPLOYEES DURING THE COURSE OF THEIR EMPLOYMENT, AS

3   TO WHETHER THEY HAD -- IF THEIR ISSUE CAME UP

4   REGARDING MOONLIGHTING OR OTHER SPECIAL SITUATIONS

5   THAT THEY MADE REQUESTS ABOUT; COMMUNICATIONS WITH

6   THEIR SUPERVISORS.

7        THE THOUSANDS AND THOUSANDS OF HOURS THAT

8   IT WOULD TAKE TO TRACK THIS DOWN, ALL FOR

9   INFORMATION THAT HAS NO RELEVANCE, WHERE WE'VE GOT

10  NO AMBIGUITY IN THE CONTRACT, AND WE HAVE NO GAP

11  THAT NEEDS TO BE FILLED.  THAT WE SUBMIT, YOUR

12  HONOR.

13       JUDGE INFANTE:  ALL RIGHT.  LET ME DEAL WITH

14  THE MOTION, WITH RESPECT TO TOPICS 25 AND 52, THE

15  30(B)(6) DEPOSITION NOTICE WHICH ORIGINALLY WAS

16  SERVED ON DECEMBER '04.

17       THE MOTION TO OVERRULE MATTEL'S RELEVANCY

18  OBJECTIONS AND COMPEL DISCOVERY ON THOSE TOPICS IS

19  DENIED.  I FIND THAT BOTH TOPICS BETWEEN THE 25 AND

20  52 ARE GROSSLY OVERBROAD, SEEK IRRELEVANT

21  INFORMATION, AND CREATE UNDUE BURDEN.

22       TO THE EXTENT THAT PORTIONS OF WHAT IS

23  SOUGHT IN THOSE TOPICS IS RELEVANT, THAT RELEVANCY

24  IS SUBSTANTIALLY OUTWEIGHED BY THE ENORMOUS BURDEN

25  IT WOULD TAKE TO PREPARE WITNESSES TO DEAL WITH THE

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

Exhibit 118,
P. 490

EXHIBIT 10

PAGE 571

1   SCOPE OF THESE TOPICS.  IN MY VIEW, ALSO, IT'S NOT

2   LIKELY TO LEAD TO ADMISSIBLE EVIDENCE.  AND FOR ALL

3   THOSE REASONS, I WOULD DENY THAT MOTION.

4          NOW, I'D LOOK LIKE TO GO BACK TO THE

5   UNDERLYING MOTION FOR RECONSIDERATION.  WITH

6   RESPECT TO THE DOCUMENT REQUESTS THAT WERE AT ISSUE

7   BACK IN SEPTEMBER, WHICH I ORDERED PRODUCED, WITH

8   RESPECT TO THOSE, MY JUDGMENT IS TO ONLY PARTIALLY

9   GRANT THE MOTION FOR RECONSIDERATION, BY LIMITING

10  MY ORDER TO THE FEW HUNDRED PEOPLE THAT WERE

11  EMPLOYED IN THE DESIGN CENTER -- THE DESIGN CENTER

12  WHERE BRYANT WORKED.

13          ESSENTIALLY, THAT'S THE ONLY CHANGE TO MY

14  ORDER.

15          ARE THERE ANY QUESTIONS WITH RESPECT TO

16  THAT?

17      MR. ALGER:  YOUR HONOR, I DO HAVE A QUESTION AS

18  TO THE LAST PART OF YOUR ORDER.  AND THAT IS:  THE

19  PEOPLE IN THE DESIGN CENTER, IS THAT LIMITED AS TO

20  TIME?  BECAUSE OVER THE COURSE OF YEARS IT WOULD BE

21  QUITE A LARGE NUMBER OF PEOPLE.

22      JUDGE INFANTE:  WELL, I DON'T HAVE THE REQUEST

23  DIRECTLY IN FRONT OF ME, BUT I BELIEVE THE

24  REQUEST -- I DON'T RECALL WHETHER THE REQUEST WAS

25  LIMITED IN TIME.

23

Exhibit 118,
P. 491

EXHIBIT ___10___

PAGE ___572___