# EXHIBIT A

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
michaelzeller@quinnemanuel.com
Jon D. Corey (Bar No. 185066)
joncorey@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. CV 04-09059 and Case No. CV 05-02727 |
| vs. | [CORRECTED] [PUBLIC REDACTED] NOTICE OF MOTION AND MOTION OF PLAINTIFF MATTEL, INC. FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS MADE IN FURTHERANCE OF CRIMES AND FRAUDS; |
| MATTEL, INC., a Delaware corporation, | |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| | **Phase 1** Pre-Trial Conference: May 19, 2008 Trial Date: May 27, 2008 |

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that in Courtroom 1 of the above-captioned court

3  located at 3470 Twelfth Street, Riverside, California, before the Honorable Steven

4  G. Larson, on August 4, 2008 at 10 a.m. or on such earlier date as the parties may be

5  heard, plaintiff Mattel, Inc. ("Mattel") will, and hereby does, move the Court:

6      (1) to compel MGA Entertainment, Inc. ("MGA") to produce Entry Nos. 374,

7  375, 549, 550, 1327, 1328, 1643, 1820, 1821, and 1822 from MGA's Revised

8  January 23, 2008 Privilege Log; and

9      (2) to compel Isaac Larian ("Larian") to produce Entry Nos. 69, 70, 72, 73,

10  79, 89, 90, 92, 95, 97, 100, 101, 113, 114, and 115 from his January 15, 2008

11  Privilege Log and Entry No. 63 from his January 30, 2008 Privilege Log.

12      Mattel brings this motion based on the crime-fraud exception to the attorney-

13  client privilege.  In the alternative, Mattel requests that the Court review these

14  communications *in camera* for possible production.

15      This Motion is based on this Notice of Motion and Motion, the accompanying

16  Memorandum of Points and Authorities, the Declaration of Harry A. Olivar, Jr.

17  dated May 23, 2008 filed concurrently herewith, the records and files of this Court,

18  all matters of which the Court may take judicial notice, and any other evidence and

19  argument as may be presented at the hearing on the Motion.

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS .............................................................................. 2

ARGUMENT .................................................................................................. 9

I.   THE ATTORNEY-CLIENT PRIVILEGE DOES NOT PROTECT
     COMMUNICATIONS FROM A CLIENT SEEKING TO FURTHER
     A CRIME OR FRAUD .......................................................................... 9

II.  LARIAN'S COMMUNICATIONS WITH GLASER FALL WITHIN
     THE CRIME FRAUD EXCEPTION TO THE ATTORNEY-CLIENT
     PRIVILEGE ....................................................................................... 10

    A.   MGA Engaged in Criminal Infringement of Mattel's Copyrights ........ 12

        1.   MGA Has Infringed Mattel's Copyrights in Bratz ..................... 12

        2.   Defendants' Infringement Was Willful ....................................... 15

        3.   Defendants' Infringement Was Unquestionably Profitable ........ 16

    B.   Larian's Communications Were "In Furtherance of" MGA's
     Larceny of Mattel's Property ................................................................. 17

        1.   Larian and MGA Took Property that Belonged to Mattel ......... 17

        2.   Larian and MGA Intended to Permanently Deprive Mattel
     of Its Property ............................................................................. 18

        3.   Larian and MGA Carried Away Mattel's Property and
     Controlled It by Removing It from Mattel's Possession ............ 18

    C.   MGA Has Perpetrated a Fraud on the Court ......................................... 19

CONCLUSION ............................................................................................. 20

-i-

Case No. CV 04-9049 SGL (RNBx)
[CORRECTED] [PUBLIC REDACTED] NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING
PRODUCTION OF COMMUNICATIONS

# **TABLE OF AUTHORITIES**

**Page**

### Cases

Appling v. State Farm. Mut. Auto. Ins. Co.,
340 F.3d 769 (9th Cir. 2003) ....................................................................... 18

Clark v. United States,
289 U.S. 1 (1933) .................................................................................... 9, 16

Columbia Pictures Television, Inc. v. Krypton Broad.,
106 F.3d 284 (9th Cir. 1997) ....................................................................... 12

Dolman v. Agee,
157 F.3d 708 (9th Cir. 1998) ....................................................................... 12

Foreshee v. Runnels,
No. S-03-1647, 2007 WL 2505578 (E.D. Cal. Aug. 31, 2007) .......................... 17

In re Grand Jury Proceedings,
87 F.3d 377 (9th Cir. 1996) ................................................................. 9, 10, 11

In re Grand Jury Proceedings,
727 F.2d 1352 (4th Cir. 1984) ..................................................................... 19

In re Grand Jury Subpoena 92-I (SJ),
31 F.3d 826 (9th Cir. 1994) .......................................................................... 8

Int'l Tel. & Tel. Corp. v. United Tel. Co.,
60 F.R.D. 177 (M.D. Fla. 1973) ................................................................... 19

In re Levander,
180 F.3d 1114 (9th Cir. 1999) ..................................................................... 18

In re Napster, Inc. Copyright Litig.,
479 F.3d 1078 (9th Cir. 2007) ............................................................. *Passim*

People v. Avery,
27 Cal. 4th 49 (2002) ................................................................................. 17

People v. Davis,
19 Cal. 4th 301 (1998) ............................................................................... 18

People v. Kronemyer,
189 Cal. App. 3d 314 (1987) ....................................................................... 17

In re Sealed Cases,
676 F.2d 793 (D.C. Cir. 1982) ..................................................................... 19

In re St. Johnbury Trucking Co.,
184 B.R. 446 (Bankr. D. Vt. 1995) ............................................................... 19

United States v. Chen,
    99 F.3d 1495 (9th Cir. 1996)................................................................. 10

United States v. Corona-Sanchez,
    234 F.3d 449 (9th Cir. 2000)................................................................. 17

United States v. Drebin,
    557 F.2d 1316 (9th Cir. 1977)............................................................... 12

United States v. Hodge & Zweig,
    548 F.2d 1347 (9th Cir. 1977)............................................................. 9, 10

United States v. Laurins,
    857 F.2d 529 (9th Cir. 1988)................................................................. 10

United States v. Martin,
    278 F.3d 988 (9th Cir. 2002)................................................................... 8

United States v. Thordarson,
    646 F.2d 1323 (9th Cir. 1981)............................................................... 17

United States v. Wise,
    550 F.2d 1180 (9th Cir. 1977)............................................................... 12

United States v. Zolin,
    491 U.S. 554 (1989) .......................................................................... 8, 11

### Statutes

Cal. Labor Code § 2870.......................................................................... 3

### Other Authorities

3 Nimmer on Copyright § 1404[B] .......................................................... 12

8 Wigmore, Evidence § 2298 (McNaughton ed. 1961) ............................... 19

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3                 **Introduction**

4        Years before this litigation was commenced, on June 30, 2001, Isaac Larian

5 advised his then-attorney, Patricia Glaser, by e-mail that

6

7

8

9

10

11

12

13        Mattel does not know what Glaser told Larian in response. Mattel does know,

14 however, that there were a number of e-mails back and forth between Larian and

15 Glaser in the days that followed. And, just last week, Mattel learned from Glaser's

16 deposition that on July 3, 2001--three days after Larian e-mailed Glaser--

17

18

19

20                                  . Thus, something Glaser said made

21 Larian want to misrepresent the facts to his own attorney, not to mention Mattel.

22 The deception had begun.

23        The fraud has continued for years, including right into this Courthouse. In

24 their dealings with Mattel, filings with the Copyright Office and this Court, and in

25 litigation around the globe, Defendants concealed what Larian had reported to

26 Glaser concerning the development of Bratz. Instead of disclosing that

27                                     , MGA and Bryant

28 fashioned a story of Bryant's supposedly inspirational breakthrough while driving by

1  a Missouri high school in 1998 during a brief interruption of his Mattel employment.

2  By alleging that Bryant created Bratz while living in Missouri in 1998--

3                                                                          --

4  MGA was able to hide Defendants' willful infringement of Mattel's copyrights in

5  Bratz and its theft of Bryant's drawings, both crimes.  Larian's communications with

6  Glaser in the summer of 2001--

7                                                        --were "in furtherance" of

8  MGA's willful infringement of Mattel's copyrights and theft of Mattel property and,

9  hence, were not privileged.  Those communications should either be ordered

10  produced, or reviewed for possible production *in camera*.[1]

11

12                        **Statement of Facts**

13

14  **MGA's Production of the June 30, 2001 E-Mail Message**

15          On January 31, 2008, counsel for MGA produced, among other documents,

16  an e-mail message identified by Bates No. KS 07831.  The message was sent from

17  Isaac Larian to Patty Glaser on June 30, 2001.  It is identified on Larian's

18  January 15, 2008 Privilege Log, Entry No. 89, as a "message requesting legal advice

19  regarding Mattel litigation."

20          Eight days earlier, on January 23, 2008, Mattel had filed a motion asserting

21  that MGA had waived the attorney-client privilege with respect to at least 21

22  communications based on its assertion of "good faith" defenses.[2]  Mattel's motion

23

24  ———————————————

25      [1]  Mattel has seen the June 30, 2001 e-mail because it was produced by MGA.
     However, recognizing its damning significance, MGA has since clawed it back,

26  claiming it was supposedly inadvertently produced.
        [2]  Motion of Plaintiff Mattel, Inc. for Order Finding Waiver and to Compel

27  Production of Documents withheld as Privileged, dated January 23, 2008,
     Declaration of David Harry A. Olivar, Jr. dated May 23, 2008 ("Olivar Decl.")

28  Exh. 1.

1 | specifically sought production of Entry No. 89 on Larian's Privilege Log.[3]  In its

2 | Opposition filed January 31, 2008--the same day KS 07831 was produced--MGA

3 | offered to produce 17 of the communications, tying its disclosure to its own requests

4 | for privileged Mattel documents.[4]  The 17 documents specifically identified by

5 | MGA included Entry No. 89 on Isaac Larian's Privilege Log of January 15, 2008.[5]

6 | The same day, MGA produced that message voluntarily as part of the disclosure

7 | noted earlier.  Thus, on January 31, 2008, MGA simultaneously produced KS 07831

8 | and specifically called it out as one of 17 documents that it was willing to produce

9 | voluntarily.

10 | **The E-mail Message**

---

[3]   See id.  Mattel sought: (1) Entry Nos. 655-657 and 660 on MGA's August 14, 2007 Supplemental Privilege Log; (2) Entry Nos. 12-19 and 21-27 on MGA's Supplemental Revised Privileged and Redaction Log for MGA's 2005 Document Production; and (3) Entry Nos. 89 and 90 on Isaac Larian's Privilege Log of January 15, 2008.  Id. at 2:2-16.

[4]   MGA Entertainment Inc.'s Opposition to the Motion of Plaintiff Mattel, Inc. for Order Finding Waiver and to Compel Production of Documents Withheld as Privileged, dated January 31, 2008 ("Opposition to Motion for Waiver"), Olivar Decl. Exh. 2 at 10 n.7.

[5]   Id. at 10 n.7.

1

2

3

4

5

6                                                                               8

7         In the next three days after that email was sent, there were seven e-mail

8    communications between Larian and Glaser.[9]

9

10

11                                                                   . As the

12   Court will recall, Bryant had faxed his MGA agreement to MGA from Mattel's

13   Design Center.  MGA has never produced a copy of this agreement with the Mattel

14   fax header.  Victoria O'Connor, a former MGA executive, testified that Larian

15   instructed her to white out "Barbie Collectibles" from the MGA/Bryant contract and

16   _____

17        [6]  Cal. Labor Code § 2870; see also Order Granting in Part, Denying In Part, and
18   Deferring in Part the Parties' Motions for Partial Summary Judgment ("Summary
     Judgment Order"), dated April 25, 2008 at 5, Olivar Decl. Exh. 3 ("Pursuant to that
19   statute (and its incorporation in the Inventions Agreement) . . . the factual question
     of whether Bryant worked on them on his own time, rather during his working hours
20   at Mattel, is not relevant").
          [7]  Deposition of David Rosenbaum ("Rosenbaum Dep.") at 38:14-22, 64:2-10,
21   Olivar Decl. Exh. 4.
          [8]  Id. at 90:9-17.  Moreover, Bryant was only one of a number of former Mattel
22   employees hired by MGA during this period, such as Paula Garcia (formerly
     Treantafelles), who also signed Inventions Agreements with Mattel.  See Garcia's
23   Employee Confidential Information and Inventions Agreement with Mattel, dated
     July 4, 1997, Olivar Decl. Exh. 5.  MGA also produced in discovery a
24   September 14, 2000 fax, sent from Bryant to Rosenbaum, enclosing Bryant's offer
     letter from Mattel, which specifically referenced Bryant's Confidential Information
25   and Inventions Agreement with Mattel, Olivar Decl. Exh. 6.  In the fax, Bryant
     advised Rosenbaum that he was "unable to look into this too much . . . without
26   risking suspicion" on Mattel's part.  Id.
          [9]  See Entry No. 63 on the January 30, 2008 Larian Privilege Log; Entry Nos.
27   69, 70, 89 from the January 15, 2008 Larian Privilege Log; and Entry Nos. 549,
     1327, and 1328 on the January 23, 2008 Revised MGA Privilege Log, Olivar Decl.
28   Exh. 7.

1  send it to Glaser.[10]

2

3

4              .[12]

5

6  **MGA Fabricates the Genesis of Bratz**

7        From the beginning, MGA tried mightily to hide Bryant's role in the creation

8  of Bratz and his relationship with Mattel.  Bryant acknowledged at deposition that

9  both MGA and Larian knew that he was a Mattel employee when he pitched his

10  ideas to MGA, accepted payments from it, worked with MGA, and entered into an

11  agreement with MGA.[13]  Rachel Harris of MGA, who attended a meeting with

12  Bryant and Larian in October 2000, testified that she and others knew that it would

13  be "    " for Bryant if Mattel learned he was presenting drawings to MGA while still

14  employed by Mattel.[14]  Harris also testified that Larian told MGA employees that if

15  asked, he planned to say either that he came up with Bratz or that the inspiration

16  came from his daughter.[15]

17        Accordingly, after Bryant left Mattel, both Larian and Paula Garcia instructed

18  that no one at MGA was to discuss Bryant's involvement with Bratz outside MGA.[16]

19  Larian directed MGA personnel that "

20

21

22  ──────────────

23  [10]   Deposition of Victoria O'Connor ("O'Connor Dep.") at 18:5-19:4, Olivar Decl. Exh. 8.

24  [11]   Deposition of Patricia Glaser at 26:3-24, 28:3-12, 29:11-14 and Exh. 5905 thereto, Olivar Decl. Exh. 9.

25  [12]   Id.

26  [13]   Deposition of Carter Bryant ("Bryant Dep.") at 67:7-21, 88:7-13, 21-24, Olivar Decl. Exh. 10.

27  [14]   Deposition of Rachel Harris ("Harris Dep.") at 167:20-169:11, 170:12-172:10, 262:21-264:11, Olivar Decl., Exh. 11.

28  [15]   Harris Dep. at 263:6-264:11, Olivar Decl. Exh. 11.
    [16]   Id.

1                 ."[17]  Similarly, MGA

2 employee Dee Dee Valencia wrote "                  " in

3 response to an e-mail message from Larian in which he proposed the development

4 of a limited edition model and asked "         "[18]  A later list of MGA

5 employees who came from Mattel notes Bryant's dates of employment at MGA as

6 "        " and his Mattel dates as "       ."[19]

7        Publicly, Larian likewise sought to conceal Bryant's role in Bratz.  He

8 variously:  (1) identified himself, not Bryant, as the creator of Bratz; (2) claimed that

9 he, Larian, "               ;"[20] (3) averred that "

10

11      ;"[21] (4) stated it was his son's "       ;"[22] and (5) declared under

12 penalty of perjury to the U.S. Patent and Trademark Office that he personally

13 created the Bratz feet and packaging,[23] even though Bryant testified that he (Bryant)

14 had created that invention before even meeting MGA and had presented it to

15 MGA.[24]  MGA admits that no public statement recognizing Bryant as Bratz's creator

16

17

18

19

---

20      [17]  E-mail message from Issac Larian, dated March 12, 2002, Bates-numbered MGA 3801819R-22R, Olivar Decl. Exh. 12.

21      [18]  E-mail message from Isaac Larian to Dee Dee Valencia, dated February 6, 2003, Bates-numbered MGA 3801558-9, Olivar Decl. Exh. 14.

22      [19]  MGA spreadsheet listing former Mattel employees ("Former Mattel Employee List"), Bates-numbered MGA 1134723-30, dated April 20, 2006, Olivar Decl. Exh. 13 at MGA 1134726-20.

23      [20]  Affidavit of Isaac Larian in MGA v. Metson, dated May 14, 2004, Olivar Decl. Exh. 15, ¶ 8.

24      [21]  Palmeri, Christopher, "To Really Be a Player Mattel Needs Hotter Toys," Business Week, July 28, 2003, Olivar Decl. Exh. 16 at 65.

25      [22]  Weiss, Jeff, "Immigrant's Company Shakes Up Toy Industry," San Fernando Valley Business Journal, March 29, 2004 ("My oldest son, seventeen year old Jason is very creative . . . It was Jason's idea for Bratz."), Olivar Decl. Exh. 17 at 230.

26      [23]  See United States Patent Application for a Doll with Aesthetic Changeable Footgear, Matter No. 15904-142, Olivar Decl. Exh. 18.

27      [24]  Bryant Dep. at 343:15-344:7, 1172:7-18, Olivar Decl. Exh. 10.

1   was issued until July 18, 2003, when the *Wall Street Journal* published an article

2   with that information.[25]

3       MGA's deceptions were not limited to keeping Bryant's role under wraps, or

4   to Bryant's own exit interview lies to Mattel and to co-workers. Undoubtedly

5   working with MGA, Bryant wrote "1998" on drawings that even Bryant admits were

6   made later.[26] MGA then used those drawings, and that date, to register its claims of

7   copyright in Bryant's Bratz drawings, listing the date of creation as 1998.[27]

8       Similarly, on November 2, 2004, Bryant filed a Complaint for Declaratory

9   Relief of Copyright Non-Infringement, representing to this Court that he created

10  Bratz in 1998 while living at his parents' home in Missouri.[28] This was Defendants'

11  first public recitation of Bryant's "inspiration" story. Bryant alleged that while he

12  was in Missouri, "he worked exclusively on his own ideas and drawings, with the

13  hopes of building a career as a freelance artist."[29] While returning home from Old

14  Navy (where he worked to supplement his income), Bryant had a "eureka

15  moment."[30] Allegedly "[i]nspired by the 'bratty' attitude he had observed, as well as

16  advertisements that he had seen relating to hip-hop fashion and other trends of the

17  _____

18  [25]   MGA Entertainment, Inc.'s Supplemental and Amended Responses to Mattel, Inc.'s Third Set of Requests for Admission to MGA Entertainment, Inc., dated

19  May 4, 2007, Response to Request for Admission Nos. 183-185, Olivar Decl. Exh. 19.

20  [26]   Carter Bryant's Responses to Mattel, Inc.'s Fifth Set of Requests for Admission to Carter Bryant, dated July 9, 2007, Response Nos. 27 and 29 at 25, 27-

21  28, Olivar Decl. Exh. 20.

    [27]   MGA's 2003 applications for copyright registration of the four original Bratz

22  drawings for (1) Yasmin, (2) Sasha, (3) Jade, and (4) Cloe, provide 1998 as the year of creation and identify Carter Bryant as the author. MGA simultaneously applied

23  to register a group drawing of the four characters enumerated above. That application also gave 1998 as the year of creation and identified Bryant as the

24  author. Certificate of Registration VA 1-218-491 (Yasmin drawing), Certificate of Registration VA 1-218-488 (Sasha drawing), Certificate of Registration VA 1-218-

25  487 (Jade drawing), Certificate of Registration VA 1-218-490 (Cloe drawing), Certificate of Registration VA 1-218-489 (Bratz group drawing), Olivar Decl.

26  Exh. 21.

    [28]   *Carter Bryant v. Mattel, Inc.*, Complaint for Declaratory Relief of Copyright

27  Non-Infringement, dated November 2, 2004 ¶¶ 31-33, Olivar Decl. Exh. 22.

    [29]   *Id.* ¶ 31.

28  [30]   *Id.* ¶ 32.

time, Bryant started sketching multi-ethnic, urban youth, dressed in trendy fashions. Bryant tried to capture in his sketches the 'bratty' attitude he had observed."[31]  He claimed to have observed multi-ethnic, trendy students in August 1998 after he passed Kickapoo High School in Springfield, Missouri while driving home one day from Old Navy.[32]  Bryant averred that he made the drawings the same day.[33]  Bryant also testified that he wrote the text related to the Bratz dolls in 1998, and that he also came up with the "Bratz" name in 1998.[34]  According to Bryant, the name "Bratz" was always attached to the project.[35]  Bryant's deposition was defended by counsel for MGA even before MGA appeared in the case.[36]

## MGA Claws Back the E-mail

On or about March 17, 2008, six weeks after MGA had identified the June 30, 2001 e-mail as one of the 17 documents identified to be produced to resolve a discovery dispute, and the message was voluntarily produced, Mattel was notified by MGA that the disclosure of the message in question was inadvertent, and that the message was being clawed back on attorney-client privilege grounds.[37]  Mattel returned the document.

---

[31] Id. ¶ 32.
[32] Bryant Dep., Olivar Decl. Exh. 10 at 140:9-20, 141:7-21, 142:6-17.
[33] Id. at 142:24-143:1.
[34] Id. at 139:23-140:8 ("

").
[35] Id. at 156:5-8.
[36] Id. at 3:23-24.
[37] March 17, 2008 Clawback Letter from Bryant Delgadillo to Juan Pablo Albán, Olivar Decl. Exh. 23.  Mattel destroyed the e-mail message in accordance with the Protective Order and hence cannot lodge it with this motion.

-8-

1

**<u>Argument</u>**

2  **I.   THE ATTORNEY-CLIENT PRIVILEGE DOES NOT PROTECT**

3  **COMMUNICATIONS FROM A CLIENT SEEKING TO FURTHER A**

4  **CRIME OR FRAUD**

5         The attorney-client privilege is not absolute.  <u>In re Grand Jury Subpoena 92-I</u>

6  <u>(SJ)</u>, 31 F.3d 826, 829 (9th Cir. 1994).  When a lawyer's advice is solicited by a

7  client to further a crime or fraud, a communication loses its privilege.  <u>See</u> <u>United</u>

8  <u>States v. Martin</u>, 278 F.3d 988, 1000 (9th Cir. 2002) (holding that "when a lawyer's

9  advice is sought to further a crime or fraud, those communications are not

10  privileged").  The Supreme Court has long prohibited the misuse of the attorney-

11  client privilege to protect communications made for the purpose of obtaining advice

12  for the commission of a fraud or a crime.  In <u>United States v. Zolin</u>, 491 U.S. 554,

13  563 (1989), the Court held that "it is the purpose of the crime/fraud exception to the

14  attorney-client privilege to assure that the seal of secrecy between lawyer and client

15  does not extend to communications made for the purpose of getting advice for the

16  commission of a fraud or crime."

17         The Ninth Circuit has similarly recognized an exception to protect against the

18  abuse of the attorney-client relationship.  In <u>United States v. Hodge & Zweig</u>,

19  548 F.2d 1347, 1354-55 (9th Cir. 1977), the Ninth Circuit explained that because the

20  "attorney-client privilege is not to be used as a cloak for illegal or fraudulent

21  behavior, it is well established that the privilege does not apply where legal

22  representation was secured in furtherance of intended, or present, continuing

23  illegality."  Simply put, "the privilege takes flight if the relation is abused.  A client

24  who consults an attorney for advice that will serve him in the commission of a fraud

25  will have no help from the law."  <u>Clark v. United States</u>, 289 U.S. 1, 15 (1933), *cited*

26  *with approval by* <u>In re Napster, Inc. Copyright Litig.</u>, 479 F.3d 1078, 1090 (9th Cir.

27  2007).

28

[CORRECTED] [PUBLIC REDACTED] NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING
PRODUCTION OF COMMUNICATIONS

1    It is immaterial whether the attorney aided the crime or fraud.  All that is

2 required is that the client have made the communication because the client wanted

3 to advance a fraud or crime.  "[T]he crime-fraud exception does not require a

4 completed crime or fraud but only that the client have consulted the attorney in an

5 effort to complete one." In re Grand Jury Proceedings, 87 F.3d at 381 (emphasis

6 added).

7    It is also well settled that the attorney need not have been aware that the client

8 had an improper purpose in seeking advice.  See Napster, 479 F.3d at 1090 ("The

9 attorney need not have been aware that the client harbored an improper purpose.

10 Because both the legal advice and the privilege are for the benefit of the client, it is

11 the client's knowledge and intent that are relevant"); In re Grand Jury Proceedings,

12 87 F.3d at 381-82 ("the attorney need not himself be aware of the illegality

13 involved; it is enough that the communication furthered, or was intended by the

14 client to further, that illegality"); United States v. Chen, 99 F.3d 1495, 1504 (9th

15 Cir. 1996) ("it is the client's knowledge and intentions that are of paramount concern

16 to the application of the crime-fraud exception; the attorney need know nothing

17 about the client's ongoing or planned illicit activity for the exception to apply");

18 Hodge & Zweig, 548 F.2d at 1354 ("[t]he crime or fraud exception applies even

19 where the attorney is completely unaware that his advice is sought in furtherance of

20 such an improper purpose").  It is the client's abuse of the attorney client-

21 relationship, irrespective of whether there is a successful criminal or fraudulent act,

22 that warrants piercing the privilege.  In re Grand Jury Proceedings, 87 F.3d at 381.

23

24 **II.    LARIAN'S COMMUNICATIONS WITH GLASER FALL WITHIN**

25 **THE CRIME FRAUD EXCEPTION TO THE ATTORNEY-CLIENT**

26 **PRIVILEGE**

27    A party seeking to establish the crime-fraud exception must satisfy a two-part

28 test.  First, the party must show that the party asserting the privilege "was engaged

1  in or planning a criminal or fraudulent scheme when it sought the advice of counsel

2  to further the scheme." In re Grand Jury Proceedings, 87 F.3d 377, 381 (9th Cir.

3  1996); see also Napster, 479 F.3d at 1090 (emphasis added).  Second, the party must

4  show that "the attorney-client communications for which production is sought are

5  'sufficiently related to' and were made 'in furtherance of [the] intended, or present,

6  continuing illegality.'"  Napster, 479 F.3d at 1090 (emphasis in original); see also In

7  re Grand Jury Proceedings, 87 F.3d at 382-83.  In this Circuit, the "in furtherance"

8  requirement is met if there is "some relationship between the communications and

9  the illegality."  Napster, 479 F.3d at 1094-1095; United States v. Laurins, 857 F.2d

10  529, 540 (9th Cir. 1988).  To pierce the privilege, the movant need only establish

11  these elements by a preponderance of the evidence.  Napster, 479 F.3d at 1094-95.

12  An even lower standard is applied when *in camera* review, rather than disclosure, is

13  sought. Id. at 1096.

14      These standards are met here.  The Ninth Circuit has recognized that a party

15  seeking to pierce the privilege is inevitably at a disadvantage in establishing how

16  communications it is not fully aware of furthered a crime or fraud.  See id. at 1096;

17  Zolin, 491 U.S. at 569-70.  Here, though, it is clear that MGA's claim of rights to

18  Bryant's drawings is grounded in its deceptions about the timing and substance of

19  Bryant's work.

20

21          ,

22

23

24

25                              .  Larian had no right to seek legal

26  "counsel" to assist him in infringing Mattel's copyrights and stealing its property.

27      It is not necessary that Ms. Glaser did anything unlawful.  Indeed, it appears

28  that because of advice Larian received from Glaser, he then proceeded to alter facts

-11-

1    to deceive his lawyers.  It is not even necessary that Larian or the MGA defendants

2    completed any crime or fraud, although they plainly did.  All that is necessary is for

3    Mattel to establish by a preponderance of the evidence that the communications at

4    issue, instead of reflecting a proper effort to secure advice on compliance with the

5    law, were made in furtherance of unlawful action.  Given the factual record here,

6    that is the case.  The communication furthered at least two crimes, as discussed

7    below.

8         **A.   MGA Engaged in Criminal Infringement of Mattel's Copyrights**

9

10                                                                                              ,

11   which has been ongoing from the introduction of Bratz to the present.  In re Grand

12   Jury Proceedings, 87 F.3d at 381.

13                                                                          . MGA's

14   subsequent, elaborate efforts to recreate the history of Bratz's creation and cover up

15   the facts attest to its willful effort to infringe those copyrights.

16        Criminal copyright infringement consists of (1) infringement of a copyright,

17   (2) committed willfully, (3) for profit.  United States v. Drebin, 557 F.2d 1316, 1326

18   (9th Cir. 1977); United States v. Wise, 550 F.2d 1180, 1190 (9th Cir. 1977).

19   Willfulness is defined as "with knowledge that [one's] conduct constitutes copyright

20   infringement."  Dolman v. Agee, 157 F.3d 708, 715 (9th Cir. 1998); see also

21   Columbia Pictures Television, Inc. v. Krypton Broad., 106 F.3d 284, 293 (9th Cir.

22   1997), *rev'd on other grounds by* Feltner v. Columbia Pictures Television, Inc.,

23   523 U.S. 340 (1998); 3 Nimmer on Copyright § 1404[B], at 14-40.2-.3.

24              **1.   MGA Has Infringed Mattel's Copyrights in Bratz**

25        Pursuant to the Inventions Agreement, Bryant agreed to "promptly and fully"

26   disclose and assign to Mattel his "right, title, and interest in such inventions, and all

27   [his] right, title, and interest in any . . . copyrights . . . [and] copyright applications"

28   he conceived or reduced to practice while employed by Mattel.  "Inventions"

1  included, but was not limited to, "all discoveries . . . [and] designs, whether

2  patentable or unpatentable."[38]   Whether or not MGA ever saw Bryant's specific

3  agreement, it was clearly familiar with such agreements:  MGA was populated with

4  employees who had signed such agreements when they were at Mattel, such as

5  Paula Garcia.[39]   Rosenbaum, MGA's lawyer, testified that he knew the "        "

6  terms of Mattel's agreement that works created by Carter Bryant while employed by

7  Mattel belonged to Mattel.[40]   And MGA made its own employees sign comparable

8  agreements.[41]

9       Because Bryant's work for Mattel had always involved fashion dolls (*i.e.*,

10  dolls whose clothing and accessories are intended to be changed) and Bratz is a

11  competing fashion doll,

12

13

14

15       Of course, the evidence of Mattel's ownership is not limited to the e-mail

16  message.  To the contrary, the evidence adduced to date overwhelmingly shows

17  Mattel's ownership.  For example, forensic evidence shows that Bryant's first Bratz

18  drawings, purportedly made in 1998, were drawn on pages torn from the middle of a

19  notebook that has drawings, images, and entries for projects that Bryant worked on

20  for Mattel in 1999 and 2000.[42]   Bryant would have had to make a three mile detour

21

22  ─────────────

[38]   Carter Bryant's Confidential Information and Inventions Agreement with
23  Mattel, Olivar Decl., Exh. 24.
       [39]   Former Mattel Employee List, Olivar Decl. Exh. 13.
24     [40]   Rosenbaum Dep, at 90:9-17, Olivar Decl. Exh. 4.
       [41]   Ward Confidentiality and Inventions Assignment Agreement, dated
25  October 18, 2000, Olivar Decl. Exh. 38.
       [42]   Expert Report of Lloyd Cunningham, dated February 11, 2008, at 2-4, Olivar
26  Decl. Exh. 25;  see also Deposition of Anna Rhee at 107:4-108:10; 109:5-25;
27  110:7-9, 112:21-113:12, 113:22-114:15; 127:8-14; 132:22-133:2; 138:9-22; 201:25-
    204:9, Olivar Decl. Exh. 26 (

28                                    ).

through a residential neighborhood to pass Kickapoo High School when commuting from his job at Old Navy;[43] and even if he had done so, he would not have seen ethnically diverse students who resembled the Bratz dolls because Kickapoo High School is not ethnically diverse.[44]  Bryant failed to retain the magazine that supposedly inspired his work (his mother testified that she had not subscribed to Seventeen in 20 years, and certainly did not while her son was living with her).[45]  Advertisements similar to the one he claimed to have seen in 1998 appeared in Seventeen in 1999 and 2000, but the latter ads resembled Bratz much more closely.[46]  In other litigation, Bryant himself denied under oath that he had done *anything* in the design field while he was away from Mattel in 1998--at a time when he had already made millions on Bratz.[47]  In another proceeding in Hong Kong, MGA expressly admitted under oath that Bryant's drawings were created in 1999.[48]

Other forensic evidence is even more damning.  "8/1998" shows up on drawings that Bryant himself admits were not prepared in 1998.  They are, instead, color drawings he created in 1999 or later.[49]  To "date" them, Bryant had some of his Bratz drawings notarized by a Mattel notary in August 1999.  To "date" black-and-white Bratz line drawings Bryant claims to have created in 1998, Bryant had

---

[43]   Map showing Kickapoo High School, Old Navy, and the Bryant home, Olivar Decl. Exh. 27.
[44]   Deposition of Sarah Odom at 22:9-23:16 and Springfield Public Schools Annual Report, 2006-2007, Exhibit B thereto, Olivar Decl. Exh. 28 at 6.
[45]   Deposition of Janet Bryant at 305:14-306:3, 307:3-9, Olivar Decl. Exh. 29.
[46]   September 1999 Seventeen, Trial Exhibit 10132, December 1999 Seventeen, Trial Exhibit 10139, March 2000 Seventeen, Trial Exhibit 10142, April 2000 Seventeen, Trial Exhibit 10145, Olivar Decl. Exh. 39; see also Expert Rebuttal Report of Lee Loetz, dated March 17, 2008, Olivar Decl. Exh. 40.
[47]   Deposition of Carter Bryant in Gunther Wahl v. Mattel, taken Sept. 9, 2003, M 0061802-917 at M 0061890-91 (deposition transcript at 89:23-90:7), Olivar Decl. Exh. 30.
[48]   Affidavit of Raymond David Black from MGA Entertainment, Inc. (1st Plaintiff), MGA Entertainment (HK) Limited (2nd Plaintiff) and Double Grand Corporation Limited (Defendant) HCA No. 1883/2003, dated June 3, 2003, Bates-numbered MGA 0885348 - MGA 0885414 at 0885378, Olivar Decl. Exh. 41.
[49]   Bryant Dep. at 151:12-25, Olivar Decl. Exh.10.

1   some of his Bratz drawings notarized by a Mattel notary in August 1999.[50]  Because

2   the notary refused his request to back-date the drawings, he claimed he asked her to

3   write in her notary book: "From Missouri 1998."[51]  However, the word

4                " were added to the notary book after the fact, and were not present

5   when the original entry was written--in other words, the entry in the notary book

6   was forged.[52]

7          Nor is MGA's story of the creation of the name "Bratz" supportable.

8   According to MGA, Bryant had already attached the name "Bratz" when he first

9   pitched it.[53]  However, Jennifer Maurus, a former MGA employee, testified in

10  another action that the Bratz name did not even exist when Bryant first pitched the

11  project to MGA.[54]  Rachel Harris of MGA testified to the same thing.[55]  And Isaac

12  Larian has admitted the same thing on video.[56]

13         In short, with or without the e-mail message, the evidence of Mattel's

14  ownership, and of MGA's infringement, is overwhelming, and clearly meets the

15  preponderance threshold the Court must apply now.

16          **2.     Defendants' Infringement Was Willful**

17         Rather than own up to these facts, the MGA defendants have sought to cloak

18  their knowledge--an unprivileged fact--in the attorney-client privilege and create a

19  fictional account of the creation of Bratz to place it outside Mattel's ownership.

20  Once it became clear that the "                          " story would not protect them,

21  _____

22  [50]  Id. at 55:22-56:7; See also Deposition of Jacqueline Ramona Prince at
     124:21-125:7; 138:20-139:21, Olivar Decl. Exh. 31.
23  [51]  Id. at 55:22-56:7; see also Deposition of Jacqueline Ramona Prince at
     124:21-125:7; 138:20-139:21, Olivar Decl. Exh. 31.
     [52]  Expert Report of Valery Aginsky ("Aginsky Report"), dated February 8,
24  2008, Olivar Decl. Exh. 32 at 8.
     [53]  Deposition of Paula Garcia at 1073:18-1074:6, 1076:17-1077:14, Olivar
25  Decl. Exh. 42; Deposition of Isaac Larian at 180:22-181:4, Olivar Decl. Exh. 43.
     [54]  Testimony of Jennifer Maurus, Larian v. Larian, at 228:10-18, Olivar Decl.
26  Exh. 33.
     [55]  Harris Dep. at 57:5-58:1, 61:14-63:3, Olivar Decl. Exh. 11.
27  [56]  Joan Gaynor Video Interview of Isaac Larian at the 2001 Tokyo Toy Fair,
28  Trial Exh. 13182, Olivar Decl. Exh. 44.

[CORRECTED] [PUBLIC REDACTED] NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING
PRODUCTION OF COMMUNICATIONS

1 │ they told the Copyright Office and this Court that the project was created in 1998,

2 │

3 │     Defendants went to great lengths to conceal the truth.  Extensive evidence of

4 │ this concealment has been set forth at length elsewhere[57] and will not be repeated

5 │ here.

6 │                                     . Mattel had known

7 │ since O'Connor was deposed that Larian instructed her to white-out "Barbie

8 │ Collectibles" from the header of the MGA/Bryant agreement and send it to Glaser.

9 │ But Mattel just learned last week

10 │

11 │

12 │

13 │                                 .[58]  That Larian sought to

14 │ hide the relevant facts even from his own lawyer, when seeking her advice, shows

15 │ that these communications with her are not entitled to protection.  See, e.g., Clark,

16 │ 289 U.S. at 15 ("A client who consults an attorney for advice that will serve him in

17 │ the commission of a fraud will have no help from the law.")

18 │     **3.**    **Defendants' Infringement Was Unquestionably Profitable**

19 │     Defendants' infringement of Mattel's copyright interests has been enormously

20 │ profitable.  Mattel's experts estimate the total net revenue of Bratz to be in excess of

21 │ $2.8 billion.[59]

22 │

23 │

───────────────────────────────────

24 │    [57]  See Mattel, Inc.'s Corrected Separate Statement of Uncontroverted Facts and

25 │ Conclusions of Law, dated March 10, 2008, Olivar Decl. Exh. 34; Notice of Motion and Corrected Motion of Mattel, Inc. for Partial Summary Judgment, dated

26 │ March 10, 2008, Olivar Decl. Exh. 35.

   [58]  Email identified as Bates No. CG 0009, produced May 13, 2008, Olivar Decl.

27 │ Exh. 36.

   [59]  Expert Report of Michael Wagner, dated February 11, 2008, at 11, Olivar

28 │ Decl. Exh. 37.

1   Accordingly, the preponderance of the evidence demonstrates that defendants

2   engaged in criminal copyright infringement.  Under Larian's own version of the

3   facts, Mattel owned the Bratz copyrights.  Defendants therefore tried to conceal

4   Mattel's ownership of Bratz, and profited handsomely from their acts.  A

5   preponderance of the evidence--the legal standard--demonstrates both infringement

6   and willfulness.

7   **B.   Larian's Communications Were "In Furtherance of" MGA's**

8   **Larceny of Mattel's Property**

9   There is also a tangible, physical aspect to MGA's wrongdoing, as this Court

10  recognized in concluding that Mattel's copyright claim did not preempt its

11  allegations of conversion.  The criminal analogue for conversion is larceny.  To

12  sustain a claim for larceny in California, a person must establish that (1) a person

13  took personal property of some value belonging to another, (2) when the person took

14  the property he had the specific intent to deprive the alleged victim permanently of

15  his property; and (3) the person carried the property away by obtaining physical

16  possession and control for some period of time and by some movement of the

17  property.  United States v. Corona-Sanchez, 234 F.3d 449, 454 (9th Cir. 2000);

18  United States v. Thordarson, 646 F.2d 1323, 1335 (9th Cir. 1981).

19  **1.   Larian and MGA Took Property that Belonged to Mattel**

20  This Court has ruled that any Bratz drawings or other Bratz-related inventions

21  made while Bryant worked for Mattel belong to Mattel under the Inventions

22  Agreement.[60]  The Court has also recognized that the Bratz drawings are "works of

23  art that may have value of apart from the copyrights they represent." Id. at 3.  It

24  follows that in taking these drawings, which they unquestionably did, Larian and

25  MGA took Mattel's property.

26

27  _____

28  [60]  Summary Judgment Order at 4-5, Olivar Decl. Exh. 3.

Case No. CV 04-9049 SGL (RNBx)
[CORRECTED] [PUBLIC REDACTED] NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING
PRODUCTION OF COMMUNICATIONS

### 2.   Larian and MGA Intended to Permanently Deprive Mattel of Its Property

The requirement of intent to deprive permanently is not interpreted literally in California. People v. Avery, 27 Cal. 4th 49, 55 (2002) (noting that "the word permanently as used here is not to be taken literally") (internal citations omitted). Rather, this requirement is "satisfied by the intent to deprive temporarily but for an unreasonable time so as to deprive the person of a major portion of its value or enjoyment." Id. at 58; Foreshee v. Runnels, No. S-03-1647, 2007 WL 2505578 at *6 (E.D. Cal. Aug. 31, 2007) (noting that "California law requires an intent to permanently deprive the owner of his or her property or to take the property temporarily but for an unreasonable time to deprive the owner of a major part of its value or enjoyment."). For purposes of larceny, the relevant intent is the intent at the time of taking. People v. Kronemyer, 189 Cal. App. 3d 314, 363 (1987) (finding that "a key element of larceny is that the perpetrator has the intent to permanently deprive the victim of property at the time it was taken") (emphasis in original).

When he provided the Bratz drawings to Larian and MGA, Bryant unquestionably had the requisite intent to deprive Mattel of their value and use, and MGA and Larian intended to do the same.

### 3.   Larian and MGA Carried Away Mattel's Property and Controlled It by Removing It from Mattel's Possession

The requirement of carrying away and controlling the victim's property is a low threshold that can be satisfied by even the slightest movement. People v. Davis, 19 Cal. 4th 301, 305 (1998) (holding that "if the taking has begun, the slightest movement of the property constitutes a carrying away or asportation"). Here, there is no dispute that Larian and MGA took the Mattel-owned Bratz drawings from Bryant, and have retained both possession and control of the drawings from late 2000 to the present. Thus, the final element is satisfied as well.

C.   **MGA Has Perpetrated a Fraud on the Court**

Defendants' fraud on the Court provides an additional and independent basis for piercing the attorney-client privilege. Fraud on the court embraces "that species of fraud [that] does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." In re Levander, 180 F.3d 1114, 1119 (9th Cir. 1999). Fraud on the court requires "a grave miscarriage of justice, and a fraud that is aimed at the court." Appling v. State Farm. Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003) (citations omitted). The Ninth Circuit has held that isolated instances of perjury or the non-disclosure of information do not ordinarily constitute fraud on the court. Napster, 479 F.3d at 1096.

However, this is not a case of such isolated instances. Here, Defendants have engaged in a continuous, complex, multi-year effort to directly mislead this Court. Specifically, Defendants have repeatedly falsely stated to the Court in their various pleadings and discovery responses that Bryant created Bratz in 1998 while in Missouri, falsified and back-dated drawings, and otherwise attempted to hide the truth. Their actions go to the core question in the litigation: ownership of Bratz. Defendants have manipulated and subverted the judicial machinery, and continue to do so to this day. It would be unconscionable to allow defendants to hide the truth behind the privilege.[61]

---

[61]   Notably, proof of an actual crime or fraud--which Mattel has shown--is not required. Courts also pierce the attorney-client privilege where communications furthered torts and other misconduct. In re Sealed Cases, 676 F.2d 793, 812 (D.C. Cir. 1982) (holding that crime-fraud exception applies to crimes, frauds, and "other type[s] of misconduct fundamentally inconsistent with the basic premises of the adversary system"); In re Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir. 1984) (piercing the privilege on a number of grounds in a tax fraud case and holding that "privilege applies only when the person claiming the privilege has as a client (footnote continued)

1

### Conclusion

2         For the foregoing reasons, Mattel respectfully requests that the Court enter an

3  Order compelling:  (1) MGA to produce Entry Nos. 374, 375, 548, 549, 1325, 1326,

4  1641, 1818, 1819, and 1820 from MGA's January 23, 2008 Privilege Log, and

5  (2) Larian to produce Entry Nos. 69, 70, 73, 79, 89, 90, 92, 95, 97, 100, 101, 113,

6  114, and 115 from his January 15, 2008 Privilege Log and Entry No. 63 from his

7  January 30, 2008 Privilege Log.  At a minimum, Mattel respectfully requests that

8  the Court review those e-mails *in camera* to determine if disclosure is required

9  under the standard set forth in <u>Napster</u>.

10

11  DATED:  June 20, 2008          QUINN EMANUEL URQUHART OLIVER &
                                   HEDGES, LLP
12

13                                 By<u>/s/ John B. Quinn</u>
14                                   John B. Quinn
                                     Attorneys for Mattel, Inc.
15

16

17

18

19
_____

20  consulted an attorney for the purpose of securing a legal opinion or services and not
    'for the purpose of committing a crime or tort'"); <u>Int'l Tel. & Tel. Corp. v. United</u>
21  <u>Tel. Co.</u>, 60 F.R.D. 177, 180 (M.D. Fla. 1973) (holding that the attorney-client
    privilege applies "not only where fraud or crime is involved, but also where there
22  are other substantial abuses of the attorney-client relationship); <u>In re St. Johnbury</u>
    <u>Trucking Co.</u>, 184 B.R. 446, 456 (Bankr. D. Vt. 1995) (piercing the privilege based
23  upon the filing of an unreasonable pleading for an improper purpose and noting that
24  "precedent and authority also recognize that not just technical crimes or frauds are
    excluded from the attorney-client privilege"). <u>See also</u> 8 Wigmore, <u>Evidence</u>
25  § 2298 (McNaughton rev. 1961) ("[I]t is difficult to see how any moral line can
26  properly be drawn at [the] crude boundary [of the definition of crime or fraud], or
    how the law can protect a deliberate plan to defy the law and oust another person of
27  his rights, whatever the precise nature of those rights may be").

28
                                            -20-            Case No. CV 04-9049 SGL (RNBx)