**Exhibit 1**

COPY

ORIGINAL FILED

AUG 2 5 2003

LOS ANGELES
SUPERIOR COURT

1  HOWARTH & SMITH
   DON HOWARTH (State Bar No. 53783)
2  SUZELLE M. SMITH (State Bar No. 113992)
   BRIAN D. BUBB (State Bar No. 137408)
3  ROBERT D. BRAIN (State Bar No. 98815)
   800 Wilshire Blvd., Suite 750
4  Los Angeles, California 90017

5  (213) 955-9400

6  Attorneys for Plaintiff
   FARHAD LARIAN

7

8        SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF LOS ANGELES

10

11  FARHAD LARIAN,                    CASE NO.   BC301371

12        Plaintiff,                  VERIFIED COMPLAINT FOR:

13  vs.                               1)  FRAUD & DECEIT IN THE
                                          INDUCEMENT OF
14  ISAAC LARIAN and DOES 1 through       ARBITRATION
    50, inclusive,                        AGREEMENT;
15
         Defendants.                  2)  BREACH OF FIDUCIARY
16                                        DUTIES;

17                                    3)  FRAUD & DECEIT IN THE
                                          CONDUCT OF
18                                        ARBITRATION PROCESS;

19                                    4)  BREACH OF IMPLIED
                                          COVENANT OF GOOD
20                                        FAITH AND FAIR DEALING;

21                                    5)  VIOLATION OF
                                          CALIFORNIA
22                                        CORPORATIONS CODE §§
                                          25401 AND 25501;
23
                                      6)  VIOLATION OF
24                                        CALIFORNIA
                                          CORPORATIONS CODE §§
25                                        25402 AND 25502;

26                                    7)  FRAUD & DECEIT RE
                                          DECEMBER 2000
27                                        AGREEMENT;

28

EXHIBIT     1
PAGE        4

03:P391001.618                        FL 6465        VERIFIED COMPLAINT

1         )  8) NEGLIGENT
           )     MISREPRESENTATION;

2         )
           )  9) UNFAIR COMPETITION, IN

3         )     VIOLATION OF
           )     CALIFORNIA BUSINESS &

4         )     PROFESSIONS CODE §
           )     17200; and

5         )
           )  10) RESCISSION BASED ON

6 _____)     MISTAKE

7

8                DEMAND FOR JURY TRIAL

9    Plaintiff, FARHAD LARIAN ("Plaintiff" or "Fred") alleges as follows:

10           **COMMON ALLEGATIONS**

11 **Parties and Venue**

12   1. Plaintiff Farhad Larian, also known as "Fred" Larian, is now, and at all

13 times herein mentioned was, a resident of the State of California.  He is currently residing

14 in Los Angeles County, California.

15   2. Defendant Isaac Larian ("Isaac") is now, and at all time herein mentioned

16 was, a resident of Los Angeles County, California.

17   3. Plaintiff is unaware of the true names and capacities of Defendant DOES 1

18 through 50, inclusive, and therefore sues such Defendants by fictitious names.  Plaintiff

19 will amend this complaint to show the true names and capacities of, and to make specific

20 allegations against, these Defendants if and when additional information against them is

21 ascertained.  Plaintiff is informed and believes and thereon alleges that each of the

22 Defendants, including each fictitiously named Defendant, is liable in some manner for the

23 events referred to in this complaint.

24   4. At all times mentioned herein, each Defendant was the agent of each of the

25 other Defendants, and was acting within the course and scope of said agency in

26 performing the acts described herein.

27   5. Venue is proper in Los Angeles County under California Code of Civil

28 Procedure § 395 because Defendant Isaac Larian resides in Los Angeles County.

**EXHIBIT** 1

**PAGE** 5  2    FL 6466

**General Background**

6.      In or about 1979, two brothers, Plaintiff Fred Larian and Defendant Isaac Larian formed an equal partnership to import and distribute name brand consumer products, splitting the profits and losses 50/50.

7.      In or about 1982 the partnership was incorporated as ABC International Traders, Inc. ("ABC"), a closely-held, not publicly traded company, with each brother owning an equal 50 percent of the corporation.  Upon incorporation, the brothers continued as before to divide the work and to split equally the profits in running the business.  In or about 2002, the name of ABC was changed to MGA Entertainment, Inc. ("MGA).

8.      In or about 1985 or 1986, Fred's and Isaac's shares were diluted when ABC sold stock to their brother-in-law, Jahangir "Eli" Makabi.  Such sale left Fred and Isaac each with an equal 45 percent share of the ownership of ABC.  After the sale of the stock to Mr. Makabi, the brothers continued as partners and joint venturers in operating the Company, both continued to divide the work at ABC, and each sharing equally 45 percent of its profits.

9.      In or about 1994, Fred and Isaac also became equal 45 percent shareholders (with 10 percent going to Mr. Makabi) in  MGA Hong Kong, Limited (together with MGA and ABC, "the Company"), and operated part of their business through such entity.  At all times referenced herein, Isaac has served as the President of the Company.  More recently, Isaac also acquired the additional title of CEO.

10.     Starting as far back as 1993, disputes arose between the brothers over the operation of the Company.  In part, this was because, as Isaac put it, they were "equal partners in the Company" yet had different ideas on how best to make the Company prosper.  Over the years, Fred and Isaac discussed various ways to resolve these disputes.

///
///
///
///

EXHIBIT ___1___

PAGE ___6___

FL 6467

3

11.     One method the brothers' discussed was having one brother buy out the other's equity interest.  Over the years, various such purchases were discussed and on one occasion an outside appraisal of the Company, performed at the specific request of Isaac, valued the Company at $35 million to $40 million.

12.     By 1999, Isaac, as President, had assumed control of sales, product development and financial matters.  At Isaac's direction, Fred assumed responsibility for major projects such as customs regulations, facilities management and warehouse distribution control, and was not as involved in the day-to-day sales or financial control of the Company.  For his role, Isaac took a significantly greater salary.

**Defendant's Concealment of the Bratz Doll Line**

13.     Plaintiff is informed and believes that beginning in or about late 1999 and early 2000, Isaac became aware of a potential new product line that had tremendous potential for the Company.  The new product line involved the "Bratz" dolls and related products.  Bratz dolls are "hipper" and more "edgy" than Barbie and Barbie-type dolls, and are aimed at the post-adolescent, pre-teen and early teen market, i.e., a market where the allure of playing with Barbie-type dolls wanes.

14.     Plaintiff is informed and believes that during this same time period, Isaac devised a plan to keep this business opportunity secret from Fred and to gain control of the Company by buying Fred's shares at a value which did not include this new business opportunity.  Isaac concealed from Plaintiff, his brother and partner and stockholder, knowledge he had, as well as his intentions and actions undertaken, regarding the Bratz product line.

15.     In or about early 2000, Isaac called a meeting to discuss the new Bratz product line with selected individuals in the Company.  Plaintiff is informed and believes that those present at the meeting spoke enthusiastically of the tremendous opportunity the Bratz line presented for the Company as, *inter alia*, it captured a vacant market niche.

///

**EXHIBIT** ____

VERIFIED COMPLAINT

1  Fred was not present for this meeting.  Upon information and belief, Isaac took steps to

2  conceal the results of the meeting from Fred.

3       16.  ·  Also in or about February 2000, Isaac tried to dissuade Fred from attending

4  the New York Toy Fair, even though Fred had routinely and regularly attended such toy

5  fairs in the past.  The New York Toy Fair is an important venue for discussing and

6  researching the market potential of new product lines.  Isaac was furious when he

7  discovered that Plaintiff was traveling to New York for the fair.  Plaintiff was expelled by

8  Isaac from meetings he tried to attend and was excluded from any discussions Isaac may

9  have had relating to the Bratz line of products at the fair.

10       17. .  In early March 2000, while continuing to conceal from Fred the Company's

11  plans for the Bratz line, Isaac offered to purchase all of Plaintiff's 45 percent interest in

12  the Company for $9 million.  The offer was based on a total value of the Company of $20

13  million.  Upon information and belief, Isaac knew at the time he made the offer of the

14  Company's plans already in place, and actions already undertaken, regarding the Bratz

15  line, and that such plans made the Company worth well in excess of $20 million.

16       18.  As set forth herein, the two brothers divided responsibilities with Isaac,

17  assuming control of sales, product development and financial matters, and Fred assuming

18  responsibility for major projects.  Financial information was handled by Isaac and the

19  Controller, Dennis Medici.  Throughout 2000 Isaac repeatedly and routinely shared with

20  Fred any financial information that showed the Company was performing poorly, while

21  withholding any positive financial information about the Company, including the plans

22  for the Bratz line.  Indeed, in May 2000 Isaac told the Company's the Controller, Dennis

23  Medici, that he was to no longer give Fred any information regarding the financial

24  operation of the Company. During this period, Isaac gave Fred only bleak financial news

25  about the Company and continued to conceal the Company's plans and actions

26  undertaken regarding Bratz.

27       19..  On or about September 18, 2000, Isaac caused the Company to enter into a

28  worldwide licensing agreement for the Bratz dolls and related items. The existence of

1  this license was concealed from Fred.  Upon information and belief, these important and

2  valuable rights are already generating revenues of in excess of $500 million a year and

3  are expected to exceed $3 billion in the next few years.

4

5  <u>Fraud Regarding the Arbitration Agreement</u>

6       20.    In or about September 2000, Isaac resumed his efforts to buy Fred's interest

7  in the Company.  Isaac kept the Bratz opportunity and other information about the true

8  financial condition of the Company hidden from Fred in an effort to secure Fred's

9  agreement to a proposed arbitration process with their Uncle Morad Zarabi.  Isaac agreed,

10  and induced Fred to agree, to the arbitration process without disclosing that during the

11  arbitration he would conceal the Company's plans and actions undertaken regarding the

12  Bratz line, and other financial information about the Company so that such information

13  would not be included in Mr. Zarabi's valuation of the Company.  In or about September

14  2000, Isaac and Fred executed the "Agreement to Arbitrate and Selection of Arbitrator"

15  ("Arbitration Agreement") attached hereto as Exhibit A.

16       21.    At all times before and up through his execution of the Arbitration

17  Agreement and for some considerable time thereafter, Fred was unaware of the true facts

18  regarding the new business opportunities and Bratz line of products, was unaware of the

19  true financial condition of the Company, and was unaware of the intention of Isaac to

20  conceal such material facts from the arbitrator and from him during the arbitration

21  process.  Had Fred been aware of the new business opportunities, the Bratz line of

22  products, the true financial condition of the Company, and/or the plans of Isaac to

23  conceal such material information from him and from the arbitrator, he would not have

24  agreed to enter into the arbitration process for the sale of his interest in the Company;

25  would not have agreed to the Arbitration Agreement; would not have agreed to have Mr.

26  Zarabi serve as arbitrator; and, would have placed greater restrictions and obligations on

27  the powers of any arbitrator, including without limitation a written requirement that the

28  Company be valued by an independent appraiser outside the family and that such

EXHIBIT

PAGE ___9___

6

EL-6470

1  appraisal be distributed to the parties for comment before any decision in the arbitration

2  was reached.

3      22.    In or about, December 2000, as a result of the Arbitration Agreement, Fred

4  and Isaac entered into a settlement and resolution of their differences with Fred agreeing

5  to sell his shares to Isaac.  Fred and Isaac executed a written "Agreement for Sale of

6  Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached hereto as

7  Exhibit B.  One of the factors in causing Fred to enter into the Agreement for Sale of

8  Stock was the fact that he had been fraudulently induced into entering into the Arbitration

9  Agreement.

10      23.    At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the

11  Company and other issues, and at all relevant times thereafter, Isaac knew that he would

12  continue to conceal the existence of his and the Company's plans for the Bratz line from

13  Mr. Zarabi and Fred during the arbitration, and other financial information about the

14  Company, the result of which, Isaac knew and intended, would be a fraudulently

15  diminished value of Fred's shares from what they would be worth if all pertinent

16  financial information about the Company and its plans for the Bratz product line were

17  disclosed.  Isaac entered into the arbitration with the intent to induce Fred to rely on his

18  presenting Mr. Zarabi with all material information about the Company and its finances

19  so as to allow Mr. Zarabi to determine a fair value for the Company.  Fred did, in fact,

20  actually and reasonably rely on Isaac disclosing such material information in agreeing to

21  have Mr. Zarabi decide the value of the shares and other matters, and in executing the

22  "Arbitration Agreement".

23

24  **Fraud in the Conduct of the Ongoing Arbitration**

25      24.    Mr. Zarabi held various hearings and received financial and other

26  information about the Company in his role as arbitrator beginning in the Fall of 2000.

27  Isaac did not disclose to Fred the license the Company had obtained in September 2000

28  for the Bratz line, the plans that Company had to develop and distribute, or any other

**EXHIBIT** 1

1  actions the Company had already undertaken regarding, the Bratz product line and other

2  business opportunities, the true financial condition of the Company, or the other matters

3  alleged heretofore. Upon information and belief, during this period, Isaac did not

4  disclose to Mr. Zarabi the license the Company had obtained in September 2000 for the

5  Bratz line, the plans the Company had to develop and distribute, or any other actions the

6  Company had already undertaken regarding, the Bratz product line and other business

7  opportunities, the true financial condition of the Company, or the other matters alleged

8  heretofore.

9      25.    At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the

10  Company and other issues, and at all relevant times thereafter, Isaac knew that he would

11  continue to conceal the existence of his and the Company's plans for the Bratz line from

12  Mr. Zarabi and Fred during the arbitration, and other financial information about the

13  Company, the result of which, Isaac knew and intended, would be a fraudulently

14  diminished value of Fred's shares from what they would be worth if all pertinent

15  financial information about the Company and its plans for the Bratz product line were

16  disclosed. Isaac entered into the arbitration with the intent to induce Fred to rely on his

17  presenting Mr. Zarabi with all material information about the Company and its finances

18  so as to allow Mr. Zarabi to determine a fair value for the Company. Fred did, in fact,

19  actually and reasonably rely on Isaac disclosing such material information in agreeing to

20  have Mr. Zarabi decide the value of the shares and other matters, and in agreeing to the

21  arbitration process.

22      26.    In or about, December 2000, as a result of the arbitration process,

23  Fred and Isaac entered into a settlement and resolution of their differences with Fred

24  agreeing to sell his shares to Isaac. Fred and Isaac executed a written "Agreement for

25  Sale of Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached

26  hereto as Exhibit B. One of the factors in causing Fred to enter into the Agreement for

27  Sale of Stock was the fraud and facts set forth heretofore.

28  ///

03-P391001.618

**EXHIBIT** \

EL 6473

**Fraud In the Agreement for Sale of Stock**

27.    At all relevant times herein and during the negotiation of the December 2000 Agreement, Isaac continued his fraudulent concealment and nondisclosure as set forth herein of the Company's plans, assets and steps undertaken, regarding the Bratz product line as well as other financial information regarding the Company. But for the fraud, and had Plaintiff known of the true facts regarding the Company's plans, assets and steps undertaken regarding the Bratz product line, the true financial information about the Company and the other matters alleged heretofore, he would not have agreed to sell his shares to Isaac under the terms of the December 2000 Agreement.

**Discovery of Fraud**

28.    In or about late spring and summer 2002, Plaintiff first became aware of the true scope of the Company's extraordinary plans, efforts and history regarding the Bratz product line and other financial information about the Company that had been concealed from him by Isaac, as the license had been concealed from him. In or about the spring and summer 2002, Isaac asked Fred to audit payments that were due to the Company. In that audit, Fred discovered information, for the first time, that the Company had been receiving or was expecting significant revenues based on the Bratz product line.

29.    Fred then asked Mr. Zarabi whether Isaac had disclosed that information to Mr. Zarabi and/or any appraiser involved with the arbitration. Plaintiff was told by Mr. Zarabi that Isaac had not provided him with such information. Plaintiff made a demand that Mr. Zarabi rectify the situation, but to date nothing has been done. Thereafter, Plaintiff made a demand that Isaac pay the fair market value of Plaintiff's share of the company, but Isaac has failed and refused to do so.

///
///
///
///

EXHIBIT ___1___

PAGE ___12___

9

03-P391001.618        FL 6473        VERIFIED COMPLAINT

# FIRST CAUSE OF ACTION

### (Fraud & Deceit in the Inducement of Arbitration Agreement)

30.    Plaintiff hereby reasserts and realleges Paragraphs 1 through 29 inclusive, as though set forth in full herein.

31.    In entering into the Arbitration Agreement, agreeing to participate in the arbitration process contemplated thereby, and offering to purchase Plaintiff's shares in the Company, Defendant knowingly made false representations of material fact to Plaintiff and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to Plaintiff. Such facts specifically include, without limitation, his intentions regarding the information he was planning to conceal from the arbitrator, otherwise fail to disclose during the course of the arbitration process, and/or had already concealed from Plaintiff, concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

32.    Plaintiff actually, reasonably, and justifiably relied upon the false statements, concealments, and omissions of Defendant described above in agreeing to execute the Arbitration Agreement, participate in the arbitration process contemplated thereby, and sell his shares in the Company. Had Plaintiff known of the true facts, specifically including the true facts concerning Defendant's intentions regarding, without limitation, the information he was planning to conceal from arbitrator, otherwise fail to disclose during the arbitration process and/or already had concealed from Plaintiff concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the Arbitration Agreement, would not have agreed to participate in the arbitration process contemplated thereby, and would not have agreed to sell his shares of the Company.

33.    Defendant made the false representations, concealments and omissions alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

EXHIBIT 1

PAGE 13

1 for purposes of inducing Plaintiff to execute the Arbitration Agreement, agree to

2 participate in the arbitration process contemplated thereby, and sell his shares in the

3 Company at a below fair market price.

4    34.    At all material times, Plaintiff was unaware of the falsity of the

5 representations and disclosures of Defendant as alleged above and believed them to be

6 true. At all material times, Plaintiff was unaware of the material omissions, concealments

7 and misstatements of material facts by Defendant, and could not, in the exercise of

8 reasonable care, made himself aware of the falsity of such misrepresentations and

9 nondisclosures, or the existence of such omissions or concealments.

10    35.    As a direct and proximate result of the fraudulent conduct alleged above,

11 Plaintiff has been damaged, without limitation, in that he was fraudulently induced to

12 enter the Arbitration Agreement, participate in the arbitration process contemplated

13 thereby, sell his shares of the Company to Defendant at a below fair market price of less

14 than $9 million, and enter into the December 2000 sale agreement. Plaintiff is entitled to

15 rescission of the September agreement to arbitrate, rescission of the December 2000 stock

16 sale agreement and restitution of his shares in the Company. In the alternative, Plaintiff

17 is entitled to damages, the amount of such damage is not presently ascertainable, but will

18 be proven at trial.

19    36.    The conduct of Defendant as alleged above, was fraudulent, malicious,

20 oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

21 disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

22 award of punitive damages against Defendant.

23

24                  <u>SECOND CAUSE OF ACTION</u>

25                  **(Breach of Fiduciary Duties)**

26    37.    Plaintiff hereby reasserts and realleges Paragraphs 1 through 36 inclusive,

27 as though set forth in full herein.    EXHIBIT ___1___

28 ///                                    PAGE ___14___

                              ·11

38.    As alleged herein, as an officer, manager and major shareholder of the Company in which Plaintiff was a shareholder, and as Plaintiff's partner and joint venturer in the management and operation of the Company, and otherwise due to their family relationship, Defendant owed Plaintiff fiduciary duties of loyalty, honesty, care and fair dealing in all matters concerning the Company.

39.    At all times alleged herein, Plaintiff actually and reasonably reposed the highest trust and confidence in Defendant's loyalty, honesty, care, and fair dealing in all matters concerning the Company.

40.    Defendant repeatedly breached and violated such fiduciary duties owed Plaintiff by, among other things, failing to inform Plaintiff, without limitation, of the true and accurate financial condition of the Company, its financial prospects, its business opportunities, the Company's plans and actions already undertaken concerning the Bratz product line, and/or his intentions regarding the information he was planning to conceal from the arbitrator and others in the course of the arbitration process stemming from the Arbitration Agreement.

41.    Said breaches of fiduciary duties by Defendant have caused Plaintiff damage, including but not limited to damages resulting from the sale of his shares of the Company to Defendant at a below fair market price, in an amount not presently ascertainable, but which will be proven at the time of trial.

42.    The conduct of Defendant, as alleged above, was fraudulent, malicious, oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant.

## THIRD CAUSE OF ACTION

### (Fraud & Deceit in the Conduct of the Arbitration Process)

43.    Plaintiff hereby reasserts and realleges paragraphs 1 through 42, inclusive, as though set forth in full herein.

EXHIBIT ___1___

PAGE ___15___

03:P391001.618

FL 6476

VERIFIED COMPLAINT

12

1    44.    In participating in the arbitration process contemplated by the Arbitration

2  Agreement, Defendant knowingly made false representations of material fact and/or

3  concealed and/or failed to disclose material facts known to Defendant which he was

4  under a duty to disclose to the arbitrator and otherwise during the arbitration. Such facts

5  specifically included, without limitation, information as to the true and accurate financial

6  condition of the Company, its financial prospects, its business opportunities, and/or the

7  Company's plans and actions already undertaken concerning the Bratz product line.

8    45.    Plaintiff actually, reasonably, and justifiably relied upon the false

9  statements, concealments, and omissions of Defendant described above in participating in

10  the arbitration process contemplated by the Arbitration Agreement. Had Plaintiff known

11  of the true facts, specifically including, without limitation, the scope of the information

12  Defendant concealed from the arbitrator and otherwise not disclosed in the course of the

13  arbitration process regarding the true and accurate financial condition of the Company, its

14  financial prospects, its business opportunities, and/or the Company's plans and actions

15  already undertaken concerning the Bratz product line, Plaintiff would not have

16  participated in the arbitration process or agreed to sell his shares of the Company.

17    46.    Defendant made the false representations, concealments and omissions

18  alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

19  for purposes of inducing Plaintiff to participate in the arbitration process contemplated by

20  the Arbitration Agreement and to sell his shares of the Company to Defendant at a below

21  market price.

22    47.    At all material times, Plaintiff was unaware of the falsity of the

23  representations and disclosures of Defendant as alleged above and believed them to be

24  true. At all material times, Plaintiff was also unaware of the material omissions,

25  concealments and misstatements of material facts by Defendant, and could not, in the

26  exercise of reasonable care, made himself aware of the falsity of such misrepresentations

27  and nondisclosures, or the existence of such omissions or concealments.

28  ///

EXHIBIT ____I____

PAGE  16

05:P591001.610

13

FL 6477

VERIFIED COMPLAINT

48.     As a direct and proximate result of the fraudulent conduct alleged above, Plaintiff has been damaged in that he was fraudulently induced to participate in the arbitration contemplated by the Arbitration Agreement and sell his shares of the Company to Defendant at a below fair market price.  Plaintiff is entitled to rescission of the December 2000 stock sale agreement and restitution of his shares in the Company.  In the alternative, Plaintiff is entitled to damages, the amount of such damage is not presently ascertainable, but will be proven at trial.

49.     The conduct of Defendant, as alleged above was fraudulent, malicious, oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant.

## FOURTH CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing in the Arbitration Agreement)**

50. .   Plaintiff hereby reasserts and realleges paragraphs 1 through 49, inclusive, as though set forth in full herein.

51.     The Arbitration Agreement contract executed by Plaintiff and Defendant contained an implied covenant of good faith and fair dealing which imposed the following, among others duties on Defendant: (a) a duty to act with honesty in fact in his performance under the agreement; (b) a duty of fair, open and honest disclosure to Plaintiff; (c) a duty to refrain from realizing secret gains at the expense of Plaintiff by connivance, deceit, suppression of facts, or other improper means; and (d) a duty to refrain from taking any action which would unfairly injure the rights of the Plaintiff or interfere in his ability to recognize his reasonable expectations under, and benefits of, the Agreement.

52.     By engaging in the conduct described above, specifically including, without limitation, concealing from the arbitrator and otherwise failing to disclose material facts

EXHIBIT ___

14

FL 6478

VERIFIED COMPLAINT

03:P391001.618

PAGE ___

1    in the course of the arbitration process information regarding the true and accurate

2    financial condition of the Company, its financial prospects, its business opportunities,

3    and/or the Company's plans and actions already undertaken concerning the Bratz product

4    line, Defendant has breached his duties of good faith and fair dealing set forth above.

5        53.    At all times herein relevant, Plaintiff has performed and discharged all

6    covenants, conditions, and duties required of him under the Arbitration Agreement,

7    including all duties imposed by the covenant of good faith and fair dealing, except those

8    obligations, if any, which have been prevented by Defendant, those obligations Defendant

9    has waived by his words and/or conduct, or those obligations which Defendant is

10   estopped from asserting that Plaintiff has not performed as a result of Defendant's

11   conduct alleged herein.

12       54.    As a direct and proximate result of Defendant's actions and breaches as

13   alleged herein, Plaintiff has suffered, and continues to suffer damages in an amount as yet

14   unascertained but which will be established at trial.

15       55.    The conduct of Defendant, as alleged above, was fraudulent, malicious,

16   oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

17   disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

18   award of punitive damages against Defendant.

19

20                           **FIFTH CAUSE OF ACTION**

21          **(Violation of California Corporations Code §§ 25401 and 25501)**

22       56.    Plaintiff hereby reasserts and realleges paragraphs 1 through 55, inclusive,

23   as though set forth in full herein.

24       57.    In committing the acts, omissions, and concealments alleged herein,

25   Defendant has violated California Corporations Code, Section 25401 by, among other

26   things, offering to purchase a security in this State: (a) by means of written and/or oral

27   communications containing untrue statements of material facts, specifically including

28   untrue facts regarding the true and accurate financial condition of the Company, its

EXHIBIT ____ 1

15

PAGE 18

1  financial prospects, its business opportunities, and/or the Company's plans and actions

2  already undertaken concerning the Bratz product line; and/or (b) omitting to state material

3  facts necessary in order to make statements made, in light of the circumstances when they

4  were first made, not misleading, specifically regarding the true and accurate financial

5  condition of the Company, its financial prospects, its business opportunities, and/or the

6  Company's plans and actions already undertaken concerning the Bratz product line.

7      58.   As a direct and proximate result of the acts and conduct of Defendant,

8  Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

9  or damages under California Corporations Code § 25501, in an amount as yet

10  unascertained but which will be established at trial, plus such other relief as pled herein.

11

12              **SIXTH CAUSE OF ACTION**

13        **(Violation of California Corporations Code §§ 25402 and 25502)**

14      59.   Plaintiff hereby reasserts and realleges paragraphs 1 through 58 inclusive,

15  as though set forth in full herein.

16      60.   At all times alleged herein, Defendant was an officer of the Company, a

17  director of the Company, a controlling person of the Company, and/or a person whose

18  relationship with the Company provided him access, directly and indirectly, to material

19  information about the Company, within the meaning of California Corporations Code §

20  25402.

21      61.   At all times alleged, Defendant had access to, and had information about,

22  the Company not generally available to the public or to Plaintiff, which would

23  significantly affect the value, and fair market price of the shares, of the Company,

24  specifically including, without limitation, information regarding the true and accurate

25  financial condition of the Company, its financial prospects, its business opportunities,

26  and/or the Company's plans and actions already undertaken concerning the Bratz product

27  line.   EXHIBIT ____1____

28  ///   PAGE ____19____

16

FL 6480

VERIFIED COMPLAINT

03:P391001.618

1    62.    At all times herein alleged, Defendant knew such information regarding,

2  without limitation, the true and accurate financial condition of the Company, its financial

3  prospects, its business opportunities, and/or the Company's plans and actions already

4  undertaken concerning the Bratz product line, was not generally available to the public or

5  to Plaintiff, and was not intended to be available to the public or to Plaintiff.

6    63.    In committing the acts, omissions, and concealments alleged herein,

7  Defendant has violated California Corporations Code, Section 25402 by, among other

8  things, purchasing and offering to purchase from Plaintiff his shares of the Company at a

9  time when he knew of material, non-public, undisclosed information about the Company

10 gained from his status as an officer, director, controlling person, and individual with

11 access to such information regarding, without limitation, the true and accurate financial

12 condition of the Company, its financial prospects, its business opportunities, and/or the

13 Company's plans and actions already undertaken concerning the Bratz product line.

14    64.    As a direct and proximate result of the acts and conduct of Defendant,

15 Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

16 or damages pursuant to California Corporations Code § 25502 in an amount as yet

17 unascertained but which will be established at trial, plus such other relief as pled herein.

18

19                    **SEVENTH CAUSE OF ACTION**

20           **(Fraud & Deceit Regarding the December 2000 Agreement)**

21    65.    Plaintiff hereby reasserts and realleges paragraphs 1 through 64 inclusive,

22 as though set forth in full herein.

23    66.    Prior to Plaintiff's entering into the December 2000 Agreement to sell

24 Plaintiff's stock in the Company to Defendant, Defendant knowingly made false

25 representations of material fact and/or concealed and/or failed to disclose material facts

26 known to Defendant which he was under a duty to disclose to Plaintiff. Such facts

27 specifically included, without limitation, the true and accurate financial condition of the

28 ///    **EXHIBIT** _____

       **PAGE** 20               17          FL 6481        VERIFIED COMPLAINT

03:P391001.618

1  Company, its financial prospects, its business opportunities, and/or the Company's plans
2  and actions already undertaken concerning the Bratz product line.

3      67.    Plaintiff actually, reasonably, and justifiably relied upon the false
4  statements, concealments, and omissions of Defendant described above in executing the
5  December 2000 Agreement and agreeing to sell his shares to Defendant. Had Plaintiff
6  known of the true facts, specifically including, without limitation, the facts concerning
7  true and accurate financial condition of the Company, its financial prospects, its business
8  opportunities, and/or the Company's plans and actions already undertaken concerning the
9  Bratz product line, Plaintiff would not have entered into the December 2000 Agreement,
10 or otherwise agreed to sell his shares in the Company at that time.

11     68.    Defendant made the false representations, concealments and omissions
12 alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth
13 for purposes of inducing Plaintiff to execute the December 2000 Agreement and to sell
14 his shares in the Company to the Defendant at a below fair market price.

15     69.    At all material times, Plaintiff was unaware of the falsity of the
16 representations and disclosures of Defendant as alleged above and believed them to be
17 true. At all material times, Plaintiff was also unaware of the material omissions,
18 concealments and misstatements of material facts by Defendant, and could not, in the
19 exercise of reasonable care, made himself aware of the falsity of such misrepresentations
20 and nondisclosures, or the existence of such omissions or concealments.

21     70.    As a direct and proximate result of the fraudulent conduct alleged above,
22 Plaintiff has been damaged in that he was fraudulently induced to enter the December
23 2000 Agreement calling for the sale of his shares of the Company at a below fair market
24 price. The amount of such damage is not presently ascertainable, but will be proven at
25 trial.

26 ///       EXHIBIT ___1___
27 ///
28 ///       PAGE __21__

03:P391001.618                        FL 6482               VERIFIED COMPLAINT

71.     The conduct of Defendant, as alleged above, was fraudulent, malicious, oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant.

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

72.     Plaintiff hereby reasserts and realleges paragraphs 1 through 70 inclusive, as though set forth in full herein.

73.     Prior to Plaintiff's entering into the December 2000 Agreement to sell Plaintiff's stock in the Company, Defendant owed Plaintiff a duty of reasonable care regarding, without limitation, the accuracy and honesty of the statements made regarding the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

74.     Defendant breached his duty to Plaintiff by making misrepresentations of material facts, and by omitting and failing to disclose material facts, which he knew, or in the exercise of reasonable care, should have known were inaccurate and which he was under a duty to disclose to Plaintiff, specifically including, without limitation, information concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

75.     Defendant made such misrepresentations and omissions concerning, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line with the intent to induce Plaintiff into executing the December 2000 Agreement and selling his shares to Defendant at below fair market value price.   **EXHIBIT** 1

76.     Plaintiff actually, reasonably, and justifiably relied upon the false statements and omissions of Defendant described above in deciding to execute the December 2000 Agreement and sell his shares in the Company to Defendant.  Had Plaintiff known of the true facts, specifically including, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the December 2000 Agreement, or otherwise agreed to sell his shares in the Company at that time.

77.     As a direct and proximate result of the negligent conduct alleged above, Plaintiff has been damaged in that he was improperly induced to enter the December 2000 Agreement and sold his shares of the Company at a below fair market price.  The amount of such damage is not presently ascertainable, but will be proven at trial.

### NINTH CAUSE OF ACTION

**(Unfair Competition in Violation of California Business & Professions Code §§ 17200 et seq.)**

78.     Plaintiff hereby reasserts and realleges paragraphs 1 through 77 inclusive, as though set forth in full herein.

79.     California Business and Professions Code §§ 17200 et seq. proscribes, in part, "any unlawful, unfair, or fraudulent business practice."

80.     By virtue of the conduct alleged above, Defendant has committed unlawful, unfair, and/or fraudulent business practices with regard to his dealings with Plaintiff.

81.     As a direct and proximate result of Defendant's violations Business and Professions Code §17200 et seq. alleged above, Plaintiff has been harmed and is entitled to restitution of the amounts to which he has been unjustly harmed, and Defendant unjustly enriched, and other relief as pled herein.

///     EXHIBIT ___1___

///     PAGE ___23___

20

03:P39J001.618                                    FL 6484                    VERIFIED COMPLAINT

**TENTH CAUSE OF ACTION**

(Rescission Based on Mistake)

82.    Plaintiff hereby reasserts and realleges paragraphs 1 through 81, inclusive, as though set forth in full herein.

83.    In entering into both the Arbitration Agreement and the December 2000 Agreement, Plaintiff was mistaken in his belief that Defendant planned to inform the arbitrator, and otherwise to disclose during the course of the arbitration proceeding, and/or had already had disclosed to Plaintiff, without limitation true and accurate information concerning the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

84.    The disclosure of true and accurate information to Plaintiff and to the arbitrator concerning, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line was a basic assumption on which the Arbitration Agreement and/or the December 2000 Agreement rested.

85.    Defendant's failure to accurately disclose true and accurate information to Plaintiff and to the arbitrator regarding, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line had a such material effect on the Arbitration Agreement and/or the December 2000 Agreement that enforcement of either agreement against Plaintiff would be unfair and unconscionable.

86.    Defendant both knew about, and was the cause of, Plaintiff's mistake in believing Defendant would accurately disclose to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line at the time Plaintiff executed those agreements.

**EXHIBIT** 1

21

FL 6485

VERIFIED COMPLAINT

03-3391001.618

87. Plaintiff did not bear the risk of Defendant's entering into the Arbitration Agreement and/or the December 2000 Agreement without disclosing to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

### ON THE FIRST AND SECOND CAUSES OF ACTION

1. For rescission of the Arbitration Agreement;

2. For rescission of Plaintiff's sale of his shares in the Company;

3. For restitution of Plaintiff's shares in the Company;

4. In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

5. For punitive damages in an amount necessary to punish the Defendant, to the extent permitted by law.

6. For attorneys fees and cost of suit.

7. For interest at the maximum rate allowed by law.

8. For such other and further relief the Court may deem just, equitable, and/or proper.

### ON THE THIRD AND SEVENTH CAUSES OF ACTION

1. For rescission of Plaintiff's sale of his shares in the Company;

2. For restitution of Plaintiff's shares in the Company;

3. In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

4. For punitive damages in an amount necessary to punish the Defendant, to the extent permitted by law.

EXHIBIT _____1_____

PAGE ___25___

22

FL 6486

03:P391001.618

VERIFIED COMPLAINT

5.     For attorneys fees and cost of suit.

6.     For interest at the maximum rate allowed by law.

7.     For such other and further relief the Court may deem just, equitable, and/or proper.

### ON THE FOURTH AND EIGHTH CAUSES OF ACTION

1.     For damages according to proof;

2.     For attorneys fees and cost of suit.

3.     For interest at the maximum rate allowed by law.

4.     For such other and further relief the Court may deem just, equitable, and/or proper.

### ON THE FIFTH AND SIXTH CAUSES OF ACTION

1.     For rescission of Plaintiff's sale of his shares in the Company;

2.     For restitution of Plaintiff's shares in the Company;

3.     In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

4.     For attorneys fees and cost of suit.

5.     For interest at the maximum rate allowed by law.

6.     For such other and further relief the Court may deem just, equitable, and/or proper.

### ON THE NINTH CAUSE OF ACTION

1.     For restitution in an amount necessary to restore to Plaintiff the amount by which Defendant has been unjustly enriched by means of the unlawful, unfair, and fraudulent acts alleged above.

2.     For attorneys fees and cost of suit.

3.     For interest at the maximum rate allowed by law.

**EXHIBIT** 1

**PAGE** 26

23

4.   For such other and further relief the Court may deem just, equitable, and/or proper.

### ON THE TENTH CAUSE OF ACTION

1.   For rescission of Plaintiff's sale of his shares in the Company;

2.   For restitution of Plaintiff's shares in the Company;

3.   For attorneys fees and cost of suit.

4.   For interest at the maximum rate allowed by law.

5.   For such other and further relief the Court may deem just, equitable, and/or proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury herein on all causes of action so triable.

DATED: August 25, 2003

HOWARTH & SMITH
DON HOWARTH
SUZELLE M. SMITH
BRIAN D. BUBB
ROBERT D. BRAIN

By: _Don Howarth_
    Don Howarth

Attorneys for Plaintiff
Farhad Larian

EXHIBIT ____1____

PAGE ___27___

24

03:P391001.618                    FL 6488          VERIFIED COMPLAINT

## VERIFICATION

I, Farhad Larian, declare:

I am a party to this action, and I certify and declare that I have read the foregoing **VERIFIED COMPLAINT** and know its contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that this Verification was executed on August 22, 2003, at Los Angeles, California and that the foregoing is true and correct.

Farhad Larian

EXHIBIT ___1___

PAGE ___28___

03:P390001.618

VERIFICATION

FL 6489

EXHIBIT A

EXHIBIT ___1___

PAGE ___29___

FL 6490

## AGREEMENT TO ARBITRATE AND SELECTION OF ARBITRATOR

This Agreement is made between Isaac Larian ("Isaac"), Farhad Larian ("Farhad") and Morad Zarabi ("Morad") pursuant to the following recitals, terms and conditions.

A.  Isaac and Farhad each own a 45% shareholder interest in ABC Int'l Traders Inc., a California corporation ("Corporation").

B.  Disputes have arisen between Isaac and Farhad concerning the continuing operation of the Corporation and other matters such as partnerships. Isaac and Farhad have been unable to resolve their disputes and desire to conclude their disputes in an economical and timely manner, outside of the formal judicial process.

C.  Both Isaac and Farhad have great confidence in the business and personal judgment of Morad and desire to utilize the services of Morad as a binding arbitrator of the disputes between Isaac and Farhad.

D.  As an accommodation to Isaac and Farhad, Morad agrees to undertake the position as arbitrator.

Now Therefore, the parties agree as follows:

1.  Isaac and Farhad irrevocably appoint Morad to arbitrate their disputes with respect to the Corporation, its operation and their shareholder interests in the Corporation, and other disputes.

2.  Upon execution of this Agreement, Isaac and Farhad shall deliver their irrevocable shareholder proxy and share certificates to Morad so that Morad may vote their shares of Corporation as Morad so determines, including the voting for positions on the Board of Directors.

3.  Upon execution of this Agreement, Isaac and Farhad shall each deliver to Morad their personal check in the amount of $500,000.00 payable to the other, to be utilized as a down payment of the purchase price as determined in Section 5 of this Agreement for the Sale of either Isaac's or Farhad's shares of the Corporation to the other.

4.  Isaac and Farhad shall present their arguments and concerns to Morad in a manner as determined by Morad. Evidence may be admitted or excluded in the sole discretion of Morad. Morad shall then render his decisions with respect to the disputes and said decisions shall be binding and conclusive upon Isaac and Farhad.

5.  In rendering his decisions, Morad has the right and power to determine, among other issues, whether either Isaac or Farhad will have to sell his shares of Corporation to the other and the purchase price and terms of payment for said shares; setting the salaries of Isaac and Farhad; and the continuation of employment by the Corporation of either Isaac or Farhad.

EXHIBIT ____1____

PAGE __30__                                          FL 6491

6.    Isaac and Farhad agree to be bound by the terms of Morad's decisions and to implement the terms of Morad's decisions in the time parameters as established by Morad.

7.    Isaac and Farhad acknowledge that Morad has agreed to perform such services as arbitrator as an accommodation to Isaac and Farhad. Isaac and Farhad agree to hold Morad harmless and to indemnify Morad from any cost, liability, suit, claim, damage or judgment, including court costs and reasonable attorneys' fees arising out of or relating to this Agreement and the decisions made by Morad pursuant to the terms of this Agreement.

8.    Isaac and Farhad agree to pay equally the costs and expenses of Morad incurred by him, including his attorneys' fees, in drafting and implementing the terms of this Agreement and performing his responsibilities herein.

9.    Isaac and Farhad agree and intend hereby that Morad's decisions will constitute a full and final resolution of all disputes, past or present, between Isaac and Farhad concerning the Corporation, its operation their shareholder interests in Corporation, and other disputes.

10.   Any judgment or award rendered by Morad may be entered in any Court having jurisdiction over the disputes between Isaac and Farhad.

11.   To the extent not otherwise provided by this Agreement or determined by Morad, the rules governing the arbitration and enforcement of the arbitration award shall be governed by the California Arbitration Act, California Code of Civil Procedure, Section 1280 et seq.

Dated:_____, 2000

_____         _____         _____
ISAAC LARIAN                     FARHAD LARIAN                     MORAD ZARABI

EXHIBIT __1_____

PAGE __31_____

FL 6492

**EXHIBIT B** $\int$

EXHIBIT ___I___

PAGE ___32___

FL 6493

## AGREEMENT FOR SALE OF STOCK

This Agreement, made this 4TH day of December, 2000, by and between Farhad Larian ("SELLER"), and Isaac Larian ("BUYER").

Whereas, the SELLER is the owner of 10,000,000 shares of common stock of ABC International Traders Inc., a California corporation and 450 shares of MGA Entertainment Hong Kong Limited, a Hong Kong Corporation (collectively "CORPORATION"), with offices at 16730 Schoenborn Street, North Hills, California 91343-6122, and desires to sell to the BUYER, and the BUYER desires to purchase from the SELLER, these 10,000,000 and 450 shares of common stock of CORPORATION.

Now, therefore, in consideration of the promises and of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1. At Closing, as defined hereinafter, SELLER shall sell, transfer and convey to BUYER and BUYER shall purchase from SELLER, SELLER'S 10,000,000 and 450 shares of common stock of CORPORATION.

2. The purchase price for said shares shall be the sum of Eight Million Seven Hundred Seventy Five Thousand Dollars ($8,775,000.00), payable as follows:

a. The sum of $500,000.00 at Closing, as defined hereinafter; plus

b. The sum of $8,275,000.00 evidenced by BUYER'S promissory note made payable to SELLER, in the form as attached hereto as Exhibit "A" and incorporated herein by reference. Said promissory note shall provide for a principal payment in the amount of $2,000,000.00, with interest at nine and one-half percent on or before April 15, 2001 and the remainder of the principal balance amortized in equal monthly payments of principal and interest over 120 months at an annual interest rate of nine and one-half percent commencing June

1

EXHIBIT 1
PAGE 33

FL 6494

1, 2001. The promissory note shall also provide that, in the event of default, BUYER agrees that SELLER'S personal residence located at 237 North Carolwood Drive, Los Angeles, CA shall be exempt from lien or attachment.

1. BUYER agrees to secure his promissory note obligation to SELLER as follows:

BUYER shall execute a Pledge Agreement in favor of SELLER in the form as attached hereto as Exhibit "B" and incorporated herein by reference. Said Pledge Agreement shall be for the purposes of securing BUYER'S total shareholder interest in CORPORATION in favor of SELLER until such time as BUYER'S obligations pursuant to his promissory note in favor of SELLER has been paid in full. Said Pledge Agreement shall have restrictions imposed upon BUYER with respect to the amount of compensation paid to BUYER from CORPORATION during the period of time that BUYER'S promissory note in favor of SELLER remains outstanding.

4. In addition to the purchase price as above stated, BUYER shall cause ABC International Traders Inc. to enter into a Consultation Agreement with BUYER in the form as attached hereto as Exhibit "C" and incorporated herein by reference.

5. SELLER warrants and represents to the BUYER the following:

a. That CORPORATION is a corporation duly organized, validly existing, and in good standing under the laws of California or Hong Kong, respectively, has all necessary corporate powers to own its properties and carry on its business as now owned and operated by it.

b. That SELLER is the owner of and has the good and marketable title to the 10,000,000 shares and 450 shares, respectively, of stock agreed to be sold herein, representing 45% of the issued and outstanding shares of CORPORATION, and each of them, free of all encumbrances, liens and security interests.

2

EXHIBIT ___1___

PAGE ___34___

FL 6495

c.   That the authorized capital stock of CORPORATION consists of 100,000,000 shares and 1,000 shares respectively of common stock no or nominal par value, of which 22,200,000 shares of ABC International Traders Inc. are presently issued and outstanding and 1,000 shares of MGA Entertainment Hong Kong Limited are presently issued and outstanding.

d.   That any right of first refusal, stock option or any other agreement wherein SELLER has the right to purchase shares of CORPORATION is hereby terminated.

6.   BUYER acknowledges that he is a current shareholder of CORPORATION, has been the President and a Director of CORPORATION; and an employee of CORPORATION for at least 18 years for ABC International Traders Inc. and at least 7 years for MGA Entertainment Hong Kong Limited, since the inception of CORPORATION.  BUYER is thoroughly familiar with the operations of CORPORATION and purchases the shares of CORPORATION from SELLER with full knowledge of the business, prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, and financial condition of CORPORATION.  SELLER makes no warranty, either express or implied as to the business of CORPORATION, its prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, or financial condition.

7.   The consummation of the transaction contemplated by this Agreement ("Closing") shall take place at the offices of the CORPORATION on the 2nd day of January 2001, at 10:00 a.m., or such other time and place as the parties may agree.  The sale shall be effective as of the close of business on December 31, 2000, the end of the calendar and fiscal year of CORPORATION.  At the Closing the

3

EXHIBIT ___1___

PAGE ___35___

FL 6496

following documents and instruments shall be exchanged between the parties:

  a. SELLER shall deliver to BUYER:

   (i). CORPORATION'S share certificate number 3 issued in favor of SELLER representing 10,000,000 shares of ABC International Traders Inc.; and share certificated number 2 issued in favor of SELLER representing 450 shares of MGA Entertainment Hong Kong Limited, duly endorsed by SELLER in favor of BUYER.

   (ii). The resignation of SELLER as a Director and employee of CORPORATION.

   (iii). Any and all records of CORPORATION in the possession of SELLER.

   (iv). A Pledge Agreement executed by SELLER as the secured party in the form as attached hereto as Exhibit "B".

   (v). A Consultation Agreement executed by SELLER in the form as attached hereto as Exhibit "C".

   (vi). A Mutual Release executed by SELLER in the form as attached hereto as Exhibit "D".

  b. BUYER shall deliver to SELLER:

   (i). Cash in the sum of $500,000.00 in the form of a cashier's check, certified check or wired funds.

   (ii). BUYER'S Promissory Note in the amount of $8,275,000.00 made payable to SELLER in the form as attached hereto as Exhibit "A".

   (iii). A Pledge Agreement executed by BUYER as the securing party in the form as attached hereto as Exhibit "B".

   (iv). A Consultation Agreement executed by ABC International Traders Inc. in the form as attached hereto as Exhibit "C".

   (vi). A Mutual Release executed by BUYER in the form as attached

4

**EXHIBIT** I

**PAGE** 36

FL 6497

hereto as Exhibit "D".

8.   The parties acknowledge that differences have arisen between them concerning the continued management and operation of CORPORATION, to the extent that the continued successful operation of CORPORATION is threatened unless one of the parties purchases the other party's shareholder interest.   The parties have each sought the assistance of Morad Zarabi ("Morad") as an "arbitrator" to determine the seller and buyer between the parties, the purchase price and the terms of the purchase.   The parties previously executed an Agreement To Arbitrate And Selection of Arbitrator setting forth their agreement in this regard.   Morad has determined the purchase price and terms of payment from consultations with each of the parties and by undertaking his own outside independent research as to the value of CORPORATION.   Morad shall not charge a fee for his services rendered herein.   The costs and expenses of Morad, including appraisal costs and attorneys' fees incurred by Morad in drafting this Agreement, the various Exhibits attached hereto and the Agreement To Arbitrate And Selection of Arbitrator shall be paid by the CORPORATION at time of closing.   The parties acknowledge that Morad agreed to undertake his duties as arbitrator as an accommodation to the parties.   Each of the parties agrees to indemnify Morad, his associates, employees, consultants, lawyers, family members and all other persons employed or consulted by Morad in connection with the consummation of this Agreement or the Agreements or other documents attached as Exhibits hereto, and hold him and them harmless from any suit, claim, liability, loss, expense or damage, including court costs and reasonable attorneys' fees, as a result Morad's actions as arbitrator or any other actions concerning the drafting or implementation of this Agreement or the Agreements or other documents attached as Exhibits hereto.

5

EXHIBIT 1

PAGE 37

FL 6498

9.  Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to Morad who shall serve as sole arbitrator with respect to said disputes.  The decision of Morad shall be final and binding upon both parties.  In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator.  Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act.

10.  The parties acknowledge that this Agreement, the Agreements attached hereto as Exhibits, and the Agreement To Arbitrate And Selection Of Arbitrator were drafted at the request of and on behalf of Morad by his attorneys, Stern & Goldberg.  The parties each acknowledge that Stern & Goldberg does not represent either party to this Agreement.  The parties have each been advised to seek legal counsel of their choice to represent their respective interests prior to entering into this Agreement and the Agreements attached hereto as Exhibits.  Each party shall have three business days from the date of signing this Agreement to consult with legal counsel of his choice concerning the terms and conditions of this Agreement.  Either party may terminate this Agreement without any further liability thereon, except to the extent such liability arises under the Agreement To Arbitrate And Selection of Arbitrator previously signed by the parties, in the event he notifies Morad and the other party in writing of his intent to do so within three business days from the signing of this Agreement.  In the event no such written notification has been given, it shall be assumed that each party has chosen either to have this Agreement reviewed by legal counsel of his choice and no objections to the form and content of this Agreement has been made; or said party has decided, in its unilateral discretion despite repeated warnings by

6

EXHIBIT ___1___

PAGE ___38___

FL 6499

Morad and his attorney to seek such independent legal review, not to seek such legal advice. The parties have initialed this section hereinafter indicating their knowledge of the provisions of this Section.

11. The parties agree that, to the extent required, the transfer of shares as contemplated by this Agreement will have been qualified with the California Commissioner of Corporations in accordance with the California Corporate Securities Law and the Commissioner's Rules and Regulations; and the appropriate Hong Kong governmental authorities, respectively. The parties agree to utilize their best efforts and timely file any applications, consents or notices to secure the Commissioner's and/or Hong Kong authorities consent to the transfer of shares as contemplated herein.

12. Each party represents and warrants that it has dealt with no broker or finder in connection with any transaction contemplated by this Agreement, and as far as it knows, no broker or other person is entitled to any commission or finder's fee in connection with any of these transactions. Each party will indemnify and hold one another harmless against any loss, liability, damage, cost, claim, or expense incurred by reason of any brokerage commission or finder's fee alleged to be payable because of any act, omission, or statement of the indemnifying party.

13. The parties intend that this Agreement and the parties timely compliance with the terms hereof shall resolve and settle all of the claims of either party against the other, including any claim one party may have against the other or CORPORATION for any prior monetary discrepancy whatsoever. The parties shall execute a Mutual Release in the form as attached hereto as Exhibit

7

EXHIBIT ___I___

PAGE ___39___

FL 6500

"D".

14.  BUYER agrees that, during the time that any portion of the promissory note from BUYER payable to SELLER as provided herein remains outstanding, BUYER shall cause CORPORATION to name Morad as a member of the Board of Directors of CORPORATION.

15.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by the parties.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

16.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.  This Agreement shall be binding on and shall inure to the benefit of the parties to it, and their respective heirs, legal representatives, successors and assigns; provided, however, no assignment by BUYER shall relieve BUYER of any of his obligations or duties under this Agreement.

18.  If any action or other proceeding is commenced to enforce the terms of this Agreement, the prevailing party, in addition to all other relief as appropriate under California law, shall be entitled to the recovery of court costs and reasonable attorneys fees.

19.  This Agreement shall be construed in accordance with and be governed

8

EXHIBIT ___1_____

PAGE __40_____

FL 6501

by the laws of the State of California.

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it effective the day and year first above written.

BUYER:                          SELLER:

_____         _____

ISAAC LARIAN                    FARHAD LARIAN

EXHIBIT ___1_____

PAGE ___41_____            FL 6502

## SPOUSAL CONSENT

The undersigned is the spouse of Farhad Larian.  To the extent that the undersigned now has a community property interest in the shares of ABC International Traders Inc. registered in the name of her husband, the undersigned hereby acknowledges that she has read this Agreement For Sale Of Stock, understands its contents and agrees that her community property interest in the shares of said corporation registered in the name of her husband shall be bound by and subject to the terms of this Agreement.

Dated: _____, 2000       _____

10

EXHIBIT ___1_____

PAGE ___42_____          FL 6503

PROMISSORY NOTE

$8,275,000.00    Los Angeles, California,  January __ 2001

    In installments as herein stated, for value received, the undersigned promises to pay to Farhad Larian, or order, at Los Angeles, California, the sum of Eight Million Two Hundred Seventy Five Thousand Dollars, with interest from date of making on unpaid principal, at the rate of nine and one-half percent per annum, payable in installments of principal and interest (amortized on $6,275,000.00 portion of note) of $83,798.90 or more on the first day of each successive month, commencing June 1, 2001.  Principal and accrued interest on the above portion of the note shall be all due and payable on June 1, 2004.  The undersigned shall have a ten (10) day grace period from and after the due date of any payment prior to being in default of his obligation herein.  In addition thereto, the undersigned shall make a principal payment of $2,000,000.00, with interest thereon, on or before April 15, 2001.

    Should default be made in payment of any installment of principal or interest when due the whole sum of principal and interest shall become immediately due at the option of the holder of this note.  Principal and interest payable in lawful money of the United States.  If action be instituted on this note the undersigned promises to pay such sum as the Court may fix as attorney's fees.

    This Promissory Note is secured by a Pledge Agreement of even date executed by the undersigned and beneficiary herein.

    In the event of default, the principal residence of the undersigned, located at 237 North Carolwood Drive, Los Angeles, California 90077 shall not be subject to lien, attachment or seizure.

ISAAC LARIAN

EXHIBIT __1__

PAGE __43__

FL 6504

'01-21-01   17:13   From-Stern & Goldberg          +310 270 0521       .-755   P.003/007   F-722

## AMENDMENT TO PROMISSORY NOTE

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into an Agreement For Sale of Stock, which included an $8,275,000.00 Promissory Note ("Note") executed by Isaac in favor of Farhad. The Note provided, in part, for a principal payment of $2,000,000.00 with interest thereon, on or before April 15, 2001.

Isaac and Farhad agree that the payment date for said $2,000,000.00 installment, plus interest, at the request of Isaac, be and is hereby extended to "on or before June 3, 2001".

All other terms of the Note shall remain in full force and effect.

Dated: 2/1/2001

_____
Farhad Larian

_____
Isaac Larian

EXHIBIT ____1____

PAGE ____44____

FL 6505

1

```
--------------------------------------------------------------------
                                    12-04-2000  17:59:53  Pg  1
--------------------------------------------------------------------

Compounding interval:  Monthly

Annual percentage rate......:  9.500%
Effective annual rate.......:  9.925%
Rate per compounding period.:  0.7917%
Equivalent daily rate.......:  0.02603%

Valuation date: 01-01-2001    Value:  $ 6,275,000.00

CASH FLOW DATA
--------------------------------------------------------------------
First date   Payment amount  -#- Interval   Last date
--------------------------------------------------------------------
06-01-2001   $    83,798.90  35 Monthly     04-01-2004
05-01-2004   $ 5,211,001.13   1
```

AMORTIZATION SCHEDULE  -  Normal amortization

| Pmt | Date | Payment | Interest | Principal | Balance |
|-----|------|---------|----------|-----------|---------|
| | | | | Balance at 01-01-2001 | 6,275,000.00 |
| 1 | 06-01-2001 | 83,798.90 | 252,349.44 | 168,550.54− | 6,443,550.54 |
| 2 | 07-01-2001 | 83,798.90 | 51,011.44 | 32,787.46 | 6,410,763.08 |
| 3 | 08-01-2001 | 83,798.90 | 50,751.87 | 33,047.03 | 6,377,716.05 |
| 4 | 09-01-2001 | 83,798.90 | 50,490.25 | 33,308.65 | 6,344,407.40 |
| 5 | 10-01-2001 | 83,798.90 | 50,226.56 | 33,572.34 | 6,310,835.06 |
| 6 | 11-01-2001 | 83,798.90 | 49,960.78 | 33,838.12 | 6,276,996.94 |
| 7 | 12-01-2001 | 83,798.90 | 49,692.89 | 34,106.01 | 6,242,890.93 |
| 2001 totals | | 586,592.30 | 554,483.23 | 32,109.07 | |
| 8 | 01-01-2002 | 83,798.90 | 49,422.89 | 34,376.01 | 6,208,514.92 |
| 9 | 02-01-2002 | 83,798.90 | 49,150.74 | 34,648.16 | 6,173,866.76 |
| 10 | 03-01-2002 | 83,798.90 | 48,876.45 | 34,922.45 | 6,138,944.31 |
| 11 | 04-01-2002 | 83,798.90 | 48,599.98 | 35,198.92 | 6,103,745.39 |
| 12 | 05-01-2002 | 83,798.90 | 48,321.32 | 35,477.58 | 6,068,267.81 |
| 13 | 06-01-2002 | 83,798.90 | 48,040.45 | 35,758.45 | 6,032,509.36 |
| 14 | 07-01-2002 | 83,798.90 | 47,757.37 | 36,041.53 | 5,996,467.83 |
| 15 | 08-01-2002 | 83,798.90 | 47,472.04 | 36,326.86 | 5,960,140.97 |
| 16 | 09-01-2002 | 83,798.90 | 47,184.45 | 36,614.45 | 5,923,526.52 |
| 17 | 10-01-2002 | 83,798.90 | 46,894.58 | 36,904.32 | 5,886,622.20 |
| 18 | 11-01-2002 | 83,798.90 | 46,602.43 | 37,196.47 | 5,849,425.73 |
| 19 | 12-01-2002 | 83,798.90 | 46,307.95 | 37,490.95 | 5,811,934.78 |
| 2002 totals | | 1,005,586.80 | 574,630.65 | 430,956.15 | |
| 20 | 01-01-2003 | 83,798.90 | 46,011.15 | 37,787.75 | 5,774,147.03 |
| 21 | 02-01-2003 | 83,798.90 | 45,712.00 | 38,086.90 | 5,736,060.13 |

```
--------------------------------------------------------------------
                                        12-04-2000  17:59:53 Pg  2
--------------------------------------------------------------------
```

| Pmt | Date | Payment | Interest | Principal | Balance |
|-----|------|---------|----------|-----------|---------|
| 22 | 03-01-2003 | 83,798.90 | 45,410.48 | 38,388.42 | 5,697,671.71 |
| 23 | 04-01-2003 | 83,798.90 | 45,106.57 | 38,692.33 | 5,658,979.38 |
| 24 | 05-01-2003 | 83,798.90 | 44,800.25 | 38,998.65 | 5,619,980.73 |
| 25 | 06-01-2003 | 83,798.90 | 44,491.51 | 39,307.39 | 5,580,673.34 |
| 26 | 07-01-2003 | 83,798.90 | 44,180.33 | 39,618.57 | 5,541,054.77 |
| 27 | 08-01-2003 | 83,798.90 | 43,866.68 | 39,932.22 | 5,501,122.55 |
| 28 | 09-01-2003 | 83,798.90 | 43,550.55 | 40,248.35 | 5,460,874.20 |
| 29 | 10-01-2003 | 83,798.90 | 43,231.92 | 40,566.98 | 5,420,307.22 |
| 30 | 11-01-2003 | 83,798.90 | 42,910.77 | 40,888.13 | 5,379,419.09 |
| 31 | 12-01-2003 | 83,798.90 | 42,587.07 | 41,211.83 | 5,338,207.26 |
| 2003 totals | | 1,005,586.80 | 531,859.28 | 473,727.52 | |
| | | | | | |
| 32 | 01-01-2004 | 83,798.90 | 42,260.81 | 41,538.09 | 5,296,669.17 |
| 33 | 02-01-2004 | 83,798.90 | 41,931.96 | 41,866.94 | 5,254,802.23 |
| 34 | 03-01-2004 | 83,798.90 | 41,600.52 | 42,198.38 | 5,212,603.85 |
| 35 | 04-01-2004 | 83,798.90 | 41,266.45 | 42,532.45 | 5,170,071.40 |
| 36 | 05-01-2004 | 5,211,001.13 | 40,929.73 | 5,170,071.40 | 0.00 |
| 2004 totals | | 5,546,196.73 | 207,989.47 | 5,338,207.26 | |
| | | | | | |
| Grand totals | | 8,143,962.63 | 1,868,962.63 | 6,275,000.00 | |

EXHIBIT ___1___

PAGE __46__          FL 6507

<u>PLEDGE AGREEMENT</u>

THIS PLEDGE AGREEMENT made this __ day of _DEC._, 2001, by and
between Isaac Larian hereinafter referred to as "Pledgor"; and Farhad Larian
hereinafter referred to as "Pledgee"; and Morad Zarabi hereinafter referred to
as "Trustee".

<u>W I T N E S S E T H</u>

Pledgor, as security for the performance of his obligations under and
pursuant to a promissory note payable to Pledgee of even date herewith in the
principal amount of $8,275,000.00, as well as the performance of all other
obligations contemplated hereby and pursuant to the terms of the Agreement For
Sale Of Stock dated December __, 2000 between Pledgor and Pledgee, pledges,
assigns and delivers to Trustee for the benefit of Pledgee the hereinafter
described shares of stock of ABC International Traders Inc., a California
corporation, and MGA Entertainment Hong Kong Limited, a Hong Kong corporation,
hereinafter collectively referred to as "Company", subject to the terms and
conditions hereinafter set forth.

NOW, THEREFORE, it is mutually agreed by the parties as follows:

1)     <u>PLEDGE</u>

(a)   Pledgor hereby delivers to Trustee certificates of stock in
ABC International Traders Inc. numbered 1 and 3 representing a total of
20,000,000 shares of common stock of ABC International Traders Inc.; and
certificates of stock in MGA Entertainment Hong Kong Limited numbered 1 and 2
representing a total of 900 shares of common stock of MGA Entertainment Hong

1

EXHIBIT   1

PAGE   47                    FL 6508

Kong Limited issued in the name of Pledgor, together with an assignment separate from certificate executed by Pledgor in favor of Pledgee assigning said shares of common stock in Company to Pledgee, said stock certificates and assignment to be held by Trustee as security for the payment of Pledgor's promissory note and other obligations referred to above.

(b)   Pledgor warrants and represents that he owns said stock free and clear of any liens or encumbrances except this Pledge Agreement; and agrees not to encumber, transfer or otherwise hypothecate said stock during the term of the Pledge Agreement.

(c)   In the event that during the term of this Pledge Agreement any stock dividend, reclassification, readjustment, or other change is declared or made in the capital stock of the Company which affects the pledged shares, or any subscription, warrant, or other option is exercised with reference to the pledged stock, all the new, substituted or additional shares, or other securities issued pursuant to any such change or option shall be delivered to Trustee by Pledgor and shall be held by Trustee under the terms of this Pledge Agreement in the same manner as the stock originally pledged hereunder.   Trustee shall have no duty or obligation to compel Pledgor to deliver such new, substituted or additional shares, or other securities so issued to Trustee.

2)   <u>VOTING RIGHTS, DIVIDENDS AND OTHER RESTRICTIONS ON DISTRIBUTIONS</u>:

(a)   Pledgor shall have the right to vote the stock pledged as herein and to receive all cash dividends, as limited hereinafter, if any, declared on said stock, so long as the Pledgor is not in default in the performance of any of the terms of this Pledge Agreement, the Agreement For Sale Of Stock or in the payment of the promissory note secured hereby during

2

EXHIBIT ___1___

PAGE ___48___

FL 6509

the term of this Pledge Agreement.  In the event Pledgee notifies the Trustee that Pledgor is in default hereunder, Pledgee shall be entitled to vote the shares for which payment is in default.  For voting purposes, Trustee shall be entitled to rely upon the written representations of Pledgee concerning a default relative to shares held by Trustee, and Trustee shall have no obligation to make any such determination unless Pledgee sends to Trustee a letter by certified mail specifying a default as set forth in Paragraph 4 below.

(b)  During the term of this Pledge Agreement, Pledgor and his immediate family members shall be limited in the aggregate annual amount of distributions from ABC International Traders Inc., whether as salary, dividends, perquisites or any other form to an amount no greater than the sum of the annual principal and interest payments payable to Pledgee under the promissory note plus the sum of $500,000.00 plus the amount of any federal and state taxes payable by Pledgor on said amounts.  Notwithstanding the above, this distribution limitation shall not apply with respect to any distributions to family members of Pledgor who are presently employed at Company.

3)   <u>RETURN OF COLLATERAL</u>:  At such time as Pledgor has presented to Trustee evidence satisfactory to Trustee of full payment of Pledgor's promissory note to Pledgee, and the complete performance of any other obligation imposed on Pledgor pursuant to the terms of the Agreement For Sale Of Stock above mentioned, Trustee shall deliver to Pledgor all of the stock held hereunder together with the assignment executed by Pledgor.

4)   <u>DEFAULT</u>:  An event of default by Pledgor as used in this Pledge Agreement shall be any and all of the following, provided, however, that the default shall not be deemed to occur until the Pledgee shall have notified the

3

EXHIBIT ___1___

PAGE ___49___

FL 6510

Pledgor in writing specifying the nature of the default, and until the time for curing the same, if any, following Pledgor's receipt of notice from Pledgee, has expired:

      (a)  The failure of Pledgor to pay the indebtedness evidenced by the promissory note in favor of Pledgee in accordance with the terms thereof, should Pledgor fail to make such payment within thirty (30) days from the due date of any payment thereunder.

      (b)  The failure of Pledgor to observe, keep or perform within ninety (90) days any covenant, agreement or condition required in this instrument or the Agreement For Sale Of Stock or the Promissory Note in favor of Pledgee herewith to be observed, kept or performed for the benefit of Pledgee.

      (c)  If Pledgor is adjudicated a bankrupt, or requests, either by way of petition or answer, that Pledgor be adjudicated a bankrupt, or if any involuntary petition in bankruptcy be filed against Pledgor and the same shall not have been determined in favor of Pledgor or dismissed within ninety (90) days from the date thereof.

    5)   <u>RIGHTS ON DEFAULT</u>:

      (a)  Upon the happening of any of the events specified in Paragraph 4, Pledgee may, at Pledgee's election and upon proper notice and after the appropriate curative periods set forth in Paragraph 4, declare any and all obligations of the Pledgor in default secured hereby immediately all due and payable, and Pledgee is given the full power and authority to take possession of all stock pledged hereunder by the Pledgor in default from Trustee, and, at Pledgee's option, to sell and deliver the whole or any part of the herein described stock held by Trustee, or any substitutions or

4

EXHIBIT ___1___

PAGE ___50___

FL 6511

additions thereto, at one or more private or public sales, with notice, as Pledgee shall determine.

(b) Upon any such sale, Pledgee may become the purchaser of the whole, or any part, of such stock, discharged from any right of redemption, and after deducting all costs and expenses of collection, sale and delivery, including reasonable attorney's fees, may apply the residue of the proceeds of such collection, sale or sales, to the payment of the obligations secured hereby. Any overage of the residue of the proceeds of such sales shall be forthwith returned to Pledgor.

(c) In the event of any public sale of the stock hereunder, if any law or regulation of the Securities and Exchange Commission or the California Commissioner of Corporations, or any other Federal or state body having jurisdiction, shall require that the Company whose stock is pledged hereunder or Pledgee or Pledgor should take any action prior to the sale of said stock, each of the parties hereto shall use his or its respective best efforts to comply with all of the said requirements. Pledgee agrees to indemnify and hold Pledgor and Company harmless against any liabilities incurred by either of them by virtue of Pledgee's sale of the stock in violation of any such law or regulation.

6) <u>LIENS</u>: Pledgor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the stock pledged hereunder.

7) <u>CAPTIONS</u>: The paragraph captions are inserted in this Pledge Agreement merely for convenience and are not to be construed as a part of this Pledge Agreement, or in any way limiting or affecting the language of any paragraph in this Pledge Agreement.

8) <u>PLEDGE CONSENT</u>: Where the consent of the Pledgee is required in

5

EXHIBIT _____ 1 _____

PAGE _____ 51 _____                    FL 6512

this Agreement, in connection with actions proposed to be taken by Pledgor, such consent shall not be withheld or delayed unreasonably.  Consent shall be deemed to have been given to any specific action by Pledgor if Pledgee has not responded to written request for such consent within fifteen (15) days after receipt of notice in accordance with paragraph 12 of this Agreement.

9)   GENDER:  In this Agreement, whenever the context so requires, the masculine gender herein written shall include the feminine or the neuter and the singular number shall include the plural.

10)   TRUSTEE:

(a)  Trustee, by its signature hereto, consents to act as Trustee hereunder upon the express understanding that it shall be solely responsible for the physical holding of the shares described herein, and shall deliver said shares of stock to Pledgee in the event of default as hereinabove provided, together with the attached assignment; or to Pledgor upon full satisfaction of the promissory note and obligations pursuant to the Agreement For Sale Of Stock, both above described.

(b)  It is expressly understood that the duties and obligations of the Trustee are to be strictly limited to the foregoing, and the parties acknowledge that they do hereby hold Trustee free and harmless from any and all liability, costs, and expenses, including attorney's fees, by reason hereof, and that said parties shall and do hereby indemnify Trustee therefrom. Pledgor does hereby acknowledge that the stock being deposited with Trustee hereunder is deposited upon the joint risk of Pledgor and Pledgee.  Any fees of Trustee for acting as Trustee shall be paid by Pledgor.

(c)  Trustee shall have the power to appoint, currently or prospectively, a successor Trustee to so serve under the terms of this Pledge

6

EXHIBIT ___1___

PAGE ___52___

FL 6513

Agreement in the event Trustee is unable or unavailable to so act.

11) SUCCESSORS AND ASSIGNS: This Pledge Agreement shall be binding upon the parties hereto, and upon their respective heirs, personal representatives, successors and assigns.

12) NOTICES: Any and all notices to be served on or given to either Pledgor or Pledgee hereto, shall be in writing and shall be deemed duly served and given when personally delivered to either of the parties or in lieu of such personal service, when deposited in the United States mail, first-class, postage prepaid, addressed to Pledgor at 237 North Carolwood Drive, Los Angeles, California 90077, or to Pledgee at 2142 Century Park Lane, #6108, Los Angeles, CA 90067. Any and all notices to be served on or given to Trustee shall be in writing and shall be deemed duly served and given upon receipt by Trustee.

13) GOVERNING LAW: This Agreement shall be governed and interpreted in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

PLEDGEE:

_____
FARHAD LARIAN

PLEDGOR:

_____
ISAAC LARIAN

TRUSTEE:

_____
MORAD ZARABI

7

**EXHIBIT** ___1___

**PAGE** ___53___

FL 6514

<u>CONSULTING AGREEMENT</u>

This Consulting Agreement is entered into this <u>1</u> day of JBN 2001, by and between ABC International Traders Inc., a California corporation ("Company") and Farhad Larian ("Consultant").

WHEREAS, CONSULTANT was a former shareholder, Director and employee of COMPANY.

WHEREAS, COMPANY desires to have CONSULTANT perform certain services on behalf of COMPANY as an Independent Contractor.

NOW, THEREFORE, for valuable consideration, it is hereby agreed by the parties hereto as follows:

    1.   <u>TERM</u>

The term of this Agreement shall be for a period of five years, commencing January 1, 2001 and terminating December 31, 2005, unless earlier terminated as provided hereinafter.

    2.   <u>SERVICES</u>

(a)  CONSULTANT agrees to provide and make himself available to perform general administrative services, at the request of COMPANY, and/or otherwise make himself available to COMPANY for consultation by telephone, for a total period of time not more than ten hours per month, during the normal



EXHIBIT   1

PAGE   54

FL 6515

business hours of COMPANY.

(b)   COMPANY hereby acknowledges that during the term of this Agreement, CONSULTANT may engage in any other business or professional activity provided that such activity does not directly compete with the business of COMPANY within Los Angeles County, California, and the performance of such activity does not interfere with his present work as a consultant for COMPANY.

(c)   CONSULTANT hereby acknowledges that he is being employed as an Independent Contractor to render the services described herein and that CONSULTANT shall be solely responsible for any Federal and State Income Tax withholding or Estimated Tax Payments that CONSULTANT may be required to file and/or pay.

3.   <u>COMPENSATION</u>

For all services rendered by CONSULTANT under this Agreement, COMPANY <u>shall pay to CONSULTANT the sum of $7,500.00 per month payable on the first day of each month of the term hereof.</u>

4.   <u>TERMINATION</u>

This Agreement may be terminated by either party for cause or for breach by the other party of any provision contained in this Agreement. COMPANY may not terminate CONSULTANT for a breach of this Agreement until COMPANY has furnished CONSULTANT with written notice of the breach contended by COMPANY and CONSULTANT fails to cure said breach within ten (10) days of receipt of said notice.

After five years from the date hereof but not before, this Agreement may be terminated by COMPANY upon payment in full of the promissory note given by Isaac Larian to CONSULTANT as part of the purchase of CONSULTANT'S shares of COMPANY.

2

EXHIBIT  1

PAGE  55

FL 6516

This Agreement may be terminated by CONSULTANT, at any time, without cause, upon giving COMPANY thirty (30) days prior written notice.

5.   TRADE SECRETS

CONSULTANT acknowledges and represents that the sources of COMPANY's services, techniques, methods, products, manufacturing techniques, manufacturing requirements, pricing, customer lists and vendor lists are a trade secret and the property of COMPANY.   It is agreed that all such data is confidential and that it shall not be disclosed, directly or indirectly, or used by CONSULTANT in any way, except on behalf of COMPANY, either during the term of this Agreement or at any time thereafter.

6.   NOTICES

Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered mail to the principal office of COMPANY or personal residence of CONSULTANT.

7.   COUNTERPARTS

The within Agreement may be executed in duplicate counterparts and each such signed duplicate counterpart shall be deemed to be an original.

8.   TITLES AND CONSTRUCTION

The titles of the paragraphs in this Agreement are set forth for convenience only.  This Agreement shall not be construed or interpreted for or against either of the parties hereto by reason of its draftsmanship by either party.

9.   ASSIGNMENT

The rights, benefits, duties and obligations of COMPANY and CONSULTANT under this Agreement may not be assigned without the express written permission of the other.

3

EXHIBIT ___1___

PAGE ___56___

FL 6517

10.   ARBITRATION

Any controversy between the parties arising out of this Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes.  If Morad Zarabi is unable to so act, Kambiz Zarabi is appointed arbitrator.  Either arbitrator can select another person or entity to serve as arbitrator, either currently or prospectively, if neither of the above two named arbitrators are available to so serve.  The decision of the arbitrator shall be final and binding upon both parties.

11.   ATTORNEYS' FEES

If any action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled.

12.  ENTIRE AGREEMENT

(a)   This Agreement constitutes the entire Agreement between the parties and contains all of the agreement between the parties with respect to the subject matter hereof; this Agreement supersedes any and all other agreements, either oral or in writing, between parties hereto with respect to the subject matter hereof.

(b)   No change or modification of this Agreement shall be valid unless the same be in writing and signed by the person or party to be charged.

13.  GOVERNING LAW

This Agreement shall be subject to and governed by the laws of the State of California.

EXHIBIT ___1___

PAGE ___57___

FL 6518

DATED: ___JON  1_____, 2001


COMPANY:                                CONSULTANT:

ABC INTERNATIONAL TRADERS INC.

                                        _Farhad Liang_____

                                        FARHAD LARIAN

By:_____
      Isaac Larian, President


5

EXHIBIT ___1_____

PAGE ___58_____

FL 6519