## MUTUAL RELEASE

For valuable consideration, receipt of which is hereby acknowledged:

1.   Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, on behalf of themselves, their associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, do hereby acquit, release and forever discharge Farhad Larian, an individual, and his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the sale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

2.   Farhad Larian, an individual, on behalf of himself, his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, do hereby acquit, release and forever discharge Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, their respective associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the dale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

3.   The foregoing release is and shall be a release of all claims, whether known or unknown, and each of the undersigned parties waives all rights reserved to him, it or them, by Section 1542 of the Civil Code of the State of California, which provided, as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the Release which if known by him must have materially affected his settlement with the debtor."

4.   This Release shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors and assigns.

Exhibit "D"

EXHIBIT ___1___

PAGE ___59___

FL 6520

5.   Each of the undersigned individuals represents that he signs this Release with the express authority of the party on whose behalf he signs.

IN WITNESS WHEREOF, the parties hereto have executed this Release on the 4th day of DECEMBER , 200:9 6)

_____          _____
ISAAC LARIAN                              FARHAD LARIAN


ABC INTERNATIONAL TRADERS INC.

By:  _____
     Isaac Larian, President


EXHIBIT _____1_____

PAGE _____60_____

FL 6521

## AMENDMENT TO AGREEMENTS

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into one or more of the following agreements concerning or relating to the sale by Farhad to Isaac of Farhad's shareholder interest in ABC and MGA Entertainment Hong Kong Limited, a Hong Kong corporation:

> A. Agreement For Sale of Stock.
> B. Promissory Note.
> C. Pledge Agreement.
> D. Consulting Agreement.
> E. Mutual Release.

The parties desire to amend the agreements as specifically provided herein, and in all other respects, ratify and confirm said agreements.

1. Agreement For Sale of Stock.

a. There should be inserted as a second paragraph at section 12 on page 7 to read as follows:

"BUYER shall, and shall additionally cause CORPORATION to, indemnify and hold SELLER harmless from and against any claim, suit, liability, cause of action or damages arising from or related to SELLER's employment by CORPORATION, ownership of the stock in CORPORATION and/or any personal guarantees given by SELLER in his capacity as a shareholder, officer or employee of CORPORATION, to the greatest extent permitted by law. The provisions of this paragraph shall survive any termination of this Agreement. In addition thereto, BUYER shall, and shall additionally cause CORPORATION to, utilize all commercially reasonable efforts to have SELLER removed as a guarantor of any of the obligations of CORPORATION. Notwithstanding the above, SELLER shall remain personally liable on the SBA guarantee concerning the real property located at 16730 Schoenborn Street, North Hills, CA 91343".

b. There should be inserted at the end of section 14 on page 8 the following additional sentence:

"BUYER shall execute in favor of Morad or any successor pledgeholder under the Pledge Agreement a limited proxy to vote his shares of CORPORATION for the purpose of electing Morad or any successor pledgeholder as a member of the board of directors of CORPORATION, so that Morad or the successor pledgeholder will serve in such capacity until such time as the promissory note issued by BUYER in favor of SELLER has been paid in full."

1

EXHIBIT ___1___

PAGE __6l__

FL 6522

2. Promissory Note.

    a. The date of making for purposes of interest accruals shall be January 1, 2001.

    b. There shall be added as Exhibit "1" to the Promissory Note the amortization schedule for the $6,275,000.00 principal as attached hereto.

    c. There shall be inserted the following additional paragraph between the first and second paragraphs:

"In the case of a sale of at least a majority of the shares of ABC International Traders Inc. ("ABC") by the maker hereof in a single transaction or in a series of related transactions; or the sale of at least a majority of ABC's assets in a single transaction or a series of related transactions, then, in any such case and notwithstanding anything to the contrary contained in this promissory note, all or a portion of the remaining unpaid principal and then accrued interest thereon shall then become due and payable in the same fractional proportion as determined by a fraction the numerator of which is the sale proceeds received and the denominator of which is the total value of ABC shares or assets, as the case may be. In the event of an exchange by the maker of shares of ABC for shares in another corporation, Morad Zarabi, designated arbitrator under the Agreement For Sale Of Stock between maker and beneficiary herein, shall determine, in his sole discretion, whether some or all of the newly acquired shares shall be transferred to beneficiary herein in payment of a portion of the promissory note; or whether said newly acquired shares shall instead be substituted for ABC shares under the Pledge Agreement executed between the maker, beneficiary and Morad Zarabi."

    d. There shall be added the following additional paragraph to the Promissory Note:

"Notwithstanding any other provision of this Promissory Note, any controversy between the parties concerning or arising from the Promissory Note shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon both parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

3. Pledge Agreement.

    a. There shall be added an additional section 14, as follows:

"14) ARBITRATION:  Any controversy between the parties concerning or

2

EXHIBIT ____1____

PAGE ___62___

FL 6523

arising from this Pledge Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon all parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

    4. Consulting Agreement.

        a. There shall be added an additional section 14, as follows:

"14. <u>INDEMNIFICATION</u>

        To the maximum extent provided by law, COMPANY shall indemnify and hold CONSULTANT harmless from and against any claim, suit, liability, cause of action or damages arising from or related to CONSULTANT's services under the terms of this agreement or the past services of CONSULTANT as an employee of COMPANY. The provisions of this paragraph shall survive any termination of this Agreement."

    In Witness Whereof, the parties execute this Amendment To Agreements on the 31 day of December, 2000.


_____
Farhad Larian

_____
Isaac Larian


ABC International Traders Inc.

By: _____
    Isaac Larian, President

_____
Morad Zarabi


3

EXHIBIT ___1___

PAGE ___63___

FL 6524

**Exhibit 2**

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Originating Document Number | Journal Entry | Series | TRX Date | Account Number |
| 2 | | | 96589 | Financial | 12/31/1999 | 3600-000 - |
| 3 | | | | | |
| 4 | | | | | |
| 5 | LARIAN AGHDAS | | | | |
| 6 | ISAAC'S LOAN TO AGHD | | 241332 | Purchasing | 10/27/2003 | 3600-000 - |
| 7 | | | | | |
| 8 | LARIAN, FARHAD | | | | |
| 9 | 1999 INCOME TAXES | | 99705 | Purchasing | 4/14/2000 | 3600-000 - |
| 10 | FEB 03 PAYMENT | | 198680 | Purchasing | 2/5/2003 | 3600-000 - |
| 11 | MAR 03 PAYMENT | | 202041 | Purchasing | 3/5/2003 | 3600-000 - |
| 12 | APR 03 PAYMENT | | 205544 | Purchasing | 4/1/2003 | 3600-000 - |
| 13 | MAY 03 PAYMENT | | 209051 | Purchasing | 5/1/2003 | 3600-000 - |
| 14 | JUNE 03 PAYMENT | | 213038 | Purchasing | 6/4/2003 | 3600-000 - |
| 15 | JULY 03 PAYMENT | | 216617 | Purchasing | 7/1/2003 | 3600-000 - |
| 16 | AUG 03 PAYMENT | | 221723 | Purchasing | 8/1/2003 | 3600-000 - |
| 17 | SEPT 03 PAYMENT | | 227610 | Purchasing | 9/1/2003 | 3600-000 - |
| 18 | OCT 03 PAYMENT | | 235870 | Purchasing | 10/2/2003 | 3600-000 - |
| 19 | NOV 03 PAYMENT | | 242654 | Purchasing | 11/3/2003 | 3600-000 - |
| 20 | DEC 03 PAYMENT | | 247288 | Purchasing | 12/1/2003 | 3600-000 - |
| 21 | | | | | |
| 22 | LARIAN, ISAAC | | | | |
| 23 | 1999 INCOME TAXES | | 99704 | Purchasing | 4/14/2000 | 3600-000 - |
| 24 | 2001 TAXES | | 162529 | Purchasing | 4/15/2002 | 3600-000 - |
| 25 | 03/05/03 DISTRIBUTIO | | 202086 | Purchasing | 3/5/2003 | 3600-000 - |
| 26 | 07/07/03 PAYMENT | | 219813 | Purchasing | 7/21/2003 | 3600-000 - |
| 27 | 03/05/04 DISTRIB | | 265959 | Purchasing | 3/5/2004 | 3600-000 - |
| 28 | 041904 WIRE | | 275553 | Purchasing | 4/19/2004 | 3600-000 - |
| 29 | 04/30 WIRE | | 278237 | Purchasing | 4/30/2004 | 3600-000 - |
| 30 | 2002-TAXES 06/17/02 | | 166837 | Purchasing | 6/10/2002 | 3600-000 - |
| 31 | 2002 TAXES 09/16/02 | | 177044 | Purchasing | 9/11/2002 | 3600-000 - |
| 32 | 123102 EST TAX | | 193927 | Purchasing | 12/31/2002 | 3600-000 - |
| 33 | | | | | |
| 34 | ANGELA LARIAN | | | | |
| 35 | WIRE 5/19/05 | | 373837 | Purchasing | 5/19/2005 | 3611-000 - |
| 36 | WIRE 12/14/05 | | 435067 | Purchasing | 12/14/2005 | 3611-000 - |
| 37 | | | | | |
| 38 | JAHANGIR MAKABI | | | | |
| 39 | CKREQ 123002 | | 193729 | Purchasing | 12/30/2002 | 3600-000 - |
| 40 | FEB 03 PAYMENT | | 198681 | Purchasing | 2/5/2003 | 3600-000 - |
| 41 | MAR 03 PAYMENT | | 202042 | Purchasing | 3/5/2003 | 3600-000 - |
| 42 | APR 03 PAYMENT | | 205545 | Purchasing | 4/1/2003 | 3600-000 - |
| 43 | MAY 03 PAYMENT | | 209052 | Purchasing | 5/1/2003 | 3600-000 - |
| 44 | JUNE 03 PAYMENT | | 213039 | Purchasing | 6/4/2003 | 3600-000 - |
| 45 | JULY 03 PAYMENT | | 216618 | Purchasing | 7/1/2003 | 3600-000 - |
| 46 | AUG 03 PAYMENT | | 221724 | Purchasing | 8/1/2003 | 3600-000 - |
| 47 | SEPT 03 PAYMENT | | 227611 | Purchasing | 9/1/2003 | 3600-000 - |
| 48 | OCT 03 PAYMENT | | 235871 | Purchasing | 10/2/2003 | 3600-000 - |
| 49 | NOV 03 PAYMENT | | 242655 | Purchasing | 11/3/2003 | 3600-000 - |
| 50 | DEC 03 PAYMENT | | 247289 | Purchasing | 12/1/2003 | 3600-000 - |
| 51 | 03/05/04 DISTRIB | | 265960 | Purchasing | 3/5/2004 | 3600-000 - |
| 52 | 04/30 WIRE | | 278238 | Purchasing | 4/30/2004 | 3600-000 - |
| 53 | WIRE 12/13/05 | | 435422 | Purchasing | 12/13/2005 | 3601-000 - |
| 54 | WIRE 5/19/05 | | 373841 | Purchasing | 5/19/2005 | 3612-000 - |
| 55 | | | | | |
| 56 | MAKABI, SHIRIN | | | | |
| 57 | 123102 EST TAXES | | 193928 | Purchasing | 12/31/2002 | 3600-000 - |
| 58 | 1999 INCOME TAXES | | 99706 | Purchasing | 4/14/2000 | 3600-000 - |
| 59 | TAXES 2001 | | 162546 | Purchasing | 4/18/2002 | 3600-000 - |
| 60 | 2002-TAXES 06/17/02 | | 166838 | Purchasing | 6/10/2002 | 3600-000 - |
| 61 | 2002-TAXES 09/16/02 | | 177045 | Purchasing | 9/11/2002 | 3600-000 - |
| 62 | 07/07/03 PAYMENT | | 219814 | Purchasing | 7/21/2003 | 3600-000 - |
| 63 | 041904 WIRE | | 275552 | Purchasing | 4/19/2004 | 3600-000 - |

EXHIBIT 2

|  | F | G | H |
|---|---|---|---|
| 1 | Account Description | Amount | Source Document |
| 2 | Distribution | | BBF |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | Distribution | | PMTRX |
| 7 | | | |
| 8 | | | |
| 9 | Distribution | | PMTRX |
| 10 | Distribution | | PMTRX |
| 11 | Distribution | | PMTRX |
| 12 | Distribution | | PMTRX |
| 13 | Distribution | | PMTRX |
| 14 | Distribution | | PMTRX |
| 15 | Distribution | | PMTRX |
| 16 | Distribution | | PMTRX |
| 17 | Distribution | | PMTRX |
| 18 | Distribution | | PMTRX |
| 19 | Distribution | | PMTRX |
| 20 | Distribution | | PMTRX |
| 21 | | | |
| 22 | | | |
| 23 | Distribution | | PMTRX |
| 24 | Distribution | | PMTRX |
| 25 | Distribution | | PMTRX |
| 26 | Distribution | | PMTRX |
| 27 | Distribution | | PMTRX |
| 28 | Distribution | | PMTRX |
| 29 | Distribution | | PMTRX |
| 30 | Distribution | | PMTRX |
| 31 | Distribution | | PMTRX |
| 32 | Distribution | | PMTRX |
| 33 | | | |
| 34 | | | |
| 35 | Distribution-Angela Larian GRAT | | PMTRX |
| 36 | Distribution-Angela Larian GRAT | | PMTRX |
| 37 | | | |
| 38 | | | |
| 39 | Distribution | | PMTRX |
| 40 | Distribution | | PMTRX |
| 41 | Distribution | | PMTRX |
| 42 | Distribution | | PMTRX |
| 43 | Distribution | | PMTRX |
| 44 | Distribution | | PMTRX |
| 45 | Distribution | | PMTRX |
| 46 | Distribution | | PMTRX |
| 47 | Distribution | | PMTRX |
| 48 | Distribution | | PMTRX |
| 49 | Distribution | | PMTRX |
| 50 | Distribution | | PMTRX |
| 51 | Distribution | | PMTRX |
| 52 | Distribution | | PMTRX |
| 53 | Distribution-Makabi Family Trust | | PMTRX |
| 54 | Distribution-Eli Makabi GRAT | | PMTRX |
| 55 | | | |
| 56 | | | |
| 57 | Distribution | | PMTRX |
| 58 | Distribution | | PMTRX |
| 59 | Distribution | | PMTRX |
| 60 | Distribution | | PMTRX |
| 61 | Distribution | | PMTRX |
| 62 | Distribution | | PMTRX |
| 63 | Distribution | | PMTRX |

REDACTED

EXHIBIT ___2___

PAGE ___65___

CONFIDENTIAL – ATTORNEYS' EYES ONLY

MGA 3787373

| | Reference | Originating Master ID |
|---|---|---|
| 1 | Reference | Originating Master ID |
| 2 | Balance Brought Forward | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | princ 277,463.44+compound | 4066 |
| 7 | | |
| 8 | | |
| 9 | Payables Trx Entry | 4159 |
| 10 | Payables Trx Entry | 6179 |
| 11 | Payables Trx Entry | 6179 |
| 12 | Payables Trx Entry | 6179 |
| 13 | Payables Trx Entry | 6179 |
| 14 | Payables Trx Entry | 6179 |
| 15 | Payables Trx Entry | 6179 |
| 16 | Payables Trx Entry | 6179 |
| 17 | Payables Trx Entry | 6179 |
| 18 | Payables Trx Entry | 6179 |
| 19 | Payables Trx Entry | 6179 |
| 20 | Payables Trx Entry | 6179 |
| 21 | | |
| 22 | | |
| 23 | Payables Trx Entry | 4160 |
| 24 | Payables Trx Entry | 4160 |
| 25 | SHOREH LARIAN CONDO | 5161 |
| 26 | LOAN DISTRIBUTION-BEAR STEARNS | 5161 |
| 27 | DISTRIBUTION | 5161 |
| 28 | Payables Trx Entry | 5161 |
| 29 | 04/30 WIRE | 5161 |
| 30 | Payables Trx Entry | 4160 |
| 31 | Payables Trx Entry | 4160 |
| 32 | 2002 EST TAXES | 4160 |
| 33 | | |
| 34 | | |
| 35 | Payables Trx Entry | ANGELA LARIAN |
| 36 | Payables Trx Entry | ANGELA LARIAN |
| 37 | | |
| 38 | | |
| 39 | Payables Trx Entry | ELI |
| 40 | Payables Trx Entry | ELI |
| 41 | Payables Trx Entry | ELI |
| 42 | Payables Trx Entry | ELI |
| 43 | Payables Trx Entry | ELI |
| 44 | Payables Trx Entry | ELI |
| 45 | Payables Trx Entry | ELI |
| 46 | Payables Trx Entry | ELI |
| 47 | Payables Trx Entry | ELI |
| 48 | Payables Trx Entry | ELI |
| 49 | Payables Trx Entry | ELI |
| 50 | Payables Trx Entry | ELI |
| 51 | DISTRIBUTION | 2580 |
| 52 | Payables Trx Entry | 2580 |
| 53 | Payables Trx Entry | MAKABI |
| 54 | Payables Trx Entry | J MAKABI |
| 55 | | |
| 56 | | |
| 57 | 2002 EST TAXES | 8105 |
| 58 | Payables Trx Entry | 8105 |
| 59 | Payables Trx Entry | 8105 |
| 60 | Payables Trx Entry | 8105 |
| 61 | Payables Trx Entry | 8105 |
| 62 | LOAN DISTRIBUTION-BEAR STEARNS | 8102 |
| 63 | Payables Trx Entry | 8102 |

EXHIBIT 2
PAGE 66

CONFIDENTIAL – ATTORNEYS' EYES ONLY

MGA 3787374

| | K |
|---|---|
| 1 | Originating Master Name |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | LARIAN AGHDAS |
| 7 | |
| 8 | |
| 9 | LARIAN, FARHAD |
| 10 | LARIAN, FARHAD-CONSULTING |
| 11 | LARIAN, FARHAD-CONSULTING |
| 12 | LARIAN, FARHAD-CONSULTING |
| 13 | LARIAN, FARHAD-CONSULTING |
| 14 | LARIAN, FARHAD-CONSULTING |
| 15 | LARIAN, FARHAD-CONSULTING |
| 16 | LARIAN, FARHAD-CONSULTING |
| 17 | LARIAN, FARHAD-CONSULTING |
| 18 | LARIAN, FARHAD-CONSULTING |
| 19 | LARIAN, FARHAD-CONSULTING |
| 20 | LARIAN, FARHAD-CONSULTING |
| 21 | |
| 22 | |
| 23 | LARIAN, ISAAC |
| 24 | LARIAN, ISAAC |
| 25 | LARIAN, ISAAC (INTEREST) |
| 26 | LARIAN, ISAAC (INTEREST) |
| 27 | LARIAN, ISAAC (INTEREST) |
| 28 | LARIAN, ISAAC (INTEREST) |
| 29 | LARIAN, ISAAC (INTEREST) |
| 30 | LARIAN, ISAAC-EMPLOYEE |
| 31 | LARIAN, ISAAC-EMPLOYEE |
| 32 | LARIAN, ISAAC-EMPLOYEE |
| 33 | |
| 34 | |
| 35 | ANGELA LARIAN QUALIFIED ANNUITY TRU |
| 36 | ANGELA LARIAN QUALIFIED ANNUITY TRU |
| 37 | |
| 38 | |
| 39 | JAHANGIR MAKABI |
| 40 | JAHANGIR MAKABI |
| 41 | JAHANGIR MAKABI |
| 42 | JAHANGIR MAKABI |
| 43 | JAHANGIR MAKABI |
| 44 | JAHANGIR MAKABI |
| 45 | JAHANGIR MAKABI |
| 46 | JAHANGIR MAKABI |
| 47 | JAHANGIR MAKABI |
| 48 | JAHANGIR MAKABI |
| 49 | JAHANGIR MAKABI |
| 50 | JAHANGIR MAKABI |
| 51 | MAKABI, JAHANGIR |
| 52 | MAKABI, JAHANGIR |
| 53 | MAKABI LIVING TRUST |
| 54 | J MAKABI ANNUITY |
| 55 | |
| 56 | |
| 57 | MAKABI SHIRIN  (EMPLOYEE) |
| 58 | MAKABI, SHIRIN |
| 59 | MAKABI, SHIRIN |
| 60 | MAKABI, SHIRIN |
| 61 | MAKABI, SHIRIN (EMPLOYEE) |
| 62 | SHIRIN MAKABI  (INTEREST) |
| 63 | SHIRIN MAKABI  (INTEREST) |

EXHIBIT _2_

PAGE _67_

CONFIDENTIAL – ATTORNEYS' EYES ONLY

MGA 3787375

**Exhibit 3**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**Exhibit 4**

**ISAAC LARIAN**
**Total Income Per Tax Returns**

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| Wages | 218,679 | 502,007 | 660,122 | 659,622 | 658,622 | 1,409,510 | 1,496,787 | 1,513,022 |
| Interest | | 306,786 | 39,196 | 211,164 | 600,814 | 711,380 | 1,823,298 | 1,945,971 |
| Dividends | | 1,541 | 936 | 2,307 | 28,799 | 146,988 | 152,337,930 | 41,698,641 |
| Other | | (2,198,324) | 115,339 | 33,118,347 | 88,999,590 | 55,087,563 | 55,571,795 | 53,744,791 |
| | 466,895 | (1,387,990) | 815,593 | 33,991,440 | 90,287,825 | 57,355,441 | 211,029,808 | 98,902,425 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA 378727

**EXHIBIT** 4

**PAGE** 140

**Exhibit 5**

CONFIDENTIAL
ATTORNEYS EYES ONLY

HOWARTH & SMITH
ATTORNEYS AT LAW
800 WILSHIRE BOULEVARD
SUITE 750
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

DON HOWARTH                    April 6, 2004          DHowarth@howarth-smith.com
                                                      Direct Line: (213) 955-9400 Ext. 109

**VIA FACSIMILE AND U.S. MAIL**
Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, California 90067

            Re: *Larian v. Larian*

Dear Larry:

        This letter is to follow up on our meeting at your office on February 26, 2004, and our conversation by phone more recently. Since then I have also received a letter from you dated March 29, 2004 asking about our progress in getting back to you. I trust you received my message that I was out of the office in Hawaii last week and that I would get back to you with a written response upon my return. This letter is the promised written response.

        The facts of which we are presently aware clearly show that it is not correct, as you stated in our meeting, that at the end of 2000, Isaac believed Bratz was just another doll, or that Fred knew everything that Isaac knew. Indeed, even the limited evidence immediately available without discovery having yet occurred demonstrates just the reverse. For example:

    •    The July 18, 2003, Wall Street Journal reports that sometime in 1999 Isaac had a conversation with a buyer from Wal-Mart in which the idea for a Bratz-type doll germinated. The article quotes Isaac as saying that "he was motivated by a challenge from a Wal-Mart Stores, Inc. buyer to 'give me something that can compete with Barbie.'" Isaac kept this conversation secret from Fred, and Fred found out about it for the first time when he read the published article.

04:L18100L086

EXHIBIT _____5_____
PAGE _____141_____          FL 0224

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 2

- By late 1999, Isaac had decided that MGA's challenger to Barbie should be a fashion-type doll. MGA had previously distributed other types of dolls, but never a fashion doll, as the WSJ article confirms. For the first time ever, Isaac conducted a contest to select a design for the doll, and selected Carter Bryant's Bratz doll line as the winner of the contest. It is plain that Isaac did not consider Bratz to be just another doll for MGA. The existence of this contest was concealed from Fred, and, in fact, Fred was never told that the Company was looking for a fashion-type doll to compete with Barbie or that the Bratz line was being developed by Isaac and MGA during 1999 and 2000, despite Fred's position as Isaac's partner and a co-founder of MGA.

- In late 1999, and continuing at least through the spring of 2000, Isaac ordered MGA employees to stop sharing financial information with Fred. Isaac threatened at least one employee's job if the employee did not follow Isaac's instructions and cut Fred out of the information loop. In addition, Isaac instructed an employee to stop sending Fred daily sales reports that up to that point, Fred had routinely received. The result of this concerted concealment effort was that Fred did not, and could not, know the complete financial picture of the Company.

- In February 2000, Isaac tried to keep Fred from attending the N.Y. Toy Fair, the venue in which information about new, upcoming products is reviewed.

- Beginning in early 2000, Isaac began systematically portraying Fred, both internally and to the outside world, as someone who had no role in the management and decision making of the Company; and that Isaac alone controlled the strategic moves for MGA. In or about February 2000, Isaac had Fred's name removed from the Company profile, and changed the document (and history) to list only Isaac as the founder of MGA. When Fred raised this issue with Isaac, he was told that "there is . . . a lot more to come."

- In the Spring of 2000, before the Agreement to Arbitrate was signed and before Isaac had announced his plans for Bratz either publicly or to Fred, Isaac took steps to personally profit from the Bratz program. On April 11,

04:L181001.086

EXHIBIT __5__

PAGE __142__

FL 0225

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 3

2000, Isaac sought the following from the Company's Board of Directors: (1) an increase in his annual salary from $221,000 to $500,000; (2) a bonus of $750,000 for 1999; (3) a bonus of $1.5 million in 2000 if EBITA for the year reached $8 million; and (4) a separate bonus of a 4% royalty on any new toy idea he personally developed in MGA's 2001 line. Paying Isaac a royalty for anything that he "personally developed" was an absolute first for the Company, and the target figures in (3) and (4) plainly indicate an unannounced, but real plan to exploit the Bratz market beginning in 2001. A successful Bratz roll-out in 2001 would allow Isaac personally to profit (at the expense of his fiduciary Fred) from the Bratz opportunity.

- In or about July or August 2000, Isaac called internal meetings with top management at MGA about Bratz and his plans for seizing the opportunity presented by the doll line. Isaac expressed optimism in these meetings that the Bratz line could directly compete with Barbie, would appeal to an even wider range of girls than did Barbie, and presented an opportunity he had been looking to find for years. Fred, a 45% shareholder and officer of MGA, was intentionally excluded from those meetings, and from the special handling of Bratz.

- Roughly contemporaneously with these internal meetings, Isaac began negotiating with Carter Bryant and eventually obtained from him the worldwide licensing rights to Bratz. The license was unique in several important respects. For the first time in the Company's history, the Bratz license made Isaac and MGA the licensor of the product, allowing MGA to control the licensing in an unlimited number of product categories worldwide. In previous deals, MGA was just a distributor/licensee of a product. The difference between being a licensee and a licensor is enormous and becoming a licensor is something Isaac had wanted for a very long time. Further, the Bratz deal was unique because MGA paid more for that license of that doll than it ever had paid for a license of any other doll in the Company's history. Fred was not told anything about the unprecedented scope of the Bratz license prior to signing the Agreement to Arbitrate, or the Stock Sales Agreement in December 2000.

04:L181001.086

EXHIBIT __5__

PAGE __143__

FL 0226

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 4

- In the fall of 2000, Isaac began to develop the Bratz product line, including ordering prototypes and filing additional trademarks. Fred was intentionally kept unaware of the scope of Isaac's plans to develop and market Bratz at that time.

- During this time, including in the fall of 2000, Isaac followed a practice of passing along to Fred only negative financial news about the Company, such as a $2 million loss from cancelled Toys-R-Us orders, thus making the Company seem worth much less than it actually was. Isaac did not disclose to Fred news which would have a positive financial effect on the value of the Company, such as his plans for Bratz or other potential revenue streams for the Company.

- On December 11, 2000 MGA filed, and Isaac personally signed, applications for five new trademarks, including one for each of the names of the Bratz dolls. Isaac's personally signing such applications facilitated a plan to keep knowledge about the scope of the Bratz program tightly controlled.

- Then, in February 2001, with Fred out of the picture after his execution of the December Stock Sale Agreement, Isaac went public about the scope and significance of Bratz. He introduced the dolls at the February 2001 N.Y. Toy Fair with the public assertion that it was now "a Bratz world."

- Isaac's view of Bratz was further documented in June 2001, confirming that Bratz was MGA's "first intellectual property" and his belief that it was "sure to revolutionize the world of fashion dolls."

All of this and other evidence strongly indicates that Isaac made a concerted effort to get Fred out of the company so that he could exploit the unique Bratz opportunity without sharing the benefits with Fred.

When we met, you provided us with three e-mails which you claimed demonstrated that Fred knew all of what Isaac knew about Bratz when he signed the Agreement to Arbitrate. They do not. The e-mails – dated November 15, 2000, November 22, 2000, and April 30, 2001 – were all sent *after* execution of the September

04:L181001.086

EXHIBIT ___5___

PAGE ___144___

FL 0227

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 5

2000 Agreement to Arbitrate.  Further, none of them give any indication of anything unusual about Bratz that would alert Fred to its impact on the valuation of the Company.

You also asserted that the e-mails illustrate Fred's awareness of the Bratz program earlier than the time alleged in the complaint on file in the action.  Again that is not correct.  Paragraph 28 of the Complaint alleges that in late spring or summer 2002, Fred first became aware of the "true scope of the Company's extraordinary plans, efforts and history regarding the Bratz product line and other financial information about the Company that had been concealed from him by Isaac, as the license had been concealed from him."  Nothing in the three e-mails is inconsistent with this allegation.

Additional evidence that Isaac attempted to defraud Fred into signing the Agreement to Arbitrate and to pay him less than the true value of his shares comes from Mr. Dutcher's appraisal.  As may have been reported to you from the hearing on our motion to take Mr. Dutcher's deposition, the Court recognized the significance of this information, saying that, "[t]his information is directly relevant as it goes to whether [plaintiff] was defrauded because information about this new product was withheld from him."  From what we can tell from the November 7, 2000, appraisal we have (and have given to you), it seems apparent that Isaac did not provide Mr. Dutcher with information about the Company's plans for Bratz or projections of its revenue potential for 2000, 2001 and beyond.  We are advised that Isaac engaged in regular financial modeling for the Company and that in those forecasts, revenue streams were projected for each item the Company sold or was planning to sell.  There is nothing in the appraisal itself indicating that Mr. Dutcher received such 2000 or 2001 projections, either for the Company as a whole or for Bratz.  Further, it does not appear that the value of MGA Entertainment, HK was included in the appraisal at all, and Fred's shares in that company were certainly part of what was covered in the Agreement to Arbitrate.  In any event, we will know more about the information provided to Mr. Dutcher and how he proceeded when we get Mr. Dutcher's files and take his deposition now that our motion has been granted.

You indicated to me that the Company actually lost money for 2000 after realizing a profit in 1999, and thus using the 1999 figures in the appraisal worked in Fred's favor in valuing the Company.  First, it is not apparent to us that the Company lost money in 2000, as Isaac has not provided to Fred the tax returns or necessary financial information to verify that claim.  From what we know, both sales and profits were expected to be much greater in 2000 than they were in 1999.  If there was a loss in 2000, it certainly could have been the result of any number of things which would be largely irrelevant to a valuation

04:L181001.086

**EXHIBIT** 5

**PAGE** 145

FL 0228

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 6

of the Company – things such as one time writeoffs for non-repeating events, deferring
revenue and profit recognition into the future (perhaps as to Hallmark?), payment of large
bonuses to management, shifting profits into subsidiaries; etc. We do not yet know what
reserves were taken that may have reduced profits and we do not know what revenues
were attributed to or held by MGA Hong Kong. Until we are provided with the financial
information that will enable us to analyze the Company's P/L statement, cash statement,
cash flow analysis, and the like, and to have things fully audited, it is not helpful to be
advised there was a stated loss, especially on rising revenues.

We do note that in the November 7, 2000 valuation, Mr. Dutcher states that "The
most recent year (1999) was weighted only minimally as the EBDITA appears
unreasonably high based on the two prior years." Mr. Dutcher was looking at EBDITA of
$2,915,000 for 1997; EBDITA of a loss of $86,000 for 1998; and EBDITA of $5,651,000
for 1999. Looking at just those numbers, one can see why he might assume that the 1999
numbers were "high" based on a 1998 loss of $86,000. However, as Isaac knew, the 1999
revenues were not at all "unreasonably high" compared to the prior years because in 1998
there was a one-time loss of approximately $10 million in revenues and $4.5 million in
profits due to a Toys-R-Us sanction of refusing to do business for 1 year. Further, the
actual numbers for 2000 were consistent with the Company's strong growth, and had Mr.
Dutcher had those numbers, he would have seen that the 1999 numbers were not
unreasonably high. When we have complete information accounted for, it appears there
was a strong progression of $2.9 million for 1997, $4.5 million for 1998 and $5.6 million
for 1999.

Because they are not as subject to management and accounting choices - which we
will need to examine - sales are important in looking at company valuation. It appears
that sales were about $40,732,000 in 1998, $66,350,000 in 1999 (from tax returns which
Dutcher used), and we believe they were much higher in 2000. However, Dutcher used
$70,331,000 as revenues for 2000 (a pro forma 6% increase over 1999). We have now
seen documents suggesting that revenues were already higher than this in 2000, perhaps
as high as $90,000,000 or more.

Further evidence of how far off Mr. Dutcher was led by what Isaac gave him and
withheld from him is apparent when one looks at his 2003 projected revenues of
$72,793,000 (3.5% pro forma over 2002). The Wall Street Journal article reports

EXHIBIT ___5_____

PAGE __146_____

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 7

expected sales of $800 million for 2003, 65% of which is accounted for by Bratz. The appraisal without the information on Bratz was thus more than 10 times lower in its projection for 2003 than it should have been.

When Isaac chose not to share key pieces of information about the scope of the Bratz project with Fred, and to selectively provide him and the appraiser with other financial information about the Company during 1999 and 2000 and projections for the future, there is no doubt that he violated California law requiring him as a fiduciary to disclose all such information to his partner and co-venturer, Fred. Being a fiduciary means that each owes the other the "duty of highest loyalty and utmost good faith, being charged not to take any unfair advantage or secret profit." *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 772 (1942); BAJI 12.36. A fiduciary has a duty to make a full and fair disclosure of all facts which materially affect the rights and interest of the person to whom the duty is owed. A fiduciary must give priority to the best interest of the persons to whom the duty is owed. When there is a "fiduciary relationship any transaction by which one of the co-adventurers secures an advantage over the other or others is presumptively fraudulent and casts a burden on such party gaining advantage to show fairness and good faith in all respects." *Boyd v. Bevilacqua*, 247 Cal. App. 2d 272, 291 (1966).

It is also a well-settled and fundamental precept that a fiduciary such as Isaac may not usurp business opportunities such as Bratz for himself at the expense of Fred as his co-fiduciary. In *MacIsaac v. Pozzo*, 81 Cal. App. 2d 278 (1947), the parties entered into a partnership to do business together and had agreed to split profits equally. However, plaintiff went out on its own and improperly made a deal with a customer, Utah Fuel Co., and got the defendant to agree to take only 15% of the profit. When the proceeds from the Utah Fuel deal came in, a declaratory judgment action was instigated by the plaintiff and Pozzo defended on the ground that the agreement to split the profits 85/15 was procured by fraud. In agreeing with Pozzo, the court held the following:

[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if in

04:1.181001.086

EXHIBIT ___5_____

PAGE ___147_____                    FL 0230

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 8

such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all the benefits for itself, and the law will impose a trust in favor of the corporation upon the property, interests and profits so acquired.

The facts bring the case within the stated rule. While it has been applied so generally in corporation cases to have become known as the doctrine of corporate opportunity, it is founded in the doctrine of loyalty in business which applies in all situations in which trust is reposed. *The fiduciary is held to the utmost measure of loyalty and accordingly he may not use a trust opportunity for personal advantage.* "The policy of the law is to put fiduciaries beyond the reach of temptation by making it unprofitable for them to yield to it."

The primary duty of the parties was to take no advantage of each other within their fiduciary relationship by means of the slightest concealment, misrepresentation, or adverse pressure. Defendant was entitled to a complete disclosure as to the negotiations with Utah Fuel Co., and an equal opportunity to take advantage of them. Plaintiff contrived to appropriate for itself the major share of the profits with the result that the firm, when it took the contract and assumed the responsibility, stood committed to an unequal division. Defendant could not be deprived of its rights in this matter.

The judgment properly awarded defendant the amount by which plaintiff profited through breach of duty. Whether it be regarded as damages presumed to have been suffered through deprivation of a business opportunity or as profits unjustly received by a plaintiff is immaterial.

*Id.* at 284-85 (emphasis supplied; extensive internal citations omitted). *See also, e.g.,* Witkin, 9 Summary of California Law § 20, p. 419 (9th ed. 1990) ("The fiduciary relationship . . . obviously makes applicable the rule which, in corporation law, is known as the doctrine of 'corporate opportunities'"); *Air Purification v. Carle*, 99 Cal. App. 2d 258, 265 (1950) (holding ("[In] a trust relationship . . . one of the parties will not be allowed to deal with the subject matter of the association for his own advantage.").

04:L181001.086

EXHIBIT 5
PAGE 148

FL 0231

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 9

Based on just what we know without discovery it is clear that Isaac has ignored the requirement that he not engage in "the slightest concealment." When Isaac put together the licensing deal for Bratz without informing Fred of his plans or sharing with Fred the financial expectations and rewards deriving therefrom, Isaac violated his duties as a fiduciary, and he will have to account to Fred.

In addition to Isaac's duties to disclose to Fred all material information relating to the Company, and to refrain from usurping a business opportunity – both of which arose from his fiduciary relationship with Fred – Isaac's actions in isolating the Bratz and other financial information from Fred also created an independent duty of disclosure. As Witkin notes, "The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." Bernard E. Witkin, 5 Summary of California Law, § 700, p. 801 (9th ed. 1990; citations omitted). Here, as recited above – from holding secret meetings to instructing Company employees not to give Fred information – Isaac went to great lengths to make sure the material facts about the Bratz doll project were "not accessible" to Fred, when he had a duty to inform him of the scope of the Bratz program before entering into the Agreement to Arbitrate and Stock Purchase Agreement. It was impermissible for Isaac to keep his plans for the scope of the Bratz program secret. Also, note that ¶ 6 of the buy/sell agreement itself makes clear that it is Isaac, not Fred, who has "full knowledge of business prospects."

Isaac has indicated to Fred a willingness to address the merits and provide us with documents in his possession and control, including those held by the companies. Our outstanding discovery requests are a good listing of what we need, but in summary, we certainly need each of the following:

1. All documents that relate to Bratz from 1999 through 2003, including trademarks, license agreement negotiations with Carter Bryant, notes or agendas of meetings re: Bratz, prototypes, designs, correspondence with attorneys re: the license agreement or trademarks, and financial documents, including sales and revenue projections, audited and unaudited;

2. All documents that relate to the value, revenues and costs of MGA, ABC and MGA Hong Kong from 1999 through the present, including all internal materials, projections and tax returns, all reserves, write downs and supporting documentation;

04:L181001.086

EXHIBIT __5__

PAGE __149__

FL 0232

CONFIDENTIAL
ATTORNEYS EYES ONLY

Larry R. Feldman, Esq.
April 6, 2004
Page 10

     3. All information that Isaac and/or the companies provided to Morad and/or Mr. Dutcher;

     4. All corporate minutes, shareholder resolutions, stock options grants or proposals and related documentation, and general ledgers for ABC, MGA and MGA Hong Kong.

     In addition to this documentation from Isaac, we also need his reconfirmed agreement to allow Morad to release his file. We also need written confirmation by Isaac that he wants full and honest disclosure by any person who is a witness to the events herein; that he will not directly or indirectly retaliate against any person based on what they disclose; and that he is encouraging and requesting them to give Fred a candid, honest, and complete response to any questions Fred may have of them. In exchange for such complete disclosure, Fred is also willing to produce his records now.

     Once we have received the above, and do our homework in connection with what we find, we will be in a position to make a recommendation as to proceeding with a binding reference of this matter to a retired judge, and what the order of reference would provide. We also have some candidates to put forward in this regard. If in the meantime you are interested in a non-binding mediation, we are prepared to support that immediately, and without further discovery beyond production of the materials indicated. We have some thoughts as to who might be able to get this sorted out between these brothers, so that the matter can be closed. Please let me know if this is an option.

                          Very truly yours,

                          Don Howarth

04:L181001.086

EXHIBIT ___5___

PAGE ___150___

FL 0233

Larry R. Feldman, Esq.
April 6, 2004
Page 11

CONFIDENTIAL
ATTORNEYS EYES ONLY

bcc:   Mr. Farhad Larian (via U.S. Mail)

04:L181001.086

EXHIBIT __5_____

PAGE __151_____

FL 0234

**Howarth & Smith**
ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax: (213) 622-0791

CONFIDENTIAL
ATTORNEYS EYES ONLY

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service.*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:                    Larry R. Feldman, Esq.

From:                  Brian D. Bubb, Esq.

Number of pages including this page: 11

•     IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400.

Sent by:     Jason Sickler                                    Date: April 6, 2004

Re:     Larian v. Larian

COMMENTS:

EXHIBIT ___5___

PAGE ___152___

FL 0235

**Exhibit 6**

**RECEIVED**

JUL 1 0 2007

LAW OFFICES

CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP

10250 CONSTELLATION BOULEVARD

NINETEENTH FLOOR

LOS ANGELES, CALIFORNIA 90067

(310) 553-3000

FAX (310) 556-2920

DIRECT DIAL NUMBER
310-282.6217
EMAIL: PGLASER@CHRISGLASK.COM

July 5, 2007

MERITAS LAW FIRMS WORLDWIDE

<u>VIA FACSIMILE AND U.S. MAIL</u>

John B. Quinn
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

     Re:    MGA Entertainment v. Mattel

Dear John:

     This is in response to your letter of May 29, 2007 concerning your law firm's improper and unethical communications with Fred Larian and Fred Larian's counsel in 2005, the circumstances of which have only recently come to our client's attention.

     Our client has determined that in the fall of 2005, members of your law firm met with Fred Larian and/or his attorney, Robert Wilson, and spent **two days** reviewing numerous confidential and privileged documents of MGA Entertainment, Inc. ("MGA") which were in Fred Larian's possession, including documents which are relevant to the pending litigation between MGA and Mattel, and documents which are covered by the protective order in this litigation. As you know, <u>Fred Larian is the</u> brother of Isaac Larian, MGA's Chairman and Chief Executive Officer, and was Isaac Larian's business colleague for over 20 years. The business relationship of the Larian brothers encompassed the ownership and operation of various ventures and businesses over many years, including ABC International Traders, Inc. (now called MGA and MGA Entertainment (HK), Ltd.). The Larian brothers each owned 45% of the stock in MGA until 2000; another family member owned the remaining 10% of the company's shares. <u>Fred Larian served as MGA's Executive Vice President and Treasurer until 2000, served on the company's Board of Directors until 2002 (including during the time period which is relevant to this litigation) and acted as a paid consultant for the company until December 31, 2005</u> (including during the time period in which members of your law firm engaged in communications with him).

     In these capacities, Fred Larian was involved in numerous privileged and confidential matters at the company, including providing litigation consulting services for the company and being privy to an extensive amount of privileged attorney-client communications, as well as high level, confidential business matters. Further, Fred Larian was provided with or had access to an

500006 v2

**EXHIBIT** ___6___

**PAGE** ___153___

John B. Quinn, Esq.
July 5, 2007
Page 2

extensive number of privileged and confidential company documents, including documents which are relevant to this litigation. In this regard, Fred Larian was copied on numerous privileged and confidential communications which are uniquely relevant to this litigation, such as numerous communications related to the development and initial sales of the "Bratz" products. As you know, in 2005, Fred Larian was in possession of numerous confidential MGA documents, including privileged documents, and was precluded from disclosing MGA's trade secrets and confidential information pursuant to a confidentiality agreement which he had previously entered into with the company.

During your communications with Fred Larian and his counsel, members of your law firm requested and reviewed privileged and confidential information of MGA which is relevant to this action, including documents which are subject to the protective order herein, a copy of which is attached. Your letter dated November 28, 2005 to Robert Wilson, Fred Larian's then counsel ("November 28, 2005 Letter"), demonstrates this. In particular, the November 28, 2005 Letter states that your firm was aware (e.g., apparently from your discussions with Fred Larian and/or his counsel) that Fred Larian was in possession of certain general categories of documents from MGA, some of which necessarily included privileged communications, and requested that Fred Larian provide you with such documents as well as 18 other specific categories of documents which were described as "relevant to Mattel's litigation." A copy of your firm's November 28, 2005 Letter also is attached.

Your actions apparently were designed to induce Fred Larian to breach his fiduciary duties to MGA, including inducing a breach of his confidentiality agreement with MGA, *and to improperly obtain documents subject to the protective order herein without complying with such order.* You also violated your ethical obligations, including but not limited to, Rule 4.2 of the ABA Model Rules of Professional Conduct ("Rule 4.2") ("...[A] lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so") and Canon 9 of the ABA Code of Professional Responsibility ("Canon 9") ("A lawyer should avoid even the appearance of professional impropriety").

Case law prohibits counsel from seeking privileged information from former employees of an adverse party and specifies the imposition of serious remedies for engaging in such conduct. E.g., American Protection Insurance Co. v. MGM Grand Hotel-Las Vegas, Inc., 1986 WL 57464, *1, 6, 7 (D. Nev. 1986) (a violation of ethical rules and disqualification resulted where attorney had ex parte contact with a former officer of adverse party who remained a consultant for the adverse party and was privy to confidential information related to the litigation); In re Data General Corp. Antitrust Litigation, 1986 U.S. Dist. LEXIS 21923, *10 (N.D. Cal. 1986) (counsel precluded from interviewing and hiring former employees of adverse party because employees' knowledge of privileged information of adverse party was intermingled with knowledge that might have been unprotected); Butler v. Biocore Medical Technologies, Inc., 348 F.3d 1163, 1169-72 (10th Cir. 2003) (counsel violated Canon 9 and other ethical rules by contacting former employee of adverse party who possessed confidential

EXHIBIT 6

PAGE 154

John B. Quinn, Esq.
July 5, 2007
Page 3

information; court stated that access to privileged information of adverse party may be grounds to disqualify an attorney); Rentclub, Inc. v. Transamerica Rental Finance Corp., 811 F. Supp. 651, 657-58 (M.D. Fl. 1992) (court disqualified counsel who hired as consultant former officer of adverse party who was privy to adverse party's confidential and proprietary information, noting ex parte contact with former employees of adverse party should be barred to prevent disclosure of any inadvertent confidential communications).

For example, in Kaiser v. American Telephone & Telegraph, 2002 U.S. Dist. LEXIS 25758, *30-32 (D. Ariz. 2002), the court disqualified and imposed sanctions on plaintiff's counsel for seeking information relevant to plaintiff's lawsuit from a former employee of defendant after holding that counsel violated Rule 4.2. Recognizing that the majority of cases prohibit inquiry into any confidential or privileged information possessed by an adverse party's former employee, the court concluded that "[i]f a former employee occupie[s] a high ranking position such that his or her exposure to confidential or privileged information may be assumed, or occupie[s] a position giving rise to a plaintiff's claims, then no ex parte contact should be permitted absent notice to the former employer." Id. at *19-20 (emphasis in original). The court in Kaiser further explained as follows: "The interest of the corporation in protecting information - especially privileged information - acquired by an employee during the course of employment from disclosure to an opponent in litigation remains after the employee leaves the corporation....[A]t least with respect to former highly-placed former employees, such as former officers and directors of the corporation, the potential for the release of such information makes the corporation's interest paramount to the plaintiff's interest in ex parte contact." Id. at *20-21.

Fred Larian is the very type of highly-placed former employee with whom ex parte contact is disallowed, as instructed by the Kaiser court, as it can be assumed that he was privy to confidential and privileged information of MGA. Indeed, Fred Larian was a paid consultant for MGA at the time of the subject communications, and in this capacity, he had been involved with high-level issues at the company, including certain litigation matters. Thus, the holding in Kaiser provides that your conduct in contacting Fred Larian and seeking confidential and privileged information of MGA from him violates your ethical duties and entitles MGA to appropriate relief, including your disqualification and sanctions.

Given the egregious nature of your misconduct and the prejudice to MGA, we intend to bring your actions to the attention of the Court and seek all appropriate remedies. In the interim, we demand that you stipulate to (1) return all documents which you obtained from Fred Larian and/or his counsel and all notes from your meetings with Fred Larian and/or his counsel; (2) refrain from introducing or using in any fashion any documents or information obtained from Fred Larian or his counsel or derived from information or documents obtained from Fred Larian; (3) cease any further contact with Fred Larian or any of his counsel; and (4) compensate MGA for its attorneys' fees and costs in investigating this matter. We will give you until July 19, 2007 to respond to our requested stipulation before we bring your actions to the attention of the Court and seek all appropriate remedies. Some of the remedies we shall seek will include the

EXHIBIT ___6___

PAGE ___155___

John B. Quinn, Esq.
July 5, 2007
Page 4

following, among others: an order seeking to disqualify your law firm as counsel for Mattel herein; an order excluding any evidence you obtained from Fred Larian; an adverse inference instruction to the jury based on your misconduct; an order precluding you from further communication with Fred Larian; an order prohibiting you from filing documents containing or referring to any information or documents obtained from Fred Larian or derived from information or documents obtained from Fred Larian; and an order for monetary sanctions against your law firm for the costs incurred by MGA in investigating this matter and seeking such remedies.

Nothing contained herein shall be deemed as a waiver of any of our client's rights and remedies, at law or in equity, all of which are hereby expressly reserved and preserved.

Very truly yours,

Patricia L. Glaser
of CHRISTENSEN, GLASER, FINK, JACOBS,
WEIL & SHAPIRO, LLP

PLG/eb
cc:    Daphne Gronich, Esq.
       Craig Holden, Esq.
       Dale Cendali, Esq.

EXHIBIT ___6___

PAGE ___156___

**Exhibit 7**

Hearing: [Infante] 2/11/08 12:00:00 PM

2

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                   EASTERN DIVISION
 4
 5   CARTER BRYANT, AN INDIVIDUAL, )
                                   )
 6        PLAINTIFF,    )
                        )
 7        VS.           ) CASE NO.
                        )
 8   MATTEL, INC., A DELAWARE  ) CV 04-9049 SGL (RNBX)
     CORPORATION,       ) CONSOLIDATED WITH
 9                      ) CASE NO. 04-9059 AND
          DEFENDANT.    ) CASE NO. 05-2727]
10   _____)
                        )
11   AND CONSOLIDATED ACTIONS(S).  )
12   _____)
13
14
15   TELEPHONIC TRANSCRIPT OF
16   PROCEEDINGS, TAKEN BEFORE HON.
17   EDWARD A. INFANTE, AT 865 SOUTH
18   FIGUEROA STREET, THIRD FLOOR, LOS
19   ANGELES, CALIFORNIA, COMMENCING
20   AT 8:30 A.M., MONDAY, FEBRUARY 11,
21   2008, BEFORE ANGELA DUPRE, CSR 7804.
22
23
24
25
```

4

```
 1        LOS ANGELES, CALIFORNIA; MONDAY
 2             FEBRUARY 11, 2008
 3             8:30 A.M.
 4
 5        MR. WERDEGAR:  GOOD MORNING, YOUR HONOR.  THIS
 6   IS MATT WERDEGAR AND MIKE PAGE, OF KEKER &
 7   VAN NEST, ON BEHALF OF CARTER BRYANT.
 8        JUDGE INFANTE:  GOOD MORNING.
 9        I HAVE A LETTER DATED FEBRUARY 6TH IN
10   WHICH YOU INDICATE THE PRIORITY OF MOTIONS THAT YOU
11   WOULD LIKE TO BE HEARD FIRST, AND SO I AM PREPARED
12   TO HEAR THOSE MOTIONS.
13        THE FIRST ONE ON THE LIST IS MGA'S MOTION
14   TO COMPEL DISCOVERY AS TO ISSUES AS TO WHICH MATTEL
15   HAS WAIVED THE PRIVILEGE BY -- BY CLIENT ASSERTION.
16   THAT MOTION, I BELIEVE, WAS FILED JANUARY 18TH.
17   I'M PREPARED TO HEAR THAT MOTION.
18        MR. KENNEDY:  GOOD MORNING.  RAOUL KENNEDY, ON
19   BEHALF OF MGA.
20        I REALIZE WE HAVE LIMITED TIME THIS
21   MORNING.  IF THE COURT HAS QUESTIONS, I'D BE
22   PLEASED TO TRY TO ADDRESS THEM.  OTHERWISE, I THINK
23   THE MEMOS MAKE CLEAR THE ISSUE THAT HAS BEEN PLACED
24   IN ISSUE BY MATTEL, AND IT'S ONE OF THE CLASSIC
25   ISSUES THAT IN ORDER TO FULLY LITIGATE IT, WE NEED
```

3

```
 1   APPEARANCES OF COUNSEL:
 2
 3   FOR CARTER BRYANT:
 4        KEKER & VAN NEST, LLP
          BY:  MICHAEL PAGE, ESQ.
               MATTHEW WERDEGAR, ESQ.
 5        710 SANSOME STREET
          SAN FRANCISCO, CALIFORNIA 94111
 6        (415) 391-5400
          (TELEPHONICALLY)
 7
 8
 9   FOR MATTEL, INC.:
10        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
          BY:  TIMOTHY ALGER, ESQ.
               HARRY OLIVAR, ESQ.
11             CHRISTOPHER TAYBACK, ESQ.
               B. DYLAN PROCTOR, ESQ.
12        865 SOUTH FIGUEROA STREET
          TENTH FLOOR
13        LOS ANGELES, CALIFORNIA 90017-2543
          (213) 443-3000
14
15   FOR MGA ENTERTAINMENT, INC.:
16        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
17        BY:  RAOUL D. KENNEDY, ESQ.
          FOUR EMBARCADERO CENTER
18        SUITE 3800
          SAN FRANCISCO, CALIFORNIA 94111
19        (415) 984-6400
20
21   ALSO PRESENT:
22        HON. EDWARD A. INFANTE (TELEPHONICALLY)
23
24
25
```

5

```
 1   TO KNOW WHAT ADVICE MATTEL WAS RECEIVING FROM ITS
 2   LAWYERS ON THIS SUBJECT.
 3        JUDGE INFANTE:  OKAY.  WELL, I'VE READ YOUR
 4   MATERIALS.  YOU'VE BRIEFED IT TO -- YOU'VE CITED
 5   THE RAMBUS CASE AND OTHER CASES, WHICH YOU FEEL
 6   SUPPORT YOUR POSITION.
 7        THE THREE-PART TEST THAT IS CITED IN THE
 8   AUTHORITIES FROM HEARN, ET CETERA, I UNDERSTAND
 9   YOUR POSITION.  I THINK IT'S A VERY DIFFICULT --
10   VERY DIFFICULT ISSUE.
11        I'LL BE GLAD TO HEAR FROM MATTEL.
12        MR. OLIVAR:  YES, YOUR HONOR.  HARRY OLIVAR
13   SPEAKING FOR MATTEL.
14        MR. KENNEDY, AS HE SAID, THE ISSUE HAS
15   BEEN PLACED AT ISSUE, WHAT IT SEEMS MGA IS
16   ADVOCATING IS THAT WHENEVER A PARTY RAISES
17   CONCEALMENT OF FACTS OR, FRANKLY, THE DISCOVERY
18   RULE, AS A BASIS FOR TOLLING THE STATUTE OF
19   LIMITATIONS, THE POSITION SEEMS TO BE THAT THAT
20   OPERATES AS A BLANKET PRIVILEGE WAIVER, AND THAT'S
21   NOT THE NINTH CIRCUIT TEST IN THE HEARN V. RAY, AND
22   THAT'S NOT EVEN WHAT HAPPENED IN THE RAMBUS CASE
23        HERE, WE HAVE A SITUATION WHERE MATTEL
24   HAS SIMPLY SAID IT DID NOT LEARN CERTAIN FACTS
25   UNTIL NOVEMBER OF 2003, AND MATTEL HAS PROVIDED
```

EXHIBIT 7

PAGE 157

6

1  DISCOVERY AS TO WHEN IT LEARNED THOSE FACTS.  YOU
2  KNOW, THE FACTS WE'RE TALKING ABOUT WERE WHEN
3  CARTER BRYANT -- THE FACT THAT CARTER BRYANT WAS
4  DOING WORK FOR MGA WHILE HE WAS STILL AT MATTEL.
5  AND MATTEL HAS BEEN FORTHCOMING IN ALL OF ITS
6  DISCOVERY RESPONSES AND DECLARATIONS AND
7  SUBMISSIONS BEFORE YOUR HONOR; SHOWED THOSE ANSWERS
8  AND THEIR AFFIRMATIONS THAT THERE WEREN'T
9  PRIVILEGES ASSERTED WITH CERTAIN OF THOSE ANSWERS
10  AS TO WHEN MATTEL LEARNED FACTS, BECAUSE FACTS ARE
11  NOT PRIVILEGED.
12      BUT THERE IS AN EFFORT NOW ON THIS MOTION
13  TO GO BEYOND THE FACTS, AND SAY, WELL, WE -- IN
14  ADDITION TO FINDING OUT WHEN MATTEL LEARNED FACTS,
15  WE GET TO KNOW WHAT THE LEGAL ADVICE WAS ABOUT
16  THOSE FACTS.  AND WE WOULD SUBMIT, YOUR HONOR,
17  THAT'S JUST SIMPLY NOT THE LAW.
18      UNDER THE HEARN V. RAY TEST, THEY HAVE TO
19  SHOW ON PRONG 2, THAT MATTEL PUT PRIVILEGED
20  INFORMATION AT ISSUE.  AND IN THE CASES THEY RELY
21  ON, THAT'S WHAT OCCURRED.  THAT'S WHAT OCCURRED IN
22  HEARN V. RAY  THERE WAS A GOOD FAITH DEFENSE,
23  WHERE THE PRISON OFFICIAL SAID THAT WE HAD A GOOD
24  FAITH BELIEF, BASED ON WHAT WE WERE BEING TOLD AND
25  KNEW, THAT WE WEREN'T VIOLATING THE INMATES'

7

1  RIGHTS.  THE COURT FOUND PROPERLY THAT GOOD FAITH
2  BELIEF IMPLICATES WHAT YOU'RE BEING TOLD BY YOUR
3  LAWYERS.
4      AND THE SAME THING ON THE MATTEL MOTION
5  THAT CITED AGAINST MGA, THAT WAS ALSO A GOOD FAITH
6  BELIEF DEFENSE.
7      MGA SAID, IN 2000, WE HAD A GOOD FAITH
8  BELIEF THAT WE WOULD PROPERLY CONTACT BRYANT, AND
9  ADVICE OF COUNSEL WAS IMPLICATED THERE.  THAT'S NOT
10  WHAT WE'RE TALKING ABOUT WITH RESPECT TO MATTEL.
11  WE'RE TALKING ABOUT WHEN MATTEL LEARNED FACTS, AND
12  THAT DOES NOT PUT LEGAL ADVICE AT ISSUE.
13      THE SECOND POINT ABOUT HEARN V. RAY IS --
14  THE THIRD POINT IS THEY WOULD HAVE TO SHOW THAT
15  PRIVILEGED INFORMATION IS VITAL, AND NOTHING MGA
16  SUBMITTED SHOWS THAT THE LEGAL ADVICE THAT MATTEL
17  WAS RECEIVING IS VITAL TO MGA'S DEFENSE AGAINST THE
18  FRAUDULENT CONCEALMENT ALLEGATION.
19      I'M SURE MGA WOULD LIKE TO KNOW WHAT THE
20  LAWYERS WERE SAYING, BUT THE ONLY VITAL INFORMATION
21  IS WHEN MATTEL LEARNED FACTS, AND THAT'S AVAILABLE
22  FROM MULTIPLE OTHER SOURCES, INCLUDING THE WRITTEN
23  DISCOVERY RESPONSES THAT WE HAVE IDENTIFIED, AND
24  INCLUDING THE SIX DIFFERENT 30(B)(6) TOPICS THAT
25  ALL RELATE TO THESE ISSUES THAT YOUR HONOR ORDERED

8

1  ON JANUARY 11, AND, IN ONE FORM OR ANOTHER, MATTEL
2  WILL BE PRODUCING WITNESSES TO TESTIFY TO.
3      MR. KENNEDY:  YOUR HONOR, RAOUL KENNEDY.  IF I
4  MIGHT RESPOND BRIEFLY.
5      MATTEL TOOK THE POSITION BOTH IN
6  OBTAINING LEAVE TO AMEND ITS PLEADINGS, AND IN
7  RESISTING THE MOTION FOR TERMINATING SANCTIONS,
8  BASED ON SPOLIATION OF EVIDENCE, THAT IT WAS NOT
9  UNTIL NOVEMBER OF 2003 THAT IT FIRST HAD ANY REASON
10  TO SUSPECT BRYANT'S INVOLVEMENT WITH BRATZ.
11      IN DECEMBER OF 2007, AFTER BOTH OF THOSE
12  RULINGS HAD BEEN MADE, MATTEL DISCLOSES FOR THE
13  FIRST TIME THAT WELL, YEAH, BACK IN 2001 AND 2002,
14  THERE WAS RUMOR AND INNUENDO THAT THAT MIGHT BE
15  GOING ON.
16      AND ABOUT THAT SAME TIME, MR. NOLAN
17  DEPOSED MR. DIANDA, MATTEL'S CHIEF OF WORLDWIDE
18  SECURITY, AND WE FIND OUT THAT HE, BACK IN AUGUST
19  OF 2002, WAS TOLD THAT BRYANT WAS HELPING MGA.  AND
20  MR. DIANDA WROTE THAT HE WAS AWARE OF THIS
21  SITUATION AND HAD BEEN WORKING ON IT FOR SEVERAL
22  MONTHS.  THIS IS AS OF AUGUST OF 2002, BUT THAT IT
23  WAS IN THE HANDS OF MATTEL'S ATTORNEYS.
24      SO THIS IS NOT A CASE WHERE WE JUST
25  DECIDED TO GO OUT ON A FISHING EXPEDITION AND SEE

9

1  IF MAYBE THERE'S SOME INVOLVEMENT THERE.
2      THIS IS A CASE WHERE MATTEL HAS BELATEDLY
3  DISCLOSED THAT THERE WAS AT LEAST RUMOR AND
4  INNUENDO -- AND OF COURSE WE'RE TALKING HERE NOT
5  ABOUT ADMISSIBILITY, BUT JUST ABOUT
6  DISCOVERABILITY.
7      AND WHEN WE ATTEMPT TO LEARN MORE ABOUT
8  THAT INNUENDO, THE ATTORNEY-CLIENT PRIVILEGE GETS
9  DROPPED ON US.  BUT WE HAVE DOCUMENTARY EVIDENCE
10  THAT IN AUGUST OF 2002 THE HEAD OF SECURITY SAYS
11  THE LAWYERS ARE WORKING ON IT.
12      NOW, THAT'S ABOUT AS OVERWHELMING A
13  SUGGESTION OF INVOLVEMENT.  AND AS RAMBUS AND OTHER
14  CASES MAKE CLEAR THE OBVIOUS, PEOPLE DON'T DECIDE
15  WHEN TO FILE AND WHEN TO TRY TO GET AROUND THE
16  STATUTE OF LIMITATIONS WITHOUT HEAVY INVOLVEMENT ON
17  THE PART OF THEIR LAWYERS.
18      SO I -- I APOLOGIZE, YOUR HONOR, FOR
19  REPEATING WHAT'S IN THE PAPERS.  AGAIN, IF THE
20  COURT HAS QUESTIONS, I'M PREPARED TO TRY TO DEAL
21  WITH THEM.  OTHERWISE, I'M PREPARED TO SUBMIT.
22      JUDGE INFANTE:  WELL, ONE OF THE FACTORS OF THE
23  THREE-PART TEST UNDER HEARN IS WHETHER OR NOT THE
24  PRIVILEGED INFORMATION WOULD BE VITAL TO YOUR CASE.
25  AND THAT REALLY HAS WITHIN IT A QUESTION OF WHAT

EXHIBIT 7
PAGE 158

Mattel v. MGA II                Unsigned                Page 6 - 9

Hearing: [Infante] 2/11/08 12:00:00 PM

10

1  OTHER EVIDENCE IS AVAILABLE TO YOU.
2      I NOTE THAT YOU ARE GOING TO BE TAKING
3  THE DEPOSITION, IF YOU HAVEN'T ALREADY, WITH
4  RESPECT TO TOPICS NUMBERS 15 THROUGH 21 OF THE
5  30(B)(6), WHICH PRECISELY ADDRESSES THE UNDERLYING
6  ISSUES AS TO WHEN MATTEL KNEW SUFFICIENT FACTS TO
7  BRING ITS CLAIMS.
8      HAS THAT DEPOSITION TAKEN PLACE YET?
9      MR. KENNEDY: IT HAS NOT, YOUR HONOR.
10     WE HAVE BEEN ATTEMPTING TO MEET AND
11 CONFER CONCERNING GETTING OTHER FORMS OF DISCOVERY,
12 AS WELL AS THE 30(B)(6) DEPOS.
13     WE HAVE THE BENEFIT OF DOCUMENTS THAT IS
14 EXPLAINED IN OUR PENDING MOTION THAT OVERRULED THE
15 RELEVANCY OBJECTIONS REGARDING OTHER FORMS OF
16 DISCOVERY. MATTEL HAS NEVER EVEN GOTTEN BACK TO US
17 ON THE MEET AND CONFER.
18     SO THE SHORT ANSWER IS NO, THOSE
19 DEPOSITIONS HAVE NOT YET BEEN TAKEN.
20     JUDGE INFANTE: MY PROBLEM IS I CAN'T REALLY
21 FULLY ASSESS THAT MOST CRITICAL ELEMENT STATED IN
22 HEARN VERSUS RAY CASE; NAMELY, JUST HOW VITAL IS
23 THE PRIVILEGED INFORMATION IN THE CONTEXT OF ALL
24 THE EVIDENCE.
25     I'D LIKE TO QUOTE FROM MATTEL'S

11

1  OPPOSITION ON PAGE 17. IF YOU WOULD FOLLOW ME,
2  THIS IS AT LINE 9, ON PAGE 17:
3      "PURSUANT TO THE DISCOVERY
4  MASTER'S JANUARY 9TH, 2008 ORDER,
5  MATTEL WILL BE PRODUCING A DEPONENT
6  ON TOPIC NUMBERS 15 THROUGH 21.
7  MATTEL HAS NOT AND WILL NOT TAKE THE
8  POSITION THAT ITS UNDERLYING
9  KNOWLEDGE OR ANY UNDERLYING FACTS ARE
10 PRIVILEGED. MGA WILL THUS OBTAIN
11 TESTIMONY REGARDING MATTEL'S
12 KNOWLEDGE ON THE SUBJECTS OF THOSE
13 TOPICS," UNQUOTE.
14     I DON'T KNOW HOW THAT'S GOING TO PLAY
15 OUT. IF MATTEL KEEPS THAT PROMISE AND ALLOWS YOU
16 TO CONDUCT THE DEPOSITIONS AS TO TOPICS 15 AND 21,
17 WITH THE SPIRIT OF THAT STATEMENT, IT MAY VERY WELL
18 BE THAT THE PRIVILEGED INFORMATION WHICH YOU ARE
19 SEEKING WAIVER OF IS NOT VITAL TO PROVE YOUR
20 CONTENTIONS WITH RESPECT TO MATTEL'S KNOWLEDGE IN
21 THE APPLICATION OF THE STATUTE OF LIMITATIONS OR
22 LACHES DEFENSES.
23     THAT'S MY QUESTION TO YOU, MY STATEMENT
24 TO YOU -- TO BOTH OF YOU, ACTUALLY -- WHICH I THINK
25 SORT OF GOES TO THE CRUX OF THIS MOTION.

12

1  IF ANYONE WISHES TO COMMENT, YOU MAY.
2      MR. KENNEDY: YOUR HONOR, RAOUL KENNEDY.
3      UNDER THOSE CIRCUMSTANCES, I WOULD
4  SUGGEST THAT THE COURT DENY THE MOTION WITHOUT
5  PREJUDICE OR RENEWING IT -- OR TO PERHAPS SAVE
6  PAPER, TAKE IT UNDER SUBMISSION, AND NOT RULE ONE
7  WAY OR THE OTHER TODAY; THAT WE WILL CONTINUE TO
8  MEET AND CONFER ON TRYING TO GET DEPOSITION DATES
9  AND TAKE THOSE DEPOSITIONS.
10     AND ALSO IF THE COURT COULD PUT MGA'S
11 NOTICE OF MOTION TO OVERRULE RELEVANCY OBJECTIONS
12 CONCERNING OTHER FORMS OF DISCOVERY TOWARDS THE TOP
13 OF ITS STACK SO THAT WE HAVE A RULING ON THAT AS
14 WELL.
15     JUDGE INFANTE: YES.
16     MR. KENNEDY: WE CAN THEN PROCEED AND LET'S SEE
17 WHAT'S IN THE PAPER DISCOVERY INTERROGATORIES, AND
18 IN THOSE DEPOSITIONS, AND THEN WITHOUT EITHER
19 PARTIES' PREJUDICE COME BACK AND PURSUE THE MATTER.
20     THAT WOULD BE MY PROPOSAL.
21     JUDGE INFANTE: THAT'S -- THAT'S PERHAPS A GOOD
22 PROPOSAL.
23     I WOULD LIKE TO ASK MATTEL'S COUNSEL.
24     MR. OLIVAR: YOUR HONOR, I THINK A DENIAL
25 WITHOUT PREJUDICE WOULD BE APPROPRIATE. IT'S BEEN

13

1  VERY CLEAR THAT IT IS NOT MATTEL'S INTENTION TO
2  DEPRIVE MGA OF THE UNDERLYING FACTS REGARDING ITS
3  KNOWLEDGE AS IT RELATES TO THE ALLEGATION IN THE
4  COMPLAINT, AND WE JUST DON'T GET THERE WITH RESPECT
5  TO LEGAL ADVICE, GIVEN THAT POSITION.
6      I THINK YOUR HONOR HIT THE NAIL ON THE
7  HEAD; WE HAVE PROVIDED UNDERLYING FACTS AND
8  CONTINUE TO DO SO IN RESPONSE TO THESE DEPOSITION
9  TOPICS.
10     IF MGA BELIEVES THERE IS ANY ISSUE ABOUT
11 UNDERLYING FACTS AFTER THESE DEPOSITIONS, COMING
12 BACK TO YOUR HONOR MIGHT BE APPROPRIATE. BUT I
13 THINK DENIAL WITHOUT PREJUDICE IS THE APPROPRIATE
14 RESULT AT THIS TIME.
15     JUDGE INFANTE: LET ME GIVE YOU A LITTLE BIT OF
16 GUIDANCE.
17     I THINK IT'S POSSIBLE TO WAIVE AN
18 ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT
19 PRIVILEGE BY CHEATING AROUND THE STATUTE OF
20 LIMITATIONS WHERE YOU BRING A CLAIM THAT ON ITS
21 FACE MAY BE UNTIMELY. IT'S POSSIBLE.
22     THERE IS SOME CASE LAW THERE; IT'S
23 POSSIBLE. THE RULE OF WAIVER, AS APPLIED TO THESE
24 SITUATIONS, IS TRULY A RULE OF FAIRNESS. AND I
25 THINK YOU NEED TO MAKE SOME VERY CAREFUL DECISIONS

Mattel v. MGA II                    Unsigned

EXHIBIT 7
PAGE 159

Page 10 - 13

14

1 AS TO HOW YOU ALLOW THESE DEPOSITIONS TO BE
2 CONDUCTED, BECAUSE IT IS POSSIBLE THAT A COURT OR
3 SPECIAL MASTER COULD COME TO THE CONCLUSION THAT
4 THERE'S INADEQUATE INFORMATION TO YOUR ADVERSARY IN
5 A MATTER OF FAIRNESS, IN ORDER TO MEET WHAT YOU
6 HAVE PLED.  AND SO YOU NEED TO KEEP THAT IN MIND.
7     AND I THINK THAT THE QUESTIONS THAT ARE
8 FRAMED AND PUT TO THE DEPONENTS NEED TO BE PROPERLY
9 PHRASED SO THAT BY ANSWERING THE QUESTION, THE
10 DEPONENT AND THE ATTORNEY FOR THE DEPONENT IS NOT
11 PERMITTING A WAIVER OF THE ATTORNEY-CLIENT
12 PRIVILEGE OR WORK PRODUCT PRIVILEGE BY ANSWERING
13 THE QUESTION.
14     I DON'T KNOW IF I'M MAKING ANY SENSE TO
15 YOU, BUT I THINK THAT THE CONDUCT OF THIS
16 DEPOSITION IS CRITICAL TO A FINAL DETERMINATION OF
17 THIS MOTION OF WHETHER OR NOT PRIVILEGE IS
18 IMPLIEDLY WAIVED.
19     AND SO WITH THAT, I'M GOING TO SIMPLY
20 TAKE THE MOTION UNDER SUBMISSION AND NOT DECIDE IT
21 AT THIS TIME.
22     AND I THINK YOU BOTH HAVE TO WORK VERY
23 HARD IN HAVING AN EFFECTIVE DEPOSITION  AND BOTH
24 OF YOU HAVE SOME RESPONSIBILITY IN THAT REGARD,
25 BOTH AS TO THE APPROPRIATE PHRASING OF THE

15

1 QUESTIONS, AND ALLOWING THE WITNESS TO ANSWER
2     ANY OTHER COMMENTS?
3     MR. OLIVAR:  JUST THANK YOU, YOUR HONOR  I
4 THINK THAT GUIDANCE IS HELPFUL
5     JUDGE INFANTE:  OKAY.  SO WE'LL PASS THIS
6 MOTION.
7     WE COULD -- WHAT IS MOTION NUMBER 4?
8 THAT'S -- MGA HAS A MOTION, WHICH IS LISTED NUMBER
9 4 IN THE LETTER.
10     DO YOU WANT TO HEAR THAT NEXT?
11     MR. KENNEDY:  CERTAINLY, YOUR HONOR
12     JUDGE INFANTE:  OKAY.
13     MR. KENNEDY:  RAOUL KENNEDY.
14     WE BELIEVE THIS OVERLAPS, TO SOME EXTENT,
15 WITH MATTEL'S RENEWED MOTION FOR RECONSIDERATION
16 REGARDING SEARCHING OTHER EMPLOYEES' FILES.
17 VERIFICATIONS OF EFFORTS TO FORCED AND UNFORCED
18 COMPLIANCE WITH NONCONFIDENTIALITY AGREEMENTS.
19     YOUR HONOR WILL RECALL THAT RELATED TO
20 THE TOPIC 25 AND TOPIC 52, MEASURES TAKEN TO
21 ENFORCE AND FORMS OF SUCH DOCUMENTS.
22     AND THIS IS, AS I SAID, THE COROLLARY TO
23 THAT.  AGAIN, IT'S BEEN BRIEFED.  I DON'T WANT TO
24 WASTE VALUABLE TIME THIS MORNING REPEATING WHAT'S
25 IN THE -- THE PAPERS.  BUT IF WE'RE TALKING ABOUT

16

1 DISCOVERABILITY, NONADMISSIBILITY, IT'S ABUNDANTLY
2 CLEAR UNDER CALIFORNIA LAW HOW A PARTY HAS
3 INTERPRETED THE SAME OR EVEN SIMILAR LANGUAGE AS
4 THE MOVING CASE, JUDGE BURNS DEALT WITH THAT ISSUE.
5 HE'S PARTICULARLY INSTRUCTIVE ON THAT POINT.
6     AS FAR AS THE BURDEN ARGUMENT, IT SEEMS
7 TO BE A SELF-DEFEATING AGREEMENT FOR MATTEL, WHICH
8 ONE WOULD HOPE THAT THERE WOULD HAVE BEEN
9 COMPARATIVELY FEW INSTANCES OVER THE YEARS WHERE
10 MATTEL HAS ACTUALLY GOTTEN INTO A DISPUTE OVER WHAT
11 THE NONDISCLOSURE LANGUAGE MEANT.
12     HOWEVER, THOUGH, TO THE EXTENT THAT'S NOT
13 CORRECT, AND THE MORE OTHER DISPUTES AND EPISODES
14 THERE'S BEEN, SEEMS TO ME THE GREATER IT SUGGESTS
15 THAT THERE IS UNCERTAINTY IN THE LANGUAGE -- OR
16 MATTEL CERTAINLY CREATED UNCERTAINTY AMONG ITS
17 EMPLOYEES AS WE GET INTO HYPOTHETICALLY LARGER AND
18 LARGER NUMBERS OF THEM THAT CAN'T COMPLY.
19     SO I SUBMIT ON THE BURDEN SCALE, SHOW ME
20 ADDITIONAL BURDEN AND I'LL SHOW YOU ADDITIONAL
21 REASONS FOR RELEVANCY.  IT'S SIMPLY FOR INCREASED
22 DISCOVERABILITY.
23     AGAIN, IF THE COURT HAS QUESTIONS, I
24 WOULD BE PLEASED TO TRY TO ADDRESS THEM, BUT I
25 DON'T NEED TO REPEAT WHAT'S ALREADY EXHAUSTIVELY

17

1 BEEN BRIEFED.
2     JUDGE INFANTE:  THIS MOTION HAS A COUSIN TO IT;
3 NAMELY, MATTEL'S MOTION FOR RECONSIDERATION OF THE
4 SPECIAL MASTER'S SEPTEMBER ORDER WITH DOCUMENT
5 DISCOVERY ON THIS VERY TOPIC, AND THAT MOTION HAS
6 NOT BEEN FULLY RESOLVED.
7     MR. KENNEDY:  THAT'S CORRECT.  THERE IS A
8 MOTION FOR RECONSIDERATION, AND THE COURT -- I
9 BELIEVE IT WAS THE JANUARY 3 HEARING -- GRANTED
10 MATTEL PERMISSION TO FILE THE RENEWED MOTION FOR
11 RECONSIDERATION.  AND THAT'S AMONG THE MOTIONS
12 THAT'S NOW FULLY BRIEFED AND BEFORE THE COURT.
13     JUDGE INFANTE:  I THINK WE NEED TO DECIDE THAT
14 MOTION AS WELL AS THIS ONE TOGETHER.
15     I'LL HEAR FROM MATTEL NOW.
16     MR. ALGER:  GOOD MORNING, YOUR HONOR  THIS IS
17 TIM ALGER, FOR MATTEL.
18     JUST TO CORRECT THE RECORD A LITTLE BIT,
19 THE COURT GRANTED MATTEL THE RIGHT TO RENEW THE
20 MOTION, AND TO -- TO RESULT IN A FULL BRIEFING ON
21 THE ISSUE OF WHETHER MGA AND BRYANT WERE ENTITLED
22 TO DISCOVERY ABOUT OTHER EMPLOYMENT AGREEMENTS,
23 BECAUSE THE UNCONSCIONABILITY DEFENSE HAD BEEN
24 WITHDRAWN.  AND THAT WAS A DECISION THAT THE -- THE
25 DISCOVERY MASTER MADE LATE LAST YEAR.

Mattel v. MGA II                Unsigned                **EXHIBIT** 7

**PAGE** 160                                Page 14 - 17

Hearing: [Infante] 2/11/08 12:00:00 PM

18

1   THEN IN JANUARY -- WE HAD A HEARING ON
2   JANUARY 3RD THAT WAS SET FOR BOTH OF THESE MOTIONS,
3   AND -- AND AT THE DATE -- AT THE HEARING, MATTEL
4   WAS SERVED WITH A REPLY BRIEF WITH NEW ARGUMENTS
5   AND NEW AUTHORITIES. AND, AT THAT POINT, THE
6   DISCOVERY MASTER OPTED, WITH THE AGREEMENT OF THE
7   PARTIES, TO KICK IT OVER TO FEBRUARY. THAT'S WHERE
8   WE ARE WITH THAT.
9       THE MOTION ON -- THE OTHER MOTION FOR
10  RECONSIDERATION HAS BEEN FULLY BRIEFED, AND I THINK
11  THE BRIEFING IS QUITE GOOD ON THAT, AND MATTEL
12  CERTAINLY CAN RELY -- IS WILLING TO RELY ON THAT
13  BRIEFING.
14      AS TO THE OTHER MOTION, MGA'S MOTION
15  WHICH IS ON THE CALENDAR FOR TODAY, I DID WANT TO
16  ADDRESS SOME THINGS THAT WERE RAISED IN THE REPLY,
17  SOME OF WHICH HAD CAME UP LATE.
18      WHAT'S HAPPENED HERE, I THINK THE
19  DISCOVERY MASTER HAS RECOGNIZED THIS, GIVEN THAT
20  MGA AND BRYANT DON'T HAVE THE UNCONSCIONABILITY
21  DEFENSE ANYMORE -- OR CLAIM ANYMORE, THEY'VE NOW
22  SHIFTED OVER TO AN AMBIGUITY ARGUMENT. AND THEY'VE
23  TRUMPED UP THIS AMBIGUITY CONTENDING THAT THERE IS
24  AN EXCLUSION OR A LOOPHOLE FOR COPYRIGHTED SUBJECT
25  MATTER IN THE INVENTIONS AGREEMENT, AND THAT --

19

1   THAT AMBIGUITY, THEY CLAIM, ALLOWS BROAD DISCOVERY.
2       AND THE FACT OF THE MATTER IS THAT IF
3   THIS DISCOVERY WAS ALLOWED, IT WOULD BE A RADICAL
4   EXPANSION OF THE LAWSUIT, RESULTING IN MANY TRIALS
5   INVOLVING PERHAPS HUNDREDS OF EMPLOYEES.
6       BUT THE MOST IMPORTANT THING I WANT TO
7   EMPHASIZE TODAY IS THE AMBIGUITY THAT THEY CONTEND
8   EXISTS, DOES NOT EXIST. IT DOESN'T EXIST AT ALL.
9       AND I DIRECT THE DISCOVERY MASTER TO
10  THE INVENTIONS AGREEMENT ITSELF, WHICH IS ATTACHED
11  TO MR. MUMFORD'S DECLARATION, EXHIBIT 8. AND
12  THERE, IN PARAGRAPH -- IN SECTION 2(A), MR. BRYANT
13  DID THE FOLLOWING:
14      "I HEREBY ASSIGN TO THE COMPANY
15  AND/OR ITS NOMINEES ALL MY RIGHT,
16  TITLE, AND INTEREST IN SUCH
17  INVENTIONS, DEFINED BELOW, AND ALL MY
18  RIGHT, TITLE, AND INTEREST IN ANY
19  PATENTS, COPYRIGHTS, PATENT
20  APPLICATIONS, OR COPYRIGHT
21  APPLICATIONS BASED THEREON."
22      AND IT GOES ON TO DEFINE INVENTIONS AS
23  INCLUDING, BUT NOT LIMITED TO, DISCOVERIES,
24  IMPROVEMENTS, PROCESSES, DEVELOPMENTS, DESIGNS,
25  KNOW-HOW, DATA COMPUTER PROGRAMS, AND SO FORTH.

20

1   AND THE FACT OF THE MATTER IS THERE'S NO
2   AMBIGUITY HERE. AND THE WARNERS BROS. CASE DOESN'T
3   COME TO CLOSE TO THIS CASE, AND THEIRS WASN'T A
4   DISCOVERY DISPUTE AT ALL. IT WAS A BENCH TRIAL,
5   AND OTHER AGREEMENTS THAT WERE SIMILAR AGREEMENTS
6   WERE PRESENTED DURING THE BENCH TRIAL. IT WASN'T
7   AN ISSUE OF BURDEN ADDRESSED BY JUDGE BURNS IN THAT
8   CASE AT ALL. BUT THE AMBIGUITY WAS QUITE CLEAR IN
9   THAT DISPUTE.
10      THEY WERE -- THEY WERE ARGUING IN THAT
11  CASE ABOUT A 1954 AGREEMENT THAT USED THE WORD --
12  OR THE PHRASE "OR OTHERWISE" AND WHETHER "OR
13  OTHERWISE," INCLUDED PUBLICITY RIGHTS.
14      WE DON'T HAVE ANYTHING LIKE THAT HERE.
15  WE'VE GOT A QUITE CLEAR AGREEMENT THAT COVERS
16  COPYRIGHTS. SO TO GO OFF AND TRY TO FIND SOME --
17  DEAL WITH OTHER PEOPLE'S AGREEMENTS THAT DEAL WITH
18  MATTEL IS A WILD GOOSE CHASE.
19      SECOND, THE CASES THAT ARE CITED BY MGA
20  AND BRYANT IN THIS DISPUTE ARE ALL GAP FILLER
21  CASES, AND WE DON'T HAVE A GAP FILLING PROBLEM
22  HERE. WE'VE GOT AN INTERPRETATION ISSUE. AND TO
23  THE EXTENT MGA CAN ARGUE INTERPRETATION, THEY'VE
24  GOT WHAT THEY NEED ON INTERPRETATION.
25      WE HAVE -- MATTEL HAS PRODUCED TO MGA AND

21

1   BRYANT ALL FORM AGREEMENTS FOR THE INVENTORSHIP AND
2   FOR THE DISCLOSURES SINCE 1995. THEY HAVE ALL
3   THOSE FORMS.
4       SO TO THE EXTENT THAT THEY WANT TO ARGUE
5   THAT THERE WAS SOME MATERIAL CHANGE OR SOME
6   LOOPHOLE THAT WAS CREATED BY THE CHANGE IN THE
7   AGREEMENT, REVISIONS OF THE AGREEMENTS OVER THE
8   COURSE OF YEARS, THEY HAVE THE EVIDENCE THAT THEY
9   NEED FOR THAT.
10      SO THEN WE MOVE ON TO THE QUESTION OF --
11  WHICH MR. KENNEDY KIND OF GLOSSED OVER -- AND THAT
12  IS BURDEN. THE BURDEN HERE IS NOT THE DISCLOSURE
13  OF DOCUMENTS. THE BURDEN IS THE SEARCH, AND WE
14  POINTED THAT OUT, BOTH IN THIS OPPOSITION TO THIS
15  MOTION, AND ALSO IN OUR MOTION FOR RECONSIDERATION.
16  THE SEARCH ISSUE, THE THOUSANDS OF EMPLOYEES THAT
17  HAVE GONE THROUGH MATTEL'S EL SEGUNDO HEADQUARTERS
18  OVER THE YEARS. MANY HAVE GONE. MANY ARE STILL
19  THERE, AND THE BREADTH OF THE REQUESTS THAT THEY'VE
20  MADE, INCLUDING ALL EFFORTS TO ENFORCE COMPLIANCE,
21  ALL FORMS THAT ALL THESE EMPLOYEES HAVE SIGNED.
22  THAT WOULD INCLUDE, OBVIOUSLY, VIRTUALLY EVERYTHING
23  IN THEIR EMPLOYMENT FILES, RANGING FROM MEDICAL
24  AGREEMENTS, TO 401(K)'S, PERFORMANCE RESULTS THAT
25  THEY HAVE TO SIGN, A WHOLE BROAD SWATH OF

Mattel v. MGA II                    Unsigned                    Page 18 - 21

EXHIBIT ___7___

PAGE ___161___.

22

1 AGREEMENTS THEY HAVE TO SIGN; COMMUNICATIONS WITH
2 EMPLOYEES DURING THE COURSE OF THEIR EMPLOYMENT, AS
3 TO WHETHER THEY HAD – IF THEIR ISSUE CAME UP
4 REGARDING MOONLIGHTING OR OTHER SPECIAL SITUATIONS
5 THAT THEY MADE REQUESTS ABOUT; COMMUNICATIONS WITH
6 THEIR SUPERVISORS.
7      THE THOUSANDS AND THOUSANDS OF HOURS THAT
8 IT WOULD TAKE TO TRACK THIS DOWN, ALL FOR
9 INFORMATION THAT HAS NO RELEVANCE, WHERE WE'VE GOT
10 NO AMBIGUITY IN THE CONTRACT, AND WE HAVE NO GAP
11 THAT NEEDS TO BE FILLED.  THAT WE SUBMIT, YOUR
12 HONOR.
13      JUDGE INFANTE:  ALL RIGHT.  LET ME DEAL WITH
14 THE MOTION, WITH RESPECT TO TOPICS 25 AND 52, THE
15 30(B)(6) DEPOSITION NOTICE WHICH ORIGINALLY WAS
16 SERVED ON DECEMBER '04.
17      THE MOTION TO OVERRULE MATTEL'S RELEVANCY
18 OBJECTIONS AND COMPEL DISCOVERY ON THOSE TOPICS IS
19 DENIED.  I FIND THAT BOTH TOPICS BETWEEN THE 25 AND
20 52 ARE GROSSLY OVERBROAD, SEEK IRRELEVANT
21 INFORMATION, AND CREATE UNDUE BURDEN.
22      TO THE EXTENT THAT PORTIONS OF WHAT IS
23 SOUGHT IN THOSE TOPICS IS RELEVANT, THAT RELEVANCY
24 IS SUBSTANTIALLY OUTWEIGHED BY THE ENORMOUS BURDEN
25 IT WOULD TAKE TO PREPARE WITNESSES TO DEAL WITH THE

23

1 SCOPE OF THESE TOPICS.  IN MY VIEW, ALSO, IT'S NOT
2 LIKELY TO LEAD TO ADMISSIBLE EVIDENCE.  AND FOR ALL
3 THOSE REASONS, I WOULD DENY THAT MOTION.
4      NOW, I'D LOOK LIKE TO GO BACK TO THE
5 UNDERLYING MOTION FOR RECONSIDERATION.  WITH
6 RESPECT TO THE DOCUMENT REQUESTS THAT WERE AT ISSUE
7 BACK IN SEPTEMBER, WHICH I ORDERED PRODUCED, WITH
8 RESPECT TO THOSE, MY JUDGMENT IS TO ONLY PARTIALLY
9 GRANT THE MOTION FOR RECONSIDERATION, BY LIMITING
10 MY ORDER TO THE FEW HUNDRED PEOPLE THAT WERE
11 EMPLOYED IN THE DESIGN CENTER – THE DESIGN CENTER
12 WHERE BRYANT WORKED.
13      ESSENTIALLY, THAT'S THE ONLY CHANGE TO MY
14 ORDER.
15      ARE THERE ANY QUESTIONS WITH RESPECT TO
16 THAT?
17      MR. ALGER:  YOUR HONOR, I DO HAVE A QUESTION AS
18 TO THE LAST PART OF YOUR ORDER.  AND THAT IS:  THE
19 PEOPLE IN THE DESIGN CENTER, IS THAT LIMITED AS TO
20 TIME?  BECAUSE OVER THE COURSE OF YEARS IT WOULD BE
21 QUITE A LARGE NUMBER OF PEOPLE.
22      JUDGE INFANTE:  WELL, I DON'T HAVE THE REQUEST
23 DIRECTLY IN FRONT OF ME, BUT I BELIEVE THE
24 REQUEST – I DON'T RECALL WHETHER THE REQUEST WAS
25 LIMITED IN TIME.

24

1 COULD YOU HELP ME ON THAT.
2      IF NOT, I WOULD ASK MR. KENNEDY:  WHAT'S
3 YOUR PROPOSAL WITH RESPECT TO SCOPE?
4      I THINK, ROUGHLY, WE WERE TALKING 1995 TO
5 EITHER THE PRESENT OR TO SOMETHING WITHIN A YEAR
6 AFTER THE LAWSUIT WAS FIRST FILED.  I DON'T RECALL
7 OUR DISCUSSION ON THAT PARTICULAR POINT.
8      DO YOU HAVE ANY COMMENTS?
9      MR. KENNEDY:  I DON'T RECALL OUR DISCUSSING
10 SPECIFIC TIME LIMITS IN THE PAST.  BUT WE WOULD
11 CERTAINLY LIVE WITH, SAY, 1998 TO A YEAR AFTER THE
12 FILING OF THE LAWSUIT.
13      JUDGE INFANTE:  ALL RIGHT.  THAT'S ACCEPTABLE.
14 I MEAN, YES, TO THE EXTENT YOU FEEL THESE DOCUMENTS
15 COULD LEAD TO ADMISSIBLE EVIDENCE, TO SHOW MATTEL'S
16 PRACTICES IN CONDUCT, WITH RESPECT TO EMPLOYEE
17 CONFIDENTIAL INFORMATION AND INVENTION AGREEMENTS
18 AND CONFLICT OF INTEREST QUESTIONNAIRES, I'M TRYING
19 TO GIVE YOU SOME OF THAT DOCUMENT DISCOVERY, AND SO
20 1998 TO ONE YEAR AFTER THE FIRST LAWSUIT WAS FILED.
21      MR. ALGER:  AND THAT WOULD – YOUR HONOR, THAT
22 WOULD BE DESIGNERS; CORRECT?
23      JUDGE INFANTE:  THAT WOULD BE – WELL, I THINK
24 IT'S DESIGNERS – IT'S THE PEOPLE THAT WERE
25 EMPLOYED IN THE DESIGN CENTER WHERE BRYANT WORKED

25

1 OBVIOUSLY, I DON'T KNOW HOW MANY PEOPLE
2 THAT IS.  BUT, AS I RECALL IN THE BRIEFING, IT WAS
3 SUGGESTED THAT THERE WERE APPROXIMATELY 700 PEOPLE,
4 AS OPPOSED TO WHAT WOULD HAVE BEEN THOUSANDS OF
5 PEOPLE, AS THE ORDER ORIGINALLY ADDRESSED.
6      MR. ALGER:  THE REASON WHY I'M ASKING ABOUT
7 DESIGNERS IS THAT I THINK THAT PEOPLE ARE
8 CATEGORIZED IN THE – IN MATTEL BY THEIR JOB ROLES,
9 SUCH AS DESIGNER, RATHER THAN THEIR PHYSICAL
10 LOCATION.
11      AND, FOR EXAMPLE, RIGHT NOW, MANY OF THE
12 MARKETING PEOPLE AT MATTEL ARE NOW IN THE DESIGN
13 CENTER.  THERE IS A SIGNIFICANT NUMBER OF PEOPLE IN
14 THE DESIGN CENTER THAT ARE NOT DESIGNERS THAT HAVE
15 OTHER TASKS
16      JUDGE INFANTE:  BUT THE RELEVANCE MAY APPLY,
17 BECAUSE MARKETING PEOPLE SIGNED THESE CRITICAL
18 DOCUMENTS  THAT COULD BE THE SUBJECT
19 OF VIOLATIONS.  OBVIOUSLY, WE DON'T WANT TO SWEEP
20 IN JANITORS, BUT I DON'T THINK IT SHOULD BE LIMITED
21 TO DESIGNERS.
22      MR. ALGER:  OKAY.  YOUR HONOR.  OKAY.  WE'LL DO
23 OUR BEST ON THAT.  IT IS DIFFICULT TO – GIVEN THE
24 THOUSANDS OF FILES THAT WE HAVE TO –
25      JUDGE INFANTE:  WELL, I THINK THE ESTIMATE WAS

EXHIBIT  7
PAGE  162

Hearing: [Infante] 2/11/08 12:00:00 PM

26

1  700 PEOPLE OR -- WERE EMPLOYED IN THE DESIGN
2  CENTER, THAT'S WHAT THE PAPERS SAID.
3      IN FACT, IF YOU -- IF YOU GO TO PAGE 4 OF
4  YOUR REPLY BRIEF ON THE MOTION FOR RECONSIDERATION,
5  AT LINE 25, FOR EXAMPLE, DISCOVERY IN THE CASE
6  INDICATES THAT APPROXIMATELY 700 PEOPLE ARE
7  EMPLOYED IN THE DESIGN CENTER WHERE BRYANT WORKED.
8      MGA WOULD BE WILLING TO EXPLORE A PHASED
9  PRODUCTION, UNDER WHICH FILES FOR EMPLOYEES, WHILE
10  SIMILARLY SITUATED TO BRYANT, ARE TO BE PRODUCED,
11  AFTER WHICH THE PARTIES CAN EVALUATE ON THAT.
12      WHILE I'M NOT GIVING YOU EXACTLY WHAT YOU
13  ALLUDED TO THERE, I'D LIKE YOU TO PRODUCE ALL
14  DOCUMENTS THAT ARE RESPONSIVE TO THOSE REQUESTS
15  THAT I ORDERED, BUT LIMITED TO EMPLOYEES IN THE
16  DESIGN CENTER THAT BASICALLY CAME IN CONTACT WITH
17  CONFIDENTIAL INFORMATION.
18      MR. ALGER: OKAY, YOUR HONOR.
19      JUDGE INFANTE: I WOULD LIKE YOU TO PREPARE AN
20  ORDER GRANTING THE MOTION FOR RECONSIDERATION TO
21  THAT EXTENT. AND YOU CAN MEET AND CONFER REGARDING
22  THE EXACT LANGUAGE OF THAT ORDER.
23      YOU ARE BOTH POSITIONED BETTER THAN I
24  WITH RESPECT TO WHO WOULD FIT WITHIN THAT ORDER.
25      MR. ALGER: THANK YOU, YOUR HONOR.

27

1      JUDGE INFANTE: SO THE MOTION FOR
2  RECONSIDERATION IS GRANTED IN PART. AND PLEASE
3  PREPARE AN ORDER, AND THAT WILL CLOSE THE DOOR ON
4  THAT.
5      YOU MAY ALSO PREPARE AN ORDER THAT IS
6  DENYING MGA'S MOTION TO OVERRULE MATTEL'S RELEVANCY
7  OBJECTIONS AND TO COMPEL DISCOVERY RELEVANT TO
8  MATTEL'S TOPIC 25 AND 52 OF THE 30(B)(6)
9  DEPOSITION.
10      MR. ALGER: THANK YOU, YOUR HONOR.
11      JUDGE INFANTE: OKAY. ANY QUESTIONS?
12      MR. KENNEDY: YOUR HONOR, I JUST WANT TO MAKE
13  SURE THAT WE HAVE CLOSURE. IT'S PEOPLE IN THE
14  DESIGN CENTER. BECAUSE WE HAVE SCULPTORS, FOR
15  EXAMPLE, THAT MIGHT BE DIFFERENT THAN DESIGNERS, SO
16  IT'S NOT BEING LIMITED JUST TO DESIGNERS.
17      JUDGE INFANTE: NO, IT'S NOT. IT'S BASICALLY
18  ANYONE WHO CAME IN CONTACT WITH CONFIDENTIAL
19  INFORMATION, THAT WAS REQUIRED TO -- BASICALLY
20  WOULD BE REQUIRED TO SIGN THE EMPLOYEE CONFIDENTIAL
21  INFORMATION AND INVENTIONS AGREEMENT OR VARIOUS
22  VERSES OF IT.
23      MR. KENNEDY: I'M SORRY, YOUR HONOR. IN
24  LOOKING AT MY NOTES, I REALIZE MR. BRYANT FIRST
25  WENT TO WORK BACK IN 1995.

28

1      JUDGE INFANTE: THAT'S WHY I USED '95.
2      MR. KENNEDY: I PICKED UP ON THAT SUGGESTION.
3      MAY I ASK IT BE -- A MODIFICATION BE MADE
4  FOR 1995 THROUGH A YEAR AFTER THE FILING?
5      JUDGE INFANTE: THAT'S WHAT I WAS INCLINED TO
6  GIVE YOU UNTIL YOU INSERTED 1998.
7      MR. KENNEDY: IF WE CAN GO BACK TO THAT
8  PROPOSAL, I WOULD SUGGEST '96.
9      JUDGE INFANTE: '95 WOULD BE THE RELEVANT DATE.
10      MR. ALGER: YOUR HONOR, I'M SORRY TO BELABOR
11  THIS. I KNOW TIME IS WASTING HERE.
12      THE PROBLEM NOW IS THE ORDER KEEPS
13  EXPANDING OUT, AND NOT ONLY DO WE HAVE --
14      JUDGE INFANTE: NO, IT'S NOT. MY ORIGINAL
15  ORDER IN SEPTEMBER WAS A LOT WORSE THAN WHAT I JUST
16  ORDERED.
17      THE ARGUMENT IS CEASED ON THIS POINT.
18  THAT IS THE DECISION.
19      SHALL WE MOVE ON.
20      MR. ALGER: THANK YOU, YOUR HONOR.
21      JUDGE INFANTE: I WILL HEAR THE NEXT MOTION,
22  WHICH IS ON THE FEBRUARY 6TH LETTER.
23      MATTEL'S MOTION TO COMPEL RESPONSES TO
24  INTERROGATORIES NUMBERS 27 TO 44, 46 TO 50, BY MGA.
25  THIS WAS FILED DECEMBER 21 OF '07. AND THERE IS A

29

1  RELATED MOTION, MATTEL'S MOTION TO COMPEL RESPONSES
2  TO INTERROGATORIES SERVED ON CARTER BRYANT. THAT
3  MOTION, I BELIEVE, WAS FILED DECEMBER 13TH OF '07.
4      THOSE MOTIONS MAY BE HEARD.
5      MR. ALGER: GOOD MORNING, YOUR HONOR. TIM
6  ALGER AGAIN, STILL ON DECK HERE -- OR THE BATTER'S
7  PLATE.
8      THESE RESPONSES, I'D LIKE TO GO THROUGH
9  AND PROBABLY START OUT BY JUST DEALING WITH THEM IN
10  TOTAL. AND THAT IS THAT THE FACT OF THE MATTER IS
11  THE RESPONSES ARE SO HEDGED AS TO BE USELESS. THE
12  OTHER PARTIES -- MGA AND BRYANT, IN THEIR
13  RESPECTIVE RESPONSES, HAVE QUALIFIED THEIR
14  RESPONSES BY REFERENCE TO PATENT LAW, NONE OF WHICH
15  IS IN OUR REQUEST.
16      WE ASK -- WE GIVE VERY CLEAR DEFINITIONS
17  THAT ARE COMPREHENSIVE, AND WE ATTEMPT TO MAKE THEM
18  COMPREHENSIVE BY USING A VARIETY OF WORDS THAT MAKE
19  SURE THAT THEY CAN'T BE AVOIDED, TO AVOID WIGGLE
20  ROOM ON THE OTHER SIDE, SO THEY HAVE TO RESPOND AND
21  GIVE US THE INFORMATION WE SEEK.
22      WHAT THE OTHER SIDE HAS DONE IS AVOID
23  RESPONDING. THEY TRIED TO PARSE THE -- THESE
24  DEFINITIONS UP, AND TRY TO MAKE OUT THAT WE'RE
25  ASKING A MULTITUDE OF QUESTIONS, WHEN, IN FACT,

Mattel v. MGA II          Unsigned          Page 26 - 29

EXHIBIT 7
PAGE 163

Hearing: [Infante] 2/11/08 12:00:00 PM

30

```
1   WE'RE SIMPLY TRYING TO BE COMPREHENSIVE.
2         THIS IS NOT A PATENT CASE. THE REQUESTS
3   ARE NOT GEARED FOR PATENT INFORMATION. WE'RE
4   ASKING ABOUT THE INVENTION OF THE PRODUCTS, AND
5   IT'S QUITE CLEAR.
6         SECOND, WE HAVE -- AS SHOWN IN OUR PAPERS
7   AND IN THE PAPER TRAIL -- WE'RE SORRY THERE'S SO
8   MUCH PAPER, BECAUSE I SPENT ALL OF YESTERDAY GOING
9   THROUGH IT ALSO, I KNOW HOW VOLUMINOUS IT IS.
10        MGA AND BRYANT HAVE SAID THAT THEY'RE
11  ONLY GOING TO DISCLOSE PRINCIPAL FACTS. AND THAT'S
12  CONTRARY TO THE LAW. THE CONTENTION
13  INTERROGATORIES ARE ALLOWED TO ELICIT ALL THE
14  FACTS, AND PARTIES ARE -- CAN BE COMPELLED TO
15  DISCLOSE THEIR POSITIONS, BASED ON THOSE FACTS,
16  SUCH THAT THERE'S NO GUESSING GAME GOING INTO
17  TRIAL. THEY HAVE TO COMMIT TO A POSITION AND GIVE
18  THE FACTUAL SUPPORT.
19        AT THE END OF THE DAY, WE NEED AN ORDER
20  THAT REQUIRES MGA AND BRYANT TO GIVE COMPLETE AND
21  FULL RESPONSES WITHOUT CONDITION, AND -- TO THESE
22  INTERROGATORIES, AND OVERRULING ANY OBJECTION SO WE
23  GET STRAIGHT ANSWERS TO THE REQUESTS.
24        THERE ARE SOME SPECIFIC CATEGORIES THAT
25  WE SHOULD ALSO TOUCH ON THAT -- MY ARGUMENT THUS
```

31

```
1   FAR HAS DEALT MOSTLY WITH THE CONTENTION-TYPE
2   INTERROGATORIES AND THE 'ROGS INVOLVING THE TIMING
3   OF INVENTIONS. BUT ALSO JUST TO TOUCH ON THE OTHER
4   ISSUES, WE -- THE FORMER MATTEL EMPLOYEES REQUEST,
5   WHICH IS 'ROG 41 IN THE MGA REQUEST, AND I THINK
6   BRYANT HAS A SIMILAR -- HAVE SIMILAR NUMBERING --
7   THEY REFUSE TO GIVE US FIRST CONTACT INFORMATION
8   AND INTERVIEW INFORMATION FOR THESE PEOPLE, WHICH
9   IS RELEVANT TO OUR CLAIMS REGARDING THE FACT THAT
10  MGA INDUCED PEOPLE TO COME TO THEM, AND INDUCED
11  PEOPLE TO TAKE INFORMATION WITH THEM -- CONTINUE TO
12  WORK AT MATTEL AND TAKE INFORMATION WITH THEM AS
13  THEY DEPARTED.
14        WE ALSO -- WE'VE ALSO FOUND THAT THERE IS
15  A LACK OF INFORMATION ABOUT DOCUMENTS THROUGHOUT
16  ALL THESE INTERROGATORIES, AND I THINK THAT'S QUITE
17  CLEAR. VIRTUALLY EVERY INTERROGATORY LACKS ANY
18  SPECIFICATION OF DOCUMENTS.
19        MATTEL IN ITS INTERROGATORY RESPONSES HAS
20  PROVIDED IDENTIFICATION OF DOCUMENTS BY BATES
21  NUMBER. WE FULLY RESPONDED TO THE INTERROGATORY --
22  CONTENTION INTERROGATORIES.
23        WE ALSO -- THE INTERROGATORIES 48 AND 49,
24  ASKING ABOUT TRADE DRESS ARE GROSSLY INADEQUATE.
25  THERE'S VIRTUALLY NO INFORMATION ABOUT THE TRADE
```

32

```
1   DRESS CLAIMS IN 48 AND 49.
2         THERE'S VIRTUALLY NO INFORMATION ABOUT
3   THE COPYING OF PRODUCTS AND PACKAGING, 43 AND 44
4   AND THEN ON 39, WHICH ASKED FOR BANK ACCOUNT
5   INFORMATION, THERE'S NO RESPONSE AT ALL. AND THE
6   ARGUMENT MADE THERE, WHICH I'M SURE WE'LL HEAR, IS
7   THAT THIS IS GOING TO BURDEN OTHER PARTIES WITH
8   SUBPOENAS. AND THAT'S -- THAT'S AN IMPROPER
9   OBJECTION.
10        THIS IS BASIC INFORMATION THAT'S READILY
11  AVAILABLE TO THE DEFENDANTS AND THEY SHOULD BE ABLE
12  TO PROVIDE IT TO US. AND, AS TO THE BURDEN, THE
13  PROPRIETY AND THE BURDEN THAT'S IMPOSED BY ANY
14  SUBPOENAS THAT MIGHT OR MIGHT NOT COME, THAT SHOULD
15  BE ADDRESSED AT THE APPROPRIATE TIME.
16        FINALLY, SOURCES OF DOCUMENTS. WE'RE
17  GOING TO HAVE A DISCUSSION ABOUT THAT IN A FEW
18  MOMENTS. IT'S INTERESTING THAT THEY -- MGA IS
19  SEEKING INFORMATION ABOUT OUR SOURCES OF DOCUMENTS
20  IN 40 -- IN THEIR INTERROGATORIES AND IN THEIR
21  MOTION ON E-MAILS, BUT ON 40 AND 47, THEY REFUSE TO
22  GIVE US A RESPONSE.
23        AND THEN, FINALLY, 46, INVOLVING THE
24  DISPUTES BETWEEN MGA'S PRIOR COUNSEL AND MGA, WE'VE
25  EXPRESSLY EXCLUDED -- WE'VE EXPRESSLY EXCLUDED
```

33

```
1   PRIVILEGED DOCUMENTS AND INFORMATION FROM THAT
2   REQUEST, AND THEY SHOULD BE COMPELLED TO ANSWER
3   THAT QUESTION AS WELL.
4         WE'VE MADE QUITE CLEAR THAT -- THAT
5   THEY -- THEY MADE PUBLIC STATEMENTS ABOUT THE
6   DEPARTURE OF FORMER COUNSEL, AND THERE'S REASONS TO
7   BELIEVE THAT THERE MAY HAVE BEEN AN EFFORT TO
8   PURSUE AN ILLEGAL COURSE OF CONDUCT, WHICH IS NOT
9   PRIVILEGED, IN ANY EVENT. SO WE -- THEY SHOULD BE
10  ABLE TO GIVE US AN ANSWER TO 46 WITHOUT A PROBLEM.
11        THANK YOU, YOUR HONOR.
12        JUDGE INFANTE:  THANK YOU, MR. ALGER.
13        I'LL HEAR FROM MGA.
14        MR. KENNEDY:  THANK YOU, YOUR HONOR.
15        FIRST, BEFORE THIS MOTION WAS FILED ON
16  DECEMBER 20, WE TOLD MATTEL THAT WE WERE GOING TO
17  BE FILING SUBSTANTIAL SUPPLEMENTAL RESPONSES, AND
18  WE WENT AHEAD AND DID SO ON JANUARY 7.
19        WE ALSO FILED FURTHER, NOT QUITE AS
20  SUBSTANTIAL, BUT CLARIFYING OUR SUPPLEMENTAL
21  RESPONSES ON JANUARY 28. AND WE NEVER HEARD ONE
22  WORD OR COMPLAINT ABOUT THE ADEQUACY OF THOSE
23  SUPPLEMENTAL RESPONSES.
24        SO WE'RE REALLY HERE TODAY WORKING ON
25  YESTERDAY'S NEWS, BUT THIS IS WHAT'S BEFORE THE
```

EXHIBIT 7

PAGE 164

Mattel v. MGA II                    Unsigned                    Page 30 - 33

Hearing: [Infante] 2/11/08 12:00:00 PM

34

1 COURT.
2       THE SITUATION IS THE SAME FOR MR. BRYANT.
3 HE ALSO FILED VERY SUBSTANTIAL ADDITIONAL
4 RESPONSES, SO I QUESTION WHETHER WE REALLY EVEN
5 HAVE A TIMELY MOTION BEFORE US.
6       ON A PROCEDURAL FRONT ALSO, ON
7 FEBRUARY 4, JUDGE LARSON CLARIFIED, AND THAT
8 CLARIFICATION WAS NEEDED, THAT PHASE II DISCOVERY
9 IS BIFURCATED. AND I SUBMIT, AT LEAST AS TO
10 QUESTIONS 43, 44, 48, 49, 50, ARE CLEARLY ALL
11 PHASE II, AND THERE MAY BE PORTIONS OF SOME OF THE
12 OTHERS THAT ARE AS WELL.
13       TO THE EXTENT THE COURT WILL ADDRESS THE
14 SUBSTANTIVE COMPLAINTS, I THINK THEY CAN BE
15 GROUPED. THE BIGGEST ONE IS THE CONTENTION
16 INTERROGATORIES, IF I CAN CALL THEM THAT, ASKED FOR
17 ALL FACTS, EVIDENCE, ET CETERA, THAT YOU'RE GOING
18 TO RELY UPON AT THE TIME OF TRIAL.
19       I THINK IF THE COURT LOOKS PARTICULARLY
20 AT THE SUPPLEMENTAL RESPONSES THAT HAVE BEEN FILED
21 SINCE THIS MOTION WAS FILED, THE NAMES OF ALL
22 WITNESSES, THE CATEGORIES OF DOCUMENTS, THEORIES,
23 THEMES, ET CETERA, ARE SET FORTH, FULLY COMPLYING
24 WITH THE CASE.
25       MATTEL KEEPS COMPLAINING THAT THEY'RE

35

1 GOING TO SOMEHOW BE SANDBAGGED. WELL, I SUSPECT
2 THAT'S THE REASON WE'VE GOT RULE 16, AND WHY
3 PARTIES ARE REQUIRED TO MEET AND CONFER IN ADVANCE
4 OF THE FINAL C.M.C., WHICH IS COMING UP.
5       IN SOME WAYS MATTEL IS ASKING FOR EVEN
6 MORE THAN THE RULE 16 PROCEDURE FULFILLS, AND THERE
7 IS NEITHER CASE SUPPORT NOR LOGIC FOR THAT. WE
8 WOULDN'T HAVE ALL OF THESE FINAL CASE MANAGEMENT
9 CONFERENCE PROCEDURES IF THEY WERENT INTENDED TO
10 SOMEHOW SUPPLEMENT WHAT'S COME BEFORE, RATHER THAN
11 BEING A LESSER INCLUDED WITHIN.
12       THE NEXT BIG CATEGORY IS THE BRATZ
13 INVENTION. AND I WAS WORKING ON THIS MOTION OVER
14 THE WEEKEND. AND THIS IS THE EQUIVALENT TO THE
15 KIND OF PERSONAL INJURY CASES I USED TO HANDLE.
16 SOMEBODY SENDS A REQUEST FOR ADMISSION SAYING, "I
17 WANT YOU TO ADMIT THAT YOUR CLIENT CAUSED THE
18 INTERSECTION ACCIDENT. OH, BY THE WAY, WE DEFINE
19 'CAUSE' AS MEANING THAT YOU OPERATED YOUR CAR IN
20 SUCH A WAY THAT YOU HAPPENED TO ARRIVE AT THE
21 INTERSECTION AT THE SAME TIME MY CLIENT DID." AND
22 THEN PLAY THAT SOUND BITE FOR THE JURY, THE
23 DEFENDANT ADMITS HE CAUSED THE ACCIDENT. NO COURT
24 WOULD LET THAT KIND OF CONFUSION IN, THAT'S WHY 403
25 EXISTS. THAT'S EXACTLY WHAT WE'VE GOT HERE.

36

1       WE'VE ADMITTED AND TOLD THEM WHAT
2 DOCUMENTS WE BELIEVE WERE GENERATED BACK AT THAT
3 PERIOD OF TIME, WHAT IDEAS WERE CONCEIVED. BUT
4 THEY'VE GOT THIS CONVOLUTED DEFINITION, WHICH IS
5 THE HIGH TECH EQUIVALENT OF ADMITTING YOU CAUSED AN
6 ACCIDENT BECAUSE YOU HAPPENED TO BE THERE.
7       THE FORMER EMPLOYEE CATEGORY, WE'VE
8 PROVIDED THEM WITH NAMES, HIRING DATES, INCLUSIVE
9 DATES OF EMPLOYMENT FOR 188 PEOPLE, WHO AT ONE TIME
10 OR ANOTHER WORKED FOR MATTEL.
11       THEY NOW WANT THE DATE OF FIRST CONTACT,
12 WHEN CONCEIVABLY SOMEBODY FROM MGA RAN INTO ONE OF
13 THESE PEOPLE DOWN AT THE BOWLING ALLEY, AND THEY
14 SAID THEY WERE UNHAPPY AT MATTEL, AND WE SAID,
15 "GEE, YOU SHOULD REALLY CONSIDER COMING TO MGA, IF
16 YOU'RE THAT UNHAPPY," EVEN IF THAT OCCURRED A YEAR
17 BEFORE. THAT IS MERELY A MAKE WORK FILLER.
18       IF THEY'VE GOT PARTICULAR PEOPLE ON THAT
19 LIST OF 188, THAT THERE'S REALLY A REASON TO HAVE
20 TO KNOW THE FIRST CONTACT, I CAN UNDERSTAND WHERE
21 THAT MIGHT BE A LEGITIMATE SOURCE. BUT JUST MAKING
22 US SPIN OUR WHEELS TO TRY TO FIGURE OUT WHEN EACH
23 OF THE -- EACH OF THOSE 188 FIRST HAD CONTACT, IS
24 JUST INTENDED TO DIVERT US FROM TRIAL PREPARATION.
25       40 AND 47, EARLY WORK ON BRATZ, BOTH HAVE

37

1 BEEN SUBSTANTIALLY SUPPLEMENTED, BEYOND WHAT'S
2 BEING COMPLAINED ABOUT.
3       BANK ACCOUNTS, WE HAVE GIVEN THEM 37,000
4 PAGES OF FINANCIAL INFORMATION ALREADY.
5       AND FINALLY, ON NUMBER 46, THE DISPUTE
6 WITH FORMER COUNSEL, THE REASONS -- THE
7 NONPRIVILEGED REASONS HAVE BEEN SAID IN THE PRESS,
8 I'M NOT QUITE SURE WHERE THEY WANT TO GO.
9 MR. NOLAN EVEN MADE SOME OF THOSE COMMENTS IN HIS
10 DEPOSITION.
11       BEYOND THAT, THEY SAY WE MAY HAVE A
12 COVERUP OF A FRAUD, WHICH IS 100 PERCENT THE
13 PRODUCT OF MATTEL'S FERTILE IMAGINATION. AND IF
14 THEY DID THINK THEY HAVE THAT, SEEMINGLY THEY COULD
15 INVOKE THE CRIME FRAUD EXCEPTION, AND THEY WOULDN'T
16 BE LIMITING IT TO NONPRIVILEGED MATERIALS.
17       IF THE COURT HAS QUESTIONS ON THAT ONE,
18 FINE. I THINK THAT WAS PURELY A HAIL MARY TASK
19 THROWN UP TO SEE IF THEY MIGHT GET LUCKY.
20       BEYOND THAT, OBVIOUSLY, THERE ARE
21 NUMEROUS NUANCES THAT WE'VE TRIED TO COVER IN THE
22 PAPERS. I DON'T WANT TO REPEAT ALL OF THOSE. IT
23 IS BEFORE -- IF THE COURT HAS QUESTIONS, I WOULD BE
24 PLEASED TO TRY TO RESPOND.
25       JUDGE INFANTE. I JUST WANT TO CLARIFY, THE

Mattel v. MGA II          Unsigned          Page 34 - 37

EXHIBIT ___7___
PAGE ___165___

Hearing: [Infante] 2/11/08 12:00:00 PM

38

1 DATES OF YOUR SUPPLEMENTAL RESPONSES WERE DUE IN
2 JANUARY; CORRECT?
3 MR. KENNEDY: JANUARY 7 AND JANUARY 28, YOUR
4 HONOR.
5 MR. ALGER: YOUR HONOR, IT'S TIM ALGER. MAY I
6 BE HEARD FOR JUST A MOMENT?
7 JUDGE INFANTE: YES.
8 MR. ALGER: ALL MY ARGUMENTS ARE RELATED TO THE
9 MOST RECENT SET OF INTERROGATORY RESPONSES.
10 THE REQUESTS THAT -- THE RESPONSES THAT
11 WERE PROVIDED TO US IN JANUARY ARE JUST AS
12 INADEQUATE AS THE PREVIOUS SET. THEY'VE ADDED A
13 FEW THINGS. THEY'VE ADDED AN ADDITIONAL CONTENTION
14 ABOUT THE -- THE INVENTORSHIP AGREEMENT NOT
15 REACHING COPYRIGHT. THE SUBJECT MATTER WAS NOT IN
16 THEIR EARLIER ONES. BUT OTHER THAN THAT, IT'S
17 PRETTY MUCH THE SAME STUFF. AND I WENT THROUGH
18 THEM IN GREAT DETAIL YESTERDAY FOR HOURS. AND IT'S
19 THE SAME INADEQUACIES AS THE EARLIER ONES.
20 SO I DON'T -- I DON'T WANT THERE TO BE
21 ANY CONFUSION THAT I'M ARGUING BASED ON EARLIER
22 RESPONSES. THE SUPPLEMENTALS ARE STILL INADEQUATE.
23 AND AS MR. KENNEDY TOUCHED ON, YOU KNOW, THE
24 CONTENTION INTERROGATORIES THEY HAVE GIVEN US -- IN
25 MR. KENNEDY'S WORDS, I WROTE IT DOWN -- CATEGORIES

39

1 OF DOCUMENTS. THAT'S NOT WHAT THE INTERROGATORIES
2 ASK FOR. THEY ASK FOR THE ACTUAL -- THE DOCUMENTS
3 THAT SUPPORT THEIR CONTENTIONS. AND THE --
4 MR. KENNEDY ALSO USED THE WORD "VARIOUS THEMES."
5 IF YOU LOOK AT THEIR RESPONSES -- AND THE SAME GOES
6 FOR THE BRYANT RESPONSE, THEY'RE CONCLUSORY IN
7 NATURE. THEY'RE JUST CONTENTIONS, AND THEY DON'T
8 GIVE US ANY FACTS.
9 THE EXAMPLE IS THEY REPEATEDLY TALK ABOUT
10 OTHER EMPLOYEES MOONLIGHTING. WELL, THEY DON'T
11 IDENTIFY OTHER EMPLOYEES THAT ARE MOONLIGHTING.
12 THEY DON'T GIVE US ANY FACTS TO SUPPORT THE IDEA
13 THAT THERE WAS PREVALENT MOONLIGHTING GOING ON AT
14 MATTEL. IT'S JUST CONTENTIONS.
15 AND, AT THIS POINT, WITH DISCOVERY ON
16 PHASE I CLOSED, THERE'S NO REASON WHY THEY CAN'T
17 GIVE US THE ANSWERS TO THESE INTERROGATORIES.
18 JUDGE INFANTE: DOES CARTER BRYANT'S COUNSEL
19 WISH TO ADDRESS THE ISSUES?
20 MR. PAGE: YOUR HONOR, I'LL KEEP IT SHORT.
21 JUST SO THE RECORD IS CLEAR, A COUPLE OF THE
22 INTERROGATORIES MR. ALGER SPOKE ABOUT ARE NOT
23 ASSERTED AGAINST CARTER BRYANT: THAT'S NUMBERS 41
24 AND 46. THOSE ARE INCLUDED IN THE MOTION AGAINST
25 CARTER BRYANT. SO I JUST WANT TO MAKE SURE THAT

40

1 WAS -- THAT'S CLEAR TO THE COURT.
2 I JUST WANT TO REITERATE WHAT MR. KENNEDY
3 SAID ABOUT THE RECEIPT OF THIS MOTION. CARTER
4 BRYANT HAS -- CARTER BRYANT HAS SUPPLEMENTED HIS
5 RESPONSES TO THE INTERROGATORY AT ISSUE TWICE OVER
6 SINCE THIS MOTION WAS FILED. MATTEL KNEW THE FIRST
7 ROUND WAS COMING; THEY NEVER MET AND CONFERRED
8 ABOUT THAT WITH REGARD TO THE SUPPLEMENTATION ON
9 DECEMBER 17. NONETHELESS, WENT AHEAD AND SET THE
10 SECOND SUPPLEMENTATION ON JANUARY 28. THEY NEVER
11 SOUGHT TO MEET AND CONFER ABOUT THAT.
12 SO MR. ALGER'S COMMENTS TODAY ABOUT THE
13 SUPPLEMENTAL RESPONSE IS THE FIRST WE EVER HEARD
14 FROM MATTEL THAT THEY HAVE SUBSTANTIVE ISSUES WITH
15 THOSE RESPONSES.
16 BRIEFLY ON THE CONTENTION 'ROGS -- THE
17 CONTENTION INTERROGATORIES, YOUR HONOR -- THESE
18 INTERROGATORIES ARE FRAMED -- IF YOU LOOK AT THEM,
19 YOU CAN SEE THAT THEY'RE FRAMED SO BROADLY THAT
20 THEY'RE BASICALLY ASKING FOR CARTER BRYANT'S ENTIRE
21 DEFENSE IN THE CASE. THEY WANT ALL FACTS, ALL
22 DOCUMENTS, RELATED TO CARTER BRYANT'S ENTIRE
23 DEFENSE IN THE CASE. THIS IS A CASE WITH MILLIONS
24 OF DOCUMENTS, HUNDREDS OF HOURS OF DEPOSITION
25 TESTIMONY, AND DECIDED CASE AFTER CASE MATTEL HAS

41

1 ARGUED THAT ALL FACTS, CONTENTION INTERROGATORIES,
2 IS ABUSIVE -- AND, YOU KNOW, WHAT IS APPROPRIATE TO
3 SEEK MATERIAL OR PRINCIPLE FACTS, NOT TO SUMMARIZE
4 THE ENTIRE CASE IN ONE INTERROGATORY RESPONSE. AND
5 I BELIEVE CARTER BRYANT HAS DONE THAT. HE PROVIDED
6 A DETAILED ROAD MAP OF WHAT HE BELIEVES SUPPORTS
7 HIS CONTENTIONS. AND I THINK IF THE COURT TAKES A
8 CLOSER LOOK AT THE SUPPLEMENTAL RESPONSES,
9 HOPEFULLY IT WILL AGREE.
10 BRIEFLY, YOUR HONOR, ON INTERROGATORY
11 NUMBER 39, WHICH ASKS FOR THE IDENTITY OF ALL OF
12 CARTER BRYANT'S BANK ACCOUNTS AND OTHER FINANCIAL
13 ACCOUNTS, IT WOULD -- WITH THE EXPRESSED UNDERLYING
14 THOUGHT THAT MATTEL WOULD THEN SEEK TO GO AFTER ALL
15 THOSE OTHER RECORDS.
16 CARTER BRYANT HAS PRODUCED COPIOUS
17 AMOUNTS OF FINANCIAL DISCOVERY ALREADY, AND
18 INCLUDED IN ALL THE INFORMATION THAT MATTEL SHOULD
19 NEED, FOR THE REASONS WHY THEY CLAIM THEY NEED THIS
20 INTERROGATORY, AND CARTER BRYANT PRODUCED RECORDS
21 SHOWING ALL THE PAYMENTS HE RECEIVED FROM MGA OR
22 ISAAC LARIAN; HE PRODUCED DOCUMENTS SHOWING HIS NET
23 WORTH; HE PRODUCED ALL THE EXISTING PROFIT AND LOSS
24 STATEMENTS FOR CARTER BRYANT ENTERPRISES, WHICH IS
25 HIS COMPANY THROUGH WHICH HE WORKS. AND LOTS AND

**EXHIBIT 7**

PAGE 166

42

1 LOTS OF OTHER DOCUMENTS, WHICH IS ADDRESSED IN MY
2 SUPPLEMENTAL DECLARATION SERVED, THAT WE HAVE ALL
3 OF THE DISCOVERY ON THESE TOPICS THEY LEGITIMATELY
4 NEED.
5     IT'S WORTH NOTING WE HAVE A PARTICULAR
6 AGREEMENT WITH COUNSEL FOR MATTEL, AS TO THE
7 CATEGORY OF DOCUMENTS THAT WE WOULD – THIS IS IN
8 CONNECTION WITH THE SUBPOENA SERVED ON CARTER
9 BRYANT'S ACCOUNTS. WE'VE LIMITED THE SCOPE OF THE
10 SUBPOENA TO CATEGORIES THAT MATTEL'S SAID, OKAY,
11 THIS IS WHAT WE NEED, THIS IS FINE, AND WE PRODUCED
12 THOSE DOCUMENTS.
13     BUT NOW THEY'RE CONTINUING TO SEEK ABOVE
14 AND BEYOND WHAT THEY AGREED IS WHAT THEY NEEDED,
15 AND ALSO SECRETLY SUBPOENAED CARTER BRYANT'S BANK,
16 WHICH OBVIOUSLY THEY HAVE THE IDENTITY OF, AND
17 THAT'S SUBJECT TO A – A SEPARATE PENDING MOTION TO
18 QUASH THAT SUBPOENA, YOUR HONOR.
19     UNLESS THE COURT HAS ANY QUESTIONS, I'M
20 OTHERWISE READY TO SUBMIT THE PAPERS.
21 JUDGE INFANTE: THANK YOU.
22     I'LL TAKE BOTH OF THESE MOTIONS UNDER
23 SUBMISSION AND I'LL ISSUE AN ORDER WITHIN THE NEXT
24 FEW DAYS.
25 MR. ALGER: THANK YOU, YOUR HONOR.

43

1 MR. PAGE: THANK YOU, YOUR HONOR.
2 MR. KENNEDY: THANK YOU.
3 JUDGE INFANTE: LET ME SEE. I WANT TO CHECK
4 ONE THING. GIVE ME A MOMENT.
5     OKAY. MGA'S MOTION TO COMPEL MATTEL TO
6 PRODUCE E-MAIL.
7     YOU MAY PROCEED.
8 MR. KENNEDY: THANK YOU. RAOUL KENNEDY AGAIN.
9     AS I UNDERSTAND IT, MATTEL'S POSITION
10 COMES DOWN TO A REASONABLE SEARCH FOR ALL
11 POTENTIALLY RESPONSIVE DOCUMENTS, WHICH ALLOWS
12 MATTEL TO SIMPLY DECIDE BOTH LIVE E-MAIL AND E-MAIL
13 BACKUP TAPES NEED TO BE SAMPLED, EXAMINED, OR
14 CONSIDERED, BECAUSE IF YOU TRY TO CONSIDER THEM
15 COMPLETELY AND IN THEIR ENTIRETY, THAT WOULD BE
16 BURDENSOME.
17     AND MATTEL JUST GRANTED ITSELF LIMITED
18 DISPENSATION OR PROTECTIVE ORDER, WITHOUT BOTHERING
19 TO TELL US OR THE COURT ABOUT IT. AND WE SUBMIT A
20 REASONABLE SEARCH INCLUDE SOME EFFORT TO LOCATE
21 RESPONSIVE DOCS FROM ALL SOURCES.
22     AND AGAIN WITH THAT BACKGROUND, I PROPOSE
23 THE FOLLOWING: THAT, FIRST, MATTEL – LET ME BACK
24 UP.
25     AS I UNDERSTAND IT, THE TAPES ONLY GO

44

1 BACK TO 2004 OR 2005. MATTEL CAN GIVE US THE EXACT
2 DATE. BUT I WOULD PROPOSE MATTEL BE REQUIRED TO
3 SEARCH FOR THE KEY WITNESSES THAT ARE IDENTIFIED IN
4 EXHIBITS 14 AND 15 TO THE SUPPLEMENTAL DECLARATION
5 OF ROB HARRINGTON THAT WAS FILED IN SUPPORT OF THE
6 PRESENT MOTION. THAT'S 68 PEOPLE WHO WERE EITHER
7 ON MGA'S, BRYANT'S, IS I BELIEVE IN SOME CASES
8 MATTEL'S INITIAL DISCLOSURE LISTS, AND FOR WHOM NO
9 CHECK OR INSPECTION APPARENTLY WHATSOEVER HAS BEEN
10 DONE.
11     IN ADDITION, THE KEYWORDS MGA HAD BEEN –
12 I'M SURE YOUR HONOR KNOWS BY NOW, IT'S MATTEL'S
13 CODE FOR MGA – BRATZ, LARIAN, AND BRYANT, BE
14 CHECKED. THEY TELL US THEY HAVE A 90-DAY DELETE
15 POLICY, SO THEY REALLY ONLY OUGHT TO HAVE TO REVIEW
16 TAPES, 60-, 75-, OR 80-DAY INTERVALS. THEY
17 SHOULDN'T HAVE TO CHECK EVERY DAY FOR EACH OF THOSE
18 PARTICULAR CATEGORIES.
19     AS I SAID, WE WOULD BE TALKING FROM
20 FEBRUARY 2004, AT 90-DAY INTERVALS, FOR A VERY
21 LIMITED SEARCH.
22     IN ADDITION, MATTEL PUT IN A DECLARATION
23 SAYING IN CONNECTION WITH THE MY SCENE, M-Y
24 S-C-E-N-E, AND DIVA STARZ LITIGATION, BACK IN 2002
25 AND 2003, MATTEL PRESERVED SOME UNKNOWN NUMBER OF

45

1 E-MAILS AND TAPES. NO INDICATION EXACTLY WHAT THAT
2 WAS.
3     I URGE THAT THE SAME SEARCH OF LIMITED
4 NATURE THAT I JUST DESCRIBED BE ORDERED FOR THOSE
5 TAPES AS WELL. AND, FINALLY, WE'RE TALKING ABOUT
6 4,000 TAPES. I COULD SEE THERE WOULD BE A WHOLE
7 LOT OF THEM THAT COULD BE TOTALLY IRRELEVANT, BUT
8 WE NEED AN INDEX. AND I WOULD URGE THAT MATTEL BE
9 GIVEN THE OPTION, NOT THE REQUIREMENT, BUT THE
10 OPTION TO, IF THEY WANT TO PROVIDE US AN INDEX BY
11 TAPE, SHOWING THE INDIVIDUALS WHOSE E-MAIL ACCOUNTS
12 WERE KEPT ON THAT TAPE, WE MIGHT VERY WELL BE ABLE
13 TO REACH A SIGNIFICANT LIMITATION, BUT THAT ISN'T
14 RELIEF WE SPECIFICALLY REQUESTED IN THE MOTION, SO
15 I DON'T THINK IT'S SOMETHING I COULD ASK FOR IN
16 THIS ORDER.
17     I SUBMIT, AGAIN, WITH THAT KIND OF
18 PROPOSAL, THAT PARES THIS DOWN TO STUFF THAT'S
19 REALLY ESSENTIAL, BUT TO THE CASE AND WOULD
20 CONSTITUTE A REASONABLE SEARCH THAT MATTEL HAS YET
21 TO UNDERTAKE.
22     ONCE AGAIN, UNLESS THERE ARE ANY
23 QUESTIONS, I DON'T WANT TO REPEAT WHAT'S IN THE
24 PAPERS
25 JUDGE INFANTE: THANK YOU, VERY MUCH.

**EXHIBIT** ___7___

**PAGE** ___167___

Hearing:  [Infante]  2/11/08  12:00:00 PM

46

```
1      MR. TAYBACK: IT'S CHRISTOPHER TAYBACK
2   ADDRESSING THIS PARTICULAR MOTION.
3      GOOD MORNING, YOUR HONOR.
4      JUDGE INFANTE: GOOD MORNING.
5      MR. TAYBACK: IT'S ACTUALLY MY FIRST APPEARANCE
6   IN THIS PARTICULAR CASE.
7      BUT I GUESS I WANT TO START WITH THE
8   PREMISE THAT, ACTUALLY, NONE OF THE THINGS THAT
9   MR. KENNEDY JUST ASKED FOR ARE ASKED FOR IN THE
10  MOTION. THE MOTION SAYS MATTEL HAS TO GO OUT AND
11  SEARCH – AND THIS IS FROM PAGE 2, LINE 1 AND 2 OF
12  ITS MOTION – SEARCH ITS E-MAIL, INCLUDING ARCHIVED
13  E-MAIL AND E-MAIL BACKUP TAPES FOR RESPONSIVE
14  DOCUMENTS.
15     OUR POSITION HAS BEEN ALL ALONG, AS I
16  THINK WAS REPRESENTED TO THE COURT, YOUR HONOR,
17  WITH RESPECT TO THE – IN THE COTTAGE (PHONETIC) OF
18  THE MAY HEARING ON VARIOUS MOTIONS, AND ALSO IN THE
19  SEPTEMBER HEARING OF VARIOUS MOTIONS, THAT THERE
20  ARE OODLES, TO USE A TECHNICAL TERM, OF ELECTRONIC
21  DATA COMPILATIONS, INCLUDING E-MAIL BACKUP TAPES.
22  AND IT WOULD COST – TO DO A WHOLESALE RESTORATION
23  OF THESE WOULD COST TENS OF MILLIONS OF DOLLARS.
24     AND WE HAVE SAID THAT UP FRONT, IN
25  CONNECTION WITH THE EARLY HEARING, THE ONE THAT
```

47

```
1   RESULTED IN THE MAY ORDER BY YOUR HONOR. YOUR
2   HONOR CONSTRUED THE REQUEST TO WHICH WE HAD
3   OBJECTED AS BEING UNDULY BURDENSOME IN A
4   SUFFICIENTLY NARROW MANNER AS TO SAY, LOOK, YOU
5   DON'T NEED TO SEARCH ALL YOUR TAPES. LOOK, YOU
6   DON'T NEED TO SEARCH E-MAILS FOR EVERY EMPLOYEE.
7   YOU NEED TO SEARCH ONLY CERTAIN OF THESE SPECIFIC
8   PEOPLE THAT – YOU NEED TO DO A REASONABLE SEARCH
9   TO FIND RESPONSIVE DOCUMENTS WITH RESPECT TO THESE
10  SPECIFIC PEOPLE ENGAGED IN THESE SPECIFIC KINDS OF
11  COMMUNICATIONS.
12     JUDGE INFANTE: I DID NOT DEFINE A REASONABLE
13  SEARCH.
14     MR. TAYBACK: NO, YOU DID NOT.
15     AND IT'S OUR CONTENTION WHAT WE HAVE
16  DONE – AND WE RECITE IN SOME DETAIL IN OUR MOTION
17  AT PAGES – IN OUR OPPOSITION, RATHER, AT PAGES 7
18  AND 8, ALL OF THE VAST, VERY SIGNIFICANT ELECTRONIC
19  DATA COMPILATIONS THAT WE HAVE SEARCHED, MANY OF
20  WHICH INCLUDE ARCHIVED E-MAILS OR E-MAILS CONTAINED
21  IN WHAT'S CALLED SHARED SPACE, TO GATHER RESPONSIVE
22  DOCUMENTS.
23     WHAT THIS MOTION IS THE RESULT OF IS
24  ESSENTIALLY AN – A QUESTION BY MGA FOR US TO
25  DESCRIBE SPECIFICALLY, WHAT DID WE SEARCH, WHAT
```

48

```
1   HAVEN'T WE SEARCHED, WHOSE E-MAILS HAVE WE CHECKED,
2   HOW HAVE WE CHECKED THEM. AND, ESSENTIALLY, THAT'S
3   A QUESTION THAT'S PENDING AS AN INTERROGATORY.
4      BOTH PARTIES HAVE PROPOUNDED AN
5   INTERROGATORY ALONG THOSE LINES. THAT'S THE
6   SUBJECT OF ANOTHER MOTION, BECAUSE MGA
7   CATEGORICALLY REFUSED TO PROVIDE US WITH THAT
8   INFORMATION; INFORMATION AIMED AT FINDING OUT WHAT
9   DID YOU DO, HOW DID YOU SEARCH, WHAT DIDN'T YOU
10  SEARCH.
11     AT THE END OF THE DAY, THOUGH, AND A
12  POINT MR. KENNEDY MADE, I THINK THIS PARTICULAR
13  ISSUE IS MUCH ADO ABOUT NOTHING, FOR THE FOLLOWING
14  REASON, WHICH IS NOT ADDRESSED IN ANYBODY'S PAPERS
15  BECAUSE IT JUST HAPPENED, JUDGE LARSON STAYED
16  DISCOVERY, NOT JUST BIFURCATED IT, STAYED IT, WITH
17  RESPECT TO PHASE II.
18     AND AS MR. KENNEDY JUST ALLUDED TO, THE
19  E-MAIL BACKUP TAPES ONLY GO BACK TO APRIL OF 2005.
20  THERE IS, I SUBMIT, VIRTUALLY NOTHING THAT COULD BE
21  ON THE E-MAIL BACKUP TAPES FROM APRIL 2005 TO THE
22  PRESENT THAT RELATES TO PHASE I. SIMILARLY, AND
23  EVEN MORE POINTEDLY, THE IDEA OF SEARCHING A LIVE
24  E-MAIL SERVER THAT ONLY HAS A 90-DAY WINDOW OF
25  TIME, IS NOT LIKELY AT ALL TO LEAD TO RESPONSIVE --
```

49

```
1   TO DISCOVERABLE OR ADMISSIBLE EVIDENCE. AND I
2   THINK EITHER ONE IS JUST NOT A FRUITFUL WAY OF
3   CONDUCTING A REASONABLE SEARCH, ESPECIALLY GIVEN
4   THE COST CONCERNS.
5      NOW, I'VE HEARD FOR THE FIRST TIME A
6   PROPOSAL THAT TALKED ABOUT CERTAIN SPECIFIC PEOPLE;
7   ALTHOUGH, THEY HAVEN'T EXACTLY BEEN ITEMIZED ON A
8   NAME-BY-NAME BASIS, SO I CAN'T REALLY RESPOND TO
9   WHETHER THEY ARE REALLY GOING TO HAVE RESPONSIVE
10  EVIDENCE OR WHETHER THEY WERE AROUND AT MATTEL FOR
11  CERTAIN PERIODS OF TIME. THIS IS REALLY THE FIRST
12  TIME I'M HEARING SOME OF THE SPECIFIC PROPOSALS
13  BEING OFFERED.
14     WHAT I WOULD SAY IS THAT, TO THE EXTENT
15  YOUR HONOR IS GOING TO ORDER ANY SEARCH OF ANY
16  BACKUP E-MAIL TAPE, THAT ESSENTIALLY THE PARTIES
17  WOULD NEED TO MEET AND CONFER, AS YOUR HONOR
18  ORDERED WITH RESPECT TO ZEUSS.
19     JUDGE INFANTE: WOULD YOU STOP FOR A MOMENT.
20     MR. TAYBACK: YES
21     JUDGE INFANTE: I AGREE WITH YOU, IN A SENSE
22  THAT I DON'T THINK THE PARTIES HAVE MET AND
23  CONFERRED. I FIND MYSELF RIGHT NOW PRESIDING OVER
24  A MEET AND CONFER MEETING, RATHER THAN A MOTION
25  HEARING. AND I'M NOT GOING TO DECIDE THIS MOTION,
```

Mattel v. MGA II                    Unsigned                    Page 46 - 49

EXHIBIT ___7___

PAGE __168__

Hearing: [Infante] 2/11/08 12:00:00 PM

50

1   BECAUSE I BELIEVE YOU SHOULD MEET AND CONFER.
2   MR. KENNEDY, YOU RAISED A PROPOSAL TODAY
3   FOR THE FIRST TIME.
4       I BELIEVE THAT AN ADEQUATE MEET AND
5   CONFER SESSION BETWEEN YOU, IN GOOD FAITH, AS
6   REQUIRED BY THE RULES, WOULD LEAD TO A RESOLUTION
7   OF THIS QUESTION.
8       RULE 34 AND RULE 26 HAVE BEEN AMENDED
9   SINCE THIS LAWSUIT WAS FIRST FILED, WHICH GIVE YOU
10  CLARITY AS TO THE STANDARDS THAT ARE TO BE
11  EMPLOYED. AND, IN MY VIEW, THERE HASN'T BEEN AN
12  ADEQUATE MEET AND CONFER. I'M NOT GOING TO DECIDE
13  THE MOTION UNTIL THERE IS.
14      SO AS FAR AS I'M CONCERNED, THERE'S NO
15  FURTHER HEARING ON THIS MATTER AND YOU ARE ORDERED
16  TO MEET AND CONFER. AND I WOULD LIKE YOU TO
17  PREPARE A JOINT REPORT OR A STIPULATED ORDER, IF
18  YOU WILL, AS TO WHAT CONSTITUTES A REASONABLE
19  SEARCH FOR ELECTRONIC DISCOVERY.
20      WE CAN MOVE ON TO THE NEXT MOTION NOW.
21  MR. KENNEDY: THANK YOU, YOUR HONOR.
22  MR. TAYBACK: THANK YOU, YOUR HONOR.
23  JUDGE INFANTE: THE MOTION TO COMPEL PRODUCTION
24  OF DOCUMENTS OF ISAAC LARIAN AND FOR SANCTIONS
25  REGARDING MATTEL'S FIRST SET OF REQUESTS FOR

51

1   PRODUCTION. THAT IS LISTED NUMBER 6 ON THE
2   FEBRUARY 6 LETTER.
3       YOU MAY PROCEED IF YOU WISH.
4   MR. TAYBACK: GOOD MORNING, AGAIN. IT'S
5   CHRISTOPHER TAYBACK. I'M NOW MAKING MY SECOND
6   APPEARANCE IN THIS CASE.
7       THE GIST OF OUR MOTION IS WE DON'T WANT
8   TO BE CAUGHT BETWIXT AND BETWEEN. THERE ARE
9   DOCUMENTS THAT MAY BE MR. LARIAN'S, QUOTE, UNQUOTE,
10  PERSONAL FILES; THERE ARE DOCUMENTS THAT MAY BE IN
11  HIS POSSESSION AS C.E.O. OF MGA.
12      WE'RE NOT LOOKING — AND I BELIEVE THEIR
13  SOLE REAL BASIS TO OPPOSE THIS MOTION IS THAT IT
14  WOULD REQUIRE THEM TO PRODUCE DUPLICATIVE
15  DOCUMENTS; THAT IS, DOCUMENTS PRODUCED BY MGA ARE
16  ARGUABLY ALSO IN THE POSSESSION OF MR. LARIAN.
17      THAT'S NOT WHAT WE'RE ASKING FOR. AND TO
18  THE EXTENT — WHAT WE REALLY WANT IS AN ORDER THAT
19  SAYS, AS THEY'VE ACKNOWLEDGED IN THE DECLARATION
20  THAT MR. MARSH SUBMITTED AT PARAGRAPHS 24 AND 25,
21  THEY HAVE DOCUMENTS THAT HAVE NOT BEEN PRODUCED
22  THAT ARE EITHER MR. LARIAN'S PERSONAL FILES OR
23  DOCUMENTS IN HIS POSSESSION, THAT ARE IN HIS
24  POSSESSION AS C.E.O. OF MGA, THAT ARE RESPONSIVE,
25  THAT HAVE NOT OTHERWISE BEEN PRODUCED. AND THAT'S

52

1   WHAT WE ARE ESSENTIALLY LOOKING FOR, AND AN ORDER
2   ON THAT SUBJECT.
3       AND I ACTUALLY DON'T KNOW WHAT — WHAT
4   MORE THERE IS TO SAY ON IT AT THIS POINT. I THINK
5   WE'RE ENTITLED TO THAT. THERE'S NO REAL OBJECTION,
6   OTHER THAN THEIR OBJECTION TO PRODUCING ARGUABLY
7   DUPLICATIVE FILES.
8   JUDGE INFANTE: THANK YOU, VERY MUCH.
9   MR. KENNEDY?
10  MR. KENNEDY: YES, YOUR HONOR.
11      I HAVE MR. MARSH ON THE PHONE THIS
12  MORNING, WHO CAN RESPOND IF THERE ARE SPECIFIC
13  QUESTIONS CONCERNING HIS WORKS IN THE CASE.
14      AS YOU POINT OUT IN OUR OPPOSITION, AT
15  THE TIME THIS MOTION WAS FILED, THERE WAS A MOTION
16  UNDER SUBMISSION BEFORE YOUR HONOR DEALING WITH
17  VERY MUCH THE SAME SUBJECT MATTER. THAT MOTION WAS
18  RULED ON, AND SINCE WE FILED OUR REPLY, MR. LARIAN
19  HAS PRODUCED NOW A GRAND TOTAL OF 51,118 PAGES.
20  THOSE CAME IN ON A ROLLING BASIS IN JANUARY, ON THE
21  11TH, THE 15TH, THE 18TH, AND THE 25TH. AND THOSE
22  ARE IN ADDITION TO ALL OF THE DOCUMENTS THAT
23  O'MELVENY PRODUCED BEFORE.
24      AND THEN MR. MARSH COMES IN; HE HAS
25  SPOKEN WITH O'MELVENY. AND WE HAVE BEEN ADVISED

53

1   THAT O'MELVENY PRODUCED FOR MGA AND MR. LARIAN ON
2   AN UNDIFFERENTIATED BASIS, OF COURSE, CONSISTENT
3   WITH MATTEL'S EXPANSIVE DEFINITION THAT MGA,
4   MR. LARIAN, ESSENTIALLY, ARE COEXTENSIVE. BUT, IN
5   ANY EVENT, O'MELVENY ASSURED US THEY PRODUCED ON AN
6   UNDIFFERENTIATED FORM, EVERY DOCUMENT THAT
7   MR. LARIAN HAD THAT WAS RESPONSIVE TO THE
8   CATEGORIES AS TO WHICH O'MELVENY AGREED TO MAKE
9   PRODUCTION.
10      IF YOUR HONOR MAY RECALL, AFTER WE GOT IN
11  THE CASE, WE AGREED TO MAKE A PRODUCTION AS TO AN
12  ADDITIONAL 55 CATEGORIES VOLUNTARILY. AND THEN
13  YOUR HONOR TOLD US THERE WAS SOME OTHERS WE WERE
14  GOING TO BE RESPONDING TO INVOLUNTARILY; AND THAT'S
15  THE SOURCE OF THE ADDITIONAL 51,000 DOCUMENTS
16  THAT — THAT'S RESPONSIVE TO CATEGORIES WHICH
17  O'MELVENY PRODUCED NOTHING.
18      ALSO, IN OUR DUE DILIGENCE, WE FOUND
19  ADDITIONAL DOCUMENTS PERTAINING TO EARLIER
20  PRODUCTIONS. AND THOSE GOT INCLUDED AS WELL. IT'S
21  A LONG WAY FROM SAYING EVERYTHING THAT WE'RE AWARE
22  OF THAT'S RESPONSIVE TO THESE REQUESTS HAS NOW BEEN
23  PRODUCED.
24  MR. TAYBACK: THIS IS CHRISTOPHER TAYBACK.
25      I WOULD JUST ASK THAT — IT SOUNDS LIKE

**EXHIBIT** 7

**PAGE** 169

54

1 IF EVERYTHING RESPONSIVE HAS BEEN PRODUCED, THEY
2 SIMPLY MEMORIALIZE THAT AND SAY WE PRODUCED ALL
3 RESPONSIVE DOCUMENTS RESPONSIVE TO THIS REQUEST ON
4 BEHALF OF MR. LARIAN.
5     I WOULD ALSO ASK, THOUGH, THAT THEY DO,
6 AS IT SOUNDS LIKE THEY'RE PREPARED TO DO, BECAUSE
7 THEY JUST RATTLED IT OUT FAIRLY QUICKLY THERE, JUST
8 IDENTIFY FOR US BY DATES, THOSE PRODUCTIONS THAT
9 WERE FROM OR ON BEHALF OF MR. LARIAN, EITHER BY
10 MR. LARIAN, OR MR. LARIAN, YOU KNOW, IN CONJUNCTION
11 WITH MGA -- BY BATES NUMBERS, PREFERABLY. IT
12 SOUNDS LIKE THEY'RE ABLE TO DO THAT.
13     MR. KENNEDY: YOUR HONOR, WE CERTAINLY ARE ABLE
14 TO DO THAT FOR THE DOCUMENTS THAT WE'VE PRODUCED,
15 AND I CAN GET THE LIST RIGHT AWAY OF THE DATES AND
16 THE BATES NUMBERS.
17     HOWEVER, BEFORE WE GOT IN THE CASE, FOR
18 THIS PROTRACTED PERIOD OF TIME, O'MELVENY PRODUCED
19 ON THE BASIS THAT LARIAN WAS DEFINED TO BE ANYBODY
20 AFFILIATED WITH AND INCLUDING MGA; MGA WAS DEFINED
21 TO INCLUDE ALL OF ITS OFFICERS AND DIRECTORS,
22 INCLUDING LARIAN. SO THE TWO ARE -- THEY'RE
23 SELF-CONSUMING, AND O'MELVENY PRODUCED BOTH. AND I
24 DON'T KNOW ANY WAY AT THIS POINT TO GO BACK AND
25 UNTIE THAT KNOT.

55

1     JUDGE INFANTE: YEAH, THAT'S FINE. IF YOU
2 COULD SIMPLY PRODUCE THE PRODUCTION BATES THAT
3 DATED YOUR PRESENCE IN THE CASE AND SINCE YOUR
4 PRESENCE IN THE CASE, INDICATE THE PRODUCTION AND
5 DATES BY BATES NUMBERS, AND MAKE IT PERFECTLY CLEAR
6 THAT DOCUMENTS RESPONSIVE TO ALL THESE REQUESTS
7 HAVE BEEN PRODUCED -- IF YOU COULD DO THAT, I THINK
8 THAT WOULD BE APPROPRIATE, AND I WOULD DENY THE
9 MOTION ON THAT CONDITION.
10     MR. KENNEDY: THANK YOU, YOUR HONOR.
11     JUDGE INFANTE: MOTION IS DENIED ON THE
12 CONDITION THAT YOU -- YOU PREPARE THAT SUBMISSION
13 AND SERVE MATTEL WITH IT. AND IF YOU WOULD PREPARE
14 THIS ORDER FOR ME, WHICH I JUST MEMORIALIZED, I
15 WOULD APPRECIATE IT.
16     MR. KENNEDY: YES, YOUR HONOR. WE'LL DO THAT.
17     MR. TAYBACK: THANK YOU, YOUR HONOR.
18     JUDGE INFANTE: LET'S SEE. ON THE FEBRUARY 6
19 LETTER, ARE THERE ANY OTHER MOTIONS REMAINING THAT
20 I HAVE NOT HEARD?
21     I BELIEVE THAT'S IT. I HAVE TO MOVE ON
22 TO ANOTHER PIECE OF BUSINESS IN A FEW MINUTES, SO
23 THAT'S ALL I HAVE TIME TO HEAR THIS MORNING.
24     I BELIEVE THERE ARE ABOUT 20 MOTIONS
25 PENDING. IT MAY BE MORE THAN THAT. WE'VE DECIDED

56

1 A FEW THIS MORNING. I'VE TAKEN A COUPLE UNDER
2 SUBMISSION.
3     I REALLY THINK THAT THERE NEEDS TO BE A
4 BETTER EFFORT WITH RESPECT TO MEETING AND
5 CONFERRING. I AM HEREBY ORDERING THE PARTIES, IN
6 PERSON, AN IN-PERSON MEETING, TO MEET AND CONFER
7 WITH RESPECT TO ALL PENDING MOTIONS.
8     A LOT OF THESE MOTIONS GOT FILED ON THE
9 VERY LAST DAY OF DISCOVERY IN JANUARY. THERE ARE A
10 NUMBER OF THINGS THAT ARE MOVING TARGETS, BECAUSE
11 AS WE SAW THIS MORNING, JUDGE LARSON HAS STAYED THE
12 DISCOVERY AS TO PHASE II, AND I BELIEVE THAT I'M
13 HEREBY ORDERING YOU, PURSUANT TO RULE 37, FEDERAL
14 RULES OF CIVIL PROCEDURE AND LOCAL RULES OF THE
15 MUNICIPAL OF CALIFORNIA, TO CONDUCT AN IN-DEPTH
16 MEET AND CONFER SESSION, IN PERSON, REMAINING ALL
17 PENDING MOTIONS, AND REPORT BACK TO ME EITHER BY
18 JOINT LETTERS OR INDIVIDUAL LETTERS, THE
19 DISPOSITION OF ANY MOTION.
20     WHEN I RECEIVE THAT, I'LL BE GLAD TO GIVE
21 YOU A HEARING. AND I'D LIKE TO KNOW CLEARLY WHAT
22 REMAINS IN ISSUE AT THAT POINT.
23     ARE THERE ANY QUESTIONS REGARDING THAT?
24     MR. KENNEDY: NOT HERE, YOUR HONOR.
25     MR. ALGER: YOUR HONOR, TIM ALGER, FOR MATTEL.

57

1     I JUST HAVE ONE LITTLE BOOKKEEPING
2 MATTER, THE MOTION BY MATTEL TO COMPEL THE
3 DEPOSITION OF CHRISTOPHER PALMERI, THE
4 "BUSINESSWEEK" REPORTER. WE'VE HAD EXTENSIVE MEET
5 AND CONFERS ON THAT, THAT'S BEEN OUT THERE FOR
6 QUITE SOME TIME, AND I WOULD REQUEST THAT THAT BE
7 EXCEPTED FROM THE ORDER.
8     JUDGE INFANTE: OKAY. EXCEPTED FROM THE ORDER.
9     MR. ALGER: THEN, YOUR HONOR, DO YOU HAVE A
10 DEADLINE FOR THE MEET AND CONFER PROCESS, AND THE
11 REPORT BY THE PARTIES?
12     JUDGE INFANTE: WELL, I'D LIKE TO MAKE IT
13 WITHIN 10 DAYS.
14     OKAY. WITHIN 10 DAYS OF TODAY.
15     MR. ALGER: THANK YOU, YOUR HONOR.
16     JUDGE INFANTE: OKAY. THANK YOU
17     MR. KENNEDY: ONE QUICK -- IS THAT 10 FEDERAL
18 COURT DAYS OR 10 CALENDAR DAYS?
19     JUDGE INFANTE: CALENDAR DAYS.
20     MR. TAYBACK: THANK YOU, YOUR HONOR.
21     JUDGE INFANTE: I'D LIKE A TRANSCRIPT OF
22 TODAY'S HEARING. COULD YOU SEND IT TO ME IN THE
23 NEXT FEW DAYS.
24     MR. ALGER: WE'LL SEND IT TO YOU.
25     MR. PAGE: I WOULD LIKE TO REQUEST A TRANSCRIPT

Hearing: [Infante] 2/11/08 12:00:00 PM

58

1    AS WELL. THANK YOU.
2
3        (WHEREUPON, AT THE HOUR OF
4        9:46 A.M., THE PROCEEDINGS
5        WERE CONCLUDED.)
6        -OOO-
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

59

1    STATE OF CALIFORNIA    )
                            )  SS.
2    COUNTY OF LOS ANGELES   )
3
4        I,  ANGELA DUPRE  , CERTIFIED
5    SHORTHAND REPORTER, CERTIFICATE NUMBER 7804, FOR
6    THE STATE OF CALIFORNIA, HEREBY CERTIFY:
7        THE PROCEEDINGS WERE RECORDED
8    STENOGRAPHICALLY BY ME AND WERE TRANSCRIBED TO THE
9    BEST OF MY ABILITY;
10        THE FOREGOING TRANSCRIPT IS A TRUE AND
11    CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;
12        I FURTHER CERTIFY THAT I AM NEITHER
13    COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION
14    NOR IN ANY WAY INTERESTED IN THE OUTCOME THEREOF.
15        IN WITNESS WHEREOF, I HAVE HEREUNTO
16    SUBSCRIBED MY NAME THIS_____DAY OF
17    _____, 2008.
18
19
20
21        _____
22
23
24
25

EXHIBIT ___7_____

Mattel v. MGA II              Unsigned       PAGE _171_              Page 58 - 59

**Exhibit 8**

Re: Meet and confer -- NHB docume'                                                          Page 1 of 5

---

**From:** Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
**Sent:** Wednesday, January 30, 2008 4:52 PM
**To:** Timothy Alger
**Subject:** RE: Meet and confer -- NHB documents

I dont' have the dates in front of me, but I understand it was among those rescheduled today.  I'll take your word for it.  And yes, 11 is fine.  My apologies again.
-Marcus

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Wednesday, January 30, 2008 4:50 PM
**To:** Mumford, Marcus R (LAC)
**Subject:** RE: Meet and confer -- NHB documents

marcus,
tomorrow is fine.  how about 11 a.m.?

this motion does not have a hearing date (and the parties have not put it on the feb 11 hearing list that was in my letter of monday to judge infante), so i'm working on the assumption, agreed this afternoon, that our opposition will not be due until feb 7, with reply due feb 15.  let me know if you disagree.

tim

---

**From:** Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
**Sent:** Wednesday, January 30, 2008 4:44 PM
**To:** Timothy Alger
**Subject:** RE: Meet and confer -- NHB documents

I'm afraid I won't be off in time.  Tomorrow morning?  I can do it as early as you want.

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Wednesday, January 30, 2008 4:43 PM

EXHIBIT _____8_____

PAGE _____172_____

2/14/2008

Re: Meet and confer -- NHB docum                                      Page 2 of 5

**To:** Mumford, Marcus R (LAC)
**Subject:** RE: Meet and confer -- NHB documents

i have to leave the office early this evening because of family commitments.  can we agree to 5:00?

---

**From:** Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
**Sent:** Wednesday, January 30, 2008 4:39 PM
**To:** Timothy Alger
**Subject:** RE: Meet and confer -- NHB documents

Tim, my apologies.  I'm stuck on another call.  Can I ring you in 1/2 hour?

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Wednesday, January 30, 2008 4:35 PM
**To:** Mumford, Marcus R (LAC)
**Cc:** Herrington, Robert J (LAC); Miller, Timothy A (SFC); Michael T Zeller; Jon Corey; Dylan Proctor
**Subject:** RE: Meet and confer -- NHB documents

Marcus, are we on?  can you call me at 213 443 3042?

---

**From:** Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
**Sent:** Wednesday, January 30, 2008 1:43 PM
**To:** Timothy Alger
**Cc:** Herrington, Robert J (LAC); Miller, Timothy A (SFC); Michael T Zeller; Jon Corey; Dylan Proctor
**Subject:** RE: Meet and confer -- NHB documents

Can we make it today at 4:30 instead?

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Tuesday, January 29, 2008 10:23 PM
**To:** Mumford, Marcus R (LAC)
**Cc:** Herrington, Robert J (LAC); Miller, Timothy A (SFC); Michael T Zeller; Jon Corey; Dylan Proctor
**Subject:** Re: Meet and confer -- NHB documents

How about weds at 3?


Sent from BlackBerry handheld

Timothy L. Alger
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

Direct:  (213) 443-3223
Main Phone: (213) 443-3000
Main Fax:  (213) 443-3100

E-mail:  timalger@quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

EXHIBIT _____8_____

PAGE __173__

2/14/2008

Re: Meet and confer -- NHB docume

----- Original Message -----
From: Mumford, Marcus R <Marcus.Mumford@skadden.com>
To: Timothy Alger
Cc: Herrington, Robert J (LAC) <Robert.Herrington@skadden.com>; Miller, Timothy A (SFC) <Timothy.Miller@skadden.com>; Michael T Zeller; Jon Corey; Dylan Proctor
Sent: Tue Jan 29 21:18:20 2008
Subject: RE: Meet and confer -- NHB documents

Tim,
As you know, I was in deposition all day yesterday, and I did not receive your message until we had sent our motion to be filed on this issue. Of course, you know that we were, and remain, very interested in meeting and conferring on this issue. If we are able to reach a resolution, we'd be willing to withdraw the motion. I'm available tomorrow after noon. Please let me know when you are available.
-Marcus

---

From: Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Monday, January 28, 2008 10:30 AM
To: Mumford, Marcus R (LAC)
Cc: Herrington, Robert J (LAC); Miller, Timothy A (SFC); Michael T Zeller; Jon Corey; Dylan Proctor
Subject: RE: Meet and confer -- NHB documents

Marcus,

I am in the office and can meet and confer with you or anyone representing MGA at anytime today. Call me at your convenience.

MGA should be prepared to support the following assertion, in your email below: "[W]e have good grounds to believe there are similarly responsive documents or files that have not been produced and that are not listed on Mattel's privilege log."

Tim

Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3223
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: timalger@quinnemanuel.com <mailto:timalger@quinnemanuel.com>
Web: www.quinnemanuel.com <http://www.quinnemanuel.com/>

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

EXHIBIT ___8___

PAGE ___174___

---

From: Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
Sent: Friday, January 25, 2008 3:46 PM
To: Timothy Alger
Subject: Meet and confer -- NHB documents

Tim,
I just received your response to my January 18 letter regarding the documents you clawed back on January 17, requesting that we put off any meet and confer on the issue until January 28, 2008, the discovery cut-off and over 10 days after you received my letter.

We cannot allow you to delay a resolution of this issue until the discovery cut-off, and there is good cause why we are prejudiced absent a prompt response on your part. It has already been seven days since my letter and, notably, your response does not address the issue raised in any substance: (1) it does not substantiate your assertion of privilege with respect to the documents you improperly clawed back and (2) it doe

2/14/2008

Re: Meet and confer -- NHB docume

not indicate whether your document collection, review and production in this matter contemplated the fact that Mattel has been referring to MGA under codename "NHB" since well before the date Mattel represented to the court it was first on notice of a "probable claim." As I stated, we have good grounds to believe there are similarly responsive documents or files that have not been produced and that are not listed on Mattel's privilege log. Finally, given the number of depositions that your firm put off or noticed until Monday, I am unavailable to meet and confer that date.

Your assistant informed me that you are at our offices today. I am as well. If you are unwilling to meet and confer today or this evening, we will seek the assistance of the Discovery Master on this matter.

-Marcus

Marcus R. Mumford
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: 213.687.5514 | F: 213.621.5514
mmumford@skadden.com <mailto:tmmumford@skadden.com>

_____ ******************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. ******************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. ******************************************** ========================================================================

_____ ******************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. ******************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. ********************************************

_____
******************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. ********************************************
******************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
********************************************

EXHIBIT ___8___

PAGE ___175___

_____
******************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message

2/14/2008